**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-12825 (MBK)<br><br>Judge: Michael B. Kaplan |

**DEBTOR'S STATEMENT REGARDING REFILING OF CHAPTER 11 CASE**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

NAI-1536375225

LTL Management LLC (the "Debtor"), the debtor in this chapter 11 case and an indirect subsidiary of Johnson & Johnson ("J&J"), has filed for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing: to permanently, equitably and efficiently resolve all its current and future talc-related claims. To that end, the new filing includes agreements on the material terms of a proposed plan of reorganization that have the support of a substantial number of talc claimants. Central to the proposed plan terms are commitments by the Debtor and J&J to pay up to $8.9 billion net present value, over a 25-year period, to fund a trust that would fully and finally resolve all current and future talc claims. That funding constitutes an increase of $6.9 billion over the $2 billion J&J previously agreed to advance to the Debtor to establish a qualified settlement fund in the first chapter 11 case. Plaintiff law firms, on behalf of more than 60,000 current talc claimants,[2] have committed their support for this proposed plan. The breadth of support validates this proposed plan and provides a clear path forward toward a prompt resolution of this case.

Each of the plaintiff firms that has endorsed the proposed reorganization plan—including three firms who represented members of the official committee of talc claimants in the prior chapter 11 case—entered into a plan support agreement with the Debtor, J&J and the Debtor's direct parent company, Johnson & Johnson Holdco (NA) Inc. ("Holdco").[3] Pursuant to these agreements, the firms have agreed to use commercially reasonable efforts to (a) work together with the Debtor, J&J and Holdco to finalize and file a plan of reorganization by May 14, 2023 or as soon thereafter as is feasible that contains the agreed plan terms, (b) do all things reasonably

---

[2]   These claimants include individuals who did not have filed claims as of the commencement of the first case.

[3]   Holdco was formerly known as Johnson & Johnson Consumer, Inc. Holdco's name change occurred in December 2022. Holdco transferred its consumer health business to its parent company in early January 2023.

necessary and appropriate in furtherance of confirming the plan, and (c) support the Debtor's efforts to obtain and maintain injunctions to prevent continued litigation of the Debtor's talc claims in the tort system.

These commitments affirm the good-faith nature of the Debtor's filing, and that the amount of funding proffered for the proposed reorganization plan is equitable.  Indeed, the level of funding the Debtor and J&J have agreed to provide to process and pay talc claims is unprecedented.  This funding commitment, if ultimately approved by the Court, would be the largest settlement ever reached in an asbestos bankruptcy case, even cases where (unlike here) the manufacturer conceded that its products contained asbestos.[4]  The funding would also constitute the largest resolution in any mass tort product liability bankruptcy case.[5]

---

[4] Compare In re All Matters Related to N. Am. Refractories Co., 647 B.R. 466, 473 (Bankr. W.D. Pa. 2022) (North American Refractories Co. ("NARCO") trust valued at $6.32 billion as of the trust's effective date); Form 8-K filed by USG Corp. on Dec. 21, 2006, EX-99.1 (value of fully funded trust $3.95 billion); Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. 307, 314 (W.D. Pa. 2014) ("Fully funded [ ] trust will control assets worth more than $3 billion."); *Annual Report and Account of the WRG Asbestos PI Trust for the Fiscal Year Ending December 31, 2014*, Ex. 1, at 9, In re W.R. Grace & Co., No. 01-01139 [Dkt. 32559], (Bankr. D. Del. Apr. 29, 2015) (as of trust's effective date, trust valued at $3.1 billion); *Notice of Filing of the DII Industries LLC Asbestos PI Trust's Annual Report for the Year Ending December 31, 2006*, Ex. 1.A, at 3, In re Mid-Valley, Inc., No. 03-35592 [Dkt. 2686], (Bankr. W.D. Pa. Apr. 30, 2007) (trust received $2.5 billion in assets at trust's inception); see also,  Lloyd Dixon, et al., RAND Institute for Civil Justice, Asbestos Bankruptcy Trusts: *An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts* (2010) (showing value of trust for every active and proposed section 524(g) trust and indicating that the following asbestos trusts received the largest amounts of funding: (1) the North American Refractories Company Asbestos Personal Injury Settlement Trust ($6.32 billion) (id. at 137); (2) the United States Gypsum Asbestos Personal Injury Settlement Trust ($3.96 billion) (id. at 169); (3) the Pittsburgh Corning Corporation Asbestos Personal Injury Settlement Trust ($3.41 billion) (id. at 149); (4)  the WRG (W.R. Grace & Co.) Asbestos PI Trust ($2.98 billion) (id. at 183); and (5) the DII Industries, LLC Asbestos PI Trust ($2.51 billion) (id. at 91).  The Debtor is unaware of any section 524(g) trust established since the report's publication that received a larger amount of funding.

[5] Compare *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* at 4–5, In re Purdue Pharma, L.P., No. 19-23649-RDD [Dkt. 2983] (Bankr S.D.N.Y. June 3, 2021) (products liability mass tort resolution that included $5 billion to fund opioid abuse abatement trust and between $700-$750 million for personal injury trust for a total of $5.75 billion); In re Mallinckrodt PLC, 639 B.R. 837, 852-53 (Bankr. D. Del. 2022) and *Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* at 27, In re Mallinckrodt PLC, No. 20-12522-JTD [Dkt. 6510] (Bankr. D. Del. Feb. 18, 2022) (total products liability mass tort resolution equaled nearly $2.63 billion which included $1.725 billion cash contribution and warrants to acquire 19.99% of the Reorganized Debtor's outstanding shares at a strike price reflecting an aggregate equity value for the Reorganized Debtors of $1.551 billion (estimated value of $340 million)); see also In re Boy Scouts of Am., 642 B.R.

The Debtor and J&J have agreed to make this commitment notwithstanding their continued belief that the cosmetic talc products at issue are safe and did not cause any of the diseases alleged by the plaintiffs.  As detailed in its informational brief[6] submitted in connection with its initial bankruptcy case, the Debtor had prevailed in the vast majority of talc claims that were tried and most claimants received nothing.  But the cost of litigating those claims was immense and increasing, and diverted attention and resources from the businesses of the Debtor and its affiliates, including the development of pharmaceutical and medical devices.  The plan the Debtor and J&J have proposed, supported by thousands of claimants, would eliminate this waste and uncertainty, promptly and efficiently pay current and future claimants and permit the Debtor and its affiliates to focus on the development of products that advance health for all.

Bankruptcy is the only forum in which future claims can be resolved and all these laudable goals can be realized.  The Debtor's filing achieves the fundamental purposes of a bankruptcy filing, "preserving going concerns and maximizing property available to satisfy creditors."  Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999).  Absent bankruptcy, the Debtor and the claimants would once again be subject to the substantial cost, uncertainty and delay of litigating each claimant's case in the tort system.  Future claimants would be at risk of receiving lower payments or no payments at all.  And the talc litigation would continue for decades.  Renewed litigation of talc claims in the tort system is in no parties' interests and would be untenable, unsustainable and inequitable.

---

504, 561 (Bankr D. Del. 2022) (total personal injury resolution equaled approximately $7.48 billion, including $2.484 billion in noncontingent funding, $200 million in committed contingent funding and between $4.6 and $4.8 billion of cumulative estimated insurance coverage from non-settling insurance companies).

[6] *Informational Br. of LTL Management LLC* at 116, No. 21-30589 [Dkt. 3] (Bankr. W.D.N.C. Oct. 14, 2021).

NAI-1536375225

There should be no legitimate dispute that this second chapter 11 filing satisfies the good faith filing standard as articulated by the United States Court of Appeals for the Third Circuit (the "Third Circuit") in its January 30, 2023 opinion dismissing the Debtor's prior bankruptcy case.  See In re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) as amended by 2023 WL 2726441 (3d Cir. Mar. 31, 2023).  Although the Third Circuit recognized that the Debtor "inherited massive liabilities" and faced "thousands"—in fact, tens of thousands—of future claims, it concluded that the Debtor's prior case was not filed in good faith because the Debtor's financial distress before filing was not sufficiently "immediate" or "imminent."  Third Cir. Op., 762-63.  The Third Circuit focused in particular on the Debtor's right to seek funding from J&J as a co-obligor under a prior funding agreement.  The Third Circuit found this right "most important," noting that it granted the Debtor "direct access to J&J's exceptionally strong balance sheet."  Id. at 759-60.  Based on its finding that the Debtor was not in financial distress just before it filed for bankruptcy (id. at 764) and its view that the absence of financial distress alone forecloses bankruptcy as an option for resolving massive liabilities (id. at 763), the Third Circuit determined that the filing was not made in good faith and directed this Court to dismiss the Debtor's prior case.

The Third Circuit's ruling had the effect of defeating the fundamental purpose of—and depriving J&J of the material consideration offered for—J&J's backstop commitment.  J&J made that commitment to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code.  The Third Circuit determined that it had the exact opposite effect; i.e., the J&J commitment effectively rendered bankruptcy unavailable to the Debtor.  As a result, there was a material risk that the J&J co-obligation and

-5-

NAI-1536375225

the entirety of the previous funding agreement were rendered void or voidable, and unenforceable.

To eliminate that risk, effectuate the intent of the original agreements and secure funding terms consistent with the terms set forth in the plan support agreements, the Debtor, J&J and Holdco have entered into new financing arrangements. These new arrangements, among other things, (a) address the guidance provided by the Third Circuit in its dismissal opinion, (b) facilitate confirmation and consummation of a plan of reorganization containing the terms supported by thousands of claimants whose counsel have executed and delivered the plan support agreements and (c) do not adversely affect the interests of talc claimants.

The Debtor, J&J and Holdco effectuated these new financing arrangements by entering into three new agreements. The Debtor, J&J and Holdco entered into a termination and substitution agreement (the "T&S Agreement") by which the original funding agreement and a related intercompany loan were terminated and the parties, in substitution therefor, agreed to enter into two new agreements. Simultaneously with their entry into the T&S Agreement, the Debtor, J&J and Holdco then entered into these two new agreements: Holdco and the Debtor entered into a new funding agreement (the "2023 Funding Agreement"); and the Debtor, Holdco and J&J entered into a separate support agreement (the "J&J Support Agreement").

The 2023 Funding Agreement is similar in many respects to the original funding agreement. It imposes no repayment obligation on the Debtor; it is not a loan. It obligates Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case filed by the Debtor, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor

from its subsidiary, Royalty A&M LLC, are insufficient to pay those costs and expenses.  In addition, the 2023 Funding Agreement requires Holdco to fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreement, as such terms may be amended or supplemented with the consent of the parties, in both situations to the extent that any cash distributions received by the Debtor from its subsidiary are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

The J&J Support Agreement is subject to the approval of the Court and is operative only in the chapter 11 case.  It obligates J&J to provide the trust funding Holdco is required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the funding.  In return, Holdco is obligated to reimburse J&J for any amounts it pays to the trust on Holdco's behalf, and any amounts that are not reimbursed by Holdco will be deemed to be financed with a loan from J&J to Holdco.  The Debtor is obligated to use commercially reasonable efforts to obtain final Court approval of the J&J Support Agreement and to cause a plan of reorganization containing the terms reflected in the Plan Support Agreements to become effective, in both cases as soon as reasonably practicable.  The Debtor has the right to enforce J&J's obligation under the J&J Support Agreement.

These new financing arrangements resolve the concerns that led the Third Circuit to conclude the Debtor's first chapter 11 case had to be dismissed.  This Court previously found that Holdco's predecessor, the former Johnson & Johnson Consumer Inc. ("Old JJCI") was in financial distress based on a myriad of evidence submitted at the hearing on the motions to

dismiss the Debtor's prior case. That evidence included the actual and projected costs of the talc litigation, the risk of lottery-like verdicts, the anticipated duration of the litigation, the plaintiffs' increasing settlement demands in the tort system, the claimants' assertions in the Debtor's prior case regarding the magnitude of the Debtor's aggregate liability, the multitude of state attorneys general investigations and lawsuits, the Canadian class action lawsuits, indemnification claims from talc suppliers, the securities action and Congressional investigations. And the financial distress caused by this massive, nationwide litigation manifested itself in the performance of J&J's Consumer Health division, of which Old JJCI was a primary part. That division's performance swung from a $2.1 billion profit to a $1.1 billion loss based solely on the costs of the talc litigation.

In conducting its good faith inquiry, the Third Circuit determined that the focus should be on the Debtor rather than Old JJCI, notwithstanding that the corporate restructuring undertaken in 2021 and the bankruptcy filing were both part of a single integrated transaction. Third Cir. Op., 757-58. Moreover, the Third Circuit made clear that the relevant timeframe to assess whether a filing is made in good faith is the period of time just before the filing occurs. Id. at 754, 759. Under the new financing arrangements, J&J's support is only available in bankruptcy and only if approved by this Court. J&J is not a co-obligor under the 2023 Funding Agreement; it is not even a party to that agreement. And, under the separate J&J Support Agreement, J&J's obligation to pay arises only if Holdco fails to fund a trust established under a plan of reorganization that contains the terms set forth in the plan support agreements. As a result, J&J's balance sheet and liquidity were no longer available to the Debtor before the filing of this second chapter 11 case. J&J's support, which was always intended to facilitate, not frustrate, a bankruptcy filing by the Debtor now serves its intended purpose.

The Debtor's financial condition before this filing satisfies the good faith standard, including its requirement of financial distress, as described by the Third Circuit in its opinion dismissing the Debtor's prior case. At the same time, the new financing arrangements accomplish the valid bankruptcy purpose of maximizing assets to satisfy talc claimants. This is so because (a) the 2023 Funding Agreement is available to fund a trust consistent with the terms of the plan support agreements and pay expenses incurred in this bankruptcy case and (b), subject to this Court's approval, J&J's support is available in this case to provide a backstop to Holdco to ensure it can meet its trust funding obligation. The Debtor has the financial support it needs to implement the plan terms reflected in the plan support agreements.

Bankruptcy is the only forum where the Debtor and the claimants can fully, equitably and permanently resolve talc-related claims. This second chapter 11 filing and the proposed plan of reorganization agreed to by thousands of claimants are in the best interests of all parties, including the Debtor and all current and future talc claimants.

NAI-1536375225

Dated: April 4, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice* pending)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*