**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge:  Michael B. Kaplan |
| LTL MANAGEMENT LLC, | |
| Plaintiff, | |
| v. | Adv. No.:  23-_____  (___) |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | |
| Defendants. | |

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**DEBTOR'S VERIFIED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF (I) DECLARING
THAT THE AUTOMATIC STAY APPLIES OR EXTENDS TO CERTAIN
ACTIONS AGAINST NON-DEBTORS, (II) PRELIMINARILY ENJOINING
SUCH ACTIONS, AND (III) GRANTING A TEMPORARY RESTRAINING
ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY INJUNCTION**

Plaintiff LTL Management LLC, a North Carolina limited liability company and
the debtor in the above-captioned chapter 11 case (the "Debtor"), incorporates the statements
contained in (i) the *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 4 in
Case No. 23-12825] (the "First Day Declaration"), filed in the Chapter 11 Case (as defined
herein); and (ii) the *Declaration of Daniel J. Merrett in Support of Debtor's Complaint for
Declaratory and Injunctive Relief and Related Motion* (the "Counsel Declaration"),[2] filed
contemporaneously herewith, and further states as follows:

## INTRODUCTION

1.      The Debtor commenced this chapter 11 case (the "Chapter 11 Case") to
equitably and permanently resolve all current and future talc-related claims against it through the
consummation of a plan of reorganization that includes the establishment of a trust.  The relief
sought by this adversary proceeding is critical to the Debtor's ability to achieve that purpose.
Without the requested declaration or injunction, claimants would be permitted to (and in fact,
clearly are eager to) litigate, in other forums, the exact same talc claims that are being asserted
against the Debtor in this Chapter 11 Case.

---

[2]      The Counsel Declaration incorporates as exhibits relevant portions of the record regarding the Debtor's
request in the 2021 Chapter 11 Case (as defined herein) for substantially the same relief requested in this
adversary proceeding, including:  (i) declarations of certain witnesses, including the *Declaration of John K.
Kim in Support of First Day Pleadings* filed in the 2021 Chapter 11 Case [Dkt. 5 in Case No. 21-30589]
(the "2021 First Day Declaration"); (ii) transcripts of the hearings in the Chapter 11 Case regarding such
relief (together, the "PI Hearings"); and (iii) certain exhibits that were admitted into evidence at the PI
Hearings.  Any reference in this Complaint to an exhibit refers to the applicable exhibit to the Counsel
Declaration except where otherwise provided.

NAI-1535638465

2.    By this adversary proceeding, the Debtor seeks a declaration that
section 362(a) of title 11 of the United States Code (the "Bankruptcy Code") prohibits or is
extended to prohibit the commencement or continuation of any action by the defendants in this
adversary proceeding (collectively, the "Defendants")[3] seeking to hold any of the following
parties (collectively, the "Protected Parties") liable for any Debtor Talc Claims:  (a) the former
Johnson & Johnson Consumer Inc., an entity that no longer exists and whose talc-related liability
was allocated to the Debtor (including all former names and historical forms, "Old JJCI");
(b) Johnson & Johnson ("J&J"); (c) Johnson & Johnson Holdco (NA) Inc., a New Jersey
corporation formerly known as Johnson & Johnson Consumer Inc. ("Holdco"); (d) Johnson &
Johnson Inc., a federal corporation incorporated under the laws of Canada ("J&J Canada" and,
collectively with J&J and Holdco, the "Non-Debtor Affiliates"); (e) third party retailers who sold
Old JJCI's talc-containing products (the "Retailers") and other third parties whom the Debtor has
indemnified contractually (the "Indemnified Parties"), set forth on Appendix B hereto.  As used
herein, "Debtor Talc Claims" means, collectively, any talc-related claims against the Debtor,
including all claims relating in any way to talc or talc containing materials that were formerly
asserted (or that could have been asserted) against Old JJCI on any theory of liability (whether
direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable
transfer or conveyance, alter ego or otherwise).[4]  The Debtor also requests a preliminary

---

[3]    The Defendants are all plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to hold,
one or more of the Protected Parties liable for the Debtor Talc Claims, as such terms are defined herein.
These Defendants, with the exception of the John and Jane Doe Defendants, are identified in Appendix A
to this Complaint.  Appendix A specifies the civil action number (where available) for each lawsuit and the
law firms representing each of the Defendants on account of their talc claims.  The Debtor reserves the
right to supplement, amend or otherwise modify Appendix A.  For the avoidance of doubt, the inclusion of
a talc-related claim on Appendix A is not an admission that such Defendant holds a currently pending claim
against either the Debtor or the Protected Parties (as defined herein).

[4]    For the avoidance of doubt, Debtor Talc Claims include all talc personal injury claims and other talc-related
claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate

injunction under section 105(a) of the Bankruptcy Code.  The injunction will enjoin the

prosecution of actions outside of this Chapter 11 Case on account of the same talc claims that

exist against the Debtor in this Chapter 11 Case.  The Debtor also seeks immediate emergency

relief in the form of a temporary restraining order, which the Debtor requests be issued on an ex

parte basis pending a hearing on whether to enter a preliminary injunction, for the reasons set

forth below.

3.      This Court, on a full evidentiary record, ruled in the 2021 Chapter 11 Case

(as defined herein) that all litigation in respect of Debtor Talc Claims should be stayed pursuant

to section 362(a) of the Bankruptcy Code and enjoined under section 105(a).  See LTL Mgmt.

LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt. LLC), 638 B.R.

291, 308-11 (Bankr. D.N.J. 2022) (the "PI Opinion") mooted by In re LTL Mgmt. LLC,

58 F.4th 738 (3d. Cir. 2023).

4.      Significant developments led the Debtor to commence this Chapter 11

Case shortly after dismissal of the 2021 Chapter 11 Case.  Most notably, the Debtor has obtained

the support of various plaintiff law firms and thousands of claimants—including ovarian cancer

and mesothelioma claimants—on the material terms of a plan of reorganization.  The Debtor has

also entered into new arrangements with its affiliates to, among other things, (a) address the

concerns raised by the Third Circuit in its dismissal opinion and (b) facilitate confirmation and

consummation of a plan containing the terms supported by thousands of claimants.  But the

material facts are otherwise the same as they were in connection with the adversary proceeding

that the Debtor initiated in the 2021 Chapter 11 Case to extend the stay to, and preliminary

---

Restructuring (as defined below).  The Debtor Talc Claims do not include talc-related claims for which the
exclusive remedy is provided under workers' compensation statutes and similar laws.

enjoin, talc claims, including the (i) identity of interests among the Debtor and the Protected

Parties concerning the Debtor Talc Claims, (ii) the Debtor's corporate history and structure,

(iii) the nature of the Debtor Talc Claims and (iv) the irreparable harm that the Debtor would

suffer if this Court does not enjoin the Debtor Talc Claims during the pendency of this

Chapter 11 Case.  For the same reasons that this Court granted the Debtor's prior request, this

Court should grant the relief requested by this adversary proceeding.

   5. Contemporaneously with the filing of this Complaint, the Debtor has filed

a motion (the "<u>Motion</u>") seeking the same relief requested in this Complaint and setting forth

additional grounds why the relief requested herein is warranted.[5]

## <u>JURISDICTION AND VENUE</u>

   6. This Court has subject matter jurisdiction over this adversary proceeding

pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), the Debtor consents to the entry of final orders or a final judgment by

this Court in this adversary proceeding.

   7. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## <u>BASIS FOR RELIEF</u>

   8. The statutory bases for the relief requested herein are sections 105(a) and

362(a) of the Bankruptcy Code.

   9. The Debtor has commenced this adversary proceeding pursuant to

Bankruptcy Rules 7001(7), 7001(9) and 7065.

---

[5] The Debtor incorporates the arguments and authority contained in the Motion as if fully set forth herein.

NAI-1535638465

10.     The Debtor has made no prior request for the relief requested herein to this or any other court in connection with this Chapter 11 Case.

## **GENERAL BACKGROUND**

11.     On April 4, 2023 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in possession of its property and is managing its business, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## **THE PARTIES**

12.     The Debtor is a North Carolina limited liability company.

13.     Each named Defendant in Appendix A is a plaintiff in a pending talc personal injury action against the Debtor and/or one or more of the Protected Parties to recover on account of Debtor Talc Claims.  Absent the relief requested herein and the Motion, the Debtor anticipates that the filing of the Chapter 11 Case will lead Defendants to pursue Debtor Talc Claims against the Protected Parties in an effort to avoid the automatic stay.

14.     Each of Defendants John and Jane Does 1-1000 is a prospective plaintiff who may, at any time while the Chapter 11 Case is pending, seek to commence an action to pursue a Debtor Talc Claim against one or more of the Protected Parties.

15.     The Protected Parties are (a) Old JJCI, (b) the Non-Debtor Affiliates (each of which is an "affiliate" of the Debtor, as such term is defined in section 101(2) of the Bankruptcy Code); and (c) the Retailers and Indemnified Parties, all of which are identified on Appendix B hereto.

NAI-1535638465

# FACTUAL BACKGROUND

## I.    THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

### A.    The Debtor's Predecessors and Related Restructurings

16.    The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly-owned subsidiary of J&J.  First Day Decl. ¶ 12.

17.    J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder ("Johnson's Baby Powder") in 1894, launching its baby care line of products.  Id. ¶ 13.  In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder.  Id.

18.    In 1978, consistent with J&J's policy of decentralizing its business, J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products.  Id. ¶ 14.  This was part of a larger restructuring of J&J that included the transfer of assets and liabilities of seven principal operating divisions to wholly-owned subsidiaries.  Id. To effectuate the transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"),[6] pursuant to which J&J transferred all assets and liabilities associated with the baby products division to J&J Baby Products.  Id.  As part of the transfer, J&J Baby Products agreed to indemnify J&J for all claims relating to the baby products business, including the talc powder products.  Id.  Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder.  Id.

---

[6]    A copy of the 1979 Agreement is attached as Annex A to the First Day Declaration.

19.    In 1981, J&J Baby Products transferred all of its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly-owned subsidiary of J&J Baby Products. Id. ¶ 15. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Id. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[7] Id.

20.    In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc. Id. ¶ 16.

21.    In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies"). Id. ¶ 17.

22.    In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (Old JJCI). Id. ¶ 18.

23.    Following these intercompany transactions, Old JJCI became responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other diseases. Id. ¶ 19. Old JJCI also was obligated to indemnify J&J for all claims relating to the talc products. Id.

24.    Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases. Id. ¶ 20. Prior to J&J's

---

[7]    In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

decentralization, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division.  Id.  Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly-owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products.  Id.

25.    The operational responsibilities, liabilities and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.  Id. ¶ 21.

26.    In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant").  Id. ¶ 22.  Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("Bausch")) entered into an indemnification agreement.  Id.  Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement. Id.

27.    Prior to the 2021 Corporate Restructuring (as described below), except where insurance coverage was available to pay talc-related costs, all costs associated with litigation concerning any talc products—including defense costs, settlements and any verdict amounts—were borne by Old JJCI.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 121:15-19; Ex. 46 (Debtor's PI Hr'g Ex. 50, Lisman Decl.) ¶¶ 8-12.

NAI-1535638465

28.     In 2021, Old JJCI implemented a corporate restructuring (the "2021
Corporate Restructuring"), which was completed on October 12, 2021.  First Day Decl. ¶ 23.
As a result of that restructuring:  Old JJCI ceased to exist and two new entities were created:
(a) the Debtor, which was initially formed as a Texas limited liability company and then
converted into a North Carolina limited liability company; and (b) Holdco, which was initially
formed as a Texas limited liability company and then merged into a New Jersey corporation that
was its direct parent (as well as the direct parent of the Debtor), whereupon this entity changed
its name to Johnson & Johnson Consumer Inc. ("New JJCI").  Id.  In the 2021 Corporate
Restructuring, the Debtor was allocated certain of Old JJCI's assets and became solely
responsible for the talc-related liabilities of Old JJCI, and New JJCI was allocated all other assets
of Old JJCI and became solely responsible for all other liabilities of Old JJCI.  Id.

29.     Old JJCI implemented the 2021 Corporate Restructuring to facilitate a
chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future
talc-related claims through a plan of reorganization without subjecting the entire Old JJCI
enterprise to a bankruptcy proceeding.  Id. ¶ 24.

**B.      New JJCI/Holdco**

30.     New JJCI operated its business following the 2021 Corporate
Restructuring.  Id. ¶ 25.  This included the manufacture and sale of a broad range of products
used in the baby care, beauty, oral care, wound care and women's health care fields, as well as
over-the-counter pharmaceutical products (collectively, the "Consumer Business").  Id.
In December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc.
(Holdco), and, in early January 2023, Holdco transferred its Consumer Business assets to its
parent entity.  Id.

-10-

31.     Holdco is the direct parent of the Debtor; and the Debtor is the direct

parent of Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company.

Holdco is a holding company with ownership interests in various subsidiaries.  Id. ¶ 26.  As of

the Petition Date, Holdco has access to approximately $400 million in cash through J&J's cash

management system.  Id. ¶ 27.

### C.    The Debtor

32.     The Debtor was formed to manage and defend thousands of talc-related

claims and to oversee the operations of its subsidiary, Royalty A&M.  Royalty A&M owns a

portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales

of CLOROX®, ECOLAB®, ESSITY®, LACTAID®, MYLANTA® / MYLICON®,

ROGAINE®, SPARTAN® and TENA® products.  Id. ¶ 28.  It reviews royalty monetization

opportunities in the healthcare industry and seeks to grow its business by financing and/or

reinvesting the income from the existing royalty revenue streams into both the acquisition of

additional external royalty revenue streams as well as financings to third parties secured by

similar royalty streams.  Id.  In that regard, in June 2022, Royalty A&M entered into a royalty

purchase agreement whereby it acquired rights to certain royalty streams from a third-party.  Id.

33.     In addition to its equity interest in Royalty A&M, the Debtor also has

cash, interests as payee under the 2023 Funding Agreement, and certain insurance coverage

rights.  Id. ¶ 29.

### D.    J&J

34.     The Debtor's ultimate parent company, J&J, is a holding company that

through its operating subsidiaries conducts business in virtually all countries in the world,

focused primarily on products related to human health and well-being.  Id. ¶ 30.  J&J is a global

innovator and leader in public health and has been at the forefront of healthcare innovation for

NAI-1535638465

over 130 years.  Id.  That innovation includes novel oncology, immunology and vaccine

products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing.

Id.

      **E.**     **Previous Financing Arrangements**

      35.     Old JJCI and its affiliates engaged in multiple restructurings through the

years, including the 2021 Corporate Restructuring.  Id. ¶ 31.  The 2021 Corporate Restructuring

was effectuated through a series of steps, which are described in detail in the 2021 First Day

Declaration.  Id.; see also 2021 First Day Decl. ¶¶ 22-27.  A key component of the 2021

Corporate Restructuring was a funding agreement between the Debtor, on the one hand, and J&J

and New JJCI on the other (the "2021 Funding Agreement").  First Day Decl. ¶ 31.

      36.     The primary purpose of the 2021 Funding Agreement was to facilitate the

resolution of talc-related claims through a chapter 11 filing by the Debtor.  Id.  The 2021

Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide

funding, up to the full value of New JJCI, for, among other things, (a) the administrative costs of

the Debtor's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in

both situations to the extent that any cash distributions received by the Debtor from Royalty

A&M were insufficient to pay such costs and further, in the case of the funding of a trust, the

Debtor's other assets are insufficient to provide that funding.  Id.

      37.     In connection with the 2021 Funding Agreement, New JJCI and J&J

entered into a commitment and loan agreement, dated October 12, 2021, pursuant to which New

JJCI and J&J agreed that:  (a) New JJCI would be the primary obligor under the 2021 Funding

Agreement; (b) upon the request of New JJCI, J&J would make revolving credit loans to New

JJCI, with the proceeds of the loans to be used by New JJCI solely to satisfy its obligations under

the 2021 Funding Agreement; and (c) if New JJCI failed to make any payment to the Debtor

NAI-1535638465

required by the 2021 Funding Agreement and instead J&J made such payment under the 2021

Funding Agreement, New JJCI would reimburse J&J for that payment and, if it failed to do so,

the amount New JJCI owed would be deemed to be financed with a loan from J&J.  Id. ¶ 32.

### F.    Other Agreements

38.    To ensure that the Debtor had access to services it needs to effectively

operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered

into a services agreement and a secondment agreement with J&J Services.  2021 First Day Decl.

¶¶ 29-30.  In addition, Royalty A&M entered into similar agreements with J&J Services and the

Debtor, respectively, and an intercompany loan facility agreement with J&J.  Id. ¶ 30.  As a

result of these agreements, the Debtor and Royalty A&M have been able to operate their

respective businesses efficiently and effectively.  First Day Decl. ¶ 33.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.    The Debtor Talc Claims

39.    Cosmetic talc litigation against the Debtor has focused primarily on

Johnson's Baby Powder as a purported cause of ovarian cancer and mesothelioma.  2021 First

Day Decl. ¶ 32.  For over 125 years, Johnson's Baby Powder has been used by hundreds of

millions of consumers worldwide.  Id.  On May 19, 2020, Old JJCI announced it would

permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada.

Id. ¶ 33.  The decision was based on business considerations, including lack of sales due to

misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder.  Id.

40.    Before 2010, there were few lawsuits alleging claims related to Johnson's

Baby Powder or Shower to Shower.  See 2021 First Day Decl. ¶¶ 42-45.  Claims started to

NAI-1535638465

increase after the jury in a 2013 talc-related ovarian cancer case, <u>Berg</u>,[8] found for the plaintiff but awarded no damages. <u>Id.</u> ¶ 35; *Informational Brief of LTL Management LLC*, [Dkt. 3 in Case No. 21-30589], at 47; Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 120:12-121:1. In 2014, Old JJCI was served with 46 ovarian cancer complaints. 2021 First Day Decl. ¶ 43. In 2017, that number was nearly 5,000. <u>Id.</u>

41.    By the time of the filing of the 2021 Chapter 11 Case, the Debtor was besieged by talc claims premised on the false allegation that Johnson's Baby Powder contained asbestos and caused cancer. First Day Decl. ¶ 35. Notwithstanding that these claims have no valid scientific basis, a few blockbuster plaintiff verdicts in plaintiff friendly jurisdictions fueled a boom in talc claims, causing Old JJCI to incur astronomical costs: nearly $1 billion in defense costs on account of cosmetic talc litigation, most of which has been spent in only the five years immediately before the filing of the 2021 Chapter 11 Case; and over $3.5 billion in indemnity payments, primarily over the same time period. <u>Id.</u>

42.    Although Old JJCI prevailed in most of the claims brought, including securing unanimous defense verdicts in six of the eight claims tried to verdict during the 12 months prior to the 2021 Chapter 11 Case, the costs of this litigation and the intermittent extreme plaintiff verdicts made the litigation of these cases in the tort system for the next 50 years or more (as claimants seek to do) untenable, unsustainable and inequitable. <u>Id.</u> ¶ 36.

43.    As of the filing of the 2021 Chapter 11 Case, there are almost 40,000 plaintiffs asserting ovarian-cancer claims against the Debtor, including almost 36,000 plaintiffs with claims pending in a federal multi-district litigation in New Jersey (the "<u>MDL</u>"), and more

---

[8]    <u>Berg v. Johnson & Johnson</u>, 940 F. Supp.2d 983, 993 (D.S.D. 2013).

NAI-1535638465

than 3,800 plaintiffs with claims in multiple state court jurisdictions across the country.  Id. ¶ 42.

Those claims were all stayed during the pendency of the 2021 Chapter 11 Case.  Id.

44.     Approximately 470 mesothelioma cases were also pending against the

Debtor on the Petition Date.  Id. ¶ 44.  These claims, like the ovarian cancer claims, spanned the

U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio and

were stayed during the pendency of the 2021 Chapter 11 Case.  Id.

45.     In addition to the thousands of talc claims pending in the United States as

of the 2021 Chapter 11 Case, Old JJCI, J&J, J&J Canada and Bausch are named defendants in

one certified class action, three proposed class actions and one individual action in four Canadian

provinces (Alberta, British Columbia, Ontario and Quebec).  Id. ¶ 37.  The certified class action

and the proposed class actions commenced in Alberta, British Columbia, Ontario and Quebec are

brought on behalf of classes (or proposed classes) of Canadian individuals who allege injury or

damages arising from the use or purchase of talc-containing products manufactured, marketed

and/or sold by Old JJCI, J&J, J&J Canada or Bausch.  Id.  The individual action was commenced

in British Columbia by an individual who likewise alleges injury arising from the use of

talc-containing products manufactured or sold by Old JJCI, J&J or J&J Canada.  Id.  Although

subject to a stay of proceedings arising from the recognition of the 2021 Chapter 11 Case in

Canada in December 2021, 12 additional Ontario-based Canadian claims were served in

March 2022, and 26 additional British Columbia-based claims were filed in January and

February 2023. Id.

46.     Due to the long alleged latency periods for mesothelioma and ovarian

cancer, cosmetic talc litigation against the Debtor is anticipated to continue for decades more, as

are the extraordinary costs of defending and resolving the tens of thousands of expected claims.

NAI-1535638465

Plaintiff experts estimate that the latency period for mesothelioma can run as long as 60 years

and have begun to allege extended latency periods for ovarian cancer allegedly caused by

asbestos exposure.  Id. ¶ 41.  As a result, even though Old JJCI stopped selling its talc-based

Johnson's Baby Powder in North America in 2020, individuals who develop mesothelioma in

2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this

century.  Id.

47.     Even though J&J has not manufactured or sold talc-containing products

for over 40 years, the Debtor Talc Claims are asserted in virtually every case against both Old

JJCI and J&J.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 134:21-139:11.  In many

jurisdictions, the plaintiffs seek to hold Old JJCI and J&J jointly and severally liable for the

Debtor Talc Claims.  The plaintiffs rarely, if ever, attempt to differentiate between

talc-containing products sold by J&J and Old JJCI.  Id. at 134:5-18; Ex. 44 (Supp. Kim Decl.)

¶ 6.

B.     **The Debtor's Insurance Coverage and Related Litigation**

48.     The Debtor believes that it has insurance coverage for its Debtor Talc

Claims.  First Day Decl. ¶ 45.  In particular, the Debtor has access to primary and excess liability

insurance policies that cover, among other things, defense or indemnity costs related to talc

bodily injury claims, subject to the terms of the policies.[9]  Id.; see Ex. 29 (Debtor's PI Hr'g

Ex. 8, FRE 1006 Insurance Coverage Evidence Summary).  All of these insurance policies

provide that J&J and all its subsidiaries and affiliates are named insureds, and many also include

Retailers as insureds.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 146:22-153:14; Exs. 29,

---

[9]     The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the
period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI
was a subsidiary of J&J.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 148:1-17; see, e.g., Ex. 28
(Debtor's PI Hr'g Ex. 11, Aetna Insurance Agreement 38 XN 07 SCA), at 9.

28, 30, 31 (Debtor's PI Hr'g Exs. 8, 11, 12, 14).  In addition, the policies contain annual

aggregate limits shared by all of the named insureds.  Id.

49.    Aetna Casualty and Surety Company ("Travelers")[10] issued primary

general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980

(the "Travelers Policies").  2021 First Day Decl. ¶ 47; see, e.g., Ex. 32 (Debtor's PI Hr'g Ex. 10,

Aetna Insurance Agreement, #38 AL 12880 SR(Y)_1-1-1967 to 1-1-1970).  The combined limits

of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total

more than $214 million per occurrence and $263 million in the aggregate.  2021 First Day Decl.

¶ 47; Ex. 29 (Debtor's PI Hr'g Ex. 8).  The deductibles increase over time, starting at a minimal

level and increasing to $5 million per occurrence by 1977.  2021 First Day Decl. ¶ 47; see, e.g.,

Ex. 31 (Debtor's PI Hr'g Ex. 14, Aetna Insurance Agreement, Aetna Primary 38 PK 15 SCA).

50.    The limits of the Travelers Policies before 1973 are not eroded by defense

costs; under later policies, defense costs erode limits.  2021 First Day Decl. ¶ 47; see, e.g., Ex. 32

(Debtor's PI Hr'g Ex. 10).  From 1957 to 1985, Travelers also provided excess liability coverage

to J&J that covers the Debtor.  See, e.g., Ex. 28  (Debtor's PI Hr'g Ex. 11, Aetna Insurance

Agreement, 38 XN 07 SCA).  The combined aggregate limits of those policies total

approximately $563 million.  2021 First Day Decl. ¶ 48; see Ex. 29 (Debtor's PI Hr'g Ex. 8).

51.    From 1973 to 1985, a variety of other insurers issued excess policies that

cover the Debtor.  First Day Decl. ¶ 49; see Ex. 29  (Debtor's PI Hr'g Ex. 8)].  Those insurers

include subsidiaries or affiliates of the following companies:  American International Group,

Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide Indemnity

Company and North River Insurance Company.  Id.  The combined limits of those excess

---

[10]    Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

NAI-1535638465

policies total more than $1.09 billion in the aggregate.  Id.  Certain of the insurers that issued the above-described excess policies are insolvent (including, in particular, Home Insurance Company).  2021 First Day Decl. ¶ 49.

52.     From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued primary and excess coverage that covers the Debtor (the "AMICO Policies").  2021 First Day Decl. ¶ 50; see Ex. 29  (Debtor's PI Hr'g Ex. 8).  AMICO is insolvent, having been placed into liquidation in 2013.  2021 First Day Decl. ¶ 50.  The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.  Id.

53.     From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a captive insurance company that is a wholly-owned subsidiary of J&J, issued policies that cover J&J and the Debtor.  Id. ¶ 51.  Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies.  Id.  From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI.  Id.  As described in the First Day Declaration, there is a dispute between J&J, the Debtor, and Middlesex, on the one hand, and the third-party insurers (i.e., insurers other than the Middlesex captive), on the other hand, regarding the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex policies.  Id.

54.     In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.  First Day Decl. ¶ 46.  The annual limits for these policies are aggregated.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 148:18-150:1.

NAI-1535638465

55.    Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related

claims to the third-party insurers.  First Day Decl. ¶ 47.  Since then, none of those insurers has

acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or

indemnified J&J or Old JJCI for settlements or judgments.  Id.  Instead, the third-party insurers

have asserted various coverage defenses.  Id.

56.    In May 2019, certain of the Debtor's third-party insurers filed a lawsuit

against Old JJCI, J&J and Middlesex in the Superior Court of Middlesex County (Case

No. MID-L-003563-19) (the "NJ Coverage Action"), seeking a declaratory judgment regarding

the parties' respective obligations under the plaintiff insurers' policies.  Id. ¶ 48.  The insurer

plaintiffs filed a Second Amended Complaint on June 22, 2020.  Id.  On July 31, 2020, J&J, Old

JJCI, and Middlesex filed answers to the Second Amended Complaint, and asserted

counterclaims and cross-claims against certain defendants.  Id.  Travelers and certain other

insurers filed cross-claims against J&J, Old JJCI, and Middlesex to which J&J, Old JJCI, and

Middlesex responded later in 2020.  Id.

57.    In the 2021 Chapter 11 Case, certain insurers filed motions to lift the

automatic stay to permit the NJ Coverage Action to proceed.  Id. ¶ 49.  This Court denied those

motions but permitted certain third party discovery to occur.  Id.  The NJ Coverage Action

remains pending.  Id.

**C.    The Debtor's Retailers and Other Indemnified Parties**

58.    Old JJCI had relationships with various Retailers, who sold Old JJCI's

talc-containing products.  Id. ¶ 51.  Old JJCI agreed to indemnify the Retailers for claims related

to the sale of Old JJCI's talc-containing products, and these contractual indemnities were

allocated to the Debtor in the 2021 Corporate Restructuring.  Id.; see, e.g., Ex. 33 (Debtor's PI

Hr'g Ex. 15, 1989 Agreement with Safeway for indemnification); Ex. 34 (Debtor's PI Hr'g

NAI-1535638465

Ex. 16, 2020 Agreement with HEB for indemnification).  In addition, to the extent a Retailer is

held liable for a claim arising out of the products manufactured and/or sold by Old JJCI, and not

by independent actions of the Retailers (i.e., such that those claims are Debtor Talc Claims),

certain state laws could require the Debtor to indemnify the Retailers.[11]  First Day Decl. ¶ 50.

59.    Claims asserted against the Retailers for their sale of Old JJCI products are

virtually identical to the claims asserted against Old JJCI.  First Day Decl. ¶ 51.  The Debtor

believes these claims against Retailers are generally brought to defeat removal to federal court

based on diversity jurisdiction and the Retailers are often dismissed before trial without payment.

Id.

60.    Old JJCI would periodically accept from the Retailers tenders of talc-

related claims related to the sale of its products.  Id. ¶ 52; Ex. 35 (Excerpts from Debtor's PI

Hr'g Ex. 17, FRE 1006 Tender Agreement Evidence Summary); see, e.g., Ex. 36 (Debtor's PI

Hr'g Ex. 18, Tender Agreement wherein Johnson & Johnson Consumer Inc. agrees to tender

defense and indemnify Safeway for claims by Abbott, Richard, dated May 13, 2019); Ex. 37

(Debtor's PI Hr'g Ex. 19, Tender Agreement wherein Johnson & Johnson Consumer Inc. agrees

to tender defense and indemnify Albertson for claims by Lane, Ardys, dated October 8, 2018).

When a Retailer was sued on a Debtor Talc Claim, the Retailer would notify Old JJCI by

---

[11]    See, e.g., Restatement (Second) of Torts § 886B (Am. Law Inst., 1979) (establishing obligation to
indemnify party that is held vicariously liable for the conduct of the indemnitor); Restatement (Third) of
Torts § 22 (Am. Law Inst., 2000) (same, and also expressly establishing a right to recover indemnity where
indemnitee was held liable only as the seller of a product supplied to the indemnitee by the indemnitor); see
also Promaulayko v. Johns Manville Sales Corp., 562 A.2d 202, 206 (N.J. 1989) (recognizing "claims for
common-law indemnification [for asbestos-related tort claims] by one party in the chain of distribution
against a party higher up the chain" in New Jersey and other states); Fireside Motors, Inc. v. Nissan Motor
Corp. in U.S.A., 479 N.E.2d 1386, 1389 (Mass. 1985) ("[T]he retailer may recover in indemnity against the
manufacturer."); Tex. Civ. Prac. & Rem. Code Ann. § 82.002 ("A manufacturer shall indemnify and hold
harmless a seller against loss arising out of a products liability action, except for any loss caused by the
seller's negligence, intentional misconduct, or other act or omission…"); Ariz. Rev. Stat. Ann. § 12-684;
Ark. Code Ann. § 16-116-207; Iowa Code Ann. § 613.18.

submitting a tender request.  First Day Decl. ¶ 52.  Old JJCI would then determine whether to

accept the Retailer's tender of its defense and indemnified the Retailer pursuant to a tender

agreement (each, a "Tender Agreement").  Id.  Since the commencement of the talc-related

litigation, Old JJCI has agreed to indemnify and assume the defense of nearly 790 talc-related

claims against the Retailers pursuant to Tender Agreements.  Id.

      61.    In addition, Old JJCI agreed to indemnify certain other transaction

counterparties for liability arising from Debtor Talc Claims.  Id. ¶ 53.  For example, in 2005, Old

JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and

subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where

various products, including certain talc-containing products, were bottled) to PTI, which

continued to operate the facility and manufacture certain talc products until early 2020.  Id.; see

Ex. 39 (Debtor's PI Hr'g Ex. 36, Asset Purchase Agreement).  In connection with the asset sale,

Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently

amended and restated.  First Day Decl. ¶ 53.  Under the manufacturing and supply agreement,

Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims

related to talc products.  Id.  The claims against PTI are generally identical to and based on the

claims against Old JJCI.  Id.

      62.    Further, pursuant to an indemnification agreement, Old JJCI agreed to

indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a

Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant

Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal

injury and products liability actions arising from alleged exposure to "Shower to Shower"

products and for certain other regulatory actions arising out of the manufacture, use or sale of

NAI-1535638465

"Shower to Shower" products, as set forth more fully in the agreement.[12]  Id. ¶ 54; see Ex. 38

(Debtor's PI Hr'g Ex. 41, Indemnification Agreement).  The claims against Valeant (now

Bausch) are generally identical to the claims asserted against Old JJCI.  First Day Decl. ¶ 54.

### D.    The 2021 Chapter 11 Case

63.    The Debtor commenced a chapter 11 case on October 14, 2021,

No. 21-30589 (Bankr. D.N.J.) (the "2021 Chapter 11 Case") by filing a voluntary petition for

relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Western District of North Carolina (the "North Carolina Bankruptcy Court").  [Dkt. 1 in Case

No. 21-30589].  The Debtor also commenced an adversary proceeding against talc claimants

seeking (a) a declaration that the automatic stay applied to, and (b) a preliminary injunction

enjoining, claims against the Debtor's affiliates, including J&J and New JJCI, as well as the

Debtor's insurers and third-party retailers and other indemnified parties, a group referred to as

the "Protected Parties."  See Dkts. 1, 2 in Adv. Pro. No. 21-03032.  After discovery and a

two-day evidentiary hearing, on November 15, 2021, the North Carolina Bankruptcy Court

entered an order [Dkt. 102 in Adv. Pro. No. 21-03032] determining that the automatic stay

applied to, and also preliminarily enjoining, the commencement or continuation of talc claims

against the Protected Parties for 60 days (i.e., until January 14, 2022), subject to modification or

extension by this Court.

64.    On November 16, 2021, the North Carolina Bankruptcy Court entered an

order [Dkt. 416 in Case No. 21-3059] transferring the 2021 Chapter 11 Case to the District of

New Jersey, which referred the case to this Court.

---

[12]    Upon information and belief, "Shower to Shower" products sold in the U.S. and Canada no longer include
talc.  First Day Decl. n.9.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and
Canada no longer contains talc as of 2020.  Id.

NAI-1535638465

65.     After transfer, the official committee of talc claimants and two plaintiff law firms [Dkts. 632, 766, 1003 in Case No. 21-30589] moved to dismiss the 2021 Chapter 11 Case as a bad-faith filing.  On February 25, 2022, following months of discovery and a five-day trial to address the motions to dismiss and the Debtor's adversary proceeding to enjoin the talc claims, this Court issued an opinion denying the motions to dismiss.  In re LTL Mgmt. LLC, 637 B.R. 396 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt. LLC, 58 F.4th 738 (3d. Cir. 2023) (the "Dismissal Opinion").[13]  The same day, the Court issued an opinion resolving the adversary proceeding in favor of the Debtor.  LTL Mgmt. LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt. LLC), 638 B.R. 291 (Bankr. D.N.J. 2022) mooted by LTL Mgmt, 58 F.4th 738 (3d. Cir. 2023) (the "PI Opinion").[14]

66.     The TCC and two plaintiff law firms, on behalf of talc claimants they represented, filed notices of appeal of the Dismissal Opinion and the PI Opinion.  They also filed motions requesting that this Court certify its orders for direct appeal to the Third Circuit. On April 4, 2022, this Court granted the petitions for direct appeal to the Third Circuit [Dkt. 1955 in Case No. 21-30589; Dkt. 231 in Adv. Pro. No. 21-3032].  Thereafter, the Third Circuit granted the petitions for direct appeal, and the appellants' motion to consolidate their appeals and to expedite the case.  The parties fully briefed the issues and argued the matters before the Third Circuit on September 19, 2022.

---

[13]     On March 2, 2022, the Court entered an order denying the motions to dismiss [Dkt. 1603 in Case No. 21-30589] (the "Dismissal Order").

[14]     On March 4, 2022, the Court entered the *Order (I) Declaring That Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Dkt. 187 in Adv. Pro. No. 21-3032] (the "PI Order").

**E.      Third Circuit Panel Opinion Directing Dismissal of the 2021 Chapter 11
Case**

67.      On January 30, 2023, a panel of the Third Circuit issued an opinion

directing this Court to dismiss the 2021 Chapter 11 Case after finding that it was not filed in

good faith.  See In re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) as amended by 2023 WL

2726441 (3d Cir. Mar. 31, 2023) (the "Third Circuit Opinion").

68.      Although the Third Circuit panel recognized that the Debtor "inherited

massive liabilities" and faced "thousands" of future claims (Third Cir. Op., 58 F.4th at 762-63),

it concluded that the Debtor was not in financial distress before the filing.  Id. at 764.  The Third

Circuit did not reach the merits of the appeal of the PI Order and PI Opinion, finding only that

dismissal of the 2021 Chapter 11 Case "annuls the litigation stay order by the Court and makes

moot the need to decide that issue."  Id.

69.      On February 13, 2023, the Debtor filed a petition for rehearing and

rehearing en banc with the Third Circuit.  See In re LTL Mgmt. LLC, No. 22-2003 (3d Cir. Feb.

13, 2023), Dkt. 153.  On February 23, 2023, the Third Circuit entered an order directing

appellants to file responses to the petition for rehearing.  Id. at Dkt. 163.  Several responses were

filed.  On March 22, 2023, the Third Circuit entered an order denying the Debtor's petition for

rehearing.  That same day, the Debtor filed a motion seeking a stay of the Third Circuit's

mandate pending appeal to the United States Supreme Court.  The Third Circuit entered an order

denying the stay motion on March 31, 2023 and issued its mandate directing this Court to

dismiss the 2021 Chapter 11 Case on April 4, 2023.  See Dkt. 3938 in Case No. 21-30589.

**F.      The Decision to File This Chapter 11 Case**

70.      Following the Third Circuit's ruling, and with the assistance of the

mediators and the encouragement of this Court, negotiations continued between the Debtor and

-24-

J&J, and various plaintiff law firms and the Future Claimants' Representative. First Day Decl.

¶ 72. Those negotiations ultimately culminated in an agreement with thousands of claimants on

a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed

and consummated, would fully resolve all the Debtor's liability for talc-related claims. Id. That

agreement has been memorialized in a series of plan support agreements (collectively, the "Plan

Support Agreements") that have been executed and delivered by counsel on behalf of over

60,000 claimants. Id.[15]

71.    The Plan Support Agreements provide, among other things, that the

Debtor, J&J, Holdco and the claimants will work together to finalize, file and seek confirmation

of a plan of reorganization that provides for the establishment of a trust funded in the amount of

$8.9 billion on a net present value basis. Id. at 73. The Plan Support Agreements further provide

that a plan containing the terms to which the parties have agreed must be filed by May 14, 2023,

or as soon thereafter as is feasible. Id.

72.    The filing of the Chapter 11 Case also has the continuing support of

Holdco and J&J have agreed to enter into new financing arrangements with the Debtor that

facilitate the confirmation and consummation of a plan of reorganization containing the terms

described in the Plan Support Agreements. Id. ¶ 76.

73.    The Debtor, J&J, and Holdco effectuated these new financing

arrangements by entering into three new agreements. Id. ¶ 79. The Debtor, J&J, and Holdco

entered into a termination and substitution agreement (the "T&S Agreement") by which the 2021

Funding Agreement and a related intercompany loan were terminated, and the parties, in

---

[15]    A copy of a form Plan Support Agreement (without exhibits) is attached as Annex C to the First Day
Declaration.

NAI-1535638465

substitution therefor, agreed to enter into two new agreements.  Id.  Simultaneously with their

entry into the T&S Agreement, the Debtor, J&J, and Holdco then entered into these two new

agreements:  Holdco and the Debtor entered into a new funding agreement (the "2023 Funding

Agreement") and the Debtor, Holdco and J&J entered into a separate support agreement

(the "J&J Support Agreement").  Id.[16]

> 74.  The 2023 Funding Agreement is similar to the 2021 Funding Agreement.

Id. ¶ 80.  It imposes no repayment obligation on the Debtor and is not a loan.  Id.  It obligates

Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in

the normal course of its business (i) at any time when there is no bankruptcy case and (ii) during

the pendency of any chapter 11 case filed by the Debtor, including the costs of administering the

chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor

from Royalty A&M are insufficient to pay those costs and expenses.   Id.  In addition, the 2023

Funding Agreement requires Holdco to fund amounts necessary (i) to satisfy the Debtor's

talc-related liabilities at any time when there is no bankruptcy case and (ii) in the event of a

chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of

reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreement, as

such terms may be amended or supplemented with the consent of the parties, in both situations to

the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient

to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's

other assets are insufficient to provide that funding.  Id.

---

[16]    Copies of the T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement are attached
to the First Day Declaration as Annexes D, E and F, respectively.  The summaries herein of the terms of the
T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement are provided for the
convenience of the Court and parties in interest and are qualified in all respects by the terms of such
agreements.

75.     The J&J Support Agreement is subject to the approval of the Court and is operative only in the chapter 11 case.  Id. ¶ 81.  It obligates J&J to provide the trust funding Holdco is required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the funding.  Id.  In return, Holdco is obligated to reimburse J&J for any amounts it pays to the trust on Holdco's behalf, and any amounts that are not reimbursed by Holdco will be deemed to be financed with a loan from J&J to Holdco.  Id.  The Debtor is obligated to use commercially reasonable efforts to obtain final Court approval of the J&J Support Agreement and to cause a plan of reorganization containing the terms reflected in the Plan Support Agreements to become effective, in both cases as soon as reasonably practicable.  Id. The Debtor has the right to enforce J&J's obligation under the J&J Support Agreement.  Id.

76.     The Debtor's new financing arrangements do not harm talc claimants.  Id. ¶ 84.  This is so because (a) the 2023 Funding Agreement is available to fund a trust consistent with the terms of the Plan Support Agreements and pay expenses incurred in this Chapter 11 Case and (b) subject to this Court's approval, J&J's support is available in this case to provide a backstop to Holdco to ensure it can meet its trust funding obligation.  Id.  Second, the 2023 Funding Agreement is also available to fund the Debtor's talc liabilities and related costs outside bankruptcy.  Id. ¶ 84.  The Debtor has the financial support it needs to implement the plan outlined in the Plan Support Agreements.  Id.

77.     Bankruptcy is the only forum where the Debtor can fully, equitably and permanently resolve all talc-related claims.  Id. ¶ 85.  This second chapter 11 filing and the proposed plan are in the best interests of all parties, including the Debtor and all current and future talc claimants.  Id.  And the temporary stay and injunction of talc litigation that this Motion requests are critical to that outcome.

NAI-1535638465

## NATURE OF RELIEF REQUESTED

78.     To guard against the severe and irreparable harm that the Debtor would suffer in the event that Defendants are permitted to continue or commence Debtor Talc Claims against the Protected Parties (on any theory of liability) during the Debtor's Chapter 11 Case, the Debtor seeks:  (a) a declaration that, while the Chapter 11 Case remains pending, the commencement or continued prosecution of any Debtor Talc Claims against any Protected Party constitutes a violation of the automatic stay imposed by section 362 of the Bankruptcy Code; or (b) a preliminary injunction prohibiting the Defendants from commencing or continuing to prosecute any Debtor Talc Claims against any Protected Party while the Chapter 11 Case remains pending.[17]  The Debtor also seeks a temporary restraining order, issued on an ex parte basis, that prohibits the Defendants from filing or continuing to prosecute any Debtor Talc Claims against any Protected Party pending a final hearing on the merits.

### Count I:  Declaratory Relief
### Pursuant to Section 362 of the Bankruptcy Code

79.     The Debtor incorporates by reference paragraphs 1 through 78 as if fully set forth herein.

80.     Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).

---

[17]     This injunction would include, without limitation:  (a) the pursuit of discovery from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Protected Parties; (c) further motions practice related to the foregoing; and (d) any collection activity on account of a Debtor Talc Claim against any Protected Party or its officers, directors, employees or agents or its respective assets.

NAI-1535638465

81.     The continuation and commencement of Debtor Talc Claims against Old JJCI, which are unequivocally efforts to recover on claims against the Debtor, are automatically stayed.  As described above, Old JJCI no longer exists, and the Debtor is responsible for the Debtor Talc Claims.  Thus, the commencement or continuation of the Debtor Talc Claims against Old JJCI can have only one purpose:  the ultimate liquidation and recovery of claims against the Debtor.  And, because the Debtor Talc Claims allege liabilities arising out of Old JJCI's actions years before the Petition Date, such claims are expressly enjoined by the automatic stay.

82.     Likewise, the continuation and commencement of Debtor Talc Claims against J&J are automatically stayed.  All of J&J's liabilities associated with Johnson's Baby Powder and other talc-containing products were transferred to Old JJCI.  Thus, the pursuit of the Debtor Talc Claims against J&J is an effort to liquidate and recover claims against the Debtor.

83.     Third Circuit precedent, including this Court's order entered in the 2021 Chapter 11 Case, recognizes that the automatic stay imposed by section 362(a)(1) may be extended in unusual circumstances.  Unusual circumstances exist where there is an identity of interests between the debtor and non-debtor defendant such that the debtor is, in effect, the real-party defendant and where continuation of the litigation will have an adverse impact on the debtor's estate and reorganization efforts.  Here, the Protected Parties share such an identity of interests with the Debtor that the Debtor, in effect, would be the real-party defendant in litigation of Debtor Talc Claims brought against Protected Parties.  Litigating, settling or attempting to establish the value of the Debtor Talc Claims against the Protected Parties outside the Chapter 11 Case would liquidate claims against the Debtor, including by triggering existing indemnification and similar obligations of the Debtor to such entities.  Such litigation also creates risks of

-29-

binding the Debtor through *res judicata* and collateral estoppel, and creating an evidentiary

record that prejudices the Debtor from litigating the claims against it.  Moreover, all liability for

the Debtor Talc Claims was exclusively allocated to the Debtor through the 2021 Corporate

Restructuring.  Because the Debtor is the real-party defendant in any suit seeking to liquidate and

recover on account of a Debtor Talc Claim, section 362(a)(1) stays such actions.

84.    Continued litigation of the Debtor Talc Claims would also have an adverse

impact on the Debtor's estate.  The prosecution of the Debtor Talc Claims against the Protected

Parties, including J&J, would, among other things:  (i) liquidate contractual indemnification

claims against the Debtor outside of chapter 11; (ii) effectively seek to collect on claims against

the Debtor; (iii) deplete available insurance coverage; (iv) interfere with negotiation and

mediation efforts; (v) eliminate the protections of the automatic stay; and (vi) imperil the

Debtor's reorganization.

85.    Section 362(a)(3) of the Bankruptcy Code operates automatically to stay,

among other actions, "the commencement or continuation . . . of a . . . proceeding against

the debtor . . . to obtain possession of . . .  or to exercise control over property of the estate."

11 U.S.C. § 362(a)(3).  The section 362(a)(3) stay applies here in two ways.

86.    First, section 362(a)(3) bars Defendants from bringing actions against J&J

or the Retailers that would deplete the Debtor's insurance on account of the Debtor Talc Claims

because the right to insurance coverage is property of the estate and such actions could result in

depletion of an estate asset.  Here, J&J and the Debtor are both covered for talc claims under

various shared insurance policies. The Retailers are named as insureds in such policies.  If a

Debtor Talc Claim is prosecuted against J&J or the Retailer, J&J may seek coverage under these

shared insurance policies to satisfy any judgment, thereby reducing the coverage available to the

NAI-1535638465

Debtor's estate.  Such a depletion of an estate asset violates the automatic stay and, therefore, Debtor Talc Claims against the Insurers and J&J are stayed pursuant to section 362(a)(3). Second, because attempts by Defendants to pursue Debtor Talc Claims against Protected Parties—which likely would be based on theories of alter ego, successor liability and/or fraudulent transfer—would constitute property of the Debtor's estate, section 362(a)(3) operates to stay such actions.

87.    Accordingly, and in line with Third Circuit precedent with respect to the application of the automatic stay, the declaratory relief the Debtor seeks in this Complaint and in the Motion is necessary and appropriate to protect the integrity of the automatic stay and the bankruptcy proceeding.

WHEREFORE, the Debtor respectfully requests that this Court:  (a) after notice and a hearing, enter an order and judgment declaring that the commencement or continued prosecution of Debtor Talc Claims against one or more Protected Parties while the Chapter 11 Case remains pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code and (b) grant such other and further relief as the Court may deem proper.

### Count II:  Preliminary Injunctive Relief,
### Pursuant to Sections 105(a) of the Bankruptcy Code

88.    The Debtor incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

89.    Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Case, aid in the preservation of

NAI-1535638465

the assets of the Debtor's estate and aid in the formulation and confirmation of a chapter 11 plan that maximizes recovery to all of the Debtor's creditors.[18]

90.    Pursuant to sections 105(a) of the Bankruptcy Code, this Court may enjoin creditor actions against third parties where necessary to preserve a debtor's reorganization efforts, including by fully effectuating the protections of the automatic stay of section 362(a). An injunction is appropriate in this case to prohibit the Defendants from filing or continuing to prosecute any Debtor Talc Claims against the Protected Parties while the Chapter 11 Case remains pending.  Indeed, this Court previously enjoined the same actions at issue in this Complaint in the 2021 Chapter 11 Case.  Further, such an injunction is critical to the Debtor's ability to achieve the purposes for which it commenced its reorganization case.

91.    In the Third Circuit, courts considering the propriety of an injunction under section 105(a) apply the traditional four-factor test for injunctions, as tailored to the unique circumstances of bankruptcy.  In bankruptcy, these four factors are:  (a) the debtor's reasonable likelihood of successful reorganization; (b) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (c) the balance of harms between the debtor and its creditors and (d) whether the public interest weighs in favor of an injunction.  Although courts typically consider all four factors, the Third Circuit has made clear that the critical, if not decisive, issue in whether a section 105(a) injunction is warranted is whether and to what extent the non-debtor litigation interferes with the debtor's reorganization efforts.

92.    The Debtor is likely to prevail on the merits of its Complaint under the four factors considered by Third Circuit courts.  The first factor—likelihood of success—is

---

[18]    Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

satisfied because the Debtor unquestionably has the financial capacity to implement a plan of

reorganization on the terms agreed with the supporting claimants, and it is prepared promptly to

continue negotiations to resolve this case.  The Debtor's entry into new financing arrangements

resolves the concerns that led the Third Circuit to conclude that the Debtor's first chapter 11 case

had to be dismissed.  Thus, there should be no legitimate dispute that this Chapter 11 Case

satisfies the good faith filing standard as articulated by the Third Circuit in its dismissal opinion.

In addition, the Debtor has the support of thousands of talc claimants for this Chapter 11 Case

and the terms of a potential plan of reorganization.  And, the Debtor indisputably has sufficient

resources to fund the costs of this Chapter 11 Case and a plan of reorganization on the terms

agreed to in the plan support agreements to equitably and finally resolve its talc liabilities.

The Debtor is committed to building on the substantial progress made to date and continuing to

engage with claimant representatives and key stakeholders to obtain further support for a plan

that contains the terms set forth in the plan support agreements.  Thus, the Debtor's prospects for

a successful reorganization are strong.

      93.    The second factor—irreparable harm—is met because the very purpose of

this Chapter 11 Case would be defeated in the absence of the requested injunction.  It is beyond

dispute that a preliminary injunction is critical to the fundamental purpose of the case—to obtain

confirmation of a plan of reorganization that will achieve an equitable, final, and full resolution

of the Debtor's talc liabilities.  These numerous impacts on and risks to the Debtor's

restructuring efforts include, among others:  the liquidation of claims outside the Chapter 11

Case for which the Debtor is liable, whether directly or via actual or alleged indemnification

obligations; the impact of ongoing litigation on the Debtor's efforts to negotiate or mediate a

resolution with present and future claimants; the likelihood of preclusion or other prejudice

NAI-1535638465

through res judicata, collateral estoppel and record taint; the potential depletion of available insurance coverage under shared policies; the disruption that continued litigation against J&J or Holdco could cause to the funding of the Debtor's trust; and the constant drain on the Debtor's resources of monitoring fragmented litigation around the United States while seeking to preserve its rights. Continued litigation of the Debtor Talc Claims against the Protected Parties clearly presents an imminent and substantial risk of irreparable harm to the Debtor's estate.

94.     The third factor—the balance of harms—weighs heavily in favor of a preliminary injunction because it will preserve the Debtor's opportunity to pursue a successful reorganization. At the same time, halting the pursuit of the Debtor Talc Claims outside this Court will not materially harm the Defendants. Based on the historical pace of resolution of these claims, it would take decades to resolve them in the tort system. And, in the majority of cases, the Defendants would receive no recovery. In contrast, a bankruptcy trust will provide those claimants with "a far simpler and streamlined process than currently available in the tort system." PI Op., 638 B.R. at 321.

95.     The fourth factor—public interest—also supports granting the requested injunction. Not only will the requested injunction help foster a successful chapter 11 reorganization here, which is always in the public interest, it will do so by fostering a rational, equitable resolution of the Debtor Talc Claims, in stark contrast to the lottery-like results in the tort system. See PI Op, 638 B.R. at 322 ("[T]his Court holds no doubts that claim resolution through the bankruptcy process is in the public interest.").

96.     Accordingly, an injunction barring the Defendants from commencing or continuing any Debtor Talc Claims against any Protected Parties while the Chapter 11 Case remains pending is appropriate and essential to the orderly and effective administration of the

-34-

Debtor's estate.  Good cause exists for the entry of injunctive relief pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

WHEREFORE, the Debtor respectfully requests that this Court:  (a) after notice and a hearing, issue a preliminary injunction pursuant to section 105(a) of the Bankruptcy Code prohibiting the filing or continued prosecution of Debtor Talc Claims against the Protected Parties while the Chapter 11 Case remains pending and (b) grant such other and further relief as the Court may deem proper.

### Count III:  Application for Temporary Restraining Order

97.    The Debtor incorporates by reference paragraphs 1 through 96 as if fully set forth herein.

98.    To preserve the effectiveness of the automatic stay until this Court has the opportunity to hold a final hearing on the Debtor's request for declaratory and/or injunctive relief, and to prevent the foregoing harmful effects upon the Debtor's estate, the Debtor requests that the Court issue an ex parte temporary restraining order prohibiting and enjoining the Defendants from filing or continuing to prosecute Debtor Talc Claims against the Protected Parties until this Court has issued a final ruling on the merits.

99.    The issuance of a temporary restraining order is warranted for the reasons already set forth herein and as more fully set forth in the Motion.  In addition, it is appropriate for the Court to grant the temporary restraining order on an ex parte basis because notice of this Complaint and the Motion may further exacerbate the very rush-to-the-courthouse created by the notice of the bankruptcy filing, which a temporary restraining order is necessary to further prevent.

WHEREFORE, the Debtor respectfully requests that this Court enter a temporary restraining order:  (a) prohibiting the Defendants from filing or continuing to prosecute any

-35-

Debtor Talc Claims against the Protected Parties until the Court decides whether to grant

the Debtor's request in this Complaint and the Motion for declaratory and/or injunctive relief;

and (b) granting such other and further relief as the Court may deem just and proper.

Dated:  April 4, 2023                          **WOLLMUTH MAHER & DEUTSCH LLP**

                                               */s/ Paul R. DeFilippo*
                                               Paul R. DeFilippo, Esq.
                                               James N. Lawlor, Esq.
                                               Joseph F. Pacelli, Esq. (*pro hac vice pending*)
                                               500 Fifth Avenue
                                               New York, New York 10110
                                               Telephone: (212) 382-3300
                                               Facsimile: (212) 382-0050
                                               pdefilippo@wmd-law.com
                                               jlawlor@wmd-law.com
                                               jpacelli@wmd-law.com

                                               **JONES DAY**
                                               Gregory M. Gordon, Esq.
                                               Brad B. Erens, Esq.
                                               Dan B. Prieto, Esq.
                                               Amanda Rush, Esq.
                                               2727 N. Harwood Street
                                               Dallas, Texas 75201
                                               Telephone: (214) 220-3939
                                               Facsimile: (214) 969-5100
                                               gmgordon@jonesday.com
                                               bberens@jonesday.com
                                               dbprieto@jonesday.com
                                               asrush@jonesday.com
                                               (Admissions *pro hac vice* pending)

                                               *PROPOSED ATTORNEYS FOR DEBTOR*

NAI-1535638465