Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Movant Anthony Hernandez Valadez*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC, | : | Case No. 23-12825 (MBK) |
| | : | |
| Debtor. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING THE FOURTEEN DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(a)(3)**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ................................................................................4

    I.     This Action was Filed Moments After Debtor's Previous Bankruptcy was
Dismissed ...................................................................................................4

    II.    Debtor Created Financial Distress by Terminating its $61.5 billion 2021
Funding Agreement Without Receiving Reasonably Equivalent Value for
Foregoing its Rights ...................................................................................5

    III.   Movant's Personal Injury Action was Scheduled and Ready for Trial on
April 17, 2023, Because This Court Previously Granted Movant Relief
From the Automatic Stay and Preliminary Injunction in the 2021
Bankruptcy Case .......................................................................................6

    IV.   Movant will Suffer Irreparable Harm if the Relief from the Automatic
Stay and  Any Preliminary Injunction is Not Continued .........................8

         A.    At Just 24 Years Old, Mr. Valadez is Suffering from Pericardial
Mesothelioma. ...............................................................................8

         B.    The State Court Action Had an Accelerated Schedule Because  of
the Terminal Nature of Mr. Valadez's Illness. .........................10

         C.    Movant's Cancer is Progressing Despite Aggressive Treatment...............13

    V.    Movant's Pericardial Mesothelioma was Caused by Johnson's Baby
Powder .....................................................................................................14

         A.    Asbestos Causes Pericardial Mesothelioma................................14

         B.    Unbeknownst to Mr. Valadez and His Mother, Johnson's Baby
Powder Contained Carcinogenic Asbestiform Fibers..............15

         C.    Mr. Valadez Was Exposed to Asbestos From Johnson's Baby
Powder at Levels Well Above Background or Ambient Levels of
Airborne Asbestos.......................................................................19

         D.    Mr. Valadez's Exposure to Asbestiform Fibers from Johnson's
Baby Powder Increased His Risk of Developing Pericardial
Mesothelioma. .............................................................................22

    VI.   Thhe Automatic Stay and Any Potential Preliminary Injunction Prejudices
Mr. Valadez.............................................................................................24

         A.    But for the court-ordered stays, Mr. Valadez would be proceeding
to trial against Debtor, J&J, and Retailers within two weeks. ..................24

         B.    Non-Debtors refuse to negotiate in good faith to promptly resolve
Mr. Valadez's claims. ................................................................25

    VII.   Talc Litigation Has No Adverse Effect on J&J's Financial Condition. ...............26

RELIEF REQUESTED.................................................................................................28

BASIS FOR RELIEF.................................................................................................28

    I.     This Court Has Wide Discretion to Determine Whether to Lift a Stay for
"Cause" Pursuant to Section 362(d)(1)..............................................................28

    II.    An Order Lifting the Automatic Stay, TRO, and anticipated Preliminary
Injunction for "Cause" Pursuant to Section 362(d)(1) is Warranted. ...................30

         A.    The Automatic Stay and TRO irreparably harm Movant, and has
no adverse effect on Debtor, J&J, and the Retailers. ...............................30

         B.    The relief requested would result in a complete resolution of
Movant's talc-related claims....................................................................32

         C.    The relief requested would not interfere with the bankruptcy case. ..........32

         D.    The Trial Court has the necessary expertise to hear Movant's
claims against the non-debtor entities.......................................................33

         E.    Permitting the state court action to commence and proceed would
not prejudice the interests of other creditors.............................................33

         F.    Granting Movant relief from the Automatic Stay and TRO is in the
interests of judicial economy and the expeditious and economical
resolution of the litigation. .......................................................................33

         G.    Promptly lifting the automatic stay and TRO allows Movant,
Debtor, and Non-Debtors to promptly prepare for trial............................34

    III.   The Debtor Has Not Established That Any Extension of the Stay Under
Section 362(a) to Non-Debtors is Warranted.....................................................34

         A.    Section 362(a) Was Enacted to Give a Reprieve to the Debtor................34

         B.    The Stay Should Not Be Extended Here Under § 362(a)(1) ....................37

             1.    Standards for extending the stay.....................................................37

             2.    This Court lacks jurisdiction to enjoin Movant's claims
against Non-Debtors under section 105..........................................39

             3.    Denying extension of the stay would have no impact on the
Debtor's estate. .............................................................................42

             4.    The stay cannot be extended to joint tortfeasors with direct
liability to Movant..........................................................................44

             5.    Debtor fails to establish entitlement to enjoin third-party
litigation. ......................................................................................47

NOTICE...................................................................................................................48

NO PRIOR REQUEST .............................................................................................48

CONCLUSION.........................................................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin*,
   788 F.2d 994 (4th Cir.), cert. denied, 479 U.S. 876 (1986) ........................................36, 37, 45

*In re Aldan Indus., Inc.*,
   No. 00-10360DWS, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ..................................38

*Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*,
   682 F.2d 446 (3d Cir. 1982).................................................................................................35

*Austin v. Unarco Industries, Inc.*,
   705 F.2d 1 (1st Cir. 1983).....................................................................................................45

*Bradberry v. Carrier Corp.*,
   86 So. 3d 973 (Ala. 2011)................................................................................................38, 44

*In re Briarpatch Film Corp.*,
   281 B.R. 820 (Bankr. S.D.N.Y. 2002)..................................................................................36

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)..........................................................................................................40, 42

*City of Chicago v. Fulton*,
   141 S. Ct. 585 (2021)............................................................................................................35

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)..............................................................................................................41

*In re Denby-Peterson*,
   941 F.3d 115 (3d Cir. 2019).................................................................................................35

*Eastern Refractories Co. v. Forty Eight Insulations Inc.*,
   157 F.3d 169 (2d Cir. 1998).................................................................................................35

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
   765 F.3d 205 (3d Cir. 2014).................................................................................................47

*In re First Cent. Fin. Corp.*,
   238 B.R. 9 (Bankr. E.D.N.Y. 1999)......................................................................................43

*In re FPSDA I, LLC*,
   No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ..............................39, 42

*Gold v. Johns-Manville Sales Corp.*,
    723 F.2d 1068 (3d Cir. 1983) ............................................................45

*Holland v. Rosen*,
    895 F.3d 272 (3d Cir. 2018) ..................................................42, 47

*Jackson v. Trump Ent. Resorts, Inc.*,
    No. CV 13-1605 (JHR/JS), 2015 WL 13637411 (D.N.J. Feb. 11, 2015) ............................36

*In re Jamo*,
    283 F.3d 392 (1st Cir. 2002) ................................................47

*In re Johns-Manville Corp.*,
    26 B.R. 405 (Bankr. S.D.N.Y. 1983) .....................................35

*Landis v. North Amer. Co.*
    (1936) 299 U.S. 247 ......................................................31, 32

*In re LTL Mgt., LLC*,
    22-0007, 2023 WL 2760479 (3d Cir. Mar. 31, 2023) ..................................1, 4, 5, 31

*Maritime Elec. Co. v. United Jersey Bank*,
    959 F.2d 1194 (3d Cir. 1991) ...............................................36

*McCartney v. Integra Nat. Bank N.*,
    106 F.3d 506 (3d Cir. 1997) ............................................35, 36, 37

*In re Mid-Atlantic Handling Sys., LLC*,
    304 B.R. ............................................................28, 29, 32, 33

*Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al.* (*In re Phar-Mor, Inc. Sec. Litig.*),
    164 B.R. 903 (W.D. Pa. 1994) ................................................43

*Patton v. Bearden*,
    8 F.3d 343 (6th Cir. 1993) ...................................................39

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp.* (*In re Phar-Mor, Inc. Sec. Litig.*),
    166 B.R. 57 (W.D. Pa. 1994) ................................................44

*Queenie, Ltd. v. Nygard Int'l*,
    321 F.3d 282 (2d. Cir. 2003) ................................................38

*In re Scarborough-St. James Corp.*,
    535 B.R. 60 (Bankr. D. Del. 2015) ..........................................36

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) ........................................................47

*In re Sonnax Indus.*,
    907 F.2d 1280 (2d Cir. 1990) ............................................................................29

*Stanford v. Foamex L.P.*,
    2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) .........................................................44

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006) ...............................................................................40

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
    803 F.2d 61 (2d Cir. 1986) .................................................................................39

*In re Uni-Marts, LLC*,
    399 B.R. 400 (Bankr. D. Del. 2009) .........................................................37, 38, 43

*In re Univ. Med. Ctr.*,
    82 B.R. 754 (Bankr. E.D. Pa. 1988) .....................................................................39

*In re W.R. Grace & Co.*,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ...................38, 40, 41

*Wash. Constr. Co. v. Spinella*,
    8 N.J. 212 (1951) ............................................................................................40

*Wedgeworth v. Fibreboard Corp.*,
    706 F.2d 541 (5th Cir. 1983) ..............................................................................46

*Williford v. Armstrong World Industries, Inc.*,
    715 F.2d 124 (4th Cir. 1983) ..........................................................................45, 46

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................................42

**Statutes**

11 U.S.C. § 105 ....................................................................................39, 42, 47

11 U.S.C. § 105(a) .................................................................................39, 40, 47

11 U.S.C. § 362(a) .................................................................................34, 36, 37

11 U.S.C. § 362(a)(1) ...................................................................................34

11 U.S.C. § 362(a)(3) ..................................................................................34, 36

11 U.S.C. § 362(d) .......................................................................................3

11 U.S.C § 362(d)(1) .........................................................................1, 28, 30, 48

11 U.S.C. § 502(e)(1)(B) ..........................................................................................42

11 U.S.C. § 548(a) ....................................................................................................5

11 U.S.C. § 1112(b) ..................................................................................................4

22 U.S.C. § 2283 .....................................................................................................47

28 U.S.C. 1334(b) ...................................................................................................40

Cal. Code Civ. Proc. § 36(d).............................................................................25, 34

Cal. Code Civ. Proc. § 36(e).....................................................................................34

Com. L. 64, 74 (2010)..............................................................................................42

**Other Authorities**

Cal. Const. art. I, § 16 .............................................................................................30

Fed. R. Bankr. P. 4001(a)(3).....................................................................1, 3, 30, 48

H.R. Rep. No. 595, 95th Cong., 2d Sess. 343-44 ....................................................30

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787.........................29

U.S. Const. amend. VII.............................................................................................30

The law firm of Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation ("Kazan Law"), and local counsel Saiber LLC, on behalf of their dying mesothelioma client and  personal-injury claimant Anthony Hernandez Valadez ("Movant" or "Mr. Valadez"), through his undersigned counsel, hereby submits this memorandum of law in support of his motion ("Motion") for the entry of an order pursuant to Section 362(d)(1) of the Bankruptcy Code, waiving the stay of Fed. R. Bankr. P. 4001(a)(3), granting Movant relief from the Automatic Stay, Second Amended Ex Parte Temporary Restraining Order ("TRO") and anticipated Preliminary Injunction  as to LTL Management LLC ("Debtor"), non-debtor Johnson & Johnson ("J&J"), , and retailers Albertsons Companies, Inc., Lucky Stores, Inc., Safeway Inc., Save Mart Supermarkets, Target Corporation, and Walmart Inc. (collectively, "Retailers"). In support of the Motion, Movant respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1.      In defiance of the Third Circuit's decision, J&J and Debtor refiled their bankruptcy petition mere hours after being dismissed by this Court. The change in circumstances? The exact action that the Third Circuit anticipated that Debtor might attempt: divesting its Funding Agreement—an asset worth $61 billion. The question the Third Circuit posed in such event: "Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?" *In re LTL Mgt., LLC,* 22-0007, 2023 WL 2760479, at *16, fn. 18 (3d Cir. Mar. 31, 2023). *__No.__* Instead, it received a different funding agreement worth $400 million. Based upon this self-inflicted financial distress, Debtor refiles its bankruptcy

---

[1] In support of the Motion, Movant also submits the Declarations of Movant ("Valadez Decl."), Anna Camacho ("Camacho Decl."), Joseph Satterley ("Satterley Decl."), Dr. Leah Backhus ("Dr. Backhus Decl."), Dr. Dean Felsher ("Dr. Felsher Decl."), Dr. William Longo ("Dr. Longo Decl."), Dr. Ronald Dodson ("Dr. Dodson Decl."), Dr. Mohana Roy ("Dr. Roy Decl.") and Robert Johnson ("Johnson Decl.").

petition and inflicts an automatic stay upon Movant's personal injury action that was scheduled to start trial in less than two weeks.

2.      This motion seeks only limited relief necessary to ensure that Movant's personal injury action may go to trial—relief that this Court has granted in the past. During Debtor's 2021 Bankruptcy Case (defined below), Movant petitioned this Court for relief from the automatic stay and preliminary injunction. This Court granted limited relief in June, 2022, allowing Movant to file his personal injury lawsuit against non-debtors. Then, in July, 2022, this Court allowed the discovery, preservation of evidence, and Movant to pursue obtaining an expedited trial date. Movant succeeded. With trial set in February, 2023, and the preliminary injunction still in-effect, Movant petitioned this Court for further relief. This Court granted that exact relief on February 17, 2023--allowing Movant to fully prosecute his case, including proceeding through trial. Trial was set. The parties prepared. Jury selection was to begin on April 17, 2023, and would have proceeded but-for the new automatic stay imposed by Debtor's bankruptcy refiling.

3.      Movant must now petition the Court to finish what was started in the 2021 Bankruptcy Case. The circumstances that persuaded this Court to allow Movant his day in court are no different. Movant is 24 years old and dying of pericardial mesothelioma. Movant's disease is progressing—enlarging and spreading. There is no question that this disease is terminal. There is no question that pericardial mesothelioma, in particular, can worsen quickly and without notice. There is no question Movant lives on borrowed time. Movant faces ***irreparable harm*** should this Court not immediately act to allow Movant's State Court action to proceed to trial, as originally planned, contemplated, and ordered by this Court.

4.      Meanwhile, Debtor and J&J reap the benefits of Debtor's fraudulent divesture of $61 billion in asset. Within 30 minutes of Debtor's refiling, J&J's stock price and market

capitalization was up 3.2%--resulting in an approximate $13 billion value increase. This trend continued into next day's trading with an additional 1.3% increase, which resulted in a further $5 billion value increase. In total, J&J's stock went up 4.5% with a market capitalization increase of $18 billion. In contrast, during the same period, the S&P 500 dropped approximately 0.2%.

5.      Whereas Movant faces ***immediate and irreparable harm***, Debtor and J&J face ***zero prejudice*** in allowing Movant's personal injury action to proceed. Debtor's bankruptcy refiling is premised on this Court accepting that its divesture of $61 billion was proper—a divesture already specifically rejected by the Third Circuit. Debtor had already been on notice to prepare for trial on April 17, 2023, against Movant, and thus, faces no risk of distraction from reorganization. Debtor's asset valuation cannot be materially affected by Movant's personal injury action—either it has access to J&J's ever-increasing market capital or it does not. In one scenario, this refiling is dismissed due to the same lack of financial distress suffered by the 2021 Bankruptcy Case; in the other, this refiling is dismissed for fraud due to divesting material assets.

6.      Regardless of scenario, this matter's procedural issue will take time. Time, that as this Court has already recognized, Movant does not have. As a result, the only ruling that the evidence supports and justice demands, is that this Court act to prevent the immediate and irreparable harm to Movant.

7.      Accordingly, under section 362(d) of the Bankruptcy Code and this Court's prior orders in the 2021 Bankruptcy Case, Movant seeks relief an order waiving the stay of Fed. R. Bankr. P. 4001(a)(3), granting Movant relief from the Automatic Stay, ("TRO") and anticipated Preliminary Injunction  as to Debtor, J&J, and Retailers.

## FACTUAL BACKGROUND

**I.       This Action was Filed Moments After Debtor's Previous Bankruptcy was Dismissed**

8.       On October 14, 2021, Debtor filed a petition commencing a chapter 11 bankruptcy case ("2021 Bankruptcy Case"). *In re LTL,* 2023 WL 2760479, *5. In February, 2022, Debtor moved to extend the automatic stay to non-debtors and defendants moved to dismiss. *Id.* at *6. This Court granted Debtor's motion and denied defendants' the motion to dismiss on February 25, 2022. *Id.* Defendants appealed. *Id.* at *7.

9.       On January 30, 2023, the Third Circuit issued its opinion. *In re LTL,* 2023 WL 2760479, at *1. On March 31, 2023, after denying Debtor's petition for an en banc hearing and to stay, the Third Circuit issued its mandate and filed its amended opinion. *Id.* The Third Circuit concluded: "Because it abused its discretion in denying the motions to dismiss, we reverse the Bankruptcy Court's order denying the motions and remand this case with the instruction to dismiss LTL's Chapter 11 petition. Dismissing its case annuls the litigation stay ordered by the Court and makes moot the need to decide that issue." *Id.* at *18.

10.       On April 4, 2023, at 1:49 p.m.  EST, this Court issued an order dismissing Debtor's Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b). [Case No. 21-30589-MBK, Dkt. 3938.] The same day, at 4:00 p.m.  EST, Debtor refiled its Chapter 11 action. [Dkt. No. 1.] As in the 2021 Bankruptcy Case, Debtor filed an ex parte request for a temporary restraining order that automatically extends the stay  to various non-debtor parties, including J&J and Retailers. [Adv. Dkt. 9] This Court granted such relief, including specifically extending the stay to Movant's personal injury action. [Adv. Dkt. 15, p.7.]

**II.    Debtor Created Financial Distress by Terminating its $61.5 billion 2021 Funding Agreement Without Receiving Reasonably Equivalent Value for Foregoing its Rights**

11.    In its reasoning to dismiss Debtor's Chapter 11 petition, the Third Circuit determined that Debtor "was not in financial distress." *In re LTL*, 2023 WL 2760479, at *16. In reaching this conclusion, the Third Circuit made a factual finding of the value and quality of Debtor's assets—including a Funding Agreement between Debtor, J&J, and Johnson & Johnson Consumer, Inc. *Id*. at *13. The Funding Agreement gave Debtor "the right, outside of bankruptcy, to cause J&J and New Consumer, jointly and severally, to pay it cash up to the value of New Consumer as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses." *Id*. In effect, Debtor held a $61.5 billion asset—described by the Third Circuit as a "funding backstop, not unlike an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability." *Id*. at *16.

12.    The Third Circuit foresaw that Debtor may attempt to circumvent the Funding Agreement: "Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to 'avoid any transfer' made within two years of any bankruptcy filing by a debtor who 'receives less than a reasonably equivalent value in exchange for such transfer' and 'became insolvent as a result of it.' 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?" *Id*. at *18, fn. 18.

13.    On April 2, 2023, Debtor agreed to terminate the Funding Agreement— essentially divesting a $61.5 billion asset. [Dkt. 1, p. 10; see also, Dkt. 4, p. 27.) Notably, this asset divesture was prior to its 2021 Bankruptcy Case being dismissed by this Court. In

exchange, Debtor entered into a new funding agreement with Johnson & Johnson Holdco (NA) Inc. ("Holdco"). [Dkt. 4, pp. 26-28.] The funding agreement gave debtor access to funding from Holdco's assets—valued at approximately $400 million. [*Id.* at, pp. 9, 26-28.] In a second agreement, termed by debtor as the "J&J Support Agreement," J&J obligated itself to provide funding for a bankruptcy trust. [*Id*. at pp. 27-28.] But, this agreement "is operative only in the chapter 11 case" and must first be approved by this Court. [*Id.* at p. 28.] In effect, Debtor traded a $61.5 billion asset for a $400 million asset to create "financial distress."

### III.  Movant's Personal Injury Action was Scheduled and Ready for Trial on April 17, 2023, Because This Court Previously Granted Movant Relief From the Automatic Stay and Preliminary Injunction in the 2021 Bankruptcy Case

14.     On May 24, 2022, Movant filed and served his motion for an order granting relief from the automatic stay and preliminary injunction issued in the 2021 Bankruptcy Case. [Case No. 21-30589-MBK, Dkt. 2348.] On June 14, 2022, this Court heard Movant's initial motion in the 2021 Bankruptcy Case. [Satterley Decl. at ¶ 16, Exhibit 12-1] After extensive arguments [*id*. at 60-139], this Court granted "limited stay relief" by allowing Movant to file his complaint [*id.* at 139:2-16]. However, "no defendant has an obligation to file an answer or participate beyond filing the complaint. The stay and the injunction are still in place." [*Id*. at 139:13-16.]

15.     On July 28, 2022, this Court  granted Movant further limited relief from the automatic stay and preliminary injunction: "I am going to grant limited relief to allow discovery, to gather and preserve evidence that will support the claims against J&J in the future . . . . I will also allow relief from the stay to enable Mr. Satterley to make any appropriate motion required to get expedited trial dates for his clients or priority in the event the Third Circuit does reverse my decision and this case is dismissed." [7/28/22 Reporter's Transcript, Exh. 12-7 to Satterley Decl. at 20:13-21:2.]

16.     On February 2, 2023, Movant filed a Supplemental Filing requesting full relief from the automatic stay and preliminary injunction in order to: (i) allow Movant to name Debtor as a defendant in Movant's pending personal injury action; (ii) for the parties to fully prosecute and defend their respective claims in the Superior Court of California, County of Alameda ("State Court"); and (iii) for the parties to proceed to trial in State Court within 60 days from February 9, 2023. [Case No. 21-30589-MBK, Dkt. 3698.] This Court granted Movant this exact relief on February 17, 2023. [Exh. 9 to Satterley Decl.]

17.     The combined relief granted by this Court empowered the parties to prepare Movant's personal injury action for trial. The parties have taken the majority of all fact and expert witness depositions. [Satterley Decl. at ¶ 36.] The remaining depositions were all scheduled to be completed before April 17, 2023. [*Id.*]

| Movant Witnesses | | Debtor Witnesses | |
|---|---|---|---|
| *Completed* | *To be Taken* | *Completed* | *To be Taken* |
| Anthony Valadez | Dr. Dean Felsher | Dr. David Weill | Dr. Lucian Chirieac |
| Anna Camacho | Dr. Jerrold Abraham | Dr. Dominik Alexander | Laura Dolan |
| Seferita Ochoa | Dr. Ronald Dodson | James Mittenthal | Dr. Matthew Sanchez |
| Toni Hernandez | Dr. Mohana Roy | Dr. Leonel Van Zyl | Dr. Christy Barlow |
| Serena Hernandez | Robert Johnson | | Sandra Kinsey |
| Dr. Barry Horn | Dr. Leah Backhus | | Greg Compagnone |
| Dr. William Longo | | | Rebecca Swayne |
| Dr. Allan Smith | | | Coryn Kremers |
| Dr. David Egilman | | | Tami Tollefson |
| Arthur Langer, Ph.D. | | | Rylan Wiedmeier |

18.     In addition, the parties had briefed and prepared the majority of pre-trial documents, including motions *in limine* and designations of former testimony. [Satterley Decl. at ¶ 37.] The  motions in limine are ready to be argued at the State Court's discretion. [*Id.*] Jury selection was scheduled to occur on April 17, 2023. [*Id.*]

19.     As a result of Debtor's refiled bankruptcy petition and this TRO, all depositions have been taken off-calendar. [Satterley Decl. at ¶ 38.] Similarly, except for a status conference on April 6, 2023, all hearings have been taken off-calendar. [*Id.*] Should this Court lift the automatic stay, the State Court action will be able to resume immediately under the full force and effect of the California trial preference statute—with jury selection beginning on April 17, 2023. [*Id.*]

**IV.     Movant will Suffer Irreparable Harm if the Relief from the Automatic Stay and Any Preliminary Injunction is Not Continued**

    **A.     At Just 24 Years Old, Mr. Valadez is Suffering from Pericardial Mesothelioma.**

20.     Mr. Valadez is 24 years old. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 2.] He was an outgoing person who loved spending time with friends and family. [*Id.* at ¶ 8.] He planned to go to college in Southern California to major in criminology in the hopes of working in law enforcement or as a private investigator. [*Id.*]



21.     On January 10, 2022, Mr. Valadez's life suddenly changed for the worst because he was diagnosed with a terminal cancer called pericardial mesothelioma. [Valadez Decl, Exh. 24 to Satterley Decl. at ¶ 3; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶¶ 7-8 and Exh. B thereto; Dr. Felsher Decl., Exh. 28 to Satterley Decl. at ¶ 7.] That cancer affects the lining

of the heart, known as the pericardium. [Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶¶ 8, 13, 16, and Exh. F thereto at 285-286; Dr. Felsher Decl., Exh. 28 to Satterley Decl. at ¶ 7.]



22.     Mr. Valadez will never realize his hopes and dreams because of his mesothelioma. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 11.] Having mesothelioma is the worst thing that has ever happened to him. [*Id.* at ¶ 9.] He never had a serious, let alone life threatening, illness prior to his mesothelioma. [*Id.*]

23.     Mentally, Mr. Valadez's mesothelioma has caused him great anxiety and depression. [Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 10 and Exh. D thereto at 191; Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 9; Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 10.] Merely talking about his illness makes Mr. Valadez's heart race to the point where he is having a panic attack. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 9.] For example, during a hospital stay from May 15 to 17, 2022, Mr. Valadez felt anxious and wanted to leave because the doctor was discussing topics related to his mesothelioma. [*Id.* at ¶ 10.] The only way that the doctor was able to calm Mr. Valadez was to limit the conversation to just Mr. Valadez's symptoms. [*Id.*] Throughout his four days of deposition in September 2022, Mr. Valadez constantly experienced body pain, headaches, stress, and anxiety. [12/15/22 Status Update, Exh. 16 to Satterley Decl. ¶ 5 and evidence cited therein.] Mr. Valadez cannot escape his anxiety. During his frequent admissions to the hospital, which is nearly a two-and-a-half-hour

drive from his home, Mr. Valadez experiences anxiety and wants to go home. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶¶ 9-10; Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 11.] When he is at home, Mr. Valadez has anxiety about going back to the hospital. [*Id.*]

24.     Physically, the mesothelioma and any treatments related to it have caused Mr. Valadez to experience nausea/vomiting, loss of appetite, severe chest pain and tightness, anemia, persistent food regurgitation, shortness of breath, discomfort, fatigue, mouth sores, nonproductive cough, body aches, and chronic back pain. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 9; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶¶ 7-9, 14, and Exhs. B-C thereto.] His swollen lymph nodes underscore the advanced stage of his disease. [Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 8.]

25.     Mr. Valadez and his mother are in shock that he has mesothelioma. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 11; Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 10.] Mr. Valadez is very scared of what will happen to him. [*Id.*] His mother lives in fear every day because she does not know whether her son will live to see another day. [*Id.*] As recently as April 3, 2023, Mr. Valadez's aunt, Toni Hernandez, testified that Mr. Valadez is doing "terrible" because "he was depressed and he can't eat." [Toni Hernandez Depo., Exh. 2 to Satterley Decl. at 6:14-15, 9:4-7, 29:20-25.]

**B.     The State Court Action Had an Accelerated Schedule Because  of the Terminal Nature of Mr. Valadez's Illness.**

26.     On August 26, 2022, after obtaining leave from this Court, the State Court granted Mr. Valadez's motion for trial preference. [Trial Preference Order, Exh. 19.] The State Court found that the declarations of Mr. Valadez's treating doctors, Dr. Leah Backhus and Dr. Mohana Roy, constitute clear and convincing medical documentation that concludes that Mr. Valadez suffers from an illness raising substantial medical doubt of his survival. [*Id.* at 2; Dr. Roy Decl.,

Exh. 22 to Satterley Decl. at ¶¶ 12-17; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶¶ 13-18;

.]

27.    Pericardial mesothelioma is an aggressive cancer with a grave prognosis that is

almost universally fatal. [Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 12.] Because of its

aggressive nature, many of the cases of pericardial mesothelioma reported in the medical and

scientific literature were not diagnosed until after death. [*Id.* at ¶ 13.]

28.    Because mesothelioma is a terminal cancer, the risk of adverse effects, including

death, the probability that severe complications of treatment will occur, and the likelihood of

opportunistic infections or unexpected rapid tumor progression, is very high. [Dr. Roy Decl.,

Exh. 22 to Satterley Decl. at ¶ 12; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 13.] Patients

who are diagnosed with mesothelioma may undergo treatment, such as chemotherapy, surgery,

and/or radiation with the purpose of slowing the progression of the mesothelioma. [*Id.*] These

treatments do not cure mesothelioma and are considered palliative. [*Id.*] Even if the patient is a

proper candidate and elects to undergo treatment, the treatment may have only a modest impact

on the patient's survival. [*Id.*] The most likely outcome is that Mr. Valadez ultimately will die of

complications from mesothelioma. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 13;

Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 11.]

29.    The pericardial mesothelioma from which Mr. Valadez suffers can change clinical

and symptomatic directions quite quickly. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 14;

Dr. Backhus Decl., Exh. 27 to Satterley Decl. at  ¶ 15.] Several factors may influence the

progression of cancer, including the side effects from therapy, alterations of the normal

physiology, and stress, which has both emotional and physical components. [*Id.*] Mr. Valadez

has anxiety and fear because of his terminal mesothelioma, which are known emotional stressors

in terminal cancer patients. [*Id.*] Many types of stress activate the body's endocrine (hormone) system, which in turn can alter the way the immune system functions. [*Id.*]

30.     Fatigue is also a major psychological symptom. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 14; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at  at ¶ 15.] Fatigue is the most common and distressing symptom associated with cancer and cancer therapies. [*Id.*] Physical and emotional stress both contribute to a cancer patient's fatigue, which becomes progressively worse as a malignancy progresses. [*Id.*] As his illness progresses, Mr. Valadez will become less able to attend trial and participate meaningfully in litigation. [*Id.*] A prolonged case lasting over a period of many months can increase a patient's stress level and exacerbate fatigue, with its attendant negative consequences to the patient's cancer fighting ability. [*Id.*]



### C.    Movant's Cancer is Progressing Despite Aggressive Treatment.

31.     On January 25, 2023, Movant saw one of his treating physicians, oncologist Dr.

Joel Neal, to discuss Movant's latest CT scans. [Satterley Decl. 2/23/23, , Exh. 12 to Satterley

Decl. at ¶ 21 and Exh. 17 thereto at 1.]

32.     Dr. Neal noted that Movant's October 7, 2022, CT scan showed "[n]ew and

enlarging pleural and pericardial nodules." [Satterley Decl. 2/23/23, Exh. 12 to Satterley Decl. at

¶ 21 and Exh. 17 thereto at 3.]Thus, the disease had a "[m]ixed response" to Movant's ongoing

immunotherapy. [*Id.*]

33.     On January 20, 2023, Movant's CT scan showed "overall disease progression."

[Satterley Decl. 2/23/23, Exh. 12 to Satterley Decl. at ¶ 21 and Exh. 17 thereto at 4.] As a result,

Dr. Neal immediately stopped Movant's immunotherapy treatments. [*Id.* ("STOP ipi/nivo").] Dr.

Neal noted, "Overall, [Movant] appears to have progression on most recent CT. On review at

tumor board it does look like the tumor has been grown from May until now." [*Id.* at 5.]

34.     Movant has been struggling mentally and did not take the news well: "This news

was extremely traumatic to [Movant], and he and his mom decided to leave clinic before a full

discussion. However, they did agree to return soon and consider systemic gemcitabine therapy."

[Progress Notes, Exh. 17 to Satterley Decl. at 4, 5.]

35.     Mr. Valadez's condition has not changed for the better. His treating thoracic

surgeon, Dr. Backhus, testified that Mr. Valadez "has progression of his disease," specifically,

"local progression with increasing tumor bulk. So both in bulk and in locations throughout his

chest." [Dr. Backhus Depo., Exh. 1 to Satterley Decl. at 6:19-21, 33:14-23, 49:10-25.]

**V.     Movant's Pericardial Mesothelioma was Caused by Johnson's Baby Powder**

     **A.     Asbestos Causes Pericardial Mesothelioma.**

36.     Dr. Dean Felsher is a professor at the Stanford University School of Medicine and presently the school's Associate Chief in the Division of Oncology. [Dr. Felsher Decl., Exh. 28 to Satterley Decl. at ¶ 4.] He teaches, or has taught, clinics in medical oncology, oncogenes, cancer education, and translational medicine, and seminars in oncology, cancer pharmacology, cancer biology, immunology, pathology, carcinogenesis, and translational medicine. [*Id.*] He has over 30 years of experience in medical and oncology research, as well as over 20 years of clinical experience in oncology. [*Id.* at ¶ 5.]

37.     In his declaration in support of Mr. Valadez's motion, Dr. Felsher is of the opinion that asbestos exposure is a cause of malignant pericardial mesothelioma. [Dr. Felsher Decl., Exh. 28 to Satterley Decl. at ¶ 8.] The medical and scientific literature demonstrates that asbestos exposure in babies and children is a risk factor for mesothelioma and the relative risk for mesothelioma when exposed as such can be greater than when exposed as an adult. [*Id.*] In part, Dr. Felsher identifies 21 publications in support of his opinion. [*Id.* and Exhs. C-X thereto.] For example, the World Health Organization recognizes that asbestos causes malignant pericardial mesothelioma. [*Id.* and Exh. F thereto.] The United Kingdom's Committee on Carcinogenicity of Chemicals in Food, Consumer Products and the Environment concluded that the lifetime risk of developing mesothelioma is predicted to be about 3.5 times greater for a child first exposed to asbestos at age 5 compared to an adult first exposed at age 25 and about 5 times greater when compared to an adult first exposed at age 30. [*Id.* and Exh. C thereto.] And in Emory, et al., cases of mesothelioma have been observed in persons who have used cosmetic talc powder, including one pericardial mesothelioma patient whose only known exposure to asbestos was repeated use of cosmetic talc powder. [*Id.* and Exh. W thereto.]

38.     Movant's treating doctors, Dr. Backhus and Dr. Roy, likewise are of the opinion that asbestos, including those found in cosmetic talc, causes pericardial mesothelioma. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶¶ 15-17; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶¶ 16-17 and Exhs. F-G thereto.]

**B.     Unbeknownst to Mr. Valadez and His Mother, Johnson's Baby Powder Contained Carcinogenic Asbestiform Fibers.**

39.     J&J deems Johnson's Baby Powder as the "cornerstone," "flagship," "foundation," or "sacred cow" of their baby products franchise. [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exhs. O and P thereto; *Id.* at Exh. D at 3165:15-2.] As J&J officer Christian Koffmann notes, J&J understands "the equity" in the Baby franchise and calls that equity the "golden egg." [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. D thereto, 3165:10-3167:4.] J&J's objective is "to burnish the golden egg" or "to add to the gold mine." [*Id.*] "In the mind of consumers, Johnson & Johnson is synonymous with the mother/infant bond" and is "blessed to be a company in all sorts of businesses and with the image of a trustworthy, caring, small company" which the company must "protect and nurture." [*Id.*]

40.     The "primary target of the Johnson's brand" has been "mothers of babies 0 to 3 and adults who find the baby concept appealing." [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. Q, p. 7.] J&J's "secondary target" is "healthcare professionals." [*Id.*] J&J markets its products as the "purest, mildest, and gentlest choice for babies everywhere." [*Id.* at 20.]

41.     But J&J knew that there was asbestos in Johnson's Baby Powder. Indeed, J&J in its internal documents knew that asbestos was present in the talc used in Johnson's Baby Powder before and during the years that Mr. Valadez used that product. Below is a small subset of those documents:

| Exhibit(s) to Satterley 5/24/22 Declaration (Exh. 23 to Satterley Decl.) | Date | Description |
|---|---|---|
| M at 6-7, 37, 41 (emphasis added) | 05/14/1974 | Windsor Minerals report – even with new flotation methods, the finished talc product still contained amphibole and chrysotile asbestos fibers; that asbestos was a "***severe health hazard***" that was "potentially present in all talc ores" used for Johnson & Johnson's baby powder; the Hammondsville mine ore body contained "fibrous amphibole minerals and chrysotile asbestos." |
| L | Early 1990s | J&J has known about Dr. Alice Blount's article identifying asbestos in Johnson's Baby Powder since the early 1990's. |
| F at 2 | 1992 | Cyprus reports that "fibrous minerals," namely "tremolite and actinolite are ubiquitous in several zones of the Vermont mines." |
| G at 2 | 03/25/1992 | "The other serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of amphibole minerals, tremolite and actinolite…which have been classified as asbestiform minerals by OSHA and EPA." |
| H and N | 04/23/1998 | Dr. Blount's letter to Johnson & Johnson's counsel – Dr. Blount confirmed that "***Johnson & Johnson's Vermont talc contains trace amounts of asbestos which are well below those specified by OSHA***"; in Dr. Blount's 1991 publication, Sample I was Johnson & Johnson's Vermont talc. (emphasis added). |
| I | 05/23/2002 | Fibrous tremolite found in Argonaut mine. |
| J | 01/05/2004 | Johnson & Johnson on notice of Forensic Analytical lab report – Johnson's Baby Powder contained asbestos. |
| K | 10/03/2019 | Johnson & Johnson on notice that AMA found chrysotile in a lot of Johnson's Baby Powder. |

42.     Recently, Dr. Arthur Langer, testified in this case that he identified chrysotile asbestos in Johnson's Baby Powder back in 1971. [Langer Depo., Exh. 3 to Satterley Decl.at 9:25-10:8, 12:13-13:8.] Dr. Langer informed J&J's director, Dr. Gavin Hildick-Smith, of his findings. [*Id.*]

43.     Dr. William Longo is a materials scientist and expert in material science, specifically asbestos testing and exposure to asbestos. [Dr. Longo Decl., Exh. 26 to Satterley Decl. at ¶¶ 2-13 and Exh. A thereto.] He and his lab have tested the asbestos content of exemplar samples of Johnson's Baby Powder from the 1960s and through the 2000s. [*Id.* at ¶ 15.] Using the Blount concentration method, TEM, and PLM, Dr. Longo has completed testing of product containers that J&J provided and verified the presence of asbestos in a majority of those samples. [*Id.*] He also has reviewed J&J's historical documents going back to the 1960s and through the present, including positive testing records relating to the Vermont and Chinese talc used in Baby Powder. [*Id.* at ¶ 24.] Prior to 2003, Johnson's Baby Powder contained Vermont talc. Dr. Longo found asbestos in approximately 83 percent of the baby powder samples containing Vermont talc he has tested. [*Id.* at ¶ 17 and Exh. D thereto at last page.] After 2003, Johnson's Baby Powder contained Chinese talc. Dr. Longo identified and reported regulated asbestos in 77 of 81 (95%) J&J Chinese talcs and Chinese talc sourced products. [*Id.*]

44.     J&J admits that a mere 0.00001 percent chrysotile in an eight-ounce bottle of Johnson's Baby Powder would yield 10 million asbestos fibers per container. [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. D,  5436:25-5437:20.] Thus, in all of the talc samples in which Dr. Longo found asbestos, there are millions upon millions of asbestos structures in each bottle of Baby Powder. [*Id.*]

45.     J&J lied to the public about the presence of asbestos in Johnson's Baby Powder. [*See, e.g.,* Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. V thereto, p. 3 (Johnson's Baby Powder does not contain asbestos); Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. W thereto ("The FDA has tested Johnson's talc since the '70s. Every single time it did not contain asbestos.").]

46.     J&J well knew that asbestos is a health hazard. [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. D thereto, 5431:25-5432:17; Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. R thereto, p. 2 ("How bad is Tremolite medically, and how much of it can safely be in talc base we might develop?"); Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. S thereto, p. 2 ("Law Department should be consulted with regard to the defensibility of our position in the event that" allegations of respiratory illnesses "could ever arise"); Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. T thereto (authorizing Colorado School of Mines to find ways to destroy asbestos in Vermont talc); Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. U thereto (recognizing that cornstarch "by its very nature, does not contain fibers. Furthermore, it's assimilated by the body."); Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. V thereto, 3 (Johnson & Johnson declaring in an informational pamphlet that there is no asbestos in Baby Powder).]

47.     J&J knowingly used inadequate methods to test its talc's asbestos content. [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. X thereto (J4-1 method was not "accurate, reliable and practical."); Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at Exh. Y thereto, p. 2, ¶ 6 (TM-7024 method specified that detection of **five or more** asbestiform minerals of one variety in an analysis constitutes a **quantifiable** level of detection.).]

48.     Thus, despite J&J's statements that their talc never contained asbestos, there is extensive documentary evidence from J&J's files, prior to Mr. Valadez's birth, showing asbestos and asbestiform fibers in their product. [Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at at ¶¶ 16-39 and exhibits cited therein.]

49.     Neither Debtor, J&J, nor the Retailers ever warned Mr. Valadez or his mother that Johnson's Baby Powder contained carcinogenic asbestos. [Valadez Decl., Exh. 24 to Satterley

Decl. at ¶ 6; Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 7.] Mr. Valadez or Ms. Camacho would have never used Johnson's Baby Powder if Non-Debtors warned them of that product's asbestos content and related health hazards. [*Id.*] They trusted the product to be safe. [*Id.*]

### C.    Mr. Valadez Was Exposed to Asbestos From Johnson's Baby Powder at Levels Well Above Background or Ambient Levels of Airborne Asbestos.

50.    Since birth on September 23, 1998, Mr. Valadez had virtually lifelong, daily exposures to Johnson's Baby Powder talc. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶¶ 4-5; Camacho Decl., Exh. 25 to Satterley Decl. at ¶¶ 3-6.] Indeed, a particle analysis of Mr. Valadez's wet tissue revealed the presence of talc particles and mica. [Dr. Dodson Decl., Exh. 15 to Satterley Decl. at ¶¶ 14-15.] Such minerals are present in Johnson's Baby Powder. [*Id.* at ¶¶ 13-15; Dr. Egilman PowerPoint, Exh. 4 to Satterley Decl.]

51.    When Mr. Valadez was a baby, his mother, Anna Camacho, regularly used a lot of Johnson's Baby Powder talc on him every day, multiple times each day, including during diaper changes, after baths, to treat or prevent diaper rash, and whenever it was needed. [Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 3.] Ms. Camacho packed the baby powder throughout Mr. Valadez's body, including on his private areas, arms, neck, forehead, armpits, and chest. [*Id.*] She applied the powder either directly from the bottle or with her hands. [*Id.*] Ms. Camacho also saw other family members apply Johnson's Baby Powder on Mr. Valadez while he was a baby. [*Id.*]

52.    Even after Mr. Valadez was no longer wearing diapers, Ms. Camacho continued using Johnson's Baby Powder talc on him throughout his childhood. [Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 4.] She applied that product in the same way and in the same areas as described above. [*Id.*] In addition, Ms. Camacho applied Johnson's Baby Powder on her son's feet and in between his toes, as well as inside his shoes. [*Id.*]

53.    Mr. Valadez began using Johnson's Baby Powder talc on himself when he was
around 13 years old and continued using it for several years thereafter. [Valadez Decl., Exh. 24
to Satterley Decl. at ¶ 5.] He used a lot of Johnson's Baby Powder talc throughout his body,
including on his chest, armpits, private areas, back, and neck. [*Id.*] Ms. Camacho likewise knows
that her son used Johnson's Baby Powder as a teenager because she saw remnants of baby
powder on his clothes and armpits. [Camacho Decl., Exh. 25 to Satterley Decl. at
¶ 5.] Mr. Valadez used Johnson's Baby Powder talc every day, multiple times each day,
including after showers, before going out, or whenever he need to freshen up. [Valadez Decl.,
Exh. 24 to Satterley Decl.at ¶ 5.] He applied that product either directly from the bottle or with
his                                                                                                                          hands.
It took                                                                                                                  at least
a                                                                                                                            couple
of



minutes for him to apply the powder. [*Id.*] Using Johnson's Baby Powder talc in the manner
described above always generated visible dust, which Mr. Valadez breathed. [*Id.*; Camacho
Decl., Exh. 25 to Satterley Decl. at ¶ 6.]

54.    Ms. Camacho bought Johnson's Baby Powder that was used on or by
Mr. Valadez. [Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 7.] Multiple bottles of Johnson's
Baby Powder were present in the family home. [*Id.*] Ms. Camacho bought a bottle of Johnson's
Baby Powder every two weeks because the family used it frequently. [*Id.*] She bought Johnson's
Baby Powder from the Retailers. [*Id.*] She and Mr. Valadez trusted Johnson's Baby Powder. [*Id.*;

Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 5.] Family photographs show that Johnson's Baby

Powder was present throughout the family home at various stages of Mr. Valadez's life:

55.     Dr. Longo explains that Mr. Valadez was exposed to asbestos from Johnson's

Baby Powder at levels that were substantial and well above any background or ambient levels of

airborne amphibole asbestos. [Dr. Longo Decl., Exh. 26 to Satterley Decl. at ¶¶ 25, 27-28, and

Exh. E thereto.]

56.     J&J admits that a hypothetical exposure from an adult's use of Johnson's Baby

Powder is 4.5 fibers per cubic centimeter of air, which is about 90,000 times above background.

[Satterley 5/24/23 Decl., Exh. 23 to Satterley Decl. at Exh. D, 4784:18-4786:7; Satterley 5/24/23

Decl., Exh. 23 to Satterley Decl. at Exh. E, 8.]

57.     Mr. Valadez had no other source of asbestos exposure other than from Johnson's

Baby Powder. Both Mr. Valadez and Ms. Camacho attest that they do not recall any

circumstance in which they would have been in or around any dusty environments other than

through my use of Johnson's Baby Powder. [Valadez Decl., Exh. 24 to Satterley Decl. at ¶ 7;

Camacho Decl., Exh. 25 to Satterley Decl. at ¶ 9.] For most of Mr. Valadez's life, Ms. Camacho



was a stay-at-home mother who raised and cared for her two sons. [*Id.*] In 2007, Ms. Camacho

did yard duty and office work at a school. [*Id.*] She presently works an office job at a cemetery.

[*Id.*] Mr. Valadez's father, Michael Valadez, died when Mr. Valadez was four years old and did

not work for pay because he was receiving aid from a federal assistance program for families

with dependent children. [*Id.*] Mr. Valadez never interacted with his biological father. [*Id.*] And

Ms. Camacho's current husband is a residential gardener who mows lawns and does landscaping.

[*Id.*] Prior to his disease, Mr. Valadez was a customer service representative at Home Depot and

Target and did no dusty work. [*Id.*] Neither Mr. Valadez nor his mother ever saw any dust on

their work clothes. [*Id.*] Nor did they see dust on the clothes of Mr. Valadez's biological or

stepfather. [*Id.*] Mr. Valadez's family never lived in or near any industrial areas or dust-

generating facilities. [*Id.*]

58.     Mr. Valadez's mesothelioma was not caused by any genetic defect. On March 15,

2022, Mr. Valadez underwent genetic testing to detect potentially clinically actionable gene

fusion events in cancer. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 8.] Several genes were

tested by Next Generation Sequencing, including ALK. [*Id.*] Mr. Valadez had no fusions

detected, including ALK. [*Id.*] J&J in the *Prudencio* case argued that ALK is a genetic cause of

mesothelioma. [5/24/22 Satterley Decl., Exh. 23 to Satterley Decl. at ¶ 40.] The jury in

*Prudencio* rejected J&J's genetic defense. [*Id.*]

    **D.**    **Mr. Valadez's Exposure to Asbestiform Fibers from Johnson's Baby Powder Increased His Risk of Developing Pericardial Mesothelioma.**

59.     Mr. Valadez's treating oncologist, Dr. Mohana Roy, took his social history.

[Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 9.] Dr. Roy noted that Mr. Valadez's mother

"reports using large amounts of baby powder (Johnson and Johnson) in [Mr. Valadez's]

childhood." [*Id.*.] Dr. Roy also stated that there are "no other exposures to hair salon products,

chemicals in labs," and "no clear asbestos exposure" from attending school "in an old building." [*Id.*]

60.     J&J admits internally that Mr. Valadez's "[m]esothelioma [is] known to be exclusively caused by asbestos." [5/24/22 Satterley Decl., Exh. 23 to Satterley Decl. at Exh. C, 17.]

61.     J&J admits that there is no safe level of asbestos exposure. [5/24/22 Satterley Decl., Exh. 23 to Satterley Decl. at Exh. D, 5436:2-24.]

62.     Dr. Felsher also took Mr. Valadez's social history and documented how Mr. Valadez's frequent use of Johnson's Baby Powder generated visible dust. [Dr. Felsher Decl., Exh. 28 to Satterley Decl. at ¶ 6.]

63.     Based on the factual assumption regarding the asbestos content of Johnson's Baby Powder, it is Dr. Backhus', Dr. Roy's, and Dr. Felsher's opinion, to a reasonable degree of scientific and medical certainty, that it is more likely than not that Mr. Valadez's exposure to asbestos stemming from Johnson's Baby Powder increased his risk of developing mesothelioma, and that asbestos was the cause of his pericardial mesothelioma. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 17; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 18; Dr. Felsher Decl., Exh. 28 to Satterley Decl. at ¶ 9.]

64.     Dr. Ronald Dodson is an expert in electron microscopy and cell biology. [Dr. Dodson Decl., Exh. 29 to Satterley Decl. at ¶¶ 2-4 and Exh. A thereto.] He has documented the presence of asbestos and asbestiform/fibrous talc in individuals with mesothelioma. [*Id.* at ¶ 14.] Dr. Dodson has opined that exposure to such structures was a cause of each individual's mesothelioma. [*Id.*] Based on Dr. Dodson's expertise, the scientific literature, the results of tissue-digestion analyses involving other talc-exposed individuals, documents he has reviewed

regarding Johnson's Baby Powder talc, and the attestations of Mr. Valadez and his mother, it is

Dr. Dodson's opinion, to a reasonable degree of scientific certainty, that Mr. Valadez's exposure

to asbestos and asbestiform/fibrous talc in Johnson's Baby Powder is the cause of his

mesothelioma. [*Id.* at ¶ 18.]

**VI.     The Automatic Stay and Any Potential Preliminary Injunction Prejudices
         Mr. Valadez.**

      **A.     But for the court-ordered stays, Mr. Valadez would be proceeding to trial
         against Debtor, J&J, and Retailers within two weeks.**

65.     Since this Court's February 17, 2023, order in the 2021 Bankruptcy case,

Mr. Valadez, Debtor, J&J, and Retailers had been preparing for trial to begin on April 17, 2023.

The parties and the State Court had been taking all action necessary to ensure that trial could

begin timely and without continuance. [Satterley Decl. at ¶¶ 36-38.]

66.     Mr. Valadez's damages and harm are very significant. Robert Johnson is a

forensic economist with nearly 35 years of experience. [Johnson Decl., Exh. 30 to Satterley Decl.

at ¶¶ 2-5 and Exh. A thereto.] As detailed in his Economic Impact Report, Mr. Johnson has

calculated the present cash value of Mr. Valadez's economic loss using generally accepted

statistical techniques and econometric methods of analysis. [*Id.* at ¶ 6 and Exh. B thereto.]

Mr. Johnson opines that Mr. Valadez will suffer economic damages of nearly $3.7 million as a

result of his injury. [*Id.*] Specifically, Mr. Valadez will suffer (i) in excess over $1.9 million in

lost expected income, (ii) over $375,000 lost in Social Security income, and (iii) losses of over

$1.38 million in household services income. [*Id.*] Medical bills will be in the hundreds of

thousands of dollars, if not in excess of $1 million.

67.     But for his illness, Mr. Valadez had a life expectancy of another 55 years.

[Judicial Council Of California Civil Jury Instruction, Table A Life Expectancy Table – Male.]

68.     There is a high likelihood that Mr. Valadez will die before he has an opportunity to participate in his case and see its resolution. [Dr. Roy Decl., Exh. 22 to Satterley Decl. at ¶ 17; Satterley 5/24/22 Decl., Exh. 23 to Satterley Decl. at ¶ 12; Dr. Backhus Decl., Exh. 27 to Satterley Decl. at ¶ 18.] If the automatic stay and TRO are lifted, then Mr. Valadez may continue prosecuting his case and promptly begin trial after April 17, 2023, in State Court pursuant to California Code of Civil Procedure section 36(d). [Trial Setting Order, Exh. 7 to Satterley Decl.; Order Granting Trial Preference, Exh. 19 to Satterley Decl.] Mr. Valadez's case is begin handled by a department dedicated to asbestos cases, and tried before a judge with experience in asbestos trials. [Satterley Decl. at ¶ 35.]

69.     Thus, the automatic stay and TRO have  precluded Mr. Valadez from fully prosecuting his viable and valuable asbestos injury case against Debtor, J&J, and the Retailers.

### B.     Non-Debtors refuse to negotiate in good faith to promptly resolve Mr. Valadez's claims.

70.     Since Mr. Valadez's diagnosis, Movant's counsel, Joseph Satterley, invited Non-Debtors to negotiate in good faith to promptly resolve Mr. Valadez's claims against them. [Satterley Decl. at ¶ 7 and Exh. A thereto.] In his email, Mr. Satterley attached a letter, with supporting exhibits, that detailed Mr. Valadez's exposure to Johnson's Baby Powder, his claims against Non-Debtors, the course of his disease, and damages. [*Id.*] Opposing counsel was told that Mr. Valadez is interested in an efficient and fair resolution for his terminal pericardial mesothelioma. [*Id.*] As an alternative to resolution, Non-Debtors were asked whether they are amenable to lifting the Preliminary Injunction to allow Mr. Valadez to collect evidence. [*Id.*] Opposing counsel did not respond to Mr. Satterley's correspondence. [*Id.*]

71.     On May 10, 2022, Movant's counsel sent a follow-up email and attached an Economic Impact Report showing that Mr. Valadez's economic loss (not including medical bills) is over $3.6 million. [Satterley Decl. at ¶ 8 and Exh. B thereto.]

72.     Non-Debtors never responded to Movant about resolving his case or stipulating that he may file suit against them in the Trial Court despite the Preliminary Injunction. [Satterley Decl. at ¶ 9.] This is not surprising. Movant's counsel, Mr. Satterley, has filed and tried cases against J&J, including six that went to verdict. [*Id.* at ¶ 4.] In his experience, J&J, despite its talking points, is not interested in efficient resolution of mesothelioma claims. [*Id.* at ¶ 9.] J&J's intransigence in settling cases for their fair value is the reason that Movant's counsel has tried many cases against J&J, all of which eventually went to verdict. [*Id.*] For those six cases from 2018, 2019, 2020, and 2021, that eventually went to verdict, J&J refused to discuss or negotiate any of them prior to going to trial. [*Id.*] J&J's position is that it will not negotiate Kazan Law mesothelioma cases until a stay is lifted or all ovarian cases are settled. [*Id.*]

**VII.    Talc Litigation Has No Adverse Effect on J&J's Financial Condition.**

73.     Mr. Johnson also assessed, in economic terms, J&J's financial condition. [Johnson Decl., Exh. 30 to Satterley Decl. at ¶¶ 7-12.] The financial condition encompasses the areas of financial health, wealth, and economic status. [*Id.*] Mr. Johnson based his opinions on his experience, training, and knowledge as a forensic economist, as well as his review and reliance upon: (i) J&J's 10K forms from 2018 to 2021; (ii) J&J's Proxy Statement from 2022; (iii) J&J's 10-Q Report, dated April 3, 2022; and (iv) market capitalization data. [*Id.*]

74.     In 2021, J&J had over $93 billion in sales (with average sales per day of over $257 million), $20.9 billion in net earnings, and $10.5 billion in cash on hand. [Johnson Decl., Exh. 30 to Satterley Decl. at ¶¶ 8-9.] Since 2019, J&J's net worth has increased. [*Id.*] As of May 20, 2022, the date Mr. Johnson signed his declaration, J&J's net worth was $74.7 billion. [*Id.*]

75.     J&J is so financially sound, despite the bear market, that it paid its shareholders $11 billion in dividends in 2021 and paid approximately $12 billion in 2022. [Johnson Decl., Exh. 30 to Satterley Decl. at ¶ 10; Satterley Decl. at ¶ 39.] 2022 was the 61st consecutive year that J&J has increased dividends paid to its shareholders. [*Id.*]

76.     As of May 20, 2022, J&J's stock price is over $177 per share, up 9% since February 25, 2022. [Johnson Decl., Exh. 30 to Satterley Decl. at ¶ 11.] J&J's market capitalization in May 2022 was over $464.8 billion. [*Id.*] This is nearly $110 billion higher than J&J's market capitalization of about $355 billion in the beginning of 2019. [*Id.*] Talc litigation has not affected J&J's market value. Indeed, that value has increased despite J&J paying a multi-billion verdict in *Ingham*. [*Id.*]

77.     Based on his analysis, it is Mr. Johnson's opinion that talc litigation has had no effect on J&J's market valuation and overall financial condition. [Johnson Decl., Exh. 30 to Satterley Decl. at ¶ 12.] Thus, it seems that the market has reacted very well to J&J's bankruptcy maneuver and has avoided the "negative headlines" of jury trials/jury verdicts in talc cases.

78.     Similarly, Debtor's bankruptcy refiling positively affected J&J's financial position. Within 30 minutes of Debtor's refiling, J&J stock price and market capitalization was up 3.2%--resulting in an approximate $13 billion value increase. [Satterley Decl. at ¶ 39.] This trend continued into next day's trading with an additional 1.3% increase, which resulted in a further $5 billion value increase. [*Id.*] In total, J&J's stock went up 4.5% with a market capitalization increase of $18 billion. [*Id.*] In contrast, during the same period, the S&P 500 dropped approximately 0.2%. [*Id.*] Having reaped the benefits, it seems that J&J is more than financially capable to pay talc claimants, like Mr. Valadez, and/or litigate talc claims.

## RELIEF REQUESTED

79.      By this Motion, Movant respectfully requests the entry of an Order lifting the

Automatic Stay, TRO, and anticipated Preliminary Injunction pursuant to Section 362(d)(1) to

permit Movant to begin trial in his personal-injury action in State Court against Debtor, J&J, and

the Retailers.

## BASIS FOR RELIEF

**I.      This Court Has Wide Discretion to Determine Whether to Lift a Stay for "Cause" Pursuant to Section 362(d)(1).**

80.      In relevant part, Section 362(d)(1) of the Bankruptcy Code provides that on

"request of a party in interest and after notice and a hearing, the court shall grant relief from the

stay provided under subsection (a) of this section, such as by terminating, annulling, modifying,

or conditioning such stay – (1) for cause, including the lack of adequate protection of an interest

in property of such party in interest . . ."

81.      "Cause" is a "broad and flexible concept," and a court is granted wide discretion

to determine whether to lift the automatic stay on that basis. *In re Mid-Atlantic Handling Sys.,*

*LLC*, 304 B.R. at 130.

82.      "It is well-settled that a basis for granting relief from the automatic stay for

'cause' exists when it is necessary to permit litigation to be concluded in another forum,

particularly if the non-bankruptcy suit involves multiple non-debtor parties or is ready for trial."

*In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. at 130. The legislative history to Section

362(d)(1) supports this conclusion: "[I]t will often be more appropriate to permit proceedings to

continue in their place of origin, when no great prejudice to the bankruptcy estate would result,

in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many

duties that may be handled elsewhere." S. Rep. No. 95-989 at 50 (1978), *reprinted in* 1978

U.S.C.C.A.N. 5787, 5836.

83.      In this regard, courts will look to the following twelve factors to determine

whether cause exists to lift the stay to continue litigation in another forum:

1.      Impact of the stay on the parties and the balance of the harms;

2.      Whether relief would result in a partial or complete resolution of the issues;

3.      Lack of any connection with or interference with the bankruptcy case;

4.      Whether the other proceeding involves the debtor as a fiduciary;

5.      Whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

6.      Whether the debtor's insurer has assumed full responsibility for defending it;

7.      Whether the action primarily involves third parties;

8.      Whether litigation in another forum would prejudice the interests of other creditors;

9.      Whether the judgment claim arising from the other action is subject to equitable subordination;

10.     Whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor;

11.     The interests of judicial economy and the expeditious and economical resolution of litigation; and

12.     Whether the parties are ready for trial in the other proceeding.

*In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. at 130; *see also In re Sonnax Indus.*, 907 F.2d

1280, 1286 (2d Cir. 1990) (utilizing same factors).

84.      Not all twelve factors will be present or relevant in each case, and a court need

not rely on any plurality of factors in deciding whether stay relief is warranted. *In re Mid-*

*Atlantic Handling Sys., LLC*, 304 B.R. at 130 (citing *In re Ice Cream Liquidation, Inc.*, 281 B.R.

154, 165 (Bankr. D.Conn. 2002)). Other legislative history indicates that the "facts of each request will determine whether relief is appropriate under the circumstances." H.R. R$^{ep}$. No. 595, 95th Cong., 2d Sess. 343-44.

## II. An Order Lifting the Automatic Stay, TRO, and anticipated Preliminary Injunction for "Cause" Pursuant to Section 362(d)(1) is Warranted.

85. On balance, several factors point towards granting Movant's motion for relief from the automatic stay, TRO, and any preliminary injunction.

86. Further, there is no need to stay the effectiveness of this Court's order for fourteen (14) days pursuant to FRBP 4001(a)(3). Paragraph (a)(3) was added to allow a debtor time to appeal and avoid the irreparable harm that may result from immediate enforcement. Here, where Movant's case still must be tried, no irreparable harm will result. The Movant must prosecute the lawsuit through to final judgment. Accordingly, no stay is needed to protect a party that decides to appeal. In this circumstance, cause exists to waive the fourteen (14) day stay of the effectiveness of the order of Fed. R. Bankr. P. 4001(a)(3).

### A. The Automatic Stay and TRO irreparably harm Movant, and has no adverse effect on Debtor, J&J, and the Retailers.

87. For several reasons, the automatic stay, TRO, and any preliminary injunction, on the one hand, irreparably harm Mr. Valadez while, on the other hand, has no adverse effect on J&J and the Retailers (collectively, "Non-Debtors") and Debtor.

88. First, the automatic stay and TRO deprive Mr. Valadez of his right to see his civil action tried during his lifetime and to have time to live after trial. Under the federal and California constitutions, trial by jury is an inviolate right. [U.S. Const. amend. VII; Cal. Const. art. I, § 16.] Mr. Valadez's decline or death prior to judgment affects his ability to testify and assist counsel, which may be critical to success, and impacts his ultimate recovery. *Looney,* 16 Cal.App.4th at 532, fn. 12.

89.     Second, Mr. Valadez's rapidly declining health and the doomed status of this case warrants relief from the automatic stay, TRO, and any anticipated Preliminary Injunction. The Third Circuit has already dismissed Debtor's previous 2021 Bankruptcy Case by finding no financial distress. Debtor seeks to convince this Court that its financial situation changed in mere minutes between the 2021 Bankruptcy Case dismissal and the present case filing—due to no fault of its own. More outrageously, the Third Circuit anticipated the mechanism of such newfound financial distress: divesting the Funding Agreement. Such divesture, as recognized by the Third Circuit, is subject to void. *In re LTL*, 2023 WL 2760479, *18, fn. 18. Even so, it may take several weeks or months for this action to be once again dismissed by this Court and the respective appellate court. This is time that Mr. Valadez does not have due to his terminal illness. Absent an order allowing Movant full relief from the automatic stay, TRO, and preliminary injunction, he will not be able to prosecute his case prior to his death.

90.     In contrast, the passage of time has no prejudicial effect on Debtor or Non-Debtors. Allowing Movant complete relief from the automatic stay, TRO, and any preliminary injunction does not affect Debtor's ability to pursue its re-organization plan, nor does it prevent Debtor from seeking appellate review of any decision by this Court.

91.     A "stay of indefinite duration in the absence of a pressing need is abuse of discretion." *Landis v. North Amer. Co.* (1936) 299 U.S. 247, 254-255. Stays that prevent Movant from fully prosecuting his personal-injury action create irreparable injury because there is a real risk of Movant passing before the conclusion of his trial. Because the automatic stay and preliminary injunction severely harm Movant, this factor weighs in favor of lifting the automatic stay and TRO.

**B.**    **The relief requested would result in a complete resolution of Movant's talc-related claims.**

92.    Here, permitting Movant to litigate his State Court personal-injury action fully

will result in a complete resolution of the issue of Non-Debtors' and Debtor's talc-related

liability. Movant alleges that his mesothelioma stems from his substantial exposure to

asbestiform fibers from Johnson's Baby Powder talc and that those entities are in that product's

chain of distribution. Under California law, parties in a defective product's chain of distribution

may be held jointly and severally liable for the injured plaintiff's full damages without a showing

of negligence. *Wimberly,* 56 Cal.App.4th at 633. Further, California law is settled that a "strictly

liable defendant cannot reduce or eliminate its responsibility to plaintiff for all injuries caused by

a defective product by shifting blame to other parties in the product's chain of distribution who

are ostensibly more at "fault," and therefore may be negligent as well as strictly liable." [*Id.*]

Hence, allowing Movant to prosecute his viable claims against Debtor and Non-Debtors would

result in the complete resolution of the talc-related issues in his personal-injury case. This factor

weighs in Movant's favor.

**C.**    **The relief requested would not interfere with the bankruptcy case.**

93.    Lack of connection with or interference with the bankruptcy case is another factor

a court considers to determine whether cause exists to lift the stay. *In re Mid-Atlantic*, 304 B.R.

at 130.

94.    Movant's personal injury action was already proceeding to trial during the

pendency of Debtor's 2021 Bankruptcy Case, without interference. There is no reason to believe

that resuming its trial track would cause any new interference. In addition, as discussed above,

Debtor's bankruptcy refiling is in violation of the Third Circuit's direction. The trial in the

personal injury action will not interfere with this Court, or any appellate court's review, of such

violation. Indeed, Movant's State Court action cannot interfere in a bankruptcy case that will again be dismissed. This factor weighs in Movant's favor.

### D. The Trial Court has the necessary expertise to hear Movant's claims against the non-debtor entities.

95.    Another factor a court considers in whether a stay should be lifted is whether a specialized tribunal with the necessary expertise has been established to hear the cause of action. *In re Mid-Atlantic*, 304 B.R. at 130. Here, it is undisputed that the State Court has the necessary expertise to handle Movant's underlying personal-injury lawsuit. Therefore, this factor weighs in favor of lifting the automatic stay and any preliminary injunction.

### E. Permitting the state court action to commence and proceed would not prejudice the interests of other creditors.

96.    Movant's underlying personal-injury lawsuit in California would not prejudice Debtor's creditors. Movant must try his claims against Non-Debtors in State Court. Resolution of those talc-related issues must be addressed and damages, if any, fixed so that the extent of creditors' claims are known. *See In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. at 130-131 (allowing the plaintiff to proceed with his claims against the debtor in state court because it would not prejudice the debtor's creditors).

### F. Granting Movant relief from the Automatic Stay and TRO is in the interests of judicial economy and the expeditious and economical resolution of the litigation.

97.    Granting Movant further relief from the automatic stay, TRO, and any preliminary injunction is in the interests of judicial economy. Movant's exposure to asbestos and asbestiform fibers stems from his use of Johnson's Baby Powder. In light of the Third Circuit's decision, allowing Movant to proceed against Non-Debtors and Debtor will avoid the need for multiple and duplicative trials. This would lessen the strain on already scarce judicial resources and any undue expenses Movant may incur as a result of multiple trials

98.     The relief requested would also result in prompt and efficient resolution of the litigation. Indeed, Movant's claims against Non-Debtors and Debtor pertain to his exposure to asbestiform fibers from Johnson's Baby Powder. Given Movant's rapidly declining health, a trial against all named defendants must start within two weeks. [Cal. Code Civ. Proc. § 36, subds. (d) and (e).]

**G.     Promptly lifting the automatic stay and TRO allows Movant, Debtor, and Non-Debtors to promptly prepare for trial.**

99.     Lifting the stay permits Movant to fully prosecute and expeditiously try his State Court action against all named defendants, which this Court intended when it granted this same relief in the 2021 Bankruptcy Case. Given that all parties had already been preparing for trial to begin on April 17, 2023, Non-Debtors and Debtor have ample time to finalize preparations should the stay be immediately lifted.

**III.   The Debtor Has Not Established That Any Extension of the Stay Under Section 362(a) to Non-Debtors is Warranted.**

**A.     Section 362(a) Was Enacted to Give a Reprieve to the Debtor**

100.    Section 362(a) of the Bankruptcy Code provides in pertinent part:

[A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—
>    (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*\*\*

>    (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

101.    The legislative history underlying Congress's enactment of an "automatic stay" upon a debtor's bankruptcy filing is well known and oft observed. Congress created the stay as

"'one of the fundamental debtor protections provided by the bankruptcy laws,' designed to relieve 'the financial pressures that drove [debtors] into bankruptcy.'" *Eastern Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (quoting H.R. Rep. No. 95–595, at 340 (1977)). As the Third Circuit Court of Appeals has observed:

> The automatic stay imposed by the Bankruptcy Code has a 'twofold' purpose:(1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance 'to attempt a repayment or reorganization plan or simply be relieved of thefinancial pressures that drove him [or her] into bankruptcy;' and (2) to protect'creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (first quoting *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995); and then quoting *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)).

102.    In other words, "[t]he stay gives a debtor a breathing spell from creditors by stopping all collection efforts and all foreclosure actions." *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509-510 (3d Cir. 1997). (citing *Maritime Elec. Co.*, 959 F.2d at 1204 ).[2] Additionally, it "serves the debtor's interests by protecting the estate from dismemberment," while "benefit[ting] creditors as a group by preventing individual creditors from pursuing their own interests to the detriment of the others." *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021).[3]

---

[2] See also *In re Johns-Manville Corp.*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983) ("[T]he automatic stay is designed . . . 'to prevent the dissipation or diminution of the bankrupt's assets during the pendency of" [the bankruptcy proceeding] . . . . 'Without it, certain creditors would be able to pursue their own remedies against the debtor's property.'" (quoting *Paden v. Union for Experimenting Colleges and Universities*, 7 B.R. 289 (N.D. Ill. 1980); H.R. Rep. No. 95-595, pp. 5787, 6297) (emphasis original)).

[3] See also, e.g., *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982) (noting that stay is intended to "prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.").

103.    Given its purpose, courts universally acknowledge that "the stay is a shield, not a sword." *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting, that "the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors," and concluding that a debtor's use of the automatic stay to gain a litigation advantage justified lifting the automatic stay afforded by § 362(a)); *In re Briarpatch Film Corp.*, 281 B.R. 820, 834 (Bankr. S.D.N.Y. 2002) ("It has often been stated that the automatic stay is a shield, not a sword.").

104.    Because the automatic stay's protections are so broad, its applications are expressly limited. On its face, the stay applies automatically only to the debtor and the debtor's property. "Although the scope of the automatic stay is broad, the clear language of section 362(a)[1] stays actions only against a 'debtor.'" *McCartney*, 106 F.3d at 509–10 (quoting *Maritime Elec. Co.*, 959 F.2d at 1204). "As a consequence, '[i]t is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co- obligors, or others with a similar legal or factual nexus to the . . . debtor.'" *Id.* (quotations and citations omitted)).[4] Similarly, by its plain words, § 362(a)(3) protects only property in which a "debtor" had an interest as of the commencement of the bankruptcy case — whether the debtor's property was in the possession of the debtor or a third party. See 11 U.S.C. § 362(a)(3) (protecting estate property); § 541(a)(1) (defining estate property to include all pre-petition interests of the debtor "wherever located and by whomever held"); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876

---

[4] See also *Maritime Elec. Co.*, 959 F.2d at 1205 ("[T]he automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."); *Jackson v. Trump Ent. Resorts, Inc.*, No. CV 13-1605 (JHR/JS), 2015 WL 13637411, at *2 (D.N.J. Feb. 11, 2015) ("Section 362(a)(1) only stays actions against the debtor and may not be invoked by solvent codefendants, even if they are in a similar legal or factual nexus with the debtor." (citing *Travelogue Hotels, Inc. v. Patel*, C.A. No. 13-03719 (WHW), 2013 WL 4537906, at *5 (D.N.J. Aug. 27, 2013))).

(1986) ("Subsection (a)(3) directs stays of any action, whether against the debtor or third-parties, to obtain possession or to exercise control over property of the debtor.").

**B.    The Stay Should Not Be Extended Here Under § 362(a)(1)**

**1.    Standards for extending the stay.**

105.    Courts have extended the reach of the statute's stay to non-debtor parties in limited circumstances, where doing so would effectuate the language and purpose of § 362(a) — namely, to protect the debtor and its assets from creditors while it attempts to reorganize. *See, e.g., In re Uni-Marts, LLC*, 399 B.R. 400, 416 (Bankr. D. Del. 2009) ("The broader rule here is that a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's reorganization.") (quoting *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y.1999)). The seminal case in that regard is *Robins*, in which the Fourth Circuit Court of Appeals held that the stay may be extended to non- debtors in "unusual circumstances" where failing to do so would "defeat" the stay's "very purpose and intent." 788 F.2d at 999. The Fourth Circuit elaborated: "This 'unusual' situation, it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id*. As an example of such a "situation," the court cited "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id*. As the court explained, actions against such non-debtors "are so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest." *Id*. at 1001.

106.    The Third Circuit Court of Appeals has adopted *Robins*' "identity of interest" rationale for extending § 362(a)(1)'s stay to non-debtors. See, e.g., *McCartney*, 106 F.3d at 509 ("[C]ourts have found 'unusual circumstances' where 'there is such identity between the debtor

and the third-party defendant that the debtor may be said to be the real party defendant . . . .'"

(quoting *Robins*, 788 F.2d at 999)). Thus, in determining whether to extend the stay afforded by

§ 362(a)(1), the Third Circuit and other courts look to whether the action against the non-debtor

will either (i) have a substantial and immediate economic impact on a debtor's property or estate,

or (ii) adversely affect the debtor's management. See *Uni-Marts, LLC*, 399 B.R. at 416 ("The

threatened harm may be to needed debtor funds (e.g., when non-debtors are entitled to

indemnification) or personnel (e.g., when debtor needs the services of non-debtors facing

crushing litigation)."); *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d. Cir.

2003) (asking whether the action to be stayed will have an "immediate adverse economic

consequence for the debtor's estate").

107.    The "unusual circumstances" exception is intended to be narrow, and is reserved

only for "extreme" circumstances. See, e.g., *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004

WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended

to situations involving nondebtors, courts are careful to reserve such power to the most extreme

and 'unusual circumstances.'"); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719,

at *4 (Bankr. E.D. Pa. Apr. 3, 2000) (referring to Robins "as a narrow exception to the

prohibition against extending the protection of the automatic stay"). To extend the stay otherwise

would present great risk to the rights of the non-debtor's creditors. *See, e.g., Bradberry v.

Carrier Corp.*, 86 So. 3d 973, 983 (Ala. 2011) ("Extending the stay to protect solvent co-

defendants would not advance either of the purposes underlying the automatic stay.").

108.    Contrary to the Debtor's position that the application of § 362(a)(1) applies "of its

own force," without the need for any "extension" (Mem. at 40), courts within and outside of this

Circuit, in light of §362(a)(1)'s plain words, have justified the application of the stay to non-

debtors as an exercise of the Court's equitable powers granted under § 105(a). *See, e.g., Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65– 66 (2d Cir. 1986) (construing stay extension as an exercise of § 105 authority, and stating that it "cannot extend to efforts made in bad faith by non-bankrupt co-defendants in order to escape from . . . liability").

109.    As such, the relief sought by the Debtor here should be committed to the discretion of the Court, to be exercised only upon a clear and convincing showing of an "extraordinary set of circumstances." *Millard*, 266 B.R. at 44 ("Extension of the Automatic Stay to non-bankrupt defendants is a matter of discretion"); see *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *8 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("[E]xtensions of the stay to protect non-debtor parties are the exception, not the rule, and are generally not favored. Thus, the movant must show by 'clear and convincing evidence' that extension of the stay is warranted.") (citing Millard., 266 B.R. 42)); *In re Univ. Med. Ctr.*, 82 B.R. 754, 757 (Bankr. E.D. Pa. 1988) (noting that "invocation of § 105(a) must be reserved for a truly 'extraordinary set of circumstances'"). As set forth below, the Debtor has not come close to meeting this burden.

## 2.    This Court lacks jurisdiction to enjoin Movant's claims against Non-Debtors under section 105.

110.    Section 105 authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But it "does not provide an independent source of federal subject matter jurisdiction."

*Combustion Eng'g*, 391 F.3d at 224-25. The first question, then, is whether this Court has jurisdiction to enjoin claims against non-debtors.

111.    Under the Third Circuit's precedents, this Court does not. Congress has granted bankruptcy courts jurisdiction over only two kinds of proceedings: (1) core proceedings and (2) proceedings "related to" core proceedings. 28 U.S.C. § 1334(b); *id*. § 157(a). The enjoined claims against non-debtors are neither.

112.    Debtor contends that "jurisdiction over the adversary proceeding in [a] Chapter 11 case is sufficient to provide [the Court] with a basis for expanding the § 105(a) injunction." *W.R. Grace*, 591 F.3d at 174.The Third Circuit rejected that argument in *W.R. Grace*. The question isn't whether the adversary proceeding is a core proceeding, but whether the claims sought to be enjoined are core proceedings. *Id*. Otherwise, "a bankruptcy court would have power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding." *Id*. "The existence of a bankruptcy proceeding itself," however, is not "an all-purpose grant of jurisdiction." *id*.; *see Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006).

113.    That leaves related-to jurisdiction, which encompasses "suits between third parties" only if they "have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995). Simply put: "bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor." *Id*. at 308 n.6.

114.    Talc claims against non-debtors for their own liability do not affect Debtor's estate. Although Debtor points to J&J's agreement to indemnify a previous subsidiary, the agreement covers only liabilities "on the books or records of Johnson & Johnson" in 1979—not future liabilities. That is the only interpretation that gives this language meaning. See *Wash.*

40

*Constr. Co. v. Spinella*, 8 N.J. 212, 217-18 (1951). And even if it were ambiguous, ambiguity is construed against indemnification. Thus, Debtor has no legal obligation to indemnify J&J. Its attempt to concede an obligation it does not have is further evidence of bad faith.

115.    As for the hundreds of other non-debtors, Debtordidn't even try to show that an agreement exists as to each of them. So it has not overcome the "presum[ption] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

116.    Even if it were plausible that Debtor might have indemnity obligations to non-debtors, jurisdiction would still be lacking. This Court has "rejected 'related to' jurisdiction over third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim did not directly result in liability for the debtor." *Combustion Eng'g*, 391 F.3d at 231; *see W.R. Grace*, 591 F.3d at 171-73. It has done so even when non-debtors might later have indemnity claims against the debtor. *Id*. Whenever hypothetical "indemnification claims against" the debtor "would require the intervention of another lawsuit to affect the bankruptcy estate," the claims "cannot provide a basis for 'related to' jurisdiction" because their resolution, by itself, does not affect the estate. *Combustion Eng'g*, 391 F.3d at 232. As a result, the Third Circuit's "precedent dictates that a bankruptcy court lacks subject matter jurisdiction over a third-party action if the only way in which that third-party action could have an impact on the debtor's estate is through the intervention of yet another lawsuit." *W.R. Grace*, 591 F.3d at 173.

117.    This precedent controls here. The enjoined actions seek to hold non-debtors liable as joint tortfeasors, so any judgment wouldn't bind Debtor. Those actions might later give rise to

an indemnification claim asserted against Debtor by the non-debtor for any judgment it paid, but that possibility isn't enough under the Third Circuit.

118.    Moreover, contingent indemnification claims are disallowed in bankruptcy, so they cannot affect the estate. 11 U.S.C. § 502(e)(1)(B). And even if a non-debtors were eventually to pay a judgment, it would still have no effect on the estate. In that scenario, the non-debtor would have a right to take over the plaintiff's separate claim against Debtor via subrogation. *Id*. § 509(a). But swapping one claimant for another has no effect on the estate, much less a "direct and substantial adverse effect." *Celotex*, 514 U.S. at 310; see Levitin, Bankruptcy Markets: Making Sense of Bankruptcy Claims Trading, 4 Brook. J. Corp. Fin. & Com. L. 64, 74 (2010) (discussing market for claims trading).

### 3.    Denying extension of the stay would have no impact on the Debtor's estate.

119.    Jurisdiction aside, an extension of the stay is improper. Before a court may grant a preliminary injunction under section 105, it must assure itself that the debtor has established, "by a clear showing," *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018), a right to this "extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). The Debtor bears the burden of showing that the extension of the stay to non-debtors would have actual and substantial consequences to the Debtor's estate. See *FPSDA I*, 2012 WL 6681794, at *8 ("It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization, because it is always the case that a lawsuit against principals of the Debtor could have some effect on the reorganization. Rather, and in keeping with the principle that extending the stay to non-debtors is extraordinary relief, the party seeking extension of the stay must put forth real evidence demonstrating an actual impact upon, or threat to, the reorganization

efforts if the stay is not extended.").[5] Here, significantly, Debtor has shown no competent

evidence of an indemnification agreement between Debtor and Non-Debtors.

120.    Even if Debtor did have competent evidence, case law makes clear that the

existence of an indemnification from the debtor to a non- debtor (the Debtor's principal

argument for extending the stay under § 362(a)(1)) is an insufficient ground for extension of the

automatic stay. Rather, for the stay to apply, the debtor has the burden to show that the

indemnification obligation threatens the debtor's assets or reorganization. See, e.g., *Uni-Marts*,

399 B.R. at 416 (concluding that indemnification obligation did not constitute "unusual

circumstances" where it did not threaten reorganization); *Millard*, 266 B.R. at 45 ("Ultimately,

the decisive issue is consideration of the same policy underlying the Automatic Stay — whether

extension of the stay is necessary to foster the reorganization process."); *All Seasons Resorts*, 79

B.R. at 904 ("Although there is a closeness between debtor and co-defendants by reason of their

officer and agent status and their right to indemnification . . . the magnitude of the harm to debtor

if no stay is in force does not approach the scope of the potential injuries besetting the debtors in

Robins").

121.    Debtor cannot meet its burden. The previous and new Funding Agreements place

any potential liability from Non-Debtors onto the shoulders of J&J. Per Debtor's contention, this

means that Debtor's estate would be unaffected by any judgment against Non-Debtors—only

J&J and Holdco would be affected. If the contrast were true, then Debtor's estate would include

the value of J&J—and, therefore, by the Third Circuit's recent opinion, Debtor would not be in

---

[5] See also *In re First Cent. Fin. Corp*., 238 B.R. 9, 19 (Bankr. E.D.N.Y. 1999) (concluding that, absent "massive depletion of estate assets" and distraction to management, no basis to extend the stay existed); *Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al.* (*In re Phar-Mor, Inc. Sec. Litig.*), 164 B.R. 903, 906 (W.D. Pa. 1994) (declining to extend the stay where the action would not will not "materially affect or diminish the Debtor's claims.").

financial distress. By Debtor's own argument, either Non-Debtors are not entitled to the benefits

of the stay or this bankruptcy must be dismissed.

122.    J&J cannot have it both ways. Either the Funding Agreement is what they claim it

is, and such indemnification obligations merely round-trip by virtue of the Funding Agreement.

Or it is not, and such indemnification obligations instead round-trip by virtue of the avoidance of

the fraudulent transfers at the heart of the Texas Two-Step and the creation of the Debtor. In

either case, there is no ultimate harm to the Debtor's estate, and an extension of the stay to J&J

and the "Protected Parties" would serve no purpose other than to frustrate non-debtors'

legitimate claims. See *Bradberry*, 86 So. 3d at 983 ("It would make no sense to extend the

automatic stay protections to solvent co-defendants. They don't need it, and at the same time it

would work a hardship on plaintiffs, by giving an unwarranted immunity from suit to solvent co-

defendants." (citations and quotations omitted)). For this reason, too, the Debtor's request to

apply to J&J and hundreds of its affiliates, insurers and retailers should be rejected.

> **4.    The stay cannot be extended to joint tortfeasors with direct liability to Movant.**

123.    As courts often observe, "the Code was not intended to stay actions . . . where the

nondebtor's liability rests upon his own breach of duty" or to "trample the rights of the Creditor-

Defendants to assert their independent and distinct claims against a non-bankrupt third party."

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 62

(W.D. Pa. 1994); accord *Combustion Eng'g*, 391 F.3d at 234 (holding injunctive relief could not

extend to "independent non-derivative claims against non-debtor third parties," because it

"would improperly extend bankruptcy relief to non-debtors" and "would jeopardize the interests

of future . . . claimants" against the non-debtors); *see Stanford v. Foamex L.P.*, 2009 WL

1033607, *2 (E.D. Pa. Apr. 15, 2009) (concluding "unusual circumstances" did not permit

automatic stay to extend to non-debtor entities because "plaintiff in this action alleges that each of the non-bankrupt defendants is independently liable").

124.    Thus, it is settled law that "joint tortfeasors" are not entitled to the benefit of the automatic stay upon a co-defendant's bankruptcy filing. *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124, 127-28 (4th Cir. 1983); Robins, 788 F.2d at 999 (opining, in cases where a separate party, even a co-defendant with a debtor in pending litigation, is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty . . . the automatic stay would clearly not extend to such non debtor"); *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (upholding denial of a stay to co-defendants after the Johns-Manville defendants filed for bankruptcy, explaining that the suits could proceed because "the Chapter 11 debtors are potential joint tortfeasors").

125.    Indeed, given the harms to alleged victims claiming tort injury are especially high, the grant of any to a joint tortfeasor must exceed a high bar. As stated by the Third Circuit in the Johns- Manville case:

> "the clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard. Moreover, we cannot ignore the fact that plaintiffs and crucial witnesses are dying, often from the very diseases that have led to these actions. We are not persuaded that the hardship imposed on defendants by proceeding totrial without Johns-Manville or our legitimate interest in judicial economy is sufficient to force these plaintiffs to forbear until the bankrupt defendants emerge from the reorganization proceedings. The defendants may be seriously inconvenienced by the resumption of the actions against them; under the standard announced in *Landis*, however, the balance of hardship weighs in favor of the injured plaintiffs."

*Johns-Manville Sales Corp*., 723 F.2d at 1076; see also *Austin v. Unarco Industries, Inc*., 705 F.2d 1, 5 (1st Cir. 1983) (denying discretionary stay because plaintiffs and crucial witnesses are

dying and "the damage to the plaintiff would be the financial hardship of being forced to wait for an undefined but potentially lengthy period before receiving the money to which she may be entitled"); *Williford*, 715 F.2d at 127-28 (holding, in denying extension of stay, that "[o]f particular significance in balancing the competing interests of the parties in the case at bar are the human aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy, which very well could be pending for a long period of time. A stay under such circumstances would work manifest injustice to the claimant."); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (determining discretionary stay was properly denied because "the requisite balancing of the competing interests involved in these cases weighs in favor of allowing the remaining actions to proceed. The realities of the hardship of a stay on the plaintiffs, many of whom allege that they are dying from asbestosis, is substantial and, in some instances, permanent. The grim reaper has called while judgment waits.").

126. Here, the record overwhelmingly establishes that the claims in the MDL and thousands of state court actions against J&J that are pending, or have been tried to judgment, are based on J&J's conduct and are, thus, direct. Indeed, as set forth above, juries have been required to, and have, found J&J liable for talcum powder product liability claims, separately and independently from Debtor, formerly known as Johnson & Johnson Consumer Inc.. No appellate court has reversed a judgment against J&J on the grounds that, as a matter of law, it does, or did, not have a legal duty to the plaintiff. To the contrary, in affirming, in substantial part, one of the largest personal injury awards in history, the appellate court in *Ingham* found J&J liable to the plaintiffs based on the evidence in the record, rejecting any notion that J&J's liability was based on derivative principles of alter ego or agency. Hence, even if the Debtor were the valid

successor to Old JJCI, J&J is nothing more than a mere joint tortfeasor that, given the devastating impact of a stay on those suing it for personal injuries, absent clearly and convincingly proven "unusual circumstances" (not shown here), is not entitled to application of the Debtor's stay.

### 5.    Debtor fails to establish entitlement to enjoin third-party litigation.

127.    Section 105 empowers bankruptcy courts to issue orders where "necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." *In re Jamo*, 283 F.3d 392, 403 (1st Cir. 2002). The power asserted here is especially sweeping. The Anti-Injunction Act requires clear congressional authorization before a federal court may enjoin state-court proceedings, 22 U.S.C. § 2283, and there is reason to doubt that section 105 authorizes bankruptcy judges to enjoin any courts. At a minimum, these principles require that Debtor make a particularly strong showing that the injunction is "necessary." 11 U.S.C. § 105(a). "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011).

128.    Debtor comes nowhere close to making the required showing. It does not establish any of the traditional equitable factors—let alone all of them, as the Third Circuit requires. See *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

129.    The onus is on Debtor to show a likelihood of success on the merits, which in this context means a successful reorganization. But if anything, Debtor does the opposite: It concedes that the success of the bankruptcy hinges on a global resolution that is impermissible under the Third Circuit's cases and is incompatible with basic constitutional principles.

130.    Nor does Debtor show that the balance of equities supports an injunction. *Holland*, 895 F.3d at 285. Many talc claimants, and especially mesothelioma claimants, have

little time left to live. Freezing their claims against non-debtors will undeniably cause them irreparable harm and likely strip them of their constitutional rights to jury trials and due process.

131.    In addition, as discussed above, Debtor has not even articulated how the talc litigation against non-debtors for their own independent liability would be likely to cause irreparable harm to the estate.

132.    Nor can any such injunction benefit the public. There is nothing about J&J's strategy that cannot be replicated by other deep-pocketed tortfeasors. And "[o]nce the floodgates are opened," "debtors . . . can be expected to make every case that 'rare case.'" *Czyzewski*, 137 S. Ct. at 986. This Court cannot allow this to happen.

## NOTICE

133.    Notice of this Motion has been given to (i) the Debtor; (ii) counsel to the Debtor; (iii) J&J's counsel; (iv) counsel for each of the Retailers; and (v) all parties who have filed notices of appearances. Movant respectfully submits that no other or further notice need be given.

## NO PRIOR REQUEST

134.    Movant has made no prior request for the relief sought herein in this action.

## CONCLUSION

135.    For the reasons and based on the authorities set forth above, Movant respectfully requests entry of an Order lifting the automatic stay, the TRO and not extending any preliminary injunction pursuant to Section 362(d)(1), waiving the stay of Fed. R. Bankr. P. 4001(a)(3), to permit him to fully prosecute his personal-injury action in State Court, including Trial, and for such other relief to which Movant is entitled.

Respectfully submitted:

KAZAN, McCLAIN, SATTERLEY &
GREENWOOD, A Professional Law Corporation

- and -

SAIBER LLC
*Counsel for Movant Anthony Hernandez Valadez*


By:      /s/ John M. August
         JOHN M. AUGUST

DATED:  April 10, 2023