# Exhibit 1

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                        COUNTY OF ALAMEDA

3

4    ANTHONY HERNANDEZ VALADEZ,          )
                                         )
5              Plaintiff,                )
                                         )
6    v.                                  )   No. 22CV012759
                                         )
7    JOHNSON & JOHNSON; ALBERTSONS       )
     COMPANIES, INC., individually,      )
8    and as successor-in-interest,       )
     parent, alter ego and equitable     )   **Certified Transcript**
9    trustee LUCKY STORES, INC.; LUCKY   )
     STORES, INC.; SAFEWAY INC.; SAVE    )
10   MART SUPERMARKETS, individually,    )
     and as successor-in-interest,       )
11   parent, alter ego and equitable     )
     trustee of LUCKY STORES, INC.;      )
12   TARGET CORPORATION; WALMART INC.;   )
     and FIRST DOE through               )
13   ONE-HUNDREDTH DOE,                  )
                                         )
14             Defendants.               )
     _____)

15

16

17

18          VIDEOTAPED DEPOSITION VIA ZOOM OF

19                 LEAH BACKHUS, M.D.

20             VOLUME I, PAGES 1 - 139

21             Wednesday, March 8, 2023

22

23

24   Reported by:  Monica Schoonover
                   CSR No. 10220

25

iDepo
Reporters

**EXHIBIT 1**

1   APPEARANCES:

2

3   For Plaintiff:

4      KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
       BY:  IAN RIVAMONTE, ESQ.
5       irivamonte@kazanlaw.com
       BY:  JOSEPH SATTERLEY, ESQ.
6       jsatterley@kazanlaw.com
       55 Harrison Street, Suite 400
7       Oakland, California  94607
       510.302.1000
8        (appearing via videoconference)

9   For Defendants JOHNSON & JOHNSON and LTL MANAGEMENT,
    LLC:
10
       NELSON MULLINS RILEY & SCARBOROUGH LLP
11       By:  SCOTT J. RICHMAN, ESQ.
       scott.richman@nelsonmullins.com
12       100 South Charles Street, Suite 1600
       Baltimore, Maryland  21201
13       443.392.9414
       (appearing via videoconference)
14
    For Defendants ALBERTSONS COMPANIES, INC.,
15   individually, and as successor-in-interest, parent,
    alter ego and equitable trustee LUCKY STORES, INC.;
16   LUCKY STORES, INC.; SAFEWAY INC.; SAVE MART
    SUPERMARKETS, individually, and as
17   successor-in-interest, parent, alter ego and
    equitable trustee of LUCKY STORES, INC.; TARGET
18   CORPORATION; WALMART INC.:

19       BARNES & THORNBURG LLP
       BY:  MITCHELL CHARCHALIS, ESQ.
20       MCharchalis@btlaw.com
       390 Madison Avenue, 12th Floor
21       New York, New York 10017-2509
       646.746.2191
22        (appearing via videoconference)

23   Also Present:

24       BRANDON IORLANO, Videographer

25



| | | |
|---|---|---|
| 1 | Plaintiff as well. | 01:05:40 |
| 2 | MR. RICHMAN:  Good afternoon.  Scott | 01:05:43 |
| 3 | Richman for Defendants Johnson & Johnson and LTL | 01:05:43 |
| 4 | Management, LLC. | 01:05:47 |
| 5 | MR. CHARCHALIS:  Mitch Charchalis for Lucky | 01:05:52 |
| 6 | Stores; Safeway Inc.; Save Mart; Target; and | 01:05:55 |
| 7 | Safeway.  I believe I said them all, but I will also | 01:06:03 |
| 8 | email my appearance to make sure I give it to you | 01:06:07 |
| 9 | correctly. | 01:06:11 |
| 10 | THE VIDEOGRAPHER:  All right.  And if | 01:06:11 |
| 11 | that's everyone, Madam Court Reporter, can you | 01:06:12 |
| 12 | please administer the oath? | 01:06:14 |
| 13 | | 05:01:40 |
| 14 | LEAH BACKHUS, M.D., | 05:01:40 |
| 15 | having been first duly sworn remotely by the | 05:01:40 |
| 16 | reporter, was examined and testified as follows: | 05:01:40 |
| 17 | | 05:01:40 |
| 18 | EXAMINATION | 01:06:31 |
| 19 | BY MR. RICHMAN: | 01:06:32 |
| 20 | Q   Good afternoon, Dr. Backhus. | 01:06:32 |
| 21 | A   Good afternoon. | 01:06:33 |
| 22 | Q   Can you hear me okay? | 01:06:35 |
| 23 | A   Yes. | 01:06:36 |
| 24 | Q   Great.  My name is Scott Richman.  I am one | 01:06:38 |
| 25 | of the attorneys for the defendants in this case. | 01:06:40 |

| | | |
|---|---|---|
| 1 | Q   Have you ever visited a talc mine? | 01:36:19 |
| 2 | A   No. | 01:36:22 |
| 3 | Q   Have you ever received any honors or awards | 01:36:23 |
| 4 | pertaining to any work you have done with | 01:36:26 |
| 5 | asbestos? | 01:36:27 |
| 6 | A   No. | 01:36:28 |
| 7 | Q   Have you ever received any honors or awards | 01:36:30 |
| 8 | pertaining to any work you have done with talc? | 01:36:33 |
| 9 | A   No. | 01:36:34 |
| 10 | Q   Have you ever received any honors or awards | 01:36:35 |
| 11 | pertaining to any work you have done with | 01:36:37 |
| 12 | mesothelioma? | 01:36:39 |
| 13 | A   No. | 01:36:42 |
| 14 | Q   How many patients have you treated with | 01:36:43 |
| 15 | pericardial mesothelioma? | 01:36:45 |
| 16 | A   One. | 01:36:48 |
| 17 | Q   And who was the one patient? | 01:36:49 |
| 18 | A   Mr. Valadez. | 01:36:52 |
| 19 | Q   I guess, let me take a step back then. | 01:36:56 |
| 20 |     How long have you been treating patients | 01:36:59 |
| 21 | with mesothelioma? | 01:37:01 |
| 22 | A   Ever since starting training, so that would | 01:37:04 |
| 23 | have been 2007. | 01:37:06 |
| 24 | Q   And from 2007 to current day, approximately | 01:37:11 |
| 25 | how many patients have you treated with any form of | 01:37:15 |

1   review for a "Motion to Lift Stay/Declaration" for          01:55:55

2   half an hour.                                                01:56:00

3        Do you see that line there?                            01:56:01

4    A   Yes.                                                    01:56:02

5    Q   Okay.  And what specifically did you do                01:56:02

6   during that half an hour?                                   01:56:04

7    A   That was, I believe, in preparation of my              01:56:08

8   declaration whereby I reviewed it and provided some         01:56:10

9   edits and then approved the final document.                 01:56:14

10       Q   All right.  What's your understanding of           01:56:26

11  Mr. Valadez's current condition?                            01:56:27

12       A   That he has progression of his disease.            01:56:31

13       Q   And what specifically is your understanding        01:56:35

14  of the progression?                                         01:56:37

15       A   Local progression with increasing tumor            01:56:39

16  bulk.  So both in bulk and in locations throughout          01:56:42

17  his chest.                                                  01:56:46

18       Q   When is the last time you received any             01:56:51

19  update regarding Mr. Valadez's current condition?           01:56:52

20       A   I just reviewed his chart today in                 01:56:57

21  preparation for this to see how he's doing.  I saw          01:57:00

22  his last point of contact was five days ago.                01:57:03

23       Q   And what contact did Mr. Valadez have five         01:57:09

24  days ago?                                                   01:57:12

25       A   That was with a clinic visit with Dr. Roy.         01:57:13

LEAH BACKHUS, M.D., Vol I on 03/08/2023
ANTHONY HERNANDEZ VALADEZ vs JOHNSON & JOHNSON, et al.

Page 135

1        I further certify that I am not a relative

2   or employee or attorney or counsel of any of the

3   parties, nor am I a relative or employee of such

4   attorney or counsel, nor am I financially interested

5   in the outcome of this action.

6        IN WITNESS WHEREOF, I have subscribed my

7   name this 9th day of March, 2023.

8

9   _____

10       MONICA SCHOONOVER, CSR No. 10220

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 2

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                       COUNTY OF ALAMEDA
 3
   ANTHONY HERNANDEZ VALADEZ,        ) CASE NO. 22CV012759
 4                                   )
              PLAINTIFF,             )
 5                                   )
        v.                           )
 6                                   )
   JOHNSON & JOHNSON; ALBERTSONS     )
 7   COMPANIES, INC., INDIVIDUALLY AND )
   AS SUCCESSOR-IN-INTEREST, PARENT, )
 8   ALTER EGO, AND EQUITABLE TRUSTEE )
   OF LUCKY STORES, INC.; LUCKY      )
 9   STORES, INC.; SAFEWAY INC.; SAVE )
   MART SUPERMARKETS, INDIVIDUALLY,  )
10   AND AS SUCCESSOR-IN-INTEREST,    )
   PARENT, ALTER EGO AND EQUITABLE    )
11   TRUSTEE OF LUCKY STORES, INC.;   )
   TARGET CORPORATION; WALMART INC.;  )
12   AND FIRST DOE THROUGH            )
   ONE-HUNDREDTH DOE,                 )
13                                    )
              DEFENDANTS.             )
14   _____)
15
16
17
18          VIDEOTAPED DEPOSITION OF TONI HERNANDEZ
19                  MONDAY, APRIL 3, 2023
20
21
22
23
   FILE NO.  CA 5838978
24
   REPORTED BY  MARK McCLURE, CRR
25             CAL CSR 12203

                                              Page 1
```

EXHIBIT 2

```
 1    VIDEOTAPED DEPOSITION OF TONI HERNANDEZ, TAKEN AT
 2    11:34 A.M., MONDAY, APRIL 3, 2023, VIA VERITEXT REMOTE
 3    TECHNOLOGY, BEFORE MARK McCLURE, C.S.R. #12203,
 4    CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF
 5    CALIFORNIA.
 6
 7    APPEARANCES OF COUNSEL:
 8    FOR THE PLAINTIFF, ANTHONY HERNANDEZ VALADEZ, AND THE
      WITNESS, TONI HERNANDEZ:
 9
              (APPEARING BY VIDEOCONFERENCE)
10            KAZAN, McCLAIN, SATTERLEY & GREENWOOD
              BY:  IAN RIVAMONTE, ESQ.
11            55 HARRISON STREET, SUITE 400
              OAKLAND, CALIFORNIA 94607-3858
12            510.302.1000
              IRIVAMONTE@KAZANLAW.COM
13
14    FOR THE DEFENDANTS, JOHNSON & JOHNSON; ALBERTSONS
      COMPANIES, INC., INDIVIDUALLY AND AS
15    SUCCESSOR-IN-INTEREST, PARENT, ALTER EGO, AND EQUITABLE
      TRUSTEE OF LUCKY STORES, INC.; LUCKY STORES, INC.;
16    SAFEWAY INC.; SAVE MART SUPERMARKETS, INDIVIDUALLY, AND
      AS SUCCESSOR-IN-INTEREST, PARENT, ALTER EGO AND
17    EQUITABLE TRUSTEE OF LUCKY STORES, INC.; TARGET
      CORPORATION; WALMART INC.:
18
              (APPEARING BY VIDEOCONFERENCE)
19            BARNES & THORNBURG
              BY:  WILLIAM ESSIG, ESQ.
20            ONE NORTH WACKER DRIVE, SUITE 4400
              CHICAGO, ILLINOIS 60606-2833
21            312.214.5617
              WILLIAM.ESSIG@BTLAW.COM
22
23
24
25

                                          Page  2
```

```
 1   APPEARANCES - CONTINUING
 2   FOR THE DEFENDANTS, JOHNSON & JOHNSON AND LTL
     MANAGEMENT:
 3
             (APPEARING BY VIDEOCONFERENCE)
 4           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
             BY:  KATE MULLALEY, ESQ.
 5           500 BOYLSTON STREET
             BOSTON, MASSACHUSETTS 02116
 6           617.573.4851
             KATE.MULLALEY@SKADDEN.COM
 7
 8   ALSO PRESENT:
 9           SOSEH KEVORKIAN, VIDEOGRAPHER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

| | | |
|---|---|---|
| 1 | Valadez and for the witness, Toni Hernandez. | 11:35:23 |
| 2 | VIDEOGRAPHER: Thank you. | 11:35:26 |
| 3 | | 11:35:47 |
| 4 | TONI HERNANDEZ, | 11:35:47 |
| 5 | having been sworn, was examined | 11:35:47 |
| 6 | and testified as follows: | 11:35:47 |
| 7 | | 11:35:47 |
| 8 | EXAMINATION | 11:35:48 |
| 9 | BY MR. ESSIG: | 11:35:48 |
| 10 | Q. Ms. Hernandez, good morning. | 11:35:50 |
| 11 | My name is William Essig. I represent | 11:35:52 |
| 12 | retailer defendants. I'll be going first asking you | 11:35:55 |
| 13 | questions today. | 11:35:58 |
| 14 | Can you state your full name, please. | 11:35:59 |
| 15 | A. Toni Elizabeth Hernandez. | 11:36:01 |
| 16 | Q. And what is your date of birth? | 11:36:03 |
| 17 | A. 12/28/1980. | 11:36:05 |
| 18 | Q. And what address do you live at right now? | 11:36:10 |
| 19 | A. 1321 East 27th Street, Merced, California | 11:36:12 |
| 20 | 95340. | 11:36:20 |
| 21 | Q. How long have you lived at that address? | 11:36:20 |
| 22 | A. For about 17 years. | 11:36:23 |
| 23 | Q. Who do you live with at that address? | 11:36:27 |
| 24 | A. My mom and my fiancé. | 11:36:31 |
| 25 | Q. What is your fiancé's name? | 11:36:35 |

Page 6

| | | |
|---|---|---|
| 1 | 24 hours that would affect your memory or your ability | 11:38:47 |
| 2 | to testify today? | 11:38:51 |
| 3 | A. No. | 11:38:53 |
| 4 | Q. Now, you understand that you're here to give | 11:38:53 |
| 5 | your deposition and answer questions in relation to a | 11:39:00 |
| 6 | lawsuit filed by your nephew Emory Valadez, correct? | 11:39:05 |
| 7 | A. Yes. | 11:39:11 |
| 8 | Q. And what did you do to prepare for the | 11:39:12 |
| 9 | deposition today? | 11:39:16 |
| 10 | A. Nothing. | 11:39:19 |
| 11 | Q. Okay. And that's fine. I have a couple | 11:39:21 |
| 12 | follow-ups, maybe, or more specific. | 11:39:26 |
| 13 | Did you look at any documents to prepare for | 11:39:29 |
| 14 | the deposition today, read anything? | 11:39:32 |
| 15 | A. No. | 11:39:33 |
| 16 | Q. Did you talk to anybody about the deposition | 11:39:33 |
| 17 | today, putting aside any conversation you may have had | 11:39:36 |
| 18 | with Mr. Rivamonte or any lawyers or staff with his | 11:39:39 |
| 19 | firm? | 11:39:45 |
| 20 | A. No. | 11:39:46 |
| 21 | Q. Did you look at any photographs that may be | 11:39:46 |
| 22 | relevant to the case? | 11:39:52 |
| 23 | A. No. | 11:39:54 |
| 24 | Q. And a similar question, at any point, did you | 11:39:55 |
| 25 | provide any photographs to your sister Ana or your | 11:40:00 |

Veritext Legal Solutions
866 299-5127

```
 1        A.   Oh, we went to Disneyland.              12:07:01

 2        Q.   Do you recall about how old Emory was when you  12:07:07

 3   went to Disneyland with him?                       12:07:09

 4        A.   It was about in 2008, so --             12:07:11

 5        Q.   So he was maybe nine or ten?            12:07:17

 6        A.   Yeah, about that.                       12:07:19

 7        Q.   Do you recall anyone purchasing any baby  12:07:24

 8   powder for use on Anthony during that trip?        12:07:27

 9        A.   No.                                     12:07:29

10        Q.   Do you recall being present at all for any  12:07:30

11   baby powder being applied to Anthony on that trip?  12:07:35

12        A.   No.                                     12:07:41

13        Q.   Do you recall any other family trips that you  12:07:41

14   went on with Anthony where any family members purchased  12:07:52

15   baby powder on the trip for his use?               12:07:56

16        A.   No.                                     12:07:59

17        Q.   When was the last time you saw Anthony in  12:08:00

18   person?                                            12:08:37

19        A.   Last Friday.                            12:08:38

20        Q.   And I know you're not a doctor, but how would  12:08:46

21   you characterize how he was doing?                 12:08:49

22        A.   Terrible.                               12:08:52

23        Q.   Anything in particular that you saw or he told  12:08:59

24   you about that --                                  12:09:02

25        A.   He was depressed and he can't eat.      12:09:04
```

Veritext Legal Solutions
866 299-5127

```
1    12:57 p.m., and this concludes today's testimony given        12:57:23

2    by Toni Hernandez.  The total number of media units used      12:57:27

3    was two, and will be retained by Veritext.                    12:57:32

4              (The deposition concluded at 12:57 p.m.)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
1    STATE OF CALIFORNIA        )
2    COUNTY OF SANTA BARBARA    )   ss.

3

4          I, Mark McClure, C.S.R. No. 12203, in and for
5    the State of California, do hereby certify:
6            That prior to being examined, the witness
7    named in the foregoing deposition was by me duly sworn
8    to testify to the truth, the whole truth, and nothing
9    but the truth;
10           That said deposition was taken down by me in
11   shorthand at the time and place therein named and
12   thereafter reduced to typewriting under my direction,
13   and the same is a true, correct, and complete transcript
14   of said proceedings;
15           That if the foregoing pertains to the original
16   transcript of a deposition in a Federal Case, before
17   completion of the proceedings, review of the transcript
18   { } was { } was not required.
19           I further certify that I am not interested in
20   the event of the action.
21           Witness my hand this 6th day of April,
22   2023.
23

24           Certified Shorthand Reporter
             State of California
25           CSR No. 12203

                                        Page 62
```

# Exhibit 3

EXHIBIT 3

1          SUPERIOR COURT OF CALIFORNIA

2             COUNTY OF ALAMEDA

3    ----------------------------

4    ANTHONY HERNANDEZ VALADEZ,   )

5                 Plaintiff,      )

6       v.                       )    CASE NO. 22CV012759

7    JOHNSON & JOHNSON, et al.,   )

8                 Defendants.     )

9    ----------------------------

10

11

12

13

14    VIDEOTAPED DEPOSITION OF ARTHUR M. LANGER, Ph.D.

15              Williamsburg, Virginia

16              Monday, April 3, 2023

17                  9:56 a.m.

18              Pages 1 - 249

19

20

21

22

23

24   Reported by:  Penny C. Wile, RMR-CRR

25   Job No. AW5806091

                                          Page 1

```
 1        Videotaped deposition of ARTHUR M. LANGER, Ph.D.,

 2    held at:

 3

 4

 5

 6            WILLIAMSBURG LODGE

 7            310 S. England Street

 8            Williamsburg, VA 23185

 9

10

11

12            Pursuant to agreement, before Penny C. Wile,

13    Registered Merit Reporter, Certified Realtime Reporter,

14    and Notary Public for the Commonwealth of Virginia.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4        JOSEPH D. SATTERLEY, ESQUIRE

 5        KAZAN, McCLAIN, SATTERLEY & GREENWOOD, PLC

 6        55 Harrison Street, Suite 400

 7        Oakland, CA 94607

 8        (510)302-1000

 9        jsatterley@kazanlaw.com

10

11   ON BEHALF OF THE DEFENDANTS JOHNSON & JOHNSON, LTL

12   MANAGEMENT, LLC ssi/pae/et JOHNSON & JOHNSON BABY

13   PRODUCTS COMPANY, LTL MANAGEMENT, LLC sii/pae/et JOHNSON

14   & JOHNSON CONSUMER, INC.:

15        MATTHEW K. ASHBY, ESQUIRE

16        KING & SPALDING

17        633 West 5th Street

18        Los Angeles, CA  90071

19        (213)443-4345

20        mashby@kslaw.com

21

22

23

24

25
```

Page 3

```
 1              A P P E A R A N C E S

 2

 3    ON BEHALF OF THE DEFENDANTS ALBERTSONS COMPANIES, INC.,

 4    ALBERTSONS COMPANIES, INC. sii/pae/et LUCKY STORES,

 5    INC., LUCKY STORES, INC., SAFEWAY, INC., SAVE MART

 6    SUPERMARKETS, SAVE MART SUPERMARKETS sii/pae/et LUCKY

 7    STORES, INC., TARGET CORPORATION, WALMART, INC.:

 8          MITCHELL CHARCHALIS, ESQUIRE

 9          BARNES & THORNBURG, LLP

10          2029 Century Park East, Suite 300

11          Los Angeles, CA, 90067

12          (310)284-3880

13          mcharchalis@btlaw.com

14          (Via Videoconference)

15

16

17          Also present:  Jeremy Belcher, Videographer

18

19

20

21

22

23

24

25
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1                P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the video    09:56:00

 3   record.  Today's date is April 3rd, 2023, and the time  09:56:01

 4   is 9:56 a.m.  Today's witness is Arthur Langer.  Counsel 09:56:05

 5   have agreed to waive the usual videographer's            09:56:09

 6   introduction.                                            09:56:12

 7              Will counsel please introduce themselves,     09:56:12

 8   starting with plaintiff's counsel, and the court        09:56:14

 9   reporter will please swear in the witness?              09:56:14

10              MR. SATTERLEY:  Good morning.  Joe           09:56:16

11   Satterley on behalf of Anthony Hernandez Valadez.       09:56:17

12              MR. ASHBY:  Good morning.  Matthew Ashby      09:56:21

13   for Johnson & Johnson and LTL.                          09:56:22

14              MR. CHARCHALIS:  Good morning.  Mitchell      09:56:26

15   Charchalis on behalf of the retailer defendants.        09:56:28

16              MR. SATTERLEY:  If you could swear the        09:56:32

17   witness.                                                09:56:33

18                      (Exhibit A was marked and

19                       attached to the transcript.)

20

21              ARTHUR M. LANGER, Ph.D.,

22         having been sworn, testified as follows:

23   EXAMINATION BY COUNSEL FOR THE PLAINTIFF:               09:56:42

24   BY MR. SATTERLEY:                                       09:56:42

25        Q.    Good morning.  Introduce yourself to the     09:56:43
```

Aiken Welch, A Veritext Company
510-451-1580

```
1    jury.                                              09:56:45

2         A.    I am Arthur M. Langer, L-A-N-G-E-R.  My  09:56:46

3    current status is professor emeritus.  The title, of 09:56:56

4    course, is long and lengthy, as a professor emeritus of 09:57:00

5    the doctoral program in earth and environmental sciences 09:57:04

6    at the graduate school of City University of New York. 09:57:09

7    So I'm retired.  That's a long term for retirement.  09:57:16

8         Q.    We're here in a case for Anthony Hernandez 09:57:19

9    Valadez involving his exposure to Johnson & Johnson. 09:57:22

10   Have I asked you to tell us a little bit about your  09:57:25

11   history with regards to Johnson & Johnson?           09:57:28

12        A.    Johnson & Johnson specifically.  Johnson & 09:57:32

13   Johnson was a -- a producer of a talcum powder available 09:57:41

14   to the general public.  When I first started at Mount 09:57:47

15   Sinai, as the Mount Sinai Hospital, in 1965 I became  09:57:55

16   interested in the study of baby powders, just generic 09:58:01

17   baby powders.  As a result of our study at Mount Sinai 09:58:06

18   on the occurrence of objects called asbestos bodies in 09:58:13

19   the lungs of people in the general population coming to 09:58:19

20   autopsy in New York City, the asbestos body was a marker 09:58:26

21   for -- following the exposure to asbestos dust in the 09:58:34

22   workplace and used as an index of exposure.          09:58:40

23             It was an interesting marker indicating    09:58:48

24   that the agent responsible for scarring of the pulmonary 09:58:52

25   tissues, the lung tissues, was the fiber itself.  We  09:59:02
```

Aiken Welch, A Veritext Company
510-451-1580

| | | |
|---|---|---|
| 1 | include Johnson & Johnson?  Well, it just happened. | 10:01:28 |
| 2 |     Q.    Sure. | 10:01:31 |
| 3 |     A.    But there were lots of other powders that | 10:01:32 |
| 4 | we studied. | 10:01:35 |
| 5 |     Q.    So -- | 10:01:39 |
| 6 |     MR. ASHBY:  Just let me ob -- object as | 10:01:40 |
| 7 | nonresponsive.  Object -- | 10:01:42 |
| 8 | BY MR. SATTERLEY: | 10:01:43 |
| 9 |     Q.   So we're going to talk specifically about | 10:01:43 |
| 10 | Johnson & Johnson in more detail, and we're going to | 10:01:45 |
| 11 | talk about your history.  And I've marked as exhibits | 10:01:47 |
| 12 | some photographs. | 10:01:50 |
| 13 |     And before I get to the photographs, did | 10:01:50 |
| 14 | you in 1971 identify chrysotile asbestos in Johnson's | 10:01:52 |
| 15 | Baby Powder? | 10:02:01 |
| 16 |     A.    Yes. | 10:02:01 |
| 17 |     Q.    Did -- | 10:02:04 |
| 18 |     A.    Yes. | 10:02:04 |
| 19 |     Q.    Did you meet a Dr. Gavin Hildick-Smith in | 10:02:05 |
| 20 | 1971? | 10:02:08 |
| 21 |     A.    Approximate at that time, yes. | 10:02:10 |
| 22 |     Q.    And did you advise -- oh, did you | 10:02:12 |
| 23 | understand he -- he -- Dr. Gavin Hildick-Smith to be | 10:02:15 |
| 24 | with Johnson & Johnson? | 10:02:19 |
| 25 |     A.    Yes. | 10:02:19 |

| | | |
|---|---|---|
| 1 | Q. And did you advise him that you found | 10:02:20 |
| 2 | chrysotile asbestos in Johnson's Baby Powder? | 10:02:23 |
| 3 | A. Oh, you're using the word advise. I -- I | 10:02:25 |
| 4 | told him at a -- a seminar that these were my findings, | 10:02:28 |
| 5 | yes. | 10:02:36 |
| 6 | Q. And we'll talk about -- oh, did you later | 10:02:36 |
| 7 | in the '70s look at more Johnson & Johnson Baby Powder? | 10:02:39 |
| 8 | A. Yes. | 10:02:43 |
| 9 | Q. Okay. We'll talk about that in more | 10:02:43 |
| 10 | detail. | 10:02:45 |
| 11 | Let's go to the photographs. | 10:02:45 |
| 12 | (Exhibit 1 was marked and | 10:02:45 |
| 13 | attached to the transcript.) | 10:02:45 |
| 14 | BY MR. SATTERLEY: | 10:02:45 |
| 15 | Q. Exhibit 1, I've -- I've handed to Johnson | 10:02:49 |
| 16 | & Johnson's attorney, these -- these photographs. | 10:02:51 |
| 17 | Let's -- let's talk about them. If you could flip them | 10:02:52 |
| 18 | around and show the camera and -- and -- and -- and tell | 10:02:54 |
| 19 | us all who -- and right over here, Dr. Langer. | 10:02:57 |
| 20 | A. Oh, hello. | 10:03:02 |
| 21 | Q. Okay. All right. So who's in these -- | 10:03:02 |
| 22 | who's in Exhibit 1? Who's -- who's represented here? | 10:03:05 |
| 23 | A. Okay. May I? There are four seated | 10:03:08 |
| 24 | figures and two standing figures. The figure | 10:03:16 |
| 25 | immediately on the left side of the photograph seated is | 10:03:19 |

Page 13

```
1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2

3              I, Penny C. Wile, Registered Merit

4    Reporter, Certified Realtime Reporter, and Notary Public

5    for the Commonwealth of Virginia at large, whose

6    commission expires January 31, 2025, do certify that the

7    aforementioned appeared before me, was sworn by me, and

8    was thereupon examined by counsel; and that the

9    foregoing is a true, correct, and full transcript of the

10   testimony adduced.

11             I further certify that I am neither

12   related to nor otherwise associated with any counsel or

13   party to this proceedings, nor otherwise interested in

14   the event thereof.

15             IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 6th day of April,

17   2023.

18

19

20

21

22         Penny C. Wile, Notary Public, #212528

23            Commonwealth of Virginia at Large

24              REGISTERED MERIT REPORTER

25              CERTIFIED REALTIME REPORTER
```

Page 246

# Exhibit 4

# Talc Composition

**EXHIBIT 4**

1

# Mica

# Mica in Mr. Valadez's tissue



2301131-1 PA200_002.tif
Mica

HV=100kV
Direct Mag: 4000 x
Eurofins J3 Resources

# 1967 – Mica identified in Vermont talc



RECEIVED
NOV 1 1967
R. L. SUNDBERG

October 30, 1967

Mr. R. J. Mortimer

It is getting quite fashionable to do talc research in the New Jersey area these days.

Apparently Warner has given our Vermont talc product quite a run down in his laboratories recently. He is of the view that the most recent samples he looked at contain a noticeable percentage of mica as an associate mineral with the talc. He identified the mica content by an analytical technique called differential thermal analysis, and he places quite a lot of value in that particular way of assaying the purity of talc products.



that way.

Perhaps we should discuss this situation.

W. H. Ashton

paj
cc: Dr. R. A. Fuller
    Mr. J. N. Masci
    Dr. T. H. Shelley
    Dr. R. L. Sundberg

JNJ 000236810

4

# 1970 – CSMRI found mica in Vermont talc

COLORADO SCHOOL OF MINES RESEARCH INSTITUTE

Report on
COMPARATIVE MINERALOGICAL STUDIES
OF TALC SAMPLES
FROM VERMONT, DEATH VALLEY,
AND ITALY

As may be noted from the diffractograms in Figures 1 and 2, the head sample of CSMRI No. 106 showed a higher calcite content than did the CSMRI No. 105 sample. There appears to be no chlorite in these samples, whereas the Italian talc sample has a notable chlorite peak. The final products of both the 105 and 106 samples consist primarily of talc with a trace of mica.

Figure 3 shows the comparison of the Vermont talc and the Italian talc. As may be noted, the head samples contain appreciable amounts of both magnesite and dolomite and a quantity of chlorite roughly comparable to the Italian final product. The final product of the Vermont ore indicates the mineralogical constituents to be primarily talc with trace amounts of mica and chlorite.

WTALC00004339

# 1970 – CSMRI found mica in Vermont talc

COLORADO SCHOOL OF MINES RESEARCH INSTITUTE

GOLDEN, COLORADO

TABLE 1

PETROGRAPHIC CLASSIFICATION AND RESULTS OF
X-RAY DIFFRACTION ANALYSIS ON ROCK SAMPLES

Relative X-Ray Diffraction Peak Heights (Cm)

| D.D. Hole | Interval | Rock Classification | Talc | Trem/Act | Chlorite | Quartz | Calcite | Dolomite | Magnesite | Mica | Feldspar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-67-H | 301 | Garnetiferous quartz-biotite augen schist | . | | | 1.0 | | 0.3 | | 1.3 | |
| 6-67-H | 139 | Schistose augen marble | 0.9 | | 0.7 | . | | 0.3 | 0.2 | Tr. | |
| | 141 | Augen marble schist | 2.0 | | 0.5 | | | 0.1 | 0.4 | | |
| | 150 | Augen marble schist | 2.5 | | 0.5 | | | 3.2 | 0.5 | | |
| | 167 | Talc-chlorite augen schist | 4.5 | | 0.2 | | | Tr. | 0.6 | | |
| | 169 | Schistose augen marble | 2.6 | | 0.1 | | | 0.7 | 3.5 | | |
| | 176 | Talc-chlorite schist | 11.8 | | 0.4 | 0.5 | | | | 0.6 | |
| 34-67-H | 507-C | Chlorite schist | 0.7 | | 1.3 | 0.2 | | | | | |
| | 518 | Augen marble schist | 1.8 | | | | | 0.6 | | | |
| 35-67-H | 153 | Basalt | 0.2 | | | | | | | 0.3 | 0.8 |
| | 164 | Contact between basalt and quartz-biotite schist | | | | 0.5 | | | | 0.4 | 0.4 |
| | 223-A | Chlorite schist | | 0.4 | 0.2 | | | | | | |

JNJH29W_000001645

# 1971 – Mica in JBP

cc: Dr. R. A. Fuller
Dr. W. Nashed ⟵
Mr. R. J. Mortimer to Mr. R. N. Miller
Dr. T. H. Shelley
Dr. R. L. Sundberg
Assay of Talc in BABY POWDER

May 14, 1971

Dr. G. Hildick-Smith

You will note we are now picking up observable amounts of quartz in this particular batch. I have no explanation for that at present.

In addition to the attached I ran an X-ray diffractograph on that batch. It shows these minerals are present: talc, mica, chlorite, tremolite-actinolite, and magnesite.

I am proceeding to investigate samples of talc used during the past year as we discussed on Wednesday.

the past year as we discussed on Wednesday.

W. H. Ashton

rap
Attachment

JNJTALC000099166

# 1971 – CSMRI found mica in Grade 66 talc

JNJ 000300052

COLORADO SCHOOL OF MINES RESEARCH INSTITUTE
P.O. Box 112
GOLDEN, COLORADO 80401

July 7, 1971

Mr. Wm. H. Ashton                                           390517
Johnson & Johnson
Research Center

Following are the results of the x-ray analyses on the 344-L Vermont talc product and the six monthly Vermont talc product samples.

## Summary and Conclusions

Semiquantitative x-ray diffraction analyses of the Vermont products and standard mineral samples indicate that essentially no anthophyllite and only minor amounts (below 1%), of tremolite and actinolite were detected. Other nontalc phases noted in the Vermont talc samples were small amounts of mica, chlorite, magnesite, dolomite, and minor to trace amounts of quartz.

# 1973 – Bowling Green found mica in JBP

Table I

Qualitative Mineral Analyses by X-ray Diffraction

| Sample Number | Talc | Asbestosform Minerals (Serp. | Trem-Act. | Anth.) | Carbonates | Anhy-drite | Clay (Mica) | Misc. Mins. * |
|---|---|---|---|---|---|---|---|---|
| 1 | x | x | x | | | x | x | x |
| 2 | x | x | | | | x | x | x |
| 3 | x | x | | | | x | x | x |
| 4 | x | x | x | x | x | x | x | x |
| 5 | x | x | x | | | x | x | x |
| 6 | x | x | | x | x | x | x | x |
| 7 | x | x | | | | x | x | x |
| 8 | x | x | x | x | x | x | x | x |
| 9 | x | x | | | | | x | x |
| 10 | x | x | | | | x | x | x |
| 11 | x | | x | | x | x | x | x |
| 12 | x | | | | x | x | x | x |
| 13 | x | | x | x | x | | x | x |
| 14 | x | x | | | x | x | x | x |
| 15 | x | x | x | | | x | x | x |
| 16 | x | | x | | | | | x |
| 17 | x | | x | x | | x | x | x |
| 18 | x | x | | x | | x | x | x |

*Additives and inert minerals and compounds.

JNJ 000084990

9

# 1991 – Mica found mica in Vermont talc

DEPOSITION
EXHIBIT
28

**CYPRUS ORE RESERVE EVALUATION**
**PRELIMINARY SUMMARY**

R. C.

**INTRODUCTION**

A complete evaluation of the CIM talc res
a more complex task than anticipated.
assess with at least four ore quality fact
available from CIM is not always clear.
project. Two U.S.B. senior geologists
independent reserve calculations on the m

The following is a summary of our thoug

**GENERAL**

We have been working with Philippe Mor
CIM and the CIM geological staff to deter

1) How closely the real mineable ore
    numbers that have been carried by

2) The tons of ore (and years of pro
    ground at the various reserve si
    proportion to the ore requirements

--------
[1]Talc content, brightness, impurities and quality.

**Vermont**

Two dry mills and two floatation plants produce products from ore currently shipped from 5 mines operating at three Vermont locations. The ores from the producing deposits provide feed for the dry mills at Columbia and Chester and for floatation plants at Johnson and West Windsor. Other mining sites that are listed as Cyprus assets are in reality deposits that were mined in the past but are now regarded as mined out or are uneconomic at this time or are undeveloped properties with some reserve potential for the future).

The area containing these reserves is all within the Appalachian Ultramafic Belt that trends N-S through the state. In certain areas, these ultramafics host talc carbonate rock developed by the alteration of serpentine bodies. The talc bodies are contained between footwall and hanging wall quartz mica schists, and are typically found within the noses of relict folds within the trend.

IMERYS425354

10



Q. How do you know the difference between talc and the transitional zone?

A. You tell it by the mineral assemblage, by the density, by the compactness. The talc is very obvious because ***it occurs in micaceous plates***, easy to see, very easy to see.

# 2019 – FDA found mica in JBP



AMA Analytical Services, Inc.
Focused On Results.

NVLAP
NVLAP Lab Code 101143-0

NY ELAP
Lab ID 10935

## Case Narrative

| Client Name: | FDA Office of Cosmetics & Colors | Contact: | John Gasper |
| PO Number: | HHSF223201810337P | Phone: | (240) 402-1133 |
| Job Name/Location: | Task 3 – Analysis of Official Samples (4ᵗʰ Group – | Email: | john.gasper@fda.hhs.gov |

### TEM

Sample 6 was analyzed by (b) (6) on September 3, 2019. Samples 6A and 6B were analyzed by (b) (6) (b) (6) on September 7, 2019. The primary particle observed was talc along with a few talc fibers, talc ribbons and mica particles. Two Chrysotile structures were detected on the aliquot for 6A and four chrysotile structures were detected on the aliquot for 6B. The results were calculated using the equations detailed in the calculations section.

| 308006-6 | NAD |
| 308006-6A | <0.00002% |
| 308006-6B | 0.00002% |

set was transferred to AMA's lock-box for storage.

The following pictures document the condition of each sample upon receipt at AMA:



Asbestos · Lead · Mold · Nano
4475 Forbes Boulevard. · Lanham, MD 20706 · (301) 459-2640/(800) 346-0961 · Fax (301) 459-2643 · www.amalab.com

# Aluminum Silicate

# Aluminum Silicate in Mr. Valadez's tissue



2301131-1 PA200_004.tif
Aluminum Silicate Particulate

HV=100kV
Direct Mag: 6000 x
Eurofins J3 Resources

# Aluminum Silicate in Chinese JBP talc



**Safety Data Sheet**

**Section 1. Identification**

| | |
|---|---|
| Product name: | Guangxi Talc Ore # 1 and #2 |
| Chemical name: | Hydrated Magnesium Silicate |
| Recommended use and restriction on use: | Functional mineral |
| Information on manufacturer: | Luzenac America Inc. |
| | 8051 E Maplewood Ave, Bldg 4 |

## Section 3. Composition/information on ingredients

Guangxi Talc Ore #1 and #2 are natural association of talc, chlorite and dolomite.

| Chemical name | Common names and synonyms | CAS No. | % content | Classification |
|---|---|---|---|---|
| Hydrated Magnesium Silicate | Talc | 14807-96-6 | >96 | No |
| Hydrated Magnesium Aluminium Silicate | Chlorite | 1318-59-8 | <3 | No |
| Hydrated Magnesium Calcium Carbonate | Dolomite | 16389-88-1 | <1 | No |

Ingestion: No special first aid measures necessary.

**Most important symptoms/effects, acute and delayed:** Symptoms of acute accidental exposure would be non-specific and similar to those of a massive inhalation of any dust without toxic effects. These symptoms may include coughing, expectoration, sneezing, and difficulty in breathing due to upper respiratory tract irritation.

Indication of immediate medical attention and special treatment needed, if necessary: None.

Protection for first-aid providers: None.

Date of revision: December 7, 2010
Supersedes:

Page 1 of 6
Guangxi Talc Ore
ITA-Wittman-000355

Protected Document - Subject to Protective Order

IMERYS-MDL-AB_0011853

IMERYS-MDL-AB_0011853

# Aluminum Silicate = Chlorite

Johnson&Johnson

New Brunswick, N.J.
May 21, 1971

Subject: Talcs in Vaginal Sprays

The mineralogical make-up of the talc is:

Talc----------better than 90%.

Chlorite------a magnesium aluminum iron silicate-
          present above 1%.

Mica----------complex potassium aluminum silicates
          present in trace amounts.

Magnesite-----a magnesium carbonate-appears below
          1% content.

Quartz--------silicon dioxide-below 1%.

Brucite-------a magnesium oxide mineral-present
          in trace and not definite.

wide and up to 32 microns long.  These are
probably mica and chlorite fragments.

1% - Quartz - one micron and less.

3% - Other submicron particles.

# 1970 – CSMRI found chlorite in Vermont talc

COLORADO SCHOOL OF MINES RESEARCH INSTITUTE

GOLDEN, COLORADO

TABLE 1

PETROGRAPHIC CLASSIFICATION AND RESULTS OF
X-RAY DIFFRACTION ANALYSIS ON ROCK SAMPLES

| D.D. Hole | Interval | Rock Classification | Relative X-Ray Diffraction Peak Heights (Cm) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Talc | Trem/Act | Chlorite | Quartz | Calcite | Dolomite | Magnesite | Mica | Feldspar |
| 2-67-H | 301 | Garnetiferous quartz-biotite augen schist | | | | 1.0 | | 0.3 | | 1.3 | |
| 6-67-H | 139 | Schistose augen marble | 0.9 | | 0.7 | | | 0.3 | 0.2 | Tr. | |
| | 141 | Augen marble schist | 2.0 | | 0.5 | | | 0.1 | 0.4 | | |
| | 150 | Augen marble schist | 2.5 | | 0.5 | | | 3.2 | 0.5 | | |
| | 167 | Talc-chlorite augen schist | 4.5 | | 0.2 | | | Tr. | 0.6 | | |
| | 169 | Schistose augen marble | 2.6 | | 0.1 | | | 0.7 | 3.5 | | |
| | 176 | Talc-chlorite schist | 11.8 | | 0.4 | 0.5 | | | | 0.6 | |
| 34-67-H | 507-C | Chlorite schist | 0.7 | | 1.3 | 0.2 | | | | | |
| | 518 | Augen marble schist | 1.8 | | | | | 0.6 | | | |
| 35-67-H | 153 | Basalt | 0.2 | | | | | | | 0.3 | 0.8 |
| | 164 | Contact between basalt and quartz-biotite schist | | | | 0.5 | | | | 0.4 | 0.4 |
| | 223-A | Chlorite schist | | 0.4 | 0.2 | | | | | | |

JNJH29W_000001645

17

# 1971 – Chlorite in JBP



cc: Dr. R. A. Fuller
Dr. W. Nashed
Mr. R. J. Mortimer to Mr. R. N. Miller
Dr. T. H. Shelley
Dr. R. L. Sundberg                    May 14, 1971
        Assay of Talc in BABY POWDER

        Dr. G. Hildick-Smith

You will note we are now picking up observable amounts of
quartz in this particular batch. I have no explanation for
that at present.

In addition to the attached I ran an X-ray diffractograph
on that batch. It shows these minerals are present:
        talc, mica, chlorite, tremolite-actinolite, and
        magnesite.

I am proceeding to investigate samples of talc used during
the past year as we discussed on Wednesday.

the past year as we discussed on Wednesday.

                        W. H. Ashton

rap
Attachment

JNJTALC000099166

18

COLORADO SCHOOL OF MINES RESEARCH INSTITUTE
P.O. Box 112
GOLDEN, COLORADO 80401

July 7, 1971

Mr. Wm. H. Ashton                                          390517
Johnson & Johnson
Research Center

Following are the results of the x-ray analyses on the 344-L Vermont talc product and the six monthly Vermont talc product samples.

### Summary and Conclusions

Semiquantitative x-ray diffraction analyses of the Vermont products and standard mineral samples indicate that essentially no anthophyllite and only minor amounts (below 1%), of tremolite and actinolite were detected. Other nontalc phases noted in the Vermont talc samples were small amounts of mica, chlorite, magnesite, dolomite, and minor to trace amounts of quartz.

# Aluminum Silicate/Chlorite in J&J talc



Site Visit: Guilin Talc
TLH102104

## 2.0 Mine Descriptions

The mines are located in what is regarded as the "highest-purity [talc] veins"[1] in China and belong to the Middle Proterozoic Banxi-Heong Group geological formation. The host rock is an off-white dolomitic marble that is contorted into high-amplitude isoclinal folds (folds whose limbs are parallel to each other). The talc ore is typically light green to gray and locally very white. Chlorite, dolomite, magnesite, and quartz are the main contaminants.[1]

Overall, the visited mines have a maximum production of about 180,000 t/y (metric), though they average 150,000 t/y. The mines employ 300 full-time employees with an unspecified number of part-time employees.

RJ LeeGroup, Inc.
350 Hochberg Rd.
Monroeville, PA 15146
www.rjlg.com

Skillman, NJ 08558

JNJTALC001070730

Guangxi Talc Study Report

**Table 2-2 Talc Deposit Geology of Different Types, Guangxi**

| Talc genesis type | Size | Explored /Geological reserves（kt） | Ore type | Ore geology | Ore grade and quality | Mineralogy and chemistry |
|---|---|---|---|---|---|---|
| Metamorphosed Ca-Mg Carbonate hydrothermal metasomatic talc deposit | Talc ore bodies is several hundreds to thousands meters long, 100 to thousand meter fipping extension, tens centimeters to several tens meters thick. Deposit is big. | 741.4/1594.01 | Dolomite (calcite)-talc, chlorite-talc. White massive talc mainly. | Occur in Hetong formation of Danzhou Group. The wall rocks are quartzeous dolomitic marble. Ore-controlling fractures are faults between the layers and axle oriental cfaults. Ore body is as silllike, lentiform, capsule and vein. Alteration is marblisation, chloritization and talcification. | I and II grade talc mainly, high quality talc. | Talc 70-96.8%, chlorite1-9%, dolomite 1%, calcite 1-2%。 $SiO_2$ 40.77-63.00%, MgO25.30-32.55%, CaO0.05-8.10%, $Al_2O_3$0.14-8.00%, $Fe_2O_3$0.50-7.56%, whiteness 70-90° |
| Contact metasomatism talc deposit | About hundred meters long, several tens meters dipping extension and tens centimeters to meters thick. Small size deposit. | | Quartz-talc, chlorite-talc. Massive talc mainly | Occur in lower Permian Maokou Formation. wall rocks are Ca-Mg claystone interlayered with chert limestone. The contact zone between the bed and the diabase controls the ore mineralisation. Orebody is as pod and silllike. Alteration is chloritization and talcification。 | II grade talc mainly. Talc lumps will break when piled for a period of tome. | Talc 50-90%, quartz 1-6%, calcite 1-5%。$SiO_2$51.34-62.54%, MgO27.6.-30.78%, CaO0.30-3.24%, $Al_2O_3$3.00-4.50%, $Fe_2O_3$0.36-2.72%, whiteness 67.37-88.60° |
| Epithermal old Karst cave metasomatism talc deposit | Several hundreds meters long, several tens meters wide and several tens meters thick. Medium-small size deposit. | 132.4/89.2 | Carboneous dolomitic-talc, carboneous talc. Massive talc ore. | Occur in Lower Carboniferous Xiaguan Stage dolomitic limestone and silica limestone and controlled in syncline. Ore body is as silllike and lentiform. Talc ore is varicolored. | Raw ore is II and III grade, calcined ore is up to I grade ore. | Talc 90-95%, carbon 1-5%, quartz 1%. $SiO_2$61-63%, MgO31-32%, $Al_2O_3$0.17-3.03%, $Fe_2O_3$0.02-0.41%, raw ore whiteness 20.7-88.1°, calcined ore 96-97° |
| Ultramafic autolysis hydrothermal talc deposit | Several tens to 200m long, several tens meters wide and several tens centimeters to 20m thick. Small size. | ~/5.48 | Serpentine-talc, chlorite-mica-talc. Lepidosome talc mainly | Occur in the contact zone between Cambrian schist and Caledonian migmatic granite. Ore body is as lentiform and pod. Alteration is serpentisation, talcification and kaolinization. | Quality varies. Talc originated from serpentine is I and II grade, from mica schist is III grade. | Talc 80-98%, phlogopite 1-2%, chlorite1-2%, tremolite 1-2%, serpentite 1-2%, calcite 1%。$SiO_2$36.01-62.19%, MgO27.05-31.59%, CaO0.15-1.88%, $Al_2O_3$4.25-19.80%, $Fe_2O_3$0.34-1.55%, whiteness 72-97.33° |

# Aluminum Silicate/Chlorite in J&J talc

| Sample No. | Product | Lot No. | Talc | Chlorite | Phlogopite | a-Quartz | Dolomite | Tremolite | Chrysotile |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | SEPTEMBER 21 REPORT | | | | |
| 131 | J&J Medicated Powder | (no code) | 88% | 3% | 3% | N.D.* | 2% | 4% | N.D. |
| 132 | Johnson Baby Powder | (no code) | 95% | 3% | 2% | N.D. | N.D. | N.D. | N.D. |
| 133 | JOHNSON'S Baby Powder | 108T | 92% | 2% | 4% | N.D. | N.D. | N.D. | 2% |
| 134 | JOHNSON'S Baby Powder | 109T | 90% | 3% | 2% | N.D. | 2% | N.D. | 3% |
| 135 | J&J Medicated Powder | 0452K | 93% | 2% | 3% | N.D. | 2% | N.D. | N.D. |
| 136 | J&J SHOWER TO SHOWER | C512Z | 87% | 4% | 3% | 2% | 2% | N.D. | 2% |
| 137 | J&J SHOWER TO SHOWER | 0709X1 | 89% | 4% | N.D. | 3% | 2% | N.D. | 2% |
| 138 | J&J SHOWER TO SHOWER | 0872K | 83% | 7% | 3% | 2% | 3% | N.D. | 2% |

*N.D. = None Detectable.

# Titanium



Johnson & Johnson
BABY PRODUCTS COMPANY

$V2 \leq cc$
$RNM$

January 22, 1975

C. Trace Metals ppm

|  | Argonaut/B | V-66 (10-28-74) |
|---|---|---|
| Total iron as $Fe_2O_3$ | 3.07% | 3.29% |
| Cobalt | 81 ppm | 63 ppm |
| Copper | 3 | 3 |
| Chromium | 208 | 140 |
| Nickel | 1850 | 1800 |
| Manganese | 55 | 43 |
| Cadmium | 2 | 3 |
| Lead | 16 | 23 |
| Titanium | non detectable | 110 |

Protected Document - Subject to Protective Order

IMERYS 238303

# Iron

# Iron in Mr. Valadez's tissue



2301131-1 PA200_001.tif
Iron Particulate

HV=100kV
Direct Mag: 10000 x
Eurofins J3 Resources

# 1975 – Iron in J&J Grade 66 Talc



Johnson & Johnson
BABY PRODUCTS COMPANY

January 22, 1975

$VZ \rightarrow CC$
$\downarrow$
$RWM$

C. <u>Trace Metals ppm</u>

|  | <u>Argonaut/B</u> | <u>V-66 (10-28-74)</u> |
|---|---|---|
| Total iron as $Fe_2O_3$ | 3.07% | 3.29% |
| Cobalt | 81 ppm | 63 ppm |
| Copper | 3 | 3 |
| Chromium | 208 | 140 |
| Nickel | 1850 | 1800 |
| Manganese | 55 | 43 |
| Cadmium | 2 | 3 |
| Lead | 16 | 23 |
| Titanium | non detectable | 110 |

Protected Document - Subject to Protective Order          IMERYS 238303

# Iron in J&J Vermont Talc

| No. | Company | Sample Identification | Location | Type | Brightness | Major | 1-10 | 0.5-5.0 | 0.1-1.0 | 0.05-0.5 | 0.01-0.1 | 0.005-0.05 | 0.001-0.01 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Semi-quantitative Spectrographic Analysis (%) | | | |
| 20 | From Johnson & Johnson | | Eclipe Mine, Calif. | grab | 92 | magnesium silicon | | calcium | iron | aluminum | | manganese titanium | copper nickel |
| 21 | Kewced (sp?) Minerals Co. | | Death Valley Mine | grab | 86.5 | magnesium silicon | | | iron nickel | | cobalt | aluminum calcium chromium copper titanium | |
| 22 | Cascade International Talc Co., Seattle, WA | | | grab | 79 | magnesium silicon | | aluminum iron | chromium | calcium nickel | manganese | cobalt vanadium | copper titanium |
| 23 | From Johnson & Johnson | | Hammondsville Deposit, VA | grab | 78.5 | magnesium silicon | | calcium | iron | nickel | aluminum chromium manganese | cobalt | copper |
| 24 | From Johnson & Johnson | | Madoc, Ont. | grab | 91 | magnesium silicon | | | calcium | aluminum iron | | boron(<0.005) manganese | copper lead nickel titanium |
| 25 | From Johnson & Johnson | | Pinorolo, Italy | grab | 92.5 | magnesium silicon | | | iron | aluminum | | calcium titanium | copper nickel |

JNJAZ55_000002071

# 1975 – Iron in cosmetic talc

*16019I*

CONTENTS

TALC PRESENTATION BY JOHNSON & JOHNSON
TO THE O.T.C. ANTIPERSPIRANT PANEL
July 9, 1975, WASHINGTON, D. C.

Minor minerals commonly associated with cosmetic talc are chlorite; then you have the three remaining carbonates, magnesite, calcite, and dolomite.

The trace minerals commonly associated with cosmetic talc are phlogopite, muscovite, quartz, and iron oxide.

On the next slide I have a photograph of a typical cosmetic talc. It has chlorite, talc and carbonates. Can we go back to the definition of talc again?

OTC Drug(?)
Bureau of Drugs
Food and Drug Administration/DHEW

MX 180

HHS00000098

# 1975 – Iron, titanium, aluminum in high grade talc



160191

CONTENTS

TALC PRESENTATION BY JOHNSON & JOHNSON
TO THE O.T.C. ANTIPERSPIRANT PANEL
July 9, 1975, WASHINGTON, D. C.

INTRODUCTION  G. Hildick-Smith, M. D. – Director
Medical Affairs, Johnson & Johnson

TALC MINERALOGY  F. Pooley, Ph. D. – Department of
Mineral Exploitation, University
College Cardiff, Wales, U. K.

If we look at high grade talc, 30.4 which is very close to the theoretical magnesium content of pure talc, 62.1 percent $SiO_2$, again, very close with traces of calcium, iron, titanium, a little aluminum which will probably represent the chlorite mineral content of the powder, a little $CO_2$ which is reflecting the carbonate content of powder.

RECEIVED

MAR 1 1976

OTC Sub/HSE
Bureau of Drugs
Food and Drug Administration/DHEW
MX 180

HHS00000098

# 1991 – Iron found mica in Vermont talc



CYPRUS ORE RESERVE EVALUATION
PRELIMINARY SUMMARY

R. C. Munro

**INTRODUCTION**

A complete evaluation of the CIM talc reserves is underway, but has emerged as
a more complex task than anticipated. There are eighteen mining reserves to

The ores vary in talc content and brightness based upon the degree of alteration and the percentage of other minerals present, particularly iron. These ore types are classified into A,B,C ores (rock types 10,20,30) based on talc content with attendant brightness estimates.

Deleterious minerals present in the bodies include arsenic sulphides, metallic arsenates, iron and fibrous minerals, principally tremolite and actinolite.

- 1 -

IMERYS425354

# Iron in Chinese talc

**Table 2-2 Talc Deposit Geology of Different Types, Guangxi**

| Talc genesis type | Size | Explored /Geological reserves (kt) | Ore type | Ore geology | Ore grade and quality | Mineralogy and chemistry |
|---|---|---|---|---|---|---|
| Metamorphosed Ca-Mg Carbonate hydrothermal metasomatic talc deposit | Talc ore bodies is several hundreds to thousands meters long, 100 to thousand meter fipping extension, tens centimeters to several tens meters thick. Deposit is big. | 741.4/1594.01 | Dolomite (calcite)-talc, chlorite-talc. White massive talc mainly. | Occur in Hetong formation of Danzhou Group. The wall rocks are quartzeous dolomitic marble. Ore-controlling fractures are faults between the layers and axle oriental cfaults. Ore body is as silllike, lentiform, capsule and vein. Alteration is marblisation, chloritization and talcification. | I and II grade talc mainly, high quality talc. | Talc 70-96.8%, chlorite1-9%, dolomite 1%, calcite 1-2%。SiO$_2$ 40.77-63.00%, MgO25.30-32.55%, CaO0.05-8.10%, Al$_2$O$_3$0.14-8.00%, Fe$_2$O$_3$0.50-7.56%, whiteness 70-90° |
| Contact metasomatism talc deposit | About hundred meters long, several tens meters dipping extension and tens centimeters to meters thick. Small size deposit. | | Quartz-talc, chlorite-talc. Massive talc mainly | Occur in lower Permian Maokou Formation. wall rocks are Ca-Mg claystone interlayered with chert limestone. The contact zone between the bed and the diabase controls the ore mineralisation. Orebody is as pod and silllike. Alteration is chloritization and talcification。 | II grade talc mainly. Talc lumps will break when piled for a period of tome. | Talc 50-90%, quartz 1-6%, calcite 1-5%。SiO$_2$51.34-62.54%, MgO27.6.-30.78%, CaO0.30-3.24%, Al$_2$O$_3$3.00-4.50%, Fe$_2$O$_3$0.36-2.72%, whiteness 67.37-88.60° |
| Epithermal old Karst cave metasomatism talc deposit | Several hundreds meters long, several tens meters wide and several tens meters thick. Medium-small size deposit. | 132.4/89.2 | Carboneous dolomite-talc, carboneous talc. Massive talc ore. | Occur in Lower Carboniferous Xiaguan Stage dolomitic limestone and silica limestone and controlled in syncline. Ore body is as silllike and lentiform. Talc ore is varicolored. | Raw ore is II and III grade, calcined ore is up to I grade ore. | Talc 90-95%, carbon 1-5%, quartz 1%. SiO$_2$61-63%, MgO31-32%, Al$_2$O$_3$0.17-3.03%, Fe$_2$O$_3$0.02-0.41%, raw ore whiteness 20.7-88.1°, calcined ore 96-97° |
| Ultramafic autolysis hydrothermal talc deposit | Several tens to 200m long, several tens meters wide and several tens centimeters to 20m thick. Small size. | ~/5.48 | Serpentine-talc, chlorite-mica-talc. Lepidosome talc mainly | Occur in the contact zone between Cambrian schist and Caledonian migmatic granite. Ore body is as lentiform and pod. Alteration is serpentisation, talcification and kaolinization. | Quality varies. Talc originated from serpentite is I and II grade, from mica schist is III grade. | Talc 80-98%, phlogopite 1-2%, chlorite1-2%, tremolite 1-2%, serpentite 1-2%, calcite 1%。SiO$_2$36.01-62.19%, MgO27.05-31.59%, CaO0.15-1.88%, Al$_2$O$_3$4.25-19.80%, Fe$_2$O$_3$0.34-1.55%, whiteness 72-97.33° |

# Exhibit 5

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF ALAMEDA

3                HON. RICHARD SEABOLT, JUDGE

4

5   ANTHONY HERNANDEZ VALADEZ,

6          Plaintiff,

7      vs.                        Case No. 22CV012759

8   JOHNSON & JOHNSON, et al.,

9          Defendants.

    _____/

10

11

12

13

14

15       Reporter's Transcript of Remote Proceedings

16             Thursday, April 6, 2023

17

18

19

20

21

22

23       Reported By:  Sheila Pham, CSR No. 13293

24

25

Aiken Welch, A Veritext Company
510-451-1580

**EXHIBIT 5**

1                    APPEARANCES OF COUNSEL
2
3    For Plaintiff:
4            KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
             BY: JOSEPH SATTERLEY, ESQ.
5            BY: IAN RIVAMONTE, ESQ.
             55 Harrison Street, Suite 400
6            Oakland, CA 94607
             (510) 302-1000
7            jsatterley@kazanlaw.com
             jrivamonte@kazanlaw.com
8
9    For Defendants Johnson & Johnson and LTL Management:
10           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
             BY: ALLISON BROWN, ESQ.
11           One Manhattan West
             New York, NY 10001
12           (212) 735-3000
             allison.brown@skadden.com
13
             NELSON MULLINS RILEY & SCARBOROUGH
14           BY: SCOTT RICHMAN, ESQ.
             100 S. Charles Street, Suite 1600
15           Baltimore, MD 21201
             (443) 392-9414
16           scott.richman@nelsonmullins.com
17
     For Defendants Albertsons Companies Inc., Lucky Stores,
18   Save Mart LLC, Safeway Inc., Save Mart Supermarkets LLC,
     Target Corporation, and Walmart Inc.:
19
             BARNES & THORNBURG
20           BY: SANDRA KO, ESQ.
             2029 Century Park East, Suite 300
21           Los Angeles, CA 90067
             (310) 284-3880
22           sko@btlaw.com
23
24
25

1                    APPEARANCES OF COUNSEL

2

3   For Designated Defense Counsel:

4              SPANOS PRZETAK
             BY: LAURA PRZETAK, ESQ.

5              475 14th Street, Suite 550
             Oakland, CA 94612

6              (510) 250-0200
             lprzetak@spanos-przetak.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Thursday, April 6, 2023

2                       3:05 p.m. - 3:22 p.m.

3

4          THE COURT:  Good afternoon.

5          MR. SATTERLEY:  Good afternoon, Your Honor.

6          THE COURT:  So we're here on Valadez versus

7    Johnson & Johnson.

8          There was an issue that I overheard a little

9    bit about.

10         Ms. Scoggins, wasn't there someone that you

11   were talking with about -- who wasn't counsel in the

12   case?

13         THE CLERK:  That is correct, Your Honor.  And

14   they decided to log off and just listen via live stream.

15         THE COURT:  All right.  That's fine.

16         MR. SATTERLEY:  Would you like us to enter our

17   appearances?  I don't think this will be lengthy.

18         THE COURT:  Well, I don't think so either, from

19   what I've read.

20         MR. SATTERLEY:  Joe Satterley on behalf of the

21   plaintiff.

22         MR. RIVAMONTE:  Ian Rivamonte for the

23   plaintiff.

24         MS. BROWN:  Good afternoon, Your Honor.  Alli

25   Brown for J&J and LTL.

1          THE COURT:  Good afternoon.

2          MR. RICHMAN:  Good afternoon, Your Honor.

3    Scott Richman also for J&J and LTL.

4          MS. KO:  Good afternoon, Your Honor.  Sandra Ko

5    on behalf of Albertsons Company Inc., Lucky Stores LLC,

6    Safeway Inc., Save Mart Supermarkets LLC, Target

7    Corporation, and Walmart Inc.

8          THE COURT:  Good afternoon.

9          MS. PRZETAK:  Good afternoon.  Laura Przetak,

10   designated defense counsel.

11         THE COURT:  Good afternoon.

12         Anyone else?

13         (No response.)

14         THE COURT:  Go ahead, Mr. Satterley.

15         MR. SATTERLEY:  I'll just say, I'm obviously

16   not going to violate the automatic stay and do anything

17   or make any affirmative, you know, statements other than

18   to say -- to give Your Honor some information so you can

19   manage your docket because I know you've got a busy,

20   crowded docket with a lot of mesothelioma cases.

21         THE COURT:  I do.

22         MR. SATTERLEY:  And just to tell you what's

23   going on, LTL's filed yet another bankruptcy a couple

24   hours after the bankruptcy was dismissed because of the

25   Third Circuit ruling that --

1         (Simultaneous speaking.)

2         THE COURT:  -- Ms. Brown sent the petition.

3         MR. SATTERLEY:  Sure.

4         And then yesterday, Judge Kaplan issued a

5   temporary restraining order.  And so we're going to be

6   in court before Judge Kaplan on the 11th and on the

7   18th, I believe.

8         So what I'd request that Your Honor do, not

9   take any action on the case, is simply move this to the

10  19th.  We would have been in jury selection on that day,

11  anyway.

12        And if Mr. Valadez is lucky enough to have the

13  relief be granted by Judge Kaplan, you know, we'll

14  advise Your Honor either next Tuesday if, for some

15  reason, Judge Kaplan were to lift the stay or to do some

16  action.  And if the judge doesn't grant any relief

17  whatsoever, we can certainly file a statement with the

18  Court advising Your Honor as such.

19        So what I'd request is we simply not take any

20  further action in the case.  Everything is stayed until

21  the bankruptcy judge takes some action, and that we

22  report back to Your Honor so that Your Honor can manage

23  your docket.

24        THE COURT:  Thank you.  And that is obviously a

25  concern because there are a lot of statutory preference

1   cases, and it is important for me to try to manage it as

2   efficiently as possible.

3         I did have one question. And I don't think

4   this violates the stay, but I'll turn to Johnson &

5   Johnson's counsel whether it's appropriate to get the

6   answer to the question.

7         In addition to the petition that Ms. Brown sent

8   and the TRO that --

9         MS. BROWN: Your Honor, I'm sorry. The moment

10   you turned to me, my Zoom froze. If you wouldn't mind

11   just repeating your question. I apologize.

12         THE COURT: Sure. So, of course, I saw the

13   petition that was filed that you forwarded, and I saw

14   Judge Kaplan's temporary restraining order the next day,

15   which I think was yesterday.

16         And, of course, I also saw -- it was pretty

17   widely reported in the press that there's a settlement

18   fund that has been created, I think this is New York

19   Times, 8.9 billion.

20         And my question is: Is that something that

21   plaintiffs can opt out of?

22         MS. BROWN: Well, Your Honor --

23         THE COURT: Particularly if it's in violation

24   of the automatic stay.

25         MS. BROWN: Yeah, and I wouldn't want to

1    misspeak particularly on an issue of bankruptcy law.

2            What I can tell the Court and what we have

3    stated publicly is that this filing involves the support

4    of more than 60,000 claimants in the bankruptcy and it

5    involves Johnson & Johnson and LTL putting aside

6    $8.9 billion to resolve these claims.

7            My understanding, Your Honor, is the

8    particulars of a plan in a bankruptcy would still need

9    to be worked out and voted on and approved, but that

10   there is broad support with this filing from more than

11   60,000 claimants.  And the press reports are accurate,

12   Your Honor, as to $8.9 billion that Johnson & Johnson is

13   committing here.

14           THE COURT:  But I guess my question, and,

15   again, if you can't answer it, that's fine.  But if

16   sufficient, plaintiffs get to a supermajority of

17   approval, at that point is it possible for plaintiffs to

18   opt out of the settlement, which, of course, is a pretty

19   common phenomenon in class actions where plaintiffs can

20   opt out.

21           But, of course, this is a little different

22   because you're in bankruptcy court.  And I have

23   wondered, is this something about which, for example,

24   Mr. Satterley, representing Mr. Valadez, can opt out?

25           MS. BROWN:  And, Your Honor, I would have to

1   defer to bankruptcy counsel on the issues of how that

2   works.  I wouldn't want to misrepresent anything to the

3   Court, and I apologize.

4         THE COURT:  No, that's fine.  I knew it may not

5   be possible to answer the question.  I knew it may not

6   be a question that you could answer.  But when I read

7   both the petition, the temporary restraining order, and

8   the New York Times article, that's the question that I

9   had.

10        MR. SATTERLEY:  Your Honor, if I could just

11   briefly address that question.

12        Obviously, I can't answer Your Honor's question

13   because there's no plan.  There's no plan that's been

14   publicly disclosed.  And the whole process raises

15   serious, serious ethical and fraudulent issues because

16   there's no way that 60,000 women, or men for that

17   matter, could have possibly reviewed a plan that has not

18   been created and has not been written.

19        Typically, this is called a prepack bankruptcy

20   where you prepackage and you file something.  In a

21   typical prepackage bankruptcy, there would be a plan

22   filed on the first day, and there's no plan.  So I can't

23   answer Your Honor's question and I don't think anybody

24   can because there's no plan.

25        THE COURT:  Okay.

1    MR. SATTERLEY:  And we'll deal with the ethical

2  issues and the fraudulent issues in the bankruptcy

3  courts, in the appellate courts if necessary.  But

4  Your Honor's question can't be answered by Ms. Brown, by

5  me, or anybody because there's no plan.

6    MS. BROWN:  Your Honor, I think what both

7  Mr. Satterley and I can represent to the Court is that

8  upon the filing of the new bankruptcy, the automatic

9  stay applies to LTL.  Upon the entering of

10  Judge Kaplan's TRO yesterday, the case is now stayed as

11  to protected parties.  Mr. Satterley is correct, we'll

12  be back in front of the Court for a preliminary

13  injunction hearing on April 18th.

14    Mr. Satterley referenced a number of filings

15  and objections that, to my knowledge, have not yet been

16  filed.  We're certainly not aware of those, and so I

17  certainly can't speak to the timing he's proposing to

18  you, Judge.  I'm not aware of anything that

19  Mr. Satterley has put in front of the bankruptcy court

20  that would shorten the timeline for Judge Kaplan, as set

21  forth in the TRO.

22    MR. SATTERLEY:  Just on that note, Your Honor,

23  under the local rules, there's a hearing set for the

24  11th, a first day hearing, and the local rules allow

25  objections to be made orally and motions to be made

1    orally.  But I will be filing papers with the bankruptcy

2    court, and counsel will have it pursuant to the local

3    rules.

4           But unless Your Honor has any additional

5    questions...

6           THE COURT:  No, that was the one and only

7    question that I had.  And you might imagine, that's

8    because I think I have some sense as to what happens

9    depending upon the answer to that question.

10          But that's the only question I had.  I don't

11   want to put anybody on the spot.  But I had a question.

12   I thought I would ask.  I wasn't sure whether I would

13   get an answer, and apparently I can't, which is fine.  I

14   understand.  A lot of things are very complicated, and

15   sometimes it can't be easily answered.  It's a lot

16   easier always to ask a question, quite often, than it is

17   to answer it.

18          Well, it sounds as if that's all we can do.

19   I'm not going to vacate the trial date.  I mean, I

20   suppose it might make sense to do what Mr. Satterley is

21   suggesting and let it slip two days so that it is set

22   after the hearing on the motion for a preliminary

23   injunction.

24          And Judge Kaplan may -- obviously may or may

25   not rule at the time of the hearing.  But that's what

1    I'll do, and I'll just wait and see what happens in New

2    Jersey bankruptcy court and what Judge Kaplan decides.

3          I did find interesting that this case merited

4    about, I don't know, a half page of what I think was,

5    like, a six-page order.  And Judge Kaplan is

6    sufficiently familiar with this case that -- I don't

7    know, and I imagine the Johnson & Johnson bankruptcy

8    lawyers may have prepared a proposed order, but

9    Judge Kaplan was familiar enough with this case to know

10   that Valadez had been misspelled, and he had corrected

11   it.

12          So I'm sure he will do the right thing and I'm

13   sure I will find out as soon as he makes his decision.

14   But I will have the trial date slip two days so that --

15   I think it's reasonable to expect that we might not get

16   a decision before the hearing on a preliminary

17   injunction.  We may not get one on the day of or even

18   the day after.  But I would like to maintain the current

19   court schedule because of Mr. Valadez's situation.

20          MR. SATTERLEY:  I appreciate that, Your Honor.

21          Just to give Your Honor a bit of history, I

22   have moved to lift the stay with Judge Kaplan on a

23   number of cases, on a number of occasions.  And in most

24   instances, he does rule on the same day, so -- in one

25   instance, he -- yeah, I think -- and he knows the

1  Valadez case because I've moved to lift the stay a whole
2  bunch of times.
3          But I hope to be able to report back to
4  Your Honor either on the 18th or the 19th.  And if for
5  some reason, the Court doesn't rule, we will meet and
6  confer with counsel and come up with a proposal.
7          THE COURT:  That sounds --
8          MS. BROWN:  And, Your Honor, I feel, given the
9  Court's inclination to keep the date, I do need to jump
10 in with some contingency plan.  Certainly, I haven't
11 seen a motion from Mr. Satterley.  We will oppose that.
12         But if Mr. Satterley gets the relief that he's
13 seeking, is it the Court's intention to start picking a
14 jury the day after, or would we --
15         THE COURT:  I doubt that.  I mean, I think,
16 Ms. Brown, you know in the typical statutory preference
17 case in this court, it's not unusual for the first day
18 of trial to be a pretrial conference.  Mr. Satterley
19 convinced me that because of the unique circumstances of
20 the Valadez case, that it makes sense to target
21 April 17th as the actual jury selection day.
22         I'm practical enough to know that there are
23 still issues, and if this case is stayed, as I -- at
24 least I expect, up to the date when Judge Kaplan rules
25 on a preliminary injunction that there likely will still

1  be some issues that are going to need to be addressed

2  before we call in a jury.  Because, frankly, one of my,

3  always, most significant concerns is for jurors.  They

4  give up a lot of time and attention from their important

5  daily activities to resolve the problems of private

6  parties, and I don't want to keep them waiting.

7        So I will want to make sure that we don't call

8  a jury in before I feel reasonably comfortable that, in

9  fact, we're ready to call a jury in.  But I hope to do

10  that as soon as possible, consistent with what we

11  previously discussed and the fact that we previously

12  targeted April 17th as the actual day when we would call

13  in a jury.

14        MS. BROWN:  Understood, Your Honor.

15        THE COURT:  I think that's the best I can

16  answer it.

17        MS. BROWN:  I appreciate it.  Thank you, Judge.

18        THE COURT:  Is there anything else that we can

19  or should discuss?

20        MR. SATTERLEY:  No, Your Honor.  I will see you

21  tomorrow morning in other cases.

22        THE CLERK:  Your Honor?

23        THE COURT:  Yes.

24        THE CLERK:  Would you like to keep the

25  April 13th CMC on calendar in this case?

1       MR. SATTERLEY:  We can't.

2       THE COURT:  Yeah, I don't think we can.

3       THE CLERK:  Okay.

4       MR. SATTERLEY:  If for some reason,

5  Judge Kaplan rules something on Tuesday, the 11th, we

6  will immediately alert the Court to that.  So there's a

7  slight possibility.  I don't know what Judge Kaplan is

8  going to do Tuesday, but if there's a ruling that

9  impacts that or if the stay is lifted, we'll immediately

10  notify the Court.

11       MS. BROWN:  Are you intending to bring a motion

12  to lift the stay on Tuesday, Mr. Satterley?

13       MR. SATTERLEY:  Yes.

14       MS. BROWN:  Orally, or you'll file something in

15  advance?

16       MR. SATTERLEY:  I plan on filing something on

17  Monday.

18       MS. BROWN:  Okay.

19       THE COURT:  Well, let me ask.  Maybe we should

20  just let things lie as they sit right now with the

21  April 17th trial date, recognizing that federal

22  preemption precludes us from actually doing anything on

23  the 17th, likely.

24       MR. SATTERLEY:  That's fine.  And to the extent

25  that Judge Kaplan rolls the hearing on the 11th to the

1  18th, we can roll the 17th to the 19th.

2          THE COURT:  And that seems fine.  But it is

3  helpful to me in managing my own calendar because

4  generally, I am able to make decisions that affect my

5  own calendar.  This is the situation where that's not

6  the case.  And, again, as a result of federal

7  preemption, Judge Kaplan obviously has the authority to

8  make decisions that may impact my calendar, but that's

9  fine.  We'll deal with that.

10         MR. SATTERLEY:  Have a good evening,

11  Your Honor.  Thank you so much.

12         THE COURT:  Thank you very much.

13         (Proceedings concluded at 3:22 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATION

I, Sheila Pham, a Certified Shorthand Reporter, do
hereby certify:

That the foregoing proceedings were taken before me
at the time and place therein set forth, that the
proceedings were reported stenographically by me and
were thereafter transcribed under my direction and
supervision, and that the foregoing pages contain a
full, true and accurate record of all proceedings and
testimony to the best of my skill and ability.

In witness whereof, I have subscribed my name.

Dated: 4/7/2023

Sheila Pham
CSR No. 13293

# Exhibit 6

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

Order Filed on April 6, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>           Debtor. | Chapter 11<br><br>Case No.:  23-12825 (MBK)<br><br>Judge:  Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>           Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>           Defendants. | Adv. No.:  23-01092 (MBK) |

<u>**AMENDED EX PARTE TEMPORARY RESTRAINING ORDER**</u> The

relief set forth on the following pages is hereby **ORDERED**.

**DATED: April 6, 2023**

*Michael B. Kaplan*

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**EXHIBIT 6**

(Page 2)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

This matter coming before the Court on the *Debtor's Verified Complaint for*

*Declaratory and Injunctive Relief (I) Declaring That the Automatic Stay Applies or Extends to*

*Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and*

*(III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing On a Preliminary*

*Injunction* (the "Complaint") and the *Debtor's Motion for an Order (I) Declaring that the*

*Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily*

*Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a*

*Hearing On a Preliminary Injunction* (the "Motion"),[2] both filed by the above-captioned plaintiff

and debtor (the "Debtor"); the Court having reviewed (i) the Complaint, (ii) the Motion, (iii) the

*Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 4 in Case No. 23-12825]

(the "First Day Declaration") filed in the Debtor's main chapter 11 case and (iv) the *Declaration*

*of Daniel J. Merrett in Support of Debtor's Complaint for Declaratory and Injunctive Relief and*

*Related Motion*, the Court finds and concludes as follows:

## Background, Jurisdiction and Venue

A.      For purposes of this Order, the term "Debtor Talc Claims" shall mean,

collectively, any talc-related claims against the Debtor, including all claims that formerly were

asserted against (or that could have been asserted against) the former Johnson & Johnson

Consumer Inc. ("Old JJCI") relating in any way to talc or talc-containing materials (but not

including talc-related claims for which the exclusive remedy is provided under workers'

---

[2]         Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

(Page 3)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

compensation statutes and similar laws).  For the avoidance of doubt, Debtor Talc Claims

include, without limitation, all talc personal injury claims and other talc-related claims allocated

to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring

— e.g., all talc personal injury claims and other talc-related claims arising in whole or in any part

from, or otherwise in any manner relating to, any conduct, action or failure to act of Old JJCI.

B.      The Plaintiff in this adversary proceeding is Debtor LTL

Management LLC.  The Defendants in this adversary proceeding are all named plaintiffs in the

talc-related lawsuits against the Debtor (or for which the Debtor is responsible or alleged

responsible) listed on Appendix A to the Complaint, as well as John and Jane Does 1-1000.  The

actions listed on Appendix A are all lawsuits that were either allocated to the Debtor in the

2021 Corporate Restructuring or otherwise asserted against the Debtor prior to the Petition Date.

The Protected Parties are listed in Appendix B to the Complaint, which is also attached to this

Order.  Defendants John and Jane Does 1-1000 are prospective plaintiffs who may at any time

while the above-captioned chapter 11 case is pending seek to hold the Protected Parties liable for

the Debtor Talc Claims.

C.      The Debtor seeks, pursuant to Rule 65(b) of the Federal Rules of Civil

Procedure (the "Civil Rules") and Rule 7065 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), a temporary restraining order prohibiting the Defendants from

continuing or commencing against any of the Protected Parties any action or claim asserting, on

any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious

(Page 4)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

liability, fraudulent or voidable transfer or conveyance, alter ego, or otherwise), any Debtor Talc

Claims.

       D.     The Court has subject matter jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue

for this matter is proper in this District pursuant to 28 U.S.C. § 1409.

## Request for Temporary Restraining Order

       E.     A denial of the Debtor's request for a temporary restraining order pending

a final hearing on the Debtor's request for injunctive and/or declaratory relief would cause

the very harm that the Debtor seeks to prevent by the Motion and the Complaint.  Without

immediate injunctive relief, it is expected that:  (i) many Defendants who already have asserted

Debtor Talc Claims against the Protected Parties will attempt to continue prosecuting such

claims outside of the Debtor's Chapter 11 Case; (ii) many Defendants who have sued only the

Debtor will seek to amend their complaints to name one or more of the Protected Parties and

prosecute Debtor Talc Claims against those Protected Parties outside of the Chapter 11 Case; (iii)

many Defendants will seek to amend their complaints to add new causes of action against the

Protected Parties in an effort to proceed with litigation against the Protected Parties outside of the

Chapter 11 Case; and (iv) Defendants John and Jane Does 1-1000 will file Debtor Talc Claims

against the Protected Parties but not the Debtor.  The commencement or continued prosecution of

the Debtor Talc Claims against Protected Parties risks significant, immediate and irreversible

harm to the Debtor and its estate because:  (i) the Debtor has contractual obligations to indemnify

Protected Parties for any liability on account of the Debtor Talc Claims,

(Page 5)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

(ii) findings and judgment in litigation of Debtor Talc Claims  against the Protected Parties could

bind the Debtor, (iii) litigation of the Debtor Talc Claims  against the Protected Parties will

prejudice the Debtor's interests, and (iv) litigation of Debtor Talc Claims against the Protected

Parties would divert key personnel from the Debtor's reorganization efforts.  Accordingly, the

Debtor has demonstrated that it will suffer "immediate and irreparable injury, loss, or damage" in

the absence of immediate relief before any adverse party can be heard in opposition.  Fed. R. Civ.

P. 65(b).

F.     As a result of the annulment of the stay and injunction in the 2021 Chapter

11 Case, it is anticipated that litigation will immediately recommence leading imminently to

depositions occurring, court appearances being scheduled and answers coming due in cases

asserting Debtor Talc Claims.  If Debtor Talc Claims against the Protected Parties are permitted

to proceed pending a final hearing on the Debtor's request for injunctive or declaratory relief, the

Debtor will be compelled to actively monitor, participate in and defend currently pending and

additional threatened Debtor Talc Claims against the Protected Parties, notwithstanding the

automatic stay, to guard against, among other things, potential indemnity claims, evidentiary

prejudice and the risks of collateral estoppel and res judicata.  In doing so, key personnel will be

diverted from assisting the Debtor in achieving its reorganization goals.

G.     Notice of the Debtor's request for a temporary restraining order is likely to

precipitate the assertion of additional Debtor Talc Claims against the Protected Parties.  This

temporary restraining order is requested on an ex parte basis, and the Court finds that the

requested relief is required to prevent that result.

(Page 6)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

H.     Accordingly, this Court finds it appropriate to enter a temporary

restraining order without notice to the Defendants pursuant to Civil Rule 65(b)(l) and Bankruptcy

Rule 7065.

I.     To allow more parties in interest, including an appointed Talc Committee,

to participate in the hearing on the requested relief and to conserve time and resources, this Court

finds good cause for an extension and will enter a temporary restraining order extending for the

maximum period allowed under Civil Rule 65 — 28 days — and set a hearing on the Motion and

the Complaint on or before that date.

J.     The legal and factual bases set forth in the Motion, the Complaint, the First

Day Declaration establish just cause for the relief granted herein.

**Based on these findings and conclusions, IT IS HEREBY ORDERED THAT:**

1.     The Motion is GRANTED with respect to its request for a temporary

restraining order, as provided herein.

2.     The Defendants are prohibited and enjoined from commencing or

continuing to prosecute any Debtor Talc Claim against any of the Protected Parties on any theory

of liability, whether direct, derivative, joint and several, successor liability, vicarious liability,

fraudulent or voidable transfer or conveyance, alter ego or otherwise, through and including

28 days from the date of entry of this Order, during which time the Court will hold a hearing on

the Debtor's request for injunctive and/or declaratory relief on **April 18, 2023 at 10:00 a.m.**

This temporary restraining order includes, without limitation:  (i) the pursuit of discovery from

the Protected Parties or their officers, directors, employees or agents; (ii) the enforcement of any

(Page 7)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption: Ex Parte Temporary Restraining Order

discovery order against the Protected Parties; (iii) further motions practice related to the

foregoing; and (iv) any collection activity on account of a Debtor Talc Claim against any

Protected Party or its officers, directors, employees or agents or its respective assets.

3.       For the avoidance of doubt, the terms of this temporary restraining order

apply to any further proceedings in the matter styled Valadez v. Johnson & Johnson et al., which

is currently pending in the Superior Court of California, Alameda County, Case

No. 22CV012759.

In granting relief from the automatic stay and preliminary injunction in the

previous case (see ECF No. 3771 in Case No. 21-30589), it was the Court's view at that time that

there was little prospect for a reorganization, given the Third Circuit's reversal.  Inasmuch as

there is now a potential resolution favorable to all claimants through the newly-filed bankruptcy

case, the Court wishes to examine whether this litigation (and others like it) should go forward,

and regards it as prudent to do so without burdening the parties or other courts during the 13-day

period between entry of this TRO and the initial hearing on the preliminary injunction.

4.       This Order is entered without prejudice to the Debtor's right to request that

this Court extend this Order to include other entities or persons not previously identified in

Appendix A or Appendix B to the Complaint and the Motion.  For the avoidance of doubt, the

inclusion of a talc-related claim on Appendix A is not an admission that such Defendant holds a

currently pending claim against either the Debtor or the Protected Parties.

(Page 8)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

5.       Any party subject to this Order may seek relief from any of the provisions of this Order for cause shown.  This Order is without prejudice to the Debtor's or others' rights to seek relief pursuant to section 362 of the Bankruptcy Code.

6.       Notwithstanding anything to the contrary in this Order, any party asserting Debtor Talc Claims, without leave of the Court, may take reasonable steps to perpetuate the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if it is not perpetuated during the duration of this Order.  Notice shall be provided to the Debtor by notifying counsel for the Debtor of the perpetuation of such testimony.  The Debtor shall have the right to object to the notice on any grounds it would have had if it were a party to the underlying proceeding and not subject to the terms of this preliminary injunction, and the Debtor may raise any such objection with this Court.  The use of such testimony in any appropriate jurisdiction shall be subject to the applicable procedural and evidentiary rules of such jurisdiction.  All parties reserve and do not waive any and all objections with respect to such testimony.  Defendants or other individuals asserting Debtor Talc Claims may not seek to perpetuate the testimony of representatives, including directors, officers, employees and agents, of the Debtor or the Protected Parties without the consent of the Debtor or an order of the Court.  Notwithstanding the forgoing, parties in lawsuits pending in the MDL who wish to perpetuate the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if it is not perpetuated during the duration of this Order shall

(Page 9)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

comply with the process outlined in the In Extremis Deposition Protocol entered on January 23,

2017 in the MDL.

       7.    The automatic stay is hereby lifted to permit the applicable parties to

proceed with and complete the following appeals, in each of which surety bonds have been

issued in connection with the appeal:  (a) Leavitt; (b) Olson; (c) Schmitz; (d) Barden (as to

Barden, Etheridge, McNeill and Ronning); and (e) Prudencio.

       8.    All statutes of limitation related to the Debtor Talc Claims asserted by the

Defendants against either the Debtor or Old JJCI are hereby immediately tolled in accordance

with Section 108(c) of the Bankruptcy Code pending further Order of this Court.

       9.    Pursuant to Bankruptcy Rule 7065, the Debtor is relieved from posting

any security under Civil Rule 65(c).

      10.    This Order shall be immediately effective and enforceable upon its entry.

      11.    The Debtor shall cause a copy of this Order to be served via e-mail,

facsimile, hand delivery or overnight carrier on counsel for the known Defendants and the Office

of the United States Trustee within three business days of its entry on the Court's docket.

      12.    This Order shall be promptly filed in the Clerk of Court's office and

entered into the record.  This Order shall remain effective for the period through and including

28 days after the entry of this Order.

(Page 10)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092-MBK
Caption:  Ex Parte Temporary Restraining Order

13.    This Court retains exclusive jurisdiction over this Order and any and all matters arising from or relating to the implementation, interpretation or enforcement of this Order.

14.    For purposes of clarity, the Court notes that the following adversary proceedings (related Debtor's previous bankruptcy case, Case No. 21-30589) were closed as a result of the dismissal of the prior bankruptcy case.

- 22-01073 - LTL Mgmt. LLC v. San Diego County Employees Retirement Association

- 22-01123 - LTL Mgmt. LLC v. the State of New Mexico, ex rel. Hector H. Balderas, et al.

- 22-01393 - LTL Mgmt. LLC v. Moline

- 23-01022 - LTL Mgmt. LLC v. Emory

In light of their dismissal, any preliminary injunction imposed in those proceedings is no longer in effect.  Further, this Temporary Restraining Order does stay those litigations, as the parties involved are not listed in Appendix A to the Complaint.

Form order – ntcorder

## UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  LTL Management LLC
Debtor

                                       Case No.: 23–12825–MBK
                                       Chapter 11

LTL Management LLC
Plaintiff

v.

Those Parties Listed on Appendix A to the Complaint and
John and Jane Does 1–1000
Defendant

Adv. Proc. No. 23–01092–MBK                       Judge: Michael B. Kaplan

### NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

       Please be advised that on April 6, 2023, the court entered the following judgment or order on the court's docket in the above–captioned case:

Document Number: 15 – 2, 9, 14
AMENDED EX PARTE TEMPORARY RESTRAINING ORDER (related document:2 Motion re: Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non–Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction Filed by LTL Management LLC. 9 EX PARTE TEMPORARY RESTRAINING ORDER (related document:2 Motion re: Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non–Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction 14 Document re: Letter to Chief Judge Kaplan Regarding Ex Parte Temporary Restraining Order filed by Paul R. DeFilippo on behalf of LTL Management LLC. (Attachments: # 1 Annex I # 2 Annex II). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 4/6/2023 (bwj)

       Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: April 6, 2023
JAN: bwj

                                              Jeanne Naughton
                                              Clerk

# Exhibit 7



*35587450*

DOCUMENT: CASE MANAGEMENT ORDER (ORD010)

CASE: 22CV012759

--

ISSUED AND FILED: 03/02/2023

FILED BY:

BARCODE BY: ascoggins 03/02/2023 4:16 PM

ENTERED BY: ascoggins 03/02/2023 4:16 PM

**EXHIBIT 7**



FILED
ALAMEDA COUNTY

MAR 0 2 2023

CLERK OF THE SUPERIOR COURT
By_____
Deputy

1  Joseph D. Satterley (C.S.B. #286890)
   Denyse F. Clancy (C.S.B. #255276)
2  Ian A. Rivamonte (C.S.B. #232663)
   irivamonte@kazanlaw.com
3  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
4  Jack London Market
   55 Harrison Street, Suite 400
5  Oakland, California 94607
   Telephone: (510) 302-1000
6  Facsimile: (510) 835-4913

7  Attorneys for Plaintiff

8              SUPERIOR COURT OF CALIFORNIA

9                  COUNTY OF ALAMEDA

10  ANTHONY HERNANDEZ VALADEZ,          Case No. 22CV012759

11              Plaintiff,              **PREFERENCE MOTION GRANTED**

12       vs.                            Assigned for All Pre-Trial Purposes to
                                        Judge Richard Seabolt
13  JOHNSON & JOHNSON, et al.,          Department 18

14              Defendants.             [~~PROPOSED~~] CASE MANAGEMENT
                                        ORDER
15
                                        Action Filed:    June 15, 2022
16                                      Trial Date:      April 17, 2023

17

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

On February 23, 2023, this cause came before the Court for a Case Management Conference. The parties appeared through their respective counsel of record. The conference was transcribed. After the parties and this Court discussed scheduling and other issues, **IT IS HEREBY ORDERED THAT:**

1. Pursuant to the stipulation between Plaintiff Anthony Hernandez Valadez ("Plaintiff") and the Retailer Defendants,[1] this Court severs Plaintiff's fraud and punitive-damages claims against the Retailer Defendants. If necessary, Plaintiff may try those claims against the Retailer Defendants at a later date.

2. Except for the deposition of Defendants' Person(s) Most Qualified ("PMQ") and Custodian(s) of Records ("COR"), the notice of deposition for fact and expert witnesses must be served at least five days before the date set for the deposition. For PMQ and COR depositions, the notice must be served at least ten days before the date set for the deposition.

3. Fact discovery closes on April 10, 2023.

4. Expert discovery closes on April 14, 2023.

5. Any party unilaterally canceling an accepted deposition will be responsible for re-calendaring the deposition within a reasonable time before discovery closes.

6. All in limine motions are to be served on opposing counsel by March 27, 2023. All oppositions to in limine motions are to be served on opposing counsel by April 3, 2023. A party may seek leave of court to serve additional motions in limine above the maximum number set forth by the Court in its Trial Setting Order dated August 26, 2022.

7. The last day to hear any party's motion for summary judgment and/or summary adjudication is April 13, 2023. The Court finds good cause for such motions to be heard less than 30 days before trial. Pursuant to the parties' agreement, 35 days' notice is required on motions for summary judgment/adjudication, with opposition and reply papers due per Code of Civil Procedure section 437c.

---

[1] "Retailer Defendants" collectively refer to Defendants Albertsons Companies, Inc., Lucky Stores (Save Mart) LLC f/k/a Lucky Stores, Inc., Safeway Inc., Save Mart Supermarkets LLC, Target Corporation, and Walmart Inc.

[Proposed] Case Management Order

8. Unless stated herein, all other deadlines and matters set forth in this Court's Trial Setting Order, filed on August 26, 2022, still apply.

**IT IS SO ORDERED.**

DATED: 3|2|23

_____
Judge Richard Seabolt

Approved as to form:

Dated:                                          Dated:

KING & SPALDING LLP                BARNES & THORNBURG LLP

By: _____     By: _____
     Julia E. Romano                          Sandra M. Ko
     Bryan L. King                             Noushan Noureddini

Attorneys for Defendants Johnson & Johnson     Attorneys for Defendants Albertsons
and LTL Management LLC                         Companies, Inc.; Lucky Stores (Save Mart)
                                               LLC f/k/a Lucky Stores, Inc.; Safeway Inc.;
                                               Save Mart Supermarkets LLC; Target
                                               Corporation; and Walmart Inc.

covered in 3|2|23 transcript

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>03/02/2023<br>Clad Finke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>A. Scoggins |
| PLAINTIFF/PETITIONER:<br>ANTHONY HERNANDEZ VALADEZ | |
| DEFENDANT/RESPONDENT:<br>JOHNSON & JOHNSON et al | |
| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>22CV012759 |

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the **CASE MANAGEMENT ORDER** entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.

jsatterley@kazanlaw.com
lprzetak@spanos-przetak.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 03/02/2023

By:

A. Scoggins, Deputy Clerk

# Exhibit 8

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              COUNTY OF ALAMEDA

3          HON. RICHARD SEABOLT, JUDGE

4

5  ANTHONY HERNANDEZ VALADEZ,

6       Plaintiff,

7    vs.                  Case No. 22CV012759

8  JOHNSON & JOHNSON, et al.,

9       Defendants.
    _____/

10

11

12

13

14

15     Reporter's Transcript of Remote Proceedings

16         Thursday, February 16, 2023

17

18

19

20

21

22

23     Reported By:  Sheila Pham, CSR No. 13293

24

25

**EXHIBIT 8**

```
 1              APPEARANCES OF COUNSEL
 2
 3   For Plaintiff:
 4           KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
             BY: JOSEPH D. SATTERLEY, ESQ.
 5           BY: DENYSE F. CLANCY, ESQ.
             BY: IAN RIVAMONTE, ESQ.
 6           55 Harrison Street, Suite 400
             Oakland, CA 94607
 7           (510) 302-1000
             jsatterley@kazanlaw.com
 8           dclancy@kazanlaw.com
             irivamonte@kazanlaw.com
 9
10   For Defendant Johnson & Johnson:
11           KING & SPALDING
             BY: JULIA E. ROMANO, ESQ.
12           633 W. Fifth Street, Suite 1600
             Los Angeles, CA 90071
13           (213) 443-4370
             jromano@kslaw.com
14
15   For Retailer Defendants:
16           BARNES & THORNBURG
             BY: SANDRA KO, ESQ.
17           2029 Century Park East, Suite 300
             Los Angeles, CA 90067
18           (310) 284-3880
             sko@btlaw.com
19
20   For Designated Defense Counsel:
21           SPANOS PRZETAK
             BY: LAURA PRZETAK, ESQ.
22           475 14th Street, Suite 550
             Oakland, CA 94612
23           (510) 250-0200
             lprzetak@spanos-przetak.com
24
25
```

1          Thursday, February 16, 2023

2              9:59 a.m. - 11:15 a.m.

3

4          THE COURT:  Mr. Satterley, is there any kind of

5     an updated case management statement?  I mean, I'm happy

6     to do this orally.

7          MR. SATTERLEY:  I think there is, Your Honor.

8     I think Mr. Rivamonte submitted something yesterday.

9          Did we submit also the transcript from Tuesday,

10    Mr. Rivamonte, Judge Kaplan's -- the transcript of the

11    hearing we had on Tuesday in New Jersey?

12         But I can give Your Honor an overview of the

13    case.  We met and conferred with defense counsel

14    yesterday.  And just to sort of give you, I guess, what

15    our request will be, if that makes it easier for

16    Your Honor.

17         THE COURT:  And that's fine.  That's kind of

18    the question.  Should I do a little bit of reading

19    before this?

20         And, candidly, part of this is, Ms. Scoggins, I

21    think, got an inquiry yesterday about whether live

22    stream was going to be on because I think she said some

23    media outlet might be interested.

24         MR. SATTERLEY:  Yes, Your Honor.  We have no

25    objection to the live stream.  I know after Tuesday's

1 hearing, this made national news. It was in the Wall

2 Street Journal, this case, it was in Bloomberg News. So

3 I've been contacted by several folks. I haven't given

4 any interviews or anything like that.

5 But I have no objection to live stream being on

6 so folks can listen in to this because we're not going

7 to be talking about any specific evidentiary issues

8 other than just scheduling and overview of the case,

9 most of which have already been mentioned on Tuesday

10 with Judge Kaplan. And I think that was -- the public

11 was invited to that, and there was over 200 participants

12 listening in on that hearing on Tuesday.

13 THE COURT: And let me ask, is Ms. Pham, who I

14 think was on the Hall case -- is there a court reporter

15 for this?

16 THE REPORTER: I'm also on this case,

17 Your Honor.

18 THE CLERK: Ms. Pham is still in the meeting,

19 yes.

20 THE COURT: All right. Hold on just a moment.

21 So let me call Valadez versus Johnson &

22 Johnson.

23 MR. SATTERLEY: Good morning, Your Honor. Joe

24 Satterley on behalf of Anthony Valadez.

25 THE COURT: Good morning.

1          MS. CLANCY:  Good morning, Your Honor.

2     Mr. Rivamonte and Ms. Clancy also on behalf of

3     Mr. Valadez.

4          THE COURT:  And good morning.

5          MS. ROMANO:  Good morning, Your Honor.  Julia

6     Romano from King & Spalding for Johnson & Johnson.

7          THE COURT:  Good morning.

8          MS. KO:  And good morning, Your Honor.  Sandra

9     Ko from Barnes & Thornburg on behalf of Albertsons

10    Companies Inc., Lucky Stores, Save Mart LLC, Save Mart,

11    Inc., Save Mart Supermarkets LLC, Target Corporation,

12    and Walmart Inc.

13         THE COURT:  Good morning.

14         MS. PRZETAK:  Good morning, Your Honor.  Laura

15    Przetak appearing as designated defense counsel at the

16    request of defendants.

17         THE COURT:  Good morning, Ms. Przetak.

18         Has everybody stated their appearance on this

19    matter?

20         MR. SATTERLEY:  I believe so, Your Honor.

21         THE CLERK:  Your Honor, I still see a few

22    individuals who did not state their appearance, and I

23    would like to know, and I'm sure the court reporter

24    would like to know, if they're a part of this case.

25         THE COURT:  At least Mr. Spaulding, I think,

1    may be -- it may be a carryover from the Hall case.

2            THE CLERK:  They just changed their names to

3    "observer" on one of them.

4            And then there's a James Buck.

5            MR. BUCK:  Yes, good morning.  I'm actually

6    here for a 10:00 hearing in Lucas.

7            MR. SATTERLEY:  Lucas is one my cases, I think,

8    and I don't have anything --

9            THE CLERK:  There's a tentative --

10           MR. BUCK:  I saw the tentative.  It was also

11   set for case management.

12           THE CLERK:  That's correct.

13           THE COURT:  At 3:00.

14           MR. BUCK:  At 3:00.  Thank you.  I'll hop back

15   on at 3:00.

16           THE COURT:  Thank you.

17           All right.  With that, Mr. Satterley, why don't

18   you bring at least me and all of us up to date as to

19   what happened in --

20           MR. SATTERLEY:  Sure.  Your Honor, if I could

21   screen share and show some of the slides that I shared

22   with Judge Kaplan and to give Your Honor and all counsel

23   an overview of the case.

24           Is that permissible?

25           THE COURT:  Yes.

1          MR. SATTERLEY:  Let's see if I can get into --

2     so can Your Honor see the PowerPoints I'm showing?

3          THE COURT:  Yes.

4          MR. SATTERLEY:  So this is Anthony Hernandez

5     Valadez versus Johnson & Johnson and also many of the

6     other retailer defendants.  His sole exposure to

7     anything is baby powder, Johnson & Johnson baby powder.

8     This is --

9          MR. CLANCY:  I'm sorry, Mr. Satterley, I don't

10    mean to interrupt you, but we can see your note pages.

11    I think you might be showing the wrong screen.

12         MR. SATTERLEY:  Let me see what I'm doing wrong

13    here.  I didn't make any notes on this PowerPoint, so I

14    don't know.

15         THE COURT:  Candidly, I don't see any notes.

16         MS. CLANCY:  So I think if you go to slideshow

17    and then -- up there where it says "Slideshow," next to

18    animation, keep going right.  Yeah.  Then I think play

19    from start.

20         MR. SATTERLEY:  Play from start?

21         MS. CLANCY:  Yes.

22         MR. SATTERLEY:  Excellent.

23         MS. CLANCY:  It should work.

24         There it is, yeah.

25         MR. SATTERLEY:  Can you still see whatever

1   notes were on there that somebody else created?

2           MS. CLANCY:  I think that's the next slide you

3   can see now just a little portion of.

4           MR. SATTERLEY:  Are there notes there?

5           MS. CLANCY:  There's a Notes section, but no

6   notes.  So go ahead.

7           MR. SATTERLEY:  I apologize, Your Honor.

8           THE COURT:  No problem.

9           MR. SATTERLEY:  So this is a photograph of

10  Mr. Valadez as a baby in the late 1990s, and it's a

11  photograph of the Johnson's baby powder that they had in

12  his home.  This was disclosed early in the disclosure

13  last year and was also used during his deposition in

14  September.

15          This is a declaration of Mr. Valadez we

16  submitted back in May of last year.  And it's basically

17  that he was born in September -- on September 23rd,

18  1998; that Johnson baby powder was regularly used on him

19  as a baby.  He first used the baby powder on himself at

20  age 13 and continued to use that product for several

21  years multiple times a day.  And he used it for, you

22  know, combating sweat, odors because of the smell of the

23  baby powder.  And, like I said, this was submitted to

24  counsel in May of 2022.

25          This is a slide that I've used in almost every

1   one of the trials against Johnson & Johnson.  This is a

2   Johnson & Johnson official scientific engagement leader

3   where they have acknowledged that mesothelioma is known

4   to be exclusively caused by exposure to asbestos.

5           Mr. Valadez has both pleural and pericardial

6   mesothelioma.  Pericardial mesothelioma is -- there's a

7   lining of the heart, just like the lining of the lungs

8   or the lining of the stomach.  And it's mesothelioma

9   cells.  And so his cancer is particularly around his

10  heart.  And this becomes important when I explain what

11  I've shared with Judge Kaplan and defense counsel about

12  this case.  So he has it both around the lining of his

13  heart and the around lining of his lung.

14          THE COURT:  And, Mr. Satterley, I apologize for

15  interrupting, but would I be able to get a copy of the

16  PowerPoint slides?

17          MR. SATTERLEY:  I will e-mail a copy to

18  Your Honor and to all defense counsel at the conclusion

19  of today's case management conference for the trial,

20  yes.

21          THE COURT:  All right.

22          MR. SATTERLEY:  And most of these slides have

23  been already disclosed to J&J because I used them on

24  Tuesday with Judge Kaplan, at least many of them.

25          THE COURT:  Sure.

1       MR. SATTERLEY:  But I have no problem sharing

2  this with Your Honor and sharing this with all counsel.

3       So to give Your Honor an overview of what's

4  happened, starting last April -- J&J filed bankruptcy in

5  October of 2021.  Mr. Valadez is diagnosed with

6  mesothelioma in early 2022.  In April of 2022 -- before

7  April, we were engaged in negotiations on a global

8  situation with J&J and the entity that they created

9  called LTL.  That stands for long-term -- no, Legacy

10  Talc Liability (sic).  LTL was the vehicle they created

11  and put into bankruptcy.  We were in negotiations with

12  them, confidential, back in spring of 2022.  Obviously,

13  it failed.  No resolution occurred.

14       In April of 2022 -- I think April the 20th or

15  the 21st, I sent a letter to J&J's counsel, bankruptcy

16  counsel at Jones Day, along with the trial counsel at

17  King & Spalding, Mr. Calfo, and other trial counsel,

18  Allison Brown, with a description of this case which

19  included medical records, included declarations from

20  Mr. Valadez and his mom, literature regarding

21  pericardial mesothelioma, and requested the option to

22  resolve this case on April the 20th, 2022.  Heard

23  nothing back from defense counsel.

24       I followed up with them, submitted additional

25  information to their national negotiating counsel and

1   counsel for all the retailers, Mr. Murdica, Jim Murdica,

2   and submitted additional information to him requesting,

3   once again, to try to resolve the case and heard nothing

4   back from him either.  My law partner, Mr. McClain, was

5   advised that they had no interest in being involved in

6   the case or negotiating the case until our last -- the

7   stay was lifted so that the case could proceed.

8           So based upon Mr. Murdica at Barnes &

9   Thornburg's representation, I prepared and filed a

10  motion to lift the stay.  We filed that with

11  Judge Kaplan on May the 24th and set that for hearing

12  and explained the situation to Judge Kaplan.  And we had

13  a hearing on June 14th.

14          And at that point, we had already had

15  declarations from his treating doctors at Stanford,

16  which I'll show Your Honor in a minute.  And based upon

17  extensive argument on June the 14th, Judge Kaplan agreed

18  to lift the stay to allow me to file the complaint for

19  this case and the Audra Johnson case.  Audra Johnson is

20  not at issue today.

21          So we filed the complaint immediately.  And the

22  stay was lifted as it relates to J&J, the nondebtor, and

23  all the retailers that are in the nondebtor.  But at

24  that point in time, Judge Kaplan didn't lift the stay

25  for LTL, the debtor.  Judge Kaplan told me to proceed

1    with filing the complaint, but not to take any further

2    action until further hearings occurred.

3          I said okay.  Of course I'm not going to

4    violate the Court's order.

5          So we had another hearing on July the 26th, and

6    me and Ms. Clancy were there in New Jersey.  And we

7    requested the Court to lift the stay so we can move for

8    a trial date and get a preference setting.  And we

9    explained how Alameda County has a sophisticated trial

10   docket and how the preference statute in California

11   would allow Mr. Valadez to have his day in court before

12   he died.

13         Two days later, Judge Kaplan issued an order

14   allowing Mr. Valadez -- lifting the stay further,

15   allowing him to move for a trial date and allowing him

16   to preserve evidence -- gather evidence, gather tissue

17   for tissue digestion.  Because both on June 14th and on

18   July 26th, I explained to the judge how important it was

19   to get the pathology to digest the tissue to see what's

20   in his tissue because that's, you know, an important

21   part of causation.

22         So Judge Kaplan lifted the stay on July the

23   28th.  And then we moved for a trial date in August, and

24   Judge Lee set -- we had a hearing.  We submitted all the

25   declarations, and Judge Lee set the case for

1  November the 7th.

2  　　　We went back -- well, Mr. Valadez was deposed.

3  J&J appeared at his deposition, cross-examined, and it

4  turns out his only exposure is to Johnson & Johnson baby

5  powder.

6  　　　We went back to Judge Kaplan on September the

7  14th.  I attempted to get Judge Kaplan to allow me to

8  proceed to trial on November 7th that Judge Lee set.

9  　　　Judge Kaplan said, no, we've got to wait until

10  the Third Circuit decides.  And we argued back and forth

11  about what would occur with regards to if the Third

12  Circuit decide.  Ultimately, Judge Kaplan said, don't go

13  to trial until the Third Circuit decides.

14  　　　I said okay.  What we'll do is continue it

15  every month until the Third Circuit decides.

16  　　　And that's what we did.  We complied with

17  Judge Kaplan's order completely.  November, the trial

18  was continued to December.  From December, it was

19  continued to January, and then Your Honor will recall

20  last week, I requested that it be continued till today.

21  So today is the actual trial date.

22  　　　I explained all this to Judge Kaplan on Tuesday

23  and requested that, based upon the conversations we had

24  with Judge Kaplan in September, because I want to go to

25  trial, my client wants to go to trial as soon as

1    possible.  And I agreed to forego any discovery if the
2    defendants would agree to forego any discovery and let's
3    just start trial right away.

4           Ultimately, they objected to that.  And what
5    Judge Kaplan ruled on Tuesday is that -- his
6    recommendation to Your Honor would be that the case be
7    set -- you know, the actual jury selection trial occur
8    60 days from the entry of his order.  And I believe he's
9    going to enter the order today.  We agreed to it
10   yesterday and submitted it to His Honor yesterday
11   afternoon at 4:30.

12          But Judge Kaplan also said that he defers to
13   Your Honor on when to actually set it, whether it be set
14   earlier or later, depending on how discovery unfolds.
15   And that was consistent with what happened in the actual
16   trial on the motion to dismiss.  Judge Kaplan set that
17   trial to occur February of last year.  We tried that
18   case, and we only did -- about less than 60 days of
19   discovery for the overall motion to dismiss the
20   bankruptcy.

21          So just to give Your Honor a little bit of
22   overview of the case, pericardial mesothelioma, and we
23   submitted this back in April to counsel.  This is the
24   World Health Organization's classification of tumors.
25   And pericardial mesothelioma, just like pleural

1   mesothelioma, are induced by asbestos.  And all of our

2   experts, which we've disclosed to defense counsel,

3   agrees with this.

4         So the operation and the determination of this

5   mesothelioma occurred at Stanford University.  Dr. Leah

6   Backhus is the surgeon that is involved in doing the

7   surgery.  And this is the operative report.  We

8   disclosed this to defense counsel ten months ago, in

9   April, that Dr. Backhus was the surgeon involved in the

10   case.

11         Dr. Backhus, the medical records -- this is

12   Dr. Backhus.  She's a treating doctor.  We disclosed

13   these medical records to counsel, you know, ten months

14   ago as well.  Dr. Backhus is a witness and is willing to

15   testify in this case.  The operation -- this is an

16   operative report where a large amount of fluid was

17   removed and the determination that he had mesothelioma

18   occurred.

19         So this is, once again, medical records that

20   were provided to counsel certainly in April and once

21   again in May of last year that both pleural effusion,

22   that's the lining of the lung, and pericardial, lining

23   of the heart, that's where the mesothelioma has occurred

24   in this case.

25         Dr. Backhus, on May the 22nd, signed a

1   declaration, indicating a substantial medical doubt that

2   Mr. Valadez will survive beyond six months.  He has

3   survived, but Your Honor will see in a minute that he's

4   struggling.  He's struggling mightily.  We submitted

5   this declaration in support of our motion to lift the

6   stay on May the 24th, and we also submitted this

7   declaration to Judge Lee in August to get the trial

8   date.

9          Dr. Mohana Roy is his treating oncologist.  And

10  there was a cancer board meeting regarding Mr. Valadez

11  and Dr. Roy, and several other oncologists were involved

12  in this.  In the treatment -- care and treatment, they

13  elicited the exposure to talc and Johnson & Johnson

14  powder, and they also determined that he has a very poor

15  prognosis given the extent of his disease.

16         This is the Valadez declaration that we

17  submitted back in May.  And it's simply going through

18  his repeated hospitalizations, his repeated shortness of

19  breath, and his repeated complications and fatigue and

20  weakness that he's experienced over the last -- at this

21  point, over the last several months.

22         I present this to Your Honor and I presented

23  this to Judge Kaplan that Stanford did genetic testing.

24  In the last case that we went to verdict before

25  Judge Kaus, the main J&J defense was that Ms. Prudencio

1  had bad genes.  And in that particular case, certain

2  genetic testing was not done.

3       Here, the genetic testing was done, and it

4  turned out to be negative.  So there's not any genetic

5  defense that I believe J&J will legitimately be able to

6  prove in this case.  And I submitted this, like I said,

7  last May to defense counsel and to Judge Kaplan.

8       Dr. Roy, just like Dr. Backhus, the treating

9  doctor, signed a declaration indicating that Mr. Valadez

10 has terminal cancer with a dismal prognosis, and just

11 like Dr. Backhus, that six months -- there's substantial

12 medical doubt that he would survive beyond six months.

13 And that his only known exposure was Johnson's baby

14 powder, and it's her opinion that that would be a

15 contributing factor in increasing the risk of his

16 mesothelioma.

17      I presented this slide to Judge Kaplan last

18 year.  Not only will the treating doctors support

19 causation in this case, Dr. Egilman, who is on the left,

20 Dr. Felsher, upper left, Dr. Felsher, a Stanford

21 oncologist, a retained expert, Dr. Ronald Dodson, and

22 Dr. Abraham, Dr. Dodson is a cell biologist and

23 specializes in tissue digestion analysis, and

24 Dr. Abraham is a pathologist who's published on talc

25 since before Mr. Valadez was born, they all agree to

1  testify.

2       This morning, we sent to defense counsel

3  deposition dates for many of our experts, not all of

4  them.  Dr. Roy, unfortunately, is on maternity leave.

5  She just had a baby, and so we're trying to work around

6  her maternity schedule to get a date for her deposition.

7       Dr. Backhus was in surgery yesterday, and we're

8  hopeful to get a date from her in the next day or two.

9       Dr. Felsher, we've already offered March 10th

10  for a date for his deposition.

11       Dr. Dodson, we've offered March the 8th;

12  Dr. Egilman, we've offered February 21st; Dr. Horn,

13  we've offered March the 6th; Dr. Longo, we've offered

14  March the 3rd; and the economist, who I'll show you in a

15  minute, we've offered March 2nd.

16       We've also offered the deposition --

17  Mr. Valadez has already been deposed.  He's fully

18  deposed.  There's no reason to re-depose him.  He can't

19  be re-deposed.  But his mother, Anna Camacho, we've

20  offered March the 2nd for a deposition date for her to

21  be deposed, should defendant want to take her

22  deposition.

23       This is his mom pushing him in a wheelchair.

24  This was his life as of last May.  He's still in a

25  wheelchair.

1          He submitted this declaration that this is the

2     worst thing that's, obviously, ever happened to him.  He

3     suffers great anxiety and depression, he refuses to

4     communicate with any friends or family because of his

5     disbelief that he's suffering from this terminal

6     condition.  He has severe nausea, vomiting, loss of

7     appetite, severe chest pain, tightness, shortness of

8     breath, discomfort, fatigue, chronic back pain.  And,

9     you know, he went through chemotherapy last year.

10    You'll see in a minute that the chemotherapy didn't

11    work.

12         And this is the declaration we submitted to

13    counsel for J&J in April of last year from his mother

14    describing what she's observed of her son.

15         This was his deposition.  He gave a deposition,

16    obviously a very emotional deposition.  But he was

17    examined by J&J and the other defendants' counsel was

18    present.

19         Dr. Dodson gave a declaration in support of the

20    case early without -- before the tissue digestion

21    occurred.  This is Dr. Dodson at his electron microscope

22    where he can determine -- he and his colleagues can

23    determine exactly what's present in the tissue.  And

24    you'll see in a minute why that's important.

25         Robert Johnson, an economist down in Palo Alto,

did an economic loss evaluation from a lost wage
standpoint and a loss of social security and a loss of
homemaker services.  And we submitted this Economic
Impact Report to Mr. Murdica along with other counsel
back on May the 10th as a justification of why they
should negotiate this case.  Mr. Johnson is prepared to
give a deposition on May the 2nd.

Moving forward in time, and I presented this to
Judge Kaplan on Tuesday.  This was as recently as
February the 1st of this year where he's now going
through immunotherapy, and he gets an infusion.  And his
last one occurred just a couple of weeks ago.  They're
still reporting he still has vomiting, that he still has
nausea.  He has significant psychological issues, but
he's been precluded from getting psychological
intervention because of insurance issues.

This is the way he's been sleeping quite a bit.
He can only breathe when he sleeps in a certain
position.  And, you know, it's quite uncomfortable to
live in this fashion.  His life expectancy is -- his
normal life expectancy but for his mesothelioma is over
54 years.  So we're going to have loss of life of
roughly 54 years.  So he only has weeks or a few months
left to live.  Hopefully, the immunotherapy will extend
his life.  In January of this year, the doctor --

1    Dr. Neal, Joel Neal at Stanford, determined that he had

2    -- his mesothelioma had progressed since the fall.

3         Now just this past week, we finally got the

4    pathology, even though we subpoenaed that pursuant to

5    Judge Kaplan's permission, we subpoenaed that a while

6    back, we finally got the pathology blocks.  And the

7    blocks had tissue from the pericardial fat from right

8    next to where the cancer is.

9         And we sent that over to Dr. Dodson.  And

10   Dr. Dodson performed a tissue digestion and had the

11   laboratory look at that tissue, and they found talc,

12   platy talc, and this is a preliminary evaluation.

13   They're looking at additional grid openings.  But they

14   found platy talc right adjacent to the cancer, right

15   adjacent to the mesothelioma.  And then they also found

16   mica.

17        And that's important because both talc and mica

18   have been -- is in Johnson & Johnson talcum powder, and

19   it's been reported in numerous other individuals with

20   mesothelioma, for example, Ms. Prudencio and

21   Ms. Leavitt.  We had tissue digestions done in those

22   cases, and those cases were both tried to verdict.  So

23   this is significant and in support of Dr. Dodson's

24   initial opinions that the asbestos in talc, you know,

25   was causative -- the fibrous talc was causative with

1    regards to the mesothelioma.

2           So this was testing done by a contract lab with

3    the FDA, AMA lab, in October 19th.  And this was

4    off-the-shelf baby powder.  And J&J disputes this, but

5    the lab stands by their report that they found asbestos,

6    platy talc, and mica in the off-the-shelf Johnson &

7    Johnson's baby powder.

8           THE COURT:  And, I'm sorry, Mr. Satterley, this

9    is off-the-shelf purchased in October of 2019?

10          MR. SATTERLEY:  It wasn't purchased in October,

11   it was purchased shortly there -- before.  And,

12   obviously, no lawyers were involved in this, no

13   plaintiffs' lawyers were involved in this.  This is an

14   FDA project that they hired AMA to look at this

15   off-the-shelf bottle.  And so, yeah, this is the

16   findings.  And you'll hear when we get into the motions

17   in limine stages, you know, how J&J disputes this.

18          Here is the medical record I meant to show you

19   a minute ago.  This shows January the 20th, an overall

20   disease progression.  He reports body pain in the

21   morning, hurts particularly in the inner right arm and

22   inner -- posterior right knee.  His pain is a 7 or 8 out

23   of 10.  And mentally, he's struggling still and he feels

24   it day to day.  He got excited because -- he got happy

25   because he's changing his name to Emory.  And that's the

1    happiness he has in his life.  And I think it indicates

2    that he has been having trouble seeing a psychologist at

3    the oncology clinic due to insurance issues.  And this

4    was signed off on by Dr. Neal at Stanford.

5         So it's our position that this case should be

6    tried soon, it must be tried soon to give Mr. Valadez

7    his day in court.  And so what my ask for Your Honor

8    today is that we set the case for jury selection to

9    occur April the 17th.  It's two months and one day out.

10   That in between that time -- today and that time, that

11   we regularly have, at least once a week, a check-in with

12   Your Honor so that we can let Your Honor know what we've

13   done, what we haven't done, if we have any disputes.

14        As I advised defense counsel and I advise

15   Your Honor, we've already given, if they want them -- by

16   the way, last summer -- starting last summer, I said, do

17   you want to depose any of these people?  Do you want to

18   take any depositions?

19        And they said, no, we're not going to do

20   anything until the stay is lifted.

21        So we've tried to give them as much advance

22   notice for all these witnesses as we can, and we're

23   willing -- I've already given seven deposition dates to

24   occur over the next couple weeks.  And if those dates

25   are inconvenient and they don't want to depose them on

1  those dates, we'll work with them to find alternative

2  dates.

3          We met and conferred with -- or Mr. Rivamonte

4  -- I was on an airplane yesterday.  But Mr. Rivamonte

5  met and conferred with defense counsel yesterday.  And I

6  think we have agreements on many things.

7          With regards to authorization, they've asked --

8  for the first time, they asked for medical

9  authorizations yesterday.  We have no problem giving

10 them medical authorizations.  A pathology stipulation,

11 we proposed one back in October and no defense counsel

12 said anything about a pathology stipulation from October

13 until yesterday.  We continue to propose a pathology

14 stipulation.

15         Defense counsel expressed surprise that we did

16 a tissue digestion analysis.  There's no surprise with

17 regards to that because I requested that with

18 Judge Kaplan back in June and July.  And there's plenty

19 of tissue to do another digestion should J&J or their

20 experts want to digest any of the pericardial fat tissue

21 that's there.  Dr. Dodson made sure he did not use, you

22 know, 50 percent -- he used 50 percent or less.  So

23 there's tissue that can be digested should they want to

24 do that.

25         With regards to the medical records, like I

1    said, we have provided medical records, many, many, many
2    records, including status updates, in December and
3    January and once again earlier this week when we
4    submitted the status update to Judge Kaplan.  But we'll
5    provide all the medical records to counsel, and I guess
6    designated defense counsel is now involved in the case.
7    They weren't involved in it before.
8         With regards to responsive pleadings, we would
9    request that the defendants file their responsive
10   pleading answers within five days.  They entered their
11   notice of appearance on behalf of their clients back in
12   August, and they've had more than sufficient opportunity
13   to prepare responsive pleadings and should do so
14   immediately.
15        With regards to -- to avoid motion practice in
16   this case only, I've agreed with regards to the retailer
17   defendants to either sever or dismiss without prejudice
18   claims for punitive damages and fraud.  And that's
19   simply to not burden Your Honor with having to decide
20   those motions in this particular case.  I want to narrow
21   the issues before Your Honor so as not to burden the
22   Court.
23        With regards to summary judgments by J&J, we've
24   advised them, and it's our position that any summary
25   judgment by J&J in this case would be frivolous.  We

1    would move for sanctions if they do so.  They have a

2    right to move for summary judgment, but we have a right

3    to allege that they're filing a frivolous pleading.  And

4    so we're going to put them on notice of that because we

5    think that's unduly burdening the Court.  We have clear

6    undisputed evidence of exposure to the product.

7         With regards to additional fact discovery,

8    other than the mother and any other family members,

9    we're not aware of J&J or any of the retailers wanting

10   to depose anybody.  But what we're going to propose that

11   they immediately tell us who, if anybody, they want to

12   depose and that, Your Honor, we would request a five-day

13   deposition scheduling.

14        So instead of by code, we have to give ten days

15   and they give ten days, that we're willing, you know, to

16   work back and make that a five-day notice so that, you

17   know, depositions can occur.  Obviously, we can meet and

18   confer if there's a conflict.  So that is on fact

19   discovery.

20        We'll continue to meet and confer regarding any

21   corporate representative depositions at the current

22   time, unless they've got any new or creative defenses.

23   You know, any corporate rep depo that we would do would

24   be very short, very succinct.  And certainly, some of

25   the retailers, we've never deposed.  And to the extent

1    they claim they have records, obviously we'll want to

2    gather that type of evidence -- that type of factual

3    evidence.

4           We've submitted signed declarations from

5    Dr. Felsher, Dr. Dodson, Mr. Johnson, Dr. Backhus,

6    Dr. Roy, Dr. Longo, and the plaintiff and his mother.

7    So they've had that for a long time.

8           And so with that being said, Mr. Rivamonte,

9    since he did a meet and confer, I'll defer to him on any

10   additional issues.  But I would request Your Honor set

11   this case for trial and have a weekly check-in with

12   Your Honor so that we can -- if there are any disputes.

13   Hopefully, the check-in will be everything is worked up,

14   everything is going fine.  Because ultimately, my

15   concern is Mr. Valadez won't live to April 17th, and he

16   certainly may not live throughout the trial of this

17   case.

18          So with that being said, Your Honor, unless

19   Your Honor has any questions of me specifically, I would

20   request Mr. Rivamonte to raise any additional issues

21   that have come up during the meet and confer.

22          THE COURT:  I guess the only question I have

23   right now -- I'm sure there will be many others.  But

24   let me ask, was there a petition for rehearing that was

25   filed either by Johnson & Johnson or LTL and/or a

1    petition for en banc review?

2            MR. SATTERLEY:  Yes, Your Honor.  On Monday,

3    there was a petition by LTL, and they did ask for a

4    rehearing and en banc review.

5            And I'm glad you raised that because we are

6    Doe'ing in, if we have not already Doe'd in, LTL.  And

7    counsel for J&J represents LTL, and we've requested that

8    they answer the complaint on behalf of LTL as well.

9            But, yes, on Monday, they filed a petition for

10   rehearing.  And that was the gravamen of their argument

11   on Tuesday.  Judge Kaplan, wait, wait, don't send this

12   case back until after the Third Circuit rules upon our

13   en banc -- our petition for rehearing and en banc

14   review.  And we might take this case to the Supreme

15   Court of the United States.

16           After extensive argument by myself and counsel

17   for -- lead counsel for LTL and J&J, we submitted the

18   transcript, I believe, to Your Honor.  Judge Kaplan

19   denied the request, granted my motion, and said the

20   pendulum has swung.  The pendulum has swung.  Now that

21   the Third Circuit issued its opinion on January 30th,

22   there is not a likelihood of success with regards to

23   this.

24           And so I'm sure it upsets LTL and J&J that

25   Judge Kaplan has lifted the stay for this one case only.

1  And what Judge Kaplan said was, if for some reason that

2  the Third Circuit changes its mind or the Supreme Court

3  gets involved and stays the case somehow, that LTL can

4  always go back to Judge Kaplan and ask that the stay be

5  reinstated.

6          And I agreed.  I said, if something crazy like

7  that happens, you know, yeah, we can come back to

8  Your Honor and address the issue.

9          So I would suggest, Your Honor, that since

10  Judge Kaplan has lifted the stay and said, sue whoever

11  you need to sue, because I argued that if we just went

12  after J&J and the retailers, J&J might try to shift the

13  blame at trial to LTL.  And Judge Kaplan agreed with my

14  argument and said, you can pursue all those cases -- all

15  those claims.

16          So I hope that answers Your Honor's questions.

17          THE COURT:  It does.

18          MR. SATTERLEY:  With that being said, unless

19  Your Honor has any additional questions, could

20  Mr. Rivamonte just chime in to see if I've missed

21  anything?

22          THE COURT:  Yes, please, Mr. Rivamonte.

23          MR. RIVAMONTE:  Good morning, Your Honor.  I

24  think Mr. Satterley covered pretty much everything.

25          I'd just like to tell the Court that I may be

1    logging off because I have a deposition.  So I apologize

2    for that.

3             THE COURT:  No problem.

4             Ms. Romano?

5             MS. ROMANO:  Yes.  Thank you, Your Honor.

6             I don't have a PowerPoint or an opening

7    statement prepared, but I feel I have a duty to just

8    state that Johnson & Johnson certainly denies

9    plaintiff's claims and maintains that Johnson's baby

10   powder is safe and did not cause or contribute to

11   Mr. Valadez's mesothelioma.

12            With that said, we agree that as of right now,

13   the stay has been lifted as to this case, and we're here

14   today to discuss scheduling and what discovery needs to

15   be done before this case can proceed to trial.

16            As an initial matter, when the bankruptcy court

17   first granted plaintiff that very limited relief last

18   summer to conduct preservation discovery, we had asked

19   the Court to withdraw the order on Spanos Przetak as

20   designated defense counsel because there was really no

21   need for them in the case.  But now that the stay has

22   been lifted, we would request that the Court reinstate

23   its order designating Spanos as designated defense

24   counsel.

25            I've conferred with Ms. Przetak who's here

1  today, and she's agreeable to that request.  I think in

2  terms of record collection and things like that, having

3  them in the case just makes everything more efficient

4  for the Court and all parties.

5          MR. SATTERLEY:  We have no objection.

6          THE COURT:  Let me ask, is there any particular

7  form in which the order needs to be addressed, or is it

8  simply that designated defense -- Ms. Przetak is

9  reinstated as designated defense counsel for purposes of

10  this case?

11          MS. ROMANO:  I think that's sufficient,

12  Your Honor.

13          THE COURT:  All right.

14          MS. ROMANO:  Thank you.

15          And so as Your Honor is aware, prior to

16  Tuesday, the bankruptcy court had only granted plaintiff

17  very limited relief from the stay wherein he took

18  Mr. Valadez's deposition.  And that was the only

19  discovery that was done aside from plaintiff obtaining

20  pathology materials.

21          So there is a substantial amount of discovery

22  that needs to be conducted before trial.  I appreciate

23  that Mr. Satterley has agreed that the parties should

24  have those full 60 days to conduct discovery.  I think

25  we certainly need the full 60 days.  Frankly, I don't

1  know that the parties will be ready to start trial on

2  April 17th, but we will obviously work expeditiously to

3  get all of the remaining discovery done.

4         We did hold a meet and confer with

5  Mr. Rivamonte yesterday in preparation for today's

6  hearing.  With respect to Johnson & Johnson's answer, I

7  can certainly get that on file next week.  That won't be

8  a problem.

9         I also wanted to alert the Court and the

10  parties that we will also be filing a motion to have

11  trial counsel admitted pro hac vice into the case, and

12  we'll get that motion on file either tomorrow or early

13  next week.  Trial counsel will be Allison Brown from the

14  Skadden law firm.

15         With respect to --

16         MR. SATTERLEY:  We don't object to that motion,

17  Your Honor, so you can enter it whenever it's tendered.

18         MS. ROMANO:  We appreciate that.  Thank you,

19  Mr. Satterley.

20         In terms of fact discovery, I appreciate

21  Mr. Satterley has agreed to provide authorizations, and

22  I believe he also said that he would agree to provide

23  all medical and employment records that plaintiffs have

24  in their possession to the defendants.  So we would

25  certainly ask for that as soon as possible in addition

1   to the authorizations so that we can go ahead and start

2   collecting records.  That, obviously, could take a

3   little bit of time.

4         We'll also, in addition to medical records,

5   need all radiology and all pathology that exist in the

6   case so that our experts can review that prior to

7   rendering their opinions in the case.

8         As Mr. Satterley noted, and it only recently

9   came to my attention, that plaintiff's expert has

10   already performed destructive testing on some of

11   Mr. Valadez's tissue.  And they did that without a

12   stipulation governing the handling and testing of

13   pathology materials in place.  So we don't have the

14   pathology yet.  I understand Counsel has represented

15   that there will be sufficient tissue of the same quality

16   and quantity remaining for defendants to test, if we so

17   wish.

18         But I raise it just because I want to make sure

19   that it's clear that Johnson & Johnson is not waiving

20   any rights it has with respect to that issue, including

21   a motion to exclude plaintiff's testing, simply because

22   we just don't know and we'll need to confirm that there

23   is sufficient pathology --

24         (Simultaneous speaking.)

25         THE COURT:  -- Mr. Satterley and the case,

1   we're sensitive to that issue.  And I also understand

2   why you, as Johnson & Johnson's counsel, didn't fully

3   engage while the bankruptcy stay was still pending, even

4   though it was partially lifted.

5           MS. ROMANO:  Thank you, Your Honor.  I

6   appreciate that.

7           Other fact discovery that we need to complete,

8   obviously, we will take Mr. Valadez's mother's

9   deposition.  I understand she'll have both product

10  identification and damages testimony.

11          And then as I communicated to Mr. Rivamonte

12  last evening.  To the extent plaintiffs intend to have

13  any other family members or other fact witnesses testify

14  at trial, for example, any of Mr. Valadez's siblings or

15  perhaps his aunt where I think there's an allegation

16  that she may have also used baby powder on Mr. Valadez

17  as a child, to the extent that any of those family

18  members are going to testify at trial, we would seek

19  their depositions as well.  But if they're not going to

20  appear at trial, then I think we can save everyone the

21  time and expense of going through that.

22          The two treating doctors that Mr. Satterley

23  discussed earlier, Dr. Backhus and Dr. Roy, they're

24  treaters who have also apparently provided causation

25  opinions at least in the declarations that they've

1   submitted.  So we will depose both of those treaters.  I

2   think we'll also plan to serve some written discovery

3   requests on plaintiff as well.

4          And then, of course, the parties will need to

5   engage in expert discovery.  During our meet and confer

6   yesterday, we agreed that we would ask Your Honor to

7   deem a demand for expert exchange made as of today's

8   date, and then I think once we kind of have the

9   deadlines in order, just confirm that we all agree on

10   the date certain by which expert disclosures are due.

11          For Johnson & Johnson, we are in the process of

12   retaining experts and confirming their availability for

13   deposition, but, of course, they'll need time to review

14   the case-specific materials, including medical records

15   which we don't yet have.

16          And as I said before, we'll certainly work

17   expeditiously to complete all of the discovery that we

18   need to complete, but I think it's going to take some

19   time.  And we would certainly ask for at least those 60

20   days to conduct discovery and then have a status

21   conference and see where we're at and whether the

22   parties are ready to proceed to trial at that point.

23          THE COURT:  All right.  Well, preference cases,

24   as both, or all of you know, have an accelerated

25   schedule generally.  Because of the unusual, if not

1   unique, procedural posture of this case, it's going to

2   be super accelerated.

3          I'm encouraged by the fact that it appears that

4   counsel are doing everything possible to make sure that,

5   in fact, the discovery proceeds smoothly, since it does

6   seem to me that there are strong reasons to have this

7   case to proceed to trial as quickly as possible.  And

8   I'll probably need to look at the trial calendar, but

9   certainly as a tentative matter, I think, in fact, we

10  should set the case for trial on the date that

11  Mr. Satterley suggested, and I gather counsel has

12  discussed, April 17.

13         MS. KO:  Your Honor, Sandra Ko on behalf of the

14  retailer defendants, Albertsons, Safeway, Lucky, Save

15  Mart, Target, and Walmart.

16         I just wanted to raise, Your Honor, some of the

17  retailer-specific issues to be in consideration for the

18  Court in setting this trial date.  The retailer

19  defendants would also state they do each separately

20  intend to conduct written discovery on the plaintiff and

21  will conduct all of the discovery that the plaintiff and

22  Ms. Romano laid out as far as the fact discovery goes.

23         The retailer defendants, as I heard,

24  Mr. Satterley intends to depose all or some of the

25  corporate representatives.  And as Mr. Satterley said,

1  some of them have not been deposed before by his firm

2  and, to my knowledge, maybe not even at all.

3       So there would be some need and some time to

4  get some documents collected and identified, reviewed,

5  and witnesses prepped for deposition.  That makes, you

6  know, doing it on a time frame in which trial is

7  starting in 60 days aggressive.  So I wanted to raise

8  that for the Court's consideration as well.

9       THE COURT:  Well, I realize it's aggressive.  I

10 mean, I just commented on that.  All preference cases

11 are accelerated.  This is --

12      MS. KO:  Yeah.

13      THE COURT:  But in my view, this is truly a

14 unique situation because of what's happened

15 procedurally.  And what comes to mind is, counsel are

16 going to have to hit the ground running, which is

17 undoubtably why Mr. Satterley set a conference for today

18 immediately after the hearing before Judge Kaplan on

19 Tuesday.

20      MS. KO:  Understood, Your Honor.  We'll do

21 everything we can to expeditiously move forward with

22 discovery and prepare this case for trial as well.

23      So one other thing that's also unique is that

24 the retailers do intend to file motions for summary

25 judgment and/or summary adjudication.  Mr. Satterley did

1   not address the retailers when he addressed summary

2   judgment when he was addressing the Court, but the

3   retailers do file summary judgment in these talc cases

4   because there are actual real issues of causation.  And

5   so we can't waive our right to take -- or to file an

6   MSJ.

7           Just doing a trial in 61 days, though, runs

8   into issues with a notice period so that there is

9   sufficient notice -- excuse me, an opportunity to do

10  fact discovery before filing the MSJ and then

11  oppositions and replies.  So that is just something to

12  consider in setting --

13          THE COURT:  Well, in the first instance, have

14  you met and conferred to consider a stipulation with

15  respect to an accelerated briefing schedule?

16          MS. KO:  Yes.  So this was raised during our

17  meet and confer with Mr. Rivamonte.  And I believe where

18  we left off was, Mr. Rivamonte was going to discuss with

19  Mr. Satterley and get back to me.  And I have not heard

20  a proposal back.

21          MR. SATTERLEY:  I can address that now, or I

22  can wait until Counsel is finished.

23          THE COURT:  I'll leave that up to Counsel.

24          MR. SATTERLEY:  Counsel, do you want me to

25  address that now, or do you want to keep going?

1        MS. KO:  I'm almost done.  So why don't we just

2   let me finish.

3        MR. SATTERLEY:  Sure.

4        MS. KO:  And then, Your Honor, we too are in

5   the process still of retaining experts and getting, you

6   know, their availability for depositions and all of that

7   set as well.

8        And then lastly, as far as a responsive

9   pleading, we'll do everything we can to get responsive

10  pleadings on file.  We have six defendants, as

11  Your Honor heard from my appearance.

12        I will have to consider what I heard --

13  Mr. Satterley's proposal for this case, only to either

14  sever or dismiss without prejudice the fraud and

15  punitive damages claims.  As Your Honor knows, our

16  clients have been filing demurrers which have been

17  getting sustained.  And so that proposal, I just need to

18  be able to discuss those with my clients, and I'm not in

19  a position to address that today and to commit to a

20  responsive pleading date.

21        With that said, though, I will do everything I

22  can to get it on file as soon as possible.  And I had --

23  in the meet and confer had discussed with Mr. Rivamonte

24  a responsive pleading deadline of February 28th, which

25  is just, you know, the week following next week.

1          THE COURT:  All right.

2          MR. SATTERLEY:  Any other issues?  I don't want

3    to start talking if you're still going.

4          MS. KO:  Mr. Satterley, I appreciate it.  I

5    think that's it for now.

6          Thank you, Your Honor.

7          THE COURT:  Sure.

8          MR. SATTERLEY:  Your Honor, can I just say a

9    few things?  Because I think Your Honor is correct.

10   We're going to meet and confer quite a bit on this case.

11   That's why I think we should have weekly check-ins to

12   let Your Honor know if there's any issues, to avoid the

13   IDC issue, a motion to compel, you know, just have a

14   weekly check-in.

15         With regards to written discovery, I think we

16   should -- Your Honor should order shortened response

17   time.  And, you know, 10 days as opposed to 20 days or

18   30 days, you know, makes sense, or even 7 days.  And

19   I've requested the deposition notice period, as I said

20   before, be five days instead of ten days.

21         With regards to motions for summary judgment,

22   the retailers, I was under the impression that they were

23   discussing that for fraud and punitive damages.  I can't

24   imagine that they're going to succeed on a summary

25   judgment on product, simply, the testimony already in

1    the record by Mr. Valadez and through his mother, that's

2    where they bought the products.  Under the Arena case

3    and the chain of distribution, it's clear on strict

4    liability that they're still there.  But I'll be more

5    than happy to meet and confer on an order shortening

6    time in this particular case to accommodate the

7    retailers' request.

8         With regards to written discovery, I would

9    request that -- obviously, the plaintiff has already

10   been deposed and was thoroughly examined.  And so I'd

11   request the parties really look at that deposition

12   before they file burdensome written discovery, you know,

13   when there's testimony on those points already.

14        With regards to Counsel saying their experts

15   don't have the medical records, we provided a lot of

16   medical records already starting last April, and we've

17   given them updates.  They don't have all the medical

18   records, but we're going to provide all the medical

19   records probably today or tomorrow, if we haven't

20   already.

21        With regards to expert witnesses, I think

22   during the meet and confer yesterday, they agreed that

23   they are going to be using the same expert witnesses

24   that they've used in prior talc cases, including the

25   retailers.  I think they have a witness named Ms.

1  Kinsey, who is a retailer expert.

2          And they've used that expert in the past.  And

3  as Your Honor had seen, some of our experts are the same

4  that have been involved in Prudencio or have been

5  involved in Smith or Leavitt.  So I think that even

6  though this is a compressed schedule, we already know --

7  both sides already know 90 percent of the general

8  opinions that these various experts will give.

9          Now, case specific, you know, is different, and

10  they certainly have a right to ask case specific.  But I

11  hope we're not in a situation where expert depositions

12  go on for hours and hours and days and days.  Like, for

13  example, in the Prudencio case, they deposed one expert

14  for three days.  So we can meet and confer on that issue

15  as well, but I wanted to alert Your Honor to that.

16          So I think I've covered everything.  Counsel --

17  oh, on the destructive testing, without stipulation,

18  there's no requirement under California law that there

19  be a stipulation for tissue digestion.  Never has been.

20  We do it sometimes as a matter of courtesy.

21          But like I said before, Dr. Dodson says there's

22  adequate tissue for their experts.  Should they decide

23  to do a digestion, they can do that.  And we'll meet and

24  confer regarding the pathology either later today or

25  tomorrow.

1     With that being said, Your Honor, I would

2   request -- oh, two final things.  So Your Honor knows

3   and there's full disclosure, and I think it's in the

4   order that Judge Kaplan is going to enter, J&J and LTL,

5   one of those two, claims to fully indemnify all the

6   retailers.

7     And the retailers' counsel, Barnes & Thornburg,

8   is actually J&J's counsel.  Barnes & Thornburg was lead

9   trial counsel, along with King & Spalding, in the Smith

10   trial that Ms. Clancy and I tried before Judge Roesch.

11   And so even though the retailers are a different entity,

12   in actuality, J&J, through indemnification, is paying

13   for everything.

14     And I say that because there may be issues --

15   if there's going to be, you know, repetitive experts or

16   an attempt for there to be six different lawyers to give

17   an opening statement when they're all being paid for by

18   J&J.  So that's an issue that I want to alert Your Honor

19   to up front and early.

20     The final issue relates to motions in limine.

21   And I would request that if we're going to set the jury

22   -- to try to bring a jury on April the 17th that we

23   should start thinking about the motions in limine

24   because we already all know what they are.

25     And Your Honor knows what they are because

1  Your Honor has just dealt with them -- many of them in
2  the Coit case.  The same motions in limine that
3  Your Honor dealt with in Coit, that being trying to
4  exclude Dr. Longo, that's a motion in every single talc
5  case.  A motion to exclude the Maline (phonetic) article
6  is a motion in every single talc case.
7          So what I'd suggest Your Honor do is to set --
8  and you don't have to set it today, but think about as
9  to when we can start submitting papers for Your Honor to
10 consider so that we don't inundate Your Honor in April
11 with papers that justifies delaying the case even
12 further, because that will 100 percent guarantee my
13 client's dead before trial.  So I don't want motion in
14 limine practice to further delay the trial.
15         So that's the last thing I had to say, unless
16 Your Honor has any questions.
17         THE COURT:  No.  The only thing -- as always,
18 to the extent possible, if you can resolve some of these
19 issues in a meet and confer so that you can present a
20 stipulated order, including things like shortened time
21 periods for discovery, which seems to me to make sense,
22 including the date for -- an earlier date for submission
23 of motions in limine.
24         Because it's ripe in my experience in these
25 asbestos cases that motions in limine get submitted and

1   there is an unfortunate delay between the date set for

2   trial and when a jury is actually called in.  And here,

3   it does seem clear for the reasons that Mr. Satterley

4   explained that we need to be targeting April 17th as the

5   date when the jury is called in.

6          But how all of this gets set up in a schedule,

7   certainly, in the first instance, should be the subject

8   of the meet and confer, and then hopefully a proposed

9   stipulated order that can efficiently and expeditiously

10  address all of the issues that we're going to have to

11  deal with because this is kind of a super accelerated

12  schedule.

13         MR. SATTERLEY:  Yes, Your Honor.  And we'll

14  meet and confer with counsel and hopefully work through

15  these issues.  And to the extent that we don't or have a

16  dispute, that's why I think a weekly CMC, even if it's

17  for five minutes to tell Your Honor, hey, we worked

18  things out, I think that's --

19         THE COURT:  And let me suggest -- you know, I

20  think the Friday morning calendar is a little too

21  chaotic for that.  I think it might be better to set

22  this Thursday at 3:00.  But I'm open to suggestions.

23         MR. SATTERLEY:  That's perfect for plaintiff.

24  We'll be here every Thursday at 3:00.  And you can put

25  us at the end of the calendar or you can put us at the

1  beginning, either one.

2          THE COURT:  Well, no small part of it is going

3  to be whether there are issues that need to be

4  addressed.  If there aren't, it, frankly, won't make any

5  difference.  But like a lot of things, maybe we should

6  have some procedure -- when in trial and because of the

7  accelerated nature of this case, you're free to use my

8  e-mail address together with the department.  And it may

9  be that for these weekly CMCs, I should get an e-mail,

10 you know, maybe the day before because it's such a

11 compressed schedule.  You know, the normal 15 days makes

12 no sense.  We will have met twice.

13          But I suggest that -- and, again, it doesn't --

14 it shouldn't be on the Judicial Council form, but

15 something similar to, I guess, a regular case management

16 statement, but a very shortened schedule so that I get

17 it the day before Thursday at 3:00, say, by the close of

18 business on Wednesday each week so that I have a sense

19 as to what's coming up and whether there are any issues

20 that I may need to resolve.

21          MR. SATTERLEY:  I agree, Your Honor.

22          MS. ROMANO:  I think that makes sense as well,

23 Your Honor.  I was going to suggest that because I think

24 if there are no issues, we may be able to cancel the CMC

25 on a week and save you the time of having us appear on

1   your Zoom.

2           THE COURT:  And your time too.

3           MS. KO:  Your Honor, may I inquire?  And while

4   the parties, I have no doubt, will work together to meet

5   and confer and reach as many agreements as possible,

6   should there ever be a need for an IDC, does Your Honor

7   prefer to hold the issue until a weekly CMC, or will

8   there be separate IDCs contemplated or available as

9   well?

10          THE COURT:  And this has been a little bit

11  different from the CDC department.  I was a big fan of

12  IDCs in the CDC department.  I don't know exactly, but

13  my estimate is that I get about 80 percent of the

14  discovery disputes resolved in an IDC.

15          In Department 18, counsel, frankly, are more

16  familiar with the asbestos-unique issues and are very

17  sophisticated about these issues.  And, frankly, the

18  concerns that I've had about IDCs in this department is

19  that it seems to me sometimes they're used to actually

20  delay the process.

21          And that, I don't want.  The whole idea of an

22  IDC, at least in my mind, is to make things easier so

23  that counsel don't have to file, frankly, the cumbersome

24  and burdensome separate statements, and you can kind of

25  work things through and get a quick take from me on

1   discovery issues.

2          But, again, my experience is that that has not

3   worked as well in my current assignment.  And I think

4   inasmuch as we're going to be meeting every Thursday at

5   3:00, I think that probably is a more effective forum.

6          Now, it's also right that I think you get on

7   the IDC calendar pretty easily by e-mailing or calling,

8   and I'm blessed Ms. Scoggins answers her phone.  That's

9   not always true, and we're still dealing with a clerk

10  shortage as a result of the pandemic.  But she's here

11  all the time.  And, you know, reach out to her if

12  there's an issue that needs to be addressed even between

13  the weekly meetings, and I'll try to see if I can get

14  you in.  You also have or will have my e-mail address.

15         Because what I don't want to have happen is for

16  counsel -- a case to get stuck if a little bit of

17  involvement by me can help get you unstuck.  So I'm open

18  to any and all means to try to make that happen so that

19  everything proceeds smoothly.  Because it's going to

20  take a lot of cooperation to make sure that this works

21  and we're able to get a jury in on April 17th, which, by

22  the way, almost certainly will be an in-person trial.

23         You may have heard -- I mean, I'm in the middle

24  of yet another asbestos trial now following the Coit

25  settlement last week.  And depending on how that plays

1    out, that may be an in-person trial.  The mask mandate,

2    as I understand it, is going to be lifted by the County

3    and Board of Supervisors the end of this month when the

4    Governor lifts the emergency orders.  And, in my view,

5    in civil, that has been the block to -- or the pivot

6    point on whether we can move from remote to in-person

7    trials.

8         MR. SATTERLEY:  Well, it would be great to try

9    a case in person again after three years.

10        THE COURT:  We all feel that way.  And,

11   again -- and, Mr. Satterley, you've heard this.  I think

12   remote trials work well, but I think all of us are

13   anxious to get back to in-person trials.  It's just with

14   the mask mandate in county buildings, which is where I'm

15   at, for a civil case, in my view, that does not work

16   well.  But that's going to change.  So by April, there's

17   almost no doubt, this will be an in-person trial.

18        MR. SATTERLEY:  With that in mind, Your Honor,

19   one question.  I know some of the various judges

20   probably discussed this.  There's still a possibility we

21   can do the jury selection process remote, if Your Honor

22   approves and we stipulate to it, because bringing 120

23   people into a small, confined of space -- you know, I'd

24   rather there only be 16 people in the space.

25        THE COURT:  Judge Freeman told me that this is

1    the largest courtroom in the admin building.  I don't

2    know whether that's true or not true.  You may know, he

3    used to be in this department.  But the one thing I know

4    for sure, that the courtroom will not accommodate 120

5    prospective jurors.

6         So I think it's right, we've likely -- in this

7    case and, frankly, in most cases, we've learned a lot as

8    a result of the pandemic and the use of BlueJeans and

9    Zoom.  I think it does make sense that at least the

10    earliest stages of jury selection, things like the

11    introduction, the hardships, maybe all the way through

12    the end of jury selection until we swear a jury, but

13    after that, I would expect that we would move to being

14    in person in the courtroom.

15         MR. SATTERLEY:  And we can meet and confer with

16    J&J's counsel and Allison Brown, once she's involved,

17    and see if we can come to an agreement on things like

18    that.

19         THE COURT:  Sure.

20         So is there anything else that we should

21    discuss today?

22         MR. SATTERLEY:  Just so the record is clear,

23    every Thursday at 3:00.  If we don't have any issues to

24    discuss with Your Honor -- obviously, today is Thursday,

25    so we're not going to come back at 3:00.

1          THE COURT:  Right.

2          MR. SATTERLEY:  But if we don't have any

3    issues, did I hear you correctly, Wednesday at close of

4    business, we should send an e-mail saying no need to

5    appear?

6          THE COURT:  Well, I'd like either an e-mail, no

7    need to appear, or a case management statement, again,

8    not on the Judicial Council form, but of what issues, if

9    any, there are so that I get a heads up --

10          MR. SATTERLEY:  Sure.

11          THE COURT:  -- before our Thursday at 3:00

12    meeting.

13          If there's -- and, again, hopefully, everything

14    goes smoothly and we never have a Thursday at 3:00

15    meeting.  I think that's unlikely.

16          MR. SATTERLEY:  And so one last --

17          THE CLERK:  Your Honor --

18          MR. SATTERLEY:  I'm sorry, go ahead.

19          THE CLERK:  I just want to confirm that we're

20    continuing the trial date to April 17th and the CMC to

21    2/23 of next week; is that correct?

22          THE COURT:  Yes.  And I don't know if there's a

23    way to do this en masse, but the CMC, if there's a way

24    of scheduling it for every Thursday at 3:00 so it's not

25    just the 23rd.

So yes to the first question.  I think we ought
to set it for trial on April 17th.

THE CLERK:  And would you like it scheduled
every Thursday up until the trial date?

THE COURT:  Yes.

THE CLERK:  Okay.

THE COURT:  And as we get closer to trial --
and, again, some of this may be the subject of meet and
confer or stipulation because as we get closer to trial,
I would expect we're going to shift to conferences or
hearings to decide the motions in limine that will be
presented.

But for now, I think the easy thing is just
schedule it Thursday at 3:00 all the way up to
April 17th.

THE CLERK:  Will do.

THE COURT:  So is there anything else we should
cover today?

MR. SATTERLEY:  Just the last thing is, both
sides need to list our experts.  And so we're planning
on listing our experts today -- hopefully by tomorrow,
but probably today.  And I just wanted to check in with
defense counsel.  I know defense counsel has indicated
it's going to be the usual experts.

But should there be a date set for expert --

1   you know, defense expert disclosure?

2          THE COURT:  Yeah, I think -- I don't know --

3   and maybe I shouldn't make assumptions.  But my

4   assumption is that Johnson & Johnson/LTL probably has a

5   pretty good sense as to what experts they want to use.

6          Let me ask Ms. Ko, are you reasonably certain

7   that you can identify experts in the next day or two?

8          MS. KO:  Your Honor, I would hope to do it

9   within the next day or two.  I've made a request to

10  co-retain some experts with Johnson & Johnson.

11         Mr. Satterley did reference another retailer

12  expert we use.  She's on vacation at the moment, and I

13  have not been able to contact her or reach her about

14  retention in this case.  But I'm trying my best.  And

15  so, you know, I think it can be soon, I'm just not sure

16  it's going to be in the next day or two, so I'd ask for

17  a little bit of more time there.

18         MS. ROMANO:  Yes, Your Honor.  This is Julia

19  Romano for Johnson & Johnson.

20         As I mentioned, we are working on retaining our

21  roster of experts for the case.  I was going to propose

22  that expert disclosures maybe be served next Friday.  I

23  believe that's the 24th.

24         MR. SATTERLEY:  And that's fine, as long as

25  it's a mutual date.

1          MS. ROMANO:  Right.  That's what we're

2     offering.

3          MR. SATTERLEY:  Okay.  I have no problem with

4     that.

5          THE COURT:  So that will be the 24th?

6          MS. KO:  I think that will work, Your Honor.

7          THE COURT:  All right.  So, Aquetta, if you

8     would, if you could put that in the minute order.  That

9     by agreement, the expert demands are to have been deemed

10    served and the expert designations will be provided no

11    later than next Friday, February 24th.

12         MR. SATTERLEY:  With that said, Your Honor,

13    plaintiff has nothing else to raise with Your Honor

14    today.

15         THE COURT:  Thank you.

16         MS. ROMANO:  Nothing further from Johnson &

17    Johnson.  Thank you, Your Honor.

18         MS. KO:  Nothing, Your Honor, on behalf of the

19    retailer defendants.  Thank you very much.

20         THE COURT:  All right.  Well, thank you very

21    much.

22         MR. SATTERLEY:  Thank you, Your Honor.  Have a

23    good day.

24         MS. ROMANO:  Thank you, Your Honor.

25         MS. KO:  Thanks, everyone.

1          THE COURT:  Okay.  Bye, now.

2          (Proceedings concluded at 11:15 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2

3        I, Sheila Pham, a Certified Shorthand Reporter, do

4    hereby certify:

5        That the foregoing proceedings were taken before me

6    at the time and place therein set forth, that the

7    proceedings were reported stenographically by me and

8    were thereafter transcribed under my direction and

9    supervision, and that the foregoing pages contain a

10   full, true and accurate record of all proceedings and

11   testimony to the best of my skill and ability.

12       In witness whereof, I have subscribed my name.

13

14

15   Dated: 2/21/2023

16

17

18

19   _____

20                    Sheila Pham

                     CSR No. 13293

21

22

23

24

25

# Exhibit 9

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ  07932
Tel:  (973) 622-8401

-and-

Steven Kazan, Esq.
skazan@kazanlaw.com
Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Tel: (510) 302-1000

*Counsel for Movant Anthony Hernandez Valadez*

| | |
|---|---|
| In Re:<br><br>LTL MANAGEMENT LLC,<br><br>     Debtor. | Chapter 11<br><br>Case No. 21-30589 (MBK) |

Order Filed on February 17, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

<u>**ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY,**</u>
<u>**THE PRELIMINARY INJUNCTION AND THE STAY OF Fed. R. Bankr. P. 4001(a)(3)**</u>

The relief set forth on the following pages, numbered two (2) and (3), is hereby **ORDERED.**

**DATED: February 17, 2023**

*Michael B. Kaplan*

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**EXHIBIT 9**

Page 2
Debtors: LTL Management LLC
Case No.: 21-30589 (MBK)
Caption of Order: **ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY, THE PRELIMINARY INJUNCTION AND THE STAY OF Fed. R. Bankr. P. 4001(a)(3)**
-------------------------------------------------------------------------------------------------------

   **THIS MATTER** having been opened to the Court by Anthony Hernandez Valadez, by and through his counsel the law firm of Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation ("Kazan Law"), and local counsel Saiber LLC, for the entry of an order pursuant to Section 362(d)(1) of the Bankruptcy Code and this Court's prior orders, waiving the stay of Fed. R. Bankr. P. 4001(a)(3), granting Movant further relief from the *Order (I) Declaring That Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Dkt. 1635; Adv. Pro. No. 21-3032, Dkt. 187] (the "PI Order") and the automatic stay (the "Motion") [Dkt. 3698], the Court having previously entered the *Order Granting Limited Relief from the Automatic Stay* [Dkt. 2836], and the Court having considered the moving papers [Dkts. 2348, 2979, 3489, 3698], the opposition papers filed on behalf of the debtor LTL Management LLC [Dkts. 2429, 3740], the replies filed on behalf of Mr. Valadez [Dkts. 2469 3741]; and the Court having heard the statements of counsel at a hearing held on February 14, 2023 (the "Hearing"); and for the reasons set forth on the record at the Hearing;

   **IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1. The Motion is granted as set forth herein.

2. Movant Anthony Hernandez Valadez be and hereby is granted relief from the automatic stay and the PI Order as follows: (i) to permit Mr. Valadez to name the two entities created after the divisional merger as defendants in Movant's pending action in the Superior Court of California, County of Alameda (the "State Court"); (ii) for the parties to the State Court action (collectively, the "Parties") to fully prosecute and defend their respective claims in State

Page 3
Debtors: LTL Management LLC
Case No.: 21-30589 (MBK)
Caption of Order: **ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY, THE
PRELIMINARY INJUNCTION AND THE STAY OF Fed. R. Bankr. P. 4001(a)(3)**
--------------------------------------------------------------------------------------------------------------

Court, including conducting discovery and filing responsive pleadings and motions; and (iii) for

the Parties to proceed to trial in State Court, subject to paragraph 3 below.

3.      The stay shall be lifted and the PI Order modified to permit trial to occur no

earlier than 60 days from the entry of this Order, unless the State Court determines in its

discretion to schedule a trial prior to the expiration of the 60 day period.

4.      The stay set forth in Rule 4001(a)(3) of the Federal Rules of Bankruptcy

Procedure shall not apply to this Order and the Order shall be effective immediately.

5.      Except as expressly provided herein, all provisions of the PI Order shall remain in

effect.

6.      The Debtor is authorized to indemnify and pay the Protected Parties (as defined in

the PI Order) for their costs associated with the relief authorized by this Order with respect to the

State Court proceeding.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation and/or enforcement of this Order.

# Exhibit 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT LLC, | . | Adversary No. 22-01393 (MBK) |
| | . | |
| Plaintiff, | . | Clarkson S. Fisher U.S. |
| v. | . | Courthouse |
| | . | 402 East State Street |
| JACQUELINE MIRIAM MOLINE, | . | Trenton, NJ 08608 |
| | . | |
| Defendant. | . | February 14, 2023 |
| . . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF:

STATUS CONFERENCE; THE OFFICIAL COMMITTEE OF TORT CLAIMANTS'
MOTION TO COMPEL [3336]; DEBTOR'S MOTION FOR AN ORDER DIRECTING
PLAINTIFF LAW FIRMS TO DISCLOSE THIRD-PARTY FUNDING
ARRANGEMENTS [3551]; PLAINTIFF'S MOTION FOR LIMITED EXPEDITED
DISCOVERY [9]; MOTION OF THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS FOR ORDER CONFIRMING PROCEDURES FOR THE REIMBURSEMENT
OF EXPENSES INCURRED BY COMMITTEE MEMBER REPRESENTATIVES
[3111]; MEMORANDUM OF LAW IN SUPPORT OF SUPPLEMENTAL FILING BY
MOVANT ANTHONY HERNANDEZ VALADEZ IN SUPPORT OF HIS MOTION FOR
AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND
PRELIMINARY INJUNCTION, FILED ON MAY 24, 2022, AND STATUS
REPORT [3698]

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                  Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

**EXHIBIT 10**

APPEARANCES:

| | |
|---|---|
| For Anthony Hernandez Valadez: | Kazan McClain Satterley & Greenwood<br>By:  JOSEPH SATTERLEY, ESQ.<br>55 Harrison St. Suite 400<br>Oakland, CA  94607 |
| | Saiber, LLC<br>By:  JOHN M. AUGUST, ESQ.<br>18 Columbia Turnpike, Suite 200<br>Florham Park, NJ  07932 |
| For the Debtor: | Wollmuth Maher & Deutsch, LLP<br>By:  PAUL R. DeFILIPPO, ESQ.<br>500 Fifth Avenue<br>New York, NY  10110 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Skadden Arps Slate Meagher &<br>   Flom, LLP<br>By:  ALLISON M. BROWN, ESQ.<br>One Manhattan West<br>New York, NY  10001 |
| | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street, Suite 500<br>Dallas, TX  75201 |
| | Otterbourg, PC<br>By:  MELANIE L. CYGANOWSKI, ESQ.<br>2230 Park Avenue<br>New York, NY  10169 |
| For the Professional Fees Examiner: | Bernstein Shur<br>By:  ROBERT J. KEACH, ESQ.<br>100 Middle Street<br>Portland, ME  04104 |
| For the Official Committee of Talc Claimants I: | Brown Rudnick, LLP<br>By:  DAVID J. MOLTON, ESQ.<br>7 Times Square<br>New York, NY  10036 |
| For the Official Committee of Talc Claimants II: | Sherman Silverstein<br>By:  ARTHUR J. ABRAMOWITZ, ESQ.<br>308 Harper Drive, #200<br>Moorestown, NJ  08057 |

TELEPHONIC APPEARANCES (Cont'd):

For Dr. Jacqueline          Marino Tortorella & Boyle, P.C.
Miriam Moline:              By:  KEVIN H. MARINO, ESQ.
                           437 Southern Boulevard
                           Chatham, NJ  07928

For the Office of the       Office of the United States Trustee
United States Trustee:     By:  LINDA RICHENDERFER, ESQ.
                           J. Caleb Boggs Federal Building
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, DE 19801

- - - - -

1         (Proceedings commenced at 10:00 a.m.)

2         THE COURT:  All right.  Okay.  Good morning,

3 everyone.  This is Judge Kaplan on the LTL Management, LLC

4 matters.  And I wish everyone a happy Valentine's Day.  It will

5 be the second time I've said that to you all, apparently.

6         So we have a few matters that are going forward on

7 today's amended agenda.  And let me start with -- I'll just

8 follow the proposed amended agenda, the status conference in

9 the overall case.  My understanding -- I haven't read what was

10 filed, but my understanding is at some point last evening or

11 yesterday the debtor filed a -- their petition for en banc

12 review of the recent decision by the Third Circuit.

13         And my further understanding is that the filing of

14 the petition stays issuance of the mandate to this Court with

15 respect to the opinion and judgment of the Third Circuit.  And

16 this Court, obviously, will not complicate matters and will

17 abide by what's been filed.  And if and when the mandate is

18 issued, the Court will act accordingly.  It is my intention, if

19 and when a mandate is issued, to enter a judgment dismissing

20 the case.

21         It is this Court's position that the Court can

22 dismiss the case while also retaining jurisdiction for limited

23 matters such as administrative issues such as professional fees

24 and quarterly fees and the like.  That has been the practice

25 both in this district and in the circuit.  And I'll

1 certainly -- I will certainly address that at the appropriate
2 time.

3        Other than that, there is nothing for this Court to
4 undertake or discuss apart from what's on for the agenda today.
5 But let me turn to debtor's counsel if they wish to add
6 anything to the -- my limited comments.  Or if there's anyone
7 who wishes to add anything to my comments.

8        And I'll ask that you use the --

9        MR. GORDON:  Good morning, Your Honor.

10        THE COURT:  Yes.  Go ahead, Mr. Gordon.

11        MR. GORDON:  Good morning, Your Honor.  Greg Gordon,
12 Jones Day, on behalf of the debtor.  No, I don't have much to
13 add.  You are correct.  We did file our petition last night.
14 You're correct that the mandate is stayed and would not issue
15 until seven days after denial of that petition.  And there
16 would be opportunities, of course, to seek a further stay prior
17 to that in the Third Circuit or in the Supreme Court.

18        In the meantime, the -- we continue to explore
19 options, notwithstanding the panel's ruling to achieve a
20 successful resolution in the case.  You'll also hear that we're
21 engaged in obviously contingency planning as well, you know,
22 including primarily preparing for the potential return to the
23 tort system and a restart of the litigation process, which Your
24 Honor can probably imagine is a Herculean effort to get the
25 defense team back in place to manage cases around the country.

1      So there's a lot that's happening from our

2 perspective.  And, of course, it's all happening in a very

3 compressed time frame based on the rules applicable to further

4 appeals related to the dismissal issue.

5      THE COURT:  All right.  Thank you, Mr. Gordon.

6      I should note while there are 262 participants

7 remotely from the last number that I could see, I have three

8 participants in court.  Mr. Satterley is in court with me.  His

9 local counsel, Mr. August.  And as well as the debtor's local

10 counsel, Paul DeFilippo.  Everyone else is appearing remotely.

11      Is there anyone else who wishes to address the status

12 conference aspect of today's agenda?

13      MR. KEACH:  Your Honor, Robert Keach, the fee

14 examiner.  If I may briefly?

15      THE COURT:  Yes.

16      MR. KEACH:  As Your Honor knows fourth fee period

17 ended on January 31.  Normally, we would have scheduled the

18 review and hearing for that fourth period.  And then, of

19 course, the Third Circuit ruling sort of intervened, and we had

20 with -- had some discussions with both Committee counsel and

21 debtor's counsel, postponed any plan with respect to the

22 scheduling of the fourth period review and hearing.

23      In light of the petition for rehearing, I'll reengage

24 with both debtors and Committee counsel and the future claims

25 representative counsel regarding a schedule.  I think that's --

1  the issue is whether or not to wait and do one extended final
2  period and final fee application, thus saving everyone the
3  expense and burden of doing two application processes.  But if
4  we're going to have an extended period beyond the fourth period
5  then we should perhaps revisit that premise.

6          I just wanted Your Honor to know that we were
7  talking, and we were aware of the schedule.  And I had
8  presumed, as Your Honor indicated, that any dismissal order
9  would address final fees and the schedule, and we will also
10  plan for that as well.

11          THE COURT:  I --

12          MR. KEACH:  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Keach.  I appreciate it.
14  Those are the very type of administrative concerns the Court
15  continues to look at and be cognizant of.

16          Mr. Molton, I see your hand raised.

17          MR. MOLTON:  Yes, Your Honor.  Good morning to
18  everybody.  Happy Valentine's Day, Your Honor, for the second
19  time, and to everybody in the room.  David Molton of Brown
20  Rudnick for the Talc Claimants Committee.

21          Just one point, because we have so many people
22  watching and listening.  I know Mr. Gordon mentioned and Your
23  Honor mentioned the rehearing and rehearing en banc petition
24  that was filed yesterday.  I just want to let everybody know
25  that my appellate counsel always advises us, our appellate

1  counsel, the respondents to that motion, meaning the Committee
2  and the other motion to dismiss movants, pursuant to the Third
3  Circuit rules do not have a automatic response, meaning we have
4  no right to respond unless the Third Circuit asks us to.  So to
5  the extent that folks may be asking that question or looking on
6  the docket for that, we are guided by the Third Circuit and
7  bound by the Third Circuit rules.  And needless to say, if
8  there is a request for a response, you'll see us.  But if not,
9  it won't be there.

10            THE COURT:  All right.

11            MR. MOLTON:  Thank you, Judge.

12            THE COURT:  Thank you, Mr. Molton.  I think it's
13  worth informing those who are watching of the process or
14  reiterating the process.

15            I don't see any other hands raised.  Oh --

16            MR. ABRAMOWITZ:  Your Honor?

17            THE COURT:  Mr. Abramowitz physically raising his
18  hand.  Go ahead.

19            MR. ABRAMOWITZ:  Yes.  Your Honor, I'm calling about
20  an adversary proceeding, Case Number 23-01022, which is
21  LTL vs. Dr. Theresa Swain Emory, et al.  And we had reached an
22  agreement with the debtor for an extension of time to file a
23  response 30 days from the date of a determination of whether
24  the adversary proceeding will proceed or -- and with both
25  parties reserving rights for any extensions.

1   The primary focus that I'm making today is that what
2   we would ask for is perhaps a separate status conference or
3   something that just states that we will maintain the status quo
4   in the pending adversary proceeding by staying any further
5   filings, proceedings pending outcome of the appeal process.  It
6   seems pointless to file answers or make any other responses to
7   the complaint until we know if and where and when the adversary
8   proceedings are going to take place.  I don't see where there's
9   any adverse effect on this, and I just wanted to state our
10  position for the record.

11      THE COURT:  All right.  Thank you, Mr. Abramowitz.  I
12  did see the letter request, and I did intend to include it in
13  the amended agenda to address it.  I see Mr. Marino on who's
14  also counsel in the related Moline adversary proceeding.

15      Let me turn to debtor's counsel or plaintiff's
16  counsel in these cases, Ms. Brown.  It would -- it seemed to me
17  to make the most sense that there should be a stand down period
18  while we see what transpires at the circuit and for both of the
19  pending adversary proceedings.  Your thoughts?

20      MS. BROWN:  Yes.  Good morning, Your Honor.  And we
21  don't disagree.  And, in fact, we agreed for both counsel,
22  counsel for Dr. Moline and Drs. Emory, Maddox, and Kradin, that
23  we did believe a 30-day extension pending a determination of
24  the future of the proceeding would be appropriate, and we would
25  not oppose that.  So I don't think that's different than what

Mr. Abramowitz just outlined, but certainly we agree with the
Court and with counsel that we're a little bit in a holding
pattern right now, and the best course of action would be to
wait and see where things land, and then we can proceed.

THE COURT: Would I then expect two stipulations, one
for each adversary proceeding, just so that we docket and
evidence the stand down?

MS. BROWN: Absolutely, Your Honor. And we can reach
out to both counsel and get something on file.

THE COURT: Great.

MR. MARINO: Yes. Yes. Kevin Marino, Your Honor.
That works for (indiscernible) as well. So thank you very much
for your attention to it. And thank you (indiscernible).

UNIDENTIFIED SPEAKER: That works for us as well,
Your Honor.

THE COURT: All right. So we'll expect stipulations
going forward for those.

MS. BROWN: Thank you, Your Honor.

THE COURT: All right. Anyone else with respect to
status?

As far as contested matters that are not going
forward, the -- well, let's turn to -- there are several
matters that have been -- that carried to March 20th: the tort
claimants' motion to compel dealing with insurance. A motion
with respect to third-party funding has been adjourned to March

1 20th. That's Docket 3551. The other was Docket 3336. The

2 motion by the Committee for procedures for reimbursement of

3 expenses, let me turn to Mr. Molton or -- Ms. Cyganowski. Good

4 morning. Where do we stand with that?

5 MS. CYGANOWSKI: Good morning. No. Good morning.

6 For the record, Melanie Cyganowski, Otterbourg, for the TCC.

7 Your Honor, let me just take a quick moment to outline where we

8 were and where we're going.

9 The Committee, as you know, had made a motion seeking

10 to establish a procedure for reimbursement of the expenses

11 incurred by the representatives of the various Committee

12 members. This motion had been made prior to Christmas. It may

13 have been in November. I don't remember the specific date.

14 And during the time that it was pending, we continued

15 to have discussions with counsel for the debtor as well as with

16 the Office of the U.S. Trustee. This matter came to a mutual

17 resolution about a week ago, and it's reflected in a process

18 where there's a proposed consent order. It's been separately

19 docketed with an application. The consent agreement has been

20 entered into between the Committee and the debtor. It's my

21 understanding that this application for entry of a consent

22 order, which will fully resolve the matter, needs to pend for

23 approximately seven days.

24 In the meantime, I'm prepared today to withdraw the

25 reimbursement motion that the Committee had made in

1  anticipation of the pendency of this application for a consent
2  order.  It's my understanding that by proceeding in this
3  fashion, that being the withdrawal of the reimbursement motion
4  as well as the application and entry into a proposed consent
5  order, the Office of the U.S. Trustee has agreed to not object
6  to the pendency of this particular matter.

7            That's, in a nutshell, what the procedure is.  If
8  you'd like me to go through the essence of the reimbursement, I
9  can.  It's a simple process which sets forth an understanding
10  of what's a reasonable expense for a representative of a
11  Committee member to submit for processing, and it deals with
12  events that include both hearing events as well as non-hearing
13  events.

14            As the Court may be aware, throughout the pendency of
15  this case, the representatives have been specifically requested
16  from time to time, whether by the mediators, the estimator, by
17  Committee professionals or by the Court, to be present and to
18  affirmatively participate in the activity then going on.  This
19  is a process that allows for reimbursement of the expenses that
20  they incurred in connection with both activities.

21            THE COURT:  So my understanding -- and I do see
22  Ms. Richenderfer's hand.  I'll turn to her momentarily.  But my
23  understanding is the motion now at Docket Number 3111, the
24  reimbursement motion, is going to be withdrawn, and there's
25  going to be a consent order submitted consistent with local

rules that will lay out the terms of the agreement between the debtor and the TCC. And the U.S. Trustee is cognizant of those terms as well. Is that fair, Ms. Cyganowski?

MS. CYGANOWSKI: That's correct, Your Honor. Specifically, Docket Number 3111 is being formally withdrawn by the Committee. Yesterday, we filed on the docket Docket Number 3742, the application for entry of a consent order as and between the debtor and the Committee. That had been circulated prior to its filing with the Office of the U.S. Trustee.

THE COURT: All right. Thank you.

Ms. Richenderfer?

MS. RICHENDERFER: Thank you, Your Honor. Good morning. Linda Richenderfer from the Office of the United States Trustee. Agree in essence with what Ms. Cyganowski just described. Just wanted to clarify a couple of points on the record.

The debtor and the TCC agreed to enter into an arrangement, and the debtor agreed to make these payments pursuant to Code Section 363(b). That is the basis of the authority for the consent order that has been filed with the Court.

We were allowed -- we, the U.S. Trustee's Office, were allowed to see the details of that. And once we saw that they reached this agreement under 363(b), we also understood that the Committee, as Ms. Cyganowski has stated, would be

1 withdrawing their motion which was filed under different code

2 sections.  And we alerted the TCC and the debtor that under

3 these circumstances we would not object to the consent order

4 pursuant to which the debtor is exercising its 363(b) rights.

5          And so I guess it's a mutual agreement, if you will,

6 but the pieces of it are that based on the agreement between

7 the debtor and the TCC, the U.S. Trustee has stepped aside,

8 because they're withdrawing their motion.  I'm sorry.  The TCC

9 is withdrawing its motion.

10          THE COURT:  All right.  So the Court understands and

11 is cognizant of the distinctions between the applicable Code

12 sections and the reasoning for the U.S. Trustee's actions or

13 position and will let it go at that.  So I will --

14          MS. RICHENDERFER:  Thank you, Your Honor.

15          THE COURT:  I will then expect -- I will take a look

16 at the consent order -- I haven't had a chance to -- to see

17 what the terms are, to make sure that the Court has no issues

18 with the agreement that's been reached.  Thank you,

19 Ms. Cyganowski.  Thank you, Ms. Richenderfer.

20          MS. RICHENDERFER:  Thank you.

21          MS. CYGANOWSKI:  Thank you, Your Honor.

22          THE COURT:  All right.  That brings us, I believe, to

23 the only contested matter going forward which is the matter

24 brought on shortened time on behalf of Mr. Hernandez -- I'm

25 sorry, Valadez, rather, to pursue stay relief to continue with

1  the state court litigation.

2          Mr. Satterley, I know you wanted to make a

3  presentation.

4          MR. SATTERLEY:  Yes, Your Honor.  May it please the

5  Court.  Ladies and gentlemen.  Joe Satterley, Kazan McClain

6  Satterley & Greenwood, on behalf of Anthony Hernandez Valadez.

7  Along with me is John August, also counsel for the movant.

8          THE COURT:  Hold on one second.  I just want to make

9  sure, because I don't see you on the screen.

10          MR. SATTERLEY:  I can see myself, though.

11          THE COURT:  Oh, there you are.  Okay.

12          MR. SATTERLEY:  Okay.

13          THE COURT:  Too many boxes.

14          MR. SATTERLEY:  It's okay.  May I proceed, Your

15  Honor?

16          THE COURT:  Yeah.  Absolutely.  Go ahead.

17          MR. SATTERLEY:  First of all, happy Valentine's Day

18  again.

19          THE COURT:  Aw, shucks.

20          MR. SATTERLEY:  It's two years in a row we're here,

21  but I'm happy to be here.  May it please the Court.  I provided

22  the counsel the PowerPoint presentation.  May I approach and

23  hand --

24          THE COURT:  Yes, please.

25          MR. SATTERLEY:  -- a copy to Your Honor and a copy to

1  staff.

2          THE COURT:  Thank you.

3          MR. SATTERLEY:  And it's -- it may seem big, but

4  it's --

5          THE COURT:  Hefty.

6          MR. SATTERLEY:  -- it's on thick paper.

7          THE COURT:  Okay.

8          MR. SATTERLEY:  It's on thick paper.  I stopped at

9  Staples over here not too far away.  If I may share screen,

10  Your Honor?

11          THE COURT:  Yes.

12          MR. SATTERLEY:  And to sort of give you an overview

13  of -- obviously, our papers speak volumes to what we're seeking

14  relief on.  And we've been before Your Honor multiple times on

15  this particular case.  And I want to -- the presentation really

16  is broken into two different sections.  One is factually and

17  procedurally what we've done.  And then the second half of it

18  is just Mid-Atlantic and how we meet all the factors under

19  Mid-Atlantic.  So it's going to go quick -- a lot quicker than

20  Your Honor may anticipate given these 46 pages.

21          But Mr. Valadez, as Your Honor knows, is now 24.  He

22  was 23 when he was diagnosed with malignant pericardial and

23  pleural mesothelioma.  That's mesothelioma of the lining of his

24  heart and the lining of his lungs.  And he still suffers from

25  that disease.

1    The ultimate relief that we're asking for is a
2  complete lifting of the stay for all, both the debtor and the
3  protected parties.  Alternatively, we would ask that certainly
4  all the protected parties, we be permitted to go forward.  And
5  I'll explain in a few minutes the differences between the two.

6    But here's Mr. Valadez when he graduated high school
7  six years ago.  And there he is in his deposition on September
8  the 13th of last year.

9    This timeline, just to give Your Honor -- I guess you
10  looked through it, so you probably remember it.  Last May, May
11  24th, I filed the motion to lift the stay.  We had the
12  hearing -- and that was so that we could file the complaint, to
13  initially file the complaint.  We had the hearing on June the
14  14th.

15    Your Honor said I'll lift it only for filing the
16  complaint.  Don't do anything else.  I complied with Your
17  Honor's order.  Only filed the complaint.

18    I told Your Honor I'd come back and ask for further
19  relief later.  We did that in July.  Your Honor had hearings --
20  extensive hearings on that.  Then on July 28th, entered a
21  order -- or actually the transcript on July 28th where Your
22  Honor allowed Mr. Valadez to move for a trial date.

23    We did that.  We complied with Your Honor's order.
24  Did only what Your Honor said we could do.  We moved for a
25  trial date.

1     In August of 2022, Judge Lee -- Judge Jo-Lynne Lee,
2 who was the asbestos judge at the time, after reviewing all the
3 evidence we submitted, the treating doctors' declarations,
4 granted us a trial date of November the 7th, 2022.
5     In September, me and Mr. Gordon were here arguing
6 about the procedures on September the 14th.  And Your Honor
7 said let's see what happens with the Third Circuit.  And we
8 debated about how long after the Third Circuit decides should a
9 trial actually occur.
10     Mr. Valadez was deposed a few days -- right around
11 that time frame when we were here at -- in September.  His
12 deposition was complete.  He was only exposed -- and J&J was
13 present.  They had their counsel there.  They cross-examined
14 him.  His only exposure is to Johnson & Johnson baby powder.
15 No alternative exposure to any asbestos of any fashion.
16     So the trial was set on November the 7th.  Obviously,
17 the Third Circuit had ruled about that time.  And consistent
18 with what I told Your Honor, we just rolled that case.  I went
19 before the state court judge and said continue it several
20 weeks.  And Judge Lee continued it until December.
21     December came.  Still no Third Circuit decision.  I
22 went to the Judge and said continue it to January.  It was
23 continued to January.
24     Then in January, January 9th, still no Third Circuit
25 decision, so it was continued to February the 9th, last week.

1     And Judge -- in December, Judge Lee was replaced with
2 Judge Seabolt.  Judge Seabolt is the new asbestos judge, and
3 he's -- I'll tell you about him in a few minutes.  But he
4 continued the case until this Thursday.  And he said,
5 obviously, we're not going to go to trial next Thursday, but
6 I'm going to -- because the California preference statute
7 requires it to be set, he's continued it to this Thursday.  And
8 I'm going to appear and advise him this Thursday what Your
9 Honor rules today.

10     I have this little time line chart, because from
11 February until April -- and what we put in our supplemental
12 filings is that consistent with what Your Honor said in
13 September, 60 days -- we're agreeable to 60 days to do
14 discovery.  Now, debtor in their papers they filed yesterday
15 said that the case is not ready for trial.

16     And so yesterday, shortly after that, I filed a
17 supplemental and a reply saying if they want to go to trial
18 next week, I'll forgo all discovery.  I'll forgo all discovery.
19 But it's -- I think it's to their benefit to take some
20 discovery.

21     So I think a trial could occur in April.  And that's
22 consistent with what Your Honor said in September.  And I'll
23 show you a transcript in a bit.  But it's also consistent with
24 what Your Honor did when we came here back in November of 2021
25 and December of 2021, setting a trial for February the 14th of

1  2022.  You gave the parties about 60 days to conduct that

2  discovery.

3         And it occurred, a trial occurred.  Numerous experts

4  were deposed.  Numerous fact witnesses were deposed.  And that

5  trial occurred without incident.  You know?  It occurred.

6         So I just want to remind Your Honor of Mr. Valadez's

7  declaration -- I think this was back in December -- where he

8  has completed his deposition.  He's constantly experiencing

9  body pain, headaches, stress, anxiety, uses supplemental

10 oxygen.  He, at that point, had already gone through five

11 cycles of chemotherapy.  He was temporarily blind because of

12 it.

13        He now has his vision back a little bit.  He still

14 has significant anxiety, significant anxiety and depression to

15 the point where he can't communicate very well.  And he's still

16 in shock and disbelief that he has a terminal cancer.

17        He has nausea, vomiting, poor appetite, chest pain,

18 tightness, breathing, discomfort, fatigue, and body pain.  This

19 is all undisputed.  And it was verified during his deposition

20 and throughout all the medical records that I have given to

21 debtor's counsel and the protected parties' counsel.

22        Just to remind Your Honor, I showed this to you.

23 Johnson & Johnson baby powder was -- this is a photograph from

24 his house when he was a baby.  His mother provided that to us.

25 It's really undisputed he had this exposure.

1          I've showed Your Honor the declarations from the
2    treating doctors at Stanford.  None of these doctors are
3    involved in litigation.  They're not hired guns.  They're not
4    anyone that's really subject to any attack.

5          This is Dr. Backhus.  She's the surgeon that signed
6    the declaration that indicated in her opinion he was not going
7    to survive beyond six months.  Well, fortunately, he survived a
8    little bit longer than six months, but he's not doing well.
9    And the medical records will verify that in just a second.

10          Dr. Roy is one of his oncologists.  Once again, she
11   signed a declaration about the dismal prognosis of this
12   condition, of his specific disease, and that she was of the
13   opinion that he wouldn't survive six months beyond the date of
14   the declaration.  Once again, that declaration was way back in
15   May, so he's lived -- outlived the declaration, but he's
16   struggling.

17          Dr. Roy also indicates that based upon his social
18   history, his only known exposure to asbestos was through
19   Johnson's baby powder.  This is undisputed.  And since May of
20   last year, the debtors or the protected parties have not
21   submitted anything that suggests Dr. Roy or Dr. Backhus are
22   wrong in any regard.

23          This is just a couple images from his deposition.
24   It's his -- you know, exhibits that were used showing that --
25   you know, the condition that he's in.  He's in a wheelchair.

1  His mother has to push him.  He's in bed most of the time.  As
2  a 23-year-old or 24-year-old, this is his life.

3          I submitted this back in December.  This is a report
4  from Dr. Kradin.  Dr. Kradin is a renowned pathologist from
5  Harvard.  I think he's now emeritus status.  And he confirmed
6  the diagnosis.  You know, the Stanford doctors confirmed the
7  diagnosis.  Outside experts confirmed the diagnosis and
8  confirmed that it's metastatic and spread to multiple parts of
9  his body, including his lymph tissue.

10          And it's called a biphasic malignant mesothelioma,
11  which is -- there's three different types of mesotheliomas.
12  There's epithelial, there's biphasic, and there's sarcomatoid.
13  Sarcomatoid, you die quickly, rapidly.  Biphasic is somewhere
14  in between.  And epithelial, a year or two.  So he's on the
15  edge of sarcomatoid, which is a very poor prognosis.

16          Dr. Kradin, like the treating doctors, gave case
17  specific causation opinions, and he gives, you know, testimony
18  that the regular use of Johnson's baby powder was the cause of
19  this man's -- this young man's disease.  And he set forth in
20  his report his -- some of the bases in scientific literature
21  going back into the 1960s, '70s, and '80s, long before
22  Mr. Valadez was born, showing that the asbestos has been
23  documented in talcum powder, including, you know, talc -- the
24  cosmetic talc.

25          I showed you, Your Honor, this photograph of last

1  summer.  That's Mr. Valadez in the hospital bed.  He's got a
2  hospital bed at his home.  He is -- that's where he -- that's
3  how he lives his life now.  And he sleeps like this, because he
4  can't breath laying down.  He has to sleep curved up, curled up
5  in a ball.

6        Now, Your Honor did, once again, allow us to lift the
7  stay to gather the pathology so that we can see what is in his
8  tissue.  And just like Vincent Hill where we looked at the
9  tissue and the exact ingredients in Johnson's baby powder was
10 in Vincent Hill's tissue, Dr. Dotson, who has written over a
11 180 articles and books on asbestos, and he's been an expert for
12 both defendants in talc litigation, plaintiffs in talc
13 litigation -- he is truly an objective expert.  He found -- and
14 we submitted the declaration yesterday of Dr. Dotson.  He found
15 talc adjacent to the pericardial cancer, the mesothelioma.

16       In Mr. Valadez's case, there's not lung tissue, and
17 there's not lymph tissue available for digestion.  There's only
18 tissue around the heart where the -- because when they went in
19 to remove some of the cancer, they removed some of the tissue.
20 So he analyzed the pericardial fat and found talc -- platey
21 talc adjacent to my client's cancer.

22       And he also found mica.  And mica is documented, and
23 J&J documents show mica as an ingredient of J&J talc.  So two
24 of the ingredients, talc, which by nature it's a talc product,
25 and mica are identified in Mr. Valadez's tissue.

1        And I showed Your Honor this last year.  This was the
2  October 2019 testing by the FDA.  The FDA had a lab do testing
3  on off-the-shelf Johnson baby powder and found platey talc,
4  mica, and chrysotile asbestos.

5        Now, coming forward to where we are now medically, I
6  submitted in our supplemental filing medical records of
7  January 20, 2023, where the CT scan shows disease progression.
8  And he's still going through immunotherapy, but the disease
9  continues to progress.  Dr. Joel Neal is another thoracic
10  oncologist at Stanford University who is treating Mr. Valadez.

11        The medical records demonstrate body pain in the
12  morning, hurts particularly in the inner right and inner
13  posterior right arm and posterior right knee.  And the pain --
14  stretching out the arm, the pain is between a seven and an
15  eight out of ten.

16        And he -- the -- mentally, he feels he's still
17  struggling.  He feels that day to day and tries to stay busy,
18  has been in touch with Lin Cho (phonetic) -- she's a social
19  worker there at Stanford -- and not been able to see the
20  psychologist, oncologist due to insurance.  So this is a poor
21  family in California that doesn't have the financial
22  wherewithal to even get the psychological help with regards to
23  treatment.

24        He's happy -- this is his life.  What he's happy
25  about now is he got to change his name to Emery (phonetic).

1  That's his happiness, being able to change his name.

2      So I'm moving forward to this month, February.  He

3  went and got another infusion -- immunotherapy infusion.  And

4  he's discharged -- once again discharged stable but accompanied

5  by his mother, once again, in a wheelchair.  He's been in a

6  wheelchair for quite some time.

7      The active issues says reports some vomiting.  Not

8  taking anything at the time.  And he's requesting medication

9  for the vomiting.

10     So we have, in this case -- life expectancy of a 23

11 or 24-year-old man, according to life expectancy tables, is 54

12 years.  So we've got a situation where we've got 54 years lost

13 because of this situation.

14     So now I want to go back to September the 14th of

15 2022 when we -- Mr. Gordon and I was debating with Your Honor

16 about what to do and when is the Third Circuit -- we were

17 speculating when the Third Circuit might rule, when they

18 might -- and Mr. Gordon said on September the 14th, we will

19 agree in turn to give Mr. Satterley the preference he wants; we

20 just need to have a 90-day window post a Third Circuit ruling.

21 And then Your Honor said you were not overwhelmed with the 90

22 days.  Sixty days after the Third Circuit, if it were to rule

23 that way, either overrules the dismissal motion or overrules

24 the preliminary injunction, to allow a schedule and to keep it

25 within place.

1        And then we talked, and I said, Your Honor, please

2  don't vacate the trial date.  You said you don't have the

3  authority to do that.  But in your view of the record, J&J

4  should have at least 60 days to prepare.  And that's the reason

5  why I put that in the -- in the supplemental filing is to --

6  exactly what Your Honor suggested in September.

7        My client may not live 60 days.  But he's certainly

8  not going to live, you know, four months, five months, six

9  months down the road.  So anything that I can do for my client,

10  including Your Honor's suggestion back in September, I would

11  request that occur.

12        Now, the rest of this presentation deals with the

13  <u>Mid-Atlantic</u> holding, 304 B.R. 111, 2003.  Your Honor's

14  thoroughly familiar with it.  We've argued it.  We argued it in

15  June.  We argued it in July.

16        I go through the factors.  Obviously, all 12 factors

17  are not necessary in any particular case with regards to

18  lifting automatic stay or a preliminary injunction.  But in

19  this case, when we go through each and every factor, we meet

20  each and every factor.  And the debtor and the protected

21  parties do not, do not meet the factors.

22        The impact on the -- of the stay on the parties and

23  the balance of harm.  Now, the impact on Mr. Valadez is so, so,

24  so significant.  His life is at stake.  The impact upon the

25  debtor and the protected parties is they may have to pay for

1  some attorney's fees to attend depositions and attend trial.

2        They claim a tidal wave of requests would occur if

3  Your Honor grants relief.  But I would say, first of all, no

4  creditor -- not a single creditor has objected to my motions

5  that I filed in May, June, July, September.  No creditor has

6  objected.  And so there's no harm to any creditors at all with

7  regards to lifting the stay for Mr. Valadez.

8        In yesterday's filing, the debtor says that lifting

9  the stay would decide -- would cause a, you know, similar

10  case-by-case request for relief at a time when the debtor is

11  focusing its attention and resources on exploring all available

12  options in the wake of the panel opinion.  And I was thinking

13  about this last night, is Jones Day already has filed -- and

14  local counsel has already filed their motion for -- petition

15  for re-hearing.  And they have counsel -- trial counsel

16  involved that's not involved in the bankruptcy.

17        And in this particular case, on August the 17th of

18  last year, the law firm of King & Spalding entered their

19  appearance in this case.  And Mr. Calfo, Julia Romano, and

20  Bryan King, all very seasoned, experienced lawyers in

21  California -- Mr. Calfo and I tried cases against each other.

22  He's a great trial lawyer.  Ms. Romano is a great trial lawyer.

23  Bryan King is a great lawyer.  So they have experienced

24  counsel.  Mr. Calfo was lead trial counsel in the Smiths' case

25  which was recently affirmed on appeal by the California Court

1  of Appeals in a published opinion which I've submitted to Your
2  Honor. So they have counsel in California prepared to be
3  involved in this case that will not be a distraction upon Jones
4  Day or Hogan Lovells' appellate relief that they're seeking at
5  the Third Circuit.

6      In addition, the other protected parties, the
7  retailers, Lucky's, Save Mart, Safeway, they're all represented
8  by the law firm of Barnes & Thornburg and Jim Murdica's firm,
9  and it's being paid for by J&J. So they have two great trial
10 firms, King & Spalding and Barnes & Thornburg, that have been
11 in this litigation for the last several years that have nothing
12 at all to do with the bankruptcy or the appeal of the
13 bankruptcy. So I would suggest the comment from yesterday that
14 they're focusing their attention, the trial -- this trial will
15 not distract from that at all.

16     Now, whether there's a specialized tribunal with
17 necessary expertise, they've agreed to this. They agreed to
18 this last June. Alameda County is a special place where
19 mesothelioma cases have been handled for 30 -- over 30 years.
20 And they've handled more talc cases than any other court in the
21 nation as far as -- I've tried, I think, four or five cases to
22 verdict in Alameda County.

23     Judge Seabolt, who is now the asbestos judge, I was
24 in trial with Judge Seabolt with Ms. Brown last week. We
25 started trial -- we started picking a jury on January 30th. We

picked the jury. All defendants settled right before opening statements. Some during jury selection, right?

My point being Judge Seabolt -- and he presiding over other mesothelioma cases that I tried back in  -- during the pandemic. So they have -- Alameda County and Judge Seabolt, specifically, has particular expertise in dealing with this type of claim. And that's undisputed.

And whether the parties -- another factor: whether the parties are ready for trial. And as I said at the very beginning, I'll forgo any discovery if they will go to trial right away. But if they want to do discovery, I'm more than -- I'll put up my expert witnesses. I'll put up whatever other witnesses they want to depose.

I've -- on January 30th when the opinion came down, I sent the meet and confer letter to counsel saying let's meet and confer regarding what needs to be done to get ready. And they just ignored me.

Last April, April the 21st, I sent a letter to counsel. Let me know what discovery you want to be prepared if we can't resolve this case. We'd like to resolve the case, but let us know what discovery you need. In September when I met and conferred with them, I asked what discovery do you need. And I think the first question Judge Seabolt is going to have Thursday, if Your Honor grants my relief requested, is going to be exactly that. What do you need to do to be ready for trial.

1    As I said, we disclosed experts months ago.  They've
2  known about all these experts, the retained experts, having
3  cross-examined them in every -- in many other trials.  And it
4  really won't take a lot to get them up to speed to try this
5  case.

6    Now, the -- whether the action primarily involves
7  third parties, they have told us and they've told the Court
8  that they indemnify everybody.  J&J is indemnifying all the
9  parties.  So there's no third parties that's not -- that J&J
10  does not control.  Matter of fact, they sent a letter to all
11  the retailers saying if you let us control the defense, we will
12  indemnify you.  And so there's no third party to be concerned
13  about.

14    Insurance, whether the debtor's insurer has assumed
15  full responsibility for defending it.  And Ms. Clancy presented
16  this to Your Honor back in June.  Mr. Kim at the first
17  hearing -- I think this is in North Carolina -- testified that:
18  "Defendants state that they have reasonable and good faith
19  belief the policy concerned is unlikely to be implicated in
20  this action.  Do you see that?  I do."  He has agreed that
21  insurance has no play in the decisions to litigate or not to
22  litigate.

23    In fact, that's been my experience for the last six
24  years.  J&J controls it all, and they negotiate separately and
25  apart with their insurance folks.  So insurance is not really

an issue with regards to the <u>Mid-Atlantic</u> factors.

The next, as I said before, would it prejudice the creditors. No other creditor has moved to lift the stay since Your Honor ruled on July 28th for Mr. Valadez. And this is the floodgates. We've been hearing the floodgates arguments since I first made the motion at every hearing that all these other claimants and creditors are going to come and ask Your Honor to do the same thing.

Well, Your Honor lifted the stay on July 28th for Valadez and Johnson. And I'm here only for Valadez today. I'm not even asking for Johnson, because Johnson's case is not in the right framework right now to go to trial where Valadez is. So the floodgates argument not only does it have no merit factually, it hasn't occurred.

Whether the -- this case can be fully adjudicated in one action in April or whether it could be -- or whether full or partial completion. I think this case can be adjudicated in one action. And this is where I want to talk with Your Honor about why lifting the stay in total would be judicial economy.

Because if Your Honor just lifts the -- you -- the protected parties only and lets LTL sit over there to the side, then potentially Valadez can go to trial against J&J and the retailers. Which I have evidence that J&J has said they controlled everything with regards to health and safety of talc, so I think I'll still win that case for my client. But

1  at that trial, without LTL present, J&J may try to argue and

2  convince a jury, no, it's not our responsibility; it's JJCI's

3  responsibility, in essence LTL's responsibility.  And there

4  could be an apportionment at fault -- apportionment -- and then

5  if the Third Circuit doesn't grant relief and the Supreme Court

6  doesn't grant a writ, then, secondly, there might have to be a

7  second trial for LTL only.

8          So it makes more sense to lift the stay in total, let

9  us try against, you know, all the potential parties.  Let the

10  apportionment fall where it may.  And we won't have to burden

11  the court system with a second trial.  But if Your Honor only

12  says protected parties only, we'll take that.

13          Now, the jurisdiction -- the last three or four

14  slides relates to the -- Your Honor still has jurisdiction.  I

15  don't even think this is a matter that's in dispute any longer.

16  At the hearing in June, Your Honor commented that you do have

17  jurisdiction.  We just cited the same cases we cited back in

18  June.  And I've attached part of the transcript of

19  Ortho Pharmaceutical vs. Amgen, 887 F.2d 460, 1989.

20          And Your Honor at that hearing in June said you do

21  have jurisdiction.  Obviously, you lifted the stay multiple

22  times.  So any argument that you don't have jurisdiction is

23  without merit.

24          This case is unique.  And I'm not going to play you

25  the video clip of Mr. Valadez there.  This is my last slide.

1  But, basically, Mr. Valadez is just -- wished he had his life
2  back and wished he didn't have this cancer. None of my clients
3  want to be in court. They've never -- this client has never
4  filed a case against anybody.

5  And this case is so unique and deserving of the stay
6  being lifted. Your Honor, I would respectfully request Your
7  Honor to lift the stay, allow Mr. Valadez to go to trial, allow
8  J&J to prepare any defenses that it has. Whether it's
9  Ms. Brown or Mr. Calfo or Calfo's staff of attorneys at King &
10 Spalding, they have the resources to allow this case to
11 proceed.

12 I want to stop screen sharing for just one second and
13 tell Your Honor it's been an honor to be before you and appear
14 before you. I know me and Mr. Gordon and Ms. Brown may
15 dispute -- have disputes from time to time, but this profession
16 is special. This job is special. Your job is special. And
17 the right thing to do is to lift the stay and allow this young
18 man to have his day in court. Thank you, Your Honor.

19 THE COURT: Thank you, Mr. Satterley.

20 All right. Let me turn to counsel for the debtor.
21 Mr. Gordon, will it be you?

22 MR. GORDON: Yes, Your Honor. Greg Gordon on behalf
23 of the debtor. I will be brief since this matter, as
24 Mr. Satterley indicated, has been argued before. So I've got a
25 few points I wanted to make, Your Honor.

1    Initially, I would -- I just want to say that we
2  certainly recognize that Mr. Valadez's health condition is very
3  serious and that he's deserving of our sympathy.  But the
4  problem that we face is that this bankruptcy case is not over.
5  It has not been dismissed.  No mandate of dismissal was issued.
6  And it may never be issued.

7    And from our perspective, if Your Honor decides to
8  grant the relief requested by Mr. Satterley, it will set a
9  precedent that will inevitably lead to a cascade of similar
10 motions making identical arguments.  And we believe, as a
11 result, Your Honor will have then lost control over this case.

12    Moreover, the spate of motions that will almost
13 certainly follow, raising the same arguments based on similar
14 if not identical facts, will, if granted, irretrievably damage
15 LTL's ability to achieve a successful resolution of this case.
16 Again, that's in the context where this case remains pending at
17 this time.

18    Now, Mr. Satterley said in his papers and he said
19 again today that there haven't been any other requests for
20 similar relief, and, therefore, you shouldn't worry about this
21 cascade of similar motions.  But he's not correct about that.
22 Your Honor may recall that Mr. Placitella on behalf of his
23 client has filed at least five pleadings seeking the same
24 relief for five of his clients.

25    And you may recall that when we had discussions with

Your Honor back, I believe, over the summer with the TCC about
estimation and about next steps in the case, the TCC had
proposed that the stay be lifted as to, I think, originally 90
cases and then revised that down to 12 cases.  And I think Your
Honor also knows from the record, based on the trajectory of
the litigation, that it's not a stretch at all to believe that
if a precedent like this was set, we're going to have just a
cascade of similar motions that are filed.

        The next thing I wanted to say, Your Honor, is that
the timing of the request from our perspective is particularly
problematic basically for the reasons I indicated earlier.  We
are in the midst of exploring and working on options to still
successfully resolve this case.  At the same time, we're
engaging in contingency planning in the event the bankruptcy
case is dismissed and the talc litigation is returned to the
tort system.  And as I said before, but I'll emphasize it
again, you know, resuming the defense of literally thousands of
claims in multiple courts across the country is a huge task.

        And all of those work streams, Your Honor, are
occurring under considerable time pressure.  As everyone now
knows, the petition for re-hearing was filed yesterday, but
that petition could be denied in as little as ten days.  And
the panel's mandate would then issue seven days thereafter
unless stayed by the Third Circuit or the Supreme Court.  And,
of course, there's no assurance that the stay will be granted.

1        So that's what we're working with.  This would be a
2 huge distraction from efforts that we're engaging in now to try
3 to, notwithstanding the panel decision, achieve success in this
4 case, to also pursue an appeal that we think is well-taken.

5        Now, Mr. Satterley has said that preparing for trial
6 will not require much time.  He said it in his papers.  He said
7 it again today.  And he's basically suggesting that we, LTL,
8 are ready for trial or could be ready for trial in short order.

9        And he said it in part because he said -- and he said
10 it again today -- I told LTL who our experts witnesses are.
11 They've provided declarations in the bankruptcy case.  And you
12 should be set to go.

13        But what he doesn't say, of course, is that those
14 experts have not prepared and produced expert reports.  He
15 doesn't mention that following the preparation and delivery of
16 those reports, depositions will be necessary.  He doesn't
17 mention that we have to line up our own experts who must
18 produce reports and be subject to deposition.

19        Now, Mr. Satterley suggests that he's willing to
20 forgo discovery, and that's a way to help out.  But after all,
21 he represents the plaintiff.  And LTL is not willing to do the
22 same, and we should not be required to do the same.  So in
23 short, Your Honor, having to defend this case on an expedited
24 basis is just a substantial distraction, and it couldn't
25 really, from our perspective, come at a worse time.

1    And then lastly, Your Honor, I would just say that

2 granting Mr. Satterley's request will result in giving his

3 client a preference over all the other claimants who are

4 similarly situated to Mr. Valadez.  As long as this case

5 remains pending, and it's pending today, we believe that all

6 claimants should be treated in the same manner, and their cases

7 should remain stayed.

8    So, Your Honor, we'll otherwise stand on our papers

9 since we made the arguments before.  And I would just conclude

10 by saying that as much as Mr. Satterley would like this case to

11 be dismissed -- this bankruptcy case, that is, it has not been

12 dismissed.  And unless or until it is, this renewed request

13 should be denied for the same reasons the original request was

14 denied.  Thank you, Your Honor.

15    THE COURT:  Thank you, Mr. Gordon.  Appreciate it.

16    MR. SATTERLEY:  Very brief response, Your Honor?

17    THE COURT:  Mr. Satterley?

18    MR. SATTERLEY:  First of all, counsel said that

19 Mr. Valadez should be treated similarly to all other folks, and

20 there's no reason why he should get a preference.  But under

21 the law of his state, California, we have a preference statute.

22 I represent many J&J victims that do not get a trial date,

23 because they're not dying.  They have mesothelioma.  I have no

24 doctors that are saying they're going to die in the next three

25 or four, six months.

1    So under the existing law, it's different than what
2  Mr. Gordon says, that everybody is the same.  There's a
3  preference statute.  So counsel is incorrect in that regard.

4    Let me just quickly go through and respond to -- with
5  regards to the mandate not being issued.  Obviously, we believe
6  the mandate is going to be issued.  But if for some reason this
7  Third Circuit stays -- or the Supreme Court takes the case, I
8  will agree to stop and come back to Your Honor and say, Your
9  Honor, they've taken the case.  It may be a lot longer.  But to
10 get this case ready for trial, we need to get going now.

11   Counsel argued a cascade or similar motions and that
12 Your Honor would lose control of this case.  Your Honor didn't
13 have any problem when the TCC asked for 90 cases.  Your Honor
14 said no.  Your Honor doesn't lose control of the case.  Your
15 Honor has total control of the case until the mandate's issue.
16 So that argument is simply just a scare tactic to prevent this
17 one individual case from being allowed to occur.

18   Counsel said that they're exploring options to
19 resolve the case.  I've been telling Your Honor since day one,
20 I -- on behalf of my clients, I want to efficiently and
21 equitably resolve every one of my cases.  But J&J or LTL or
22 JJCI, they do not negotiate.  Zero has been the offer since
23 this case has -- they've had all the facts of this case since
24 last April, and they refuse to negotiate.

25   The last thing I'd say, the work streams argument,

1  that they -- they're -- they've got work stream problems -- no,
2  the two last things.  Work stream problems.  They're
3  represented by -- J&J is represented by the biggest law firms
4  in the world in talc litigation: King & Spalding, Orrick,
5  Jones Day, Skadden Arps, Drinkle Biddle, and numerous other
6  ones, numerous other law firms.  There's no work stream dilemma
7  that's going on here.  That's a false argument.

8          Finally, counsel said that we'd have to submit expert
9  reports.  We've already given -- I showed Your Honor
10 Dr. Kradin's detailed report.  I showed it as part of the
11 PowerPoint.  I filed that in December.

12         I've already submitted expert declarations of
13 Dr. Dotson, Dr. Felsher, several others, the treating doctors.
14 They've had that for months and months and months.

15         Now, there's no requirement under California law that
16 each expert sign off on an expert report.  So we're doing far
17 more than we're even required to.  And they have that
18 information.  And they could have, at any point in time, worked
19 up any aspect of this case.

20         And, in fact, I know who their experts are going to
21 be.  The same experts I've cross-examined in many other trials.
22 It's going to be Matt Sanchez to say there's no asbestos there.
23 They're going to have a Dr. Dee (phonetic) from Johns Hopkins
24 who's a pulmonologist who's going to talk about epidemiology.
25 They might have Attanoos from Wales to talk about pathology.

1  So this is a known quantity of -- in this situation.

2  I'll end with Your Honor -- what Your Honor said on

3  July 28th, page 21. "I'm hoping not to slow down the progress

4  of the case Mr. Satterley presented." I've highlighted; I've

5  underlined it. I would love it, because my client deserves his

6  day in court. Thank you, Your Honor.

7  THE COURT: All right. Thank you.

8  Thank you, counsel. Well argued.

9  The Court is cognizant of the Mid-Atlantic factors

10  and how they apply. The Court has addressed those factors in

11  this case and in other cases on repeated occasions. One of the

12  more -- one of the single most important factors included in

13  the Mid-Atlantic factors is the last one that Mr. Satterley

14  referenced, the impact of the stay on the parties and the

15  balance of the harms. We find that -- those same

16  considerations to be present in the statute itself, in effect,

17  362(d)(1) and (d)(2).

18  When we look at how important the stay is with

19  respect to the -- an effective reorganization that is in

20  prospect, that is what is critical for the debtor, the ability

21  to reorganize, and that is the jumping off point for the Court

22  when it examines and weighs the harms to the respective

23  parties. At the outset of the case, the Court reflected its

24  concern for the prejudicial and detrimental impact of

25  continuing litigation on the debtor's ability to reorganize

1    under Chapter 11.  That is why the Court entered injunctions

2    with respect to the MDL, the state court proceedings, the

3    securities actions, the actions of the state attorneys general,

4    the insurers, to give the debtor the opportunity to move

5    forward with what was in prospect, a reorganization.

6         The fact is, in light of the Third Circuit's ruling,

7    at this juncture it is difficult for the Court to make that

8    same finding that there is an effective reorganization in

9    prospect.  The Court is fully aware of the appellate rights of

10   the debtor in pursuing en banc relief and possibly pursuing

11   petition for certiorari to the Supreme Court.

12        But the pendulum has swung.  And in balancing the

13   harms, the Court is less deferential to the reorganization

14   needs of the debtor and has to be in light of the concerns --

15   whether or not the Court agrees with the circuit, but with the

16   concerns laid out in the circuit's opinion.  So when this Court

17   now weighs the balance of the harms and takes into account the

18   burdens placed on this particular plaintiff versus the need for

19   the continued stay in support of continued reorganization

20   efforts, the burden now has shifted a bit, and in so doing, the

21   Court deems it appropriate to grant stay relief to the

22   plaintiff in this regard.

23        I'm making a slight adjustment.  First of all, the

24   Court defers to California's rules of court and state law with

25   respect to the priorities accorded this particular plaintiff.

1  Under state -- under California law, all plaintiffs aren't
2  treated the same.
3          The Court also has the confidence and offers the
4  deference to Judge Seabolt that he will ensure that the debtor,
5  the related parties, and Johnson & Johnson are accorded their
6  necessary protections in order to fairly defend their positions
7  and to give the defendants sufficient time to do so.  The Court
8  cannot, should not, and will not dictate to Judge Seabolt how
9  he should oversee this case.  There's no reason to expect Judge
10 Seabolt won't provide the defendants with the protections, the
11 time, both substantively and procedurally, to defend their
12 cases.
13         So the change I would make is to grant stay relief
14 and include a provision that it's the -- that no trial should
15 take place within 60 days from the entry of the order granting
16 stay relief.  So it's a couple -- it's a week or so after.
17 That doesn't require a trial take place at that point in time.
18 If Judge Seabolt wishes to shorten that, I think it would be
19 unfortunate, but he is in a better position to gauge it.  And
20 if he wants to extend it, he is in a better position to gauge
21 what's appropriate.
22         So, Mr. Satterley, I'm going to grant your motion,
23 ask you to submit a revised form of order just making the
24 change that the clock starts ticking from 60 day -- for 60 days
25 for the trial.  I'll grant stay relief as to all parties

1  related -- J&J and whomever you're going to seek to add.

2          With respect to the floodgates issue on other parties

3  coming in, let me be clear.  I have -- as I indicated at the

4  outset, I have no intention of complicating this matter.  The

5  injunctions that have been issued by this Court remain in

6  effect, and I will not address them pending the issuance of the

7  mandate.  The mandate resolves, one way or the other, the

8  injunctions.

9          The next court date I have -- omnibus court date for

10  LTL is, I think, March 20th.  I don't expect to be in court on

11  LTL matters until that time.  By that time, I would assume the

12  Third Circuit will have addressed the en banc request

13  preliminarily.

14          If not -- and I take -- actually, Mr. Satterley beat

15  me to the punch in one respect.  Should en banc review be made

16  available, should the matter proceed to the Supreme Court, the

17  debtor or interested parties or J&J are free to come back to

18  me -- again, the pendulum then shifts again -- to seek a

19  further stay with respect to this litigation.  And I'm only

20  ruling on this litigation at this point.

21          So with those reservations and precautions, I believe

22  the matter is resolved.

23          MR. SATTERLEY:  Yes, Your Honor.  We'll prepare the

24  proposed order, circulate to counsel, and then tender to

25  chambers.

1          THE COURT:  All right.  I appreciate it.

2          Is there anything else anyone wishes to discuss or

3   reference?  If not, we are adjourned.  Thank you, all.

4          IN UNISON:  Thank you, Your Honor.

5          AUTOMATED VOICE:  Goodbye.

6          THE COURT:  Goodbye.  I love that.

7              Proceedings adjourned at 11:08 a.m.)

8                      *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, LIESL T. SPRINGER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.

/s/ Liesl T. Springer
LIESL T. SPRINGER, CET-685
J&J COURT TRANSCRIBERS, INC.          DATE:  February 15, 2023

# Exhibit 11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Order Filed on February 3, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

In Re:

Case No.: _____

Chapter: _____

Judge: _____

**ORDER SHORTENING TIME PERIOD FOR NOTICE,
SETTING HEARING AND LIMITING NOTICE**

The relief set forth on the following pages, numbered two (2) and three (3), is hereby **ORDERED**.

___

**DATED: February 3, 2023**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**EXHIBIT 11**

After review of the application of _____ for the reduction of time for a hearing on _____ _____under Fed. R. Bankr. P. 9006(c)(1), it is

ORDERED as follows:

1. A hearing will be conducted on the matter on _____ at _____ in the United States Bankruptcy Court, _____, Courtroom No. _____ .

2. The Applicant must serve a copy of this Order, and all related documents, on the following parties:

_____

_____

by ☐ each, ☐ any of the following methods selected by the Court:

☐ fax,  ☐ overnight mail,  ☐ regular mail,  ☐ email,  ☐ hand delivery.

3. The Applicant must also serve a copy of this Order, and all related documents, on the following parties:

_____

_____

by ☐ each, ☐ any of the following methods selected by the Court:

☐ fax,  ☐ overnight mail,  ☐ regular mail,  ☐ email,  ☐ hand delivery.

4. Service must be made:

☐ on the same day as the date of this order, or

☐ within _____ day(s) of the date of this Order.

5. Notice by telephone:

☐ is not required

☐ must be provided to _____

☐ on the same day as the date of this Order, or

☐ within _____ day(s) of the date of this Order.

2

6. A *Certification of Service* must be filed prior to the hearing date.

7. Any objections to the motion/application identified above:

    ☐ must be filed with the Court and served on all parties in interest by electronic or overnight mail _____ day(s) prior to the scheduled hearing; or

    ☐ may be presented orally at the hearing.

8.   ☐ Court appearances are required to prosecute the motion/application and any objections.

    ☐ Parties may request to appear by phone by contacting Chambers prior to the return date.

*rev.1/12/22*