# Exhibit 12

Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Movant Anthony Hernandez Valadez*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC, | : | Case No. 21-30589 |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF JOSEPH D. SATTERLEY

Pursuant to 28 U.S.C. § 1746, I, Joseph D. Satterley, declare under penalty of perjury as

follows:

1.      I am a partner in the law firm of Kazan, McClain, Satterley & Greenwood, A

Professional Law Corporation ("Kazan Law"), located at 55 Harrison Street, Suite 400, Oakland,

California 94607, and have been duly admitted to practice law in the States of Pennsylvania,

1

**EXHIBIT 12**

Kentucky, and California, the United States Supreme Court, the U.S. District Court for the
Eastern and Western Districts of Kentucky, and the U.S. Court of Appeals for the Third, Sixth,
Eighth, and Ninth Circuits. I am admitted as counsel *pro hac vice* in this action for Movant
Anthony Hernandez Valadez ("Movant" or "Mr. Valadez").

2.      Unless otherwise stated in this Declaration, I have personal knowledge of the
facts set forth herein. If called as a witness, I would testify as to those facts.

3.      I submit this Declaration in support of Movant's supplemental filing in support of
his Motion for an Order Granting Relief from the Preliminary Injunction, which was filed on
May 24, 2022.

4.      I represent Mr. Valadez. He is 24 years old and afflicted with a terminal, asbestos-
caused disease called pericardial mesothelioma. I am the Kazan Law partner charged with all
aspects of Mr. Valadez's case. But for the Preliminary Injunction, Mr. Valadez would have filed
a lawsuit in the Superior Court of California, County of Alameda ("State Court") against non-
debtors Johnson & Johnson ("J&J") and retailers Albertsons Companies, Inc., Lucky Stores, Inc.,
Safeway Inc., Save Mart Supermarkets, Target Corporation, and Walmart Inc. (collectively,
"Retailers").

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the relevant excerpts
from the Reporter's Transcript of Proceedings in this case, taken on June 14, 2022.

6.      Attached hereto as **Exhibit 2** is a true and correct e-filed copy of the Complaint,
which was filed in State Court on June 15, 2022.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of J&J's Notice of
Appearance in Movant's State Court case, served on August 17, 2022. J&J has not filed an
Answer in State Court.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of the Notice of Appearance of Albertsons Companies, Inc., Lucky Stores, Inc., Safeway Inc., and Save Mart Supermarkets, served in the State Court case on August 23, 2022. These defendants have not filed Answers in State Court.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of the Notice of Appearance of Target Corporation, served in the State Court case on August 24, 2022. This defendant has not filed an Answer in State Court.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of the Notice of Appearance of Walmart Inc., served in the State Court case on September 8, 2022. This defendant has not filed an Answer in State Court.

11.     Attached hereto as **Exhibit 7** is a true and correct copy of the relevant excerpts from the Transcript of Rulings in this case, taken on July 28, 2022.

12.     Attached hereto as **Exhibit 8** is a true and correct copy of the Minute Order for Movant's State Court action against J&J and Retailers (collectively, "Non-Debtors"), filed on August 26, 2022.

13.     Attached hereto as **Exhibit 9** is a true and correct copy of the relevant excerpts from the Reporter's Transcript of Proceedings in this case, taken on September 14, 2022.

14.     Attached hereto as **Exhibit 10** is a true and correct copy of the Minute Order for Movant's State Court action against Non-Debtors, filed on October 21, 2022.

15.     Attached hereto as **Exhibit 11** is a true and correct copy of the relevant excerpts from the Reporter's Transcript of Proceedings in the State Court action against Non-Debtors, taken on November 8, 2022.

16.     Attached hereto as **Exhibit 12** is a true and correct copy of the Minute Order for Movant's State Court action against Non-Debtors, filed on December 12, 2022.

17.     Attached hereto as **Exhibit 13** is a true and correct copy of the Minute Order for Movant's State Court action against Non-Debtors, filed on January 9, 2023.

18.     Attached hereto as **Exhibit 14** is a true and correct copy of Movant's Supplemental Case Management Conference Statement, excluding Exhibit A, filed in the State Court action on January 30, 2023.

19.     Attached hereto as **Exhibit 15** is a true and correct copy of my meet-and-cover letter to Non-Debtors, served on January 30, 2023. To date, neither J&J nor the Retailers responded to my letter.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of Non-Debtors' Joint Case Management Conference Statement, excluding Exhibit A, served in the State Court action on January 30, 2023.

21.     Attached hereto as **Exhibit 17** is a true and correct copy of the relevant excerpts from the Progress Notes/Clinical Notes of Mr. Valadez's treating oncologist Dr. Joel William Neal, dated February 25, 2023.

22.     Mr. Valadez will suffer irreparable harm absent an order further relieving him from the automatic stay and Preliminary Injunction. It is undisputed that Mr. Valadez, who is 24 years old, is dying of pericardial mesothelioma and his disease is progressing. Given the upcoming February 9, 2023, trial date, Mr. Valadez needs time to utilize all tools necessary to fully prosecute his case. This includes naming the two entities that were created after the divisional merger, Johnson & Johnson Consumer Inc. ("New Consumer") and LTL Management, LLC ("Debtor") as defendants. And Movant needs to conduct some affirmative

discovery against all named defendants, including New Consumer and Debtor. Such discovery

includes propounding written discovery and deposing defendants' corporate witnesses. Absent

an order allowing Movant full relief from the automatic stay and Preliminary Injunction, Movant

is unable to expeditiously prepare his case for trial while he is alive and able to participate at

trial.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief. I executed this Declaration on February 2,

2023, in Oakland, California.


By:    /s/ Joseph D. Satterley
       JOSEPH D. SATTERLEY

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                .     Case No. 21-30589(MBK)
                      .     Chapter 11
LTL MANAGEMENT LLC,   .
                      .     Clarkson S. Fisher U.S. Courthouse
          Debtor.    .     402 East State Street
                      .     Trenton, NJ 08608
                      .
                      .     Tuesday, June 14, 2022
. . . . . . . . . . . .   10:00 a.m.

TRANSCRIPT OF RETENTION APPLICATION FOR HOULIHAN LOKEY, AS
INVESTMENT BANKER; STATUS CONFERENCE OF THE APPLICATIONS OF THE
OFFICIAL COMMITTEE OF TALC CLAIMANTS
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:         Jones Day
                    By:   GREGORY M. GORDON, ESQ.
                        DAN B. PRIETO, ESQ.
                    2727 North Harwood Street, Suite 500
                    Dallas, TX 75201

For the Official      Brown Rudnick, LLP
Committee of Talc     By:   DAVID J. MOLTON, ESQ.
Claimants 1:               JEFFREY L. JONAS, ESQ.
                    7 Times Square
                    New York, NY   10036

                    Genova Burns, LLC
                    By:   DANIEL M. STOLZ, ESQ.
                    110 Allen Road, Suite 304
                    Basking Ridge, NJ   07920

Audio Operator:        Luz Di Dolci

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

**EXHIBIT 1**

2

APPEARANCES (Cont'd):

For Aylstock, Witkin,        Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz,           By:  ROBERT J. PFISTER, ESQ.
PLLC:                        1801 Century Park East, 26th Floor
                             Los Angeles, CA 90067

For the U.S. Trustee:        U.S. Department of Justice
                             By:  JEFF SPONDER, ESQ.
                                  LINDA RICHENDERFER, ESQ.
                                  LAUREN BIELSKIE, ESQ.
                             One Newark Center, Suite 2100
                             Newark, NJ  07102

For Kristie Lynn Doyle:      Kazan McClain Satterley & Greenwood
                             By:  JOSEPH SATTERLEY, ESQ.
                                  DENYSE CLANCY, ESQ.
                             55 Harrison Street, Suite 400
                             Oakland, CA  94607

For the ad hoc               Womble Bond Dickinson
Committee of Attorney        By:  ERICKA F. JOHNSON, ESQ.
Generals:                    1313 North Market Street, Suite 1200
                             Wilmington, DE  19801

For Katherine                Maune Raichle Hartley French & Mudd,
Tolefson:                                                     LLC
                             By:  CLAY THOMPSON, ESQ.
                             1015 Locust Street, Suite 1200
                             St. Louis, MO  63101

                              - - -

3

## I N D E X

                                                              **PAGE**

**WITNESS**
JOHN KWANG-HI KIM
  Cross Examination by Ms. Richenderfer              30




**EXHIBITS**                                        **ID. EVD.**
Mr. Kim's declaration                               --    28

Case 22-30500-MBK  Doc 369-3  Filed 04/02/23  Entered 04/02/23 07:36:28  Desc
Exhibit Exhibits 12-14 to Satterley Declaration  Page 11 of 214

4

1          THE COURT:  Good morning, again.  This is Judge

2    Kaplan.  For those appearing by CourtSolutions, please feel

3    free to use the raise hands function to make sure that I can

4    hear from you if you need to interject.  Otherwise, I'll keep

5    an eye on the screen to make sure I don't miss anyone.

6          The first matter on the agenda is the status

7    conference.  I'm actually going to treat that at the end.  Let

8    me list the matters that are not going forward today that are

9    on today's calendar.  Numbers 23 and 25 relate to the

10   establishment of a qualified settlement fund and also the

11   debtor's motion, Number 24, with respect to filing certain

12   documents under seal, those are being carried to September 14th

13   of 2022.

14         Number 1 on today's calendar, Docket Number 1488

15   which is the motion for relief from the automatic stay with

16   respect to the coverage action has been carried as well to July

17   6th.  And Number 2, motion regarding the automatic stay, Docket

18   Number 1491, also with respect to the coverage action is also

19   carried to July 6th.

20         That leaves us with the contested matters going

21   forward.  Let's start with Number 6 on the agenda, Number 29 on

22   today's calendar, which is the retention application for

23   Houlihan Lokey as the investment banker.

24         Counsel, good morning.

25         MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

Case 2:23-03895-MBK  Doc 369-43  Filed 04/10/23  Entered 04/10/23 08:36:28  Desc
Exhibit Exhibits 12-17 to Satterley Declaration  Page 12 of 214

60

 1            MR. KEACH:  That is correct, Your Honor.  In fact, we

 2    submitted an omnibus order with the final report and it should

 3    be before the Court but we're happy to resubmit it if

 4    necessary.

 5            THE COURT:  Why don't you resubmit it just to make

 6    sure we have it?  And that works for the Court as well.  So,

 7    thank you, Mr. Keach for --

 8            MR. KEACH:  Thank you, Your Honor, we will do so.

 9            THE COURT:  -- your efforts and your continuing

10    efforts in this case.

11            I thank the professionals for their accommodations

12    and their efforts to do what's right.

13            And at this point, it's 11:30, let me take a ten

14    minute break before we get to -- we have the status conference,

15    we also have the two motions for relief from the preliminary

16    injunction.  Thank you.  We'll come back in ten minutes.

17            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

18                      (Off the record)

19            THE COURT:  All right.  Thank you, all.

20            All right.  Let's turn to on the agenda Numbers 8 and

21    9 -- I'm sorry 9 and 10.  The Valadez and Johnson motions.

22    Counsel, good afternoon -- or almost afternoon.

23            MR. SATTERLEY:  Good morning, good afternoon, Your

24    Honor.  Joe Satterly and Denyse Clancy from the Kazan, McClain,

25    Satterley and Greenwood Law Firm out of Oakland, California on

Case 2:23-08895-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 08:56:28 Desc
Exhibit Exhibits 12-14 to Satterley Declaration    Page 13 of 214

61

1    behalf of Mr. Valadez and Ms. Johnson.

2             THE COURT:  Now, separate individuals, separate

3    facts, different stories, different backgrounds -- the legal

4    argument essentially the same, so let's treat them collectively

5    in that regard.

6             MR. SATTERLEY:  I was going to ask permission because

7    my PowerPoint presentation I have them combined because we're

8    covering some of the same concepts.  There's going to be some

9    factual differences but if Your Honor permits, I can do one

10   PowerPoint presentation?

11            THE COURT:  Absolutely.

12            MR. SATTERLEY:  My intention is to talk about and

13   highlight some of the facts and Ms. Clancy is going to address

14   some of the legal arguments distinct from what I'm doing.  Is

15   that acceptable for you?

16            THE COURT:  All right.  Thank you.

17            MR. SATTERLEY:  If I could screen share now?  There

18   we go.  We practiced this this morning so, hopefully, it will

19   work.  And I have a presentation for debtor's counsel and for

20   Your Honor.

21            THE COURT:  Thank you.

22            MR. SATTERLEY:  May I approach?

23            THE COURT:  Yes, please.  Great.  Thanks.

24            MR. SATTERLEY:  While that looks thick, I can promise

25   Your Honor I will efficiently go through these slides.

Case 23-12825-MBK Doc 369843 Filed 04/02/23 Entered 04/02/23 07:56:28 Desc
Exhibit Exhibits 12-14 to Satterley Declaration    Page 84 of 134

62

1    So, once again, on behalf of Mr. Anthony Hernandez

2 Valadez and Audra Johnson, this is our request pursuant to

3 Bankruptcy Code 362(d)(1) to lift the stay to allow these

4 individuals to file a complaint and to collect discovery,

5 collect evidence, gather evidence and proceed to trial.

6    I recognize Your Honor's comments on the May 24th

7 hearing that you may, given the status of mediation -- I

8 participate in all aspects of mediation -- I'm not going to

9 talk about it, obviously, but that you may allow a few cases to

10 proceed forward.  On behalf of these two individuals, if Your

11 Honor wants to allow us to begin the process and then decide at

12 a later date in July or maybe July 6th, where these cases

13 should be part of a bigger relief, that's fine with my clients.

14 I would say that they're both dying and they're both

15 progressive mesotheliomas  I'm going to go through that

16 evidence with you in a few minutes.

17    So, I start this off with what I shared with Your

18 Honor both in the Vincent Hill motion back in January 11th --

19 so much has happened since January 11th -- but I share this

20 again in the current motion that J&J's position has been that

21 mesothelioma is known to be exclusively caused by asbestos.

22 And that's particularly important in these two cases because

23 through a intensive investigation, there is no alternative to

24 exposure to asbestos for these individuals other than J&J baby

25 powder.

1    Unlike Vincent Hill, Your Honor will recall, Ms.

2   Brown did a great job cross examining Mr. Hill about he might

3   have had exposure here, he might have had exposure there, that

4   doesn't exist with these two cases.  This is the sole exposure

5   that's been identified.  So these are the two individuals at

6   issue -- Anthony Hernandez Valadez and Audra Johnson.

7    Anthony Hernandez Valadez lies with his mother in

8   Merced, California, always lived in California.  He's 23 years

9   of age, born in September 1998.  Audra Johnson, born in 1967,

10  she currently lives in Orange County, California, born in Los

11  Angeles -- always been exposed.  Both of these individuals

12  total exposure always occurred in California.

13    So, I'm going to start with Anthony's situation and

14  we've collected evidence, you know, we can do some collection

15  of evidence without the subpoena powers of the court.  We

16  collected photographs.  His mother gave us these photographs of

17  the Johnson Baby Powder in their home when he was a baby.

18    We have several photographs.  And that's important

19  because in many of these cases, I've tried six of these cases

20  to verdict, sometimes J&J questions whether the person actually

21  used the product.  They ask questions do you have your receipts

22  from your purchases at Safeway, do you have this.  And, of

23  course, nobody collected the receipts from 20, 30 years ago.

24  But this is good documenting evidence that the produce use is

25  not really an issue.

64

1          This is the declaration and I'm, obviously, not going

2    to read the entire declaration of Anthony but I do want to

3    highlight a few things.  He was born September 23, 1998.  His

4    mother regularly used the product on him.  His mother signed a

5    declaration saying that.  She's only in her 40s.  And that he

6    first started using it on himself when he was 13 years and he

7    continued for several years thereafter.

8          He used it every day, multiple times a day, and he

9    did it because it was effective combating sweat and odors.  And

10   I don't know if Your Honor's been to California, but where he

11   lives in California it's not right on the coast -- it's a

12   little bit inland.  And it gets hot, really hot, in the hundred

13   degrees, so that's one of the reasons why he used the product.

14         This is, and I attached to our motion, a whole bunch

15   of medical records.  And I did that to show Your Honor number

16   (1) the diagnosis it's undisputed, number (2) it demonstrates

17   the severe treatment and severe pain and suffering he's been

18   through already.  But this right here back in February, this is

19   the operative report performed by Dr. Backhus, Dr. Leah Backhus

20   at Stanford University and that he has primarily pericardial.

21   He also has it in the lining of his lungs.

22         Mesothelioma arises in three different, at least

23   three different, places -- the lining of the lungs, the lining

24   of the stomach, the lining of the heart.  His is primarily on

25   his heart but he also has involvement in his pleural -- the

 1  lining of his lung.  And Ms. Johnson, she has peritoneal

 2  mesothelioma which is the lining of her stomach.  And you'll

 3  see some of that medical evidence in a little bit.

 4         So this is the, once again, the medical records made

 5  a part of the record.  This is Dr. Leah Backhus -- she is the

 6  treating physician, the surgeon that is involved, one of the

 7  two surgeons -- the leading surgeon involved in his surgical

 8  intervention.  And she supports his case fully.  Supports it

 9  with regard to the life expectancy -- less than six months of

10  life expectancy, supports it in terms of causation.  The

11  medical records go through how it's extensive -- the tumor is

12  extensive in his body.

13         This is another operative report -- this one prepared

14  by Dr. Boyd, the other surgeon involved and describes how the

15  pleural surface was open widely.  They cut him open down his

16  sternum, down his chest, looked in, looked at where the cancer

17  was, both in the lining of the heart and on the lining of his

18  lungs.  And he describes several places where the tumor

19  existed.  They tried to get as much as the tumor out but they

20  couldn't get it all out.  In some of these cases they get a lot

21  more of the tumor out and that gives them prolonged life.  In

22  other cases they can't get all the tumor out and they have

23  shorter life -- shorter life expectancy.

24         This is a CT scan of the chest.  This once again

25  shows both the mesothelioma is both -- it's involved the

66

1  pleural, moderate pleural effusion and the pleural is the

2  lining of the chest.  So it's both in the heart, the lining of

3  the heart, and the lining of the chest.  I submitted Dr.

4  Backhus' declaration and, by the way, I did want to tell Your

5  Honor that I met and conferred with debtor's counsel last week

6  about all the declarations and based upon their agreement they

7  would not object to any of the declarations.  I agreed not to

8  call any witnesses because I was prepared to call a bunch of

9  witnesses but that would have been a lot longer of a hearing.

10 So, we were able to stipulate to that point so --

11           THE COURT:  Good call.

12           MR. SATTERLEY:  Yeah.  So, these declarations come in

13 without objection.  And this is the declaration of Dr. Backhus

14 that I mentioned a few minutes ago that there's substantial

15 medical doubt that Mr. Valadez's survival beyond six months

16 from the day of the declaration.  The date of the declaration

17 is May 22nd and the reason why that is important is because of

18 the Alameda County procedure that I'm going to mention a little

19 bit and Ms. Clancy will talk about in more detail that we have

20 a unique system.  Having had mesothelioma cases there for

21 decades that we could get the cases to trial very quickly.  And

22 I'll talk about that more.

23           She also says, obviously, she's not the type of

24 expert that looks under a microscope for the presence of

25 asbestos in Johnson's Baby Powder, but she says if it's true,

Case 2:23-08895-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 08:56:28 Desc
Exhibit Exhibits 12-14 to Satterley Declaration Page 19 of 214

67

1 what she's read in the literature that there's asbestos in baby

2 powder, she's of the opinion that would be his exposure and

3 that would be a substantial contributing factor to increasing

4 his risk for this cancer. And that's the standard under

5 California law.

6 And so -- and she's prepared to testify to that. And

7 this is not a person who has -- that I've ever retained in the

8 past. She's never testified in any of these trials in the

9 past. She's not a professional witness. And I say that to you

10 because the debtor did such a good job back in the trial in

11 February of painting this litigation like it was just drummed

12 up by some greedy plaintiffs' lawyers to make a bunch of money.

13 And that's not what this case is about and that's not really

14 what this litigation is about. Dr. Backhus is totally

15 independent and would testify regarding these issues.

16 THE COURT: Now just for clarification, both of these

17 plaintiffs -- respective plaintiffs no suits have been filed.

18 MR. SATTERLY: No, we can't, because Your Honor's

19 automatic stay -- the preliminary injunction --

20 THE COURT: Right. So these are clients that you've

21 -- that have retained you, among other clients, and you went

22 through and you identified these two as potential plaintiffs

23 that should be put ahead of the line, so to speak.

24 MR. SATTERLY: Yes, Your Honor, exactly. And the

25 reason why because I have other living clients that aren't as

Case 23-08895-MBK    Doc 369-43    Filed 04/01/23    Entered 04/01/23 08:56:28    Desc
Exhibit Exhibits 112-174 to Satterley Declaration    Page 20 of 214

68

advanced, quite frankly.  Some of my clients have lived for a
few years or lived for three or four years.  And we can
evaluate the medical records and talk to the treating doctors,
to the extent they'll talk to us, and evaluate really what's
the status.  And these are what we call extremist cases, that
they're going to die.  They're going to die.  And, you know,
just like Mr. Hill, you know, I've had so many clients that
have died even after we get a preference, died before we got
them to trial.  So, that's the reason why we selected these two
individual plaintiffs to bring it to Your Honor's attention
this early.

          And so that brings us to the next treating doctor.
And Roy likewise signed a declaration.  She's the Stanford
oncologist.  Once again, never hired by me as an expert
witness.  She's not been in any other J&J trials.  She is just
a treating doctor that -- she sits on the tumor board at
Stanford and she likewise describes in the medical records both
the poor prognosis that this is a worse case of survival can be
a few months right there in the medical records way back in
March.  And their real effort is to try to prolong his
survival.

          So, Dr. Roy -- I'm going to come back to Dr. Roy in a
minute.  But this is Anthony's declaration where he describes
what he's been through just since March.  In March and April he
was admitted to the hospital for continued weakness and

69

1  fatigue.  April 4th, April 9th, April 10th, emergency

2  department because of complications regarding the first round

3  of chemotherapy.  April 16th, emergency department because my

4  mouth sores from the chemotherapy, the side effects from the

5  chemotherapy.  May 15th through the 17th admitted to the

6  hospital once again for shortness of breath.  May 19th once

7  again admitted to the emergency room -- emergency department

8  for shortness of breath, discharged the same day.  May 20th and

9  21st admitted to the hospital.  And so he -- for shortness of

10 breath.  So, he has continuing progressive complications from

11 his cancer.

12       This is a genetic test that shows he has no detected

13 genetic errors.  And the reason why I put this in and I've got

14 it both for both of these individual clients is the last trial

15 I went to -- the last bonded judgment against J&J before the

16 bankruptcy was the Prudencio case.  And the primary defense by

17 J&J was that she had some genetic error.  She just had bad

18 genes.  She had bad luck.  And we tried that case.  I cross

19 examined a genetic expert and the jury ruled in favor of Ms.

20 Prudencio.

21       But here in these two cases, and this is Mr. Valadez,

22 there's no genetic errors.  There's no evidence that they can

23 go to, to say he's just got bad luck.

24       So, this is Dr. Roy's signed declaration and once

25 again she agrees with the surgeon Dr. Backhus and says it's a

Case 23-12825-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 18:56:38 Desc Exhibit Exhibits 112-174 to Satterley Declaration Page 22 of 214

70

1  terminal cancer with a dismal prognosis.  And it is her

2  professional opinion there is substantial medical doubt that

3  Mr. Valadez's survival will be beyond six months from the date

4  of the declaration.  And further, she took a social history,

5  and in the medical records she actually went through and

6  documented that he was exposed, mother described it, Johnson &

7  Johnson Baby Powder and she couldn't identify any alternative

8  exposure.  She asked questions.  What did your father do?  What

9  did your mother do?  Any asbestos in school?  And she

10 determined that in her opinion it's the only known exposure and

11 the Johnson's Baby Powder would be a substantial contributing

12 factor contributing to his risk of developing this cancer,

13 mesothelioma.  Once again, no connection with litigation.

14         So, this is Anthony on the left about three months

15 ago, I think maybe February when he was in there for the

16 surgery.  And this is Anthony last week.  He is literally in

17 his hospital bed everyday.  This is his mother taking him out

18 for a walk.  Neither of these clients play the lottery.  This

19 is not a lottery game for these clients.  And I've sat back and

20 I've been to almost every hearing, I think every hearing, and

21 I've heard debtor's counsel refer to this as lottery and

22 lottery like.  And I don't know if they're suggesting that it's

23 the plaintiff's or the plaintiff's counsel or the court system

24 or the tort system, but this is a real disease caused by a real

25 exposure impacting real people every single day.  And this is

1 | his life.

2 |       This is his declaration.  Paragraph 9, having
3 | mesothelioma is the worse thing that's ever happened to me.
4 | I've never had a serious let alone life-threatening illness
5 | prior to my mesothelioma diagnosis.  Mentally this illness has
6 | caused me great anxiety and depression.  Talking about my
7 | current state makes my heart race to the point that I'm having
8 | a panic attack.  I refuse to communicate with any of my
9 | friends, family because I'm disbelief and shock that I'm
10 | suffering from a terminal disease at such a young age.
11 | Physically this disease and any treatments related to it
12 | including chemotherapy and cardiac surgery on February 17th,
13 | 2022 caused me to experience nausea, vomiting, loss of
14 | appetite, severe chest pain, tightness, shortness of breath,
15 | discomfort, fatigue, and chronic back pain.  And then he
16 | describes being admitted to hospital and his fear regarding the
17 | chemotherapy and his treatment.

18 |       And I say that not to evoke sympathy or empathy.  I
19 | say that because Your Honor knows the standard is evaluating
20 | the harms and the losses to the creditors versus the harms to
21 | the debtor.  And I think this is important testimony to take
22 | into consideration in that regard.

23 |       This is his mother's declaration submitted.  Once
24 | again, she describes what she observed in her son, experience
25 | shortness of breath, extreme fatigue, debilitating pain

1 throughout his body, and the disease has greatly traumatized

2 both her and her son.  And she doubts that he will ever recover

3 from it.  And he won't.  He, quite frankly, won't.

4          So, the evidence is that there are literally

5 thousands of days of exposures.  Because 365 days a year, use

6 the product every single day for 15 years, 17 years, literally

7 thousands and thousands of days of exposure to asbestos from

8 Johnson & Johnson Baby Powder.

9          Let's turn to Audra Johnson's case and then I'm going

10 to come back and collectively talk about some of the other

11 evidence.  Audra Johnson, she was 54 at the time of her

12 diagnosis.  She's now 55.  She's a single mother.  Her daughter

13 Marley here is 14.  Her daughter is a great soccer player.  She

14 can't go see her daughter play soccer anymore because she can't

15 walk to the soccer field because of breathing problems.  She

16 was diagnosed -- originally they thought she had ovarian cancer

17 and they took her ovaries out.  When they got in there and they

18 got the -- and one doctor did the ovary surgery, another doctor

19 got the pathology.  They looked at it at UCLA and they

20 determined it was malignant peritoneal mesothelioma.  And

21 that's similar to what happened in the Prudencio case.  Same

22 situation.  They thought she had ovarian cancer.  Turns out she

23 had malignant peritoneal mesothelioma.

24          So, this is, once again, submitted as her medical

25 records that this is describing some of the surgery that she

1  had and some of the complications she's had.  She had surgical

2  treatment on her right diaphragm.  You're going to see her in a

3  little bit.  She had a VAT procedure, a video-assisted

4  thoracostomy.  She's also had what's called a HIPEC.  HIPEC is

5  where -- with peritoneal mesothelioma when I first started

6  representing these folks they typically die within six to eight

7  months.  That was 25 years ago.  Now they've come up with the

8  surgery where they can cut your stomach from the top of your

9  belly all the way down, open you up, look around, the surgeon

10  looks around and tries to get all the cancer.  Gets as much of

11  the cancer they can.  They close them up, put a tube in and put

12  heat treated chemotherapy in there to try to get that

13  chemotherapy to kill whatever residual cancer that exists.  And

14  she had that procedure done back in December.

15       This is the medical records of the pathology,

16  malignant mesothelioma, the diaphragm, the omentum.  The

17  omentum is right down next to the peritoneal cavity.  And when

18  I get to talking about pathology in a little bit that becomes

19  important because the exact ingredients in Johnson's Baby

20  Powder has been found in the omentum tissue of mesothelioma

21  victims including <u>Prudencio</u>.  And she also had resection, an

22  incision where they moved the tissue from her cancer.

23       This is sort of a time line of some of her treatment

24  from September of 2021 where she goes in and they identify the

25  masses, they see pelvic problems, omental infiltration.

1  September 29th chest x-ray.  She has that right side

2  pneumothorax, and that's what's causing shortness of breath.

3  In addition to having it in her stomach she has involvement in

4  her lungs causing severe shortness of breath.  And September

5  29th they identify after the surgery the mesothelioma.

6  November 22nd she has a PET scan showing additional activity

7  and tumors based upon the scan.  And then on December 8th

8  that's when she had the HIPEC procedure and they removed --

9  tried to remove as much of the cancer as they can.

10       And since then in February she's had a CT scan, she's

11  had recurrent CT scans, and now she's at a point where she's

12  having severe breathing problems and they're discussing right

13  now maybe as early as this month having lung surgery in

14  addition to the stomach surgery.  I just highlighted part of

15  her declaration.  Once again, in the balance of the creditors

16  versus the harms to the debtor, shortness of breath, lack of

17  stamina, nausea, debilitating pain throughout my body including

18  my chest, abdomen and back.  She describes her HIPEC procedure

19  on December 8th.  She describes going to the emergency

20  department, removal of the ovaries.  She describes significant

21  pain throughout her body and it's significantly worsened the

22  quality of her life.

23       She worked as a loan processor making 70 some odd

24  thousand dollars a year supporting her one daughter, but she

25  can't work.  She hasn't been able to work since this diagnosis.

1  Additional testimony regarding -- and Your Honor's read this

2  declaration, Paragraph 14 where she describes her difficulties

3  breathing.  She could barely breath after walking her dog for

4  one block and constantly needs oxygen to help her breath.  And

5  she's unable to care for her daughter or participate in her

6  daughter's activities.  So, I'm not going to read the entirety

7  because I know Your Honor reads the papers, but significant

8  suffering there.

9        Once again a genetic testing shows no variance, no

10  somatic genetic variance, no germline.  And what that means,

11  the germline would mean you get some bad genes from your

12  parents and somatic means you're just born with bad genes.  And

13  there was over 648 gene panel that was conducted and no genetic

14  defects whatsoever.

15        Here's the result of the surgery.  This is the result

16  of the HIPEC surgery.  You can see where -- so she's not a big

17  lady.  She was fairly thin, very thin.  But because of the

18  cancer she bloated up and got a really -- a big stomach and

19  they had to go in and cut her open and remove the cancer and

20  then staple her back up.  And that required extensive

21  hospitalization.  So, that's the photographic evidence of

22  what's occurred.

23        I've put this in our papers simply to show that six

24  years before Anthony was born and when Ms. Johnson was a fairly

25  young lady Johnson & Johnson's marketing department wrote this

1 memorandum.  And this is in 1992 and this has been admitted in

2 numerous trials that I've tried.  With regard to Johnson Baby

3 Powder they investigate ethnic African-American, Hispanic

4 opportunities to grow the franchise.  The brand will initiate

5 an adult Hispanic media program and potentially launch an adult

6 black print effort.  I say that because -- not to say -- well,

7 my clients are African-American and Hispanic.  And so they knew

8 that they had major opportunities in that market.  The same

9 memorandum they had major obstacles.  On the left-hand side

10 major obstacle, negative publicity from the health community on

11 talc, inhalation, and that's the way our experts testified this

12 cancer occurs, inhalation, dust, negative doctor endorsement,

13 cancer linkage continues.

14         And I submit to you that a reasonable company at this

15 time frame would have when a cancer linkage is associated with

16 the product would not try to grow the franchise especially

17 since they had cornstarch already developed on the marketplace

18 at that time.

19         Now, I want to switch gears and talk about asbestos

20 for a few minutes because since day one, the first day

21 declaration by John Kim and in almost every court hearing they

22 say there's never been asbestos, asbestos has never existed in

23 our product, we refute it, we say it's not true.  And I say

24 this to let Your Honor know how so far apart J&J, non-debtor

25 J&J and all of their affiliates are from the truth and from

Case 23-12825-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 08:36:28 Desc
Exhibit Exhibits 112-174 to Satterley Declaration Page 29 of 214

77

what we've been able to present having reviewed hundreds of
thousands of documents over six years. This is their own
definition of asbestos. Asbestos is defined to be the fibrous
serpentine chrysotile in the fibrous forms of amphibole group
as represented by amosite, anthophyllite, crocidolite,
tremolite, and actinolite.

So, using their definition we just go through the
documents and say how many times do we find that in their
documents, historically? Hundreds and hundreds of time. And
we don't have time today for me to show you all of them, but I
can tell you I've shown them to juries, I've shown them to
judges, I've shown them to anybody that will look. There's a
lot. But I will tell you about a few. And I've submitted them
in support of my motion in my declaration.

This is 1958. This is -- we got this from J&J from
the Battelle Laboratory. They looked at Johnson Baby Powder in
1958 and found fibrous particles of talc and anthophyllite.
The anthophyllite component has been established to be the
variant variety tremolite. Well, fibrous tremolite by their
own definition is asbestos. 1958. Nine years before Ms.
Johnson was born. From 1957 to 1961 that same laboratory
looked at Johnson Baby Powder hundreds of times, hundreds of
times and found tremolite over and over and over again. And so
the -- it was a small amount, one percent or trace amounts, or
less than one percent. But they admit, they admit through the

1 (indiscernible) there is no safe level of exposure to asbestos.

2          1960 looking specifically at off the shelf products.

3 Johnson & Johnson has submitted this, it shows trace amounts of

4 asbestos, trace amounts of tremolite.  Now, they're going to

5 say well, wait a second, tremolite can be the safe tremolite.

6 There could be, you know, non-asbestos tremolite.  Yeah, there

7 could be.  But they don't make that distinction at all in these

8 records back in 1960.  1969 when my client Ms. Johnson was just

9 a baby they -- and I attach this to my declaration -- April

10 15th, 1969 -- April 9th, 1969, the question was raised

11 historically in our company tremolite has been bad because of

12 needle type crystals.  Response memorandum to that from a Dr.

13 Thompson the head of medical, says we have been concerned to a

14 much greater extent with regards to the possible dangers

15 relative to the inhalation of talc with the spicule or needle

16 like crystal structure as compared with the flat plate like

17 type of crystal structure.

18          And I tell you that because it becomes important

19 later when we talk about causation that it's the needle like

20 that gets into the cells and cause the cancer.

21          THE COURT:  Mr. Satterlly, and I don't mean this with

22 disrespect either to you or to the clients, I wanted to hear

23 about the clients and the factual background.  I want to hear

24 about their damage.  I want to hear about their respective

25 lawsuit.  The science on both sides I've had the opportunity to

 1  review, I've reviewed the papers, I've reviewed the

 2  informational briefs on both sides.  For purposes of the

 3  motions you have before the Court I'd rather we move forward to

 4  that portion, your slide that has the Alameda County

 5  preferences.

 6          MR. SATTERLY:  Yes.  I'll move forward.  If I could

 7  just --

 8          THE COURT:  Just with that leeway.  That's what's in

 9  focus today is whether these should proceed.  Not the

10  underlying medicine or science because Judge Wilson has had

11  hearings and I'm not going to be deciding that today.

12          MR. SATTERLY:  Yes, I understand that, Your Honor,

13  and I appreciate Your Honor giving me that.  I would say that

14  the trial back in February we were focused on finances and

15  financial distress.  So, we -- or not me, because I was only

16  the trial lawyer -- the Committee's counsel didn't focus on

17  rebutting everything that Mr. Kim said that we thought were

18  untrue.

19          THE COURT:  Fair enough.

20          MR. SATTERLY:  But with that said --

21          THE COURT:  But I -- as you said I do read

22  everything.

23          MR. SATTERLY:  I'm going to move forward.

24          THE COURT:  I've read through the slides.  I have a

25  feel for it.

Case 23-12825-MBK Doc 369-3 Filed 04/01/23 Entered 04/01/23 08:56:28 Desc
Exhibit Exhibits 12-14 to Satterley Declaration Page 32 of 214

80

1          MR. SATTERLY:  I'm going to move forward.  Let me

2     just say that there are literally hundreds and hundreds of

3     documents to show what the debtor has come to court said is

4     inaccurate, untrue.  I'll move pass any of the others and get

5     to -- okay, this is case specific here.

6          And they -- Dr. William Longo is a renowned material

7     analyst microscopist and he evaluate Ms. Johnson's bottle.  She

8     had a bottle that she kept from 2004.  And so we sent it to Dr.

9     Longo and he analyzed it and his declaration show that in her

10    bottle specifically there were three million two hundred forty

11    thousand asbestos formed talc fibers per gram and 210 hundred

12    thousand -- 210 bundles per gram of chrysotile asbestos.  And

13    he calculates out what does that mean per bottles.  And I've

14    highlighted that that would be 54 million asbestos fibers in

15    her bottle, her one bottle.  So, that is case specific.

16         I'll move past Dr. Abraham.  He's another expert that

17    has published on talc for many years.  He did review this case

18    and sign a declaration in support of causation in Ms. Johnson's

19    case.

20         I'll move past all the medical science, overwhelming

21    medical science.  So, one thing that I did want to talk about

22    very briefly because I think it's important is the pathology.

23    Because what Your Honor's current order prevents us from doing

24    is gathering evidence and gathering -- we cannot gather any

25    pathology material in the blocks.  This is just an example of a

 1  different case, the Prudencio case where we gather the blocks,

 2  we were able to have the blocks digested and establish what's

 3  in the tissue right near the cancer.  And I say that because

 4  one of the alternative reliefs, and I think Your Honor allowed

 5  it with Vincent Hill, is allow us to take discovery and

 6  preserve evidence.  Because otherwise we sit in bankruptcy

 7  court for months and months and months and can't gather

 8  evidence.  Evidence is lost through the passage of time.

 9  Memories fade, witnesses that we would typically like to

10  preserve isn't always there.  So, this is an example of a

11  tissue digestion that shows the exact same ingredients in the

12  tissue that was in the product.

13          Dr. Dotson supports -- and Dr. Dotson's written over

14  180 articles on asbestos and disease, supports causation of Mr.

15  Valadez's exposure to Johnson's Baby Powder.  I'll skip over

16  the other medical articles regarding childhood exposure being

17  greater than adult exposure.  And this is what Your Honor asked

18  me to jump to.  And so, let me just explain, and I'll use the

19  case of Patricia Smith as an example.

20          Patricia Smith, we filed her case in October of 2019.

21  We moved -- she had mesothelioma.  We moved -- and her only

22  exposure was exposure to cosmetic talc.  And we had Johnson &

23  Johnson, Colgate, Palmolive at the trial.  We moved for

24  preference in December, we were granted preference, the trial

25  was set for April the 8th.  Me and Ms. Clancy tried the case to

1  verdict, the jury rendered a verdict June 12th, judgment was

2  entered July 12th, she died July 14th.  She had two days after

3  the judgment was entered.  That's an example of she got to

4  participate in her trial.  She got to testify in her trial.

5  She got to know the results of her trial.  And it was crucially

6  important, because otherwise if you don't get to participate

7  the jury doesn't get to assess the credibility of the witness,

8  they don't get to assess the cross examination, the skillful

9  cross examination.  So, that's one example of how the

10  preference works in Alameda County.

11         I've attached in my reply memorandum a declaration

12  for myself where I attach examples of orders from judges

13  granting preference settings as early as 30 days from the

14  motion.  The Shea (phonetic) case Judge Seligman granted --

15  Judge Brad Seligman, he was the asbestos judge there for a

16  number of years.  Judge Jo-Lynne Lee is now the asbestos judge.

17  They know how to get these cases resolved.  They know how to

18  get these cases set for trial.  And this is sort of a time line

19  of what I would think would occur with these two cases.

20         Now, with the Hernandez Valadez case because of his

21  situation I think the Alameda Court will give us a trial date

22  in August or early September.  Johnson probably not until

23  October.  And I would say that, you know, the debtor admits in

24  their response, or they say in their response that I'm just

25  rehashing all these witnesses that they see over and over and

1 over again. And that weighs in favor of, okay, let's have a

2 trial. You don't need to know much about -- you can take their

3 depositions, but you don't have to take extensive depositions.

4 We've already deposed Dr. Dotson, Dr. Abraham, Dr. Foster, Dr.

5 Egilman, Dr. Longo. So, that weighs in favor of this case --

6 these cases being permitted to participate in this process.

7 　　　　The damage and the harm. Balancing the harms I'm

8 just going to briefly talk about the damage. There's -- like I

9 said, it's not the lottery. There is pain and suffering,

10 mental suffering, disfigurement. The California objective

11 analysis of the various elements has specific ways in which a

12 jury awards damages, non-economic damages. But loss of

13 enjoyment of life is one of them and Mr. Hernandez, his life

14 expectancy, but for mesothelioma is 54.13 years. Ms. Johnson's

15 life expectancy, but for her mesothelioma is 28.85 years.

16 Medical expenses range anywhere between 800,000 and three

17 million dollars.

18 　　　　I just finished a trial, we settled after a couple

19 days, the medical expenses in that mesothelioma case, it was a

20 non-talc case, was three million dollars. So these are huge

21 expenses with regards to the damages in these cases. The

22 economic, just the lost wages and the loss social security and

23 the homemaker for Bob Johnson who's an economist trained at

24 Stanford, 3.6 million for Anthony Hernandez Valadez, Audra

25 Johnson's two million.

Case 23-12825-MBK    Doc 369-43    Filed 04/02/23    Entered 04/02/23 08:56:28    Desc
Exhibit Exhibits 112-174 to Satterley Declaration    Page 36 of 214

84

1        There has been no evidence that any of these

2   companies, any of the retailers, are they in financial

3   distress?  Ever been in financial distress?  And I said this

4   before that to the extent that we are able to succeed against

5   any of these companies pursuant to the host tort agreement they

6   made with J&J and JJCI they may be an unliquidated claim in

7   bankruptcy.  They may just have -- they may get to stand in

8   line with everybody else.  So, I would submit in addition to

9   lifting the stay with regard to the non-debtor J&J under

10  California law we're allowed to proceed under the <u>Arena</u> case of

11  anyone involved in the chain of distribution.  So the stay

12  should be lifted for these folks as well.

13       THE COURT:  Go back to the prior slide, the economic

14  damage.

15       MR. SATTERLY:  Yes, sir.

16       THE COURT:  Do you also in these trials seek punitive

17  damages?

18       MR. SATTERLY:  Well, yes.  But sometimes I'm

19  successful, sometimes I'm not successful.  For example, in the

20  <u>Levitt</u> case which was affirmed on appeal, Ms. Clancy argued

21  that on appeal, the California Court of Appeals affirmed it,

22  the jury awarded zero in punitive damages.  It was a reasonable

23  jury.  Matter of fact, a Superior Court judge from San

24  Francisco was on that jury.  So, yes, we do seek punitive

25  damages.  But in the <u>Schmitz</u> (phonetic) case it was a hung jury

Case 22-30895-MBK Doc 369-43 Filed 04/10/23 Entered 04/10/23 08:56:28 Desc
Exhibit Exhibits 112-174 to Satterley Declaration Page 37 of 214

85

1  on punitive damages.  And so there was going to be a second

2  trial on punitive damages so we ended up just dismissing

3  punitive damage claim and getting the judgment entered.

4          THE COURT:  So, if there is a punitive damage award,

5  and this is something I'm thinking about, and you understand

6  the policy in bankruptcy punitive damages are usually

7  subordinated at a fairness to all creditor bodies, and there's

8  a recovery in one of your cases in punitive damages against a

9  CVS or a Walmart, and they seek -- and they have to pay -- and

10 they seek indemnification from the debtor the claim against the

11 debtor is contractual now.  It's not a punitive damage claim.

12 It's based on the indemnification or obligation.  But now

13 there's a larger award that would never be payable in a

14 bankruptcy as a punitive damage claim had your client brought

15 the claim.

16          MR. SATTERLY:  Two things --

17          THE COURT:  So, I was asking how do you address that?

18 Because you say there's no impact on the estate, and isn't

19 there the potential?

20          MR. SATTERLY:  So, first of all, if Your Honor were

21 inclined to grant relief here in these specific instances I

22 would agree to defer punitive claim to a later date so that we

23 could do -- so they could at least get some opportunity to be

24 in court.  So, that addresses the punitive.  Secondly, I

25 believe the State law controls the punitive damage component of

 1 │ the case because who owns the -- the punitive damage is a State

 2 │ owned claim.  Now in some states the individual plaintiff may

 3 │ end up receiving the benefit of that, but that's really a

 4 │ contract between the tort feasor and the State, the punitive

 5 │ component part of the case.  So, I believe it's a State by

 6 │ State analysis.  But in this particular situation if Your Honor

 7 │ determined as it relates to retailers -- so my point being is

 8 │ we would agree to defer the punitive component of the case

 9 │ until a later date.  Does that answer Your Honor's question

10 │ with regards to this slide?

11 │         THE COURT:  Sure.

12 │         MR. SATTERLY:  Okay.  So, the final area before Ms.

13 │ Clancy takes over the law is I do want to talk about the harm

14 │ to the non-debtor J&J.  Ms. Clancy in the <u>Levitt</u> case took Mr.

15 │ Pickerelli's (phonetic) deposition.  He was the person

16 │ designated by J&J to be the person most knowledgeable on the

17 │ financial condition, ability to pay of J&J.  And he said in

18 │ January 11th, 2019 the market value was about $355 billion.

19 │ And we now know that the market value of J&J three years later

20 │ throughout the most intense part of the talc litigation has

21 │ increased by $100 billion.  And that's important when Your

22 │ Honor's balancing the harm to the creditor, the harm to the

23 │ debtor that they've increased during this intense talc

24 │ litigation by $100 billion.

25 │         And Mr. Johnson's declaration which we submitted

Case 23-12825-MBK Doc 369-43 Filed 04/10/23 Entered 04/10/23 08:56:28 Desc
Exhibit Exhibits 112-174 to Satterley Declaration Page 39 of 214

87

1  demonstrates also that they continue to pay dividends to their

2  -- these are voluntary payments to the shareholders of -- the

3  first quarter of this year is almost three billion dollars.

4  That's almost a billion dollars a month they're giving away

5  back to the shareholders when they claim to be in financial

6  distress over the talc litigation.  And it's gone up every year

7  for 60 years.  Sixty years their dividend payments to the

8  shareholders has gone up every year.

9       And I just did a simple calculation of the first

10 quarter payment back to the stockholders of over $31 million

11 for each day of the first quarter.  And their current CEO on

12 April 19th said in recognition to our 2021 results, strong

13 financial position, and confident in the future of Johnson &

14 Johnson the Board of Directors has voted to increase the

15 quarterly dividend for the 60th consecutive year.  And I think

16 that's important for Your Honor to think about in weighing the

17 harms to the non-debtor and the harms to the creditor.

18      With that I'm going to turn it over to Ms. Clancy.

19 But I wanted to say one last thing.  I've been involved in this

20 litigation for six years.  I've poured my heart and soul in on

21 behalf of these clients.  At no point in time, and I went to

22 J&J on all six of my trials to try to efficiently and equitably

23 resolve.  And every single time they said no.  Since the

24 bankruptcy I've gone to J&J and said let's resolve these cases.

25 In North Carolina when me and Ms. Clancy tried Van Clyde,

Case 22-30085-MBK    Doc 3843    Filed 04/02/23    Entered 04/02/23 08:56:28    Desc
Exhibit Exhibits 112-174 to Satterley Declaration    Page 340 of 214

88

1  (phonetic) a 49 year old mesothelioma I went to them, let's
2  resolve.  No.  Vincent Hill, you took his deposition.  You know
3  all about his case.  Let's resolve.  No.  Mr. Valadez, Ms.
4  Johnson, April 20th and April 21st I sent detailed letters to
5  four different J&J lawyers.  Please let's efficiently,
6  equitably resolve.  Didn't get a phone call back.  Didn't get
7  an e-mail back.  Didn't get a letter back.  So I did a second
8  e-mail and a second letter.  At no point in time have they
9  offered any of these clients any compensation at all.  And with
10 that I'm going to turn it over to Ms. Clancy.

11             THE COURT:  Thank you, counsel.  Ms. Clancy.

12             MS. CLANCY:  May I approach, Your Honor?

13             THE COURT:  Sure.

14             MS. CLANCY:  Good afternoon, Your Honor.  With the
15 Court's permission I would like to address three topics.
16 First, what has changed since January 11, 2022 when the Court
17 heard the motion for relief from stay with respect to Mr. Hill?
18 Second, what -- in applying the In re Atlantic factors which
19 are the governing factors for this court in terms of balancing
20 whether a lift stay is appropriate, where do the factors fall
21 on applying the facts of this case?  And third, does this Court
22 have jurisdiction to lift the stay in light of the Third
23 Circuit Appeal?  And of course any other topic that the Court
24 would like me to cover.  But with that I'll start.

25             So, first, what has changed since the January 11,

Case 23-30828 MBK   Doc 369-43   Filed 04/02/23   Entered 04/02/23 08:56:28   Desc
Exhibit Exhibits 12-174 to Satterley Declaration   Page 41 of 214

89

1   2022?  A lot of time has passed, and the Court noted this that

2   after speaking with the mediators and the Court stated on the

3   record that in May 24th, 2022 that I'm not going to simply rely

4   on mediation.  We have a pending bankruptcy case that has to

5   move forward.  We have exclusivity that goes through September.

6   We have a reevaluation date, I'll call it in June, the end of

7   June 29th to see where we're at.  There are options for the

8   Court that I'm going to consider, and I'm going to be candid.

9           I plan on reaching out for Judge Wilson to see where

10  we left off in the other cases.  If that's a possibility, or if

11  there is a small segment of cases that should go forward or

12  whether nothing should go forward.  You know obviously I'm

13  going to hear from the parties, but there are a number of

14  considerations out there as to how to both move forward with

15  mediation, but move the case forward as need be to try to

16  preserve the rights of the claimants as well as the debtor.  I

17  certainly will be open to argument and suggestions on all these

18  issues.  But I most certainly want to be clear that I'm going

19  to at least -- I'm taking it out of my own responsibility to

20  see how best to move the case forward and it calls for maybe

21  some creativity.

22          And that -- the spirit of that statement was

23  reflected in the Court's February order, the order denying --

24  or extending the injunction to third party debtors.  Because

25  what we have seen now that instead of things concluding through

1 mediation we now -- the Court's going to hear today that J&J is

2 requesting that there be a full estimation trial, that that

3 trial not even be concluded at the earliest until June of 2023.

4 And that we do not appear any closer to resolution of the

5 debtor's reorganization which is the entire purpose of this

6 appeal -- excuse me, of this bankruptcy.

7 And the Court's order was very clear on February

8 25th, 2022 that it was extending the injunction based on its

9 determination that this bankruptcy system was more efficient

10 and speedier to provide those who have been harmed their day in

11 court and to give them compensation in a fair and more

12 efficient way.  But the Court said it would not -- in order to

13 serve that purpose it would not tolerate delay and would

14 closely monitor the situation.

15 So, while J&J quotes extensively, indeed, almost

16 exclusively from the Court's February 25th, 2022 order in its

17 opposition it doesn't quote from these key admonishments by the

18 Court.  The Court finds at that time that there is simply no

19 indication that the funding agreement is, quote, is schemed to

20 hinder, delay and defraud talc powder creditors.  But the

21 Court's caveat, to the extent debtor's actions drift in that

22 direction this Court is prepared to take swift action and will

23 honor its commitment of ensuring its claimants receive fair and

24 timely compensation under a comprehensive and transparent

25 distribution scheme.

1     The Court concludes that in order to make sure that

2  it can closely monitor how long and to the extent to which this

3  stay is in place the Court concludes that taking measures in

4  smaller steps will ensure that the parties progress in good

5  faith towards mediation and plan formation.  The Court will

6  revisit continuation of the automatic stay and preliminary

7  injunction in 120 days on June 29th, 2022 and similar periods

8  thereafter.  And the Court concludes with the Court is

9  confident that it can outlast either side's efforts to slow off

10  the proceedings and will not countenance such conduct.

11     So, what has changed since January 2022 is, we now

12  have a lot more information on the speed by which J&J is

13  intending to resolve this.  J&J's earliest, earliest resolution

14  of this case as now proposed would be June of 2023 next year.

15  And as the Court noted on the record after speaking with the

16  mediators the Court was now thinking about more creative

17  solutions to possibly propel this case forward.  And we suggest

18  that applying the balancing factors, In re Atlantic, lifting

19  stay on these two entirely unique cases would be a creative

20  solution to give value to the claim for claimants who are

21  entirely far apart, and propel this forward from the stasis

22  that it is in right now as the Court admonished the parties not

23  to do when it issued its order in February, 2022.

24     What is J&J's response?  J&J has no response to this.

25  Its response in its opposition is any alleged uncertainty

1  regarding the duration of the Chapter 11 case simply cannot

2  weigh in favor of the lifting the stay.  Well, that completely

3  ignores two things.  It ignores that the balancing of the harms

4  is that every day that passes for these desperately ill

5  plaintiffs is a day they risk not seeing their case in court,

6  is a day they can't get compensated for extrordinarily high

7  medical expenses, which they can't ensure that their family

8  members will be provided for, and it ignores the Court's order

9  which states that time is of the essence.  Time is a balancing

10  factor here.  And J&J dismisses that and says that it has --

11  the delay in this case has no factor in favor of lifting the

12  stay.

13         Moving on then, Your Honor, to -- unless the Court

14  has further questions on that section?

15         THE COURT:  No.

16         MS. CLANCY:  I move on to the In re Mid-Atlantic

17  factors.  The balance of the factors plainly support lifting

18  the stay for just this discreet two cases.  Obviously we're

19  moving under Bankruptcy Code Section 362(d).  I won't reread

20  that to the Court.  And we're also critically, Your Honor, and

21  this applies both here and to the discussion as to whether the

22  Court has jurisdiction, the Court imbedded within its order and

23  made very clear any party subject to this order may seek relief

24  from any of the provision of this order for cause shown.  This

25  order is without prejudice to the debtor's or other's rights to

1   seek relief pursuant to Section 362 of the Bankruptcy Code.

2         So, when the Court applied the injunction -- the stay

3   to the third parties such as J&J and JJCI it allowed this -- it

4   contemplated within the order itself that parties -- the need

5   may arise when time passes to apply for the very relief that

6   plaintiffs seek here.  So the mysterious then what does for

7   cause mean?  What is for cause?  For cause in this circuit --

8   in this district means based on the totality of circumstances

9   in each case, and it's a broad and flexible concept.

10         And now I'll go to the In re Mid-Atlantic Holdings

11   factors.  So, again, we don't need to have all 12 factors, but

12   I would say that the balance plainly support the movants in

13   this issue.  Here are the 12 factors, and I've picked out the

14   few that really seem to be the gravamen of the issue based on

15   plaintiff's moving papers, and J&J's opposition.

16         So, the first is the impact of the stay on the

17   parties and the balance of the harm.  That is obviously of

18   critical importance in this issue.  Absent relief from this

19   stay these plaintiffs definitively will not see their day in

20   court.  They will never live to see their recovery.  That is

21   why Mr. Satterly went through in great detail their medical

22   records, the status of their cancer, and the terminal nature of

23   their diseases.

24         J&J in turn does not claim any harm to the non-

25   debtors who we are seeking to sue here, J&J and JJCI, by

 1 | lifting the stay.  Nowhere in its opposition does it set forth
 2 | any factors as to why lifting the stay would harm J&J and JJCI.
 3 | Instead, what J&J says is, quote, and this is J&J opposition at
 4 | Page 15, Note 14, the movant's focus on the allegedly lack of
 5 | adverse effect on the non-debtors is beside the point.  Well,
 6 | how can the harm -- how can that be beside the point the fact
 7 | that we're moving to sue parties to whom this Court has issued
 8 | an injunction and they're saying they don't even contest that
 9 | they will be harmed and they say will be beyond the point.

10 | What they do say is we have to focus on the harm,
11 | solely focus on the harm to the debtor, LTL.  And what they
12 | repeat over and over and this is almost the entirety of their
13 | focus on the harm is that this will open up a tidal wave of
14 | cases.  That is how they say the debtor would be harmed.  It
15 | would prevent the reorganization by opening up a tidal wave of
16 | cases.

17 | So, why we've tried to very carefully explain to the
18 | Court why we picked these two cases after great deliberation,
19 | because the Court is correct, we have many clients who are, you
20 | know, suffering from the disease and after-exposure to Johnson
21 | & Johnson's Baby Powder, but these are unique in that they will
22 | allow this Court to gain information about the value of these
23 | claims in a rapid way and in a creative way that could boost
24 | this case forward, this bankruptcy proceeding, and assist the
25 | debtor in the reorganization, because it would take two parties

1  on opposite sides of the spectrum and give a forum for a rapid

2  determination of the different competing sides of science and

3  also facts.

4         These cases, they were only exposed to Johnson's Baby

5  Powder.  They are both terminally ill.  They are both in a

6  jurisdiction, Alameda County, which has very strong expertise

7  in trying these cases.  Has tried already even during the

8  pandemic tried multiple talc exposure cases.  This summer Mr.

9  Satterly's verdict in <u>Prudencio</u> during the pandemic was done by

10 Zoom as a Johnson -- against Johnson & Johnson's Baby Powder --

11 excuse me, against Johnson & Johnson.

12        So -- and J&J doesn't dispute in its moving papers

13 that in its opposition Alameda has great expertise in this.

14 Alameda also has shown that they can move fast and we set forth

15 the time line for the Court that it would be -- we anticipate

16 for Mr. Valadez by way of example.  By July we could have the

17 preference order ruled upon and within 120 days by statute that

18 case has to be at trial.

19        The second factor is whether specialized tribunal

20 with the necessary expertise has been established.  And I just

21 covered that so I'll do that briefly.  But, again, J&J

22 opposition at 19.  The debtor does not dispute that the

23 Superior Court of California has the expertise to hear the

24 movant's personal injury cause of action.  But J&J's opposition

25 is -- the next sentence is nonsensical.  It says but this

1  factor does not distinguish the movant's claims from the

2  debtor's myriad other talc claims.  Again, remember, this is

3  J&J's almost exclusive point in opposition is floodgate will

4  open.  But these cases are extraordinarily unique.  J&J points

5  to no other case, and J&J has access to this information that

6  has been previously filed against it or stayed that would

7  mirror these cases.  Nor does J&J point out for -- and if, if

8  this Court felt, believed that this was a floodgate of

9  litigation the Court has already set forth one of the possible

10  solutions.

11        Let's pick, as Mr. Satterly suggested, a group of

12  bellwether cases, of cases that we could then say this is it,

13  this is a finite limit and we'll use these cases and the

14  results from these cases to inform our mediation, to inform

15  this Court to propel this bankruptcy out of the stasis in which

16  it appears to be regrettably fine.  And again, here is just how

17  quickly again -- I won't belabor this chart, the Court's

18  already seen it, it can be tried in Alameda County.

19        Whether the parties are ready for trial in the other

20  proceeding.  The Court pointed out wisely that, you know, these

21  cases haven't been filed.  We have not been able to file these.

22  And I know from reading the Court's orders that the Court is --

23  there is one order where you said I don't mean to be like loggy

24  or something like that.  It was a great moment.  But I know

25  that you are very familiar with the case law.  So, I'm sure you

1  are eluding to the fact that <u>In re Mid-Atlantic</u> they had

2  already -- the cases were already on file, expert discovery was

3  almost complete, and discovery was complete.  Whereas in there

4  we're asking the Court to lift the stay for two cases that

5  haven't even yet been filed.  And so -- but what two things --

6  there are many things to point out why this actually could be

7  even quicker than the cases that were released for trial in <u>In</u>

8  <u>re Mid-Atlantic</u>, or in this docket where statutorily they have

9  to go very quickly.  J&J contested none of the medical

10 declarations that we submitted meaning that that is evidence

11 that they don't contest that would allow us to then proceed to

12 a fast preferentially set trial, and that trial would

13 presumptively happen in 120 days.

14         So, while it is true that we have not been able to

15 file them yet, while it is true that that <u>In re Mid-Atlantic</u>

16 differs on that point we propose and suggest that the speed by

17 which these very unique cases can be tried dovetails then with

18 the same considerations that the Court was making in <u>In re Mid-</u>

19 <u>Atlantic</u>.

20         Whether the action primarily involves third parties.

21 The plaintiffs only seek to sue third party.  We do not seek to

22 sue the debtor at all.  Now, of course, their point is that

23 through indemnification agreements by virtue of seeking to sue

24 the third parties it will trace back to the debtor.  But they

25 don't set forth any harm in their opposition that arise to the

Case 23-12825-MBK  Doc 369-3  Filed 04/02/23  Entered 04/02/23 08:56:28  Desc
Exhibit Exhibits 12-17 to Satterley Declaration  Page 50 of 214

98

1  debtor financially by virtue of that occurring.  They never say
2  well, we couldn't handle that, it would be debilitating.  Their
3  main point is it's going to be a floodgate of litigation.  And
4  so let's cabinet it.  Let's keep these two cases and a few
5  others for bellwether and allow this Court to manage its docket
6  in a way that gives it the best information.

7       Whether the debtors insured has assumed full
8  responsibility for defending it.  I know that based on reading
9  the Court's order and the transcript this is an issue that has
10  not been determined yet by the Court.  I do point out, though,
11  that in the cross examination of Mr. Kim that occurred in
12  January, and I apologize for the small print, Mr. Kim was asked
13  about interrogatory responses served by Johnson & Johnson in
14  response to the question of any indemnity in ensuring
15  agreements described that would cover the litigation.  And he's
16  asked, it says in the next sentence that defendants state that
17  they have a reasonable and good faith basis that the above
18  policy concern is unlikely to be implicated in this action.  Do
19  you see that?  Answer, I do.

20       So, in the tort system with Johnson & Johnson and
21  Johnson & Johnson Consumer Inc. has told plaintiffs about
22  insurance is essentially don't worry, we have plenty of money
23  to satisfy these judgments and so our insurance isn't relevant.
24  Answer, the words speak for themselves.  I mean, it is what it
25  is.

Case 22-30285-MBK    Doc 369-43    Filed 04/02/23    Entered 04/02/23 08:56:28    Desc
Exhibit Exhibits 12-174 to Satterley Declaration    Page 51 of 214

99

1       The reason I read that to the Court is because even

2  in J&J's opposition to this motion J&J doesn't argue that

3  absolutely this insurance is assured, this insurance is an

4  asset of the debtor, it must be protected.  We have a very

5  ambiguous situation where outside of litigation and prior --

6  outside of bankruptcy and prior to filing for bankruptcy J&J

7  stated in interrogatories it wasn't even going to avail itself

8  of insurance.  I think that should be a factor for the Court to

9  consider in that this is not a clear cut situation where we're

10 eating into proceeds that would definitively be due other

11 claimants.

12      Whether the litigation in another form would

13 prejudice the interest of creditors, the interest of judicial

14 economy and the expeditious and economical resolution of this

15 litigation.  So, <u>In re Mid-Atlantic</u> directly comments on this.

16 It says what use will it be for us to send this case out?  And

17 here's really critical.  It states that by sending this case

18 out to trial the record before the Court suggests that

19 permitting the State Court action to proceed would not

20 prejudice Mid-Atlantic creditors since resolution of the issues

21 before the State Court must be addressed and damages, if any,

22 fixed so that the extent of creditor's claims are known.

23      And so, here that's exactly what I've been stating is

24 that if we can get a marker as to the extent of creditor's

25 claims, this is one more indicia of -- that will hopefully

Case 22-30085-MBK    Doc 369-3    Filed 04/02/23    Entered 04/02/23 08:56:28    Desc
Exhibit Exhibits 12-17 to Satterley Declaration    Page 52 of 214

100

1  bring the parties together.  And In re Mid-Atlantic expressly

2  comments on that data point as a factor that will help all

3  creditors.  Again, J&J's response to this is it would result in

4  an avalanche of claims and would frustrate the purpose of this

5  case.  I won't -- this is J&J's continually repeated phrase

6  throughout its opposition.  I've belabored the point, I think,

7  as to why these cases are entirely unique, and J&J's avalanche

8  of claims specter is just belied by both the record and the

9  fact that J&J's never shown that to happen before with the

10  limited lift of stay as such is proposed here.

11       Whether relief would result in full or partial

12  completion of the issues.  J&J does not contest that this would

13  result in full resolution of the plaintiff's claims.  And

14  that's Opposition at 18 through 19.  But J&J claims that only

15  global resolution is relevant.  Well, that's belied by J&J's

16  recent filing where they state that given the distance between

17  the parties much more information is needed as science week, I

18  think it is, medical week day in order to bring the parties

19  closer together.  So, global resolution is impossible without

20  data points like the plaintiffs are suggesting here.

21       One final point before I move on to jurisdiction was

22  would this interfere with the bankruptcy case?  In J&J's

23  opposition J&J claims that it could cause complication by means

24  of some sort of specter of res judicata.  But this Court, even

25  after an extensive analysis in this in its February, 2022

1  orders was unable to find that even if res judicata or even

2  collateral estoppel definitively attached and J&J does not

3  explain how the debtor not party to the proceeding could then

4  have issues adjudicated as against it.  So, that factor also is

5  in our favor, and in favor of lifting the stay.

6       This last section -- oh, excuse me, Your Honor.  I'm

7  going to move on from In re Mid-Atlantic unless you had

8  questions on that point.

9       THE COURT:  No.

10      MS. CLANCY:  Okay.  So, my last section is on the

11  court retaining jurisdiction.  So, this section is actually

12  quite puzzling to me, because J&J citing Griggs states that,

13  you know, the Supreme Court case states that once an appeal is

14  filed the Court lacks jurisdiction to modify its orders, but

15  ignores the extraordinarily well-settled hornbook law of the

16  Third Circuit set forth in Wright and Miller, set forth also in

17  the Federal Rules of Civil Procedure that when an appeal is

18  pending from an interlocutory order a final judgment that

19  grants, continues, modifies, refuses, dissolves, or refuses to

20  dissolve, or modify an injunction the Court may suspend,

21  modify, restore or grant an injunction on terms for bond or

22  other terms that secures the opposing party's rights.

23      In the Sheet Metal Workers case, Sheet Metal Workers

24  v. Herre Brothers sets that forth explicitly and states that

25  under -- the Court is permitted to modify order such as the

1  court order issued here with respect to a stay if -- even with
2  an appeal pending.  What J&J cites in opposition really has --
3  well, two of them have nothing to do with the issue presented.
4  One is the <u>Griggs</u> case because that doesn't deal with the
5  situation where they're modifying an issue of injunctive relief
6  or temporary stay.  And the other one <u>In re GI Holdings</u> was a
7  remand for a separate state action and it also didn't deal with
8  modifying what it was contemplated by Rule 62(c).

9      J&J's main point after conceding that, okay, under
10 <u>Favia</u> and <u>Ortho</u> it appears that you probably can modify it if
11 there has been a change in circumstances, if it's to keep the
12 status quo or to preserve the integrity of the appeal.  I don't
13 dispute that both <u>Favia</u> and <u>Ortho</u> recognize the principle under
14 Rule of Civil Procedure 62(c) that an appeal, you know, allows
15 the trial court jurisdiction to modify a stay.  But what J&J
16 then uses those for is an in opposite principle, because those
17 deal with then -- so for example, in <u>Favia</u> that then goes on to
18 deal with whether the trial court abused her discretion, not
19 whether she had jurisdiction, but whether she abused her
20 discretion in not restoring the -- not allowing the women's
21 gymnastics team to turn into a women's soccer team and stayed
22 with her original order.

23     And so, whether or not the standards to be applied to
24 a District Court as to how it modifies its injunctive relief
25 are entirely -- and whether it's an abuse of discretion is one

1  in opposite, because it's not a jurisdictional issue that's on

2  the table, and two, doesn't contemplate a situation where we

3  have here where the Court literally the order that is on appeal

4  contemplated and indeed ordered that at any point the Court for

5  good cause could go back and modify the lift stay which is

6  where we started with in the beginning.

7          So, for those reasons, Your Honor, we would ask that

8  the Court lift the stay as to these two cases, or alternatively

9  lift the discovery as to these two cases, or alternatively as I

10 saw the Court did with the insurance motion carry this to after

11 the June 29th date when the Court stated that the lift stay

12 would be -- excuse me -- the PI order would expire in that

13 event.  And if the Court has any other questions.  I think I

14 covered my three areas.

15         THE COURT:  You did, and thank you.

16         MS. CLANCY:  Thank you, Your Honor.

17         THE COURT:  Thanks.  Let me just address the calendar

18 for the moment oh with the calendar.  It seems like a calendar

19 of a clock.  It's five to one.  Bruce, how are you making out?

20         BRUCE:  I'm fine.

21         THE COURT:  Do you want to power through, or do you

22 want to break?

23         BRUCE:  Whatever works for you works for me.

24         THE COURT:  Well, now I'll turn to everyone else.  We

25 have obviously the response to this motion to listen to, and

Case 22-30085-MBK Doc 369-3 Filed 04/02/23 Entered 04/02/23 08:56:28 Desc Exhibit Exhibits 112-174 to Satterley Declaration Page 56 of 214

104

1  then we have a status conference.  So, the status conference I

2  don't anticipate length.  I've read the competing statements,

3  and I have some comments to make.  I'd rather not go into

4  breaking for lunch and coming back from lunch, but I don't want

5  to deprive anybody.  Are thoughts just to power through?

6          MR. PRIETO:  Your Honor, I think I could be done in

7  about 20 minutes.

8          THE COURT:  Okay.  We'll hold him to that.  The same,

9  just power through for the rest?  Okay.  Counsel.

10          MR. THOMPSON:  Your Honor, I'm joining their motion.

11  Can I briefly be heard?

12          THE COURT:  Absolutely.

13          MR. THOMPSON:  Good morning, Your Honor, Clay

14  Thompson with Maune Raichle on behalf of Katherine Tolefson

15  who's an appellant and a mesothelioma claimant.  Our firm only

16  represents people with mesothelioma.  I put in our papers that

17  we whole-heartedly support the motions that have been filed for

18  these two victims who can have their cases decided by a jury in

19  their lifetime.  And I think that for all the -- and in our

20  papers I attach a panel discussion in April that Mr. Gordon

21  attended and they talked about the Texas two-step.  And I think

22  that it's very clear, if it wasn't before, that the Texas two-

23  step is an attempt to change who decides what Ms. Tolefson's

24  case is worth.  Who decides if Ms. Tolefson is entitled to

25  anything.

1    The system that the U.S. Constitution established,

2  that State law, that State Constitutions, that Supreme Court

3  precedent established, the legal system is a jury system.  And

4  J&J does not want juries to decide these cases.  They really

5  don't want juries to decide mesothelioma cases, because the

6  evidence that Mr. Satterly began to present to Your Honor is

7  the evidence that the juries are seeing in these mesothelioma

8  cases.  And when the jury sees the evidence in the mesothelioma

9  cases J&J loses.  And so J&J doesn't want to keep losing in

10 trial and so they want to change who decides these cases.  And

11 so from my perspective my firm had three cases with Konigsberg,

12 Mr. Block who you've heard from.  The first case that we had

13 that went to trial in early 2019 there was no settlement offer.

14 My law firm and Mr. Block's went to verdict in that case, took

15 several months, that verdict is on appeal, Donna Olson.

16 Interestingly the jury awarded a different amount in punitive

17 damages to J&J than from JJCI.

18     A year later we had two other mesothelioma victims,

19 same jurisdiction, New York City.  Both of those cases, I had

20 one, Mr. Block has another, my case settled during jury

21 selection, Mr Block's case settled as he was rising to give his

22 opening statement.  And, in fact, Mr. Block, and I'll attach

23 this to a pleading that we're filing on the 22nd, Mr. Block and

24 J&J counsel thanked the jury in that case for helping the

25 parties reach a resolution.  Having a jury in front of them

Case 23-12825-MBK Doc 369-43 Filed 04/10/23 Entered 04/10/23 08:56:28 Desc
Exhibit Exhibits 12-174 to Satterley Declaration Page 58 of 214

106

1    helped resolve the case.

2          And so unfortunately we have the honor, I guess

3    that's the word I'll use, the honor of representing

4    mesothelioma claimants in North Carolina in all those two-step

5    cases.  And, unfortunately, what I see there is that you have

6    an injunction for a company, Georgia Pacific, Trane, Ingersoll

7    Rand, Certainty, that is not in financial distress, that was

8    resolving these cases with my clients in the jury system

9    without -- with plenty of efficiency, plenty of equity, and now

10   they have an injunction and now we're sitting there, as we are

11   here, with a debtor that doesn't sell anything, doesn't make

12   anything, doesn't have any reason to get out of bed in the

13   morning.  And so there's no incentive for them to reorganize.

14         And J&J is operating, paying billions of dollars in

15   dividends outside of this proceeding, and really if you look at

16   the Ortiz case in 1999 there Fiberboard and a large group of

17   plaintiffs and their counsel, and Fiberboard's insurance

18   company reached an agreement.  And the Supreme Court struck it

19   down for several reasons.  But one of the reasons was that

20   under the Seventh Amendment people that weren't party to that

21   agreement had their rights infringed upon.  And Justice

22   Rehnquist wrote a very succinct concurring opinion where he

23   said were I devising a system for handling these claims,

24   asbestos claims, and I think there was 45,000 asbestos claims

25   against Fiberboard, on a clean slate I would agree entirely

1 with the descent which in turn approves the near heroic efforts

2 of the District Court in this case to make the best of a bad

3 situation.

4        So, he is commending the efforts of the District

5 Court, class action case -- that was not a bankruptcy case, I

6 understand, the District Court made great efforts he called

7 near heroic try to resolve this case.  But Justice Rehnquist

8 speaking as a Supreme Court Justice said we are not free to

9 devise an ideal system for adjudicating these claims, meaning

10 asbestos claims, unless and until the Federal Rules of Civil

11 Procedure are revised the Court's opinion correctly states the

12 existing law, and I join it.  But the elephantine mask of

13 asbestos cases cries out for legislative solution.

14        So, respectfully, Your Honor, if the United States

15 Supreme Court does not have authority to devise an alternative

16 to the legal system, the jury system this Court does not

17 either.  This is a legislative -- if any solutions's going to

18 be reached it's going to be legislative.  And I think it was

19 brought to Your Honor's attention during the motion to dismiss

20 trial that many senators and members of the House have been

21 quite critical of what J&J is attempting to do and you noted

22 that that's fine, but the congress speaks through the laws that

23 it passes.

24        And so at the invitation of the Supreme Court in

25 1999, this is Ortiz, this is five years after 524G, so the

1  Supreme Court in <u>Ortiz</u> did not look at Section 524G and see

2  that that could somehow be used to benefit to benefit

3  Fiberboard, because Fiberboard was not a debtor.  Fiberboard

4  had not filed for bankruptcy.  So, the Supreme Court did not

5  look at 524G and say oh, we should use this here.  No.  They

6  declined to do that and you had noted that congress passed the

7  laws.  Well, congress hasn't passed the law since <u>Ortiz</u>.

8  There's been some attempts, but they haven't passed it.

9         And so it's not optional to have these cases in the

10  jury system.  And so, I see in the status report that J&J wants

11  to extend exclusivity, and they want to have an estimation.

12  And I'm seeing this all for five years in BesQual (phonetic)

13  where if J&J knew in October of 2021 that their goal was to

14  equitably and efficiently pay the sick claimants they don't

15  have a plan?  Even a terrible plan.  They don't have a terrible

16  plan to propose in October.  They don't have a plan now.  And

17  not only do they not have a plan they don't want to let the TCC

18  file a competing plan.

19         And just to highlight two parts that Mr. Gordon said,

20  he just said in discussing the two-step at this seminar there

21  have been other attempts, on Page 40, to try to overcome the

22  tort system.  And I think sometimes we call it the tort system

23  because that makes it seem bad if it's the tort system.  It's

24  the jury system.  Johnson & Johnson is trying to overcome the

25  jury system because they don't want juries deciding these

1 cases.  And that is contrary to the Seventh Amendment that my

2 clients have to have a jury decide their case.  Not just to

3 decide who wins, but decide what their claim is worth.

4          And if J&J really believes that their product is so

5 safe why are they so against juries deciding these cases?

6 Because they know they're going to lose these cases.  And on

7 behalf of my clients I'm not worried about these two cases

8 going forward at all.

9          The last thing I'll end off with speaking about there

10 was a question raised at the end of this panel and someone

11 asked Mr. Gordon at Page 50 why don't you just put the entire

12 entity into bankruptcy, and then propose the same sort of mass

13 tort resolution scheme as part of the class both present and

14 future?  What's the purpose of the divisional transaction if

15 anything is still available?  Because a lot of the argument is

16 well, the amount of -- the size of the pie is the same.  The

17 assets are the same.  I have an issue with that, too.  But the

18 large issue, especially for these two people right here who

19 have an opportunity to have a jury decide their case right now

20 they're going to be dead at the end of the year.  A jury is

21 entitled -- they're entitled to have a jury decide their case

22 and that's what the issue is, who decides.  Juries are supposed

23 to decide.  Juries have to decide these cases.

24          And Mr Gordon says in response to this, and why don't

25 you file the whole company into Chapter 11, well the purpose is

Case 22-30885-MBK  Doc 369-43  Filed 04/02/23  Entered 04/02/23 07:56:28  Desc
Exhibit Exhibits 112-174 to Satterley Declaration  Page 62 of 214

110

1  that you avoid having the entire company and its other

2  stakeholders subjected to a bankruptcy filing.

3          See my clients weren't consulted.  But it's okay that

4  they're subjected to a bankruptcy filing.  Even though they

5  were being paid in the jury system.  Even though J&J resolved

6  1,100 mesothelioma cases in 2020 and 2021 without financial

7  distress, my clients are not subjected to the bankruptcy

8  system.  J&J, they don't want to be subjected to the bankruptcy

9  system.  So imagine with Georgia, continuing with Mr. Gordon

10  --

11          THE COURT:  Counsel with all due respect, I addressed

12  this as part of the motion to dismiss.  This is going up on

13  appeal.  And you're welcome and I'm sure you're part of it.

14          I'm going to ask if we could just get more pointed as

15  to your motion, not the underlying whether bankruptcy is the

16  right place for this case.  That's not being decided today.

17          MR. THOMPSON:  Okay.

18          THE COURT:  All right, in fairness.  We had five days

19  of trial.

20          MR. THOMPSON:  You and I agree that my point has been

21  made on that issue Judge.

22          THE COURT:  Absolutely.

23          MR. THOMPSON:  Okay, okay.  I think that here we have

24  a situation with these two claimants that they can have their

25  case heard and I don't have, whatever this phrase is, I don't

1  have a horse in this race, you know.  It's not my case.  But I

2  think that these two people are entitled to have a jury decide

3  their case.

4          I think what was apparent to me in the seminar is J&J

5  does not want the obligations, literally.  You don't have to

6  subject the big company to the obligations of a bankruptcy

7  filing.  And meanwhile they're paying a billion dollars a month

8  in dividends that otherwise if they were in bankruptcy they'd

9  have to come and get your permission.  And they don't want to

10 do that.

11         So I think it's pretty easy Your Honor today.  J&J

12 did not file Chapter 11.  J&J is not in financial distress.

13 These motions were very well laid out and argued.  Let these

14 two people have their day in Court.  Thank you.

15         THE COURT:  Thank you counsel.  Mr. Prieto.

16         MR. PRIETO:  For the record Your Honor, Dan Prieto of

17 Jones Day on behalf of debtor again.

18         Your Honor at the outset let me just state for the

19 record that obviously we're very sympathetic to both these

20 movants here.  We recognize mesothelioma is a terrible disease.

21 Obviously saw the condition they're in and feel sympathy for

22 that.

23         But I think it's important for me to just say on the

24 record that the assumption of the entire presentation we just

25 saw from Mr. Satterly was the assumption that Johnson's baby

Case 23-03295-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 18:36:28 Desc
Exhibit Exhibits 112-174 to Satterley Declaration Page 564 of 214

112

1 powder caused those diseases. And as Your Honor knows we

2 dispute that. We don't think the science supports that.

3      And I'd also like to say that the declarations that

4 have been admitted today, we agreed to that because we didn't

5 want to have this hearing turn into a multiple witnesses on the

6 list day.

7      But that doesn't, you shouldn't take that to mean we

8 don't dispute the assertions made in those declarations. And

9 that if we were provided discovery and an opportunity we would

10 ultimately show that those assertions are not proper.

11      And then finally just as an initial matter, the

12 arguments that there's all these corporate documents that

13 demonstrate Johnson & Johnson has admitted that asbestos is

14 contained in the product, Your Honor I'm sure is aware that

15 there's multiple other documents and corporate records that

16 clarify that. And our position is that none of those documents

17 demonstrate what Mr. Satterly's asserting.

18      And if Your Honor, you know, we heard a lot about, a

19 lot of that sort of there's an opening today, so if Your Honor

20 has any interest Ms. Brown is in courtroom and can certainly

21 address that much more ably than I can, if Your Honor is

22 interested in hearing on those issues.

23      THE COURT: Rhetorical question, right?

24      MR. PRIETO: You didn't see me move from the podium.

25 All right, so with that out of the way, let me address the

Case 23-12825-MBK  Doc 369-43  Filed 04/02/23  Entered 04/02/23 08:56:28  Desc
Exhibit Exhibits 12-174 to Satterley Declaration  Page 65 of 214

113

1  arguments.

2          Your Honor this is the third and fourth attempt as

3  Your Honor knows by Mr. Satterly to permit claimants he

4  represents to pursue their talc claims during this Chapter 11

5  case while all other talc claimants against the debtor's estate

6  remain subject to the automatic stay and the preliminary

7  injunction.

8          And as Your Honor knows from reading the pleadings

9  and I'm sure you recall, on his two prior attempts, one, you

10  know, his requests were denied; one by Judge Whitley with

11  respect to the Vanklive case and one by Your Honor with respect

12  to the Hill case.

13          And I submit Your Honor that these lift stay motions

14  should likewise be denied primarily for the same reasons.  If

15  anything Your Honor, I submit that these motions have even less

16  merit than the prior efforts to lift the stay for three

17  reasons.

18          First, the prior lift stay motions were decided

19  before Your Honor's ruling on the preliminary injunction and

20  automatic stay and of course before Your Honor's ruling on the

21  Hill motion.  But now Your Honor has already addressed

22  virtually every issue raised by these motions.

23          So from my perspective what these motions are

24  essentially seeking is to have Your Honor revisit numerous

25  findings and rulings that you've already made in this Chapter

 1  11 case.

 2        Second, the Vanklive and Hill cases, there was

 3  actually pending lawsuits that were nearing trial.  And I think

 4  the other side has acknowledged here, there's not even a

 5  complaint much less any lawsuit that's started or pending which

 6  obviously from my perspective means it's not like we're on the

 7  verge of trial.  They have to rely on arguments that there be

 8  some expedited process that still would take months.  Well, if

 9  not longer.

10        And third Your Honor the parties are now engaged in

11  mediation to resolve this Chapter 11.  That wasn't the case

12  with the prior two requests.  And notwithstanding statements

13  you may have heard today about the status of mediation, you

14  know, we dispute that.  There's been significant progress made

15  in mediation.  We are continuing to be committed to that

16  process.

17        And arguments advanced today about the debtor's

18  proposed phased estimation approach is not, is sort of, the

19  implication seemed to be we're abandoning mediation.  We want

20  litigation.

21        But as Your Honor knows from reading the statement,

22  that's not what we're proposing.  What we're proposing is a

23  process that would have mediation scheduled throughout as an

24  effort to foster an earlier settlement.

25        So the outside date that they refer to that was in

Case 23-12825-MBK    Doc 369-8    Filed 04/02/23    Entered 04/02/23 17:56:28    Desc
Exhibit Exhibits 12-14 to Satterley Declaration    Page 67 of 214

115

1  the statement, June 2023, that's the date that if settlement

2  isn't reached by then would actually be the final date in which

3  there could be a ruling.  But that's, but the hope would be

4  there would be a settlement well in advance of that.

5          So I submit Your Honor there's no basis to lift the

6  stay to permit the movants to commence litigation.  These

7  motions fail to establish why the movants should be treated

8  differently from the thousands of other claimants with pending

9  claims in this bankruptcy case.

10         And really Your Honor as a result if the movants are

11 permitted to pursue their talc claims, it could defeat the very

12 purpose of this case by setting a precedent for thousands of

13 other claimants to seek the exact same relief.  And I know

14 you've heard that argument before but it remains true Your

15 Honor.  Nothing has changed in that regard.

16         So let me briefly touch on the facts and then I will

17 be briefly addressing the <u>MidAtlantic</u> factors that were covered

18 today.

19         So some of the key facts here, they're seeking to

20 initiate prosecution of meso claims against certain protected

21 parties under the preliminary injunction.  Those parties are

22 J&J, New JJCI and nine retailers.  And there's no dispute that

23 each of these parties is a protected party covered by the

24 order.  And there's no dispute that the movants are subject to

25 the injunction and the automatic stay.

Case 23-12825-MBK   Doc 369   Filed 04/01/23   Entered 04/01/23 08:56:28   Desc
Exhibit Exhibits 12-174 to Satterley Declaration   Page 68 of 214

116

1       The movants each allege exposure to Johnson's baby

2  powder.  So while the movants assert that their talc claims are

3  only against or they only pursue their claims against the

4  protected parties at this time.  There would be no claim

5  against any of these parties unless there was also a claim

6  against the debtor who's predecessors sold the products they

7  allege they were exposed to.

8       In addition, Your Honor specifically found in your PI

9  opinion that each of these protected parties and the debtor

10  enjoy such an identity of interest that a lawsuit asserting

11  talc related claims against the protected parties is

12  essentially a suit against the debtor.  That's on page 19 of

13  your opinion.

14       And that was in part because the talc claims against

15  the protected parties involved the same products, the same time

16  periods, the same alleged injuries and the same evidence as the

17  claims against the debtor.

18       Now Mr. Satterly argues in his papers that the

19  difference here is the movants' claims are very unique in some

20  way and therefore there's not really an issue about exempting

21  these particular movants' claims from the stay.

22       But I would submit Your Honor that the basis that

23  they're provided in his papers today don't establish uniqueness

24  that would be relevant to the lift stay request.

25       He says the claims are unique because the movants

1  have terminal mesothelioma and may not have an opportunity to

2  have their day in Court.  But unfortunately other claimants

3  have mesothelioma and could allege the same harm.

4        He says that they are unique because they used

5  Johnson's baby powder that they allege contained asbestos.

6  Well obviously we dispute that, Your Honor knows that.  But

7  other claimants make the same allegation.

8        And Mr. Satterly argues that the movants both allege

9  that their only exposure to asbestos was from Johnson's baby

10  powder.  Again, we've had, we have lots of claimants who make

11  the same allegations.

12        So let me just try to be, there's a lot of factors.

13  Let me try to go through this pretty quick, but I just wanted

14  to give you some of our thoughts on each of these factors which

15  as Your Honor knows is factors that you consider in assessing

16  whether cause, although as you pointed out in your Hill

17  opinion, you take the totality of the circumstances under

18  consideration.  You're not forced to rely solely on these

19  factors.

20        So the first factor is the partial or complete

21  resolution of the issues.  The movants say that well this

22  factor clearly supports them because their claims will be fully

23  resolved.

24        And again, and they don't like this argument but it

25  goes to the heart of the harm to the debtor.  If these claims

1 are allowed to proceed because they're not unique, it would

2 threaten an equitable global resolution of all of the debtors'

3 talc claims and could lead to the possibility that talc claims

4 all get litigated in the tort system in a piecemeal fashion.

5          And you know, they say again today that there's no

6 support for that kind of argument.  It's not relevant under

7 these factors and should be disregarded.

8          But Your Honor in rejecting the <u>Hill</u> lift stay

9 motion, Your Honor accepted this argument and found that

10 permitting a single mesothelioma claim to proceed would "harm

11 the debtor in its drive to reach a global resolution of all

12 cosmetic talc claims and that".  And that, "Would be unworkable

13 to allow these claimants an opportunity to pursue their rights

14 in State Court free of the efforts of the debtor to try resolve

15 equitably and fairly their claims through the bankruptcy

16 vehicle at this point."

17          So the next factor, interference with the bankruptcy

18 case.  Mr. Satterly argues that it does not, argues that

19 movants are just seeking to liquidate the claim and collect

20 from the protected parties so there's really no harm here.

21          But Your Honor liquidating the claim is precisely the

22 problem.  As this Court ruled in connection with the <u>Hill</u>

23 motion, prosecution of talc claims, "would serve to liquidate

24 existing claims against the debtor, triggering existing

25 indemnification and like obligations and that would create risk

1  of binding the debtor through principles of res judicata,

2  collateral estoppel.  And that creates risk of establishing

3  evidentiary record taint that would prejudice the debtor, all

4  of which could and would irreparably harm the debtor."

5        And now there's even more harm to the debtor because

6  lifting the stay would negatively impact the ongoing mediation

7  efforts.

8        Now I think what you heard repeatedly today, it

9  wasn't really emphasized in their papers, but there's this

10 argument that these two claims, Judge, you should let these two

11 claims go forward because one of the ideas you were considering

12 last hearing was allowing certain claims potentially to go

13 forward for purposes of moving the case forward.

14       But Your Honor as we explained in our statement,

15 trying a few additional mesothelioma cases on a one off basis

16 would not provide useful information to the parties given the

17 number of trials that have already occurred.  We cited the

18 stats in our statement but I think it was 33 trials that have

19 already occurred pre-bankruptcy.

20       So rather what it would do, it would take significant

21 time to litigant.  And that would include the appeals.  I mean

22 what you saw today was potentially the most expedited schedule

23 that would occur in California.  But, you know, there could

24 also be appeals.  And that would just be distracting the

25 parties for no real purpose.

Case 23-12825-MBK  Doc 369-43  Filed 04/10/23  Entered 04/10/23 08:56:28  Desc
Exhibit Exhibits 112-174 to Satterley Declaration  Page 62 of 134

120

 1          And the last point I'd say on that is that there's

 2   been no showing today that if Your Honor was ever inclined to

 3   do that which again we submit would not be helpful to the

 4   process, there's no showing that these particular movants are

 5   the right ones that would be representative or appropriate for

 6   that purpose.  In fact, you know, unfortunately one of the

 7   movants is a young person, I think 23 years old, with a very

 8   rare type of mesothelioma.  I don't think that's the sort of

 9   representative type of claim that would be moving forward in

10   any event.

11          Specialized tribunal; in terms of this factor we

12   don't dispute the California Court has the expertise to hear

13   this claim.  But this doesn't distinguish the movants' claim

14   from various other talc claims.  I'm sure there's many courts

15   who have like expertise as California, you know, to prosecute

16   the claims.

17          And this Chapter 11 case is the only place where the

18   debtor can achieve a global and equitable resolution of its

19   talc claims.

20          In terms of the next factor, insurance, I think I

21   heard today a concession that Your Honor has already ruled on

22   this issue in the P.I. opinion.  And that's correct, Your Honor

23   specifically found that the debtor shares insurance policies

24   which are estate property with the protected parties.  And that

25   liquidating, collecting on talc claims could deplete available

 1  insurance coverage.

 2          So obviously from my perspective the insurance is a

 3  further reason why the stay would not be lifted.  It would

 4  deplete the estate resources.

 5          On the argument about whether litigation involves

 6  third parties, you know, we certainly acknowledge the movants

 7  are only seeking to pursue their claims against third parties.

 8  But the key point is that the debtor has indemnification

 9  obligations to those parties.

10          And, you know, the argument today was well those

11  third parties have a lot of money.  There's no demonstration

12  that the retailers or J&J are in financial distress.  And I

13  agree, that is beside the point.  The point here, the reason

14  you have an automatic stay and a preliminary injunction is not

15  to protect the third parties, it's because you're protecting,

16  impacting the estate.  So I don't think arguments about the

17  financial wherewithal of third parties to pay claims is

18  relevant.

19          Impact on interests of other creditors.  The movants

20  argue that permitting their actions would not prejudice other

21  talc claims at all.  But that's not right Your Honor because

22  while the movants would be permitted to proceed on their claims

23  against the protected parties, all other talc claimants would

24  remain stayed.

25          And again, you know I keep on going back to this, but

1 I'm just trying to underscore that what they're asking Your

2 Honor to do is revisit rulings you've already made in

3 connection with the <u>Hill</u> case. Here's what Your Honor said,

4 "In permitting the single claim to proceed would also prejudice

5 the interests of the other talc claimants who have similarly

6 situated claims and yet would remain subject to the stay."

7 On the issue of the impact of the stay, the movants

8 argue that the stay irreparably harms them. And they assert a

9 number of bases for that. But this Court has already found

10 that the claimants' jury trial rights are not impaired by the

11 Chapter 11 case because their rights would "remain intact under

12 a properly drafted and approved plan". That's in your

13 dismissal opinion at 26.

14 Also we submit that the fastest way and this is

15 really the issue, how do you get money into the hands of the

16 claimants in the most efficient and fast way. We think the way

17 to accomplish that is through the establishment of a trust

18 under a plan. And obviously that's the whole purpose of the

19 mediation. That's what we're working hard to accomplish and

20 we're trying to do it as fast as we can in this case.

21 And, you know, Your Honor as we point out in our

22 papers, dely in and of itself is insufficient to overcome the

23 irreparable harm to the debtor which here is permitting claims

24 to be resolved in a piecemeal fashion outside of this forum.

25 And then with respect to judicial economy, you know,

Case 2:23-08895-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 07:36:28 Desc
Exhibit Exhibits 12-17 to Satterley Declaration Page 75 of 214

123

1 again Your Honor we believe the most efficient way to resolve

2 not only the movants' claims but all the other claims is

3 through a resolution in this case.  So judicial economy would

4 favor denying the lift stay motion.

5        And I've already addressed readiness for trial.  We

6 don't think these are ready for trial.  They're not even

7 commenced yet.

8        So let me briefly touch on two more subjects;

9 discovery and the affect of the appeals on these motions.  With

10 respect to the alternative request for discovery, Your Honor we

11 submit that it's not necessary or appropriate at this time.

12        First the movants can request their own medical

13 records and may demand that their healthcare providers preserve

14 the evidence.  And I didn't see a response to this.  But in our

15 papers we pointed out that in California, California law

16 requires medical records to be maintained for a minimum of

17 seven years.  And HIPAA has a similar requirement for six

18 years.

19        I'd also note Your Honor that there's no indication

20 that the movants have actually sought the records or other

21 evidence and have been denied by those healthcare providers.

22 Maybe they have, I didn't see it.

23        And there's no explanation regarding why the movants'

24 experts can't go to the, can go to examine the pathology

25 materials at the medical facilities if those materials will not

124

1   be released at this time.

2          And I think probably most importantly for Your

3   Honor's consideration for today's purposes, permitting the

4   movants to pursue discovery would likely lead to numerous other

5   claimants seeking the same exact relief which would disrupt

6   efforts to promptly reach a global resolution of this case.

7          Now I think what I heard today is, Your Honor, well

8   you know in the <u>Hill</u> situation you permitted discovery so you

9   should do the same thing here.  Well as I recall Your Honor

10  that was a different circumstance.  <u>Hill</u> was on the verge of

11  sort of trial as I recall.  And it occurred at a time before

12  the motion to dismiss had been decided.

13         So I think what Your Honor was concerned with was

14  putting him off schedule at a time when you were considering

15  whether or not the case would be dismissed.  If it were to be

16  dismissed and you didn't want to disrupt his trial schedule.

17         So what you did there is said well let him have the

18  discovery for the time being.  I haven't decided the motion to

19  dismiss.  And I think that was, you know, a fair resolution of

20  the issue.

21         We're in a different spot today.  The motion to

22  dismiss was denied.  It's on appeal.  So that consideration is

23  different and I think that's why it's also different than the

24  <u>Hill</u> situation.

25         Okay, finally the pending appeals.  So Your Honor as

 1  Your Honor knows although the order provided that or provides

 2  that the Court may revisit it, basically every four months, the

 3  TCC and other claimants declined to wait for that.  What they

 4  did instead is they made a determination to go ahead and appeal

 5  it shortly after you entered it.

 6          And as we explained in our papers, an appeal has an

 7  impact on this Court's jurisdiction with respect to the

 8  preliminary injunction.  And, you know, we do cite the Supreme

 9  Court case <u>Griggs</u> for the general proposition, the divestiture

10  rule.  And we also cite <u>GI Holdings</u> case which I think makes

11  clear that that rule applies to Bankruptcy Court orders.

12          THE COURT:  But to the extent I extended the

13  automatic stay as part of the preliminary injunction, one could

14  argue, could they not, that the circumstances as to whether or

15  not there was cause to grant relief from the stay in February

16  are different than they are now.  So that it would be a, it's

17  not the same issues that are pending before, as far as relief

18  from the automatic stay.  It may involve common issues of law.

19  But every stay relief effort focuses on the facts present at

20  that moment.

21          MR. PRIETO:  And I wouldn't dispute that Your Honor.

22  I think it's conceivable there could be a lift stay motion that

23  would be within your jurisdiction.  I think the fundamental

24  problem here is that and as I've tried to establish as I walk

25  through each of the factors, the arguments being advanced are

Case 22-30285-MBK   Doc 369-43   Filed 04/10/23   Entered 04/10/23 17:56:28   Desc
Exhibit Exhibits 12-174 to Satterley Declaration   Page 78 of 214

126

1 the same arguments Your Honor already addressed.

2        So in order to grant these particular motions, you'd

3 have to revisit the very findings that are the under

4 (indiscernible) order that's on appeal.  I think that's the

5 issue from my perspective.

6        And the other point I wanted to make is that, you

7 know, we obviously acknowledge in our papers that Your Honor

8 does retain some jurisdiction to modify the injunction.

9        But we thought it was important to point out what the

10 Third Circuit has, you know, has taught us in terms of what the

11 standards are for doing that.  And in particular what the Third

12 Circuit has said and this is in the Ortho Pharma case is that

13 there needs to be a change of circumstance.  And this is the

14 part that the other side misses.  And only to preserve the

15 status quo or the integrity of the appeal.  So you have, have

16 to be both change of circumstances.  And then you have to

17 either do it to preserve the status quo or if you're not

18 preserving the status quo, it has to maintain the integrity of

19 the appeal.

20        So, you know, as I've said already, the issue here is

21 that there's no way to accomplish that in my, from my

22 perspective based on the nature of the arguments that have been

23 advanced in support of these motions.

24        Now I just wanted to briefly touch on some of the

25 points they made in their reply because they criticize our view

1   of the law in this area.

2          And they say that the Divestiture rule doesn't apply

3   to the lift stay motions.  But they are incorrect for two

4   reasons.  First the movants don't cite any law that challenges

5   or changes the Third Circuit's rule in <u>Ortho</u> that permits again

6   a lower court to modify injunction while it's on appeal only to

7   preserve the status quo or the integrity of the appeal.

8          Now they do cite to the broad language of Federal

9   Rule of Civil Procedure 62.  And when I first read that I said

10  well that seems inconsistent frankly with the position I put in

11  my papers.

12         But what they omitted is that the Third Circuit in

13  <u>Ortho</u> expressly rejected an open ended reading of that Rule as

14  inconsistent with the Rule that filing a notice of appeal

15  divests the lower court of jurisdiction.  That's at <u>Ortho</u> 887

16  F2 at 464.

17         And I've already pointed out that they suggest a

18  change of circumstances alone sufficient, for justification for

19  modifying an injunction pending appeal.  But again I've already

20  demonstrated or explained why the Third Circuit would dispute

21  that.  And that's again in the <u>Ortho</u> case.  Actually the same

22  cite.

23         And although movants cite to <u>Sheet Metal Workers</u>, I

24  think I saw that in the slide deck today, for the general point

25  that the Rule has exceptions, the Third Circuit in that case

1  didn't purport to change the precedent on what those exceptions

2  are.

3         And then second Your Honor the movants have not

4  explained how permitting suits that the PI order bars would not

5  disrupt the status quo and potentially undermine the Third

6  Circuit appeal with that order.

7         You know what they point is the, is the provision

8  that's in the order.  But they don't cite any authority

9  suggesting that a court could override the Divestiture Rule by

10 including such a provision in an order.  And we submit that the

11 arguments advanced by movants granting the lift stay would

12 undermine the appeal.

13        So let me just see if there's any other arguments I

14 need to address and then I'll sit down.  Oh, so, Mr. Satterly

15 in his papers and I think I heard a little bit today, takes us

16 to task for ignoring he says offers to settle claims that he

17 submitted to us.  And he says he sent letters to like four

18 different lawyers at J&J and LTL.

19        But Your Honor that was sent after the bankruptcy

20 case.  Not only after the bankruptcy case, but after Your Honor

21 entered the preliminary injunction order and the automatic stay

22 ruling.

23        So as a bankruptcy lawyer when I hear that, what he's

24 basically saying is I willfully violated the stay.  I demanded

25 that protected parties settle these cases notwithstanding Your

Case 22-30085-MBK    Doc 369-43    Filed 04/10/23    Entered 04/10/23 08:36:28    Desc
Exhibit Exhibits 12-174 to Satterley Declaration    Page 81 of 214

129

1 Honor's order saying that they were prohibited from doing so

2 because it would negatively impact the debtor's estate.

3      So of course we didn't take him up on his offer.

4 That would have been a violation of Your Honor's Court order

5 and it would have been a violation of the automatic stay.

6      I think maybe the last thing I would say is the

7 (indiscernible) statements.  There was, you know, I think Your

8 Honor addressed this.  But there were basically attacks on the

9 2021 restructuring.  There were attacks on this Chapter 11 case

10 itself. And Your Honor's already addressed those in your motion

11 to dismiss opinion and your PI order opinion.

12      And I didn't fully follow the argument.  But the

13 Supreme Court case he was referring to, I mean obviously there

14 is legislation in the Bankruptcy Code, 524(g) and other

15 sections, that do make it available for companies to address

16 their mass tort liabilities.

17      So while the Supreme Court has said that class

18 actions don't work, that's in part why bankruptcy is the

19 necessary forum for addressing these cases.  Frankly it's the

20 only forum where we can address these cases in an a permanent

21 and efficient manner.

22      So Your Honor for all those reasons I would ask Your

23 Honor deny these motions.

24      THE COURT:  All right, thank you counsel.

25      MR. SATTERLY:  Your Honor I've got a few brief

Case 23-12825-MBK  Doc 369-43  Filed 04/02/23  Entered 04/02/23 08:36:28  Desc
Exhibit Exhibits 112-174 to Satterley Declaration  Page 82 of 214

130

1  responses but Mr. Molton asked permission if he could go ahead

2  of me if that's okay with Your Honor, just for a few minutes.

3          THE COURT:  Sure.

4          MR. SATTERLY:  And I won't be long.

5          THE COURT:  I saw all that note taking and

6  scribbling.

7          MR. SATTERLY:  Yeah, that's all I'm doing.

8          THE COURT:  See if you can condense it into five

9  minutes.

10          MR. MOLTON:  I guess it's good afternoon Judge.

11          THE COURT:  Good afternoon.

12          MR. MOLTON:  David Molton for the Talc Claimants

13  Committee and Brown Rudnik here of course with many of our

14  member reps and counsel.

15          I didn't expect to stand during this, but because Mr.

16  Preto through I guess some slight of hand infused the status

17  conference issues into this point and also other things were

18  addressed it, I've got to before Your Honor, response to all of

19  this on behalf of the TCC representing the entirety of current

20  claimants in the universe out there, we have to respond.

21          Number one, I know Mr. Prieto and I just have to say

22  it because he said something that struck me.  He said there's

23  been substantial progress in mediation.  Was that testimony, I

24  don't know what that was.

25          But, you know, maybe I haven't heard something since

1 May 23rd and maybe somebody's going to tell me during the next

2 break. But in any event, that took me.

3         Number two, he talked about estimation, their

4 proposed non-consensual one year estimation process untethered

5 to any plan. And I think Mr. Thompson got it right as the

6 reason why it won't be tethered to a plan yet because Your

7 Honor has given your explicitly order an opportunity for the

8 Committee to preview a proposed plan, a competing plan to Your

9 Honor. Once it does -- we'll address that later. I hope to

10 discuss during our status conference segment, the Committee's

11 view on what we found to be under the circumstances and in

12 light of J&J and LTL's statements repeatedly to this Court, to

13 the North Carolina and other Courts, to the North Carolina

14 Court again, a remarkable proposal that we'll get to in a

15 minute.

16         But number two, getting to where we are. Your Honor

17 knows from our status conference report, which was a status

18 conference report, we reported status. We didn't argue our

19 points and we didn't file a brief, a disguised brief on our

20 points. Bravo to the other side.

21         In any event, what we did is try to do status so we

22 can have a conversation with Your Honor. We're going to have

23 that conversation hopefully.

24         But in there Your Honor what we did do is we took

25 what Your Honor said on May 23rd about dealing with the segment

1  of cases and we took that seriously.  Because we do believe

2  Your Honor that something's got to kick this case a little bit.

3  And Your Honor talked about creative ways to do that.  And

4  we're with you on that Your Honor.  The Committee is with you

5  on that looking for creative ways and we'll talk about that

6  later.

7         But what we've done is we actually had meet and

8  confer with the Jones Day folks and we agreed to a briefing

9  schedule on that very issue that we're going to hopefully get

10  today and have Your Honor accept, that has our submission on

11  June 22nd on the issue of revisiting the stay, June 29th for

12  their response and on July 5th our reply.

13         Clearly what we're going to be doing as we said in

14  our status conference report, not a brief, status conference

15  report, would be to identify an appropriate segment of the

16  pending talc cases which would be appropriate and suitable for

17  the Court to determine an application of the automatic stay and

18  the application of the preliminary injunction so as to allow

19  trials of these cases to proceed forthwith.

20         I've talked with Ms. Clancey and Mr. Satterly.  As

21  you saw I came down from the back bench so to say.  And one of

22  Mr. Satterly's proposals was hey, Your Honor maybe this should

23  be kicked into that.  The TCC and all 38,000 filed, present

24  claims plus the tens of thousands or thousands more of unfiled

25  present claims, current claims, supports that Judge.  It's

Case 23-12825-MBK Doc 369-43 Filed 04/02/23 Entered 04/02/23 08:56:28 Desc
Exhibit Exhibits 112-174 to Satterley Declaration Page 85 of 214

133

1    really important that we not piecemeal these issues.

2           Your Honor had a thought.  You want creativity.  You

3    want this to be dealt with in a coherent way with all

4    interested parties having their say including the Committee,

5    including others behind me.  I know we have Mr. Pfister

6    representing the Alystock.  I'm sure Ms. Jones is on the Zoom

7    representing the Arnold & Itkin.

8           THE COURT:  She's there.

9           MR. MOLTON:  And we have other people.  Everybody is

10   going to want to have a say in this.  So my suggestion Your

11   Honor in terms of dealing with this efficiently, economically

12   and righteously, is to take what you heard today.  You're going

13   to be given a portfolio of proposed cases that we're going to

14   be asking Your Honor to lift the stay.  That's going to happen.

15   That's in our status report.

16          We would propose that a decision on Mr. Satterly's

17   clients which you've just heard and can take into account, be

18   held in abeyance pending that.  We think to have that decision

19   now and then to do an additional set of briefing isn't

20   necessarily the most efficient way of going forward.

21          So on behalf of the Committee and the thousands and

22   upon thousands of talc claimants who stand behind me and want

23   to see this case moved efficiently in this year, 2022, to a

24   resolution, we would make that request.  Thank you Judge.

25          THE COURT:  Thank you Mr. Molton.  Mr. Satterly, yes.

1      MR. SATTERLY:  May it please the Court.

2      THE COURT:  Yes.

3      MR. SATTERLY:  Mr. Molton I disagree with him with

4  regards to pushing my dying clients off a few weeks to July

5  6th.  I have no problem discussing those cases again on July

6  6th.  But getting the process going and getting the complaint

7  filed, the time line that we set forth, it's important to have

8  it done as soon as possible.

9      I mean, but let me address a few of the points.  And

10  as I was sitting there listening, the first thing I heard

11  debtor's counsel was that, you heard Mr. Satterly start going

12  through all this evidence and we would dispute that.  And we

13  had Ms. Brown stand up and dispute this and dispute that, and

14  dispute that.

15      What do you do when you're an individual dying of a

16  disease and the company that you believe caused you to die or

17  dying from that disease, offers you zero money and says your

18  claims are frivolous.  What do you do under that situation.

19      You have to, in that situation, I believe come seek

20  relief from whatever Court will hear you.  I've been trying

21  these cases for 25 years.  And a trial, a trial before a jury

22  or a trial before a Court is a search for the truth.  And J&J's

23  got a position that they're strongly stuck in and they strongly

24  believe that their product is safe.  And they strongly, they

25  may have that belief.

135

1  But we have the evidence. And we're willing to
2  present that evidence to juries. We're willing to present that
3  evidence to judges. We're willing to go past any type of, you
4  know, Daubert hearings or science hearings. It's not necessary
5  to have science hearings at this point.

6  So I would suggest that, I would suggest, counsel
7  said there's been 33 trials and there's no need for further
8  evidence. There's no need for further determination. Well why
9  is there no resolution. Why isn't there already no resolution.

10  Counsel said that mediation, there's been significant
11  progress in mediation. I'm bound by Your Honor's order. I
12  can't tell you my position on that. I can tell you outside of
13  mediation where I'm not subject to Your Honor's order, there's
14  been zero offers. So I don't know how to resolve that.

15  I know outside of mediation I have told by J&J they
16  won't discuss any of my cases. They won't settle my cases.
17  They won't do that until or unless there's a global resolution
18  of all 38,000 ovarian cancer cases. And so my clients have no
19  choice but to make motions like this and to seek relief.

20  So the other point I want to make is your paragraph 7
21  of your order allowing for potential relief from stay motions,
22  they're trying to make that an empty promise or an empty
23  statement from Your Honor. Because if these two cases, if
24  these two cases can't qualify for a lift of stay, what possible
25  case could qualify.

1        These are as clean as a record of a case that I could

2 possibly imagine. And I've evaluated talc cases for actually

3 15 years when I started doing industrial talc cases.

4        Counsel says there's going to be flood gates of other

5 people, there's other people that are terminal. And the first

6 thing that popped in my mind, who are these other people. Who

7 are the terminal ones. Where are they located. Why haven't,

8 why hasn't J&J who's got a list of all the people, identified

9 look, here are 20 more terminal people that should be ahead of

10 these two folks. They didn't do that in their response.

11        They say there's other claimants that make the same

12 allegation that they're going to die soon. Who are they, where

13 are they.

14        And with regard to the uniqueness of this, Alameda

15 County and the process that Alameda County allows for unique

16 circumstance for these cases to proceed.

17        On the issue of punitive damages Your Honor, I did

18 want to, Ms. Clancey reminded me that Judge Whitley in the

19 <u>Kaiser Gypsum</u> case severed punitive damages. And said you go

20 try your cases against Kaiser Gypsum because of the insurance

21 situation and everything else. But I'm going to hold the

22 punitive damage claim back. So that's certainly, there's

23 history for that as well.

24        On the discussion of what I'll call irreparable harm

25 of no discovery and loss of evidence, counsel says that we can

1 collect medical records for us to seven years. Well that's

2 true, we already collected, submitted a whole bunch of medical

3 records here.

4 But many of the bankruptcies in asbestos cases have

5 lasted a lot longer than seven years. I mean, Pittsburgh

6 Corning was 16 years. I remember when they filed in 2000. I

7 remember when they resolved 16 years later.

8 But he missed my point. I filed a declaration, a

9 signed declaration by me, pointing how we cannot collect the

10 pathology blocks. We cannot have tissue digestion analysis.

11 We can't use the subpoena powers to do what we would typically

12 do to work up the merits of our case. And that's undisputed.

13 The last section I want to talk about was the

14 jurisdiction and he talked about the Ortho Pharmaceutical v.

15 Amgen case, 887 F2nd 460, 1989. In fact if you look at that

16 opinion it says, "Amgen also contends that we should dismiss

17 the appeal as the District Court did not have jurisdiction to

18 entertain Ortho's motion. In support of this position, it

19 contends that Federal Rule of Civil Procedure 62(c) authorizes

20 District Courts to modify preliminary injunctions pending

21 appeal only to preserve status quo which in its view Ortho by

22 its motion sought to alter."

23 It goes on to say, the next paragraph, "However,

24 Federal Rule of Civil Procedure 62(c) does not contain this

25 limitation on the District Court's jurisdiction thus suggesting

Case 23-08895-MBK  Doc 369-43  Filed 04/02/23  Entered 04/02/23 08:56:28  Desc
Exhibit Exhibits 12-174 to Satterley Declaration  Page 90 of 214

138

1  that Amgen's instruction is unjustified."

2      The next paragraph it says, find the beginning of the

3  sentence, "Federal Rule of Civil Procedure 62(c) be entered to

4  preserve the integrity of the proceeding in the Court of

5  Appeals, the forum in which the dispute has been conferred by

6  the appeal."

7      And I would submit that these two cases does not

8  dispute anything about the Third Circuit hearing, the bigger

9  issue and all the bigger issues because the stay still does.

10  The bigger stay preliminary injunction still exists as it is

11  right now.  So there's nothing about the Ortho Pharmaceutical

12  case that prevents or says that Your Honor does not have

13  jurisdiction to modify this stay in this regard.

14      Finally counsel suggested that I by writing a letter

15  to them asking to efficiently and equitable resolve, that I'm

16  somehow willfully violating the automatic stay.  Nothing could

17  be further from the truth.  All I'm doing is taking them up on

18  what their talking points have been since October the 14th.

19      If they want to officially and equitably resolve, my

20  clients are willing to do so in the bankruptcy or outside the

21  bankruptcy.

22      These claimants Your Honor, their jury rights, trial

23  rights have been impacted.  They will be dead soon.  I would

24  urge Your Honor in balancing and weighing the harms to the

25  creditors, the harms to the non-debtors, that this motion

Case 2:23-08895-MBK  Doc 369-43  Filed 04/02/23  Entered 04/02/23 08:56:28  Desc
Exhibit Exhibits 112-174 to Satterley Declaration  Page 91 of 214

139

1  should be granted.  Thank you Your Honor.

2          THE COURT:  Thank you counsel.  Thank all counsel.

3  Well argued.  All right, Mr. Molton may have seen some of my

4  notes.  The Court wants the benefit of the briefing that's

5  going to be coming on the stay issue and the continuation of

6  the injunction for resolution on July 6th.

7          The Court is going to grant limited stay relief today

8  simply to file the complaints.  Not to take discovery, not to

9  require, not to prosecute the action.  I view filing a

10 complaint a little more than filing a proof of claim.  It just

11 documents that there's a claim.  We'll leave it at that.

12 Because I don't know where we're going further.

13         But file the complaint.  But let me make it clear

14 there's no, no defendant has an obligation to file an answer or

15 participate beyond filing the complaint.  The stay and the

16 injunction are still in place.

17         MR. MOLTON:  Yes, Your Honor.

18         THE COURT:  I'm going to carry both motions to July

19 6th and address these as part of the larger issues going

20 forward.

21         Let's go on to the status conference.  And I thank

22 counsel.  I think I will lead off with a few comments.  I've

23 had the -- and maybe by doing so I can save some time.  I'll

24 let everybody adjust.

25         MR. SATTERLY:  Sorry Your Honor, so much paperwork

158

# C E R T I F I C A T I O N

We, MARY POLITO, ALYCE STINE, KIMBERLY UPSHUR and
TRACY GRIBBEN, court approved transcribers, certify that the
foregoing is a correct transcript from the official electronic
sound recording of the proceedings in the above-entitled matter
and to the best of our ability.


/s/ Mary Polito

MARY POLITO


/s/ Alyce Stine

ALYCE STINE


/s/ Kimberly Upshur

KIMBERLY UPSHUR


/s/ Tracy Gribben

TRACY GRIBBEN

J&J COURT TRANSCRIBERS, INC.    DATE:  June 15, 2022

# Exhibit 2

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
06/15/2022 at 02:35:57 PM
By: Cheryl Clark,
Deputy Clerk

1  Joseph D. Satterley (C.S.B. #286890)
    jsatterley@kazanlaw.com
2  Denyse F. Clancy (C.S.B. #255276)
    dclancy@kazanlaw.com
3  Ian A. Rivamonte (C.S.B. #232663)
    irivamonte@kazanlaw.com
4  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
5  Jack London Market
   55 Harrison Street, Suite 400
6  Oakland, California 94607
   Telephone: (510) 302-1000
7  Facsimile: (510) 835-4913

8  Attorneys for Plaintiff

9            SUPERIOR COURT OF CALIFORNIA

10              COUNTY OF ALAMEDA

11  ANTHONY HERNANDEZ VALADEZ,          | Case No. 22CV012759

12            Plaintiff,                 | **COMPLAINT FOR PERSONAL INJURIES**

13        v.                             | **DEMAND FOR JURY TRIAL**

14  JOHNSON & JOHNSON;

15  ALBERTSONS COMPANIES, INC., individually
    and as successor-in-interest, parent, alter ego, and
16  equitable trustee of LUCKY STORES, INC.;

17  LUCKY STORES, INC.;

18  SAFEWAY INC.;

19  SAVE MART SUPERMARKETS, individually,
    and as successor-in-interest, parent, alter ego and
20  equitable trustee of LUCKY STORES, INC.;

21  TARGET CORPORATION;

22  WALMART INC.; and

23  FIRST DOE through ONE-HUNDREDTH DOE,

24            Defendants.

25

26

27  //

28  //

3156712.3

Complaint for Personal Injuries                    **EXHIBIT 2**

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

## GENERAL BACKGROUND AND OTHER ALLEGATIONS

### I.

**The Plaintiff:** Anthony Hernandez Valadez is the physically injured Plaintiff. His mesothelioma was caused by exposures to asbestos, asbestiform fibers, and asbestiform talc – collectively referred to herein as asbestos – for which Defendants bear responsibility.

### II.

**The Defendants:** All Defendants are listed in the case caption. The true names of the Defendants sued as DOE's are unknown to Plaintiff. Each Defendant was the agent, employee, or joint venturer of its co-defendants, and was acting in the full course and scope of the agency, employment, or joint venture.

### III.

**Alternate Entities:** All Defendants are individually liable for their own defective products and wrongful conduct; and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities because:

- there were express or implied agreements between the companies to transfer and assume the liabilities;

- the transactions between the companies amounted to a consolidation or merger;

- the purchasing company is a mere continuation of the seller;

- the transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- strict products liability was transferred because (i) there was a virtual destruction of Mr. Valadez's remedies against the original manufacturer caused by the successor's acquisition of the business, (ii) the successor has the ability to assume the original manufacturer's risk-spreading role, and (iii) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business; and

- the companies are alter egos because (i) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (ii) there would be an inequitable result if the torts in question were treated as those of one company alone.

/ / /

/ / /

3156712.3

2

Complaint for Personal Injuries

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entity |
|---|---|
| ALBERTSONS COMPANIES, INC. | LUCKY STORES, INC. |
| SAVE MART SUPERMARKETS | LUCKY STORES, INC. |

## IV.

**The Products:** For many years, Defendants and/or their predecessors have manufactured, sold, distributed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce products that contain asbestos, asbestiform fibers, and/or asbestiform talc.

## V.

**Knowledge of Asbestos Hazards:** The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants:

1.   Health hazards from asbestos exposure were identified in the 1890s. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2.   Defendants since the early 1900s possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

3.   Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

/ / /

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

4. As early as the 1920s, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5. By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns Manville.

6. In the late 1930s, case reports were published addressing the relationship between asbestos and cancer.

7. Several reports, studies, and guidelines published as early as the 1930s, including California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930s would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

8. In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10. As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."

11. In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

12. In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13. Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14. By the 1940s, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15. In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16. During the 1940s and 1950s, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17. In addition, beginning in the 1940s and 1950s, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18. In 1955, Richard Doll published a study linking asbestos to lung cancer.

19. In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

20. DEFENDANT JOHNSON & JOHNSON started selling Johnson's Baby Powder in the late 1800s. As the parent company, JOHNSON & JOHNSON made Johnson's Baby Powder until 1978, when a new subsidiary corporation, Johnson & Johnson Consumer Inc., was formed. Both JOHNSON & JOHNSON and Johnson & Johnson Consumer Inc. shared with each other all of their health-and-safety information about the talc products. Throughout this Complaint, DEFENDANT JOHNSON & JOHNSON is referred to as "J&J."

21. In the 1950s and 1960s, J&J contracted with the Battelle Laboratory in Ohio to examine its talc for the presence of dangerous minerals. Battelle reported back to J&J and William Ashton, a J&J managerial employee, that J&J's talc had tremolite, fibrous tremolite, and fibrous talc. J&J thus had knowledge for many decades that J&J's talc was dangerous to breathe.

22. In the early 1960s, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

/ / /

3156712.3

5

Complaint for Personal Injuries

23. In 1966, J&J knew of published medical and scientific articles that warned it that breathing talc could lead to asphyxiation and death in infants. J&J knew that this information could hurt its baby products franchise and chose not to warn about the dangers of breathing talc for many decades.

24. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

25. In 1969, product-liability lawsuits were brought against asbestos manufacturers. Under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere a workplace standard of no more than 12 fibers per cubic centimeter of air.

26. In April 1969, J&J medical doctor, Dr. Timothy Thompson, wrote that J&J should consult the law department for potential litigation arising out of breathing tremolite. This J&J medical doctor specifically discussed the risk of cancer and other diseases from inhalation of needle-like tremolite.

27. In 1970s, J&J knew of the risk of ovarian cancer and never warned regarding any type of cancer. Ovarian cancer occurs via inhalation and translocation of the asbestiform minerals in the body. J&J failed to warn of all cancer risks, including mesothelioma.

28. In early 1970s, J&J submitted false information to the federal Food and Drug Administration ("FDA") claiming J&J's products did not have asbestos in them when J&J had internal documents demonstrating its submission was false. J&J and other companies jointly convinced the FDA to not regulate the issues of asbestos in talc. The FDA allowed the talc industry to self-regulate regarding the health impact of breathing talc.

29. J&J claims to have had a facility since the early 1970s to retain samples of each batch of its talc for future analysis. J&J has destroyed those samples and all underlying testing data including photographs, Transmission Electron Microscopy grids, Energy Dispersive X-ray Spectroscopy grids, and Selected Area (Electron) Diffraction grids.

30. In the 1970s, J&J worked jointly with other companies, including members of the Cosmetic, Toiletry & Fragrance Association ("CTFA"), to adopt a testing method that would not find the asbestos in their talc. That method, known as the J4-1, was adopted by the industry in 1976.

31. In the 1970s, J&J misled physicians and nurses into believing that J&J's product was safe and falsely telling them in mailings that there was no asbestos in Johnson's Baby Powder.

32. In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. J&J management employees

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

worked to keep fibrous talc and asbestiform minerals in their product from
being regulated by OSHA.

33. In 1971, J&J met with scientists at Mt. Sinai Hospital in New York who
warned J&J of the risk of asbestos in its products and the risk of disease.
J&J knew that fibrous talc and asbestos from talc translocated through the
body after inhalation and were found in the ovaries of women.

34. In 1971, the Colorado School of Mines advised J&J managerial employee,
Robert S. Russell, that there is fibrous tremolite and actinolite (asbestos),
and fibrous talc in J&J samples submitted to them. Later in the mid-1970s,
J&J agents and employees, including Mr. Russell, obtained, with his
knowledge, used Johnson's Baby Powder in a study on live babies, thereby
exposing these babies to risk of disease.

35. In 1972, the American Conference of Governmental Industrial Hygienists
listed asbestos as a carcinogen.

36. In 1974, J&J employee, Dr. Fuller, told the FDA that the risk of *any* harm
would be reason to take J&J's talcum powder off the market. Dr. Fuller and
J&J did not live up to their promise to the FDA and falsely reassured the
FDA for decades J&J's product was safe.

37. A 1976 follow-up study conducted by researchers at Mt. Sinai concluded
that "[t]he presence in these products of asbestiform anthophyllite and
tremolite, chrysotile, and quartz indicates the need for a regulatory standard
for cosmetic talc...We also recommend that evaluation be made to
determine the possible health hazards associated with the use of these
products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral
and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).]
The results of the Mount Sinai study were soon picked up and reported by
both the New York Times and the Washington Post that same year. The
study and subsequent newspaper articles listed explicitly popular consumer
cosmetic talcum powders as containing high percentages of asbestos.

38. In the early 1970s, the FDA began an inquiry into whether to regulate and
require warnings on consumer talcum powder products. Defendants, who
were part of an exclusive lobbying and advocacy group representing
companies engaged in the cosmetic products industry, repeatedly conspired
and worked in concert to block efforts to label and warn consumers
regarding the dangers associated with cosmetic talcum powder products.

39. In the 1970s and 1980s, J&J employee, William Ashton, knowing that
fibrous talc and asbestos was dangerous, worked to keep J&J's product
from being subject to any industry standards, including joining the
American Society for Testing and Materials, and insuring J&J's product
would not be subject to scrutiny by the scientific community.

40. In the 1970s and 1980s, J&J continued to mislead the public by engaging in
an anti-warning marketing campaign to tell consumers that J&J's product
was "pure" and would "protect" the user of the product. The marketing
campaign consisted of print, radio, and television advertisements to falsely
reassure the public about the safety of talc.

/ / /

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

41. In 1983, Anthony and Mary Rose Gambino sued J&J for injuries Mr. Gambino sustained from his use of Johnson's Baby Powder talc. J&J did nothing to preserve evidence of the talc samples it was allegedly testing from the early 1980s forward.

42. In 1991, J&J knew that Dr. Alice Blount published on the presence of asbestos in its Johnson's Baby Powder. Dr. Blount told J&J several times in the 1990s and yet J&J did nothing to warn Mr. Valadez or other end users of the dangerous associated with J&J's product.

43. J&J in the 1990s continued its pattern and practice of marketing talcum powder as safe despite knowing of the "cancer linkage." In 1992, J&J knew its major opportunities would be to market to minorities, but also knew the major obstacles would be the inhalation risk and cancer linkage.

44. J&J were in charge of worldwide testing of talc to determine how much asbestos was in each talc. They created a testing scheme to appear like there was no asbestos in their talc. However, they knew the testing methods used were inadequate and would not detect the asbestos in the talc.

45. J&J engaged in a pattern and practice of not warning the public through 2018 when its Chief Executive Officer, Alex Gorsky, falsely told American consumers that J&J's talcum products have always been free of asbestos.

All Defendants failed to place any warning on their products or ever disclose the fact that these products contained asbestos, asbestiform fibers, and/or asbestiform talc at any point, up to and including present day, despite the clear hazard and direct information that their products *did* contain asbestos, asbestiform fibers, and asbestiform talc.

## VI.

**Additional Allegations as to J&J:** The following facts are illustrative, but not exhaustive, of J&J's wrongful conduct.

J&J knew that the needle-like shape of asbestos fibers, found in some talc deposits, makes the fibers causative of mesothelioma. And J&J knew that babies inhaled the talc, at variable levels, whenever Baby Powder was applied. J&J therefore understood that if its talc contained asbestos, and if that fact were publicized, it would be bad for J&J's business and reputation.

To avoid the risk of end-users' asbestos exposures, J&J always had the option to use cornstarch, instead of talc, as its Baby Powder's active ingredient. However, J&J waited until 1980 to start selling a cornstarch version alongside the talc version. Thereafter, J&J advertised that its cornstarch version was the "safest powder you can use on your baby." J&J never warned anyone

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    about the asbestos content of its talc.

2         Despite admittedly knowing that its talc Baby Powder contained toxic asbestos from at

3    least the 1960s through the 2000s, J&J concealed or otherwise misrepresented that fact from its

4    products' consumers, including Mr. Valadez. In part, J&J engaged in the following acts and

5    omissions:

6    1.    J&J lied to the FDA about the presence of asbestos in the talc used in J&J's
           products, including Johnson's Baby Powder. J&J hid these results and, in
7          some cases, asked that these results be altered or destroyed. For example, in
           January 1974, J&J's managing agents Dr. R. Fuller, Dr. G. Hildick-Smith,
8          and Dr. W. Nashed met with the FDA regarding "Talc/Asbestos." In that
           meeting, J&J promoted its Johnson's Baby Powder as the "best talc
9          available," despite knowing the talc's asbestos content. J&J also falsely
           claimed to the FDA that "substantial asbestos can be allowed safely in a
10         baby powder." J&J further assured the FDA that, if studies showed that the
           talc was unsafe, J&J "will not hesitate to take it off the market." J&J never
11         took its Johnson's Baby Powder off the market despite knowing that the
           product contained asbestos. J&J, itself and through the CTFA, also withheld
12         original documents and reports identifying asbestos in its talc and talc-
           containing products, like Johnson's Baby Powder, and instead falsely
13         reported to the FDA there was no asbestos. After providing this false
           information to the FDA, the CTFA, including J&J, met privately and
14         congratulated themselves on the "success" of the "presentations" to the
           FDA, and agreed that they should not bind themselves to having to further
15         update the FDA. Despite its admission that asbestos is a carcinogen, J&J
           never suggested—or revealed—to the FDA any asbestos in its Johnson's
16         Baby Powder or talc products, including the list of positive asbestos
           findings in its talc ore, talc, and products throughout the decades.

17

18   2.    In or around 1978, J&J and other members of the CTFA destroyed evidence
           showing positive findings of asbestos in round-robin testing of J&J and
19         other manufacturers' consumer talcum products for asbestos content. The
           FDA initially proposed regulating the cosmetic talc industry. However, J&J
20         and other members of the CTFA contended that they should be able to self-
           regulate. As a result, the FDA had no authority to "go into [J&J's] files"; it
21         was up to J&J to voluntarily provide information to the FDA. Because the
           cosmetic talc industry was self-regulating, the CTFA rejected the FDA's
22         proposal to have CTFA disclose the results of CTFA's respective periodic
           monitoring for asbestos. At J&J's direction, the CTFA was instructed to
23         "[d]estroy your copy of the table" containing the results of the CTFA Task
           Force on Round Robin Testing of Consumer Talcum Products for
           Asbestiform Amphibole Minerals.

24

25   3.    J&J fraudulently labeled and advertised its Johnson's Baby Powder as being
           pure and protective of health, and free of asbestos fibers. J&J maintained
26         the trust of mothers and other consumers who used its Johnson's Baby
           Powder products through print advertisements and other methods. In the
27         1940s, J&J emphasized that doctors and nurses preferred Johnson's Baby
           Powder because of its effectiveness and alleged purity. J&J described the
28         product as the "purest." J&J also directly promoted its baby powder to
           medical personnel. J&J provided samples for doctors to distribute. A 1965

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

brochure for doctors claimed that the powder was safe and had medical benefits. The bottle itself even said, "Purest Protection." Another version of the bottle said, "Good for baby, Good for you." However, J&J well knew that its Johnson's Baby Powder was not pure because it contained asbestos. J&J also knew that its Johnson's Baby Powder provided no medical protection or any other medicinal value.

4.  J&J and its officers, directors, and managing agents including, but not limited to, Bill Ashton, Dr. R. Fuller, Dr. Gavin Hildick-Smith, Dr. Al Goudie, Dr. W. Nashed, and members of J&J's Talc Advisory Group, kept from or otherwise misrepresented to the public test results showing the presence of asbestos and asbestiform fibers in its talcum products, including Johnson's Baby Powder. For example, in or around October 1972, Dr. Nashed stated to Dr. Goudie that he "thought tremolite was mistakenly identified in view of similarity to Na [sodium] sesquicitrate!" Dr. Goudie replied, "There are trace quantities present confirmed both by McCrone & Bill Ashton. Levels are extremely low but occasionally can be detected optically. *This is not new*." In or around June 1973, the University of Minnesota lab reported to J&J that its Shower to Shower talc powder contained "1/100th of 1 percent asbestos," as shown by electron microscopy, both in the material from J&J and from Dr. Lewin's sample. Shortly thereafter, J&J and the McCrone lab authored their own report in which they misquoted the University of Minnesota lab's report by using misleading ellipses that concealed the asbestos findings. In its November 1974 letter to a concerned consumer in California, J&J (i) falsely claimed that it used only the "purest talc available," (ii) described contrary articles as "sensational and scary," and (iii) claimed to be "highly ethical and responsible" because its products were safe.

## VII.

**The Exposures:** Mr. Valadez was born on September 23, 1998. He was exposed to asbestos, asbestiform fibers, and asbestiform talc through his and his family's use of Johnson & Johnson talc powder products. Mr. Valadez used and purchased Defendants' talc powder products in California and elsewhere. Mr. Valadez was exposed to Defendants' asbestos, asbestiform fibers, and asbestiform talc in California because Defendants (i) marketed and sold their talc products in California, and (ii) engaged in asbestos-related conduct that occurred in California.

## VIII.

**Venue:** Venue is proper in Alameda County because it is the headquarters and principal place of business of Defendant SAFEWAY INC.

## IX.

**The Harm:** Mr. Valadez has malignant mesothelioma caused by his exposures to asbestos, asbestiform fibers, and asbestiform talc. The mesothelioma has caused, and will cause,

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  Mr. Valadez to experience physical pain, mental suffering, loss of enjoyment of life,

2  disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress,

3  and other similar harm. And the mesothelioma will continue to inflict these harms on Mr. Valadez

4  in the future, ceasing only when it causes his untimely death.

5      Plaintiff incorporates by reference all of the above-mentioned allegations to each of the

6  liability theories set forth below and reserve the right to conform this Complaint to proof later

7  ascertained.

8  ### FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY

9  ### I.

10     **Design Defect:** All Defendants, and the 1st through 100th Doe Defendants, have for many

11  years, manufactured, sold, distributed, designed, formulated, developed standards for, prepared,

12  processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled,

13  and/or otherwise placed into the stream of commerce, products containing asbestos, asbestiform

14  fibers, and/or asbestiform talc. First, these Defendants' products were defective and unsafe for

15  their intended purpose and foreseeable use in that when used, handled, mixed, or otherwise

16  disturbed, said products would result in the release, and therefore inhalation, of hazardous and

17  dangerous asbestos fibers, asbestiform fibers, and/or asbestiform talc by exposed persons,

18  including Mr. Valadez. Second, each product did not perform as safely as an ordinary consumer

19  would have expected it to perform when used or misused in an intended or reasonably foreseeable

20  way, because each product caused hazardous asbestos, asbestiform fibers, and/or asbestiform talc

21  to become airborne. Third, Mr. Valadez developed mesothelioma. Fourth, each product's failure to

22  perform safely was a substantial factor in causing Mr. Valadez's mesothelioma.

23  ### II.

24     **Failure-to-Warn Defect:** All Defendants, and the 1st through 100th Doe Defendants, are

25  strictly liable for their products' failure-to-warn defects. First, these Defendants and/or their

26  predecessors have for many years, manufactured, sold, distributed, designed, formulated,

27  developed standards for, prepared, processed, assembled, tested, listed, certified, marketed,

28  advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce,

3156712.3

**11**

Complaint for Personal Injuries

products containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, each product

had potential risks that were known or knowable in light of the scientific and medical knowledge

that was generally accepted in the scientific community at the time of design, manufacture, label,

distribution, and sale. Third, the potential risks presented a substantial danger when each product

was used or misused in an intended or reasonably foreseeable way, because each product caused

hazardous asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Fourth,

ordinary consumers would not have recognized the potential risks. Fifth, these Defendants failed

to adequately warn or instruct of the potential risks. Sixth, Mr. Valadez developed mesothelioma.

Seventh, the lack of sufficient warnings or instructions was a substantial factor in causing

Mr. Valadez's mesothelioma.

## SECOND CAUSE OF ACTION FOR NEGLIGENCE

### I.

**General Negligence:** All Defendants, and the 1st through 100th Doe Defendants, are

liable for their general negligence. First, Defendants failed to use reasonable care to prevent harm

to others, because they caused hazardous asbestos, asbestiform fibers, and/or asbestiform talc to

become airborne. Second, Defendants unreasonably acted and failed to act. They acted in ways

that a reasonably careful person would not do in the same situation, and failed to act in ways that a

reasonably careful person would do in the same situation. Third, Mr. Valadez developed

mesothelioma. Fourth, each Defendant's general negligence was a substantial factor in causing

Mr. Valadez's mesothelioma.

### II.

**Negligent Design, Manufacture, Supply, Testing, Packaging, and Labeling of**

**Products:** All Defendants, and the 1st through 100th Doe Defendants, are liable for their

negligent design, manufacture, marketing, supply, testing, packaging, and labeling of products

containing asbestos, asbestiform fibers, and/or asbestiform talc. First, these Defendants designed,

manufactured, sold, distributed, formulated, developed standards for, prepared, processed,

assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or

otherwise placed into the stream of commerce, products containing asbestos, asbestiform fibers,

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  and/or asbestiform talc. Second, these Defendants were negligent in manufacturing, selling,

2  distributing, developing standards for, processing, assembling, testing, certifying, marketing,

3  advertising, packaging and/or labeling, and/or otherwise placing into the stream of commerce,

4  products containing asbestos, asbestiform fibers, and/or asbestiform talc because they caused

5  hazardous asbestos, asbestiform fibers, and asbestiform talc to become airborne. They failed to use

6  the amount of care that a reasonably careful person would use in similar circumstances to avoid

7  exposing others to a foreseeable risk of harm. Third, Mr. Valadez developed mesothelioma.

8  Fourth, each Defendant's negligence was a substantial factor in causing Mr. Valadez's

9  mesothelioma.

### III.

11  **Negligent Failure to Warn about Products:** All Defendants, and the 1st through 100th

12  Doe Defendants, are liable for their negligent failure to warn about their products. First, these

13  Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold products

14  containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, these Defendants knew or

15  reasonably should have known that each product was dangerous or was likely to be dangerous

16  when used or misused in a reasonably foreseeable manner, because each product caused hazardous

17  asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Third, these Defendants

18  knew or reasonably should have known that users would not realize the danger. Fourth, these

19  Defendants failed to adequately warn of the danger or instruct on the safe use of each product.

20  Fifth, a reasonably careful person under the same or similar circumstances would have warned of

21  the danger or instructed on the safe use of each product. Sixth, Mr. Valadez developed

22  mesothelioma. Seventh, each Defendant's negligent failure to warn or instruct was a substantial

23  factor in causing Mr. Valadez's mesothelioma.

### IV.

25  **Negligent Failure to Recall and Retrofit Products:** All Defendants, and the 1st through

26  100th Doe Defendants, are liable for their negligent failure to recall and retrofit their products.

27  First, these Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold

28  products containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, these

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  Defendants knew or reasonably should have known that each product was dangerous or was likely

2  to be dangerous when used in a reasonably foreseeable manner, because each product caused

3  hazardous asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Third, these

4  Defendants became aware of this defect after each product was sold. Fourth, these Defendants

5  failed to recall and retrofit each product. Fifth, a reasonably careful person under the same or

6  similar circumstances would have recalled and retrofitted each product. Sixth, Mr. Valadez

7  developed mesothelioma. Seventh, each Defendant's negligent failure to recall and retrofit each

8  product was a substantial factor in causing Mr. Valadez's mesothelioma.

9  ### THIRD CAUSE OF ACTION FOR FRAUD

10  ### I.

11  All Defendants, and the 1st through 100th Doe Defendants, are liable for fraud, including

12  fraudulent misrepresentation, fraudulent concealment, conspiracy to commit fraudulent

13  misrepresentation, and conspiracy to commit fraudulent concealment, as set forth herein.

14  ### II.

15  **Fraudulent Misrepresentation:** Defendants are liable for their fraudulent

16  misrepresentations.

17  First, each Defendant, via its employees, agents, advertisements, or any other authorized

18  person or document, represented that certain facts were true when they were not. The specific

19  identities of these employees, agents, advertisements, or any other authorized person or document

20  are maintained in Defendants' records. Such records remain in the exclusive control of Defendants

21  pursuant to their respective document-retention policies. While he does not currently know the

22  specific advertisements or names of the employees, agents, or any other authorized person who

23  made the representations, Plaintiff will have access to this information once discovery has

24  commenced and will be able to specifically name the advertisement as well as the employee,

25  agent, or any other authorized person.

26  Second, Defendants represented that the products they manufactured, supplied, or specified

27  for use were not hazardous to humans. These representations were made before and during the

28  years that Mr. Valadez and his family purchased and were exposed to asbestos from Defendants'

3156712.3

14

Complaint for Personal Injuries

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1 talc powder products. Such representations were made either directly to Mr. Valadez and his

2 family, or to a third party intending and reasonably expecting that the substance of those

3 representations would be repeated to Mr. Valadez and his family.

4      Third, Defendants knew that the representations were false when they made them, or they

5 made the representations recklessly and without regard for their truth.

6      Fourth, Defendants intended that Mr. Valadez and his family, and/or the same class of

7 persons as Mr. Valadez and his family, rely on the representations or their substance.

8      Fifth, Mr. Valadez and his family reasonably relied on Defendants' representations or the

9 substance of these representations.

10      Sixth, Mr. Valadez developed mesothelioma.

11      Seventh, Mr. Valadez and his family's reliance on those representations was a substantial

12 factor in causing Mr. Valadez's mesothelioma.

**III.**

14      **Fraudulent Concealment (Nondisclosure):** Defendants are liable for their fraudulent

15 concealment (nondisclosure).

16      First, each of the Defendants made affirmative statements that were so misleading (e.g.,

17 misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

18 specific relationship or transaction as between Defendants and Mr. Valadez. Specifically,

19 Defendants stated that their products could be used safely while concealing they were in fact lethal

20 because they contain and release asbestos fibers, asbestiform fibers, and asbestiform talc.

21      Second, Defendants (i) had exclusive knowledge of material facts not known to

22 Mr. Valadez (as set forth above), (ii) actively concealed these material facts from Mr. Valadez,

23 (iii) made partial representations but also suppressed material facts, as set forth above, and

24 (iv) made factual representations, but did not disclose facts which materially qualified those

25 representations. Such nondisclosures included Defendants representing their products as safe when

26 used as intended and as fit for the particular purpose for which they were marketed, while not

27 disclosing the facts that these products contained asbestos, asbestiform fibers, and asbestiform talc

28 that would become airborne during the intended and foreseeable use of the products, rendering

Case 22-30085-MBK Doc 369-3 Filed 04/02/23 Entered 04/02/23 08:56:28 Desc
Exhibit Exhibits 12-14 to Satterley Declaration Page 109 of 214

1  them dangerous and unfit for their intended purpose.

2      Third, each Defendant entered into a relationship and/or a transaction with Mr. Valadez

3  sufficient to give rise to a duty to disclose. For example, Mr. Valadez used or otherwise

4  encountered Defendants' products that were purchased either directly from Defendants and

5  Defendants' authorized dealer or supplier, or any other entity upon which Defendants derived a

6  direct monetary benefit directly from Mr. Valadez's purchase and use of the products. As for

7  another example, Defendants directly advertised their products to those in California and

8  elsewhere, as a symbol of freshness, cleanliness, and purity. Defendants advertised and marketed

9  this product as the "purest protection," the beacon of "freshness" and "comfort," eliminating

10  friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable,

11  and "clinically proven gentle and mild." Defendants compelled men and women through

12  advertisements to dust themselves with this product for a wide variety of reasons, including the

13  elimination of odors. Defendants knew that users would use the talcum powder as a dry shampoo

14  and it would release substantial asbestiform minerals into user's breathing zone. Defendants

15  derived direct monetary benefit from these individuals' use of these products because Mr. Valadez

16  decided to use or purchase Defendants' products.

17      Fourth, Mr. Valadez did not know of the concealed facts.

18      Fifth, Defendants intended to deceive Mr. Valadez by concealing the facts, and/or by

19  making certain representations without disclosing additional facts that would have materially

20  qualified those representations.

21      Sixth, had the omitted information been disclosed, Mr. Valadez reasonably would have

22  behaved differently.

23      Seventh, Mr. Valadez developed mesothelioma.

24      Eighth, each Defendant's concealment was a substantial factor in causing Mr. Valadez's

25  mesothelioma.

26  **IV.**

27      **Conspiracy to Commit Fraudulent Misrepresentation:** Plaintiff hereby incorporates by

28  reference the allegations above in this Third Cause of Action as if fully stated herein.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Defendants are liable for their conspiracy to commit fraudulent misrepresentation. First,

2    Defendants were aware that their conspirators, which included all co-defendants and others,

3    planned to commit fraudulent misrepresentation against Mr. Valadez and his family, and/or the

4    same class of persons as Mr. Valadez and his family. Second, Defendants agreed with their

5    conspirators and intended that the fraudulent misrepresentation be committed. Third, Mr. Valadez

6    developed mesothelioma. Fourth, each Defendant's participation in the conspiracy was a

7    substantial factor in causing Mr. Valadez's mesothelioma.

8                                              **V.**

9        **Conspiracy to Commit Fraudulent Concealment (Nondisclosure):** Plaintiff hereby

10   incorporates by reference the allegations above in this Third Cause of Action as if fully stated

11   herein. Defendants are liable for their conspiracy to commit fraudulent concealment. First,

12   Defendants were aware that their conspirators, which included all co-defendants and others,

13   planned to commit fraudulent concealment against Mr. Valadez and his family, and/or the same

14   class of persons as Mr. Valadez and his family. Second, Defendants agreed with their conspirators

15   and intended that the fraudulent concealment be committed. Third, Mr. Valadez developed

16   mesothelioma. Fourth, each Defendant's participation in the conspiracy was a substantial factor in

17   causing Mr. Valadez's mesothelioma.

18                                             **VI.**

19       **Knowledge of Hazards:** At all times pertinent hereto, Defendants, including 1st through

20   100th Doe Defendants, owed Mr. Valadez a duty, as provided for in Civil Code sections 1708,

21   1709, and 1710, to abstain from injuring his person, property, or rights. In violation of that duty,

22   Defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as

23   set forth herein, thereby proximately causing injury to Mr. Valadez. Such acts and omissions

24   consisted of acts falling within Civil Code section 1710, and more specifically were

25   (i) suggestions of fact which were not true and which the Defendants did not believe to be true,

26   (ii) assertions of fact of that which was not true, which the Defendants had no reasonable ground

27   for believing it to be true, and (iii) the suppression of facts when a duty existed to disclose it, as

28   more fully set forth herein, and the violation of which as to any one such item gave rise to a cause

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    of action for violation of Mr. Valadez's rights as provided for in the aforementioned code sections.

2    Defendants have known and possessed of the true facts (consisting of medical and

3    scientific data, and other knowledge) which clearly indicated that the materials and products

4    referred to herein were and are hazardous to the health and safety of Mr. Valadez, and others

5    similarly situated. In addition to the allegations set forth in this Third Cause of Action, Defendants

6    engaged in the following acts and omissions:

7    1.    Did not label any of the aforementioned asbestos-containing materials and products as to the hazards of such materials and products to the health and safety of Mr. Valadez, and others in their position using these products when the knowledge of such hazards was existing and known to Defendants, and each of them, since 1924. By not labeling such materials as to their said hazards, Defendants, and each of them, caused to be suggested as a fact to Mr. Valadez that it was safe for his to use such materials, when in fact these things were not true and Defendants did not believe them to be true.

12    2.    Suppressed information relating to the danger of using the aforementioned materials by requesting the suppression of information to Mr. Valadez and the general public concerning the dangerous nature of the aforementioned materials to all persons, including users, bystanders and household members, by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof when Defendants were bound to disclose such information.

16    3.    Sold the aforementioned products and materials to the public, including Mr. Valadez, and others in California and other states without advising them of the dangers of use of such materials and to those persons' household members, when Defendants knew of such dangers, as set forth herein and above, and had a duty to disclose such dangers. Thus, Defendants caused to be positively asserted to Mr. Valadez, and the public that which was not true and which Defendants had no reasonable ground for believing it to be true, in a manner not warranted by the information possessed by said Defendants, and each of them, of that which was and is not true, to wit, that it was safe for Mr. Valadez to use such materials and that it did not pose a risk of harm.

22    4.    Suppressed and continue to suppress from everyone, including Mr. Valadez, medical, scientific data, and knowledge of the accurate results of studies including, but not limited to, Waldemar C. Dreesen of the United States Public Health Service's 1933 report to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National

3156712.3

18

Complaint for Personal Injuries

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

5. Belonged to, participated in, and financially supported the Industrial Hygiene Foundation, Asbestos Information Association, the Asbestos Textile Institute (ATI), and other industry organizations, including the Cosmetic, Toiletry, and Fragrance Association (now known as the Personal Care Products Council), which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of Defendants, and each of them, thereby misleading Mr. Valadez to their prejudice through the suggestions and deceptions set forth above in this cause of action. ATI's Dust Control Committee, which changed its name to the Air Hygiene Committee of ATI, was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (i) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to Mr. Valadez at this time.

6. Knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina. This information was disseminated through the ATI and other industry organizations to all other Defendants, and each of them, herein. Between 1942 and 1950, Defendants, and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the ATI and other industry organizations to all other Defendants herein. Thereby, Defendants suggested as fact that which is not true and disseminated other facts likely to and did mislead Mr. Valadez for want of communication of true facts, which consisted of the previously described medical and scientific data and other knowledge by not giving Mr. Valadez the true facts concerning such knowledge of danger, when Defendants were bound to disclose it.

7. Failed to warn Mr. Valadez and others similarly situated regarding the nature of Defendants' talcum products. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).] Defendants

19

Complaint for Personal Injuries

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

failed to warn Mr. Valadez and others similarly situated that their talcum products are, among other things, dangerous when breathed and causes pathological effects without noticeable trauma, although Defendants possessed knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and under a duty to disclose it.

8. Concealed from Mr. Valadez, and others similarly situated the true nature of their exposure, the fact that Defendants knew that exposure to respirable asbestos meant that Mr. Valadez would inhale this asbestos, significantly increasing his risk of developing asbestosis, lung cancer, and mesothelioma; that Mr. Valadez that had in fact been exposed to respirable asbestos; that the materials to which Mr. Valadez was exposed would cause pathological effects in the human body without noticeable or perceptible trauma to warn him of injury; and Defendants engaged in these acts and omissions while under a duty to and bound to disclose this information.

9. Failed to provide information to the public at large and buyers, users and physicians of Mr. Valadez for the purpose of conducting physical examinations of anyone whom came in contact with asbestos as to the true nature of the hazards of asbestos, in order for such physicians to diagnose, and treat individuals coming into contact with asbestos, in that the materials to which Mr. Valadez had been exposed would cause pathological effects without noticeable trauma, even though Defendants were under a duty to supply such information and such failure was and is likely to mislead persons including Mr. Valadez as to the dangers and risk of harm to which they were exposed.

10. Affirmatively misrepresented that asbestos-containing products were safe to use and handle, when Defendants knew such statements were false when made, or made said false statements recklessly and without regard for whether the statements were true.

Each of the foregoing acts, suggestions, assertions, and forbearances to act when a duty existed to act, the said Defendants, and each of them, having such knowledge, knowing Mr. Valadez did not have such knowledge and would breathe such material innocently, was done falsely and fraudulently and with full intent to induce Mr. Valadez to be present in a dangerous environment and to cause him to remain unaware of the true facts, all in violation of Civil Code section 1710.

## BASIS FOR PUNITIVE DAMAGES

**Malice, Oppression, or Fraud:** Mr. Valadez hereby incorporates by reference the allegations of all causes of action as if fully stated herein. Defendants, including 1st through 100th Doe Defendants, are liable for punitive damages because they engaged in the conduct that caused Mr. Valadez's harm with malice, oppression, or fraud.

First, Defendants committed malice in that they acted with intent to harm when they caused Mr. Valadez's exposures to asbestos, asbestiform fibers, and/or asbestiform talc, and because their conduct was despicable and was done with a willful and knowing disregard of the rights and safety of others.

Second, Defendants committed oppression in that their conduct was despicable and subjected Mr. Valadez to cruel and unjust hardship in knowing disregard of his rights.

Third, Defendants committed fraud in that they intentionally and fraudulently concealed and misrepresented material facts and did so intending to harm Mr. Valadez and with reckless disregard for whether their fraud would harm Mr. Valadez.

The conduct of Defendants constituting malice, oppression, or fraud was committed, authorized, and adopted by one or more officers, directors, and managing agents within the corporate hierarchy of each Defendant, who acted on behalf of each Defendant.

## **PRAYER FOR DAMAGES**

Plaintiff prays for judgment for:

1.      All economic and non-economic compensatory damages in excess of $25,000;

2.      Punitive damages according to proof;

3.      Pre- and post-judgment interest;

4.      Costs of suit; and

5.      Such other relief as is fair, just, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: June 15, 2022

KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation

By: _____

Joseph D. Satterley

Attorneys for Plaintiff

Complaint for Personal Injuries

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit 3

67942964
Aug 17 2022
06:49PM
E-SERVICE
File & ServeXpress

1   ALEXANDER G. CALFO (SBN 152891)
    *acalfo@kslaw.com*
2   JULIA E. ROMANO (SBN 260857)
    *jromano@kslaw.com*
3   BRYAN L. KING (SBN 281192)
    *bking@kslaw.com*
4   **KING & SPALDING LLP**
    633 West 5th Street, Suite 1600
5   Los Angeles, CA 90071
    Telephone:   +1 213 443 4355
6   Facsimile:    +1 213 443 4310

7   Attorneys for Defendant
    JOHNSON & JOHNSON

8

9         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10               **COUNTY OF ALAMEDA**

11   ANTHONY HERNANDEZ VALADEZ,        Case No. 22CV012759

12                Plaintiff,         **NOTICE OF APPEARANCE**

13       v.                    Complaint Filed:     June 15, 2022

14   JOHNSON & JOHNSON; ALBERTSONS
    COMPANIES, INC., individually. and as
15   successor-in-interest, parent, alter ego and
    equitable trustee LUCKY STORES, INC.;
16   LUCKY STORES, INC.; SAFEWAY INC.;
    SAVE MART SUPERMARKETS, individually,
17   and as successor-in-interest, parent, alter ego
    and equitable trustee of LUCKY STORES, INC.;
18   TARGET CORPORATION; WALMART INC.;
    and FIRST DOE through ONE-HUNDREDTH
19   DOE,

20               Defendants.

21

22

23

24

25

26

27

28

NOTICE OF APPEARANCE        **EXHIBIT 3**

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Alexander G. Calfo, Julia E. Romano, and Bryan L. King of KING & SPALDING LLP hereby enter an appearance as counsel of record for defendant JOHNSON & JOHNSON in the above-captioned matter (hereinafter referred to as "J&J Counsel").

It is respectfully requested that J&J Counsel be added to the service list of this action, and that all pleadings, papers, notices and other documents pertaining to this matter be served on J&J Counsel either via File&ServeXpress or at the following mail and/or email address:

> Julia E. Romano
> KING & SPALDING LLP
> 633 West 5th Street, Suite 1600
> Los Angeles, CA 90071
> Tel: (213) 443-4355
> Fax: (213) 443-4310
> Email: jromano@kslaw.com

Dated: August 17, 2022

KING & SPALDING LLP

By: _____
Alexander G. Calfo
Julia E. Romano
Bryan L. King
Attorneys for Defendant
JOHNSON & JOHNSON

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071

## PROOF OF SERVICE

*Anthony Hernandez Valadez v. Johnson & Johnson, et al.,*
Alameda County Superior Court Case No. 22CV012759

I, the undersigned, declare:  I am a citizen of the United States, over 18 years of age and not a party to the within action.  I am employed in the County of Los Angeles, State of California; my business address is 633 W. 5th Street, Suite 1600, Los Angeles, CA 90071.

On the date specified below, I served a copy of the foregoing document described as:

### NOTICE OF APPEARANCE

on the interested parties in this action as follows:

**[X]      BY ELECTRONIC SERVICE VIA FILE & SERVEXPRESS:** File & ServeXpress for service on all counsel of record by electronic service pursuant to the Order Authorizing Electronic Service and pursuant to California Code of Civil Procedure § 1010.6 and California Rules of Court 2.251.  The transmission was reported as complete without error.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 17, 2022 in Los Angeles, California.


_____
Brigette S. Price

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071

3

# Exhibit 4

E-SERVICE
67964500
Aug 23 2022
03:32PM
File & ServeXpress

1   SANDRA M. KO (SBN 260863)
     SKO@btlaw.com
2   NOUSHAN NOUREDDINI (SBN 278512)
     NNoureddini@btlaw.com
3   **BARNES & THORNBURG LLP**
    2029 Century Park East, Suite 300
4   Los Angeles, California  90067
    Telephone:   (310) 284-3880
5   Facsimile:   (310) 284-3894

6   Attorneys for Defendants
    ALBERTSONS COMPANIES, INC. (erroneously sued as
7   ALBERTSONS COMPANIES, INC., individually, and as
    successor-in-interest, parent, alter ego, and equitable trustee of
8   LUCKY STORES, INC.); LUCKY STORES (SAVE MART)
    LLC f/k/a LUCKY STORES, INC. (erroneously sued as LUCKY
9   STORES, INC.); SAFEWAY INC.; SAVE MART
    SUPERMARKETS LLC (erroneously sued as SAVE MART
10  SUPERMARKETS, individually, and as successor-in-interest,
    parent, alter ego, and equitable trustee of LUCKY STORES,
11  INC.)

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF ALAMEDA

14

15  ANTHONY HERNANDEZ VALADEZ,          Case No.  22CV012759 / JCCP 4872

16              Plaintiff,               Assigned for all Purposes to
                                         the Honorable Jo Lynn Lee**,** Dept. 18
17       v.

18  JOHNSON & JOHNSON; ALBERTSONS        **NOTICE OF APPEARANCE**
    COMPANIES, INC., individually and as
19  successor-in-interest, parent, alter ego, and
    equitable trustee of LUCKY STORES, INC.;
20  LUCKY STORES, INC.; SAFEWAY INC.;    Complaint Filed:  June 15, 2022
    SAVE MART SUPERMARKETS,
21  individually, and as successor-in-interest,
    parent, alter ego and equitable trustee of
22  LUCKY STORES, INC.; TARGET
    CORPORATION; WALMART INC.; and
23  FIRST DOE through ONE-HUNDREDTH
    DOE,
24
                Defendants.
25

26

27

28

**EXHIBIT 4**

TO THE HONORABLE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Sandra M. Ko and Noushan Noureddini of BARNES & THORNBURG LLP hereby enter an appearance as counsel of record for defendants ALBERTSONS COMPANIES, INC. (erroneously sued as ALBERTSONS COMPANIES, INC., individually, and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY STORES, INC.); LUCKY STORES (SAVE MART) LLC f/k/a LUCKY STORES, INC. (erroneously sued as LUCKY STORES, INC.); SAFEWAY INC.; and SAVE MART SUPERMARKETS LLC (erroneously sued as SAVE MART SUPERMARKETS, individually, and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY STORES, INC.) in the above-captioned matter.

The undersigned counsel respectfully request to be added to the service list of this action, and request that all pleadings, papers, notices and other documents pertaining to this matter be served on the undersigned counsel either via File&ServeXpress or at the following mail and/or email address:

> Sandra M. Ko
> BARNES & THORNBURG LLP
> 2029 Century Park East, Suite 300
> Los Angeles, California 90067
> Telephone: (310) 284-3880
> Facsimile: (310) 284-3894
> Email: sko@btlaw.com

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

Dated:  August 23, 2022                    **BARNES & THORNBURG LLP**

By: _____

Sandra M. Ko
Noushan Noureddini
Attorneys for Defendants
ALBERTSONS COMPANIES, INC.
(erroneously sued as ALBERTSONS
COMPANIES, INC., individually, and as
successor-in-interest, parent, alter ego, and
equitable trustee of LUCKY STORES, INC.);
LUCKY STORES (SAVE MART) LLC f/k/a
LUCKY STORES, INC. (erroneously sued as
LUCKY STORES, INC.); SAFEWAY INC.;
SAVE MART SUPERMARKETS LLC
(erroneously sued as SAVE MART
SUPERMARKETS, individually, and as
successor-in-interest, parent, alter ego, and
equitable trustee of LUCKY STORES, INC.)

## **PROOF OF SERVICE**

I, Jennifer Fukai, declare, I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2029 Century Park East, Suite 300, Los Angeles, California 90067-2904.

On August 23, 2022, I served a true copy of **NOTICE OF APPEARANCE** on the interested parties in this action by:

☒ BY ELECTRONIC SERVICE. I provided the document(s) listed above electronically to the File & ServeXpress Website for service on all counsel of record by electronic service pursuant to the Order Authorizing Electronic Service to the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 23, 2022, at Los Angeles, California.

_____
Jennifer Fukai

# Exhibit 5

67969360
Aug 24 2022
04:23PM
E-SERVICE
File & ServeXpress

1   SANDRA M. KO (SBN 260863)
      SKO@btlaw.com
2   NOUSHAN NOUREDDINI (SBN 278512)
      NNoureddini@btlaw.com
3   **BARNES & THORNBURG LLP**
    2029 Century Park East, Suite 300
4   Los Angeles, California  90067
    Telephone:   (310) 284-3880
5   Facsimile:   (310) 284-3894

6   Attorneys for Defendants
    ALBERTSONS COMPANIES, INC. (erroneously sued as
7   ALBERTSONS COMPANIES, INC., individually, and as
    successor-in-interest, parent, alter ego, and equitable trustee of
8   LUCKY STORES, INC.); LUCKY STORES (SAVE MART)
    LLC f/k/a LUCKY STORES, INC. (erroneously sued as LUCKY
9   STORES, INC.); SAFEWAY INC.; SAVE MART
    SUPERMARKETS LLC (erroneously sued as SAVE MART
10  SUPERMARKETS, individually, and as successor-in-interest,
    parent, alter ego, and equitable trustee of LUCKY STORES,
11  INC.); and TARGET CORPORATION

12          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                   **COUNTY OF ALAMEDA**

14

15  ANTHONY HERNANDEZ VALADEZ,          | Case No.  22CV012759

16          Plaintiff,                           Assigned for all Purposes to
                                                 the Honorable Jo-Lynne Lee, Dept. 18
17          v.

18  JOHNSON & JOHNSON; ALBERTSONS       **NOTICE OF APPEARANCE**
    COMPANIES, INC., individually, and as
19  successor-in-interest, parent, alter ego, and
    equitable trustee of LUCKY STORES, INC.;
20  LUCKY STORES, INC.; SAFEWAY INC.;   Complaint Filed:  June 15, 2022
    SAVE MART SUPERMARKETS,
21  individually, and as successor-in-interest,
    parent, alter ego and equitable trustee of
22  LUCKY STORES, INC.; TARGET
    CORPORATION; WALMART INC.; and
23  FIRST DOE through ONE-HUNDREDTH
    DOE,
24
            Defendants.
25

26

27

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1    **TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

2    PLEASE TAKE NOTICE that Sandra M. Ko and Noushan Noureddini of BARNES &

3    THORNBURG LLP hereby enter an appearance as counsel of record for Defendant TARGET

4    CORPORATION in the above-captioned matter.

5    The undersigned counsel respectfully request to be added to the service list of this action,

6    and request that all pleadings, papers, notices and other documents pertaining to this matter be

7    served on the undersigned counsel either via File&ServeXpress or at the following mail and/or

8    email address:

9    
10   Sandra M. Ko
     BARNES & THORNBURG LLP
     2029 Century Park East, Suite 300
11   Los Angeles, California  90067
     Telephone:      (310) 284-3880
     Facsimile:      (310) 284-3894
12   Email:          sko@btlaw.com

13   

14   Dated:  August 24, 2022                    **BARNES & THORNBURG LLP**

15   

16   By:  _____
     Sandra M. Ko

17   Noushan Noureddini
     Attorneys for Defendants

18   ALBERTSONS COMPANIES, INC.
     (erroneously sued as ALBERTSONS

19   COMPANIES, INC., individually, and as
     successor-in-interest, parent, alter ego, and

20   equitable trustee of LUCKY STORES, INC.);
     LUCKY STORES (SAVE MART) LLC f/k/a

21   LUCKY STORES, INC. (erroneously sued as
     LUCKY STORES, INC.); SAFEWAY INC.;

22   SAVE MART SUPERMARKETS LLC
     (erroneously sued as SAVE MART

23   SUPERMARKETS, individually, and as
     successor-in-interest, parent, alter ego, and

24   equitable trustee of LUCKY STORES, INC.);
     and TARGET CORPORATION

25   

26   

27   

28

## PROOF OF SERVICE

*Anthony Hernandez Valadez v. Johnson & Johnson, et al.*
Alameda County Superior Court Case No. 22CV012759

I, Sarita Govin-Gonzales, declare, I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2029 Century Park East, Suite 300, Los Angeles, California 90067-2904.

On August 24, 2022, I served a true copy of **NOTICE OF APPEARANCE** on the interested parties in this action by:

☒    BY ELECTRONIC SERVICE. I provided the document(s) listed above electronically to the File & ServeXpress Website for service on all counsel of record by electronic service pursuant to the Order Authorizing Electronic Service to the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 24, 2022, at Los Angeles, California.

_____
Sarita Govin-Gonzales

# Exhibit 6

E-SERVICE
68065861
Sep 08 2022
12:54PM
File & ServeXpress

1  SANDRA M. KO (SBN 260863)
    SKO@btlaw.com
2  NOUSHAN NOUREDDINI (SBN 278512)
    NNoureddini@btlaw.com
3  **BARNES & THORNBURG LLP**
   2029 Century Park East, Suite 300
4  Los Angeles, California 90067
   Telephone:   (310) 284-3880
5  Facsimile:   (310) 284-3894

6  Attorneys for Defendants
   ALBERTSONS COMPANIES, INC. (erroneously sued as
7  ALBERTSONS COMPANIES, INC., individually, and as
   successor-in-interest, parent, alter ego, and equitable trustee of
8  LUCKY STORES, INC.); LUCKY STORES (SAVE MART)
   LLC f/k/a LUCKY STORES, INC. (erroneously sued as LUCKY
9  STORES, INC.); SAFEWAY INC.; SAVE MART
   SUPERMARKETS LLC (erroneously sued as SAVE MART
10 SUPERMARKETS, individually, and as successor-in-interest,
   parent, alter ego, and equitable trustee of LUCKY STORES,
11 INC.); TARGET CORPORATION; and WALMART INC.

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF ALAMEDA

14

15 ANTHONY HERNANDEZ VALADEZ,              Case No.  22CV012759 / JCCP 4872

16              Plaintiff,                 Assigned for all Purposes to
                                           the Honorable Jo Lynn Lee, Dept. 18
17      v.

18 JOHNSON & JOHNSON; ALBERTSONS          **NOTICE OF APPEARANCE**
   COMPANIES, INC., individually and as
19 successor-in-interest, parent, alter ego, and
   equitable trustee of LUCKY STORES, INC.;
20 LUCKY STORES, INC.; SAFEWAY INC.;       Complaint Filed:  June 15, 2022
   SAVE MART SUPERMARKETS,
21 individually, and as successor-in-interest,
   parent, alter ego and equitable trustee of
22 LUCKY STORES, INC.; TARGET
   CORPORATION; WALMART INC.; and
23 FIRST DOE through ONE-HUNDREDTH
   DOE,
24
                Defendants.
25

26

27

28

**TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Sandra M. Ko and Noushan Noureddini of BARNES & THORNBURG LLP hereby enter an appearance as counsel of record for Defendant WALMART INC. in the above-captioned matter.

The undersigned counsel respectfully request to be added to the service list of this action, and request that all pleadings, papers, notices and other documents pertaining to this matter be served on the undersigned counsel either via File&ServeXpress or at the following mail and/or email address:

Sandra M. Ko
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone:      (310) 284-3880
Facsimile:      (310) 284-3894
Email:          sko@btlaw.com

Dated: September 8, 2022          **BARNES & THORNBURG LLP**

By: _____
Sandra M. Ko
Noushan Noureddini
Attorneys for Defendants
ALBERTSONS COMPANIES, INC.
(erroneously sued as ALBERTSONS
COMPANIES, INC., individually, and as
successor-in-interest, parent, alter ego, and
equitable trustee of LUCKY STORES, INC.);
LUCKY STORES (SAVE MART) LLC f/k/a
LUCKY STORES, INC. (erroneously sued as
LUCKY STORES, INC.); SAFEWAY INC.;
SAVE MART SUPERMARKETS LLC
(erroneously sued as SAVE MART
SUPERMARKETS, individually, and as
successor-in-interest, parent, alter ego, and
equitable trustee of LUCKY STORES, INC.);
TARGET CORPORATION; and WALMART
INC.

## PROOF OF SERVICE

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2029 Century Park East, Suite 300, Los Angeles, California 90067-2904.

On September 8, 2022, I served a true copy of **NOTICE OF APPEARANCE** on the interested parties in this action by:

☒ BY ELECTRONIC SERVICE. I provided the document(s) listed above electronically to the File & ServeXpress Website for service on all counsel of record by electronic service pursuant to the Order Authorizing Electronic Service to the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 8, 2022, at Los Angeles, California.

_____
Monica Hampton

# Exhibit 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                        .    Case No. 21-30589(MBK)
                              .
LTL MANAGEMENT LLC,           .
                              .
        Debtor.               .
. . . . . . . . . . . . . .   .
LTL MANAGEMENT, LLC,          .    Adversary No. 21-3032(MBK)
                              .
        Plaintiff,            .
                              .    Clarkson S. Fisher U.S.
      v.                      .       Courthouse
                              .    402 East State Street
THOSE PARTIES LISTED ON       .    Trenton, NJ 08608
APPENDIX A TO COMPLAINT       .
and JOHN AND JANE DOES        .
1 TO 1000,                    .
                              .
        Defendants.           .    Thursday, July 28, 2022
. . . . . . . . . . . . . .   .    11:00 a.m.


               TRANSCRIPT OF RULINGS
    BEFORE THE HONORABLE MICHAEL B. KAPLAN
      UNITED STATES BANKRUPTCY COURT JUDGE




Audio Operator:           Wendy Quiles



Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

**EXHIBIT 7**

2

1        (Proceedings commenced at 11:01 a.m.)

2            THE COURT:  All right.  Thank you all.

3        This is Judge Kaplan, and this morning, I'll be

4    reading several rulings relative to the hearings that were held

5    on Tuesday in the LTL Management LLC matter.

6            My rulings today probably will engender, as they

7    normally do, questions or concerns.  Rather than have a

8    dialogue today, my intention today is simply to read the

9    rulings into the record.  I will welcome communications to

10   chambers by email and correspondence if there are any

11   clarifications or issues which the parties wish to raise

12   regarding the rulings.  I'll act on those either by entering

13   text orders on the docket or making arrangements for another

14   telephonic hearing if the issues merit it.  Otherwise, I'll

15   start now just going over the rulings.

16           I'm going to start with what I think is most

17   important, the matter of how to or whether to proceed with

18   estimation in this matter.  There is no current motion pending

19   seeking estimation.  The issues have been addressed in response

20   to the Court's queries regarding the value and purpose and

21   method of estimation going forward.

22           So let's start with the TCC's, I guess repeated

23   references to estimation as a road to nowhere.  Now, like most

24   of us, I have in life, both on and off the bench, aggressively

25   proceeded down roads to nowhere.  Usually because I hate asking

 1  and the Court that they hold the veto power and that all the

 2  leverage remains in the fact that the statute requires 75

 3  percent of the claimants to approve the plan.  It's just,

 4  again, an inconsistency.

 5          At the end of the day, the Court remains unconvinced

 6  that advancing -- allowing the cases to proceed to judgment

 7  only, without any enforcement, without the ability to secure

 8  payment, that doing so offers little true relief to those who

 9  are in financial need, and, in fact, probably would be a --

10  would be physically burdensome on certain of the plaintiffs and

11  in doing so there would not be any identifiable benefit to the

12  bankruptcy proceeding.

13          With respect to the two motions for relief from the

14  stay brought by Mr. Satterley for the two specific clients, I

15  am going to grant limited relief to allow discovery, to gather

16  and preserve evidence that will support the claims against J&J

17  in the future.  I think that's reasonable.  I think it makes

18  sense for equitable considerations in that we don't want to

19  lose evidence.  And it does have an identifiable benefit to the

20  bankruptcy in that it will streamline access to funds in the

21  future, whether it be through a channeling injunction or

22  outside the bankruptcy if a plan is not confirmed.

23          I will also allow relief from the stay to enable Mr.

24  Satterley to make any appropriate motion required to get

25  expedited trial dates for his clients or priority in the event

Case 22-30085-MBK   Doc 369-43   Filed 04/10/23   Entered 04/10/23 08:56:28   Desc
Exhibit Exhibits 12-174 to Satterley Declaration   Page 136 of 214

21

1  the Third Circuit does reverse my decision and this case is

2  dismissed.   I am hoping not to slow down the progress of the

3  case Mr. Satterley presented.

4            Finally, on this topic, as to counsel's suggestion

5  that the Court should make the -- any continued extension of

6  the automatic stay contingent on the protected entities placing

7  their dividends in escrow rather than distributing same to

8  equity holders, the Court questioned during the hearing what

9  authority it had to direct third party public companies not to

10  declare dividends or distribute dividends.

11            And although the attorney characterized this as a

12  choice, the suggestion ignores the concept that the automatic

13  stay and the extension to non-debtor entities serves to protect

14  the debtor, not those entities.   Even if the Court were to

15  reframe a decision between dividends and stay protection as a

16  choice, the Court -- and the choice could potentially affect

17  the debtor's estate.

18            The Court provided its rationale for extending the

19  automatic stay in its February opinion and will not repeat

20  those reasons here.   The parties have provided no justification

21  for allowing non-debtor entities to choose to impact the

22  bankruptcy estate, and no argument regarding dividends alters

23  this court's opinion regarding the extension of the automatic

24  stay.   The Court will not modify the preliminary injunction and

25  effectively give non-debtor entities the option of violating

Case 22-30895-MBK  Doc 3843  Filed 04/02/23  Entered 04/02/23 08:56:28  Desc
Exhibit Exhibits 112-174 to Satterley Declaration  Page 137 of 214

24

1  person mediation session, which will follow the estimation

2  process.

3          So those are my rulings for today.  Clarifications or

4  questions can be directed to my chambers and I will act upon

5  them as I see fit.

6          Again, with respect to Mr. Feinberg's potential

7  appointment, the Court's motion is returnable August 11th.  No

8  appearances are required.  No oral argument is expected.

9  Concerns, objections, or issues can be filed by August 9th,

10  close of business, and the Court will review same and act upon

11  them in appropriate fashion, which may include scheduling a

12  hearing if it's warranted.

13          Thank you all.  We're done, in recess.

14

15                  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

25

**C E R T I F I C A T I O N**

1

2          WE, KAREN K. WATSON and LORI KNOLLMEYER, court

3   approved transcribers, certify that the foregoing is a correct

4   transcript from the official electronic sound recording of the

5   proceedings in the above-entitled matter and to the best of our

6   ability.

7

8   /s/ Karen K. Watson

9   KAREN K. WATSON

10

11  /s/ Lori Knollmeyer

12  LORI KNOLLMEYER

13  J&J COURT TRANSCRIBERS, INC.    DATE:  July 28, 2022

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Rene C. Davidson Courthouse, Department 18

## JUDICIAL OFFICER: HONORABLE JO-LYNNE LEE

Courtroom Clerk: Timothy Lopez                                    CSR: None

---

**22CV012759**                                                   August 26, 2022
                                                                  10:00 AM

**VALADEZ**
  **vs**
**JOHNSON & JOHNSON, et al.**

---

### MINUTES

**NATURE OF PROCEEDINGS: Hearing on Motion for Trial Preference**

Counsel on Zoom:

Joe Satterley, Julia Romano, Ian Rivamonte, Noushan Noureddini.

REPORTED BY CSR SHEILA PHAM.

The Motion for Trial Preference filed by ANTHONY HERNANDEZ VALADEZ on 08/04/2022 is Granted.

Plaintiff Anthony Valadez's ("Plaintiff" or "Mr. Valadez") Motion for Trial Setting Preference pursuant to CCP §§ 36(d)-(f) is GRANTED pursuant to CCP § 36(d).

Plaintiff filed his Complaint in this action on 6/15/2022.

Plaintiff is only 23 years old but has malignant pericardial (lining of the heart) mesothelioma, a particularly rare form of mesothelioma. He alleges his claims against Johnson & Johnson and retailers for exposure to J & J baby powder (talc), which his mother apparently used regularly on him and in the home during his childhood.

Asbestos torts claims against Johnson & Johnson (or a successor entity holding Johnson & Johnson's asbestos torts liabilities) and retailers who sold Johnson & Johnson talcum powder products are currently stayed by the New Jersey Bankruptcy Court in the case In re LTL Management LLC, Case No. 21-3032. The New Jersey Bankruptcy Court stay Order is currently on appeal in the Third Circuit Court of Appeals ("Third Circuit").

Plaintiff successfully sought leave from the bankruptcy court to allow Plaintiff "limited relief to allow discovery, to gather and preserve evidence" and also "to make any appropriate motion required to get expedited trial dates ....in the event the Third Circuit does reverse ... and the case is dismissed."

**EXHIBIT 8**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

In support of the trial preference motion, Plaintiff presents the following evidence: Plaintiff's symptoms of persistent cough and pericardial effusion presented in 2020. He was given multiple courses of colchine and prednesone without positive response. On 1/4/2022, he presented with progressive cervical adenopathy (enlarged or swollen lymph nodes), worsening pericardial effusion and small pleural effusions. He underwent a biopsy on 1/10/2022, performed by declaring doctor Leah Backhus, his thoracic surgeon, pathology of which revealed pericardial mesothelioma, epitheliod type. In February, Mr. Valadez underwent bilateral thoracentesis with removal of 1.5 liters from each side of his chest.

Dr. Backhus declares that as of 2/14/2022, Mr. Valadez's "extensive adenopathy ... underscores the advanced stage of his pericardial mesothelioma." Another medical record of this date prepared by Dr. Backhus describes Mr. Valadez's mesothelioma as "overall poor prognosis with advanced local disease." On 2/17/2022, Dr. Backhus performed a partial pericardiectomy on Mr. Valadez and had catheters inserted in his chest. A medical record dated 3/8/2022 describes "diffuse tumor involvement of the pericardium with areas of invasion into the myocardium [heart muscle]." After the surgery, medical records indicate that Mr. Valadez still had "significant mesothelial tumor involvement around his heart and some into the myocardium."

Mr. Valadez's oncologist, Dr. Mohana Roy, provides a declaration reporting that Mr. Valadez began chemotherapy on or around 3/18/2022. According to Dr. Roy, Plaintiff underwent two cycles of chemotherapy as of 4/9/2022, which he did not tolerate well, suffering from mouth sores, linear dermatitis, nausea, lack of appetite, shortness of breath, acute anemia and fatigue. As a result, chemotherapy was discontinued after two cycles in May 2022. A 5/5/2022 CT scan showed that the chemotherapy was not effective: the CT scan showed "increased diffuse nodular interlobal septal thickening" and "new and increasing pulmonary nodules, concerning for progression of disease." As of 5/6/2022, it was decided that Plaintiff would instead undergo immunotherapy.

Dr. Backhus opines that there is substantial doubt that Mr. Valadez will survive more than six months from 5/22/2022, and Dr. Roy opines that there is substantial medical doubt that Mr. Valadez will survive more than six months from 6/2/2022.

Plaintiff's counsel declares that all defendants have been served with process.

Wherefore, the Court GRANTS Plaintiffs' Motion for Trial Setting Preference pursuant to CCP § 36(d)-(f). The jury trial shall commence on Monday, November 7, 2022 at 8:30 a.m. in Dept. 18, but only in the event that the New Jersey Bankruptcy Court stay is lifted as to defendant Johnson & Johnson and the retailer defendants prior to the 11/7/2022 trial date. The Pretrial Conference shall be held on the first day of trial.

Counsel shall meet and confer to discuss stipulations for the extension of statutory deadlines with regard to discovery, motions, expert designations, authorizations, etc. Where necessary, counsel shall obtain further clarification or further leave from the bankruptcy court as to what, if any, additional order is needed in order for parties to adequately prepare this matter for trial by November 7, 2022. These issues will be discussed at the next scheduled Case Management Conference.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

The Court orders counsel to obtain a copy of this order from the eCourt portal.

Designated Defense Counsel shall serve all pending defendants in this action. Plaintiff shall serve endorsed filed copies of this order upon all defendants who have been served but not yet appeared or answered in this action.

By:

T. Lopez, Deputy Clerk

Minutes of: 08/26/2022

Entered on: 08/26/2022

# Exhibit 9

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT, LLC, | . | Adversary No. 21-1231(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | Clarkson S. Fisher U.S. |
| v. | . | Courthouse |
| | . | 402 East State Street |
| STATE OF NEW MEXICO, EX REL. | . | Trenton, NJ 08608 |
| HECTOR H. BALDERAS, ATTORNEY | . | |
| GENERAL, AND STATE OF | . | |
| MISSISSIPPI, EX REL. JIM | . | |
| HOOD, ATTORNEY GENERAL, | . | |
| | . | |
| Defendants. | . | September 14, 2022 |
| . . . . . . . . . . . . . . . | . | 9:58 a.m. |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Jones Day
                           By:  GREGORY M. GORDON, ESQ.
                           2727 North Harwood Street, Suite 500
                           Dallas, TX 75201


For the Official           Brown Rudnik, LLP
Committee of Talc          By:  SUNNI BEVILLE, ESQ.
Claimants 1:               One Financial Center
                           Boston, MA  02111


Audio Operator:            Luz Di Dolce


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

**EXHIBIT 9**

2

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Official<br>Committee of Talc<br>Claimants 1: | Brown Rudnik, LLP<br>By:  DAVID J. MOLTON, ESQ.<br>7 Times Square<br>New York, NY  10036 |
| | Genova Burns LLC<br>By:  DANIEL M. STOLZ, ESQ.<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920 |
| For Ad Hoc Committee of<br>States Holding Consumer<br>Protection Claims: | Womble Bond Dickinson LLP<br>By:  ERICKA FREDRICKS JOHNSON, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |
| For Anthony Valdez: | Kazan McClain Satterley & Greenwood<br>BY:  JOSEPH SATTERLEY, ESQ.<br>55 Harrison Street, Suite 400<br>Oakland, CA 94607 |
| State of New Mexico,<br>and State of<br>Mississippi: | Gibbons<br>BY:  ROBERT K. MALONE, ESQ.<br>One Gateway Center<br>Newark, New Jersey 07102-5310 |

- - - - -

3

| | |
|---|---|
| 1 | (Proceedings commenced at 9:58 a.m.) |
| 2 | THE COURT: All right. We will start today's LTL |
| 3 | Management, LLC, calendar. Wendy, you can hear, correct? |
| 4 | COURTROOM DEPUTY: Yes. |
| 5 | THE COURT: Okay. Great. And it looks like all |
| 6 | technology is working for now. |
| 7 | Let's start. We have essentially three matters. We |
| 8 | have the New Mexico, Mississippi issues. We have the fee |
| 9 | applications and we have the discovery dispute. |
| 10 | Let me start with the discovery dispute with respect |
| 11 | to Mr. Satterley's clients. That way, Mr. Satterley, if you |
| 12 | don't want to stay, you can leave after that. |
| 13 | MR. SATTERLEY: Excellent, Your Honor. Thank you so |
| 14 | much. |
| 15 | Good morning, Your Honor. Joe Satterley of Kazan |
| 16 | McClain Satterley and Greenwood on behalf of Anthony Valadez. |
| 17 | I appreciate Your Honor hearing us today. This |
| 18 | matter -- |
| 19 | COURTROOM DEPUTY: Mr. Satterley, we're having a |
| 20 | slight issue with the broadcast for the Zoom. Can you give me |
| 21 | just a minute? |
| 22 | THE COURT: Sure. |
| 23 | I knew it was too easy. |
| 24 | MR. GORDON: I don't think it really matters if |
| 25 | people can't hear Mr. Satterley anyway. |

 1      I appreciate Your Honor hearing this discovery issue

 2 this morning.  By way of background, following Your Honor's

 3 July 28, 2022, ruling, allowing Mr. Valadez to move for an

 4 expedited trial date, we did that.  We followed Your Honor's

 5 direction with regard to that.

 6      Judge Jo-Lynne Lee of Alameda County had a hearing on

 7 August 26th, issued a ruling, found sufficient evidence to

 8 grant a preference trial, set the trial for November 7, 2022.

 9 Attached in our Docket filing 2973 is Exhibit A, the minutes

10 from that proceeding.  And Judge Lee, during that hearing, had

11 a question.  She said, basically, I'm going to grant your

12 motion for a trial but is J&J allowed relief from stay to work

13 up their case?  And she put in the minute order, "Counsel shall

14 meet and confer to discuss stipulations for extension of

15 statutory deadlines with regard to discovery motions, expert

16 designations, authorizations.  Where necessary, counsel shall

17 obtain further clarification or further leave from the

18 bankruptcy court as to what, if any, additional order is needed

19 in order for the parties to adequately prepare this matter for

20 trial by November 7th."

21      So based upon Judge Lee's questions and her minutes,

22 I immediately met and conferred with counts for the protected

23 parties, J&J and the retailers.  I wrote a letter to them

24 requesting that we stipulate to work up the case and counsel

25 advised me that they had, other than Mr. Valadez's deposition,

 1 which he was deposed yesterday, and he's going to be

 2 cross-examined today, and a little pathology issue, they're not

 3 inclined to do anything to work up the case.  And so based upon

 4 their decision not to work up the case, they wrote the letter

 5 and I responded to the letter.

 6         And I would say that if Your Honor would simply enter

 7 the order as tendered, that it would allow the case to be

 8 worked up for trial in the event that the Third Circuit grants

 9 relief.  Obviously, their letter says that I want to go to

10 trial no matter what the Third Circuit does.  And as I've said

11 repeatedly, consistently, only if there is relief granted by

12 the Third Circuit should the case go to trial, I mean,

13 obviously, based upon the posture of the case.  And otherwise,

14 if Your Honor doesn't allow the case to be prepared, Your

15 Honor's order of July 28th would be rendered meaningless

16 because what would occur is I'm prepared to go to trial.  I'd

17 like to try this case tomorrow.

18         But J&J would go to Judge Lee and say Judge Kaplan

19 did not allow us to work up the case.  The automatic stay

20 prevented us from doing anything other than a few little things

21 here.  So we need to push this trial out from November 7th to

22 January or February.  And so, as I advised Your Honor

23 previously in April, I disclosed many of the witnesses in the

24 case, declarations from treating doctors, medical records,

25 expert witnesses.  I wrote letters requesting to negotiate.

1  J&J has refused to negotiate.  J&J has refused to take

2  discovery.  J&J has refused to prepare this case.  And, quite

3  frankly, I believe the trial is not difficult to prepare.

4  Having tried six of these cases, I already know what

5  the witnesses are going to look like.  It's going to be the

6  same witnesses, many of whom that they've called in every

7  single case.  I mean, Matt Sanchez, their mineralogist is in

8  every single mesothelioma case for J&J.  They'll call a

9  pathologist to say something about pathology.  They'll call a

10  epidemiologists to say the epidemiology is not sufficient.

11  They might -- sometimes they try to call somebody to talk about

12  genetics.  So my point in that regard is this is not a

13  complicated case to be prepared.  It won't be much of a burden

14  on the non-debtor protected parties.

15  And so for all the reasons set forth in my letter, I

16  would request Your Honor to enter the proposed order.  As I

17  said, if the Third Circuit doesn't grant relief, we won't go to

18  trial.  I mean, we'll -- and Your Honor will obviously control

19  what goes forward and we'll come back to Your Honor for

20  additional relief prior to the trial of November 7th.  I think

21  there's another omnibus hearing at the end of October,

22  October 25th?

23  THE COURT:  October 25th.

24  MR. SATTERLEY:  And so we certainly, before the

25  trial, we can come back to Your Honor and get the final stamp

 1  of approval that we can go to trial.

 2          THE COURT:  All right.  Thank you, Counsel.

 3          MR. SATTERLEY:  Thank you, Your Honor.

 4          THE COURT:  Mr. Gordon.

 5          MR. SATTERLEY:  And I encourage you to listen to

 6  Mr. Gordon.

 7          THE COURT:  I listen to everyone.

 8          MR. GORDON:  Good morning, Your Honor.

 9          THE COURT:  Good morning.

10          MR. GORDON:  Greg Gordon, Jones Day, on behalf of the

11  debtor.

12          So I think it's clear, Your Honor, both from the

13  letters and from Mr. Satterley's remarks this morning that

14  there's clearly a disconnect between the parties on this.  And

15  I think it goes back to the ruling Your Honor initially made

16  with respect to this matter.  And we even went through a

17  process, Your Honor may recall, where we submitted competing

18  orders with respect to the very issue I think that's being

19  raised today.

20          We had understood that Your Honor, in your order, was

21  basically permitting Mr. Satterley to do two things.  One, to

22  seek a preferential trial setting which he's done, and two, to

23  pursue discovery but only for the purpose of preserving

24  evidence.  I think Your Honor, I thought was clear that you had

25  indicated you didn't want any evidence to be lost.  And we've

Case 22-30895-MBK Doc 369-43 Filed 04/10/23 Entered 04/10/23 08:56:28 Desc
Exhibit Exhibits 12-174 to Satterley Declaration Page 151 of 214

9

1  now moved well beyond that. I mean, now what we're to is a

2  situation where Mr. Satterley is saying that, no, it's not just

3  to preserve evidence. And that's already been done by the way.

4  I don't think there's any issue about preservation of evidence.

5      Now, it's a matter of, we have to prepare for trial.

6  So even though we're in this bankruptcy case, we believe the

7  stay is in place, we have a preliminary injunction order in

8  place. For one particular case that Mr. Satterley wants to

9  move to the front of the line, we now have to devote time and

10  attention to preparing for that case. And it's in a scenario

11  where, from my perspective, it's really unfair to us because

12  we're facing a situation that no matter what the timing of the

13  Third Circuit ruling is, assuming that the appeal is

14  successful, we have to be prepared to go to trial on

15  November 7th.

16      So if the ruling came down November 5, we have to be

17  ready for trial on November 6th or October 25. And that just

18  seems unfair. It seems contrary to what Your Honor ordered.

19  Now, what we've proposed is that we'd be willing to agree that

20  we'll go to trial 90 days after any ruling by the Third Circuit

21  that basically green lights this trial. That's shorter than we

22  would normally agree. My understanding is in these

23  preferential situations, normally, a defendant has 120 days,

24  maybe more. We're saying we can get ready in 90 days. And

25  that'll put us in a position where we don't have to spend time

Case 22-30352-MBK   Doc 3984   Filed 04/02/23   Entered 04/02/23 08:56:28   Desc
Exhibit Exhibits 12-17 to Satterley Declaration   Page 152 of 214

10

1 now during the bankruptcy case preparing to work this up.

2          It still puts Mr. Satterley in the position where his

3 client is probably at the front of the line.  I mean, it's

4 literally within 90 days of a court ruling.  And that's what we

5 would propose as an alternative to address this issue.  We

6 don't see any harm with respect to that.  This party, you know,

7 this plaintiff has its preference.

8          There have been issues raised in the past by

9 Mr. Satterley about the potential loss of pain and suffering

10 damages if this plaintiff were to die before trial.  My

11 understanding is the law in California has been changed.

12 That's no longer an issue.  So we don't see any harm.

13          So, again, we would respectfully request that the

14 Court not require us at this stage to gear up for trial, to

15 work with our experts, to work up this case, which we have to

16 do, that we shouldn't have to do that now.  But we will agree,

17 in turn, to give Mr. Satterley the preference he wants.  We

18 just need to have a 90-day window post a Third Circuit ruling.

19          THE COURT:  Thank you, Mr. Gordon.

20          Mr. Satterley.

21          MR. SATTERLEY:  Yes.  Briefly, Your Honor.

22          Your Honor said on Page 21 of the transcript of

23 July 28th, "I'm hoping not to slow down the progress of the

24 case Mr. Satterley presented."  The law firm defending the

25 case, King and Spalding, is the main law firm for J&J in all

1  California actions.  Mr. King appeared yesterday at

2  Mr. Valadez's deposition.  There's nothing -- Mr. Calfo is lead

3  trial counsel.  I've tried cases against him at King and

4  Spalding.  They are not doing anything with regards to the LTL

5  and the bankruptcy.  They are trial counsel in California and

6  have been for many years.

7         So there's absolutely no harm to the debtor or the

8  protected parties, for that matter, to allow this case to be

9  worked up in the fashion.  What counsel proposes of 90 days

10  after ruling by the Third Circuit will virtually ensure that

11  Mr. Valadez who's 23 years of age will not be able to be

12  present during his trial.  Undisputed declarations submitted to

13  both this Court and to the Alameda court from his treating

14  doctors gives him six months to live from earlier in the year,

15  I think it was May.

16         And so to grant the relief that LTL is requesting for

17  the protected parties, J&J and the retailers, would essentially

18  harm Mr. Valadez because he wouldn't be able to participate in

19  his trial.  And I think that the the whole point of Your

20  Honor's relief of July 28th was to allow Mr. Valadez to prepare

21  his case with regards to, you know, our earlier trial date.

22  Once again, if the Third Circuit doesn't rule, what Judge Lee

23  will do as she did end the Vincent Hill case is push the case

24  out.  If not November 7th, until December 7th, if the Third

25  Circuit doesn't rule.  So there's already procedures in place

1  to ensure that nothing's going to happen with regards to that

2  trial until the Third Circuit decides.

3      Thank you, Your Honor.

4      THE COURT:  Thank you, Mr. Satterley.

5      And I appreciate how difficult this issue is for the

6  plaintiff.  The goal in my original order was, as has been

7  stated, to preserve the evidence.  To ensure the integrity of

8  the trial from an evidentiary standpoint and also to allow the

9  plaintiff to enter the queue, so to speak, to be able to place

10 itself in a position where, depending upon how the Circuit

11 rules, it could move forward expeditiously as opposed to months

12 and months later, or being placed at the end of a queue, given

13 that it's a recent complaint being filed.

14      That was the sole limit and extent of the relief I

15 granted.  And that's the limit of what I'm prepared to do.  I

16 didn't want to be placed in a position where I'm choosing

17 between plaintiffs on who gets to go first and who gets to move

18 and have their day in court first, whose condition warrants it

19 over others.  It can be an extensive issue being raised and I

20 didn't want to be placed in that position.  I think other

21 judges have felt the same way on those issues.

22      I am prepared to allow you to continue rescheduling

23 at the state court, certainly, rescheduling the trial to keep

24 it close without coming back to this Court.  And, frankly, I

25 would say it can be rescheduled so that there's at least, I'm

Case 22-30085-MBK Doc 3843 Filed 04/02/23 Entered 04/02/23 08:56:28 Desc
Exhibit Exhibits 12-14 to Satterley Declaration Page 155 of 214

13

 1   not overwhelmed with the 90 days -- 60 days after the Third
 2   Circuit, if it were to rule that way, either overrules the
 3   dismissal motion or overrules the preliminary injunction
 4   ruling, to allow a scheduling, so to keep it within place.
 5          But my goal, and let me just emphasize, the goal was
 6   to preserve the evidence to ensure that, given the plaintiff's
 7   distress physically, that there would be no question that there
 8   could be testimony preserved.
 9          MR. SATTERLEY:  I appreciate Your Honor's point of
10   clarification.  If the Third Circuit decides quickly, I would
11   hope that we would be able to maintain the November 7th trial
12   date because, you know, as my current proposal is that, you
13   know, expert discovery goes all the way to the end of October.
14   So I hope that Your Honor is not saying that you're somehow
15   vacating the current trial date.
16          THE COURT:  No, I don't have the authority to vacate
17   the state court --
18          MR. SATTERLEY:  Okay.
19          THE COURT:  -- order.  I would leave that issue for
20   the state court.  If defendants are going to come in and they
21   want to argue that they need more time, they're entitled to do
22   that and the state court's entitled to rule on that.
23          MR. SATTERLEY:  I understand, Your Honor.
24          THE COURT:  I'm just saying, going forward, depending
25   upon how long it takes for the Circuit to decide one way or the

Case 23-12825-MBK  Doc 3794  Filed 04/01/23  Entered 04/01/23 18:56:28  Desc
Exhibit Exhibits 12-17 to Satterley Declaration  Page 156 of 214

14

other, I don't want you to feel that you're under a compulsion
to come back before me to get permission or for the state court
to be unsure whether they can continue.

        MR. SATTERLEY:  One other point of dispute that I've
raised in the letter is that we were seeking to also preserve
evidence of J&J and we sought out to identify what efforts
they're doing to preserve evidence that we've requested.  And
they've resisted that as well.

        THE COURT:  That's more of an issue for the state
court.  That's not tied to the plaintiff's condition.

        MR. SATTERLEY:  No.  But we don't want to lose
evidence that J&J or the retailers have, for example, the
retailers maintain records regarding individual documents that
relate to that individual.

        THE COURT:  I would assume that all the defendants
are on notice of their obligations to preserve evidence.

        MR. SATTERLEY:  But, and we're seeking -- but I'll
address that with Judge Lee.

        THE COURT:  That's correct.

        MR. SATTERLEY:  Okay.  Thank you, Your Honor.

        THE COURT:  All right.

        Mr. Gordon.

        MR. GORDON:  Greg Gordon on behalf of the debtor.

        I just want to be sure now that we're clear.  What I
heard was that Your Honor is saying that we should be allowed

Case 23-12825-MBK  Doc 569-3  Filed 04/10/23  Entered 04/10/23 08:56:28  Desc
Exhibit Exhibits 12-14 to Satterley Declaration  Page 157 of 214

15

1  at least 60 days post.  The stay should work in a way where
2  we'd have at least 60 days post a ruling favorable to the
3  appellants in order to have time to prepare for trial.  And I
4  just wanted to put that on the record to make sure that
5  we're --
6       THE COURT:  Yes.
7       MR. GORDON:  -- hearing that correctly.
8       THE COURT:  Well, we're talking about the first date.
9  I mean, we're arguing about something that's unlikely to occur
10  that, certainly, there's a November 7th trial date.  There's a
11  ruling, and either way, and you all would have to address
12  what's the impact if it goes on back or if there's an
13  application to have it -- does that free it up or not?
14       MR. GORDON:  Right.
15       THE COURT:  But I think we used the extreme, that if
16  the ruling comes down November 5th, I can't see compelling J&J
17  to go to trial in two days.  So I was looking for a shorter
18  window.  And as far as adjourning it, I'm asking the state
19  court to bear in mind that J&J should have at least a 60-day
20  window and future adjournments.
21       MR. GORDON:  Right.  The reason I rise is because the
22  first point Mr. Satterley made was, well, I want to keep the
23  November 7th date.  Well, we're already going to be within 60
24  days of the November 7th date.
25       THE COURT:  Well, I took that to mean for me to

Case 2:23-08895-MBK   Doc 369-43   Filed 04/10/23   Entered 04/10/23 08:56:28   Desc
Exhibit Exhibits 12-174 to Satterley Declaration   Page 158 of 214

16

1 vacate that date.  I don't have the authority to vacate the

2 date.  That's a trial date.  I let the state court -- the state

3 court has the authority to choose it.  I'm not touching that

4 date.  But going forward, in rescheduling, I'm placing on the

5 record my views that J&J should have at least 60 days to

6 prepare.  I think that's reasonable.

7           MR. GORDON:  Right.  And as I read the state court's

8 order, I mean, the state court understands full well that

9 there's a stay and a preliminary injunction, that the court has

10 to look to this Court for guidance in that respect in any

11 event.

12           THE COURT:  And, again, I'm not going anywhere.  If

13 the need for further clarity should change, Mr. Satterley, we

14 could have a telephone conference call and discuss what's

15 reasonable going forward.

16           MR. SATTERLEY:  Yes, Your Honor.  And I just want to

17 clarify what Your Honor says, California state judge, once the

18 stay is lifted would control her docket because I've had many

19 trials, or at least three trials, where 30 days a trial was

20 given because of the condition of the plaintiff.

21           So I would request, basically, Your Honor defers, you

22 know, telling the state court what to do other than what you've

23 already done.

24           THE COURT:  Well, I've put my feelings on the record.

25 If it turns out that it's going to make it an issue, somebody's

Case 23-12825-MBK   Doc 369-1   Filed 04/02/23   Entered 04/02/23 08:56:28   Desc
Exhibit Exhibits 112-174 to Satterley Declaration   Page 159 of 214

17

1   going to come back in front of me and then it'll be a question

2   of what authority I have.

3           MR. SATTERLEY:  I mean, the frustrating part, Your

4   Honor, J&J has repeatedly come to this Court and other courts

5   and said these cases are frivolous and have no merit but

6   they're afraid to go to trial.  And I know Your Honor's order,

7   I've read Your Honor's order, and Your Honor's order said that

8   you believe that you could provide a better outcome for

9   individuals.  But I've been doing this for 25 years

10  representing mesothelioma victims, and quite frankly, I have

11  had success for my clients and I would request that Your Honor

12  take into consideration the totality of the circumstances and

13  the harms to the debtor, the non-debtors and the harm to

14  Mr. Valadez.  I know Your Honor has ruled, but I just can't

15  imagine why J&J would be afraid to go to trial.

16          MR. GORDON:  Your Honor, Greg Gordon.

17          I just can't let that go.

18          THE COURT:  Of course not.

19          MR. GORDON:  No one's afraid to go to trial.  That's

20  not what this is about.

21          MR. SATTERLEY:  Then, stipulate.  Let's go to trial.

22          MR. GORDON:  That's not what this is about at all.

23  This is about a bankruptcy proceeding and preserving the

24  integrity --

25          THE COURT:  All right.

Case 22-30895-MBK Doc 369-4 Filed 04/10/23 Entered 04/10/23 08:35:28 Desc
Exhibit Exhibits 12-174 to Satterley Declaration Page 160 of 214

18

1    MR. GORDON:  -- of the bankruptcy proceeding.

2    THE COURT:  Thank you.

3    I'm letting my initial order stand.  I've placed my

4  comments on the record.  Depending upon how quickly or not the

5  Circuit acts, most of this is moot which is why I don't think

6  we need to address it at this juncture.  But if we need to, I'm

7  giving assurances to all sides, I'm here and we can have

8  another conversation.

9    MR. SATTERLEY:  Appreciate it, Your Honor.  Thank

10  you.

11    THE COURT:  Thank you.  All right.

12    The next matter or matters.  Let's address all of the

13  interim fee applications.

14    Mr. Keach, I've had the benefit of reviewing your

15  report.

16    (Electronic voice:  This meeting is being recorded.)

17    THE COURT:  That was you.  All right.

18    And let me first ask Mr. Keach.  Good morning.

19    MR. KEACH:  Good morning, Your Honor.

20    THE COURT:  Is there anything you wish to add to your

21  report?

22    MR. KEACH:  No, nothing further, Your Honor.  I am

23  aware of the additional discussions between the debtor and

24  Cooley regarding an additional voluntary reduction by Cooley.

25  I believe Cooley, represented by counsel, is present and can

1    UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

2                         * * * * *

3                **C E R T I F I C A T I O N**

4        WE, KAREN K. WATSON, DIPTI PATEL, LIESL SPRINGER and

5    CYNDI POND, court approved transcribers, certify that the

6    foregoing is a correct transcript from the official electronic

7    sound recording of the proceedings in the above-entitled matter

8    and to the best of our ability.

9

10   /s/ Karen K. Watson

11   KAREN K. WATSON

12

13   /s/ Dipti Patel

14   DIPTI PATEL

15

16   /s/ Liesl Springer

17   LIESL SPRINGER

18

19   /s/ Cyndi Pond

20   CYNDI POND

21   J&J COURT TRANSCRIBERS, INC.   DATE:  September 15, 2022

22

23

24

25

# Exhibit 10

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Rene C. Davidson Courthouse, Department 18

### JUDICIAL OFFICER: HONORABLE JO-LYNNE LEE

Courtroom Clerk: Timothy Lopez                                      CSR: None

---

**22CV012759**                                                October 21, 2022
                                                                  9:00 AM

**VALADEZ**
 **vs**
**JOHNSON & JOHNSON, et al.**

---

### MINUTES

**NATURE OF PROCEEDINGS: Case Management Conference**

Counsel on Zoom:

Joe Satterley, Ian Rivamonte, Julia Romano, Noushan Noureddini.

REPORTED BY CSR SHEILA PHAM.

ORDER RE: CASE MANAGEMENT AND TRIAL SETTING ORDER WITH NOTICE

The Court has ordered the following after review of the case.

The Jury Trial scheduled for 11/07/2022 is continued to 11/08/2022 at 03:00 PM in Department 18 at Rene C. Davidson Courthouse.

The trial date is continued one day. Counsel to appear to advise the Court of the status of the bankruptcy stay.

FURTHER CONFERENCE
A Case Management Conference is scheduled for 11/08/2022 at 03:00 PM in Department 18.


This matter is continued for status (see above).

An Updated Case Management Statements is requested to be filed by Plaintiff Counsel on or before 11/4/2022 with courtesy copy emailed to Dept. 18. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day. Individual defendants may also opt to file their own CMC Statements. All CMC Statement shall be submitted on pleading paper with a brief summary of the status of the case and any specified issues that need to be addressed by the court. Do not use Judicial Council Form CM-110.

**EXHIBIT 10**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

To appear at a ZOOM conference or hearing set in Dept. 18, follow the instructions below:

1. Open an account with CourtScribes.  There is NO COST to counsel to open an account or to
schedule an appearance.  To open an account, use this  link: https://scheduling.courtscribes.com.
From the home screen, click Sign up and enter:  Name, Email, Password

2. Once an account has been created for you, you may schedule an appearance. To schedule an
appearance, go to the website and click Schedule Now and enter:

Case Number
Case Name
Date of Hearing
Time
State (enter CALIFORNIA)
Judge (enter Jo-Lynne Lee)
Participant(s) Appearing
Party being represented
Select type of hearing

Once this information has been entered, you will receive a confirmation page with the dial-in
instructions for their remote court appearance.

For any questions, contact scheduling@courtscribes.com or 833-727-4237.

Joseph Donald Satterley (Attorney) must forthwith serve a copy of this order on all counsel of
record and self-represented parties, and file proof of service.
The Court orders counsel to obtain a copy of this order from the eCourt portal.

By:          T. Lopez, Deputy Clerk
                    Minutes of: 10/21/2022
                    Entered on: 10/21/2022

---

Minute Order                                          Page 2 of 2

# Exhibit 11

1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                      COUNTY OF ALAMEDA

3                   HON. JO-LYNNE LEE, JUDGE

4

5    ANTHONY HERNANDEZ VALADEZ,

6          Plaintiff,

7       vs.                        Case No. 22CV012759

8    JOHNSON & JOHNSON, et al.,

9          Defendants.

     _____/

10

11

12

13

14

15        Reporter's Transcript of Remote Proceedings

16             Tuesday, November 8, 2022

17

18

19

20

21

22

23        Reported By:  Sheila Pham, CSR No. 13293

24

25

**EXHIBIT 11**

2

1                    APPEARANCES OF COUNSEL

2

3   For Plaintiff:

4          KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
           BY: JOSEPH SATTERLEY, ESQ.

5          BY: IAN RIVAMONTE, ESQ.
           55 Harrison Street, Suite 400

6          Oakland, CA 94607
           (510) 302-1000

7          jsatterley@kazanlaw.com
           irivamonte@kazanlaw.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    Tuesday, November 8, 2022

2                    3:03 p.m. - 3:09 p.m.

3

4            THE COURT:  This is the 3:00 p.m. calendar for

5    both case management and law and motion matters.

6            Very quickly, the McDuffey matter.

7            (Off the record.)

8            THE COURT:  The other matter I need to hear on

9    is Valadez versus Johnson and Johnson, 22CV012759.

10           Let me have appearance from plaintiffs.

11           MR. SATTERLEY:  Your Honor, Joe Satterley for

12   the plaintiffs.

13           THE COURT:  Mr. Satterley.

14           And I have designated defense counsel?  No.

15           MS. HUTH:  Your Honor, we actually are not

16   appointed in Valadez.

17           THE COURT:  Oh, that's right, you're not in

18   this one.  That's right.

19           Okay.  This is on for two matters.  One is that

20   -- this actually was the trial yesterday, but we moved

21   it for one day, the trial date on this preference matter

22   today, and also a case management conference.  But I

23   know that the whole issue has been whether or not the

24   trial can go forward with the bankruptcy stay still in

25   place.  And I'm assuming it's still in place.

4

1           Mr. Satterley or Mr. Rivamonte --

2           MR. SATTERLEY:  Yes, Your Honor.  We're waiting

3    for the Third Circuit to decide any day now.  So we

4    would request that this be continued to three weeks,

5    21 days, somewhere around that time frame.

6           THE COURT:  So you're looking at December?

7           MR. SATTERLEY:  Early December, yes,

8    Your Honor.

9           THE COURT:  Okay.  Let's see.  Well, how is --

10   I'm thinking -- hold on a second.  Let me take a look.

11   I'm looking for the first Monday that --

12          What's the second Monday in December?

13          THE CLERK:  The 12th.

14          THE COURT:  12/12, yeah?

15          MR. RIVAMONTE:  December 12th.

16          THE COURT:  So I can move it to December 12th.

17   How about that?

18          MR. SATTERLEY:  That's, fine Your Honor.

19          THE COURT:  And what makes you think the Third

20   Circuit is just about to do a ruling?  Or is it just --

21          MR. SATTERLEY:  Well, we asked for an expedited

22   review, and they granted it.  And both debtor's counsel

23   and myself at the last hearing before Judge Kaplan

24   predicted that the Third Circuit -- or we were

25   guesstimating the Third Circuit would decide within a

5

1    couple months.  I mean, the oral arguments were

2    September the 19th, so we're hoping that it's going to

3    come soon.

4              THE COURT:  Well, good luck.

5              All right.  I'm going to put it on for

6    9:00 a.m. the first day of trial rather than 8:30 a.m.

7    And that will be Department 18.

8              And then the case management is just really --

9    I just put it on for the same time as today, just to see

10   where we are.  But, obviously, it will just go to 12/12,

11   right, for status, unless you think you can tell the

12   Court, like, in advance of that December 12 date whether

13   or not the Third Circuit has done something.

14             Although, what I think maybe might make sense

15   is, as soon as you get that order from the Third

16   Circuit, assuming it happens before 12/12, that you

17   would -- well, 12/12 -- hold on.  Let me double-check.

18   12/12 is -- yeah, is 2022.  Okay.  If you get something

19   from the Third Circuit, then just, you know, shoot it

20   over to Department 18 right away.  Right?

21             MR. SATTERLEY:  You'll be the first to know,

22   Your Honor, I promise.

23             THE COURT:  If it's after 12/2, I will not be

24   the first to know.  It will be a different judge.

25   You're going to get a new judge in Department 18.  So

6

```
 1    they're going to reassign the asbestos calendar to a new
 2    judge, but, you know, everything will remain in
 3    Department 18.
 4            In other words, the cases will remain on the 18
 5    calendar, but you'll get a reassignment of the judge who
 6    will then be sitting in Department 18.  All right?
 7            MR. SATTERLEY:  Yes, Your Honor.
 8            THE COURT:  And I don't know exactly when
 9    they're going to be doing that, but that's coming.
10            Okay.  So 12/12 at 9:00 a.m. in Department 18,
11    and I'm just putting the preference trial is continued
12    in light of the existing bankruptcy stay.
```

```
13            Now, let me ask you a quick question on this,
14    Mr. Satterley and Mr. Rivamonte.  Let's assume for the
15    moment that the case actually can get out close to
16    12/12, if not exactly 12/12.  I know that you've been
17    doing some limited discovery.
18            So what do we ought to be doing about this
19    discovery that may go beyond what the bankruptcy court
20    has allowed in this case?
21            MR. SATTERLEY:  Well, it all depends on what
22    the Third Circuit rules, Your Honor.  And so, I mean, it
23    sort of depends on if they -- there's two different
24    issues.  So it's premature for us to really predict what
25    exactly is going to happen.  So I think the best course
```

1  of action is just to wait and see --

2          THE COURT:  All right.

3          MR. SATTERLEY:  -- and address it when we find

4  out.

5          THE COURT:  Yeah, I mean, I think that's the

6  only thing you can do.  And so we'll put it out for

7  12/12, and you'll let the judge know at that time --

8  well, hopefully maybe perhaps in advance of that, what

9  the situation is.

10         Maybe you can do some updated -- I'm thinking

11  that I would like some updated report, perhaps, very

12  close to that 12/12 date.

13         What do you think?

14         MR. SATTERLEY:  Yes, yes, we can file an update

15  for the Court maybe the week before.

16         THE COURT:  Sure.  So we're looking at 12/6?

17         MR. SATTERLEY:  That's fine.

18         THE COURT:  All right.  That makes sense.

19         All right.  Yeah, so I would just like an

20  updated CMC statement, essentially, to be filed no later

21  than 12/6/2022, and then you'll come in on 12/12 for the

22  trial at 9:00 a.m.

23         MR. SATTERLEY:  Yes, Your Honor.

24         THE COURT:  All right.  Very good.

25         MR. SATTERLEY:  Thank you.

8

1          (Proceedings concluded at 3:09 p.m.)

9

1                    REPORTER'S CERTIFICATION

2

3          I, Sheila Pham, a Certified Shorthand Reporter, do

4     hereby certify:

5          That the foregoing proceedings were taken before me

6     at the time and place therein set forth, that the

7     proceedings were reported stenographically by me and

8     were thereafter transcribed under my direction and

9     supervision, and that the foregoing pages contain a

10    full, true and accurate record of all proceedings and

11    testimony to the best of my skill and ability.

12         In witness whereof, I have subscribed my name.

13

14

15    Dated: November 11, 2022

16

17

18

19    _____

20              Sheila Pham

                CSR No. 13293

21

22

23

24

25

# Exhibit 12

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Rene C. Davidson Courthouse, Department 18

## JUDICIAL OFFICER: HONORABLE RICHARD SEABOLT

Courtroom Clerk: Aquetta Scoggins                    CSR: Sheila Pham CSR No. 13293,
                                                      spham28@yahoo.com

---

**22CV012759**                                        December 12, 2022
                                                                  9:00 AM

**VALADEZ**
 **vs**
**JOHNSON & JOHNSON, et al.**

---

## MINUTES

**APPEARANCES:**

No Appearances

**NATURE OF PROCEEDINGS: Case Management Conference**

Counsel on Zoom:

Joe Satterley representing Plaintiff, Ian Rivamonte representing Plaintiff, Sandra Ko representing
Defendants Safeway, Inc., Albertsons Co., Inc., Lucky Stores, Inc., Save Mart Supermarkets,
Target Corporation, Walmart, Inc., Julia Romano representing Defendant Johnson & Johnson

Court and counsel discuss trial readiness. Counsel informs the court the case is not ready for trial
and ask for the trial to be continued to January 9, 2023. Court grants continuance.

The Case Management Conference scheduled for 12/12/2022 is continued to 01/09/2023 at 09:00
AM in Department 18 at Rene C. Davidson Courthouse.

By:    A. Scoggins, Deputy Clerk
                                        Minutes of: 12/12/2022
                                        Entered on: 12/12/2022

**EXHIBIT 12**

# Exhibit 13

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Rene C. Davidson Courthouse, Department 18

## JUDICIAL OFFICER: HONORABLE RICHARD SEABOLT

Courtroom Clerk: Aquetta Scoggins

CSR: Sheila Pham, CSR No. 13293,
spham28@yahoo.com

---

**22CV012759**

January 9, 2023
9:00 AM

**VALADEZ**
 **vs**
**JOHNSON & JOHNSON, et al.**

---

### MINUTES

**NATURE OF PROCEEDINGS: Jury Trial**

Counsel on zoom:

Ian Rivamonte for plaintiff, Joseph Satterley for plaintiff, Julia Romano for Defendant Johnson & Johnson

Court and counsel discuss trial setting. Court sets trial date and further case management conference on 2/9/2023 at 3:00 p.m. in Department 18.

By:    A. Scoggins, Deputy Clerk
Minutes of: 01/09/2023
Entered on: 01/13/2023

**EXHIBIT 13**

# Exhibit 14

1  Joseph D. Satterley (C.S.B. #286890)
   Denyse F. Clancy (C.S.B. #255276)
2  Ian A. Rivamonte (C.S.B. #232663)
   irivamonte@kazanlaw.com
3  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
4  Jack London Market
   55 Harrison Street, Suite 400
5  Oakland, California 94607
   Telephone: (510) 302-1000
6  Facsimile:  (510) 835-4913

7  Attorneys for Plaintiff

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
01/30/2023 at 04:34:03 PM
By: Anita Dhir,
Deputy Clerk

8              SUPERIOR COURT OF CALIFORNIA

9                 COUNTY OF ALAMEDA

10  ANTHONY HERNANDEZ VALADEZ,          Case No. 22CV012759

11            Plaintiff,                Assigned for All Pre-Trial Purposes to
                                        Judge Richard Seabolt
12        v.                            Department 18

13  JOHNSON & JOHNSON, et al.,          **PLAINTIFF'S SUPPLEMENTAL CASE
                                        MANAGEMENT CONFERENCE
14            Defendants.               STATEMENT**

15                                      Date:         February 9, 2023
                                        Time:         3:00 p.m.
16                                      Action Filed: June 15, 2022
                                        Trial Date:   February 9, 2023
17

18        Plaintiff Anthony Hernandez Valadez ("Plaintiff") provides this Supplemental Case

19  Management Conference Statement to apprise this Court of the Third Circuit's recently published

20  opinion and order dismissing the Chapter 11 bankruptcy case of Johnson & Johnson's ("J&J")

21  subsidiary, LTL Management LLC ("LTL"). [*In re: LTL Management, LLC* (3d Cir. Jan. 30,

22  2023, No. 22-2003) __ F.3d __ <https://www2.ca3.uscourts.gov/opinarch/222003p.pdf>.] The

23  Third Circuit's two-page Order Reversing Bankruptcy Court Decision and Directing Dismissal of

24  Case ("Order") and 52-page Opinion are attached hereto as **Exhibit A.**

25        In the pages that follow, Plaintiff summarizes (i) the procedural background of the

26  bankruptcy case, (ii) the Bankruptcy Court's orders providing Plaintiff limited relief from the

27  various stay orders of the bankruptcy case, and (iii) the impact of the Third Circuit's Order and

28  Opinion in this case. Because the Order and Opinion allow Plaintiff to prosecute his claims against

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**EXHIBIT 14**

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Defendants fully, Plaintiff will be prepared to discuss discovery and trial-related matters, including

2    trial assignment, during the Case Management Conference ("CMC") on February 9, 2023.

3    **I.    The Bankruptcy Court's Orders Precluded Plaintiff from Filing Suit.**

4         Following a corporate restructuring, LTL became responsible for the talc-related claims

5    asserted against J&J subsidiary Johnson & Johnson Consumer Inc. On October 14, 2021, LTL

6    filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Bankruptcy

7    Court issued a Preliminary Injunction order that prohibits and enjoins Plaintiff from commencing

8    a personal injury action against Defendants because they are in the distribution chain of Johnson's

9    Baby Powder talc. But for the Preliminary Injunction, Plaintiff would have filed a lawsuit and

10   moved for trial preference several months ago in this Court for his exposure to asbestos and

11   asbestiform fibers from Johnson's Baby Powder talc.

12   **II.    Plaintiff Was Granted Limited Relief from the Preliminary Injunction Order.**

13        The Preliminary Injunction order provides that claimants like Plaintiff may seek relief

14   from any of its provisions for cause shown. As a result, Plaintiff filed a motion in the Bankruptcy

15   Court for an order granting him relief from the Preliminary Injunction to file and prosecute his

16   claims against Defendants in this Court.

17        On June 14, 2022, the Bankruptcy Court allowed Plaintiff to file his Complaint in this

18   Court. Six weeks later, the Bankruptcy Court granted Plaintiff "limited relief to allow discovery,"

19   "to gather and preserve evidence that will support the claims against J&J in the future," and "to

20   make any appropriate motion required to get expedited trial dates…or priority in the event the

21   Third Circuit does reverse" the Bankruptcy Court's orders denying the motion to dismiss LTL's

22   bankruptcy and granting the Preliminary Injunction.

23        As a result of the Bankruptcy Court's orders granting limited relief, Plaintiff filed his

24   complaint, obtained an order for a preferential trial setting, and completed his deposition. All

25   Defendants have appeared. Beyond that, the parties could not proceed any further unless and until

26   the Third Circuit reverses the Bankruptcy Court's orders precluding Plaintiff from prosecuting his

27   case against J&J and other Defendants.

28   //

## III.    The Third Circuit Dismisses the Bankruptcy Case.

On January 30, 2023, the Third Circuit filed its Order and Opinion. The Third Circuit's decision "dismisses the bankruptcy filing of a company [LTL] created to file for bankruptcy." [*In re: LTL*, __ F.3d __, Written Opn. at 55.] The Third Circuit rejected J&J's belief, "no matter how sincerely held," that LTL's bankruptcy "creates the best of all possible worlds for it and the talc claimants." [*Id.* at 56.] The Third Circuit reasoned, "[b]ut given Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so. Applied here, while LTL faces substantial future talc liability, its funding backstop plainly mitigates any financial distress foreseen on its petition date." [*Id.* at 55.] The Third Circuit "thus reverse[s] the Bankruptcy Court's order denying the motions to dismiss and remand this case with the instruction to dismiss LTL's Chapter 11 petition. Dismissing its case annuls the litigation stay ordered by the Court and makes moot the need to decide that issue." [*Id.* at 56; *see also* Order at 2.]

As a result of the Order and Opinion, and upon the Bankruptcy Court dismissing LTL's Chapter 11 petition, Plaintiff may fully prosecute his claims against Defendants.

## IV.    Conclusion.

Plaintiff requests that this Court maintain the CMC so the parties can discuss case status, discovery, trial, and other matters.

DATED:  January 30, 2023

KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation

By: _____
Ian A. Rivamonte

Attorneys for Plaintiff

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Case 2:23-cv-02885-MBK Doc 369-3 Filed 04/02/23 Entered 04/02/23 07:56:28 Desc
Exhibit Exhibits 12-174 to Satterley Declaration Page 173 of 214

**PROOF OF SERVICE**

***Anthony Hernandez Valadez v. Johnson & Johnson, et al.***
**Alameda County Superior Court Case No. 22CV012759**

**STATE OF CALIFORNIA, COUNTY OF ALAMEDA**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Alameda, State of California. My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

On January 30, 2023, I served true copies of the following document(s) described as:

**PLAINTIFF'S SUPPLEMENTAL CASE MANAGEMENT CONFERENCE STATEMENT**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY ELECTRONIC SERVICE:** I electronically served the document(s) by using the File & ServeXpress system. Participants in the case who are registered users will be served by the File & ServeXpress system. Participants in the case who are not registered users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 30, 2023, at Richmond, California.

_____
Paula Katayanagi

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

3212253.1

**SERVICE LIST**

BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles CA 90067
Telephone: (310)284-3880
Facsimile: (310)284-3894
FOR: ALBERTSONS COMPANIES, INC.,
ALBERTSONS COMPANIES, INC.sii/pae/et
LUCKY STORES, INC., LUCKY STORES,
INC., SAFEWAY INC., SAVE MART
SUPERMARKETS , SAVE MART
SUPERMARKETS sii/pae/et LUCKY
STORES, INC., TARGET CORPORATION,
WALMART INC.

KING & SPALDING LLP
633 West  5th Street,
Suite 1600
Los Angeles CA 90071
Telephone: 213-443-4351
Facsimile: 213-443-4310
FOR: JOHNSON & JOHNSON

SPANOS PRZETAK
475 14th St. Ste. 550
Oakland CA 94612
Telephone: (510) 250-0200
Facsimile: (510) 380-6354
FOR: DESIGNATED DEFENSE COUNSEL

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit 15

**Kazan, McClain, Satterley & Greenwood** ℠

A Professional Law Corporation

KAZANLAW.COM

E-SERVICE
69034072
Jan 30 2023
04:16PM
File & ServeXpress

Joseph D. Satterley
jsatterley@kazanlaw.com

January 30, 2023

**Via File & ServeXpress**

All Defense Counsel and Designated Defense Counsel (See Attached Service List)

Re:     **Valadez v. Johnson & Johnson, et al.**
        **Alameda County Superior Court, Case No. 22CV012759**

Dear Counsel:

Today, the Third Circuit issued its precedential opinion and order dismissing the Bankruptcy Court's orders denying the motions to dismiss and granting the request for a preliminary injunction. [*In re: LTL Management, LLC* (3d Cir. Jan. 30, 2023, No. 22-2003) __ F.3d __ <https://www2.ca3.uscourts.gov/opinarch/222003p.pdf>.]

Accordingly, I request that the parties meet and confer on discovery deadlines and other matters in this trial-preference case. Given the upcoming CMC and pre-trial conference on February 9, 2023, at 3 p.m., please let me and my associate, Ian Rivamonte, know when defendants are available for a meet-and-confer call tomorrow, January 31st, or Wednesday, February 1st.

Sincerely,

/s/ Joseph D. Satterley
Joseph D. Satterley

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, CA 94607
(510) 302-1000 • Fax (510) 835-4913

**EXHIBIT 15**

## PROOF OF SERVICE

***Anthony Hernandez Valadez v. Johnson & Johnson, et al.***
**Alameda County Superior Court Case No. 22CV012759**

**STATE OF CALIFORNIA, COUNTY OF ALAMEDA**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Alameda, State of California. My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

On January 30, 2023, I served true copies of the following document(s) described as:

**LETTER TO DEFENDANTS RE THIRD CIRCUIT OPINION AND TRIAL**

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY ELECTRONIC SERVICE:** I electronically served the document(s) by using the File & ServeXpress system. Participants in the case who are registered users will be served by the File & ServeXpress system. Participants in the case who are not registered users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 30, 2023, at Oakland, California.

/s/ Brenda Leal Alvarez
Brenda Leal Alvarez

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Case 23-03025-MBK   Doc 369-3   Filed 04/01/23   Entered 04/01/23 08:56:28   Desc
Exhibit Exhibits 12-174 to Satterley Declaration   Page 188 of 214

**SERVICE LIST**

BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles CA 90067
Telephone: (310)284-3880
Facsimile: (310)284-3894
FOR: ALBERTSONS COMPANIES, INC.,
ALBERTSONS COMPANIES, INC.sii/pae/et
LUCKY STORES, INC., LUCKY STORES,
INC., SAFEWAY INC., SAVE MART
SUPERMARKETS , SAVE MART
SUPERMARKETS sii/pae/et LUCKY
STORES, INC., TARGET CORPORATION,
WALMART INC.

SPANOS PRZETAK
475 14th St. Ste. 550
Oakland CA 94612
Telephone: (510) 250-0200
Facsimile: (510) 380-6354
FOR: DESIGNATED DEFENSE COUNSEL

KING & SPALDING LLP
633 West  5th Street,
Suite 1600
Los Angeles CA 90071
Telephone: 213-443-4351
Facsimile: 213-443-4310
FOR: JOHNSON & JOHNSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit 16

69055245
Feb 01 2023
03:04PM

E-SERVICE

File & ServeXpress

1 | ALEXANDER G. CALFO (SBN 152891)
*acalfo@kslaw.com*
2 | JULIA E. ROMANO (SBN 260857)
*jromano@kslaw.com*
3 | BRYAN L. KING (SBN 281192)
*bking@kslaw.com*
4 | **KING & SPALDING LLP**
633 West 5th Street, Suite 1600
5 | Los Angeles, CA 90071
Telephone:    +1 213 443 4355
6 | Facsimile:    +1 213 443 4310

7 | Attorneys for Defendant
JOHNSON & JOHNSON

8

9 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10 | **COUNTY OF ALAMEDA**

11 | ANTHONY HERNANDEZ VALADEZ, | Case No. 22CV012759

12 |         Plaintiff, | **[PREFERENCE MOTION GRANTED]**

13 |    v. | **DEFENDANTS' JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

14 | JOHNSON & JOHNSON; ALBERTSONS COMPANIES, INC., individually. and as
15 | successor-in-interest, parent, alter ego and equitable trustee LUCKY STORES, INC.;
16 | LUCKY STORES, INC.; SAFEWAY INC.; SAVE MART SUPERMARKETS, individually,
17 | and as successor-in-interest, parent, alter ego and equitable trustee of LUCKY STORES, INC.;
18 | TARGET CORPORATION; WALMART INC.; and FIRST DOE through ONE-HUNDREDTH
19 | DOE,

Date:       February 9, 2023
Time:      3:00 pm
Dept.:     18

Complaint Filed:   June 15, 2022
Trial Date:       February 9, 2023

20 |         Defendants.

*(sidebar, left margin)* King & Spalding LLP / 633 West Fifth Street / Suite 1600 / Los Angeles, CA 90071

---

DEFENDANT'S JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**EXHIBIT 16**

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071

Defendants respectfully submit this Case Management Conference Statement in preparation for the upcoming February 9, 2023 Case Management Conference in this action.

## I. Background

The Bankruptcy Court previously granted Plaintiff Anthony Hernandez Valadez ("Plaintiff") only *limited* relief from the automatic stay, and that limited relief is set forth in the Bankruptcy Court's August 8, 2022 order, attached hereto as **Exhibit A**. The Order permitted Plaintiff to do two things: (1) obtain preferential status or priority in the event the Third Circuit Court of Appeals reverses and the automatic stay is lifted; and (2) conduct such discovery as necessary to preserve evidence pertinent to Plaintiff's claim that may otherwise be lost or destroyed (such as obtaining pathology materials). (*See,* August 8, 2022 Order Granting Limited Relief from the Automatic Stay, *In Re LTL Management LLC,* U.S. Bankruptcy Court, District of New Jersey, Case No. 21-30589-MBK, Dkt. No. 2836, attached hereto as **Exhibit A**.) Plaintiff has done both of those things: Plaintiff filed a motion for preference, which was granted, and the parties completed Plaintiff's deposition in September 2022.

The scope and intent of the Bankruptcy Court's Order granting limited relief from the automatic stay was further discussed with Judge Kaplan at the September 14, 2022 omnibus hearing. At that hearing, Judge Kaplan made clear that he had no intention of allowing the trial of this action to proceed while the automatic stay remains in effect. Judge Kaplan also made clear that if/when the stay is fully lifted, Defendants should be given at least 60 days to conduct discovery and prepare for trial.

## II. The Third Circuit's Decision and Current Status of the Bankruptcy Stay

J&J has reviewed Plaintiff's Supplemental Case Management Conference Statement regarding the Third Circuit's decision and Plaintiff's position that he may now "fully prosecute his claims against Defendants." This is incorrect.

The Third Circuit's opinion does not immediately change anything regarding the Bankruptcy Case or the preliminary injunction staying the underlying tort cases. The Bankruptcy Court's preliminary injunction remains in place, and attempting to litigate stayed cases violates that injunction.

"An appellate court's decision is not final until its mandate issues." *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 97 (3d Cir. 1988). The mandate's issuance "returns jurisdiction to" the lower court. *Roudabush v. Bitener*, No. 15-3185(RMB), 2016 WL 3466092, at *2 (D.N.J. June 22, 2016) (quoting 20A James Wm. Moore, et al., Moore's Federal Practice § 341.02 (3d ed. 1999)). Thus, until the Third Circuit's mandate issues, the Bankruptcy Court does not have jurisdiction to dismiss LTL's petition, which would have the effect of dissolving the court's preliminary injunction.

To be clear, the Third Circuit has not yet issued its mandate. The Third Circuit's mandate issues seven days after the time to file a petition for rehearing expires or seven days after the entry of an order denying a timely petition for rehearing. Fed. R. App. 41(b). Significantly, LTL has 14 days to petition for rehearing (i.e.: until February 13, 2023), Fed. R. App. P. 40(a)(1), and has announced its intention to do so.

Moreover, the Third Circuit can further stay its mandate while LTL seeks Supreme Court review. That stay can last up to 90 days until LTL files a petition for writ of certiorari and then continue until the Supreme Court disposes of the petition. Fed. R. App. P. 41(d).

In short, at present, everything remains as-is to allow LTL to seek further review of the Third Circuit's opinion. As such, it is premature to discuss any further discovery, pre-trial dates/deadlines, or trial.

Dated: February 1, 2023                                    KING & SPALDING LLP

By: _____
Alexander G. Calfo
Julia E. Romano
Bryan L. King
Attorneys for Defendant
JOHNSON & JOHNSON

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071

1  Dated: February 1, 2023       **BARNES & THORNBURG LLP**

By: _____

Sandra M. Ko
Noushan Noureddini
Attorneys for Defendants
ALBERTSONS COMPANIES, INC.
(erroneously sued as ALBERTSONS
COMPANIES, INC., individually, and as
successor-in-interest, parent, alter ego, and
equitable trustee of LUCKY STORES, INC.);
LUCKY STORES (SAVE MART) LLC f/k/a
LUCKY STORES, INC. (erroneously sued as
LUCKY STORES, INC.); SAFEWAY INC.;
SAVE MART SUPERMARKETS LLC
(erroneously sued as SAVE MART
SUPERMARKETS, individually, and as
successor-in-interest, parent, alter ego, and
equitable trustee of LUCKY STORES, INC.);
TARGET CORPORATION; and WALMART
INC.

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071

DEFENDANTS' JOINT CASE MANAGEMENT CONFERENCE STATEMENT

# Exhibit 17



**Name:** Emory Michael Hernandez-Valdez  |  **DOB:** 9/23/1998  |  **MRN:** 36945558

## Appointment Details

Progress Notes - Clinical Notes

Joel William Neal at 1/25/2023  4:30 PM



**Stanford Thoracic Oncology Clinic
Established Patient Visit
Palo Alto**

**Telemedicine:** I have discussed the risks, benefits, and limitations of receiving care virtually with the patient. The patient expresses understanding and is willing to move forward.

RE:
Dr. Leah Backhus
Dr. Josh Fronk

MRN: 36945558
DOB: 9/23/1998

**History of present illness:**
Anthony Michael Hernandez-Valdez is a 24 Y old male who was recently diagnosed with epithelioid mesothelioma, suspect pericardial primary, on carboplatin and pemetrexed, with poor chemotherapy tolerance, now on nivolumab and ipilimumab here for follow up and scan review.

His oncologic history is summarized as follows:

2020: Developed cough and shortness of breath. Had been admitted with several echocardiograms performed, which showed pericardial effusions. Has only been treated on colchicine and prednisone.

6/8/2020-echo at that time with normal LV size and systolic function, EF 60 to 70%, moderate septal and moderate posterior LVH.  Large pericardial effusion.

12/24/21-follow-up echo with normal LV size, small anterior and moderate sized posterior pericardial effusion

**EXHIBIT 17**

Of note the prior notes note that he was supposed to be on colchicine 0.6 mg twice daily for 3 months however did not follow-up between July 2020 and February 2021

5/4/2021-admitted briefly due to chest pain and shortness of breath thought to be viral pericarditis, we started colchicine and weaning off steroids.

11/21/22-complex pericardial effusion seen on CTA chest, along with mediastinal and epicardial adenopathy.  Pericardial effusion not measured by radiologist at that time. Recommendation for PCP to refer to rheumatologist given recurrent pericarditis

1/4/22: Developed worsening adenopathy and neck swelling and underwent a CT neck for left sided neck swelling. Imaging revealed abnormal shotty appearing lymph nodes along the left neck and left neck soft tissue spaces including the left jugulodigastric which is enlarged measuring 1.3 cm. Numerous posterior cervical lymph nodes and bilateral supraclavicular lymph nodes.

CT chest revealed worsening lobulated masslike pericardial effusion. Worsening multiple enlarged neck soft tissue lymph nodes and subcutaneous soft tissue edema extending through the chest wall to level of the trachea. Notable supraclavicular, mediastinal, and retroperitoneal lymphadenopathy. Small pleural effusion.

1/10/22: Underwent right paratracheal (R4) lymph node biopsy. Path revealed mesothelioma, epithelioid type.

1/27/2022-patient went to Valley heart Institute in Modesto for chest discomfort, follow-up appointment at that time and, thought to be due to viral pericarditis from respiratory infection without tamponade.

1/28/2022: **Initial Thoracic Oncology Visit (Roy)**

1/31/22: AFP, LDH, beta HCG, uric acid levels are wnl.

2/3/22: Scrotal ultrasound is negative.

2/6/22- SHC admission for shortness of breath-initially relieved by 2 thoracentesis with 1-1/2 L taken out on each side.  Pleural fluid confirms malignant cells, morphologically similar to mesothelioma.

2/12/-2/22/22-SHC readmission with worsening respiratory status, concern for right-sided heart failure and will remain tachycardic.
He underwent **Pericardiectomy (performed by local Dr. Boyd) Bilateral PleurX catheters,  Resection of mediastinal mass and thymectomy on 2/17/22**
OPERATIVE FINDINGS:
1.  Large bilateral chylothoraces.
2.  Diffuse tumor involvement of the pericardium with areas of invasion  into the myocardium

3/18/22 CT Chest- Similar to 2/26/2022, **multiple pericardial masses nearly encasing the heart, thoracic lymphadenopathy, retrocrural lymphadenopathy**, and adjacent right upper lobe and right middle lobe interlobular septal thickening, concerning for residual/recurrent malignancy. Interlobular septal thickening may represent lymphangitic carcinomatosis versus lymphatic obstruction. Interval increase in extensive filling defects throughout the venous system, including left internal jugular, left brachiocephalic, right internal jugular, right brachiocephalic, and right vertebral veins. No evidence of extension of the thrombus into the superior vena cava

3/18/22 - **C1 Carboplatin AUC 5/Pemetrexed 375 mg/m2**

**Significant nausea, vomiting, fatigue-** had also **allergic rxn to Emend**
Added low dose haldol for nausea/vomiting, compazine and reglan has not helped in past
Two admissions for symptom control

4/9/22- C2 carboplatin AUC 4, Pemetrexed 375 mg/m2 (scheduled admission for chemo given symptom burden)

4/29/22- C3 held given fatigue, cytopenia and anemia, 1 unit PRBC given

5/5/22- CT chest- **Interval increased diffuse nodular interlobular septal thickening, right greater than left lung, as well as new and increasing pulmonary nodules, concerning for progression of disease.**.  Extensive thoracic lymphadenopathy and multiple pericardial masses nearly encasing the heart, overall stable compared to prior exam with the exception of a few lymph nodes which are slightly decreased in size.

5/13/22- **C1D1 Nivolumab + Ipilimumab**

5/29/22- ED visit -SOB

5/31/22-6/4/22- **SHC admission-** SOB-worsening effusions, no thoracentesis able. **Course c/b catatonia -**helped with **ativan and amantadine.**

6/7/22-he again went to a local emergency room for shortness of breath, CT chest done there noting worsening findings from February where the last scan there was done.  Larger and more complex bilateral loculated pleural effusions, right pleural fluid location more loculated, multiple loculated pericardial masses which are overall similar.

6/11-6/20/22- **SHC admission-**
**Recurrent admission for shortness of breath-**no further interventions from thoracic surgery available for loculated pleural effusions.  Prolonged course given need for physical therapy and also oxygen.  Detailed conversation regarding overall poor prognosis and goals and goals of care had with the primary team and also palliative medicine.  Started on an increased dose of methadone to help with air hunger.

6/24/22- **C2D1- Nivolumab + Ipilimumab**
7/15/22- C2D22
8/5/22- C3D1

8/9/22 CT CAP-  History of pericardial mesothelioma status post pericardiectomy, with increasing nodular encasement of the heart. Lung findings may be related to any combination of lymphangitic carcinomatosis, pulmonary edema, and/or infection. Decreasing bilateral pleural effusions with Pleurx catheter is in place. Stable lymphadenopathy. Diffuse anasarca.

8/26/22- C3D22

9/16/22- C4D1

10/7/22: C4D22

10/7/22 CT CAP- **Mixed response** New and enlarging pleural and pericardial nodules.Stable lymphadenopathy above the diaphragm.Improved interlobar septal thickening, edema, and opacities
10/28/22: C5D1 planned HELD due to uveitis

11/18/22: C5D1 ipi/nivo

12/7/22: C5D22 nivo

12/30/22: C6D1 ipi/nivo

1/20/23: CT CAP- overall disease progression. STOP ipi/nivo

**Interval History**
Here for next dose of ipi/nivo and presents with his supportive mother.

Reports bothersome "body pain" in the morning. Hurts particularly in the inner R arm and inner/posterior right knee. Pain exacerbated by stretching out the arm or leg. Using methadone 5 mg which helps but continues to have aches. Seen by palliative 1/23/23 but forgot to ask about increasing methadone. Pain is 7-8/10. Tried Tylenol which helped.

Recovered from recent URI last month. Had COVID 3 weeks ago. Felt was a mild case and doing well.

Mentally, feels he is still struggling. Feels it is day to day. Tries to stay busy. Has been in touch with Lynn Chao, SW. Recommended AYA. Not able to see psych onc clinic due to insurance. Has felt happy about changing his name legally to Emory and awaiting birth certificate change to move forward.

Has been vomiting on and off. Feels it is related to his diet ie greasy foot or over eating.

**Wt Readings from Last 5 Encounters:**
01/25/23     80.6 kg (177 lb 11.1 oz)
12/30/22     80.4 kg (177 lb 4 oz)
12/09/22     78.2 kg (172 lb 6.4 oz)
11/18/22     78.8 kg (173 lb 11.6 oz)
10/07/22     84.3 kg (185 lb 13.6 oz)

**Review of systems:**
A comprehensive 14-point review of systems was performed, with pertinent positives as noted above; all other systems negative.

**Past medical history:**
Anxiety
Appendicitis

**Past surgical history:**
Past Surgical History:

| Procedure | Laterality | Date |
|---|---|---|
| • BILATERAL PROCEDURE; SECONDARY MODIFIER | N/A | 2/17/2022 |
| *Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM* | | |
| • CHEST DRAINAGE CATHETER INSERTION | Bilateral | 2/17/2022 |
| *Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM* | | |
| • MEDIASTINAL LYMPHADENECTOMY, BILATERAL TUNNELED PLEURAL CATHETERS (PLEUR-X), POSSIBLE PLEURECTOMY, RADICAL PERICARDIECTOMY, THYMECTOMY WITH CPB STANDBY | N/A | 2/17/2022 |
| *Performed by Boyd, Jack H, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM* | | |
| • THYMECTOMY; MEDIAN STERNOTOMY APPROACH | N/A | 2/17/2022 |
| *Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM* | | |

cancer directed treatment would make sense.

| | |
|---|---|
| **Documented by** | |

RTC in 1-2 weeks to start gemzar

I, Clara Mays, served as a Medical Scribe and documented the clinic visit for Joel William Neal, MD, PhD on 1/25/2023.

 As usual, we encouraged the patient to contact us sooner should he develop any new symptoms or have any questions or concerns.

The patient was seen with Dr. Joel Neal, attending physician, who agrees with the above assessment and plan.

Signed, 1/25/2023
Judy Yang Pagtama, RN, MSN, FNP-C
Stanford Cancer Center
Nurse Practitioner
Thoracic Oncology
Pager 15415

**Physician Addendum**
I examined the patient, reviewed pertinent findings, and developed the treatment plan with the APP as per above note. I independently reviewed the scans if applicable. I performed substantive portions of E/M on the stated date of service and discussed management with patient, and agree with the impression and plan as outlined above, with the additional notes below:

Overall, he appears to have progression on most recent CT.  On review at tumor board it does look like the tumor has been grown from May until now.  This news was extremely traumatic to, and he and his mom decided to leave clinic before a full discussion.  However, they did agree to return soon and consider systemic gemcitabine therapy.  Incidentally, he was discussed at tumor board and gemcitabine and vinorelbine, with consideration of tumor treatment fields, seem to be the best treatment options.

Joel W Neal, MD, PhD
Associate Professor of Medicine (Thoracic Oncology)
875 Blake Wilbur Drive CC2220
Stanford, CA 94305
(650) 725-3081 (Direct Line)
(650) 725-5849 (Clinical Fax)
(650) 498-6000 (Patient Help Line)
(866) 742-4811 (Physician Referral Line)
jwneal@stanford.edu

Referring physicians may access Stanford EPIC records electronically:
https://prism.stanfordmedicine.org/

Stanford Cancer Clinical Trials:
http://med.stanford.edu/cancer/trials/flowcharts.html

# Exhibit 13

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Rene C. Davidson Courthouse

| | |
|---|---|
| ANTHONY HERNANDEZ VALADEZ | No.      22CV012759 |
| Plaintiff/Petitioner(s) | Date:    02/16/2023 |
| vs. | Time:   10:00 AM |
| JOHNSON & JOHNSON et al | Dept:   18 |
| Defendant/Respondent(s) | Judge:   Richard Seabolt |

ORDER re: Case Management

Conference

Counsel on Zoom:

Joseph Satterley, Ian Rivamonte and Denyse Clancy representing Plaintiff
Edward Hugo representing Defendant Eaton Corporation
Laura Przetak as Designated Defense Counsel
Julia Romano representing Defendant Johnson & Johnson
Sandra Ko representing Defendants ALBERTSONS COMPANIES, INC.(erroneously sued as
ALBERTSONS COMPANIES, INC., individually, and as successor-in-interest, parent, alter ego,
and equitable trustee of LUCKY STORES, INC.); LUCKY STORES (SAVE MART) LLC f/k/a
LUCKY STORES, INC. (erroneously sued as LUCKY STORES, INC.); SAFEWAY INC.;
SAVE MART SUPERMARKETS LLC (erroneously sued as SAVE MART SUPERMARKETS,
individually, and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY
STORES, INC.); TARGET CORPORATION; and WALMART, INC.

Court and counsel discuss scheduling and remaining discovery issues.

Plaintiff's counsel Joseph Satterley request to share screen and gives brief presentation pertaining
to his client and the case.

Court continues the trial date to 4/17/2023. Court will conduct a Case Management Conference
every Thursday at 3:00 p.m. until the trial date. Any issues are due the Wednesday prior to the
Thursday hearing.

Court instructs counsel to provide motions in limine prior to trial date.

By agreement of parties, the expert demands are being deemed served and the experts'
designations will be provided no later than next Friday, 2/24/2023.

The Case Management Conference scheduled for 02/16/2023 is continued to 02/23/2023 at 03:00
PM in Department 18 at Rene C. Davidson Courthouse.

The Court orders counsel to obtain a copy of this order from the eCourt portal.

---

ORDER re: Case Management Conference                                          Page 1 of 2

**EXHIBIT 13**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
Rene C. Davidson Courthouse

Dated: 02/16/2023

Richard Seabolt / Judge

---

# Exhibit 14

Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Movant Anthony Hernandez Valadez*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC, | : | Case No. 21-30589 |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF JOSEPH D. SATTERLEY

Pursuant to 28 U.S.C. § 1746, I, Joseph D. Satterley, declare under penalty of perjury as follows:

1.      I am a partner in the law firm of Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation ("Kazan Law") located at 55 Harrison Street, Suite 400, Oakland, California 94607. I have been duly admitted to practice law in the States of Pennsylvania,

**EXHIBIT 14**

Kentucky, and California, the United States Supreme Court, the U.S. District Court for the Eastern and Western Districts of Kentucky, and the U.S. Court of Appeals for the Third, Sixth, Eighth, and Ninth Circuits. I am admitted as counsel *pro hac vice* in this action for personal-injury claimant Anthony Hernandez Valadez.

2.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. If called as a witness, I would testify as to those facts.

3.      I submit this Declaration in support of Mr. Valadez's Further Status Update and Reply to Debtor's Objection to Supplemental Filing.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the Progress Note and After Visit Summary related to Mr. Valadez's first cycle of gemcitabine therapy on February 1, 2023.

5.      Since this Court issued its order granting limited relief to Mr. Valadez on July 28, 2022, no other claimant has requested such relief.

6.      The current trial date in the State Court action is February 16, 2023. If the Protected Parties agree to start the State Court trial on February 16th, Mr. Valadez will forego all discovery and start the trial.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. I executed this Declaration on February 13, 2023, in San Francisco, California.

By:     /s/ Joseph D. Satterley
        JOSEPH D. SATTERLEY

# Exhibit 1



**Name:** Emory Michael Hernandez-Valdez   |   **DOB:** 9/23/1998   |   **MRN:** 36945558

# Appointment Details

<span style="color:blue">Progress Notes - Clinical Notes</span>

<span style="color:blue">Hazel S at 2/1/2023  8:42 PM</span>
Patient tolerated infusion without incident. Discharged home in stable condition accompnied by mother via wheelchair.

<span style="color:blue">Alexis J at 2/1/2023  7:23 PM</span>
**Diagnosis:** Mesothelioma (CMS-HCC)
**Major Secondary Diagnosis**:
**Attending Physician:** No att. providers found
**APP (Heme)**:

**Chemotherapy/Immunotherapy Regimen:** gemzar   **Frequency**:
**Cycle #** 1 **Day #** 1  **received on** 2/1/22 (current treatment)

**Supportive plan(s):   Frequency:   Last given:**

**History of transfusion reaction? (List premedications if applicable):** no
**History of infusion reaction? (List additional premedications if applicable):** no

**IV Access Type**: PIV

**Date of Last ECHO and LVEF% (if applicable)**: 6/16/22 LVEF-53%

**Active Issues:**
- Pt reports some vomiting, not taking anything at this time. Pt requesting medication for at home for nausea. Mother uncertain of what he tolerates and will message team tomorrow. Dr. Neal notified. Per dr. Neal ok to just give dex 12 mg today.

**Today's Treatments** (insert dot phrase below):

Labs drawn peripherally upon arrival. Type and screen collected. Report given to Hazel S. Rn to administer gemzar and discharge patient.

**Patient needs growth factor today or following today's treatment**? no
**Are there active orders?** no
**Is growth factor listed in the appointment note and is there authorization?** no
**Verified appointment date and time with patient?** no

**Patient given the date** 2/15 **of next scheduled follow-up appointment for (labs, clinic, treatment).**
**Pt confirmed that they have a copy of their future appointments/ utilizes My Health:** yes

EXHIBIT 1

**Patient is aware of when and who to call if needed for questions or concerns** yes

**Follow up call needed:** yes  **Scheduled?** yes  **Reason for call**:yes

**Labs** (from last 24 hours)
Results for orders placed or performed during the hospital encounter of 02/01/23 (from the past 24 hour(s))
**Metabolic Panel, Comprehensive**
Collection Time: 02/01/23  6:15 PM

| Result | Value | Ref Range |
|---|---|---|
| Sodium, Ser/Plas | 134 (L) | 135 - 145 mmol/L |
| Potassium, Ser/Plas | 4.3 | 3.5 - 5.5 mmol/L |
| Chloride, Ser/Plas | 97 (L) | 98 - 107 mmol/L |
| CO2, Ser/Plas | 26 | 22 - 29 mmol/L |
| Anion Gap | 11 | 5 - 15 mmol/L |
| Fasting | | |
| Glucose, Ser/Plas | 83 | 70 - 140 mg/dL |
| Creatinine, Ser/Plas | 0.69 | 0.67 - 1.17 mg/dL |
| eGFR Refit Without Race (2021) | 133 | >60 mL/min/1.73 m2 |
| BUN, Ser/Plas | 10 | 6 - 20 mg/dL |
| Calcium, Ser/Plas | 8.8 | 8.4 - 10.5 mg/dL |
| Protein, Total, Ser/Plas | 7.6 | 6.0 - 8.3 g/dL |
| Albumin, Ser/Plas | 3.5 | 3.5 - 5.2 g/dL |
| Total Bilirubin, Ser/Plas | 1.0 | <1.2 mg/dL |
| Alk P'TASE, Total, Ser/Plas | 259 (H) | 40 - 130 U/L |
| AST (SGOT), Ser/Plas | 19 | 10 - 50 U/L |
| ALT (SGPT), Ser/Plas | 13 | 10 - 50 U/L |
| Globulin | 4.1 | 2.0 - 5.0 g/dL |

**CBC with Differential**
Collection Time: 02/01/23  6:15 PM

| Result | Value | Ref Range |
|---|---|---|
| WBC | 7.3 | 4.0 - 11.0 K/uL |
| RBC | 3.66 (L) | 4.40 - 5.90 MIL/uL |
| Hemoglobin | 8.4 (L) | 13.5 - 17.7 g/dL |
| Hematocrit | 28.4 (L) | 40.0 - 52.0 % |
| MCV | 77.6 (L) | 82.0 - 98.0 fL |
| MCH | 23.0 (L) | 27.0 - 34.0 pg |
| MCHC | 29.6 (L) | 32.0 - 36.0 g/dL |
| RDW | 15.8 (H) | 11.5 - 14.5 % |
| Platelet count | 443 (H) | 150 - 400 K/uL |
| Neutrophil % | 56.2 | % |
| Lymphocyte % | 14.1 | % |
| Monocyte % | 18.5 | % |
| Eosinophil % | 10.0 | % |
| Basophil % | 0.8 | % |
| Imm. Granulocyte, % | 0.4 | 0.0 - 0.7 % |
| Neutrophil, Absolute | 4.10 | 1.70 - 6.70 K/uL |
| Lymphocyte, Absolute | 1.03 | 1.00 - 3.00 K/uL |
| Monocyte, Absolute | 1.35 (H) | 0.30 - 0.95 K/uL |
| Eosinophil, Absolute | 0.73 (H) | 0.05 - 0.55 K/uL |
| Basophil, Absolute | 0.06 | 0.00 - 0.25 K/uL |
| Imm. Granulocyte, Abs | 0.03 | 0.00 - 0.06 K/uL |
| nRBC, Abs | 0.00 | K/uL |
| nRBC, % | 0.0 | % |



**Name:** Emory Michael Hernandez-Valdez  |  **DOB:** 9/23/1998  |  **MRN:** 36945558

## Appointment Details

# AFTER VISIT SUMMARY



## Emory M. Hernandez-Valdez  MRN: 36945558

📅 2/1/2023  6:00 PM  📍 Infusion Treatment Area 650-498-6000

Legal Name: Anthony M. Hernandez-Valdez

## Today's Visit

You were seen on Wednesday February 1, 2023. The following issue was addressed:
Mesothelioma (CMS-HCC).

|  Blood Pressure 112/68 | BMI 25.55 |  Weight 175 lb 7.8 oz |
| --- | --- | --- |
| Height 5' 9.49" | Temperature (Oral) 99 °F | Pulse 97 |
| Respiration 18 | Oxygen Saturation 100% | |

### 🧰 Done Today

CBC with Differential for Mesothelioma (CMS-HCC)

Metabolic Panel, Comprehensive for Mesothelioma (CMS-HCC)

Type and Screen (ABO/Rh and Ab Screen (Shc)) for Mesothelioma (CMS-HCC)

### 💉 Medications Given

dexAMETHasone (Decadron) for Mesothelioma (CMS-HCC)

gemcitabine 1 gram/26.3 mL (38 mg/mL) for Mesothelioma (CMS-HCC)

Ns for Mesothelioma (CMS-HCC)

# What's Next

**FEB 15 2023** Return Patient Visit with Joel William Neal, MD, PhD
Wednesday February 15 11:30 AM

Thoracic Oncology
875 Blake Wilbur Drive
Palo Alto CA 94305
650-498-6000

**FEB 15 2023** Med Onc Infusion 2 hours
Wednesday February 15 12:50 PM

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

**FEB 23 2023** Video Visit with Joshua Cade Fronk, DO
Thursday February 23 12:00 PM

#|V|#

Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.

Instructions on how to join a Video Visit can be found in our FAQ.

**FEB 27 2023** Return Patient Visit with Hashem Hammouda Ghoraba, MD
Monday February 27 8:30 AM

Eye Institute at Stanford
2452 Watson Court
Palo Alto CA 94303
650-723-6995

The time above does not reflect the actual time that will be spent with the health team and provider. The scheduler or front desk staff will be able to provide you this information.

All Ophthalmology: Please allow 1.5 to 2.5 hours for your entire appointment to accommodate possible dilation, testing, and treatment.

Optometry: Please allow 30 minutes to 1 hour

Visual Field: Please allow 1 hour

Injection: Please allow 1 hour

Case 23-03895-MBK Doc 374 Filed 04/08/23 Entered 04/08/23 08:38:22 Desc
Exhibit Exhibits 1 to 14 to Satterley Declaration Page 211 of 214

MAR
**1**
2023

## Video Visit with Jason K

Wednesday March 1 11:00 AM

#|V|#

Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.

Instructions on how to join a Video Visit can be found in our FAQ.

MAR
**1**
2023

## Med Onc Infusion 2 hours

Wednesday March 1 12:30 PM

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

MAR
**15**
2023

## Video Visit with Joel William Neal, MD, PhD

Wednesday March 15 9:00 AM

#|V|#

Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.

Instructions on how to join a Video Visit can be found in our FAQ.

MAR
**15**
2023

## Med Onc Infusion 2 hours

Wednesday March 15 10:00 AM

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

MAR
29
2023

## Video Visit with Jason K

Wednesday March 29 10:30 AM

#|V|#

Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.

Instructions on how to join a Video Visit can be found in our FAQ.

MAR
29
2023

## Med Onc Infusion 2 hours

Wednesday March 29 11:20 AM

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

APR
12
2023

## Video Visit with Jason K

Wednesday April 12 9:00 AM

#|V|#

Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.

Instructions on how to join a Video Visit can be found in our FAQ.

APR
12
2023

## Med Onc Infusion 2 hours

Wednesday April 12 10:00 AM

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

Case 23-02895-MBK   Doc 374-14   Filed 04/08/23   Entered 04/08/23 08:32:22   Desc
Exhibit Exhibits 10-14 to Satterley Declaration   Page 213 of 214

**APR 26 2023**

## Video Visit with Joel William Neal, MD, PhD

**Wednesday April 26 9:00 AM**

#|V|#
Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.
Instructions on how to join a Video Visit can be found in our FAQ.

**APR 26 2023**

## Med Onc Infusion 2 hours

**Wednesday April 26 10:00 AM**

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

**MAY 10 2023**

## Video Visit with Joel William Neal, MD, PhD

**Wednesday May 10 9:00 AM**

#|V|#
Virtual Visit Location: Due to individual state regulations, Stanford Medicine providers may not be able to conduct telemedicine visits with patients who are located outside of California at the time of their appointment. If you plan to be outside the State of California at the time of your appointment, please immediately contact your clinic to reschedule or discuss alternative care options.
Instructions on how to join a Video Visit can be found in our FAQ.

**MAY 10 2023**

## Med Onc Infusion 2 hours

**Wednesday May 10 10:00 AM**

Infusion Treatment Area
875 Blake Wilbur Drive
Stanford CA 94305
650-498-6000

# Your Medication List

## Notice

A record of your medication list is currently not available. If you need access to this medication list, call your doctor's office.

# Allergies

| | |
|---|---|
| **Compazine [prochlorperazine]** | Other (Specify with Comments) |
| Talking slow . | |
| **Fosaprepitant** | Shortness of Breath |
| Throat tightness | |
| **Oxycodone** | Itching, pruritus |
| **Zofran [ondansetron Hcl]** | Shortness of Breath, Nausea, Vomiting, Dizziness, Headache |
| Chest tightness | |