# Exhibit 20

Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Anthony Hernandez Valadez*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| LTL MANAGEMENT LLC, | : | Case No. 21-30589 |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

## DECLARATION OF JOSEPH D. SATTERLEY

Pursuant to 28 U.S.C. § 1746, I, Joseph D. Satterley, declare under penalty of perjury as

follows:

1.      I am a partner in the law firm of Kazan, McClain, Satterley & Greenwood, A

Professional Law Corporation, located at 55 Harrison Street, Suite 400, Oakland, California

94607, and have been duly admitted to practice law in the States of Pennsylvania, Kentucky, and

**EXHIBIT 20**

California, the United States Supreme Court, the U.S. District Court for the Eastern and Western

Districts of Kentucky, and the U.S. Court of Appeals for the Third, Sixth, Eighth, and Ninth

Circuits. I am admitted as counsel *pro hac vice* in this action for Anthony Hernandez Valadez.

2.       Unless otherwise stated in this Declaration, I have personal knowledge of the

facts set forth herein. If called as a witness, I would testify as to those facts.

3.       I submit this Declaration in support of Mr. Valadez's reply to Debtor LTL

Management LLC's response to claimants' objection to continuing the Preliminary Injunction

entered in this matter [Dkt. 2631] against non-debtors Johnson & Johnson ("J&J") and retailers

Albertsons Companies, Inc., Lucky Stores, Inc., Safeway Inc., Save Mart Supermarkets, Target

Corporation, and Walmart Inc. (collectively, "Retailers").

4.       Attached hereto as **Exhibit A** is a true and correct copy of the relevant excerpts

from Mr. Hernandez's Patient Health Summary, generated on July 17, 2022.

5.       Attached hereto as **Exhibit B** is a true and correct copy of the Complaint, filed on

June 15, 2022, in the Superior Court of California, County of Alameda.

6.       Attached hereto as **Exhibit C** is a true and correct copy of the Proof of Service of

Summons for each of J&J and Retailers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief. I executed this Declaration on July 18, 2022,

in Oakland, California.


By:     /s/ Joseph D. Satterley
        JOSEPH D. SATTERLEY

# Exhibit A

# Anthony Michael Hernandez-Valdez

Patient Health Summary, generated on Jul. 17, 2022

---

## Patient Demographics - Male; born Sep. 23, 1998

| Patient Address | Communication | Language | Race / Ethnicity | Marital Status |
|---|---|---|---|---|
| 2695 Agnes Way *(Home)* <br> Merced, CA 95340-3133 | ▮▮▮▮ (Mobile) <br> ▮▮▮▮ (Home) <br> ▮▮▮▮▮▮ | English (Preferred) | Other Race / Hispanic or Latino | Single |

*Former (Jan. 18, 2022 - Jan. 17, 2022):*
2695 Agness Way *(Home)*
Merced, CA 95340

*Former (Mar. 07, 2017 - Jan. 17, 2022):*
2695 Agnes Way *(Home)*
MERCED, CA 95340

---

## Note from Stanford Health Care and University Healthcare Alliance

This document contains information that was shared with Anthony Michael Hernandez-Valdez. It may not contain the entire record from Stanford Health Care and University Healthcare Alliance.

---

## Allergies

**Prochlorperazine** (Other (Specify with Comments))
**Fosaprepitant** (Shortness of Breath)
**Oxycodone** (Itching, pruritis)
**Ondansetron Hcl** (Shortness of Breath, Nausea, Vomiting, Dizziness, Headache)

📝 **Progress Notes** - documented in this encounter
Mohana Roy, MD - 07/15/2022 12:00 PM PDT
Formatting of this note is different from the original.
Images from the original note were not included.

Stanford Thoracic Oncology Clinic
Established Patient Visit
Palo Alto
RE:
Dr. Leah Backhus
Dr. Josh Fronk

MRN: 36945558
DOB: 9/23/1998

History of present illness:
Anthony Michael Hernandez-Valdez is a 23 Y old male who was recently diagnosed with epithelioid mesothelioma, suspect pericardial primary, on carboplatin and pemetrexed, here for followup

His oncologic history is summarized as follows:

2020: Developed cough and shortness of breath. Had been admitted with several echocardiograms performed, which showed pericardial effusions. Has only been treated on colchicine and prednisone.

6/8/2020-echo at that time with normal LV size and systolic function, EF 60 to 70%, moderate septal and moderate posterior LVH. Large pericardial effusion.

12/24/21-follow-up echo with normal LV size, small anterior and moderate sized posterior pericardial effusion

Of note the prior notes note that he was supposed to be on colchicine 0.6 mg twice daily for 3 months however did not follow-up between July 2020 and February 2021

not measured by radiologist at that time.

1/4/22: Developed worsening adenopathy and neck swelling and underwent a CT neck for left sided neck swelling. Imaging revealed abnormal shotty appearing lymph nodes along the left neck and left neck soft tissue spaces including the left jugulodigastric which is enlarged measuring 1.3 cm. Numerous posterior cervical lymph nodes and bilateral supraclavicular lymph nodes.

CT chest revealed worsening lobulated masslike pericardial effusion. Worsening multiple enlarged neck soft tissue lymph nodes and subcutaneous soft tissue edema extending through the chest wall to level of the trachea. Notable supraclavicular, mediastinal, and retroperitoneal lymphadenopathy. Small pleural effusion.

1/10/22: Underwent right paratracheal (R4) lymph node biopsy. Path revealed mesothelioma, epithelioid type.

1/27/2022-patient went to Valley heart Institute in Modesto for chest discomfort, follow-up appointment at that time and, thought to be due to viral pericarditis from respiratory infection without tamponade.

1/28/2022: Initial Thoracic Oncology Visit (Roy)

1/31/22: AFP, LDH, beta HCG, uric acid levels are wnl.

2/3/22: Scrotal ultrasound is negative.

2/6/22- SHC admission for shortness of breath-initially relieved by 2 thoracentesis with 1-1/2 L taken out on each side. Pleural fluid confirms malignant cells, morphologically similar to mesothelioma.

2/12/-2/22/22-SHC readmission with worsening respiratory status, concern for right-sided heart failure and will remain tachycardic.
He underwent Pericardiectomy (performed by local Dr. Boyd) Bilateral PleurX catheters,  Resection of mediastinal mass and thymectomy on 2/17/22
OPERATIVE FINDINGS:
1.  Large bilateral chylothoraces.
2. Diffuse tumor involvement of the pericardium with areas of invasion into the myocardium

3/18/22 CT Chest- Similar to 2/26/2022, multiple pericardial masses nearly encasing the heart, thoracic lymphadenopathy, retrocrural lymphadenopathy, and adjacent right upper lobe and right middle lobe interlobular septal thickening, concerning for residual/recurrent malignancy. Interlobular septal thickening may represent lymphangitic carcinomatosis versus lymphatic obstruction. Interval increase in extensive filling defects throughout the venous system, including left internal jugular, left brachiocephalic, right internal jugular, right brachiocephalic, and right vertebral veins. No evidence of extension of the thrombus into the superior vena cava

3/18/22 - C1 Carboplatin AUC 5/Pemetrexed 375 mg/m2

Significant nausea, vomiting, fatigue- had also allergic rxn to Emend
Added low dose haldol for nausea/vomiting, compazine and reglan has not helped in past
Two admissions for symptom control

4/9/22- C2 carboplatin AUC 4, Pemetrexed 375 mg/m2 (scheduled admission for chemo given symptom burden)

4/29/22- C3 held given fatigue, cytopenia and anemia, 1 unit PRBC given

5/5/22- CT chest- Interval increased diffuse nodular interlobular septal thickening, right greater than left lung, as well as new and increasing pulmonary nodules, concerning for progression of disease.. Extensive thoracic lymphadenopathy and multiple pericardial masses nearly encasing the heart, overall stable compared to prior exam with the exception of a few lymph nodes which are slightly decreased in size.

5/13/22- C1D1 Nivolumab + Ipilimumab

5/29/22- ED visit -SOB

5/31/22-6/4/22- SHC admission- SOB-worsening effusions, no thoracentesis able. Course c/b catatonia -helped with ativan and amantadine.

6/7/22-he again went to a local emergency room for shortness of breath, CT chest done there noting worsening findings from February where the last scan there was done. Larger and more complex bilateral loculated pleural effusions, right pleural fluid location more loculated, multiple loculated pericardial masses which are overall similar.

prognosis and goals and goals of care had with the primary team and also palliative medicine. Started on an increased dose of
methadone Case 23:30:33 AM BRK Doc 273662 Filed 07/10/22 Entered 04/10/22 08:36:21 Desc
Exhibit Exhibits C - 1 8 A State by Declaration Page 8 of 45

6/24/22- C2D1- Nivolumab + Ipilimumab

Interval History
Here for next dose of nivolumab, with his mother
He is much more alert today, sitting upright in wheelchair
Notes baseline SOB, on 5L NC most times, 6L with exertion and movement
No recent sensation of sudden SOB, using ativan occasionally
No recurrent nausea/vomiting
No new rashes, diarrhea
Has dry skin and frequently itchy

Review of systems:
A comprehensive 14-point review of systems was performed, with pertinent positives as noted above; all other systems negative.

Past medical history:
Anxiety
Appendicitis

Past surgical history:
Past Surgical History:
Procedure Laterality Date
• BILATERAL PROCEDURE; SECONDARY MODIFIER N/A 2/17/2022
Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM
• CHEST DRAINAGE CATHETER INSERTION Bilateral 2/17/2022
Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM
• MEDIASTINAL LYMPHADENECTOMY, BILATERAL TUNNELED PLEURAL CATHETERS (PLEUR-X), POSSIBLE PLEURECTOMY,
RADICAL PERICARDIECTOMY, THYMECTOMY WITH CPB STANDBY N/A 2/17/2022
Performed by Boyd, Jack H, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM
• THYMECTOMY; MEDIAN STERNOTOMY APPROACH N/A 2/17/2022
Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM

Appendectomy 2009

Medications:
Outpatient Medications Prior to Visit
Medication Sig Dispense Refill
• acetaminophen (Tylenol 8 Hour) 650 mg TbSR take 1 Tablet by mouth daily as needed
• albuterol 90 mcg/actuation HFA inhaler 1 Puff by Inhalation route daily as needed
• cetirizine (ZyrTEC) 10 mg tablet take 1 Tablet (10 mg total) by mouth daily as needed for Allergies 30 Tablet 0
• Cholecalciferol (Vitamin D3) (Vitamin D3) 2,000 unit CAPS take 1 Capsule by mouth every day 30 Capsule 3
• fluticasone propionate (Flonase) 50 mcg/actuation SpSn spray 2 Sprays by Nasal route daily as needed (spray in each nostril as
needed for allergies)
• folic acid 1 mg tablet take 1 mg by mouth daily
• furosemide 40 mg tablet take 1 Tablet (40 mg total) by mouth 2 times a day 60 Tablet 0
• HYDROmorphone (Dilaudid) 2 mg tablet take 1 Tablet (2 mg total) by mouth every 4 hours as needed (pain) Can take 2mg in
the morning and 2mg in the evening each day (please only take while alert and awake) 30 Tablet 0
• hydrOXYzine HCL (ATARAX) 50 mg tablet take 1 Tablet (50 mg total) by mouth every bedtime 30 Tablet 0
• lidocaine (Lidoderm) 5% patch apply 1 Patch to skin daily at noon Apply patch to back for up to 12 hours in any 24 hour
period. 10 Patch 0
• LORazepam (Ativan) 1 mg tablet Please take lorazepam 0.5 mg three times a day scheduled. For break through anxiety, okay to
take up to 1mg lorazepam three times a day. 30 Tablet 0
• melatonin 5 mg tablet take 1 Tablet (5 mg total) by mouth every bedtime as needed 30 Tablet 0
• methadone (Dolophine) 5 mg tablet take 0.5 Tablets (2.5 mg total) by mouth every day AND 1 Tablet (5 mg total) every
bedtime. This drug is associated with a BLACK BOX WARNING. Click on the blue hyperlink below to review the details.. 21 Tablet
0
• metoprolol succinate (Toprol XL) 25 mg extended release tablet take 3 Tablets (75 mg total) by mouth daily 90 Tablet 0
• multivitamin tablet take 1 Tablet by mouth daily 30 Tablet 0
• naloxone (Narcan) 4 mg/actuation Spry Spray 0.1 mL (4 mg) into one nostril for suspected overdose. Repeat into other nostril
after 2 to 3 minutes if no or minimal response. 2 Each 1
• ondansetron 4 mg orally disintegrating tablet take 1 Tablet (4 mg total) by mouth every 6 hours as needed 10 Tablet 0
• pantoprazole (Protonix) 40 mg delayed release tablet take 40 mg by mouth every morning
• polyethylene glycol (MIRAlax) 17 gram packet take 1 Packet (17 g total) by mouth daily 10 Packet 0
• potassium chloride (Klor-Con) 10 mEq sustained release tablet take 3 Tablets (30 mEq total) by mouth daily Do not crush. May

No facility

Allergies:
NKDA

Social history: obtained at prior visits
Father works in construction and may have exposures, however only started in the past couple of years
Previously attended school in an old building, no clear asbestos exposure
Mother reports using large amounts of baby powder (Johnson and Johnson) in his childhood
No other exposures to hair salon products, chemicals in labs
Works at Home Depot
EtOH socially
No recreational drug use

Family history:
Father had ?bone cancer
Maternal aunt had early age breast cancer (diagnosed at age 33) and AML (diagnosed 35)

BRCA mutation:
- Mother, maternal grandmother, maternal aunts x 2

Physical Exam:
Filed Vitals:
07/15/22 1246
BP: 91/54
Pulse: 103
Resp: 18
Temp: 36.9 °C (98.4 °F)
TempSrc: Oral
SpO2: 99%
On 5L NC
General: chronically ill appearing, but more alert, answering questions
CV: Tachycardic, distant heart sounds
Resp: improved aeration at bases, crackles bilaterally still present
Abdomen: soft, non tender, sites of pleurx covered with bandage, minimal to no drainage
Extremities: no edema, +diffuse xerosis and excoriations

Labs and studies:
CBC
Recent Labs
07/15/22
1240 06/24/22
1626 06/20/22
0612
WBC 5.9 5.4 8.2 | 8.2
HGB 9.7* 8.1* 9.1* | 9.1*
HCT 33.1* 28.1* 31.0* | 31.0*
MCV 91.9 91.5 92.0 | 92.0
RDW 15.8* 16.7* 16.4* | 16.4*
PLT 396 321 362 | 362
NEUTAB 3.96 3.19 5.90

Recent Labs
07/15/22
1240 06/24/22
1626 06/20/22
0612
NEUT 67.0 58.9 72.4
LYM 8.3 10.0 5.8
MONO 20.1 24.8 16.2
EOS 3.6 5.0 4.7
BASO 0.7 0.9 0.7

CMP
Recent Labs

NA 133* 135 133* | 133*
K 2.9* 2.9* 3.3* 3.3* | 3.3*
CL 88* 93* 92* | 92*
CO2 40* 35* 31* | 31*
AG 5 7 10 | 10
BUN 10 11 13 | 13
CR 0.57* 0.74 0.74 | 0.74
GLU 96 96 85 | 85
EGFR 141 131 131 | 131
CA 7.8* 8.4 8.3* | 8.3*
TP 5.8* 6.4 6.4
ALB 2.2* 2.6* 2.4*
TBIL 0.4 0.5 0.5
AST 21 18 20
ALT 15 10 15
ALKP 195* 199* 217*

ANEMIA
Recent Labs
04/29/22
0937
FERRITIN 1,351*
TIBC 200*
FE 32*
TRFSAT 16*

Imaging
As in HPI

Pathology:
2/25/22 Pericardiectomy Specimen Review

A. THYMUS PERICARDIAL FAT
B. PERICARDIUM AND TUMOR
DIAGNOSIS (MICROSCOPIC):
A. THYMUS AND PERICARDIAL FAT, EXCISION
--   PERICARDIAL TISSUE WITH MALIGNANT MESOTHELIOMA, EPITHELIOID
TYPE
--   METASTATIC MALIGNANT MESOTHELIOMA COMPLETELY REPLACING ONE
LYMPH NODE (1/1)
--   EXTENSIVE VENOUS AND LYMPHATIC INVOLVEMENT BY MALIGNANT
MESOTHELIOMA
--   INVOLUTED THYMIC TISSUE
B. HEART, PERICARDIUM AND TUMOR, EXCISION
--   MALIGNANT MESOTHELIOMA, EPITHELIOID TYPE
LIBERT/C. WANG/BERRY

COMMENT:  We note the patient's recent diagnosis of metastatic
malignant mesothelioma, epithelioid type (SHS-22-03759). The tumor
present in the current resection specimen is morphologically
similar.

Stanford Review
DIAGNOSIS:
LYMPH NODES. RIGHT LOWER PARATRACHEAL/4R, EXCISIONAL BIOPSY
(1/10/22; 22MS-133)
    --   HISTOLOGIC AND IMMUNOPHENOTYPIC FINDINGS SUPPORTING
METASTATIC MALIGNANT MESOTHELIOMA, EPITHELIOID TYPE.

COMMENT:  I have reviewed the H&E stained slides and accompanying
immunostains and agree with Dr. Silveira as listed above. In light
of the unusual diagnosis in this age group I performed a battery of
immunostains in our lab along with additional H&E stained slides.
The neoplastic cells within the lymph node show the following
immunophenotypic profile: WT1 positive, P40 negative, CK5/6
positive, D2-40 positive,  BAP1 retained, BerEP4 negative,

EBUS of 4R 1/10/22:

Case 2:23-cv-02885-WBK Doc 273662 Filed 07/09/22 Entered 04/09/22 08:06:21 Desc
Exhibit Exhibit A 20-20 Gaterley Declaration Page 11 of 45

Molecular:
2/4/22 Guardant peripheral- negative

STAMP 1/26/22

Fusion STAMP 3/15/22- Negative: No fusions detected

Assessment & Plan:
Anthony Michael Hernandez-Valdez is a 23 Y old male with newly diagnosed pericardial mesothelioma, status post pericardiectomy and Pleurx placement on 2/17/2022, here for follow-up -he is status post 2 cycles of chemotherapy and 2 cycles of immunotherapy with nivolumab and ipilimumab.

#Epithelioid mesothelioma, pericardial-metastatic
We had previously discussed that this appears to be a primary mesothelioma of the pericardium which is exceedingly rare, even within the rare diagnosis of mesothelioma in general. In addition him being so young and age makes this additionally difficult.

Detailed discussion given patient's recurrent ED visits and hospitalizations for shortness of breath, uncontrolled anxiety and also uncontrolled respiratory symptoms with complex loculated effusions.

-Continue with nivolumab
-Messaged Dr. Fronk on reconnecting with him, prior missed appts esp with frequent hospitalizations

-Likely plan to remove Pleurx if not draining appropriately, multiple assessments of drain placement done with CTs

#Shortness of breath- continue methadone 2.5 mg qAM and 5 pm qPM
==Chronic Issues===

#Catatonia-he had during his last admission episodes with freezing and staring with minimal verbal response with was a clear change from his prior status. CT head without any acute findings. Likely catatonia from metabolic reasons, improved with amantadine which he continues. No clear evidence of encephalitis or other immunotherapy neurotoxicity or any infections. EEG unrevealing.No wimproved.

#Mouth Sores- improved- suspect chemotherapy related-

#Dry Skin, Linear dermatitis- -stable - can do VV likely with Dr. Rana in cutaneous oncology- messaged

#Nausea- multiple medications have been tried including ondansetron, Haldol, metoclopramide, Ativan.
Improved now off chemotherapy

#Chylous Pleural Effusions- drainage decreased on right, no further intervention, minimal drainage

#Anxiety-baseline with coping of diagnosis -
- Ativan 1mg TID PRN for anxiety
- Ativan 0.5 mg TID scheduled
- Amantadine taper of 25 mg Daily for 1 week (6/11-6/21)
- Dilaudid 2mg q4h PRN; per palliative recs, added dilaudid 2mg PO BID- not needing as regularly
- cont hydroxyzine 50 mg qHS

#Cardiac Management-in discussing the case with Dr. Boyd and Dr. Backus and reviewing the operative reports, he has still significant mesothelial tumor involvement around his heart and some into the myocardium. Recommend continuing metoprolol succinate 75 mg daily.
-Continue lasix 40 mg BID -hypokalemia likely due to furosemide, education re: potassium repletion at home
-Oral K and monitoring

#Hypokalemia-continue oral repletion

#Thrombosis - non occlusive thrombus bilateral internal jugular and left brachiocephalic veins-extension seen on recent CT, likely also due to impaired venous drainage from tumor burden
#Right subsegmental PE:
He is continuing on rivaroxaban daily

#Leg pain- seems to be related to chemo, no acute swelling- Negative for DVT

RTC for scheduled immunotherapy, 10 day symptom check

Documented Time
Prognosis was shared as follows: continued decline in function
Comment: --- 6/09/2022 2 PM Mohana Roy, MD ---
Discussed that initial prognosis was uncertain but however given progression of disease and still large burden of disease, concerned about any further significant decrease is expected from immunotherapy. Still plan to continue medical treatment however would consider hospice focused care given high burden of symptoms and recurrent emergency visits and hospitalizations.

6/15/22 Mohana Roy, MD
I spoke to his mother, Anna, along with Dr. Chris chen (primary MD) and Dr. Torrey Simons (Palliative care MD). Expressed concern given large burden of pericardial and pleural-based disease without significant if any improvement after 2 doses of chemotherapy and 1 dose of immunotherapy. Discussed that in general mesothelioma is not responsive to as many systemic treatments. that I would be open to giving him 1 more dose of immunotherapy per her wishes as his advocate and spokesperson- however, if worsening clinical status beyond this, I do not think further cancer directed treatment would make sense.

Documented by

RTC for immunotherapy schedule, ongoing conversations as above

As usual, I encouraged the patient to contact us should he develop any new symptoms or have any questions or concerns

Mohana Roy, MD
Clinical Assistant Professor-Oncology
Stanford Cancer Center Palo Alto and South Bay

Electronically signed by Mohana Roy, MD at 07/16/2022 10:24 PM PDT

# Exhibit B

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**06/15/2022 at 02:35:57 PM**
By: Cheryl Clark,
Deputy Clerk

1  Joseph D. Satterley (C.S.B. #286890)
    jsatterley@kazanlaw.com
2  Denyse F. Clancy (C.S.B. #255276)
    dclancy@kazanlaw.com
3  Ian A. Rivamonte (C.S.B. #232663)
    irivamonte@kazanlaw.com
4  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
    A Professional Law Corporation
5  Jack London Market
    55 Harrison Street, Suite 400
6  Oakland, California 94607
    Telephone: (510) 302-1000
7  Facsimile: (510) 835-4913

8  Attorneys for Plaintiff

9                SUPERIOR COURT OF CALIFORNIA

10                    COUNTY OF ALAMEDA

11  ANTHONY HERNANDEZ VALADEZ,          Case No. 22CV012759

12            Plaintiff,                **COMPLAINT FOR PERSONAL
                                        INJURIES**
13        v.
                                        **DEMAND FOR JURY TRIAL**
14  JOHNSON & JOHNSON;

15  ALBERTSONS COMPANIES, INC., individually
    and as successor-in-interest, parent, alter ego, and
16  equitable trustee of LUCKY STORES, INC.;

17  LUCKY STORES, INC.;

18  SAFEWAY INC.;

19  SAVE MART SUPERMARKETS, individually,
    and as successor-in-interest, parent, alter ego and
20  equitable trustee of LUCKY STORES, INC.;

21  TARGET CORPORATION;

22  WALMART INC.; and

23  FIRST DOE through ONE-HUNDREDTH DOE,

24            Defendants.

25

26

27  //

28  //

3156712.3

*Kazan, McClain, Satterley & Greenwood*
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**EXHIBIT B**

## GENERAL BACKGROUND AND OTHER ALLEGATIONS

### I.

**The Plaintiff:** Anthony Hernandez Valadez is the physically injured Plaintiff. His mesothelioma was caused by exposures to asbestos, asbestiform fibers, and asbestiform talc – collectively referred to herein as asbestos – for which Defendants bear responsibility.

### II.

**The Defendants:** All Defendants are listed in the case caption. The true names of the Defendants sued as DOE's are unknown to Plaintiff. Each Defendant was the agent, employee, or joint venturer of its co-defendants, and was acting in the full course and scope of the agency, employment, or joint venture.

### III.

**Alternate Entities:** All Defendants are individually liable for their own defective products and wrongful conduct; and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities because:

- there were express or implied agreements between the companies to transfer and assume the liabilities;

- the transactions between the companies amounted to a consolidation or merger;

- the purchasing company is a mere continuation of the seller;

- the transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- strict products liability was transferred because (i) there was a virtual destruction of Mr. Valadez's remedies against the original manufacturer caused by the successor's acquisition of the business, (ii) the successor has the ability to assume the original manufacturer's risk-spreading role, and (iii) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business; and

- the companies are alter egos because (i) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (ii) there would be an inequitable result if the torts in question were treated as those of one company alone.

/ / /

/ / /

*Kazan, McClain, Satterley & Greenwood*
*A Professional Law Corporation*
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entity |
|---|---|
| ALBERTSONS COMPANIES, INC. | LUCKY STORES, INC. |
| SAVE MART SUPERMARKETS | LUCKY STORES, INC. |

## IV.

**The Products:** For many years, Defendants and/or their predecessors have manufactured, sold, distributed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce products that contain asbestos, asbestiform fibers, and/or asbestiform talc.

## V.

**Knowledge of Asbestos Hazards:** The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants:

1. Health hazards from asbestos exposure were identified in the 1890s. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2. Defendants since the early 1900s possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

3. Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

/ / /

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

4.  As early as the 1920s, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5.  By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns Manville.

6.  In the late 1930s, case reports were published addressing the relationship between asbestos and cancer.

7.  Several reports, studies, and guidelines published as early as the 1930s, including California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930s would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

8.  In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9.  In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10. As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."

11. In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

12. In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13. Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14. By the 1940s, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15. In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16. During the 1940s and 1950s, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17. In addition, beginning in the 1940s and 1950s, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18. In 1955, Richard Doll published a study linking asbestos to lung cancer.

19. In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

20. DEFENDANT JOHNSON & JOHNSON started selling Johnson's Baby Powder in the late 1800s. As the parent company, JOHNSON & JOHNSON made Johnson's Baby Powder until 1978, when a new subsidiary corporation, Johnson & Johnson Consumer Inc., was formed. Both JOHNSON & JOHNSON and Johnson & Johnson Consumer Inc. shared with each other all of their health-and-safety information about the talc products. Throughout this Complaint, DEFENDANT JOHNSON & JOHNSON is referred to as "J&J."

21. In the 1950s and 1960s, J&J contracted with the Battelle Laboratory in Ohio to examine its talc for the presence of dangerous minerals. Battelle reported back to J&J and William Ashton, a J&J managerial employee, that J&J's talc had tremolite, fibrous tremolite, and fibrous talc. J&J thus had knowledge for many decades that J&J's talc was dangerous to breathe.

22. In the early 1960s, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

/ / /

23. In 1966, J&J knew of published medical and scientific articles that warned it that breathing talc could lead to asphyxiation and death in infants. J&J knew that this information could hurt its baby products franchise and chose not to warn about the dangers of breathing talc for many decades.

24. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

25. In 1969, product-liability lawsuits were brought against asbestos manufacturers. Under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere a workplace standard of no more than 12 fibers per cubic centimeter of air.

26. In April 1969, J&J medical doctor, Dr. Timothy Thompson, wrote that J&J should consult the law department for potential litigation arising out of breathing tremolite. This J&J medical doctor specifically discussed the risk of cancer and other diseases from inhalation of needle-like tremolite.

27. In 1970s, J&J knew of the risk of ovarian cancer and never warned regarding any type of cancer. Ovarian cancer occurs via inhalation and translocation of the asbestiform minerals in the body. J&J failed to warn of all cancer risks, including mesothelioma.

28. In early 1970s, J&J submitted false information to the federal Food and Drug Administration ("FDA") claiming J&J's products did not have asbestos in them when J&J had internal documents demonstrating its submission was false. J&J and other companies jointly convinced the FDA to not regulate the issues of asbestos in talc. The FDA allowed the talc industry to self-regulate regarding the health impact of breathing talc.

29. J&J claims to have had a facility since the early 1970s to retain samples of each batch of its talc for future analysis. J&J has destroyed those samples and all underlying testing data including photographs, Transmission Electron Microscopy grids, Energy Dispersive X-ray Spectroscopy grids, and Selected Area (Electron) Diffraction grids.

30. In the 1970s, J&J worked jointly with other companies, including members of the Cosmetic, Toiletry & Fragrance Association ("CTFA"), to adopt a testing method that would not find the asbestos in their talc. That method, known as the J4-1, was adopted by the industry in 1976.

31. In the 1970s, J&J misled physicians and nurses into believing that J&J's product was safe and falsely telling them in mailings that there was no asbestos in Johnson's Baby Powder.

32. In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. J&J management employees

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

worked to keep fibrous talc and asbestiform minerals in their product from being regulated by OSHA.

33.   In 1971, J&J met with scientists at Mt. Sinai Hospital in New York who warned J&J of the risk of asbestos in its products and the risk of disease. J&J knew that fibrous talc and asbestos from talc translocated through the body after inhalation and were found in the ovaries of women.

34.   In 1971, the Colorado School of Mines advised J&J managerial employee, Robert S. Russell, that there is fibrous tremolite and actinolite (asbestos), and fibrous talc in J&J samples submitted to them. Later in the mid-1970s, J&J agents and employees, including Mr. Russell, obtained, with his knowledge, used Johnson's Baby Powder in a study on live babies, thereby exposing these babies to risk of disease.

35.   In 1972, the American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen.

36.   In 1974, J&J employee, Dr. Fuller, told the FDA that the risk of *any* harm would be reason to take J&J's talcum powder off the market. Dr. Fuller and J&J did not live up to their promise to the FDA and falsely reassured the FDA for decades J&J's product was safe.

37.   A 1976 follow-up study conducted by researchers at Mt. Sinai concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer cosmetic talcum powders as containing high percentages of asbestos.

38.   In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products.

39.   In the 1970s and 1980s, J&J employee, William Ashton, knowing that fibrous talc and asbestos was dangerous, worked to keep J&J's product from being subject to any industry standards, including joining the American Society for Testing and Materials, and insuring J&J's product would not be subject to scrutiny by the scientific community.

40.   In the 1970s and 1980s, J&J continued to mislead the public by engaging in an anti-warning marketing campaign to tell consumers that J&J's product was "pure" and would "protect" the user of the product. The marketing campaign consisted of print, radio, and television advertisements to falsely reassure the public about the safety of talc.

/ / /

41. In 1983, Anthony and Mary Rose Gambino sued J&J for injuries Mr. Gambino sustained from his use of Johnson's Baby Powder talc. J&J did nothing to preserve evidence of the talc samples it was allegedly testing from the early 1980s forward.

42. In 1991, J&J knew that Dr. Alice Blount published on the presence of asbestos in its Johnson's Baby Powder. Dr. Blount told J&J several times in the 1990s and yet J&J did nothing to warn Mr. Valadez or other end users of the dangerous associated with J&J's product.

43. J&J in the 1990s continued its pattern and practice of marketing talcum powder as safe despite knowing of the "cancer linkage." In 1992, J&J knew its major opportunities would be to market to minorities, but also knew the major obstacles would be the inhalation risk and cancer linkage.

44. J&J were in charge of worldwide testing of talc to determine how much asbestos was in each talc. They created a testing scheme to appear like there was no asbestos in their talc. However, they knew the testing methods used were inadequate and would not detect the asbestos in the talc.

45. J&J engaged in a pattern and practice of not warning the public through 2018 when its Chief Executive Officer, Alex Gorsky, falsely told American consumers that J&J's talcum products have always been free of asbestos.

All Defendants failed to place any warning on their products or ever disclose the fact that these products contained asbestos, asbestiform fibers, and/or asbestiform talc at any point, up to and including present day, despite the clear hazard and direct information that their products *did* contain asbestos, asbestiform fibers, and asbestiform talc.

**VI.**

**Additional Allegations as to J&J:** The following facts are illustrative, but not exhaustive, of J&J's wrongful conduct.

J&J knew that the needle-like shape of asbestos fibers, found in some talc deposits, makes the fibers causative of mesothelioma. And J&J knew that babies inhaled the talc, at variable levels, whenever Baby Powder was applied. J&J therefore understood that if its talc contained asbestos, and if that fact were publicized, it would be bad for J&J's business and reputation.

To avoid the risk of end-users' asbestos exposures, J&J always had the option to use cornstarch, instead of talc, as its Baby Powder's active ingredient. However, J&J waited until 1980 to start selling a cornstarch version alongside the talc version. Thereafter, J&J advertised that its cornstarch version was the "safest powder you can use on your baby." J&J never warned anyone

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    about the asbestos content of its talc.

2         Despite admittedly knowing that its talc Baby Powder contained toxic asbestos from at

3    least the 1960s through the 2000s, J&J concealed or otherwise misrepresented that fact from its

4    products' consumers, including Mr. Valadez. In part, J&J engaged in the following acts and

5    omissions:

6    1.   J&J lied to the FDA about the presence of asbestos in the talc used in J&J's
          products, including Johnson's Baby Powder. J&J hid these results and, in
7         some cases, asked that these results be altered or destroyed. For example, in
          January 1974, J&J's managing agents Dr. R. Fuller, Dr. G. Hildick-Smith,
8         and Dr. W. Nashed met with the FDA regarding "Talc/Asbestos." In that
          meeting, J&J promoted its Johnson's Baby Powder as the "best talc
9         available," despite knowing the talc's asbestos content. J&J also falsely
          claimed to the FDA that "substantial asbestos can be allowed safely in a
10        baby powder." J&J further assured the FDA that, if studies showed that the
          talc was unsafe, J&J "will not hesitate to take it off the market." J&J never
11        took its Johnson's Baby Powder off the market despite knowing that the
          product contained asbestos. J&J, itself and through the CTFA, also withheld
12        original documents and reports identifying asbestos in its talc and talc-
          containing products, like Johnson's Baby Powder, and instead falsely
13        reported to the FDA there was no asbestos. After providing this false
          information to the FDA, the CTFA, including J&J, met privately and
14        congratulated themselves on the "success" of the "presentations" to the
          FDA, and agreed that they should not bind themselves to having to further
15        update the FDA. Despite its admission that asbestos is a carcinogen, J&J
          never suggested—or revealed—to the FDA any asbestos in its Johnson's
16        Baby Powder or talc products, including the list of positive asbestos
          findings in its talc ore, talc, and products throughout the decades.

17

18   2.   In or around 1978, J&J and other members of the CTFA destroyed evidence
          showing positive findings of asbestos in round-robin testing of J&J and
19        other manufacturers' consumer talcum products for asbestos content. The
          FDA initially proposed regulating the cosmetic talc industry. However, J&J
20        and other members of the CTFA contended that they should be able to self-
          regulate. As a result, the FDA had no authority to "go into [J&J's] files"; it
21        was up to J&J to voluntarily provide information to the FDA. Because the
          cosmetic talc industry was self-regulating, the CTFA rejected the FDA's
22        proposal to have CTFA disclose the results of CTFA's respective periodic
          monitoring for asbestos. At J&J's direction, the CTFA was instructed to
23        "[d]estroy your copy of the table" containing the results of the CTFA Task
          Force on Round Robin Testing of Consumer Talcum Products for
          Asbestiform Amphibole Minerals.

24

25   3.   J&J fraudulently labeled and advertised its Johnson's Baby Powder as being
          pure and protective of health, and free of asbestos fibers. J&J maintained
26        the trust of mothers and other consumers who used its Johnson's Baby
          Powder products through print advertisements and other methods. In the
27        1940s, J&J emphasized that doctors and nurses preferred Johnson's Baby
          Powder because of its effectiveness and alleged purity. J&J described the
28        product as the "purest." J&J also directly promoted its baby powder to
          medical personnel. J&J provided samples for doctors to distribute. A 1965

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

brochure for doctors claimed that the powder was safe and had medical benefits. The bottle itself even said, "Purest Protection." Another version of the bottle said, "Good for baby, Good for you." However, J&J well knew that its Johnson's Baby Powder was not pure because it contained asbestos. J&J also knew that its Johnson's Baby Powder provided no medical protection or any other medicinal value.

4.    J&J and its officers, directors, and managing agents including, but not limited to, Bill Ashton, Dr. R. Fuller, Dr. Gavin Hildick-Smith, Dr. Al Goudie, Dr. W. Nashed, and members of J&J's Talc Advisory Group, kept from or otherwise misrepresented to the public test results showing the presence of asbestos and asbestiform fibers in its talcum products, including Johnson's Baby Powder. For example, in or around October 1972, Dr. Nashed stated to Dr. Goudie that he "thought tremolite was mistakenly identified in view of similarity to Na [sodium] sesquicitrate!" Dr. Goudie replied, "There are trace quantities present confirmed both by McCrone & Bill Ashton. Levels are extremely low but occasionally can be detected optically. *This is not new*." In or around June 1973, the University of Minnesota lab reported to J&J that its Shower to Shower talc powder contained "1/100th of 1 percent asbestos," as shown by electron microscopy, both in the material from J&J and from Dr. Lewin's sample. Shortly thereafter, J&J and the McCrone lab authored their own report in which they misquoted the University of Minnesota lab's report by using misleading ellipses that concealed the asbestos findings. In its November 1974 letter to a concerned consumer in California, J&J (i) falsely claimed that it used only the "purest talc available," (ii) described contrary articles as "sensational and scary," and (iii) claimed to be "highly ethical and responsible" because its products were safe.

## VII.

**The Exposures:** Mr. Valadez was born on September 23, 1998. He was exposed to asbestos, asbestiform fibers, and asbestiform talc through his and his family's use of Johnson & Johnson talc powder products. Mr. Valadez used and purchased Defendants' talc powder products in California and elsewhere. Mr. Valadez was exposed to Defendants' asbestos, asbestiform fibers, and asbestiform talc in California because Defendants (i) marketed and sold their talc products in California, and (ii) engaged in asbestos-related conduct that occurred in California.

## VIII.

**Venue:** Venue is proper in Alameda County because it is the headquarters and principal place of business of Defendant SAFEWAY INC.

## IX.

**The Harm:** Mr. Valadez has malignant mesothelioma caused by his exposures to asbestos, asbestiform fibers, and asbestiform talc. The mesothelioma has caused, and will cause,

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   Mr. Valadez to experience physical pain, mental suffering, loss of enjoyment of life,

2   disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress,

3   and other similar harm. And the mesothelioma will continue to inflict these harms on Mr. Valadez

4   in the future, ceasing only when it causes his untimely death.

5      Plaintiff incorporates by reference all of the above-mentioned allegations to each of the

6   liability theories set forth below and reserve the right to conform this Complaint to proof later

7   ascertained.

8      **<u>FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY</u>**

9                      **I.**

10      **Design Defect:** All Defendants, and the 1st through 100th Doe Defendants, have for many

11   years, manufactured, sold, distributed, designed, formulated, developed standards for, prepared,

12   processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled,

13   and/or otherwise placed into the stream of commerce, products containing asbestos, asbestiform

14   fibers, and/or asbestiform talc. First, these Defendants' products were defective and unsafe for

15   their intended purpose and foreseeable use in that when used, handled, mixed, or otherwise

16   disturbed, said products would result in the release, and therefore inhalation, of hazardous and

17   dangerous asbestos fibers, asbestiform fibers, and/or asbestiform talc by exposed persons,

18   including Mr. Valadez. Second, each product did not perform as safely as an ordinary consumer

19   would have expected it to perform when used or misused in an intended or reasonably foreseeable

20   way, because each product caused hazardous asbestos, asbestiform fibers, and/or asbestiform talc

21   to become airborne. Third, Mr. Valadez developed mesothelioma. Fourth, each product's failure to

22   perform safely was a substantial factor in causing Mr. Valadez's mesothelioma.

23                      **II.**

24      **Failure-to-Warn Defect:** All Defendants, and the 1st through 100th Doe Defendants, are

25   strictly liable for their products' failure-to-warn defects. First, these Defendants and/or their

26   predecessors have for many years, manufactured, sold, distributed, designed, formulated,

27   developed standards for, prepared, processed, assembled, tested, listed, certified, marketed,

28   advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce,

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    products containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, each product

2    had potential risks that were known or knowable in light of the scientific and medical knowledge

3    that was generally accepted in the scientific community at the time of design, manufacture, label,

4    distribution, and sale. Third, the potential risks presented a substantial danger when each product

5    was used or misused in an intended or reasonably foreseeable way, because each product caused

6    hazardous asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Fourth,

7    ordinary consumers would not have recognized the potential risks. Fifth, these Defendants failed

8    to adequately warn or instruct of the potential risks. Sixth, Mr. Valadez developed mesothelioma.

9    Seventh, the lack of sufficient warnings or instructions was a substantial factor in causing

10    Mr. Valadez's mesothelioma.

11    **<u>SECOND CAUSE OF ACTION FOR NEGLIGENCE</u>**

12    **I.**

13    **General Negligence:** All Defendants, and the 1st through 100th Doe Defendants, are

14    liable for their general negligence. First, Defendants failed to use reasonable care to prevent harm

15    to others, because they caused hazardous asbestos, asbestiform fibers, and/or asbestiform talc to

16    become airborne. Second, Defendants unreasonably acted and failed to act. They acted in ways

17    that a reasonably careful person would not do in the same situation, and failed to act in ways that a

18    reasonably careful person would do in the same situation. Third, Mr. Valadez developed

19    mesothelioma. Fourth, each Defendant's general negligence was a substantial factor in causing

20    Mr. Valadez's mesothelioma.

21    **II.**

22    **Negligent Design, Manufacture, Supply, Testing, Packaging, and Labeling of**

23    **Products:** All Defendants, and the 1st through 100th Doe Defendants, are liable for their

24    negligent design, manufacture, marketing, supply, testing, packaging, and labeling of products

25    containing asbestos, asbestiform fibers, and/or asbestiform talc. First, these Defendants designed,

26    manufactured, sold, distributed, formulated, developed standards for, prepared, processed,

27    assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or

28    otherwise placed into the stream of commerce, products containing asbestos, asbestiform fibers,

and/or asbestiform talc. Second, these Defendants were negligent in manufacturing, selling,
distributing, developing standards for, processing, assembling, testing, certifying, marketing,
advertising, packaging and/or labeling, and/or otherwise placing into the stream of commerce,
products containing asbestos, asbestiform fibers, and/or asbestiform talc because they caused
hazardous asbestos, asbestiform fibers, and asbestiform talc to become airborne. They failed to use
the amount of care that a reasonably careful person would use in similar circumstances to avoid
exposing others to a foreseeable risk of harm. Third, Mr. Valadez developed mesothelioma.
Fourth, each Defendant's negligence was a substantial factor in causing Mr. Valadez's
mesothelioma.

### III.

**Negligent Failure to Warn about Products:** All Defendants, and the 1st through 100th
Doe Defendants, are liable for their negligent failure to warn about their products. First, these
Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold products
containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, these Defendants knew or
reasonably should have known that each product was dangerous or was likely to be dangerous
when used or misused in a reasonably foreseeable manner, because each product caused hazardous
asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Third, these Defendants
knew or reasonably should have known that users would not realize the danger. Fourth, these
Defendants failed to adequately warn of the danger or instruct on the safe use of each product.
Fifth, a reasonably careful person under the same or similar circumstances would have warned of
the danger or instructed on the safe use of each product. Sixth, Mr. Valadez developed
mesothelioma. Seventh, each Defendant's negligent failure to warn or instruct was a substantial
factor in causing Mr. Valadez's mesothelioma.

### IV.

**Negligent Failure to Recall and Retrofit Products:** All Defendants, and the 1st through
100th Doe Defendants, are liable for their negligent failure to recall and retrofit their products.
First, these Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold
products containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, these

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   Defendants knew or reasonably should have known that each product was dangerous or was likely

2   to be dangerous when used in a reasonably foreseeable manner, because each product caused

3   hazardous asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Third, these

4   Defendants became aware of this defect after each product was sold. Fourth, these Defendants

5   failed to recall and retrofit each product. Fifth, a reasonably careful person under the same or

6   similar circumstances would have recalled and retrofitted each product. Sixth, Mr. Valadez

7   developed mesothelioma. Seventh, each Defendant's negligent failure to recall and retrofit each

8   product was a substantial factor in causing Mr. Valadez's mesothelioma.

9   ## THIRD CAUSE OF ACTION FOR FRAUD

10  ### I.

11      All Defendants, and the 1st through 100th Doe Defendants, are liable for fraud, including

12  fraudulent misrepresentation, fraudulent concealment, conspiracy to commit fraudulent

13  misrepresentation, and conspiracy to commit fraudulent concealment, as set forth herein.

14  ### II.

15  **Fraudulent Misrepresentation:** Defendants are liable for their fraudulent

16  misrepresentations.

17      First, each Defendant, via its employees, agents, advertisements, or any other authorized

18  person or document, represented that certain facts were true when they were not. The specific

19  identities of these employees, agents, advertisements, or any other authorized person or document

20  are maintained in Defendants' records. Such records remain in the exclusive control of Defendants

21  pursuant to their respective document-retention policies. While he does not currently know the

22  specific advertisements or names of the employees, agents, or any other authorized person who

23  made the representations, Plaintiff will have access to this information once discovery has

24  commenced and will be able to specifically name the advertisement as well as the employee,

25  agent, or any other authorized person.

26      Second, Defendants represented that the products they manufactured, supplied, or specified

27  for use were not hazardous to humans. These representations were made before and during the

28  years that Mr. Valadez and his family purchased and were exposed to asbestos from Defendants'

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

talc powder products. Such representations were made either directly to Mr. Valadez and his

family, or to a third party intending and reasonably expecting that the substance of those

representations would be repeated to Mr. Valadez and his family.

Third, Defendants knew that the representations were false when they made them, or they

made the representations recklessly and without regard for their truth.

Fourth, Defendants intended that Mr. Valadez and his family, and/or the same class of

persons as Mr. Valadez and his family, rely on the representations or their substance.

Fifth, Mr. Valadez and his family reasonably relied on Defendants' representations or the

substance of these representations.

Sixth, Mr. Valadez developed mesothelioma.

Seventh, Mr. Valadez and his family's reliance on those representations was a substantial

factor in causing Mr. Valadez's mesothelioma.

**III.**

**Fraudulent Concealment (Nondisclosure):** Defendants are liable for their fraudulent

concealment (nondisclosure).

First, each of the Defendants made affirmative statements that were so misleading (e.g.,

misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

specific relationship or transaction as between Defendants and Mr. Valadez. Specifically,

Defendants stated that their products could be used safely while concealing they were in fact lethal

because they contain and release asbestos fibers, asbestiform fibers, and asbestiform talc.

Second, Defendants (i) had exclusive knowledge of material facts not known to

Mr. Valadez (as set forth above), (ii) actively concealed these material facts from Mr. Valadez,

(iii) made partial representations but also suppressed material facts, as set forth above, and

(iv) made factual representations, but did not disclose facts which materially qualified those

representations. Such nondisclosures included Defendants representing their products as safe when

used as intended and as fit for the particular purpose for which they were marketed, while not

disclosing the facts that these products contained asbestos, asbestiform fibers, and asbestiform talc

that would become airborne during the intended and foreseeable use of the products, rendering

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    them dangerous and unfit for their intended purpose.

2         Third, each Defendant entered into a relationship and/or a transaction with Mr. Valadez

3    sufficient to give rise to a duty to disclose. For example, Mr. Valadez used or otherwise

4    encountered Defendants' products that were purchased either directly from Defendants and

5    Defendants' authorized dealer or supplier, or any other entity upon which Defendants derived a

6    direct monetary benefit directly from Mr. Valadez's purchase and use of the products. As for

7    another example, Defendants directly advertised their products to those in California and

8    elsewhere, as a symbol of freshness, cleanliness, and purity. Defendants advertised and marketed

9    this product as the "purest protection," the beacon of "freshness" and "comfort," eliminating

10   friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable,

11   and "clinically proven gentle and mild." Defendants compelled men and women through

12   advertisements to dust themselves with this product for a wide variety of reasons, including the

13   elimination of odors. Defendants knew that users would use the talcum powder as a dry shampoo

14   and it would release substantial asbestiform minerals into user's breathing zone. Defendants

15   derived direct monetary benefit from these individuals' use of these products because Mr. Valadez

16   decided to use or purchase Defendants' products.

17        Fourth, Mr. Valadez did not know of the concealed facts.

18        Fifth, Defendants intended to deceive Mr. Valadez by concealing the facts, and/or by

19   making certain representations without disclosing additional facts that would have materially

20   qualified those representations.

21        Sixth, had the omitted information been disclosed, Mr. Valadez reasonably would have

22   behaved differently.

23        Seventh, Mr. Valadez developed mesothelioma.

24        Eighth, each Defendant's concealment was a substantial factor in causing Mr. Valadez's

25   mesothelioma.

26                                    **IV.**

27        **Conspiracy to Commit Fraudulent Misrepresentation:** Plaintiff hereby incorporates by

28   reference the allegations above in this Third Cause of Action as if fully stated herein.

3156712.3

16

Complaint for Personal Injuries

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Defendants are liable for their conspiracy to commit fraudulent misrepresentation. First,

2    Defendants were aware that their conspirators, which included all co-defendants and others,

3    planned to commit fraudulent misrepresentation against Mr. Valadez and his family, and/or the

4    same class of persons as Mr. Valadez and his family. Second, Defendants agreed with their

5    conspirators and intended that the fraudulent misrepresentation be committed. Third, Mr. Valadez

6    developed mesothelioma. Fourth, each Defendant's participation in the conspiracy was a

7    substantial factor in causing Mr. Valadez's mesothelioma.

8                                            **V.**

9    **Conspiracy to Commit Fraudulent Concealment (Nondisclosure):** Plaintiff hereby

10   incorporates by reference the allegations above in this Third Cause of Action as if fully stated

11   herein. Defendants are liable for their conspiracy to commit fraudulent concealment. First,

12   Defendants were aware that their conspirators, which included all co-defendants and others,

13   planned to commit fraudulent concealment against Mr. Valadez and his family, and/or the same

14   class of persons as Mr. Valadez and his family. Second, Defendants agreed with their conspirators

15   and intended that the fraudulent concealment be committed. Third, Mr. Valadez developed

16   mesothelioma. Fourth, each Defendant's participation in the conspiracy was a substantial factor in

17   causing Mr. Valadez's mesothelioma.

18                                           **VI.**

19   **Knowledge of Hazards:** At all times pertinent hereto, Defendants, including 1st through

20   100th Doe Defendants, owed Mr. Valadez a duty, as provided for in Civil Code sections 1708,

21   1709, and 1710, to abstain from injuring his person, property, or rights. In violation of that duty,

22   Defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as

23   set forth herein, thereby proximately causing injury to Mr. Valadez. Such acts and omissions

24   consisted of acts falling within Civil Code section 1710, and more specifically were

25   (i) suggestions of fact which were not true and which the Defendants did not believe to be true,

26   (ii) assertions of fact of that which was not true, which the Defendants had no reasonable ground

27   for believing it to be true, and (iii) the suppression of facts when a duty existed to disclose it, as

28   more fully set forth herein, and the violation of which as to any one such item gave rise to a cause

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

of action for violation of Mr. Valadez's rights as provided for in the aforementioned code sections.

Defendants have known and possessed of the true facts (consisting of medical and scientific data, and other knowledge) which clearly indicated that the materials and products referred to herein were and are hazardous to the health and safety of Mr. Valadez, and others similarly situated. In addition to the allegations set forth in this Third Cause of Action, Defendants engaged in the following acts and omissions:

1. Did not label any of the aforementioned asbestos-containing materials and products as to the hazards of such materials and products to the health and safety of Mr. Valadez, and others in their position using these products when the knowledge of such hazards was existing and known to Defendants, and each of them, since 1924. By not labeling such materials as to their said hazards, Defendants, and each of them, caused to be suggested as a fact to Mr. Valadez that it was safe for his to use such materials, when in fact these things were not true and Defendants did not believe them to be true.

2. Suppressed information relating to the danger of using the aforementioned materials by requesting the suppression of information to Mr. Valadez and the general public concerning the dangerous nature of the aforementioned materials to all persons, including users, bystanders and household members, by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof when Defendants were bound to disclose such information.

3. Sold the aforementioned products and materials to the public, including Mr. Valadez, and others in California and other states without advising them of the dangers of use of such materials and to those persons' household members, when Defendants knew of such dangers, as set forth herein and above, and had a duty to disclose such dangers. Thus, Defendants caused to be positively asserted to Mr. Valadez, and the public that which was not true and which Defendants had no reasonable ground for believing it to be true, in a manner not warranted by the information possessed by said Defendants, and each of them, of that which was and is not true, to wit, that it was safe for Mr. Valadez to use such materials and that it did not pose a risk of harm.

4. Suppressed and continue to suppress from everyone, including Mr. Valadez, medical, scientific data, and knowledge of the accurate results of studies including, but not limited to, Waldemar C. Dreesen of the United States Public Health Service's 1933 report to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

5. Belonged to, participated in, and financially supported the Industrial Hygiene Foundation, Asbestos Information Association, the Asbestos Textile Institute (ATI), and other industry organizations, including the Cosmetic, Toiletry, and Fragrance Association (now known as the Personal Care Products Council), which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of Defendants, and each of them, thereby misleading Mr. Valadez to their prejudice through the suggestions and deceptions set forth above in this cause of action. ATI's Dust Control Committee, which changed its name to the Air Hygiene Committee of ATI, was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (i) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to Mr. Valadez at this time.

6. Knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina. This information was disseminated through the ATI and other industry organizations to all other Defendants, and each of them, herein. Between 1942 and 1950, Defendants, and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the ATI and other industry organizations to all other Defendants herein. Thereby, Defendants suggested as fact that which is not true and disseminated other facts likely to and did mislead Mr. Valadez for want of communication of true facts, which consisted of the previously described medical and scientific data and other knowledge by not giving Mr. Valadez the true facts concerning such knowledge of danger, when Defendants were bound to disclose it.

7. Failed to warn Mr. Valadez and others similarly situated regarding the nature of Defendants' talcum products. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).] Defendants

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

failed to warn Mr. Valadez and others similarly situated that their talcum products are, among other things, dangerous when breathed and causes pathological effects without noticeable trauma, although Defendants possessed knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and under a duty to disclose it.

8. Concealed from Mr. Valadez, and others similarly situated the true nature of their exposure, the fact that Defendants knew that exposure to respirable asbestos meant that Mr. Valadez would inhale this asbestos, significantly increasing his risk of developing asbestosis, lung cancer, and mesothelioma; that Mr. Valadez that had in fact been exposed to respirable asbestos; that the materials to which Mr. Valadez was exposed would cause pathological effects in the human body without noticeable or perceptible trauma to warn him of injury; and Defendants engaged in these acts and omissions while under a duty to and bound to disclose this information.

9. Failed to provide information to the public at large and buyers, users and physicians of Mr. Valadez for the purpose of conducting physical examinations of anyone whom came in contact with asbestos as to the true nature of the hazards of asbestos, in order for such physicians to diagnose, and treat individuals coming into contact with asbestos, in that the materials to which Mr. Valadez had been exposed would cause pathological effects without noticeable trauma, even though Defendants were under a duty to supply such information and such failure was and is likely to mislead persons including Mr. Valadez as to the dangers and risk of harm to which they were exposed.

10. Affirmatively misrepresented that asbestos-containing products were safe to use and handle, when Defendants knew such statements were false when made, or made said false statements recklessly and without regard for whether the statements were true.

Each of the foregoing acts, suggestions, assertions, and forbearances to act when a duty existed to act, the said Defendants, and each of them, having such knowledge, knowing Mr. Valadez did not have such knowledge and would breathe such material innocently, was done falsely and fraudulently and with full intent to induce Mr. Valadez to be present in a dangerous environment and to cause him to remain unaware of the true facts, all in violation of Civil Code section 1710.

## BASIS FOR PUNITIVE DAMAGES

**Malice, Oppression, or Fraud:** Mr. Valadez hereby incorporates by reference the allegations of all causes of action as if fully stated herein. Defendants, including 1st through 100th Doe Defendants, are liable for punitive damages because they engaged in the conduct that caused Mr. Valadez's harm with malice, oppression, or fraud.

1    First, Defendants committed malice in that they acted with intent to harm when they

2  caused Mr. Valadez's exposures to asbestos, asbestiform fibers, and/or asbestiform talc, and

3  because their conduct was despicable and was done with a willful and knowing disregard of the

4  rights and safety of others.

5    Second, Defendants committed oppression in that their conduct was despicable and

6  subjected Mr. Valadez to cruel and unjust hardship in knowing disregard of his rights.

7    Third, Defendants committed fraud in that they intentionally and fraudulently concealed

8  and misrepresented material facts and did so intending to harm Mr. Valadez and with reckless

9  disregard for whether their fraud would harm Mr. Valadez.

10    The conduct of Defendants constituting malice, oppression, or fraud was committed,

11  authorized, and adopted by one or more officers, directors, and managing agents within the

12  corporate hierarchy of each Defendant, who acted on behalf of each Defendant.

### **PRAYER FOR DAMAGES**

14  Plaintiff prays for judgment for:

15  1.    All economic and non-economic compensatory damages in excess of $25,000;

16  2.    Punitive damages according to proof;

17  3.    Pre- and post-judgment interest;

18  4.    Costs of suit; and

19  5.    Such other relief as is fair, just, and equitable.

### **DEMAND FOR JURY TRIAL**

21  Plaintiff hereby demands a trial by jury on all issues so triable.

22  DATED: June 15, 2022            KAZAN, McCLAIN, SATTERLEY & GREENWOOD
                                    A Professional Law Corporation

25  By: _____

26        Joseph D. Satterley

        Attorneys for Plaintiff

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit C

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Ian A. Rivamonte, Esq | SBN: Bar No. 232663
KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

FOR COURT USE ONLY

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
07/06/2022 at 02:40:48 PM
By: Andrel Gospel,
Deputy Clerk

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: Valadez |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   - a. ☑ Summons
   - b. ☑ Complaint
   - c. ☑ Alternative Dispute Resolution (ADR) package
   - d. ☑ Civil Case Cover Sheet
   - e. ☐ Cross-Complaint
   - f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**
3. a. Party served *(specify name of party as shown on documents served):*

   **ALBERTSONS COMPANIES, INC., individually and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY STORES, INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino

4. Address where the party was served: **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**
5. I served the party *(check proper box)*
   - a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/23/2022**   (2) at *(time):* **9:30 AM**
   - b. ☐ **by substituted service.** On *(date):*  at  *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

     (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

     (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

     (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

     (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
     *(date):*  from *(city):*                                    **or** ☐ a declaration of mailing is attached.

     (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

**EXHIBIT C**

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):*                      (2) from *(city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **ALBERTSONS COMPANIES, INC., individually and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY STORES, INC.**

   under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number: **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

   (1) ☐ not a registered California process server.

   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

   (3) ☑ registered California process server:

      (i) ☐ owner    ☐ employee    ☑ independent contractor.

      (ii) Registration No.: **2013128925**

      (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/23/2022**

**N** Nationwide Legal, LLC
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

▶ *(signature)*

_____
**Dion Jones**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

POS-050/EFS-050

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO.: 286,890<br>NAME: JOSEPH D. SATTERLEY<br>FIRM NAME: KAZAN, McCLAIN, SATTERLEY & GREENWOOD, A Profesional Law Corp.<br>STREET ADDRESS: 55 Harrison Street, Suite 400<br>CITY: Oakland STATE: CA ZIP CODE: 94607<br>TELEPHONE NO.: 510- 302-1000 FAX NO. :<br>E-MAIL ADDRESS:<br>ATTORNEY FOR (name): PLAINTIFF | **FOR COURT USE ONLY**<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>07/06/2022 at 02:38:55 PM<br>By: Andrei Gospel,<br>Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA<br>STREET ADDRESS: 1225 FALLON STREET<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Oakland, CA 94612<br>BRANCH NAME: Rene C. Davidson Courthouse | |
| PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ | CASE NUMBER:<br>22CV012759 |
| DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, ET AL. | JUDICIAL OFFICER: |
| **PROOF OF ELECTRONIC SERVICE** | DEPARTMENT: |

1. I am at least 18 years old.

    a. My residence or business address is *(specify):*
       1609 JAMES M. WOOD BLVD., LOS ANGELES, CA 90015

    b. My electronic service address is *(specify):*
       NWLPROCESS@NATIONWIDELEGAL.COM

2. I electronically served the following documents *(exact titles):*
   Summons; Complaint; Alternate Dispute (ADR) Package; Civil Case Cover Sheet; Civil Case Cover Sheet Addendum; Notice of Case Management Conference; Letter to Judge Jo-Lynne Q. Lee

   [ ] The documents served are listed in an attachment. *(Form POS-050(D)/EFS-050(D) may be used for this purpose.)*

3. I electronically served the documents listed in 2 as follows:
    a. Name of person served: JOHNSON & JOHNSON

    On behalf of *(name or names of parties represented, if person served is an attorney):*

    b. Electronic service address of person served *:*
       serviceofprocess@its.jnj.com

    c. On *(date):* 6/28/2022

    [x] The documents listed in item 2 were served electronically on the persons and in the manner described in an attachment.
        *(Form POS-050(P)/EFS-050(P) may be used for this purpose.)*

Date: 6/28/2022

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Anthony Iavarone
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

Page 1 of 1

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-050/EFS-050 [Rev. February 1, 2017] | **PROOF OF ELECTRONIC SERVICE**<br>**(Proof of Service/Electronic Filing and Service)** | Cal. Rules of Court, rule 2.251<br>*www.courts.ca.gov* |

Case 2:23-cv-02889-WBK Doc 27-2 Filed 07/10/23 Entered 07/10/23 08:06:21 Desc
Exhibit Exhibits to 2021 Satterley Declaration Page 186 of 45

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Ian A. Rivamonte, Esq | SBN: Bar No. 232891
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS

ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
06/22/2022 at 03:09:19 PM
By: Lynn Wiley,
Deputy Clerk

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: Valadez |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*
   **LUCKY STORES, INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Cogency Global Inc., Registed agent by serving Mai Yang - Dropped in Basket, Per Authorized Procedure**
   **Age: 26-30 | Weight: 100-120 Lbs. | Hair: Black | Sex: Female | Height: 5'1" - 5'6" | Eyes: Brown | Race: Asian**

4. Address where the party was served:  **1325 J St Ste 1550**
   **Sacramento, CA 95814-2976**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/22/2022**   (2) at *(time):* **2:00 PM**

   b. ☐ **by substituted service.** On *(date):*  at *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him or her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*  from *(city):*  **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
POS010-1/SF98374

PETITIONER: ANTHONY HERNANDEZ CALADER
RESPONDENT: **JOHNSON & JOHNSON, et al.**

Case 2:23-02895-MBK Doc 2766-2 Filed 07/10/23 Entered 07/10/23 08:30:21 Desc
Exhibits 20-21 Easterly Declaration Page 187 of 45
22CV012759

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **LUCKY STORES, INC.**

     under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name: **Michael Romero - Nationwide Legal, LLC REG: 12-234648**

b. Address: **1625 Clay Street 4th Floor Oakland, CA 94612**

c. Telephone number: **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

(1) ☐ not a registered California process server.

(2) ☐ exempt from registration under Business and Professions Code section 22350(b).

(3) ☑ registered California process server:

     (i) ☐ owner    ☐ employee    ☑ independent contractor.

     (ii) Registration No.: **2020-03**

     (iii) County: **Sacramento**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/22/2022**

**N**

**Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

 

| | |
|---|---|
| **Michael Romero** | ▶ |
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | |

Case 22-30295-WBK Doc 2736-2 Filed 07/10/22 Entered 07/10/22 08:30:21 Desc Exhibit Exhibit B - 2021 Satterley Declaration Page 336 of 45

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Ian A. Rivamonte, Esq | SBN, Bar No. 232032
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
06/22/2022 at 03:10:22 PM
By: Tania Pierce,
Deputy Clerk

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:
Valadez

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**
3. a. Party served *(specify name of party as shown on documents served):*
   **SAFEWAY INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   **Age: 36-40 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino**

4. Address where the party was served:
   **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/22/2022**   (2) at *(time):* **12:30 PM**
   b. ☐ **by substituted service.**  On *(date):*   at *(time):*   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20).  I mailed the documents on *(date):*  from *(city):*   **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
POS010-1/SF98373

PETITIONER: ANTHONY HERNANDEZ VALADEZ

RESPONDENT: **JOHNSON & JOHNSON, et al.**

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                       (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **SAFEWAY INC.**

    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

    a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

    b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

    c. Telephone number: **(510) 444-4690**

    d. **The fee** for service was: **$ .00**

    e. I am:

        (1) ☐ not a registered California process server.

        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

        (3) ☑ registered California process server:

            (i) ☐ owner    ☐ employee    ☑ independent contractor.

            (ii) Registration No.: **2013128925**

            (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/22/2022**

**N**   **Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____

▶

    **Dion Jones**
  (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

POS-010

Case 2:23-cv-02829-WBS Document 27-2 Filed 04/10/23 Entered 04/10/23 08:30:21 Desc Exhibit Exhibit A - 2021 SATTERLEY DECLARATION Page 43 of 45

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Ian A. Rivamonte, Esq | SBN. Bar No. 232685
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
06/22/2022 at 10:56:17 AM
By: Tania Pierce,
Deputy Clerk

Superior Court of California, County of Alameda
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: Valadez |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF CASE MANAGEMENT CONFERENCE; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*
   **SAVE MART SUPERMARKETS, individually, and as successor-in-interest, parent, alter ego and equitable trustee of LUCKY STORES, INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Cogency Global Inc., Registed agent by serving Lya Dagette  - Dropped in the Basket, Per Authorized Procedure**
   **Age: 36-40 | Weight: 161-180 Lbs. | Hair: Brown | Sex: Female | Height: 5'7 - 6'0 | Eyes: Blue | Race: Caucasian**

4. Address where the party was served:  **1325 J St Ste 1550**
   **Sacramento, CA 95814-2976**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/22/2022**     (2) at *(time):* **10:25 AM**

   b. ☐ **by substituted service.** On *(date):*  at  *(time):*  I left the documents listed in item 2 with or
   in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
   *(date):*  from *(city):*                                **or** ☐  a declaration of mailing is attached.

   (5) ☐ I attach a  **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10
POS010-1/SF98273

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*  (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **SAVE MART SUPERMARKETS, individually, and as successor-in-interest, parent, alter ego and equitable trustee of LUCKY STORES, INC.**

under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name: **Michael Romero - Nationwide Legal, LLC REG: 12-234648**

b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number: **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

(1) ☐ not a registered California process server.

(2) ☐ exempt from registration under Business and Professions Code section 22350(b).

(3) ☑ registered California process server:
   (i) ☐ owner   ☐ employee   ☑ independent contractor.
   (ii) Registration No.: **2020-03**
   (iii) County: **Sacramento**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/22/2022**

**N**

**Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____    ▶    _____
**Michael Romero**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Ian A. Rivamonte, Esq | SBN: Bar No. 232180
KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO.: (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**07/06/2022 at 02:42:56 PM**
By: Gina Fu,
Deputy Clerk

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:
Valadez

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**
3. a.  Party served *(specify name of party as shown on documents served):*

   **TARGET CORPORATION**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   **Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino**

4. Address where the party was served:   **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service for the party (1) on *(date):* **6/23/2022**   (2) at *(time):* **9:30 AM**
   b. ☐ **by substituted service.** On *(date):*  at  *(time):*  I left the documents listed in item 2 with or
   in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him or her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
   *(date):*  from *(city):*  **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
POS010-1/SF98451

PETITIONER: ANTHONY HERNANDEZ-VALLADARES
RESPONDENT: **JOHNSON & JOHNSON, et al.**

Case 2:23-cv-02825-MRK  Doc 27362  Filed 07/10/23  Entered 07/10/23 08:30:21  Desc
Exhibits C-1 to 2-21 BASTERLY DECLARATION  Page 46 of 45
22CV012759

c. ☐ **by mail and acknowledgment of receipt of service.**  I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                                       (2) from  *(city):*

(3) ☐ with two copies of the  *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of  *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **TARGET CORPORATION**

under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name:  **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

b. Address:  **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number:  **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

(1) ☐ not a registered California process server.

(2) ☐ exempt from registration under Business and Professions Code section 22350(b).

(3) ☑ registered California process server:

(i) ☐ owner     ☐ employee        ☑ independent contractor.

(ii) Registration No.: **2013128925**

(iii) County:  **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  **6/23/2022**

**Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____
**Dion Jones**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶

POS-010

Case 2:23-cv-02895-WBK Doc 273662 Filed 07/10/22 Entered 07/10/22 08:30:21 Desc Exhibit Exhibits 2-21 SATTERLEY DECLARATION Page 46 of 45

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar Number, and Address): FOR COURT USE ONLY
Ian A. Rivamonte, Esq. | SBN: Bar No: 232363
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS

ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
07/06/2022 at 02:44:03 PM
By: Andrei Gospel,
Deputy Clerk

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225 FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: Valadez |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*
   **WALMART INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino

4. Address where the party was served: **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/23/2022**   (2) at *(time):* **9:30 AM**
   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):* **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
POS010-1/SF98452

Case 22-30295-MBK Doc 2762 Filed 07/09/22 Entered 07/09/22 08:36:21 Desc
Exhibit Exhibits A-D - 21 SASTERLY DECLARATION Page Page 48 of 45

22CV012759

PETITIONER: ANTHONY HERNANDEZ VALADEZ

RESPONDENT: **JOHNSON & JOHNSON, et al.**

---

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                      (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **WALMART INC.**

    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number: **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☑ registered California process server:

        (i) ☐ owner   ☐ employee   ☑ independent contractor.

        (ii) Registration No.: **2013128925**

        (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/23/2022**

**N** **Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

---

        **Dion Jones**     ▶

    (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

# Exhibit 21

Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Movant Anthony Hernandez Valadez*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC, | : | Case No. 21-30589 |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF JOSEPH D. SATTERLEY

Pursuant to 28 U.S.C. § 1746, I, Joseph D. Satterley, declare under penalty of perjury as

follows:

1.      I am a partner in the law firm of Kazan, McClain, Satterley & Greenwood, A

Professional Law Corporation ("Kazan Law"), located at 55 Harrison Street, Suite 400, Oakland,

California 94607, and have been duly admitted to practice law in the States of Pennsylvania,

1

**EXHIBIT 21**

Kentucky, and California, the United States Supreme Court, the U.S. District Court for the

Eastern and Western Districts of Kentucky, and the U.S. Court of Appeals for the Third, Sixth,

Eighth, and Ninth Circuits. I am admitted as counsel *pro hac vice* in this action for Movant

Anthony Hernandez Valadez ("Movant" or "Mr. Valadez").

2.      Unless otherwise stated in this Declaration, I have personal knowledge of the

facts set forth herein. If called as a witness, I would testify as to those facts.

3.      I submit this Declaration in support of Movant's reply ("Reply") to the omnibus

objection ("Objection") of Debtor LTL Management LLC ("Debtor") to Movant's motion (the

"Motion") seeking relief from the Preliminary Injunction [Dkt. No. 1635] as to non-debtors

Johnson & Johnson ("J&J"), Johnson & Johnson Consumer Inc. ("New JJCI"), and retailers

Albertsons Companies, Inc., Lucky Stores, Inc., Safeway Inc., Save Mart Supermarkets, Target

Corporation, and Walmart Inc. (collectively, "Retailers"), or such other and further relief as the

Court deems just and proper.

4.      On June 9, 2022, pursuant to D.N.J. LBR 9013-3, I met and conferred with

Debtor's counsel Dan B. Prieto to determine whether Debtor will agree to lift the stay imposed

by the Preliminary Injunction and allow Movant to commence an asbestos personal-injury action

in Superior Court of California, County of Alameda, against J&J, New JJCI, and Retailers

(collectively, "Non-Debtors"). Because Debtor refuses to lift the stay, the parties were unable to

resolve the issues raised in the Motion and a hearing is required.

5.      Attached hereto as **Exhibit A** is a true and correct copy of the relevant excerpts

from the Transcript of Applications of the Official Committee of Talc Claimants, taken in this

case on May 24, 2022.

6.      Attached hereto as **Exhibit B** is a true and correct copy of the relevant excerpts from the transcript of Dr. Arthur Langer's deposition testimony in *Hall v. Johnson & Johnson*, U.S. District Court, District if New Jersey, Civil Action No. 3:18-cv-01833, taken on August 19, 2021, along with Exhibits 1, 2, 8, and 9 thereto.

7.      Attached hereto as **Exhibit C** is a true and correct copy of the Amended and Restated Funding Agreement by and among J&J, New JJCI, and Debtor, dated October 12, 2021.

8.      As previously stated in my declaration in support of this Motion [Dkt. No. 2348-2], I am the Kazan Law partner charged with all aspects of Mr. Valadez's case, including case management and discovery. But for the Preliminary Injunction, Mr. Valadez would have filed a lawsuit in Alameda County Superior Court against Non-Debtors for his exposure to asbestos and asbestiform fibers from his and his family's use of Johnson's Baby Powder talc. After Non-Debtors were served with the complaint and summons, I would have immediately moved for a preferential trial setting pursuant to California Code of Civil Procedure section 36(d) because Mr. Valadez's treating cardiothoracic surgeon Dr. Leah Backhus [Dkt. No. 2348-13] and treating oncologist Dr. Mohana Roy[1] each opine that there is substantial medical doubt of Mr. Valadez's survival beyond late November or early December 2022. Hence, based on my over 10 years of experience litigating asbestos cases in Alameda County, Mr. Valadez's case would have had an expedited discovery schedule and a preferential jury trial set by as early as October 2022.

9.      In its Objection, Debtor argues that "there is no guarantee that lifting the stay would result in more expedient treatment of or recovery with respect to [Movant's] claims" because Movant's request for a preferential trial setting "may not be granted." [Dkt. No. 2429, ¶ 21.] Debtor is wrong. Based on California law and my experience litigating asbestos cases in

---

[1] Dr. Roy's declaration accompanies Movant's Reply.

Alameda County Superior Court, it is virtually certain that the asbestos judge will grant a motion

for preference under California Code of Civil Procedure section 36(d) on behalf of a Kazan Law

mesothelioma plaintiff who has presented undisputed, clear, and convincing evidence that there

is substantial medical doubt of the mesothelioma plaintiff's survival beyond six months.

Accordingly, I strongly believe that Mr. Valadez would have received a trial date in October

2022, if he was able to commence suit against Non-Debtors.

10. To the contrary, Kazan Law has obtained orders in Alameda County Superior

Court in which the trial was set within one month from the day of the order granting preference.

For example, in *Marshall*, the trial court granted the plaintiff's motion for preference on

February 1, 2017, and set the trial 37 days later on March 3, 2017. Attached hereto as **Exhibit D**

is a true and correct copy of the Order Granting Motion for Preference in *Marshall*. Similarly, in

*Shea,* the trial court set a preferential trial within 32 days of the order granting preference.

Attached hereto as **Exhibit E** is a true and correct copy of the Order Granting Motion for

Preference in *Shea*. Given Mr. Valadez's declining health, I would have moved for preference

and sought a trial setting far less than the maximum 120 days that California Code of Civil

Procedure section 36 allows.

11. The asbestos personal-injury case of Patricia Schmitz is an example of a J&J talc

case that was given preferential status in Alameda County Superior Court and resulted in a

judgment entered against J&J before Ms. Schmitz's passing. I was the Kazan Law partner

charged with all aspects of the *Schmitz* case, including trial. The *Schmitz* personal-injury case

was filed in Alameda County Superior Court on October 5, 2018. In her complaint, Ms. Schmitz

alleged that she was exposed to asbestos from talc powder products, including Johnson's Baby

Powder. On November 20, 2018, Ms. Schmitz moved for a preferential trial setting under

4

California Code of Civil Procedure section 36(d) based on clear and convincing medical documentation that there is substantial medical doubt of her survival beyond six months from October 30, 2018. On December 18, 2018, the trial court granted Ms. Schmitz's motion and set a preferential trial for April 8, 2019. The trial began on April 8, 2019, and the jury reached a verdict in Ms. Schmitz's favor and against J&J on June 12, 2019. Judgment was entered on July 12, 2019. Ms. Schmitz died two days later on July 14, 2019.

12.    Since 2016, I have filed asbestos-related cases against J&J and other entities responsible for the marketing, distribution, sale, and design of Johnson's Baby Powder talc. To date, I have tried six cases to verdict against J&J on behalf of plaintiffs afflicted with mesothelioma in New Jersey, California, and Kentucky. Four of those six cases resulted in verdicts against J&J. In my experience, J&J, despite its talking points, is not interested in efficient and economic resolution of mesothelioma claims. For all of those six cases from 2018, 2019, 2020, and 2021, that eventually went to verdict, J&J refused to discuss or negotiate any of them prior to going to trial. Of the four cases that resulted in verdicts in the plaintiff's favor, J&J still refused to resolve any of them after the conclusion of trial.

13.    J&J's steadfast refusal to resolve mesothelioma claims, including those that Kazan Law has filed, is evident from its conduct after Debtor filed for Chapter 11 protection. For example, since the Chapter 11 filing, J&J has made no attempt to resolve the claims of Kazan Law clients Nedelka Vanklive and decedent Vincent Hill despite having more than sufficient information to do so. Also, to date, it is my understanding that Debtor and J&J have spent over $40 million in professional services related to this bankruptcy, yet J&J was able to pay its shareholders over $2.8 billion in dividends for the first quarter of 2022 alone. During the pendency of this bankruptcy, J&J has not voluntarily compensated a single mesothelioma victim.

14.     Attached hereto as **Exhibit F** is a true and correct copy of Plaintiff's Notice to Take Deposition of Matthew Streck in *Streck v. Johnson & Johnson*, Jefferson Circuit Court, Kentucky, Case No. 21-CI-06290 ("*Streck*"), served on January 20, 2022.

15.     Attached hereto as **Exhibit G** is a true and correct copy of the relevant excerpts from Matthew Streck's deposition testimony in *Streck*, taken on February 25, 2022.

16.     Attached hereto as **Exhibit H** is a true and correct copy of Plaintiff's Notice to Take Continued Deposition of Matthew Streck in *Streck*, served on February 28, 2022.

17.     Attached hereto as **Exhibit I** is a true and correct copy of the relevant excerpts from Matthew Streck's deposition testimony in *Streck*, taken on March 9, 2022.

18.     It has been my experience that J&J has no interest in appearing for depositions to preserve a dying mesothelioma plaintiff's testimony. In addition to Mr. Valadez, I represent Matthew Streck in his asbestos personal-injury action against J&J and other defendants in Jefferson Circuit Court in Kentucky. On January 20, 2022, the notice of Mr. Streck's deposition was served on counsel for J&J. [Exh. G.] No lawyer representing J&J appeared during the first day of Mr. Streck's deposition on February 25, 2022. [Exh. H at 3:2-4:15.] J&J was also on notice that Mr. Streck's continued deposition will occur on March 9, 2022. [Exh. I.] Again, no lawyer representing J&J appeared for Mr. Streck's continued deposition. [Exh. J at 3:2-4:15.]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. I executed this Declaration on June 10, 2022, at Oakland, California.


By:     /s/ Joseph D. Satterley
        JOSEPH D. SATTERLEY

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                    .    Case No. 21-30589(MBK)
                          .    Chapter 11
LTL MANAGEMENT LLC,       .
                          .    Clarkson S. Fisher U.S. Courthouse
            Debtor.       .    402 East State Street
                          .    Trenton, NJ 08608
                          .
                          .    Tuesday, May 24, 2022
. . . . . . . . . . . ..        10:00 a.m.

TRANSCRIPT OF APPLICATIONS OF THE
OFFICIAL COMMITTEE OF TALC CLAIMANTS
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Jones Day
                            By:  GREGORY M. GORDON, ESQ.
                            2727 North Harwood Street, Suite 500
                            Dallas, TX 75201

For Plaintiffs'             Otterbourg P.C.
Steering Committee in       By:  MELANIE CYGANOWSKI, ESQ.
MDL Litigation:             230 Park Avenue
                            New York, NY  10169Å

For the Official            Brown Rudnik, LLP
Committee of Talc           By:  SUNNI BEVILLE, ESQ.
Claimants 1:                One Financial Center
                            Boston, MA 02111

                            Brown Rudnik, LLP
                            By:  DAVID J. MOLTON, ESQ.
                            7 Times Square
                            New York, NY  10036

Audio Operator:             Luz Di Dolci

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For the Official          Genova Burns LLC
Committee of Talc         By:  DANIEL M. STOLZ, ESQ.
Claimants 1:              110 Allen Road, Suite 304
                          Basking Ridge, NJ  07920

For the U.S. Trustee:     U.S. Department of Justice
                          By:  JEFF SPONDER, ESQ.
                               LINDA RICHENDERFER, ESQ.
                          One Newark Center, Suite 2100
                          Newark, NJ  07102

For Aylstock, Witkin,     Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz,        By:  ROBERT J. PFISTER, ESQ.
PLLC:                     1801 Century Park East, 26th Floor
                          Los Angeles, CA 90067

For Arnold & Itkin:       Pachulski Stang Ziehl & Jones
                          By:  LAURA DAVIS JONES, ESQ.
                          919 North Market Street, 17th Floor
                          Wilmington, DE 19801

                            - - -

3

1          THE COURT:  Good morning, everyone.  We'll start

2   today's calendar with LTL Management matters.  We have maybe a

3   half a dozen attorneys appearing on CourtSolutions.  Thank you

4   for appearing through that platform.  If you have questions or

5   wish to be heard, please use the raise-hand function.

6          Now, before we start the calendar today, let me run

7   through some housekeeping issues.  As I indicated at a prior

8   hearing, the Court was inclined to appoint an additional co-

9   mediator to address, primarily, the claims brought by the

10  various State Attorneys General, as well as to assist the

11  existing co-mediators, Judge Schneider and Mr. Russo.  I have

12  asked and selected former retired bankruptcy Judge Don

13  Steckroth to undertake that task.  He's in the courtroom.

14                    (Technical Difficulties)

15          THE COURT:  Well, hopefully people will hear me.

16          So, I've asked Judge Steckroth to get involved.  I've

17  had him make sure he has no conflicts.  I'll ask that he file a

18  2016 statement regarding any potential connections with his

19  firm, Cole Schotz.  And I'm hoping he can, and I'm confident he

20  can assist in the process.

21          Mediation -- let's talk about the process.  I do want

22  to express my appreciation to all of the professionals.  I

23  guess over the past month or so you've been engaged in

24  mediation efforts with Judge Schneider and Mr. Russo.  My

25  limited understanding -- I had a very brief conversation with

Case 22-30895-MBK  Doc 246-2  Filed 06/10/22  Entered 06/10/22 08:35:09  Desc
Exhibit B - Exhibits 20A21 to Satterley Declaration  Page 60 of 186

4

1  them, we are, I think it's fair to say, not as far along as he

2  would have liked, but he has seen some progress and I think

3  those who are familiar with Philadelphia sports, there's a

4  phrase trust the process.  It hasn't gone very well because

5  they have that phrase and they keep watching losing years year

6  after year.

7                    (Laughter)

8          So, I also have a trust in the process in mediation.

9  I don't plan on having a losing season year after year here.

10  I'm hoping quite the contrary.  So, I don't want to abandon the

11  mediation efforts.  I think they are valuable and I think Judge

12  Steckroth will supplement that endeavor.  I'm hoping that as we

13  move along, in the interim, I'm going to, obviously, defer to

14  the mediators but they can pick off various issues, small and

15  large, and prioritize while the process goes forward.  But we

16  need to go forward.

17          I'm not going to simply rely on mediation.  We have a

18  pending bankruptcy case that has to move forward.  We have

19  exclusivity that goes through September.  We have a

20  reevaluation date, I'll call it, in June -- the end of June --

21  June 29th -- to see where we're at.  There are options for the

22  Court that I'm going to consider and I'm going to be candid.  I

23  plan on reaching out for Judge Wilson to see where we left off

24  in bellwether cases.  If that's a possibility or if there is a

25  small segment of cases that should go forward or whether

Case 22-30085-MBK Doc 246-2 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 61 of 186

5

1  nothing should go forward.

2          You know, obviously, I'm going to hear from the

3  parties but there are a number of considerations out there as

4  to how both move forward with mediation but move the case

5  forward as need be and try to preserve the rights of the

6  claimants as well as the debtor.  I certainly will be open to

7  argument and suggestions on all of these issues, but I

8  certainly want to be clear I'm going to, at least, I'm taking

9  it on my own responsibility to try to see how best to move the

10 case forward and it calls for maybe some creativity.

11         I'm sure each side or all sides -- I don't know if

12 there's just two sides here or maybe multiple sides here --

13 have different perspectives on how this case is going to go

14 forward.  I may have my own -- which is always the perogative

15 sitting up here.  But we'll try to see what we best can do.

16 But I do want to, at least, express my appreciation, obviously,

17 to the co-mediators for what efforts they're putting in, but

18 also to the professionals.

19         I have no reason to believe that anybody has

20 undertaken the efforts in the past month and a half without a

21 good faith goal to try to reach a compromise.  And I'm going to

22 ask that we continue in that regard.  This case will resolve

23 itself through some form of mediation or settlement.  I'm

24 confident.  It's just a matter of it's not going to be

25 overnight.  It is the process.  Hopefully, not as long as the

# C E R T I F I C A T I O N

       WE, ALYCE H. STINE, KELLI R. PHILBURN and ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Alyce H. Stine

ALYCE H. STINE


/s/ Kelli R. Philburn

KELLI R. PHILBURN


/s/ Elaine Howell

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.    DATE:  May 24, 2022

# Exhibit B

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF NEW JERSEY

3    ----------------------------x

4    FRANK HALL, Individually

5    and on Behalf of All Others

6    Similarly Situated,

7              Plaintiff,

8        -against-       Civil Action No.

9    JOHNSON & JOHNSON, et al.,     3:18-cv-01833

10             Defendants.  FLW-TJB

11   ----------------------------x

12

13

14     VIDEOTAPED STENOGRAPHIC DEPOSITION OF:

15        ARTHUR M. LANGER, Ph.D.

16         Williamsburg, Virginia

17        Thursday, August 19, 2021

18         9:14 a.m. - 3:31 p.m.

19    Reported Remotely through Zoom Videoconference

20

21

22

23   Reported stenographically by:

24   JoRita B. Meyer, RPR, RMR, CRR

25   JOB NO. 10085830

1       VIDEOTAPED STENOGRAPHIC DEPOSITION of

2   ARTHUR M. LANGER, Ph.D., taken in the

3   above-entitled matter before JoRita B. Meyer,

4   Registered Professional Reporter, Registered

5   Merit Reporter, Certified Realtime Reporter,

6   taken via remote video teleconference on

7   Thursday, August 19, 2021, commencing

8   at 9:14 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:23-cv-02995-MBK Doc 246-62 Filed 06/10/22 Entered 06/10/22 08:36:09 Desc Exhibit Exhibits 20-21 to Skakun Declaration Page 66 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

```
 1        A P P E A R A N C E S:

 2      ROBBINS GELLER RUDMAN & DOWD LLP

 3     BY:  ROBERT R. HENSSLER, JR., ESQUIRE

 4       655 West Broadway, Suite 1900

 5       San Diego, California  92101

 6       (619) 231.1058 / (610) 231.7423 (FAX)

 7       bhenssler@rgrdlaw.com

 8       Attorneys for Lead Plaintiff,

 9       San Diego County Employees

10        Retirement Association

11

12        SIDLEY AUSTIN LLP

13      BY:  JOHN M. SKAKUN, ESQUIRE

14        One South Dearborn Street

15        Chicago, Illinois  60603

16        (312) 853.7000

17        jskakun@sidley.com

18        Attorneys for the Defendants

19

20    ALSO PRESENT:

21        Lucas Cannon, RGRD

22        Chris Lee, SIDLEY

23        Triet Tran, RGRD

24        Stan Egilman, RGRD Consultant

25        Aaron Isaac, Legal Video Specialist
```

Case 3:23-08895-MBK Doc 246-2 Filed 06/00/22 Entered 06/00/22 08:55:09 Desc
Exhibit Exhibit 20-21 to Stuckey Declaration Page 67 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1        I N D E X

2    ARTHUR M. LANGER, Ph.D.            PAGE

3    Examination by Mr. Henssler..........8, 188

4    Examination by Mr. Skakun...............103

5

6

7        E X H I B I T S

8    EXHIBIT NO.     DESCRIPTION        PAGE

9    Exhibit 1 ..Bates stamped JNJ000288077.........29

10

11     Exhibit 2 ..Bates stamped JNJ000260527.........35

12

13     Exhibit 3 ..Bates stamped JNJ000265335.........38

14

15     Exhibit 4 ..Bates stamped JNJ000231200.........46

16

17     Exhibit 5 ..Bates stamped JNJ000253056.........50

18

19     Exhibit 6 ..Bates stamped JNJHALL_00011607.....60

20

21     Exhibit 7 ..Bates stamped JNJ000304381.........66

22

23     Exhibit 8 ..New York Times article,

24            December 14, 2018.................74

25

Case 2:23-08895-MBK Doc 246962 Filed 06/00/22 Entered 06/00/22 08:36:09 Desc
Exhibit Exhibit 20-21 to Satterley Declaration Page 88 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

| 1 | E X H I B I T S (CONT'D.) |
|---|---|
| 2 | EXHIBIT NO.        DESCRIPTION        PAGE |

3   Exhibit 9 ..Reuters article with the title

4        "Johnson & Johnson knew for

5        decades that asbestos lurked in

6        its Baby Powder"....................76

7

8   Exhibit 10 ..Bates stamp JNJ000299021..........87

9

10   Exhibit 11 ..Bates stamped JNJNL61_000034842...89

11

12   Exhibit 12 ..Bates stamped JNJ000273901........90

13

14   Exhibit 13 ..Bates stamped JNJ000274212........92

15

16   Exhibit 14 ..article titled:  "Consumer talcums

17        and powders:  Mineral and chemical

18        characterization," by Rohl,

19        Langer, Selikoff, Tordini,

20        Klimentidis, and Skinner...........92

21

22   Exhibit 15 ..Bates stamped JNJ0050002573,

23        three-page document with header

24        "Arthur M. Langer"................165

25

1    E X H I B I T S (CONT'D.)

2    EXHIBIT NO.        DESCRIPTION           PAGE

3    Exhibit 16 ..Bates numbers starting JNJ1106,

4            Addison and Langer................177

5   ///

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Bobby Henssler from Robbins Geller Rudman &

2    Dowd.  I'm also with Lucas Cannon from my

3    firm.  We represent the lead plaintiff in

4    this proposed class action, the San Diego

5    County Employees Retirement Association.

6       MR. SKAKUN:  Good morning.  My name is

7    John Skakun.  I'm at Sidley Austin.  We

8    represent defendant Johnson & Johnson, as

9    well as the individual defendants in this

10    matter, and I'm here with my colleague, Chris

11    Lee.

12       THE VIDEOGRAPHER:  Thank you.  Our court

13    reporter for today is JoRita Meyer and she'll

14    now administer the oath.

15       ARTHUR M. LANGER, Ph.D.,

16    WAS SWORN AND TESTIFIED AS FOLLOWS:

17          EXAMINATION

18  BY MR. HENSSLER:

19    Q.  Dr. Langer, you've just raised your

20  right hand and sworn an oath to tell the truth.

21  Do you understand that's the same oath were we

22  sitting in a courtroom today?

23    A.  Yes.

24    Q.  Thank you, sir.

25       This case is about Johnson & Johnson's

Case 2:23-08895-MBK Doc 246962 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibit 20-21 to Satterley Declaration Page 71 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1   conduct and certain statements relating to the

2   asbestos-free nature of J&J baby powder and talcs,

3   and I'm going to ask you some questions about your

4   experience regarding Johnson & Johnson's baby

5   powder and talcs.  Okay?

6       A.  Fine.

7       Q.   And I'm also going to ask you some

8   questions about some documents relating to those

9   same topics, your experience concerning

10  Johnson & Johnson's baby powder and talcs.  Okay?

11      A.  Fine.

12      Q.   And did you receive a binder from me?

13      A.  Yes.

14      Q.   Okay.  Great.  And do you have that

15  handy?

16      A.  Yes.

17      Q.   Okay.  Perfect.  We'll do some

18  background questions before we get to those

19  documents.

20          Before we start on the substantive

21  questions, do you understand that I'm not asking

22  you for any expert opinions, I'm just asking for

23  your factual testimony based on your experience

24  today?  Is that okay?

25      A.  Fine.

1    Q.   Okay.  First two questions.

2        Did you ever test talc from

3    Johnson & Johnson's baby powder to see if it

4    contained asbestos?

5    A.   Yes.

6    Q.   And did you find asbestos in the

7    Johnson & Johnson's baby powder and talc that you

8    tested?

9        MR. SKAKUN:  Objection, form.

10       THE WITNESS:  If I'm permitted.

11       MR. SKAKUN:  Go ahead.

12       MR. HENSSLER:  Dr. Langer, let me just

13    pause here.  So counsel for

14    Johnson & Johnson, Mr. Skakun, he may object

15    to some of my questions today, maybe all of

16    them.  You can answer all of those questions,

17    unless he tells you not to answer.  I don't

18    think that's going to happen, because he's

19    not your lawyer.  So -- and if he says that,

20    he and I will have a separate argument,

21    but -- so his objections are for the record.

22    You can answer all the questions.

23       Let me just re-ask that question.

24    BY MR. HENSSLER:

25    Q.   Did you find asbestos in the

Case 22-30895-MBK Doc 4692 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibits 20-21 to Saketey Declaration Page 73 of 186

Hall vs.
Johnson and Johnson

Arthur M. Langer, Ph.D.

1  Johnson & Johnson's baby powder that you tested?

2       MR. SKAKUN:  Objection, form.

3       THE WITNESS:  My findings' mineral

4    analysis depended on the time and year.

5  BY MR. HENSSLER:

6    Q.   And at any time when you tested J&J's

7  talc and baby powder, did you find asbestos?

8    A.   The first analyses --

9       MR. SKAKUN:  Same objection.

10       THE WITNESS:  The first analyses

11    conducted showed the presence of small

12    amounts of chrysotile asbestos.

13  BY MR. HENSSLER:

14    Q.   Were you surprised that your analysis

15  showed small amounts of chrysotile asbestos?

16    A.   At that time, no, I wasn't surprised.

17  In fact -- in fact, I rather suspected it, since

18  the sources of the talc used was in an area known

19  for the presence of a rock type called serpentine,

20  and the serpentine rock consists of three

21  principal minerals: lizardite, antigorite, and

22  chrysotile.  So the finding of small amounts,

23  trace amounts of chrysotile, did not surprise me,

24  no.

25    Q.   Your testing of J&J talc did find trace

Case 2:23-08895-MBK Doc 246962 Filed 06/10/22 Entered 06/10/22 08:35:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 74 of 186

Hall vs.
Johnson and Johnson

Arthur M. Langer, Ph.D.

1   amounts of chrysotile asbestos, correct?

2       A.   Yes.

3           MR. SKAKUN:  Objection,

4       mischaracterization, form.

5   BY MR. HENSSLER:

6       Q.   Did your testing find trace amounts of

7   chrysotile asbestos in J&J talc?

8           MR. SKAKUN:  Same objection.

9           THE WITNESS:  In the initial assays or

10      tests that we conducted, yes, there was

11      the -- small amounts of chrysotile present,

12      yes.

13  BY MR. HENSSLER:

14      Q.   Do you recall whether you communicated

15  that fact to Johnson & Johnson, that you had --

16  your tests had determined that there were small

17  amounts of chrysotile asbestos in J&J talc?

18      A.   Did I directly contact

19  Johnson & Johnson?

20      Q.   Do you recall --

21      A.   No, I did not.

22      Q.   Okay.  Dr. Langer, let's tell the jury a

23  little bit about your background.

24          Could you please tell us about your

25  college and postgrad degrees?

Case 2:23-08825-MBK   Doc 74-62   Filed 06/00/22   Entered 06/00/22 08:55:09   Desc
Exhibit Exhibit 20-21 to Satterley Declaration   Page 75 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    A.   I have a bachelor's degree from Hunter

2  College of the City College of New York, which I

3  was granted in 1956.  I then went on to Columbia

4  University to study in the Department of Geology.

5  I received a master's degree in 1962 and a Ph.D.

6  degree in 1965.

7    Q.   What was your Ph.D. in?

8    A.   My Ph.D. was granted and given from the

9  Department of Geology, where I specialized in the

10  subdiscipline mineralogy.

11    Q.   Was your master's the same type of

12  degree?

13    A.   My master's degree focused on -- I

14  studied under a professor of petrology; petrology,

15  yeah, the study of rocks and rock systems and how

16  they form.  The -- petrology is basically a study

17  of the mineral components of these units, these

18  lithologic units we call rocks.  So there is a

19  broad association, yes.

20    Q.   Could you also please tell the jury

21  about your work and professional experience

22  following your education?

23    A.   In the midyear of 1965 -- I was granted

24  my Ph.D. in March of 1965.  In midyear 1965, my

25  professor that I had studied with at Columbia

1   University, Professor Paul Kerr, was approached by

2   a Dr. Irving Selikoff, who was exploring the

3   possibility of the hiring of a recent Ph.D. in

4   mineralogy to join his newly formed unit in the

5   Mount Sinai Hospital, a division of environmental

6   health in the Department of Medicine.

7          Irving Selikoff was a pulmonary

8   physician, essentially, gained notice with his

9   clinical award, his Lasker Award for the clinical

10  trials with a new drug used as a -- as a -- a drug

11  for the treatment of tuberculosis.  The drug was

12  isoniazid.  Irving Selikoff achieved fame for his

13  Lasker Award, and he proceeded from tuberculosis

14  to the study of the asbestos diseases through a

15  number of routes.

16         Irving -- Irving approached Paul Kerr,

17  my professor -- my former professor, my colleague,

18  and explored the possibility of a recent Ph.D. to

19  join a medical research unit.  I was approached

20  for that position.  I -- it was a hard decision

21  for me because I had received interest and

22  appointment offers from a number of other units

23  and organizations.  However, after deliberation

24  with Paul Kerr, he thought it was a good idea to

25  begin my career in a field that was really

Case 2:23-08895-MBK  Doc 2476-2  Filed 06/00/22  Entered 06/00/22 08:35:09  Desc
Exhibit Exhibits 20-21 to Satterley Declaration  Page 77 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    different from classical mineralogy, so it seemed.

2         One of his former students was at

3    Harvard, studying the relationship -- a

4    crystallographer, studying the relationship

5    between appetite, bone, and cartilage, where these

6    substances, the inorganic substance and the

7    biological substrate, met and how this influenced

8    the structure of bone.

9         So I joined -- I agreed to join Irving

10   Selikoff's group, and my career began at Mount

11   Sinai hospital in 1965.

12        In 1967, the hospital became accredited

13   as a medical school, and my appointment changed

14   from a research associate in the Department of

15   Medicine to one of the professorial ranks in the

16   School of Medicine.

17        I remained there until the end of

18   approximately 1989.  In 1986 I had moved over to

19   the center for polypeptide and membrane research,

20   following their interest in my research concerning

21   the surface properties of minerals and their

22   interaction with biological membranes.  And so

23   this -- this time --

24        (Telephonic interruption)

25        MR. HENSSLER:  Do you need to pause and

1   take that call?

2       THE WITNESS:  It's probably -- it's

3   probably spam, with which I'm blessed a few

4   times every day.  God Almighty.

5       No.  Mercifully, they've given up their

6   pitch.

7       So it's an interesting career.  I stayed

8   with Irving Selikoff for 20 years.  We

9   pursued the study of the nature of certain

10  variants of chrysotile asbestos.  We pursued

11  the nature of the amphibole asbestos fiber

12  types.  I developed the techniques through

13  grants, Career Development Award with the

14  National Institute of Environmental Health

15  Sciences, to study the and develop the

16  technique for the isolation of microparticles

17  from human tissues and subject them to

18  analysis using electron beam instruments,

19  electron microscopy.

20      I've studied the asbestos fibers.  I've

21  studied fibrous -- I've studied talc in

22  detail, the cosmetic pharmaceutical grades of

23  talc and the industrial grades of talc, which

24  are very, very different, and of course a

25  number of other minerals that are consumed in

Case 2:23-cv-08895-MBK   Doc 246962   Filed 06/00/22   Entered 06/00/22 08:36:09   Desc
Exhibit Exhibits 20-21 to Satterley Declaration   Page 79 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    commerce in the United States, including

2    replacements of pigments in leads.  White

3    lead -- not white lead.  White paint is

4    formulated with lead compounds, and when lead

5    was removed from paints, the substitutes, at

6    least one of the substitutes, a titanium

7    compound, became suspect as a carcinogen as

8    well.

9        So there were a number of studies.  I

10    participated in the face mask studies.  I

11    participated in the characterization of

12    asbestos substitutes, and so on and so forth.

13    It was a -- it was a career packed with very

14    fascinating and interesting endeavors.

15  BY MR. HENSSLER:

16      Q.   And are you now retired, sir?

17      A.   I beg your pardon?

18      Q.   Are you now retired?

19      A.   Well, on paper I'm retired, but I

20  still -- I still do other consulting with people,

21  and I write.  So I'm not sitting by a pond with a

22  fishing rod.

23      Q.   Well, we hope you get to do that every

24  once in a while.

25      A.   Once in a while.

Arthur M. Langer, Ph.D.

1    Q.   Do you consider yourself an expert on

2   the identification of asbestos in talc?

3    A.   Yes.

4         MR. SKAKUN:  Objection.

5   BY MR. HENSSLER:

6    Q.   You've published journal articles about

7   the identification of asbestos in talc, right?

8    A.   Yes.

9    Q.   Is chrysotile always asbestos?

10   A.   Yes.

11        MR. SKAKUN:  Objection, form.

12   BY MR. HENSSLER:

13   Q.   Doctor, I want to talk a little bit more

14   about kind of the background of how you came to be

15   testing talcs, including J&J's talcs and baby

16   powder, for the presence of asbestos.

17        About when did you test J&J baby powder

18   for asbestos?  Do you recall?

19   A.   When did I first look at it?  I first

20   looked at that in -- I believe Selikoff and I

21   presented at a Food and Drug seminar -- Food and

22   Drug, the federal agency.  We presented at a

23   seminar, I believe in late 1968.  And we presented

24   a seminar focusing on particles found in human

25   tissues and their potential biological activity.

1   your time, Dr. Langer, and not keep you here

2   longer than we need to, so --

3       A.   Thank you.

4       Q.   No, yeah, that's all very helpful, I

5   think, for all of us, including the jury.

6           So --

7       A.   Let me get back to your original

8   question, please.

9       Q.   Thank you.

10      A.   The original question was:  Why are we

11  looking at talc?

12          Well, we looked at talc in 1968 because

13  there were predecessors who said mineral fiber is

14  responsible for the development of these objects

15  we called asbestos bodies, and someone from the

16  National Institute of Environmental Health -- no,

17  Lou Cralley, Dr. Cralley, who was the United

18  States Public Health Service in Cincinnati, had

19  two papers which indicated that consumer talc may

20  be a source of mineral fiber for the production of

21  asbestos bodies.

22          Well, then, the issue was, if we read

23  the literature, are these talcs possibly

24  contaminated or associated with mineral fiber that

25  we call asbestos?  That is why I looked at

Case 2:23-30895-MBK Doc 246962 Filed 06/00/23 Entered 06/00/23 08:36:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 82 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1  consumer talcum back in 1968 -- actually,

2  1967-'68.

3     Q.  And when you started looking at J&J's

4  talc specifically, what J&J talc did you test?

5  Was that off-the-shelf Johnson & Johnson baby

6  powder?

7     A.  Off-the-shelf, my recollection is,

8  Johnson & Johnson baby powder, but I -- my recall

9  may be imperfect, but it sounds like it at that

10  time, yes.

11     Q.  And "at that time" being the late '60s,

12  early '70s?

13     A.  Yes.

14     MR. SKAKUN:  Objection to form.

15  BY MR. HENSSLER:

16     Q.  And that would have been American

17  off-the-shelf J&J baby powder?

18     A.  Yes.

19     Q.  Dr. Langer, how did you analyze whether

20  there was asbestos in talc, including J&J baby

21  powder?

22     A.  We used a range of --

23     MR. SKAKUN:  Objection to form.

24     THE WITNESS:  We used a range of

25  standard mineralogical techniques.  The most

1 | prominent would be polarized light microscopy

2 | with an adequate set of immersion oils.  We

3 | used standard X-ray diffraction techniques.

4 | We used a SPECT scanning method of

5 | integrating X-ray counts over a specific

6 | range of the spectrum for diagnostic

7 | reflections, concentrations of X-ray counts

8 | brought about by a structure of the molecules

9 | within the crystal.

10 | We went -- we used other techniques as

11 | well.  Some of them were just applied to

12 | satisfy the literature.  Basically, people

13 | used techniques like infrared spectroscopy

14 | and X-ray diffraction -- no, differential

15 | thermal analysis, and these techniques were

16 | only suitable for analysis of individual

17 | specimens rather than complex mixtures of

18 | particles.

19 | We went further.  We explored the use of

20 | electron beam instruments, electron

21 | transmission: electron microscopy; selected

22 | area electron diffraction, which is like a

23 | single-crystal procedure by X-ray; and

24 | microchemical analysis by both standard

25 | electron microprobe techniques, crystal

Case 2:23-cv-08895-MBK  Doc 246-962  Filed 06/00/22  Entered 06/00/22 08:35:09  Desc
Exhibit Exhibits 20-21 to Satterley Declaration  Page 84 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1  spectrometry, as well as energy-dispersive

2  X-ray spectrometry.

3  I also had the good fortune of a

4  collegial relationship with Professor Donald

5  R. Bowes at the University of Glasgow.  He

6  had a marvelous geochemical laboratory, and

7  so we sent specimens of talcs of various

8  kinds, consumer powders, talcs, to his

9  laboratory.  They provided superb analyses of

10  these talcs, both major oxide percentages as

11  well as trace metals.  Professor Bowes and

12  Skinner were both recognized for their

13  contribution with co-authorship of several of

14  our papers.

15  BY MR. HENSSLER:

16  Q.  And, Dr. Langer --

17  A.  Please.

18  Q.  Yeah.  And you said that your analysis

19  determined that there was chrysotile asbestos

20  present in J&J talc, correct?

21  A.  Correct.

22  MR. SKAKUN:  Objection, form, and

23  mischaracterization.

24  BY MR. HENSSLER:

25  Q.  Do you recall -- did your analysis

Case 22-30835-MBK Doc 4662 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 85 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1  determine that there was chrysotile asbestos

2  present in J&J talc?

3     A.  Yes.

4        MR. SKAKUN:  Objection, vague.

5  BY MR. HENSSLER:

6     Q.  And do you recall what the testing

7  methodology was that you used when you made that

8  determination?

9     A.  I believe it was electron microscopy.

10    Q.  Is that a recognized testing

11  methodology?

12       MR. SKAKUN:  Objection, vague, and

13  scope.

14       THE WITNESS:  When?  Then, or now?

15  BY MR. HENSSLER:

16    Q.  Is that --

17    A.  Was it a standard method then?  No, I

18  don't think so.  I think the only --

19    Q.  What about now?

20       MR. SKAKUN:  Objection.

21       Please let the witness finish his

22  answer, Mr. Hennssler.

23       MR. HENSSLER:  John, please object and

24  then keep it to that.  Okay?

25       MR. SKAKUN:  I'm going to object to you

Case 2:23-08895-MBK Doc 246962 Filed 06/00/22 Entered 06/00/22 08:55:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 86 of 186

Hall vs.
Arthur M. Langer, Ph.D.                                                    Johnson and Johnson

1    interrupting the witness when he's giving

2    testimony that you don't like.  That's not

3    appropriate.

4        MR. HENSSLER:  John, knock it off.

5    Okay?  That's not appropriate.  You get to

6    ask questions when I'm done, and you can do

7    that, okay?

8        MR. SKAKUN:  Counselor, don't interrupt

9     the witness again.

10   BY MR. HENSSLER:

11       Q.   Doctor, once again, I'm sorry for the

12   interruptions.  Counsel for J&J will get to ask

13   you anything they want after I do, and so he can

14   go ahead and take notes and be prepared to do

15   that.

16       So the question was:  Today, is that

17   methodology a recognized testing methodology?

18       A.   Yes.

19       Q.   Dr. Langer, do you recall whether you

20   met with folks from J&J to talk to them about your

21   findings where you determined that there was

22   chrysotile asbestos in J&J talc?

23       MR. SKAKUN:  Objection, form.

24       THE WITNESS:  Yes.

25   BY MR. HENSSLER:

1    Q.   You did meet with folks from J&J?

2    A.   Yes.

3    Q.   Do you recall who you met with?

4        MR. SKAKUN:  Same objection.

5        THE WITNESS:  I believe it was the

6    president of the J&J, president of

7    Johnson & Johnson.  It could be one of the

8    divisions.  It's Mr. Johnson.  And Gavin

9    Hildick-Smith, who was the -- I guess the

10    corporate medical officer.

11   BY MR. HENSSLER:

12    Q.   And during that meeting, did you tell

13   them about your finding where you determined that

14   there was chrysotile asbestos in J&J talc?

15       MR. SKAKUN:  Objection, vague, asked and

16    answered.

17       THE WITNESS:  The nature of the meeting

18    was not the discussion of our findings,

19    essentially.  The meeting occurred in 1976,

20    following the publication of our paper on the

21    mineralogy and chemistry of consumer talcum

22    products, and the nature of the meeting was

23    not to discuss specifically the finding of

24    chrysotile in J&J talc.

25   BY MR. HENSSLER:

1    Q.   Okay.  Dr. Langer, let's start looking

2    at a few of those documents that I mentioned, and

3    we'll go ahead and mark the first exhibit to

4    today's deposition, if you have that binder, and

5    this is Tab 3 of the binder.

6         For the record, Exhibit 1 to today's

7    deposition is Bates stamped JNJ000288077.

8         If Lucas, my colleague, could mark that

9    for the electronic deposition.  I think that's

10   been done.

11        (Deposition Exhibit 1 marked for

12   identification)

13   BY MR. HENSSLER:

14   Q.   Dr. Langer, did you find Tab 3?

15   A.   Yes.

16   Q.   And are you looking at a November 10th,

17   1971 letter to a Dr. Hildick-Smith from yourself?

18   A.   Yes.

19   Q.   And that's what this appears to be,

20   right, a letter that you wrote around November

21   10th, '71 to Dr. Hildick-Smith?

22   A.   Yes.

23   Q.   And on page 2, is that your signature

24   underneath "Sincerely"?

25   A.   Yes, it looks like it.

Case 3:23-08095-MBK Doc 2469-2 Filed 06/10/22 Entered 06/10/22 08:35:09 Desc
Exhibit Exhibit 20-21 to Stickley Declaration Page 89 of 186

Hall vs.
Johnson and Johnson

Arthur M. Langer, Ph.D.

1    Q.   And your signature indicates that you

2   drafted the letter and you were conveying accurate

3   information to Dr. Hildick-Smith?

4    A.   Yes.

5    Q.   Let's take a quick look at parts of the

6   letter.

7         And, Dr. Langer, for your reference,

8   like I said earlier, in the interest of being

9   as -- using as little of your time as we need to,

10   I'm going to direct you to various points of some

11   of these documents we look at.  If you need to

12   sort of, for context or otherwise, look at other

13   parts, that's fine by me.  Okay?

14    A.   Okay.

15    Q.   So let's start on paragraph 3, on

16   page 1.

17    A.   Yes.

18    Q.   You wrote, "We have also analyzed one of

19   your talc samples in some detail."  Correct?

20    A.   Yes.

21    Q.   And was that true?

22    A.   Yes.  If I wrote it, I would assume it's

23   true.

24    Q.   And you and your team analyzed a J&J

25   talc sample in some detail; is that correct?

Case 2:23-08895-MBK Doc 246962 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibit 20-21 to Stahley Declaration Page 90 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    A.   Yes.

2    Q.   Okay.  Going on to the next page, page 2

3  of Exhibit 1, the fifth line down from the top you

4  wrote:  "We also observed trace amounts of

5  chrysotile asbestos only when the talc was

6  sonified and markedly dispersed.  The amounts of

7  chrysotile are relatively small, occurring in

8  amounts, we estimate, at less than .01%."

9        And that's what you wrote, correct?

10   A.   Yes.

11   Q.   And that was true, right?

12   A.   I would think so, yes.

13   Q.   And you stand by that finding that there

14  was chrysotile asbestos present in J&J talc,

15  right?

16   A.   Yes.

17       MR. SKAKUN:  Objection to form.

18  BY MR. HENSSLER:

19   Q.   Do you stand by that finding,

20  Dr. Langer, that you found chrysotile asbestos in

21  J&J talc?

22       MR. SKAKUN:  Same objection, form.

23       THE WITNESS:  Well, if I wrote it then,

24   and it was based on my observations, then I

25   assume that this is accurately reported.

Case 3:23-08295-MBK Doc 246-2 Filed 06/00/23 Entered 06/00/23 08:56:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 91 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    Yes.

2  BY MR. HENSSLER:

3    Q.   And just so you know, from time to time,

4  when Mr. Skakun, the lawyer for J&J, objects, I

5  may repeat a question.  It's definitely not

6  because I want to bother you with the same

7  question again.  I'm attempting to address, you

8  know, sometimes, his objections, just for your

9  information, Dr. Langer.

10    A.   Fine.

11    Q.   Dr. Langer, the next sentence in that

12  paragraph states:  "The J&J baby talc is of quite

13  high quality and as a matter of fact, in relation

14  to the number of samples we have examined thus

15  far, it is the 'purest'."

16        And you put "purest" in quotation marks,

17  correct?

18    A.   Yes.

19    Q.   What did you mean by "purest"?

20    A.   Meaning that a number of other talcums

21  we examined had many other minerals present in the

22  product.  In other words, if you take a rock and

23  you grind it up, although you call the rock a talc

24  rock, it can -- invariably, it can contain other

25  minerals as well.  And so the talc specimen that

Case 2:23-08895-MBK   Doc 246962   Filed 06/00/22   Entered 06/00/22 08:35:09   Desc
Exhibit Exhibits 20-21 to Stdecky Declaration   Page 92 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1   outside of the living space.  So Tenovus is the

2   name of their institute, their foundation:  Ten of

3   us, Tenovus.  And that is the name of the

4   organization.

5       Q.   Okay.  In the second paragraph of your

6   letter, Exhibit 1 to today's deposition, it

7   states:  "In respect to the Tenovus samples that

8   were sent to us, we made the following

9   observations.  We did find some grains that

10  resembled talc with the usual electron diffraction

11  pattern consistent for a sheet silicate

12  structure."

13      A.   Yes.

14      Q.   Going down, skipping a couple sentences,

15  it also says:  "We also got a few surprises in

16  what we observed" -- "in that we observed some

17  chrysotile asbestos to be present in the tissue as

18  well.  We've been kicking this observation around

19  the Laboratory for a while and we might consider a

20  publication somewhere -- just a short note

21  indicating that we have observed these materials

22  present in the tissues."

23          And that's what you wrote, correct?

24      A.   Yes.

25      Q.   And was that true, that you observed

Case 2:23-08895-MBK    Doc 246-2    Filed 06/00/22    Entered 06/00/22 08:35:09    Desc
Exhibit Exhibit 20-21 to Satterley Declaration    Page 93 of 186

Arthur M. Langer, Ph.D.                                                          Hall vs.
                                                          Johnson and Johnson

1  chrysotile asbestos in this tissue sample?

2      A.   Apparently so, yes.

3      Q.   And when you wrote that you might

4  consider a publication somewhere, does that refer

5  to a journal paper?

6      A.   Yes.

7      Q.   Do you recall whether you did publish a

8  journal paper about the chrysotile asbestos you

9  found in this tissue?

10     A.   I'm not sure we published a separate

11  paper, but we may have attributed our findings

12  elsewhere in the text of some paper we did

13  publish.  But I am uncertain of that.

14     Q.   You can put that document aside,

15  Dr. Langer.  Let's look at the next exhibit, which

16  is Tab 5 to today's deposition.

17          For the record, Exhibit 2 to today's

18  deposition is Bates stamped JNJ000260527.

19          (Deposition Exhibit 2 marked for

20  identification)

21  BY MR. HENSSLER:

22     Q.   Dr. Langer, this document appears to be

23  a letter that you received around December 14,

24  1971, correct?

25     A.   Yes.

Case 2:23-08825-MBK Doc 246962 Filed 06/00/22 Entered 06/00/22 08:55:09 Desc
Exhibit Exhibit 20-21 to Satterley Declaration Page 94 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1   time today, and we're trying to move this along as

2   quickly as we can for you, sir.

3       Did you have conversations with Dean

4   Chalmers about the fact that he had received a

5   letter from the president of Johnson & Johnson?

6       A.   Two questions.  The first part of the

7   question, did I ever meet with Dr. Chalmers

8   concerning the talc issue?  The answer is yes.

9       And did I -- did he inform me that he

10  received this letter from Mr. Johnston?  No.  No,

11  he did not.

12      Q.   Okay.  Let's put that one aside.

13      Dr. Langer, I want to fast-forward to

14  the last few years and talk about some interviews

15  that you did with Reuters and the New York Times.

16      Okay?

17      A.   Okay.

18      Q.   Did you speak with reporters from

19  Reuters and the New York Times during 2018?

20      A.   I believe so.

21      MR. SKAKUN:  Objection, form.

22  BY MR. HENSSLER:

23      Q.   And did the Reuters reporter ask about

24  your analysis of J&J baby powder and whether you

25  had found asbestos in J&J baby powder and talc?

Arthur M. Langer, Ph.D.

1        MR. SKAKUN:  Objection, form.

2        THE WITNESS:  Yes.

3    BY MR. HENSSLER:

4      Q.   That was yes?

5      A.   Yes.

6      Q.   And did you confirm to the Reuters

7    reporter that you had found chrysotile asbestos in

8    J&J powder and talc?

9      A.   Yes.

10        MR. SKAKUN:  Same objection.

11        THE WITNESS:  When they asked me the

12      question, I said yes.

13    BY MR. HENSSLER:

14      Q.   And did you tell the Reuters reporter

15    that you stood by your finding of chrysotile

16    asbestos in J&J talc?

17      A.   Yes.

18      Q.   And did you also tell the New York Times

19    reporter that you stand by your finding of

20    chrysotile asbestos in J&J talc?

21      A.   Yes.

22        MR. SKAKUN:  Same objection.

23        MR. HENSSLER:  Okay.  Let's look at a

24    New York Times article from around

25    December 14, 2018.  This is at Tab 1.  It's

Case 3:23-cv-02885-MBK   Doc 246-2   Filed 06/10/22   Entered 06/10/22 18:55:09   Desc
Exhibit Exhibit 20-21 to Satterley Declaration   Page 96 of 186

Hall vs.
Arthur M. Langer, Ph.D.                                                                    Johnson and Johnson

1    in the binder that we sent to you,

2    Dr. Langer.

3       For the record, this will be

4    Exhibit 7 -- oh, no, Exhibit 8.  I apologize,

5    Madam Reporter.

6       (Deposition Exhibit 8 marked for

7    identification)

8    BY MR. HENSSLER:

9       Q.   So Exhibit 8 is a New York Times article

10   entitled "Johnson & Johnson Feared Baby Powder's

11   Possible Asbestos Link For Years:

12   Johnson & Johnson says its product is safe.  But

13   asbestos, a carcinogen that can exist underground

14   near talc, was a concern inside the company for

15   decades."

16       Do you see that article, Dr. Langer?

17   Looks like it's dated December 15, 2018 at the top

18   right?

19       A.   Yes.

20       Q.   I want to ask you a couple questions

21   about this article.

22       On page 6 of 11, down at the bottom of

23   that page, Dr. Langer, it states:  "In a recent

24   interview, Mr. Langer told the Times that

25   Dr. Chalmers 'spoke for himself and for the

Case 2:23-08895-MBK Doc 246962 Filed 04/01/22 Entered 04/01/22 08:35:09 Desc
Exhibit Exhibit 20-21 to Satterley Declaration Page 97 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    institution, not our research group.'  He

2    reiterated that his team had detected asbestos in

3    Johnson's Baby Powder.

4         "'I stand by that today, absolutely,' he

5    said."

6         Do you see that?

7    A.   Is that at the top of the page, or the

8    second paragraph?

9    Q.   Yeah, I'm sorry, and that's one of the

10   difficulties when we do this by Zoom.

11        So are you on page 6 of 11?

12   A.   Yes.

13   Q.   At the very bottom of the page --

14   A.   "In a recent interview"?

15   Q.   Yes.

16   A.   Okay.

17        Yes.  Okay.

18   Q.   Do you see where it says that, what I

19   just read?

20   A.   Yes.

21   Q.   And do you believe that the New York

22   Times accurately quoted you when they said, in

23   quotations, "I stand by that today, absolutely,"

24   close quote?

25   A.   Yes.  Yes, yes.

Case 3:23-08895-MBK  Doc 2-46  Filed 06/01/22  Entered 06/01/22 08:36:09  Desc
Exhibit Exhibits 20-21 to Satterley Declaration  Page 98 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    Q.   And you told the New York Times that

2   your Sinai team had detected asbestos in Johnson's

3   baby powder, correct?

4    A.   Yes.

5        MR. SKAKUN:  Objection, form.

6   BY MR. HENSSLER:

7    Q.   Did you tell the New York Times that

8   your team had detected asbestos in Johnson's baby

9   powder?

10    A.   Yes.

11        MR. SKAKUN:  Objection, form.

12        MR. HENSSLER:  Okay.  You can put that

13   one aside.

14        This next exhibit is at Tab 13 in your

15   binder.  I'll mark this as Exhibit 9 to

16   today's deposition.

17        (Deposition Exhibit 9 marked for

18   identification)

19        MR. HENSSLER:  For the record, Exhibit 9

20   at page 2 is a Reuters article with the title

21   "Johnson & Johnson knew for decades that

22   asbestos lurked in its Baby Powder."

23        For identification, on page 1 of this

24   exhibit, Exhibit 9 to today's deposition,

25   there's a stamp from a court filing and it

Case 2:23-08895-MBK Doc 246962 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 99 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    says "Exhibit 3" in the middle of the page.

2    BY MR. HENSSLER:

3       Q.   Dr. Langer, could you go to page -- at

4    the top, it's 275 of 284.  At the top, there's

5    some blue numbering.

6          Let me know when you're there.

7       A.   What's the page number you're looking at

8    now?

9       Q.   It's 275 of 284, and it looks like

10   there's a picture of you.

11      A.   Oh, now we're talking.  Okay.  I'm here.

12      Q.   Is that a picture of you, Dr. Langer?

13      A.   You mean the one on top, the

14   good-looking one?

15      Q.   On top, yeah.

16          MR. SKAKUN:  We'll stipulate to that.

17   BY MR. HENSSLER:

18      Q.   Did the Reuters reporter come with a

19   photographer and take your picture?

20      A.   Yes -- oh, wait a minute.  Did the

21   reporter come as well?  No.  But a photographer

22   was sent.

23      Q.   Okay.  Thanks for correcting that.  So

24   just a photographer came out and took a picture?

25      A.   Yes.

Case 3:23-08895-MBK Doc 246962 Filed 06/10/22 Entered 06/10/22 08:55:29 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 450 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    Q.   And you agreed to sit for a photo?

2    A.   Yes.  Why not?

3    Q.   Yeah.  It's a nice picture.

4         Was that at your house?

5    A.   Yes.

6    Q.   Under the photograph, it says -- in very

7  tiny letters, it says:  "ROCK STEADY:  Dr. Arthur

8  Langer, who was part of a Mount Sinai team

9  researching asbestos and talc in the 1970s, says

10  he stands by his findings of small amounts of

11  asbestos in Baby Powder."

12        Do you see that?

13   A.   Yes.

14   Q.   And did Reuters accurately convey what

15  you had told the Reuters reporter?

16   A.   Yes.

17   Q.   Could you turn to the next page, please?

18        Right at the top, the first paragraph

19  says:  "Langer, Selikoff and Kretchmer ended up on

20  a J&J list of 'antagonistic personalities' in a

21  November 29, 1972, memo, which described Selikoff

22  as the leader of an 'attack on talc.'"

23        Then it says:  "'I suppose I was

24  antagonistic,' Langer told Reuters."

25        Do you see that?

Case 2:23-28895-MBK   Doc 2469-2   Filed 06/00/23   Entered 06/00/23 08:36:09   Desc
Exhibit Exhibits 20-21 to Satterley Declaration   Page 460 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    A.  Yes.

2    Q.  And did Reuters accurately quote you

3  there?

4    A.  I think so, yes.

5    Q.  The next paragraph says:  "Langer said

6  he told J&J lawyers who visited him last year that

7  he stood by all of his findings.  J&J has not

8  called him as a witness."

9      Do you see that?

10    A.  Yes.

11    Q.  Did the J&J lawyers visit you around

12  that time, a year before this article?

13    A.  I believe so, yes.

14      MR. SKAKUN:  Objection, form.

15  BY MR. HENSSLER:

16    Q.  Was that in 2017?

17    A.  Yes.  I believe so.

18    Q.  And did Reuters get that right?  Did you

19  tell the J&J lawyers who visited you that you

20  stood by all of your findings?

21    A.  Yes.

22    Q.  Including the finding of chrysotile in

23  J&J talc?

24    A.  Yes.

25    Q.  Do you recall what J&J lawyers visited

Case 2:23-08895-MBK Doc 2469-2 Filed 06/00/22 Entered 06/00/22 08:55:09 Desc
Exhibit Exhibit 20 21 to Satterley Declaration Page 102 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    you in 2017?

2        A.   You mean the who?

3        Q.   Yes, please.

4        A.   The who?  I believe the national

5    litigation counsel.  That would be Peter Bicks.

6    Smart guy, knowledgeable.

7            I'm thinking Bruce Bishop was there.

8    He's a Norfolk lawyer.

9            I'm wondering out loud.

10            There were several others, and I'm

11    uncertain as to who they were.  I have to think

12    about it.

13        Q.   Do you recall about how many people?

14        A.   About four or five.

15        Q.   Do you recall if they were all from

16    Mr. Bicks's law firm?

17        A.   No, I think they were from other law

18    firms.

19        Q.   Were lawyers from Sidley Austin,

20    Mr. Skakun's law firm, there?

21        A.   I would have remembered him.  No.

22            THE REPORTER:  What was your answer,

23    Doctor?

24            THE WITNESS:  I'm saying no to Mr. --

25    the lawyer who has been present at this

Case 2:23-08895-MBK Doc 2465 Filed 06/00/22 Entered 06/00/22 08:55:09 Desc
Exhibit Exhibits 20A 21 to Satterley Declaration Page 430 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1    Q.   Dr. Langer, so some of the documents

2  that you've looked at with Mr. Bicks and the J&J

3  lawyers included documents related to a 1976

4  paper, and in particular where you had determined

5  there were trace amounts of chrysotile asbestos in

6  J&J talc?

7    A.   Yes.

8    Q.   Okay.  And do you recall which paper

9  that is?  Do you recall the name of the '76 paper?

10    A.   The 1976 paper was called "Consumer

11  talcums and powders:  Mineral and chemical

12  characteristics -- characterization."  That's

13  Rohl, Langer, Selikoff, et al.

14    Q.   Okay.  Thank you.

15        The Reuters article also stated that J&J

16  has not called you as a witness.  Is that correct?

17    A.   Yes.

18    Q.   And it's still correct today?

19    A.   Yes.

20    Q.   You didn't tell the J&J lawyers that you

21  retract your findings of chrysotile asbestos in

22  J&J talc?

23    A.   No, of course not.

24    Q.   Did you e-mail with the J&J lawyers who

25  visited you in 2017?

Page 83

Case 2:23-mc-08895-MBK Doc 246962 Filed 06/10/22 Entered 06/10/22 08:35:09 Desc Exhibit Exhibits 20-21 to Satterley Declaration Page 104 of 186

Arthur M. Langer, Ph.D.

Hall vs.
Johnson and Johnson

1      C E R T I F I C A T E

2      COMMONWEALTH OF VIRGINIA

3      I, JoRita B. Meyer, Registered

4    Professional Reporter, Registered Merit

5    Reporter, Certified Realtime Reporter, Notary

6    Public for the Commonwealth of Virginia,

7    hereby certify that the foregoing is a

8    correct transcript of the deposition of

9    ARTHUR M. LANGER, Ph.D., taken 8/19/21,

10    reported by me using the stenotype reporting

11    method in conjunction with computer-aided

12    transcription, and that same is a true and

13    correct transcript to the best of my ability

14    and understanding.

15      I further certify that I am not related

16    to any of the parties to this action by blood

17    or marriage, and that I am in no way

18    interested in the outcome of this matter.

19      IN WITNESS WHEREOF, I have hereunto set

20    my hand this 30th day of August, 2021.

21

22

23    _____    *JoRita B. Meyer*

24      /s/ JoRita B. Meyer

25

**Exhibit 1**

Langer, A.
08/19/21
@ptus

TF **0039**



MOUNT SINAI SCHOOL OF MEDICINE
*of The City University of New York*

FIFTH AVENUE AND 100TH STREET · NEW YORK, N.Y. 10029



*Department of Community Medicine*

November 10, 1971

Dr. Gavin Hildick-Smith
Director of Clinical Research
Johnson and Johnson
Research Division
New Brunswick, New Jersey

Dear Dr. Hildick-Smith:

I have in front of me a letter dated August 9, 1971 addressed
to Dr. Selikoff indicating your wish to receive some informa-
tion on the Tenovus sample that you so kindly lent to us. I
have been putting off answering this letter not because I am
a feisty devil so much as the fact that I lost the letter on
my desk! I called your office last week. You were out and
I feel that I would do as well to report to you in writing.

In respect to the Tenovus samples that were sent to us, we
made the following observations. We did find some grains that
resembled talc with the usual electron diffraction pattern
consistent for a sheet silicate structure. Again, we have no
definitive means of identifying the particle on the basis of
its electron diffraction pattern in that many sheet silicates
yield a similar array of spots. We assume that the particles
were talc or, rather, were consistent with talc. We also got
a few surprises in that we observed some chrysotile asbestos
to be present in the tissue as well. We have been kicking
this observation around the Laboratory for a while and we
might consider a publication somewhere -- just a short note
indicating that we have observed these materials present in
the tissues.

We have also analyzed one of your talc samples in some detail.
In addition to the normal platy talc present, we have observed
many "fibrous talcs" as well. This fibrous talc material
closely resembles normal platy talc but appears with a greater
length aspect. Its terminations are prism terminations and

J&J-0071382

JNJ 000288077

Dr. Gavin Hildick-Smith                    November 10, 1971

                          Page Two

and the general characteristics under the electron microscope
do indeed resemble normal talc. Electron diffraction on
~~these grains again yields~~ these grains again yields a talc
pattern which is a very well-defined hexagonal array of spots.
We also observed trace amounts of chrysotile asbestos only
when the talc was sonified and markedly dispersed. The amounts
of chrysotile are relatively small, occurring in amounts, we
estimate, at less than .01%. The J & J baby talc is of quite
high quality and as a matter of fact, in relation to the
number of samples we have examined thus far, it is the "purest".

We just thought that we would pass this information along to
you as our colleagues in scientific research and you may use
it as you wish. Again, many thanks for giving us the samples
and allowing us to look them over. Incidentally, I am very
interested in obtaining some of your material called sodium
sesquicitrate which has been bandied about as possessing a
structure that is not unlike chrysotile. Do you think you
could have one of your research boys send me some of this?

Again, many thanks, and if you need any further information,
please don't hesitate to call on me.

                          Sincerely,

                          Arthur M. Langer
                          Associate Professor
                          Mineralogy

AML:lkh

J&J-0071383

JNJ 000288078

F

December 14, 1971

Dr. Arthur M. Langer
Associate Professor
Mineralogy
Mount Sinai School of Medicine
Fifth Avenue and 100th Street
New York, New York 10029

Dear Dr. Langer:

I should like to thank you for your letter dated November 10, 1971,
in which you kindly responded to my letter addressed to Dr. Selikoff
dated August 9, 1971.

You indicated in your letter that you had examined the Tenovus samples
which we forwarded to you and other independent investigators for study.
The samples forwarded to you were identified as follows:

        A.    No. 11 - Hospital No. 34907 - Uterus
            (1) Surface - Tumor

        B.    No. 13 - Hospital No. Ineson (130215)
            Ovary (Normal)

It is understood that by the use of electron diffraction methodology you
found in the samples grains that resembled talc and that they gave a
diffraction pattern consistent for a sheet silicate structure although
you have no definitive means of identifying these particles on the
basis of their electron diffraction pattern. You also indicate that
you observed some chrysotile asbestos to be present in the tissue
although you do not mention the method by which you had precisely
determined the identification of these particles.

RECEIVED

Dec 2 1 1971

W. NASHED
JOHNSON & JOHNSON

**Exhibit 2**
Langer, A.
08/19/21
@ptus

JNJ 000260527

Dr. Arthur M. Langer                    -2-                    December 14, 1971

In relation to your observations on the Tenovus samples sent to you
for study, it might be mentioned that it is our understanding that no
attempt was made by the Tenovus group to prepare the samples under
"particle-free" conditions and as such, the possibility of their
contamination from the environment cannot be overlooked. It would
seem, then, that it is impossible to determine whether the particles
are contaminants or in fact were actually contained in the tissues.
It is suggested, therefore, that a publication of your observations
on potentially contaminated tissue may have limited scientific value.

We were interested to learn of your analysis of our talc samples and
the fact that you had observed trace amounts of chrysotile asbestos in
amounts you estimated to be less than .01%. We are, of course,
somewhat surprised to learn that you found chrysotile asbestos as
other independent workers have not so far reported such findings
to us and we would like to know exactly the method used to obtain
the figure of .01% of chrysotile asbestos and whether this was on a
weight or count basis.

In my previous letter, we had requested that the Tenovus samples sent
you be returned to us and that we would cover the expenses of your
studies. As such, would you kindly forward to me the remaining
Tenovus samples. We will be forwarding to you a check for $1000.
drawn on the Department of Community Medicine to cover costs of
your studies which, if considered inadequate, please so inform me.

We greatly appreciate your kind interest and cooperation in helping
us with the study of the talc sample and Tenovus samples forwarded
to you.

                                        Sincerely yours,


                                        Gavin Hildick-Smith, M.D., F.A.A.P.
                                        Director of Clinical Research

GHS:jm
cc: Dr. I.J. Selikoff

bcc:  Dr. F.R. Rolle
      Dr. W. Nashed
      Dr. T.H. Shelley

JNJ 000260528

Exhibit 8

Langer, A.
08/19/21
@ptus

# Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years

nytimes.com/2018/12/14/business/baby-powder-asbestos-johnson-johnson.html

December 15, 2018

Johnson & Johnson says that its Johnson's Baby Powder has never contained asbestos and that claims are based on "junk science."Credit...Jens Mortensen for The New York Times

The memos were concise and direct.

An executive at Johnson & Johnson said the main ingredient in its best-selling baby powder could potentially be contaminated by asbestos, the dangerous mineral that can cause cancer. He recommended to senior staff in 1971 that the company "upgrade" its quality control of talc.

Two years later, another executive raised a red flag, saying the company should no longer assume that its talc mines were asbestos-free. The powder, he said, sometimes contained materials that "might be classified as asbestos fiber."

The carcinogen, which often appears underground near talc, has been a concern inside the company for decades. In hundreds of pages of memos, executives worried about a potential government ban of talc, the safety of the product and a public backlash over Johnson's Baby Powder, a brand built on a reputation for trustworthiness and health.

Executives proposed new testing procedures or replacing talc outright, while trying to discredit research suggesting that the powder could be contaminated with asbestos, according to corporate documents unearthed by litigation, government records obtained by The New York Times through the Freedom of Information Act, and interviews with scientists and lawyers.

Advertisement

Continue reading the main story
*[Thousands of people who trusted Johnson & Johnson's baby powder for decades are suing the company after developing cancer. "The Weekly," The Times's new TV show, investigates their allegations.]*

In one instance, Johnson & Johnson demanded that the government block unfavorable findings from being made public. An executive ultimately won assurances from an official at the Food and Drug Administration that the findings would be issued only "over my dead body," a memo summarizing the meeting said.

Dig deeper into the moment.

Special offer: Subscribe for $1 a week.

Those efforts are now forming the crux of a new legal front in a long-running battle over Johnson's Baby Powder, potentially leaving the company exposed in nearly 12,000 lawsuits across the country claiming that the product can cause cancer.

This summer, 22 women with ovarian cancer successfully sued the company, arguing that Johnson & Johnson knew about the connection between talc and asbestos. A jury in St. Louis awarded them $4.69 billion, one of the largest personal injury verdicts ever.

The company lost two other cases this year, in California and New Jersey, brought by people with mesothelioma, a cancer of the lining of internal organs that is associated with asbestos.

Advertisement

Continue reading the main story

The prospect of asbestos "puts the defense in a much more difficult position," said Nathan Schachtman, a lawyer who has defended asbestos companies. "You get a much higher degree of indignation from juries."

Shares of Johnson & Johnson dropped 10 percent on Friday on an article by Reuters about the asbestos concerns related to Johnson's Baby Powder.

Johnson & Johnson is appealing the three asbestos-related cases. The company has won three cases related to mesothelioma, while four others were declared mistrials.

The company defends the safety of its baby powder, saying that it has never contained asbestos and that the claims are based on "junk science." Johnson & Johnson says that the lawyers in the cases have "cherry-picked" the memos, and that they instead show the company's focus on safety.

"Johnson & Johnson's talc has been tested by scientists at multiple entities since the early 1970s up to the present," said Peter Bicks, a partner at Orrick, one of the law firms representing the company in the lawsuits. "None of these routine tests over the past 50 years detected the presence of asbestos."

For more than a century, Johnson & Johnson has promoted its baby powder as pure and gentle enough for babies' bottoms, a product that mothers can trust, made by a company that puts customers first.

Advertisement

Continue reading the main story

The company's image has long been bound up in the product and its iconic white bottle, even though baby powder counts for only a sliver of overall sales. Its fragrance is said to be among the most recognizable in the world. Employees have called it a "sacred cow" in emails,

according to court documents.

Image



Krystal Kim, who has been treated for ovarian cancer, was one of 22 women who won a lawsuit against Johnson & Johnson in St. Louis in July.Credit...Michelle Gustafson for The New York Times

Krystal Kim, a 53-year-old mother of two from Philadelphia, was 10 when her mother suggested she use Johnson's Baby Powder to stay "fresh" and "clean smelling." She continued using it for decades, on her face, between her legs and on her sheets. Many women use baby powder as a feminine hygiene product, applying it to their bodies and breathing in airborne powder.

Daily business updates  The latest coverage of business, markets and the economy, sent by email each weekday. .
Five years ago, Ms. Kim learned she had invasive ovarian cancer and was treated with chemotherapy. Parts of her colon and intestines were removed. Ms. Kim, one of the plaintiffs in the Missouri case, wants Johnson's Baby Powder taken off the shelves and, if not, warnings put on it.

Before the Missouri verdict, Johnson & Johnson had been able to knock back most of the legal challenges that connected talcum powder alone to cancer, by claiming, in part, that the scientific research was flawed and offering studies to the contrary.

Of the six cases that Johnson & Johnson has lost on that issue by itself, three decisions were overturned on appeal, one is still being appealed, and one plaintiff won her case but was awarded no damages. One verdict, for $110 million, has been upheld by a judge; the company is appealing.

But asbestos, unlike talc, is an indisputable carcinogen. Even trace amounts are considered dangerous. Its dagger-like fibers penetrate deep into tissue and can lead decades later to cancer of the lungs, voice box and ovaries, and to mesothelioma.

Several lab tests, some conducted in the past few years by plaintiffs' lawyers, have found evidence of asbestos in talc. The link between asbestos and ovarian cancer was first reported in 1958, and in 2011, the International Agency for Research on Cancer said it was a cause.

Advertisement

Continue reading the main story

"There's no ambiguity," said Mark Lanier, the lawyer who represented the women in the Missouri case. Mr. Lanier has won large industry payouts for workers who were exposed to asbestos on the job.

"It's a no-brainer that asbestos causes ovarian cancer," he added. "That's not an argument anyone will win."

## 'Frightening Mothers'

Asbestos was once ubiquitous in home insulation, shipyards, factories and even automobile parts. It was cheap to mine, durable and strong.

By the early 1970s, it was also widely considered dangerous. As consumer groups sounded the alarm, environmental scientists started testing building materials and household products that might contain asbestos.

Two mineralogists, Arthur Langer at Mount Sinai Medical Center and Fred Pooley of University College Cardiff in Wales, collaborated on a study about the asbestos content of powders sold on both sides of the Atlantic. Mr. Pooley planned to present their findings at an occupational health conference in Britain in September 1975.

But he had also been a consultant for the cosmetics industry. When Mr. Langer revealed that he had found minerals that might be asbestos in Johnson's Baby Powder, Mr. Pooley called to warn the company.

Daily Business Briefing

## Latest Updates

Updated
Aug. 12, 2021, 4:26 p.m. ET2 hours ago
2 hours ago

- Disney+ reaches 116 million subscribers, and its parks division returns to profitability.
- Adidas sells Reebok to Authentic Brands for $2.5 billion.
- Today in On Tech: Smartphones won. We can ignore them.

Johnson & Johnson executives slammed Mr. Langer in internal memos as "devious," saying his data was "controversial." Mr. Pooley canceled his presentation, and the company pressured him to pull the report from the conference materials.

Advertisement

Continue reading the main story
Mr. Pooley could not be reached for comment.

Mr. Langer continued the research without Mr. Pooley. And in 1976, he and colleagues at Mount Sinai told reporters that they had detected asbestos in several commercial talcum powders, though they explicitly said it hadn't been found in Johnson & Johnson's products. The results were later published in a journal.

The company went on the offensive anyway. Within days, executives met with Mr. Langer and two of his colleagues and said they should avoid "frightening mothers unnecessarily," according to a company memo describing the meeting.

"It was pointed out in plain language to the Mt. Sinai group that appropriate correction of their statements should be made to the news media and the public, and that this should be made available by noon of the next day," the memo said.

Image



Johnson & Johnson's concern was not only to make sure that the public was accurately informed but avoid frightening mothers unnecessarily who were used to using a valuable safe product in infant care. It was pointed out in plain language to the Mt. Sinai group that appropriate correction of their statements should be made to the news media and the public, and that this should be made available by noon of the next day. The Mt. Sinai

In response, the Mount Sinai scientists told the company that they actually had found asbestos in Johnson & Johnson's talc but hadn't mentioned it because they thought the levels were too low to be of significance.

Eight days later, Dr. Thomas C. Chalmers, Mount Sinai's president, issued a news release to correct "misimpressions the media reports may have generated" about talc. He said that the asbestos tests had been run on older powders, that new ones were safe and that Mount

Sinai's pediatricians endorsed using baby powder on babies.

Image



FROM: Dr. Thomas C. Chalmers
President, Mount Sinai Medical Center
New York, New York

- - - - - - - - - - - - - - - - - - - - - - -

Recent media reports concerning research on talcum powder carried out by the Mount Sinai Medical Center created considerable confusion on the part of the public. ==The Medical Center has issued the following statement in order to correct any misinterpretation or misimpressions the media reports may have generated.==

Advertisement

<u>Continue reading the main story</u>

But one of Mr. Langer's colleagues from Mount Sinai disputed Dr. Chalmers's statement in a 1976 interview with The Washington Post, saying the team had tested new and old powders. The newspaper also quoted a Food and Drug Administration official saying that Mount Sinai's testing methods could detect asbestos at lower levels than the agency could.

Mount Sinai received funds throughout the 1970s from the Robert Wood Johnson Foundation, according to the foundation's annual reports. The foundation, which was <u>established as a national philanthropy</u> in the early 1970s with $1.2 billion in Johnson & Johnson stock, is independent from the company. But during the 1970s, several senior executives, including the chief executive Philip B. Hofmann, served on the foundation's board. Others joined the board after retiring from the company.

Mr. Bicks, Johnson & Johnson's lawyer, said the company had never influenced the foundation's decisions.

Dr. Chalmers died in 1995, and a Mount Sinai spokeswoman said she could not comment on events from so long ago. The medical center's press office denied a request to see its archives.

In a recent interview, Mr. Langer told The Times that Dr. Chalmers "spoke for himself and for the institution, not our research group." He reiterated that his team had detected asbestos in Johnson's Baby Powder.

"I stand by that today, absolutely," he said.

## 'Over My Dead Body'

With the increasing concern over asbestos, the Food and Drug Administration was under
pressure to regulate talc, which is also used in makeup like mascara, lipstick and face
powder. In the early 1970s, the agency commissioned Seymour Lewin, a well-regarded
chemist at New York University, to test talc products. Mr. Lewin found asbestos in more than
half the 11 Johnson's Baby Powder samples he tested.

An industry trade group was given a confidential copy of the report by the F.D.A. The group,
which shared it with Johnson & Johnson, threatened to sue to try to block it from being made
public.

Advertisement

Continue reading the main story

The company asked the F.D.A. to hold the findings in "strict confidence," according to a
memo summarizing a meeting. "A release of such untrue information will create a great deal
of unwarranted alarm," executives told the F.D.A.

Image



A review of the data by the various experts clearly shows that Prof. Lewin's
finding is wrong and has no basis in fact. We would like to point out that
a release of such untrue information will create a great deal of unwarranted
alarm among the public and will cause serious damage to our reputation and
business.

In view of the nature of the enclosed material and the comments regarding
Professor Lewin's work, we request that this material be held in strict
confidence by the employees of the Food and Drug Administration interested
in this subject, unless we consent to other use of it.

An agency official told the company that the report would be issued only "over my dead
body," according to an internal corporate memo about the conversation.

Johnson & Johnson asked Walter McCrone, the scientist who usually tested its talc, to visit
Mr. Lewin and inspect his slides. The company also compiled testimonials and data from
other scientists to challenge Mr. Lewin's results.

The final report by Mr. Lewin looked different. Though he had initially said the tainted
Johnson & Johnson's talc samples contained 2 percent or more of asbestos, the final version
sent to the F.D.A. said that most were free of asbestos and that two test results were
inconclusive.

Ultimately, the government retreated from a plan to regulate asbestos in talc. The cosmetics
trade group adopted a standard of "zero tolerance" for asbestos in talc, but adherence is
voluntary.

"The F.D.A. takes the possible presence of asbestos in cosmetics very seriously, and the agency uses several means to monitor cosmetic safety generally, including conducting research, to help ensure that cosmetics available to American consumers are safe," the agency said in a statement.

Advertisement

Continue reading the main story

It said that the most recent tests of cosmetics, in 2009-10, had found no asbestos, but that the results were "limited" since few products and raw talc samples had been tested.

"The F.D.A. also continues to investigate and monitor reports of asbestos contamination in certain cosmetic products, and will provide additional information as it becomes available," the agency added.

Mr. Lewin died several years ago. But Aviam Elkies, who was a doctoral candidate and testified that Johnson & Johnson had funded him to work in Mr. Lewin's lab in 1972 analyzing samples from talc mines supplying the company, said he and Mr. Lewin had detected asbestos in at least half the samples they tested.

"It appeared randomly in samples taken from the same mines," Mr. Elkies said in an interview in Israel, where he lives. "It appeared in different concentrations. There was no pattern, no way to predict."

He said Johnson & Johnson had terminated the project after learning about the results and yanked his scholarship money. Mr. Elkies did not finish his degree and moved to Israel, where he taught chemistry to high school and college students.

Mr. Bicks said that Johnson & Johnson was not aware of any evidence that Mr. Elkies had a scholarship from the company and that Mr. Elkies reported testing talc from mines in Canada and New York that the company didn't use.

Johnson & Johnson's efforts to temper the debate over its baby powder continue today. It has sought to have documents used in court sealed, hired lawyers known for their work in crisis management and created a website to extol talc's safety.

Advertisement

Continue reading the main story

The website, started in 2016, initially mentioned asbestos once. It now mentions asbestos several times in sections about safety and mesothelioma.

"When science is false and inaccurate, it should be corrected," Mr. Bicks said.

## Legal Roadblocks

8/11

Darlene Coker developed mesothelioma in 1997. But Ms. Coker, then 52 and living in Beaumont, Tex., had never worked in shipyards, construction or mining, like many mesothelioma sufferers. She was a lifelong user of Johnson's Baby Powder.

When she sued Johnson & Johnson, she didn't get far. As part of the discovery process, her lawyers tried to get information about asbestos from the company. Its response: There wasn't anything relevant.

When they asked for names of labs that had tested Johnson's talc for asbestos and records of the test results, Johnson & Johnson told them that the questions were "vague." Requests for documents were declined for being "over broad and unintelligible," according to legal filings. The company called it a "fishing expedition."

Ms. Coker's lawyers withdrew the case. She died in 2009 from mesothelioma.

Mr. Lanier, the lawyer in the Missouri case, said he planned to revisit Ms. Coker's lawsuit now that the documents obtained in recent cases showed that the company did have information to share.

Case 22-30085-MBK Doc 246-2 Filed 06/10/22 Entered 06/10/22 08:36:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 118 of 186

Image



Mark Lanier, a lawyer who represented the plaintiffs in Missouri, said he planned to revisit an older case in light of company documents that recent cases have revealed.Credit...Todd Spoth for The New York Times

The recent spate of asbestos-related cases, which has unearthed the troves of internal Johnson & Johnson's documents, is prompting a broad legal rethink by plaintiffs' lawyers.

Advertisement

Continue reading the main story
After the Missouri trial, Michael J. Miller, a lawyer in Virginia involved in the talc litigation, said more plaintiffs lawyers were considering whether their clients' ovarian cancer was linked to asbestos.

"We knew for years that there was something about the talc that caused ovarian cancer, and there had been rumors about asbestos, but we were really being stonewalled by Johnson & Johnson about the documents we needed," he said. "The trial in St. Louis was very instructive, very informative, and it's got us all enthused."

Mr. Miller's firm represents 900 plaintiffs who have blamed their ovarian cancer on long-term use of Johnson's Baby Powder. He expects his first trial in early 2020.

"We didn't even need to know there was asbestos in there to win these cases, but now that we know, it makes it even easier," he said. "We're all eager to get to trial."

Case 2:23-08895-MRK Doc 276962 Filed 06/00/22 Entered 06/00/22 8:55:09 Desc
Case 8:13-cv-08897-LW-TWC Document 90 Filed 02/28/19 Page 267 of 284 PageID: 053
Exhibit E Exhibit 30 A21 to Stalter key Declaration Page 652 of 186

# EXHIBIT 3



**Exhibit 9**

Langer, A.

08/19/21

@ptus

Case 3:19-cv-01983-FLW-TJB Document 32 Filed 02/28/19 Page 268 of 294 PageID: 654
Case 2:23-02895-MBK Doc 246-2 Filed 06/00/22 Entered 06/00/22 08:35:09 Desc
Exhibit Exhibit 20-21 to Satterley Declaration Page 662 of 316



REUTERS/Mike Wood

Facing thousands of lawsuits alleging that its talc caused cancer, J&J
insists on the safety and purity of its iconic product. But internal
documents examined by Reuters show that the company's powder was
sometimes tainted with carcinogenic asbestos and that J&J kept that
information from regulators and the public.

By LISA GIRION in Los Angeles   |   Filed Dec. 14, 2018, 2 p.m. GMT

Darlene Coker knew she was dying. She just wanted to know why.

She knew that her cancer, mesothelioma, arose in the delicate membrane surrounding her lungs and other organs. She knew it
was as rare as it was deadly, a signature of exposure to asbestos. And she knew it afflicted mostly men who inhaled asbestos dust
in mines and industries such as shipbuilding that used the carcinogen before its risks were understood.

Coker, 52 years old, had raised two daughters and was running a massage school in Lumberton, a small town in eastern Texas.
How had she been exposed to asbestos? "She wanted answers," her daughter Cady Evans said.

Fighting for every breath and in crippling pain, Coker hired Herschel Hobson, a personal-injury lawyer. He homed in on a
suspect: the Johnson's Baby Powder that Coker had used on her infant children and sprinkled on herself all her life. Hobson knew
that talc and asbestos often occurred together in the earth, and that mined talc could be contaminated with the carcinogen. Coker
sued Johnson & Johnson, alleging that "poisonous talc" in the company's beloved product was her killer.



EARLY INDICATION: Cady Evans (left) and her sister, Crystal Deckard, surrounded by pictures of their mother, Darlene Coker, whose lawsuit against Johnson & Johnson 20 years ago was one of the first to allege that the company's Baby Powder caused cancer. REUTERS/Mike Blake

> **J&J didn't tell the FDA that at least three tests by three different labs from 1972 to 1975 had found asbestos in its talc – in one case at levels reported as "rather high."**

J&J denied the claim. Baby Powder was asbestos-free, it said. As the case proceeded, J&J was able to avoid handing over talc test results and other internal company records Hobson had requested to make the case against Baby Powder.

Coker had no choice but to drop her lawsuit, Hobson said. "When you are the plaintiff, you have the burden of proof," he said. "We didn't have it."

That was in 1999. Two decades later, the material Coker and her lawyer sought is emerging as J&J has been compelled to share thousands of pages of company memos, internal reports and other confidential documents with lawyers for some of the 11,700 plaintiffs now claiming that the company's talc caused their cancers — including thousands of women with ovarian cancer.

A Reuters examination of many of those documents, as well as deposition and trial testimony, shows that from at least 1971 to the early 2000s, the company's raw talc and finished powders sometimes tested positive for small amounts of asbestos, and that company executives, mine managers, scientists, doctors and lawyers fretted over the problem and how to address it while failing to disclose it to regulators or the public.

The documents also depict successful efforts to influence U.S. regulators' plans to limit asbestos in cosmetic talc products and scientific research on the health effects of talc.

A small portion of the documents have been produced at trial and cited in media reports. Many were shielded from public view by court orders that allowed J&J to turn over thousands of documents it designated as confidential. Much of their contents is reported here for the first time.

The earliest mentions of tainted J&J talc that Reuters found come from 1957 and 1958 reports by a consulting lab. They describe contaminants in talc from J&J's Italian supplier as

RELATED CONTENT

Case 2:18-cv-01823-FLW-TJB Document 32 Filed 02/28/19 Page 270 of 284 PageID: 656
Case 2:23-08825-MBK Doc 2462 Filed 06/06/22 Entered 06/06/22 16:36:09 Desc
Exhibit Exhibit 3042 to Satterley Decl. Page 122 of 186

fibrous and "acicular" crystals — like crystals that some of the
six minerals that in their naturally occurring fibrous form are
classified as asbestos.



Read the documents cited in this article

After damaging Reuters report, J&J doubles down on talc
safety message

At various times from then into the early 2000s, reports by
scientists at J&J, outside labs and J&J's supplier yielded similar
findings. The reports identify contaminants in talc and finished
powder products as asbestos or describe them in terms typically
applied to asbestos, such as "fiberform" and "rods."

In 1976, as the U.S. Food and Drug Administration (FDA) was weighing limits on asbestos in cosmetic talc products, J&J assured the regulator that no asbestos was "detected in any sample" of talc produced between December 1972 and October 1973. It didn't tell the agency that at least three tests by three different labs from 1972 to 1975 had found asbestos in its talc – in one case at levels reported as "rather high."

Most internal J&J asbestos test reports Reuters reviewed do not find asbestos. However, while J&J's testing methods improved over time, they have always had limitations that allow trace contaminants to go undetected – and only a tiny fraction of the company's talc is tested.

The World Health Organization and other authorities recognize no safe level of exposure to asbestos. While most people exposed never develop cancer, for some, even small amounts of asbestos are enough to trigger the disease years later. Just how small hasn't been established. Many plaintiffs allege that the amounts they inhaled when they dusted themselves with tainted talcum powder were enough.

The evidence of what J&J knew has surfaced after people who suspected that talc caused their cancers hired lawyers experienced in the decades-long deluge of litigation involving workers exposed to asbestos. Some of the lawyers knew from those earlier cases that talc producers tested for asbestos, and they began demanding J&J's testing documentation.



0:00 / 7:44

▇ A big verdict fuels a reporter's curiosity. REUTERS/Mike Wood

What J&J produced in response to those demands has allowed plaintiffs' lawyers to refine their argument: The culprit wasn't necessarily talc itself, but also asbestos in the talc. That assertion, backed by decades of solid science showing that asbestos causes mesothelioma and is associated with ovarian and other cancers, has had mixed success in court.

In two cases earlier this year – in New Jersey and California – juries awarded big sums to plaintiffs who, like Coker, blamed asbestos-tainted J&J talc products for their mesothelioma.

A third verdict, in St. Louis, was a watershed, broadening J&J's potential liability: The 22 plaintiffs were the first to succeed with a claim that asbestos-tainted Baby Powder and Shower to Shower talc, a longtime brand the company sold in 2012, caused ovarian cancer, which is much more common than mesothelioma. The jury awarded them $4.69 billion in damages. Most of the talc cases

Case 3:18-cv-01833-FLW-TJB  Document 92  Filed 02/28/19  Page 271 of 184 PageID: 657
Case 3:23-cv-08895-MAS-DDC  Document 22  Filed 00/00/00  Entered 00/00/00 00:00:00  Desc
Exhibit Exhibit 20A1 to Slattery Declaration  Page 124 of 186

have been brought by women with ovarian cancer, who say their mothers used J&J talc as both a feminine antiperspirant and deodorant.

At the same time, at least three juries have rejected claims that Baby Powder was tainted with asbestos or caused plaintiffs' mesothelioma. Others have failed to reach verdicts, resulting in mistrials.

J&J has said it will appeal the recent verdicts against it. It has maintained in public statements that its talc is safe, as shown for years by the best tests available, and that the information it has been required to divulge in recent litigation shows the care the company takes to ensure its products are asbestos-free. It has blamed its losses on juror confusion, "junk" science, unfair court rules and overzealous lawyers looking for a fresh pool of asbestos plaintiffs.

"Plaintiffs' attorneys out for personal financial gain are distorting historical documents and intentionally creating confusion in the courtroom and in the media," Ernie Knewitz, J&J's vice president of global media relations, wrote in an emailed response to Reuters' findings. "This is all a calculated attempt to distract from the fact that thousands of independent tests prove our talc does not contain asbestos or cause cancer. Any suggestion that Johnson & Johnson knew or hid information about the safety of talc is false."

J&J declined to comment further for this article. For more than two months, it turned down repeated requests for an interview with J&J executives. On Dec. 8, the company offered to make an expert available. It had not done so as of Thursday evening.

The company referred all inquiries to its outside litigation counsel, Peter Bicks. In emailed responses, Bicks rejected Reuters' findings as "false and misleading." "The scientific consensus is that the talc used in talc-based body powders does not cause cancer, regardless of what is in that talc," Bicks wrote. "This is true even if - and it does not - Johnson & Johnson's cosmetic talc had ever contained minute, undetectable amounts of asbestos." He dismissed tests cited in this article as "outlier" results.

In court, J&J lawyers have told jurors that company records showing that asbestos was detected in its talc referred to talc intended for industrial use. Other records, they have argued, referred to non-asbestos forms of the same minerals that their experts say are harmless. J&J has also argued that some tests picked up "background" asbestos – stray fibers that could have contaminated samples after floating into a mill or lab from a vehicle clutch or fraying insulation.

The company has made some of the same arguments about lab tests conducted by experts hired by plaintiffs. One of those labs found asbestos in Shower to Shower talc from the 1990s, according to an Aug. 11, 2017, court report. Another lab found asbestos in more than half of multiple samples of Baby Powder from past decades – in bottles from plaintiffs' cupboards and acquired from eBay, and even a 1978 bottle held in J&J's corporate museum. The concentrations were great enough that users "would have, more likely than not, been exposed," the plaintiffs' lab report presented in several cases this year concluded.

Matthew Sanchez, a geologist with consultants RJ Lee Group Inc and a frequent expert witness for J&J, dismissed those findings in testimony in the St. Louis trial: "I have not found asbestos in any of the current or modern, what I consider modern, Johnson & Johnson talc products," Sanchez told the jury.

Sanchez did not return calls seeking comment. RJ Lee said it does not comment on the work it does for clients.

Since 2003, talc in Baby Powder sold in the United States has come from China through supplier Imerys Talc America, a unit of Paris-based Imerys SA and a co-defendant in most of the talc litigation. Imerys and J&J said the Chinese talc is safe. An Imerys spokesman said the company's tests "consistently show no asbestos. Talc's safe use has been confirmed by multiple regulatory and scientific bodies."

J&J, based in New Brunswick, New Jersey, has dominated the talc powder market for more than 100 years, its sales outpacing those of all competitors combined, according to Euromonitor International data. And while talc products contributed just $420 million to J&J's $76.5 billion in revenue last year, Baby Powder is considered an essential facet of the healthcare-products maker's carefully tended image as a caring company – a "sacred cow," as one 2003 internal email put it.

"When people really understand what's going on, I think it increases J&J's exposure a thousand-fold," said Mark Lanier, one of the lawyers for the women in the St. Louis case.

The mounting controversy surrounding J&J talc hasn't shaken investors. The share price is up about 6 percent so far this year. Talc cases make up fewer than 10 percent of all personal injury lawsuits pending against J&J, based on the company's Aug. 2 quarterly report, in which the company said it believed it had "strong grounds on appeal."

J&J Chairman and Chief Executive Officer Alex Gorsky has pledged to fight on, telling analysts in July: "We remain confident that our products do not contain asbestos."

Gorsky's comment, echoed in countless J&J statements, misses a crucial point. Asbestos, like many environmental carcinogens, has a long latency period. Diagnosis usually comes years after initial exposure – 20 years or longer for mesothelioma. J&J talc products today may be safe, but the talc at issue in thousands of lawsuits was sold and used over the past 60 years.

That point is recognized in a 2013 markup of a statement for the "Safety & Care Commitment" page of J&J's website. The original version conveyed a blanket assurance of safety. The edited version was less definitive: "Our talc-based consumer products are ~~have always been~~ (we cannot say "always") asbestos free, as confirmed by regular testing since the 1970s."

**2013**







NEEDLES IN A HAYSTACK: Bundles (top, center) and a single fiber (bottom) that a plaintiffs' lab found in a 1978 bottle of Baby Powder from J&J's corporate museum show the telltale needle-like shape of asbestos. Photo courtesy of Mark Lanier.

JOHNSON'S® talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. Our talc-based consumer products are~~have always been~~ (we cannot say "always") asbestos free, as confirmed by regular testing conducted since the 1970s. We also make JOHNSON'S® Baby Powder that contains cornstarch.

THEN AND NOW: A 2013 markup of a statement for J&J's website implicitly recognizes the possibility that the company's talc could have been tainted in earlier times.

## "Safety first"

Case 3:18-cv-01833-FLW-TJB Document 32 Filed 02/28/19 Page 273 of 294 PageID: 659
Case 2:23-08825-MBK Doc 246-2 Filed 06/00/22 Entered 06/00/22 08:36:09 Desc
Exhibit Exhibit 2 to Satterley Declaration Page 126 of 186

In 1886, Robert Wood Johnson enlisted his younger brothers in an antiseptic startup built around the "Safety First" motto. Johnson's Baby Powder grew out of a line of medicated plasters, sticky rubber strips loaded with mustard and other home remedies. When customers complained of skin irritation, the brothers sent packets of talc.

Soon, mothers began applying the talc to infants' diaper-chafed skin. The Johnsons took note. They added a fragrance that would become one of the most recognizable in the world, sifted the talc into tin boxes and, in 1893, began selling it as Johnson's Baby Powder.

In the late 1950s, J&J discovered that talc from its chief source mine for the U.S. market in the Italian Alps contained tremolite. That's one of six minerals – along with chrysotile, actinolite, amosite, anthophyllite and crocidolite – that occur in nature as crystalline fibers known as asbestos, a recognized carcinogen. Some of them, including tremolite, also occur as unremarkable "non-asbestiform" rocks. Both forms often occur together and in talc deposits.

J&J's worry at the time was that contaminants made the company's powder abrasive. It sent tons of its Italian talc to a private lab in Columbus, Ohio, to find ways to improve the appearance, feel and purity of the powder by removing as much "grit" as possible. In a pair of reports from 1957 and 1958, the lab said the talc contained "from less than 1 percent to about 3 percent of contaminants," described as mostly fibrous and "acicular" tremolite.

Most of the authors of these and other J&J records cited in this article are dead. Sanchez, the RJ Lee geologist whose firm has agreed to provide him as a witness in up to 100 J&J talc trials, has testified that tremolite found decades ago in the company's talc, from Italy and later Vermont, was not tremolite asbestos at all. Rather, he has said, it was "cleavage fragments" from non-asbestiform tremolite.

J&J's original records don't always make that distinction. In terms of health risk, regulators since the early 1970s have treated small fiber-shaped particles of both forms the same.

The U.S. Environmental Protection Agency, for example, "makes no distinction between fibers and (comparable) cleavage fragments," agency officials wrote in a response to an RJ Lee report on an unrelated matter in 2006, the year before the firm hired Sanchez. The Occupational Safety and Health Administration (OSHA), though it dropped the non-fibrous forms of the minerals from its definition of asbestos in 1992, nonetheless recommends that fiber-shaped fragments indistinguishable from asbestos be counted in its exposure tests.

And as the product safety director for J&J's talc supplier acknowledged in a 2008 email to colleagues: "(I)f a deposit contains 'non-asbestiform' tremolite, there is also asbestiform tremolite naturally present as well."



"SACRED COW": Today, Baby Powder accounts for only a small portion of J&J's annual revenue, but is considered essential to the company's caring image. REUTERS/Mike Segar

## "The lungs of babies"

Case 3:18-cv-01833-FLW-TJB Document 23 Filed 02/28/19 Page 274 of 294 PageID: 669

Case 22-30085-MBK Doc 24692 Filed 05/00/22 Entered 00/00/22 06:36:29 Desc
Exhibit Exhibit (3.2.1) to Sarrett's Declaration Page 722 of 3186

In 1964, J&J's Windsor Mineral became the majority owner of talc mines in Vermont, with names like Argonaut, Rainbow, Frostbite and Black Bear. By 1966, it was blasting and bulldozing white rock out of the Green Mountain state. J&J used the milled powder in its cosmetic powders and sold a less-refined grade to roofing, flooring and tire companies for use in manufacturing.

Ten years after tremolite turned up in the Italian talc, it showed up in Vermont talc, too. In 1967, J&J found traces of tremolite and another mineral that can occur as asbestos, according to a table attached to a Nov. 1, 1967, memo by William Ashton, the executive in charge of J&J's talc supply for decades.

J&J continued to search for sources of clean talc. But in an April 9, 1969, memo to a company doctor, Ashton said it was "normal" to find tremolite in many U.S. talc deposits. He suggested J&J rethink its approach. "Historically, in our Company, Tremolite has been bad," Ashton wrote. "How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"

Since pulmonary disease, including cancer, appeared to be on the rise, "it would seem to be prudent to limit any possible content of Tremolite ... to an absolute minimum," came the reply from another physician executive days later.

The doctor told Ashton that J&J was receiving safety questions from pediatricians. Even Robert Wood Johnson II, the founder's son and then-retired CEO, had expressed "concern over the possibility of the adverse effects on the lungs of babies or mothers," he wrote.

"We have replied," the doctor wrote, that "we would not regard the usage of our powders as presenting any hazard." Such assurances would be impossible, he added, "if we do include Tremolite in more than unavoidable trace amounts."

The memo is the earliest J&J document reviewed by Reuters that discusses tremolite as more than a scratchy nuisance. The doctor urged Ashton to consult with company lawyers because "it is not inconceivable that we could become involved in litigation."

## Never "100% clean"

By the early 1970s, asbestos was widely recognized as the primary cause of mesothelioma among workers involved in producing it and in industries that used it in their products.

Regulation was in the air. In 1972, President Richard Nixon's newly created OSHA issued its first rule, setting limits on workplace exposure to asbestos dust.

By then, a team at Mount Sinai Medical Center led by pre-eminent asbestos researcher Irving Selikoff had started looking at talcum powders as a possible solution to a puzzle: Why were traces of lung tissue taken post mortem from New Yorkers who never worked with asbestos finding signs of the mineral? Since talc deposits are often laced with asbestos, the scientists reasoned, perhaps talcum powders played a role.

They shared their preliminary findings with New York City's environmental protection chief, Jerome Kretchmer. On June 29, 1971, Kretchmer informed the Nixon administration and called a press conference to announce that two unidentified brands of cosmetic talc appeared to contain asbestos.

The FDA opened an inquiry. J&J issued a statement: "Our fifty years of research knowledge in this area indicates that there is no asbestos contained in the powder manufactured by Johnson & Johnson."

Later that year, another Mount Sinai researcher, mineralogist Arthur Langer, told J&J in a letter that the team had found a "relatively small" amount of chrysotile asbestos in Baby Powder.

Case 3:19-cv-01923-FLW-TJB   Document 32   Filed 02/28/19   Page 275 of 284 PageID: 661
Case 2:23-08825-MBK   Doc 246-62   Filed 06/00/02   Entered 06/00/23 04:36:09   Desc
Exhibit Exhibit 20 to Satterley Declaration   Page 128 of 186



ROCK STEADY: Dr Arthur Langer, who was part of a Mount Sinai team researching asbestos in talc in the 1970s, says he stands by his finding of small amounts of asbestos in Baby Powder. REUTERS/Julia Rendleman



SPREADING THE WORD: Jerome Kretchmer was New York City's environmental protection chief when he announced that the Mount Sinai research team had found what appeared to be asbestos in two unidentified brands of cosmetic talc. REUTERS/Jeenah Moon

**1972**

Case 3:19-cv-01223-FLM-TJB   Document 32   Filed 02/28/19   Page 278 of 384 PageID: 662
Case 2:23-08-25-MBK   Doc 246-12   Filed 05/02/23   Entered 05/02/23 07:55:09   Desc
Exhibit Exhibit 30-1 to Satterley Declaration   Page 129 of 186

RECEIVED
DEC 1 1972
JOHNSON & JOHNSON

W. NASHED
JOHNSON & JOHNSON

New Brunswick, N.J.
November 29, 1972

**Subject:** Antagonistic Personalities
In The Talc Story In The U.S.A.

NOTORIETY: Langer and Kretchmer ended up on an internal J&J list of "antagonistic personalities."

Langer, Selikoff and Kretchmer ended up on a J&J list of "antagonistic personalities" in a Nov. 29, 1972, memo, which described Selikoff as the leader of an "attack on talc."

"I suppose I was antagonistic," Langer told Reuters. Even so, in a subsequent test of J&J powders in 1976, he didn't find asbestos – a result that Mount Sinai announced.

Langer said he told J&J lawyers who visited him last year that he stood by all of his findings. J&J has not called him as a witness.

Selikoff died in 1992. Kretchmer said he recently read that a jury had concluded that Baby Powder was contaminated with asbestos. "I said to myself, 'How come it took so long?' " he said.

In July 1971, meanwhile, J&J sent a delegation of scientists to Washington to talk to the FDA officials looking into asbestos in talcum powders. According to an FDA account of the meeting, J&J shared "evidence that their talc contains less than 1%, if any, asbestos."

Later that month, Wilson Nashed, one of the J&J scientists who visited the FDA, said in a memo to the company's public relations department that J&J's talc contained trace amounts of "fibrous minerals (tremolite/actinolite)."

As the FDA continued to investigate asbestos in talc, J&J sent powder samples to be tested at private and university labs. Though a private lab in Chicago found trace amounts of tremolite, it declared the amount "insignificant" and the samples "substantially free of asbestiform material." J&J reported that



TOP TESTER: Irving Selikoff, who led the Mount Sinai team that investigated asbestos and talc, was also listed among J&J's "antagonistic personalities." Photo courtesy of Arthur Langer

finding to the FDA under a cover letter that said the "results clearly show" the samples tested "contain no chrysotile asbestos." J&J's lawyer told Reuters the tremolite found in the samples was not asbestos.

But J&J's FDA submission left out University of Minnesota professor Thomas E. Hutchinson's finding of chrysotile in a Shower to Shower sample – "incontrovertible asbestos," as he described it in a lab note.

1972

to estimate the relative ~~area~~ area of asbestos
and ~~non~~ talc ~~assam~~. One fifth of one square
contained in controvertable asbestos. while
approximately 1550 squares were covered
with talc. This yield an area percentage

NO DOUBT: In a lab note, a University of Minnesota professor recorded finding "incontrovertible asbestos" in a sample of J&J's Shower to Shower talc.

The FDA's own examinations found no asbestos in J&J powder samples in the 1970s. Those tests, however, did not use the most sensitive detection methods. An early test, for example, was incapable of detecting chrysotile fibers, as an FDA official recognized in a J&J account of an Aug. 11, 1972, meeting with the agency: "I understand that some samples will be passed even though they contain such fibers, but we are willing to live with it."

By 1973, Tom Shelley, director of J&J's Central Research Laboratories in New Jersey, was looking into acquiring patents on a process that a British mineralogist and J&J consultant was developing to separate talc from tremolite.

Case 3:18-cv-01833-FLW-TJB Document 33 Filed 02/28/19 Page 277 of 284 PageID: 663
Case 2:23-05-825-WBK Doc 246-82 Filed 09/01/23 Entered 09/01/23 20:35:09 Desc
Exhibit Exhibits 20 to Sartier Declaration Page 730 of 1186

"It is quite possible that asbestos... in all talc," Shelley wrote on Feb. 20, 1973, to a British colleague. Therefore, he added, the "process may well be valuable property to us."

At the end of March, Shelley recognized the sensitivity of the plan in a memo sent to a J&J lawyer in New Jersey: "We will want to carefully consider the ... patents re asbestos in talc. It's quite possible that we may wish to keep the whole thing confidential rather than allow it to be published in patent form and thus let the whole world know."

J&J did not obtain the patents.

While Shelley was looking into the patents, J&J research director DeWitt Petterson visited the company's Vermont mining operation. "Occasionally, sub-trace quantities of tremolite or actinolite are identifiable," he wrote in an April 1973 report on the visit. "And these might be classified as asbestos fiber."

J&J should "protect our powder franchise" by eliminating as many tiny fibers that can be inhaled in airborn talc dust as possible, Petterson wrote. He warned, however, that "no final product will ever be made which will be totally free from respirable particles." Introducing a cornstarch version of Baby Powder, he noted, "is obviously another answer."

**1973**



Mama taught me it takes more than a towel to really get dry.

JOHNSON'S Baby Powder. It gets you drier than just your towel.

1972: Baseball Hall of Fame slugger Harmon Killebrew plugs Baby Powder.

> undertaken with a good chance of success in this area. It should be cautioned, however, that no final product will ever be made which will be totally free from respirable particles. We are talking about a significant reduction in fine particle count but not 100% clean-up.

UNACHIEVABLE: J&J research director DeWitt Petterson warned the company that producing pure talc was impossible.

Bicks told Reuters that J&J believes that the tremolite and actinolite Petterson cited were not asbestos.

Cornstarch came up again in a March 5, 1974, report in which Ashton, the J&J talc supply chief, recommended that the company research that alternative "for defensive reasons" because "the thrust against talc has centered primarily on biological problems alleged to result from the inhalation of talc and related mineral particles."

## "We may have problems"

A few months after Petterson's recognition that talc purity was a pipe dream, the FDA proposed a rule that talc used in drugs contain no more than 0.1 percent asbestos. While the agency's cosmetics division was considering similar action on talcum powders, it asked companies to suggest testing methods.

At the time, J&J's Baby Powder franchise was consuming 20,000 tons of Vermont talc a year. J&J pressed the FDA to approve an X-ray scanning technique that a company scientist said in an April 1973 memo allowed for "an automatic 1% tolerance for asbestos." That would mean talc with up to 10 times the FDA's proposed limit for asbestos in drugs could pass muster.

The same scientist confided in an Oct. 23, 1973, note to a colleague that, depending on what test the FDA adopted for detecting asbestos in cosmetic talc, "we may have problems."

Case 3:23-cv-01823-FLW-TJB Document 22 Filed 03/28/19 Page 279 of 334 PageID: 684
Case 22-30085-WLH Doc 246-2 Filed 05/02/22 Entered 06/01/22 06:35:09 Desc
Exhibit Exhibit B42 to Satterley Declaration Page 731 of 186

The best way to detect asbestos in talc was to concentrate the sample and then examine it through a microscope, the Colorado School of Mines Research Institute told J&J in a Dec. 27, 1973, report. In a memo, a J&J lab supervisor said the concentration technique, which the company's own researchers had earlier used to identify a "tremolite-type" asbestos in Vermont talc, had one limitation: "It may be too sensitive."

---

**"No mother was going to powder her baby with 1% of a known carcinogen irregardless of the large safety factor."**

An FDA official commenting in 1975 on the talc testing method J&J backed

---

In his email to Reuters, J&J's lawyer said the lab supervisor's concern was that the test would result in "false positives," showing asbestos where there was none.

J&J also launched research to find out how much powder a baby was exposed to during a diapering and how much asbestos could be in that powder and remain within OSHA's new workplace exposure limits. Its researchers had strapped an air sampling device to a doll to take measurements while it was powdered, according to J&J memos and the minutes of a Feb. 19, 1974, meeting of the Cosmetic Toiletry and Fragrance Association (CTFA), an industry group.

"It was calculated that even if talc were pure asbestos the levels of exposure of a baby during a normal powdering are far below the accepted tolerance limits," the minutes state.

In a Sept. 6, 1974, letter, J&J told the FDA that since "a substantial safety factor can be expected" with talc that contains 1 percent asbestos, "methods capable of determining less than 1% asbestos in talc are not necessary to assure the safety of cosmetic talc."

Not everyone at the FDA thought that basing a detection method on such a calculation was a good idea. One official called it "foolish," adding, according to a J&J account of a February 1975 meeting: "No mother was going to powder her baby with 1% of a known carcinogen irregardless of the large safety factor."

## "Misrepresentation by omission"

Having failed to persuade the FDA that up to 1 percent asbestos contamination was tolerable, J&J began promoting self-policing as an alternative to regulation. The centerpiece of this approach was a March 15, 1976, package of letters from J&J and other manufacturers that the CTFA gave to the agency to show that they had succeeded at eliminating asbestos from cosmetic talc.

"The attached letters demonstrate responsibility of industry in monitoring its talcs," the cover letter said. "We are certain that the summary will give you assurance as to the freedom from contamination by asbestos for materials of cosmetic talc products."

In its letter, J&J said samples of talc produced between December 1972 and October 1973 were tested for asbestos, and none was detected "in any sample."

J&J didn't tell the FDA about a 1974 test by a professor at Dartmouth College in New Hampshire that turned up asbestos in talc from J&J — "fiberform" actinolite, as he put it. Nor did the company tell the FDA about a 1975 report from its longtime lab that found particles identified as "asbestos fibers" in five of 17 samples of talc from the chief source mine for Baby Powder. "Some of them seem rather high," the private lab wrote in its cover letter.

Bicks, the J&J lawyer, said the contract lab's results were irrelevant because the talc was intended for industrial use. He said the company now believes that the actinolite the Dartmouth professor found "was not asbestiform," based on its interpretation of a photo in the original lab report.

Just two months after the Dartmouth professor reported his findings, Windsor Minerals Research and Development Manager Vernon Zeitz wrote that chrysotile, "fibrous anthophyllite" and other types of asbestos had been "found in association with the Hammondsville ore body" — the Vermont deposit that supplied Baby Powder talc for more than two decades.

FOR EVERYONE: For decades, J&J has promoted its iconic Baby Powder as a safe, gentle product for babies and adults alike.

Zeitz's May 1974 report on efforts to minimize asbestos in Vermont talc "strongly urged" the adoption of ways to protect "against what are currently considered to be materials presenting a severe health hazard and are potentially present in all talc ores in use at this time."

Bicks said that Zeitz was not reporting on actual test results.

The following year, Zeitz reported that based on weekly tests of talc samples over six months, "it can be stated with a greater than 99.9% certainty that the ores and materials produced from the ores at all Windsor Mineral locations are free from asbestos or asbestiform minerals."

J&J's selective use of test results figured in a New Jersey judge's decision this year to affirm the first verdict against the company in a case claiming asbestos in J&J products caused cancer. "Providing the FDA favorable results showing no asbestos and withholding or failing to provide unfavorable results, which show asbestos, is a form of a misrepresentation by omission," Middlesex County Superior Court Judge Ana Viscomi said in her June ruling.

"J&J respectfully disagrees with the Judge's comments," Bicks said. "J&J did not withhold any relevant testing from FDA."

The FDA declined to comment on the ruling.

Lacking consensus on testing methods, the FDA postponed action to limit asbestos in talc. Years later, it did set limits on asbestos in talc used in drugs. It has never limited asbestos in cosmetic talc or established a preferred method for detecting it.

Instead, in 1976, a CTFA committee chaired by a J&J executive drafted voluntary guidelines, establishing a form of X-ray scanning with a 0.5 percent detection limit as the primary test, the method J&J preferred. The method is not designed to detect the most commonly used type of asbestos, chrysotile, at all. The group said the more sensitive electron microscopy was impractical.

The CTFA, which now does business as the Personal Care Products Council, declined to comment.

X-ray scanning is the primary method J&J has used for decades. The company also periodically requires the more sensitive checks with electron microscopes. J&J's lawyer said the company's tests exceed the trade association standard, and they do. He also said that today, J&J's X-ray scans can detect suspect minerals at levels as low as 0.1 percent of a sample.

But the company never adopted the Colorado lab's 1973 recommendation that samples be concentrated before examination under a microscope. And the talc samples that were subjected to the most sensitive electron microscopy test were a tiny fraction of what was sold. For those and other reasons, J&J couldn't guarantee its Baby Powder was asbestos-free when plaintiffs used it, according to experts, including some who testified for plaintiffs.

As early as 1976, Ashton, J&J's longtime talc overseer, recognized as much in a memo to colleagues. He wrote that talc in general, if subjected to the most sensitive testing method, using concentrated samples, "will be hard pressed in supporting purity claims." He described this sort of testing as both "sophisticated" and "disturbing."

By 1977, J&J appeared to have tamped down concerns about the safety of talc. An internal August report on J&J's "Defense of Talc Safety" campaign noted that independent authorities had deemed cosmetic talc products to be "free of hazard." It attributed "this growing opinion" to the dissemination to scientific and medical communities in the United States and Britain of "favorable data from the various J&J sponsored studies."

Case 3:18-cv-01833-FLW-TJB Document 83 Filed 02/28/19 Page 280 of 284 PageID: 686
Case 2:23-cv-08895-MCA-DoC 24-6 2 Filed 05/00/22 Entered 05/10/22 08:55:09 Desc
Exhibit Exhibits 20-21 to Satterley Declaration Page 133 of 186

In 1984, FDA cosmetics official John Eiermann reiterated that view. He told the New York Times that the agency's investigation a decade earlier had prompted the industry to ensure that talc was asbestos-free. "So in subsequent analyses," he told the paper, "we really could not identify asbestos or only on very rare occasions."

Two years later, the FDA rejected a citizen request that cosmetic talc carry an asbestos warning label, saying that even if there were trace contamination, the use of talc powder during two years of normal diapering would not increase the risk of cancer.

In 1980, J&J began offering a cornstarch version of Baby Powder – to expand its customer base to people who prefer cornstarch, the company says.



**Blair Brown for Johnson's Baby …**

Actress Blair Brown touts Baby Powder in this 1970s-era TV commercial

The persistence of the industry's view that cosmetic talc is asbestos-free is why no studies have been conducted on the incidence of mesothelioma among users of the products. It's also partly why regulations that protect people in mines, mills, factories and schools from asbestos-laden talc don't apply to babies and others exposed to cosmetic talc – even though Baby Powder talc has at times come from the same mines as talc sold for industrial use. J&J says cosmetic talc is more thoroughly processed and thus purer than industrial talc.

Until recently, the American Cancer Society (ACS) accepted the industry's position, saying on its website: "All talcum products used in homes have been asbestos-free since the 1970s."

After receiving inquiries from Reuters, the ACS in early December revised its website to remove the assurance that cosmetic talcs are free of asbestos. Now, it says, quoting the industry's standards, that all cosmetic talc products in the United States "should be free from detectable amounts of asbestos."

The revised ACS web page also notes that the World Health Organization's International Agency for Research on Cancer classifies talc that contains asbestos as "carcinogenic to humans."

Despite the success of J&J's efforts to promote the safety of its talc, the company's test lab found asbestos fibers in samples taken from the Vermont operation in 1984, 1985 and 1986. Bicks said: "The samples that we know of during this time period that contained a fiber or two of asbestos were not cosmetic talc samples."

Then, in 1992, three years after J&J sold its Vermont mines, the new owner, Cyprus Minerals, said in an internal report on "important environmental issues" in its talc reserves that there was "past tremolite" in the Hammondsville deposit. Hammondsville was the primary source of Baby Powder talc from 1966 until its shutdown in 1990.

Bicks rejected the Cyprus report as hearsay, saying there is no original documentation to confirm it. Hammondsville mine records, according to a 1993 J&J memo, "were destroyed by the mine management staff just prior to the J&J divestiture."

Bicks said the destroyed documents did not include talc testing records.

**1993**

> *(Note- The specifics of the mining operation at Hammondsville are uncertain, as most of the pre-Luzenac records were destroyed by the mine management staff just prior to the J&J divestiture and the Cyprus purchase. However, several former Hammondsville miners are still employed at the Ham mine, and they provided us with useful information as to the nature of the underground works.)

MISSING: A J&J memo reveals that records of the Hammondsville mine, the main source of Baby Powder talc from 1966 until 1990, were destroyed by mine managers while J&J still owned the business.

In 2002 and 2003, Vermont mine operators found chrysotile asbestos fibers on several occasions in talc produced for Baby Powder sold in Canada. In each case, a single fiber was recorded – a finding deemed "BDL" – below detection limit. Bicks described the finding as "background asbestos" that did not come from any talc source.

In 2009, the FDA, responding to growing public concern about talc, commissioned tests on 34 samples, including a bottle of J&J Baby Powder and samples of Imerys talc from China. No asbestos was detected.

FDA Commissioner Scott Gottlieb said the agency continues to receive a lot of questions about talc cosmetics. "I recognize the concern," he told Reuters. He said the agency's policing of cosmetics in general – fewer than 30 people regulating a "vast" industry – was "a place where we think we can be doing more."

Case 3:19-cv-01324-FLW-TJB Document 23 Filed 02/28/19 Page 281 of 294 PageID: 667
Case 2:23-08825-MBK Doc 246-52 Filed 05/10/22 Entered 05/10/22 06:35:09 Desc
Exhibit Exhibit 52 to Satterley Declaration Page 134 of 186

Gottlieb said the FDA planned to hire an outside consultant in early 2019 to "look at how we would develop standards for evaluating any potential risk." An agency spokeswoman said that would include examining "scientific test methods for assessment of asbestos."

# "Fishing expedition"

Before law school, Herschel Hobson worked at a rubber plant. There, his job included ensuring that asbestos in talc the workers were exposed to didn't exceed OSHA limits.

That's why he zeroed in on Johnson's Baby Powder after he took on Darlene Coker as a client in 1997. The lawsuit Coker and her husband, Roy, filed that year against J&J in Jefferson County District Court in Beaumont, Texas, is the earliest Reuters found alleging Baby Powder caused cancer.

Hobson asked J&J for any research it had into the health of its mine workers; talc production records from the mid-1940s through the 1980s; depositions from managers of three labs that tested talc for J&J; and any documents related to testing for fibrous or asbestiform materials.

J&J objected. Hobson's "fishing expedition" would not turn up any relevant evidence, it asserted in a May 6, 1998, motion. In fact, among the thousands of documents Hobson's request could have turned up was a letter J&J lawyers had received only weeks earlier from a Rutgers University geologist confirming that she had found asbestos in the company's Baby Powder, identified in her 1991 published study as tremolite "asbestos" needles.

Hobson agreed to postpone his discovery demands until he got the pathology report on Coker's lung tissue. Before it came in, J&J asked the judge to dismiss the case, arguing that Coker had "no evidence" Baby Powder caused mesothelioma.

Ten days later, the pathology report landed: Coker's lung tissue contained tens of thousands of "long fibers" of four different types of asbestos. The findings were "consistent with exposure to talc containing chrysotile and tremolite contamination," the report concluded.



"The asbestos fibers found raise a new issue of fact," Hobson told the judge in a request for more time to file an opposition to J&J's dismissal motion. The judge gave him more time but turned down his request to resume discovery.

Without evidence from J&J and no hope of ever getting any, Hobson advised Coker to drop the suit.

Hobson is still practicing law in Nederland, Texas. When Reuters told him about the evidence that had emerged in recent litigation, he said: "They knew what the problems were, and they hid it." J&J's records would have made a "100% difference" in Coker's case.

Had the information about asbestos in J&J's talc come out earlier, he said, "maybe there would have been 20 years less exposure" for other people.

NO SATISFACTION: Lacking the evidence she needed, Darlene Coker, here with one of her doctors, died without ever finding out what caused her mesothelioma. Cady Evans/Handout via REUTERS

Bicks, the J&J lawyer, said Coker dropped her case because "the discovery established that J&J talc had nothing to do with Plaintiff's disease, and that asbestos exposure from a commercial or occupational setting was the likely cause."

Coker never learned why she had mesothelioma. She did beat the odds, though. Most patients die within a year of diagnosis. Coker held on long enough to see her two grandchildren. She died in 2009, 12 years after her diagnosis, at age 63.

Coker's daughter Crystal Deckard was 5 when her sister, Cady, was born in 1971. Deckard remembers seeing the white bottle of Johnson's Baby Powder on the changing table where her mother diapered her new sister.

"When Mom was given this death sentence, she was the same age as I am right now," Deckard said. "I have it in the back of my mind all the time. Could it happen to us? Me? My sister?"

Case 3:19-cv-01553-FLW-TJB Document 83 Filed 02/28/19 Page 282 of 284 PageID: 669
Case 3:23-cv-02825-MBK Doc 246-62 Filed 06/10/22 Entered 06/10/22 08:36:09 Desc
Exhibit Exhibit 30-21 to Satterley Declaration Page 135 of 186

# A guiding hand on talc safety research

By LISA GIRION

Johnson & Johnson developed a strategy in the 1970s to deal with a growing volume of research showing that talc miners had elevated rates of lung disease and cancer: Promote the positive, challenge the negative.

That approach was summed up by a J&J applied research director in a "strictly confidential" March 3, 1975, memo to managers of the baby products division, which used the talc in J&J's signature Baby Powder.

"Our current posture with respect to the sponsorship of talc safety studies has been to initiate studies only as dictated by confrontation," the memo said. "This philosophy, so far, has allowed us to neutralize or hold in check data already generated by investigators who question the safety of talc."

**1973**



> Our current posture with respect to sponsorship of talc safety studies has been to initiate studies only as dictated by confrontation. This philosophy, so far, has allowed us to neutralize or hold in check data already generated by investigators who question the safety of talc. The principal advantage for this operating philosophy lies in the fact that we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing.

A J&J executive laid out the company's policy of countering negative research about the health effects of talc in a memo to managers.

Also, the memo said, "we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing."

J&J's effort to protect its iconic Baby Powder franchise by shaping research was led by physician and scientist executives. An early 1970s study of 1,992 Italian talc miners shows how it worked: J&J commissioned and paid for the study, told the researchers the results it wanted, and hired a ghostwriter to redraft the article that presented the findings in a journal.

The effort entailed other attempts to influence research, including a U.S. government study of the health of talc workers in Vermont. J&J's Windsor Minerals Inc subsidiary, one of several mine operators involved in the study, developed a relationship with the U.S. National Institute of Occupational Safety and Health researchers to "even influence the conclusions" through suggestions of "subjective interpretations," according to a 1973 Windsor Minerals memo.

Peter Bicks, outside counsel for J&J, told Reuters in an email that for the Vermont study, company "representatives acted in an 'educational and advisory capacity' to provide the researchers with a realistic study plan."

A 1979 article in the Journal of Environmental Pathology and Toxicology detailing the findings of the study was not good news for talc. It reported a "significant increase" in "respiratory cancer mortality" among miners. A subsequent analysis of the underlying data published in 1988 determined that at least one of the workers died of mesothelioma, the cancer most closely associated with asbestos.

The proposal to study the health of miners of the Italian talc used in Baby Powder for decades came from William Ashton, J&J's longtime talc supply chief. Ashton had obtained a summary of miners' medical records compiled by an Italian physician, who also happened to control the country's talc exports.

J&J should use those records "for maximum benefit," Ashton said in a May 8, 1973, letter to Dr Gavin Hildick-Smith, J&J's director of medical affairs. "It seems to me that the Italian records give us the opportunity to fortify a position on talc safety."

At the time, the U.S. Food and Drug Administration was considering a limit on asbestos in talcs. In an Oct. 18, 1973, memo, Hildick-Smith advised J&J: "The risk/benefit ratio of conducting an epidemiological study in these mines must be considered."

By early 1974, the study was a go. Hildick-Smith sent money to the Italian talc exporter-physician to hire a team of researchers. Hildick-Smith told the lead researcher in a June 26, 1974, letter exactly what J&J wanted: data that "would show that the incidence of cancer in these subjects is no different from that of the Italian population or the rural control group."

That is exactly what J&J got, Hildick-Smith told colleagues a few months later. At a meeting on Sept. 27, 1974, for a "Talc/powder Safety Studies Review," he reported the Italian study would dispel the "cancer concern associated with exposure to talc."

Case 3:19-cv-01933-FLW-TJB Document 33 Filed 02/28/19 Page 283 of 294 PageID: 659
Case 2:23-03825-MBK Doc 246-2 Filed 04/00/23 Entered 04/00/23 06:35:09 Desc
Exhibit Exhibit B 2-2 to Satterley Declaration Page 136 of 186

The following spring, Hildick-Smith got a draft of the Italian study from the lead researcher. It needs to meet the "form and style" requirements of the target journal, he told colleagues in a March 31, 1975, memo. He added that he would send it to a scientific ghostwriter "who will hold it in confidence and rewrite it."

The article that appeared in 1976 in the Journal of Occupational and Environmental Medicine reported results even better than J&J had bargained for. The study found fewer lung cancer deaths than expected, a result that the authors said supported "the thesis of no cancerogenic effect attributable to pure talc."

It also found no mesothelioma, the signature cancer of asbestos exposure. There is no evidence J&J manipulated or misused the data. Experts for plaintiffs have testified that the Italian study was too small to draw any conclusions about the incidence of such a rare cancer. J&J's expert witnesses have concluded the opposite.

**REUTERS INVESTIGATES**

 More Reuters investigations and long-form narratives

 Got a confidential news tip? Reuters Investigates offers several ways to securely contact our reporters

Bicks noted that the Italian study has been updated three times – in 1979, 2003 and 2017 – "confirming the lack of association between exposure to asbestos-free talc, lung cancer and mesothelioma."

J&J got a lot of mileage out of the study. It was cited in a review article titled "The Biology of Talc," published Nov. 1, 1976, in the British Journal of Industrial Medicine. In addition to dozens of published studies, the review cited unpublished research, including one experiment that used a doll as a proxy for infants and that supported the company's position on the safety of talc. It didn't disclose that J&J had commissioned the unpublished research.

The author of the review article concluded that the "concern that has been expressed about the possible health hazard from consumer exposure to cosmetic talc is unwarranted ... There is no evidence that its normal use poses a hazard to health."

The author was Hildick-Smith, the J&J physician executive who had overseen the Italian study and played a key role in the company's talc safety research. The article did not disclose his J&J connection, identifying him only as a Rutgers University clinical assistant professor. Hildick-Smith died in 2006.



**Powder Keg**
By Lisa Girion
Photo editing: Steve McKinley
Video: Zachary Goelman, Jane Lee, Mike Wood and Krystian Orlinski
Design: Troy Dunkley
Edited by Janet Roberts and John Blanton

f ✆ in ☺ ✉ 🖨

Follow Reuters Investigates  f ✆

OTHER REUTERS INVESTIGATIONS




**Legacy of Contamination**



**Project Raven**

The decades-long environmental cleanup of a former San Francisco Navy base shows the harm that can linger after the military departs.

Reuters reveals how a UAE surveillance operation, staffed by former U.S. cyber-agents, spied on dissidents, rivals and Americans. Inside 'Project Raven.'



**The Karma Hack**

A spying squad based in Abu Dhabi used a hacking tool called Karma to spy on iPhones of opponents. Reuters explains how the exploit worked.



**Left in the Dust**

In a little-known regulatory drama, the GOP has pushed to strip key pieces of a workplace safety rule adopted in Obama's final days in office.

# Exhibit C

## AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated October 12, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is by and among JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation ("JJCI"), and LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL").

## RECITALS

A.      On the date hereof, but prior to the execution of this Agreement, in contemplation of the divisional merger (the "Divisional Merger") of Chenango Zero LLC, a Texas limited liability company ("Chenango"), pursuant to Chapter 10 of the Texas Business Organizations Code, J&J and Currahee Holding Company Inc., a New Jersey corporation ("Currahee"), as payors, and Chenango, as payee, executed and delivered a funding agreement dated as of October 12, 2021 (the "Original Funding Agreement").

B.      Immediately following the execution and delivery of the Original Funding Agreement, Currahee, in its capacity as the sole member of Chenango approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

C.      At the effective time of the Divisional Merger, (1) certain property of Chenango as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of Chenango as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("Chenango One"), (2) the remaining property, liabilities and obligations of Chenango were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("Chenango Two"), and (3) Chenango ceased to exist.

D.      Pursuant to the Original Funding Agreement, J&J and Currahee agreed, on a joint and several basis, to provide funding to Chenango sufficient to pay the costs of operations of Chenango's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

E.      The Allocated Assets and Liabilities included the rights and obligations of Chenango under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms of the Plan of Divisional Merger, the rights and obligations of Chenango under the Original Funding Agreement were allocated to Chenango One such that, following the effectiveness of the Divisional Merger, Chenango One had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities.

F.      Following the Divisional Merger, (1) Chenango One effected a conversion (the "NC Conversion") into a North Carolina limited liability company and changed its name to "LTL Management LLC" and (2) Chenango Two effected a merger (the "TX-to-NJ Merger") with and into Currahee, which changed its name to "Johnson & Johnson Consumer Inc."

G.    Payors and Payee desire to amend and restate the Original Funding Agreement to reflect that the Divisional Merger, the NC Conversion and the TX-to-NJ Merger have occurred and that JJCI, now a New Jersey corporation having the name "Johnson & Johnson Consumer Inc.," and Payee, now a North Carolina limited liability company having the name "LTL Management LLC," are the parties to such agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"<u>Board</u>" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"<u>Business Day</u>" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"<u>Capital Stock</u>" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"<u>Chenango</u>" has the meaning specified in recitals to this Agreement.

"<u>Chenango One</u>" has the meaning specified in the recitals to this Agreement.

"<u>Chenango Two</u>" has the meaning specified in the recitals to this Agreement.

"<u>Contractual Obligation</u>" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"<u>Currahee</u>" has the meaning specified in first paragraph of this Agreement.

"<u>Default</u>" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"<u>District Court</u>" means the United States District Court in the district of the Bankruptcy Court.

"<u>Divisional Merger</u>" has the meaning specified in the recitals to this Agreement.

"<u>Event of Default</u>" has the meaning specified in <u>Section 6</u>.

"<u>Federal Funds Effective Rate</u>" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"<u>Funding Account</u>" means the account of the Payee listed on <u>Schedule 2</u> to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payors from time to time.

"<u>Funding Date</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>Funding Request</u>" has the meaning specified in <u>Section 2(b)</u>.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"J&J" has the meaning specified in first paragraph of this Agreement.

"JJCI" has the meaning specified in first paragraph of this Agreement.

"JJCI Value" means the greater of:

    (a)    the fair market value of the businesses and other assets (including equity interests) held by Chenango, as determined (i) immediately prior to the effective time of the Divisional Merger, (ii) assuming the Allocated Assets and Liabilities are not held by Chenango, and (iii) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

    (b)    the sum of:

    (i)    the fair market value of the businesses and other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI, as determined (A) as of the applicable calculation date, (B) assuming neither Chenango Two nor, after the TX-to-NJ Merger, JJCI has any obligations under this Agreement, and (C) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

    (ii)    the fair market value of any businesses or other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI that, following the effective time of the Divisional Merger and prior to the applicable calculation date, are distributed by Chenango Two or, after the TX-to-NJ Merger, JJCI to its members, as determined (A) at the time of such distribution and (B) based on the aggregate amount that would be received upon a sale of such businesses or other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length,

under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses or other assets.

"LTL" has the meaning specified in the first paragraph of this Agreement.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" means LTL Management LLC, a North Carolina limited liability company.

"Payee Affiliate" means any controlled Affiliate of the Payee.

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payors under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor Affiliate" means any Affiliate of a Payor, excluding the Payee and any Payee Affiliate.

"Payor Material Adverse Effect" means with respect to a Payor: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of such Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of such Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against such Payor.

"Payors" means J&J and JJCI.

"Permitted Funding Use" means each of the following:

(a)       the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time

when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b)     the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c)     the funding of any amounts to satisfy:

(i)     the Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(ii)     following the commencement of any Bankruptcy Case, the Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payors will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy Code and regardless of whether the Payors support such plan of reorganization); and

(iii)     in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

(d)     the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e)     the funding of any obligations of the Payee owed to any Payor or Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f)     the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payors, or either of them, of any provision of this Agreement;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Talc Related Liabilities in connection with the funding of such trust or trusts.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Talc Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"TX-to-NJ Merger" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.  Funding Obligations and Procedures.

(a)  Funding Obligations.  The Payors hereby agree, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for a Permitted Funding Use. Nothing in this Agreement shall obligate the Payors to (i) make Payments under this Agreement that in the aggregate exceed the lesser of (A) the JJCI Value and (B) the aggregate amount of all Permitted Funding Uses or (ii) make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.  The JJCI Value shall be calculated at, and only at, any date on which (x) the Payors refuse to make a requested Payment under this Agreement based on clause (i) of the immediately preceding sentence and (y) the Payments made by the Payors under this Agreement prior to such date, together with the requested Payment, are in the aggregate not in excess of the aggregate amount of all Permitted Funding Uses.

(b)  Funding Requests.  To request a Payment, the Payee shall deliver to the Payors a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payors and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)     Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payors shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payors do not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payors shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)     Conditions to Payments.  The Payors' obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment:  (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.     Representations and Warranties.

(a)     Representations and Warranties of the Payor.  Each Payor represents and warrants to the Payee that:

(i)     Existence, Qualification and Power.  Such Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

(ii)     Authorization; No Contravention. The execution, delivery and performance by such Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

8

(iii)   <u>Governmental Authorization; Other Consents</u>.   No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, such Payor.

(iv)   <u>Binding Effect</u>.   This Agreement has been duly executed and delivered by such Payor.  This Agreement constitutes a legal, valid and binding obligation of such Payor, enforceable against such Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)   <u>Representations and Warranties of the Payee</u>.   The Payee represents and warrants to the Payors that:

(i)   <u>Existence, Qualification and Power</u>.   The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)   <u>Authorization; No Contravention</u>.   The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)   <u>Governmental Authorization; Other Consents</u>.   No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

(iv)    Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    Covenants of the Payors.

(a)    Provision of Financial Information.

(i)    No later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), (A) J&J will furnish to the Payee audited annual and unaudited quarterly consolidated financial statements of J&J prepared in accordance with GAAP, subject, with respect to quarterly financial statements, normal year-end audit adjustments, and (B) Currahee will furnish to the Payee unaudited annual and quarterly income statements and balance sheets of Currahee prepared in accordance with GAAP and Currahee's historical cost basis of its subsidiaries, subject to the absence of notes to the financial statements and related disclosures and, with respect to quarterly financial statements, normal year-end adjustments.

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify such Payor promptly thereof); *provided*, *however*, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)    Notwithstanding the foregoing, but subject to the last sentence of this Section 4(a)(iii), the financial information required to be furnished as described in Section 4(a)(i) may be, rather than that of a Payor, those  of any direct or indirect parent of such Payor.  Notwithstanding the foregoing, a Payor may fulfill the requirement to furnish such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  Subject to the last sentence of this Section 4(a)(iii), a Payor will be deemed to have satisfied the requirements of Section 4(a)(i) if any direct or indirect parent of such Payor has filed such reports containing the required information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of a Payor furnishes financial information pursuant to the first sentence of this Section 4(a)(iii) or such parent files a report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of such Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent, on the one

hand, and the information relating to such Payor and its Subsidiaries on a standalone basis, on the other hand.

      (b)    <u>Successor to J&J upon Consolidation or Merger</u>.

      (i)    Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of J&J with or into any Person, or successive consolidations or mergers in which J&J or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J), to any Person; *provided*, *however*, that J&J hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than J&J, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of J&J's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by J&J, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which J&J shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of J&J with an Affiliate thereof solely for the purpose of reincorporating J&J in another jurisdiction within the United States, (B) any conversion of J&J from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of J&J from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among J&J and its Subsidiaries.

      (ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with J&J or into which J&J is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to J&J, including as a Payor, shall refer instead to the successor Person and not to J&J), and may exercise every right and power of, J&J, including as a Payor, under this Agreement with the same effect as if such successor Person had been named herein. In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

      (iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted

under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5. <u>Covenants of the Payee</u>. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6. <u>Events of Default</u>. Each of the following events constitutes an "<u>Event of Default</u>":

(a) the Payors default in the funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b) a Payor defaults in the performance of, or breaches, any covenant or representation or warranty of such Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to such Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c) a Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d) a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against a Payor, (ii) appoints a custodian of a Payor for all or substantially all of the property of a Payor, or (iii) orders the liquidation of a Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, a Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7. <u>Remedies</u>. Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.    Notices.    All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payors:

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Michelle Ryan, Treasurer
Email:  mryan1@its.jnj.com

Johnson & Johnson Consumer Inc.
199 Grandview Road
Skillman, NJ 08558
Attention:  Michelle Goodridge, President
Email:  mgoodrid@its.jnj.com

Payee:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwhuestho@its.jnj.com

with a copy to:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

9.    Governing Law; Submission to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  Each Payor and the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10.     <u>No Implied Waiver; Amendments</u>.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payors, or either of them, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payors, or either of them, in any case shall entitle the Payors, or either of them, to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payors and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.     <u>Counterparts; Entire Agreement; Electronic Execution</u>.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.     <u>Severability</u>.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.     <u>Transfer; Assignment</u>.  This Agreement shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  A Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; <u>*provided*</u>, <u>*however*</u>, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with <u>Section 4(b)</u>.  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payors.  Any purported assignment of rights or obligations under this Agreement other than as permitted by this <u>Section 13</u> shall be null and void.

14.    <u>Construction</u>.    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.    <u>Rights of Parties</u>.    This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

16.    <u>Joint and Several Obligations</u>.    Obligations of the Payors under this Agreement are joint and several.

[<em>Signature Page Follows</em>]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

Michelle Ryan,
Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

Michelle Goodridge,
President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

Robert Wuesthoff,
President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

      Michelle Ryan,
      Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: *Michelle Goodridge*

      Michelle Goodridge,
      President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

      Robert Wuesthoff,
      President

*[Signature Page to A&R Funding Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

JOHNSON & JOHNSON, a New Jersey corporation, as a Payor

By: _____
      Michelle Ryan,
      Treasurer

JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation, as a Payor

By: _____
      Michelle Goodridge,
      President

LTL MANAGEMENT LLC, a North Carolina limited liability company, as the Payee

By: _____
      Robert Wuesthoff,
      President

## SCHEDULE 1

### Definition of Talc Related Liabilities

For purposes of this Agreement, "<u>Talc Related Liabilities</u>" means all Liabilities (as defined below) of the Payee related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of talc, including talc contained in any product, with asbestos or any other material.

Capitalized terms that are used in this <u>Schedule 1</u> have the following meanings:

(a)     "<u>Cause of Action</u>" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "<u>Contract</u>" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "<u>Governmental Authority</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "<u>Law</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "<u>Liability</u>" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss

of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)     "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

# Exhibit D

Kazan, McClain, Satterley &
Greenwood a professional law
corporation
Attn:  McClain, David
Jack London Market
55 Harrison St., Suite 400
Oakland, CA  94607____

Imai, Tadlock, Keeney & Cordery,
LLP
Attn:  Cordery, Theodore T
The Mills Building
220 Montgomery Street, Suite 301
San Francisco, CA  94104

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Marshall<br><br>              Plaintiff/Petitioner(s)<br><br>VS.<br><br>Allied Fluid Products Corp.<br>              Defendant/Respondent(s)<br>              (Abbreviated Title) | No. <u>RG16843626</u><br><br>Order<br><br>Motion to Advance Trial Date<br>Granted |

The Motion to Advance Trial Date was set for hearing on 02/01/2017 at 02:30 PM in Department 17 before the Honorable George C. Hernandez, Jr..

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

The motion of Plaintiff for trial setting preference is GRANTED.  The court hereby sets the trial for Friday, March 10, 2017 at 8:30 am in Department 17.  The court further orders a pre-trial hearing scheduled for Friday, March 3, 2017 at 8:30 am.  Counsel shall submit a stipulation regarding briefing schedules by Friday, February 3, 2017.

The Case Management Conference scheduled for February 9, 2017 at 2:30 pm in Dept. 17 is maintained.  Counsel may contact the court via its departmental e-mail (dept.17@alameda.courts.ca.gov) regarding any interim issues.

Civil Jury Trial scheduled on 03/10/2017 08:30 AM in Department 17, Administration Building, 1221 Oak Street, Oakland.

Case Management Conf Continuance scheduled on 03/03/2017 08:30 AM in Department 17, Administration Building, 1221 Oak Street, Oakland.

Dated:  02/01/2017

facsimile

_____
Judge George C. Hernandez, Jr.

Order

# Exhibit E

ENDORSED
FILED
ALAMEDA COUNTY

JAN 2 5 2016

CLERK OF THE SUPERIOR COURT
By _____
Maria Carrera Deputy

1  Justin Bosl, Esq. (C.S.B. # 241117)
   JBosl@kazanlaw.com
2  Carole Bosch, Esq. (C.S.B. # 239790)
   CBosch@kazanlaw.com
3  Henry Steinberg, Esq. (C.S.B. # 284998)
   HSteinberg@kazanlaw.com
4  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
5  Jack London Market
   55 Harrison Street, Suite 400
6  Oakland, California 94607
   Telephone: (510) 302-1000
7  Facsimile: (510) 835-4913

8  Attorneys for Plaintiffs

9           SUPERIOR COURT OF CALIFORNIA

10              COUNTY OF ALAMEDA

11

12  ROBERT E. SHEA and SUSAN SHEA,          Case No. RG15789519

13              Plaintiffs,                 **PROOF OF SERVICE RE:**

14       vs.                                **1) ORDER MOTION FOR PREFERENCE
                                            GRANTED;**
15  BASCO DRYWALL & PAINTING CO., et
    al.,                                    **2) ORDER MOTION FOR PROTECTIVE
16                                          ORDER – CASE CONTINUED TO
                Defendants.                 JANUARY 29, 2016 IN DEPT. 30 AT 9:31
17                                          A.M.**

18                                          Hearing Date:    January 29, 2016
                                            Time:            9:31 a.m.
19                                          Dept.:           30
                                            Judge:           Hon. Brad Seligman
20
                                            Action Filed:    October 14, 2015
21                                          **Trial Date:     February 16, 2016**

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1430816.1                          1
                               PROOF/SHEA

Kazan, McClain, Satterley, Lyons,
Greenwood & Oberman
Attn: Bosi, Justin
Jackson London Market
55 Harrison St., Suite 400
Oakland, CA  94607____

Herr & Zapala, LLP
Attn: Zapala, Alan J
6155 Almaden Expy
Suite 460
San Jose, CA  95120____

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Shea | No. RG15789519 |
| Plaintiff/Petitioner(s) | Order |
| vs. | Motion for Preference Granted |
| Basco Drywall & Painting Co. | |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

The Motion for Preference was set for hearing on 01/15/2016 at 09:31 AM in Department 30 before the Honorable Brad Seligman.  The Tentative Ruling required that the parties appear, and the matter came on regularly for hearing.

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

The court GRANTS Plaintiffs Robert and Susan Shea's motion for a trial preference under Code of Civil Procedure section 36, subdivision (a) ("section 36(a)"). (When the court uses the singular "Plaintiff" below, it refers to Plaintiff Robert Shea.)

The court concludes that Section 36(a) entitles Plaintiffs to a preference. The supporting declaration of Plaintiff's treating oncologist, Thierry Jahan, based on having treated Plaintiff August 31, 2015, and examined him most recently on November 9, establishes that Plaintiff is over age 70 (he is 79), was diagnosed in July 2015 with malignant mesothelioma, lost 25 pounds in roughly six weeks after his initial diagnosis, is not a candidate for surgery and was unable to tolerate a course of palliative chemotherapy.

Plaintiffs originally filed this motion on December 10 for hearing on January 8, with an ex parte application for an order shortening time (OST). On December 15, the court advanced the hearing to January 4 and noted that, in light of its limited ability to advance the hearing on the motion given the holidays, it might issue an order at the January 4 hearing setting the case for trial in less than 120 days.

No defendant has opposed the motion, although Defendants Kaiser Gypsum and Hanson Permanente Cement filed a conditional non-opposition about the choice of a trial date in which several other Defendants have filed joinders. Kaiser Gypsum's non-opposition states that, on December 23, Plaintiffs proposed an agreement that trial be set for March 21, and that Plaintiffs stipulate to summary judgment motions being heard on 30 days' notice as late as March 18 in exchange for Defendants' not opposing the preference motion. (Ostott Decl., ex. A [ltr from Plff's atty].) No Defendant filed an opposition by the December 29 deadline set in the court's OST. On December 29, though, after a further decline in Plaintiff's health had necessitated the suspension of his deposition on December 23, Plaintiffs stated that they would request a trial date of February 3. (Id., ex. B [ltr from Plffs' atty].)  Defendants filed their conditional non-opposition (and joinders therein) to request that the court set trial no later than the previously implicitly agreed-on date of March 21(subject to various conditions as to timing).

Accordingly, the court issues the following order:

Trial is set to begin February 16, 2016, in Department 30 (All dates below are in 2016.)

Plaintiffs were required to disclose the status of all named defendants at the January 4 hearing; Plaintiffs' claims against any party that has not generally or specially appeared by January 4 are hereby SEVERED.

All parties are deemed to have demanded an exchange of expert witnesses and discoverable writings (Code Civ. Proc., § 2034). Parties must designate their expert witnesses and those witnesses' discoverable writings, pursuant to section 2034, no later than February 2, with depositions to follow. The designating party shall "offer up" the expert(s) for deposition within a reasonable time before discovery closes; any party unilaterally cancelling an accepted deposition will be responsible for re-calendaring the deposition within a reasonable time before discovery closes.

By January 15, Plaintiffs must give Designated Defense Counsel copies of any claims thus far made to bankruptcy trusts; thereafter, they must promptly provide copies of any newly made bankruptcy claims. Product-identification and PMK witnesses must be disclosed by February 2.

The parties are to meet and confer as necessary about a protocol for handling pathology evidence, including any necessary destructive testing.

All parties must respond within 14 days to written discovery (unless otherwise agreed to). All fact and expert discovery must be completed, and any discovery motions heard, by February 11, 2016.

Given Plaintiffs' stipulation, MSJ/As may be filed and served on by January 25, with oppositions due February 5 and replies by February 9. The hearing on said motions shall be February 11 at 3:00 P.M. Good cause appearing, MSJ/As may be heard beyond the statutory limit of 30 days before trial.

All parties must deliver hard courtesy copies of all MSJ/A papers to Department 30 and email a PDF copy of all reply papers to dept30@alameda.courts.ca.gov. For motion papers over 20 pages long (especially voluminous declarations), the court requests (but does not order) that the parties, if practicable, provide courtesy hard copies printed/copied on both sides of the page and/or courtesy PDF copies. As to hard copies, this request concerns only courtesy copies for Department 30, and not originals and copies filed with the clerk's office, which must still be single-sided.

The court will separately issue a pre-trial and trial setting order.

Prevailing party shall serve a copy of this order upon all parties forthwith and file a proof of service with the Court.

Dated: 01/15/2016

facsimile

_____
Judge Brad Seligman

Order

## PROOF OF SERVICE

*Robert E. Shea and Susan Shea v. Basco Drywall & Painting Co., et al.*
**Alameda County Superior Court Case No. RG15789519**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Alameda, State of California. My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

On January 22, 2016, I served true copies of the following document(s) described as:

**PROOF OF SERVICE RE:**
**1) ORDER MOTION FOR PREFERENCE GRANTED; AND,**
**2) ORDER MOTION FOR PROTECTIVE ORDER CONTINUED TO JANUARY 29, 2016**
**IN DEPT. 30 AT 9:31 A.M.**

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY ELECTRONIC SERVICE:** I electronically served the document(s) described above via File & ServeXpress, on the recipients designated on the Transaction Receipt located on the File & ServeXpress website (https://secure.fileandservexpress.com) pursuant to the Court Order establishing the case website and authorizing service of documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 22, 2016, at Oakland, California.

Marion Valdez

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1430816.1

PROOF/SHEA

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# SERVICE LIST

ARCHER NORRIS
2033 N. Main Street
Suite 800
Walnut Creek CA 94596
Telephone: (925) 930-6600
Facsimile: (925) 930-6620
FOR: MARCONI PLASTERING COMPANY,
INC

BERRY & BERRY
P.O. Box 16070
Oakland CA 94610
Telephone: (510) 835-8330
Facsimile: (510) 835-5117
FOR: DESIGNATED DEFENSE COUNSEL

DeHAY & ELLISTON, LLP
1111 Broadway
Suite 1950
Oakland CA 94607
Telephone: 510-285-0750
Facsimile: 510-285-0740
FOR: HANSON PERMANENTE CEMENT,
INC. fka KAISER CEMENT CORP., KAISER
GYPSUM COMPANY, INC.

HERR & ZAPALA
6155 Almaden Expressway
Suite 460
San Jose CA 95120
Telephone: (408) 287-7788
Facsimile: (408) 287-3388
FOR: BASCO DRYWALL & PAINTING CO.

HUGO PARKER LLP
135 Main Street
20th Floor
San Francisco CA 94105
Telephone: (415) 808-0300
Facsimile: (415) 808-0333
FOR: CAHILL CONTRACTORS, INC.,
FOSTER WHEELER LLC, J.S. GUERIN &
COMPANY, SAN FRANCISCO GRAVEL
CO., INC.

PERKINS COIE LLP
505 Howard Street
Suite 1000
San Francisco CA 94105
Telephone: (415) 344-7000
Facsimile: (415) 344-7288
FOR: GEORGIA-PACIFIC LLC fka
GEORGIA PACIFIC CORPORATION

POND NORTH
350 South Grand Avenue
Suite 3300
Los Angeles CA 90071
Telephone: (213) 617-6170
Facsimile: (213) 623-3594
FOR: CBS CORP, a Del Corp fka VIACOM sii
by merger to CBS a Penn Corp etc.

SEDGWICK LLP
333 Bush Street
30th Floor
San Francisco CA 94104
Telephone: (415) 781-7900
Facsimile: (415) 781-2635
FOR: GENERAL ELECTRIC COMPANY

SEDGWICK LLP
520 Pike Street
Suite 2200
Seattle WA 98101
Telephone: 206-462-7560
Facsimile: 206-462-7561
FOR: GENERAL ELECTRIC COMPANY

STEPTOE & JOHNSON
633 West Fifth Street
Suite 700
Los Angeles CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599
FOR: METROPOLITAN LIFE INSURANCE
COMPANY

1430816.1

PROOF/SHEA

1  WFBM, LLP
   601 Montgomery Street
2  9th Floor
   San Francisco CA 94111
3  Telephone: (415) 781-7072
   Facsimile: (415) 391-6258
4  FOR: FDCC CALIFORNIA, INC. formerly
   known as DINWIDDIE CONSTRUCTION
5  COMPANY, PIERCE LATHING CO.,
   PIERCE LATHING
6  CO./sii/pae/alt/eqt/FRANK D. SMITH
   COMPANY
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1430816.1

PROOF/SHEA

# Exhibit F

CASE NO. 21-CI-06290

JFFERSON CIRCUIT COURT
DIVISION FOUR (4)

MATTHEW STRECK, INDIVIDUALLY,
AND
KAITLYN STRECK AND KARA STRECK, BOTH
MINORS, BY AND THROUGH THEIR PARENT,
GUARDIAN, AND NEXT FRIEND, MATTHEW STRECK

PLAINTIFFS

v.  *ELECTRONICALLY FILED*

JOHNSON AND JOHNSON, ET AL.

DEFENDANTS

---

### PLAINTIFFS' NOTICE TO TAKE DEPOSITION OF
### MATTHEW STRECK BY STENOGRAPHY AND VIDEOGRAPHY

---

**PLEASE TAKE NOTICE THAT** on **Friday, February 4, 2022,** at **11:00 a.m.**
**(Eastern Time),** the Plaintiffs, by counsel, at **Satterley & Kelley, PLLC, 8700 Westport Road,**
**Louisville, KY 40242,** will proceed to take the deposition, by stenography and videography, of
**Matthew Streck.**

Said deposition will be taken pursuant to and for all purposes provided by the Kentucky
Rules of Civil Procedure.

Respectfully submitted,

**SATTERLEY & KELLEY, PLLC**

/s/ Paul J. Kelley
Joseph D. Satterley
Paul J. Kelley
Paul J. Ivie
J. Garrett Cambron
8700 Westport Road, Suite 202
Louisville, KY 40242
PH: (502) 589-5600
FAX: (502) 814-5500
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served to all Counsel of Record per the attached Service List by email and First-Class U.S. Mail, on this **20**th day of **January, 2022**.

/s/ Paul J. Kelley
**COUNSEL FOR PLAINTIFFS**

cc:    Coulter Reporting, LLC
       krego@coulterreporting.com

## MATTHEW STRECK - SERVICE LIST

Patrick W. Gault
NAPIER GAULT SCHUBACH
& STEVENS, PLC
730 West Main Street, Suite 400
Louisville, KY 40202
pgault@napiergaultlaw.com
Phone: (502) 855-3802
Fax: (502) 855-3838
*Counsel for Genuine Parts Co.*
*and Heustis Auto Supply, Inc.*

Scott A. Davidson
BOEHL STOPHER & GRAVES LLP
400 West Market Street, Suite 2300
Louisville, KY 40202
sdavidson@bsg-law.com
Phone: (502) 589-5980
Fax: (502) 561-9400
*Counsel for Honeywell International, Inc.*

Kyle M. Virgin
Dave T. Cecil
FREEMAN MATHIS & GARY, LLP
2525 Harrodsburg Road, Suite 500
Lexington, KY 40504
kyle.virgin@fmglaw.com
dave.cecil@fmglaw.com
Phone: (859) 410-7868
*Counsel for Pep Boys*

Douglas C. Ballantine
STOLL KEENON OGDEN PLLC
500 West Jefferson Street, Suite 2000
Louisville, KY 40202
douglas.ballantine@skofirm.com
Phone: (502) 333-6000
*Counsel for Chattem, Inc., and*
*Winn-Dixie Stores, Inc.*

Palmer G. Vance, II
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507
gene.vance@skofirm.com
Phone: (859) 231-3000
*Counsel for Chattem, Inc., and Winn-Dixie*
*Stores, Inc.*

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, IL 60601
bberens@jonesday.com
Phone: (312) 782-3939
Fax: (312) 782-8585
*Counsel for Johnson & Johnson*

Gregory M Gordon
Dan B. Prieto
Amanda Rush
JONES DAY
2727 North Harwood St.
Dallas, TX 75201
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
Phone: (214) 220-3939
Fax: (214) 969-5100
*Counsel for Johnson & Johnson*

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD
710 W. Main St., 4th Fl.
Louisville, KY 40202
mabate@kaplanjohnsonlaw.com
Phone: (502) 540-8280
*Counsel for Johnson & Johnson*

M. Trent Spurlock
DINSMORE & SHOHL, LLP
101 South Fifth St., Ste. 2500
Louisville, KY 40202
trent.spurlock@dinsmore.com
Phone: (502) 540-2300
Fax: (502) 585-2207
*Counsel for The Kroger Co.*

Stephen T. Porter
2406 Tucker Station Road
Louisville, KY 40299
stpinlou@aol.com
502-905-9991
*Counsel for Bernie's Automotive (f/k/a*
*Bernie's Auto Supply, Inc.)*

## MATTHEW STRECK - SERVICE LIST

Robert W. "Tad" Adams, III
Mary E. Eade
ADAMS LAW GROUP
6004 Brownsboro Park Blvd., Ste. A
Louisville, KY 40207
rwa@tadamslaw.com
me@tadamslaw.com
Phone: (502) 895-8210
***Counsel for PMR Companies***

Houston Bragg
DINSMORE & SHOHL LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Houston.Bragg@dinsmore.com
***Counsel for Barretts Minerals, Inc.***

Aurora Louisville, LLC
c/o Corporation Service Company
251 Little Falls Dr.
Wilmington, DE 18808

Aurora Louisville, LLC
575 Lexington Ave., Ste. 3200
New York, NY 10022

Aurora Louisville, LLC
3500 South Dupont Hwy.
Dover, DE 19901

C2C08FC4-9804-4501-B236-5D1040709CF8 : 000004 of 000004

NVD : 000004 of 000004        000004 of 000004

# Exhibit G

---

Page 1

1 NO. 21-CI-06290      JEFFERSON CIRCUIT COURT
                                    DIVISION FOUR (4)
2

3

4 MATTHEW STRECK, INDIVIDUALLY
  AND KAITLYN STRECK AND KARA
5 STRECK, BOTH MINORS, BY AND
  THROUGH THEIR PARENT, GUARDIAN,
6 AND NEXT FRIEND, MATTHEW STRECK      PLAINTIFFS

7

8
  V.      VIDEO DEPOSITION FOR THE PLAINTIFFS
9

10

11 JOHNSON AND JOHNSON, et al.      DEFENDANTS

12

13                * * *

14

15 DEPONENT: MATTHEW STRECK
            (Volume I)
16
   DATE:      FEBRUARY 25, 2022
17

18                * * *
19

20

21          RICHARD L. COULTER
            Coulter Reporting, LLC
22          101 East Kentucky Street
                 Suite 200
23          Louisville, Kentucky 40203
                (502) 582-1627
24          FAX: (502) 587-6299
   E-MAIL: rcoulter@coulterreporting.com
25   WEB SITE: Coulterreporting.com

---

Page 2

1                INDEX

2
   Examination by Mr. Kelley...................... 6
3
   Reporter's Certificate........................161
4

5                EXHIBITS

6
   Exhibit No. 1................................. 72
7   (Photographs)

8 Exhibit No. 2................................. 72
    (Family photographs)
9
   Exhibit No. 3................................. 84
10   (Photograph of baby powder bottle)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 3

1                APPEARANCES

2

3 FOR THE PLAINTIFFS:

4      PAUL J. KELLEY, ESQ.
       Satterley & Kelley, PLLC
5      8700 Westport Road, Suite 202
       Louisville, Kentucky 40242
6      pkelley@satterleylaw.com

7 FOR THE DEFENDANTS, GENUINE PARTS CO. AND HEUSTIS
  AUTO SUPPLY, INC.:
8
       PATRICK W. GAULT, ESQ.
9      Napier Gault Schupbach & Stevens, PLC
       730 West Main Street, Suite 400
10     Louisville, Kentucky 40202
       pgault@napiergaultlaw.com
11

12 FOR THE DEFENDANT, HONEYWELL INTERNATIONAL, INC.:

13     SCOTT A. DAVIDSON, ESQ.
       Boehl, Stopher & Graves, LLP
14     400 West Market Street, Suite 2300
       Louisville, Kentucky 40202
15     sdavidson@bsg-law.com

16

17 FOR THE DEFENDANT, PEP BOYS:

18     DAVE T. CECIL, ESQ. - via video
       Freeman Mathis & Gary, LLP
19     2525 Harrodsburg Road, Suite 500
       Lexington, Kentucky 40504
20     dave.cecil@fmglaw.com

21 FOR THE DEFENDANTS, CHATTEM, INC., AND WINN-DIXIE
  STORES, INC.:
22
       PALMER G. VANCE, II, ESQ.
23     Stoll Keenon Ogden, PLLC
       300 West Vine Street, Suite 2100
24     Lexington, Kentucky 40507
       gene.vance@skofirm.com
25

---

Page 4

1      APPEARANCES (Continued)

2 FOR THE DEFENDANT, THE KROGER CO.:

3      TRAVIS R. SMITH, ESQ. - via video
       Dinsmore &I Shohl, LLP
4      101 South Fifth Street, Suite 2500
       Louisville, Kentucky 40202
5      travis.smith@dinsmore.com

6

7 FOR THE DEFENDANT, BERNIE'S AUTOMOTIVE (f/k/a
  BERNIE'S AUTO SUPPLY, INC.)

8      STEPHEN T. PORTER, ESQ. - via video
       2406 Tucker Station Road
9      Louisville, Kentucky 40299
       stpinlou@aol.com
10

11 FOR THE DEFENDANT, PMR COMPANIES:

12     MARY E. EADE, ESQ.
       Adams Law Group
13     6004 Brownsboro Park Boulevard, Suite A
       Louisville, Kentucky 40207
14     me@tadamslaw.com

15

16 FOR THE DEFENDANT, BARRETTS MINERALS, INC.:

17     D. MATTHEW KANNADY, ESQ.
       Dinsmore & Shohl, LLP
18     100 West Main Street, Suite 900
       Lexington, Kentucky 40507
19     matthew.kannady@dinsmore.com

20

21 VIDEOGRAPHER:

22     TJ BARR, Coulter Reporting

23

24

25

Page 5

1       The videotaped deposition of MATTHEW

2  STRECK, taken in the offices of Satterley & Kelley,

3  PLLC, 8700 Westport Road, Louisville, Kentucky, on

4  Friday, the 25th day of February, 2022, at

5  approximately 11:46 a.m.; said deposition being taken

6  pursuant to Notice for use in accordance with the

7  Kentucky Rules of Civil Procedure.

8

9              * * *

10

11      VIDEOGRAPHER:  Here begins the

12  videotaped deposition of Matthew Streck, taken in the

13  matter of Streck v. Johnson and Johnson, et al.

14  Today's date is February 25th, 2022, and the time is

15  11:46 a.m.

16      This deposition is being held at

17  Satterley & Kelley, PLLC, in Louisville, Kentucky.

18  The court reporter is Rick Coulter; the video camera

19  operator is TJ Barr.

20      Will counsel please introduce

21  themselves and state whom they represent.

22      MR. KELLEY:  This is Paul Kelley on

23  behalf of Matthew Streck.

24      MR. KANNADY:  Matthew Kannady on

25  behalf of various defendants.

Page 6

1      MR. VANCE:  Gene Vance on behalf of

2  Chattem and Winn-Dixie.

3      MS. EADE:  Mary Eade on behalf of PMR

4  Companies.

5      MR. GAULT:  Patrick Gault for Genuine

6  Parts Company and Heustis Auto Supply.

7      MR. DAVIDSON:  Scott Davidson for

8  Honeywell International, Inc., formerly known as

9  Allied Signal, Inc., successor in interest to

10  defendant corporation.

11      REPORTER:  Folks on Zoom.

12      MR. SMITH:  Travis Smith for The

13  Kroger Co.

14      MR. CECIL:  Dave Cecil for Pep Boys.

15      MR. PORTER:  Stephen Porter for

16  Bernie's Automotive.

17

18      MATTHEW STRECK, after first being duly

19  sworn, was examined and testified as follows:

20

21            EXAMINATION

22

23  BY MR. KELLEY:

24    **Q.   All right.  I obviously know who you**

25  **are, but can you introduce yourself to everyone.**

Page 7

1    A.   Matthew Streck.

2    **Q.   And do you go by Matt?**

3    A.   Yes.

4    **Q.   So, Matt, we're going to be spending**

5  **some time today and perhaps other days talking a**

6  **little bit about your life and your work history and**

7  **your medical history.  Is that okay for us to do?**

8    A.   Yes.

9    **Q.   And, Matt, have you recently been**

10  **diagnosed with cancer?**

11    A.   Yes.

12    **Q.   And do you know what kind of cancer**

13  **you've been diagnosed with?**

14    A.   Mesothelioma.

15    **Q.   And where -- what part of your body**

16  **does the mesothelioma affect you?**

17    A.   In my abdomen and my chest and -- and

18  lungs.

19    **Q.   And we will talk about your medical**

20  **situation a little later on today, but I want to talk**

21  **about a few other things before we get there.**

22    **Where do you live?**

23    A.   7405 Stone Bluff Court, Louisville,

24  Kentucky.

25    **Q.   And how long have you lived there?**

Page 8

1    A.   Almost -- I guess it's almost four

2  years now.

3    **Q.   And what's your date of birth?**

4    A.   7-15-74.

5    **Q.   And does that make you 47 years old**

6  **today?**

7    A.   Yes, sir.

8    **Q.   And, Matt, do you -- do you have kids?**

9    A.   Two girls.

10    **Q.   And what are their names?**

11    A.   Kara and Kaitlyn Streck.

12    **Q.   And how old is Kara?**

13    A.   Kara's 8 and Kaitlyn's 11.

14    **Q.   And, Matt, did your -- did your wife**

15  **pass away a few years ago?**

16    A.   Yes, she did.

17    **Q.   And what was your wife's name?**

18    A.   Leslie Streck.

19    **Q.   And since she passed away, have you**

20  **remarried?**

21    A.   No.

22    **Q.   Are you raising Kara and Kaitlyn by**

23  **yourself?**

24    A.   Yes.

25    **Q.   Why don't you -- you've told us that**

Page 25

```
 1    Q.    Have you ever worked in a steel mill?
 2    A.    No.
 3    Q.    Have you ever worked at any factories
 4  ever?
 5    A.    No.
 6    Q.    Have you ever worked for a railroad?
 7    A.    No.
 8    Q.    Have you ever worked in an oil
 9  refinery?
10    A.    No.
11    Q.    Have you ever done any welding?
12    A.    No.
13    Q.    Have you ever either worked with or
14  around any insulation products during your life?
15    A.    Yes.  I mean...
16    Q.    Where have you worked around
17  insulation work?
18    A.    I have been in buildings.  One of
19  them -- they were called Americana Apartments --
20         REPORTER:  I'm sorry, what's the name
21  of it?
22         THE WITNESS:  Americana Apartments at
23  the time I was there.  There was insulation and stuff
24  at that -- that apartment.
25    Q.    Okay.  We'll come back and talk about
```

Page 26

```
 1  that --
 2    A.    Okay.
 3    Q.    -- in a few moments.
 4         Have you ever worked with gaskets?
 5    A.    No.
 6    Q.    Have you ever worked with packing?
 7    A.    No.
 8    Q.    Now, have you ever used or been around
 9  talcum powder?
10    A.    Yes.
11    Q.    And what powders have you either used
12  or been around during the course of your life?
13    A.    Baby -- Johnson & Johnson Baby Powder
14  and Gold Bond.
15    Q.    We'll come back and talk about those
16  as well.
17         So we received -- during our
18  investigation of your work history we received a copy
19  of your Social Security Administration printout.  I
20  think you've seen that, have you not?
21    A.    Yes.
22    Q.    So I want to go through the jobs that
23  are listed here, and you can explain to -- to me and
24  everybody and the judge and jury what you did at all
25  of those jobs.
```

Page 27

```
 1    A.    Okay.
 2    Q.    So I'll start off with a place in the
 3  early '90s when you might have still been in high
 4  school called China Joe's.
 5    A.    Yeah.
 6    Q.    What was that?
 7    A.    It was just a Chinese restaurant, a
 8  little fast-food Chinese restaurant that I -- I did
 9  -- actually made food -- you know, cooked and
10  delivered food.  It was a delivery.
11    Q.    And is that all you did for China
12  Joe's?
13    A.    Yes.  Yes.
14    Q.    Okay.  And then it looks like you
15  spent a short period of time over at Mr. Gatti's.
16  What did you do for Mr. Gatti's?
17    A.    Yeah, that was a very quick one.  That
18  was -- I put door hangers on neighborhood doors for
19  the advertisement for...
20    Q.    And there was a place that -- that was
21  not on your Social Security printout but a place that
22  you said you worked at called Michael Scott Masonry.
23    A.    Yes.
24    Q.    First of all, do you recall about how
25  long worked for Michael Scott Masonry?
```

Page 28

```
 1    A.    Probably about three years, I think.
 2    Q.    And what did you do -- and
 3  about approximately when did you work for Michael
 4  Scott Masonry?
 5    A.    I'm trying to think.  That would have
 6  been -- shoot, probably, if I'm guessing -- if I
 7  remember right, maybe '91, '93, maybe.
 8    Q.    Okay.
 9    A.    I may have that off somewhere.
10    Q.    Sometime in the early to mid '90s?
11    A.    Yeah.
12    Q.    And -- so tell us, what did you do as
13  an employee for Michael Scott Masonry?
14    A.    Well, I was a laborer for them.  I
15  made the mortar and carried the mortar -- carried the
16  bricks, and then I also helped lay the bricks for
17  them.
18    Q.    Okay.  And that's what Michael Scott
19  Masonry did --
20    A.    Yes.
21    Q.    -- it laid bricks?
22    A.    Yeah.  Masonry; yeah.
23    Q.    The type of -- well, first of all, did
24  you work on residential properties or commercial
25  properties?
```

Page 161

1  STATE OF KENTUCKY    )(

2                       )( SS:
   COUNTY OF JEFFERSON  )(
3

4        I, RICHARD L. COULTER, Notary Public,
   State of Kentucky at Large, hereby certify that the
5  foregoing deposition was taken at the time and place
   stated in the caption; that the appearances were as
   set forth in the caption; that prior to giving
6  testimony the witness was first duly sworn by me;
7  that said testimony was taken down by me in
   stenographic notes and thereafter reduced under my
8  supervision to the foregoing typewritten pages and
   that said typewritten transcript is a true, accurate
9  and complete record of my stenographic notes so
   taken.
10       I further certify that I am not
   related by blood or marriage to any of the parties
11 hereto and that I have no interest in the outcome of
   captioned case.
12       My commission as Notary Public expires
   February 23, 2025.
13       Given under my hand this the 6th
   day of March , 2022, at Louisville, Kentucky.
14

15

16

17            RICHARD L. COULTER
              NOTARY NUMBER KYNP23021
18

19

20

21

22

23

24

25

# Exhibit H

AF1A647F-9A99-48C5-9353-69E97101D0E8 : 000001 of 000004

CASE NO. 21-CI-06290              **JEFFERSON CIRCUIT COURT**
                                                      **DIVISION FOUR (4)**

MATTHEW STRECK, INDIVIDUALLY,
AND
KAITLYN STRECK AND KARA STRECK, BOTH
MINORS, BY AND THROUGH THEIR PARENT,
GUARDIAN, AND NEXT FRIEND, MATTHEW STRECK        **PLAINTIFFS**

v.                   ***ELECTRONICALLY FILED***

JOHNSON AND JOHNSON, ET AL.                 **DEFENDANTS**

---

### PLAINTIFFS NOTICE TO TAKE CONTINUED DEPOSITION OF MATTHEW STRECK BY STENOGRAPHY AND VIDEOGRAPHY

---

       **PLEASE TAKE NOTICE THAT** on **Wednesday, March 9, 2022,** at **10:00 a.m.**

**(Eastern Time),** the Plaintiffs, by counsel, at **Satterley & Kelley, PLLC, 8700 Westport Road,**

**Louisville, KY 40242,** will proceed to take the continued deposition, by stenography and

videography, of **Matthew Streck.**

       Said deposition will be taken pursuant to and for all purposes provided by the Kentucky

Rules of Civil Procedure.

                           Respectfully submitted,

                           **SATTERLEY & KELLEY, PLLC**


                           /s/ Paul J. Kelley
                           Joseph D. Satterley
                           Paul J. Kelley
                           Paul J. Ivie
                           8700 Westport Road, Suite 202
                           Louisville, KY 40242
                           PH: (502) 589-5600
                           FAX: (502) 814-5500
                           **COUNSEL FOR PLAINTIFFS**

NTD : 000001 of 000004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served to all Counsel of Record per the attached Service List by electronic mail, on this **28th** day of **February, 2022**.

/s/ Paul J. Kelley
**COUNSEL FOR PLAINTIFFS**

cc:     Coulter Reporting, LLC
         **krego@coulterreporting.com**

AF1A647F-9A99-48C5-9353-69E97101D0E8 : 000002 of 000004

NTD : **000002 of 000004**

## MATTHEW STRECK - SERVICE LIST

Patrick W. Gault
NAPIER GAULT SCHUBACH
& STEVENS, PLC
730 West Main Street, Suite 400
Louisville, KY 40202
pgault@napiergaultlaw.com
Phone: (502) 855-3802
Fax: (502) 855-3838
*Counsel for Genuine Parts Co.*
*and Heustis Auto Supply, Inc.*

Scott A. Davidson
BOEHL STOPHER & GRAVES LLP
400 West Market Street, Suite 2300
Louisville, KY 40202
sdavidson@bsg-law.com
Phone: (502) 589-5980
Fax: (502) 561-9400
*Counsel for Honeywell International, Inc.*

Kyle M. Virgin
Dave T. Cecil
FREEMAN MATHIS & GARY, LLP
2525 Harrodsburg Road, Suite 500
Lexington, KY 40504
kyle.virgin@fmglaw.com
dave.cecil@fmglaw.com
Phone: (859) 410-7868
*Counsel for Pep Boys*

Douglas C. Ballantine
STOLL KEENON OGDEN PLLC
500 West Jefferson Street, Suite 2000
Louisville, KY 40202
douglas.ballantine@skofirm.com
Phone: (502) 333-6000
*Counsel for Chattem, Inc., and*
*Winn-Dixie Stores, Inc.*

Palmer G. Vance, II
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507
gene.vance@skofirm.com
Phone: (859) 231-3000
*Counsel for Chattem, Inc., and Winn-Dixie*
*Stores, Inc.*

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, IL 60601
bberens@jonesday.com
Phone: (312) 782-3939
Fax: (312) 782-8585
*Counsel for Johnson & Johnson*

Gregory M Gordon
Dan B. Prieto
Amanda Rush
JONES DAY
2727 North Harwood St.
Dallas, TX 75201
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
Phone: (214) 220-3939
Fax: (214) 969-5100
*Counsel for Johnson & Johnson*

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD
710 W. Main St., 4th Fl.
Louisville, KY 40202
mabate@kaplanjohnsonlaw.com
Phone: (502) 540-8280
*Counsel for Johnson & Johnson*

M. Trent Spurlock
DINSMORE & SHOHL, LLP
101 South Fifth St., Ste. 2500
Louisville, KY 40202
trent.spurlock@dinsmore.com
Phone: (502) 540-2300
Fax: (502) 585-2207
*Counsel for The Kroger Co.*

Stephen T. Porter
2406 Tucker Station Road
Louisville, KY 40299
stpinlou@aol.com
502-905-9991
*Counsel for Bernie's Automotive (f/k/a*
*Bernie's Auto Supply, Inc.)*

AF1A647F-9A99-48C5-9353-69E97101D0E8 : 000003 of 000004

NTD : **000003 of 000004**

## MATTHEW STRECK - SERVICE LIST

Robert W. "Tad" Adams, III
Mary E. Eade
ADAMS LAW GROUP
6004 Brownsboro Park Blvd., Ste. A
Louisville, KY 40207
rwa@tadamslaw.com
me@tadamslaw.com
Phone: (502) 895-8210
*Counsel for PMR Companies*

Houston Bragg
DINSMORE & SHOHL LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Houston.Bragg@dinsmore.com
*Counsel for Barretts Minerals, Inc.*

Aurora Louisville, LLC
c/o Corporation Service Company
251 Little Falls Dr.
Wilmington, DE 18808

Aurora Louisville, LLC
575 Lexington Ave., Ste. 3200
New York, NY 10022

Aurora Louisville, LLC
3500 South Dupont Hwy.
Dover, DE 19901

# Exhibit I

Page 1

```
 1   NO. 21-CI-06290          JEFFERSON CIRCUIT COURT
                                  DIVISION FOUR (4)
 2

 3

 4   MATTHEW STRECK, INDIVIDUALLY
     AND KAITYLYN STRECK AND KARA
 5   STRECK, BOTH MINORS, BY AND
     THROUGH THEIR PARENT, GUARDIAN,
 6   AND NEXT FRIEND, MATTHEW STRECK        PLAINTIFFS

 7

 8
     V.      VIDEO DEPOSITION FOR THE PLAINTIFFS
 9

10

11   JOHNSON AND JOHNSON, et al.          DEFENDANTS

12

13                     * * *

14

15   DEPONENT: MATTHEW STRECK
               (Volume II)
16
     DATE:   MARCH 9, 2022
17

18                     * * *

19

20

21           RICHARD L. COULTER
             Coulter Reporting, LLC
22           101 East Kentucky Street
                    Suite 200
23           Louisville, Kentucky 40203
                 (502) 582-1627
24           FAX: (502) 587-6299
     E-MAIL: rcoulter@coulterreporting.com
25      WEB SITE: Coulterreporting.com
```

Page 2

```
 1                      INDEX

 2
     Examination by Mr. Gault.................... 7, 203
 3
     Examination by Mr. Davidson................. 73, 207
 4
     Examination by Mr. Vance....................136
 5
     Examination by Mr. Kannady..................166
 6
     Examination by Ms. Eade.....................171
 7
     Examination by Mr. Smith....................173
 8
     Examination by Mr. Virgin...................198
 9
     Examination by Mr. Kelley...................208
10
     Reporter's Certificate......................214
11

12                    EXHIBITS

13
     Exhibit No. 4................................  6
14     (Two photographs of disc brakes)

15   Exhibit No. 5................................114
       (Bendix warnings)
16
     Exhibit No. 6................................213
17     (Photographs of Gold Bond Powder bottle)
```

Page 3

```
 1                   APPEARANCES

 2
     FOR THE PLAINTIFFS:
 3
            PAUL J. KELLEY, ESQ.
 4          Satterley & Kelley, PLLC
            8700 Westport Road, Suite 202
 5          Louisville, Kentucky 40242
            pkelley@satterleylaw.com
 6

 7   FOR THE DEFENDANTS, GENUINE PARTS CO. AND HEUSTIS
     AUTO SUPPLY, INC.:
 8
            PATRICK W. GAULT, ESQ.
 9          Napier Gault Schupbach & Stevens, PLC
            730 West Main Street, Suite 400
10          Louisville, Kentucky 40202
            pgault@napiergaultlaw.com
11

12   FOR THE DEFENDANT, HONEYWELL INTERNATIONAL, INC.:

13          SCOTT A. DAVIDSON, ESQ.
            Boehl, Stopher & Graves, LLP
14          400 West Market Street, Suite 2300
            Louisville, Kentucky 40202
15          sdavidson@bsg-law.com

16
     FOR THE DEFENDANT, PEP BOYS:
17
            KYLE M. VIRGIN, ESQ. - via video
18          Freeman Mathis & Gary, LLP
            2525 Harrodsburg Road, Suite 500
19          Lexington, Kentucky 40504
            kyle.virgin@fmglaw.com
20

21   FOR THE DEFENDANTS, CHATTEM, INC., AND WINN-DIXIE
     STORES, INC.:
22
            PALMER G. VANCE, II, ESQ.
23          Stoll Keenon Ogden, PLLC
            300 West Vine Street, Suite 2100
24          Lexington, Kentucky 40507
            gene.vance@skofirm.com
25
```

Page 4

```
 1              APPEARANCES (Continued)

 2
     FOR THE DEFENDANT, THE KROGER CO.:
 3
            TRAVIS R. SMITH, ESQ. - via video
 4          Dinsmore & Shohl, LLP
            101 South Fifth Street, Suite 2500
 5          Louisville, Kentucky 40202
            travis.smith@dinsmore.com
 6

 7   FOR THE DEFENDANT, PMR COMPANIES:

 8          MARY E. EADE, ESQ.
            Adams Law Group
 9          6004 Brownsboro Park Boulevard, Suite A
            Louisville, Kentucky 40207
10          me@tadamslaw.com

11
     FOR THE DEFENDANT, BARRETTS MINERALS, INC.:
12
            D. MATTHEW KANNADY, ESQ.
13          Dinsmore & Shohl, LLP
            100 West Main Street, Suite 900
14          Lexington, Kentucky 40507
            matthew.kannady@dinsmore.com
15

16   VIDEOGRAPHER:

17          TJ BARR, Coulter Reporting
```

Page 5

1 The continuation of the videotaped
2 deposition of MATTHEW STRECK, taken in the offices of
3 Satterley & Kelley, PLLC, 8700 Westport Road,
4 Louisville, Kentucky, on Wednesday, the 9th day of
5 March, 2022, at approximately 10:04 a.m.; said
6 deposition being taken pursuant to Notice for use in
7 accordance with the Kentucky Rules of Civil
8 Procedure.
9
10 * * *
11
12 (Off video record.)
13 MR. KELLEY: This is Paul Kelley. I
14 would propose that we stipulate an objection for one
15 is an objection for all. All objections except to
16 form are preserved for the record.
17 And any other stipulations that
18 you-all want to discuss, I'm happy to.
19 MR. GAULT: I can't speak for
20 everybody, but I agree to those stipulations.
21 MR. KELLEY: Okay.
22 MS. EADE: Yeah.
23 MR. KELLEY: Very good.
24 MR. GAULT: If you do not agree, say
25 something.

Page 6

1 MR. KELLEY: Right. And then last
2 session, the last set of photographs I put up, which
3 were two photographs of disc brakes, I think I failed
4 to attach them as exhibits, so I will mark them as
5 Exhibit 4.
6 I believe that's our next exhibit;
7 right?
8 REPORTER: Yes.
9 (STRECK DEPOSITION EXHIBIT NO. 4
10 MARKED)
11 MR. KELLEY: All right. And I will
12 pass the witness.
13 (On video record.)
14 VIDEOGRAPHER: We're back on the
15 record on March 9th, 2022 at 10:04 a.m.
16 Will counsel please introduce
17 themselves and state whom they represent.
18 MR. KELLEY: This is Paul Kelley
19 representing Matthew Streck and his family.
20 MR. GAULT: Patrick Gault for Genuine
21 Parts Company and Heustis.
22 MR. KANNADY: Matthew Kannady on
23 behalf of Barretts Minerals.
24 MR. VANCE: Gene Vance on behalf of
25 Chattem and Winn-Dixie.

Page 7

1 MS. EADE: Mary Eade on behalf of PMR
2 Companies.
3 MR. DAVIDSON: Scott Davidson on
4 behalf of Honeywell International.
5 MR. GAULT: People on Zoom.
6 REPORTER: Go ahead, Travis.
7 MR. SMITH: Travis Smith for the
8 Kroger Co.
9 MR. VIRGIN: Kyle Virgin on half of
10 Pep Boys.
11
12 EXAMINATION
13
14 BY MR. GAULT:
15 Q. Mr. Streck, I'm Patrick Gault, and as
16 I mentioned I represent Genuine Parts Company and
17 Heustis. I'm going to ask you a few questions, and
18 if something I ask you doesn't make sense, just ask
19 me to rephrase it, okay?
20 A. Okay.
21 Q. If you need to take a break any time,
22 just let me know.
23 Has anything changed since you last
24 gave a deposition a little less than two weeks ago in
25 terms of -- I know you were talking to the -- the

Page 8

1 doctors up in Pittsburgh and you had just talked to
2 one at MD Anderson. Have you had any more
3 communications or any other discussions with any
4 doctors?
5 A. No, just -- we just had a follow-up
6 with -- well, I had a follow-up with the doctor in
7 Pittsburgh and he explained that the -- kind of gave
8 me some more detail about the condition and, you
9 know, where it was in -- it's kind of in the lining
10 around my lungs and he's not able to operate and that
11 he's referring me to a physician in MD Anderson to
12 see if he's skilled enough to maybe do the operation.
13 Other than that, nothing.
14 Q. Okay. I think, correct me if I'm
15 wrong, but that the last time you had just talked to,
16 I think the night before, a doctor from MD Anderson.
17 A. Yes. We just talked briefly about
18 setting up an appointment. He kind of gave me a
19 brief description of what he was going to do, you
20 know. He was looking for my scans and wanted to look
21 over those, and then he said he would reach back out
22 to me to set up another conference call to go over,
23 you know, what he thought might be possible.
24 Q. Do you have --
25 MR. SMITH: Sorry to interrupt, but is

Page 213

1  MR. KELLEY: Thank you.

2  MR. SMITH: Objection to form,

3  foundation, calls for speculation.

4  MR. KELLEY: Thank you, Matt. Those

5  are all the questions I have.

6  Does anybody have any follow-up?

7  (No response.)

8  MR. KELLEY: All right. We'll close

9  the record.

10  Oh, wait a minute. I'm sorry, hold

11  on. I apologize.

12  I will take a photograph of the bottle

13  of Gold Bond that Matt testified about earlier, I'll

14  take pictures of all sides of the bottle, front,

15  back, bottom, sides and top and we'll mark that as

16  Exhibit 6.

17  (STRECK DEPOSITION EXHIBIT NO. 6

18  MARKED)

19  VIDEOGRAPHER: The deposition is

20  concluded. We're off the record at 2:43 p.m.

21  (OFF THE RECORD)

22

23  (DEPOSITION CONCLUDED AT 2:43 P.M.)

24  * * *

25

Page 214

1  STATE OF KENTUCKY    )(

2                       )( SS:
   COUNTY OF JEFFERSON  )(

3

4        I, RICHARD L. COULTER, Notary Public,
   State of Kentucky at Large, hereby certify that the

5  foregoing deposition was taken at the time and place
   stated in the caption; that the appearances were as

6  set forth in the caption; that prior to giving
   testimony the witness was first duly sworn by me;

7  that said testimony was taken down by me in
   stenographic notes and thereafter reduced under my

8  supervision to the foregoing typewritten pages and
   that said typewritten transcript is a true, accurate

9  and complete record of my stenographic notes so
   taken.

10       I further certify that I am not
   related by blood or marriage to any of the parties

11 hereto and that I have no interest in the outcome of
   captioned case.

12       My commission as Notary Public expires
   February 23, 2025.

13       Given under my hand this the 26th
   day of March , 2022, at Louisville, Kentucky.

14

15

16

17            RICHARD L. COULTER
              NOTARY NUMBER KYNP23021

18

19

20

21

22

23

24

25