**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126

*Local Counsel to the Ad Hoc Committee*
*of Certain Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
Eric R. Goodman, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
egoodman@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Co-Counsel for the Ad Hoc Committee*
*of Certain Talc Claimants*

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
jmassey@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC  20024
Tel: (202) 652-4511
Fax: (312) 379-0467

*Special Counsel for the Ad Hoc Committee*
*of Certain Talc Claimants*

**OTTERBOURG PC**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104

*Co-Counsel for the Ad Hoc Committee*
*of Certain Talc Claimants*

| In Re: | Chapter 11 |
| **LTL MANAGEMENT, LLC,**[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

### INFORMATIONAL BRIEF OF THE AD HOC
### COMMITTEE OF CERTAIN TALC CLAIMANTS REGARDING
### SECOND BANKRUPTCY FILING BY LTL MANAGEMENT, LLC

In its Precedential Opinion, the United States Court of Appeals for the Third Circuit stated that it would "start, and stay, with good faith." *In re LTL Mgmt., LLC*, --- F.4th --- , 2023 WL 2760479, at *1 (3d Cir. 2023). LTL 1.0 had none. Filed only two hours and eleven minutes after the dismissal of LTL 1.0, during which time the Debtor, J&J and their officers, directors and counsel effectuated the largest fraudulent conveyance in the history of the United States (which they had collusively planned and prepackaged during the waning days of the LTL 1.0 case), LTL 2.0 has even less. Over the past eighteen months, hundreds of victims of J&J's talc products have died waiting for justice to be done and their cases returned to the civil justice system for trials by juries of their peers. The Debtor's new filing, with its request to again stay all litigation against non-debtor J&J and other non-debtor defendants, is deliberately intended to forestall that return – all to the mortal prejudice and sanctionable injustice of the talc victims. A bad faith bankruptcy is not transformed because a debtor claims that certain creditors want to support its settlement. To honor the memory of those victims who have died, to bring justice to the survivors and their families, and to protect the bankruptcy system from fraudulent machinations that erode its

---

[1]   The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

integrity, in light of the fraud and sanctionable conduct that permeates LTL's second filing, this case must also be dismissed.

The Ad Hoc Committee of Certain Talc Claimants (the "AHC") in the above captioned case, by and through its undersigned counsel, hereby respectfully submits this Informational Brief regarding the second bankruptcy filing of LTL Management, LLC (the "Debtor" or "LTL").[2]

The AHC is an ad hoc group comprised of nine members of the Official Committee of Talc Claimants (the "TCC") in the Debtor's first bankruptcy, all of whom carefully and with diligence exercised their fiduciary duties on behalf of all talc claimants in that role—Alishia Landrum; Rebecca Love; Blue Cross Blue Shield of Massachusetts; Tonya Whetsel; Kristie Doyle; William A. Henry; Randy Derouen; April Fair; and Patricia Cook.[3]  These parties and their counsel are intimately familiar with the Debtor and its bankruptcy case based on their faithful and extraordinary services as members on the Tort Claimants' Committee in the Debtor's first bankruptcy. Respectfully, this Court should take no substantive actions in this bad faith case, other than its *sua sponte* dismissal, including issuance of a Preliminary Injunction, until an Official Committee of Talc Claimants is appointed and can represent the interests of all talc claimants.

## INTRODUCTION

1.      This bankruptcy—filed two hours and eleven minutes after the dismissal of the Debtor's earlier bankruptcy as a bad faith filing—must be dismissed.  It is a deliberate defiance of the Third Circuit's mandate and opinion.  It is premised on the **largest intentional fraudulent transfer in United States history**, cooked up while LTL was a debtor-in-possession in its earlier

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Kim Declaration [Dkt. No. 4] (the "Kim Decl.").

[3]  The other two members of the TCC are represented by Onder Law and Nachawati Law Group—who have executed Plan Support Agreements with J&J.

case, and purportedly consummated within two hours and eleven minutes of dismissal.  The public and indisputable facts make a mockery of the Third Circuit's Opinion, Judgment, and Mandate, and of our justice system.

2.     Indeed, while the Debtor and its co-conspirators attempt to create jurisdiction by intentionally engaging in a fraudulent scheme to manufacture financial distress, the very Opinion they seek to defy commands immediate dismissal.  The Debtor was not in financial distress prior to filing its serial petition.  The Third Circuit described LTL as follows: "At base level, LTL, whose employees are all J&J employees, is essentially a shell company 'formed,' almost exclusively, 'to manage and defend thousands of talc-related claims' while insulating at least the assets now in New Consumer. …  And LTL was well-funded to do this.  As of the time of its filing, we cannot say there was any sign on the horizon it would be anything but successful in the enterprise.  It is even more difficult to say it faced any 'serious financial and/or managerial difficulties' calling for the need to reorganize during its short life outside of bankruptcy." *LTL Mgmt.*, 2023 WL 2760479, at *16.

3.     Nothing could have occurred in the two hours and eleven minutes between bankruptcy cases to overcome the Third Circuit's admonition that "[f]inancial distress must not only be apparent, but it must be ***immediate enough*** to justify a filing." *Id.* at *9 (emphasis added). The Debtor did not conduct any "business" in the two hours and eleven minutes aside from purportedly signing papers—**prepared and agreed to during the pendency of LTL 1.0**—that caused the most facially disrespectful intentional fraudulent transfer in history in an attempt to create financial distress.

4.     And to the extent additional cases were filed and served during the two hours and eleven-minute window, the Third Circuit explicitly recognized that the immediacy of financial

distress required to invoke bankruptcy court jurisdiction cannot be based on "back-of-the-envelope" projections of liability that ignore "the possibility of meaningful [in the tort system] settlement, as well as successful defense and dismissal, of claims." *Id.* at *14. LTL's lack of financial distress was the same as when the Third Circuit issued its opinion.

5.    The Debtor has not and cannot present any evidence that even as LTL stood one minute before the present fraudulent and sanctionable petition (with the 2023 Funding Agreement) it suffered from financial distress of the immediacy sufficient to invoke bankruptcy protection under the Third Circuit's Opinion. *See id.* at *11 ("The takeaway here is that **when financial distress is present**, bankruptcy **may be** an appropriate forum for a debtor to address mass tort liability.") (emphasis added).

6.    Even J&J's corporate family dread at facing a single mesothelioma trial brought by Mr. Valadez, permitted by this Court prior to dismissal, and the exposure of a non-debtor parent company to independent liability is not sufficient, but it is telling about the real reasons for this bankruptcy—**the same as before, delay, non-debtor protection, and litigation advantage**.

7.    Born of fraud and misrepresentations to obtain a litigation advantage and deny talc victims their constitutional right to a jury trial, this bankruptcy—mockingly dubbed by its conspirators, no doubt for their own smug, self-satisfactory amusement, as "Project Plato II"—must end immediately.  At each level, this case is premised on fraud and misrepresentations which infect every aspect of it.  This Court should show no hesitation or delay in ordering dismissal.

8.    **First**, in an alleged effort to make itself eligible for bankruptcy, the Debtor willingly, knowingly, deliberately, fraudulently, and outrageously dissipated and transferred its most significant asset just before filing.

9.    The Debtor replaced the 2021 Funding Agreement—that gave it access to *at least*

$61 billion (and likely much more than that as of noon on April 4, 2023) on demand (inside or outside of bankruptcy)—with new agreements under which **J&J's balance sheet and the value of JJCI's consumer health business are no longer available to pay claims**. Roughly $50 billion (at a minimum) of value left the Debtor in an eyeblink's time on Tuesday, April 4th, as a result of collusive machinations by J&J, the Debtor, and their directors, officers, and counsel.

10.     In support of its decision to terminate the 2021 Funding Agreement, Mr. Kim testified by declaration that he believed the agreement was "void or voidable." Kim Decl. at ¶ 78. **It is not, and no explanation or analysis—legal or factual—is provided to substantiate this assertion**, which is facially incomprehensible, patently incredible and impossible to reconcile with his own prior testimony that the 2021 Funding Agreement made at least $61 billion available to the Debtor to pay talc claims—whether liquidated by a settlement or a judgment—outside of bankruptcy.[4]

11.     It likewise cannot be reconciled with the arguments of J&J's Two-Step architecture that convinced this Court not to dismiss LTL 1.0. According to Mr. Gordon, the 2021 Funding Agreement "is different from all other cases in the sense that it includes also a Johnson & Johnson, the ultimate parent, agreeing to obligate itself to the extent of the value of Old JJCI. So you have

---

[4]    *See* Declaration of John K. Kim in Support of First Day Pleadings, *In re LTL Management LLC*, Case No. 21-30589 [Docket No. 5] (Bankr. D.N.J. Oct. 14, 2021) ("Significantly, the Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan. ***It obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case*** and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. ***In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case*** and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.) (emphasis added).

basically two sources of asset availability." *In re LTL Management*, LLC, Case No. 21-30589 (Bankr. D.N.J) Feb. 18, 2022 Hearing Transcript 56:1-8. In fact, according to Mr. Gordon, "the whole idea with these funding agreements… [is} to basically say to the Court, to say to the parties, look, you haven't been hurt because the entity that was standing behind or the value of assets that were effectively standing behind the liability or were available to pay the liability, that value is fully preserved through that funding agreement. So that was fully preserved. The only difference is that instead of having the company there, you have a funding agreement that provides direct right to those assets through this funding agreement. *Id.* at 59:7-16.

12.    Advocating against dismissal, Mr. Gordon also pointed out to the Court that "there's literally no conditions or any material conditions on the permitted uses under this document", and he expressly included "funds available to pay settlements, to pay judgments in the tort system. So it makes it very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. So this is there to protect the claimants. It's there to assure this isn't treated or consider a fraudulent conveyance. The idea was and the intent was the claimants are covered either way in bankruptcy or outside." *Id.* at 60:16-20, 61:5-20.

13.    Even Mr. Katyal, LTL's appellate counsel, said that a case such as this would look like a pure litigation ploy absent the 2021 Funding Agreement:  "[W]e're not here defending something in the absence of a funding agreement.  If there is no funding agreement, that valid bankruptcy purposes [*sic*] that Judge Kaplan isolated those [for] look very different. **They look**

*like litigation advantages*." Third Circuit Oral Arg. Tr. 74:7-11, Sept. 19, 2022 (emphasis added).[5]

Mr. Gordon intimated the same fourteen months ago.[6]

14.    The 2021 Funding Agreement from the Debtor's first bankruptcy case was unambiguous; it was not voidable, and it was available in the absence of the Debtor's bankruptcy case and a global settlement. *See id.* at 83:21-25 ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

15.    Based on the sworn statements of Mr. Kim and the concessions in the arguments of Mr. Gordon and Mr. Katyal, the Third Circuit took "J&J and LTL at their word." *In re LTL Mgmt., LLC*, 2023 WL 2760479 at *16 (3d Cir. 2023). In filing LTL 2.0 J&J flippantly turns back to the Circuit Court and brazenly announces: *If that's all it takes, we'll just change our word.*

---

[5]   The fact that LTL's bankruptcy is now a transparent and obvious litigation tactic is yet further grounds for dismissal.  *See In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118-20 (3d Cir. 2004) ("Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith:  (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage"); *In re SGL Carbon Corp.*, 200 F.3d 154, 162-64 (3d Cir. 1999) (dismissing as a bad faith filing a petition filed to "put pressure on antitrust plaintiffs to accept the company's settlement terms" and "gain tactical litigation advantages"); *accord In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280-81 (4th Cir. 2007) (affirming dismissal of chapter 11 petition as a bad faith filing where the debtor filed to gain a litigation advantage over an adversary); *In re Marsch*, 36 F.3d 825, 828-29 (9th Cir. 1994) (dismissal of chapter 11 petition for cause was proper where the debtor had the financial means to pay its debts and petition was filed as a litigation tactic); *In re HBA East, Inc.*, 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

[6]   Mr. Gordon: "Also, I should just point out because all the time that was spent trying to suggest some nefarious connection between the corporate restructuring and the spinoff, the fact that J&J is now including [*sic*] as a payor or isn't included as a payor in this funding agreement should eliminate any concern about that because it doesn't matter. If assets are spun out, if that actually occurs, a transaction like that occurs, there's full protection because J&J is sitting there with an obligation to pay up to the value of Old JJCI. And what's important, unlike the other cases, this funding agreement sets the floor on value . . . There's another reason for doing this, again, to try to eliminate some of the objections and concerns that we heard with respect to the earlier funding agreements." Feb. 18, 2022 Hearing Transcript 58:1-23.

16.    Simply put, this case is an abuse of the bankruptcy system and an affront to our justice system.  Because of the delay caused by this case, dying cancer victims will continue to be deprived of their constitutional right to a jury trial.  Many died during LTL's first bankruptcy without receiving fair compensation or their day in court.  Because of J&J's continued abuse, many more will die without receiving fair compensation or having their day in court unless this Court puts a stop to this horrendous strategy.

17.    The Third Circuit had no problem seeing through J&J's tactics and mandated that the Debtor's case be dismissed as a bad faith filing.  What is at stake here goes beyond this case. J&J—one of the wealthiest companies in the world—has not chosen to file and does not belong in bankruptcy.  J&J does not deserve to continue to enjoy the benefits of a bankruptcy it has elected not to file.  The fraudulent, sanctionable, and unethical conduct of the Debtor and its advisors, in dereliction of their duty to maximize the value of assets for the benefit of creditors of LTL's bankruptcy estate, is reprehensible and cannot be rewarded with another 18 months in bankruptcy while talc victims continue to suffer and die.

18.    **Second**, because it is axiomatic that absent financial distress this Court lacks jurisdiction, alleged "support" by some law firms is irrelevant. It is a press relations stunt that helped raise J&J's stock price, and a ploy to again lead this Court into error.  Worse yet, it is premised on a lie. The Debtor has **not** reached a settlement with 60,000-70,000 talc victims.  The Debtor and J&J negotiated a deal with certain law firms who claim to represent an undisclosed number of claimants.  To be clear, their purported "settlement" and "Plan Support Agreement" is obvious for what it is—fraudulently and collusively constructed with exaggerated claim populations in an effort to persuade this Court that something has changed in the two hours and eleven minutes between the last case and this one.  When even cursorily examined, LTL's claim—

look we have the makings of a confirmable chapter 11 plan and a real shot of exit here—is specious. Even if the Debtor had reached a settlement on a Plan Support Agreement with certain law firms, that would not alter circumstances under which the second highest court in the country found bad faith.

19.      J&J is intentionally misrepresenting that state of the world and its intentions to try to convince this Court to permit this fraudulent bankruptcy boondoggle to continue.  Respectfully, this Court cannot ignore the Third Circuit Opinion or its mandate. The touted "deal" is merely an instrument of J&J's scheme to delay talc victims and does not have the numerosity, authority, or legitimacy it purports to have.  Rather, it is meant to convince the Court to keep this case in bankruptcy while voting and plan litigation takes years.  Meanwhile J&J makes several billion a year simply on interest from their fraudulent transfer of value from Holdco (in addition to the interest it will earn from the value that remains in Holdco).  LTL's re-manufactured Top Law Firm List (reduced in size from 30 to 18 law firms) is also an instrument of J&J's scheme to deceive this Court and the United States Trustee as that office forms an official committee—and revealing of the true nature of this "deal" and its participants.

20.      According to a Press Release dated April 3, 2023, issued by Watts Guerra LLP — while LTL was still a debtor-in-possession in its prior case—, the law firms that support J&J's deal are:  [1] Watts Guerra LLC; [2] Onder Law; [3] Nachawati Law Group; [4] Ferrer Poirot Wansbrough; [5] Lanier Law Firm; [6] Johnson Law Group; [7] Pulaski Law Firm, PLLC; [8] Trammell PC; [9] McDonald Worley; [10] Seeger Weiss; [11] Slater, Slater & Schulman; [12] Linville Law Group; and [13] Carabin Shaw LLP.  *See* Press Release, Watts Guerra LLP, *$8.9 Billion Settlement Against J&J for Talc Clients* (April 4, 2023) https://wattsguerra.com/8-9-billion-settlement-against-jj-for-talc-clients/.

21.     The Debtor's representations to this Court and in press releases issued before the ink was dry on the Dismissal Order are grossly misleading and inaccurate. Tellingly, four (4) law firms—Watts Guerra LLP, Ferrer Poirot Wansbrough, Pulaski Law Firm, PLLC, and McDonald Worley—that appear on the Debtor's newly updated "Top Talc Counsel List" (*see* Dkt. No. 1, p. 18 of 24) did **not** appear on the list identifying the Top 30 Law Firms that represent talc claimants filed by the Debtor in its first case (*see* Case No. 21-30589, Dkt. No. 1, p. 16 to 19 of 22).  And five (5) of these law firms do not appear on the Debtor's new Top Talc Counsel List.  **In fact, according to Exhibit A of the LTL 2.0 Preliminary Injunction Complaint, Watts Guerra LLP, Ferrer Poirot Wansbrough, McDonald Worley, Carabin Shaw LLP do not have a single filed talc lawsuit against J&J, the Debtor, or any of its affiliates**.

22.     The Lanier Law Firm identified by Watts Guerra LLP as allegedly supporting J&J's deal issued a press release on April 6, 2023, disclaimed support for J&J's plan and stated that it first learned about the alleged settlement on April 1, 2023.[7]  Mr. Lanier stated that he has not read the plan, has not agreed to participate in it, and supports voluntary settlements, which obviously can be done outside of a chapter 11 proceeding.  *See id.*

23.     And the Seeger Weiss firm—also identified by Watts Guerra LLP as a supporting firm—has informed the AHC that it does not think the use of bankruptcy by J&J, 3M, or any solvent company is legitimate, it has referred all of its cases to Beasley Allen (and is only local

---

[7]     *See* Press Release, Lanier Law Firm, Mark Lanier (Apr. 6, 2023),
https://www.benzinga.com/pressreleases/23/04/n31709613/lanier-law-firm-responds-to-proposed-plan-to-resolve-talc-litigation:
A wise person once said, 'Settlements feed families; verdicts feed egos.'  That sentiment was behind my comments that are circulating concerning J&J resolving talc cancer cases.  **My comments should not be taken as my support for the plan, which I have not yet read, nor its economics.  I have not agreed to participate in it, and I hadn't even heard of it, ironically, until April Fool's Day.**  I am in favor of victims receiving prompt and fair compensation from voluntary settlements.  (emphasis supplied).

counsel in a few others), it has no votes in the bankruptcy, and would not undermine the MDL

leadership on their judgment on a suitable resolution on talc related injuries.

24.    And, while the Debtor or its agents represent that their deals are with victims, the

Debtor has failed to disclose any documents showing this to be true.  It is not clear how the law

firms that allegedly support J&J's plan could have received actual, informed consent from the

clients they purport to represent to vote on an unformed and unfiled plan, let alone consent to

signing up to a Plan Support Agreement that contains no fiduciary out and requires counsel to

oppose any alternative that would afford their clients with a superior recovery.

25.    The AHC doubts whether the law firms understood the gravity and ethical

consequences of such an agreement (assuming that they even signed it), especially when it was

part of an integrated transaction that stripped approximately \$\$50 billion or more in value from

the sources available to pay the very talc victims they purport to represent.

26.    **Third**, not only can creditor support not legitimize a bad faith bankruptcy, but the

Debtor's counting game is also misleading.  The Debtor did **<u>not</u>** negotiate a settlement with an

official committee, the MDL leadership, or law firms that represent the majority of talc claimants.

These parties were intentionally excluded from the Debtor's "negotiations" which took place,

hidden from the real parties in interest, behind closed doors and in the shadows.  *See* Kim Decl. at

¶ 72.

27.    More than 100 law firms representing ovarian cancer and mesothelioma claimants,

including all of leadership, vehemently ***oppose*** the Debtor's plan and represent over 40,000

claimants and the majority of cases that have been filed in state and federal courts around the

country.  The Debtor is nowhere close to a consensual or confirmable plan of reorganization (which

is likely by design).  As explained below, reaching a confirmable plan to pay talc victims what they deserve is **not** and has never been LTL's or J&J's primary objective.

28.      **Fourth**, the Debtor's proposed settlement will not result in a confirmed chapter 11 plan, assuming that this case can survive dismissal, which it cannot.  The legal obstacles to confirming the Debtor's desired plan are insurmountable.  The Debtor cannot explain how J&J can be released for its own independent liability in the face of the Third Circuit's opinion in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004), or how the best interest test under 11 U.S.C. § 1129(a)(7) can be satisfied for a non-consenting talc claimant who would be able to pursue a half-trillion-dollar company absent the Debtor's suggested plan.  Plan litigation and appeals will force years of delay on talc victims—**which is the real reason LTL was put into bankruptcy and is the core design and specific intent of the J&J's fraudulent scheme**.

29.      **Fifth**, the Debtor is **not** offering to pay current talc claimants $8.9 billion.  Even the headline number is misleading.  The Debtor is offering to fund a trust in the amount of $8.9 billion on a net present value basis, over the course of twenty-five (25) years if, and only if, J&J's desired plan is confirmed, and the confirmation order becomes a final, non-appealable order.  *See* Kim Decl. at ¶ 73.  **This will take years of litigation**.

30.      And, critically, if J&J did ever fund a trust, that trust would be responsible for every conceivable talc claim against J&J and its affiliates.  The trust would have to cover current and future talc claims for mesothelioma and ovarian cancer, **and likely many billions of dollars of claims asserted by third-party payors and governmental units, and likely billions of dollars**

**of claims for indemnification and other damages asserted by talc suppliers such as bankrupt**

**Imerys and Cyprus companies, distributors, and hundreds of retailers**.[8]

      A.      **The New Financing Arrangements Are Intended to Harm Talc Claimants**

    31.    In an effort to make the Debtor appear eligible for bankruptcy, the Debtor, a

subsidiary of and beholden to J&J, parted with its most significant asset—the 2021 Funding

Agreement. This dereliction of the Debtor's duty to its creditors surely benefited J&J at the same

time that it deprived the Debtor and its creditors of access to nearly $50 billion. The Third Circuit

warned LTL not to violate its duties for the benefit of it parent. *LTL Mgmt.,* , 2023 WL 2760479,

at *14 (discussing whether LTL may choose not to access the 2021 Funding Agreement and stating

"The assumption seems to be that, out of concern for its affiliates, LTL may avoid drawing on the

payment right to its full amount. But this is unsupported and disregards the duty of LTL to access

its payment assets.").

    32.    As the Third Circuit found, the 2021 Funding Agreement functioned "not unlike an

ATM" and provided the Debtor with a right to at least $61.5 billion in cash with minimal

conditions. *See id.* at at *13-16. The Debtor's ability to obtain access to over $61.5 billion to pay

judgments and settlements was backstopped by J&J—a highly creditworthy counterparty." *Id.* at

*13. In fact, J&J is one of the most profitable corporations in the world and has a sterling credit

rating.

    33.    During the two hours and eleven minutes that it spent outside of bankruptcy on

April 4, 2023, the Debtor deliberately replaced its $61.5 billion ATM with a new set of agreements

in a purposeful, bad faith effort to render the Debtor under financial distress. Under the new

---

8    There is a material risk that such claims will fundamentally impact the economics of J&J's settlement
    in ways that law firms may not fully understand.

agreements, planned, prepared and agreed to during the pendency of LTL 1.0 while LTL's directors, officers and counsel owed fiduciary duties to the talc victims, "J&J's balance sheet [is] not available to the Debtor," and "Holdco's [formerly New JJCI's] assets … no longer include the consumer health business." Kim Decl. at ¶ 83. Clearly the negotiation and documentation by which these transactions occurred was conducted while LTL was a debtor-in-possession, held a fiduciary duty to its creditors and while its assets and estate were under the supervision this Court. Yet not a word was uttered, and no effort was made to apprise the Court and parties that such an out-of-the-ordinary-course of business transaction was being developed.

34.    The Debtor contends that it had to part with its most valuable asset so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third Circuit." *Id.*[9]  Nothing in the Third Circuit's opinion permits LTL to create contrived financial distress for the sole purpose of filing bankruptcy.  In the same breath, the Debtor incredibly contends that its "new financing arrangements do not harm talc claimants." *Id.* at ¶ 84.

35.    But the Debtor's only liabilities are for talc claims.  That is how the Debtor was created and designed by J&J.  The Debtor's liability to the talc claimants is the exclusive source of financial distress the Debtor has ever identified.

36.    **Therefore, if the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement and the J&J Support Agreement created financial distress, then *a priori* the talc claimants must be harmed.  If talc claimants are not harmed—*i.e.*, the Debtor still has access to sufficient financial resources to pay all talc claims in full as they are liquidated**

---

[9]    In other words, it had to attempt to manufacture financial distress.

**by settlement or judgment—then the Debtor is not in financial distress and its case must be dismissed here and now for the reasons articulated by the Third Circuit in its opinion**.[10]

37.     The Debtor's response to this conclusion is its well-worn mantra that "[b]ankruptcy is the only forum where the Debtor and the claimants can fully, equitably and permanently resolve all talc-related claims" and that, therefore, its "second chapter 11 filing and proposed plan are in the best interest of all parties, including the Debtor and all current and future talc claimants."  Kim Decl. at ¶ 85.  But this answer is not only non-responsive but was conclusively and emphatically rejected as a ticket for entry to bankruptcy by the Third Circuit.

38.     If the talc claimants were not harmed, there is no financial distress, and this case must be dismissed in accordance with the Third Circuit's opinion. *See LTL Mgmt.*, 2023 WL 276049, at * 17 ("[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so."). Further, this answer is disingenuous—it should now be clear to the Court that the Debtor and J&J are **not** trying to equitably resolve talc claims and their plan is **not** in the best interest of any talc claimants.  J&J is trying yet again to cram down talc victims through mortal delay and denial of due process and trial by jury before the courts.

**B.      The Termination of the 2021 Funding Agreement Was Fraudulent**

39.     Assuming, *arguendo*, that the Debtor is now in financial distress because it parted with its most valuable asset during the moments of time it spent outside of bankruptcy on April 4, 2023, it follows that this case must be dismissed as it is based on a deliberate and orchestrated

---

10     *See LTL Mgmt.*, 2023 WL 2760479, at *17 ("[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so.").

fraud that can be avoided.  And a bankruptcy predicated on a $50 billion fraud reflects even more

bad faith than the Debtor's first bankruptcy.

40.    Again, the 2021 Funding Agreement functioned "not unlike an ATM" and provided

the Debtor with a right to at least $61.5 billion in cash with minimal conditions.  *LTL Mgmt.*, 2023

WL 2760479, at *13-16.  As this Court found, the resources under the 2021 Funding Agreement

were "available upon confirmation of a plan—whether or not the plan is acceptable to J&J or New

JJCI, and whether or not the plan offers payors protections under § 524(g)."  *In re LTL Mgmt.,*

*LLC*, 637 B.R. 396, 424 (Bankr. D.N.J. 2022).

41.    As Mr. Katyal explained to the Third Circuit, the 2021 Funding Agreement gave

"entire value of JJCI, the entire value, $61 billion free and clear to the potential claimants so that

entire pot of money is available."  Third Circuit Oral Arg. Tr. 65:6-9, Sept. 19, 2022.  Of course,

$61 billion was "only a floor, not a ceiling"—payments to J&J or to shareholders increased the

"$61 billion pot."  *Id.* at 65:13-17

42.    The 2021 Funding Agreement has ***always*** been critical to defending against

allegations that the Debtor's creation through a divisive merger was fraudulent.

43.    The Debtor maintained that tort victims were not harmed by the divisive merger

because the 2021 Funding Agreement meant that the Debtor would always be "fully capable of

satisfying the talc claims."  *See id.* at 79:5-9 ("MR. KATYAL:  By itself without a resort to the

funding agreement, we think the answer to [the question is LTL fully capable of satisfying the talc

claims] is no.  But with the funding agreement, absolutely"); *Id.* at 91:19-22 ("MR. KATYAL …

And what we've done is, through the use of this funding agreement, provide a backstop that's

much better than they could get under the mass tort system, not for any one of their individual

clients but comprehensively and overall").  And, as Mr. Gordon explained, the 2021 Funding

Agreement could have been used to fund a plan proposed by the TCC in addition to a plan proposed by the Debtor.[11]

44.     The 2021 Funding Agreement was a valuable asset to the Debtor, its estate, and its creditors.   But the new agreements—the 2023 Funding Agreement and the J&J Support Agreement—do not have the same value.   Through the T&S Agreement, which replaced the 2021 Funding Agreement with the 2023 Funding Agreement and the J&J Support Agreement, the Debtor has lost nearly $50 billion in value or more.

45.     Under the new arrangements, Holdco (formerly New JJCI) remains obligated to provide funding to the Debtor to pay for the cost and expense of the Debtor incurred in the normal course of its business and pay final settlements and judgments involving talc claims.   "[B]ut Holdco's assets, which were prior to [the] filing (and are) available through the 2023 Funding Agreement, no longer include the consumer health business."   Kim Decl. at ¶ 83.   In short, Holdco's assets are no longer worth anywhere near $61 billion.

46.     Most significant of all:  J&J is not a party to the 2023 Funding Agreement.   "J&J's balance sheet [is] not available to the Debtor" under the new agreements.   *Id.*   J&J's funding obligation under the J&J Support Agreement arises if, and only if, the Court confirms J&J's desired plan, and such plan goes effective after all appeals are exhausted. In other words, J&J brazenly purports to buy insulation from any and all talc liability forever for at least $50B less than it tried to 18 months ago.

---

[11]  Hr'g Tr. 64:11-15, Feb. 18, 2022 ("THE COURT:  So just to clarify, if a plan is confirmed and it's a TCC plan as a proponent, the funding agreement – and they can include in that plan the funding agreement?  MR. GORDON.  Yes.").  The ability of a TCC plan to utilize the Debtor's rights under the 2021 Funding Agreement followed from the Code and Circuit precedent.  *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 382 (3d Cir. 2012).  Since a plan trust could be appointed as representative of the Debtor's estate under section 1129(b)(3)(B) (*i.e.*, the trust is an extension of the estate), it could step into the Debtor's shoes and exercise its rights under the 2021 Funding Agreement without any technical assignment.  *See In re Thorpe Insulation Co.*, 677 F.3d 869, 889-90 (9th Cir. 2012).

47.    The Debtor admits that it relinquished its rights under the 2021 Funding Agreement for the expressed purpose of creating financial distress (Kim Decl. at ¶ 83), which makes the April 4th transaction mandatorily avoidable as an actual fraudulent transfer. *See* 11 U.S.C. § 548(a). And, because the Debtor's rights under the new agreements are worth tens of billions less than under the 2021 Funding Agreement, the April 4th transaction must be avoided as a fraudulent transfer. *See id.*

48.    The directors and officers should now be sued for breaching their fiduciary duties. And other individuals—including the Debtor's and J&J's attorneys—can be sued for aiding and abetting this fraud. *See Banco Popular North America v. Gandi*, 184 N.J. 161 (2005). The consequences may be worse. **Devising a fraudulent bankruptcy petition, and actively conspiring to strip a debtor of its assets, can give rise to criminal penalties under Title 18**.

49.    The Third Circuit warned the Debtor that parting with the 2021 Funding Agreement would not solve its problems:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]." 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?

2023 WL 2760479, at n. 18. And yet the Debtor did it anyway, all in the face of the clear cautioning from the Third Circuit.

50.    To evade this problem, the Debtor must construct and proffer with incredulity the position that "there is a material risk that the 2021 Funding Agreement and the 2021 Commitment and Loan Agreement were rendered void and voidable by [the Third Circuit's] ruling and other

developments in the 2021 Bankruptcy Case that were not reasonably foreseeable by the Parties." Kim Decl. at ¶ 78.

51.    **This is simply not true, and the Debtor offers no explanation—legal or factual—as to how or why there is (or could be) any risk that the 2021 Funding Agreement was rendered void or voidable by the Third Circuit's ruling**.  **The Third Circuit did not find that the 2021 Funding Agreement was void or voidable**.  **The opinion accepted the Debtor at its word and found that on its face, as admitted by the Debtor multiple times during the pendency of LTL 1.0, the 2021 Funding Agreement made a least $61 billion available to the Debtor to pay talc claims outside of bankruptcy and regardless of a global settlement**.

52.    And suffice to say that the Third Circuit certainly did not invite the Debtor to commit fraud so that it could re-file for bankruptcy.  The Debtor cannot manufacture jurisdiction or financial distress by engaging in fraud.  If this were true, any solvent company that wanted to use bankruptcy to enjoin litigation could do so by fraudulently transferring its assets on the eve of a bankruptcy filing and then seek to enjoy years of bankruptcy protection.

### C.    The Debtor Has Not Reached a Deal or Obtained the Support of a Substantial Number of Talc Claimants

53.    To gloss over its blatant fraud and disrespect for the Third Circuit's opinion, the Debtor contends that this bankruptcy is different because it has reached a deal with the claimants.

54.    The Debtor contends that "with the assistance of the *mediators* and the encouragement of this Court," it engaged in negotiations with "various plaintiff law firms," and that those "negotiations ultimately culminated in an agreement with *thousands of claimants*" on a plan that will "*fully resolve* all of the Debtor's liability for *talc-related claims*."  Kim Decl. at ¶ 72 (emphasis added).  This assertion is both troubling—to the extent that it suggests the mediators aided and encouraged J&J's fraudulent scheme—and misleading.

55.    **First**, more than 100 law firms representing ovarian cancer and mesothelioma claimants, oppose J&J's plan.  Most of these law firms have been active participants in the federal MDL or state courts for years, have filed talc claims against J&J and its affiliates, and represent talc claimants with cancer diagnoses that have a scientific link to exposure to J&J's toxic products.

56.    The AHC can confirm that **not a single** law firm that was placed on the Plaintiffs' Steering Committee in the MDL supports the J&J deal or this bankruptcy case.  And only four (4) law firms identified by the Debtor in the list of the Top 30 Law Firms that represent talc claimants filed in the first bankruptcy—Onder Law, Nachawati Law Group, Johnson Law Group, and Trammell PC—have pledged their allegiance to J&J's plan.  If the Debtor were to solicit votes on a plan today, it would not obtain the required level of acceptance and would face vigorous and vociferous opposition.  The Debtor did not return to this Court with a deal in hand, as its pleadings suggest.

57.    **Second**, the Debtor does not have the support of 60,000 to 70,000 claimants.  Certain of the settling law firms are strangers to the MDL or other consolidated litigation and **have never filed a talc-related lawsuit against J&J**.

58.    **Third**, the settlement is illusory.  The Debtor says J&J is now offering to pay $8.9 billion.  But the definition of talc liability that J&J is purporting to "settle" is, unsurprisingly, extremely broad.  The $8.9 billion payment is for "all talc claims for all time"—meaning that the $8.9 billion is intended to satisfy all current and future talc claims for mesothelioma, ovarian cancer, and other cancers linked to talc in the future, billions of dollars of claims asserted by third-party payors and governmental units, and billions of dollars of claims for indemnification and other damages asserted by co-defendants, retailers, talc suppliers such as bankrupt Imerys and Cyprus companies, and any drugstore or supermarket that sold J&J's toxic baby-powder.

59.     For example, it includes a talc claim asserted by an individual who develops mesothelioma in "2080 and beyond," as the Debtor acknowledges and is consistent with established long latency period between first exposure to asbestos and development of mesothelioma.  Kim Decl. at ¶ 42.  And it includes claims asserted by governmental units against J&J alleging false advertising, unfair competition, and deceptive trade practices, which claims could be massive.  And it includes indemnification claims and claims for damages asserted by Imerys and Cyprus.

60.     Under J&J's desired plan, **all** talc claims will be channeled to a ***single pot***.  And Holdco's funding obligations will be ***capped***, with potentially no support at all from J&J.  All claimants will be entitled to a *pro rata* distribution of the trust funds.  If the amounts asserted by governmental claims are allowed, such claims will substantially dilute the funds available to pay individual claimants.

61.     The definition of talc liability that J&J is purporting to "settle" also includes future claims.  To obtain a channeling injunction under section 524(g), the plan trust must be structured to ensure that it will "be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner."  11 U.S.C. § 524(g)(2)(B)(ii)(V).

62.     This means that any settlement trust must reserve—or set aside—funds sufficient to ensure that individuals who develop mesothelioma or ovarian cancer in 2080 and beyond receive the same pro rata distribution as individuals who have already developed mesothelioma or ovarian cancer based on exposure to J&J's products.  Without this reserve, neither LTL nor J&J can get the desired protections under section 524(g).

63.    Given the scope of talc claims that J&J wants channeled to resolve "all talc claims for all time," it is possible, if not likely, that only a small percentage of the $8.9 billion will be available to pay individuals holding current talc claims, both ovarian and mesothelioma.

64.    **It gets worse**.  J&J is only required to fund the $8.9 billion if a final, non-appealable order is entered confirming its desired plan.  The litigation required to obtain such an order could take years.  Because the plan J&J desires will release J&J from its own independent liability, it is certain that the Third Circuit will reject it.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004) (Circuit Judges Scirica, Ambro, and Fuentes) (the Bankruptcy Code does **not** "permit the extension of a channeling injunction to the non-derivative claims against non-debtors").

65.    And LTL's (a/k/a J&J's) plan will face objections from parties alleging that it fails the best interest test under 11 U.S.C. § 1129(a)(7).  This means that all litigation against J&J could be placed on hold for years and years and the outcome could be that no bankruptcy trust is ever funded, and no settlement payments are ever made pursuant to a chapter 11 plan.

66.    But if J&J's plan is somehow confirmed and upheld on appeal years from now— such that a settlement trust is funded and can afford to pay individual cancer victims (or their estates, since many will be dead by then)—there is no guarantee that every victim will keep this money.  Legal fees and certain medical liens asserted by third-party payors that paid for medical treatment under the terms of their policies will come out of each claimant's distribution.  The cost of medical care alone (not taking into account lost wages or other allowable measures of damages) for ovarian cancer and mesothelioma victims often exceeds $500,000.  Individuals who are encouraged to vote to accept J&J's plan may recover ***nothing*** on a net basis.

67.     There is no evidence that the settling law firms that support J&J's plan have advised their clients of this reality or obtained their clients' informed consent to support a plan under which they may receive no net compensation.  By signing on to LTL's & J&J's fraudulent scheme, the settling law firms have done nothing more than aid in J&J's efforts to delay and deny payments to talc victims, including the very clients that they purport to represent.

68.     **Finally**, the Plan Support Agreements that the Debtor *alleges* "have been executed and delivered by counsel on behalf of over 60,000 claimants and signed by the Debtor, Holdco and J&J," may not be enforceable.  Kim Decl. at ¶ 72.  The settling law firms have irrevocably pledged to oppose any plan that is not J&J's desired plan, even if such plan provides their clients with a superior recovery and is in their clients' best interest.  The Plan Support Agreements do not give the settling law firms any fiduciary out, meaning that they have irrevocably bound themselves to J&J.  Even worse, the supporting firms appear to be co-conspirators in a fraudulent scheme to place roughly $50 billion or more in value beyond the reach of their own clients.

69.     The important questions to ask here are why would the Debtor devise a fraudulent scheme so that it could return to bankruptcy?  And why would the Debtor enter into agreements with plaintiffs' counsel that do not provide a path to confirming a consensual plan and do nothing more than encourage years of litigation and further delay.  The AHC submits that the answer to these questions go to the heart of the Texas Two Step.

### D.      The Objective of a Texas Two Step Is to Create Undue Delay

70.     The true objective of a Texas Two Step is **not** to provide claimants with fair compensation.  To believe this, one would have to assume that J&J cares about the claimants and wants them to be compensated.  No one makes this assumption.  J&J vigorously disputes liability for all talc claims.  J&J admits again that it does not believe that it should have to pay anyone.

71.    The true objective of a Texas Two Step is to create extreme delay by creating a non-operating company to file for bankruptcy, extending the automatic stay to non-debtors, and asking a court to estimate tort claims and establish a claims bar date.  The key part of the Texas Two Step—from the tortfeasor's perspective—is that the debtor, which has no operations and no employees, does not need to confirm a plan, or consummate a settlement.  The debtors in cases like *Bestwall LLC*, *Aldrich Pump LLC*, and *DBMP LLC* were built to be able to stay in bankruptcy for years and years.  **Creating delay is their only business**.

72.    If the victims capitulate and agree to accept a *de minimis* settlement, the debtor can propose a plan based on a capped trust structure, under which the debtor or an affiliate will make a fixed contribution to a trust.  When that contribution proves to be inadequate to pay present and future tort claims in full, the non-debtor affiliates will be protected by a channeling injunction. But settlement does not have to be the outcome.  In fact, the Texas Two Step is built on the assumption that no good faith settlement that is fair to victims will be reached, and no plan will ever be confirmed.  Here, if the talc victims stand firm and demand fair compensation, J&J and its affiliates will still get the benefit of years of delay.  J&J and its affiliates will save substantial amounts on defense costs, and they will not have to make any payments to talc victims while the case is pending.  And, during this time, J&J can pay dividends, shower its executives with compensation, and engage in transactions outside of the ordinary course of business without seeking Court approval—*e.g.*, like spinning off a multi-billion consumer health business.

73.    The reason why LTL filed for bankruptcy in the first instance, and the reason why LTL orchestrated a fraud to return to bankruptcy, is to create unconscionable, massive, and mortal delay.  But committing fraud is not a legitimate use of bankruptcy.  A basic policy animating the Bankruptcy Code is affording "an honest but unfortunate debtor" a fresh start.  *Lamar, Archer &*

*Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1758 (2018).  LTL has no need of a fresh start as it has

no business.  J&J is not a debtor and J&J is clearly not honest.  J&J is a Fortune 500 company with

a market capitalization of nearly half a trillion dollars and does not need or deserve any bankruptcy

protections.

### E.    There Is No Basis to Enjoin Litigation Against J&J

74.    The Third Circuit has already decided that non-debtors J&J did not need the

protection of a stay of litigation when it dismissed the case and annulled the stay.  This Court failed

to heed that admonition by entering an *ex parte* TRO.  The TRO has caused disruption to the MDL

and state courts that were preparing to reinstitute the stayed litigation and to the talc claimants who

were able to pursue their claims.  The Court must do no more harm—equity and justice demand

it.  Given the fraudulent nature of this bankruptcy, this Court should not extend the automatic stay

to protect J&J and its affiliates.

75.    As a threshold matter, section 362(a), as written, affords no protections to J&J.

Section 362(a)(1) stays actions (1) "against the debtor" or (2) "recover a claim against the debtor."

11 U.S.C. § 362(a)(1).  LTL, not J&J, is the "debtor."  *See id.* at § 101(13).  Therefore, section

362(a)(1) does not apply to J&J.  Section 362(a)(1)'s second prong—which stays "actions … to

recover a claim against the debtor"—reaches only inches further and does not protect J&J because,

again, J&J is not a debtor.

76.    The AHC recognizes that this Court has found that section 362(a)'s protection can

extend beyond the plain language of the statute and protect a non-debtor where "unusual

circumstances" exist.[12]  And this Court has also found grounds in the Bankruptcy Code to enjoin

---

[12] *In re LTL Mgmt., LLC*, 640 B.R. 322, 335 (Bankr. D.N.J. 2022) (citing *McCartney v. Integra Nat. Bank
N.*, 106 F.3d 506, 510 (3d Cir. 1997) and *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.),
*cert. denied*, 479 U.S. 876, 107 S. Ct. 251, 93 L.Ed.2d 177 (1986)); *In re LTL Mgmt., LLC*, 638 B.R.
291, 304 (3d Cir. 2022).

litigation against non-debtors pursuant to section 105(a) to avoid irreparable harm. The AHC respectfully disagrees with the Court's analysis on this issue. But assuming, *arguendo*, that section 362(a)'s protections can be extended in "unusual circumstances" or to avoid "irreparable harm" under section 105(a), doing so here to protect J&J cannot be proper.

77.    The parties that are being irreparably and mortally harmed are the talc victims, like Mr. Valadez. And this irreparable harm is being caused by J&J's manipulation of the Debtor's bankruptcy case and injunctions issued by this Court. When the Third Circuit reversed this Court's order denying the motion to dismiss the Debtor's first bankruptcy, it assumed that dismissal would annul the litigation stay ordered by this Court. *LTL Mgmt.*, 2023 WL 2760479, at *18. The Third Circuit's expectation is that right now talc claimants like Mr. Valadez should be pursuing their claims against J&J in the tort system.

78.    If the stay is extended to non-debtor J&J, the practical effect will be that this Court and J&J will have countermanded the Third Circuit's mandate. If, as the Debtor contends, no harm was done to talc claimants by the April 4th transactions, the Debtor, nonetheless, is still not in financial distress and this case must be dismissed. If claimants were harmed such that the Debtor is now in financial distress, this case is based on fraud and is an abuse of the bankruptcy process. LTL and J&J do not care if the claimants ultimately vote down the desired plan. Their goals are achieved here by the delay ensuing from years of litigation while the non-debtor stay remains in place, achieved by fraud.

79.    Finally, because the Court's equitable powers are grounded in section 105(a) of the Bankruptcy Code, it follows that the terms and conditions of any injunction issued by this Court must "achieve fairness and justice" in the reorganization process. *See Combustion Eng'g*, 391 F.3d at 235-36 (equitable powers authorized by section 105(a) must be invoked to "achieve

fairness and justice in the reorganization process."). A reorganization process based on a fraud, the true objective of which is to create delay and deny tort victims their right to a jury trial and fair compensation, would not "achieve fairness and justice in the reorganization process."

80.    The Bankruptcy Code does not sanction this conduct. Title 28 makes it clear that title 11 does "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." 28 U.S.C. § 1411(a). Our country's laws demand that Mr. Valadez and other talc victims have their day in Court. J&J must be held accountable by jurors who hear the evidence and find the facts in Courts across the country.

## CONCLUSION

81.    For the reasons set forth above, this Court should not hesitate to invoke its equity powers, *sua sponte* dismiss the Debtor's new bankruptcy case and hold LTL, J&J and their enablers accountable for their fraudulent and sanctionable conduct.

82.    Respectfully, this Court should take no substantive actions in this bad faith case, other than *sua sponte* dismissal, including issuance of a Preliminary Injunction, until an Official Committee of Talc Claimants is appointed and can represent the interests of all talc claimants. The AHC reserves all rights.

Respectfully submitted,

**GENOVA BURNS, LLC**

By:___*Daniel M. Stolz*_____
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126

Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Ad Hoc Committee*
*of Certain Talc Claimants*