# Exhibit 31



FINAL REPORT - 04/11/2023



| Ordered By | | | Patient Name: **Hernandez-Valdez, Emory Michael** | |
|---|---|---|---|---|
| Medical Professional: | Roy, Mohana, MD | Contact ID:4166156  Org ID:3860 | Accession #: **23-157917** | Specimen #: |
| | | | AP2 Order #: 2223570 | Specimen: Blood EDTA (Purple top) |
| Client: | Stanford Cancer Genetics Clinic (06186) | | | |
| **Additional Authorized Recipient:** | | | Birthdate: 09/23/1998 | Sex at Birth: M |
| Lara-Otero, Karlena PhD, MS, CGC | | | MRN #: 36945558 | Collected: 03/31/2023 |
| | | | Indication: Diagnostic/Family History | Received: 04/04/2023 |

## *BRCA1/2 Analyses with CustomNext-Cancer® +RNAinsight®*

| RESULTS | |
|---|---|
| *RAD51C* | Variant, Unknown Significance:  p.F164L |

| SUMMARY |
|---|

## Variant of Unknown Significance Detected

| INTERPRETATION |
|---|

- ■ **No known clinically actionable alterations were detected.**

- ■ One variant of unknown significance was detected in the *RAD51C* gene.

- ■ **Risk Estimate:** should be based on clinical and family history, as the clinical significance of this result is unknown.

- ■ Genetic counseling is a recommended option for all individuals undergoing genetic testing.

This individual is heterozygous for the p.F164L (c.492T>G) variant of unknown significance in the *RAD51C* gene, which may or may not contribute to this individual's clinical history. Refer to the supplementary pages for additional information on this variant. No additional pathogenic mutations, variants of unknown significance, or gross deletions or duplications were detected. Genes Analyzed (86 total): *AIP, ALK, APC, ATM, BAP1, BARD1, BLM, BMPR1A, BRCA1, BRCA2, BRIP1, CDC73, CDH1, CDK4, CDKN1B, CDKN2A, CHEK2, DICER1, FANCC, FH, FLCN, GALNT12, KIF1B, LZTR1, MAX, MEN1, MET, MLH1, MRE11A, MSH2, MSH6, MUTYH, NBN, NF1, NF2, NTHL1, PALB2, PHOX2B, PMS2, POT1, PRKAR1A, PTCH1, PTEN, RAD50, RAD51C, RAD51D, RB1, RECQL, RET, SDHA, SDHAF2, SDHB, SDHC, SDHD, SMAD4, SMARCA4, SMARCB1, SMARCE1, STK11, SUFU, TMEM127, TP53, TSC1, TSC2, VHL* and *XRCC2* **(sequencing and deletion/duplication);** *AXIN2, CASR, CTNNA1, EGFR, EGLN1, FAM175A, HOXB13, KIT, MITF, MLH3, MSH3, PALLD, PDGFRA, POLD1, POLE, RINT1, RPS20* and *TERT* **(sequencing only);** *EPCAM* and *GREM1* **(deletion/duplication only)**. RNA data is routinely analyzed for use in variant interpretation for all genes.

**Order Summary:** The following products were included in the test order for this individual. Please note: tests on hold and those that have been cancelled (including reflex testing steps cancelled due to a positive result in a preceding test) are excluded. For additional information, please contact Ambry Genetics.

- ■ BRCA1/2 seq and del/dup (Product Code 8838)
- ■ CustomNext: Cancer® +RNAinsight® (Product Code 9510-R)

| ELECTRONICALLY SIGNED BY |
|---|

**Jiameng Geng, MB(ASCP)CM, CGMBS, on 04/11/2023 at 23:13:37 pm**

Toll Free:(866)262-7943    Ph:(949)900-5500    Fx:(949)900-5501    www.ambrygen.com    7 Argonaut, Aliso Viejo, CA 92656
Laboratory Director: Chia-Ling Gau, PhD, DABMGG    CLIA# 05D0981414    Page 1/6    **EXHIBIT 31**

## ASSAY INFORMATION

**Methodology:** The **CustomNext-*Cancer*®+RNAinsight®** test is a customizable screen of up to 91 genes associated with hereditary cancer predisposition. Genomic deoxyribonucleic acid (gDNA) and ribonucleic acid (RNA) are isolated from the patient's specimen using standardized methodology and quantified. RNA is converted to complementary DNA (cDNA) by reverse transcriptase polymerase chain reaction (RT-PCR). Sequence enrichment of the targeted coding exons and adjacent intronic nucleotides is carried out by a bait-capture methodology using long biotinylated oligonucleotide probes followed by polymerase chain reaction (PCR) and Next-Generation sequencing. Additional DNA analyses include Sanger sequencing for any regions missing or with insufficient read depth coverage for reliable heterozygous variant detection. Variants in regions complicated by pseudogene interference, variant calls not satisfying depth of coverage and variant allele frequency quality thresholds, and potentially homozygous variants are verified by Sanger sequencing. For *BRCA2* and *MSH2*, the Portuguese founder mutation, c.156_157insAlu (also known as 384insAlu), and the coding exons 1-7 inversion, respectively, are detected by next generation sequencing and confirmed by multiplex ligation-dependent probe amplification (MLPA) or PCR and agarose gel electrophoresis. Gross deletion/duplication analysis for ordered genes (excluding *AXIN2, CASR, CFTR, CPA1, CTNNA1, CTRC, EGFR, EGLN1, FAM175A (ABRAXAS1), HOXB13, KIT, MITF, MLH3, MSH3, PALLD, PDGFRA, POLD1, POLE, PRSS1, PMS2, RINT1, RPS20, SPINK1,* and *TERT*) is performed using a custom pipeline based on read-depth from NGS data and/or targeted chromosomal microarray with confirmatory MLPA when applicable. For *PMS2*, gross deletion/duplication analysis is performed using MLPA kit P008-B1. If a deletion is detected in exons 13, 14, or 15 of *PMS2*, double stranded sequencing of the appropriate exon(s) of the pseudogene *PMS2CL* will be performed to determine if the deletion is located in the *PMS2* gene or pseudogene. NCBI reference sequences are as follows: *AIP-* NM_003977.2, *ALK-* NM_004304.4, *APC-* NM_000038.5 & NM_001127511.2, *ATM-* NM_000051.3, *AXIN2-* NM_004655.3, *BAP1-* NM_004656.2, *BARD1-* NM_000465.2, *BLM-* NM_000057.2, *BMPR1A-* NM_004329.2, *BRCA1-* NM_007294.3, *BRCA2-* NM_000059.3, *BRIP1-* NM_032043.2, *CASR-* NM_000388.3, *CDC73-* NM_024529.4, *CDH1-* NM_004360.3, *CDK4-* NM_000075.3, *CDKN1B-* NM_004064, *CDKN2A-* NM_000077.4 and NM_058195.3 (p14ARF), *CFTR-* NM_000492.3, *CHEK2-* NM_007194.3, *CPA1-* NM_001868.2, *CTNNA1-* NM_001903.2, *CTRC-* NM_007272.2, *DICER1-* NM_177438.2, *EGFR-* NM_005228.3, *EGLN1-* NM_022051.2, *FAM175A (ABRAXAS1)-* NM_139076.2, *FANCC-* NM_000136.2, *FH-* NM_000143.3, *FLCN-* NM_144997.5, *GALNT12-* NM_024642.4, *HOXB13-* NM_006361.5, *KIF1B-* NM_015074.3, *KIT-* NM_000222.2, *LZTR1-* NM_006767.3, *MAX-* NM_002382.3, *MEN1-* NM_130799.2, *MET-* NM_000245.1, *MITF-* NM_000248.3, *MUTYH-* NM_001128425.1, *MRE11A-* NM_005591.3, *MLH1-* NM_000249.3, *MLH3-* NM_001040108.1, *MSH2-* NM_000251.1, *MSH3-* NM_002439.3, *MSH6-* NM_000179.2, *NBN-* NM_002485.4, *NF1-* NM_000267.3, *NF2-* NM_000268.3, *NTHL1-* NM_002528.5, *PALB2-* NM_024675.3, *PALLD-* NM_001166110.1, *PDGFRA-* NM_006206.4, *PHOX2B-* NM_003924.3, *PMS2-* NM_000535.5, *POLD1-* NM_002691.2, *POLE-* NM_006231.2, *POT1-* NM_015450.2, *PRKAR1A-* NM_002734.3, *PRSS1-* NM_002769.4, *PTCH1-* NM_000264.3, *PTEN-* NM_000314.4, *RAD50-* NM_005732.3, *RAD51C-* NM_058216.1, *RAD51D-* NM_002878.3, *RB1-* NM_000321.2, *RECQL-* NM_002907.3, *RET-* NM_020975.4, *RINT1-* NM_021930.4, *RPS20-* NM_001023.3, *SDHA-* NM_004168.2, *SDHAF2-* NM_017841.2, *SDHB-* NM_003000.2, *SDHC-* NM_003001.3, *SDHD-* NM_003002.2, *SMAD4-* NM_005359.5, *SMARCA4-* NM_001128849.1, *SMARCB1-* NM_003073.3, *SMARCE1-* NM_003079.4, *SPINK1-* NM_003122.3, *STK11-* NM_000455.4, *SUFU-* NM_016169.3, *TERT-* NM_198253.2, *TMEM127-* NM_017849.3, *TP53-* NM_000546.4, *TSC1-* NM_000368.4, *TSC2-* NM_000548.3, *VHL-* NM_000551.3, *XRCC2-* NM_005431.1.

**Analytical Range:** The **CustomNext-*Cancer*®+RNAinsight®** test detects variants in up to 89 genes by either Next-Generation or Sanger sequencing of all coding domains and well into the flanking 5' and 3' ends of all the introns and untranslated regions. Unless explicitly stated, sequence and copy number variants in the promoter, non-coding exons or 3' untranslated regions are not routinely reported. For *HOXB13*, only variants impacting codon 84 are routinely reported. For *MITF*, only the status of the c.952G>A (p.E318K) alteration is analyzed and reported. For *EGFR*, only the status of the c.2369C>T (p.T790M) and c.2327G>A (p.R776H) alterations are analyzed and reported. For *PALLD*, only the status of the variant c.451C>T (p.P139S) is analyzed and reported. For *FAM175A (ABRAXAS1)*, only the status of the variant c.1082G>A (p.R361Q) is analyzed and reported. For *TERT*, only the status of the promoter variant c.-57A>C is analyzed and reported. For *RPS20*, missense variants are not routinely reported. For *POLD1* and *POLE*, only missense variants and in-frame insertions/deletions in the exonuclease domains (codons 311-541 and 269-485, respectively) are routinely reported. For *ALK*, only variants located within the kinase domain (c.3286-c.4149) are reported. For *EGLN1*, only missense variants within the catalytic domain (codons 188-418) are reported. For *RECQL*, only missense variants in the helicase and RCQ domains (codons 63-592) and exonic truncating variants are reported. For *PDGFRA*, only missense variants or in-frame insertion/deletions located in coding exons 9, 11, 13, and 17 are reported. For *KIT*, only missense variants or in-frame insertion/deletions located in coding exons 8, 9, 11, 13, and 17 are reported. The *MSH3* and the *PHOX2B* polyalanine repeat regions are excluded from analysis. Gross deletion/duplication analysis determines gene copy number for the covered exons and untranslated regions of ordered genes (excluding *AXIN2, CASR, CFTR, CPA1, CTNNA1, CTRC, EGFR, EGLN1, FAM175A (ABRAXAS1), HOXB13, KIT, MITF, MSH3, PALLD, PDGFRA, POLD1, POLE, PRSS1,* RINT1, RPS20, *SPINK1, and TERT*). For *GREM1*, only the status of the 40kb 5'UTR gross duplication is analyzed and reported. For *EPCAM*, only gross deletions encompassing the 3' end of the gene are reported. For *NTHL1*, only full-gene gross deletions and duplications are detected. For *APC*, all promoter 1B gross deletions as well as single nucleotide substitutions within the promoter 1B YY1 binding motif (NM_001127511 c.-196_-186.) are analyzed and reported. RNA transcripts are screened and compared to a human reference pool. The presence of RNA transcripts meeting quality thresholds is incorporated as evidence towards assessment and classification of DNA variants. Any regions not meeting RNA quality thresholds, including regions with chronically low expression in human peripheral lymphocytes, are excluded from analysis. RNA transcripts derived from genes with limited gene-disease validity or with an inconsistent mechanism of disease do not routinely contribute to variant interpretation.

**Result Reports:** Results reported herein may be of constitutional or somatic origin. This methodology cannot differentiate between these possibilities. DNA alterations in the following classifications are always reported:

- **Pathogenic Mutation**: alterations with sufficient evidence to classify as pathogenic (capable of causing disease). Previously described pathogenic mutations, including intronic mutations at any position, are always reported when detected.
- **Variant, Likely Pathogenic (VLP)**: alterations with strong evidence in favor of pathogenicity. Previously described likely pathogenic variants, including intronic VLPs at any position, are always reported when detected.
- **Variant, Unknown Significance (VUS)**: alterations with limited and/or conflicting evidence regarding pathogenicity. Intronic VUSs are always reported out to 5 base pairs from the splice junction when detected.

Alterations of unlikely clinical significance (those classified as "likely benign" and "benign") are not routinely included in results.

*Assay Information Continued on Next Page*

**Toll Free:**(866)262-7943      **Ph:**(949)900-5500      **Fx:**(949)900-5501      **www.ambrygen.com**      **7 Argonaut, Aliso Viejo, CA 92656**

**Laboratory Director: Chia-Ling Gau, PhD, DABMGG   CLIA# 05D0981414   Page 3/6**

## ASSAY INFORMATION *(Supplement to Test Results - Continued)*

**Resources:** The following references are used in variant analysis and classification when applicable for observed genetic alterations.

1. The 1000 Genomes Project Consortium. An integrated map of genetic variation from 1092 human genomes. *Nature*. 2012;491:56-65.
2. ACMG Standards and guidelines for the interpretation of sequence variants. *Genet Med*. 2015 May;17(5):405-23.
3. Ambry Genetics Variant Classification Scheme. http://www.ambrygen.com/variant-classification.
4. Berkeley Drosophila Genome Project [Internet]. Reese MG et al. *J Comp Biol*. 1997;4:311-23. http://www.fruitfly.org/seq_tools/splice.html.
5. Database of Single Nucleotide Polymorphisms (dbSNP) [Internet]. Bethesda (MD): National Center for Biotechnology Information, National Library of Medicine (dbSNP Build ID:135) Available from: www.ncbi.nlm.nih.gov/SNP. Accessed Jan 2012).
6. ESEfinder [Internet]. Smith PJ, et al. (2006) *Hum Mol Genet*. 15(16):2490-2508 and Cartegni L, et al. *Nucleic Acid Research*. 2003;31(13):3568-3571. http://rulai.cshl.edu/cgi-bin/tools/ESE3/esefinder.cgi?process=home.
7. Exome Variant Server, NHLBI Exome Sequencing Project (ESP) [Internet], Seattle WA. Available from: evs.gs.washington.edu/EVS.
8. Grantham R. Amino acid difference formula to help explain protein evolution. *Science*. 1974;185(4151):862-864.
9. HGMD® [Internet]: Stenson PD et al. *Genome Med*. 2009;1(1):13.  www.hgmd.cf.ac.uk.
10. Landrum MJ et al. ClinVar: public archive of relationships among sequence variation and human phenotype. *Nucleic Acids Res*. 2014 Jan 1;42(1):D980-5. doi: 10.1093/nar/gkt1113. PubMed PMID: 24234437.
11. Online Mendelian Inheritance in Man, OMIM®. McKusick-Nathans Institute of Genetic Medicine, Johns Hopkins University (Baltimore, MD), Copyright® 1966-2012. World Wide Web URL: http://omim.org.
12. Feng BJ. PERCH: A Unified Framework for Disease Gene Prioritization. *Hum Mutat*. 2017 Mar;38(3):243-251.
13. Exome Aggregation Consortium (ExAC) [Internet], Cambridge, MA. Available from: http://exac.broadinstitute.org.
14. Genome Aggregation Database (gnomAD) [Internet], Cambridge, MA. Available from: http://gnomad.broadinstitute.org.
15. Lek M et al. Analysis of protein-coding genetic variation in 60,706 humans. *Nature*. 2016 Aug 17;536(7616):285-91. PMID: 27535533
16. Mu W et al. *J Mol Diagn*. 2016 Oct 4. PubMed PMID: 27720647
17. Karczewski KJ et al. *Nature*. 2020 May;581(7809):434-443. PMID: 32461654
18. Splicing Prediction: Jaganathan K et al. *Cell*. 2019 Jan 24; 176(3):535-548.e24. PMID: 30661751

**Disclaimer:** This test was developed and its performance characteristics were determined by Ambry Genetics Corporation. It has not been cleared or approved by the US Food and Drug Administration. The FDA does not require this test to go through premarket FDA review. It should not be regarded as investigational or for research. This test should be interpreted in context with other clinical findings. This report does not represent medical advice. Any questions, suggestions, or concerns regarding interpretation of results should be forwarded to a genetic counselor, medical geneticist, or physician skilled in interpretation of the relevant medical literature. This laboratory is certified under the Clinical Laboratory Improvement Amendments (CLIA) as qualified to perform high complexity clinical laboratory testing. This test analyzes the following types of mutations: nucleotide substitutions, small deletions (up to 25 bp), small insertions (up to 10 bp), small indels and gross deletions/duplications. Unless otherwise noted in the methodology section above, it is not intended to analyze the following types of alterations: gross rearrangements, deep intronic variations, Alu element insertions, and other unknown abnormalities. The pattern of mutation types varies with the gene tested and this test detects a high but variable percentage of known and unknown mutants of the classes stated. A negative result from the analysis cannot rule out the possibility that the tested individual carries a rare unexamined mutation or mutation in the undetectable group. This test is designed and validated to be capable of detecting ~99% of described mutations in the 91  orderable genes on the test (analytical sensitivity). The clinical sensitivity of  this test may vary widely according to the specific clinical and family history. Cancer is a complex clinical disorder. Mutations in other genes or the regions not analyzed by  this test can also give rise to similar clinical conditions. Although molecular tests are highly accurate, rare diagnostic errors may occur. Possible diagnostic errors include sample mix-up, erroneous paternity identification, technical errors, clerical errors, and genotyping errors. Genotyping errors can result from trace contamination of PCR reactions, from maternal cell contamination in fetal samples, from rare genetic variants that interfere with analysis, germline or somatic mosaicism, presence of pseudogenes, technical difficulties in regions with high GC content or homopolymer tracts, active hematologic disease, a history of allogeneic bone marrow or peripheral stem cell transplant, or from other sources. Rare variants present in the human genome reference sequence (GRCh37.p5/hg19) or rare misalignment due to presence of pseudogenes can lead to misinterpretation of patient sequence data.

**Toll Free:**(866)262-7943      **Ph:**(949)900-5500      **Fx:**(949)900-5501      **www.ambrygen.com**      7 Argonaut, Aliso Viejo, CA 92656

**Laboratory Director:** Chia-Ling Gau, PhD, DABMGG   **CLIA#** 05D0981414   **Page 4/6**

## RAD51C NM_058216 c.492T>G p.F164L

## VARIANT DETAILS:

The **p.F164L** variant (also known as c.492T>G), located in coding exon 3 of the *RAD51C* gene, results from a T to G substitution at nucleotide position 492. The phenylalanine at codon 164 is replaced by leucine, an amino acid with highly similar properties. This variant was identified in a cohort of 85 patients undergoing HBOC testing in Colombia (Cock-Rada AM et al. *Fam. Cancer*, 2018 01;17:23-30). This alteration was also identified in an individual diagnosed with breast cancer (Weitzel JN et al. *Cancer*, 2019 08;125:2829-2836). This amino acid position is highly conserved in available vertebrate species. In addition, the *in silico* prediction for this alteration is inconclusive. Since supporting evidence is limited at this time, the clinical significance of this alteration remains unclear.

## GENE INFORMATION:

The *RAD51C* gene (NM_058216.1) is located on chromosome 17q22, encodes the DNA repair protein RAD51 homolog 3, and contains 9 coding exons. Pathogenic variants in this gene have been detected in individuals diagnosed with increased susceptibility to ovarian cancer, which is inherited in an autosomal dominant fashion. Pathogenic variants in *RAD51C* confer a cumulative lifetime risk of approximately 10-15% for ovarian cancer (Loveday C et al. *Nat Genet.* 2012 Apr 26;44(5):475-6; Song H et al. *J. Clin. Oncol.* 2015 Sep;33(26):2901-7; Yang X et al. *J Natl Cancer Inst.* 2020 Dec;112:1242-1250; Lilyquist J et al. *Gynecol Oncol.* 2017 Nov;147(2):375-380). Pathogenic variants in this gene may also confer a 20-40% cumulative lifetime risk for female breast cancer, specifically for the ER-negative or triple negative subtypes (Li N et al. *J Natl Cancer Inst.* 2019 12;111:1332-1338; Couch FJ et al. *JAMA Oncol.* 2017 Sep 1;3(9):1190-1196.; Hu C et al. *N Engl J Med.* 2021 02;384:440-451; Yang X et al. *J Natl Cancer Inst.* 2020 Dec 14;112(12):1242-1250; Shimelis H et al. *J Natl Cancer Inst.* 2018 Aug 1;110(8):855-862. Penetrance in individuals with pathogenic variants in *RAD51C* is incomplete and variable expressivity is observed; therefore, cancer risks will differ based on individual and family history. Biallelic pathogenic variants in this gene have been detected in individuals diagnosed with Fanconi anemia type O (FA-O), which is inherited in an autosomal recessive fashion. Fanconi anemia is characterized by clinical findings such as progressive bone marrow failure, adult onset aplastic anemia, pre- and postnatal growth deficiency, abnormal skin pigmentation, characteristic skeletal malformations, and impaired endocrine functioning. Fanconi anemia can be established in a patient following cytogenic testing of patient lymphocytes that demonstrate increased chromosomal breakage and radial forms following diepoxybutane and mitomycin C exposure (Mehta P et al. *Fanconi Anemia.* 2002 Feb 14 [updated 2021 Jun 3]. In: Gene Reviews [Internet]. Seattle (WA): University of Washington, Seattle; 2022). Individuals with Fanconi anemia are at an increased risk of malignancies, with highest risk of acute myelogenous leukemia, early-onset solid tumors including head and neck squamous cell carcinoma, and non-melanoma skin cancer (García-de-Teresa B et al. *Genes (Basel).* 2020 Dec 21;11(12):1528., 2020). Individuals of reproductive age are at 25% risk of having a child with FA-O with each pregnancy when both biological parents have a pathogenic variant in *RAD51C*. Loss of function has been reported as the mechanism of disease for *RAD51C*-related tumor predisposition and FA-O.

## ADDITIONAL SUPPORTING INFORMATION:

| | |
|---|---|
| Co-Segregation | Co-segregation data for this variant is currently unavailable. |
| Co-occurrence | No significant co-occurrence data is currently available at our laboratory. |
| Frequency | Internal Frequency: <0.01% (36/362000) total alleles studied. |
| | 1000 Genome:0.02% (1/4932) total alleles studied, 0.47% (1/214) Spanish alleles. |
| | gnomAD: <0.01% (10/251476) total alleles studied, 0.03% (9/34592) Latino alleles. |
| Grantham Score | 22 (highly similar amino acid substitution) |
| *in silico* | Inconclusive |

**Toll Free:**(866)262-7943      **Ph:**(949)900-5500      **Fx:**(949)900-5501      **www.ambrygen.com**      7 Argonaut, Aliso Viejo, CA 92656

**Laboratory Director: Chia-Ling Gau, PhD, DABMGG    CLIA# 05D0981414    Page 5/6**

RAD51C NM_058216 c.492T>G p.F164L

## Evolutionary conservation diagram: Amino Acid Alignment

This amino acid position is highly conserved in available vertebrate species.



Danio rerio*: common name "Zebrafish"

**Amino Acid Change:**

| Trait | Phe (F) | Leu (L) |
|---|---|---|
| Amino Acid Name | Phenylalanine | Leucine |
| Polarity/Charge | non-polar | non-polar |
| pH | neutral | neutral |
| Residue Weight | 147 | 113 |
| Hydrophobicity Score | 2.8 | 3.8 |
| Hydrophilicity Score | -2.5 | -1.8 |
| Secondary Structure Propensity | α former / β former | strong α former / β former |

Grantham Difference

22.00



0.00   43.00   86.00   129.00   172.00   215.00



# Understanding Your VUS Hereditary Cancer Genetic Test Result

INFORMATION FOR PATIENTS WITH A **VARIANT OF UNKNOWN SIGNIFICANCE**

| | | |
|---|---|---|
| Result | **VUS** | Your testing found at least one variant of unknown significance (VUS) in a gene tested. A VUS is a change in a gene from what we expect to see, but we do not know if it causes an increased risk for cancer or not. |
| Reclassification | **POSSIBLE** | Collecting information about a VUS is an ongoing process, so it is possible that your result may be better understood in the future. The healthcare provider that ordered your test will be notified if new information becomes available about your VUS. |
| Cancer Risk | **VARIES** | Even though your genetic test result was a VUS, you and your relatives may still have an increased risk of developing cancer based on other factors, including your medical and/or family history. Your healthcare provider can help you learn more about this. |
| Risk Management | **VARIES** | Risk management decisions are very personal and depend on many factors. Talk to your doctor about which, if any, options may be right for you. |
| Family Members | **POSSIBLE FURTHER TESTING** | Certain family members may be eligible for genetic testing through our Family Studies Program. In some cases, this may help add to the understanding of your result. If you and your relatives are interested in this, please speak to your healthcare provider about it. |
| Next Steps | **DISCUSS** | It is recommended that you stay in contact with your healthcare provider on a regular basis for possible new information about your result. |
| Reach Out | **RESOURCES** | • Ambry's Hereditary Cancer Site for Families  patients.ambrygen.com/cancer<br>• American Cancer Society  cancer.org<br>• Genetic Information Nondiscrimination Act (GINA)  ginahelp.org<br>• National Society of Genetic Counselors  nsgc.org<br>• Canadian Association of Genetic Counsellors  cagc-accg.ca |

Please discuss this information with your healthcare provider. The cancer genetics field is continuously evolving, so updates related to your genetic test result, medical recommendations, genetic testing options, and/or potential treatments may be available over time. This information is not meant to replace a discussion with a healthcare provider, and should not be considered or interpreted as medical advice.



# Understanding Your VUS Hereditary Cancer Genetic Test Result

INFORMATION FOR PATIENTS WITH A **VARIANT OF UNKNOWN SIGNIFICANCE**

| | |
|---|---|
| **PATHOGENIC MUTATION** (POSITIVE TEST RESULT) | Contains enough evidence showing it can cause a disease |
| **VARIANT, LIKELY PATHOGENIC** (VLP, POSITIVE TEST RESULT) | Strong evidence to suggest it causes a disease |
| **VARIANT UNKNOWN SIGNIFICANCE** (VUS) | Limited and/or conflicting evidence to suggest it may cause a disease |
| **VARIANT, LIKELY BENIGN** (VLB, NEGATIVE TEST RESULT) | Strong evidence to suggest it does not cause a disease |
| **BENIGN** (NEGATIVE TEST RESULT) | Contains enough evidence to show it does not cause a disease |

1.  **Does finding a VUS on genetic testing change medical management recommendations?**

    VUS by definition have not been proven to increase an individual's risk for disease or to be the cause of the disease within a family. Medical recommendations should be based on personal and/or family history of a specific disease.

2.  **What percentage of VUS are reclassified?**

    Of the VUS that are reclassified, the vast majority will be reclassified to VLB or benign, although many VUS will not be reclassified at all due to lack of additional information. Only a small percentage of VUS will ultimately be reclassified to VLP or pathogenic.

3.  **How long does it take to reclassify a VUS?**

    This depends upon several factors:
    - How often the VUS is found in individuals (rare variants may take longer to reclassify)
    - How common the disease is in the general population and how strongly the gene has been linked to the disease
    - Participation of certain families with the VUS in our Family Studies Program
    - Eligibility for additional specialized testing performed by Ambry's Translational Genomics (ATG) laboratory
    - Amount of active research taking place on a particular gene or VUS

4.  **Who is notified if a VUS gets reclassified?**

    When enough evidence becomes available to cause a significant change, Ambry will make every attempt to send reclassification alerts for a VUS that gets reclassified to the healthcare provider.

5.  **What is Ambry's Family Studies Program, and is it worth participating in it?**

    Our Family Studies Program and ATG lab include follow-up testing for you or certain family members after a VUS has been found. These studies can be worthwhile if many family members (especially those with the disease) are willing to participate. For more information, please visit our website for the Family Studies Program or ATG lab.

6.  **Does Ambry perform family studies for VUS in all genes?**

    Not all genes are well suited for family studies. To find out if the VUS found is eligible for family studies contact FamilyStudies@ambrygen.com

7.  **How often does Ambry check to see if there is new information about a VUS?**

    Ambry regularly assesses the data and emerging evidence related to a specific variant. Healthcare providers are welcome to contact Ambry Genetics at +1.866.262.7943 on a yearly basis to request the most current assessment of a particular variant.



**P R O M P T**

**P**rospective **R**egistry **O**f **M**ulti**P**lex Testing

## Opportunity to Enroll in Hereditary Cancer Research

Genetic testing can help individuals and families by giving them a clearer idea of their cancer risks. Genetic tests (called multi-gene or multiplex panels) look for changes in several different genes, all in a single test. While all of the genes on these panels have been tied to an increased risk of cancer, we understand the risks associated with some of the genes better than we understand others. One way to help improve our understanding is to enroll people with pathogenic mutations or variants of unknown significance in registries. Registries typically follow people over many years to learn more about these alterations and how they impact their health.

**How can I find a research registry?**

There are several hereditary cancer research registries that are studying individuals who have had multiplex panel testing. One registry that is open to individuals nationwide is PROMPT (or **P**rospective **R**egistry **O**f **M**ulti**P**lex **T**esting). PROMPT is an online registry for patients and families who have had multiplex testing and have been found to have a genetic variation which may be linked to an increased risk of cancer. PROMPT is a joint effort involving several academic medical centers and commercial laboratories, working together to learn more about the genes that are studied on multiplex panels. PROMPT will allow researchers to better understand the cancer risks associated with changes in these genes and thus provide a better understanding of the best way to take care of individuals who have such changes.

**What is involved in participation?**

Participation in the study simply involves completing online surveys. Additionally, the PROMPT team may reach out to you to talk about ways that you can get more involved with the research effort. Your participation will help researchers learn more and improve the ability of this genetic testing to help people.

**How do I enroll?**

You can learn more about or register for PROMPT by going to www.promptstudy.info or by scanning the QR code below.

Thank you again for considering taking part in PROMPT!



If you would like to read more about multiplex panels, including details about specific genes, please visit our informational website at www.promptstudy.info.

# Exhibit 32

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                      COUNTY OF ALAMEDA

3

4    ANTHONY HERNANDEZ VALADEZ,          )
                                         )
5              Plaintiff,                )
                                         )
6    v.                                  )   No. 22CV012759
                                         )
7    JOHNSON & JOHNSON; ALBERTSONS       )
     COMPANIES, INC., individually,      )
8    and as successor-in-interest,       )   **Certified Transcript**
     parent, alter ego and equitable    )
9    trustee LUCKY STORES, INC.; LUCKY   )
     STORES, INC.; SAFEWAY INC.; SAVE    )
10   MART SUPERMARKETS, individually,    )
     and as successor-in-interest,       )
11   parent, alter ego and equitable     )
     trustee of LUCKY STORES, INC.;      )
12   TARGET CORPORATION; WALMART INC.;   )
     and FIRST DOE through               )
13   ONE-HUNDREDTH DOE,                  )
                                         )
14             Defendants.               )
     _____)

15

16

17

18          VIDEOTAPED DEPOSITION VIA ZOOM OF

19                 LEAH BACKHUS, M.D.

20             VOLUME I, PAGES 1 - 139

21             Wednesday, March 8, 2023

22

23

24   Reported by:  Monica Schoonover
                   CSR No. 10220
25



```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    COUNTY OF ALAMEDA

 3

 4   ANTHONY HERNANDEZ VALADEZ,            )
                                          )
 5              Plaintiff,                )
                                          )
 6   v.                                   )   No. 22CV012759
                                          )
 7   JOHNSON & JOHNSON; ALBERTSONS        )
     COMPANIES, INC., individually,       )
 8   and as successor-in-interest,        )
     parent, alter ego and equitable      )
 9   trustee LUCKY STORES, INC.; LUCKY    )
     STORES, INC.; SAFEWAY INC.; SAVE     )
10   MART SUPERMARKETS, individually,     )
     and as successor-in-interest,        )
11   parent, alter ego and equitable      )
     trustee of LUCKY STORES, INC.;       )
12   TARGET CORPORATION; WALMART INC.;    )
     and FIRST DOE through                )
13   ONE-HUNDREDTH DOE,                   )
                                          )
14              Defendants.               )
     _____)

15

16

17

18

19           VIDEOTAPED DEPOSITION OF LEAH BACKHUS,
             M.D., VOLUME I, taken on behalf of the
20           Defendants, beginning at 1:04 p.m. and
             ending at 4:00 p.m., on Wednesday, March
21           8, 2023, via Zoom videoconference before
             Monica Schoonover, Certified Shorthand
22           Reporter No. 10220.

23

24

25
```



1    APPEARANCES:

2

3    For Plaintiff:

4         KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
          BY:   IAN RIVAMONTE, ESQ.
5         irivamonte@kazanlaw.com
          BY:   JOSEPH SATTERLEY, ESQ.
6         jsatterley@kazanlaw.com
          55 Harrison Street, Suite 400
7         Oakland, California  94607
          510.302.1000
8         (appearing via videoconference)

9    For Defendants JOHNSON & JOHNSON and LTL MANAGEMENT,
     LLC:
10
          NELSON MULLINS RILEY & SCARBOROUGH LLP
11        By:   SCOTT J. RICHMAN, ESQ.
          scott.richman@nelsonmullins.com
12        100 South Charles Street, Suite 1600
          Baltimore, Maryland  21201
13        443.392.9414
          (appearing via videoconference)
14
     For Defendants ALBERTSONS COMPANIES, INC.,
15   individually, and as successor-in-interest, parent,
     alter ego and equitable trustee LUCKY STORES, INC.;
16   LUCKY STORES, INC.; SAFEWAY INC.; SAVE MART
     SUPERMARKETS, individually, and as
17   successor-in-interest, parent, alter ego and
     equitable trustee of LUCKY STORES, INC.; TARGET
18   CORPORATION; WALMART INC.:

19        BARNES & THORNBURG LLP
          BY:   MITCHELL CHARCHALIS, ESQ.
20        MCharchalis@btlaw.com
          390 Madison Avenue, 12th Floor
21        New York, New York 10017-2509
          646.746.2191
22        (appearing via videoconference)

23   Also Present:

24        BRANDON IORLANO, Videographer

25



| | | |
|---|---|---|
| 1 | Plaintiff as well. | 01:05:40 |
| 2 | MR. RICHMAN:  Good afternoon.  Scott | 01:05:43 |
| 3 | Richman for Defendants Johnson & Johnson and LTL | 01:05:43 |
| 4 | Management, LLC. | 01:05:47 |
| 5 | MR. CHARCHALIS:  Mitch Charchalis for Lucky | 01:05:52 |
| 6 | Stores; Safeway Inc.; Save Mart; Target; and | 01:05:55 |
| 7 | Safeway.  I believe I said them all, but I will also | 01:06:03 |
| 8 | email my appearance to make sure I give it to you | 01:06:07 |
| 9 | correctly. | 01:06:11 |
| 10 | THE VIDEOGRAPHER:  All right.  And if | 01:06:11 |
| 11 | that's everyone, Madam Court Reporter, can you | 01:06:12 |
| 12 | please administer the oath? | 01:06:14 |
| 13 | | 05:01:40 |
| 14 | LEAH BACKHUS, M.D., | 05:01:40 |
| 15 | having been first duly sworn remotely by the | 05:01:40 |
| 16 | reporter, was examined and testified as follows: | 05:01:40 |
| 17 | | 05:01:40 |
| 18 | EXAMINATION | 01:06:31 |
| 19 | BY MR. RICHMAN: | 01:06:32 |
| 20 | Q    Good afternoon, Dr. Backhus. | 01:06:32 |
| 21 | A    Good afternoon. | 01:06:33 |
| 22 | Q    Can you hear me okay? | 01:06:35 |
| 23 | A    Yes. | 01:06:36 |
| 24 | Q    Great.  My name is Scott Richman.  I am one | 01:06:38 |
| 25 | of the attorneys for the defendants in this case. | 01:06:40 |



| | | |
|---|---|---|
| 1 | Q    Yes.  If you have such an assumption. | 03:03:20 |
| 2 | A    I do not have an assumption of quantity. | 03:03:23 |
| 3 | Q    Okay.  Let me ask it a little bit | 03:03:25 |
| 4 | differently. | 03:03:28 |
| 5 | You say in the first part of that sentence, | 03:03:28 |
| 6 | "Based on the factual assumption regarding the | 03:03:30 |
| 7 | asbestos content of Johnson's Baby Powder." | 03:03:32 |
| 8 | What is that factual assumption that you | 03:03:36 |
| 9 | are making? | 03:03:37 |
| 10 | A    As in the assumption of its content as in | 03:03:39 |
| 11 | its presence, as in a binary yes or no, not -- | 03:03:42 |
| 12 | Q    Okay. | 03:03:48 |
| 13 | A    -- in regards to amounts. | 03:03:48 |
| 14 | Q    Okay.  So as far as percentages of asbestos | 03:03:50 |
| 15 | or type of asbestos or fiber type, you don't have | 03:03:52 |
| 16 | any opinion of that?  It's just whether or not | 03:03:56 |
| 17 | asbestos was or was not present; is that correct? | 03:03:58 |
| 18 | A    Correct. | 03:04:01 |
| 19 | Q    Okay.  And do you have any opinions as to | 03:04:02 |
| 20 | the amount of asbestos that is required to cause a | 03:04:15 |
| 21 | mesothelioma? | 03:04:19 |
| 22 | A    No. | 03:04:22 |
| 23 | Q    Okay.  What is your understanding of the | 03:04:23 |
| 24 | potential causes of pericardial mesothelioma? | 03:04:33 |
| 25 | A    Well, given the overwhelming association | 03:04:40 |



1    between mesothelioma in general and asbestos, that          03:04:43
2    would be the highest risk factor exposure that we          03:04:47
3    would associate -- associate with subsequent               03:04:52
4    development of mesothelioma.                                03:04:55
5            Other risk factors would be radiation,             03:05:00
6    other sorts of inflammatory insults like other             03:05:06
7    sclerosing procedures as is listed in some of the          03:05:12
8    case reports with regards to the pericardium, but          03:05:18
9    for the most part the main association is with             03:05:27
10   asbestos.                                                   03:05:30
11       Q    And that's the main association specific to       03:05:30
12   pericardial or for mesothelioma generally?                 03:05:33
13       A    Both.                                              03:05:35
14       Q    Okay.  What is the basis of your statement        03:05:36
15   that mesothelioma -- pericardial mesothelioma is           03:05:39
16   mostly associated with asbestos exposure?                  03:05:43
17       A    Based upon the larger series and my               03:05:46
18   literature review that included pericardial cases          03:05:49
19   within their -- within their study cohorts that            03:05:52
20   otherwise declare that association.                         03:06:01
21           All of the studies that are confined to           03:06:03
22   pericardial mesothelioma as you somewhat alluded to        03:06:07
23   are too small to make the same arguments with as           03:06:10
24   much rigor.  So those are sort of more loose               03:06:14
25   associations because they don't have the numbers to        03:06:17



1    be able to run more sophisticated statistical          03:06:21
2    analyses like you can for larger studies.              03:06:24
3        Q    Okay.  And you said based on the larger       03:06:26
4    series.  What larger series are you referring to?      03:06:28
5        A    That I encountered during my literature       03:06:31
6    review.                                                03:06:34
7        Q    Okay.  Do you know what specifically -- I     03:06:34
8    mean, what literature are you referring to when you    03:06:36
9    say that?                                              03:06:38
10       A    The scientific literature on mesothelioma.    03:06:39
11   That if you go to PubMed and you just type it in,      03:06:42
12   then there's a whole treasure trove of articles that   03:06:45
13   come up, and sort of confining things to the larger    03:06:47
14   studies, these are where my conclusions are based      03:06:53
15   upon, but I don't have the titles.  I don't have the   03:06:57
16   PDF saved or anything like that for you.               03:07:01
17       Q    And sitting here today, do you know the       03:07:04
18   authors of any of the studies you are referencing?     03:07:06
19       A    I do not.                                      03:07:08
20       Q    Okay.  Is it your understanding -- strike     03:07:09
21   that.                                                  03:07:14
22            Is it your opinion that people can get        03:07:15
23   pericardial mesothelioma without any prior exposure    03:07:17
24   to asbestos?                                           03:07:19
25       A    I am sure that's possible.                    03:07:23



| | | |
|---|---|---|
| 1 | Q    That is something you have seen in your | 03:07:26 |
| 2 | literature review; correct? | 03:07:28 |
| 3 | A    In the literature review, we have -- there | 03:07:30 |
| 4 | are reports of patients with pericardial | 03:07:33 |
| 5 | mesothelioma for whom they are -- they, the people, | 03:07:36 |
| 6 | are unable to document prior asbestos exposure, | 03:07:39 |
| 7 | true.  It doesn't mean it hadn't occurred.  It just | 03:07:42 |
| 8 | means they can't document it. | 03:07:46 |
| 9 | Q    Okay. | 03:07:48 |
| 10 | A    Many of those studies were prior to any | 03:07:51 |
| 11 | association or any inquiry as to cosmetic talc | 03:07:53 |
| 12 | exposure, so they are simply looking for asbestos | 03:07:56 |
| 13 | but not necessarily looking specifically with | 03:07:59 |
| 14 | regards to any prior talc exposure because that | 03:08:01 |
| 15 | association hadn't really been made at some of | 03:08:04 |
| 16 | these -- at the time that some of these earlier | 03:08:06 |
| 17 | studies were published. | 03:08:07 |
| 18 | Q    Okay.  And what is your understanding as to | 03:08:08 |
| 19 | when an association was made between talc and | 03:08:10 |
| 20 | asbestos? | 03:08:13 |
| 21 | A    Much more recently.  Within the last few | 03:08:15 |
| 22 | years. | 03:08:18 |
| 23 | Q    And when specifically in the last few | 03:08:19 |
| 24 | years? | 03:08:21 |
| 25 | A    I don't have, like, a date when, like, this | 03:08:24 |



1        I further certify that I am not a relative

2   or employee or attorney or counsel of any of the

3   parties, nor am I a relative or employee of such

4   attorney or counsel, nor am I financially interested

5   in the outcome of this action.

6        IN WITNESS WHEREOF, I have subscribed my

7   name this 9th day of March, 2023.

8

9

10   _____
     MONICA SCHOONOVER, CSR No. 10220

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Exhibit 33

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
03/23/2023 at 01:38:08 PM
By: Cheryl Clark,
Deputy Clerk

1   Joseph D. Satterley (C.S.B. #286890)
    Denyse F. Clancy (C.S.B. #255276)
2   Ian A. Rivamonte (C.S.B. #232663)
       irivamonte@kazanlaw.com
3   KAZAN, McCLAIN, SATTERLEY & GREENWOOD
    A Professional Law Corporation
4   Jack London Market
    55 Harrison Street, Suite 400
5   Oakland, California 94607
    Telephone: (510) 302-1000
6   Facsimile:  (510) 835-4913

7   Attorneys for Plaintiff

8                   SUPERIOR COURT OF CALIFORNIA

9                       COUNTY OF ALAMEDA

10  ANTHONY HERNANDEZ VALADEZ,          | Case No. 22CV012759

11                Plaintiff,            | **PREFERENCE MOTION GRANTED**

12       v.                            | Assigned for All Pre-Trial Purposes to
                                       | Judge Richard Seabolt
13  JOHNSON & JOHNSON, et al.,          | Department 18

14                Defendants.           | **PLAINTIFF'S RESPONSE TO
                                       | DEFENDANTS' OPPOSITION TO
15                                     | TRAILBLAZER STUDIOS' REQUEST
                                       | TO RECORD TRIAL PROCEEDINGS**
16
                                       | Case Filed:   June 15, 2022
17                                     | Trial Date:   April 17, 2023

18

19

20

21

22

23

24

25

26

27

28

3247451.1

1

**EXHIBIT 33**

Plaintiff's Response to Defendants' Opposition to Trailblazer Studios' Request to Record Trial Proceedings

This Court has the discretion to permit, refuse, or limit Trailblazer Studios' access to record this case's trial proceedings. [Cal. Rules of Ct., rule 1.150(e); *People v. Dixon* (2007) 148 Cal.App.4th 414, 437.] In exercising that discretion, this Court should disregard Defendants' argument that Trailblazer Studios' request is "improper" under Civil Code section 3344(a) because it purportedly "would violate California law prohibiting profit from the use and likeness of an individual absent their consent." [Defendants' Opp. at 8.] Defendants are wrong because subdivision (d) of section 3344 states that matters of "***public affairs***," including this case "***shall not constitute a use for which consent is required under subdivision (a).***" [Civ. Code § 3344(d) (emphasis added).]

In California, a plaintiff may allege misappropriation of their name or likeness under Civil Code section 3344(a). However, "no cause of action will lie" under a section 3344 claim for misappropriation "for the '[p]ublication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'" [*Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793; *see also Eliott v. Lions Gate Entertainment Corp.* (C.D. Cal., Nov. 8, 2022, No. 221CV08206SSSDFMX) 2022 WL 17408662, at *9 (citing to *Montana,* 34 Cal.App.4th at 793).] Indeed, section 3344(d) states that "[f]or purposes of" section 3344, "a use of a name, voice, signature, photograph, or likeness in connection with any news, ***public affairs***, or sports broadcast or account, or any political campaign, ***shall not constitute a use for which consent is required under subdivision (a)***." [Civ. Code § 3344(d) (emphasis added).]

For example, in *Eliott*, the plaintiff claimed that the at-issue documentary "suggests that he was a 'recruiter and member of a purported sex cult.'" [*Eliott*, 2022 WL 17408662, at *7.] Applying section 3344 and California authorities interpreting it, the federal district court held that the plaintiff had no valid claim for improper use of his name and likeness because the at-issue documentary involved "a matter of public interest." [*Id.* at *9.] "And as California's courts have held, even private individuals cannot state a claim for misappropriation for their portrayal in a publication concerning a public matter." [*Id.* (citing *Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 543).]

Defendants' bad-faith bankruptcy and infliction of further harm upon mesothelioma

**Kazan, McClain, Satterley & Greenwood**
**A Professional Law Corporation**
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

victims like Plaintiff Anthony Hernandez Valadez is a "matter of public interest." [*See, e.g.,*

Spector, M., *Judge Indicates Intention to Dismiss J&J Talc Unit Bankruptcy* (Feb. 14, 2023)

Reuters <https://tinyurl.com/2tum2v4y> (as of Mar. 23, 2023).] Indeed, Mr. Valadez's case is the

only one allowed to proceed to trial despite the bankruptcy stay affecting thousands of other talc

claimants. [Church, S., *J&J Must Face Baby Powder Suit From 24-Year-Old With Cancer* (Feb.

14, 2023) Bloomberg Law <https://tinyurl.com/4jwva59n> (as of Mar. 23, 2023).] Thus,

Defendants' claim that "Court approval" of Trailblazer Studios' "request creates a myriad of legal

concerns and potential liabilities" is unfounded. Their argument also contradicts Rule 1.150 and

Code of Civil Procedure section 124 because, under Defendants' mistaken interpretation of

California law, it creates a presumption against recording or broadcasting court proceedings. [Cal.

Rules of Ct., rule 1.150(a) ("This rule does not create a presumption for or against granting

permission to photograph, record, or broadcast court proceedings."); *see also* Code Civ. Proc.

§ 124 (generally, "the sittings of every court shall be public").]

      Defendants' arguments that Civil Code section 3344 "should cause the court additional

concern" are unfounded and inconsistent with the law. Accordingly, Plaintiff requests that this

Court disregard Defendants' section 3344 arguments in exercising its discretion to permit, refuse,

or limit Trailblazer Studios' access to record the trial proceedings in this case.


DATED: March 23, 2023                KAZAN, McCLAIN, SATTERLEY & GREENWOOD
                                A Professional Law Corporation


By: _____
                      Ian A. Rivamonte

Attorneys for Plaintiff

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1

## PROOF OF SERVICE

2

***Anthony Hernandez Valadez v. Johnson & Johnson, et al.***
**Alameda County Superior Court Case No. 22CV012759**

3

4        At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Alameda, State of California.  My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

5

6        On March 23, 2023, I served true copies of the following document(s) described as:

7

**PLAINTIFF'S RESPONSE TO DEFENDANTS' OPPOSITION TO TRAILBLAZER STUDIOS' REQUEST TO RECORD TRIAL PROCEEDINGS**

8

on the interested parties in this action as follows:

9

### SEE ATTACHED SERVICE LIST

10

**BY ELECTRONIC SERVICE:**  I electronically served the document(s) by using the File & ServeXpress system.  Participants in the case who are registered users will be served by the File & ServeXpress system.  Participants in the case who are not registered users will be served by mail or by other means permitted by the court rules.

11

12        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

13

14        Executed on March 23, 2023, at Tracy, California.

15

16

17        _____
          E. A. Pawek

18

19

20

21

22

23

24

25

26

27

28

BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles CA 90067
Telephone: (310)284-3880
Facsimile: (310)284-3894
FOR: ALBERTSONS COMPANIES, INC.,
ALBERTSONS COMPANIES, INC.sii/pae/et
LUCKY STORES, INC., LUCKY STORES,
INC., SAFEWAY INC., SAVE MART
SUPERMARKETS , SAVE MART
SUPERMARKETS sii/pae/et LUCKY
STORES, INC., TARGET CORPORATION,
WALMART INC.

KING & SPALDING LLP
633 West  5th Street,
Suite 1600
Los Angeles CA 90071
Telephone: 213-443-4351
Facsimile: 213-443-4310
FOR: JOHNSON & JOHNSON , LTL
MANAGEMENT LLC, LTL MANAGEMENT
LLC sii/pae/et JOHNSON & JOHNSON
BABY PRODUCTS COMPANY, LTL
MANAGEMENT LLC sii/pae/et JOHNSON &
JOHNSON CONSUMER INC.

SPANOS PRZETAK
555 12th Street
Suite 2060
Oakland CA 94607
Telephone: (510) 250-0200
Facsimile: (510) 380-6354
FOR: DESIGNATED DEFENSE COUNSEL

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit 34


E-SERVICE

69722858
Apr 03 2023
04:54PM

File & ServeXpress

Joseph D. Satterley (C.S.B. #286890)
Denyse F. Clancy (C.S.B. #255276)
Ian A. Rivamonte (C.S.B. #232663)
  irivamonte@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000
Facsimile: (510) 835-4913

Attorneys for Plaintiff

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

| | |
|---|---|
| ANTHONY HERNANDEZ VALADEZ,<br><br>Plaintiff,<br><br>vs.<br><br>JOHNSON & JOHNSON, et al.,<br><br>Defendants. | Case No. 22CV012759<br><br>**PREFERENCE MOTION GRANTED**<br><br>Assigned for All Pre-Trial Purposes to<br>Judge Richard Seabolt<br>Department 18<br><br>**PLAINTIFF'S OPPOSITION TO JOINT DEFENDANT JOHNSON & JOHNSON'S MOTION IN LIMINE NO. 2 TO EXCLUDE REFERENCES TO LTL MANAGEMENT LLC'S BANKRUPTCY**<br><br>**[Opposition to Joint Defense MIL No. 2.]**<br><br>Action Filed:       June 15, 2022<br>Trial Date:          April 17, 2023 |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    **I.      Introduction.**

2            An order denying the motion in limine of Defendant Johnson & Johnson ("J&J") to

3    exclude "any…reference" to the "circumstances surrounding the LTL [Management LLC]

4    bankruptcy" and "the Third Circuit's recent decision" is warranted because the motion is

5    procedurally and substantively flawed. [Motion at 3:3-4, 17-21.]

6            Procedurally, J&J improperly seeks a blanket order excluding a broad category of

7    evidence. But J&J fails to identify any particular document, testimony, or argument by Plaintiff's

8    counsel that is purportedly irrelevant or unduly prejudicial. Instead, J&J asserts that *all* evidence

9    and arguments that touch upon the LTL bankruptcy should be barred at this trial.  Because

10   Plaintiff and this Court do not know what specific evidence and arguments might be the subject of

11   J&J's vague motion, the motion should be denied, and then any proper objections may be

12   addressed during the trial. [*Kelly v. New West Fed. Savings* (1996) 49 Cal.App.4th 659, 670-671;

13   Case Management & Trial Setting Order, Exh. 7 to Rivamonte Decl. at p. 4.; *People v. Morris*

14   (1991) 53 Cal.3d 152, 188-190 (evidentiary objections must be made at a time court can

15   effectively consider them).][1]

16           Substantively, evidence or reference to "circumstances surrounding the LTL bankruptcy"

17   is relevant and admissible for numerous purposes, including, but not limited to: (i) to explain who

18   LTL is, including its creation, formation, and existence; (ii) how LTL, which was formerly known

19   as Johnson & Johnson Consumer Inc. ("JJCI"), played a significant role in the manufacture and

20   distribution of Johnson's Baby Powder talc; (iii) LTL's financial condition and ability to pay

21   punitive damages; and (iv) explain the motivation and biases of all Defendants and their witnesses

22   based on LTL's indemnity agreements with the Retailer Defendants. To be clear and to assuage

23   J&J's unfounded concerns of undue prejudice under Evidence Code section 352, Plaintiff will not

24   mention LTL's bankruptcy so long as this Court's order applies mutually to all parties.

25           Accordingly, Plaintiff requests that this Court deny J&J's motion in limine and for such

26   other relief to which they may be entitled.

27   _____

28   [1] If J&J later challenges any specific evidence, Plaintiff requests the opportunity to provide a
     supplemental briefing.

3248908.1

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

## II.    Discussion.

### A.    J&J fails to identify what evidence it moves to exclude.

This Court should deny J&J's motion outright because it fails to identify any specific document or other evidence to be excluded.

A "motion *in limine* to exclude evidence is not a sufficient objection unless it was directed to a particular, identifiable body of evidence and was made at a time when the trial court could determine the evidentiary question in its appropriate context." [*Morris*, 53 Cal.3d at 188-190 (original italics).] Indeed, a "motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal only when it satisfies the basic requirements of Evidence Code section 353, *i.e.*: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." [*Id.*]

Here, J&J's motion fails because J&J does not challenge (or even attach) any specific evidence from the LTL bankruptcy or any "circumstances" surrounding those proceedings. In other words, matters lacking in "factual support or argument" are not properly the subject of motions in limine. [*Kelly,* 49 Cal.App.4th at 670.]

Because J&J fails to follow the proper procedure under *Morris* and *Kelly*, Plaintiff urges this Court to wait until any specific evidence from the LTL bankruptcy or "circumstances" related to it is offered, evaluate the evidence at that time in the proper context, and decide admissibility at that stage, rather than in the context of J&J's motion. [*See Morris*, 53 Cal.3d at 188-190.]

### B.    Evidence of the circumstances involving the LTL bankruptcy is admissible for numerous purposes.

Because J&J's motion runs afoul of *Kelly* and *Morris*, Plaintiff cannot precisely address what admissibility issue any evidence of the "circumstances surrounding the LTL bankruptcy" and "the Third Circuit's recent decision" may present for this Court. Indeed, as phrased, the "circumstances surrounding the LTL bankruptcy" necessarily include LTL's formation, financial condition, and indemnity agreements with the Retailer Defendants. Further, the "Third Circuit's

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    recent decision" describes LTL's financial condition and, therefore, its ability to pay punitive

2    damages. Here, Plaintiff provides examples of why evidence from the LTL bankruptcy is relevant

3    against Defendants.

4              **1.    The jury is entitled to know who LTL is.**

5              Plaintiff is entitled to present evidence and argument regarding LTL's creation, formation,

6    existence, and role in manufacturing and liabilities related to Johnson's Baby Powder talc—the

7    product Plaintiff alleges exposed them to carcinogenic asbestos. [*See, e.g., People v. Arnold*

8    (1926) 199 Cal. 471, 486 (the purpose of an opening statement is "to prepare the minds of the jury

9    to follow the evidence to more readily discern its materiality, force and effect.").]

10             Plaintiff will explain to the jury that J&J's wholly owned subsidiary, JJCI, has directly sold

11   Johnson's Baby Powder since 1979. [*In re LTL Management LLC* (3d Cir. 2023) 58 F.4th 738

12   (amended 3/31/23), Exh. 1 at pp. 20-21.][2] JJCI purportedly "was liable for all claims relating to

13   Johnson's Baby Powder, either directly or indirectly through its responsibility to indemnify J&J."

14   [*Id.*] Like J&J, JJCI was also aware of the asbestos content of its Johnson's Baby Powder talc,

15   which is the "S[a]cred cow" of JJCI and J&J's line of baby products. [9/26/84 Memo., Exh. 3;

16   6/30/03 Email, Exh. 4.]

17             LTL's "primary function since its formation" on August 12, 2021, was "to manage [JJCI's]

18   liabilities in talc litigation." [Mittenthall 3/31/23 Depo. (Rough), Exh. 2 at 9:19-10:2, 15:25-17:3,

19   29:2-16, 34:3-24.][3] JJCI's talc liabilities were transferred to LTL through "a corporate

20   restructuring relying principally on a [divisional] merger under Texas law." [Exh. 1 at p. 25.] "In

21   simplified terms, the merger splits a legal entity into two, divides its assets and liabilities between

22   the two entities, and terminates the original entity." [*Id.*] "As the most important step, the merger

23   allocated LTL," which stands for "Legacy Talc Litigation," "responsibility for essentially all

24   liabilities of [JJCI] tied to talc-related claims." [*Id.* at p. 26.] "This meant, among other things, it

25   would take the place of [JJCI] in current and future talc lawsuits and be responsible for their

26

27   [2] Hereinafter, all references to "Exh(s)." are to the exhibits attached to the Rivamonte Declaration.

28   [3] Presently, Plaintiff only has the rough transcript of James Mittenthal's deposition testimony. If
     necessary, Plaintiff will provide the final transcript at the hearing on J&J's motion in limine.

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   defense." [Exh. 1 at p. 26.] On October 14, 2021, two days after the divisional merger, LTL filed a

2   petition for Chapter 11 relief. While they will not mention the bankruptcy of LTL or how LTL

3   was destined for bankruptcy upon its creation, Plaintiff is entitled to tell the jury some background

4   information about LTL, even if such facts are "circumstances" that led to LTL's bankruptcy.

5            **2.   LTL's ability to pay a punitive damages award is at issue in this non-bifurcated trial.**

6

7            This is a non-bifurcated trial, meaning punitive damages are at issue. "In light of our

8   holding that evidence of a defendant's financial condition is essential to support an award of

9   punitive damages, Evidence Code section 500 mandates that the plaintiff bear the burden of proof

10  on the issue." [*Adams v. Murakami* (1991) 54 Cal.3d 105, 119.] "Because the award, whatever its

11  amount, cannot be sustained absent evidence of the defendant's financial condition, such evidence

12  is 'essential to the claim for relief.'" [*Id.*] Here, Plaintiff may offer evidence from the LTL

13  bankruptcy proceedings and the Third Circuit opinion about LTL's financial condition and ability

14  to pay a punitive damages award. For example, the Third Circuit opinion detailed LTL's financial

15  condition: "The Funding Agreement merits special mention. To recap, under it LTL had the right,

16  outside of bankruptcy, to cause J&J and New Consumer, jointly and severally, to pay it cash up to

17  the value of New Consumer as of the petition date (**estimated at $61.5 billion**) to satisfy any talc-

18  related costs and normal course expenses. Plus this value would increase as the value of New

19  Consumer's business and assets increased…The Agreement provided LTL a right to cash that **was**

20  **very valuable, likely to grow, and minimally conditional**. And this right was reliable, as J&J

21  and New Consumer were highly creditworthy counterparties (an understatement) with the capacity

22  to satisfy it." [Exh. 1 at 48 (emphasis added).] In other words, LTL's value was, at a minimum,

23  $61.5 billion, which was the "enterprise value of New Consumer as of LTL's filing." [*Id.*] Thus,

24  "[w]hen the ink dried, LTL—having received [JJCI's] talc liability, rights under the Funding

25  Agreement, a royalties business, and cash—was prepared to fulfill its reason for being: a

26  bankruptcy filing." [*Id.* at 28.]

27

28

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

The "circumstances" surrounding LTL's financial condition and ability to pay punitive damages, although tied to the bankruptcy, is an essential fact Plaintiff needs to satisfy the requirements under *Adams.* Accordingly, J&J's motion should be denied.

> **3. Evidence of LTL's agreement to indemnify the Retailers is relevant to show the motivations and biases of all Defendants and their witnesses.**

As a result of the LTL bankruptcy and the order lifting the automatic stay and preliminary injunction to allow Plaintiff's case to proceed to trial, LTL has accepted certain Retailers' tender of defense. [Exh. 2 at 35:8-25, 37:16-38:16; *see, e.g.,* Indemnification Agreement between LTL and Lucky/Save Mart, Exh. 5; Indemnification Agreement between LTL and Target, Exh. 6.] As a result, LTL "will indemnify" those Retailers in this case "against claims related to [JJCI] talc products," namely Johnson's Baby Powder. [*Id.*] As more fully detailed in Plaintiff's Opposition to Retailers' Motion in Limine No. 1, evidence regarding contractual indemnity between LTL and any Retailer is relevant to show the motivations and biases of the nominally adverse defendants and their witnesses. [*See* Plaintiff's Opposition to Retailers' MIL No. 1 at 9-11.] Absent information about LTL's indemnity agreements with the Retailers, "the jury might simply accept the Retailer Defendants' evidence and argument that they reasonably did not need to inspect or test for asbestos in the Johnson's Baby Powder talc that they sold because that was the sole responsibility of the J&J Defendants. In truth, the Retailer Defendants did owe a legal duty to inspect and test, but their indemnity rights caused them to unreasonably save resources by failing to ever inspect or test, while knowing that the J&J Defendants would pay and defend against any lawsuits by consumers who might develop cancer. With proper instructions and evidence, the jury may find that the Retailer Defendants unreasonably elected not to satisfy their duty to inspect and test Johnson's Baby Powder talc because the Retailer Defendants preferred to risk consumers' safety and then rely upon the Retailer Defendants' indemnity rights. By contrast, without such instructions, and "[w]ithout that evidence [of indemnity rights], the jury [would be] prevented from fully assessing the credibility of the witnesses called by the [Retailer Defendants], and from evaluating the tactical motivations underlying the presentations and arguments that the [Retailer

Defendants] advanced at trial." [*Id.* at 11 (citing *Diamond v. Reshko* (2015) 239 Cal.App.4th 828, 850).]

### C.  J&J fails to show undue prejudice under Evidence Code Section 352.

J&J has not met its burden to show that *any particular* evidence, much less evidence regarding the "circumstances" from the LTL bankruptcy, is unfairly prejudicial under Evidence section 352, which provides that this Court "in its discretion may exclude evidence if its probative value is *substantially* outweighed by the *probability* that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." [Evid. Code § 352 (emphasis added).]

In applying section 352, the word "prejudice" is not synonymous with "damaging." Evidence is not unfairly prejudicial, as that term is used in section 352, merely because the evidence undermines J&J's position or shores up that of Plaintiff. Instead, the "prejudice " section 352 is designed to avoid is not prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." [*People v. Branch* (2001) 91 Cal.App.4th 274, 286 (internal quotes omitted).] To put it another way, "evidence should be excluded as unduly prejudicial when it is of such nature as to *inflame the emotions* of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. [*Id.* (emphasis added).]

Again, this Court cannot meaningfully analyze section 352 because J&J's motion identifies no particular evidence from the LTL bankruptcy. However, as shown above, evidence regarding the circumstances of the LTL bankruptcy—such as LTL's formation, creation, financial condition, and indemnity agreements with the Retailers—is relevant to each cause of action and claim for damages. And there is no risk of a "trial within a trial" because Plaintiff will not mention the bankruptcy or any J&J entity's motivation to undergo that process unless Defendants "open the door" to those issues.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**III.    Conclusion.**

An order denying J&J's motion is warranted because it fails to (i) move to exclude any specific evidence related to the LTL bankruptcy, (ii) show that any such evidence is per se inadmissible, and (iii) show how any such evidence is unfairly prejudicial under Evidence Code section 352.

DATED: April 3, 2023

KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation

By: _____
        Ian A. Rivamonte

Attorneys for Plaintiff

# Exhibit 35

1        COURT SUPERIOR OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF ALAMEDA

3

4

5   CHRISTINA G. PRUDENCIO,          )
                                     )
6          Plaintiff,                )
                                     )
7     vs.                            ) Case No.
                                     ) RG20061303
8                                    )
    JOHNSON & JOHNSON; JOHNSON &     )
9   JOHNSON CONSUMER INC. (Sued      )        **Certified Transcript**
    individually and as             )
10  successor-in-interest to         )
    JOHNSON & JOHNSON CONSUMER       )
11  COMPANIES, INC.), et al.,        )
                                     )
12         Defendants.               ) (Pages 1 - 145)
    _____)
13

14

15

16         DEPOSITION OF EXPERT WITNESS

17            BARRY R. HORN, M.D.

18         THURSDAY, APRIL 15, 2021

19

20

21

22

23

24  Reported by:
    PAIGE I. HUTCHINSON, CA CSR No. 13459,
25  TX CSR No. 11222, WA CCR No. 3336

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         FOR THE COUNTY OF ALAMEDA

3

4

5   CHRISTINA G. PRUDENCIO,        )
                                   )
6         Plaintiff,           )
                                   )
7    vs.                    ) Case No.
                            ) RG20061303
8                           )
    JOHNSON & JOHNSON; JOHNSON &    )
9   JOHNSON CONSUMER INC. (Sued    )
    individually and as            )
10   successor-in-interest to         )
    JOHNSON & JOHNSON CONSUMER      )
11   COMPANIES, INC.), et al.,      )
                            )
12        Defendants.          )
    _____)
13

14

15

16

17

18      DEPOSITION OF BARRY R. HORN, M.D., taken on

19   behalf of Defendants, remotely via videoconference,

20   commencing at 2:08 p.m. (PST), Thursday,

21   April 15, 2021, before Paige I. Hutchinson,

22   Certified Shorthand Reporter for the State of

23   California No. 13459, Texas CSR No. 11222,

24   Washington CCR No. 3336.

25

1    APPEARANCES (Via Videoconference):

2

3    For Plaintiff:

4       KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
        BY:  IAN RIVAMONTE, ESQ.
5        Jack London Market
        55 Harrison Street
6        Suite 400
        Oakland, California  94607
7        (510) 302-1000
        irivamonte@kazanlaw.com

8

9

10   For Defendants LONGS DRUG STORES CALIFORNIA,
     L.L.C., on behalf of LONGS DRUG STORES CALIFORNIA,
11   INC. (Erroneously sued as LONGS DRUGS STORES
     CALIFORNIA, L.L.C., individually and as
12   successor-in-interest, parent, alter ego, and
     equitable trustee of LONGS DRUG STORES CALIFORNIA,
13   INC.); SAFEWAY INC.; LUCKY STORES, INC.; and
     ALBERTSONS COMPANIES, INC.:

14
        BARNES & THORNBURG LLP
15       BY:  ERIN PAULEY, ESQ.
        One North Wacker Drive
16       Suite 4400
        Chicago, Illinois  60606
17       (312) 214-4598
        erin.pauley@btlaw.com

18

19
     For Defendants JOHNSON & JOHNSON and JOHNSON &
20   JOHNSON CONSUMER INC.:

21       KING & SPALDING LLP
        BY:  MATTHEW K. ASHBY, ESQ.
22       633 West Fifth Street
        Suite 1600
23       Los Angeles, California  90071
        (213) 443-4384
24       mashby@kslaw.com

25



1   APPEARANCES (Via Videoconference) (continued):

2

3   For Defendant PERRIGO COMPANY OF TENNESSEE:

4     POLSINELLI LLP
      BY:  DAVID ARTHUR, ESQ.
5     2049 Century Park East
      Suite 2900
6     Los Angeles, California  90067
      (310) 203-5331
7     darthur@polsinelli.com

8

9
    For Defendant VI-JON, INC.:
10
      REED SMITH LLP
11     BY:  STEVEN J. BORANIAN, ESQ.
      101 Second Street
12     Suite 1800
      San Francisco, California  94105-3659
13     (415) 543-8700
      sboranian@reedsmith.com
14

15
    Also Present:
16
      Syed Hassan, Videographer,
17     Videoconference Moderator,
      iDepo Reporters
18

19

20

21

22

23

24

25



1              I N D E X

2    DEPONENT:              EXAMINATION          PAGE:

3    BARRY R. HORN, M.D.

4              BY MR. ASHBY        8/138

5              BY MS. PAULEY        116

6              BY MR. BORANIAN        126

7              BY MR. ARTHUR        130

8              BY MR. RIVAMONTE        137

9

10

11          E X H I B I T S

12    MARKED                    PAGE

13    Exhibit 1   April 12, 2021, letter Kazan        9
              firm with enclosed documents
14          (37 pages)

15    Exhibit 2   December 3rd, 2020, Declaration     9
              of Barry R. Horn, M.D. in
16            Support of Plaintiff's motion
              for Trial Preference (174 pages)
17
      Exhibit 3   November 19th, 2021, Supplemental  9
18            Declaration of Barry R. Horn, M.D.
              in Support of Plaintiff's Motion
19            for Trial preference and attached
              November 19, 2020, report of
20            Dr. Horn (49 pages)

21    Exhibit 4   Handwritten notes (2 pages)       14

22    Exhibit 5   Summary of the billing records    17

23    Exhibit 6   Materials provided from Kazan      21
              firmrelated to J3 Resources
24          (86 pages)

25



1  to give in the matter now pending will be the

2  truth, the whole truth, and nothing but the truth?

3         THE DEPONENT:  I do.

4         DEPOSITION OFFICER:  Thank you.

5

6              BARRY R. HORN, M.D.,

7        called as a deponent and sworn in by

8        the deposition officer, was examined

9          and testified as follows:

10               -o0o-

11

12             EXAMINATION                                    14:10:01

13  BY MR. ASHBY:                                             14:10:01

14    Q.  Hi, Dr. Horn.  How are you?                         14:10:03

15    A.  Pretty good.                                        14:10:05

16    Q.  Would --                                            14:10:05

17    A.  Slightly bored, but otherwise pretty good.          14:10:14

18       (Reporter clarification.)                            14:10:14

19  BY MR. ASHBY:                                             14:10:19

20    Q.  What's your understanding of the case that          14:10:19

21  you're here to testify in today?  Do you know the         14:10:21

22  name of the plaintiff?                                    14:10:24

23    A.  Prudencio.  Christina Prudencio.                    14:10:25

24    Q.  All right.  I know, Dr. Horn, you're a pro          14:10:28

25  at being deposed.  Is it okay with you if I               14:10:32



BARRY R. HORN, M.D., on 04/15/2021
CHRISTINA G. PRUDENCIO vs. JOHNSON & JOHNSON, et al.

Page 137

| | | |
|---|---|---|
| 1 | MR. ARTHUR:  All right.  With that, | 17:15:21 |
| 2 | Dr. Horn, I'll pass the witness.  Thank you for | 17:15:23 |
| 3 | your time.  I hope that's -- that cough you just | 17:15:25 |
| 4 | had isn't you getting sick but just -- | 17:15:29 |
| 5 | THE DEPONENT:  I need a lung specialist. | 17:15:31 |
| 6 | I don't know of any -- no. | 17:15:33 |
| 7 | MR. RIVAMONTE:  I just have a couple | 17:15:37 |
| 8 | questions for Dr. Horn. | 17:15:39 |
| 9 | | 17:15:40 |
| 10 | EXAMINATION | 17:15:40 |
| 11 | BY MR. RIVAMONTE: | 17:15:40 |
| 12 | Q.  You ready, Dr. Horn? | 17:15:44 |
| 13 | A.  Yeah. | 17:15:47 |
| 14 | Q.  Now, Dr. Horn, is there a requirement, | 17:15:48 |
| 15 | based upon what you know about mesothelioma, that | 17:15:51 |
| 16 | someone must have pleural plaques in order for you | 17:15:53 |
| 17 | to say that their mesothelioma is related to | 17:15:57 |
| 18 | asbestos exposure? | 17:16:01 |
| 19 | A.  No.  They're two separate diseases.  Some | 17:16:01 |
| 20 | people who have asbestos exposure develop pleural | 17:16:04 |
| 21 | plaques; most do not.  It's a separate disease. | 17:16:08 |
| 22 | You don't -- in order to link asbestos exposure and | 17:16:11 |
| 23 | mesothelioma, you don't need to have pleural | 17:16:16 |
| 24 | plaques; you need asbestos exposure. | 17:16:17 |
| 25 | Q.  So similar question.  Now, is there a | 17:16:18 |

| | | |
|---|---|---|
| 1 | requirement, based upon what you know about | 17:16:20 |
| 2 | mesothelioma, to -- that the person must have | 17:16:22 |
| 3 | asbestosis or a scarring in order to attribute that | 17:16:25 |
| 4 | mesothelioma as asbestos-caused? | 17:16:29 |
| 5 |   A.  Same answer.  It's a separate disease.  We | 17:16:32 |
| 6 | have biological variability.  Individuals who are | 17:16:35 |
| 7 | exposed to asbestos, some may develop a malignant | 17:16:41 |
| 8 | disease; some may develop a nonmalignant disease. | 17:16:44 |
| 9 | Some may develop both.  You don't need asbestosis | 17:16:49 |
| 10 | to link asbestos exposure and mesothelioma. | 17:16:50 |
| 11 |   Q.  Now, you were asked earlier about | 17:16:53 |
| 12 | objective markers, and asbestosis and pleural | 17:16:55 |
| 13 | plaques are those markers.  But do you -- do you | 17:17:01 |
| 14 | need objective markers in order to say that | 17:17:03 |
| 15 | someone's mesothelioma is asbestos-caused? | 17:17:05 |
| 16 |   A.  No. | 17:17:10 |
| 17 |   Q.  Thank you, Doctor. | 17:17:10 |
| 18 |       MR. ASHBY:  This is Matt. | 17:17:16 |
| 19 | | 17:17:16 |
| 20 |       FURTHER EXAMINATION | 17:17:16 |
| 21 | BY MR. ASHBY: | 17:17:16 |
| 22 |   Q.  Just to follow up -- actually -- strike | 17:17:18 |
| 23 | that.  I'll put the video back on. | 17:17:23 |
| 24 |       Okay.  So, Dr. Horn, are you familiar with | 17:17:26 |
| 25 | skin lesions that are caused by asbestos fibers in | 17:17:35 |



1    STATE OF CALIFORNIA          )
                                  )
2    COUNTY OF LOS ANGELES        )

3

4         I, Paige I. Hutchinson, Certified

5    Shorthand Reporter, No. 13459, do hereby certify:

6         That prior to being examined, the witness

7    named in the foregoing deposition was by me duly

8    sworn to testify to the truth, the whole truth, and

9    nothing but the truth;

10        That said deposition was taken before me

11   remotely via videoconference; and thereafter

12   reduced to print by means of computer-aided

13   transcription; and the same is a true, correct, and

14   complete transcript of said proceedings taken at

15   that time, to the best of my ability.

16        I further certify that I am not interested

17   in the outcome of the action.

18        Witness my hand this, Thursday, April 22,

19   2021.

20

21

22

23   _____

24       Paige I. Hutchinson, CA CSR No. 13459,
         TX CSR No. 11222, WA No. 3336

25



# Exhibit 36

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF ALAMEDA

3

4   ANTHONY HERNANDEZ VALADEZ,        )
                                      )
5          Plaintiff,             )
                                      )
6   v.                        ) No. 22CV012759
                                      )
7   JOHNSON & JOHNSON; ALBERTSONS    )
    COMPANIES, INC., individually,   )
8   and as successor-in-interest,    )
    parent, alter ego and equitable  )
9   trustee LUCKY STORES, INC.; LUCKY )
    STORES, INC.; SAFEWAY INC.; SAVE  )
10  MART SUPERMARKETS, individually,  )
    and as successor-in-interest,    )
11  parent, alter ego and equitable   )
    trustee of LUCKY STORES, INC.;    )
12  TARGET CORPORATION; WALMART INC.; )
    and FIRST DOE through          )
13  ONE-HUNDREDTH DOE,            )
                                      )
14         Defendants.           )
    _____) (Pages 1 - 120)
15

16

17

18          DEPOSITION VIA ZOOM OF

19           BARRY R. HORN, M.D.

20          Monday, March 27, 2023

21

22

23

24  Reported by:  Monica Schoonover
              CSR No. 10220
25

**Certified Transcript**

iDepo
Reporters

**EXHIBIT 36**

BARRY HORN, M.D., on 03/27/2023
ANTHONY HERNANDEZ VALADEZ vs JOHNSON & JOHNSON, et al.

Page 2

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF ALAMEDA

3

4   ANTHONY HERNANDEZ VALADEZ,        )
                                      )
5          Plaintiff,                 )
                                      )
6   v.                                )  No. 22CV012759
                                      )
7   JOHNSON & JOHNSON; ALBERTSONS    )
    COMPANIES, INC., individually,   )
8   and as successor-in-interest,    )
    parent, alter ego and equitable  )
9   trustee LUCKY STORES, INC.; LUCKY )
    STORES, INC.; SAFEWAY INC.; SAVE )
10  MART SUPERMARKETS, individually,  )
    and as successor-in-interest,    )
11  parent, alter ego and equitable  )
    trustee of LUCKY STORES, INC.;   )
12  TARGET CORPORATION; WALMART INC.; )
    and FIRST DOE through             )
13  ONE-HUNDREDTH DOE,                )
                                      )
14         Defendants.                )
    _____  )
15

16

17

18

19          REMOTE DEPOSITION OF BARRY R. HORN, M.D.,
    taken on behalf of the Defendants, beginning at
20     2:11 p.m. and ending at 4:58 p.m., on Monday,
    March 27, 2023, via Zoom videoconference before
21     Monica Schoonover, Certified Shorthand Reporter
    No. 10220.

22

23

24

25

1  APPEARANCES (via videoconference):

2

3  For Plaintiff:

4     KAZAN, McCLAIN, SATTERLEY & GREENWOOD
      BY:  MARK SWANSON, ESQ.
5      mswanson@kazanlaw.com
      55 Harrison Street, Suite 400
6      Oakland, California  94607
      888.887.1238

7

8  For Defendants JOHNSON & JOHNSON and LTL MANAGEMENT, LLC:

9     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      BY:  ALLISON M. BROWN, ESQ.
10     allison.brown@skadden.com
      One Manhattan West
11     New York, New York 10001-8602
      212.735.3222

12

13
    For Defendants ALBERTSONS COMPANIES, INC., individually,
14  and as successor-in-interest, parent, alter ego and
    equitable trustee LUCKY STORES, INC.; LUCKY STORES, INC.;
15  SAFEWAY INC.; SAVE MART SUPERMARKETS, individually, and
    as successor-in-interest, parent, alter ego and equitable
16  trustee of LUCKY STORES, INC.; TARGET CORPORATION;
    WALMART INC.:
17
      BARNES & THORNBURG LLP
18     BY:  MIHRAN YEZBEKYAN, ESQ.
      mihran.yezbekyan@btlaw.com
19     2029 Century Park East, Suite 300
      Los Angeles, California  90067
20     424.343.5541

21

22  Also Present:

23     ALEX LIEBOVITZ, Legal Assistant

24     MICHAEL SAITO, iDepo Moderator

25



BARRY HORN, M.D., on 03/27/2023
ANTHONY HERNANDEZ VALADEZ vs JOHNSON & JOHNSON, et al.

Page 4

1                    INDEX

2

3  WITNESS                            PAGE

4  Barry R. Horn, M.D.

5     Examination by Ms. Brown          5, 112

6     Examination by Mr. Yezbekyan        106

7

8

9

10

11                    EXHIBITS

12

13  DEFENDANT'S EXHIBITS                PAGE

14  Exhibit 1     Curriculum Vitae and Report     18
                  of Barry R. Horn, M.D.
15
    Exhibit 2     Stanford Health Care Records    76
16
    Exhibit 3     Emails                 106
17

18  Exhibit 4     Invoices               106
                  (not reported to court reporter)
19

20

21

22

23

24

25

1          MONDAY, MARCH 27, 2023, 2:11 P.M.

2

3              BARRY R. HORN, M.D.,

4   having been first duly sworn remotely by the reporter,

5          was examined and testified as follows:

6

7              EXAMINATION BY MS. BROWN

8   BY MS. BROWN:

9    Q   Good afternoon, Dr. Horn.  How are you?

10   A   Good.

11   Q   My name is Alli Brown, and I have some questions

12  for you on behalf of J&J and LTL.

13       Could we start by talking about when were you

14  first retained in this case?

15   A   Oh, I don't know.  Many months ago.  I don't

16  actually have anything written.  I was sent a CD, but

17  almost everything else came in Hightail files, and I have

18  been receiving Hightail files, you know, for a month and

19  a half.

20   Q   Okay.

21   A   Or thereabouts.

22   Q   Okay.  So let me try to unpack that a little

23  bit.

24       Did there come a point when someone representing

25  the plaintiff asked you to serve as an expert in this

1    Q   Right.

2    A   Yeah.  I would say because there are other

3  family members at issue, that would be -- well, it would

4  not have an impact on him.  That is not an unreasonable

5  question to ask.

6    Q   Right.  And did you see the note from the

7  genetics counselor at Stanford who was asking Mr. Valadez

8  to come to the genetic appointment with documentation of

9  his mom's BRCA positive testing?

10   A   You know, in 17,000 pages of records --

11   Q   I get it.

12   A   -- I don't remember that, but that would have

13  been a reasonable thing for the geneticist to do.

14   Q   Okay.  How many people are you aware of,

15  Dr. Horn, in Mr. Valadez's family who are positive for

16  the BRCA mutation?

17   A   His mother, two aunts, and a grandmother.

18   Q   And did you know that he had two separate

19  appointments with the genetic counselors at Stanford that

20  he canceled?

21   A   No.  I don't know.

22   Q   Do you have any information as to why just a few

23  weeks before his deposition in this lawsuit he would have

24  canceled those genetic counseling appointments?

25   A   I have no idea other than this has been -- I

1    guess it's an understatement to say that this has been a

2    very difficult illness for him.  He's been profoundly

3    depressed, alternating between profound depression,

4    extreme agitation, and catatonia.  This has been a

5    challenge for him.

6       Q    Of course.

7           Do you agree with the recommendation of the

8    Stanford physicians that given his siblings and given his

9    family history, he should undergo germline testing?

10      A    Yeah.  Principally because of his siblings.

11      Q    Okay.  Oh, sorry.  I was just going to go back

12   to that document.  Thanks, Alex.

13          We were making our way through this cover

14   letter.

15          Dr. Horn, the next thing on here is that it

16   states that you reviewed the deposition testimony of Anna

17   Camacho, Dr. Leah Backhus, and Dr. William Longo.  Is

18   that accurate, Doctor?

19      A    So I read the deposition testimony of Miss

20   Camacho.  I read -- Dr. Backhus was deposed twice.  I was

21   sent -- well, I read both.  And I read the deposition

22   of -- if it was one day, I read the deposition of

23   Dr. Longo.

24      Q    Okay.  And then this letter says that, Dr. Horn,

25   you had reviewed Dr. Jerrold Abraham's report, and I

BARRY HORN, M.D., on 03/27/2023
ANTHONY HERNANDEZ VALADEZ vs JOHNSON & JOHNSON, et al.

Page 116

1   employee or attorney or counsel of any of the parties,

2   nor am I a relative or employee of such attorney or

3   counsel, nor am I financially interested in the outcome

4   of this action.

5        IN WITNESS WHEREOF, I have subscribed my name

6   this 29th day of March, 2023.

7

8   _____
        MONICA SCHOONOVER, CSR No. 10220

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 37

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .    Case No. 23-12825(MBK)
                                .
                                .    Clarkson S. Fisher U.S.
LTL MANAGEMENT LLC,             .      Courthouse
                                .    402 East State Street
                                .    Trenton, NJ 08608
        Debtor.                 .
                                .    April 11, 2023
. . . . . . . . . . . . . . .   .    9:59 a.m.

TRANSCRIPT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN
   ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND
AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED
PRELIMINARY INJUNCTION, AND (II) WAITING THE FOURTEEN DAY STAY
  UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(A)(3) [71];
DEBTOR'S MOTION FOR AN ORDER EXTENDING THE TIME WITHIN WHICH IT
MUST FILE ITS (I) SCHEDULES OF ASSETS AND LIABILITIES AND (II)
  STATEMENT OF FINANCIAL AFFAIRS [14]; DEBTOR'S MOTION FOR AN
ORDER: (I) APPROVING THE CONTINUED USE OF ITS BANK ACCOUNT AND
BUSINESS FORMS AND (II) AUTHORIZING THE DEBTOR'S BANK TO CHARGE
   CERTAIN FEES AND OTHER AMOUNTS [13]; DEBTOR'S APPLICATION
PURSUANT TO 28 U.S.C. § 156(C) AND 11 U.S.C. § 105(A) FOR ENTRY
   OF AN ORDER AUTHORIZING THE APPOINTMENT OF EPIQ CORPORATE
  RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT NUNC PRO TUNC
TO THE PETITION DATE [11]; DEBTOR'S APPLICATION FOR DESIGNATION
 AS COMPLEX CHAPTER 11 CASE [6]; DEBTOR'S MOTION FOR AN ORDER
SUSPENDING ENTRY AND SERVICE OF STANDARD NOTICE OF COMMENCEMENT
[5]; DEBTOR'S MOTION FOR AN ORDER: (I) AUTHORIZING IT TO FILE A
LIST OF THE TOP LAW FIRMS WITH TALC CLAIMS AGAINST THE DEBTOR
IN LIEU OF THE LIST OF THE 20 LARGEST UNSECURED CREDITORS; (II)
  APPROVING CERTAIN NOTICE PROCEDURES FOR TALC CLAIMANTS; AND
 (III) APPROVING THE FORM AND MANNER OF NOTICE OF COMMENCEMENT
OF THIS CASE [10]; DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 1505
FOR AN ORDER AUTHORIZING IT TO ACT AS FOREIGN REPRESENTATIVE ON
              BEHALF OF THE DEBTOR'S ESTATE [12]
          BEFORE THE HONORABLE MICHAEL B. KAPLAN
          UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                 Wendy Quiles

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

**EXHIBIT 37**

APPEARANCES:

For the Debtor:               Jones Day
                              By:  GREGORY M. GORDON, ESQ.
                                   DAN B. PRIETO, ESQ.
                                   AMANDA S. RUSH, ESQ.
                              2727 North Harwood Street, Suite 500
                              Dallas, TX  75201

                              Skadden Arps Slate Meagher &
                                Flom, LLP
                              By:  ALLISON M. BROWN, ESQ.
                              One Manhattan West
                              New York, NY  10001

Various Talc Personal         Watts Guerra LLP
Injury Claimants:             By:  MIKAL C. WATTS, ESQ.
                              5726 W. Hausman Road, Suite 119
                              San Antonio, TX  78249

For Ad Hoc Committee          Genova Burns LLC
of Certain Talc               By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc          494 Broad Street
Committee of Creditors:       Newark, NJ  07102

                              Brown Rudnick
                              By:  JEFFREY L. JONAS, ESQ.
                                   DAVID J. MOLTON, ESQ.
                              7 Times Square
                              New York, NY  10036

                              Otterbourg PC
                              By:  MELANIA CYGANOWSKI, ESQ.
                              230 Park Avenue
                              New York, NY  10169-0075

For Anthony Hernandez         Kazan McClain Satterley & Greenwood
Valadez:                      By:  JOSEPH SATTERLEY, ESQ.
                              55 Harrison St. Suite 400
                              Oakland, CA  94607

For the Office of the         Office of the United States Trustee
United States Trustee:        By:  LINDA RICHENDERFER, ESQ.
                                   JEFF SPONDER, ESQ.
                              J. Caleb Boggs Federal Building
                              844 King Street, Suite 2207
                              Lockbox 35
                              Wilmington, DE 19801

APPEARANCES CONT'D:

<pre>
For Various Talc        Maune Raichle Hartley Frency &
Claimants:                 Mudd, LLC
                        By:  CLAYTON L. THOMPSON, ESQ.
                        150 West 30th Street, Suite 201
                        New York, NY 10001

                        Levy Konigsberg, LLP
                        By:  JEROME H. BLOCK, ESQ.
                             MOSHE MAIMON, ESQ.
                        101 Grovers Mill Road, Suite 105
                        Lawrence Township, NJ  08648

                        Simon Greenstone Panatier, PC
                        By:  LEAH CYLIA KAGAN, ESQ.
                        1201 Elm Street, Suite 3400
                        Dallas, TX  75720

For Claimant Alishia    Beasley Allen
Landrum:                By:  ANDY BIRCHFIELD, ESQ.
                        218 Commerce Street
                        Montgomery, AL  36104

For Arnold & Itkin:     Pachulski Stang Ziehl & Jones LLP
                        By:  LAURA DAVIS JONES, ESQ.
                        919 North Market Street
                        17th Floor
                        Wilmington, DE 19801

For Paul Crouch,        Ruckdeschel Law Firm, LLC
individually and on     By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of     8357 Main Street
Cynthia Lorraine Crouch: Ellicott City, MD 21043

For the Ad Hoc Committee Womble Bond Dickinson
of Attorney Generals:   BY:  ERICKA JOHNSON, ESQ.
                        1313 North Market Street
                        Suite 1200
                        Wilmington, DE, US 19801
</pre>

- - - - -

4

(Proceedings commenced at 9:59 a.m.)

2          THE COURT:  We have new technology here.  Everything

3 is supposed to work better, more enhanced.  Not just for you

4 all.

5          Well, okay.  Good morning, again.  This is the LTL

6 Management LLC matter and -- log in.

7          All right.  We have a full plate on for today.  A

8 number of matters.  If I may, I'd like to take the liberty of

9 making a few preliminary comments.

10         My goal today is really to listen.  Listen to

11 presentations, listen to arguments from all parties.  Because

12 that's the intent, I am going to be somewhat generous in

13 allowing the use of the PowerPoints, the presentations, the

14 hyperbole, all of it.  I want to hear from you all about this

15 case and the respective positions.

16         I've read a lot.  We hear a lot.  But this is where

17 it's important.  In that regard, I'm cognizant that there's

18 been a significant amount of vitriol, ad hominem attacks,

19 lawyer versus lawyer, lawyers versus the Court, directed at

20 Johnson and Johnson, directed at groups.  That's unfortunate.

21         I think we all need to a degree to have a bit of a

22 thin skin.  I like to think the Court has a thick -- a thin

23 skin -- a thicker skin.  Wrong analogy.  A thicker skin.  Some

24 may be familiar.  I was a mayor of a small town in North Jersey

25 and there came a point in time when I would say more than half

WWW.JJCOURT.COM

1          MR. SATTERLY:  May I proceed again, Your Honor?

2          THE COURT:  Yes, please

3          MR. SATTERLY:  Okay.  I'm not going to directly

4   address many of the things in the papers.  We've submitted

5   extensive written materials addressing things that were brought

6   up earlier today with regards to the $61 billion termination of

7   the funding agreement, I'm not going to address that, we

8   incorporate by reference in our papers that, and I'm not going

9   to address the alleged settlement that apparently Counsel

10  believes may exist somewhere.  I haven't seen any proof of

11  that, I'm not going to address it, but we incorporate by

12  reference what we put in our papers.

13         The automatic stay filed last -- with the filing and

14  the temporary restraining order that Your Honor entered last

15  Wednesday irreparably harms the movant, Anthony Hernandez

16  Valadez, and we would request Your Honor to enter an order

17  lifting the stay and setting aside the temporary restraining

18  order with regards to this individual case.

19         Your Honor said first thing this morning you're going

20  to put your head down and do what is right, and that is the

21  only right thing to do under the facts and the law of this

22  land.

23         This is a couple of the photographs I've showed Your

24  Honor.  Just since this is a new bankruptcy, I feel like I have

25  to incorporate by reference that this is, I think, my fourth

1 time before Your Honor on this individual case. Starting last
2 June, I filed the motion; June, Your Honor lifted the stay to
3 allow me to file the lawsuit. In July, you lifted the stay to
4 allow me to move for a trial date and collect and preserve
5 evidence, and I appreciate that. We got the trial date and I'm
6 going to go through the timeline in a few minutes.

7 So some of these photographs are in here that Your
8 Honor has seen before, but because this is a new case I have to
9 cite to it. The photograph on the left, though, is Mr. Valadez
10 on Sunday, Easter Sunday, and his condition has progressed to
11 the point where he is in very bad medical shape. And he's
12 living and he still gets treatment and he still goes to the
13 emergency room, he still goes to the doctors, and he's trying
14 to live and his doctors are trying to keep him living.

15 The photograph on the right is when he gave his
16 deposition on September the 13th of 2022, and J&J was present
17 and cross-examined him.

18 I will -- does the volume go through this TV? I
19 didn't hear it come on. I could --

20 THE COURTROOM DEPUTY: I believe -- let's give it a
21 shot. I'm working, but --

22 MR. SATTERLY: No, let me just turn my little speaker
23 on.

24 THE COURTROOM DEPUTY: We might get some feedback,
25 but let's give it a shot.

1    MR. SATTERLY:  If we get feedback, I'll turn it off.
2 Okay?
3            Sorry, we talked about this earlier, Your Honor.
4            THE COURT:  Let's give it a shot.
5            MR. SATTERLY:  Okay.  We'll come to the other video
6 in a few minutes.
7            This -- Your Honor has seen this before -- this is
8 Mr. Valadez as a baby in 1998 with Johnson baby powder products
9 in his home, on his dresser.  It's undisputed in this case that
10 he was extensively exposed to asbestos from Johnson's baby
11 powder and used Johnson baby powder for decades.
12            This is both a pericardial, primary pericardial, but
13 also a pleural mesothelioma.  You'll see in the medical
14 records, which I've submitted, that he's got cancer in the
15 lining of his heart and the lining of his lungs.
16            This is a -- oh, I skipped past that -- this was his
17 declaration we submitted to Your Honor in the first bankruptcy
18 that served as the basis for Your Honor to lift the stay on
19 three separate occasions and this is where he said during his
20 four days of deposition he experienced body pain, headaches,
21 stress, anxiety; he's used supplemental oxygen, he's been
22 through five cycles of chemotherapy.  He is -- the cancer has
23 triggered his emotions to the point that he can barely
24 function.  He has nausea, vomiting, poor appetite, chest pain,
25 tightness, breathing difficulties, discomfort, fatigue, and

1 body pain.  All undisputed.

2          We submitted the medical records showing that he has
3 mesothelioma, that he has bilateral, that means on both sides
4 of the lining of his lungs of this pleural fusion that cause
5 this compressed atelectasis, and that means is lungs collapsed
6 because of that, that so much fluid that is causing his lung to
7 collapse.

8          This right here is Dr. -- oh, let's go back.  There
9 we go.  First of all, this is the World Health Organization --
10 well, there's a little delay there.  I've got to go slower.

11          There we go.  The World Health Organization
12 classification of tumors of the lung, pleura thymus, and heart.
13 And they conclude that pericardial mesothelioma is caused by
14 exposure to asbestos, just like pleural mesothelioma.

15          This is Dr. Backhus.  Dr. Backhus -- and I got this
16 image at the top off of J&J's website -- Dr. Leah Backhus is
17 one of the leading surgeons in the country, she's at Stanford
18 University, and so much to the point that Johnson & Johnson has
19 her on their website as one of the leading surgeons in America.
20 And last May, when I submitted the very first motion to lift
21 stay, I submitted a declaration from Dr. Backhus confirming
22 that her patient, her patient has this disease and that, in her
23 view, based upon her review of the scientific literature, it's
24 caused by exposure to asbestos from Johnson's baby powder.

25          She has recently testified and we submitted her

1  testimony as Exhibit 1 to the current motion to lift stay that

2  his condition has progressed, he has progression of the

3  disease, specifically local progression with increasing tumor

4  bulk, both in bulk and the locations throughout his chest.

5          You'll see in a few minutes when I get to the

6  timeline that some of these medical experts were deposed

7  already.  Dr. David Egilman, he was deposed already in this

8  case and he's been deposed and cross-examined in numerous other

9  cases.  He's an occupational and environmental medicine

10 specialist.  And he took the medical information and was able

11 to create a PowerPoint, which we marked as Exhibit, I think, 4

12 to the current motion, that shows the exact ingredients -- not

13 just the talc and mica, but lumen silicates, iron, the other

14 ingredients documented in Johnson's baby powder in the tumor --

15 right next to the tumor tissue in Mr. Valadez's case.

16         Dr. Felsher is a Stanford oncologist.  Dr. Ronald

17 Dodson, you'll see in a few minutes, he's published over 180

18 publications regarding issues important for this case,

19 including many, many peer-reviewed publications on asbestos

20 disease causation.

21         Dr. Gerald Abraham first started writing about talc

22 and disease in the 1980s and he actually was consulted back in

23 the 1990s and deposed by Johnson & Johnson in a mesothelioma

24 case called Darlene Coker.

25         All four of those retained experts conclude that, in

1  this case, asbestos and asbestos-formed fibers from J&J's talc

2  products is the cause of this man's mesothelioma.

3  And then we have the treating doctors. We have Dr.

4  Roy on the left, she's the treating oncologist. And her

5  deposition was scheduled weeks ago and J&J canceled it, they

6  had a conflict, and it was moved to be deposed -- her

7  deposition was to occur last week. Obviously, the TRO stopped

8  that deposition.

9  Dr. Backhus, she was deposed three times in this case

10 over three days and she was in -- she's a treating surgeon --

11 think about this for a minute -- she's a treating surgeon of

12 Stanford University, she's on her third day of deposition and,

13 right in the middle of her deposition, the attorney stops and

14 says I can't ask any further questions, a TRO has been issued.

15 So, instead of just finishing the deposition, they

16 stopped that deposition.

17 This is Dr. Langer -- is the volume not working? Oh,

18 your volume is not working and my volume is not working.

19 Well, I'll talk -- this is a video of Dr. Langer from

20 last Monday, the 3rd, a week ago yesterday. Dr. Arthur Langer

21 from Mount Sinai University testified that 1971 he met with Dr.

22 Galvin Hildick-Smith at Johnson & Johnson and specifically told

23 him that he documented chrysotile asbestos in Johnson's baby

24 powder. And we submitted his testimony. I took his deposition

25 in Virginia just last week.

1      Once again, I think Your Honor has seen these

2 photographs at the last motion to lift stay on Valentine's Day

3 when you lifted the stay.  This is just a condition in

4 evaluating and weighing the harm, that weighing the harm to the

5 creditor and balancing it to the harm to the debtor and the

6 third party non-debtors, I believe this weighs heavily in favor

7 of the creditor Mr. Valadez.

8      And Your Honor has seen many of these photographs and

9 each of the -- or some of the times when Your Honor lifted the

10 stay, in each of the three occasions when you lifted the stay.

11 This is his  mother pushing him in a wheelchair.  This is how

12 he slept for a number of months because it was the only way he

13 could breathe.

14      Now, I think I presented back in February a timeline.

15 I sort of went back in time of what occurred in this case, and

16 how Your Honor lifted the stay originally on June the 14th to

17 allow me to file the complaint.  You allowed -- on July the

18 28th, you entered an order allowing us to ask for a trial date.

19 We did exactly what Your Honor said to do, we didn't do any

20 more.  When Your Honor limited us, we followed Your Honor's

21 directions at every step of the way.

22      You said Mr. Valadez could be deposed and he was

23 deposed in September.  You said we can get a trial date, we

24 went and got a trial date.  Judge Lee, at the time, the

25 asbestos judge, gave us a trial date of November 7th.  Your

1 | Honor told us not to go to trial unless the Third Circuit
2 | ruled; we didn't go to trial.  What I did every single time,
3 | let's kick the case a month, let's go to December, let's go to
4 | January, let's go to February, and that's what we did.  And the
5 | trial was continued to December the 9th, continued to January
6 | 9th, continued to February 9th.

7 |         The Third Circuit ruled on January the 30th.  I
8 | immediately moved to lift the stay, came back before Your Honor
9 | on Valentine's Day, and we had arguments at that time.  And I
10 | used this timeline and I said, Your Honor, I believe I can get
11 | this case to trial in April.  And Your Honor said 60 days, let
12 | him have 60 days.  And I said, yes, Your Honor, I'll tell Judge
13 | Seabolt that, 60 days.  That was on February the 14th.  This
14 | was your order entered on February 17th, after Your Honor
15 | orally lifted the stay on the 14th.  You granted the relief
16 | from the automatic stay and allowed us to proceed to get a
17 | trial date.

18 |         So what did Judge Seabolt do?  So I left here on the
19 | 14th and went back to Judge Seabolt in Alameda County and
20 | reported exactly what Your Honor ruled.  And I believe we have
21 | provided the transcript, so that there was no question and
22 | confusion about what occurred.  We argued, counsel for J&J --
23 | several counsel for J&J was present.  And the judge set the
24 | case for jury selection beginning April the 17th.  That's this
25 | coming Monday, that's this coming Monday.

1          So we also -- oh, before I go back to that, he set a

2   case management conference every Thursday at 3 o'clock, and we

3   had those case management conferences every Thursday.  One

4   week, he moved it to a Wednesday, but every week he was closely

5   monitoring everything that we were doing, and any and all

6   discovery disputes or any issues at all were brought to Judge

7   Seabolt's attention at least on a weekly basis, if not more

8   often.

9          So Judge Seabolt entered a fact discovery deadline of

10  April the 10th, yesterday, and an expert discovery deadline of

11  April the 14th.  I argued for earlier.  I said, Your Honor,

12  let's stop the fact discovery earlier, let's stop the expert

13  discovery earlier.  J&J said no, no, no, we need to as close to

14  trial as possible.  And since the trial was going to be on next

15  Monday, he gave them until -- expert discovery the day before

16  trial.  I said, okay, that's fine, let's -- I can deal with

17  that.

18          He also ordered that all motions in limine were to be

19  filed by March the 27th, with all oppositions filed by April

20  the 3rd.  We did that.  We filed all of our motions in limine,

21  they filed all their motions in limine; we filed all of our

22  responses, they filed all their responses.  And the court was

23  intending to rule upon those but for the TRO.

24          This was the answer to complaint.  Both J&J and LTL

25  answered the complaint back in February, I think February the

1 24th, and they immediately, the same day, listed their expert

2 witnesses. And it wasn't like they had to do a lot of work or

3 do, you know -- within ten days of Your Honor lifting the stay,

4 orally lifting the stay here, they had already listed their

5 expert witnesses in this case.

6 So here is -- I put this chart -- and, Your Honor, I

7 believe I've provided Your Honor this PowerPoint and your staff

8 -- this is sort of an overview of what we've done to work up

9 this case. Mr. Valadez's mother was deposed, his grandmother

10 was deposed, his two aunts were deposed. Dr. William Longo

11 documented asbestos in baby powder for decades and through

12 probably over a hundred tests was deposed. His deposition was

13 completed, completed in, I think, about three and a half hours.

14 Dr. Allan Smith, an epidemiologist, he was deposed,

15 his deposition was completed.

16 Dr. Egilman, his deposition began, although I got the

17 feeling during the deposition that -- I mean, now and looking

18 back at it, I feel like it was -- they were asking the same

19 questions they asked him other depositions and they said they

20 weren't finished with the deposition, so I got the feeling

21 something strange was going on last week when that occurred.

22 Dr. Langer, his deposition, I tried to show you a

23 video clip. He was one of the folks that documented asbestos

24 in baby powder in 1971.

25 Now, we had on calendar -- oh, Dr. Backhus was

1 deposed three times. When it says "to be taken," it should be
2 "to be completed." So I apologize there on that one.

3 We had all these other depositions on calendar. Dr.
4 Dodson was scheduled to be deposed today, Dr. Abraham was
5 scheduled to be deposed yesterday, Dr. Roy was supposed to be
6 scheduled -- taken last week, you know, before the TRO was
7 entered. And Johnson is the economist, the millions of dollars
8 of lost wages, and his deposition was -- they were all on
9 calendar and we were ready to get this case ready for trial.

10 With regard to defense witnesses, they were all on
11 calendar. We completed three expert depositions. Dr. David
12 Weil, he's a witness I've cross-examined many times, he says
13 everything is idiopathic, spontaneous. Alexander, his
14 deposition was complete.

15 Lionel Van Zyl is a geneticist who I deposed over
16 four days who, even though all the genetic testing is negative
17 in this case, was potentially going to try to say this guy has
18 just got bad genes. There would be some Daubert-style, Frye-
19 style issues with regard to him.

20 The folks on the right, the first five, are expert
21 witnesses and their depositions were all scheduled. Some of
22 them were -- like Lucian Chirieac, his deposition was scheduled
23 originally and then continued to last Thursday. So I don't
24 know if it was purposely continued because they knew they were
25 going to be filing a second bankruptcy, but they continued it

1 until after the filing of the bankruptcy.

2      The five people at the bottom are all, I believe,

3 retailer witnesses, retailer -- they're the ones that

4 interacted with J&J, the corporate witnesses from folks like

5 Target and some of the other protected parties.

6      All of these depositions could easily get back on

7 calendar quickly should Your Honor lift the stay.

8      You won't be able to hear this testimony, but this is

9 Dr. -- yeah, you can't hear it -- this is Dr. Backhus in her

10 deposition where she's testifying about asbestos in Johnson

11 baby powder being a cause of her patient's disease.  And that's

12 the declaration I submitted last May where she said, more

13 likely than not, his exposure to asbestos stemming from

14 Johnson's baby powder increases risk of developing mesothelioma

15 and asbestos was the cause of his pericardial mesothelioma.

16 And that's the legal standard in Kentucky that it increased the

17 risk of developing his disease.

18      Dr. Roy, likewise, gave the declaration last May and,

19 like I said, she was scheduled to be deposed several weeks ago,

20 but they canceled and moved her deposition until recently.

21      Dr. Ronald Dodson, Ronald F. Dodson, I believe that

22 he is one of the most world-renowned experts on what's called

23 tissue digestion analysis and he digested Mr. Valadez's tissue,

24 the pericardial tissue right next to the cancer, and documented

25 talc and mica and lumen silicates.  And he did find asbestos,

1   but the size of the sample was so small that he wouldn't expect
2   to find asbestos.

3          And, by the way, he is a consultant not only for
4   plaintiffs, he works for defendants, he works for talc
5   defendants, he works for Ms. Brown, he's an expert witness for
6   Ms. Brown, so -- and he's published, like I said, extensively
7   on -- scientific literature on asbestos and disease.

8          And we've turned over -- and I showed this to Your
9   Honor back in February, the talc and Mr. Valadez's tissue right
10  adjacent to his cancer and the mica right adjacent to the
11  cancer.  And this is -- Your Honor has seen this probably a
12  couple times, this is the off-the-shelf testing done by FDA's
13  lab.  So when they attack and say only Dr. Longo or only
14  certainly plaintiffs-hired experts have found asbestos, that's
15  not accurate.  Well over ten labs have found asbestos in their
16  product.  And they found mica and they found the platy talc,
17  the exact ingredients in Mr. Valadez's tissue.

18         I showed Your Honor this back in February, this was
19  in addition to -- we attached Exhibit 2, Exhibit 2 is his
20  testimony where he's doing -- she's testified just last week,
21  last Monday the 3rd, that her nephew, she sees him on a regular
22  basis and he's doing terrible.

23         This is medical records showing his disease
24  progression, that he's struggling.  And this is, once again,
25  another treating doctor, Dr. Joe O'Neill (phonetic).  Another

1  progress note in early February showing the progression of the

2  disease and he's having additional immunotherapy.

3         I told Your Honor in February when you lifted the

4  stay that this is 54 years of lost life, he will die this year

5  from this disease, and this is a significant, significant

6  situation.

7         Now, earlier this morning we heard all about J&J's

8  promises, we heard all about their false promises, they're not

9  living up to their promises.

10        Mr. Gordon, last fall when we argued this, said --

11 and I showed Your Honor this in February -- we will agree --

12 this is if the Third Circuit makes a ruling -- we will agree

13 and try to give Mr. Satterly the preference he wants, we just

14 need to have a 90-day window post the Third Circuit ruling.

15        And Your Honor at that hearing said, no, you don't

16 need 90 days, 60 might be enough.  And this is Your Honor

17 saying 60 days after the Third Circuit, if I were to rule that

18 way, to allow scheduling and keep things within place.  And I

19 said I appreciate Your Honor's point of clarification.

20        So Your Honor said 60 days, you said it last fall and

21 you said it in February.  And you further say, I'm placing on

22 my record my views that J&J should have at least 60 days to

23 prepare, I think that's reasonable.  And Judge Seabolt and I

24 complied with what Your Honor said was reasonable both in the

25 fall and in February.

1        Now, the next series of slides is <u>Mid-Atlantic</u>

2    factors.  And I think this is the fourth time I'm arguing <u>Mid-</u>

3    <u>Atlantic</u>.  So, if Your Honor doesn't mind, can I go quick?

4        THE COURT:  Please.

5        MR. SATTERLY:  Okay.

6            (Laughter)

7        MR. SATTERLY:  So under the <u>Mid-Atlantic</u> factors, all

8    12 factors don't need to be present, but if you look at the

9    factors and you look at my presentations which I've submitted

10   to Your Honor, you're going to find they all weigh in favor of

11   -- all weigh in favor of Mr. Valadez.  And the impact of the

12   stay and the balance of the harm is important and, quite

13   frankly, crucial.

14       And I'm going to skip past many of these because

15   you've had the slides.  I do want to say, I want to focus on

16   what I think Ms. Brown's argument is going to be, what it's

17   been in the past when Mr. Gordon made the argument and what I

18   think it's going to be today, is we should not be distracting

19   taking -- focusing the time and attention away from the

20   bankruptcy, the new bankruptcy.  Back then it was we want to

21   explore all the available options in the wake of the panel

22   opinion.  And before that it was we need to spend time and

23   energy and resources on the bankruptcy LTL-1.

24       Well, I want to just make a real obvious point that

25   the lawyers litigating the case, for the most part -- and I'm

1  going to show Your Honor -- are not the lawyers involved in

2  this bankruptcy.  And here are -- this is a good demonstrative

3  of who are the counsel in the Valadez case.  Only one of those

4  counsel has appeared before Your Honor in this bankruptcy and

5  that's Ms. Brown, all the way over to the right.  Every one of

6  these other attorneys -- Mike Brown, who's lead counsel, who I

7  think has -- I've tried several -- I've tried cases against

8  him.  Mr. Richman, who's done many of the depositions and

9  deposed Dr. Backhus three times.  Mr. Bernardo and Mr. Cox and

10 Ms. -- is it Melani (phonetic)?

11          MS. MULLALEY:  Mullaley.

12          MR. SATTERLY:  Mullaley.  They're all with Ms.

13 Brown's firm and they're all involved, and we -- they *pro hac*

14 *vice*'d into the case and I said no objection to at least those

15 folks.

16          And then we have King & Spalding -- we have Nelson

17 Mullins law firm, Skadden Arps law firm, King & Spalding law

18 firm.  We have ten lawyers working on this case against me --

19 and maybe one or two other lawyers -- and there's no

20 distraction.  The claim of distraction is just false.

21          Ms. Brown wasn't distracted with LTL-1 from November

22 of 2022 to the end of January 2023 because she was in trial

23 against me in a talc case in Alameda County that settled -- it

24 settled right before jury selection, but she was -- the J&J

25 litigation was going on, the LTL litigation was going on.  But

1  it wasn't so much of a distraction that it prevented her from

2  being in trial in a mesothelioma case involving cosmetic talc.

3         So that's the biggest point I wanted to make because

4  I think that's the only thing that really their argument is.

5  Don't distract us, let us focus, let us focus on LTL.

6         The rest of these are obvious.  We meet all the Mid-

7  Atlantic factors, I'm not going to go through and restate

8  everything I've submitted to Your Honor.

9         I wish I could play Mr. Valadez's --

10        UNIDENTIFIED SPEAKER:  Mr. Satterly, do you want me

11 to see if I can adjust the setting on your computer?

12        MR. SATTERLY:  Yeah, is it on my computer?

13        UNIDENTIFIED SPEAKER:  Yeah.  I don't know if it's

14 going to work, but let me just give it a shot.

15        MR. SATTERLY:  Okay.  This is my last slide, Your

16 Honor, and then I'll sit down after I've concluded.

17                        (Crosstalk)

18        THE COURT:  One thing I did notice, Mr. Satterly, is

19 when the trial lawyers present and argue in front of me, they

20 can't help it, they keep looking at the jury box.

21                        (Laughter)

22        THE COURT:  There's no jury there.

23        MR. SATTERLY:  I was waiting for a jury over.  I

24 think I got a couple votes over there.

25        THE COURT:  But everybody today was looking at the

1  jury box.

2          MR. SATTERLY:  Maybe it's 26 years or 20 -- of doing

3  this, I don't know.

4                      (Crosstalk)

5          MR. SATTERLY:  There we go, let's try this.  If not,

6  I'll just summarize.

7                 (Excerpt of video deposition)

8          MR. SATTERLY:  Am I ever going to get my life back.

9          Everyone of these cases, Your Honor -- and Your Honor

10 has made a comment when I was here with Vincent Hill talking

11 about other folks -- they are somebody suffering.  And I know

12 what Your Honor probably is thinking that, you know, who am I

13 to pick and choose who gets to go to trial, but I think I've

14 demonstrated on behalf of Mr. Valadez since May and June of

15 last year that his case is truly a case that the stay should be

16 lifted and he should be allowed to go to trial before he dies.

17         I said earlier today that J&J has never -- or LTL has

18 never offered a nickel or penny for this case, and I'm only

19 asking for this relief because they put us in this position.

20 The irreparable harm is occurring every single day, every

21 single day, and I can't imagine another case that's not so

22 obvious with regards to the irreparable harm.

23         And, as being completely candid with Your Honor, I

24 request Your Honor to lift the stay and, to the extent that

25 Your Honor chooses not to lift the stay, I'd request Your Honor

1 to certify the question. We're going to be filing an emergency
2 writ and I'd request Your Honor to certify the question to the
3 Third Circuit.
4 I think this is a very straightforward, put your head
5 down and do what is right. It calls for, it mandates the
6 lifting of the stay here.
7 I appreciate your patience, Your Honor. I know it's
8 late in the day. I have great confidence that justice will
9 occur. Thank you, Your Honor.
10 THE COURT: Thank you, Mr. Satterly.
11 Ms. Brown?
12 MS. BROWN: Thank you, Your Honor.
13 And, Judge, I have a PowerPoint, can I just approach
14 with --
15 THE COURT: Absolutely. Thank you. Already I'm
16 happy, it's much lighter than his.
17 MS. BROWN: I'm going to go fast, Judge. And I know
18 I --
19 MR. SATTERLY: It's the weight of the evidence, the
20 weight of the evidence.
21 MS. BROWN: Yeah.
22 (Laughter)
23 MS. BROWN: May I proceed, Your Honor?
24 THE COURT: Yes, please.
25 MS. BROWN: Your Honor, I am going to do my best to

1    refer to Emery Valadez in the way that Emery would like us to.

2    As you probably saw, Mr. Satterly put up a slide from the

3    medical records where we know that one of the few things that

4    has brought Emery Valadez happiness in this enormously

5    difficult time has been changing their name from Anthony to

6    Emery, and no longer identifying as Anthony Valadez or as a man

7    or a woman.  And so I want to be respectful of that and so my

8    presentation refers to the plaintiff as they wish to be

9    referred.

10          This, Your Honor, is a recent picture of Emery just a

11   few weeks ago on social media.  Emery, Valadez Your Honor,

12   suffers from pericardial mesothelioma.

13          One of the things Your Honor has come to learn about

14   this litigation is that while Johnson's baby powder is one of

15   the most commonly used products in America and in the world,

16   the diseases that plaintiffs claim in the underlying litigation

17   that baby powder causes are some of the most rare diseases.

18   Mesothelioma and ovarian cancer, fortunately, are very, very

19   rare cancers that most people do not get.

20          So, for example, there are over 300 million people in

21   the United States and, thankfully, each year the number of

22   those folks who are diagnosed with mesothelioma is only about

23   3,000.  Of course, Your Honor, not to take away from the

24   seriousness of the disease and the terrible fate of those 3,000

25   folks, but in terms of sheer numbers this is a rare disease.

1    The disease that Emery Valadez has is pericardial
2    mesothelioma.  Each year, only ten to 15 people in the entire
3    country are diagnosed with the disease that the plaintiffs are
4    claiming in this lawsuit was caused by one of the most popular
5    consumer products that many, if not all people have used, Your
6    Honor.  And that's one of the things when these cases get
7    before juries that have them scratching their head and
8    returning defense verdicts, Your Honor, because it doesn't make
9    sense that if Johnson's baby powder truly had asbestos and
10   truly caused these diseases, that, for example, only ten to 15
11   people a year would be diagnosed with the disease that Emery
12   Valadez has been diagnosed with.

13   I thought I heard Mr. Satterly suggest, well, it
14   could also be a pleural mesothelioma, but the testimony from
15   Dr. Backhus, Emery's treating physician, is crystal clear
16   because she was the surgeon that went in and did this surgery
17   and looked at the pleural cavity and determined, no, there was
18   not primary tumor in the pleural cavity, but rather this tumor
19   began around the lining of the heart.

20   And what Dr. Roy's medical records show, Your Honor,
21   is that, number one, pericardial mesothelioma, in the words of
22   the treating physicians at Stanford, is exceedingly rare.  You
23   see this note from Dr. Roy, one of the Stanford treating
24   physicians last year, exceedingly rare and sometimes reported
25   at a very young age and without clear association with asbestos

1  exposure.

2         If you look down at the bottom, Your Honor, you see

3  that Dr. Roy references that in all of the world's scientific

4  literature this type of mesothelioma, mesothelioma of the

5  lining of the heart, has only been reported in the medical

6  literature about 200 times.

7         And there is a body of scientific literature, Your

8  Honor, that pericardial mesothelioma is not caused by asbestos

9  exposure, but rather by genetic mutations, by familial

10 hereditary cancer syndrome.  And in large part, Your Honor,

11 science doesn't know a lot about this disease because it is so

12 exceedingly rare and so very few people are diagnosed with it

13 each year.

14        What Dr. Roy recommended and it is, frankly, what we

15 see in these cases a lot, Your Honor, is a genetic referral.

16 The treating physicians at Stanford have implored Emery Valadez

17 to get genetic testing.

18        And I think Mr. Satterly must have misspoke before,

19 Your Honor, when he said Emery had genetic testing and it was

20 negative.  We'll go through some of those records, Your Honor;

21 that's not accurate.  The tumor was tested to try and figure

22 out the best chemotherapy to try and prolong Emery's life as

23 long as possible, but what the treaters, what Dr. Roy

24 recommended here is called germ line testing where you take a

25 blood or a saliva test and you look at a panel of genes to try

1 and identify whether or not there is a genetic or familial

2 mutation that could be causing the cancer.

3        And, Your Honor, there are very many reasons to

4 believe that Emery Valadez has that type of a mutation.  And

5 one of the reasons -- and it's listed throughout the medical

6 records and there are a lot of them from Stanford -- is that

7 Emery Valadez has an incredibly strong history, a family

8 history of cancer and of genetic mutations, and Emery Valadez

9 was diagnosed with cancer at such an extraordinarily young age.

10 Mesothelioma, as Your Honor has heard, is a disease that is

11 usually diagnosed later in life, 50, 60, 70 years old, but

12 Emery Valadez was diagnosed at just age 23, Your Honor.  Many

13 people would say the latency period for asbestos exposure isn't

14 even long enough because, unfortunately, Emery wasn't even

15 alive for what it typically takes for a disease like

16 mesothelioma to develop.

17        But, Your Honor, going back to the family history,

18 Emery's father passed away from something called osteo myeloma,

19 which is a very rare type of bone cancer caused by a plasma, a

20 rare plasma, at age 38.  At 38 years old, his father passed

21 away of this extraordinarily rare cancer.

22        His mom, his two aunts, and his grandmom have the

23 BRCA mutation that is associated with a number of cancers,

24 including breast cancer.  One of his aunts who has that BRCA

25 mutation had breast cancer herself at an extraordinarily young

age and then I had a second cancer, leukemia, as well as Emery's great grandfather suffered from lung cancer.

And, Your Honor, this is a case that is on an enormously fast-paced discovery track and we are only just starting to understand the different parts of this family tree. And so, as the treating physicians at Stanford suspect, there are no doubt other folks that fill this tree out that also suffer from cancer at a young age or from a genetic mutation.

This is plaintiff's expert Dr. Barry Horn, whose deposition I took a few weeks ago, and he testified, Your Honor, to the truth, which is that this family needs a genetic analysis. That Emery, for the good of Emery's treatment and the many siblings that Emery has, should undergo genetic testing to try and understand if this very, very rare cancer was, as the treaters at Stanford suspect, caused by a genetic mutation.

We'll talk in a moment, Your Honor, about the fierce opposition that has come from the plaintiffs' lawyers in this case to that genetic testing and how that's a problem that we see in a number of these cases, Your Honor.

But what I want to start by talking about, Your Honor -- and I know I'm the last person to speak, I'm going to try and go as quickly as possible, but I want to talk about some of the statements the Court made when we were here in February of 2023.

1    As Your Honor knows and as Mr. Satterly referenced
2 today, he has come before the Court many, many times seeking to
3 lift the stay on the Valadez case. And we were recently in
4 front of the California judge and I think Mr. Satterly told him
5 he's moved on this case 18 or 19 times, and I think that might
6 be about right.

7    And 18 of those 19 times, the Court, mindful of Mid-
8 Atlantic factors, weighed the harms and considered the
9 potential prejudice to the other creditors, and considered how
10 lifting the stay for one case would impact a potential global
11 resolution. And so each time Your Honor was very careful to
12 either deny the relief entirely or to allow only a preservation
13 of evidence; allow a testing to be done, allow records to be
14 collected. But it wasn't until this February hearing when Your
15 Honor said the pendulum had swung.

16    At that point, Your Honor, the Third Circuit had
17 ruled and, from the Court's perspective and based on your
18 comments, the Court perceived this to be the end of the case.
19 The Court perceived the options to essentially be out and,
20 based on your comments, the Court intimated that in just a
21 short period of time all of the cases would be back in court
22 system. And so the Court made clear, because of a change in
23 circumstances, at that time it was appropriate to lift the stay
24 and allow the Valadez case to get a trial date.

25    But we are here before you today, Your Honor, in a

1  totally different factual pattern.  We are here before you

2  today with real, clear prospects of reorganization.  You heard

3  today about the support of ten, 20, 30, 40, 50, 60,000

4  claimants, Your Honor, who are in support of plans of

5  reorganization.  And so, respectfully, Your Honor, we're back

6  to where we were the other 18 times before this hearing when

7  the Court said that understanding the Mid-Atlantic factors, and

8  weighing the harms and the potential prejudice and the

9  potential interference with the bankruptcy case, it would be

10 inappropriate to lift the stay for just one case.

11         And, Your Honor, that is even more so true when you

12 consider two categories of facts that I want to briefly run

13 through for the Court.  One, there is no question, based on a

14 number of different pieces of evidence that we'll run through

15 quickly, that the plaintiffs intend to put the bankruptcy

16 itself on trial in front of a jury in Alameda, California in

17 the Valadez case.  And, two, Your Honor, I would submit to the

18 Court that representations about the case that have been made

19 to Your Honor in that February conference and even in Counsel's

20 presentation here today are not supported by the evidence and

21 are not accurate.

22         So, Your Honor, starting with plaintiffs' unambiguous

23 intention -- not intentions to put the bankruptcy on trial, I

24 want to start by informing the Court about a documentary that

25 Trailblazer Studios is making about what they call the ongoing

1 talc bankruptcy saga.

2      This, Your Honor, is a letter that was sent to the

3 Court in California, the trial judge, Richard Seabolt,

4 overseeing that trial, requesting the ability to bring into the

5 courtroom during the trial film crews and to film what they

6 term a key part of the story.  They term the Valadez case to be

7 a key part of their documentary on the ongoing talc bankruptcy

8 saga.

9      Your Honor won't be surprised to learn that we, on

10 behalf of LTL and J&J, objected to the documentary, to the film

11 crew.  The prejudice is enormous, the relevance is

12 questionable, at best.  But plaintiffs didn't, Your Honor.

13      Plaintiffs submitted this response where they made

14 clear that they fully support the filming of this bankruptcy

15 saga.  And what the plaintiff's response says is that

16 defendant's bad faith bankruptcy and infliction of further harm

17 upon mesothelioma victims like Anthony Hernandez Valadez is a

18 matter of public interest.  And, Your Honor, this response from

19 plaintiff's counsel goes on to set forth all of the reasons

20 that the California court should ignore our opposition to the

21 Trailblazer's request and that Trailblazer Studios should be

22 allowed to create and disseminate a documentary about this very

23 bankruptcy.

24      And, as Your Honor knows, the <u>Mid-Atlantic</u> factors

25 are in part geared towards evaluating whether or not lifting

1 the stay would cause an interference with the bankruptcy and

2 there is no question that having an ongoing documentary of a

3 trial in which plaintiff intends to introduce evidence of this

4 bankruptcy would frustrate and interfere with the

5 reorganization efforts and plans that we've been talking about

6 all day today.

7          We moved in limine, Your Honor, to exclude reference

8 to the bankruptcy as prejudicial and irrelevant.  And

9 plaintiffs responded and said there were -- that this evidence

10 was absolutely relevant and admissible for numerous purposes.

11 They opposed, Your Honor, our motion to exclude evidence to the

12 bankruptcy.  And while they said, well, we won't use the word

13 bankruptcy, they said what they were going to offer was

14 evidence from the proceedings in front of Your Honor, that they

15 intend to offer evidence from the LTL bankruptcy proceedings,

16 as well as the Third Circuit opinion.

17          So, Your Honor, they have made clear and have listed

18 five or six different ways and reasons why this evidence they

19 believe would be admissible in front of a jury in California

20 who is supposed to be deciding whether this incredibly rare

21 cancer that is most often not associated with asbestos exposure

22 could have anything to do with Johnson's baby powder.  But the

23 plaintiffs in this document, Your Honor, list out defendant's

24 motivation as one of the reasons why they want to put this

25 evidence in front of the jury.

1    Additionally, Your Honor, plaintiff has sought
2 extensive discovery in the Valadez case about issues that go to
3 the very heart of this bankruptcy.  Mr. Satterly has served
4 notices for persons most qualified from LTL and J&J on issues
5 of LTL and this very bankruptcy.

6    For example, Your Honor, the notice that went to
7 Johnson & Johnson sought a category, somebody from Johnson &
8 Johnson to be prepared as the person most knowledgeable about
9 Mr. Erik Haas' involvement in LTL's decisions on talc issues.
10 The same for Andrew White, another in-house lawyer at J&J.  The
11 list went on to list five or six additional lawyers, past and
12 present, at Johnson & Johnson and requests that someone be
13 educated to divulge information about their knowledge about
14 LTL's decisions.

15    As well, Your Honor, you can see on the right-hand
16 side there was an additional notice for someone most
17 knowledgeable from LTL, those topics were lengthy and they
18 included some of the categories that you see here:  formation,
19 existence, acceptance of liability, agreement to indemnify co-
20 defendants.  And on the very long list that Counsel put up
21 there of depositions that still need to occur, this deposition,
22 Your Honor, is front and center.  Mr. Satterly only had a
23 couple of hours to start this deposition last week, there are
24 no doubt, I would anticipate, many more days and hours that
25 will be spent on these topics and these questions, if Your

1  Honor allows this case to proceed.

2          Finally, Your Honor, as if there were any question

3  about the intentions of putting this bankruptcy in front of a

4  jury and, you know, at the heart of the Valadez trial, this is

5  an email chain in which I informed the California court of the

6  bankruptcy filing LTL 2, and Mr. Satterley responded and

7  informed the court that in his view, the fraudulent

8  transactions and conspiracy from LTL 2's filing will be at

9  issue in the Valdez case, Your Honor.  So from numerous

10 different sources, from briefing, from trailblazers requests,

11 from notices for persons most qualified, Your Honor, we know

12 that allowing this case to move forward will jeopardize

13 reorganizations here and will interfere with efforts to get a

14 plan out and to reorganize and equitably and efficiently

15 resolve this case.

16         Finally, Your Honor, and I'll do it quickly, I do

17 want to point out to the Court representations that I believe

18 were made in an effort to convince the Court that this was the

19 case.  Out of all the tens of thousands of other cases, this is

20 the case that should be allowed to move forward when all the

21 others are not.  But those representations, Judge, in discovery

22 and through the collection of evidence have proven to be

23 inaccurate.  And so I want to start with some statements

24 Mr. Satterley made to this Court regarding product usage.

25         This was one of the many hearings we had where

1 Mr. Satterley was seeking some type of stay relief, and one of

2 the arguments he made to you, Judge, was that, well, you know,

3 sometimes in these J&J cases there's a question about product

4 usage.

5 We don't really know if the person actually used it.

6 J&J alleges they didn't. But he said, here, what's special

7 about the Valdez case is that we have good documenting evidence

8 that product use is not going to be an issue. And what he did

9 is he showed the Court the very same picture that he showed

10 today. It was a picture of what Mr. Satterley represented was

11 Emery Valdez's nursery. And it was a picture that Emery

12 Valdez's mom testified under oath was the bottle that was used

13 on Emery Valdez.

14 And, Judge, the moment I saw that picture back in

15 June, I knew something wasn't right because the bottle in that

16 picture is a bottle that we never made during Emery Valdez's

17 lifetime. And so what we did is we asked for the opportunity

18 to inspect the picture, Your Honor, during discovery, and the

19 inspection of the picture confirmed our suspicions, which is

20 that based on the watermark on the back of the picture, this

21 picture could not have been taken during Emery Valdez's

22 lifetime. Emery Valdez was born in 1998, but Kodak didn't use

23 this type of paper after 1995. And so those representations,

24 Judge, that product usage wouldn't be an issue in this case are

25 just not accurate.

1          Like many of these cases, Your Honor, product usage
2    is a huge issue because this isn't a case about a medicine
3    where you have pharmacy records or a medical device.  This is a
4    litigation about an over-the-counter product that people have
5    used for decades more than a century.  And so people can and do
6    claim usage even when that's not accurate.

7          Next, Your Honor, we heard from Mr. Satterley at one
8    of the many hearings on this case about the support that he had
9    from these treating physicians at Stanford.  And I was
10   surprised again today to see this slide, Your Honor, titled --
11   it didn't have a page number, but it says, "Causation Experts,"
12   and it lists two of the treating physicians from Stanford.  And
13   representations were certainly made to the Court that one of
14   the things that's different about the Valdez case is that these
15   treating physicians have concluded that Johnson's Baby Powder
16   was the cause or increased the risk of Emery Valdez's
17   pericardial mesothelioma.

18          And as the Court will recall, there were declarations
19   submitted to the Court in an effort to shore up these
20   representations by counsel.  But what happened, Your Honor,
21   during discovery is that we were provided with the
22   correspondence that went back and forth between these treating
23   physicians and Mr. Satterley's office.  As Mr. Satterley's
24   office tried to send to these doctors declarations for them to
25   sign that they were not comfortable with, Your Honor.  And so,

1   for example, this is some correspondence from Dr. Roy.  Ian
2   Rivamonte is a colleague of Mr. Satterley's at the Kazan firm.
3   Mr. Rivamonte wrote up the declaration that was submitted to
4   this Court, sent it to Dr. Roy, and she said that the part that
5   implied causation was what she was not comfortable with, Your
6   Honor.  That she was not comfortable making the statements that
7   are intimated on this causation expert slide that Johnson's
8   Baby Powder was in any way, shape, or form the cause of Emery
9   Valdez's pericardial mesothelioma.

10          And, Your Honor, while we're on this slide, I would
11  note that almost all of the individuals on this slide that
12  counsel showed have yet to be deposed.  So Dr. Roy's deposition
13  has not yet gone forward, Dr. Abraham, Dr. Dodson, Dr. Felsher
14  (phonetic).  These are all purported causation experts that
15  have not even in this case yet given testimony, much less been
16  preparing for trial.

17          What Dr. Roy's records really show, Your Honor, is a
18  plea for Emery Valdez to get genetic consultation and to get
19  genetic tests.  And, in fact, that was scheduled, Your Honor,
20  at Stanford.  Emery Valdez had an appointment at the very end
21  of August.  And you see this correspondence sort of second from
22  the bottom is where the cancer geneticists were asking Emery
23  and their mom to bring documentation of the BRCA mutation
24  because the geneticists believed it was important to
25  understanding the familial history of cancer.

1    And then just before Emery Valdez's deposition took

2 place in this trial, Your Honor, about two weeks before,

3 unexpectedly, and has not been explained to this day, the

4 appointment with the genetics counselor was canceled and was

5 not pursued and was not rescheduled. And, Your Honor, their

6 own expert agrees with the strong recommendations of the

7 physicians at Stanford that Emery should follow those

8 recommendations and get genetic testing.

9    Dr. Horn says, principally, because Emery Valdez has

10 a number of siblings, and those siblings, Your Honor, should

11 likely be screened for cancer at a very young age, that we

12 moved the Court, Your Honor, and this is one of the major

13 issues that remains in this case to be worked out before any

14 trial could ever happen. We moved the Court for the ability to

15 get access to a very, very tailored gene analysis. Not a full

16 panel, only a small set of genes that we believe are related to

17 pericardial mesothelioma.

18    And Mr. Satterley and his partners objected to that

19 request. They have refused to allow a blood test or a saliva

20 test to do this very tailored genetic profile, as recommended

21 by Emery's own physicians at Stanford, Your Honor. And so one

22 of the main issues, even if this case were close to trial, one

23 of the main issues that remains, plaintiff still needs to file

24 a response to our motion to compel. We need to file a reply.

25 There needs to be argument. There's a potential for a hearing

1    at which experts would testify.  This is a huge unresolved

2    discovery issue in the case, Your Honor.

3              Just two more points, Your Honor, about

4    representations that were made to this Court about plaintiff's

5    claim that they would find asbestos if they could only test the

6    tissue of Emery Valdez.  This is a declaration that was

7    submitted to this Court, Your Honor, from an expert,

8    Dr. Dodson, who asked the Court to lift the stay to allow this

9    testing.

10             And what he told the Court is that if he could do

11   this testing and confirm the presence of asbestos, talc, and

12   other talc associated minerals, he would have a fingerprint.

13   He would have a fingerprint for this cancer being caused by

14   Johnson's Baby Powder.  Asbestos plus talc plus talc associated

15   minerals.  And he said to the Court if he could just test it,

16   he was going to find it.

17             And what happened, Your Honor, is they sent this

18   expert back four times to try and find it, and he couldn't

19   because it's not there.  Four different reports were issued

20   from this expert, and they all begin with Mr. Satterley asked

21   us to go back and check again.  And that happened on

22   February 9th, on February 13th, on February 17th, right around

23   the time, Your Honor, that he was asking this Court to lift the

24   stay for the trial.  And again on February 17th.  And despite

25   all of this repeat testing, Dr. Dodson was not able to find a

1 single fiber of asbestos.

2        In fact, he was able to find 200 other particles,
3 Your Honor.  An overwhelming majority of the other particles he
4 found have nothing to do with Johnson's Baby Powder.  And so if
5 you look at this pie chart in his report, all of that blue, 83
6 percent of these 200 particles were iron.  Nobody claims that
7 iron is a part of Johnson's Baby Powder.

8        And so I asked him, well, Dr. Horn, where did the
9 iron come from.  He says, I have no clue.  Titanium, aluminum
10 silicate, crystalline silica, all of these particles were found
11 in the tissue, Judge, and their expert agrees they have nothing
12 to do with Johnson's Baby Powder.

13        Counsel made a big deal and showed pictures about
14 talc being found close to the heart.  So four particles of
15 talc, Your Honor, were found and Dr. Horn says I got no idea
16 where they came from.  I don't know if they were actually in
17 the tissue, if they were picked up in the handling of the
18 tissue, in the preserving of the tissue, in looking at the
19 tissue.  He agreed it could have been somebody's eyeshadow in
20 the pathology lab packaging up the tissue and some of the talc
21 from the eyeshadow got on it.

22        Four particles of talc, Your Honor, is what they
23 found.  And Counsel yet represented that a fingerprint for
24 Johnson's Baby Powder was found in the tissue.  Not true, Your
25 Honor.  Most of what was found, 83 percent of what was found

1   had nothing to do with Johnson's Baby Powder, and nobody knows
2   where it came from.

3          Moreover, Your Honor, what Dr. Horn agreed to and
4   what is the truth based on the evaluation of his CT scan, this
5   individual has no markers of asbestos exposure.  And, Your
6   Honor, one of the things you may have seen in some of the
7   briefing is that when someone is exposed to a lot of asbestos,
8   when someone inhales the amount of asbestos that these folks
9   claim is in Johnson's Baby Powder, your body should show the
10  mark of that.

11         Your lungs should show the scarring of that.  You can
12  have what are called plural plaques that form and you can see
13  on x-rays.  You can get thickening of the plural tissue.  You
14  can get a disease called asbestosis.  And, of course, asbestos
15  bodies can be found in the tissue.  Unequivocally, Judge, none
16  of these things exist for Emery Valdez and their own expert
17  admits that.

18          Finally, Your Honor, and we touched on this briefly,
19  and we in fact just discussed it with the California court last
20  week, this case is not trial-ready, Your Honor.  There are
21  almost 20 expert and fact depositions that remain, some of the
22  most critical folks in the case.  I mean Mr. Satterley showed
23  the Court this slide and the majority of the "causation
24  experts" on this slide have yet to be deposed.

25         Our experience in these Alameda cases is that

1  depositions are not completed in one city but rather they will

2  go on for multiple days.  So we have about 20 of those left to

3  do.  We have serious and important and critical to causation

4  issues, motion practice on this genetic testing that we have

5  requested, that the treating physicians have pleaded for, and

6  that plaintiff's counsel have opposed.

7  There is extensive written discovery that's been

8  served on us and that we've served on plaintiffs that needs to

9  be responded to.  We have not even been able to start the

10  process of designating testimony from most of the transcripts

11  because the depositions haven't been completed.  And so we

12  reached an agreement that we'd wait until five days after we

13  got complete transcripts to do that process.  But for at least

14  15 witnesses, that process hasn't even been started.

15  And, of course, Your Honor, we will move to exclude a

16  number of these experts.  And, in fact, we have a motion that

17  will be pending for spoilation against Dr. Longo.  Another big

18  motion practice issue that exists in this case is that Dr.

19  Longo has a set of slides that counsel represented existed and

20  now appear to have been destroyed.  The Court has allowed us to

21  get another deposition of Dr. Longo and to file a motion for

22  potential spoilation of evidence and an adverse inference.

23  And what's more, Your Honor, is that normally a

24  records collection process in a case that has at least six or

25  eight months lead time takes a few months.  Here we have had to

1  rely almost exclusively on records that the plaintiff's lawyers

2  have collected over the last year because our own service just

3  doesn't have enough lead time.

4          So, for example, in a case like this where family

5  history is so critical to understanding the complete picture of

6  this individual, we don't have any records that predate one or

7  two years before the diagnosis.  So we don't know critical

8  facts about family history.  We don't know what the lungs CTs

9  looked like before he was diagnosed.  And so those efforts are

10 still underway to get those materials, as well.

11         So, in short, Your Honor, Your Honor is well familiar

12 with Mid-Atlantic factors.  Your Honor has evaluated those

13 factors 18 times before and denied a request to lift the stay.

14 Given the current posture of this case, Your Honor, the

15 enormously hopeful prospects of reorganization that exists

16 today, the stay should not be lifted to allow this one case to

17 go forward when the tens of thousands of other cases are

18 working together and cooperatively to try and reach a

19 resolution.

20         As a practical matter, Your Honor, the case is not

21 trial ready.  Thank you very much.

22         THE COURT:  Thank you, Ms. Brown.

23         Mr. Satterley.

24         MR. SATTERLEY:  So Ms. Brown has her opening

25 statement ready.  I just saw it.  It's a nice PowerPoint.  If

1 Ms. Brown and J&J has such great defenses, then they should

2 allow the case to proceed to trial and they can win the case if

3 they think they have such great defenses.  This is further

4 evidence of why the stay should be lifted and the case should

5 be allowed to proceed if they're so confident that they have

6 such great defenses.

7 　　　　Let me start by, number one, saying there's no

8 declarations from any witnesses that they submitted, right.

9 What you heard so far is lawyer argument.  And I know Your

10 Honor said that some of this may bleed over to the 18th because

11 Your Honor is going to take time and give thoughtful

12 consideration to this.  So I'd request Your Honor to allow at

13 least brief discussion of this on the 18th because I've just

14 been presented with things, many things I've never seen in the

15 past.

16 　　　　Apparently, they've got some expert witness to make a

17 comment upon the back of a photograph about -- a Kodak

18 photograph.  I guess they're basically saying the plaintiff's a

19 liar, the mom's a liar, the grandma's a liar, the aunt -- both

20 aunts are a liar.  And it just so happens that that picture

21 with the little I think it's Mickey Mouse --

22 　　　　THE COURT:  Yes.

23 　　　　MR. SATTERLEY:  -- in the bedroom is made up.  I

24 guess that's -- I mean it's brand new.  I've never seen that

25 before.

1    Let me switch gears and talk about a couple of the
2 little things that counsel is using out of context.  And
3 counsel's very good at doing that.  This Trailblazers Studio,
4 it's some production company.  I don't know the details of
5 that.  All we were saying when we didn't object is there's a
6 freedom of the press in the United States.

7    It's my understanding that Courtroom View Network
8 who's done ten or more talc trials likewise applied to have
9 access to the courtroom.  Judge Seabolt hasn't made a ruling
10 upon that yet.  So the mere fact that we responded says the
11 media has a right to participate is not a basis to deny our
12 motion to lift stay.

13    Second, counsel said that we were going to put the
14 bankruptcy on trial.  Quite the contrary.  We conceded we would
15 never use bankruptcy in the court.  I don't want the jury to be
16 thinking about J&J's in bankruptcy.  What I said is some of the
17 -- because they insist that LTL is now the entity for JJCI and
18 the verdicts form is going to have J&J and LTL on it, the jury
19 has to know in order to properly allocate fault under the
20 statute who is LTL without talking about the bankruptcy.

21    And as a matter of fact, counsel said we've engaged
22 in intense and aggressive discovery and she showed the notice.
23 Last Friday I took the deposition of the person they put up as
24 LTL's corporate witness.  I took his deposition for three hours
25 and, at the conclusion, I said I have two hours left because

1 they just gave me 2,000, over 2,000 documents the day before

2 the deposition. Two thousand PDFs.

3     I said there's no way I could possibly read 2,000

4 PDFs in less than 24 hours. So we did three hours, and I

5 agreed that I had about two hours left of the deposition of Mr.

6 Mittenthal that they designated as a corporate representative.

7 So a lot has been taken out of context.

8     With regards to the genetic testing, the genetic

9 testing, our opposition to the motion to compel genetic tests

10 was due last Wednesday, the day Your Honor entered the TRO.

11 And we had it ready to file. And the TRO entered. We couldn't

12 do anything. Otherwise, we'd violate an automatic stay. And

13 Judge Seabolt was ready to hear the issue.

14     With regards -- and just with regards to that issue,

15 they hire a guy, a Van -- a plant geneticist from North

16 Carolina State that's never testified before any jury, never

17 ever been involved in any genetics at all to say that my client

18 should get tested by some third-party lab that no one's ever

19 heard of because the expert they hired is not a doctor, not

20 licensed to do genetic testing; in fact, has done genetic

21 testing illegally in the past.

22     So there's a lot of little things that Judge Seabolt

23 would have to siphon through with regards to the genetic issue.

24 But certainly, it's not something to deny the stay.

25     The discovery that she showed you about indemnity

1 agreements, it was to demonstrate, because we were having --

2 they hired an expert. The retailers had an expert that said

3 they had no duty to do any research. It was industry standard

4 for retailers not to do research regarding the safety of

5 products.

6      And the expert they have, Ms. Kinsey, one of the

7 points is if you have no obligation under the law because of an

8 indemnity agreement, that's a motive and a factor for you to

9 not do any research.

10      The other thing we uncovered in the course of

11 discovery is what they've been telling Your Honor about

12 indemnity agreements with retailers is not true. Two of the

13 retailers said no, we are not being indemnified by J&J.

14 There's no indemnity at all. And I forgot -- I forgot if it

15 was Walmart, maybe. I forgot the two, but there was two

16 indemnity agreements that turned out to be -- what they've told

17 Your Honor turns out to be false when we take the deposition

18 and learn of this.

19      With regards to the tissue digestion analysis, Dr.

20 Dodson, who I believe is talc defendants' consultant on many

21 occasions, his deposition was supposed to occur today. They

22 could have asked him all the questions about where the various

23 particles were and what's the import of not finding asbestos.

24 Instead, they've chose to ask for a TRO.

25      Your Honor didn't just *sua sponte* do this TRO. They

1  asked for it, right?  They're asking -- so they're

2  affirmatively asking to stop this discovery, and now they're

3  using it as an excuse on why they can't be prepared for trial.

4          So I'm sure there are several other points that I

5  would make in response to this PowerPoint that I saw for the

6  very first time.  Unless Your Honor is inclined to grant the

7  motion today, if Your Honor is going to -- oh, yeah, here's the

8  picture with the Minnie Mouse in the background and Mickey

9  Mouse in the background.  I guess they're -- now they're

10  accusing my clients of all being frauds.  And by the way,

11  there's multiple pictures, family pictures, of baby powder in

12  their house back in the time.

13          And also, just off the top of my head, it says -- I

14  don't know the citation.  It says, Dates uses '91 to '95.  And

15  they cite to Weaver v. Long in 2009.  I have no clue what the

16  heck  Weaver v. Long in 2009 is.  My point is I don't think

17  Kodak Paper -- you know, I don't know how long that lasts.

18  We'd have to inquire.  Having been turned over just now, I

19  really don't have anything further to say on that.

20          Let me end with a suggestion to Your Honor.  Unless

21  Your Honor is inclined to grant the stay today, which I think

22  Your Honor said you wanted to take time in consideration, I

23  have requested some time be set aside for next Tuesday, the

24  18th, so I can maybe further address a couple other points, but

25  --

1           THE COURT:  That's fine.  I have no issue with that.

2           MR. SATTERLEY:  And I believe Your Honor is seeing

3  firsthand how these trials unfold in the sense that everything

4  the Plaintiff asserts, J&J contests, even down to the point to

5  where it gets ridiculous, contesting that they didn't use the

6  product.  Well, where did the talc come from in his body?

7  Where did the mica come from in his body, right next to the

8  cancer?

9           So I appreciate Your Honor's time and consideration

10 today.  Since Your Honor is inclined not to rule until next

11 Tuesday, I'll be back with -- prepared to argue more next week.

12          Thank you, Your Honor.

13          THE COURT:  All right.  Thank you, Mr. Satterley.

14          I am not going to rule today.  I think the issues are

15 somewhat to what's at issue on Tuesday, the 18th.

16          Just for the record, and I'm not sure for what it's

17 worth, Trailblazer Studios did reach out to my chambers twice

18 now asking for Zoom video recordings that we would have.  That

19 request has been referred to the administrative law office of

20 the U.S. Courts.  It is unlikely to be agreed to, because it's

21 not the official record.  But they have reached out

22 independently to our court as well.  I just wanted to make that

23 clear.

24          Long day.  Safe travels, folks.  I appreciate your

25 time.

1           THE COURT:  -- whether it's a good faith filing and

2   fraudulent transfers, and that's what I'm trying to hone in on.

3           MS. CYGANOWSKI:  Correct.

4           MR. SATTERLEY:  Yes, Your Honor.

5           THE COURT:  All right.  Then the preliminary

6   injunction.

7           MR. SATTERLEY:  Thank you, Your Honor.

8           THE COURT:  You're welcome.

9           MR. GORDON:  Thank you, Your Honor.

10          THE COURT:  All right.  Court is adjourned.

11                      (Court adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25