IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | Tuesday, April 18, 2023 |
| . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF HEARING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
PROCEDURE 400l(a)(3) [DOCKET 7l]; AND DEBTOR'S MOTION FOR AN
ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
SERVICE PROCEDURES MOTION
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES:

For the Debtor:              Jones Day
                             By:  GREGORY M. GORDON, ESQ.
                                  DAN B. PRIETO, ESQ.
                                  AMANDA S. RUSH, ESQ.
                             2727 North Harwood Street, Suite 500
                             Dallas, TX  75201

                             Skadden Arps Slate Meagher &
                               Flom, LLP
                             By:  ALLISON M. BROWN, ESQ.
                             One Manhattan West
                             New York, NY  10001

Various Talc Personal        Watts Guerra LLP
Injury Claimants:            By:  MIKAL C. WATTS, ESQ.
                             5726 W. Hausman Road, Suite 119
                             San Antonio, TX  78249

For Ad Hoc Committee         Genova Burns LLC
of Certain Talc              By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc         494 Broad Street
Committee of Creditors:      Newark, NJ  07102

                             Brown Rudnick
                             By:  JEFFREY L. JONAS, ESQ.
                                  DAVID J. MOLTON, ESQ.
                                  MICHAEL WINOGRAD, ESQ.
                             7 Times Square
                             New York, NY  10036

                             Otterbourg PC
                             By:  MELANIE CYGANOWSKI, ESQ.
                             230 Park Avenue
                             New York, NY  10169-0075

For Anthony Hernandez        Kazan McClain Satterley & Greenwood
Valadez:                     By:  JOSEPH SATTERLEY, ESQ.
                             55 Harrison St. Suite 400
                             Oakland, CA  94607

For the Office of the        Office of the United States Trustee
United States Trustee:       By:  LINDA RICHENDERFER, ESQ.
                                  JEFF SPONDER, ESQ.
                             J. Caleb Boggs Federal Building
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, DE 19801

```
APPEARANCES CONT'D:

For Various Talc          Maune Raichle Hartley Frency &
Claimants:                  Mudd, LLC
                          By:  CLAYTON L. THOMPSON, ESQ.
                          150 West 30th Street, Suite 201
                          New York, NY 10001

                          Levy Konigsberg, LLP
                          By:  JEROME H. BLOCK, ESQ.
                              MOSHE MAIMON, ESQ.
                          101 Grovers Mill Road, Suite 105
                          Lawrence Township, NJ  08648

                          Simon Greenstone Panatier, PC
                          By:  LEAH CYLIA KAGAN, ESQ.
                          1201 Elm Street, Suite 3400
                          Dallas, TX  75720

For Claimant Alishia      Beasley Allen
Landrum:                  By:  ANDY BIRCHFIELD, ESQ.
                          218 Commerce Street
                          Montgomery, AL  36104

For Arnold & Itkin:       Pachulski Stang Ziehl & Jones LLP
                          By:  LAURA DAVIS JONES, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE 19801

For Paul Crouch,          Ruckdeschel Law Firm, LLC
individually and on       By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of       8357 Main Street
Cynthia Lorraine Crouch:  Ellicott City, MD 21043

For the Ad Hoc Committee  Womble Bond Dickinson
of Attorney Generals:     BY:  ERICKA JOHNSON, ESQ.
                          1313 North Market Street
                          Suite 1200
                          Wilmington, DE, US 19801


                      - - - - -
```

# INDEX

**WITNESSES**

**PAGE**

**FOR THE PLAINTIFF:**

JOHN KIM

| | |
|---|---|
| Cross-Examination by Mr. Jonas | 42 |
| Cross-Examination by Mr. Satterly | 98 |
| Cross-Examination by Mr. Maimon | 120 |
| Cross-Examination by Ms. Richenderfer | 150 |
| Cross-Examination by Mr. Placitella | 159 |
| Cross-Examination by Mr. Thompson | 176 |
| Cross-Examination by Mr. Ruckdeschel | 176 |
| Redirect Examination by Mr. Brown | 178 |
| Recross Examination by Mr. Satterly | 182 |
| Recross Examination by Mr. Maimon | 183 |

1          THE COURT:  Okay.  We are here this morning on LTL

2     Management, LLC.  I think there are two -- well, no, there are

3     three matters on the amended agenda: the continued automatic

4     stay litigation regarding Mr. Satterley's client, the

5     preliminary injunction in the adversary proceeding, and I

6     believe an uncontested matter on the service procedures motions

7     within the preliminary injunction matter, there's the Official

8     Committee's motion to seal and motion to intervene as well as I

9     believe the debtor's motion to seal.

10          I think I covered it all.  If not, you'll let me

11     know.  Let me turn to debtor's counsel.

12          Good morning, Mr. Gordon

13          MR. GORDON:  Good morning, Your Honor.

14          Greg Gordon, Jones Day, on behalf of the debtor.  A

15     preliminary matter for Your Honor.  We had discussions over the

16     last few days about the conduct of the hearing today.  And we

17     almost have an agreement but not completely as best I

18     understand it.  So I'd like to describe what we propose, and

19     then I think Mr. Jonas or Mr. Winograd will describe where the

20     other side may be on these issues and ultimately we may need

21     some guidance from Your Honor.

22          What we had proposed for the conduct of the hearings,

23     and in my mind, I'm combining Mr. Satterley's motion with the

24     PI motion --

25          THE COURT:  Yes.

1          MR. GORDON:  -- because to me they're very

2 interrelated.  We had proposed because we have limited time a

3 50-50 time split.  Those supporting the motion have 50 percent

4 of the time, those opposing the motion would have 50 percent of

5 the time.

6          We had proposed time limits, and we are thinking

7 based on the Court's schedule, and this is very presumptuous of

8 us that we'd each have three hours for six hours total.

9          With respect to the presentations today, I think we

10 mostly have agreement but I'm not sure.  We basically agreed to

11 one live witness at the moment which Mr. Kim who Your Honor

12 knows.  The debtor plans to put him up on direct through his

13 declaration.  He's been deposed.  And then he'd be made

14 available for cross, and we'd follow up with redirect.

15          And our view is that would be the only live testimony

16 that Your Honor would hear today.  Again, there may not be

17 complete agreement on that because there's been some back and

18 forth about whether the other side might want to call Mr.

19 Murdica.  We hadn't really prepared for that, but to be honest,

20 Mr. Murdica's here in the courtroom.  So that's an issue that's

21 at least open at the moment.

22          I think otherwise, Your Honor, in terms of the

23 record, I think we do have an agreement as to exhibits that

24 each side can submit exhibits, ones produced in discovery or

25 used during the depositions.  We've also agreed we can -- both

1  sides can use the record from the prior PI and dismissal

2  hearings.

3          And the plan would be to basically exchange the list

4  of exhibits after the hearing.  We haven't settled quite yet on

5  the time by which that would be done, but it would be done

6  quickly, presumably sometime this week.

7          And there would be a similar agreement with respect

8  to designations from the depositions, that each side following

9  the hearing would put together a list of deposition

10  designations giving the other side an opportunity to review and

11  put in counter-designations.  And, again, I think the thought

12  would be that that would all be finished by the end of this

13  week.

14          So that's at least what we have in mind.  As I've

15  said, we've had a bunch of back and forth with the other side.

16  It's not entirely clear to me where we are, but I want to just

17  put that on the record and see if we can't resolve some of

18  these issues right upfront.

19          THE COURT:  All right.  Thank you, Mr. Gordon.

20          Counsel?

21          MR. WINOGRAD:  Good morning, Your Honor.

22          Michael Winograd from Brown Rudnick on behalf of the

23  -- we are proposed counsel for the Official Committee of the

24  Talc Claimants, Your Honor.

25          Your Honor, with respect to the time, we just don't

1  see it being reasonable 50-50 split.  I don't see why we need

2  to allocate the time at all.  But 50-50 certainly isn't fair.

3  We have multiple parties that they're attributing to us

4  including the United States Trustee, including other parties

5  other than the TCC.

6        And, for example, while we'll discuss it in a moment,

7  if ultimately Mr. Kim's declaration comes in on direct, that is

8  a huge sloth of time that they don't have to devote towards

9  that witness.  And we just don't think the 50-50 split is fair.

10        With respect to Mr. Kim's declaration, I think we are

11  in agreement with the live cross and live redirect.  We think

12  he's here.  There are parties that would like potentially to

13  have him testify live.  We understand that he submitted a

14  declaration in this matter, as well, Your Honor.

15        With respect to Mr. Murdica, the intent -- he is

16  here.  We deposed him.  The intent is simply Mr. Kim throughout

17  his testimony referred and pushed things off to Mr. Murdica

18  quite a bit.  We don't know what Mr. Kim may or may not say

19  especially if he's testifying live.  And in that event, we may

20  need to call Mr. Murdica.  And so that was the simple

21  reservation that we discussed with the other side.

22        With respect to the exhibits and designations, Your

23  Honor, we agree that the parties should have some amount of

24  time to submit those to the Court after the hearing.  We just

25  don't think that we need all that much time, and we would

1  propose the end of day Wednesday.

2          THE COURT:  All right.

3          MR. WINOGRAD:  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Winograd.

5          Mr. Satterley?

6          MR. SATTERLEY:  Good morning, Your Honor.  Jose

7  Satterley, Kazan McClain Satterley & Greenwood.  I would agree

8  with Mr. Winograd, and I would just say a few additional

9  comments.

10         We want to be efficient today, and we want to get

11 this done quickly.  On behalf of Mr. Valadez, I would like to

12 get a ruling upon his specific case because Judge Seabolt is

13 waiting in the wings to find out what's going to happen.  He

14 moved the trial from yesterday to tomorrow.  So certainly, for

15 Mr. Valadez, we want to do that.

16         I want to also say with regards to the 50-50 time

17 split, I don't think Your Honor needs to make a ruling about

18 that right now.  Hopefully, we can go and see how things work

19 out.  I do agree that submitting a detailed declaration gives

20 the debtor a lot of advantage because Your Honor's had that for

21 several days.  And so there shouldn't be a strict 50-50 time

22 split.

23         Also, I would endorse the position that several other

24 parties including the U.S. Trustee and Arnold & Itkin and other

25 objectors may want to be heard, as well.

10

1          Finally, with regard to Mr. Murdica, as it stands

2     right now, we subpoenaed him.  He was deposed on Sunday.  They

3     had full knowledge that he is a potential witness.  Do I think

4     he's actually going to be called as a witness?  Probably not.

5     Maybe.  We'll see how the testimony unfolds and to what extent

6     Mr. Kim actually says he doesn't have personal knowledge

7     because part of the declaration he submitted, first-day

8     declaration, I believe there's evidentiary problems with

9     regards to does he actually have personal knowledge.

10          With that, Your Honor, I believe that we should

11     proceed and have this trial quickly and efficiently, and I

12     think we can do that.  And I don't believe Your Honor really

13     needs to make a ruling.  We should probably just jump in and

14     proceed.  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you, Mr. Satterley.

16          MR. PLACITELLA:  Good morning, Your Honor.

17          THE COURT:  Mr. Placitella, good morning.

18          MR. PLACITELLA:  How are you?

19          THE COURT:  Good, thank you.

20          MR. PLACITELLA:  So sometime while I was on a train

21     last night around 8:00, I got a kind of secret motion to affect

22     my cases to add debtors to the preliminary injunction.  I'm

23     assuming that was directly directed at the cases I filed last

24     week against Janssen and Kenvue.  So I don't see how a 50

25     percent-50 percent time slot -- I'm actually still working on

1  my response as I sit here.  So I can't predict how long I'm

2  going to need, but I'm going to need some time.  Thank you.

3          THE COURT:  All right.  Thank you.

4          MR. PLACITELLA:  And I have some questions.

5          THE COURT:  Of who?

6                    (Laughter)

7          MS. RICHENDERFER:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MS. RICHENDERFER:  Linda Richenderfer from the Office

10 of the United States Trustee.

11          To be very clear, the U.S. Trustee will be speaking

12 today, maybe conducting examination.  I think that there was

13 the implication that maybe there was a question whether we

14 would be addressing the Court.  We will be addressing the

15 Court.

16          Unfortunately, communications that were occurring

17 yesterday about how today's hearing would be conducted excluded

18 the U.S. Trustee.  I shouldn't say exclude.  We weren't

19 included on the emails.  So when you're not included on the

20 emails, you don't know what's being agreed to.

21          And I agree with what Mr. Satterley said.  It remains

22 to be seen what Mr. Kim can and cannot address today.  There

23 was a lot that Mr. Murdica could not address during his

24 deposition and we'll see if Mr. Kim can address it today, but

25 there may be the need to go forward with the testimony of Mr.

1  Murdica live today.

2          Like I said, I question Mr. Murdica, and I think that

3  there may be a need for that.  But, also, I don't think it's

4  fair that the U.S. Trustee's position that it be 50-50.  We're

5  here to figure out which way this case should proceed.  And I

6  think that there are various views that need to be presented

7  fully and completely to this Court, and I don't know that 50-50

8  is fair.  But I also think that we can wait and see how the day

9  goes.  I just don't want to see somebody dragging out to fill

10  three hours and then leaving the rest of us to three hours.

11          Thank you, Your Honor.

12          THE COURT:  Well, one more.

13          MR. RUCKDESCHEL:  Your Honor, Jonathan Ruckdeschel on

14  behalf of Paul Crouch.  I join in the comments of my

15  colleagues.  We were not consulted.  I filed pleadings on

16  behalf of Mr. Crouch.  I've made it clear that we're

17  participating.  I've been in the depositions.  I was not

18  consulted about these alleged agreements, and I object.

19          UNIDENTIFIED SPEAKER:  Me too, Judge.

20          THE COURT:  I like that response.

21                          (Laughter)

22          THE COURT:  Maybe some of you can adopt that, and we

23  can done here.

24          MR. GORDAN:  Your Honor, I have like three brief

25  points to make.  One is that going to the 50-50 split, there

1  are people on our side who want to be heard, as well, parties

2  who support the plan.  And I want Your Honor to know there is

3  an Ad Hoc Committee of plaintiffs that support the plan that is

4  forming.  I don't know if their representative is here today,

5  but I know some of the members of that committee are here today

6  and want to be heard.  So that's one thing.

7        Number two, I thought Your Honor should know that

8  there was a reference here to the U.S. Trustee and the fact

9  that we're attributing their time to the other side.  That's

10 because the U.S. Trustee is opposed to the motion.  Your

11 Honor's not surprised by that.  He may be surprised by the fact

12 that in depositions, we learned that the Committee is asserting

13 a common interest privilege with the U.S. Trustee's Office and,

14 based on that privilege, refused to answer any questions about

15 conversations between the Committee or its members and the U.S.

16 Trustee.  So that's another reason why it's clear to us that

17 they should be on that side.

18        And the only other point I would make in response to

19 what I heard, they seem to be suggesting some unfairness

20 because we want to put up Mr. Kim through his declaration.  But

21 there is a balance there anyway because they will have a right

22 to cross-examine.  I imagine there's going to be multiple

23 attorneys that do.  We're going to have a right to redirect, so

24 there's going to be a balance there with respect to that.

25        So we continue to believe that the 50-50 split is

1 appropriate.  We have a concern we won't get done without the

2 time limits, but obviously we recognize that's up to Your

3 Honor.

4             THE COURT:  All right.  Thank you.

5             MR. GORDON:  Thank you.

6             THE COURT:  Ms. Richenderfer?

7             MS. RICHENDERFER:  Your Honor, I hate to arise again,

8 but I was not on for most of Mr. Molton's deposition last

9 night.  I was on for only a very small portion of it because I

10 was preparing for today's hearing.  I don't know the basis of

11 the common interest privilege.

12             Let me tell you this.  I have entered into no common

13 interest agreement with the TCC.  And the Office of the United

14 States Trustee remains open to hear from all parties, and we do

15 get calls from all parties.  I don't know again what the basis

16 was.  And if I recall correctly the little bit that's been

17 reported to me and that I heard, I don't think the questions

18 even went to the issue of the preliminary injunction and

19 questions that there may have been with the U.S. Trustee

20 conversations.

21             So I do take exception to that.  It's been a very

22 contentious week.  And they're trying to drag the U.S. Trustee

23 into it, and we object to that, Your Honor.  And I just needed

24 to address that.  Thank you, Your Honor.

25             THE COURT:  All right.  Thank you.

1          We're going to move forward today.  It is my express

2   goal to get evidence in today, to hear from everyone on oral

3   argument.  I don't need to allocate time.  I will be pushing

4   everyone.  In that regard, try your best not to be repetitive.

5   I'm not a brick.  Some may disagree, but I understand the

6   arguments.  We had a good chunk of the arguments previously.

7   I'm aware of a lot of the facts except what you've all

8   discovered during your recent depositions.

9          We can move this forward.  It's in the interest of

10  the claimants to move this forward, so you're stepping on your

11  own toes by delaying it.  It's in the interest of the debtor to

12  move this forward because there's a time frame involved in this

13  case, a limited window.  So let's do that, and I would hope to

14  be in a position to rule.

15          As far as documents and exhibits, I understand the

16  record is important.  So we'll accommodate the interest to have

17  a complete record if there's a need for appeals.  But other

18  than that, this should get done today.  So let's move on.  And

19  please have a thick skin if I prod you a bit, especially during

20  the PowerPoints, okay, so that we can accommodate everybody.

21          I'm going to -- you can come up, Mr. Stolz.

22          I am going to allow Mr. Kim's direct testimony

23  through the declaration.  It will expedite the process.  You've

24  had him available for discovery.  You've had him in discovery

25  in the last case.  You've had him in discovery prior to the

16

1 bankruptcy.  Let's get to it.

2          Mr. Stolz?

3          MR. STOLZ:  Good morning, Your Honor.  Daniels Stolz,

4 Genova Burns, on behalf of the TCC.

5          There are two preliminary motions which relate to the

6 proceedings that are going to ensue.  One is our motion to

7 intervene which has been assigned to me since it's uncontested,

8 which should tell you something.  And as Your Honor knows,

9 under Marion Motor Oil, the Committee has an absolute right to

10 intervene.  I understand the debtor's not objecting.  We

11 intervened in LTL 1, so we'd ask that that be granted.

12          There is then the debtor's motion to seal and our

13 motion to seal.  Just to be clear, the Committee only made its

14 motion because the debtor had designated certain items we

15 wanted to present to Your Honor as confidential.  So however

16 Your Honor rules on their motion to seal, ours will just follow

17 along with that.

18          THE COURT:  All right.  Thank you.  Is there any

19 opposition for the Committee's motion to intervene?  I didn't

20 think it was something to bleed over, right, Mr. Stolz.

21          So that's fine.  It will be granted.  As to the

22 motions to seal, they will be granted for purposes of today's

23 hearing.  And we'll see what's required down the road.

24          Mr. Gordon or Mr. Prieto, however you wish to

25 proceed.

17

1          MR. GORDON:  Your Honor, Greg Gordon again on behalf

2  of the debtor.  I have a brief opening statement I would like

3  to make.

4          THE COURT:  That's fine.  I would assume -- does the

5  Committee want to make or do you want to reserve your openings

6  for your case?  I'm just trying to think of what's going to be

7  expeditious.

8          MR. SATTERLEY:  I'll tell Your Honor what's going to

9  happen is I'm going to give a very brief, no PowerPoint opening

10  statement.  Mr. Maimon's going to give a very brief opening

11  five or ten minutes with a few slides.  Mr. Jonas is going to

12  give a very brief opening statement.  so we're going to be

13  quick and efficient.

14          THE COURT:  All right.  Mr. Sponder, you're --

15          MR. SPONDER:  We're all -- U.S. Trustee's also going

16  to (indiscernible).

17          THE COURT:  I will not discount the U.S. Trustee.

18          Go ahead, Mr. Gordon.

19          MR. GORDON:  Your Honor, at last week's hearing, Mr.

20  Molton and others proclaimed that the debtor J&J and the

21  plaintiff firms who support the plan of reorganization we

22  described committed various bad acts.

23          We committed fraud.  We engaged in collusive

24  behavior.  We lied and fabricated facts.  We breached fiduciary

25  duties.  We acted unethically.  We engaged in criminal

1  activity.

2           As Your Honor may recall, they provided no evidence

3  to support any of those accusations other than a press release

4  from a plaintiffs' firm that is not one of the plan supports.

5  Mr. Molton even acknowledged later in the hearing that he had

6  no evidence to present.

7           Since last week, the group of firms representing a

8  minority of claimants, this group, that opposed the plan has

9  embarked on an effort to acquire that evidence.  They have

10 requested documents and sought to take the depositions of Mr.

11 Kim and Mr. Dickinson from LTL -- you may recall Mr. Dickinson

12 is the CFO of LTL -- Mr. Haas and Mr. Murdica from J&J.  And

13 they also sought to take the depositions of two of the

14 supporting plaintiffs' firms and those are Mr. Watts and Mr.

15 Pulaski.

16          The debtor in fact produced documents responsive to

17 the document request and agreed to submit each of Mr. Kim, Mr.

18 Dickinson, Mr. Murdica, and Mr. Haas for deposition.  And Mr.

19 Watts and Mr. Pulaski also submitted themselves to deposition.

20 The debtor and J&J for their part took the depositions of Mr.

21 Birchfield, you may recall him from last week, and Mr. Molton.

22          What you will learn during the course of this hearing

23 is that this group of firms still has no evidence to support

24 any of their accusations.  They have no evidence that LTL's and

25 J&J's negotiations with law firms during the first case and

19

1  into this one were improper, no evidence of any side deals.

2  They have no evidence that LTL or J&J committed fraud or sought

3  to harm the claims or in fact harmed the claimants.

4        They have no evidence that the claimants support we

5  described to Your Honor last week is fabricated or is a lie.

6  They have no evidence that LTL and J&J are seeking to defy the

7  Third Circuit.  To the contrary, Your Honor, the evidence will

8  confirm what we said, that this group of firms and others have

9  been harassing supporters for the plan and seeking to

10 intimidate them in order to coerce firms not to support the

11 plan or to withdraw their support for the plan.

12       We will show that the purported opposition to the

13 plan they described at last week's hearing appears much smaller

14 than represented and that the support for the proposed plan we

15 described is even greater than what we said.  The evidence will

16 reinforce the extent of LTL's and J&J's good faith by offering

17 a trust funding number that is unprecedented in any mass tort

18 bankruptcy, a number that includes an ovarian cancer settlement

19 that is more than double the amount Mr. Birchfield offered to

20 accept through the Imerys bankruptcy prior to the filing of the

21 first LTL Chapter 11 case.

22       And it will further confirm the benefits of a

23 resolution in bankruptcy by showing how the tort system fails

24 to provide for timely consideration of claims and how most

25 claimants after suffering long delays receive nothing.  In

 1  short, Your Honor, the evidence will not support these firms'

 2  contention that LTL and J&J have engaged in bad faith or

 3  committed any of the other bad acts the firms have accused them

 4  of.  It will also not support these firms' contention that the

 5  debtor has no chance of achieving a successful reorganization.

 6        Indeed, it will show the opposite.  It will show,

 7  Your Honor, that the likelihood of a successful reorganization

 8  is very high, that the debtor and LTL believe they already have

 9  the support of 70 to 80 thousand claimants and that that

10  support is sufficient to surpass the 75 percent voting

11  threshold in the Bankruptcy Code.

12        Aside from these issues, Your Honor, the evidence

13  will establish that the claims the plaintiffs seek to assert

14  against the protected parties which include primarily

15  affiliates of LTL and retailers are the same claims they assert

16  against LTL.  They involve the same products, the same time

17  periods, the same injuries, the same evidence.

18        The evidence will confirm that the debtor's insurance

19  is shared and will be diminished if the claims are permitted to

20  proceed.  The evidence will establish that given the

21  indemnities LTL has provided, judgments against the protected

22  parties would be the equivalent of judgments against LTL.

23        The evidence will establish that the litigation of

24  claims in the tort system will impede plan negotiations here

25  and distract LTL from its efforts to finalize and confirm a

1  plan consistent with the plan support agreements as soon as

2  possible.  And the evidence will establish, Your Honor, that

3  the absence of a stay and injunctive relief to prevent

4  piecemeal litigation in the tort system of the same claims that

5  LTL seeks to resolve here will thwart the fundamental objective

6  of this case which is to equitably resolve all current and

7  future talc claims in this proceeding.

8         In sum, Your Honor, we submit that the evidence Your

9  Honor will hear today will fully support our motion, and we

10  will request based on the record that Your Honor grant the

11  motion and overrule the objections of these law firms.

12         Thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Gordon.

14         Mr. Satterley?

15         MR. SATTERLEY:  May it please the Court, Joe

16  Satterley, Kazan, McClain, Satterley & Greenwood, on behalf of

17  Anthony Valadez, Vincent Hill, Kristie Doyle, Marlon Eagles

18  (phonetic), Dean McElroy, Terry Leavitt, Susan Bader, and many

19  many other cancer victims.  I appreciate Your Honor allowing me

20  to be here and allowing us to be here on behalf of these cancer

21  victims, to be heard regarding LTL's second bankruptcy.

22         We believe the bankruptcy to be in bad faith, a

23  litigation tactic, and there is no chance of success on the

24  merits when analyzed under the facts.  The PI, the preliminary

25  injunction must be dismissed and Your Honor should do away with

1   the temporary restraining order.

2          I'm going to defer many of my arguments until later

3   and allow co-counsel, Mr. Maimon, to speak regarding many of

4   the issues.  I just want to say that yesterday the debtor filed

5   a list of the top creditors.  And me and Mr. Maimon represent

6   -- are listed as three of the top four.  We've gone diverted

7   against J&J, JJCI, Cyprus, Imerys.  We know the affiliates that

8   they're trying to protect the party.

9          And nothing could be further from the truth that this

10  is a cookie-cutter situation and the facts are the same in

11  every case.  In fact, when we try cases against J&J alone which

12  I have done that without JJCI, the evidence and witnesses are

13  different than if I had to try cases against JJCI or LTL now.

14  And same goes with regards to Cyprus, Imerys, the retailers.

15  So it's not the same facts, not the same evidence.  There is

16  some overlapping, but it's not the same.

17         I'll leave Your Honor and I'll sit down, I told you

18  I'd be brief, with this precedential decision by Third Circuit

19  amended at the end of March.  And on Page 48 and 49, a

20  unanimous Third Circuit says,

21             "Most importantly, though the payment right gave LTL

22             direct access to J&J's exceptionally strong balance

23             sheet, at the time of LTL's filing, J&J had well over

24             400 billion in equity with a Triple A credit rating

25             and $31 billion just in cash and marketable

1          securities.  It distributed over $13 billion of

2          shareholders in each of 2020 and 2021.  It is hard to

3          imagine a scenario where J&J and new consumer would

4          be unable to satisfy their joint obligations under

5          the funding agreement."

6          Page 49.  I say that because I believe throwing away

7   a funding agreement, destroying a $61 billion contract is

8   fraud.  And I believe all of the facts support what the U.S.

9   Trustee filed yesterday, that this bankruptcy is

10  unconscionable.  It's unconscionable under the law.  It's

11  unconscionable on their facts.  Your Honor should deny the

12  preliminary injunction and allow these cancer victims to have

13  their day in court.

14          Thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Satterley.

16          Mr. Maimon?

17          MR. MAIMON:  Thank you, Your Honor.

18          Thank you, Your Honor.  May it please the Court.  i

19  appreciate the opportunity to speak briefly.  I'm going to

20  speak on behalf of two of Mr. Satterley and mine's clients who

21  we put in our oppositions to the preliminary injunction

22  yesterday, and that is widow or the representative of the

23  Estate of Terry Leavitt, Dean McElroy, as well as Susan Bater,

24  the sister and Executrix of the Estate of Patricia Schmitz.

25          Both of those mesothelioma victims had full trials in

1 Alameda County, verdicts in their favor, affirmed on appeal,

2 and final judgments against Johnson & Johnson as well as

3 Johnson & Johnson Consumer Inc.

4       What's important about those cases is that the issues

5 of liability, the issues of proximate cause, the issues of

6 allocation of fault have all been determined and are therefore

7 res judicata against the debtor when it comes out that the case

8 is dismissed but more importantly for Your Honor's purposes

9 today, against Johnson & Johnson.

10       In the Leavitt case, Mr. McElroy's wife, Johnson &

11 Johnson was independently assessed 78 percent of the liability

12 for their own independent liability.  And so a court of

13 competent jurisdiction affirmed on appeal and denied cert by

14 the California Supreme Court has determined that Johnson &

15 Johnson has independent liability there and there is absolutely

16 no basis for a preliminary injunction to prevent the Leavitt

17 family from having a damage inquest to determine the wrongful

18 death damages because that's all there's left to do.

19 Everything else is res judicata.

20       The same thing is true with the Schmitts family.  Ms.

21 Schmitts died.  Her case has now been rejected for certiorari

22 by the California Supreme Court having affirmed the published

23 decision in the Bater case which Your Honor has been given a

24 copy of.  Johnson & Johnson is jointly and severally liable for

25 the entire liability in that case because of the jury's finding

1  of an intentional tort in that regard against Johnson & Johnson

2  specifically.

3        And so we're here to urge the Court to deny the

4  motion by Johnson & Johnson for the preliminary injunction and

5  to vacate the temporary restraining order that the Court had

6  issued.  Johnson & Johnson says that in their papers, Your

7  Honor, we've been through this.  We had a whole big hearing.

8  Your Honor decided it.  Just do it again.  But we live in a

9  whole new world today than we did when Your Honor made that

10  ruling then.

11        The Third Circuit has ruled in a precedential opinion

12  that LTL's filing was in bad faith.  Bad faith in terms of the

13  law, bad faith in terms of what the Bankruptcy Code requires.

14  They throw around good faith, we have good intentions.  The

15  Circuit said that doesn't matter.  Your good intentions don't

16  matter for this.  This is legally in bad faith.

17        And what is important here is that in order to even

18  file the first bankruptcy, Johnson & Johnson did the Texas Two-

19  Step divisional merger and put a $61.5 billion funding

20  agreement in order to avoid a fraudulent transfer claim.  That

21  was central to what they came in front of Your Honor for.

22        And now that that has now been terminated voluntarily

23  without any consideration as the Circuit mentioned, that

24  crumbles under its own weight and that fraudulent transfer ab

25  initio destroys the bankruptcy here and we believe the

26

1   jurisdiction in order to give the preliminary injunction.

2           And so the Circuit Court of Appeals took the funding

3   agreement and they took Mr. Kim, Mr. Gordon, and Mr. Katyal at

4   their word and those are binding admissions that the funding

5   agreement pays and is binding even out of bankruptcy and, as

6   Mr. Gordon stood in front of Your Honor and said, even if the

7   case is dismissed.  They cannot run away from that, and they

8   are stuck with that.

9           The Court said we take J&J and LTL at their word.

10  Those are the words of Mr. Kim, Mr. Gordon, Mr. Katyal.  And so

11  the issue is they fall under their own weight that now that

12  there's been a termination of the most valuable asset that the

13  debtor had for no consideration whatsoever, that is under the

14  law a fraudulent transfer, under bankruptcy law, a fraudulent

15  transfer.  And we believe that the evidence that's going to be

16  submitted here today will show that without any, any, any

17  doubt.

18          And so the Circuit prescient said, well, maybe

19  they're going to do it and the question is did LTL receive

20  reasonably equivalent value in exchange for foregoing its

21  rights under the funding agreement.  It's not a question of

22  reasonably equivalent value.  They had no value.  And that was

23  an admission by the chief financial officer of LTL.

24          And so there is no financial consequence to LTL by

25  the lack of the funding agreement.  He said that.  There is no

27

1  difference in the financial condition before the bankruptcy was

2  dismissed and after the bankruptcy was dismissed for LTL, the

3  chief financial officer admitted.  LTL can meets its

4  obligations now, he testified under oath, the chief financial

5  officer.  LTL can meet its obligations into the foreseeable

6  future, which is exactly what the Circuit said is the

7  requirement for good faith and financial distress.

8          And so, Your Honor, there is no reasonable chance of

9  success for this bankruptcy filing.  The fraud on two parts,

10  first, with regard to the funding agreement being central to

11  the divisional merger which established the first bankruptcy,

12  now that it's gone, crumbles under its own weight; and, second,

13  the fraudulent transfer of terminating the funding agreement.

14  And, third, there's no financial distress whatsoever.

15          So how do you get around and escape the Third Circuit

16  holding?  And you do it with the opening that Mr. Gordon gave.

17  And that is like anyone trying to have a magic trick, you have

18  to have a diversion.  And the diversion is often glitzy, it's

19  often sensational, but it's all meant to misdirect you from the

20  three principle points that make it all moot and make it all

21  irrelevant.

22          And I'll briefly talk what those diversions are.

23  Diversion number one is the claim that there's $8.9 billion

24  available to satisfy J&J's creditors.  We'll see what's wrong

25  with that.  Secondly is the entire or the most of the opening

1  was about this so-called claimants' support.  I want to state

2  right upfront both of these are absolutely irrelevant to the

3  preliminary injunction and irrelevant to the merits of this

4  case and the fact that it should be dismissed because you can't

5  manufacture jurisdiction.  You can't manufacture financial

6  distress.  And it doesn't matter how many people support a

7  bankruptcy that's filed in bad faith and has no financial

8  distress and shouldn't have been filed in the first place.

9       And so let's go right to it.  The claim is that

10  there's $8.9 billion.  And in their papers, J&J and the debtor

11  put together what it's going to cover.  They say it's going to

12  cover gynecological cancers, although today Mr. Gordon says

13  that is ovarian cancer.  They say that it's going to cover

14  mesothelioma claims, and they say that it's going to cover the

15  claims of the governmental entities, the states' attorneys

16  generals and so forth that Your Honor has dealt with.

17       Nowhere in their papers, nowhere in the term sheet,

18  nowhere in the plan support agreements that plaintiffs' lawyers

19  signed is there anything for the third-party parent claims.

20  Blue Cross Blue Shield of Massachusetts is a creditor on the

21  Official Committee.  And, yet, there is nothing from this $8.9

22  billion that is allocated to there.

23       Where does that money come out of?  Whose pocket does

24  that come out of?  The plaintiffs' lawyers who signed the plan

25  support agreements, they have no idea.  It's not coming out of

1   their part.  And J&J is silent because they don't want anyone

2   to know that the $8.9 billion isn't real.

3        The other part of it is that they make no claims or

4   they make no provision for the indemnity claims that are

5   asserted by their suppliers of talc over the years, Imerys as

6   well as Cyprus, which in the Imerys bankruptcy, Johnson &

7   Johnson went into that court and characterized the value, the

8   potential value of those indemnity claims, quote, in the

9   billions of dollars.

10       Where is those billions of dollars coming out of?

11  J&J is not going to agree to pay on top of that.  J&J's going

12  to say, well, we're putting aside $8.9 billion.  And so

13  diversion number one doesn't meet it, and it flows into

14  diversion number two.  And that is that diversion of claimant

15  support.

16       Let me say again claimant support is irrelevant to

17  any issue Your Honor is dealing with today.  It's irrelevant

18  here because claimant support cannot fix the fatal flaw of a

19  bad-faith filing and no financial distress and that was what

20  the Circuit Court held.

21       And so let's look at Johnson & Johnson's false claims

22  and what we intend and expect the evidence to show about that.

23  They filed on the first day of this bankruptcy that Your Honor

24  will see an 8-K form together with the Securities and Exchange

25  Commission.  There are rules and regulations for making false

1  claims in an 8-K form.

2          In their 8-K filing, Johnson & Johnson represented

3  that LTL also has secured commitments from over 60,000 current

4  claimants to support a global resolution in these terms.  That

5  is their representation to the Securities and Exchange

6  Commission that they had some secured commitments from over

7  60,000 claimants.

8          They've also done so in their own website.  They say

9  LTL's organization announced in April 2023 is supported by

10  60,000 current claimants.  They say that publicly in a website.

11  They've told the press this.  In an email statement from

12  Allison Brown, lawyer for J&J, she said, "The refiling

13  represents significant progress for the plan for efficient and

14  effective resolution that addresses the concerns raised by the

15  Third Circuit, is consistent with the Bankruptcy Code" -- and

16  here's the important part -- "and currently supported by

17  roughly 70,000 claimants and numerous law firms."

18          The conjunctive, not the disjunctive.  In front of

19  Your Honor, Mr. Gordon got up and said that this is the group

20  includes -- the second filing is supported by over 60,000 talc

21  claimants.  He said that as a representative of LTL in open

22  court.

23          He said, "We've also moved for the appointment of co-

24  mediators Judge Snyder and Mr. Russo.  Their involvement was

25  instrumental in reaching the agreement we've reached with over

31

1  60,000 claimants.: He represented in open court as an officer

2  of the Court that the debtor has reached agreement with over

3  60,000 claimants. He says it's unprecedented $8.9 billion.

4  It's supported by over 60,000 claimants who have signed and

5  delivered plan support agreements and support is continuing to

6  come in.

7         Your Honor will see that not a single claimant, not a

8  single claimant has signed a plan support agreement. Not a

9  single one. And so these are the false claims. The truth, and

10  we've asked the plaintiffs' lawyers themselves about this. The

11  plaintiffs' lawyers have said that their clients have not yet

12  decided whether to approve the agreement, that they've told

13  Reuters that they, the lawyers, plan to recommend their clients

14  take the deal.

15         If we don't want to believe Reuters for reporting

16  this, we can look to the evidence that Your Honor is going to

17  have which is the sworn testimony of two of the major

18  proponents of the deal with Johnson & Johnson who signed plan

19  support agreements, Mr. Pulaski.

20         Mr. Pulaski testified under oath and was questioned,

21  "Q   Does LTL have secured commitments from over 60,000 current

22  claimants to support a global resolution?

23  "A   My understanding is they have commitments from attorneys

24  representing those clients, if not more. And I believe there

25  are probably more with attorneys that are going to recommend

1  that their clients support the agreement."

2          Nowhere does Mr. Pulaski, and we'll see why in a

3  moment, nowhere does Mr. Pulaski represent that any of his

4  clients have signed commitments where it actually committed to

5  the plan.  He simply said that he understands that his

6  obligations under the plan support agreement that he signed is,

7  "If the plan sheet is there, I believe there's finality to that

8  and at such time when the plan is disseminated for voting if it

9  gets there, then in all likelihood, I'll propose to our clients

10 that they support the plan."

11         Mr. Watts when we deposed him said, yeah, I plan on

12 supporting -- recommending to my clients as well, but I don't

13 know what's going to happen between now and the time they send

14 it out to vote.  If it changes substantially, I'm going to be

15 on the other side and oppose this.

16         The false claim that 60 or 70 thousand claimants

17 support it is not only false but again it's a diversion, it's a

18 sensational claim to try and take this Court's attention away

19 from where under the law it should be.

20 "Q   Did J&J or LTL secure commitments from any of your

21 individual clients?

22

23 "A   They have secured my commitment to propose to my clients

24 that they support the plan."

25         And so we do have the evidence that J&J has not been

33

1  forthright with this Court, has not been forthright in their

2  security filings, and has not been forthright with the public.

3          Mr. Watts who was the first to sign the PSA or

4  negotiate the PSA with Johnson & Johnson said on Page 64 of his

5  deposition,

6  "Q   At any point did you tell Mr. Murdica that your clients

7  had consented to the support plan, to the PSA?"

8          And let's see what he said.  He said,

9  "A   No.  In fact, I think it would be a violation of the anti-

10  solicitation rules under the Bankruptcy Code for me to do so

11  before his term sheet is transferred into plan documents.

12  Litigation is had with respect to whether or not that's going

13  to be actually sent out for a vote."

14          And so he under oath disclaimed what they represented

15  that he did.  He said it would absolutely be a violation of the

16  Bankruptcy Code for me to get pre-consent from my clients and

17  yet that's what Ms. Brown said to the press, that's what Mr.

18  Gordon said to Your Honor, and that's what they put in a public

19  filing to the SEC.

20          We asked him point-blank, because you can't do it, he

21  said it would be a violation, you have never committed to Mr.

22  Murdica or Mr. Haas who are the two people he negotiated the

23  deal with from J&J that your clients would vote in favor of the

24  plan.

25  "A   True.  That's true.  I've committed that I will recommend

1  it and that's all.

2          Both of these diversions, Your Honor -- that's at

3  Page 248 and 249 of his transcript which will be available to

4  Your Honor.  Both of these diversions, Your Honor, are illusory

5  because they weren't straight with the Court about what they

6  were.  But, most importantly, let me reiterate what I said in

7  the beginning.  They are diversions because they cannot get

8  away, they cannot say, oh, but this is going to frustrate our

9  purpose.  Their purpose here is irrelevant if you don't come,

10  A, with clean hands but, more importantly, with financial

11  distress that the Circuit said.  And, therefore, it's all a

12  diversion.

13          Your Honor, in  the first-day hearing, and we heard

14  from Mr. Murdica, we heard from Mr. Haas, we heard from Mr.

15  Kim, we heard from Mr. Watts that they want to give these women

16  the choice to vote, they want to give them the chance to vote.

17  I want to tell Your Honor that on behalf of my clients, we do

18  not and will never stand in the way or urge anyone not to

19  settle with J&J.

20          We urge J&J to sit down without holding anybody

21  captive by way of a preliminary injunction or an automatic stay

22  to enter into good-faith negotiations with Mr. Watts, with Mr.

23  Pulaski, with Mr. Birchfield, with Mr. Satterley, with Mr.

24  Simon.  Let them do that.

25          In bankruptcy, Your Honor, the Circuit has said that

1  J&J cannot do this because it is not eligible for bankruptcy.

2  It said that the desire for settlement, "cannot displace the

3  rule that resort of Chapter 11 is appropriate, only for

4  entities facing financial distress."

5          And, therefore, Your Honor, because there's no

6  reasonable chance of success due to the fraud both ab initio

7  with the funding agreement being the basis for the reliability

8  and foundation of the Texas Two-Step, as well as the fraudulent

9  transfer of no value for the termination of the funding

10 agreement, and because they are not according to their own

11 chief financial officer, under immediate financial distress,

12 this case cannot have a preliminary injunction in favor of a

13 non-debtor or any non-debtors.

14         Fraud is not a legitimate way to manufacture

15 distress, and no one should fall for the diversions of the

16 half-trillion-dollar magician.  I appreciate the Court's

17 indulgence.  Thank you.

18         THE COURT:  Thank you, Counsel.

19         As we go forward, I hope there's not a disconnect

20 between a lawyer's five and ten minutes and five and ten

21 minutes in real terms.  But I appreciate that there's a lot to

22 get out there.

23         MS. RICHENDERFER:  Good morning, Your Honor.  Linda

24 Richenderfer from the Office of the United States Trustee.

25         Your Honor, we heard from Mr. Gordon today and at the

1  first-day hearing that a fundamental objective of this debtor

2  is to resolve all claims of all talc clients.  Admirable

3  objective, but that doesn't mean they qualify for bankruptcy.

4         And that's the lesson learned in part from the Third

5  Circuit opinion.  And I'll have other lessons in that opinion,

6  but that's one of the lessons from the Third Circuit opinion.

7  That objective alone is not grounds for the filing of a

8  bankruptcy.

9         To bring us back to what we are here today to talk

10  about, there's no debate.  LTL's covered by the stay.  What we

11  are only talking about today is LTL non-debtor affiliates.

12  We're talking about J&J, JJCI, Holdco.  I don't know what all

13  the names are at this point in time, Your Honor.  They've

14  changed since the first case.  But that's what we're talking

15  about.  Whether 362 allows this Court to extend the stay or

16  whether under 105 Your Honor has the power to impose a stay to

17  prevent claims from going forward against non-debtor

18  affiliates.

19         And in order to get the preliminary injunction, I

20  just want to bring us all back to the four elements that the

21  people who want the injunction and stay must prove.  There's no

22  burden of proof on people opposing the preliminary injunction

23  to prove bad faith.  I think that was implied in Mr. Gordon's

24  opening remarks.  There's no objective.  There's no burden

25  today to do that.

1        The burden is totally on the movant.  And the movant

2  must prove likelihood of success on the merits that it is in

3  the public interest that when you balance the harms, Your Honor

4  should extend the stay or the preliminary injunction.  And you

5  have to look at the irreparable harm to the ability to

6  reorganize.  That's the way that they have phrased it.

7        In my opening remarks, I'm only going to focus on two

8  or three of these points.  There will be a lot more in the

9  closing after Your Honor has a chance to hear the evidence.

10  Likelihood of success on the merits, remember, this is

11  likelihood of success from the non-debtor affiliates.  Not LTL,

12  non-debtor affiliates.

13        So first we have the issue that we've been talking

14  about and that I've talked about during the first-day hearing,

15  number of people in favor of the plan.  This is not a situation

16  where we have an RSA that the actual creditors have signed on

17  to.  We have a PSA where attorneys have signed on to it,  And

18  as has been mentioned, the attorneys admit it's still up to

19  their clients to vote on the plan.

20        One of the things we tried to determine during

21  discovery and Your Honor will hear evidence of this is to what

22  extent has the number been I'll call it de-duping.  I don't

23  know what else to call it.  I speak from experience in Imerys.

24  I can tell you how many claims were knocked out because more

25  than one attorney thought that they represented the same party.

1  Sometimes it's because the party actually did sign more than

2  one agreement.  It happens.

3          And there were thousands if not tens of thousands of

4  votes that were knocked out because of that.  But nobody here

5  is de-duped.  I don't know whether the number is 60, 70, 80.  I

6  don't know if it's 30 or 40.  I don't know what it is.  But we

7  also don't know how many of those people will ever be able to

8  vote on the plan because we don't know how many of those people

9  have medical records that support the fact that they should be

10 voting on this plan, or how many of these people can show that

11 they had exposure to talc products.  And that's based on the

12 deposition testimony of people like Mr. Watts and Mr. Pulaski.

13          The other issue that comes up on likelihood of

14 success on the merits is will this case survive a

15 jurisdictional challenge.  Will this case survive a motion to

16 dismiss?  And the third issue is if this case survives the

17 challenge, will there be a channeling injunction and a case

18 where LTL and J&J tell us there's no asbestos in their product,

19 or will there be a third-party release in this plan to cover

20 the non-debtor affiliates?

21          That's an important point, Your Honor.  It's an issue

22 that I'm sure Your Honor's well aware how it's pending in front

23 of the Second Circuit yet and hopefully they'll rule any day

24 now in the Purdue case.  But likelihood of success on the

25 merits, we need to focus on the non-debtor affiliates.  And

1   that last point is very important.

2         I'm also going to talk about the public interest

3   here.  I'll allow plaintiffs' counsel and Committee counsel to

4   focus on the balance of harms.  But I need to talk about the

5   public interest here, Your Honor.

6         The Third Circuit, we are well aware of, stated that

7   good intentions of resolving talc claims wasn't enough.  There

8   needed to be financial distress.  And it found that financial

9   distress wasn't present on the record before it.

10         And I've heard during depositions, I've heard during

11   argument that the Third Circuit gave LTL the path forward on

12   how to file the second bankruptcy.  Your Honor, I think it's in

13   the public interest that we make clear the Third Circuit, in no

14   uncertain terms, gave LTL a path forward to turn around two

15   hours and eleven minutes later to file a bankruptcy case after

16   it went through the machinations that it did.

17         And it's important to look at where Footnote 18

18   appears in the Third Circuit's opinion.  Third Circuit said,

19   quote, while LTL inherited massive liabilities, its call on

20   assets to fund them exceeded any reasonable projections

21   available on the record before us.

22         The, quote, attenuated possibility, end quote, that

23   top litigation may require it to file for bankruptcy in the

24   future does not establish its good faith as of the petition

25   date.  At best, the filing was premature.

1          And then it goes to Footnote 18 where it says, quote,

2    some might read our logic to suggest LTL meet only part with

3    its funding backstop to render itself fit for renewed filing.

4    While this question is also premature, we note interested

5    parties may seek to avoid any transfer made within two years of

6    any bankruptcy filing by a debtor who receives less than a

7    reasonably equivalent value in exchange for such transfer and

8    became insolvent as a result.

9          So if the question becomes ripe, the next question

10   might be that LTL receive reasonably equivalent value in

11   exchange for forgoing its rights under the funding agreement.

12   And, Your Honor, I'll admit I skipped over some of the

13   citations to code provisions when reading that for the Court.

14         Your Honor, I would say that that footnote gives

15   people opposing what's going on in this court the game path for

16   how we proceed forward.  It did not give LTL instructions, go

17   get rid of the funding agreement and then you can come back

18   into the bankruptcy court.  Your Honor, it's exact opposite.

19         And so, Your Honor, to the extent that the non-debtor

20   affiliates become covered by another preliminary injunction or

21   a stay, or whatever terminology is used, Your Honor, I think I

22   its in the public interest that this Court consider whether or

23   not that is to be allowed under the scenario that is in front

24   of the Court today.

25         I would submit, Your Honor, that when one takes into

Kim - Cross/Jonas                                    41

1    account the public interest to uphold the rule of law that was

2    laid down by the Third Circuit, that public interest requires

3    that the preliminary injunction stay not be extended to cover

4    the non-debtor affiliates.  Thank you, Your Honor.

5              THE COURT:  Thank you.  Mr. Jonas?

6              MR. JONAS:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MR. JONAS:  Jeff Jonas from Brown Rudnick.  With me

9    are my partners Mike Winograd and David Molton, proposed

10   counsel for the Official Committee of Talc Claimants.

11             Your Honor, I'm going to reserve my opening for

12   close.  I think the evidence in this case is the most important

13   thing we can do.  And I'd like to use the time we have with you

14   to present the evidence.  Thank you.

15             THE COURT:  Sensible.  Thank you.

16             All right.  Then I return to Mr. Gordon.  We have Mr.

17   Kim's declaration as direct, correct?

18             MR. GORDON:  Yes, Your Honor.

19             We would tender Mr. Kim on direct through his

20   declaration.  We also reserve the right, as I indicated

21   earlier, to provide evidence through exhibits and through

22   deposition designations which we'll work on post the hearing as

23   soon as we can.

24             But Mr. Kim is here and available for cross-

25   examination.  And we reserve our right to redirect.

Kim - Cross/Jonas                                   42

1          THE COURT:  All right, thank you.  Mr. Kim, please,

2   if you would take the stand.  And by any chance, do we have an

3   extra copy of his declaration if we want to mark it?

4          MS. BROWN:  Your Honor, we'll make sure you get it at

5   the next break.

6          THE COURT:  Okay.  Great.  Thank you.  Mr. Kim,

7   please raise your right hand.

8              JOHN KIM, PLAINTIFF'S WITNESS, SWORN

9          THE COURT:  All right.  Please have a seat.  State

10  your name and business address for the record.

11         THE WITNESS:  John Kim.  I'm at 501 George Street, 1

12  J&J Plaza, New Brunswick, New Jersey.

13         THE COURT:  All right.  Thank you, Mr. Kim.

14         And, Mr. Jonas, will you be leading off?

15         MR. JONAS:  Yes.  I think so, Your Honor.

16         THE COURT:  All right.

17         MR. JONAS:  For the record, Your Honor, Jeff Jonas,

18  Brown Rudnick, for the TCC.

19                         CROSS-EXAMINATION

20  BY MR. JONAS:

21  Q    Good morning, Mr. Kim.

22  A    Good morning, Mr. Jonas.

23  Q    Mr. Kim, I'd like to start with a document --

24         MR. JONAS:  Your Honor, I would ask your patience.

25  We've been going around the clock the last week or so.  I think

1  we have enough copies at least for the witness, the Court, and

2  opposing counsel.  But we're doing this a little bit on the

3  fly.  We didn't have a chance to pre-mark or anything like

4  that.  So I would just ask your indulgence.

5              THE COURT:  Absolutely.  Understood.

6              MR. JONAS:  We're going to have two -- we're going to

7  start with two exhibits, Your Honor.  If I could have what

8  we'll mark as I guess Trial Exhibits 1 and 2.

9              THE COURT:  Why don't we mark this as TCC-1 and

10 TCC-2?

11             MR. JONAS:  Thank you, Your Honor.  May I approach?

12             THE COURT:  Yes, please.  Thank you.

13 BY MR. JONAS:

14 Q    Okay.  Mr. Kim, I'm going to show you tow documents which

15 have been marked Exhibits TCC-1 and TCC-2.  The first one I'd

16 like you to take a look at, it should be a voluntary petition

17 filed on October 14th, 2021.  That was the earlier bankruptcy

18 case for LTL Management LLC.  Do you see that?

19 A    I do.

20 Q    And if you look at Page 22 of 22, you signed that under

21 the penalty of perjury, correct?

22 A    I'm sure I signed it.  I'm sorry, you said Page 22 of 22?

23 Q    At the top, you'll see the Court stamp.  And if you look

24 at what's stamped as 22 of 22.  You should see your signature

25 at the bottom.

1  A    Yes.

2  Q    Okay.  Now just to orientate, let's look at Exhibit 2,

3  TCC-2 which is the petition, more recent petition filed on

4  April 4th, 2023.  And if you look at Page 24 of 24, you also

5  signed this petition under penalty of perjury, correct?

6  A    I did.

7  Q    Okay.  Now the latest petition, that is TCC-2, which was

8  filed at the beginning of this bankruptcy case, there is a list

9  beginning on Page 18.  And it's the list of law firms with

10 significant talc claims.  Just let me know when you get there.

11 A    Yes, I have it.

12 Q    Okay.  And this list that you filed a few weeks ago, it

13 doesn't have certain of the plaintiffs' law firms that were

14 listed on the earlier bankruptcy petition, that is that

15 commenced the first bankruptcy case.  Correct?

16 A    I believe that's true.  Yes.

17 Q    And conversely, certain plaintiffs' firm, law firms which

18 did not appear on the prior petition now appear on this list of

19 plaintiffs' law firms, correct?

20 A    They do.

21 Q    For example, the Ferrer Poirot & Wansbrough firm is listed

22 on your latest petition, but not on the earlier petition,

23 correct?

24 A    I'd have to check.  I'll take your word for it.

25 Q    Okay.

Kim - Cross/Jonas                    45

1  A    And the McDonald Worley PC firm, it's listed on your

2  latest petition.  It's not on your earlier petition, correct?

3  A    Again, I'd have to check.  I believe -- if you represent

4  that's true, I'll believe that.

5  Q    Okay.  The Pulaski Kherker firm, it's listed on your

6  latest petition but not on your earlier petition, correct?

7  A    Again, same answer.  I could check if you'd like me to.

8  But I'll take -- I trust your representation.

9  Q    The Reub Stoller & Daniel firm, listed on your latest

10 petition, not your earlier petition, correct?

11 A    Again, same answer.  I will defer to your representation.

12 I'd have to check to make sure.

13 Q    The Watts Guerra firm, listed on your latest petition, not

14 your earlier petition, correct?

15 A    Same -- same answer.

16 Q    Okay.  Now all the firms I just mentioned, they're law

17 firms with which LTL has entered into plan support agreements,

18 right?

19 A    I would have to check the plan support agreements to

20 confirm what you said.  I haven't memorized all the firms.

21 Q    Will you accept my representation on that?

22 A    If you say so.  But again, I'd have to go check to --

23 Q    Okay.

24 A    -- to confirm.

25 Q    All right.  Now let's go back and look at Exhibit 1, the

 1 petition filed in LTL-1.  You see the Ashcraft & Gerel firm

 2 listed there?  Right at the second firm listed.

 3 A    I'm sorry.  I'm trying to get to the list.

 4 Q    Sure.  It's on Page 16 of 22.

 5 A    Okay.

 6 Q    Do you see the Ashcraft & Gerel firm?

 7 A    I do see that.

 8 Q    That firm was a member of the TCC, the Talc Claimants

 9 Committee, in the first bankruptcy case.  Wasn't it?

10 A    I actually don't -- don't know what the composition of the

11 TCC was.

12 Q    Okay.  Okay.  You didn't include that firm in your

13 bankruptcy petition this time around, did you?

14 A    Again, I'll take your word for it.  I can check if you'd

15 like me to.

16 Q    The Karst Von Oiste firm that's listed, I think it's,

17 let's see, number 17.  That firm was a member of the Talc

18 Claimants Committee in LTL-1, wasn't it?

19 A    Again, I don't know the composition of the committee.

20 Q    You didn't list that firm here, did you?

21 A    Again, I'll take your -- I'll take your word for it unless

22 you want me to check.

23          MR. JONAS:  I'll tell you what.  Your Honor, may I

24 approach?

25          THE COURT:  Sure.

1          MR. JONAS:  Your Honor, I don't have enough copies.

2   So I'll just introduce it.  Hopefully, it will refresh the

3   witness' recollection.  It's an order appointing the Official

4   Committee of Talc claimants, again LTL-1.

5          THE COURT:  Okay.

6   BY MR. JONAS:

7   Q    Mr. Kim, you're looking at -- okay.  You're looking at a

8   list.  And you'll see it's from the North Carolina bankruptcy

9   case.  And it has the representatives.  And I appreciate that

10  the law firms themselves are not members.  But they have

11  clients that are members of the Talc Claimants Committee and

12  they're representatives.

13         And you'll see on there, just to confirm what I've

14  represented to you, you see on there the Ashcraft & Gerel firm,

15  right?

16  A    I see this on this list, yes.

17  Q    And you see the Karst Von Oiste firm, don't you?

18  A    I do see that on the list.

19  Q    You see Weitz & Luxenberg?

20  A    I do see that on this list, yes.

21  Q    Do you see Kazan McClain?

22  A    I do see that on the list.

23  Q    And the Levy Konigsberg firm, do you see that on there?

24  A    I do.

25  Q    Okay.  Now all of the firms I just mentioned that you,

Kim - Cross/Jonas                                48

1 when you filed your petition in the earlier bankruptcy case,

2 you didn't include any of those law firms in your second, more

3 recent bankruptcy petition.

4 A    Again, I'll take your -- I'll take your word for it unless

5 you want me to check.

6 Q    Well, the reason you didn't include the five firms that

7 were listed on your initial petition, and you didn't include

8 them on your second petition was you were attempting to

9 manipulate how the creditor's committee in this case would be

10 put together.  Were you not?

11 A    No.

12 Q    And the reason, sir, that you've added at least four or

13 five firms that you've now settled with, and you've included

14 them on your list of law firms representing talc claimants,

15 again you're attempting to manipulate the list so that you

16 would have input into which creditors were on the creditor's

17 committee.  Isn't that correct?

18 A    I disagree with that.

19 Q    Okay.  Mr. Kim, with respect to talc claims against LTL,

20 there's a difference between talc cases and talc claims,

21 correct?

22 A    Some people would define them differently, yes.

23 Q    And you define them differently, don't you?

24 A    I think what I said in my deposition is I sometimes use

25 them interchangeably.

1  Q    But you also told me that a case is something that's

2  filed, correct?

3  A    Technically, a case is filed, a claim is not filed.

4  Q    Okay.  A case is filed, a claim is not filed.  And at the

5  beginning of this case, the debtor and loiters for the debtor

6  alleged that there were approximately 60,000 talc claimants

7  that were supportive of the debtor's proposed plan, correct?

8  A    We did.

9  Q    And that you, I think you said that was indicated by

10 certain plan support agreements, or PSAs, which the debtor

11 Johnson & Johnson Holdco, Inc. and Johnson & Johnson entered

12 into with talc plaintiffs' lawyers, correct?

13 A    That is true.

14 Q    And you agree that those are not actual settlements of any

15 talc claims, correct?

16 A    Correct.  They're not settlements.  They are just

17 indications of support for a plan to eventually lead to a

18 settlement.

19 Q    The PSAs themselves simply provide that the talc

20 plaintiffs' lawyer will recommend the deal to his or her

21 clients, correct?

22 A    I think the PSA doesn't actually say that.  My

23 understanding is that the PSAs represent a commitment by the

24 attorney that his clients will support a plan.

25 Q    You think the lawyer was binding his clients to support

Kim - Cross/Jonas                                        50

1  the plan?

2  A    No.  I did not say that.  I said the lawyer represents

3  that his clients will support the plan.

4  Q    Well, how could he represent that?  Do you know if he

5  spoke to his clients?

6  A    The issue is not whether we're binding claimants to the

7  plan.  As we do in -- as a standard practice in any mass tort

8  settlement, when we're negotiating something with a plaintiffs'

9  counsel, we get a representation from the plaintiffs' counsel

10 that their clients will do what the plaintiffs' lawyer says

11 they will do.

12      In other words, they are representing that, you know, they

13 will either recommend or actually have commitments or, I mean,

14 there are various forms that that can take.  But what it really

15 means is that when you're dealing with a plaintiffs' lawyer,

16 you have a commitment that the plaintiffs' clients will follow

17 the recommendation.  That's true for virtually every mass tort

18 settlement we enter into.

19 Q    Mr. Kim, I know you appreciate how important your

20 testimony is today, correct?  You appreciate that?

21 A    I -- I think I do, yes.

22 Q    Okay.  Good, because I want to get -- this is a very

23 important fact.

24 A    Yes.

25 Q    Are you saying that the lawyers that sign the PSAs

1  committed their clients to vote in favor of the plan that's

2  outlined there?

3  A    No, I'm not saying that.  I just explained what I'm

4  saying.  I'm saying that --

5  Q    Right.  All it -- I'm sorry.  Go ahead.

6  A    I'm saying that the plaintiffs' lawyer has committed to us

7  in one form or another as if whether he's going to recommend

8  the -- the proposal to his clients, and he believes that the

9  clients will listen to his recommendation.  That's one way to

10 do it.

11     Other times they have actual commitments from plaintiffs'

12 clients.  But whatever form it takes, what we take is that it's

13 a representation that we believe that the claimants will

14 eventually go -- would go with the plaintiffs' lawyer's

15 recommendation, follow the recommendation, and that that's a

16 commitment to us.

17 Q    Of the alleged 60,000 supporters that you had, how many of

18 them were, to use your words, commitments?  How many were

19 absolute commitments from an underlying talc claimant to

20 support the plan?

21 A    I don't have that number.  We don't ask for that number.

22 For us, all we need to know is that the plaintiffs' lawyer is

23 committing to us that these folks, his clients will eventually

24 support a plan.

25 Q    Mr. Kim, I want you to be very careful because I think

1   you've said a few different things.  So let me try it my way.

2   All the lawyers that -- all the plaintiffs' lawyers that

3   signed, all they did was basically represent to you that they

4   would advise their clients to support the plan.  They would

5   recommend that, correct?

6   A    And that they believed that the clients will follow the

7   recommendation.  You know, things may change in the future.

8   Again, this is -- entering into plan support agreement is not

9   the settlement, right?  There's still a lot of things that have

10  to be done before we get to a plan and get the confirmation.

11  There has to be a vote.

12       So before that happens, all we can get is a, you know, a

13  commitment that the plaintiffs' lawyer represents to us that he

14  believes that his clients are going to vote for the plan, or

15  support the plan.

16  Q    It's the case, is it not, that anyone, or all of the

17  plaintiffs' lawyers that sign these could go to their clients,

18  they could make a recommendation, and every one of those

19  clients could say you know, I don't like that deal.  I'm not

20  going to vote for this plan.  That could happen, could it not?

21  A    If it went to vote, it could.  And we think that, we

22  believe that what -- so, yes.  I agree with you, absolutely,

23  because that's the way this is designed.  What we said is that

24  we have the commitments from the lawyers that their clients are

25  going to follow their advice and vote and support the plan.  We

Kim - Cross/Jonas                                        53

1  have no reason to believe that they won't.

2       We've done this.  This is a matter of course in many, many

3  mass tort situations.  This is the way it's done.  We're not

4  going to go and we're not going to try to get actual

5  commitments ahead of time for this.  It makes no sense to do

6  that.

7  Q    I appreciate that.  But do you think before you tell

8  everyone that you have the vote or you have support, that you

9  should get a commitment?

10 A    No.  We have the support.  We absolutely believe we have

11 the support.  We've talked to the lawyers who have represented

12 these claimants.  You know, I've, again -- you know, as I

13 testified earlier, we have Jim Murdica who has been negotiating

14 this has extensive experience with these plaintiffs' lawyers.

15 We have done this time and time again in other situations.

16      Members of the -- my understanding is that members of the

17 TCC, in trying to negotiate with us, have done the same thing.

18 We don't get commitments from their clients before we talk to

19 them.  And so what I would say is that this is standard

20 practice.  We believe we have the commitments.  It's absolutely

21 truthful what we've said.  And we believe that we have

22 sufficient to get a plan approved.

23 Q    Okay.  Let me wrap up on this.  Let me see if I've got

24 this right.  You've got 15, 16, 17, I think you've told me high

25 teens, signatures from plaintiffs' lawyers and pieces of paper

Kim - Cross/Jonas                              54

1  that say they will suggest or recommend to their clients to

2  support your plan.  That's what you have, right?

3  A    Well, again, I don't think plan support agreements say

4  that.  I think the plan support agreements say that we have the

5  commitment of the -- of claimants.

6  Q    A commitment of claimants.

7  A    No, no.  The -- I'm sorry.  The commitment of the

8  plaintiffs' counsel, and that we understand from

9  representations that when they commit to this, we believe that

10 they will come through and those votes -- and the claimants

11 will support this plan.

12 Q    Sir, you don't know if any one of the 16 or 17 plaintiffs'

13 lawyers that you signed up with, you don't know if any one of

14 them have spoken to their clients about this deal, do you?

15 A    All I know is the representation that they made that they

16 have looked at the plan, they've -- they believe that the plan

17 is fair, reasonable, and that the clients will take it.  And

18 that's all I need to know at this time, at this juncture.

19 Whether they talk to their clients, you know, they are in the

20 best position to know what their clients would want.

21 Q    Mr. Kim, yes or no.  Do you know if any of the plaintiffs'

22 lawyers that you've signed up with discussed the terms of your

23 plan with their clients?  Yes or no?

24 A    No, because I did not ask for that, nor would I have.

25 Q    You didn't ask for anything.  You don't know -- let me ask

1  you, did you talk to any of the underlying clients?

2  A    No.  I talked to my attorney.  Or I talked to attorneys

3  and that were involved in negotiations.

4  Q    You haven't talked to a single one of the alleged 60,000

5  people that are going to, I guess, support your plan.  You

6  haven't talked to one of them, have you?

7  A    Mr. Jonas, you know that would not be appropriate.

8  Q    Well, before signing a PSA with any specific talc

9  plaintiffs' lawyer, you didn't vet those underlying claims, did

10 you?

11 A    I did vet them to the extent that I relied on my lawyer

12 who has significant experience dealing with these plaintiffs

13 firms and got representations from those firms, and that we had

14 asked for supporting data that had individualized names.  And

15 that this is something that happens in every -- every --

16 virtually ever mass tort settlement that we enter into.  That's

17 how I vetted it.

18 Q    Let me ask you because you keep making reference to this

19 is how it's done in every mass tort case.  Is this how it's

20 done in a mass tort bankruptcy where the first bankruptcy was

21 dismissed for bad faith, and then the company filed a new one

22 two hours later?  Is that how it's done in your experience in

23 that type of bankruptcy case?

24 A    Well, if there were that type of bankruptcy case, I would

25 suspect the same methodology would have been used, yes.

Kim - Cross/Jonas                                  56

1  Q    If the talc plaintiffs' lawyer told you that he had 500

2  claims or 5,000 claims, you wouldn't do anything to confirm the

3  number of claims.  You didn't do anything to confirm the number

4  of claims, did you?

5  A    The number of claims are confirmed by the reputation that

6  that lawyer has with the lawyer that I was using to negotiate.

7  Plus, we did ask for underlying data.  Plus, you know, there is

8  a process that would happen later on to confirm this.

9      When this goes to a vote or when plaintiffs will get paid,

10 all that data, all the confirmation will happen at that time

11 because that's when it's appropriate.  At this time, it makes

12 no sense to spend the time, the energy, the cost of trying to

13 confirm these things up front when all we're trying to do is

14 get the plan to a vote.

15 Q    Let me try my question again.  If a talc plaintiffs'

16 lawyer told you that he had 500 claims or 5,000 claims, you

17 didn't do anything to confirm the number of claims, did you?

18 A    No, that's not true.

19          MS. BROWN:  Your Honor, respectfully, I'm going to

20 object.  I believe this question --

21          MR. JONAS:  I'll move on, Your Honor.

22          MS. BROWN:  -- has been asked --

23          MR. JONAS:  I'll move on.

24          MS. BROWN:  Thank you.

25          THE COURT:  I'll just give an admonition.  I get the

Kim - Cross/Jonas                              57

1  points very often.

2           MR. JONAS:  I know you --

3           THE COURT:  I understand.  So I understand where

4  you're going.

5           MR. JONAS:  I apologize.  Sometimes I like to make

6  sure you do, Your Honor.

7           THE COURT:  Beating a dead judge.  Go ahead.

8           MR. JONAS:  I'll move on.

9  BY MR. JONAS:

10 Q   Okay.  The -- let me strike that.  It is the case, is it

11 not, Mr. Kim, that some of those talc plaintiffs' lawyers have

12 backed out of the -- I think those were your words, backed out

13 of PSAs that they had signed?

14 A   That is true.

15 Q   And you mentioned this, but let me make sure the Court's

16 aware of it.  The only information that the plan support

17 agreement requires that a talc plaintiffs' lawyer provide is

18 his or client's name, right?  Name?

19 A   Yes.  There's a chart.

20 Q   Okay.  I'll tell you what.  I'll lay it out for you.  It's

21 name, date of birth, and the last four digits of their Social

22 Security number, right?

23 A   That's what's required on the -- on the documents.  But

24 again, you know, this -- that happens after numerous

25 conversations that the plaintiffs' lawyer has with the person

Kim - Cross/Jonas                                          58

1  negotiating.

2       Jim Murdica who had been negotiating for the most part

3  these plans, and Jim Murdica gets -- asks a lot of questions

4  about what claimants do you have and has many discussions with

5  them beforehand.

6  Q    I don't want to -- we're not here to talk about

7  Mr. Murdica.  You are an officer of this debtor in this case,

8  right?

9  A    I am.

10 Q    And you signed the PSAs, right?

11 A    I did.

12 Q    Okay.  So before you signed the PSA, did you ask for any

13 information relating to the plaintiffs' lawyers, any medical

14 information?

15 A    No.  My understanding was that the person negotiating the

16 PSAs had discussions with the plaintiffs' lawyer who was going

17 to sign the PSAs, and that there was a commitment and

18 representations from that plaintiffs' lawyer about the number

19 of claims they had.

20      We asked for other identifying information in the PSAs to

21 be attached as an attachment.  That is the appropriate level of

22 inquiry we need to do, and what makes sense at the time that we

23 enter into these things.

24 Q    It made sense to you, right?

25 A    Because of my -- that -- my experience negotiating and

Kim - Cross/Jonas                                    59

1    settling cases and coming to agreements in numerous mass tort

2    settings.

3    Q    Did you -- when you signed the PSA, did you have any

4    information as to when the particular plaintiffs' lawyer had

5    signed up his clients?

6    A    Again, that's irrelevant to me because we had the

7    representation up from that lawyer.  And again, that

8    representation is based -- is given to a person negotiating

9    that has a lot of experience with that lawyer, knows the

10   credibility of that lawyer.  And you know, I think you asked me

11   the question.

12        If someone, if any lawyer comes and says they have 500

13   claimants, would you take him at his word.  No, of course not.

14   There are discussions that are had.  And the person negotiating

15   has to know and do their due diligence as to what they know

16   about the plaintiffs' lawyer that they're talking about.

17   Q    And do you know what due diligence, to use your words,

18   Mr. Murdica did in connection with his negotiations with the

19   plaintiffs' lawyers?

20   A    I've known and worked with Mr. Murdica for over 20 years.

21   I know what he does in these types of situations.  I know the

22   questions he asks.  I know the detail that he goes into.  In 20

23   years of experience with Mr. Murdica settling 20, 30, 40 mass,

24   major mass tort cases, I have relied on Mr. Murdica.  He has

25   not let me down on this type of information.

1  Q    Do you know if Mr. Murdica had any medical information

2  with respect to the underlying claimants?

3  A    Again, just like every other claim including claims --

4  claimants represented by members of the TCC, we don't ask for

5  that type of material.  We don't vet it.  There's no need to do

6  it at this juncture.  When it comes down to voting, whether

7  it's a valid vote, when it comes down to payment, whether we

8  actually have to pay these people, that's when it makes sense

9  to do that process.

10       It doesn't make sense to take the effort, the cost, the

11 time at this juncture when all we're asking for is an

12 indication of support for a plan.  We did not pay these --

13           THE COURT:  The answer's no.  The answer is no.

14           MR. JONAS:  Sorry, Your Honor.

15 BY MR. JONAS:

16 Q    Last question on this topic, and I promise I won't --

17 Mr. Kim, of these lists you have of claimants, you don't know

18 if there's any duplicate claimants on those lists, do you?

19 A    No.  But what I do know is that when we -- when going

20 through this process, we asked these plaintiffs' lawyers to

21 only give us names of people who they are the main counsel for.

22 Q    That was a no?

23 A    That's a no.

24 Q    Okay.  Okay.  Okay.  In the first day declaration you

25 filed in the first bankruptcy case on October 4th, 2021, you

Kim - Cross/Jonas                                      61

1  state, and I'll quote, the design of the 2021 corporate

2  restructuring insures that the debtor has at least the same, if

3  not greater, ability to fund talc-related claims that -- and

4  other liabilities as old JJCI had before the restructuring.

5  You said that in your first declaration, right?

6  A     I did.

7  Q     And the first funding agreement, I may call it funding

8  agreement one versus funding agreement two, the first funding

9  agreement was available to LTL, the debtor here, both in and

10 outside of bankruptcy, correct?

11 A     Based upon the facts and law that we knew at the time,

12 yes.

13 Q     That's a yes?

14 A     At that time, yes.

15 Q     Under the funding agreement one, there was total value of

16 around, let me -- I think you said around $60 billion available

17 to LTL, correct?

18 A     At the time of the filing, there was.

19 Q     Today, under funding agreement two, the total value

20 available to LTL is tens of billions of dollars less than under

21 funding agreement one, correct?

22 A     That's assuming that funding agreement one was still

23 enforceable and not void or voidable.  If the Third Circuit had

24 not rendered the opinion the way it had, then that would be

25 true.

1  Q    Sir, very, very important question, okay?  Yes or no.

2  Today, under funding agreement two, the total value available

3  to LTL is tens of billions of dollars less than was available

4  under funding agreement one.  Yes or no?

5  A    That is not true.

6  Q    So you think today, LTL-2 -- no, strike that.  You think

7  that the debtor today under funding agreement two has available

8  to it to satisfy talc claims around $60 billion?

9  A    No, that's not what I said.  What I said was that it's not

10 the -- not tens of billions of dollars less because you have to

11 take into account that because of the Third Circuit decision,

12 funding agreement two was rendered void or voidable, and

13 there's material risk that it was not enforceable.  So

14 therefore, if you're trying to compare those two, I think that

15 statement would not be true.

16 Q    I don't want to compare anything.  I just want -- let's --

17 I'll tell you what.  Let's do it this way.  Funding agreement

18 one, the debtor had $60-odd billion available to it to satisfy

19 my client's claims, right?

20 A    Prior to the Third Circuit decision, I would say yes.

21 Q    Great.  Today, how much does the debtor have available to

22 it under its funding agreement to satisfy talc claims?

23 A    I think there's a calculation about what the value of --

24 an internal valuation of the principal assets of Holdco which

25 is around $30 billion, plus the amounts that LTL has through

Kim - Cross/Jonas                                      63

1  (indiscernible).

2  Q    Well, pick a number.  Is it 30, is it 40?  I don't know.

3  You're the chief legal officer of the debtor, right?  Let me

4  ask you a few questions.  You're the chief legal officer of the

5  debtor, right?

6  A    I am.

7  Q    Now, do you understand that these funding agreements,

8  they're the most valuable asset of the debtor, right?

9  A    That's true.

10  Q    Do you understand how critically important they are to

11  talc victims who the only way they're going to be able to

12  recover effectively is under the funding agreement?

13  A    I do.

14  Q    Okay.  So when you negotiated funding agreement two, you

15  had that in mind how critically important it was, right?

16  A    Well, when we agreed to funding agreement two, I did.

17  Yes.

18  Q    So did you think to yourself I better make sure I get at

19  least $60 billion of value for these people because I'm a

20  debtor in Chapter 11.  I have fiduciary duties to these people.

21  And I better make sure I get them at least the same amount of

22  value.  Did that go through your mind?

23  A    No, because at the time that -- after the Third Circuit

24  decision, the -- it was clear, there was consensus reached that

25  the first funding agreement was void or voidable, at least the

Kim - Cross/Jonas                                        64

1  J&J guarantee part of that.  And so when we were entering into

2  funding agreement two, we took out this risk of enforceability

3  and put in a new agreement that would benefit all the parties.

4  Q    Sir, do my clients have the same amount that they can

5  recover from under funding agreement two as under funding

6  agreement one?  Yes or no?

7  A    No, because of the Third Circuit decision, not because of

8  what we did.

9  Q    It's the Third Circuit's fault?

10           MS. BROWN:  Your Honor, I object.  It's

11 argumentative.

12           THE COURT:  Sustained.

13 BY MR. JONAS:

14 Q    Are you saying that the Third Circuit is responsible for

15 my clients having tens of billions of dollars less that they

16 can recover from?

17           MS. BROWN:  Same objection, Judge.

18           MR. JONAS:  I'd like to know, Your Honor.

19           THE COURT:  Overruled.

20           THE WITNESS:  What I'm saying is that when the Third

21 Circuit made its decision, one of the ramifications of the

22 decision was that it frustrated the purpose of the first

23 funding agreement, rendering it void or voidable.  So I don't

24 think -- the Third Circuit didn't meant do that.  I don't blame

25 the Third Circuit for doing that.  It's just a consequence of

1  how the Third Circuit ruled.

2          Therefore, when we were looking at this, from LTL's

3  position, we're now looking at an agreement, a funding

4  agreement which is the most valuable asset that has been

5  rendered void or voidable.  And so we came up with the solution

6  to try to rectify the situation, get -- get sufficient funding

7  for the claimants, and turn to a plan, a support agreement with

8  J&J where they would provide enough liquidity to come up with

9  the -- a solution to the issue which is embodied in the

10  proposal.

11  BY MR. JONAS:

12  Q    So when you gave up funding agreement one and you entered

13  into funding agreement two, you were trying to take care of my

14  clients?  Is that what you're saying?

15  A    Yes, absolutely, because we did not give up funding

16  agreement one.  Funding agreement one became void or voidable

17  and unenforceable, particularly the J&J guarantee as a result

18  of the Third Circuit decision.

19          What we did, we took that situation and tried to come up

20  with a situation for the benefit of all parties.  So we

21  exchanged an unenforceable funding agreement with an

22  enforceable funding agreement with Holdco, and a plan support

23  agreement that would provide, you know, $8.9 billion in a

24  settlement that has been -- that has the overwhelming support

25  of claimants.

Kim - Cross/Jonas                                    66

1 Q    Let me get at it another way.  I want to talk about how

2 J&J did under the funding agreements.  What was J&J's

3 liability, potential exposure or liability under funding

4 agreement one?

5 A    They had a void or voidable commitment under funding

6 agreement one after the Third Circuit decision.

7 Q    Sir, let's go back in time, okay, before I think you said

8 the Third Circuit made a mistake.  Before that happened, what

9 was J&J's exposure, possible exposure under funding agreement

10 one?  How much?

11 A    First, I didn't say the J&J -- that the Third Circuit made

12 a mistake.  I never -- I never said it.  And if I did say that,

13 I didn't mean to say that.  But under funding agreement one,

14 under the terms at that time, it voluntarily, without any need

15 to -- obligation as the Third Circuit said, J&J committed to

16 fund up to the fair market value of JJCI for the purpose of

17 getting all the cases resolved in a bankruptcy.

18 Q    Okay.  So under funding agreement one, J&J's total

19 exposure could have been $60 billion, right?

20 A    At that time, knowing the facts that we knew in

21 bankruptcy, yes.

22 Q    Okay.  Funding agreement two, today, under funding

23 agreement two, what is J&J's total potential exposure under

24 funding agreement two?

25 A    So after the funding agreement one was found void or

Kim - Cross/Jonas                                    67

voidable, and it had no exposure, it then committed to a $8.9

billion support agreement in order to get a plan approved to

resolve all talc claims, which again has the overwhelming

support of claimants.

Q    J&J's exposure went from 60 billion to 8.9 billion?

A    So --

Q    Yes or no, sir.

A    No.  No.  J&J -- no, no.  J&J's exposure originally was

nothing.  It -- without -- and again, as the Third Circuit

said, it voluntarily, without obligation, committed to $60

billion to get these claims resolved in bankruptcy.  Once the

Third Circuit ruled, exposure then became potentially zero.

And so after that, in order to get a plan approved, it now has

an exposure of $8.9 billion in order to get a plan approved in

bankruptcy.

Q    Okay.  So let me ask you, was it automatic?  When the

Third Circuit ruled, did J&J's exposure go to zero?

A    I think when it happened, there was a material risk that

its exposure went to zero automatically.

Q    Okay.  Material risk.  That's a good time to negotiate.

So tell me, when you were sitting there with J&J and you said

-- and they said -- they did tell you they thought their

exposure went to zero, right?  Did they tell you that?

A    I'm a little hesitant on attorney/client. But I will

answer.

Kim - Cross/Jonas                                              68

1  Q    Well, let's wait.

2  A    Yeah.

3  Q    Wait, because at deposition, you wouldn't answer that

4  question.  So let's see whether your counsel now for the first

5  time wants to let you, allow you to answer these types of

6  questions.

7         MS. BROWN:  Well, Your Honor, I think that is also

8  argumentative.  And certainly, what was true in the deposition

9  is true here.  To the extent answering that question is going

10 to reveal attorney/client communications, protected by work

11 product or common interest, then Mr. Kim shouldn't reveal

12 conversations he had with lawyers.  But certainly, he should be

13 able to answer that in the way that he understands he can do

14 without violating the privilege.

15        THE WITNESS:  So what I would say is my understanding

16 -- I had numerous conversations with J&J attorneys.  My

17 understanding from going away with that was that they were

18 asserting that the -- it was -- the contract was void or

19 voidable because of the Third Circuit decision based on a

20 number of legal principals that they had researched, my lawyers

21 had researched.  And we came to the conclusion there's a

22 material risk that the contract was void or voidable.

23        MR. JONAS:  Your Honor, I'm going to move to strike

24 because at deposition, time and time again we were not allowed

25 -- we were told that the only people, and I'll ask questions to

Kim - Cross/Jonas                                          69

1  confirm this, that the only people that could answer questions

2  about the alleged negotiation, to say it lightly, between J&J

3  and JJCI and the debtor were between lawyers.  And so they

4  could not tell us anything about those conversations.

5          So now for the first time, I guess we're going to

6  hear about it.  And I think it's inappropriate.  They cannot

7  use the privilege as a sword and a shield, Your Honor.

8          THE COURT:  Well, okay.  If I sustain your objection,

9  and his testimony's stricken, then what's the purpose in asking

10 the question.

11         MR. JONAS:  Well, I didn't know when I asked the

12 question, first of all, Your Honor.  So now that it's been

13 confirmed, I just, I don't think they can meet their burden

14 without answering these questions.  They didn't answer in the

15 deposition.  I don't think they should be able to permit it

16 here, and I don't think they can meet the burden.

17         THE COURT:  I'll sustain the objection.  I'll strike

18 the answer.

19         MS. BROWN:  Your Honor, can I be heard on this,

20 though?

21         THE COURT:  Yes.

22         MS. BROWN:  His testimony here is entirely consistent

23 with what the testimony was at the deposition.  He is giving

24 the testimony that he made the conclusion there was a material

25 risk.  He gave testimony at the deposition as he did right here

Kim - Cross/Jonas                                    70

1  about what his understanding was about J&J's position.  Beyond

2  that, as we asserted at the deposition, and as is true here,

3  discussions about a legal issue were had between lawyers.

4              THE COURT:  Mr. Jonas?

5              MR. JONAS:  Well, let me --

6              THE COURT:  He can testify as to his understanding.

7              MR. JONAS:  That's fine, Your Honor.  I'll keep --

8              THE COURT:  And if you want to phrase it -- that's

9  the bulk of it, although he referred to --

10             MR. JONAS:  Let me try some other questions, Your

11 Honor.

12             THE COURT:  All right.

13             MR. JONAS:  Maybe it will be useful.

14 BY MR. JONAS:

15 Q    So who at LTL negotiated this resolution with J&J?  Was it

16 you?

17 A    I was involved, with my counsel.

18 Q    You were involved, with your counsel.  That's the counsel

19 -- that's Jones Day, the folks that negotiated the funding

20 agreement one, right?

21 A    It is.

22 Q    Okay.  And so were you the principal -- you had authority

23 to bind LTL in connection with these negotiations?

24 A    We did not bind LTL until the board resolution.

25 Q    Okay.  But you were authorized to go out and speak for

Kim - Cross/Jonas                                      71

1  LTL?

2  A    I was authorized to discuss this.

3  Q    Okay.  So tell us about the negotiation between LTL and

4  J&J.  Did you guys say hmm, okay, maybe it's voidable.  How

5  about 59 billion, give us 59 billion.  And they said no, we're

6  only going to give you 8.9.

7       What happened?  How did you end up at 8.9 billion?

8  A    It's a result of the PSA.  There was -- so at the same

9  time that we are discussing how to deal with this situation

10 with the void or voidable -- I'm sorry, funding agreement and

11 the support agreement, at the same time there were negotiations

12 going on, of course, about a potential resolution through a

13 plan.

14      And so when those resolution -- when the discussions about

15 a potential plan resolution were being had, and a number was

16 proposed and accepted by lawyers representing over 60,000

17 claimants, that number of course became the basis for a new

18 support agreement in the bankruptcy setting.

19 Q    Okay.

20 A    That's where the number came from.

21 Q    Let me try and wrap up on a little piece here.  The

22 bottom, let me see if I can get to the bottom line.  The bottom

23 line is under funding agreement one, J&J's liability could have

24 been 60 billion.  Under funding agreement two, it's 8.9

25 billion.

Kim - Cross/Jonas                                        72

1          Is that right?

2    A    With all the, you know, answers that I've given on how

3    that came to be.

4    Q    I find it curious that you tell me that J&J raised the

5    issue of voidability or void because I think you said at your

6    deposition, please tell me if I'm wrong, that you made a

7    determination that there was a material risk that funding

8    agreement one was void or voidable based on the Third Circuit

9    Court of Opinions decision that LTL's first bankruptcy was

10   filed in bad faith.

11         Is that right?

12   A    That is right.  But that doesn't foreclose the discussions

13   I had with other people, and that they reached the same

14   conclusions either at the same time or before I did.  So --

15   Q    Well, who approached who?  Who -- was it J&J or was it LTL

16   that said oh my God, the funding agreement might be void or

17   voidable?  Who raised it first?

18   A    It was raised on a call that we were having.  We have

19   routine calls to discuss the bankruptcy.  I'm not sure who

20   raised it first.  But I think we quickly -- the issue came up

21   quickly.  And then the parties went off and did research on

22   that.

23   Q    But you're the guy that came up with the idea, right?

24   A    I never said that I came up with the idea.

25   Q    Well, let me --

1  A    I came up with an idea in my head that this is a

2  possibility.  I don't think I was the one that actually raised

3  it with J&J.  I think they also -- I think you cannot read that

4  decision without coming to the conclusion that there was a

5  frustration of purpose.

6      In fact, the Third Circuit itself pointed it out by saying

7  that it was ironic that the funding agreement that was there to

8  support a bankruptcy was used, you know, prevented the

9  bankruptcy.  So I think this is something that like minds think

10 alike.

11     And so, you know, I don't know that I was the one that

12 first raised the issue.  I know that it was discussed very

13 early on.  And everybody had that thought already.

14 Q    Just so you know, Mr. Kim, I read the decision a few

15 times.  Frustration of purpose never crossed my mind, just so

16 you know that.  Okay.  The Third Circuit's decision was issued

17 on or about January 30th, 2023, correct?

18 A    Yes.

19 Q    And prior to January 30th, 2023, you had never thought

20 about or considered that funding agreement one might be void or

21 voidable, right?

22 A    That's correct.

23 Q    And then on January 30th, the Third Circuit's decision

24 comes down.  And you think to yourself funding agreement one

25 now could be void or voidable, right?

Kim - Cross/Jonas                          74

1  A    That is true.

2  Q    And your determination was based on a footnote in the

3  Third Circuit's decision, right?

4  A    Well, that was part of it.  It was the entire decision.

5  But the footnote was a good marker for that, yes.

6  Q    And let me ask you, going back to when you first did

7  funding agreement one because again, that was the most valuable

8  asset, right?

9  A    Yes.

10 Q    You knew how important it was, right?

11 A    Yes.

12 Q    You knew it was really important to my clients, right?

13 A    We understood it was important for everyone.

14 Q    So when you negotiated funding agreement one, you hired

15 great counsel, Jones Day, right?

16 A    We did.

17 Q    Yeah.  And you really put a lot of effort into making sure

18 that funding agreement one would be a great agreement.  It

19 would always be available to our clients, right?

20 A    Well, in bankruptcy, yes.

21 Q    I thought you said the funding agreement was available in

22 and out of bankruptcy.

23 A    Well, it's a little complicated because the funding

24 agreement is really in two parts.  There's the part where JJCI

25 has, you know, has given up its agreement to fund up to its

1  value.  And then there's the J&J basically backstop.  That

2  backstop really was only intended to deal with things in

3  bankruptcy.

4       The J&J -- the JJCI portion of it, you know, is really a

5  function of the fact that we filed the divisional merger and we

6  had to take all the assets, or we wanted to have the assets of

7  JJCI.

8  Q    Did J&J tell LTL that it would not honor the funding

9  agreement outside of bankruptcy after the Third Circuit's

10 decision?

11 A    No, it didn't get that far because we came to a

12 resolution.  We understood the funding agreement was void or

13 voidable.  We never said to J&J well, you must pay us or else.

14 We both came to the conclusion, and a consensus, that the

15 funding agreement was void or voidable, possibly unenforceable.

16 There's a material risk.

17      And so what we did was we negotiated a solution.  We came

18 to a consensus on a solution to it before having a need to how

19 J&J, you know, refused to fund anything.

20 Q    Did you go to the TCC or any of the talc claimants, the

21 beneficiaries of funding agreement one and say hey guys, let's

22 talk about this.  We've got to figure out a strategy against my

23 counter party J&J because I don't want to lose $60 billion.

24 Did you talk to any of these folks who were the beneficiaries

25 about what to do?

Kim - Cross/Jonas                                             76

1  A    I did not.  I had my own counsel.  And I did my own review

2  and came to my own conclusions.

3  Q    So you thought it was best for you, yourself, to make

4  decision for tens of thousands of talc victims as to how to

5  handle the funding agreement?

6  A    I relied on, again, discussions I had with my counsel.

7  And we came -- and this is the path we chose.

8  Q    Did the board or anybody at LTL examine whether maybe

9  there was a claim against your counsel to what negotiated the

10  first funding agreement?

11          MS. BROWN:  Your Honor, I'm going to object to the

12  extent that implicates legal advice and exploration of legal

13  claims.  I don't think that's proper.

14          THE COURT:  Overruled.

15          THE WITNESS:  I think I did answer this in the

16  deposition.  So again, having been involved in putting together

17  the funding agreement, I was aware of these issues.  There was

18  -- it was clear to me and to others that this was something

19  that was completely unforseen and would be unforseen by all

20  parties.  And there was no question that there was no need to

21  try to look into filing a lawsuit against counsel.

22  BY MR. JONAS:

23  Q    I think everybody's going to get sick of me in about 30

24  seconds.  So I'm going to ask one last question to wrap it up

25  and see if I have it right.  Maybe I do, maybe I don't.  My

1  clients had the benefit of a $60 million funding agreement, the

2  first funding agreement, right?

3  A    At that time, yes.

4  Q    And today, maybe, maybe, I guess if they vote in favor of

5  a plan, they'd have the benefit of funding agreement two which

6  I'm not sure what you said, I think you said $30 billion of

7  value.  Is that right?

8  A    It is.  But then you're missing out that there's a plan

9  proposal on the table that a substantial number of claimants

10 have approved, which would be $8.9 billion, which is fully

11 funded under the funding agreement.

12 Q    Okay.  So that's my client.  Now let's just make sure I

13 got the J&J piece right.  J&J was liable for up to $60 billion

14 under funding agreement one, right?

15 A    Again, J&J, without any obligation, put that in in order

16 to enhance the prospects of a bankruptcy.  So that was why it

17 got put in.  At some point, it becomes void or voidable because

18 the Third Circuit decision.  And then they again committed

19 without having to, to an $8.9 billion support agreement in

20 order to facilitate a resolution.

21 Q    Just to wrap up, today, J&J's maximum liability is $8.9

22 billion, right?

23 A    Under the support agreements that it has.

24 Q    So with -- because of the Third Circuit's decision, J&J

25 got off the hook for $50 billion of talc liability?

Kim - Cross/Jonas                                     78

1  A     Again, it did not get off the hook.  The hook -- the

2  agreement itself, the first funding agreement was not required

3  by J&J.  And as the Third Circuit noted, it put in that

4  guarantee in order to facilitate a resolution of bankruptcy.

5        Once the -- ironically, I think it was the Third Circuit

6  said the very -- the very provision that was supposed to help

7  it in bankruptcy actually turned into a provision that

8  prevented the bankruptcy, causing that guarantee to be void or

9  voidable.

10       And after that, as a resolution to try to resolve all this

11 talc claims in bankruptcy, J&J again committed $8.9 billion

12 which was part of the PSA, part of the plan that was negotiated

13 to try to resolve all the litigation.  And that's what

14 happened.

15            MR. JONAS:  Your Honor, could we have a short break?

16            THE COURT:  Sure.  Let's see.  It's ten to 12.  My

17 plan is to go to 1:00, take a half-hour lunch.  Why don't we

18 come back in ten minutes?

19            MR. JONAS:  Thank you, Your Honor.

20            (Recess at 11:52 a.m./Reconvene at 12:06 p.m.)

21            THE COURT:  Okay.

22 BY MR. JONAS:

23 Q    Mr. Kim, on what date did the old funding agreement become

24 inoperative and the new funding agreement become operative?

25 A    I think the date of the termination agreement.

Kim - Cross/Jonas                        79

1  Q    Which is what?

2  A    It became effective right after the case, the bankruptcy

3  case was dismissed.

4  Q    So the funding agreement, even though this risk

5  void/voidability occurred on January 30th, the funding

6  agreement remained operative for the remainder of the

7  bankruptcy case?

8  A    That was our agreement.

9  Q    Your agreement with whom?

10 A    Well, because it's a termination agreement, the agreement

11 was that it would remain operative until the termination

12 agreement.

13 Q    Okay.  Well, on what date did you reach that -- strike

14 that.

15      I take it that agreement was between LTL and J&J; right?

16 A    I think there was a consensus among the lawyers.

17 Q    Consensus among the lawyers.  Well, lawyers don't make

18 deals -- can't bind clients to deals; right?  Clients have to

19 do that themselves; right?

20 A    Right.  The board was apprised ahead of time that there

21 was a termination agreement that was going to be in place and

22 what that would mean is that everything would stay in place so

23 that, you know, LTL would  not remain bare until the

24 termination agreement became effective, which happened as soon

25 as the bankruptcy case was dismissed.  So you'll see, I think,

Kim - Cross/Jonas                                    80

1  I'm sure there's a packet of materials where there's a

2  termination agreement that becomes effective right after the

3  bankruptcy case gets dismissed.

4  Q    So while you were -- strike that.

5       While you were an officer of a Chapter 11 debtor in

6  bankruptcy with fiduciary duties to talc claimants, you had

7  negotiated the termination of the existing funding agreement;

8  correct?

9  A    Well, we had authorized the termination if the bankruptcy

10 -- again, it was all predicated upon the bankruptcy being

11 dismissed; therefore, at that point, we would not have, you

12 know, the bankruptcy.  So all the things that go with the

13 bankruptcy, including creditors committees, the debtor, you

14 know, the claimants, once we're out of bankruptcy, that would

15 all have ended.  So what we agreed was that, if the bankruptcy

16 gets terminated, then we would take these actions.

17 Q    Okay, let me back up.  I'm not being clear and I

18 apologize.

19      This case, LTL I was dismissed on April 4 -- April -- I

20 think it was April 3rd or 4th; right?

21           THE COURT:  April 4th.

22 BY MR. JONAS:

23 Q    4th.  Correct?

24 A    I will take your word for that as well.

25 Q    Okay.  And about two hours or so after LTL I was

Kim - Cross/Jonas                                            81

1  dismissed, LTL II commenced a new bankruptcy case; right?

2  A    It did.

3  Q    Okay.  Now, that whole -- you've told about this

4  void/voidability issue, negotiation, discussion, termination

5  agreement, new funding agreement, that all didn't happen in two

6  hours; did it?

7  A    The discussions around it didn't happen in the two hours,

8  the authorization for it, it was -- the authorization for it

9  specifically stated that it would not become effective until

10 the termination of the first bankruptcy.

11 Q    And those -- I think you said those discussions,

12 negotiations, whatever they are, between LTL and J&J, they

13 started pretty quick after the Third Circuit decision; right?

14 A    There were numerous discussions right after the Third

15 Circuit decision, yes.

16 Q    Okay, so February, March.  And over those months, while

17 you were an officer of a Chapter 11 debtor, you were doing a

18 new deal, a new transaction, a new arrangement with J&J to

19 terminate the existing funding agreement and enter into a new

20 funding agreement; right?

21 A    I would say that there were ongoing discussions among the

22 lawyers of a variety of things that could happen, one of them

23 which was the termination of the old funding and the new

24 funding agreement, but there were discussions throughout that

25 period of how to -- how to resolve sort of the talc litigation

Kim - Cross/Jonas                                              82

1  for everyone.

2  Q    And so, obviously, LTL, J&J, they knew what was going on

3  in this connection because they were involved in it; right?

4  A    They were involved in it, yes.

5  Q    Okay.  Did you tell the creditors committee, the TCC, what

6  was going on during this time that you were in Chapter 11?

7  A    Not -- I did not have any conversations with the creditors

8  committee or the TCC.

9  Q    In fact, sir, you hid it from the Bankruptcy Court and the

10 bankruptcy community, meaning the TCC and others, you hid that

11 from them; didn't you?

12 A    I --

13           MS. BROWN:  I object, Your Honor, argumentative.

14           THE COURT:  Overruled.

15           THE WITNESS:  I would say, you know, these are

16 confidential communications, we had no idea what we were going

17 to do.  We were looking at various options and we did not want

18 to make public disclosures about this at the time that we were

19 still involved in looking at these issues.

20           MR. JONAS:  May I approach, Your Honor?

21           THE COURT:  Yes, please.

22           MR. JONAS:  I think we're on --

23           THE COURT:  3.

24           MR. JONAS:  -- 3.

25 BY MR. JONAS:

Kim - Cross/Jonas                          83

1  Q    Mr. Kim, I want you to take a look at what's been marked

2  as TCC Exhibit 3.  And you're familiar with this type of form,

3  it's a monthly operating report; right?

4  A    I am.

5  Q    And this one is dated March 21, '23.  Do you see that at

6  the top?

7  A    I do.

8  Q    Okay.  And this is a document that LTL, the debtor, files

9  to advise the Court and to advise its creditors and, in this

10 case, talc claimants how the debtor is doing, what's going on

11 financially with the debtor; right?

12 A    I believe that's true, yes.

13 Q    And I want you to take a look at page, at the top it says

14 3 of 11, paragraph 9.  And the second sentence says --

15 A    I'm sorry --

16 Q    I'm sorry.

17 A    -- 3 of 11 -- oh, I see, yes.

18            THE COURT:  It's the --

19            THE WITNESS:  I got it.

20            THE COURT:  -- there's a second document that has

21 numbers.

22            MR. JONAS:  I'm sorry --

23            THE WITNESS:  Thank you, Your Honor.

24            MR. JONAS:  -- I'm sorry.

25 BY MR. JONAS:

Kim - Cross/Jonas                                  84

1  Q    Just let me know when you're there.  You'll see the first

2  full paragraph is 8 and then it says 9.

3  A    I see that, yes.

4  Q    And 9, the second sentence says, "Further funding, if

5  necessary, will be available under the funding agreement to

6  satisfy the debtor's expenses."  Do you see that?

7  A    I do.

8  Q    So, on March 21st, you knew on this date you would --

9  strike that.

10     On March 21st, you had had multiple discussions,

11  conversations, whatever you want to call them, between LTL and

12  J&J about terminating the funding agreement and doing a new

13  funding agreement; right?

14  A    Yeah, when the bankruptcy got dismissed.

15  Q    Okay, but that -- on March 21st, you knew that; right?

16  A    Yeah, when the bankruptcy got dismissed, there was a

17  discussion of terminating the funding agreement.

18  Q    You knew the bankruptcy was going to get dismissed within

19  a few weeks; right?

20  A    No.  We were still at that point hopeful that we would get

21  a stay of proceedings and seek review, cert review by the

22  United States Supreme Court.  So, you know, there was still --

23  we still had our plan to try to get the U.S. Supreme Court to

24  hear it.

25  Q    Okay, but on March 21st, notwithstanding that you knew and

1  J&J knew and JJCI knew that, if the case was dismissed, you

2  were going to terminate the existing funding agreement and you

3  were going to do a new funding agreement and you were going to

4  have -- let J&J off the hook for tens of billions of dollars,

5  you filed something with the Court letting everybody know the

6  funding agreement was still in place?

7  A    In bankruptcy because, again, the plan was the termination

8  doesn't happen until the bankruptcy is dismissed.  So this

9  report talking about what funds are available in bankruptcy is

10 true then, it's true now, and I'm not sure what you're getting

11 at.

12 Q    Sir, with respect to -- strike that.  Okay, moving on.

13      Mr. Kim, in the first bankruptcy case, Randi Ellis was

14 appointed Future Claimants Representative or FCR; correct?

15 A    That is correct.

16 Q    And Ms. Ellis' role as FCR was terminated on the dismissal

17 date April 4th, 2023; correct?

18 A    I believe that's true.  I'd have to look at the order and

19 the date of the order.

20 Q    I'll represent that to you.

21 A    That's fine.

22 Q    The debtor is seeking to have Ms. Ellis appointed as FCR

23 again in the second bankruptcy case; correct?

24 A    We are.

25 Q    And I want to show you the next exhibit, the term sheet.

Kim - Cross/Jonas                          86

1          MR. JONAS:  May I approach, Your Honor?

2          THE COURT:  Yes, please.

3          THE WITNESS:  Thank you.

4          MR. JONAS:  This will be TCC-4.

5          THE WITNESS:  Thank you.

6    BY MR. JONAS:

7    Q    And, Mr. Kim, this is a term sheet for, I guess I'll call

8    it the debtor's plan; is that fair?

9    A    Well, it was a term sheet that was attached to the plan

10   support agreement.

11   Q    Okay.  And this is basically outlined in the term sheet;

12   right?

13   A    These were terms that were proposed.

14   Q    Okay.  Now, you didn't file this -- you filed the PSA with

15   your declaration; correct?

16   A    Correct.

17   Q    But you didn't file this?

18   A    I believe that's true, yes.

19   Q    Okay.  And I want to -- and this was prepared in probably

20   March sometime?

21   A    I don't know when it was prepared.

22   Q    Okay.  It wasn't prepared in the two hours between the two

23   bankruptcy cases; right?

24   A    I doubt that, but I don't know when it was prepared.

25   Q    Well, you have PSAs, if we went and looked, you have PSAs

Kim - Cross/Jonas                                        87

1  dated in mid-March; right?

2  A    There are, but I don't know what was attached or if

3  anything was attached to them at that time.

4  Q    So there's PSAs that don't have the term sheet attached?

5  A    Again, I don't believe that's true, I just don't know.

6  Q    Well, sir --

7  A    Well, and when I say attached, I understand that people --

8  and I've read Mr. Murdica's testimony that he discussed these

9  terms with everyone, but I don't know what form was there.

10 Q    I'm going to make it easy.  You -- on behalf of the

11 debtor, you signed plan support agreements; right?

12 A    I did.

13 Q    Okay.  My question is, the 16 or 17 plan support

14 agreements that you signed, did they all have the term sheet

15 attached?

16 A    I signed a document in -- to be effective as of the -- as

17 of the date of the bankruptcy.  So they weren't physically

18 attached when I signed it, I believe they were attached, but,

19 again, I don't know.

20

21 Q    Do you know if they were attached when the plaintiffs' law

22 firm signed it?

23 A    I don't know if they were attached or whether they were

24 discussed or given to them separately, that's all.

25 Q    Well, if they weren't attached, do you think the law firms

Kim - Cross/Jonas                                    88

1 were bound to the PSA that says we're bound to the attached

2 term sheet and there's no term sheet?

3 A    Again, according to Mr. Murdica, all the plaintiffs knew

4 what the terms were.

5 Q    Okay.  So, as early as mid-March, there's PSAs getting

6 signed up and, I guess, maybe they have a term sheet attached

7 and maybe they don't; right?

8 A    Yeah, I don't know exactly what was attached.

9 Q    Okay.  The term sheet is the centerpiece of LTL's Chapter

10 11 plan to go forward and resolve talc claims; correct?

11 A    Well, the terms are the important terms, but some of these

12 terms, as I think I explained to you in my deposition, some of

13 these are just placeholders and some are still subject to

14 negotiation.

15 Q    Sir, the plan -- the term sheet is the centerpiece of the

16 Chapter 11 plan; right?

17 A    No, I would say -- I disagree with that.  I would say some

18 terms are material and the centerpiece, I would say some of the

19 terms in here are not the centerpiece, they're just typical

20 terms that appear in many agreements and that are necessary for

21 a plan.

22 Q    Let's try it this way:  Is the term sheet important in

23 this bankruptcy case?

24 A    I would say most of the terms of that term sheet are

25 important, some terms are more important than others.

Kim - Cross/Jonas                              89

1  Q    Okay.  Let's take a look at page 5.  At the top of this

2  term sheet, which you were signing people up to during the

3  pendency of the first bankruptcy case, while Ms. Ellis had a

4  court-appointed official, she was the FCR, during that period

5  of time, on paragraph -- on page 5, at the top, (b)(1), "Randi

6  Ellis shall serve as claims administrator of the Talc Trust for

7  purposes of qualifying claimants and allocating proceeds to be

8  distributed amongst all existing and future qualifying

9  claimants.  Ms. Ellis shall utilize and supervise Archer

10 Systems, LLC in the qualification and allocation of talc

11 claims."

12      Do you see that?

13 A    I do see that.

14 Q    And in fact that was in March, at least the first term

15 sheet that was attached to a PSA was in mid-March; right?

16 A    Yes.  Understand, this is a placeholder name that Mr.

17 Murdica put in without really consultation because he thought

18 that this was a -- she would be a good choice.  But, again,

19 this is one of these terms that is not really material and that

20 is subject to a negotiation.

21 Q    Sir, it may not be material to you, but are you aware --

22 give me a second.  I'm not trying to be -- cause a firestorm, I

23 just want to know, are you aware that it is a bankruptcy crime

24 under 18 U.S.C. 152(6) to knowingly and fraudulently give,

25 offer, receive, or attempt to attain any money, property,

Kim - Cross/Jonas                                        90

1  remuneration, compensation, reward, advantage, or promise

2  thereof, for acting or forbearing to act in any case under

3  Title 11, are you aware of that law?

4        MS. BROWN:  Your Honor, I object to this question for

5  numerous reasons, including that it's argumentative.

6        THE COURT:  Overruled.  Are you -- can you answer

7  that question?

8        THE WITNESS:  So this is -- no, I'm not aware; it

9  makes sense to me, but I'm not aware.

10  BY MR. JONAS:

11  Q   Okay.  And, after you filed the second bankruptcy case on

12  April 4th, you filed a motion to have Ms. Ellis, the claims

13  administrator under your term sheet, to be reappointed as FCR;

14  correct?

15  A   Correct.  And, again, she's not claims administrator under

16  the term sheet.  This is a placeholder put in place because Mr.

17  Murdica thought she'd make a good claims administrator.  My

18  understanding is that, you know, there was no offer or

19  discussion about this.  This is a placeholder and subject to

20  negotiation.

21  Q   Well, when the plaintiffs' lawyers show the PSA and the

22  term sheet to their 60-odd-thousand, according to you, clients,

23  they're going to think Ms. Ellis is the claims administrator;

24  right?

25  A   Yeah.  I'm not sure they're going to care about that at

Kim - Cross/Jonas                                    91

1  all.

2  Q    I know, sir, and maybe they won't care, but we're in a

3  formal legal proceeding and there are rules that have to be

4  abided by.  Do you understand that?

5  A    Yeah, I don't think there's a rule about putting a

6  placeholder name in a document.

7  Q    Okay.  You're aware that Ms. Ellis filed a declaration in

8  support of the motion to have her appointed, reappointed as

9  FCR; correct?

10  A    I think I heard that at the last hearing; I don't think

11  I've ever seen it.

12  Q    You've never seen it.  So you don't know whether Ms. Ellis

13  disclosed her role as claims administrator in her declaration?

14  A    I would say that assumes that she has a role as claims

15  administrator, which she doesn't.

16  Q    Well, let me ask it this way:  Did she disclose she might

17  be the claims administrator?

18  A    She might or she might not.  I don't think -- I don't even

19  really know that -- I don't believe Ms. Ellis even knows that

20  her name appears in this.  You'd have to ask her.

21  Q    How do you know that, sir?  How do you know that?

22  A    Because my understanding is that, at least from our

23  perspective, Mr. Murdica never talked to Ms. Ellis about

24  putting this -- about this and he had put her name is a

25  placeholder.

1  Q    Did you read the term sheet before you signed the PSAs?

2  A    I did.

3  Q    You read it carefully, I hope, right, because that's going

4  to -- if this works, if your plan works, you're going to bind

5  all the talc claimants; right?

6  A    Well, the plan -- the plan will bind it, if it gets

7  approved.  And this is not part of the plan.  Again, this is

8  subject to negotiation, there are parts of this that are going

9  to be changed when an actual plan comes together and when

10 actual people decide that they really want these roles or that

11 the roles are actually offered to them.  So that's somewhere

12 down the road.

13 Q    You testified quite a bit about your, I don't know, I'll

14 deign to call it vast experience in mass tort cases; right?

15 A    Well, I shouldn't have used the word vast.  I have a lot

16 of experience in mass tort cases --

17 Q    Okay.

18 A    -- yes.

19 Q    So you know that claims administrators oftentimes in large

20 mass tort cases, they get paid millions of dollars, you know

21 that; don't you?

22 A    So I don't know that.  You know, from my perspective,

23 that's -- usually claims administrators, when we enter into a

24 mass tort settlement, is something that the defense really has

25 very little interest in.  The defense cares about putting the

Kim - Cross/Jonas                                    93

 1  money into a fund and then how it gets administered and the

 2  administration of that, that's generally left up to the

 3  plaintiffs.

 4  Q    Well, let's take a look at some board minutes of March

 5  16th.

 6                          (Crosstalk)

 7            MR. JONAS:  May I approach, Your Honor?

 8            THE COURT:  You may.

 9            THE WITNESS:  Thank you.

10  BY MR. JONAS:

11  Q    Okay, let's just take a quick look -- I hope we're in the

12  home stretch, Mr. Kim -- at what will be, I think, TCC No. 5.

13  This is the debtor's minutes from a board of managers meeting

14  on March 16th, 2023; correct?

15  A    Yes.

16  Q    And you were at this meeting; right?

17  A    I was.

18  Q    And down below, on March 16th, 2023, the board was talking

19  about contingency planning; right?

20  A    Correct.

21  Q    And they talked about seeking approval from the board to

22  file another bankruptcy; right?

23  A    That's one of the things that -- contingencies they were

24  looking at, yes.

25  Q    Yeah.  And another thing you talked about -- turn the page

1  over, please, and if you look at the fourth bullet, you talked

2  about gauging whether the future claimants representative would

3  support a further bankruptcy in the contours of a plan; right?

4  A    I see that, yes.

5  Q    Because you thought it was important to get the future

6  claimants representative on board with your new plan; right?

7  A    No, we were not trying to get the future claimants

8  representative on board.  We were having discussions to see

9  what her reaction would be if a new bankruptcy were filed.

10  Q    But let me ask you what I asked you at your deposition.

11  The debtor's board thought it was important to get the FCR on

12  board to support a second bankruptcy and the contours of a

13  plan; isn't that right?

14  A    If that was the question, I mean, the -- well, I think

15  getting on board would be objectionable.  I don't know that we

16  tried getting her on board.  We were trying to determine what

17  the -- what her views were on it.

18  Q    Okay.  Let's look at hopefully the last exhibit, which

19  will be a presentation on March 28th to the board.

20            MR. JONAS:  May I approach, Your Honor?

21            THE COURT:  Yes.

22            MR. JONAS:  TCC Exhibit 6.

23            THE WITNESS:  Thank you.

24                      (Pause)

25  BY MR. JONAS:

1  Q     Mr. Kim, I want to show you what's been marked as TCC-6,

2  it's a presentation to the board of managers of LTL on March

3  28th; right?

4  A     It is.

5  Q     And you were at that board meeting too; right?

6  A     I was.

7  Q     And if you go to page 7 of the presentation, it has the

8  Bates number 239, the last digits on the bottom.

9  A     Yes.

10 Q     It says -- the title is "Support of Future Claimants

11 Representative."  Do you see that?

12 A     I see that.

13 Q     And you were having separate discussions about your new

14 plan with the FCR during the old bankruptcy case; right?

15 A     No.  We weren't actually -- at that point, it was just a

16 support for the bankruptcy.  I don't know about she was

17 presented or discussed any plan with her.

18 Q     Sir, the top bullet, it says, "Separate discussions have

19 occurred with FCR."

20       Those discussions were about the yet-to-be-filed new

21 bankruptcy; were they not?

22 A     Yeah, they were about the bankruptcy, not the plan.  In

23 other words, it wasn't -- I don't think at this time we were --

24 we had started -- I think there were talks about starting to

25 talk also about a plan, but at the time we were trying to her

Kim - Cross/Jonas                                              96

1  support just on a new bankruptcy filing.

2  Q    Really?  Okay.

3       And it says here that she -- I guess the good news, she

4  was supportive of a second LTL Chapter 11 case in the event the

5  current case is dismissed; right?

6  A    That's what this says, but, you know, eventually, she

7  decided that she was not going to take a position on the

8  filing.

9  Q    But, sir, I heard what you said, but the last bullet says,

10 "In addition, discussions are ongoing to obtain a plan support

11 agreement from the FCR."

12      Do you see that?

13 A    I do, but this is not the same plan support agreements

14 that we would have signed by the plaintiffs' counsel, this is

15 -- you know, if you look at the form, it would make no sense

16 for her to sign the plan support agreement that we were looking

17 at.  I think discussions were ongoing as to what kind of -- if

18 she would support a plan and what kind of plan she would

19 support.  But, again, nothing happened because she decided that

20 she was not going to take a position on this.

21 Q    But you tried to get her to take a position; did you not,

22 sir?

23 A    Well, we wanted to see if she was supportive of what we

24 were trying to do.

25 Q    Yeah.  And I assume, in connection with getting her to

1  sign a plan support agreement, did you give her the term sheet?

2  A    Again, there would be a different plan support agreement.

3  That plan support agreement that the plaintiffs signed would

4  not be the same plan support agreement she has.  I mean, if you

5  look at the form, it would not make sense.

6  Q    Did you give her the term sheet, sir?

7  A    I don't believe so, but, again, I don't know.

8  Q    Mr. Kim, you understand that in order for the Court to

9  grant a preliminary injunction today it has to find a

10  reasonable likelihood of success that the debtor will be able

11  to confirm a plan; correct?

12  A    I believe that's -- I believe that's true.  I'm not a

13  bankruptcy expert, but I've heard -- I've heard that said here

14  several times.

15  Q    And do you understand that that means that this Court and

16  likely the Third Circuit Court of Appeals would have to find

17  that termination of the funding agreement was not a fraudulent

18  transfer, do you understand that?

19  A    I believe that's true, yes.

20  Q    Okay.  And do you also understand that you would need 75

21  percent of talc claimants to approve any plan?

22  A    When it came to a vote, yes, I do.

23  Q    And you understand that the Official Committee of Talc

24  Claimants in this case, substantially composed of plaintiffs'

25  lawyers representing thousands or tens of thousands of talc

1 claimants, opposes the debtor's plan, do you understand that?

2 A    I understand that they're a very small portion of the

3 claimants and the vast majority of claimants support the plan.

4 Q    Do you understand that during any stay that the debtor and

5 J&J obtain in this case talc claimants die during that period

6 of time?

7              THE COURT:  Sustained.

8              MS. BROWN:  Objection, Your Honor.

9              MR. JONAS:  No further questions, Your Honor.  Thank

10 you.

11             THE COURT:  Mr. Satterly, just give me an estimate.

12 I wanted to stop at 1:00.  Are we going to fit you in?

13             MR. SATTERLY:  Yes, I'll stop at 1:00.  I may be

14 finished by 1:00, but if not, it will just be a few minutes

15 after lunch.

16             THE COURT:  Okay.

17             MR. SATTERLY:  May I proceed, Your Honor?

18             THE COURT:  Yes.

19                          CROSS-EXAMINATION

20 BY MR. SATTERLY:

21 Q    Good afternoon, Mr. Kim.  Joe Satterly.  You and I met

22 many times; correct?

23 A    We have, Mr. Satterly.

24 Q    And I'm going to talk about specific individual claimants

25 that Mr. Maimon mentioned earlier, but before I do that I want

Kim - Cross/Satterly                                    99

1  to make sure I clearly understand the situation here.

2       LTL and J&J are separate entities; correct?

3  A    Yes, but LTL is a subsidiary indirectly of J&J.

4  Q    And you, upon reading the Third Circuit opinion on January

5  30th, in your mind, you made the decision that the funding

6  agreement could be void or voidable; correct?

7  A    No.  I came to the conclusion that that was an issue that

8  -- I think everyone thought that was an issue and that, after

9  further discussions and research, then I came to the conclusion

10 that there was a material risk that the agreement was void or

11 voidable and unenforceable.

12 Q    And at no point in time in February of this year are there

13 any board minutes where you and Robert Wuesthoff and Rich

14 Dickinson sat down and talked about whether the funding

15 agreement was void or voidable; true?

16 A    Not true.

17 Q    That's not true?

18 A    No, it's in the resolutions and it was discussed at the

19 board meeting --

20 Q    And --

21 A    -- before --

22          MS. BROWN:  Let him finish.

23          THE WITNESS:  -- I'm sorry --

24 BY MR. SATTERLY:

25 Q    I'm sorry, February?

Kim - Cross/Satterly                    100

1   A    Maybe it's the date issue.

2   Q    I said February.

3   A    In February.

4   Q    In February.  I'll get to April 2nd in a little bit.

5   A    Okay.  In February, there are no board meetings, but there

6   were staff meetings where we discussed the potential issues

7   with the contract.

8   Q    So let me ask the question again.  In February 2022, there

9   are no board minutes, no documents discussing the funding

10  agreement being void or voidable?

11          THE COURT:  February 2023?

12          MR. SATTERLY:  February 2023, yes, Your Honor.  Sorry

13  about that.

14          THE COURT:  Time flies.

15          THE WITNESS:  There may be legal -- there may be

16  documents, there are no board minutes.  When you say are there

17  any documents, I don't know how many documents could be out

18  there that discuss this.  There was a lot of research being

19  done on this, but there were no board minutes that discussed

20  this before --

21  BY MR. SATTERLY:

22  Q    Well, let me ask a question.  LTL, over the last week or

23  so since the filing of the second bankruptcy, hasn't produced a

24  single document in February 2023 wherein the discussion of the

25  funding agreement being void or voidable is discussed?

1  A    No.  I think, because of the press of time, we have not

2  been able to do a full document production review.  So we tried

3  to get as much information as we could for this hearing and we

4  came up with the board minutes and the presentations, which you

5  have.

6  Q    At any point in time from January 30th until April the 4th

7  of 2023, LTL did not get independent evaluations, separate and

8  apart from whatever lawyers you were talking about, independent

9  evaluations regarding the funding agreement being void or

10 voidable; correct?

11 A    I'm actually not sure whether there was other lawyers that

12 were asked about this.  I don't have any recollection

13 currently, but I do recall there were -- there were -- there

14 may have been some conversations with other lawyers, but,

15 again, I don't recall them specifically.

16 Q    At no point in time from January 30th of this year until

17 the filing of the second bankruptcy did LTL come back to this

18 Court, to Judge Kaplan, and say I want Your Honor to declare

19 one way or the other whether or not this funding agreement is

20 void or voidable; true?

21 A    It's true.  It did not come to the point where we needed

22 to do that because we came to an agreement as to how to resolve

23 the issues by entering into another funding agreement and a

24 support agreement by J&J.

25          MR. SATTERLY:  Move to strike everything beyond "It's

 1  true."

 2          THE COURT:  Sustained.

 3  BY MR. SATTERLY:

 4  Q    It's true, sir, that you have never negotiated anything

 5  with regards to any of the plaintiffs' lawyers that have signed

 6  this plan support agreement; true?

 7  A    No, that is true, I did not do the negotiations.

 8  Q    You never, other than maybe meeting Mr. Watts at one point

 9  in time, you never sat down and negotiated anything with

10  regards to any talc claimants with him; correct?

11  A    I did not.

12  Q    And same with regard to Mr. Pulaski, you haven't conducted

13  any negotiations with him as well; correct?

14  A    No, correct.  I relied on counsel.

15  Q    And I'm going to get to relied upon counsel in a minute.

16       And you have not negotiated anything on behalf of LTL with

17  any plaintiffs' lawyers with regard to talc at all; correct?

18  A    Not directly with plaintiffs' lawyers, no.

19  Q    Okay.  And you said you relied upon counsel.  The counsel

20  that you relied upon is Mr. Murdica, you said that earlier;

21  correct?

22  A    Well, Mr. Murdica was doing most of the direct

23  negotiations, but my counsel at Jones Day also was involved in

24  reviewing materials as well.

25  Q    And so with regards to the negotiations, though, I'm not

1 talking about just reviewing materials, with regards to the

2 negotiations with these plaintiffs' counsel, it's your

3 testimony that you relied upon Jim Murdica --

4 A    Well, again, I --

5 Q    -- correct?

6 A    No.  It depends on how you define the negotiations.  We

7 were -- I included where it was being apprised routinely about

8 the state of the negotiations, asked questions, had input.  So

9 I did not read -- I and Jones Day may not have been interacting

10 directly with counsel, but, you know, we were aware of the

11 negotiations and we had discussions about them.

12 Q    You said earlier that it was Mr. Murdica's obligation to

13 do due diligence with regards to these plaintiffs' law firms;

14 correct?

15 A    That would be one of his obligations, yes.

16 Q    And Mr. Murdica at no point in time provided you a due

17 diligence report regarding his evaluations; correct?

18 A    No.  We discussed the things that he was doing and getting

19 periodically.  So I don't know what a due diligence report is,

20 but, again, I've known Mr. Murdica for over 20 years, I've

21 worked with him.  We have discussions regularly about what's

22 going on, what's being provided, who's saying what, what

23 representations are being made.

24     So, again, if that's -- you know, I'm not sure what you

25 mean by due diligence report --

Kim - Cross/Satterly                104

1  Q    A document, a report.  Let me show you my due diligence,

2  what I did with regards to investigating these lawyers, these

3  law firms, what's happening with these settlements?

4  A    And none of my dealings of over 30 years of negotiating

5  these --

6  Q    I didn't ask you --

7  A    -- agreements do we ever see a due diligence report.

8         MR. SATTERLY:  Move to strike, Your Honor, non-

9  responsive.  I didn't ask him whether something happened over

10 30 years.

11        MS. BROWN:  But, Your Honor, could he at least be

12 allowed to finish his answer, please?  I think --

13        MR. SATTERLY:  I'll let him finish, Your Honor --

14        MS. BROWN:  -- Counsel is cutting him off --

15        MR. SATTERLY:  -- before I move to strike.

16        MS. BROWN:  -- multiple times.

17        THE COURT:  Motion to strike is granted.  Allow him

18 to finish the answer.

19        Limit your answers, please, to yes or no when you

20 can.

21        THE WITNESS:  Thank you, Your Honor.

22        MS. BROWN:  Thank you, Your Honor.

23 BY MR. SATTERLY:

24 Q    Let me ask the question again, sir.  Has Mr. Murdica, who

25 is charged with the due diligence of investigating these

Kim - Cross/Satterly                        105

 1  lawyers, these law firms, provided any written reports to LTL,

 2  to you or anybody else at LTL?

 3  A    There's no --

 4  Q    Is that a yes or no?

 5  A    Would an email count?  There may be emails, but no written

 6  due diligence, something called -- titled due diligence report.

 7  Q    Did Mr. Murdica share with you any investigation with

 8  regards to Mr. Watts' previous representations of having claims

 9  and representing to courts that he had claims when he really

10  didn't have claims?

11  A    I assume, since they didn't have claims.  I've seen the

12  PSA, I've seen the chart that Mr. Watts provided; I had

13  conversations with Mr. Murdica about Mr. Watts.  I'm not sure

14  what you're -- you know, is there a formal report titled a due

15  diligence report?

16  Q    Sure.

17  A    No.

18  Q    Well, let me ask you, let me just ask you this, sir, did

19  Mr. Murdica advise you, for example, that Mr. Watts in the BP

20  litigation claimed to have 40,000 claims and it turned out that

21  he didn't?

22          MS. BROWN:  Your Honor, I'm going to object as

23  assuming facts and lacking foundation.

24          MR. SATTERLY:  I think it's right on point, Your

25  Honor, with regard to this due diligence that he delegated to a

1   separate entity.

2           THE COURT:  Objection sustained.

3   BY MR. SATTERLY:

4   Q    Did Mr. Murdica advise you as to any aspect of what he did

5   with regards to any of these lawyers?

6   A    As I guess I testified several times, we -- I know that we

7   had discussions about him having discussions with lawyers,

8   about his knowledge of the reputation, of how long he's been

9   dealing with these folks, how -- you know, whether he trusted

10  them or not, what information he was getting from them.

11          So, you know, we had -- and also what is actually needed

12  at this time for our purposes and whether, you know, a process

13  should be taken later to confirm all this stuff.  So we've had

14  discussions about that.

15  Q    With regards to these negotiations of mass tort cases that

16  you have relied upon with regards to Mr. Murdica, you said, in

17  the past, none of them, zero, involved the entry of a

18  channeling injunction preventing individuals from filing

19  lawsuits against J&J; true?

20  A    Yeah, none of them were in bankruptcy, but --

21  Q    And none --

22  A    -- nothing else --

23          MS. BROWN:  Can you please let him finish?

24          THE WITNESS:  Yeah, none of them was in bankruptcy,

25  but --

Kim - Cross/Satterly                    107

 1 | BY MR. SATTERLY:

 2 | Q    Is that a true statement?

 3 | A    -- so that -- yeah, so that that -- yeah, so that would be

 4 | different, yes.

 5 | Q    So that's a yes; correct?

 6 | A    That's true.

 7 | Q    Okay.  And so none of the negotiations that you're

 8 | referring to in the past would have prevented future

 9 | individuals from making a lawsuit against J&J or any of the J&J

10 | subsidiaries through the negotiation process that Mr. Murdica

11 | engaged in with these lawyers; correct?

12 | A    I believe that's -- that's true.

13 | Q    Okay.  Let me just ask a few more points before the lunch

14 | break.

15 |     The PSA, the plan support agreement, is dated March 21st;

16 | correct?

17 | A    I don't believe it's dated at all.

18 |         MR. SATTERLY:  Well, Your Honor, I only have one copy

19 | of it.  May I approach at lunch and we'll make copies?

20 |         COUNSEL:  What number again?

21 |         MR. SATTERLY:  It's -- what number do you guys want

22 | to call it?

23 |         COUNSEL:  No.  Who signed it?

24 |         MR. SATTERLY:  Who signed it?  John Kim signed it.

25 | No, this one is Johnson Law Group.

Kim - Cross/Satterly                    108

 1          COUNSEL:  We don't have that one.  I'm sorry.

 2          MR. SATTERLY:  It doesn't matter, they're all the

 3 same.

 4 BY MR. SATTERLY:

 5 Q   Well, let me ask.  You know the plan support agreements

 6 are all the same; right?

 7 A   I think they are all the same, but they're not dated.  The

 8 signature may be dated, but they're different dates for

 9 different people.  So I --

10          MR. SATTERLY:  May I approach, Your Honor?

11          THE COURT:  Yes.

12          MR. SATTERLY:  Oh, they got a whole bunch of them.

13 We'll call this 8, right?  Is that 8?

14          COUNSEL:  It's 7.

15          MR. SATTERLY:  7?  All right.

16          May I approach again, Your Honor?

17          THE COURT:  Yes, please.

18 BY MR. SATTERLY:

19 Q   Do you see right below the words "Plan Support Agreement"

20 --

21 A   I see, yes.

22 Q   -- it says dated March 21st, 2023.  Do you see that?

23 A   I do see that.

24 Q   Okay.  And so -- and then if we go over to the page 11,

25 the signature page of this particular one is Slater Slater

Kim - Cross/Satterly                                    109

1  Schulman, and it's signed on March 27th; correct?

2  A    I see that, yes.

3  Q    And then, if we flip over to the next page, we've got your

4  signature on the 4th of April; correct?

5  A    Yes, I see that.

6  Q    And, as I looked at these plan support agreements, all of

7  them have the exact same signature, I mean, verbatim, because

8  you only signed one document; correct?

9  A    To be effective for the sign -- yes, because everything is

10 supposed to be effective on the date of bankruptcy.

11 Q    Sure.  You predated your signature a couple days

12 beforehand and just let the lawyers attach this to the

13 agreement on the 4th; correct?

14 A    They were attached on the 4th or shortly thereafter.

15 Q    I couldn't hear you, sir.

16 A    On the 4th or shortly thereafter, they were attached.

17 Q    And so that is a true statement, you signed this document

18 in advance a few days beforehand, gave it to the lawyers, and

19 then they attached it to this agreement at the time of the

20 bankruptcy; correct?

21 A    I'm actually not --

22        MS. BROWN:  Your Honor, I object, that misstates his

23 testimony.

24        THE WITNESS:  Yeah, I'm actually not sure when I

25 signed it.

**WWW.JJCOURT.COM**

Kim - Cross/Satterly                    110

1              THE COURT:  Repeat the question.

2    BY MR. SATTERLY:

3    Q    You signed this document a few days before this was filed

4    in court -- or in the bankruptcy; correct?

5              MS. BROWN:  Same objection, Your Honor.

6              MR. SATTERLY:  Let me withdraw the question.

7    BY MR. SATTERLY:

8    Q    You signed this document a few days before it's dated;

9    correct?

10              MS. BROWN:  Same objection.

11              THE WITNESS:  It may have been --

12              THE COURT:  Overruled.

13              THE WITNESS:  -- on the date that I signed it.

14    BY MR. SATTERLY:

15    Q    Okay.  Do you have any evidence of that?

16    A    I don't -- I don't recall when I signed --

17    Q    Did you do this through DocuSign or --

18    A    No, this was a -- I think a hard signature.

19    Q    And so, as you sit here today, you can't tell the Judge

20    exactly the date or time when you actually signed this plan

21    support agreement?

22    A    I cannot, but it was effective as of the date of the

23    bankruptcy.

24    Q    All right.  And you signed one document, it was your

25    understanding it was going to be applicable to all of them;

Kim - Cross/Satterly                    111

1  correct?

2  A    Correct.

3  Q    And you did not have all the attachments, the exhibits,

4  Exhibit A, Exhibit B, a listing of cases, you didn't have all

5  that.  You just signed the document; correct?

6  A    I had a file of all the PSAs and all the exhibits that we

7  had.  You know, the exhibits were coming in from time to time,

8  but I had a -- I did have a file of all those and, you know,

9  reviewed most of them.

10 Q    So I'm confused.  Are you saying, when you just signed one

11 document for all these, you reviewed everything associated with

12 all these different agreements?

13 A    I knew they were there, I had a file of all the

14 agreements.  I did not look at every page of every exhibit, you

15 know, but I did have it in my possession and satisfied myself

16 that they were what they were.

17 Q    And you were never involved on behalf of LTL of

18 negotiating the plan support agreement.  That was done by

19 Murdica; correct?

20 A    That is true.

21 Q    You were not even given -- let me just ask you a

22 hypothetical.  If Mr. Watts emailed a plan support agreement or

23 template for one back in February, you weren't carbon copied on

24 that; were you?

25 A    I was not.

Kim - Cross/Satterly                    112

1  Q    The first time you saw this agreement was in early April;

2  true?  Let me -- early April.

3  A    I'm not sure when I saw it.  I saw templates at some point

4  and one is attached to the declaration.  Yeah, I'm not sure

5  when I first saw it.

6  Q    Nowhere in the plan support agreement does it say a law

7  firm must commit its clients to follow the attorney's

8  recommendation; true?

9  A    I think that's true, yes.

10 Q    And you know -- you're a lawyer; correct?

11 A    I am a lawyer.

12 Q    And are you licensed here in New Jersey?

13 A    I am not.

14 Q    Have you ever been licensed --

15 A    No, sorry, I have what they call a provisional in-house

16 license by the bar.  So there is a provision for licensing in-

17 house counsel in New Jersey.

18 Q    Are you subject to the Rules of Professional Conduct in

19 New Jersey?

20 A    I believe I am.

21 Q    And you know that the rules of New Jersey courts, Rule 3.3

22 says a lawyer shall not make a false statement of material fact

23 or law to a tribunal?

24         MS. BROWN:  Objection, Your Honor, to this line of

25 questioning.

Kim - Cross/Satterly                     113

1              THE COURT:  Overruled.

2              MS. BROWN:  There are also ethical implications, Your

3    Honor, to making ethical claims and reading from Codes of

4    Professional Conduct.  I object to the implications and to

5    these questions.

6              MR. SATTERLY:  I'm just asking if he's familiar with

7    that rule.

8              THE COURT:  And that limited question, just like the

9    one with the bankruptcy fraud, limited question, he can ask.

10             MS. BROWN:  Thank you, Your Honor.

11   BY MR. SATTERLY:

12   Q    Do you want me to ask it again?

13   A    What I will say, I haven't read this specific chapter, but

14   that's generally true in most jurisdictions.

15   Q    3.3, it's a lawyer shall not knowingly make a false

16   statement of material fact or law --

17             THE COURT:  Sustained.

18             MS. BROWN:  Thanks, Judge.

19   BY MR. SATTERLY:

20   Q    All right.  Now let me ask you about Valadez.

21        Now, LTL -- this Court permitted me to bring a claim

22   against LTL in the Valadez case, you know --

23   A    I am familiar with it, yes.

24   Q    Okay.  And the court in Alameda required LTL to put up a

25   corporate representative in the Valadez case to give testimony

Kim - Cross/Satterly                    114

1  and did so, LTL did so on March the 31st.  Do you know that?

2  A    I do know that.

3  Q    And no one from the LTL board, you, Wuesthoff, or

4  Dickinson, was that corporate representative; correct?

5  A    Correct.

6  Q    Okay.  And you do know that a fellow named James

7  Mittenthal was the corporate representative in the Valadez

8  case; correct?

9  A    He was designated as a corporate representative pursuant

10 to the rules of the court, yes.

11 Q    And did you meet with him -- and I'm not going to ask the

12 substance of your discussions, but did you meet with him to

13 educate him to be the person most qualified in the Valadez

14 case?

15 A    I did.

16 Q    Okay.  And you do know that in the Valadez, specifically,

17 several retailers refused to agree to indemnification

18 agreements allowing LTL and J&J to indemnify them?

19         MS. BROWN:  Your Honor, that assumes facts, it's

20 inaccurate, and it lacks foundation.

21         MR. SATTERLY:  Well, he -- she shouldn't be able to

22 say -- give him -- coaching him while he's on cross-

23 examination.

24         THE COURT:  Objection overruled.  Ask the question --

25 can you answer the question?

1           THE WITNESS:  Yeah, I believe that's not true.

2   BY MR. SATTERLY:

3   Q    Oh, really?  So Mr. Mittenthal gave false testimony for

4   LTL on March the 31st --

5           THE COURT:  Sustained.

6   BY MR. SATTERLY:

7   Q    -- when he said several retailers refused to sign an

8   indemnification agreement?

9   A    No, I --

10          MS. BROWN:  Wait, I object.

11  BY MR. SATTERLY:

12  Q    Is that --

13          MS. BROWN:  Hold on.

14          THE COURT:  Ask the question again.

15  BY MR. SATTERLY:

16  Q    Did Mr. Mittenthal, the LTL corporate representative, give

17  false testimony on March the 31st when he said several

18  retailers refused to sign indemnification agreements?

19          MS. BROWN:  That's a complete inaccurate

20  representation --

21          MR. SATTERLY:  I'm asking him --

22          MS. BROWN:  -- of his testimony.  I object.

23          THE WITNESS:  I dis --

24          THE COURT:  Objection sustained.  Do you know of the

25  testimony he gave?

1              THE WITNESS:  I do know of the testimony, yes, but

2  that's not what the testimony was.

3  BY MR. SATTERLY:

4  Q    You were not personally involved in negotiating any

5  indemnification agreements between the prospective protected

6  third parties, the retailers, and LTL; correct?

7  A    There were times where I did get involved in the past.

8  I'm not sure which retailers you're talking about now, but I

9  have been involved in negotiations --

10 Q    Since LTL's creation and specifically with regards to Mr.

11 Valadez, did you negotiate with the retailers regarding any

12 indemnification agreements?

13 A    I'd have to know which retailers are in the Valadez case

14 and when the negotiations happened.  So there is a possibility,

15 I just don't recall sitting here right now whether we had

16 negotiated indemnification with these retailers three years

17 ago, in which case I would have been involved, or whether these

18 are new negotiations.  I just don't -- you'd have to tell me

19 more information about that -- about that --

20 Q    As you sit here today, can you offer any personal -- do

21 you have any personal knowledge that you were involved in

22 negotiating any indemnification in the Valadez case?

23 A    Again, when you say negotiations of retailers in the

24 Valadez case, I don't know which retailers are in the Valadez

25 case, and so I don't know when those negotiations happened.

1  Q    It's almost 1 o'clock, I've got one last topic.

2       The Leavitt case, Terry Leavitt case, you're very familiar

3  with Terry Leavitt's case; correct?

4  A    I believe I am.  You'd have to, again, remind me of sort

5  of the details of that.  I have not looked at these cases in

6  over a year.

7  Q    It's a case that went to verdict and you were in Oakland

8  during that trial.  Do you recall coming to Oakland?

9  A    I was in Oakland for -- is this the one --

10 Q    Two of them.  I'm going to ask you about Leavitt and

11 Schmitz.

12 A    Okay.

13 Q    You were there for both of them at least part of the time;

14 correct?

15 A    I believe I was at most trials, but I don't have a solid

16 recollection of which case is which.

17 Q    And you know because at the time back in 2019 when those

18 cases went to verdict that you were counsel for J&J charged

19 with overseeing the talc litigation; correct?

20 A    I was one of the lawyers that was overseeing the talc

21 litigation.

22 Q    And you know that the Leavitt case, that there was a

23 verdict in favor of the plaintiff, and the jury allocated 78

24 percent to J&J -- the mother ship, the big J&J -- 20 percent to

25 JJCI, and two percent to Cypress.  Do you recall that?

Kim - Cross/Satterly                    118

1  A    I know that in various cases, I think as I testified in

2  the first hearing, there have been all these allocations, many

3  of them that don't make sense because they're different than

4  others.

5       So I don't recall specifically the Leavitt case

6  allocation, but I'll take your word that that's what the jury

7  did.

8  Q    And you know that the Leavitt case was affirmed on appeal

9  and J&J sought review at the California Supreme Court, it was

10 denied, and J&J and JJCI has paid that verdict, you understand

11 that?

12 A    I believe that's true, yes.

13 Q    And you know that, with regard to the Schmitz case in

14 2019, Patricia Schmitz, there was a verdict in the summer of

15 2019 of approximately $12 million and it was affirmed on appeal

16 in a published opinion and recently, as recently as a week or

17 so ago, the Supreme Court of California denied review, you know

18 that; correct?

19 A    I recall that, yes.

20 Q    And you know that -- and you know just yesterday LTL

21 listed its largest creditors -- and Mrs. Schmitz's estate,

22 Susan Bader was listed as one of the largest creditors;

23 correct?

24 A    I believe she is on that list, yes.

25 Q    And with regard to Mrs. Schmitz, you know that J&J was

1  found jointly and severally liable, along with Colgate, because

2  of intentional misconduct; true?

3  A    I'd have to go back and look at the trial.  I don't

4  recall, sitting here right now.

5  Q    Are you aware of the implications of what that means under

6  California law with regards to J&J, the parent company's

7  responsibility with regard to the Schmitz case?

8            MS. BROWN:  Objection, Your Honor.

9            THE COURT:  Sustained.

10 BY MR. SATTERLY:

11 Q    Do you know whether or not the process, having been senior

12 counsel involved in all the talc litigation for all those

13 years, you know what occurs next with regards to the Schmitz

14 case?

15           MS. BROWN:  Same objection.

16           THE COURT:  No, he can answer that.

17           THE WITNESS:  Yeah, I'm not sure what you mean by

18 what -- I mean, are you talking about further appeal or --

19 BY MR. SATTERLY:

20 Q    Well, there's no further appeal --

21 A    -- cert denial or --

22 Q    -- I mean, but do you know what happens under California

23 procedure?

24 A    I'd have to advise -- get counsel's advice on that.

25 Q    Okay.

Kim - Cross/Maimon                    120

 1          MR. SATTERLY:  Your Honor, it's 1 o'clock, I have no

 2  further questions.  I'm going to pass the witness formally.

 3  I'm sure they're going to probably complain that I should have

 4  said reserve, but in the interest of time, I'm going to pass

 5  the witness.

 6          THE COURT:  All right.  Thank you.

 7          Let's come back at 1:30, folks.

 8          ALL COUNSEL:  Thank you, Your Honor.

 9          THE COURT:  The usual admonitions, don't discuss your

10  testimony with anybody.

11          THE WITNESS:  Thank you, Your Honor.

12          (Recess at 1:01 p.m./Reconvened at 1:36 p.m.)

13          THE COURT:  Are we good to go?

14          THE CLERK:  Yes, sir.

15          THE COURT:  Let's see.

16          THE CLERK:  We are unmuted.

17          THE COURT:  All right.  Here we go.

18          All right.  Thanks, everyone.  Hope everyone had a

19  good lunch.  Mr. Maimon.

20          MR. MAIMON:  May I proceed, Your Honor.

21          Thank you, very much.

22                          CROSS-EXAMINATION

23  BY MR. MAIMON:

24  Q    Good afternoon, Mr. Kim.

25  A    Good afternoon, Mr. Maimon.

Kim - Cross/Maimon                          121

1  Q    First of all, do you recall that Mr. Satterley and I tried

2  to let a case together in Oakland that you came to watch?

3  A    I do believe so.  Again, I sometimes get the cases a

4  little mixed up, so.

5  Q    Right.  Understandable.  I'd like to start talking to you

6  about the funding agreement, number one, the $61.5 billion

7  funding agreement that was part of LTL 1, okay.

8  A    Okay.

9  Q    And that funding agreement was in place when the

10 restructuring took place that led to the creation of LTL,

11 correct?

12 A    I think they were all done at the same time.

13 Q    Understand.  But it was part of that restructuring to have

14 a funding agreement that would provide LTL with the value in

15 the restructuring, right?

16 A    Correct.  But when you say funding agreement, again there

17 were sort of two parts to that.  There was the JJCI, the New

18 JJCI agreement, and then the backup by J&J, the --

19 Q    Right.  But in all of the Court documents, and the Third

20 Circuit Court of appeals, talked about the funding agreement.

21 That's the one we're talking about, the $61.5 billion funding

22 agreement.  Right.

23 A    I understand that, yes.

24 Q    Okay.  And part of what happened in the restructuring is

25 Johnson & Johnson Consumer Incorporated put its talc

Kim - Cross/Maimon                    122

1 liabilities into LTL, right?

2 A    Through a series of transactions, that's eventually what

3 happened, yes.

4 Q    And a lot of the assets went to another company, right?

5 A    All the other assets, but except for the TA assets, went

6 to what became New JJCI.

7 Q    And the talc assets went where?

8 A    I'm not sure what you mean by talc assets.

9 Q    The baby powder line, where did it go?

10 A    The baby powder line went to -- I'm trying to place

11 whether there was actually be a better line at the time.

12 Q    Well, you still --

13            THE COURT:  Consumer products.

14            THE WITNESS:  Consumer products.

15 BY MR. MAIMON:

16 Q    Consumer products went to New JJCI, right.

17 A    Consumer products went to New JJCI.

18 Q    Right.

19 A    But I don't know that there were baby powder products at

20 that time.

21 Q    Well, the company still continued to sell Johnson's Baby

22 Powder as cornstarch, right?

23 Q    Oh, the cornstarch products.  Well, yes --

24 A    Consumer.

25 Q    -- was in the consumer group, yes.

1  A     Okay.  And part of the restructuring and having that $61.5

2  billion funding agreement in place was so that nobody could

3  claim that J&J was fraudulently decreasing the value of its old

4  business by splitting off the talc liabilities to LTL, correct?

5  A     I think part of it.  So the JJCI agreement was to make

6  sure that the new, what would turn into LTL, had the financial

7  backing of JJCI up to that amount.  The J&J, of course, backup,

8  was so that in bankruptcy, the asset -- that number could be

9  preserved in bankruptcy.

10 Q     Well, that, what you just said, is not written in that

11 agreement, is it?

12 A     There would be no other reason why J&J would have with

13 that obligation in it, a backup.  JJCI's value is JJCI's value.

14 I think the issue is if you're not putting JJCI into bankruptcy

15 and you're only putting LTL into bankruptcy, how do you stop

16 the diminution of the JJCI assets, and so in bankruptcy, the

17 J&J guarantee comes into play so that it doesn't.  So that's

18 the only reason to have the J&J guarantee.

19         MR. MAIMON:  Move to strike as non-responsive.  My

20 question is, that's not in the agreement itself, Your Honor.

21         THE COURT:  Is it in the terms of the agreement?

22         THE WITNESS:  I'm not sure.  Well, I'm not sure if

23 that's laid out.

24 BY MR. MAIMON:

25 Q     That's fine.

Kim - Cross/Maimon                    124

 1  A    I think that's the intent and maybe parts of that may be

 2  in that agreement.

 3  Q    If you're not sure, you just tell us you're not sure,

 4  okay.  It's a perfectly acceptable answer.  All right.

 5         THE COURT:  Mr. Kim, I know we've done this in the

 6  past.

 7         Answer yes or no, if you can.  Limit your answers to

 8  the questions, and we'll move on expeditiously.

 9         THE WITNESS:  Yes, sir.

10  BY MR. MAIMON:

11  Q    Now, you testified this morning that the $61.5 billion

12  funding agreement was LTL's largest asset when it first filed

13  in October of '21, correct?

14  A    True.  Yes.

15  Q    Okay.  And do you still have the exhibit up with you?

16  A    I do.

17  Q    Take a look at Exhibit 1.

18       That's the voluntary petition that was filed on

19  October 14, 2021, correct?

20  A    Exhibit 1, yes.

21  Q    And if you turn to Page 4 of that voluntary petition, you

22  signed that as Chief Legal Officer, correct?

23  A    I did.

24  Q    And you dated it and executed it on October 14, 2021,

25  true?

Kim - Cross/Maimon                    125

1  A    Yes.

2  Q    And you signed it under penalty of perjury, correct?

3  A    I did.

4  Q    And Mr. Gordon signed it as the attorney on the next page,

5  Page 5, right?

6  A    He did.

7  Q    Okay.  So now, you just told us that on that date, the

8  funding agreement of $61.5 billion was its largest asset.  Take

9  a look on Page 4, Number 15, estimated assets.

10 A    Yes.

11 Q    Are you there?

12 A    I do see that.

13 Q    You marked the section that the estimated assets were

14 between 1 billion and $10 billion, and you did so under penalty

15 of perjury, correct?

16 A    I did.

17 Q    Okay.  Thank you.

18      Now, you recall that in the first bankruptcy, there was a

19 hearing in this Court on the motion to dismiss.

20 A    I do recall that, yes.

21 Q    And Mr. Gordon represented LTL at that hearing, correct?

22 A    He did.

23 Q    And he was authorized as your attorney to speak for LTL on

24 your behalf, correct?

25 A    He was.

1  Q    Were you present in Court when Mr. Gordon, in arguing

2  against dismissal of the first LTL bankruptcy, pointed to the

3  $61.5 billion funding agreement and assured Judge Kaplan that

4  it applied outside of bankruptcy even if the bankruptcy was

5  dismissed?  Were you present when he made that statement?

6  A    I was.

7  Q    Thank you.  Were you present on September 19, 2022, when

8  Neal Katyal argued on behalf of the debtor at the Third Circuit

9  Court of Appeals?

10 A    I was.

11 Q    And were you there -- and he was retained to argue on

12 behalf of LTL, true?

13 A    He was.

14 Q    And he was authorized to speak on behalf of LTL, correct?

15 A    He was.

16 Q    And were you there when he told the panel of the Third

17 Circuit that the funding agreement applied outside of

18 bankruptcy?

19 A    I was.

20 Q    Okay.  Now, you told us that when you read the Third

21 Circuit opinion on or about January 30, 2023, you first started

22 thinking that the funding agreement might be void or voidable.

23     Is that correct?

24 A    That is.  Correct, that discussion did come up.

25 Q    Now, this morning there was some discussion between you

Kim - Cross/Maimon                    127

1  and Mr. Jonas about what exactly it was that you concluded.

2           MR. MAIMON:  May I approach, Your Honor?

3           THE COURT:  Yes.

4           MR. MAIMON:  Thank you.

5  BY MR. MAIMON:

6  Q    I'm handing you up your deposition in this case of

7  April 14, 2023.

8       And just for identification, we'll mark this as TCC-9.

9           MR. MAIMON:  Is that our next number?

10          THE COURT:  Eight.

11          MR. MAIMON:  Okay.

12          MS. BROWN:  Mr. Maimon, could I have a copy, please?

13          MR. MAIMON:  Here you go, eight.

14 BY MR. MAIMON:

15 Q    Now, if you can turn to -- you'll see this is a condensed

16 transcript and there are four to a page.  Do you see that?

17 A    I do see that.

18 Q    Go to the page where the transcript pages are 77 through

19 80.

20 A    I'm there.

21 Q    Now, do you see on the bottom of the previous page,

22 Page 76, Mr. Jonas asked you, "What about the Third Circuit

23 opinion made you believe that the funding agreement was void or

24 voidable?"  Do you see he was asking you about that?

25 A    I think --

Kim - Cross/Maimon                         128

1          MS. BROWN:  I'm sorry, Counsel.  What line are you

2   on?

3          MR. MAIMON:  Page 76, Line 24.

4          MS. BROWN:  Thank you.

5   BY MR. MAIMON:

6   Q    Do you see that?

7   A    Yes.

8   Q    Okay.  And then I'd like to draw your attention to Page 78

9   and your answer at Lines 6 through 10.  You stated under oath,

10  "I think everyone agrees --

11         MS. BROWN:  Your Honor --

12         MR. MAIMON:  -- that the Third Circuit decision --

13         THE COURT:  Wait, Mr. Maimon.

14         MS. BROWN:  I'm just going to object.  This is

15  improper use of this deposition.  He has not testified

16  inconsistently with his deposition.  If he's looking to impeach

17  him, he knows there's a proper way to do that.  I would just

18  object to reading sections of a deposition where there's been

19  no inconsistent testimony.

20         THE COURT:  Mr. Maimon?

21         MR. MAIMON:  Yes.  May I proceed, Your Honor.  I'll

22  ask a new question.

23  BY MR. MAIMON:

24  Q    This morning, when Mr. Jonas --

25         THE COURT:  Sustained.

**WWW.JJCOURT.COM**

Kim - Cross/Maimon                          129

1  BY MR. MAIMON:

2  Q    -- was asking you --

3          THE COURT:  He's asking a new question.

4          MS. BROWN:  Okay.

5          MR. MAIMON:  I'm sorry.

6          THE COURT:  You're asking a new question?

7          MR. MAIMON:  Yes.

8          THE COURT:  Yes.

9  BY MR. MAIMON:

10 Q    This morning, you told Mr. Jonas that you never said that

11 the Circuit decision was wrong.  Didn't you say that this

12 morning?

13 A    No, no, no.  I said that I did not state in my prior

14 answer to Mr. Jonas that they had made a mistake.

15 Q    Okay.

16 A    I believe the Circuit decision is in error.  We filed

17 appeals and papers with our position on that.  So, I just said

18 that, or Mr. Jonas said, you said the Third Circuit made a

19 mistake.  And I responded, I don't think I said they made a

20 mistake.  They did what they did.  I accept that.  I think it's

21 in error.  But I didn't say that.  I didn't say -- yeah, I just

22 said -- I didn't say that it was a mistake.

23 Q    You were of the opinion that the Third Circuit made a

24 mistake and that the Third Circuit was wrong, true?

25 A    I believe the Third Circuit was wrong in its decision.  We

1 filed papers to support that.

2 Q    The Third Circuit decision is the law, and you have given

3 up all of your appeals on that, true?

4 A    Yeah.  And we followed the law, the Third Circuit law

5 specifically, when we entered into the new funding arrangement

6 and support agreement, so we're not flouting what the Third

7 Circuit said.

8          THE COURT:  Mr. Kim.

9          THE WITNESS:  I'm sorry.

10          MR. MAIMON:  Move to strike everything after --

11          THE COURT:  Sustained.

12          MR. MAIMON:  -- "Yes, it is the law."

13          THE COURT:  Sustained.

14          MR. MAIMON:  Thank you.

15 BY MR. MAIMON:

16 Q    In your deposition, you said that everyone agrees that the

17 Third Circuit was wrong.

18          MS. BROWN:  And, Your Honor, it's the same objection.

19 I mean, the proper way to do it is ask the question, if you get

20 an inconsistent answer, then you go to the deposition.  But

21 he's making representations of the deposition without the

22 predicate question, and so I just object to the way this is

23 being done as improper.

24          MR. MAIMON:  I'll ask it differently if that's okay,

25 Your Honor.

1              THE COURT:  All right.  Thank you.

2              MS. BROWN:  Thank you, Your Honor.

3    BY MR. MAIMON:

4    Q    It was your opinion, Mr. Kim, as the chief legal officer

5    of LTL, that everyone agreed that the Third Circuit was wrong,

6    true?

7    A    No, clearly, not the Third Circuit.  But I was just trying

8    to say that the people that I consulted on this issue agreed

9    that there was an error.

10   Q    And that was the Jones Day people, right?

11   A    Yes.

12   Q    And that was the Hogan Lovells people, right?

13   A    Yes.

14   Q    And the Skadden Arps people, right?

15   A    Yes.

16   Q    And all of you agreed that the --

17   A    Well, there are others.  I mean --

18   Q    -- Circuit was wrong, right?

19   A    I'm sure there are others, too.

20   Q    You wouldn't tell us who the others were at your

21   deposition, would you?

22             MS. BROWN:  Your Honor, at the deposition, we

23   instructed him to not reveal privileged communications.  He

24   gave the answers of the law firms that were on the brief, which

25   is exactly what he's done today and which is consistent with

Kim - Cross/Maimon                        132

 1  the privilege law.

 2          THE COURT:  All right.  Thanks.  Sustained.

 3  BY MR. MAIMON:

 4  Q    Now, do you have Exhibit 7 up there with you?   That's the

 5  plan support agreement that was signed by Mr. Slater.

 6  A    I do.

 7  Q    And that was signed by Mr. Slater, if you look at Page 11,

 8  on March 27, 2023, correct?

 9  A    I see that date is there.

10  Q    But the agreement itself, the plan support agreement, is

11  dated as of March 21, 2023, correct?

12  A    Well, that's what the date is on the agreement, but

13  that's -- but it was -- the date is on the agreement.

14  Q    Yes, that's the date on the agreement, right?

15  A    That's what it states on the first page, yes.

16  Q    Okay.  Now, if you turn to Exhibit 5, these are the board

17  minutes from LTL Management from five days earlier, March 16,

18  2023.  Do you see that?

19  A    I'm sorry.  I'm sorry.  I've got a bunch of exhibits up

20  here.

21  Q    It's a single page.

22  A    Okay.  Some of these exhibits are just, they're not marked

23  with a number.

24  Q    You've got the right one there.

25          MS. BROWN:  You have it.

**WWW.JJCOURT.COM**

1          THE COURT:  That's it.

2   BY MR. MAIMON:

3   Q    Got it?

4   A    Yeah, I do.

5   Q    Okay.  And what happened at that meeting is Mr. Prieto led

6   a discussion on contingency planning, right?

7   A    Yes.

8   Q    And Mr. Prieto sought approval from the board to file

9   another bankruptcy, correct?

10  A    No.

11  Q    Who sought approval from the board?  It says, you see the

12  bullet point at the bottom of page one?

13  A    I do.

14  Q    It says, "Seeking approval from this board to file another

15  bankruptcy."

16  A    Planning in the event we get an adverse ruling.

17  Q    Right.

18  A    So we were not seeking approval at this time.  We were

19  raising the possibility as a contingency that we might come

20  back later to to seek approval.  And if you look at the minutes

21  where we actually sought approval, you can see that.  So this

22  was just a, again, contingency planning.  In the event we get

23  an adverse ruling, one of the contingency plans that we were

24  looking at was whether to seek approval to the board to file

25  another bankruptcy.

Kim - Cross/Maimon                    134

1  Q    Now, the second bullet point, and so it was contemplated

2  on March 16, 2023.  The second bullet point is amending the

3  funding agreement, right?   Or entering into new agreements,

4  right?

5  A    Correct.  That's what it says.

6  Q    Okay.  So that we know that as of March 16th, LTL and

7  their board were discussing amending the funding agreement or

8  entering into new agreements, true?

9  A    I would say we were discussing the possibility of doing

10 that.  These are all contingency plans.  These are not plans

11 that we have agreed to do or wanted or decided to do.  These

12 are contingency plans.  We're looking at all contingencies

13 trying to determine and giving the board a view of things that

14 could happen.

15 Q    Are you done with your answer?

16 A    Yes.

17 Q    Turn back to the plan support agreement, Exhibit 7.

18 A    Okay.

19 Q    If you take a look at the bottom, the last paragraph

20 there, it has in bold letters, the word "term sheet."  Do you

21 see that?

22 A    I'm sorry, where?

23 Q    First page, bottom paragraph?

24 A    Yes.  I do see that.

25 Q    And it says, "A copy of the term sheet is attached to this

 1 agreement as Exhibit B," right?

 2 A    Correct.

 3 Q    So we know, whatever else, is that as of March 21, 2023,

 4 the date of this, it says that a term sheet is attached to this

 5 agreement as Exhibit B, correct?

 6 A    That's what it says, yes.

 7 Q    Okay.  Let's take a look at the term sheet, which was

 8 Exhibit 4.

 9      And if you take a look, the first page has a section

10 called "agreement."  Do you see that?

11 A    Yes.

12 Q    And it lists certain qualifications that the payment terms

13 are contingent on.  Do you see that?

14 A    I see that, yes.

15 Q    Okay.  And then it lists 1, 2, and I'd like to go on to

16 Page 2, the third contingency item.  Do you see that?

17 A    I see that.

18 Q    Within the term sheet that was attached to the PSA dated

19 March 21, 2023, one contingency was, "The futures claims

20 representative agreement that she will not assign more than one

21 third of the trust corpus to qualifying future claims."  That's

22 what it says.

23 A    I do see that.

24 Q    And that was a contingency that was put into the term

25 sheet that Mr. Murdica drafted on your behalf, true?

1  A    Yes, as a contingency.

2  Q    Okay.  Now, let's take a look at Page 5.

3      Ms. Ellis, who was referred to as the FCR and it had to be

4  that she couldn't commit more than one third of the corpus of

5  the trust to future claims, is discussed on Page 5,

6  Section B(1) as a claims administrator of the talc trust.  Do

7  you see that?

8  A    I'm sorry.  Could you read back that question?

9  Q    Sure.

10     Page 2 refers to the future's claims representative,

11 right?

12 A    It does.

13 Q    At that time, LTL 1 was -- LTL was still in bankruptcy,

14 right?

15 A    Well, at the time that this was being discussed, yes, we

16 were (indiscernible) --

17 Q    At the time that this was finalized and signed by

18 Mr. Slater on March 27, 2023, LTL was still in bankruptcy,

19 right?

20 A    It's not finalized.  It is not finalized.  It is not

21 effective until after the bankruptcy was dismissed.  That was

22 one of the contingents -- that was one of the conditions we had

23 when we -- we wouldn't sign it until the bankruptcy was

24 dismissed.

25 Q    Go back to Page 2.  Let's make sure we're on the same

Kim - Cross/Maimon                    137

1 wavelength.  The future's claims representative agreement that

2 she -- Do you see that?

3 A    Yeah, it's not an agreement by the future claims

4 representative.  This is a contingency.

5 Q    Sir, if you could listen to my questions.

6         MS. BROWN:  Judge, could he just be allowed to

7 answer, please?

8         MR. MAIMON:  But he's not listening to my question.

9         THE WITNESS:  But he said the agreement.

10         THE COURT:  Mr. Kim, I think he's asking you just to

11 read the agreement.

12         THE WITNESS:  Okay.

13         THE COURT:  All right.

14         MR. MAIMON:  The term sheet.

15         THE COURT:  So just read the terms.

16 BY MR. MAIMON:

17 Q    Number 3, "The future claims representatives agreement

18 that she will not assign more than one third of the trust

19 corpus to qualifying future claims."  Did I read that

20 correctly?

21 A    Yes.

22 Q    It refers to the future claims representative as she,

23 correct?

24 A    It does.

25 Q    Because at that point, the only future claims

Kim - Cross/Maimon                           138

1  representative was Randi Ellis, right?

2  A    Yes.

3  Q    And J&J has immediately, upon filing -- or, I'm sorry,

4  withdrawn.

5      LTL, immediately upon filing this bankruptcy, moved for

6  Ms. Ellis to be reappointed as FCR in this bankruptcy, correct?

7  A    We did.

8  Q    Okay.  Now, so we know what that contingency was on

9  Page 2.  Let's go now to Page 5.  This refers to Ms. Ellis by

10 name here, right?

11 A    It does.

12 Q    And it refers to, even if it's a placeholder, first of

13 all, you didn't draft this agreement, did you?

14 A    I did not draft it, no.

15 Q    Okay.  It says, "Randi Ellis shall serve as claims

16 administrator of the talc trust for purposes of qualifying

17 claimants and allocating proceeds to be distributed among all

18 existing and future qualifying claimants."

19     Do you see that?

20 A    I do see that.

21 Q    And so this is talking about somebody whose role it would

22 be to say how much each contingent of the claimant pool was

23 going to get, right?

24 A    I'm not sure what the exact duties would be of the claims

25 administrator.

1  Q    Well, that's what it describes, "allocating proceeds to be

2  distributed amongst all existing and future qualifying

3  claimants."  That's the role that it says, right?

4  A    It is.

5  Q    Okay.

6  A    But allocate, I'm just quibbling with the word allocating

7  proceeds.  I'm not -- my understanding is that a claims

8  administrator just takes proceeds, takes the chart, and

9  determines where you fall, and then sends the money to where

10 it's supposed to be sent.

11 Q    Here it says, the purposes for the claims administrator of

12 the talc trust are, quote "qualifying claimants and allocating

13 proceeds to be distributed amongst all existing and future

14 qualifying claimants."  That's what it says, right?

15         MS. BROWN:  And, Your Honor, I would just object to

16 the way that's being read.  I think it misstates how it's

17 worded, and I think it speaks for -- the sentence speaks for

18 itself.

19         MR. MAIMON:  I can't ask a question unless we read

20 it, Your Honor.

21         THE COURT:  All right.  I've read this paragraph.

22 Ask the question.

23         MR. MAIMON:  Yes.

24 BY MR. MAIMON:

25 Q    How was it that J&J thought that somebody could ethically

Kim - Cross/Maimon                    140

1  be a FCR commit to less than one third of the proceeds going to

2  future representatives and yet be a claims administrator whose

3  duties it was to allocate proceeds to be distributed among all

4  existing and future qualifying claimants?

5          MS. BROWN:  I object, Your Honor.  Lacks Foundation.

6  Calls for speculation.

7          THE COURT:  Sustained.

8  BY MR. MAIMON:

9  Q    Now, when LTL made the motion to have Ms. Ellis appointed

10 as FCR in this case, it did not disclose to the Court that it

11 also put her as a placeholder prospective claims administrator

12 whose responsibilities would be to allocate proceeds to be

13 distributed amongst all existing and future claimants, did it?

14         MS. BROWN:  I object, Your Honor.  That misstates the

15 testimony.  It's also a duplicative questioning of what we had

16 before on this issue.  I'd object to that as well.

17         THE COURT:  Overruled.

18         THE WITNESS:  No.  Because, again, as a placeholder,

19 it did not mean that she was the claims administrator.

20         MR. MAIMON:  move to strike everything after no, Your

21 Honor.

22         THE COURT:  Overruled.

23 BY MR. MAIMON:

24 Q    When LTL moved to have Ms. Ellis appointed futures claims

25 representative in this case, it did not disclose to the Court

Kim - Cross/Maimon                    141

1  that part of the agreement that it made with various law firms

2  was that J&J's payment was contingent on that FCR agreeing not

3  to assign more than a third of the trust corpus to qualifying

4  future claims.  You didn't disclose that, did you?

5  A    No.

6        MS. BROWN:  Objection, Your Honor.  Misstates the

7  evidence.

8        THE COURT:  Sustained.  The question is confusing.

9  I'm aware of what they disclosed.  Remember, I'm the trier of

10 fact.  I know the docket.  Let's move forward so we can get

11 this moving forward.

12        MR. MAIMON:  Thank you.

13 BY MR. MAIMON:

14 Q    Take a look at Exhibit 6.  This is the presentation to the

15 board of LTL on March 28, 2023.  Do you have that?

16 A    I do.

17 Q    And this was a presentation that Mr. Prieto made, correct?

18 A    Parts of it, yes.

19 Q    Okay.  And parts of this discuss terms that are straight

20 out of the term sheet.  For instance, Page 5, the payments.

21 That's exactly what's provided for in the term sheet, right?

22 A    It may be, yes, those same terms.  Yes.

23 Q    And already on March 28th, we saw Mr. Slater, if you look

24 on Page 4, there's a report here that law firms representing

25 thousands of claimants have signed or are expected to sign the

Kim - Cross/Maimon                              142

1  plan support agreements, right?

2  A    I believe that's true, yes.

3  Q    And there were signed PSAs by this time, right?

4  A    We believe -- I think there were, yes.

5  Q    Okay.  So now we know from Exhibit 5, which were the board

6  meeting minutes of March 16th, that one of the bullet points

7  was gauging whether the future's claims representative would

8  support a further bankruptcy and the contours of a plan, right?

9  That was discussed on March 16, right?

10 A    That was one of the items discussed, yes.

11 Q    If we take a look at Page 7 of the PowerPoint

12 presentation, this now reports 12 days later that separate

13 discussions have occurred with the FCR, right?

14 A    Yes.

15 Q    You did not have those discussions with her, did you?

16 A    I did not.

17 Q    Who did?

18 A    I'm actually not sure who was actually having discussions

19 with the FCR.  I can guess.

20 Q    Okay.

21          MR. MAIMON:  We don't want you to guess.

22          THE COURT:  Don't guess.

23 BY MR. MAIMON:

24 Q    We don't want you to guess.  But as the chief legal

25 officer, you didn't know who was having discussions on behalf

Kim - Cross/Maimon                    143

1  of the LTL with Ms. Ellis?

2  A    I guess I had an assumption.

3  Q    I don't want your assumption.  You don't know.  You can't

4  tell us, right?

5  A    Again, I have an assumption of who it was.  I don't know

6  that I actually know.  I wasn't part of those discussions.

7  Q    I'm not looking for your assumptions.  I'm not looking for

8  guesses, sir.

9  A    Okay.

10 Q    Either tell us you know or you don't know.  Either one is

11 fine.

12 A    I have a strong assumption.  I won't get into it.

13 Q    There's also a report here for -- well, first of all, you

14 didn't give this information, which is on Page 7, right,

15 because you didn't speak with Ms. Ellis, right?

16 A    That's correct.

17 Q    Okay.  There's also a statement here that the FCR is

18 supportive of a second LTL Chapter 11 case, right?

19 A    Yes, I see that.

20 Q    Now, at that time, the FCR, Ms. Ellis, was the FCR in

21 LTL 1, right?

22 A    She was.

23 Q    Okay.  It also says here, the FCR has agreed to sign and

24 submit a declaration in support of a new Chapter 11 case,

25 right?

1  A    Yeah.  That's the filing of the case, yes.

2  Q    Well, let's just read what it actually says.  "FCR has

3  agreed to sign and submit a declaration in support of a new

4  Chapter 11 case."  Those are the words, right?

5  A    That's exactly right.  The filing of a new Chapter 11

6  case.

7  Q    Well, it doesn't say "filing."  It says what it says.  Can

8  we agree on that?

9  A    Sure.  Yes, we can.

10 Q    Okay.  And this is phrased in the past tense, that she

11 already has agreed, right?

12 A    Which, yeah, did not turn out to be true.

13 Q    And then -- well, this is what was reported to the board,

14 right?

15 A    Correct.

16 Q    Okay.

17 A    And it was later reported that it was not happening.

18 Q    And then, later it was reported that she was unwilling to

19 sign a declaration, right?

20 A    That she chose not to, yeah, sign a declaration.

21 Q    In addition to a declaration, there's a discussion here

22 about discussions are ongoing to obtain a plan support

23 agreement from the FCR, correct?

24 A    Yes.  Yes, I see that.

25 Q    And the FCR, Ms. Ellis, chose not to execute that as well,

Kim - Cross/Maimon                    145

1  correct?

2  A    Correct.  Any plan support agreement?  She did not

3  choose -- she did not submit any plan support agreement.

4  Q    It has the words "Plan Support Agreement."  The first

5  letter of each word is in capitals, correct?

6  A    It is.

7  Q    Okay.  Thank you.

8       And the only -- withdrawn.

9       Now, the same day that that meeting took place of the

10 board of LTL Management, we saw that LTL Management filed its

11 monthly operating report for the period ending February 28,

12 2023.  That's Exhibit 3, correct?

13 A    Yeah, I'm not -- I can check the dates.  I take your word

14 for it.

15 Q    That's Exhibit 3.  Please take it up.  I just want to make

16 sure that we have accurate testimony.

17 A    I do see that.

18 Q    Okay.  And that was one week before the dismissal of the

19 first bankruptcy and the filing of the second, right?

20 Remember, February only has 28 days this year.

21 A    I believe that's correct, yes.

22 Q    Okay.  Now, during this time period and these discussions

23 and these board meetings that you were having, I think you told

24 Mr. Jonas that there was a discussion about terminating the old

25 funding agreement and having a new one in place, right?

Kim - Cross/Maimon                    146

1  A    That's correct.

2  Q    And that was a central part to the second bankruptcy,

3  right?

4  A    That was --

5  Q    The new funding agreement?

6  A    That is part of the second bankruptcy, yes.

7  Q    And nobody suggested, among anyone that you spoke to,

8  either at LTL or J&J, to keep the old funding agreement in

9  place and on top of that, to make sure that you had belts and

10  suspenders to have a new one with an $8.9 billion funding

11  agreement, correct?

12  A    That was never suggested or never discussed.

13  Q    I'm not surprised.  LTL did not -- withdrawn.

14      You spoke to Mr. Satterley a little bit about your

15  knowledge of the ethical rules, right?

16  A    Yes.

17  Q    And you also recognize that here in New Jersey, it's not

18  only a violation to violate the ethics rules yourself, but it's

19  also a violation to urge or ask another lawyer to do so?  You

20  realize that, right?

21          MS. BROWN:  Objection.

22          THE COURT:  Sustained.  This line of questioning is

23  not relevant.

24          MS. BROWN:  Thank you, Your Honor.

25  BY MR. MAIMON:

1  Q    In addition to ethical obligations, you realize that as

2  the debtor-in-possession, you had fiduciary duties to

3  creditors, correct?

4  A    I believe there are duties to creditors by a debtor-in-

5  possession, yes.

6  Q    And those duties to the creditors of LTL 1 continued up

7  until the minute that the case was dismissed, true?

8  A    I believe that's true.

9  Q    Okay.  As the fiduciary, you did not disclose to the TCC

10  your plans to either terminate the old funding agreement and

11  file another bankruptcy.

12        MS. BROWN:  And Your Honor, I would just --

13        MR. MAIMON:  True?

14        MS. BROWN:  -- object as this very same question was

15  asked by Mr. Jonas this morning.  It's duplicative, cumulative,

16  harassing.

17        THE COURT:  We know the answer.  Sustained.

18  BY MR. MAIMON:

19  Q    In addition to not informing either the TCC who

20  represented at that time the creditors to whom you owed a

21  fiduciary duty, and not reporting it to Judge Kaplan, you did

22  not report it to the United States Trustee's Office, either,

23  did you?

24        MS. BROWN:  Same objection, Your Honor.

25        THE COURT:  Well, he did answer that before, but --

1          MR. MAIMON:  I didn't hear an answer before.

2          THE WITNESS:  Yeah, we did not report this to the

3    Trustee.  The transaction happened after the dismissal of the

4    first bankruptcy.

5    BY MR. MAIMON:

6    Q    I understand that's when you made it effective, but the

7    plan was in place before the bankruptcy of LTL 1 was dismissed,

8    true?

9    A    Well, there were discussions about it going into

10   effectiveness at the time that the bankruptcy gets dismissed.

11   Q    The decision and authorization of the Board to file a new

12   bankruptcy occurred before the first bankruptcy was dismissed,

13   true?

14   A    The board meeting happened, yes, before -- the

15   authorizations happened before the bankruptcy was dismissed to

16   be effective once the bankruptcy was dismissed.

17   Q    Okay.  So the decision by LTL to terminate the old funding

18   agreement and file a new bankruptcy was made by the management

19   of LTL while it had fiduciary duties in the first bankruptcy,

20   correct?

21   A    It's correct that the board decided that they were going

22   to replace a funding agreement that was void or voidable or

23   unenforceable with a better funding arrangement that also had

24   the support agreement to dismiss -- to resolve fairly, fully,

25   and equitably all the talc claims in the second bankruptcy that

Kim - Cross/Maimon                    149

1  had the support of lawyers representing over 60,000 claimants.

2             MR. MAIMON:  Move to strike as non-responsive.

3             THE COURT:  Granted.

4             MR. MAIMON:  Thank you.

5             THE COURT:  This is why I couldn't allocate 50

6  percent of the time to 50 percent of the time.  I wouldn't know

7  who to charge this to.

8             MR. MAIMON:  Thank you.

9             THE COURT:  Limit your answers, please, yes or no.

10 BY MR. MAIMON:

11 Q    Did you play any role in J&J's filing of it's 8K statement

12 in which it asserted that LTL had secured commitments from over

13 60,000 current claimants to support a global resolution on

14 these terms?

15            MS. BROWN:  Object, Your Honor.

16            MR. MAIMON:  Did you play any role?

17            THE COURT:  Objection sustained.

18 BY MR. MAIMON:

19 Q    Did you -- withdrawn.

20     Did you play any role in putting onto LTL's website the

21 statement that LTL's organization plan announced in April 2023

22 is supported by 60,000 current claimants?  Did you have any

23 role in putting that on LTL's Website?

24 A    I believe I saw the statements before they were posted.

25 Q    And did you approve them?

Kim - Cross/Richenderfer                    150

1  A    Yeah, I did approve them.

2  Q    Thank you.

3         MR. MAIMON:  Those are all the questions I have here,

4  Your Honor.

5         THE COURT:  Thank you, Counsel.

6         Well, Mr. Placitella, we'll let Ms. Richenderfer -- I

7  think we did that the last time.

8         UNIDENTIFIED SPEAKER:  Okay.

9         THE COURT:  Ms. Richenderfer.

10         MS. RICHENDERFER:  Thank you, Your Honor.  Good

11  afternoon.  Linda Richenderfer on behalf of the Office of the

12  United States Trustee.

13                     CROSS-EXAMINATION

14  BY MS. RICHENDERFER:

15  Q    Mr. Kim, I think we've spent some time together over the

16  last several years.

17  A    We have.

18  Q    Question for you.  When did LTL retain Mr. Murdica to

19  represent it?

20  A    Mr. Murdica is not retained by LTL.  Mr. Murdica is

21  retained by Johnson and Johnson.

22  Q    Yeah.  I believe you've testified today that Mr. Murdica

23  was negotiating the PSAs on behalf of LTL, correct?

24  A    Oh, I would say for the benefit of LTL or with, you know,

25  with, frankly, we had also counsel for LTL involved discussing

Kim - Cross/Richenderfer                    151

1  with Mr. Murdica.  Mr. Murdica is J&J's counsel and he was

2  doing this, and it benefitted LTL.

3  Q    And I think several times, you referred to Mr. Murdica as

4  LTL's counsel?

5  A    If I did, that was a mistake.  I apologize.

6  Q    Okay.

7  A    He's J&J's counsel.

8  Q    Okay.

9  A    So we can set the record clear on that.

10 Q    So then who, on behalf of LTL, was involved in negotiating

11 the plan support agreements?

12 A    So, you know, when you say negotiating, so Mr. Murdica was

13 charged with doing the actual face-to-face negotiations.

14 Q    Right.

15 A    He was reporting continually to attorneys of Jones Day and

16 to myself and getting input.  So he was the face of the

17 negotiations on behalf of J&J, but he was taking, getting

18 comments, and reporting things to LTL because, of course,

19 there's a sort of common interest in resolving all these

20 litigations.

21 Q    Who was the face during the negotiations for LTL?  You

22 said Mr. Murdica was the face for J&J.  Who was the face,

23 during the negotiation of the PSAs --

24 A    Yeah, I --

25 Q    Yeah, I would say it's faceless because, again, we weren't

Kim - Cross/Richenderfer                    152

1  having direct negotiations -- people at LTL were not having

2  direct negotiations with the plaintiffs.  We were, again, in

3  constant contact with Mr. Murdica being apprised of what he was

4  doing, giving comments and things like that.

5  Q    Directing Mr. Murdica?

6  A    Directing?  I think I would say that we were having

7  consultations with Mr. Murdica.

8  Q    The transaction by which J&J Consumer Incorporated or New

9  JJCI, as we referred to them in the first case, the transaction

10 by which it became HoldCo and basically transferred a great

11 number of its assets occurred in early January 2023, correct?

12          MS. BROWN:  Objection, Your Honor, to the question.

13 Assumes facts.

14          MS. RICHENDERFER:  I'm sorry, Your Honor.  I didn't

15 hear that.

16          MS. BROWN:  I object to the question, Your Honor.  It

17 was lacking foundation, assuming facts.

18          MS. RICHENDERFER:  Okay.  Mr. --

19          THE COURT:  Rephrase it, please.

20          MS. RICHENDERFER:  Well, Your Honor, I am looking at

21 Mr. Kim's first day declaration.  I don't know if he has it

22 there.  I forget if we ever eventually marked it as an exhibit.

23          THE WITNESS:  I don't know if I do.

24          THE COURT:  I don't know we have it.

25          THE WITNESS:  Yeah, I don't have it.

WWW.JJCOURT.COM

Kim - Cross/Richenderfer                    153

1        MS. RICHENDERFER:  Okay.

2        UNIDENTIFIED SPEAKER:  You want it?

3        MS. RICHENDERFER:  I have it here, but if you have an

4  extra copy to give the witness so that we can see exactly what

5  the witness has already confirmed under -- I'll go on to

6  another question while they look for that for me.

7        UNIDENTIFIED SPEAKER:  I think we have it right here.

8  Here you go, Linda.

9        MS. RICHENDERFER:  Your Honor, may I approach?

10       THE COURT:  Yes.

11       MS. RICHENDERFER:  I apologize.  This has many more

12  pages (indiscernible) but --

13       THE COURT:  That's all right.  Thank you.

14       Thank you.

15       And actually, I believe we had this marked as

16  Debtor's 1.

17       MS. BROWN:  Yes, Your Honor.  I actually have a copy

18  right here.

19       MS. RICHENDERFER:  Okay.

20  BY MS. RICHENDERFER:

21  Q    Then, I will refer you to what's been marked as

22  Debtor's 1, but you can look at the one that's in front of you,

23  because I don't think the debtor gave you a copy.  I'm not

24  sure.  Or it's lost in the -- can you turn to Paragraph 26?

25  A    Yes.  I see that.

Kim - Cross/Richenderfer                    154

1  Q    Okay.  And my question was based on the last sentence in

2  Paragraph 26, "In December 2022, New JJCI changed its name" --

3  A    I apologize.  I'm sorry.  Paragraph 26?

4  Q    Paragraph 26.  It's on Page 8 --

5         THE COURT:  On Page 8.

6  BY MS. RICHENDERFER:

7  Q    -- of your first day declaration that you signed.

8  A    Yes.

9  Q    Okay.  Last sentence there.  "December 2022, New JJCI

10  changed its name to Johnson and Johnson HoldCo NA, Inc., a New

11  Jersey corporation, which has been referred to today as HoldCo.

12  And in early January, 2023, HoldCo transferred its consumer

13  business assets to its parent entity."

14  A    Yes, I see that.

15  Q    So let me ask the question again.  Prior to the Third

16  Circuit issuing its opinion at the end of January, New JJCI

17  became HoldCo and HoldCo, in early January, transferred its

18  consumer business assets to its parent.

19  A    That's true.

20  Q    And who is its parent?

21  A    I actually don't have a corporate chart in front of me.  I

22  don't know sitting here right now, but we can get that

23  information.

24  Q    I believe if you look at your first day declaration, it is

25  Annex B, Page 2 of 2.

Kim - Cross/Richenderfer                    155

1        If you're looking, I don't know whether you have a -- yes,

2   you do have the copy that was filed on the docket, so it is

3   Page -- it's Document 4-2, Page 2 of 2, if that helps;

4   A    I appreciate that.

5        Yeah, it's either Janssen Pharmaceuticals or, I believe it

6   is Janssen Pharmaceuticals.  I think that line may be, yeah, I

7   think it's -- I think it looks from this chart to be Janssen

8   Pharmaceuticals, Inc.

9   Q    Okay.  So based on your affirmed testimony as part of your

10  first day declaration, prior to even the Third Circuit's

11  opinion being issued, HoldCo transferred its consumer business

12  to Janssen Pharmaceuticals, Inc., which appears to be the

13  parent based on the yes chart that you gave as part of your --

14  A    Yes.  Unrelated to the Third Circuit decision, this

15  transaction happened.

16  Q    And was that ever disclosed to the Tort Claimant's

17  Committee?

18  A    No, nor do I understand why it would have to be disclosed.

19        MS. RICHENDERFER:  Your Honor, please, I'd like to

20  strike everything after, "No."

21        THE COURT:  Just, again --

22        MS. RICHENDERFER:  I know, Your Honor.

23        THE COURT:  I'm the jury, so I understand it.

24        MS. RICHENDERFER:  Okay.

25        THE COURT:  Please limit your answers to yes or no.

Kim - Cross/Richenderfer                    156

1  BY MS. RICHENDERFER:

2  Q    And did -- I'm going to call it LTL 1, meaning LTL, the

3  debtor that existed prior to 1:49 p.m. on April 4th.  Did LTL 1

4  have any funding or support agreements with Janssen

5  Pharmaceuticals?

6  A    I don't believe it did, no.

7  Q    Okay.  So in the original funding agreement that we've

8  been calling funding agreement one included support from JJCI,

9  New JJCI.  And that was supported by its consumer business,

10 which prior to the dismissal of the case was transferred to

11 Janssen Pharmaceuticals, correct?

12 A    I don't understand that question.

13 Q    I think it's a pretty simple question, Mr. Kim, based on

14 your years of experience.  You've got far more --

15        THE COURT:  Sustained.  Rephrase the question,

16 please.

17 BY MS. RICHENDERFER:

18 Q    What was left in HoldCo after this transfer occurred prior

19 to the dismissal of LTL 1?

20 A    The non-consumer assets.  And, again, it did have the

21 support agreement.  You know, the funding agreement also

22 included J&J, so, it had the co-obligation of J&J.  So prior to

23 the Third Circuit decision, it had, you know, the resource of

24 the funding agreement.  It had the funding agreement also with

25 J&J to support LTL.

1    Q    Okay.  So prior to the dismissal, HoldCo transfers its

2    consumer business assets to Janssen, but your point, if I

3    understand you, is that LTL 1 still had the funding support

4    agreement that included J&J and now, HoldCo.  Is that correct?

5    A    Well, HoldCo is JJCI and --

6    Q    Well --

7    A    -- all it did was change its name.

8    Q    I'm using the terminology that's in your affidavit here so

9    that we can all be on the same terminology.  Okay.

10   A    I understand.  I just wanted to clarify that HoldCo is the

11   same as JJCI, it just changed its name.

12   Q    Right.

13   A    So it --

14   Q    But it changed its name and gave away its consumer

15   business, right?

16   A    Unrelated to anything, it gave away its consumer business,

17   but still had, at that time, prior to the Third Circuit

18   decision, it still had the agreement, the backup of J&J.

19   Q    That's right.  But it did give away its consumer business,

20   correct?

21   A    It did.

22   Q    Okay.  When you were talking previously about the FCR and

23   you were asked about the PSA, you said, oh, well, there would

24   be a different PSA with the FCR, not the PSA that we signed

25   with the plaintiff's attorneys.

Kim - Cross/Richenderfer                    158

1    Have you ever seen a draft PSA that the FCR would have

2  signed?

3  A    I don't think I saw a draft, no.

4  Q    To your knowledge, was one ever drafted.

5  A    I'm actually not sure.  There may have been.  I haven't

6  seen it.

7          MS. RICHENDERFER:  Your Honor, if I could just have a

8  minute.  There was something right there on the tip of my

9  tongue and it --

10  BY MS. RICHENDERFER:

11  Q    I know that the term sheet was marked previously as an

12  exhibit.  I believe it's Exhibit 4, if you want to find that

13  there.

14  A    Yes.

15  Q    How many pages is the term sheet?

16      I know there's an annex to it, so maybe you can give us

17  the number count for the pages of the agreement and of the term

18  sheet, and then the pages for the annex.

19  A    So there are eight pages to the term sheet and there are

20  five pages to the annex.

21  Q    Okay.  Do you know how many pages the 10th amended Imerys

22  plan of reorganization was?

23  A    No.

24          MS. BROWN:  Objection, Your Honor.

25          THE COURT:  Sustained.

**WWW.JJCOURT.COM**

Kim - Cross/Placitella                159

1           MS. RICHENDERFER:  Well, Your Honor, if I could just

2   respond.  We're talking about something that is far removed

3   from --

4           THE COURT:  You can argue it --

5           MS. RICHENDERFER:  Okay.

6           THE COURT:  -- when the time comes.

7           MS. RICHENDERFER:  We'll do so, Your Honor.

8           No further questions.

9           THE COURT:  Thank you, Ms. Richenderfer.

10          Mr. Placitella.

11          MR. PLACITELLA:  Thank you, Your Honor.

12                          CROSS-EXAMINATION

13  BY MR. PLACITELLA:

14  Q    So the good news, Mr. Kim, is the U.S. Trustee took a lot

15  of my questions.

16       So I want to follow up on the line of questions that you

17  were being asked.  And late last night -- I want to try to

18  share something.

19          MS. BROWN:  Mr. Placitella, if it's a document, do

20  you have a copy?

21          MR. PLACITELLA:  I got it from you, so.

22          THE COURT:  Well, let's see what it is.

23          MR. PLACITELLA:  Sure.

24          MS. BROWN:  Thank you.

25          MR. PLACITELLA:  Okay.

1              Is that showing up?

2              THE COURT:  Yes.

3              MR. PLACITELLA:  Okay.

4   BY MR. PLACITELLA:

5   Q    So last night when I was on the train --

6              MS. BROWN:  I'm sorry I understand that's been filed

7   on the docket.  I'm just wondering if you have a hard copy of

8   what you're about to use.

9              MR. PLACITELLA:  No, I don't.  I got it on the train

10  last night.  You sent it to me and I barely had time to read it

11  before I came here today, so no, I don't have a hard copy.

12             MS. BROWN:  Judge, I don't think that's necessary.

13  If we're going to use exhibits, I'm just inquiring if there's

14  one for me to look at.

15             MR. PLACITELLA:  Well, they filed it, Your Honor.

16             THE COURT:  True.  But we don't have access to the

17  document here.

18             MR. PLACITELLA:  I'm just going to ask questions.

19             THE COURT:  Why don't we see where the questions go?

20             MS. BROWN:  Okay.

21             THE COURT:  All right.  And if you have a need, we'll

22  arrange --

23             MR. PLACITELLA:  There's no trick questions.

24             THE COURT:  -- to pull it up.

25             MR. PLACITELLA:  Okay.

1          MS. BROWN:  Thanks, Judge.

2    BY MR. PLACITELLA:

3    Q    Last night, you filed this document with the Court,

4    correct?

5    A    I believe that's true, yes.

6    Q    And the title of the document is "Notice of Filing

7    Supplemental Appendices."  Do you see that?

8    A    That's true, yes.

9    Q    Okay.  And what was the reason you filed that?

10   A    I think over the weekend, we discovered that you had filed

11   a complaint against several entities unrelated to talc but for

12   a talc claim.  And what we had done prior to filing our list of

13   protected parties is we had put together, at the request of

14   every -- I think -- I keep saying everybody.

15        We understand that the first list we had of protected

16   party was large.  And the reason we did that was because we

17   didn't want any of our subsidiaries unrelated to the talc

18   litigation to get sued in various courts.  We found out over

19   the weekend that you had filed a lawsuit against parties that,

20   A, have no relationship to talc --

21   Q    We're going to get there.

22   A    Okay.

23   Q    Okay.

24   A    But, again, because we had, in the first instance, to try

25   to streamline the injunction here, limited the protected

Kim - Cross/Placitella                    162

1  parties to people who actually have claims against them, when

2  you filed a lawsuit involving defendants that have nothing to

3  do with talc, or, you know, that have never been sued before,

4  we wanted to make sure that any injunction that issued would

5  then cover them.  So I think we explained early on that our

6  list of protected parties was going to be limited with the

7  reservation of rights and if people started suing them that we

8  can put them into the list of protected parties.

9      And so that's what this is.  This is a notice that we want

10 to expand the list because you had filed a lawsuit against

11 them.

12 Q    Okay.  Let's talk about that for a second.

13 A    Okay.

14 Q    So I got this last night and it talks about Appendix A.

15 And Appendix A are all the people who you said filed new

16 lawsuits against you, right?

17 A    This is -- yeah.  That was also part of the filing was we

18 had a number of other lawsuits filed --

19 Q    Okay.

20 A    -- that we wanted to put in the record.

21 Q    And Appendix A, that's where you listed them.  That's what

22 I have up here, right?

23 A    Yes.

24 Q    All right.  You didn't list an Appendix A, the lawsuit I

25 filed against you, which was last week, not over the weekend,

Kim - Cross/Placitella                    163

1  right?

2  A    I think we just found out about it last week.

3  Q    You didn't list it though, did you?

4  A    I think we listed the parties.

5  Q    I don't think so.

6  A    (Indiscernible) have the parties)?

7  Q    Do you want me to flip through them?

8  A    Yeah, I'd have to review the list to see what --

9  Q    Okay.  So I'm going to give you my copy because it was

10  late, so ignore my handwriting.

11  A    It's okay.

12  Q    This is the lawsuit filed by Justin Bergeron, a 32-year

13  old man with mesothelioma with two minor children.  Did you

14  know that?

15  A    No.  I think I looked at the complaint.

16  Q    Okay.  And Mr. Bergeron sued Janssen and Kenvue as

17  successors-in-interest under New Jersey law for the torts of

18  JJCI, correct?

19  A    I think the complaint speaks for itself.  I didn't study

20  the complaint in detail.  My understanding it's a talc claim

21  against Kenvue and Janssen.

22  Q    Well, in Mr. Bergeron's complaint I put up on the screen,

23  that complaint -- you know, the facts in that complaint come

24  primarily from the affidavit you filed in this Court, right?

25  You read that part, correct?

Kim - Cross/Placitella                    164

1   A    I saw references to that.  Again, I didn't read the

2   complaint thoroughly.  I just looked at -- I was apprised of

3   the lawsuit, who the defendants were, and we wanted to make

4   sure that we covered them as protected parties.

5   Q    Well, as you see on Page 4, on Paragraph 14, it talks

6   about the information in the complaint coming directly from

7   your affidavit.  Do you see that?

8        Here, I'll blow it up in case you don't see it.  Do you

9   see that?

10  A    Fourteen, I see.

11       I do see that.

12  Q    Okay.  And one of the things that was talked about -- oh,

13  by the way, the U.S. Trustee did a lot of this so we can dial

14  it forward.  But give me a second.

15       It's written on Paragraph 26, "Unbeknownst to the

16  plaintiffs, during the time the Third Circuit Court of Appeals

17  was considering the propriety of LTL'S bankruptcy filing, New

18  JJCI," that was who you were working for, right, before you

19  changed the name?

20  A    I was working for LTL.

21  Q    Oh, okay.  I'm sorry.

22       "New JJCI began the process of moving its assets and

23  businesses to yet another J&J subsidiary," correct?

24  A    That's what you say.

25  Q    Right.  What you did is you took the assets, you then

Kim - Cross/Placitella                    165

 1  transferred them to the parent, which was Janssen, with the

 2  notion that you were going to put it in still another

 3  subsidiary called Kenvue, right?

 4          MS. BROWN:  Objection, Your Honor.

 5          THE COURT:  What's the basis?

 6          MS. BROWN:  It assumes facts.  There's no factual

 7  support for these allegations.

 8          MR. PLACITELLA:  I'm going to go right through it,

 9  Judge.

10          MS. BROWN:  And this is a complaint that he's filed

11  and it is inconsistent with the facts.

12          MR. PLACITELLA:  The complaint quotes from your

13  affidavit, sir.  So let's just talk to it.

14          THE COURT:  Well, are you just reciting the

15  complaint?  Or --

16          MR. PLACITELLA:  I'm asking if my complaint correctly

17  cites his affidavit and what he believes to be true.

18          THE COURT:  And what's the purpose?

19          MR. PLACITELLA:  The purpose is to demonstrate here

20  that Johnson and Johnson, while the Third Circuit's decision

21  was pending, was moving assets out of Old JJCI -- out of New

22  JJCI into Janssen with the intention of then moving those

23  assets again to Kenvue.  And they brought to this Court trying

24  to extend the TRO to those transfers.

25          And my client, Justin Bergeron, under New Jersey law,

Kim - Cross/Placitella                166

1  has every right to proceed against Janssen and Kenvue in the

2  chain of distribution of those assets.  It wasn't me that

3  brought this to the Court, Your Honor.  They brought it to the

4  Court late last night.

5          They didn't tell the Court that the reason they were

6  doing it was because Mr. Bergeron had sued them.  They just

7  said, can't we just add these on, Judge?  No big deal.  And it

8  is a big deal.

9          THE COURT:  All right.  It's more of an argument,

10  which is fine.  What specific questions --

11          MR. PLACITELLA:  Well, can I go through the facts,

12  please?

13          THE COURT:  Okay.  I'm trying to make sure that

14  everybody can have an opportunity to go forward.

15          MR. PLACITELLA:  Okay.

16  BY MR. PLACITELLA:

17  Q    Sir, do you --

18          MS. BROWN:  I'm sorry, Your Honor, and just as to the

19  objection that we're reading unsubstantiated allegations in a

20  complaint into the record, I object to that.

21          THE COURT:  Why don't you ask Mr. Kim if he has

22  knowledge of this transaction?

23  BY MR. PLACITELLA:

24  Q    Sir, you just told the U.S. Trustee that you transferred

25  the assets of New JJCI to the parent Janssen, correct?

Kim - Cross/Placitella                    167

1  A    No.  I said that that part of the transaction is what I

2  know.  What's in the affidavit is what I know.  I was not

3  involved in this transaction.  This is not an LTL transaction.

4       You know, again, what I know is what I used to determine

5  the value of HoldCo, which is what assets it contains.

6  Q    Well, sir, you said in Paragraph 26 of your affidavit, in

7  early 2023, New JJCI transferred its consumer business assets

8  to its parent entity.  That's what you said.

9  A    Yes.  That is the part of the transaction that I know.  I

10 was not involved in that transaction.  The reason I know it is

11 because I wanted to know what the value of HoldCo was at this

12 time.  But I was not involved in that transaction.  That's a

13 J&J transaction, or a Janssen transaction, and I'm at LTL.  I

14 had nothing to do with that transaction.

15       MR. PLACITELLA:  Move to strike, Your Honor.  All I

16 asked him is if that was what was in his affidavit.

17       THE COURT:  Well, his answer, it was in the

18 affidavit.

19       MR. PLACITELLA:  Okay.

20 BY MR. PLACITELLA:

21 Q    Okay.  It was in your affidavit and you said to its parent

22 entity, correct?

23 A    Yes.  That's what I understood it to have transferred it

24 to.

25 Q    How come you didn't name the parent entity?  Why did

Kim - Cross/Placitella                              168

1  people have to figure it out?

2  A    As you can tell, I actually don't know what the actual

3  parent is.  My understanding of the transaction is what I put

4  in my declaration.  The reason I needed to know that much was

5  trying to figure out what the assets of HoldCo were at the

6  time.

7  Q    So when you had Figure 1 in your affidavit, which lists

8  who the parent entity is, who did that for you if you didn't

9  know anything about it?

10 A    That was done by Counsel.

11 Q    Okay.  And does it list here the parent entity as Janssen

12 Pharmaceuticals?

13 A    We can look at it again.  I believe it does.

14 Q    I've got it up on the screen.  Let me blow it up for you.

15 A    I think it's -- the only thing that bothers me is the way

16 the lines connect suggesting that other direct subsidiaries

17 somehow might be above Johnson and Johnson -- the HoldCo

18 between Janssen and HoldCo.  I don't know.  I don't think

19 that's true.  But that line just threw me because it's a little

20 confusing.

21 Q    Well, but this is in your affidavit that you spoke to

22 under oath.

23 A    It is.

24 Q    Okay.

25 A    But, again, what I swore to is that went into its parent.

**WWW.JJCOURT.COM**

Kim - Cross/Placitella                169

 1 I believe this is the right one.  It's just a little confusing

 2 because of the way that the other direct subsidiaries is.

 3 Q    Okay.  And the parent Janssen, last year made in sales

 4 what?  $138 billion?

 5 A    I don't know.

 6            MS. BROWN:  Lacks foundation.

 7 BY MS. PLACITELLA:

 8 Q    They're not bankrupt, are they sir?

 9            MS. BROWN:  Your Honor, I object.

10            THE COURT:  Sustained.

11 BY MR. PLACITELLA:

12 Q    Are they in financial distress?

13            MS. BROWN:  Wait, but there's a --

14            THE COURT:  Sustained.

15            MS. BROWN:  -- pending objection.

16            THE COURT:  Thank you.

17            MR. PLACITELLA:  Okay.

18 BY MR. PLACITELLA:

19 Q    Sir, do you know anything about during the pendency of the

20 Third Circuit decision that Janssen was then going to try to

21 transfer those same assets that started with your company to a

22 company called Kenvue?

23            MS. BROWN:  I object, Your Honor.  This completely

24 lacks foundation.

25            MR. PLACITELLA:  I'm asking if he knows anything

Kim - Cross/Placitella                    170

 1  about it.

 2          MS. BROWN:  LTL --

 3          THE COURT:  He's already testified his knowledge is

 4  limited to the asset went to the parent.

 5          MS. BROWN:  All right.  Your Honor, object to this

 6  entire line of questioning.  LTL owns the liability and this

 7  witness lacks foundation about other transactions within the

 8  J&J corporate family.

 9          MR. PLACITELLA:  Judge, I'll make a --

10          THE COURT:  Proceed.

11          MR. PLACITELLA:  -- separate submission.  This is not

12  the time for argument, but in fact SEC filing from Kenvue says

13  that they're responsible for Johnson's Baby Powder.

14          THE COURT:  And that may --

15          MR. PLACITELLA:  And we'll go through --

16          THE COURT:  Again, that's more argument.

17          MR. PLACITELLA:  Okay.

18          THE COURT:  Thank you.

19  BY MR. PLACITELLA:

20  Q    So, just to be clear, you knew about the transfer of the

21  assets out of HoldCo during the pendency of the Third Circuit

22  decision, correct?

23          MS. BROWN:  Objection, Your Honor.  That misstates

24  his testimony?

25          THE WITNESS:  Yeah, I know the transaction.  I don't

Kim - Cross/Placitella                    171

1  know when --

2            THE COURT:  Overruled.

3            THE WITNESS:  Yeah.  I didn't learn about it until

4  afterwards.

5  BY MR. PLACITELLA:

6  Q    Okay.  But you don't know anything about taking those

7  assets and then moving them again?

8  A    I do not.

9  Q    Okay.  Let me ask you a couple other questions.

10     Representation -- then I'll sit down because I'm not

11  allowed to ask you all the questions I want, good for you.

12           THE COURT:  It happens.  Go ahead.

13           MR. PLACITELLA:  It happens.  It happens.

14  BY MR. PLACITELLA:

15  Q    Okay.  So you represented to the Court that you had the

16  support of some 60,000 claimants, correct?

17  A    Correct.

18  Q    But you don't know how many of those claimants actually

19  had claims that they could make within the statute of

20  limitations, correct?

21  A    Yeah.  I don't know.  I don't know whether any of them

22  are.  Yeah, I don't know.

23           THE COURT:  So the answer is yes.

24           THE WITNESS:  Yes.  I don't know.

25  BY MR. PLACITELLA:

Kim - Cross/Placitella          172

1  Q    So it could be that of the 60,000 claimants that you say

2  support the claim, a high percentage of them could have had

3  diagnosis or died more than two years before the LTL 1

4  bankruptcy, correct?

5           MS. BROWN:  Objection, Your Honor.

6           THE COURT:  Sustained.  Speculation.

7  BY MR. PLACITELLA:

8  Q    Well, your Counsel testified under oath that they don't

9  know what claims were barred or not barred?  Do you know that?

10          MS. BROWN:  Objection, Your Honor.  Misstate's

11 testimony, lacks foundation, calls for speculation.

12          THE COURT:  Sustained.

13          MR. PLACITELLA:  Okay.

14 BY MR. PLACITELLA:

15 Q    Do you know that -- well, here, because I don't want to

16 misstate anything.

17     Mr. Watts (phonetic) is the gentleman that you say

18 supports your proposal.

19          MS. BROWN:  And, Your Honor, I will object here.  I

20 don't know what document this is, and I --

21          MR. PLACITELLA:  It comes from his deposition,

22 Counsel.  You were there yesterday.

23          MS. BROWN:  Okay.  If you're referring to the

24 transcript of somebody else's deposition --

25          MR. PLACITELLA:  Yes, sir.

Kim - Cross/Placitella                    173

1          MS. BROWN:  -- I don't have it memorized.  And this

2    appears to be in a PowerPoint that says, "Who is in the 60,000

3    count?"  I would just ask Your Honor if he's going to question

4    about a document that we provide each other with a copy.

5          MR. PLACITELLA:  Well, you have it.

6          THE COURT:  Mr. Placitella, let me ask you this.  Can

7    you ask the question without referring to the PowerPoint?

8          MR. PLACITELLA:  Yeah.

9    BY MR. PLACITELLA:

10   Q    Did you know that Mr. Watts testified under oath that he

11   does not know and had not done the analysis as to how many

12   claimants that you say support the plan inhaled baby powder and

13   got sick versus had it applied perineal, ovarian cancer

14   claimants?  Do you know that?

15         MS. BROWN:  Your Honor, I object as lacking

16   foundation, calling for speculation.

17         THE COURT:  Sustained.

18   BY MR. PLACITELLA:

19   Q    Do you know that your own lawyer, Mr. -- oh, he's not your

20   lawyer, right?  Johnson's and Johnson's lawyer.

21        Do you know that he testified under oath that he doesn't

22   know how many of the claimants with ovarian cancer --

23         MS. BROWN:  Same objection.

24         THE COURT:  Sustained.

25   BY MR. PLACITELLA:

Kim - Cross/Placitella                          174

1  Q    Or did you listen to the testimony, sir?

2  A    I did not.

3  Q    Okay.  Did you know, sir, that under Judge Wolfson's

4  opinion --

5           MS. BROWN:  I think it's the same objection, Judge.

6           MR. PLACITELLA:  I'm going to ask him if he knows.

7  BY MR. PLACITELLA:

8  Q    Did you ever read Judge Wolfson's Daubert decision, sir?

9  A    I have.

10          MS. BROWN:  Objection, Your Honor.

11 BY MR. PLACITELLA:

12 Q    Yes?

13 A    I have read the Daubert decision.

14 Q    Okay.  So you know under Judge Wolfson's Daubert

15 decision --

16          THE COURT:  Wait.

17          MR. PLACITELLA:  -- that if someone inhaled Johnson

18 and Johnson's talc and got ovarian cancer, that claim would be

19 disallowed in this Court.  You know that, correct?

20          THE WITNESS:  No, I don't think that's what the --

21          THE COURT:  Wait.  Don't answer.

22          MS. BROWN:  Your Honor, I object on multiple grounds,

23 including foundation --

24          THE COURT:  Sustained.

25          MS. BROWN:  -- speculation.

 1             THE COURT:  The objection is sustained.

 2             MS. BROWN:  Thank you.

 3    BY MR. PLACITELLA:

 4    Q    So as we sit here, sir, you don't really know how many of

 5    the 60,000 claimants could actually qualify to file a lawsuit.

 6             MS. BROWN:  Same objection.

 7             MR. PLACITELLA:  Correct?

 8             THE COURT:  Sustained.

 9             MR. PLACITELLA:  Basis, sir?

10             THE COURT:  Yes.

11             MR. PLACITELLA:  Excuse me.

12             THE COURT:  Oh, basis.

13             MR. PLACITELLA:  Yeah, just so I want it just --

14             THE COURT:  Speculate.

15             MR. PLACITELLA:  I'm just asking if he knows.

16             MS. BROWN:  You're asking him to speculate, so I

17    object.

18             MR. PLACITELLA:  No, I'm just asking if he knows.

19             MS. BROWN:  And the Judge sustained it.

20             UNIDENTIFIED SPEAKER:  We stipulate it's speculative,

21    how many people there are.

22             MR. PLACITELLA:  Okay.

23    BY MR. PLACITELLA:

24    Q    Since I'm not allowed to ask you any other questions about

25    what happened with the money in Kenvue, which we'll save for

Kim - Cross/Thompson                           176

1 another time, I'm done for the day.

2               MR. PLACITELLA:  Thank you, Your Honor.

3               THE COURT:  Thank you, Mr. Placitella.

4               MR. RUCKDESCHEL:  Judge, I have two questions.

5               THE COURT:  Okay.  Come on up.

6                         CROSS-EXAMINATION

7 BY MR. THOMPSON:

8 Q    Mr. Kim, you're a J&J shareholder, right?

9 A    Yes, I am.

10 Q    And you're aware that Johnson and Johnson just this

11 morning increased its dividends by 5.3 percent.  Did you know

12 that?

13 A    No.

14               MS. BROWN:  Objection, Your Honor.

15               MR. THOMPSON:  That's all I have.

16               THE COURT:  Overruled.

17               MR. RUCKDESCHEL:  Your Honor, I also have two

18 questions.

19               THE COURT:  Okay.

20                         CROSS-EXAMINATION

21 BY MR. RUCKDESCHEL:

22 Q    Mr. Kim, what consideration did HoldCo get from Janssen

23 Pharmaceuticals for giving it its consumer product business?

24               MS. BROWN:  Objection, Your Honor.  Speculation.

25               THE WITNESS:  I --

1          THE COURT:  Wait.  Do you know this answer?

2          THE WITNESS:  I was not.  No, I don't.

3  BY MR. RUCKDESCHEL:

4  Q    What have you done to investigate what consideration

5  HoldCo received from Janssen Pharmaceuticals for giving away

6  its valuable consumer product business?

7          MS. BROWN:  Lacks foundation.

8          THE COURT:  Sustained.

9          MR. RUCKDESCHEL:  I'm asking whether he has done any

10  investigation.

11  BY MR. RUCKDESCHEL:

12  Q    And, Mr. Kim, since LTL determined that the funding

13  agreement, one, with respect to Johnson and Johnson was, as

14  you've termed it, void and voidable, what steps has LTL done to

15  get those assets back to HoldCo?

16          MS. BROWN:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yeah, I don't understand the question.

19  BY MR. RUCKDESCHEL:

20  Q    Has LTL's --

21          THE COURT:  Wait a minute.  Wait a minute.  Do you

22  need the question rephrased?

23          THE WITNESS:  Yeah.  I don't understand the question.

24  BY MR. RUCKDESCHEL:

25  Q    Has LTL taken any steps to attempt to have the assets that

Kim - Redirect/Brown                      178

1  HoldCo gave away to Janssen return to HoldCo so that they can

2  backstop LTL under funding agreement two?

3           MS. BROWN:  I object, Your Honor.  Lacks foundation,

4  misstates the record, and it's vague.

5           THE COURT:  Overruled.  Answer if you can.

6           THE WITNESS:  Yeah, I wouldn't know what theory we

7  would even try to do that.

8  BY MR. RUCKDESCHEL:

9  Q    So LTL has taken no steps?

10 A    There would be no steps to take.

11 Q    There would be no steps to take even though you don't know

12 what theory you could potentially pursue?

13 A    Well, what I said is, yeah, I can't even think of the

14 theory that that would pertain to that, that you would do that.

15          MR. RUCKDESCHEL:  No further questions.

16          THE COURT:  All right.  Thank you.

17          Redirect.

18          MS. BROWN:  Thank you, Your Honor.  Very briefly.

19          THE COURT:  I tried.

20          THE WITNESS:  Thank you.

21                    REDIRECT EXAMINATION:

22 BY MS. BROWN:

23 Q    Mr. Kim, how are you?

24 A    Very well, thank you.

25 Q    Well, a lot of questioning, but I just have a couple of

1 questions to clear something up.

2      Earlier this morning, sir, you were asked a number of

3 questions about funding agreement one and funding agreement

4 two.  Do you remember those questions?

5 A    I do.

6 Q    Okay.  And numbers were put on those funding agreements,

7 like $61.5 billion and the like, right, sir?

8 A    Yeah, I recall that.

9 Q    Okay.  But the truth is, sir, that the value of the

10 funding agreements are driven by the talc liability, correct?

11 A    It is.  It would be part of that, the value.

12 Q    Okay.  And so, for example, J&J'S liability is limited to

13 J&J's exposure for the talc liability, correct?

14 A    That would be the -- right.  So when you say -- I think

15 the issues --

16           UNIDENTIFIED SPEAKER:  (Indiscernible)

17           THE COURT:  Leading?

18           UNIDENTIFIED SPEAKER:  Both leading, yes.

19           THE COURT:  Try to avoid the leading if possible.

20           MS. BROWN:  I will, Your Honor.  Just trying to move

21 it along.  But I will, I'll ask an open-ended question.

22 BY MS. BROWN:

23 Q    Mr. Kim, you were going to answer that?

24 A    Yes.  The opening question.  Yeah, the amount of money

25 we're talking about, of course, is the maximum that is, not the

Kim - Redirect/Brown                    180

1  exposure, of liability.  So it's the amount that they agreed to

2  fund not any, you know, what the exposure.  I think that's what

3  the question that you're getting at is.

4  Q    Well, and in terms of the liability, that was the same

5  under funding agreement one -- in terms of whether -- do you

6  have a view on whether or not the liability changed under

7  funding agreement one and funding agreement two?

8  A    Well, so the talc liability, so I, yeah I see.  The talc

9  liability is enormous.  We don't have an aggregate number for

10 it, but it is, you know, huge.  I think what I would do is

11 refer to all the testimony I gave in the prior proceeding about

12 the liability and adopt that here.

13      That liability, if anything, has gotten bigger.  We know

14 that after a year of being in bankruptcy, we have at least -- I

15 think it almost doubled from what we know from unknown claims.

16 So what I would say is that the liability itself is even much

17 larger than it was when the first bankruptcy was filed.

18 Q    And how does that liability relate to the value of the

19 funding agreement?

20 A    Well, at the end of the day, we believe that we have

21 sufficient funds to meet the liability except for the -- so we

22 believe we're not insolvent, but we do believe that we are in

23 financial distress because of the magnitude of the liability,

24 the wild and unpredictable verdicts, the cost of the

25 litigation, which is ever increasing.

Kim - Redirect/Brown                   181

1  Q    So putting aside the liability and the value of the

2  funding agreements, are you familiar with commitments to fund

3  that J&J and LTL made in the first bankruptcy and in this

4  bankruptcy?

5  A    I am.

6  Q    Okay.  And unlike the amount of the liability, have the

7  commitments changed from the first bankruptcy to this

8  bankruptcy?

9  A    They have.  They're changed in terms of where they're

10  coming from.

11  Q    And was the commitment in the first bankruptcy

12  approximately $2 billion?

13  A    Oh, well, the commitment of $2 billion was the original

14  amount that was going to be put into a qualified trust fund.

15  And that's changed dramatically from the $2 billion.  Now, it's

16  the $8.9 billion in the bankruptcy.

17  Q    Okay.  And so the commitment has gone from 2 billion to

18  8.9 billion now, correct?

19  A    From the first qualified fund in the first bankruptcy to

20  what is now committed in the second bankruptcy has increased to

21  $8.9 billion.

22  Q    Okay.  Thanks very much, Mr. Kim.

23        MS. BROWN:  I have no further questions.

24        THE COURT:  Thank you.

25        Any redirect?

1          MR. SATTERLEY:  I've just got a couple questions,

2   Your Honor.

3                    RECROSS-EXAMINATION

4   BY MR. SATTERLEY:

5   Q    Just on the point that you've made a determination that

6   the liability has doubled.  You would agree that's pure

7   speculation, Mr. Kim.  You haven't done an analysis of that,

8   have you?

9   A    Yeah, I didn't say the -- I'm sorry.  If I said the

10  liability doubled, what I meant to say was that we know that

11  the number of claims have doubled.

12  Q    Well the truth of the matter is, you said just a few

13  minutes ago that the liability is now enormous, it's doubled

14  since the first bankruptcy because of the number of potential

15  claimants, correct?

16  A    Yeah.  I think if I said that, I was a little sloppy.

17  Q    You were sloppy.  You've not done even a back of the

18  envelope analysis of any of these potential claimants, correct?

19  A    Again, we know who the potential claimants are and the

20  number of claimants has doubled from the first bankruptcy.

21  Q    You don't have any pathology reports for a single

22  claimant, true?

23  A    We don't have that for the original claimants.

24  Q    You have no depositions or sworn testimony of a single

25  claimant, true?

1 A    Again, we have --

2         MS. BROWN:  Objection, Your Honor.  Misstates the

3 record, asked and answered.

4         THE COURT:  Overruled.

5         MR. SATTERLEY:  Well, Your Honor, I'm making a point.

6         He said it's enormous now and it's doubled.  I'm just

7 demonstrating that's incorrect testimony.

8         THE COURT:  Accepted.  Move on.  Thank you.

9         MR. SATTERLEY:  All right.

10 BY MR. SATTERLEY:

11 Q    Final question.  You have no expert witness evaluation of

12 those doubled, enormous number of cases that you're saying has

13 agreed to this plan, true?

14 A    We have no experts, no, not yet.

15         MR. SATTERLEY:  Thank you.  Thank you, Mr. Kim.

16         MR. MAIMON:  May I briefly, Your Honor.

17         THE COURT:  All right.

18                    RECROSS-EXAMINATION

19 BY MR. MAIMON:

20 Q    Mr. Kim, you discussed the funding agreement with your

21 attorney, Ms. Brown.  Do you recall that?

22 A    Yes.

23 Q    The Third Circuit Court of Appeals on Page 24 of its

24 opinion said still, Old Consumer was a highly valuable

25 enterprise, estimated by LTL to be worth $61.5 billion,

Kim - Recross/Maimon                    184

1  excluding future talc liabilities, with many profitable

2  products and brands.

3      Do you recall that statement in the Third Circuit opinion?

4  A    I do recall that statement.

5  Q    And whether or not it's an error, J&J and LTL have

6  foregone their right to appeal anything in the Third Circuit

7  opinion, correct?

8          MS. BROWN:  Objection, Your Honor.

9          THE COURT:  Sustained.

10 BY MR. MAIMON:

11 Q    The Third Circuit also says that with regard to funding

12 agreement number one, there were few conditions to funding and

13 no repayment obligations.  Do you recall that?

14         MS. BROWN:  Objection, Your Honor.  This goes beyond

15 the three questions I asked about the funding agreement.  I

16 object as beyond the scope.

17         MR. MAIMON:  Well, this goes to the difference

18 between funding number one and funding number two, which was

19 exactly testimony that was (indiscernible).

20         THE COURT:  Objection overruled.

21 BY MR. MAIMON:

22 Q    Do you recall the Circuit saying that?

23 A    I do recall the Circuit saying that.

24 Q    And the Circuit said that the value of the payment right

25 could not drop below a floor defined as the value of new

1  Consumer measured as of the time of the divisional merger

2  estimated by LTL at $61.5 billion, right?

3  A     That's the J&J guarantee portion, yes.

4  Q     That was the floor, correct, sir?

5  A     I read what they said.  I'm not, I guess I agree that

6  there was a J&J guarantee for that amount.

7  Q     That was the floor, correct?

8  A     I believe that's true.

9  Q     Thank you.

10            THE COURT:  Thank you.

11            MR. MAIMON:  That's all I have.  Thank you.

12            MR. JENKINS:  Nothing further, Your Honor.

13            THE COURT:  Thank you, Mr. Jonas.

14            All right.  Mr. Kim, you may step down.

15            THE WITNESS:  Thank you.

16                    (Witness dismissed)

17            THE COURT:  Mr. Gordon, did you have any other

18  witnesses?

19            MR. GORDON:  We do not, Your Honor, other than my

20  point earlier about deposition designations and exhibits, but

21  no further witnesses.

22            THE COURT:  All right.  Thank you, Mr. Kim.

23            All right.

24            MR. PLACITELLA:  Are they resting?  Are they resting

25  their case?

1             THE COURT:  Are you --

2             MR. GORDON:  I mean, subject to closing.

3             THE COURT:  Yes.  Well, yes, but you have no further

4    testimony or evidence.

5             Mr. Satterley.

6             MR. SATTERLEY:  Nothing here, Your Honor.  Just

7    respectfully to the U.S. Trustee just to ask if they're done.

8             THE COURT:  Ms. Richenderfer.

9             MS. RICHENDERFER:  Nothing from the U.S. Trustee,

10   Your Honor.

11            THE COURT:  Mr. Satterley.

12            MR. SATTERLEY:  I would just add, Your Honor, in

13   addition to what Mr. Gordon said, the deposition testimony

14   Mr. Maimon referred to earlier, we're going to incorporate that

15   into the record as long as well as some exhibits.

16            THE COURT:  That's appropriate.

17            Mr. Placitella.

18            MR. PLACITELLA:  I would offer two additional

19   exhibits, Your Honor.

20            THE COURT:  Yes.

21            MR. PLACITELLA:  Mr. Bergeron's complaint and the

22   Kenvue SEC filing.

23            THE COURT:  Any objections?

24            UNIDENTIFIED SPEAKER:  Not here, Your Honor.

25            MS. BROWN:  Yes, Your Honor.  We would object to two

187

1  complaints that were not the subject of any discovery that have

2  no relevance to what's going on here in this proceeding.

3        THE COURT:  Well, I'll accord them relevance.

4        Let's --

5        MR. PLACITELLA:  Your Honor, they made it the subject

6  of a late night application to extend the TRO.

7        THE COURT:  I'm going to mark the -- I

8  have -- Mr. Placitella?

9        MR. PLACITELLA:  Yes.

10       THE COURT:  I have the exhibit.  Do you have the

11  second document?

12       MR. PLACITELLA:  I'm going to ask Mr. Stolz if he can

13  get me a copy during a break.

14       THE COURT:  All right.  Thank you.

15       Then, I'm going to mark this Placitella 1.

16       MR. PLACITELLA:  And I guess we should mark the

17  notice of supplemental filing that came in last night.

18       THE COURT:  It's on the docket.

19       MR. PLACITELLA:  Okay.

20       THE COURT:  Thank you.

21       All right.  Does this mean we're ready for argument?

22       MR. GORDON:  Your Honor, Greg Gordon on behalf of the

23  debtor.

24       I think it would be helpful if we could take about a

25  10 minute break.  Also, I wanted to note for the record, we've

1  probably been going four and a half hours or longer.  I think

2  the debtor's share of the time has been about 20 minutes.  And

3  the only reason I bring it to Your Honor's attention, I am

4  worried that we're going to get pressure to shorten our

5  presentations and we would prefer that not happened given the

6  sort of inequality in the time that's been used.

7          THE COURT:  Do you all have two suits like

8  Mr. Satterley brings?

9          UNIDENTIFIED SPEAKER:  I've got two suits, Your

10  Honor.  I'm willing to spend the night.  I love Trenton.  I

11  would say that a lot of the questions were not answered.

12  Mr. Kim likes to give speeches, so --

13          THE COURT:  I don't want to have argument over who's

14  dawdling, who's moving efficiently.  I want to get this done

15  today.  I'll be prepared to stay as late as it takes.  Kiya, is

16  that okay.

17          THE CLERK:  I'm okay with this.

18          THE COURT:  Okay.  So let's take a break.

19          (Recess at 2:55 p.m./Reconvened at 3:08 p.m.)

20          MR. GORDON:  So Your Honor --

21          THE CLERK:  Yes.  Yes, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MR. GORDON:  Thank you, Your Honor.  Greg Gordon on

24  behalf of the debtor.  We actually have two PowerPoints, Your

25  Honor.  I'm going to do one, and then Ms. Brown is going to do

1 one.  And we're going to go through them, I think, fairly

2 rapidly.

3       And I will say as a forewarning that there are some

4 video clips from the deposition.  We've tried to keep them

5 under five minutes.  I'm not even sure how many there are at

6 this point, but we'll go through them as quickly as --

7       THE COURT:  All right.  Thank you.

8       UNIDENTIFIED SPEAKER:  We have two.

9       MR. GORDON:  There are two video clips?

10       UNIDENTIFIED SPEAKER:  About five minutes.

11       MR. GORDON:  Okay.  All right.  Next slide, please.

12       So, Your Honor, in our view, there are three primary

13 issues in this proceeding.  Number one is whether the debtor

14 has a realistic opportunity to --

15       MR. SATTERLEY:  Is it possible, Your Honor, just to

16 get a copy so we can follow along like Ms. Brown was suggesting

17 earlier when something is displayed.  We could follow along

18 maybe.

19       UNIDENTIFIED SPEAKER:  Sure.

20       MR. SATTERLEY:  Save me from having to write notes

21 and transfer out stuff.

22                 (Counsel confer)

23       UNIDENTIFIED SPEAKER:  May I approach, Your Honor?

24       THE COURT:  Yeah.  Please.  Thank you.

25       MR. SATTERLEY:  Pretty heavy and thick, Your Honor.

1          THE COURT:  They use good paper.

2          Mr. SATTERLEY:  This is both, right?

3          THE COURT:  Thank you.

4                    (Counsel confer)

5          MR. GORDON:  So we'll try again.  You know, it's

6    funny.  Since COVID, I don't do much in the way of paper

7    anymore, so I'm not used to it when people ask for paper.

8    Okay.

9          THE COURT:  Continue.

10          MR. GORDON:  So, Your Honor, there are, in our view,

11   three primary issues that are raised by the relief we're

12   seeking.  Number one, which has probably been the focus of most

13   of what you've heard today already, is whether the debtor has a

14   realistic opportunity to successfully reorganize.

15          Number two are the talc claims against the protected

16   parties, including allegedly direct and independent claims

17   which we heard about today, fundamentally the same claims

18   against Old JJCI and now the debtor.  And this is going to take

19   a little bit of a recap of what you heard before, but we're

20   going to do it in a really summary fashion.

21          And then will ending the stay and preliminary

22   injunction and joining actions against the protected parties

23   thwart the objectives of the case?  And we think the answer to

24   all three of these questions, as indicated on the slide, is

25   yes.

1           Next slide, please.

2           So in our view, a stay of the litigation is required,

3  and it's required for multiple reasons.  And number one is that

4  the debtor has broad support for its reorganization.  And I'm

5  going to come back to this, but think about what you heard

6  today and think about the assertions that were made by this

7  group of law firms back a week ago about how the support's not

8  real; it's a lie.  I don't think you heard anything today that

9  suggests that anything that we've said to Your Honor wasn't

10 true.

11          The second point is -- and, again, we're going to

12 come back to this.  There's been no improper conduct.  There's

13 been no fraudulent transfer.  There's just been lots of

14 accusations, lots of innuendo, but no facts.

15          And I think it's clear and it will be clear from the

16 record that continued litigation outside of this case would

17 jeopardize what we're trying to do inside this case which is to

18 equitably resolve all the claims here, treat the claims in an

19 equivalent manner.  And from your earlier opinion, if the stay

20 is not extended to the protected parties, it's difficult to

21 envision how a successful reorganization can be achieved in

22 this case.  And I would say that that finding has the same

23 vitality today as it did when you made it back in 2022.

24          Next slide, please.

25          These are just -- this is just the outline of what

1  I'm going to discuss.  And obviously I'm going to go through

2  some factual background.  Some of this I'm going to do very

3  quickly.  And then I'll go through the legal arguments.

4           Next slide.  Next, please.

5           So I want to focus on some things here, because

6  you've heard a lot.  Again, a number of accusations and

7  innuendos suggesting that the fact that we were actually

8  continuing or engaging in negotiations with the plaintiffs or

9  with plaintiffs' firms and utilizing the mediators was somehow

10  improper.

11           So if you recall, Your Honor, back in March of 2022,

12  in the first case you referred the parties to mediation.  And

13  then you amended that order in May.  And what's important about

14  the order -- I went back and looked at it -- is that order

15  obligated the parties to make a good-faith attempt to settle.

16  And it also said that the parties were required to make

17  reasonable efforts to attend all mediation sessions.

18           And that order remained in effect all the way through

19  March '23.  And in March '23, Your Honor entered a text order.

20  In it, you terminated the mediation and the mediators and the

21  estimator.  But in that order, you also encouraged the parties

22  to continue any settlement efforts following the termination of

23  the mediation.

24           And per Your Honor's orders, the debtor continued

25  settlement efforts during this full period.  I don't think

1  there's any basis for anyone to argue that following Your

2  Honor's order is somehow a violation of law, a breach of

3  fiduciary duty, unethical conduct, whatever.

4         Next slide, please.

5         As Your Honor knows from what you've already heard,

6  the negotiations achieved a significant degree of success.

7  After all this time, they ultimately generated significant

8  support from law firms.  And there's been lots of argument by

9  the other side about, well, you're really misstating or you're

10 exaggerating.  It's really not the claimant's support.  It's

11 technically the lawyer's, right?

12        But you've heard Mr. Kim testify, and you're going to

13 see in a deposition from Mr. Murdica that the way this was

14 done, the commitments were made are a standard practice in mass

15 torts.  I've certainly seen it in every asbestos case I've been

16 in.  I think Mr. Molton did the exact thing in the Boy Scouts

17 case, representing claimants who settled in that case.

18        But to suggest that there's some problem in

19 representing support because we haven't produced affidavits

20 from claimants or we haven't verified specifically the

21 claimants themselves supported or we haven't ourselves talked

22 with claimants, which we can't do because they're represented

23 by counsel, that somehow it means that support isn't there.

24        So where we are at this point, Your Honor -- and,

25 again, this is all in the record -- 15 firms signed plan

1    support agreements.  These firms represent more than 55,000

2    claimants.  And the reason -- you've heard 60,000 and then

3    57,000 and 55,000.  We've taken into account that there are, I

4    think, two agreements that have been rescinded since what we've

5    talked about before.  But we're at more than 55,000.  And these

6    are ones that signed plan support agreements.

7          And, importantly, of those there are over 600

8    mesothelioma claimants.  And that's important, because Your

9    Honor may recall that at the outset of the first case there

10    were 400.  Now we're at 600.  I think I said last week we're

11    still working on trying to figure out what the denominators are

12    here.  And hopefully in short order we'll be able to provide a

13    bit more information on that.  We're trying to get a handle on

14    that.

15          But, you know, we're at a point where we believe the

16    support is very substantial (indiscernible) with the support we

17    have from people who haven't executed -- haven't yet executed

18    plan support agreements.  So we do have documentation.  It's

19    real.  We think we're approaching or exceeding 75 percent based

20    not only on the signed agreements but also on commitments we

21    have that are not yet the subject of agreements.  And I'm going

22    to come back to that in a little more detail.

23          And it's interesting.  I think Mr. Maimon said today

24    that, you know, this claimant support is a diversion.  It's

25    irrelevant.  And it's interesting to hear him say that when the

195

1  plaintiffs have pretty much spent all their time, both today

2  and in discovery, focusing on this very issue, trying to show

3  that the support doesn't exist, trying to show that there's a

4  huge amount of opposition.  And they haven't been able to deny

5  this -- these facts or support their view that there's a

6  substantial amount of dissent.

7          Next slide, please.

8          Just trying to provide more detail on this, Your

9  Honor.  This is a chart that just shows the firms that have

10  signed.  It also shows the approximate numbers of claims.

11          And if you go to the right of this, you'll see not

12  only total numbers but we've also tried to report the filed

13  claims and the unfiled in the last two columns.  Because,

14  again, I think there's been this sort of innuendo that, well,

15  if they weren't filed before, they're not real or somehow you

16  don't really have any of the filed claims.  Well, here we're

17  showing you that out of the 40,000 or approximately 38,000, I

18  guess, that existed at the time of the first filing, we've got

19  16,000 of those with commitments from their lawyers through the

20  PSAs.  And, again, we have more support that we believe have

21  where the PSAs have not yet been executed.

22          Next slide, please.

23          Now, you've heard a lot about Mr. Murdica.  He's in

24  the courtroom today.  He's at Barnes & Thornburg, and he's the

25  counsel for J&J who's led the efforts.  You heard that --

1  Mr. Kim testify about him.  And he's been working on this since

2  2019.  We've been somewhat inpatient with Mr. Murdica to

3  deliver faster, but he's done a great job gathering support.

4           But he's -- and you'll see this from his deposition.

5  He's been instrumental in 20 prior mass tort settlements and

6  often with the same firms.  And what's important about this is

7  it completely undermines these firms' views that these claims

8  aren't real, because you don't have the substantiation you

9  should have.

10          And you'll see from Mr. Murdica's deposition, he

11 makes clear that the way this support has been generated is the

12 way it's done in all mass torts and that he trusts the

13 representations made by these firms, because he's worked with

14 them before.  He's settled many cases with them before.

15 There's a relationship there.  And that's extremely important.

16          So his testimony is that at this point we have over

17 70,000 claimants through law firms that he has commitments

18 from, perhaps as high as 80,000.  And he believes if the vote

19 occurred today, we would surpass the 75 percent threshold.  And

20 he also believes, based on the commitments that he has, that we

21 have over half of the filed claims.

22          You saw about, I think, 40 percent or so on the chart

23 for the executed agreements.  We believe based on other

24 commitments we're over half of all filed claims.  And, again,

25 it's based on -- you'll see from his deposition he has a high

1  degree of confidence in this, because these are firms that he's

2  worked with.  He's done it in a way that's consistent with the

3  course of dealing and the course of conduct he's had with

4  this -- these same firms for many years across many different

5  torts.

6         Next slide, please.

7         Okay.  And then here's one of the videos.  That's

8  Mr. Murdica, as you can probably tell.

9            (Video deposition of Jim Murdica Played)

10         MR. GORDON:  Okay.  Next slide.

11         So, Your Honor, you may recall from the last hearing,

12  Mr. Watts came up to the podium.  His deposition was taken as

13  well, as I indicated earlier.

14         He is counsel for close to 17,000 talc claims,

15  including approximately 500 mesothelioma claims.  He has

16  medical records for over 14,000 claims, and he has a robust

17  process to check the legitimacy of the claims.  You're going to

18  see from the record that he was extensively involved in

19  negotiating the plan support agreement and also involved in

20  negotiating a term sheet.

21         This settlement, I think you'll hear, is -- from his

22  perspective, this $8.9 billion settlement an historic one.

23  It's a one-time opportunity for claimants who would otherwise

24  continue to suffer with delay in the tort system and never

25  receive any recovery to actually receive a recovery.  He views

198

1  it, and you heard him say this last week, as a material

2  improvement over prior settlement offers.  He believes it's the

3  best one available.

4         And in his experience, his view is that 97 to 99

5  percent of his clients will accept the settlement or clients

6  generally will accept the settlement if recommended by their

7  lawyers.  And he'll also confirm that there are a significant

8  number of firms not yet heard from who have expressed support

9  or not yet -- who've become public, have expressed support.

10        So next slide, please.

11        So here's the next video clip, Your Honor.

12           (Video Deposition of Mikal Watts Played)

13        MR. GORDON:  Next slide, please.

14        So, Your Honor, as you've heard, we have these plan

15  support agreements.  You'll see these are all in the record

16  now.  Also in the record are claimant lists, redacted claimant

17  lists that go along with them.

18        And the commitments reflected in these agreements are

19  important.  The parties to those agreements, and we're one of

20  the parties, have committed to negotiate, finalize, and file a

21  plan by May 14th.  They've all agreed to support relief to stay

22  and/or enjoin the talc litigation during the pendency of the

23  bankruptcy case, so there's an opportunity to actually resolve

24  the claims here.  And they've also agreed to do all things

25  necessary -- reasonably necessary to confirm a plan, including

1  voting, supporting approval of a disclosure statement,

2  supporting voting procedures for the solicitation process.  And

3  there are other commitments reflected in the agreements as

4  well, all of which are intended to provide overall support for

5  an expedited plan process to get to a vote to see, as Mr. Watts

6  said, whether we have a plan or we don't have a plan based on

7  how the vote comes out.

8          Next slide, please.

9          So, Your Honor, this is just an outline of the plan

10 terms.  You've heard this, I think.  This is just what was in

11 the plan support agreement, the $8.9 billion I described the

12 last time.  Unlike the last time, we've laid out now the actual

13 installment payments over the 25-year period which we didn't

14 provide the detail before.

15         You'll see an amount -- there is an amount allocated

16 for the governmental claims, the state AGs.  And there is the

17 one-third -- no more than one-third is proposed as an

18 allocation for futures.

19         But, again, as I think Mr. Kim testified to, these

20 are the broad outlines of the plan, the broad outlines of the

21 economics.  There's more work to be done, and there's more work

22 to be done not only with the claimants who have signed up to

23 support the plan but also the ones that haven't, and we're

24 working on that.

25         Next slide, please.

1          I thought it would make sense, Your Honor, to provide

2     a timeline of what we're thinking.  And we describe this as

3     illustrative, because we don't know exactly how things are

4     going to unfold.  But this one assumes that we file the plan on

5     May 14th.  That's the deadline in the plan support agreement.

6     We would hope to file even sooner than that if possible.  We've

7     got drafts in the works, and we've got a lot of people working

8     on the final pieces of the plan.

9          But we're anticipating that we're going to file a

10    motion in the -- well, really in the next day or two to start

11    setting the process for a disclosure statement hearing.  And

12    you can see what we're proposing in terms of a timeline for

13    that with objections as soon as June the 5th.  So that

14    obviously assumes we're going to be filing a disclosure

15    statement very quickly.

16         And then we're proposing a -- under this timeline a

17    hearing on the adequacy of the disclosure statement by

18    mid-June.  And then we've got -- the next box, we set it up as

19    a range.  And the reason for the range -- and Your Honor

20    probably has a lot of experience with this -- it depends really

21    on the contours of the noticing program.

22         And in these mass tort cases, as Your Honor probably

23    knows, we typically have for due process purposes a very broad

24    program that goes out on several levels.  It's not -- you know,

25    in the old days, it used to be you'd publish in The Wall Street

1  Journal and The New York Times and local newspapers.  And of

2  course we'll do that.  We'll do the print media.  But there's

3  also all the social media and everything else.  And that's got

4  to be developed.

5          So we are in the process right now of engaging an

6  expert to assist with this, and we're working with that expert

7  right now to sort of nail this down.  But so we have sort of

8  a -- you know, we have sort of a very optimistic schedule for

9  that.  Another one -- in other words, one that's expedited and

10  one that's longer.

11          But under either scenario, it seems to us if we move

12  quickly, we shorten some of the time periods, we could actually

13  get the confirmation by mid-August or perhaps late October.

14  And the good news, in both events we're seeing this happening

15  this year.  That's kind of what we're looking at.

16          And, obviously, again, this is illustrative.  And

17  we'll be talking to other parties about this and how to do it.

18  But this reflects our preliminary thinking at this point on a

19  plan process.

20          Next slide, please.

21          So, Your Honor, you've heard a lot about the

22  financing arrangements, and I think Your Honor's aware from the

23  documentation, the way this was done, that there was -- there's

24  a termination agreement that had the effect of terminating the

25  initial funding agreement Your Honor was well familiar with.

1   And there was a related intercompany loan agreement between New

2   JJCI and J&J that was also terminated.  And then they were

3   replaced by the two new agreements which you heard a fair

4   amount about today, the new funding agreement and the New J&J

5   support agreement.

6           Next slide, please.

7           So just to provide some of the details, and this is

8   laid out in Mr. Kim's declaration, the funding agreement is

9   between HoldCo and the debtor.  And Your Honor knows, I think,

10  from what you've heard that HoldCo is the new name for New

11  JJCI.  And, of course, it has the in-bankruptcy component and

12  the outside-bankruptcy component like the initial funding

13  agreement.  And I should say, this funding agreement in a lot

14  of respects is very similar to the first one.

15          But in a bankruptcy case, HoldCo would provide backup

16  funding for the costs of the case.  And that's -- I say backup

17  because that's in instances where the debtor's cash flow isn't

18  sufficient.  And I'll come back to that.  And then also funding

19  for a talc trust on terms consistent with the plan support

20  agreements.  And, again -- well, in this case, if there's

21  insufficient cash and the debtor's assets are insufficient.

22          And then outside a Chapter 11, it's operative where

23  HoldCo would provide funding for all costs, and those would

24  include judgments and settlements.  But, again, in the event

25  the debtor's cash flow is insufficient to do that.

1          And unlike the first funding agreement, J&J is not a

2    party.  It's not an obligor.  It's not a party at all under

3    this new funding agreement.

4          Next slide, please.

5          Then we have the J&J support agreement.  There's

6    actually three parties to that agreement: J&J, HoldCo, and the

7    debtor.  And here, J&J is committed to pay HoldCo's trust

8    funding obligation under the funding agreement if HoldCo fails

9    to do that on a timely basis.  HoldCo then is obligated

10   promptly to reimburse J&J.  And if it doesn't do that, then the

11   obligation -- that obligation to reimburse is deemed a

12   financing that's covered by a loan by J&J.

13         This agreement is operative only in the Chapter 11

14   case, and it's effective only upon approval by the Court.

15   Those are the -- what I would describe as sort of the key

16   aspects of the J&J support agreement.

17         Next slide, please.

18         There's been a lot of contentiousness about this

19   issue.  We believe -- the debtor believes that this new

20   financing arrangement follows the Third Circuit guidance.  And

21   it -- you know, it's interesting.  I guess there's just a

22   fundamental disagreement about what the Third Circuit said in

23   this respect and particularly as to the so-called footnote 18.

24   And the other side's position seems to be that the Third

25   Circuit was saying absolutely no way can the funding agreement

1  ever be changed, period, end of story.

2       And our reading is that's not what it says.  It

3  actually anticipated the possibility it would be changed but

4  pointed out, correctly we believe, it would be subject to

5  fraudulent transfer review.

6       But if you go back to the opinion, in our view, what

7  the Third Circuit did was they found that LTL was not in

8  financial distress in the period prior to the filing because of

9  the funding agreement.  And they focus in particular on the

10 co-obligation of J&J.  And as was pointed out -- somebody read

11 the language in court this morning which they said provided the

12 debtor with direct access to J&J's strong balance sheet.

13      After making that finding, they had to acknowledge

14 the irony of their ruling.  The fact that J&J, which had no

15 obligation to provide that support, provided it, it was

16 provided for the purposes of facilitating a bankruptcy.  Yet

17 the Third Circuit determined it had exactly the opposite

18 effect.  It made bankruptcy unavailable for LTL.

19      And, again, the third bullet just goes back to what I

20 said.  In our view, footnote 18 is an indication by the Third

21 Circuit that they foresaw the possibility of a second

22 bankruptcy filing.  And they said without the funding backstop

23 altogether but noted the applicability of fraudulent transfer

24 law.

25      And, importantly, they referred specifically to the

205

1  issue of reasonably equivalent value but also to the question

2  of solvency.  And we know that under fraudulent transfer law,

3  it takes both.  It's got to be lack of reasonably equivalent

4  value and the entity is rendered insolvent.  And in our view,

5  the other side tends to just gloss over that and just focus on

6  reasonably equivalent value.

7          Next slide, please.

8          So I want to address these points, because obviously

9  a essential piece of the arguments the other side is advancing

10  is that this case should be dismissed.  Therefore, there is no

11  possibility of a successful reorganization.  Therefore, there

12  should be no injunction.

13          We believe the debtor is in financial distress.  Our

14  view is that the Third Circuit would have been of the same

15  opinion based on the evidence Your Honor heard about all the

16  impacts of the talc claims on the Old JJCI business but for the

17  J&J support.  And, you know, they talked about making it a $61

18  billion ATM machine or words to that effect.

19          Well, that support -- that access to the J&J balance

20  sheet no longer exists outside of bankruptcy.  Under the

21  funding agreement, the sole sources of funding are the debtor's

22  assets, which Your Honor knows very well what those are.  They

23  include the subsidiary, RAM.  And then the assets of HoldCo.

24          And HoldCo is an entity -- it is called HoldCo now

25  because it is primary a holding company.  It has $400 million

206

 1   in cash.  It has rights to dividends from the subsidiaries that

 2   it has interest in, although those dividends are uncertain in

 3   timing and amount.

 4        And I think it's important to note -- and we'll get

 5   into this more at the appropriate time -- that HoldCo's assets

 6   are otherwise illiquid.  And as a consequence, the debtor and

 7   HoldCo may need to be liquidated in order to pay talc

 8   liability.

 9        Again, we know from the prior record that the talc

10   litigation and its related costs were literally massive.  They

11   were increasing at an extraordinary scale.  And, I mean, Your

12   Honor remembers.  I think we had a chart.  I think Ms. Brown

13   put it together.  It was like a circle showing all the things

14   that were bearing down on the company.

15        You know, it wasn't just the personal injury claims.

16   It was the governmental entities.  It was the Canadian class

17   actions.  It was a whole variety of problems.  It was -- state

18   attorneys general investigations, congressional investigations,

19   securities fraud actions and the like.  It was many, many

20   things.

21        And, of course, maybe one of the worst aspects of it

22   was the episodic plaintiff verdicts in huge amounts.  And, of

23   course, the Ingham was the one big example of that.

24        Next slide, please.

25        But in our view, the debtor is not insolvent.  I

1 think at the last hearing, the first day hearing, yeah, you

2 heard a lot about, well, nobody is saying what the value of

3 HoldCo is.  Well, that's all in the record now.  Based on

4 valuations, we have the value of HoldCo as 30 billion.

5         Again, it's an entity that it has interest in

6 subsidiaries, primarily foreign.  But in the view of the

7 company, it has sufficient value to cover the liability.  So

8 from a balance sheet perspective, in our view it's not

9 insolvent.  But Your Honor probably remembers that the Third

10 Circuit itself drew a distinction between insolvency and

11 financial distress and indicated that insolvency is not

12 required, noting there is a difference.

13         Next slide, please.

14         So here's just a little bit more on HoldCo itself.

15 The subsidiaries in which it holds ownership interest are

16 largely foreign based, and they're operating in treasury

17 companies.  Most of the value is held in a Apsis subsidiary.

18 That's a French company.  And it holds a 36.1 percent interest

19 in an Irish company called Gh Biotech Holdings Limited.  And

20 then there are other companies that are owned by HoldCo that --

21 the ones that are listed, there's Janssen Sciences.  Then there

22 are distributors and medical devices companies and other

23 entities.

24         But, importantly, what's reflected at the bottom is

25 the most recent valuations we have reflect a total value of

1  these entities at about $30 billion.

2          Next slide, please.

3          So on the fraudulent transfer allegation, you know,

4  we've heard from the beginning that this is the largest

5  fraudulent transfer that's ever occurred in the history of the

6  United States.  But we don't believe there's a basis to find

7  either an actual or a constructive fraudulent transfer.  I

8  don't think there's any question based on the financing

9  arrangements that are in place that the debtor has sufficient

10  funding or sufficient resources to fund the agreed plan.  And

11  in that case, both the funding agreement and the J&J support

12  agreement are available to provide funding.  Again, as I've

13  said before, we believe the debtor has sufficient asset value

14  to cover talc costs outside of bankruptcy, again based on the

15  assets of HoldCo and the debtor.

16          And then the other point I wanted to make here --

17  and, obviously, there's a major disagreement over this, but you

18  heard Mr. Kim answer many, many questions in response on this

19  issue.  We believe -- the debtor believes that there was a

20  serious question, and I think Mr. Kim characterized it as a

21  material risk, that in the wake of the Third Circuit ruling the

22  funding agreement would no longer be enforceable.

23          And, you know, fundamentally, the thinking is that

24  the way the court ruled was not reasonably foreseeable.  It had

25  the effect of frustrating the central purpose of the funding

1 agreements.  We don't believe it was reasonably foreseeable to

2 affect -- to expect that the Third Circuit would find that the

3 funding agreement had the exact opposite effect of what it was

4 intended to do.

5         It was intended to facilitate a bankruptcy.  It

6 wasn't intended to make a bankruptcy unavailable.  Yet, that's

7 where we ended up.

8         THE COURT:  Well, let me ask this --

9         MR. GORDON:  Yeah.

10         THE COURT:  -- Mr. Gordon.  One of the arguments

11 that's been put forward is that the funding agreement clearly

12 provided for a mechanism of payment outside of a bankruptcy.

13         MR. GORDON:  Correct.

14         THE COURT:  So how can it not be reasonably

15 foreseeable to have a situation where the debtor is outside of

16 a bankruptcy as a result of a dismissal of the case by this

17 Court or the reversal?  How is that not foreseeable, and why

18 would it make it void or voidable?

19         MR. GORDON:  Well, the point I'm making -- that's a

20 really good question, Your Honor.  The point I'm making is I'm

21 not saying that a dismissal was not reasonably foreseeable.

22 Obviously, we -- the --

23         THE COURT:  Well, I didn't see it coming, but go

24 ahead.

25         MR. GORDON:  Well, I'm just saying -- I'm talking

210

1  about in a more general way.  For example, the case -- let's

2  just say we were still here three years later and weren't

3  making much progress.  You could see the case being dismissed.

4  The debtor might dismiss at some point, saying there's just no

5  hope.

6         So we -- there was a recognition that a dismissal

7  could occur.  The point I'm making is that nobody could have

8  expected that the dismissal would be based on the existence of

9  an agreement that was intended to facilitate the bankruptcy.

10 And that's, to us, what raised a material question as to

11 whether the fundamental purpose of that agreement was

12 frustrated, affecting its enforceability, whether there was

13 really any consideration received, for example, by J&J in

14 making its commitment, because its commitment was intended to

15 facilitate a bankruptcy.

16        And Your Honor may remember this, but I remember it

17 very well.  In North Carolina, we were always being criticized

18 in these funding agreements on the basis that what's to stop

19 the (indiscernible) from dividending all its assets up to the

20 parent.  And one of the big justifications or thinking behind

21 this funding agreement or the J&J support was just to take that

22 issue off the table.

23        And, again, it was to facilitate a filing to get

24 parties beyond concerns about fraudulent transfer and then move

25 forward to try to confirm a plan.  And the tables were

1  completely turned on us where the Third Circuit came back and

2  said that's exactly the opposite of what you intended.  In

3  fact, it's what disqualified you.  We recognize the irony in

4  our opinion, but that's where we are based on financial

5  distress.

6         Did I answer your question, Your Honor?

7         THE COURT:  It's an answer.

8         MR. GORDON:  I wasn't asking you to comment whether

9  it was a good answer, of course.

10        You know, I think the -- you know, the other thing I

11 want to say about this is one reason we're getting into this

12 point is I think it takes off the table the idea of there's

13 some problem with reasonably equivalent value.  Because from

14 our perspective, we weren't just in a situation where we were

15 saying we're just giving up something for nothing.  We had a

16 concern that there was a material issue about enforceability.

17 And in return for eliminating that risk, we got a new funding

18 agreement and a new support agreement which provided the debtor

19 with the ability, in our view, to satisfy claims both inside

20 the bankruptcy and outside the bankruptcy.

21        And so, from our perspective, there was sufficient

22 value to pay claims both before and after.  And I should

23 comment on that.  I should pause and comment for a second,

24 because there were a lot of questions today about a $60 billion

25 funding agreement versus a $30 billion funding agreement, and

212

1  you allowed all this value to go away.  That's really not

2  correct.

3          The value of the funding agreement is equal to the

4  amount of the liability.  And so in other words, there's just

5  not -- there's not an obligation to pay 60 billion.  There was

6  an obligation to provide backup support to cover talc

7  liability.

8          And the reason I make that point, it goes to just

9  what I've been saying.  LTL was of the view that under the

10 first funding agreement it had sufficient resources to cover

11 its talc liability.  It feels the exact same way under the

12 second funding agreement.  And to suggest that there's been

13 some huge transfer of value out that creates a fraudulent

14 conveyance we believe mischaracterizes the way those agreements

15 work.

16         Value is equal to the liability.  It's not $60

17 billion.  It's whatever the liability is.  And that hasn't

18 changed.  So I did want to clarify that.

19         Next slide, please.  So I wanted to come back on the

20 no improper conduct.  And I realize I addressed this in my

21 opening, but --

22         Oh, let me go back -- go back to that prior slide,

23 please.

24         I got -- there's one other point I thought I should

25 make that's very important.  And that's the last bullet.  And

1  this also really undercuts, I think, all the vitriol we're

2  hearing about what happened and how this is a fraud and it's

3  criminal liability.

4          There's no harm to claimants outside bankruptcy for

5  the additional reason that -- and you heard them say it two or

6  three times today.  Their position is J&J is jointly and

7  severally liable on the talc claims.  And so they're going

8  to -- if this case were be -- to be dismissed, and we'd go back

9  in the tort system, based on their own arguments there's more

10  than enough to cover, because in their position J&J has joint

11  and several liability.

12          That, to me, is sort of separate and apart from the

13  fraudulent transfer analysis.  But it goes to the point of this

14  doesn't harm anybody.  So these allegations that great harm's

15  been done, you didn't consult with our clients, how could you

16  do this while you're a Chapter 11 debtor, to me there's just no

17  foundation for that based on what their position is in the

18  litigation outside.

19          And what happens, of course, is if J&J pays, it's

20  still a problem for HoldCo, because HoldCo has the obligation

21  to cover the liability, as Your Honor remembers before, because

22  it assumed it.  But from the outside perspective, in other

23  words, the perspective of the claimants, they get paid under

24  that theory.

25          Next slide, please.

1            So on the improper conduct, again, it's -- what made

2   me think of it, in our view, no harm has been done to the

3   claimants.  And, in fact, in our view, all the actions we've

4   taken we've taken to benefit them.  We believe that we've been

5   comporting with our fiduciary duties, because we continue to

6   believe that a resolution in the bankruptcy is in the best

7   interest of the claimants.

8            Your Honor sees now from the documents from Mr. Kim

9   we are engaging in contingency planning.  We were at a time

10  where although the Third Circuit had ruled, we had re-hearing

11  petitions pending.  We filed motions for stay.  It wasn't clear

12  whether the case was going to be dismissed or not, and we were

13  planning for either scenario.  We were planning for the

14  possibility that as this plan was coming to fruition, we could

15  proceed in the initial bankruptcy case.  But if not, we could

16  proceed potentially in a second bankruptcy case.

17           Again, we don't think we've defied the Third Circuit,

18  because we think, you know, we've read carefully what they've

19  said.  There have been no improper negotiations.  And this is

20  interesting, because we answered these questions in the

21  depositions about the negotiations and when they occurred and

22  why we did them.

23           When we asked questions of the other side, like

24  Mr. Molton about whether he was doing the same thing, all those

25  questions were cut off.  And the reason they were, we believe,

1  is because they were doing the same thing.  I mean, they were

2  doing what Your Honor asked as well which is to continue

3  negotiating.

4         There's no evidence of any side deals.  There's no

5  evidence that we fabricated anything.  The only improper

6  actions that have occurred -- and you'll see this in the

7  record -- is that the firms who oppose the plan have been

8  engaging in threats and intimidation.

9         And you saw today with the witness with a number of

10  times with Mr. Kim he was asked, are you familiar with Title 18

11  of the Bankruptcy Code?  Are you familiar with the New Jersey

12  rule that says you're not supposed to basically lie to a

13  tribunal?  And there's just -- in our view, the record's very

14  clear there's a concerted effort by this group of firms who

15  represents a minority of plaintiffs to effectively

16  disenfranchise the group.  They're going to do everything in

17  their power to stop this case from even getting to a vote.

18         And that's what would test ultimately their

19  allegations that the support isn't there.  Take it to a vote.

20  If that's what you really think, let's go to a vote.

21         Next slide, please.  Next.  Next slide, please.

22         So, Your Honor, I'm just going to --

23         I'm sorry.  The one before that.  My mistake.

24         So, Your Honor, this is very much short -- and you

25  remember all this.  There's the corporate history that we went

216

1  through.  You know that the division was transferred to a

2  predecessor of JJCI and that the liability for the baby

3  products assets was picked up at that point and it traveled all

4  the way through in various restructurings that occurred through

5  2015.

6            Next slide, please.

7            You know from the evidence we presented before that

8  the liabilities included Shower to Shower.  And I won't go

9  through the details, but we had, I think, a 10-K filing.  There

10 was correspondence, and there was an annual report, all of

11 which reflected the fact that the transfer occurred, I think,

12 at the end of 1977.  And that Shower to Shower liability also

13 ultimately became the responsibility of Old JJCI through a --

14 through the series of restructurings.

15            Next slide, please.

16            The other thing I wanted to remind Your Honor of is

17 that on top of that -- because we -- there was a lot of

18 disputes about this.  There was also the established course of

19 performance that had been in place since literally 1979 or '78

20 where all the costs related to talc were ultimately born by

21 JJCI.  And this is just some of the detail of how the

22 accounting was handled and how things work.

23            I mean, you may have a vague memory of this.  You may

24 have wanted to wipe it out of your memory banks.  But this

25 largely went back to Mr. Lisman who testified about the course

217

1  of performance.

2          Next slide, please.

3          And, of course, Your Honor made findings based on the

4  record as it was about the fact that Old JJCI had assumed the

5  responsibility for the talc liabilities, including the Shower

6  to Shower liability.

7          Next slide, please.

8          And you may remember that Judge Whitley, before he

9  transferred the case here, made a similar finding with respect

10  to Old JJCI assuming the responsibility for the talc liability

11  back in 1979.

12          Next slide, please.

13          Again, I'm going to breeze through these.  This is

14  important for the PI motion, because it goes to the point of

15  whether the claims are basically one and the same.  And there

16  were allegations made by the plaintiffs back in the first trial

17  and even going back to North Carolina that the claims were

18  different.  You've heard today even I think from Mr. Placitella

19  and others, they're independent, they're separate.

20          But we showed you various pleadings that had been

21  filed before the first case where the parties just treated J&J

22  and Old JJCI interchangeably.  This is an example from the MDL

23  master complaint.

24          Next slide, please.

25          Here's another one from a complaint, Anderson vs.

1  Borg-Warner.

2         Next slide, please.

3         Similar one.  And this is one I always remember from

4  the court in South Carolina where the judge basically had the

5  same view that these were the same.  And he says if you think

6  anybody in any of these cases is going to allow the stay

7  against liability on behalf of Old JJCI to somehow affect the

8  evidence that's going to be received whether that evidence was

9  from J&J, Old Johnson, or New Johnson, that is a very different

10 kettle of fish, and I can tell you right now that's not going

11 to happen in this case as far as I'm concerned.

12        Again, to point out the way these cases were being

13 tried.  And they were being tried as if J&J and Old JJCI were

14 interchangeable.

15        Next slide, please.

16        This is -- again, I won't spend much time on this.

17 This was one of Mr. Satterley's cases.  And, again, expressing

18 a similar view.  This was the Van Klive case that was pending

19 shortly before the first bankruptcy filing.

20        Next slide, please.

21        Also same thing here from Mr. Satterley, same case,

22 Van Klive.

23        Next slide.

24        And then we had some excerpts from the Ingham case as

25 well where, again, like so many of the complaints, they just

1  aggregated all the allegations against the Johnson & Johnson

2  defendants.  They made -- drew no distinction between J&J or

3  Old JJCI.  No distinction between their conduct.  No

4  distinction between theories of liability.

5        In fact, the only difference that ever occurred was

6  the amount of punitive damages that might be awarded, and

7  that's because those were based on the amount of the respective

8  entity's net worth.  Had nothing to do with whether the claims

9  were different or whether the legal theories on which they were

10  based were different.

11        Next slide, please.

12        And, again, both Your Honor in your opinion and Judge

13  Whitley in his basically found the claims were the same.  As

14  you put it, the talc claims against the protected parties

15  involved the same products, the same time periods, the same

16  alleged injuries, and the same evidence.  And Judge Whitley's

17  finding was very similar a few months before that.

18        Next slide, please.  Again, I'll go through these

19  very quickly.  Next.

20        I think you remember the issue about indemnification

21  and the evidence that was submitted with respect to the

22  retailers.  Here's an example of language in one of the

23  guarantees that had been executed in connection with the sale

24  of talc products.

25        And, Your Honor, let me know if I'm going too fast.

1  I just feel like --

2          THE COURT:  Oh, you can't be going too fast.

3          MR. GORDON:  I'm trying to go as fast as I can.  Next

4  slide, please.

5          MR. SATTERLEY:  Only 50 more slides.

6          MR. GORDON:  And, again, we had a list of all the

7  tenders, a summary list of all the tenders that had been

8  received from retailers.

9          Next slide.

10         We gave you an example of what a letter looked like

11 where the company would accept a tender from the retailer, so

12 you get a sense for how that worked.

13         Next slide, please.

14         Then briefly on the insurance policies.  Again,

15 another summary exhibit that showed there are about 450 shared

16 insurance policies, the defense cost indemnity payments on

17 claims against J&J, and the retailers would erode coverage

18 under those policies.

19         Next slide, please.

20         And here's some of the operative language that makes

21 clear that the insureds included subsidiaries of J&J as well as

22 the retailers.

23         Next slide.  Okay.  All right.  Next slide.

24         Again, I'm going to go through these quickly, Your

25 Honor, because you've been through this at least three times, I

1 think, in this case.  So we think you have ample authority, as

2 you've said, to extend the stay under Section 362(a), to do

3 that under 105(a), and to issue a preliminary injunction.  And

4 you had, I think, cited the <u>McCartney</u> case which cites the

5 <u>Robins</u> case with approval.

6          Next slide, please.

7          Again, this comes from you.  There's a three-step

8 inquiry in connection with the motion: whether the Court has

9 jurisdiction, whether the stay applies or should be extended,

10 and whether the Court should issue a preliminary injunction.

11          Next slide.  Next, please.

12          So we believe that the jurisdiction is clear.  Your

13 Honor is familiar with the three aspects of jurisdiction: the

14 arising under, arising in, or related to.

15          Next slide.

16          I think we've actually added to this list a bit.

17 There is a long list of asbestos cases where the stay has been

18 extended in analogous circumstances.  And we haven't been able

19 to find -- well, maybe we could say <u>Aearo</u>.  I don't know.  But

20 in any event, our experience has always been these are granted.

21 In fact, my experience until this case, and I guess a couple of

22 others, was it was retained.  They weren't even contested to

23 extend these.  But lots of authority for extending the stay in

24 these circumstances.

25          Next slide, please.

222

 1          We believe there's arising under, because the

 2  automatic stay is a substantive right.  And we cited cases that

 3  support that proposition.

 4          Next slide.

 5          Arising in.  Again, it has no existence outside of

 6  the bankruptcy case.  This is a preliminary injunction and a

 7  request to extend the stay within the case for the purposes of

 8  the case.  We think, therefore, the Court has arising-in

 9  jurisdiction.

10          Next slide.

11          And at a minimum, the Court has related-to

12  jurisdiction, because the -- you know, these claims could

13  conceivably have an effect on the estate.  And, in fact, they

14  could have a very serious effect, because they impact our

15  ability to actually achieve the reorganization that we are

16  seeking to achieve.

17          Next slide, please.

18          And this is just some -- here again, Your Honor, I

19  think, found this related-to jurisdiction existed, you know,

20  due to the impact on the claims we're seeking to resolve as

21  well as the potential impact on the insurance coverage.

22          Next slide.

23          And we believe there's clearly a potential -- or

24  there's clearly an adverse effect on the estate if the

25  litigation were allowed to proceed.  And in various ways, it

1  would impact the estate.  Again, number one on our list is just

2  the impairment of our ability to resolve cases in bankruptcy

3  when the same claims are being adjudicated outside of

4  bankruptcy.

5          You have the indemnification obligations which have

6  the effect of making judgments against the protected parties,

7  effectively judgments against the debtor.  You have the

8  potential loss of insurance.  And then you have the collateral

9  estoppel and evidentiary prejudice risks, all of which I think

10 Your Honor recognized in your earlier opinions.

11         Next slide, please.

12         And, again, I think Your Honor put it well.  You said

13 it's difficult to envision how successful reorganization could

14 be achieved in this case without extending the stay.  And,

15 again, Judge Whitley made a very similar finding during the

16 time -- the short time he had the case in North Carolina.

17         Next slide, please.

18         We think it's clear that Your Honor has jurisdiction

19 to enjoin the claims, whether they're deemed direct,

20 derivative, independent, because of the impact they would have

21 on the estate.  And, you know, we've cited Judge Beyer from the

22 Bestwall opinion that found that exactly.  And we've also cited

23 the Mallinckrodt case where again with respect to independent

24 liability the Court reached the same conclusion.

25         Next slide.  All right.  Next, please.

224

1          And, again, this just lays out the law a bit.

2     Section 362(a)(1).  And, you know, here the Colonial Realty

3     case makes clear that 362(a)(1) must encompass cases in which

4     the debtor is not a defendant.  Otherwise, some of the language

5     would be mere surplusage.

6          Next slide.

7          The automatic stay has the effect of centralizing the

8     claims against the debtor in the bankruptcy case.  And when the

9     claims against protected parties are the same, that central

10    purpose of the automatic stay would be defeated.  I mean, we

11    need to have the claims here so that they can be resolved here.

12         Next slide, please.

13         Again, there's support for extending the automatic

14    stay in unusual circumstances.  That comes from the Third

15    Circuit's McCartney decision.

16         Next.

17         You know, we've seen various courts talk about what

18    the unusual circumstances are.  And from Robins, probably the

19    number one description of it is where there's such an identity

20    of interests that the debtor would be said to be the real party

21    in interest or the real party defendant and that a judgment

22    would have the effect -- a judgment against a third party would

23    have the effect of being a judgment against the debtor.  And

24    then just more generally, you see it like in Philadelphia

25    newspapers, a third-party action would have an adverse impact

1 on the debtor's ability to achieve a reorganization.

2          Next slide, please.

3          Identity of interest.

4          Next.

5          So, Your Honor, we think the record makes clear that

6 the debtor is the real party in interest.  Old JJCI had the

7 responsibility for all talc liability.  LTL now has that

8 responsibility.  It's indemnified the protected parties.

9 There's an identity of claims.  There's an identity of issues.

10 And they're all -- the allegations against JJCI and J&J are

11 inextricably intertwined in the sense that they seek the same

12 damages and the same relief, and they do that against protected

13 parties -- the same damages and relief against protected

14 parties they would seek against the debtor.

15          Next slide.

16          And I think Your Honor found this again in your

17 opinion.  Same product, same time periods.  I think I went

18 through that before.  And I think you found there was a basis

19 for that.  No basis to deny the corporate transactions and

20 indemnity agreements that left the debtor ultimately

21 responsible for talc liability.

22          Next, please.

23          You had similar rulings by Judge Whitley in the DBMP

24 and Aldrich where he found that the debtor was the real party

25 defendant.  Because, again, in those cases, he viewed the

1 claims as basically the same.

2            Next slide.

3            And, again, just more case law on this point about

4 the direct or independent claims should be stayed.  And you can

5 see <u>Mallinckrodt</u>, the <u>Grace</u> case, <u>American Film Technologies</u>

6 and the <u>Ms. Kipps</u> case.

7            Next slide, please.

8            We had some argument the last time about whether

9 these indemnification agreements were of a type that would be

10 viewed as creating a problem sufficient to warrant a stay, and

11 there was discussion about automatic liability, whether

12 there -- there's automatic liability or not.  From our view,

13 the agreements are clear that the debtor has liability if, in

14 fact, the liability against the retailers is based on the sale

15 of products that were manufactured by LTL's predecessors.  And

16 we have some cites there to the <u>Dow Corning</u> case, the re cite.

17            Next slide, please.  All right.  Next.

18            And here again, this just kind of sums up the

19 findings Your Honor made on the point about the impact

20 continued litigation would have on the reorganization.  You

21 noted the liquidation of the pending tort claims and the

22 problem that would occur.  You noted the potential depletion of

23 insurance coverage.  You noted the potential impact on

24 mediation efforts and negotiations and the diversion of funds

25 and resources toward defense costs rather than towards a trust

1  to fund a plan.

2          And I think the third point is even more significant

3  now given that we have a plan in prospect.  And we have a lot

4  of work to do in the next several weeks and beyond to finalize

5  that plan and push forward to take that plan to a vote, to see

6  if we can consummate a trust and reorganize in a fashion that

7  we believe is beneficial to everyone.

8          Next slide, please.

9          This again provides some additional support on the

10 point about the shared insurance coverage and the fact that the

11 fact there is shared insurance coverage supports extending the

12 stay.

13         Next slide.

14         And, you know, there was some arguing the last time

15 about how this really wasn't important, because the insurers

16 were disputing coverage.  But as we pointed out, and I think

17 Your Honor ultimately found, there's been no determination at

18 this point in time whether coverage is available or not or the

19 extent to which it's available.  And there's just no reason not

20 to protect this insurance, because it's potentially very

21 valuable at a time when it's -- the extent of the availability

22 of that coverage has not been determined.

23         THE COURT:  The $8.9 billion proposal, that's not

24 dependent on insurance coverage?

25         MR. GORDON:  No, Your Honor.

228

1           THE COURT:  So that's outside of the funds that would

2    be available?

3           MR. GORDON:  Right.  That's correct.

4           Next slide, please.

5           You know, and I should mention while you're asking me

6    about that, Mr. Watts referred to it.  There's also a provision

7    that says that if there's additional funds that would be made

8    available through Imerys, those are on top of the 8.9.  So I

9    did want to make that clear.  There was maybe one question this

10   morning that seemed to reflect maybe a misunderstanding about

11   that, so I didn't want to --

12          THE COURT:  So in other words, if there's a recovery

13   in the Imerys case --

14          MR. GORDON:  Yeah.  Because there's an overlap in the

15   claimants.  And you may remember that Mr. Watts, I think,

16   pointed that out when he came to the podium at the first

17   hearing.

18          THE COURT:  That's what I'm confused on is I thought

19   there was a potential obligation, indemnification obligations

20   in Imerys.

21          MR. GORDON:  Correct.

22          THE COURT:  So we don't know if that's materially --

23          MR. GORDON:  We don't --

24          THE COURT:  Which way the dollars are flowing.

25          MR. GORDON:  Well, we don't know how that's going to

1    work.  We believe -- the way I think about it, putting aside

2    the complexity of indemnification, we have _Imerys_ sitting in

3    bankruptcy with _Cyprus_.  The claims have been filed against

4    that by most of the same parties related to the same talc.  And

5    what I'm saying is if there's a recovery in that case to the

6    same talc claimants, that would be on top of the recovery in

7    this case.

8                THE COURT:  Okay.

9                MR. GORDON:  In other words, the --

10               THE COURT:  They're not going to get it in both

11   cases.

12               MR. GORDON:  Yeah.  We're not saying we get the

13   money.  We're putting up the 8.9.  If we were to win and get

14   money out of _Imerys_, we get to keep it, it would go to the

15   claimants.

16               THE COURT:  Okay.

17               MR. GORDON:  Okay.  And this is just saying, again,

18   our insurance hasn't been exhausted, and it hasn't -- the

19   extent of coverage hasn't been determined.

20               Next slide, please.

21               Your Honor recognized potential collateral estoppel,

22   res judicata, and evidentiary prejudice risks of continued

23   litigation.  And I -- again, we think the record supports that

24   finding again.

25               Next slide.  All right.  I'm getting towards the end

1 here, I think.  Next slide.  Preliminary injunction.  Next.

2        So, you know, the standards here are somewhat

3 different.  You know, from the Grace case, the standard for a

4 grant of a stay is generally whether the litigation could

5 interfere with the reorganization, whether it could diminish

6 the debtor's ability to formulate a plan.  And it's, again,

7 from the McKellan (phonetic) case, same thing.  Standard for a

8 grant of the stay is generally whether the litigation could

9 interfere with the reorganization.  For the reasons I've

10 already indicated, we think interference is clear here.

11        Next slide.

12        Again, I think we've seen this before.  These

13 injunctions have been issued many times.

14        Next.

15        We believe you have the authority under Section 105

16 to enjoin direct and independent claims based on -- or

17 allegedly based on non-debtor conduct.  And, again, we cited a

18 number of cases which Your Honor is familiar with.

19        Next slide.

20        We have the traditional preliminary injunction

21 factors.  I'll just go through these quickly.

22        Next slide.  And next.

23        (Audio skip from 4:20:41 p.m. to 4:20:44 p.m.)

24        MR. GORDON:  -- Your Honor is familiar with this

25 proposition that establishing the reorganization is likely to

1  be successful is not intended to be a particularly high

2  standard.  You'll see that from Bestwall and this

3  Solidus Networks case and other cases as well.

4          Next slide.

5          We believe the case has a proper reorganizational

6  purpose.  In fact, we note that even the Third Circuit

7  referenced our good intentions with respect to the bankruptcy

8  filing.  But you'll see from these other courts as well they

9  recognize the good-faith purpose of attempting to resolve mass

10  tort liability in a bankruptcy case.

11          Next slide.

12          We believe we can successfully reorganize.  And we

13  think our case on this prong is even stronger than it was the

14  last time Your Honor heard from us on the preliminary

15  injunction matters because of the plan support we have and not

16  only through the executed agreements but also the support you

17  heard -- or the commitments that Mr. Murdica indicated he had

18  from other firms as well.  We have the principal economic

19  terms.  We have an agreement on those.  And Your Honor probably

20  knows from other mass tort cases that's probably the number one

21  issue that has to be resolved before anything can happen.

22          And I think there's reasons to think this

23  reorganization will be successful just given the size of the

24  amount.  It's historic.  It's unprecedented.  We think the

25  changes are good that the momentum in favor of the plan is

232

1  going to continue to build.

2        And, again, we're going to move very quickly on the

3  plan process.  So I think the Court's going to know if we're

4  permitted to move forward and we can keep these cases in front

5  of this Court that you're going to find out really relatively

6  quickly whether we're a go on a plan or not.

7        And as I said before, and I won't repeat it, we

8  believe the second filing does comply with the good-faith

9  standard for filing as articulated by the Third Circuit in its

10 recent opinion.

11       Next, please.

12       Again, I'm not going to repeat this, but the

13 claimants' support is real.  It's interesting; you didn't

14 really hear much today so far, maybe we'll hear more, about the

15 claimant counts anymore.  And, again, I think the evidence has

16 only served to confirm that the support is even more

17 significant than we indicated at the last hearing, and the

18 opposition is smaller than was represented by the other side.

19 And, again, we are going to make every effort to broaden the

20 support and to finalize the plan and move forward.

21       Next slide, please.

22       And you can see, again, Mr. Maimon indicated this is

23 all just a side show.  It's a diversion.  But the fact there's

24 significant claimant support is very important.  It's very

25 important for this factor.  It's very important, I think, for

1  demonstrating our good faith.

2          And just to be dismissive of that, I think, is just

3  false.  It's exceedingly important to Your Honor's

4  consideration, I think, of this motion and other matters that

5  come before you as hopefully we move down the road towards a

6  plan of reorganization.

7          Next slide, please.  Irreparable harm.  Next.

8          Again, this sort of goes back to what I talked about

9  before.  It's hard to imagine how you can reorganize if at the

10  same time you're trying to resolve the claims here the claims

11  are proceeding outside of this court.

12          And if you think about it now, Your Honor, you know,

13  in a situation now where we have substantial support, and we're

14  moving forward, imagine the distraction that would arise if the

15  litigation is allowed to proceed outside of this court.

16  Because it's going to put -- I think it's going to create this

17  scenario where claimants who might otherwise be prepared to

18  move forward might say, well, let me wait and see what happens

19  in this case.  Or maybe I want to see how this appeal turns

20  out.  You know, maybe I should just wait for this.

21          And that -- to me, it's an enormous distraction.  Not

22  to mention from the company's perspective all the time we would

23  have to spend as this litigation would literally be restarting

24  in thousands of cases and all the work that would have to be

25  devoted to that at a time that's so critical to us, because

234

1  we're under an extremely tight deadline to get a plan moving

2  forward.

3        And I know Your Honor expects from us -- you want us

4  to give our maximum effort to move this process as fast as we

5  can.  So to me, this is even a bigger issue for us in this case

6  than it was in the last case given where we are in this case.

7        Next slide.

8        Other harms are the ones we've already talked about:

9  impacts on insurance, evidentiary prejudice, res judicata,

10  indemnification obligations.  So I won't repeat those.

11        Next, please.

12        I did want to point out, I think Mr. Kim alluded to

13  this earlier, that we have modified the protected parties list.

14  Because we have heard some criticism about, you know, how you

15  can just put in literally hundreds of J&J affiliates.  That

16  seems overly broad.

17        From my perspective, that wasn't really an issue,

18  because if nobody's intending to sue those affiliates, there's

19  no harm.  But by the same token, I can't really say we have to

20  have the relief, that we need the relief, because they haven't

21  been sued.  So we've tried to reduce the list of affiliates

22  down to the companies that have been named.

23        And you heard in the back and forth with

24  Mr. Placitella that in addition to the four we had on our

25  original list, which were Old JJCI, J&J, HoldCo, and J&J

235

1  Canada, we've added Janssen Pharmaceutical and Kenvue, because

2  they've now been identified for the first time as defendants in

3  talc litigation.  And then, of course, we have the retailers

4  and the indemnified parties.  We have not included the

5  insurers.

6       So we have attempted to modify the list somewhat to

7  address some of the criticisms that were made to the initial

8  list of protected parties.

9       Next slide, please.  Next, please.

10       I think the balance of the harms, in our view,

11  ultimately comes down to the issue I've been emphasizing, which

12  is absent an injunction, we think our ability to succeed with

13  this plan will be, if not defeated, altogether substantially

14  undermined.  We also continue to believe strongly that

15  resolution in bankruptcy is better for the claimants.  It's

16  more efficient.  It's more equitable to the claimants.

17       I mean, what we see is a situation in the tort system

18  where the large majority get nothing.  And you're going to see

19  in the record, by the way, Your Honor, that that's reflected in

20  the record of what we -- what came out in the depositions.  The

21  large majority get nothing.

22       I think the plaintiffs' firms hope that while

23  occasionally we might hit the ultimate home run, get a big

24  recovery for the claimant and ourselves.  But what about all

25  the others who get nothing?  And the benefit of a plan is they

1  all get something, and they all get equivalent payments based

2  on their circumstances.

3         So we continue to believe that this is in their best

4  interests.  And, again, the tort system and the record bears

5  this out based on the deposition.  There's substantial delay.

6  You heard it from Mr. Watts.  There's substantial uncertainty

7  and a high prospect of no recovery at all.

8         Next slide.

9         And, again, I won't spend much time on this.  You may

10 remember that Mr. Mullin -- or Dr. Mullin of Bates White had

11 issued a report in the prior proceedings about the benefits of

12 a resolution through bankruptcy.  And here's some of the

13 significant points he made about the benefits of trust

14 resolution, including at the bottom just the cost is so much

15 less.  The cost of processing and paying claims is so much less

16 than the cost of litigation in the tort system.

17        Next slide.

18        And, again, just the way these -- the trust would

19 work, this is just really important in our view that there's

20 common set of rules, common set of criteria.  Similarly

21 situated claimants are treated the same.  There's assurances

22 for the future claimants that they get treated in the same way

23 as currents.

24        And that's one of the benefits that I see of this

25 plan proposal that it literally provides for payments over a

1 25-year period, which I would think would provide the future

2 claimants with comfort that the money is going to be there.  It

3 won't all be spent on current claims or claims that come to

4 fruition before a future claimant's claim arises.

5          Next slide, please.

6          Again, just sort of more of the same from courts

7 noting the benefits of trust resolution in addition to Your

8 Honor.  Judge Beyer in <u>Bestwall</u> and the <u>Federal-Mogul</u> decision.

9 Recognition by the Third Circuit of the benefits of the trusts.

10          Next slide.

11          And, again, these are all things you've heard before,

12 and these are the findings that you made based on the evidence

13 before with respect to these issues.  And, again, we believe

14 the evidence in the record, which includes evidence from the

15 prior record, supports the same findings this time around.

16          Next slide.  Public interest.  Next.

17          THE COURT:  We're getting close.

18          MR. GORDON:  I'm getting close.  It's good, because

19 I'm sort of tired of standing right now.  It's been a long few

20 days.

21                    (Counsel confer)

22          MR. GORDON:  So, Your Honor, these slides just point

23 out that a successful reorganization, many courts have

24 recognized that that's in the public interest if it can be

25 accomplished.  And I would say it's especially so in mass tort

238

1  cases where you can resolve literally thousands of claims or,

2  in this case, tens of thousand of claims in a uniform manner

3  and in an equitable manner.

4          Next slide.

5          MR. SATTERLEY:  Our slide show only goes to 94, so

6  that's why we don't have those.  I did not --

7          THE COURT:  They win.

8          MR. GORDON:  Well, these are the key slides too.

9          UNIDENTIFIED SPEAKER:  We have one.  We'll share with

10  you.

11          MR. SATTERLEY:  That's okay.

12          MR. GORDON:  Sorry about that.

13          MR. SATTERLEY:  Proceed on to --

14          MR. GORDON:  Sorry.  And, again, this is from your, I

15  think, prior ruling with respect to public interest.  And,

16  again, we think the basis for your finding then, it equally

17  applies now.

18          Next slide.

19          So I'm at the conclusion.  So, Your Honor, just to go

20  through the basics on the stay and the preliminary injunction,

21  we think the record's clear that the debtor is responsible for

22  all the talc liability.  The claims at their core -- you can

23  call them independent or separate with respect to protected

24  parties, but at their core they're all the same.  It's the same

25  legal theory, same injury, same time period, same damages.

1          The claims have been indemnified by the debtor.  The

2   debtor has shared insurance.  There's a potential that

3   insurance would be diminished.

4          And then if you think about where we are, we're in a

5   good place.  Recent negotiations, in our view, have created a

6   window of opportunity to effectuate the largest mass tort

7   bankruptcy resolution ever.  In our view, that opportunity will

8   be lost absent a stay and injunction.  And it shouldn't be

9   lost, in our view, because a group of law firms who represent a

10  minority of the claimants want to prevent the majority of

11  claimants from having the ability to decide for themselves

12  whether to approve the plan that's been put together.

13         And that's all we're really asking.  We want -- we're

14  asking for the ability to get to a vote, to provide the

15  claimants with an opportunity to decide for themselves.  And we

16  believe that in order to do that, we need the stay and

17  injunction that we've requested.

18         THE COURT:  All right.

19         MR. GORDON:  So we are -- we do ask Your Honor to

20  grant the motion.  But I know Ms. Brown's got some additional

21  slides.

22         THE COURT:  Thank you, Mr. Gordon.

23         MR. GORDON:  Thank you.

24         THE COURT:  Ms. Brown?

25         MS. BROWN:  Thank you, Your Honor.  And if I could

1  ask for the Court's indulgence for just two minutes while I

2  make sure the slides are there --

3          THE COURT:  Yes.

4          MS. BROWN:  -- and just get a clicker.  Would that be

5  okay?

6          THE COURT:  That's fine.

7          MS. BROWN:  Thank you so much.

8                      (Counsel confer)

9          MS. BROWN:  Okay, Your Honor.  Thank you.  I think

10  we're set up.

11                      (Counsel confer)

12          MS. BROWN:  May I approach with a copy?  Thank you.

13  Thank you, Your Honor.

14          May I proceed, Your Honor?

15          THE COURT:  Please.

16          MS. BROWN:  Thank you very much.  Judge, we are back

17  before you now.  I think it's only --

18                      (Counsel confer)

19          THE COURT:  Here, you can -- if you want to use --

20          MS. BROWN:  Or use this --

21          THE COURT:  Yeah.

22          MR. SATTERLEY:  Well, this one has Mr. Valadez in it,

23  and I think I need to read what she's going to say about

24  Mr. Valadez.  So I'm sorry.  And I didn't know we were going to

25  do both the general and Valadez at the same time.  But however

1  Your Honor wants to proceed.

2          This 50-point -- 50-page PowerPoint seems a little

3  excessive since we've already seen a hundred, but -- and it's

4  5:00 at night.  But I got two suits, and I'm willing to come

5  back tomorrow, Your Honor.

6          THE COURT:  Well, no.  I have other -- I do have

7  other cases just --

8          MS. BROWN:  I talk fast, Judge.  I talk really fast.

9          THE COURT:  Okay.

10          MS. BROWN:  I'm going to fly through this, Your

11  Honor, and certainly not duplicate anything Mr. Gordon did.

12  Your Honor, we are back before you now.  It has only been a

13  week but an incredible amount of discovery has happened, as

14  Your Honor knows, because we had to drag you into some of it.

15          But at the end of more than five depositions,

16  multiple meet and confers and exchange of documents, what is

17  clear, Your Honor, is that the overwhelming evidence

18  demonstrates the likelihood of success of reorganization here.

19  The evidence in the record now for the support of firms who

20  will recommend to claimants to support the plan, Your Honor, is

21  substantiated.  It's real.  And it's supported by testimony and

22  documents, whereas the evidence of opposition to the plan that

23  Your Honor heard from the now TCC members last week is not

24  substantiated and through multiple depositions has no support

25  in the record.

242

1           Your Honor heard, of course, through the testimony of

2    Mr. Kim by his declaration that what is on the table here is an

3    unprecedented proposal.  It would be the largest asbestos

4    bankruptcy case settlement ever, Your Honor, including an --

5    for all of these companies who intentionally put asbestos in

6    their products, Your Honor.  And, of course, the Court is very

7    familiar that J&J has never wavered in its position that

8    cosmetic talc is safe, does not contain asbestos, and does not

9    cause cancer.

10          But nevertheless, Your Honor, this settlement is

11   historic, and it is far more than settlements that had been

12   made throughout the years, including by members of the TCC.

13   What has come out in the discovery over just the last few days,

14   Your Honor, is evidence including a proposal made by

15   Mr. Birchfield of Beasley Allen to resolve all of the ovarian

16   cancer claims, both the current and the future, through the

17   Imerys bankruptcy for $3.25 billion, Your Honor, back in 2020.

18   And, of course, as Your Honor knows, as we just looked at, this

19   settlement encompasses more claims but is more than double what

20   Mr. Birchfield himself offered just a few years ago.

21          We heard, Your Honor, when we were here just a few

22   weeks ago from Mr. Molton that there was vehement opposition to

23   the plan, that there were over 100 law firms representing

24   40,000 claimants who were going to oppose this plan.  But, Your

25   Honor, here before you a week later and all these depositions

1 and documents later, we don't know who they are.

2        What we do know from some depositions, including that

3 of Mr. Birchfield, is that they include unfiled cases.

4 Mr. Birchfield testified that he believes of the 40,000 cases

5 that Mr. Molton represented would be in opposition, about 5,000

6 of them are unfiled, and they're cases that Mr. Birchfield

7 would not recommend filing in the tort system.

8        But beyond that, Your Honor, we don't know much more.

9 We don't know for -- we know there are no written agreements --

10 at least Mr. Birchfield was not aware of any written agreements

11 to oppose the plan or any written agreements that co-counsel

12 might have to oppose a settlement on these terms.  And, Your

13 Honor, when we asked Mr. Molton about the identity of the 100

14 law firms or the 40,000 claimants he represented to the Court

15 would be in opposition to the plan, numerous privileges were

16 asserted, including the attorney/client privilege, the attorney

17 work product privilege.  We'll talk a little bit later about

18 the mediation privilege, the settlement privilege, the common

19 interest privilege that was asserted during that deposition,

20 Your Honor.

21       But we have no evidence in the record of who these

22 firms are or who -- any documentary evidence that there are 100

23 firms with 40,000 claimants that are, indeed, objectors to the

24 plan.  That, of course, is in stark contrast to the evidence

25 Mr. Gordon reviewed with the Court that came in through the

244

1  plan support agreements that we have of lawyers who have

2  committed to recommend to their clients that they will support

3  this historic settlement, through the testimony of lawyers who

4  have provided hours and hours of testimony about their

5  evaluation of this deal and how they think it is historic and

6  the best for plaintiffs.

7         You heard, Your Honor, last week allegation that J&J

8  and LTL's conduct is rotten and that not one talc claimant has

9  agreed to this deal, that Mr. Molton hadn't seen a lawyer

10 affidavit, that these were unsubstantiating (sic) claims that

11 the debtor and, indeed, also J&J were making up, Your Honor.

12 But what we've heard through discovery, Your Honor, and what

13 you heard a little bit about here today is that the process

14 that was filed -- that was followed here to substantiate the

15 support that we have for the plan is the very same process that

16 has been followed through a number of different other events,

17 including, as Mr. Haas testified, at least three times in his

18 dealings with Mr. Birchfield in trying to reach a global

19 resolution of these claims over the years.

20        Mr. Haas testified that here in terms of the

21 information we required, in terms of our dealings with the

22 plaintiffs' lawyers, we followed the exact same process that we

23 have in the past.  So, for example, in the past in negotiating

24 with the plaintiffs, affidavits had not been required.  There

25 had not been representations about what clients said or agreed

245

1  to.  And, of course, that's exactly the same scenario that went

2  on here.

3          As Mr. Gordon mentioned and Mr. Haas testified that

4  when he gets -- he gives his word in a settlement negotiation,

5  he keeps it.  And you heard on the very first day from both

6  Mr. Birchfield and from Mr. Watts that Mr. Haas gave his word

7  that there would be no side deals and that Mr. Birchfield and

8  Mr. Watts agreed that, in their point of view, they're aware of

9  no side deals.  No evidence has come in over the past week,

10 Your Honor, that anything improper or untoward or any side deal

11 or side cut is going on here.

12         You heard and you saw testimony and Mr. Gordon's

13 presentation, Your Honor, about Mr. Murdica's confidence as the

14 person who has been negotiating most closely with the

15 plaintiffs on -- the plaintiffs' lawyers on the other side.

16 His confidence based on 20 years of doing this type of work, of

17 negotiating with some of these very same plaintiffs' lawyers

18 that he's confident when representations are made to him by

19 these particular professionals that they'll be kept.  And when

20 they say in the past that their claimants will support a deal,

21 that's what they're going to do.  And you heard his confidence

22 in that video clip, Your Honor, that if the plan were to go to

23 a vote today, more than 75 percent of the claimants would

24 approve it.

25         Importantly, Your Honor, one of the things that was

1  revealed in discovery were some of the terms of the offer that

2  Mr. Birchfield made to resolve all of the current and future

3  ovarian claims back in 2020 for $3.25 billion.  And what's

4  critical and what's important here, Judge, is that this

5  proposed settlement agreement tracks almost perfectly with some

6  of the provisions put forth in the plan support agreement and

7  the term sheet.

8          So, for example, Your Honor -- and we'll take a look

9  at the language in a second, this master settlement agreement

10  provides that the identification of the plaintiffs would come

11  through a spreadsheet, just like the ones that we have in this

12  case and that we produced to the other side that contains

13  identifying information like social security number, first

14  name, last name, and in our case also the type of disease.

15  Certainly, there were no client affidavits that were required

16  or declarations about conversations with plaintiffs that were

17  required under Mr. Birchfield's proposal.

18          We heard in discovery, Your Honor, a fair amount of

19  criticism about the proposed lien administrator in the term

20  sheet and the PSA.  In fact, it's the same one that was

21  contained in the proposal that Mr. Birchfield sent in 2020.

22  And, of course, what Mr. Birchfield recognized in the proposal

23  he made for less than half of the amount of the current

24  proposal is that a channeling injunction was needed to be able

25  to -- to provide for and resolve these claims for not just

1  current claims but, of course, future claims as well.

2          And Your Honor has heard, and I won't repeat it here,

3  how it -- how especially important it is in a case like this

4  where the latency period on the two diseases that plaintiffs

5  claim are associated with cosmetic talc have latency periods of

6  anywhere from 20 to 30, all the way up to 60 years, Your Honor.

7          This is some of the actual language, Your Honor, from

8  the proposal that came from the other side a few years ago.

9  You can see that the way that you would evidence the agreement

10 would be through an Excel spreadsheet that -- listing the

11 claimants.  Again, that's, of course, exactly what we did here.

12         And we have some testimony, Your Honor, on that as

13 well.  Mr. Birchfield was good enough to sit for a deposition

14 and explain to us that, exactly as the agreement reads, yes,

15 the way we would provide consent would be through a spreadsheet

16 with the current claims.  And he would not, Your Honor, require

17 affidavits that we've heard so much questioning about,

18 commitments through conversations with claimants or anything

19 like that.

20         You'll recall, Your Honor, when we were here last

21 week, those were some of the very same criticisms that we heard

22 of our proposal was that we didn't have affidavits and

23 conversations with claimants.  And I think we even heard that

24 in some of the questioning with Mr. Kim this morning.  But

25 Mr. Birchfield made clear that this is standard practice and

248

1  the practice he followed as well.

2        Your Honor, we also heard a fair amount of

3  suggestions last week that some misconduct or something

4  untoward happened in terms of LTL and J&J's continued effort to

5  try and resolve this case even after the Third Circuit's ruling

6  on January 30th.  There was a suggestion that there was

7  something wrong about the parties continuing to negotiate,

8  continuing to try to find a way to reach a resolution.

9        And, of course, as this Court well knows, the Court

10  urged the parties to continue informal settlement discussions

11  even when the Court was discharging the mediators and the

12  estimator and other court professionals.  And the Court urged

13  the parties to continue these discussions, recognizing the

14  importance of trying to resolve this litigation.

15        And, Your Honor, we asked -- even though our

16  deponents were truthful and accurate and honest about those

17  continued efforts, Your Honor, we asked the TCC about their own

18  efforts, about what they were doing during that time period.

19  Mr. Molton was deposed late last night.  And this was another

20  effort -- another example, Your Honor, of this sort of sword

21  and shield use of the privilege.  Because when we asked about

22  the TCC's efforts to continue to settle, to resolve the case

23  after the 30th of January, all of these privileges were

24  asserted, and Mr. Molton was instructed not to answer.

25        Here, the instructions, Judge, went beyond

249

attorney/client, attorney work product.  They reached

mediation.  Which as the Court will remember, I had actually

argued in opposition to Mr. Haas' deposition.  And the Court

found, of course, that was not appropriate, and Mr. Haas sat

for a deposition.

But the TCC invoked that, and Mr. Molton didn't

answer questions.  Settlement privilege was also invoked, and

an instruction not to answer was given.

But perhaps, most importantly to draw to the Court's

attention, and I think it was referenced earlier, was a common

interest with the United States Trustee that was invoked.  And

here's some of the details on that, Your Honor.

In fact, this questioning, and Your Honor will see it

in the deposition, happened a number of times throughout the

deposition, so much so that Mr. Storner (phonetic) went back to

it at the end of the deposition to just confirm that, in fact,

counsel for Mr. Molton was asserting a common interest with the

United States Trustee's Office for the period of time after the

Third Circuit decision and up to and including the filing of

the second bankruptcy.  And, again, as you'll see there,

Mr. Molton was instructed, maybe for the twelfth time, that

there was a common interest between two parties, the U.S.

Trustee and the TCC, co-litigants, and that there was going to

be an instruction not to answer the substance of communications

with the U.S. Trustee.

1            And, Your Honor, we also heard today some suggestions

2    that something improper was going on with Ms. Ellis, Your

3    Honor.  And as the Court knows and as the Court instructed, all

4    parties continued to do what they could to resolve the case.

5    We have no idea about the discussions that went on between the

6    TCC and the FCR, because they similarly instructed Mr. Molton

7    not to answer those questions, Your Honor.  We were complete

8    and truthful when those questions were asked of Mr. Kim,

9    Mr. Murdica, Mr. Haas.

10           And I would just remind the Court about the

11   endorsement that came from the TCC when Ms. Ellis was

12   appointed, how folks stood up here and sang her praises and

13   said what an important day it was for the first woman future

14   claims representative in the entire history of future claim

15   representatives in the United States, Your Honor.  That the TCC

16   was, of course, in support of that.

17           And all of a sudden this morning, Your Honor, we --

18   and throughout the depositions, we have heard suggestive,

19   threatening questioning about something improper happening in

20   terms of dealings with the FCR.  Your Honor, there is no basis

21   in the record, in the truth to suggest that.  This is a team of

22   lawyers who were in favor of her just a few months ago, Your

23   Honor, that have now, all of a sudden, refused to answer

24   questions about their own discussions with her and are starting

25   to ask questions, Your Honor, and make suggestions that are

251

1  wholly inappropriate and, we believe, unsupported by the

2  record.

3          Your Honor, I want to talk a little bit about what

4  has been reinforced in this short window of discovery.  And

5  I'll do it quickly, because this was the subject, as Your Honor

6  knows quite clearly, of the motion to dismiss hearing.

7          But our discovery over the last few days has only

8  reinforced what this Court found last year and what is the

9  truth.  The tort system has failed the plaintiffs in this

10 litigation, Your Honor.  This is a slide that we used in the

11 motion to dismiss hearing, and these facts are well familiar to

12 the Court.

13         If we just look at the cases in the MDL, almost

14 40,000 cases pending in the MDL at the time of our motion to

15 dismiss hearing last year.  Only 1,000 of them even got to the

16 point of filling out what we call a plaintiff profile form.

17 Only 30 of those were selected for discovery work up, some

18 discrete depositions, Your Honor, and more involved written

19 discovery.  Only six of them were selected to have expert

20 discovery and start getting ready for trials.  And at the time

21 of the bankruptcy, Your Honor, even though the MDL had been in

22 existence for over five years, no cases had gone to trial at

23 all.

24         And that's not wholly unrepresentative of what things

25 looked like out in the larger state court system where the

1  state court system didn't have any more success, so to speak,

2  Your Honor, with getting cases through jury trials.  At the

3  time of the bankruptcy filing, Your Honor, again almost, you

4  know, 40,000 cases pending everywhere.

5       Forty-six cases went to trial.  Of those, only 38

6  went to an actual verdict.  Of those, the overwhelming majority

7  were either won by defendants in front of a jury, were won by

8  defendants on appeal.  A small handful of them remain on appeal

9  at the time of the bankruptcy filing.  A handful of them were

10 resolved on appeal.  But only two final plaintiff's verdicts

11 all the way through the appeal process were paid out and

12 finalized, Your Honor.  And that would include the Ingham

13 verdicts that we spent so much time talking about in the motion

14 to dismiss hearing.

15      Your Honor saw these stats and know that post that

16 Ingham decision where that jury awarded almost $5 billion to 22

17 plaintiffs, the plaintiffs' bar went on a losing streak for

18 five years of ovarian cancer cases, a mistrial, a defense

19 verdict, and then four straight unanimous defense verdicts,

20 including in a multi-plaintiff case in the City of St. Louis.

21      And, Your Honor, we heard from Mr. Birchfield both in

22 court last week and through his press releases that he is

23 opposed to this deal, Your Honor.  He doesn't think it's enough

24 money.  And he was here last week and showed the Court a chart

25 with the medical expenses that he thinks are sort of the

1    average for his cases.

2        But what I think is important and what we talked to

3    Mr. Birchfield about a little bit in his deposition and what

4    was left out of this slide, Your Honor, is that the plaintiffs

5    in each one of these cases received zero dollars.  And that's

6    either because a jury returned a defense verdict or because the

7    case was reversed on appeal.  And so while the slide was used,

8    of course, for the point of medical expenses that were being

9    asked of a jury, the reality is the majority of those juries

10   and appellate -- the totality of the jury and the appellate

11   courts came back with zero dollars, Your Honor.

12       THE COURT:  So doesn't that go to what Judge Ambro

13   was saying in the Third Circuit that the -- I should have taken

14   into account these verdicts and potential settlements in

15   calculating distress?

16       MS. BROWN:  Well, Your Honor, I think the issue is we

17   could win 50 trials in a row and then get hit with an Ingham

18   verdict.  The problem with the tort system is the lottery-like

19   jury verdicts.  Two issues actually, Judge.  One is the

20   lottery-like verdicts where you could go on for ten years --

21   even if you only had one Ingham verdict for ten years -- we

22   submitted that information to the Court.

23       But also, Your Honor, it's the cost of defense.  It's

24   the cost of -- my colleagues agree.  It's the cost of defense,

25   Your Honor, of just paying lawyers like me and a lot of other

254

1  lawyers like me to do all the discovery in these cases, to try

2  these cases that are going on all at the same time.  The volume

3  is enormous.

4         And the testimony was that those costs just to defend

5  could reach $190 billion.  And that's money that's going to no

6  claimant at all.  I mean, that's just the side cost to lawyers

7  to be able to get the cases to a place where we can defend

8  ourselves.  So there's an enormous waste of money in the tort

9  system if what your objective is, is to compensate plaintiffs.

10 And the risk of financial distress, Your Honor, comes not just

11 from an _Ingham_-type verdict but from the cost of having lawyers

12 defend the cases.

13        And so, Your Honor, these are just a little more

14 details on the cases and the verdicts that we went through with

15 Mr. Birchfield.  But, you know, Mr. Birchfield, to his absolute

16 credit, was perfectly honest with us and was asked, you know,

17 with respect to the 11,000 or so claims that Beasley Allen

18 represents, they have tried only 11 cases.  They haven't

19 settled a case.  And they haven't recovered a dime for

20 claimants in the last ten years.

21        And that is no disrespect, Your Honor, to

22 Mr. Birchfield or to his firm.  I have litigated against these

23 folks, and they are good lawyers.  The science does not support

24 these claims, Your Honor.  And when the truth gets to juries

25 around the country, they are resoundingly rejecting these

1  claims.

2          And the Beasley Allen inventory is a perfect example

3  of that, Your Honor.  Ten years, 11 cases, small number -- I'd

4  say -- we did the math yesterday.  It's something like .000009

5  percent of the cases got to a jury.  And when they did, every

6  single one of those women went home with zero dollars.

7          And, Your Honor, the concern -- and we've raised it

8  in the past.  The concern is that while the tort system is not

9  benefitting the plaintiffs themselves, there is a perverse

10 incentive for the lawyers to want to remain in the tort system.

11         And in addition, you know, to the percentage of

12 recovery they can get on a lottery-type verdict, there is

13 something called a common benefit fund.  And one was created in

14 the multi-district litigation, Your Honor.  And it doesn't

15 exist, of course, in bankruptcy.  But in the MDL here in New

16 Jersey, a common benefit fund was created so that if you are

17 doing work for the benefit of the entire litigation, you have

18 the ability to essentially tax everybody else's settlements or

19 verdicts or resolutions.

20         The percentage that the common benefit fund was

21 established here in New Jersey was 12 percent, Your Honor.  It

22 changed a little bit over time, but it started at 12 percent.

23 And Mr. Birchfield agreed that given their leadership role,

24 Beasley Allen stood to recover the bulk of that 12 percent tax

25 on any settlements or recovery in the MDL.

1          And so if you just assume for a moment, Judge,

2 that -- you know, take the $6.5 billion that is allocated to

3 the ovarian claims in the term sheet here, and let's say that

4 was a tort system recovery.  In bankruptcy, that $6.5 billion

5 is going to the claimants with the, you know, attorney's fees

6 coming out of it.  But in the tort system, the $6.5 billion is

7 being sort of taxed twice to the benefit of the lawyers.

8 There's fees coming out of it, and then there's a common

9 benefit fund, 12 percent tax, that here would amount to $780

10 million.

11          And we talked about this perverse incentive in the

12 past, but it's very hard to look at these kind of structural

13 processes that exist in the tort system like the common benefit

14 fund and think that this is something that is not incentivizing

15 lawyers to want to stay there as opposed to resolve claims in a

16 bankruptcy with a historic settlement number on the table.

17          Mr. Gordon touched on this a little bit before, but

18 we really have here -- and you've seen it on display here

19 today, Judge.  You know, this is a situation of the tail

20 wagging the dog in terms of some of the most vocal opponents in

21 this case.  Just take some of the folks, including

22 Mr. Satterley -- he won't mind if I pick on him a little bit,

23 Judge.

24          MR. SATTERLEY:  Don't worry.  I'll pick back.

25          MS. BROWN:  I know.  But he's here, Judge, very

257

1  loudly and very vocally opposing this and taking a lot of time

2  up.  You know, no disrespect.  But he has 13 filed claims, Your

3  Honor.  I mean, we are talking about numbers, if you look at

4  Mr. Murdica's testimony, some of the information Mr. Gordon put

5  up, we're looking at, you know, 80 -- maybe 80,000, 90,000

6  claimants or so.

7       THE COURT:  But these claims listed, are they

8  primarily meso claims?

9       MS. BROWN:  Correct, Your Honor.  Mr. Satterley

10  represents, as far as I know on the filed claims, exclusively

11  mesothelioma.  Mr. Konigsberg, mesothelioma, 100.  I'm sorry.

12  Mr. Maimon from Levy Konigsberg and Mr. Block also from the

13  same firm.

14       And so this really is a situation -- we have

15  Mr. Birchfield, the leadership of the MDL.  And there are, you

16  know, sort of issues we discussed with that.  And then we have

17  a small minority of claims that are voicing enormous

18  opposition, Your Honor.

19       We believe, Your Honor, that at this point in time --

20  you saw Mr. Gordon's timeline of events.  We are so close,

21  Judge.  Mr. Gordon's timeline has a plan being proposed in just

22  a few weeks in the middle of May.

23       Our focus right now should be on finalizing a plan

24  and getting a plan to go through all of the appropriate

25  channels so that we can get it out for a vote.  We have a short

1  window of time to do this.  We've set forth the self-imposed

2  deadline as close to May 14th as we can get, Your Honor.

3         And to touch briefly on the issue that we were before

4  Your Honor with just last week, this issue of lifting the stay

5  for one of Mr. Satterley's 13 clients at a time when the debtor

6  should be singularly focused on getting the Court this plan.

7  You have to consider stats like this.  Mr. Satterley's cases,

8  you will not be surprised, Your Honor, are some of the longest

9  cases in this litigation.  The average ovarian cancer trial is

10 about 25 days.  Mr. Satterley more than doubles that, most of

11 those cases in Alameda County, Your Honor, where -- California

12 where most of the judges do four days a week, 9 to 2.

13        These trials go on for an enormous amount of time.

14 And so if you just look at it this way, Your Honor, the Valadez

15 trial that Mr. Satterley is asking for the stay to be lifted

16 would still be going well past the time period that we are

17 targeting trying to finalize this plan and get it to Your

18 Honor.

19        I want to also respond briefly, Your Honor, to what I

20 heard was the Court's suggestion about a potential way to allow

21 some discovery to continue in these cases short of trials

22 continuing.  And having been on the front line of these

23 discovery efforts for the past five years, I want to put on the

24 record and give the Court some statistics about what really

25 goes on when the idea of something like a corporate

1 representative deposition or a company witness deposition is

2 made available.

3          Here are some statistics of what has happened in our

4 litigation, Your Honor, over the past five or so years.  One

5 hundred and five Johnson & Johnson or JJCI -- and I think these

6 stats even include the most recent LTL witness -- have been

7 deposed.  One hundred and five individuals from one of the

8 company defendants.

9          Fifty corporate representatives.  And Your Honor, of

10 course, well knows what that means is those individuals had to

11 be educated on a list of sometimes 100 topics.  And there's the

12 stat more than 1,000 topics were identified.  Forty-seven

13 different witnesses.  And you see, you know, it's like a

14 third -- more than a third of a year of testimony and nearly

15 40,000 pages of testimony.

16          Specifically, when you start thinking about the

17 Valadez case, Your Honor, it's important to know the Kazan

18 McClain firm has been particularly aggressive and robust in --

19          MR. SATTERLEY:  Your Honor, I want to object.  First

20 of all, none of this is in the record.  This is so far outside

21 the record.  I don't -- we have time limits, and Ms. Brown is

22 now -- she's going to go way out of the record in a little bit,

23 because I've looked at her sides.

24          There needs to be some rules of evidence,

25 something -- we need to have some federal rules of evidence and

1  some arguments based upon the evidence.  Otherwise, I'm going

2  to need hours to respond to all of this stuff.  So I object to

3  this, Your Honor.

4            THE COURT:  All right.

5            MS. BROWN:  Your Honor, I'm responding in three

6  slides to something that the Court raised with us on one of the

7  meet and confer -- the discovery calls we had with the Court.

8  And it fits squarely in connection with this motion, Your

9  Honor.

10           MR. SATTERLEY:  But --

11           MS. BROWN:  I mean, are moving -- can I just finish,

12 please?  We are moving, Your Honor, for all of the reasons

13 articulated by Mr. Gordon and myself, for the stay to be

14 extended so that all of discovery and all of the trials are

15 stopped, and we can focus on what should be the singular

16 priority is getting this plan out to a vote.

17           But we hear the Court.  We hear the Court that you

18 may be inclined to allow some portion of discovery to go

19 forward, and this information is critical as the Court tries to

20 weigh whether or not that is going to harm the debtor and

21 potentially put a reorganization plan in jeopardy.

22           MR. SATTERLEY:  If I may respond, please?

23           MS. BROWN:  And so I have two more slides on this

24 issue, Your Honor.

25           THE COURT:  Mr. Satterley?

261

1          MS. BROWN:  Yes.  First of all, there's -- most of

2    the remaining slides are outside the record.  This slide right

3    here, she already went past -- 105 company witnesses, 50

4    corporate representatives, 1,000 topics, 47 different -- it's

5    so far outside the record.  I object --

6          THE COURT:  Mr. Satterley, this -- these slides

7    aren't part of the record.  This is argument.  I wouldn't have

8    even --

9          MR. SATTERLEY:  But argument's got to be --

10          THE COURT:  You just repeated them again to me.  I

11    was already past them.

12          MR. SATTERLEY:  I know.  But argument has got to be

13    based upon the record, Your Honor.  And a lot of this -- I've

14    sat by and listened to a lot of argument not based upon the

15    record, just attorney argument.  And so I want to object for

16    the record.  I know it's late in the day, but I think fairness

17    to my clients require that Your Honor's decision be based upon

18    actual evidence and not just argument.

19          THE COURT:  All right.  Please continue.  I don't

20    need to see the slides.  Just make the arguments --

21          MS. BROWN:  Okay.

22          THE COURT:  -- as far as the -- I assume you're

23    focusing on the merits of the automatic stay with respect to

24    the general -- my comments as to my initial inclinations.

25          MS. BROWN:  Exactly right, Your Honor.  And in the

1  interest of efficiency, I was also attempting to do the second

2  part of the Valadez argument which I'll -- I've sort of folded

3  into one section here.  And I think it squarely fits in both,

4  Your Honor, because these -- we talked last week about the

5  corporate representative deposition notices that Mr. Satterley

6  issued in the Valadez case and how they went squarely to issues

7  in the bankruptcy, LTL's ability to pay, who LTL is, LTL's

8  history.

9          And this really gives the Court a flavor for how

10 broad those categories can be.  This (indiscernible) notice

11 meant that Johnson & Johnson and JJCI had to take an individual

12 person and educate them on a 110 categories for depositions

13 that in some cases, Your Honor, lasted four, five, even six

14 days.

15         And when you look at the categories of topics that

16 are requested, they are always duplicative.  These are two

17 notices a month -- or a few weeks apart that --

18         THE COURT:  Move past it.  I can't even read it.

19 It's too small.

20         MS. BROWN:  Okay.  Sorry, Judge.  That are identical.

21 The questioning in a corporate representative deposition, Your

22 Honor, we just gave you a flavor here, oftentimes is well

23 outside of the notice.  And we are required -- the attention --

24 to the extent the Court would allow corporate representative

25 depositions to move forward in a short time period, Your Honor,

1  they're not one or two-hour depositions.  They are multi-day

2  depositions with a hundred topics that someone has to be

3  educated on with reams of documents that are, you know,

4  probably now back to being done in person but for a while we

5  were doing them on Zoom.  It is an enormous undertaking, Your

6  Honor.

7          Very quickly, Judge, I want to touch on just two

8  points that have come up in the opposition -- the reply papers

9  in the Valadez case.  One of the discovery issues, Your Honor,

10 that I raised with the Court last week that remains to be

11 completed before we could ever even get to a trial in Valadez

12 is a ruling on our motion to compel.

13         We talked about the pericardial mesothelioma, the

14 most rare mesothelioma that Mr. Emory (sic) Valadez has, how

15 only 15 people a year get that disease, and the efforts of the

16 Stanford physicians to get Emory genetically tested.

17 Unbeknownst to me as I stood before the Court last week but

18 known to Mr. Satterley is that Emory was finally recently

19 genetically tested at Stanford.  Very limited panel, Your

20 Honor.  And it revealed a genetic mutation.  It revealed a

21 RAD51C variant of unknown significance, Your Honor.  That is

22 critical to our experts in understanding the genetic reasons or

23 the familial cancer syndrome that Emory Valadez likely has.

24         And plaintiffs were absolutely dishonest with the

25 Court in their papers, Your Honor, when they suggested there is

1  no scientific literature associating this mutation with

2  mesothelioma, because the evidence is actually just the

3  opposite, Your Honor.  This is a significant gene in malignant

4  mesothelioma.

5          And so one of the big issues in the Valadez case that

6  would take an enormous amount of time and briefing would be

7  whether or not they're still going to stand on preventing us of

8  getting our own genetic testing, whether our experts can now

9  opine on this significant mutation as it relates to the type of

10 mesothelioma that Emory Valadez has.

11         Two more slides, Your Honor, and I will sit down.

12 And I appreciate the Court's indulgence in listening to a

13 number of these points that I'm addressing here.

14         But in addition to apparently undergoing genetic

15 testing, something else happened after we were with Your Honor

16 just last week.  Emory Valadez -- Emory Hernandez is another

17 name they go by -- the evening after the hearing when I showed

18 the Court the picture of Emory, removed all Facebook posts,

19 completely shut down all social media and took everything down.

20         And I wonder, Your Honor, why that was.  When I

21 looked back at the information that was shared with the world

22 through social media from this particular individual, I wonder

23 why it was that after the April 11th hearing Emory decided to

24 make -- to take all of that away.  And I think, Your Honor, it

25 might be this.

1          Mr. Satterley stood up that day in court in fierce

2  opposition to a potential resolution, in strong advocacy for

3  proceeding with a trial for one of his 13 plaintiffs and he

4  said for most people suffering and dying of cancer, it's not

5  about the money; most of the time it's about justice.  And just

6  a few weeks ago, what Emory Valadez posted on February 27th at

7  a time where we were issuing deposition notices in the Valadez

8  case was that I want money, not feelings.

9          And what I would suggest to the Court is that we need

10 to let the claimants vote, Your Honor, that the only people we

11 have heard from advocating for jury trials are people who stand

12 to benefit from those jury trials, Your Honor.  When we look at

13 the record of what actual claimants have got, actual claimants

14 who want and need and whose family needs compensation, those

15 folks have not been compensated through the tort system, Your

16 Honor.

17         And so I echo Mr. Gordon's priority on getting this

18 plan done in a short period of time and putting it out to the

19 claimants so that if people would prefer to take compensation

20 over decades and decades in the tort system with an enormous

21 risk that they would go home with nothing, it's their choice to

22 do so.

23         And so, Your Honor, for reasons that I articulated

24 last week, the stay should not be lifted for one out of tens of

25 thousands of claimants.  If the Court is inclined to allow any

1  limited discovery, we would ask for the opportunity to brief

2  that, Your Honor, because there are particular areas that we

3  believe are particularly burdensome to the debtor, and we would

4  request the opportunity to further address that with the Court.

5  Thanks very much, Judge.

6          THE COURT:  All right.  Thank you.

7          Hold on one second, folks.  Is there anyone else who

8  wishes to speak to the Court in favor of the injunctions?

9          UNIDENTIFIED SPEAKER:  The injunctions, did Your

10 Honor say?

11         THE COURT:  In favor of continuing the restraints in

12 the injunctions.

13         UNIDENTIFIED SPEAKER:  Oh, okay.

14         THE COURT:  In other words, supporting the debtor.

15         MR. WATTS:  Your Honor, if I could take four minutes.

16         THE COURT:  Okay.

17         MR. WATTS:  I do not intent to become the ham and

18 cheese between these two, so let me just do this.  I was

19 shocked by the difference between the tone of the informational

20 brief and what actually came out in the depositions, and I just

21 want to call out some things you haven't heard.

22         Number one, the cross-examination that the debtor

23 committed fraud by manipulating the list of the counsel, I will

24 tell you that two members of the TCC and LTL 1 support the deal

25 and did not apply for the TCC in LTL 2.  Instead, I'm just

1 notifying you that those of us who support the plan are

2 organizing an ad hoc committee which we will tell the Court

3 about.

4        Number two, there was a comment today about a

5 "alleged negotiation" that they couldn't pursue because their

6 claims are privileged.  I think you saw in the video.  I was at

7 my ranch yesterday.  I was by myself.  I did not have a lawyer.

8 I sat for what was supposed to be two hours, then became four.

9 And I kept answering questions until it was four hours and 27

10 minutes and did not refuse to answer one.

11        So that's something I think the Court needs to

12 understand.  There was no sword by this person who negotiated

13 the deal.

14        Number three, the innuendo that the Court is going to

15 see in the depositions with respect to how these negotiations

16 occurred, you're going to hear all sorts of innuendo against

17 Mr. Murdica who likes to fish on fishing yachts and every once

18 in a while does it with lawyers.  Turns out Mr. Birchfield does

19 as well.  As an officer of the court, I'll tell you that this

20 was negotiated in the Barnes & Thornborough (sic) conference

21 room, and I've never been on a fishing yacht with Mr. Murdica.

22        Off the record, you heard a comment about something

23 that happened to me 13 years ago.  I'm happy to tell you all

24 about it.  There is a gentleman in federal prison, and I am

25 not.  I would just caution counsel that it's real easy to ring

 1  sanctimonious about let Mr. Valadez go because of the merits of

 2  jury verdicts under the Seventh Amendment, but it would be

 3  unfortunate for that same mouth to desecrate verdicts under the

 4  Sixth.

 5          Now, with respect to the settlement process, there

 6  was no attempt to hide this from the TCC.  There were SEC

 7  problems with it getting out, and so there was a decision that

 8  I recommended that was made to make people sign an NDA before

 9  they could hear about what was going on.  I could not get

10  Mr. Birchfield to do that.  I don't criticize him for it.  But

11  that's why it was there.

12          One more comment with respect to the settlement and

13  the Birchfield deposition.  In addition to the 3.25 billion

14  that was pitched back in 2020 that I was familiar with at the

15  time, I will tell you, and you know a lot about the mediation

16  that your mediators did last summer, that this deal that was

17  negotiated was materially better than whatever disconnect these

18  two gentlemen had.

19          I'm sitting in the negotiations.  There was very

20  clearly a disconnect between one side that thought it was worth

21  a certain amount of money and the other side that thought they

22  could pay it over time.  This negotiation got that net present

23  value up front where 12.08 billion was paid over time with a

24  net present value of $8.9 billion.

25          The payments were accelerated under the first year,

1  one at 30 days, one after a year, to get 5.9 billion paid so

2  that all the existings could be paid.

3          MR. SATTERLEY:  Your Honor, I want to object to all

4  this hearsay.

5          MR. WATTS:  This is in the record.

6          MR. SATTERLEY:  Wait a second.  This --

7          THE COURT:  Wait.

8          MR. SATTERLEY:  I just want to object to all this

9  hearsay.  And, obviously, he was deposed yesterday.  I asked

10  him a lot of questions.  But I think a lot of this is hearsay

11  within hearsay, double hearsay, triple hearsay.  I just want to

12  make that record.

13          THE COURT:  Well, sustained.  Just --

14          MR. WATTS:  It's going to be in the deposition.

15          THE COURT:  -- speak to arguments --

16          MR. WATTS:  Sure.  It's --

17          THE COURT:  -- not other testimony.

18          MR. WATTS:  The point is, is the testimony you're

19  going to see is going to show this improvement that occurred

20  during this.  And, of course, we'll go from there.

21          You heard today about the TCC supports the plan.

22  Until before Friday, the two members of the TCC that have more

23  cases than the rest of them have agreed to support the plan.

24  So what's left of the TCC doesn't support the plan.  But when

25  you add up all the votes, they are in favor of the plan.

1          Lastly, with respect to this argument that you heard

2     last week and you heard again this week that it's lawyers

3     supporting the plan and not their clients, I would just

4     reiterate the discussion there.  But I've been through this out

5     in California with respect to the solicitation rules, and there

6     are very clear guidelines that I don't need to educate the

7     Court on with respect to what has to happen.  And so that's why

8     this process is being done so that we comply with Rule 3017(d),

9     11 U.S.C. Section 1125(b), Rule 3017(c), 11 U.S.C. Section

10    1126(b).

11         Lastly, deduping.  It has been done before.

12    Mr. Birchfield recommended it.  We sent Excels.  They are

13    deduping.  That's one.

14         Number two, with respect to who should be voting,

15    there's very robust discussion in all of these depositions as

16    to the quality of Mr. Birchfield's docket, as to the process

17    that my docket is underway and Mr. Pulaski's and the like.

18    That's a decision for another day.

19         What I would tell the Court is this.  What we tried

20    to do and what I'm encouraging the Court is it was not lost on

21    me the heat that was coming my way when I stood up and said we

22    were negotiating this.  But part of what we got is there shall

23    be plan documents by May the 14th so this Court can consider

24    the motions and what's going to be appropriate quickly so we

25    can get a vote done.

1          Out in California four years ago, the voting took 45

2     days.  I very much commend to the Court the timeline that was

3     proposed that we should be done with this vote by the end of

4     the summer.  And then you can have final confirmation motions

5     and hear all the evidence if the vote goes the way I think the

6     evidence most certainly is going to show that it does.

7          So I appreciate the Court's time.  Thank you.

8          THE COURT:  Thank you, Mr. Watts.

9          All right.  The Court needs, and probably others, to

10    take ten minutes.  And then we'll continue.  I assume

11    there's --

12          (Recess at 5:23 p.m./Reconvened at 5:35 p.m.)

13          THE COURT:  I'm ready.  Kiya, are you ready?

14          THE CLERK:  Yes, Your Honor.

15          THE COURT:  Okay.  Sounds like, feels like about 35

16    minutes.

17          MR. JONAS:  32.  Your Honor, Jeff Jonas from Brown

18    Rudnick for the official committee of Talc claimants.  I just

19    want to say, Your Honor, it has been really a difficult week I

20    know for everybody on both sides of the aisle but I just want

21    to thank my co-counsels obviously from Brown Rudnick, Mr.

22    Molton and Mr. Winograd, also Susan Sieger-Grimm was here with

23    us, Otterbourg, Melanie Cyganowski, Richard Haddad and David

24    Castleman who's here.  Of course, Mr. Stolz and Mr. John

25    Massey, all proposed counsel for the official committee of Talc

1 claimants and I also want to thank our members, Your Honor, who

2 in very short order have already had meetings and have already

3 started to put the time that's necessary in and so I want to

4 thank all those parties, Your Honor.

5        With that, Your Honor, before I get to the slides, I

6 just wanted to give a quick few responses to some of what I

7 heard on the other side that aren't covered by the slides.  And

8 first, Your Honor, I just have to say because it seems so apt

9 that this truly is a case of the emperor not wearing any

10 clothes.  You've heard the testimony.  You've heard, and let me

11 tell you why that it is, Your Honor.  You know and this goes

12 back to what Mr. Molton has been criticized for saying that

13 there's something rotten and it just doesn't smell right.

14        And I agree with that, Your Honor.  We've had a lot

15 of talk from Mr. Gordon about rushing to a plan and letting

16 people vote and I'll get to that of course, Your Honor.  But at

17 its core, and I think rather than speeches, the evidence speaks

18 to it.  You heard Mr. Kim, and you'll form your own view as to

19 what the facts are but to me, it was crystal clear that this

20 new bankruptcy case is based on a fraud and it proves one of

21 the things that we complained about throughout LTL 1 which was

22 that this debtor is controlled by Johnson & Johnson.  This

23 debtor does Johnson & Johnson's bidding.

24        And the reason I say there's a fraud here is because,

25 and it's so incredibly contorted, that that's why I say the

1  emperor isn't wearing any clothes, because they had to contort

2  themselves to get to where we are today.  They had to rely,

3  they had to find a way and rely on a theory, I don't know when

4  the last time you had a frustration of purpose case, Your

5  Honor.  I've never had one.  So unlike Mr. Kim when I read the

6  Third Circuit's opinion it frankly didn't occur to me that my

7  God, the whole funding agreement is void or voidable to use

8  their term.

9         So what really happened?  You heard it.  They got

10 together with their masters, the LTL got together with their

11 masters at J&J and they said how do we fix this?  We're J&J.

12 We're exposed for 60 billion bucks now outside of bankruptcy

13 and to use what they would probably say, we've got these crazy

14 tort lawyers coming after us and we're hanging fire on 60

15 billion bucks.  So they said what do we do?  Ah, frustration of

16 purpose.  See that footnote in that decision by the Third

17 Circuit which found that the first case was filed in bad faith.

18 On that basis, we can void the agreement and reduce Johnson &

19 Johnson's exposure by $50 billion.  That's what you heard.

20        And that Your Honor, I don't think we need anymore

21 than that.  We can talk about votes and plans.  I'll tell you

22 why I think they're doing that.  I mean it's obvious.  But

23 that's it.  If you find that in fact what I'm saying is correct

24 which I think the evidence supports, I think you should sua

25 sponte dismiss the case right now.  We asked you to do that

1  last time and you said I don't have any evidence.

2        Okay, you've got all the evidence you need, Your

3  Honor.  We had a debtor who had a fiduciary duty to us and

4  frankly, respectfully, Your Honor, not only did they put one

5  over on us, they put one over on you.  They used the cover of

6  the bankruptcy process while under the cover of the bankruptcy

7  process.  As a debtor, they were planning this fraud.  They had

8  it all lined up.  They negotiated the termination and a new

9  funding agreement.  They had the petition ready.  And within

10  two hours of the dismissal, bang, they're back in and here we

11  are.

12        Why?  Not only did they want to eliminate Johnson &

13  Johnson's massive exposure, they wanted to do something else.

14  They didn't give up on trying to "beat the tort system" or beat

15  the tort lawyers.  They said aha, we'll go, well, I'll get to

16  that.  We'll give it another shot.  Let's see if we can -- in

17  my opinion they're trying to outrun respectfully if you don't

18  do as we ask, and either dismiss the case or deny the PI, even

19  if you deny the PI but don't dismiss the case, they're trying

20  to outrun the appellate process.  Again, respectfully, Your

21  Honor, we believe no matter, if you don't do as we suggest, we

22  think we're going to win on appeal.  Because we think the Third

23  Circuit will be outraged, outraged by what happened here.  And

24  if that's the case, we'll win but it will be too late.  They're

25  trying to outrun them.  That's why they've got this great time

table, May, June, they're going to be out of bankruptcy.

They'll let people vote.  That doesn't work.

First of all, you can't outrun your fraud and you shouldn't be able to outrun the appellate system.  And so I would just say, Your Honor, and I do want to get to the slides because the way we've had this case on fast, it's important that I get the record in through some of the slides.  But just sitting here and thinking about it, I just, you know we heard all about lots of different things.  Mr. Molton, my partner is not answering questions and Mr. Birchfield, his cases haven't been successful.  What does that got to do with anything?

We had the debtor in the box answering questions, has proven a record, on the basis of which this case should be dismissed right now.  And if you don't dismiss the case, you should absolutely not give a PI because I don't think without good faith for starters, I don't think a PI should be granted. And if they want to try this, let them run for luck, but they shouldn't get the benefit of a PI.

So that's my first kind of off the cuff comment. Second, Your Honor, they made a big deal about your order encouraged the parties to continue their settlement efforts.  I thought that was funny.  Because what they interpret that to mean, not to continue their settlement efforts with all the folks that were spending lots of time trying to settle with them, they went out and found some new folks who allegedly have

1  all kind of claims.  I'm not going to disparage them.

2        And when I say allegedly, it's not in an effort to

3  disparage, I don't know.  All they are, are names on a piece of

4  paper right now.  Even they don't know.  They didn't talk to

5  their clients about this plan.  They don't have, some of them

6  don't have medical records.  They don't have cases.  They're

7  just claims.

8        So whatever they are, they are.  It's not for me to

9  cast dispersions on them.  But the point is they went out, they

10 didn't follow your order to continue the settlement efforts.

11 They went out and found a new paradigm.  They went out and

12 found some people and said wow, we'll do it and run around

13 those other people.  Those people have been too tough for us.

14 So I don't think that qualifies under your order is what was

15 intended.

16        Third, Your Honor, again the arrogance of J&J is just

17 incredible.  Not only everything we've heard today, we heard on

18 one of Mr. Gordon's slide, it's a one time offer.  Never going

19 to get better.  Take it or lose it.  That's not the way the

20 system is supposed to work, Your Honor.  It's not the way the

21 tort system is supposed to work.  It's not the way the

22 bankruptcy system is supposed to work.

23        Four, Your Honor, it's a little bit of deja vu from

24 when I was here in LTL 1 and I know, well, I shouldn't say I

25 know, I think you always try to do the right thing and I think

1   you would like to see the right thing get done here and you may

2   believe that the right thing is to get some money to some

3   people.  But please, Your Honor, the ends can't justify the

4   means.  They can't.

5          If you find, as I hope you will and I think you

6   should that there was a fundamental fraud here, a breach of

7   fiduciary duties, they pulled one over on us.  They pulled one

8   over on you.  If you find that, it doesn't matter what they're

9   promising.  They can pay all the money in the world, it won't

10  fix the fraud that happened here.

11         And last, Your Honor, as I said, and then I'll go to

12  my slides, there has been a whole bunch of slides, lots of

13  slides about my partner, Mr. Molton and Mr. Birchfield and ad

14  hominem attacks against them.  I just, I don't think it's

15  relevant.  I don't think it has anything to do with what we're

16  here for.  And with that, Your Honor, let me turn to my slides.

17         First, Your Honor, I want to talk about the

18  likelihood of success on the merits and the lack of financial

19  distress.  You heard here, you heard testimony that LTL 2 is

20  not insolvent.  This is another pin that Mr. Kim dances on the

21  head of.  He said we're not insolvent but we're in financial

22  distress.  They can't be insolvent because then there would be

23  even more clear fraudulent transfer so they don't want to be

24  insolvent but they've got to be in financial distress.

25         So even with the termination of the 2021 funding

1  agreement, we know based on the testimony that LTL has not been

2  solvent.  Go to the next slide.  As to financial distress, LTL

3  is actually better positioned now then Old JJCI.  That's what

4  Mr. Kim said.  The question was, is it true today, that the

5  debtor, LTL has at least the same if not greater ability to

6  fund Talc related claims and other liabilities as Old JJCI had

7  before the prior restructuring.  I believe it is.  So I don't

8  think they've improved their argument that they're now in

9  financial distress.

10         Next slide.  And they still have at least as you

11  heard the testimony, at least $30 billion available to pay Talc

12  claims.  So again, there's no immediacy, no urgency here and

13  LTL still hasn't shown any difference in the tort system

14  litigation since the last time.  Mr. Kim, because it has

15  sufficient funds to pay off its debts currently as they come

16  due.  And the says, I would include even prior to our, we

17  disagree with the Third Circuit on whether it was in financial

18  distress during LTL 1.

19         THE COURT:  Mr. Jonas, can I ask you a question?

20         MR. JONAS:  Please, Your Honor.

21         THE COURT:  Because I had trouble reconciling this in

22  LTL 1 and the issue doesn't go away.  I'm reading from the

23  committee's brief and it speaks to the settlement being

24  illusory.  The $8.9 billion payment isn't enough when you take

25  into account the billions that are due to governmental units on

1  the Deceptive Trade Practices claims.  The billions, and I'm

2  using your language or your firm language, the billions that

3  are due for indemnification, the billions that are due on

4  copays to the insurance claims.  Lot of billions are thrown

5  here that aren't covered by the 8.9.

6           MR. JONAS:  Uh-hum.

7           THE COURT:  So how do, and the committee and others

8  make arguments that there's no financial distress and there has

9  been huge fraudulent transfer.

10          MR. JONAS:  Uh-hum.

11          THE COURT:  It sounds like financial distress when

12  you hear all these billions that are being thrown in your own

13  words about beyond the 8.9 billion.  The billions for mesos,

14  the billions for other ovarian, the billions of estate, the

15  billions on insurance.

16          MR. JONAS:  Sure.  I can respond to that.

17          THE COURT:  So it's either these are real potential

18  liabilities which suggest distress or they're not and it's much

19  lower and then maybe there's not an insolvency.  How is it

20  reconciled?

21          MR. JONAS:  Sure.  Let me, I think there's two

22  responses to that, Your Honor.  First, I don't think you can in

23  this context any way, I don't think, there are separate

24  arguments here, okay.  First there's the fraudulent transfer

25  argument and second there's somewhat separately a financial

280

1 distress argument.  But I think they're related in the

2 following way which is I don't think you can commit a

3 fraudulent act or commit a fraudulent transfer and say oh my

4 God, now we're in financial distress.  And so then you begin to

5 use, and I'll just play this out, you say well, now they don't

6 have 60 billion.

7        Now, they only have 30 billion and if I add up a

8 bunch of billions that you're throwing at me, maybe it's pick a

9 number, 15, 20 billion and therefore now they're in financial

10 distress.  What I would say to that is, it's, you've turned it

11 on its head and I would argue an improper way because you

12 can't, you can't create financial distress in a fraudulent way.

13 So I would argue, first of all, I'm not sure that the Third

14 Circuit Court of Appeals would accept that if in fact the total

15 claims are 15 billion and they have the wherewithal of 30

16 billion, I don't know if that's financial distress.  Frankly,

17 Your Honor, I argue it's probably not.

18        And so that, I just I think that's the way you have

19 to look at it.  I don't think you can, it's unfair to match

20 whatever these claims might be --

21        THE COURT:  Well, just seems to be an inconsistency

22 to argue that there's no distress because of the wherewithal of

23 the company but in a couple of paragraphs later suggest that

24 the 8.9 billion can't approach covering the liabilities that

25 are out there in the billions.

1              MR. JONAS:  Well, --

2              THE COURT:  And I don't know and I agree, I respect

3    the Third Circuit opinion.  It's not, if a company is worth 30

4    billion on paper and it owes 15 billion and has to write a

5    check, not every company can do that without liquidating.  Is

6    that distress?  We all know there are different situations.

7    Book value isn't the only way of looking at it.

8              MR. JONAS:  Yeah, I agree.  I guess what I would say

9    to that, Your Honor, is, I don't want to say don't put too much

10   weight on what we said in our papers but we were trying to make

11   a point which is they're extolling the virtues of an $8.9

12   billion settlement and I think the point we were trying to make

13   is that this isn't just to settle the OC claims, which at one

14   point in time in ancient history we were talking about.

15             There's a lot more here.  This settlement gets them

16   off the hook for everything now, futures, mesos, OC's, et

17   cetera, et cetera, states, there was, and again I'm not trying

18   to put on evidence as far as I know, in all the prior

19   discussions, I don't think the states ever were kind of wrapped

20   into a settlement number at least in the prior.  So the point

21   we were trying to make, Your Honor, is don't be fooled by an

22   $8.9 billion number that the biggest amount ever funded to a

23   trust in history, yadda, yadda, yadda.  The point is there's a

24   lot, you've got to look under the hood a little bit.  And yes,

25   there's more, you know there's more there.  I can't, and I'm

1 not here to tell you exactly what that number is and I'm not

2 here to necessarily say as against $30 billion that's evidence

3 of financial distress.

4          I think it's a fundamentally unfair inquiry to use

5 the 30 billion when they got there by committing, you know a

6 fraudulent act.  So that's how I would respond to that, Your

7 Honor.

8          THE COURT:  All right, fair enough.

9          MR. JONAS:  Mike, can we go to slide eight?

10          MR. WINOGRAD:  Sure.

11          MR. JONAS:  On this point exactly, Your Honor, LTL

12 failed to manufacture financial distress and it's still not in

13 financial distress and you don't have to believe me.  So I

14 think we have their witness that answers your question where he

15 was asked, this is the CFO, Mr. Dickinson, can you personally

16 identify any financial consequence to LTL from terminating the

17 2021 funding agreement, yes or no.  No, I cannot.  Next

18 question, Mr. Dickinson, as the chief financial officer of LTL,

19 can you identify anything that was different about LTL's

20 financial condition on April 3rd as compared to April 4th?  I

21 cannot.

22          So at least the CFO is telling us he doesn't think

23 they're in financial distress or worse off.  That's what the

24 evidence shows.  Next slide.  Actually, let's go to 10, Mike.

25 I won't speak to the slide exactly, Your Honor.  I'll just say

1  this.  We don't believe and I think the evidence now shows that

2  they still setting everything else aside, they still have not

3  met the requirement per the Third Circuit of being in financial

4  distress independent of everything else.

5       Slide 11, Mike and the next one.  Your Honor, this

6  goes to my kind of fundamental point that I freelanced with at

7  the beginning.  They cannot create subject matter jurisdiction.

8  And we quote a number of cases here that go to this point.

9  They, they cannot manufacture subject matter jurisdiction by

10  engaging in fraud, that's, and I've tried to back up my

11  comments if you will with a little bit of law including

12  combustion engineering where the Third Circuit rejected any

13  suggestion that a debtor could create subject matter

14  jurisdiction by agreement.

15       Next slide 13.  Your Honor, termination of the 2021

16  funding agreement is avoidable as a fraudulent transfer.

17  They've admitted that intent of terminating the 2021 funding

18  agreement was to create financial distress, trying to find a

19  basis in which to be before this Court.  Mr. Kim, you'll see in

20  the last comment in his declaration, debtor believes its

21  prefiling financial condition is sufficiently distressed to

22  satisfy the standard established by the Third Circuit and

23  obviously that was the result of terminating the first funding

24  agreement.

25       Next slide.  Termination of the 2021 funding

1  agreement again is avoidable because these are a couple

2  examples where at least, at least somewhat prior to today,

3  J&J's counsel refused to answer questions on this topic

4  claiming privilege.  Mr. Haas was asked when did you first

5  obtain any knowledge that J&J and LTL were going to terminate

6  the '21 funding agreement.  Ms. Vonn (phonetic) gave an

7  instruction.  He himself said yeah, that calls for an attorney

8  client privilege information and my role as litigation counsel

9  of J&J so it's not an appropriate inquiry.

10        Similarly, later on, Mr. Haas, are you aware, yes or

11  no, of whether J&J and LTL agreed to terminate the 2021 funding

12  agreement while the first LTL bankruptcy was still pending.  I

13  object privilege instruction not to answer.  Again, Your Honor,

14  we really have, I think we have enough facts to conclude my, to

15  reach my summary of what I think happened but we have very

16  little facts.

17        My first question to Mr. Kim at his deposition was

18  did J&J call you and say they were going to void the agreement?

19  Of course I didn't get an answer.  He says he came up, it's

20  like the gang that can't shoot straight.  He says he came up

21  with the idea.  Well, why would you call your counterparty and

22  suggest that the agreement is voidable?  I have no idea.  Do we

23  have an answer?  No answer, none at all.

24        Your Honor -- slide 15, Mike.  Objectively,

25  termination of the '21 funding agreement is bad for LTL and

1  it's good for J&J.  But again, and I think the answer to that

2  is why?  Well, you had lawyers on both sides of the

3  transaction.  Mr. Haas', J&J lead litigation counsel, and he

4  was on both sides of the transaction.  He says, when he was

5  asked, sir, do you represent at this time in any capacity LTL?

6  Of course I do.  They're a subsidiary of Johnson & Johnson,

7  wholly owned.  Well, sure if you have lawyers on both side of

8  the transaction, I can surmise what's going to happen.

9          Later on, you'll see on the left hand side, Ms. Brown

10  asserted well, he has a common interest with LTL.  Common

11  interest between LTL and J&J.  It's interesting, you see on my

12  next slide before I even heard the testimony of Mr. Kim, I

13  used, I used the analogy LTL was an empty chair with respect to

14  the restructuring.  J&J negotiated on both sides.  Mr. Kim used

15  the word faceless.  He said well, when you were asked about who

16  was negotiating for LTL, on the PSA agreements, he said we were

17  faceless because all that was done by J&J or J&J's lawyer.

18          And that's seen here on slide 16 regarding the PSA's.

19  Question, who negotiated this PSA on behalf of LTL?  I know Mr.

20  Kim signed it.  Who negotiated?  The witness, and this was Mr.

21  Murdica.  I don't have any information that would implicate a

22  privilege.  Same thing with Mr. Kim.

23          Again, Your Honor, LTL claims that the Third

24  Circuit's opinion may have created a risk that the '21 funding

25  agreement is void or unenforceable.  That is clearly contrived.

1    LTL's CFO testified when asked, let me rephrase the question.

2    Other than what is shown here in the minutes about what Mr.

3    Prieto said to you about the risk of the '21 funding agreement

4    being potentially void, avoidable, do you have any other

5    information about that?

6            Once again, going to defer to the minute notes, that

7    could have been more than Mr. Prieto, I'm going to defer to the

8    minute notes.  Okay.  No business person at JJCI or J&J ever

9    told you as a business person that the funding agreement was

10   void or voidable, correct?  Correct.

11           In fact, Your Honor, as I've suggested but now proven

12   out by the evidence on the slide, it looks like no one at LTL

13   even put the ultimate question to J&J about the funding

14   agreement.  Question to Mr. Haas.  Do you recall any

15   conversations concerning without going into the substance of

16   those conversations, do you recall any conversations concerning

17   the enforceability of the '21 funding agreement prior to the

18   Third Circuit decision?  And there's a number of questions and

19   answers.  Down below, I do not recall having conversations

20   about the agreement being void or voidable.

21           And on the right hand side, Mr. Kim, which party

22   wanted to declare it void?  His answer, consistent with what he

23   said today.  I would say there was a consensus reached that

24   there was a material risk that the funding agreement was

25   unenforceable because it was void or voidable.

1          That's not how parties to a contract talk.  That's

2   not how we expected our fiduciary, the debtor in this case to

3   protect our interests.  To put it quite bluntly, Your Honor,

4   that $61 billion, that was our money and they gave it away.

5   Didn't ask us.  As far as we can tell, didn't negotiate it.  He

6   listened to his master and they restructured it in a way that

7   was best for J&J.

8          I'm going to go ahead, Your Honor, ah, to slide 21.

9   Your Honor, the 2021 funding agreement provided LTL with over

10  $61 billion in funding to pay Talc claims inside or outside of

11  bankruptcy.  So yes, Your Honor, it was clearly my client's

12  expectation when the case got dismissed, the funding agreement

13  would be available to ultimately satisfy claims.  Were we

14  somehow misguided in that thinking?  Was that unreasonable?  I

15  don't think so.  Because Mr. Gordon told this Court whether

16  there was no case filed or whether the case is filed or

17  dismissed, the money is available for that purpose.

18         Mr. Katyal, Katyal, to the Third Circuit said I

19  understand that the funding agreement does have provisions for

20  funding outside of bankruptcy.  And I think it was Judge Ambro

21  but I'm not sure.  The Court said yeah, that's what I thought.

22  So we've now had 18 months of bankruptcy.  We've now had two

23  courts issue decisions critical for my clients and I don't

24  know, Your Honor, was that based, I don't think there were

25  misrepresentations made at the time that they were made.  But

288

1  now all of a sudden, we don't have the benefit of it.

2       And clearly, whether some of the earlier decisions in

3  this case might have been different had the Court known how

4  this was going to turn out.  Your Honor -- slide 23.  Your

5  Honor, as you know, Section 548(a), the actual intent standard

6  doesn't require insolvency.  And we believe that avoidance of

7  the April 4th transactions and restoration of the '21 funding

8  agreement are required under the Bankruptcy Code.  Once

9  restored, the 2021 funding agreement mandates dismissal under

10  the Third Circuit's opinion and LTL cannot evade the Circuit's

11  mandate by committing the fraud they committed in this case.

12       Your Honor -- next slide.  The LTL, this bankruptcy

13  is even filled with more bad faith than the first bankruptcy.

14  The Third Circuit dismissed the first bankruptcy for lack of

15  good faith.  We believe that LTL's fraud means that LTL's

16  second bankruptcy has even less good faith.  The fraud was

17  orchestrated while LTL 1 was a debtor in possession.  It

18  certainly was not an ordinary course transaction.  Just like

19  LTL cannot create subject matter jurisdiction by engaging the

20  fraudulent transfer.  LTL cannot create good faith by engaging

21  in a fraudulent transfer.

22       Slide 26, Mike.  Your Honor, the question here,

23  another question here, although as I've mentioned I think I've

24  been pretty clear, I don't think you even get to it, but if you

25  do and you consider the PI on its merits, the question is

1 whether there's a reasonable likelihood of a successful plan.

2 And they've asserted, the debtors asserted that it has support

3 of roughly 70,000 claimants.  And before we go down this path,

4 Your Honor, I just want to say it one more time.  We think we

5 can win on the standard but I think it's wholly inappropriate

6 to even go there.

7         Again, whether or not you dismiss the case, I think

8 the evidence is abundantly clear that there is a lack of good

9 faith in this case and if you require us to file a formal

10 motion to dismiss, we plan on doing it.  We plan on doing it

11 soon but a PI should not issue on this record, Your Honor.  And

12 you know we've made, we've tried to make much of this, Your

13 Honor, in terms of the fact that while they claim that there

14 are 70,000 claimants that support the plan, the fact of the

15 matter is, and we can go to slide 28, they have no idea how

16 many Talc claimants each of the support firms represent.  Mr.

17 Kim says he's relied unverified statements from the firms and

18 Mr. Murdica, you can see it here and I think you heard it again

19 today, he said well, we rely on the statements of counsel.  I

20 rely on Mr. Murdica.

21         As we said, Your Honor, we think there's quite a bit

22 of unfiled claims, to the extent you find that to be important

23 versus claims that have been filed.  And Your Honor, critically

24 on slide 31, as I think we've brought out pretty clear, Mr.

25 Murdica simply relied on the law firms without further

1  verification.  You'll see the testimony at his deposition.  He

2  was asked did you request any diligence or evidence of that

3  representation and he said that's not the way this works.

4         And then you'll see also, question, did the lawyers

5  who told you that their claimants would support this claim, did

6  they say they had commitments from their claimants to support

7  the terms?  Answer, I don't know what, that I can make a

8  blanket statement for all of that.  And when they make a

9  representation to me that their claimants are going to support

10 the plan, or in the past, when their claimants are going to

11 support a settlement, they've always followed through.  And I

12 think we brought this out, Your Honor.  The fact of the matter

13 of is, not one actual claimant has committed to support this

14 claim.  They've got a lot of lawyers.  They've got to talk to

15 their clients.  They're going to recommend that they support

16 the plan.  But not one actual voter, and you heard Mr. Kim say

17 this, I asked him.  Not one voter has said he's going to, he or

18 she is going to support this plan.

19         Your Honor, we've also talked about the very limited

20 information that has been provided about particular claimants.

21 You'll see on slide 33 quite a bit of this was redacted before

22 we got it but this is what an actual, not sure you saw this

23 earlier, this is what an actual signed PSA, this is the March

24 27th PSA that was signed.  This is what it looks like.

25 Obviously here we just have the first names listed but it's

1   very limited information.

2          And let's go to slide 35, Mike.  Again, here's some

3   testimony, Your Honor, particularly Mr. Watts, you'll see on

4   the left hand side.  All I've committed is that I'm going to

5   recommend it to them.  Also, later what I can't commit to the

6   Court is I have ordered records, this is as to records for his

7   client's medical records.  I have ordered all of them.  I've

8   got a ton of them going back internally.  We're having them

9   analyzed at this point and we'll certainly have the data at

10  some point.

11         Your Honor, slide 37.  I did not negotiate with or

12  obtain the support of a substantial number of claimants.  Over

13  100 law firms have pledged to defeat the plan.  Four of the law

14  firms that have signed PSA's, do not have a single filed Talc

15  lawsuit against J&J, LTL or any of their affiliates including

16  the Watts' firm.  Sixty to 70,000 claimant number is

17  unreliable.  As I said, all of the MDL leadership, and

18  concluding all of the MDL leadership opposed the plan,

19  represent over 40,000 claimants and the majority of the cases

20  that have been filed in state and federal courts around the

21  country.

22         Your Honor, you've seen first hand unfortunately the

23  acrimony between the parties, the odds of a consensual plan

24  here are low.  The mass tort bar is galvanized behind defeating

25  J&J particular giving the maneuvering since the Third Circuit

1 ruling.  In any event, Your Honor, as we show on slide 38,

2 J&J's plan faces lengthy appeals.  It does have independent

3 liability which can't be channeled under 524(g) and we cite the

4 Combustion Engineering case.  Next slide.

5        Let's go to slide 40, Mike.  But again, Your Honor,

6 whether or not the plan is confirmed, part of the game here for

7 J&J is just getting more time.  They've gotten too much time

8 already, Your Honor, and it's time to bring this to a close.

9 We thought that would be the case after the Third Circuit

10 ruling.  I guess we got that wrong.  But we would urge, Your

11 Honor, to finally bring this somewhat ugly chapter to a close.

12        As for irreparable harm, Your Honor, slide 42, the

13 only harm articulated by LTL is that litigation could go

14 forwarded against responsible parties as Mr. Kim testified.

15 Having all this ancillary litigation on the same claims, same

16 product with the same plaintiffs would clearly be a detriment

17 to the ability to reorganize.  Yet, Your Honor, next slide, an

18 injunction would cause irreparable harm to Talc claimants.

19 Talc claimants died during LTL's first bankruptcy without

20 having their day in court because of the injunction issued by

21 the Court.

22        Continuation of the injunction would cause further

23 mortal delay.  A solvent Fortune 500 company being subject to

24 litigation in the tort system for selling products that

25 contains asbestosis is not irreparable harm.  Title 11 does not

1   affect any right to trial by jury that an individual has under

2   applicable nonbankruptcy law with regard to a personal injury,

3   a wrongful death tort claim.

4       This Court cannot and should not strip Talc claimants

5   of finally of their right to a jury trial.  J&J should be held

6   accountable in the Court system.  We've talked, Your Honor, on

7   slide 45 in terms of balancing the harms, particularly

8   continuing to protect J&J with an injunction while Talc

9   claimants suffer which would be irreparable harm.

10      Your Honor, we think that once the April 4th

11  transactions are voided, LTL will again have access to over $61

12  billion to pay Talc claims.  And in contrast continuing to

13  prevent Talc claimants from exercising their rights is causing

14  irreparable harm, Your Honor.  People are dying.  Protecting

15  J&J discourages settlement discussions because it means that

16  they have no incentive to further negotiate in good faith.

17      Your Honor, in trying to wrap up, on slide 47, I just

18  wanted to highlight some comments made by the Third Circuit and

19  I think it's relevant to whether LTL can build a record

20  supporting a stay.  Third Circuit said it is not obvious LTL

21  must indemnify J&J's for the latter's independent post 1979

22  conduct that is the basis of a verdict rendered against it.

23  Liabilities and obligations of every kind and description which

24  are allocated on the books or records of J&J as pertaining to

25  its baby division and lastly, it is also not clear, the

1  indemnity should be read to reach punitive damage verdicts

2  rendered against J&J for its own conduct.

3           Your Honor, as for public interest on slide 49, and

4  we'll certainly let the UST speak to this directly.  We believe

5  that granting an injunction would be contrary to the public

6  interest.  The Third Circuit ordered that LTL's case be

7  dismissed and granting, and you should not grant an injunction

8  and reward a party for committing fraud.  And we believe that

9  this entire second bankruptcy is a clear attempt to circumvent

10 the Third Circuit's ruling.  I think that's almost admitted.

11          The public interest is not served by parties

12 disregarding rulings made by a Circuit Court and the

13 continuation of this case has the potential to undermine public

14 confidence in the judicial system.  Slide 50, and again I'll

15 let the UST speak to it directly.  Their papers state that to

16 subject these victims to any additional delay would be

17 unconscionable, especially when balanced against LTL's slim to

18 nonexistent prospect for reorganization.

19          So Your Honor, in closing, I come back to what I

20 started.  The emperor really is not wearing any clothes.

21 There's some great lawyers on the other side.  There's a mega

22 corporation that can spend all the money in the world and they

23 can make up whatever they want to make up about why things are

24 the way they are but at base, Your Honor, and I think the

25 evidence, the evidence, not speeches, nothing else, the

1  evidence shows what happened here.  There was a fraud.  There

2  was a fraud committed on Talc claimants.  On one day they had

3  something.  The next day they didn't.  Why?  Allegedly because

4  of a Circuit Court of Appeals decision?  It's ridiculous on its

5  face, Your Honor.  And we would ask that you dismiss this case.

6  If you don't dismiss this case and you want to take it up on

7  our motion to dismiss it will be filed in short order, we would

8  ask that you not countenance this and not grant any further

9  injunctive relief.

10         Your Honor, may I ask permission?  I don't like to do

11 this but I have a trial tomorrow in Indianapolis on a motion to

12 dismiss in the Aearo case which relates to 3M and if I don't

13 leave --

14         THE COURT:  Good bye.

15         MR. JONAS:  Thank you, Your Honor.  I appreciate.

16         THE COURT:  Just jealous.

17         MR. JONAS:  Thank you, Your Honor.

18         THE COURT:  Travel safely.

19         MR. JONAS:  Thank you, Your Honor.

20         UNIDENTIFIED SPEAKER:  All right, point of order,

21 maybe the US Trustee would go next.

22         THE COURT:  Ms. Richenderfer, do you want to go?  I'm

23 going to take, I just want people to come up.  I'll take from

24 whomever.

25         UNIDENTIFIED SPEAKER:  You should always go before me

1 anyhow.

2       UNIDENTIFIED SPEAKER:  I was going to invite the US

3 Trustee to go and then Mr. Birchfield and then myself and Mr.

4 Meyner (phonetic).

5       UNIDENTIFIED SPEAKER:  (indiscernible)

6       UNIDENTIFIED SPEAKER:  Oh, I'm sorry.

7       THE COURT:  Folks?

8       UNIDENTIFIED SPEAKER:  I apologize, Your Honor.

9       THE COURT:  This is getting a little bit absurd.

10      MS. RICHENDERFER:  I plan on going next.

11      THE COURT:  It's twenty after six.  In your

12 presentations, I will ask that you try not to be repetitive of

13 points that have been made incessantly.  I get it.  So Ms.

14 Richenderfer.

15      MS. RICHENDERFER:  Thank you, Your Honor.  I

16 apologize in advance because some of this is going to seem a

17 little out of order because I am going to try to jump around in

18 my notes and cover territory that has already been covered.

19 I'll try as best as I can.  Your Honor, to prepare for a

20 bankruptcy it's not unusual to find out that the debtor

21 prepetition sat down, entered into a restriction support

22 agreement with certain of its largest creditors, entered into

23 arrangements with the secured lenders, its shareholders, its

24 equity, all sorts of important parties, all sorts of important

25 players in its bankruptcy.  Gets itself set ready to go and

1 walks into court the first day with everything in place.

2          And Your Honor, I know you've seen it, I've seen it

3 and it usually ruins my weekend because everyone likes to file

4 on Sunday night and so I end up working on the weekend to go

5 over all that.

6          J&J, I'm sorry, LTL, that really was just I'm tired.

7 LTL is trying to do that here but they're forgetting there's a

8 big fly in the ointment here, Your Honor.  They were already in

9 bankruptcy.  There were certain boundaries on what LTL could do

10 and not do prior to walking in the door the second time.  We

11 have here a debtor that never had any operations and for its

12 very short time period that has been in existence, I guess it's

13 about, is it even two years at this point, I can't remember

14 when it incorporated.

15          But during its short existence, it has been in

16 bankruptcy continually except for two days at the beginning and

17 two hours and 11 minutes in between.  And during that time, it

18 owed a fiduciary duty to all of its creditors and there is the

19 Bankruptcy Code that tells it what it can and cannot do.  And

20 so this is not like the normal bankruptcy filing where you know

21 we walk in, we have the first days and we have the agreements.

22          I by no means of suggesting that there's something

23 wrong with the PSA's, Your Honor.  I'm focusing right now on a

24 funding agreement.  I'm focusing right now on having Holdco or

25 JJCI at one point in time having the consumer business.  Prior

1 to the end of, prior to the end of January so before the Third

2 Circuit issued its ruling, that consumer business evaporates

3 which means therefore that LTL becomes more dependent on J&J's

4 ability to step up to the plate under the joint and several

5 liability agreement that was the 2021 funding agreement.

6       And it doesn't tell anybody, doesn't tell anybody

7 that that has happened and the Third Circuit issues its opinion

8 and for some reason the Third Circuit that says no, you can't

9 do this.  You didn't do this in good faith.  They think that's

10 a sign to go back and get rid of the assets.  It's astonishing

11 to me how getting rid of assets that occurred and overlapped

12 with the first bankruptcy, maybe documents were signed in two

13 hours and 11 minutes, I don't know.  I don't think they were

14 docusigned.  Maybe they were sitting there already signed and

15 somebody had to staple the pages together.

16       But this was negotiated while they were still in

17 bankruptcy and I'm focusing right now, Your Honor, on the

18 funding agreements.  You asked Mr. Jonas about assets of the

19 debtor.  The second time around, LTL walked into this Court

20 with a new funding agreement that says that it will get money

21 for Holdco and Holdco can get a loan from J&J.  Holdco no

22 longer has consumer business assets.  And it walked in with the

23 fraudulent conveyance claim.  And if the debtor doesn't want to

24 bring it, I'm sure the committee will look into bringing it.

25       But it walked into this courtroom with 52 billion or

1  whatever, I can't do the math this late at night in claims for

2  a fraudulent conveyance.  And as Mr. Jonas pointed out, under

3  548, there's two provisions in there.  They don't have to prove

4  insolvency under 548, I'm going to get it wrong now, --

5            THE COURT:  A.

6            MS. RICHENDERFER:  8(2)(a).  Thank you, Your Honor.

7  They don't have to prove insolvency.  You have to prove intent

8  and I think we've already heard an awful lot because they

9  intended to get rid of that agreement.  Mr. Kim was very clear.

10 They intended to get rid of that agreement and they did.  They

11 got rid of that agreement.  May have been based on bad, legal

12 advice.  I don't know because I just don't understand how void

13 or voidable, I mean if it's voidable, that means that one of

14 the two parties has to take a step to make a void.  If it's

15 void, then when did it become void?  Was it void ab initio?

16 Did it become void because the Third Circuit said you're not

17 suffering financial distress.  I don't know when allegedly it

18 became void.  But if it's voidable, one of the two parties has

19 to take a step and Mr. Kim doesn't define when that occurred,

20 just people were talking about it and then next thing you know

21 there's no agreements that are in place.

22         These are all issues that go to the success on the

23 merits, Your Honor.  They go to issues that will probably be in

24 front of this Court maybe on May 3rd, I don't know.  I guess it

25 depends on how fast we all can move on appropriate motions to

1  dismiss.  But those are issues that are going to be back in

2  front of this Court.  But when LTL 2.0 came in, it had a lot of

3  money.  And the difference is this, Your Honor.  If we assume,

4  and I'll assume for the sake of argument, that they have 60,000

5  claimants all tied up because their attorneys are going to send

6  in ballots signing their names.  That's what happened in Imerys

7  and we ended up with a huge amount of votes that gone thrown

8  out for one reason or another.  One being absolutely no proof

9  of the claimant themselves, 15,000 of them having a claim and

10  other votes got thrown out because multiple law firms were

11  submitting ballots and it wasn't that the claimants were

12  signing two ballots, it was at two different law firms were

13  submitting a ballot for the same person.

14          So let's just assume that they do have 60,000 claims.

15  I don't know if that's claimants tied up.  I don't know if it's

16  75 percent or not, Your Honor.  I really don't know.  Because

17  of the overwhelming number of claims that Mr. Watts has

18  acquired since the first filing.  I don't know whether or not

19  anybody else has equally acquired the same number of claims.

20          But there's also the State Attorney Generals has

21  substantial claims.  And I heard reference made to claims

22  against Imerys and Cypress.  Well, I'll tell you this, Your

23  Honor.  There have been adversary proceedings pending since,

24  see 2019 is when Imerys filed so probably 2020, adversary

25  proceedings by Imerys against Johnson & Johnson for

1 indemnification claims and also seeking coverage under these

2 insurance policies that are part of the monies that may or may

3 not end up in the pot here for this case.

4      And I will tell you that both Imerys and Cypress also

5 believe they have huge indemnification claims against Johnson &

6 Johnson.  And I believe it was one of the counsel for the

7 debtor, Your Honor, made a comment about how well, you know if

8 claims get covered in the Imerys case.  Your Honor, I went back

9 and I looked and of the 12 primary law firms, that have signed

10 PSA's, all but two of them either had no votes submitted in the

11 Imerys case or had their votes thrown out because there were

12 other law firms claiming the particular claimant as their

13 client.

14      So I don't see that there's going to be a lot of

15 overlap between people that are going to try to get paid

16 through the Imerys trust and people that are going to try to

17 get paid through the J&J or the LTL trust.  And we started off

18 this case back in October 2021 with a pot of money that I will

19 admit is larger than what I can even comprehend.  We now in LTL

20 2.0 have a pot plan, meaning here it is, here's the cutoff.  So

21 all of you tort claimants, all you State Attorney Generals,

22 anybody seeking indemnification from us, insurance carriers,

23 Blue Cross, Blue Shield, here it is.  Divvy it up.

24      There's a huge difference between the two.  And

25 that's the problem here, the pot plan.  There might still be

1 money here but they gave away an awful lot while they were

2 still in bankruptcy and I think that's just the most important

3 point, one of the most important points from my office is that

4 what was the conduct while they were still in bankruptcy.  And

5 we were relying on them in their capacity as fiduciaries for

6 the debtor's estate.

7       This time around, Your Honor, not only do we have the

8 debtors coming into the Court with that hanging over their

9 heads, we have the debtors coming to the Court with the Third

10 Circuit's opinion hanging over their heads.  I will never

11 comprehend how they believed that that gave them permission to

12 get rid of the 2021 funding agreement, how they thought that

13 Judge Ambro was telling them to do that.

14       And maybe when this is all over and done with we can

15 have a drink sometime with Judge Ambro and see if that was

16 really what he had in mind when he wrote that opinion and put

17 (indiscernible) got in there.

18                  (Laughter)

19     MS. RICHENDERFER:  I didn't know I was going to get

20 such a laugh on that one.

21                  (Laughter)

22     THE COURT:  I'll ask at the Third Circuit conference

23 coming up.

24     MS. RICHENDERFER:  Okay, Your Honor.  And then when

25 all this is over, they'll have a drink with you.  Then you can

1  tell us what Judge Ambro says.  But I know that Footnote 18

2  talks about fraudulent conveyances, which to me is saying don't

3  do it.  But I guess minds can differ, that's why lawyers have

4  jobs, because we all disagree about how to interpret things.

5         It's beyond challenge that funding agreement one was

6  available in or outside of bankruptcy.  Mr. Jonas already told

7  you, I think, about the colloquy that went forth between, it

8  was Judge Ambro who asked the question, and appellate counsel

9  for the debtor at first said that it wasn't available outside

10 of bankruptcy.

11        And then one of the co-counsel whispered in his ear

12 and he went up and he corrected himself.  And Judge Ambro said

13 yes, I know that.  I mean, Judge Ambro asked that question

14 knowing the answer, and he got the wrong answer and then got

15 corrected.  So that agreement was available in or out of

16 bankruptcy.

17        Your Honor, the plan.  And Your Honor saw me asking

18 questions of Mr. Kim about this.  A plan in a case like this is

19 going to be 50, 60, 70 pages long.  That's not even including

20 TDP's, that's not even including the trust agreement.  I know

21 Your Honor is very well aware of this whole process.  You've

22 had asbestos cases.  You know how long these things are.  You

23 know how heavily, heavily, heavily negotiated they are.

24 Because this means real dollar and cents.

25        And to take that term sheet and get it into a real

304

1 plan that each one of the law firms assigned a PSA is going to

2 say okay, that's it, that's what I agree to, that's what I

3 agree to support, we're a long way from that point, Your Honor.

4 We are a long way.

5 You know, I come from the <u>Emerest</u> (phonetic) case

6 where here we are going on, it will be four years.  It is four

7 years, that's right.  It was in February of 2019 that it filed.

8 Nowhere near it.  It's the details.  The devil is in

9 the details in these plans.  And that's where reasonable people

10 differ.  And so the time line that they set out, I'd love to

11 see a plan on May 14th.  I have a feeling though it's going to

12 look like what I saw in <u>Emerest</u>, which was plan number one that

13 was so bereft of details that you didn't even know where to

14 begin in drafting your objection to it.  And it wasn't until we

15 got to the tenth amended plan that it finally was in a state

16 where it could go out for solicitation.

17 So I believe there will be something that we will see

18 filed on May 14th.  But I really question whether it is going

19 to be something that all of us, including Your Honor, will feel

20 is appropriate to send out to the claimants for them to vote

21 on.  I mean, we haven't even had major discussions like okay,

22 how are they going to do the voting.  I mean, that can take

23 days of arguments about do you send it to their attorneys, how

24 do you make sure that they get it, how do you make sure that if

25 they want to vote themselves, they get to vote.

1          So Your Honor, I'm just saying all of this because I

2    think that there's been a heavy emphasis by the debtor on let

3    us go forward, we're going to get this wrapped up like this.

4    And that is not going to occur here.  Reality -- I just want to

5    bring a sense of reality into all of this.

6          And I go back to my opening statement, Your Honor.

7    There are four elements that need to be proved here.  And most

8    of what I just said goes to element number one, success on the

9    merits.  I haven't heard anything discussed as to why J&J and

10   its other nine debtor affiliates get a channeling injunction or

11   why they get a third party release, whatever it ends up being.

12         And I go to the fourth element which is the public

13   interest.  And the public interest is in not allowing opinions

14   of the Third Circuit Court of Appeals to be ignored in this

15   fashion.  To be twisted and turned around in this fashion.  And

16   it is not in holding up people who have not been able to go

17   forward with their claims in the meantime.

18         The details on the claims I've left up to the

19   Committee and plaintiff's counsel that are here to discuss.

20   But the public interest is not allowing J&J to keep them again

21   from their day in court.  Thank you, Your Honor.

22         THE COURT:  Thank you, Ms. Richenderfer.  So you can

23   come up, whoever is next.  It is 6:36.  I am telling you all

24   now, and adjust your arguments accordingly, I am adjourning at

25   7:30.  I owe it to my staff for their health and their safety.

1 Let's get it done.

2       MR. BIRCHFIELD:  Good evening, Your Honor.  Andy

3 Birchfield, Beasley Allen.  I know it's late in the day and I

4 appreciate you giving us this opportunity to be heard.  J&J

5 began the day, LTL began the day denigrating me personally in

6 their opening, and my law firm.  And they ended their day in

7 their closing denigrating me personally and my law firm.  Why?

8 To what end?  What relevance does that have to this proceeding?

9       I think there we may have evidence of true

10 frustration of purpose.  It's not me.  It's not me.  There is a

11 committed team, a leadership team of a large member of lawyers

12 and we have held together and we have held firm.  And because

13 we have held together and we have held firm that frustrates

14 J&J's purpose of using the bankruptcy process to coerce

15 plaintiffs to accept deeply discounted values.

16       And as part of the presentation you were given some

17 quotes from my deposition.  Part of those, a significant

18 portion of that dealt with a proposed agreement, a proposal, a

19 draft proposal from September of 2020.  And it was suggested

20 that that proposal was for all ovarian cancer claimants for

21 3.25 billion.  I don't know what relevance, or I don't know

22 where 408 is here.  But you will have the deposition and you

23 will have the agreement.  And I'm going to --

24       I urge you, Your Honor, look at the agreement.  See

25 if the total payments under that agreement are 3.25 or 5.5

1  billion.  I urge you to review that agreement and see if that

2  is for ovarian cancer claimants only or does it include

3  mesothelioma claimants, does it include A.G. claimants.  It

4  does not.  It is ovarian cancer claimants only.

5        Look at that agreement.  See if it is not a voluntary

6  opt-in proposal for a private QSF outside of bankruptcy.  Only

7  a portion would have been involved in the Emerest and a

8  contribution into the Emerest bankruptcy.  Look at that

9  agreement, see if it was accurately portrayed to Your Honor

10 here.

11        I also want you to remember, Your Honor, and I know

12 you do, from the first proceeding you had an enormous amount of

13 time that was spent on the spike, the huge spike in new claims.

14 There was a tremendous amount of time spent on.  So what is the

15 difference, what is the difference in the number of claims

16 pending in September of 2020 and what is pending today.  So

17 when every proposal, our leadership team on behalf of the

18 ovarian cancer claimants, we have been committed, we have been

19 committed from day one and we have held together and we have

20 encouraged all the lawyers, all the lawyers across the country

21 to hold together, to hold together in insisting that J&J pay

22 reasonable values for their claimants.

23        There is a big difference in the number of claims

24 that would have been, current claims that would have been

25 existed in 2020 and what there are today.

1            THE COURT:  What is the difference?  We started with

2  38,000 in the MDL, 3,000 in the State and four or 500 meso

3  claims.  And now if, just by 40,000 are opposed and 60,000,

4  we're at 100,000 or more.  Why in a year and a half?

5            MR. BIRCHFIELD:  Because there is a difference

6  between filed claims and claims that may be valid claims that

7  are in lawyer's offices.  So since LTL filed its bankruptcy

8  there could be no new claims.  But law firms, they are

9  following the process.

10            What they would do, they would get a client to come

11  into their office, they would begin to investigation that claim

12  and they would look at the statute of limitations.  When is the

13  statute of limitations?  They would gather medical records and

14  they would evaluate that claim and determine whether or not

15  that claim should be filed or not.

16            And so all of that was put on hold in October of 2021

17  when J&J filed bankruptcy.  And so there could be no new filed

18  claims.  But claimants who have used baby powder for years or

19  decades were still getting ovarian cancer claims.  So those

20  claims are still coming into lawyer's offices.  They're still

21  being evaluated.  Their medical records should still be

22  gathered on those claims, but they're not filed.

23            THE COURT:  But then shouldn't the Court take that

24  into account for potential liabilities?  And when we go back to

25  financial distress, that in a year and a half we've had 100

1  percent increase in claims?

2        MR. BIRCHFIELD:  I mean, yes, Your Honor, I think you

3  should take that into consideration.  It does not rise to the

4  level of putting J&J in financial distress.  It doesn't.  There

5  are a significant --

6        THE COURT:  Not J&J --

7        MR. BIRCHFIELD:  LTL.  LTL in the position of

8  financial distress.  Are there claims?  Yes.  There are claims.

9  Will there be more claims in the future?  Yes.  Does it rise to

10 the level, have they offered a showing that that rises to the

11 level of financial distress?  It does not.

12        And Your Honor, I think one of the things that J&J,

13 LTL's presentation, because you had both today, one of the

14 things that it does show, I mean, they say that there is no

15 threat in the tort system, we're only facing 11 trials per

16 year.  So that's why it's going to take claimants thousands of

17 years to be heard.  And so there is no threat.

18        If that were the case, they made a significant

19 presentation about how the mass tort system has failed

20 plaintiffs.  Your Honor, they're urging the Court to weigh in

21 on that policy, the policy matter of mass tort settlements in

22 bankruptcy court versus MDLs.  The mass tort MDL system has

23 worked, it does work.  If --

24        THE COURT:  Right.  And for today's purposes I'm not

25 -- This isn't a motion to dismiss --

1              MR. BIRCHFIELD:  Yes, Your Honor.

2              THE COURT:  -- in its current form.

3              MR. BIRCHFIELD:  So one of the things -- I mean,

4      another issue, another issue here is what they're saying, if

5      you look at, if you take their argument, if you take their

6      argument then we would not have had a tobacco settlement.  The

7      initial claims, if a company has the wherewithal to avoid

8      paying through settlements or taking verdicts and through

9      appeal, if they can avoid a global settlement for 10 years then

10     case over.  They are entitled to bankruptcy.

11             Tobacco, the tobacco cases, you are talking decades

12     where the tobacco companies were resisting that, resisting any

13     liability.  They were taking the same position that J&J is

14     taking here.  No liability.  But yet they ended up in a $200

15     billion settlement.  So the mass tort system works.

16             I must address the issue of the losing streak.  You

17     have that.  You have losing streaks, you have winning streaks

18     in virtually every mass tort.  I mean, in the Vioxx litigation

19     you had a couple of wins, you had a significant number of

20     losses.  No claimant was paid.  No claimants were paid for

21     nearly seven or eight years, until there was a global

22     settlement paid.

23             It would be the equivalent here.  Except J&J is

24     stopping short and they're saying cut us out of the tort

25     system, give us a steeply discounted settlement for the

1 claimants here.  And I urge you not to do that.

2   Ms. Brown showed this list of wins and how those were

3 vacated.  J&J got the benefit.  They got the benefit of a

4 Supreme Court decision in BMS that vacated those verdicts,

5 significant verdicts.  Verdicts of 72 million, 110 million.

6   THE COURT:  For jurisdiction.

7   MR. BIRCHFIELD:  On personal jurisdictional grounds.

8 Not the merits.  And those cases are re-filed and pending

9 today.  J&J, and she pointed out that J&J was on a winning

10 streak.  They were winning those last few cases.  J&J engaged

11 in highly aggressive out of bounds trial tactics.  Tactics that

12 ended up with criminal contempt charges against J&J and its

13 medical officer and a guilty plea.  That is not a sustainable

14 method of litigation.  That's why we are here in the

15 bankruptcy.  That's why they're asking for the preliminary

16 injunction.

17   And Your Honor, I want to turn to one last point.

18 And that is to respond to J&J's position, why not just let the

19 claimants vote.  And they're going to be, and my colleagues are

20 going to address, you can't vote because this is not a

21 legitimate bankruptcy.

22   THE COURT:  We'll they'll get to it once you sit

23 down.

24   MR. BIRCHFIELD:  Yes, yes.  So I'm not going to touch

25 that.

1          THE COURT:  You're going to get notes soon.

2          MR. BIRCHFIELD:  But here's what the other, here's

3     what I want to address.  One of the things that is clear, one

4     of the things that is clear is J&J's effort here to stuff the

5     ballot box.  All of our proposals, you look at the proposal

6     that they submit in my deposition, it is for ovarian cancer

7     cases that are supported by the science that Judge Wolfson

8     adopted in her <u>Daubert</u> decision.  Here they are expanding that

9     to a lot of other claims that are not included.  It's an effort

10    to stuff the ballot box.  They should not be granted that

11    delay.  Thank you, Your Honor.

12         THE COURT:  Fair enough.  Thank you, Mr. Birchfield.

13    Mr. Satterley.

14         MR. SATTERLEY:  May it please the Court, Joe

15    Satterley, Kazan McClain Satterley and Greenwood.  I don't have

16    150 slides like the debtor's counsel.  I promise I have zero

17    slides.  I'm only going to be a few minutes.  On behalf of

18    Anthony Valadez I would request Your Honor to lift the stay so

19    we can proceed to trial.  I'm not going to respond to all the

20    attacks on him or me.  I'll get back to the balance of interest

21    in just a few minutes.

22         From my perspective, she had a slide that said I had

23    13 cases.  I don't know if that's true.  I don't know if I have

24    14, 15, 20, 30.  All I know is from my perspective this is a

25    manufactured cram-down to protect J&J's reputation.  That's all

1  it is.  In the first trial, which I was here for every single

2  day, they tried this as a tort reform.  They had slides of

3  advertising, lawyer advertising, how much they spend.  And one

4  of the slides was Mr. Onder's slide.  And they tried to say

5  Your Honor, you could fix this system.

6        And Your Honor wrote an opinion on February 25th,

7  refusing to grant the motion to dismiss.  And in March, on

8  March the 19th Mr. Watts signed up his first talc case.  I saw

9  him on March the 30th here in this courthouse 11 days later.  I

10  didn't know he signed up his first case 11 days beforehand.

11  But the record, we took his deposition and he admitted he

12  didn't get involved in trying to collect cases until after Your

13  Honor denied the motion to dismiss.

14        And then from March 19th of 2022 until the day before

15  yesterday, because he said he signed up his last talc case the

16  day before yesterday, he signed up 16,925 cases of which 500

17  are meso.  Now, I've been handling mesothelioma victims,

18  clients for 26, 27 years, actually as a paralegal for 30 years

19  beforehand.  There's only 2,500 mesos a year.  It's virtually

20  impossible for him to have signed up 500 mesotheliomas.

21        And when we asked have you obtained the medical

22  records, have you obtained and confirmed the pathology?  We've

23  ordered them.  We got good people that's going to look through

24  them.  We're going to analyze them.  And Mr. Block asked, can

25  you even say there's 1,000 confirmed cases?  We got people who

1  are looking at them.

2           So what's happening here, Your Honor, is after the

3  Third Circuit reversed Your Honor's decision on January 3rd,

4  Mr. Watts on February the 26th, and this is in the record

5  yesterday, emailed Mr. Murdica and said here's a template for

6  what I did before on February 26th, almost 26 days later.  And

7  from February the 26th there's not any additional written

8  negotiations.  There's not any response emails that have been

9  produced.  I asked counsel and they say they did everything

10 orally.

11          And so what do we have here?  As the U.S. Trustee

12 said, this is not a plan.  This term sheet, when I asked Mr.

13 Watts about the mesothelioma, I said did you negotiate this?

14 No, I didn't have anything to do with it.  Who wrote it?  Mr.

15 Murdica.  Well, you know how much Mr. Valadez would be entitled

16 to under this plan that Mr. Murdica wrote and there was no

17 negotiations whatsoever between J&J, LTL and anybody?  Mr.

18 Valadez would be entitled to $50,000 under this plan.  $50,000.

19          So I would say to Your Honor that this is a

20 manufacturing attempt to cram-down.  They have said today that

21 Mr. Murdica has been involved for 20 or 30 years negotiating

22 cases and settling cases.  They're free to settle with anybody

23 they want at any point in time.

24          But what they're not free to do is to do a cram-down

25 to force people that want their day in court, to have their day

in court under the constitution.  And that's just not permitted.  None of the negotiations that Mr. Murdica has done in the last 20 or 30 years and end it with a channeling injunction what they're seeking out today.

Now let me just turn -- I have a lot of other notes but we've got other people who want to talk.  Let me just turn to Mr. Valadez.  The Valadez case, you know, counsel showed some pictures from Facebook.  I've never been on Mr. Valadez' Facebook page.  I didn't even know he had a Facebook page.  I assume they got them off his Facebook page, I assume they're accurate.  I have no idea.

But it doesn't seem surprising to me that someone like Mr. Valadez, who's been suffering with this disease for over a year, in a wheelchair and had his trial yanked from him by an improper bankruptcy, that maybe -- And also probably the PR, the press release where $8.9 billion is going to be given, he probably had to answer questions from friends.  Oh, are you going to get money?  I have no idea.  I know I had to answer questions from clients and colleagues about this.

And so it doesn't surprise me at all that there might be something about financial issues with this.  But this isn't a settlement.  And it isn't about J&J saying it's all good.

THE COURT:  Mr. Satterley, let me ask you a question, if I may.

MR. SATTERLEY:  Yes.

1          THE COURT:  On Mr. Valadez' case.

2          MR. SATTERLEY:  Yes.

3          THE COURT:  In your view, what remains to be

4     undertaken?

5          MR. SATTERLEY:  We were prepared to be ready for

6     trial within eight days of the TRO being entered on the 5th of

7     --

8          THE COURT:  You showed me lists of depositions that

9     had to be taken.  Do they still have to be taken?  I'm trying

10    to get a handle --

11         MR. SATTERLEY:  Sure.

12         THE COURT:  -- objectively on what remains.

13         MR. SATTERLEY:   Sure, sure.  And I was going to

14    request, Your Honor, probably eight to 10 days.  Maybe a little

15    bit longer depending upon the expert witness's schedule.  Quite

16    frankly, Judge Seabolt was doing a great job managing the

17    docket every single week.  And he's prepared to resume again

18    tomorrow morning.  Tomorrow at three o'clock.  Tomorrow at

19    three o'clock we have, which is six o'clock eastern time, we're

20    scheduled to have another case management conference where I

21    tell him what Your Honor says to do or not to do.

22         So, Your Honor, I think that we got derailed by the

23    bankruptcy, the unexpected bankruptcy.  But we can get back on

24    track in a very quick time frame, whether it be 10 days, two

25    weeks.  And Judge Seabolt is, you know, he practiced for 43

1   years before he went on the bench and I'm sure he can manage

2   this case.  All the other things that they raised last time and

3   today about Valadez, they're jury questions.  They're jury

4   questions.

5          They got a great defense.  They took a picture, the

6   back of a picture and went on the internet and found some --

7   the photograph was only on certain years.  As I said before,

8   they're basically calling five people liars.  That's a jury

9   question.  If they're so confident that they're going to win

10  this case, let's go do it.

11         The bottom line, the balancing of interest, and I'm

12  going to end with this.  I'm going to end with two things.  The

13  balancing of interest and the irreparable harm I can't imagine

14  they would be more dramatic.  Because on the one hand you have

15  somebody dying and living the last few days of their life.  And

16  the other side of the balancing is we may have to pay lawyer

17  fees some money to go defend this case and potentially get a

18  defense verdict if they're really that good.  If the evidence

19  is really on their side.

20         That's the balancing.  There's no disruption.  The

21  only disruption they're concerned about, to be candid, which

22  the Third Circuit said you can't consider, is protecting their

23  reputation.

24         The last point I'll make, Your Honor, and I've got a

25  lot of other notes but I know a lot of folks want to say, is

1  Mr. Kim said today oh, it's double, we got enormous, enormous.

2  There's no real evidence of that.  Unfiled, unverified,

3  unknowns is not doubling on the back of an envelope.  It's not

4  enormous liability.  Don't fall for those arguments, because I

5  think -- I just don't think it's right under law.

6        You know, a long time ago somebody told me when the

7  law is not on your side argue the facts.  When the facts are

8  not on your side, you know, attack the plaintiff's counsel.

9  When the plaintiff's counsel is not necessarily a bad guy,

10  attack the plaintiff.  Well, that's what's happening here.

11        The law is not on their side, the facts are not on

12  their side, they attack me and say somehow I'm doing -- my

13  trials are too long because we go half days four days a week.

14  Or I take too many depositions because I'm a zealous advocate.

15  And now when they can't attack me because I'm genuinely a

16  pretty nice guy, they're going to attack Mr. Valadez.  You

17  know, I urge Your Honor to not grant the preliminary injunction

18  for all my clients.  But specifically to lift the stay and

19  allow the Valadez case to proceed.  Thank you, Your Honor.

20        THE COURT:  All right.  Thank you, Mr. Satterley.

21        MR. MAIMON:  Your Honor, while Ms. Davis Jones is

22  coming up to the podium, I just wanted to let the Court know

23  I've done a little bit of a head count here just so you have an

24  idea that myself, Mr. Thompson, Mr. Placitella, Mr. Simon, Ms.

25  Johnson, Ms. Davis Jones obviously, and Ms. Parfitt all would

1  like to be heard.

2          THE COURT:  Divided by 35 minutes.  And you could do

3  the math as easy as I can.

4          MR. MAIMON:  Two minutes.

5          THE COURT:  Thank you.  Ms. Jones.

6          MS. JONES:  Good evening, Your Honor.  Laura Davis

7  Jones on behalf of Arnold and Itkin.  Your Honor, I'm

8  representing thousands of ovarian cancer claimants.

9          Your Honor, we filed an opposition to the motion for

10  preliminary injunction on Sunday, and I trust Your Honor has

11  reviewed that opposition and I won't repeat it.  Your Honor, I

12  would like to highlight two points that are made in our papers.

13  And with the support of the evidence today, we submit that this

14  motion should be denied.

15          Your Honor, as has been said a couple times, this is

16  a manufactured situation.  It's a Chapter 11 designed attempt

17  to overrun and sidestep the rulings of the Third Circuit.  By

18  the P.I. motion the debtor is asking for equitable relief,

19  relief that should be denied since the debtors have unclean

20  hands and cannot establish a reasonable likelihood of a

21  successful reorganization.

22          As to unclean hands, Your Honor, the debtor's actions

23  in manufacturing the financial distress the Third Circuit found

24  lacking in the first LTL qualifies as unconscionable.  This is

25  especially so when the debtor now seeks to use the financial

1 distress those actions created as a pretext for a new Chapter

2 11 case that enables it to seek broad equitable relief against

3 the very talc claimants that were harmed by their actions.

4          The actions of the debtor J&J, in creating the

5 faceless debtor's new financial distress are directly related

6 to the requested preliminary injunction.  But for those

7 actions, this Chapter 11 case could not have been filed.

8 Without a Chapter 11 case there would be no basis for any

9 equity relief that is sought in this motion.

10          The talc claimants would be free to pursue or settle

11 their claims against the debtor J&J and other protected

12 parties.  Without the improper conduct to create financial

13 stress, the debtor could not have sought such an injunction.

14 The Court should bar such relief under the Unclean Hands

15 Doctrine.

16          Your Honor, as to my second point, the debtor cannot

17 establish a reasonable likelihood of a successful

18 reorganization if the debtor and J&J require a plan with a

19 channeling injunction that includes all of the "protected

20 parties" and "debtor talc claims".  Such an injunction would be

21 beyond the permissible scope of a channeling injunction under

22 524(g)(4) of the Code.

23          Under the plain language of 524(g)(4) neither

24 retailers nor indemnified parties are among the parties for

25 whom can favor a channeling injunction may be issued under

1  Section 524(g)(4).  Neither a party's status as a retailer nor

2  a party's status as an indemnified party qualifies the party

3  for inclusion in any of the four categories of the statutorily

4  defined relationships set forth in Sections 1 through 4 of

5  Section 524(g)(4)(ii) so as to qualify claims against that

6  party for inclusion in a third party channeling injunction.

7  The fact that such parties may have contractual indemnification

8  rights against the debtor does not change that result.

9        Your Honor, we would, given the lateness of the hour,

10  I'd ask Your Honor to look closely at the opposition that we've

11  put before the Court.  We've spent only two pages describing

12  the Grace case which was mentioned earlier by Mr. Gordon.  But

13  I was debtor's counsel in Grace all the way up since 2001.  And

14  his recitation of what happened in Grace is not exactly on

15  point.  Your Honor, we spent some time, as I said, a couple

16  pages in our opposition that I'd ask you to look at.

17        Your Honor, the proposed injunction goes well beyond

18  the stridency of 524(g).  And Combustion Engineering instructs

19  us that 105 cannot be used to expand the injunction.  Your

20  Honor, as I heard counsel discuss their debt presentations, and

21  I think Mr. Jonas said this too, all I could think of Your

22  Honor, is here we go with the end justifies the means.  That,

23  Your Honor, is not the law of this Circuit and indeed has not

24  been sanctioned by the Third Circuit.  Precedent is critical

25  and instructive and controlling.

1          Your Honor, the same is true whether there's one

2     claimant complaining about this.  There were comments made

3     earlier that there's only 100 people complaining, or 15 people

4     complaining, what have you.  I'm standing here with thousands

5     of ovarian cancer claimants.  But that issue aside, Your Honor,

6     the issue is the same whether it's one or thousands of us.  We

7     found that argument, Your Honor, to be ridiculous and frankly

8     offensive.  And Your Honor, we'd ask that the motion for

9     preliminary injunction be denied.  Thank you, Your Honor.

10          THE COURT:  Thank you, Ms. Jones.  Mr. Placitella.

11          MR. PLACITELLA:  If I'm more than two minutes, you

12    give me the hook, Your Honor.

13          THE COURT:  Your colleagues will do that.  Go ahead.

14          MR. PLACITELLA:  Janssen and Kenvue are not protected

15    parties under this Court's TRO and there's no basis in law or

16    fact to enjoin plaintiffs from proceeding against them,

17    including Mr. Burgeron (phonetic).  They asked in the middle of

18    the night, they submitted a pleading sticking Janssen and

19    Kenvue with a pleading with no facts whatsoever.  And I asked

20    Mr. Kim, why did you do it?  He said it was a knee jerk

21    reaction.  You filed a lawsuit, we figured we could go to Judge

22    Kaplan, he'd fix it for us.

23          But there has been no proof today.  I asked Mr. Kim,

24    what do you know about Kenvue?  Nothing.  What do you know

25    about Janssen?  Nothing.  So they have not satisfied their

1  burden of proof to impose an injunction as it relates to those

2  parties.   LTL has no -- There was no issue about shared

3  insurance, indemnity claims, all these things that they're

4  talking about.   LTL has no standing to make arguments about

5  Kenvue or Janssen.   There's nothing to support jurisdiction

6  respectfully of this Court concerning those claims.

7         And whether Janssen and Kenvue are responsible to Mr.

8  Burgeron who's dying of cancer with two minor children is

9  something for the trial Court to determine under law of the

10 State of New Jersey.   And if J&J or LTL or whoever -- Forget

11 it.   They have nothing to say about it.   If Kenvue or Janssen

12 think that's wrong, they can go to the appellate courts.   But

13 that's a matter of State law, it's not a matter for this Court.

14 Thank you very much for hearing me.

15         THE COURT:   Thank you, Mr. Placitella.

16         MR. SIMON:   Good evening, Your Honor.   My name is

17 Jeffrey Simon and I filed a pro hac yesterday.   May I be heard

18 with a few brief remarks?

19         THE COURT:   Absolutely.

20         MR. SIMON:   Thank you.   As I said, my name is Jeffrey

21 Simon.   I'm losing my voice, but I'm with the law firm of Simon

22 Greenstone Panatier and we are a firm that specializes in mass

23 tort litigation and particularly mesothelioma litigation.   I

24 personally have been trying mesothelioma cases for over 30

25 years.   Our firm has tried many talc related mesothelioma

1 cases, including several against Johnson & Johnson and I

2 personally have tried several myself.

3        Our firm represents hundreds of people with

4 mesothelioma who would have claims against Johnson & Johnson in

5 the tort system if given the opportunity to pursue them.  And

6 we object, join in the objections which have been heard.  And I

7 would note that we are among over 40 firms that filed formal

8 objections to the relief that the debtor and the non-debtor

9 parent seek.

10       I'm going to talk fast.  I have a somewhat unique

11 perspective and Your Honor will decide if it's meaningful or

12 not.  I'm a professor of mass tort litigation at SNU Law School

13 and I teach about your opinion from March 4th, 2022.  And I

14 teach about the Third Circuit opinion regarding it.  And I read

15 your opinion many times.  And when I read it I --

16       THE COURT:  When can I be a guest lecturer?

17       MR. SIMON:  You can.  You can.  I agreed with a lot

18 of where you described the complexities of coming up with

19 resolution methodologies in mass tort litigation that are fair

20 and equitable to all the parties, and the struggles that

21 various types of Courts have had over the years to apply them.

22 You know, the only area where I respectfully departed from your

23 conclusion was how then we should reason our way through the

24 issues that were before you.  So be it.

25       Having said that, the Third Circuit opinion set forth

1 some core truths that really were no different than your

2 reasoning.  It was just some difference in how they chose to

3 apply them.  And I'd like to just comment on two.  One of them

4 at page 40 was Congress designed Chapter 11 to give those

5 businesses teetering on the verge of a fatal financial plummet

6 an opportunity to reorganize on solid ground and try again.

7 Not to give profitable enterprises an opportunity to evade

8 contractual or other liability.

9        Respectfully, LTL is not teetering on the verge of a

10 fatal financial plummet.  I don't even think they're contending

11 that they are.  And J&J is not either.  And because that is

12 true, because LTL has never paid a dollar in the tort system in

13 terms of a settlement or a judgment, what is before us now is

14 the kind of distortion of Chapter 11 that I believe the Third

15 Circuit said let's not countenance that.  We're not here for

16 that.

17        They have terrific lawyers and they make impassioned

18 arguments about how the mass tort system is broken.  But

19 bankruptcy courts are courts of limited jurisdiction and it is

20 not their job to resolve those kinds of policy questions about

21 the pros and cons of the mass tort litigation system.

22        And I would make the point that it is now self

23 evident, it is not even in dispute that Johnson & Johnson is

24 extremely adept and astute in resolving mass torts in the tort

25 system.  Mr. Kim said it is standard practice.  He testified

1 that Mr. Murdica has assisted him in the resolution of 20, 30,

2 40 mass torts in the system.  They know how to do this and

3 they're free to do so, which says too much about why only this

4 one for which they seek bankruptcy protection.

5        Having said that, at the end of the day Your Honor

6 knows what issues to balance and you've heard them.  And I

7 don't want to be presumptuous or repetitive.  But I would take

8 Your Honor back to some observations you made in your March

9 4th, 2022 opinion which were dead-on.  Which is that history

10 has taught us in mass tort litigation that resolution by forced

11 proxy is usually the least equitable and least effective.

12 That's what we saw when we tried the class action structures.

13 Not me personally, but Amchem Products and Ortiz.

14        What works is informed free choice of each claimant

15 to decide based on counsel whether or not to move forward with

16 their claim in the tort system, risk dismissal on motion,

17 settle, or attempt to try their case to verdict.  And

18 bankruptcy courts are not set up to circumvent that system,

19 which is what they're trying to do here.

20        With that, unless you have any questions, which I bet

21 you don't, thank you for your time and consideration of my

22 remarks.

23        THE COURT:  Thank you, counsel.  Appreciate it.  Mr.

24 Maimon.

25        MR. MAIMON:  Thank you, Your Honor.  May it please

1   the Court.  I'd like to start off by answering a question that

2   Your Honor put to Mr. Jonas.  And it reminds me of the song

3   that our grand kids sing, a billions here, billions there,

4   billions everywhere.  How is that not financial distress?  Your

5   Honor asked that question.  And I'll answer that question

6   straight on from a legal perspective, because Your Honor is not

7   sitting here as a CPA, as a financial advisor.  Your Honor is

8   sitting here as a jurist.

9       The same record that existed in LTL 1 exists in LTL 2

10   with regard to the debtor.  But the Circuit said no, they're

11   not in financial distress.  The billions that were there

12   before, billions in claims are here again.  That they're here

13   now and the Circuit said no financial distress.  And that was

14   assuming what Kim admitted was a floor of $61.5 billion.

15       And that is why, at page 55 of the Circuit Court's

16   opinion it said what if time shows with the progression of

17   litigation outside of bankruptcy that cash available under the

18   funding agreement cannot adequately address talc liability.

19   Perhaps at that time LTL could show it belonged in bankruptcy.

20   That was the context of the footnote that the Circuit dropped

21   about them getting rid of the funding agreement.

22       But they said there's going to be litigation and

23   we're going to see what happens.  They circumvented it and they

24   completely threw it out.  The proof of financial stability and

25   no financial distress is from Mr. Kim's own words where he

 1  said, "we have sufficient funds to meet the liability."  There

 2  can be no financial distress according to the Circuit's

 3  reasoning if they have sufficient funds to meet the liability.

 4      And so they must advance the ridiculous notion that

 5  the Circuit got it wrong but we've made -- And that they could

 6  never have reasonably anticipated it.  But if you look at the

 7  appellate briefs that were filed on behalf of the appellants,

 8  the appellants raised this very issue.  That by virtue of the

 9  $61.5 billion funding agreement there is no financial distress.

10      And so with only the hubris and conceit that a half

11  trillion dollar company can have, they thumb their nose and

12  they say no one could have expected that Judge Ambro and his

13  panel mates would have been so stupid to accept such an

14  argument.  That is if not so outrageous, it would be laughable.

15      The frauds here, the 51, $61.5 billion that was there

16  to justify the Texas two-step has now gone and it crumbles of

17  its own accord.  Mr. Gordon said that it was provided to

18  facilitate bankruptcy.  No.  According to Mr. Kim in his sworn

19  testimony, it was provided to save the Texas two-step from a

20  claim of fraudulent transfer.  The termination of the funding

21  agreement for absolutely zero value in exchange is a fraud.

22  And as the U.S. Attorney's Office pointed out today, the

23  disgorgement by Holdco of the consumer business is likewise.

24      You can't create financial distress through fraud and

25  there is none here.  And so what does that bring us to?  That

1  brings us to the diversions for which they have no answer.  The

2  billions of dollars that Your Honor asked about perhaps the

3  third party payers are there.  But they're not considered to be

4  somebody who's going to get money through their plan.  The

5  billions of dollars for the indemnity claims that the U.S.

6  Attorney confirmed is a claim against J&J.  That's not there.

7  That's the illusory sensational headline of $8.9 billion.

8         Not only that.  The false claims that J&J has made

9  about claimant support is also a diversion.  And I'll answer

10  your question, Your Honor.  Should you take into account new

11  claims?  If there were evidence of new claims perhaps the Court

12  could take it into account.  But all the Court has in front of

13  it are lists of names.  Lists of names where the attorneys who

14  represent them have admitted under oath that they haven't even

15  looked at those people's medical records to see if they

16  actually have the diseases that they called on the phone about.

17         Mr. Kim says no, no, no, no, no, we have commitments

18  from lawyers that their clients will follow their

19  recommendations.  He says, we take the representation that

20  claimants will follow the recommendations and will come with

21  us.  The lawyer's commitments that the clients would support

22  the plan.  Contrast that, Your Honor, with Mr. Watts' --

23         THE COURT:  He's not here.  I wish he were.

24         MR. MAIMON:  -- assurances that he follows the

25  ethical rules.  He follows the bankruptcy rule, that there's no

330

1 claimant support at this point in time.  There is none.

2 Because to get it would be a violation of the anti solicitation

3 rule.  He said it's not my job, it's not my role, it's not my

4 right to give consent.  That's a client's right.  He said he

5 did not even send the term sheet to the clients because that

6 would be improper.

7      And so there's nothing for these clients and these

8 claimants to support.  He said it's the obligation of the

9 lawyer to account for a client's unique situation, particular

10 objective and interest in making settlement decisions.  And he

11 said to fatally doom the diversion here.  That is why this is a

12 proposal.  This is not an agreement to settle.  There is no

13 claimant support, and he said it.

14      He was honest and said I can't tell you what the

15 analysis of the medical records for my clients has said.  I

16 don't know.  I know that I have listed 500 mesotheliomas, but I

17 can't tell you if any of them have a confirming pathology

18 report.

19      How could Your Honor take that into account, a list

20 of names?  Mr. Birchfield doesn't have a list of names.  We

21 don't have lists of names.  That's not something that the Court

22 should take into account.  And Mr. Kim's suggestion, Mr. Kim's

23 suggestion that the claimants have committed and the lawyers

24 have committed their clients to vote in favor of the plan would

25 be unethical.  It would be unethical.  And yet he says we do it

1  time and time again.

2       I don't know if J&J really does it time and time

3  again, because I believe Mr. Watts that he never does it

4  because it's unethical.  But doing something time and time

5  again doesn't make it right.  And therefore they say the best

6  argument we have, Your Honor, the best argument we have is Jim

7  Murdica trusts these firms.  He believes that the clients will

8  follow them and he believes that over 50 percent of the filed

9  claims will go along with it.

10      Shorthand, we know we've got their support because

11  these lawyers have come through for us in the past.  That

12  cannot be a basis for this Court's opinion that Jim Murdica

13  trusts somebody, or Jim Murdica believes somebody.  That would

14  be, with all due respect, an abdication of this Court's role to

15  put everyone at the mercy of what Jim Murdica trusts and

16  believes.

17      Mr. Watts, according to J&J this was said.  Mr. Watts

18  testified at his deposition that according to J&J this was a

19  one-time opportunity and they will not settle outside of

20  bankruptcy.  So I understand Mr. Watts and I sympathize with

21  the position that he's put in.  That if his clients want

22  compensation instead of waiting, they should be able to do

23  that.  I agree.  We agree.  But we do not agree that they

24  should be able to do that by depriving other claimants of their

25  Seventh Amendment rights.  But that is exactly the threat that

1   Johnson & Johnson makes and it should not be countenanced.

2        Because right now all of our claimants, all claimants

3   are being held captive in this court by a TRO and a preliminary

4   injunction.  Somebody whose claim is being held captive may

5   feel that they are under duress to accept anything that's

6   offered and not risk, maybe I get out, maybe I don't.  But the

7   threat to lawyers that we will not settle your cases unless you

8   support our efforts to deny others their jury rights should not

9   be countenanced by this Court.

10        The last point that I have, Your Honor, and I

11  appreciate the opportunity.  The excuse that it's only a small

12  minority of people who oppose this, the small minority excuse.

13  This is not only in the name of, words of my colleague,

14  unacceptable, this is abhorrent.  The excuse that it's been,

15  that the use of this excuse to abuse minority rights in the

16  past has been an abhorrence that our country and our Court

17  should not countenance.  How many does it take to make it

18  wrong?  Does it take 13, does it take 100, does it take 1,000?

19  How many does it take to make it wrong?

20        The Third Circuit started and ended the following

21  way.  We start and stay with good faith.  Good intentions such

22  as to protect the J&J brand or comprehensively resolve

23  litigation do not suffice alone.  What counts to access the

24  bankruptcy code safe harbor is to meet its intended purposes.

25  Only a punitive debtor in financial distress can do it.  LTL

1  was not.  That's why they dismissed.

2         In Your Honor's words, in Your Honor's words at the

3  first day hearing, the world is watching.  We have every

4  confidence that Your Honor will do the right thing.  Thank you,

5  Your Honor.

6         THE COURT:  Thank you, counsel.

7         MS. PARFITT:  Your Honor, good evening and thank you

8  for the opportunity to speak.  Your Honor, I haven't had a

9  chance to be before you up until now, but my name is Michelle

10 Parfitt and I co-lead the multi district litigation along with

11 Leigh O'Dell.

12        I've listened today and I've listened for the last 18

13 months and I do have a few remarks.  And if you will indulge

14 me.  And I'm trying to be very conscientious of the needs of my

15 other colleagues.

16        Your Honor, when I heard Ms. Brown say that the tort

17 system is broken, it has failed, the tort system has not

18 failed.  It has been a system of justice that has been embraced

19 by both sides of the table.  It has been a system of justice

20 that has worked for centuries.  It is a system of justice that

21 provides choices, rights, and liberties.  One has to ask why,

22 why does LTL seek to retreat to the bankruptcy system?

23        They have a system of justice that they have

24 embraced, but here today in this case they retreat to the

25 bankruptcy system.  To say it's perverse, is perverse the fact

1  that the Honorable Judge Wolfson for the last seven years

2  governed the multi-district litigation and put attorneys to

3  task to prove the case, to prove the science before we were

4  able to embark on a liability of the case we were to prove the

5  science of the case.  Not a check box on a bankruptcy form, but

6  to prove what diseases are related to what exposures.

7      And Judge Wolfson, after a very lengthy <u>Daubert</u>

8  proceeding, and after years of preparing for that determined

9  that there were certain cancers, certain epithelial ovarian

10 cancers that could be caused by and were caused by exposure to

11 talcum powder.  Not uterine cancer, not vaginal cancer, not

12 cervical cancer, not categorically gynecological cancers, but

13 ovarian cancers.

14     What they seek to do is to come into the bankruptcy

15 court, keep our clients there, provide them with a checklist of

16 broad ranges of mesothelioma, asbestos exposure, broad ranges

17 of gynecological cancers.  You asked Mr. Birchfield why the

18 increase of cases?  You know why there's an increase of cases,

19 Your Honor, at 60, 70,000?  Ask what kinds of cancers are

20 those?  Is it a grab bag or are they cancers that are proved by

21 the science?  Perverse, the word perverse is used.  What's

22 perverse is for a half trillion dollar corporation to retreat

23 to the bankruptcy system claiming the need for refuge and

24 protection for their company.

25     Dishonestly, that was used too.  Dishonest people,

1   dishonest claimants.  What's dishonest is to sell and

2   manufacture to consumers around the world a product that

3   contained asbestos and they knew was not safe for 100 more

4   years.  That's dishonest.

5         Time.  Your Honor, our claimants don't have time.

6   J&J has all the time in the world.  They can spend five years

7   working through the different formulas and time lines for a

8   bankruptcy system.  Our clients have spoken.  We are their

9   voices.  They have said give us at least the right, the choice

10   to go into a tort system.  At least give us the right to speak.

11   Don't force us into a system we never asked to be in.  For

12   those that choose, that's a good right, that is their choice.

13   For those that believe the tort system can be fair.

14         If J&J believes what they say, that they want to give

15   our claimants fair and reasonable compensation, you can do that

16   in a tort system.  You can do it in a trial, outside of a

17   trial, in a resolution or not.  You don't need to cram the

18   people into a bankruptcy system under a false premise that you

19   are insolvent or that you have financial distress.

20         THE COURT:  All right, counsel.

21         MS. PARFITT:  Thank you.

22         THE COURT:  Thank you.

23         MS. JOHNSON:  Good evening, Your Honor.  Ericka

24   Johnson from Womble Bond Dickinson on behalf of the Ad Hoc

25   Committee of State Attorney Generals.  I rise just to raise a

1  discrete issue with respect to the likelihood of success.

2         Your Honor has heard it's premised on a plan that's

3  to be formed and drafted consistent with the term sheet that

4  was admitted to evidence today.  You've also heard Your Honor

5  that that term sheet was negotiated by J&J on the one hand and

6  primarily one plaintiff attorney on the other hand.  They came

7  up with a number for total talc liability.  It's unclear what

8  the basis for that number was.

9         They also allocated that amount for claimants that

10  weren't part of the negotiation, including the amount that's to

11  be allocated for government claims.  Again, it's unclear what

12  the basis was for that allocation.  And I didn't want our

13  silence throughout today or debtor's arguments to suggest that

14  there is an agreement with respect to the amount other parties

15  have allocated to the government claims.  There's no agreement

16  that the $400 million that's allocated for all government

17  claims is sufficient.

18         Your Honor keeps hearing that there's a resolution.

19  But as Your Honor knows, settlement requires a meeting of the

20  minds.  The states weren't consulted in negotiating the term

21  sheet, they haven't agreed that the debtor's liability for all

22  government claims is capped at $400 million.  I also want to

23  note Your Honor, that contrary to debtor's assertion that they

24  can come and develop a plan, confirm a plan in short order is

25  just not close to reality.

1          First of all, that plan has to be drafted.  But it

2    also can't be solicited if it's unconfirmable.  And as Your

3    Honor knows that you can't provide for a dissenting class with

4    materially different treatment, especially when a company, as

5    they assert, is solvent.  And under that term sheet, that's

6    what's proposed here.

7          It would be materially different treatment likely for

8    the government claims, which constitutes unfair discrimination,

9    and such a plan cannot be confirmed.  Thank you, Your Honor.

10          THE COURT:  All right, thank you.  I think, you have

11    a minute and a half.  Give it your best shot.

12          MR. RUCKDESCHEL:  Well, Your Honor, I'm going to

13    defer to Mr. Thompson and I ask the Court's -- Give him it's

14    indulgence.

15          THE COURT:  I can't --

16          MR. RUCKDESCHEL:  This is a $10 billion case at a

17    minimum and I would like to be heard.

18          THE COURT:  Counsel, the Court's been very indulgent

19    and I owe it to my employees and the staff here.  I'm sorry.

20          MR. RUCKDESCHEL:  Your Honor, if LTL 1 from the Third

21    Circuit stands for anything, it's that Your Honor cannot fill

22    in evidentiary gaps in the proof submitted by the defendant, by

23    the debtor here.  The debtor has the burden to show that they

24    are in imminent financial distress such that they need the

25    relief of the Code.  They have failed.

1              You have to take their testimony at its word.  You

2    can't fill it in.  What have they admitted?  They admitted

3    they're not insolvent, they can pay their liabilities as they

4    come due.  They have not estimated their aggregate liability so

5    they can't say we've got too much debt and not enough assets.

6    The CFO admitted to me in deposition in this case two days ago

7    that they've done no analysis of how much it would take to fund

8    their liability in the tort system for the next year, the next

9    three years or at any time.

10             There is no estimate or evidence before this Court

11   that they are unable to fund the stream of payments required to

12   be in the tort system.  I asked the CFO specifically and he

13   said there's no such analysis that he's aware of.  Nobody has

14   done it.  And he's the CFO.  There's not a shred of evidence

15   before this Court that they can't meet their liabilities as

16   they come due.  In fact, the testimony is contrary to that.

17   And what LTL 1 says is you can't go beyond the record and fill

18   that in yourself.

19             And so the last thing I'll say, because I know you're

20   trying to get done.  And I have more things and I wish I could

21   say them all, is Your Honor last week suggested that you were

22   inclined to potentially continue some sort of injunction for a

23   brief period of time.  That would be an abuse of discretion.

24   Johnson & Johnson cannot obtain permanent relief.  It can't buy

25   its way into permanent relief, it's definitely not distressed

1  itself.  New Jersey law prevents the indemnity contract that it

2  bases related to jurisdiction on.

3      They admit that the shared insurance doesn't really

4  exist, or it's highly contingent at best.  They can't get

5  permanent relief and they can't get temporary relief because of

6  it.  And In Re Piccadilly Circus, In Re Marsh which are both

7  cited in the papers I filed for Mr. Crouch, specifically deal

8  with this.

9      In In Re Marsh they found it an abuse of discretion

10 to delay for 60 days the imposition of the jurisdictional

11 ruling that there wasn't a jurisdictional basis to hold the

12 case so that the debtor could more orderly liquidate.  And

13 Piccadilly Circus says the prospect of a successful resolution

14 cannot override the jurisdictional concerns.  You cannot say

15 there will be a settlement and we'll come back and say that

16 it's okay to be here now.  It's not okay to be here now.

17     The debtor is praying on Your Honor's belief in the

18 bankruptcy system which is a good thing for a bankruptcy judge

19 to have.  It's a good thing.  And I applaud Your Honor for the

20 thoughtful, I disagreed with, but 50 page decisions that you

21 entered in LTL 1, the analysis that was done and for certifying

22 the issue to the Third Circuit.  The Third Circuit said the

23 record is not there.

24     And when I asked John Kim in deposition before this

25 hearing, what's the evidence of financial distress of LTL that

1 you have today, he said it's the same as I testified to before

2 and that His Honor found before.  And I clarified, this is at

3 page 205 and 206 of his deposition.  I said, you're saying the

4 bankruptcy Court's findings.  He said, that's right.  And those

5 are findings that the Circuit Court found were not supported by

6 the evidence.  You can't fill in their case for them.  They

7 didn't submit evidence and they can't, because if they

8 submitted that evidence they'd be admitting fraud.  Thank you,

9 Your Honor.

10          THE COURT:  Thank you.

11          MR. THOMPSON:  I have one sentence.

12          THE COURT:  One sentence I can fit.

13          MR. THOMPSON:  All of the arguments that they made

14 today are policy arguments and they're the kind of arguments

15 that you make when the law is not on your side and the Third

16 Circuit did not just kibosh your whole scheme.  This Court does

17 not have subject matter jurisdiction.  The Third Circuit said

18 so.  Start and stay with good faith.  They are not in good

19 faith.  I'm not yelling at you, Judge.  Thank you for hearing

20 me.

21          THE COURT:  No, I understand.  All right, folks.

22 Thank you very much.  Long day.  I'm not giving a ruling right

23 now.  I understand what's going on in California.  I will give

24 a ruling, I will read a ruling into the record probably a

25 condensed version Thursday at, I don't know, we'll call it

1  noon, high noon.  All right?  We'll set up a Zoom.

2          MR. SATTERLEY:  Can I just ask for Judge Seabolt's --

3  So there's not going to be anything on Valadez tomorrow at all.

4  That will be Thursday.

5          THE COURT:  Correct.  Move the conference to Thursday

6  afternoon.

7          MR. SATTERLEY:  Okay.  Yes, Your Honor.

8          MR. MOLTON:  Judge, can I make, just for the purpose

9  of going forward.

10          THE COURT:  Yes.

11          MR. MOLTON:  You haven't heard from me today except

12  for the fact that, as you predicted, I protected my client's

13  attorney/client privilege and my deposition was short.  But I

14  guess that's why they did it, they wanted to use it for that

15  purpose.

16          In any event, we intend to file.  David Molton, by

17  the way, for the proposed counsel for the Talc Claimants

18  Committee.  We propose, we are intending to file and

19  contemplate filing a motion to dismiss.  Nothing surprising in

20  that.  Hopefully by the end of this week we'll be talking with

21  Jones Day about scheduling and looking forward to getting that

22  on your calendar in accordance with the Bankruptcy Rules within

23  the time frame as required.  Thank you, Judge.

24          THE COURT:  Understood.  Thank you.

25          MR. GORDON:  Your Honor, I'm sorry, there's one other

1  loose end quickly.

2          THE COURT:  Yes.

3          MR. GORDON:  We talked about finalizing the rest of

4  the record, so we've got to get that to you before Thursday.

5  So we'll work on that.  We still have to get to you the

6  exhibits and the deposition designations because you should

7  have the full record --

8          THE COURT:  See what you could do.  That's why I'm --

9  That's why I pushed it to Thursday.

10          MR. GORDON:  Okay.  We appreciate it, Your Honor.

11          THE COURT:  All right.  Thank you all.  Get home

12  safely, or wherever you're going.

13          ATTORNEY:  Everybody clean up your --

14          THE COURT:  Yes.  And this isn't Yankee Stadium.

15                          * * * * *

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

We, DIPTI PATEL, TRACEY WILLIAMS, KAREN WATSON, LIESL SPRINGER and TRACY GRIBBEN, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.

/s/ Dipti Patel
DIPTI PATEL

/s/ Tracey Williams
TRACEY WILLIAMS

/s/ Karen Watson
KAREN WATSON

/s/ Liesl Springer
LIESL SPRINGER

/s/ Tracy Gribben
TRACY GRIBBEN

J&J COURT TRANSCRIBERS, INC.      DATE:  April 20, 2023