```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF NEW JERSEY

IN RE:                         .    Case No. 21-30589(MBK)
                               .
LTL MANAGEMENT LLC,            .
                               .
           Debtor.             .
 . . . . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,           .    Adversary No. 21-03032(MBK)
                               .
           Plaintiff,          .
                               .    Clarkson S. Fisher U.S.
v.                             .      Courthouse
                               .    402 East State Street
THOSE PARTIES LISTED ON        .    Trenton, NJ 08608
APPENDIX A TO THE              .
COMPLAINT, ET AL.,             .
                               .    Friday, February 18, 2022
           Defendants.         .    9:01 a.m.
 . . . . . . . . . . . . . . .

                   TRANSCRIPT OF TRIAL DAY FIVE
                BEFORE THE HONORABLE MICHAEL B. KAPLAN
                 UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

For the Debtor:          Jones Day
                         By:  GREGORY M. GORDON, ESQ.
                              DANIEL B. PRIETO, ESQ.
                              AMANDA RUSH, ESQ.
                         2727 North Harwood Street, Suite 500
                         Dallas, TX 75201

                         Jones Day
                         By:  ROBERT W. HAMILTON, ESQ.
                         325 John H. McConnell Blvd., Suite 600
                         Columbus, Ohio  43215-2673


Audio Operator:          Wendy Romero

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

─────────────────────────────────────────────────────────────

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For the Debtor:          Jones Day
                         By: DAVID S. TORBORG, ESQ.
                         51 Louisiana Avenue, N.W.
                         Washington, D.C.  20001-2113

                         Jones Day
                         By: CAITLIN K. CAHOW, ESQ.
                         77 West Wacker, Suite 3500
                         Chicago, IL  60601-1692

                         Skadden, Arps, Slate, Meagher &
                           Flom LLP and Affiliates
                         By: ALLISON M. BROWN, ESQ.
                         One Manhattan West
                         New York, NY  10001-8602

                         Otterbourg P.C.
                         By: MELANIE L. CYGANOWSKI, ESQ.
                             ADAM C. SILVERSTEIN, ESQ.
                         230 Park Avenue
                         New York, NY 10169-0075

For the Official         Brown Rudnik, LLP
Committee of Talc        By: JEFF JONAS, ESQ.
Claimants 1:                 MICHAEL WINOGRAD, ESQ.
                         7 Times Square
                         New York, NY 10036

                         Genova Burns, LLC
                         BY: DANIEL M. STOLZ, ESQ.
                         110 Allen Road, Suite 304
                         Basking Ridge, NJ 07920

                         Bailey & Glasser, LLP
                         By: BRIAN GLASSER, ESQ.
                         105 Thomas Jefferson Street NW
                         Suite 540
                         Washington, DC 20007

For the Official         Sherman Silverstein
Committee of Talc        By: ARTHUR ABRAMOWITZ, ESQ.
Claimants 2:             East Gate Corporate Center
                         308 Harper Drive, Suite 200
                         Moorestown, NJ 08057

3

```
APPEARANCES (Cont'd):

For the Official         Cooley LLP
Committee of Talc        By:  IAN SHAPIRO, ESQ.
Claimants 2:             55 Hudson Yards
                         New York, NY 10001

                         Cooley LLP
                         By:  SHAMIS BECKLEY, ESQ.
                         500 Boylston Street, 14th Floor
                         Boston, MA  02116-3736

                         Cooley LLP
                         By:  MATTHEW KUTCHER, ESQ.
                         444 W. Lake Street, Suite 1700
                         Chicago, IL  60606

For Johnson & Johnson:   White & Case LLP
                         By:  JESSICA LAURIA, ESQ.
                         1221 Avenue of the America
                         New York, NY  10020

                         Lowenstein Sandler
                         By:  KENNETH ROSEN, ESQ.
                         One Lowenstein Drive
                         Roseland, NJ 07068

                         Johnson & Johnson
                         By:  ERIK HAAS, ESQ.
                              ANDREW WHITE, ESQ.
                         1 Johnson & Johnson Plaza
                         New Brunswick, New Jersey, 08933

For the U.S. Trustee:    U.S. Department of Justice
                         By:  LAUREN BIELSKIE, ESQ.
                              LINDA RICHENDERFER, ESQ.
                              JEFFREY M. SPONDER, ESQ.
                         One Newark Center, Suite 2100
                         Newark, NJ  07102

For Arnold & Itkin, LLP: Pachulski Stang Ziehl Young & Jones,
                           PC
                         By:  LAURA DAVIS JONES, ESQ.
                         919 Market Street
                         16th Floor, PO Box 8705
                         Wilmington, DE 19899
```

**WWW.JJCOURT.COM**

4

```
APPEARANCES (Cont'd):

For DeSanto Canadian        Lite DePalma Greenberg & Afanador,
Class Action Plaintiffs:      LLC
                            By:  ALLEN JOSEPH UNDERWOOD, II, ESQ.
                            570 Broad Street, Suite 1201
                            Newark, NJ 07102

For Aylstock, Witkin,       Klee, Tuchin, Bogdanoff & Stern, LLP
Kreiss & Overholtz,         By:  ROBERT J. PFISTER, ESQ.
PLLC:                       1801 Century Park East, 26th Floor
                            Los Angeles, CA 90067

                  * * * * *
```

**WWW.JJCOURT.COM**

1  movants' own experts on this point.  Again, Mr. Burian, the LTL
2  transaction's a single pre-planned integrated transaction
3  comprised of five related interdependent steps.  He said it
4  again, it's a single transaction and the debtor was created for
5  one purpose, bankruptcy.
6           And, again, Mr. Diaz, the defined term he used to
7  cover both the restructuring and the bankruptcy was "integrated
8  transaction series."  And, in fact, he went on to say ignoring
9  JJCI's financial distress is the purposely -- or purposefully
10 misapprehend the facts that led to this bankruptcy proceeding.
11 You would be misapprehending the facts, ignoring the facts.
12 It's interesting, notwithstanding that, he did not analysis of
13 -- he did not focus on Old JJCI.  He focused on J&J because
14 that's what the movants asked him to do.
15          And Mr. Burian, just to go on, basically said, well,
16 not only does his report basically contradict what you're
17 hearing from the movants that Old JJCI is irrelevant, he spent
18 17 slides in his report on the issue of whether Old JJCI was in
19 financial distress.  And, of course, if you look at this
20 adjusted income chart that he used, this is the chart that
21 makes very plain that he ignored talc litigation costs.  So you
22 look at 2020 and 2021, he has the adjusted income going up and
23 he has it going up because he hasn't accounted for any of the
24 talc litigation costs.  That's how he got there.
25          So I think Your Honor's pretty well aware the basics

1  of the corporate restructuring.  At this point, this is just a
2  depiction of it that we put together before.  The one thing I
3  would note, of course, is, you know, the funding agreement here
4  is different from all the other cases in the sense that it
5  includes also a Johnson & Johnson, the ultimate parent,
6  agreeing to obligate itself to the extent of the value of Old
7  JJCI.  So you have basically two sources of asset availability
8  to LTL.

9            So Mr. Molton yesterday, again, used the phrase BadCo
10 that LTL is a BadCo.  Otherwise, I think until that, the
11 movants were pretty careful in not using that term.  I mean you
12 saw that Mr. Diaz referred to it as I think a talc powder
13 company or something like that.  But here we know that it
14 actually does, aside from the funding agreement or in addition
15 to the funding agreement, it has significant assets.

16           And, of course, it came into this court with an
17 agreement from J&J and New JJCI to -- for them to advance under
18 the funding agreement $2 billion to be deposited in a QSF.
19 And, of course, we've put that off.  You know, we filed a
20 motion to have Your Honor approve that.  We put that off at the
21 request of the other side.

22           But, again, you heard in the testimony I think from
23 Mr. Kim that that was done to show the good faith.  And I think
24 Mr. Wuesthoff said the same thing, to show the good faith here
25 that we're serious, that we're willing to put up a lot of money

1  as a start here just to not even have to argue about this issue
2  of whether there's undercapitalization or unfairness or harm.
3  We just wanted to be past that issue. We want to get to the
4  guts of this case, which is to negotiate an agreement on a
5  resolution of the talc claims.
6  Now the funding agreement, I want to spend a little
7  time on this because it's obviously extremely important to
8  understanding what the situation is. But, again, you have two
9  payors here. You have not only JJCI, but you have J&J. And
10 part of the reason for that, Your Honor, is that in the other
11 cases, we heard complaints about, w ell, but we're worried that
12 the entity, the obligor, the payor in those cases is going to
13 be dividending assets away -- dividending assets up to the
14 parent. At the end of the day, we're going to be left with an
15 empty bag.
16 And, you know, we try to learn from the other cases.
17 And so we thought let's take that issue off the table. We'll
18 actually have an obligation from the ultimate parent. So that
19 was based on learning that we had received from the North
20 Carolina cases, and frankly, you know, we've been criticized
21 greatly for forum shopping and filing in North Carolina. But
22 part of the thinking was that we have a jurisdiction that's
23 actually confronted some of these issues. We tried to learn
24 from those issue and actually address some of those issues in
25 how things were designed in connection with the restructuring.

1            Also, I should just point out because of all the time
2   that was spent trying to suggest some nefarious connection
3   between the corporate restructuring and the spinoff, the fact
4   that J&J is now including as a payor or isn't included as a
5   payor in this funding agreement should eliminate any concern
6   about that because it doesn't matter.  If assets are spun out,
7   if that actually occurs, a transaction like that occurs,
8   there's full protection because J&J is sitting there with an
9   obligation to pay up to the value of Old JJCI.
10           And what's important, unlike the other cases, this
11  funding agreement sets the floor on the value.  It sets a
12  floor.  So whatever the value was basically the day because the
13  restructuring, that value is locked in.  So it can only go up.
14  It can't go down.  That's unlike other cases where it's
15  potentially the payor based on developments with its business
16  operations or what have you, you know, could suffer some
17  diminution in value.  That can't happen here.
18           There's another reason for doing this, again, to try
19  to eliminate some of the objections and concerns that we heard
20  with respect to the earlier funding agreements.
21           THE COURT:  Mr. Gordon, you said value of Old JJCI.
22  It's the value of New JJCI, is it not, under the funding
23  agreement?
24           MR. GORDON:  Well, no, it's the value of Old JJCI.
25  Actually, whatever that -- I hope I'm getting this right.  It's

1  whatever that value was basically at the time that the
2  restructuring occurred.  Let me just -- maybe my nomenclature's
3  off.
4              THE COURT:  I thought it's the 60 billion cap --
5              MR. GORDON:  Correct.  It's the value of Old JJCI.
6              THE COURT:  Right.
7              MR. GORDON:  But Mr. Prieto pointed out excluding the
8  talc liability.  So it's the value whatever it was on the day
9  before excluding the talc liability.  That's the whole idea
10 with these funding agreements.  It's to basically to be able to
11 say to the Court, to say to the parties, look, you haven't been
12 hurt because the entity that was standing behind or the value
13 of assets that were effectively standing behind the liability
14 or were available to pay the liability, that value is fully
15 preserved through that funding agreement.  So what that was is
16 fully preserved.
17             The only difference is is that instead of having the
18 company there, you have a funding agreement that provides
19 direct right to those assets through this funding agreement.
20             THE COURT:  All right.
21             MR. GORDON:  Did I answer your question, Your Honor?
22             THE COURT:  Yeah.  I guess I have to take a look
23 back.  I thought the language of the funding agreement, it
24 references the value of New JJCI.  And I've seen it stated
25 differently --

1          MR. GORDON:  Yeah.

2          THE COURT:  -- in different briefs.

3          MR. GORDON:  Yeah.  I think what you're referring --
4    and these are good questions, Your Honor.  This is complicated,
5    so I appreciate your asking me.  I think what you're referring
6    to is the fact that, again, we tried to make clear in this
7    funding agreement that if the value of New JJCI actually goes
8    up post the transaction, then the value under the funding
9    agreement also goes up.

10         And that goes to my point about it sets a floor based
11   on the value of what Old JJCI was in the moment in time before
12   this transaction minus or excluding the talc costs.  And then
13   if that value goes up, the estate would get the benefit of that
14   value, as well.

15         THE COURT:  Okay.  Thank you.

16         MR. GORDON:  And I just wanted to point out also in
17   this slide, and I think Your Honor's probably seen there's
18   literally no conditions or any material conditions on the
19   permitted funding uses under this document.  I'll come back to
20   this.

21         So I did want to focus on permitted funding use
22   because the other side I think has fashioned a new argument
23   that we hadn't heard before with respect to the funding
24   agreement.  So there's basically two different scenarios where
25   funding is available.

1             The first is funding in the tort system.  And as you
2  would expect, what that funding says is that the payors are
3  obligated to pay the liabilities to the extent they're
4  established by a judgement or a settlement in the tort system.
5  That's what you would expect and that's what happens.  You want
6  funds available to pay settlements, to pay judgments in the
7  tort system.  So it makes very clear this is what we're talking
8  about if there's no proceeding in bankruptcy.  Whether there
9  was no case filed or whether the case is filed or dismissed,
10 the money's available for that purpose.

11            And you can imagine, Your Honor, by the way, the hue
12 and cry you would have heard if this provision weren't in there
13 because they would have said that we've manipulated the whole
14 system because you filed bankruptcy and now you're going to
15 tell the Court you can't dismiss our case because there's no
16 money available if we go back in the tort system.

17            So this is there to protect the claimants.  It's
18 there to assure this isn't treated or consider a fraudulent
19 conveyance.  The idea was and the intent was the claimants are
20 covered either way in bankruptcy or outside.

21            Now where the criticism I think has been focused is
22 on this provision.  And this talks about how the funding is
23 used if a bankruptcy case is commenced.  And what it talks
24 about is if the payors are obligated to pay the liabilities in
25 connection with the funding of one or more trusts for the

Case 23-12825-MBK    Doc 286-12    Filed 04/24/23    Entered 04/24/23 12:06:09    Desc
Exhibit 10    Page 12 of 12

62
1  benefit of claimants created pursuant to a plan that's
2  confirmed by a final non-appealable order of the bankruptcy
3  court and, to the extent required, the district court.
4              And all that -- you know, the other side has said
5  that puts the claimants in a worse position. It puts a variety
6  of limitations and conditions on the funding. It's not fair.
7  It doesn't exist in the tort system. And I would say to that,
8  Your Honor, all this does is recognize the way the rules and
9  the law work in bankruptcy. The idea is that if you have a
10 bankruptcy case, the intent is to ultimately reach a plan or
11 reorganization and then you want the funding available to fund
12 the trust. This is what has happened in every asbestos case,
13 Your Honor. This is where these cases end up.
14             And you heard some hypotheticals. I think Mr. Diaz
15 said, well, what if the stay were lifted -- if the stay is
16 lifted and somebody's allowed to go back and collect a
17 judgment, the money wouldn't be available. That's technically
18 correct, but we wouldn't expect that to happen in a bankruptcy
19 case.
20             The way I think about it is in these mass tort cases,
21 you either have a bankruptcy case or you don't. And if you
22 don't have a bankruptcy case, then you have the money available
23 to you to pay the judgments and the settlements in the tort
24 system. And if you do have a bankruptcy case, it's available
25 for when you need it which is in connection with a plan.