## AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated October 12, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is by and among JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation ("JJCI"), and LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL").

## RECITALS

A.    On the date hereof, but prior to the execution of this Agreement, in contemplation of the divisional merger (the "Divisional Merger") of Chenango Zero LLC, a Texas limited liability company ("Chenango"), pursuant to Chapter 10 of the Texas Business Organizations Code, J&J and Currahee Holding Company Inc., a New Jersey corporation ("Currahee"), as payors, and Chenango, as payee, executed and delivered a funding agreement dated as of October 12, 2021 (the "Original Funding Agreement").

B.    Immediately following the execution and delivery of the Original Funding Agreement, Currahee, in its capacity as the sole member of Chenango approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

C.    At the effective time of the Divisional Merger, (1) certain property of Chenango as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of Chenango as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("Chenango One"), (2) the remaining property, liabilities and obligations of Chenango were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("Chenango Two"), and (3) Chenango ceased to exist.

D.    Pursuant to the Original Funding Agreement, J&J and Currahee agreed, on a joint and several basis, to provide funding to Chenango sufficient to pay the costs of operations of Chenango's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

E.    The Allocated Assets and Liabilities included the rights and obligations of Chenango under the Original Funding Agreement and, at the effective time of the Divisional Merger, pursuant to the terms of the Plan of Divisional Merger, the rights and obligations of Chenango under the Original Funding Agreement were allocated to Chenango One such that, following the effectiveness of the Divisional Merger, Chenango One had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities.

F.    Following the Divisional Merger, (1) Chenango One effected a conversion (the "NC Conversion") into a North Carolina limited liability company and changed its name to "LTL Management LLC" and (2) Chenango Two effected a merger (the "TX-to-NJ Merger") with and into Currahee, which changed its name to "Johnson & Johnson Consumer Inc."

**LTL 0002300**

G.     Payors and Payee desire to amend and restate the Original Funding Agreement to reflect that the Divisional Merger, the NC Conversion and the TX-to-NJ Merger have occurred and that JJCI, now a New Jersey corporation having the name "Johnson & Johnson Consumer Inc.," and Payee, now a North Carolina limited liability company having the name "LTL Management LLC," are the parties to such agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"<u>Board</u>" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

2

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Chenango" has the meaning specified in recitals to this Agreement.

"Chenango One" has the meaning specified in the recitals to this Agreement.

"Chenango Two" has the meaning specified in the recitals to this Agreement.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Currahee" has the meaning specified in first paragraph of this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payors from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

LTL 0002302

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"J&J" has the meaning specified in first paragraph of this Agreement.

"JJCI" has the meaning specified in first paragraph of this Agreement.

"JJCI Value" means the greater of:

(a)   the fair market value of the businesses and other assets (including equity interests) held by Chenango, as determined (i) immediately prior to the effective time of the Divisional Merger, (ii) assuming the Allocated Assets and Liabilities are not held by Chenango, and (iii) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

(b)   the sum of:

(i)   the fair market value of the businesses and other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI, as determined (A) as of the applicable calculation date, (B) assuming neither Chenango Two nor, after the TX-to-NJ Merger, JJCI has any obligations under this Agreement, and (C) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

(ii)   the fair market value of any businesses or other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI that, following the effective time of the Divisional Merger and prior to the applicable calculation date, are distributed by Chenango Two or, after the TX-to-NJ Merger, JJCI to its members, as determined (A) at the time of such distribution and (B) based on the aggregate amount that would be received upon a sale of such businesses or other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length,

4

under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses or other assets.

"LTL" has the meaning specified in the first paragraph of this Agreement.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" means LTL Management LLC, a North Carolina limited liability company.

"Payee Affiliate" means any controlled Affiliate of the Payee.

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payors under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor Affiliate" means any Affiliate of a Payor, excluding the Payee and any Payee Affiliate.

"Payor Material Adverse Effect" means with respect to a Payor: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of such Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of such Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against such Payor.

"Payors" means J&J and JJCI.

"Permitted Funding Use" means each of the following:

(a)     the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time

5

LTL 0002304

when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b)    the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c)    the funding of any amounts to satisfy:

(i)    the Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(ii)    following the commencement of any Bankruptcy Case, the Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payors will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy Code and regardless of whether the Payors support such plan of reorganization); and

(iii)    in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

(d)    the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e)    the funding of any obligations of the Payee owed to any Payor or Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f)    the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payors, or either of them, of any provision of this Agreement;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Talc Related Liabilities in connection with the funding of such trust or trusts.

LTL 0002305

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Talc Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"TX-to-NJ Merger" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.    Funding Obligations and Procedures.

(a)    Funding Obligations.  The Payors hereby agree, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for a Permitted Funding Use. Nothing in this Agreement shall obligate the Payors to (i) make Payments under this Agreement that in the aggregate exceed the lesser of (A) the JJCI Value and (B) the aggregate amount of all Permitted Funding Uses or (ii) make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.  The JJCI Value shall be calculated at, and only at, any date on which (x) the Payors refuse to make a requested Payment under this Agreement based on clause (i) of the immediately preceding sentence and (y) the Payments made by the Payors under this Agreement prior to such date, together with the requested Payment, are in the aggregate not in excess of the aggregate amount of all Permitted Funding Uses.

(b)    Funding Requests.  To request a Payment, the Payee shall deliver to the Payors a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payors and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

7

(c)    _Payments_.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payors shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payors do not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate _plus_ 2% until such Payment is made and the Payors shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)    _Conditions to Payments_.  The Payors' obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment:  (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.    _Representations and Warranties_.

(a)    _Representations and Warranties of the Payor_.  Each Payor represents and warrants to the Payee that:

(i)    _Existence, Qualification and Power_.  Such Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

(ii)    _Authorization; No Contravention_.  The execution, delivery and performance by such Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

LTL 0002307

(iii)    Governmental Authorization; Other Consents.    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, such Payor.

(iv)    Binding Effect.    This Agreement has been duly executed and delivered by such Payor.  This Agreement constitutes a legal, valid and binding obligation of such Payor, enforceable against such Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)    Representations and Warranties of the Payee.  The Payee represents and warrants to the Payors that:

(i)    Existence, Qualification and Power.    The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)    Authorization; No Contravention.    The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    Governmental Authorization; Other Consents.    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

9

LTL 0002308

(iv)    Binding Effect. This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    Covenants of the Payors.

(a)    Provision of Financial Information.

(i)    No later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), (A) J&J will furnish to the Payee audited annual and unaudited quarterly consolidated financial statements of J&J prepared in accordance with GAAP, subject, with respect to quarterly financial statements, normal year-end audit adjustments, and (B) Currahee will furnish to the Payee unaudited annual and quarterly income statements and balance sheets of Currahee prepared in accordance with GAAP and Currahee's historical cost basis of its subsidiaries, subject to the absence of notes to the financial statements and related disclosures and, with respect to quarterly financial statements, normal year-end adjustments.

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify such Payor promptly thereof); *provided*, *however*, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)    Notwithstanding the foregoing, but subject to the last sentence of this Section 4(a)(iii), the financial information required to be furnished as described in Section 4(a)(i) may be, rather than that of a Payor, those of any direct or indirect parent of such Payor.  Notwithstanding the foregoing, a Payor may fulfill the requirement to furnish such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  Subject to the last sentence of this Section 4(a)(iii), a Payor will be deemed to have satisfied the requirements of Section 4(a)(i) if any direct or indirect parent of such Payor has filed such reports containing the required information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of a Payor furnishes financial information pursuant to the first sentence of this Section 4(a)(iii) or such parent files a report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of such Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent, on the one

LTL 0002309

hand, and the information relating to such Payor and its Subsidiaries on a standalone basis, on the other hand.

        (b)      <u>Successor to J&J upon Consolidation or Merger</u>.

        (i)      Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of J&J with or into any Person, or successive consolidations or mergers in which J&J or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J), to any Person; *provided, however*, that J&J hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than J&J, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of J&J's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by J&J, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which J&J shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to (A) a merger of J&J with an Affiliate thereof solely for the purpose of reincorporating J&J in another jurisdiction within the United States, (B) any conversion of J&J from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of J&J from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among J&J and its Subsidiaries.

        (ii)      Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with J&J or into which J&J is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to J&J, including as a Payor, shall refer instead to the successor Person and not to J&J), and may exercise every right and power of, J&J, including as a Payor, under this Agreement with the same effect as if such successor Person had been named herein.  In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

        (iii)      Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted

LTL 0002310

under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.     <u>Covenants of the Payee</u>. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6.     <u>Events of Default</u>.   Each of the following events constitutes an "<u>Event of Default</u>":

(a)     the Payors default in the funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b)     a Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of such Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to such Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     a Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)     a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against a Payor, (ii) appoints a custodian of a Payor for all or substantially all of the property of a Payor, or (iii) orders the liquidation of a Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, a Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.     <u>Remedies</u>.   Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

LTL 0002311

8.    <u>Notices</u>.    All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

<u>Payors</u>:

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Michelle Ryan, Treasurer
Email:  mryan1@its.jnj.com

Johnson & Johnson Consumer Inc.
199 Grandview Road
Skillman, NJ 08558
Attention:  Michelle Goodridge, President
Email:  mgoodrid@its.jnj.com

<u>Payee</u>:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwhuestho@its.jnj.com

with a copy to:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

9.    <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  Each Payor and the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

13

10.    <u>No Implied Waiver; Amendments</u>.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payors, or either of them, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payors, or either of them, in any case shall entitle the Payors, or either of them, to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payors and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.    <u>Counterparts; Entire Agreement; Electronic Execution</u>.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.    <u>Severability</u>.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.    <u>Transfer; Assignment</u>.  This Agreement shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  A Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *<u>provided, however</u>*, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with <u>Section 4(b)</u>.  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payors.  Any purported assignment of rights or obligations under this Agreement other than as permitted by this <u>Section 13</u> shall be null and void.

LTL 0002313

14.     <u>Construction</u>.   The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.     <u>Rights of Parties</u>.   This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

16.     <u>Joint and Several Obligations</u>.   Obligations of the Payors under this Agreement are joint and several.

*[Signature Page Follows]*

LTL 0002314

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

    Michelle Ryan,
    Treasurer


**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

    Michelle Goodridge,
    President


**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

    Robert Wuesthoff,
    President


*[Signature Page to A&R Funding Agreement]*

LTL 0002315

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

    Michelle Ryan,
    Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: *Michelle N Goodridge*

    Michelle Goodridge,
    President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

    Robert Wuesthoff,
    President

*[Signature Page to A&R Funding Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

      Michelle Ryan,
      Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

      Michelle Goodridge,
      President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

      Robert Wuesthoff,
      President

*[Signature Page to A&R Funding Agreement]*

LTL 0002317

## SCHEDULE 1

### Definition of Talc Related Liabilities

For purposes of this Agreement, "Talc Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of talc, including talc contained in any product, with asbestos or any other material.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)    "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)    "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)    "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)    "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)    "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss

of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)     "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

LTL 0002319

## SCHEDULE 2

### Funding Account

LTL Management LLC
Account Number:  237025463987
ABA/Routing Number:  053000196
Swift: BOFAUS3N

**LTL 0002320**