# **EXHIBIT 3**

```
              IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF NEW JERSEY

IN RE:                             .    Case No. 23-12825(MBK)
                                   .
LTL MANAGEMENT LLC,                .
                                   .    U.S. Courthouse
             Debtor.               .    402 East State Street
                                   .    Trenton, NJ 08608
. . . . . . . . . . . . . . . . .  .
                                   .
LTL MANAGEMENT LLC,                .    Adv. No. 23-01092(MBK)
                                   .
          Plaintiff,               .
                                   .
     v.                            .
                                   .
THOSE PARTIES LISTED ON            .
APPENDIX A TO COMPLAINT AND        .
JOHN AND JANE DOES 1-1000,         .
                                   .
          Defendants.              .    Tuesday, April 18, 2023
. . . . . . . . . . . . . . . . .  .    10:00 a.m.
```

                    TRANSCRIPT OF HEARING ON
   MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
  HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
 AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
 ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
     THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
   PROCEDURE 4001(a)(3) [DOCKET 71]; AND DEBTOR'S MOTION FOR AN
  ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
    TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
       ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
  RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
     INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
                      SERVICE PROCEDURES MOTION
               **BEFORE THE HONORABLE MICHAEL B. KAPLAN
               UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                         Kiya Martin

Proceedings recorded by electronic sound recording, transcript
                 produced by transcription service.
_____

                   **J&J COURT TRANSCRIBERS, INC.
                        268 Evergreen Avenue
                     Hamilton, New Jersey 08619
                    E-mail:  jjcourt@jjcourt.com

                (609) 586-2311    Fax No. (609) 587-3599**

Case 23-12825-MBK    Doc 280-5    Filed 04/28/23    Entered 04/28/23 10:00:09    Desc
Exhibit 3 to Johnson Declaration    Page 3 of 12
Exhibit 2    Page 77 of 343

Kim - Cross/Jonas                                                                    77

1  clients had the benefit of a $60 million funding agreement, the
2  first funding agreement, right?
3  A    At that time, yes.
4  Q    And today, maybe, maybe, I guess if they vote in favor of
5  a plan, they'd have the benefit of funding agreement two which
6  I'm not sure what you said, I think you said $30 billion of
7  value.  Is that right?
8  A    It is.  But then you're missing out that there's a plan
9  proposal on the table that a substantial number of claimants
10 have approved, which would be $8.9 billion, which is fully
11 funded under the funding agreement.
12 Q    Okay.  So that's my client.  Now let's just make sure I
13 got the J&J piece right.  J&J was liable for up to $60 billion
14 under funding agreement one, right?
15 A    Again, J&J, without any obligation, put that in in order
16 to enhance the prospects of a bankruptcy.  So that was why it
17 got put in.  At some point, it becomes void or voidable because
18 the Third Circuit decision.  And then they again committed
19 without having to, to an $8.9 billion support agreement in
20 order to facilitate a resolution.
21 Q    Just to wrap up, today, J&J's maximum liability is $8.9
22 billion, right?
23 A    Under the support agreements that it has.
24 Q    So with -- because of the Third Circuit's decision, J&J
25 got off the hook for $50 billion of talc liability?

Kim - Cross/Jonas                                                    78

1  A    Again, it did not get off the hook.  The hook -- the
2  agreement itself, the first funding agreement was not required
3  by J&J.  And as the Third Circuit noted, it put in that
4  guarantee in order to facilitate a resolution of bankruptcy.
5       Once the -- ironically, I think it was the Third Circuit
6  said the very -- the very provision that was supposed to help
7  it in bankruptcy actually turned into a provision that
8  prevented the bankruptcy, causing that guarantee to be void or
9  voidable.
10      And after that, as a resolution to try to resolve all this
11 talc claims in bankruptcy, J&J again committed $8.9 billion
12 which was part of the PSA, part of the plan that was negotiated
13 to try to resolve all the litigation.  And that's what
14 happened.
15           MR. JONAS:  Your Honor, could we have a short break?
16           THE COURT:  Sure.  Let's see.  It's ten to 12.  My
17 plan is to go to 1:00, take a half-hour lunch.  Why don't we
18 come back in ten minutes?
19           MR. JONAS:  Thank you, Your Honor.
20         (Recess at 11:52 a.m./Reconvene at 12:06 p.m.)
21           THE COURT:  Okay.
22 BY MR. JONAS:
23 Q    Mr. Kim, on what date did the old funding agreement become
24 inoperative and the new funding agreement become operative?
25 A    I think the date of the termination agreement.

Case 23-12825-MBK    Doc 280-5    Filed 04/28/23    Entered 04/28/23 10:00:09    Desc
Exhibit 3 to Johnson Declaration    Page 5 of 12
Exhibit 2    Page 79 of 343

Kim - Cross/Jonas                                                    79

1  Q    Which is what?
2  A    It became effective right after the case, the bankruptcy
3  case was dismissed.
4  Q    So the funding agreement, even though this risk
5  void/voidability occurred on January 30th, the funding
6  agreement remained operative for the remainder of the
7  bankruptcy case?
8  A    That was our agreement.
9  Q    Your agreement with whom?
10 A    Well, because it's a termination agreement, the agreement
11 was that it would remain operative until the termination
12 agreement.
13 Q    Okay.  Well, on what date did you reach that -- strike
14 that.
15      I take it that agreement was between LTL and J&J; right?
16 A    I think there was a consensus among the lawyers.
17 Q    Consensus among the lawyers.  Well, lawyers don't make
18 deals -- can't bind clients to deals; right?  Clients have to
19 do that themselves; right?
20 A    Right.  The board was apprised ahead of time that there
21 was a termination agreement that was going to be in place and
22 what that would mean is that everything would stay in place so
23 that, you know, LTL would not remain bare until the
24 termination agreement became effective, which happened as soon
25 as the bankruptcy case was dismissed.  So you'll see, I think,

Kim - Cross/Jonas                                                80

1  I'm sure there's a packet of materials where there's a
2  termination agreement that becomes effective right after the
3  bankruptcy case gets dismissed.
4  Q    So while you were -- strike that.
5       While you were an officer of a Chapter 11 debtor in
6  bankruptcy with fiduciary duties to talc claimants, you had
7  negotiated the termination of the existing funding agreement;
8  correct?
9  A    Well, we had authorized the termination if the bankruptcy
10 -- again, it was all predicated upon the bankruptcy being
11 dismissed; therefore, at that point, we would not have, you
12 know, the bankruptcy.  So all the things that go with the
13 bankruptcy, including creditors committees, the debtor, you
14 know, the claimants, once we're out of bankruptcy, that would
15 all have ended.  So what we agreed was that, if the bankruptcy
16 gets terminated, then we would take these actions.
17 Q    Okay, let me back up.  I'm not being clear and I
18 apologize.
19      This case, LTL I was dismissed on April 4 -- April -- I
20 think it was April 3rd or 4th; right?
21           THE COURT:  April 4th.
22 BY MR. JONAS:
23 Q    4th.  Correct?
24 A    I will take your word for that as well.
25 Q    Okay.  And about two hours or so after LTL I was

Kim - Cross/Jonas                                                  81

1  dismissed, LTL II commenced a new bankruptcy case; right?
2  A    It did.
3  Q    Okay.  Now, that whole -- you've told about this
4  void/voidability issue, negotiation, discussion, termination
5  agreement, new funding agreement, that all didn't happen in two
6  hours; did it?
7  A    The discussions around it didn't happen in the two hours,
8  the authorization for it, it was -- the authorization for it
9  specifically stated that it would not become effective until
10 the termination of the first bankruptcy.
11 Q    And those -- I think you said those discussions,
12 negotiations, whatever they are, between LTL and J&J, they
13 started pretty quick after the Third Circuit decision; right?
14 A    There were numerous discussions right after the Third
15 Circuit decision, yes.
16 Q    Okay, so February, March.  And over those months, while
17 you were an officer of a Chapter 11 debtor, you were doing a
18 new deal, a new transaction, a new arrangement with J&J to
19 terminate the existing funding agreement and enter into a new
20 funding agreement; right?
21 A    I would say that there were ongoing discussions among the
22 lawyers of a variety of things that could happen, one of them
23 which was the termination of the old funding and the new
24 funding agreement, but there were discussions throughout that
25 period of how to -- how to resolve sort of the talc litigation

1 for everyone.

2 Q   And so, obviously, LTL, J&J, they knew what was going on
3 in this connection because they were involved in it; right?
4 A   They were involved in it, yes.
5 Q   Okay.  Did you tell the creditors committee, the TCC, what
6 was going on during this time that you were in Chapter 11?
7 A   Not -- I did not have any conversations with the creditors
8 committee or the TCC.
9 Q   In fact, sir, you hid it from the Bankruptcy Court and the
10 bankruptcy community, meaning the TCC and others, you hid that
11 from them; didn't you?
12 A   I --
13          MS. BROWN:  I object, Your Honor, argumentative.
14          THE COURT:  Overruled.
15          THE WITNESS:  I would say, you know, these are
16 confidential communications, we had no idea what we were going
17 to do.  We were looking at various options and we did not want
18 to make public disclosures about this at the time that we were
19 still involved in looking at these issues.
20          MR. JONAS:  May I approach, Your Honor?
21          THE COURT:  Yes, please.
22          MR. JONAS:  I think we're on --
23          THE COURT:  3.
24          MR. JONAS:  -- 3.
25 BY MR. JONAS:

Kim - Cross/Jonas                                                83

1  Q    Mr. Kim, I want you to take a look at what's been marked
2  as TCC Exhibit 3.  And you're familiar with this type of form,
3  it's a monthly operating report; right?
4  A    I am.
5  Q    And this one is dated March 21, '23.  Do you see that at
6  the top?
7  A    I do.
8  Q    Okay.  And this is a document that LTL, the debtor, files
9  to advise the Court and to advise its creditors and, in this
10 case, talc claimants how the debtor is doing, what's going on
11 financially with the debtor; right?
12 A    I believe that's true, yes.
13 Q    And I want you to take a look at page, at the top it says
14 3 of 11, paragraph 9.  And the second sentence says --
15 A    I'm sorry --
16 Q    I'm sorry.
17 A    -- 3 of 11 -- oh, I see, yes.
18           THE COURT:  It's the --
19           THE WITNESS:  I got it.
20           THE COURT:  -- there's a second document that has
21 numbers.
22           MR. JONAS:  I'm sorry --
23           THE WITNESS:  Thank you, Your Honor.
24           MR. JONAS:  -- I'm sorry.
25 BY MR. JONAS:

WWW.JJCOURT.COM

Case 23-12825-MBK    Doc 280-5    Filed 04/28/23    Entered 04/28/23 10:00:09    Desc
Exhibit 3 to Exhibit 2 to Dexter Declaration    Page 10 of 12    Page 179 of 343

Kim - Redirect/Brown                                             179

1  questions to clear something up.
2        Earlier this morning, sir, you were asked a number of
3  questions about funding agreement one and funding agreement
4  two.  Do you remember those questions?
5  A    I do.
6  Q    Okay.  And numbers were put on those funding agreements,
7  like $61.5 billion and the like, right, sir?
8  A    Yeah, I recall that.
9  Q    Okay.  But the truth is, sir, that the value of the
10 funding agreements are driven by the talc liability, correct?
11 A    It is.  It would be part of that, the value.
12 Q    Okay.  And so, for example, J&J'S liability is limited to
13 J&J's exposure for the talc liability, correct?
14 A    That would be the -- right.  So when you say -- I think
15 the issues --
16           UNIDENTIFIED SPEAKER:  (Indiscernible)
17           THE COURT:  Leading?
18           UNIDENTIFIED SPEAKER:  Both leading, yes.
19           THE COURT:  Try to avoid the leading if possible.
20           MS. BROWN:  I will, Your Honor.  Just trying to move
21 it along.  But I will, I'll ask an open-ended question.
22 BY MS. BROWN:
23 Q    Mr. Kim, you were going to answer that?
24 A    Yes.  The opening question.  Yeah, the amount of money
25 we're talking about, of course, is the maximum that is, not the

Case 23-12825-MBK    Doc 280-5    Filed 04/28/23    Entered 04/28/23 10:00:09    Desc
Exhibit 3 to Exhibit 2 n Declaration 180 of 348 Page 11 of 12

Kim - Redirect/Brown                                                    180

1 exposure, of liability.  So it's the amount that they agreed to
2 fund not any, you know, what the exposure.  I think that's what
3 the question that you're getting at is.
4 Q    Well, and in terms of the liability, that was the same
5 under funding agreement one -- in terms of whether -- do you
6 have a view on whether or not the liability changed under
7 funding agreement one and funding agreement two?
8 A    Well, so the talc liability, so I, yeah I see.  The talc
9 liability is enormous.  We don't have an aggregate number for
10 it, but it is, you know, huge.  I think what I would do is
11 refer to all the testimony I gave in the prior proceeding about
12 the liability and adopt that here.
13      That liability, if anything, has gotten bigger.  We know
14 that after a year of being in bankruptcy, we have at least -- I
15 think it almost doubled from what we know from unknown claims.
16 So what I would say is that the liability itself is even much
17 larger than it was when the first bankruptcy was filed.
18 Q    And how does that liability relate to the value of the
19 funding agreement?
20 A    Well, at the end of the day, we believe that we have
21 sufficient funds to meet the liability except for the -- so we
22 believe we're not insolvent, but we do believe that we are in
23 financial distress because of the magnitude of the liability,
24 the wild and unpredictable verdicts, the cost of the
25 litigation, which is ever increasing.

Case 23-12825-MBK    Doc 280-5    Filed 04/28/23    Entered 04/28/23 10:00:09    Desc
Exhibit 3 to Johnson Declaration Page 12 of 12
Exhibit 2 Page 181 of 343

Kim - Redirect/Brown                                          181

1  Q   So putting aside the liability and the value of the
2  funding agreements, are you familiar with commitments to fund
3  that J&J and LTL made in the first bankruptcy and in this
4  bankruptcy?
5  A   I am.
6  Q   Okay.  And unlike the amount of the liability, have the
7  commitments changed from the first bankruptcy to this
8  bankruptcy?
9  A   They have.  They're changed in terms of where they're
10 coming from.
11 Q   And was the commitment in the first bankruptcy
12 approximately $2 billion?
13 A   Oh, well, the commitment of $2 billion was the original
14 amount that was going to be put into a qualified trust fund.
15 And that's changed dramatically from the $2 billion.  Now, it's
16 the $8.9 billion in the bankruptcy.
17 Q   Okay.  And so the commitment has gone from 2 billion to
18 8.9 billion now, correct?
19 A   From the first qualified fund in the first bankruptcy to
20 what is now committed in the second bankruptcy has increased to
21 $8.9 billion.
22 Q   Okay.  Thanks very much, Mr. Kim.
23          MS. BROWN:  I have no further questions.
24          THE COURT:  Thank you.
25          Any redirect?