UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGION 3
Jeffrey M. Sponder, Esq.
Lauren Bielskie, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
E-mail:　　jeffrey.m.sponder@usdoj.gov
　　　　　　lauren.bielskie@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>LTL Management LLC,[1]<br><br>Debtor. | : Case No. 23-12825 (MBK)<br>:<br>: Chapter 11<br>:<br>: The Honorable Michael B. Kaplan, Chief Judge<br>:<br>:<br>: Hearing Date: May 22, 2023 at 10:00 a.m.<br>: |

## MOTION OF THE UNITED STATES TRUSTEE TO DISMISS CASE PURSUANT TO 11 U.S.C. § 1112(B)

Andrew R. Vara, the United States Trustee for Regions 3 and 9 (the "U.S. Trustee"), by his undersigned counsel, and in furtherance of his duties pursuant to 28 U.S.C. §§ 586(a)(3), (5), and (8), respectfully moves to dismiss the above-captioned chapter 11 case of debtor LTL Management, LLC ("LTL") for cause pursuant to 11 U.S.C. § 1112(b), and respectfully represents as follows:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**PRELIMINARY STATEMENT**

LTL's bankruptcy petition appears to reflect a mistaken belief that the best cure for bad faith is more bad faith. This case was filed just 131 minutes after the Court dismissed LTL's previous chapter 11 case for cause, following a ruling by the United States Court of Appeals for the Third Circuit that found that LTL lacked a valid reorganization purpose and that it had sought bankruptcy protection in bad faith. *In re LTL Mgmt. LLC*, 64 F.4th 84 (3d Cir. 2023) (amended opinion). Standing alone, LTL's defiance of the Third Circuit (and the controlling effect of the Third Circuit's decision) would be sufficient cause for immediate dismissal of its refiled case. But LTL did more.

In the weeks leading up to its second bankruptcy filing, LTL and its ultimate parent, Johnson & Johnson (collectively with its nondebtor affiliates, "J&J"), engaged in a series of transactions that LTL admits were designed for no purpose other than creating artificial "financial distress" to sidestep the Third Circuit's decision. Although the U.S. Trustee and other interested parties have had only a brief opportunity to investigate these transactions, it appears that they involved, at a minimum, (i) significant intracompany asset transfers that materially eroded the value of LTL's support from its affiliates and (ii) LTL's decision to terminate, for no apparent benefit, its rights under a funding agreement that had been its principal asset from the very moment of its creation. Furthermore, these transfers were either substantially or fully consummated when LTL was still a debtor in possession in its first case, subject to broad fiduciary duties to its creditors and the supervision of this Court. But despite being under a statutory obligation to do so, LTL never disclosed these transactions to its creditors and never sought or obtained approval from this Court for either its termination of the funding agreement or its decision to file a second bankruptcy petition.

2

LTL is nothing more than J&J's captive and this case is but a part of J&J's scheme to discharge its tort obligations at cents on the dollar—without itself filing for bankruptcy. LTL itself is largely bereft of employees, independent revenue, any real business, and any prospects for a viable, operating business on the backside of bankruptcy. It exists solely to get J&J out of a jam as cheaply as possible. Assuming J&J were ever to face financial distress, it would be free to resolve its debts by seeking chapter 11 relief. But J&J cannot escape its financial obligations by piggybacking on LTL's bankruptcy. LTL's singular priority to shield J&J's $187 billion in assets[2] in this bankruptcy-by-proxy—when LTL owes its fiduciary duties to its creditors, *not* J&J—lays bare the reality that LTL is by design incapable of acting as a fiduciary for its creditors. The bankruptcy system deserves better, as do LTL's and J&J's creditors. LTL's second bankruptcy case should thus fare no better than its first. The doors of this Court are open to honest but unfortunate debtors, *Grogan v. Garner*, 498 U.S. 279, 287 (1991), but they are not open to parties that lack a legitimate bankruptcy purpose or that seek to abuse the bankruptcy process to hinder or delay their creditors. This case should be dismissed.

## **JURISDICTION**

The United States Bankruptcy Court for the District of New Jersey has jurisdiction over this Motion pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. § 1409.

Pursuant to 28 U.S.C. § 586(a)(3), the United States Trustee is charged with administrative oversight of bankruptcy cases in this District. Such oversight is part of the "U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted

---

[2] *See* J&J's Annual Report, at 54, available at https://www.investor.jnj.com/asm/2022-annual-report (assets valued at $187 billion, $5 billion more than one year ago). J&J also reported a sixtieth straight year of shareholder dividend increases and boasted that it is one of three companies in the world with a AAA credit rating. *Id.* at 5.

by the courts." *United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest).

The statutory predicate for the relief sought is 11 U.S.C. § 1112(b).

## STATUTORY AUTHORITY

Under section 1112(b)(1) of the Bankruptcy Code, upon a request of a party in interest, and after notice and a hearing, the court shall convert or dismiss a case "for cause." The Third Circuit and other courts have consistently recognized that a lack of good faith may be cause for dismissal under this section. *See In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 210 (3d Cir. 2003). The debtor bears the burden of establishing good faith on a motion to dismiss. *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir.1999).

## BACKGROUND

### A. **J&J Creates LTL Through the Divisional Merger**

LTL was created on October 12, 2021, through a series of internal corporate transactions by J&J in response to its then-mounting talc personal injury liability. *See* Declaration of John K. Kim in Support of First Day Pleadings at ¶¶ 24-25 (Dkt. 4) (the "Kim Declaration"). Under those transactions—referred to by the Third Circuit as the "Divisional Merger" and by others as the "Texas Two Step," *see LTL*, 64 F.4th at 96—LTL became responsible for the talc tort liabilities of its predecessor. Kim Decl. ¶ 24. But LTL did not receive the business assets associated with those liabilities, which were assigned to a different, newly created affiliate, known at the time as Johnson & Johnson Consumer Inc. ("New JJCI"). *Id.* Instead, the principal consideration LTL received in exchange for its assumption of a multibillion-dollar tort liability was its rights under a funding agreement with its affiliates (the "2021 Funding Agreement").

4

Under the 2021 Funding Agreement, which the Third Circuit likened to "an ATM disguised as a contract," *LTL,* 64 F.4th at 109, LTL had a right to payment in cash from J&J and New JJCI in an amount up to the value of New JJCI, which was estimated to be approximately $61.5 billion as of 2021. *Id.* at 206. The purposes for which this funding could be used varied depending on whether LTL was or was not a bankruptcy debtor. Outside of bankruptcy, the 2021 Funding Agreement would be used to pay LTL's talc-related costs and operating expenses, *id.,* while in bankruptcy, it could be used to fund the administrative expenses of the bankruptcy case as well as any trust that would eventually be created to pay the claims of talc claimants. *See* Kim Decl. 32.

As LTL repeatedly emphasized during its first case, the 2021 Funding Agreement was the linchpin of the Divisional Merger. *See* Declaration of John K. Kim in Support of First Day Pleadings (Bankr. D.N.J. Case No. 21-30859, Dkt. 5) (the "Kim 2021 Declaration") at ¶ 21[3] (stating that the "key objective" of the Divisional Merger was "achieved through the establishment of a funding agreement"); *see also LTL*, 64 F.4th at 96 (describing the 2021 Funding Agreement as the "most important" asset of LTL). In addition, as LTL itself acknowledged, another principal purpose of the 2021 Funding Agreement may have been to protect the Divisional Merger from legal challenge, because without it, the funneling of J&J's consumer assets to New JJCI and its liabilities to LTL would almost certainly have been avoidable as a fraudulent conveyance. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 404 (Bankr. D.N.J. 2022), *rev'd*, 64 F.4th 84 (3d Cir. 2023) ("*LTL I*") (noting LTL's argument that 2021 Funding Agreement "serves to . . . overcome fraudulent transfer challenges").

---

[3] Attached as Exhibit A to the Certification of Lauren Bielskie in Support of the within Motion ("Bielskie Cert.").

### B. Two Days After Its Creation, LTL Files for Bankruptcy

Although LTL was ostensibly formed to "manage and defend thousands of talc-related claims," Kim Decl. ¶ 29, it has never actually performed that function. Instead, on October 14, 2021, just two days after the Divisional Merger, LTL commenced a chapter 11 case in the United States Bankruptcy Court for the Western District of North Carolina that was later transferred to this Court (the "2021 Case").

From the outset, LTL admitted that its goals in filing the 2021 Case were not merely to resolve its own liabilities, but also to obtain a preliminary and permanent injunction that would bar talc claims against countless other defendants, including J&J and New JJCI (collectively, the "Protected Parties"), without requiring those companies to file bankruptcy themselves. *See* Kim 2021 Decl. ¶ 59. Accordingly, LTL sought and obtained an order from the North Carolina Bankruptcy Court that temporarily enjoined all talc-related claims and litigation against the nondebtor Protected Parties. Following the transfer of venue, this Court granted the stay on an extended basis. *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 638 B.R. 291 (Bankr. D.N.J. 2022). In addition, the Court denied motions to dismiss the 2021 Case filed by various talc claimants and committees. *LTL I*, 637 B.R. 396 (Bankr. D.N.J. 2022). Both decisions were subsequently certified for direct appeal to the Third Circuit.

### C. The Third Circuit Dismisses the 2021 Case for Bad Faith

On January 30, 2023, the Third Circuit issued a decision that found LTL had not filed its bankruptcy in good faith and remanded the case to this Court with instructions to dismiss. *LTL*, 64 F.4th at 111. In reaching this conclusion, the Third Circuit started from the well-established principle that in order to meet its burden of showing good faith, a putative debtor must

6

demonstrate that it sought bankruptcy for a "valid bankruptcy purpose." *Id.* at 101. In turn, as a threshold requirement for showing that it has a valid bankruptcy purpose, the Third Circuit held that LTL was required to demonstrate that it was in "financial distress." *Id.* ("a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith"). Finally, in order to show "financial distress," it was necessary for LTL to show more than that there was an "attenuated possibility . . . that [it] may have to file for bankruptcy in the future;" rather, good faith requires that its distress must be "immediate." *Id.* at 102 (internal quotation omitted).

Turning to the facts and circumstances of LTL's bankruptcy, the Third Circuit concluded that any argument that LTL was in financial distress was "untenable." *Id.* at 106. Although the court stated that LTL's right to access $61.5 billion under the 2021 Funding Agreement merited "special mention" for purposes of this analysis, *id.*, the 2021 Funding Agreement was not the only factor in LTL's failure to establish financial distress. On the other side of the balance sheet, the court also noted a lack of evidentiary support in the record for the actual value of LTL's talc liabilities, which precluded LTL from demonstrating that those liabilities would exceed its ability to pay, *see id.* at 108. The court also cited several other facts as relevant to its financial distress analysis, including LTL's self-professed ability to pay its obligations as they came due in the ordinary course and the limited nature of LTL's business operations. *Id.* at 109.

The Third Circuit acknowledged that LTL's financial prospects might change in the future, but it declined to uphold LTL's bankruptcy petition on that basis, stating that "[a]t best the filing was premature." *Id.* And in a footnote that would prove prescient, the Third Circuit cautioned LTL against trying to manufacture distress by manipulating its financial condition:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note

7

> interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]." 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?

*Id.* at 109 n.18.

Because the Third Circuit found the "financial distress" prong of the good faith test dispositive, it did not consider other potential grounds to dismiss the case. Thus, because it did not need to consider whether LTL lacked a legitimate bankruptcy purpose for reasons other than its lack of financial distress, the Third Circuit never addressed the issue of whether the Divisional Merger and LTL's avowed purpose of shielding its nondebtor parent from liability was itself a form of bad faith. Similarly, the Third Circuit did not reach the second half of its good faith test, which looks to whether a debtor had filed its case "merely to obtain a tactical litigation advantage," although it strongly suggested that LTL's case might have been dismissed on this basis as well. *See id.* at 110 n.19 ("[w]hile we ultimately leave the question unaddressed, a filing to change the forum of litigation where there is no financial distress raises, as it did in *SGL Carbon*, the specter of 'abuse which must be guarded against to protect the integrity of the bankruptcy system'") (internal citation omitted).

### D. LTL Attempts to Manufacture Financial Distress

LTL initially sought to challenge the Third Circuit's ruling through a petition for *en banc* rehearing, which it filed on February 13. No. 22-2003, Dkt. 153 (3d Cir. filed Feb. 13., 2023). On March 22, LTL's petition was unanimously denied. *Id.*, Dkt. 172 (Mar. 22, 2023). That same day, LTL moved for a stay of the Third Circuit's mandate—which would have delayed dismissal of the 2021 Case and kept in place the nondebtor injunction issued by this Court—and represented that such a stay was necessary to enable it to file a petition for certiorari with the

Supreme Court. *Id.*, Dkt. 173. [4] On March 31, the Third Circuit denied the stay motion and issued its mandate. *Id.*, Dkt. 180, 181.

But while LTL was publicly vowing to pursue its appellate remedies, a very different strategy was playing out behind the scenes. Beginning in January 2023, LTL, J&J, and New JJCI—by then renamed Johnson & Johnson Holdco (NA) Inc. ("Holdco")—entered what LTL euphemistically refers to as "new financing arrangements," which severely eroded the value of LTL's contractual rights against its affiliates. *See* Kim Decl. ¶ 76. Thus, in January 2023, New JJCI/Holdco transferred its consumer business assets to its corporate parent. Kim Decl. ¶ 26. Although LTL itself does not appear to have been a party to this transaction, New JJCI's transfer of approximately half of its value had the effect of nullifying a key provision of the 2021 Funding Agreement, which allowed LTL to benefit from any increase in value of New JJCI. *See LTL*, 64 F.4th at 106.

J&J and LTL next turned to the 2021 Funding Agreement itself. Through a Termination and Substitution Agreement (the "T&S Agreement"), LTL agreed to cancel the 2021 Funding Agreement and *voluntarily* relinquish its principal asset—its rights to more than $61.5 billion from its affiliates—which was to be replaced with a similar, but far less lucrative, agreement (the "2023 Funding Agreement."). *See* Kim Decl. ¶¶ 79-80. Specifically, while under the 2021 Funding Agreement J&J and New JJCI were each jointly and severally liable to LTL for an amount that could never be less than $61.5 billion, *see LTL*, 64 F.4th at 106, under the new 2023 Funding Agreement, J&J is no longer a primary obligor, its balance sheet is no longer available to LTL, and LTL's right to payment is now effectively limited to the much-reduced value of Holdco following the transfer of New JJCI's consumer business. *See* Kim Decl. ¶ 82. The effect

---

[4] Attached as Exhibit B to the Bielskie Cert.

9

of the T&S Agreement, then, appears to be LTL's surrender of a contract right worth potentially $61.5 billion (or more) to itself and its creditors for one worth far less, possibly tens of billions of dollars less. Apart from its wholly unsupported speculation that J&J might invoke the dubious affirmative defense of frustration of purpose (which it never did), *see* Kim Decl. ¶ 78, LTL offers no rationale or business justification for its decision to sacrifice this asset. LTL does, however, appear to acknowledge a tactical motivation for its decision, observing that under the 2023 Funding Agreement (and in contrast to the 2021 Funding Agreement), "[LTL's] prefiling financial condition is sufficiently distressed to satisfy the standard established by the Third Circuit." *Id*. ¶ 83.

Although the Kim Declaration does not specify when LTL decided to enter into the T&S Agreement, this presumably must have occurred before April 4, 2023, which is both the date of the Kim Declaration and the order dismissing LTL's 2021 Case. As such, LTL would still have been a debtor in possession in its first case at the time these agreements were made. Despite this, LTL never sought or obtained approval from the Court for its inexplicable surrender of its rights under the 2021 Funding Agreement, nor did it disclose that decision to the U.S. Trustee or to its creditors generally.

### E. LTL Files a Second Bankruptcy Case Immediately After Dismissal of Its First

At 1:49 p.m. on April 4, 2023—a little more than two months after the Third Circuit's decision and four days after the issuance of its mandate—the Court dismissed the 2021 Case. But LTL would remain outside of bankruptcy for barely more than two hours. At 4:00 p.m. that same day, just 131 minutes after it exited bankruptcy, LTL filed a petition commencing the present chapter 11 case. (Dkt. 1).

On April 14, 2023, the U.S. Trustee appointed an Official Committee of Talc Claimants (the "TCC") (Dkt. 162). On April 24, 2023, the TCC filed a motion to dismiss LTL's bankruptcy case (Dkt. 286) (the "TCC MTD").

## ARGUMENT

### A. The Third Circuit's Decision Dismissing the 2021 Case Also Compels Dismissal of This Case Because LTL Is Not In Financial Distress

LTL filed its present bankruptcy case less than three months after the Third Circuit found a lack of good faith and cause for dismissal in its 2021 Case. LTL's history, general financial structure, case strategy, and reorganization goals are largely unchanged from its first case. The legal conclusions of the Third Circuit from the first *LTL* case are no longer subject to appeal and are now binding in this case, and LTL is not free to relitigate those matters. As the party that bears the burden of proving its own good faith, LTL can survive dismissal if, and only if, it can point to a changed circumstance that would lead to a different outcome under the Third Circuit's analysis. It cannot do so.

In an informational brief that it filed in connection with its second petition, LTL relies on only a single new fact relevant to the Third Circuit's good faith analysis: its replacement, through the T&S Agreement, of the 2021 Funding Agreement with the less beneficial 2023 Funding Agreement. *See* Debtor's Statement Regarding Refiling of Chapter 11 Case (Dkt. 3). But LTL's reliance on this single fact ignores the Third Circuit's multi-factor analysis used to determine that LTL was not in financial distress, and there is no basis to believe that the Third Circuit would rule differently now. But even if the Court finds that LTL has manufactured genuine financial distress, the only real effect would be that LTL has substituted one cause for dismissal for another. In either scenario, its chapter 11 case remains one that was filed in bad faith.

11

1.   The Underlying Facts Relied on by the Third Circuit Have Not Changed.

LTL's exclusive reliance on its surrender of its $61.5 billion payment right ignores that this was just one of several independent grounds supporting the Third Circuit's conclusion that LTL was not in financial distress. And while the 2021 Funding Agreement was undoubtedly an important consideration in the Third Circuit's decision, *see LTL*, 64 F.4th at 106, the Third Circuit's decision nowhere suggests that the $61.5 billion was the dividing line between good faith and bad faith, or that it might have ruled differently had the value of the 2021 Funding Agreement been only $30 billion or $10 billion. Rather, the Third Circuit's conclusion of no financial distress was also supported by numerous other factors, including LTL's inability to substantiate its worst-case liability projections, *see id.* at 108, the fact that its capitalization was sufficient for its limited business operations, *see id.* at 109, and perhaps most importantly, its self-professed ability to pay all talc claims in full in the ordinary course. *See id.*

There is no evidence that any of these facts have changed since January 30, 2023. Thanks to the nationwide third-party injunction that has existed for the past eighteen months, the litigation history of LTL and J&J is exactly what it was in October 2021, and there have been no fresh verdicts that might give the Third Circuit reason to revisit its conclusions regarding LTL's potential liability. As to the crucial factor of LTL's ability to meet its obligations in the ordinary course, LTL continues to insist in its filings that the replacement of the 2021 Funding Agreement has not prejudiced its creditors. *See* Kim Decl. ¶ 84 ("[t]he Debtor's new financing arrangements do not harm talc claimants"). Even after the cancellation of its 2021 Funding Agreement, LTL falls well short of overcoming the Third Circuit's financial distress analysis.

Furthermore, the only other new fact identified by LTL undermines, rather than supports, its claim of financial distress. In its first day pleadings, LTL asserts that it had entered into plan

support agreements affecting an alleged 60,000 claimants, under which J&J and LTL would resolve their collective present and future talc liability for $8.9 billion. *See* Kim Decl. ¶ 8. But even taking LTL's characterization of these settlements at face value,[5] the fact that it believes it can comprehensively resolve talc claims for this amount (which it admits it can comfortably pay) undercuts any argument that it faces the kind of astronomical liabilities that would exhaust its existing resources. Indeed, the Third Circuit anticipated this very criticism when it faulted LTL for ignoring the "possibility of meaningful settlement" in its projections of financial distress. *LTL*, 64 F.4th at 107.

        2.      <u>Any Financial Distress is Offset by LTL's Claims Against Its Affiliates.</u>

Even if LTL's recent corporate transactions did impair LTL's ability to meet its obligations (notwithstanding LTL's sworn assurances to the contrary), the ultimate result would be no different. In this case, as the Third Circuit carefully cautioned, LTL and its creditors would have sizeable causes of action, under various legal theories, against J&J, New JJCI/Holdco, and possibly LTL's own directors and officers arising from their decision to strip LTL of its most valuable asset. *See id*. at 109 n.18. The only real consequence of LTL's financial machinations would be to replace a large contract right with a smaller contract right coupled with a large litigation claim.[6] But the net effect, for purposes of LTL's financial distress, would be zero.

---

[5] The U.S. Trustee notes that the validity of LTL's plan support agreements, as well as the true degree of creditor support that LTL enjoys, are currently matters of considerable dispute among the parties in this case. *See* TCC MTD at 16. The question of creditor support is in any event irrelevant for purposes of the dismissal analysis by the Third Circuit, which based its decision on LTL's bad faith and not its hypothetical prospects for reorganization.

[6] Under this scenario, the Court would then be faced with another difficult question: who should evaluate and prosecute these claims? Certainly not LTL's existing managers and officers, who were responsible for the decisions at issue (and who may themselves be litigation defendants along with J&J). In virtually any other case involving the diversion of debtor assets in this manner, there would be clear cause for appointment of a trustee under 11 U.S.C. § 1104. *See, e.g., In re Sharon Steel Corp.*, 86 B.R. 455 (Bankr. W.D. Pa. 1988), *subsequently aff'd,* 871 F.2d 1217, (3d Cir. 1989). But the court may also dismiss the case in lieu of appointing a chapter 11 trustee if doing so would be in the best interests of creditors. *See* 11 U.S.C. § 1112(b)(1). In this case, given the needless delay that LTL's creditors have already been forced to endure in two cases, the U.S. Trustee believes that dismissal rather than appointment of a trustee is the more appropriate remedy.

B. **Even If LTL Successfully Manufactured Financial Distress, There Remain Independent Grounds For Dismissal.**

As the Third Circuit held, financial distress is a threshold requirement for bankruptcy relief, and LTL's failure to prove this requirement is automatic grounds for dismissal. *See id.* at 101. But even if LTL clears this hurdle, there exist other grounds on which the Court should conclude that it filed for bankruptcy in bad faith and that its case should be dismissed.

1. LTL Acted In Bad Faith When It Terminated the 2021 Funding Agreement.

Apart from its lack of financial distress, LTL's bad faith is conclusively established by its "prepetition" decision to sacrifice its rights under the 2021 Funding Agreement for zero consideration—and for the sole benefit of its nondebtor, corporate parent—a decision that removed tens of billions of dollars from the reach of its creditors. This breach of its duties is all the more egregious because LTL presumably made these decisions, even if did not fully execute them, when LTL was a chapter 11 debtor and a fiduciary to its creditors. *See In re Marvel Ent. Grp., Inc.,* 140 F.3d 463, 471 (3d Cir. 1998) ("The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization").

Remarkably, LTL does not offer any business justification or any explanation for how its decision to terminate the 2021 Funding Agreement was consistent with its duties to creditors. Rather, LTL's only defense for its actions is to speculate that under the Third Circuit's decision, the 2021 Funding Agreement might have become "void or voidable." Kim Decl. ¶ 78. But LTL offers no evidentiary support for this contention. LTL does not assert that J&J or New JJCI ever refused to honor their obligations under the 2021 Funding Agreement or that they were likely to

14

do so in the future.[7] LTL's theory that the 2021 Funding Agreement became void upon dismissal is also inconsistent with the actual terms of that agreement, which contained express provisions for its operation outside as well as inside a bankruptcy case. *See* Kim 2021 Decl. ¶ 27 (summarizing terms of 2021 Funding Agreement, including J&J's obligation to provide funding "at any time when there is no bankruptcy case"). In short, despite LTL's after-the-fact attempts to rewrite its terms, there is no reason for the Court to conclude that the cancellation of the 2021 Funding Agreement was anything other than a bad-faith scheme to defeat the rights of LTL's creditors.

    2.    <u>LTL's Bankruptcy Does Not Serve a Valid Bankruptcy Purpose Because It Is Designed to Benefit J&J, Not LTL</u>

As the Third Circuit explained, the threshold "financial distress" test is merely a part of a larger inquiry into whether the debtor has a "valid bankruptcy purpose." *LTL*, 64 F.4th at 101. In this case, as with LTL's 2021 Case, LTL does not meet this test because the entire history of LTL—from the Divisional Merger to now—conclusively demonstrates that it has no need of reorganization for itself, and that its chapter 11 cases have been filed for the sole benefit of nondebtor J&J.

LTL has been a chapter 11 debtor for all but two days of its existence. Apart from a single revenue stream assigned to it under the Divisional Merger, it has no business outside of its

---

[7] Nor did they move to lift the stay to file suit to avoid the 2021 Funding Agreement. Moreover, it strains credulity that the beneficiary of a multi-billion dollar contract would, *sua sponte*, when a question *might* have arisen about the validity of that contract, offer to its counterparty that the beneficiary relinquish billions of dollars of contractual rights rather than assert its rights or litigate them to avoid speculative uncertainty over a legal doctrine—frustration of purpose—virtually unknown in modern contract law to ever have voided a contract. *See Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981) (discussing limitations to doctrine of frustration of purpose, including that parties "may not invoke the doctrine of frustration to escape their obligations" if the risk was reasonably foreseeable or if it was addressed in the parties' contract). Because the 2021 Funding Agreement had toggle provisions applying whether LTL was in or out of bankruptcy, it is unreasonable to contend, much less conclude, that the risks of LTL not being in bankruptcy were unforeseeable or that they were not addressed in the parties' contract.

15

role as a bankruptcy vehicle for J&J's talc liabilities. A central purpose of chapter 11 is to allow a distressed business to "preserv[e] going concerns" while navigating financial hardship. *Integrated Telecom*, 384 F.3d at 119 (*quoting Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). Here, however, this purpose is not served, and cannot be served, because LTL has no meaningful going concern business to preserve, and any financial hardship that it has experienced was created for the sole purpose of allowing it access to bankruptcy. Because LTL has "no going concerns to preserve—no employees, offices, or business other than the handling of litigation," *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009)—its bankruptcy petition cannot substantially further the fundamental reorganization purpose of chapter 11.

Furthermore, LTL's own statements reflect that the ultimate purpose of the Divisional Merger, as well as of both bankruptcy cases, has been to benefit J&J, not LTL, by giving J&J all of the protections of a chapter 11 case without requiring it to become a debtor itself. *See* Kim Decl. ¶ 25 ( "Old JJCI implemented the 2021 Corporate Restructuring to facilitate a chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future talc-related claims through a plan of reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding"). And LTL has been clear throughout these two cases that its goal is a plan that will permanently discharge nondebtor J&J's talc liability. *Id.* at ¶ 86 (stating that LTL's objective is "the issuance of an injunction that will permanently protect the Debtor, its affiliates and certain other parties from further talc-related claims"). Although this goal might be a legitimate bankruptcy purpose in a case where J&J was a debtor, it is not a valid purpose in a case where J&J is not a debtor. *See BEPCO*, 589 F.3d at 624 (finding bad faith where debtors were primarily concerned with protecting nondebtor affiliates).

16

      3.      <u>LTL's Case Should Be Dismissed Because It Was Filed as a Litigation Tactic.</u>

As the second prong of the Third Circuit's good faith analysis, the Court must consider whether the case "is filed merely to obtain a tactical litigation advantage." *LTL*, 64 F.4th at 101. Considering the conduct of J&J and LTL in its entirety, this factor also requires dismissal. Through the Divisional Merger, J&J essentially divided its creditors into two classes—those who would be assigned to New JJCI ,who could continue to be paid in the ordinary course, and those assigned to LTL, who have been forced to deal with the delay and uncertainty of the bankruptcy process. This not only undermines the Code's priority scheme, "which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate," *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 979 (2017), but it also provides additional evidence that LTL's petition was "filed merely for tactical advantage" in ongoing litigation. *SGL Carbon*, 200 F.3d at 165. In *SGL Carbon*, for example, the debtor filed for bankruptcy after it was named as a defendant in a large antitrust suit, apparently because it believed that bankruptcy would provide a preferable venue for resolving the antitrust claims. In evaluating a motion to dismiss the petition, this Court examined the proposed reorganization plan, which provided for all creditors to "be paid in full in cash" except antitrust judgment creditors—who would be "required to accept limited-time credits to purchase SGL Carbon's products." *Id.* at 167. This Court explained that the "plan's differing treatment of creditors suggests SGL Carbon's petition was not filed to reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms." *Id*. The same conclusion applies with equal force here.

17

    4.    <u>LTL's Failure to Obtain Authorization for Its Prepetition Transactions Is Further Cause for Dismissal</u>

Lastly, in considering the totality of LTL's bad faith, the Court should also consider LTL's willful disregard of its duties to this Court and its creditors in its 2021 Case, particularly given its failure to disclose or obtain authorization for the non-ordinary course transactions that allowed it to file its second case.

When LTL sought bankruptcy protection in its 2021 Case, it subjected itself and its affairs to the oversight of this Court, its creditors, and the U.S. Trustee, and it assumed a fiduciary duty to its creditors. *See Marvel Ent. Grp., Inc.,* 140 F.3d at 471. A key mechanism for the supervision of debtors in chapter 11 is section 363(b) of the Bankruptcy Code, which requires disclosure to creditors and approval by the court of any proposed transactions that are outside the ordinary course of business. 11 U.S.C. § 363(b)(1). *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (noting that section 363 "protect[s] creditors by giving them an opportunity to be heard when transactions are not ordinary"). A similar purpose is found in Bankruptcy Rule 9019, which requires notice to creditors and court approval before the debtor in possession may enter into settlements. Fed. R. Bankr. P. 9019(a).

Here, the record reflects that in the weeks leading up to its second bankruptcy, LTL engaged in a series of transactions and other actions that cannot plausibly be characterized as ordinary course. These include its entry into the T&S Agreement, under which it gave away its most valuable asset, its corporate action to authorize its second bankruptcy filing, and its execution of plan support agreements with an alleged 60,000 claimants. *See* Kim Decl. ¶ 8. Given the very brief time that elapsed between the dismissal of the 2021 Case and the filing of this case, it is almost certain that these activities were either fully or substantially consummated

during the first case. But LTL never sought Court authorization for these transactions and never provided notice to its creditors or the U.S. Trustee of its intent to engage in those transactions.

LTL's failure to comply with section 363 was not harmless. Even after the Third Circuit's decision, LTL's case remained open until April 4, and so long as LTL was pursuing its appeals, there was a possibility that the dismissal would be overturned. Had LTL provided proper notice of the T&S Agreement and sought Court approval, its creditors would have had an opportunity to object to its wholesale surrender of the 2021 Funding Agreement, and the Court would have had an opportunity to evaluate the business rationale, if any, behind it. Because LTL did not provide notice, creditors who have been prejudiced by that transaction now face the considerably more burdensome task of unwinding a completed transaction in LTL's new bankruptcy case.

Given the totality of LTL's other conduct, the Court may conclude that these omissions were deliberate. As late as March 22, the date on which it moved for a stay, LTL publicly represented that it intended to file a petition for a writ of certiorari (which it never did); it did not disclose that it was, at the very same time, already preparing for a serial bankruptcy petition. As such, LTL's conduct in late March 2023 appears to reflect a tactical decision to conceal its actions and intentions from the creditors and Court to whom it owed duties as a debtor in possession. This strategic disregard of the Bankruptcy Code is yet another ground for dismissal. *See SGL Carbon,* 200 F.3d at 161 (noting that "[a] debtor who attempts to garner shelter under the Bankruptcy Code, therefore, must act in conformity with the Code's underlying principles").

WHEREFORE, for the foregoing reasons, the U.S. Trustee respectfully requests that the Court dismiss the above-captioned chapter 11 case and grant such other and further relief that is deemed just and equitable.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

Dated: May 1, 2023

By: */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney
Lauren Bielskie
Trial Attorney
United States Department of Justice
Office of the United States Trustee
One Newark Center, Suite 2100
Newark, NJ 07102

-and-

Linda Richenderfer
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
linda.richenderfer@usdoj.gov

20