UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
     crobinson@pszjlaw.com
     pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 23-12825 (MBK) |
| Debtor. [1] | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF ARNOLD & ITKIN, ON BEHALF OF CERTAIN TALC CLAIMANTS, TO DISMISS CHAPTER 11 CASE**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

1

Table of Contents

**Page**

I. PRELIMINARY STATEMENT ................................................................................. 1

II. JURISDICTION, VENUE, AND STATUTORY PREDICATES ......................................... 13

III. FACTUAL BACKGROUND ................................................................................. 14

    A.    Talc Litigation against the Debtor's Parent and Predecessor ............................ 14

    B.    The 2021 Corporate Restructuring and Divisional Merger ............................... 14

    C.    The 2021 Funding Agreement ..................................................................... 15

    D.    New JJCI ................................................................................................ 16

    E.    The Debtor's First Bankruptcy Filing and Procedural History ......................... 17

    F.    The Third Circuit's Decision and Dismissal of LTL I ...................................... 18

    G.    The New Funding Agreements ...................................................................... 19

    H.    The Preliminary Injunction Motion ............................................................... 22

IV. BASIS FOR RELIEF REQUESTED ........................................................................ 24

    A.    Statutory Framework for Dismissal ............................................................... 24

    B.    Financial Distress that Satisfies the Third Circuit's Standard is a
           Prerequisite to a Finding of Good Faith; Absent Such Financial Distress, a
           Chapter 11 Case Must Be Dismissed ............................................................. 25

          (1)    Financial Distress Is a Precondition to a Good Faith Chapter 11
                 Filing ......................................................................................... 25

          (2)    The Requirement of Genuine Financial Distress Plays a Critical
                 Role in Protecting Creditors and Preserving the Integrity of the
                 Bankruptcy System—Particularly in a Mass Tort Asbestos Case,
                 Where Section 524(g) Gives the Debtor Extraordinary Powers to
                 Disrupt the Claims of Present and Unknown Future Asbestos
                 Claimants .................................................................................... 26

    C.    The Debtor's Case Lacks a Valid Bankruptcy Purpose ..................................... 29

          (1)    The Debtor Has Not Met its Burden to Show Financial Distress ............ 29

          (2)    The Debtor Has Not Shown, and Cannot Show, that There Is Any
                 Threat to Ongoing Business Operations ................................................ 31

D.    Manufacturing Financial Distress to Qualify for Chapter 11 Relief is Bad Faith *Per Se* ........................................................................................... 32

E.    If the Termination of the 2021 Funding Agreement Did Place the Debtor in Financial Distress, Then Such Termination Was A Fraudulent Transfer That Is an Improper Underpinning for Filing This Second Chapter 11 Case ...... 34

F.    No Reorganization is Possible as Long as J&J, New JJCI and the Debtor Insist that a Plan Include a Channeling Injunction that is Well Beyond the Permissible Scope of a Section 524(g) Channeling Injunction Under Applicable Third Circuit Precedent .................................................................... 37

    (1)    A Channeling Injunction that Extends to all "Debtor Talc Claims" and "Protected Parties," as Defined in the Preliminary Injunction Motion, Would Be Beyond the Scope of A Third Party Channeling Injunction Under a Plan Permitted by Section 524(g)(4) ...................... 38

    (2)    Section 105 Cannot Be Used to Expand the Parties or Claims that Can Be Included in a Channeling Injunction under a Plan for a Chapter 11 Asbestos Debtor Beyond the Scope of a Channeling Injunction Permitted under Section 524(g) ............................................... 43

G.    The Debtor's Bankruptcy Filing is Simply a Litigation Tactic ........................... 44

V. NO PRIOR REQUEST ........................................................................................... 46

VI. NOTICE ................................................................................................................. 46

VII. CONCLUSION ..................................................................................................... 46

# CASES

*15375 Memorial Corp. v. BEPCO, Op (In re 15375 Mem'l Corp.)*,
589 F.3d 605 (3d Cir. 2009) ............................................................................................ passim

*Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Corp.)*,
232 B.R. 565 (Bankr. N.D.N.Y. 1999) .................................................................................... 35

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*,
13 F.4th 279 (3d Cir. 2022) .................................................................................................. 39

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*,
900 F.3d 126 (3d Cir. 2018) ................................................................................................. 39

*Feld v. Zale Corp. (In re Zale Corp.)*,
62 F.3d 746 (5th Cir. 1995) ................................................................................................. 44

*Fesco Plastics Corp.*,
996 F.2d 152 (7th Cir. 1993) ............................................................................................... 43

*Hometown 2006-1 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.*,
847 F.3d 302 (5th Cir. 2017) ............................................................................................... 35

*In re 1121 Pier Vill. LLC*,
635 B.R. 127 (Bankr. E.D. Pa. 2022) ..................................................................................... 37

*In re Barbieri*,
199 F.3d 616 (2d Cir. 1999) ................................................................................................. 43

*In re Coffee Cupboard, Inc.*,
119 B.R. 14 (Bankr. E.D.N.Y. 1990) ...................................................................................... 33

*In re Combustion Eng'g, Inc., Inc.*,
391 F.,3d 190 (3d Cir. 2004) ............................................................................................... 43

*In re C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
113 F.3d 1304 (2d. Cir. 1997) ......................................................................................... 32, 33

*In re Healthco Int'l, Inc.*,
208 B.R. 288 (Bankr. D. Mass. 1997) .................................................................................... 36

*In re Jackson*,
459 F.3d 117 (1st Cir. 2006) ................................................................................................ 36

*In re Johns-Manville Corp.*,
36 B.R. 727 (Bankr. S.D.N.Y. (1984) ................................................................................. 26, 32

*In re Julian*,
No. 11-30151 (LMW), 2012 Bankr. LEXIS 494 (Bankr. D. Conn. Feb. 15, 2012) ................. 33

*In re Little Creek Dev. Co.*,
779 F.2d 1068 (5th Cir. 1986) ............................................................................................. 32

*In re LTL Management, LLC*,
64 F.4th 84 (2023) ......................................................................................................... passim

*In re Mintze*,
434 F.3d 222 (3d Cir. 2006) .................................................................................................. 7

*In re Morristown & Erie R.R. Co.*,
885 F.2d 98 (3d Cir. 1989) .................................................................................................. 43

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ............................................................................................ passim

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) .................................................................................................. 40

*Moody v. Sec. Pac. Bus. Credit,*
    971 F.2d 1056 (3d Cir. 1992)................................................................................. 36
*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,
    Inc.),*
    384 F.3d 108 (3d Cir. 2004)............................................................... 10, 24, 25, 45
*Norwest Bank Worthington v. Ahlers,*
    485 U.S. 197 (1988)................................................................................... 43, 44
*Official Comm. V. T.D. Invs. I, LLP (In re Great Lakes Quick Lube L.P.),*
    816 F.3d 482 (7th Cir. 2016) ............................................................................ 35
*Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),*
    849 F.2d 1393 (11th Cir. 1988) ........................................................................ 33
*Pleasant Pointe Apts., Ltd. v. Ky. Hous. Corp.,*
    139 B.R. 828 (W.D. Ky. 1992) ......................................................................... 33
*Resorts Int'l v. Lowenschuss (In re Lowenschuss),*
    67 F.3d 1394 (9th Cir. 1995) ........................................................................... 43
*Scarano v. Cent. R.R. Co. of N.J.,*
    203 F.2d 510 (3d Cir.1953)................................................................................ 7
*SE Property Holdings, LLC v. Braswell,*
    255 F. Supp. 3d 1187 (S.D. Ala. 2017) ............................................................. 36
*United States v. Pepperman,*
    976 F.2d 123 (3d Cir. 1992).............................................................................. 43

## STATUTES

11 U.S.C. § 105(a) ....................................................................................................... 43
11 U.S.C. § 524(e) ....................................................................................................... 38
11 U.S.C. § 524(g) .................................................................................................. passim
11 U.S.C. § 524(g)(2) .................................................................................................. 28
11 U.S.C. § 524(g)(4)(A)............................................................................................. 44
11 U.S.C. § 524(g)(4)(A)(ii) .................................................................................. 28, 40
11 U.S.C. § 524(g)(ii) ........................................................................................... 40, 42
11 U.S.C. § 548(a)(1)(B)(ii)(II) ............................................................................ 11, 36
11 U.S.C. § 548(a)(1)(B)(ii)(III) ........................................................................... 12, 36
11 U.S.C. § 1112(b) ....................................................................................... 1, 14, 17
11 U.S.C. § 1112(b)(1) ................................................................................................ 24
11 U.S.C. § 1112(b)(4) ................................................................................................ 24
11 U.S.C. § 1112(B)(4)(A)-(P)..................................................................................... 24
28 U.S.C. § 157(b)(2) ............................................................................................ 13, 14
28 U.S.C. § 1334 ......................................................................................................... 13
28 U.S.C. § 1409 ......................................................................................................... 14
103 H.R. REP. 835, 41 (1994) ..................................................................................... 27

## RULES

Fed. R. Bankr. P. 1017.......................................................................................... 1, 14

iv

The law firm of Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of certain talc personal

injury claimants who are represented by Arnold & Itkin (the "Movants"), hereby submits this

memorandum of law in support of its motion (the "Motion") for an order pursuant to section

1112(b) of title 11 of the United States Code (the "Bankruptcy Code" or the "Code") and Rule

1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to dismiss the

chapter 11 bankruptcy case of LTL Management, LLC (the "Debtor"). In support of the Motion,

the Movants respectfully represent as follows: [2]

## I.

## PRELIMINARY STATEMENT

1.       With the ink barely dry on the Third Circuit's ruling that the Debtor's first chapter

11 case ("LTL I") had to be dismissed, on the basis that it was not filed in good faith because the

Debtor was not in financial distress,[3] the Debtor and its parent, Johnson & Johnson ("J&J"), came

up with a plan to manufacture financial distress so that the Debtor could make a second run at

chapter 11. The plan was ready to go when the Third Circuit issued its mandate and LTL I was

dismissed, and was implemented during the brief hiatus between the dismissal of LTL I and the

filing of this, the Debtor's second chapter 11 case ("LTL II").

2.       The centerpiece of their plan was the Debtor's agreement to terminate its existing

funding agreement that obligated J&J and J&J affiliate "New JJCI" (defined below), the Debtor's

direct parent, jointly to provide the Debtor with up to $61.5 billion in funding for various purposes,

including satisfaction of the Debtor's talc liabilities, *in or out of bankruptcy* (the "2021 Funding

Agreement"). The Debtor's contractual right to funding from J&J outside of bankruptcy formed

---

[2]     In support of the Motion, Movants also submit the Declaration of Laura Davis Jones (the "Jones Dec.").

[3]     *LTL Mgmt., L.L.C. v. Those Parties listed on Appendix A to Complaint (In re LTL Mgmt., L.L.C.),* 58 F.4th 738, 746 (3d Cir. 2023), as amended, 64 F.4th 84, 93 (3d Cir. 2023) ) ("*LTL Mgmt.*").

the lynchpin of the Third Circuit's conclusion in LTL I that the Debtor was not in financial

distress. *LTL Mgmt.,* 64 F.4th at 106-07. The Debtor's agreement to terminate the 2021 Funding

Agreement was designed to destroy that lynchpin. In exchange for terminating the 2021 Funding

Agreement, the Debtor entered into two new funding agreements (the "New Funding

Agreements") under which its funding resources were substantially less valuable, more restricted,

and more conditional than they had been under the 2021 Funding Agreement: (i) a funding

agreement to which only the Debtor and New JJCI are parties (the "2023 Funding Agreement")

and (ii) a funding agreement to which J&J is also a party, but that is operative only in a chapter 11

case (the "J&J Support Agreement").

3.      Outside of bankruptcy, the Debtor relinquished entirely its existing right to have

J&J fund up to $61.5 billion to satisfy the Debtor's liability to cancer victims for talc-related

injuries ("Talc Claimants") and pay its normal course expenses outside of bankruptcy. This change

left only New JJCI with an obligation to fund the payment of the Debtor's talc liabilities outside of

bankruptcy. But New JJCI had recently been stripped of assets representing roughly half its value

and a substantial portion of its cash flow, by the gratuitous upstream transfer of its consumer health

business to its parent entity a few months earlier. Moreover, the Debtor did not even bother to

secure a covenant in the 2023 Funding Agreement prohibiting future asset stripping transfers of

this kind by New JJCI. Based on the agreed relinquishment of the Debtor's funding rights against

J&J outside of bankruptcy, the Debtor claims that it is now in "financial distress" sufficient to

justify its new chapter 11 filing.

4.      In bankruptcy, and in anticipation of the Debtor's new chapter 11 filing, the New

Funding Agreements handed J&J and New JJCI a veto over any chapter 11 plan in this case – a

veto they did not enjoy in LTL I. The New Funding Agreements replaced the provision in the

2

terminated 2021 Funding Agreement that obligated J&J and New JJCI to fund a trust for Talc

Claimants under a chapter 11 plan confirmed by a final order of the Court **whether or not they**

**supported the plan**, with provisions that obligate them to fund a plan trust for Talc Claimants **only**

**under a plan that J&J and New JJCI support**.

5.      The Debtor's pretext for this one-sided eve-of-bankruptcy exchange with its direct

and indirect parents is that there was a "material risk" that the 2021 Funding Agreement would be

"void or voidable," on the basis that the Third Circuit's ruling on dismissal "frustrated the

purpose" of the 2021 Funding Agreement. But, as explained below, this pretext cannot withstand

scrutiny and contradicts statements the Debtor made to the Court in LTL I regarding the "purpose"

of the 2021 Funding Agreement. Moreover, even if there was such a risk, there is no evidence that

the one-sided exchange with affiliates resulted from the kind of hard-fought negotiations and push-

back that would have occurred between parties to a contract that entitled one party to tens of

billions of dollars in funding the from the other party, where the funding obligor challenged the

enforceability of its obligation to the funding obligee, if the parties were unaffiliated and dealing at

arms' length. Nor is there any evidence that the Debtor's Chief Legal Officer – a long time J&J

employee – or outside counsel undertook the kind of in-depth research and analysis of relevant

legal issues that an obligee under such a contract would have undertaken in the face of a challenge

to its enforceability if the parties were dealing at arms' length.

6.      The Debtor filed this chapter 11 case just two hours and eleven minutes after LTL I

was dismissed pursuant to the Third Circuit's mandate. The Debtor claims that during that brief

interlude, it "resolve[d] the concerns that led the Third Circuit to believe that the 2021 chapter 11

case should be dismissed" by entering into "these new financing arrangements" that were

3

apparently crafted even before LTL I was dismissed. *Declaration of John K. Kim in Support of First Day Orders* [LTL II, D.I. 4] ("2023 Kim Dec.") ¶¶ 82; 78-81.

7.      The "concern" that led the Third Circuit to mandate dismissal was that the Debtor was not in financial distress. *See LTL Mgmt.*, 64 F.4th at 110. That finding was based on the Debtor's rights under the 2021 Funding Agreement – specifically, the obligation of J&J and New JJCI to fund the payment of the Debtor's talc liabilities and normal course expenses "outside of bankruptcy," subject to a cap estimated at $61.5 billion. *See id.* at 106. The Court of Appeals found it "[m]ost important" that "the payment right [under the 2021 Funding Agreement] gave [the Debtor] direct access to J&J's exceptionally strong balance sheet." *Id.* The Debtor "addressed" this "concern" by abrogating J&J's obligation to provide any funding to the Debtor outside of bankruptcy. The Debtor did so at a time when J&J's funding backstop had become more important than ever as a result of New JJCI's recent transfer of New JJCI's consumer health business to its parent. That transfer resulted in the loss of another facet of the 2021 Funding Agreement that the Third Circuit found very significant: "access to [the] cash-flowing brands and products along with the profits they produced" that New JJCI had received from Old JJCI. *Id.* The Debtor apparently mistook the Third Circuit's reasoning for a primer on how to ***create*** "financial distress" in advance of a second chapter 11 filing. But even the Debtor's temerity has its limits: The Debtor does not claim that its agreement to change the funding obligations of J&J and New JJCI ***in bankruptcy*** by handing them a veto over any chapter 11 plan in this case bore any relation to any "concern" expressed by the Third Circuit.

8.      The 2021 Funding Agreement arose as part of a "divisional merger" of the Debtor's predecessor entity, Johnson & Johnson Consumer, Inc. ("Old JJCI"), which replaced Old JJCI with two new entities: (i) the Debtor, which received a transfer of all of Old JJCI's talc-related liabilities

4

and certain assets, the most important of which was the 2021 Funding Agreement; and (ii) a new

entity that ultimately took the name Johnson & Johnson Consumer, Inc. ("New JJCI") that

received a transfer of Old JJCI's multi-billion dollar global consumer health business, along with

Old JJCI's non-talc liabilities (the "2021 Corporate Restructuring"). *See generally Declaration of

John K. Kim in Support of First Day Orders* [LTL I, D.I. 5] ("2021 Kim Dec.") ¶¶ 19, 24.

9.        The 2021 Funding Agreement was the "most important" asset that LTL received in

the 2021 Corporate Restructuring and its primary source of funding to satisfy its talc liabilities. *See

LTL Mgmt.*, 64 F.4th at 106. The Debtor's pretext for giving up this asset in the one-sided funding

makeover that preceded LTL II is that the Third Circuit's finding that the Debtor was not in

financial distress as a result of its rights under the 2021 Funding Agreement "defeated the

fundamental purpose of [the 2021 Funding Agreement], which purpose was to facilitate the

Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the

Bankruptcy Code." 2023 Kim Dec. ¶ 78. This, the Debtor claims, created a "material risk that the

2021 Funding Agreement was no longer enforceable because it had become void or voidable." *Id*.

10.        This pretext is contrived and cannot withstand scrutiny. To begin with, the

circumstances surrounding its creation may be suspect. It appears that it was not J&J or New JJCI

that first came up with this theory or threatened that the 2021 Funding Agreement was "void or

voidable." Rather, this theory apparently originated with the ***Debtor's*** Chief Legal Officer, John

Kim. Mr. Kim was a 20-year veteran of J&J who served as "J&J's Assistant General Counsel,

Practice Group Lead for the Product Liability Litigation Group" when he was installed as the

Debtor's Chief Legal Officer. 2023 Kim Dec. ¶ 3. He apparently came up with this "frustration of

purpose"/"void or voidable" theory "around the time of the Third Circuit's decision" and

communicated it "that day." *See* Reporter's Transcript of Deposition of John Kim, April 14, 2023

5

("Kim Depo. Tr."), a copy of which is attached as **Exhibit A** to the Jones Dec., at 74:23-75:10;

76:3-13; 77:2-18. It seems odd, to say the least, for the **Debtor's** Chief Legal Officer to have

suggested to J&J a means by which J&J might escape its obligations to the Debtor under the 2021

Funding Agreement, without J&J having raised the issue and threatening to challenge the

enforceability of the 2021 Funding Agreement in the first instance.

11.    Regardless of who concocted this "fundamental purpose"/"void or voidable"

theory, that theory cannot be squared with the fact that the 2021 Funding Agreement required J&J,

as well as New JJCI, to fund "amounts to satisfy . . . [LTL's] Talc-Related Liabilities" **outside of**

**bankruptcy**. 2021 Funding Agreement (Exh. A to 2021 Kim Dec.) at 6. There was no reason to

require J&J to fund talc-related payments **outside** of a bankruptcy proceeding if the "fundamental

purpose" of the 2021 Funding Agreement was to facilitate the resolution of talc-related personal

injury and wrongful death claims ("Talc Claims") **in** a chapter 11 case.

12.    In fact, the New Funding Agreements **frustrated** what Mr. Kim **himself** previously

told the Court was a "key objective" of the 2021 Corporate Restructuring: "to make certain that the

Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and

future talc-related claims as Old JJCI did prior to the restructuring." 2021 Kim Dec. ¶ 21. This

"key objective" was the same whether the Debtor was in or out of bankruptcy. *See id.* ¶ 27 (2021

Funding Agreement required New JJCI and J&J to "fund amounts necessary (a) to satisfy the

Debtor's talc-related liabilities **at any time when there is no bankruptcy case** . . .") (emphasis

added)). J&J's liability as a co-obligor under the 2021 Funding Agreement, in or out of

bankruptcy, was the means by which the 2021 Funding Agreement accomplished this "key

objective."

6

13.     The Debtor itself highlighted this point in LTL I when it explained to the Court that an important purpose of having J&J as a co-payor with New JJCI was "***providing protection against any theoretical future diminishment of New JJCI's ability to pay Talc Claims***." *Debtor's Objection to Motion to Dismiss Chapter 11 Case* [LTL I, D.I. 956] ("2021 Dismissal Objection") at 30 (emphasis added). When the Official Committee of Talc Claimants ("TCC") in LTL I complained about the planned spin-off of New JJCI's consumer health business to J&J shareholders, the Debtor responded that J&J's joint obligation under the 2021 Funding Agreement "moots any concern about the impact of the proposed spin-off on New JJCI's value." 2021 Dismissal Objection at 25, n.33. But after the upstream transfer of New JJCI's consumer health business earlier this year produced a sharp drop in New JJCI's value, the Debtor agreed to *eliminate* this "protection against any . . . diminishment of New JJCI's ability to pay Talc Claims" provided by J&J's joint obligation under the 2021 Funding Agreement. 2021 Dismissal Objection at 30. This about-face frustrated the "key objective" touted by Mr. Kim and the "protection" promised by the Debtor. The Debtor is judicially estopped by its prior statements to the Court in LTL I from asserting that the "purpose" of the 2021 Funding Agreement was not the "purpose" of that agreement as the Debtor represented it to the Court in LTL I, and from denying that it was the *termination* of the 2021 Funding Agreement after the sharp decline in New JJCI's value that "frustrated" the purpose of that Agreement. *See In re Mintze*, 434 F.3d 222, 232 (3d Cir. 2006) ("The doctrine [of judicial estoppel] was designed to prevent parties from 'playing fast and loose with the courts.'") (quoting *Scarano v. Cent. R.R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir.1953)).

14.     In spite of these efforts, the Debtor still has not met (and cannot meet) its burden of demonstrating that the New Funding Agreements actually reduced the Debtor to the level of financial distress required to justify a chapter 11 filing under the Third Circuit's ruling in *LTL*

7

*Mgmt.* Those new funding arrangements may have increased the "'attenuated possibility'" that LTL "'may have to file for bankruptcy in the future'" but that "does not establish good faith." *See LTL Mgmt.,* 64 F.4th at 102 (*quoting In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999)). This chapter 11 filing is still premature. Indeed, in defense of the new arrangements, the Debtor has assured the Court that, "[W]e believe *the debtor has sufficient asset value to cover talc costs outside of bankruptcy*, again based on the assets of HoldCo [New JJCI] and the debtor." Reporter's Transcript of Proceedings, April 18, 2023 ("4/18/2023 Tr."), a copy of which is attached as **Exhibit B** to the Jones Dec., at 208:12-15 (emphasis added). The Debtor's Chief Legal Counsel acknowledged that "[the Debtor] has sufficient assets to pay off its . . . debts currently as they come due." Kim Dep. Tr. at 117:14-16. When the Debtor makes concessions like this, the Third Circuit "takes [the Debtor] at [its] word." *LTL Mgmt.*, 64 F.4th at 109.

15.    New JJCI, which remains liable to fund payment of the Debtor's talc liabilities and other expenses outside of bankruptcy, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████[4] This value may increase over time. *See* Kim Dep. Tr. at 72:18-21. To establish "financial distress" under the Third Circuit's test, the Debtor must provide evidence of New JJCI's current value, the dividend history of its subsidiaries, and reasonable projections of New JJCI's cash flow and future value.

16.    Moreover, the record before the Court is insufficient to support projections of future talc liability that would render New JJCI's existing value, along with its cash flow, insufficient to satisfy its obligation to fund the payment of the Debtor's talc liability outside of bankruptcy. *See*

---

[4]    Jones Dec., **Exhibit D** ████████████████████████████
████████████████████

*generally*, *LTL Mgmt.*, 64 F.4th at 107-09. Indeed, after 18 months in chapter 11, after the Third

Circuit criticized "back-of-the-envelope forecasts of hypothetical worst case scenarios" that

originated with the Debtor (*see LTL Mgmt.*, 64 F.4th at 108), and despite ample financial and

professional resources, ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ The fact that "substantial"

liability will have to be addressed by substantial assets does not establish anything more than an

attenuated possibility of the need for future bankruptcy relief. To the extent that there is any

uncertainty about the volume of pending and future Talc Claims or the cost of addressing the

Debtor's present and future talc liabilities, that uncertainty must be resolved against the Debtor,

because the Debtor bears the burden of proving good faith generally, and financial distress in

particular, and has not presented any serious estimate or analysis of those amounts to meet its

burden.

17.    Even if the Debtor does manage to demonstrate that it is in financial distress

sufficient to satisfy the Third Circuit's standard, that does not end the good faith inquiry. Although

a debtor's lack of financial distress is sufficient to disqualify it from access to chapter 11, a

debtor's financial distress does not automatically qualify it for access to chapter 11. The Court

must still consider the "totality of facts and circumstances" and determine whether this chapter 11

filing is "abusive." *See LTL Mgmt.*, 64 F.4th at 100 (citing *15375 Memorial Corp. v. BEPCO, Op*

---

[5]    *See also* Jones Dec., **Exhibit D** ████████████████████████████████████████

*(In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004)); *SGL Carbon*, 200 F.3d at 165.

18.     Here, even if the new funding arrangements did place the Debtor in financial distress, dismissal is still required for lack of good faith because the Debtor's second chapter 11 filing is "abusive." A debtor that is not in financial distress cannot manufacture its own financial distress two hours before filing a new chapter 11 case in order to circumvent a prior dismissal that is the result of a mandate by a court of appeals to a lower court. Under the "mandate rule," which obligates the lower court to follow the appellate court's mandate in both letter and spirit, this Court cannot give effect to such a circumvention. To avoid duplication on this point, Movants adopt the argument set forth on pages 29-30 of the *Motion of the Official Committee of Talc Claimants to Dismiss the Second Bankruptcy Petition of LTL Management, LLC* [D.I. 286] (the "TCC Motion to Dismiss").

19.     Even if the mandate rule did not apply, a debtor cannot manufacture financial distress to obtain access to what the Third Circuit has described as the "considerable powers" of a chapter 11 debtor to "disrupt[] creditors' existing claims against the debtor." *LTL Mgmt.*, 64 F.4th at 103. In *LTL Mgmt.*, the Third Circuit explained that, "[T]esting the nature and immediacy of a debtor's financial troubles, and examining its good faith more generally, are necessary" because chapter 11 vests debtors with "considerable powers" to "disrupt[] creditors' existing claims against the debtor." *Id.* (quoting *Integrated Telecom*, 384 F.3d at 120). The exercise of those powers is justified, "[w]hen *financially troubled* petitioners seek a chance *to remain in business . . . .*" *Id.* (first emphasis in original; second emphasis added). But that is not the case where, as here, the Debtor "is essentially a shell company 'formed' almost exclusively 'to manage and defend

10

thousands of talc-related claims' . . ." (*LTL Mgmt.*, 64 F.4th at 109) that has no real "business," and attempted to place itself in financial distress so that it could obtain access to the "considerable [indeed, extraordinary] powers" afforded a debtor in an asbestos case and protect its wealthy, non-debtor parent from talc litigation and liability. *See In re 15375 Mem'l Corp.*, 589 F.3d at 624 ("we turn to an issue that the Bankruptcy Court failed to consider in its good faith analysis: *the Debtors' representative was primarily concerned with protecting the GSF Entities, not the Debtors*") (emphasis in original). Such a ploy represents the kind of "abusive" chapter 11 filing that mandates dismissal for want of good faith.

20.     Such abuse is compounded where a debtor manufactures financial distress by making a fraudulent transfer two hours before a second chapter 11 filing in order to qualify for chapter 11 relief. Here, if the termination of the 2021 Funding Agreement did place the Debtor in "financial distress," then the underpinning for this chapter 11 case – the termination of the 2021 Funding Agreement – would be a transfer which, even if not made with the actual intent to hinder, delay or defraud creditors (which it was), was constructively fraudulent.

21.     The Debtor claims that no fraudulent transfer occurred because it is not insolvent. According to the Debtor, proving a constructive fraudulent transfer "takes both lack of reasonably equivalent value" and "the entity is rendered insolvent." 4/18/2023 Tr., at 204:25-205:6. No, it does not. There are two alternative grounds other than insolvency for finding that a transfer made for less than reasonably equivalent value is constructively fraudulent. First, under Code section 548(a)(1)(B)(ii)(II), a transfer made for less than reasonably equivalent value is constructively fraudulent where the debtor "was engaged in business or a transaction. . . for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II). Second, under Code section 548(a)(1)(B)(ii)(III), a transfer made for less than reasonably

11

equivalent value is constructively fraudulent where the debtor "believed that [it] would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . ." 11 U.S.C. § 548(a)(1)(B)(ii)(III). If the Debtor's financial condition after the 2021 Funding Agreement was terminated was reduced to the level required to satisfy the Third Circuit's standard for "financial distress," then both of these alternative grounds for finding that a transfer made for less than reasonably equivalent is a constructive fraudulent transfer would be satisfied.

22.    The Debtor's claim that it has 60,000 Talc Claimant votes for its yet-to-be-filed plan, and expects a 75% acceptance rate, cannot create good faith where it has not otherwise been established. There will be many thousands (likely tens of thousands) of current Talc Claimants who reject the plan. There will be many future unknown Talc Claimants who will not get to vote on the plan at all. It is only because of the "considerable powers" vested in chapter 11 debtors that the Debtor might be able to bind those dissenting current Talc Claimants, as well as non-voting unknown future Talc Claimants, to a plan that releases not only the Debtor, but hundreds of other parties, including its AAA-rated parent, from any liability on Talc Claims. The exercise of a chapter 11 debtor's extraordinary power to bind thousands of dissenting current, and unknown future, Talc Claimants to a plan that insulates its wealthy parent and numerous other non-debtors from Talc Claims is not justified where, as here, the Debtor attempted to place itself in financial distress in order to circumvent a prior mandate of the Third Circuit and obtain access to that extraordinary power.

23.    In any event, whether or not the Debtor has the claimed level of plaintiff lawyer support for its to-be-filed plan, any plan that the Debtor is likely to propose, and J&J and New JJCI to support, will be non-confirmable due to the overbreadth of the third-party channeling injunction that such a plan will require. The plan the Debtor intends to file with the support of J&J and New

12

JJCI will likely include a section 524(g) channeling injunction that extends to all "Protected Parties" and "Debtor Talc Claims," as those terms are defined in the Debtor's *Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction* (the "Preliminary Injunction Motion") [Adv. D.I. 2]. J&J and New JJCI are likely to insist that any other plan they support and fund include a similarly broad channeling injunction. But if that is the case, then no plan can be confirmed in this case as long as the obligation of J&J and New JJCI to fund a plan trust is limited to a plan they support.[6] This is because, under applicable Third Circuit authority, a plan channeling injunction that encompasses all "Debtor Talc Claims" against "Protected Parties," as those terms are defined in the Preliminary Injunction Motion, would exceed the permissible scope of a channeling injunction under a chapter 11 plan for an asbestos debtor. Under such circumstances, there is no point to this chapter 11 case other than to cause further delay on top of the 18-month delay that resulted from LTL I. This case should be dismissed, and Talc Claimants permitted to proceed against the Debtor, J&J and the other "Protected Parties."

## II.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

24.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and the Amended Standing Order of Reference from the United States District Court for the District of New Jersey, dated September 18, 2012. Venue is proper before this Court pursuant

---

[6] This problem did not exist in LTL I, because under the 2021 Funding Agreement, J&J and New JJCI were required to fund a plan trust under a plan confirmed by a final order of this Court, whether or not they supported the plan, and whether or not they received the benefit of a channeling injunction. Thus, for example, if the Court confirmed a creditor plan that did not include a channeling injunction that extended to all "Debtor Talc Claims" against "Protected Parties," and the confirmation order became final, J&J and New JJCI would nevertheless have been required to fund the plan trust. With the demise of the 2021 Funding Agreement, that is not the case in LTL II.

13

to 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The statutory basis for the relief requested herein is section 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017.

III.

**FACTUAL BACKGROUND**

A.      **Talc Litigation against the Debtor's Parent and Predecessor**

25.      J&J has sold Johnson's Baby Powder made with talcum powder (talc) since 1894, but has not always sold baby powder directly. Through a series of transfers that began in 1979, various wholly owned subsidiaries have sold baby powder; and the baby powder operation was ultimately transferred to Old JJCI. *See LTL Mgmt.*, 64 F.4th at 93.

26.      In recent years, increasing numbers of individuals suffering from ovarian cancer or mesothelioma have sued J&J and Old JJCI, claiming that their illnesses resulted from the use of talc-based baby powder. Over 38,000 ovarian cancer actions (most consolidated in federal multidistrict litigation in New Jersey) and over 400 mesothelioma actions were pending against Old JJCI and J&J when the Debtor filed LTL I in October, 2021. *See id.* at 93-94.

27.      J&J explored ways to mitigate its and Old JJCI's exposure to talc litigation (*id.* at 95) and seized upon a restructuring that would capture all asbestos liability in a subsidiary to be placed into bankruptcy, *i.e.*, the Debtor. *See id.*

B.      **The 2021 Corporate Restructuring and Divisional Merger**

28.      On October 12, 2021, Old JJCI proceeded with a corporate restructuring under Texas law referred to as a "divisional merger," in which it divided its assets and liabilities between two new entities and ceased to exist. *See generally id.* at 95-96. Through a series of steps, Old

14

JJCI's divisional merger created two entities, the Debtor and New JJCI, and allocated Old JJCI's

assets and liabilities between them. Importantly, the divisional merger "also featured the creation

of a Funding Agreement," which "ultimately . . . gave [the Debtor] rights to funding from [New

JJCI] and J&J." *Id*. at 96.

29.     The divisional merger allocated to the Debtor responsibility for essentially all

liabilities of Old JJCI tied to talc related claims and allocated Old JJCI's consumer health products

business to New JJCI. As described by the Third Circuit, the Debtor, "whose employees are all

J&J employees, is essentially a shell company 'formed,' almost exclusively, 'to manage and

defend thousands of talc-related claims,' while insulating at least the assets now in [New JJCI]."

*Id*. at 109 (citation omitted). The other assets received by the Debtor in the divisional merger

included Old JJCI's contracts related to talc litigation, indemnity rights, and its interests in a

subsidiary that owned a portfolio of royalty streams derived from consumer brands (valued by the

Debtor at approximately $367.1 million). But the most important asset received by the Debtor was

rights as payee under the 2021 Funding Agreement with J&J and New JJCI. *Id*. at 96-97.

**C.      The 2021 Funding Agreement**

30.     As described by the Third Circuit, the 2021 Funding Agreement:

> gave LTL, ***outside of bankruptcy***, the ability to cause [New JJCI] and J&J,
> jointly and severally, to pay it cash up to the value of [New JJCI] for
> purposes of satisfying any talc-related costs. . . In bankruptcy, the [2021
> Funding Agreement] gave [the Debtor] the right to cause [New JJCI] and
> J&J, jointly and severally, to pay it cash . . . to fund a trust, created in a plan
> of reorganization, to address talc liability for the benefit of future and
> existing claimants. In either scenario, there were few conditions to funding. .
> . .

*Id*. at 96. The limit on the aggregate amount of the payments required to be made under the 2021

Funding Agreement could not drop below a floor tied to the value of New JJCI, measured as of the

15

time of the divisional merger, which was "estimated by LTL at $61.5 billion," and which was

"subject to increase as the value of [New JJCI] increased after that date." *Id*. at 97.

31.    In order to fully grasp the negative impact that replacing the 2021 Funding

Agreement with the New Funding Agreements had on the Debtor and Talc Claimants, it is worth

reviewing the precise terms that established the scope of J&J's and Old JJCI's obligation to fund

payment of the Debtor's talc liabilities. That obligation included the obligation to make payments

to fund "any amounts to satisfy:"

> (i) the [Debtor's] Talc Related Liabilities established by a judgment of a
> court of competent jurisdiction or final settlement thereof ***at any time when
> there is no proceeding under the Bankruptcy Code pending with respect to
> the [Debtor]***;

> (ii) following the commencement of any Bankruptcy Case, the [Debtor's]
> Talc Related Liabilities in connection with the funding of one or more trusts
> for the benefit of existing and future claimants created pursuant to a plan of
> reorganization for the [Debtor] confirmed by a final, nonappealable order of
> the Bankruptcy Court and, to the extent required, the District Court (for the
> avoidance of doubt, ***regardless of whether such plan of reorganization
> provides that the Payors will receive protection pursuant to section 105 or
> section 524(g) of the Bankruptcy Code and regardless of whether the
> Payors support such plan of reorganization***); and

> (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the
> [Debtor] associated with such Talc Related Liabilities and any litigation
> thereof, including the costs of any appeals;

2021 Funding Agreement (Exh. A to 2021 Kim Dec.) at 6 (definition of "Permitted Funding Use,"

clause (c)) (emphasis added).

## D.    **New JJCI**

32.    New JJCI received Old JJCI's "productive business assets, including its valuable

consumer products. . . ." *LTL Mgmt*., 64 F.4th at 97. It then began operating the consumer health

business formerly held by Old JJCI. *Id*.

16

33.    In December 2022, New JJCI was rechristened Johnson & Johnson Holdco (N.A.) Inc.[7] In January 2023, New JJCI transferred its "Consumer Business,"[8] "which represented a substantial portion of its assets" to its parent entity. 2023 Kim Dec. ¶¶ 82, 83. New JJCI was then left with its interest in subsidiaries that was valued at roughly $30 billion, the dividends they provide, and access to about $400 million in cash through J&J's cash management system as its sources of value to satisfy its obligation to fund the payment of the Debtor's talc liabilities under the 2021 Funding Agreement. *See id*. at ¶ 26-28. As substantial as this may be, it was far less than the $61.5 billion or more in funding from J&J to which the Debtor was entitled to fund the payment of its talc liabilities outside of bankruptcy.

E.    **The Debtor's First Bankruptcy Filing and Procedural History**

34.    On October 14, 2021, two days after its formation, the Debtor filed LTL I in North Carolina. The Debtor then succeeded in obtaining a series of injunctions against the prosecution of talc claims arising from Johnson's Baby Powder asserted against over 600 non-debtors (the "Third-Party Claims"), including affiliates such as J&J and New JJCI, as well as insurers and third-party retailers (such non-debtors being referred to collectively as the "Protected Parties"). *See LTL Mgmt*., 64 F.4th at 97. Those injunctions lasted through the roughly 18 month duration of LTL I, until LTL I was dismissed.

35.    After the North Carolina Bankruptcy Court ordered that venue of LTL I be transferred to this District, the TCC and others moved to dismiss the Debtor's chapter 11 petition under section 1112(b) of the Code as not having been filed in good faith. *See id*. at 98. Meanwhile,

---

[7] The Debtor refers to New JJCI in its renamed form as "Holdco." *See* 2023 Kim Dec. ¶ 26. Objectors refer to this entity throughout as "New JJCI," because "New JJCI" and "Holdco" are the same entity, albeit with "Holdco" being a stripped-down version of New JJCI.

[8] The 2023 Kim Dec. defines the "Consumer Business" as "the manufacture and sale of a broad spectrum of products used in the baby care, beauty, oral care, wound care, and women's health care fields, as well as over-the-counter pharmaceutical products." 2023 Kim Dec. ¶ 26.

17

the Debtor sought to have the order enjoining Third-Party Claims against the Protected Parties for a 60-day period that had been entered by the North Carolina Bankruptcy Court before the transfer of venue extended. *Id*.

36.    Following a hearing on the motions to dismiss and the Debtor's third-party injunction motion, the Court denied the motions to dismiss and granted the injunction motion. *Id*. Appeals were taken from both orders. The Court certified the challenged orders for direct appeal to the Third Circuit, and the Third Circuit authorized direct appeal of the orders. *Id.* at 99.

**F.    The Third Circuit's Decision and Dismissal of LTL I**

37.    The Third Circuit reversed the order denying the motions to dismiss and remanded the case with instructions to dismiss LTL I. It also found that, because dismissing the case would annul the litigation stay, there was no need to reach that issue. *Id*. at 99 n.11. The Court of Appeals held that the chapter 11 case had not been filed in good faith because the Debtor was not in financial distress. *Id*. at 93.

38.    The Court first explained that, as a matter of law, "a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith." *Id*. at 101. "[A]bsent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose." *Id*.

39.    The Court then concluded that "LTL Was Not in Financial Distress." *Id*. at 106. In so doing, it relied on the availability of funding under the 2021 Funding Agreement: "[W]e cannot agree [the Debtor] was in financial distress when it filed its Chapter 11 petition. The value and quality of its assets, which include a $61.5 billion payment right against J&J and [New JJCI], make this holding untenable." *Id*. The Court focused on the Debtor's right "outside of bankruptcy" to

18

cause J&J and New JJCI to pay in cash up to the value of Old JJCI (estimated at $61.5 billion) to satisfy any talc related costs and normal course expenses. *Id*.

40.     The Court viewed this right as "reliable." *Id*. It found "[m]ost important" that "the payment right gave LTL direct access to J&J's exceptionally strong balance sheet." *Id*. It also noted that New JJCI had access to Old JJCI's cash-flowing brands and products along with the profits they generated (which underpinned the $61.5 billion enterprise value). *Id*.

41.     After the Third Circuit issued its opinion, the Debtor moved unsuccessfully for rehearing and, thereafter, moved unsuccessfully to stay the mandate of the Court of Appeals pending the Debtor's filing of a petition for *certiorari* with the Supreme Court and until the Supreme Court's final disposition. The Third Circuit then issued its mandate and LTL I was dismissed.

**G.     The New Funding Agreements**

42.     Shortly after the Third Circuit issued its opinion, and while the Debtor was still debtor in possession prior to the dismissal of LTL I, the Debtor, J&J and New JJCI began planning the "new arrangements" that would place the Debtor in financial distress as the precursor to a second chapter 11 filing that would follow on the heels of the dismissal of LTL I. *See* Kim Dep. Tr. at 75:5-76:13.The centerpiece of these "new arrangements" was the elimination of J&J's obligation to fund the payment of the Debtor's talc-related liabilities outside of bankruptcy – an obligation that the Third Circuit had found "[m]ost important" in its analysis of the Debtor's alleged financial distress. *See* 64 F.4th at 106. This left the Debtor with only a funding obligation from a downsized New JJCI that no longer "had access to [Old JJCI's] cash-flowing brands and products along with the profits they produced, . . ." *See id*.

19

43.     The plan and pretext for these "new arrangements" first began taking shape when

the Third Circuit issued its opinion. According to his deposition testimony, it occurred to Mr. Kim

***on the day the Third Circuit opinion was issued*** that the 2021 Funding Agreement might be "void

or voidable." In other words, the Debtor's own Chief Legal Officer apparently came up with the

supposed basis for eliminating the Debtor's extremely valuable funding rights under the 2021

Funding Agreement. *See* Kim Dep Tr. at 74:23-75:10, 76:3-13. But conspicuously absent from Mr.

Kim's story is any mention of having conducted any meaningful, in depth analysis of, or due

diligence into, potential challenges to his "frustration of purpose"/"void or voidable" theory. In

fact, as he testified at the April 18, 2023 hearing on the Debtor's request for a preliminary

injunction, the Debtor's "analysis" was limited to conversations among lawyers; the Debtor did not

seek any independent evaluation outside of counsel conversations. *See* 4/18/2023 Tr. at 100:6-

102:2. Importantly, had the Debtor expanded its "analysis" and researched the viability of Mr.

Kim's theory that the 2021 Funding Agreement was "void or voidable" under a "frustration of

purpose" theory, the Debtor would have found that the theory was untenable. To avoid duplication,

Movants adopt the arguments on this point made at pages 32-37 of the TCC Motion to Dismiss.

44.     Mr. Kim declined to identify which party to the 2021 Funding Agreement wanted to

declare it void or voidable, instead testifying that "there was a consensus that – there was a

material risk that the funding agreement was void or voidable." Kim Dep. Tr. at 190:1-3. J&J

never informed LTL that it refused to comply with the 2021 Funding Agreement, and LTL never

attempted to enforce it against J&J. *See id.* at 207:7-208:25. Remarkably, the "common interest

privilege" was raised with respect to discussions between the Debtor's counsel and J&J's counsel

with respect to a transaction – termination of the 2021 Funding Agreement – with respect to which

20

the Debtor and J&J were supposedly on opposite sides of the contract they were renegotiating. *See id.* at 207:17-208:7.

45.    There is no evidence that the Debtor ever pushed back on the "frustration of purpose"/"void or voidable" theory, considered challenges to the viability of that theory, considered the inconsistency of that theory with representations made to the Court in LTL I regarding the "purpose" of the 2021 Funding Agreement, or considered filing a declaratory relief action to resolve the issue and create pressure on J&J and New JJCI. There is also no evidence of the kind of hard fought negotiations that would have taken place in the renegotiation of a contract that gave one party a multi-billion dollar funding right against the other party, where the funding obligor challenged the enforceability of the contract, if the transaction was at arms' length and the funding obligor was not the parent entity of the funding obligee. Apparently, there was no time to lose taking such responsible measures before the stage had to be set be set for LTL II by gutting J&J's funding obligations. The plan for the new funding arrangements was ready to go when the Court of Appeals issued its mandate and LTL I was dismissed.

46.    After LTL I was dismissed, and within hours (or minutes) before LTL II was filed, the Debtor, J&J, and New JJCI entered into an agreement that terminated the 2021 Funding Agreement and replaced it with the two New Funding Agreements. New JJCI and the Debtor entered into the 2023 Funding Agreement, and the Debtor, New JJCI and J&J entered into the separate J&J Support Agreement. *See* 2023 Kim Dec. ¶ 79.

47.    The 2023 Funding Agreement obligates New JJCI to fund amounts necessary, among other purposes, (i) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (ii) in the event of a chapter 11 filing by the Debtor, to fund a trust created pursuant to a plan of reorganization for the Debtor, but only if that plan contains the terms agreed

21

to in the Plan Support Agreement, as such terms may be modified with the consent of the parties to that Agreement. *See* 2023 Funding Agreement (Annex E to 2023 Kim Dec.) at 4 (definition of "Permitted Funding Use," clause (c)(ii)), 6 (definitions of "Supported Plan" and "Supported Plan Terms"). Because both J&J and New JJCI are parties to the Plan Support Agreement and must consent to any amendment of its terms (*see* Plan Support Agreement (Annex A to 2023 Kim Dec.) at 1 (defining "Parties" to include J&J and New JJCI), 7 §6 ("Amendment")), this limitation means that New JJCI is not required to fund a plan trust under a plan that it and J&J do not support, and, correspondingly, that J&J has no obligation to provide funding for such a plan trust under the J&J Support Agreement. This limitation effectively gives J&J a veto over any plan in this case.

48.     The J&J Support Agreement is subject to the approval of the Court and is operative ***only*** in the chapter 11 case. It obligates J&J to provide the chapter 11 plan trust funding New JJCI is required to provide under the 2023 Funding Agreement, but only if New JJCI fails to provide the funding. *See* 2023 Kim Dec. ¶ 81.

## H.     The Preliminary Injunction Motion

49.     Shortly after it filed LTL II, the Debtor filed the *Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction* [Adv. D.I. 2] (the "Preliminary Injunction Motion"). The Preliminary Injunction Motion sought an order prohibiting the commencement or continuation of any actions by Talc Claimants that seek to hold any of the "Protected Parties" liable for any "Debtor Talc Claims." Both terms are defined broadly. The Protected Parties are defined to include: J&J; Old JJCI; Johnson & Johnson, Inc. (a Canadian corporation); New JJCI; and

22

(e) third-party retailers who sold Old JJCI's talc-containing products (the "Retailers") and other third parties whom Old JJCI and now the Debtor has indemnified contractually (the "Indemnified Parties"), identified on Appendix B to the Complaint.

Preliminary Injunction Motion at 2. Appendix B identifies hundreds of parties.

50.     The "Debtor Talc Claims" are defined broadly:

"Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) Old JJCI on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). . . . For the avoidance of doubt, Debtor Talc Claims include all talc personal-injury claims and other talc-related claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring . . . The Debtor Talc Claims do not include talc-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

Preliminary Injunction Motion at 2 & n.4. It is fair to assume that any plan that J&J and New JJCI will support and fund, and any plan the Debtor will file, will include a channeling injunction under section 524(g) of the Code that would enjoin all present and future Talc Claimants from commencing or prosecuting "Debtor Talc Claims" against the "Protected Parties, as those terms are defined in the Preliminary Injunction Motion.

51.     Following a hearing on the Preliminary Injunction Motion, the Court granted more limited injunctive relief than had been sought. The Court enjoined Talc Claimants from commencing or conducting trials or appeals on Debtor Talc Claims against Protected Parties (other than two that were carved out), but otherwise permitted any party to commence or proceed with discovery or other pretrial matters in those suits, or, following notice to the Debtor, file suit against a Protected Party. *See Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and Granting Limited Preliminary Restraints* [Adv. D.I. 91].

23

IV.

**BASIS FOR RELIEF REQUESTED**

A.    **Statutory Framework for Dismissal**

52.    "[O]n request of a party in interest, and after notice and a hearing, the court

*shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this

chapter, whichever is in the best interests of creditors and the estate, for cause." *See* 11

U.S.C. § 1112(b)(1) (emphasis added). Section 1112 includes a non-exhaustive list of what

constitutes "cause." *See* 11 U.S.C § 1112(b)(4)(A)-(P); *see also SGL Carbon Corp.*, 200 F.3d at

160. In addition to the list enumerated in section 1112(b)(4), cause exists to dismiss a chapter

11 case when the petition was not filed in good faith. *LTL Mgmt.*, 64 F.4th at 100 ("lack of good

faith constitutes 'cause,' though it does not fall into one of the examples of cause specifically listed

in the statute"); *see also 15375 Mem'l Corp.*, 589 F.3d at 618; *SGL Carbon Corp.*, 200 F.3d at

160. "Once at issue, the burden to establish good faith *is on the debtor*." *LTL Mgmt.*, 64 F.4th at

100 (emphasis added); *see Integrated Telecom Express*, 384 F.3d at 118; *SGL Carbon Corp.*, 200

F.3d at 162 & n.10.

53.    The Third Circuit Court of Appeals has adopted the following framework for

evaluating the good faith of a chapter 11 petition:

> Our cases have accordingly focused on two inquiries that are
> particularly relevant to the question of good faith: (1) whether the
> petition serves a valid bankruptcy purpose, e.g., by preserving a going
> concern or maximizing the value of the debtor's estate, and (2)
> whether the petition is filed merely to obtain a tactical litigation
> advantage.

*Integrated Telecom Express,* 384 F.3d at 119-20; *see also LTL Mgmt.*, 64 F.4th at 100-01.

54.    As explained in the next section of this Memorandum, financial distress is a

prerequisite to a finding of good faith; and a chapter 11 case filed by a debtor that is not in

24

financial distress must be dismissed. But the converse is not true; that is, even if a debtor is in

financial distress, that does not automatically qualify the debtor for chapter 11 relief and end the

good faith inquiry. The Court must still consider the "totality of facts and circumstances" to

determine whether the chapter 11 filing is "abusive." *See LTL Mgmt.*, 64 F.4th at 100 (citing *In re

15375 Mem'l Corp.*, 589 F.3d at 618; *Integrated Telecom*, 384 F.3d at 118); *SGL Carbon*, 200

F.3d at 165.

**B.      Financial Distress that Satisfies the Third Circuit's Standard is a Prerequisite to a
          Finding of Good Faith; Absent Such Financial Distress, a Chapter 11 Case
          <u>Must Be Dismissed</u>**

    **(1)      Financial Distress Is a Precondition to a Good Faith Chapter 11 Filing**

55.      The Third Circuit's decision in *LTL Mgmt.* underscores the principles that: (i) a

chapter 11 case filed by a debtor that does not face financial distress that satisfies the Third

Circuit's standard must be dismissed as not having been filed in good faith, and (ii) the burden of

establishing the requisite level of financial distress is on the debtor. *See LTL Mgmt.,* 64 F.4th at

100. A valid bankruptcy purpose "assumes a debtor in financial distress." *Id.* at 101 (quoting

*Integrated Telecom Express,* 384 F.3d at 128). This is true because "absent financial distress, there

is no reason for Chapter 11 and no valid bankruptcy purpose." *LTL Mgmt.*, 64 F.4th at 101. "A

debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition

serves a valid bankruptcy purpose supporting good faith." *Id.* Accordingly, for a Chapter 11 case

to be filed in good faith, there must be "some degree of financial distress on the part of a debtor."

*Id.* (quoting *Integrated Telecom*, 384 F.3d at 121).

56.      "Financial distress must not only be apparent, but it must be immediate enough to

justify a filing. '[A]n attenuated possibility standing alone' that a debtor 'may have to file for

bankruptcy in the future' does not establish good faith." *LTL Mgmt.*, 64 F.4th at 102 (citing and

25

quoting *SGL Carbon*, 200 F.3d at 163). Thus, for example, a financially troubled debtor facing

mass tort liability may require bankruptcy to "'enable a continuation of [its] business and to

maintain access to the capital markets' even before it is insolvent." *LTL Mgmt.*, 64 F.4th at 102

(quoting *SGL Carbon*, 200 F.3d at 169). The same may be true of a debtor like Johns-Manville that

faced mass tort litigation that, but for its bankruptcy filing, would have triggered the acceleration

of $950 million in debt, "'possibly resulting in a forced liquidation of key business segments.'"

*LTL Mgmt.*, 64 F.4th at 104 (quoting *In re Johns-Manville Corp.*, 36 B.R. 727, 720 (Bankr.

S.D.N.Y. (1984)). But the same is not true of a debtor with no "business" whose continuation is

threatened and no "key business segments" that could face a forced liquidation that faces only the

"'attenuated possibility' that talc litigation may require it to file for bankruptcy in the future." *See*

*LTL Mgmt.*, 64 F.4th at 102. Accordingly, when weighing whether prospective mass tort liability

has created financial distress sufficient to justify a bankruptcy filing, the Court must consider:

(1) whether a debtor's ongoing operations are threatened; (2) the scope of the debtor's liabilities;

(3) the capacity of the debtor to meet those liabilities; and (4) the immediacy of any financial

distress. *See LTL Mgmt*., 64 F.4th at 103-04.

> **(2)    The Requirement of Genuine Financial Distress Plays a Critical Role in Protecting Creditors and Preserving the Integrity of the Bankruptcy System— Particularly in a Mass Tort Asbestos Case, Where Section 524(g) Gives the Debtor Extraordinary Powers to Disrupt the Claims of Present and Unknown Future Asbestos Claimants**

57.    In *LTL Mgmt.*, the Court explained that:

> [T]esting the nature and immediacy of a debtor's financial troubles, and examining its good faith more generally, are necessary because bankruptcy significantly disrupts creditors' existing claims against the debtor: "Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When ***financially troubled*** petitioners seek a chance ***to remain in business***, the exercise of those powers is justified." Accordingly, we have said ***the***

26

> ***availability of certain debtor-favored Code provisions "assume[s] the
> existence of a valid bankruptcy, which, in turn, assumes a debtor in
> financial distress." Put another way, "Congress designed Chapter 11 to
> give those businesses teetering on the verge of a fatal financial plummet
> an opportunity to reorganize on solid ground and try again, not to give
> profitable enterprises an opportunity to evade contractual or other
> liability*."**

*Id*. at 103 (emphasis added; internal citations omitted).

58.    The Third Circuit's concern about "disrupt[ing] creditors' existing claims against
the debtor" and "impos[ing] significant hardship on particular creditors" is particularly acute, and
the corresponding need for careful scrutiny of "the nature and immediacy of the debtor's financial
troubles," and "its good faith more generally" is heightened in a mass tort asbestos case like this
one. *See id*. In *LTL Mgmt.*, the Court expressed concern about a risk unique to creditors in a mass
tort chapter 11 case:

> Risks associated with premature filing may be ***particularly relevant*** in the
> context of a mass tort bankruptcy. Inevitably those cases will involve a
> bankruptcy court estimating claims on a great scale—introducing the
> possibility of undervaluing future claims (and underfunding assets left to
> satisfy them) and the difficulty of fairly compensating claimants with wide-
> ranging degrees of exposure and injury.

*Id.* at 103 (emphasis added and footnote omitted). This risk is compounded where, as here, the
Debtor does not have (and Old JJCI did not have) "a longer history of litigation outside of
bankruptcy," such as the benefit of data from 15 years of tort litigation by A.H. Robins before its
chapter 11 filing. *See id.*at 103 & n.13.

59.     The power to bind present and unknown future asbestos claimants to such an
aggregate claims estimation is but ***one*** of the extraordinary powers conferred on an asbestos debtor
under section 524(g) of the Code. Section 524(g) provides particularly powerful tools for debtors
facing "overwhelming liability." 103 H.R. REP. 835, at 41 (1994). It authorizes enjoining all
present and future claims against related third parties, not just the debtor, and channeling them to a

27

claims trust, depriving claimants of their choice of forum and limiting their recovery to the funding

of the plan trust. 11 U.S.C. § 524(g)(2), (g)(4)(A)(ii). This broad injunctive power to protect non-

debtors from suit extends not only to bar claims of dissenting current asbestos creditors who reject

the plan, but also binds even unknown future claimants whose claims have not accrued, who

receive no notice of the proceeding, and who cannot vote on or object to the plan. *Id.* And, again,

as the Third Circuit noted in *LTL Mgmt.*, there is the ever-present risk of underestimating mass tort

claims in the aggregate and the corresponding risk that the plan trust to which the recourse of

present and unknown future asbestos claims is limited will be underfunded. *LTL Mgmt.*, 64 F.4th at

103.

60.    Empowering a debtor to impose these extraordinary burdens on claimants is

unjustifiable if the debtor is not in financial distress. Careful scrutiny of both financial distress, and

good faith generally, is particularly appropriate where, as here, the Debtor seeks access to those

"considerable powers" primarily to protect its wealthy, non-debtor parent from talc litigation. The

Third Circuit has cited the use of chapterr 11 for the primary purpose of protecting the debtor's

non-debtor affiliates from liability as a significant element of bad faith. *See In re 15375 Mem'l*

*Corp.*, 589 F.3d at 624, 626 (in affirming district court's reversal of bankruptcy court's order

denying motion to dismiss chapter 11 case, court of appeals noted that: "[W]e turn to an issue that

the Bankruptcy Court failed to consider in its good faith analysis: *the Debtor's representative was*

*primarily concerned with protecting the GSF Entities, not the Debtors*;" court further cited

debtor's misuse of bankruptcy to protect affiliates from liability to a creditor of the debtor as an

element of bad faith) (emphasis in original).

C.      **The Debtor's Case Lacks a Valid Bankruptcy Purpose**

   **(1)     The Debtor Has Not Met its Burden to Show Financial Distress**

61.      This case lacks a "valid bankruptcy purpose," because the Debtor has not met its

burden of demonstrating that replacing the 2021 Funding Agreement with the New Funding

Agreements actually reduced the Debtor to the level of financial distress required to justify a

chapter 11 filing under the Third Circuit's ruling in *LTL Mgmt.*

62.      To begin with, even after the New Funding Agreements replaced the 2021 Funding

Agreement, New JJCI, which remains liable to fund payment of the Debtor's talc liabilities and

other expenses outside of bankruptcy, ████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████[9] This value may increase over time. *See* Kim Dep. Tr. at 72:18-21. As in

LTL I, the record before the Court is insufficient to support projections of future talc liability that

would render New JJCI's existing value, along with its cash flow, insufficient to satisfy its

obligation to fund the payment of the Debtor's talc liability outside of bankruptcy. *See generally*,

*LTL Mgmt.,* 64 F.4th at 107-09.

63.      From the perspective of the Debtor's capacity to meet its (unquantified) talc

liabilities, the New Funding Agreements and the gratuitous upstream transfer of New JJCI's

consumer health business to its parent may have increased somewhat the "attenuated possibility"

that LTL "'may have to file for bankruptcy in the future;'" but that "does not establish good faith."

*See LTL Mgmt.,* 64 F.4th at 109 (*citing SGL Carbon Corp.*, 200 F.3d at 164). This chapter 11 filing

is still premature, as the relevant inquiry is whether the Debtor has "access to cash to meet

---

[9]      Jones Dec. **Exhibit D** ████████████████████████████████████████████
████████████████████

comfortably its liabilities as they come due for the foreseeable future." *LTL Mgmt.*, 64 F.4th at

108. The Third Circuit found that it did in LTL I. *Id.* The Debtor has stated that it does here.

64.    In defense of the New Funding Agreements, the Debtor has told the Court that,

"Again, as I've said before, ***we believe the debtor has sufficient asset value to cover talc costs***

***outside of bankruptcy***, again based on the assets of HoldCo [New JJCI] and the debtor." 4/18/2023

Tr. at 208:12-15 (emphasis added). Its Chief Legal Officer has acknowledged that, "[The Debtor]

has sufficient assets to pay off its . . . debts currently as they come due." Kim Dep. Tr. at 117:14-

16.

65.    Moreover, without a reasonably reliable estimate of the Debtor's present and future

talc liabilities, the Court cannot possibly "weigh . . . the scope of liabilities the debtor faces"

against its capacity to meet them. *LTL Mgmt.*, 64 F.4th at 104. Yet, ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ The fact that "substantial"

liability will have to be addressed by substantial assets does not establish anything more than an

attenuated possibility of the need for future bankruptcy relief.

66.    The Debtor's failure to produce a reasoned estimate or valuation of its aggregate

talc liabilities after 18 months in bankruptcy smacks of gamesmanship. The Debtor and J&J

certainly have available to them the financial and professional resources to develop such a

---

[10]    Jones Dec. **Exhibit D** ████████████████████████████████████████
    ██████████████

30

reasoned estimate or valuation. But they know that, in providing an estimate of aggregate talc liabilities sufficient to establish that the Debtor faces financial distress despite the substantial resources still available to it to satisfy those talc liabilities, they would also demonstrate the clear inadequacy of the proposed $8.9 billion in trust funding that is currently on the table (and of any lesser amount of trust funding they were previously prepared to offer). An estimate of aggregate talc liabilities sufficient to support a claim of financial distress would underscore the risk of substantial trust underfunding if the funding of a plan trust is limited to $8.9 billion, and the concomitant risk of substantially undercompensating Talc Claimants whose recourse for their injuries would be limited to such an underfunded plan trust. *Cf. LTL Mgmt.*, 64 F.4th at 103 (noting the risk of trust underfunding entailed in the estimation of mass tort claims in the aggregate).

67.    For all its machinations in manufacturing financial distress, the Debtor still has done nothing to provide a reasonable estimate or valuation of the scope of its liabilities, despite the Third Circuit's clear concern that the casually calculated projections in LTL I were clearly erroneous. Like LTL I, this case must be dismissed, because the Debtor has provided insufficient evidence to meet its burden of showing a likely insufficiency of assets to satisfy its talc liabilities. At best, this chapter 11 filing is still premature.

**(2)    The Debtor Has Not Shown, and Cannot Show, that There Is Any Threat to Ongoing Business Operations**

68.    As evidenced by the Third Circuit's reference to "financially troubled petitioners" who "seek a chance to remain in business" (*LTL Mgmt.*, 64 F.4th at 103), the nature of a debtor's business and operations – and whether the debtor has any business to preserve – are relevant to whether its chapter 11 petition serves a valid bankruptcy purpose.

31

69.    Here, the Debtor has no meaningful business operations to preserve or continue to operate – let alone any business operations whose continued viability is threatened by financial distress. The Debtor is a shell company with no employees of its own, formed almost exclusively to manage and defend thousands of talc-related claims against it, funded almost exclusively not by any business operations of its own, but by affiliates. *See id.* at 109. Unlike the debtors in *Johns-Manville* and *A.H. Robins*,[11] the Debtor has no ongoing business operations that are threatened by its talc liabilities and require bankruptcy protection. This factor weighs in favor of dismissal.

70.    In sum, the Debtor has not met its burden in establishing financial distress sufficient to meet the good faith requirement set forth in *LTL Mgmt.* The case must be dismissed.

**D.    Manufacturing Financial Distress to Qualify for Chapter 11 Relief is Bad Faith *Per Se***

71.    Even where a debtor does meet its burden of demonstrating that it is in financial distress, the court must still consider the "totality of the circumstances" to determine whether the chapter 11 filing is "abusive." The Debtor's attempt to manufacture financial distress to circumvent the Third Circuit's ruling and gain access to chapter 11 represents just such an abuse.

72.    The good faith requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with 'clean hands.'" *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *see In re C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d. Cir. 1997) ("The good faith standard applied to bankruptcy petitions furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of

---

11    89 B.R. 555, 558 (Bankr. E.D. Va. 1988).

the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to

a bankruptcy.") (internal quotation omitted).

73.     Courts have dismissed bankruptcy cases on good faith grounds in light of the

debtor's unclean hands. *See*, *e.g.*, *C-TC 9th Ave. P'ship*, 113 F.3d at 1311; *Phoenix Piccadilly, Ltd.*

*v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393, 1394-95 (11th Cir.

1988); *Pleasant Pointe Apts., Ltd. v. Ky. Hous. Corp.*, 139 B.R. 828, 832-33 (W.D. Ky. 1992); *In*

*re Julian*, No. 11-30151 (LMW), 2012 Bankr. LEXIS 494, 2012 WL 506573, at *4 (Bankr. D.

Conn. Feb. 15, 2012). "The lack of good faith in maintaining the case must rest on the totality of

the circumstances, and involves finding an intent to abuse the judicial process, and the purpose of

the reorganization process." *In re Coffee Cupboard, Inc.*, 119 B.R. 14, 17-18 (Bankr. E.D.N.Y.

1990).

74.     As previously set forth in paragraphs, *supra*, the Debtor, acting in concert with J&J,

engineered its own financial distress after the Third Circuit ruled that LTL I must be dismissed

because the Debtor had not established that it was in financial distress. The Debtor did so in an

effort to render itself sufficiently financially distressed to qualify for an immediate second chapter

11 filing. The pretext for the transaction that ostensibly created this new state of financial distress

cannot withstand scrutiny and contradicts statements that the Debtor itself made to the Court in

LTL I regarding the "purpose" of the 2021 Funding Agreement. *See*, *supra*, ¶¶ 5-10.

75.     The Court itself has remarked on the apparently manufactured nature of the Debtor's

"financial distress":

> Since the first filing, the acknowledged floor for the debtor's talc liabilities
> has increased from 2 billion to 8.9 billion . . .

33

> Does this increase[d] floor of debt add to or create financial distress for this debtor? Again, maybe. Maybe not. Since the first filing, the debtor's funding resources have been reduced from 61 billion to possibly 30 billion plus. ***The reduction certainly appears manufactured by the debtor, HoldCo, and J&J in response to the Third Circuit's ruling.***

Reporter's Transcript of Proceedings, April 20, 2023 ("4/20/2023 Tr."), a copy of which is attached as **Exhibit C** to the Jones Dec., at 7:8-19 (emphasis added).

76. The Third Circuit commented that: "[W]e cannot currently see how [the Debtor's] lack of financial distress could be overcome," and admonished that "part[ing] with its funding backstop [under the 2021 Funding Agreement]" to render the Debtor fit for a second chapter 11 filing would need to be in exchange for reasonably equivalent value in order not to constitute an avoidable fraudulent transfer. *LTL Mgmt.*, 64 F.4th at 109 n.18, 110.

77. Simply stated, a debtor that is not in financial distress cannot use manufactured, intentionally self-inflicted financial distress as a pretext to circumvent a prior dismissal order and obtain access to the extraordinary powers of a debtor in a section 524(g) asbestos case to disrupt creditor claims. A chapter 11 filing that is grounded on such a ruse is a bad faith filing. It is an abuse of the bankruptcy system that threatens the integrity of that system. And the bad faith problem here is only compounded by the fact that, if the Debtor did succeed in placing itself in financial distress sufficient to support a second chapter 11 filing, it did so by means of a transfer that, even if not an "actual intent" fraudulent transfer (which it is), is, as the Third Circuit warned, a constructively fraudulent transfer.

**E.     If the Termination of the 2021 Funding Agreement Did Place the Debtor in Financial Distress, Then Such Termination Was A Fraudulent Transfer That Is an Improper Underpinning for Filing This Second Chapter 11 Case**

78. If, as the Debtor contends, the termination of the 2021 Funding Agreement, and its replacement by the New Funding Agreements, placed the Debtor in "financial distress" sufficient

DOCS_DE:243041.1 05471/003

to support a second chapter 11 filing, then the underpinning of this chapter 11 case is a transfer

that, even if not made with actual intent to "hinder, delay or defraud creditors" (which it was), was

constructively fraudulent. A second chapter 11 case predicated on a constructively fraudulent

transfer made to overcome the basis for dismissing its first chapter 11 case cannot be filed in good

faith.

79.     To begin with, there can be no serious question that the termination of the 2021

Funding Agreement was a "transfer."[12] It is equally clear that the New Funding Agreements –

providing as they did for far more limited and conditional funding rights than the 2021 Funding

Agreement – did not represent "reasonably equivalent value" for the termination of the 2021

Funding Agreement. This is especially true given the non-arms' length nature of the transaction

(and of whatever "negotiation" preceded it): "Where the facts and circumstances of the transaction

indicate a collusive sale, as they do here, a lack of reasonably equivalent value is established by

even a miniscule disparity between value given up and value received." *Breeden v. L.I. Bridge*

*Fund, LLC (In re Bennett Funding Corp.)*, 232 B.R. 565, 572 (Bankr. N.D.N.Y. 1999). The

collusive nature of the transaction here is underscored by the remarkable assertion of a "common

interest privilege" with respect to discussions between counsel for the Debtor and counsel for J&J

regarding this transaction. *See* Kim Dep. Tr. at 83:9-24; 207:17-208:3.

80.     The Debtor contends, however, that it was not insolvent, and that "under fraudulent

transfer law, it takes both" "lack of reasonably equivalent value and the entity is rendered

---

[12]    *See, e.g., Official Comm. V. T.D. Invs. I, LLP (In re Great Lakes Quick Lube L.P.)*, 816 F.3d 482 (7th Cir. 2016)
(reversing bankruptcy court's determination that lease terminations were not transfers, court of appeals held that
landlord that terminated debtor's lease with debtor's agreement prepetition may have received a preferential and/or
fraudulent transfer and be liable to the estate for the value of the lease); *Hometown 2006-1 Valley View, L.L.C. v.
Prime Income Asset Mgmt., L.L.C.*, 847 F.3d 302 (5th Cir. 2017) (waiver of 60-day notice period for termination
of management services agreement under which debtor received fees, which resulted in a waiver of the right to the
base fee payment during the 60-day period, was a transfer of an interest in property which was subject to avoidance
and recovery under fraudulent transfer laws).

35

insolvent" to establish that a transfer was constructively fraudulent. 4/20/2023 Tr., at 204:25-205:6. The Debtor is wrong, because there are two alternative tests *other than insolvency* for determining whether the debtor was in financial distress sufficient to render a transfer made for less than reasonably equivalent avoidable; if either test is satisfied, the transfer is constructively fraudulent.

81.    First, Code section 548(a)(1)(B)(ii)(II) renders a transfer made for less than reasonably equivalent value avoidable where the debtor: "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II). "[U]unreasonably small capital denotes a financial condition short of equitable insolvency." *Moody v. Sec. Pac. Bus. Credit,* 971 F.2d 1056, 1070 (3d Cir. 1992). The term connotes a financial condition less severe than insolvency but "which makes insolvency reasonably foreseeable." *In re Healthco Int'l, Inc*., 208 B.R. 288, 302 (Bankr. D. Mass. 1997) ("[A] transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency.")[13] Here, the Debtor's "business" is managing and defending thousands of talc-related claims. Implicit in a finding of financial distress immediate enough to support a chapter 11 filing under *LTL Mgmt.* is that the capital that the Debtor had available to it to carry on this "business" was unreasonably small.

82.    Second, Code section 548(a)(1)(B)(ii)(III) renders a transfer made for less than reasonably equivalent value avoidable if the Debtor "intended to incur, *or believed that the debtor*

---

[13]    *See also In re Jackson*, 459 F.3d 117, 123-24 (1st Cir. 2006) (explaining court must "examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable after a transfer") (internal quotations omitted); *SE Property Holdings, LLC v. Braswell*, 255 F. Supp. 3d 1187, 1206 (S.D. Ala. 2017) ("[T]his element may be satisfied even when the transferor is technically solvent.").

*would incur*, debts that would be beyond the Debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III) (emphasis added). Here, the Debtor apparently expected (and hoped) that terminating the 2021 Funding Agreement and replacing it with the New Funding Agreements would reduce it to a level of "financial distress" sufficient to overcome the Third Circuit's ruling in LTL I and satisfy the standard applied in that case. But the Debtor also had to know that if its expectation of "financial distress" panned out, it would be because the Debtor would have demonstrated that it would incur debts for talc liabilities beyond its ability to pay as they matured; otherwise, its claimed "financial distress" would be too attenuated to pass muster under the Third Circuit's test.

**F.    No Reorganization is Possible as Long as J&J, New JJCI and the Debtor Insist that a Plan Include a Channeling Injunction that is Well Beyond the Permissible Scope of a Section 524(g) Channeling Injunction Under Applicable Third Circuit Precedent**

83.    "Cause" for dismissal of a chapter 11 case includes the absence of any reasonable likelihood that a chapter 11 plan can be confirmed. *See generally In re 1121 Pier Vill. LLC*, 635 B.R. 127, 137 n.14 (Bankr. E.D. Pa. 2022) ("It is well settled that a debtor's inability to achieve confirmation of a plan, by itself, provides sufficient 'cause' for dismissal or conversion of a chapter 11 case"). For example, there is no point to a chapter 11 case where the only plan that would be feasible would be one funded by a third-party funder who would insist on a plan provision that contravenes applicable circuit-level precedent. That is the case here.

84.    Under the New Funding Agreements, J&J and New JJCI have what amounts to a veto over any plan, because they are only required to fund a plan trust under a chapter 11 plan they support. *See supra ¶* 47. Without their funding, no plan is feasible. Consequently, any plan that they do not support cannot be confirmed.

85.    Meanwhile, judging from the relief sought in the Preliminary Injunction Motion, it appears that a channeling injunction under any plan the Debtor files and J&J and New JJCI support will extend to all of the "Protected Parties" and "Debtor Talc Claims," as those terms are defined in the Preliminary Injunction Motion. However, if the Debtor, J&J and New JJCI will only support (and J&J and New JJCI will only fund a plan trust under) a plan that includes such a broad channeling injunction, then there is virtually no likelihood of a confirmed plan in this case. This is because under applicable Third Circuit law, such a channeling injunction would be well beyond the permissible scope of a channeling injunction under section 524(g)(4) of the Code.

**(1)    A Channeling Injunction that Extends to all "Debtor Talc Claims" and "Protected Parties," as Defined in the Preliminary Injunction Motion, Would Be Beyond the Scope of A Third Party Channeling Injunction Under a Plan Permitted by Section 524(g)(4)**

86.    Section 524(g)(4)(A)(ii) of the Bankruptcy Code provides that:

(ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor *to the extent such alleged liability of such third party arises by reason of-*

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . .

38

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).

87.    The Third Circuit Court of Appeals has summarized the limited scope of the third-

party channeling injunction permitted by section 524(g)(4) as follows:

> Largely in order to encourage contributions to the trust, ***certain*** third
> parties may also benefit from a § 524(g) channeling injunction.
> However, ***these protections do not extend to all claims brought
> against third parties***. In order to conform with the statute, (1) these
> claims must be 'directed against a third party who is identifiable from
> the terms of such injunction' and (2) the third party must be 'alleged
> to be directly or indirectly liable for the conduct of, claims against, or
> demands on the debtor'; in addition, (3) ***'such alleged liability' must
> arise 'by reason of' one of four statutory relationships . . . .***

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*, 13 F.4th 279, 283 (3d Cir. 2022) ('*Grace II*')

(emphasis added). Those four "statutory relationships" consist of the four relationships set forth in

clauses (I)-(IV) of section 524(g)(4)(ii)(A)). *See id.* at 283 n.6. The Third Circuit refers to the

second requirement as the "derivative liability" requirement, and the third requirement as the

"statutory relationship" requirement. *Id.* at 284; *see Cont'l Cas. Co. v. Carr (In re W.R. Grace &

Co.),* 900 F.3d 126, 135 (3d Cir. 2018) ('*Grace I*') ("We assess only the second and third

conditions for protection: whether the Montana Claims seek to hold CNA 'directly or indirectly

liable for the conduct of, claims against, or demands on' Grace, *i.e.*, the 'derivative liability'

requirement, and whether CNA's alleged liability 'arises by reason of' its provision of insurance to

Grace, *i.e.*, the 'statutory relationship' requirement."). ***Both*** requirements must be satisfied in order

for a claim to fall within the scope of a permissible section 524(g)(4) channeling injunction.

88.    Under the plain language of section 524(g)(4), neither "Retailers" nor "Indemnified

Parties" are among the parties in whose favor a channeling injunction may be issued under section

524(g)(4). Neither a party's status as a retailer, nor a party's status as an indemnified party,

qualifies the party for inclusion in any of the four categories of statutorily-defined relationships set

forth in clauses (I) - (IV) of section 524(g)(4)(A)(ii), so as to qualify claims against that party for

inclusion in a third-party channeling injunction. The fact that such parties may have contractual

indemnity rights against the Debtor does not change that result. *See In re W.R. Grace & Co.,* 475

B.R. 34, 99-100 (D. Del. 2012).

89.    In *W.R. Grace*, the District Court held that a section 524(g) channeling injunction

could not be extended to enjoin claims against a party (BSNF) where actions were brought against

it that were allegedly derivative of the debtor's conduct, despite the fact that BSNF had contractual

indemnity agreements with Grace. The Court explained: "If the third party does not fall into one of

[the four categories set forth in section 524(g)(4)(A)(ii)(I)-(IV)], then its claims will not be

considered derivative of the debtor's liability, and thus are not eligible to be enjoined." *Id*. at 99

(citing numerous cases). The Court further noted: "It has been explicitly recognized . . . that

contractual indemnity agreements that do not otherwise meet the definitional requirements of

section 524(g) cannot serve as the link in the chain connecting a third party's liability to the debtor

for purposes of extending the channeling injunction to non-debtors." *Id.* at 100. "Thus, because

BSNF's claims against Grace do not meet the Code's definitional requirements of derivative

liability, §514(g) explicitly ***precludes*** the Court from extending injunctive relief to BSNF under

these circumstances." *Id.* (emphasis added).

90.    Moreover, even as to a party who does have one of the four statutory relationships

required by section 524(g)(4)(A)(ii), a claim against that party must still "arise[] by reason of" that

statutory relationship in order for that claim to be covered by a section 524(g) channeling

injunction. This point is underscored by the decision in *Grace II,* 13 F.4th 279, in which the Third

Circuit recognized that even though insurers are included in clause (III) of section 524(g)(4)(A)(ii),

40

not every claim of an asbestos creditor of the debtor against one of the debtor's insurers can be subject to a channeling injunction.

91.     In *Grace II*, individuals who had worked at a mine operated by the debtor and suffered from asbestos disease ("Montana Plaintiffs") filed suit asserting claims for negligence against an insurer, CNA ("Montana Claims"). Those claims were based on allegations that CNA was aware of the asbestos exposure at the mine and related dangers and incurred a duty to protect and warn the workers of the dangers when it undertook to provide them with "industrial hygiene services" and when it inspected the mines. The Montana Plaintiffs further alleged that by failing to fulfill this duty, CNA caused their asbestos-related injuries. *Grace II*, 13 F.4th at 285.

92.     In response, CNA filed suit in the Bankruptcy Court seeking a declaration that the Montana Claims were barred by the section 524(g)(4) channeling injunction under the debtor's confirmed plan. Following a remand to the Bankruptcy Court from an earlier appeal, the Bankruptcy Court entered summary judgment in favor of the Montana Plaintiffs, and CNA appealed. The Third Circuit agreed with CNA that the claims of the Montana Plaintiffs met the "derivative liability" requirement, but remanded to the Bankruptcy Court to determine whether the statutory relationship requirement was satisfied, based on guidance provided by the Court of Appeals. *Grace II*, 13 F.4th at 285.

93.     The Third Circuit explained that, in determining whether the statutory relationship test was satisfied, the presence of an insurance relationship alone was not sufficient to satisfy that test. "We did not mean to suggest – as CNA argues – that the presence of an insurance relationship alone is sufficient to meet the statutory relationship requirement." *Id*. at 290. The Court had to consider the elements necessary to establish the Montana Claims under applicable state law, and to determine whether the insurer's provision of insurance to the debtor was relevant legally to those

41

elements. In the Court's view, satisfaction of the "statutory relationship"' test turned on whether CNA's provision of insurance was legally relevant to its alleged negligent undertaking of industrial hygiene and medical monitoring services.

94.     CNA argued that because its alleged undertakings arose solely due to its insurer relationship with Grace, its provision of insurance was legally relevant for purposes of the "statutory relationship" inquiry. The Court of Appeals disagreed, explaining that if Montana law did not take into consideration "the basis (here, the provision of insurance) for the alleged undertaking," and was concerned only that the insurer did undertake to render the services, that would not be enough to satisfy the "statutory relationship" requirement. *Id.* at 290.

95.     Similarly here, the fact that J&J owns a financial interest in the Debtor or is involved in managing it, *per se*, would not be sufficient for a claim against J&J to satisfy the statutory relationship test and fall within the permissible scope of a section 524(g)(4) channeling injunction. Such a channeling injunction could apply to a claim against J&J only to the extent that its liability "arises by reason of" its ownership of a financial interest in the Debtor or involvement in the management of the Debtor. Under *Grace* II, claims against J&J for alleged misconduct would not "arise[ ] by reason of" its ownership of the Debtor or involvement in the Debtor's management if J&J's ownership of the Debtor or involvement in its management was not "legally relevant" to liability for its alleged misconduct under applicable law. Similarly, claims against the other non-debtor affiliates that are included within the definition of "Protected Parties" could be enjoined under section 524(g) only to the extent that such claims "arise[ ] by reason of" one of the four relationships set forth in clauses (I) - (IV) of section 524(g)(ii).

96.     Thus, based on the plain language of section 524(g)(4) and controlling Third Circuit authority, a plan channeling injunction that applied to all of the Debtor Talc Claims and Protected

42

parties covered by the injunctive relief sought in the Preliminary Injunction Motion would include

parties and claims that are far beyond the permissible scope of a section 524(g) channeling

injunction under a plan.

> **(2)** **Section 105 Cannot Be Used to Expand the Parties or Claims that Can Be Included in a Channeling Injunction under a Plan for a Chapter 11 Asbestos Debtor Beyond the Scope of a Channeling Injunction Permitted under Section 524(g)**

97.    The Third Circuit Court of Appeals has explained that:

> Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction – and sets out the specific requirements that must be met in order to permit inclusion – *the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g).*

*In re Combustion Eng'g, Inc., Inc.*, 391 F.3d 190, 236-37 (3d Cir. 2004) (emphasis added

and footnote omitted).

98.    In explaining this conclusion, the Court observed that:

> Importantly for this case, § 105(a) does not "'give the court the power to create substantive rights that would otherwise be unavailable under the Code.'" *United States v. Pepperman,* 976 F.2d 123, 131 (3d Cir. 1992) (quoting *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir. 1989)); *see also In re Barbieri,* 199 F.3d 616 (2d Cir. 1999) (warning the "equitable powers emanating from § 105(a) . . . are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules") (citations omitted).
>
> The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself. *See generally Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 99 L.Ed. 2d 169, 108 S. Ct. 963 (1988) ("Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154-55 (7th Cir. 1993) ("When a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code.");

> *Resorts Int'l v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394, 1402
> (9th Cir. 1995) ("Section 105 does not authorize relief inconsistent
> with more specific law"); *Feld v. Zale Corp. (In re Zale Corp.),* 62
> F.3d 746, 760 (5th Cir. 1995) ("A § 105 injunction cannot alter another
> provision of the Code.").
>
> Here, the Bankruptcy Court relied upon § 105(a) to achieve a result
> inconsistent with § 524(g)(4)(A). Although the Bankruptcy Court has
> broad equitable authority to craft remedies necessary to facilitate the
> reorganization of a debtor, this power is cabined by the Code. *Ahlers,*
> 485 U.S. at 206.

*Id.* at 236.

99.     Because section 524(g) would not permit a channeling injunction under a plan to

include all of the "Protected Parties" and "Debtor Talc Claims," section 105 could not be used as a

basis for confirming a plan that contains such a broad channeling injunction, either. Accordingly,

no plan that contains such a broad channeling injunction could be confirmed. Unless J&J and New

JJCI, as well as the Debtor, are prepared to support a plan that does not include such an overly-

broad channeling injunction, the result of J&J's and New JJCI's plan veto is that no plan will be

confirmable in this case. Under such circumstances, there would be no valid reason for this chapter

11 case to continue and add years of additional delay to that already imposed on Talc Claimants by

LTL I.

**G.      The Debtor's Bankruptcy Filing is Simply a Litigation Tactic**

100.    Because the Third Circuit ordered the dismissal of LTL I on the basis that the

Debtor was not in financial distress, the Court of Appeals did not reach the issue of the Debtor's

bad faith in filing chapter 11 as a litigation tactic. *LTL Mgmt.*, 64 F.4th at 110 n.19. Yet it remains

true that this chapter 11 case really comes down to the Debtor's use (or abuse) of chapter 11 as a

litigation tactic, to move the resolution of the talc-related claims against it that it inherited from

Old JJCI out of the tort system and the jury trial system, and into the bankruptcy system, and to

take advantage of provisions and procedures regarding the adjudication and other resolution of

claims that are unique to bankruptcy proceedings (such as the automatic stay, the ability to seek a

third party injunction to halt litigation against non-debtor affiliates and other non-debtor third

parties, the estimation of mass tort claims on an aggregate basis, and the use of a channeling

injunction under section 524(g) of the Code to protect non-debtors from litigation). It is axiomatic,

however, that the filing of a chapter 11 petition simply to obtain tactical litigation advantages or

orchestrate litigation is in bad faith and warrants dismissal. *See 15375 Mem'l Corp.,* 589 F.3d at

618; *Integrated Telecom Express,* 384 F.3d at 119; *SGL Carbon,* 200 F.3d at 165.

101.    Moreover, a desire to take advantage of a particular provision (or provisions) of the

Bankruptcy Code, standing alone, does not establish good faith. *See Integrated Telecom Express,*

384 F.3d at 128. In fact, in *15375 Mem'l Corp.*, the Court expressly found that:

> The protection of the automatic stay, however, is not *per s*e valid
> justification for a Chapter 11 filing; rather it is a consequential benefit
> of an otherwise good faith filing. As such, courts universally demand
> more of Chapter 11 petitions than a naked desire to stay pending
> litigation, and any perceived benefit of the automatic stay, without
> more, cannot convert a bad faith filing to a good faith one. More
> generally, ***the desire to take advantage of the protections of the Code,
> such as the automatic stay of litigation outside of bankruptcy cannot
> establish good faith as a matter of law given the truism that every
> bankruptcy petition seeks some advantage offered in the Code [and
> that] any other rule would eviscerate any limitation that the good
> faith requirement places on Chapter 11 filings***.

*15375 Mem'l Corp*., 589 F.3d at 620 (internal quotations and citations omitted, emphasis

added).

102.    Yet, that is pretty much all there is to this chapter 11 case—the Debtor's desire (and

that of its controlling parent, J&J) to take advantage of particular provisions of the Bankruptcy

Code such as those relating to the automatic stay, third party injunctions and claims resolution. *See*

2023 Kim Dec. ¶¶ 86, 105.

## V.

## NO PRIOR REQUEST

103.     The Movants have made no prior request for the relief sought herein. On April 24,

2023 the Official Committee of Talc Claimants filed the TCC Motion to Dismiss.

## VI.

## NOTICE

104.     Notice of this Motion has been given to (a) counsel to the Debtor; (b) the United

States Trustee; (c) J&J; (d) New JCCI, and (e) all parties who have filed notices of appearances.

The Movants respectfully submit that no other or further notice need be given.

## VII.

## CONCLUSION

105.     For the reasons and based on the authorities set forth herein, this case should be

dismissed. The Debtor's second chapter 11 filing stands on no better footing than its first.

Dated: May 1, 2023                          **PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Colin R. Robinson*
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
    crobinson@pszjlaw.com
    pkeane@pszjlaw.com

*Counsel for Arnold & Itkin LLP*

46