No. 23 - ____

# United States Court of Appeals for the Third Circuit

IN RE OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Petitioner.*

On Petition for Writ of Mandamus to the United States Bankruptcy Court
for the District of New Jersey, Chapter 11 No. 23-12825, Adv. Pro. No. 23-01092

### PUBLIC PETITION FOR WRIT OF MANDAMUS OF OFFICIAL COMMITTEE OF TALC CLAIMANTS AND APPENDIX VOLUME 1 OF 11 (Pages A1 to A66)

MOLOLAMKEN LLP
Jeffrey A. Lamken
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2010

GENOVA BURNS LLC
Angelo J. Genova
Daniel M. Stolz
110 Allen Road
Basking Ridge, NJ 07920
(973) 533-0777

*Proposed Counsel for Official Committee of Talc Claimants*
(Additional Counsel Listed on Inside Cover)

May 1, 2023

BROWN RUDNICK LLP
David J. Molton
Robert J. Stark
Michael S. Winograd
Seven Times Square
New York, NY 10036
(212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Adam C. Silverstein
230 Park Avenue
New York, NY 10169
(212) 661-9100

MASSEY & GAIL LLP
Jonathan S. Massey
1000 Maine Ave. S.W., Suite 450
Washington, DC 20024
(202) 652-4511

*Proposed Counsel for Official Committee of Talc Claimants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 of the Federal Rules of Appellate Procedure and 26.1 of the Third Circuit Local Appellate Rules, counsel for Petitioner hereby state that the Official Committee of Talc Claimants is not a corporate entity. The Committee consists of ten natural persons and Blue Cross and Blue Shield of Massachusetts ("BCBSMA"). BCBSMA is composed of Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS Inc.") and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("HMO Inc."). BCBS Inc. and HMO Inc. are not-for-profit medical services corporations organized as charitable organizations. BCBS Inc. is organized under M.G.L. cc.176A and 176B, and HMO Inc. is organized under M.G.L. c.180. BCBS Inc. is the parent of HMO Inc.

Counsel for Petitioner further state that Johnson & Johnson is the parent company of the Debtor in Chapter 11 Proceeding No. 23-12825 and Adversary Proceeding No. 23-01092, LTL Management LLC. Johnson & Johnson is a publicly owned corporation with a financial interest in this litigation. Among other things, Johnson & Johnson asserts that it has indemnification rights against the Debtor and has obligations to the Debtor under a Funding Agreement. This appeal also involves an order entered by the bankruptcy court halting talc-related litigation against Johnson & Johnson and other entities.

May 1, 2023

*/s/ Angelo J. Genova*
Angelo J. Genova

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ................................................................................1

ISSUES PRESENTED .........................................................................6

STATEMENT ......................................................................................6

I.    LTL's First Bankruptcy ..............................................................6

    A.    Talc Suits Against J&J and LTL's Creation .........................6

    B.    This Court Orders Dismissal of LTL's First Bankruptcy ....8

II.    LTL's Second Bankruptcy ..........................................................9

    A.    LTL's Surrender of the 2021 Funding Agreement ............10

    B.    LTL's Second Bankruptcy Petition ...................................12

    C.    The Bankruptcy Court Issues a Sweeping Non-Debtor
        Injunction .........................................................................13

REASONS THE WRIT SHOULD ISSUE ...........................................15

I.    LTL Did Not and Cannot Show Good Faith—or the Probability of
    Success Required for Injunctive Relief—in Light of This Court's
    Prior Decision ...........................................................................18

    A.    LTL's Surrender of Its $61.5 Billion Payment Right from J&J
        Cannot Establish Good-Faith Financial Distress ...............19

    B.    LTL's Attempt To Blame This Court Is Baseless ..............20

    C.    LTL's Surrender of Its $61.5 Billion Payment Right Belies
        Good Faith ........................................................................23

    D.    LTL Cannot Evade This Court's Requirement of Immediate
        Financial Distress ..............................................................26

i

II.    LTL Did Not and Cannot Satisfy the Demanding Preliminary-
        Injunction Requirements ................................................................................ 29

CONCLUSION .......................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 15375 Mem'l Corp. v. BEPCO, L.P.*,
   589 F.3d 605 (3d Cir. 2009) ..............................................................27

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ....................................32

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993) ......................29

*Brenner v. Little Red Sch. House, Ltd.*, 274 S.E.2d 206 (N.C. 1981) ....................22

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989).............................................20

*Citibank, N.A. v. Fullam*, 580 F.2d 82 (3d Cir. 1978) ............................................17

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) .............................20, 33

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health &*
   *Human Servs.*, 724 F.3d 397 (3d Cir. 2013)........................................................30

*EEOC v. Kronos Inc.*, 694 F.3d 351 (3d Cir. 2012) ................................................17

*In re Enron Corp.*, 328 B.R. 58 (Bankr. S.D.N.Y. 2005)........................................24

*Faulconer v. Wysong and Miles Co.*,
   574 S.E.2d 688 (N.C. Ct. App. 2002)..................................................................22

*In re FCC*, 217 F.3d 125 (2d Cir. 2000) ..................................................................17

*In re Federal-Mogul Glob. Inc.*, 300 F.3d 368 (3d Cir. 2002) ................................32

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
   765 F.3d 205 (3d Cir. 2014) .........................................................................29, 30

*Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068 (3d Cir. 1983) ......................34

*Hackel v. FDIC*, 858 F. Supp. 289 (D. Mass. 1994) ...............................................23

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ......................................24

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices and Prods. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) ........................13

*Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 285 N.J. Super. 575 (App. Div. 1995) ................................................32

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986) ....................................20

*In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023) ..............................*passim*

*Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364 (3d Cir. 2021) ......................................30

*Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194 (3d Cir. 1991) ............................................................32

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248 (1st Cir. 1991)..............................................................24

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).....................................................29, 30

*Moss v. First Premier Bank*, No. 2:13-cv-05438, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020).....................23

*Nken v. Holder*, 556 U.S. 418 (2009) .........................................................................30

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002) .........................................29

*Ex parte Republic of Peru*, 318 U.S. 578 (1943).....................................................17

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) ...........................................21

*In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147 (2d Cir. 2021)....................24

*In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693 (3d Cir. 1989) .........................30

*Winter v. NRDC*, 555 U.S. 7 (2008) ..................................................................29, 30

**STATUTES**

11 U.S.C. §105(a) ....................................................................................................30

11 U.S.C. §362.........................................................................................................33

11 U.S.C. §524(g) ...................................................................................12

11 U.S.C. §524(g)(2)(B)(ii)(IV)(bb) .....................................................12

11 U.S.C. §548(a) ...............................................................................9, 23

11 U.S.C. §548(a)(1)................................................................................24

11 U.S.C. §548(a)(1)(A) ....................................................................24, 25

11 U.S.C. §548(a)(1)(B) ....................................................................25, 26

11 U.S.C. §1112(b)(3)..............................................................................18

28 U.S.C. §158(d)(2)(B) ..........................................................................14

**OTHER AUTHORITIES**

Restatement (Second) of Contracts §265 (1981).....................................22

## **INTRODUCTION**

On January 30, 2023, this Court directed dismissal of LTL's bankruptcy petition because LTL could not show the "immediate" "financial distress" required for a "good-faith" bankruptcy petition. *In re LTL Management, LLC*, 64 F.4th 84, 93, 100-11 (3d Cir. 2023) (as amended) (Ambro, Fuentes, and Restrepo, JJ.) ("*LTL*"). The Court "c[ould ]not currently see how [LTL's] lack of financial distress could be overcome." *Id.* at 110. Outside bankruptcy, LTL had access to $61.5 billion under a funding agreement (the "2021 Funding Agreement") backed by both Johnson & Johnson and Johnson & Johnson Consumer, Inc., which then owned valuable brands like Tylenol. The funding agreement was a veritable "ATM" allowing LTL to "pay liabilities without any . . . threat to its financial viability." *Id.* at 109. The Court presciently cautioned LTL against just "part[ing] with [that] funding backstop to render itself fit for a renewed filing," as any such effort would be subject to challenge as a fraudulent conveyance. *Id.* at 109 n.18.

***Two hours and 11 minutes*** after the bankruptcy court executed this Court's mandate and dismissed LTL's first bankruptcy, LTL filed for bankruptcy again. LTL had done exactly what this Court warned against: It gave up its most valuable asset, the 2021 Funding Agreement, in a deliberate attempt to manufacture financial distress. LTL's chief legal officer ("CLO") ***admitted*** the transfer was designed so

1

that LTL's "financial condition" would be "sufficiently distressed" to make it eligible for bankruptcy.  A652(Kim).

Terminating the 2021 Funding Agreement, LTL replaced it with the "2023 Funding Agreement," under which Holdco (formerly Johnson & Johnson Consumer, Inc.) is the sole obligor, along with a "Support Agreement" from J&J that offers funding only inside bankruptcy.  A650(Kim).  Gone was J&J's commitment to provide a $61.5 billion fund for talc liabilities outside bankruptcy.  Also gone was Holdco's cash-generating consumer-products business, formerly available to provide cash to fund LTL.  That business was transferred to Holdco's direct parent (Janssen Pharmaceuticals) in early January 2023—while LTL's first bankruptcy was still pending—without notice to the bankruptcy court or U.S. Trustee.

LTL's pretext for surrendering the 2021 Funding Agreement is that this Court's *LTL* decision "changed the law" and rendered the 2021 Funding Agreement "void or voidable" by "frustrat[ing its] purpose."  A770(Kim).  But the holding that munificently funded entities like LTL cannot proceed in bankruptcy could not frustrate the 2021 Funding Agreement's purpose:  As LTL represented to this Court, that agreement expressly applied ***outside bankruptcy***, too.  64 F.4th at 96, 106; A2301(CA3 Oral Arg.).  LTL's CLO nonetheless blamed this Court, insisting that talc claimants lost access to the $61.5 billion fund "because of the Third Circuit decision, not because of what we did."  A130(Kim).

2

The U.S. Trustee vigorously opposed the new bankruptcy filing, explaining that LTL's reorganization efforts were "[f]utile." A676, A678. "LTL surrendered its most valuable asset" for "apparently no consideration," "replacing it with an instrument far less valuable," in a transaction that could be "'the largest fraudulent conveyance in the history of the United States'"—all "to circumvent the Third Circuit's ruling" in *LTL*. A676-677. The U.S. Trustee excoriated LTL's embrace of the dubious "void or voidable" theory as "wholly adverse to LTL's own interests." A677(n.4). Filing this new case and subjecting talc victims to further "delay," the U.S. Trustee stated, was "unconscionable." A670.

At the first-day hearing on April 11, talc claimants orally moved to dismiss LTL's end-run around this Court's decision. The newly constituted Official Committee of Talc Claimants ("TCC") joined those motions on April 18.[1] The bankruptcy court recognized its authority to dismiss, even *sua sponte*. A20. But it refused. A20. Instead, it granted LTL a preliminary injunction that bars talc claimants from conducting trials on talc claims ***against non-debtors***, including J&J and 100 other entities, through at least June 15.

Far from finding a reasonable likelihood LTL would succeed in reorganizing, the bankruptcy court acknowledged the opposite. The court was "skeptical" LTL

---

[1] The TCC filed a written motion to dismiss on April 24. Bankr. D.N.J. Case No. 23-12825, Doc. 286.

could succeed.  A23.  LTL "[u]ndoubtedly" faced an "uphill battle" to show a good-faith basis for proceeding in bankruptcy.  A23.  LTL's abandonment of the 2021 Funding Agreement was "the potentially 'largest intentional fraudulent transfer in United States history.'"  A23.  It "certainly appear[ed] to be manufactured" to create financial distress "in direct response to the Third Circuit's ruling."  A18.  Even if that transfer could stand, the court could not say whether "this reduction in funding" or any of LTL's other maneuvers "adds to—or creates—[the] financial distress" necessary to survive dismissal.  A18.  The court nonetheless granted LTL injunctive relief in favor of non-debtors, because it could not conclude "there is ***no possibility*** of a successful reorganization."  A23 (emphasis added).

Those rulings cannot be reconciled with this Court's *LTL* decision or basic legal principles.  A party seeking preliminary injunctive relief must make a ***clear showing*** of a ***reasonable probability*** of success.  On that point, LTL's showing was non-existent.  The bankruptcy court granted an injunction only by disregarding that standard, holding that an injunction should issue unless the bankruptcy court "agree[s]" there is "***no possibility***" of success.  A23 (emphasis added).  In *LTL*, moreover, this Court held that LTL cannot proceed in bankruptcy unless it establishes "good faith."  64 F.4th at 100.  It is incompatible with good faith for a debtor to deliberately give up its most valuable asset to manufacture financial distress.  That is doubly true when the debtor undertakes such machinations to

4

circumvent a judicial decision finding it too "financially healthy" to "need to reorganize" in bankruptcy. *Id.* at 101. LTL's purported justification—that this Court's *LTL* decision "changed the law," rendering the 2021 Funding Agreement "void or voidable"—is pretextual. Indeed, bad faith is so clear on the undisputed record that this Court can—and should—direct dismissal now.

The TCC has taken the (concededly extraordinary) step of seeking mandamus to vindicate this Court's prior decision and because the circumstances are urgent. LTL has filed a scheduling motion revealing that it seeks to short-circuit the appellate process by filing a reorganization plan by May 14, A683-684—***before*** resolution of motions to dismiss, which LTL has indicated it will seek to delay until late June or beyond. After rushing its plan, LTL also apparently seeks to stuff the ballot box by opening voting to individuals who do not have cancers linked to J&J products. A683-684. The risk of evasion of appellate review is tremendous. And LTL's filing again forecloses sick and dying claimants from getting their day in court, just hours after this Court's mandate reopened the courthouse doors for them. Swift action is needed to halt this unconscionable abuse of the bankruptcy system and disregard for this Court's mandate.

## ISSUES PRESENTED

1.      Whether LTL's second bankruptcy petition impermissibly attempts to circumvent the good-faith and financial-distress requirements this Court found unsatisfied in LTL's first bankruptcy, where LTL:

- Attempted to manufacture financial distress by surrendering a $61.5 billion payment right against J&J that had allowed LTL to pay all talc claimants in full outside of bankruptcy, despite this Court's warning that such a surrender would be subject to challenge as a fraudulent conveyance.

- Justified surrender of its payment right on the ground that this Court's decision purportedly "changed the law," even though that decision was based on longstanding precedent and LTL's own admissions, and purportedly "frustrated the purpose" of the 2021 Funding Agreement, even though the agreement expressly applied outside bankruptcy.

- Has failed to comply with the standards established by this Court for showing immediate financial distress.

2.      Whether the bankruptcy court failed to apply the proper legal requirements for injunctive relief, by restraining litigation against non-debtors based on a mere "possibility" that LTL could successfully reorganize in bankruptcy.

## STATEMENT

### I.     LTL's First Bankruptcy

### A.      Talc Suits Against J&J and LTL's Creation

Johnson & Johnson ("J&J") and its subsidiary Johnson & Johnson Consumer Inc. ("Old JJCI" or "Old Consumer") sold talc-based baby powder for over a century. *In re LTL Management, LLC*, 64 F.4th 84, 93 (3d Cir. 2023).  For decades, J&J

concealed that it had detected asbestos in its talc products, and continued selling them despite mounting evidence they cause epithelial ovarian cancer and mesothelioma. After juries and regulators linked J&J's baby powder to those diseases, J&J and Old Consumer found themselves facing thousands of lawsuits. *Id.* at 94.

J&J and Old Consumer nevertheless remained extraordinarily valuable. 64 F.4th at 106. Much of J&J's talc-related costs were attributable to a single verdict, *Ingham*, which J&J described in SEC filings as "unique" and "not representative." *Id.* at 95. J&J paid its talc-related costs in the ordinary course, and insisted in financial disclosures and court filings that those costs were manageable. *Id.*

Nonetheless, J&J sought to resolve its talc liabilities outside the tort system. Employing a divisional merger under Texas law—the so-called "Texas Two-Step"—J&J split Old Consumer into two new entities, LTL and New JJCI (or "New Consumer"). 64 F.4th at 95-96 & n.3. New Consumer received all the "productive business assets" and "valuable consumer products," including famous brands like Neutrogena and Tylenol. *Id.* at 97. LTL was "allocated" all talc-related "liabilities." *Id.* at 96. LTL also agreed to indemnify J&J, New Consumer, and hundreds of third parties for their talc-related costs. *Id.* & n.6.

LTL's most significant asset was a funding agreement with J&J and New Consumer (the "2021 Funding Agreement"). 64 F.4th at 96. It "gave LTL, ***outside of bankruptcy***, the ability to cause ***New Consumer and J&J, jointly and severally***,

7

to pay it cash up to the value of New Consumer"—more than $61.5 billion—"for purposes of satisfying any talc-related costs." *Id.* (emphasis added).

### B.    This Court Orders Dismissal of LTL's First Bankruptcy

Two days after LTL was formed, it filed for Chapter 11 bankruptcy. 64 F.4th at 97. The bankruptcy court denied motions to dismiss and issued a preliminary injunction extending the bankruptcy stay to hundreds of non-debtor third parties. *Id.* at 97-98.

This Court reversed and ordered dismissal of LTL's bankruptcy. 64 F.4th at 100-11. It reaffirmed the longstanding rule—articulated in precedents of this Court and eight other circuits—that debtors "who do[] not suffer from financial distress cannot demonstrate" a "good faith" basis for filing for bankruptcy. *Id.* at 101-04 & n.14.

The record showed that LTL could "meet comfortably its liabilities as they became due for the foreseeable future." 64 F.4th at 108. The Court could not credit LTL's and the bankruptcy court's inflated "back-of-the-envelope forecasts" of LTL's "future liability." *Id.* at 107-08. And the 2021 Funding Agreement provided LTL a $61.5 billion "ATM" to fund talc liabilities, backed by "direct access to J&J's exceptionally strong balance sheet" and revenues from New Consumer's "cash-flowing brands." *Id.* at 95, 106, 109. This Court preemptively addressed any effort by LTL to "part with its funding backstop to render itself fit for a renewed filing,"

8

warning that such a gambit would be subject to challenge under "11 U.S.C. § 548(a)," the fraudulent-transfer statute. *Id.* at 109 n.18. The Court remanded to the bankruptcy court with instructions to dismiss LTL's petition. *Id.* at 111.

This Court denied LTL's petition for rehearing, which argued that the panel "[b]roke [f]rom [this Court's] [p]recedent." A2340-2341; A2348. No judge voted for rehearing. A2414-2415. LTL sought a stay of the mandate pending its submission of a certiorari petition. A2428; A2279. It urged that, if the bankruptcy case were dismissed, "[e]ach of [the talc] cases would suddenly spring back into activity and proceed towards trial." A2440. On March 31, 2023, this Court denied the stay and immediately issued the mandate. A2447; A2824. LTL never filed a certiorari petition. Nor, it turns out, did LTL have any intention of allowing talc cases to proceed to trial.

## II.   LTL's Second Bankruptcy

As LTL's rehearing and stay petitions stalled issuance of this Court's mandate, LTL secretly prepared a second bankruptcy petition. On April 4, 2023— just 2 hours and 11 minutes after the bankruptcy court executed this Court's mandate and dismissed LTL's first petition—LTL filed that second petition. A2764.

### A.   LTL's Surrender of the 2021 Funding Agreement

In January 2023, while the prior appeal was pending, Holdco (formerly New Consumer) transferred its valuable consumer-health business to its parent; it did not

notify the TCC, bankruptcy court, or U.S. Trustee.  A631 (Kim).  As a result, LTL

lost the benefit of "cash-flowing brands" whose revenues formerly backstopped New

Consumer's (now Holdco's) payment obligations under the 2021 Funding Agree-

ment.  64 F.4th at 106.

Once this Court announced its decision ordering dismissal of LTL's first

petition, LTL and J&J worked together to set aside the 2021 Funding Agreement

that rendered LTL too wealthy for bankruptcy.  LTL CLO John Kim testified that,

the day of this Court's decision, he conceived the idea that it might render the 2021

Funding Agreement "void or voidable."  A766-767 (74:23-75:10); A768 (3-13);

A769 (2-18); A774 (11-23); A128 (12); *see* A649 (¶78).  Despite this Court's

application of longstanding precedent, Kim claimed "no one" "could have

anticipated" the *LTL* decision, which he asserted "changed the law" and "frustrated

the purposes of the funding agreement."  A770 (5-18).  ███████████████

██████████████████████████—all paid by J&J—to void the 2021

Funding Agreement.  A881-883.

Kim could not explain why he, as LTL's CLO, was thinking of ways to void

LTL's most valuable asset.  No businessperson at J&J claimed the 2021 Funding

Agreement was unenforceable or that J&J would refuse to honor it.  A901-

902 (209:9-210:18); A141; *see* A1818-1819 (Dickinson).  J&J never refused to pay

under the agreement.  A899 (7-14).  J&J's head of litigation did ███████████

████████████████████████████████████████████ A1108 (22-24).   LTL

never raised the issue with the TCC, U.S. Trustee, or bankruptcy court.  On March

21, 2023, LTL filed a monthly operating report, signed by LTL's CFO and its

counsel, indicating the 2021 Funding Agreement remained in place.  A2197.

LTL, J&J, and Holdco nonetheless agreed to terminate the 2021 Funding

Agreement and replace it with two new agreements:

- A 2023 Funding Agreement, under which Holdco—***but not J&J***—must pay for LTL's talc-related liabilities, inside and outside bankruptcy.

- A J&J Support Agreement, under which J&J agrees to backstop Holdco's obligations under the 2023 Funding Agreement, but ***only in bankruptcy*** and only pursuant to ***court order***.

A650-651 (¶¶ 79-81).

Whereas the 2021 Funding Agreement provided funding to LTL valued at

***$61.5 billion***, backed by brands like Tylenol, its 2023 replacement offers funding

only up to the value of Holdco's now-more-limited assets, which LTL values at

approximately ***$30 billion***.   A760 (Kim).   Holdco also has access to about $400

million cash.  A632 (¶ 28).  LTL has $15.78 million cash and rights to royalty streams

it values at approximately $402 million.  A2199, A2205 (LTL March Report).

### B.    LTL's Second Bankruptcy Petition

Filed hours after dismissal of its first bankruptcy, LTL's second petition raised

grave concerns.  It was not just that LTL sought to circumvent this Court's ruling

and surrendered its most valuable asset just before the new bankruptcy.  LTL now

asserted that its new petition had the "support[ ]" of "over ***60,000 claimants who***

***have signed and delivered*** plan support agreements."    A435 (9-10) (emphasis

added).  LTL seeks to create an asbestos-claim trust under 11 U.S.C. § 524(g), which

would require support from "at least 75 percent" of voting affected claimants.

§ 524(g)(2)(B)(ii)(IV)(bb).  But most of the supposed new claimants have not even

filed suits yet.  And LTL had no commitments from claimants, only "***commitments***

***from attorneys*** representing those clients" to "***recommend*** that their clients support"

a proposed agreement.  A1221 (17-22) (emphasis added); A637-648 (Kim).

The U.S. Trustee found "how the math works" impenetrable:  "Where are

these claimants coming from and who are these claimants?  Because we just can't

reconcile them with the numbers . . . that were in front of us in the first case."

A511 (5-22).  In the *Imerys* case (involving a J&J talc supplier), "thousands if not

tens of thousands" of votes were ultimately excluded because of double-counting or

other issues.  A103-104.  Yet LTL made no effort to verify the newly recruited

claims or eliminate double-counting.  A739-A740; A745.  As one plaintiff attorney

told J&J, "[a]s we add law firms, we just get them to sign . . . with the number of

claimants ***they profess to represent***."  A1298 (Watts Email).

Critically, LTL seeks to broaden the claimant pool—inflating the voting

rolls—by including unfiled, unsubstantiated claims that would ultimately recover no

(or only nominal) compensation.   The MDL court had limited the scientifically

supported claims associated with talc exposure to "epithelial ovarian cancer" cases,

rather than "gynecological cancers" or even ovarian cancer generally.   *In re Johnson*

*& Johnson Talcum Powder Prods. Mktg., Sales Practices and Prods. Litig.,* 509 F.

Supp. 3d 116, 181 (D.N.J. 2020).   LTL would expand the definition of ████

███████████████████████████████████   A1326; A1385(14-18)

(emphasis added).

### C.    The Bankruptcy Court Issues a Sweeping Non-Debtor Injunction

In an April 20, 2023 bench decision, the court issued a preliminary injunction

barring claimants from commencing or conducting trials on talc claims against J&J

and more than 100 protected ***non-debtor*** parties through at least June 15.  A48.  The

bankruptcy court also denied multiple motions to dismiss LTL's second filing for

lack of good faith.  A21-22 & n.11.

The bankruptcy court recited a litany of its concerns about LTL's petition.

Even after a full-day evidentiary hearing, the court had "more questions than

answers."  A44(5-6).  It doubted whether LTL really faced more claims compared

to its first bankruptcy—"Maybe.  Maybe not."  A45(7).  It described the "voidability

of the 2021 funding agreement" as an "unresolved issue[]."  A47(11).  It agreed the

2021 Funding Agreement's abrogation "certainly appears manufactured," A45(18-

19), and was "potentially [the] largest fraudulent transfer undertaken in history,"

A47(11-13).  LTL faced an "uphill battle" to show good faith.  A47(10).  And the court was "skeptical" of LTL's ability to reorganize.  A47(22).  The bankruptcy court, however, treated those doubts as reason to **_grant_** the extraordinary relief of an injunction—to preclude sick-and-dying claimants from getting trials—because **_objectors_** had not shown there was "**_no possibility_** of a successful reorganization." A47(16) (emphasis added).

"[R]ead[ing its] ruling into the record," the bankruptcy court indicated that its April 20 bench opinion constituted its decision on the preliminary injunction, "subject to the terms of a more formal order."  A64(25:25-26:6); A43.  The court entered that order on April 25.  A32.

On April 21, the TCC filed a notice of appeal and moved the bankruptcy court to certify a direct appeal to this Court under 28 U.S.C. § 158(d)(2)(B).  A2733.  The TCC stated that, absent certification by April 27, it would seek relief from this Court. A2745.  The bankruptcy court did not rule on the certification motion by that date. *See* A2761(setting May 9 hearing).  Instead, on April 27, the bankruptcy court issued a written opinion "to clarify and supplement [its] oral opinion."  A8.

The written opinion restated much of the bench ruling's analysis.  A16-28.  It purported to clarify that LTL bears the burden of proof.  A16(n.9).  But it declared that LTL "need only show the **_possibility_** that it will succeed" in reorganizing.  A16 (emphasis added).  Like the oral opinion, the written order concluded an injunction

14

was appropriate because, "with so many unanswered questions," the "Court cannot

agree with the Objecting Parties that there is **no possibility** of a successful

reorganization." A23 (emphasis added).

## REASONS THE WRIT SHOULD ISSUE

LTL's new bankruptcy petition seeks to circumvent this Court's decision in

*In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023), and eviscerate Chapter

11's good-faith requirement. This Court ordered dismissal of LTL's prior bank-

ruptcy petition because LTL could not show the imminent financial distress needed

for a good-faith bankruptcy filing. *Id.* at 110. The then-existing 2021 Funding

Agreement with J&J and New Consumer gave LTL at least $61.5 billion to resolve

talc liabilities—funds available inside and "outside of bankruptcy." *Id.* at 96-97,

106, 109. And while LTL posited over $190 billion in liability and litigation costs,

this Court found that "back-of-the-envelope" figure speculative and clearly

erroneous. *Id.* at 107-08. Nor could this Court "see how [LTL's] lack of financial

distress could be overcome": The 2021 Funding Agreement made LTL "highly

solvent," and any surrender of that asset would be subject to challenge as a fraudulent

conveyance. *Id.* at 108, 110 & n.18.

Despite those warnings, LTL walked away from that Funding Agreement—

its most valuable asset—in an effort to "manufacture[ ]" financial distress. A18. For

that massive giveaway, LTL blames **this Court**. The 2021 Funding Agreement's

"purpose," it says, was supposedly "frustrated"—rendering the agreement "void or voidable"—because this Court's decision purportedly "changed the law" and prevented LTL from proceeding in bankruptcy. A770 (9-18). But this Court did not change the law; it relied on longstanding precedent requiring financial distress. And LTL's ineligibility for bankruptcy could not possibly defeat the 2021 Funding Agreement's purpose, because the agreement **expressly provided** that the $61.5 billion in funding was available "**outside of bankruptcy**," 64 F.4th at 106 (emphasis added)—as LTL explicitly represented to this Court, A2289 (21-25).

LTL's new petition is a transparent, bad-faith attempt to circumvent this Court's decision. Yet the bankruptcy court did not merely refuse to dismiss the petition. It exacerbated the harm by enjoining talc victims—who are dying every day—from trying cases against **non-debtor** third parties. Its rationale: It was not convinced "there is **no possibility** of a successful reorganization." A23 (emphasis added). But it was LTL's burden, as debtor, to show good faith and to clearly establish the likelihood of success that is a prerequisite to injunctive relief. A **reasonable likelihood** of success requires more than mere "possibility" of success, A16, as this Court and the Supreme Court have repeatedly made clear. Mere possibility cannot justify barring sick and dying talc victims from trying their cases against non-debtors. Neither LTL's bankruptcy case nor the injunction can be sustained.

16

Mandamus is for "extraordinary" cases, but this case is extraordinary. *Citibank, N.A. v. Fullam*, 580 F.2d 82, 86 (3d Cir. 1978) (mandamus to district court sitting in bankruptcy); *see In re FCC*, 217 F.3d 125, 137 (2d Cir. 2000) (mandamus to bankruptcy court to enforce prior decision). Mandamus is proper to enforce the bankruptcy court's and LTL's "clear duty to comply with [this Court's] order," *Citibank*, 580 F.2d at 87, "both [in] letter and spirit," *EEOC v. Kronos Inc.*, 694 F.3d 351, 361 (3d Cir. 2012). Mandamus is also appropriate to "confin[e] the inferior court to a lawful exercise of its prescribed jurisdiction." *Ex parte Republic of Peru*, 318 U.S. 578, 583 (1943). The maintenance of this case and grant of injunctive relief—despite LTL's failure to make any showing on bankruptcy's "gateway" good-faith requirement, 64 F.4th at 102—necessitate immediate correction.

Mandamus would be warranted even if the bankruptcy court's actions could be reviewed on appeal later. *Citibank*, 580 F.2d at 89-90. Here, LTL seeks to short-circuit future appellate review. LTL has announced it will propose a plan by May 14, 2023 and rush confirmation proceedings, stuffing the ballot box with newly recruited claimants without cancers linked to J&J products. A264. At the same time, LTL has told the TCC it will seek to ***delay*** a hearing on motions to dismiss past the 30-day statutory deadline, *see* 11 U.S.C. § 1112(b)(3), into late June or beyond. Time is of the essence. The Court should put an end to LTL's abuse of the bankruptcy system.

I.    **LTL DID NOT AND CANNOT SHOW GOOD FAITH—OR THE PROBABILITY OF SUCCESS REQUIRED FOR INJUNCTIVE RELIEF—IN LIGHT OF THIS COURT'S PRIOR DECISION**

LTL's inability to meet bankruptcy's good-faith requirement does not merely preclude injunctive relief in favor of non-debtors.  It compels dismissal.  Under Chapter 11, "the debtor" has the "burden" of proving the "bankruptcy petition is filed in good faith."  64 F.4th at 100.  The "good-faith gateway" requires (*inter alia*) "financial distress" "immediate enough to justify a filing"; absent such distress, the debtor "cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith."  *Id.* at 101-02.  LTL did not—and cannot—show good faith. It attempted to ***manufacture*** financial distress by surrendering the $61.5 billion 2021 Funding Agreement on the flimsiest of pretenses.

A.    **LTL's Surrender of Its $61.5 Billion Payment Right from J&J Cannot Establish Good-Faith Financial Distress**

In *LTL*, this Court held that LTL's $61.5 billion payment right under the 2021 Funding Agreement—which "gave LTL direct access to J&J's exceptionally strong balance sheet" and "$31 billion just in cash and marketable securities"—foreclosed any showing of immediate financial distress or good faith.  64 F.4th at 106.  That agreement made LTL "highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future."  *Id.* at 108.  And the Court "c[ould ]not currently see how [LTL's] lack of financial distress could be overcome."  *Id.* at 110.

To evade that ruling, LTL tried to "manufacture[ ]" financial distress, A18, by surrendering its rights under the 2021 Funding Agreement, forfeiting any payment rights against J&J outside bankruptcy.  As LTL's chief legal officer admitted, LTL parted with those rights so "its pre-filing financial condition" would be "sufficiently distressed" to resort to bankruptcy.  A652(¶83).  But bankruptcy requires "***good faith***."  64 F.4th at 100-01 (emphasis added).  Surrendering a $61.5 billion asset to supposedly render a highly solvent debtor "distressed" is ***bad*** faith.  This Court held that LTL had a "duty" "to access its payment assets."  *Id.* at 107.  But LTL now seeks to surrender those assets and preclude itself from meeting that duty.  This Court warned LTL against "part[ing] with its funding backstop to render itself" underfunded and thus putatively "fit for a renewed filing."  *Id.* at 109 n.18; *see* pp. 23-26, *infra*.  But LTL did just that.

LTL's actions make clear it does not "face[ ] the kinds of problems that justify Chapter 11 relief," but instead seeks "'to step outside [Chapter 11's] "equitable limitations."'"  64 F.4th at 100, 102.  Any "problems" were self-inflicted to obtain bankruptcy protection for an entity this Court already held does not qualify for bankruptcy.  Debtors cannot manufacture financial distress—and with it, bankruptcy-court jurisdiction—in this manner.  *See Carolin Corp. v. Miller*, 886 F.2d 693, 696 (4th Cir. 1989); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986); *In*

*re Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004) (debtor may not "create" bankruptcy jurisdiction).

**B.    LTL's Attempt To Blame This Court Is Baseless**

Recognizing that voluntary surrender of its most valuable asset is antithetical to good faith, LTL shifts blame to ***this Court***.  The day this Court issued its prior decision—while LTL still had a fiduciary duty to creditors—LTL's chief legal officer conceived a rationalization for impoverishing his own company.  To justify relinquishing the $61.5 billion Funding Agreement, LTL declared that this Court's decision was "in error and changed the law" to produce a result "no one" "could have anticipated."  A770.  That decision, LTL says, "frustrated the purposes of the funding agreement and rendered it void or voidable."  *Id.*

The theory is frivolous.  This Court was not "in error" and did not "change the law."   As the Court explained, the requirement of "immediate" "financial distress" comes from foundational precedents, *In re SGL Carbon Corp.*, 200 F.3d 154, 159, 163 (3d Cir. 1999), and *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 120-124 (3d Cir. 2004).  64 F.4th at 101-03.  That conclusion was "reinforced" by decisions from ***eight*** other circuits.  *Id.* at 103-04 & n.14.  In finding financial distress absent, the Court took "LTL at [its] word" that it had ample resources to "pay current and future talc claimants in full."  *Id.* at 109.  The notion that LTL could

not have anticipated the Court's decision is baseless.  LTL admitted below that the decision was "reasonably foreseeable."  A275-276 (209:14-210:5).

Regardless, the Court's dismissal of LTL's bankruptcy could not have frustrated the 2021 Funding Agreement's purpose, because that agreement *expressly provided for funding outside of bankruptcy*.  *See* A2178 (2021 Funding Agreement, § 1 Definition of "JJCI Value").  As this Court explained, the agreement gave LTL "the right, *outside of bankruptcy*, to cause J&J and New Consumer, jointly and severally, to pay it cash up to the value of New Consumer as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses."  64 F.4th at 106 (emphasis added).  LTL's counsel represented *to this Court* that the "funding agreement does have provisions for funding *outside of bankruptcy*."  A2301 (21-25) (emphasis added).  LTL represented that to the bankruptcy court, too.  A2225 (5-20)(LTL's counsel); A2130 (¶27)(LTL's CLO); A127 (7-14), A754 (15-21), A874 (10-17)(same).

"Frustration of purpose" can justify rescission or non-performance only where "'a fortuitous event supervenes to cause a *failure of consideration* or a *practically total destruction* of the expected value of the performance.'"  *Brenner v. Little Red Sch. House, Ltd*., 274 S.E.2d 206, 211 (N.C. 1981) (emphasis added).  "Essentially, there must be an implied condition to the contract that a changed condition would excuse performance; this changed condition causes a failure of consideration or the

expected value of performance; *and that the changed condition was not reasonably foreseeable*." *Faulconer v. Wysong and Miles Co*., 574 S.E.2d 688, 691 (N.C. Ct. App. 2002) (emphasis added); *see* Restatement (Second) of Contracts § 265 (1981).

Here, there was no "changed condition." This Court did not change the law. There was also no "implied condition" of the 2021 Funding Agreement that dismissal of LTL's bankruptcy would excuse J&J's performance: The agreement's *express* terms required J&J to pay *outside* bankruptcy. "[I]f the parties have contracted in reference to the allocation of the risk involved in the frustrating event, they may not invoke the doctrine of frustration to escape their obligations." *Brenner*, 274 S.E.2d at 211. LTL has conceded dismissal was "reasonably foreseeable." A275-276 (209:14-210:5). And there was no "total failure" of consideration or "total destruction of the expected value." LTL was allocated talc liabilities; in exchange, J&J and New Consumer had agreed to fund them.

LTL and J&J could have provided in the 2021 Funding Agreement that J&J's obligations were "void or voidable" if LTL's bankruptcy were dismissed. Instead, they agreed J&J's obligations would apply "outside of bankruptcy." 64 F.4th at 106. The notion that an agreement *expressly applying outside bankruptcy* has been frustrated, simply because a party *finds itself outside bankruptcy*, is specious.

LTL's embrace of that frivolous argument—"wholly adverse to LTL's own interests," A677(U.S. Trustee)—reeks of bad faith.[2]

## C. LTL's Surrender of Its $61.5 Billion Payment Right Belies Good Faith

LTL's surrender of the 2021 Funding Agreement confirms its bad faith and evasion of this Court's decision. Anticipating that LTL might try to engineer financial distress by surrendering that agreement, the Court warned LTL against "part[ing] with its funding backstop to render itself fit for a renewed filing." 64 F.4th at 109 n.18. Such a move would be subject to challenge (and avoided) as a fraudulent conveyance under 11 U.S.C. § 548(a). *Id.* That warning was prescient.

1. LTL's maneuver is an ***actual*** fraudulent conveyance because it was undertaken "to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). LTL's CLO ***conceded*** its intent was to deny creditors access to the $61.5 billion J&J promised under the 2021 Funding Agreement, and cashflow from the consumer business previously owned by Holdco, so that LTL's "financial condition" would be "sufficiently distressed" to invoke bankruptcy. A652(Kim.Decl. ¶83). "[C]ourts

---

[2] If the 2021 Funding Agreement ***were*** voidable, that would ***also*** void the divisional merger that created LTL and assigned it talc liabilities. There is no basis for selectively unwinding only half of what LTL insists was a "'single integrated transaction.'" *Id.* at 99, 105; *see Moss v. First Premier Bank*, No. 2:13-cv-05438, 2020 WL 5231320, at *5 (E.D.N.Y. Sept. 2, 2020); *Hackel v. FDIC*, 858 F. Supp. 289, 292-93 (D. Mass. 1994). LTL admitted the $61.5 billion Funding Agreement was provided to avoid the concern that saddling LTL with massive potential liability could be "consider[ed] a fraudulent conveyance." A1925.

applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991) (citation omitted).    Here, no inference is needed—it is admitted.

LTL's actions exhibit unmistakable "badges of fraud." *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 160 (2d Cir. 2021); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995); *In re Enron Corp.*, 328 B.R. 58, 73 (Bankr. S.D.N.Y. 2005).  The transaction involved LTL's most significant asset, took place outside the usual course of business, and was not disclosed in advance despite LTL's fiduciary duties.  Indeed, even as LTL was arranging to surrender the 2021 Funding Agreement, it told the bankruptcy court the agreement remained intact.  A2197.

LTL's "void or voidable" justification for surrendering the 2021 Funding Agreement, *see* pp. 20-22, *supra*, is an obvious fig leaf.  In reality, LTL surrendered that asset to deplete resources available for paying creditors, in an attempt to render itself fit for a renewed bankruptcy filing.  No further factfinding is needed to show intent to "hinder, delay, or defraud," § 548(a)(1)(A)—the ***whole point*** was to hinder efforts to recover from a highly solvent entity unfit for bankruptcy.[3]

---

[3] The suggestion that determining LTL's "subjective intent" is "impossible" on the current record, A19-20, is unsustainable.  LTL ***admitted*** its intent to manufacture

2.     With respect to ***constructive*** fraudulent conveyance, *see* § 548(a)(1)(B),

J&J's and LTL's entire aim was to provide LTL with less than "reasonably equiva-

lent value" for surrendering the 2021 Funding Agreement, and thereby manufacture

financial distress that did not previously exist.  In lieu of a $61.5 billion payment

guarantee enforceable jointly and severally against J&J and New Consumer—

backed by "J&J's exceptionally strong balance sheet," 64 F.4th at 106—LTL

received a commitment limited to Holdco's $30 billion in assets and enforceable

outside bankruptcy only against Holdco.  Holdco, moreover, lacks New Consumer's

"cash-flowing brands," *id.*, which were transferred to a different entity.  LTL thus

exchanged a "reliable" $61.5 billion right enforceable against two "highly credit-

worthy counterparties" awash with cash, *id.*, for a $30 billion right against a single

counterparty that had just shed its lucrative business.  Trading a cow for magic beans

would have been a more balanced exchange.

LTL insists the transfer did not render it "insolvent."  *See* § 548(a)(1)(B).  LTL

insists it is not currently insolvent, is unlikely to become insolvent in the future, and

can "pay off its debts currently as they come due." A809 (14-15); *see* A246 (20-25);

A272-273 (206:25-208:15).  But those representations also undermine LTL's claim

that it suffers the ***immediate financial distress*** needed to justify bankruptcy.  *See* pp.

---

financial distress and hinder creditors.  Nor does actual fraudulent conveyance turn
on whether a debtor's "remaining assets are sufficient to cover [its] liabilities."  A20;
*see* 5 Collier on Bankruptcy ¶ 548.04[1][b][iii].

26-28, *infra*.  And the fact remains that a transaction undertaken for the ***purpose*** of driving a "highly solvent" entity like LTL into bankruptcy reflects a "lack of good faith" and absence of "a valid bankruptcy purpose."  64 F.4th at 100, 101, 108.  That alone is fatal to LTL's petition.  Where the bankruptcy petition is so clearly in bad faith, the bankruptcy court had no authority to entertain it—much less exacerbate the injury to dying claimants by enjoining trials against scores of non-debtors.

### D.    LTL Cannot Evade This Court's Requirement of Immediate Financial Distress

In ordering dismissal of the first bankruptcy, this Court held LTL could not show "immediate" financial difficulty sufficient to justify bankruptcy relief.  64 F.4th at 102.  It found LTL's lawyer-driven estimates of talc exposure "clearly erroneous," and the "'attenuated possibility' that talc litigation may require LTL to file for bankruptcy in the future" insufficient.  *Id.* at 108-09.  This Court contrasted mass-tort cases where debtors faced true financial distress, including "'forced liquidation of key business segments.'"  *Id.* at 104.  And "a lack of meaningful operations show[ed] that LTL did not suffer from sufficient kinds of financial distress."  *Id.* at 109 n.17.

Nothing has changed.  LTL's second filing relies on the same speculative "forecasts" of liability that this Court rejected.  64 F.4th at 108.  LTL conceded as much:  Its CLO testified that LTL is asserting the "same basis" for financial distress

as in the first bankruptcy, stating "I would rely on the testimony from the last proceeding." A897-898 (205:23-206:5). And LTL's counsel trumpeted the same "$190 billion" figure for trial costs, A320 (5), that this Court decisively rejected, 64 F.4th at 107.

This Court had faulted LTL for failing to sufficiently analyze its liability before seeking bankruptcy protection. 64 F.4th at 107-08. But LTL did nothing to cure that defect. Two days before the second bankruptcy, LTL's Board acknowledged it had ████████████████████████████████ A2835. LTL's CFO testified he was not aware of any evaluation, by LTL after this Court's decision, of the cost to litigate talc claims in the tort system over the next year or even three years. A1829-1830. LTL simply refuses to accept this Court's requirements.

LTL remains a "shell company" with no business operations and no "need to reorganize." 64 F.4th at 109. With "no going concerns to preserve—no employees, offices, or business other than the handling of litigation," *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009), its petition "'cannot serve the rehabilitative purpose for which Chapter 11 was designed,'" 64 F.4th at 101.

While LTL had no justification for surrendering its $61.5 billion payment right under the 2021 Funding Agreement, *see* pp. 18-23, *supra*, it admittedly lacks immediate financial distress even under the diminished 2023 Funding Agreement. LTL's CFO could not "identify ***any financial consequence*** to LTL from terminating

27

the 2021 Funding Agreement" and testified that LTL was "able to meet its liabilities as they came due."  A1803(21-25); A1829(11-717) (emphasis added).  LTL's CLO agreed that LTL "has sufficient funds to pay off its debts currently as they come due," A809(14-15), and, "at the end of the day, *we believe that we have sufficient funds to meet the liability*," A246(20-21) (emphasis added).  Taking "LTL at [its] word," 64 F.4th at 109, those representations again defeat LTL's attempt to prove financial distress.   LTL cannot, consistent with this Court's mandate, declare bankruptcy a second time while retaining the very features that this Court held required dismissal of its first petition.

LTL's failures are particularly glaring given that LTL was, as the bankruptcy court recognized, "certainly on notice of the issue of dismissal based on the absence of good faith," which was "raised, and requested, at the First Day hearings."  A21. LTL in no way lacked "an adequate opportunity to respond."  A21.  It had every opportunity to address good faith, which its request for injunctive relief "[u]ndeniably" implicated.  A21.  It also had every *incentive* to address the issue, given that lack of good faith was the entire basis for dismissing its first bankruptcy.

\* \* \*

This Court can—and should—hold that LTL's lack of good faith and absence of financial distress require dismissal.  *See* 64 F.4th at 110-11.  At the very least, the preliminary injunction is improper.   Unable to meet the basic requirements of

bankruptcy, LTL cannot show the reasonable likelihood of success needed to justify a preliminary injunction.  *See* Section II, *infra*.

## II.    LTL DID NOT AND CANNOT SATISFY THE DEMANDING PRELIMINARY-INJUNCTION REQUIREMENTS

Mandamus is also warranted because the bankruptcy court's order defies basic principles governing the "'extraordinary remedy'" of preliminary injunctive relief. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *see Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163 & n.9 (3d Cir. 1993) (abuse of discretion supports mandamus relief).  The movant has the burden of meeting all requirements for injunctive relief "*by a clear showing*."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see Winter v. NRDC*, 555 U.S. 7, 22 (2008).

It thus was LTL's burden to clearly show (1) it is likely to succeed on the merits, (2) it will likely suffer irreparable harm if third-party trials are not enjoined, (3) the balance of equities favors it, and (4) an injunction is in the public interest. *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). Failure to establish any "'element renders a preliminary injunction inappropriate.'" *Id.* (ellipsis omitted); *see In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989) (elements apply to injunctions under 11 U.S.C. § 105(a)).

Rather than enforce those requirements, the bankruptcy court held LTL "need only show the ***possibility*** that it will succeed," and granted an injunction because the

court was unwilling to find "***no possibility*** of a successful reorganization." A16; A23 (emphasis added). But this Court has consistently held that movants must demonstrate a reasonable "***probability***" of success. *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (emphasis added). The Supreme Court has emphasized that "'***[m]ore than a mere "possibility"*** of relief is required.'" *Nken v. Holder*, 556 U.S. 418, 435 (2009) (emphasis added) (addressing parallel requirement for stay); *cf. Winter*, 555 U.S. at 22 ("'possibility' standard is too lenient" for showing likelihood of irreparable harm). Even the dissent the bankruptcy court cited for its mere "possibility" standard, A16, demanded a reasonable "'probability'" of success, not mere possibility. *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 397 (3d Cir. 2013) (Jordan, J., dissenting).

The bankruptcy court effectively conceded LTL could not establish a reasonable probability of success under the proper standard—much less make the "clear showing" precedent requires. *Mazurek*, 520 U.S. at 972. The court found LTL faces "an uphill battle." A23. LTL offered "only speculation" that the 60,000 "new claims" purportedly supporting its plan were "viab[le]." A18. LTL's decision to give up $31 billion—"potentially [the] largest intentional fraudulent transfer undertaken in history"—"certainly appear[ed] to be manufactured." A18, A23. Even if upheld, it was far from clear LTL's intentional "reduction in funding" (or

30

LTL's other maneuvers) "adds to—or creates—[the] financial distress" necessary to survive dismissal: "Maybe.  Maybe not."  A45(7).

To succeed, LTL will have to prevail on each of those issues.  Yet the bankruptcy court never found it reasonably probable LTL will succeed on *even one*, much less run the table and prevail on *all*.  Having concluded that LTL's machinations "raise more questions regarding financial distress and good faith than they answer," and that LTL "offered only speculation," the bankruptcy court was required to deny injunctive relief.  A18.

To avoid that result, the court held uncertainty against *claimants*, invoking a supposed "conce[ssion] that it was uncertain" whether LTL could show financial distress.  A22.  But objectors were unequivocal that LTL had *not* established good-faith financial distress.  A344-346.  Regardless, granting an injunction despite "so many unanswered questions," because "*Objecting Parties*" had not eliminated the "*possibility* of a successful reorganization," A23 (emphasis added), inverts the burden of proof and applies a fundamentally erroneous standard.  This Court, moreover, has already held LTL cannot satisfy *its burden* to show immediate financial distress while admitting "it can pay current and future talc claimants in full."  64 F.4th at 109.  The same remains true now.

In *LTL*, this Court raised a litany of concerns about the bankruptcy court's injunction restraining suits against non-debtors.  64 F.4th at 108 n.16.  They remain

unaddressed.   This Court explained that the bankruptcy court's prior analysis "lack[ed] full discussion" of "pertinent factors," including (i) LTL's (non-existent) indemnification obligations for J&J's "independent, post-1979 conduct," which gave rise to tort liability entirely separate from LTL's; (ii) language in a 1979 transfer agreement limiting LTL's assumed liabilities to those "allocated on the books or records of J&J as pertaining to the BABY Division" (books and records LTL never examined); and (iii) LTL's (lack of) indemnification obligations for punitive-damages liability under New Jersey law.  *Id.*; *see Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 285 N.J. Super. 575, 580-89 (App. Div. 1995).   The bankruptcy court failed to address ***any*** of those identified problems.  It simply readopted its prior reasoning, asserting that "[n]othing offered in the Third Circuit's Opinion" warranted reexamination.  A13-15.[4]

The bankruptcy court's irreparable-harm analysis is likewise indefensible. The court suggested that allowing trials against non-debtors would "negatively affect mediation, valuation, and claims estimation inside this bankruptcy."  A25.  But this

---

[4] The bankruptcy court cannot end-run the injunction factors by invoking § 362, A13; § 362's "clear language" expressly limits it to suits "against the debtor."  *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).  It does not encompass suits against non-debtors for their own culpable acts, *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986), or cases where a further lawsuit would be required to impose debtor liability, *In re Federal-Mogul Glob. Inc.*, 300 F.3d 368, 382 (3d Cir. 2002)—much less cases where the asserted grounds for extending relief to non-debtors were created on the eve of bankruptcy solely to justify that relief, *Combustion Engineering*, 391 F.3d at 228.

Court found the opposite, explaining that further talc litigation would help rather than hinder reorganization by providing the bankruptcy "court with better guideposts when tackling" valuation and estimation.  64 F.4th at 103.  The A.H. Robins bankruptcy, the Court noted, "had the benefit of data from 15 years of tort litigation."  *Id.* n.13.  The bankruptcy court never responded to this Court's concerns.

On the balance of equities and public interest, the bankruptcy court brushed aside grave harms to talc claimants, who have already been denied their day in court for 18 months by LTL's unlawful bankruptcy.  Take Anthony Valadez, a 24-year-old whose mesothelioma has progressed so rapidly that his doctors stopped immunotherapy treatments in January 2023.  A2463(¶21); A2468(¶33).  Anthony's claims had been set for trial starting April 17, 2023.  A2480(¶68); A2596-2600(Case Management Order).  Now, he may die without getting his day in court.

Other claimants with advanced terminal illnesses have seen trial dates deferred.  Marlin Eagles, an 81-year-old with metastatic mesothelioma, was set to try his claims on May 1, 2023.  A2712(Order re: Trial); A2718(¶8).  That trial has been continued.  A2721(Case Management Statement).  Another claimant with a May 1 trial date, Meredith Egli, has (again) been told she must wait.  A2730(Order re: Case Management Conference).  Dozens of other epithelial ovarian cancer and mesothelioma cases awaiting trial across the country have likewise been stymied by LTL's improper bankruptcy and the bankruptcy court's injunction.  *E.g.*, A2838-

2839 (state court would consider consolidating cases for trial only "if the bankruptcy is dismissed").

In *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983), this Court declined to enjoin suits against non-debtor co-defendants, citing the "hardship" to victims from "being forced to wait for an indefinite and . . . lengthy time before their causes are heard," while "plaintiffs and crucial witnesses are dying, often from the very diseases" underlying the litigation. No less is true here. The public interest favors letting talc victims attain some measure of justice while they still can.

## CONCLUSION

The petition should be granted and the case remanded with instructions to dismiss. At a minimum, the preliminary injunction should be vacated.

May 1, 2023                                Respectfully submitted,

                                           */s/ Angelo J. Genova*

MOLOLAMKEN LLP                             GENOVA BURNS LLC
Jeffrey A. Lamken                          Angelo J. Genova
600 New Hampshire Ave., N.W.               Daniel M. Stolz
Washington, DC 20037                       110 Allen Road, Suite 304
(202) 556-2010                             Basking Ridge, NJ 07920
                                           (973) 533-0777


BROWN RUDNICK LLP                          OTTERBOURG P.C.
David J. Molton                            Melanie L. Cyganowski
Robert J. Stark                            Adam C. Silverstein
Michael S. Winograd                        230 Park Avenue
Seven Times Square                         New York, NY 10169
New York, NY 10036                         (212) 661-9100
(212) 209-4800


MASSEY & GAIL LLP
Jonathan S. Massey
1000 Maine Ave. S.W., Suite 450
Washington, DC 20024
(202) 652-4511

*Proposed Counsel for Official Committee of Talc Claimants*

## **CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to Third Circuit Local Rule 28.3(d), I certify that I am a member of

the Bar of this Court.


May 1, 2023                          */s/ Angelo J. Genova*
                                     Angelo J. Genova

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because this brief contains 7,786 words, excluding the parts of the brief required by Fed. R. App. P. 32(f) and Fed. R. App. P. 21(a)(2)(C).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

This brief complies with the electronic filing requirements of Third Circuit Local Rule 31.1(c) because the text of the electronic brief is identical to the text in the paper copies, and a virus detection program has been run on this file and no virus was detected.  The virus detection program utilized was Vipre Virus Protection, version 3.1.

May 1, 2023                          */s/ Angelo J. Genova*
                                     Angelo J. Genova

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that today, May 1, 2023, I caused a true and correct copy of the foregoing to be served upon the parties listed on the Bankruptcy Court service list in Chapter 11 Case No. 23-12825 and Adversary Proceeding No. 23-01092, and arranged for a true and correct paper copy of the foregoing to be served upon the Bankruptcy Court by commercial carrier.

I filed the foregoing Brief and Appendix Volume 1 with the Clerk of Court for the United States Court of Appeals for the Third Circuit via CM/ECF today.

May 1, 2023                         */s/ Angelo J. Genova*
                                    Angelo J. Genova

# APPENDIX VOLUME 1

## APPENDIX
### TABLE OF CONTENTS

### VOLUME I
### IN COMPLIANCE WITH LOCAL RULE 32.2(C)

| ITEM | DESCRIPTION | APPENDIX PAGE |
|------|-------------|---------------|
| 1. | Memorandum Opinion (Doc. No. 94, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 27, 2023) | A1 |
| 2. | Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and Granting Limited Preliminary Restraints and Transcript of Ruling (Doc. No. 91, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 25, 2023) | A32 |

### VOLUME II

| ITEM | DESCRIPTION | APPENDIX PAGE |
|------|-------------|---------------|
| 3. | Transcript of Proceedings on April 18, 2023 in *In re LTL Management LLC* (Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 18, 2023) | A67 |

### VOLUME III

| ITEM | DESCRIPTION | APPENDIX PAGE |
|------|-------------|---------------|
| 4. | Transcript of Proceedings on April 11, 2023 in *In re LTL Management LLC* (Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 11, 2023) | A410 |
| 5. | Declaration of John K. Kim in Support of First Day Pleadings (Doc. No. 4, Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 4, 2023) | A624 |
| 6. | Objection of the United States Trustee to Debtor's Motion for Order (Doc. No. 38, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 17, 2023) | A667 |
| 7. | Debtor's Motion for Order on Miscellaneous Relief (Doc. No. 240-1, Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 19, 2023) | A683 |

## VOLUME IV
### FILED UNDER SEAL

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 8. | Deposition Transcript of John Kim (Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 14, 2023) | A692 |
| 9. | Deposition Transcript of Erik Haas (Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 14, 2023) | A936 |

## VOLUME V
### FILED UNDER SEAL

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 10. | Deposition Transcript of Adam Pulaski (Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 15, 2023) | A1162 |
| 11. | Email from Mikal Watts to James Murdica and Jason Itkin re: RSA-Talc, with accompanying attachment (Feb. 26, 2023) | A1298 |
| 12. | Term Sheet for Plan Support Agreement, Bates No. LTLMGMT-00002628 | A1318 |
| 13. | Deposition Transcript of James Murdica (Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 16, 2023) | A1331 |

## VOLUME VI
### FILED UNDER SEAL

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 14. | Deposition Transcript of Richard Dickinson (Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 17, 2023) | A1667 |

## VOLUME VII

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 15. | Transcript of Proceedings on February 18, 2022 in *In re LTL Management LLC* (Ch. 11 No. 21-30589, Adv. Proc. No. 21-03032 (Bankr. D.N.J.)) (Feb. 18, 2022) | A1865 |

| 16. | Declaration of John K. Kim in Support of First Day Pleadings (Doc. No. 5, Ch. 11 No. 21-30589 (Bankr. W.D.N.C.)) (Oct. 14, 2021) | A2121 |
| 17. | Amended and Restated Funding Agreement (Oct. 12, 2021) | A2175 |
| 18. | Monthly Operating Report: Global Notes & Statements of Limitations & Disclaimers Regarding the Debtor's Monthly Operating Report (Doc. No. 3886-1, Ch. 11 No. 21-30589 (Bankr. D.N.J.)) (Mar. 21, 2023) | A2196 |

## VOLUME VIII

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 19. | Transcript of Oral Argument in *In re LTL Management LLC* (No. 22-2003 (3d Cir.)) (Sept. 19, 2022) | A2207 |
| 20. | Petition for Rehearing and Rehearing En Banc (Doc. No. 153, No. 22-2003 (3d Cir.)) (Feb. 13, 2023) | A2329 |
| 21. | Order Sur Petition for Rehearing (Doc. No. 172, No. 22-2003 (3d Cir.)) (Mar. 22, 2023) | A2414 |
| 22. | Motion to Stay the Mandate (Doc. No. 173, No. 22-2003 (3d Cir.)) (Mar. 22, 2023) | A2416 |
| 23. | Order Denying Motion to Stay the Mandate (Doc. No. 180, No. 22-2003 (3d Cir.)) (Mar. 31, 2023) | A2447 |

## VOLUME IX

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 24. | Memorandum of Law In Support of Motion by Movant Anthony Hernandez Valadez for an Order (I) Granting Relief from the Automatic Stay, Second Amended Exp Parte Temporary Restraining Order, and Anticipated Preliminary Injunction, and (II) Waiving the Fourteen Day Stay Under Federal Rule of Bankruptcy Procedure 4001(a)(3) (Doc. No. 71, Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 10, 2023) | A2449 |
| 25. | Exhibits in Support of Memorandum of Law of Anthony Hernandez Valadez (Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 10, 2023) | A2505 |

| 26. | Order re: Hearing on Motion for Trial Preference, *Eagles v. ArvinMeritor, Inc.*, No. 22CV018294 (Cal. Super. Ct. Dec. 9, 2022) | A2712 |
|---|---|---|
| 27. | Declaration of Joseph D. Satterley in Support of Marlin Eagles's Opposition to Debtor's Motion for Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminary Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction (Doc. No. 53-1, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 17, 2023) | A2716 |
| 28. | Plaintiffs' Case Management Statement, *Eagles v. ArvinMeritor, Inc.*, No. 22CV018294 (Cal. Super. Ct. Apr. 5, 2023) | A2721 |
| 29. | Order re: Case Management Conference, *Egli v. Johnson & Johnson*, No. RG20075272 (Cal. Super. Ct. Apr. 7, 2023) | A2730 |

### VOLUME X

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 30. | Notice of Appeal and Statement of Election (Doc. No. 83, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 21, 2023) | A2731 |
| 31. | Request of Official Committee of Talc Claimants for Order Certifying Direct Appeal of Preliminary Injunction Order of April 20, 2023 to the United States Court of Appeales for the Third Circuit (Doc. No. 84, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 21, 2023) | A2740 |
| 32. | Order Shortening Time Period for Notice, Setting Hearing and Limiting Notice (Doc. No. 87, Adv. Proc. No. 23-01092 (Bankr. D.N.J.)) (Apr. 24, 2023) | A2760 |
| 33. | Voluntary Petition for Non-Individuals Filing for Bankruptcy of LTL Management LLC (Doc. No. 1, Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 4, 2023) | A2764 |
| 34. | Information Brief of the Ad Hoc Committee of Certain Talc Claimants Regard Second Bankruptcy Filing by LTL Management, LLC (Doc. No. 79, Ch. 11 No. 23-12825 (Bankr. D.N.J.)) (Apr. 10, 2023) | A2788 |

| 35. | *Monthly Asbestos Trial Calendar – January 2023-June 2023*, N.J. Courts, https://www.njcourts.gov/sites/default/files/mcl/asbestos/trialcal.pdf (last accessed Apr. 27, 2023) | A2817 |
| 36. | Judgment (Doc. No. 181-1, No. 22-2003 (3d Cir.)) (Mar. 31, 2023) | A2824 |

### VOLUME XI
### FILED UNDER SEAL

| ITEM | DESCRIPTION | APPENDIX PAGE |
|---|---|---|
| 37. | Presentation to Board of Managers of LTL Management LLC, Bates No. LTLMGMT-00000260 (Apr. 1, 2023 draft) | A2826 |
| 38. | Letter from Ana C. Viscomi, J.S.C., Superior Court of New Jersey, to All Plaintiffs' Counsel Who Have J&J Talc Matters Venued in Middlesex County re Scheduling of Cases for Case Management and Trial (Apr. 26, 2023) | A2838 |

NOT FOR PUBLICATION

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

<br><br>

LTL Management, LLC,
    Debtor.

---

LTL Management, LLC,

    Plaintiff,

  v.

Those Parties Listed on Appendix A to the Complaint
and John and Jane Does 1-1000,

    Defendants.

</td><td>

Case No. 23-12825 (MBK)

Adv. Pro. No. 23-01092 (MBK)

Chapter 11

Hearing Date:  April 18, 2023

</td></tr>
</table>

*All Counsel of Record*

### MEMORANDUM OPINION

   This matter comes before the Court by way Debtor's bankruptcy case (Case No. 23-12825)

and subsequent adversary proceeding (Adv. Pro. No. 23-01092) and motion ("Motion") (ECF No.

2 in Adv. Pro. No. 23-01092)[1] filed by Plaintiff LTL Management, LLC ("LTL" or "Debtor")

seeking an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions

Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary

---

[1] Unless otherwise specified, all ECF Nos. will refer to docket entries in the instant adversary proceeding (the "Second Talc Adversary Proceeding"), Adv. Pro. No. 23-01092.

Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction Filed by LTL

Management LLC. The Court has fully considered the submissions of the parties and the

arguments set forth on the record at a hearing held on April 18, 2023. The Court also takes judicial

notice of prior rulings and documents filed in this and in the prior bankruptcy case (Case No. 21-

30589) and the related adversary proceedings.[2] For the reasons set forth below, the Court grants

Debtor's Motion in part and denies the Motion in part and enters a limited preliminary injunction

(the "Preliminary Injunction").[3] Specifically—with the exception of the Multi-District Litigation

("MDL")—the limited Preliminary Injunction will prohibit *only* the commencement or

continuation of any *trial* and appellate practice against any of the parties identified in Appendix B

to the Verified Complaint, as amended[4] (the "Protected Parties"), through and including June 15,

2023, a period of approximately 60 days. No parties are enjoined or restrained from filing new

complaints against non-debtor third parties, or from engaging in any ongoing discovery or other

pre-trial matters. On the May 22, 2023 omnibus date, the Court will revisit the continuation and/or

modification of the Preliminary Injunction as it relates the MDL pending before Judge Shipp. The

---

[2] *See In re Davis*, 597 B.R. 770, 773 (Bankr. M.D. Pa. 2019) ("Federal Rule of Evidence 201 allows a federal court to take judicial notice of facts that are not subject to reasonable dispute. A bankruptcy court may take judicial notice of the docket entries in a case and the contents of the bankruptcy schedules to determine the timing and status of case events, as well as facts not reasonably in dispute."); *see also In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n.1 (3d Cir. 2018) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) and taking judicial notice of documents, "including matters of public record and judicial opinions").

[3] The Court also grants in part and denies in part Mr. Satterley's Motion for Stay Relief (ECF No. 71 in Case No. 23-12825). Although he may not proceed to trial, Mr. Satterley is granted limited stay relief against Debtor for purposes of taking discovery against Debtor related to the underlying state litigation. The Court has entered an Order to this effect in the main bankruptcy case. *April 25, 2023 Order*, ECF No. 298 in Case No. 23-12825.

[4] As discussed on the record on April 20, 2023, Janssen Pharmaceuticals, Inc. and Kenvue Inc. are excluded, and the Preliminary Injunction does not extend to those entities.

Court issues the following findings of fact and conclusions of law as required by FED. R. BANKR.

P. 7052.[5]

## I.    Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and
157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended
September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court.  As explained in detail
below, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (G).
Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    Background

The parties are familiar with the factual background and procedural history of this case.
LTL, which is an indirect subsidiary of Johnson & Johnson ("J&J"), traces its roots back to
Johnson & Johnson Baby Products, Company, a New Jersey company incorporated in 1970 as a
wholly owned subsidiary of J&J. *Declaration of John K. Kim in Support of First Day Pleadings*
("*Kim Decl.*") ¶¶ 13-15, ECF No. 4 in Case No. 23-12825.  A thorough discussion of the history
of J&J and its talc products can be found in this Court's February 25, 2022 Opinion Denying the
Motions to Dismiss and the Court will limit its recitation of the factual background here. *See In re
LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  In relevant part, in 1979, J&J transferred
all its assets associated with the Baby Products division to J&J Baby Products Company (the "1979
Agreement").  Thereafter, as the result of intercompany transactions, one of J&J's corporate

---

[5] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such.
Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

subsidiaries, Johnson & Johnson Consumer Inc. ("Old JJCI") assumed responsibility for all claims alleging that J&J's talc-containing products caused ovarian cancer and mesothelioma. *Kim Decl.* ¶¶ 16-21, ECF No. 4 in Case No. 23-12825.

On October 12, 2021, Old JJCI engaged in a series of transactions pursuant to the Texas divisional merger statute, *See* Tex. Bus. Orgs. Code Ann. §§ 10.001 *et seq.* (the "2021 Corporate Restructuring") through which it ceased to exist and two new companies, LTL and Johnson & Johnson Consumer Inc. ("New JJCI"), were formed. *Kim Decl.* ¶ 24, ECF No. 4 in Case No. 23-12825.  The alleged purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Kim Decl.* ¶ 29, ECF No. 4 in Case No. 21-30589.  As a result of the restructuring, LTL assumed responsibility for all of Old JJCI's talc-related liabilities. *Id.*  Through the restructuring, LTL also received rights under a funding agreement (the "2021 Funding Agreement"). *Kim Decl.* ¶ 32, ECF No. 4 in Case No. 23-12825.  Under the 2021 Funding Agreement, J&J and New JJCI were obligated to pay, *inter alia*, the "Payee's Talc-Related Liabilities", as well as "any and all costs and expenses" LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case" to the extent necessary. *Funding Agreement* 6, *Annex 2 to Kim Decl. in Support of First Day Pleadings*, ECF No. 5 in Case No. 21-30589; *see also Kim Decl.* ¶ 32, ECF No. 4 in Case No. 23-12825.

On October 14, 2021, LTL filed its initial voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Western District of North Carolina. *Petition*, ECF No. 1 in Case No. 21-30589.  One week after the chapter 11 filing, Debtor initiated an adversary

proceeding (the "Talc Adversary Proceeding"), seeking declaratory and injunctive relief against plaintiffs (the "Talc Claimants") who had filed federal and state actions against Debtor's affiliates and other entities for talc-related claims (the "Talc Actions"). *Complaint*, ECF No. 1 in Adv. Pro. No. 21-03032. By way of the Talc Adversary Proceeding, the Debtor sought an order declaring that the automatic stay applies to those actions against nondebtors or, in the alternative, to enjoin such actions and grant a temporary restraining order pending a final hearing. Debtor simultaneously filed a motion requesting a preliminary injunction enjoining the prosecution of actions outside of the chapter 11 case on account of the same talc claims that exist against the Debtor in the chapter 11 case. *Motion*, ECF No. 2 in Adv. Pro. No. 21-03032. Ultimately, the chapter 11 and related adversary proceeding case were transferred to the District of New Jersey. Following a five-day evidentiary hearing—during which the Court contemporaneously heard arguments on pending motions to dismiss—the Court denied the motions to dismiss in the underlying bankruptcy case and granted the motion for preliminary injunction in the Talc Adversary Proceeding. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022) (denying motions to dismiss); *In re LTL Management, LLC*, 638 B.R. 291, 297 (Bankr. D.N.J. 2022) (granting preliminary injunction). Several other adversary proceedings followed wherein Debtor sought similar relief. *See Securities Adversary Proceeding*, Adv. Pro. No. 22-01073; *Consumer Protection Adversary Proceeding*, Adv. Pro. No. 22-01231. This Court likewise granted the motion for preliminary injunction and extended the automatic stay to nondebtor defendants in those actions. *See In re LTL Mgmt., LLC*, No. 22-01073, 640 B.R. 322 (Bankr. D.N.J. 2022); *In re LTL Mgmt., LLC*, 645 B.R. 59 (Bankr. D.N.J. 2022).

Meanwhile, several parties appealed this Court's denial of the motions to dismiss and its imposition of a preliminary injunction in the Talc Adversary Proceeding. While the appeals were pending, New JJCI—which had continued operations—changed its name to Johnson & Johnson Holdco (NA) Inc. ("Holdco") in December 2022. *Kim Decl.* ¶ 26, ECF No. 4 in Case No. 23-12825. Holdco is the direct parent of the Debtor. *Id.* at ¶ 27. In early January 2023, Holdco transferred its Consumer Business assets to its parent entity. *Id.* at ¶ 26.

On January 30, 2023, the Third Circuit ruled on the pending appeals and issued an opinion directing this Court to dismiss the 2021 Chapter 11 Case (the "Third Circuit Opinion"). *See In re LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023) as amended by 2023 WL 2726441 (3d Cir. Mar. 31, 2023). Specifically, the Third Circuit ruled that the case was not filed in good faith due to Debtor's lack of financial distress. The Debtor filed a petition for rehearing and rehearing en banc with the Third Circuit, which the circuit court denied on March 22, 2023. The Debtor then filed a motion seeking a stay of the Third Circuit's mandate pending appeal to the United States Supreme Court, which the circuit court denied on March 31, 2023. This Court entered an order dismissing the initial chapter 11 bankruptcy case on April 4, 2023. *Dismissal Order*, ECF No. 3938 in Case No. 21-30589. Approximately two hours later, Debtor initiated the instant bankruptcy case. *Petition*, ECF No. 1 in Case No. 23-12825. In conjunction with the Petition, Debtor filed "support agreements (collectively, the "Plan Support Agreements") that have been executed and delivered by counsel on behalf of over 60,000 claimants and signed by the Debtor, Holdco and J&J[,]" which Debtor states demonstrates support for "an agreement with thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and

consummated, would fully resolve all the Debtor's liability for talc-related claims." *Kim Decl.* ¶ 72, ECF No. 4 in Case No. 23-12825. Debtor also terminated the 2021 Funding Agreement and entered into "new financing arrangements." *Id.* at ¶ 78. The new funding agreement (the "2023 Funding Agreement") "obligates Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the normal course of its business" to the extent Debtor is unable to do so. *Id.* at ¶ 79. Debtor, Holdco and J&J entered into a separate agreement (the "J&J Support Agreement"), which operates only in the chapter 11 case and "obligates J&J to provide the trust funding Holdco is required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the funding." *Id.* at ¶¶ 80, 81.

Shortly after filing the Petition, Debtor commenced the instant Adversary Proceeding and filed the Motion, which is the subject of this Opinion. The Court issued an ex parte Temporary Restraining Order (ECF No. 9), which was thrice amended (ECF Nos. 15, 16, and 20), and, at the parties' request, the Court kept this matter on a tight timeframe, scheduling a hearing for April 18, 2023. Multiple interested parties (collectively, the "Objecting Parties") filed Objections to the Debtor's Motion.[6] At the hearing on April 18, 2023, the parties presented argument, testimony,

---

[6] *See* Objections filed by: Arnold & Itkin LLP (ECF No. 37); United States Trustee (ECF No. 38); Official Committee of Talc Claimants ("TCC") (ECF No. 39); John M. August on behalf of Kristie Lynn Doyle (ECF No. 43); John M. August on behalf of Trevor Barkley (ECF No. 46); John M. August on behalf of Alison Daugherty (ECF No. 51); John M. August on behalf of Marlin Lewis Eagles (ECF No. 53); John M. August on behalf of Susan Jean Bader (ECF No. 54); John M. August on behalf of Dean McElroy (ECF No. 56); Jerome Howard Block on behalf of Paul Crouch (ECF No. 57); Joinder filed by E. Richard Dressel on behalf of Evan Plotkin (ECF No. 58); Suzanne Ratcliffe on behalf of Various Talc Claimants, Katherine Tollefson (ECF No. 60); a Limited Objection by John Maloney on behalf of Travelers Casualty and Surety Company (f/k/a The Aetna Casualty and Surety Company) ("Travelers") (ECF No. 61). Several parties also filed joinders and/or supplemental objections following the April 18, 2023 hearing. *See* Supplemental Objection filed by Jerome Howard Block on behalf of Paul Crouch (ECF No. 62); Supplemental Objection filed by Clay Thompson on behalf of Katherine Tollefson, Various Talc Claimants (ECF No. 65); Joinder of TCC's Objection filed by Christopher M. Placitella on behalf of Justin Bergeron (ECF No. 80).

and admitted evidence into the record.  To accommodate the parties' request that the Court rule on this matter as soon as possible, the Court read an oral ruling into the record on April 20, 2023. This written Opinion is intended to clarify and supplement the oral opinion, the transcript of which is available on the docket at ECF No. 82 and is hereby incorporated by reference.

## III.   Discussion

### A.  Authority and Standard for Extension of Stay to Nondebtors

The Court discussed its authority to stay litigation against nondebtor third parties in its Opinions granting preliminary injunctions in the prior bankruptcy case. *See In re LTL Mgmt., LLC*, 645 B.R. 59 (Bankr. D.N.J. 2022); *In Re LTL Mgmt., LLC*, 640 B.R. 322 (Bankr. D.N.J. 2022); *In re LTL Management, LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022).  The Court will not repeat the lengthy discussions therein and, instead, incorporates them by reference.  In sum, the Court concludes that § 362(a), §105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties.  Nevertheless, because certain courts in this circuit still view the source of authority to extend the automatic stay as an open-ended question, this Court will utilize the same three-step inquiry outlined in its prior decision to address the instant Motion.  Namely, in determining whether to extend the automatic stay to nondebtor third parties, the Court considers: (1) whether it has jurisdiction to issue the injunction; (2) whether extension of the automatic stay under § 362(a) to the nondebtors is appropriate; and (3) whether the Court should, in its discretion, issue the injunction. *In re LTL Mgmt., LLC*, 638 B.R. at 301 (citing *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 102 (E.D. Pa. 2010)) (other citations omitted).

### 1. Subject Matter Jurisdiction

The Objecting Parties contend that the Debtor has failed to establish that this Court has subject matter jurisdiction to enjoin the Talc Actions. The Objecting Parties' arguments in this respect are premised primarily on their contention that the instant bankruptcy was filed in bad faith and, thus, this Court does not have subject matter jurisdiction to enter *any* orders in this case. *See e.g., Objection by TCC* 16, ECF No. 39 (stating that "LTL's failure to show financial distress or good faith [among other things] . . . deprives this Court of subject matter jurisdiction to enter the relief requested by this Motion")[7]; *Objection by Maune Raichle Hartley French & Mudd, LLCR* 3, 5, 11-15, ECF No. 60 (positing that this Court lacks subject matter jurisdiction because the bankruptcy was not filed in good faith); *id.* at 14 ("Therefore, this Court accordingly has no jurisdiction over LTL's instant Petition."). For reasons that will be discussed, this Court determines that it cannot, at this juncture, find that the petition was filed in bad faith sufficient to establish cause to dismiss. Accordingly, this Court again concludes that it has the authority to examine and determine the scope of a substantive right afforded under the Bankruptcy Code.

"Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), as amended (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391

---

[7] The TCC also challenges this Court's jurisdiction to enter an injunction under § 105, arguing that the Court the bankruptcy court does not have core or related-to jurisdiction over the claims in the tort cases sought to be enjoined. *See e.g.*, TCC's Objection 54, ECF No. 39. As an initial matter, this Court disagrees with the TCC's position regarding a bankruptcy court's authority to extend the automatic stay under § 362

F.3d at 225 (citations omitted)).  "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)).  A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings. 28 U.S.C. §157(b)(1); *In re Roggio*, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020).

A proceeding "arise[s] under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d at 217. A proceeding "arise[s] in" a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Id.* at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) and explaining that a proceeding arises in a bankruptcy case if it has "no existence outside of the bankruptcy").  Finally, "a claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted); *see also In re W.R. Grace & Co.*, 591 F.3d 164.  "What will or will not be sufficiently related to a bankruptcy to warrant the exercise of subject matter jurisdiction is a matter that must be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d at 174 n.9.

Here, Debtor's Motion unquestionably implicates § 362(a), which is a substantive right under the Code.  This Court certainly has jurisdiction to determine § 362(a)'s applicability and scope in this bankruptcy case, and—more specifically—whether it is appropriate to extend the

substantive rights afforded under § 362(a) to nondebtors. *See, e.g., Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1100 (9th Cir. 2005) (holding that lower court had jurisdiction to determine whether the automatic stay of the Texas bankruptcy court applied to the Attorney General's suit). Therefore, the instant matter is decidedly a proceeding over which this Court has "core" jurisdiction. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, 2022 WL 190673, at *4 (collecting cases).

Having found "core" jurisdiction over the instant Adversary Proceeding, there is no need for a secondary source of jurisdiction. *See In re Essar Steel Minnesota, LLC*, 47 F.4th 193 (3d Cir. 2022) (discussing *In re Shenango Group, Inc.*, 501 F.3d 338, 342–44 (3d Cir. 2007), and holding that where a court finds one type of jurisdiction, it need not go further in its jurisdictional inquiry). Nevertheless, given the lack of clarity regarding the appropriate authority to enjoin third party actions, the Court offers the following analysis and again determines that, at a minimum, it has "related to" jurisdiction. As discussed in prior opinions, continued litigation of talc claims against the Protected Parties—especially to the point of liquidation of a claim through trial—has a "conceivable effect" on the bankruptcy estate because it effectively seeks to collect and liquidate claims against Debtor, could deplete available insurance coverage, and could trigger indemnification obligations. More to the point, verdicts outside of bankruptcy will set a dollar amount to liability, and—whether those verdicts are in favor of Debtor or of individual claimants— they will certainly impact claims valuations, estimation, insurance, and mediation efforts inside this bankruptcy.

In sum, this Court previously held that there is an identity of interests between the Protected Parties and the Debtor, that the parties share insurance coverage, that there exist potential indemnification obligations, and that continued litigation has a potential adverse impact on a debtor's estate and prospect of reorganization. *See In re LTL MANAGEMENT, LLC*, 638 B.R. at 303-306. (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d at 999; *see also McCartney*, 106 F.3d at 510); *see also In re Boy Scouts of Am. & Delaware BSA, LLC,* No. 20-10343-LSS, 2023 WL 2662992 (D. Del. Mar. 28, 2023) (finding related-to jurisdiction based on identity of interest, shared insurance coverage, and indemnification obligations).  Nothing presented in opposition to the instant Motion or in the Third Circuit's Opinion changes that analysis.  Therefore, the Court again concludes that it has subject matter jurisdiction.

## 2.   The Automatic Stay Under § 362(a)

The Court must next examine whether extension of the stay to nondebtors is appropriate given the circumstances.  Section 362(a) provides, in relevant part, that

> a petition filed under section 301, 302, or 303 of this title . . . operates as a stay applicable to all entities, of—
>
> > (1) the commencement or continuation, . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> >
> > . . .
> >
> > (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a)(1), (3).

### (a) § 362(a)(1)

The Court previously held that the Talc Claims are, fundamentally, an attempt to liquidate and recover claims against the Debtor.  As this Court's prior opinions observe, Debtor is responsible for any and all liabilities associated with the talc products by virtue of the 1979 Agreement and the 2021 Corporate Restructuring.  Accordingly, this Court previously concluded that the claims in the Talc Actions constitute "action[s] or proceeding[s] against the debtor," for which the Debtor is entitled to protection under § 362(a)(1).  Nothing offered in the Third Circuit's Opinion or in the parties' arguments compels deviation from this Court's prior ruling.

### (b) § 362(a)(3)

"It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (collecting cases); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 148–49 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).  Here, it is undisputed that the Protected Parties and Debtor share insurance policies.  Although, certain coverage is disputed, and no definitive determination has been made as to exhaustion, the shared policies— which are undeniably part of the bankruptcy estate—may be impacted by any judgment obtained by the Talc Claimants against the Protected Parties outside of bankruptcy. *See In re Boy Scouts of Am. & Delaware BSA, LLC,* 2023 WL 2662992, at *22-24.   These same circumstances led this Court to extend the automatic stay to the Protected Parties in the initial bankruptcy case.  The Objecting Parties do not present a persuasive argument that warrants alteration of this Court's previous finding.  Likewise, the Third Circuit's Opinion does not demand reconsideration of this

matter. Accordingly, the Court again concludes that an extension of the automatic stay under § 362(a)(3) is appropriate.

### (c) "Unusual Circumstances"

The Third Circuit has recognized that § 362(a)'s protection is applicable to nondebtors where "unusual circumstances" exist. *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997) (citing *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876, 107 S. Ct. 251, 93 L.Ed.2d 177 (1986)); *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 104. When deciding to extend the stay to nondebtors, the Court follows the Third Circuit's guidance and considers the "unusual circumstances" present in the instant case—namely, the identity of interests between Debtor and the Protected Parties and the potential prejudicial impact of Talc Action verdicts outside of bankruptcy on Debtor's reorganizational efforts. *See In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that unusual circumstances exist warranting extension of the stay to nondebtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization"); *see also In re LTL Management, LLC*, No. 21-30589, 2022 WL 586161, at *9 (explaining that "a critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate and prospect of reorganization").

The Court's analysis of the potential harm to the bankruptcy estate from trials in the Talc Actions mirrors the jurisdictional analysis previously discussed—particularly, the Court's findings regarding "related to" jurisdiction. *See In re Boy Scouts of Am. & Delaware BSA, LLC,* 2023 WL

2662992, at *18-24.   Those same considerations supporting subject matter jurisdiction also support the conclusion that "unusual circumstances" exist warranting extension of § 362(a)'s automatic stay protection to the nondebtor defendants in the Talc Actions.[8]

### 3. § 105(a) Injunction

The Court next turns to address the parties' competing positions as to whether an injunction under § 105(a) is appropriate.   Pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).   "The issuance of an injunction under section 105(a) is governed by the standards generally applicable to the issuance of injunctive relief in non-bankruptcy contexts." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 105.   In determining whether a preliminary injunction is appropriate, the Court considers the following factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*McTernan v. City of York, Pa.,* 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell*, 414 F.3d 474, 478 n.4 (3d Cir. 2005)); *see also ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *1 (3d Cir. Apr. 21, 2022) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), as amended (June 26, 2017)).   "A preliminary injunction is an 'extraordinary

---

[8] In the Third Circuit Opinion, the circuit court held that "unusual circumstances" were not present in the Debtor's prior bankruptcy case. *In re LTL Mgmt., LLC*, 64 F.4th 84, 110-111 (3d Cir. 2023).   However, this finding was made in different context—specifically, in the context of examining dismissal under § 1112(b)—and not in examining extension of the automatic stay, which is the issue presently before this Court.

remedy, which should be granted only in limited circumstances.' " *Kos Pharmaceuticals Inc. v. Andrex Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)).

### a. Success on the Merits

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986) (explaining reasonable likelihood of success in terms of a successful reorganization)).   To demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty. *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 397 (3d Cir. 2013) (Jordan, J., dissenting) (reversed and remand on other grounds) (collecting cases).   At this juncture, Debtor has met its burden.[9]   Indeed, Debtor has outlined its reorganizational strategy, executed a funding agreement (albeit a new one), and it has come to this bankruptcy court alleging that the plan it intends to file will have the support of nearly 60,000 claimants.   Admittedly, as the Objecting Parties argue, this creditor support is not guaranteed.   However, case law establishes that certainty is not required; a debtor need only show the possibility that it will succeed—a hurdle that this Debtor has cleared given the early stages of this litigation.[10]   *See Conestoga*, 724 F.3d 397.

---

[9] As recognized repeatedly in the Court's prior published opinions, the burden rests on the Debtor to establish the likelihood of success.  The to the extent the Court was unclear in articulating the standards in its oral ruling, this Opinion reaffirms and clarifies the law and the Court's finding that the Debtor has satisfied its burden.

[10] The Court notes that during oral argument on April 18, 2023, Counsel for the United States Trustee argued that the "likelihood of success" inquiry should be focused on the non-debtor affiliates. *See* Tr. Apr. 20, 2023 Hrg. 37:10-

### i. Good Faith

The Objecting Parties argue that Debtor has not satisfied its burden of establishing a viable prospect of successful reorganization. Specifically, the Objecting Parties assert that Debtor has no realistic possibility of success because the bankruptcy was not filed in good faith. "Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'" *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999) (citations omitted). As stated, Debtor has executed a funding agreement and has outlined its reorganizational strategy for which it alleges it has the support of 60,000 claimants as evidenced by the Plan Support Agreements.

Our Third Circuit has made clear that it views the gateway to good faith as being a determination that a debtor is in financial distress. During oral argument at the hearing on April 18, 2023, counsel for various Objecting Parties argued that this determination should be straightforward. Essentially, they inquired whether anything occurred in the 2 hours and 11 minutes between filings, and after the Third Circuit's ruling, which changed the Debtor's financial situation and created distress. As this Court discussed during its oral ruling on April 20, 2023, the Court does not agree that this is the appropriate inquiry for applying the Third Circuit's financial distress ruling. Rather, this Court believes the focus should be on whether anything changed in

---

12, ECF No. 81 ("Likelihood of success on the merits, remember, this is likelihood of success from the non-debtor affiliates. Not LTL, non-debtor affiliates."). The Court disagrees and believes the United States Trustee conflates the inquiry for purposes of a preliminary injunction in the bankruptcy context. The weight of the case law establishes that when assessing whether to grant a preliminary injunction in bankruptcy, courts should evaluate the reasonable likelihood of a debtor's successful bankruptcy reorganization. *See, e.g.*, *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J. 2009) (discussing plan feasibility and describing the first factor in the test for a preliminary injunction as "a reasonable likelihood of a successful plan of reorganization"); *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986).

the debtor's financial picture since October of 2021—the date of the first filing and the period
fixed for purposes of the five-day trial undertaken in February of 2022—and April 4, 2023, the
date of the second filing.  This Court observed the following changes, which raise more questions
regarding financial distress and good faith than they answer:

- First, claims against the Debtor have increased from approximately 41,000 to (in all
  likelihood) well over 100,000.  It is uncertain whether these new claims are supportable;
  however, the parties offered only speculation in support of their respective positions as to
  viability.  Accordingly, the Court cannot make a conclusive determination at this time, and
  it remains unclear whether the increased volume of claims adds to—or creates—financial
  distress for this Debtor.

- Second, since the first bankruptcy filing, the acknowledged floor for the Debtor's talc
  liability has increased from $2 billion to $8.9 billion, with questions remaining as to
  whether this sum would cover the billions claimed due for third-party providers, state
  regulators, Canadian class actions, and indemnified parties, among others.   It is unclear
  whether this increased floor of debt adds to—or creates—financial distress for this Debtor.

- Third, since the first filing, the Debtor's funding resources have been reduced from
  approximately $61 billion to potentially upwards of $30 billion.  The Court acknowledges
  that the reduction certainly appears to be manufactured by the Debtor, Holdco, and J&J in
  direct response to the Third Circuit's ruling.   Nevertheless, it is unclear whether this
  reduction in funding adds to—or creates—financial distress for this Debtor.  The Objecting
  Parties assert that the manner in which these transactions were undertaken gives rise to

independent bases for a bad faith finding.  However, the record is not developed as to this issue.  For example, it remains unclear whether the transactions give rise to fraudulent transfer liability for the benefit of the Debtor's creditors.  Indeed, constructive fraud generally under the Bankruptcy Code and state law requires a determination of insolvency. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I).  The Court is unable to conclude on this record that the Debtor's liabilities exceed its assets.  Indeed, the extent of the liabilities has not been anywhere close to being fixed.  The Third Circuit specifically cautioned and admonished against "casual[] . . . calculations" and "back-of-the envelope forecasts." *In re LTL Mgmt., LLC*, 64 F.4th at 108.  Given the limited record, this Court cannot make an informed determination, calculation, or comparison of the assets and liabilities of *this* Debtor, which—the Third Circuit instructs—is the entity upon which the inquiry should be focused. *See id.* at 105-106.  The Objecting Parties likewise admit uncertainty exists as to the true value of Debtor's liabilities compared to its assets. *See, e.g.* Tr. Apr. 18, 2023 Hrg. 280:13-16 ("I'm not sure that the Third Circuit Court of Appeals would accept that if in fact the total claims are 15 billion and they have the wherewithal of 30 billion, *I don't know if that's financial distress.*") (emphasis added); *Id.* at 281:23 – 282: 3 ("The point is there's a lot [of liability], you've got to look under the hood a little bit. And yes, there's more, you know there's more there. I can't, and I'm not here to tell you exactly what that number is and I'm not here to necessarily say as against $30 billion that's evidence of financial distress.").

As to actual fraud, this Court is unable to conclude on this record whether there has been an actual intent to hinder, delay, and defraud creditors. *See* 11 U.S.C. § 548(a)(1)(A).

This inquiry requires the Court to determine Debtor's subjective intent—a task rendered nearly impossible without knowing the extent of the liabilities and whether it is reasonable to believe that the Debtor's remaining assets are sufficient to cover such liabilities.

- Finally, the Court is troubled by the uncertainty that flows from the loss of value in the funding agreements and the potential impact of this funding loss on the interests of creditors of the estate. It is unclear what will occur if this case is dismissed. Undoubtedly, the lawyers that represents the Talc Claimants will fight zealously and tirelessly for their individual clients. Questions remain, including: "Who will pursue the claims for the possible loss in funding value?" "Who will fight for the other 100,000 or so claimants to pursue any claims that may arise out of the transactions?" And, "Outside of a bankruptcy, who will fight to protect the interests of future claimants?" While not dispositive on their own, these concerns certainly factor into the good faith analysis and the appropriateness of dismissal under § 1112(b), which are the foundations of the Objecting Parties' arguments against reasonable likelihood of this Debtor's successful reorganization.

To be clear, this Court does not doubt its authority to *sua sponte* dismiss a chapter 11 bankruptcy case for bad faith. *See* 11 U.S.C. § 1112(b); *see also, e.g.*, *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997) ("A bankruptcy court may dismiss a bad faith filing on an interested party's motion or *sua sponte*."); *Argus Grp. 1700, Inc. v. Steinman*, 206 B.R. 757, 766 (E.D. Pa. 1997). However, "[t]he power of the court to act *sua sponte* should be used sparingly and only in emergency situations." 11 U.S.C. § 1112(b) (advisory committee notes). Moreover, before taking action, a court must satisfy due process rights by providing a debtor with notice of

the issue and an opportunity to address it, and the court must engage in extensive fact-finding. *See, e.g.*, *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003); *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). Here, Debtor was certainly on notice of the issue of dismissal based on the absence of good faith—it was raised, and requested, at the First Day hearings in this bankruptcy case. However, the Court questions whether Debtor had an adequate opportunity to respond. Indeed, the Motion presently before the Court and argued at the hearing on April 18, 2023, was devoted primarily to Debtor's request for a preliminary injunction for which Debtor bears the burden. Undeniably, the issue of good faith was implicated in the context of this Motion. However, the Court questions whether the Debtor—who was focused on satisfying its burden demonstrating entitlement to extension of the automatic stay—was provided with an adequate opportunity to also satisfy its burden of establishing good faith. *See In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999) ("Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.' ") (collecting cases).

In any event, the Court determines—for reasons discussed—that the factual record is too uncertain and undeveloped for this Court to exercise its *sua sponte* dismissal authority, which the Rules themselves advise should be used "sparingly and only in emergency situations." 11 U.S.C. § 1112(b) (advisory committee notes). As always, the Court acknowledges and appreciates the time-sensitivity of rulings in this case given the health of Talc Claimants. However, in light of the

extremely limited nature of the preliminary injunction issued, the Court does not view these circumstances as presenting an emergent situation warranting immediate, *sua sponte* dismissal.[11]

In short, this Court is constrained to apply the Third Circuit's ruling to the facts of the present case. The Third Circuit's ruling was limited to a bad faith finding based on the absence of financial distress. As outlined, the Debtor's financial circumstances have changed since the time of the last filing, and the question of financial distress remains an open one for now. In response to the Court's question during oral argument on April 18, 2023, the Objecting Parties conceded that it was uncertain whether Debtor's new financial circumstances—consisting of funding resources of approximately $30 billion and liabilities that the Objecting Parties argue exceed the $8.9 settlement by *billions*—evidence financial distress. *See, e.g.* Tr. Apr. 18, 2023 Hrg. 280:13-16 ("I'm not sure that the Third Circuit Court of Appeals would accept that if in fact the total claims are 15 billion and they have the wherewithal of 30 billion, *I don't know if that's financial distress*.") (emphasis added); *Id.* at 281:23 – 282:3; *see also TCC's Objection* 31, ECF No. 39 (describing Debtor's $8.9 billion settlement as "illusory" because it proposes to settle all present and future Talc Claims as well as "billions of dollars of claims asserted by third-party payors and governmental units, and billions of dollars of claims for indemnification and other damages asserted by co-defendants, retailers, talc suppliers . . . and any drugstore or supermarket that sold J&J's toxic baby-powder," which "will substantially dilute the funds available to pay individual claimants"). The Court further acknowledges the Objecting Parties' contention that Debtor's

---

[11] The Court notes that the TCC has already filed a Motion to Dismiss (ECF No. 286 in Case No. 23-12825) and perceives that as the more appropriate vehicle to directly address this issue and develop the necessary factual record.

"[f]inancial distress stemming from a fraudulent transfer does not satisfy good faith." *Maune Raichle Hartley French & Mudd's Objection* 29-30, ECF No. 60. As discussed, however, the Court cannot make a determination as to whether a fraudulent transfer occurred on this record.

For these reasons, the Court cannot, at this juncture, *sua sponte* dismiss the case or rely on bad faith as a basis to deny the Preliminary Injunction Motion. That being said, the Court is skeptical and will require well-supported and timely showings by the Debtor that this reorganization continues to have a chance of success. Undoubtedly, Debtor has an uphill battle. In response to a motion to dismiss, Debtor will likely have to address unresolved issues such as the voidability of the 2021 Funding Agreement, the potentially "largest intentional fraudulent transfer in United States history,"[12] and the need to acquire 75% support for its plan. But, at this point, with so many unanswered questions, the Court cannot agree with the Objecting Parties that there is no possibility of a successful reorganization premised upon the bad faith objections of certain claimants—vehement as they may be. As stated, the Debtor comes to this bankruptcy with an estimated 60,000 claimants in support of its proposed settlement. This Court cannot discount those claimants' rights and preferences in favor of others. Notwithstanding, claimants who have had their claims and litigation stalled during the pendency of the prior bankruptcy should not lose more valuable time. Therefore, the Court will replace the TRO with a more limited preliminary injunction discussed in detail in the Section C of this Opinion.

---

[12] *TCC's Objection* 14, ECF No. 39.

### b. Irreparable Injury

The Court next assesses whether Debtor is likely to suffer irreparable injury without the requested relief.  In its prior Opinions, this Court discussed in detail the considerations central to the irreparable injury inquiry, summarizing as follows:

> In sum, the Court recognizes that the alleged irreparable harm cannot be too remote—in terms of time—or too speculative—in terms of likeliness to occur.  As stated previously, to hold otherwise would contradict developed case law and the Third Circuit's instruction that preliminary injunctions should be granted only in limited circumstances.  Nevertheless, this Court concludes that the test for whether irreparable harm has been demonstrated in the context of a bankruptcy case should encompass a broader view of the impact on the debtor and can take into account risks of negative consequences.

*In Re LTL Mgmt., LLC*, 640 B.R. 322, 341 (Bankr. D.N.J. 2022).  The Court incorporates the framework previously utilized by reference and employs the same analysis here.  For reasons already discussed, this Court concludes that liquidation of individual talc claims via trial verdicts will have an adverse impact on the bankruptcy estate by hindering mediation efforts, impacting the claims liquidation and estimation processes, and possibly strengthening insurance defenses against coverage—all of which will impair reorganization efforts and drain resources and time.

The Objecting Parties contend that Debtor has failed to demonstrate imminent, irreparable harm.  Specifically, the TCC asserts that the Third Circuit's Opinion forecloses the Debtor's argument as to irreparable harm. *TCC's Objection* 58, ECF No. 39.  The TCC relies on the portion of the Third Circuit's decision wherein it observed that "a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling [issues surrounding valuation of claims]." *In re LTL Mgmt., LLC*, 64 F.4th at 103.  However, the Third Circuit made those statements in the larger context of discussing the many forms of financial distress that can

lead to a hypothetical debtor's chapter 11 bankruptcy filing and the many factors that must be considered. In that same section, the Third Circuit concluded that "[t]he takeaway here is that when financial distress is present, bankruptcy may be an appropriate forum for a debtor to address mass tort liability." *Id.* at 104. Thus, nothing in the Third Circuit's decision regarding Debtor's financial distress precludes this Court from concluding that, in the present circumstances, Debtor will suffer irreparable harm if Talc Claims are allowed to proceed to trial. Again, it is this Court's view that allowing the Talc Claims to be liquidated outside of this bankruptcy will irreparably harm this Debtor because such liquidation will negatively affect mediation, valuation, and claims estimation inside this bankruptcy.

### c. Harm to Nonmoving Party

The Court must also consider whether granting preliminary relief will result in even greater harm to the nonmoving party—here, the Talc Claimants. Given the very limited nature of the Preliminary Injunction, this Court concludes that the Talc Claimants will not be harmed. The Objecting Parties independently cite the postponement of the Talc Claimants' litigation as a "grave injustice" or "extreme prejudice" that can be avoided only by denying Debtor's Motion in its entirety. *See, e.g.*, *TCC's Objection* 59, ECF No. 39; *Maune Raichle Hartley French & Mudd's Objection* 37, ECF No. 60. However, the Court has already ruled that, under the circumstances, Talc Claimants who have had their claims and litigations stalled during pendency of the prior bankruptcy case should not lose more valuable time. Accordingly, as more fully described in the Section C, Talc Claimants may proceed with litigation up to the point of trial. The only exception is that restraints remain in place as to the MDL and, as stated, this Court has agreed with Judge

Shipp that the Preliminary Injunction will be revisited at the Court's Omnibus Hearing scheduled

for May 22, 2023.  Accordingly, the Court does not perceive any harm to the Talc Claimants in

imposing the limited Preliminary Injunction contemplated herein.[13]

### d.  Public Interest

As to the fourth factor, the Court has weighed all competing factors and concludes that

granting the preliminary injunction would be in the public interest.  The Objecting Parties argue

that the public interest is best served by affording the Talc Claimants their day in court and their

constitutional right to a jury trial. *See, e.g.*, *TCC's Objection* 60, ECF No. 39.  They assert that

only the Debtor's interests are served by a preliminary injunction. *See Maune Raichle Hartley*

*French & Mudd's Objection* 38, ECF No. 60.  ("[T]he only benefit advanced by an injunction here

would flow to one group of private corporate affiliates[.]").  However, as discussed, this Court

must also consider the desires and interests of the claimants who purportedly are in support of the

Debtor's reorganization and the settlement proposed therein.  As it did in its prior Opinions, the

Court also considers interests of future talc claimants. *See, e.g.*, *In re LTL MANAGEMENT, LLC*,

638 B.R. 291, 323 (Bankr. D.N.J. 2022).  Further, the Objecting Parties here raise the same policy

---

[13] The Court is mindful of Mr. Satterley's Motion and respects the time-sensitivity of his litigation given the medical condition of his client, Emory Valadez.  As set forth on the record during the hearings on Emory Valadez's Motion for Stay Relief (ECF No. 71 in Case No. 23-12825), Mr. Satterley has approximately 16 remaining depositions to take. *See Affidavit of Joseph Satterley* 12, ECF No. 71-2.  Mr. Satterley confirmed these depositions remained outstanding at the hearing on April 18, 2023, and indicated that it would take approximately "10 days" or "a little bit longer" to complete them. Tr. of Apr. 18, 2023 Hrg. 316:13-15, 24-25.  Based on oral argument on April 11, 2023, it is also the Court's understanding that certain motion practice remains. Tr. of Apr. 11, 2023 Hrg. 200:3-5, 15-24. While the Court has every confidence that Judge Seabolt in California, who is handling the Valadez state litigation, can expeditiously move the matter along, this Court is doubtful that its ruling on Mr. Satterley's Motion—which precludes only trial and will be revisited on May 3, 2023 to consider the progress made in the state case—will have any real-world impact on the Valadez litigation.

considerations and allegations of abusive practices as were raised in oppositions to similar motions in the prior bankruptcy case.  There, this Court held:

> Congress implemented § 524(g) and granted the bankruptcy court broad equitable powers under § 105(a) to serve a purpose under a specific set of circumstances. When companies can utilize that statute for their benefit and the benefit of existing and future claimants, they should be permitted to do so. Admittedly, the bankruptcy system—like the mass tort system, or any tool in the proverbial "toolbox"—is susceptible to abuse. However, this Court does not believe that mere potential for abuse requires removal of a tool from the toolbox. Instead, the potential for abuse demands stronger scrutiny. Thus, courts must conduct a fact-specific inquiry in each case and determine—among other things—whether an appropriate set of circumstances are present, whether an entity is in compliance with statutory regulations, whether a valid reorganization purpose exists, and whether innocent third parties will be unduly prejudiced. After considering those factors in the context of this case, the Court determines that extension of the automatic stay to the Protected Parties is warranted. Given that this determination is limited to the unique facts of the case presently before the Court, this ruling will not open the floodgates to an unchecked, unregulated, or inherently abusive method of addressing liability.

*Id.*

Nothing in the Objecting Parties' arguments or in the Third Circuit's Opinion warrant reconsideration.  This Court continues to believe that—assuming the bankruptcy is found to be in good faith—claim resolution through the bankruptcy process is in the public interest, especially when it is supported by the talc claimants themselves. *See In re LTL Mgmt., LLC*, 637 B.R. 396. A settlement trust benefits claimants—whose time is valuable and may be limited due to their illness—by streamlining the claim recovery process.  Additionally, a bankruptcy trust protects the needs of future talc claimants.  Certainly, the chapter 11 bankruptcy and resolution of Talc Claims are of paramount public import.

In conducting this analysis, the Court considers the public policy concerns that underlie every decision made in this case and balances the equities on all sides. Indeed, as explained above and emphasized in this Court's prior opinions, the Debtor's reorganization and the uniform, timely, and equitable resolution of the Talc Claims for the benefit of injured parties—existing and future— are at the forefront of this Court's mind. The Talc Actions seek to liquidate talc claims against Debtor, itself, and against Debtor's affiliates.

### B.  Protected Parties

At the request of all parties, the Court considered the instant Motion—including thousands of pages of briefing and exhibits, and hours of oral argument and testimony—on an extremely truncated timetable. As a result, the Court was unable to conduct a thorough analysis as to the appropriateness of extending the stay to each, individual Protected Party listed on Appendix B. Nevertheless, given the limited scope of the restrictions imposed by way of the Preliminary Injunction, the Court is confident that no Talc Claimants are prejudiced by the broad scope of the parties to whom the Preliminary Injunction applies. To the extent an interested party objects to the extension of the automatic stay to a particular Protected Party, the Court is certainly willing to revisit the appropriateness of its ruling as to that entity.

### C.  The Limited Preliminary Injunction

For the aforementioned reasons, the Court determines that the TRO formerly in place should be dissolved and replaced with a far more limited preliminary injunction. Needless to say,

the automatic stay remains in effect as to the Debtor.[14]  The more limited preliminary injunction

to be entered will prohibit the commencement or continuation of any trial against any of the

Protected Parties identified in Appendix B to the Verified Complaint, as amended,[15] through and

including June 15, 2023—a period of approximately 60 days.  The Court is neither enjoining, nor

restraining the filing of new complaints against non-debtor third parties, any ongoing discovery,

or other pre-trial matters.

## 1.  The MDL

The restraints included in the current, amended Temporary Restraining Order (ECF No.

20) will remain in effect as to the MDL pending before Judge Michael Shipp.  This Court has been

in communication with Judge Shipp and we both agree that the continuing restraints as to the MDL

will be revisited, along with the continuing appropriateness of the Preliminary Injunction, at the

Court's Omnibus Hearing scheduled for May 22, 2023.

## 2.  Tolling

With respect to the Section 108(c) tolling provisions relative to the statute of limitations

for unfiled claims, at the Court's suggestion the Preliminary Injunction Order includes language

indicating that the automatic stay under § 362(a) remains in effect for unfiled claims unless the

claimant, through counsel, notifies the Debtor in writing of his, her or their intent to proceed with

filing a complaint. *Preliminary Injunction* ¶¶ 5, 6, ECF No. 91.  The purpose of this language is to

---

[14] With the exception of certain relief having been afforded to Mr. Satterley as the result of his Motion for Stay Relief (ECF No. 71 in Case No. 23-12825), discussed *infra*.

[15] With the exception of Janssen Pharmaceuticals, Inc. and Kenvue Inc., as discussed on the record during the April 20, 2023 hearing.

ensure that such claimants who wish to defer filing a complaint and paying the necessary filing

fees while the bankruptcy case unfolds are not placed in the position of having to file.

### 3.  Emory Valadez's Motion for Stay Relief

With respect to the Valadez matter, this Court wrestled with the same issue it had to tackle

in the prior case; namely, whether it is ever appropriate to start picking and choosing which

claimant—among thousands—should be permitted to go forward and liquidate claims, while

others abide by the process.  As discussed, the record indicates that there remain considerable tasks

(including expert discovery and motion practice) which must be completed before the matter is

ready for trial.  There are no present restraints preventing parties from moving forward in this

regard, apart from proceeding to trial.  To afford Emory Valadez an opportunity to quickly revisit

this issue, the Court has carried the motion to May 3 and, if appropriate, to May 22 to hear where

the parties stand with respect to pre-trial matters.

Case 23-12825-MBK    Doc 987    Filed 04/27/23    Entered 04/27/23 10:56:07    Desc Main
Exhibit Public Petition for Writ of Mandamus to Official Committee of Talc Claim    Page 83 of 118
Document - of Page 83 of 118

## IV.      Conclusion

For the reasons set forth above, the Court concludes that "unusual circumstances" are present warranting an extension of the automatic stay to the nondebtor Protected Parties under § 362(a).  To the extent § 362(a) does not serve as an independent basis for extension of the stay to nondebtor parties, the Court determines that a preliminary injunction under § 105(a) extending the stay is appropriate.  In reaching today's ruling, the Court employs its discretion and judgment to balance the interests of the tens of thousands of claimants who wish to go forward outside of the bankruptcy, the interests of the tens of thousands of claimants who wish to pursue settlement within this case, and the interests of the Debtor in pursuing a fair and equitable resolution of these claims through a bankruptcy reorganization.   The parties are directed to settle a proposed form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: April 27, 2023

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*PROPOSED ATTORNEYS FOR DEBTOR*

Order Filed on April 25, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>         Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Judge:  Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>         Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>         Defendants. | Adv. No.:  23-01092 (MBK)<br><br>**Hearing Date and Time:**<br>**April 18, 2023 at 10:00 a.m.** |

**ORDER DISSOLVING TEMPORARY RESTRAINING ORDER, EXTENDING THE**
**AUTOMATIC STAY, AND GRANTING LIMITED PRELIMINARY RESTRAINTS**

The relief set forth on the following pages is hereby **ORDERED**.

**DATED: April 25, 2023**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

(Page 2)

Debtor: LTL Management LLC

Adv. Pro. No. 23-01092 (MBK)

Caption:  Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and Granting Limited Preliminary Restraints

This matter, having come before the Court upon the filing of an adversary complaint [dkt #1] (the "Complaint") by the Debtor commencing the above-captioned adversary proceeding and a motion [dkt #2] (the "Motion")[2] seeking among other relief, the entry of a temporary restraining order preventing the commencement or continuation of Debtor Talc Claims against the Protected Parties, including the continuation of all actions against the Protected Parties identified in the exhibits and amended exhibits to the Debtor's adversary complaint; and this Court having entered an ex parte temporary restraining order, as amended [dkt #20] restraining all parties from pursuing all claims against the Protected Parties, pending the Court's consideration of the entry of a preliminary injunction (the "TRO"), and opposition to the TRO and the imposition of preliminary restraints having been filed by an ad hoc committee of talc claimants, which opposition was subsequently adopted by the Official Committee of Talc Claimants (the "TCC") formed by the Office of the United States Trustee (the "TCC Opposition"), and opposition to the entry of a preliminary injunction or extension of the automatic stay having been filed by the Office of the United States Trustee, representatives of an ad hoc committee of state attorneys general, and a number of representatives of plaintiffs restrained under the TRO and proposed to be restrained under the preliminary injunction and extension of the automatic stay, and a cross-motion for relief from the automatic stay having been filed by counsel for Anthony Hernandez Valadez; and the Court having conducted a full day trial on April 18, 2023, and having rendered its ruling and rendered a Bench Order on April 20, 2023, a transcript of such ruling being attached hereto as Exhibit A; for the reasons set

---

[2]    Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

(Page 3)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092 (MBK)
Caption:  Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and
Granting Limited Preliminary Restraints

forth in the Bench Order, which is incorporated herein by reference as if set forth verbatim, **IT**

**IS HEREBY ORDERED THAT:**

1.    The Motion is GRANTED in part and DENIED in part as set forth herein.

2.    The TRO is hereby dissolved.

3.    The Defendants identified in <u>Appendix A</u> to the Complaint, as amended

[dkt #1, 55] are hereby stayed pursuant to section 362 of the Bankruptcy Code and enjoined from

the commencement or conducting of any trial or appeal of any Debtor Talc Claim against any of

the Protected Parties identified in <u>Appendix B</u> to the Complaint, as amended [dkt #1, 55] (other

than Janssen Pharmaceuticals, Inc. and Kenvue Inc.) (collectively, the "<u>Modified Protected</u>

<u>Parties</u>") through and including June 15, 2023, but nothing in this order (except as provided in

Paragraph 4 below) shall be construed to enjoin or restrain any party from commencing or

proceeding with discovery or other pretrial matters in those suits, or from filing suit against a

Protected Party, subject to Paragraph 6 below.

4.    The parties to the multi-district litigation pending before the Honorable

Michael Shipp (the "<u>MDL Litigation</u>") concerning ovarian cancer cases shall take no legal action

with regard to the MDL Litigation until May 22, 2023, on which date the Court shall consider

whether any further restraints with regard to the MDL Litigation shall be issued.

Notwithstanding the foregoing, parties in lawsuits pending in the MDL Litigation who wish to

perpetuate the testimony of any person subject to this Order who is not expected to survive the

duration of this Order or who otherwise is expected to be unable to provide testimony if it is not

perpetuated during the duration of this Order shall be permitted to do so subject to the process

Debtor: LTL Management LLC
Adv. Pro. No. 23-01092 (MBK)
Caption:  Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and
Granting Limited Preliminary Restraints

outlined in the *In Extremis Deposition Protocol* entered on January 23, 2017 in the MDL

Litigation.

5.    With respect to all activities enjoined by this Order, this Order shall toll,

as of April 4, 2023, the time period fixed under any applicable non-bankruptcy law, any order

entered in a non-bankruptcy proceeding, or any agreement that fixes a period under which an

enjoined Defendant is required to commence or continue a civil action in a court other than this

Court on any Debtor Talc Claim asserted against the Debtor or any of the Modified Protected

Parties until the later of:  (i) the end of such period, including any suspension of such period

occurring on or after the commencement of the case; or (ii) 30 days after notice of the

termination or expiration of the stay or preliminary injunction issued by this Order.  Any tolling

of the period for any Defendant to file a complaint asserting a Debtor Talc Claim against a

Modified Protected Party shall terminate upon the Debtor's receipt of written notice of such

Defendant's intent to file such a complaint, as set forth in Paragraph 6 below.

6.    The filing of any complaint by any Defendant asserting any Debtor Talc

Claim against any of the Modified Protected Parties shall be and hereby is stayed and enjoined

until the Defendant, through counsel, notifies the Debtor in writing of his, her, or their interests

and intent to proceed with the filing of a complaint.  Once filed, such cases will be subject to the

restrictions on trial set forth in Paragraph 3, but shall be free to commence or proceed with

discovery or other pretrial matters as set forth in Paragraph 3.

7.    With regard to the case of <u>Valadez v. Johnson & Johnson et al.</u>, the

plaintiff therein is permitted to proceed with all litigation and all pretrial proceedings against any

of the Modified Protected Parties, except commencement of trial.  The Court intends to revisit

Debtor: LTL Management LLC
Adv. Pro. No. 23-01092 (MBK)
Caption:  Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and
Granting Limited Preliminary Restraints

whether to continue any restraints against Mr. Valadez proceeding to trial at the Court's

scheduled omnibus hearings, currently scheduled for May 3, 2023 and May 22, 2023.

8.    Imerys Talc America, Inc. and its affiliates (collectively, the "Imerys

Entities") and Cyprus Mines Corporation and its affiliates (collectively, the "Cyprus Entities")

are not Defendants in this proceeding and the relief granted herein shall not apply to the Imerys

Entities or the Cyprus Entities, and the findings of fact and conclusions of law set forth in this

Order shall not bind the Imerys Entities or the Cyprus Entities, without prejudice to the Debtor's

right to seek (and other parties' right to oppose) such relief in the future.

9.    Governmental units (as defined under section 101 of the Bankruptcy

Code) are not Defendants in this proceeding and the relief granted herein, including any relief

granted under this Order under section 105 of the Bankruptcy Code, shall not apply to restrict or

enlarge the rights of the Debtor or any governmental unit under applicable bankruptcy law,

without prejudice to any parties' right to seek or oppose relief in the future.

10.    The Debtor's request to amend the list of Protected Parties to include

Kenvue Inc. and Janssen Pharmaceuticals, Inc. and to restrain the further litigation of the case of

Bergeron v. Janssen and Kenvue [dkt # MID-L-002089], is hereby denied without prejudice.

11.    The deadline to file any answer or other response to the Complaint is

tolled indefinitely subject to an order of this Court.

12.    Notwithstanding anything to the contrary in this Order, the limited

preliminary restraints issued by the Order shall not include, and the automatic stay shall continue

to be lifted to permit the Defendants to proceed with and complete, the following appeals, in

Case 23-12825-MBK    Doc 987    Filed 04/25/23    Entered 04/25/23 18:05:07    Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim    Page 89 of 118
Document    of Page 6 of 34

(Page 6)
Debtor: LTL Management LLC
Adv. Pro. No. 23-01092 (MBK)
Caption:  Order Dissolving Temporary Restraining Order, Extending the Automatic Stay, and
Granting Limited Preliminary Restraints

each of which surety bonds have been issued in connection with the appeal:  (a) <u>Olson</u>; (b)

<u>Schmitz</u>; (c) <u>Barden</u> (as to Barden, Etheridge, McNeill and Ronning); and (d) <u>Prudencio</u>.

       13.    The Debtor shall cause a copy of this Order to be served via e-mail,

facsimile, hand delivery or overnight carrier on the Modified Protected Parties and counsel for

the known Defendants within three business days of its entry on the Court's docket.

       14.    This Court retains jurisdiction over this Order and any and all matters

arising from or relating to the interpretation or enforcement of this Order.

Case 23-12825-MBK   Doc 987   Filed 04/25/23   Entered 04/25/23 18:06:07   Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim    Page 90 of 118
Document of Official Committee of Talc Claim    Page 7 of 34

## EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

```
IN RE:                              .    Case No. 23-12825(MBK)
                                    .
LTL MANAGEMENT LLC,                 .
                                    .    U.S. Courthouse
            Debtor.                 .    402 East State Street
                                    .    Trenton, NJ 08608
. . . . . . . . . . . . . . .       .
                                    .
LTL MANAGEMENT LLC,                 .    Adv. No. 23-01092(MBK)
                                    .
            Plaintiff,              .
                                    .
      v.                            .
                                    .
THOSE PARTIES LISTED ON             .
APPENDIX A TO COMPLAINT AND         .
JOHN AND JANE DOES 1-1000,          .
                                    .
            Defendants.             .    Thursday, April 20, 2023
. . . . . . . . . . . . . . .       .    12:02 p.m.
```

TRANSCRIPT OF RULING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
PROCEDURE 4001(a)(3) [DOCKET 71]; AND DEBTOR'S MOTION FOR AN
ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
SERVICE PROCEDURES MOTION
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                     Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

**A39**

2

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>        DAN B. PRIETO, ESQ.<br>        AMANDA S. RUSH, ESQ.<br>2727 North Harwood Street, Suite 500<br>Dallas, TX  75201<br><br>Skadden Arps Slate Meagher &<br>  Flom, LLP<br>By:  ALLISON M. BROWN, ESQ.<br>One Manhattan West<br>New York, NY  10001 |
| Various Talc Personal<br>Injury Claimants: | Watts Guerra LLP<br>By:  MIKAL C. WATTS, ESQ.<br>5726 W. Hausman Road, Suite 119<br>San Antonio, TX  78249 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Genova Burns LLC<br>By:  DANIEL M. STOLZ, ESQ.<br>494 Broad Street<br>Newark, NJ  07102<br><br>Brown Rudnick<br>By:  JEFFREY L. JONAS, ESQ.<br>        DAVID J. MOLTON, ESQ.<br>        MICHAEL WINOGRAD, ESQ.<br>7 Times Square<br>New York, NY  10036<br><br>Otterbourg PC<br>By:  MELANIE CYGANOWSKI, ESQ.<br>230 Park Avenue<br>New York, NY  10169-0075 |
| For Anthony Hernandez<br>Valadez: | Kazan McClain Satterley & Greenwood<br>By:  JOSEPH SATTERLEY, ESQ.<br>55 Harrison St. Suite 400<br>Oakland, CA  94607 |
| For the Office of the<br>United States Trustee: | Office of the United States Trustee<br>By:  LINDA RICHENDERFER, ESQ.<br>        JEFF SPONDER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |

Case 23-12825-MBK    Doc 3187 Filed 04/26/23 Entered 04/26/23 08:06:07    Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim    Page 93 of 118

3

APPEARANCES CONT'D:

For Various Talc               Maune Raichle Hartley Frency &
Claimants:                        Mudd, LLC
                               By:  CLAYTON L. THOMPSON, ESQ.
                               150 West 30th Street, Suite 201
                               New York, NY 10001

                               Levy Konigsberg, LLP
                               By:  JEROME H. BLOCK, ESQ.
                                    MOSHE MAIMON, ESQ.
                               101 Grovers Mill Road, Suite 105
                               Lawrence Township, NJ  08648

                               Simon Greenstone Panatier, PC
                               By:  LEAH CYLIA KAGAN, ESQ.
                               1201 Elm Street, Suite 3400
                               Dallas, TX  75720

For Claimant Alishia           Beasley Allen
Landrum:                       By:  ANDY BIRCHFIELD, ESQ.
                               218 Commerce Street
                               Montgomery, AL  36104

For Arnold & Itkin:            Pachulski Stang Ziehl & Jones LLP
                               By:  LAURA DAVIS JONES, ESQ.
                               919 North Market Street
                               17th Floor
                               Wilmington, DE 19801

For Paul Crouch,               Ruckdeschel Law Firm, LLC
individually and on            By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of            8357 Main Street
Cynthia Lorraine Crouch:       Ellicott City, MD 21043

For the Ad Hoc Committee       Womble Bond Dickinson
of Attorney Generals:          BY:  ERICKA JOHNSON, ESQ.
                               1313 North Market Street
                               Suite 1200
                               Wilmington, DE, US 19801


                        - - - - -

4

1          THE COURT:  Okay.  Good afternoon, everyone.

2          This is Judge Kaplan.  Getting a little feedback.

3          UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          I hope everybody's doing well.  Bear with me as I go

6  through the usual mechanics of getting us up from an IT

7  perspective.

8          All right.  Thank you.  This afternoon I intend to

9  address the pending motions with respect to the preliminary

10 injunction based on the debtor's verified complaint, as well as

11 the pending relief from automatic stay filed by Mr. Satterley

12 on behalf of Emory Valadez.

13          First, some preliminary matters, if I may.  The Court

14 is in receipt of submitted evidence and deposition designations

15 proffered, by both the debtor and the committee, TCC.  The

16 Court is also in receipt of the objection filed by the TCC to

17 certain designations of testimony with respect to Mr. Haas,

18 Mr. Murdica, and Mr. Birchfield.

19          At this point in time, the Court is accepting into

20 evidence all of the evidence and designations submitted by both

21 the debtor and the Committee.  The Court is overruling the

22 objections raised by the Committee with respect to those

23 identified depositions and testimony.  But the Court is going

24 to note that the Court in reaching its ruling this afternoon

25 has accorded zero weight to the depositions and the evidence

5

1  reflected in the testimony.

2       The Court is also in receipt of supplemental

3  submissions from you all.  Thank you.  We have the debtor's

4  supplemental submission dated April 19th.  We have the

5  Committee's objection to it.  We have supplemental submissions

6  on behalf of the Bergeron's, on behalf of Maune Raichle's

7  clients, Katherine Tolleson, on behalf of Paul Crouch.  We have

8  also, the Court is in receipt of an initial statement on behalf

9  of an ad hoc committee supporting talc claimants.

10       Oh, let me go back.  With respect to the evidence, I

11  have also received the U.S. Trustee's objection with respect to

12  the use of confidentiality designations.  And the Court agrees

13  that the evidence has been accepted for purposes of the PI

14  motion only and not for any other purpose in this case.  I

15  think that covers all these supplemental submissions.  And the

16  Court has had the opportunity to review these this morning.

17       I'm prepared to read my ruling into the record.  I

18  hope you all will bear with me in the time it takes.

19       I sat through yours.

20       All right.  One of the advantages of conducting the

21  hearing in a hybrid fashion, both live and remote this past

22  Tuesday, was that my wife could log in and see that I was

23  actually working and in Court for over nine hours.  And when I

24  got home, she asked me why I didn't cut off the arguments and

25  the endless PowerPoint presentations sooner.  I told her that I

6

1  was looking for answers, that it was repeated often that the

2  world is watching and I wanted every opportunity to understand

3  the facts and get answers to my concerns.  I believe that the

4  Court and the world is entitled to such answers.

5         Well, frankly, after Tuesday, I have more questions

6  than answers.  The fundamental question addressed by the

7  parties is whether the debtor has a realistic possibility of

8  success.  It is the linchpin of the four-prong injunction test

9  employed universally.  In Chapter 11, the inquiry is more

10  focused on whether the debtor has a reasonable possibility of

11  reorganizing, which needless to say, at a minimum, requires

12  that the debtor survive any motions to dismiss for cause,

13  including lack of good faith.

14         Our Third Circuit now has made clear that it views

15  the gateway to good faith being a determination that a debtor

16  is in financial distress.  Mr. Maimon, among others, argued

17  that this determination should be straightforward.  Did

18  anything occur in the two hours and 11 minutes between filings

19  and after the Third Circuit's ruling, which changed the

20  debtor's financial situation and created distress.

21         I'm not sure that this is the correct question.

22  Rather, I think it must be whether anything changed in the

23  debtor's financial picture.  Since October of '21, the date of

24  the first filing and the period fixed for purposes of the five-

25  day trial undertaken in February of 2022, and April 4, 2023,

7

1  the date of the second filing.

2         Well, certain things have changed.  Claims against

3  the debtor have soared from approximately 41,000 to in all

4  likelihood well over a 100,000.  Are these new claims

5  supportable?  Tuesday provided more speculation than answers.

6  Does the increased volume of claims add to or create financial

7  distress for this debtor?  Maybe.  Maybe not.

8         Since the first filing, the acknowledged floor for

9  the debtor's talc liability has increased from 2 billion to 8.9

10  billion with questions remaining as to whether this sum would

11  cover the billions claim due for third-party providers, state

12  regulators, Canadian class claimants, indemnified parties, and

13  others.

14         Does this increase floor of debt add to or create

15  financial distress for this debtor?  Again, maybe.  Maybe not.

16  Since the first filing, the debtor's funding resources have

17  been reduced from 61 billion to possibly 30 billion plus.  The

18  reduction certainly appears manufactured by the debtor, HoldCo,

19  and J&J in response to the Third Circuit's ruling.  Does this

20  reduction in funding add to or create financial distress for

21  this debtor?  Maybe.  Maybe not.

22         Does the manner in which the transactions were

23  undertaken give rise to an independent bases for finding bad

24  faith?  Possibly.  Do the transactions give rise to fraudulent

25  transfer liability for the benefit of the debtor's creditors?

8

1   Well, constructive fraud generally, under the Bankruptcy Code
2   and state law, requires a determination of insolvency.  Can the
3   Court conclude after Tuesday's hearings that the debtor's
4   liabilities exceed its assets?  I don't think so since the
5   extent of the liabilities has not been anywhere close to being
6   fixed.

7          The Third Circuit specifically cautioned and
8   admonished against casual calculations and back of the envelope
9   forecasts.  Given the limited record here, this Court cannot
10  make an informed determination or comparison of the assets and
11  liabilities of this debtor in this bankruptcy, which according
12  to the Third Circuit, is where the inquiry should be focused.

13         As to actual fraud, can the Court conclude that
14  there's been an actual intent to hinder, delay, and defraud
15  creditors?  Maybe.  But proof of subjective intent may be
16  difficult to determine without knowing the extent of the
17  liabilities and whether it's reasonable for the debtor to
18  believe that its remaining assets are sufficient to cover such
19  liabilities.

20         And for the Court, there was a very concerning
21  question regarding this loss of value in the funding agreements
22  and its potential impact on the interest of present and future
23  creditors.  What happens if this case is dismissed?  I know the
24  lawyers that represent these claimants will fight zealously and
25  tirelessly for their individual clients, as they should.  But

Case 23-12825-MBK   Doc 9387   Filed 04/05/23   Entered 04/05/23 08:06:07   Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim    Page 99 of 118

9

1  who pursues the claims for the possible loss in funding value?

2  Who will fight for the other a 100,000 or so creditors or

3  claimants to pursue recovery that may be available because of

4  these transactions?  Outside of bankruptcy, who will fight to

5  protect the interest of future claimants?

6          Now, it may be that this Court determines that the

7  last series of questions, or in fact any of the other

8  questions, are not relevant.  Once the Court hears from the

9  movants with regard to the anticipated motion to dismiss,

10  undoubtedly the debtor has an uphill battle.  There are

11  unresolved issues such as the voidability of the 2021 funding

12  agreement, the potentially largest fraudulent transfer

13  undertaken in history, as the phrase has been proffered; the

14  need to acquire 75 percent approval for the plan.  But at this

15  point, with so many unanswered questions, the Court cannot

16  reach a determination that there is no possibility of a

17  successful reorganization premised upon the objections of

18  certain claimants, vehement as they may be.

19          The Court cannot at this juncture *sua sponte* dismiss

20  this case or rely on bad faith as a basis to deny the

21  preliminary injunction.  That being said, the Court is

22  skeptical and will require a well-supported and timely showing

23  by the debtor that this reorganization has a meaningful chance.

24          For purposes of today, the Court refers and

25  incorporates into this ruling its analyses and discussions

Case 23-12825-MBK    Doc 987    Filed 06/02/23    Entered 06/02/23 06:07:03    Desc Main
Exhibit Public Petition for Writ of Mandamus or Offical Committee of Talc Claim    Page 100 of 118
Document    Page 100 of 114

10

1  found in its prior published opinions at 638 B.R. 291, 640 B.R.

2  at 322, and 645 B.R. 59.  Specifically, these prior opinions

3  explicate the Court's authority to hear, decide, and enter a

4  final order and judgment in the adversary proceeding, which

5  would have the effect of extending the automatic stay and

6  enjoining litigation against non-debtor third parties relative

7  to the debtor talc claims as defined in the verified complaint.

8        In sum, the Court concludes that Section 362(a) and

9  Section 105(a), and/or the Court's inherent powers can each

10  serve as an independent basis to extend the stay to non-debtor

11  third parties.  In so concluding, the Court continues to follow

12  the Philadelphia newspapers approach set forth at 423 B.R. 102,

13  which considers whether there is jurisdiction to enter the

14  injunction, whether the extension of the automatic stay to non-

15  debtors is appropriate, and whether the Court should in its

16  discretion, issue the injunction.

17        As in the last case, the debtor has asked for a

18  preliminary injunction and/or an extension of the stay to

19  certain non-debtor parties.  The UST, the TCC, and

20  representatives of certain claimants, among others, oppose this

21  request.  At the core of all these objections is the argument

22  that the debtor cannot confirm a plan, that there is no

23  likelihood of success because the objecting claimants will not

24  agree to a plan proposed by the debtor.  Yet the debtor comes

25  before this Court with an alleged 55,000 or more claimants in

Case 23-12825-MBK   Doc 9387   Filed 04/25/23   Entered 04/25/23 18:06:07   Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim   Page 101 of 118

11

1   support of a proposed settlement.

2          This Court cannot discount those claimant's rights

3   and preferences in favor of others.  Notwithstanding, claimants

4   who have had over the past 18 months their claims and

5   litigation stalled during the pendency of the prior bankruptcy,

6   should not lose more valuable time.  Therefore, I have

7   determined that the TRO currently in place should be dissolved

8   and replaced with a far more limited preliminary injunction.

9          Needless to say, the automatic stay remains in effect

10  as to the debtor.  The more limited preliminary injunction to

11  be entered will prohibit the commencement or continuation of

12  any trial against any of the protected parties identified in

13  Appendix B to the verified complaint, as amended, through and

14  including June 15, 2023, a period of approximately 60 days.

15  This is aimed at preventing the liquidation of claims for which

16  this debtor may have liability with the liquidation occurring

17  outside of this bankruptcy.

18          But to be clear, I am neither enjoining nor

19  restraining the filing of new complaints against the protected

20  parties, nor am I enjoining or restraining any ongoing

21  discovery or other pretrial matters.  Given the very limited

22  scope of these restraints, the Court did not, and frankly could

23  not, on the factual record examine the basis of relief for each

24  of the specific protected parties.

25          The restraints included in the current amended TRO

1  will remain in effect as to the MDL that's currently pending

2  before Judge Michael Shipp.  I have spoken with Judge Shipp and

3  we both agree that the continuing restraints as to the MDL

4  should and will be revisited along with the continuing

5  appropriateness of the preliminary injunction itself at the

6  Court's omnibus hearing scheduled for May 22, 2023.

7  　　　　With respect to Section 108(c) tolling provisions

8  relative to the statute of limitations for unfiled claims, the

9  Court's preliminary injunction order will include language that

10  the automatic stay under Section 362(a) remains in effect for

11  unfiled claims unless the claimant, through counsel, notifies

12  the debtor in writing of his, her, or their interests and

13  intent to proceed with the filing of a complaint.

14  　　　　The purpose of this language is to ensure that such

15  claimants who wish to defer filing a complaint and paying the

16  necessary filing fees while the bankruptcy case unfolds are not

17  placed in the position of having to file and incur that

18  expense.  The Court welcomes any and all suggestions as to

19  workable language that addresses this issue.

20  　　　　Finally, the Court recognizes the debtor's concern

21  that a full throttled resumption of litigation may place

22  immediate burdens on staff and potential witnesses, such as a

23  proffered 30(b)(6) witness and sees no reason why transcripts

24  of such initial depositions can't be provided in lieu of

25  multiple repeat and duplicative depositions across the country.

Case 23-12825-MBK   Doc 9387   Filed 04/05/23   Entered 04/05/23 18:56:07   Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim   Page 103 of 118
Document of Page 20 of 34

1 If a problem arises in this regard, the Court will address this

2 and any specific problems at a future date.

3        In reaching today's ruling, that Court employs its

4 discretion and judgment to balance the interest of the tens of

5 thousands of claimants who wish to go forward outside of

6 bankruptcy, the interest of the tens of thousands of claimants

7 who wish to pursue settlement within this case, and the

8 interest of the debtor in pursuing a fair and equitable

9 resolution of these claims through a bankruptcy reorganization.

10        I wish to make one thing clear.  Contrary to some

11 suggestions, the Court is not endeavoring to make policy.  That

12 has never been the Court's aim.  Rather, the Court is engaged

13 in trying to do its best to advance the interest of creditors

14 as a whole, a task I and my bankruptcy judge colleagues

15 undertake daily.

16        With respect to the Valadez matter, I am troubled

17 with the same issue I've had to tackle in the prior case,

18 whether it is ever appropriate to start picking and choosing

19 which claimant among thousands should be permitted to go

20 forward and liquidate claims while others abide by the process.

21 From everything I have heard and read there remains

22 considerable tasks, including expert discovery and motion

23 practice, which must be completed before the matter is ready

24 for trial.

25        Mr. Satterley, I see you're on.  There are no present

Case 23-12825-MBK    Doc 937-6  Filed 04/05/23    Entered 04/05/23 18:06:07    Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim    Page 104 of 118
Document    Page 20 of 34

14

1   restraints preventing you from moving forward in this regard

2   apart from proceeding to trial.  I will provide your client the

3   opportunity to quickly revisit this issue by carrying your

4   motion to May 3rd, and if appropriate, that's the next

5   scheduled omnibus hearing, and if appropriate to the May 22nd

6   hearing, to hear where you stand with respect to pretrial

7   matters.

8           Alternatively, you may submit a form of order

9   granting in part and denying in part your requested relief so

10  that you may pursue an immediate appeal.  You can advise

11  chambers after this hearing as to your preference.

12          Finally, as noted, on Tuesday as part of the text

13  order in the first case, which terminated mediation due to the

14  anticipated dismissal of the case, I urge the parties to

15  continue settlement discussions.  I have not altered my view

16  that mediation is important.  Indeed, considering the debtors'

17  intent to file a plan in short order I believe mediation is

18  critical and should begin as soon as possible.

19          The parties must have confidence in the mediator, and

20  the mediator must have plenary authority to conduct any

21  mediation as he, she, or they deem appropriate.  I know the

22  debtor has filed a motion to reappoint Mr. Russo and Judge

23  Schneider.  Notwithstanding, I am directing the Committee and

24  the debtor to provide me in confidence with three names of

25  proposed mediators by the close of business this coming

Case 23-12825-MBK  Doc 987  Filed 04/26/23  Entered 04/26/23 08:56:07  Desc Main
Document  Page 22 of 34

Case 23-1925-MBK  Doc 987  Filed 04/26/23  Entered 04/26/23 08:56:07  Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim  Page 105 of 118

1  Wednesday.  I am away out of state until then.  My inclination
2  is to appoint a single mediator to start who will be subject to
3  the same mediation protocol employed in the prior case.  Thank
4  you.
5          I will ask the debtor to settle a form of order with
6  the Committee and others, reflecting my ruling today, of course
7  by reference.  And fearfully I will ask are there any
8  questions?
9          MR. SATTERLEY:  Yes, Your Honor.
10          THE COURT:  Well --
11          MR. SATTERLEY:  I'm sorry.
12          THE COURT:  We'll start -- Mr. Satterley?
13          MR. SATTERLEY:  Yes.  So, obviously I got -- I'm
14  going to read Your Honor's -- the transcript whenever we get it
15  today, and I need to consult with appellate counsel, but I just
16  got a little confused as you read along.
17          With regards to the granting of the -- or the
18  decision to appeal, will Your Honor allow me and certify the
19  issue to the Third Circuit?  I need to know that so I can talk
20  to appellate counsel also as I advised Your Honor on the 11th.
21  I advised Your Honor that it was my intention to take a writ --
22  emergency writ because of the pending death of my client, so I
23  just wanted to find out from Your Honor will you give me
24  permission, if my appellate counsel tells me it's appropriate,
25  to go to the Third Circuit directly?

16

1           THE COURT:  The best I can do is give you the
2  authorization to make the request to me formally.  I have to --
3           MR. SATTERLEY:  Yes, Your Honor.
4           THE COURT:  -- allow other parties to weigh in on it.
5           MR. JONAS:  Your Honor, may we have the same
6  response?  Because we would intend to do so, as well.
7           THE COURT:  The same response would be appropriate.
8           MR. JONAS:  Thank you, Your Honor.
9           MS. BROWN:  Your Honor, this is Allie Brown.  Could I
10 ask, I understand the Court's ruling.  Given the significance
11 of the discovery that will no doubt be coming our way very
12 soon, could we ask that the order not go into effect until
13 Monday at nine a.m. so that we can alert counsel throughout the
14 country who handle these matters on a local basis and have no
15 visibility into what's been going on here, so they are prepared
16 to deal with letters to the Court, and calls to the Court in
17 the individual cases they are monitoring?  I fear if we don't
18 do that it could be somewhat chaotic, as discovery requests
19 start immediately.
20          THE COURT:  Well, as a practical --
21          MR. SATTERLEY:  May I respond to that, Your Honor?
22          THE COURT:  Let me -- I'll let you respond.  Let me
23 -- as a practical matter I don't have an order.  I asked the
24 parties to settle an order.  And I leave on Saturday morning,
25 and I'll be out of the state.  So --

1          MS. BROWN:  Understood.

2          THE COURT:  I don't know how to respond to you.

3    Certainly --

4          MS. BROWN:  I think I understand, Your Honor.  So, it

5    will be dependent on us proposing something to the Court --

6          THE COURT:  Right.

7          MS. BROWN:  -- and there is at least a few days time

8    on that so we can get the logistics in order.

9          THE COURT:  Right.  With Mr. Satterley --

10         MS. BROWN:  Understood.

11         THE COURT:  Yes.  Thank you.

12         MR. SATTERLEY:  So, this -- counsel has been aware of

13   Your Honor's tentative since last Thursday, and Your Honor, you

14   know, while it's more formalistic and you put it all in more

15   detail, they have been aware, and just as Your Honor directed

16   me to do, I went to Judge Seabolt and asked him to do exactly

17   what Your Honor said, move the hearing until today.  And

18   counsel for J&J and all the retailers were present, and they

19   said I correctly stated what Your Honor said.  There is

20   absolutely no reason to further delay, because trial courts,

21   state courts have a docket also, and they need to manage their

22   docket.

23         So I would request, Your Honor, to allow us to advise

24   the state courts, advise the trial judges the procedure.

25   Obviously various state laws control with regards to how much

18

1  time they have to respond to discovery.  No state that I'm

2  aware of requires the debtor -- I mean, the non-debtor, the

3  non-debtor to respond immediately to discovery.  Usually it's

4  20 days, or 30 days, or 45 days.

5         So even if we were to tender discovery today, it's

6  not going to be tomorrow that they're going to respond to it.

7  So I object to Mrs. Brown's request to once again further delay

8  the resumption of our client's rights to go -- and because, for

9  example, Your Honor, one of the cases I filed an objection to

10  was Mr. Eagles (phonetic).  His trial, Mr. Eagles' trial was

11  already set for April the 2nd.  Because of the TRO we moved it

12  to May the 1st.  And now I was going to tell Judge Seabolt to

13  move it to June the 15th.  And what Ms. Brown is in essence

14  asking for is in Mr. Eagles' case, who is dying of

15  mesothelioma, that we would not be able to start preparing that

16  case further for trial.  So I would object to Mrs. Brown's

17  request, and allow us to begin the preparation so that these

18  individuals are not further harmed.

19         THE COURT:  I think I can --

20         MS. BROWN:  Your Honor --

21         THE COURT:  Well, Ms. Brown, I think I can address

22  this -- and I see other hands raised.  I do not have an

23  objection -- I know you all will secure a copy of this

24  transcript quickly.  I have no objection to you providing it to

25  non-bankruptcy courts with the note that a formal order has not

1  been entered.  It will speak for itself.

2          MS. BROWN:  And, Your Honor, until the formal order

3  is entered we will have at least a few days to organize the

4  local counsel and be prepared to respond?

5          THE COURT:  I can't see any court acting to prejudice

6  those interests in the days it will take.  Work hard, get me an

7  order.  I will enter it even if I am not in the state.  But --

8          MS. BROWN:  Understood, Your Honor.

9          THE COURT:  All right.  Mr. Placitella?

10         MR. PLACITELLA:  Good morning, Your Honor.  Thank you

11 very much.  In your decision you referenced Appendix B to the

12 Notice of Filing.  There was an amended Appendix B that listed

13 Janssen and Kenvue that we received with no notice and no

14 evidence offered during the hearing, and I want to understand

15 the scope of your decision if it includes Janssen and Kenvue

16 for which no evidence was submitted during the hearing, and for

17 which Mr. Kim said he had no knowledge whatsoever.

18         THE COURT:  Well, I anticipated your question, and

19 candidly, I can't see how your clients would be prejudiced with

20 no trial to occur.  That's the only limitation until June in a

21 case that where issue hasn't even been joined yet.  So, but if

22 you want to explain --

23         MR. PLACITELLA:  But the issue, Your Honor --

24         THE COURT:  If you want to address it --

25         MR. PLACITELLA:  Respectfully, Your Honor, yes,

1 because the issue is whether the standard has been met for a

2 temporary restraining order.  And with no evidence, and in

3 fact, they submitted a brief to you saying whatever happened

4 after Holdco is irrelevant, with no evidence, even with Your

5 Honor's best intent there is no basis even for a short

6 restraint to stop the case against Kenvue or Janssen.  The

7 operation of -- I'm assuming what's going to happen is they are

8 going to file a motion to dismiss, and the trial court will

9 make a determination.

10         But, you know, having them give notice, you know,

11 after five a day before the hearing, put on no evidence and say

12 oh, well, protect them too when Mr. Kim doesn't even know why

13 it was included, respectfully, I don't think it should be

14 included.

15         THE COURT:  All right.  Fair enough.  At this

16 juncture I am going to excise out those two defendants from the

17 Exhibit A.  I will preserve the debtor's rights to come back

18 before me to include them at a later date if it becomes

19 relevant.

20         MR. PLACITELLA:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. JONAS:  Your Honor?

23         THE COURT:  Yes?

24         MR. JONAS:  Your Honor, it's Jeff Jonas from Brown,

25 Rudnick, and with me is Melanie Cyganowski from Otterbourg on

Case 23-12825-MBK    Doc 9387    Filed 04/05/23    Entered 04/05/23 18:06:07    Desc Main
Document    Page 26 of 84
Case 23-12825-MBK    Doc 937    Filed 04/05/23    Entered 04/05/23 18:06:07    Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim    Page 111 of 118

21

1 behalf of the Committee, TCC.  Your Honor, I would ask that you

2 sua sponte grant the Committee derivative standing to

3 investigate and bring state court causes of action and claims.

4 I think -- I hope, Your Honor, that our hearing, trial earlier

5 this week, if nothing else, demonstrated, and I think you have

6 sufficient evidence as to the futility of expecting this debtor

7 to investigate, never mind bring, those claims and causes of

8 action.  So we would ask you to do that now, Your Honor.

9         THE COURT:  All right.  Does the debtor wish to be

10 heard?  Mr. Gordon?

11         MR. GORDON:  Greg Gordon, Your Honor, Jones Day, on

12 behalf of the debtor.  I don't think it's appropriate to make

13 that request orally for a sua sponte ruling.  There are

14 standards that have to be met, including advising the Court and

15 the parties what claims we're talking about, and there's got to

16 be a showing that they are colorable claims.  And so from our

17 perspective we think, as you handled the other matter, a motion

18 should be filed and we should be given the right to respond to

19 it.

20         THE COURT:  All right.  I knew there would be a

21 danger in conducting this not in a webinar format where counsel

22 had the ability to ask questions.  I'm not prepared or inclined

23 to grant sua sponte relief at this -- or any further relief

24 today.  The purpose for today's hearing was to try to read a

25 ruling and direct the parties to come to a form of order.

1      MR. GORDON:  And, Your Honor, I wanted to spend one

2  minute on Mr. Placitella, if I could.  I obviously heard Your

3  Honor's ruling.  I just wanted to indicate that he did say in

4  court, as I recall, that the basis for the claims is successor

5  in interest, which would be property of the estate, and

6  therefore those claims would be barred by the automatic stay.

7  But we heard Your Honor.  We'll handle that appropriately.

8  We'll file a motion as necessary to get the relief that we

9  think would confirm that those claims are barred by the

10  automatic stay.

11      THE COURT:  In fairness to Mr. Placitella, I was

12  moving everybody along quickly --

13      MR. GORDON:  Understood.

14      THE COURT:  -- on Tuesday, and we didn't vet these

15  arguments.

16      MR. GORDON:  Sure.

17      THE COURT:  And given the stage where it's at there's

18  ample time to address it further.

19      MR. GORDON:  Understood, Your Honor.

20      THE COURT:  Ms. Cyganowski, I can't tell, is there

21  still a hand up?

22      MS. CYGANOWSKI:  Yes, there is, Your Honor.  Melanie

23  Cyganowski for the Committee.  I'm not asking for the relief

24  today, but just to advise the Court that we will be opposing

25  the debtor's request for expedited relief with respect to the

1  hearing on the disclosure and plan.

2         THE COURT:  The Court has received the debtor's

3  motion on shortened time, but I believe the Court did receive

4  something from your firm, or one of the firms representing the

5  TCC in opposition.  In all candor, it sits on the corner of my

6  desk, and I have not looked at it, nor will I through today and

7  probably through tomorrow.  So if other firms want to weigh in,

8  one side or the other, they may do so.

9         MS. CYGANOWSKI:  Thank you.

10        MR. SATTERLEY:  Your Honor, I have one last question.

11 Can we -- I know Your Honor said you were going to be away.  Is

12 it -- can we have a deadline for the order?  The only thing I'm

13 afraid of, we can obviously meet and confer today.  Can we

14 submit by tomorrow competing orders to the extent we can't

15 agree on the exact language?  Because I have -- not necessarily

16 with this debtor, but I have had situations where defendants in

17 litigation don't agree, and it just protracts the submission of

18 the order of the Court.  So I was going to suggest is it

19 possible we'll meet and confer this afternoon.  If we can't

20 agree to an order by 12 noon tomorrow we can submit competing

21 orders, and Your Honor decide what's appropriate?

22        THE COURT:  My thought is that if you -- let's see.

23 I'm trying to make it as expeditious, but I am not sure where I

24 am going to be during the early part of next week.  So, how

25 about this?  Do your best to meet and confer, come up with the

Case 23-10925-MBK   Doc 9387   Filed 04/25/23   Entered 04/25/23 18:06:07   Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim   Page 114 of 118
Document   Page 31 of 34

24

1  terms.  It shouldn't be a difficult order.  I have laid it out

2  subject to anybody's rights to take an appeal, of course, but

3  most of it should just be by reference.

4         And so, you should be able to come up with the terms

5  of the order.  You can take action as appropriate.

6         So, if by the close of business on Monday you haven't

7  all agreed on a form of order, reach out for chambers.  We'll

8  see if we can have a conference call.

9         MS. BROWN:  Thank you, Your Honor.

10         MR. STOLZ:  Your Honor, maybe an easier way to -- to

11  handle it is to have this -- Your Honor's ruling constitute a

12  bench order to be followed up by a written order so it's

13  effective immediately?

14         MS. BROWN:  Judge, we'd like the opportunity to

15  follow your instructions, and we can certainly do so by Monday,

16  and we'll reach out if there is an issue.

17         THE COURT:  I think --

18         MR. SATTERLEY:  The only problem with that, Your

19  Honor --

20         THE COURT:  Go ahead.

21         MR. SATTERLEY:  -- my clients die.  Every day is

22  important to my client.  And if I have to make a decision about

23  an emergency appeal, as I told Your Honor on the 11th, every

24  single day that goes by my client is -- is closer to being in

25  the ground, dead, and so I would request -- Your Honor made it

Case 23-12825-MBK   Doc 937   Filed 04/05/23   Entered 04/05/23 18:06:07   Desc Main
Exhibit Public Petition for Writ of Mandamus of Official Committee of Talc Claim   Page 115 of 118
Document of Official Committee   Page 32 of 34

1  real clear what your order is today.  There's no reason why we

2  cannot agree to something this afternoon or tomorrow morning

3  and submit something to Your Honor.  What -- so, I would -- Mr.

4  Stolz makes a great point, and I would request that Your Honor

5  incorporate Mr. Stolz's request.

6         MS. BROWN:  Your Honor, there are wide implications

7  of your order, and we are prepared to follow the Court's

8  instruction to immediately meet and confer and get the Court by

9  Monday a proposed order.

10         MR. MAIMON:  Your Honor?

11         THE COURT:  Yes, Mr. Maimon?

12         MR. MAIMON:  Thank you, Your Honor.  We object to the

13  debtor stringing this out.  This is -- Your Honor noted that

14  the delay for claimants should not continue any more as to the

15  non-debtors, and it should not be that on Monday, first thing,

16  with Your Honor out of the state, and we don't know what the

17  Court's availability is, that we then have to first start

18  scheduling conferences.  The Court was very clear with its

19  decision today.  Mr. Stolz is correct.  It's standard practice

20  for courts to issue a bench order that the transcript is the

21  order of the Court to be followed up with a more formal written

22  order that can form the basis of any appeals or anything like

23  that.  But we should be able to proceed in accordance with the

24  Court's ruling immediately.

25         THE COURT:  All right.  Well, in effect I thought I

1  was providing Mr. Satterley and others with the authorization

2  to take this transcript.  A bench order requires the transcript

3  in the first place.  So, I anticipate that you're going to be

4  using the transcript.  If you want the magic language that this

5  is it's so ordered from the bench subject to the terms of a

6  more formal order to be entered at a later date, you have it.

7  　　　　　　MR. SATTERLEY:  Thank you, Your Honor.

8  　　　　　　UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

9  　　　　　　THE COURT:  All right.  And then I think I wish all

10  of you a good weekend.

11  　　　　　　UNIDENTIFIED ATTORNEY:  Enjoy your vacation, Your

12  Honor.

13  　　　　　　THE COURT:  Thank you.

14  　　　　　　UNIDENTIFIED ATTORNEY:  Don't tell anyone where you

15  are.

16  　　　　　　THE COURT:  I should be so lucky.  Thank you.

17  　　　　　　UNIDENTIFIED ATTORNEY:  Thank you.

18  　　　　　　　　　　* * * * *

19

20

21

22

23

24

25

27

**C E R T I F I C A T I O N**

We, KAREN K. WATSON and TAMMY DERISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Karen K. Watson

KAREN K. WATSON


/s/ Tammy DeRisi

TAMMY DERISI

J&J Court TRANSCRIBERS, INC.        DATE:  April 20, 2023

Case 23-12825-MBK   Doc 817-1   Filed 04/25/23   Entered 04/25/23 11:46:05   Desc
Exhibit Public Petition for Writ of Mandamus or Other Official Page 118 of 118
Form order – ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  LTL Management LLC
Debtor

Case No.: 23−12825−MBK
Chapter 11

LTL Management LLC
Plaintiff

v.

Those Parties Listed on Appendix A to the Complaint and
John and Jane Does 1−1000
Defendant

Adv. Proc. No. 23−01092−MBK                     Judge: Michael B. Kaplan

### NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

Please be advised that on April 25, 2023, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 91 − 2
ORDER DISSOLVING TEMPORARY RESTRAINING ORDER, EXTENDING THE AUTOMATIC STAY, AND GRANTING LIMITED PRELIMINARY RESTRAINTS (related document:2 Motion re: Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non−Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction Filed by LTL Management LLC. filed by Plaintiff LTL Management LLC). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. Signed on 4/25/2023. (wiq)

Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: April 25, 2023
JAN: wiq

Jeanne Naughton
Clerk

**A66**