IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . | Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtor. | . | |
| | . | Wednesday, May 3, 2023 |
| . . . . . . . . . . . . . . | . | 10:02 a.m. |

TRANSCRIPT OF HEARING ON ORDER GRANTING IN PART AND DENYING IN
PART THE MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN
ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND
AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED
PRELIMINARY INJUNCTION, AND (II) WAIVING THE FOURTEEN-DAY STAY
UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(a)(3) [DKT.
298]; MOTIONS TO DISMISS THE CHAPTER 11 CASE [DKTS. 286, 335,
346, 350, 352, 358]; DEBTOR's MOTION FOR AN ORDER APPOINTING
RANDI S. ELLIS AS LEGAL REPRESENTATIVE FOR FUTURE TALC
CLAIMANTS [DKT. 87]; THE OFFICIAL COMMITTEE OF TALC CLAIMANTS'
MOTION TO SEAL THE REDACTED PORTIONS OF THE COMMITTEE OBJECTION
[DKT. 312]; THE UNITED STATES TRUSTEE'S MOTION TO SEAL THE
REDACTED PORTIONS AND EXHIBITS TO THE U.S. TRUSTEE OBJECTION
[DKT. 322]; AND THE DEBTOR'S MOTION TO SEAL EXHIBITS

**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

For the Debtor:            Jones Day
                          By:  GREGORY M. GORDON, ESQ.
                               DAN B. PRIETO, ESQ.
                               AMANDA S. RUSH, ESQ.
                          2727 North Harwood Street, Suite 500
                          Dallas, TX  75201

                          Skadden Arps Slate Meagher &
                            Flom, LLP
                          By:  ALLISON M. BROWN, ESQ.
                          One Manhattan West
                          New York, NY  10001

For Various Talc Personal  Watts Guerra LLP
Injury Claimants:         By:  MIKAL C. WATTS, ESQ.
                          5726 W. Hausman Road, Suite 119
                          San Antonio, TX  78249

For Ad Hoc Committee       Genova Burns LLC
of Certain Talc           By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc      494 Broad Street
Committee of Creditors:   Newark, NJ  07102

                          Brown Rudnick
                          By:  JEFFREY L. JONAS, ESQ.
                               DAVID J. MOLTON, ESQ.
                               MICHAEL WINOGRAD, ESQ.
                          7 Times Square
                          New York, NY  10036

                          Otterbourg PC
                          By:  MELANIE CYGANOWSKI, ESQ.
                          230 Park Avenue
                          New York, NY  10169

For Anthony Hernandez      Kazan McClain Satterley & Greenwood
Valadez:                  By:  JOSEPH SATTERLEY, ESQ.
                          55 Harrison St. Suite 400
                          Oakland, CA  94607

For the Office of the      Office of the United States Trustee
United States Trustee:    By:  LINDA RICHENDERFER, ESQ.
                               JEFF SPONDER, ESQ.
                               LAURA DAVIS JONES, ESQ.
                          J. Caleb Boggs Federal Building
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, DE 19801

```
APPEARANCES CONT'D:

For Various Talc          Maune Raichle Hartley Frency &
Claimants:                  Mudd, LLC
                          By:  CLAYTON L. THOMPSON, ESQ.
                          150 West 30th Street, Suite 201
                          New York, NY 10001

                          Levy Konigsberg, LLP
                          By:  JEROME H. BLOCK, ESQ.
                               MOSHE MAIMON, ESQ.
                          101 Grovers Mill Road, Suite 105
                          Lawrence Township, NJ  08648

                          Simon Greenstone Panatier, PC
                          By:  LEAH CYLIA KAGAN, ESQ.
                          1201 Elm Street, Suite 3400
                          Dallas, TX  75720


For Claimant Alishia      Beasley Allen
Landrum:                  By:  ANDY BIRCHFIELD, ESQ.
                          218 Commerce Street
                          Montgomery, AL  36104


For Arnold & Itkin:       Pachulski Stang Ziehl & Jones LLP
                          By:  LAURA DAVIS JONES, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE 19801


For Paul Crouch,          Ruckdeschel Law Firm, LLC
individually and on       By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of       8357 Main Street
Cynthia Lorraine Crouch:  Ellicott City, MD 21043


For the Ad Hoc Committee  Womble Bond Dickinson
of Attorney Generals:     BY:  ERICKA JOHNSON, ESQ.
                          1313 North Market Street
                          Suite 1200
                          Wilmington, DE, US 19801

For Randi Ellis,          Walsh Pizzi O'Reilly Falanga LLP
Proposed Future Claims    BY:  LIZA M. WALSH, ESQ.
Representative:           Three Gateway Center
                          100 Mulberry Street, 15th Floor
                          Newark, NJ 07102
```

APPEARANCES CONT'D:

```
For Ad Hoc Committee      Paul Hastings, LLP
of Supporting Counsel:    BY:  KRIS HANSEN, ESQ.
                          200 Park Avenue
                          New York, NY 10166
```

- - - - -

5

1          (Proceedings commenced at 10:02 a.m.)

2          THE COURT:  Okay.  Good morning everyone.  This is

3     Judge Kaplan, and we have LTL Management, LLC matters on for

4     today.  Are we okay?  Yep, speakers.

5          All right.  Good morning.  We have quite a few

6     matters on the agenda.  And let me turn to Mr. Gordon or

7     counsel for the debtor and see how you wish to proceed.

8          MR. GORDON:  Good morning, Your Honor.  Greg Gordon,

9     Jones Day, on behalf of the debtor.

10          I think from our perspective, Your Honor, we're

11     prepared to proceed in the order the matters appear on the

12     agenda.

13          THE COURT:  Okay.  I think there's some matters that

14     are not on there or at least my last look.  So the first matter

15     we have up for this morning contested that's going forward is

16     the debtors' motion appointing Randi Ellis as the future talc

17     claims representative.  And this has been opposed.

18          There have been objections raised by various

19     objectors including the Office of the U.S. Trustee.  And let me

20     turn to the debtors' counsel and do you want to lay out

21     anything in addition to your papers?

22          MR. GORDON:  You will not surprised to hear I have a

23     PowerPoint presentation I would like to run through.

24          THE COURT:  Then let's have at it.

25          MR. GORDON:  Thank you, Your Honor.

1           THE COURT:  I'll note Ms. Ellis and her counsel are

2  in the courtroom.

3           MR. GORDON:  And, Your Honor, we're supposed to have

4  somebody working behind the scenes to bring this up on the

5  screen.  Someone is supposedly on the Zoom.

6           THE COURT:  There we go.  Well, I don't see it on

7  that.

8                         (Pause)

9           UNIDENTIFIED SPEAKER:  Your Honor, can I approach?

10          THE COURT:  Absolutely.

11                        (Pause)

12          THE COURT:  Would it help just to take a five-minute

13  break?

14          THE CLERK:  (Indiscernible).

15          THE COURT:  All right.  Why don't we go off record.

16  We'll start over in five.

17        (Recess at 10:06 a.m./Reconvened at 10:08 a.m.)

18          MR. GORDON:  Thank you, Your Honor.  Again, Greg

19  Gordon, Jones Day, on behalf of the debtor.

20          Next slide, please.

21          So, Your Honor, just to set the table here, this is

22  obviously the hearing on the debtors' motion to appoint Ms.

23  Ellis as the future claimants' representative in this Chapter

24  11 case.  And these are kind of the key points that I'm going

25  to make in the presentation this morning.

1          Number one, that Ms. Ellis was appointed as the FCR

2   in the first LTL case, and her appointment was approved by all

3   parties, including I think everyone in the courtroom here

4   today.  And all the parties agreed she was qualified, they

5   agreed she was independent.

6          And now we're at a point where she's coming here and

7   we're proposing her after having her be involved in the first

8   case.  And based on that, we expected that her appointment in

9   this case would be non-controversial.  She's clearly up the

10  learning curve, spent a lot of time educating herself on the

11  facts and on the issues

12         But, instead, what we're faced with is a minority of

13  claimants represented by firms we believe are conflicted by

14  their own self-interest who now purport to strongly oppose this

15  appointment.  And the opposition, frankly is just based on

16  blatant character assassination of Ms. Ellis.  And I'm going to

17  show you this morning through the slide deck that all these

18  allegations of misconduct, of impropriety have already proven

19  to be false.

20         And so from our perspective, this appointment should

21  be approved.  And what this Court should not countenance is

22  objectors who are using this process to actually delay this

23  case and to delay our ability to get to a vote in the hopes

24  that they can avoid a vote on the plan that's supported by the

25  large majority of the claimants in this case.

8

1          Next slide, please.

2          Now I just wanted to set the legal framework for the

3   application.  A future claimants' representative, as Your Honor

4   well knows, is someone who is required to be appointed under

5   Section 524(g) of the Bankruptcy Code.  If we want to get to

6   the end of this case and have a channeling injunction in place,

7   which is what 524(g) contemplates, we need a future claimants'

8   representative.

9          We have the recent ruling in the <u>Imerys</u> case,

10  relatively recent, where it's now been made clear that the FCR

11  is someone who is to be able to act in accordance with, one, a

12  duty of independence from the debtor and other parties in

13  interest in the bankruptcy; two, someone who has a duty and can

14  act consistent with a duty of undivided loyalty to the future

15  claimants; and three, someone who has the ability to be an

16  effective advocate for the best interest of the future

17  claimants.

18          Back in LTL1, no one disputed that Ms. Ellis was able

19  to meet all those requirements.  And in this case, appointment

20  is especially important and it's important early in this case

21  because it will allow us, the debtor, to move forward with a

22  plan as indicated is supported by the substantial majority of

23  claimants.  And as Your Honor knows, we've made commitments in

24  the plan support agreements to file that plan by May 14th.

25  We're only a couple of weeks away from that, and we need to

1   have a future claimants' representative in place with whom we

2   can negotiate the details of that plan.

3           Next slide, please.

4           So if you take a step back with Ms. Ellis, this is

5   where we were I guess it was over a year ago when her

6   appointment was first broached with the Court.  She's someone

7   who's well known to many parties.  She's someone who's been

8   involved in complex civil cases for a long period of time.  She

9   has national recognition as a fiduciary.  She's been appointed

10  in a variety of roles as an arbitrator, a neutral, a special

11  master, guardian ad litem, and as a mediator.  And that

12  includes MDL matters and other mass-tort liability cases.

13          Well, she still has all those qualifications.

14  Nothing's changed.  Those qualifications continue to exist.

15  She still has that same very relevant experience today that she

16  had then.  But, more importantly, she's now someone who served

17  as the future claimants' representative in the first LTL case.

18  As a result of that, she has knowledge about the debtors'

19  current and future talc liability, she participated in the

20  mediation in that case, she participated in the estimation in

21  that case, and she's the only one who would be in a position if

22  appointed to immediately engage in negotiations with the debtor

23  and the other key constituencies on the plan terms that have

24  been described to Your Honor.

25          So to us, that makes her uniquely qualified to serve

1  in this role.  We won't find anybody who has the same

2  qualifications because she's up the learning curve and she's

3  been steeped in the issues and the facts that have to be

4  addressed in connection with this case and the plan that's on

5  the table.

6          Next slide, please.

7          Back in 2021, the support for her was universal.  And

8  we should remember that Ms. Ellis was actually proposed jointly

9  by the two committees that were in place at that time.  We

10  referred to them as TCC1 and TCC2.  And look at the comments

11  that were made at the time by the parties that are now opposing

12  her appointment today: "TCC2 worked cooperatively with TCC1 to

13  both submit the names of three potential candidates and to

14  strike two candidates submitted by the debtor.  Ms. Ellis was

15  among the three FTCR candidates supported and proposed jointly

16  by TCC1 and TCC2 without qualification."

17          To go on, "Ms. Ellis can adequately and safely

18  represent all future victims whose disease was caused by

19  Johnson & Johnson's talc products."

20          Another statement in court, "We did file a letter

21  indicating that we support Ms. Ellis' appointment, and we are

22  certainly pleased that there would be a female in the mix if

23  that were to occur."

24          So, again, the acclaim for Ms. Ellis was universal.

25  No one was opposing her.  She was actually proposed by firms

1    that today are now telling you that she couldn't possibly be

2    appointed, that she should be rejected out of hand.

3                  Next slide, please.

4                  Now, Ms. Ellis fulfilled her fiduciary duty.  She

5    performed her role as required following Your Honor's

6    appointment of her in the first case.  That appointment

7    occurred on March 18th, 2022.  She continued to perform her

8    role through April 4th, 2023.  And you can just see from the

9    declaration that she submitted the things that she did.  She

10   gathered information from the Committee.  She gathered

11   information from the debtor.  And with her experts, she did her

12   own research.

13                  She engaged in the mediation process in good faith,

14   and, as she says, and I'm going to come back to this, she

15   maintained her independence from the Committee and the debtor

16   throughout the case.  So why is it, Your Honor, she's no longer

17   qualified?  What has happened so that these parties would come

18   in here now and engage in the character assassination that

19   you've been seeing in their pleadings and hearing from them in

20   court?

21                  Next slide, please.

22                  So there's been a series of accusations.  So the

23   first accusation is that Ms. Ellis continued to negotiate or

24   mediate after the Third Circuit decision on January 30th of

25   this year.  That's accusation number one.  Number two, Ms.

1  Ellis considered submitting but she didn't submit a declaration

2  in support of this second bankruptcy case.

3          Number three is that unbeknownst to Ms. Ellis, her

4  name appears as the claims administrator in the debtors' plan

5  term sheet.  And then, number four, she has not adopted the

6  positions of these law firms and the U.S. trustee who oppose

7  this bankruptcy case and the proposed plan.

8          Those are the four accusations we read their

9  pleadings and you hear what they say in court, that's what

10 they're accusing her of and that's why they're telling you you

11 cannot appoint her in this case.  So let's go through these one

12 by one.

13          Next slide, please.

14          Okay, accusation number one, that Ms. Ellis continued

15 to negotiate post the Third Circuit decision.  So, first of

16 all, Your Honor, what she was doing in that respect was

17 required by Your Honor's mediation order in the first case.

18 And that mediation order stated that, "The mediation parties"

19 -- which included Ms. Ellis -- "will make a good-faith attempt

20 to settle the mediation issues.  The mediation parties either

21 personally or through a representative with authority to

22 negotiate and settle the mediation issues will make reasonable

23 efforts to attend all sessions scheduled by the co-mediators to

24 which they are invited to attend by the co-mediators."

25          She did that.  And then in your text order dated

1  March 23, 2023, you stated the parties are urged to continue

2  informal settlement negotiations.  She did that.

3          Now the TCC filed pleadings, the U.S. Trustee, other

4  parties, and they're shocked and amazed.  They can't believe

5  that she was actually involved in negotiations post January 30.

6  And they say that even though they were doing the same thing.

7  They were doing the exact same thing.

8          So next slide, please.

9          So we know from Mr. Molton, his deposition was taken.

10 He was directed not to answer questions about his conversations

11 with Ms. Ellis, but by just having this objection made, he's

12 basically reflecting that they were having these negotiations

13 or discussions with Ms. Ellis.  And, frankly, this activity is

14 confirmed by the TCC professionals' own time entries.

15         So next slide, please.

16         So this is just a few of them, Your Honor, but

17 looking at their fee applications for January and February,

18 just go down the list.  These are descriptions of time based on

19 settlement discussions, plan alternatives, and the like.  You

20 got Brown Rudnick, Otterbourg, FTI, the Brattle Group, and

21 there were others, as well.  I think in total, there were over

22 2025 hours spent on settlement and mediation matters in the

23 first month following the Third Circuit's decision in that

24 February time frame.

25         And so for them to accuse her of engaging in

14

1   misconduct for the very same conduct they were engaged in just

2   shows how weak and spurious these allegations are.

3              Next slide, please.

4              And Mr. Molton, he had reached out to me by email on

5   March 24, well, that was almost two months after the Third

6   Circuit decision, "Consistent with the Court's text order, the

7   ovarian cancer representative of the TCC have prepared a

8   proposal that would resolve present and future ovarian cancer

9   claims."  Well, I guess he engaged in misconduct by sending

10  that email even though, again, it was strictly in accordance

11  with, as he references, Your Honor's text order.

12             Next slide, please.

13             So in accusation number one, that is not a legitimate

14  basis in our view to reject the motion for her appointment.

15  Just absolutely no basis whatsoever for that.

16             So the second accusation goes to the draft future

17  claimants' representative declaration.  So if we start here,

18  Your Honor, where this gets its start is in a board

19  presentation which was turned over to the other side in

20  discovery in connection with the PI motion.  And that board

21  presentation reflected the debtors' belief at that time, this

22  was on March 28th, that Ms. Ellis would sign a declaration in

23  support of the Chapter 11 case and that she might sign a plan

24  support agreement.

25             And in the box underneath, we actually have the exact

1  language out of the board minutes, "Separate discussions have

2  occurred.  FCR is supportive of a second Chapter 11 case in the

3  event the current case is dismissed.  FCR has agreed to sign

4  and submit a declaration in support.  In addition, discussions

5  are ongoing to obtain a plan support agreement."

6         That's what's contained in those -- in that

7  presentation.  That was the belief at the time.

8         Next slide, please.

9         Then we have April 2 board minutes.  These are also

10  produced in the PI proceeding.  And they clarified that Ms.

11  Ellis has decided not to submit a declaration -- she did not --

12  and/or agreed to any plan terms.

13         And, again, the language appears in the box

14  underneath: "Since the March 28th board meeting, the FCR

15  determined not to submit a declaration in support of a new

16  Chapter 11 case or agreed to the terms of a plan of

17  reorganization for the company described in the plan support

18  agreements, though the FCR remains supportive of a new Chapter

19  11 case and the resolution of future talc claims in

20  bankruptcy."

21         That's what comes out of the documents produced in

22  discovery.

23         Next slide, please.

24         And this was confirmed in the deposition taken of Mr.

25  Kim.  You can read down, and he basically acknowledges exactly

16

what happened in terms of the board meetings:

"Q   The question is FCR's agreed to sign and submit a
declaration in support of a new Chapter 11 case."  Those are
the words, right, that comes out of the board presentation.  "A
      That's exactly right.  The filing of a new Chapter 11
case.

"Q   And it was later reported that was not happening.  And
then later it was reported that she was unwilling to sign a
declaration, right, that she chose not to --

"A   Yeah.

"Q   -- sign a declaration.  And the FCR and Ms. Ellis chose
not to execute that, as well, correct?

"A   Correct.  Any plan support agreement she did not choose,
she did not submit any plan support agreement."

            Next slide, please.

            Next slide.

            THE CLERK:  I've just been told that the wi-fi
dropped out.

            THE COURT:  There we go.

            All right.  We'll have a reminder please discontinue
any use in the courtroom of the Court's wi-fi unless necessary.
Thank you.

            MR. GORDON:  So, Your Honor, what was in the
documents was confirmed by Mr. Kim's testimony.  And then from
Ms. Ellis' declaration where she says, "I decline to sign a

1  declaration in support of the filing."  She said she was

2  generally aware plan discussions were ongoing but was not

3  involved.  And she said she was not aware of terms of plan

4  support agreements and could not have accepted them without

5  more time.

6              Next slide, please.

7              And this had just a couple of the paragraphs right

8  out of the declaration that has the actual language:

9              "I was approached to provide a declaration.  I

10             considered such because the Court encouraged the

11             parties to continue settlement efforts, and I believe

12             it would have been a dereliction of my duties not to

13             consider any proposed resolution options.  After

14             consideration, I declined to sign the declaration."

15             "While I was generally aware there were ongoing

16             discussions about a proposal of a plan, I was not

17             involved in any discussion or negotiations regarding

18             a plan or plan support agreement.  I was not aware of

19             the terms set forth in the plan support agreement.

20             and had I been aware of such terms, I would have

21             needed additional time for my retained professionals

22             to review the terms, complete their work, and advise

23             me before I could make any decision."

24             That's the record, Your Honor, on this point, on this

25  accusation about this improper activity engaged in by Ms. Ellis

1 that she would submit a declaration, which she never did.  She

2 never did.

3          Next slide.

4          So the third accusation goes to the issue of the

5 claims administrator.  And, again, this was explored at length

6 in the discovery that was taken in connection with the PI

7 motion.  So starting with Mr. Murdica, he was asked about this

8 in his deposition and he said he thought that Ms. Ellis would

9 be a good claims administrator to promote an efficient claims

10 process.

11          But look at what he said in his deposition.

12 "A   It's a placeholder because the claims administrator, if

13 you look later in the document, is the one who would decide on

14 the amount of the quick pay.  And that would have in my view

15 the most significant ramifications for an FCR."

16          So he's saying it's a placeholder, and he's

17 describing why he thought about Ms. Ellis as the placeholder at

18 that time.

19          Next slide.

20          Mr. Watts, his deposition was taken, as well.  He

21 pretty much said the same thing that Mr. Murdica said about Ms.

22 Ellis.  He says:

23 "A   Ms. Ellis has a superior knowledge base to anybody else

24 Mr. Watts could think of for the role which would promote a

25 situation where the claims were being administered as fast as

1 they can with the goal of paying every existing client within

2 one year of plan confirmation."

3          So that's what he's thinking.  But the next slides I

4 think are critical.

5          Go to the next slide, please.

6          But on the question of whether Ms. Ellis knew

7 anything about this, the record is again consistent and clear.

8 To Mr. Murdica:

9 "Q   Did you have any conversations with Ms. Ellis about her

10 serving as claims administrator?

11 "A   No.

12 "Q   Do you know if anybody did?

13 "A   I don't know, but I don't think so.  I'm not even sure you

14 can be an FCR and a claims administrator.  So it was just a

15 placeholder."

16          Next slide.

17          Same for Mr. Watts:

18 "Q   And did you have any conversations with Ms. Ellis about

19 her potentially serving as claims administrator?

20 "A   So I don't recall that.  I don't recall a specific

21 discussion with her about her serving as claims rep, claims

22 administrator, although I do think she is the individual most

23 highly qualified to do so."

24          But if there were any doubt, then you look to what

25 Ms. Ellis has to say about this.

20

1          Next slide, please.

2          From her declaration, "At no time was I offered, nor

3    did I seek or accept any promises in exchange for supporting

4    any parties' position.  I have no knowledge of my name being

5    included on documents prepared by the debtor as a claims

6    administrator of any proposed settlement or plan and had no

7    control over the actions of the debtor."

8          Again, all of this is completely consistent.  The

9    record establishes again that these accusations just have no

10   foundation at all with respect to the objections that have been

11   leveled at this point against Ms. Ellis.

12         Next slide, please.

13         So accusation number four, that Ms. Ellis, she should

14   be disqualified because she hasn't adopted the positions of the

15   objecting parties in this case.  And you can see this from just

16   reading the objections themselves.  And they make clear that no

17   one would be qualified as an FCR candidate in this case unless

18   they were to support the minority position that's being

19   advanced by the law firms that are making so much noise in this

20   case.

21         So from the Maune Raichle opposition and there's many

22   examples but here's one,

23              "Unless and until there was credible evidence that

24              the debtors' liabilities, not including J&J's

25              independent non-derivative liabilities, exceeded $61

billion.  Ms. Ellis' only duty under Third Circuit

precedent and state tort law and the Constitution of

the United States of America was to preserve future

claimants' rights to full recourse in the tort

system, in other words, dismissal."

That's why Maune Raichle's opposing her.  That's why

Maune Raichle has objected to her fee applications in the other

case.  She thinks she had no business talking to anybody about

a potential consensual plan in a bankruptcy case and, for that

reason, she should be disqualified.

Similarly, with Paul Crouch, "Any appointment of an

FCR at this time would have to be limited to protecting the

state law jury trial rights of future claimants against the

debtor."  Unless you agree with us that the case should be

dismissed, you are not qualified to be a future claims

representative.  So think about that.

These parties that come in here and tell you that she

should be disqualified because she's not independent are

telling you that the reason she should be disqualified is

because she's not aligning with them.  That's the exact

opposite of independence.  She should not be appointed because

she hasn't come up to this podium or filed a paper that says I

agree this case should be dismissed, I agree this plan should

not go forward, I agree that the majority of claimants

shouldn't be allowed to vote.  That's why they want her

22

1   disqualified.

2          Next slide, please.

3          And, again, I don't think there's any question based

4   on this record that Ms. Ellis is independent.  She said she

5   understands she has a duty of independence.  She says she

6   maintained that independence from both the TCC and the debtor.

7   And we know that she has because she has not adopted the

8   position of the minority of claimants.  We know that because

9   that's why they're complaining about her, and we know that she

10  didn't submit a declaration in support of this second case.  We

11  know she didn't sign a PSA so she's not aligned with us either.

12  That doesn't show bias.  That establishes her independence.

13         Next slide.

14         So nobody's lying.  I can't tell you how many emails

15  that we're seeing like this.  We need to get to the bottom of

16  who is telling the truth and who is lying prior to the Court

17  hearing argument on the appointment of an FCR.  Nobody's lying,

18  Your Honor.  I just showed you the record.  The testimony is

19  consistent.  They can say that people are lying, but they have

20  had discovery, they've seen the documents, they've taken

21  depositions, they know that nobody's lying and nobody is.

22         Next slide.

23         So just to conclude, Your Honor, Ms. Ellis has the

24  same qualifications and the same experience she had when you

25  appointed her the first time.  In addition to that, she now has

23

considerable knowledge, understanding of facts and issues that

no one else has.  The objectors' accusations of bias and

misbehavior are not supported by the facts.  They're belied by

the facts.  And, in fact, they're undercut by the objectors'

own actions.  The things that they complain about her doing,

they did the exact same thing.

Ms. Ellis has done nothing wrong.  She's done nothing

to deserve the criticism that she's been receiving by these

firms representing a minority of the claimants in this case.

And we would ask that Your Honor appoint her as someone who's

imminently qualified as everyone agreed before, who is

independent, she has displayed undivided loyalty to the future

claimants.

THE COURT:  All right.  Thank you, Mr. Gordon.

MR. GORDON:  Thank you.

THE COURT:  Either for the TCC?

MR. MOLTON:  Your Honor, we've discussed the order.

David Molton, Brown Rudnick --

THE COURT: Yes.

MR. MOLTON:  -- for the TCC -- proposed counsel for

the TCC.  We've discussed the order.  And Mr. Maimon's going to

go first followed by a few other objectors.  The TCC will then

follow up, and I think the U.S. Trustee will be --

THE COURT:  Perfect.

MR. MOLTON:  -- going last.

24

1          THE COURT:  All right.  Thank you.

2          Mr. Maimon?

3          MR. MAIMON:  Thank you, Your Honor.

4          May I, Your Honor?

5          THE COURT:  Yes, please.

6          MR. MAIMON:  Thank you.

7          THE COURT:  Thank you.

8          MR. MAIMON:  Thank you, Your Honor.  May it please

9    the Court.

10         There are multiple independent grounds requiring the

11   denial of the instant motion.  You will hear from others with

12   regard to various aspects of each of those independent grounds.

13   What I'd like to concentrate, Your Honor, are the facts that

14   deal with one aspect of them that hopefully cover many of them,

15   but we're trying to coordinate that.

16         Histrionics aside and a self-imposed and imposing on

17   others deadline aside, this is a new case which requires the

18   Court to deal with motions that are brought anew.  And it

19   really doesn't matter what happened the first time and Ms.

20   Ellis' appointment the first time or, quite frankly, as far as

21   I'm concerned, her qualifications and her history as serving as

22   special master and as serving as a guardian ad litem, although

23   guardian ad litem we all know is very very different because a

24   guardian ad litem represents those who are incompetent.  No one

25   who Ms. Ellis seeks to represent the interests of is

incompetent.  And we're going to see why that's very important

with regard to the inevitable conclusion that this motion must

be denied.

        This gets down to the deal that was made between

Johnson & Johnson and various law firms who claim to support

their efforts.  Over and over, the mantra is majority minority,

it's an illusion.  it's false.  There's no evidence to support

it.  There's just the debtors' claims and their lawyers'

claims, and a bunch of first names on a bunch of lists.

        But there's no record in front of this Court of any

support for a plan aside from lawyers, no record in front of

Your Honor with regard to any claimant supporting it.  And the

insistence to keep saying it and saying it and saying it over

is the attempt, quite frankly, to normalize the outrageous.

        Mr. Watts testified that it would be outrageous to a

claimant at this point to seek support.  It would be a

violation of the Bankruptcy Code, the anti-solicitation.  And

yet, we hear it over and over and over again because when you

have nothing else, you have to normalize the outrageous.

        This sensational deal for $8.9 billion, which is also

illusory, is embodied in the plan support agreements.  And

there are several aspects to that which bear upon the motion

that Your Honor has in front of him.  First of all, we know

that the plan support agreement is dated, it's dated March

21st, 2023, including all the exhibits.  And we know that

1  Exhibit B is the term sheet to the plan, and that is the

2  material terms of the Chapter 11 plan of reorganization.  These

3  are the material terms.

4          And so we are going to look at what those material

5  terms are and what Ms. Ellis' role was in getting there not in

6  trying to settle anything but what her role was in that regard.

7  But there are other aspects to the plan support agreement which

8  are important.

9          Number one, the rule on amendments.  And because LTL,

10 the debtor, is a debtor in possession, it cannot without the

11 permission of this Court amend any contracts.  And so this

12 contract which we're going to see cannot be amended.

13         Number two, it says, it's the entire agreement.  And

14 so there is no parol evidence.  There is no intentions.  There

15 is no placeholders.  There's nothing else.  This is the entire

16 agreement pursuant to the contract.  And contract laws in New

17 Jersey are very clear on this.

18         And, finally, specific performance that the debtor

19 acknowledges here that there is -- this is not something that

20 can be cured a breach of by simply damages.  And so this is the

21 deal.  And, ultimately, it's the term sheet which are the

22 material terms of the deal.

23         So let's take a look at what they are.  And there are

24 three critical terms that are dispositive of this motion.

25 Number one, Randi Ellis will be the claims administrator.  It's

27

1  not the TCC that's making it up.  It's not Mr. Crouch.  It's no

2  one.  It's the term sheet that LTL entered into and J&J entered

3  into with these lawyers.

4        Number two, she agrees that no more than one-third of

5  the trust of the trust corpus will be assigned to future

6  claimants.  Those are people that supposedly she has a

7  fiduciary duty to represent.

8        And then, number three, that the existing claims are

9  cut off as of April 1, 2023.  We'll see those in turn.

10        Number one, Randi Ellis shall serve as claims

11  administrator of the talc trust.  Shall, not perhaps may.  Not

12  somebody, and we'd like to think she would be a good person.

13  This is the contractual language, these are the material terms

14  that they chose.  She shall serve as claims administrator, and

15  we'll see what her role was as shown by the evidence as opposed

16  to the self-serving statements of her declaration.

17        Number two, the qualification and payment terms

18  contemplated below where J&J pays that $8.9 billion are

19  contingent on.  And Mr. Kim in his testimony at the hearing on

20  the 18th acknowledged this that the future claims

21  representative, and at that time the only future claims

22  representative was Ms. Ellis -- this is March 21, 2023 -- her

23  agreement that she will not assign more than one-third of the

24  trust corpus to qualifying future claims.

25        And so we have the "shall," that she shall be the

1  claims administrator, and we have that she will not assign more

2  than one-third.  But as claims administrator, it defines her

3  duties as allocating proceeds to be distributed amongst all

4  existing and future claimants.  There is absolutely not way

5  that those two things can be reconciled either legally or under

6  any ethical code that governs bankruptcy court, New Jersey

7  courts, any courts in the country.  Those simply cannot be

8  reconciled.

9       But there's more.  This supposedly, and this deals

10  with the ovarian cancer claims, this is $6.5 billion for

11  existing and future ovarian cancer claims.  That's what the

12  deal calls for.  However, the deal also delineates what is an

13  existing claim and what is a future claim.  And the cutoff date

14  that they chose is April 1st, 2023.

15       Why is this important?  Well, it's important for two

16  reasons.  First is the reason that Mr. Watts told us about in

17  his deposition.  He told us that this was his idea.  And what

18  he wanted to make sure is that after the big sensational

19  headlines of $8.9 billion was announced on April 4th when they

20  filed the second petition, somebody didn't do what he did,

21  which is go out and mass market and get a bunch of claims that

22  would dilute the value of his existing claims.

23       And so if you cut off those existing claims as of

24  April 1st, 2023, which is what the agreement does, the material

25  terms of the agreement, the value to him and his clients and

29

all of J&J's PSA partners is maintained.  Is that some small
thing?  It's not.  Two-thirds of the trust corpus for the
ovarian cancers is to existing clients.  That's $4.3 billion.
If they have 75 percent, which they don't and which is simply
made up, but if they do, that's $3.25 billion or 3.25 billion
reasons why April 1, 2023 is an important date.

        But it's important in one other regard, Your Honor,
that impacts this motion.  Under bankruptcy law, only present
and existing claimants can vote on confirmation.  Future
claimants are represented by an FCR.  The claimants themselves
cannot vote on confirmation.  The FCR cannot vote on
confirmation.  The FCR can only object to confirmation.

        And so what happened here is J&J and its PSA partners
dealt away the voting rights of every woman diagnosed who
retained a lawyer between April 1st, 2023 and confirmation.  If
you believe Mr. Watts and Mr. Onder and all those where they
put that slight in front of you on the 18th to show -- or the
20th, I forget, I think it was the 18th to show how many new
claims, unfiled claims there are, there were 40,000.  Assume
half that number, that would be 20,000 women diagnosed or
retaining lawyers after April 1st, 2023 who don't get to vote.
They've dealt away their rights to vote.

        And so while the lawyers and J&J's PSA partners are
dealing away rights, lawyers like Andy Birchfield and Jason
Itkin are looking to maintain the rights that their clients

1  have.  And this is one of the major reasons not addressed by

2  J&J, not addressed by LTL, not even touched upon by Ms. Ellis

3  in her declaration, which means you can't do this.  This

4  agreement cannot have Ms. Ellis and her agreement to just give

5  away people's right to vote.

6         What else?  Well, Mr. Watts also testified that he's

7  not done signing up people.  We deposed him I think it was the

8  16th or the 17th, I think it was the 16th of April before the

9  hearing in front of Your Honor on the 18th, and he said, Well,

10  I know that the first ovarian cancer case that I signed up was

11  in March of 2022.  The last one, probably yesterday.  They're

12  still coming in.

13         Which makes another conflict.  The FCR now represents

14  the interests of people who retained Mr. Watts.  Mr. Watts

15  could have brought in a new client who signed a retainer with

16  him on April 17th, April 16th, April 15th, but because of the

17  April 1st cutoff, their interests are represented by Ms. Ellis.

18         Yes, Your Honor?

19         THE COURT:  Counsel, if I may?  I just want to

20  clarify.  So according to your position on what this means, Mr.

21  Watts' new clients or anyone who comes in would be deemed a

22  future claimant and not voting.

23         MR. MAIMON:  Correct.

24         THE COURT:  But wouldn't -- since Mr. Watts is

25  supportive of the plan, of the settlement that's been proposed,

1  wouldn't he want his claimants to be able to vote and be

2  included in the 75 percent?

3         MR. MAIMON:  No.

4         THE COURT:  Why not?

5         MR. MAIMON:  Because he's already got 17,000 of them

6  in the bag which if you believe him, they're in the bag and

7  they're going to vote yes, and they can't be diluted anymore.

8  He's maintained --

9         THE COURT:  Well, from a financial perspective.  But

10  for voting, you would think knowing that there's a 75 percent

11  bar or a threshold, none of it means anything if he can't reach

12  that 75 percent.

13         MR. MAIMON:  Right.  But what if somebody else

14  dilutes not only financially but vote wise?  He believes he's

15  got it.  He believes he's got in the bag.  He made the deal

16  with Mr. Murdica.  He told them I've got the votes, I got them

17  for you.  Don't let anything be diluted, that's the way this is

18  set up.

19         And we'll see that Ms. Ellis not only is conflicted

20  because of that, legally conflicted because who represents the

21  interests of those clients.  According to the term sheet, it's

22  Ms. Ellis.  According to Mr. Watts and the ethical rules that

23  he is governed by because he signed retainers with those

24  people, it's him.  He's given away their right to vote.

25         THE COURT:  So your position is any FCR would be

1  conflicted in that?

2          MR. MAIMON:  No.  Well, I think that --

3          THE COURT:  Right?

4          MR. MAIMON:  Well, I think that this is a -- part of

5  what happens, Your Honor, when we have motions like this is the

6  rot within the core of the scheme, it comes out.  I think that

7  having dealt away voting rights for people is a major problem.

8  And because it's a material term to their plan, it's a major

9  problem.  It can't be overcome.

10         But it's certainly not something that Ms. Ellis can

11 sign on to.  And we're going to see what her role was in this

12 which we believe disqualifies her.

13         Okay.  Number two, so we know that as of March 21,

14 2023, the terms of the deal are that she will become claims

15 administrator to allocate amongst existing and future claims.

16 She will already have agreed that future claimants get less

17 than a third of the $6.5 billion for ovarian cancers.  We know

18 that the number of future claims is now inflated, and their

19 value is lessened because of a cutoff of April 1st.  And we

20 know that their rights to vote have been sold down the river.

21         So what happened after this deal was done?  What

22 happened after March 21st, 2023 which is the date of the PSA?

23 Well, we know that Mr. Murdica and his partners had extensive

24 conversations and correspondence with Ms. Ellis about the BK

25 declaration, the bankruptcy declaration.  This was March 22.

1          And they drafted a declaration for her to sign in

2    support of their new Chapter 11 case.  We know that there was

3    correspondence back and forth.  Did we get it back, was it

4    signed?  We know that there was different versions, and it went

5    through drafting.  So this is not something that was simply

6    maybe she'll do it, maybe she won't.  But it went through

7    different versions and different drafting.  And we know that

8    there was a push to make sure that this is done and done on

9    time and can we get this done.

10         And so what do we know?  We know that as time went on

11   and we're up to March 26th now, they're setting up Zoom calls.

12   On March 28th, the board of LTL meets.  And this is important

13   because we saw part of this, but Mr. Prieto using a

14   presentation talks to the board about the support of the

15   potential -- the FCR support of the potential filing of a new

16   Chapter 11 bankruptcy case.

17         We know that the centerpiece of the new strategy was

18   to terminate the old funding agreement and replace it with a

19   much more inexpensive and detrimental one, less detrimental to

20   J&J's interests.  But now in support of this plan, in support

21   of the whole scheme to get rid of the funding agreement, to

22   file the second bankruptcy, Ms. Ellis' support is being used to

23   talk the board into approving it.

24         And what do they say?  The presentation on March

25   28th, exactly here.  No self-serving declaration can get around

1  this.  The FCR has agreed to sign and submit a declaration in

2  support of a new Chapter 11 case, period, hard stop.  There's

3  no qualifiers, there's no nothing here.

4          If there's a new Chapter 11 case, and at this point,

5  correct me if I'm wrong, en banc had already been unanimously

6  denied by the Third Circuit and all that was pending was the

7  dishonest motion for a stay because they claimed that they were

8  going to go to the United States Supreme Court.  And,

9  meanwhile, what they really had planned was getting all their

10  ducks in a row to refile for bankruptcy.

11          And in addition, discussions are ongoing to obtain a

12  plan support from the FCR.  So why didn't she sign the

13  declaration?  She doesn't say in the declaration she put in

14  here.  J&J doesn't tell us why even though they knew why,

15  because this is Ms. Ellis on the 23rd back to Mr. Murdica and

16  his partner.

17          Quoting from Paragraph 2 of the declaration that they

18  sent her, "I served as the FCR" -- from that date when Your

19  Honor appointed her -- "until the Chapter 11 case was

20  dismissed" -- on such-and-such date.  And her notes, "I am

21  still serving.  It's a hard to sign as-is.  Thoughts?"  Well,

22  what does that mean?  First of all, it contradicts the

23  declaration in support of this motion.

24          What I hope it means, what I really hope it means

25  and, quite frankly, having had an opportunity to meet Ms.

1  Ellis, what I trust that it means is that she realized that she

2  had an irreconcilable conflict while the first case was pending

3  to do this.  I don't think it's been well thought out that that

4  conflict is anywhere gone, but she had a conflict.

5       What's the conflict?  The ovarian cancer conflict.

6  She as FCR had a duty of undivided loyalty to the future

7  claimants in the first bankruptcy, not an abstract duty.  A

8  duty of undivided loyalty to those people.  And if we're

9  talking about the ovarian cancer victims, to the women

10 diagnosed with ovarian cancer after confirmation or effective

11 date, depending on which date was used to define what the

12 future claims are.  She had a duty to them.

13      She also had a duty to make sure that anyone who had

14 interests adverse to the people she had the duty to she had to

15 protect her fiduciaries.  And so what that means is that for

16 LTL1, all of the women with ovarian cancer who were present

17 claimants, she did not have a duty to them.  In fact, she had

18 to protect her -- the people she had a fiduciary duty to, the

19 future claimants to the extent that there was any adversity.

20      Now we have LTL2.  And we have the now imposed April

21 1, 2023 cutoff date.  Those same future claimants are still

22 there.  You can't get rid of your fiduciary duties just because

23 a case ends.  It doesn't work that way.  She still has duties

24 to those people who Your Honor appointed her to represent in

25 LTL1.

1    But what happens with the people she was adverse to

2 in LTL1?  They now become her clients.  They're now there, and

3 she owes them the same fiduciary duty that she had with people

4 who were adverse two months ago.  That is an irreconcilable

5 conflict.  I don't understand why -- I understand why the

6 debtor doesn't want to talk about it.  I don't understand

7 ,March 21, 2023, Randi Ellis was the future claims

8 representative appointed by the bankruptcy court.  According to

9 J&J, according to the contract, according to LTL, according to

10 Mr. Watts, according to the verified complaint, she agreed to

11 this.  Now she may want to come in and disavow that.

12    But for the reasons that my colleagues are going to

13 talk about, the Court cannot ignore this and the Court cannot

14 appoint her in its face.  And so what would we have, at the end

15 of the day, we have a deal stemming from negotiations with Ms.

16 Ellis and agreed to by Ms. Ellis that, number one, asserts that

17 she shall become the future -- that she shall be the claims

18 administrator to allocate amongst existing and future claims,

19 that she already as a contingent term, that the whole deal is

20 premised on will have agreed that the future claimants gets

21 less than one-third of the $6.5 billion allocated to the

22 ovarian cancer victims.

23    That the future claims are numerically inflated and

24 dollar-wise devalued by setting a cutoff date as of April 1,

25 2023.  Those are the people that they claim she's going to

1  represent.  And their voting rights have been dealt away.

2         The facts are so damning, Your Honor, that you need a

3  PowerPoint that doesn't talk about this case and what happened

4  here but just talks about expedience and hysterical claims of a

5  majority wanting to do this and please let us vote at the same

6  time that they're disenfranchising those very people.  I

7  appreciate the Court's indulgence.  Thank you.

8         THE COURT:  Thank you.

9         Mr. Satterley?

10        MR. SATTERLEY:  Yes.

11        Good morning, Your Honor.  Joe Satterley.

12        THE COURT:  Good morning.

13        MR. SATTERLEY:  Kazan McClain Satterley & Greenwood.

14 The good news is I don't have a PowerPoint for this part, and

15 I'm going to be brief.

16        First, what's going on here, the debtor wants this

17 FCR quickly so they can cram down this case.  As I argued on

18 the 18th, that's what this is about.  They want a cramdown.  We

19 object to this process.  Your Honor, in the first LTL, engaged

20 in a process where names were submitted and people were

21 considered.  That process should occur in this new bankruptcy,

22 and it shouldn't be a cramdown of a plan, and it shouldn't be a

23 cramdown of an FCR.

24        I only have a couple of points.  Mr. Maimon hit on

25 most of them.  I do object to Mr. Gordon's statement.  He said

1  it four times, A minority of claimants who are conflicted by

2  their own self interests.  I agree with Mr. Maimon, if I have

3  any conflicts, report me to the bar.  My clients who probably

4  many of them are watching, and some of them are after April

5  1st, know that I don't have a conflict and that I have their

6  interest in my heart.

7          The second point i would make is, quite frankly,

8  there doesn't need to be an FCR appointed right now.  Your

9  Honor has a motion to dismiss pending.  If in fact we get to a

10 point that there needs to be an FCR. the Court should keep in

11 mind that this is a full value plan.  There's at least $61

12 billion that is guaranteed according to the first funding

13 agreement.

14         A couple of points regarding their PowerPoint.  Slide

15 Number 24 is quoting me Friday night at 10:00 Eastern Time.

16 7:00 I was in San Francisco on a date, and I sent this email

17 because it became obvious, it became obvious --

18         THE COURT:  Too much information.  Go ahead.

19                        (Laughter)

20         MR. SATTERLEY:  It was a fun date.  But I think the

21 Warriors were playing, also.  They lost.

22         But I sent this who was lying because it became

23 obvious to me just comparing the declaration of Ms. Ellis to

24 what was submitted to us before the 18th and on the 18th, there

25 was definitely something not true.  So I asked her for

 1  deposition on Friday night, and I was never obviously given her

 2  deposition.

 3          At this point, it's not necessary because it's so

 4  obvious that she cannot serve in the roles of an FCR.  Her

 5  declaration, by the way, we got -- I did serve a subpoena and

 6  last night while I was at the Knicks games, we got several

 7  documents.  And her draft declaration that was sent to her that

 8  she did not sign was prepared and written by J&J, by J&J.  She

 9  didn't prepare it.  She didn't write it.  It was prepared by

10  J&J.

11          The declaration that she did submit on Friday night

12  on Paragraph 7, says she didn't support a plan and she uses the

13  word by the debtor and others, but she leaves out J&J.

14  Paragraph 7 of her declaration leaves out specifically the

15  words J&J.  And it's very artfully written to leave out J&J

16  because it's obvious through the emails we got last night that

17  she was meeting with Mr. Murdica, emailing with Mr. Murdica,

18  seven or eight Zoom meetings.

19          The future clients do not need someone to serve as a

20  future claims representative who has been working hand in hand

21  with Jim Murdica and J&J for the last several weeks.

22          The last point I would make, Your Honor, is Counsel

23  said mediation was -- there was a mediation order, Your Honor

24  ordered a mediation.  I participated in all the mediations that

25  Your Honor ordered.  And that mediation order specifically said

the mediation should occur with the TCC.  And certain other folks back at the time in 2022 wanted to participate in the mediation, and Your Honor did not allow them.  The TCC, the FCR, LTL, J&J was all there.

The mediation order did not say that the LTL could go out and find a bunch of unknown lawyers and that would constitute a mediation.  So I would object to the notion that they were simply just working in compliance with Your Honor's mediation order.

Finally, I just object to the declaration of Ms. Ellis submitted on Friday as hearsay.  And today's not an evidentiary hearing, so there's not going to be any testimony given.  But I would object under the Rules of Evidence that that's hearsay.

And the submission by Mr. Gordon regarding Mr. Murdica's testimony, once again, today is not an evidentiary hearing, so those were improper.  And those questions were asked in relationship to the PI motion, not the FCR motion. With that, Your Honor -- yes?

THE COURT:  Don't go.  I just have a question.

MR. SATTERLEY:  Okay.

THE COURT:  Both of you and Mr. Maimon, I think, referenced the supposed discussions between Ms. Ellis and Mr. Murdica, or the debtor, and there are, and this Court has had prepack asbestos cases where there's been a lot of activity

1 prepetition with a potential future claimants rep who's not yet

2 appointed but who acts as a fiduciary.  And there's obviously

3 communications.  Why is it problematic here?

4          UNIDENTIFIED SPEAKER:  Can I answer that?

5          THE COURT:  If you look at it as a prepack or even

6 though maybe for two hours, 11 minutes is a prepack.

7          MR. MAIMON:  So if for a month and a half, because we

8 know that's how long it was going on, it was going on for two

9 months ever since the Third Circuit opinion.  If they had gone

10 to somebody else and said, we're going to do a prepack like any

11 prepack, we need you to be the FCR, and we want you to be fully

12 informed, that would be a different issue.  When she did this

13 for this so-called prepacking bankruptcy, she still was the FCR

14 for those and she had the fiduciary duties to the future

15 claimants in LTL 1.  She cannot be the FCR for the claimants in

16 LTL 2.  It's a clear conflict.

17          MR. SATTERLEY:  It's a simple --

18          MR. MAIMON:  That's the problem.

19          MR. SATTERLEY:  -- simple answer.  She was already in

20 the capacity of FCR at the time this was going on when all

21 these secret negotiations were going on with these unknown

22 attorneys.  So I hope that answers Your Honor's questions.

23          THE COURT:  All right.

24          MR. SATTERLEY:  And I didn't address the law because

25 Mr. Molton, I believe will address the law.  But under the law

42

1 that he will address, she cannot be appointed.

2          Thank you, Your Honor.

3          THE COURT:  All right.  Thank you, Mr. Satterley.

4          Mr. Molton, or Mr. Thompson.

5          MR. MOLTON:  We're going to let Mr. Thompson go based

6 on his assurance to me that he's going to be quick.

7          THE COURT:  They always try to cabin you,

8 Mr. Thompson.  It's --

9          MR. THOMPSON:  There was no assurance.  I'm kidding.

10          So, Mr. Gordon is absolutely right about what my

11 position is.  He quoted it exactly right.  Until there's

12 evidence that their liabilities exceed $61 billion, we don't

13 need an FCR.

14          Addressing your last question, so the debtor attached

15 to its reply a bench ruling that you gave in Duro Dyne.  And I

16 believe that was a prepack.

17          THE COURT:  Yes.

18          MR. THOMPSON:  And this is at Page 14 of the

19 transcript from the debtor's reply, so this is you speaking.

20 Because there was some challenge to Mr. Fitzgerald's [sic]

21 independence.  And there, there was negotiations between an ad

22 hoc committee of creditors.  You know the case better than I

23 do.  But my understanding is, there was an ad hoc group of

24 creditors, proposed FCR, and the debtor negotiating.  And Duro

25 Dyne was in financial distress and J&J is not.

43

1         But, this is you, "As to his pecuniary interest in

2   being appointed, Mr. Fitzpatrick confirms, and the Court again

3   finds credible, that he never demanded nor requested

4   appointment as a post-confirmation FCR.  The practice was just

5   followed in a way that had been done in the past in prior

6   cases."

7         Further down on Page 14 of the transcript that was

8   attached to the debtor's brief, "According to Mr. Fitzpatrick,

9   it is offensive to him to suggest that the $2,000 in monthly

10  income is sufficient to persuade him to undercut or sell out

11  his applications to future claimants."  So he was getting paid

12  about $2,000 a month.  Ms. Ellis has billed about $900,000 in

13  this case, and one of the things she wanted to make very clear

14  in her declaration is that she is still owed $76,000.  In

15  addition to that, that she wants, she's billing $1,000 an hour,

16  Mr. Fitzgerald [sic] getting $2,000 a month.  And then the

17  other concept I wanted to touch on from Duro Dyne was,

18  "Mr. Fitzpatrick," this is you, bench order, "did not act at

19  the direction of the debtors, did not receive salary or

20  benefits.  His billing averaged $2,000 a month.  There was no

21  deal in place with the debtors and the ad hoc committee that he

22  engaged in substantial negotiations and worked toward

23  modifications of the existing and initial term sheet."  He

24  further testified that he would never accept an assignment in

25  which he was brought in at the last moment to rubber stamp.

44

1        What we have here -- so that's Fitzgerald [sic].

2   That's Duro Dyne.  That's a legitimate distressed bankruptcy.

3   Okay.  What we have here is the lawyer for J&J.  This isn't

4   even the debtor.  This isn't even the debtor.  This is

5   Mr. Murdica, J&J's lawyer, allegedly.  The debtor and J&J are

6   adverse, right, because the debtor has got to maximize the

7   estate.  But it's not the debtor.  It's Mr. Murdica.  And

8   Mr. Murdica drafts a declaration for her to sign.  He drafted

9   it.  He wrote it.  Or someone at his firm did.  He sends it to

10  Ms. Ellis and Ms. Ellis rubber stamps it.  And the only change

11  she has to that, that Mr. Maimon I think pointed out, was, well

12  I'm still the FCR.  I haven't been removed yet.

13       And so her only change was, I still am supposed to be

14  representing future victims in the first case so that change

15  needs to be made.  This is just so opposite of Duro Dyne and

16  it's so opposite of Imerys, right.  And one of the things that

17  you noted in the Duro Dyne opinion was the Congoleum decision,

18  2005, from the Third Circuit.  And that's a different issue.

19  That was an insurance counsel matter, right.

20       But the Third Circuit at Page 693, "As this case

21  demonstrates, leaving the procedures for allocation of

22  resources predominantly in the hands of private conflicting

23  interests has led to the problems of fair and equal resolution.

24  The need for counsel and undivided loyalties is more pressing

25  in cases of this nature," another prepack, "than in more

1  familiar conventional litigation."

2         So what Ms. Ellis has done in this case, touched by

3  Mr. Maimon, which I adopt all those arguments, disqualifies

4  her.  The question is, how is this going to look on appeal?

5  Because if she's appointed, we are going to appeal it.  How is

6  this going to look to future victims that you have their

7  representative rubber stamping a declaration that she supports

8  a second bankruptcy for J&J?  How's that going to look?  Right.

9  That's who she's allegedly representing.

10         And there's been some comments about bar complaints

11  and other stuff, about the representations.  About every other

12  day, Mr. Haas releases a press statement about how greedy some

13  of the minority of the plaintiff's firms are and we're acting

14  against our clients' best interests.

15         The term sheet, the term sheet that contains all of

16  these wonderful details about how great their plan is,

17  confidential.  So they could say all this stuff about how

18  greedy we are and how we're going against our clients'

19  interests, but the term sheet that has the actual money that

20  would be paid, that's confidential, we can't talk about that.

21         Okay.  We have the benefit of seeing how Ms. Ellis

22  operates as an FCR, so it doesn't matter what people said in

23  March of 2022.  Does not matter.  Completely irrelevant.  We've

24  seen how she behaves as the FCR.  This is an unlimited fund

25  case where the debtor told the Third Circuit, "We've got $61

1    billion floor," not ceiling.  "We got $61 billion of floor," so

2    there's no resolution that the FCR can ethically support for

3    less than $61 billion.

4            The whole point is to protect the rights of the

5    victims, and so I want to talk briefly about how the Supreme

6    Court and the Third Circuit talks about rights.  And in Imerys,

7    what the Third Circuit said was, at Page 375, "The Code does

8    not explicitly lay out FCR appointment standard."  Mr. Molton

9    will talk about this in detail, but they cite the statute,

10   524(g)(4)(B), "You need a legal representative to protect the

11   rights."  That's the word the statute uses, "rights," okay.

12           That's what her job is to do, is to protect rights.

13   Well, what are rights?  Rights are constitutional rights.

14   Rights are state law remedies.  All of these claims are state

15   law remedies.  Ms. Tolleson has a state law based claim against

16   J&J.  Minnesota was where she was exposed and New Jersey was

17   where all the decisions were made.  These are state law claims.

18   They have a right to pursue all state law remedies in state

19   court.  They have a right to due process.

20           This is Judge Fuentes at the hearing in this case at

21   Page 22 and 23.  "I assume that," he's referring to future

22   victims, "would protect people who were exposed down the road.

23   They," future victims, "would not be subject to bankruptcy, of

24   course.  They would be protected."  How the Third Circuit views

25   protection is full unfettered access to the tort system.

1          _Imerys_, "Effective advocacy and undivided loyalty.

2    This record reveals a complete absence of independence, a

3    complete absence of inability to effectively advocate for

4    future victims."  Skipping over a lot of stuff here because

5    Mr. Molton told me I needed to.

6          I go to _Ortiz_, right.  So _Ortiz_ is the class action.

7    I've cited this more times than you want to read me cite it,

8    right.  But it's a class action and it failed.  And what the

9    Supreme Court of the United States said was, "Fiberboard's

10   assets available for claimants."  Fiber Board listed its

11   supposed entire net worth as a component of the total and

12   allegedly inadequate assets available for claimants but

13   subsequently retained all but 500,000 of that equity for

14   itself.  On the face of it, the arrangement seems

15   irreconcilable with the justification of necessity in denying

16   any opportunity for withdrawal of class members whose jury

17   rights will be compromised," -- and this is the key part --

18   "whose damages will be capped, and whose payments will be

19   delayed."  The kinds of jury rights that exist in a legitimate

20   524(g) financially distressed company, TDP, are not the same as

21   what the Supreme Court is saying here.  Capped damages

22   unconstitutional.  And all of these victims, ovarian cancer and

23   mesothelioma, have state law rights to uncapped damages.  Those

24   are the rights that the Circuit cares about.  Those are the

25   rights the Supreme Court cares about.

1          And then, if we look to -- and, again, we don't have

2     to wonder about what Ms. Ellis is going to do as an FCR because

3     she's already done it.  She did it in the first case.  She came

4     out in July and said, with expedited existential appeals

5     pending, there is every incentive for the parties to move as

6     quickly as possible to seek compromise.  Future claimants do

7     not exist until plan confirmation.  So she's the one person,

8     the one party in interest in this case to where timing is not a

9     factor.  Why is she so eager to bind tens of thousands of

10    people to capped damages trampled upon jury access?  That

11    disqualifies her.

12         I tried to be helpful.  I objected to her fees and

13    expressed my opinion about why she shouldn't be getting fees

14    after the Third Circuit decision, and she never really

15    addressed through her counsel my arguments, but she did say

16    that her job, and this is her response, 3816 document dated

17    March 2nd, "The Walsh firm and their experts will continue to

18    represent the interests of future claimants as they in their

19    professional judgment deem necessary with the goal of

20    maximizing recovery either," either, "by way of future

21    litigation or settlement."

22         So what she's saying there, I think, is it's her job.

23    Her job.  One person is going to decide for tens of thousands

24    of people whether they're better off getting crammed down in

25    the bankruptcy and getting this term sheet that's confidential

but no one can talk about until it's public.  Whether that's

what's best for them or whether they should litigate in the

tort system.

She has zero power to do that.  That renders her

disqualified.  That statement alone renders her disqualified to

represent future victims in a case where the debtor has $61

billion.  She wants to bind people apparently to a resolution

where they get a third of 9 billion where the debtor says

they've got 61 billion minimum.

This view that Ms. Ellis has of how the bankruptcy

system is better is a view that Your Honor shares in your

opinion of February 2022.  And so I think in the declaration

that she filed more recently, where I think it was maybe in the

statements of the debtor, Ms. Ellis is taking the position that

bankruptcy is better, right.  And so the Third Circuit had that

before it.

The Third Circuit had this issue of what system is

better, the tort system or the bankruptcy system.  It was

before it.  And the Circuit wrote at Page 108.  Sorry.  Okay.

We take LTL at their word.  Okay.  This is, I'm sorry, Page 99.

"The bankruptcy court" talking about, Your Honor, "ultimately

saw the bankruptcy forum as having a superior ability compared

to trial courts to protect the claimants' interest, viewing

this as an unusual circumstance that precluded dismissal.  At

the same time, the bankruptcy court grappled with existing

50

Circuit case law.  It's the bankruptcy court, the court

believed, that presented a far more significant issue than

equitable limitations on bankruptcy filings, which judicial

system better served talc claimants, the state, federal court

trial system, or a trust vehicle established under Chapter 11."

Answering the question, it provided a full defense of

its strong conviction that "the bankruptcy court is the optimal

venue for redressing the harms of both present and future talc

claimants in this case."  So that's the Circuit quoting your

opinion and that's an opinion about what's better, the court

system of the bankruptcy, that Ms. Ellis shares, okay.

The Third Circuit rejected Ms. Ellis's view of the

world, okay.  What the Third Circuit said on Page 111 was,

"J&J's belief that this bankruptcy creates the best of all

possible worlds for it and the talc claimants is not enough, no

matter how sincerely held."  The Third Circuit did not say that

J&J was sincere.  What the Third Circuit said was, even

assuming they're sincere, it's not enough, "nor is the

bankruptcy court's commendable effort to resolve a more than

thorny problem.  These cannot displace the rule that resort to

Chapter 11 is appropriate only for entities facing financial

distress.  This safeguard ensures that claimants," my clients,

"pre-bankruptcy remedies, state law remedies, full tort access,

uncapped damages, punitive damages.  Here, the chance to prove

to a jury of their peers injuries, claimed to be caused by a

1  consumer product are disrupted only when necessary."

2          So the votes don't matter.  The number of people

3  allegedly supporting the plan don't matter.  This Court

4  respectfully does not have subject matter jurisdiction.  It

5  doesn't matter how many people approve a plan.  It doesn't

6  matter what Ms. Ellis thinks.  Her view of the world was

7  rejected.

8          And I'll end with this.  This is a, well, a claimant

9  can't do worse in a Chapter 11 than they can do in a

10 settlement.  So rather than accept a $9 billion settlement, the

11 claimants would be better off electing to liquidate the debtor,

12 liquidate the $30 billion.  That's the better option, rather

13 than have an FCR that's advocating for one-third of $9 billion.

14 Let's just liquidate 30 billion.  And, by the way, Ms. Ellis

15 was the FCR who signed on to a second bankruptcy and all

16 indications are she may or may not have been perfectly fine

17 with them giving away $30 billion, which is what the debtor

18 did.

19         This perversion of 524(g) by the debtor, they said in

20 their reply, "Objecting parties may pursue dismissal, but this

21 Chapter 11 case and the protection of the rights of future

22 claimants cannot be put on hold."  They're so eager to rush

23 forward and bind people that aren't sick yet, because that's

24 really what this is about, Judge.  They want to bind people

25 that aren't sick yet and they want to do it as soon as

1  possible, and the future claimants of all the people don't

2  exist.

3          And so I would urge you to not appoint Ms. Ellis.

4  But if you do, she can only represent claimants as to the

5  debtor.  She cannot represent claimants against J&J for J&J's

6  independent non-derivative tort liability.  That's <u>Combustion</u>

7  <u>Engineering</u>.  They said, Basic and Lummus, who probably had

8  about 50 bucks between the two of them, weren't entitled to a

9  channeling injunction because they didn't file for bankruptcy

10  and they didn't have a separate FCR.  So Ms. Ellis cannot

11  represent future victims against both J&J and LTL.

12          Thank you for your time.

13          THE COURT:  Thank you Mr. Thompson.

14          MR. MOLTON:  I thank Mr. Thompson for that short

15  presentation.  But thank you, Clay.

16          In any event, Judge, I've got a very short PowerPoint

17  I'm going to hand up to Your Honor and give to debtors'

18  counsel.

19          THE COURT:  Thank you.  Kiya, how are you doing?

20          COURT REPORTER:  I'm okay, Judge.

21          MR. MOLTON:  Judge, hopefully, I'm going to be not as

22  lengthy.  Hopefully more akin to Mr. Satterley, but we'll see.

23  There's been a lot said.

24          I view this as, again, I've mentioned it a number of

25  times.  David Molton, proposed counsel for the TCC, the Talc

53

1   Claimant's Committee, of Brown Rudnick.  And we're pleased to

2   be here as usual, Judge, presenting in front of you on

3   something that's very important.  I love seeing my picture on

4   the screen and I know Mr. Gordon loves putting out that yes, we

5   did, in accordance with Your Honor's note on the text order,

6   reach out to him to meet.

7          He told us that what he doesn't put on the screen,

8   Judge, is his response that it would be a waste of time.  And

9   why would it have been a waste of time?  Because they were, at

10  that point, colluding behind the scenes.  While they were

11  telling the Third Circuit that they needed to go file a cert

12  petition and they needed a stay, they were preparing a second

13  bankruptcy and preparing to incinerate the 2001 funding

14  agreement and replace it with something that I think Your Honor

15  remarked in your PI order decision may be -- and I think I got

16  attacked for it.  Indeed, they used the word libel, defamation.

17  The largest fraudulent transfer in the history of the United

18  States.  That's something we'll get to eventually.  But I'm

19  going to really want to put a point on that.

20         Number two, we've heard, and I know others have

21  talked about it, but I want to reiterate something.  The mantra

22  that has been beaten without evidence, without a record, said

23  here by Mr. Gordon earlier today that the objectors represent a

24  minority of the claimants, "minority of the claimants."  How do

25  we know that?  We don't, Your Honor.  There's no record for it.

1  Who are they?

2        I know we've had ad hoc committees of law firms, not

3  of claimants, of law firms and we haven't seen a 2019.  We

4  haven't seen the retainer agreements.  We haven't seen all of

5  that.  We'll get to that at some point if this case proceeds,

6  maybe sooner rather than later.  But that's just a

7  misrepresentation.  That's just advocacy, Your Honor, without a

8  record.

9        Number two, that these folks who are objecting are

10  motivated by self-interest.  What do they mean?  Well, they've

11  referred to it, I think they've talked about common benefit

12  funds.  I'm at this business long enough to know that's a straw

13  man.  Common benefit funds aren't mutually exclusive.  They're

14  often dealt with in a bankruptcy as they are outside of

15  bankruptcy.  I've lived since 2003 with bankruptcies and plans

16  that deal with common benefit funds.  Indeed, the opioid

17  benefit bankruptcies dealt with those as well.

18        But turn, talk about motivated by self-interest.

19  What the proponents of this fast track cram down second bad

20  faith bankruptcy don't say is that the law firms who purport to

21  represent the claimants that have not yet been disclosed or not

22  yet have agreed to anything stand to make 33 to 40 percent, 33

23  to 40 percent in attorney's fees.  And as Your Honor remarked,

24  where did these claims come from?  Where are they?  Who are

25  they?

1          We've seen claim proliferation in other bankruptcies,

2   Judge, and we do know and it has been put on the record here

3   before, and I think has been talked about during the

4   depositions, that many of these claims may not have diagnoses,

5   may not have medical records, may be empty files referred to

6   gynecological or cervical cancer, cancers which are not tied by

7   Daubert to causation with respect to Johnson and Johnson's

8   talc.  And, accordingly, I think it's fair to say that many of

9   these claims would not, could not be brought in the tort system

10  and would not be brought in the tort system by the law firms

11  that are offering them recently as claims in a bankruptcy.

12          I'm going to talk about financial interest.

13  Financial interest is dismissal of the first bankruptcy, as

14  well as dismissal of this bankruptcy, Your Honor, may be fatal

15  to those law firms.  I'm going to say it again.  Dismissal of

16  the prior bankruptcy.  There was a 30-day window, as Your Honor

17  knows, to file claims in the tort system, that was stopped by

18  Your Honor's TRO and then, PI order.  But dismissal of this

19  bankruptcy may be fatal to those law firms' investments.

20          So whenever you hear the mantra, realize the other

21  side.  Also, we heard from Mr. Gordon this morning, and I'm

22  sorry, I just have to respond to this before I get to my legal

23  presentation.  I'm going to quote him because I wrote it as he

24  said it, "that this purported plan support agreement and term

25  sheet are supported by a large majority of claimants in this

1  case."  "Supported by a large majority of claimants in this

2  case."  We know that's not true.

3         Indeed, when they're forced to admit it, they say,

4  well, we have law firms who have agreed to recommend to their

5  clients this settlement.  That may be accurate, but what we

6  heard today, which is an attempt to get out on the wires, get

7  out in the press, is absolute balder gash.  We have not yet

8  one, as I think some of my friends have said, not one piece of

9  evidence to show what Mr. Gordon said this morning.

10        I'm pleased, Your Honor, to represent the Tort

11 Claimant's Committee on behalf of all talc victims.  We did so

12 I thought ably, professionally, without vitriol in LTL 1, and

13 we're going to do so here.  But when we smell rot, as I said my

14 first day.  Remember, my first day here, something smells funny

15 in Denmark.  We're going to call it.  We're going to call it,

16 put it up here, offer it to Your Honor, and tell Your Honor

17 what we think we see, why we see it, and what we urge you to do

18 about it to protect, again, the integrity of the system that

19 you love, Your Honor, this bankruptcy court and this bankruptcy

20 system.

21        So that's my introduction.  I didn't expect to give

22 it, but I was kind of compelled to.

23        Can you go to Page 1?

24        The Third Circuit has set forth, as Your Honor knows,

25 the duties and eligibility criteria for the FCR.  You've heard,

1  Your Honor, Duro Dyne, and the facts of Duro Dyne, you asked

2  about.  I'm not going to deal with that.  Mr. Thompson dealt

3  with that.  But the standard that Your Honor, at that point,

4  applied in Duro Dyne, and did so pursuant to case law that

5  existed is no longer.

6          THE COURT:  Upheld on appeal by the district court.

7  But just go ahead.

8          MR. MOLTON:  Okay.

9                      (Laughter)

10         MR. MOLTON:  This is no longer the standard here.

11 Your Honor knows that.  Your Honor knows that.  So I'm not

12 going to argue Duro Dyne, but I'm going to talk about Imerys.

13 The FCR serves as a fiduciary to the future claimants.

14         Next, please.

15         We looked at 524(g).  This FCR, Ms. Ellis, must be

16 more than merely disinterested.  She must be independent and

17 instead must be able to fulfill the heightened duties owed by

18 fiduciaries.  That's the law of our land here deep in New

19 Jersey.

20         Next page, please.

21         The Third Circuit requires independence and undivided

22 loyalty.  Your Honor, an FCR is not a guardian ad litem.  And

23 Footnote 9 of Imerys makes clear, guardian ad litems [sic] can

24 bind their charges who are usually incompetent for some reason.

25 Here they don't bind and the Third Circuit made clear.  But

58

1  they must be able to act in accordance with the duty of

2  independence from the debtor and other parties in interest, a

3  duty of undivided loyalty to the future claimants, and an

4  ability to advocate for the best interest of future claimants,

5  not follow along what the debtor wants, not receive

6  declarations written by J&J's counsel.

7          One of the things I will add, and I'm not going to

8  deal with the facts, but all the email chain we saw that was

9  produced last night, late, last night, late, what's

10 conspicuously absent from it?  Mr. Gordon, Mr. Prieto,

11 Mr. Falanga only came in later.  We don't even see FCR's

12 counsel until later on.  We see one-on-one between Mr. Murdica

13 and Ms. Ellis and Mr. Murdica's colleague.

14         Again, _Imerys_, I think I went through the guardian ad

15 litem, but we adopt merely a standard akin to those employed to

16 guardian ad litems [sic] in other contexts.  What is the

17 standard of a guardian ad litem in other contexts in New

18 Jersey?

19         Can we go to the next blurb?

20         New Jersey courts have an exacting standard, Your

21 Honor.  Guardian ad litem must come to a role as a true

22 independent without a preconceived strategy or opinion.  Now,

23 when Ms. Ellis was negotiating with Mr. Murdica, she was not

24 yet the FCR in Number 2, but she was in Number 1, and that

25 presents other problems that I think that Mr. Maimon went into

1   and Mr. Satterley went into.  She wasn't a outsider for the

2   purpose of the next petition.

3          "Guardian ad litems [sic]," <u>Matter of Jobes</u>, New

4   Jersey Superior Court (1986), we put the blurb there, "who come

5   to this formidable task with a commitment to achieve a

6   particular result are not fulfilling the solemn fiduciary duty

7   of protecting their charges."  Guardian ad litems [sic] are

8   more akin to independent investigators who must objectively

9   evaluate the best interests of their constituents.  They act as

10  the eyes -- Next, please. -- the eyes of the court to further

11  the best interests of the alleged incompetent."

12         "Why a guardian ad litem is an independent fact

13  finder," and I'm citing <u>Bacon v. Mandell</u>, "and an investigator

14  for the court who objectively evaluates the best interests of

15  the alleged incompetent."  What really is the default?

16         Next page.

17         The appearance of impropriety.  The same standard

18  that applies in other contexts.  A guardian ad litem will not

19  be independent if there is an appearance of impropriety.

20  <u>Citibank Farmers Co. v. COPs</u>.  "It's the guardian ad litem's

21  duty to attack and question everything he honestly believes

22  requires explanation."  I don't know if we saw any of that with

23  respect to even the declaration written by Mr. Murdica that

24  Ms. Ellis reviewed and eventually did not sign.  I'll get to

25  that in a minute.  But we didn't see any of that.

60

1          What do you mean by this?  What do you mean by that?

2   What do you mean?  We saw none of that.  And, again --

3   Next slide, please. -- <u>Molinar v. Molinar</u>.  The foregoing

4   circumstances in that case, I won't get into, an irregularity

5   which could cause a reasonable person to perceive an appearance

6   of impropriety.

7          Last, <u>Matter of Muricswell</u> (phonetic).  We must be

8   scrupulously careful that we avoid the appearance of any

9   impropriety.  That's New Jersey law regarding guardian ad

10  litems [sic].

11          Accordingly, Your Honor -- First bullet, please. --

12  the FCR in this case can only be appointed under the heightened

13  standard akin to a guardian ad litem and must, number two,

14  you've seen facts in the other presentations.  At a minimum, at

15  a minimum, there is an appearance, an appearance, of

16  impropriety.

17          Just give me a second, Your Honor.

18          Debtors' submissions to this Court, which Mr. Maimon

19  went through and Mr. Satterley went through, shows that at

20  least provides an appearance of impropriety and shows a lack of

21  independence, a preconceived disposition.  Your Honor, the

22  proposed declaration, draft declaration that Ms. Ellis was

23  given, for one, I mentioned, where was the investigation?

24  Where were the questions?

25          "Due to long latency periods," Paragraph 6, "for

1  mesothelioma and ovarian cancer, renewed litigation of talc

2  claims in the tort system would pose a serious risk that debtor

3  later would be unable to pay future claimants at the same level

4  as current claimants."  What?  With a $61 billion funding

5  agreement that had not yet been set afire to?  That was written

6  by Mr. Murdica, by Johnson and Johnson, and wasn't questioned

7  by Ms. Ellis.

8           Debtors' submissions to this Court show, Your Honor,

9  and their representations that Ms. Ellis was supportive of a

10  second bankruptcy filing, while the FCR was already in the

11  dismissed case.  That was a commitment we argue, and I'll get

12  to that, that impacted her former and punitive future

13  constituencies.  The Matter of Jobes, again.  If you're coming

14  into a new position, you have to come into that new position

15  without a preconceived notion and a preconceived map and a

16  preconceived outline of where you're going?

17           There was a requirement to mediate under the

18  mediation order, or there was a mediation order, but in no way

19  did that mediation order call for somebody whose constituency

20  was about to gain back their jury trial rights when their

21  illnesses became manifest against a solvent debtor, a solvent

22  non-debtor.  But for the benefit of J&J and LTL and an LTL 2

23  bankruptcy and with $30 billion of less assets, again, I

24  mentioned earlier, the court in the PI ruling said, as I said,

25  this might be the largest fraudulent transfer in the history of

62

1  the United States.

2          Go to the next page.  Bring it back to present

3  matters.

4          At a minimum, Your Honor, and I'll get there as well,

5  Ms. Ellis has agreed to support the filing of the bankruptcy

6  case.  The documents that Mr. Maimon went through from late

7  March clearly show that notwithstanding that she did not sign

8  that declaration.  J&J's intention in LTL 2, as it was in

9  LTL 1, is to channel future independent non-derivative claims

10 against non-debtor J&J into a trust.  This, too, is beyond the

11 scope of what this circuit finds permissible.

12          I'm going to read to you from Combustion Engineering,

13 Your Honor, when that happened.  "The interests of the future

14 Basic and Lummus asbestos claimants are not necessarily aligned

15 with those of future Combustion Engineering asbestos claimants.

16 The future asbestos claimants of non-debtors," I'm reading from

17 the Third Circuit, "might prefer to have recourse against

18 solvent entities rather than being limited to a proceeding

19 against the asbestos PI trust, a limited fund subject to

20 depletion, by current and future debtor, Combustion

21 Engineering, claimants."

22          In any event, none of this seems to be taken into

23 consideration during these negotiations.

24          Next page.

25          I'm citing Combustion Engineering again.  I'm not

63

1  going to read it again, Your Honor.  But what didn't we see?

2  The desire of future claimants might against non-debtors and

3  debtors, taking the benefit of the Third Circuit's dismissal of

4  this case, want to go into the tort system and file their

5  claims and prosecute their claims against solvent non-debtors

6  and a debtor that had the benefit of a $61 billion funding

7  agreement.

8          Next slide.

9          FCR must be independent and willing to approach anew

10 in order to satisfy the Third Circuit under these

11 circumstances.  Reading from the Third Circuit's case here from

12 January, "But given the Chapter 11's ability to redefine

13 fundamental rights of third parties, only those facing

14 financial distress can call in bankruptcy tools to do so."

15 Applied here while LTL substantial future talc liability, its

16 funding backstop plainly mitigates against any financial

17 distress foreseen on its petition date."

18          Again, it stands in marked contrast to what was in

19 the proposed declaration as we see it, but there was no

20 discussion or negotiation or questioning or examination of

21 those provisions.  Again, LTL Management, from January, we take

22 J&J and LTL at their word.  LTL is a funding backstop, not

23 unlike an atm designed as a contract, which, again, they put

24 afire to because J&J remains its ultimate safeguard.  Juxtapose

25 that with what we see in the proposed declaration.

64

1          Lastly, I know Mr. Thompson talked about it, the

2     public policy or the arguments as to bankruptcy or non-

3     bankruptcy, the Circuit says, "These cannot display the rule

4     that resort to Chapter 11 is appropriate only for entities

5     facing financial distress.  This safeguard ensures that

6     claimant's pre-bankruptcy remedies here, the chance to prove to

7     a jury of their peers injuries claimed to be caused by a

8     consumer product are disrupted only when necessary."

9          Again, everything on this page are issues that an FCR

10    when asked about participating in a second bankruptcy after the

11    first one was dismissed, you would expect to show independence

12    to, awareness of, and deal with.  At a minimum, Judge, we

13    believe that everything you've heard today raises serious

14    concerns about independence and neutrality.  Simply put, this

15    record that you've seen today does not dispense with, but

16    actually raises issues of about an appearance of impropriety.

17         One of the things that I think is important was

18    recited by others is this declaration was not drafted by

19    Mr. Falanga and his office, was not drafted by Ms. Ellis.  It

20    was drafted by Mr. Murdica's office, given to her.  That's a

21    serious issue we believe under these circumstance.  Mr. Maimon

22    pointed out issues and conflicts regarding other issues and

23    substantial provisions, but I want to get to something that I

24    think in and of itself ends the matter here.

25         Paragraph 7 of Ms. Ellis's declaration to you, Your

1   Honor, to this Court, Friday, and I'm going to quote, "At no

2   time did I commit or express to either support or reject any

3   proposals that were presented to me by the court appointed

4   expert mediators and debtor, or the TCC."  I think one of the

5   prior presenters mentioned that this was very carefully

6   wordsmithed.  J&J doesn't appear in here.  It doesn't appear in

7   here.  And that's who she was dealing with.

8         But I think it's fair to say, Judge, if you look at

9   the email correspondence that Mr. Maimon showed, especially the

10  one of the declaration where the response was, not, I object to

11  this, tell me what this means, let me talk to you about this

12  issue, let me discuss the second bankruptcy and how it affects

13  my potential future constituents and my present constituents

14  who at this point are getting ready to return or will have an

15  opportunity when their injury, god forbid, manifests to return

16  to the tort system.  None of that.

17        All we have, Judge, is a paragraph, "I served as the

18  FCR."  "Served."  Not, "I am serving."  And the response from

19  Ms. Ellis quote, "I am still serving, so hard to sign 'as is.'"

20        Thoughts.  To me, Judge, one of the things I learned

21  when I was a prosecutor is that my former boss used to tell me

22  that the presumption of innocence is a rule of evidence, not a

23  rule of common sense.  And when juries go decide factual

24  questions, they're asked to apply common sense as well.  And

25  here, we're doing it, too.  Common sense as to what happened,

1  including this statement that challenges only the "served" as

2  opposed to "I am serving" along with a verified complaint

3  talking about Ms. Ellis's approval of a second bankruptcy,

4  along with the board representations made by Mr. Prieto,

5  talking about Ms. Ellis's agreement, or her inclination to

6  approve a second bankruptcy.

7          Judge, I think that at a minimum, creates

8  irreconcilable conflict between this declaration submitted to

9  you and Paragraph 7 and the record you have in front of it.

10 I'm not here to judge.  I'm not here to decide.  I'm not here

11 to say anything other than what we have here is an appearance,

12 an appearance of impropriety.

13         Again, Your Honor, to protect this institution, to

14 protect this case, however long it exists, and to protect these

15 proceedings, we believe, Your Honor, that this is a ill-made

16 motion, not based on a year ago, which was a very different

17 circumstance.  And I celebrated Ms. Ellis's appointment as FCR,

18 as the first woman FCR, as Your Honor well knows.  But we've

19 got a different record and we have different circumstances and

20 we have different documents and different evidence, and we have

21 to deal with what's in front of us now.  And this motion cannot

22 and should not be granted, Your Honor.

23         What Your Honor should do, which I applauded you for

24 last year, if Your Honor remembers, from this very rostrum, is

25 do a process that will allow proper vetting and limited

67

1  discovery of various candidates.  And should this case proceed,

2  and I know Mr. Satterley talked about there's a motion to

3  dismiss pending, Judge, there's seven.  I'm raising my hand.

4  Seven.

5           And Your Honor, we'll see some pleadings from the TCC

6  soon.  We're going to be asking Your Honor to stand down on

7  plan and other case issues with some carve outs pending a

8  motion to dismiss.  It should be no surprise that that's what

9  we're going to be asking Your Honor to do.  Probably this week

10 you'll see that.

11          But in any event, should this case go forward and

12 Your Honor require an FCR, we believe very strongly for the

13 benefit of all the talc victims that there be a due process, a

14 fair process, Your Honor has the template for it, let's get on

15 with that if that's what Your Honor wants to do.

16          Thank you.

17          THE COURT:  Thank you, Mr. Molton.

18          I do see, before I turn to you as Trustee,

19 Mr. Ruckdeschel, do you wish to be heard, remotely?

20          MR. RUCKDESCHEL:  John Ruckdeschel on behalf of Paul

21 Crouch.  Can you hear me okay?

22          THE COURT:  Yes, I can.

23          MR. RUCKDESCHEL:  All right.  Thank you, Your Honor.

24 And I appreciate the courtesy of being allowed to appear by

25 Zoom.  Once again, thank you very much.

1          I'll be very quick.  I know most people have said

2  that and weren't, but I will.  I want to start Slide 22 of

3  Mr. Gordon's presentation referenced something that I put in

4  Mr. Crouch's pleading about the limitations on the role of an

5  FCR absent demonstration of an actual limited fund.  And the

6  accusation, I believe on the slide was that this position was

7  contradictory to the contention that the future's claims

8  representative, whoever it may be, must be independent.  And

9  that's simply not true.

10          The duty of the futures claims representative is

11  circumscribed by the rulings of the Third Circuit in Combustion

12  Engineering and in LTL that the tort law rights of claimants

13  can only be disrupted when necessary.  And they have defined

14  "when necessary," and that's when there's an actual limited

15  fund and actual financial distress.  That hasn't been

16  demonstrated with respect to LTL, and it cannot be demonstrated

17  with respect to non-debtor J&J or any of the retailers.  No

18  attempt has been made.

19          So the position that an FCR, if appointed now, would

20  have to be appointed for the limited role of protecting tort

21  law rights of the future's claimants is not at all in conflict

22  with the independence of the FCR.  It's requiring the FCR to

23  abide by the Third Circuit.

24          And that takes me to my next point, which is, there's

25  no dispute.  There is no dispute in this case that there were

69

1  discussions between counsel for Johnson and Johnson and

2  Ms. Ellis during the pendency of LTL 1 after the dismissal when

3  Ms. Ellis voiced her support for the filing of a second

4  bankruptcy.  There's no dispute that that happened.  There's no

5  dispute that she agreed.  It was presented to the board.  It's

6  in the complaints.  It's in the emails.  The only caveat to the

7  draft agreement that Ms. Ellis ever expressed, as Mr. Molton

8  just pointed out, was that they had written her status as FCR

9  in the past tense when she was still serving.

10        She never said, but I don't agree with the other

11  stuff in it.  And that's what was presented to the board.

12  That's what's been presented to this Court.  The FCR of LTL 1

13  supports the filing of LTL 2.  There are only two

14  possibilities.  Either, either Ms. Ellis was not aware of the

15  scheme that was being concocted to cancel the first financing

16  agreement, replace it with the limited and conditional

17  financing agreement, and come back in.  If she's not aware of

18  that happening, Judge, then her support of LTL 2, right, is in

19  direct violation of the Third Circuit's ruling in LTL 1 that

20  you can't get there from here.

21        So that's one possibility.  She didn't know, which is

22  sort of the implication in her declaration, though it's not

23  exactly clear.  Or, she knew they were going to cancel the

24  first funding agreement and replace it with the new limited

25  conditional funding agreement, but with (indiscernible) as the

1  pending FCR, she had an obligation to tell the United States

2  Trustee and to tell Your Honor, and she didn't.

3        Either way, there is a gross appearance of

4  impropriety here.  Either she supported the refiling of LTL 2

5  in direct violation of the specific ruling of the Third Circuit

6  that all of the concerns about the inefficiencies of the tort

7  system weren't enough, or she knew they were going to cancel

8  the funding agreement and she didn't say anything.

9        I don't know.  We can't tell from these very

10  carefully scripted declarations how things play out there.  But

11  there is certainly an appearance of impropriety.  And I'll end

12  with the last thought that I have here, Judge, which is there

13  was a comment towards the end of Mr. Gordon's presentation

14  about there's this urgency, and we've got this deadline in the

15  plan support agreements to get a plan submitted by May 14th or

16  whenever that date is, right.

17        Well, when you kill your parents, you can't complain

18  that you're an orphan.  When you light your house on fire, you

19  can't complain that the fire department's not getting there

20  fast enough.  And that's what they did.  They tore up the first

21  funding agreement.  They replaced it with the new scheme to

22  manufacture financial distress.  They agreed to a deadline

23  that's binding in the PSAs, and I'll come back to that in just

24  one second.  And now they say, but you've got to fast, Judge.

25        Well, that's on them.  They set their house on fire,

1  and that's on them.  You are not under any obligation to abide

2  by the deadlines that LTL has manufactured and put before the

3  Court.

4          And that leaves me with my final point, which is

5  something Mr. Maimon touched on, and I just want to give you a

6  little bit of the law, right.  New Jersey follows the objective

7  law of contract like all states, right.  And you can look at

8  Cohn vs. Fisher, 118 N.J. Super. 286; Collins vs. Mary Kay,

9  874 F.3d 176; Leitner v. Braen, 51 N.J. Super. 31; or Looman

10  Realty vs. Broad Street Bank, 74 N.J. Super. 71.

11          The Court, Your Honor, is required to interpret the

12  contract documents before you under the objective law of

13  contract.  What does it say?  Not what does it say, and then,

14  we're going to tell you it doesn't really mean that.  And the

15  debtor constantly is asking the Court to do just that, right.

16  So funding agreement one says unconditionally inside and

17  outside of bankruptcy, it applies.  Now, oh, we had the secret

18  caveat that the purpose would be frustrated and so you really

19  should let us out even though it says what it says, and you're

20  required under North Carolina law to interpret it that way.

21          Well, now we have the same with the PSAs.  On the one

22  hand, the debtor wants Your Honor to believe the PSAs, this is

23  binding support.  We definitely have unequivocal commitments of

24  all of these lawyers and all of their tens of thousands of

25  clients to support this new scheme, right.

72

1           On the other hand, because there are significant

2    ethical obligations to that that would make it ethically

3    improper, Mr. Kim then testifies, oh, well, we're not going to

4    enforce it if anybody backs out.  And they want the Court to

5    understand that the funding limitation of 8.9 is a hard

6    condition.  But that the appointment of the claims

7    administrator, Ms. Ellis, was just a placeholder.

8           Well, that's not how the law of contract works.  And

9    they want it to be binding on the one hand, and they want it to

10   be not binding in just sort of an idea on the other.  Well,

11   that's not how it works.  It's governed by New Jersey law on

12   its face.  There's a selection clause.  It has an integration

13   agreement.  And Cohen vs. Fisher said it perfectly.  They said,

14   "Under the objective theory of mutual ascent followed in all

15   jurisdictions, a contracting party is bound by the apparent

16   intention he outwardly manifests to the other contracting

17   party.  To the extent that his real secret intention differs

18   therefrom, it is entirely immaterial."

19          So you can't have it both ways.  Either the PSAs are

20   garbage.  They mean nothing and they're not enforceable and

21   they're just this place mat that we're wiping up spilled coffee

22   with.  Or, they mean what they say and they're binding, right.

23   Now, if they're binding, then the appearance of impropriety

24   here is overwhelming, right.  And Your Honor has to go with

25   what the contract says.  The contract says it's governed by New

1 Jersey law.  It's got a complete agreement in it and all of the

2 terms in the term sheet have to be followed.  And the term

3 sheet says what it says.  And now, what you are getting is this

4 selective picking and choosing of clauses, this flip flopping

5 on whether it's binding, whether it's not, whether it means

6 something, whether it doesn't, and these are the biggest

7 corporations in the world, Judge, with the biggest --

8           THE COURT:  All right.  Thank you, Mr. Ruckdeschel.

9           MR. RUCKDESCHEL:  -- law firms representing them.

10 This is improper.  There's no hurry.  The motion should be

11 denied.

12           THE COURT:  Thank you, Counsel.

13           The office of the U.S. Trustee.

14           All right.  We're going to take -- I'm sorry,

15 Mr. Sponder.  We're going to take a five minute break.

16           Thank you.

17      (Recess at 12:05 p.m./Reconvene at 12:12 p.m.)

18           THE COURT:  All right.

19           Actually, Mr. Sponder, before you begin, let's just

20 outline what the rest of our day is going to look like.  It

21 seems like I always have to do this with you all.

22           I assume after Mr. Sponder speaks, Mr. Gordon,

23 assuming, we'll call it this side, is done with their

24 presentations, Mr. Gordon, you're going to respond.

25           MR. GORDON:  I am, Your Honor.

74

1          THE COURT:  The question becomes, and then after the

2    motion relative to Ms. Ellis is completed, the arguments, we

3    have other matters on the agenda.  Unless you tell me we can

4    resolve those, and I probably won't believe you, in 45 minutes

5    or an hour, I think we would break for a half hour lunch.  Make

6    sense?

7          MR. GORDON:  That makes sense to us, Your Honor.

8          UNIDENTIFIED SPEAKER:  With us as well, Your Honor.

9          THE COURT:  So you're telling me it's not going to be

10   45 minutes or an hour.

11         MR. SATTERLEY:  If they agree to my Valadez motion,

12   that will solve everything.

13         THE COURT:  Sit down.

14                          (Laughter)

15         THE COURT:  All right.

16         MR. SATTERLEY:  Trying to have a early lunch.

17         THE COURT:  Mr. Sponder.

18         MR. SPONDER:  Thank you, Your Honor.  Good afternoon.

19   Jeff Sponder, together with Lauren Bielskie and Linda

20   Richenderfer, on behalf of the United States Trustee.

21         Your Honor, at the outset, debtors' counsel made a

22   few statements that need to be clarified.  First, debtors'

23   counsel advised that all parties, including all in the

24   courtroom, approved Ms. Ellis as the FCR.  I'm not sure who

25   parties is referenced, but the United States Trustee did not

1  take part in that.  We remain neutral and didn't take a

2  position.

3        Second, Your Honor, debtors' counsel stated that in

4  LTL 1, no one disputed the standards for appointment of the FCR

5  and Mr. Gordon read the standards from <u>Imerys</u>.  But the <u>Imerys</u>

6  standard was not in effect at the time Ms. Ellis was appointed.

7  The disinterested standard, of course, was in effect at that

8  time.

9        Your Honor, just as the Court determined it would not

10  automatically reappoint the same mediators from the first case

11  and asked for new recommendations, so too, should the Court

12  take a fresh look at candidates for FCR.  As such, the U.S.

13  Trustee does not object to the debtors' general request for the

14  appointment of an FCR.

15        As Your Honor is aware, the standard for appointment

16  of an FCR was recently articulated by the Third Circuit in the

17  <u>Imerys</u> case, which has been described several times already so

18  I won't go into that.  I will quote, though, a few spots from

19  <u>Imerys</u> where the Third Circuit said, and I quote, that

20  "variations in the appointment process are otherwise within the

21  discretion of the bankruptcy court."

22        The Third Circuit also offered this instruction and I

23  quote, "Implicit in the FCR appointment standard is one

24  procedural requirement, that whatever process the bankruptcy

25  court follows ensures that the court has the information

1  necessary to assess the candidate's qualifications."  This

2  fiduciary standard, which as you heard and know, is akin to the

3  guardian ad litem standard, was not the standard when Ms. Ellis

4  was appointed.  It is the standard now.

5        Here, Your Honor, similar to the first bankruptcy

6  case, the debtor presents its chosen candidate and asks this

7  Court to appoint its chosen candidate, Ms. Ellis.  However,

8  Your Honor, in the first case, the debtor withdrew its motion

9  to appoint its chosen candidate as FCR at Your Honor's

10  direction.  In the first case, Your Honor entered a case

11  management order and expressed concerns regarding anticipated

12  costs, delays, and resources associated with litigation over

13  the nomination and appointment of an FCR, which led to Your

14  Honor instituting a process to select the FCR.

15        That process included the submission of candidates by

16  the parties and the Court, allowed the striking of candidates,

17  and allowed limited discovery, which would conclude no later

18  than 14 days following the conclusion of the hearing on the

19  motions to dismiss filed in the first bankruptcy case.  As

20  such, Your Honor, the FCR was not selected in the first case

21  until after the motions to dismiss were heard and Your Honor

22  rendered your decision.  The Court should again institute a

23  process similar to the first case in order to produce a

24  candidate for FCR.

25        Your Honor, aside from the procedure to appoint an

1  FCR, the motion should be denied as there exist unanswered

2  questions about Ms. Ellis's independence and loyalty to future

3  claimants, which Your Honor has already heard over and over

4  from this side so I will not go into it much.  One of the

5  issues here is Ms. Ellis's involvement in the plan to file the

6  second case while still in bankruptcy during the first case.

7          Also, Your Honor, and one thing I think that should

8  be noted is that, if Your Honor peruses the motion for the FCR

9  and the original Ellis declaration, there's no mention of any

10  information about any conversations, negotiations, discussions

11  at all with Ms. Ellis.  That was left out and only found out

12  during the depositions for the preliminary injunction.

13          Your Honor, as the process to appoint an FCR must

14  ensure that the court has the information necessary to assess

15  the candidate's qualifications, at the very least, more

16  information is required to determine whether Ms. Ellis meets

17  the fiduciary standards set by the Third Circuit.  With that

18  said, Your Honor, the U.S. Trustee believes that a similar

19  process used in the first bankruptcy case should be enlisted

20  again.  If the same process is used in this case, and to the

21  extent Ms. Ellis is selected as a candidate by one of the

22  parties or Your Honor, and survives being stricken, discovery

23  should be allowed concerning whether she would meet the Third

24  Circuit standard.

25          Your Honor, I also want to note that during debtors'

1  counsel's presentation today, the United States Trustee's

2  objection as to process seems to have been ignored as process

3  was not discussed at all or a reason to not have that process.

4          So with that, Your Honor, that is the United States

5  Trustee's position, and I thank Your Honor for the time.

6          THE COURT:  Thank you, Mr. Sponder.  I do take your

7  argument to mean that the U.S. Trustee is not seeking

8  additional discovery as part of this motion.

9          MR. SPONDER:  Correct, Your Honor.  The United States

10  Trustee's position is that there should be a process for the

11  appointment of the FCR, that the debtor should not choose the

12  FCR, and similar to what we did in the first case.  If

13  Ms. Ellis is chosen as one of the candidates, if Your Honor was

14  to do that process, then at that time, there could be some

15  discovery, if necessary.

16          THE COURT:  All right.  Thank you.

17          MR. SPONDER:  Thank you, Your Honor.

18          THE COURT:  Mr. Gordon.

19          Oh, I'm sorry.  Mr. Falanga

20          MS. WALSH:  Mr. Falanga is missing the party.  He is

21  in --

22          THE COURT:  Oh, I'm sorry.

23          MS. WALSH:  -- Ms. Walsh, my name is Liza Walsh.  I'd

24  like to say a few words on behalf of Randy Ellis with the --

25          THE COURT:  Yes.

79

1          MS. WALSH:  -- Court's permission.  Granted, it's not

2     our motion, but I do want to make a couple of statements.

3          First.  Mr. Falanga apologizes.  He's in Utah in

4     depositions and I'm sure he's --

5          THE COURT:  He shouldn't apologize for that.

6          MS. WALSH:  -- very disappointed.  I'm sure he's

7     disappointed he's missing all of the fun today.

8          First of all, we want to thank you for the

9     opportunity allowing us to say a few words on behalf of

10    Ms. Ellis, who, undoubtedly after all of the presentation this

11    morning, she's without a doubt feeling all of the love in the

12    room.  So thank you all for your comments.

13         I have had a front row seat since her appointment to

14    Ms. Ellis and she is -- you know, I'm not a young lawyer any

15    more and I've seen a lot, but what I can tell you, Ms. Ellis is

16    honorable, she's ethical, an independent woman, and I'm going

17    to stress that, an independent woman.  I'm sorry, is it --

18         MR. MAIMON:  I rise to object, with all due respect,

19    Your Honor.  But counsel vouching for somebody is not only

20    improper, but it's prejudicial to our rights.

21         THE COURT:  It's argument.  Overruled.

22         MR. MAIMON:  But she has no standing to argue, Your

23    Honor.

24         THE COURT:  That's fine.  Overruled.

25         Continue, please.

1          MS. WALSH:  Since the inception of her appointment,

2    both sides have worked very, very hard to convince Ms. Ellis

3    that their position, no matter what the issue was, their

4    position was the right one.  And, frankly, I could tell you

5    that most of the times it appeared as if it was the dueling in

6    the wild, wild west.  Or what do they call it?  A wild, wild

7    west dueling for her support and for her affection.

8          But no matter how difficult it was, Ms. Ellis, at all

9    times, stood her ground because the only constituents and the

10   only loyalty she ever thought about was the future claims

11   representatives because at all times she recognized that she

12   was a creature of this Court's appointment and that is the only

13   loyalty she had to this Court and to the future claimants.

14         What you're hearing today and what you've heard in

15   some of the papers that have been submitted to you in the last

16   several months and also some of the objections to the fee

17   applications is nothing more than a disappointment in

18   Ms. Ellis's independence, plain and simple.  Because if

19   Ms. Ellis had agreed with one side or the other, you would not

20   see and not hear those complaints.  And I wish this wouldn't

21   start blanking out on me.

22         We're not here to advocate for her appointment

23   because, obviously, it's not our motion.  However, we do

24   believe that her record up to this point, her declaration, the

25   detailed declaration we've submitted, speak for themselves and

1 would warrant such an appointment.  She worked very, very hard

2 to get herself up to speed under very, very difficult

3 conditions where there wasn't as much cooperation as one would

4 hope to get an FCR up to speed and enable them to get the

5 experts that she needed in order to get up to speed to

6 participate in the mediation, the estimation, and all of the

7 other proceedings in this Court.  But she did it anyway.

8         What I would like to express on her behalf is that

9 her disappointment, her absolute disappointment in the reckless

10 and malicious attacks, character attacks, simply because of her

11 independence, whether she gets appointed or somebody else does,

12 or another FCR in another proceeding around the country, those

13 attacks should not be used -- or those tactics should not be

14 used to control an FCR because, as the Third Circuit said, they

15 have to be independent.

16         Intimidation through subpoenas, news articles,

17 baseless public filings, and overall bullying, absolute

18 bullying tactics should have no place in these types of

19 proceedings -- or anywhere else, but certainly not in an

20 equitable court.

21         After Ms. Ellis submitted her affidavit to Your

22 Honor, certain plaintiffs served discovery requests on three

23 days' notice.  We worked diligently over the weekend -- we

24 affirmed accepted service, we worked diligently over the

25 weekend to respond as quickly as possible.  Three days' notice.

1  We spent the weekend searching for documents to respond and

2  submitted -- and responded last night.

3        So the accusations that somehow we did not provide

4  what they needed is not accurate.

5        The other point we'd like to make is, no matter how

6  many PowerPoints, how many arguments, how many people stand up

7  here to make those arguments, one thing is not -- two things

8  are not going to change, they're never going to change because

9  they're undisputed:  Ms. Ellis never asked or agreed to be a

10 claims administrator.  Plain and simple, that is the end of the

11 story.  What the debtor may have wanted or may have wished or

12 may have planned she certainly had no knowledge of, but it is

13 undisputed that she never asked or agreed.

14       What's also undisputed is that Ms. Ellis did not sign

15 the declaration that was given to her, whether you want to say

16 it was given to her by the debtor or it was given to her by

17 Johnson & Johnson or it was given to her by whoever you -- a

18 representative of Johnson & Johnson, it doesn't matter, Ms.

19 Ellis did not sign that declaration supporting a second filing,

20 plain and simple.  And all the arguments that were made today

21 were made based upon the assumption that in fact it was signed,

22 but it is undisputed that that document was not signed.

23       Mr. Moulton made an argument regarding paragraph 7 of

24 her declaration, the affidavit she submitted to Your Honor,

25 which says "at no time did I commit or express to either

1  support or reject any proposals that were presented to me by

2  the court-appointed expert, mediators, the debtor, or the TCC."

3          And it criticizes that we did not include Johnson &

4  Johnson.  Well, we will be submitting a supplemental

5  declaration that will include Johnson & Johnson.

6          There was no intentional exclusion of Johnson &

7  Johnson in that declaration.

8          The last point we would like to make, Your Honor, is

9  that we can assure Your Honor and we can assure everybody in

10 this room, and those who are participating by Zoom or on the

11 telephone, Ms. Ellis will not be coerced to agree with any

12 party, whether it be the TCC or the debtor or Johnson & Johnson

13 or anybody else, to agree with the position without educating

14 herself, consulting with the experts, consulting with her

15 lawyers, plain and simple.  That is what she has done from day

16 one and that's what she's going to continue to do if she's

17 fortunate enough or maybe crazy enough to want to do this

18 again.

19         Lastly, again, I'm going to stress that this was a

20 historical appointment and her character, her character, her

21 reputation are at stake and, zealous advocacy is one thing, but

22 the intentional attacks camouflaged as arguments should not be

23 accepted.

24         Again, thank you for Your Honor and, most

25 importantly, on behalf of Ms. Ellis, I would like to thank you

84

1  for the confidence you placed in her during the first

2  bankruptcy proceeding.

3            THE COURT:  Thank you, Ms. Walsh.

4            MR. SATTERLEY:  Your Honor, can I make one point,

5  just one minute, just one minute on that.

6            THE COURT:  Very briefly.

7            MR. SATTERLEY:  I was the one that served the

8  subpoena.  They couldn't have worked all weekend because I

9  served it at 5:25 on Sunday evening.  So the representation

10 they worked all weekend to produce the 17 documents last night

11 couldn't have been all weekend.

12           So I just want to correct the record.  I have a copy

13 of the subpoena.  And I certainly don't bully anybody.

14           MS. WALSH:  We did --

15           THE COURT:  This is not going to be dispositive of my

16 decision --

17                          (Laughter)

18           MR. SATTERLEY:  But I wanted to correct the record.

19           THE COURT:  -- the time frame.  I respect everybody

20 is professionals here.

21           MS. WALSH:  We did receive from Mr. Thompson an

22 earlier communique or love note, as we'd like to call it.

23 Thank you.

24           THE COURT:  All right.  Thank you.

25           Counsel?

85

1          MR. HANSEN:  Good afternoon, Your Honor, Kris Hansen

2  of Paul Hastings on behalf of the Ad Hoc Committee of

3  Supporting Counsel.  I wanted to just take a moment to

4  introduce myself, Your Honor, as well as my co-counsel, and

5  make a few remarks, if that would be okay with the Court?

6          THE COURT:  Sure.

7          MR. HANSEN:  Your Honor, I'm also accompanied by Mr.

8  Seth Van Aalten of Cole Schotz, and Mr. Charles Rubio of

9  Leonard -- Parkins & Rubio, our co-counsel to the Ad Hoc

10 Committee of Supporting Counsel.

11         Your Honor, we represent approximately 20 law firms

12 who have approximately 60,000 claimants that they represent.

13 We're hard at work on the 2019 statement; we'll get that on

14 file as soon as we can.  Obviously, with that number of law

15 firms and that number of claimants, it's a tall task and we are

16 putting it together.

17         THE COURT:  Sure.

18         MR. HANSEN:  What we're trying to do, Your Honor, is

19 put a consolidated 2019 together for yourself and for all the

20 other parties in interest in the case.  It will obviously come

21 with a motion to redact as well, which is similar to all the

22 other 2019s that have been filed in the case by all of the

23 various law firms with respect to their claimants.

24         So I wanted to make sure the Court understood that

25 and we'll get that on as soon as we can, Your Honor.

1          Your Honor, with respect to the questions before the

2   Court at the moment, the Future Claims Representative, from the

3   ad hoc committee's perspective, cutting through what I can

4   really only describe as hyperbole and self-validating

5   statements, there have been hours of those that have been going

6   on -- all without fact -- Your Honor, cutting through all of

7   that, what's really happening here is what's before the Court

8   is a plan process and a motion to dismiss.

9          Obviously, there was a prior preliminary injunction

10  motion, that will play itself out, you know.  We have a motion

11  to intervene in that adversary that's on file, we'll take that

12  up at the appropriate time, but what's really going on here is

13  a plan process and a motion to dismiss.  If the TCC and the

14  other firms who are against the plan believe that the votes

15  will come in -- and I think we're all clear here, it's not a

16  cramdown, this is a question of whether or not a voting

17  threshold can be obtained -- if they don't believe that that

18  voting threshold can be obtained, then I don't really

19  understand, from the ad hoc committee's perspective, what the

20  fear is in letting the plan move forward and if they believe

21  that that plan will be voted down.  And I don't really

22  understand what their fear is with respect to this Future

23  Claimants Representative either, who they supported in the

24  prior case.

25          So, from the ad hoc committee's perspective, that's

87

1  what's really going on.  They want to try to prevent the votes

2  from coming in with respect to the plan because they're afraid

3  of what the result is.  And so, from the ad hoc committee's

4  perspective, we urge the Court to go ahead and appoint the

5  Future Claims Representative, who's already familiar with the

6  case, who can expedite the process, and we can move to that

7  question of the vote.  And with respect to the motion to

8  dismiss, you'll take that up as well, Your Honor.

9         And I have to say that I was a little bit taken aback

10  by Mr. Molton's statement that the TCC absolutely respects the

11  integrity of this Court and the integrity that is placed upon

12  the process that plays out before this Court, after having

13  threatened Your Honor and fined a mandamus motion shortly

14  thereafter to try to take the cases away from Your Honor.  If

15  justice is to play out in this Court, it should play out in

16  this Court with respect to both a plan process and the motion

17  to dismiss.

18         So, again, Your Honor, we would urge you here to

19  appoint the claims representative that is most familiar with

20  the case, that can expedite the process in front of Your Honor,

21  and we can get to what is really going on in this case, which

22  is whether or not the case should be dismissed and whether or

23  not the votes are here to support the plan.

24         Thank you, Your Honor.

25         THE COURT:  Thank you, Counsel.

1          Mr. Gordon?

2          MR. GORDON:  Your Honor, Greg Gordon again on behalf

3   of the debtor.  I'd like to make a few points, if I could.

4          Number one, sort of going in reverse order here, Mr.

5   Molton said -- he acknowledged, of course, that he sent an

6   email to me indicating that he had a proposal to make, and then

7   he sort of brushed it aside saying, well, my response was it

8   was a waste of time, and he attributed that to the fact that we

9   were scheming to come up with the second bankruptcy.  What he

10  didn't tell you was that my email said why I indicated it was a

11  waste of time.  He said he had an ovarian cancer-only deal to

12  discuss, but not including (indiscernible) at all.  And I told

13  him what we said from the beginning that we want a full

14  resolution of all claims in the case, and I didn't hear

15  anything further from Mr. Molton.  So just to straighten that

16  out for the record.

17         The second thing about Mr. Molton is he stands up

18  here and he says there's absolutely no evidence at all of these

19  contentions and a majority of the claimants support a plan,

20  nothing, Your Honor.  It's totally ridiculous.  In fact, he

21  used a word I haven't heard in a long time, balderdash, it's

22  absolute balderdash.  I had to look that up, I couldn't

23  remember what was.  No evidence.

24         But what's so telling about that, Your Honor, is that

25  the evidence that exists or the support that exists for that is

1    what's always done in these cases.  I mean, you heard evidence

2    about this.  It's firms standing up saying, I represent these

3    claimants, I'm going to recommend to them this plan and I

4    believe that they will support this plan.  That's about as far

5    as you can go.  He knows that, and so for him to stand up here

6    and to say that.

7            And the other thing, of course, he's omitting is he's

8    saying we have absolutely no evidence of that.  Well, yes, we

9    do.  We've submitted all these signed plan support agreements.

10   We've provided to them the list of the claimants.  Now, they

11   don't like the list because they've been redacted to protect

12   personal information, but we have it.  He stands up here, Mr.

13   Maimon stands up here and says this is all unreal, it's not

14   true; we have thousands of claims, all these law firms.  What

15   do they have?  They have nothing.

16           And so it's just striking to me that they are making

17   -- they continue to make the same point, this is all made up,

18   this majority doesn't exist, but we have evidence -- they might

19   complain about the evidence -- they don't have anything.

20           And the other point, the related point here, is they

21   always ignore the fact that this group of supporting firms

22   includes the Onder firm, includes the Madgett firm, they were

23   on the initial TCC.  Mr. Molton was never standing up here

24   saying, you know, these members of the TCC, we're not really

25   sure they represent anybody.  We don't really know because we

1  haven't -- we've been asking, you know, we haven't seen any

2  medical diagnosis or some engagement letter or what else.  So,

3  for me, you should just take that for what it is.

4       And I think, Your Honor, bottom line, it's what

5  Counsel for the Ad Hoc Committee just said, this is about they

6  don't want the vote.  So they can stand up here and say a

7  hundred times this is not real, the majority doesn't exist, but

8  the real test of that is the vote and they don't want you to

9  have the vote.  That is -- if there's anything that's clear

10 from today, that is clear.

11      Mr. Satterley is a hundred percent wrong when he says

12 this is about cramdown, it's exact opposite.  We're trying to

13 get to a consensual deal that has the support of 75 percent,

14 they don't want that to happen.  And I presume they don't want

15 that to happen because they have a significant fear that we do

16 have the vote.

17      The other thing, Your Honor, I feel like this thing

18 has gone way off track in some respects.  Your Honor, I

19 thought, asked a good question, which is what if this were just

20 a standard prepack case -- and we've had these -- and you had a

21 committee appointed and a Future Claimants Representative in

22 place in advance of the case, who then come into bankruptcy and

23 say we've agreed to a plan.  And you have some minority firms

24 come in and say we don't like the plan, and they would say to

25 Your Honor this FCR can't be appointed, and I assume they might

91

1  say, and this ad hoc committee can't be appointed either

2  because they come in to you with a preordained view of what

3  should happen in this case.  That doesn't make any sense at

4  all.

5        And the reason I raise it is, just think, if Ms.

6  Ellis actually signed the declaration, or let's hypothesize she

7  actually signed a PSA, because she determined in both cases

8  that those were a fair and proper resolution of the case with

9  respect to future.  Is that disqualifying?  Why would that be

10  disqualifying if, in her capacity as FCR, she decided that that

11  plan deserved to be supported or that the case deserved to be

12  supported.  They would suggest and they've said, basically,

13  that would be disqualifying.

14        And, to me, all I can hear over and over again is

15  it's disqualifying because they disagree with that.  They don't

16  think anybody in their right mind could ever agree to do a plan

17  in bankruptcy that calls for a permanent resolution of the

18  liability, and I suggest to Your Honor that cannot -- that

19  cannot be the rule.

20        So we've really sort of gone way out there with this

21  because that's not even this hypothetical.  She didn't sign the

22  declaration, that's undisputed; she didn't sign a PSA, that's

23  undisputed.  But I'm just saying to Your Honor I think, even if

24  she did, that shouldn't be viewed as disqualifying that, in her

25  capacity as FCR, doing the work you asked her to do, if she had

1   made a determination that that was the right thing to do for

2   her constituents, then that's what she did.  That's not a

3   disqualification.  That doesn't show a lack of independence,

4   that shows someone who actually performed the job that she was

5   called on to perform.

6          THE COURT:  What about the committee or the

7   objectors' position that her consideration or even just

8   consideration of a new filing while she was still the FCR in

9   case one would be a breach of -- especially given the

10  overlapping and the selection of a date of who would qualify as

11  a Future Claimant, their position is that she's breaching her

12  obligations to those future claimants in case one by the

13  actions she was taking in supporting going forward with the

14  bankruptcy in case two?

15         MR. GORDON:  Well, I have to be honest, Your Honor, I

16  didn't really understand those arguments at all, and the reason

17  I don't is I think the constituency is the same.  So when Mr.

18  Maimon puts up a bunch of slides showing little people moving

19  around from one box to the other, I honestly didn't understand

20  what he was talking about.

21         She represents the future claimants.  These are

22  people who have not manifested a disease, we don't know who

23  they are, and the -- we had LTL I, LTL II, I don't -- I'm just

24  being honest -- I don't understand the argument that somehow

25  she represented one constituency there of future claimants and

1  now she has a different constituency.

2         Now, Mr. Maimon made a big to do out of that

3  provision on the April 4th cutoff date and what I heard him

4  saying were things like, well, they've just disenfranchised

5  everybody after that date, they can't vote.  That's not a

6  voting provision.  There's going to be a solicitation motion

7  filed.  And so I didn't really understand that argument either.

8         The other thing, generally, about Mr. Maimon which I

9  just don't get is he stands up here in the first slide, he

10  says, just the facts, and then he purports to ignore all the

11  facts.  And he just acts like Ms. Ellis signed the PSA, he acts

12  like she agreed to have her name put into the terms sheet as

13  the claims administrator.  The unequivocal evidence, the

14  undisputed evidence, is the opposite of that.  He went on and

15  on and on, how could anyone agree to the one third?  How could

16  she agree to this?  How could she agree to that?  And he did

17  that knowing full well she didn't agree to anything.

18         And so that's all -- it's just fiction.  You know,

19  that's the problem with this, this is just trashing somebody,

20  it's character assassination.  It's coming up with accusations

21  and then, when you're called on it and you're shown that your

22  accusations are boundless, you double down and you make them

23  again anyway, even though the record says -- the record says

24  otherwise.

25         So I'll pause there for a second.  I'm not sure I

1  answered your question, but I'm just being honest, I didn't

2  really understand what the argument is.

3           THE COURT:  All right, fair enough.

4           MR. GORDON:  So, Mr. Thompson, I just have to respond

5  to one thing that he said.

6           And Mr. Thompson, to me, just proved my point that he

7  doesn't want Ms. Ellis appointed because she disagrees -- you

8  know, she hasn't adopted his arguments about constitutional

9  principles and limited funds and the like, but he keeps saying

10 over and over and over again, everybody keeps saying it, is the

11 funding agreement was a $61 billion commitment and that's been

12 thrown away to 30 billion.  And I tried to clarify this before,

13 that is not true.  That was a 60 -- that was a commitment to

14 fund liability, the amount of the liability.  The amount of the

15 liability hasn't changed.  And so to say that $30 billion has

16 been lost, that's just, to me, a misrepresentation or a

17 mischaracterization of the facts.

18          He made an argument that you need to have a separate

19 FCR for J&J's independent liability based on combustion.  The

20 difference here, Your Honor, these are the same claims.  As

21 Your Honor knows, Old JJCI assumed the liability, all the

22 liability back in 1979.  So, to me, combustion doesn't apply

23 and that wouldn't make sense to have a separate FCR for that.

24          And the other thing, you know, I would just go back

25 to Mr. Maimon again.  He made this impassioned plea that the

1  documents are what they are, they're solidified in stone.  I

2  think Mr. Ruckdeschel said the same thing, New Jersey law,

3  you've got to apply the documents, they say what they say.

4  And, to me, it just ignores the very top of the document that's

5  attached to the plan support agreement, it's a term sheet; it's

6  a term sheet subject to documentation, it's subject to further

7  negotiation.  We've said that from day one.

8          And so for someone to stand up here and say, whether

9  or not Ms. Ellis says she's a claims representative or not, or

10  whether she knew about it or not, the document, by God, says

11  she's a claims representative and that's the end of it.  That,

12  to me, doesn't make sense.

13          And then two other things, Your Honor.  The whole

14  idea of delay, Mr. Molton is all about he wants delay.  After

15  months and months and months that delay is harmful to his

16  clients, we've got to move quickly, now he wants a delay.  And

17  that's, to me, just to avoid the vote, if he can avoid it.

18          And then the last thing to say is, so the ultimate

19  fallback is there's an appearance of impropriety.  So think

20  about that in this context.  You have somebody who was vetted

21  before, approved before.  A series of baseless accusations are

22  made, they're proven to be false, but nonetheless, because they

23  were made and even though they're false, there's an appearance

24  of impropriety and she should be rejected, and I don't think

25  the Court should embrace a standard like that.

1          I don't think Ms. Ellis has done anything wrong, I

2    don't think she deserves any of the criticisms she's received,

3    and we would ask Your Honor to appoint her as the FCR.

4          THE COURT:  All right.  Thank you.

5          All right, argument is done.

6          MR. MAIMON:  I told everyone, we shouldn't even ask

7    to rebut.

8          THE COURT:  Smart move.

9          UNIDENTIFIED SPEAKER:  I have four points, he told me

10   not to make them.

11         THE COURT:  Discretion, right?

12         All right, let's -- I'm going to reserve.  I am

13   unlikely to make a decision today.  We are convening on

14   Tuesday, I'm hoping to have a decision by then.  I think we

15   have argument on the certification issues on Tuesday.

16         We have lots more to discuss today, we'll do that

17   after lunch.  Come back, we'll start no later than 1:30.  Try

18   to come back by 1:20.

19         Thank you.

20         COUNSEL:  Thank you, Your Honor.

21          (Recess at 12:47 p.m./Reconvened at 1:32)

22         THE COURT:  Okay, we are back on record.  And so we

23   finished the first item on the agenda.

24                         (Laughter)

25         THE COURT:  Let's go on.  Let's see, Valadez.

97

1          MR. SATTERLEY:  May it please the Court, Your Honor?

2          THE COURT:  Yes.

3          MR. SATTERLEY:  Joe Satterley of Kazan McClain

4   Satterley & Greenwood for Mr. Valadez.  Let me just get this

5   presentation rolling.

6          May I approach, Your Honor?

7          THE COURT:  Absolutely.

8          MR. SATTERLEY:  A very short presentation.

9          THE COURT:  You know I don't believe any of you.

10                       (Laughter)

11         MR. SATTERLEY:  It's only 15 pages.  I told Ms.

12  Theriot it was 12, but I added a couple.  So I appreciate Your

13  Honor allowing me to give Your Honor a status update.

14         As Your Honor knows, I've been before Your Honor on

15  this case many times and when you lifted the stay back in

16  February, and then they filed and you lifted the stay again on

17  the 20th, I've been working very, very hard to get the case

18  prepared for trial and it is ready for trial.

19         And this photograph right here is Mr. Valadez last, I

20  think Friday, and the photo on the left is him receiving

21  immunotherapy.  His treating doctor is giving it to him.  And

22  then that's him on the way home.  He's deteriorated quite a bit

23  since I first started asking for Your Honor to grant him relief

24  last May and he's deteriorated quite a bit just since Your

25  Honor granted full relief on Valentine's Day, February 14th.

98

1        I showed Your Honor this slide many times.  These

2   witnesses have all been deposed.  As a matter of fact, every

3   one of them, with the exception of Dr. Felsher, their

4   deposition is complete, totally complete.

5        Yesterday, Dr. Backhus finished her fourth day of

6   deposition, her fourth day, and her deposition was completed in

7   about an hour.

8        Dr. Abraham, the pathologist in the lower left, gray-

9   haired fellow, his deposition was completed yesterday as well.

10        Dr. Ronald Dodson, who did the tissue digestion

11   analysis and found the talc and the mica and the other

12   ingredients from J&J in Mr. Valadez's body, his deposition was

13   completed in about three hours.

14        Dr. David Egilman, he's with the glasses on the top,

15   he was deposed twice in this case, his deposition was

16   completed.

17        Dr. Roy, the treat oncologist, her deposition was

18   completed in four hours.

19        Dr. Felsher, who is the only remaining expert -- or,

20   actually, the only remaining witness to be -- his deposition to

21   be finished, I offered him to be deposed again on the 8th.  And

22   lead counsel for J&J, Mike Brown, told me he wasn't available

23   on the 8th, so I offered the 9th.  And he's accepted it and he

24   said he will finish -- Mr. Brown said he will finish the

25   deposition on the 9th in less than three hours, and we've set

99

1  aside that time for that to occur.

2          I submitted yesterday a supplemental submission and I

3  included in here sort of a review of all the depositions that

4  have occurred and when they occurred.  I did have a typo.  I

5  had Dr. Langer was March the 3rd, his deposition actually occur

6  on April the 3rd, but his deposition is complete.

7          All of these depositions have been completed and

8  including the economist, all experts, the family members, the

9  grandmother, the two aunts, the mother.  So, from our

10 perspective, all the witnesses that we're offering have been

11 completed, with the exception of Dr. Felsher, which will be

12 next week.

13         The defendants, on the other hand, immediately on the

14 20th when Your Honor issued your ruling, that was early in the

15 morning on West Coast time, I offered our experts and witnesses

16 and I asked for their witnesses.  And they sort of slow-walked

17 me, but I eventually got them on track and we have a schedule

18 here.  So I deposed Target last week, I finished their -- or

19 the person most knowledgeable yesterday at Skadden Arps in New

20 York, and so that was finished.

21         What I've highlighted in yellow are the four experts

22 and Dr. Sanchez is the only one that's beyond May 15th.  And

23 Dr. Sanchez, I've cross-examined him, they argued last week

24 dozens of times, but only about six or seven times.  He's their

25 testing expert to say there's no asbestos, he's the only

1  witness they have to say there's no asbestos in their talc.

2          He says -- or they say he only has that date to be

3  deposed.  He was deposed on Monday in a different talc case and

4  he was asked what's he got planned over the next few weeks.  He

5  says, I'm working on reports.  He didn't identify any real

6  conflict other than working on reports.  But if May 17th is the

7  only day they want to give me, you know, after jury selection,

8  if Your Honor allows us to go forward, I'll depose him on that

9  day or have somebody depose him on that day.

10          So all of these dates are before what Judge Seabolt

11  believes when the case should start.

12          And Judge Seabolt, we appeared before him on the 20th

13  and on the 27th.  And this is a transcript, I've submitted the

14  entire transcript to Your Honor yesterday from last Thursday,

15  the 27th, and this is Ms. Brown suggesting to Judge Seabolt,

16  she suggested that maybe we shouldn't even -- he shouldn't even

17  be able to discuss setting for trial.  And Judge Seabolt

18  responded and said we certainly can discuss potentially when

19  the trial might begin.  And he says -- and I highlighted it --

20  "It is true we don't have the go-ahead to do that" -- go-ahead

21  to do that, actually set the trial, but my hope is that he

22  gives us the go-ahead on May the 3rd.

23          And Ms. Brown responds, "Yes, Your Honor, I

24  understand that."

25          And the court says, "We might be saying exactly the

1  same thing."

2  Ms. Brown says, "I think we are, Judge, except that I

3  thought you were suggesting I might have been acting improperly

4  by talking about when we might start trial."

5  And counsel of course said, no, no, I don't think you

6  are.

7  So what Judge Seabolt decided is that he can decide

8  all outstanding motions tomorrow, the 4th, and they can be

9  fully briefed and argued next Thursday in the afternoon.  And

10  the genetics motion, they filed a motion to do some more

11  genetic testing, we opposed it.  I think they're submitting a

12  reply either already or today.  They have a motion regarding

13  one of the experts, Dr. Longo; we briefed it, we objected to

14  it.  And they have a motion for summary adjudication on the

15  fraud count, and the court said he would hear all those

16  arguments tomorrow afternoon.

17  Also, he's said that he would set aside next week,

18  the week of the 8th, to deal with any additional motions,

19  expert motions or any additional issues because, originally, on

20  the 20th, I suggested we start picking a jury on the 8th, and

21  now I've pushed that back a full week and to May 15th to give

22  His Honor -- first of all, to give Your Honor the chance to say

23  it's okay, but then to give His Honor, Judge Seabolt, the

24  chance to overrule any outstanding motions.

25  And in the transcript, I don't know if Your Honor has

had a chance to read it, Judge Seabolt explains how the

California legislature requires that cases be tried within 120

days of a preference order.  And he takes the California law

seriously and he actually in the transcript said, but for the

two bankruptcies, this case would have already been resolved

because the Coight (phonetic) case, which we tried, me and Ms.

Brown tried, it settled after jury selection, that case was set

for trial after the preference setting after Valadez.  So this

case would have been resolved long ago.  And Judge Seabolt said

this is the most serious case I've seen.

Judge Seabolt also:  "I do think the 15th is probably

the most practical target date, but I would like to try and

make sure that we are as firm as possible.  And I realize Judge

Kaplan needs to make a decision and that's fine.  This is an

unusual situation, but in fact he controls my calendar, at

least in this case."

So then I asked Judge Seabolt specifically, "So it's

very clear, Judge Kaplan, if he allows the case to be released

from the stay next Wednesday on the 3rd, would this Court be

able to begin trial somewhere around the 15th?"

Judge Seabolt said, "That's what I'm planning on."

I said, "Thank you."

He said, "This isn't entirely within my control, but

that's certainly my hope and plan and I don't have a

conflicting trial."

1          As a matter of fact, last Thursday, when we were

2    making the argument, there was a jury that -- a jury returned a

3    verdict in a mesothelioma case right after this argument.

4          Now, Dr. Roy, the treating doctor, was deposed and in

5    her deposition she described how his disease has progressed.

6    And she said, "I think he's really towards the end of his life.

7    I don't think that there are any really validated treatments

8    left.  I have consulted with physicians throughout the country

9    about his case and different treatment options available.  This

10   next chemotherapy that I'm changing to, I do not have very high

11   hopes for.  The hope is, essentially, just to prevent

12   additional growth.  I do not anticipate significant shrinkage

13   or benefit from the next treatment."

14         So the photograph I showed you at the beginning I

15   think is that new chemotherapy that she's talking about there.

16         Also, in her record she described a sale and the

17   question was asked, "Can you elaborate what you meant there by

18   the approximate four to 4.5 on a 5 scale?"

19         She said, "Sure.  I apologize that's not clear.  Mr.

20   Valadez has had a really hard time discussing any imaging

21   results from the start of his case.  In the middle of his

22   treatment course, he was able to discuss that a little bit

23   more, but that had declined in light of bad news.  So he wanted

24   me to say, one being good and five being kind of the worst

25   possible thing, where would I rate it, and not go into any more

1  details on the imaging," the scans, the chest X-rays and such.

2          "So on a four to four and a half is towards the worst

3  possible scenario then; is that right?"

4          And she says, "Correct."

5          So I'm getting close to the end of my presentation

6  here, Your Honor.  This is just an overview.  Your Honor has

7  seen this slide several times where Your Honor lifted the stay

8  last June and we got the trial setting for November, and it was

9  continued to December, until January, to February, and then it

10 was set for trial April 17th.  And now, I believe, May the 15th

11 we should be able to try this case, according to Judge

12 Seabolt's schedule.

13         So I would request Your Honor apply the <u>Mid-Atlantic</u>

14 factors that Your Honor and I talked about many, many times.  I

15 would request Your Honor to fully lift the stay, allow us to

16 proceed to trial, so this man can have his day in court before

17 he dies.

18         THE COURT:  Mr. Satterley, let me just clarify

19 because there's a little confusion in my chambers and with me.

20         We looked in the complaint, LTL is not a defendant,

21 it -- correct?  Or I thought it was simply Johnson & Johnson.

22         MR. SATTERLEY:  So the way it works under California

23 law, you did not allow me to -- wait, let me just think -- I'm

24 getting my cases mixed up.

25         THE COURT:  So I'm wondering if this is stay relief

1 or just modifying the injunction as to third parties.

2          MR. SATTERLEY:  I think --

3          MR. BROWN:  Mr. Satterley, you amended the complaint

4 to add LTL.

5          MR. SATTERLEY:  Yeah, under California law, what's

6 called Doe'd them in, you have a Doe defendant.  So we Doe'd

7 them in, so LTL -- with Your Honor's permission on Valentine's

8 Day, I believe.

9          THE COURT:  That's fine.  I just wanted to clarify

10 that.

11          MS. BROWN:  Yes.

12          THE COURT:  All right.

13          MR. SATTERLEY:  Any further questions, Your Honor?

14          THE COURT:  No, thank you.  Thank you.

15          Ms. Brown?

16          MS. BROWN:  Thank you, Your Honor.  And may I

17 approach with a copy of the --

18          THE COURT:  Yes.  The paper, right?  Mr. Maimon's

19 paper is the thickest.  It's cardboard.

20          MS. BROWN:  May I proceed, Your Honor?

21          THE COURT:  Yes, please.

22          MS. BROWN:  Good afternoon, Your Honor, Allie Brown

23 for the debtor.

24          Your Honor, Mr. Maimon started his presentation today

25 talking about just the facts.  The facts are that the vast and

growing majority of claimants support the debtor's proposed

plan.  Those are the facts that have come to this Court through

real evidence and real testimony in this case, through the

depositions of Mr. Watts and Mr. Pulaski, through signed PSAs,

through attachments to those PSAs that identify the individual

claimants and identify the lawyers that have pledged the

support for this plan.  But what is happening here, Your Honor,

in this motion is that a single claimant is seeking to

prejudice the rights and the interests of the others.

Mr. Valadez is one of perhaps 80,000 or 100,000

claimants in this case, Your Honor.  And the Court recognized

over a year ago now that permitting a single claim to proceed

would prejudice the interests of other claimants, claimants

whose lawyers have pledged support for a quick, fast plan of

reorganization.

Your Honor, just a few a weeks ago when you were

reading your order in this case, you again raised the Court's

concern if it's ever appropriate in a case like this to start

picking and choosing one claimant out of tens of thousands of

claimants, many of which we believe will be in support of a

quick plan of reorganization.

Your Honor, at the time the first bankruptcy was

filed, as the Court has heard, there were over 40,000 claims

that had been filed against the debtor.  We now have evidence

today from the representatives of the Ad Hoc Committee, of

1 firms and lawyers in support of this case, that they represent

2 approximately 60,000 claimants, and we believe the number could

3 be even higher, Your Honor.

4       What this motion seeks to have this Court do is to

5 select a single claimant out of almost 100,000 claimants and

6 allow that claimant to go to trial.  And what's particularly

7 unfair about that, Your Honor, is that many of these claims had

8 been filed 2013, '14, '15, or '16.  The Court allowed Mr.

9 Valadez to file his claim less than a year ago, Your Honor.

10 His claim has only been a filed claim for less than a year.

11 What Counsel is asking this Court to do for no reasoned way,

12 Your Honor, is to pick one out of these many, many claimants

13 and allow their claim to go forward.  And that threatens the

14 reorganization process, Your Honor, and the progress.

15       To start, Mr. Valadez is asking for an enormous

16 amount of money.  These are the demands that were made in the

17 case, these notices pursuant to California Civil Procedure

18 Code, a $20 million demand against Johnson & Johnson and a $20

19 million demand against LTL.

20       And I can assure you, Judge, having tried six of

21 these cases, that if this case were to get before a jury, if

22 this case, where there are punitive damages are at play,

23 Counsel will ask for far more than $40 million from that jury.

24       And so we have a situation where one claimant is

25 seeking to get before a jury and ask for an enormous amount of

1  money while we have come before the Court at the very same

2  time, with the support of more than 20 firms representing

3  60,000 claimants, in an effort to propose and get a plan to a

4  vote.  Your Honor has heard we hoped to do that by May 14th and

5  Counsel is asking for a trial in Valadez to start the very next

6  day.  What could threaten more, Your Honor, the efforts to get

7  a plan out to tens of thousands people than to allow one of

8  them to proceed with a single trial.

9        Your Honor heard from me last time about the evidence

10 we have based on filings and based on statements in California

11 that this plaintiff's counsel intends to put this bankruptcy on

12 trial in California.  I told Your Honor about a motion *in*

13 *limine* we filed in Valadez seeking to exclude as irrelevant and

14 prejudicial reference to this ongoing bankruptcy, Your Honor.

15       We reviewed with the Court last time plaintiff's

16 opposition to that motion and plaintiff's stated intention that

17 evidence relevant to the bankruptcy could come in for and was

18 admissible for numerous purposes, Your Honor, including the

19 punitive damages and the motivation and biases of all

20 defendants and their witnesses.  But, Your Honor, as discovery

21 has now proceeded at a breakneck pace in Valadez, we have more

22 granular information about the intentions to have a trial going

23 on where the propriety of this bankruptcy is before a jury in

24 California.

25       This is a letter we received from Mr. Satterley's law

firm just a few days ago disclosing reliance materials for

their expert witness Mr. Johnson.  The Court should be alarmed

to see that some of the reliance materials for this witness

include the Third Circuit's opinion, which was sent to this

expert by Counsel highlighted with the sections they wanted him

to pay attention to, the amended and restated funding

agreement, and excerpts from the oral argument in front of the

Third Circuit, Your Honor.

As if there were any doubt in our mind that Counsel

intends to put this bankruptcy, this ongoing bankruptcy before

a jury, we have a statement on the record from now just a few

days ago from Mr. Satterley's colleague about what they intend

to do with information about this bankruptcy.

And, Your Honor, what Mr. Reed, Mr. Satterley's

partner, said just on the record a few days ago is that, as

discovery continues and goes on through the claimant

bankruptcy, including discovery propounded by the Kazan McClain

law firm just last night on LTL and assorted individuals.  As

that information is discovered and rulings are made in

Bankruptcy Court by Judge Kaplan and/or by the Third Circuit,

we'll be providing those to our expert Mr. Johnson with these

additional materials, and maybe we'll let you take his

deposition, but we might also take the position that because

you committed these bad faith acts we're not going to give you

the deposition.

1    But the point is, Judge, they made entirely clear on

2 the record that they intend to funnel the discovery they get

3 from this case to their expert in this state court case, and it

4 underscores all of the evidence, Your Honor, we reviewed last

5 time that they intend to put the propriety of this bankruptcy

6 on trial in California.

7    The Court will recall the documents and testimony

8 about the Trailblazers documentary film crew that intends to be

9 in the courtroom, capturing what they termed to be a bankruptcy

10 saga.  Mr. Satterley informed the California court that there's

11 going to be another crew there from Courtroom View Network,

12 they're going to be there as well filming what all of this

13 correspondence suggest what they believe to be a bankruptcy

14 saga.

15    And so, unquestionably, Your Honor, there will be

16 active efforts captured by a documentary film crew that will no

17 doubt harm the debtors reorganization efforts and prejudice the

18 rights of tens of thousands of claimants who do want to get a

19 plan to a vote, who do want compensation in a fair and

20 equitable manner.

21    And, Your Honor, we heard a ton this morning about

22 the Future Claims Representative.  And, I have to admit, I

23 didn't really follow Mr. Maimon's slides either, but I did

24 understand the point was that he was concerned about other

25 claimants, about future claimants, and about how those future

1  claimants were going to be treated.

2         And that's ironic, Judge, because, as you know, our

3  tort system can't provide for future claimants, but it's also

4  particularly ironic to come right before a motion like this

5  where Mr. Maimon's colleague seeks to put the interests of one

6  of his clients, one of the 13 clients he represents, above all

7  other current and future claimants.

8         Your Honor, I reviewed with the Court last time how

9  the discovery in this case, like many other cases I have tried,

10 is revealing that the evidence and the facts and the truth do

11 not support the claims being  made in this lawsuit.  And I

12 won't belabor the point, Judge, but just to update the Court on

13 a few developments regarding pieces of evidence that have been

14 put before you, Judge.  We've seen now several times this slide

15 of the causation experts who Mr. Satterley believes will come

16 to court and support his claim that the most rare cancer, a

17 cancer that only 15 people get each year, was caused by one of

18 the most common products, baby powder.

19        But Dr. Roy was deposed just this week and she said

20 she'll do no such thing.  She said, when she got the

21 declaration from Mr. Satterley, she redlined and crossed out

22 all of the business about causation because she did not make a

23 determination in her care and treatment that Mr. Valadez's

24 cancer had anything to do with Johnson's Baby Powder.

25        She was asked, well, do you even have an opinion

1  about whether Mr. Valadez was exposed to asbestos at all?  And

2  she said not within the materials that were provided to me.

3          And, Your Honor, to be clear, we saw some heart-

4  wrenching pictures of Mr. Valadez -- of Emery Valadez.  Emery

5  Valadez has an awful, awful disease that will no doubt take

6  their life very soon.  But unfortunately, Judge, that is no

7  different than any of the other claimants in this litigation

8  because both ovarian cancer and mesothelioma are,

9  unfortunately, fatal diseases.  And so Mr. Valadez is in a

10  situation that many -- most, if not all of the claimants

11  involved in this litigation are in.  They are facing absolutely

12  awful diseases that were not caused by Johnson's Baby Powder.

13          Your Honor, we spoke last time a bit about the

14  picture that was produced and Mr. Valadez's mother's testimony

15  that this was indeed Emery's nursery and this was indeed the

16  bottles.  Your Honor heard that the picture actually was taken

17  three years before Emery Valadez was even born.  That will

18  certainly be an issue if that case ultimately tries.  But what

19  has happened just within the past couple of weeks is that the

20  retailers have produced loyalty records.

21          This is a case, like many others in this litigation,

22  where the plaintiffs have testified about making specific

23  purchases of baby powder at specific stores.  And that

24  certainly was the testimony of Emery Valadez's mom that she

25  made specific purchases.  In fact, her declaration in this very

1  bankruptcy, Judge, said every two weeks from the time Emery was

2  born up until 2022, every two weeks, purchases at these stores.

3  Well, we got the records this week from Target and what they

4  show is a lot of purchases of personal care products, including

5  Johnson & Johnson products like baby shampoo and things like

6  that.  Six hundred and eighty three purchases total, Judge, not

7  one purchase of Johnson's Baby Powder.

8          The truth is, Your Honor, that Emery Valadez

9  themselves testified that they're not even sure they used

10  Johnson's Baby Powder with talc.

11          We make two products, we made a product with talc and

12  a product with corn starch.  The corn starch product is not the

13  subject of this litigation, but when questioned, Emery Valadez

14  wasn't sure if it was the baby powder with talc or the baby

15  powder with corn starch that they claim to have used.  And that

16  testimony is entirely consistent with the testimony of the

17  grandmother and the aunts who were deposed who also said, you

18  know what, I'm not sure if it was the corn starch or the talc

19  version.

20          And so, Your Honor, we have a case, like many of

21  these other cases, where there are significant product

22  identification and product usage issues.

23          Very quickly, Your Honor, because Counsel spent quite

24  a lot of time on what's been done and what remains to be done,

25  we have done enormous work, Your Honor, since the Court's

ruling that discovery could proceed here.  We scheduled and

took 12 depositions.  We have continued to brief and will

tomorrow argue the genetics motion.  We have moved to compel

genetic testing, plaintiffs have opposed.  We have an issue

with the destruction of evidence by one of plaintiff's experts,

these polarized light microscopy slides; that has been briefed

over the last two weeks, we'll argue that tomorrow.

We have filed, as the transcripts have become

available, additional deposition designations, and we are

working enormously hard to get our own copy of medical records,

which, Your Honor, often has a very big lead time.  And so

while plaintiffs have instant access to it through their

client, we are disadvantaged because until the provider can get

us the records, until plaintiffs can release them to us, we

don't have them.

So those efforts have been going on nonstop, Your

Honor, since the Court's ruling, but there still remains work

to be done.  We have nine expert and fact depositions that have

not been completed and are continuing.  We have 13 depositions

from which we need to designate testimony, Judge.  That can't

be done until the transcripts are final and we don't have these

13 files contemplated yet.

I mentioned the challenge about getting medical

records in this time period.  We have not yet argued or

received rulings on motions *in limine*.  We have motions we will

115

1  make to exclude their experts, I expect they'll do the same for

2  ours.  We have the genetic testing motion, we have the

3  spoliation motion.  The question of whether this court is going

4  to allow Trailblazers in or not has not been resolved, although

5  the Judge has indicated he intends to.

6          We have additional pretrial submissions and we have a

7  long motion for Mr. Satterley about time limits that we need to

8  argue as well.

9          But what you heard this morning and what happened --

10  and this, Your Honor, is to just give you a flavor -- we're

11  trying to get these genetic records and Mr. Satterley has them,

12  and we've asked if you could just, you know, speed up your look

13  on them and hand them to us, and he has taken a position he

14  will not do that.

15          And so what we have on the most critical issue in the

16  case are records that look like this, you know, key parts of

17  them redacted.  We don't have our own copies, we don't know

18  what in this genetic analysis that showed a mutation has been

19  blocked out, and we're facing some challenges, Judge, in trying

20  to get our own copies of these.

21          So enormous work has been done, to the distraction,

22  in large part, of debtor's counsel, but there a lot of people

23  on this case trying to move forward, consistent with the

24  Court's ruling, consistent with the California court's

25  expectation.  But, Your Honor, what happened last week is that

1  Mr. Satterley represented to this California court that

2  basically you, Judge Kaplan, told us just go ahead and get

3  everything ready, report back on the 3rd, and I'll give the

4  final go-ahead.

5         And I would suggest to the Court there is no basis in

6  the law, in the Mid-Atlantic factors, and there is no basis in

7  the facts to give what Mr. Satterley has termed this cavalier

8  final go-ahead and start picking a jury in three days.  Your

9  Honor, this is one out of almost 100,000 claimants who no doubt

10 has an awful and terminal disease, but so do many, if not all

11 of these claimants.  Your Honor has recognized before that it

12 is unfair and in fact detrimental to the efforts to reorganize

13 to allow one out of many to go forward.  And so it's not that

14 we should come to you, Judge, and you just give the final

15 thumbs-up, I would suggest it is a serious question of law and

16 fact that is not supported by the evidence.  The stay should

17 remain in place so that the debtor can get this plan out to a

18 vote.

19         Thank you, Your Honor.

20         THE COURT:  Thank you, Ms. Brown.

21         Mr. Satterley?

22         MR. SATTERLEY:  May I proceed?

23         THE COURT:  Yeah.

24         MR. SATTERLEY:  I'm not going to go down all those

25 rabbit holes, I'm going to talk about a few of those, but most

1  of her argument seems to be, if she thinks they have such a

2  strong case, it's a jury question or it's the court's, Judge

3  Seabolt's evidentiary decisions based upon the law.

4          Counsel made an argument that a hundred thousand

5  people are impacted.  Since I first made the first motion last

6  May, all the way up until today, not a single person, not a

7  single claimant has objected to my motion coming before Your

8  Honor each and every time.  So if there's a hundred thousand

9  people out there, maybe half of them are unknown, but not a

10  single one of these new lawyers that's never filed a lawsuit

11  before, a talc lawsuit before, has even objected.

12          So that argument is totally without merit.

13          Many of those slides had misrepresentations.  The

14  part about Mr. Johnson and the, quote, "bringing bankruptcy

15  in," I told Your Honor before, we're not bringing, bankruptcy

16  in.  I told Your Honor before a jury trial.  I don't want some

17  jury to think they're bankruptcy, I mean, that's outrageous.

18  The reason why the bankruptcy was discussed in discovery is Mr.

19  Johnson is the economist and he has to give testimony about the

20  ability to pay should a jury award punitive damages.

21          And they selected, they selected -- they had the

22  option to bifurcate punitive damages away, but they want an

23  all-issues trial, they want a punitive damage trial, they

24  selected that under California law.  So all that discussion

25  about bankruptcy on trial, that had to do with Mr. Johnson had

1  to review what they've said about LTL's ability to pay.

2         The slide with the nice grocery basket and the

3  citation to Target.  And she says, from 1998, there's zero

4  purchases.  I deposed the Target representative last Friday,

5  Target's -- the earliest record they produced to my client's

6  mother was 2021, not 1998, and most of the records were 2022

7  and 2023, after the diagnosis.

8         The other photos, they haven't listed a single

9  witness to talk about these photos.  They apparently got

10  something off some internet search.  It says at the bottom of

11  the slide Weaver Long, I have no idea who that is.  They listed

12  no witnesses to talk about it, that's only attorney argument.

13         The whole issue of corn starch versus talc.  Well,

14  the tissue digestion, which is undisputed, has talc and mica in

15  his pericardial tissue right next to his cancer, no corn

16  starch.

17         I could go on and on and on about this, but the

18  bottom line is a lot of the evidentiary issues is for Judge

19  Seabolt to resolve.  If they have such -- if they're so

20  confident this is a merit less case, they'll get a defense

21  verdict, they'll win the case, and there won't be any harm at

22  all, it won't affect any creditors whatsoever.

23         But the Mid-Atlantic factors do have Your Honor weigh

24  the harm to the creditor, which has been great and significant,

25  versus the harm to the debtor, which all it is right now is

1  paying lawyers' fees to defend this case.

2       I believe, Your Honor, irreparable harm will occur if

3  the case is once again continued for I think the fifth, sixth

4  time now, and Mr. Valadez deserves to be heard while he's

5  living.

6       Thank you, Your Honor.

7       THE COURT:  Thank you.  Thank you, Counsel.

8       I guess for about 20 months now, it seems, we've been

9  addressing this issue specifically to Mr. Valadez.  And I

10 struggle, and I think the slides noted, the most difficult

11 issue for this Court has been selection of a plaintiff to move

12 forward when others are stayed, and the unfairness to others

13 who aren't proceeding, the potential impact upon the

14 reorganization.

15      A lot of work has been undertaken in this case, it's

16 happening daily, depositions and motions in preparation for

17 trial.  Judge Seabolt has quite a bit on his plate.  Well, I

18 can recognize that, I have empathy; I have quite a bit on my

19 plate with this case.  There is a lot of significant issues

20 going on in this case; whether the Third Circuit decides to

21 provide for an early dismissal, whether they reshape the

22 preliminary injunction.  There are seven, as I've been told,

23 dismissal motions, which we'll get to.  There's a plan process

24 that's going forward, which we'll get to.  There is the issues

25 on the Future Claims Rep, mediation, and we are spending an

1 exorbitant amount of time on this issue that can be better

2 allocated, I think, elsewhere.

3          So I am lifting the stay and I am modifying the

4 injunction to allow the matter to go forward to trial, not to

5 enforcement or of any judgment against any defendant because I

6 don't -- I'm not prepared to gauge the impact.  But, in doing

7 so, I take into account the Mid-Atlantic factors and the

8 balancing the harms.

9          The concern I have as far as other claimants coming

10 in I'm going to address as follows:  they haven't, they haven't

11 to date, nor will my decision today dictate how I will treat

12 them in the future.  In fact, I will say, plaintiffs' counsel,

13 the various plaintiffs' counsel that have appeared before me in

14 this case have supported this case going forward and not come

15 forward with the me-too suggestion or identification of other

16 cases.  I am not going to be receptive to diluting the

17 injunction one case at a time for 80,000 cases, I'm telling you

18 that right now.

19          This has the potential to burden the reorganization,

20 I recognize that.  In balancing the harms, I believe, without

21 enforcement and if -- depending upon a verdict and depending

22 upon appeals, the reorganization can overcome this hurdle when

23 the time comes, if and when we get that far.

24          So you can submit a form of order granting limit --

25 well, that phrase, limited stay relief -- stay relief up

1  through and including verdict.

2          MR. SATTERLEY:  Yes, Your Honor, I'll submit an

3  order.

4          THE COURT:  All right?

5          MR. SATTERLEY:  Thank you, Your Honor.

6          THE COURT:  Let's move on to other items.  We have --

7  well, let me -- before we move on to other items, let me

8  preface my -- let me make some preliminary remarks.

9          As I indicated, I respect the Third Circuit, I

10 understand the recent application made to the Third Circuit.

11 If the Third Circuit decides to play a role in an early

12 dismissal of this case, so be it; if the Third Circuit decided

13 to ask me or on its own to reshape the preliminary injunction,

14 so be it; and, if they do neither, so be it.  I am going

15 forward with this case, addressing it the way I would any

16 Chapter 11 proceeding, which means I do not intend to engage in

17 beat-the-clock on either side, on the dismissal motions or on

18 the plan process.  It's not going to be a race because, at the

19 end of the day, that's not going to be effective.  There are

20 too many factors, appeals, stays, and the like.

21         So I suggest counsel take a realistic approach going

22 forward as to how best to move the plan process forward and how

23 best to move the dismissal motions forward.  Let's not have

24 unrealistic expectations on timing.  I have seen you all for 20

25 months argue, nothing happens quickly.  All right?  It's just

1  the reality.  And we're talking about tens of thousands of

2  claimants and billions of dollars, and I'm not going to treat

3  this case as if it's -- to give it less time, effort, and

4  consideration than I would a Chapter 13 case.

5          So let's address -- why don't we address a couple of

6  matters.  The -- and not on the agenda.  Mediation.  I have

7  decided to appoint two co-mediators.  And I understand,

8  Mr. Molton, there may be a motion asking me to cease efforts

9  going forward in the case pending the dismissal motion.  I'll

10 consider it when it gets filed.

11         MR. MOLTON:  Sure.

12         THE COURT:  But as of this point, as I've said, I'm

13 going to treat this as I would any Chapter 11 and do what I

14 think is warranted.  I received the input of the debtor and the

15 TCC and recommendations and admonitions of -- as to whether

16 it's appropriate to move forward with mediation.  I think it

17 is.  I always think talking serves a purpose in trying to come

18 to a consensus.

19         I have decided to appoint two co-mediators, Gary

20 Russo, who's been involved in this case, and Eric Green.  Both

21 are well-known, obviously Mr. Russo from his experience

22 already.

23         I'm confident everyone in this courtroom is familiar

24 with -- I'll call him Professor Green, a law professor at BU

25 for 30 years.  Founder and a chief mediator at JAMS in Boston.

123

1   Involved as FCR in multiple asbestos bankruptcies.  A special

2   master in Takata Airbags.  Also involved in, as a special

3   master in Ohio, asbestos litigation.

4        He's well-qualified.  If there's any -- if you need

5   any information, the Court is happy to supply the CVs.  But I'm

6   pretty confident that's not a name that's unknown to the

7   professionals in this room.

8        I am going to ask them to undertake to pursue

9   mediation immediately.  I am cognizant of the TCC's request

10  that there be a limitation on ex parte communications with the

11  Court by the mediators.  Notwithstanding, I will permit -- I

12  will authorize the co-mediators to have ex parte communications

13  with the Court on procedural matters.  I've never had

14  discussions as to dollars or substantive matters with the

15  mediators.  I don't intend to start now.

16       I will require that both mediators be present on any

17  conversation with me.  I've chosen the mediators, because I

18  recognize -- at least it seems that both the debtor and the TCC

19  are comfortable with one or the other but maybe not both.

20  Well, that to me serves as the best check and to ensure that

21  there's no untoward influence.  But in any conversation I'll

22  have with the mediators, both mediators will be involved unless

23  one authorizes another to speak to me on their own for ease or

24  to facilitate a conversation.

25       The mediators will have full authority -- we're going

124

1  to work off of the prior amended mediation orders.  I will ask

2  debtor's counsel to supply a draft -- the most recent draft.  I

3  may mark it up, so please send it in Word.

4          I will authorize the mediators to have full authority

5  and discretion to conduct the mediation as they seem -- or they

6  deem it appropriate, to require the attendance of such parties

7  as they deem appropriate.  So submit an order to that effect.

8          It is not my intention to delay mediation past

9  motions to dismiss or the plan process, because, as we've seen,

10 they take on lives of their own.  And I don't think any day

11 that goes by benefits by not having people starting to talk.

12         MR. MAIMON:  Your Honor?

13         THE COURT:  Yes?

14         MR. MAIMON:  With regard to that, the motion that had

15 been pending by the debtor to appoint both Mr. Russo and

16 Judge -- retired Judge Schneider, which was withdrawn, we --

17         THE COURT:  That was withdrawn.

18         MR. MAIMON:  We were going to file opposition because

19 of what we learned in discovery about their involvement in the

20 discussions before the dismissal of the first bankruptcy.

21 Because they withdrew the motion, we didn't file any

22 opposition.

23         But we would have opposition to Mr. Russo.  And I'm

24 asking the Court leave to make that application that he not be

25 appointed as a mediator.  This would have been done already but

125

1  for the withdrawal of the motion.  And we just believe that we

2  are entitled to bring that issue before the Court.

3         THE COURT:  I'm overruling the objection.  You're

4  free to file a motion.

5         MR. MAIMON:  Thank you.

6         THE COURT:  That I would never deny.

7         MR. MAIMON:  Thank you.

8         THE COURT:  But I'm not modifying my determination to

9  appoint them as of today co-mediators.

10        MR. MAIMON:  We always seek permission to file

11 motions.

12        THE COURT:  All right.

13        MR. SATTERLEY:  He does.  Not me.

14        THE COURT:  I wish I had the authority to say no.

15        MR. SATTERLEY:  Mosh does.  Not me.

16        THE COURT:  All right.  Let's talk about the motions

17 to dismiss and timing.  I believe correspondence was submitted

18 and was -- on behalf of the Committee and responded to by

19 debtor's counsel.

20        And I understand the Committee's position as far as

21 not wishing to consent or -- it's not even just the Committee.

22 We have U.S. Trustees.  We have other parties who filed motions

23 or joinders.

24        And I understand the unwillingness to consent to an

25 extension of the time frames listed under 362, the 30 days to

1  commence and the 15 days for which I'm supposed to whip out a

2  decision.  But we're dealing with seven motions.  We're dealing

3  with a court calendar that is difficult to block out the days,

4  quite candidly.  There are other cases and other burdens.

5         We're dealing with a much more compressed time frame

6  than you afforded me the last time where we started in December

7  talking about dates in February.  Now we're talking about dates

8  in the next three weeks.  Well, I don't have three, four, five

9  days so easily just to give.

10        But I'd like to hear from the counsel as to what are

11  their expectations as far as days that would be required.  Let

12  me turn -- since these motions to dismiss are by plaintiffs'

13  side, does the Committee or others have a sense of what they're

14  looking for as far as a time commitment?

15        MR. MOLTON:  Michael, you want to --

16        MR. WINOGRAD:  Good afternoon, Your Honor.  This is

17  Michael Winograd for the TCC -- proposed counsel for the TCC.

18  Your Honor, I will try and tailor what I was going to say to

19  what Your Honor has just said.  And I -- we appreciate the fact

20  that Your Honor has said that this is not going to be a race to

21  beat the clock.

22        We are most concerned with delay.  Obviously,

23  we've -- it's been said numerous times before.  There are many

24  victims that have been subject to delay.  There was a great

25  deal of hope after the Third Circuit opinion came out and after

1  this case was dismissed, and that lasted just over two hours.

2       There is a statutory time period of 30 days to begin

3  a hearing and 15 days from the beginning to render a decision.

4  In terms of what our expectations are, Your Honor, it's

5  important to remember -- and I'd be happy to very briefly

6  summarize some of the cases that were pointed out in the

7  letters by the debtor.  It's important to remember we're not

8  starting from scratch.

9       This case has been litigated through a full motion to

10 dismiss trial.  The Third Circuit ruled just a few months ago.

11 Since then, the new facts that are relevant are very narrow.

12 And we had significant discovery and an evidentiary hearing on

13 them just two weeks ago.

14      So our position is we're -- we think that this case

15 can be decided on a motion to dismiss as is.  If the -- Your

16 Honor believes that there is some incremental discovery that

17 needs to take place on the new facts that haven't already been

18 covered in the preliminary injunction hearing, we think that

19 can take place certainly within three weeks.  Now, I understand

20 Your Honor is talking about how long the hearing will take and

21 whether Your Honor can schedule that.

22      And if you look at just the law and the cases which I

23 think are informative to Your Honor's question, counsel

24 looked -- counsel for the debtor looked like -- you know,

25 searched the entire country, pulled all the cases it could find

128

where these motions were granted.  If you look at four out of
those six cases, they're just granting an extension of time for
the court to render its decision, because the court's calendar
was full.  And those weren't lengthy extensions.

If you look at the only cases that extended the
actual hearing date, one was extended by six days, again so the
court could find time within its calendar to do it.  And it was
a six-day extension.  The other one, I think, was granted a
month, but that was on consent.  It actually had the hearing
within 30 days, during which point at the end of the hearing
the parties said we consent, we all think we need a huge amount
of discovery, and the court granted it at that point.

So in terms of what we think, Your Honor, there's not
much discovery that we think needs to be done, if any at all.
If it -- there is discovery to be done, this new sort of
bucket, it can be done very quickly and certainly within three
weeks.

And then we think that Your Honor -- it's -- we have
talked -- in terms of the length of the hearing, we've talked
with the other side.  And, obviously, subject to your Court --
Your Honor's preferences, we think most of these witnesses can
come through deposition designations.  They've been deposed
already.  Again, I don't know how many really need to be
re-deposed.

We could put these witnesses in through deposition

designations.  The number of live witnesses would be, I would

have to think, maybe a few.  I don't even know that we need new

expert opinions.  If we do, that's, you know, a few experts.

This is a few-day trial at most, Your Honor, at most.

Now, I know that the other side has taken the position that

they're going to need six to eight fact witnesses and -- I

think it was two to three experts.  We think this is just an

effort to deluge in extraneous witnesses and facts.

We don't think it's that -- it's necessary.  But,

again, the experts can come through their expert reports, at

least for direct examination.  And most or all of these

witnesses can come through a designation.

So subject to your Court -- Your Honor being able to

schedule two, three days, we think we can certainly do this

within the time frame.

THE COURT:  All right.  Well, but you envision

calling witnesses, correct?

MR. WINOGRAD:  Well, Your Honor, again, so what we

would envision --

THE COURT:  I'm not going to dictate to you what

discovery you should take.

MR. WINOGRAD:  Yeah, yeah.  So in terms of what

discovery we can take and what witnesses will be called, we had

had conversations about, you know, exchanging witnesses lists

in advance of today so we could understand this.  But we're in

1  a position where we can't really tell Your Honor.

2          It's their burden.  It's mostly their witnesses.

3  We need to see what they intend.  I was surprised to hear they

4  have witnesses offering new evidence.  To the extent that there

5  are witnesses with new evidence, we'd have to take a couple of

6  those depositions.  But in terms of live witnesses at trial,

7  Your Honor, I don't know that there's more than, you know, one,

8  two, three instrumental witnesses who would have to testify

9  live as opposed to by deposition designation.

10         And, Your Honor, really, the only -- you know, if I

11  could just take a brief moment.  The only bases that the other

12  side has offered is -- as Your Honor has pointed out, there are

13  seven motions to dismiss.  We think that, in part, speaks

14  volume for the dismissability of this case.

15         But in any event, those motions are largely

16  overlapping.  I suspect there will be one omnibus reply, which

17  we hope -- response or objection.  We hope to get that in

18  advance of being able to tell Your Honor what our discovery or

19  witness strategy will be.  But they're largely overlapping and

20  largely say and emphasize the same points.

21         They've talked about discovery.  I've already

22  addressed that, Your Honor.  We don't think there's much new,

23  and we think we can do it in the time frame.  And, again,

24  they've talked about the trial -- you know, the witnesses.  And

25  again, Your Honor, I think most of those can be handled through

1  deposition designation, and we can do this in a very timely and

2  efficient manner.

3          And, Your Honor, if -- consistent with about four of

4  the six cases they cited, if Your Honor gets to the end and

5  feels this is an extremely -- you know, there have been new

6  issues raised and Your Honor needs more than the 15 days to

7  render the decision, then Your Honor will tell us how much time

8  Your Honor needs.  But that issue, I think, is premature at

9  this point, certainly not -- doesn't warrant putting off the

10  actual trial.

11          THE COURT:  All right.

12          MR. WINOGRAD:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Mr. Gordon?

15          Oh, Ms. Richenderfer?

16          MS. RICHENDERFER:  Thank you, Your Honor.  I have to

17  make my trip worthwhile today.  Your Honor, Linda Richenderfer

18  on behalf of the Office of the United States Trustee.  Your

19  Honor, I think in large extent we agree with what counsel for

20  the TCC said.

21          I liken what we're looking at as to what we looked at

22  when we did the preliminary injunction hearing.  You had

23  multiple, multiple objections that were filed.  There was

24  organization, though, on behalf of the parties who were

25  objecting or who were against the relief that was being sought

1  by the debtor.

2          I think that this time we've had some experience and

3  hopefully this time will be -- we can be just a teensy bit

4  better in terms of not overlapping each other.  So I'm not

5  saying that there wasn't room for improvement, but I think it

6  could have gone far worse.  Could have gone far longer, I

7  should say.

8          Your Honor, I think it's -- this is largely an issue

9  of law.  I think it is largely an issue of law that's been

10 raised in all of the motions.  And it's law applied to the

11 facts that are already before this Court.  And the facts were

12 brought in through the motion for a preliminary injunction.

13         And designations can be done.  We have time now.  We

14 didn't have time before.  Very, very compressed schedule before

15 the hearing on the preliminary injunction motion.  We now have

16 three weeks.  To a lawyer, that's like a lifetime.  Before, we

17 had two days.  I mean, we were doing depositions up until 8:00

18 the night before the --

19         THE COURT:  Well, you were all asking for a

20 sua sponte decision.

21         MS. RICHENDERFER:  Well, that --

22         THE COURT:  You know, look at the irony there.

23         MS. RICHENDERFER:  Well, my office was not, Your

24 Honor.

25         THE COURT:  We're talking about days of trial and

1  designation of discovery, and I was supposed to make a decision

2  in hours.

3         MS. RICHENDERFER:  Well, to be clear, Your Honor, the

4  United States Trustee did not ask for that sua sponte ruling.

5  We do believe there needs to be a record that is put together,

6  because, unfortunately, I think that whichever side does not

7  prevail will be seeking relief elsewhere.  And we understand

8  the importance of Your Honor being able to put together that

9  record.  And we want to put together that record.

10        THE COURT:  Well, and I agree with you.  Because what

11  nobody needs is a remand.

12        MS. RICHENDERFER:  Exactly, Your Honor.  To me, this

13  is the remand.

14        So, Your Honor, I think that normally I would say

15  this should be a one-day hearing.  But I saw what happened with

16  the preliminary injunction.  And when we've got closings that

17  take three hours, it means it's a two-day hearing.

18        But I do think that, again, I echo what was said by

19  TCC counsel.  We don't know what the party to the left of me,

20  who bears the burden of proof, is going to put on.  But I don't

21  know what more they can or should be saying other than what's

22  in Mr. Kim's first day declaration.  That's supposed to be the

23  support for this filing.  That's supposed to tell the world,

24  the Court, the U.S. Trustee's Office, everyone else why this

25  case was filed.

1          And there was an opportunity to take Mr. Kim's

2    deposition.  There was some cross-examination of him in court

3    that day.  And I don't know how much further anything really

4    needs to be taken.

5          I don't know what other evidence.  Does it need to be

6    compiled together for Your Honor in a very organized fashion?

7    Most definitely.  We owe the Court that.

8          But I see this as, like I said, primarily -- it's a

9    legal argument based on the facts that have been set forth by

10   the debtor in its own first day declarations.  So, Your Honor,

11   the U.S. Trustee would agree that limited hearing -- like I

12   said, I would say one day, but I saw what happened.  A lot of

13   people want to speak.  So I would say two days.

14          THE COURT:  All right.  Fair enough.  I will --

15          Come up, Mr. Satterley.

16          MR. SATTERLEY:  Yes.

17          THE COURT:  I, of course, have to bear in mind the

18   admonition of the Third Circuit when they didn't care for my

19   casual math.  Well, all right.  To overcome casual math, I need

20   a record.  So I'm not sure I share the optimism here, but we'll

21   see.

22          Mr. Satterley?

23          MR. SATTERLEY:  Yeah.  Joe Satterley, Kazan, McClain

24   Satterley & Greenwood.  I would suggest -- I'll echo what the

25   U.S. Trustee just said.

1          I would suggest that the debtor share with us over

2     the next day or two -- I thought they were going to do it last

3     Friday -- what witnesses, what evidence, what information they

4     have.  And then we meet and confer.  And then next -- I think

5     Your Honor said next Tuesday, you've got a hearing scheduled in

6     this case.  Then we will -- we'll be in a better position to

7     advise Your Honor exactly the length of anything.

8          I agree for the most part this is a question of law.

9     But the debtor seems to think that they're going to be putting

10    on a lot of witnesses.  And so I would request Your Honor to

11    order them to do what I thought they were going to do last week

12    and tell us, well, who are the witnesses and what's the scope

13    of their testimony.  And then we can meet and confer regarding,

14    you know, whether that's really actual testimony that needs to

15    be heard live or whether depositions are sufficient.

16         So that's my suggestion.  The other suggestion would

17    be they could file a written opposition outlining their

18    arguments to the motion to dismiss, preliminarily at least, so

19    we know what their arguments are and what they think is

20    important.  I think that will give everybody guidance on what a

21    trial would look like.  Thank you, Your Honor.

22         THE COURT:  All right.  Thank you, Mr. Satterley.

23         Ms. Richenderfer?

24         MS. RICHENDERFER:  Your Honor, I apologize.  I got

25    back to my seat and I was reminded by my co-counsel.  I forgot

1 an important point.  We don't see the need for expert discovery

2 here.  Your Honor made a remark about what the Third Circuit

3 said about the record in terms of numbers of claims.  I

4 don't -- that's not an issue at least that the United States

5 Trustee sees.

6          I do see -- think that we are starting from a point

7 in time.  We're not starting fresh.  We're starting from a

8 point in time, and it's a point in time when the Third Circuit

9 said this case, they do not show financial distress.  And we're

10 starting from that point in time.

11          And then we're moving forward from that point in

12 time.  Do they -- can they show financial distress at this

13 point in time?  And as I said during the preliminary injunction

14 hearing, are we looking at a debtor that still basically has

15 the same assets?  They're just in different form, fraudulent

16 conveyance claim and a settlement or agreement with its

17 ultimate parent corporation that's worth an amount less than it

18 started with.

19          But we're not starting from scratch.  We are starting

20 from the Third Circuit opinion on --

21          THE COURT:  Well --

22          MS. RICHENDERFER:  I don't see why we need experts.

23          THE COURT:  I'm not sure I agree.  I'm certainly

24 wiling to listen to argument.

25          MS. RICHENDERFER:  Uh-huh.

1          THE COURT:  The Third Circuit looked at a snapshot

2    the day of --

3          MS. RICHENDERFER:  Right.

4          THE COURT:  -- the petition from the first case.

5          MS. RICHENDERFER:  Uh-huh.

6          THE COURT:  The Third Circuit or any reviewing court

7    and I have to look at a snapshot the first day of the petition

8    in the new case.

9          MS. RICHENDERFER:  I --

10          THE COURT:  And that's the comparison.

11          MS. RICHENDERFER:  And I understand, Your Honor.  And

12   I think the Third Circuit's already spoken to that in footnote

13   18.  It's unbelievable how much people can read that and

14   disagree about what it means.

15          THE COURT:  In this case, nothing is unbelievable.

16          MS. RICHENDERFER:  Well, I guess that I should -- but

17   you're right, Your Honor.  It's a different point in time.

18   It's a point that's 2 hours and 11 minutes later.  It's a

19   different point in time.

20          But we -- same number of claimants.  They may be

21   current now whereas before they were future.  That's where I'm

22   still puzzled by these numbers of people, where they're coming

23   from.  So I guess that between the first filing and the second

24   filing, futures all of a sudden became current.  I don't know.

25          But it doesn't make a difference, the number of

1 claimants, because we have here now a pot plan whereas before

2 we had a plan that went up to $61.5 billion.  I think

3 Mr. Gordon even said it today.  The whole idea was not that

4 that much money would be turned over but enough money would be

5 turned over so it was a 100 percent plan.

6         And so, at this point in time, Your Honor, I think

7 that there is the need to, you're right, look at the two points

8 in time and what changed.  And I think that's what the motions

9 to dismiss -- at least I know our motion to dismiss focused on,

10 to a great extent, what changed and was the debtor allowed to

11 make that change or did the debtor do something it should not

12 have done while it was still in that position.

13         Your Honor, earlier today I was talking about

14 prepacks.  And I've dealt with them in Delaware.  Prepacks,

15 you've got a company that's sitting there and it can do

16 whatever it wants to do.  And Imerys started off that way.  It

17 brought in Mr. Patton.

18         THE COURT:  I don't want to get too far afield.

19         MS. RICHENDERFER:  Okay.  But my point is this, Your

20 Honor --

21         THE COURT:  We'll be arguing it.

22         MS. RICHENDERFER:  -- prepack doesn't apply here.

23 They were already in bankruptcy.  You can't do a prepack when

24 you're already in bankruptcy to go from one bankruptcy to the

25 next.  I'm sure they're going to disagree with that.  But, Your

1  Honor, I think the concept doesn't fit within the reality of

2  what happened here.

3          THE COURT:  Fair enough.  Thank you.

4          Ms. Jones?

5          MS. JONES:  Thank you, Your Honor.  Good afternoon.

6          THE COURT:  Good afternoon.

7          MS. JONES:  Your Honor, Laura Davis Jones of

8  Pachulski Stang Ziehl & Jones on behalf of Arnold & Itkin.

9  Your Honor, just very briefly.  We do not believe that there's

10  any further discovery needed.  I agree with the U.S. Trustee

11  that we're at the point now that we're talking about largely

12  legal arguments that would be discussed.  And those -- and

13  they're based on facts that are already in the record, Your

14  Honor.

15          Your Honor, with respect to the debtor filing a

16  response, Your Honor, obviously, if they have a response, the

17  burden's on them.  So I would expect they would get their

18  papers in.  But I think, Your Honor, like a lot of lawyers,

19  unless we see a deadline, things don't get moving along.

20          So I'd suggest, Your Honor, as where we stand right

21  now that we move forward, have the motion to dismiss heard on

22  May 22.  If parties decide that they do need more time for

23  whatever reason, we can bring that matter before Your Honor at

24  that point.

25          THE COURT:  All right.  Thank you, Ms. Jones.

1          MS. JONES:  Thank you.

2          MR. MAIMON:  If I could raise just one point, Your

3   Honor?

4          THE COURT:  Yes.

5          MR. MAIMON:  And that has to do with claims.  And I

6   hope this is well understood.  You can't have more than all,

7   right?  If I have all of something, I can't have more than all

8   of it.

9          LTL 1 was filed to resolve all talc claims.  You may

10  put them in the future bin.  You may put them in the present

11  bin.  But that's just moving things from one jar to another.

12  It was all then.  They say it's all now.  You can't have more

13  than all.

14          THE COURT:  All right.  Thank you.

15          Mr. Thompson?

16          MR. THOMPSON:  Clay Thompson with Maune Raichle.  We

17  strongly join all of that.  There's no discovery that's needed.

18  They filed on April 4th.  This is their scheme.  Not ours.

19          They're a bad faith debtor.  They have the burden.

20  We don't need to listen to four days of how bad the claimants'

21  bar is again.  The Third Circuit already ruled on that issue

22  anyway.

23          And Mr. Ruckdeschel is texting me frantically to say

24  that he joins for Mr. Crouch that no discovery is needed.

25  Thank you.

1          THE COURT:  I see his hand up, but that's fine.

2          All right.  From the debtor's perspective?

3          MR. GORDON:  Thank you, Your Honor.  Greg Gordon,

4   Jones Day, on behalf of the debtor.  I find it remarkable that

5   the parties who filed motions to dismiss and proclaim that it's

6   our burden, and we don't dispute that, would then attempt to

7   dictate how we should meet our burden and what we should be

8   required to do and should circumscribe this process in the

9   manner that they're proposing.

10          And, you know, I will say to Your Honor that we've

11  had meet and confers with the other side before today about

12  scheduling.  And what you're seeing today is a reversal in

13  position on where they were just last Friday or so.  And this

14  is reflected in the letter that we sent in.

15          Last Friday -- and maybe it was last Thursday.  I

16  can't remember.  Where they were was we need discovery.  We

17  will have two to three experts.  We expect to have four fact

18  witnesses.  And we need you, the debtor, to tell us who your

19  witnesses are, fact and expert; and, in fact, that information

20  should be exchanged on Tuesday, the Tuesday that just went by.

21          And we actually agreed to that.  And the schedule

22  that we put in the letter to Your Honor is the schedule that we

23  proposed to them last Friday based on the discussions that we

24  had.

25          So since those discussions last Friday and today,

there's now a complete reversal in position that, oh, no, no

discovery is needed.  We don't need anything.  And we also are

basically asking you to order that they, the debtor, is not

entitled to anything.  Now you're being asked to order us not

to do any expert discovery.

          And this has just gotten to the point of being

ridiculous.  I mean, we literally on Friday were to the point

where each side had said about four fact witnesses and two to

three expert witnesses each.  Based on that, there's no

conceivable way that could be tried by May 22nd.  They know

that.

          And so what we then tried to do was come up with a --

what we thought was a very compressed schedule under those time

frames.  Now, for parties to come up here and say this is all

legal, I don't see how they can make that contention based on

what's been filed with the Court.  There are legal issues

imbedded in this.

          But their number one issue, for example, is there's

no financial distress.  That's a factual issue.  And Your Honor

made the point that I was going to make.  The Third Circuit was

critical of the fact that the first time around there weren't

sufficient projections in the record about -- that go -- went

to the issue of financial distress.  Well, we expect to have

experts who would address those issues.

          Part of their case is that we, again, engaged in the

1 largest fraudulent conveyance in the history of the United

2 States.  Those are -- there's legal issues there, but they're

3 factual issues as well.

4      They've also said that our support is all fake or its

5 de minimis.  Those are all factual disputes.  Those are raised.

6 Those would be addressed as well.

7      So there's any number of issues that would need to be

8 addressed.  And to me, it would be completely unfair for there

9 to be directives from this Court that we have to try our case

10 in a way that works for the objectors, particularly given that

11 it's our burden to make the case.

12      So, Your Honor, if you'd just look for a moment at

13 the schedule.  And we tried to think through what all the

14 deadlines would be.  And I don't think anybody can look at this

15 and say that these deadlines are unreasonable or reflect delay.

16      Again, if you look -- the very first date which we

17 had talked about was service of written discovery requests and

18 simultaneous identification of fact witnesses, including

19 statement of topics of testimony and whether the party expects

20 currently the witness to be presented live or deposition

21 designation.  That was to have been done yesterday.

22      We advised Mr. Winograd and the other side we were

23 still prepared to do that.  And Mr. Winograd told us that,

24 well, we're not willing to do it anymore.  And so for

25 Mr. Satterley to come up here and say, well, we were expecting

1  to know about this by today, the reason they don't know about

2  it is because they wouldn't do what they -- we thought they had

3  agreed to do earlier.

4         And then if you go down the deadlines, then by May

5  12th the parties would identify expert witnesses, including

6  their CVs and anticipated opinions.  The 19th, discovery

7  responses and productions would be due.  I mean, this is all

8  accelerated.  The 24th, objections to motions to dismiss due.

9         So we -- and we would anticipate filing a single

10 response brief.  We think that'd be easier for Your Honor.

11        And one thing I would add at this point, the motions

12 to dismiss keep coming in.  There were two more that came in

13 just on May 1st, one from the U.S. Trustee, one from the Itkin

14 firm.  We probably ought to add a deadline by which no further

15 motions to dismiss can be filed, because I don't think it makes

16 sense for anybody to go down this road for two or three weeks,

17 then to have two or three more motions filed.  So I think maybe

18 we would add to that list.

19        But continuing.  You got expert reports served on the

20 30th.  Fact discovery completed on June 6th.  Expert discovery

21 completed June 20th.  And then one week before the hearing, you

22 designate deposition testimony, you proffer exhibits,

23 et cetera.

24        And so that, to me, is an enormously compressed

25 schedule.  We thought something like this would fly.  We've now

1  been told that it's May 22nd or nothing.  And that, to us, just

2  isn't realistic.

3          So whether we go with exactly this schedule --

4  obviously, we're not going to insist on that.  But something

5  like this, it seems to us, works.  This is what would be

6  approximately the time frame that we had for the motion to

7  dismiss -- or the motions to dismiss in LTL 1.  It's about the

8  same period of time.

9          But if you look at these dates and you think that --

10 we believe we're going to have two experts.  They've said two

11 or three.  Each side at one point in time talked about

12 discovery.  I know we have plans for some written discovery.

13 To suggest a schedule that's much more compressed with this, I

14 think, would run the risk of being unrealistic.

15          So and this -- if you work your way through this,

16 this would likely end up with a hearing in the early -- and,

17 again, subject to Your Honor's availability -- in the July --

18 early to mid-July time frame.  And we do believe this is a four

19 or five-day hearing given where we are.

20          And, you know, they are today equivocating on what

21 they would do.  Before, they were telling us four fact, two to

22 three experts.  Now they're telling you, well, we're not sure;

23 we want to see what the debtor has first, and then we'll

24 respond.

25          I don't see, if that's their position, again, how you

1  remotely get to a hearing on May 22nd.  As you said, it's like

2  three weeks from today.  That just seems impossible.  So that's

3  fundamentally, Your Honor, where we are on this.

4          THE COURT:  All right.  Mr. Winograd?

5          MR. WINOGRAD:  Your Honor, Mike Winograd from Brown

6  Rudnick, proposed counsel to the TCC.  Your Honor, there has

7  been a lot of lawyers talking about other lawyers today, and

8  I'm not going to contribute to that.

9          Here, we now have conversations about who said what

10 on meet and confers and in emails.  What Mr. Gordon just said

11 is inaccurate.  He failed to read the part where that was

12 explained in the email thread he was looking at.

13         And what we have said consistently is it is hard for

14 us to say what witnesses we need when it is your case, it is

15 your burden, and it is, in fact, your witnesses that have all

16 the information, so let us know what those -- who those

17 witnesses are.   What we said in response -- the response we

18 heard, you need simultaneous -- we need something simultaneous.

19         And what I responded with was, okay, we can tell you

20 we know that Mr. Kim is going to be a witness at this trial.

21 We think Mr. Murdica will probably be a witness at this trial.

22 But beyond that, we're going to have to reserve.  And the other

23 side was fine with that.

24         With respect to discovery, the only time we said we

25 needed discovery is when we were told, surprisingly, that there

1    are going to be witnesses with new testimony from the PI

2    hearing.  Now, we just said we don't know what that is.  But if

3    there's new testimony, we're going to need to know what that

4    is.  And then we may have to take some discovery, but it will

5    be limited.

6              This pushes and emphasizes that they should file

7    their opposition to the motion to dismiss.  They've had this

8    work -- this scheme in the works for months.  Let them file

9    their motion to dismiss.  We can see their arguments.  We can

10   see what actually -- what sliver we're actually talking about.

11             If there is, in fact, a sliver of new things that

12   need to be addressed -- Your Honor talked about experts and

13   financial distress.  If we need to address the impact of the

14   termination of the 2021 funding agreement and the new funding

15   agreement, that is a very discrete area that I'm quite

16   confident we could do in depositions in a day and have one or

17   two witnesses -- one witness on either side testify on it.

18             But, again, if there is new testimony, Your Honor, we

19   are talking about just a sliver that can easily be handled in

20   three weeks, which I'm told in bankruptcy world is an eternity.

21   And at trial -- I believe in debtor's own letter they had

22   suggested it would be -- I don't remember, Your Honor -- two to

23   three, three to five-day -- not a week-long trial.

24             And, again, as counsel previously suggested, if we

25   get to that hearing, and it appears that we are not going to

get through it in two to three days, and that's all the time

Your Honor has, we can continue the hearing or address it at

that point.  But at this point, it is premature to push off the

hearing under the statutory time period.  Thank you, Your

Honor.

THE COURT:  Mr. Satterley?

MR. SATTERLEY:  Very briefly, Your Honor.

THE COURT:  Yes.

MR. SATTERLEY:  So a week or so ago, I did

participate in a meet and confer, and I asked that very

question.  What witnesses?  What experts?  Are you going to

have a medical expert that's actually going to look at the

records -- the pathology records to see if these are frivolous

cases or real cases?  And they said we'll let you know.  I

think they said we don't know.

So from the get-go, I've been asking that question.

I wasn't on the Friday meet and confer, because I was busy

deposing Target in Valadez's case.  So I don't know what was

discussed in any great detail on the phone.

But the bottom line is, we know from the depositions

we took with the preliminary injunction and the testimony of

Mr. Kim and Mr. Dickinson that LTL -- nobody -- no board

member, nobody made any estimate of future liabilities at any

point in time.  And so I think it's improper for them now to

try to hire somebody to backfill what they should have done in

1  the beginning before they filed this on April the 4th, is to

2  actually do what a board of directors should be doing, is

3  estimating their liabilities.  They didn't do it.  So it should

4  be a pretty simple trial, Your Honor.

5          THE COURT:  All right.  Well, the fact is, there are

6  constraints on my calendar that are unavoidable.  What I was

7  going to suggest -- and this will dissatisfy -- not satisfy

8  probably anyone -- is that I can carve out four days.  Last

9  time it was four days, and the fifth was the preliminary

10 injunction.  I don't see why it should be more than that.  It

11 probably should be less than that.

12         But I can carve out June -- the week of June 12th.

13 It's three weeks after -- I think it's three weeks, roughly,

14 after the motion is calendar, which is not excessive.  It's

15 after the Memorial Day weekend, which we all have to take into

16 account.  It gives time for the parties to do discovery,

17 limited.

18         What I'm going to suggest is I will carve out that

19 week.  Why don't you engage in another meet and confer about a

20 schedule.  If the parties can't agree, we can talk about it.

21 We'll be together on Tuesday.

22         So as of now, based on the motion filing, there's --

23 opposition, I guess, would be due May 16th, the week before the

24 motion on the 23rd.  That's normal local rules.  Obviously,

25 that's all subject to discussions.

1          I think what would make the most sense -- Mr. Gordon,

2   is the debtor in a position to identify, at least initially,

3   its prospective witnesses?

4          MR. GORDON:  We're in a position, I believe, to

5   identify the fact witnesses.  As I said, we are (sic) prepared

6   to do that yesterday.  The experts are still working on that.

7          THE COURT:  All right.  Well, then --

8                        (Counsel confer)

9          MR. GORDON:  Excuse me?

10          MR. MAIMON:  I believe they should have had the

11   experts when they filed, Your Honor.

12          MR. GORDON:  And why is that?

13          MR. MAIMON:  Because if you claim financial distress

14   and you made claims in a petition --

15          MR. GORDON:  Yeah.

16          MR. MAIMON:  -- that Mr. Kim asserted to, they should

17   have been prepared.

18          MR. GORDON:  Thank you.

19          THE COURT:  I don't see in the petition where it

20   requires financial distress in the petition.  Obviously, you

21   identify -- there's a lot that goes into the petition.  But I'm

22   not familiar with that check box.

23          Identify your fact witnesses by close of business

24   tomorrow.  We're going to move the process along a lot better

25   if you can identify your expert witnesses in short term.  Why

1  don't we conference this on Tuesday.

2         If you all tell me the week of June 12th is not

3  acceptable -- we can proceed on the 23rd.  I can make a ruling

4  that will not stand up either way, because it probably is just

5  going to be remanded, and we're going to be back here.  And I'm

6  not sure what anybody's accomplished if they're looking to save

7  time.

8         MR. MOLTON:  Judge, we'll take those dates.

9         THE COURT:  Okay.  All right.  Well, then why don't

10 you talk and work it out.  If not, we can talk about it on the

11 9th.  All right?

12        MR. GORDON:  Your Honor, Greg Gordon.

13        THE COURT:  Yeah.

14        MR. GORDON:  Just one thing.  I mean, obviously,

15 we'll comply with the fact witnesses.  I would say to Your

16 Honor, though, we would want to reserve our rights.  We're

17 obviously doing that in a vacuum, not knowing what their case

18 is going to be.  I mean, they put it all on us, but this is a

19 two-way street.  And so we'd reserve our rights to supplement

20 that as need be based on whatever we see from the other side.

21        THE COURT:  I'm not asking for commitments.

22        MR. GORDON:  Thank you.

23        MS. BROWN:  And, Your Honor, can I raise one issue?

24        THE COURT:  Yes.

25        MS. BROWN:  I very much on behalf of my client would

152

1 like to participate in the motion to dismiss hearing, but I

2 will now --

3          THE COURT:  Well, you'll be done with that trial in

4 California.

5          MS. BROWN:  -- be -- unfortunately, Judge, we'll

6 probably just be halfway through.  And so, Your Honor, that

7 raises a problem for my client.  I can't be in two places at

8 once.

9          MR. SATTERLEY:  They have 11 lawyers.

10          MR. MAIMON:  And Mr. Satterley won't be here either.

11          MR. SATTERLEY:  Yeah.  I won't be here.  They have 11

12 lawyers against me, so I think they've got enough.  And so,

13 Ms. Brown, she can -- Mike Brown, who's actually also lead

14 trial counsel, has tried a lot of J&J cases.  They've got King

15 & Spaulding, Skadden Arps, Nelson Mullins, another law firm.

16 There's no reason to have this motion to dismiss to be any way

17 conflicted by Valadez.

18          THE COURT:  I can't dictate what goes on in this

19 court based on another court at least a month in advance.

20 Let's see what happens and what -- where we're going as far as

21 agreed dates and time frames.  It could very well be that

22 you're not needed out there on a particular day that's here.

23 So we'll play it by ear, at least at this juncture.

24          MS. BROWN:  Thank you, Your Honor.

25          THE COURT:  So other than carving out that week, I'm

1  going to leave it -- I'm going to ask you all to engage in

2  another meet and confer and see what can be agreed upon.

3        Let's talk about -- well, what else is on the agenda?

4  There were some items -- let me address, if I may, I received

5  correspondence from Weitz & Luxenberg regarding the scope of

6  the stay on post-verdict matters.  For the benefit of all, the

7  Court's concern is always -- has been liquidating claims --

8        MS. BUSCH:  Your Honor?

9        THE COURT:  Counsel?

10       MS. BUSCH:  Lisa Busch from Weitz & Luxenberg.  We

11 were pretty forward on those papers.  I don't know if you need

12 me to give you any more enlightenment on that.

13       THE COURT:  No.  I was going to just give you the

14 Court's assessment of what was intended with the Court -- with

15 the order that's in place.

16       MS. BUSCH:  Okay.  Thank you.

17       THE COURT:  And that's -- the Court is -- has been

18 concerned with liquidating claims outside of bankruptcy.  And

19 that would include the appellate practice.  I included that

20 language in the opinion that I published.  So the stay remains

21 in effect as to trials, post-trial -- and including post-trial

22 activity and appeals, except if there's bonds in place.  I

23 think that was carved out.

24       So that should address that concern.  Again,

25 everybody is free to seek relief by motion if necessary.

1         We had some confidentiality issues on the agenda.

2              (Counsel confer)

3         MR. WINOGRAD:  Your Honor, there were three other

4    issues that were addressed in the letters back and forth

5    between the parties: the confidentiality designations by LTL, a

6    common interest issue on the termination of the 2021 funding

7    agreement as between LTL and J&J, and then communications

8    between the TCC -- the discoverability of communications

9    between the TCC and the United States Trustee since January 30

10   of 2023.

11        Those were addressed, at least in part, in the

12   letters.  And I would leave it to your Court.  I'm prepared to

13   talk about all of those, but I'd -- whatever your Court would

14   like to hear today.

15        THE COURT:  Well, is the debtor prepared to discuss

16   it?  I couldn't tell if there was a request to having briefing

17   on any of the issues, especially the common interest issues.  I

18   thought there was an inclination to have additional briefing.

19        MR. GORDON:  Greg Gordon on behalf of the debtor.

20   You know, I think the question is what's the best use of the

21   parties' time.  On confidentiality, what happened there, which

22   happens in all these cases, when we took these depositions in a

23   very compressed time frame in connection with the PI, much was

24   designated as confidential, both deposition testimony as well

25   as documents, with an understanding that we'd go back and

1  revisit those issues.

2        And we've had a further exchange of correspondence on

3  that where we basically indicated we were prepared to forego

4  all the confidentiality designations except for one, which was

5  we believe we should preserve the confidentiality of the

6  exhibit to the term sheet.  So you have the plan support

7  agreements, you have the term sheet, and then the exhibit.

8        And the exhibit has very sensitive information on the

9  valuation on the grid for the claims.  And that's never been

10  made public.  It's never been talked about in court.  We view

11  that public disclosure of that at this point as potentially

12  damaging to further negotiations at this point in time.

13        So we were prepared to basically forego every --

14        THE COURT:  Forego all other objections --

15        MR. GORDON:  -- everything else except for that.  And

16  the only other condition was we want a new protective order

17  that's modeled after the protective order in the old case.  But

18  the one difference is this one would have a use restriction

19  that would make clear that these -- information and discovery

20  would be for purposes of this bankruptcy case only.

21        And the reason for that is the concerns we've had

22  about this information being used in the tort proceedings now

23  that are moving forward in some respects.  We also had the

24  problem with some leakage of documents produced in discovery to

25  the press in the prior case which was a problem.  And so those

1  are the only two things.

2        We said, otherwise, we'll forego everything else.  We

3  just want to protect the exhibit to the term sheet, and we'd

4  like that use restriction in the protective order.

5        THE COURT:  All right.  Mr. Winograd?

6        MR. WINOGRAD:  Your Honor, Michael Winograd again

7  from Brown Rudnick, proposed counsel for the TCC.  Number one,

8  Your Honor, I do understand that during the depositions swaths

9  of information are typically by, you know, just automatic

10 reaction, knee-jerk reaction designated confidential.  There

11 was about 15 pages of those that we challenged.

12        We are grateful that the debtor has agreed, albeit

13 with conditions, which I'll address in a moment, to

14 de-designate all of that other than one attachment.  We don't

15 think that should be conditioned on anything.  It's either

16 confidential or it's not.  We don't think any of it's

17 confidential.  We think the fact that they're willing to

18 de-designate all of that proves that point and should all right

19 now be de-designated as nonconfidential.

20        With respect to the attachment to the term sheet,

21 Your Honor, if Your Honor would like briefing on that, that's

22 fine.  But I will note for Your Honor that that attachment was

23 discussed in open court.  In fact, one, if not two, counsel got

24 up and gave the number -- the amount of money that their

25 clients would be entitled to under the formula.  So it was

157

1  absolutely discussed without objection.  There was no objection

2  to confidentiality when it was discussed.

3        That term sheet and those calculations are also the

4  basis of all these public statements that have been made about

5  folks supporting that term sheet.  It sort of seems ironic that

6  you would say all these people in the public, tens of

7  thousands, support it but we won't tell you what those terms

8  are.  So we would oppose keeping even that one fraction of one

9  document confidential.

10        With respect to the use, Your Honor, the -- and I

11  will not speak for the United States Trustee.  But the U.S.

12  Trustee has stated in open court it would not agree, and I

13  think it said it could not agree, to any use restriction.  But

14  there's no basis -- it was not in the first PO, and we just

15  don't see any basis for a use restriction now.

16        This is all relevant information, and it should be

17  able to be used in other trials that are -- to avoid

18  duplication and a deficiency.  Thank you, Your Honor.

19        THE COURT:  Mr. Satterley?

20        MR. SATTERLEY:  Yes, Your Honor.  Joe Satterley,

21  Kazan McClain Satterley & Greenwood.  I actually filed a brief

22  on this very issue which was not responded to.  I don't know if

23  they're intending to respond to it.

24        And I specifically addressed the fact that once

25  exhibits are used in court and marked and introduced before

1  Your Honor, they're no longer confidential.  Your Honor

2  received them.  There was no objection at the time.  I cited to

3  numerous cases.  I'm not going to argue all those cases today.

4        But those -- that includes the PSA, the term sheets,

5  the board minutes, the two different board minutes.  So there's

6  four specific exhibits that were received into evidence.  And I

7  did argue in closing argument that Mr. Valadez, under the

8  terms, would only be entitled to $50,000.  And that's what the

9  calculation is.  So I think Your Honor should deem those

10  matters -- those documents for sure not confidential.

11        Second, they criticize us for not "getting our

12  clients on board with this plan."  Well, right now, under their

13  confidentiality, we can't even explain to our clients the

14  details of this, or they would potentially be -- we'd be in

15  violation, I guess, of the confidentiality order is what --

16        So it would hinder -- not that I'm going to agree to

17  a $50,000 settlement for a young man or anything like that.

18  But it would hinder the ability to even negotiate in mediation.

19  Because how do you do that?  How do you actually explain to a

20  client what they might get under a plan when all the terms are

21  confidential and doesn't allow you to talk to your clients

22  about it?

23        Finally, with regards to the depositions, I'm glad

24  they're de-designating them, no longer confidential.  As far as

25  the "use," the Federal Rules of Procedure and the Federal Rules

1   of Evidence control that.  I mean, a deposition can be used in

2   another proceeding if it meets certain things.  If it's -- and

3   another court, maybe not Your Honor, another court, another

4   federal court, the MDL may have to decide.  There's a whole

5   bunch of body of law that on use of prior testimony.

6           Johns Manville depositions -- the Sixth Circuit has

7   ruled on which depositions of Johns Manville from the 1980s

8   could be used in subsequent proceedings.  So there's a whole

9   body of law on that.  And so we would object to an order that

10  says these depositions cannot be used.  We would just say

11  follow the rules.  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Thompson?

14          MR. THOMPSON:  Okay.  So Clay Thompson with Maune

15  Raichle on behalf of Katherine Tolleson.  I also filed a

16  joinder to Mr. Satterley's motion.  It's at Document Number 99.

17          First of all, Your Honor will remember with Reuters

18  there was a lot of fast and loose allegations from Jones Day

19  about people leaking stuff to Reuters.  And then it turned out

20  that none of the stuff that was given to Reuters was

21  confidential.  And then Jones Day was like, oh, sorry, you

22  know, never mind.  So nothing bad happened, and Reuters got

23  involved.  And I don't know why the debtor is so against the

24  First Amendment.

25          Here's some things that Mr. Haas said, okay?  And I

1  attached it to my appendix, which I will add to the longer this

2  case lasts.   "As demonstrated by the recent hearings, there

3  is" -- this is April 24th -- "there is significant support for

4  the plan including from major plaintiffs law firms representing

5  the vast majority of claimants.   Opposition to the plan is

6  driven by firms who have a profit motive to remain in the tort

7  system that is at odds with the interests of their clients."

8           April 20th: "We are confident that the vote will

9  overwhelmingly support the proposal as it presents the only

10  equitable path forward.   The proposal commits 8.9 billion to

11  claimants whose claims otherwise would languish in the tort

12  system for decades and, based upon the trial record, likely not

13  receive a single dollar."

14           He issues one of the -- and he's free to do that.   I

15  don't have any problem with J&J issuing press releases.   What

16  I have a problem with is them issuing press releases about how

17  great the plan is and then telling you that the dollar amounts

18  in the plan -- the term sheet is where the dollar amounts are.

19  Mr. Gordon doesn't want those to get out, because they're

20  terrible, right?

21           So you can't -- it's a sword and a shield.   If

22  they're going to say to the public 8.9 billion, great deal,

23  greedy plaintiffs lawyers are against it, that's fine.   But

24  they can't then hide behind confidentiality, and the numbers

25  have to be disclosed.

1            And so I don't have to get up again, just to make a

2    record, I appreciate Your Honor's ruling on the mediation.  We

3    would have objected to that.  I would ask that Mr. Russo and

4    the other mediator whose name I forget be asked to include my

5    firm in that and Mr. Crouch and everybody else at this time.  I

6    think that was it.  Thank you, Judge.

7            THE COURT:  All right.  Thank you.

8            I don't know what I'm hearing.  Let me -- just bear

9    one moment.

10           Mr. Ruckdeschel?  I'm sorry if I butcher your name.

11           MR. RUCKDESCHEL:  No, that's fine.  Thank you, Your

12   Honor.  Very briefly.  Jonathan Ruckdeschel on behalf of Paul

13   Crouch.  The debtor has provided no legal authority for its

14   sweeping request about restricting use.  And saying, well,

15   things that are taken in this case or discovered in this case

16   can only be used in this case, there's no legal authority for

17   that.

18           Sworn testimony is sworn testimony.  You know,

19   statements under oath are statements under oath.  And as

20   Mr. Satterley said, the federal rules cover that.

21           You know, there's simply no authority that's been

22   submitted.  Nor am I aware of any that would allow for a

23   sweeping entry of such an order that says everything that

24   happens here stays here.  This isn't that old ad campaign for

25   Las Vegas.  What happens in LTL stays in LTL, you know?  And

1  it's just baseless.  It's baseless under the law.

2          And with respect to confidentiality of the term

3  sheet, you know, I think we heard everything we needed to hear

4  with what Mr. Gordon just said, which is, Judge, if you let

5  people know what the numbers are in the term sheet, it's going

6  to undermine the support for our plan.  Yeah.  No doubt.

7  Because it's outrageous.

8          You know, if there's any other exposure for somebody

9  with mesothelioma, they get one percent, $5,000.  Well, yeah.

10 That's pretty outrageous, because that's not how it works in

11 the tort system.  So, you know, the fact that if you let people

12 know what this scheme is, they're not going to support it is

13 not a basis for holding it confidential.

14          And I understand the original order here was done in

15 the beginning.  We had the informal hearing.  It wasn't

16 transcribed.  And the Court entered an order saying things

17 could be designated as confidential.

18          But the default has to be not confidential.  And if

19 somebody's going to designate something as confidential, they

20 should have to come to the Court, designate it, and then come

21 and support and each one.  If there's a dispute, it should be

22 their burden, not ours to challenge.

23          That's the way that American society works.  That's

24 the way this Court should work.  And I ask that you not

25 continue this confidentiality scam.

1          THE COURT:  All right.  Thank you.  Thank you,

2    counsel.

3          Mr. Gordon?

4          MR. GORDON:  Just I think, Your Honor, three points.

5    You know, one thing with respect to the exhibit to the term

6    sheet -- and just to step back.  Just to be sure the record's

7    clear, we're agreeing to -- we've proposed to de-designate

8    everything with that one exception.

9          And the arguments I heard back were, well, you can't

10   do it, because it was already disclosed in court.  And I was

11   trying to rack my brain to remember when that happened.

12   Mr. Satterley just explained it.  I remember him saying the

13   50,000.  I didn't know where he got it from.  He didn't

14   attribute it to that in particular.

15         But, frankly, that was a violation of the

16   confidentiality designation.  He knew that document was

17   designated confidential.  So that would not be a basis to not

18   permit its confidentiality.

19         His second point that we need to be able to share it

20   with the claimants, well, there's nothing in the protective

21   order that would prevent him to do that.  I think -- prevent

22   him from doing that.  I think there may be a requirement that

23   his client would have to agree -- or his clients would have to

24   agree to abide by the terms of the confidentiality.  But it's

25   not a block in terms of sharing the terms with a client.  So

1  that's a false argument.

2          And then in terms of the use restriction, the only

3  other thought I have on that, if it would make this an easier

4  issue, perhaps short of what we suggested, if instead we had an

5  order that said use is restricted to this case subject to the

6  rights of any party who feels the need to use it for some other

7  purpose to make a request.  And the request could come to us.

8  We would either agree with it or not.

9          And if we ultimately can't agree, then Your Honor

10  could decide whether a request to use this information outside

11  of this case is a proper one or not.  That would at least put

12  some kind of governor on this and prevent some of the things

13  that we're concerned about, and number one of which probably is

14  if this case ends up being tried in the tort cases that are now

15  going forward to some extent in the tort system.

16          THE COURT:  Help me out.  Before you go --

17  Mr. Satterley, I'm trying to get a sense of what motion on the

18  agenda -- or am I -- or are we discussing the letters that were

19  asked to be considered motions?  Do you know offhand on the

20  agenda --

21          MR. GORDON:  No, I don't think there's a particular

22  motion on the agenda.  I mean, we had an agreement back at the

23  time the discovery was being taken, including the depositions,

24  that the party -- parties would --

25          THE COURT:  Right.

1          MR. GORDON:  -- abide by the existing protective

2     order in the old case, understanding that a new order would be

3     prepared.  And we've prepared it and sent it to the other side.

4          And then, otherwise, the TCC sent us -- I can't

5     remember whether it was a letter or an email, but basically

6     challenging a number of the designations that had been made.

7     And then we responded with the proposal that I described to

8     Your Honor.

9          So you're correct.  There's not a motion --

10          THE COURT:  On the agenda was the debtor's motion to

11     seal exhibits.  I didn't know if this was part of it or not.

12          MR. GORDON:  Well, that's based -- and there's other

13     motions to seal as well.

14          THE COURT:  Right.

15          MR. GORDON:  I think they're all based on the

16     understanding that existed before we were getting to this point

17     of trying not hash out what the extent of the confidentiality

18     would be.

19          THE COURT:  All right.

20          MR. GORDON:  So the parties were recognizing that

21     items were designated as confidential.  And, therefore, abiding

22     by the prior protective order, they needed to seek relief to

23     see all the documents.

24          THE COURT:  All right.  You can come up,

25     Mr. Satterley.  What I'm going to --

1          MR. SATTERLEY:  I just got two minutes, Your Honor,

2   less than --

3          THE COURT:  Yeah.  Sure.

4          MR. SATTERLEY:  Two points.  I was just accused of

5   violating a confidentiality order.  The TCC moved into

6   evidence -- Mr. Jonas moved into evidence the term sheet.  And

7   I've never in 27 years trying cases -- when something comes

8   into evidence, I'm allowed to comment upon it in closing

9   arguments.  I wasn't violating any aspect of that.  I believe

10  once it came into evidence, it's a public record under the law.

11  And that's what my brief addressed.

12         Second point, I stand by my arguments on use

13  restrictions.  I had another point, but I forgot it.

14         THE COURT:  All right.

15         MR. SATTERLEY:  Thank you, Your Honor.

16         MR. MAIMON:  If I can make a suggestion, Your Honor?

17         THE COURT:  Suggestions I'll take.

18         MR. MAIMON:  If the debtor has agreed to de-designate

19  everything except that one attachment, let's go that way.  And

20  they can make a motion for Your Honor to find that the

21  attachment deserves confidential treatment, and then we can

22  treat it in the ordinary course.

23         THE COURT:  All right.

24         MR. SATTERLEY:  I would object to that, because I

25  already filed a brief on this issue.

1          THE COURT:  Mr. Sponder?

2          MR. SPONDER:  Your Honor, thank you.  Jeff Sponder

3    form the Office of the United States Trustee.  Your Honor,

4    there is no basis for a use restriction, especially on the

5    United States Trustee.  I'm not sure if that's what's being

6    asked here.  We weren't privy or party to the protective order

7    in the first case.  We're not going to be party or privy to the

8    protective order in the second case.

9          The new proposed restriction, I'm not sure if that

10   was meant for those -- it was going to be the protective order

11   for those parties or if that was meant for the entire case.

12   That's why I stood up.  If it's meant for the entire case, we

13   definitely object, Your Honor.  Thank you.

14         MR. SATTERLEY:  My second point I forgot to make is

15   this becomes incredibly burdensome, because all these pleadings

16   now are blacked out in part.  And Your Honor gets -- and we

17   don't know exactly -- we have to call around, say can I -- I

18   signed the confidentiality, can I get a unredacted version?

19   And I'm writing emails to the U.S. Trustee.  I'm writing emails

20   to other counsel.  And it's all --

21         So you got two pleadings.  One is partially blacked

22   out.  One's not blacked out.  It's a big mess.  Once

23   something --

24         THE COURT:  Well, I agree.  It's burdensome on the

25   Court too.  We get all these orders shortening time on the

1  motions with every motion.  Every motion becomes two motions.

2          Here.  Here's how we're going to move forward.  We're

3  going to accept the debtor offer as to eliminating the

4  confidentiality restrictions on all documents except the

5  document they've just identified, which is the exhibit, for

6  now.  I will ask, in the next seven days, anybody wants to make

7  an additional submission on that can do so.

8          So the only confidentiality designation -- it exists

9  only as to the exhibit to the term sheet, if I understand it

10 correctly.  As to the use, we will carve out the U.S. Trustee.

11 The use will be limited to this case.  However, a party simply

12 must, before seeking permission to use it, contact the debtor.

13 And it's the debtor's burden to come before the Court to

14 restrict it.  All right?

15          MR. SATTERLEY:  Just so we're clear on what we're

16 talking about, we're only talking about the depositions that

17 were taken prior to the preliminary injunction?  That's what

18 we're talking about?

19          THE COURT:  Is that correct?  No.

20          MR. GORDON:  We view it as broader than that.  It's a

21 use restriction generally, Your Honor.

22          MR. SATTERLEY:  No, no, no, no, no.  That's

23 outrageous, Your Honor.  For example, depositions of Mr. Kim

24 from -- that I took October of 2021 in North Carolina that's

25 been -- how is that possibly a part of this?  This is --

1              THE COURT:  All right.  This has gone --

2              MR. SATTERLEY:  This is a oral --

3              THE COURT:  -- beyond the Court's understanding of

4    what was being -- was --

5              MR. GORDON:  Well, it's discovery in this case.  And

6    if you want to take it --

7              MR. SATTERLEY:  No.

8              THE COURT:  Discovery in this case?

9              MR. GORDON:  Yes.

10             MR. SATTERLEY:  Oh, LTL 2?

11             THE COURT:  This case is just LT (sic) 2.  That's

12   what I'm trying to clarify.

13             MR. GORDON:  Yeah.

14             MR. SATTERLEY:  Oh, so there's only been -- the

15   discovery in this case has been those depositions that occurred

16   right before the preliminary injunction.  I thought I was

17   hearing counsel say everything that was done in LTL 1 would

18   apply to the use.  And he -- counsel's now --

19             THE COURT:  That's what I was -- that's what I'm

20   looking to clarify.  It's just discovery in this case, which is

21   the --

22             MR. GORDON:  Right.

23             THE COURT:  -- in advance of the preliminary

24   injunction?

25             MR. GORDON:  We're not going back in time, as far as

1 I know.

2       THE COURT: Okay.

3       MR. SATTERLEY: So but I'm further confused, because

4 the way counsel argues, it's not just simply use in another

5 court proceeding. Counsel says you can't use it for anything.

6 You can't share it with the media. You can't share it with --

7 if, you know -- pardon? I'm sorry. So I just want --

8       THE COURT: Well, there's -- right now, we're not --

9 this is supposed to be incorporated in a protective order.

10       MR. GORDON: Right.

11       THE COURT: There is no such language, correct? You

12 have not made a proposal.

13       MR. GORDON: No, I think we have made a proposal.

14 It's sitting with the other side, I think.

15       THE COURT: I haven't seen it, right?

16       MR. GORDON: Correct. You have not.

17       THE COURT: All right.

18       MR. SATTERLEY: And the problem is, the other side is

19 not necessarily defined, because there's lots of other folks

20 here on the other side. So --

21       THE COURT: Well, then --

22       MR. SATTERLEY: -- but I think what we should do,

23 Your Honor, is you -- they've stipulated to everything. I

24 think we should -- if they want to make a motion under the law

25 on this use, they should do that so that we can respond and

1  show Your Honor the law that's contrary to what they're

2  suggesting.

3         I mean, sworn testimony that's not "confidential,"

4  there's no way you're not --

5         THE COURT:  All right.

6         MR. SATTERLEY:  -- allowed to share it with your

7  friends, your family --

8         THE COURT:  Unless --

9         MR. SATTERLEY:  -- your other attorneys, the media.

10        THE COURT:  Well, unless the parties -- thank you,

11 Mr. Satterley.  Unless the parties can agree to language in a

12 confidentiality order, then it has to come by motion in front

13 of me.  So I'll leave it at that.

14        MR. SATTERLEY:  Thank you, Your Honor.

15        THE COURT:  I was trying to get you there.  But if

16 you can't, file the motions.

17        UNIDENTIFIED SPEAKER:  Yes, Your Honor.

18        THE COURT:  All right.  Is there anything else we

19 have to discuss this afternoon?

20        MS. BROWN:  Just one thing to put on the record,

21 Judge, because I want to be totally transparent.  I've just

22 learned for that June week, Your Honor, that I understand we

23 may revisit, Mr. Murdica will be out of the country.  I

24 understand we're still far away, but I didn't want to be

25 accused of springing that at the last minute.  So we can

1  discuss that with the Court at a later date if he's needed.

2  But I did want to be transparent.

3            MR. MAIMON:  We can always --

4            MR. SATTERLEY:  We can meet and confer on that, Your

5  Honor.  Unavailability sometimes --

6            MR. MAIMON:  We can preserve testimony.  It's always

7  done.

8            THE COURT:  I'm just looking at my calendar.  The

9  next block of dates I have would be -- so that you all know, is

10  Tuesday, June 20th through Thursday, June 22nd.

11            MS. BROWN:  Okay.

12            MR. SATTERLEY:  And we would request Your Honor

13  maintain the June 12th.  And we can meet and confer regarding

14  if we -- if he's even going to be a witness and if we need to

15  preserve his testimony in some fashion.  We've done it

16  thousands of times in other cases.

17            THE COURT:  We'll talk again on the 9th.

18            MR. MAIMON:  Thank you, Your Honor.

19            THE COURT:  Thank you, all.

20            MS. BROWN:  Thanks, Judge.

21            THE COURT:  Take care.  We are adjourned.

22                         * * * * *

23

24

25

173

# **C E R T I F I C A T I O N**

1

2        We, DIPTI PATEL, TRACEY WILLIAMS, KAREN WATSON and

3 LIESL SPRINGER, court approved transcribers, certify that the

4 foregoing is a correct transcript from the official electronic

5 sound recording of the proceedings in the above-entitled matter

6 and to the best of our ability.

7

8 /s/ Dipti Patel

9 DIPTI PATEL

10

11 /s/ Tracey Williams

12 TRACEY WILLIAMS

13

14 /s/ Karen Watson

15 KAREN WATSON

16

17 /s/ Liesl Springer

18 LIESL SPRINGER

19 J&J COURT TRANSCRIBERS, INC.      DATE:  May 4, 2023

20

21

22

23

24

25