Levy Konigsberg, LLP
605 Third Avenue, 33rd Floor
New York, New York 10158
(212) 605-6200
*Counsel for Paul Crouch, Individually and as*
*Executor and as Executor Ad Prosequendum of*
*the Estate of Cynthia Lorraine Crouch*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, | ) |
| | ) Lead BK Case: 23-12825-MBK |
| Debtor. | ) |

**OBJECTION OF PAUL CROUCH TO APPOINTMENT OF**
**GARY RUSSO AS A CO-MEDIATIOR**

Paul Crouch, individually and as executor *ad prosequendum* of the Estate of Cynthia Lorraine Crouch, respectfully files the following Objection to the Court's stated intention to appoint Gary Russo as a co-mediator in this case.

**Preliminary Statement**

The Debtor claims that it commenced this Chapter 11 case "after it reached an agreement with more than 60,000 claimants on the material terms of a plan of reorganization." The negotiations that led to the purported agreement certainly did not take place during the two hours and eleven minutes between the dismissal of its first Chapter 11 case and the commencement of this one. Rather, the Debtor's efforts to reach a deal that could be the centerpiece of a second bankruptcy case took place *during* its prior bankruptcy case, when it had a fiduciary duty to its creditors.

1

The centerpiece of this "agreement" is the Term Sheet attached to the Plan Support Agreements – which state that it contains the material terms of the "agreement". The Term Sheet (attached hereto as Exhibit A[1]) provides for a cap of $8.9 Billion – and splits that $8.9 Billion between Ovarian Cancer cases, Mesothelioma cases, and Governmental cases (totally ignoring Third Party Payor claims and Indemnity claims). It also splits the funds allocated to personal injury claims between "existing" and "future" claimants – remarkably making the entire agreement contingent on "the Future Claims Representative's agreement that she will not assign more than 1/3 of the Trust corpus to qualifying future claims." Finally, for Ovarian Cancer claims, the Term Sheet sets a date delineating between "existing" and "future" claimants of April 1, 2023. While this term ensures that the value of the cases represented by J&J's PSA partners is not diluted[2], it also deprives any woman diagnosed with Ovarian Cancer after April 1, 2023 - or even if diagnosed before then but having retained an attorney after that date - and before Confirmation, of her right to vote on any Plan.

There are (at least) seven motions to dismiss and a Writ of Mandamus filed with the Third Circuit. As such, there is no reason to rush to mediation. That having been said, Gary Russo – who

---

[1] The Debtor maintains that Exhibit A to the Term Sheet must remain confidential because dissemination of it will erode support for the Plan. We agree; if legitimate claimants were truly aware of the particulars of the J&J/LTL scheme, they would not be blinded by sensational (but misleading) headlines such as "$8.9 Billion" and would reject it. That having been said, while the Court considers the Debtor's baseless claims of confidentiality, we annex the Term Sheet without its exhibit.

[2] The delineation date between "existing claimants" (which the FCR must agree will receive >2/3 of the corpus of the trust) and "future claimants" (which she must agree get <1/3 of it) was set to April 1, 2023 (before LTL 2.0 was even filed) and prevents the dilution of the value of J&J"s PSA partners' claims by preventing other mass marketers from doing what they did in the year since this Court denied the Motion to Dismiss in LTL 1.0; that is accumulate tens of thousands of clients who would share in the fund allocated to "Existing" Ovarian Cancer Claimants".

according to the Debtor was involved in the negotiations leading up to the "agreement" and the filing of this second bad faith bankruptcy – cannot be legitimately appointed as a co-mediator[3].

## Objection

1. The Debtor filed its first Chapter 11 case on October 14, 2021, thereby preventing tens of thousands of individuals who have suffered grievous personal injury and/or death and huge financial loss as a result of the use of products manufactured and sold by the Debtor and affiliates from pursuing those claims in a manner provided for in the Seventh Amendment of the U.S. Constitution for 18 months. The Debtor filed its second Chapter 11 case two hours and eleven minutes after its first case had been dismissed by the United States Court of Appeals for the Third Circuit.

2. As such, this Chapter 11 case does not begin with a "blank slate", but rather with the overhang of a precedential decision of the second highest Court in the land resoundingly finding that the Debtor's first Chapter 11 filing was in bad faith and warning that machinations to avoid the ruling of that Court would be improper.

3. Through its second bankruptcy case, the Debtor seeks to further inflict damage on innocent victims of its wrongdoing. Based on the Debtor's actions during its first bankruptcy case, there is absolutely no basis to believe that the Debtor has any intention to engage in a good faith mediation. In all events, the Court should not <u>order</u> mediation.

---

[3] The Debtor previously moved to appoint Mr. Russo as a co-mediator in this second bad faith bankruptcy (along with retired Judge Joel Schneider). Before opposition to the Debtor's motion was due, Judge Schneider withdrew his candidacy and the Debtor withdrew its motion. As a result, the Court was deprived of the opportunity to consider Mr. Russo's conduct prior to the April 4, 2033 filing that – it is respectfully submitted – disqualifies him from the appointment as co-mediator.

4.  Indeed, ordering mediation of this petition, which is entirely premised on a) the termination of FA1 and its replacement with FA2 and b) the PSAs which incorporate the material terms set forth in the Term Sheet - is wasteful and an abuse of discretion. FA2 and the PSAs make clear that the premise of this petition and alleged plan requires J&J get 524g relief. The Court cannot grant that relief – as it lacks authority to do so under *LTL1, SGL Carbon* and *Combustion Engineering*. That lack of authority cannot be avoided by any agreement.

5.  Accordingly, <u>ordering</u> mediation when the baseline construct of the entire petition requires agreement to relief that the Court cannot grant over the objection of any dissenting current claimants and can never grant as to future claimants, is wasteful and an abuse of discretion – particularly when the jurisdiction of the Court has not yet been determined.

6.  Should the Court nevertheless maintain its desire to proceed down the path of compelling mediation at this time, it should appoint mediators who are independent from the pre-filing negotiations that led to this bad faith bankruptcy.

7.  The April 4, 2023 Declaration by the Debtor's Chief Legal Officer in support of first day pleadings (Doc 4) clearly shows Mr. Russo's involvement with the Debtor and its PSA partners after the Third Circuit's ruling on January 30, 2023. Indeed, paragraph 72 of Mr. Kim's Declaration alone is fatal to Mr. Russo's appointment here:

> 72. Following that ruling, however, and with the assistance of the mediators and the encouragement of this Court, negotiations continued between the Debtor and J&J, and various plaintiff law firms. Those negotiations ultimately culminated in an agreement with thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's liability for talc-related claims. That agreement has been memorialized in a series of plan support agreements (collectively, the "Plan Support Agreements") that have been executed and delivered by counsel on behalf of over 60,000 claimants and signed by the Debtor, Holdco and J&J.[14]

8. As stated by the Debtor, negotiations "with the assistance of" Mr. Russo "ultimately culminated in" the agreement whose material terms are set forth in the Term Sheet.

9. In other words, Mr. Russo has already mediated an agreement – one that provides for J&J to get an illegal and improper channeling injunction; one that caps J&J's liability for its own independent and non-derivative liability; one that caps the funds allocated to future cancer victims at 1/3 of what present claimants will get; one that dilutes the number of "future" ovarian cancer claimants (who are already capped at a 1/3 valuation compared to "existing" ones); and one that denies voting rights to an untold number of women.

10. Worse yet, he mediated this inequitable agreement – for a second bad faith bankruptcy – while he was still appointed as a mediator in the first, and without so informing the Court or all of the Parties to the Court's Mediation Order in the first bankruptcy[4].

---

[4] Unknown to anyone – including the Court – is the extent to which the Debtor and J&J informed Mr. Russo of their intention to fraudulently terminate the unconditional $61.5 Billion Funding

5

11. The Debtor, of course wants Mr. Russo appointed as a mediator in the bankruptcy that stemmed from the "agreement" that he already assisted in negotiating. But the integrity of the processes utilized by the Bankruptcy Court are too important to compromise by acceding to their preferences. Moreover, claimants like Paul Crouch – who was completely excluded from the prior mediations/negotiations Mr. Russo helped J&J and the Debtor with - deserve to be assured that those appointed by the Court to oversee those processes are independent and have not pre-judged the issues. Given his choice to involve himself in the activities described above (and likely many more that have not been disclosed), Mr. Russo is not such an individual.

12. Put differently, if no one objected to the Debtor's scheme, there would be nothing to mediate – and those who believe it is fraudulent and object should not and cannot be excluded from a court-ordered mediation. Yet, how can they trust a mediator who helped craft the deal they believe is fraudulent? Even if the Court would conduct an investigation into Mr. Russo's pre LTL2 activities and involvement, and even if Your Honor were to conclude that nothing improper took place, there is no chance parties who believe he helped negotiate this fraud can productively mediate with him. There is simply no chance that objectors to this petition can view someone the Debtor touts as having helped it negotiate it as a disinterested neutral and trust him as such. And they shouldn't have to.

---

Agreement that on its face (as well as through judicial admissions by its attorneys to both this Court as well as the Third Circuit) would pay outside of bankruptcy and even if the bankruptcy was dismissed, in an attempt to manufacture financial distress and justify a second bad faith bankruptcy. It certainly makes sense that they would have shared such an integral part of their scheme with those who helped negotiate it; but absent discovery we cannot be sure.

**WHEREFORE**, Ms. Crouch requests that the Court not appoint Gary Russo as a co-mediator in this action.

Respectfully submitted:

Dated: May 5, 2023

*/s/ Moshe Maimon*
Moshe Maimon (I.D. 042691986)
LEVY KONIGSBERG, LLP
605 Third Avenue, 33rd FL
New York, NY 10158
Tel: (212) 605-6200
Fax: (212) 605-6290
Email: mmaimon@levylaw.com
Attorneys for Talc Claimant
Paul Crouch, Individually and as Executor
and as Executor Ad Prosequendum of the
Estate of Cynthia Lorraine Crouch
And

JONATHAN RUCKDESCHEL
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043
Email: ruck@rucklawfirm.com
Attorneys for Talc Claimant
Paul Crouch, Individually and as Executor
and as Executor Ad Prosequendum of the
Estate of Cynthia Lorraine Crouch
     *Admitted Pro Hac Vice