IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . | Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtor. | . | |
| . . . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092 (MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT and | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Tuesday, May 9, 2023 |
| Defendants. | . | 1:00 p.m. |
| . . . . . . . . . . . . . . . | | |

TRANSCRIPT OF HEARING ON STATUS CONFERENCE REGARDING
MOTIONS TO DISMISS THE CHAPTER 11 CASE [DKTS. 286, 335, 346,
350, 352, 358, 379, 384] AND OBJECTIONS THERETO; AND
REQUEST OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS FOR ORDER
CERTIFYING DIRECT APPEAL OF PRELIMINARY INJUNCTION ORDER OF
APRIL 20, 2023 TO THE UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT [ADV. DKT. 84] AND OBJECTIONS THERETO; AND
PAUL CROUCH MOTION AND JOINDER FOR AN ORDER CERTIFYING DIRECT
APPEAL OF PRELIMINARY INJUNCTION ORDER OF APRIL 20, 2023 TO THE
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT  [ADV.
DKT. 89] AND OBJECTIONS THERETO; AND
MOTION OF AD HOC COMMITTEE OF SUPPORTING COUNSEL TO INTERVENE
[ADV. DKT. 104] AND OBJECTIONS THERETO

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

```
APPEARANCES:

For the Debtor:            Jones Day
                           By:  GREGORY M. GORDON, ESQ.
                                DAN B. PRIETO, ESQ.
                                AMANDA S. RUSH, ESQ.
                           2727 North Harwood Street, Suite 500
                           Dallas, TX 75201

                           Skadden Arps Slate Meagher &
                             Flom, LLP
                           By:  ALLISON M. BROWN, ESQ.
                           One Manhattan West
                           New York, NY 10001


For Ad Hoc Committee       Genova Burns LLC
of Certain Talc            By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc       494 Broad Street
Committee of Creditors:    Newark, NJ 07102

                           Brown Rudnick LLP
                           By:  JEFFREY L. JONAS, ESQ.
                                DAVID J. MOLTON, ESQ.
                                MICHAEL WINOGRAD, ESQ.
                           7 Times Square
                           New York, NY 10036

                           Brown Rudnick LLP
                           By:  SUNNI BEVILLE, ESQ.
                           One Financial Center
                           Boston, MA 02111

                           Otterbourg PC
                           By:  MELANIE CYGANOWSKI, ESQ.
                           230 Park Avenue
                           New York, NY 10169


For the Office of the      Office of the United States Trustee
United States Trustee:     By:  LINDA RICHENDERFER, ESQ.
                                JEFF SPONDER, ESQ.
                                LAURA DAVIS JONES, ESQ.
                           J. Caleb Boggs Federal Building
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, DE 19801
```

APPEARANCES CONT'D:

For Anthony Hernandez        Kazan McClain Satterley & Greenwood
Valadez:                     By:  JOSEPH SATTERLEY, ESQ.
                             55 Harrison St. Suite 400
                             Oakland, CA 94607

Various Talc Personal        Watts Guerra LLP
Injury Claimants:            By:  MIKAL C. WATTS, ESQ.
                             5726 W. Hausman Road, Suite 119
                             San Antonio, TX 78249

For Various Talc             Maune Raichle Hartley Frency &
Claimants:                      Mudd, LLC
                             By:  CLAYTON L. THOMPSON, ESQ.
                             150 West 30th Street, Suite 201
                             New York, NY 10001

                             Levy Konigsberg, LLP
                             By:  JEROME H. BLOCK, ESQ.
                                  MOSHE MAIMON, ESQ.
                             101 Grovers Mill Road, Suite 105
                             Lawrence Township, NJ 08648

                             Simon Greenstone Panatier, PC
                             By:  LEAH CYLIA KAGAN, ESQ.
                             1201 Elm Street, Suite 3400
                             Dallas, TX 75720

For Claimant Alishia         Beasley Allen
Landrum:                     By:  ANDY BIRCHFIELD, ESQ.
                             218 Commerce Street
                             Montgomery, AL 36104

For Arnold & Itkin:          Pachulski Stang Ziehl & Jones LLP
                             By:  LAURA DAVIS JONES, ESQ.
                             919 North Market Street
                             17th Floor
                             Wilmington, DE 19801

For Paul Crouch,             Ruckdeschel Law Firm, LLC
individually and on          By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of          8357 Main Street
Cynthia Lorraine Crouch:     Ellicott City, MD 21043

```
APPEARANCES CONT'D:

For the Ad Hoc Committee   Womble Bond Dickinson
of Attorneys General:      By:  ERICKA JOHNSON, ESQ.
                           1313 North Market Street
                           Suite 1200
                           Wilmington, DE 19801

For Randi Ellis,           Walsh Pizzi O'Reilly Falanga LLP
Proposed Future Claims     BY:  LIZA M. WALSH, ESQ.
Representative:            Three Gateway Center
                           100 Mulberry Street, 15th Floor
                           Newark, NJ 07102

For Ad Hoc Committee       Paul Hastings, LLP
of Supporting Counsel:     By:  KRIS HANSEN, ESQ.
                           200 Park Avenue
                           New York, NY 10166

For Ad Hoc Committee       Gupta Wessler PLLC
of Mesothelioma            By:  DEEPAK GUPTA, ESQ.
Claimants:                 2001 K Street, NW
                           Suite 850 North
                           Washington, D.C. 20006

For the Talc               Massey & Gail LLP
Claimants Committee:       By: JONATHAN S. MASSEY, ESQ.
                           The Wharf
                           1000 Maine Avenue, SW
                           Suite 450
                           Washington, D.C. 20024

               - - - - -
```

5

1            (Proceedings commenced at 1:00 p.m.)

2            THE COURT:  Okay.  We are up and running.

3            Good afternoon, everyone.  This is Judge Kaplan, and

4    we are here in the LTL Management, LLC matters on for today.

5            All right.  Let me turn to debtor's counsel.  Do you

6    have a preference on what matters we begin with?

7            MR. GORDON:  Greg Gordon, Your Honor, Jones Day on

8    behalf of the debtor.  I don't think so.  I think we've got the

9    issues related to the motions to dismiss --

10           THE COURT:  We have --

11           MR. GORDON:  -- and then the certification question,

12   as well.

13           THE COURT:  Well, we have the intervention motion,

14   correct?

15           MR. GORDON:  Correct.

16           THE COURT:  We'll talk about scheduling on the motion

17   to dismiss.

18           MR. GORDON:  Right.

19           THE COURT:  The motions for certification.

20           MR. GORDON:  Correct.

21           THE COURT:  And the Court has also has a ruling on

22   the FCR.

23           MR. GORDON:  Correct.

24           THE COURT:  So I'll do the ruling at the end.

25           MR. GORDON:  Okay.

1          THE COURT:  Keep you all in suspense.  And then let's

2     get to the heart of it.  Let's get to the certifications.

3          Good morning.

4          MR. MASSEY:  afternoon, Your Honor.  Jonathan Massey,

5     the proposed counsel to the TCC.  I have a PowerPoint.  If I

6     may approach, I'll --

7          THE COURT:  Sure.

8          MR. MASSEY:  And I also tried to do it on the

9          THE COURT:  The Federal Circuit has page limits.  I'm

10    thinking about having PowerPoint slide limits.

11         MR. MASSEY:  Well --

12         THE COURT:  But this is only 12.

13         MR. MASSEY:  Yeah, this is a -- this will hopefully

14    meet with your approval at least on that.  And I will try to

15    share my screen so that I can do the -- apologies.

16                         (Pause)

17         MR. GORDON:  Your Honor, I would note for the record

18    that the intervention motion relates to --

19         THE COURT:  Yeah.  I was just actually thinking about

20    that and I guess it would make the most sense to decide who's

21    going to argue or be permitted to argue.  So with apologies,

22    Mr. Massey, let me hear the intervention motion.

23         MR. MOLTON:  Judge, can I intervene --

24         THE COURT:  Yeah.

25         MR. MOLTON:  -- and interject for a moment of --

7

1            THE COURT:  Sure.

2            MR. MOLTON:  -- breaking news?

3            THE COURT:  Breaking news, okay.

4            MR. MOLTON:  Breaking news.

5            I just got on my cell phone a docket entry from the

6    Third Circuit.  Can I read it into the record?

7            THE COURT:  Absolutely.

8            MR. MOLTON:  Docket order from Judge Schwartz,

9    Restrepo, and Ambro, "In order to allow the Chapter 11

10   proceedings of LTL Management, Inc." -- and I'm going to cut

11   out some of the docket entry numbers -- "to continue on an

12   expedited basis set by the district court, the Bankruptcy Court

13   for the District of New Jersey, in recognizing that the writ of

14   mandamus is a drastic and extraordinary remedy and there are

15   other adequate means for the petitioner to obtain the relief it

16   seeks, the public petition for writ of mandamus of the Talc

17   Claimants is hereby denied."

18           So I just wanted to let everybody know that

19   especially before we begin this argument, which possibly

20   informs this argument.  And it was important for me to get up.

21           THE COURT:  So I'm not off the hook.

22                         (Laughter)

23           MR. MOLTON:  Very good, Judge.  And this was David

24   Molton of Brown Rudnick for the proposed counsel for the TCC.

25   So I just wanted to let everybody know.

8

1              THE COURT:  No.  Real breaking news.

2              MR. MOLTON:  Real breaking.

3              THE COURT:  All right.  Well, thank you, Mr. Molton.

4       Let me then -- let's move to the motion to intervene.

5  It does make the most sense.

6              Counsel, good afternoon.

7              MR. HANSEN:  Good afternoon, Your Honor.

8              Kris Hansen with Paul Hastings on behalf of the Ad

9  Hoc Committee of Supporting Counsel, otherwise known as the

10 interveners in connection with this motion, Your Honor.

11             Your Honor, you have the papers.  I don't want to

12 necessarily go back over.  We have a long day today.  I don't

13 want to go back over everything we said in there.  But I just

14 want to point out I just basically what I want to do is address

15 some of the objections --

16             THE COURT:  Yes, please.

17             MR. HANSEN:  -- that were raised with respect to the

18 motion.  I think it's the easiest way to proceed.

19             So just so we're all clear, one of the big objections

20 was that the Ad Hoc Committee of Supporting Counsel does not

21 have a 2019 on file.  We filed a 2019 last night, Your Honor.

22 It's obviously redacted.  We have also filed a motion to submit

23 that under seal --

24             THE COURT:  Right.

25             MR. HANSEN:  -- and to keep the unredacted copy with

1    the Court.  We'll work out with other parties if they want to

2    see it on an unredacted basis some type of appropriate

3    protective order or other type of mechanism in the order with

4    respect to sealing to the extent Your Honor is amenable to

5    doing that, which we hope you are.

6              That's a living document.  It will continue, we

7    believe, to expand as we obtain more information in terms of

8    newer claimants with respect to lawyers that we represent in

9    addition to other lawyers that are signing plan support

10    agreements and coming on as well.  The 2019 that we filed is

11    approximately on behalf of 56,000 claimants represented by the

12    law firms that we list in the 2019.  It's approximately 15

13    firms.

14              THE COURT:  I saw that I think it was 1,300 odd

15    pages.  I obviously didn't print it or go through it.  So I

16    assume, though, it includes some identity of the actual

17    underlying clients, not just the law firms.

18              MR. HANSEN:  Correct.

19              THE COURT:  All right.

20              MR. HANSEN:  So what you have, Your Honor, is, again,

21    we're -- and to be clear because this is a point that the TCC

22    has raised with us repeatedly and it was also put in their

23    objection, right now we are an Ad Hoc Committee of Supporting

24    Counsel.  So those are the law firms that represent those

25    claimants who have signed the plan support agreement.

1          The claimants that they represent under their various

2     retainer letters, as Your Honor can see in connection with the

3     2019, give them broad authority to act on behalf of their

4     clients, which is pretty standard with respect to these -- not

5     that much different from many of the law firms that serve on

6     the other side of the aisle here.  And so for now, we represent

7     the Ad Hoc Committee of Supporting Counsel.

8          We have Paul Hastings level representing them, all

9     right.  We have not yet had an individual meeting with 56,000

10    claimants that they represent and more that are coming on

11    board.  And, again, we'll continue to update that, Your Honor.

12    But we wanted to live up to the promise that we made last week

13    that we would be filing that in, quote, the coming days.  So we

14    did.

15         I don't know that there are many other 2019s on file

16    in the case, but we hope that that's helpful to the Court.  We

17    realize that Paul Hastings is a newcomer to the situation.  We

18    wanted to make sure that that information was out.

19         So, yes, the identifying information that's in the

20    voluminous 2019 that was filed which took an awfully long time

21    to get filed and to get prepared includes first name, last

22    initial, blanks out the address, et cetera.  It's very similar

23    to the schedules that Your Honor will have seen in connection

24    with the other 2019s that were filed in the last case.  We

25    candidly looked at those in order to obtain some guidance on

1 that.

2　　　　So we believe that at least on the complaint that we

3 don't have a 2019 on file and on the anticipated complaint that

4 if we do file a 2019, it will be non-compliant, that we have

5 done our best to comply with the rule and that it's a living

6 document.  It will continue to be updated.

7　　　　THE COURT:  Thank you.

8　　　　MR. HANSEN:  With respect to the other objections

9 which really return to this question of is a committee of

10 lawyers representing claimants a cognizable party in interest

11 in the case under 1109 or Rule 24(a) or (b).  We submit, Your

12 Honor, the answer is unequivocally yes.  These are the law

13 firms that signed the plan support agreements that are at the

14 core of this case.  They are -- those plan support agreements

15 really drive the plan process that is at the core of this case.

16　　　　And as we said last week, Your Honor, and Mr. Molton

17 said it too and I'm glad the the Third Circuit recognized it,

18 this is the courtroom in which the plan process should play out

19 and in which the motion to dismiss should play out, not some

20 other courtroom.

21　　　　　　　　(Sneeze)

22　　　　THE COURT:  Bless you.

23　　　　MR. HANSEN:  You're the trier of fact in the first

24 instance, so to speak, with all of those issues, Judge.  And

25 the lawyers who signed the PSAs on behalf of themselves and now

1  they're working out with respect to all their claimants and the

2  broad authority that exists under their letters, and we do

3  expect each of those claimants to vote with respect to the plan

4  when it's solicited.  This is not -- we don't believe this

5  should be a lawyers' vote.  We should leave this as a claimant

6  vote.

7          So from our perspective, they're unquestionably a

8  party in interest.  They absolutely are.  They're driving this

9  case from behind the scenes from a negotiating standpoint with

10  the debtors and they've brought it here before Your Honor.  So

11  1109 is meant to be flexible.  It's meant to recognize the

12  rights of multiple parties.  We appreciate that Your Honor

13  recognized our rights in the context of mediation, as well.

14          And when you look at the rules of either -- from an

15  mandatory perspective or a permissive perspective that sit

16  behind 1109, our view is we satisfy those, as well.  One of the

17  big objections that's been raised is that we are superfluous.

18  We signed a PSA, so we should go sit in the corner and since

19  the debtor's carrying the ball, we have no further interest in

20  this case.  And we can't even negotiation on supplemental plans

21  or changes, whatever it might be.

22          Nothing's further from the truth, Your Honor.  The

23  law firms that are a part of the Ad Hoc Committee continue to

24  work in this case.  There's a lot to work out in terms of the

25  plan, the disclosure statement, the solicitation materials

1  going effective, what the trust distribution procedures look

2  like, et cetera.  There's an awful lot to do here.  And in

3  connection with all of the issues that are going to come before

4  the Court, our Committee is really important.  And we believe

5  has the ability to bring a central voice.

6        We've said it's a majority of the claimants

7  repeatedly.  It's a little bit of I think we should all --

8  there's bickering back and forth on that.  We'll let the facts

9  bear that out as we move through solicitation with respect to

10 the plan.  But unquestionably, we believe that they are a party

11 in interest.

12       And so we think we satisfy 1109, and we think we

13 satisfy 24(a) and (b).  So those are really the main objections

14 which were can you recognize lawyers as a party in interest

15 and, if you do, are we duplicative of everybody else's efforts.

16 And I think the answers are yes and no unequivocally.

17       And then I also would just raise the point that I

18 think that's prejudicial to the extent that if the Court were

19 to exclude the Ad Hoc Committee of Supporting Counsel from

20 participating in this process.  We from an organizational

21 perspective, we're not in existence when the injunctive hearing

22 was held and when Your Honor's narrow ruling was granted.

23       Obviously, there was an objection to that, and now

24 there's an effort to seek to have that ruling brought up to the

25 Third Circuit.  The TCC seems desperate to just put anything

14

1  they can in front of the Third Circuit in the hope that this

2  case gets thrown out before due process can take its course

3  regarding the plan and their motion to dismiss here.

4        Hopefully, the Third Circuit's message today is heard

5  by everybody in the room, and we can proceed in front of Your

6  Honor and stop trying to get out of this courtroom and get

7  higher up.  But when you come back to it from a prejudice

8  perspective, if the Ad Hoc Committee of Supporting Counsel is

9  excluded from participating in this process, we believe that's

10 prejudicial to them and the 56,000 parties that they represent

11 and more who are about to sign up.

12       We also don't see any prejudice whatsoever to any

13 other party in this courtroom from allowing the Ad Hoc

14 Committee of Supporting Counsel to participate in the process.

15 So no need to go on on argument, Your Honor.  You have our

16 perspective.  And, obviously, if you have more questions for me

17 after the respondents come up, I'd be happy to answer them.

18       THE COURT:  Thank you, Counsel.

19       Ms. Richenderfer?

20       MS. RICHENDERFER:  Thank you, Your Honor.

21       Linda Richenderfer on behalf of the United States

22 Trustee.

23       Your Honor, we have not filed any documents with

24 respect to the request for intervention.  I did though want to

25 briefly address the 2019 issue.  Counsel is correct, they did

1    file a 2019.  And upon our request I believe right before we

2    were walking up the steps, we did receive an unredacted copy of

3    that.

4              But, Your Honor, I just wanted to point out a few

5    things.  One is that the United States Trustee appoints

6    claimants to the TCC.  We don't appoint law firms.  And so it's

7    striking to me that this group consistently calls itself the

8    group of -- I'm not going to get the correct -- supporting

9    counsel.  And I just think that that's just something that we

10   all need to bear in mind.  We will be reviewing what they filed

11   as part of their 2019.

12             I don't want our silence in this courtroom to be an

13   indication that we think that they have met all the

14   requirements of 2019 and that they have given us the same

15   information as was given in LTL1.  Counsel for the supporting

16   group of -- Ad Hoc Committee of Supporting Counsel did not live

17   through the first case as we did when he talks about due

18   process, and we all know.  We've spent a lot of time in front

19   of Your Honor going through what we all believe was due process

20   and that's why we got in front of the Third Circuit.  That's

21   part of the due process that we're all afforded.

22             So, Your Honor, I don't -- we have to look at the

23   2019.  I don't know if -- I don't think I've ever heard of a

24   supporting counsel forming an ad hoc committee.  An d hoc

25   committees usually come knocking at the door later on in the

case for a substantial contribution claim, which is another

reason why 2019 filings and status as an ad hoc committee is of

some great importance.

THE COURT:  Well, let me ask you a question and it's

more of in the nature of picking your brain.

MS. RICHENDERFER:  Okay.

THE COURT:  And I know you filed -- I do want to note

I saw that you filed a motion directed at all committees --

MS. RICHENDERFER:  Yes, Your Honor.  Yes.

THE COURT:  -- all potential groups --

MS. RICHENDERFER:  Yes.

THE COURT:  -- to satisfy 2019 -- to meet the 2019

requirements.

MS. RICHENDERFER:  Yes, Your Ho nor.

THE COURT:  We see in all of the various mass-tort

cases, whether it be the Diocese case down in Camden or

pharmaceutical cases, it becomes standard that the committees

work through the attorneys, the tort claimants committees

specifically.

In fact, I think when there was litigation or

pleadings regarding compensation for committee members, much of

the focus was on the fact that the actual claimants were not in

a position physically to attend to travel, to participate and,

therefore, it was logical to work through counsel.

Why doesn't that extent in all scenarios?  I know we

have an ad hoc committee and mesothelioma claimants but, yet, the activity has been through counsel.  It is counsel that retained appellate counsel.  So it's a fine line, but I'm wondering if it's a meaningful distinction for representation purposes.

MS. RICHENDERFER:  Your Honor, it's an extremely important meaningful distinction.  When the motion was filed during LTL1, the United States Trustee's Office, we filed an objection, and we objected.  And our objection was never withdrawn.  It was mooted basically when the case was dismissed.  And it was also mooted because there was an agreement that was made that I don't even know if it was debtors or LTL or J&J.

I'm not quite sure, Your Honor, but there was some agreement that was reached that certain costs were going to be paid to certain attorneys.  And it was sort of all at the end of the case so I apologize, Your Honor.  I don't have all the details fresh in my memory as to how that all worked out.

But we stood by our objection that those costs should not have been paid.  And we also know, Your Honor, that we are talking about committee members who are participating, we have learned, in the process and who are very aware of the process. And by that, I mean the actual claimants themselves.

I hesitate because I know that one of these days I'm going to have to be asked, probably something's going to come

1  up about the TCC.  But, Your Honor, we interviewed, we did a

2  whole new interview process when the TCC was formed for this

3  case.  And I can tell you people that are very involved in the

4  process are on that TCC.  And by people, I mean claimants.

5  They are on that Committee, and they are involved and they are

6  participating.

7          And, Your Honor, I don't know if there's a lot of

8  them on today's hearing because, quite frankly, as events go,

9  it's probably all not that interesting to non-lawyers.  But I

10 do know that on many of our conferences, we have participation

11 via Zoom from people who are absolutely on the Committee.  And

12 it is still the U.S. Trustee's position that the Bankruptcy

13 Code does not permit for the expenses of a lawyer who happens

14 to represent a member of the Committee to be reimbursed.  And

15 we stood by that objection.

16         And it's a very important distinction, Your Honor.

17 That's the way that it is.  And 2019 talks about ad hoc

18 committees of claimants.  I mean it would be -- otherwise, we

19 open the door to all sorts of groups coming in pulling in a

20 couple of parties that they say they represent and, yet, moving

21 forward with the litigation.

22         What troubles me, Your Honor, is I don't understand

23 it's not an ad hoc group of supporting claimants.  I don't

24 understand that.

25         THE COURT:  So if the --

1              MS. RICHENDERFER:  That's my concern.

2              THE COURT:  And I'll be asking Mr. Molton or

3   whoever's speaking on behalf of the TCC the same.  If with each

4   law firm that's a committee member, and I think there are --

5   with respect to the Ad Hoc --

6              MS. RICHENDERFER:  Okay.

7              THE COURT:  -- they have a representative client in

8   name, it would be no different than the workings of a TCC

9   because we don't have 55 -- you can't make 55,000 -- form a

10  committee out of 55,000 that's workable whether they're

11  working.  And to be representative, they work through counsel.

12             Is that the fundamental difference that they haven't

13  linked with a specific identified claimant?

14             MS. RICHENDERFER:  Well, Your Honor, they did file as

15  part of their redacted disclosures to the U.S. Trustee the list

16  of names of people that they represent.

17             But let me use an example for Your Honor.  The Arnold

18  & Itkin firm, they have been represented by Ms. Laura Davis

19  Jones in this courthouse.  And she filed a 2019 statement.  And

20  it was filed on behalf of Arnold & Itkin.  And she is

21  representing the claimants represented by Arnold & Itkin.  And

22  so it really wasn't an ad hoc committee per se, but it was

23  loosely combined group of people who had similar positions in

24  the case.  And she's not representing Arnold & Itkin.  She's

25  representing the Arnold & Itkin claimants.

1    The same thing happened with -- I'm going to get

2 confused here now.  I know there was another individual who was

3 here often and argued in front of Your Honor.  A very tall

4 individual.

5          THE COURT:  Oh, from California?

6          MS. RICHENDERFER:  Yes, from California.

7          UNIDENTIFIED SPEAKER:  Mr. Pfister.

8          UNIDENTIFIED SPEAKER:  Rob Pfister.

9          THE COURT:  Mr. Pfister.

10          MS. RICHENDERFER:  Mr. Pfister.

11          THE COURT:  Mr. Pfister.

12          MS. RICHENDERFER:  And he was here on behalf of a

13 plaintiffs' law firm.  And he always represented that he was

14 representing the so-and-so law firm appearing on behalf of

15 their claimants.  And so that's why I can't figure out here,

16 Your Honor, why is it an ad hoc group of counsel, supporting

17 counsel as opposed to an ad hoc group of claimants who are

18 represented by the various participants.

19          So it puzzles us because in Imerys, I got several

20 different groupings like that and, here, in the first case we

21 had groupings like that.  We had the Ad Hoc Group of Meso

22 Claimants that are represented.

23          THE COURT:  So it could be -- and I'm not trying to

24 solve the problem.  I'm just trying to get an understanding of

25 where the distinctions are.  So it could be an ad hoc group of

21

1 claimants appearing through counsel on the committee because

2 now they --

3        MS. RICHENDERFER:  It could be.  But that's not

4 what's being (indiscernible).

5        THE COURT:  No, I understand.  I'm just trying to see

6 where the differences lie.

7        MS. RICHENDERFER:  Right.  Your Honor, we've been

8 very confused they filed a 2019 and they're still calling

9 themselves the Ad Hoc Committee of Supporting Counsel.  And so

10 our confusion continues.

11        THE COURT:  Fair enough.

12        MS. RICHENDERFER:  I don't understand why it's not

13 the claimants, an ad hoc committee of claimants who support the

14 plan because ultimately, it's the claimants who get to make the

15 decision.  And no one's saying they got to sign on the dotted

16 line today because one of the things is, oh yeah, it was the

17 term sheet and we don't even know where that is right now let

18 alone a plan, a real fully-baked plan.

19        So I'm not saying that people have to be prepared to

20 sign on the dotted line today.  They can't.  There's nothing to

21 sign.  But this has continued to baffle the office and we will

22 be looking closely at the 2019 that they did file.  We felt it

23 necessary to file it because we think that sometimes everyone

24 needs a deadline.  And we have been hearing from a lot of

25 different people including this Ad Hoc Group we're going to get

22

1  to it, we're going to get to it.

2          So we did this in the first case also, Your Honor,

3  you may recall.

4          THE COURT:  Yes.

5          MS. RICHENDERFER:  Never really had to have a hearing

6  on it because everybody got it done.  And that's all we want.

7  We just want it done so that there's a record and we'll proceed

8  from there.

9          THE COURT:  Fair enough.  Thank you, Counsel.

10          Ms. Cyganowski or --

11          MS. CYGANOWSKI:  Yes.  Just for a moment, Your Honor.

12          Melanie Cyganowski, proposed counsel to the

13  Committee.

14          For a very limited purpose, I know Ms. Beville is

15  going to address the motion, but so that the record is clear

16  because it's been stated in several times in different ways

17  that our TCC members are not as active as they are.  But so

18  that the record is clear, they are on all of our meetings.

19  They receive all of our correspondence.  When there are votes

20  taken, they are actively participating.

21          Do they have counsel?  Yes.  Do they have counsel

22  assist them from time to time?  Yes.  But the Committee truly

23  functions through our committee members.

24          THE COURT:  Thank you.  I appreciate that.

25          Counsel?

23

1              MS. BEVILLE:  Good afternoon, Your Honor.

2              Sunni Beville from Brown Rudnick on behalf of the

3  TCC.

4              Your Honor, I'll just cut straight to your question,

5  and the question really is is an ad hoc committee or a

6  committee of creditors, they're acting through their lawyers so

7  what is the distinction between an ad hoc committee of law

8  firms.  It is a very meaningful distinction.

9              You'll see that Rule 2019 specifically describes

10  groups of creditors acting in concert, not their law firms.

11  It's creditors that are sharing a same purpose, the same goal.

12  In <u>Boy Scouts</u>, I believe Judge Silverstein called it having the

13  same agenda.  There has been no evidence, Your Honor that the

14  clients that the law firms represent share this agenda.  There

15  is no evidence that their clients are even aware that their law

16  firms are participating as part of an ad hoc committee.

17              I will just turn Your Honor to the <u>Boy Scouts</u> case

18  before Judge Silverstein.  In that case, Your Honor, there was

19  an ad hoc committee participating in the case and seeking the

20  Court's authority to be heard to participate in a plan process

21  to be a mediation party.  And there were a number of objections

22  raised on a similar basis that law firms are not the

23  appropriate parties.  Law firms don't have claims.  Law firms

24  don't have a stake in the outcome of litigation.

25              And Judge Silverstein agreed.  And so it was

24

1   important and there was extensive hearings and a bench ruling

2   and an opinion that law firms are not the appropriate party in

3   interest.  Law firms don't have standing.  For an ad hoc

4   committee to exist, it has to exist through its clients,

5   through members.

6            And in that case, Your Honor, in <u>Boy Scouts</u>, what

7   Judge Silverstein required was for this ad hoc committee to

8   reach out to the various claimants of the law firms and get

9   their consent to act as a committee on their behalf.

10           THE COURT:  To reach out to the underlying claimants.

11           MS. BEVILLE:  Yes.  So in that case, Your Honor, yes,

12  letters were sent out to tens of thousands of sexual abuse

13  victims.  And, yes, Your Honor, they asked those sexual abuse

14  victims to consent to being represented as an ad hoc committee

15  to have their collective interests represented by the group,

16  not their individual interest, their collective interest.

17           And they had to acknowledge, A, that they gave

18  authority to their law firm to represent them in participating

19  in the ad hoc committee, they had to acknowledge how the fees

20  and costs of the ad hoc committee were being born; were those

21  fees being passed on to the claims and, if not, they needed to

22  understand what that fee arrangement was.  That was part of the

23  affirmative consent required.

24           And, Your Honor, Judge Silverstein did not permit

25  that group to espouse that they represented tens of thousands

of claimants.  They were only allowed to espouse that they were representative of the number of claimants who responded with affirmative consents.  So while the law firms may have represented tens of thousands of sexual abuse victims, 18,000 responded in the affirmative.  So it was an ad hoc committee that represented the interest of those 18,000 claimants.

Here, Your Honor, it's very important to draw that distinction.  There has been a lot said in the various hearings, the various briefing there's support, 60,000 claimants support or 75,000 claimants.  There's no evidence that those claimants support the plan.  There's evidence that the law firms support a plan, but that's not the equivalent to claimant support.

And so it's important to recognize that Rule 24 of Civil Procedure requires for intervention, for participation that the party have a legally protected interest in the proceeding.  It's not the law firms that have that interest, Your Honor.  It's the clients that have that interest.  And it is simply enough for this to be an ad hoc committee of supporting claimants, but that is not the path that these law firms chose but it's not a supportable path, Your Honor.

It's important that there's other ad hoc committees in Boy Scouts.  It was an ad hoc committee of abuse survivors. When they originally participated in the case, Your Honor, they touted themselves as an ad hoc committee of supporting talc

1 claimants.  But that changed to ad hoc committee of supporting

2 counsel.  Those terms are not interchangeable, Your Honor.

3 Those terms do have a meaningful distinction, and it's

4 important for that to be recognized.

5        THE COURT:  Thank you.

6        MS. BEVILLE:  One of the points I'd like to just

7 point your Court to is after reviewing the Ad Hoc's motion

8 reviewing the cases that were cited, there are no cases that

9 stand for the proposition that a group of law firms can

10 participate in the case.

11        The cases that were cited point to standing of

12 official committees as that is an express party in interest

13 under Section 1109 of the Bankruptcy Code.  It talks about

14 standing of court-appointed legal representatives, for example,

15 the FCR in this case as they are standing for future claimants

16 that don't have a voice absent that representative.  But

17 there's no case law, Your Honor, at least that I could find

18 that stands for the proposition that law firms acting on behalf

19 of law firms have standing.

20        When we all come to the podium, Your Honor, we talk

21 about -- we represent we're part of this law firm acting on

22 behalf of and we name a client or a client group.  That's not

23 what's being done here with this Ad Hoc Committee of Supporting

24 Counsel.  Paul Hastings stands here on behalf of a group of law

25 firms.  That's not appropriate.

27

1          The case law under Rule 24 and Section 1109 talks

2   about a legally protected interest.  It's not an interest in

3   the case outcome.  That's not sufficient.  The interest must be

4   concrete, it must be more than generalized, and it must be more

5   than a general economic interest in the outcome of the case.

6   And, Your Honor, all of those cases that have those standings

7   were adopted in Third Circuit and have even been cited in

8   bankruptcy courts here in New Jersey.

9          Your Honor, I'll note that the Ad Hoc Committee did

10  file a 2019 statement.  It did check the boxes as far as the

11  law firms acknowledging that they're acting as part of a group.

12  It did not check the boxes that the creditors have acknowledged

13  they're acting as part of a group.  There's no statement, no

14  evidence that any of their clients are aware that they're part

15  of the Ad Hoc, that they're aware of the positions of the Ad

16  Hoc Committee.

17         Are their clients even aware of the terms of the term

18  sheet?  And are the clients aware that they are being held out

19  as supporting the terms of the plan term sheet?  There is no

20  evidence of that, Your Honor.

21         THE COURT:  But I don't need evidence of that at this

22  juncture.  I mean that is an important issue down the road.

23  The issue you would agree is whether or not they're aware that

24  they are being represented in this case as a group.

25         MS. BEVILLE:  That they're aware they're being

1  represented in the case as a group and that the law firms are

2  acting on their collective interest?

3          THE COURT:  Yes.

4          MS. BEVILLE:  And the law firms as a group stated

5  collective interest is to support the debtor's plan.  That is

6  not a defensible legally protected interest for intervention

7  purposes.  And if the clients are not aware that their names

8  are being used to support that collective interest, then I

9  don't think it is proper, Your Honor.

10          So if I am a client in this case, I sign an

11  engagement letter with a firm, I want them to represent me.

12  But if they're now saying that Sunni Beville supports a debtor

13  plan that I've never seen before, I may not consent to that.

14  And as a client, as a claimant, I have a right to consent to my

15  participation in an ad hoc group.

16          And that was the finding by Judge Silverstein in <u>Boy</u>

17  <u>Scouts</u>, Your Honor, was that it had to be an ad hoc committee

18  of creditors and those creditors had to consent to their

19  participation in the group.  And we don't have that here, Your

20  Honor.

21          And we were talking about Rule 2019.  I would submit,

22  Your Honor, that simply because it was filed doesn't mean that

23  Rule 2109 was complied with.  In the <u>Boy Scouts</u> case, Your

24  Honor, they had to include a list of the claimants, the cancer

25  type.

29

1          In Imerys, that was required.  But it was more than

2    that, Your Honor.  They required a showing, they required

3    copies of the affirmative consents.  And that was not done

4    here, and I will argue that that is actually fatal to the Ad

5    Hoc Committee's participation in the case where they can't show

6    that their individual law firm clients have consented to

7    participation.

8          And I'll note, and I know that the Ad Hoc Committee

9    counsel included in their letter to the Court a brief that was

10   filed in Boy Scouts.  But that is not the full story, Your

11   Honor.  And the 2019 is not a technical requirement.  And as

12   Judge Silverstein stated, the ad hoc committee law firms

13   themselves don't have standing.  It's their clients that have

14   standing.

15         And when we start to talk about the clients of these

16   law firms, I'm going to leave to Mr. Birchfield from Beasley

17   Allen to address the claimant interest themselves.  But here,

18   Your Honor, the Ad Hoc Committee indicates that its stated

19   interest is to support the debtor.  And in the same pleading,

20   Your Honor, it indicates that the debtor's primarily goal in

21   this case is to resolve its talc liability while paying as

22   little as possible.

23         That's the stated purpose of the Ad Hoc Committee is

24   to support the debtor in that endeavor.  I'm not sure that any

25   of the claimants have consented to that representation.

1          And, Your Honor, I'll just make a final note.  The

2    debtor and the Ad Hoc Committee are conflating representation

3    of the law firms with representation of claimants.  We've heard

4    the debtors state time and time again they have the support of

5    a majority of claimants.  That hasn't been proven.  And we are

6    not even aware if any claimants are aware of the terms of their

7    proposed plan.

8          The Ad Hoc Committee identifies itself first as

9    supporting talc claimants, and then they change that to

10   supporting counsel.  Again, Your Honor, they're not

11   interchangeable.  Their interests are not synonymous.

12         I know that you'll hear a lot of passion from the

13   parties at the podium, Your Honor.  And you'll hear from the

14   law firm members of the Ad Hoc counsel's desire to express

15   support for case outcome.  But those desires and passion for

16   this case cannot displace the rules of the Court, the

17   restrictions of the Bankruptcy Code, and the applicability of

18   the bankruptcy rules.

19         The rules matter here, Your Honor.  The Ad Hoc

20   Committee submitted a brief to the Third Circuit without leave

21   of the Third Circuit, without leave of this Court to do so.

22   It's important for Your Honor to assess whether or not the Ad

23   Hoc Committee of Law firms has requisite standing.  We argue

24   they do not.

25         If you find that they are acting on behalf of their

31

1    claimants, then before they are permitted to intervene, they

2    have to get consent of their claimants to take the positions

3    that they're taking and have the claimants be a part of the

4    process, be part of the decision making, and sign on to the

5    positions that are being taken.

6            Ms. Cyganowski was absolutely correct.  The TCC is

7    often used as an example of a minority of claimants.  We are a

8    fiduciary, Your Honor, for all talc claimants.  We are a

9    committee comprised of members that participate and input all

10   of the decision-making of the Committee.  And the point, Your

11   Honor, here is the other claimants should be afforded the same

12   opportunity.  Thank you.

13           THE COURT:  Thank you, Counsel.

14           MS. BEVILLE:  One other note, Your Honor, just on the

15   Rule 2019, it has been filed but it was filed in redacted

16   process.  I know counsel indicated he would work with the

17   parties, but the TCC does request an unredacted copy.  Thank

18   you.

19           THE COURT:  That's fine.  Thank you.

20           Mr. Birchfield, you've been trying.  Come on up.

21           MR. BIRCHFIELD:  Good afternoon, Your Honor.

22           THE COURT:  Good afternoon.

23           Andy Birchfield, Beasley Allen, on behalf of Alishia

24   Landrum.  And my purpose is to address the narrative of the Ad

25   Hoc Committee of Counsel, the narrative that is the foundation

32

1  of its motion to intervene.  That narrative is that the Ad Hoc

2  Committee of Law Firms represent a vast majority of talc

3  claimants, and it seeks to intervene in order to serve as a

4  counterweight to the loud minority of the TCC and to maximize

5  the Ad Hoc Committee's constituents' recovery by supporting the

6  debtor's plan of reorganization.

7         This narrative raises two important and troubling

8  questions.  The first question is if this group represents the

9  majority of talc claimants, what is the definition of talc

10  claimants that's being used.  And the second question is

11  according to the terms of the agreement that this group

12  contends maximizes recovery, what would the talc claimants

13  receive.

14         So for the first question, what is the definition of

15  talc claimants, one definition, the definition that is used and

16  has been used by the TCC and its members is based on the

17  evidence and the science that has been guided by years of

18  litigation; years of litigation in state courts, litigation in

19  federal court here, the MDL court, that has been guided through

20  an extensive Daubert process hearings, experts, and a Daubert

21  decision by Judge Wolfson.

22         That is the basis of the definition of talc claims

23  that focuses on the types of injuries that are supported both

24  by the evidence and the science.  Those injuries are epithelial

25  ovarian cancer with specific subtypes and mesothelioma.

33

1    This Court in appointing in its order appointing Mr.

2 Ken Feinberg as a Rule 706 expert followed this definition

3 without objection from LTL.  The Court ordered Mr. Feinberg to

4 estimate the value and the volume of ovarian cancer claims and

5 mesothelioma claims, not uterine cancer claims or vaginal

6 cancer claims or cervical cancer claims.  Not the whole host of

7 additional claims that would be covered under this new

8 definition of gynecological cancers.

9    This new and expensive definition that is outlined in

10 the debtor's plan, the plan support agreement, and that the

11 members of the Ad Hoc Committee are -- they're contractually

12 bound to accept this definition.  This would be counter to the

13 definition that was employed in LTL1.  It would be counter to

14 what the Court ordered Mr. Feinberg to investigate and to

15 estimate.

16    Your Honor, for years, leadership law firms, law

17 firms that have been litigating in state courts, the MDL

18 leadership that has operated here in this courthouse, they have

19 been guided by what the evidence and the science supports and

20 they have been advising, they have been counseling law firms

21 across the country about what types of claims are supported.

22 And law firms have -- many law firms have followed that

23 guidance.

24    If the debtor and the Ad Hoc Committee of Supporting

25 Counsel, if their agreement were implemented, if their

34

1  agreement were implemented and this new definition were

2  applied, a definition that is untethered, untethered to support

3  from the evidence and the science, the floodgates would be

4  flung open wide.

5          If the floodgates are opened, then who could say what

6  the denominator would be, who could say what it would require

7  to have a majority, much less a super majority?  The overly

8  broad definition is an effort to distort the voting power, the

9  voting power of the real victims here.  So the first question,

10  what is the definition that's being used, that's a troubling

11  question.

12          The second question is what has the Ad Hoc Committee

13  law firms agreed to?  What are the terms that they have agreed

14  to that purportedly maximizes value for its constituents?  Your

15  Honor, if we could take -- I want to take just a quick look for

16  just a moment --

17          THE COURT:  Sure.

18          MR. BIRCHFIELD:  -- at the plan support agreement.

19          THE COURT:  But I have a question for you --

20          MR. BIRCHFIELD:  Yes, sir.

21          THE COURT:  -- while you pull it up.  So what do you

22  -- what role do you see for claimants who are victims of --

23  alleged victims of other types of cancer that they ascribe to

24  talc in this case?  Are they claimants?

25          MR. BIRCHFIELD:  Your Honor, I would say that they

1  would not be claimants.  The tort system, the civil justice

2  system has mechanisms for addressing that.  I mean if we --

3          THE COURT:  But under the very broadest definition

4  under the Bankruptcy Code, it would be a claim, so -- and I'm

5  asking this because we haven't discussed this --

6          MR. BIRCHFIELD:  Right.

7          THE COURT:  -- in detail.

8          MR. BIRCHFIELD:  And it would be a very difficult

9  question to grapple with if we were dealing with a debtor in

10 financial distress.  Here we have a debtor that could choose,

11 and I would urge they do pay.  If they want to pay all of the

12 claims that the Ad Hoc Committee represents, J&J can do that.

13 J&J is not a debtor.  J&J can agree to enter into settlement

14 agreements with the Ad Hoc Committees on the terms that they

15 have here.

16         But if you were dealing with -- to address your

17 question, if you were dealing with a debtor that was in

18 financial distress, then you would have to weigh, I believe the

19 Court would have to weigh what are the claims that are

20 supported by the evidence and the science and the ones that are

21 not.  You would have to vet those.

22         THE COURT:  I guess --

23         MR. BIRCHFIELD:  And the tort system has done that.

24         THE COURT:  One would think that the plan could

25 address that just by ascribing a different value or potential

36

 1  compensation scheme for -- depending upon the injury and the

 2  nature of the cancer.

 3          MR. BIRCHFIELD:  Your Honor, not with what's been

 4  proposed here.  Not what's been put forward by the Ad Hoc

 5  Committee.  Then it would come -- it comes back to the

 6  foundational question of whether there is jurisdiction here,

 7  whether there's financial distress or not.

 8          Theoretically, Your Honor, if you were dealing with a

 9  company in financial distress, I'm not trying to avoid the

10  issue.

11          THE COURT:  No, I understand.

12          MR. BIRCHFIELD:  There would be ways that that could

13  be addressed.  It would be addressed by following what has been

14  -- what has played out in the tort system over the following

15  years.

16          THE COURT:  Just one second.  Mr. Gordon?

17          MR. GORDON:  I'm sorry to interrupt.  I need to

18  interpose an objection.  He's about to put up on the screen

19  because we just saw it the exhibit to the term sheet that we

20  maintain is confidential.  It's subject to confidentiality.

21  The issue of its confidentiality is set for hearing on May

22  16th, and we object to this being shown publicly.

23          MR. BIRCHFIELD:  Your Honor, I did not intend.  I did

24  not intend.  I had two slides in here.  The only slides that I

25  have are from the plan support agreement that are not

1  confidential.

2        I had two slides here that are based on the term

3  sheet that would show what the claimants would receive.  It is

4  confidential.  I thought that it was going to be addressed

5  here.  I hid the slides, as Mr. Gordon can see.  Those slides

6  that pertain to the term sheet are hidden.  I had no intention

7  of displaying those.

8        I would like to address --

9        MR. GORDON:  It did just come up on the screen.  It's

10  right there.

11        MR. BIRCHFIELD:  That's the plan.  The only ones that

12  I have.

13        THE COURT:  Nothing's up on the -- at least nothing's

14  up on the screen yet that I haven't seen.

15        MR. GORDON:  Well, it was up.

16        THE COURT:  Oh, okay.

17        MR. GORDON:  Because what's going to happen here,

18  they've already advanced the argument that they're just going

19  to put it in publicly and then contend that we can't argue its

20  confidentiality, and we have a I think a text order from Your

21  Honor setting the hearing on that very issue for the 16th, and

22  I would ask that the confidentiality not be breached today.

23        I would also object on the basis this is far beyond

24  information needed to assess whether or not an ad hoc committee

25  should intervene.  This is getting into plan issues and

1  solicitation issues and the like.  It's not relevant.

2      MR. BIRCHFIELD:  Well, what the plan support

3  agreement shows, it is a contract that binds the ad hoc

4  committees to the terms of the plan support agreement which

5  includes the term sheet, which includes the grid that shows the

6  values that the claimants would receive.  That is an important

7  part of the narrative here.  And that is an important part of

8  our position that the motion should be denied.

9      THE COURT:  Go ahead and argue it.  I don't have to

10 read the language.  Argue the position.

11     MR. BIRCHFIELD:  All right.  So, Your Honor, the plan

12 support agreement says --

13     THE COURT:  Of course, don't read the slide into the

14 record.  Okay?

15                    (Laughter)

16     MR. BIRCHFIELD:  Okay.  All right.

17     The plan support agreement is not contested as being

18 confidential.  That's not.  The exhibit to the term sheet is

19 what is argued as being confidential.  But the plan support

20 agreement says that all present and future talc claims,

21 personal injury, governmental entity claims, all talc claims

22 against all debtor-related parties for a total contribution

23 from the debtor not to exceed the present value of $8.9

24 billion.

25     According to that plan support agreement, the members

of the Ad Hoc Committee, the signators on that agreement, they agree to oppose any objection to the debtor's efforts to confirm the Chapter 11 plan, to oppose any other restructuring proposal or plan of reorganization.  So if there were a proposal that evolved through this process or another plan that was put forward that would be better for talc claimants, the Ad Hoc Committee members are contractually bound to oppose that proposal.

They're contractually bound to not seek to materially amend the -- or modify the Chapter 11 plan or any related documents.  That's the term sheet, not to file any pleading materially inconsistent, not to object or to delay or impede or take any other action to interfere with the confirmation of the Chapter 11 plan.

Your Honor, what I think is vitally important here to address, what would the claimants receive.  What would the claimants receive under the terms of the agreement?  There is a grid, and we argue that it should not be confidential.  They've doubled down on their position today that that is the heart of their proposal.  That is the heart of this proceeding that these firms are bound to this term sheet and they say that it is, that the support is growing.  What would the claimants get?

And, Your Honor, I would ask the permission to walk through just a couple of examples of what the claimants would get.

40

1          THE COURT:  No, I'm going to pass on that, because I

2   understand the point you're making.

3          MR. BIRCHFIELD:  Your Honor, the lawyers that

4   comprise the Ad Hoc group, they're good lawyers.  If they and

5   their clients choose to accept, if they choose to accept such

6   discounted values and they are, I mean I know I can't talk

7   about it, but they're bound.  They're in the agreement.  They

8   are steeply, steeply discounted values.

9          If they choose to do that in exchange for quickpay, I

10  respect that decision.  But they should not be able to foist

11  that position on the majority of claimants, the majority of

12  claimants if the definition is an appropriate definition of

13  talc claims -- epithelial ovarian cancer claims and

14  mesothelioma claims -- then they do not represent the majority

15  of those claims.

16         If J&J wants to settle with them, they can do that.

17  I would urge them to do that today.  Based on the terms that

18  they have in the term sheet, they can do that outside of

19  bankruptcy.  Just don't attempt, don't attempt to force these

20  values on the majority of talc claims that are supported by the

21  evidence and the science.

22         The TCC urges the Court to -- continue to urge the

23  Court to dismiss this as a bad-faith filing.  But for

24  consideration of the motion that all further proceedings, the

25  Ad Hoc Committee by contract is an alter ego of LTL.  And

41

1  allowing them to be a party in these proceedings just gives LTL

2  a second seat at the table, and that's inappropriate and we

3  urge you to deny the motion, Your Honor.

4         THE COURT:  Thank you.

5         MR. BIRCHFIELD:  Thank you.

6         THE COURT:  Ms. Beville?

7         MS. BEVILLE:  Your Honor, if I may, I just want to

8  address the question that you asked about whether claimants

9  with different types of cancer that have been litigated

10 already, would they have a claim in the bankruptcy.  I think,

11 Your Honor, you're right they would have a right to file a

12 claim.  Claims are broadly defined and can include any

13 potential right to payment.

14         But you put your finger on the very issue, Your

15 Honor, is those claims may not be compensable either under the

16 plan or under trust distribution procedures.  If we got to a

17 point where we were actually voting on a plan, they may be

18 either separately classified or allowed for zero dollars for

19 voting purposes.  There's a lot of ways that those claims could

20 be treated.

21         One of the concerns we have is this conflation of all

22 claims being put in one pot and potentially sharing a pot of

23 money pro rata not depending on the legitimacy of the claims

24 that are being reported.  So you may have a claim, but it may

25 not be a compensable claim.

42

1          THE COURT:  All right.  Thank you.

2          Mr. Thompson?

3          MR. THOMPSON:  Thank you.   Your Honor, I'll be

4  brief.  I've tried to limit what I was going to say based on

5  what's already been said.

6          In response to your question, who decides what a

7  valid claim is, that's a great question and it's one that

8  respectfully you don't have subject matter jurisdiction to

9  decide because this is a bad-faith bankruptcy.  And so what we

10 see here are claims, what LTL has done is they've broadened the

11 creditor class beyond what was being litigated in the tort

12 system.  They've broadened it to include claims that are not

13 supported, that did not clear the Daubert challenges just to

14 get the votes.

15         They're doing all this just to get the votes.

16 They're creating creditors that they don't have to pay anything

17 to out of bankruptcy.  Tens of thousands of these gynecological

18 cancers that don't have a scientific connection to talc, they

19 are willing to pay those people who are owed -- if they exist,

20 that are owed nothing in the tort system.  The gate is the --

21 the challenge is to enter -- who decides what is a good case,

22 well, the tort system does and that limits the types of claims

23 that are filed.

24         I have a large firm.  We are retained by about 350

25 mesothelioma victims a year.  We only sued J&J probably 35 to

43

1  40 of those cases.  Why?  Because most of them weren't very

2  good J&J cases.  They had a lot of other exposure to other

3  stuff.  The tort system determines what valid claims are.  And,

4  obviously, J&J is desperate to not have that Exhibit A out

5  there because if the public saw Exhibit A, they'd see how

6  terrible their plan is and that's why they got to keep it a

7  secret.

8          And so this is all just an effort to base subject

9  matter jurisdiction on votes.  And it's not even claimants

10 before you, it's lawyers saying -- so one thing that's very

11 clear is that the supporting counsel want to get paid.  That

12 much is obvious.  I think that's very clear.  And that's not a

13 basis for subject matter jurisdiction.  The whole point of

14 Judge Ambro's ruling was you can't infringe on my clients' pre-

15 bankruptcy remedies to the tort system if you file in bad

16 faith, which J&J has done again after giving away billions of

17 dollars in a fraudulent transfer.

18          The other thing is there's a conflict for the firms

19 that are supporting this deal because they're saying we

20 represent ovarian cancer victims and we represent mesothelioma

21 victims, but we also represent these gynecological victims.

22 And they've created an artificial limited fund where the

23 supporting counsel have a conflict between representing their

24 own clients.  Because the mesothelioma and epithelial ovarian

25 cancer claims, if the supporting counsel actually have them, I

44

1  would request the unredacted version of the 2019 verified

2  statement as well for my law firm.

3       I'm not ashamed of the answer when someone asks me if

4  I have medical records because I do.  I have medical records

5  for all my clients.  When we asked Mr. Pulaski at Page 19 of

6  his deposition, he claims to have 6,000 clients.  It's very

7  clear he wants to be paid for them.  But what he's not willing

8  to do is share the medical information.

9       Question, Page 19 of his deposition,

10  "Q   Does your firm have medical records with respect to all

11  6,000 of your clients?

12       Privileged is the objection that's given by his

13  lawyer.  He refuses to answer.  And so I think what we're

14  talking about here today is gate, right.  So you have a gate to

15  decide who votes.  You have a gate to decide whether a debtor

16  that files in bad faith can come into the bankruptcy system,

17  and they can't.  And I think everything else -- last thing.

18       They've already agreed to be bound by the deal.  So

19  they come in later and say, no, this is going to be negotiated.

20  No, they're bound by the deal.  They have agreed to bind their

21  clients that they're adding numbers to, so this limited fund of

22  8.9 billion, they're just adding claimants to reduce what's

23  available for everybody else.  Thank you.

24       THE COURT:  All right.  Mr. Thompson, just don't go

25  for a second.  Thank you.

45

1          MR. THOMPSON:  You've never asked me to come back.

2          THE COURT:  I know.  It's troubling for me, as well.

3                         (Laughter)

4          THE COURT:  But I'm going to give you another -- a

5    small homework assignment.  I didn't want to interrupt.  But

6    I've heard reference to this Court lacking subject matter

7    jurisdiction.  And it struck me as a question that the Supreme

8    Court recently touched on.  In fact, they touched on it this

9    past April subsequent to Judge Ambro's decision because I know

10   he used -- he referenced subject matter jurisdiction.

11         It's the MOAC Mall Holdings case, S.Ct. April 19,

12   2023.  And before the Supreme Court, and I'm not going to go

13   into it.  This isn't classroom.  But it was an analysis of

14   whether 363(m) is jurisdictional or not.  And the Supreme Court

15   took the time to say we need to address subject matter

16   jurisdiction because there's a misconception about it and how

17   it applies in bankruptcy.

18         And they made the point, and I'm going to read if I

19   can, "The court" -- I'm sorry, bear with me.

20              "This court has clarified that the jurisdictional

21              label bears on the power of the court rather than on

22              the rights of the obligations of the parties.  The

23              court will only treat a provision as jurisdictional

24              if Congress clearly states as much."

25              And it goes down further.

46

1          "This clear statement rule does not require Congress

2          to use magical words.  But Congress' statement must

3          be clear and not merely plausible or better than non-

4          jurisdictional alternatives."

5          I think there's another quote.

6          "Statutory context further clenches the case.  In

7          that case, 363(m) is separated from the Code

8          provisions that recognize federal courts'

9          jurisdiction over bankruptcy matter, which is 28

10         U.S.C. Section 1334(a) through (b) and (e).  And

11         unlike other Code provisions, Section 363(m) contains

12         no clear tie to the Code's plainly jurisdictional

13         provisions."

14         What I'm going to ask because we can all form

15    different opinions, I read this and it says look at Section

16    1112(b), are there any jurisdictional -- is there any clear

17    evidence or demonstration that Congress intended in Section

18    1112(b) to refer or speak to subject matter jurisdiction.  I

19    guess it doesn't because I cannot act on the requirements of

20    1112(b) which is maybe to dismiss a case for cause.

21         And, indeed, even if there's cause, Section 1112(b)

22    allows the Court in certain circumstances to continue the case,

23    not to either dismiss it or convert it.  The Court must have

24    subject matter jurisdiction.

25         So what I'm saying is I'm not sure the issue that,

1   and it's raised so often, is one of subject matter

2   jurisdiction.  It may be -- and ultimately it is whether or not

3   there's cause to dismiss this case.

4           MR. THOMPSON:  Right.

5           THE COURT:  But I don't know if you could say I can't

6   act on that or act in any way, whether it be appointing an FCR

7   or appointing an ad hoc because of subject matter jurisdiction

8   because I don't believe 1112 speaks to subject matter

9   jurisdiction at all.  It's found in 28 U.S.C. 1334.

10          So that's my view now.  I'm more than happy to have

11  others brief it if they wish or raise it in further pleadings

12  or tell me I'm wrong.  It won't be the first time.

13          MR. THOMPSON:  So I appreciate that, Your Honor.  And

14  I would say I'll look into that, obviously, and I appreciate

15  the homework assignment.  And I think what I'm saying is

16  subject matter jurisdiction is, is that this is a bad-faith

17  bankruptcy in which they should be denied entry.

18          Now you've got to have a -- you're going to hear

19  argument about that in a couple of weeks.  You're going to make

20  a ruling on that.  I'm saying that just in a broad sense that

21  as we're talking about votes, because that's really the

22  argument they're making.  They're claiming that you have

23  subject matter jurisdiction, this is a good-faith bankruptcy

24  because they have enough votes.  I think that's what they're

25  saying.

1          And they moved all the papers around and did a

2  fraudulent transfer so now they're in distress.  But they're

3  really basing this on we got all these votes.  But the lawyers

4  are the ones before you.  The reason it is not the clients is

5  because the lawyers themselves have conflicted themselves by

6  signing agreements that preclude them from supporting any plan.

7  This is the risk when you asked me to come back up, Judge.  I

8  was going to leave, but this is the problem.

9          THE COURT:  I know.  I get the good with the bad.

10         MR. THOMPSON:  By signing agreements that preclude

11  them from supporting any plan other than the debtors.  So if

12  there's a plan offered by a party other than the debtor that is

13  actually better for their clients, the PSA specifically prevent

14  these lawyers from supporting it.  This is a conflict.

15         So the voice in support of the plan is the debtors.

16  The supporting counsel have tied themselves to the debtor.

17  They both want the same thing.  They both want a channeling

18  injunction.  The conditions of the term sheet are a preliminary

19  injunction, a permanent injunction, and the FCR giving a third

20  of the trust to future victims.  How does that work?  How does

21  an FCR who is an elected representative of the victims make a

22  necessary condition that she gives one third to everybody

23  that's ever going to get sick for any cancer alleged from talc?

24         This is a problem caused completely by J&J.  All of

25  this mess in here about who's a claimant, who's not is J&J's

49

1   fault.  If we were in the tort system, it would be very clear

2   and it was very clear.  The tort system's working.  Valid

3   claims are being settled.  Invalid claims were not being filed

4   because they were too difficult.  They wouldn't sue if you

5   didn't think you could win.  Thank you, Your Honor.

6          THE COURT:  You're welcome.  Thank you, Mr. Thompson.

7          Counsel, did you want to respond?

8          We've gone afield a bit.

9          MR. HANSEN:  Just a bit, Your Honor.

10         I'm going to try to stay to the narrow issue of our

11  intervention with respect to the preliminary injunction section

12  proceeding.  I realize that things have gone further afield.

13         But where I wanted to focus back, Your Honor, is

14  we've heard an awful lot here.  I think I have to address some

15  of the speculation which is all it is.  We stand before you

16  today -- Paul Hastings, Cole Schotz, and Parkins & Rubio --

17  representing an ad hoc group of supporting counsel.  Those

18  counsel have engagement letters with their claimant clients.

19  Those claimant clients are again approximately 56,000 members

20  which we filed last night.

21         We've got everybody saying you can't let us in

22  because we have --

23                 (Music playing from gallery)

24         MR. HANSEN:  I should have had that play when I came

25  up, Your Honor.  Intro music is always great.  That's a --

1          THE COURT:  It's not my phone.

2          MR. HANSEN:  The basic argument here is you can't be

3    here because you don't represent the actual claimants.  So,

4    again, the clients that we have right now at the law firm

5    level, they represent the claimants.  We filed a consolidated

6    2019 which is what we told you we would do last week to try to

7    ease the burden on everybody.  And what we have is individual

8    law firms with their clients, with their engagement letters,

9    and then our engagement letters on top of those.  So you have

10   effectively a structure in that 2019.

11         There's been tons of speculation around, well, I

12   understand those are the lawyers that signed the PSA.  I

13   understand that they speak on behalf of their clients, but we

14   don't think they speak on behalf of their clients, the law firm

15   members.  Your Honor, it's simply untrue.  The fact that it's a

16   speculative comment.  There's no evidence with respect to that.

17         The question of intervention when we go back to --

18   and, by the way, like the accusation that these law firms don't

19   keep their clients apprised, it's simply not true.  They do

20   keep their clients apprised.  In the 2019, we haven't filed any

21   emails or other types of evidence that says, yes, I gave them

22   specific notice of serving in connection with this ad hoc

23   committee for this purpose, for this purpose of entry into a

24   motion to intervene regarding the preliminary injunction

25   proceeding.  But I don't think you need that.

51

1          Your Honor, it's a good-faith attempt on behalf of

2     the law firms to demonstrate to you who the claimants are, who

3     the law firms that represent them are, and who we as the

4     consolidated counsel for that entire group represent.

5          THE COURT:  When you say the group, is it the group

6     of law firms or is it the group of claimants or both?  It's an

7     ad hoc group of whom?

8          MR. HANSEN:  Right now, Your Honor, for Paul

9     Hastings, for Cole Schotz, and for Parkins & Rubio, it's an ad

10    hoc group of the supporting counsel who represent those

11    claimants.  And what we would say is those claimants have the

12    authority -- I'm sorry, those law firms have the authority in

13    their engagement letters to act on behalf of their claimant

14    clients.  So we are helping them in that job.

15         If the Court says we'd like you to organize and bring

16    a claimant from each, we're not going to bring 56,000 claimants

17    and form an ad hoc committee of them.  It would be pretty

18    impossible to host those phone calls.  It would be hard to get

19    -- have any type of, like, interactive communication.

20         And, obviously, form the TCC's perspective, you heard

21    the U.S. Trustee say we appoint a claimant, that claimant

22    designates a lawyer, that lawyer sits on the committee with

23    their claimant, and they have meetings and they discuss.  The

24    lawyers that sit on that committee also represent other

25    claimants.  That's not the only claimant they represent.  And,

52

1  obviously, they're acting on behalf of lots of other claimants,

2  and we've heard many times from TCC counsel that they represent

3  the interest of everyone.  But as a fiduciary, which they do as

4  an official committee, they aren't listening to us at all on

5  that front or our clients on that front.

6        But the members law firms that serve by designation

7  on that creditors' committee, probably pursuant to their

8  bylaws, represent other parties, too.  I don't know whether

9  they have authority from those other clients to serve on the

10 committee on behalf of one client in opposing a deal that's

11 come in.

12       At the end of the day with respect to the claimants,

13 they're going to vote on a plan.  That's what they vote on, and

14 that's what should be put to them.  And their votes will come

15 in, and we'll see whether or not it meets the threshold under

16 the Bankruptcy Code.  But Your Honor asked me a direct

17 question.

18            THE COURT:  Yeah.

19            MR. HANSEN:  Today standing here, we represent the

20 law firms who have authority to speak on behalf of their

21 clients.

22            THE COURT:  And that authority is found in the

23 retention agreements between the law firms and their clients?

24            MR. HANSEN:  That's right, Your Honor.

25            THE COURT:  And those are attached to the 2019?

53

1          MR. HANSEN:  That's right, Your Honor.

2          THE COURT:  So it's your position that you don't need

3    specific authorization to represent them in this bankruptcy?

4          MR. HANSEN:  Well, Your Honor, yeah, our --

5          THE COURT:  Not you, that the law firms don't need

6    specific as you just detailed consent or authorization to

7    represent their interest in opposing this or in supporting the

8    debtor's plan?

9          MR. HANSEN:  Well, they have it, Your Honor.  I mean,

10   again, the law firms are communicating with their clients,

11   right.  So, obviously, those are privileged communications, but

12   they're communicating with their clients.  And then they're

13   telling us we would like you to represent us and on behalf of

14   us our clients in connection with this proceeding.

15         I feel like we've elevated so much form over

16   substance and that what's happening here -- and, again, just to

17   go to Boy Scouts for a second, as I understand it, I was not

18   involved in the case.  But as I understand it, the Brown

19   Rudnick firm started out representing law firms.  And Judge

20   Silverstein asked them over time to get engagement letters or

21   consents, if you will, from individual claimants, which they

22   went ahead and did.  And I believe they participated in the

23   case as they went ahead and did that.

24         I mean if Your Honor takes that approach, we'll deal

25   with it.  We would hope that you would find it to be

54

1  unnecessary and that we can advance this case to the vote which

2  matters.  And in the meantime, like in many cases, even if Paul

3  Hastings, Cole Schotz, and Parkins & Rubio were not here, the

4  individual law firms on behalf of their clients would still

5  have to file a 2019.  The lawyers would have to stand in front

6  of you and make arguments.

7          So we are basically facilitating the voices of

8  56,000-plus claimants to come before the Court through their

9  law firms, and we are speaking on their behalf.  They're also

10 not bankruptcy lawyers, right.  They're lawyers in the tort

11 system.  And so we are here assisting them from a bankruptcy

12 perspective here in this Court.

13         So I do think it's a distinction without a difference

14 for purposes of intervention in this motion.  We've also had a

15 lot of arguments in here.  At this point, I think people are

16 trying to object to our participation in anything in the case.

17 I completely disagree with that approach.  And everyone seems

18 to be pointing a finger at the plan support agreement as if

19 it's a horrible contract, something that binds us and

20 eliminates any type of latitude.

21         As we pointed out for the Court before, that's an

22 agreement that this case rides in the back of, but there's an

23 awful lot of negotiation that goes forward.  And as Your Honor

24 is aware, those processes, right, most large cases get solved

25 through the plan support agreement process or the mediation

1  process, candidly, with parties breaking out on both sides and

2  hopefully coming together.  That's what we hope to happen here.

3  So that's not another -- that's not a reason to deny us

4  standing in connection with the motion to intervene.

5        Your Honor, a couple of other points.  There's been a

6  lot said about how we represent ad claims, fake claims.  This

7  was all over the TCC's pleadings.  What's happening is we're

8  stuffing the ballot box with fake claims.  That's -- there's no

9  truth to that statement.  There's no basis for that statement.

10 And to come up here for everyone to say to you, Your Honor,

11 again that the definition of claim shouldn't be what the

12 Bankruptcy Code says the definition of claim is and you should

13 have to go resort to some other definition of claim is

14 inappropriate, number one.

15       Number two, it's inappropriate to make those kinds of

16 statements without anything to back them up.  And, candidly,

17 Your Honor, as I think we mentioned at the last hearing, a few

18 of the members of the Ad Hoc Committee that we represent sat on

19 the TCC in the first case.  They have now entered into plan

20 support agreements.  They're in the Ad Hoc Committee in this

21 case.  The claimants that they represented, they're all filed

22 claims.  So many of those 56,000 claims are actually filed.

23 They have been on file, right, like actual lawsuits where they

24 have been filed.

25       So, Your Honor, again, the PSA process, this case is

56

designed to facilitate a speedy recovery.  It's designed

ultimately to get money into the pockets of claimants as

opposed to waiting out, you know, if you do the average with

the number of claims that are here and the number of trials

that are held each year and you go through the appellate

process, I mean you could be talking hundreds of years before

you ultimately arrive at justice if there isn't a settlement in

the meantime.

And so, of course, bankruptcy, as you pointed out in

the first case in denying the motion to dismiss, is designed to

consolidate that.  It's designed to speed the recoveries, and

it's designed to present a fair process.  So all of this talk

when you get down to the narrow question about bad claims,

first of all, those are false statements.  And, second of all,

they have no relevance with respect to the motion to intervene.

And I didn't really want to get into that, but I just feel like

so much has been said that we have to defend it on that basis.

So coming back to this narrow issue, Your Honor,

again, I think it is elevating form over substance.  I think

when you look at the question of whether there is a concrete

interest in the outcome here, absolutely, a concrete interest

in the outcome.  The lawyers on behalf of their clients, well,

the lawyers signed PSAs.  The votes will come in on the plan.

Ultimately, it doesn't bind the claimants.

And do they have an interest in the outcome?  They

57

1  do.  It's a faster recovery.  It's a faster process.  They have

2  an interest in not letting this case get dismissed.  They have

3  an interest in combating the efforts to drive it back out of

4  bankruptcy.  And they also have an interest in participating

5  and trying to get to a solution with everyone.  That's the part

6  that I think gets lost here in the stark positions that are

7  taken by the parties.

8           Bankruptcy is a consolidating event.  People are

9  supposed to come in and try to get to a deal because by getting

10 to a deal, everybody gets better justice.  That's where this is

11 supposed to go and so we applaud the Court's appointment of the

12 mediators.  We appreciate the opportunity to participate in

13 that and we hope all parties take that seriously and move

14 towards that and allowing the Ad Hoc Committee to participate

15 in the question of whether or not the appeal of the denial or

16 the appeal of the grant of the motion for preliminary

17 injunction should be put up to the Third Circuit.

18          I think it just demonstrates that we have an interest

19 in the outcome of that proceeding, just like we have an

20 interest in the outcome of everything else that's happening

21 here.  I'm happy to answer any other questions you have, Your

22 Honor.  There was a lot said.  I could keep going, but I -- I

23 guess the other thing I would point out, too, we didn't submit

24 the Boy Scouts pleadings with respect to this motion.  We gave

25 those to Your Honor in a letter in connection with the

58

1  mediation process because the TCC opposed our participation in

2  mediation on similar grounds.

3        So, again, we didn't put it in so that it could be

4  dragged out publicly and talked about them being cynical and

5  all the rest of that, but they were the ones who have brought

6  it up and dove into it which is why I addressed it.

7        Do you have any other questions for me, Your Honor?

8        THE COURT:  I don't at the moment.  Thank you.

9        Ms. Richenderfer.

10       MR. HANSEN:  Thank you, Your Honor.

11       MS. RICHENDERFER:  Your Honor, Linda Richenderfer

12  from the Office of the United States Trustee.  I was just

13  surprised to learn that something was submitted to Your Honor

14  that we did not receive a copy of.  So I would ask in the

15  future the Ad Hoc Committee, in whatever form it is, also

16  provide to the U.S. Trustee's Office anything that is submitted

17  to the Court.

18       Your Honor, I've been back there learning an awful

19  lot about the Boy Scouts case, and that includes the fact that

20  Judge Silverstein ordered that notices go out to all of the

21  claimants who were represented by the law firms who wanted to

22  be part of the coalition.  Ended up that not all of them

23  submitted a letter in favor of the coalition and then the

24  coalition put together a steering company.  And why that's

25  important, Your Honor, is that here we have Cole Schotz and

59

1   Paul Hastings, they owe a fiduciary duty to their clients.

2          Who was their client?  Their client are law firms.

3   The client is not claimants.  The clients are law firms.  Those

4   law firms represent claimants.  And I was surprised to hear

5   Counsel say that the claimants support the plan because I sat

6   through a lot of the depositions for the preliminary

7   injunction.  Mr. Watts (phonetic) was extremely clear.  He

8   hadn't talked to his clients yet about the PSA.  There wasn't

9   anything to talk to them about he said.  This is just a term

10  sheet.

11         Yeah, there still needs to be a plan to be developed.

12  He says some of them may support it, some of them may not

13  support it, but that was his response to the question of, are

14  you binding your clients?  And he was very clear.  I'm not

15  binding my clients.  I think this is a good deal.  I'm going to

16  tell them I'm in favor of this deal, but I haven't even spoken

17  to them about it yet.  And that was what he testified to in

18  connection with the preliminary injunction hearing.

19         My memory's not as good as to, I know there was at

20  least one other counsel who was deposed, who had signed a PSA.

21  And so, Your Honor, I'm not sure where the statement's coming

22  from that all of the collective clients are on board because

23  this group is -- it's gathered together under one concept,

24  which is we support the plan.  I don't know, again, I don't

25  know what the plan is.  I guess it's just the term sheet.

60

1  That's all they could be supporting right now, because we don't

2  have a plan yet.

3        But we don't know whether or not these claimants do

4  support even the term sheet because it hasn't gone down to that

5  lower level.  This has nothing to do with whether or not people

6  who do support the term sheet and people who do support signing

7  plan support agreements should or shouldn't be allowed to

8  intervene.  I'm not taking a position on that, Your Honor.

9        I just, unfortunately, we seem to have segued into

10 the standing of this group, and I just wanted to make it clear

11 on the record, Your Honor, that I need to investigate a little

12 further into the Boy Scout situation as we may be raising

13 questions ourselves.  But I have to respectfully disagree with

14 the concept that all of these claimants are on board.  They may

15 or may not have given authority to their attorneys to do

16 certain things but to say that they individually are on board,

17 I think is a mistake.

18       THE COURT:  The Court doesn't accept -- the Court has

19 no misconception that 55,000 claimants haven't expressed a

20 willingness to adopt even the term sheet as it is.

21       MS. RICHENDERFER:  Okay.  Thank you, Your Honor.  And

22 that's what I wanted to clarify because when I heard that said,

23 I was a little surprised because Mr. Watts was very open and

24 frank and honest about that whole scenario.

25       Thank you, Your Honor.

61

1          THE COURT:  Mr. --

2          MR. HANSEN:  Your Honor, I didn't make the

3   representation --

4          THE COURT:  I understand.

5          MR. HANSEN:  -- that 5,000 of them were authorizing

6   their lawyer.  I never made that representation.  The lawyers

7   are going to recommend it to them.  They'll vote when the plan

8   comes across to them.  I just want to be clear on that.

9          THE COURT:  As I said repeatedly throughout the five-

10  day trial last year, I understood the points that were being

11  made.  I got it.  Thank you.

12         Mr. Molton.

13         MR. MOLTON:  Just a little process, Your Honor, and

14  since Boy Scouts was mentioned, I don't know, other than

15  Ms. Beville, anybody in this room who's got as much experience

16  with that case as I do.  I don't know if Ms. Lori (phonetic) is

17  here, but she would be able to weigh in if she were here.

18  She's not.

19         In any event, first point, I know Mr. Hansen, very

20  good lawyer, recited the mantra of getting folks paid.  Suffice

21  it to say that on behalf of the members of the Committee, we

22  want people to be paid as soon as possible.  We had thought

23  that the tort system was open and people would start litigating

24  and settlements would start happening.  But we're back here and

25  Your Honor knows what's in front of you going forward.

1          And in any event, I want to remind Mr. Hansen that

2   for the last 19 months there have been no payments made to any

3   of the talc claimants whatsoever.  I refer Mr. Hansen to what

4   goes on in North Carolina where for years, no payments have

5   been made to those asbestos victims.  I want to remind

6   everybody that the term sheet is geared to payment by J&J and

7   LTL, however it worked.  I guess J&J is funding the 8.9 billion

8   upon final non-appealable order.  Final non-appealable order.

9          In <u>Boy Scouts</u>, there's money that's already gone as

10  of the effective date, and we don't have a final non-appealable

11  order.  That's a condition of the agreement.  To the extent

12  that this plan is an attempt to get plaintiff's warring against

13  each other, talc claimants against talc claimants, individual

14  plaintiffs against states, third-party payers against

15  everybody, estates against everybody, all feeding on the same

16  pot, and then we have the indemnification claims by <u>Imerys</u> and

17  <u>Cyprus</u>, final non-appealable order is a long way off

18  Mr. Hansen.  That's number one.

19         Number two, Coalition of Abuse Scouts for Justice,

20  Boy Scouts, that was the name of that ad hoc group from day

21  one.  It wasn't of the law firms, it was of the survivors.  And

22  the attempt was made to tie their consent under 2019 to the

23  retainer letters, to the retainer letters, Your Honor.  And

24  those retainer letters were produced in template form for

25  everybody to see.  The argument was made that those retainer

63

letters contained authorization.  And I know my friends from
the U.S. Trustee's Office were very, very involved in making
sure that was exactly the case.

Indeed, the U.S. Trustee took a very principled
position on 2019 in that case that extended the hearings over a
number of hearing dates in front of Judge Silverstein until
they were satisfied that the actual creditors, the claimants,
had given their informed consent to be represented for the
collective purpose of an ad hoc group in front of Judge
Silverstein.  At the end of the day, that wasn't just the
retainer letters, although those had to be given out and those
had to be given out also in terms of understanding how the
payment was made or who was going to be charged, whether the
claimants themselves would be charged by the professionals.

At the end of the day, that charge would be passed
along to the claimants.  But at the end of the day, it was
worked out after a number of hearings with an active, proactive
involvement.  And the U.S. Trustee attorney will no doubt
recall that, although I don't believe she was specifically the
trial attorney on that case, was that the coalition received
signed consents, informed consents, for the collective action
by the coalition from 18,000 of the law firm's members.

And that's how that was resolved, and Ms. Gavel will
tell me if I'm wrong, if I'm mis-remembering.  But one of the
things in terms of process, maybe, Judge, the thing to do is to

64

1  push this hearing to allow the U.S. Trustee's Office and the

2  other interested parties to take a look-see at what actually is

3  in the 2019, whether the attachments to the 2019, Mr. Hansen

4  says those include the retainer letters.  We don't have them.

5  We need them.  We need to see them.  We're willing to work with

6  Mr. Hansen on confidentiality, whatever's required in order for

7  us to assess them.  But we need to see those and come back and

8  deal with this in a short time.  I'm not talking about a long

9  time, but a short time.  These are all important questions,

10 questions that we have.

11          And, again, Your Honor, at the end of the day, if

12 Your Honor believes the <u>Boy Scouts</u> precedent informs Your

13 Honor, that's possibly one way to deal with this.  I do note

14 that Mr. Hansen said we opposed their participation in the

15 mediation process.  So the record's clear, we did not.  We said

16 we agreed with the order that allowed the mediators in their

17 discretion to allow anybody they believe to participate.  I

18 know that includes Mr. Hansen's group, but that is within the

19 purview now of the mediators.

20          And lastly, Judge, we've heard a lot about voting and

21 plan.  Your Honor has our suspension motion in front of you

22 that's on for next week.  We feel that the first issue in this

23 case is dismissal, Your Honor.  You're going to hear in a few

24 minutes as to the PI certification op.  We got Judge Ambro's

25 authored text order today.  The breaking news that I reported

65

1  earlier that I reported to Your Honor in the Court that talked

2  about the expedited or accelerated nature of this bankruptcy

3  proceeding and their comfort with that in lieu of declining the

4  extraordinary vehicle of a mandamus to address that situation.

5       So to the extent if and when we ever get to voting

6  issues and other plan issues, needless to say, a lot of what

7  you heard today may be raised there and may be raised there in

8  more detail and probably evidentiary fashion.  So I just want

9  to put a marker on that.  And just wanted to say those things

10 just in terms of process, Judge.  I hope that was helpful.  I

11 didn't expect to stand up, but when I heard Boy Scouts, I think

12 I had to, so.

13      THE COURT:  Thank you.

14      Mr. Hansen, very briefly, please.

15      MR. HANSEN:  Very briefly, Your Honor.  It just

16 sounds to me like what Mr. Molton explained was they started it

17 exactly the same way we did.  They represented law firms, even

18 though they had a different name.  They relied on the retainer

19 letters and over time in that case, they were asked to go get

20 information from their claimants specifically demonstrating

21 authorization.

22      So where we start today is we chose to use the name

23 supporting counsel rather than saying, supporting counsel on

24 behalf of their clients.  But that's what we're doing and I

25 know you understand that, Your Honor.  The other thing I'd

66

1  point out is that the TCC has already served discovery on the

2  Ad Hoc Committee of Supporting Counsel as well as the members

3  of the Committee themselves.  So they are obviously treating us

4  as a party in interest themselves.

5            Thank you, Your Honor.

6            THE COURT:  Fair enough.  All right.

7            Oh, Mr. Gordon.

8            MR. GORDON:  Your Honor, I've said nothing.  I have

9  like one minute if I could.

10           THE COURT:  That's all right.

11           MR. GORDON:  Your Honor, I just wanted to say on

12  behalf of the debtor, we support the motion to intervene.  I'm

13  sure Your Honor's not surprised by that.  It's striking to me,

14  sitting here watching this, the extent of the opposition to the

15  motion.  This is a sort of a plain vanilla -- they're only

16  asking for the right to intervene in a proceeding.  And we've

17  basically heard arguments that go to the substance of their

18  position, whether or not they're even legitimate parties, do

19  they really have claimants.

20           And to me, it's consistent with what's been going on

21  in this case from the beginning, which is, over-the-top efforts

22  by this Committee to deny the majority of claimants in this

23  case a vote and a right to even be heard on the issues.  And

24  this has just happened from the beginning.  And I would think

25  from Your Honor's perspective, it would be helpful for you to

1  actually have available to you the views of a group of

2  claimants who disagree with the Committee in this case.

3          I mean, the Committee in this case who purports to

4  represent everybody is obviously pursuing an agenda with which

5  there are tens of thousands of claimants that disagree with

6  that, or law firms, if you want to say law firms that disagree.

7          But it seems to me, from a judicial perspective, it

8  would be helpful to the Court and all parties to allow them to

9  participate.  I don't see that does any harm to the TCC.  And

10 if there's a technical issue about how you describe the

11 Committee or how you want to denominate exactly who its

12 representatives are, it seems to me that can be fixed.

13         Thank you.

14         THE COURT:  All right.  Thank you.

15         Thank you all.  Well argued.

16         All right.  It seems to me, and we'll probably touch

17 on this with the next argument on the certification process,

18 that the relief sought by the motion, at least today, is rather

19 limited.  It is to intervene and participate in the adversary

20 proceeding pursuing the preliminary injunctive relief.

21 Obviously, it's going to be built upon to extend to other

22 avenues in the case.

23         In listening to the argument and reading the

24 submissions, it is clear to me that this group, however large

25 it is, does not necessarily have its interests aligned with

1  either the debtor or the TCC.  It could clearly come to a point

2  where it's going to try to renegotiate or the plan process

3  itself calls for always continued negotiations.  And from what

4  I'm hearing, the interests as far as compensation and their

5  avenues towards compensation may differ from other creditors

6  that are being represented by the TCC.

7          So, we're speaking of potentially tens of thousands

8  of voices who do need to have representation in this case.  I

9  am determining, I am ruling that this ad hoc group, as of now

10 it's Ad Hoc Group of Counsel, based on the representation that

11 each of these law firms do represent the interests of thousands

12 of creditors for whose identity they have supplied, at least in

13 a limited fashion, satisfy the requirements necessary to

14 intervene in the preliminary injunction proceeding consistent

15 with Rule 24(a)(1), 24(a)(2), and 1109.

16         I am reaching that conclusion based on a condition

17 that I'm going to require, that there will be supplemental

18 certifications filed by each of the law firms, I believe I

19 heard 20 law firms, that form the ad hoc group that they, in

20 other words, a principal from each of the firms has to certify

21 under penalty of perjury that they are authorized to represent

22 the interest of their clients, those identified clients in this

23 case and to support on behalf of these clients they're

24 authorized in this case to support the plan support agreement,

25 and that they have sent out a notice to each of their clients

1  of their intent to represent their interest in this bankruptcy

2  proceeding and to support the terms of the plan support

3  agreement, or support, however you want to phrase it, the

4  debtor's efforts to implement the plan support agreement.

5        I don't think that's burdensome.  Yes, each of the 20

6  has to reach out to their own clients and confirm that they are

7  representing their interest in this bankruptcy and they're to

8  certify to this Court that they have done so and that they

9  have, based on their retention agreement, retainer agreement,

10  the authority to act on behalf of all of the identified

11  claimants in this proceeding.

12        I will give them time to do so.  I will ask that it,

13  it be done in the next 30 days.  In the interim, I will accept

14  argument from the Ad Hoc Committee today on the certification

15  issue and we will get to that issue in 10 minutes.  I'm going

16  to take a break.  My back requires it.

17        I'll ask the Ad Hoc Committee to submit a form of

18  order.

19      (Recess from 2:31 p.m./Reconvened at 2:45 p.m.)

20        MR. MASSEY:  Thank you, Your Honor.

21        THE COURT:  The floor and the video is yours.

22        MR. MASSEY:  Thank you very much, Your Honor.

23  Jonathan Massey, proposed counsel to the TCC.  We're here this

24  afternoon on the argument for motion to certify for direct

25  appeal the Court's PI ruling.  And at the outset, I've got a

PowerPoint.  But just, I'm aware of two points that are going to be of interest to Your Honor.  First, obviously, the Third Circuit's ruling on mandamus that's just come down.  How does that affect things?  And as Your Honor mentioned they didn't take it off your plate, so you're still stuck with it.  But I'll talk about that a little bit more.

And then, second, Your Honor's remarks on the last motion about the limited nature of the relief and the limited nature of the motion at stake how that would fit into the PI order.  Because obviously we all know the motion to dismiss is coming down the pike, and I'm sure Your Honor's thinking should I certify the PI order or should I wait and do the motion to dismiss?  Is that the main event or not?

And I'll explain that.  I believe that the PI order itself involves several foundational issues, which are appropriate for certification now that are purely legal in nature will not be affected by any facts or evidence that will come up at the motion to dismiss hearing.  So those would be appropriate, we believe, for certification now.  But I'll talk more about that.  But I just wanted to acknowledge at the outset the remarks Your Honor had made.

So the very first slide are the three certification criteria, actually it's slide two on the written document, Your Honor is very familiar with these factors.  You've applied them in actually several different certification motions that Your

Honor has heard, so I'm not going to read those to you.  This
was a slide I made before the mandamus ruling from the Third
Circuit about why Mandamus strengthened the case for certifying
the direct appeal.  Obviously, that's been mooted by what the
Third Circuit has done.  But the Third Circuit relied in
denying the mandamus on the recognition that, "The write of
mandamus is a drastic and extraordinary remedy and there are
other adequate means for the petitioner to obtain the relief it
seeks."  And one of those alternative avenues for seeking
relief is of course appeal.

         And, in fact, the debtor, in opposing the petition
for mandamus in the Third Circuit, said at Page 17 of its
opposition, that the availability of appeal was a reason to
deny the petition for mandamus.  Now, I think the debtor's
argument here is that we should go to the district court.  We
should appeal the PI order to the district court not to seek
direct certification.  And the last couple of bullets on this
page are attempting to respond to that.  I mean, basically the
debtors' attempt is to keep the foundational issues away from
the Third Circuit for as long as possible, even though what's
really at issue here is the Third Circuit's prior decision
dismissing this case and what effect that has on LTL 2.0.

         And sending this appeal to the district court for it
to decide what the Third Circuit meant when the district court
has had no prior experience or history with this case doesn't

72

really make any practical sense.  It just delays things and
would eventually wind up going to the Third Circuit anyway, and
it is really in our view an illogical and impractical attempt
to just delay the proceeding.

The first criterion for applying the certification
question is the public importance of the case.  I don't think I
have to talk very much about the public importance of the case
as a whole.  Your Honor is very familiar with the importance of
this case, generally.  It affects tens of thousands of
litigants, billions upon billions of dollars, and so on.  The
real issue comes when the debtor says the PI order itself is
not an important ruling in this overall case because it's
limited in time and scope.  It allows for discovery and
preparation.  It simply says trials and appeals.  It lasts
until June 15th.  So why are we bothering with the appeal of
the PI ruling?

Well, first obviously, it affects dozens of talc
victims who are awaiting trial across the country.  Your
Honor's allowed Mr. Valadez to go forward, and Your Honor said
I don't want to be hearing now about this whole seriatim of
requests for lift stay motions.  But there are in fact,
obviously, dozens of other people out there who had trial dates
scheduled.  Marlon Eagles (phonetic) and Meredith Eggley
(phonetic) are two of them in Alameda County.  There's the
Judge Viscomi in Middlesex County has been asked to hold the 22

73

1  plaintiff consolidated trial, and she's declined to consider

2  that while the bankruptcy's pending.

3      I mean, ironically, the debtor told the Third Circuit

4  in asking them to stay the mandate.  If you don't stay the

5  mandate, there are at least 20 meso cases that are going to go

6  to trial in the next 60 days.  And they told the Third Circuit

7  that back in March.  So we all recognize that there are a

8  significant number of people who are going to be affected by

9  the PI order even in the interim.

10     And the U.S. Trustee has said that further delay

11  would be unconscionable.  And in prior cases, like the <u>Gold</u> and

12  <u>Johns-Manville</u> case, the Third Circuit recognized that there's

13  a lot of hardship to asbestos victims in particular, for being

14  forced to wait, and many of them will die.

15     So in our view, Even though the PI is not as broad as

16  it could be, and even though it's limited until June 15th,

17  reviewing that order would give guidance.  I don't know what

18  Your Honor envisions past June 15th.  This PI lasts only until

19  June 15th.  So there is some reason here for appeal and getting

20  guidance on the legal status of the PI ruling.

21     The PI order itself also involves issues at the heart

22  of the second filing.  Your Honor called good faith a gateway

23  question, whether it's subject matter or not, it's a gateway

24  question.  And that effects any PI of any kind.  It goes to the

25  Court's legal authority to issue any kind of injunctive relief.

1  And central to the PI question, in Your Honor's word, was the

2  fundamental question, whether there's a realistic possibility

3  of success.  It's the lynchpin of the four prong injunctive

4  standard.

5          So, that's what Your Honor was deciding when you

6  issued the PI was really was whether the debtor, as you said,

7  would have a realistic chance of reorganizing successfully in

8  light of the Third Circuit's decision.  And that's why the

9  Trustee has opposed the PI.  I mean, the U.S. Trustee's

10  position is that any reorganization is futile, it's intended to

11  circumvent the Third Circuit's ruling, it doesn't have a chance

12  of success, and that's why you should deny the PI.  That was

13  the U.S. Trustee's position.  And that just shows that this PI,

14  unlike the first PI actually in LTL 1.0, this PI is more tied

15  in to all the fundamental legal questions at the basis of the

16  bankruptcy.

17          The first PI had some other issues that Your Honor

18  didn't think warranted separate certification.  This one is

19  actually quite intertwined with the fundamental question of

20  what are we doing here in light of the Third Circuit's

21  decision.  I know they didn't want to hear about mandamus, but

22  they said there were other ways to hear that question.  And so

23  I think, fundamentally, that's the real question before this

24  Court on the PI as well as the motion to dismiss.

25          Now, the next slide.  The question here is really the

75

1    debtors putting the Third Circuit's decision at issue.  I mean,

2    the TCC, which represents, as you heard, all talc creditors, a

3    fiduciary duty to talc creditors, the U.S. Trustee's Office,

4    the state attorneys general, other claimants have all shown

5    that the Third Circuit decision really does foreclose the

6    second bankruptcy filing.  We'll get into some of those issues

7    later.

8            But the debtors' takes the opposite view.  The debtor

9    has said Footnote 18 was Mr. Kim's revelation that he read that

10   and he had the idea, oh, well this is how we do bankruptcy in

11   LTL 2.0 is we surrender the funding agreement.  So the question

12   is, was that a correct reading of footnote 18?  The rest of the

13   world doesn't seem to think so.  The debtor believes it was.

14   And the debtor says the Third Circuit decision changed the law,

15   rendered the funding agreement void or voidable.  I mean, that

16   is a question which really the Third Circuit should

17   authoritatively resolve.

18           Did they change the law in a way that nobody could

19   have predicted?  I mean, that's the debtor's position for

20   why -- that's at the foundation of this bankruptcy, is do you

21   change the law on us?  No one could have predicted it.  The

22   funding agreement is void or voidable.  We traded it away

23   because it wasn't worth anything anymore.

24           I mean, if that premise is wrong, then the rest of

25   this proceeding is just paper shuffling and we should address

1  that in the Third Circuit now.  That's kind of our position on

2  why the PI order makes sense, why certification of the PI order

3  makes sense.  And Your Honor has identified additional legal

4  questions throughout the last couple of hearings that are also

5  basically tied into what I've just discussed, but are worthy of

6  certification in their own right.

7          I mean, Your Honor asked, does the manner in which

8  the transactions were undertaken give rise to an independent

9  basis for finding bad faith?  Possibly.  The transaction

10  certainly appeared to be manufactured to create financial

11  distress in direct response to the Third Circuit's ruling.  I

12  mean, Your Honor is teeing up the question of whether a debtor

13  can manufacture financial distress as a basis for good faith,

14  regardless of whether that's technically a fraudulent

15  (indiscernible) or not.

16          Leave all that aside.  Just, can you create financial

17  distress by doing something that is a naked attempt to achieve

18  financial distress to fit yourself within the Third Circuit's

19  ruling?  That's sort of just a straightforward legal question.

20          Next question that Your Honor has teed up.  There are

21  unresolved issues such as the voidability of the 2021 funding

22  agreement.  I mean, it's undisputed that the funding agreement

23  applied outside bankruptcy.  It's undisputed that it applied in

24  the event of dismissal.  Mr. Gordon has admitted that.  It's

25  undisputed that dismissal was reasonably foreseeable, that it

1  came out of the PI hearing on the 18th and so there are no

2  facts relevant to this question at all.

3       This is a straightforward question of, actually it's

4  North Carolina law because the funding agreement is covered by

5  North Carolina law, but is there frustration of purpose within

6  these parameters?  And frankly, this is like a first year

7  contracts law school exam question.  It's not a question for a

8  motion to dismiss trial.  It does not depend on any kind of

9  factual record beyond what we've already got.

10      I mean, Mr. Kim has actually testified twice that the

11 funding agreement applied outside bankruptcy.  In his first-day

12 declaration in LTL 1.0.  He reaffirmed that testimony later.

13      I know they've got an argument for why they think

14 that the reason that the dismissal was predicated on the

15 funding agreement upset their expectations.  Whatever the

16 merits of that argument, we have a very dim view of the merits

17 of that argument, that's a legal argument that can be teed up

18 now and decided.  I mean, there's just no -- the motion to

19 dismiss trial is not going to affect that question.

20      And then another question Your Honor is posed, as to

21 actual fraud, can the Court conclude that there has been actual

22 intent to hinder, delay, and defraud creditors?  Maybe.  And we

23 think, actually, that issue is unusually susceptible to a legal

24 determination.  You might think that a lot of times actual

25 fraud is hard to prove and difficult, you know, it's subjective

78

1   intent is something that you have to have a trial about.

2         But here, we know.  We know what happened.  We know

3   that LTL surrendered the funding agreement so it would be

4   sufficiently distressed to invoke bankruptcy.  And part of that

5   may be the void or voidability point.  But that's also a legal

6   question.  We know that creditors were denied access to the

7   2021 funding agreement and cash flow from the consumer

8   business.  Remember that was spun off in January.

9         So HoldCo, they're going to argue that HoldCo's

10  insolvent because it doesn't have the cash flow from the

11  consumer business.  That is a product of their own spinoff.

12  And courts applying the 548(a)(1)(A) actual fraud test often

13  look at badges of fraud.  So if you want to look at objective

14  evidence of indicia of fraud, I mean here, of course it's here

15  in spades.

16        I mean, the transaction involved the most significant

17  asset, took place basically in secret outside the normal course

18  of business.  It wasn't disclosed in advance to anybody.  I

19  mean, you remember also it was listed in the March monthly

20  operating report as the funding agreement's still in place at

21  the very time when all the paperwork was being done to

22  terminate it.

23        So there's a paper record here of badges of fraud as

24  well as basically what the corporate purpose was in

25  determination and substitution agreement that resulted in the

1  end of the 2021 funding agreement.  And so there are cases,

2  there are plenty of cases, here are a few, where actual fraud

3  is decided on summary judgment on basically the record that

4  we've got now.

5          And insolvency, as you know, is not an element here.

6  It would be an element for constructive fraudulent conveyance,

7  but not actual fraudulent conveyance, so all the questions at

8  the motion to dismiss trial about the financial situation that

9  LTL and HoldCo and how liquid or HoldCo's assets and all the

10 rest of that is not going to affect this issue.  It's basically

11 teed up now the way it's going to be teed up later.

12         So in our view, all of those questions are tied into

13 the PI, don't need a motion to dismiss trial, are really

14 important, and the Third Circuit is the best situated forum to

15 resolve them.  Even financial distress actually has a legal

16 issue, this slide, Slide 10.  The financial distress angle here

17 is interesting because we know that LTL did not do any analysis

18 of its talc liabilities after the Third Circuit's decision.

19         And there are board minutes from April 2nd that say

20 that where the board acknowledged it had no estimate or

21 valuation of aggregate talc liability and that LTL's CFO wasn't

22 aware of any such analysis when Mr. Dickinson testified to that

23 on the 17th.  So basically, the question here is, whether you

24 can shoot first and analyze later in bankruptcy.  In other

25 words, whether you can file for bankruptcy without actually

1  having done an analysis of your liabilities and then come to a

2  motion to dismiss trial and say we've got experts and witnesses

3  and other people who are going to generate a record to

4  demonstrate that we were in fact in financial distress on

5  April 4th, even though we didn't actually do that analysis

6  ahead of time.

7        And that's actually a good legal question because I

8  think the SGL Carbon case doesn't hold this, but it disparages

9  the post-hoc rationalization by the debtors' attorneys.

10  Basically, it says, well, it's kind of late in the game to be

11  finding financial distress after you've actually filed for

12  bankruptcy.  So even if you were concerned about, I mean,

13  admittedly, there will be other financial distress issues

14  decided at the motion to dismiss hearing.

15        There's going to be evidence on the financial

16  condition.  I'm not denying all of that.  But there is still a

17  financial distress issue, which could be decided on the papers

18  as we are now.  So the legal standards governing PI relief are

19  also in our motion.  I don't think that there is -- I mean, I

20  don't think we have to spend too much time on it.

21        Except I do think that the debtor in its papers

22  opposing the instant motion has said that the Third Circuit did

23  not address the issues relating to the injunction in its

24  decision.  That the Third Circuit decision was all about the

25  motion to dismiss.  But there's a footnote, Footnote 16, where

1  Judge Ambro went out of his way basically to say, hey, there

2  are some issues here on the PI which we need to talk about and

3  it said this Court's prior analysis lacked full discussion of

4  three pertinent factors.  One, J&J'S independent tort

5  liability; two, the whole 1979 transfer agreement, the books

6  and records issue; and three, whether you can indemnify

7  punitive damages liability, whether LTL could assume J&J's

8  punitive damages liability because in New Jersey, there are

9  restrictions and limits on the indemnification obligation for

10  punitive.

11         The other thing I think that's worth saying about the

12  PI, which the Third Circuit decision effects, is that the PI

13  rests on a finding that trials against non-debtors would

14  negatively affect mediation, valuation, and estimation.  But in

15  this last bullet, the Third Circuit actually took the other

16  view of what talc litigation would do.  It said it would help

17  rather than hinder reorganization by providing the Court with

18  better guideposts, particularly when it's tackling valuation

19  and estimation.

20         And it dropped a footnote at that point that said,

21  hey, in the A.H. Robins bankruptcy, there was the benefit of 15

22  years of tort data.  Actually, a lot of what we hear today kind

23  of supports that view.  There are a lot of fundamental

24  disagreements about the values and various kinds of claims.  I

25  don't want to go into that.  But the Third Circuit was able to

82

1  say when you've got a history, a track record, stuff you could

2  look at, that benefits.  So I don't think the Third Circuit was

3  saying, in fact, it said the opposite.  I don't think it was

4  saying that there was irreparable harm from allowing litigation

5  against non-debtors to proceed.  Okay.

6        So the last slide I have, last point I want to make

7  is just a practical point, which Your Honor has always seen

8  before, that how do you materially advance the process of the

9  case?  Do you send this appeal to the district court, which has

10 had, as I said, no real experience with this case to review

11 these questions without the background that Your Honor has or

12 the Third Circuit has?  And, as you said before, it seems

13 senseless to do that.

14       And the last bullet, I just want to point out, I mean

15 Congress when it amended Section 158(d)(2), said we want more

16 decisions to go to the courts of appeals.  We don't like this

17 idea that the cases are going from the bankruptcy courts to the

18 district courts, they're not binding, they lack *stare decisis*

19 value and results in a dearth of appellate precedent on

20 bankruptcy.  I mean, Your Honor's reference to the Supreme

21 Court case shows there aren't that many bankruptcy cases that

22 are getting decided certainly by the highest court, also by the

23 intermediate appellate courts, and Congress was trying to

24 change that in 2005.

25       So I think there's a congressional purpose here as

83

1  well as just practical sense, like where does it make sense to

2  send this appeal?  It's primarily legal.  It's tied in with

3  fundamental questions about whether this bankruptcy belongs

4  here, and it doesn't make any sense to send it to the district

5  court.

6           Thanks.

7           THE COURT:  All right.  Mr. Massey.  Thank you.

8           Let me ask you a question and I'm trying to be

9  pragmatic.  I know the rest of the week, the Circuit is at a

10 Third Circuit conference, they're not going to be doing too

11 much.  Maybe that's why they rushed the decision today.

12          MR. MASSEY:  Yes.

13          THE COURT:  To get it off their desks.

14          Even if I were to enter an order tomorrow authorizing

15 direct appeal, that just begins a process of filing motions in

16 the Circuit --

17          MR. MASSEY:  Correct.

18          THE COURT:  -- and briefing schedules.

19          MR. MASSEY:  Correct.

20          THE COURT:  And then they may have oral argument or

21 they may not.

22          MR. MASSEY:  Right.

23          THE COURT:  I have a limited, and it's limited

24 compared to the prior injunction, a limited injunction that

25 expires on its own terms June 15th.  Is it realistic to think

84

1  that you're going to get this argued in the next 30 days?  Or a

2  decision, even a decision to take the appeal, let alone to

3  argue the appeal before it's mooted out.  Isn't the Circuit

4  going to look at it and say it's moot?  And then, let me just

5  finish, go through it all, will go the next step.

6          And if it's not moot, the reality is, I'll be

7  possibly or probably in the midst of that week, June 15th, or

8  close to it, a motion to dismiss, which will touch on the

9  various issues that, while you say the Third Circuit need not

10  address because they're factual and it's not necessary, they

11  have a bearing.  Some of these issues are going to have a

12  bearing.

13          How practical is that the Circuit's just not going to

14  say wait until the motion to dismiss?  First of all, there's no

15  guaranty, A, I could grant the motion to dismiss, which moots

16  out it again, so the Circuit's going to look at that

17  alternative.  B, if I deny the motion to dismiss, it still

18  doesn't mean I extend the injunction.  And, C, if I deny the

19  motions to dismiss and extend the injunction, it's going to

20  have to be on an application by the debtor based on, in all

21  likelihood, what I'm hearing at the motion to dismiss.

22          So how is this even practical?  And why try to throw

23  this up to the Circuit now when it's in all likelihood going to

24  be mooted out or could very well be mooted out one way or the

25  other, either on my granting a motion to dismiss or the

1  injunction not being extended.

2          MR. MASSEY:  Right.  And I take all those points.  I

3  think the reason to send it up is to give them the opportunity

4  to do what they want.  If it gets mooted out, then the appeal

5  gets dismissed.  If the appealed winds up being mooted, there's

6  just, you file a notice of dismissal in the Third Circuit and

7  that's nothing.

8          If it doesn't get mooted out, then what happens on

9  June 15th becomes important because this appeal could provide

10  guidance for whatever comes next.  There are a lot of

11  contingencies as Your Honor's comments make clear.  But I think

12  if we don't certify the appeal now, then we're basically

13  foreclosing the Third Circuit's opportunity to review anything

14  if it wanted to.

15          And denial of mandamus can read it different ways.

16  One way to read it would be, hey, there are other ways to get

17  here.  Appeal is obviously the obvious one.  And so here we

18  are.  We're saying we're going to present you with an appeal on

19  legal questions.  It's true, if you wanted to decide this

20  before the motion to dismiss, and I know we're about to discuss

21  the scheduling of the motion to dismiss, and we're all hopeful

22  that this motion to dismiss will be heard as early as possible.

23  So it may be, certainly, that you certify appeal and it winds

24  up getting mooted.

25          But if you don't certify the appeal, then you've made

1  the Third Circuit's decision for them, and they don't have the

2  opportunity to say, we would have wanted to hear that.  We

3  would have expedited it.  We wouldn't have heard argument, we

4  would have just ruled and there you are.

5         So we really don't know what the Third Circuit's

6  preference is, and so my position is, well, I'll offer it to

7  them, and if they want to take it, it's there.  If they don't

8  want it, they'll deny the petition for leave to appeal, as Your

9  Honor said, or if it gets mooted, it gets mooted.  But this is

10 kind of a point where we either foreclose that option to them

11 or we keep the option open.

12        THE COURT:  One could say that's what you did with

13 the petition for mandamus.  You offered it up and --

14        MR. MASSEY:  Yes.

15        THE COURT:  -- and they said no.

16        MR. MASSEY:  Yeah.  That's right.  But they said, no,

17 not --

18        THE COURT:  I know, it's extraordinary relief.

19        MR. MASSEY:  Yeah, right.  They said you've got other

20 ways to get here, so now we're in the next way to get here.

21 And so I do think, look, our position is, not just the TCC's

22 position, the U.S. Trustee's position, the state attorneys

23 general, is to fundamentally this bankruptcy, the second

24 proceeding, is not in conformance with the Third Circuit's

25 decision.  So I make no apologies for saying, I think it makes

1 sense to ask the Third Circuit to get involved.

2          The debtor thinks that's obstruction.  I mean, we

3 think it's actually rule following and enforcing the law.  We

4 think there was a decision that was pretty clear and,

5 obviously, they have a different view from us about what that

6 decision means.  But to say that the forum that rendered that

7 decision shouldn't be able to say what it means or somehow that

8 it's gamesmanship to go ask the Third Circuit to enforce its

9 mandate, I mean, that's not the rule of law and the way our

10 system of justice works.  I have no apologies for that.

11          THE COURT:  Fair enough.  All right.  Thank you,

12 Counsel.

13          Is there anyone else arguing in support of the

14 certification motions?

15          MR. GUPTA:  Yes, Your Honor.  Can you hear me?

16          THE COURT:  Yes.  Mr. Gupta.  Good afternoon.

17          MR. GUPTA:  Yes.  Good afternoon, Your Honor.  Deepak

18 Gupta from the Gupta Wessler firm.  The Ad Hoc Group of

19 Mesothelioma Claimants have filed a motion for me to appear pro

20 hoc vice.  So with Your Honor's permission, I'll address the

21 certification motion as well.  And I also appreciate the

22 ability to pipe in here quickly by Zoom.

23          And I'll try to be quick --

24          THE COURT:  Wait one second.  Mr. Gordon.

25          MR. GORDON:  Your Honor, Greg Gordon on behalf of the

88

1   debtor.  I'm not sure I heard that exactly, but is he

2   purporting to appear on whose behalf?  I'm not sure.

3              THE COURT:  The Ad Hoc Committee of Mesothelioma

4   Victims, I believe -- Claimants.

5              MR. GUPTA:  That's right.  And we --

6              MR. GORDON:  So a group that has not even sought

7   intervention?

8              MR. GUPTA:  No, no.  I'm here on behalf of the Ad Hoc

9   Group of Mesothelioma Claimants.  We have filed a pro hoc vice

10  motion to appear.  We're appellate counsel for the Ad Hoc Group

11  of Mesothelioma Claimants.  We appeared in the Third Circuit in

12  this proceeding before.  But this is my first time before Your

13  Honor.

14             THE COURT:  The Ad Hoc Group, I believe, did file a

15  separate motion --

16             MR. GUPTA:  Correct.

17             THE COURT:  -- to certify.

18             MR. GUPTA:  It's on the agenda for today.  That's

19  right.  And so that's all I'm addressing.  And I'll be, see if

20  Mr. Gordon has any --

21             THE COURT:  Well, I think we're all struggling

22  with --

23             MR. GORDON:  Procedure here --

24             THE COURT:  -- what seems to be a procedural

25  quagmire.  But before you start, Mr. Gupta.

89

1          MR. MASSEY:  I don't understand what the confusion

2    is.  Mr. Gupta represents the Ad Hoc Group of Mesothelioma

3    Claimants.  Katherine Tolleson, my client, was an appellant to

4    the Third Circuit.  She opposed the preliminary injunction, as

5    did Evan Plotkin, who's represented by the Dean Omar firm, as

6    did Giovanni Sosa from the Cooney and Conway firm.  We opposed

7    the PI.  We joined the motion to certify for immediate appeal.

8    Mr. Gupta seeks admission pro hoc to argue on our behalf here

9    today.

10          All of these are claimants that have counsel who have

11   entered appearances for them and that opposed the PI and it's

12   on the agenda.  And so this is not the situation.  There's no

13   issue here.

14          MR. GORDON:  So, Your Honor, just to point out, I

15   mean, there's obviously an inconsistency in positions here.  On

16   the one hand, the Ad Hoc Committee of Supporting Claimants

17   files a motion to intervene.  It's subject to staunch

18   opposition, but any party on the supporting side gets to show

19   up and say whatever they want, file any pleading they want, not

20   follow the rules of intervention.

21          I understand today, I guess that's where we are if

22   people have filed these things.  Maybe that's our bad on that.

23   But there should be a consistent approach going forward in

24   terms of who's allowed to be heard.  It shouldn't be that

25   Mr. Thompson can come up here and argue that someone shouldn't

90

1  be allowed to intervene when he's appearing on behalf of

2  someone who hasn't intervened.

3          THE COURT:  My understanding of the distinction so

4  far to date is that Mr. Thompson represents and is representing

5  to the Court that he's representing specific claimants who have

6  taken a position in this case.  And the Ad Hoc Committee for

7  Settling Law Firms is one removed.  It's the law firms not the

8  claimants, which is why I tried to address it with the notice

9  and the authorization.  Then everybody will be on the same

10 level.

11         For purposes of today, I'll listen to argument.

12         MR. GORDON:  Understood.

13         THE COURT:  Thank you.

14         MR. GUPTA:  Thank you, Your Honor.

15         We'll probably spend just as much time talking about

16 my ability to be here as what I wanted to share with you

17 because I agree with everything that my friend Mr. Massey had

18 to say, and my presentation won't be extended.

19         In short, we think this Court was correct the last

20 time around when it's certified an appeal and that

21 certification of an appeal is even more appropriate this time

22 around.  And I want to start, Your Honor, with the question

23 that you asked Mr. Massey, which is why do it now and could

24 this become moot?

25         And I think it's important to emphasize one thing

1  that Mr. Massey did say, which is, the question really is where

2  this appeal is going to take place and when because notices of

3  appeal have already been filed to the district court and that

4  doesn't have much to recommend it, that there be an appeal in

5  the district court on this issue.  So that injects an

6  additional decision maker into the process.  It injects

7  uncertainty into the process.  That district court decision

8  maker may have views that are different from Your Honor and

9  they may also be views that are inconsistent with what the

10  Third Circuit ultimately holds.

11        And so on threshold legal questions, not just about

12  whether this was a good faith filing, but also, as I'll get to,

13  questions about the Court's power to act and the Court's power

14  to enjoin litigation in state court with respect to third-party

15  non-debtors with respect to their independent liability.  Those

16  questions will be teed up and there could be different

17  decisions in the district court and then again in the Third

18  Circuit.  And all of that just prolongs the inevitable because

19  of course there will be appeals on those questions.

20        And so I think the basic submission we're making to

21  you is, it is better to get more guidance early if that's what

22  the Third Circuit is prepared to provide.  And so all you would

23  be doing by certifying is providing the Third Circuit with the

24  opportunity to take this matter rather than have it decided by

25  a district court, have it decided by the Third Circuit and

1  provide everybody, Your Honor and all of the many parties

2  involved, with guidance going forward.

3         And I think the issue that we want to focus on, and

4  this is what we focused on in the Third Circuit, is the

5  question, as I've alluded to, of the propriety of the

6  injunctive relief with respect to third-party non-debtors for

7  their independent liability.  The previous Third Circuit appeal

8  I think, demonstrated that that was a very significant issue.

9         The appellants in LTL 1 raised serious unsettled

10 questions about the lawfulness of the Court's order.  And this

11 Court's order itself, the most recent order, acknowledged that

12 the unsettled nature of the authority.  At Page 11 of your PI

13 order, you referred to the lack of clarity regarding the

14 appropriate authority to enjoin third-party actions.

15        At Page 8 of your order, you acknowledged, recognized

16 that courts in the Circuit view the source of authority to

17 extend the automatic stay as an open-ended question.  And most

18 recently, in the Seventh Circuit heard argument in a different

19 bankruptcy, in the 3M bankruptcy, where all three members of

20 the panel in that Court of Appeals expressed serious concern

21 about the propriety of injunctive relief of that kind.

22        The debtor argues in its opposition to certification

23 at Page 10, it says, "The Third Circuit has already declined an

24 opportunity to provide further guidance on jurisdiction to stay

25 actions against third parties during a bankruptcy case."  But

93

1  that makes no sense.  The Third Circuit held in the very last

2  sentence of LTL 1 that it was dismissing the case and so that

3  annulled the litigation stay ordered by the Court and made moot

4  the need to decide that issue.

5         But that issue isn't going away, Your Honor.  It's

6  not a transitory issue.  It's in fact central to this whole

7  bankruptcy proceeding just as it was central to the previous

8  proceeding because I think LTL has acknowledged that the whole

9  point of this proceeding, this proceeding is not worth the

10  candle unless they can get injunctive relief against state

11  court litigation against J&J over its independent liability.

12         So that issue is going to have to be addressed.  And

13  it will be need to be addressed by the Third Circuit.  And our

14  submission is simply that the Court ought to give the Third

15  Circuit an opportunity if it wants to take up those questions

16  now, along with all of the other threshold legal questions that

17  Mr. Massey addressed that are not fact bound.

18         And so I think all the things that the Court said

19  about the public importance of this proceeding are just as true

20  now as they were then.  And even if you set aside all of the

21  things that my friend said about their arguments about whether

22  or not this court's decision is consistent with the mandate of

23  the Third Circuit, even if you set aside all of those questions

24  of good faith, there are still fundamental questions about the

25  Court's propriety to act.

94

1          And those can be characterized as you alluded to

2    earlier.  You can characterize them as subject matter

3    jurisdiction.  You can characterize them as merely statutory

4    questions about the Court's power.  There are many commentators

5    that have suggested those questions have constitutional

6    dimensions as well.  But those are basic questions that go to

7    the architecture of this proceeding.  And so if the Third

8    Circuit wants to, and it has the opportunity to, it should

9    address them and provide guidance to everyone.

10          Thank you.

11          THE COURT:  Thank you, Counsel.

12          All right.  On behalf of the debtor.

13          MR. GORDON:  Thank you, Your Honor.  Greg Gordon on

14   behalf of the debtor, I do have a PowerPoint.  May I approach?

15          THE COURT:  Yes, please.

16          Thirty pages.  I'm thinking the 25-page limit works

17   best.

18          MR. GORDON:  This will go fast, Your Honor.

19          All right.  First slide please.

20          Next slide.  No slide.

21          THE COURT:  There we go.

22          MR. GORDON:  So, Your Honor, just to start by way of

23   introduction.  And I do, I recognize there's a number of

24   slides, but I don't think this is going to take me that long.

25          So I think it's important to start with the

95

1 proposition that, as Your Honor just said in asking one of your

2 questions, the PI opinion is extremely limited.  And

3 importantly, for purposes of this relief that's being sought

4 today, it includes an extensive discussion of the Third

5 Circuit's LTL decision.

6         And if you just step back and look at the

7 certification motions from a very high level, they don't even

8 come close to meeting the applicable standards for

9 certification.  In fact, they argue the exact opposite because

10 what they're saying fundamentally is is that we have a

11 controlling decision, but you're not following it.  And that's

12 the opposite of what certification is about.

13         And of course, we already have a situation on top of

14 all that, that the movements have already filed motions to

15 dismiss.  And the issue of good faith is obviously squarely in

16 the middle of those motions to dismiss.  It can be addressed as

17 Your Honor pointed out more directly in connection with the

18 motions.  And obviously, at the time this was done, there was

19 the mandamus petition pending.  That's been taken care of.

20         Next slide.

21         And Your Honor, this is just the outline of what I'm

22 going to cover here.

23         Next slide, please.

24         Next slide.

25         So, Your Honor, just briefly, on the point about the

1  order being extremely limited.  As Your Honor just pointed out,

2  it's only for 60 days expires on June 15th.  It enjoins trials

3  only and otherwise, it permits all other pretrial activity to

4  proceed, including discovery.  And it's also important to note

5  that since the time you wrote the PI order, you've lifted the

6  stay as to the Valadez case and that trial is set to proceed.

7        And I think it's important to note that no other

8  party had sought similar relief.  So you saw on a slide just a

9  few moments ago some references to claimants who purportedly

10  have other trials that could have gone in the 60-day period.

11  To my knowledge, that wasn't brought to the attention of the

12  Court.  And the one thing that was, Your Honor took care of it

13  to the point that I think a couple of times in your PI order,

14  you found that and believed that the talc claimants wouldn't be

15  harmed by the limited relief you were entering.

16        Next slide, please.

17        Next slide.

18        So, Your Honor, this just sets forth the applicable

19  principles.  It really boils down to three things.  Is there no

20  controlling decision on a question of law?  Does the matter

21  involve an issue of public importance?  And will certification

22  materially advance the case?

23        Next slide, please.

24        Again, fundamentally, Your Honor is aware of this

25  from before.  The idea is to basically ask an appellate court

1  to provide guidance on questions of law to basically build up

2  or develop bankruptcy court precedent.  And I think when you're

3  considering the motions before the Court today, you have to

4  think in those terms.  Is there any legal precedent that would

5  be developed by certifying your decision to the Third Circuit?

6           Next slide, please.

7           Again, I'm not going to spend much time on this, but

8  generally fact bound appeals aren't suitable for direct appeal.

9  I think, fundamentally, what you're being asked to is to

10 certify a fundamental question of good faith on the basis that

11 that's a legal issue I think is what's being represented to the

12 Court when in fact, it's a very fact-bound issue.  Whether

13 financial distress exists or not is very fact bound.  I think

14 it's obvious from the Third Circuit's ruling in late January

15 that the Third Circuit viewed it as a fact-bound issue.

16           Next slide.

17           And, again, to the contrary, if you have pure

18 questions of law, then it's a different story with respect to

19 certification.

20           Next slide, please.

21           And next.

22           So part of the problem here I think with these

23 motions is that the claimants are trying to sort of fit a

24 square peg in a round hole because they're trying to make, and

25 their focus is on -- they're trying to make this all about good

1  faith.  And so when you look at the issue they're raising

2  fundamentally in connection with the injunction, it's LTL's

3  alleged lack of good faith in filing the second case.

4        But if that's your issue, and that's what they're

5  claiming and that's what you heard again today, no one can take

6  the position there's an absence of controlling authority on

7  that.  We have a controlling opinion from the Third Circuit

8  that was just issued on January 30th.  And, again, Your Honor

9  extensively discussed it.  The debtors now taking the position

10 that that's not binding and the movants, otherwise, are

11 conceding that it's a controlling decision.  And in fact, they

12 say the question of good faith has been settled in the Third

13 Circuit.  So again, that's all the opposite of what the

14 standard is for certification, which fundamentally goes to, is

15 there an absence of controlling precedent here?  Obviously, all

16 sides agree that the controlling precedent exists.

17        Next slide.

18        And, frankly, even if it that weren't the case, in

19 our view, certification still wouldn't be appropriate in this

20 instance because the PI standard here only very indirectly or

21 tangentially considers good faith.  It comes up as Your Honor

22 noted in your opinion as one of the prongs for preliminary

23 injunctive relief, the reasonable likelihood of success prong,

24 which as Your Honor noted, requires a showing of a reasonable

25 likelihood, not a certainty of a successful reorganization.

1          In addition, Your Honor acknowledged the limited

2    record before it and said the factual record is too uncertain

3    and undeveloped to make a finding regarding good faith and *sua*

4    *sponte* dismiss the case.  And I think that's really a lot of

5    what these certification motions are about.  These claimants

6    want to take issues that are more properly heard and considered

7    in dismissal and have them heard through this vehicle based on

8    a limited record that they think puts them in a better position

9    to prevail.

10         And, again, I think Your Honor recognized, and this

11   will be our view, that questions like those, questions about

12   good faith, questions about financial distress, questions about

13   dismissal, they should be raised and considered in connection

14   with the motions to dismiss, which Your Honor has already

15   indicated are going to proceed on a prompt schedule.

16         Next slide, please.

17         And of course, again, you can see all the motions to

18   dismiss that have already been filed.  They all raise the issue

19   of absence of good faith.  That's the centerpiece of all of

20   them.  And so they overlap completely with what's really the

21   focus of the arguments that the claimants are seeking to have

22   you certify to the Third Circuit in connection with the PI

23   order.

24         Next slide.

25         I'll skip over this, obviously, because that no

1    longer exists.  It is interesting though.  I think Mr. Massey

2    said that we're trying to have it both ways, the way we've

3    argued with respect to the mandamus.  I would say they're the

4    ones, the claimants are the ones trying to have it every which

5    way by basically making the same arguments in a multiplicity of

6    context.  So this slide is just intended to show the

7    duplication.

8            And, again, you can skip the middle column, but the

9    allegations they're making in the dismissal motion overlap very

10   much with what's in the certification motion.  And, obviously,

11   with the arguments that were made in connection with the PI

12   order.  They're all the same.

13           They're all the same.  The big difference is they

14   were indirect and tangential in the PI context.  They were done

15   on an expedited basis.  There was a limited record.  And I

16   think Your Honor was correct in your ruling and thinking about

17   these issues could be handled more directly in connection with

18   dismissal as opposed to in the PI.

19           Next slide, please.

20           Here, just to say good faith is obviously directly

21   relevant to the dismissal.  That's what the standard is all

22   about under Section 1112.  They can be decided on a full

23   factual record.  And Your Honor noted in your opinion the fact

24   that the Third Circuit was critical of Your Honor's findings,

25   your factual findings in connection with the dismissal ruling

1   in the first case.

2          And we should have an opportunity, we, the debtor,

3   should have an opportunity and Your Honor should have the

4   opportunity to consider those questions based on a full and

5   complete record.

6          Next slide, please.

7          The other thing I think it's important to note, and I

8   think Your Honor recognized this as well in the PI opinion, is

9   that you indicated that you found it difficult in the first

10  case to identify controlling issues that hadn't been addressed

11  in connection with preliminary injunctions and mass tort cases.

12  And, fundamentally, you sort of went back and relied on your

13  rulings from before and you had cited a lot of authority

14  before.  And I think ultimately the McCartney Third Circuit

15  case was the one that you felt addressed most of the issues

16  that were raised by the other side from a legal perspective in

17  opposition to the PI.

18         But among other things, you found an identity of

19  interest between the protected parties and the debtor.  You

20  found shared insurance coverage, you found the existence of

21  indemnification obligation, and you also found that continued

22  litigation outside the case would adversely affect the debtors'

23  ability to reorganize in the case because the same claims will

24  be being liquidated outside of bankruptcy while efforts were

25  being made by the debtor to have them resolved and paid in the

1  bankruptcy.

2         And as Your Honor noted, there's nothing in the Third

3  Circuits January 30 opinion that changed any of that analysis.

4  And, again, I think that's a very important point for

5  certification.  The arguments have been made that the Third

6  Circuit has already weighed in, therefore, you should want to

7  get this to the Third Circuit immediately.  Well, the Third

8  Circuit didn't weigh in on the PI.  Now it's true, as was

9  pointed out just a few minutes ago, there was a footnote or

10 maybe footnotes that *indicta* raised some questions, but

11 otherwise there was no ruling by the Third Circuit on the PI

12 and certainly no pronouncements by the Third Circuit about the

13 law with respect to preliminary injunctions or the extension of

14 the automatic stay in a bankruptcy case.

15         Next slide, please.

16         Now I think it was Mr. Crouch separately raised the

17 jurisdictional issue.  Your Honor actually cited a case this

18 morning that Mr. Thompson, which is part of arguments coming up

19 in the Bestwall hearing on a motion to dismiss for lack of

20 jurisdiction based on the U.S. Constitution.  But the point is,

21 this is another issue that just doesn't warrant certification.

22 There's not an absence of controlling authority.  There's not a

23 disagreement among the Circuits.  I mean, this is a very

24 straightforward analysis with respect to jurisdiction.

25         And Your Honor, again, I think noted that, the law

1  covered that.  I thought your opinion went into great deal in

2  terms of the applicable law on jurisdiction.  It supported your

3  jurisdiction to entertain a PI request.

4          Now, we've lost our -- do we have a bandwidth problem

5  again?

6          MULTIPLE SPEAKERS:  Proceed.  I can cut that.

7          MR. GORDON:  It's not on here.

8          UNIDENTIFIED SPEAKER:  Maybe disconnect.  Whoever's

9  doing screen share, stop screen share.

10          MR. GORDON:  Could we try stopping and starting the

11  screen share?  See if that will work.

12          THE CLERK:  It's back up?

13          MR. GORDON:  No.

14          THE COURT:  Not on the big screen.  There's a

15  [indiscernible].

16          So we're on Slide 19.  Maybe the cap should be 20.

17                      (Laughter)

18          MR. GORDON:  You have to admit that I'm going pretty

19  fast.  Well, you don't have to.

20          THE COURT:  Oh, no it's an improvement over the 90

21  page slide you had the other last week.

22          MR. GORDON:  Fair enough.

23          The suspense is building and the best slides are

24  always the last few.

25          THE COURT:  Here we go.

1          MR. GORDON:  Okay.  And I think, again, this slide is

2   just intended to point out that, I think the first go-round,

3   the reason that you certified the PI order the first time was

4   because, in your view, it didn't make sense to have that

5   proceed by way of a different -- or have a different appellate

6   status in the motion to dismiss.  It wasn't because you found

7   that it separately warranted certification under the standards

8   and you kind of reiterated that in connection with the request

9   by -- for certification by the States of New Mexico and

10  Mississippi, but there you also certified it because of the

11  issues about police power, the police power exception.

12         And, again, if you look at the _LTL_ opinion, the Court

13  had an opportunity, if it wished, to weigh in on jurisdiction

14  or any other legal issue with respect to the preliminary

15  injunction and did not do that.

16         Next slide, please.  Next slide, please?  Next.

17         So, again, I'll just cruise past this.  This issue of

18  public importance is a standard that's viewed narrowly and the

19  standard is high, but let's go to the next slide, please, 22.

20         So, in our view, it's clear this is not a matter of

21  public importance and, number one, it's because there isn't a

22  question of law lacking precedent, controlling precedent.  It

23  doesn't transcend the parties in the sense that, again, what

24  the movants are arguing simply is that Your Honor has

25  misapplied an existing authority from the Third Circuit and

1  misapplied it to the facts of this case.

2        And that's what, in my mind, makes this very

3  different from the certification from the first case.  You

4  know, the other side is basically saying to you, you certified

5  it before, you should certify it now.  But unlike before when

6  you had a dismissal request in front of you or you had entered

7  a dismissal order, that was about the entirety of the

8  bankruptcy case, here we don't have that.  There's no motion to

9  dismiss before the Court.  Again, we're back to an order that's

10  very, very narrow in scope that will expire by its own terms in

11  a matter of weeks, and all that's -- and this order that's up

12  is the type of order that Your Honor found before wasn't worthy

13  by itself of certification.

14        Next slide, please.

15        So here, unlike before, there's no concurrent

16  dismissal order.  The key question that the other side is

17  focused on, and that question being good faith, was only

18  addressed on a preliminary basis and, again, on a limited

19  record.  Since then, multiple motions to dismiss have been

20  filed and are pending that raised that issue over and over

21  again.

22        And so, again, from a public importance perspective,

23  it seems to us that make this situation completely different

24  from the situation Your Honor faced back in the first case.

25        Next slide, please.

1          And the point as well is appellate review is

2    otherwise available because, you know, the other side is

3    obviously anxious to get this good faith question and the

4    dismissal question back before the Third Circuit and, they're

5    so anxious to do so, they're trying to do it through a PI

6    order.  That's the square peg in the round hole concept.  But

7    they can pursue an appeal if Your Honor -- and, of course, we

8    don't know how Your Honor is going to rule, but if Your Honor

9    rules against the motions to dismiss, decides to deny them,

10   they can appeal it then; they can seek certification then.  And

11   they even have a right to appeal later in the case, if we get

12   to the point where there's plan confirmation where Your Honor

13   has to make a finding of good faith, that issue can be raised

14   at that point.

15          So this is not a situation where like you see in

16   other certification situations where appellate review would not

17   otherwise be available or appellate review would be lost for

18   some reason.

19              Next slide.  Next slide.

20              And, again, this concept of materially advancing the

21   case, the other side is making a big push here that we're going

22   to appeal this to the Third Circuit anyway, this will

23   materially advance the case.  And, of course, you found this

24   before.  When I went back and looked at your ruling before,

25   Your Honor was very focused on this.  I think it was the first

standard that you addressed and you talked about the extent the

record had been developed and how no real purpose would be

served in the District Court because there were no further

findings that would need to be made by the court.  It was --

basically, everything was there, it was in a position to be

resolved by the Third Circuit.

Next slide, please.

Well, that's a far cry from where we are here with an

order that's limited in time and scope, where there's no

concurrent dismissal order.

And, again, I think the important thing to note, it's

not inevitable this appeal would even reach the Third Circuit.

That's the other point.  They argue that we're going to be in

the Third Circuit anyway and, frankly, in this situation, I

highly doubt that.  Number one, because the order ends on June

15th and, as Your Honor pointed out, you'll probably never get

that far.

And, number two, it's going -- in my view, it will be

taken over by the motions to dismiss because that's really what

the focus is, that's what they've asked for.  Every -- almost

every lawyer that comes to the podium for the other side makes

a plea that this case should be dismissed.  They ask it to be

*sua sponte* dismissed; Your Honor didn't do that, based on the

incomplete record.  I think you indicated as well you thought

that would deprive the debtor of due process.

1        Obviously, that was up to the Third Circuit in some

2   form in connection with the mandamus; they haven't done that

3   either, they denied the mandamus.

4        And so this idea that it's inevitable that this would

5   ultimately get there, it just seems to me, is not -- that's not

6   a foregone conclusion because I don't see that it ultimately

7   serves any purpose, because what they really want, what the

8   other side is really asking for is dismissal.  And if you think

9   about it, how is this going to work that if you allow this to

10  go to the Third Circuit, that you have two appeals ultimately

11  that are there, potentially, that raise the same issue, one

12  raises it directly, the other raises it indirectly, one

13  presents it on a fully-developed record, the other presents it

14  on a partial record put together in connection with an

15  expedited process that led to a very limited, short-term order.

16  That to me just seems to utterly belie a request for

17  certification and show that the standards can't even remotely

18  be satisfied with respect to an order as limited as this order

19  is.

20       Next slide, please.  And next.

21       All right, before I get to that, Your Honor, I just

22  want to check my notes for a couple of things.

23       One of the counsel, I think it was Mr. Gupta, had

24  argued that -- and I think Mr. Massey did as well, that the

25  legal questions should be sent to the Third Circuit right away

1   and that this is basically an affront to the Third Circuit's

2   decision, this case is, and they should have an opportunity to

3   look into it, but what are the pure legal questions that we're

4   talking about?

5          I think what they're talking about is good faith and

6   I think they're talking about financial distress, and I would

7   submit to Your Honor that those are highly fact-bound

8   questions.  I think the Third Circuit believes they're highly

9   fact-bound questions, I think that's one of the -- probably the

10  primary reasons they sent it back to Your Honor to actually do

11  the fact finding that they've asked for.

12         And, again as Your Honor noted, the Court was

13  critical before with respect to the factual findings that were

14  made in connection with the dismissal motion the first time

15  around.

16         I think, again, another point -- and I think this is

17  telling, this argument that's been made, I think Mr. Massey

18  made it that we're not permitted to put in evidence that the

19  committee characterizes as post hoc rationalization of our

20  decision to file bankruptcy a second time.  And I would submit

21  that there's no legal principle that would support that point

22  of view that there's some limitation on the evidence that we

23  can put in.  In other words, that we can't put any evidence in

24  beyond what might have given to a board in the board meetings

25  leading up to the filing.

1          And, again, that to me doesn't make sense, but it's

2   transparent in that, to me, that shows that what the real goal

3   here is to get the fundamental question of good faith to the

4   Third Circuit on a record that they know is a very limited

5   record in hopes that they can convince the Court based on an

6   incomplete record and very little -- and a constrained ability

7   by Your Honor to actually make the fact findings that should be

8   made in the hopes that they're in a stronger position to obtain

9   a dismissal from the Court, and I would say that that's not

10  appropriate.

11         So, Your Honor, in conclusion I would just say that

12  this is a situation that's very different from the situation

13  Your Honor had in the first case in connection with the

14  dismissal ruling and the PI ruling, which were concurrent.

15  This is a very limited opinion, it was -- as you acknowledge,

16  it's on a very limited record, and it's not the type of opinion

17  that's suitable for direct appeal.

18         There is no lack of controlling authority.  In fact,

19  to the contrary, all the parties to this proceeding agree that

20  there is controlling authority, they just have a disagreement

21  as to how that controlling authority should be applied to the

22  facts and, again, that's not a basis to certify.

23         The issue that they actually want to litigate is more

24  directly pending in front of Your Honor and, for that reason

25  and for these others, a direct appeal won't advance this case,

1  what it will do is just distract the parties and require them

2  to focus on the good faith issue in the Third Circuit in an

3  indirect context, on an inadequate record, at the same time

4  they're trying to more fully litigate the issue in this Court

5  and provide Your Honor with an opportunity to more fully make

6  the findings that the Third Circuit would expect you to make.

7          THE COURT:  All right.

8          MR. GORDON:  Thank you, Your Honor.

9          THE COURT:  Thank you, Mr. Gordon.

10         Mr. Hansen?  I'll note, I got a text from law clerks

11 that said, if we have a slide limit, there would just be more

12 bullet points on each slide.

13                        (Laughter)

14         THE COURT:  So it's not going to get anywhere.

15         MR. HANSEN:  No slide deck for me, Your Honor.  Chris

16 Hansen with Paul Hastings on behalf of the Ad Hoc Committee of

17 Supporting Counsel.

18         Your Honor, Mr. Gordon, towards the end of his

19 presentation, got to where I wanted to start, which is there's

20 an intentional conflation of issues here.  The TCC and the

21 other parties who are seeking the certification are very clear,

22 they're not really trying to overturn the PI ruling; they're

23 trying to get the case dismissed.

24         And, to Mr. Gordon's point, we're about to undertake

25 a trial on the motion to dismiss and the Third Circuit should

1  hear that on appeal on a full record; it shouldn't hear it on a

2  record dealing with the preliminary injunction where there

3  hasn't been a full record.

4           In some ways, Your Honor, I actually think it would

5  be inappropriate to send this to the Third Circuit as a result

6  of that, sending them an incomplete record when you know that

7  you're about to undertake a trial on a complete record that's

8  going to go up.  And, to Your Honor's own point, there may be

9  an issue of mootness that comes along because you're going to

10 be -- if you think about the timing for a briefing argument and

11 decision, and they've said we want to bring that on while

12 trying to get the case dismissed.  Well, while you're hearing a

13 trial on the motion to dismiss, you may be deciding that very

14 issue.  So we think, from the ad hoc's perspective, that that's

15 inappropriate to send it to the Third Circuit on that basis.

16          When you go back to your narrowly-tailored ruling

17 from the preliminary injunction perspective, again, it raises

18 that question of mootness.  You may or may not need to extend

19 it in order to protect the process that plays out in connection

20 with the motion to dismiss process, as well as the plan

21 process, but it still raises that mootness question.  And when

22 you look at the factors for direct certification on appeal, as

23 Mr. Gordon noted, we don't believe that the TCC or any of the

24 other movants meet the standards.

25          Thank you, Your Honor.

113

1              THE COURT:  Thank you, Counsel.

2              Mr. Massey?

3              MR. MASSEY:  Thank you, Your Honor.  I won't burden

4    you too long, I know it's been a long day.  Jonathan Massey,

5    proposed counsel for the TCC, just a few points.

6              The notion that this is a -- that the issues here are

7    fact-bound is just a slogan, but, you know, void/voidable,

8    what's fact-bound about the void/voidable argument?  We know

9    that the 2021 funding agreement applied outside bankruptcy, we

10   know that it applied in the event of dismissal, we know that

11   the debtor for -- debtor's counsel has represented that the

12   Third Circuit's decision was even foreseeable.  Did the Third

13   Circuit change the law?  Is that a factual issue?  No, those

14   are all legal questions.

15             I don't want to get out my PowerPoint again.  Slides

16   7 through 10 of my PowerPoint outlined a bunch of legal

17   questions that Your Honor has framed on the PI.  In deciding

18   the PI order, Your Honor recognized these kind of foundational

19   questions about whether this was an actual fraudulent

20   conveyance, whether there's void/voidable, whether you can

21   manufacture financial distress by evading the Third Circuit's

22   mandate, none of that is factual.

23             Yes, there will be a trial on the motion to dismiss

24   and I'm very glad to hear the debtor's intent in creating a

25   full record because you're about to hear now, or very shortly,

1    all the efforts that are being made to create this full record

2    that the debtor is now in support of, but the point is there

3    are distinctive legal questions which will not be affected by

4    the motion to dismiss trial.  And, actually, Mr. Gordon even

5    said, when it comes to the sort of -- the financial distress

6    legal question of whether you can shoot first, file for

7    bankruptcy, and then analyze what your financial distress was

8    after the fact, Mr. Gordon said, well, that rule wouldn't make

9    any sense, but that's the whole point, it's a rule.  That's

10   going to be -- actually, the Third Circuit seemed to express

11   support for that rule in SGL Carbon.  But, in any event, that's

12   an issue that's distinct from the motion to dismiss.

13        The next point I want to make, the debtor's argument

14   that controlling precedent exists, and in fact they -- if you

15   look at slide 12 -- I don't want you to look at their slide 12,

16   but I'll just tell you it says debtor agrees LTL provides

17   binding guidance.  In their view what that means is, yes, the

18   Third Circuit told us exactly what to do, it said in Footnote

19   18, surrender the 2021 funding agreement and create this

20   void/voidable theory; that's what the Third Circuit's

21   controlling decision is, in their eyes.  You know, that's

22   almost -- it's almost a parody.  That proves the reason why the

23   Third Circuit -- why there should be certification, why the

24   Third Circuit should decide that question because, if that's

25   what they think the Third Circuit means and the rest of the

115

world -- not just the TCC, but the U.S. Trustee, the State
Attorney's Generals and everybody else reads the Third Circuit
decision quite differently -- then I think certification,
they've proven our case.

The last point -- well, last couple points they said,
wait for the motion to dismiss because that's where all the
real issues are going to come up.  And, as I said, there are
legal questions, which are separate, but even if you look at
their slide 16, they say, oh, well, they're making the same
arguments on the PI that they made in the motion to dismiss.
That's what I was trying to say before, there's this inter-
linkage, which actually wasn't present in LTL 1.0, between the
PI and the motion to dismiss.  As Your Honor recognized when
you read your decision on the PI order, it turns on the
likelihood -- the probability of success of reorganization,
which in turn relies on their compliance with the Third
Circuit.

Mr. Gordon had the scenario that there might be two
appeals simultaneously and that somehow would be problematic.
In our view, that's quite easy:  they would be consolidated.  I
mean, if there was an appeal from the PI order and then there
was a subsequent appeal from a motion to dismiss order, weren't
mooted or whatever, the Third Circuit would just take them and
consolidate them.  That's not a big deal.

When Your Honor certified the New Mexico and

1    Mississippi PI order, the Third Circuit sat on that, didn't

2    rule on it because it knew it was going to do something with

3    the dismissal.  I mean, the Third Circuit is quite able to

4    stage things and coordinate things as it wants.  And, you know,

5    the point I made before, if you don't certify, you're making

6    the decision for them.

7           The other last point is this notion that the -- we

8    keep hearing the PI order is going to expire on June 15th, and

9    that's what Mr. Gordon said, and that just raised the question

10   to us about whether they will seek to renew it after that date

11   because, obviously, if they don't, that would be something that

12   they could say on the record and that would clarify things, and

13   that might change the complexity of the PI order.  If they

14   intend to renew it for another period of time, then I think it

15   points up the need to certify the existing order because that

16   will provide guidance on whatever subsequent orders are coming

17   down the pike.

18           So, you know, that's -- if they would like to clarify

19   whether they will be seeking an extension, that would be

20   relevant, I suppose, to how Your Honor might think about this.

21   But if the PI is going to be extended, they're going to seek

22   further extensions, then I think it just makes it more

23   appropriate to hear -- to get guidance, authoritative guidance

24   on the existing PI order.

25           Thank you very much.

1          THE COURT:  Thank you, Mr. Massey.

2          All right, thank you all again, well-argued.

3          There are two premises put forward by the TCC with

4    respect to the certification motions which I have trouble with;

5    one is that I should, essentially, not stand in the way, let

6    the Circuit decide what issues it wants to address.  To me,

7    that flies in the face of the role the Court plays under 28

8    U.S.C. 158(d)(2).  We're a gatekeeper.

9          There would be no purpose served by the Court

10   certifying an order for immediate review if I was just to stand

11   aside and let them decide what they want to keep.  I believe

12   Congress, in implementing the process and the circuits depend

13   on the lower courts, the trial-level courts, to act as a

14   gatekeeper, identify which judgments or orders are ready and

15   appropriate for review.

16         The second issue is that this is really just about

17   which court is going to hear it, the District Court or the

18   Circuit Court.  I don't, frankly, envision the District Court

19   hearing the appeals in this matter.

20         We have an injunction, a preliminary injunction

21   that's set to expire on June 15th.  I have a motion to dismiss

22   -- several motions, seven, I think, that will be tried.  And,

23   as I've said before, if I grant any one of the seven or all

24   seven -- I can't imagine picking and choosing, but if I grant

25   the motions, then it's all academic, there's no case.  If I

118

1  deny the motions, it doesn't mean the injunction continues

2  because that's already terminated.  I have to affirmatively

3  extend the injunction, which requires a factual showing,

4  probably addressing the very concerns that the Third Circuit

5  identified as being problematic from the first go-around, in

6  which case there's a new order.

7        And I will tell you right now that, in the event I

8  were to deny the motions to dismiss and extend the injunction,

9  I can't see not certifying it for the appeal to the Circuit at

10 that point, but that's -- the Circuit will benefit from a full

11 record, the Court will benefit from a full record, and the

12 Circuit will benefit from not having issues that are moot.

13 There will be a new order entered extending -- possibly

14 extending the injunction based on an evidentiary record that

15 may be conjunction with the motion to dismiss -- we'll have to

16 discuss that -- or there won't be anything in front of the

17 Circuit because I will dismiss the case.

18       It makes no sense to me.  It does not further advance

19 this case.  In fact, to me, it does the opposite; it places

20 hurdles for an effective appellate review to certify the

21 existing order at this juncture.

22       While I and my law clerks think that the issue as to

23 whether 362 or 105 serve as a proper basis to stay third party

24 actions is interesting -- you know, to some extent, we're all

25 nerds, you know, these issues interest us -- but I'm not sure

1  it rises to the level of public importance, at least out of the

2  context of dismissal of this case, and nor do I think that

3  there's a lack of controlling law.  Yes, we have <u>LTL I</u>, the

4  Third Circuit's opinion, and we have <u>McCartney</u>.  If I am acting

5  outside the scope of those decisions, if I have acted to date

6  outside the scope of those decisions, well, that's what

7  appellate review will be and the Circuit will make it clear at

8  that point in time, if it ever gets there.

9        So, for these reasons, I don't believe the criteria

10  under 28 U.S.C. 158(d)(2) have been satisfied, it's without

11  prejudice to raise these issues again with further judgments or

12  orders, and I'll ask debtor's counsel to submit forms of order.

13        So what's left for today, I have a ruling to read and

14  also a discussion about what's happening on the trial.

15        Ms. Beville?

16        MS. BEVILLE:  And I apologize, Your Honor, I don't

17  want to take us backwards, but in the effort to be most

18  efficient going forward, you ordered in connection with the

19  intervention that notice be sent out to the individual

20  claimants seeing their authority and consent, I just wanted to

21  confirm for the record that that required affirmative consent

22  and authority or -- I just wanted to make sure that part was

23  clear.

24        THE COURT:  Well, okay, let me clarify it.  I

25  required that the attorneys who are the -- who compose the

1  committee at this juncture, that they certify that they have

2  notified their clients that they are engaging -- two things --

3  they have to certify that they have the authority under their

4  current retention agreements to represent their clients in this

5  court and that they are to notify the clients that they've

6  taken a position in support of -- that they are, in doing so,

7  taking a position in support of the debtor's proposed plan or

8  term sheet or tentative agreement.

9           MS. BEVILLE:  Okay.  And so, to be clear, you are not

10 requiring that the clients --

11          THE COURT:  No.

12          MS. BEVILLE:  -- themselves respond affirmatively --

13          THE COURT:  No --

14          MS. BEVILLE:  -- just that the law firms --

15          THE COURT:  -- that they have notified.

16          MS. BEVILLE:  -- represent to you affirmatively that

17 they've notified the clients?

18          THE COURT:  For my purposes, that suffices.

19          MS. BEVILLE:  Okay.  Thank you, Your Honor.

20          THE COURT:  You're welcome.

21          All right, do we want to discuss the trial?

22          Good afternoon, Mr. Winograd.

23          MR. WINOGRAD:  Good afternoon, Your Honor.  Michael

24 Winograd from Brown Rudnick; I'm proposed counsel for the TCC.

25          Your Honor, we have, as Your Honor instructed, met

1    and conferred on behalf of the TCC with debtor's counsel and

2    the U.S. Trustee, and several others participated in the emails

3    as well.  We have exchanged proposed schedules back and forth,

4    which many of the deadlines are not actually far off.  It

5    appears there are two sticking points, the hearing date and the

6    date for the motion to dismiss opposition brief.

7              And, if I may, Your Honor, I'd just like to --

8              THE COURT:  The date for --

9              MR. WINOGRAD:  The motion to dismiss objection by --

10   the date -- the deadline to file --

11             THE COURT:  For the written submission?

12             MR. WINOGRAD:  For the written submission, yes, Your

13   Honor.

14             THE COURT:  Okay.

15             MR. WINOGRAD:  I apologize.

16             THE COURT:  No, that's all right.

17             MR. WINOGRAD:  And, if I may, Your Honor, I'd just

18   like to start with the hearing date.  And I'd like to really

19   just point out, you know, why this comes up.  We had thought

20   this was resolved at the last hearing, debtors disagree with

21   that and, you know, they will present their side, but let me

22   just make three initial observations, Your Honor.

23             First of all, again, we thought the Court had

24   resolved that this would take place beginning on June 12th at

25   the May 3rd hearing when it indicated there were constraints in

1  the Court's calendars, that a limited amount of extra would

2  allow for what the Court called limited discovery, on page 149

3  of its opinion.  It instructed a meet-and-confer.  Your Honor,

4  I took that to mean a meet-and-confer on the schedule with

5  respect to the pretrial schedule.

6          And the Court said if there is no agreement

7  ultimately on the week of June 12th that we'll just proceed on

8  May 23rd.  And, again, Your Honor, we are prepared to proceed

9  on May 23rd.

10          The next point, Your Honor, that I want to make to

11  you is really a, I think, dispositive one.  The Third Circuit

12  came out today and denied our petition for a writ and, in doing

13  so, it expressly said, the very first thing that it said is

14  we're denying this extraordinary relief to allow the Bankruptcy

15  Court to continue on the expedited basis set by the Bankruptcy

16  Court.

17          Now, why did it say that?  If you look to what LTL

18  told the Third Circuit yesterday, on May 8th, in its

19  submission, it said two things.  Number one, on page 12 of its

20  submission, that the Bankruptcy Court kept it on a tight time

21  frame with respect to the preliminary injunction.  It then went

22  on to talk about the motion to dismiss at pages 14 and 15, and

23  it said, motions to dismiss have been filed -- and I'll quote

24  -- "and the Bankruptcy Court has set aside June 12 to 16, 2023

25  for a hearing."

1        That is what LTL told the Third Circuit.  The Third

2   Circuit denied a writ, specifically saying to allow these

3   proceedings on the motion to dismiss to continue on an

4   expedited basis.

5        Your Honor, I would submit that is dispositive and

6   ends this inquiry and, at the very least, if not putting it on

7   for May 23rd, we should take the time Your Honor has set aside

8   already on June 12th.  And that is even more pronounced now for

9   the reasons others have articulated with direct appeal for the

10  preliminary injunction being denied and those issues being

11  merged into the motion to dismiss hearing.

12       I won't get back into the merits that were set out in

13  four different letters on April 25th, April 28th, May 1st, and

14  May 2nd that were submitted with the Court, or the argument

15  that happened on May 3rd addressing the merits of why we

16  believed that we shouldn't even stray at all from the statutory

17  time period of 30 days.

18       I will add, however, Your Honor, that the limited

19  discovery that is being asked for in connection with the motion

20  to dismiss only confirms that June 12th is plenty of time.

21       We asked for targeted discovery, the TCC asked for

22  targeted discovery of LTL, seven document requests, in addition

23  to standard financial due diligence that is turned over in a

24  matter of days, typically.  Those seven requests, three of them

25  asked for specific documents:  One asked for documents they say

they don't have; one asked for documents over which they appear

to continue to assert a common interest with respect to the

voidability or termination of the 2021 funding agreement; one

which documents a new witness that they propose, the Vice

President for Tax of J&J intends to talk about.

The financial due diligence, Your Honor, just to -- I

hear reactions on the other side -- the deadline for producing

documents which would include all those, there is no

disagreement on that deadline between the two parties.  The

deadline to complete document productions was May 17th; that

was proposed by LTL and that was agreed to by the TCC.  None of

this discovery is burdensome.

With respect, Your Honor, to one additional -- I

should point out that there was one additional document request

that was served on the counsel that signed the plan support

agreements and those are very targeted to go to whether these

firms actually are committed to litigate these cases in the

event the bankruptcy didn't happen, the subtype of cancer that

their clients have, and the legitimacy of those claims.

We were told by at least one counsel already -- we

just served these yesterday -- by at least one counsel who is

one of the firms that represents among the higher number of

claimants that he will not produce any of this on grounds of

privilege.  That was told to us by email this morning.

For their part, Your Honor, LTL has again, maybe to

1  distract from the actual relevant facts here, asked for a

2  deluge of information.  They've asked for 17, I believe,

3  requests for production, 24 interrogatories of us.  They've

4  repeated many of those to other counsel.  But at the end of the

5  day, Your Honor, again, we've all agreed on a common date for

6  producing all of this.

7          With respect to witnesses, Your Honor, there are

8  seven fact witnesses that LTL proposes.  We've added two, their

9  CFO and the president that they left off the list.  Six or

10  seven of those have already been deposed.  There's one new

11  witness, there's one unnamed, which we don't know that they

12  have -- they haven't given us a name, they just told us

13  somebody, an additional person from our committee -- but it

14  seems like all of these have already been deposed in the

15  preliminary injunction proceeding.  One, their president was

16  deposed in connection with the last motion to dismiss, there

17  may be some incremental amount of information we need from him.

18          But at the end of the day, Your Honor, four days for

19  the hearing is plenty, I don't think there's a dispute over

20  that, and over a month between now and then, again, is plenty

21  based on the facts before us.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          Mr. Gordon?

25          MR. GORDON:  Greg Gordon on behalf of the debtor.

1          The first thing I was going to say is that we've made

2    progress, but I'm not sure after having heard that.

3          I did want to approach.  I want to provide a chart

4    that actually Mr. Winograd provided to us with the schedule --

5          MR. WINOGRAD:  Sure.

6          MR. GORDON:  -- because I think it would be helpful

7    to walk through this.  May I approach, Your Honor?

8          THE COURT:  Yes, please.  Thank you.

9          MR. GORDON:  So before I respond to some of the

10   substantive points, I wanted Your Honor to see this schedule

11   because what this reflects is we had the meet-and-confer, the

12   debtor laid out a schedule that it was proposing that would

13   have assumed a hearing on June 20th.  And we focused on that

14   because I think Your Honor at the last hearing, although you

15   said June 12th, you also said you had some availability on the

16   20th, and we had understood your instruction to be you need to

17   go meet and confer and come back, and we'll talk about it

18   again.  But you can see how expedited this schedule this is.

19          And one of the things I'll note right off the bat is

20   we agreed on the date for exchanging initial discovery

21   requests, which was yesterday, and I did see -- I forget now

22   whether it was by email or pleading -- today that the Committee

23   of States wants to serve discovery tomorrow.  So we have

24   another party that wants to serve discovery, which would

25   actually be on May the 10th.

1          We've agreed to identify our expert witnesses

2    tomorrow.  The TCC is proposing they don't have to identify

3    theirs for another three days.  And then we had actually put in

4    that -- if you're tracking this with me, Your Honor -- that we

5    thought that maybe a deadline should be imposed for the filing

6    of motions to dismiss because they keep -- they were coming in

7    in various batches and I think the most recent was maybe May

8    the 2nd, a couple came in then.

9          Now, it looks like the committee's position is that's

10   not necessary, and maybe it's not, but we have a concern,

11   obviously, that we're going to move down this schedule and all

12   of a sudden two or three more motions to dismiss would come in.

13   So I guess we're suggesting there should be a deadline.  It

14   would be nice for all parties to know that we're done with the

15   motions coming in.

16         And then you can see there's a deadline for responses

17   and objections, which the committee is proposing to accelerate

18   that five days earlier than what we had proposed.  I think we

19   can probably live with that.

20         And then we have a deadline to complete document

21   production and interrogatories.  And I would just note that,

22   although both sides are saying right now that's an acceptable

23   date, I mean, that's only eight days from today.  And there has

24   been substantial discovery that's been exchanged and now we

25   know that the States are going to have some additional

1  discovery coming in tomorrow.

2         So I don't want Your Honor to have the impression

3  that we're proposing some very lax schedule that's well beyond

4  what would be required.  And, you know, I appreciate the fact

5  that Mr. Winograd is talking about the targeted discovery that

6  he has, but I've noticed in the discovery he served when he

7  targets certain documents, but then he says, but you've got to

8  prepare -- you've got to identify all your privileged documents

9  and provide a privilege log; we want all transmittal letters,

10 cover letters, transmittal emails; we want all exhibits, we

11 want all enclosures, all attachments; we want all drafts, all

12 revisions, all modifications, all versions, all supplements.

13 And, of course, they want ESI.

14        And so, to me, it would be an extraordinary

15 achievement if within eight days or so -- and longer in a

16 couple cases, shorter in others, if we get the States'

17 discovery, that we could actually produce within that time

18 frame.

19        And then you'll see deadline for expert reports,

20 we're very close on that.  They actually proposed a couple

21 additional days to allow the fact discovery deadline to be

22 completed.  You can see only five days for rebuttal expert

23 reports.

24        And then the motion to dismiss opposition, the May

25 16th date, as we understand their position, they're just fixing

1  on what Your Honor said at the last hearing, and we took that

2  to just be a reference to the fact that when this matter was

3  noticed by the other side, they noticed it for the 22nd.

4  Normally, the deadline is, what, seven days before --

5              THE COURT:  Correct.

6              MR. GORDON:  -- six or seven days before.

7              What we have proposed is May 29th, which would be,

8  what, over two weeks before the hearing, if it starts on June

9  12th, and of course three weeks or more if the hearing is later

10 than that, and we need more time.  May 16th is going to be very

11 difficult for us because we've got -- at the moment, we've got

12 seven motions to deal with.  Now, admittedly, there's overlap,

13 but it's still seven different motions and that's a lot of work

14 for us.  And of course we've been subsumed with the mandamus

15 and certification and everything else.

16             So we are proposing May 29th, which, again, should

17 give them plenty of time to have that and plenty of time to

18 reply.

19             So you can see the proposed fact discovery deadline.

20 We proposed May 31, they're at May 24.  Again, an incredibly

21 expedited schedule.  Expert discovery deadline would be June

22 the 6th.  And then they've proposed May 22nd for replies and,

23 of course, we're suggesting -- for a motion to dismiss reply,

24 we would suggest that be pushed a few weeks.  And then just

25 going on down.

130

1          And so I wanted to spend some time to go through

2  that, number one, so that you can see we're trying to come up

3  with dates that we think are reasonable, but very expedited.

4  And, you know, standing here today, I have a hard time

5  personally seeing how we're going to meet these dates, but

6  we're committed to doing our best to do that, and that in part

7  is going to depend on our ability to make progress in meet-and-

8  confers to narrow the scope of some of the discovery to deal

9  with the fact that you've got discovery now served on a lot of

10 law firms and the like, you've got the states getting involved.

11 There's a lot of different parties and firms involved, all who

12 have to sort of support this schedule and agree to abide by it

13 and that's not going to be easy.

14          And then the hearing date, as you heard from Mr.

15 Winograd a few minutes ago, they want to stick with the June

16 12th date.  And I just want to remind Your Honor that on June

17 the 12th Mr. Murdica is not available that day, Ms. Brown is

18 also not available that day.  And June the 20th, although we

19 propose this hear for purposes of putting together the

20 construct, the problem we have with that date as well is that

21 Mr. Brown won't be available then.  So I want to give Your

22 Honor an update on Valadez and the scheduling.

23          So what the judge has told the parties is that he

24 wants the trial to start May 15th and he's told the parties he

25 wants it to be ready to go to the jury on June 22nd.  And if

1  that schedule holds -- and he says he's committed to that --

2  then Ms. Brown would be available the following week, that week

3  of June the 26th.

4  　　　　Now, the other side is strongly opposed to this for

5  reasons we don't fully understand.  We can't see why a week or

6  two on issues of this magnitude would make that much

7  difference.

8  　　　　And it's easy for them to say that you've got

9  multiple law firms who can work on these matters, but Your

10  Honor knows from the first dismissal and PI hearings that Ms.

11  Brown played a very important role in connection with that.

12  And, to me, it just wouldn't be fair to us that based on a

13  request that one of the counsel on their side made to proceed

14  with a trial that she's rendered unavailable, particularly when

15  we know that the judge in the State Court case has said he's

16  committed to having that trial done -- and think about that,

17  May 15th all the way through June 22nd -- he's committed to

18  having it done and presented to the jury then, which would make

19  her available the following week.

20  　　　　So that's a long way of saying that the 12th doesn't

21  work for us because of her unavailability and Mr. Murdica's

22  unavailability, who's one of our witnesses.  The 20th doesn't

23  work for us that week because of Ms. Brown's unavailability,

24  but that following week would work and we would ask for Your

25  Honor to move the date until then and, if Your Honor would be

132

1  willing to do that, I think that would allow us -- or provide

2  us with some additional flexibility to put a little more time

3  between some of these other deadlines and make these more

4  manageable than they are here.  This is an extremely tight time

5  frame as it's laid out.

6            THE COURT:  All right.  Thank you, Mr. Gordon.

7            MR. GORDON:   Thank you.

8            THE COURT:  Mr. Winograd?

9            MR. WINOGRAD:  Your Honor, Michael Winograd from

10  Brown Rudnick, proposed counsel for the TCC.

11            Your Honor, if there are scheduling difficulties,

12  then we would take Your Honor up on the idea that if the

13  parties can't agree, what Your Honor said last time, we'll make

14  it May 23rd.  We agreed -- when Your Honor proposed June 12th,

15  we agreed to it.

16            Yesterday -- I will say it again -- yesterday,

17  counsel for the TCC filed a brief --

18            MR. GORDON:  The debtor.

19            MR. WINOGRAD:  I'm sorry, counsel for the debtor

20  filed a paper with the Third Circuit talking about how this is

21  on an expedited schedule and the Court has said aside June 12

22  to 16 for the motion to dismiss hearing.  That's what they told

23  the Third Circuit.  And the Third Circuit, apparently, latched

24  onto it and said I'm going to deny this writ and allow the

25  Bankruptcy Court to continue on that expedited basis.

1          There is no overwhelming discovery hear.  They even

2  agreed preliminarily to the June 17th discovery -- complete

3  deadline for completion of document productions and

4  interrogatories.

5          With respect to the witnesses, they're all their

6  witnesses.  We're the ones deposing them, they have to sit

7  there and defend them, but most of them have already been

8  deposed, almost all of them.  There simply isn't a lot of

9  substantive discovery to do.

10          And it is ironic that they have asked us for more

11  discovery than we've asked them.  Again, other than financial

12  due diligence, which is pretty standard, which we have

13  discussed coming down the pike, which they had done the last

14  time and it usually takes a matter of three, four, five days to

15  do it all, we told them about that in advance.  We're talking

16  about a handful of targeted discovery requests that actually

17  request unredacted copies of X; that's one request, for

18  example, lots of them like that.  They ask, on the other hand,

19  for far more discovery, even though it is their burden, it is

20  their good faith at issue, it is their financial distress at

21  issue and they seem to think we have more information on that

22  than they do.

23          In any event, Your Honor, let me turn -- again, we've

24  agreed on a document production deadline, one month to do this

25  is plenty.  This is limited, narrow discovery for facts that

1 have come up since the January 30th ruling until now that

2 haven't already been covered in the preliminary injunction

3 proceedings.

4         I will say just briefly, Your Honor, with respect to

5 the motion to dismiss opposition brief, I don't see any basis

6 -- Your Honor had said that Your Honor's calendar is congested

7 and suggested June 12th, I don't see any basis based on that to

8 push off their deadline of May 16th to file an opposition.

9         We need to see what their case is.  It's their case,

10 it's their good faith, it's their financial distress, we need

11 to see their arguments before we can determine exactly the

12 scope of discovery that may be needed beyond what we've already

13 asked for.  That needs to happen before discovery is completed.

14         And by the way, Your Honor, there cannot be any doubt

15 that the debtor already knows what it's going to say in that

16 brief.  This is not something that has come up quickly.  They

17 have planned this, this entire bankruptcy was planned, and they

18 should know exactly what that opposition is going to say.  I

19 would venture to guess that it's probably already drafted, Your

20 Honor.

21         Thank you, Your Honor.

22         THE COURT:  All right, thank you.

23         All right.  There are no easy choices -- Mr. Malone?

24         MR. MALONE:  Your Honor, Robert Malone of Gibbons on

25 behalf of the States of New Mexico and Mississippi.  I rise

1  only because I'm not going to interfere with the schedule.

2  We're Switzerland as far as that, in fact.  Probably for once,

3  I'd probably agree with the debtor that the June date is

4  appropriate.

5          As the Court may understand, when you represent

6  states, it takes a while for people to give sign-off on certain

7  things, and I only received the sign-off of one of my two State

8  Attorney Generals while we're sitting here in court.

9          We will be filing tomorrow, because I'm here, a

10  motion to dismiss.  That motion to dismiss adopts a lot of the

11  other arguments of the Talc and other people, but to the point

12  of what we're putting in there that may be unique is the State

13  -- the sovereign rights of the States, which I think is more of

14  a legal issue.  I don't think I'll be seeking independent

15  discovery from the debtor.  Of course, if they seek it from us,

16  there may be some back-and-forth, but as far as I can see,

17  we've got plenty of time to get that to them.  It is not a very

18  long motion, it doesn't have multiple exhibits.  Again, it

19  adopts everybody, but I wanted to be heard to be included

20  within it and we'll abide by whatever the schedule is that this

21  Court orders today.  But we will be the number eight, I guess,

22  as far as motions to dismiss in this matter.

23          Thank you.

24          THE COURT:  All right, thank you.

25          See, and I was going to say, I can't imagine who else

1  would be filing.

2                      (Laughter)

3          THE COURT:  But I can't imagine, if there are more

4  filings, that it's going to raise any issues that haven't been

5  addressed in the seven or eight prior ones.

6          Folks, I'm looking for blank dates on a calendar;

7  there aren't many.  It's a struggle in June.

8          To say let's start -- do it on May 23rd is just a

9  nonstarter, it's just not practical.  We'd get nowhere.  We'd

10  get -- we'd get argument, but it's not meaningful.  To suggest

11  that the Circuit would have granted the mandamus if they knew I

12  was going to do it a few days later is also nonsensical.  I

13  don't think they reach decisions based on a week one way or the

14  other, I would hope not.  Six months, three months, yes; a

15  week, it can't be.

16          So what I'm going to suggest is I'll break it up.

17  I'll give a little bit more time, not what the debtor wants,

18  not what the committee wants, but I'll break it up.  I'm going

19  to dedicate four days with a fifth in reserve that I could

20  squeeze if you all get very verbose.  What I will do is push it

21  later.  I will give the June 15th and 16th, and June 21st and

22  22nd.  Those are four days.  That Friday, the 23rd, I can't

23  give, it's an important Judges' date, but I have that Monday in

24  my back pocket, the following, the 23rd.

25          So it's June 15th, June 16th, June 21st, and June

137

1  22nd.  So we're talking about -- what are we talking about --

2  ten days later, two weeks later.  If Ms. Brown finishes the

3  trial earlier, she can accompany, if she can be squeezed out a

4  day or two, if she can be there.  It addresses Mr. Murdica's

5  issue -- well, I don't know, I don't know how long he's away.

6  But we'll start with the 15th and 16th, and we'll continue the

7  following week.

8              MR. MOLTON:  Your Honor, David Molton, excuse me for

9  interfering --

10             THE COURT:  Yeah.

11             MR. MOLTON:  -- proposed counsel for the TCC.  Can we

12  confer?  I mean, there are folks not just on my left side, but

13  on my right side who have scheduling issues as well --

14             THE COURT:  I was going to offer that --

15             MR. MOLTON:  -- and -- yeah, and more than just one.

16             THE COURT:  Yeah.

17             MR. MOLTON:  So --

18             THE COURT:  What I wanted to provide you with is --

19  so I have the 15th and the 16th, I have the 21st and the 22nd.

20             I have also -- let me give you these days.  I have

21  the week of the 26th as well.  I can probably carve out the

22  Monday.  I have a hearing on the 27th, an omnibus date for

23  Whittaker, Clark, I can probably move it.  I mean, I'll try to

24  accommodate the following days as well, that following week as

25  well.

138

1          MR. MOLTON:  Okay, if you can give us just a few

2     minutes, Your Honor.

3          THE COURT:  Well, what I was going to suggest is work

4     -- you know, we're going to be back here next Tuesday.

5          MR. MOLTON:  Yeah.

6          THE COURT:  Why don't you all confer on both sides --

7          MR. MOLTON:  That's fine.

8          THE COURT:  -- and then come up with a workable

9     schedule.

10          As far as the brief, my feeling was it should be May

11     26th, so that -- and if this is the schedule that works, that

12     puts it far in advance.

13          MR. MOLTON:  Yes.  Judge, just from my personal --

14     the 26th of June is really --

15          THE COURT:  No, no, May 26th.

16          MR. MOLTON:  No, no, no, I'm just talking about the

17     trial date --

18          THE COURT:  Oh, yeah.

19          MR. MOLTON:  -- that that may be -- that is a date I

20     can't be here, but we'll discuss with other folks.

21          THE COURT:  July is very open, but I don't want to

22     touch that, July, but I could be far more flexible in July.

23     But, in June, I'm giving you four or five dates that can work.

24          MR. MOLTON:  Yes, Your Honor.

25          THE COURT:  Okay, all right.  And then if we need to

have -- we don't have to wait for the 16th, if you want to have

a call, we can do that as well, just to refine it.

　　　　All right.  Now, no PowerPoints, just a ruling on the

future claims rep motion.  Not double-spaced, it shouldn't take

too long.  All right.

　　　　With respect to the debtor's motion to appoint Randi

Ellis as for the Future Talc Claims Representative, the Court

renders the following ruling.

　　　　The Court has jurisdiction under 28 U.S.C. Section

1334, it's a core matter under 28 U.S.C. Section 157(b), and

jurisdiction is also found 11 U.S.C. 524(g).

　　　　I learned about 17 years ago back in baby judge

school that the desire to avoid appeals is not a proper

foundation for judicial decision-making.  After listening to

oral argument last week, last Wednesday on this motion, and

reviewing all of the information in the written submissions and

exhibits, including all supplemental submissions and exhibits,

it became evident to the Court that the only reason not to

appoint Ms. Ellis as the FTCR in this case would be to avoid

potential appellate practice and a disruptive impact on the

reorganization and potential plan process, to the extent we get

that far.

　　　　Indeed, my law clerks and I agreed that the easiest

course and pathway of least resistance would be to simply abide

by the calls for the appointment of a different FTCR.  However,

1   we also agreed that to do so would be a disservice to Ms.

2   Ellis, her constituency of potential future claimants, the

3   Court, the bankruptcy estate, and possibly our judicial system

4   as a whole where decisions must be made after a careful review

5   of the record and not simply premised on litigation strategy-

6   driven accusations which provide unfounded.

7        Put simply, the Court finds nothing in the record

8   presented which establishes that Ms. Ellis is unqualified, nor

9   incapable of satisfying all of her fiduciary obligations to

10  protect and advance the interests of all Future Talc Claimants,

11  however ultimately defined.  Quite the contrary, Ms. Ellis's

12  training, considerable experience, and nationwide reputation

13  for her work in the mass tort area has gone unchallenged both

14  in the first LTL case, as well as the present.  Indeed, she

15  received nearly universal plaudits and praise for taking on the

16  role of the FTCR in the first case.  She was the consensus

17  election after a judicially-crafted selection protocol, which

18  offered ample opportunity for discovery and consideration of

19  alternative candidates.

20       So what has changed since the first case?  Well, it

21  has not been either her work product or her performance as the

22  FTCR.  It appears uncontested that copies of her work and

23  findings, including those of her routine professionals, were

24  sought by the TCC professionals even after the Circuit directed

25  dismissal of the case.  Moreover, her professionals were

1 implored to continue their work.

2      What this Court finds that really has changed is that

3 Ms. Ellis engaged in communications with counsel for J&J and,

4 presumably, that counsel also served as counsel for new JJCI

5 or, presently, Holdco, which entities were the very funding

6 sources under the 2021 funding agreement.  These communications

7 came at a time when the first case was about to be dismissed

8 after the Circuit's ruling, but during a period of time in

9 which this Court implored all stakeholders to continue

10 settlement discussions.  These communications, without

11 meaningfully more, can hardly be viewed as a disabling

12 conflict.

13      The Court notes that the communications evidence that

14 Ms. Ellis was made aware of the debtor's intent to re-file a

15 new Chapter 11 case, and was asked by counsel to support the

16 re-filing effort and to execute a declaration to that effect.

17 There is no dispute that she chose not to execute such a

18 declaration.

19      The Court turns to what has not been established and

20 has been raised only through unsupported innuendo.

21 Specifically, it has not been established that Ms. Ellis had

22 any involvement in the debtor's decision, planning, or

23 implementation of its decision to re-file the Chapter 11; or,

24 number two, that Ms. Ellis -- it has not been established that

25 Ms. Ellis engaged in any negotiations whatsoever with J&J,

142

Holdco, the debtor, or anyone with regard to any terms for any

plan support agreement or term sheets, including any dollar

figures attributable to the overall settlement, the percentage

shares to be divided among present or future claimants, or

detailed compensation matrices.

Rather, the evidence confirms that Ms. Ellis was not

in a position without further review and investigation or study

to agree to such terms.  How could she inasmuch as her work as

the FTCR in the first case was coming to an end and no one had

given her assurances that she would be selected as the FTCR in

any future case, certainly not the Court.

The record is also lacking any evidence that she

sought or negotiated for any position as the claims

administrator post-confirmation in any second filing.  Rather,

all evidence points to a rather nonsensical decision by others

to include her name as a placeholder without her knowledge or

consent.

In sum, the record is clear and this Court so finds

that, while at some point in time she was made aware of the

debtor's intent to re-file a Chapter 11 case, Ms. Ellis never

made a commitment to support a new filing or any specific terms

put forward by the debtor; instead, she refused to sign off on

any such agreement or declaration.

This Court disagrees with those parties who contend

that Ms. Ellis had a duty to disclose voluntarily the debtor's

143

1  intent to re-file.  Her fiduciary obligations ran to her

2  constituency, Future Talc Claimants, in the first case, and she

3  was and remains obligated to here consider and investigate all

4  options of recovery.

5        The mandate for independence and loyalty under the

6  Imerys standards compels her objective analysis and decision-

7  making.

8        In In re Imerys, the Third Circuit clarified the

9  standard for appointment of an FCR, and I quote:  "The FCR

10 standard requires more than disinterestedness.  An FCR must be

11 able to act in accordance with a duty of independence from the

12 debtor and other parties in interest in the bankruptcy, a duty

13 of undivided loyalty to the future claimants, and an ability to

14 be an effective advocate for the best interests of the future

15 claimants."  That's In re Imerys, 38 F.4th 361, 374.

16       The Third Circuit noted that the standard is akin to

17 those employed for guardian ad litem, yet in other contexts.

18 This Court has employed the same standard in considering the

19 present motion and, as instructed by the Circuit Court, has

20 bottomed its analysis on Ms. Ellis's ability to serve the

21 future claimants' interests effectively and impartially.

22       So I return to the question of what has changed.

23 Well, I believe Mr. Thompson was correct in his assessment, Ms.

24 Ellis has demonstrated a willingness to consider bankruptcy as

25 an effective pathway to protect the interests of future

claimants; that recovery under a settlement trust, pursuant to

a plan reorganization, may offer a more fair and equitable

remedy for future claimants in lieu of recourse through

exercising Seventh Amendment jury trial rights with the

attendant risks and delays.  This is hardly surprising for a

Future Claims Representative.

The willingness to explore and consider options lay

at the heart of an FCR's fiduciary obligations and can never

serve as the basis for a disabling conflict or give rise to an

appearance of impropriety.

The independence demanded of Ms. Ellis under the

Imerys standard require that an FCR be free to take differing

views about the proper pathways for protecting, as a fiduciary,

the interests of her constituency.

No, what has changed in this case is merely buyer's

remorse for certain objectors who once supported Ms. Ellis

unequivocally, but now find that she's independent and willing

to consider all options, even those presented under a new

filing.

Here, the TCC objects to Ms. Ellis's appointment and

asserts that an appearance of impropriety exists, excluding her

from consideration.  As discussed, the FCR's support of the

bankruptcy option does not create a conflict; it's an opinion

based on what she thinks is best for her constituency,

something which she was specifically ordered and appointed to

1  consider.

2          I referenced New Jersey State Court <u>Zukerman v.</u> -- Z-

3  u-k-e-r-m-a-n -- by <u>Zukerman v. Piper Pools, Inc.</u>, 232 N.J.

4  Super. 74, Appellate Division, (1989), which said, merely

5  "because a settlement is rejected by a guardian ad litem is not

6  in and of itself a sufficient basis to warrant removal.  Nor

7  would it establish the type of conflict contemplated by our

8  rules.  More is required."

9          Well, there is case law that indicates that the

10 appearance of impropriety must have a reasonable basis and must

11 be more than simply a fanciful possibility.

12         The New Jersey Appellate Division succinctly

13 explained that the appearance of impropriety must be something

14 more than a mere fanciful possibility, it must have a

15 reasonable basis, and the conclusion must be based upon a

16 careful analysis of the record.  That's <u>McCarthy v. John T.</u>

17 <u>Henderson, Inc.</u>, 246 N.J. Super. 225, Appellate Division,

18 (1991).

19         The Court overrules the objections raised.  In doing

20 so, the Court finds that Ms. Ellis's retention raises no

21 specter of impropriety and wholly satisfies the standards

22 enunciated by the Circuit in <u>Imerys</u>.

23         In choosing not to undertake any further

24 consideration of alternative candidates, the Court is mindful

25 of the cost and delays which would be required to do so.

1  Likewise, the Court is mindful that Ms. Ellis faced

2  considerable hurdles in securing competent and independent

3  professionals who did not have conflicts or a desire to avoid

4  the scrutiny which accompanies this case.  It makes little

5  sense to place a new FTCR in such a position once again.

6        In addition to the time that would be necessary for

7  that professional to come up to speed, it makes little sense to

8  force a new professional to incur the delay attendant to

9  obtaining new professionals.

10        I make the appointment today with the proviso for all

11  concerned that I cannot at this juncture envision approving Ms.

12  Ellis for any role as a post-confirmation administrator for any

13  confirmed plan, again, assuming we get there.

14        I'll ask debtor's counsel to submit a form of order.

15        Thank you.  Court -- Ms. Richenderfer, I was just

16  about to end it.

17                    (Laughter)

18        THE COURT:  You got me.

19        MS. RICHENDERFER:  I apologize, Your Honor, and I

20  rise, believe me, to address something that I do not like to

21  have to bring before the Court.

22        Your Honor, may I approach?

23        THE COURT:  Yes.

24        MS. RICHENDERFER:  Your Honor, during both the first

25  case and the second case, you have commented on the world is

1 watching us --

2          THE COURT:  Yes.

3          MS. RICHENDERFER:  -- and you have also commented on

4 and chastised, and I'm not going to comment one way or the

5 other, on certain statements that were made by plaintiffs'

6 counsel.  Unfortunately, Your Honor, the United States Trustee

7 has to come before you and complain about certain things that

8 J&J is saying on its website regarding the United States

9 Trustee's Office.

10          Your Honor, at the top of it, the website there is

11 listed.  The cover page of this website states, "From time to

12 time, the topic of talc will be in the news.  This is the

13 Johnson & Johnson home for company statements on major news

14 events related to talc."

15          The first statement made by Mr. Haas, who I think,

16 unfortunately, has left, Your Honor, and I highlighted and

17 underlined, he talked about a, quote, "common interest fee

18 agreement between the United States Trustee's Office and a

19 group of minority law firms that oppose the plan."

20          Your Honor, I'm just appalled to suggest that there

21 was a fee agreement.  Mr. Haas is an attorney, he knows what

22 these words mean.  He stands right there behind my left

23 shoulder and listens to everything that is said in this

24 courtroom.  Sometime between 11:30 last night, when I copied

25 the first statement, and 7 o'clock this morning the second

1  statement was made, "common interest agreement."  I don't know

2  who or why they changed, but that's still not correct, Your

3  Honor.

4          Down below, I quoted from the transcript.  On April

5  18th, Mr. Gordon brought up that the committee asserted a

6  common interest privilege with the U.S. Trustee's Office.  In

7  response, I stated definitively, there is no common interest

8  agreement.  Your Honor, I think that Johnson & Johnson cannot

9  be allowed to be making these statements on the record about

10  the Office of the United States Trustee.

11          We debated on what to do with this, whether we should

12  have referred it elsewhere.  We wanted instead to bring it to

13  Your Honor's attention.  But the fact was that, on May 2nd,

14  they wrote that we had a common interest fee agreement, which

15  is just appalling that those phrases would be used.  Mr. Haas

16  knows better than that and it's just beyond -- and I just want

17  to put an end to it right now.

18          The debtor is not happy that the U.S. Trustee is

19  taking certain positions in this case.  We look at the case and

20  we determine what we need to say and the positions we need to

21  take and the questions we need to ask, but the fact is that

22  they're going to start making accusations about us in response

23  to this?  This is, I think, untenable, Your Honor, and I needed

24  to bring that to your attention.

25          THE COURT:  No, I'm glad you did.  I think I would

149

1  note, with respect to common interest privilege, I think you

2  were involved in a case in Delaware as a practicing attorney,

3  <u>Simplex</u> or something along those lines, where the court ruled

4  that the common interest privilege, it can't come about by

5  agreement.  It's a common law privilege, it either exists or it

6  doesn't, you cannot make such an agreement.

7        So, but I can -- or Suttletex (phonetic) -- it was a

8  case, I have to --

9        MS. RICHENDERFER:  Your Honor, you have me, I have to

10  say, because I think you're talking about a period before I

11  came to the office perhaps?

12        THE COURT:  Yes, yes.

13        MS. RICHENDERFER:  Okay.  Your Honor, I don't know

14  what that was all about, but there was no -- there is no common

15  interest privilege --

16        THE COURT:  I think your point has been taken and

17  I'll --

18        MS. RICHENDERFER:  -- especially not an agreement

19  because an agreement entails --

20        THE COURT:  I would --

21        MS. RICHENDERFER:  -- a meeting of the minds, a

22  handshake, a written document --

23        THE COURT:  I don't accept --

24        MS. RICHENDERFER:  -- so even if it arises.

25        THE COURT:  I don't accept that there's been an

1 agreement.  I think the fee agreement may be just poor language

2 or choice, I can't imagine that either, but we'll let Johnson &

3 Johnson and counsel -- do you want to be heard?

4          MR. STARNER:  Your Honor, if I may?

5          THE COURT:  Yes.

6          MR. STARNER:  Your Honor, Greg Starner of White &

7 Case on behalf of J&J.  I'll be very brief.

8          This was brought to our attention yesterday, the

9 reference to common interest fee agreement.  It is a typo and

10 J&J merely fixed it, and we informed Mr. Vera of that.  So he's

11 in receipt of that, I think he acknowledged that we had fixed

12 it.

13          The second statement, as I'm just seeing now, it

14 actually is accurate.  It does refer to the Trustee's motion

15 and refers to whose counsel testified they entered into a

16 common interest agreement.

17          I agree that that is a little bit disturbing, but

18 that is an accurate statement.  This was what occurred during

19 the deposition of Mr. Molton, so I was there at the deposition.

20 So certainly that statement is accurate.

21          And we can certainly debate about whether or not a

22 common interest exists, and I acknowledge that the U.S.

23 Attorney's Office has acknowledged that there is no common

24 interest, but it is accurate to say that the TCC did take that

25 position.

1          So I just want to be very clear about that is a typo

2     that has been fixed and so I don't think there really is an

3     issue for the Court to, you know, take up.

4          THE COURT:  All right.

5          MR. STARNER:  Unless there's any other questions,

6     Your Honor --

7          THE COURT:  I don't.  Thank you.

8          Mr. Winograd?

9          And here I thought I was a gavel drop after a ruling

10    on the --

11         MR. WINOGRAD:  Your Honor, I'm sorry.  Michael

12    Winograd from Brown Rudnick on behalf of proposed counsel for

13    the TCC.

14         Your Honor, that statement is still not accurate.  I

15    defended Mr. Molton in that deposition and, while we referred

16    to a different common interest agreement with a different

17    party, which does exist, we never once identified or claimed

18    there was ever a common interest agreement.  What we said over

19    and over again in paragraphs of explanation was that they were

20    looking for communications between the TCC and the UST.  It was

21    beyond the scope of the topics that we were informed of for

22    that deposition, it was completely irrelevant to the PI.

23    They've asked for it again, it's completely irrelevant to the

24    motion to dismiss.

25         We asserted a common interest by virtue of the fact

1 that we were co-litigants taking the same side with the U.S.

2 Trustee, we never asserted that there was any agreement

3 whatsoever.

4          And I will go one step further, Your Honor.  There

5 was never, despite all the fanfare and this press release, not

6 once before Your Honor has there been an actual objection

7 filed, a motion, you know, to compel.

8          Second, Your Honor, we just again received document

9 requests for the exact same stuff, communications generally

10 with respect to the 2.0 filing, settlement with -- or talc

11 claimants between the committee and the U.S. Trustee.  We are

12 happy to consider those, address those, and we will not raise a

13 common interest if that is the cause of the problem.  There are

14 other objections, in any event, but I will say that if Your

15 Honor thinks it's relevant and we are instructed or we decide

16 to produce it, I think that the other side is going to be

17 sorely disappointed.  I don't know exactly what they think is

18 there, but I think they'll be sorely disappointed.

19          Thank you, Your Honor.

20          THE COURT:  All right.  We're adjourned.  Thank you

21 all.

22                    * * * * *

23

24

25

153

1                    **C E R T I F I C A T I O N**

2            We, DIPTI PATEL, KAREN WATSON and TRACEY WILLIAMS,

3     court approved transcribers, certify that the foregoing is a

4     correct transcript from the official electronic sound recording

5     of the proceedings in the above-entitled matter and to the best

6     of our ability.

7

8     /s/ Dipti Patel

9     DIPTI PATEL

10

11    /s/ Karen Watson

12    KAREN WATSON

13

14    /s/ Tracey Williams

15    TRACEY WILLIAMS

16    J&J COURT TRANSCRIBERS, INC.      DATE:  May 10, 2023

17

18

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**