MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com
150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Plaintiff Katherine Tollefson*
*and Certain Mesothelioma Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, | ) | |
| | ) | Lead BK Case: 23-12825-MBK |
| Debtor. | ) | |

## MRHFM'S JOINDER TO THE TCC'S CROSS-MOTION FOR SUSPENDING DEBTOR'S CHAPTER 11 CASE PURSUANT TO 11 U.S.C. §§ 105 AND 305

MRHFM's plaintiffs—all diagnosed with a cancer caused by asbestos and who have filed lawsuits in state courts across the country—join the TCC's motion (Dkt. 414) and adopt all arguments and evidence referenced therein. The Ad Hoc Committee of Supporting Counsel ("AHCSC") (Dkt. 497) and the Debtor (Dkt. 501) oppose the motion.

The Third Circuit ruled this Court can only permit LTL Management to enter bankruptcy's "safe harbor" and access Chapter 11's tools if it files in good faith, and it did not. *LTL Mgmt. LLC*, 64 F.4th 84, 93 (3d Cir. 2023). Does a $30 billion fraud after that

ruling *really* change things? Several parties have challenged the Court's subject matter

jurisdiction, and this must be addressed, including by the Third Circuit, if necessary,

before anything else goes forward in this, the most egregious abuse of the bankruptcy

system in American history.

The AHCSC's opposition means nothing; its members are *required* to support

Johnson & Johnson's ongoing assault on the Seventh Amendment and mockery of the

people the Company poisoned to death. Even if the AHCSC represented a super-majority

of claimants with cancers medically and scientifically connected to J&J's talc—and it

doesn't—this Court lacks subject matter jurisdiction and votes don't change that.

Johnson & Johnson issues press releases on a regular basis, beating the drum that

a "small number of law firms" are preventing all "claimants" from voting on a "plan" in

its second bad faith bankruptcy. *See* <u>Ex</u>. 1, Appendix of Johnson & Johnson Statements

("J&J Statements"). J&J says that "when presented with a clear and complete explanation

and the opportunity to make an informed choice, we firmly believe the claimants will

approve the plan." *See* J&J Statements, No. 6 (Apr. 24th). And yet Exhibit A to the Term

Sheet, which contains a complete explanation of how terrible this "plan" is, remains

"confidential" at J&J's insistence.

The Company's metamorphosis from advocating for tort system access for all

plaintiffs in May 2020 (<u>Ex</u>. 2, Appendix of Tort System Flip-Flops), to extolling the virtues

of bankruptcy over the tort system in October 2021, to bashing the "plaintiff's bar" in

February 2022, to requesting extensive discovery and estimation in July 2022 so only

"valid" claims are filed in *LTL1* (Ex. 3, Tr. 7/26/22, pgs. 101-02),[12] to now, making a "deal"

with the AHCSC, relying entirely on its members' baseless representations about proper

diagnosis and exposure is astounding, even for J&J.

Mr. Birchfield explained to the Court on Tuesday the importance of how "talc

claimants" are defined. Ex. 4, Tr. 5/9/23, pgs. 32-34, 41. The Court asked the right question:

"So what do you, what role do you see for claimants who are victims of, alleged victims

of **other types of cancer** that they ascribe to talc in this case? Are they claimants?" *Id.*, pg.

34 (emphasis). They are not. Mesothelioma is overwhelming linked to asbestos and

asbestos was in Baby Powder. The MDL rulings were based on evidence linking talc to

---

[1] "And it's always been beyond me why there's so much opposition to discovery that's intended just to seek the basic information that any court would want to assess the validity of these claims."

[2] Debtor's counsel advocating for estimation to permit the Court to "shed light on the proposals" (pg. 18); saying "either we need to negotiate an agreement" (with mesothelioma and OC claimants involved in *LTL1*, which failed) or "there needs to be a process by which the parties' due process rights are respected and they have an opportunity to have their day in court…" (pg. 19-20); "I mean I can't overemphasize from our perspective, the discovery [of claimants' exposure] is very important" (pg. 23); estimation will enable the parties to gather information that they need to make their cases" and "it will require the parties, as I said before, to support their position" (pgs. 26-27); it "would also provide the claimants and the Court with information necessary to evaluate any plan" (pg. 27); "[w]e have not proposed that the estimation would set the amounts of the distribution. I think we've been very clear about that. We have not said that the estimation would be used to set a hard cap on the amount of trust funding. What we're proposing doesn't violate anyone's constitutional rights" (pgs. 27-28); discussing the importance of discovery from claimants to show all their exposures (pgs. 31-32); in response to MRHFM's objection to an aggregate resolution and demanding individual jury trials, "[MRHFM] doesn't know what values might be offered…Well, of course, they don't care about the aggregate value. They want to know what the claim values are" (pg. 100); and finally, "obviously, what's being proposed by way of cram down is a plan that wouldn't do that." Pg. 101.

very specific forms of cancer, much narrower than the types listed in Exhibit A to the Term Sheet.

The AHCSC and the Debtor have the burden to establish a connection between the "gynecological" and other cancers listed in Exhibit A and J&J's asbestos-contaminated talc. The TCC correctly identified one of the major flaws in the Debtor's plan is it purports to generate votes for claims that lack a medical and scientific connection to talc. *Id.*, pg. 41.[3]

To J&J and the AHCSC, a claimant is anyone with a name, a Social Security Number, a gynecological cancer (maybe), and some proximity to one of the most ubiquitous products in world history. In other words, anyone whose lawyers are willing to flush the civil justice system by voting for this plan. J&J doesn't care one whit about the real talc victims, and it shows.

For all these reasons, all activities in this case must be stayed until after this Court rules on the motions to dismiss. If the Court denies those motions this case should be stayed until after the Third Circuit rules.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

---

[3] "One of the concerns we have is this conflation of all claims being put in one pot and potentially sharing a pot of money pro rata not depending on the legitimacy of the claims that are being reported."

_____

Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY**
**FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhmflaw.com

# <u>EXHIBIT 1</u>

## Appendix of Johnson & Johnson Statements

| No. | Date | Statement |
|---|---|---|
| 13 | May 12, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>This motion is yet another desperate attempt by a small group of plaintiff's law firms—whose financial interests conflict with, diverge from and contravene those of their clients—to deprive all claimants of the right to vote and decide for themselves whether to accept the proposed plan, which a growing and significant majority of claimants already support. The court rulings this week cleared the way for the filing of the plan in the near term, and we will vigorously oppose the effort to derail that filing with this baseless and premature motion.[i] |
| 12 | May 9, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The Third Circuit properly denied a request by a small number of law firms, which represent the minority of claimants, attempting to prevent all claimants from having the opportunity to vote on the proposed resolution plan. As the Third Circuit stated, the Bankruptcy Court has established an "expedited" process to resolve this matter. We look forward to filing our plan shortly and to allowing claimants the opportunity to vote.[ii] |
| 11 | May 7, 2023 | We empathize with anyone suffering from cancer and understand that people are searching for answers. We believe science provides those answers, with evidence from clinical research and over 40 years of studies by independent medical experts around the world supporting our position that our cosmetic talc is safe, does not contain asbestos and does not cause cancer. Plaintiff lawyers are promulgating their unfounded theories for their own financial interest and are doing a disservice to their clients by leading them to believe that their cancer was caused by our cosmetic talc.<br><br>While the talc-related claims against the Company have no merit, we recognize that resolving these cases in the tort system would take decades, with most claimants never receiving any compensation. Resolving this matter through the proposed reorganization plan in Bankruptcy Court is both more equitable and more efficient and allows claimants to be compensated in a timely manner. It is also a legitimate and appropriate use of the bankruptcy process. Our resolution proposal has the support of the vast majority of claimants, and we look forward to letting all the claimants vote on the proposed plan.[iii] |

## Appendix of Johnson & Johnson Statements

| No. | Date | Statement |
|---|---|---|
| 10 | May 3, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The Company deeply sympathizes with anyone suffering from cancer and understands that they are looking for answers, however, the science doesn't support that the exceedingly rare form of mesothelioma at issue in Mr. Valadez's case is connected to talc exposure. We stand ready to try this matter, where we will present evidence that scientific research, clinical evidence and over 40 years of studies by independent medical experts around the world continue to support that our cosmetic talc is safe, does not contain asbestos and does not cause cancer. The Company has won the majority of talc cases brought against it since these lawsuits began despite the misinformation campaigns driven by plaintiff lawyers.<br><br>The Bankruptcy Court correctly recognized that no other claimant has moved to have the stay lifted to pursue claims in the tort system, but rather have elected to avail themselves of the bankruptcy process. We look forward to finalization and vote by all claimants on the reorganization plan.[iv] |
| 9 | May 2, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The Trustee's motion repeats the positions of the small minority of law firms that oppose the plan, whose counsel testified that they entered into a common interest fee agreement with the agency. We consider more compelling the views of the vast majority of the claimants' law firms who support the proposed reorganization plan.<br><br>We are engaging in a legitimate and appropriate use of the bankruptcy process, and look forward to<br><br>letting all the claimants vote on the proposed plan, which presents an equitable, efficient and complete resolution.[v] |
| 8 | May 2, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The filing is a desperate and legally deficient attempt by a small number of law firms to try to prevent claimants from voting on the resolution plan - a plan the vast and growing majority of claimants support. The law firms |

## Appendix of Johnson & Johnson Statements

| No. | Date | Statement |
|---|---|---|
| | | behind this filing have financial interests that conflict with, diverge from and contravene those of their clients. We will be submitting a response to the appellate court.[vi] |
| 7 | April 27, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>As unequivocally and unambiguously stated, Johnson & Johnson has agreed to retain all the talc-related liabilities—and indemnify Kenvue for any and all costs—arising from litigation in the United States and Canada. Any suggestion to the contrary is false and misleading.[vii] |
| 6 | April 24, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The motion is nothing more than a desperate attempt to prevent the tens of thousands of claimants from deciding for themselves and vote on a resolution plan.<br><br>As demonstrated in the recent hearings, there is significant support for the plan, including from major plaintiffs' law firms representing the vast majority of the claimants in this litigation, as well as lawyers who previously led the opposition to the first bankruptcy.<br><br>Opposition to the plan is driven by firms who have a profit motive to remain in the tort system that is at odds with the interests of their clients. When presented with a clear and complete explanation and the opportunity to make an informed choice, we firmly believe the claimants will approve the plan.[viii] |
| 5 | April 20, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The decision is a win for claimants, who are now one step closer to being able to vote for themselves on whether to accept the proposed resolution. We are confident the vote will overwhelmingly support the proposal, as it presents the only equitable path forward. The proposal commits $8.9 billion to claimants, whose claims otherwise would languish in the tort system for decades and, based upon the trial record to date, likely would not receive a single dollar. Major plaintiffs' law firms representing the vast |

**Appendix of Johnson & Johnson Statements**

| No. | Date | Statement |
|---|---|---|
|  |  | majority of the claimants in this litigation support the plan, including lawyers who previously led the opposition to the first bankruptcy filing.<br><br>Despite this support, we expect a few plaintiffs' law firms will continue to oppose and seek to delay this plan. The evidence presented to the court this week shows that these firms have a profit motive to remain in the tort system that is at odds with the interests of their clients. When presented with a clear and complete explanation and the opportunity to make an informed choice, we firmly believe the claimants will approve the plan.[ix] |
| 4 | April 18, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>The evidence presented today re-confirmed that plaintiffs' lawyers representing over 60,000 claimants already support the $8.9 billion resolution plan, including lawyers who had previously opposed the first bankruptcy filing. We remain confident that thousands more will join once this plan is allowed to be put out for a vote. Additionally, counsel in support of the resolution plan representing over 15,000 of the claimants echoed the desire to present the court with a resolution plan by May 15, 2023.<br><br>Opposition to our plan was presented today from a few plaintiffs' lawyers who have repeatedly stated they have no interest in a settlement under any circumstance and whose business model would be threatened by a complete resolution. That model is premised on large, aberrant verdicts where most claimants get nothing.<br><br>The only equitable path forward is for claimants to be allowed to decide for themselves and to let them vote yes or no on the reorganization plan.[x] |
| 3 | April 11, 2023 | Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:<br><br>Progress toward our reorganization plan continues with Bankruptcy Court Judge Michael Kaplan's denial today of plaintiff law firms' request to dismiss the case. We look forward to proceeding with the bankruptcy and moving toward a vote on a final reorganization plan.[xi] |
| 2 | April 4, 2023 | Johnson & Johnson (NYSE:JNJ) (the Company) today announced that its subsidiary LTL Management LLC (LTL) has re-filed for voluntary Chapter 11 bankruptcy protection to obtain approval of a reorganization plan that |

## Appendix of Johnson & Johnson Statements

| No. | Date | Statement |
|-----|------|-----------|
| | | will equitably and efficiently resolve all claims arising from cosmetic talc litigation against the Company and its affiliates in North America. To that end, the Company has agreed to contribute up to a present value of $8.9 billion, payable over 25 years, to resolve all the current and future talc claims, which is an increase of $6.9 billion over the $2 billion previously committed in connection with LTL's initial bankruptcy filing in October 2021. LTL also has secured commitments from over 60,000 current claimants to support a global resolution on these terms.[xii] |
| 1 | March 22, 2023 | Our review petition raised significant concerns with the Third Circuit's decision, both in how it applied the law to the facts of Judge Kaplan's ruling, as well as the impracticality of the Third Circuit's new legal standard. We will immediately move for a stay of this opinion so we can seek review directly from the U.S. Supreme Court.<br><br>Today's ruling ignores the facts established during the Bankruptcy Court's trial regarding the appropriateness of LTL Management's (LTL) formation and filing, as well as the Company's intention to efficiently resolve the cosmetic talc litigation for the benefit of all parties, including current and future claimants.<br><br>We continue to stand behind the safety of Johnson's Baby Powder, which is safe, does not contain asbestos and does not cause cancer. [xiii] |

---

[i] https://www.factsabouttalc.com/_document/statement-on-tcc-standing-motion-to-dismiss?id=00000188-1125-d1d3-adde-5925f0290000

[ii] https://www.factsabouttalc.com/_document/statement-on-tcc-mandamus-denial?id=00000188-0209-d1d3-adde-4a0900490000

[iii] https://www.factsabouttalc.com/_document/johnson-johnson-statement-on-cnn-segment?id=00000187-f925-d1d3-add7-f925a0b10000

[iv] https://www.factsabouttalc.com/_document/statement-on-the-valadez-case-stay-lifted?id=00000187-e2f3-d2f1-adcf-e7f339780000

[v] https://www.factsabouttalc.com/_document/statement-on-united-states-trustee-motion-to-dismiss?id=00000187-dd25-d1d3-add7-dd2596bf0000

[vi] https://www.factsabouttalc.com/_document/statement-on-tcc-mandamus-petition?id=00000187-dc60-d1d3-add7-dc6058eb0000

[vii] https://www.factsabouttalc.com/_document/statement-on-talc-related-liability-and-kenvue?id=00000187-c2d9-d2f1-adcf-e7f9c8170000

[viii] https://www.factsabouttalc.com/_document/statement-on-tcc-motion-to-dismiss?id=00000187-b47f-d1d3-add7-fc7f65a00000

[ix] https://www.factsabouttalc.com/_document/statement-on-bankruptcy-court-ruling?id=00000187-9f60-d1d3-add7-df602e5d0000

### Appendix of Johnson & Johnson Statements

---

x https://www.factsabouttalc.com/_document/april-18-statement-on-bankruptcy-court-hearing-on-ltl?id=00000187-96d0-d1d3-add7-ded0a8830000

xi https://www.factsabouttalc.com/_document/statement-on-bankruptcy-court-ruling-allowing-ltls-voluntary-chapter-11-re-filing-to-proceed?id=00000187-71e0-d1d3-add7-79e0266c0000

xii https://www.factsabouttalc.com/_document/johnson-johnson-subsidiary-ltl-management-llc-ltl-re-files-for-voluntary-chapter-11-to-equitably-resolve-all-current-and-future-talc-claims?id=00000187-4dec-d1d3-add7-4decec340000

xiii https://www.factsabouttalc.com/_document/johnson-johnson-statement-on-third-circuit-review-petition?id=00000187-09c4-deef-a1df-adf4a9de0000

# <u>EXHIBIT 2</u>

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 1 | 5/28/2020 | "The holders [of J&J Talc Claims] will keep their day in court and be assured a <u>full recovery</u> of any judgment or settlement, backed by the credit of one of the world's largest companies, J&J." **Exhibit A1**, Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol, *In re: Imerys Talc America, Inc.*, Case 19-10289-LSS, Dkt. 1769, ¶ 4 (emphasis original). | 8/15/2022 | "Worse, the mass-tort system was failing claimants. At the rate cases were being tried, it would have taken hundreds—if not thousands—of years to give all plaintiffs their day in court, to say nothing of the new plaintiffs whose lawsuits were piling up at a staggering rate. And the tort system was yielding results that were becoming increasingly difficult to rationalize. Most plaintiffs got nothing; a handful got tens of millions or billions. Future claimants could be shut out entirely." **Exhibit A2**, Debtor Appellee Brief, pg. 2. |
| 2 | 5/28/2020 | The tort claimants filing claims in *Imerys*, according to J&J, were "seeking [ ] higher and more certain payout[s]" through the *Imerys* bankruptcy in a trust than the in the tort system; in the bankruptcy, groups representing claimants could "inflate values, settle claim amounts for numbers of their own choosing without proving causation, and establish their own eligibility criteria…" *Id.*, ¶ 15. | 9/19/2022 | "And so you are asked to compare two different worlds. One is the baseline of the pre-restructuring, pre-bankruptcy world in which Johnson & Johnson owes nothing, in which some people slowly get paid but that's subject of course to any other claims against Old JJCI, any recovery. And under the restructuring and the funding agreement, instead, you have a very different world, one with a $61-billion plus floor. That money is guaranteed free and clear. You have a faster process so current claimants get paid and future claimants have a voice at the table. They have a representative because that is under 524(g)." **Exhibit A3**, Tr. 9/19/2022, pg. 85. |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|---|---|---|---|---|
| 3 | 5/28/2020 | "Even if estimation of mass tort claims may be appropriate in other chapter 11 cases, they are not appropriate when a credit-worthy party is standing ready to take over the claims and pay proven claims in full." *Id.*, ¶ 15. | 12/28/2022 | The "estimation process will facilitate mediation by [ ] requiring the parties to provide support for their respective positions, better understand the positions of the other parties, and focus on the central issue in this case—the extent of the Debtor's liability for talc claims." Debtor Motion to Disclose Funding, Dkt. 3351-1, ¶ 10. |
| 4 | 5/28/2020 | "J&J as a source of recovery for future claimants who can prove their claims is undoubtedly a more certain bet than the standard bankruptcy claims trust." *Id.*, ¶ 17(2). | 9/19/2022 | "Our argument is that each of their tort lawsuits has tunnel vision. It examines only their individual case and delays future ones. It's a home run or a strikeout and precious few get up to bat. The only way to get a system wide resolution that's comprehensive, that protects future claimants, is through bankruptcy. Third, and finally, they ignore several key limiting principles of our argument, particularly Mr. Frederick, and four things make this case unique. First, a latency period of nearly 50 years with many, many future claimants who can't get any relief now and who risk not getting paid." Tr. 9/19/2022, pg. 61 |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 5 | 5/28/2020 | The individual tort claimants who hold J&J Talc Claims would particularly benefit by taking their claims out of the bankruptcy and restoring to each full due process rights to 'have h[er or his] own day in court.'" *Id.*, ¶ 30 | 9/19/2022 | THE COURT: You contemplate that this plan even though it's not yet in place will allow for any type of opt-out?<br>MR. KATYAL: I don't know that we have gotten that far. I think that's a pre -- to use a word from earlier, I think that's a premature question. But I would say that, you know, 75 percent threshold is of course very daunting. We are highly incentivized to put a good plan together because otherwise we get returned to the mass tort system with all of the uncertainty and all of the problems attendant to it. Tr. 9/19/2022, pgs. 83-84. |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 6 | 5/28/2020 | "[T]he Debtors [Imerys] contend, in four full paragraphs, that J&J may lack the financial wherewithal to meet its obligations. This is the most absurd argument the Debtors make (and the one that most demonstrates that they are grasping at straws). As of the date hereof, J&J has a market capitalization of over $385 billion and extensive insurance coverage of its own. It is one of the top 10 companies in the United States by market value. J&J can provide the claimants far greater protection than the Debtors or the bankruptcy claims trust ever could (as discussed above)." *Id.*, ¶ 41. | 8/15/2022 | "Not even J&J could 'sustain operations and remain viable in the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward.' Although claimants repeatedly cite J&J's significant market capitalization and strong credit rating, they cite no evidence suggesting that J&J had the capacity to pay tens of billions of dollars in defense costs and verdicts for decades without falling into financial distress." Debtor Appellee Brief, pg. 50 (internal citations omitted). |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 7 | 5/28/2020 | "More importantly, J&J is offering each of those plaintiffs her or his own day in court to attempt to prove her/his allegations—against the Debtors and against J&J… There will be no 'dumping' of thousands of cases into the court system. The suits are already there. J&J, in agreeing to defend the claims, is not taking away anyone's claims or rights. It is J&J's rights that are being denied under the status quo." *Id.*, ¶ 74. | 8/15/2022 | "Worse still, 38,000 claimants could not all get their day in court any time soon, if at all. In Missouri, one of plaintiffs' favored jurisdictions, only 297 civil jury verdicts of any kind were returned in 2019. At that pace, it would have taken 'decades to resolve the currently pending claims in the tort system' and another 10,000 would be added to the backlog each year." Debtor Appellee Brief, pg. 17. |

# <u>EXHIBIT A1</u>

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19–10289 (LSS) |
| **Debtors.** | Jointly Administered |

**JOHNSON & JOHNSON'S OMNIBUS REPLY IN SUPPORT
OF J&J'S MOTION FOR ENTRY OF ORDER MODIFYING
AUTOMATIC STAY TO IMPLEMENT TALC LITIGATION PROTOCOL**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

same claim—one as to Imerys and another in the tort system as to J&J—potentially leading to inconsistent results and overcompensation of the claims. If the Motion is not granted, J&J could prevail against a particular plaintiff after a fair and lengthy trial and yet still have to pay that same plaintiff's claims under the Imerys Plan. That is not fair. Or J&J could theoretically lose at trial and pay the plaintiff's full claim and then still have to pay the plaintiff again under the Imerys TDPs, an unjustifiable double recovery.[3]

4.          Through the Motion, to avoid these results, J&J makes an *extraordinary offer*: to take over liability for, and thereby remove from the Debtors' bankruptcy estates, most of the Debtors' liabilities—approximately 90% of the current and future claims against the Debtors. The holders of these claims (the J&J Talc Claims), the very claims that precipitated the Debtors' filing of these Chapter 11 Cases, will be treated as if the Debtors' Chapter 11 Cases were never filed. They will keep their day in court and be assured a <u>full recovery</u> of any judgment or settlement, backed by the credit of one of the world's largest companies, J&J. In the revised proposed order approving the Motion, attached hereto as **<u>Exhibit A</u>** (the "**Revised Proposed Order**"), J&J has also now agreed to pick up **<u>full indemnity</u>** for J&J Talc Claims for **<u>all years</u>**, regardless of the timing of exposure, beyond J&J's alleged obligations even under the most expansive reading of the indemnity agreements.[4] This eliminates one major "issue" raised by the objectors to the Motion. In addition, J&J would waive its claims against the Debtors **and** most of its defenses to indemnity. This will resolve the Unresolved Indemnity Issues, as described in the Motion,

---

[3] While J&J would have rights to set off, this right varies by jurisdiction and the circumstances and timing of the Trust's payments. J&J reserves all rights to assert any claims it may have against the Debtors, the Reorganized Debtors, and/or the Trust, including claims for contribution or set-off, if the Motion is denied.

[4] J&J would indemnify for all years in which the Debtors supplied J&J talc, not merely the years in which it could potentially be owed. Importantly, under the contracts, J&J's indemnity obligations only cover exposure from years up through the year 2000. And, while the 2011 MPA provided that J&J would indemnify Debtors for that calendar year – there was no survival language, thus terminating J&J's obligations upon expiration of the Agreement.

3

2738, Civil Action No. 16-2738 (FLW) (D.N.J. April 27, 2020) [D.I. 13186].

15.     Under these circumstances, perhaps it should come as no surprise that the TCC and FCR object to going back to the tort system, apparently seeking for the tort claimants a higher and more certain payout in these Chapter 11 Cases (where they can inflate values, settle claim amounts for numbers of their own choosing without proving causation, and establish their own eligibility criteria) than they would potentially receive outside of chapter 11.  But, as the United States Supreme Court has cautioned, this is an illegitimate expectation.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) (a creditor should not obtain a "windfall merely by reason of the happenstance of bankruptcy"); *see also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 224 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012) ("It is an axiomatic principle of chapter 11 practice that creditors cannot be elevated to a better position than their pre-petition legal entitlements.") (citing *Butner*).  Even if estimation of mass tort claims and settlement through a trust may be appropriate in other chapter 11 cases, they are not appropriate when a credit-worthy

---

2738, Civil Action No. 16-2738 (FLW) (D.N.J. April 27, 2020) [D.I. 13186].   The purposes of this transfer and "centralization" process is to avoid duplication of discovery, to prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel, and the judiciary.  Thereafter, plaintiffs and J&J filed motions challenging the scientific reliability of the opinions of each side's causation experts.  In August of 2019, the Chief Judge of the U.S. District Court for the District of New Jersey, Honorable Freda L. Wolfson, conducted a *Daubert* hearing to determine the admissibility of eight of the challenged experts' opinions.  The Debtors did not participate in this hearing because of the automatic stay.

On April 27, 2020, the court issued a ruling significantly limiting the testimony of two of plaintiffs' key expert witnesses: asbestos testing expert, Dr. William Longo, and biology expert, Dr. Ghassen Saed, finding that these witnesses did not present scientifically sound evidence to support key aspects of their opinions.  Specifically, Judge Wolfson excluded the testimony of plaintiffs' asbestos testing expert, Dr. William Longo regarding the results of his polarized light microscopy (PLM) testing due, in part, to his own prior statements that it was not a reliable methodology.  *Id.* at 56.  Further, and significantly, Judge Wolfson barred Dr. Longo from testifying in any fashion that women who used talcum powder were exposed to any level of asbestos, let alone a level significant enough to cause ovarian cancer because he "fail[ed] to offer any scientific support for his opinion that the use of Defendants' talc products causes exposure, let alone significant exposure, to asbestos."  *Id.* at 59.  Finally, the Court also excluded plaintiffs' theory that inhalation of talc can cause ovarian cancer, citing the "scant" support offered by plaintiffs' experts for that theory.  *Id.* at 96–97.  In addition, Judge Wolfson excluded plaintiff's expert biologist Dr. Saed from testifying that his experiments showed that talc could cause ovarian cancer because the Court found that his opinion that "the use of talc causes ovarian cancer" was "unsupported by the findings of his study" and was an "unreliable" conclusion.  *Id.*  Notably, in the same ruling, Judge Wolfson denied plaintiffs' motion to exclude or limit the opinions and testimony of any of defendants' experts.

party is standing ready to take over the claims and pay proven claims in full.  None of the objectors cite to a single case in which claims were estimated and settled under such circumstances.

16.     Granting J&J's requested relief is thus necessary to protect J&J from hardship.  It will not only eliminate the moral hazard problem, it will ensure that these Chapter 11 Cases are conducted consistently with the fundamental tenet that bankruptcy cannot be used for improper purposes.  "The conduct of bankruptcy proceedings not only should be right but must seem right." *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir. 1966).  And the right thing to do in these cases is to grant the Motion to permit J&J take over the defense to the claims.

## **SUMMARY OF ARGUMENT ON *REXENE* FACTORS**

17.     Application of the *Rexene* factors and their underlying principles points in favor of granting the motion, lifting the stay, and permitting J&J to implement the Talc Litigation Protocol. Unlike a case where a court must compare a burden to the estate against a hardship to the party seeking to lift the stay, in this case, granting the relief will both lead to benefits to the estate *and* alleviate hardship to J&J, all without prejudice to individual tort claimants' right to have their day in court.  That is, all the relevant factors point in the same direction:  to lifting the stay.  And even if the Court were to find that that there are burdens to the estate, they are incidental and insignificant, and easily outweighed by the direct and concrete hardship to J&J.

18.     Below is a summary of the main facts supporting application of the *Rexene* factors.

19.     <u>First</u>, the Debtors will benefit from and are not harmed by the relief sought in the Motion:

> 1)  <u>Payment in Full of Most Claims and Higher Recoveries for Other Claims.</u>  J&J's proposal essentially guarantees payment in full to holders of J&J Talc Claims who have successful claims, without the Debtors having to use their assets to pay those claims.  This also benefits the holders of non-J&J Talc Claims, as a greater percentage of the Debtors' assets will be available to pay those claims.

2) <u>Financial Certainty for Future Claims.</u>  For future claimants especially, J&J's offer presents a far superior deal.  J&J as a source of recovery for future claimants who can prove their claims is undoubtedly a more certain bet than the standard bankruptcy claims trust.

3) <u>Preservation of Indemnity Rights.</u>  Without the requested relief, there is a good chance that the holders of talc claims against the Debtors allegedly arising from use of J&J products will lose the benefit of any value of J&J's indemnity agreement with respect to the Debtors' liability given J&J's strong defenses based on the Debtors' actions and the section 524(g) settlement.  Moreover, J&J submits that the Debtors cannot assume the J&J indemnity agreements, which are executory contracts, under section 365 of the Bankruptcy Code because they cannot cure the Debtors' breach of the provision permitting J&J to assume the defense of the claims unless they actually let J&J assume the defense of claims (or their failure to abide by the cooperation provisions or the defense based on non-conforming talc).

4) <u>Waiver of J&J's Indemnity Claims</u>.  The Responses fail to mention J&J's indemnification claims under the 2001 agreement for which J&J filed a proof of claim.  Without the relief requested, J&J will continue to pursue these claims against the Debtors (and will pursue its objections that the Plan does not treat these claims properly).

5) <u>Avoidance of the Unresolved Indemnity Issues</u>.  Granting the Motion resolves complicated litigation that will otherwise be necessary not only to resolve J&J's defenses to the Debtors' indemnity claims, but also the complicated allocation issues relating to J&J's own indemnity claims and gap years.

6) <u>Preservation of Insurance</u>.  Granting the relief will increase the chances that the Debtors' insurance will be available to satisfy Talc Claims.  In contrast, without the requested relief, and to the extent the Debtors are found to have breached their obligations as indemnitees under agreements with J&J, then the Debtors' insurers may argue that the Debtors' actions impairing the indemnification claims against J&J have vitiated the Debtors' claims to insurance with respect to future payouts by the Debtors' insurers.

20.    <u>Second</u>, the issues raised (and exaggerated) in the Responses do not outweigh the foregoing benefits:

1) J&J now agrees to expand the dates in its proposal to cover all time periods of alleged exposure to J&J products, eliminating one of the issues raised in several Responses.

2) The cooperation provisions are standard and necessary to defend the claims and J&J commits to work with the Debtors to ensure that its requests are reasonable.  In addition, J&J has modified the cooperation provisions in the Revised Proposed Order to eliminate some of the language the objectors criticized.

11

filed their Plan. Deferring the issue of J&J assuming the defense of the claims until confirmation will potentially result in a great waste of estate resources soliciting a Plan that is not appropriate in light of J&J's offer and prejudice J&J, as the Debtors will beat the "too late" drum even harder when they are on the brink of emerging from chapter 11 and have gone through the cost and time of solicitation. For this reason, now is the best time for the Court to grant the Motion.

### A. Lifting the Stay Will Benefit the Debtors and Their Estates, Not Prejudice Them.

30. J&J has proposed something that any normal debtor would surely welcome: to take away and pay (in accordance with applicable non-bankruptcy law) the vast majority of the Debtors' largest liabilities. J&J has offered to assume the defense and indemnify Imerys for *all* J&J Talc Claims, encompassing (by the Debtors' calculations) 99.8% of the total ovarian cancer claims and 80.1% of the total mesothelioma claims against Debtors.[18] *See* Disclosure Statement 4.1(a). By assuming those liabilities, J&J's proposal would expand the assets available to the Debtors' estates, benefitting other creditors. The individual tort claimants who hold J&J Talc Claims would particularly benefit by taking their claims out of the bankruptcy and restoring to each full due process rights to "have h[er or his] own day in court." *Taylor* v. *Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Richards* v. *Jefferson County*, 517 U.S. 793, 798 (1996)).

31. The benefits do not end there. Many other benefits are apparent and detailed in both the Motion and the summary of the *Rexene* factors section above, but in brief summary, they include:

---

[18] J&J has not verified these numbers, but notes that to the extent any claimant asserts a claim based on exposure both to a J&J product and a product not manufactured by J&J, J&J will only assume the defense of and pay for liability associated with J&J products. Thus, some claimants may continue to assert a claim against the Trust relating to other products (assuming they can satisfy the Trust's eligibility criteria for those products) while simultaneously proceeding against J&J in the tort system with respect to claims based on J&J products. This bifurcation, which may only apply to a small percentage of the claims, is not all that different than the bifurcation that would exist under the Plan for all the J&J Talc Claims—for the same injury caused by the same product, a plaintiff would simultaneously collect from the Trust and sue J&J and other manufacturing defendants in the tort system. J&J's proposal consolidates all alleged liability resulting from a single product.

16

rights J&J possesses under insurance and indemnity law upon assuming the indemnitee's defense.

Certain insurance carriers negotiated agreed language in J&J's Revised Proposed Order, and their

consent to J&J's requested relief confirms that J&J's proposal merely maintains the status quo

(*i.e.*, that J&J is not waiving any rights it might have under applicable law to those insurance

policies), not increasing any rights J&J might have to insurance policies.  In addition, this argument

completely ignores that (i) these insurance allocation issues already exist in the Plan (*see, e.g.*,

Plan § 11.4.1) and (ii) if avoiding complicated allocation issues is a goal, then granting the Motion

would further it, because, as explained in the Motion, this would resolve the complicated

Unresolved Indemnity Issues relating to the competing indemnity agreements.

41.     *Fifth*, the Debtors contend, in four full paragraphs, that J&J may lack the financial

wherewithal to meet its obligations.  Debtors' Objection ¶¶ 33–38.  This is the most absurd

argument the Debtors make (and the one that most demonstrates that they are grasping at straws).

As of the date hereof, J&J has a market capitalization of <u>over $385 billion</u> and extensive insurance

coverage of its own.  It is one of the top 10 companies in the United States by market value.[25]  J&J

can provide the claimants far greater protection than the Debtors or the bankruptcy claims trust

ever could (as discussed above).  More fundamentally, the Debtors' *own plan* relies on J&J's

ability to pay individual claims.  Even if the risk that the Debtors identified were realistic rather

than fanciful, it thus would provide no reason to deny J&J's motion because the same risk is also

present under the Debtors' own Plan.

42.     Those five arguments lack merit.  But more concerning, and more broadly, the

Debtors' failure to even acknowledge the obvious countervailing *benefits* suggests that the

---

[25]     *See*  Bloomberg,  JNJ  company  information  and  market  quotes,  available  at
https://www.bloomberg.com/quote/JNJ:US.

its rights to access the insurance that would otherwise be available for J&J Talc Claims. As a result, J&J's reservation will not prejudice the estates.

73.    *Fifth*, the TCC asserts that any order must provide that no rights of the Debtors, the TCC, or the Talc Claimants are waived against J&J. TCC Response ¶¶ 26–28. The Talc Litigation Protocol does not seek any such waiver. In fact, J&J is agreeing to take on liability beyond anything it could be contractually obligated to do. J&J is seeking party-in-interest status for the limited purpose of avoiding any negative impact to its right to defend the J&J Talc Claims in the tort system. The TCC and other parties in the case should *prefer* that J&J bring its issues before the Bankruptcy Court, given their purported concern that J&J would simply terminate the indemnity if the Debtors breach. Moreover, the TCC and the FCR have no rights as against J&J— they are not a party to the indemnity agreements, and the agreements are clear that there are no third-party beneficiaries. *See* 1989 SPA § 13.1; 1989 SA § 15(a). Rather, the agreements are for the benefits of the parties thereto. Thus, the TCC and the FCR are losing no rights under the Talc Litigation Protocol.

74.    The TCC's attempts to pull at heartstrings are inapposite. J&J acknowledges that the individual plaintiffs have a terrible disease and are indeed suffering, but J&J firmly believes, and the science demonstrates, that J&J's products did not cause or contribute to those illnesses and instead are safe. More importantly, J&J is offering each of those plaintiffs her or his own day in court to attempt to prove her/his allegations—against the Debtors and against J&J. Because each holder of a current J&J Talc Claim is already suing J&J (and those in the future would similarly sue J&J), granting the Motion does not require any plaintiff to pursue a court case that she or he is not already pursuing. There will be no "dumping" of thousands of cases into the court system.

36

The suits are already there.[35]  J&J, in agreeing to defend the claims, is not taking away anyone's
claims or rights.  It is J&J's rights that are being denied under the status quo.

### III.    The FCR Joinder Fails for Similar Reasons as the TCC Response.

75.    The FCR joined the TCC's response and filed a limited objection to J&J's motion,
argues that the Motion should be denied unless the modifications outlined in the TCC Response
are adopted.  The FCR Joinder lack merit, largely for reasons discussed above.

76.    *First*, the FCR argues that J&J is improperly seeking to force the Debtors to waive
certain rights to assert indemnification and to reserve rights to the Debtors' insurance policies
unilaterally.  J&J is doing no such thing, as previously discussed.  *See supra* ¶ 72.  *Second*, the
FCR argues that J&J does not offer evidence satisfying the *Rexene* factors.  As summarized in
paragraphs 17–21 hereof, J&J has satisfied the *Rexene* factors.  *See supra* ¶¶ 17–21, 30–56.  *Third*,
the FCR argues that J&J should be required to indemnify all claims and demands against the
Debtors and their affiliates for all years.  As explained above, J&J has agreed to cover all years,
but there is no basis to require J&J to cover non-J&J Talc Claims or the Debtors' affiliates.

77.    *Fourth*, the FCR argues that J&J should not be afforded "party-in-interest" standing
in these chapter 11 cases.  Specifically, the FCR asserts that J&J points to no actual or imminent
injury that would afford it standing in these cases.  That is incorrect.  As discussed above, J&J will
need to ensure that its ability to defend the claims is not prejudiced, and J&J ability to police this
issue more closely and raise issues early will actually mitigate the concern raised by the parties
that J&J will somehow seek to cease defending the claims.

---

[35] The tort claims that J&J seeks to assume the defense of all have something in common:  they involve J&J products
and already exist in the tort system as against J&J.  J&J is unaware of even a single plaintiff who asserts a J&J Talc
Claim against the Debtors while not also naming J&J as a co-defendant.  Thus, irrespective of this Court's decision
on J&J's Motion, there will be the same exact number of J&J Talc Claims in the tort system.

# <u>EXHIBIT A2</u>

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

═══════════════════════════════════════

IN THE

# United States Court of Appeals
# for the Third Circuit

───────────────

IN RE: LTL MANAGEMENT, LLC,

*Debtor*

───────────────

*OFFICIAL COMMITTEE OF TALC CLAIMANTS

*Appellant*

*(Amended per Court's Order dated 06/10/2022)

───────────────

On direct appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3023

───────────────

**BRIEF FOR DEBTOR-APPELLEE**

───────────────

GREGORY M. GORDON          NEAL KUMAR KATYAL
BRAD B. ERENS              SEAN MAROTTA
DAN B. PRIETO              WILLIAM E. HAVEMANN
JONES DAY                  JO-ANN TAMILA SAGAR
2727 North Harwood Street  PATRICK C. VALENCIA
Dallas, Texas 75201        HOGAN LOVELLS US LLP
                           555 Thirteenth Street, N.W.
C. KEVIN MARSHALL          Washington, D.C. 20004
DAVID S. TORBORG          (202) 637-5600
JONES DAY                  neal.katyal@hoganlovells.com
51 Louisiana Avenue, N.W.
Washington, D.C. 20001     *Counsel for Debtor-Appellee*

August 15, 2022

═══════════════════════════════════════

JJCI was prepared to fight every case filed in the mass-tort system.  And Old JJCI was almost always successful; many cases were dismissed, and in 32 of the 41 cases that went to verdict, Old JJCI was not found liable, if not with the jury then on appeal.

Although Old JJCI was being largely vindicated in the tort system, two concerns loomed large.  First, Old JJCI's vigorous defense did not come cheap; defense costs alone were projected to run into the billions.  Second, plaintiffs occasionally hit the jackpot with juries, racking up outlier verdicts in the hundreds of millions or even billions.  Talc-litigation costs pushed Old JJCI, as well as the entire Global Consumer Business of which Old JJCI was a part, from profit to a loss in just one year and cast doubt on whether the company could keep its head above water.

Worse, the mass-tort system was failing claimants.  At the rate cases were being tried, it would have taken hundreds—if not thousands—of years to give all plaintiffs their day in court, to say nothing of the new plaintiffs whose lawsuits were piling up at a staggering rate.  And the tort system was yielding results that were becoming increasingly difficult to rationalize.  Most plaintiffs got nothing; a handful got tens of millions or billions.  Future claimants could be shut out entirely.  This lottery benefited lawyers and a handful of lucky plaintiffs whose

one part—to book a pre-tax loss of $893.4 million during that 20-month period,

A7227, and swing from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020.

A4.

Based on past outcomes, the Bankruptcy Court estimated that LTL could

expect more than $15 billion in potential liability from its existing inventory of 430

mesothelioma claims, many billions more for the 38,000 existing ovarian-cancer

claims, and yet even more for the not-yet-asserted claims.  A17, 7137-41.  It would

cost Old JJCI $190 billion just to *try* the current claims—as a single ovarian-cancer

trial costs Old JJCI between $2 million and $5 million, A2170—to say nothing of

the costs to defend claims for the next 50 years.  A458.  All told, it would cost Old

JJCI tens to hundreds of billions of dollars to resolve current and future claims.

A34, 37, 40.  On top of that, Old JJCI could owe billions more in indemnification

to its talc suppliers.  A16, 24, 7130.

Worse still, 38,000 claimants could not all get their day in court any time

soon, if at all.  In Missouri, one of plaintiffs' favored jurisdictions, only 297 civil

jury verdicts *of any kind* were returned in 2019.  At that pace, it would have taken

"*decades* to resolve the currently pending claims in the tort system" and another

10,000 would be added to the backlog each year.  A7264.  Although roughly

35,000 claims have been consolidated into a New Jersey multidistrict litigation, the

MDL judge's principal role is to coordinate *pretrial* proceedings, and cases would

by J&J." A&I Br. 41. Talc-related expenses were charged to Old JJCI because it had legal responsibility for them. A4107 ("[A]ll costs that relate to this talc matter get sent to, to JJCI"); A8103 ("[T]hese are talc product liability costs that JJCI was ultimately responsible for, which is why it is showing up as a expense on their account.").

Claimants also ignore the Bankruptcy Court's finding that Old JJCI's talc liabilities were so massive that even J&J itself could not satisfy them indefinitely. A40-41. The court found "that the weight of evidence supports a finding that *J&J and Old JJCI were in fact facing a torrent of significant talc-related liabilities for years to come*." A40 (emphasis added). It explained that the talc liabilities were so substantial "that the continued viability of *all J&J companies is imperiled*." A36 (emphasis added). Not even J&J could "sustain operations and remain viable in the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward." A37. Although claimants repeatedly cite J&J's significant market capitalization and strong credit rating, *see* TCC Br. 8; A&I Br. 42, they cite no evidence suggesting that J&J had the capacity to pay tens of billions of dollars in defense costs and verdicts for decades without falling into financial distress. Even if J&J's financial health were relevant, the Bankruptcy Court's findings should still be upheld.

50

# EXHIBIT A3

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-2003/22-2004 |
| | . | |
| LTL MANAGEMENT LLC, | . | 21400 U.S. Courthouse |
| Debtor, | . | 601 Market Street |
| | . | Philadelphia, PA 19106 |
| OFFICIAL COMMITTEE OF TALC | . | |
| CLAIMANTS, | . | Monday, September 19, 2022 |
| Appellant. | . | |

. . . . . . . . . . . . . . . . ..

| | | |
|---|---|---|
| IN RE | . | Case No. 22-2005 |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| Debtor. | . | |
| | . | |
| LTL MANAGEMENT, LLC. | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000 | . | |
| OFFICIAL COMMITTEE OF TALC | . | |
| CLAIMANTS, | . | |
| Appellant. | . | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-2006/22-2007 |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| Debtor. | . | |
| | . | |
| OFFICIAL COMMITTEE OF TALC | . | |
| CLAIMANTS, ET AL. | . | |
| Appellants. | . | |

. . . . . . . . . . . . . . .

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-2008 |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| Debtor. | . | |
| | . | |
| LTL MANAGEMENT LLC | . | |
| | . | |
| v. | . | |
| | . | |
| THIRD PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| OFFICIAL COMMITTEE OF TALC | . | |
| CLAIMANTS, ET AL. | . | |

```
OFFICIAL COMMITTEE OF TALC      .
CLAIMANTS, ET AL.               .
               Appellants.      .
. . . . . . . . . . . . . . .
IN RE:                          .     Case No. 22-2009
                                .
LTL MANAGEMENT LLC,             .
               Debtor.          .
                                .
ARNOLD & ITKIN LLP, ON BEHALF   .
OF CERTAIN PERSONAL INJURY      .
CLAIMANTS REPRESENTED BY        .
ARNOLD & ITKIN,                 .
               Appellant.       .
. . . . . . . . . . . . . . . .
IN RE:                          .     Case No. 22-2010
                                .
LTL MANAGEMENT LLC,             .
               Debtor.          .
                                .
AYLSTOCK WITKIN KRIES &         .
OVERHOLTZ PLLC, ON BEHALF OF    .
MORE THAN THREE THOUSAND        .
HOLDERS OF TALC CLAIMS,         .
               Appellant.       .
. . . . . . . . . . . . . . . .
IN RE:                          .     Case No. 22-2011
                                .
LTL MANAGEMENT LLC,             .
               Debtor.          .
                                .
LTL MANAGEMENT LLC              .
                                .
          v.                    .
                                .
THOSE PARTIES LISTED ON         .
APPENDIX A TO COMPLAINT AND     .
JOHN AND JANE DOES 1-1000       .
                                .
AYLSTOCK WITKIN KRIES &         .
OVERHOLTZ, PLLC., ON BEHALF OF  .
MORE THAN THREE THOUSAND        .
HOLDERS OF TALC CLAIMS,         .
               Appellant        .
. . . . . . . . . . . . . . . .
```

3

TRANSCRIPT OF ORAL ARGUMENT
BEFORE
THE HONORABLE JUDGE THOMAS L. AMBRO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE L. FELIPE RESTREPO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE JULIO M. FUENTES
UNITED STATES THIRD CIRCUIT JUDGE

APPEARANCES:

For the Appellants:      MoloLamken
                        By:  JEFFREY A. LAMKEN, ESQ.
                        600 New Hampshire Avenue, N.W.
                        Washington, D.C.  20037

                        Kellogg Hansen Todd Figel & Frederick
                        BY:  DAVID C. FREDERICK, ESQ.
                        1615 M Street, N.W., Suite 400
                        Washington, D.C.  20036

For U.S. Trustee:      U.S. Department of Justice
                        By:  SEAN JANDA, ESQ.
                        Appellate Section
                        Room 7260
                        950 Pennsylvania Avenue, N.W.
                        Washington, D.C.  20530

For Appellees:         Hogan Lovells US
                        By:  NEAL K. KATYAL, ESQ.
                        555 Thirteenth Street, N.W.
                        Washington, D.C.  20004

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311    Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

 1  restructured and created two entities, New JJCI and LTL.  Every

 2  dollar that the Old JJCI was liable for, every dollar of its

 3  own conduct and anything alleged by J&J, the New JJCI had

 4  agreed to pay 100 percent.  The restructuring and bankruptcy

 5  petition didn't debate anything.  It was a full one-to-one

 6  placement.  Indeed, it was even more than one-to-one for

 7  reasons our brief explains.

 8          Now my friends say, well, they represent the victims

 9  and speak for them.  That proves our point and proves

10  Congress's point.  They are all current claimants.  Our

11  argument is that each of their tort lawsuits has tunnel vision.

12  It examines only their individual case and delays future ones.

13  It's a home run or a strikeout and precious few get up to bat.

14  The only way to get a system wide resolution that's

15  comprehensive, that protects future claimants, is through

16  bankruptcy.

17          Third, and finally, they ignore several key limiting

18  principles of our argument, particularly Mr. Frederick, and

19  four things make this case unique.  First, a latency period of

20  nearly 50 years with many, many future claimants who can't get

21  any relief now and who risk not getting paid.

22          Second, wild lottery style judgments like _Ingham_,

23  including some for billions, and a massive number of cases,

24  40,000, with more filed every hour of every day of every year,

25  creating a tsunami of litigation.

1          MR. KATYAL:  Yes.  So I apologize for that.  But our

2  --

3          THE COURT:  What are the opt-outs that are being

4  considered?

5          MR. KATYAL:  So the 524(g) process has --

6          THE COURT:  People who can say I don't want to be

7  part of the bankruptcy, I'm going to opt out and go forward

8  with respect to my litigation.

9          MR. KATYAL:  Yeah.  So, I mean, I think Congress put

10 that into the statute itself saying there has to be a 75

11 percent requirement for the plan and then, of course, there's

12 two-court review.  So there's a lot that has to happen.

13         And I think the most important point about that is --

14         THE COURT:  You contemplate that this plan even

15 though it's not yet in place will allow for any type of opt-

16 out?

17         MR. KATYAL:  I don't know that we have gotten that

18 far.  I think that's a pre -- to use a word from earlier, I

19 think that's a premature question.  But I would say that, you

20 know, 75 percent threshold is of course very daunting.  We are

21 highly incentivized to put a good plan together because

22 otherwise we get returned to the mass tort system with all of

23 the uncertainty and all of the problems attendant to it.

24         And Judge Kaplan -- you know, my friend Mr. Frederick

25 said he wants you to write a decision really about these facts.

1  We absolutely agree. Judge Kaplan has said time and again his

2  goal is to move this thing incredibly expeditiously. My

3  friends on the other side said they thought this process could

4  be done as early as the first quarter of next year.

5        And Judge Kaplan has rejected time and again any

6  attempt to delay the bankruptcy process which looks very

7  different, of course, than what's going on in the tort system

8  as Your Honor was asking my friends on the other side. Massive

9  delay, only a few trials to verdict. And, you know, as Judge

10  Kaplan found, future trials are going to be even more delayed

11  and very few settlements because of the <u>Ingham</u> verdict and

12  other things.

13        And so you are asked to compare two different worlds.

14  One is the baseline of the pre-restructuring, pre-bankruptcy

15  world in which Johnson & Johnson owes nothing, in which some

16  people slowly get paid but that's subject of course to any

17  other claims against Old JJCI, any recovery. There are huge

18  defense costs, and future claimants risk not getting paid with

19  all the latency.

20        And under the restructuring and the funding

21  agreement, instead, you have a very different world, one with a

22  $61-billion plus floor. That money is guaranteed free and

23  clear. You have a faster process so current claimants get paid

24  and future claimants have a voice at the table. They have a

25  representative because that is under 524(g). And, of course,

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT, LLC, | . | Adversary No. 21-3032(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | Clarkson S. Fisher U.S. |
| v. | . | Courthouse |
| | . | 402 East State Street |
| THOSE PARTIES LISTED ON | . | Trenton, NJ 08608 |
| APPENDIX A TO COMPLAINT | . | |
| and JOHN AND JANE DOES | . | |
| 1 TO 1000, | . | |
| | . | |
| Defendants. | . | Tuesday, July 26, 2022 |
| . . . . . . . . . . . . | . | 10:04 a.m. |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Jones Day
                            By:  GREGORY M. GORDON, ESQ.
                                 DANIEL B. PRIETO, ESQ.
                            2727 North Harwood Street, Suite 500
                            Dallas, TX 75201


For the Official            Otterbourg P.C.
Committee of Talc           By:  MELANIE CYGANOWSKI, ESQ.
Claimants 1:                230 Park Avenue
                            New York, NY  10169


Audio Operator:             Wendy Quiles


Proceedings recorded by electronic sound recording, transcript
                  produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

5

1          MR. GORDON:  No, Your Honor.  We're fine with that.

2          THE COURT:  Okay.

3          MR. GORDON:  Thank you.

4          And we do have a PowerPoint presentation.

5          THE COURT:  Of course you do.

6                         (Laughter)

7          MR. GORDON:  And hopefully, we've got someone behind

8    the scenes here that's going to make that happen.

9          Greg Gordon again on behalf of the debtor, Your

10   Honor.

11         THE COURT:  Thank you.  Good morning.

12         MR. GORDON:  Good morning.

13         So we in advance of the June hearing had submitted a

14   statement indicating what we thought the appropriate next steps

15   would be for this case.  And I think by the time we got to the

16   June hearing, Your Honor had had an opportunity to read that

17   and we tried to be very thoughtful about a way to move forward

18   with an estimation process that would both be shorter than what

19   we've seen in other cases and also be done in a way that would

20   complement the mediation process and hopefully provide energy

21   to the mediation process.

22         And at the June hearing, Your Honor indicated that

23   you were very seriously thinking about the retention of a Rule

24   706 expert.  And I think I indicated at that hearing that we

25   would go back and think about that.  That was something that

17

1  the aggregate liability here, whereas, the other side's

2  proposal as best we can tell just disregards that.  I mean

3  their plan as we understand it in their proposal is just pay-

4  as-you-go, it's irrelevant what the aggregate liability is, put

5  us in control of the trust, and we'll just run the claims

6  through the trust.  So to them, it's irrelevant apparently what

7  the aggregate liability is.

8          And then at the same time, they're apparently going

9  to propose claim values but do it in a way that minimizes or

10 impairs, I should say, our ability to present our case as to

11 why their claim values are likely inflated, which is what we

12 expect and probably materially inflated.

13         Next slide, please.

14         So I'll go through these quickly.  In these cases, I

15 mean we know what the principle issue is.  We know what the

16 central issue is.  Its been identified by many courts over the

17 last 20 years.  And here in USG, the court said the court's

18 aware that the tension between the positions articulated by the

19 parties concerning the proper mode of valuing the debtor's

20 asbestos liability reveals a fundamental, perhaps the

21 fundamental divide between the parties.  Indeed, the issue may

22 lie at the heart of all asbestos bankruptcies.

23         And through the years, we know that that's true.

24         Next slide, please.

25         And if you think about it, this issue that we want

1  the parties and this process to focus on, it is at the center

2  of everything in the case.  It's the issue that basically is

3  critical to plan negotiations.  It's central to the mediation.

4  It's central to the formulation of a plan.  It's ultimately

5  central to the claimants who have got to decide whether any

6  proposed plan, whether by one side or the other, is acceptable

7  to them.  It's information that's important to them.

8          And it's also what allows the Court ultimately to

9  determine whether a plan that's being proposed is in the

10  claimant's best interest or not.  And any process, in our view,

11  whose intent is to basically minimize the ability of the Court

12  and the debtor to test the proposals, to shed light on the

13  proposals, basically is -- undercuts everything in this case.

14  It's going to put the Court in a position and the parties in a

15  position where they really can't do their jobs the way the Code

16  contemplates they should be done.

17          Next slide, please.

18          All right.  Let's go to the next slide.

19          Next slide, please.

20          So Section 502(c), the statute which provides the

21  authority for the estimation of claims, is mandatory.  We've

22  highlighted the key language that says it shall -- "There shall

23  be estimated for purposes of allowance under this section any

24  contingent or unliquidated claim, the fixing or liquidation of

25  which, as the case may be, would unduly delay the

1  administration of the case."

2          Next slide.

3          We have a number of -- I won't go through each of

4  these, but there's many many cases where estimation has been

5  authorized, and they've been authorized for exactly the reason

6  we're asking for it here.  You know, situations where courts

7  were faced with literally thousands of unliquidated claims and,

8  you know, clear recognition by these courts that liquidation of

9  those claims in the case would cause undue delay.  You see it

10 in G-1, you see it in Federal-Mogul, and most recently, in

11 Bestwall.

12         Next slide, please.

13         I mean estimation has been ordered, you know, I think

14 basically uniformly any time it's been requested in asbestos

15 cases.  Here's a long list on this slide.  There's many others

16 that we could have added.  I mean years ago there was never

17 even any opposition to this, you know, unless there was an

18 agreement when it wasn't asked for.  Now it's become a little

19 more common in the recent cases for the claimants to oppose

20 estimation for basically the reasons you're hearing about it

21 today and reasons personally I haven't fully understood.

22         But from our perspective, we're in a court

23 proceeding.  One of two things need to happen from our

24 perspective.  Either we negotiate an agreement, which we've

25 been trying very very hard to do, or there needs to be a

1   process by which the parties' due process rights are respected

2   and they have an opportunity to have their day in court as to

3   what the aggregate liability is that needs to be addressed in

4   the bankruptcy case.

5           THE COURT:  Now I'm sure you're going to address it.

6           MR. GORDON:  Yeah.

7           THE COURT:  Their -- TCC's contention is that if we

8   were to even go down the path of estimation, it could be part

9   and parcel of a confirmation hearing.

10          MR. GORDON:  Right.

11          THE COURT:  So that we're not ignoring that

12  obligation, but why have two separate lengthy convoluted

13  proceedings.

14          MR. GORDON:  Well, I mean there's a couple of --

15          THE COURT:  Does it work as part of confirmation?

16          MR. GORDON:  Yeah.  I think there's a couple of

17  answers to that.  One is unlike cases where that's been done,

18  this is a case where we've had absolutely no discovery.

19          There's been no proceedings at all with respect to

20  this issue.  And now you're talking about I think under their

21  proposal, given their timeline, compressing all that into a

22  much shorter period of time which to me clearly says we're not

23  going to get PIQ discovery, there won't be time, we're not

24  going to get Trust discovery.

25          And we know that they strongly oppose both of those

1   types of discovery in every case.  So it's a way from our

2   perspective to avoid all of that.  And we think that's

3   definitely a problem.

4          The other issue is that you're putting the cart

5   before the horse in the sense that, as Your Honor knows better

6   than me, a confirmation process is very expensive.  And there's

7   lots of pieces to it.  There's disclosure statement.  There's

8   solicitation.  The noticing anymore by itself costs millions of

9   dollars.  It takes time.

10         And you're basically saying we're going to go through

11  all of that before we have any ability to assess whether or not

12  -- whether there's competing plans or one plan, whether any of

13  these proposals is workable or not.  And you're going to be

14  spending a lot of time focusing on those issues as opposed to

15  actually zeroing in on the issue that makes the difference.  So

16  it's really those two things.

17         So I mean if you're talking about I guess a

18  confirmation process that bakes into it an estimation process

19  that gives us the rights to pursue the discovery that we think

20  we're entitled to, discovery that goes to the merits of the

21  claims, basic information that you would need to assess the

22  merits of the claims, that's potentially doable.

23         But, again, it seems wasteful to do that because you

24  could get to the end of that and then realize we don't have

25  anything that's going to move forward here.  Or the parties may

1  be in a position based on what happens to amend their plans,

2  then you're going to have to re-solicit anyway and kind of

3  start over again with disclosure statement and the process.  So

4  --

5          THE COURT:  But the history of discovery disputes

6  relative to the questionnaires, the --

7          MR. GORDON:  Yeah.

8          THE COURT:  -- the trusts and the payments would seem

9  to disrupt the timeline that you suggest.  It's a timeline that

10 seems dependent upon almost all the parties working in sync.

11 And what is there to suggest that that's going to happen given

12 the ratholes that we've seen in other cases as far as

13 contentious litigation over the questionnaires and the forms

14 and the like?

15         MR. GORDON:  That's a very good question, Your Honor.

16         In some respects, it's a matter of if you take the

17 parties at their word.  I mean what we hear at every single

18 hearing is that this is an emergency, time is of the essence,

19 we have to move, we have to move quickly.  And if that's really

20 what the sentiment is, then we should be able to do that a lot

21 faster.

22         The other thing is if orders get entered, the order

23 should be respected.  And I believe that this Court has the

24 power and the ability to enforce those orders and make these

25 things happen so that we're not in such an intractable delay.

23

1          But I mean having said all that, at the end of the

2 day, I obviously hear you.  I think we tried to be clear that

3 we're assuming that parties are motivated to move quickly, that

4 they're acting in good faith, and that they'll abide by court

5 orders.  And if we're wrong about any one of those three

6 things, then obviously the process could be drawn out.

7          But we do think -- I mean I can't overemphasize from

8 our perspective, the discovery is very important.  It's the

9 information our experts need to do the analysis necessary to

10 present our case.

11          And I think, you know, the question for the Court

12 ultimately will be it's a decision between do you try to

13 abbreviate the schedule in some way that potentially impairs

14 the company's ability to make its case or do you do everything

15 you can to give us the opportunity to provide us with the

16 opportunity to obtain the information we need and then do

17 everything in your power to ensure that the schedule is

18 maintained as best as it can be, because, you know, at the end

19 of the day, to us one of the benefits of estimation is that it

20 imposes a process.

21          I mean Your Honor would be authorizing the

22 estimation, you'd be approving presumably a case management

23 order that sets all the deadlines that sets the process.  And,

24 you know, we believe that you have a significant ability to

25 influence the course of events and hopefully to make that

24

1    process run on time.

2              Did I answer your question?

3              THE COURT:  Yes.  Thank you.

4              MR. GORDON:  Thank you.  Next slide, please.

5              This is kind of an obvious slide here, Your Honor.

6    Obviously, given the number of claims we have, it would be

7    literally impossible to have any kind of allowance process with

8    respect to the claims.

9              Next slide, please.

10             All right.  Next.

11             I mean some of this, you know, these issue have been

12   kicking around for a long time.  I mean this comes -- slide

13   comes out of the A.H. Robins case back in 1986.  And here where

14   the Court said:

15             "The interest of all the claimants and the public

16             interest in a reasonable and fair reorganization

17             combine in favor of an effort at an estimation of the

18             Dalkon Shield claims as a basis for formulating a

19             plan and as a possible step in working out a

20             mechanism acceptable to all the claimants for a

21             dispute resolution of their claims without burdening

22             the estate with a tremendous expense of endless

23             litigation."

24             So, you know, this concept of estimation, which

25   really until recently has been relatively routine, goes back a

25

1   long time in mass tort claims, and I think for good reason.

2            Next slide, please.

3            You know, there's been disagreement with the TCC

4   about the impact of estimation, but we think the track record's

5   very clear on this.  And it's just demonstrated by some of the

6   cases that we have up on the slide here.

7            The G-1 case, there was an agreement reached before

8   the estimation hearing was completed.

9            Grace, the agreement was reached shortly before the

10  estimation hearing.

11           USG, agreement was reached after the court-ordered

12  estimation.

13           Garlock, agreement reached after the court had issued

14  an estimation decision.

15           And then Specialty Products, the same thing.

16           And both Garlock and Specialty Products which filed

17  around the same time had a similar experience in the sense that

18  the cases were making no progress or very little progress, the

19  claimants were repeatedly telling the court they would never

20  reach an agreement.  And ultimately, in both cases the courts

21  approved estimation and the estimation ultimately, you know, in

22  our view, and I think it's born out by the record, was the key

23  factor in getting the parties to a settlement.

24           And it's interesting to me that in Specialty

25  Products, the court ultimately or the parties ultimately

1  settled at an amount below the estimation amount.  And in

2  <u>Garlock</u>, it was the opposite, the parties ultimately settled in

3  an amount that was above.  But if you look at the record in

4  both cases, the estimation was key to assisting the parties in

5  getting to an agreement.

6          Next slide, please.

7          Now it's interesting there are a couple of cases that

8  we found where courts did employ an estimation in connection

9  with mediation.  And here, you can see in this <u>Mona Lisa</u> case,

10  the court said, In these adversary proceedings, mediation

11  followed by an estimation is the most efficient and economical

12  method to liquidate the claims and proceed toward confirmation.

13          And next slide, please.

14          It's a similar sentiment in the next case.  This

15  <u>North American Health Care</u> case, It would take years to

16  liquidate, if relief from stay were granted in the state and

17  federal court actions by the tort claimants against the debtors

18  proceeded in their ordinary course, the court agrees that

19  estimation is not simply optional in this case, that it's

20  required.  And there, there was a two-step mediation estimation

21  process.

22          Next slide, please.

23          So we see a number of benefits in proceeding with an

24  estimation.  It will enable the parties to gather information

25  that they need to make their cases.  It will allow them to

27

1  better understand and evaluate the strength of their own case

2  and the cases of others.  It will require the parties, as I

3  said before, to support their position, and they have to do so

4  within a timeline that's been set by the Court.  It would allow

5  the parties to understand realistic bookend, supported bookends

6  for the liability, within which a settlement may be possible.

7          In this case, it would also allow the parties to

8  better assess amounts that have already been discussed in the

9  mediation to date.  And then, with what we're proposing, it

10 would provide the parties with the benefit of the views of

11 independent experts and then ultimately, if we get that far,

12 with the Court's impartial views about an estimation of the

13 liability.

14          And then it would also provide the claimants and the

15 Court with information necessary to evaluate any plan.  So,

16 again, it's important for the claimants because they ultimately

17 are the ones that would have to vote on any plan proposal.

18          Next slide, please.

19          Now there's lots of things that the other side has

20 been saying about our proposal, which frankly they just miss

21 the mark.  We have not proposed that the estimation would set

22 the amounts of the distributions.  I think we've been very

23 clear about that.  We have not said that the estimation would

24 be used to set a hard cap on the amount of trust funding.

25          What we're proposing doesn't violate anyone's

1  constitutional rights.  It preserves all due process rights to

2  address the issue that's key to resolving this case.  And

3  they've also argued that our approach will cause significant

4  delay.

5          And, you know, obviously, what we're outlining is a

6  process that we think will take a year and, obviously, I hear

7  what Your Honor is saying about a concern that we may have --

8  it may be prolonged based on discovery fights.  But I think

9  what's important not to lose track of is we've tried to

10 carefully design the process in a way that would facilitate

11 settlement at virtually every step, including as early as the

12 fall of this year.

13         And so the real purpose of this, it's not to set hard

14 caps, it's not to file a cramdown plan, which I guess is what's

15 been suggested.  But instead, it's to drive a successful

16 mediation.  It's to drive a consensual resolution.  And I think

17 everyone in the courtroom should be able to agree that that's

18 the result that's in the best interest of all parties and

19 particularly the claimants.

20         Next slide, please.

21         Next.

22         So here, just a few points on this slide and talking

23 about our process.  Again, we think it's one that the way it's

24 designed would move quickly, you know, particularly, on the

25 medical and science side.

1          There's been arguments made that we're just trying to

2    re-litigate Judge Wolfson's Daubert ruling.  That's not true.

3    And one of the things that's important to recognize, and I

4    think the other side acknowledged it in their reply brief, is

5    there's been significant developments we believe in the

6    scientific world since the evidence that was presented to Judge

7    Wolfson.  And I think that evidence -- I won't get the date

8    right, it either dates back to 2020 or 2019.  Obviously, the

9    ruling was later than that, but the evidence, we're talking

10   about at least a couple of years or longer of developments.

11         But the other point is, and you'll see this in

12   upcoming slides, we're not asking for like -- this wouldn't be

13   asking for an up or down ruling on whether, you know, the

14   science shows this or science shows that.

15         But what it will do is it will put the Court in a

16   position and the independent experts in a position to determine

17   whether these claims are strong or weak or somewhere in

18   between, which is, you know, very important information that

19   Your Honor would need, the experts would need to evaluate

20   ultimately what the estimation should look like because if the

21   view based on the medical science -- and that's what informs

22   these claims -- is that the claims are weak, then you would

23   expect the quantification would be on the low side.

24         On the other hand, if you think there's a strong

25   relationship between the use of these products and causation of

1   this disease, which we don't think the evidence will show, then

2   you would come up with a higher estimation.  But in any event,

3   the issue to us is very different than what Judge Wolfson was

4   dealing with in the Daubert -- in her Daubert ruling.  And,

5   again, lots of developments have occurred since the evidence

6   was presented in connection with that.

7           And, again, I think phase two, I've covered all of

8   this.  In both cases, subject matter expert assistance to help

9   out with the process and to also help the parties settle.

10          Next slide, please.

11          And, again, I think I've largely covered this on the

12  overview of the expert process.  We did plug in some dates here

13  just to give you a sense for how this works.  So in that first

14  stage, that preliminary positions on both medical science and

15  quantification, that does happen so that that occurs in the

16  fall, there would be actually feedback provided in the fourth

17  quarter of this year, which is not that far away.

18          And then you can see phases two and three, we're

19  moving then into the second quarter of 2023.  So, you know,

20  this is something on the phasing process with the experts,

21  their actual assistance in trying to help the parties get to a

22  deal.  This would occur very very quickly.  All three stages,

23  frankly, would move pretty rapidly.

24          Next slide, please.

25          This slide is intended, Your Honor, just to reinforce

31

1  the point the discovery we're seeking really is critical.  And,

2  again, I understand Your Honor's concern about the discovery,

3  but the question ultimately of estimating this liability goes

4  to the merits.

5          And the other side in these cases takes the position

6  essentially that the merits are irrelevant.  I don't know what

7  their approach will be exactly in this case, but in other

8  cases, their position has been merits are irrelevant, all you

9  need to do is take a look at what settlements have been paid

10  and extrapolate from those.

11         And the problem with that, of course, is that because

12  there's so many of these cases, most companies don't have the

13  ability to litigate each and everyone one and so they settle

14  many many cases just to avoid or reduce defense costs.  Well,

15  that doesn't have anything to do with liability.  And then, you

16  know, we've learned from other cases that settlement were

17  reached based on an absence of key evidence, evidence that was

18  withheld by the plaintiffs in many cases.  And we've seen this

19  in the asbestos side and the mesothelioma cases.

20         And one of the primary reasons to get the Trust

21  discovery, particularly with respect to the meso claims is to

22  determine whether that happened here.  And that to us is

23  extremely important evidence in the event that the other side

24  would come in here and say all you need to do is use the

25  company's settlement history and extrapolate, and that's how

1  you determine the liability.

2         To us, that's problematic for a lot of reasons, but

3  it's particularly problematic if in fact there is evidence

4  which has been shown ==in other cases that those settlement were==

5  ==made within complete information because evidence was withheld.==

6         THE COURT:  Just a question.

7         MR. GORDON:  Yeah.

8         THE COURT:  It actually goes to the other issues, the

9  extension of the preliminary injunction, the stay relief.  But

10 the new data available according to Johnson & Johnson and the

11 debtor --

12 (Phone ringing)

13        THE COURT:  All right, we've had -- my phone's gone

14 off.  We've had a few phones.  By now, everybody should know to

15 take their phones off.  All right.

16        But if we were -- if I were to release some or all of

17 the dozen identified cases, does that new science come into

18 play or is that -- given that discovery's already been fixed,

19 they were trial ready.  Do those reflect any of the new science

20 as proffered by the debtor?

21        MR. GORDON:  You know, that's a specific question.

22        THE COURT:  And maybe you need to --

23        MR. GORDON:  Yeah, I might need to consult on that.

24        THE COURT:  But when we get to the other issues --

25        MR. GORDON:  Okay.

96

1 anything above zero is overpaying.

2          I think if you peel it back, what the debtor is

3 really saying is, is we want you, Judge, to agree that we owe

4 nothing and so we would like to do a year-long estimation

5 process so we can convince you of the science and get you to

6 say we owe nothing.  And they're viewing it as really as a

7 mediation tool.  And, you know, echoing Mr. Molton's comments,

8 I don't think that's an appropriate use of estimation and I

9 don't think it's a path to anywhere in this case.

10          Anyway, thank you, Your Honor.  I appreciate the

11 opportunity to participate by Zoom.

12          THE COURT:  Thank you, Mr. Pfister.  And I hope you

13 get better --

14          MR. PFISTER:  Thank you.

15          THE COURT:  -- and look forward to seeing you on this

16 coast.

17          Anyone else wish to be heard?  Don't feel compelled.

18                    (Laughter)

19          THE COURT:  All right.  Mr. Gordon, did you want to

20 respond?

21          MR. GORDON:  I do, Your Honor.  I can be relatively

22 brief I think.

23          Just starting with a point that Mr. Pfister made and

24 others, there seems to be a number of efforts to try to paint

25 us as changing positions.  And I don't think, Your Honor, that

97

1  we've changed positions on anything.  Mr. Pfister suggests that

2  today, we're now arguing that J&J's consent is required for

3  plan confirmation.  I did not make that argument.

4        The point I was making is that we're in a judicial

5  proceeding.  We believe, like the claimants, that we have

6  rights to be heard, that we have due process rights to make our

7  case and it was unimaginable to me that we could have a

8  situation where a plan gets approved based on the claimants

9  agreeing to their own demands or we don't have a full right to

10  be heard in terms of what the results of that settlement with

11  themselves are and without a right to fully defend ourselves.

12  So there's no change in position.

13        Also Mr. Pfister said that in his view, this case is

14  unique because this company has been telling this Court from

15  the beginning that it owes nothing.  And we do believe we owe

16  nothing.  If the merits are properly examined with all the

17  facts, we do believe that's the case.  I can tell Your Honor

18  that many companies have gone into asbestos cases making the

19  exact same argument.  It was made in Garlock.  It was made in

20  Bondex.  That was the view in Kaiser Gypsum.  There, the

21  arguments were different.  It was based on the fact that the

22  products at issue had chrysotile asbestos not anthophyl, that

23  the exposures would not -- that that's a less toxic asbestos,

24  that the exposures were not sufficient to cause disease and no

25  liability.  So I just want to say there's nothing unique.

1           But there's a suggestion embedded in what he said

2    which is a suggestion that we're not even proceeding in good

3    faith in this case, that we're not negotiating in good faith,

4    and I assure Your Honor that the debtor and J&J have taken the

5    mediation very seriously.  Significant offers have been made

6    and to imply that maybe there's an unwillingness to make any

7    kind of material offer to resolve this case and move on and be

8    done with it, that's completely incorrect.

9           As to the U.S. Trustee's comments about the Rule 706

10   expert, all I would say there is we gave a lot of thought to

11   those issues as well, did research.  Knowing Your Honor, I know

12   you did too.  And I would say a couple things, and I was remiss

13   probably in not saying something before.  The reason we propose

14   two experts is because we can't envision anyone, any single

15   person, who would have the requisite expertise to address both

16   science issues, medical science issues, and economic issues.

17          We can envision that there are people who have the

18   expertise to advise on all the medical science issues and then

19   on all the economic issues.  So I did want to be clear.  I

20   don't think I said it before.  That's the reason we thought

21   that two were necessary.  We just racked our brains and we just

22   couldn't think of a single individual or type of individual who

23   would provide the expertise across the spectrum of issues who

24   would have to be considered.

25          But with respect to the U.S. Trustee's point

1  specifically, she's right that we found as well there's sort of

2  a pure 706 expert, which is more like an expert witness who

3  writes reports can be cross-examined.  And then the other

4  concept we found was a technical advisor serving more in the

5  role of a technical advisor.  And that seemed to us what Your

6  Honor was thinking about here.  We don't know exactly what Your

7  Honor was thinking about, but at least I think when we were

8  laying out our proposal, that's the way we were thinking about,

9  somebody who could provide technical, scientific, or economic

10 advice to the Court on issues that, you know, are pretty, you

11 know, are pretty complex and not easy to understand for, you

12 know, someone who's not immersed in those issues day-to-day.

13         So we think there is plenty of authority for that.

14 And that would be someone that wouldn't be an expert report,

15 per se, or there wouldn't be cross-examination, per se.  But

16 admittedly, we've seen two different approaches adopted by

17 courts and we don't see either of them falling in the category

18 of a special master.  That's not what we were seeing here.  A

19 special master to us is where the court's basically delegating

20 responsibility to make a decision or recommend a decision.  We

21 didn't see it that way.  We saw it more in terms of providing

22 needed advice to the Court and assessing the issues that would

23 be presented by the experts in the case.

24         Mr. Thompson, the one thing -- I mean, obviously,

25 he's made very clear and his firm has made very clear, they are

1  opposed to the bankruptcy period.  They're opposed to every

2  bankruptcy.  They want to litigate every one of their cases and

3  they argue that every single one of their claimants would

4  rather proceed in court than accept a fixed payout under a

5  plan.  But at the same time, he has to concede he hasn't seen

6  any plan.  He doesn't know what values might be offered.  So to

7  me, I don't think we can put much stock in a position like that

8  where a party's telling you that no agreement would be

9  acceptable.  We don't care about the aggregate value.  Well, of

10  course, they don't care about the aggregate value.  They want

11  to know what the claim values are.

12         But he did attempt, and we've seen this multiple

13  times, to distinguish the Paddock case.  And he said that

14  company was in distress.  That's different.  Well, that

15  company's equity was preserved.  He also said that there was no

16  PI in that case.  That's a totally different case.  Well, there

17  was no PI in that case because there was no litigation in that

18  case.  All their claims were handled under administrative

19  settlement.  So that's just not a fair way to distinguish

20  Paddock.  And of course Paddock, although a Texas divisional

21  merger wasn't utilized, the equivalent type transaction was

22  done in that case and there was a funding agreement and that

23  sort of thing.

24         Ms. Jones, again, in another effort to paint us as

25  changing our position, said that what she heard today was very

1  troubling because that was contrary to our assertion that we

2  were intending to fund claims in full.  And she was basically

3  suggesting that because we're not, at this point, supportive of

4  a pay-as-you-go plan that that's a change in position.  That's

5  no change in position.  All the parties know that.  We've been

6  very clear from day one in this case that we want a global

7  permanent resolution of this liability.  We want to fund the

8  liability and we want to be done with the liability.

9          And, obviously, what's being proposed by way of cram

10  down is a plan that wouldn't do that.  It basically takes off

11  the table immediately what our objective is in this case.  So

12  that is not a change in position.  The reason we want to focus

13  on the aggregate liability is we want to pay a funding amount

14  that's acceptable to the parties and we want to be done.

15  There's no surprise in that.  There's no change in position.

16          There's also been a lot said by, I think

17  Mr. Satterley made a comment, Mr. Molton made a comment, about

18  the PIQ discovery and the trust discovery.  And, again, we hear

19  this in every case.  I think Mr. Satterley said we don't need

20  the information.  We already have the information.

21          Well, we don't have the information.  I put up the

22  statistics from the other cases to show you that those

23  companies didn't have the information either.  And it's always

24  been beyond me why there's so much opposition to discovery

25  that's intended just to seek the basic information that any

1  court would want to assess the validity of these claims.  Why

2  is there such opposition to that?  Why don't they want to tell

3  us from whom else they're seeking recoveries?  Why don't they

4  want to tell us what other recoveries they've gotten in the

5  same claims?

6        On the trust discovery, why don't they want us to

7  know that they're seeking recoveries from other trusts with

8  respect to the same claims?  That's all we're asking.  We want

9  to know.  These are claims that there's either several

10 liability or joint and several liability.  Aren't we entitled

11 to know whether or not they've actually recovered on those

12 claims already or they're asserting somewhere else that they've

13 been exposed to other companies' products.

14        This was a gigantic battle in the Garlock case and

15 Judge Hodges ultimately said, I think some discovery is

16 permitted.  And I know you've read his opinion.  At the end of

17 the day, he said, look, I limited your discovery, but I looked

18 at 15 cases and in every single one of the case, it was clearly

19 established that the plaintiffs suppressed evidence of having

20 submitted trust claims, that they told the company one thing,

21 I've only been exposed to your product or maybe a couple, but

22 at the same time, they were going to other courts going to

23 trust and saying, I've been exposed to 15 other products or 20.

24 And that was enough for him to say, I don't accept any

25 estimation based on settlements because I don't need to see any

1    more.  If it happened in 15 out of 15, that's enough for me.

2          So that's a long way of saying, Your Honor, that,

3    again, the opposition, I guess, is not surprising based on what

4    we've seen in other cases, but the PIQ, that's very basic

5    discovery about the merits of the claims and trust discovery is

6    very key with respect to alternative exposures.  And remember

7    that the trust discovery is pursued against trusts who all have

8    electronic databases.  It takes them a push of the button to

9    spit that data out to provide it.  There's no burden.  The

10   companies typically offer to pay the costs.  That should not be

11   a problem.

12         Mr. Satterley just misspoke on one point I'll comment

13   on.  He criticized us for proposing that the medical science

14   hearings would be one day.  I mean, our proposal was actually

15   four days for ovarian, three days from mesothelioma, and

16   obviously, that's a proposal we're making.  We think, based on

17   what we know and our experience in the tort system, that would

18   be sufficient.  But we're not saying that it's four and three

19   and that's it, we're not willing to talk about that.

20         I thought you asked an interesting question of

21   Mr. Molton about the value of the insurance and what you would

22   do with that at confirmation.  And his answer, I thought, which

23   I think was the right answer was, well, you're going to have to

24   do an aggregate liability determination at least to show that

25   the liability exceeds one to two billion or three billion.  I

1   wish it had succeeded by now.  It hasn't happened for reasons

2   that are bothersome to us, but it is what it is.   But we're

3   trying to come up with other ways to focus the parties in the

4   right way and to put them in a position to settle this sooner

5   rather than later.

6          So I guess in the end, Your Honor, I would just say

7   this.  All I hear and all I've heard from these counsel, one by

8   one, is that we have a veto right, we can do what we want.  We

9   make the demand.  We decide.  It's irrelevant what the debtor

10  thinks.  It's irrelevant what J&J thinks.  And, frankly,

11  they're trying to put you, I believe, in a position where it's

12  very difficult for you to determine whether what they decide

13  for themselves works for them is actually fair and appropriate.

14          We're in a court process to try to fairly resolve

15  this liability.   And, you know, we believe that we have rights

16  that we're entitled to to protect our interests in that

17  respect.  And I would just ask Your Honor to take those

18  comments for what they are.  I've heard them in every single

19  case.  We will never agree.  We will never accept anything less

20  than what we demand.  Anything we say goes.  Anything we say

21  will be accepted by the claimants.

22          Well, my answer to that is we have a court process.

23  This Court is here to find the truth and to do justice and

24  that's what we're asking this Court to do.

25          THE COURT:  Thank you, Mr. Gordon.

1            MR. GORDON:  Thank you.

2            MR. MOLTON:  Judge, just one point and I'm not

3   going --

4            THE COURT:  Sure.

5            MR. MOLTON:  -- to reply to anything.  You know, we

6   are also cognizant we're here in a court process and we're

7   looking for justice too.  I just need to say something because

8   this isn't the first time it's happened.

9            We heard Mr. Gordon lecture the plaintiff lawyers

10  hear about adherence to Court orders.  We have a mediation

11  order that talks about confidentiality and I've heard just now

12  from Mr. Gordon what I consider to be a breach of that order in

13  terms of talking about whatever offers have been made there and

14  characterizing them.

15           Put it this way, I'm not going to respond to it.  I'm

16  going to adhere to the mediation order which I think we all

17  need to do.  And, again, this isn't the first time.  But be

18  advised, Your Honor, we dispute every, every characterization

19  that was made in front of Your Honor right now on that issue.

20           THE COURT:  All right.  Thank you, Mr. Molton.

21           To quote my favorite auctioneer, are we done?

22           I think we are for now.  Let's try to return about by

23  1:30 and we'll get started again.

24           Thank you.

25           (Recess at 12:46 p.m./Reconvened at 1:40 p.m.)

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . | Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtor. | . | |
| . . . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092 (MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT and | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Tuesday, May 9, 2023 |
| Defendants. | . | 1:00 p.m. |
| . . . . . . . . . . . . . . . | | |

TRANSCRIPT OF HEARING ON STATUS CONFERENCE REGARDING
MOTIONS TO DISMISS THE CHAPTER 11 CASE [DKTS. 286, 335, 346,
350, 352, 358, 379, 384] AND OBJECTIONS THERETO; AND
REQUEST OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS FOR ORDER
CERTIFYING DIRECT APPEAL OF PRELIMINARY INJUNCTION ORDER OF
APRIL 20, 2023 TO THE UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT [ADV. DKT. 84] AND OBJECTIONS THERETO; AND
PAUL CROUCH MOTION AND JOINDER FOR AN ORDER CERTIFYING DIRECT
APPEAL OF PRELIMINARY INJUNCTION ORDER OF APRIL 20, 2023 TO THE
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT  [ADV.
DKT. 89] AND OBJECTIONS THERETO; AND
MOTION OF AD HOC COMMITTEE OF SUPPORTING COUNSEL TO INTERVENE
[ADV. DKT. 104] AND OBJECTIONS THERETO

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:              Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES:

For the Debtor:              Jones Day
                            By:  GREGORY M. GORDON, ESQ.
                                 DAN B. PRIETO, ESQ.
                                 AMANDA S. RUSH, ESQ.
                            2727 North Harwood Street, Suite 500
                            Dallas, TX 75201

                            Skadden Arps Slate Meagher &
                              Flom, LLP
                            By:  ALLISON M. BROWN, ESQ.
                            One Manhattan West
                            New York, NY 10001


For Ad Hoc Committee         Genova Burns LLC
of Certain Talc              By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc         494 Broad Street
Committee of Creditors:      Newark, NJ 07102

                            Brown Rudnick LLP
                            By:  JEFFREY L. JONAS, ESQ.
                                 DAVID J. MOLTON, ESQ.
                                 MICHAEL WINOGRAD, ESQ.
                            7 Times Square
                            New York, NY 10036

                            Brown Rudnick LLP
                            By:  SUNNI BEVILLE, ESQ.
                            One Financial Center
                            Boston, MA 02111

                            Otterbourg PC
                            By:  MELANIE CYGANOWSKI, ESQ.
                            230 Park Avenue
                            New York, NY 10169


For the Office of the        Office of the United States Trustee
United States Trustee:       By:  LINDA RICHENDERFER, ESQ.
                                 JEFF SPONDER, ESQ.
                                 LAURA DAVIS JONES, ESQ.
                            J. Caleb Boggs Federal Building
                            844 King Street, Suite 2207
                            Lockbox 35
                            Wilmington, DE 19801

1 claimants, then before they are permitted to intervene, they

2 have to get consent of their claimants to take the positions

3 that they're taking and have the claimants be a part of the

4 process, be part of the decision making, and sign on to the

5 positions that are being taken.

6        Ms. Cyganowski was absolutely correct.  The TCC is

7 often used as an example of a minority of claimants.  We are a

8 fiduciary, Your Honor, for all talc claimants.  We are a

9 committee comprised of members that participate and input all

10 of the decision-making of the Committee.  And the point, Your

11 Honor, here is the other claimants should be afforded the same

12 opportunity.  Thank you.

13        THE COURT:  Thank you, Counsel.

14        MS. BEVILLE:  One other note, Your Honor, just on the

15 Rule 2019, it has been filed but it was filed in redacted

16 process.  I know counsel indicated he would work with the

17 parties, but the TCC does request an unredacted copy.  Thank

18 you.

19        THE COURT:  That's fine.  Thank you.

20        Mr. Birchfield, you've been trying.  Come on up.

21        MR. BIRCHFIELD:  Good afternoon, Your Honor.

22        THE COURT:  Good afternoon.

23        Andy Birchfield, Beasley Allen, on behalf of Alishia

24 Landrum.  And my purpose is to address the narrative of the Ad

25 Hoc Committee of Counsel, the narrative that is the foundation

of its motion to intervene.  That narrative is that the Ad Hoc

Committee of Law Firms represent a vast majority of talc

claimants, and it seeks to intervene in order to serve as a

counterweight to the loud minority of the TCC and to maximize

the Ad Hoc Committee's constituents' recovery by supporting the

debtor's plan of reorganization.

         This narrative raises two important and troubling

questions.  The first question is if this group represents the

majority of talc claimants, what is the definition of talc

claimants that's being used.  And the second question is

according to the terms of the agreement that this group

contends maximizes recovery, what would the talc claimants

receive.

         So for the first question, what is the definition of

talc claimants, one definition, the definition that is used and

has been used by the TCC and its members is based on the

evidence and the science that has been guided by years of

litigation; years of litigation in state courts, litigation in

federal court here, the MDL court, that has been guided through

an extensive Daubert process hearings, experts, and a Daubert

decision by Judge Wolfson.

         That is the basis of the definition of talc claims

that focuses on the types of injuries that are supported both

by the evidence and the science.  Those injuries are epithelial

ovarian cancer with specific subtypes and mesothelioma.

1          This Court in appointing in its order appointing Mr.

2    Ken Feinberg as a Rule 706 expert followed this definition

3    without objection from LTL.  The Court ordered Mr. Feinberg to

4    estimate the value and the volume of ovarian cancer claims and

5    mesothelioma claims, not uterine cancer claims or vaginal

6    cancer claims or cervical cancer claims.  Not the whole host of

7    additional claims that would be covered under this new

8    definition of gynecological cancers.

9          This new and expensive definition that is outlined in

10   the debtor's plan, the plan support agreement, and that the

11   members of the Ad Hoc Committee are -- they're contractually

12   bound to accept this definition.  This would be counter to the

13   definition that was employed in LTL1.  It would be counter to

14   what the Court ordered Mr. Feinberg to investigate and to

15   estimate.

16         Your Honor, for years, leadership law firms, law

17   firms that have been litigating in state courts, the MDL

18   leadership that has operated here in this courthouse, they have

19   been guided by what the evidence and the science supports and

20   they have been advising, they have been counseling law firms

21   across the country about what types of claims are supported.

22   And law firms have -- many law firms have followed that

23   guidance.

24         If the debtor and the Ad Hoc Committee of Supporting

25   Counsel, if their agreement were implemented, if their

1  agreement were implemented and this new definition were

2  applied, a definition that is untethered, untethered to support

3  from the evidence and the science, the floodgates would be

4  flung open wide.

5          If the floodgates are opened, then who could say what

6  the denominator would be, who could say what it would require

7  to have a majority, much less a super majority?  The overly

8  broad definition is an effort to distort the voting power, the

9  voting power of the real victims here.  So the first question,

10  what is the definition that's being used, that's a troubling

11  question.

12          The second question is what has the Ad Hoc Committee

13  law firms agreed to?  What are the terms that they have agreed

14  to that purportedly maximizes value for its constituents?  Your

15  Honor, if we could take -- I want to take just a quick look for

16  just a moment --

17          THE COURT:  Sure.

18          MR. BIRCHFIELD:  -- at the plan support agreement.

19          THE COURT:  But I have a question for you --

20          MR. BIRCHFIELD:  Yes, sir.

21          THE COURT:  -- while you pull it up.  So what do you

22  -- what role do you see for claimants who are victims of --

23  alleged victims of other types of cancer that they ascribe to

24  talc in this case?  Are they claimants?

25          MR. BIRCHFIELD:  Your Honor, I would say that they

1  would not be claimants.  The tort system, the civil justice

2  system has mechanisms for addressing that.  I mean if we --

3          THE COURT:  But under the very broadest definition

4  under the Bankruptcy Code, it would be a claim, so -- and I'm

5  asking this because we haven't discussed this --

6          MR. BIRCHFIELD:  Right.

7          THE COURT:  -- in detail.

8          MR. BIRCHFIELD:  And it would be a very difficult

9  question to grapple with if we were dealing with a debtor in

10 financial distress.  Here we have a debtor that could choose,

11 and I would urge they do pay.  If they want to pay all of the

12 claims that the Ad Hoc Committee represents, J&J can do that.

13 J&J is not a debtor.  J&J can agree to enter into settlement

14 agreements with the Ad Hoc Committees on the terms that they

15 have here.

16          But if you were dealing with -- to address your

17 question, if you were dealing with a debtor that was in

18 financial distress, then you would have to weigh, I believe the

19 Court would have to weigh what are the claims that are

20 supported by the evidence and the science and the ones that are

21 not.  You would have to vet those.

22          THE COURT:  I guess --

23          MR. BIRCHFIELD:  And the tort system has done that.

24          THE COURT:  One would think that the plan could

25 address that just by ascribing a different value or potential

1  compensation scheme for -- depending upon the injury and the

2  nature of the cancer.

3          MR. BIRCHFIELD:  Your Honor, not with what's been

4  proposed here.  Not what's been put forward by the Ad Hoc

5  Committee.  Then it would come -- it comes back to the

6  foundational question of whether there is jurisdiction here,

7  whether there's financial distress or not.

8          Theoretically, Your Honor, if you were dealing with a

9  company in financial distress, I'm not trying to avoid the

10 issue.

11         THE COURT:  No, I understand.

12         MR. BIRCHFIELD:  There would be ways that that could

13 be addressed.  It would be addressed by following what has been

14 -- what has played out in the tort system over the following

15 years.

16         THE COURT:  Just one second.  Mr. Gordon?

17         MR. GORDON:  I'm sorry to interrupt.  I need to

18 interpose an objection.  He's about to put up on the screen

19 because we just saw it the exhibit to the term sheet that we

20 maintain is confidential.  It's subject to confidentiality.

21 The issue of its confidentiality is set for hearing on May

22 16th, and we object to this being shown publicly.

23         MR. BIRCHFIELD:  Your Honor, I did not intend.  I did

24 not intend.  I had two slides in here.  The only slides that I

25 have are from the plan support agreement that are not

1  allowing them to be a party in these proceedings just gives LTL

2  a second seat at the table, and that's inappropriate and we

3  urge you to deny the motion, Your Honor.

4          THE COURT:  Thank you.

5          MR. BIRCHFIELD:  Thank you.

6          THE COURT:  Ms. Beville?

7          MS. BEVILLE:  Your Honor, if I may, I just want to

8  address the question that you asked about whether claimants

9  with different types of cancer that have been litigated

10  already, would they have a claim in the bankruptcy.  I think,

11  Your Honor, you're right they would have a right to file a

12  claim.  Claims are broadly defined and can include any

13  potential right to payment.

14          But you put your finger on the very issue, Your

15  Honor, is those claims may not be compensable either under the

16  plan or under trust distribution procedures.  If we got to a

17  point where we were actually voting on a plan, they may be

18  either separately classified or allowed for zero dollars for

19  voting purposes.  There's a lot of ways that those claims could

20  be treated.

21          One of the concerns we have is this conflation of all

22  claims being put in one pot and potentially sharing a pot of

23  money pro rata not depending on the legitimacy of the claims

24  that are being reported.  So you may have a claim, but it may

25  not be a compensable claim.

42

1           THE COURT:  All right.  Thank you.

2           Mr. Thompson?

3           MR. THOMPSON:  Thank you.   Your Honor, I'll be

4   brief.  I've tried to limit what I was going to say based on

5   what's already been said.

6           In response to your question, who decides what a

7   valid claim is, that's a great question and it's one that

8   respectfully you don't have subject matter jurisdiction to

9   decide because this is a bad-faith bankruptcy.  And so what we

10  see here are claims, what LTL has done is they've broadened the

11  creditor class beyond what was being litigated in the tort

12  system.  They've broadened it to include claims that are not

13  supported, that did not clear the Daubert challenges just to

14  get the votes.

15          They're doing all this just to get the votes.

16  They're creating creditors that they don't have to pay anything

17  to out of bankruptcy.  Tens of thousands of these gynecological

18  cancers that don't have a scientific connection to talc, they

19  are willing to pay those people who are owed -- if they exist,

20  that are owed nothing in the tort system.  The gate is the --

21  the challenge is to enter -- who decides what is a good case,

22  well, the tort system does and that limits the types of claims

23  that are filed.

24          I have a large firm.  We are retained by about 350

25  mesothelioma victims a year.  We only sued J&J probably 35 to