# **EXHIBIT A**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE DISTRICT OF NEW JERSEY

IN RE:                              .      Case No. 23-12825(MBK)
                                    .
LTL MANAGEMENT LLC,                 .
                                    .      U.S. Courthouse
          Debtor.                   .      402 East State Street
                                    .      Trenton, NJ 08608
. . . . . . . . . . . . . . . . .   .
                                    .
LTL MANAGEMENT LLC,                 .      Adv. No. 23-01092(MBK)
                                    .
          Plaintiff,                .
                                    .
    v.                              .
                                    .
THOSE PARTIES LISTED ON             .
APPENDIX A TO COMPLAINT AND         .
JOHN AND JANE DOES 1-1000,          .
                                    .
          Defendants.               .      Tuesday, April 18, 2023
. . . . . . . . . . . . . . . . .          10:00 a.m.
```

TRANSCRIPT OF HEARING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
PROCEDURE 4001(a)(3) [DOCKET 71]; AND DEBTOR'S MOTION FOR AN
ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
SERVICE PROCEDURES MOTION
**BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                            Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail: jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By: GREGORY M. GORDON, ESQ.<br>    DAN B. PRIETO, ESQ.<br>    AMANDA S. RUSH, ESQ.<br>2727 North Harwood Street, Suite 500<br>Dallas, TX  75201 |
| | Skadden Arps Slate Meagher &<br>  Flom, LLP<br>By: ALLISON M. BROWN, ESQ.<br>One Manhattan West<br>New York, NY  10001 |
| Various Talc Personal<br>Injury Claimants: | Watts Guerra LLP<br>By: MIKAL C. WATTS, ESQ.<br>5726 W. Hausman Road, Suite 119<br>San Antonio, TX  78249 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Genova Burns LLC<br>By: DANIEL M. STOLZ, ESQ.<br>494 Broad Street<br>Newark, NJ  07102 |
| | Brown Rudnick<br>By: JEFFREY L. JONAS, ESQ.<br>    DAVID J. MOLTON, ESQ.<br>    MICHAEL WINOGRAD, ESQ.<br>7 Times Square<br>New York, NY  10036 |
| | Otterbourg PC<br>By: MELANIE CYGANOWSKI, ESQ.<br>230 Park Avenue<br>New York, NY  10169-0075 |
| For Anthony Hernandez<br>Valadez: | Kazan McClain Satterley & Greenwood<br>By: JOSEPH SATTERLEY, ESQ.<br>55 Harrison St. Suite 400<br>Oakland, CA  94607 |
| For the Office of the<br>United States Trustee: | Office of the United States Trustee<br>By: LINDA RICHENDERFER, ESQ.<br>    JEFF SPONDER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |

```
APPEARANCES CONT'D:

For Various Talc          Maune Raichle Hartley Frency &
Claimants:                  Mudd, LLC
                          By:  CLAYTON L. THOMPSON, ESQ.
                          150 West 30th Street, Suite 201
                          New York, NY 10001

                          Levy Konigsberg, LLP
                          By:  JEROME H. BLOCK, ESQ.
                               MOSHE MAIMON, ESQ.
                          101 Grovers Mill Road, Suite 105
                          Lawrence Township, NJ  08648

                          Simon Greenstone Panatier, PC
                          By:  LEAH CYLIA KAGAN, ESQ.
                          1201 Elm Street, Suite 3400
                          Dallas, TX  75720

For Claimant Alishia      Beasley Allen
Landrum:                  By:  ANDY BIRCHFIELD, ESQ.
                          218 Commerce Street
                          Montgomery, AL  36104

For Arnold & Itkin:       Pachulski Stang Ziehl & Jones LLP
                          By:  LAURA DAVIS JONES, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE 19801

For Paul Crouch,          Ruckdeschel Law Firm, LLC
individually and on       By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of       8357 Main Street
Cynthia Lorraine Crouch:  Ellicott City, MD 21043

For the Ad Hoc Committee  Womble Bond Dickinson
of Attorney Generals:     BY:  ERICKA JOHNSON, ESQ.
                          1313 North Market Street
                          Suite 1200
                          Wilmington, DE, US 19801


                         - - - - -
```

# **INDEX**

**WITNESSES**

**FOR THE PLAINTIFF:**

**PAGE**

JOHN KIM

  Cross-Examination by Mr. Jonas                42

  Cross-Examination by Mr. Satterly             98

  Cross-Examination by Mr. Maimon              120

  Cross-Examination by Ms. Richenderfer        150

  Cross-Examination by Mr. Placitella          159

  Cross-Examination by Mr. Thompson            176

  Cross-Examination by Mr. Ruckdeschel         176

  Redirect Examination by Mr. Brown            178

  Recross Examination by Mr. Satterly          182

  Recross Examination by Mr. Maimon            183

1  Q    Sir, very, very important question, okay?  Yes or no.
2  Today, under funding agreement two, the total value available
3  to LTL is tens of billions of dollars less than was available
4  under funding agreement one.  Yes or no?
5  A    That is not true.
6  Q    So you think today, LTL-2 -- no, strike that.  You think
7  that the debtor today under funding agreement two has available
8  to it to satisfy talc claims around $60 billion?
9  A    No, that's not what I said.  What I said was that it's not
10 the -- not tens of billions of dollars less because you have to
11 take into account that because of the Third Circuit decision,
12 funding agreement two was rendered void or voidable, and
13 there's material risk that it was not enforceable.  So
14 therefore, if you're trying to compare those two, I think that
15 statement would not be true.
16 Q    I don't want to compare anything.  I just want -- let's --
17 I'll tell you what.  Let's do it this way.  Funding agreement
18 one, the debtor had $60-odd billion available to it to satisfy
19 my client's claims, right?
20 A    Prior to the Third Circuit decision, I would say yes.
21 Q    Great.  Today, how much does the debtor have available to
22 it under its funding agreement to satisfy talc claims?
23 A    I think there's a calculation about what the value of --
24 an internal valuation of the principal assets of Holdco which
25 is around $30 billion, plus the amounts that LTL has through

Case 23-12825-MBK   Doc 524-2   Filed 05/15/23   Entered 05/15/23 21:28:04   Desc
Exhibit A   Page 7 of 16

Kim - Cross/Jonas                                                63

1  (indiscernible).
2  Q    Well, pick a number.  Is it 30, is it 40?  I don't know.
3  You're the chief legal officer of the debtor, right?  Let me
4  ask you a few questions.  You're the chief legal officer of the
5  debtor, right?
6  A    I am.
7  Q    Now, do you understand that these funding agreements,
8  they're the most valuable asset of the debtor, right?
9  A    That's true.
10 Q    Do you understand how critically important they are to
11 talc victims who the only way they're going to be able to
12 recover effectively is under the funding agreement?
13 A    I do.
14 Q    Okay.  So when you negotiated funding agreement two, you
15 had that in mind how critically important it was, right?
16 A    Well, when we agreed to funding agreement two, I did.
17 Yes.
18 Q    So did you think to yourself I better make sure I get at
19 least $60 billion of value for these people because I'm a
20 debtor in Chapter 11.  I have fiduciary duties to these people.
21 And I better make sure I get them at least the same amount of
22 value.  Did that go through your mind?
23 A    No, because at the time that -- after the Third Circuit
24 decision, the -- it was clear, there was consensus reached that
25 the first funding agreement was void or voidable, at least the

WWW.JJCOURT.COM

Kim - Cross/Jonas                                                64

1  J&J guarantee part of that.  And so when we were entering into
2  funding agreement two, we took out this risk of enforceability
3  and put in a new agreement that would benefit all the parties.
4  Q    Sir, do my clients have the same amount that they can
5  recover from under funding agreement two as under funding
6  agreement one?  Yes or no?
7  A    No, because of the Third Circuit decision, not because of
8  what we did.
9  Q    It's the Third Circuit's fault?
10           MS. BROWN:  Your Honor, I object.  It's
11 argumentative.
12           THE COURT:  Sustained.
13 BY MR. JONAS:
14 Q    Are you saying that the Third Circuit is responsible for
15 my clients having tens of billions of dollars less that they
16 can recover from?
17           MS. BROWN:  Same objection, Judge.
18           MR. JONAS:  I'd like to know, Your Honor.
19           THE COURT:  Overruled.
20           THE WITNESS:  What I'm saying is that when the Third
21 Circuit made its decision, one of the ramifications of the
22 decision was that it frustrated the purpose of the first
23 funding agreement, rendering it void or voidable.  So I don't
24 think -- the Third Circuit didn't meant do that.  I don't blame
25 the Third Circuit for doing that.  It's just a consequence of

**WWW.JJCOURT.COM**

1  how the Third Circuit ruled.

2          Therefore, when we were looking at this, from LTL's
3  position, we're now looking at an agreement, a funding
4  agreement which is the most valuable asset that has been
5  rendered void or voidable.  And so we came up with the solution
6  to try to rectify the situation, get -- get sufficient funding
7  for the claimants, and turn to a plan, a support agreement with
8  J&J where they would provide enough liquidity to come up with
9  the -- a solution to the issue which is embodied in the
10 proposal.
11 BY MR. JONAS:
12 Q    So when you gave up funding agreement one and you entered
13 into funding agreement two, you were trying to take care of my
14 clients?  Is that what you're saying?
15 A    Yes, absolutely, because we did not give up funding
16 agreement one.  Funding agreement one became void or voidable
17 and unenforceable, particularly the J&J guarantee as a result
18 of the Third Circuit decision.

19      What we did, we took that situation and tried to come up
20 with a situation for the benefit of all parties.  So we
21 exchanged an unenforceable funding agreement with an
22 enforceable funding agreement with Holdco, and a plan support
23 agreement that would provide, you know, $8.9 billion in a
24 settlement that has been -- that has the overwhelming support
25 of claimants.

Kim - Cross/Jonas                                                68

1  Q    Well, let's wait.
2  A    Yeah.
3  Q    Wait, because at deposition, you wouldn't answer that
4  question.  So let's see whether your counsel now for the first
5  time wants to let you, allow you to answer these types of
6  questions.
7           MS. BROWN:  Well, Your Honor, I think that is also
8  argumentative.  And certainly, what was true in the deposition
9  is true here.  To the extent answering that question is going
10 to reveal attorney/client communications, protected by work
11 product or common interest, then Mr. Kim shouldn't reveal
12 conversations he had with lawyers.  But certainly, he should be
13 able to answer that in the way that he understands he can do
14 without violating the privilege.
15          THE WITNESS:  So what I would say is my understanding
16 -- I had numerous conversations with J&J attorneys.  My
17 understanding from going away with that was that they were
18 asserting that the -- it was -- the contract was void or
19 voidable because of the Third Circuit decision based on a
20 number of legal principals that they had researched, my lawyers
21 had researched.  And we came to the conclusion there's a
22 material risk that the contract was void or voidable.
23          MR. JONAS:  Your Honor, I'm going to move to strike
24 because at deposition, time and time again we were not allowed
25 -- we were told that the only people, and I'll ask questions to

**WWW.JJCOURT.COM**

1  value.  And then there's the J&J basically backstop.  That
2  backstop really was only intended to deal with things in
3  bankruptcy.
4      The J&J -- the JJCI portion of it, you know, is really a
5  function of the fact that we filed the divisional merger and we
6  had to take all the assets, or we wanted to have the assets of
7  JJCI.
8  Q    Did J&J tell LTL that it would not honor the funding
9  agreement outside of bankruptcy after the Third Circuit's
10 decision?
11 A    No, it didn't get that far because we came to a
12 resolution.  We understood the funding agreement was void or
13 voidable.  We never said to J&J well, you must pay us or else.
14 We both came to the conclusion, and a consensus, that the
15 funding agreement was void or voidable, possibly unenforceable.
16 There's a material risk.
17     And so what we did was we negotiated a solution.  We came
18 to a consensus on a solution to it before having a need to how
19 J&J, you know, refused to fund anything.
20 Q    Did you go to the TCC or any of the talc claimants, the
21 beneficiaries of funding agreement one and say hey guys, let's
22 talk about this.  We've got to figure out a strategy against my
23 counter party J&J because I don't want to lose $60 billion.
24 Did you talk to any of these folks who were the beneficiaries
25 about what to do?

1  clients had the benefit of a $60 million funding agreement, the
2  first funding agreement, right?
3  A    At that time, yes.
4  Q    And today, maybe, maybe, I guess if they vote in favor of
5  a plan, they'd have the benefit of funding agreement two which
6  I'm not sure what you said, I think you said $30 billion of
7  value.  Is that right?
8  A    It is.  But then you're missing out that there's a plan
9  proposal on the table that a substantial number of claimants
10 have approved, which would be $8.9 billion, which is fully
11 funded under the funding agreement.
12 Q    Okay.  So that's my client.  Now let's just make sure I
13 got the J&J piece right.  J&J was liable for up to $60 billion
14 under funding agreement one, right?
15 A    Again, J&J, without any obligation, put that in in order
16 to enhance the prospects of a bankruptcy.  So that was why it
17 got put in.  At some point, it becomes void or voidable because
18 the Third Circuit decision.  And then they again committed
19 without having to, to an $8.9 billion support agreement in
20 order to facilitate a resolution.
21 Q    Just to wrap up, today, J&J's maximum liability is $8.9
22 billion, right?
23 A    Under the support agreements that it has.
24 Q    So with -- because of the Third Circuit's decision, J&J
25 got off the hook for $50 billion of talc liability?

Kim - Cross/Jonas 78

1 A   Again, it did not get off the hook.  The hook -- the
2 agreement itself, the first funding agreement was not required
3 by J&J.  And as the Third Circuit noted, it put in that
4 guarantee in order to facilitate a resolution of bankruptcy.
5     Once the -- ironically, I think it was the Third Circuit
6 said the very -- the very provision that was supposed to help
7 it in bankruptcy actually turned into a provision that
8 prevented the bankruptcy, causing that guarantee to be void or
9 voidable.
10     And after that, as a resolution to try to resolve all this
11 talc claims in bankruptcy, J&J again committed $8.9 billion
12 which was part of the PSA, part of the plan that was negotiated
13 to try to resolve all the litigation.  And that's what
14 happened.
15        MR. JONAS:  Your Honor, could we have a short break?
16        THE COURT:  Sure.  Let's see.  It's ten to 12.  My
17 plan is to go to 1:00, take a half-hour lunch.  Why don't we
18 come back in ten minutes?
19        MR. JONAS:  Thank you, Your Honor.
20     (Recess at 11:52 a.m./Reconvene at 12:06 p.m.)
21        THE COURT:  Okay.
22 BY MR. JONAS:
23 Q   Mr. Kim, on what date did the old funding agreement become
24 inoperative and the new funding agreement become operative?
25 A   I think the date of the termination agreement.

1  Q    Which is what?
2  A    It became effective right after the case, the bankruptcy
3  case was dismissed.
4  Q    So the funding agreement, even though this risk
5  void/voidability occurred on January 30th, the funding
6  agreement remained operative for the remainder of the
7  bankruptcy case?
8  A    That was our agreement.
9  Q    Your agreement with whom?
10 A    Well, because it's a termination agreement, the agreement
11 was that it would remain operative until the termination
12 agreement.
13 Q    Okay.  Well, on what date did you reach that -- strike
14 that.
15      I take it that agreement was between LTL and J&J; right?
16 A    I think there was a consensus among the lawyers.
17 Q    Consensus among the lawyers.  Well, lawyers don't make
18 deals -- can't bind clients to deals; right?  Clients have to
19 do that themselves; right?
20 A    Right.  The board was apprised ahead of time that there
21 was a termination agreement that was going to be in place and
22 what that would mean is that everything would stay in place so
23 that, you know, LTL would  not remain bare until the
24 termination agreement became effective, which happened as soon
25 as the bankruptcy case was dismissed.  So you'll see, I think,

**WWW.JJCOURT.COM**

1  dismissed, LTL II commenced a new bankruptcy case; right?
2  A    It did.
3  Q    Okay.  Now, that whole -- you've told about this
4  void/voidability issue, negotiation, discussion, termination
5  agreement, new funding agreement, that all didn't happen in two
6  hours; did it?
7  A    The discussions around it didn't happen in the two hours,
8  the authorization for it, it was -- the authorization for it
9  specifically stated that it would not become effective until
10 the termination of the first bankruptcy.
11 Q    And those -- I think you said those discussions,
12 negotiations, whatever they are, between LTL and J&J, they
13 started pretty quick after the Third Circuit decision; right?
14 A    There were numerous discussions right after the Third
15 Circuit decision, yes.
16 Q    Okay, so February, March.  And over those months, while
17 you were an officer of a Chapter 11 debtor, you were doing a
18 new deal, a new transaction, a new arrangement with J&J to
19 terminate the existing funding agreement and enter into a new
20 funding agreement; right?
21 A    I would say that there were ongoing discussions among the
22 lawyers of a variety of things that could happen, one of them
23 which was the termination of the old funding and the new
24 funding agreement, but there were discussions throughout that
25 period of how to -- how to resolve sort of the talc litigation

1  for everyone.
2  Q    And so, obviously, LTL, J&J, they knew what was going on
3  in this connection because they were involved in it; right?
4  A    They were involved in it, yes.
5  Q    Okay.  Did you tell the creditors committee, the TCC, what
6  was going on during this time that you were in Chapter 11?
7  A    Not -- I did not have any conversations with the creditors
8  committee or the TCC.
9  Q    In fact, sir, you hid it from the Bankruptcy Court and the
10 bankruptcy community, meaning the TCC and others, you hid that
11 from them; didn't you?
12 A    I --
13            MS. BROWN:  I object, Your Honor, argumentative.
14            THE COURT:  Overruled.
15            THE WITNESS:  I would say, you know, these are
16 confidential communications, we had no idea what we were going
17 to do.  We were looking at various options and we did not want
18 to make public disclosures about this at the time that we were
19 still involved in looking at these issues.
20            MR. JONAS:  May I approach, Your Honor?
21            THE COURT:  Yes, please.
22            MR. JONAS:  I think we're on --
23            THE COURT:  3.
24            MR. JONAS:  -- 3.
25 BY MR. JONAS: