**EXHIBIT A**

**Chapter 11 Plan of Reorganization of LTL Management LLC**

NAI-1530627343

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |

## CHAPTER 11 PLAN OF REORGANIZATION OF LTL MANAGEMENT LLC

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF AN INJUNCTION PURSUANT TO SECTIONS 524(g) AND 105(a) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4 TALC PERSONAL INJURY CLAIMS AGAINST THE DEBTOR AND THE PROTECTED PARTIES (AS DEFINED HEREIN) TO A TRUST, AS WELL AS OTHER INJUNCTIONS DESCRIBED IN <u>ARTICLE XI</u> OF THE PLAN.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS AND RULES OF INTERPRETATION ................................ 1

    1.1    Terms ................................................................................................... 1
    1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time ............................................................................ 21
    1.3    Exhibits ............................................................................................... 22
    1.4    Ancillary Documents .......................................................................... 22

ARTICLE II      TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ................................................................................... 22

    2.1    Administrative Claims ........................................................................ 22
    2.2    Fee Claims .......................................................................................... 23
    2.3    Payment of Statutory Fees .................................................................. 23
    2.4    Allowed Priority Tax Claims .............................................................. 24

ARTICLE III     TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ................. 24

    3.1    Claims and Interests Classified ........................................................... 24
    3.2    Treatment and Classification of Claims and Interests ......................... 24
    3.3    Debtor's Rights with Respect to Unimpaired Claims .......................... 27
    3.4    Elimination of Vacant Classes ............................................................ 27

ARTICLE IV     THE TALC PERSONAL INJURY TRUST ................................................ 27

    4.1    Establishment ..................................................................................... 27
    4.2    Purpose ............................................................................................... 27
    4.3    Initial Talc Trustees ........................................................................... 27
    4.4    Initial Talc Trust Advisory Committee and FCR ................................ 28
    4.5    Initial Talc Trust Administrators ........................................................ 28
    4.6    Payment of Talc Personal Injury Trust Expenses Prior to the Effective Date ..................................................................................................... 29
    4.7    Trust Distribution Procedures ............................................................. 29
    4.8    Assumption of Liability for Trust Personal Injury Claims .................. 29
    4.9    Contribution of Certain Assets ........................................................... 31
    4.10   Payment of Talc Personal Injury Trust Expenses From and After the Effective Date .................................................................................... 34
    4.11   Treatment of Remainder Assets .......................................................... 34
    4.12   Dissolution ......................................................................................... 34
    4.13   Funds and Investment Guidelines ....................................................... 34
    4.14   Compliance with QSF Regulations ..................................................... 35
    4.15   Cooperation Agreement ...................................................................... 35
    4.16   Indemnification and Reimbursement of the Protected Parties ............. 35
    4.17   Exculpation of the Protected Parties ................................................... 36

## TABLE OF CONTENTS

Page

ARTICLE V     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................ 36

5.1     General Treatment ...................................................................... 36
5.2     Assumption and Assignment ....................................................... 36
5.3     Approval of Assumptions and Assignments and Related Procedures ................. 37
5.4     Payments Related to Assumption .................................................. 38
5.5     Executory Contracts and Unexpired Leases to Be Rejected and Rejection
Procedures .................................................................................. 38
5.6     Claims Based on Rejection .......................................................... 39
5.7     Contracts and Leases Entered Into After the Petition Date ................. 40
5.8     Reservation of Rights .................................................................. 40
5.9     Imerys/Cyprus Agreements .......................................................... 40
5.10    Talc Insurance Assets ................................................................. 40

ARTICLE VI    DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-
TALC CLAIMS ............................................................................... 41

6.1     Distributions............................................................................... 41
6.2     Timing and Calculation of Amounts to be Distributed...................... 41
6.3     Designation of Disbursing Agent................................................... 41
6.4     Rights and Powers of Disbursing Agent........................................ 41
6.5     Distributions on Account of Claims Allowed After the Effective Date ........... 42
6.6     Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 42
6.7     Time Bar to Cash Payments......................................................... 43
6.8     Record Date for Holders of Claims ............................................... 43
6.9     Compliance with Tax Requirements and Allocations ....................... 43
6.10    Transfers of Claims..................................................................... 44
6.11    Setoffs ...................................................................................... 44

ARTICLE VII   RESOLUTION OF DISPUTED CLAIMS OTHER THAN TALC
PERSONAL INJURY CLAIMS.......................................................... 45

7.1     Disputed Claims.......................................................................... 45
7.2     Prosecution of Claims Generally ................................................... 45
7.3     Prosecution of Disputed Non-Talc Claims and Claims Objection Deadline ....... 45
7.4     Distributions on Account of Disputed Claims ................................. 45
7.5     No Distributions Pending Allowance .............................................. 46
7.6     Authority to Amend Schedules ..................................................... 46

ARTICLE VIII  CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ................................................... 46

8.1     Conditions Precedent to the Confirmation of the Plan ..................... 46
8.2     Conditions Precedent to the Effective Date of the Plan.................... 51
8.3     Waiver of Conditions Precedent ................................................... 53
8.4     Notice of Effective Date .............................................................. 53

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 8.5 | Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan | 53 |

**ARTICLE IX — MEANS FOR IMPLEMENTATION OF THE PLAN** ... 53

| | | |
|---|---|---|
| 9.1 | General | 53 |
| 9.2 | Operations of the Debtor Prior to the Effective Date | 53 |
| 9.3 | Articles of Organization and Operating Agreement | 53 |
| 9.4 | Corporate Action | 54 |
| 9.5 | Authority of Officers | 54 |
| 9.6 | Post-Effective Date Governance; Continued Existence of the Reorganized Debtor | 54 |
| 9.7 | Arrangements of the Reorganized Debtor with Managers, Officers and Employees | 54 |
| 9.8 | Good Faith Compromise and Settlement | 55 |
| 9.9 | Resolution of Talc Personal Injury Claims | 55 |
| 9.10 | Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan | 55 |
| 9.11 | Modification of the Plan | 55 |
| 9.12 | Revocation or Withdrawal of the Plan | 56 |
| 9.13 | Certain Technical Modifications | 56 |

**ARTICLE X — EFFECT OF CONFIRMATION** ... 56

| | | |
|---|---|---|
| 10.1 | Preservation of Rights of Action by the Debtor and the Reorganized Debtor | 56 |
| 10.2 | Imerys/Cyprus Related Rights | 57 |
| 10.3 | Talc Insurance Assets | 59 |
| 10.4 | Preservation of Rights of Action by the Talc Personal Injury Trust | 61 |
| 10.5 | Terms of Injunctions and Automatic Stay | 61 |
| 10.6 | The FCR and the TCC | 62 |
| 10.7 | No Effect on United States Trustee | 62 |
| 10.8 | Binding Effect | 62 |

**ARTICLE XI — DISCHARGE, SETTLEMENT, RELEASES, INJUNCTIONS, AND EXCULPATION** ... 62

| | | |
|---|---|---|
| 11.1 | Discharge and Injunctions | 62 |
| 11.2 | Settlement of Certain Estate Claims | 63 |
| 11.3 | Releases | 64 |
| 11.4 | Channeling Injunction and Insurance Entity Injunction | 66 |
| 11.5 | Exculpation | 70 |
| 11.6 | Disallowed Claims | 71 |
| 11.7 | No Successor Liability | 71 |
| 11.8 | Corporate Indemnities | 71 |
| 11.9 | Independent Legal Significance of Individual Provisions | 72 |

## TABLE OF CONTENTS

**Page**

ARTICLE XII     JURISDICTION OF BANKRUPTCY COURT ........................................... 72

12.1   Jurisdiction ................................................................................. 72
12.2   Specific Purposes ......................................................................... 72
12.3   District Court Jurisdiction ............................................................ 74
12.4   Reservation of Rights ................................................................... 74
12.5   Compromises of Controversies .................................................... 74

ARTICLE XIII     MISCELLANEOUS PROVISIONS .................................................. 75

13.1   Closing of Chapter 11 Case ......................................................... 75
13.2   Timing of Distributions or Actions .............................................. 75
13.3   Governing Law ............................................................................ 75
13.4   Entire Agreement ........................................................................ 75
13.5   Headings ..................................................................................... 75
13.6   Notices to the Debtor and Reorganized Debtor ........................... 75
13.7   Plan Supplement ......................................................................... 76
13.8   Post-Effective Date Notices by the Reorganized Debtor .............. 76
13.9   Inconsistencies ........................................................................... 77
13.10   Withholding of Taxes .................................................................. 77
13.11   Transfer Taxes ............................................................................ 77
13.12   Successors and Assigns ............................................................... 77
13.13   Duty to Cooperate ....................................................................... 77
13.14   Effective Date Actions Simultaneous .......................................... 77

## EXHIBITS AND SCHEDULES TO PLAN

| | |
|---|---|
| Exhibit A | Amended Articles of Organization of the Reorganized Debtor* |
| Exhibit B | Amended Operating Agreement of the Reorganized Debtor* |
| Exhibit C | Cash Contributions** |
| Exhibit D | Cash Contributions Parent Guarantee** |
| Exhibit E | Cooperation Agreement* |
| Exhibit F | Governmental Claims* |
| Exhibit G | Retained Rights of Action* |
| Exhibit H | Talc Insurance Policies* |
| Exhibit I | Talc Insurance Settlement Agreements* |
| Exhibit J | Talc Personal Injury Trust Agreement* |
| Exhibit K | Talc PI Note* |
| Exhibit L | Talc PI Pledge Agreement* |
| Exhibit M | Trust Distribution Procedures** |
| Exhibit N | Executory Contracts and Unexpired Leases to Be Rejected* |
| Exhibit O | Officers and Managers of the Reorganized Debtor* |
| Schedule 1 | Imerys/Cyprus Parties** |
| Schedule 2 | LTL Corporate Parties** |
| Schedule 3 | Retailers and Indemnified Parties** |

\* To be attached to the Plan Supplement

\*\* Attached hereto

## **INTRODUCTION**

LTL Management LLC, the debtor and debtor-in-possession in the above captioned Chapter 11 Case, respectfully proposes the following chapter 11 plan of reorganization.  Unless otherwise indicated, capitalized terms shall have the meanings ascribed to them in <u>Section 1.1</u>.

The following chapter 11 plan of reorganization contains the terms described in plan support agreements that the Debtor, J&J, and Holdco have entered into with law firms representing certain holders of Talc Personal Injury Claims, as those agreements have been modified, amended, and supplemented, and has been negotiated, and is being filed, by the Debtor pursuant to its commitments under such agreements.

Nothing in the Plan Documents constitutes an admission by the Debtor as to the existence, merits, or amount of the Debtor's actual present or future liability on account of any Claim or demand (including any Talc Personal Injury Demand) except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for, among other things, a discussion of the history, business, results of operations, and assets of the Debtor, and risks associated with the Plan.  The Disclosure Statement also provides a summary of the Plan.  YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## **ARTICLE I**
## **DEFINITIONS AND RULES OF INTERPRETATION**

1.1    <u>Terms</u>.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this <u>Section 1.1</u>, but that is defined elsewhere in the Plan or in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.  For the avoidance of doubt, the uncapitalized terms "affiliate," "claim," "demand," "entity," "governmental unit," and "lien" have the meanings given to them in sections 101(2), 101(5), 524(g)(5), 101(15), 101(27), and 101(37) of the Bankruptcy Code, respectively.

1.1.1    "**2021 Chapter 11 Case**" means the chapter 11 case of the Debtor that was commenced in the Bankruptcy Court on October 14, 2021 and subsequently dismissed by the Bankruptcy Court on April 4, 2023.

1.1.2    "**2021 Corporate Restructuring**" means, the internal corporate restructuring of Old JJCI that was completed on October 12, 2021, by which Old JJCI ceased to exist and the Debtor and Holdco were formed.

1.1.3    "**Administrative Claim**" means any Claim for any cost or expense of administration of the Chapter 11 Case under section 503(b) of the Bankruptcy Code, including (a) any actual and necessary post-petition cost or expense of preserving the Estate or operating the business of the Debtor, (b) Cure Amount Claims, (c) post-petition costs,

1

indebtedness or contractual obligations duly and validly incurred or assumed by the Debtor in the ordinary course of business, (d) any Fee Claim, including any Claim for compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, 330(a), 331, or 503(b) of the Bankruptcy Code or the provisions of the Plan, (e) any fee or charge assessed against the Estate under 28 U.S.C. § 1930(6), and (f) any Claim of the Information Officer and/or counsel for the Information Officer.

1.1.4 "**Administrative Claims Bar Date**" means the applicable deadline for filing requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) and shall be the Business Day that is sixty (60) days after the Effective Date.

1.1.5 "**Affiliate**" means, with respect to any specified entity: (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity. As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

1.1.6 "**AHC of Supporting Counsel**" means the Ad Hoc Committee of Supporting Counsel formed to advance the common interests of the law firms representing certain holders of Talc Personal Injury Claims that have entered into plan support agreements with the Debtor, J&J and Holdco.

1.1.7 "**Allowed**" means, with respect to Non-Talc Claims, and including applicable premiums and penalties to the extent allowable: (a) any Claim proof of which is timely filed by the applicable Claims Bar Date; (b) any Claim that is listed in the Schedules as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim that is allowed pursuant to the Plan; *provided*, *however*, that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance of such Claim has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is filed and the Claim shall have been allowed by a Final Order.

1.1.8 "**Allowed Amount**" means, with respect to any Non-Talc Claim, the amount for which that Claim is Allowed, denominated in U.S. dollars, Canadian dollars, or Euros, as applicable.

1.1.9 "**Amended Articles of Organization**" means, the amended and restated articles of organization of the Reorganized Debtor, in substantially the form of Exhibit A.

1.1.10 "**Amended Charter Documents**" means, collectively, the Amended Articles of Organization and the Amended Operating Agreement.

1.1.11    "**Amended Operating Agreement**" means, the amended and restated operating agreement of the Reorganized Debtor, in substantially the form of Exhibit B.

1.1.12    "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date or thereafter amended with retroactive applicability to the Chapter 11 Case.

1.1.13    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Case.

1.1.14    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.1.15    "**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

1.1.16    "**Canadian Claims**" shall mean (a) Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed and (b) Talc Personal Injury Claims brought, threatened, or pursued in any court in Canada.

1.1.17    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

1.1.18    "**Canadian Proceeding**" means the proceeding commenced by the Debtor before the Canadian Court pursuant to the Companies Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended.

1.1.19    "**Cash**" means lawful currency of the United States of America and its equivalents.

1.1.20    "**Cash Contributions**" means contributions of Cash to the Talc Personal Injury Governmental Action Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust in the amounts and on the dates set forth on Exhibit C.

1.1.21    "**Cash Contributions Parent Guarantee**" means the parent guarantee, in substantially the form of Exhibit D, to be executed and delivered by J&J and Holdco for the benefit of the Talc Personal Injury Trust, pursuant to which each of J&J and Holdco will guarantee the timely delivery of the Cash Contributions.

1.1.22    "**Channeling Injunction**" means the permanent injunction provided for in Section 11.3.1 with respect to Talc Personal Injury Claims against the Protected Parties to be issued pursuant to the Confirmation Order.

1.1.23    "**Chapter 11 Case**" means the chapter 11 case of the Debtor pending in the Bankruptcy Court.

1.1.24    "**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code as it pertains to "claims" against the Debtor.

1.1.25    "**Claims Agent**" means Epiq Corporate Restructuring, LLC.

1.1.26    "**Claims Bar Date**" means any deadline for filing a Proof of Claim that may be specifically fixed by an order of the Bankruptcy Court with respect to certain Claims.

1.1.27    "**Claims Objection Bar Date**" means the deadline for objecting to Non-Talc Claims (other than Administrative Claims, including Fee Claims and Cure Amount Claims) set forth in Section 7.3.2 which shall be one hundred and twenty (120) days after the Effective Date, unless extended by operation of the Bankruptcy Rules or order of the Bankruptcy Court prior to the expiration of such period.

1.1.28    "**Claims Register**" means the register of Claims filed against the Debtor in the Chapter 11 Case maintained by the Claims Agent as such register is updated from time to time to reflect, among other things, Claims that have been Allowed or Disallowed.

1.1.29    "**Class**" means a category of holders of Claims or Interests described in Article III.

1.1.30    "**Clerk**" means the clerk of the Bankruptcy Court.

1.1.31    "**Compensation Procedures Order**" means that certain *Order Establishing Procedures for Interim Compensation and Reimbursement of Retained Professionals* [Dkt. [●]].

1.1.32    "**Confirmation**" means the entry of the Confirmation Order on the docket of the District Court.

1.1.33    "**Confirmation Date**" means the date on which the District Court enters the Confirmation Order on its docket.

1.1.34    "**Confirmation Hearing**" means, collectively, the hearing or hearings held by the Bankruptcy Court or the District Court on Confirmation of the Plan, as such hearing or hearings may be continued from time to time.

1.1.35    "**Confirmation Order**" means the order of the Bankruptcy Court and the District Court acting jointly or the order of the District Court affirming an order entered separately by the Bankruptcy Court, in either case which order confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.36    "**Contribution Claim**" means any and all rights of a non-Settling Talc Insurance Company, whether legal, equitable, contractual, or otherwise, of contribution,

indemnity, reimbursement, subrogation, or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of the Debtor in connection with any Talc Personal Injury Claim.

1.1.37    "**Cooperation Agreement**" means that certain Cooperation Agreement among the Reorganized Debtor, J&J, and the Talc Personal Injury Trust, in substantially the form of Exhibit E.

1.1.38    "**Cure Amount Claim**" means a Claim based on the Debtor's defaults pursuant to an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under section 365 of the Bankruptcy Code.

1.1.39    "**Debtor**" means LTL Management LLC.

1.1.40    "**Deficiency Claim**" means, with respect to any Non-Talc Claim, an Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim.

1.1.41    "**Disallowed**" means any Non-Talc Claim that (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan, (b) has been listed in the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed filed with the Bankruptcy Court or the Claims Agent pursuant to any order establishing a Claims Bar Date or otherwise deemed timely filed under applicable law, or (c) has been withdrawn, in whole or in part (but solely to the extent of such withdrawal).

1.1.42    "**Disbursing Agent**" means the Reorganized Debtor, or such other Person or Persons chosen by the Debtor or the Reorganized Debtor to make or facilitate Distributions pursuant to the Plan.

1.1.43    "**Discharge Injunction**" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Section 11.1.2.

1.1.44    "**Disclosure Statement**" means the *Disclosure Statement for Chapter 11 Plan of Reorganization of LTL Management LLC*, dated [●], 2023, including all exhibits and schedules thereto and references therein that relate to the Plan, approved by order of the Bankruptcy Court as containing adequate information, and distributed in accordance with such order of approval, as such disclosure statement and supplemental disclosure documents may be amended, modified, or supplemented from time to time.

1.1.45    "**Disputed**" means any Non-Talc Claim, or any portion thereof, that has not been Allowed or Disallowed pursuant to the Plan or a Final Order of the Bankruptcy Court, or that is contingent or unliquidated.

1.1.46    "**Distributions**" means Cash, property, or interest in property to be paid or delivered hereunder to holders of Allowed Non-Talc Claims under the terms of the Plan.

1.1.47    "**Distribution Date**" means the date which is as soon as reasonably practicable after the later of (a) the Effective Date, or (b) in the case of a Non-Talc Claim that is not yet Allowed as of the Effective Date, the date that such Claim becomes Allowed.

1.1.48    "**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Talc Claims, which shall be the Confirmation Date.

1.1.49    "**District Court**" means the United States District Court for the District of New Jersey.

1.1.50    "**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

1.1.51    "**Effective Date**" means the Business Day upon which all of the conditions precedent to the occurrence of the Effective Date contained in <u>Section 8.2</u> have been satisfied or waived pursuant to <u>Section 8.3</u>.

1.1.52    "**Encumbrance**" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

1.1.53    "**Equity Interests of the Debtor**" means the Interests issued by the Debtor.

1.1.54    "**Estate**" means the estate created in the Chapter 11 Case under section 541 of the Bankruptcy Code.

1.1.55    "**Exculpated Parties**" means, collectively, (a) the Debtor's officers and managers who served during any time, whether before, on, or after the Petition Date, prior to the Effective Date of the Plan (each solely in their capacity as such); (b) the Debtor; (c) the TCC and each of the members thereof, solely in his or her capacity as such; (d) the FCR, solely in her capacity as such; (e) the Retained Professionals, and (f) solely as to conduct found by a court of competent jurisdiction to have been undertaken while acting as a fiduciary of the Debtor or the Estate, the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the Retained Professionals, each solely in their capacities as such; and counsel to the individual members of the TCC, each solely in their capacity as such, *provided*, *however* that the Bankruptcy Court is not determining the fiduciary status of any employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), or any employees of any of the Retained Professionals or counsel to the individual members of the TCC.  Nothing herein shall shift the burden of the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the

Retained Professionals or counsel to the individual members of the TCC, to establish that they were fiduciaries of the Debtor or the Estate prior to the Effective Date of the Plan.

1.1.56 "**Exculpation Injunction**" means the injunction described in <u>Section 11.6.1</u>.

1.1.57 "**Executory Contract**" means any executory contract as to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.58 "**FCR**" means Randi S. Ellis (or any Bankruptcy Court-appointed successor), in her capacity as the legal representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown. "FCR" stands for Future Claimants' Representative.

1.1.59 "**Fee Claim**" means any Claim of a (a) Professional for allowance of compensation and reimbursement of costs and expenses and (b) member of the TCC for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Case on or before the Effective Date.

1.1.60 "**Fee Examiner**" means **[Robert J. Keach, Esq.]** (or any Bankruptcy Court-appointed successor), in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

1.1.61 "**Fee Examiner Order**" means the *Order Appointing an Independent Fee Examiner and Establishing Procedures* [Dkt. [●]].

1.1.62 "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which the order or judgment was appealed or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied with prejudice or resulted in no modification of such order or judgment or has otherwise been dismissed with prejudice, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

1.1.63 "**Funding Agreement**" means that certain Funding Agreement, dated April 4, 2023, by and between Holdco, as payor, and the Debtor, as payee.

1.1.64    "**Governmental Action Claims**" means any and all claims asserted or assertable against the Debtor or any other Protected Party by any governmental unit, or by any other Person pursuant to any private right of action, under any federal, state, international, or foreign rule, statute, or regulation, directly or indirectly arising out of or in any way relating to the presence of or exposure of individuals to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtor, Old JJCI, or any other Person for whose conduct the Debtor has, or is alleged to have, liability, whether by assumption of such liability from such other Person, by agreement to indemnify, defend, or hold harmless such other Person from and against such liability, or otherwise, including any such claims directly or indirectly arising out of or in any way relating to:  (a) any products previously mined, processed, manufactured, designed, marketed, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, and/or in any other way made available by the Debtor or any other Person; (b) any materials present at any premises owned, leased, occupied, or operated by any Person; or (c) any talc in any way connected to the Debtor alleged to contain asbestos or other constituent.  For the avoidance of doubt, Governmental Action Claims shall include such claims that are listed or described on Exhibit F.  For the avoidance of doubt, Governmental Action Claims shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual caused by talc or a product or material containing talc regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict.  By way of illustration and not limitation, a Governmental Action Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

1.1.65    "**Holdco**" means Johnson & Johnson Holdco (NA) Inc., a New Jersey corporation that was formerly named Johnson & Johnson Consumer Inc.

1.1.66    "**Imerys/Cyprus Agreements**" means those contracts and/or agreements setting forth certain Imerys/Cyprus Related Rights, including as applicable: (a) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (b) that certain Talc Supply Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (c) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (d) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; (e) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011; and/or (f) any other applicable agreement, order, or law.

1.1.67    "**Imerys/Cyprus Defenses**" means any and all rights and defenses that any Imerys/Cyprus Party may have under any Imerys/Cyprus Agreement or applicable law with respect to a claim for contribution, reimbursement, subrogation, or indemnification in respect of Talc Personal Injury Claims, but Imerys/Cyprus Defenses do not include (a) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (b) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, or any other action contemplated by Section 4.9.3, is prohibited by the Imerys/Cyprus Agreements or applicable non-bankruptcy law.

1.1.68    "**Imerys/Cyprus Parties**" means all Persons listed on Schedule 1.

1.1.69    "**Imerys/Cyprus Related Rights**" means any and all rights of contribution, reimbursement, subrogation, or indemnification that the Debtor or any Protected Party has against any Imerys/Cyprus Party in respect of Talc Personal Injury Claims under any Imerys/Cyprus Agreement or applicable law.

1.1.70    "**Impaired**" means a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.1.71    "**Indirect Talc Personal Injury Claim**" means (a) a Talc Personal Injury Claim for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other derivative Talc Personal Injury Claim, whether in the nature of or sounding in contract, tort, warranty, or other theory of law, including a Talc Personal Injury Claim of Imerys/Cyprus Party for contribution, reimbursement, subrogation, or indemnity under any Imerys/Cyprus Agreement or otherwise, or (b) a Governmental Action Claim.  For the avoidance of doubt, an Indirect Talc Personal Injury Claim shall not include (i) any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual caused by talc or a product or material containing talc regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict or (ii) any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.  By way of illustration and not limitation of claims contemplated by the foregoing clause (i), an Indirect Talc Personal Injury Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

1.1.72    "**Information Officer**" means any Person (current and former), in its capacity as the information officer appointed by the Canadian Court in the Canadian Proceeding.

1.1.73    "**Injunctions**" means the Discharge Injunction, the Channeling Injunction, the Insurance Entity Injunction, the Release Injunction, the Exculpation Injunction, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

1.1.74    "**Insurance Entity Injunction**" means the injunction described in Section 11.3.2.

1.1.75    "**Intercompany Claim**" means any Claim (including Claims related to setoff rights) held against the Debtor by any Affiliate of the Debtor.

1.1.76    "**Interest**" means the rights of any holder of the equity of the Debtor and the rights of any Person to purchase or demand the issuance of any equity of the Debtor, including:  (a) redemption, conversion, exchange, voting, participation, and distribution rights; (b) liquidation preferences; and (c) any option and warrant rights.

1.1.77    "**Internal Revenue Code**" or "**Tax Code**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

1.1.78    "**IRS**" means the Internal Revenue Service of the United States of America.

1.1.79    "**J&J**" means Johnson & Johnson, a New Jersey corporation.

1.1.80    "**Judgment**" means a final and binding judicial determination or arbitration award.

1.1.81    "**LTL Corporate Parties**" means J&J and all of its current and former Affiliates other than the Debtor, including all Persons listed on Schedule 2, each of which are or were Affiliates of J&J.

1.1.82    "**Non-Talc Claim**" means any Claim that is not a Talc Personal Injury Claim.

1.1.83    "**Old JJCI**" means the former Texas limited liability company named Chenango Zero LLC (successor-by-merger to Johnson & Johnson Consumer Inc., a New Jersey corporation, and predecessor to the Debtor and Holdco), which ceased to exist as of the completion of the 2021 Corporate Restructuring (including all former names and historical forms).

1.1.84    "**Ordinary Course Professionals Order**" means the *Order Authorizing the Retention and Compensation of Professionals Utilized by the Debtor in the Ordinary Course of Business* [DKT.[●]].

1.1.85    "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit, or other entity.

1.1.86    "**Petition Date**" means April 4, 2023.

1.1.87    "**PI/Stay Order**" means the *Order (I) Declaring that Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Adv. 23-[●]; Dkt. [●]].

1.1.88    "**PI/Stay Order Claims**" means any and all claims enjoined or otherwise stayed by the PI/Stay Order.

1.1.89    "**Plan**" means this *Chapter 11 Plan of Reorganization of LTL Management LLC*, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code.

1.1.90    "**Plan Documents**" means the Plan, the Disclosure Statement, the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing (including, for the avoidance of doubt, the Talc Personal Injury Trust Documents and the Cooperation Agreement).

1.1.91    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtor at least fourteen (14) days prior to the deadline for objecting to Confirmation of the Plan, as the same may be amended, modified, or supplemented before the Effective Date, including the following: (a) the Amended Articles of Organization of the Reorganized Debtor (Exhibit A to the Plan), (b) the Amended Operating Agreement of the Reorganized Debtor (Exhibit B to the Plan), (c) the Cooperation Agreement (Exhibit E to the Plan), (d) a list or description of Governmental Claims (Exhibit F to the Plan), (e) a list or description of Retained Rights of Action (Exhibit G to the Plan), (f) a list of Talc Insurance Policies (Exhibit H to the Plan), (g) a list of Talc Insurance Settlement Agreements (Exhibit I to the Plan), (h) the Talc Personal Injury Trust Agreement (Exhibit J to the Plan), (i) the Talc PI Note (Exhibit K to the Plan), (j) the Talc PI Pledge Agreement (Exhibit L to the Plan), (k) the list of Executory Contracts and Unexpired Leases to be rejected by the Debtor (Exhibit N to the Plan), and (l) the list of officers and manager of the Reorganized Debtor (Exhibit O to the Plan); *provided, however*, that the Plan Document listed in clause (k) will be revised as needed to take into account any additional Executory Contracts and Unexpired Leases to be rejected in accordance with Article V. The Plan Supplement will be served only on those parties that have requested notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtor. Once the Plan Supplement is filed, a copy will also be available for review on the Claims Agent's website free of charge at https://dm.epiq11.com/case/ltl/dockets.

1.1.92    "**Postpetition Interest**" means, for the period following the Petition Date: (a) interest at the rate set forth in the contract or other applicable document between the holder of a Claim and the Debtor giving rise to such holder's Claim, but excluding, for

the avoidance of doubt, interest at any default rate; (b) if no such rate exists, interest at the federal judgment rate; or (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the Debtor.

1.1.93 "**Prepetition Funding Agreement Modifications**" means the transactions contemplated by that certain Termination and Substitution Agreement, dated April 4, 2023, by and among J&J, Holdco, and the Debtor.

1.1.94 "**Priority Non-Tax Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.1.95 "**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.1.96 "**Professional**" means any Person retained or to be compensated pursuant to sections 327, 328, 330, 503(b), 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code, including any professional retained by the TCC, the AHC of Supporting Counsel, or the FCR.

1.1.97 "**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or the Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against the Debtor.

1.1.98 "**Protected Party**" means any of the following:

(a) the Debtor and its Representatives;

(b) the Reorganized Debtor and its Representatives;

(c) the LTL Corporate Parties and their respective Representatives;

(d) the Settling Talc Insurance Companies;

(e) all Persons listed on <u>Schedule 3</u>, each of which is a third party retailer that sold Old JJCI's talc-containing products or a third party to which the Debtor has contractual indemnification obligations relating to Old JJCI's talc-containing products;

(f) Imerys/Cyprus Parties; *provided*, *however*, that the Imerys/Cyprus Parties shall only be Protected Parties if, at least fourteen (14) days prior to the deadline for objecting to Confirmation of the Plan, either (i) a settlement agreement, acceptable in form and substance to the Debtor, J&J, and the AHC of Supporting Counsel, is entered into by and between Imerys Talc America, Inc. and the Debtor or (ii) the Debtor, J&J, and the AHC of Supporting Counsel jointly determine that the Imerys/Cyprus Parties shall be Protected Parties absent such a settlement agreement;

(g) Persons that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of the Debtor or the

Reorganized Debtor, or the Talc Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Person becoming such a transferee or successor;

(h) Persons that, pursuant to the Plan or on or after the Effective Date, make a loan to the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, or to a successor to, or transferee of, any assets of the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender; and

(i) Persons that are alleged to be directly or indirectly liable for the conduct of, claims against or demands on the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, to the extent that such alleged liability arises by reason of one or more of the following:

(i) such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of a Debtor or Reorganized Debtor, or a predecessor in interest of a Debtor or Reorganized Debtor (including Old JJCI);

(ii) such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(iii) such Person's service as an officer, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); and

(iv) such Person's involvement in a transaction changing the corporate structure (including the 2021 Corporate Restructuring), or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (x) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (y) acquiring or selling a financial interest in any Person as a part of such transaction.

1.1.99 "**Recovery Actions**" means, collectively and individually, preference actions, fraudulent conveyance actions, and other claims or causes of action under

sections 510, 544, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code and other similar state law claims and causes of action.

1.1.100    "**Reinstated**" or "**Reinstatement**" means the treatment of a Claim or Interest, at the Reorganized Debtor's sole discretion, in accordance with one of the following:

(a)    the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or

(b)    notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

(i)    any such default that occurred before the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;

(ii)    the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;

(iii)    the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(iv)    the legal, equitable, or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

1.1.101    "**Release Injunction**" means the injunction described in Section 11.3.3.

1.1.102    "**Released Parties**" means each of: (a) the Debtor, (b) the Reorganized Debtor, (c) the LTL Corporate Parties; and (d) to the fullest extent permitted by applicable law, with respect to each of the foregoing Persons in clauses (a)-(c), each such Person's Representatives.

1.1.103    "**Releasing Claim Holder**" means, collectively: (a) all holders of Claims that vote to accept the Plan; (b) all holders of Claims that are presumed to accept the Plan and fail to timely object to the releases provided for in the Plan; (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases provided for in the Plan; and (d) all holders of Claims entitled to vote for or against the Plan who do not vote for or against the Plan and do not opt out of the releases provided for in the Plan.

1.1.104    "**Reorganized Debtor**" means the Debtor on and after the Effective Date.

1.1.105    "**Reorganized Debtor Payment Default**" means the failure by the Reorganized Debtor to pay when due any amount owed under the Talc PI Note.

1.1.106    "**Reorganized Debtor Payment Event of Default**" means a Reorganized Debtor Payment Default that is not remedied within thirty (30) days after the Reorganized Debtor has received written notice of such Reorganized Debtor Payment Default from the Talc Personal Injury Trust.

1.1.107    "**Representatives**" means, with respect to any Person, such Person's current and former (a) officers, directors, managers, employees, agents, and nominees and (b) financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals, in each case solely in their capacity as such.

1.1.108    "**Retained Professionals**" means the professionals retained in the Chapter 11 Case by the Debtor, the TCC, or the FCR, including financial advisors, attorneys, accountants, investment bankers, and consultants.

1.1.109    "**Retained Rights of Action**" means any claims, demands, rights, and causes of action that the Debtor or its Estate may hold against any Person that are not transferred or assigned under the Plan to the Talc Personal Injury Trust, including (a) any Recovery Actions, (b) any right of contribution, reimbursement, subrogation, or indemnification, or similar rights, that the Debtor has against any Person in respect of Talc Personal Injury Claims under contract or applicable law (other than the Imerys/Cyprus Related Rights), and (c) the causes of action listed or described on Exhibit G.

1.1.110    "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs of the Debtor as filed on the Docket in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

1.1.111    "**Secondment Agreement**" means that certain Amended and Restated Secondment Agreement, dated as of October 12, 2021, between the Debtor and Johnson & Johnson Services, Inc., a New Jersey corporation.

1.1.112    "**Secured Claim**" means a Claim, or any portion thereof:  (a) secured by a lien on property in which the Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code, (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code, or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

1.1.113    "**Settled Talc Insurance Policy**" means any Talc Insurance Policy as to which the Talc Insurance Rights thereunder have been released pursuant to a Talc Insurance Settlement Agreement or will be deemed settled, released, and extinguished pursuant to Section 11.2.1.

1.1.114 "**Settling Talc Insurance Company**" means, solely with respect to Settled Talc Insurance Policies:

(a) any Talc Insurance Company that contributes funds, proceeds, or other consideration in respect of Talc Personal Injury Claims or will be deemed released pursuant to Section 11.3.1 and is designated, with the consent of the Debtor, in the Confirmation Order as a Settling Talc Insurance Company; and

(b) any Talc Insurance Company that contributes funds, proceeds, or other consideration in respect of Talc Personal Injury Claims and is designated as a Settling Talc Insurance Company by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee having the exclusive right to negotiate and enter into Talc Insurance Settlement Agreements, pursuant to the Cooperation Agreement) on or after the Effective Date; *provided*, *however*, that any addition to the list of Protected Parties on or after the Effective Date does not become effective until entry of a Final Order approving the addition.

1.1.115 "**Support Agreement**" means that certain Support Agreement, dated April 4, 2023, by and among J&J, Holdco, and the Debtor, approved pursuant to that certain [***Insert Title of Order***][Dkt.[●]] entered by the Bankruptcy Court on [●], 2023.

1.1.116 "**Talc In-Place Insurance Coverage**" means all of the Talc Insurance Rights under any Talc Insurance Policy that is not a Settled Talc Insurance Policy, including the right to payment or reimbursement of liability, indemnity, or defense costs arising out of or in any way relating to Talc Personal Injury Claims.

1.1.117 "**Talc Insurance Action**" means any claim, cause of action, or right of the Debtor under the laws of any jurisdiction against any Talc Insurance Company with respect to any Talc Personal Injury Claim based on, arising out of, or in any way relating to: (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay in respect of Talc In-Place Insurance Coverage; (b) the refusal of any Talc Insurance Company to compromise and settle any Talc Personal Injury Claim under or pursuant to any Talc Insurance Policy; (c) the interpretation or enforcement of the terms of any Talc Insurance Policy with respect to any Talc Personal Injury Claim; (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any other dispute under, arising out of, or in any way relating to Talc In-Place Insurance Coverage or other Talc Insurance Rights.

1.1.118 "**Talc Insurance Assets**" means (a) all Talc In-Place Insurance Coverage, (b) all Talc Insurance Actions, (c) all Talc Insurance Recoveries, and (d) all Talc Insurance Settlement Agreements. For the avoidance of doubt, Talc Insurance Assets do not include Talc Insurance Policies themselves or any rights thereunder that are not related to the Debtor's coverage or rights to coverage for Talc Personal Injury Claims.

1.1.119    "**Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Person that may have liability under a Talc Insurance Policy.

1.1.120    "**Talc Insurance Policy**" means any insurance policy, currently or previously in effect at any time on or before the Effective Date, as to which the Debtor has rights as an insured, additional insured, successor, beneficiary, or otherwise, solely to the extent such policy provides the Debtor with coverage or a right to coverage for Talc Personal Injury Claims, including the policies listed on Exhibit H.  For the avoidance of doubt, Talc Insurance Policies shall not include any policy providing reinsurance to any Settling Talc Insurance Company.

1.1.121    "**Talc Insurance Recoveries**" means (a) the right to receive proceeds of Talc In-Place Insurance Coverage (including any receivables), (b) the right to receive the proceeds or benefits of any Talc Insurance Action, and  (c) the right to receive amounts payable pursuant to any Talc Insurance Settlement Agreement.

1.1.122    "**Talc Insurance Rights**" means all rights of the Debtor to make claims under the Talc Insurance Policies.

1.1.123    "**Talc Insurance Settlement Agreement**" means any settlement agreement entered into after the Petition Date by and between (a) any Talc Insurance Company, on the one hand, and (b) on or prior to the Confirmation Date, the Debtor or, on or after the Effective Date, the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee having the exclusive right to negotiate and enter into Talc Insurance Settlement Agreements, pursuant to the Cooperation Agreement), on the other hand, pursuant to which Talc Insurance Rights thereunder are released, including the settlement agreements listed on Exhibit I.

1.1.124    "**Talc Insurer Coverage Defense**" means all rights and defenses that any Talc Insurance Company may have under any Talc Insurance Policy and applicable law with respect to a claim seeking insurance coverage for a Talc Personal Injury Claim or to a Talc Insurance Action, but Talc Insurer Coverage Defenses do not include (a) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (b) any defense that the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to Section 4.9.4, or any other action contemplated by Section 4.9.4, is prohibited by the Talc Insurance Policies or applicable non-bankruptcy law.

1.1.125    "**Talc Personal Injury Claim**" means any claim or Talc Personal Injury Demand against the Debtor, Old JJCI, or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtor, Old JJCI, or any other Person for whose conduct the Debtor has, or is alleged to have, liability,

whether by assumption of such liability from such other Person, by agreement to indemnify, defend, or hold harmless such other Person from and against such liability, or otherwise, including any such claims and Talc Personal Injury Demands directly or indirectly arising out of or in any way relating to: (a) any products previously mined, processed, manufactured, designed, marketed, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, and/or in any other way made available by the Debtor or any other Person; (b) any materials present at any premises owned, leased, occupied, or operated by any Person; or (c) any talc in any way connected to the Debtor alleged to contain asbestos or other constituent. Talc Personal Injury Claims include all such claims and Talc Personal Injury Demands, whether: (i) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, reimbursement, or any other theory of law, equity or admiralty, whether brought, threatened, or pursued in any United States court or other court anywhere in the world, including Canada; (ii) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise (including under piercing the corporate veil, agency, alter ego, successor liability, fraudulent conveyance, conspiracy, enterprise liability, market share, joint venture, or any other legal or equitable theory); (iii) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs, fees, injunctive, or similar relief, or any other measure of damages; (iv) seeking any legal, equitable, or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims and Talc Personal Injury Demands arising out of or in any way relating to the presence of or exposure to talc or talc-containing products assertable against the Debtor or any other Protected Party; or (v) held by Persons residing within the United States or in a foreign jurisdiction, including Canada. Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Talc Personal Injury Claims do not include any claim or demand by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For the avoidance of doubt, Talc Personal Injury Claims include: (A) all claims, demands, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; (B) PI/Stay Order Claims; (C) Indirect Talc Personal Injury Claims; and (D) Canadian Claims. Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such. For the avoidance of doubt, Talc Personal Injury Claims do not include any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

1.1.126    "**Talc Personal Injury Demand**" means a demand for payment, present or future, against the Debtor or any other Protected Party that: (a) falls within the meaning of "demand" in section 524(g) of the Bankruptcy Code; (b) is in respect of an injury that manifests after the Effective Date; and (c) would have otherwise been a Claim that is a Talc Personal Injury Claim if such injury had manifested on or before the Effective Date. For the avoidance of doubt, Talc Personal Injury Demands do not include any demand for payment against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

1.1.127    "**Talc Personal Injury Governmental Action Claims Sub-Trust**" means the sub-trust of the Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement to resolve and satisfy Governmental Action Claims.

1.1.128    "**Talc Personal Injury Governmental Action Claims Sub-Trust Funds**" means collectively, (a) Cash Contributions delivered to the Talc Personal Injury Governmental Action Claims Sub-Trust pursuant to <u>Section 4.9.1(a)</u> and all earnings thereon, and (b) proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding Governmental Action Claims deposited in the Talc Personal Injury Governmental Action Claims Sub-Trust pursuant to <u>Section 4.8</u> and all earnings thereon.

1.1.129    "**Talc Personal Injury Tort Claims Sub-Trust**" means the sub-trust of the Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement to resolve and satisfy Talc Personal Injury Claims other than Governmental Action Claims, which sub-trust is a "qualified settlement fund" within the meaning of Treasury Regulations issued under Section 468B of the Internal Revenue Code.

1.1.130    "**Talc Personal Injury Tort Claims Sub-Trust Funds**" means collectively, (a) Cash Contributions delivered to the Talc Personal Injury Tort Claims Sub-Trust pursuant to <u>Section 4.9.1(a)</u> and all earnings thereon, (b) principal and interest payments made to the Talc Personal Injury Tort Claims Sub-Trust pursuant to the Talc PI Note and all earnings thereon, (c) proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding Talc Personal Injury Claims other than Governmental Action Claims deposited in the Talc Personal Injury Tort Claims Sub-Trust pursuant to <u>Section 4.8</u> and all earning thereon, and (d) proceeds of the recoveries on any Imerys/Cyprus Related Rights deposited in the Talc Personal Injury Tort Claims Sub-Trust pursuant to <u>Section 4.9.3(b)</u> and all earnings thereon.

1.1.131    "**Talc Personal Injury Trust**" means the LTL Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement and comprised of the Talc Personal Injury Governmental Action Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust.

1.1.132    "**Talc Personal Injury Trust Agreement**" means that certain trust agreement, substantially in the form of <u>Exhibit J</u>.

1.1.133    "**Talc Personal Injury Trust Defenses**" means all defenses, cross-claims, offsets, and recoupments regarding Talc Personal Injury Claims that the Debtor or

the Reorganized Debtor has (or would have had absent the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for the Talc Personal Injury Claims as contemplated by <u>Section 4.7.1</u>) against any Person under applicable law; *provided*, *however*, that the Talc Personal Injury Trust Defenses shall not include (a) any defenses, cross-claims, offsets, or recoupments against any Protected Party or any Talc Insurance Company, (b) any Retained Rights of Action, or (c) any Imerys/Cyprus Related Rights.

1.1.134 "**Talc Personal Injury Trust Documents**" means the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust, which shall be substantially in the form set forth as exhibits hereto or in the Plan Supplement, as they may be amended or modified from time to time in accordance with their terms and the Plan.

1.1.135 "**Talc Personal Injury Trust Expenses**" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Talc Personal Injury Trust once established (except for payments to holders of Talc Personal Injury Claims on account of such Claims). Talc Personal Injury Trust Expenses shall also expressly include the reasonable documented costs and expenses incurred by the Reorganized Debtor or any Non-Debtor Affiliate in taking any action on behalf of or at the direction of the Talc Personal Injury Trust, if any.

1.1.136 "**Talc PI Note**" means the note to be executed and delivered by the Reorganized Debtor in favor of the Talc Personal Injury Trust, in substantially the form of <u>Exhibit K</u>, in the principal amount of $400,000,000.00.

1.1.137 "**Talc PI Pledge**" means the pledge by Holdco of all of the membership interests of the Reorganized Debtor pursuant to the Talc PI Pledge Agreement.

1.1.138 "**Talc PI Pledge Agreement**" means the Pledge Agreement, substantially in the form of <u>Exhibit L</u>, to be executed and delivered by Holdco pursuant to which the Talc PI Pledge will be granted as security for payment of the Talc PI Note.

1.1.139 "**Talc Trust Advisory Committee**" means the committee appointed and serving in accordance with <u>Section 4.4</u>, and having the powers, duties and obligations set forth in the Talc Personal Injury Trust Agreement.

1.1.140 "**Talc Trust Advisory Committee Member**" means any member of the Talc Trust Advisory Committee.

1.1.141 "**Talc Trust Claims Administrator**" means (a) the individual who, pursuant to <u>Section 4.4.1</u>, is appointed by the Bankruptcy Court to serve as the initial claims administrator of the Talc Personal Injury Trust or (b) any individual who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.142   "**Talc Trust Liens Resolution Administrator**" means (a) the Person who, pursuant to <u>Section 4.4.2</u>, is appointed by the Bankruptcy Court to serve as the initial liens resolution administrator of the Talc Personal Injury Trust or (b) any Person who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.143   "**Talc Trustee**" means (a) any individual who, pursuant to <u>Section 4.3</u>, is appointed by the Bankruptcy Court to serve as an initial trustee of the Talc Personal Injury Trust or (b) any individual who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.144   "**TCC**" means the official committee of talc claimants appointed in the Chapter 11 Case, as such committee is reconstituted from time to time.

1.1.145   "**Trust Distribution Procedures**" means the Talc Personal Injury Trust Distribution Procedures, substantially in the form of <u>Exhibit M</u>.

1.1.146   "**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.147   "**Unimpaired**" means a Claim, or a Class of Claims, that is not Impaired under the Plan.

1.1.148   "**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of New Jersey.

1.1.149   "**Unsecured Claim**" means a Claim against the Debtor that is not an Administrative Claim, a Cure Amount Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Secured Claim, a Talc Personal Injury Claim, or an Intercompany Claim, including any Deficiency Claim.

1.2   <u>Interpretation; Application of Definitions; Rules of Construction; and Computation of Time</u>.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  Unless otherwise specified, all Article, Section, Exhibit, or Schedule references in the Plan are to the respective article or section of, or schedule or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code will apply to the construction of the Plan.  Unless otherwise stated herein, all references to dollars mean U.S. dollars.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) will apply.  The words "including" or "includes" shall be without limitation.

1.3 Exhibits. All exhibits and schedules to the Plan, to the extent not annexed hereto, and any agreements referred to herein and therein will be available for review following their filing with the Bankruptcy Court on (a) the Court's website: www.njb.uscourts.gov, and (b) the website maintained by the Claims Agent at https://dm.epiq11.com/case/ltl/dockets.

1.4 Ancillary Documents. Each of the exhibits and schedules to the Plan (whether annexed hereto or included in the Plan Supplement), the Disclosure Statement and supplements thereto, and the exhibits and schedules to the Disclosure Statement and the supplements thereto are an integral part of the Plan, and are hereby incorporated by reference and made a part of the Plan, including the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, the Amended Charter Documents, and the other Plan Documents.

# ARTICLE II
# TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

2.1 Administrative Claims.

2.1.1 Allowed Administrative Claims. Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 2.2, and Cure Amount Claims, which are governed by Section 5.4) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such other amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; provided, however, that (a) Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtor shall be paid by the Debtor or the Reorganized Debtor, as the case may be, in accordance with the terms and conditions of the particular transactions and agreements relating to such liabilities without any further action by the holders of such Claims or further approval of the Bankruptcy Court and (b) holders of such Administrative Claims shall not be required to comply with the requirements set forth in Section 2.1.2.

2.1.2 Administrative Claims Bar Date. Except as otherwise provided in this Article II, requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than sixty (60) days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtor or the Reorganized Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously

Allowed by Final Order, including all Administrative Claims expressly Allowed under the
Plan.

2.1.3     Disputed Administrative Claims.  If a Disputed Administrative Claim is
thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as
determined to be practicable by the Reorganized Debtor) distribute to the holder of such
Administrative Claim, the Cash that such holder would have received on account of such
Claim if such Administrative Claim had been an Allowed Administrative Claim on the
Effective Date.

2.2     Fee Claims.

2.2.1     All final fee requests for compensation or reimbursement of Fee Claims
pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code for
services rendered to the Debtor, the TCC, the AHC of Supporting Counsel, or the FCR, all
Fee Claims of members of the TCC for reimbursement of expenses, and all requests or
Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the
Reorganized Debtor and other parties required to be served by the Compensation
Procedures Order no later than forty-five (45) days after the Effective Date, unless
otherwise ordered by the Bankruptcy Court; *provided*, *however*, that the AHC of
Supporting Counsel shall be deemed to have substantially contributed to the Chapter 11
Case and shall not be required to make any further showing under section 503(b)(3)(D) of
the Bankruptcy Code.  Any objections to a final Fee Claim or any requests or claims under
section 503(b)(4) of the Bankruptcy Code must be filed no later than twenty (20) days after
the filing of such Claim.  The terms of the Compensation Procedures Order shall govern
the allowance and payment of any final Fee Claims submitted in accordance with this
Section 2.2.  The Fee Examiner appointed under the Fee Examiner Order shall continue to
act in this appointed capacity unless and until all final Fee Claims have been approved by
order of the Bankruptcy Court, and the Reorganized Debtor shall be responsible for the
payment of the fees and expenses incurred by the Fee Examiner in rendering services after
the Effective Date.

2.2.2     The amount of the Fee Claims owing to the Professionals on and after
the Effective Date shall be paid by the Reorganized Debtor in Cash to such Professionals
as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court
order.  Upon the Effective Date, any requirement that Professionals and Ordinary Course
Professionals of the Reorganized Debtor comply with sections 327 through 331 and 1103
of the Bankruptcy Code, the Compensation Procedures Order, the Fee Examiner Order, or
the Ordinary Course Professionals Order in seeking retention or compensation for services
rendered after such date will terminate, and the Reorganized Debtor may employ and pay
any Professional or Ordinary Course Professional in the ordinary course of business
without any further notice to or action, order or approval of the Bankruptcy Court.

2.3     Payment of Statutory Fees.  All fees payable under section 1930 of title 28 of the
United States Code, as determined at the Confirmation Hearing by the Bankruptcy Court or the
District Court, as applicable, shall be paid on or before the Effective Date.  The Reorganized

Debtor shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Case, and shall comply with all applicable statutory reporting requirements.

2.4     Allowed Priority Tax Claims.  On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, plus Postpetition Interest, if any, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such Claim agrees to an alternative treatment. Notwithstanding the provisions of this Section 2.4, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

## ARTICLE III
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1     Claims and Interests Classified.  For purposes of organization, voting, and all Plan confirmation matters, all Claims (other than Administrative Claims and Priority Tax Claims) against and Equity Interests of the Debtor are classified as set forth in this Article III.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Article II, have not been classified and are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes.  Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Non-Talc Claim that is not an Allowed Claim for distribution purposes.

3.2     Treatment and Classification of Claims and Interests.  For purposes of all Plan confirmation matters, including voting on, Confirmation of, and Distributions under, the Plan, all Claims (other than Administrative Claims and Priority Tax Claims, which are not classified) against and Equity Interests of the Debtor shall be classified and treated in the manner set forth below.

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|-------|-------------|-----------|---------------------|--------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|-------|-------------|-----------|---------------------|--------------------|
| 3 | Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 4 | Talc Personal Injury Claims | Impaired | Entitled to Vote | 100% |
| 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 6 | Equity Interests of the Debtor | Impaired | Entitled to Vote | Reinstated Subject to Talc PI Pledge |

### 3.2.1     Class 1 – Priority Non-Tax Claims

(a)     Classification: Class 1 consists of all Priority Non-Tax Claims against the Debtor.

(b)     Treatment: On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim plus Postpetition Interest thereon, unless the holder of such Claim, agrees to less favorable treatment.

(c)     Voting: Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of an Allowed Claim in Class 1 is entitled to vote to accept or reject the Plan.

### 3.2.2     Class 2 – Secured Claims

(a)     Classification: Class 2 consists of all Secured Claims against the Debtor.

(b)     Treatment: On the Distribution Date, unless otherwise agreed to by the holder of an Allowed Secured Claim in Class 2 and the Debtor or Reorganized Debtor, each holder of an Allowed Class 2 Claim, at the option of the Debtor or Reorganized Debtor, shall either (i) be paid in full in Cash, plus Postpetition Interest thereon, or (ii) have its Allowed Class 2 Claim Reinstated. Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.

(c)     Voting: Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy

Code.  No holder of an Allowed Claim in Class 2 is entitled to vote to accept or reject the Plan.

### 3.2.3    Class 3 – Unsecured Claims

(a)    Classification:  Class 3 consists of all Unsecured Claims against the Debtor.

(b)    Treatment:  Each holder of an Allowed Unsecured Claim against the Debtor shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus Postpetition Interest, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of such Unsecured Claim and the Debtor or Reorganized Debtor.

(c)    Voting:  Class 3 is Unimpaired and each holder of an Allowed Claim in Class 3 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of an Allowed Claim in Class 3 is entitled to vote to accept or reject the Plan.

### 3.2.4    Class 4 – Talc Personal Injury Claims

(a)    Classification:  Class 4 consists of all Talc Personal Injury Claims.

(b)    Treatment:  On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Talc Personal Injury Trust Documents.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Talc Personal Injury Trust Documents.

(c)    Voting:  Class 4 is Impaired and each holder of a Talc Personal Injury Claim in Class 4 is entitled to vote to accept or reject the Plan.

### 3.2.5    Class 5 – Intercompany Claims

(a)    Classification:  Class 5 consists of all Intercompany Claims.

(b)    Treatment:  On the Effective Date, each Allowed Claim in Class 5 shall be Reinstated.

(c)    Voting: Class 5 is Unimpaired and each holder of an Allowed Claim in Class 5 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of a Claim in Class 5 is entitled to accept or reject the Plan.

3.2.6     **Class 6 – Equity Interests of the Debtor**

      (a)     Classification: Class 6 consists of all Equity Interests of the Debtor.

      (b)     Treatment: On the Effective Date, Equity Interests of the Debtor shall be Reinstated, and the holder of such Interests shall retain such Interests, subject to the Talc PI Pledge.

      (c)     Voting: Class 6 is Impaired and each holder of an Equity Interest of the Debtor in Class 6 is entitled to vote to accept or reject the Plan.

3.3     <u>Debtor's Rights with Respect to Unimpaired Claims</u>. Nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4     <u>Elimination of Vacant Classes</u>. Any Class of Claims against or Interests in the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than $0.00 for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**ARTICLE IV**
**THE TALC PERSONAL INJURY TRUST**

4.1     <u>Establishment</u>. On the first Business Day following the Confirmation Date, the Talc Personal Injury Trust, and the Talc Personal Injury Governmental Action Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust comprising the Talc Personal Injury Trust, shall be created in accordance with the Plan Documents. The Talc Personal Injury Tort Claims Sub-Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Tax Code. The Talc Trustees shall segregate, and separately account for the use of, Talc Personal Injury Governmental Action Claims Sub-Trust Funds, on the one hand, and Talc Personal Injury Tort Claims Sub-Trust Funds, on the other hand.

4.2     <u>Purpose</u>. The purposes of the Talc Personal Injury Trust shall be to assume all Talc Personal Injury Claims and, among other things: (a) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents. The Talc Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly and equitably, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code. In the event of a conflict between the terms or provisions of the Plan and the Talc Personal Injury Trust Documents, the terms of the Plan shall control.

4.3     <u>Initial Talc Trustees</u>. There shall be two initial Talc Trustees. The initial Talc Trustees of the Talc Personal Injury Trust shall be [●] and [●]. All successor Talc Trustees shall

be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trustee shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code. A Talc Trustee shall be designated as the "administrator" of the Talc Personal Injury Trust Claims Sub-Trust as such term is used in Treasury Regulation Section 1.468B-2(k)(3).

4.4     Initial Talc Trust Advisory Committee and FCR.

     4.4.1     Initial Talc Trust Advisory Committee. The Talc Trust Advisory Committee shall be established pursuant to the Talc Personal Injury Trust Agreement. The initial Talc Trust Advisory Committee Members shall include: [●]. Each of the Talc Trust Advisory Committee Members shall serve in accordance with the terms and conditions contained in the Talc Personal Injury Trust Agreement. Successor Talc Trust Advisory Committee Members shall be appointed pursuant to the terms of the Talc Personal Injury Trust Agreement. For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trust Advisory Committee Member shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

     4.4.2     Initial FCR. The Talc Personal Injury Trust Agreement shall provide for the continuation of an FCR to represent any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown. The initial FCR under the Talc Personal Injury Trust Agreement shall be [●]. Any successor FCR under the Talc Personal Injury Trust Agreement shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, the FCR under the Talc Personal Injury Trust shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.5     Initial Talc Trust Administrators.

     4.5.1     Initial Talc Trust Claims Administrator. The initial Talc Trust Claims Administrator of the Talc Personal Injury Trust shall be [●]. All successor Talc Trust Claims Administrators shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, the Talc Trust Claims Administrator shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

     4.5.2     Initial Talc Trust Liens Resolution Administrator. The initial Talc Trust Liens Resolution Administrator of the Talc Personal Injury Trust shall be [●]. All successor Talc Trust Liens Resolution Administrators shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing its duties and

fulfilling its obligations under the Talc Personal Injury Trust Agreement and the Plan, the Talc Personal Injury Trust Lien Resolution Administrator shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.6     Payment of Talc Personal Injury Trust Expenses Prior to the Effective Date. From and after the Confirmation Date until the earlier of (a) the Effective Date and (b) such time as the Confirmation Order is vacated by the Bankruptcy Court, the Reorganized Debtor shall pay all reasonable and documented Talc Personal Injury Trust Expenses. For the avoidance of doubt, Talc Personal Injury Trust Expenses do not include payments to holders of Talc Personal Injury Claims on account of such Claims. All Cash necessary for the Reorganized Debtor to fund such Talc Personal Injury Trust Expenses shall be obtained through (a) the Debtor's Cash balances or (b) the Funding Agreement.

4.7     Trust Distribution Procedures. On the Effective Date, the Talc Personal Injury Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Talc Personal Injury Trust Agreement. From and after the Effective Date, the Talc Trustees shall have the authority to administer, amend, supplement, and modify the Trust Distribution Procedures solely in accordance with the terms thereof and of the Talc Personal Injury Trust Agreement.

4.8     Assumption of Liability for Trust Personal Injury Claims.

4.8.1     Assumption of Liability Generally. In consideration for the assets delivered, transferred, and assigned to the Talc Personal Injury Trust pursuant to this Article IV, and in furtherance of the purposes of the Talc Personal Injury Trust and the Plan, on the Effective Date, and without further action of any Person, subject to Section 4.8.4(a), the Talc Personal Injury Trust shall assume all liabilities, obligations, and responsibilities of the Debtor and the other Protected Parties for all Talc Personal Injury Claims, financial or otherwise, including Governmental Action Claims, Indirect Talc Personal Injury Claims, Talc Personal Injury Demands, and claims of any Imerys/Cyprus Party against the Debtor or any Protected Party under any Imerys/Cyprus Agreement or applicable law. This assumption shall not affect (a) the application of the Discharge Injunction and the Channeling Injunction to the Debtor; (b) any Talc Insurance Company's obligation under any Talc Insurance Policy; or (c) the Imerys/Cyprus Related Rights. From and after the Effective Date, the Debtor, the Reorganized Debtor, and the other Protected Parties shall have no liability, obligation, or responsibility, financial or otherwise, for any Talc Personal Injury Claim.

4.8.2     Defenses. Upon the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for Talc Personal Injury Claims as contemplated by Section 4.8.1, subject to Section 4.8.4(b) the Talc Personal Injury Trust Defenses shall be transferred to the Talc Personal Injury Trust. The transfer of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to this Section 4.8.2 shall not impair, affect, alter, or modify the right of any Person (including the Imerys/Cyprus Parties), against whom the Talc Personal Injury Trust may exercise Talc Personal Injury Trust Defenses to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor prior to the Effective Date, *provided*, *however*, for

the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to this <u>Section 4.8.2</u>, or any other action contemplated by this <u>Section 4.8.2</u>, is prohibited by applicable non-bankruptcy law.

4.8.3    <u>Enforcement of Defenses and Other Related Rights</u>.  From and after the Effective Date:  (a) the Talc Personal Injury Trust shall have control over the Talc Personal Injury Trust Defenses and the Talc Personal Injury Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each of the Talc Personal Injury Trust Defenses; and (b) subject to <u>Section 4.8.4(c)</u>, the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses shall be deposited in and become the property of the Talc Personal Injury Trust and the Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Cooperation Agreement) according to their respective term.  Notwithstanding the provisions of <u>Section 4.8.2</u> and this <u>Section 4.8.3</u>, (i) the Talc Personal Injury Trust shall have no rights against the Reorganized Debtor or the other Protected Parties except to enforce the Plan and the other Plan Documents, (ii) the Talc Personal Injury Trust Defenses transferred to the Talc Personal Injury Trust shall not include any claims fully and finally released, enjoined, compromised, or settled pursuant to the Plan, and (iii) for the avoidance of doubt, the Talc Personal Injury Trust Defenses transferred to the Talc Personal Injury Trust shall not include any rights of the Debtor, the Reorganized Debtor, or the other Protected Parties arising under the Channeling Injunction or any of the other injunctions or releases, or the discharge, granted under the Plan and the Confirmation Order.

4.8.4    <u>Effects of the Sub-Trusts</u>.  For the avoidance of doubt, notwithstanding anything to the contrary contained in this <u>Article IV</u>:

(a)    under <u>Section 4.8.1</u>, (i) the Talc Personal Injury Governmental Action Claims Sub-Trust shall assume the liabilities, obligations, and responsibilities for all Governmental Action Claims and (ii) the Talc Personal Injury Tort Claims Sub-Trust shall assume all liabilities, obligations, and responsibilities for all Talc Personal Injury Claims other than Governmental Action Claims;

(b)    under <u>Section 4.8.2</u>, (i) the Talc Personal Injury Trust Defenses regarding Governmental Action Claims shall be transferred to the Talc Personal Injury Governmental Action Claims Sub-Trust and (ii) the Talc Personal Injury Trust Defenses regarding Talc Personal Injury Claims other than Governmental Action Claims shall be transferred to the Talc Personal Injury Tort Claims Sub-Trust; and

(c)    under <u>Section 4.8.3</u>, (i) the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding Governmental Action Claims shall be deposited in and become the property of the Talc Personal Injury Governmental Action Claims Sub-Trust and (ii) the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding Talc Personal Injury Claims other than Governmental Action

Claims shall be deposited in and become the property of the Talc Personal Injury Tort Claims Sub-Trust.

4.8.5    No Common Benefit Fund Obligation.  Notwithstanding anything to the contrary contained in the Plan, neither the Reorganized Debtor nor the Talc Personal Injury Trust shall have any obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, to withhold any amounts from payments made by it under the Plan or any other Plan Document, including the Trust Distribution Procedures, in respect of Talc Personal Injury Claims to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

4.9    Contribution of Certain Assets.

4.9.1    Cash Contributions.

(a)    The Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Personal Injury Governmental Action Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust the Cash Contributions in accordance with Exhibit C.

(b)    All Cash Contributions to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund such Cash Contributions pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through (a) the Reorganized Debtor's Cash balances, (b) the Funding Agreement and, if such funding is not provided to the Reorganized Debtor under the Funding Agreement as required pursuant thereto, the Support Agreement, or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.

(c)    On the Effective Date, J&J and Holdco shall execute and deliver to the Talc Personal Injury Trust the Cash Contributions Parent Guarantee.  For the avoidance of doubt, nothing contained in this Section 4.9.1 shall in any way affect the obligations of J&J and Holdco under the Cash Contributions Parent Guarantee.

4.9.2    Talc PI Note and Related Talc PI Pledge.

(a)    On the Effective Date, (i) the Reorganized Debtor shall execute and deliver to the Talc Personal Injury Tort Claims Sub-Trust the Talc PI Note and (ii) Holdco shall execute and deliver to the Talc Personal Injury Trust the Talc PI Pledge Agreement.

(b)    The Talc PI Note shall:  (i) bear no interest; (ii) mature on the first anniversary of the Effective Date; (iii) be secured by the Talc PI Pledge; and (iv) provide for payment in full of the principal amount of the PI Talc Note on or before its maturity date.

(c)     A Reorganized Debtor Payment Event of Default shall not provide a basis for the Talc Personal Injury Trust or any other Person to contend that a material breach of the Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to the Plan, including the protections of the Channeling Injunction and related indemnification by the Talc Personal Injury Trust. If a Reorganized Debtor Payment Event of Default occurs, the Talc Personal Injury Trust may, upon five (5) days' written notice to the Reorganized Debtor and Holdco, foreclose upon the Talc PI Pledge.

4.9.3     Imerys/Cyprus Related Rights.

(a)     On the Effective Date, the Reorganized Debtor and J&J shall (and J&J shall cause any other LTL Corporate Party that has Imerys/Cyprus Related Rights to) transfer and assign to the Talc Personal Injury Trust the Imerys/Cyprus Related Rights. The transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust pursuant to this Section 4.9.3 shall not impair, alter, or modify the right of any Imerys/Cyprus Party against whom the Talc Personal Injury Trust may exercise the Imerys/Cyprus Related Rights to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor prior to the Effective Date; *provided*, *however*, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust  pursuant to this Section 4.9.3, or any other action contemplated by this Section 4.9.3, is prohibited by applicable non-bankruptcy law.

(b)     From and after the Effective Date:  (a) the Talc Personal Injury Trust shall have control over the Imerys/Cyprus Related Rights and the Talc Personal Injury Trust shall be the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce the Imerys/Cyprus Related Rights; and (b) the proceeds of the recoveries on any Imerys/Cyprus Related Rights shall be deposited in and become the property of Talc Personal Injury Tort Claims Sub-Trust.

(c)     From and after the Effective Date, pursuant to the Cooperation Agreement:  (i) the Reorganized Debtor, J&J, and the Talc Trustees shall cooperate and use their respective commercially reasonably efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust in accordance with this Section 4.9.3; and (ii) without limiting the generality of the foregoing clause (i), the Reorganized Debtor and J&J shall provide the Talc Personal Injury Trust with copies of the Imerys/Cyprus Agreements and such other information within the possession and control of the Reorganized Debtor and J&J as the Reorganized Debtor and J&J may determine to be necessary or appropriate in their respective sole discretion.  Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the provisions of this Section 4.9.3 or the Cooperation Agreement, such provision of information shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

4.9.4    <u>Talc Insurance Assets</u>.

(a)    Subject to the provisions of this <u>Section 4.9.4</u> and the Cooperation Agreement, on the Effective Date, the Reorganized Debtor shall transfer and assign to the Talc Personal Injury Trust the Talc Insurance Assets; *provided*, *however*, that, for the avoidance of doubt, the Reorganized Debtor shall not transfer and assign to the Talc Personal Injury Trust, and shall retain, (i) all proceeds of Talc In-Place Insurance Coverage received by the Debtor on or prior to the Effective Date, (ii) all proceeds or benefits of any Talc Insurance Action received by the Debtor on or prior to the Effective Date, and (iii) all amounts payable pursuant to any Talc Insurance Settlement Agreement received by the Debtor on or prior to the Effective Date.

(b)    From and after the Effective Date, in consideration of the Reorganized Debtor's obligations under <u>Section 4.9.1</u>, <u>Section 4.9.2</u>, and <u>Section 4.9.3</u>, (i) the Reorganized Debtor, as the agent for and subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement and (ii) any of the following received by the Talc Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor, which may thereafter use the same as it may determine in its sole discretion:  (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement.  Subject to the provisions of the Cooperation Agreement, the Reorganized Debtors shall pay, and bear sole responsibility with respect to the payment of, all costs and expenses, including attorneys' fees and expenses and other out-of-pocket fees and expenses, incurred by the Reorganized Debtor acting as agent for and subrogee of the Talc Personal Injury Trust pursuant to this <u>Section 4.9.4(b)</u>.  For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any LTL Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

(c)    From and after the Effective Date, pursuant to the Cooperation Agreement:  (i) the Reorganized Debtor, J&J, and the Talc Trustee shall cooperate and use their respective commercially reasonably efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with this <u>Section 4.9.4</u>; and (ii) without limiting the generality of the foregoing clause (i), the Reorganized Debtor and J&J shall provide the Talc Personal Injury Trust with copies of the Talc Insurance Policies and Talc Insurance Settlement Agreements and such other information within the possession and control of the Reorganized Debtor and J&J as the Reorganized Debtor and J&J may determine to be necessary or appropriate in their respective sole discretion.  Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the provisions of this <u>Section 4.9.4</u> or the Cooperation Agreement, such provision of information shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

(d)    If, notwithstanding the provisions of the Plan and Confirmation Order, the transfer and assignment of any of the Talc Insurance Assets is determined by any court of competent jurisdiction to be invalid under, or to violate the provisions of, any Talc Insurance Policy, then, notwithstanding anything to the contrary in the Plan, solely with respect to such Talc Insurance Asset, (i) the Reorganized Debtor will be deemed to have retained such Talc Insurance Asset and (ii) each provision of the Plan that provides or contemplates that the Talc Personal Injury Trust shall act through the Reorganized Debtor, or that the Reorganized Debtor shall act, as the agent for and subrogee of the Talc Personal Injury Trust with respect to such Talc Insurance Asset shall be deemed to instead provide or contemplate that the Reorganized Debtor will act for the benefit of the Talc Personal Injury Trust with respect to such Talc Insurance Asset.  For the avoidance of doubt, nothing in this Section 4.9.4(d) shall affect clause (ii) of Section 4.9.4(b).

4.10    Payment of Talc Personal Injury Trust Expenses From and After the Effective Date. Subject to Section 4.6, (a) the Talc Personal Injury Trust shall pay all Talc Personal Injury Trust Expenses from the assets of the Talc Personal Injury Trust and (b) the Talc Personal Injury Trust shall bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses.  Subject to Section 4.9.4(b) and the provisions of the Cooperation Agreement, the Talc Personal Injury Trust shall promptly pay all reasonable and documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtor or any Non-Debtor Affiliate for any and all liabilities, costs, or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.  The Talc Trustees shall cause (i) all Talc Personal Injury Trust Expenses related to Governmental Action Claims to be paid using Talc Personal Injury Governmental Action Claims Sub-Trust Funds and (ii) all Talc Personal Injury Trust Expenses related to Talc Personal Injury Claims other than Governmental Action Claims to be paid using Talc Personal Injury Tort Claims Sub-Trust Funds.

4.11    Treatment of Remainder Assets.  To the extent there are any assets of the Talc Personal Injury Governmental Action Claims Sub-Trust remaining at such time as the Talc Personal Injury Governmental Action Claims Sub-Trust is dissolved, such remaining assets shall be transferred to the Talc Personal Injury Tort Claims Sub-Trust.  To the extent there are any assets of the Talc Personal Injury Tort Claims Sub-Trust remaining at such time as the Talc Personal Injury Tort Claims Sub-Trust is dissolved, such remaining assets shall be transferred to a charity or charities for such charitable purposes as the Talc Trustees, in their reasonable discretion, shall determine.

4.12    Dissolution.  The Talc Personal Injury Trust shall be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents.  Upon dissolution of the Talc Personal Injury Trust, the Talc Trustees, the Talc Trust Advisory Committee Members, the FCR under the Talc Personal Injury Trust Agreement, the Talc Trust Claim Administrator, and the Talc Trust Liens Resolution Administrator shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case.

4.13    Funds and Investment Guidelines.  All monies held in the Talc Personal Injury Trust, whether held in the Talc Personal Injury Governmental Action Claims Sub-Trust or the Talc

Personal Injury Tort Claims Sub-Trust, shall be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

4.14    <u>Compliance with QSF Regulations</u>.  The Debtor and the Reorganized Debtor shall take all actions required of them as "transferor," and the designated Talc Trustee shall take all actions required of him or her as "administrator," with respect to the Talc Personal Injury Tort Claims Sub-Trust pursuant to Treasury Regulations promulgated under section 468B of the Internal Revenue Code.  Pursuant to such Treasury Regulations, the Talc Trustee designated as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made from the Talc Personal Injury Tort Claims Sub-Trust.  Any issue of interpretation of the Plan, the Talc Personal Injury Trust Agreement or other Talc Personal Injury Trust Documents, or the Confirmation Order shall be resolved in favor of an interpretation that conforms to the requirements of section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

4.15    <u>Cooperation Agreement</u>.  On the Effective Date, the Reorganized Debtor, J&J, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement.  The parties to the Cooperation Agreement shall be bound by the terms thereof.  The provision of information by the Reorganized Debtor or J&J to the Talc Personal Injury Trust pursuant to the Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

4.16    <u>Indemnification and Reimbursement of the Protected Parties</u>.  From and after the Effective Date, the Talc Personal Injury Trust shall indemnify, defend, and hold harmless, to the fullest extent permitted by applicable law, each of the Reorganized Debtor and the other Protected Parties (other than the Imerys/Cyprus Parties, if they are Protected Parties, for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) from and against any and all claims, demands, disputes, suits, damages, remedies, losses, awards, judgments, settlements, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever suffered or incurred by it subsequent to the Effective Date arising out of or in any way relating to any Talc Personal Injury Claim.  Without limiting the generality of the foregoing, from and after the Effective Date, the Talc Personal Injury Trust shall promptly reimburse each Protected Party (other than the Imerys/Cyprus Parties, if they are Protected Parties, for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) for any and all out-of-pocket damages, remedies, losses, awards, judgments, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever actually incurred by such Protected Party subsequent to the Effective Date attributable to the defense of any Talc Personal Injury Claim in the event that the holder of such Talc Personal Injury Claim seeks to hold such Protected Party liable for such Talc Personal Injury Claim in violation of the Plan and the Channeling Injunction.  For the avoidance of doubt, notwithstanding the foregoing, under this <u>Section 4.16</u>, (a) the Talc Personal Injury Governmental Action Claims Sub-Trust shall indemnify, defend, and hold harmless such Persons from against such items arising out of or in any way relating to any Governmental Action Claim and (b) the Talc Personal Injury Tort Claim Sub-Trust shall indemnify, defend, and hold harmless such Persons from and against any such items arising out of or in any way relating to any Talc Personal Injury Claim other than Governmental Action Claims.

4.17    Exculpation of the Protected Parties.  None of the Protected Parties shall have or incur any liability to any Person for any act or omission taken or to be taken in connection with, arising out of, or in any way relating to the administration or operation of the Talc Personal Injury Trust, including (a) the management of the assets of the Talc Personal Injury Trust and (b) the processing, liquidation, and payment of Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1    General Treatment.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtor or the Reorganized Debtor shall assume each of its Executory Contracts and Unexpired Leases other than those listed on Exhibit N; provided, however, that the Debtor reserves the right, at any time prior to the Effective Date, to amend Exhibit N to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to Exhibit N, thus providing for its rejection pursuant to Section 5.5.  The Debtor shall provide notice of any amendments to Exhibit N to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 11 Case.  Nothing herein shall constitute an admission by the Debtor or the Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability thereunder.

5.2    Assumption and Assignment.

5.2.1    Assumption.  Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

5.2.2    Postpetition Amendments.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.2.3    Assignment.  Each assumed Executory Contract or Unexpired Lease shall be a contract or lease of the Reorganized Debtor unless an assignee is identified in accordance with the procedures in Section 5.3.

5.3     Approval of Assumptions and Assignments and Related Procedures.

5.3.1     Effect of Assumption.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.3.2     Approval and Related Procedures.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section 5.1, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption or assumption and assignment of an Executory Contract or Unexpired Lease are as follows:

(a)     After the entry of the Confirmation Order, the Debtor shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned and, if applicable, any assignee; (ii) the Cure Amount Claim, if any, that the Debtor believes would be payable in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

(b)     Any Person wishing to object to (i) the proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must file and serve on counsel to the Debtor or the Reorganized Debtor a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section 5.3.2(a).

(c)     If no objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (i) the proposed assumption or assumption and assignment of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtor in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

(d)     If an objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtor or the Reorganized Debtor, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)     If an objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtor or the Reorganized Debtor, as applicable, may file a reply to such objection no later than thirty (30) days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtor or the Reorganized Debtor, as applicable, may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section 5.5 and amend Exhibit N accordingly.

5.4     Payments Related to Assumption.

5.4.1     Payment Options.  To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or the Reorganized Debtor assuming such contract or lease or the assignee of the Debtor or the Reorganized Debtor, if any:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or as promptly as reasonably practicable after the Cure Amount Claim is allowed or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.

5.4.2     Disputes.  Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest.  If there is a dispute regarding (a) the amount of any Cure Amount Claim, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

5.5     Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures.

5.5.1     Rejection Generally.  On the Effective Date, each Executory Contract and Unexpired Lease listed on Exhibit N shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and lease listed on Exhibit N shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit N shall not constitute an admission by the Debtor or the Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

5.5.2     Rejection Procedures.  The procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

(a)       After the entry of the Confirmation Order, the Debtor shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.  For the avoidance of doubt, additional notices may be served upon any amendment to Exhibit N (including pursuant to Section 5.3.2(e)).

(b)       Any Person wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must file and serve on counsel to the Debtor or the Reorganized Debtor a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section 5.5.2(a).

(c)       If no objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

(d)       If an objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtor or the Reorganized Debtor, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)       If an objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtor or the Reorganized Debtor, as applicable, may file a reply to such objection no later than 30 days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

5.6       Claims Based on Rejection.

5.6.1       Proof of Claim Required.  If the rejection or deemed rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor, the Reorganized Debtor, any assignee, or their properties, whether by way of setoff, recoupment, or otherwise, unless a Proof of Claim is filed with the Claims Agent and served upon counsel for the Debtor or the Reorganized Debtor by the later of (a) thirty (30) days after service of the notice described in Section 5.5.1(a), and (b) thirty (30) days after service of notice of entry of a Final Order rejecting such Executory Contract or Unexpired Lease, which notice, in each case, will set forth such deadline.

5.6.2       Classification of Claims.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time period provided in Section 5.6.1 will be automatically disallowed, forever barred from assertion, and unenforceable, without the need for any objection, or further notice to, or action, order, or approval of the Bankruptcy Court.  All Allowed Claims arising from the

rejection of an Executory Contract or Unexpired Lease shall be classified as a Class 3 Unsecured Claim and shall be treated in accordance with Section 3.2.3.

5.7    Contracts and Leases Entered Into After the Petition Date.  Notwithstanding any other provision of the Plan, contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, shall be performed by the Debtor or the Reorganized Debtor in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business.  Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

5.8    Reservation of Rights.  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the list of the Executory Contracts and Unexpired Leases to be rejected by the Debtor, or anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor, or any assignee has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, the Reorganized Debtor, or any assignee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.9    Imerys/Cyprus Agreements.  Notwithstanding any other provision of this Plan, this Article V shall not apply to the Imerys/Cyprus Agreements.  To the extent that the Imerys/Cyprus Agreements are considered to be executory contracts, the Plan shall constitute a motion to assume and assign the Imerys/Cyprus Agreements to the Talc Personal Injury Trust in accordance with Section 4.9.3, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption  and assignment is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to any Imerys/Cyprus Agreements. The Imerys/Cyprus Agreements shall be assigned by the Reorganized Debtor and J&J (and other applicable LTL Corporate Parties) to the Talc Personal Injury Trust as of the Effective Date to effect the assignment of the Imerys/Cyprus Related Rights in accordance with Section 4.9.3.

5.10    Talc Insurance Assets.  Notwithstanding any other provision of this Plan, this Article V shall not apply to the Talc Insurance Assets.  To the extent that the Talc Insurance Assets are considered to be executory contracts, the Plan shall constitute a motion to assume and assign the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with Section 4.9.4, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to any Talc Insurance Asset.  The Talc Insurance

Assets shall be assigned by the Reorganized Debtor to the Talc Personal Injury Trust in accordance with <u>Section 4.9.4</u> as of the Effective Date.

## ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-TALC CLAIMS

6.1     <u>Distributions</u>.  Distributions on account of Allowed Non-Talc Claims shall be made on or after the Distribution Date as provided in this <u>Article VI</u>.  This <u>Article VI</u> shall not apply to Talc Personal Injury Claims.   All Talc Personal Injury Claims shall be liquidated and, as appropriate, paid, or otherwise resolved, by the Talc Personal Injury Trust pursuant to and in accordance with the Talc Personal Injury Trust Documents.

6.2     <u>Timing and Calculation of Amounts to be Distributed</u>.

6.2.1     <u>General</u>.  On the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Non-Talc Claim shall receive the full amount of the Distribution that the Plan provides for such Allowed Claim in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any Distribution to be made pursuant to the Plan shall be deemed to have been timely made if made within sixty (60) days after the time therefor specified in the Plan.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

6.2.2     <u>Disputed Non-Talc Claims</u>.  If and to the extent that there are Disputed Non-Talc Claims, Distributions on account of any such Disputed Non-Talc Claims shall be made pursuant to the provisions set forth in this <u>Article VI</u>.

6.3     <u>Designation of Disbursing Agent</u>.  All Distributions under the Plan shall be made by the Disbursing Agent.  The Reorganized Debtor, or any such other Person or Persons designated by the Reorganized Debtor, shall serve as Disbursing Agent for all Non-Talc Claims.

6.4     <u>Rights and Powers of Disbursing Agent</u>.

6.4.1     <u>General</u>.  The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

6.4.2     <u>Fees and Expenses</u>.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent

on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

6.5     **Distributions on Account of Claims Allowed After the Effective Date**. Notwithstanding any other provision of the Plan, no Distributions shall be made under the Plan on account of any Disputed Non-Talc Claim, unless and until such Disputed Non-Talc Claim becomes an Allowed Non-Talc Claim.  Distributions made after the Effective Date to holders of Disputed Non-Talc Claims that are not Allowed Non-Talc Claims as of the Effective Date but which later become Allowed Non-Talc Claims shall be made as if such Claim had been an Allowed Claim on the Effective Date.  Except as otherwise may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Non-Talc Claim, on the other hand, and notwithstanding any provision otherwise in the Plan, no partial payments and no partial Distributions shall be made with respect to any Disputed Non-Talc Claim until all Disputed Non-Talc Claims held by the holder of such Disputed Non-Talc Claim have become Allowed Non-Talc Claims or have otherwise been resolved by settlement or Final Order.

6.6     Delivery of Distributions and Undeliverable or Unclaimed Distributions.

6.6.1     Delivery of Distributions to Holders of Non-Talc Claims.  Distributions to holders of Allowed Non-Talc Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.

6.6.2     Full Benefit of Distributions.  Distributions under the Plan on account of Non-Talc Claims shall not be subject to levy, garnishment, attachment, or similar legal process, so that each holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan.  None of the Debtor, the Reorganized Debtor, or the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct, or fraud.

6.6.3     Undeliverable Distributions and Unclaimed Property.  In the event that any Distribution to any holder of an Allowed Non-Talc Claim is returned as undeliverable, no further Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable to such holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of three (3) months from the applicable Distribution Date.  After such date, all

"unclaimed property" or interests in property in respect of the Reorganized Debtor shall revert to the Reorganized Debtor, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The claim of any holder to such property or interest in property shall be discharged and forever barred. Nothing contained in the Plan shall require the Debtor, the Reorganized Debtor, or the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

6.7     Time Bar to Cash Payments. Checks issued by the Disbursing Agent in respect of Allowed Non-Talc Claims shall be null and void if not cashed within one hundred and eighty (180) days of the date of issuance thereof. The holder of the Allowed Non-Talc Claim with respect to which such check originally was issued may make a request for re-issuance of any check directly to the Disbursing Agent; *provided*, *however*, that any such request for re-issuance of a check shall be made on or before the twelve (12) month anniversary of the Distribution Date. After such date, all Non-Talc Claims in respect of void checks shall be discharged and forever barred.

6.8     Record Date for Holders of Claims. Except as otherwise provided in an order of the Bankruptcy Court that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001, on or prior to the Distribution Record Date, shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. If there is any dispute regarding the identity of the Person entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

6.9     Compliance with Tax Requirements and Allocations.

6.9.1     General. In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan if necessary to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other reasonable mechanisms it believes are necessary or appropriate. To the extent that any Claim holder fails to submit appropriate tax certification forms required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with such withholding and reporting requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed "unclaimed property" subject to Section 6.6.3.

6.9.2     Tax Withholding. Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally

include corporations) and, when required, demonstrates this fact; or (b) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Among other things, to receive any Postpetition Interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding. Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form) to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan. Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of Postpetition Interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

6.9.3    _Obligations of Distribution Recipients_.  Notwithstanding any other provision of the Plan, each Person receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding, and other tax obligations.

6.9.4    _Tax Allocations_.  For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.10    _Transfers of Claims_.  In the event that the holder of any Non-Talc Claim shall transfer such Claim after the Distribution Record Date, it shall immediately advise the Reorganized Debtor in writing of such transfer and file a notice of the transfer with the Bankruptcy Court. The Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the Reorganized Debtor. Each transferee of any Non-Talc Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Reorganized Debtor shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

6.11    _Setoffs_.  The Debtor and the Reorganized Debtor may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, causes of action, debts, or liabilities of any nature that the Debtor or the Reorganized Debtor may hold against the holder of such Allowed Claim; _provided_, _however_, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts, or liabilities.

## ARTICLE VII
## RESOLUTION OF DISPUTED CLAIMS OTHER THAN
## TALC PERSONAL INJURY CLAIMS

7.1     Disputed Claims.  This Article VII shall apply to all Disputed Claims against the Debtor, other than Talc Personal Injury Claims and Administrative Claims (including Fee Claims and Cure Amount Claims).  This Article VII shall not apply to Talc Personal Injury Claims or Administrative Claims (including Fee Claims and Cure Amount Claims).  All Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents as indicated in Section 7.2.2.  All Administrative Claims (including Fee Claims and Cure Amount Claims)  shall be resolved as provided in Article II and Article V as indicated in Section 7.2.2.

7.2     Prosecution of Claims Generally.

    7.2.1     No Approval or Notice Required Generally.  Subject to the provisions contained herein, after the Effective Date, only the Reorganized Debtor may object to the allowance of any Non-Talc Claim.  After the Effective Date, the Reorganized Debtor shall be accorded the power and authority to allow or settle and compromise any Non-Talc Claim without notice to any other party or approval of or notice to the Bankruptcy Court.

    7.2.2     Procedures for Specified Claims.  Notwithstanding anything to the contrary in this Article VII, (a) resolution of Talc Personal Injury Claims shall be handled exclusively by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, (b) objections to Administrative Claims (excluding Fee Claims and Cure Amount Claims) shall be handled in accordance with Section 2.1, (c) objections to Fee Claims shall be handled in accordance with the Compensation Procedures Order, subject to Section 2.2, and (d) resolution of Cure Amount Claims shall be handled in accordance with Section 5.3 and Section 5.4.

7.3     Prosecution of Disputed Non-Talc Claims and Claims Objection Deadline.

    7.3.1     Right to Litigate.  The Reorganized Debtor shall have the right, after the Effective Date, to file objections to Non-Talc Claims that have not already been Allowed by Final Order, agreement, or the Plan, and litigate to judgment, settle, or withdraw such objections to Disputed Non-Talc Claims.  Without limiting the foregoing, the Reorganized Debtor shall have the right to litigate any Disputed Non-Talc Claim either in the Bankruptcy Court or in any court of competent jurisdiction.

    7.3.2     Claims Objection Deadline.  Unless otherwise ordered by the Bankruptcy Court, objections to Non-Talc Claims (other than Administrative Claims, including Fee Claims and Cure Amount Claims) shall be filed with the Bankruptcy Court and served upon the holders of each such Non-Talc Claim to which objections are made on or before the Claims Objection Bar Date, unless extended by order of the Bankruptcy Court prior to the expiration of such period.

7.4     Distributions on Account of Disputed Claims.  At such time as determined to be practicable by the Reorganized Debtor, the Disbursing Agent will make Distributions on account

of any Disputed Claim that has become Allowed.  Such Distributions will be made pursuant to the applicable provisions of Article VI.

7.5     No Distributions Pending Allowance.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved by agreement or Final Order and such Disputed Claim becomes an Allowed Claim.

7.6     Authority to Amend Schedules.  The Debtor or the Reorganized Debtor shall have the authority to amend the Schedules with respect to any Non-Talc Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or the Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have twenty (20) days to file an objection to such amendment with the Bankruptcy Court.  If no such objection is filed, the Debtor or the Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

8.1     Conditions Precedent to the Confirmation of the Plan.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Section 8.3:

(a)     The Bankruptcy Court shall have entered an order, acceptable in form and substance to the Debtor, J&J, and the AHC of Supporting Counsel approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(c)     The Plan and the Plan Supplement, including any schedules, documents, supplements, and exhibits thereto, shall be in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel and shall be consistent with (i) section 524(g) of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan.

(d)     The Confirmation Order shall:

(i)     have been entered by the Bankruptcy Court and the District Court acting jointly, or by the District Court affirming an order entered separately by the Bankruptcy Court;

(ii)    be reasonably acceptable in form and substance to the Debtor, J&J, and the AHC of Supporting Counsel; and

(iii)    provide for the Injunctions in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel.

(e)    The Bankruptcy Court and the District Court acting jointly or the Bankruptcy Court acting separately but affirmed by the District Court shall have made the following findings, each of which shall be contained in the Confirmation Order:

(i)    The Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Plan and the Talc Personal Injury Trust.

(ii)    (A) As of the Effective Date, the Talc Personal Injury Trust shall assume all liability and responsibility, financial and otherwise, for all Talc Personal Injury Claims and (B) subject to the delivery, transfer, or assignment, as applicable, to the Talc Personal Injury Trust of the Cash Contributions, Talc PI Note, Talc Pledge Agreement, Imerys/Cyprus Related Rights, and Talc Insurance Assets pursuant to <u>Section 4.9</u>, from and after the Effective Date, no Protected Party (other than any Imerys/Cyprus Party, if the Imerys/Cyrus Parties are Protected Parties, for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights, as applicable) shall have any liability or responsibility, financial or otherwise, for any Talc Personal Injury Claims.

(iii)    As of the Petition Date, the Debtor had been named as a defendant in personal injury or wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

(iv)    The Talc Personal Injury Trust shall be funded in whole or in part by securities of the Reorganized Debtor and by the obligation of the Reorganized Debtor to make future payments.

(v)    The Talc Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor.

(vi)    The Talc Personal Injury Trust shall use its assets or income to pay Talc Personal Injury Claims, including Talc Personal Injury Demands.

(vii)    As to Talc Personal Injury Demands:

(A)    The Debtor is likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(B) The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(C) Pursuit of Talc Personal Injury Demands outside the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to deal equitably with Talc Personal Injury Claims and Talc Personal Injury Demands.

(viii) The terms of the Channeling Injunction and the Insurance Entity Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.

(ix) The Plan establishes a separate class of the claimants whose claims are to be addressed by the Talc Personal Injury Trust which class has voted, by at least 75% of those voting, in favor of the Plan.

(x) Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms, such as structured, periodic, or supplemental payments, *pro rata* distributions, matrices, or periodic review of estimates of the numbers and values of Talc Personal Injury Claims, or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust shall value, and be in a financial position to pay, Talc Personal Injury Claims, including Talc Personal Injury Demands, that involve similar claims in substantially the same manner.

(xi) Each Protected Party is:

(A) identifiable from the terms of the Channeling Injunction and the Insurance Entity Injunction by name or as part of an identifiable group and is or may be alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor to the extent that such alleged liability arises by reason of one or more of the following:

(I) such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(II) such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(III)    such Person's service as an officer, director, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(IV)    such Person's provision of insurance to the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); or

(V)    such Person's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or any Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (I) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (II) acquiring or selling a financial interest in any Person as part of such transaction; and/or

(B)    otherwise entitled to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code.

(xii)    The FCR was appointed as part of the proceedings leading to issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of protecting the rights of all Persons, whether known or unknown, that might subsequently assert, directly or indirectly, against the Debtor a Talc Personal Injury Demand that is addressed in the Channeling

Injunction and the Insurance Entity Injunction and channeled to the Talc Personal Injury Trust.

(xiii)     Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Channeling Injunction and the Insurance Entity Injunction is fair and equitable with respect to individuals that might assert Talc Personal Injury Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of any such Protected Party.

(xiv)     The Plan and the Plan Documents comply with section 524(g) of the Bankruptcy Code in all respects, and the Talc Personal Injury Trust Documents are fully consistent with the Plan.

(xv)     The Plan, including the Channeling Injunction and the Insurance Entity Injunction, and the other Plan Documents are a fair, equitable, and reasonable resolution of the liability of the Debtor for the Talc Personal Injury Claims, including Talc Personal Injury Demands.

(xvi)     The FCR has adequately and completely fulfilled her duties, responsibilities, and obligations as the representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown, in accordance with section 524(g) of the Bankruptcy Code.

(xvii)     Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to:  (A) all known creditors and holders of Interests; (B) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the TCC and the FCR); (C) all parties to Unexpired Leases and Executory Contracts with the Debtor; (D) all taxing authorities listed on the Debtor's Schedules or in the Debtor's Claims database; (E) the Department of the Treasury by service upon the District Director of the IRS; (F) state attorneys general and state departments of revenue for states in which the Debtor has conducted business; and (G) the Securities and Exchange Commission; in each case, (I) in accordance with the solicitation procedures governing such service and (II) in substantial compliance with Bankruptcy Rules 2002(b), 3017, and 3020(b).  Such transmittal and service were adequate and sufficient to bind, among other parties, each holder of a Talc Personal Injury Claim, and each party represented by the FCR, and no other or further notice is or shall be required.

(xviii)   Each holder of a Talc Personal Injury Claim and each party represented by the TCC or the FCR has been afforded due process based on the notice referenced in clause (xvii) above, the appointment of the TCC and the FCR, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

(xix)     The Bankruptcy Code authorizes the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, and from and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust, no Imerys/Cyprus Party may assert under any Imerys/Cyprus Agreement or otherwise (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.3</u>, or any other action contemplated by <u>Section 4.9.3</u>, is prohibited by any Imerys/Cyprus Agreement or by applicable non-bankruptcy law.

(xx)     The Bankruptcy Code authorizes the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, and from and after the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, no Talc Insurance Company may assert under any Talc Insurance Policy or Talc Insurance Settlement Agreement (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, or any other action contemplated by <u>Section 4.9.4</u>, is prohibited by any Talc Insurance Policy or Talc Insurance Settlement Agreement or by applicable non-bankruptcy law.

(xxi)     Neither the Plan nor any other Plan Document, including the Trust Distribution Procedures, creates any obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, that would require the Reorganized Debtor or the Talc Personal Injury Trust to withhold any amounts from payments made by it under the Plan or any other Plan Document, including the Trust Distribution Procedures, in respect of Talc Personal Injury Claims to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(f)     The Bankruptcy Court and the District Court, as required, shall have entered an order approving the Channeling Injunction and the Insurance Entity Injunction, which order may be included in the Confirmation Order and which order shall be in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel.

8.2     <u>Conditions Precedent to the Effective Date of the Plan</u>. Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the

first Business Day on which each of the following conditions has been satisfied or waived pursuant to Section 8.3:

(a)     The Confirmation Order in form and substance reasonably acceptable to the Debtor, J&J, and the AHC of Supporting Counsel shall have been entered by the Bankruptcy Court and the District Court acting jointly or by the District Court affirming an order entered separately by the Bankruptcy Court, and shall have become a Final Order.

(b)     An order shall have been entered by the Bankruptcy Court and the District Court acting jointly or by the District Court affirming an order entered separately by the Bankruptcy Court approving the Channeling Injunction and the Insurance Entity Injunction and authorizing the Debtor and the Reorganized Debtor to implement the Plan, which order may be included in the Confirmation Order and which order shall be in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel.

(c)     The Confirmation Order, the Channeling Injunction, and the Insurance Entity Injunction shall be in full force and effect, and no order shall be in effect staying or enjoining the implementation or enforcement of the Plan, the Confirmation Order, the Channeling Injunction, or the Insurance Entity Injunction.

(d)     No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall be pending.

(e)     The Talc Personal Injury Trust Defenses, initial Cash Contribution, Talc PI Note, Talc PI Pledge Agreement, Imerys/Cyprus Related Rights, and Trust Insurance Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be delivered, transferred, and assigned, as applicable, to the Talc Personal Injury Trust in accordance with Article IV.

(f)     The Talc Personal Injury Trust Agreement (and related documents), and the other applicable Plan Documents (including those attached to the Plan Supplement) necessary or appropriate to implement the Plan shall have been executed, delivered, and, where applicable, filed with the appropriate governmental units in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel, and shall be fully enforceable in accordance with their terms.

(g)     The fees of the United States Trustee then owing by the Debtor shall have been paid in full.

(h)     The Canadian Court shall have entered an order in the Canadian Proceeding recognizing the Confirmation Order in its entirety and ordering the Confirmation Order and the Plan to be implemented and effective in Canada in accordance with their terms.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time, on the date that the Debtor or Reorganized Debtor files a notice with the Bankruptcy Court stating that the Effective

Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

8.3     Waiver of Conditions Precedent. To the greatest extent permitted by law, each of the conditions precedent in this Article VIII may be waived or modified, in whole or in part, by the Debtor (with the consent of (a) in the event such waiver or modification affects the rights of J&J expressly contained herein, J&J and (b) in the event such waiver or modification affects the rights of the AHC of Supporting Counsel expressly contained herein, the AHC of Supporting Counsel). Any waiver or modification of a condition precedent under this Section 8.3 may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action. Confirmation and the Effective Date shall occur irrespective of whether any Claims allowance process or related litigation has been completed.

8.4     Notice of Effective Date. The Debtor shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within five (5) Business Days thereafter, which notice shall confirm that the foregoing conditions have been satisfied or waived.

8.5     Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan. If any of the conditions precedent to the Effective Date of the Plan set forth in Section 8.2 has not been satisfied or duly waived in accordance with Section 8.3, then, upon motion by the Debtor made before the time that each of such conditions precedent has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent set forth in Section 8.2 is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section 8.5: (a) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtor or (ii) prejudice in any manner the rights, including any claims or defenses, of the Debtor or any other Person.

# ARTICLE IX
## MEANS FOR IMPLEMENTATION OF THE PLAN

9.1     General. On or after the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtor to implement effectively the provisions of the Plan, the Talc Personal Injury Trust Documents, and the Confirmation Order, including the creation of the Talc Personal Injury Trust and the preparations for the delivery, transfer, and assignment of assets to the Talc Personal Injury Trust pursuant to Article IV.

9.2     Operations of the Debtor Prior to the Effective Date. The Debtor shall continue to operate as debtor and debtor-in-possession through and until the Effective Date.

9.3     Articles of Organization and Operating Agreement. From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the Amended Charter Documents.

The Amended Articles of Organization and the Amended Operating Agreement shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.

9.4     Corporate Action.  On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtor or Reorganized Debtor, including actions requiring a vote of the board of managers and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or managers of the Debtor or Reorganized Debtor.

9.5     Authority of Officers.  Each officer of the Debtor and the Reorganized Debtor shall be authorized and empowered to execute, deliver, file, or record such contracts, instruments, releases, and other agreements and documents and take such other actions as may be necessary or appropriate to effect and implement the provisions of the Plan.  The secretary or any assistant secretary of the Debtor or the Reorganized Debtor shall be authorized to certify or attest to any of the actions taken pursuant to this Section 9.5.

9.6     Post-Effective Date Governance; Continued Existence of the Reorganized Debtor.

9.6.1     General.  The Reorganized Debtor shall continue its existence as a separate entity after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is formed and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

9.6.2     Officers and Managers.  On the Effective Date, the officers and managers  of the Reorganized Debtor shall consist of the individuals that will be identified in Exhibit O.

9.6.3     Property and Operations.  On the Effective Date, all property of the Debtor's Estate other than the assets delivered, transferred, or assigned to the Talc Personal Injury Trust pursuant to Article IV, including any property acquired by the Debtor or the Reorganized Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, interests, liens, other Encumbrances, and liabilities of any kind.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, interests, or Retained Rights of Action, without supervision or approval by the Bankruptcy Court, or notice to any other Person, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.7     Arrangements of the Reorganized Debtor with Managers, Officers and Employees. As of the Effective Date, the Reorganized Debtor shall be authorized to:  (a) maintain, amend, or revise existing indemnification and other arrangements with its active and retired managers and

officers, subject to the terms and conditions of any such agreement, or enter into new indemnification and other arrangements with its active and retired managers and officers; and (b) maintain, amend, cancel, or revise the Secondment Agreement or enter into new employee secondment arrangements with its Affiliates; all as determined by the board of managers of the Reorganized Debtor.

9.8     Good Faith Compromise and Settlement.  The Plan, the other Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies based on the unique circumstances of this Chapter 11 Case, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.

9.9     Resolution of Talc Personal Injury Claims.  Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, subject to:  (a) the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee having the exclusive right to right (i) to pursue and resolve any Talc In-Place Insurance Coverage, (ii) to pursue and resolve any Talc Insurance Action, (iii) to pursue and obtain any Talc Insurance Recoveries, and (iv) to negotiate and enter into any Talc Insurance Settlement Agreement, pursuant to the Cooperation Agreement) in respect of any Talc Insurance Assets; and (b) the right of any Imerys/Cyprus Party to raise any valid Imerys/Cyprus Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust in respect of any Imerys/Cyprus Related Rights.

9.10    Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan.  All Cash for the payment of Cash Contributions, Distributions, and other Cash payments to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund the payment of such Cash Contributions, Distributions, and other Cash payments pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through (a) the Reorganized Debtor's Cash balances, (b) the Funding Agreement and, if such funding is not provided to the Reorganized Debtor under the Funding Agreement as required pursuant thereto, the Support Agreement, or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.  On the Effective Date, J&J and Holdco shall execute and deliver to the Talc Personal Injury Trust the Cash Contributions Parent Guarantee as provided in Section 4.9.1(c).  For the avoidance of doubt, nothing contained in this Section 9.10 shall in any way affect the obligations of J&J and Holdco under the Cash Contributions Parent Guarantee.

9.11    Modification of the Plan.  To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted by the Debtor, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires

additional disclosure.  To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary or appropriate to carry out the purposes and intent of the Plan.  From and after the Effective Date, any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented pursuant to this Section 9.11, unless the Bankruptcy Court rules otherwise.

9.12    Revocation or Withdrawal of the Plan.  The Debtor reserves the right to revoke and withdraw the Plan at any time before its substantial consummation.  If the Debtor revokes or withdraws the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, or any other Person, or to prejudice in any manner the rights of the Debtor, or such Person in any further proceedings involving the Debtor until the occurrence of the Effective Date.  For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

9.13    Certain Technical Modifications.  Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided, however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Interests under the Plan.

## ARTICLE X
## EFFECT OF CONFIRMATION

10.1    Preservation of Rights of Action by the Debtor and the Reorganized Debtor.

10.1.1    Retained Rights of Action.  The Reorganized Debtor shall retain and may enforce, prosecute or settle, and shall have the sole right to enforce, prosecute or settle, the Retained Rights of Action.  The Reorganized Debtor or its successors may pursue or resolve such Retained Rights of Action, as appropriate in accordance with the best interests of the Reorganized Debtor or its successors holding such Retained Rights of Action.  The Reorganized Debtor's rights under this Section 10.1.1 shall be preserved notwithstanding the occurrence of the Effective Date.

10.1.2    Reservation of Rights.  No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Rights of Action against them as any indication that the Reorganized Debtor will not pursue the Retained Rights of Action.  The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Rights of Action.  Unless any of the Retained Rights of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all such Retained Rights of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue

preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Rights of Action as a consequence of the Confirmation of the Plan.

10.1.3    <u>Retained Defenses</u>.  Without limiting the generality of the foregoing, upon the Effective Date, except as expressly provided in <u>Article IV</u> with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights, and Talc Insurance Assets, the Reorganized Debtor shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtor or its Estate, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

10.1.4    <u>No Approval Required</u>.  On or after the Effective Date, subject to <u>Article IV</u> with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights, and Talc Insurance Assets, the Reorganized Debtor may pursue, settle, or withdraw, without Bankruptcy Court approval, claims, rights, or causes of action as it determines in accordance with its best interests.

10.2    <u>Imerys/Cyprus Related Rights</u>.  The provisions of this <u>Section 10.2</u> shall apply to all Persons (including the Imerys/Cyprus Parties).

10.2.1    <u>Preservation of Imerys/Cyprus Related Rights</u>.  All Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, shall be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order.  For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

10.2.2    <u>Actions in Respect of Imerys/Cyprus Related Rights From and After the Effective Date</u>.

(a)    Upon the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.3</u> on the Effective Date, the Imerys/Cyprus Related Rights shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code;

(b)    From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.3</u> on the Effective Date, the Talc Personal Injury Trust shall retain the Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court; and

(c)    From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.3</u> on the Effective Date, the Talc Personal Injury Trust shall have the exclusive right to pursue and resolve the Imerys/Cyprus Related Rights.

10.2.3    <u>No Impairment of Rights or Obligations of Imerys/Cyprus Parties</u>.

(a)    Nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Imerys/Cyprus Party or the Debtor arising out of or under any Imerys/Cyprus Agreement. For all issues relating to indemnity rights of the Debtor, including the venue and choice-of-law rules for resolving disputes relating thereto, the provisions, terms, conditions, and limitations of the Imerys/Cyprus Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Imerys/Cyprus Party to indemnify or pay the liability of any other Protected Party that it would not have been required to pay in the absence of the Plan, or to impose any requirement for an Imerys/Cyprus Party to mount the defense of any claim, indemnify any claim, or otherwise undertake any action that an Imerys/Cyprus Party would not have been required to take in the absence of the Plan.

(b)    The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Imerys/Cyprus Parties, and the Talc Personal Injury Trust under the Imerys/Cyprus Agreements. Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

10.2.4    <u>Plan Binding on Imerys/Cyprus Parties</u>. The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Imerys/Cyprus Parties; *provided, however*, that, except as provided in <u>Section 10.2.5</u>, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to the Imerys/Cyprus Parties, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any of them under any Imerys/Cyprus Agreement.

10.2.5    <u>Issues Actually Litigated by Imerys/Cyprus Parties</u>. Nothing in this <u>Section 10.2</u> is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against the Imerys/Cyprus Parties with respect to any issue that is actually litigated by any of them as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by any Imerys/Cyprus Party in conjunction with or related to Confirmation of the Plan; *provided, however*, that any Plan objection that an Imerys/Cyprus Party withdraws prior to the conclusion of the Confirmation Hearing (or a finding that an Imerys/Cyprus Party lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated. The resolution of any related objection raised by other parties and

any related findings or determinations (other than those contemplated by <u>Section 8.1(e)(xix)</u>) shall not be offered for evidentiary purposes nor be binding on any Imerys/Cyprus Party in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) an Imerys/Cyprus Party's legal, equitable, or contractual rights or obligations.  No Imerys/Cyprus Party shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that an Imerys/Cyprus Party withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

10.3    <u>Talc Insurance Assets</u>.  The provisions of this <u>Section 10.3</u> shall apply to all Persons (including all Talc Insurance Companies).

10.3.1    <u>Preservation of Talc Insurance Assets</u>.  Except as otherwise provided in <u>Section 11.2.1</u>, all Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, shall be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order.  For the avoidance of doubt, except as otherwise provided in <u>Section 11.2.1</u>, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Talc Insurance Company based on, arising out of, or in any way relating to the Talc Insurance Assets.

10.3.2    <u>Actions in Respect of Talc Insurance Assets From and After the Effective Date</u>.

(a)    Upon the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> on the Effective Date, subject to the provisions of <u>Section 4.9.4</u> and the Cooperation Agreement, the Talc Insurance Assets shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code;

(b)    From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> on the Effective Date, subject to the provisions of <u>Section 4.9.4</u> and the Cooperation Agreement, the Talc Personal Injury Trust shall retain the Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court; and

(c)    From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> on the Effective Date, pursuant to the provisions of <u>Section 4.9.4</u> and the Cooperation Agreement, (i) the Reorganized Debtor, as the agent for and subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement and (ii) any of the following received by the Talc Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor: (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance

Settlement Agreement. For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any LTL Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

10.3.3    <u>No Impairment of Rights or Obligations of Talc Insurance Companies</u>.

(a)    Except as provided in any Talc Insurance Settlement Agreement or in <u>Section 11.2.1</u> or <u>Section 11.3.1</u>, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Talc Insurance Company or the Debtor arising out of or under any Talc Insurance Policy. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or Talc Insurance Settlement Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

(b)    The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Talc Insurance Companies, and the Talc Personal Injury Trust under the Talc Insurance Policies. Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

10.3.4    <u>Plan Binding on Talc Insurance Companies</u>. The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Talc Insurance Companies; *provided*, *however*, that, except as provided in <u>Section 10.3.6</u>, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Talc Insurance Company under any Talc Insurance Policy.

10.3.5    <u>Plan Protections of Settling Talc Insurance Companies</u>. No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in <u>Article XI</u>, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

10.3.6    <u>Issues Actually Litigated by the Talc Insurance Companies</u>. Nothing in this <u>Section 10.3</u> is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc

Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan; *provided*, *however*, that any Plan objection that a Talc Insurance Company withdraws prior to the conclusion of the Confirmation Hearing (or a finding that a Talc Insurance Company lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated. The resolution of any related objection raised by other parties and any related findings or determinations (other than those contemplated by Section 8.1(e)(xx)) shall not be offered for evidentiary purposes nor be binding on any Talc Insurance Company in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) a Talc Insurance Company's legal, equitable, or contractual rights or obligations. No Talc Insurance Company shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that a Talc Insurance Company withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

10.4    Preservation of Rights of Action by the Talc Personal Injury Trust. As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust, including Talc Personal Injury Claims and Talc Personal Injury Trust Defenses. Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions in the name of either the Debtor or the Reorganized Debtor, if deemed necessary or appropriate by the Talc Personal Injury Trust. The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising out of or in any way relating to any such legal action or other proceeding. This Section 10.4 shall not apply to legal actions and other proceedings related to the Imerys/Cyprus Related Rights, which shall be pursued, resolved, and settled in accordance with the provisions of Section 4.9.3 and Section 10.2, or the Talc Insurance Assets, which shall be pursued, resolved, and settled in accordance with the provisions of Section 4.9.4, Section 10.3, and the Cooperation Agreement.

10.5    Terms of Injunctions and Automatic Stay.

10.5.1    General. All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Case, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after Confirmation, the Debtor may seek such further orders as the Debtor deems necessary or appropriate to preserve the *status quo* during the time between the Confirmation Date and the Effective Date.

10.5.2    Effectiveness.  Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

10.6    The FCR and the TCC.

10.6.1    General.  The FCR and the TCC shall continue in their official capacities until the Effective Date.  The Debtor shall pay the reasonable fees and expenses incurred by the FCR and the TCC through the Effective Date, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Section 2.2.

10.6.2    Dissolution.  On the Effective Date, the TCC shall dissolve and the members of such committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case.  Similarly, on the Effective Date, the FCR shall be deemed released and discharged from all duties and obligations from or related to the Chapter 11 Case.  The Professionals retained by the TCC and the members thereof or by the FCR shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2.2.

10.7    No Effect on United States Trustee.  Nothing in this Section 10 shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Fee Claims and other Administrative Claims.

10.8    Binding Effect.  Subject to Section 10.2 and Section 10.3, the Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtor, the Reorganized Debtor, the Talc Personal Injury Trust, any and all holders of Claims against or Interests in the Debtor (regardless of whether such Claim or Interest is Impaired and regardless of whether such holder voted to accept the Plan), and any and all other Persons that are affected in any manner by the Plan.

## ARTICLE XI
## DISCHARGE, SETTLEMENT, RELEASES, INJUNCTIONS, AND EXCULPATION

11.1    Discharge and Injunctions.

11.1.1    Discharge of Claims Against the Debtor.  As of the Effective Date, Confirmation of the Plan shall afford the Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

11.1.2    **Discharge Injunction.  From and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand, or other debt or liability that is discharged are**

permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, demands, debts, or liabilities: (i) commencing or continuing any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any lien or other Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the successors of the Debtor (including the Reorganized Debtor) and their respective properties and interests in property. The discharge provided in this **Section 11.1.2** shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.

11.2    **Settlement of Certain Estate Claims.**

11.2.1    **Settlement of Certain Claims Against Certain Released Parties.** Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the Reorganized Debtor, the LTL Corporate Parties, and the respective Representatives of the Debtor, the Reorganized Debtor, and the LTL Corporate Parties that are or would have been property of the Estate or could have been brought by the Estate, including Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud, or conspiracy, except for Intercompany Claims, shall be deemed settled, released, and extinguished. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtor, the Reorganized Debtor, and the holders of Claims and Interests and is fair, equitable, and reasonable. For the avoidance of doubt, nothing contained in this **Section 11.2.1** shall release or affect the obligations of any Person to be performed from and after the Effective Date under the Funding Agreement or the Support Agreement.

11.2.2    **Settlement of Certain Claims Against Holders of Talc Personal Injury Claims.** Pursuant to Bankruptcy Rule 9019 and in consideration for the releases and other benefits provided under the Plan, any and all claims against the holders of Talc Personal Injury Claims who received payments in respect of their claims from the Debtor or any of its predecessors, or from any Affiliate of the Debtor or any of its predecessors, prior to the Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), that are or would have been property of any of the Estate or could have been brought by the Estate or any Protected Party, including Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising

out of, based upon, or resulting from payments to holders of Talc Personal Injury
Claims from the Debtor or any of its predecessors, or from any Affiliate of the Debtor
or any of its predecessors, prior to the Petition Date, shall be deemed settled, released,
and extinguished. The entry of the Confirmation Order shall constitute the
Bankruptcy Court's approval, as of the Effective Date, of the compromise or
settlement of all such claims and the Bankruptcy Court's finding that such
compromise or settlement is in the best interest of the Debtor, the Reorganized
Debtor, and the holders of Claims and Interests and is fair, equitable, and reasonable.

11.3    **Releases.**

      11.3.1    **Releases by the Debtor and Its Estate**. As of the Effective Date, for
good and valuable consideration (including services provided before and during the
Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust),
the adequacy of which is hereby confirmed, the Reorganized Debtor, the LTL
Corporate Parties, and the respective Representatives of the Debtor, the Reorganized
Debtor, and the LTL Corporate Parties shall be deemed conclusively, absolutely,
unconditionally, irrevocably, and forever released, to the maximum extent permitted
by law, as such law may be extended subsequent to the Effective Date, by the Debtor
and the Estate from any and all claims, counterclaims, disputes, obligations, suits,
judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses,
contributions, indemnities, costs, liabilities, fees (including attorneys' fees) and
expenses whatsoever, including any derivative claims, asserted or assertable on behalf
of the Debtor or the Estate (including any Recovery Actions), whether liquidated or
unliquidated, fixed or contingent, matured or unmatured, known or unknown,
foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or
hereinafter arising, whether in law or equity, whether sounding in tort or contract,
whether arising under federal or state statutory or common law, or any other
applicable international, foreign, or domestic law, rule, statute, regulation, treaty,
right, duty, requirement, or otherwise, that the Debtor or the Estate would have been
legally entitled to assert in its own right, or on behalf of the holder of any Claim or
Interest or other Person, based on, arising out of, or in any way relating to, in whole
or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021
Corporate Restructuring, the 2021 Chapter 11 Case, the Prepetition Funding
Agreement Modifications, the Estate, the Chapter 11 Case, the purchase, sale, or
rescission of the purchase or sale of any security of the Debtor, the subject matter of,
or the transactions or events giving rise to, any Claim or Interest that is treated in the
Plan, the business or contractual arrangements or interactions (including the exercise
of any common law or contractual rights of setoff or recoupment at any time on or
prior to the Effective Date) between the Debtor, on the one hand, and the Reorganized
Debtor, any LTL Corporate Party, or any Representative of the Debtor, the
Reorganized Debtor, or any LTL Corporate Party, on the other hand, the
restructuring of any Claim or Interest before or during the Chapter 11 Case, the
Disclosure Statement, the Plan, and related agreements, instruments, and other
documents, and the negotiation, formulation, preparation, or implementation of, the
solicitation of votes with respect to, the Plan, or any other related act or omission.
Notwithstanding the foregoing, claims or causes of action against the Reorganized

Debtor, any LTL Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any LTL Corporate Party arising out of or relating to any act or omission of such Person prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this <u>Section 11.3.1</u>. For the avoidance of doubt, nothing contained in this <u>Section 11.3.1</u> shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under the Funding Agreement, the Support Agreement, the Cash Contributions Parent Guarantee, or any other Plan Document to which it is a party. The Reorganized Debtor, and any other entity that continues the Debtor's business after the Effective Date, shall be bound, to the same extent the Debtor and the Estate are bound, by the releases set forth in this <u>Section 11.3.1</u>.

       11.3.2    <u>Releases by Holders of Claims</u>. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs, liabilities, fees (including attorneys' fees), and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the Prepetition Funding Agreement Modifications, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and any other Released Party, on the other hand, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the

negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other related act or omission. Notwithstanding the foregoing, claims or causes of action against a Released Party arising out of or relating to any act or omission of such Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this <u>Section 11.3.2</u>. For the avoidance of doubt, nothing contained in this <u>Section 11.3.2</u> shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under the Funding Agreement, the Support Agreement, or the Cash Contributions Parent Guarantee or any other Plan Document to which it is a party.

11.3.3     <u>Injunction Related to Releases</u>. The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action, and liabilities released pursuant to this <u>Section 11.3</u>.

11.4     <u>Channeling Injunction and Insurance Entity Injunction</u>. In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

11.4.1     <u>Channeling Injunction</u>.

(a)     To preserve and promote the settlements contemplated by and provided for in the Plan and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 524(g) and 105(a) of the Bankruptcy Code, notwithstanding anything to the contrary contained in the Plan, (i) the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be to and against the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents and (ii) such holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively, collecting, recovering, or receiving payment, satisfaction, or recovery of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including:

(i)     commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against

or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

(iv) asserting, implementing, or effectuating any setoff, recoupment, right of contribution, reimbursement, subrogation, or indemnification, or similar right of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

(v) taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b) Notwithstanding anything to the contrary in <u>Section 11.4.1(a)</u>, this Channeling Injunction shall not impair:

(i) the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents;

(ii) the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii) the rights of all Persons to assert any Claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust; or

(iv) the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents, including the Imerys/Cyrus Related Rights.

(c)     There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)     Nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

(e)     The Debtor's compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(f)     Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

(g)     If a non-Settling Talc Insurance Company asserts that it has Contribution Claims against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee having the exclusive right to pursue and resolve any Talc Insurance Action, pursuant to the Cooperation Agreement) may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.

11.4.2     <u>Insurance Entity Injunction</u>.

(a)     In order to protect and preserve the Talc Insurance Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction; *provided, however,* that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance Settlement Agreement.

(b)     Subject to the provisions of <u>Section 11.4.1</u> and this <u>Section 11.4.2</u>, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand, or cause of action against any Talc Insurance Company based on, arising out of, or in any way relating to any Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed,

restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(ii) enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

*provided, however,* that (A) the injunction set forth in this **Section 11.4.2(b)** shall not impair in any way (I) any actions pursued by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) against any Talc Insurance Company or (II) the rights of any co-insured of the Debtor (x) with respect to any Talc Insurance Policy or Talc Insurance Settlement Agreement against any Talc Insurance Company or (y) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance Settlement Agreement; and (B) the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this **Section 11.4.2(b)** with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) shall not have any authority to terminate, reduce, or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long

as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)    Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)    the rights of all Persons to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Talc Personal Injury Trust Documents;

(ii)    the rights of all Persons to assert any claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust;

(iii)    the rights of the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; or

(iv)    the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance Settlement Agreement.

(d)    For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any LTL Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

11.5    <u>Exculpation</u>.

11.5.1    <u>**Exculpation of Certain Parties**</u>.  **None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission taken or to be taken, whether before, on, or after the Petition Date through and including the Effective Date in connection with, arising out of, or in any way relating to:  (a) the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the Prepetition Funding Agreement Modifications, or the Chapter 11 Case; (b) the negotiation, formulation, and preparation of the Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents, and the releases and Injunctions contained in the Plan; (c) the pursuit of Confirmation of the Plan; (d) the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan or the Trust Distribution Procedures; or (e) the management or operation of the Debtor (except for any liability**

that results primarily from such Person's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order). In all respects, each and all of such Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Case, the Plan, the Plan Documents, and the administration of each of them.

      11.5.2    **<u>Injunction Related to Exculpation</u>. The Confirmation Order shall permanently enjoin all Persons from taking any action against any Exculpated Party for the purpose of, directly or indirectly or derivatively, receiving payment of, on, or with respect to any liability from which the Exculpated Parties are exculpated pursuant to this <u>Section 11.5</u>.**

      11.6    <u>Disallowed Claims</u>. On and after the Effective Date, the Debtor and the Reorganized Debtor shall have no liability or obligation on a Disallowed Claim, and any order disallowing a Claim which is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such Final Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall, nevertheless, become and be deemed to be a Final Order on the Effective Date. The Confirmation Order shall constitute a Final Order: (a) disallowing all Claims (other than Talc Personal Injury Claims) to the extent such Claims are not allowable under any provision of Section 502 of the Bankruptcy Code, including time-barred Claims and Claims for unmatured interest, and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

      11.7    <u>No Successor Liability</u>. The Reorganized Debtor does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtor arising out of or in any way relating to the operations of or assets of the Debtor, whether arising prior to, on, or after the Effective Date. None of the Reorganized Debtor, the other Protected Parties, and the Talc Personal Injury Trust is, or shall be deemed to be, a successor to the Debtor by reason of any theory of law or equity (except as otherwise provided in <u>Article IV</u>), and none shall have any successor or transferee liability of any kind or character; *provided*, *however*, the Reorganized Debtor and the Talc Personal Injury Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

      11.8    <u>Corporate Indemnities</u>.

      11.8.1    <u>Prepetition Indemnification and Reimbursement Obligations</u>. The obligations of the Debtor to indemnify and reimburse Persons who are or were managers, officers, or employees of the Debtor on the Petition Date or at any time thereafter through the Effective Date, against and for any obligations pursuant to the articles of organization or operating agreement of the Debtor, applicable state or non-bankruptcy law, or specific agreement, or any combination of the foregoing, (a) shall survive Confirmation of the Plan and remain unaffected thereby, (b) are assumed by the Debtor, and (c) shall not be discharged under Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

11.8.2    Plan Indemnity.  In addition to the matters set forth above and not by way of limitation thereof, the Debtor shall indemnify, defend, and hold harmless all Persons who are or were managers or officers of the Debtor on the Petition Date or at any time thereafter through the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost, or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such managers or officers that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtor's Estate.

11.8.3    Limitation on Indemnification.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Debtor and the Reorganized Debtor, as applicable, shall not be obligated to indemnify, defend, or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost, or expense that results primarily from (i) such Person's bad faith, gross negligence, or willful misconduct or (ii) a Talc Personal Injury Claim.

11.9    Independent Legal Significance of Individual Provisions.  For the avoidance of doubt, each of Sections 11.1 through 11.8 is legally independent from the other such Sections and the validity and effect of any such Section is not dependent upon, will not be affected in any manner by, and will not be interpreted or construed by reference to any other such Section.  By way of illustration and not limitation, the releases set forth in Section 11.3 are independent from, will not be affected in any manner by, and will not be interpreted or construed by reference to the Channeling Injunction set forth in Section 11.4.

## ARTICLE XII
## JURISDICTION OF BANKRUPTCY COURT

12.1    Jurisdiction.  Subject to Section 12.3, the Bankruptcy Court shall retain the fullest and most extensive exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  The Bankruptcy Court shall retain exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) to hear and determine all Claims against the Debtor, and to adjudicate and enforce the Talc Insurance Actions, and all other causes of action which may exist on behalf of the Debtor.

12.2    Specific Purposes.  Subject to Section 12.3, in furtherance to the foregoing, the Bankruptcy Court shall retain exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) for each of the following specific purposes after Confirmation of the Plan:

(a)    to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)    to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Talc Personal Injury Trust Agreement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(c)       to assure the performance by the Talc Personal Injury Trust and the Disbursing Agent of their respective obligations under the Plan;

(d)       to enforce and interpret the terms and conditions of the Plan, the other Plan Documents, and the Talc Personal Injury Trust Agreement; to enter such orders or judgments, including injunctions (i) as are necessary to enforce the title, rights, and powers of the Reorganized Debtor and the Talc Personal Injury Trust, and (ii) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

(e)       to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters, including contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Case;

(f)       to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code;

(g)       to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby;

(h)       to adjudicate any Retained Rights of Action that are retained by the Reorganized Debtor hereunder, including any Recovery Actions and the causes of action listed or described on <u>Exhibit G</u>;

(i)       to resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or the Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

(j)       to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k)       to determine the allowance and/or disallowance of any Claims, including Administrative Claims, against the Debtor or the Estate, including any objections to any such Claims, and the compromise and settlement of any Claim, including Administrative Claims, against the Debtor or the Estate;

(l)       to determine all questions and disputes regarding title to the assets of the Debtor or the Estate, or the Talc Personal Injury Trust;

(m)       to issue such orders as may be necessary for the addition of any Settling Talc Insurance Company as a Protected Party;

(n)    to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(o)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, in each case, for the purpose of determining whether a Claim is discharged hereunder or for any other purpose;

(p)    to enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the releases and the Injunctions described herein; and

(q)    to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Talc Personal Injury Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Talc Insurance Policy, *provided, however*, (i) such orders shall not impair any Talc Insurer Coverage Defense or the rights, claims, or defenses, if any, of any Talc Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Chapter 11 Case, (ii) this provision does not, in and of itself, grant the Bankruptcy Court jurisdiction to hear and decide disputes arising out of or relating to any Talc Insurance Policy, and (iii) all interested parties, including any Talc Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article shall be deemed to be replaced by the "District Court." Notwithstanding anything to the contrary in this Article 12, the resolution of Talc Personal Injury Claims, and the forum in which such resolution will occur, shall be governed by and in accordance with the provisions of Section 3.2.4 and Article IV and the Talc Personal Injury Trust Documents.

12.3    District Court Jurisdiction.  The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after entry of the Confirmation Order to hear and determine any motion to extend the Channeling Injunction, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

12.4    Reservation of Rights.  Nothing contained in the Plan will (i) constitute a waiver of any claim, right, or cause of action that the Debtor, the Reorganized Debtor, or the Talc Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company; or (ii) limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense.

12.5    Compromises of Controversies.  From and after the Effective Date, the Reorganized Debtor and/or the Talc Personal Injury Trust, as appropriate based on assets and liabilities retained

or owed by each respectively, shall be authorized to compromise controversies in their discretion in a manner not inconsistent with the terms of the Plan, without notice to any other party or approval of or notice to the Bankruptcy Court.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1     <u>Closing of Chapter 11 Case</u>.  The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

13.2     <u>Timing of Distributions or Actions</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.3     <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an instrument, agreement, or other document executed under the Plan provides otherwise, the rights, duties, and obligations arising under the Plan, and the instruments, agreements, and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New Jersey without giving effect to the principles of conflicts of law thereof.

13.4     <u>Entire Agreement</u>.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings, and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

13.5     <u>Headings</u>.  Headings are utilized in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

13.6     <u>Notices to the Debtor and Reorganized Debtor</u>.  All notices, requests, and demands required or permitted to be provided to the Debtor or the Reorganized Debtor under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, to the addresses set forth below:

**THE DEBTOR:**

LTL MANAGEMENT LLC
Attention: John K. Kim, Esq.
501 George Street
New Brunswick, New Jersey 08933
E-mail: jkim8@its.jnj.com

**PROPOSED COUNSEL FOR THE DEBTOR:**

WOLLMUTH MAHER & DEUTSCH LLP
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
E-mail: pdefilippo@wmd-law.com
    jlawlor@wmd-law.com
    jpacelli@wmd-law.com

JONES DAY
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
    bberens@jonesday.com
    dbprieto@jonesday.com
    asrush@jonesday.com

**COUNSEL FOR JOHNSON & JOHNSON**

WHITE & CASE LLP
Jessica C. Lauria (Boelter), Esq.
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: jessica.boelter@whitecase.com

    13.7   <u>Plan Supplement</u>. Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court at least fourteen (14) days prior to the deadline for objecting to Confirmation of the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein. The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Claims Agent (https://dm.epiq11.com/case/ltl/dockets), and at the Bankruptcy Court's website (https://ecf.njb.uscourts.gov/).

    13.8   <u>Post-Effective Date Notices by the Reorganized Debtor</u>. After the occurrence of the Effective Date, the Reorganized Debtor has authority to send a notice to any Person providing that to continue to receive documents pursuant to the Bankruptcy Rule 2002, such Person must file

a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the United States Trustee need not file such a renewed request and shall continue to receive documents without any further actions being necessary.  After the occurrence of the Effective Date, the Reorganized Debtor is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the United States Trustee and those Persons that have filed such renewed requests.

13.9    Inconsistencies.    To the extent the Plan is inconsistent with the Disclosure Statement or other Plan Documents, the provisions of the Plan shall be controlling.  To the extent the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

13.10    Withholding of Taxes.    The Disbursing Agent, the Talc Personal Injury Trust, or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state, and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

13.11    Transfer Taxes.    Pursuant to Section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax, filing fee, sales or use tax, or other similar tax shall be imposed or assessed by any taxing authority on account of (a) the transfer of any assets or property pursuant to the Plan; or (b) the making or delivery of an instrument of transfer under the Plan.  The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation of any of the foregoing instruments or other documents without the payment of any such tax.

13.12    Successors and Assigns.    The rights, duties, and obligations of any Person under the Plan, the Plan Documents, and the Confirmation Order shall be binding upon, and shall inure to the benefit of, the successors, assigns, heirs, executors, legal representatives, and estates of such Person.

13.13    Duty to Cooperate.    Nothing in the Plan, the other Plan Documents, or the Confirmation Order shall relieve (by way of injunction or otherwise) any Person that is or claims to be entitled to indemnity under a Talc Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Talc Insurance Policy.

13.14    Effective Date Actions Simultaneous.    Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Dated: May 15, 2023          **LTL MANAGEMENT LLC**
         New Brunswick, NJ


_/s/ John K. Kim_____
John K. Kim
Chief Legal Officer

**EXHIBIT A**

**Amended Articles of Organization of the Reorganized Debtor**

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT B

**Amended Operating Agreement of the Reorganized Debtor**

[TO BE FILED WITH PLAN SUPPLEMENT]

## EXHIBIT C

### Cash Contributions

On each date specified in the table below (column (a)), the Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Personal Injury Governmental Action Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust contributions of Cash in the total amount set forth opposite such date (column (d)), with such total amount of Cash contributions to be allocated between the Talc Personal Injury Governmental Action Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust as set forth opposite such date (column (b) and column (c), respectively).

| Delivery Date for Cash Contribution (a) | Cash Contribution to Talc Personal Injury Governmental Action Claims Sub-Trust (b) | Cash Contribution to Talc Personal Injury Tort Claims Sub-Trust (c) | Total Amount of Cash Contributions to be Delivered by the Reorganized Debtor (d) |
|---|---|---|---|
| Effective Date | $400,000,000.00 | $2,600,000,000.00, as adjusted* | $3,000,000,000.00, as adjusted* |
| 1st Anniversary of Effective Date | — | $2,500,000,000.00 | $2,500,000,000.00 |
| 2nd Anniversary of Effective Date | — | $1,000,000,000.00 | $1,000,000,000.00 |
| 7th Anniversary of Effective Date | — | $1,000,000,000.00 | $1,000,000,000.00 |
| 12th Anniversary of Effective Date | — | $1,000,000,000.00 | $1,000,000,000.00 |
| 17th Anniversary of Effective Date | — | $1,000,000,000.00 | $1,000,000,000.00 |
| 22nd Anniversary of Effective Date | — | $1,000,000,000.00 | $1,000,000,000.00 |
| 25th Anniversary of Effective Date | — | $1,180,000,000.00 | $1,180,000,000.00 |
| | | **TOTAL** | $11,680,000,000.00, as adjusted above |

\* The $2,600,000,000.00 to be delivered to the Talc Personal Injury Tort Sub-Trust on the Effective Date is subject to adjustment as follows:

(a) commencing on the first Business Day after the Confirmation Date, interest shall accrue on such amount at the rate of 4% per annum, with interest to be calculated on the basis of a 365/366-day year and paid for the actual number of days elapsed; and

(b) the such amount shall be reduced by the amount of Talc Personal Injury Trust Expenses paid by the Reorganized Debtor pursuant to Section 4.6.

# EXHIBIT D

## Cash Contributions Parent Guarantee

[TO COME]

# EXHIBIT E

## Cooperation Agreement

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT F

## Governmental Claims

[TO BE FILED WITH PLAN SUPPLEMENT]

## EXHIBIT G

## Retained Rights of Action

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT H

## Talc Insurance Policies

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT I

## Talc Insurance Settlement Agreements

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT J

## Talc Personal Injury Trust Agreement

[TO BE FILED WITH PLAN SUPPLEMENT]

**EXHIBIT K**

**Talc PI Note**

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT L

## Talc PI Pledge Agreement

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT M

# Trust Distribution Procedures

## <u>Table of Contents</u>

**Page**

Article 1 INTRODUCTION & OVERVIEW ....................................................................- 1 -

    1.1    Purpose.................................................................................................................- 1 -

    1.2    Interpretation......................................................................................................- 1 -

    1.3    Exclusivity .........................................................................................................- 1 -

    1.4    General Principles .............................................................................................- 1 -

Article 2 INTERPRETATION & DEFINITIONS .............................................................- 2 -

    2.1    Interpretation......................................................................................................- 2 -

    2.2    Incorporation of Plan Definitions .....................................................................- 2 -

    2.3    Definitions..........................................................................................................- 2 -

Article 3 TDP ADMINISTRATION ..................................................................................- 8 -

    3.1    General Administration......................................................................................- 8 -

        3.1.1    Coordination of Trustees, Claims Administrator & Claims Processor...................- 8 -

        3.1.2    Preparation of and Deadline for Distribution of Trust Rules and Submission Procedures......................................................................................................................- 8 -

        3.1.3    Consent & Consultation with the Payor, the TAC, and the FCR .........................- 9 -

    3.2    Appropriateness of Costs ..................................................................................- 9 -

    3.3    Lien Resolution..................................................................................................- 9 -

    3.4    Trust Disclosure of Information........................................................................ - 10 -

    3.5    Notice Requirements.......................................................................................... - 10 -

    3.6    Auditing ............................................................................................................ - 11 -

        3.6.1    Cross-Trust Audit Program ................................................................................. - 11 -

        3.6.2    Claims Audit Program ......................................................................................... - 11 -

        3.6.3    Consequences of Audit Programs ....................................................................... - 12 -

Article 4 INDIVIDUAL CLAIMS ALLOWANCE PROCESS........................................ - 12 -

    4.1    General Principles ............................................................................................. - 12 -

        4.1.1    Recovery Only With Respect to a Single Individual Claim ................................. - 12 -

        4.1.2    Treatment of Individual Claims Previously Resolved......................................... - 12 -

        A.    Individual Claims Previously Settled but Unpaid................................................ - 12 -

        B.    Individual Claims Previously Settled and Paid.................................................... - 13 -

        C.    Claims Previously Rejected or Dismissed .......................................................... - 13 -

        D.    Claims Otherwise Subject to Final Judgment..................................................... - 13 -

    4.2    Submission Deadlines........................................................................................ - 13 -

i

4.2.1   Deadline to Submit Existing Individual Claims to Trust .......................- 13 -

4.2.2   Effect of Statutes of Limitations and Repose ......................................- 13 -

A.   Existing Individual Claims Previously Filed in Tort System ..............- 13 -

B.   Unfiled Existing Individual Claims ...................................................- 14 -

C.   Tolling and Timeliness .....................................................................- 14 -

(i)   Existing Individual Claims ...........................................................- 14 -

(ii)   Future Individual Claims .............................................................- 14 -

4.3   Submission Procedures ..........................................................................- 14 -

4.3.1   FIFO Processing Queue ....................................................................- 14 -

4.3.2   Withdrawal of Submitted Claims.......................................................- 15 -

4.3.3   Deferral of Submitted Claims ...........................................................- 15 -

4.3.4   Non-Responsive Individual Claimants ...............................................- 15 -

4.3.5   Submission Requirements ..................................................................- 16 -

4.3.6   Disallowed Claims ...........................................................................- 17 -

4.4   Claim Evaluation Procedures..................................................................- 17 -

4.4.1   FIFO Processing...............................................................................- 17 -

4.4.2   Preliminary Evaluation of Claim Submissions ...................................- 18 -

4.4.3   General Principles for Evaluation of Confirmed Claims .....................- 19 -

4.4.4   Standard Qualification Evaluation Process.........................................- 19 -

A.   Ovarian Cancer Qualification Criteria ...............................................- 19 -

B.   Mesothelioma Qualification Criteria ..................................................- 20 -

4.4.5   Accelerated Evaluation Process ........................................................- 20 -

A.   In General.........................................................................................- 20 -

B.   Accelerated Claims Criteria ..............................................................- 21 -

Article 5 VALUATION OF ALLOWED CLAIMS ..........................................- 21 -

5.1   In General..............................................................................................- 21 -

5.2   Determination of Scheduled Values for Qualifying Claims .....................- 21 -

5.2.1   Qualifying Ovarian Cancer Claims....................................................- 21 -

A.   Initial Point Values ...........................................................................- 22 -

B.   Point Value Adjustment Factors ........................................................- 22 -

C.   Talc Use and Risk Factor Reductions .................................................- 23 -

(i)   Step I Reductions:  Length of J&J Talc Use ..................................- 23 -

(ii)   Step II Reductions:  Time Since Last Use ....................................- 24 -

(iii)   Step III Reductions:  Less than Regular Use ...............................- 24 -

(iv)      Step IV Reductions:  Medical Risk Factors ...................................................- 24 -

(v)      Step V Reductions:  Non-J&J Talc Use.......................................................- 25 -

D.   Scheduled Value ..................................................................................................- 25 -

5.2.2   Qualifying Mesothelioma Claims ................................................................- 25 -

A.   Initial Point Value ...............................................................................................- 26 -

B.   Point Value Adjustment Factors ..........................................................................- 26 -

C.   Talc Use & Risk Factor Reductions .....................................................................- 27 -

(i)      Step I Reductions:  J&J Talc Use ...............................................................- 27 -

(ii)      Step II Reductions:  Less than Regular Use.................................................- 27 -

(iii)      Step III Reductions:  Non-J&J Talc Use......................................................- 27 -

D.   Scheduled Value ..................................................................................................- 28 -

5.3      Scheduled Values for Approved Accelerated Claims.........................................- 28 -

5.3.1   Individual Claims Which Could Have Appropriately Elected to Proceed Under the Qualification Evaluation Process ............................................................................- 28 -

5.3.2   Canadian Claims ........................................................................................- 28 -

5.3.3   Other Allegedly Talc-Related Diseases .......................................................- 28 -

Article 6 RECONSIDERATION REQUESTS & ADR PROCEDURES ...............................- 29 -

6.1      Reconsideration of Determination ...................................................................- 29 -

6.1.1   Requirements for Reconsideration Requests .....................................................- 29 -

6.1.2   Forfeiture of Right to Request Reconsideration .................................................- 29 -

6.1.3   Failure to Request Reconsideration Deemed Acceptance ....................................- 29 -

6.1.4   Reconsideration Request Procedures ...............................................................- 30 -

6.2      Post-Reconsideration Litigation ......................................................................- 30 -

Article 7 INDIVIDUAL CLAIMS PAYMENT PROCESS ....................................................- 31 -

7.1      Points-Based Monetary Values .......................................................................- 31 -

7.1.1   Uncertainty of Debtor's Talc Liabilities ...........................................................- 31 -

7.1.2   Description & Application of Points Valuation System ......................................- 31 -

A.   In General............................................................................................................- 31 -

B.   Supplemental Payments Owed Due to Increases to the Point Value....................- 32 -

C.   Determination of Value........................................................................................- 32 -

7.2      General Guidelines for Liquidating & Paying Allowed Claims ..............................- 33 -

7.2.1   Documentation Requirements............................................................................- 33 -

A.   Acceptance & Release .........................................................................................- 33 -

B.   Documents Establishing Legal Representation ....................................................- 33 -

7.2.2   Offsets ...........................................................................................................- 33 -

7.3     Payment of Claims ................................................................................- 33 -

  7.3.1   Allowed Claim Amounts Held in Escrow ..........................................- 33 -

  7.3.2   Payment of Allowed Claims ................................................................- 34 -

  7.3.3   Payment of Legal Fees ........................................................................- 34 -

7.4     Payment Processing ...............................................................................- 35 -

  7.4.1   FIFO Payment Processing....................................................................- 35 -

  7.4.2   Discretion to Vary the Order & Amounts of Payments in Event of Limited Liquidity
     - 35 -

7.5     Punitive Damages ..................................................................................- 36 -

Article 8  RESOLUTION OF GOVERNMENTAL ACTION CLAIMS..................................- 36 -

8.1     Governmental Action Claims Are Subject to These TDP ........................- 36 -

8.2     Settlement Offer and Negotiations..........................................................- 36 -

8.3     Mediation ..............................................................................................- 37 -

8.4     Arbitration .............................................................................................- 37 -

8.5     Litigation ...............................................................................................- 38 -

8.6     Statute of Limitations & Repose .............................................................- 38 -

Article 9  MISCELLANEOUS ................................................................................- 39 -

9.1     Non-Binding Effect of Trust and/or Litigation Outcome .......................- 39 -

9.2     Independence of Trust............................................................................- 39 -

9.3     Amendments ..........................................................................................- 39 -

9.4     Severability ...........................................................................................- 39 -

9.5     Governing Law ......................................................................................- 39 -

# TRUST DISTRIBUTION PROCEDURES

The LTL Personal Injury Trust Distribution Procedures (hereafter "TDP") contained herein provide the means for resolving all Talc Personal Injury Claims, including Individual Claims and Governmental Action Claims, as provided in and required by the Plan and the Talc Personal Injury Trust Agreement (the "Trust Agreement").

The Plan and the Trust Agreement establish the Talc Personal Injury Trust (the "Trust"). The trustee(s) of the Trust (the "Trustees") shall implement and administer these TDP in accordance with the Trust Agreement.

## Article 1
## INTRODUCTION & OVERVIEW

### 1.1    Purpose

These TDP have been adopted pursuant to the Trust Agreement and are intended to provide reasonable assurance that the Talc Personal Injury Trust will evaluate, value, and pay Talc Personal Injury Claims that involve similar claims in substantially the same manner, and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code.  To achieve this goal, these TDP set forth procedures for liquidating and paying Governmental Action Claims and processing, evaluating, resolving, and paying (as appropriate) Individual Claims through either the Qualification Evaluation Process or the Accelerated Evaluation Process as set forth, herein. These procedures are designed to be consistent with characteristics known to drive valuation of similar personal injury claims in the tort system, such as specific disease type and age at diagnosis, and/or are tied to the scientific theories promulgated by plaintiffs' experts in the Johnson & Johnson Talcum Powder Products Marking, Sales Practices and Products Liability Litigation multidistrict litigation, such as time since last talc use.

### 1.2    Interpretation

Except as expressly provided below, nothing in these TDP shall be deemed to create a substantive right for the holder of any Talc Personal Injury Claim.  To the extent these TDP provide certain rights and benefits to holders of Talc Personal Injury Claims, such rights and benefits shall vest as of the Effective Date.

### 1.3    Exclusivity

These TDP and any related procedures set forth or designated herein shall be the sole and exclusive method by which a Person may seek allowance and distribution on a Talc Personal Injury Claim.

### 1.4    General Principles

These TDP are founded on the following principles:

1)      The efficient resolution of all Talc Personal Injury Claims and equitable valuation of all similarly situated Talc Personal Injury Claims;

- 1 -

2)     Clear and objective qualification and valuation criteria;

3)     Clear and reliable evidentiary requirements;

4)     A rigorous review and evaluation process requiring the Trustee to determine the appropriate Scheduled Values for Individual Claims in accordance with these TDP and applicable law;

5)     Independence of the Trust and the Trustee;

6)     Administrative transparency; and

7)     Fraud detection and prevention.

## Article 2
## INTERPRETATION & DEFINITIONS

### 2.1   Interpretation

The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

### 2.2   Incorporation of Plan Definitions

Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Trust Agreement, and such definitions are incorporated by reference herein. To the extent a term is defined in these TDP, as well as in the Plan and/or the Trust Agreement, the definition contained in these TDP shall control.

### 2.3   Definitions

1.     **"Accelerated Evaluation Process"** shall mean the claims evaluation process by which the Claims Administrator shall evaluate Confirmed Claims to determine whether they are Other Approved Claims and shall be allowed, as set forth in Section 4.4.5.

2.     **"Accelerated Claims Criteria"** shall mean the requirements set forth in Section 4.4.5, which a Confirmed Claim proceeding under the Accelerated Evaluation Process must satisfy in order to be deemed an Other Approved Claim.

3.     **"Acceptance and Release"** shall have the meaning set forth in Section 7.2.1(A).

4.     **"ADR Procedures"** shall mean the alternative dispute resolution procedures set forth in Article 6.

5.     **"Allowed Claim Amount"** shall mean the actual dollar value for an Allowed Claim whether based on the Scheduled Value proposed and offered by the Trust for any such Allowed Claim, or whether based on the resolution of the Individual

Claim pursuant to any ADR Procedures or post-reconsideration litigation in the tort system pursuant to Article 6 of these TDP.

6.  **"Allowed Claim(s)"** shall mean all Qualifying Claims and Other Approved Claims, collectively.

7.  **"Allowed Claimant(s)"** shall mean Individual Claimants whose Submitted Claims are determined to be Allowed Claims.

8.  **"Claimant's Jurisdiction"** shall mean either (a) the jurisdiction in which the Individual Claim was filed against the Debtor or any of its Affiliates in the tort system prior to the Petition Date or, (b) if the Individual Claim was not filed against the Debtor or any of its Affiliates in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the Individual Claimant resided on the Date of Diagnosis; (ii) the jurisdiction in which the Individual Claimant resides at the time he/she submits her Individual Claim to the Trust; or (iii) a jurisdiction in which the claimant Regularly Used J&J Talc Products.

9.  **"Claim Submission"** shall mean the substantially complete submission to the Trust of all Claims Materials required by these TDP by an Individual Claimant.

10. **"Claim Submission Form"** shall mean the form developed and adopted by the Trustees, in concert with the Claims Administrator and the Claims Processor, which Individual Claimants must to submit to the Trust pursuant to the Submission Procedures as set forth herein.

11. **"Claims Materials"** shall mean any evidence and other materials submitted in support of Individual Claims, including but not limited to the materials required pursuant to Section 4.3.5.

12. **"Claims Administrator"** shall mean ARCHER Systems LLC and/or any other Talc Trust Claims Administrator subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP.

13. **"Claims Processor"** shall mean Pattern Data, Inc., which shall be engaged by the Claims Administrator to assist in the development of procedures and protocols to implement these TDP effectively and efficiently.

14. **"Common Benefit Fund"** shall mean the common benefit fund established pursuant to Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marking, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738.

15. **"Common Benefit Fund Obligations"** shall mean any common benefit fund obligations arising from that certain multidistrict litigation known as the Johnson & Johnson Talcum Powder Litigation, Master Docket 3:16-md-02738 in the United States District Court for the District of New Jersey.

16. **"Confirmation Order"** shall mean the order of the Bankruptcy Court and the District Court acting jointly or the order of the District Court affirming an order entered separately by the Bankruptcy Court, in either case which order confirms the Plan pursuant to section 1129 of the Bankruptcy Code**.**

17. **"Confirmed Claim"** shall mean a Submitted Claim which the Claims Administrator determines has satisfied the Preliminary Evaluation Criteria.

18. **"Claims Audit Program"** shall mean the audit program adopted and implemented by the Trust pursuant to Section 3.6.2.

19. **"Cross-Trust Audit Program"** shall mean the audit program adopted and implemented by the Trust pursuant to Section 3.6.1.

20. **"Date of Diagnosis"** shall mean the date on which an Individual Claimant received the original pathologic diagnosis that is the basis of his/her Individual Claim.

21. **"Evaluation Track(s)"** shall mean the Qualification Evaluation Process and/or the Accelerated Evaluation Process that is elected by Individual Claimants in their Claim Submissions.

22. **"Existing Claimant(s)"** shall mean, collectively, all Existing Mesothelioma Claimants, Existing Ovarian Cancer Claimants, as well as any Individual Claimants who submit an Other Talc Claim to the Trust which involved a Date of Diagnosis prior to April 1, 2023.

23. **"Existing Individual Claim(s)"** shall mean Individual Claims held by Existing Ovarian Cancer Claimants and Existing Mesothelioma Claimants, collectively.

24. **"Existing Mesothelioma Claimant(s)"** shall mean Mesothelioma Claimant who asserts a Mesothelioma Claim involving a Date of Diagnosis before June 1, 2023, not otherwise barred by applicable statutes of limitations.

25. **"Existing Ovarian Cancer Claimant(s)"** shall mean any Individual Claimant who holds an Ovarian Cancer Claim not otherwise barred by applicable statutes of limitations, involving an initial date of diagnosis prior to April 1, 2023, and if retained by counsel, having executed a retention agreement with his/her lawyer prior to June 1, 2023.

26. **"FIFO Payment Queue"** shall mean the processing queue for the payment of Qualifying Claims and Other Approved Claims, as described in Section 7.4.

27. **"FIFO Processing Queue"** shall mean the processing queue for the evaluation of Submitted Claims, as described in Sections 4.3 and 4.4.

28. **"Future Claimant(s)"** shall mean, collectively, Future Mesothelioma Claimant(s) and Future Ovarian Cancer Claimants.

29.   **"Future Mesothelioma Claimant(s)"** shall mean any Mesothelioma Claimant who is not an Existing Mesothelioma Claimant.

30.   **"Future Ovarian Cancer Claimant(s)"** shall mean any Ovarian Cancer Claimant who is not an Existing Ovarian Cancer Claimant.

31.   **"Governmental Action Trust"** shall mean the Talc Personal Injury Governmental Action Claims Sub-Trust described in the Plan.

32.   **"Gynecologic Claim"** shall mean any Individual Claim that involves allegations that the Individual Claimant developed a gynecologic cancer that is not an Ovarian Cancer Claim.

33.   **"Identifying Information"** shall mean, with respect to Individual Claims, the (i) full legal name, (ii) date of birth, (iii) address, and (iv) social security number, of both the relevant injured/deceased individual and his/her legal representative, as well as the law firm and attorney serving as the holder's Representative (if any) and such counsel's address.

34.   **"Individual Claim"** shall mean any Talc Personal Injury Claim other than a Governmental Action Claim.

35.   **"Individual Claimant"** shall mean the holder of any unresolved Individual Claim. Unless otherwise specified herein, Individual Claimant also collectively refers to any relevant minors, decedents or other derivative claimants and the person(s) asserting the Individual Claim on behalf of such claimants and/or their estates in a representative capacity.  For avoidance of doubt, Individual Claimant specifically excludes any person whose Individual Claim was previously filed and dismissed with prejudice or whose Individual Claim was adjudicated and resulted in an unfavorable final judgment prior to October 14, 2021.

36.   **"Initial Filing Date"** shall mean the date on which the Trust first begins to accept claims.

37.   **"J&J"** shall mean Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtor.

38.   **"J&J Talc Product(s)"** shall mean any and all products manufactured, distributed, and/or sold by the Debtor and/or J&J containing talcum powder, to which Individual Claimants allege they were exposed, including but not limited to Johnson's Baby Powder and Johnson & Johnson's Shower to Shower. Talc Products also includes any product containing talcum powder manufactured, distributed, and/or sold by any of the Debtor and/or J&J affiliates, subsidiaries, divisions, parent companies, predecessors, or successors.

39. **"Lien Resolution Administrator"** shall mean shall mean ARCHER Systems LLC and/or any other Talc Trust Lien Resolution Administrator subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP.

40. **"Maximum Value"** shall be the maximum amount any Individual Claimant may receive in payment from the Settlement Trust and shall be defined as three times (3x) the Initial Point Value as defined under Article V for a given Allowed Claim based on the Individual Claimant's age on the Date of Diagnosis and disease type.

41. **"Mesothelioma"** shall mean the type of cancer that develops from the mesothelium (*i.e.*, the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities). For purposes of evaluating Individual Claims pursuant to these TDP, this definition is limited to malignant mesothelioma that develops in the lining of the lungs, chest wall, abdomen, heart, and testes.

42. **"Mesothelioma Claim"** shall mean any Individual Claim involving a claim alleging use of J&J Talc Products and in which the relevant Individual Claimant developed Mesothelioma.

43. **"Mesothelioma Claimant"** shall mean any Individual Claimant who asserts a Mesothelioma Claim.

44. **"Mesothelioma Qualification Criteria"** shall mean the requirements set forth in Section 4.4.4(B), which an Individual Claim alleging Mesothelioma must satisfy in order to be deemed a Qualifying Claim.

45. **"Non-J&J Talc Products"** shall mean any and all talc-containing products which are not J&J Talc Products.

46. **"Other Approved Claim"** shall mean an Individual Claim that has satisfied the Accelerated Claim Criteria, as determined by the Claims Administrator pursuant to Section 4.4.4.

47. **"Other Approved Claimant"** shall mean an Individual Claimant who's Individual Claim has been determined to be an Other Approved Claim.

48. **"Other Talc Claim"** shall mean any Individual Claim that is not an Ovarian Cancer Claim or Mesothelioma Claim.

49. **"Ovarian Cancer"** shall mean, collectively, epithelial cancer, that originates in the ovaries, fallopian tubes, and/or peritoneum (*i.e.*, primary peritoneal cancer), with serous, endometrioid, clear cell, or undifferentiated subtypes (or a mixture of subtypes that includes one or more of these subtypes). This definition specifically includes tumors designated as "borderline" or of "low malignant potential."

50. **"Ovarian Cancer Claim"** shall mean any Individual Claim involving allegations that the relevant Individual Claimant developed Ovarian Cancer.

51.    **"Ovarian Cancer Claimant"** shall mean any Individual Claimant who asserts an Ovarian Cancer Claim.

52.    **"Ovarian Cancer Qualification Criteria"** shall mean the requirements set forth in Section 4.4.4(A) which an Ovarian Cancer Claim must satisfy in order to be deemed a Qualifying Claim.

53.    **"Payor"** shall mean Johnson & Johnson.

54.    **"Points Valuation System"** shall mean as the points-based claim valuation system described in Article 5 of these TDP.

55.    **"Preliminary Evaluation"** shall mean the preliminary evaluation process described in Section 4.4.2, pursuant to which determinations shall be made as to whether each Submitted Claim constitutes a Confirmed Claim and should further evaluated via either the standard Qualification Evaluation Process or Accelerated Evaluation Process.

56.    **"Preliminary Evaluation Criteria"** shall mean the four (4) preliminary criteria set forth in Section 4.4.2 which Individual Claims must satisfy in order to progress to either the standard Qualification Evaluation Process or Accelerated Evaluation Process.

57.    **"Qualification Criteria"** shall collectively mean the Ovarian Cancer Qualification Criteria and the Mesothelioma Qualification Criteria.

58.    **"Qualifying Claim(s)"** shall mean any Individual Claim that the Claims Administrator determines, pursuant to Sections 4.4.3 and 4.4.4, has satisfied the applicable Qualification Criteria.

59.    **"Qualifying Claimant"** shall mean an Individual Claimant who's Individual Claim has been determined to be a Qualifying Claim.

60.    **"Regular J&J Talc Use"** shall mean an Individual Claimant's regular use of J&J Talc Products on his/her own body, as proven by sworn testimony or affidavit.

61.    **"Regular Perineal J&J Talc Use"** shall mean an Individual Claimant's regular use of J&J Talc Products in her own perineal area after puberty, as proven by sworn testimony or affidavit.

62.    **"Scheduled Value"** shall mean the final scheduled Point-Value for any Qualifying Claim or Other Approved Claim, as determined by the Claims Administrator pursuant to Section Article 5 of these TDP.

63.    **"Settlement Trust"** shall mean the Talc Personal Injury Tort Claims Sub-Trust described in the Plan.

64. **"Qualification Evaluation Process"** shall mean the claims-resolution method in which an Individual Claim is evaluated as described in Sections 4.4.3 and 4.4.4 of these TDP.

65. **"Submitted Claim"** shall mean an Individual Claim that has been submitted to the Trust pursuant to these TDP.

66. **"Submission Procedures"** shall mean the procedures developed and adopted by the Trustees, in conjunction with the Claims Administrator and Claims Processor, which

67. **"TAC"** shall mean the Trust Advisory Committee that represents (i) the interests Existing Individual Claimants identified and (ii) the interests of the Payor, and ensures that these TDP are properly implemented and the Trust properly administered.

68. **"Talc Personal Injury Claimant"** shall mean the holder of a Talc Personal Injury Claim.

69. **"Trust"** shall mean the Talc Personal Injury Trust as defined in the Plan.

## Article 3
## TDP ADMINISTRATION

### 3.1   General Administration

#### 3.1.1   Coordination of Trustees, Claims Administrator & Claims Processor

The Trustees shall implement these TDP to resolve any and all existing and future Individual Claims pursuant to the Plan and Trust Agreement, with the assistance of the Claims Administrator and the Claims Processor.  Further, the Trustees, the Claims Administrator, and the Claims Processor shall consult and coordinate with each other to develop and implement administrative and background processes intended to (i) provide the Trustees with all information necessary to implement these TDP, (ii) streamline the submission procedures for Individual Claimants, (iii) ensure maximally efficient evaluation of the Individual Claims and the Reconsideration Requests, and (iv) promote prompt payment of Allowed Claims.

#### 3.1.2   Preparation of and Deadline for Distribution of Trust Rules and Submission Procedures

Within sixty (60) days following entry of the Confirmation Order, the Trustees shall (i) adopt and distribute detailed Submission Procedures required by these TDP to counsel for all known Existing Individual Claimants, and (ii) make such Submission Procedures publicly available on a website addressing the same.

To that end, immediately upon confirmation of the Plan, the Trustees, the Claims Administrator, and the Claims Processor shall coordinate with respect to the development and

finalization of the comprehensive platforms, systems, procedures, rules, documents, and actions necessary to implement these TDP.

### 3.1.3    Consent & Consultation with the Payor, the TAC, and the FCR

The Trustees shall administer the Trust and implement these TDP in consultation with the Payor, TAC, and the FCR.  Specifically, pursuant to the Plan, the Trust Agreement, and these TDP, the Trustees shall (i) obtain the consent of the Payor, the TAC, and the FCR with respect to any substantive amendment, change, or modification to these TDP, and on such other matters as are required herein or in the Trust Agreement; and (ii) consult and coordinate with the Claims Administrator and Claims Processor with respect to any proposed amendment, change, or modification that could significantly impact the submission, evaluation, and processing of Individual Claims.

In the event that consultation with or consent of the Payor, the TAC, and the FCR is required, the Trustees shall provide written notice to the Payor, the TAC, the FCR, the Claims Administrator, and the Claims Processor of the specific amendment, change, modification, or other action proposed.  The Trustees shall not implement any such proposed amendment, change, or modification, or take such other action unless and until the parties have engaged in the Consultation Process or the Consent Process described in the Trust Agreement.

## 3.2    <u>Appropriateness of Costs</u>

The Trustees shall seek to ensure that the costs incurred by the Trust with respect to evaluating and investigating the validity of the Claims Materials submitted by an Individual Claimant are necessary and reasonable in light of the expected benefit to the Trust.  Nothing herein, however, shall prevent the Trustees from either (i) contesting the validity of any Individual Claim, whatever the costs, or (ii) declining to accept the Claims Materials from sources determined to be deceptive, fraudulent, or otherwise unreliable.

The Trustees shall periodically, and at least annually, review the cost of evaluating and investigating the Submitted Claims and take steps to reduce such costs where feasible and appropriate, while still ensuring that the Trust's obligations pursuant to the Plan, the Trust Agreement, and these TDP are appropriately satisfied.

## 3.3    <u>Lien Resolution</u>

Upon completion of (i) the applicable evaluation process for each Allowed Claim, and (ii) resolution of any Reconsideration Request of the Claim Administrator's determinations, the Settlement Trust shall pay the final Allowed Claim Amount to a segregated account pending the satisfaction of liens and other administrative issues until final payment to the relevant Individual Claimant and/or his/her respective attorneys is made.  Subject to the terms of the Trust Agreement, ARCHER Systems LLC shall serve as the Lien Resolution Administrator, which among other things is responsible for the distribution of net proceeds for Allowed Claims to the appropriate Approved or Qualifying Claimants.

On or as soon as possible following the Effective Date, the Lien Resolution Administrator shall begin working to satisfy any and all known medical liens arising from or related to the

Ovarian Cancer Claims or the Mesothelioma Claims, with the goal of negotiating the satisfaction of any such liens and claims as to each Allowed Claim by the time the Trustees have finalized the relevant Allowed Claim Amount determined by the Claims Administrator. The Lien Resolution Administrator shall be responsible for the satisfaction of any and all known medical liens arising from or related to each Allowed Claim, and shall provide written verification of the same to the Debtor prior to distributing any portion of the Allowed Claim Amount from the Settlement Trust to the relevant Individual Claimant or his/her counsel. Following distribution of the net proceeds for an Allowed Claim (*i.e.*, the Allowed Claim Amount minus attorneys' fees and satisfaction of lien amounts), neither the Debtor nor any Payor shall bear any responsibility for payment of any Individual Claimant's liens.

## 3.4    Trust Disclosure of Information

Periodically, and at least annually, the Trust shall publish a report summarizing the Individual Claims resolved pursuant to these TDP, including breakdowns with respect to (i) the types of Individual Claim involved; (ii) application of the standard Qualification Process, Accelerated Evaluation Process, and/or any ADR Procedures described herein, and (iii) the average Allowed Claim Amounts by type of Individual Claim, specific category of injury within the Qualification Criteria and Accelerated Claim Criteria. The Trustees also shall provide the Payor, the TAC, and the FCR with (i) a more detailed version of the above-mentioned report that also includes breakdowns as to Claimant Jurisdiction and the law firm and/or attorneys representing Individual Claims submitted to the Trust, and (ii) detailed monthly status reports regarding the evaluation status of all Submitted Claims, as well as the valuation and payment status of all Approved Claims and Qualifying Claims for which Scheduled Values have been determined.

## 3.5    Notice Requirements

Following entry of the Confirmation Order, the Trustees shall coordinate with the Claims Administrator to develop formal procedures for providing notice to Individual Claimants of determinations made pursuant to these TDP, which shall be adopted by the Trust upon consent of the TAC and the FCR. Such notice procedures must include both hard copy and electronic methods of notice and incorporate the applicable notice deadlines as set forth in these TDP.

Individual Claimants shall be provided with notice pursuant to the notice requirements adopted by the Trust after any determination is made by either the Claims Administrator or Trustees with respect to Individual Claims. This includes the following: (i) determinations as to whether any Submitted Claim satisfied the Preliminary Evaluation Criteria; (ii) determinations as to whether any Confirmed Claim satisfies the required Qualification Criteria or Accelerated Claim Criteria, whichever is applicable; (iii) determinations as to whether or not any Individual Claim is an Allowed Claim; (iv) determinations as to the Scheduled Value and/or Allowed Claim Amount for an Individual Claim; and (v) determinations regarding the outcome of any Reconsideration Request.

### 3.6   Auditing

#### 3.6.1   Cross-Trust Audit Program

The Trust, with the consent of the Payor, the TAC, and the FCR, shall develop a Cross-Trust Claims Audit Program, which shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of usage of talc or talc-containing products for which the Trust has legal responsibility and the reliability of reporting on other asbestos exposure. This Cross-Trust Audit Program will be designed to compare Individual Claims submitted to the Trust against claims filed with any other bankruptcy trusts at the sole discretion of the Auditor (defined below), and is not limited in count to the number of bankruptcy trusts that are subject to the Cross Trust Claims Audit Program.  Further, as part of its coordination with other bankruptcy trusts the Trust shall fully comply with reasonable subpoenas served against it by other bankruptcy trusts or mass-tort trusts seeking to conduct a similar claim audit.

By submitting an Individual Claim to the Trust, regardless of the treatment sought, an Individual Claimant shall be deemed to have affirmatively consented to (i) any release by the Trust of necessary and sufficient information sought either through the Cross-Trust Audit Program or in response to any subpoena served against the Trust; (ii) any release by any other bankruptcy or mass-tort trusts that participate in the Cross-Trust Audit Program or the Trust has served a subpoena on, to the entity overseeing the Cross-Trust Audit Program (the "Auditor") of all information submitted to such other trusts by or on behalf of the relevant Individual Claimant pursuant to the provisions of the Cross-Trust Audit Program, or subpoena, if applicable, and (ii) disclosure by or to the Auditor of the status, amount, and date of payment made with respect to the claim asserted or filed by the relevant Individual Claimant to the  Trust or any other bankruptcy or mass-tort trust.

To the extent that the Trustees believe it is relevant, nothing herein shall preclude the Trust or the Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state or federal court complaints, available discovery from any such case, or other claims filed against other mass-tort trusts.  Any Individual Claimant subject to the Cross-Trust Audit Program shall cooperate with and provide the Trust with (i) any non-privileged information reasonably requested by the Trust, and (ii) upon request by the Trust, authorization to obtain from other mass tort trusts any information such claimant has provided to such other trusts.

#### 3.6.2   Claims Audit Program

Separate from the Cross-Trust Audit Program, the Payor is authorized, but not required, under these TDP to design and implement its own annual Claims Audit Program, and to audit up to ten percent (10%) of the determinations by the Claims Administrator and/or Trustees with respect to any and all Individual Claims submitted to the Trust, which may be either based on 10% of the total universe of Submitted Claims, or be a stratified subset of claims of particular interest to the Payor.  Any Claims Audit Program pursuant to this Section shall be implemented by Barnes & Thornburg as the Payor's agent.  Except as otherwise detailed herein, the Payor has the sole discretion regarding whether and/or when to implement such Claims Audit Program.

### 3.6.3   Consequences of Audit Programs

In the event that an audit under either the Cross-Trust Audit Program or the Claims Audit Program reveals that deceptive or fraudulent information has been provided to the Trust, the Trust may penalize the relevant Individual Claimant and his/her counsel by (a), disallowing the relevant Individual Claim, (b) seeking to require the source of such deceptive or fraudulent information to reimburse the Payor for all costs incurred in connection with the audit and any future audit or audits, (c) reordering the priority of payment of all affected Individual Claimants, (d) placing reasonable restrictions, limitations, or affirmative requirements on Individual Claims submitted to the Trust in the future by Individual Claimants represented by such counsel, (e) subjecting all Individual Claims represented by the same counsel to audit, and (f) any other appropriate action, including seeking  sanctions.

Individual Claims determined to be subject to heightened scrutiny pursuant to any part of these TDP shall be considered to be automatically subject to audit under either the Cross-Trust Audit Program or the Claims Audit Program, or both.

## Article 4
## INDIVIDUAL CLAIMS ALLOWANCE PROCESS

### 4.1   General Principles

#### 4.1.1   Recovery Only With Respect to a Single Individual Claim

An Individual Claimant may assert no more than one Individual Claim to the Trust, and may recover only in respect of such Individual Claim from the Trust, based on the Individual Claim asserted at the time he/she submitted the claim to the Trust.  For the avoidance of doubt, after submitting his/her claim to the Trust, an Individual Claimant may not allege or seek to assert an additional or different Individual Claim, with the exception that an Individual Claimant may at any time during the pendency of his/her claim, request that his/her Individual Claim be processed pursuant to the Accelerated Evaluation Process, as set forth in Section 4.4.4.

#### 4.1.2   Treatment of Individual Claims Previously Resolved

##### A.   Individual Claims Previously Settled but Unpaid

If, prior to October 14, 2021, (i) an Individual Claimant submitted his/her Individual Claim to the Debtor and/or J&J for settlement consideration, and thereafter (ii) reached an agreement with Debtor and/or J&J to settle said Individual Claim at an amount certain, but (iii) the Debtor and/or J&J were unable to process the related transfer of settlement funds before October 14, 2021, then such Individual Claimant may choose to either: (i) submit his/her Individual Claim to the Trust for evaluation pursuant to the procedures set forth in these TDP; or (ii) agree to accept the amount certain that was previously agreed upon of his/her claim up to the Maximum Value allowed under these TDP.  In the event that an Individual Claim is submitted to the Trust pursuant to this Section, the prior settlement agreement shall be immediately deemed null and void and relevant Individual Claimant's right to recover pursuant to such prior agreement waived.

### B. Individual Claims Previously Settled and Paid

Any Individual Claimant that previously (i) reached a settlement with the Debtor or any of its predecessors related to an Individual Claim, (ii) settled in principle subject to a Master Settlement Agreement, (iii) submitted a release (with the exception of Individual Claims subject to the preceding Section 4.1.2(A)), or (iv) received payment with respect to Individual Claim his/her may not receive any additional payment from the Settlement Trust.  Further, any Individual Claim being submitted on behalf of or derivative of a previously released Individual Claimant may not receive any additional payment from the Settlement Trust. As part of the establishment of the Trust, the Debtor will provide the Trust and the Trustees with a list of all Individual Claimants subject to this Section, their Identifying Information, and basic settlement information.

### C. Claims Previously Rejected or Dismissed

Any individual who filed an Individual Claim in any state or federal court prior to October 14, 2021, which was thereafter dismissed with prejudice shall not be eligible to recover any payment whatsoever from the Trust.  Individual Claims which were filed before October 14, 2021, and thereafter either (i) dismissed without prejudice or (ii) rejected as ineligible under a Master Settlement Agreement may be submitted to the Trust for evaluation pursuant to these TDP, but shall be subject to heightened scrutiny by the Trustees and the Claims Administrator during their evaluation.

### D. Claims Otherwise Subject to Final Judgment

Any individual who filed an Individual Claim in any state or federal court, and whose Individual Claim was adjudicated and resulted in a final unfavorable judgment (*e.g.*, a defense verdict) shall not be eligible to recover any payment whatsoever from the Trust.

## 4.2  Submission Deadlines

### 4.2.1  Deadline to Submit Existing Individual Claims to Trust

Existing Individual Claimants must submit their Individual Claims to the Trust within one-hundred twenty (120) days of the Trust's distribution of its rules and submission procedures.  If an Individual Claimant fails to submit his/her Existing Individual Claim or seek a deferral pursuant to Section 4.3.3 within this time period, such Individual Claimant shall be deemed to have waived the right to submit his/her Existing Individual Claim or otherwise seek compensation from the Trust pursuant to these TDP.

### 4.2.2  Effect of Statutes of Limitations and Repose

### A. Existing Individual Claims Previously Filed in Tort System

For each Individual Claim submitted to the Trust that was filed in the tort system against the Debtor and/or a Protected Party prior to October 14, 2021, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in Sections Article 4, the Individual Claim must have been timely filed pursuant to the applicable federal or state statutes of limitations and/or repose that were in effect at the time the related case was filed in the tort system.

- 13 -

B.      **Unfiled Existing Individual Claims**

For each Existing Individual Claim submitted to the Trust that was not filed in the tort system against the Debtor, J&J, and/or a Protected Party prior to October 14, 2021, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in Article 4, the Individual Claim must not be time-barred under the applicable federal or state statute of limitations and/or repose that are in effect at the time the Individual Claimant submits his/her Individual Claim to the Trust.  The applicable federal or state statute of limitations and/or repose shall be deemed to have begun running as of the date that J&J publicly announced the discontinuation of the sale of J&J Talc Products, which was May 19, 2020.

C.      **Tolling and Timeliness**

(i)      <u>Existing Individual Claims</u>

The running of the applicable statute of limitations or repose shall be considered tolled as of the earliest of: (a) October 14, 2021; (b) the actual filing of a claim against Debtor, J&J, and/or a Protected Party in the tort system prior to the October 14, 2021; or (c) the date specified in any tolling agreement between the relevant Individual Claimant and the Debtor and/or J&J, provided such tolling was still in effect as of April 4, 2023.  Any Existing Individual Claim that meets any of these three tolling provisions shall be treated as timely filed so long as (i) the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, and (ii) the Submitted Claim is submitted to the Trust within one hundred twenty (120) days after the Initial Filing Date.

(ii)      <u>Future Individual Claims</u>

Any Individual Claim involving a Date of Diagnosis after June 1, 2023, irrespective of the application of any relevant federal or state statute of limitations or repose, shall be treated as timely filed if it is submitted to the Trust within three (3) years after (i) the Initial Filing Date, or (ii) the relevant Date of Diagnosis, whichever is later.

**4.3      <u>Submission Procedures</u>**

**4.3.1      FIFO Processing Queue**

The Trust shall order all claims to be reviewed for processing purposes on a FIFO basis in the order each Claim Submission is received, except as otherwise provided herein. For all Individual Claims submitted to the Trust on or before the date that is one hundred and twenty (120) days after the Initial Filing Date, an Individual Claimant's position in the FIFO Processing Queue shall be determined based on the earliest of (i) the date prior to the Petition Date that the Individual Claimant filed a related case against Debtor, J&J, or any other Protected Party in the tort system; (ii) the date prior to the Petition Date that the Individual Claimant filed a related case against another defendant in the tort system, if at the time the related claim against was subject to a tolling agreement with Debtor or J&J; (iii) the date the Individual Claim is submitted to the Trust; (iv) the date after the Petition Date but before the Effective Date that a Proof of Claim was filed by the Individual Claimant against the Debtor in the Debtor's first chapter 11 case; and (v)  the date a

ballot was submitted on behalf of the Individual Claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

For all Individual Claims involving a Claim Submission submitted more than one hundred and twenty (120) days after the Initial Filing Date, an Individual Claimant's position in the FIFO Processing Queue shall be determined based on the date that the Individual Claim was properly and completely submitted to the Trust. If any Claim Submissions are filed on the same date, an Individual Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day Claim Submissions shall be determined based on the alleged Date of Diagnosis for each, with the earlier Date of Diagnosis having priority over the later. In the unlikely event that two or more Individual Claims are submitted to the Trust on the same date and also have the same Date of Diagnosis, the Individual Claimant with the earliest date of birth shall receive priority in the FIFO Processing Queue over one with a later date of birth.

### 4.3.2   Withdrawal of Submitted Claims

An Individual Claimant may, at any time after submitting his/her Individual Claim to the Trust, withdraw his/her Submitted Claim, by providing written notice to the Trust. The related Individual Claimant shall retain the right to file a new Individual Claim after withdrawal of the first; however, any such subsequent Claim Submission shall be evaluated the same as a new Claim Submission and otherwise unrelated to the first, except that (i) it shall be subject to heightened scrutiny by Claim Administrator, Claim Processor, and Trustees, and (ii) the Individual Claimant's place in the FIFO Processing Queue shall be determined only based on most recent date that the Individual Claim was submitted to the Trust (*i.e.*, the Individual Claim is moved to the end of the queue).

### 4.3.3   Deferral of Submitted Claims

An Individual Claimant also may request that the Trust defer processing the his/her Submitted Claim (a "Deferral Request") so long as the Deferral Request (i) is made in writing pursuant to any procedures adopted by the Trust for such requests, and (ii) is made before the date the Trustees provides notice to the Individual Claimant either that his/her Submitted Claim is being disallowed, or that the Submitted Claim is an Allowed Claim and of the Scheduled Value proposed by the Claims Administrator.

The Trust may not defer any Submitted Claim for longer than two (2) years from the date the Individual Claim was submitted to the Trust, without such deferral affecting the status of the Submitted Claim for statute of limitations or repose purposes. Any Individual Claimant who makes a Deferral Request shall retain his/her original place in the applicable FIFO Processing Queue until the earliest of (i) his/her written request that the Trust end the deferral and proceed with processing the relevant Individual Claim, (ii) the expiration of the deferral, or (iii) two years after the date the deferred Individual Claim was originally submitted to the Trust.

### 4.3.4   Non-Responsive Individual Claimants

Except for those Individual Claimants who (i) hold Submitted Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court approval before accepting any Scheduled Value proposed by Trust, Allowed Claimants shall have one

hundred eighty (180) days from the date an offer is made by the Trust to either accept, reject, or request reconsideration of the offer pursuant to the terms of Section 6.1. In the event that an Allowed Claimant fails to properly submit a Reconsideration Request or to provide written notice to the Trust of his/her acceptance or rejection of the Trust's offer, the Individual Claim shall be deemed rejected, and the Individual Claimant shall not retain any right to re-submit his/her Individual Claim or any other new Individual Claim to the Trust pursuant to these TDP or otherwise.

### 4.3.5   Submission Requirements

Any Individual Claimants who wishes to submit his/her respective Individual Claim to the Trust must satisfy the following applicable requirements with respect to the information and documentation required to prove that the Individual Claim should be allowed pursuant to these TDP. Regardless of the type of treatment sought, every Individual Claimant seeking compensation from the Trust must include the following at the time of submission:

1) <u>Citizenship/Residency</u>: Proof that the Individual Claimant (and, to any extent applicable, the minor, deceased, or incapacitated individual represented by such Individual Claimant) is a United States citizen, a lawful permanent resident of the United States, or a Canadian citizen;

2) <u>Claimant Information</u>: All claimant information required under the Submission Procedures adopted by the Trust (the "Claimant Information"), including but not limited to the Individual Claimant's Identifying Information.

3) <u>Proof of Claim</u>: A properly completed Form 410 (*i.e.*, Proof of Claim form)

4) <u>Claim Submission Form</u>: A properly completed Claim Submission Form (the template for which shall be attached to the Claim Submission Procedures adopted by the Trust);

5) <u>Retention Agreement</u>: To the extent the Individual Claimant is represented by counsel, a copy of the related retention agreement;

6) <u>Talc Use Evidence</u>: A sworn affidavit or other testimony establishing the Individual Claimant's use of any and all talc and talc-containing products (including J&J Talc Products) that the Individual Claimant reasonably believes is sufficient to satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to these TDP;

7) <u>Lack of Asbestos Exposure</u>: In the case of a Mesothelioma Claim a sworn affidavit asserting the Mesothelioma Claimant does not allege any asbestos exposure unrelated to use of talc-based products; and

8) <u>Medical Evidence</u>: Medical records that the Individual Claimant reasonably believes is sufficient to (i) satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to these TDP, and (ii) provide the Claims

- 16 -

Administrator with all information necessary to accurately determine the appropriate Scheduled Value and Allowed Claim Amount.

While the precise extent of medical records required by the above Submission Requirements may vary from claim to claim, as well as generally, depending on the particular types of Individual Claims involved, diseases alleged, and other factors relevant to the valuation of Individual Claims pursuant to these TDP, in general, production of all pathology reports and contemporaneous treatment records, along with records sufficient to establish an Individual Claimant's medical history, would be satisfactory for any Individual Claimant regardless of the type of Individual Claim asserted or Evaluation Track elected. However, medical evidence that does not include either a pathology report related to the Individual Claimant's alleged disease or treating physician's detailed report as to the Individual Claimant's pathologic diagnosis shall not be deemed satisfactory evidence to establish a Qualifying Claim. Individual Claimants who are unable to satisfy these requirements may, however, still be eligible to proceed under the Accelerated Evaluation Process.

Individual Claims that are substantially complete at the time of submission shall be deemed Submitted Claims and be subjected to the Preliminary Evaluation Process set forth below.

### 4.3.6   Disallowed Claims

In the event that an Individual Claimant submits materials that are clearly insufficient (as determined by the Claims Administrator) to satisfy the Submission Requirements, the Trustees shall provide notice of each deficiency to such Individual Claimant and automatically defer the related Submitted Claim for sixty (60) days (the "Deficiency Cure Period"), to ensure the Individual Claimant a fair opportunity to cure any such deficiencies. If the Individual Claimant fails to either supplement his/her Submitted Claim with materials sufficient to resolve any deficiencies identified, or respond to the deficiency notice requesting further relief, the Submitted Claim at issue shall be disallowed (the "Disallowed Claim") and the Trustees shall provide notice to the Individual Claimant of the same (the "Disallowed Claims Notice").

If the Trustees find that a Submitted Claim is a Disallowed Claim, the Trustees will not perform the analysis pursuant to the Qualification Evaluation Process described below in Section 4.4.4. Individual Claimants shall have the ability to seek reconsideration of the Trustees' determination set forth in the Disallowed Claim Notice as described in Article 6 herein.

### 4.4   Claim Evaluation Procedures

To determine whether each Individual Claim submitted to the Trust is either (i) legally valid and therefore should be allowed, or (ii) legally invalid and therefore should be disallowed, the Claims Administrator, in conjunction with the Claims Processor, shall act according to the following uniform procedures and guidelines to thoroughly and individually evaluate all related Claim Submissions.

### 4.4.1   FIFO Processing

Individual Claims shall be processed based on their place or places in the applicable FIFO Processing Queues based upon the election of an Evaluation Track. The Trust shall take all

reasonable steps to resolve Individual Claims as efficiently and expeditiously as possible at each stage of claims processing, including with respect to any Reconsideration Requests and/or ADR Procedures, which steps may include, in the Trust's sole discretion, conducting settlement discussions with Representatives with respect to more than one Individual Claim at a time, provided that the relevant Individual Claimants' respective positions in the applicable FIFO Processing Queues are maintained, and each Individual Claim is individually evaluated pursuant to the valuation factors set forth in Article 7.

### 4.4.2   Preliminary Evaluation of Claim Submissions

Within sixty (60) days of each Individual Claim being submitted to the Trust and thereby becoming a Submitted Claim, the Claims Administrator shall conduct a Preliminary Evaluation of the related Claim Submission to determine whether:

a)   the Submitted Claim was timely submitted to the Trust pursuant to Section 4.2;

b)   the Submitted Claim has not previously been submitted to the Trust pursuant to these TDP or otherwise (except for Individual Claims that were submitted and later formally withdrawn pursuant to Section 4.3.2);

c)   the Submitted Claim had not previously been resolved through litigation and/or settlement involving a Protected Party; and

d)   the Individual Claimant's Proof of Claim and Claim Submission are substantially and substantively completed and signed under penalty of perjury.

Submitted Claims that satisfy these four (4) preliminary criteria (the "Preliminary Evaluation Criteria") shall be deemed Confirmed Claims and thereafter routed to either the standard Qualification Evaluation Process or the Accelerated Evaluation Process, as elected by the Individual Claimant in his/her Claim Submission.  Submitted Claims that fail to satisfy one or more of the Preliminary Evaluation Criteria shall be disallowed and the Trust shall give notice to the Individual Claimant of the disallowance.

In the event that a Submitted Claim is disallowed because it was previously submitted to the Trust with different independent counsel, the Trust shall provide notice to the related Individual Claimant regarding the duplicative submission and such Claimant shall have thirty (30) days to submit to the Trust a certification signed by himself/herself, and both independent counsel who purported to represent the Individual Claimant for one of his/her Individual Submissions confirming which counsel shall be representing the Individual Claimant with respect to the original Submitted Claim and withdrawing any later Submitted Claim.  If the Individual Claimant satisfies this option, he/she may retain his/her place in the FIFO Processing Queue and the Individual Claim may proceed through the evaluation processes set forth in these TDP.  Failure to submit such certification shall result in (i) the original Submitted Claim being indefinitely deferred pending clarification from the Individual Claimant and his/her counsel as to who represents the Individual Claimant and (ii) any later Submitted Claim being deemed withdrawn.

### 4.4.3    General Principles for Evaluation of Confirmed Claims

For each Confirmed Claim, the Claims Administrator shall, in conjunction with the Claims Processor, individually evaluate the related Claim Submission pursuant to the Individual Claimant's selected Evaluation Track to determine whether the Individual Claim should be allowed.  Regardless of the Evaluation Track selected, this process shall involve (i) a thorough review and consideration of all the submitted Claims Materials, (ii) a full evaluation and determination as to the credibility of such evidence, and (iii) determination as to whether such evidence satisfies the substantive criteria for the applicable Evaluation Track.

If the Claims Administrator verifies that a Confirmed Claim (i) satisfies the applicable substantive criteria as set forth in this Section and (ii) the related Claim Materials are not deceptive or fraudulent, then the Confirmed Claim shall be deemed an Allowed Claim.  If, on the other hand, the Claims Administrator verifies that (i) the relevant Claim Materials are not deceptive or fraudulent, but (ii) the Confirmed Claim does not satisfy the applicable substantive criteria, then the Claims Administrator has the discretion to either (i) disallow the claim, or, (ii) alternatively, request supplemental evidence sufficient to resolve the deficiency from the Individual Claimant in question.

In the event, however, that the Claims Administrator determines that any portion of the Claims Materials are deceptive or include fraudulent information, then such Individual Claim shall be disallowed, and the Trustees shall provide the required notice of such disallowance to the related Individual Claimant.  Further, once any such disallowance becomes a final determination pursuant to these TDP, the Trust may subject counsel for that Individual Claimant, to the extent such counsel represents additional Individual Claimants that have submitted, or in the future submit, their Individual Claims to the Trust, to heightened scrutiny, limitations, and/or any other penalties the Trust determines are appropriate.

### 4.4.4    Standard Qualification Evaluation Process

For each Confirmed Claim electing to proceed under the standard Qualification Evaluation Process, the Claims Administrator shall, in conjunction with the Claims Processor, thoroughly review and evaluate the related Claim Submission to determine whether either the Ovarian Cancer Qualification Criteria or the Mesothelioma Qualification Criteria, as applicable, are satisfied.  If, in undertaking this Qualification Evaluation Process, the Claims Administrator determines that a Confirmed Claim satisfies the applicable Qualification Criteria, then such claim shall be deemed a Qualifying Claim and may proceed to the valuation processes set forth in these TDP.  Individual Claimants who do not satisfy the applicable Qualification Criteria are non-qualifying claims under these TDP and shall be disallowed.

### A.    Ovarian Cancer Qualification Criteria

Individual Claimants who submit to the Trust an Ovarian Cancer Claim and satisfy the following three (3) Ovarian Cancer Qualification Criteria shall be deemed Qualifying Ovarian Cancer Claimants.  Ovarian Cancer Claims that fail to satisfy these criteria are non-qualifying claims under these TDP and shall be disallowed.

- 19 -

1) <u>Proof of Regular Perineal Use of J&J Talc Products</u>: the Individual Claimant consistently used J&J Talc Products in her perineal area after puberty for a minimum of four (4) consecutive years (*i.e.*, "Regular Perineal Use"), and proves as much via sworn testimony or affidavit, including the alleged dates of first and last use;

2) <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with a Ovarian Cancer at least ten (10) years following her first post-pubertal perineal use of J&J Talc Products; and

3) <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

**B.     Mesothelioma Qualification Criteria**

Individual Claimants who submit to the Trust a Mesothelioma Claim and satisfy the following three (3) Mesothelioma Qualification Criteria shall be deemed Qualifying Mesothelioma Claimants.  Mesothelioma Claims that fail to satisfy these criteria are non-qualifying claims under these TDP and shall be disallowed.

1) <u>Proof of Use of J&J Talc Products</u>: the Individual Claimant was consistently used J&J Talc Products for a minimum of four (4) consecutive years (*i.e.*, "Regular Use"), and proves as much via sworn testimony or affidavit;

2) <u>Lack of Asbestos Exposure</u>: the Individual Claimant has no known history of exposure to asbestos and does not allege any asbestos exposure unrelated to use of talc-based products;

3) <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with malignant Mesothelioma (either pleural [except WDPM], peritoneal, pericardial or testicular) at least ten years following his/her first use of J&J Talc Products; and

4) <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

**4.4.5   Accelerated Evaluation Process**

**A.     In General**

For each Confirmed Claim electing to proceed under the Accelerated Evaluation Process, the Claims Administrator shall, in conjunction with the Claims Processor and with a focus on efficiency, review and evaluate the related Claim Submission to determine whether the Accelerated Evaluation Criteria are satisfied.  If in doing so the Claims Administrator determines that a Confirmed Claim satisfies the Accelerated Criteria, then such claim shall be deemed an Approved Claim.

## B.    Accelerated Claims Criteria

Individual Claimants who submit to the Trust an Other Talc Claim and satisfy the following three (3) Accelerated Claims Criteria shall be deemed Other Approved Claimants:

1)  <u>Proof of Use of J&J Talc Products</u>: the Individual Claimant was consistently exposed to J&J Talc Products for a minimum of four (4) consecutive years (*i.e.*, "Regular Use"), and proves as much via sworn testimony or affidavit;

2)  <u>Lack of Asbestos Exposure</u>: the Individual Claimant has no known history of exposure to asbestos and does not allege any asbestos exposure unrelated to use of talc-based products;

3)  <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with a Gynecological Cancer, Ovarian Cancer, or Mesothelioma at least ten years following his/her first use of J&J Talc Products; and

4)  <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

## Article 5
## <u>VALUATION OF ALLOWED CLAIMS</u>

### 5.1    <u>In General</u>

The Claims Administrator, in conjunction with the Claims Processor, shall identify and utilize the appropriate multi-stage valuation process, as described in this Article, to determine the Scheduled Value for every Allowed Claim under these TDP.  These valuation processes specifically are intended to be a direct continuation of the resolution process for Individual Claimants, immediately upon determination of allowance pursuant to the standard Qualification Evaluation Process or the Accelerated Evaluation Process.  Promptly after determination of each Allowed Claim's Scheduled Value, the Trustees shall notify the related Individual Claimant of (i) the determination that his/her Individual Claim is either a Qualifying Claim or Other Approved Claim and (ii) the Scheduled Value determined as to the same pursuant to Sections 5.2 and 5.3, below.

### 5.2    <u>Determination of Scheduled Values for Qualifying Claims</u>

#### 5.2.1    Qualifying Ovarian Cancer Claims

Upon determination that an Ovarian Cancer Claim submitted to the Trust is a Qualifying Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following seven (7) stage valuation process for any such Ovarian Cancer Claim that elected evaluation under the Qualification Evaluation Process.  This process requires the Claims Administrator:

- 21 -

1)   To identify the initial Point Value based on the Individual Claimant's age at diagnosis and specific category of injury; then

2)   To adjust that initial Point Value based on diagnostic disease subtypes; then

3)   To further adjust that Point Value based on the length of use of J&J Talc Products, if applicable; then

4)   To reduce that Point Value based on the length of time between the end of the Individual Claimant's Regular Use and the relevant date of diagnosis, if applicable; then

5)   To further adjust that Point Value based on the frequency of use of J&J Talc Products, if applicable; then

6)   To further adjust that Point Value by a certain percentage discount based on the existence of certain risk factors, if applicable; and finally

7)   To further adjust the resulting Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable

Gynecologic Claims other than Ovarian Cancer claims shall only be eligible to receive a Point Value based on the Accelerated Evaluation Process.

### A.   Initial Point Values

The Initial Point Value for Qualifying Ovarian Cancer Claims, prior to the application of any of the listed adjustments will be determined based on the Individual Claimant's age at diagnosis and stage of cancer as detailed below:

| Age at Diagnosis (in years) | Stage IV OR Related Death | Stage III (with recurrence) | Stage III (no recurrence) OR Stage I-II (with recurrence) | Stage II | Stage I |
|---|---|---|---|---|---|
| Under 45 | 260,000 | 230,000 | 150,000 | 90,000 | 25,000 |
| 45-49 | 230,000 | 200,000 | 140,000 | 80,000 | 20,000 |
| 50-54 | 200,000 | 180,000 | 130,000 | 75,000 | 17,500 |
| 55-59 | 180,000 | 150,000 | 120,000 | 65,000 | 12,500 |
| 60-64 | 140,000 | 115,000 | 80,000 | 50,000 | 10,000 |
| 65-69 | 100,000 | 80,000 | 50,000 | 40,000 | 7,500 |
| 70+ | 65,000 | 50,000 | 40,000 | 25,000 | 5,000 |

### B.   Point Value Adjustment Factors

Each Individual Claimant's initial Point Value will then be adjusted by a series of multiplicative factors to determine the Claim-specific Point Value.

The standard Point Value for all claims is the value of a qualifying serous carcinoma (*i.e.*, "100%"), and claims of other types are treated as being worth a percentage of whatever that standard Point Value is.

| Ovarian Cancer Diagnostic Subtypes | Point Value (as a percentage of a qualifying serous carcinoma) |
|---|---|
| Serous Carcinoma | 100% |
| Endometrioid Carcinoma | 90% |
| Clear Cell Carcinoma | 75% |
| Mixed Epithelial Carcinoma | See below |
| – Each subtype identified is a qualifying subtype (*e.g.*, serous with clear cell) | 100% |
| – Primary subtype is a qualifying subtype (*i.e.*, serous, endometrioid, clear cell) but other subtypes are non-qualifying (*e.g.*, serous with mucinous) | 65% |
| Undifferentiated Epithelial Carcinoma | 100% |
| Ovarian Carcinoma with Epithelial Component of Unknown or Unidentified Subtype (*e.g.*, "ovarian adenocarcinoma") | 50% |
| Borderline Ovarian Tumors with Serous, Endometrioid, or Clear Cell Subtypes | 30% |

### C.   Talc Use and Risk Factor Reductions

(i)   Step I Reductions:  Length of J&J Talc Use

The Claim-specific Point Value established by the above process shall be adjusted based on the length of time an Individual Claimant regularly used J&J Talc Products.  Specifically, the Claim-specific Point Value shall be reduced proportional to the Years of Regular Perineal J&J Talc Use relative to the Maximum Years of Regular Perineal J&J Talc Use.  For purposes of this valuation process, "Years of Regular Perineal J&J Talc Use" shall be defined as the lesser of (i) the number of full years of Regular Perineal J&J Talc Use after the Individual Claimant reached puberty[1], or (ii) 40 years.  Similarly, the Maximum Years of Regular Perineal J&J Talc Use is defined as the lesser of (i) 40 years or (ii) the number of years elapsed between puberty and the Individual Claimant's Date of Diagnosis.

$$Reduction\ of\ Point\ Value = 1 - \frac{(Years\ of\ Regular\ Perineal\ J\&J\ Talc\ Use\ )}{(Maximum\ Years\ of\ Regular\ Perineal\ J\&J\ Talc\ Use\ )}$$

This reduction factor shall be referred to as the "Length of Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

---

[1] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

(ii)    Step II Reductions:  Time Since Last Use

Next, the Claim-specific Point Value shall be further adjusted based on the length of time between the Individual Claimant's last daily perineal use of J&J Talc Products and Date of Diagnosis, as set forth in the following table:

| Time Since Last Regular Use | Reduction of Point Value |
|---|---|
| 0 to <5 years since last daily use | 0% |
| 5 to <30 years since last daily use | 2% per year[2] |
| 30+ years since last daily use | 55% |

This reduction factor shall be referred to as the "Time Since Last Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(iii)    Step III Reductions:  Less than Regular Use

Next, the Claim-specific Point Value as established by the other factors shall be further reduced by the Less Than Daily Use Factor if Individual Claimant's use of J&J Talc Products is less frequent than daily. The Less Than Daily Use Factor is based on the relative frequency with which the Individual Claimant used J&J Talc Products through his/her years of use and will be calculated based on the table below:

| Frequency of Regular Use | Reduction of Point Value |
|---|---|
| Daily Use | 0% |
| Weekly Use | 50% |
| Monthly Use | 95% |

This reduction factor shall be referred to as the "Less Than Daily Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(iv)    Step IV Reductions:  Medical Risk Factors

Next, the Pre-Risk Point Value as established by above process shall be further reduced based on the Individual Claimant's family history and genetic predisposition to Ovarian Cancer, based on the table below.  Only the greatest of the reductions for applicable Step IV risk factors shall apply.  For avoidance of doubt, discounts within this factor itself are not cumulative (i.e., if a claimant has BRCA 1 as well as a family history of ovarian cancer, the total reduction is 45%, not 80%).

| Risk Factor | Reduction of Point Value |
|---|---|
| BRCA 1 or BRCA 2 | 45% |
| Family Hx of ovarian cancer (in 1st degree relative) | 35% |

---

[2] For avoidance of doubt, an Individual Claimant who was diagnosed with a qualifying disease 11 years after her last Regular Use of J&J Talc Products would be subject to a discount of $(11 - 5) \times 2\% = 12\%$.

- 24 -

| Personal or family history (in 1st degree relative) of colon or breast cancer | 20% |
|---|---|

This reduction factor shall be referred to as the "Medical Risk Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(v)  Step V Reductions:  Non-J&J Talc Use

Next, the Point Value established by the above process shall be further reduced based on an Individual Claimant's Regular Perineal Use of Non-J&J Talc Products (if applicable and established by affidavit or legal pleadings).

| Discounts | Reduction of Point Value |
|---|---|
| Other Talc Use (applies only if Individual Claimant regularly used a non-J&J Talc Product in her perineal area for a period of greater than 4 years) | 25% (increasing to the total percentage of other non-J&J Talc Product use in pleadings or affidavit) |

This reduction factor shall be referred to as the "Non-J&J Talc Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

**D.  Scheduled Value**

Each Individual Claimant's Scheduled Value shall be determined based on his/her Claim-specific Point Value as adjusted by each of the reduction factors described in Steps I–V, as follows:

$$Scheduled\ Value$$
$$= (Initial\ Point\ Value) \times (Diagnostic\ Adjustment)$$
$$\times (1 - J\&J\ Talc\ Use\ Factor\ Reduction)$$
$$\times (1 - Time\ Since\ Last\ Use\ Factor\ Reduction)$$
$$\times (1 - Less\ Than\ Daily\ Use\ Factor\ Reduction)$$
$$\times (1 - Medical\ Risk\ Factor\ Reduction)$$
$$\times (1 - Non\ J\&J\ Talc\ Use\ Factor\ Reduction)$$

The Scheduled Value shall not exceed the Maximum Value, and shall not be less than 1,000 points.  In the event that this valuation process results in an amount above the Maximum Value, the Scheduled Value for the Individual Claimant shall be equal to the Maximum Value.  Likewise, if this valuation process results in an amount below 1,000 points, then the Scheduled Value shall be equal to 1,000 points.

**5.2.2  Qualifying Mesothelioma Claims**

Upon determination that an Individual Claim submitted to the Trust is a Qualifying Mesothelioma Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following five (5) stage valuation process for any such Mesothelioma Claim that elected evaluation under the Qualification Evaluation Process.  This process requires the Claims Administrator:

1) To identify the initial Point Value based on the Individual Claimant's age at diagnosis; then

2) To adjust that initial Point Value based on diagnostic disease subtypes; then

3) To further adjust that Point Value based on length of use of J&J Talc Products, if applicable; then

4) To reduce that Point Value based on the frequency of use of J&J Talc Products, if applicable; and finally

5) To further adjust the resulting Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable.

## A. Initial Point Value

The initial Point Value for Qualifying Mesothelioma Claims, prior to the application of any of the listed adjustments will be determined based on the Individual Claimant's age at diagnosis as detailed below:

| Age at Diagnosis | Mesothelioma |
|---|---|
| Under 45 | 500,000 |
| 45-49 | 450,000 |
| 50-54 | 400,000 |
| 55-59 | 350,000 |
| 60-64 | 300,000 |
| 65-69 | 200,000 |
| 70+ | 100,000 |

## B. Point Value Adjustment Factors

Each Qualifying Mesothelioma Claimant's Point Value will then be adjusted by a series of multiplicative factors to determine the appropriate Claim-specific Point Value.

The standard Point Value for all Qualifying Mesothelioma Claims is the value of a qualifying pleural mesothelioma (*i.e.*, "100%"), and claims of other types are treated as being worth a percentage of whatever that standard Point Value is.

| Diagnostic Subtypes | Point Value (as a percentage of a qualifying Pleural Mesothelioma) |
|---|---|
| Pleural Mesothelioma (non-WDPM) | 100% |
| Peritoneal Mesothelioma | 75% |
| Pericardial Mesothelioma | 10% |
| Testicular Mesothelioma | 10% |

## C.    Talc Use & Risk Factor Reductions

(i)    Step I Reductions:  J&J Talc Use

The Claim-specific Point Value established by the above process shall be adjusted based on the length of time an Individual Claimant regularly used J&J Talc Products.  Specifically, the Claim-specific Point Value shall be reduced proportional to the Years of Regular J&J Talc Use relative to the Maximum Years of Regular J&J Talc Use.  For purposes of this valuation process, "Years of Regular J&J Talc Use" shall be defined as the lesser of (i) the number of full years of Regular J&J Talc Use after the Individual Claimant reached puberty[3], or (ii) 40 years.  Similarly, the Maximum Years of Regular J&J Talc Use is defined as the lesser of (i) 40 years or (ii) the number of years elapsed between puberty and the Individual Claimant's Date of Diagnosis.

$$Reduction\ of\ Point\ Value = 1 - \frac{(Years\ of\ Regular\ J\&J\ Talc\ Use)}{(Maximum\ Years\ of\ J\&J\ Talc\ Use)}$$

The J&J Talc Use Reduction of Point Value factor shall not exceed 1.0, and shall not be less than 0.0.

(ii)    Step II Reductions:  Less than Regular Use

Next, the Claim-specific Point Value as established by the other factors shall be further reduced if the Individual Claimant's use of J&J Talc Products is less frequent than daily based on the relative frequency with which the Individual Claimant used J&J Talc Products through his/her years of use and will be calculated based on the table below:

| Frequency of Regular Use | Reduction of Point Value |
|---|---|
| Daily Use | 0% |
| Weekly Use | 50% |
| Monthly Use | 95% |

This reduction factor shall be referred to as the "Less Than Daily Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(iii)    Step III Reductions:  Non-J&J Talc Use

Next, the Point Value established by the above process shall be further reduced based on an Individual Claimant's Regular Use of Non-J&J Talc Products (if applicable and established by affidavit or legal pleadings).

| Discounts | Reduction of Point Value |
|---|---|
| Other Talc Use | 25%<br>(increasing to the total percentage of other talcum powder use in pleadings or affidavit) |

---

[3] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

This reduction factor shall be referred to as the "Non-J&J Talc Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

### D.    Scheduled Value

Each Individual Claimant's Scheduled Value shall be determined based on his/her Claim-specific Point Value as adjusted by each of the reduction factors described in Steps I–III, as follows:

$$\begin{aligned}
Scheduled\ Value \\
= (Initial\ Point\ Value) \times (Diagnostic\ Adjustment) \\
\times\ (1 - J\&J\ Talc\ Use\ Factor\ Reduction) \\
\times\ (1 - Less\ Than\ Daily\ Use\ Factor\ Reduction) \\
\times\ (1 - Non\ J\&J\ Talc\ Use\ Factor\ Reduction)
\end{aligned}$$

The Scheduled Value shall not exceed the Maximum Value, and shall not be less than 1,000 points. In the event that this valuation process results in an amount above the Maximum Value, the Scheduled Value for the Individual Claimant shall be equal to the Maximum Value. Likewise, if this valuation process results in an amount below 1,000 points, then the Scheduled Value shall be equal to 1,000 points.

## 5.3    Scheduled Values for Approved Accelerated Claims

Upon determination that an Individual Claim submitted to the Trust is an Other Approved Claim, the Claims Administrator, in conjunction with the Claims Processor, shall determine the Scheduled Value for any such Other Approved Claim, as follows:

### 5.3.1    Individual Claims Which Could Have Appropriately Elected to Proceed Under the Qualification Evaluation Process

If an Individual Claimant could have appropriately elected to submit his/her Individual Claim to the Trust pursuant to the standard Qualification Evaluation Process, but for whatever reason chose to instead elect the Accelerated Evaluation Process, the resulting Other Approved Claim shall have a Scheduled Value of 1,000 points.

### 5.3.2    Canadian Claims

Other Approved Claims that involve an Individual Claimant who is not a citizen or legal permanent resident of the United States, but who is a citizen or legal permanent resident of Canada, shall have a Scheduled Value of 500 points.

### 5.3.3    Other Allegedly Talc-Related Diseases

Other Approved Claims that involve an Individual Claimant who was diagnosed with Mesothelioma or Ovarian Cancer but nonetheless elected to proceed via the Accelerated Evaluation Process shall have a Scheduled Value of 500 points.

## Article 6
## RECONSIDERATION REQUESTS & ADR PROCEDURES

### 6.1    Reconsideration of Determination

#### 6.1.1    Requirements for Reconsideration Requests

An Individual Claimant may submit a request to the Trust that the Trustees reconsider any initial determination (a "Reconsideration Request") (i) that the Individual Claimant's Submitted Claim is a Disallowed Claim (regardless of the stage of the resolution process pursuant to these TDP that this determination occurred), or (ii) of the applicable Scheduled Value for the relevant Allowed Claim.  Each Reconsideration Request must include:

a)    A completed Reconsideration Form, the template for which shall be designed and adopted by the Trustees and included as an Exhibit to the Submission Procedures;

b)    Payment of five hundred dollars ($500) as an administrative reconsideration fee, in the form of either check, money order, or via any electronic payment process deemed acceptable by the Trustees; and

c)    At the requesting Individual Claimant's discretion, further evidence in support of the relevant Submitted Claim.

#### 6.1.2    Forfeiture of Right to Request Reconsideration

Individual Claimants found to have submitted deceptive or fraudulent information or documents to the Trust shall be deemed to have forfeit their right to request reconsideration pursuant to these TDP.  Similarly, where the Trust has determined that deceptive or fraudulent information was submitted in support of an Individual Claim, counsel for that Individual Claimant at the time of such submission shall be deemed to have forfeit the right for other Individual Claimants also represented by the same counsel to request reconsideration pursuant to these TDP.[4]

#### 6.1.3    Failure to Request Reconsideration Deemed Acceptance

The deadline to submit a Reconsideration Request shall be fifteen (15) days after written notice of the determination at issue is given pursuant to these TDP.  Any Individual Claimant who fails to properly submit a Reconsideration Request to the Trust within this fifteen (15) deadline shall be deemed to accept the original determination of the Claims Administrator, which determination shall become final and non-appealable.

---

[4] As an exception to this provision, where an Individual Claimant's counsel was unaware that information or documents later determined to be deceptive or fraudulent were included in the Individual Claimant's submissions to the Trust, and is the party responsible for discovering the deception or fraudulent nature of the submissions, brings the deception or fraudulent information to the attention of the Trust, and withdraws representation of said Individual Claimant, the counsel at issue shall not be deemed to have forfeit future rights to request reconsideration for other Individual Claimants.

### 6.1.4    Reconsideration Request Procedures

Upon receipt of a properly submitted Reconsideration Request, the Trustees shall proceed with an independent evaluation of the Individual Claim and specific determination in question. Within fifteen (15) days of receiving a Reconsideration Request, the Trustees shall provide written notice to the requesting Individual Claimant as to the outcome of the Trustees' independent evaluation, which may either be to maintain or revise the Claims Administrator's original determination or, alternatively to request supplemental information and/or materials necessary to reach a final conclusion.

The Trustees' decision to affirm or revise the Claims Administrator's original determination shall be binding and non-appealable. To the extent that the Trustees determine that a Submitted Claim is, upon reconsideration, an Allowed Claim or should receive a higher proposed Scheduled Value, the Trustees shall return the administrative fee to the relevant Individual Claimant. If, however, the Trustees decide that no change to the Claims Administrator's original determination is warranted, that the Allowed Claim should receive a lower proposed Scheduled Value, or that insufficient information was provided by the Individual Claimant to reach a different conclusion at the time, then the administrative fee shall not be returned. Only in the event that the Trustees affirm the original determination at issue shall the requesting Individual Claimant pursue any further remedy pursuant to the ADR Procedures set forth below.

## 6.2    Post-Reconsideration Litigation

Individual Claimants who have exhausted their Reconsideration Request rights pursuant to Section 6.1 shall retain the right to institute a lawsuit in the tort system against the Trust in the Claimant's Jurisdiction, as defined by these TDP. Such lawsuit may not name the Debtor, Payor, or any Protected Party and must only be filed against the Trust as defendant. Any such lawsuit must be filed by the Individual Claimant in his/her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. Both the Individual Claimant and the Trust shall have all appropriate defenses available to them (including, with respect to the Trust, all defenses which could have been asserted by any Protected Party). Further, the Trust may use any and all information and/or materials submitted to the Trust by the Individual Claimant in its defense of any lawsuit in the tort system, including evidence of deceptive or fraudulent behavior. In the event that the Individual Claimant does not prevail at trial or prevails but is awarded a judgment less than the Allowed Claim amount offered by the Trust, the Individual Claimant shall be responsible for reimbursing the Trust for all attorney fees and costs the Trust incurred in defending against the Individual Claimant's lawsuit.

In the event an Individual Claimant elects to pursue a lawsuit pursuant to this Section which results, after waiver and/or exhaustion of any party's rights of appeal, in a final judgment for monetary damages, then such Individual Claimant shall be eligible for payment of the portion of such judgment that constitutes compensatory damages through the Trust, up to the Maximum Amount for such Individual Claim pursuant to these TDP. Payment of such judgment shall be processed in the same manner as payments made to Individual Claimants who accepted the Claims Administrator's original Scheduled Value determined and proposed for their Allowed Claims, pursuant to Section Article 5, except that upon reaching the front of the FIFO Processing Queue, the Settlement Trust shall distribute to the Individual Claimant only an initial payment equal to

Trust's last offer, if any, to the Individual Claimant (provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system). The balance of the judgment, up to the Maximum Value for the Individual Claim, if any, shall be paid to the Individual Claimant in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment. Under no circumstances shall any non-compensatory monetary damages or any interest be paid under any statute on any judgments obtained in the tort system.

## Article 7
## INDIVIDUAL CLAIMS PAYMENT PROCESS

### 7.1 Points-Based Monetary Values

#### 7.1.1 Uncertainty of Debtor's Talc Liabilities

Litigation arising from the use of talc or talc-containing products is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtor's total talc-related liabilities. As a result of this uncertainty, in undertaking to ensure substantially equitable treatment of all similar Existing and Future Claims, the Trustees must from time to time determine the per-point dollar value of the points used to value Individual Claims under these TDP (the "Point Value").

#### 7.1.2 Description & Application of Points Valuation System

##### A. In General

Promptly after the Trust is established, the Trustees, with the consent of the Payor, the TAC, and the FCR, shall establish an initial Point Value for Individual Claims (the "Initial Point Value"). This Initial Point Value shall be calculated on the basis of the initial trust claim submissions, an estimate of future submissions, and the claim valuation procedures outlined in these TDP. The Trust was established with the goal of achieving a Point Value of one dollar ($1) per point and the Debtors believe the Initial Point Value will be between fifty cents ($0.50) and two dollars ($2) per point. Given the uncertainty associated with Individual Claims, and in recognition of the fact that the Trust may increase the Point Value in the future, the Trust shall take a conservative posture in setting the Initial Point Value, and may set a separate Point Value for Mesothelioma and Ovarian Cancer claims.

The totality of the Individual Claims to be paid over time pursuant to these TDP is not certain. In particular, the number and type of Existing Claims, as well as the stage, age, and other key characteristics, are still unknown at this time. The Claim Submissions will provide information on these factors for Existing Claims which will allow the Trust to better assess the Point Value that can be paid for each awarded point. Further, there is also some uncertainty surrounding the value of the Trust's assets in the future. If the value of the Trust's future assets increases materially and/or if the value or volume of Individual Claims actually filed with the Trust is materially lower than originally estimated, the Trust shall use the increase in Trust assets available first to maintain the Point Value then in effect.

### B.      Supplemental Payments Owed Due to Increases to the Point Value

If the Trustees, after consultation with the TAC and the Payor, and with the consent of the FCR, determines that an increase to the Point Value is warranted due to a material change in the estimates of the Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to Individual Claimants and Indirect Claimants who previously liquidated their Allowed Claims against the Trust and received payments based on a lower Point Value; provided, however, that no additional supplemental payments will be made to any Individual Claimant who previously has already received one such supplemental payment.  The amount of any supplemental payment shall be the liquidated value of the Allowed Claim in question multiplied by the newly adjusted Point Value, less all amounts previously paid by the Settlement Trust with respect to that Allowed Claim.

The Settlement Trust's obligation to make a supplemental payment to any Individual Claimant shall be suspended in the event the payment in question would be less than one hundred dollars and zero cents ($100.00), and the amount of the suspended payment shall be added to the amount of any prior supplemental payment(s) also suspended because they would have been less than one hundred dollars and zero cents ($100.00).  The Settlement Trust's obligation to make a previously suspended supplemental payment shall resume when the payment in question is equal to or greater than one hundred dollars and zero cents ($100.00).

### C.      Determination of Value

The Trustees shall base its determination of the Point Value on (i) current estimates as to the number, types, and Scheduled Values determined for Existing Claims and Future Claims,  (ii) the value of the assets available to the Trust for payment of Allowed Claims, (iii) all anticipated administrative and legal expenses, and any other matters that are reasonably likely to affect the sufficiency of funds to pay on an equal application of the TDP methodology to all Existing Claimants and Future Claimants based on the points awarded to each Individual Claimant.  When making these determinations, the Trustees shall evaluate all relevant factors to determine a conservative Point Value with the goal of assuring that the Trust will be able to treat all similar Existing and Future Claims in a similar manner.

The Point Value shall be subject to change pursuant to the terms of these TDP and the Talc Personal Injury Trust Agreement.  The Trustees shall review the then-applicable Point Value as it deems necessary to assure that it is based on accurate, current information, and shall compare the liability forecast on which the then-applicable Point Value was based with the actual claims submission and payment experience of the Trust to date, and the projected assets of the Trust on which the then-applicable Point Value was based with the current assets, and any updated projections of asset values, of the Trust and Future Claims.  If the results of the comparisons call into question the ability of the Trust to rely upon the current liability and asset forecasts, the Trustees may, if necessary, propose a change in the Point Value. Any change is the Point Value must be approved by the TAC, the FCR, and the Payor.

### 7.2   General Guidelines for Liquidating & Paying Allowed Claims

#### 7.2.1   Documentation Requirements

##### A.   Acceptance & Release

Individual Claimants who decide to accept an offer of payment from the Trust based on the proposed Scheduled Values for their Allowed Claims shall complete and execute the applicable acceptance and release form to be adopted by the Trust with the consent of the TAC and FCR (the "Acceptance and Release").  The standard Acceptance and Release form provided to Qualifying Claimants and Other Approved Claimants shall include a release of all claims against Debtor, which is discharged, the Payor, and the Protected Parties, to the extent any such claims arise from or are related to the accepting Individual Claimant's alleged use of J&J Talc Products and resulting injury.  The Acceptance and Release form shall be filed as a supplemental exhibit to these TDP prior to the Initial Filing Date and included with in the distribution of the Submission Procedures, As an exception, however, the Acceptance and Release form provided to Individual Claimants seeking payment of a judgment obtained in the tort system pursuant to the procedures described in Section 6.2 of these TDP shall explicitly provide that the Individual Claimant is releasing the Trust's liability in respect of other Protected Parties.  The applicable Acceptance and Release shall be available for completion electronically and may be executed by the accepting Individual Claimant or his/her legal Representative via Adobe Sign or DocuSign, or a similar authorized electronic signature program, or such other simplified and expedient means that the Trust, with the consent of the TAC and FCR, may adopt.

##### B.   Documents Establishing Legal Representation

Individual Claimants asserting an Individual Claim on behalf of a minor, incapacitated, or deceased person, must, before any funds related to such Allowed Claim may be distributed from the Settlement Trust, submit to the Trust appropriate documentation confirming the Allowed Claimant's legal authority to resolve the Individual Claim on behalf of the minor, incapacitated, or the deceased person and his/her estate.

#### 7.2.2   Offsets

The Trust shall have the right to offset or reduce payment of an Allowed Claim Amount, on a dollar for dollar basis based on any amounts paid, agreed upon, or reasonably likely to be paid to the relevant Individual Claimant on account of his/her Individual Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Trust.

### 7.3   Payment of Claims

#### 7.3.1   Allowed Claim Amounts Held in Escrow

Promptly upon receipt of an Individual Claimant's properly executed Acceptance and Release, the final Allowed Claim Amount for the released Allowed Claim shall be set aside and held in escrow within the Settlement Trust pending the final resolution of various administrative issues involving the resolution of the Individual Claim including, but not limited to issues related

- 33 -

to probate, guardianship, personal bankruptcy filings, lien resolution issues, and duplicate sign-up issues.

### 7.3.2    Payment of Allowed Claims

Once all applicable administrative issues related to an Individual Claimant's acceptance of his/her Allowed Claim Amount are resolved, the Trustees shall transfer to the Individual Claimant his/her Net Award Amount (*i.e.*, the total Allowed Claim Amount, less amounts required to satisfy liens and less any attorney's fees and litigation expenses born by the Individual Claimant's counsel.

### 7.3.3    Payment of Legal Fees

Pursuant to these TDP, for any Individual Claimants represented by independent counsel, payment of contingency fees to such independent counsel shall be 25% of the Allowed Claim Amount, unless the Individual Claimant or his/her counsel submits materials to the Trust documenting a contingency fee arrangement of less than 25%, in which case attorney's fees paid to counsel shall be the documented percent of the Allowed Claim Amount. The remainder of the Allowed Claim Amount (generally 75%), less any amount required for payment of the Individual Claimant's liens, shall be paid directly to the Individual Claimant.  The intent of allowing attorney's fees at 25% is to maximize the amount of funds available to pay Individual Claimants. For any Individual Claimants representing themselves on a pro-se basis who accept an Allowed Claim Amount offered by the Trust, 100% of the Allowed Claim Amount, less any funds required for payment of liens, shall be paid directly to the Individual Claimant.

The Trust, however, recognizes that Existing Claimants with a Date of Diagnosis prior to the Petition Date may have contracted with their counsel for contingency fee payments in excess of 25%.  Accordingly, in the event that counsel for such Existing Claimants produces a valid contingency fee agreement entered into with the relevant Individual Claimant prior to the Petition Date with a contracted upon contingency rate above 25%, the Trust shall honor the such prior fee arrangement.  Under no circumstances, however, shall any counsel for an Individual Claim involving a Date of Diagnosis postdating the Petition Date be paid a contingency fee in excess of 25% of the Liquidated Value of the claim.

Attorneys seeking to represent Individual Claimants are or should be aware of this cap when agreeing to represent such Individual Claimants.  Notably, in light of these TDP procedures and the proposed trust funding, the representation of Future Claims is subject to different (lesser) risk than the representation of Existing Claims.

For those Individual Claimants represented by counsel with respect to their Allowed Claims, the Settlement Trust shall only pay attorneys' fees or expenses to the attorneys and/or law firms named in the Individual Claimants' client retention agreements with their counsel.  For avoidance of doubt, no payments may be made to any attorney not specifically identified on such agreement. Further, this Plan and these TDP do not contemplate any common benefit fund obligations for Allowed Claim Amounts paid by the Settlement Trust.  As such, no common benefit fees or costs shall be deducted from Allowed Claim Amounts or paid by the Settlement

Trust, regardless of whether the Allowed Claim Amount was awarded via the procedures set forth in the TDP or outside of the bankruptcy, via the tort system.

## 7.4    Payment Processing

### 7.4.1    FIFO Payment Processing

Individual Claims that have been liquidated in accordance with the terms herein shall be paid from the Settlement Trust in FIFO order based on the date that they accepted an offer from the Trust and their liquidation became final, all such payments being subject to the applicable, the applicable Maximum Payment, and sequencing adjustment provided for in below, and as otherwise provided herein (the "FIFO Payment Queue").

For those Individual Claimants who (i) hold Qualifying Claims or Other Approved Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court or other probate approval before accepting any Scheduled Value proposed by Trust, the Individual Claim shall retain its position in the FIFO Payment Queue so long as the as proceedings to obtain such approval remain pending, and provided that the Individual Claimant has provided the Trust with evidence that the proposed Allowed Claim Amount has been submitted to such court or in that probate process for approval.  If the Individual Claimant ultimately obtains the required court or probate approval and a properly completed Acceptance and Release is submitted to the Trust, the Settlement Trust shall pay the Allowed Claim Amount offered, accepted, and approved.

In the event that any Allowed Claims are liquidated on the same date, each Individual Claimant's position in the applicable FIFO Payment Queue shall be determined by his/her relevant Date of Diagnosis, with the earlier diagnosis having priority over the later diagnosis.  In the unlikely event that any Allowed Claims are liquidated on the same date and also have the same relevant Date of Diagnosis, those Individual Claimants' positions in the FIFO Payment Queue shall be determined by the Trust based on the such Individual Claimants' dates of births, with older claimants given priority over younger claimants.

### 7.4.2    Discretion to Vary the Order & Amounts of Payments in Event of Limited Liquidity

Consistent with the provisions hereof and subject to the FIFO Processing Queue, FIFO Payment Queue, and applicable Maximum Payments, the Trustees shall proceed as quickly as possible to liquidate Allowed Claims and shall promptly make payments to relevant Individual Claimants in accordance with these TDP on an ongoing basis, as funds become available and as Individual Claims are liquidated, while maintaining sufficient resources to pay Future Claimants who submit Individual Claims that are determined to be Allowed Claims in substantially the same manner.

Because the Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to Individual Claimants.  The Trustees shall, however, use their best efforts to treat similar Individual Claims in substantially the same manner, consistent with their duties as Trustees, the

- 35 -

purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Trust faces issues with respect to liquidity, the Trustees may, with the consent of the Payor, the TAC, and the FCR, (a) suspend the normal order of payment, or (b) temporarily limit or suspend payments altogether.

## 7.5   Punitive Damages

In determining the value of any liquidated or unliquidated Individual Claim, punitive or exemplary damages (*i.e.*, damages other than compensatory damages) shall not be considered or allowed, notwithstanding their availability in the tort system.  Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system pursuant to Article 6 herein.

## Article 8
## RESOLUTION OF GOVERNMENTAL ACTION CLAIMS

## 8.1   Governmental Action Claims Are Subject to These TDP

Each holder of a Governmental Action Claim which (a) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) filed a Proof of Claim asserting a Governmental Action Claim by the Claims Bar Date (each a "Governmental Holder" and collectively, the "Governmental Holders") shall participate in these TDP.  The Claims Administrator shall have the right at any time to request additional information from any Governmental Holder regarding its Governmental Action Claims.  Notwithstanding the foregoing, the Governmental Action Claims of the State of New Mexico or the State of Mississippi shall receive the treatment the applicable State agrees to with the Debtor prior to the entry of the Confirmation Order.  If no such agreement is reached in respect of such State's Governmental Action Claim, the Governmental Action Claim shall be liquidated and paid pursuant to these TDP.

## 8.2   Settlement Offer and Negotiations

The Claims Administrator shall make a written or oral offer to settle the Governmental Holder's Governmental Action Claim (a "Settlement Offer").  The offer shall be made to counsel for the Governmental Holder or, if no counsel has been identified, the Governmental Holder.

After a Governmental Holder has received a Settlement Offer, the Governmental Holder shall contact the Claims Administrator and provide a written or oral response to the Settlement Offer (the "Response").  The Governmental Holder may accept or reject the Settlement Offer or make a counteroffer.  In the event the Governmental Holder declines to accept the Settlement Offer, the Governmental Holder and the Claims Administrator shall engage in good faith negotiations regarding the Governmental Action Claim.

If the Governmental Holder accepts the Settlement Offer or the Claims Administrator and the Governmental Holder otherwise reach agreement on the amount of the Governmental Holder's Governmental Action Claim (in either case, the "Settlement Amount"), the Governmental Action

- 36 -

Claim shall be fixed at the Settlement Amount and the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the Settlement Amount in full to the Governmental Holder.

If the parties are unable to reach agreement pursuant to the procedures in this Section 8.2, the Governmental Holder 's Governmental Action Claim shall be referred to mediation.

## 8.3    Mediation

A Governmental Holder 's Governmental Action Claim shall be referred to mediation if the Claims Administrator and the Governmental Holder are unable to reach agreement pursuant to the procedures set forth in Section 8.2 of these TDP.

A mediator (the "Mediator") shall be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the Mediator, the Governmental Holder 's Governmental Action Claim shall either, at the option of the Governmental Holder, (i) be referred to arbitration as provided in Section 8.4 of these TDP or (ii) proceed to litigation as provided in Section 8.5 of these TDP.

The Mediator will work with the Claims Administrator and the Governmental Holder to reach a settlement of the Governmental Action Claim that is mutually acceptable to both parties.  The Mediator shall not have the authority to unilaterally impose a settlement upon the parties.  The Governmental Holder and the Claims Administrator shall each pay one half of the fees and expenses, including legal fees, incurred by the Mediator.  The parties shall otherwise bear their own costs, including legal fees.

If the mediation results in a settlement agreement, the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the Settlement Amount in full to the Governmental Holder.  If the mediation concludes with no settlement, the Governmental Holder shall elect to either (i) participate in binding arbitration pursuant to Section 8.4 of these TDP or (ii) proceed to litigation pursuant to Section 8.5 of these TDP.

## 8.4    Arbitration

A Governmental Action Claim may be referred to binding arbitration as provided in Section 8.3 of these TDP and at the option of the Governmental Holder.

If a Governmental Holder's Governmental Action Claim is referred to arbitration, an arbitrator (the "Arbitrator") shall be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the Arbitrator, the a Governmental Holder's Governmental Action Claim shall proceed to litigation as provided in Section 8.5 of these TDP.

The arbitration shall be governed by the Federal Arbitration Act, Title 9, United States Code.  The Arbitrator shall determine the amount of the Government Holder's Governmental Action Claim.  Unless otherwise agreed by the parties, the arbitration shall be conducted pursuant to the dispute resolution procedures for commercial claims of the American Arbitration Association, as currently in effect and appropriate.  The Governmental Holder and the Claims

- 37 -

Administrator shall each pay one-half of the fees and expenses, including legal fees incurred by the Arbitrator. The parties shall otherwise bear their own costs, including legal fees.

The amount of the Governmental Holder's Governmental Action Claim awarded by the Arbitrator (the "Arbitration Award") shall be binding and determined by the Arbitrator, in their discretion. In no event shall the Arbitration Award include any punitive or exemplary damages. Neither party shall have the right to appeal the Arbitration Award except on the grounds set forth in the Federal Arbitration Act. There will be no right to a trial de novo. Once the Arbitration Award is final and non-appealable, the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the Arbitration Award in full to the Governmental Holder.

## 8.5    Litigation

Any Governmental Holder that elects to litigate their Governmental Action Claims pursuant to the procedures in this Section 8.5 of these TDP, or is otherwise required to litigate its Governmental Action Claim pursuant to Section 8.4 of these TDP, shall have the right to institute a lawsuit against the Trust in: (i) the District Court for the District of New Jersey (the "District Court"); or (ii) if Governmental Holder commenced litigation against the Debtor prior to the Petition Date and that litigation remains pending on the Effective Date, at the option of the Governmental Holder, in the District Court or the United States District Court in the jurisdiction in which the pre-petition litigation is pending. All defenses, which include all defenses that could have been asserted by the Debtor, shall be available to the Talc Personal Injury Trust at trial.

The court adjudicating the Governmental Action Claims shall determine the Debtor's liability for the Governmental Action Claims and shall not consider or allow punitive or exemplary damages. Once any Governmental Action Claims is litigated to a final, non-appealable judgment in accordance with this Section 8.5, the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the judgment in full to the Governmental Holder. The Governmental Holder shall be responsible for its fees and costs, including legal fees. The Governmental Holder shall also be responsible for the fees and costs, including legal fees, incurred in the litigation by the Claims Administrator if the amount of the final non-appealable judgment is less than the last Settlement Offer made to Governmental Holder by the Claims Administrator.

## 8.6    Statute of Limitations & Repose

To be eligible for payment pursuant to these TDP, a Governmental Holder must have either (i) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) submitted a Proof of Claim asserting a Governmental Action Claim by the Bar Date, in either case prior to the expiration of any applicable statute of limitations or repose as such statute may have been tolled pursuant to section 108 of the Bankruptcy Code. At any time during the administration of these TDP, including during arbitration or litigation, the Claims Administrator may agree to a settlement with a Governmental Holder.

# Article 9
## MISCELLANEOUS

## 9.1    Non-Binding Effect of Trust and/or Litigation Outcome

Notwithstanding any other provision of these TDP, the Trust's determination to pay or not to pay any claim shall not be binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against the Debtor, the Protected Parties, or any other entity other than the Trust.  Nor shall the outcome of litigation against the Debtor by the holder of an Indemnified Claim be used in, admissible as evidence in, binding in, or have any other preclusive effect in connection with the Trust's resolution or valuation of an Indemnified Claim.

## 9.2    Independence of Trust

Except as otherwise specifically stated herein, neither the Debtor nor the Payor shall have any rights or involvement whatsoever in the Trust.  Neither the Debtor nor the Payor are a third-party beneficiary of the Trust or these TDP, and nothing herein creates any rights or obligations that may give rise to a claim or cause of action by the Debtor or the Payor against the Trust or any Talc Personal Injury Claimant.

## 9.3    Amendments

Except as otherwise provided herein, the Trustees may not amend, modify, delete, or add to any provisions of these TDP, without the written consent of the Payor, the TAC, and the FCR.  Nothing herein is intended to preclude the Payor, the TAC, or the FCR from proposing to the Trustees, in writing, amendments to these TDP.  For the avoidance of doubt, these TDP may not be amended to alter the allocation of the assets of the Trust between or among Funds.

## 9.4    Severability

Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

## 9.5    Governing Law

Except for purposes of determining the liquidated value of any Talc Personal Injury Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of New Jersey.  The review and evaluation of Individual Claims under these TDP and the law governing mediation, arbitration, or litigation in the tort system shall be the law of the jurisdiction in which the Individual Claimant could have filed a lawsuit alleging an Individual Claim under applicable law.

# EXHIBIT N

**Executory Contracts and Unexpired Leases to Be Rejected**

[TO BE FILED WITH PLAN SUPPLEMENT]

# EXHIBIT O

## Officers and Managers of the Reorganized Debtor

[TO BE FILED WITH PLAN SUPPLEMENT]

# SCHEDULE 1

## Imerys/Cyprus Parties

## Imerys Corporate Parties

## CURRENT AFFILIATES

- 000 CALDERYS
- AFRICA REFRACTORY CONSULTANTS (PTY) LTD
- AKROTIRIO THAHILAS DYO S.A.
- ALMATECH MINERAL INTERNATIONAL LTD
- ALMERIA, SA DE CV
- ALUMICA CANADA INC.
- AMERICARB, INC.
- AMMIN HOLDINGS, INC.
- ANGANG STOLLBERG & SAMIL CO., LTD
- ARDOISIERES D'ANGERS
- AUSTRALIAN VERMICULITE INDUSTRIES (PTY) LTD
- CALDERYS ALGERIE SPA
- CALDERYS AUSTRALIA PTY LTD
- CALDERYS CHINA CO., LTD
- CALDERYS DANMARK A/S
- CALDERYS DEUTSCHLAND GMBH
- CALDERYS FINLAND OY
- CALDERYS FRANCE
- CALDERYS IBERICA REFRACTARIOS, SA
- CALDERYS INDIA REFRACTORIES LIMITED
- CALDERYS ITALIA SRL
- CALDERYS JAPAN CO., LTD
- CALDERYS KOREA CO. LTD
- CALDERYS MAGYARORSZAG K.F.T. (HUNGARY)
- CALDERYS NGJ LIMITED
- CALDERYS NORDIC AB
- CALDERYS POLSKA SP. Z.O.O.
- CALDERYS REFRACTARIOS VENEZOLANOS SA
- CALDERYS REFRAKTER
- CALDERYS SOUTH AFRICA (PTY) LTD
- CALDERYS TAÏWAN CO LTD
- CALDERYS THE NETHERLANDS B.V.
- CALDERYS UK LTD
- CALDERYS UKRAINE LTD
- CALDERYS USA, INC.
- CEBO HOLLAND B.V.
- CEBO INTERNATIONAL B.V.

- CEBO MARINE B.V.
- CEBO UK LIMITED
- DONBASSKERAMIKA
- DONKAOLIN
- ECCA HOLDINGS (PTY) LTD
- ECCA MINERALS (PTY) LTD
- ECO-BOS DEVELOPMENT LIMITED
- FAGERSTA ELDFASTA AB
- FOKIS MINING PARK
- GIMPEX-IMERYS INDIA PRIVATE LTD
- GUIYANG JIANAI SPECIAL ALUMINATES
- HARBORLITE AEGEAN ENDUSTRI MINERALLERI SANAYI A.S.
- HAZNEDAR DURER DI? T?CARET A.? (f.k.a. VENDER ENDÜSTRIYEL MALZEMELERI TICARET A.S.)
- HAZNEDAR DURER REFRAKTER MALZEMELERI SANAYI VE TICARET A.S.
- HAZNEDAR GMBH
- IMERTECH
- IMERYS KILN FURNITURE HUNGARY KFT.
- IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD
- IMERYS ADMINISTRATIVE GERMANY GMBH
- IMERYS AL ZAYANI FUSED MINERALS CO. W.L.L.
- IMERYS ALUMINATES ASIA PACIFIC PTE LTD
- IMERYS ALUMINATES CORPORATE (f.k.a. KERNEOS CORPORATE SAS)
- IMERYS ALUMINATES GROUPE (f.k.a. KERNEOS GROUP SAS)
- IMERYS ALUMINATES LIMITED
- IMERYS ALUMINATES SA
- IMERYS ASIA PACIFIC PTE LTD
- IMERYS BAUXITE SA (f.k.a. ELMIN BAUXITES SA)
- IMERYS BELGIUM SA
- IMERYS BENTONITE GEORGIA LTD
- IMERYS BENTONITE HUNGARY KFT
- IMERYS BENTONITE ITALY S.P.A.
- IMERYS CANADA INC.
- IMERYS CARBONATES (THAILAND), LTD
- IMERYS CARBONATES AUSTRIA GMBH
- IMERYS CARBONATES INDIA LIMITED
- IMERYS CARBONATES USA, INC.
- IMERYS CERAMICS (INDIA) PRIVATE LIMITED
- IMERYS CERAMICS (THAILAND) LTD
- IMERYS CERAMICS BRASIL MINERAIS PARA CERAMICAS LTDA
- IMERYS CERAMICS EGYPT
- IMERYS CERAMICS FRANCE
- IMERYS CERAMICS ITALY S.R.L.
- IMERYS CERAMICS MEXICO SA DE CV

- IMERYS CERAMICS NEW ZEALAND
- IMERYS CERAMICS PORTUGAL, SA
- IMERYS CLAYS, INC.
- IMERYS CSI SWITZERLAND SAGL
- IMERYS DIATOMITA ALICANTE, S.A.
- IMERYS DIATOMITA MEXICO, SA DE CV
- IMERYS DO BRASIL COMERCIO DE EXTRAÇAO DE MINÉRIOS
- IMERYS FILTRATION FRANCE
- IMERYS FILTRATION MINERALS, INC.
- IMERYS FUSED MINERALS (YINGKOU) CO., LTD
- IMERYS FUSED MINERALS BEYREDE SAS
- IMERYS FUSED MINERALS DOMODOSSOLA S.P.A.
- IMERYS FUSED MINERALS FRANCE SARL
- IMERYS FUSED MINERALS GREENEVILLE, INC.
- IMERYS FUSED MINERALS GUIZHOU CO. LTD
- IMERYS FUSED MINERALS LAUFENBURG GMBH
- IMERYS FUSED MINERALS MURG GMBH
- IMERYS FUSED MINERALS NIAGARA FALLS, INC.
- IMERYS FUSED MINERALS RUSE D.O.O.
- IMERYS FUSED MINERALS SALTO LTDA
- IMERYS FUSED MINERALS TEUTSCHENTHAL GMBH
- IMERYS FUSED MINERALS VILLACH GMBH
- IMERYS FUSED MINERALS ZSCHORNEWITZ GMBH
- IMERYS GECKO GRAPHITE (NAMIBIA) (PTY) LTD
- IMERYS GECKO HOLDING (NAMIBIA) (PTY) LTD
- IMERYS GECKO OKANJANDE MINING (PTY) LTD
- IMERYS GRAPHITE & CARBON BELGIUM SA
- IMERYS GRAPHITE & CARBON CANADA INC.
- IMERYS GRAPHITE & CARBON JAPAN KK
- IMERYS GRAPHITE & CARBON KOREA
- IMERYS GRAPHITE & CARBON SWITZERLAND SA
- IMERYS HIGH RESISTANCE MINERALS JAPAN KK
- IMERYS INDUSTRIAL MINERALS DENMARK A/S
- IMERYS INDUSTRIAL MINERALS GREECE S.A.
- IMERYS ITATEX SOLUCOES MINERAIS LTDA
- IMERYS KAOLIN, INC.
- IMERYS KILN FURNITURE (THAILAND) CO. LTD
- IMERYS KILN FURNITURE ESPAÑA, SA
- IMERYS METALCASTING FRANCE SARL
- IMERYS METALCASTING GERMANY GMBH
- IMERYS MICA KINGS MOUTAIN, INC.
- IMERYS MIDDLE EAST HOLDING COMPANY W.L.L.
- IMERYS MINERAL AB
- IMERYS MINERAL ARABIA LLC

1-3

- IMERYS MINERALES ARGENTINA S.A.
- IMERYS MINERALES CHILE SPA
- IMERYS MINERALES PERU SAC
- IMERYS MINERALI CORSICO SRL
- IMERYS MINERALI SPA
- IMERYS MINERALS (INDIA) PRIVATE LIMITED
- IMERYS MINERALS (TAIWAN) LTD
- IMERYS MINERALS (THAILAND) LTD
- IMERYS MINERALS BULGARIA AD
- IMERYS MINERALS CHINA, INC.
- IMERYS MINERALS GMBH
- IMERYS MINERALS HOLDING LIMITED
- IMERYS MINERALS INTERNATIONAL SALES S.A.
- IMERYS MINERALS JAPAN KK
- IMERYS MINERALS KOREA LTD
- IMERYS MINERALS LTD
- IMERYS MINERALS MALAYSIA SDN. BHD.
- IMERYS MINERALS NETHERLANDS B.V.
- IMERYS MINERALS OY
- IMERYS MINERALS USA, INC.
- IMERYS MINERALS VIETNAM LIMITED
- IMERYS MINERAUX BELGIQUE SA
- IMERYS MINÉRAUX FRANCE
- IMERYS NEWQUEST (INDIA) PRIVATE LIMITED
- IMERYS OILFIELD MINERALS, INC.
- IMERYS PACIFIC LTD
- IMERYS PCC FRANCE
- IMERYS PCC UK
- IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
- IMERYS PERFORMANCE MINERALS AMERICAS, INC. (f.k.a. IMERTECH USA, INC.)
- IMERYS PERLITA BARCELONA, S.A.
- IMERYS PERLITE SARDINIA S.R.L.
- IMERYS PERLITE USA, INC.
- IMERYS PIGMENTS (QINGYANG) CO., LTD
- IMERYS PIGMENTS (WUHU) CO., LTD
- IMERYS RE
- IMERYS REFRACTORY MINERALS CLERAC
- IMERYS REFRACTORY MINERALS GLOMEL
- IMERYS REFRACTORY MINERALS INTERNATIONAL SALES
- IMERYS REFRACTORY MINERALS SOUTH AFRICA (PTY) LTD
- IMERYS REFRACTORY MINERALS USA, INC.
- IMERYS RIO CAPIM CAULIM S.A.
- IMERYS ROCA RODANDO CONCESIONES HMO, S.A. de C.V.

1-4

- IMERYS SERAMIK HAMMADDELERI SANAYI VE TICARET LIMITED SIRKETI
- IMERYS SERVICES
- IMERYS SERVICES GERMANY GMBH & CO. KG
- IMERYS SERVICES GREECE
- IMERYS SOUTH AFRICA (PTY) LTD
- IMERYS SOUTH EUROPE, S.L.
- IMERYS SPECIALITIES JAPAN CO., LTD
- IMERYS STEELCASTING DO BRASIL LTDA
- IMERYS STEELCASTING INDIA PRIVATE LIMITED
- IMERYS STEELCASTING USA, INC.
- IMERYS TABLEWARE CR S.R.O.
- IMERYS TABLEWARE DEUTSCHLAND GMBH
- IMERYS TABLEWARE FRANCE
- IMERYS TALC AUSTRALIA PTY LTD
- IMERYS TALC AUSTRIA GMBH
- IMERYS TALC BELGIUM
- IMERYS TALC EUROPE
- IMERYS TALC FINLAND OY
- IMERYS TALC GERMANY GMBH
- IMERYS TALC ITALY S.P.A.[1]
- IMERYS TALC LUZENAC FRANCE
- IMERYS TALC MEXICO, SA DE CV
- IMERYS TALC UK HOLDING LTD
- IMERYS TCSI SWITZERLAND SAGL
- IMERYS TRADING MINERALS EGYPT
- IMERYS TRUSTEES LTD
- IMERYS UK FINANCE LIMITED
- IMERYS UK LTD
- IMERYS UK PENSION FUND TRUSTEES LTD
- IMERYS USA, INC.
- IMERYS WOLLASTONITE USA, LLC
- IMERYS ZHEJIANG ZIRCONIA CO., LTD
- INDUSTRIA MACINAZIONE MINERALI PER L'INDUSTRIA CERAMICA S.P.A
- INDUSTRIAL MINERALS OF GREECE
- ISOCON S.A.
- KENTUCKY-TENNESSEE CLAY COMPANY
- KERNEOS (CHINA) ALUMINATE TECHNOLOGIES CO., LTD
- KERNEOS AUSTRALIA PTY LTD
- KERNEOS DO BRASIL COMERCIAL LTDA
- KERNEOS INC.
- KERNEOS INDIA ALUMINATE PRIVATE LIMITED
- KERNEOS INDIA ALUMINATE TECHNOLOGIES PRIVATE LIMITED

---

[1]    Imerys Talc Italy S.p.A. is only an Imerys/Cyprus Party to the extent it does not commence a bankruptcy case.

- KERNEOS SOUTHERN AFRICA PTY LTD
- KINTA POWDERTEC SDN. BHD
- LATOMIA N. KORAKAS SA
- LAVIOSA CHIMICA MINERARIA SPA
- LAVIOSA PROMASA S.A.
- LINJIANG IMERYS DIATOMITE CO., LTD
- LIQUID QUIMICA MEXICANA, SA DE CV
- LLC IMERYS ALUMINATES
- METALLEION METALLEYMATON
- MICRON-ITA MINERACAO LTDA
- MIKRO MINERAL ENDUSTRIYEL MINERALLER SANAYI VE TICARET A.S.
- MILOS INITIATIVE
- MILOS MINING MUSEUM
- MINERA ROCA RODANDO S.DE R.L. DE C.V.
- MINERAL RESOURCES DEVELOPMENT (M.R.D.) CO. LTD
- MINVEN - (C-E MINERALES DE VENEZUELA)
- MIRCAL
- MIRCAL BRESIL
- MIRCAL DE MEXICO SA DE CV
- MIRCAL ITALIA SPA
- MONREFCO GMBH
- MRD-ECC CO. LTD
- MSL MINERAIS S.A.
- NIIGATA GCC LTD
- NIPPON POWER GRAPHITE CO., LTD
- NORTH AFRICAN INDUSTRIAL MINERAL EXPLORATION SARL - NAIMEX
- NYCO MINERALS, LLC
- ORGANIK MADENCILIK AS
- PARIMETAL
- PARNASSE TRENTE DEUX
- PERAMIN AB
- PERGEM MINERAL MADENCILIK SANAYI VE TICARET AS
- PLIBRICO INSTALLACIONES REFRACTARIAS
- PPSA
- PT BINAH SURINDAH CEMERLANG
- PT ESENSINDO CIPTA CEMERLANG
- PT IMERYS CERAMICS INDONESIA
- PT INDOPORLEN
- PT INDOPORLEN SAKTI
- PT STOLLBERG - SAMIL INDONESIA
- PYRAMAX CERAMICS SOUTHEAST, LLC
- QA REFRACTORIES (PTY) LTD
- QINGDAO STOLLBERG & SAMIL CO., LTD
- QUARTZ CORP (SHANGHAÏ) CO., LTD

1-6

- RECLAYM LIMITED
- REFRACTORY MINERALS (PTY) LTD
- RUMICO FEUERFESTE BAUSTOFFE GMBH
- S&B BENTONITE CHAOYANG CO., LTD
- S&B ENDUSTRIYEL MINERALLER A.S.
- S&B HOLDING GMBH
- S&B INDUSTRIAL MINERALS (HENAN) CO., LTD
- S&B INDUSTRIAL MINERALS MOROCCO S.A.R.L.
- S&B INDUSTRIAL MINERALS SPAIN S.L.U.
- S&B MINERALS FINANCE SARL
- S&B MINERALS PARTICIPATIONS SARL
- SAMREC (PTY) LTD
- SERVICIOS PIEDRA TUMBANTE S.DE R.L. DE C.V.
- SHANDONG IMERYS MOUNT TAI CO., LTD
- SIBIMIN OVERSEAS LTD
- SPRINDEALS SIX PTY LTD
- STOLLBERG & SAMI CO., LTD
- SUNWARD REFRACTORIES CO., Ltd
- THE QUARTZ CORP AS
- THE QUARTZ CORP SAS
- THE QUARTZ CORP USA
- TYGERKLOOF MINING (PTY) LTD
- US CERAMICS LLC
- VATUTINSKY KOMBINAT VOGNETRYVIV
- VERMICULITA Y DERIVADOS, SL
- VOUGIOUKLI QUARRIES AVEE
- XINYANG ATHENIAN MINING CO., LTD
- YBB CALCIUM PRODUCTS CO. LTD
- YUEYANG IMERYS ANTAI MINERALS CO., LTD
- ZHENGZHOU JIANAI SPECIAL ALUMINATES CO., LTD

## FORMER AFFILIATES

- 11656490 CANADA INC.
- ADVANCED MINERALS CORPORATION
- AKROTIRIO TRAHILAS TRIA S.A.
- AMERICAN TRIPOLI, INC.
- ANADOLU PERLIT MEDENCILIK SANAYI
- ARC FUSED ALUMINA
- ARDOISE ET JARDIN
- AREFCON B.V.
- AREFCON HISMA B.V.
- ASSOS MERMER SANAYI VE TICARET LTD SIRKETI
- B & B REFRACTORY SERVICES PTY LTD

1-7

- BAOTOU JINGYUAN GRAPHITE CO., LTD
- BLX TRADING SAS
- CALDERYS ALGERIE SERVICES SPA
- CALDERYS BELGIUM
- CALDERYS CHINA
- CALDERYS CZECH S.R.O
- CALDERYS DE MEXICO SA DE CV
- CALDERYS NORWAY AS
- CAPTELIA
- CARBONATOS ANDINOS SA
- C-E NEWELL, INC.
- CELITE MEXICANA, SA DE CV
- CHANGBAI CELITE DIATOMITE CO., LTD
- CHARGES MINERALES DU PERIGORD - CMP
- CHOICEWISE LIMITED
- CONDIMENTUM OY
- COVEO
- DALIAN JINSHENG FINE CHEMICAL INDUSTRY CO., LTD
- DAMOLIN ETRECHY
- DAMOLIN GMBH
- DAMOLIN INVESTMENT A/S
- DOLPHIN FELDSPAR PRIVATE LIMITED
- DOYET TERRE CUITE
- ECC OVERSEAS INVESTMENTS LTD
- ECC PACIFIC (AUSTRALIA) PTY LTD
- ECCA CALCIUM PRODUCTS, INC.
- EDWIN H. BRADLEY HOLDINGS LTD
- ELMIN BAUXITES S.R.L.
- ENGLISH CHINA CLAYS LTD
- EUROARGILLE
- EUROPE COMMERCE REFRACTORY
- FEL-MAC COMPANY LLC
- FIBERLEAN TECNOLOGIA E SOLUCOES EIRELI
- FIBERLEAN TECHNOLOGIE LIMITED
- FIBERLEAN TECHNOLOGIE NA INC.
- GOONAMARRIS LIMITED
- GRAN BIANCO CARRARA SRL
- GUIZHOU S&B NEW-TYPE MATERIALS CO., LTD
- GUIZHOU STAR MINERALS CO., LTD
- GUNUNG IMBANGAN SDN. BHD
- HARBORLITE (UK) LTD
- HJM INDUSTRIES SDN. BHD
- IGM FOR FIBRE GLASS
- IMERPLAST UK LIMITED

- IMERYS (SHANGHAÏ) FILTRATION MINERALS TRADING CO., LTD
- IMERYS ADVANCED MATERIALS (YINGKOU) CO., LTD
- IMERYS ALÜMINÄT DIS TICARET
- IMERYS ALUMINATES GMBH
- IMERYS ALUMINATES ITALIA S.R.L.
- IMERYS ALUMINATES NORDIC AB
- IMERYS ARGENTINA SRL
- IMERYS BENTONITE USA, LLC
- IMERYS CALCIUM SOLUTIONS AUSTRIA GMBH
- IMERYS CANADA 2004, INC.
- IMERYS CANADA LP
- IMERYS CARBONATES LLC
- IMERYS CERAMICS ESPAÑA
- IMERYS CERAMICS ITALIA
- IMERYS FINE CHEMICAL (CHANGSHU) CO., LTD
- IMERYS FUSED MINERALS (TAICANG) CO., LTD
- IMERYS FUSED MINERALS (ZIBO) CO., LTD
- IMERYS FUSED MINERALS HULL LIMITED
- IMERYS GRAPHITE & CARBON (CHANGZHOU) CO., LTD
- IMERYS GRAPHITE & CARBON GERMANY GMBH
- IMERYS GRAPHITE & CARBON USA, INC.
- IMERYS KAOLIN BELGIUM
- IMERYS KILN FURNITURE FRANCE
- IMERYS MICA SUZORITE INC.
- IMERYS MINERALES ESPANA, S.L.
- IMERYS MINERALES PERU S.A.C.
- IMERYS MINERALES SANTIAGO LIMITADA
- IMERYS MINERALI GAMALERO SRL
- IMERYS MINERALS (HEZHOU) CO., LTD
- IMERYS MINERALS AUSTRALIA PTY LTD
- IMERYS MINERALS CALIFORNIA, INC.
- IMERYS MINERALS HONG KONG LIMITED
- IMERYS MINERAUX DE TUNISIE "IMT"
- IMERYS MINING DEVELOPMENT (QINGYANG) CO., LTD
- IMERYS PAPER CARBONATES LLC
- IMERYS PARTICIPACOES LTDA
- IMERYS PERLITA PAULINIA MINERAIS LTDA
- IMERYS PIGMENTS TRADING (SHANGHAI) CO., LTD
- IMERYS PIGMENTS, INC.
- IMERYS REFRACTARIOS PARTICIPACOES MONTE DOURADO LTDA
- IMERYS REFRACTORY MINERALS JAPAN KK
- IMERYS TABLEWARE BALKANS SRL
- IMERYS TABLEWARE GUANGZHOU CO., LTD
- IMERYS TABLEWARE NEW ZEALAND LTD

1-9

- IMERYS TALC CALIFORNIA, INC.
- IMERYS TALC DELAWARE, INC.
- IMERYS TALC OHIO, INC.
- IMERYS TALC SPAIN, S.A.
- IMERYS TC
- IMERYS TECHNOLOGY CENTER AUSTRIA GMBH
- IMERYS TOITURE BELGIE N.V.
- IMERYS VOSTOK
- IMERYS WINDFARM PROJECT LTD
- IMERYS YILONG ANDALUSITE (XINJIANG) CO, LTD
- IMPALA ADMINCO LTD
- INDUSTRIALMIN
- ITACA S.R.L.
- KAOLIN AUSTRALIA PTY LTD
- KAOLINS DE NOZAY (SOCIÉTÉ ANONYME DES)
- KAOPOLITE, INC.
- KERAPLAN GMBH
- KERN TECH 1
- KERN TECH 2
- KERN TECH 3
- KERNEOS DE MEXICO SA DE CV
- KERNEOS ESPANA SL
- KERNEOS HOLDING GROUP SAS
- KERNEOS HOLDING NORTH AMERICA, INC.
- KERNEOS HOLDING NORTHERN EUROPE LIMITED
- KERNEOS POLSKA SP. Z.O.O.
- KERNEOS SERVICIOS SA DE CV
- KILITEAM V
- KORUND D.O.O.
- KPCL  K.V.S.
- LA FRANCAISE DES TUILES ET BRIQUES
- L-IMERYS INDUSTRIA E COMERCIO DE CAL LTDA
- LUXOL PHOTOVOLTAICS SN
- LUZENAC MICRO MILLING LIMITED
- MAGEMO SCI
- MASSA MINERALI SRL
- MATISCO DEVELOPPEMENT
- METRAMCO (PTY) LTD
- MICRON-ITA INDUSTRIA E COMERCIO DE MINERAIS LTDA
- MINERAL HOLDINGS, INC.
- MINERALIEN SCHIFFAHRT SPEDITION UND TRANSPORT GMBH - MST
- MINERALS MILLING TUNISIA
- MINERALS TRADING, INC.
- MIRCAL ARGENTINA SRL

- MIRCAL ASIA
- MIRCAL AUSTRALIA PTY LTD
- MIRCAL CHILI
- MIRCAL EUROPE
- MIRCAL TALC HOLDING
- MSL OVERSEAS LTD
- MULLITE COMPANY OF AMERICA - MULCOA
- N.G. JOHNSON (NORTHERN) HOLDINGS LIMITED
- N.G. JOHNSON LIMITED
- NIZEROLLES
- NYCO MINERALS CANADA, INC.
- PABALK MADEN SANAYI VE TICARET A.S.
- PANSHI HUANYU WOLLASTONITE CO., LTD
- PARNASSE TRENTE ET UN
- PARNASSE TRENTE TROIS
- PARNASSE VINGT DEUX
- PERU MINERALS CORPORATION
- PERUCO, INC.
- PGB SA
- PLIBRICO LTD
- PLR REFRACTAIRES SAS U
- PPSA OVERSEAS LTD
- PROFIMO
- PROPERTY COMPANY ONE
- PROPERTY COMPANY TWO
- PYRAMAX CERAMICS ARKANSAS, LLC
- PYRAMAX CERAMICS, LLC
- QS ABRASIVI MARENGO SRL
- QUARTZ DE MAURITANIE SA
- RECURSOS MINERALES DEL NORTE, SA DE CV
- RT 043 MINERACAO LTDA
- S&B INDUSTRIAL MINERALS (SHANGHAI) CO., LTD
- S&B INDUSTRIAL MINERALS (TIANJIN) CO., LTD
- S&B MINERALS LIMITED
- S&B MINERALS PARTICIPATIONS 2 SARL
- S&B MINERALS PARTICIPATIONS LLC
- S&B MINERALS US HOLDING GMBH
- S&B MINERALS VERWALTUNG GMBH
- S&B WINES S.A.
- SAMREC VERMICULITE (ZIMBABWE) ( PRIVATE) LTD
- SCEA STE COLOMBE
- SCOVER PLUS
- SEG
- SET LININGS GMBH

- SIDEX MONOLITHIQUES SRL
- SILLA DE PAITA S.A.C.
- SLS BAUSTOFFE GESELLSCHAFT MBH
- SOCIEDAD MINERA CELITE DEL PERU SA
- SOCIETE DE VALORISATION DES MINERAUX INDUSTRIELS SAS
- SOTRIVAL
- TALIMMO
- TENNESSEE ELECTRO MINERALS, INC. - TECO
- TERMORAK AB
- TERMORAK OY
- TERMORAK (THAILAND) CO LTD
- TOKAI CERAMICS CO., LTD
- TREIBACHER SCHLEIFMITTEL ABRASIVES KAILI CO., LTD
- TREIBACHER SCHLEIFMITTEL ASIA LTD
- TREIBACHER SCHLEIFMITTEL INTERNATIONALE VERTRIEBS MBH
- TREIBACHER SCHLEIFMITTEL ITALIA P. MAROZZI & CO SAS
- UCM GROUP LTD
- UCM MAGNESIA, INC.
- UNITEC CERAMICS LIMITED
- VERMICULITE INTERNATIONAL SALES
- WORLD MINERALS AMERICA LATINA, SA
- WORLD MINERALS USD LLC
- WORLD MINERALS USD SARL
- ZHENGZHOU TREIBACHER SCHLEIFMITTEL TENGDA ABRASIVES CO., LTD

### Rio Tinto Corporate Parties

- 10029734 Canada Inc.
- 1043802 Ontario Ltd
- 10676276 Canada Inc.
- 10676284 Canada Inc.
- 11091905 Canada Inc.
- 1109723 B.C. Ltd.
- 201 Logistics Center, LLC
- 46106 YUKON INC.
- 46117 YUKON INC.
- 535630 YUKON INC.
- 7600 West Center, LLC
- 7999674 CANADA INC.
- AGM Holding Company Pte. Ltd.
- Alcan Alumina Ltda.
- Alcan Asia Limited
- Alcan Betriebs- und Verwaltungsgesellschaft GmbH
- Alcan Chemicals Limited
- Alcan Composites Brasil Ltda
- Alcan Corporation
- Alcan Farms Limited
- Alcan Finances USA LLC
- Alcan Gove Development Pty Limited
- Alcan Holdings Australia Pty Limited
- Alcan Holdings Europe B.V.
- Alcan Holdings Nederland B.V.
- Alcan Holdings Switzerland AG (SA/Ltd.)
- Alcan International Network U.S.A. Inc.
- Alcan Lebensmittelverpackungen GmbH
- Alcan Management Services (Shanghai) Co., Ltd.
- Alcan Management Services Canada Limited / Societe de Services de Gestion Alcan Canada Limitee
- Alcan Northern Territory Alumina Pty Limited
- Alcan Packaging Mühltal Gmbh & Co. KG
- Alcan Primary Metal Australia Pty Ltd
- Alcan Primary Products Company LLC
- Alcan Primary Products Corporation
- Alcan Realty Limited / Societe Immobiliere Alcan Limitee
- Alcan South Pacific Pty Ltd
- Alcan Trading AG (SA/Ltd.)
- Alufluor AB
- Aluminerie Alouette Inc.
- Aluminerie De Bécancour, Inc.

- Aluminium & Chemie Rotterdam B.V.
- Aluminium Pechiney
- Aluminum Company of Canada Limited / Aluminium du Canada Limitee
- AML Properties Pty Ltd
- Anglesey Aluminium Metal Limited
- AP Service
- Argyle Diamond Mines Pty Limited
- Argyle Diamonds Limited
- Ashton Mining Pty Ltd
- Ashton Nominees Pty Limited
- Asia Gold Mongolia LLC
- Asia Naran Bulag LLC
- Asia Now Resources Corp
- Australian Coal Holdings Pty. Limited
- Australian Mining & Smelting Pty Ltd
- Balkhash Saryshagan LLP
- Bao-HI Ranges Joint Venture
- Beasley River Joint Venture
- Beasley River Management Pty Limited
- Beasley River Marketing Pty Ltd
- Beasley River Mining Pty Limited
- Beijing Iron Ore Trading Centre Corporation
- Bektau B.V.
- Boké Investment Company
- Boke Personnel Limited
- Boké Services Company SA
- Boké Services Management, Inc.
- Boké Trading Inc.
- Borax España, S.A.
- Borax Europe Limited
- Borax Francais
- Borax Malaysia Sdn Bhd
- Borax Rotterdam N.V.
- Boyne Smelters Limited
- British Alcan Aluminium Limited
- C.V.G. Bauxilum C.A.
- Canning Resources Pty Limited
- CanPacific Potash Inc.
- Cape Bougainville Joint Venture
- Capricorn Diamonds Investments Pty Limited
- Carol Lake Company Ltd.
- Cathjoh Holdings Pty Limited
- Champlain Reinsurance Company Ltd.
- Channar Management Services Pty Limited

- Channar Mining Joint Venture
- Channar Mining Pty Ltd
- Chinalco Rio Tinto Exploration Co. Ltd
- Chlor Alkali Unit Pte Ltd
- CIA. Inmobiliaria e Inversiones Cosmos S.A.C.
- Compagnie des Bauxites de Guinée
- Compania de Transmision Sierraoriente S.A.C.
- Consórcio de Alumínio do Maranhão
- CRA Investments Pty. Limited
- CRA Pty Ltd
- Dampier Salt Limited
- Daybreak Development LLC
- Daybreak Property Holdings LLC
- Daybreak Secondary Water Distribution Company
- Daybreak Water Holding LLC
- DB Medical I LLC
- DBVC1 LLC
- Diamond Producers Association Limited
- Diavik Diamond Mines (2012) Inc.
- Diavik Joint Venture
- Donkerpoort Iron Ltd
- East Kalimantan Coal Pte. Ltd
- Eastland Management Inc.
- Electric Power Generation Limited
- Elysis Limited Partnership / Elysis Societe en Commandite
- Empresa de Mineracao Finesa Ltda.
- Enarotali Gold Project Limited
- Endurvinnslan Ltd.
- Energy Resources of Australia Ltd
- Entrée Resources Ltd.
- Exeltium
- EXELTIUM 2
- Fabrica De Plasticos Mycsa, S.A.
- Falcon Insurance Ltd.
- Flambeau Mining Company
- Fondation Rio Tinto
- Foundation for Australia-Japan Studies
- France Aluminium Recyclage Sa
- Fundsprops Pty. Limited
- Gladstone Infrastructure Pty Ltd
- Gladstone Power Station Joint Venture
- Global Coal Limited
- Global Hubco BV
- Globalore Pte. Ltd.

- Gove Aluminium Ltd
- GPS Energy Pty Limited
- GPS Nominee Pty Limited
- GPS Power Pty. Limited
- Green Mountain Mining Venture
- Groupement pour la Gestion de Pensions Complementaires
- Gulf Power Company / La Compagnie Gulf Power
- Halco (Mining) Inc.
- Hamersley Exploration Pty Limited
- Hamersley HMS Pty Ltd
- Hamersley Holdings Limited
- Hamersley Iron - Yandi Pty Limited
- Hamersley Iron Pty. Limited
- Hamersley Resources Limited
- Hamersley WA Pty Ltd
- Henlopen Manufacturing Co., Inc.
- Heruga Exploration LLC
- High Purity Iron Inc.
- HIsmelt Corporation Pty Limited
- Hope Downs Joint Venture
- Hope Downs Marketing Company Pty Ltd
- Hunter Valley Resources Pty Ltd
- IAL Holdings Singapore Pte. Ltd.
- IEA Coal Research Limited
- IEA Environmental Projects Limited
- Industrias Metalicas Castello S.A.
- Integrity Land and Cattle LLC
- InterEmballage
- IOC Sales Limited
- Iron Ore Company of Canada
- Itallumina Srl
- Johcath Holdings Pty Limited
- Juna Station Pty Ltd
- Kalimantan Gold Pty Limited
- Kelian Pty. Limited
- Kembla Coal & Coke Pty. Limited
- Kennecott Barneys Canyon Mining Company
- Kennecott Exploration Company
- Kennecott Exploration Mexico, S.A. de C.V.
- Kennecott Holdings Corporation
- Kennecott Land Company
- Kennecott Land Investment Company LLC
- Kennecott Molybdenum Company
- Kennecott Nevada Copper Company

- Kennecott Ridgeway Mining Company
- Kennecott Royalty Company
- Kennecott Services Company
- Kennecott Uranium Company
- Kennecott Utah Copper LLC
- Kennecott Water Distribution LLC
- Korgantas LLP
- Kutaibar Holdings Pty Ltd
- Lao Sanxai Minerals Company Limited
- Lawson Mardon Flexible Limited
- Lawson Mardon Smith Brothers Ltd.
- Magma Arizona Railroad Company
- Metallwerke Refonda AG
- Metals & Minerals Insurance Pte. Limited
- Minera Escondida Ltda
- Minera IRL Limited
- Minera Kennecott, S.A. de C.V.
- Mineração Rio do Norte S.A.
- Mineracao Tabuleiro Ltda
- Minmetals Rio Tinto Exploration Company Limited
- Mitchell Plateau Bauxite Co. Pty. Limited
- Mitchell Plateau Joint Venture
- Mount Bruce Mining Pty Limited
- Mount Pleasant Pty Ltd
- Movele
- Mutamba Mineral Sands S.A.
- NBH Pty Ltd
- New Zealand Aluminium Smelters Ltd
- Nhulunbuy Corporation Limited
- Norgold Pty Limited
- North Gold (W.A.) Pty Ltd
- North Insurances Pty. Ltd.
- North IOC (Bermuda) Holdings Limited
- North IOC (Bermuda) Limited
- North IOC Holdings Pty Ltd
- North Limited
- North Mining Limited
- Northern Land Company Ltd
- Nozalela Mineral Sands (Pty) Ltd
- NZAS Retirement Fund Trustee Limited
- Oyu Tolgoi LLC
- Oyu Tolgoi Netherlands BV
- Pacific Aluminium (New Zealand) Limited
- Pacific Aluminium Pty. Limited

NAI-1530333158

- Pacific Coast Mines, Inc.
- Pechiney Aviatube Limited
- Pechiney Bâtiment
- Pechiney Bécancour, Inc.
- Pechiney Cast Plate, Inc.
- Pechiney Consolidated Australia Pty Limited
- Pechiney Holdings, Inc.
- Pechiney Metals LLC
- Pechiney Philippines Inc.
- Pechiney Plastic Packaging, Inc.
- Pechiney Reynolds Quebec, Inc.
- Pechiney Sales Corporation
- Peko Exploration Pty Ltd.
- Peko-Wallsend Pty Ltd
- Pilbara Iron Company (Services) Pty Ltd
- Pilbara Iron Pty Ltd
- Port d'Ehoala S.A.
- Procivis Savoie
- Project Generation Group Pty Ltd
- PT Hutan Lindung Kelian Lestari
- PT Kelian Equatorial Mining
- PT Rio Tinto Consultants
- QIT Madagascar Minerals Ltd
- QIT Madagascar Minerals SA
- Quebec North Shore and Labrador Railway Company / Compagnie de Chemin de Fer du Littoral Nord de Quebec et du Labrador Inc.
- Queensland Alumina Limited
- Queensland Coal Pty. Limited
- Química e Metalúrgica Mequital Ltda.
- Ranges Management Company Pty Ltd
- Ranges Mining Pty Ltd
- Resolution Copper Company
- Resolution Copper Mining LLC
- Rhodes Ridge Joint Venture
- Richards Bay Mining (Proprietary) Limited
- Richards Bay Mining Holdings (Proprietary) Limited
- Richards Bay Prefco (Pty) Ltd
- Richards Bay Titanium (Proprietary) Limited
- Richards Bay Titanium Holdings (Proprietary) Limited
- Rightship Pty Ltd
- Rio de Contas Desenvolvimentos Minerais Ltda
- Rio Santa Rita Empreenimentos e-Particiacoes Ltda
- Rio Sava Exploration DOO
- Rio Tinto (Commercial Paper) Limited

1-18

- Rio Tinto (Hong Kong) Ltd
- Rio Tinto Advisory Services Pty Limited
- Rio Tinto Alcan Fund Inc.
- Rio Tinto Alcan Inc.
- Rio Tinto Alcan International Ltd. / Rio Tinto Alcan International Ltee
- Rio Tinto Alcan Middle East DMCC
- Rio Tinto Alcan Technology Pty Ltd
- Rio Tinto Aluminium (Bell Bay) Limited
- Rio Tinto Aluminium (Holdings) Limited
- Rio Tinto Aluminium Bell Bay Sales Pty Limited
- Rio Tinto Aluminium Limited
- Rio Tinto Aluminium Pechiney
- Rio Tinto Aluminium Services Pty Limited
- Rio Tinto America Holdings Inc.
- Rio Tinto America Inc.
- Rio Tinto Asia Ltd
- Rio Tinto Asia Pty. Limited.
- Rio Tinto AuM Company
- Rio Tinto Australian Holdings Limited
- Rio Tinto Bahia Holdings Limited
- Rio Tinto Base Metals Pty. Limited
- Rio Tinto Brazilian Holdings Limited
- Rio Tinto Brazilian Investments Limited
- Rio Tinto Canada Diamond Operation Management Inc.
- Rio Tinto Canada Inc
- Rio Tinto Canada Management Inc./ Rio Tinto Gestion Canada Inc.
- Rio Tinto Canada Uranium Corporation
- Rio Tinto Chile S.A.S.
- Rio Tinto Coal (Clermont) Pty Ltd
- Rio Tinto Coal Australia Pty Limited
- Rio Tinto Coal Investments Pty Limited
- Rio Tinto Coal NSW Holdings Limited
- Rio Tinto Commercial Americas Inc.
- Rio Tinto Commercial GmbH
- Rio Tinto Commercial Pte. Ltd.
- Rio Tinto Desenvolvimentos Minerais LTDA.
- Rio Tinto Diamonds and Minerals Canada Holding Inc.
- Rio Tinto Diamonds Limited
- Rio Tinto Diamonds Netherlands B.V.
- Rio Tinto Diamonds NV
- Rio Tinto Eastern Investments B.V.
- Rio Tinto Energy America Inc.
- Rio Tinto Energy Limited
- Rio Tinto Escondida Limited

- Rio Tinto European Holdings Limited
- Rio Tinto Exploration (Asia) Holdings Pte. Ltd.
- Rio Tinto Exploration (PNG) Limited
- Rio Tinto Exploration and Mining (India) Private Limited
- Rio Tinto Exploration Canada Inc.
- Rio Tinto Exploration Dunav d.o.o. Beograd-Vracar
- Rio Tinto Exploration Finland OY
- Rio Tinto Exploration India Private Limited
- Rio Tinto Exploration Kazakhstan LLP
- Rio Tinto Exploration Pty Limited
- Rio Tinto Exploration Zambia Limited
- Rio Tinto FalCon Diamonds Inc.
- Rio Tinto Fer et Titane inc.
- Rio Tinto Finance (USA) Inc.
- Rio Tinto Finance (USA) Limited
- Rio Tinto Finance (USA) plc
- Rio Tinto Finance Limited
- Rio Tinto Finance plc
- Rio Tinto France S.A.S.
- Rio Tinto Global Employment Company Pte. Ltd.
- Rio Tinto Guinée S.A.
- Rio Tinto Holdings LLC
- Rio Tinto Hydrogen Energy LLC
- Rio Tinto Iceland Ltd.
- Rio Tinto India Private Limited
- Rio Tinto Indonesian Holdings Limited
- Rio Tinto International Holdings Limited
- Rio Tinto Investments One Pty Limited
- Rio Tinto Investments Two Pty Limited
- Rio Tinto Iron & Titanium (Suzhou) Co., Ltd
- Rio Tinto Iron & Titanium GmbH
- Rio Tinto Iron & Titanium Holdings GmbH
- Rio Tinto Iron & Titanium Limited
- Rio Tinto Iron and Titanium Canada Inc. / Rio Tinto Fer et Titane Canada Inc.
- Rio Tinto Iron Ore Atlantic Limited
- Rio Tinto Iron Ore Europe S.A.S.
- Rio Tinto Iron Ore Trading China Limited
- Rio Tinto Japan Ltd
- Rio Tinto Jersey Holdings 2010 Limited
- Rio Tinto Korea Ltd
- Rio Tinto Limited
- Rio Tinto London Limited
- Rio Tinto Management Services South Africa (Proprietary) Ltd
- Rio Tinto Marketing Pte. Ltd.

- Rio Tinto Marketing Services Limited
- Rio Tinto Medical Plan Trustees Limited
- Rio Tinto Metals Limited
- Rio Tinto Minera Peru Limitada SAC
- Rio Tinto Mineracao do Brasil Ltda
- Rio Tinto Minerals Asia Pte Ltd
- Rio Tinto Minerals Development Limited
- Rio Tinto Minerals Exploration (Beijing) Co., Ltd
- Rio Tinto Minerals Inc.
- Rio Tinto Mining and Exploration Inc.
- Rio Tinto Mining and Exploration Limited
- Rio Tinto Mining and Exploration S.A.C.
- Rio Tinto Mining Commercial (Shanghai) Co., Ltd.
- Rio Tinto Mongolia LLC
- Rio Tinto Nominees Limited
- Rio Tinto Orissa Mining Private Ltd
- Rio Tinto OT Management Limited
- Rio Tinto Overseas Holdings Limited
- Rio Tinto PACE Australia Pty Limited
- Rio Tinto PACE Canada Inc. / Gestion Rio Tinto PACE Canada Inc.
- Rio Tinto Pension 2009 Trustees Limited
- Rio Tinto Pension Fund Trustees Limited
- Rio Tinto Pension Investments Limited
- Rio Tinto Peru Limited
- Rio Tinto plc
- Rio Tinto Potash Management Inc. / Rio Tinto Potasse Management Inc.
- Rio Tinto Procurement (Singapore) Pte Ltd
- Rio Tinto Pte Ltd
- Rio Tinto Saskatchewan Management Inc.
- Rio Tinto Saskatchewan Potash Holdings General Partner Inc.
- Rio Tinto Saskatchewan Potash Holdings Limited Partnership
- Rio Tinto Secretariat Limited
- Rio Tinto Services Inc.
- Rio Tinto Services Limited
- Rio Tinto Shared Services Pty Limited
- Rio Tinto Shipping (Asia) Pte. Ltd.
- Rio Tinto Shipping Pty. Limited.
- Rio Tinto Simfer UK Limited
- Rio Tinto Singapore Holdings Pte Ltd
- Rio Tinto Sohar Logistics LLC
- Rio Tinto South East Asia Limited
- Rio Tinto Staff Fund (Retired) Pty Limited
- Rio Tinto Sulawesi Holdings Limited
- Rio Tinto Technological Resources Inc.

- Rio Tinto Technological Resources UK Limited
- Rio Tinto Trading (Shanghai) Co., Ltd.
- Rio Tinto Uranium Limited
- Rio Tinto Western Holdings Limited
- Rio Tinto Winu Pty Limited
- Riversdale Connections (Proprietary) Ltd
- Robe River Iron Associates Joint Venture
- Robe River Limited
- Robe River Mining Co. Pty. Ltd.
- Robe River Ore Sales Pty. Ltd.
- Rocklea Station Pty Ltd
- RTA AAL Australia Limited
- RTA Boyne Limited
- RTA Gove Pty Limited
- RTA Holdco 1 Limited
- RTA Holdco 4 Limited
- RTA Holdco 7 Limited
- RTA Holdco 8 Limited
- RTA Holdco Australia 1 Pty Ltd
- RTA Holdco Australia 3 Pty Ltd
- RTA Holdco Australia 5 Pty Ltd
- RTA Holdco Australia 6 Pty Ltd
- RTA HOLDCO FRANCE 1 S.A.S.
- RTA HOLDCO FRANCE 2 S.A.S.
- RTA Pacific Pty Limited
- RTA Sales Pty Ltd
- RTA Smelter Development Pty Limited
- RTA Weipa Pty Ltd
- RTA Yarwun Pty Ltd
- RTAlcan 1 LLC
- RTAlcan 2 LLC
- RTAlcan 3 LLC
- RTLDS Aus Pty. Ltd
- RTLDS UK Limited
- RTPDS Aus Pty Ltd
- Saryarka B.V.
- Scheuch Unterstuetzungskasse GmbH
- SGLS LLC
- Sharp Strategic Funding Pte. Ltd.
- Simfer Jersey Finance 1 Ltd
- Simfer Jersey Finance 2 Ltd
- Simfer Jersey Limited
- Simfer Jersey Nominee Limited
- SIMFER S.A.

- Singapore Metals Pte. Ltd.
- Skymont Corporation
- Société De Financement Des Risques Industriels
- Société Départementale De Développement 65
- Société Minière Et De Participations Guinée-Alusuisse
- Sohar Aluminium Co. L.L.C.
- Sohio Western Mining Company
- Solutions Strategiques Funding LLC
- Southern Copper Pty. Limited
- Swift Current Land & Cattle LLC
- Swiss Aluminium Australia Limited
- TBAC Limited
- Technological Resources Pty. Limited
- The Barrier Corporation (Vic.) Pty. Limited
- The Kelian Community and Forest Protection Trust
- The Pyrites Company, Inc.
- The Roberval and Saguenay Railway Company/ La Compagnie du Chemin de Fer Roberval Saguenay
- The Zinc Corporation Pty Ltd
- Thos. W. Ward Limited
- THR Aruba Holdings LLC A.V.V.
- THR Delaware Holdings, LLC
- THR Kharmagtai Pte. Ltd.
- THR MINES (BC) LTD.
- THR Mines Services Co. Ltd.
- THR OYU TOLGOI LTD.
- THR Ulaan Pte. Ltd.
- Three Crowns Insurance Company, formerly known as Three Crowns Insurance Company Limited
- Tinto Holdings Australia Pty. Limited
- Tisand (Proprietary) Limited
- Tomago Aluminium Company Pty Limited
- Tomago Aluminium Joint Venture
- Trans Territory Pipeline Pty Limited
- TRQ Australia Pty. Ltd.
- Turquoise Hill (Beijing) Services Company Ltd
- Turquoise Hill Netherlands Cooperatief U.A.
- Turquoise Hill Resources Ltd.
- Turquoise Hill Resources Philippines Inc.
- Turquoise Hill Resources Singapore Pte Ltd.
- Twin Falls Power Corporation Ltd
- U.S. Borax Inc.
- Victoria Technology Inc.
- Waste Solutions and Recycling LLC

- West Kutai Foundation Limited
- Wimmera Industrial Minerals Pty. Limited
- Winchester South Development Company Proprietary Limited
- Winter Road Joint Venture
- Wright Mgmt Services Pte. Ltd.
- Wyoming Coal Resources Company
- Yalleen Pastoral Co. Pty. Ltd.
- Yarraloola Pastoral Co
- Zululand Titanium (Pty) Ltd

**Cyprus Corporate Parties**

- Ajo Improvement Company [AZ]
- Amax Arizona, Inc. [NV]
- Amax Energy Inc. [DE]
- Amax Exploration, Inc. [DE]
- Amax Metals Recovery Inc. [DE]
- Amax Nickel Overseas Ventures, Inc. [DE]
- Amax Research & Development, Inc. [DE]
- Amax Specialty Coppers Corporation [DE]
- Amax Specialty Metals (Driver), Inc. [DE]
- Amax Zinc (Newfoundland) Limited [DE]
- American Metal Climax, Inc. [DE]
- Ametalco Limited [UK]
- Ametalco, Inc. [DE]
- Apache Nitrogen Products, Incorporated [AZ]
- Arguello Inc. [DE]
- Arroyo Grande Land Company LLC [DE]
- Asarel-Exploration AD [Bulgaria]
- Atlantic Copper, S.L.U. [Spain]
- AZ Big Sandy, LLC [NV]
- Bagdad Fire and Rescue, Inc. [DE]
- Balkan Metals and Minerals EOOD [Bulgaria]
- Bisbee Queen Mining Co. [DE]
- Blackwell Zinc Company, Inc. [DE]
- Byner Cattle Company [NV]
- Cane River Development LLC [DE]
- Capital Gestao de Negocios LTDA. [Brazil]
- Carollite Holdings B.V. [The Netherlands]
- Cattierite Holdings Coöperatief U.A. [The Netherlands]
- Chino Acquisition LLC [DE]
- Climax Canada LTD. [DE]
- Climax Engineered Materials, LLC [CO]
- Climax Molybdenum Asia Corporation [DE]
- Climax Molybdenum B.V. [The Netherlands]
- Climax Molybdenum China Corporation [DE]
- Climax Molybdenum Company [DE]
- Climax Molybdenum GMBH [Germany]
- Climax Molybdenum Marketing Corporation [DE]
- Climax Molybdenum U.K. Limited [UK]
- Cobaltite Holdings Limited [Bermuda]
- Compania Exploradora De La Isla, S.A. [Cuba]
- Copper Market Inc. [AZ]
- Copper Overseas Service Company [DE]

- CuAu International Holdings (BVI) LTD. [BVI]
- Cukaru Peki B.V. [The Netherlands]
- Cyprus Amax Indonesia Corporation [DE]
- Cyprus Amax Minerals Company [DE]
- Cyprus Climax Metals Company [DE]
- Cyprus Copper Marketing Corporation [DE]
- Cyprus Copperstone Gold Corporation [DE]
- Cyprus El Abra Corporation [DE]
- Cyprus Exploration and Development Corporation [DE]
- Cyprus Gold Company [DE]
- Cyprus Gold Exploration Corporation [DE]
- Cyprus Metals Company [DE]
- Cyprus Mines Corporation [DE]
- Cyprus Pinos Altos Corporation [DE]
- Cyprus Specialty Metals Company [DE]
- Cyprus Tohono Corporation [DE]
- Discovery Metals Kazakhstan LLP [Kazakhstan]
- Drum Mountains Mineral Properties LLC [DE]
- Eastern Mining Company, Inc. [DE]
- Enarotali Gold Project Limited [Isle of Jersey]
- Exploraciones Antakana S.A.C. [Peru]
- FCX Investment LLC [DE]
- FCX Investment LTD [Cayman Islands]
- FCX Oil & Gas LLC [DE]
- Flobarco S.A. de C.V. [Mexico]
- FM Chile Holdings Inc. [DE]
- FM Myanmar Holding LTD. [Bermuda]
- FM O&G Mexico Holdings B.V. [The Netherlands]
- FM O&G Mexico Intermediate Holdings B.V. [The Netherlands]
- FM Services Company [DE]
- FNS Holdings, LLC [AZ]
- Freeport Asia Holdings PTE. LTD. [Singapore]
- Freeport Azufre Limitada [Chile]
- Freeport Canadian Exploration Company [DE]
- Freeport Cobalt Americas LLC [DE]
- Freeport Cobalt Asia LTD. [Taiwan]
- Freeport Cobalt Europe GMBH [Germany]
- Freeport Cobalt Japan Inc. [Japan]
- Freeport Cobalt OY [Finland]
- Freeport Cobalt Trading (Shanghai) Co., LTD. [China]
- Freeport Copper Company [DE]
- Freeport Finance Company B.V. [Netherlands]
- Freeport International, Inc. [DE]
- Freeport Minerals Corporation [DE]

- Freeport Overseas Service Company [DE]
- Freeport Research and Engineering Company [DE]
- Freeport Sulphur Company [DE]
- Freeport Warim Inc. [DE]
- Freeport-McMoRan Inc. [DE]
- Freeport-McMoRan Australasia Inc. [DE]
- Freeport-McMoRan Bagdad Inc. [DE]
- Freeport-McMoRan Bulgaria B.V. [The Netherlands]
- Freeport-McMoRan Chino Inc. [DE]
- Freeport-McMoRan Chino Mines Company [NM]
- Freeport-McMoRan Cobalt Holdings Limited [Bermuda]
- Freeport-McMoRan Copper & Gold China Corporation [Cayman Islands]
- Freeport-McMoRan Copper & Gold Energy Services LLC [DE]
- Freeport-McMoRan Copper & Gold Investment Co., S.A. [Cayman Islands]
- Freeport-McMoRan do Brasil Mineração LTDA. [Brazil]
- Freeport-McMoRan Energy LLC [DE]
- Freeport-McMoRan Exploration & Production LLC [DE]
- Freeport-McMoRan Exploration Australia PTY LTD [Australia]
- Freeport-McMoRan Exploration Corporation [DE]
- Freeport-McMoRan Mercantile Company Inc. [DE]
- Freeport-McMoRan Miami Inc. [DE]
- Freeport-McMoRan Mineral Properties Canada Inc. [Canada]
- Freeport-McMoRan Mineral Properties Inc. [DE]
- Freeport-McMoRan Morenci Inc. [DE]
- Freeport-McMoRan Nevada LLC [DE]
- Freeport-McMoRan of Canada Limited [DE]
- Freeport-McMoRan Oil & Gas Inc. [DE]
- Freeport-McMoRan Oil & Gas LLC [DE]
- Freeport-McMoRan Safford Inc. [DE]
- Freeport-McMoRan Sales Company Inc. [DE]
- Freeport-McMoRan Shelf Properties LLC [DE]
- Freeport-McMoRan Sierrita Inc. [DE]
- Freeport-McMoRan Spain Inc. [DE]
- Freeport-McMoRan Tyrone Inc. [DE]
- Freeport-McMoRan Tyrone Mining LLC [NM]
- Fundacion Freeport-McMoRan Chile [Chile]
- Gaviota Gas Plant Company [CA]
- Grand Ecaille Land Company, Inc. [LA]
- Gulf Coast Ultra Deep Royalty Trust [DE]
- Habirshaw Cable and Wire Corporation [DE]
- Hidalgo Mining, LLC [NM]
- International Administrative Services Company [DE]
- International Air Capital Inc. [DE]
- International Asaz LLC [DE]

- International Mining Investments, LLC [DE]
- International Purveyors Inc. [DE]
- International Support LLC [DE]
- James Douglas Insurance Company, LTD. [Bermuda]
- Jenny East Holdings LTD. [Bermuda]
- JRTW Holdings Inc. [DE]
- Kameni Potok Coöperatief U.A. [The Netherlands]
- Kisanfu Holdings LTD. [Bermuda]
- K-Mc Venture I LLC [DE]
- Koboltti Chemicals Holdings Limited [Bermuda]
- Las Quintas Serenas Water Co. [AZ]
- LHD Ventures, LLC [DE]
- Lompoc Land Company LLC [DE]
- Main Pass Energy Hub LLC [DE]
- McMoRan Exploration LLC [DE]
- Mcmoran Oil & Gas LLC [DE]
- Midwest Land Acquisition Company LLC [DE]
- Minera Cuicuilco S.A. de C.V. [Mexico]
- Minera Freeport-McMoRan South America Limitada [Chile]
- Minera Freeport-McMoRan South America S.A.C. [Peru]
- Missouri Lead Smelting Company [DE]
- Molinos Corporation [AZ]
- Montebello Land Company LLC [DE]
- MSS Properties, LLC [DE]
- Mt. Emmons Mining Company [DE]
- Nabire Bakti LLC [DE]
- Nicaro Nickel Company [DE]
- Nuevo Energy Company [DE]
- Overseas Service Company [DE]
- Pacific Western Land Company [CA]
- PD Peru, Inc. [DE]
- PD Receivables, LLC [DE]
- PDM Energy, LLC [AZ]
- PDRC Laurel Hill 9, LLC [DE]
- PDRC Laurel Hill Development, LLC [DE]
- Phelps Dodge Ajo, Inc. [DE]
- Phelps Dodge Congo S.A.R.L. [DRC]
- Phelps Dodge Development Corporation [DE]
- Phelps Dodge Hidalgo, Inc. [DE]
- Phelps Dodge High Performance Conductors of NJ, Inc. [NJ]
- Phelps Dodge Holdings Mexico, S.A. de C.V. [Mexico]
- Phelps Dodge Industries, Inc. [DE]
- Phelps Dodge Katanga Corporation [DE]
- Phelps Dodge Mining (Zambia) Limited [Zambia]

- Phelps Dodge Molybdenum Corporation [DE]
- Phelps Dodge of Africa, LTD. [DE]
- Phelps Dodge Refining Corporation [DE]
- Plains Acquisition Corporation [DE]
- Plains Offshore LLC [DE]
- Plains Offshore Operations Inc. [DE]
- Plains Vietnam LTD. [Cayman Islands]
- Pogo Partners, Inc. [TX]
- Point Arguello Natural Gas Line Company [CA]
- Point Arguello Pipeline Company [CA]
- PT Airfast Aviation Facilities Company [Indonesia]
- PT Eksplorasi Nusa Jaya [Indonesia]
- PT Freeport Indonesia [Indonesia]
- PT Freeport Management Indonesia [Indonesia]
- PT IRJA Eastern Minerals [Indonesia]
- PT Kencana Infra Nusakarya [Indonesia]
- PT Kencana Wisata Nusakarya [Indonesia]
- PT Manyar Maju Refinery [Indonesia]
- PT Mineserve International [Indonesia]
- PT Mitradaya Vulkanisindo [Indonesia]
- PT Nabire Bakti Mining [Indonesia]
- PT Papua Utama Mitra [Indonesia]
- PT Puncakjaya Power [Indonesia]
- PT Rio Tinto Indonesia [Indonesia]
- PT Smelting [Indonesia]
- PXP Aircraft LLC [DE]
- PXP Gulf Coast LLC [DE]
- PXP Louisiana LLC [DE]
- PXP Louisiana Operations LLC [DE]
- PXP Luxembourg S.A.R.L. [Luxembourg]
- PXP Morocco B.V. [The Netherlands]
- PXP Oil & Gas Inc. [DE]
- PXP Producing Company LLC [DE]
- PXP Resources LLC [DE]
- Rakita Exploraton DOO BOR [Serbia]
- Red Metal Limited [Australia]
- Servicios Especiales Nacionales, SA de CV a.k.a. "PD SENSA" [El Salvador]
- Silver Springs Ranch, Inc. [CO]
- Sociedad Contractual Minera El Abra [Chile]
- Sociedad Minera Cerro Verde S.A.A. [Peru]
- Southern Bayou Holdings, LLC [DE]
- Southern Discovery Metals LTD. [BVI]
- Southern Pearl Holdings, LLC [DE]
- Suva Reka (BVI) LTD. [BVI]

- Tank Barge LLC [DE]
- The Morenci Water & Electric Company [AZ]
- Timok JVSA (BVI) LTD. [BVI]
- Timok Metals D.O.O. BOR [Serbia]
- Tucson, Cornelia and Gila Bend Railroad Company [AZ]
- United States Metals Refining Company [DE]
- Warren Company [AZ]
- Western Nuclear, Inc. [DE]

# SCHEDULE 2

## LTL Corporate Parties

3Dintegrated ApS
ABD Holding Company, Inc.
ABIOMED R&D, Inc.
ABIOMED, Inc.
Acclarent, Inc.
Actelion Ltd
Actelion Pharmaceuticals Ltd
Actelion Pharmaceuticals Trading (Shanghai) Co., Ltd.
Actelion Pharmaceuticals US, Inc.
Actelion Treasury Unlimited Company
Albany Street LLC
ALZA Corporation
Alza Land Management, Inc.
AMO (Hangzhou) Co., Ltd.
AMO (Shanghai) Medical Devices Trading Co., Ltd.
AMO ASIA LIMITED
AMO Australia Pty Limited
AMO Canada Company
AMO Denmark ApS
AMO Development, LLC
AMO France
AMO Germany GmbH
AMO Groningen B.V.
AMO International Holdings Unlimited Company
AMO Ireland
AMO Italy SRL
AMO Japan K.K.
AMO Manufacturing USA, LLC
AMO Netherlands BV
AMO Nominee Holdings, LLC
AMO Norway AS
AMO Puerto Rico Manufacturing, Inc.
AMO Sales and Service, Inc.
AMO Singapore Pte. Ltd.
AMO Spain Holdings, LLC
AMO Switzerland GmbH
AMO United Kingdom, Ltd.
AMO Uppsala AB
Anakuria Therapeutics, Inc.
AorTx, Inc.
Apsis SAS
Aragon Pharmaceuticals, Inc.

Asia Pacific Holdings, LLC
Atrionix, Inc.
AUB Holdings LLC
Auris Health, Inc.
Backsvalan 6 Handelsbolag
Beijing Dabao Cosmetics Co., Ltd.
BeneVir BioPharm, Inc.
Berna Rhein B.V.
BioMedical Enterprises, Inc.
Biosense Webster (Israel) Ltd.
Biosense Webster, Inc.
Breethe, Inc.
C Consumer Products Denmark ApS, n/k/a Coloplast Konsumerntvarer A/S
Carlo Erba OTC S.r.l.
Centocor Biologics, LLC
Centocor Research & Development, Inc.
Cerenovus, Inc.
ChromaGenics B.V.
Ci:z. Labo Co., Ltd.
Cilag AG
Cilag GmbH International
Cilag Holding AG
Cilag Holding Treasury Unlimited Company
Cilag-Biotech, S.L.
Coherex Medical, Inc.
ColBar LifeScience Ltd.
Consumer Test Entity
Cordis de Mexico, S.A. de C.V.
Corimmun GmbH
CoTherix Inc.
CRES Holdings, Inc.
CrossRoads Extremity Systems, LLC
CSATS, Inc.
Debs-Vogue Corporation (Proprietary) Limited
DePuy Hellas SA
DePuy International Limited
DePuy Ireland Unlimited Company
DePuy Mexico, S.A. de C.V.
DePuy Mitek, LLC
DePuy Orthopaedics, Inc.
DePuy Products, Inc.
DePuy Spine, LLC
DePuy Synthes Institute, LLC
DePuy Synthes Products, Inc.
DePuy Synthes Sales, Inc.
DePuy Synthes, Inc.

Dutch Holding LLC
ECL7, LLC
EES Holdings de Mexico, S. de R.L. de C.V.
EES, S.A. de C.V.
EIT Emerging Implant Technologies GmbH
Ethicon Endo-Surgery (Europe) GmbH
Ethicon Endo-Surgery, Inc.
Ethicon Endo-Surgery, LLC
Ethicon LLC
Ethicon Sarl
Ethicon US, LLC
Ethicon Women's Health & Urology Sarl
Ethicon, Inc.
Ethnor (Proprietary) Limited
Ethnor del Istmo S.A.
Ethnor Farmaceutica, S.A.
Finsbury (Development) Limited
Finsbury (Instruments) Limited
Finsbury Medical Limited
Finsbury Orthopaedics International Limited
Finsbury Orthopaedics Limited
FMS Future Medical System SA
GATT Technologies B.V.
GH Biotech Holdings Limited
Global Investment Participation B.V.
GMED Healthcare BV
Guangzhou Bioseal Biotech Co., Ltd.
Hansen Medical Deutschland GmbH
Hansen Medical International, Inc.
Hansen Medical UK Limited
Hansen Medical, Inc.
Healthcare Services (Shanghai) Ltd.
I.D. Acquisition Corp.
Innomedic Gesellschaft für innovative Medizintechnik und Informatik mbH
J & J Company West Africa Limited
J&J Argentina S.A.
J&J Pension Trustees Limited
J&J Productos Medicos & Farmaceuticos del Peru S.A.
J.C. General Services BV
Janssen Biologics (Ireland) Limited
Janssen Biologics B.V.
Janssen BioPharma, LLC
Janssen Biotech, Inc.
Janssen Cilag Farmaceutica S.A.
Janssen Cilag S.p.A.
Janssen Cilag SPA

Janssen Cilag, C.A.
Janssen Development Finance Unlimited Company
Janssen Egypt LLC
Janssen Farmaceutica Portugal Lda
Janssen France Treasury Unlimited Company
Janssen Global Services, LLC
Janssen Holding GmbH
Janssen Inc.
Janssen Irish Finance Unlimited Company
Janssen Japan Treasury Unlimited Company
Janssen Korea Ltd.
Janssen Mexico Treasury Unlimited Company
Janssen Oncology, Inc.
Janssen Ortho LLC
Janssen Pharmaceutica (Proprietary) Limited
Janssen Pharmaceutica NV
Janssen Pharmaceutica S.A.
Janssen Pharmaceutical K.K.
Janssen Pharmaceutical Sciences Unlimited Company
Janssen Pharmaceutical Unlimited Company
Janssen Pharmaceuticals, Inc.
Janssen Products, LP
Janssen R&D Ireland Unlimited Company
Janssen Research & Development, LLC
Janssen Sciences Ireland Unlimited Company
Janssen Scientific Affairs, LLC
Janssen Supply Group, LLC
Janssen Vaccines & Prevention B.V.
Janssen Vaccines Corp.
Janssen-Cilag
Janssen-Cilag (New Zealand) Limited
Janssen-Cilag A/S
Janssen-Cilag AG
Janssen-Cilag Aktiebolag
Janssen-Cilag AS
Janssen-Cilag B.V.
Janssen-Cilag d.o.o. Beograd
Janssen-Cilag de Mexico S. de R.L. de C.V.
Janssen-Cilag Farmaceutica Lda.
Janssen-Cilag Farmaceutica Ltda.
Janssen-Cilag GmbH
Janssen-Cilag International NV
Janssen-Cilag Kft.
Janssen-Cilag Limited
Janssen-Cilag Manufacturing, LLC
Janssen-Cilag NV

Janssen-Cilag OY
Janssen-Cilag Pharma GmbH
Janssen-Cilag Pharmaceutical S.A.C.I.
Janssen-Cilag Polska, Sp. z o.o.
Janssen-Cilag Pty Ltd
Janssen-Cilag S.A.
Janssen-Cilag s.r.o.
Janssen-Cilag, S.A.
Janssen-Cilag, S.A. de C.V.
Janssen-Pharma, S.L.
J-C Health Care Ltd.
Jevco Holding, Inc.
JJ Surgical Vision Spain, S.L.
JJC Acquisition Company B.V.
JJHC, LLC
JJSV Belgium BV
JJSV Manufacturing Malaysia SDN. BHD.
JJSV Norden AB
JJSV Produtos Oticos Ltda.
JNJ Global Business Services s.r.o.
JNJ Holding EMEA B.V.
JNJ International Investment LLC
JNTL (APAC) HoldCo 2 LLC
JNTL (APAC) HoldCo 3 Pte. Ltd.
JNTL (APAC) HoldCo LLC
JNTL (APAC) HoldCo Pte. Ltd.
JNTL (Japan) HoldCo Inc.
JNTL (Malaysia) Sdn. Bhd.
JNTL (Middle East) HoldCo LLC
JNTL (Puerto Rico) HoldCo GmbH
JNTL (Shanghai) Investment Co., Ltd.
JNTL (Switzerland) HoldCo GmbH
JNTL (Thailand) HoldCo LLC
JNTL (UK) HoldCo Limited
JNTL Consumer Health (Belgium) BV
JNTL Consumer Health (Brazil) Ltda.
JNTL Consumer Health (Czech Republic) s.r.o.
JNTL Consumer Health (Dominican Republic), S.A.S.
JNTL Consumer Health (Finland) Oy
JNTL Consumer Health (France) SAS
JNTL Consumer Health (Hungary) Kft
JNTL Consumer Health (India) Private Limited
JNTL Consumer Health (New Zealand) Limited
JNTL Consumer Health (Norway) AS
JNTL Consumer Health (Philippines) Inc.
JNTL Consumer Health (Poland) sp. z o.o.

JNTL Consumer Health (Portugal) Limitada
JNTL Consumer Health (Services) LLC
JNTL Consumer Health (Slovakia), s.r.o.
JNTL Consumer Health (Spain), S.L.
JNTL Consumer Health (Taiwan) Limited
JNTL Consumer Health (Vietnam) Co. Ltd.
JNTL Consumer Health General Services BV
JNTL Consumer Health I (Ireland) Limited
JNTL Consumer Health I (Switzerland) GmbH
JNTL Consumer Health II (Switzerland) GmbH
JNTL Consumer Health LLC
JNTL Consumer Health Mexico, S. de R.L. de C.V.
JNTL Consumer Health Middle East FZ-LLC
JNTL HoldCo 2 LLC
JNTL HoldCo 3 LLC
JNTL HoldCo 4 LLC
JNTL HoldCo 5 LLC
JNTL HoldCo 6 LLC
JNTL HoldCo 7 LLC
JNTL HoldCo 8 LLC
JNTL HoldCo LLC
JNTL Holdings 2, Inc.
JNTL Holdings 3, Inc.
JNTL Holdings B.V.
JNTL Holdings, Inc.
JNTL Ireland HoldCo 2 B.V.
JNTL Netherlands HoldCo B.V.
JNTL Turkey Tüketici Sağlığı Limited Şirketi
Johnson & Johnson
Johnson & Johnson - Societa' Per Azioni
Johnson & Johnson (Angola), Limitada
Johnson & Johnson (Australia) Pty Ltd
Johnson & Johnson (Canada) Inc.
Johnson & Johnson (China) Investment Ltd.
Johnson & Johnson (Ecuador) S.A.
Johnson & Johnson (Egypt) S.A.E.
Johnson & Johnson (Hong Kong) Limited
Johnson & Johnson (Ireland) Limited
Johnson & Johnson (Jamaica) Limited
Johnson & Johnson (Kenya) Limited
Johnson & Johnson (Middle East) Inc.
Johnson & Johnson (Mozambique), Limitada
Johnson & Johnson (Namibia) (Proprietary) Limited
Johnson & Johnson (New Zealand) Limited
Johnson & Johnson (Philippines), Inc.
Johnson & Johnson (Private) Limited

Johnson & Johnson (Singapore) Holdco LLC
Johnson & Johnson (Thailand) Ltd.
Johnson & Johnson (Trinidad) Limited
Johnson & Johnson (Vietnam) Co., Ltd
Johnson & Johnson AB
Johnson & Johnson AG
Johnson & Johnson Bulgaria EOOD
Johnson & Johnson China Ltd.
Johnson & Johnson Consumer (Hong Kong) Limited
Johnson & Johnson Consumer (Thailand) Limited
Johnson & Johnson Consumer B.V.
Johnson & Johnson Consumer Holdings France
Johnson & Johnson Consumer Inc.
Johnson & Johnson Consumer NV
Johnson & Johnson Consumer Saudi Arabia Limited
Johnson & Johnson Consumer Services EAME Ltd.
Johnson & Johnson d.o.o.
Johnson & Johnson de Argentina S.A.C. e. I.
Johnson & Johnson de Chile S.A.
Johnson & Johnson de Colombia S.A.
Johnson & Johnson de Mexico, S.A. de C.V.
Johnson & Johnson de Uruguay S.A.
Johnson & Johnson de Venezuela, S.A.
Johnson & Johnson del Ecuador, S.A.
Johnson & Johnson Del Paraguay, S.A.
Johnson & Johnson del Peru S.A.
Johnson & Johnson do Brasil Industria E Comercio de Produtos Para Saude Ltda.
Johnson & Johnson Dominicana, S.A.S.
Johnson & Johnson Enterprise Innovation Inc.
Johnson & Johnson European Treasury Unlimited Company
Johnson & Johnson Finance Corporation
Johnson & Johnson Finance Limited
Johnson & Johnson Financial Services GmbH
Johnson & Johnson for Export and Import LLC
Johnson & Johnson Gateway, LLC
Johnson & Johnson Gesellschaft m.b.H.
Johnson & Johnson GmbH
Johnson & Johnson GT, Sociedad Anónima
Johnson & Johnson Guatemala, S.A.
Johnson & Johnson Health and Wellness Solutions, Inc.
Johnson & Johnson Health Care Systems Inc.
Johnson & Johnson Hellas Commercial and Industrial S.A.
Johnson & Johnson Hellas Consumer Products Commercial Societe Anonyme
Johnson & Johnson Hemisferica S.A.
Johnson & Johnson Holdco (NA) Inc.
Johnson & Johnson Holdco (NA) Inc.

Johnson & Johnson Holding GmbH
Johnson & Johnson Holdings (Austria) GmbH
Johnson & Johnson Inc.
Johnson & Johnson Industrial Ltda.
Johnson & Johnson Innovation - JJDC, Inc.
Johnson & Johnson Innovation Limited
Johnson & Johnson Innovation LLC
Johnson & Johnson International
Johnson & Johnson International (Singapore) Pte. Ltd.
Johnson & Johnson International Financial Services Unlimited Company
Johnson & Johnson Irish Finance Company Limited
Johnson & Johnson K.K.
Johnson & Johnson Kft.
Johnson & Johnson Korea Selling & Distribution LLC
Johnson & Johnson Korea, Ltd.
Johnson & Johnson Limited
Johnson & Johnson LLC
Johnson & Johnson Luxembourg Finance Company Sarl
Johnson & Johnson Management Limited
Johnson & Johnson Medical (China) Ltd.
Johnson & Johnson Medical (Proprietary) Ltd
Johnson & Johnson Medical (Shanghai) Ltd.
Johnson & Johnson Medical (Suzhou) Ltd.
Johnson & Johnson Medical B.V.
Johnson & Johnson Medical Devices & Diagnostics Group - Latin America, L.L.C.
Johnson & Johnson Medical GmbH
Johnson & Johnson Medical Greece Single Member S.A.
Johnson & Johnson Medical Korea Ltd.
Johnson & Johnson Medical Limited
Johnson & Johnson Medical Mexico, S.A. de C.V.
Johnson & Johnson Medical NV
Johnson & Johnson Medical Products GmbH
Johnson & Johnson Medical Pty Ltd
Johnson & Johnson Medical S.A.
Johnson & Johnson Medical S.p.A.
Johnson & Johnson Medical SAS
Johnson & Johnson Medical Saudi Arabia Limited
Johnson & Johnson Medical Taiwan Ltd.
Johnson & Johnson Medical, S.C.S.
Johnson & Johnson Medikal Sanayi ve Ticaret Limited Sirketi
Johnson & Johnson MedTech (Thailand) Ltd.
Johnson & Johnson Medtech Colombia S.A.S.
Johnson & Johnson Middle East FZ-LLC
Johnson & Johnson Morocco Societe Anonyme
Johnson & Johnson Nordic AB
Johnson & Johnson Pacific Pty Limited

Johnson & Johnson Pakistan (Private) Limited
Johnson & Johnson Panama, S.A.
Johnson & Johnson Personal Care (Chile) S.A.
Johnson & Johnson Pharmaceutical Ltd.
Johnson & Johnson Poland Sp. z o.o.
Johnson & Johnson Private Limited
Johnson & Johnson Pte. Ltd.
Johnson & Johnson Pty. Limited
Johnson & Johnson Romania S.R.L.
Johnson & Johnson S.E. d.o.o.
Johnson & Johnson S.E., Inc.
Johnson & Johnson Sante Beaute France
Johnson & Johnson SDN. BHD.
Johnson & Johnson Services, Inc.
Johnson & Johnson Surgical Vision India Private Limited
Johnson & Johnson Surgical Vision, Inc.
Johnson & Johnson Taiwan Ltd.
Johnson & Johnson UK Treasury Company Limited
Johnson & Johnson Ukraine LLC
Johnson & Johnson Urban Renewal Associates
Johnson & Johnson Vision Care (Australia) Pty Ltd
Johnson & Johnson Vision Care (Shanghai) Ltd.
Johnson & Johnson Vision Care Ireland Unlimited Company
Johnson & Johnson Vision Care, Inc.
Johnson & Johnson Vision Korea, Ltd.
Johnson & Johnson, Lda
Johnson & Johnson, S.A.
Johnson & Johnson, S.A. de C.V.
Johnson & Johnson, s.r.o.
Johnson & Johnson, s.r.o.
Johnson and Johnson (Proprietary) Limited
Johnson and Johnson Sihhi Malzeme Sanayi Ve Ticaret Limited Sirketi
Johnson Y Johnson de Costa Rica, S.A.
JOM Pharmaceutical Services, Inc.
Kenvue Inc.
La Concha Land Investment Corporation
McNeil AB
McNeil Consumer Pharmaceuticals Co.
McNeil Denmark ApS
McNeil Healthcare (Ireland) Limited
McNeil Healthcare (UK) Limited
McNeil Healthcare LLC
McNeil Iberica S.L.U.
McNeil LA LLC
McNEIL MMP, LLC
McNeil Nutritionals, LLC

McNeil Panama, LLC
McNeil Products Limited
McNeil Sweden AB
Medical Device Business Services, Inc.
Medical Devices & Diagnostics Global Services, LLC
Medical Devices International LLC
Medos International Sarl
Medos Sarl
MegaDyne Medical Products, Inc.
Menlo Care De Mexico, S.A. de C.V.
Mentor B.V.
Mentor Deutschland GmbH
Mentor Medical Systems B.V.
Mentor Partnership Holding Company I, LLC
Mentor Texas GP LLC
Mentor Texas L.P.
Mentor Worldwide LLC
Middlesex Assurance Company Limited
Momenta Ireland Limited
Momenta Pharmaceuticals, Inc.
NeoStrata Company, Inc.
NeoStrata UG (haftungsbeschränkt)
Netherlands Holding Company
Neuravi Limited
NeuWave Medical, Inc.
Novira Therapeutics, LLC
NuVera Medical, Inc.
Obtech Medical Mexico, S.A. de C.V.
OBTECH Medical Sarl
OGX Beauty Limited
OMJ Holding GmbH
OMJ Pharmaceuticals, Inc.
Omrix Biopharmaceuticals Ltd.
Omrix Biopharmaceuticals NV
Omrix Biopharmaceuticals, Inc.
Ortho Biologics LLC
Ortho Biotech Holding LLC
Orthospin Ltd.
Orthotaxy SAS
Patriot Pharmaceuticals, LLC
Peninsula Pharmaceuticals, LLC
Percivia LLC
Pharmadirect Ltd.
Pharmedica Laboratories (Proprietary) Limited
preCARDIA, Inc.
Princeton Laboratories, Inc.

Productos de Cuidado Personal y de La Salud de Bolivia S.R.L.
Proleader S.A.
Prosidyan, Inc.
PT Integrated Healthcare Indonesia
PT Johnson & Johnson Indonesia
PT Johnson and Johnson Indonesia Two
Pulsar Vascular, Inc.
Regency Urban Renewal Associates
RespiVert Ltd.
Review Manager Test Entity 2
Royalty A&M LLC
Royalty A&M LLC
Rutan Realty LLC
Scios LLC
Serhum S.A. de C.V.
Shanghai Elsker Mother & Baby Co., Ltd
Shanghai Johnson & Johnson Ltd.
Shanghai Johnson & Johnson Pharmaceuticals Ltd.
Sodiac ESV
Spectrum Vision Limited Liability Company
Spectrum Vision Limited Liability Partnership
SterilMed, Inc.
Surgical Process Institute Deutschland GmbH
Synthes Costa Rica S.C.R., Limitada
SYNTHES GmbH
Synthes GmbH
Synthes Holding AG
Synthes Holding Limited
SYNTHES Medical Immobilien GmbH
Synthes Medical Surgical Equipment & Instruments Trading LLC
Synthes Produktions GmbH
Synthes Proprietary Limited
Synthes S.M.P., S. de R.L. de C.V.
Synthes Tuttlingen GmbH
Synthes USA Products, LLC
Synthes USA, LLC
Synthes, Inc.
TARIS Biomedical LLC
TearScience, Inc.
The Anspach Effort, LLC
The Vision Care Institute, LLC
Tibotec, LLC
Torax Medical, Inc.
UAB "Johnson & Johnson"
Vania Expansion
Verb Surgical Inc.

Vision Care Finance Unlimited Company
Vogue International LLC
WH4110 Development Company, L.L.C.
Xian Janssen Pharmaceutical Ltd.
XO1 Limited
Zarbee's, Inc.

# SCHEDULE 3

## Retailers and Indemnified Parties

7-Eleven
7-Eleven, Inc.
Acme Markets, Inc.
Ahold Delhaize USA, Inc.
Albertsons Companies, Inc.
Alpha Beta Company
Associated Wholesaler Grocers, Inc.
Bartell Drug Company
Bashas', Inc.
Bausch Health US, LLC
Bausch Health Americas, Inc.
Bausch Health Companies Inc.
BCW LLC
Best Market of Astoria, Inc.
BI-LO, LLC
Bi-Mart Corporation
C&S Wholesale Grocers
C&S Wholesale Grocers, Inc.
Classic Pharmacy, Inc.
Cosentino Enterprises, Inc.
Cosentino Group, Inc.
Cosentino Price Chopper
Cosentino's Food Stores
Costco Wholesale Corporation
CVS Health Corporation
CVS Pharmacy, Inc.
Demoulas Super Markets, Inc.
Dierbergs Markets, Inc.
Discount Drug Mart, Inc.
Dollar Tree Stores, Inc.
DRI I, Inc.
Duane Reade, Inc.
Eckerd Corporation of Florida, Inc.
Family Dollar Stores
Fleming Companies, Inc.
Food 4 Less of California
Food 4 Less of Southern California, Inc.
Foodland
Foodland Super Market, LTD
Foot Locker Specialties, Inc., individually and as successor-in-interest to F.W. Woolworth Co.
Foot Locker Specialty, Inc.
Foot Locker, Inc./Woolworth Corporation
Four B Corporation d/b/a Balls Food Stores

NAI-1530333158

3-1

Fred Meyer Stores, Inc.
Fruth Pharmacy, Inc.
Gerlands Food Fair, LLC
Gerlands, LLC
Gerlands, LLC/Lewis Food Town, Inc.
Giant Eagle, Inc.
Giant Food of Maryland, LLC
Giant Food Stores, LLC
Grocery Outlet Holding Corporation
Grocery Outlet Inc.
Grocery Outlet, Inc.
HAC, Inc.
H-E-B, LP
Hughes Markets, Inc.
Hy-Vee, Inc.
Jewel Food Stores
Jewel Osco
Jewel Osco Southwest
K&B Corporation
K&B Louisiana Corporation
Kings Park Slope, Inc.
Kings Pharmacy
Kings Pharmacy Holdings, LLC
Kings Third Ave. Pharmacy, Inc.
Knorr Street ShopRite, Inc.
La Luz Market, LTD. Co.
Lewis Food Town, Inc.
Longs Drug Stores California, L.L.C
Longs Drug Stores of Southern California, L.L.C.
Longs Drug Stores, L.L.C.
Lucky Stores, Inc.
Marc Glassman Inc.
Marc Glassman, Inc. d/b/a Marc's Store & Pharmacy
MBF Healthcare Holdings, Inc.
MBF Healthcare Management, LLC
Meijer, Inc.
MMG Equity Partners
Navarro Discount Pharmacies No. 5, LLC
Navarro Discount Pharmacies, LLC
Owens & Minor Distribution, Inc.
Owens & Minor, Inc.
Piggly Wiggly Carolina Co.
Piggly Wiggly Carolina Co., Inc.
Piggly Wiggly Companies, Inc.
Piggly Wiggly, LLC
Piggly Wiggly, LLC (subsidiary of C&S Wholesale Grocers)

Port Jervis Laboratories, Inc., f/k/a Kolmar Laboratories, Inc.
PTI
PTI Royston LLC, a Georgia Limited Liability Co., d/b/a Pharma Tech Industries
PTI Union, LLC d/b/a Pharma Tech Industries
Publix Super Markets, Inc.
Raley's
Ralphs Grocery Company
Randall's Food & Drug LP
Randall's Food Markets, Inc.
Rite Aid
Rite Aid Corporation
Rite Aid Hdqtrs. Corp.
Rite Aid of New York City, Inc.
Rite Aid of New York, Inc.
Rite Aid of Pennsylvania, Inc.
Rite Aid of South Carolina, Inc.
Rouse's Enterprises, L.L.C.
Rouse's Enterprises, L.L.C. d/b/a Rouses Market
Safeway Inc.
Save Mart Supermarkets, Inc.
Save Mart Supermarkets, Inc./Lucky Stores
Schnuck Markets
Schnuck Markets, Inc.
Sedano's Market, Inc.
Shanti Pharmacy Corp.
Shaw's Supermarkets, Inc.
Shop-Rite Supermarkets, Inc. a/k/a Shop Rite of Knorr Street
Smith Food and Drug Center, Inc.
Southeastern Grocers, Inc.
Star Markets Company, Inc.
Stater Bros. Markets
Super Center Concepts, Inc. d/b/a Superior Grocers
Superior Grocers
SuperValu, Inc.
T. Levy Associates, d/b/a Beauty Land Enterprises
T. Levy Associates, Inc. d/b/a Beauty Land Enterprises/Beautyland
Target Corporation
The Bartell Drug Company
The Kroger Company
The Stop & Shop Supermarket Company LLC
The Vons Companies, Inc.
Thrifty Payless, Inc.
Thrifty White Drug
Tops Holding, LLC
Valeant Pharmaceuticals International
Valeant Pharmaceuticals International, Inc.

Valeant Pharmaceuticals North America LLC
Wakefern Food Corp.
Walgreen Co.
Walgreen Eastern Co., Inc.
Walgreen Pharmacy Strategies, LLC
Walgreens Boots Alliance, Inc.
Walmart Inc.
Wegmans Food Markets, Inc.
Winn-Dixie Stores, Inc.
Woolworth Corporation