IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . | Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtor. | . | |
| . . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092 (MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT and | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Tuesday, May 16, 2023 |
| Defendants. | . | 10:01 a.m. |
| . . . . . . . . . . . . . . | . | |

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE AND MOTION HEARING

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES ON NEXT PAGE.

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES:

For the Debtor:                Jones Day
                               By:  GREGORY M. GORDON, ESQ.
                                    DAN B. PRIETO, ESQ.
                                    AMANDA S. RUSH, ESQ.
                               2727 North Harwood Street, Suite 500
                               Dallas, TX 75201

                               Skadden Arps Slate Meagher &
                                 Flom, LLP
                               By:  ALLISON M. BROWN, ESQ.
                               One Manhattan West
                               New York, NY 10001


For Ad Hoc Committee           Genova Burns LLC
of Certain Talc                By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc           494 Broad Street
Committee of Creditors:        Newark, NJ 07102

                               Brown Rudnick LLP
                               By:  JEFFREY L. JONAS, ESQ.
                                    DAVID J. MOLTON, ESQ.
                                    MICHAEL WINOGRAD, ESQ.
                               7 Times Square
                               New York, NY 10036

                               Brown Rudnick LLP
                               By:  SUNNI BEVILLE, ESQ.
                               One Financial Center
                               Boston, MA 02111

                               Otterbourg PC
                               By:  MELANIE CYGANOWSKI, ESQ.
                               230 Park Avenue
                               New York, NY 10169


For the Office of the          Office of the United States Trustee
United States Trustee:         By:  LINDA RICHENDERFER, ESQ.
                                    JEFF SPONDER, ESQ.
                               J. Caleb Boggs Federal Building
                               844 King Street, Suite 2207
                               Lockbox 35
                               Wilmington, DE 19801

TELEPHONIC APPEARANCES CONT'D:

For Anthony Hernandez          Kazan McClain Satterley & Greenwood
Valadez:                       By:  JOSEPH SATTERLEY, ESQ.
                               55 Harrison St. Suite 400
                               Oakland, CA 94607


Various Talc Personal          Watts Guerra LLP
Injury Claimants:              By:  MIKAL C. WATTS, ESQ.
                               5726 W. Hausman Road, Suite 119
                               San Antonio, TX 78249


For Various Talc               Maune Raichle Hartley Frency &
Claimants:                       Mudd, LLC
                               By:  CLAYTON L. THOMPSON, ESQ.
                               150 West 30th Street, Suite 201
                               New York, NY 10001

                               Levy Konigsberg, LLP
                               By:  JEROME H. BLOCK, ESQ.
                                    MOSHE MAIMON, ESQ.
                               101 Grovers Mill Road, Suite 105
                               Lawrence Township, NJ 08648

                               Simon Greenstone Panatier, PC
                               By:  LEAH CYLIA KAGAN, ESQ.
                               1201 Elm Street, Suite 3400
                               Dallas, TX 75720


For Claimant Alishia           Beasley Allen
Landrum:                       By:  ANDY BIRCHFIELD, ESQ.
                               218 Commerce Street
                               Montgomery, AL 36104


For Arnold & Itkin:            Pachulski Stang Ziehl & Jones LLP
                               By:  LAURA DAVIS JONES, ESQ.
                               919 North Market Street
                               17th Floor
                               Wilmington, DE 19801


For Paul Crouch,               Ruckdeschel Law Firm, LLC
individually and on            By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of            8357 Main Street
Cynthia Lorraine Crouch:       Ellicott City, MD 21043

TELEPHONIC APPEARANCES CONT'D:

For the Ad Hoc Committee      Womble Bond Dickinson
of Attorneys General:         By:  ERICKA JOHNSON, ESQ.
                              1313 North Market Street
                              Suite 1200
                              Wilmington, DE 19801

For Randi Ellis,              Walsh Pizzi O'Reilly Falanga LLP
Proposed Future Claims        BY:  LIZA M. WALSH, ESQ.
Representative:               Three Gateway Center
                              100 Mulberry Street, 15th Floor
                              Newark, NJ 07102

For Ad Hoc Committee          Paul Hastings, LLP
of Supporting Counsel:        By:  KRIS HANSEN, ESQ.
                              200 Park Avenue
                              New York, NY 10166

For Ad Hoc Committee          Gupta Wessler PLLC
of Mesothelioma               By:  DEEPAK GUPTA, ESQ.
Claimants:                    2001 K Street, NW
                              Suite 850 North
                              Washington, D.C. 20006

For the Talc                  Massey & Gail LLP
Claimants Committee:          By: JONATHAN S. MASSEY, ESQ.
                              The Wharf
                              1000 Maine Avenue, SW
                              Suite 450
                              Washington, D.C. 20024

For States of                 Gibbons P.C.
New Mexico and                By: ROBERT K. MALONE, ESQ.
Mississippi:                  One Gateway Center
                              Newark, NJ 07102

                    - - - - -

1          (Proceedings commenced at 10:01 a.m.)

2          THE COURT:  Good morning, everyone.  This is Judge

3  Kaplan.  I hope everybody is doing well.  We are this morning

4  addressing a variety of motions in LTL.  And because it's all

5  remote, I will ask those who wish to be heard at some point to

6  raise their hand.  I see Mr. Molton already asked.  Quick on

7  the draw.

8          I would like to start, and I'll go to Mr. Molton in a

9  second.

10          THE CLERK:  (Indiscernible) no sound.

11          THE COURT:  What was that?

12          THE CLERK:  They can't hear the sound.

13          THE COURT:  Can you all hear me?

14          MR. MOLTON:  All good, Judge.

15          THE COURT:  Okay.  All right.

16          My suggestion is that we address the motion to

17  suspend, the motion with the -- as far as scheduling with

18  disclosure statement, as well as the correspondence on the

19  motions to dismiss collectively because they are somewhat

20  related.

21          Mr. Molton, you are the first one with the hand up.

22          MR. MOLTON:  Judge, I was going to propose a similar

23  sequencing.  Maybe a little different since that's what you're

24  going to hear from me today a little bit about today is

25  sequencing.  My suggestion was going to be but, needless to

1  say, Your Honor, this is your courtroom and we'll follow your

2  lead, motion to dismiss status conference followed by motions

3  pertaining thereto, following by the suspension abeyance

4  motion, followed by a disclosure statement status conference,

5  if appropriate.  But we'll follow your lead, Judge.

6          THE COURT:  I think it will all fall in place.

7          Mr. Gordon, did you have any thoughts?

8          MR. GORDON:  Good morning, Your Honor.  Greg Gordon

9  on behalf of the debtor.

10          Our thoughts actually were consistent with yours.  We

11  think it would be helpful to take the scheduling matters first

12  and primarily the motion to dismiss scheduling and the

13  suspension scheduling because that will help inform I think the

14  other motions, including disclosure statement scheduling and

15  the like.

16          And the other thing we might want to consider upfront

17  is I know Your Honor wanted to talk about scheduling of omnibus

18  hearing dates, as well.

19          THE COURT:  Right.

20          MR. GORDON:  It might make sense to lay some of those

21  out also because I think those might be helpful in dealing with

22  some of the other matters.

23          THE COURT:  All right.  Well, let's start with let me

24  hear the motion to suspend if that works.

25          MR. MOLTON:  Judge, that works and I guess that

1  throws the baton to me.

2          THE COURT:  Yes.

3          MR. MOLTON:  Thank you, Your Honor.

4          Hello.  Good morning, everybody that I see in the

5  Zoom webinar as well as those on the audio Zoom or non-

6  participating video Zoom.  My name is David Molton of Brown

7  Rudnick, and I am -- and Brown Rudnick is along with co-counsel

8  with me, proposed counsel to the TCC.

9          Your Honor, the TCC, as you know, is a fiduciary for

10 all the talc claimants in this case.  And all of its positions

11 and the positions it advances today are on behalf of all of

12 those claimants in fulfillment of their fiduciary duty to them.

13          Back to the cross-motion to suspend the case, Judge.

14 It's really very simple.  Again, and I'm not going to spend a

15 lot of time on it.  Your Honor has full briefing including our

16 reply which was filed yesterday that I think answers the case

17 law issues and legal issues that were raised by the debtor's

18 opposition, and I'm not going to waste or burden the Court's

19 time going through that.  I know Your Honor read it.

20          But this case, where we are now is about sequencing

21 and case management.  I think no one disagrees that Your Honor

22 has the authority to order and manage this case in the manner

23 described in our cross-motion.  Myself and Mr. Gordon and

24 others may joust on whether we look to Section 305(a), the

25 Federal Rules of Civil Procedure Section 105, or this Court's

1 own inherent authority.

2        But I think it's fairly safe to say that everyone

3 would agree that this Court can manage this case in the way

4 that it thinks is proper for the circumstances of this case.

5 And clearly, what we're suggesting is Your Honor setting a

6 dismissal track first and foremost which I think is how it's

7 fallen out and indeed we're looking forward to trying the

8 dismissal motions at some point with all due speed and

9 alacrity, a word that I like, next month.

10        What the objections really come down to, Judge, is a

11 question of what is appropriate here, what's in the best

12 interest of the creditors of this estate, and the best interest

13 of the case under the circumstances of this case.  Again, I'm

14 not going to go over the case law that we raised yesterday and

15 dealt with the debtor's arguments.

16        But what do courts look for when considering

17 suspension or a simple abeyance under the Court's inherent case

18 management authority is a non-exclusive list of factors that

19 are pertinent here: the interest of both the creditors and the

20 debtor, the interest of economy and efficiency, the best

21 interest of creditors, and also whether there are case

22 determinative issues, gating issues, significant gating issues

23 that need to be decided before this case proceeds on a path

24 that will certainly under the circumstances of this case, which

25 are well known to everybody I see and everybody that I don't

1  see, are going to engender significant controversy, litigation,

2  resources, and time.

3         We have in front of us with respect to the case

4  determinative element, Your Honor, I think my count a week or

5  two ago was seven motions to dismiss.  I think New Mexico and

6  Mississippi have now joined.  Whether that's eight or nine,

7  I'll leave it for other people to count.  But we have a

8  significant case determinative issue in front of Your Honor

9  right now with respect to this second bankruptcy.

10        Critically, a final order on the motion to dismiss

11  will answer the gateway question about whether this debtor can

12  be in bankruptcy in the first place.  From our position, Judge,

13  we all know the sordid history of how we're here, why we're

14  here, how we got here again.  Again, the debtor is asking you

15  to embark, and we saw a plan filed late last night.  I don't

16  know if they met their deadline of May 14th, but they met a

17  deadline of getting it on the docket before this hearing, and

18  we had no doubt that they would endeavor to do that.

19        Needless to say, Judge, we haven't read the plan or

20  the disclosure statement in detail.  We're going to study it.

21  Needless to say, we've already identified some very problematic

22  positions, and we also wonder if the Ad Hoc Committee law firms

23  expected or support what we have seen filed last night.  But

24  those are questions for a different day.

25        Judge, the debtor is asking you to embark through

1   their filed plan of last night and disclosure statements a

2   series of contentious litigations, investigations, disputes,

3   and decisions that need to be made in connection with the plan

4   process.  There's substantial front-end litigation, discovery,

5   and expert work that will have to be done before the

6   solicitation process even kicks off.

7        All of this is premature and necessary and ultimately

8   may be mooted by the motions to dismiss.  And Your Honor knows

9   that the bases of those motions are based on what I'll call

10   LTL1 Third Circuit decision, no financial distress or bad faith

11   as a result of manufactured financial distress as well as other

12   reasons that have been raised in the motions.

13        For a plan to proceed, there will necessarily be

14   classification and estimation for voting purposes.  The Court

15   cannot shrink away from addressing the serious issues of plan

16   voting, especially under the circumstances of this case and

17   classification, in other words, who can vote and in what amount

18   and in what class.  These are appropriate things to do, as Your

19   Honor knows, using an estimation process and a tool which is a

20   tool under the Code.

21        And as Your Honor knows, although we opposed

22   untethered estimation last year, we did note that estimation

23   can and often is proper when it's tethered to a legitimate plan

24   issue such as voting or feasibility.

25        I think the Court agrees as much because it said so

1  last year, Judge, on July 28th, 2002 [sic] when you appointed

2  your 706 expert, Mr. Feinberg, Hearing Transcript Page 7 to 8.

3  I think you said the work of such an expert is especially

4  critical in dealing with complex mass tort problems, reasoning

5  that, quote, Courts cannot proceed towards a just and equitable

6  result with some reasonable firm data projecting the numbers

7  and volumes of claims at issue. and that all parties have a

8  strong and conflicting interest in the character of the data.

9  That's Your Honor.

10         And in the same transcript, Your Honor, on Page 5, I

11 think you talked about it as a necessary pre-disclosure

12 statement.  You mentioned, Judge, quote, The Court believes

13 strongly that all creditors and claimants have a right to this

14 information, again, before voting on any plans.  The Court

15 recognized that a court expert neutral was the appropriate

16 route.  This Court concluded that, quote, These factors alone

17 and in combination point to the necessity of a neutral expert

18 providing assistance under the auspices of the Court.  That's

19 at Page 8.

20         And you recognized that a 706 expert's assistance

21 would be necessary for a plan itself.  Your Honor said it is a

22 big ask, I believe, and this is Page 4, I believe, to have this

23 Court approve the solicitation of one or more plans to confirm

24 a plan with the requisite findings as to good faith under

25 1129(a)(3) and fair and equitable treatment without a

1 meaningful record evidencing the amounts needed to satisfy the

2 claims, the amounts intended to be paid out, and the available

3 funding.

4       This Court rightfully reviewed an independent

5 estimation report as a necessary pre-condition to a disclosure

6 statement in LTL 1.0.  The debtor has now put forth a pot plan

7 which again, Your Honor, we believe is a pot plan in an

8 illegitimate bankruptcy and, therefore, that gating issue needs

9 to go first.  But that pot plan, it will be virtually -- with

10 respect to that pot plan, it will be virtually impossible for

11 any talc claimants to determine with any degree of certainty

12 how much she or he will be paid and when without the necessary

13 predetermined work, as I just mentioned.

14       It would be improper, Your Honor, for the debtor to

15 solicit votes on a plan that on its face promises substantial

16 payments to talc claimants within the next few years when in

17 reality, we submit the plan delivers nothing more than pennies

18 on the dollar possibly years or a decade from now.

19       Your Honor, the parties are poised to proceed to a

20 motion to dismiss.  It's my suggestion and the Committee's

21 request that that's where all of our attention should be

22 devoted.  I know the debtor has its trial team, and we have our

23 trial team.  And other parties in interest have their trial

24 lawyers working hard to get ready to present those matters to

25 Your Honor, again, next month I believe.  And that's where we

1   should go.

2          It's our request, Judge, in our suspension motion

3   which again I don't think we need to belabor whether it's

4   305(a), 105, the Court's inherent authority.  This Court has

5   the authority and power to case manage its case in the way it

6   believes proper.  And our submission, Your Honor, is that in

7   this case, it's proper to abey plan proceedings, as we argued

8   in our motion, pending a final non-appealable order on the

9   motion to dismiss.

10          If Your Honor does not accept abeyance pending final

11   non-appealable order, then at a minimum, plan issues can and

12   would be addressed in the event Your Honor contrary to our

13   belief is what the evidence will show, but if Your Honor finds

14   our motion to dismiss and others' motion to dismiss to be

15   unsuccessful.

16          From a case management point of view, Your Honor, and

17   in light of what Your Honor had mentioned I think at the May

18   3rd hearing, we're not on a time clock.  Nobody's in a race.

19   This is a complex case, probably one of the most if not the

20   most complex case in the country right now.  We should be

21   focusing on the matter at hand and not engage in "beat the

22   clock," which is what I think Your Honor, I'm paraphrasing Your

23   Honor -- from the May 3rd hearing on Page 121.

24          In any event, Your Honor, that's our motion.  We

25   believe it's the way to structure a going forward coherent

1  rational way of dealing with the issues in front of you.  And

2  we ask Your Honor to accept that and grant our motion.

3          Thank you.

4          THE COURT:  Thank you, Mr. Molton.  Before I turn --

5  Mr. Thompson, that was going to be my question, is there anyone

6  else who wishes to be heard before I turn to Mr. Gordon.

7          Mr. Thompson, go ahead.

8          MR. THOMPSON:  Good morning, Your Honor.  Can you

9  hear me okay?

10         THE COURT:  Yes, I can.

11         MR. THOMPSON:  Okay.  So I'm going to slightly

12  disagree with Mr. Molton on -- I agree completely with the TCC

13  that the focus needs to be on the motion to dismiss, and the

14  reason for that is the Third Circuit told us to do that.  Judge

15  Ambro's opinion of January 30th said that good faith debtors

16  are the only kinds of debtors that can access the tools of

17  bankruptcy.

18         Chapter 11 has a number of tools: estimation, plan

19  confirmation, voting on plans, solicitation.  None of those

20  tools are available to bad faith debtors, which is what LTL1

21  was, and post-fraudulent transfer, what LTL2 remains.

22         So before we do anything about this ridiculous plan

23  that they filed last night, we have to determine whether the

24  Court has subject matter jurisdiction, and there are several

25  challenges to that, and we would ask you to address those

1  first.  That is a gatekeeping matter.

2       The one thing that I would disagree with Mr. Molton

3  on is the need for estimation.  This plan is unconfirmable on

4  its face.  It violates Combustion Engineering.  It violates

5  LTL1.  We don't need estimation to know that.

6       The proper purpose here needs to be addressed before

7  we can get to anything else.  Bad faith debtors, which is what

8  J&J who's controlling LTL is, don't have access to Chapter 11

9  tools.  They can't have them.  And so rushing through a vote,

10 this Court respectfully does not have power to do, and I would

11 only disagree with Mr. Molton on the need for estimation.

12 There's no need for estimation.

13      Thank you, Your Honor.

14      THE COURT:  Thank you, Mr. Thompson.

15      Mr. Satterley?

16      MR. SATTERLEY:  Good morning, Your Honor.

17      May it please the Court, Joe Satterley of Kazan

18 McClain Satterley & Greenwood.

19      I would agree with Mr. Thompson that the focus should

20 remain on the motions to dismiss and evidence and that

21 documents that are necessary for Your Honor to make the rulings

22 on the motion to dismiss.  All other matters should be deferred

23 until Your Honor has had the opportunity to rule on the

24 motions.  Thank you, Your Honor.  That's it.

25      THE COURT:  Thank you, Mr. Satterly.

1          Bear with me.  I don't see anyone else, so let me

2   turn to Mr. Gordon.

3          MR. GORDON:  Good morning, Your Honor.

4          Greg Gordon again on behalf of the debtor.

5          Your Honor, as you know from our papers, we view this

6   motion as a very one-sided request by a group of firms that

7   represent a minority of claimants in the case.  And I note that

8   Mr. Molton went out of his way to say that the Committee is

9   representing all claimants in the case and the actions they're

10  taking are for the benefit of all claimants in the case and on

11  their behalf.

12         But as Your Honor knows, there is an ad hoc group of

13  firms I think that would disagree with that who support the

14  plan, who support the case, who very much want to move forward

15  with a plan process.  And we think what the Committee is asking

16  you to do is actually prejudicial to their constituency.  And I

17  was listening against today.  I still haven't heard the

18  Committee explain what the prejudice is to the claimants in

19  this case to permit a plan process to move forward in parallel

20  with the motions to dismiss.

21         And to me, the Court should not be interested in a

22  selective suspension of the proceedings that would do nothing

23  but advance the litigation agenda of this minority group of

24  firms at the expense of a process that not only has the support

25  of the majority of claimants but as a process that hopefully

1  and ultimately will lead to the consensual -- the largely

2  consensual resolution of claims in this case.

3          Now it was also interesting to me I thought Your

4  Honor that Mr. Molton went back to the May 3rd remarks of the

5  Court and actually cited to them but didn't actually address

6  what the Court literally said at the May 3rd hearing, which to

7  me was a clear indication that Your Honor thought it best to

8  move forward with both the plan process and the motions to

9  dismiss.  And I think just to quote one thing you said in

10  particular, I believe you said that "I do not intend to engage

11  in 'beat the clock' on either side on the dismissal motion or

12  the plan process."

13          Mr. Molton's spinning that to say, well, that meant

14  that you wanted to proceed only with the dismissal motion and

15  not have some sort of "beat the clock" with respect to the

16  plan.  What I heard was the opposite, which was you would allow

17  these to proceed in parallel, but what you were saying was that

18  you would separately consider the timing for each so that each

19  track could move forward in a way that was reasonable and

20  appropriate and would provide sufficient time for the parties

21  to address the issues presented by each path.

22          And, frankly, Your Honor, I don't think there's

23  anything in the motion that was filed by the TCC or in the

24  comments made by counsel today that should cause Your Honor to

25  deviate from that.

1          I also thought it was interesting that Mr. Molton

2    spent considerable time going back to estimation in the prior

3    case, appointment of a 706 expert in the prior case, and then

4    he launched into some potential objections that the Committee

5    has to the plan that was filed late last night.  And, of

6    course, suggesting when he talked about estimation that there's

7    many issues that have to be addressed in connection with a

8    plan, much work to do.

9          And to me, all of those comments are reasons why you

10   should deny the relief sought by the TCC.  In other words,

11   those are reasons it seems to me to have the plan process move

12   forward so that we can make some progress.  And I don't know

13   whether the Committee is worried somehow that the plan process

14   could be completed before motion to dismiss could be heard and

15   decided by Your Honor.  But it seems to me there's no

16   circumstance where that could happen.

17         And given that basically the arguments have been made

18   this morning about all the work that needs to be done with

19   respect to the plan, our view is then we should get -- we

20   should move forward with the plan, again, on a schedule that

21   Your Honor thinks is appropriate but that allows the parties to

22   begin to address and resolve and if necessary have this Court

23   resolve issues in connection with that process.

24         Briefly, just in terms of legal arguments, we don't

25   think Section 305, which is the fundamental basis for the

1  Committee motion, could be used in the way it's being used here

2  in the sense that there's really not any support for the idea

3  that you can selectively suspend the case and permit a

4  Committee basically to hijack the case and pursue its agenda

5  and deny the debtor its right to proceed with the case in the

6  way that it wants and particularly in this case where you've

7  got a process that's supported by literally thousands of

8  claimants.

9         Also, Your Honor, if you -- and I should say with

10  respect to that issue, the cases that we cited and other

11  authorities that we cited including <u>Collier</u> and the rest and

12  the language of the statute itself all seem to indicate that

13  it's an all or nothing proposition with respect to suspension.

14  In addition, we don't see how suspension's in the best interest

15  of the claimants and, again, for the reasons that I said before

16  that we have a plan on the table that has support.  And we

17  think it's in the best interest of all parties to move forward

18  with that.

19         And, also, Your Honor, I would just say generally,

20  with respect to the law, this is not the prototypical

21  suspension case where there's some alternative forum that may

22  be available to resolve the issues this case presents.  To the

23  contrary here, bankruptcy is the only forum in which these

24  claims can be resolved including future claims.

25         So, Your Honor, just to sum up, in our view, you

should stick with the views you seems to express, at least as we understood them on May 3rd.  We would ask that you would deny this request, that you would permit us to move forward with a plan process.  And, again, we can address the timing of that and will I guess later this morning address the timing of that.  But we believe that would be in the best interest of all the claimants.

The parties have counsel.  They can certainly handle this in parallel.  We can do both the dismissal track and the plan track.  And we just think, Your Honor, it would be in appropriate to allow this group of firms to get their way and deny the majority of firms their entitlement to move forward with a plan that they believe fairly resolves and appropriately resolves the claims in this case.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Gordon.

Mr. Hansen, on behalf of the Ad Hoc Committee?

Speaker.  I think you're muted.  You're still muted.

MR. HANSEN:  Can you hear me now, Your Honor?

THE COURT:  Now we can.

MR. HANSEN:  I was working off the wrong speaker.

Your Honor, Kris Hansen with Paul Hastings on behalf of the Ad Hoc Committee of Supporting Counsel.

Your Honor, I'd just start by saying that this is truly within the Court's discretion which I think everyone here

21

agrees with.  And the decision from a discretion perspective
should not be to slant the proceedings in any one way or the
other to advantage any party in the case.  I think it should be
to give everyone in the case a fair shot at everything that's
being put in front of the Court.

          What I would say as the newcomer here is that I've
been surprised, I'm sure no one else is, by the proliferation
of pleadings that happened in connection with this case and by
the vitriol that gets traded between the parties.  None of it
seems particularly productive from our perspective.  And what
we would love to see is global consensus.

          Regarding the plan that was put on file last night,
we have issues with it but that's normal.  People have to work
through documents to get to a conclusion.  That's how these
cases go.  You know that, Your Honor.  You've been on the bench
a very long time.

          You have two really capable mediators that you
appointed.  Our request would be that you send us all to
mediation as soon as possible to see if we can find a global
resolution to this case and we can stop the burn associated
with endless motion practice which seems to have no end in
sight.

          If you're not prepared to do that, Your Honor, I
think our view is advance the case on all fronts and let the
parties see if they can find a way to come to a conclusion

themselves.  Again, as the outsider here, I would say that it

really seems apparent to me that the parties need the help of

the mediators that you've appointed.  And if you were going to

really make that mediation meaningful, the real question for

the Court is whether you suspend everything while we advance

ourselves to mediation or whether we go to mediation while we

continue to prep the motions to dismiss and keep the disclosure

statement time on and deal with all the objections that are

filed to that.

I don't really have an opinion on that, Your Honor,

although I do know that having participated in a lot of

mediations, when everyone's focus is on the mediation, they

tend to get to a deal.  The other thing I'd say, Your Honor,

too, is that Mr. Molton was clear in saying now, now that the

mandamus has been denied and the attempt to take this case away

from you on an unprecedented and expedited basis is over, Mr.

Molton's view if we have plenty of time.  There's nothing here

to rush about.

So if we have plenty of time, there's no reason to

sequence things in the way that the TCC wants.  And I come back

to it again, Your Honor, and just say that from our

perspective, if you're not inclined to send us all to

mediation, then move the case forward so that no one's

prejudiced by process.  And if you are inclined to send us to

mediation, which is what the Ad Hoc Committee of Supporting

23

1  Counsel thinks should be done, the real question which we

2  should all discuss is what goes on in the case while we're at

3  mediation.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. Hansen.

6          Ms. Richenderfer?

7          MS. RICHENDERFER:  Thank you, Your Honor.  Good

8  morning.

9          THE COURT:  Good morning.

10         MS. RICHENDERFER:  Your Honor, I think just a few

11 comments.  I think the U.S. Trustee's Office respectfully sees

12 the motion to dismiss as a gating issue.  We did not file

13 anything with respect to the motion to suspend because we think

14 that it's truly within the realm of Your Honor to set the

15 schedule for this case and that's what the real issue here is,

16 the schedule, when things will be considered, when things will

17 be done.

18         I have to comment, though, because last week we did

19 the 341 Meeting of Creditors.  It has not yet been concluded

20 because there were certain information that Mr. Kim who wasn't

21 the one who signed the schedules and statements, but Mr. Kim

22 was not able to give us information that was missing from them.

23         And an important point that I think the Court should

24 be aware of is that Schedule E/F, which is supposed to be the

25 list of all known claimants or creditors of the debtor, does

24

not include any of the people who signed, who are represented
by attorneys who signed a PSA prior to the petition filing
date.  And so Mr. Gordon and others on behalf of the debtor
keep saying that the arguments by the TCC, he called it I think
a very one-sided request, they represent a minority of the
claimants, but the claimants that are on Schedule E/F that was
submitted by the debtor that represents all creditors they know
of as of the filing of the petition at 4:00 on April 4th does
not include any party, does not include any individuals who are
represented by attorneys who signed PSA prior to the filing
date.

And when I asked Mr. Kim why that was, the only
response I could get out of him was, and I'm paraphrasing, Your
Honor, here, I don't have the transcript yet, was that, well,
we figured those people would be identified in 2019s.  That's
not an answer, Your Honor.  If the debtor believes that these
are creditors and claimants and that they knew about them as of
the filing, they should have been on Schedule E/F.  I don't
know why they weren't, Your Honor.

And it also is concerning to me, just there's one
correction though and I just got reminded of that.  I'm very
thankful for texting.  I was reminded by one of my co-counsel
that the Onder Law Firm is on Schedule E/F because they started
in LTL1 as a group of claimants and then since then and I think
there might be some from (indiscernible) Nachawati since then.

1  Both of those firms have signed PSAs prior to the second

2  petition.

3            But of great importance, Your Honor, is Mr. Watts who

4  represents a significant number of these new claimants that

5  debtors have brought to us.  We're not on Schedule E/F, and

6  there are other firms, I don't have the list in front of me.

7  So, Your Honor, I don't know why that is, but we have debtor

8  representing to the Court that they're claimants and that they

9  have different interests but they're not on the schedules

10 recognized by the debtors as claimants.

11            And I'm not saying they should update them. to give

12 us information on people identified after the petition date,

13 but the Code says they're supposed to give us everybody they

14 know of as of the petition date.  And they did not do that in

15 their schedules and statements.

16            And if indeed there is anything untoward that people

17 believe has been done by the Tort Claimants' Committee, that's

18 an issue to raise with the U.S. Trustee's Office, Your Honor.

19 I have seen nothing.  The Tort Claimants' Committee is

20 representing the interests of all creditors of the estate.

21 There may be some creditors, I don't know if they are or aren't

22 creditors because the debtor doesn't list them as creditors.

23 But there may be others that have different viewpoints.

24            The U.S. Trustee is still looking into the issue of a

25 2019 statement and an ad hoc committee of counsel as opposed to

1 an ad hoc committee of creditors or claimants who hold

2 different positions.  And, Your Honor, I think it's a

3 distinction of great difference.  I don't think it's a

4 distinction of no difference.

5        So, Your Honor, I just wanted to say that for the

6 record because we've heard about the majority of the claimants

7 feeling one way.  And once we had the time to sit down with Mr.

8 Kim and go over the schedules and statements, they don't

9 reflect that.  So I just wanted to bring that important point

10 to the Court's attention, but to start where I -- to end where

11 I began, which is that we do believe the motion to dismiss is a

12 gating issue that needs to be taken up by the Court sooner

13 rather than later.  Thank you, Your Honor.

14        THE COURT:  Thank you, Ms. Richenderfer.

15        Mr. Malone?

16        MR. MALONE:  Good morning, Your Honor.

17        Robert Malone of Gibbons representing the states of

18 New Mexico and Mississippi who are parties in interest to these

19 proceedings.

20        While we did not file any formal joinder in this case

21 to belabor the Court with any more paper, but since Mr. Gordon

22 has decided to make it an issue that it's just the Talc

23 Committee who is supportive of going forward first with the

24 motion to dismiss, I felt compelled to rise in support of the

25 Talc Committee.  This is not a situation of "beat the clock,"

27

1  but rather a question to Your Honor of judicial economy.  It's

2  been well over two years and it doesn't seem to be urgent that

3  now all of a sudden a plan process must go forward on a rapid

4  track.

5        Judicial economy in this case would dictate that the

6  motions to dismiss would proceed first because if the

7  disclosure statement and plan were to proceed at the same time

8  until the Court has made a decision one way or the other on the

9  motion to dismiss, it could all be rendered moot, whether it be

10 by way of the appeal process or a dismissal of the entire case.

11       So if we're going to look at the energies that are

12 being put into the case, I think there should be focused in a

13 very (indiscernible) time.  Next month we have hearings already

14 set up in June.  It's not like they're out in July or August.

15 I think we'll have a determination in very short order whether

16 this case is going to proceed or not.

17       Thank you.

18       THE COURT:  Thank you, Mr. Malone.

19       Before I go back to counsel who have already spoken,

20 let me just bring in Ms. Jones.

21       MS. JONES:  Good morning, Your Honor.

22       THE COURT:  Good morning.

23       MS. JONES:  Laura Davis Jones of Pachulski Stang

24 Ziehl & Jones on behalf of Arnold & Itkin.

25       Your Honor, like Mr. Malone, we have not filed a

28

1   response in connection with this motion, but now that Mr.

2   Gordon has opened the door and is speaking he says for all

3   claimants, again, Your Honor, the Arnold & Itkin firm does not

4   agree with his path.  But, indeed, Your Honor, we think the

5   motion to dismiss is case dispositive and we need to start

6   there.

7            Thank you, Your Honor.

8            THE COURT:  Thank you, Ms. Jones.

9            Mr. Satterley?

10           MR. SATTERLEY:  Yes, Your Honor.

11           I just want to respond to both Mr. Gordon and the Ad

12  Hoc attorney.

13           First of all, the argument that we represent, we who

14  oppose represent a minority of claimants, there's no real

15  evidence of that.  That's just attorney argument.  Your Honor

16  presided in LTL1, and you had the motion to dismiss trial last

17  February.

18           THE COURT:

19

20  So that's the Court's outlook.  And at this point, before we

21  proceed to the other discovery issues, let me hear from

22  parties.  Although you ruled against my position and what I

23  thought was proper, you handled it appropriate.  You did the

24  right thing.  We didn't get to mediation and all the other

25  things until after that trial occurred and after Your Honor

1 | certified it to the Third Circuit.

2 |         I would urge Your Honor to do the exact same thing

3 | you did in LTL1, have the trial on the motion to dismiss.  If

4 | Your Honor decides not to dismiss it, which I think Your Honor

5 | should dismiss it as a bad-faith filing, Your Honor should once

6 | again certify the matter to the Third Circuit.

7 |         With regards to the ad hoc argument that we should

8 | rush into another mediation, I participated on all five days of

9 | mediation in LTL1 --

10 |         THE COURT:  I think we're losing, at least I am

11 | losing Mr. Satterley.

12 |         MR. SATTERLEY:  (Audio interference).

13 |         THE COURT:  Mr. Satterley, unfortunately, I think

14 | we're losing you.

15 |         Let me turn to --

16 |         MR. SATTERLEY:  Can you --

17 |         THE COURT:  I can hear you.

18 |         MR. SATTERLEY:  Can you hear me now?

19 |         THE COURT:  I can, yes.

20 |         MR. SATTERLEY:  I turned my video off.  I apologize.

21 | Maybe my internet -- all right.  So I'll conclude, Your Honor,

22 | that just as Your Honor did in LTL1, the motion to dismiss

23 | trial should occur first.  If anything other than the motion to

24 | dismiss, there should be an investigation into the largest

25 | fraudulent transfer in U.S. history.

30

1          With that, I'll submit, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Mr. Thompson and then I'll go to Mr. Molton.

4          MR. THOMPSON:  Thank you, Your Honor.

5          I did want to highlight -- I wanted to highlight what

6  the Circuit said in denying the mandamus petition.  And so this

7  is on May 9th, "In order to allow the Chapter 11 proceedings of

8  LTL Management to continue on the expedited basis set by the

9  Bankruptcy Court for the District of New Jersey and recognizing

10  that the writ of mandamus is a drastic and extraordinary remedy

11  and there are other adequate means for the petitioner" --

12  meaning the Committee of Claimants -- "to obtain the relief it

13  seeks, the public petition for writ of mandamus of talc

14  claimants is hereby denied."

15          And they mention the expedited basis of the

16  bankruptcy case, and the reason they probably did that was

17  because the debtor in opposing mandamus said that the trial for

18  motion to dismiss was going to be June 12th.  And when we were

19  arguing the certification for immediate appeal to the Third

20  Circuit last week, the debtor said, essentially their argument

21  was, well, the motion to dismiss trial is going to be soon and

22  that's going to be appealed, so let's appeal them both

23  together.  And that was an argument that made sense to Your

24  Honor.

25          And so it doesn't matter how many claimants there are

1  that allegedly support this plan, if Mr. Satterley says there's

2  zero evidence of that, which clears that the Ad Hoc Committee

3  represents lawyers that say they represent a lot of claims and

4  there's zero evidence of that.  And there's zero evidence that

5  those claims have any value in the tort system.

6        So, of course, the Ad Hoc Committee of Supporting

7  Counsel is in favor of a bankruptcy plan.  They want to mediate

8  because they've got a bunch of claims that probably are worth

9  zero in the tort system.  And my firm filed a motion on that

10 issue over the weekend.

11        The way that things are normally done in bankruptcy

12 is that you have a good-faith debtor which we don't have here.

13 And so before we get to mediation, before we get to any of this

14 other stuff that the debtor is trying to cram down on

15 everybody, the Court first has to do, as Mr. Satterley said,

16 that you correctly did last time.  You have to address the

17 threshold jurisdictional issues, and we would urge you to do

18 that first.  Thank you.

19        THE COURT:  Thank you, Mr. Thompson.

20        Mr. Molton?

21        MR. MOLTON:  Yeah.  Finishing up, Your Honor.  Thank

22 you for everybody for participating.

23        First of all, I have to applaud Mr. Gordon.  I

24 expected his talking point on TCC representing minority of tort

25 claimants, and he didn't disappoint me.  I'm sure we're going

1  to hear that repeatedly as a way for them to bolster their

2  defense to our legitimate objections to this bankruptcy, number

3  one, and to what they're trying to do within it.

4         I was going to mention exactly -- a few of my reply

5  points got taken by others.  Ms. Richenderfer talked about the

6  claim issue.  Clearly, DHC represents law firms and Ms.

7  Richenderfer talked about the debtor not having listed any of

8  those or most of those purported claimants of those firms as

9  creditors.  As Your Honor knows and I'll just repeat it and

10 then go on, it seems that many or most of the claimants

11 represented by the Ad Hoc Committee have never filed lawsuits

12 in the tort system and many of them apparently have diseases

13 which are not tethered to any Daubert finding.

14        Needless to say, those are issues for a later day.

15 But whenever you hear Mr. Gordon and his talking point, I'd

16 like Your Honor to note my response so I don't have to say it

17 every time.

18        Number two, Mr. Thompson, I don't think we're

19 misaligned on our views.  Clearly, we're going to look at the

20 plan, the proposed plan, and I'm sure we'll have agreement that

21 it's patently unconfirmable on many many grounds.  But we don't

22 have to deal with that now.  All I was referring to Your Honor

23 on estimation is before there's a solicitation to voters, those

24 voters have to be known and we have to understand who they are,

25 what they are, and the weight to be given thereto in light of

1 | what I just said.

2 | I'm going to challenge Mr. Gordon. He said -- his

3 | mantra from day one of LTL Number 1, talking point -- first

4 | talking point before his second talking point that I got to in

5 | LTL2, bankruptcy is the only forum. I'm not going to spend any

6 | time on that. All I'm going to do is see emphatically Judge

7 | Ambro's and his unanimous panel decision. He didn't agree with

8 | you, Mr. Gordon.

9 | And my last point or second to last point was taken

10 | by Mr. Thompson. I was going to -- Mr. Gordon raised the

11 | mandamus, tried to use that as a way against our proposal for

12 | effective case management in this case. And Mr. Thompson

13 | quoted Judge Ambro's written text order there denying mandamus

14 | on the understanding of that panel that decided the mandamus

15 | that there will be an expedited proceeding here with respect to

16 | the motion to dismiss that will allow those issues should they

17 | get to the Third Circuit to get there, again, Judge, one of my

18 | favorite words, with alacrity.

19 | Lastly, my colleague Mr. Hansen said a few things.

20 | Nobody here, Mr. Hansen, wants to engage in vitriol. And if

21 | you examine the history of LTL1, you can see from where the

22 | vitriol comes and I applaud Mr. Hansen. This case can proceed

23 | with vigorous advocacy without vitriol or that sort of

24 | condescending dialogue.

25 | Mr. Hansen did mention in response to my question as

1  to whether the Ad Hoc Committee firms expected or even support

2  what we see was filed yesterday.  They quite candidly say they

3  have issues with it.  And I wonder if there's still a deal.

4  But those are things for later on, Judge.

5         And those things later on need not even be addressed

6  or time wasted on them if we get to dismissal first, as we

7  should from a case management point of view, from the point of

8  view of this Court's resources, from the point of view of the

9  expectations of the world watching, now I'm quoting Your Honor,

10 which includes the panel that wrote and endorsed the text order

11 on the mandamus decision.

12         Thank you, Judge.

13         THE COURT:  Thank you, Mr. Molton.

14         All right, folks.  Bear with me.

15         So the Court has thought a lot about these issues.

16 And in my ruling on the Committee's 305, I'll call it a 305

17 motion, I am probably or most definitely going to be touching

18 on issues that are relevant to the scheduling of the motions to

19 dismiss and the scheduling of the disclosure statement for the

20 plan that's been filed by the debtor.

21         In bankruptcy, we often talk about the race to the

22 courthouse.  Apparently, that's not our concern here today.  We

23 have a race in the courthouse which has been brought by the

24 parties, each seeking to move forward quickly with certain of

25 their goals and proceedings and minimizing the time, at least

1  to the Court, that it would take to address the matters and

2  then wishing to delay those that are not on respected parties'

3  agenda.

4         I'm not going to delve into or try to read between

5  the lines of the Third Circuit's text order on the mandamus

6  petition.  I think that's always dangerous.  I'm not sure

7  exactly the parameters of expedited.  I know the Second Circuit

8  in the Purdue Pharma appeal had an expedited appeal and that's

9  been a year and, I don't know, 15 months.  So who knows what

10 expedited means these days.

11        I intend to proceed efficiently and as quickly as I

12 deem reasonable.  I make the commitment again that justice is

13 not going to be run over by parties seeking to pursue their

14 specific goals, that we have to have a process that makes

15 sense.  So in doing so, when I look at the motion under 305 and

16 105 for suspension of the proceedings, I don't believe it's

17 necessary.  The factors as outlined in the Third Circuit and

18 briefed and noted in the Northshore Mainland Services case, the

19 number one factor is the economy and efficiency of the

20 administration.

21        I agree with, I believe it was Ms. Richenderfer who

22 said the Court can address these issues through scheduling, and

23 I can.  The inherent power of the Court to manage its docket

24 has been noted in much of the briefing, permits the Court to

25 address the needs of the parties and the Court through

36

1  scheduling, not necessarily through a blanket suspension of the

2  case.

3          So the motion will be denied, but the Court is taking

4  into account the needs of the parties in further ruling.

5          In that regard, there are some important issues that

6  need to be addressed as part of the motion to dismiss.  There

7  are important discovery issues, there are pretrial motions that

8  I'm sure is coming.  If the plethora of filings even for today

9  is any indication with eight motions to dismiss and from

10 reading the correspondence, potential for over a dozen

11 witnesses including expert witnesses, to address the dismissal

12 motion in a haphazard fashion just to squeeze it in is a

13 disservice to the parties and to the Court and probably to any

14 appellate tribunal reviewing the case.

15         So taking into account scheduling issues that were

16 raised in the correspondence and also taking into account the

17 assurances, and I'm going to address the plan process after,

18 there is no need to squeeze in in the two days and one week in

19 June and the following two days and -- two more days the

20 following week the motions to dismiss and to create unnecessary

21 time constraints on discovery that will be ongoing and motion

22 practice relative to discovery, that burdens the Court in an

23 already very time-restricted calendar.

24         There is no doubt in my mind that the complexity of

25 eight separate motions to dismiss, the complexity of the

37

1    issues, the importance of the issues, the potential for

2    discovery issues relative to the hearing warrant the compelling

3    circumstances to move scheduling of this motion outside the

4    restrictive constraints of Section 1112.

5           So it is my view that this trial on the motion to

6    dismiss should go forward starting June 27th.  It's a Tuesday

7    through June 30th, which is the Friday.  That's four separate

8    days.  I don't believe it's in everybody's interest to break it

9    up over weeks.

10          And, Mr. Winograd, I see your hand raised.  I'll get

11   to you.  I'll hear everyone.

12          But that would be -- the only option after that is

13   probably the second week -- well, right after July 4th.  But I

14   see no reason why we can't complete it that last week in June.

15          Now it will not be an issue of having to erase the

16   disclosure statement hearing because I have concerns with the

17   disclosure statement process.  My first concern is that the

18   debtors requested that I appoint Ms. Ellis, for instance, as an

19   FCR who has already represented to the Court and the parties

20   that she did not take part in negotiations under any plan and

21   she needs her own experts and professionals to make an informed

22   qualitative decision on any plan.

23          So I don't know how we move forward so quickly and

24   yet deprive her of the opportunity to examine the issues.

25   Certainly, the creditor body's going to need to know whether

1   the FCR is supportive or not, the Court's going to need to

2   know, and the parties are going to need to know.

3          But more importantly, I'm not convinced at this

4   juncture that there should not be a competing plan process in

5   the event this case continues subsequent to the motion to

6   dismiss.  I said this in the first case, and I repeat it.

7   Successful confirmation of a plan is all about getting the

8   numbers, 75-percent threshold.  I don't know if the debtor and

9   the debtor's plan, they can get to that point.  I don't know if

10  the competing plan can get to that point.  But in essence,

11  whether or not there are competing plans, it's really about

12  alternatives to the creditors.

13         So I'm not making a decision that I'm going to

14  terminate exclusivity at this juncture, but I will invite the

15  Committee or any parties in interest to file a motion to

16  terminate exclusivity because I want to be convinced that a

17  plan that goes forward, whether there should be one or two

18  plans going forward, because that will impact on scheduling

19  certainly with respect to disclosure statements and plans.

20         I would invite, and I'm picking June 13th as a day

21  knowing that the debtor in all likelihood needs to come in

22  before the Court if they wish an extension of the preliminary

23  injunction and to make the showing that was pointed out as

24  being required by the Third Circuit in the prior opinion, to

25  extend the injunction.  So the injunction terminates on the

1  15th.  It would make sense to hear the matter on the 13th.

2         And, also, I would invite the Committee to file a

3  motion if they wish to pursue a competing plan and think it's

4  warranted so that the motion gets filed.  I would say file the

5  motion by June 5th to allow the debtor to respond prior to the

6  hearing.  I think that's -- so that touches on how we're going

7  forward with the disclosure statement.

8         My suggestion is to carry the debtor's motion

9  scheduling disclosure statement hearing on the plan that's been

10  filed to the 13th, as well.  So I am not -- I am still pursuing

11  and allowing a dual track, but I'm doing so in the Court's view

12  in a manner that will make the most sense to allow the Court

13  and the parties to gauge, should the case go forward beyond the

14  motion to dismiss, how it goes forward and how creditors have

15  the opportunity to express their opinions by voting.

16         When I looked at the proposed schedule and I know

17  there could be modifications put forward by the debtor, it

18  seemed clear that it would be just too oppressive and

19  burdensome on the Court to have to address the plethora of

20  issues relative to the disclosure statement at the same time

21  conducting a trial on the motion to dismiss.

22         I think it's no secret that there are no attorneys

23  who are shy about submitting filings.  With eight separate

24  motions, there's going to be voluminous filings, voluminous

25  issues with respect to discovery.  And it's inconceivable that

40

1  the Court could address those issues relative to the motion to

2  dismiss and at the same time address valuation classification

3  and the host of other issues relative -- and solicitation which

4  is relative to a disclosure statement.

5          So that's the Court's outlook.  And at this point

6  before we proceed to the other discovery issues, let me hear

7  from parties.

8          Mr. Winograd?

9          MR. WINOGRAD:  Thank you, Your Honor.

10         Michael Winograd from Brown Rudnick on behalf of --

11 proposed counsel for the TCC.

12         Your Honor, we heard what you said, so I'm certainly

13 going to -- I guess I can move one of my binders to the side

14 for now, although I'd always been told that weeks were an

15 eternity in bankruptcy time.  But I did just want to raise one

16 issue, Your Honor.

17         You mentioned conflicts that the debtor had raised

18 and I think they had raised them before Your Honor proposed

19 dates the last time.  If you are contemplating as I think you

20 just said the week of June 26th starting on the 27th, I

21 believe, and I've indicated this in meet and confers, we will

22 need to meet and confer because I believe we have a very

23 serious witness availability issue that week.  And we would

24 just -- I would just want to note to Your Honor that we'll need

25 to meet and confer on that.

1          I'm not aware of any other conflicts after that, but

2    I do know that there's a serious conflict with a witness during

3    that week.

4          THE COURT:  All right.  That's fair enough.  I would

5    hope you would meet and confer.  I will tell you that I could

6    block out time -- I know everybody wants to get to this sooner

7    than later, but there's a July 4th holiday, so I can't put that

8    the following week.  I can block out July -- the week of July

9    10th as well.

10         But given that there is no race between the plan and

11   disclosure statement as of yet, they are both proceeding in a

12   reasonable course, I did not see the need to jam in four dates

13   among two weeks in a scattered approach, which would still

14   impose time constraints and time pressures on the parties and

15   the Court.

16         So I'll wait to hear, but as of now, I'm prepared to

17   block out the 27th, that time period.  I can also block out the

18   week of the 10th.

19         MR. WINOGRAD:  Thank you, Your Honor.

20         THE COURT:  Mr. Sponder?

21         MR. SPONDER:  Good morning, Your Honor.  Jeff Sponder

22   from the Office of the United States Trustee.

23         Your Honor, the week of the 27th is a problem for the

24   United States Trustee.  Several of our attorneys, including

25   myself, have planned vacations that week, and I just wanted the

42

1   Court to be aware of that.  I believe July 10th would work,

2   but, again, as Mr. Winograd said, I think we could meet and

3   confer and see how we can resolve that.

4           I just wanted to advise you of that.  Thank you, Your

5   Honor.

6           THE COURT:  I appreciate it.  It is much easier to

7   schedule these in a February when nobody is going anywhere, as

8   we did the last trial.  As we approach the summer, it is

9   difficult, but that cannot take away from, as Mr. Molton noted,

10  the importance of the issues, the complexities of the issues.

11          So the Court will try to be as flexible as possible,

12  but if the parties cannot agree, we'll proceed as we can on the

13  time scheduled.

14          Mr. Gordon?

15          MR. GORDON:  Thank you, Your Honor.  I appreciate all

16  the information you just provided about scheduling.  That's

17  enormously helpful, given that -- the amount of time we've been

18  expending trying to come to a consensus, so that's much

19  appreciated.

20          And we'll obviously -- we're obviously happy to meet

21  and confer with the other side to work through any scheduling

22  conflicts that may exist with respect to that last week in

23  June.

24          I did -- with Your Honor's indulgence, I did want to

25  go back to the June 13 hearing, just to make sure we're all in

43

1  sync in terms of what you're contemplating.  And what I heard,

2  Your Honor, is that there would be three things potentially

3  that would be heard on June 13th.

4         One would be any request by the debtor to extend the

5  preliminary injunction beyond the June 15 date.

6         THE COURT:  Correct.

7         MR. GORDON:  The second would be any motion to

8  terminate exclusivity filed by the TCC or any claimant, and

9  that motion would need to be filed -- or those motions would

10  need to be filed by June 5.

11        And then that would be as well -- June 13 as well

12  would be the date for the hearing on the motion that was up

13  today on schedule with respect to the disclosure statement.

14        So I just wanted to be sure, Your Honor, that I had

15  that all correct.

16        THE COURT:  That is correct.

17        MR. GORDON:  Thank you.

18        THE COURT:  I also -- for the benefit of the parties,

19  I -- as counsel have noted, the issues are just too important

20  to -- to create any uncertainty as to what issues need to be

21  resolved.

22        And in that regard, with respect to the motion to

23  dismiss, another reason I wanted to speak to counsel, beyond

24  the issues that everyone has identified as far as cause and the

25  lack of good faith being a foundation for cause and all of the

1  -- all of the arguments that will be presented as to whether or

2  not the debtor has pursued and filed the case in good faith, I

3  do want the parties to address one other issue briefing-wise.

4  And I'd rather give it to you now than to surprise you.

5       It was addressed in my opinion, it was addressed by

6  Judge Ambro toward the end of his opinion, but I'd like to

7  revisit it.  And it is whether or not -- because there are

8  different factual scenarios in this case -- whether or not

9  dismissal of a case -- well, strike that.  Whether or not under

10 1112(b)(2) this case should not be dismissed in the interest of

11 the bankruptcy estate and creditors, notwithstanding a

12 determination that there is cause under 1112(b)(1).

13      If this court -- and I understand Judge Ambro read

14 into or referenced the financial distress as a gating

15 requirement even for 1112(b)(2).  I read 1112(b)(2), and it

16 only comes about -- and there are certain criteria that have to

17 be met in 1112(b)(2), but there are -- I read it and it comes

18 about notwithstanding a finding of cause to dismiss under

19 1112(b)(1), cause being lack of good faith.

20      So I'm not sure how financial distress can be the

21 gating factor for 1112(b)(2).  I welcome the opportunity to be

22 educated by you all.  But rather than address it without the

23 benefit of your briefing, and under the facts scenario, I

24 brought it up even in my initial determination of -- my

25 decision with respect to the preliminary injunction.

1        One of the questions I had is if this case were to be

2   dismissed, what happens to the causes of action and any claims

3   that there could be or any efforts to secure the funding under

4   either the 2021 funding agreement or the 2023 funding

5   agreement.  So I think that's part of the analysis as to what

6   happens and whether or not this is such a case.

7        And I'm not -- I haven't made any determination,

8   needless to say.  But I'd rather have the benefit of the

9   briefing than -- and give you all the opportunity to say it

10  doesn't apply or it does apply.  So in your briefing ultimately

11  for the motion to dismiss, please address what it takes and

12  historically I guess what other courts have -- may have viewed

13  1112(b)(2), I think.  Hopefully I'm giving the right cite.

14  It's not a commonly employed section of the Code.

15       All right.  Now, we can move on.  So I don't think we

16  need to address the disclosure statement -- in fact, we can all

17  take some time now and actually read what's been filed last

18  night -- and address the discovery issues, I'll call them, the

19  motion to compel and the motion for the protective order.

20       Mr. Winograd, will you be arguing the motions to

21  compel and the cross motions?

22       MR. WINOGRAD:  I will be, Your Honor.  I believe

23  there are several.  There's a motion with respect to the use

24  restriction in the protective order.

25       THE COURT:  Right.

1          MR. WINOGRAD:  There is a motion with respect to D,

2    designating Exhibit A to the term sheet, and there is a motion

3    to un-redact redacted information.  I'll be arguing those, Your

4    Honor.

5          There's also a motion with respect to the asserted

6    common interest privilege as between LTL and J&J in connection

7    with the 2021 funding agreement and 2023 funding agreement, and

8    Mr. Jonas will be arguing that.

9          THE COURT:  All right.  Well, let's start with -- how

10   about the protective order?

11         MR. WINOGRAD:  Sure.  Your Honor, again, Michael

12   Winograd from Brown Rudnick on behalf of proposed counsel for

13   the TCC.

14         Your Honor, the motions -- I know there's a lot going

15   on, so just for the record, the motions and objections on this

16   were at Dockets 439, 491, 492, and 510.

17         And there's really just one issue, Your Honor, and

18   that is whether the protective order should have a general use

19   restriction with respect to non-confidential information.  In

20   LTL 1.0, there was no such use restriction.  The parties had

21   agreed on that.  The Court had ordered it.

22         In the preliminary injunction proceedings, the

23   parties agreed to abide by the protective order in LTL 1.0,

24   which, again, did not have any such restriction.

25         Now LTL wants such a use restriction going forward

47

1  for 2.0, for LTL 2.0.  And they want a blanket use restriction

2  for everything and to place the burden on a party to lift that

3  use restriction.

4        As the cases that we cited make clear, Your Honor, in

5  our motion, that literally just flips the burden and the case

6  law on its head.  LTL has offered zero authority for what they

7  are asking.  And, in fact, some of the cases they've cited for

8  some general propositions decidedly cut against them.

9        The burden here is on the debtor.  Again, it wants a

10 blanket -- a blanket non-use restriction.  And again, the case

11 law, if you look at our brief at paragraph 4 to 5, says exactly

12 the opposite.  They need to show a particular need for

13 protection, and that's the Cipollini case in the District of

14 New Jersey, 1986.  They need specificity.  And the harm, Your

15 Honor, has to be significant.  It needs to be a particularized

16 showing.

17        The debtors have offered really three reasons.  One,

18 they don't want the non-confidential information used in tort

19 cases.  Cipollini, Your Honor, outright rejects that as a

20 basis.  Not wanting litigation documents to be used outside of

21 that litigation is not in and of itself good cause.

22        The discovery here was proper.  The creditors here

23 are plaintiffs in those tort cases.  LTL and J&J are in this

24 case because LTL filed this case based on their own

25 machinations.

1        If the information discovered here properly that's

2   non-confidential is relevant to those tort cases, it should be

3   allowed to be used in those tort cases, and the case law makes

4   that clear.

5        Number two, they argue -- LTL argues that while these

6   documents may not be confidential, they ordinarily wouldn't

7   have been disclosed to the public.  Well, that's the nature of

8   litigation, Your Honor.  And, in fact, this litigation they

9   started twice.

10       They argue, Your Honor, that they were -- next, for

11   the third basis, that there were purported leaks to the media.

12   Again, what was shared with Reuters were non-confidential

13   documents.  And I believe, if memory serves, LTL had made

14   something of that and then later acknowledged that they had de-

15   designated those documents and the issue went away.

16       But it's ironic.  LTL and J&J have gone on a media

17   campaign here.  They have a website exclusively for press

18   releases and statements about the case and participated in a

19   CNN special.

20       This court has noted the importance of this case,

21   that the world is watching.  Well, when the world is watching,

22   Your Honor, in an important case, the world shouldn't be

23   prevented from seeing.

24       And I will note just very briefly, Your Honor, that

25   the cases cited by LTL not only don't help them, but they

49

1   actually go against them.  They only cite two cases for this

2   proposition that a general use restriction with respect to non-

3   confidential information is appropriate.

4        What they didn't tell the Court in their brief, and

5   you had to dig a little bit to figure this out, is that in both

6   of those cases -- in one case, actually, the opinion references

7   it in a sentence.  In the other case, you had to dive into the

8   prior case to actually look at the information, and we provided

9   that to the Court in our filing.

10       But in both of those cases, the use restriction was

11  by consent of the parties.  Nobody is arguing that parties

12  cannot restrict use where the both agree that that's

13  appropriate.

14       There is zero authority in LTL's brief for the idea

15  that without consent you can impose this.  And, in fact, they

16  cited the Floor Design case where, again, the issue -- the

17  protective order at issue was on consent.  If you actually dive

18  into that case, there was a similar defendant in multiple

19  related cases.

20       In one of those related cases, it tried to impose

21  this exact same restriction, but this time without consent.

22  And that was the Insignia case.  And what the Court said was

23  no, we will not allow -- without consent, we will not allow a

24  use restriction with respect to non-confidential information.

25       Again, Your Honor, there was no such restriction in

50

1  1.0.   There was no such restriction in the preliminary

2  injunction proceedings.   There is no basis to impose such a

3  restriction now.   There has been no authority given to support

4  restriction.   And the only authority that has been given, if

5  anything, cuts the other way.

6          Again, Your Honor, the world is watching.   We can't

7  put blinders on them and force them not to be able to see.

8  Thank you, Your Honor.

9          THE COURT:   Thank you.   I'm going to regret ever

10  using that phrase, "the world is watching," and I blame Mr.

11  Molton.

12          So, do I hear from -- on behalf of the debtor?

13          MR. GORDON:   Thank you, Your Honor.   Greg Gordon on

14  behalf of the debtor.   And just so Your Honor knows, I'm going

15  to handle this motion.   The other two matters David Torborg, my

16  partner, will handle those.

17          THE COURT:   All right.

18          MR. GORDON:   So, Your Honor, there is some good news,

19  I suppose, with respect to this matter, which is I think the

20  parties are otherwise in agreement as to the terms of a

21  protective order to govern issues in this case.

22          And, in fact, in the second case -- and, in fact,

23  it's just this one issue that's the subject of these pleadings

24  that is not resolved.   And I think that -- that Mr. Winograd

25  has really overstated what we're seeking in connection with

1    this.  I mean, he -- he referred to this as a blanket request,

2    you know, made this sound, I think, more than it is.

3         And really what it is I think is a very balanced

4    proposal.  And, in fact, it picks up some comments that Your

5    Honor made in a prior hearing.  So the language at issue is in

6    Section K of the protected order.  It basically does say that

7    the use documents produced in discovery, whether confidential

8    or not, can't be used other than in connection with the

9    bankruptcy proceedings.

10        But what's important about this -- and this was

11   misstated somewhat, I think, by Mr. Winograd.  It's not just a

12   blanket prohibition.  Instead, it basically permits parties to

13   seek relief from the restriction simply by making a request to

14   the producing party.

15        And then at that point, the burden shifts to the

16   producing party.  The producing party would be required if

17   there -- if it's not willing to agree, it would have to file a

18   motion to resolve the dispute with the Court.  So this doesn't

19   place the burden on the party seeking to use the information.

20   It places the burden, excuse me, on the party seeking to

21   protect the information.

22        And I think that's very, very important.  This is an

23   area where I think we agree that the Court has discretion in

24   terms of provisions to be included with respect to discovery

25   and pursuant to Rule 26(c).

52

1       Mr. Winograd has taken issue with the two cases we've

2  cited that support the proposition that you can have this type

3  of use restriction.  But, in fact, there are two cases that we

4  cited, both cases in which there were use restrictions like

5  these -- or like this that were adopted.

6       And again, I would just simply point out that ours is

7  not a blanket prohibition, as indicated by Mr. Winograd, but

8  instead, has a balance to it that permits the parties to take

9  an issue to the Court if they otherwise can't agree.

10       And, you know, we are concerned about two things in

11  particular, one of which happened in the prior case, which was

12  the disclosure of information produced in discovery to media

13  sources for the purposes of conducting a media campaign against

14  the bankruptcy.  We'd like to avoid that this time.

15       You know, it's one thing if the media has available

16  to it information that's in the public record in the case, but

17  to us it's something different again.  It's a different

18  situation where there's private information produced in

19  discovery that somehow finds its way into the press.

20       And probably the bigger reason, the bigger concern we

21  have is a concern that information produced in discovery in

22  this case will end up being used in tort litigation that's

23  being permitted to proceed outside of this case.

24       And Your Honor is already aware from the evidence

25  submitted in connection with Mr. Satterley's Valadez motion

53

1  that there was an express desire there in the Court to

2  basically try the propriety of LTL-1 and LTL-2 in the

3  bankruptcy case.

4          And we think that's problematic.  We think that

5  should be of concern to the Court that, you know, issues that

6  are bankruptcy issues should be dealt with in the bankruptcy

7  case, not in state court litigation.  And we think that's a

8  further reason for the use restriction.

9          So, Your Honor, we do think there's authority for

10  this.  We think it's appropriate, given the ability of the

11  parties seeking to use the information to overcome this use

12  restriction.

13          And I would just say, with respect to that, we think

14  the way it's drafted here appropriately balances the interest

15  of the parties in the sense that it provides -- it balances the

16  interests of the debtor and J&J in protecting otherwise private

17  documents from use in proceedings outside of the bankruptcy.

18  It protects the interests of the TCC and the claimants in using

19  information generated in discovery here and the other cases, if

20  there's an appropriate reason for doing so.

21          And I would point out, Your Honor, that it's never

22  really been entirely clear to us why this information needs to

23  be used, since this is not information that generally goes to

24  the merits of individual claims.

25          And then the third interest, Your Honor, that I think

54

1   that it balances is, frankly, Your Honor's interest in managing

2   this case and your ability to ensure that information being

3   generated in discovery here that's otherwise not public is not

4   being misused in some way outside of the case that's

5   potentially harmful to the bankruptcy case, potentially harmful

6   to the plan process, or harmful to whatever issues are pending

7   at the time.

8           So we would request that Your Honor approve the

9   protective order with this use restriction that we have in

10  there which, again, we think appropriately balances the

11  interest of all parties.

12          THE COURT:  Thank you.

13          MR. GORDON:  Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Gordon.

15          Mr. Thompson.

16          MR. THOMPSON:  Yes, Your Honor.

17          Okay.  So what they're asking you to do is to protect

18  non-confidential information, what they're describing as

19  private information.  There's no basis to do that.  There's no

20  private document exception.  J&J created this mess.  They put

21  all these documents in these matters at issue.

22          So let me give you an example.  That motion to

23  dismiss, Exhibit 161, that I've cited a bunch of times, it

24  lists the total amount of money that they settled talc claims

25  for.  If they hadn't have filed for bankruptcy, I wouldn't have

1   been entitled to see that.  But they did, and they put their

2   settlements at issue.

3           And so what they're asking you to do is essentially

4   enter a gag order that just facially violates the First

5   Amendment for non-confidential information, right.  And their

6   reasoning is that the information that they apparently think

7   they're going to be producing doesn't make them look very good.

8           Well, there's not confidentiality for information

9   that makes J&J look bad.  Okay.  They have no legal basis to

10  protect any of this information.  There's no private documents

11  exception.  And we object to anything -- any sort of restraint

12  on what is made available to the public in this matter.

13          Thank you.

14          THE COURT:  All right.  Thank you.

15          Well, my first inclination was to put in place -- I

16  wouldn't call it a use restriction.  It would be a notice

17  restriction.  I just don't see it as being necessary.  We are

18  dealing with non-confidential documents.  They are

19  discoverable.  They are -- their use is permissible.

20          That doesn't mean that the debtor is foreclosed, or

21  Johnson & Johnson, or any affiliated entity, or even a third

22  party can't come before me on an emergent basis to raise the

23  issue of whether there should be a restriction on its use if

24  it's for an improper purpose or a bad faith purpose.

25          The Court will make itself available on a shortened

56

1  time.  Everything in this case is filed on shortened time, so

2  it should be no surprise.  I don't see a need to have that

3  restriction put into the protective order version 2.0 when it

4  wasn't there the first time.

5          But the Court will remain available if there's any

6  issues, and the Court can change its mind if it turns out that

7  there is a piece of the provisions.

8          So, go ahead and enter into a protective order

9  without that provision.

10          MR. WINOGRAD:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. WINOGRAD:  Your Honor, should we now -- which

13  would you like to hear next?  Would you like --

14          THE COURT:  So --

15          MR. WINOGRAD:  There's a motion to --

16          THE COURT:  Why don't we address the term sheet

17  issue.

18          MR. WINOGRAD:  Sure.  Again, Your Honor, this is

19  Michael Winograd on behalf of Brown Rudnick, proposed counsel

20  for the TCC.

21          Your Honor, the -- again, for the record, the motion

22  to de-designate Exhibit A to the term sheet was -- the

23  arguments were set forth in an April 25th letter to the Court.

24  It was addressed in a May 3rd -- at a May 3rd conference where,

25  if you'll recall, the debtor agreed to de-designate everything

1   but Exhibit A to the term sheet.

2          It was also addressed in our motion, Docket 440, just

3   filed on May 5th.  And last night -- late last night, debtors

4   filed a response to that at Docket 136.

5          Your Honor, the entire term sheet was de-designated,

6   except for this one exhibit.  The one exhibit is labeled, and

7   this is -- you know, I will read the title into the record,

8   which I believe has been read previously and described

9   previously, Agreed Injury Criteria and Discount Percentages.

10         It sets forth who will get how much.  The term sheet,

11  Your Honor, and its exhibit were negotiated between J&J and

12  Mikal Watts, a plaintiff's lawyer, who was purportedly

13  representing talc claimants.

14         It has been used, including Exhibit A, to solicit

15  purported support for that term sheet that was -- came through

16  the PSAs which attached the term sheet at Exhibit A.

17         Let me just make a few very quick points, Your Honor,

18  because I know there's been briefing on this.  There is nothing

19  confidential about Exhibit A under the current protective

20  order, either 1.0, which the same relevant terms carried over

21  to 2.0 now as well.

22         There is an argument by LTL that it does, it contains

23  confidential proprietary business information.  This, again,

24  was something negotiated between J&J and an outside plaintiff's

25  lawyer.  There is nothing proprietary about it.  It's agreed

1  payment information in a plan.

2         Now, there are some generic cases that LTL cites in

3  its opposition with respect to confidentiality of term sheets.

4  This term sheet has been de-designated.  We're just talking

5  about the payment formula.  And here, unlike any of the cases

6  it cites, where you're talking about two parties, three parties

7  negotiating a settlement agreement, that is not what's

8  happening here.

9         This is a key part of a term sheet that is being

10 touted publicly as having garnered support by thousands of

11 claimants.  There's been a campaign.  It's been in the public

12 eye.  And all of that is because of J&J and LTL.

13        Number two, when they argue that it should be kept

14 confidential, they rely on NDAs that were purportedly entered

15 into between LTL on the one hand and the plaintiffs' firms on

16 the other.

17        Signing an NDA does not make something confidential.

18 But more importantly, Your Honor, they have outright repeatedly

19 refused to produce the NDAs.  They cannot on the one hand say

20 these were all provided to parties subject to NDAs and on the

21 other hand refuse to provide those actual NDAs.

22        We also believe, Your Honor, as we put in our brief,

23 that we believe on information and belief that it was, in fact,

24 shared with plaintiffs' law firms other than -- other than

25 those who have signed NDAs.

1    We've reached out to Mr. Watts to confirm that.  We

2  reached out on April 24th.  I understand from his law firm that

3  he's traveling.  We have not yet heard back.  But we understand

4  that they were provided to folks absent NDAs.  But in any

5  event, they will not provide the NDAs pursuant to which they

6  claim that these were provided in the first place.

7    Their second argument is that the -- I think that

8  Exhibit A was not introduced into the record, that it was

9  marked as an exhibit.  That is not true.  We've cited the exact

10  point.  If you look at our Docket 440, paragraph 6 and 8, it

11  was both marked and introduced into evidence.  It is a part of

12  the record, Exhibit A.

13    It was done so without objection.  It was marked at a

14  hearing.  It was discussed at a hearing.  There is no motion to

15  seal pending, Your Honor.  A judicial record, which this

16  undeniably is, right -- and, again, at their brief on page 6,

17  they say it was filed, but it -- it wasn't filed, but it was

18  just introduced.  It was filed as part of the record.

19    As an undeniable judicial record, it has to be de-

20  designated.  They would need to file a motion to seal, which we

21  all know is a high bar.  Once it is a judicial record, the

22  public is entitled to see it.

23    They cite one case, Your Honor, D'Amico, an Eastern

24  District of Wisconsin case that they say agrees to

25  designations, confidentiality designations with respect to term

60

1  sheets.  Again, that case explicitly -- and I think they even

2  note this in their parenthetical -- was dealing with a document

3  not only that had not been filed, but where the Court said

4  there's been no indication that it would ever be filed.

5       Next, Your Honor -- and, again, I believe the absence

6  of the NDAs alone warrants de-designation.  The fact that this

7  is a judicial record alone warrants judicial -- warrants de-

8  designation.

9       In addition, it was discussed in open court.  The

10  exact number that was derived from it, with respect to Mr.

11  Valadez, was stated in open court, without objection.  And

12  J&J's counsel then gave a settlement number, a confidential

13  settlement number, that was proposed during settlement

14  negotiations and said that number also tracked from the

15  formula.

16       They have touted this plan publicly, Your Honor.

17  They have touted the total payment.  They've said it fairly

18  compensates victims and that they have support for it, but they

19  simply won't disclose who is getting paid how much.

20       They can't do that, Your Honor.  The term sheet has

21  been de-designated.  Exhibit A should go along with it.

22  There's simply no basis to keep it confidential.  And to the

23  extent there ever was, it has to have been waived.

24       I will add one other point, Your Honor.  The plan

25  itself has now been made public.  It provides a formula, and

61

1  that's public.  There's now even less of an argument to

2  conceivably keep what apparently was a draft formula that was

3  shared and used to solicit support confidential when the final

4  is out in the public.  There won't be any confusion, as debtor

5  claims.  The plan is the plan, but we are entitled to de-

6  designate whatever that draft of that -- of that formula was.

7          Thank you, Your Honor.

8          THE COURT:  Thank you, Mr. Winograd.

9          Mr. Torborg.  And if you would address, Mr. Torborg,

10  the last issue, because I haven't looked at what was filed, the

11  plan and disclosure statement.

12          Are the terms that appear in the term sheet -- have

13  they been included in the plan or disclosure statement?

14          MR. TORBORG:  Can you hear me okay, Your Honor?

15          THE COURT:  Yes.

16          MR. TORBORG:  This is David Torborg.

17          THE COURT:  Yes, I can.

18          MR. TORBORG:  Great.  You know, as it happens, I was

19  going to start with that issue.  And we think it actually

20  supports the debtor's position here.

21          The terms that are in Exhibit A are really a

22  precursor to the TDPs that are included as Exhibit M of the

23  plan.  There are some differences between those TDPs and the

24  terms that are in Exhibit A.

25          So we believe that disclosing Exhibit A would just

62

1  cause confusion that is completely not necessary here.  The

2  need that they've cited in their brief, that the public needs

3  to see these terms so they can decide whether to support it,

4  that's been rendered moot, because the terms are -- the terms

5  that the plaintiffs will be asked to decide upon are the TDPs.

6  So there's really no need now to disclose the terms of Exhibit

7  A.

8        To the extent that there is some other need to see

9  the terms of Exhibit A, the TCC has it.  Any other party who

10  wants to see it can sign a protective order and get a copy of

11  it, any interested party that wants to get it.  And I don't

12  know why anyone would want to do that, because the terms are

13  now in the TDPs.

14        Exhibit A is confidential.  Movants spend most of

15  their arguments in their briefing talking about waiver issues,

16  which I'll get to in a second.  But there really shouldn't be

17  any serious disagreement that the terms that resulted from

18  extensive settlement negotiations over a number of years are

19  not confidential material.

20        Indeed, Mr. Winograd, during Mr. Murdica's

21  deposition, objected to testimony about the term sheet,

22  describing it as confidential settlement communications.

23        We have cited a number of decisions in our brief for

24  the proposition that settlement discussions and term sheets are

25  confidential.  Against all of that, the TCC argues that Exhibit

63

A is not confidential because it sets forth the terms of a

potential plan that is being actively marketed to lawyers.

But Exhibit A was only shared with law firms willing to sign an

NDA, which itself underscores its confidential nature.

Mr. Winograd argues today that we can't reply upon

these NDAs because we haven't produced them, but it cites no

authority for this novel proposition that a company must

disclose all who sign an NDA before it can assert

confidentiality over a document covered by it.  There is no

reason and no legal basis that we're aware of for such a

requirement.

Now, Mr. Winograd speculates that on information and

belief certain third-party plaintiffs' lawyers, including Mr.

Watts, shared and discussed the term sheet with other plaintiff

firms.  It cites no evidence of this, and it had -- the TCC had

the opportunity to depose Mr. Watts.

The only evidence in the record is that Exhibit A was

shared under the protections of a confidentiality agreement.

Mr. Watts specifically testified about that.

In any event, even if Mr. Watts did share Exhibit A

with somebody else -- no evidence of that -- that says nothing

about whether J&J or LTL waived any confidentiality.  So we

think that's just a non-issue.

And then finally, with respect to the claim that

confidentiality was lost because the term sheet was discussed

64

1  in open court where the debtor filed the document in connection

2  with a PI record, we don't believe either argument is correct.

3         First, no witness was asked about Exhibit A in

4  particular.  It was not shown in the courtroom.  In fact, Your

5  Honor might remember, last week there was a little bit of a

6  dust-up with Mr. Birchfield when he had inadvertently showed

7  the term sheet on the Zoom link in court.

8         So the debtor has been very cognizant of whether that

9  document is getting out and they have talked to the public and

10 has taken precautions against that.

11        As to the notion that it's a judicial record because

12 it was filed with the Court, that does not automatically mean

13 that it loses its confidentiality status.  When the parties

14 submitted their exhibits in camera to the Court, the debtor

15 marked this Exhibit A as confidential and there was no

16 challenge to that at the time.

17        None of the cases that the TCC has cited support the

18 notion that filing a document into the record automatically

19 defeats confidentiality protection.

20        And finally, you know, courts have long recognized

21 the sensitivities around disclosure and settlement

22 negotiations, given the likelihood of public disclosure will

23 chill, you know, settlement negotiations.  I think the same is

24 true here.

25        And finally I would note, on the topic of judicial

1  records, that nothing in the Court's decision on the PI appears

2  to rely at all upon the terms of Exhibit A.  So we're not

3  dealing with a situation where the public is being deprived of

4  information that was material to its decision.

5          So for all those reasons, we think the motion should

6  be denied.  And unless Your Honor has any questions, that's all

7  I have.

8          THE COURT:  All right.  Thank you, Mr. Torborg.

9          MR. TORBORG:  Thank you.

10         THE COURT:  Ms. Richenderfer?

11         MS. RICHENDERFER:  Thank you, Your Honor.  Linda

12  Richenderfer, counsel for the U.S. Trustee.

13         Your Honor, I'm just observing something that I hear

14  developing throughout this morning's conference.  We have --

15  debtor is arguing that their plan is supported by an

16  overwhelming majority of claimants.  And Your Honor has raised

17  the issue of the application of 1112(b)(2)(a), which requires

18  that the -- there is reasonable likelihood that a plan will be

19  confirmed.

20         And now we're hearing that the term sheet, which is

21  the basis of debtors claiming that a majority of the claimants

22  support their plan, that the term sheet does not match all of

23  the TDPs, which they say is the portion of the plan we should

24  be looking at.

25         And so, Your Honor, I think what's happening is that

1  they're putting at issue -- I think the debtors are putting at

2  issue what is in the exact term sheet, because if they're going

3  to come into court for the motion to dismiss and continue to

4  argue a majority of people support this, and the majority of

5  people agree to a term sheet that we're now told is different

6  than what's in the plan, and we even heard from counsel for the

7  Ad Hoc Committee that there are some differences and they're

8  looking into them, then I think that the term sheet, if for no

9  other reason, has been put at issue by the debtors and for that

10 reason alone should be disclosed.

11        I know that the U.S. Trustee's office has never seen

12 it.  And I know that when questions were asked during the

13 depositions I attended for the preliminary injunction, the

14 claim -- privilege, common interest, settlement discussions,

15 various different objections were made depending on who was

16 defending the deponent.

17        But I think that it has now been put issue.  So, as I

18 said, regardless of what occurred in the past for the

19 preliminary injunction, it's at issue now, I believe.

20        Thank you, Your Honor.

21        THE COURT:  Thank you, Ms. Richenderfer.

22        Mr. -- before I go back to Mr. Winograd, Mr.

23 Satterley.

24        MR. SATTERLEY:  Yes, Your Honor, very briefly.  Joe

25 Satterley, Kazan McClain Satterley & Greenwood.

1          I filed a brief on this issue.  The document was

2     introduced into evidence.  I argued from it in closing

3     arguments and specifically said -- told Your Honor what Mr.

4     Valadez would be entitled to under the plan.  There was no

5     objection.  $50,000 is all you would be entitled to under that

6     term sheet.  There was no objection by the debtor or by anybody

7     else.

8          Under the case law submitted and the brief that we

9     submitted, this is a judicial record.  It must be deemed to be

10    non-confidential.  It's not a secret.

11         And I would echo what the U.S. Trustee just said.  I

12    looked at the plan last night and this morning, and to me it

13    looks substantially similar to the term sheet, but now that the

14    debtor says there's differences, the public has a right to know

15    what's the difference between all these alleged 60,000 or

16    70,000 people's agreements, which I don't really believe has

17    occurred, and this what's now been submitted.

18         We have a right to know, the public has a right to

19    know, the media has a right to know, the women and men that are

20    going to vote on this have a right to know.  So I would

21    strongly urge Your Honor to deem this to be non-confidential

22    and allow this -- allow everybody to see both the term sheet

23    and compare it to the plan that was filed last night.

24         Thank you, Your Honor.

25         THE COURT:  Thank you, Mr. Satterley.

1          Mr. Thompson.

2          MR. THOMPSON:  I'll be brief.  Everyone's touched on

3   all the good stuff.

4          I would just point out -- I would just point out that

5   the sole basis that the debtor and the ad hoc group are telling

6   you, Your Honor, the Court has jurisdiction over this matter is

7   based on votes.  And it's based on the credibility of Mr.

8   Murdica and Mr. Watts and Mr. Pulaski and everybody else that

9   was involved in negotiating Exhibit A and now this plan.

10          And the public needs to be able to determine what

11   differences, if any, exist between Exhibit A and this current

12   iteration of the plan, which, depending on who you talk to and

13   what motion they're arguing, is either binding on everybody or

14   is subject to negotiation.

15          All of this needs a lot of sunlight, Judge.  Thank

16   you.

17          THE COURT:  Thank you, Mr. Thompson.

18          Mr. Winograd.

19          MR. WINOGRAD:  Your Honor, I will -- I will start

20   where Your Honor started and where Ms. Richenderfer left off.

21          As you heard from counsel, they have now published

22   effectively Exhibit A.  The numbers are a little bit different.

23   The formula is a little bit different, maybe.  I haven't done a

24   close compare.  But the numbers are now public, and the issue

25   has been made public.  There is absolutely no basis to withhold

1  the prior iteration of that, what Mr. -- what counsel called a

2  precursor.

3          In addition, Your Honor, it's not entirely moot,

4  because those numbers remain the numbers that we were told were

5  supported by these 60-plus thousand unfiled claimants.

6          Your Honor, with respect to the NDA, Mr. Torborg

7  raised -- said, you know, well, we only did it pursuant to

8  NDAs.  Again, NDAs don't create confidentiality.  And with

9  respect to the legal basis that you have to produce the NDAs, I

10 can't understand how -- what basis there would be to assert a

11 confidentiality based on a document and then refuse to produce

12 the actual document so folks can verify it.  That, to me, just

13 is -- is absurd, Your Honor.

14         Your Honor, it was mentioned in open court.  The

15 numbers were given.  We were told those numbers tracked with

16 the formula.  And that happened twice, once by Mr. Satterley as

17 he again explained, and once again, as I mentioned, by counsel

18 for J&J in public.

19         Mr. Torborg argued that if Mr. Watts shared the

20 document with people who didn't sign the NDA -- and, again, we

21 don't have -- we understand that on identification and belief.

22 We're waiting for a response from -- you know, we've been

23 waiting a couple of weeks for a response from Mr. Watts.  It is

24 equally his document as it was J&J's.  There was a document

25 that apparently J&J and Mr. Watts negotiated and put together.

1          The point on judicial record, we're not arguing

2   judicial records are automatically, you know, accessible to the

3   public.  But there is a strong presumption, as we noted in our

4   briefing, and a motion to seal is required.  We all know the

5   high standard on a motion to seal.  And that just simply hasn't

6   been met.  It's a judicial document.  It's been discussed twice

7   in open court.  There's just no basis to keep it confidential.

8          With respect, Your Honor, to settlement negotiations,

9   again, these are not generic settlement negotiations.  This is

10  an actual term sheet that has been touted publicly in an

11  important case as having garnered support and as providing fair

12  compensation to the victims.

13         There's simply for five or six different reasons,

14  including the fact that it's subsequent iteration is now public

15  and at issue, there are five or six independent bases to de-

16  designate Exhibit A.

17         Thank you, Your Honor.

18         THE COURT:  Thank you, Counsel.

19         Because the information is available -- to the extent

20  it comports with what's listed in the term sheet is available

21  as part of the filing by the debtor last night or early this

22  morning, the public has access to such information.

23         The concern I have is that there is a substantial

24  risk of prejudice and confusion.  This is not the document that

25  is going by -- that this court has approved to go out to the

1    public.  There's been no -- we're far away from approving a

2    disclosure statement with terms that the public can view and

3    consider.  These terms arise from settlement discussions that

4    can and in all likelihood will change as the process goes

5    forward.

6            Indeed, as I've indicated, the Court does not have

7    the benefit of even a view or an opinion put forward by the

8    future claims representative as to the merits of any numbers

9    included in any matrices or the like.

10           It would simply prejudice and cause confusion to have

11   multiple sets of numbers available.  The information is

12   available in discovery, consistent with protective orders.  No

13   parties are being disadvantaged.  And it doesn't mean that once

14   the disclosure statement process moves forward, if it does move

15   forward, and we have to see in what context, that the document

16   is inappropriate to be de-classified as far as confidentiality.

17           So I am not going to order the removal of the

18   designation at this time, but will revisit it as part of the

19   disclosure statement process.  Also, I don't see it as

20   necessarily relevant to the motion to dismiss.  The actual

21   dollars per victim, depending upon nature of injuries and

22   credits to be accorded, don't touch on the issues relative to

23   financial distress or the like.

24           And I'm happy to reconsider as we progress going

25   forward.

72

1           Mr. Satterley?

2           MR. SATTERLEY:  Yes, Your Honor.  I just want to

3    clarify so the record is absolutely 100 percent clear.

4           The term sheet that we're talking about here is the

5    only thing that remains confidential from the PI hearing and

6    the discovery that we had, based upon Your Honor's previous

7    ruling, correct?

8           THE COURT:  Correct.

9           MR. SATTERLEY:  Okay.  Thank you, Your Honor.  That's

10   all I had.

11          THE COURT:  The exhibit -- I believe it's the exhibit

12   to the term sheet.

13          MR. SATTERLEY:  Yes, the exhibit to the term sheet.

14   Yes, Your Honor.  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Next matter, the --

17          MR. WINOGRAD:  Your Honor --

18          THE COURT:  Mr. Winograd.

19          MR. WINOGRAD:  Your Honor, this is Michael --

20          THE COURT:  Yes.

21          MR. WINOGRAD:  This is Michael -- I'm sorry, Your

22   Honor.

23          THE COURT:  No, go ahead.

24          MR. WINOGRAD:  We've got the motion to unredact and

25   we have the motion with respect to the common interest

1 privilege, whichever Your Honor would like to hear first.

2        THE COURT:  Let's address the motion to -- I'm sorry,

3 te common interest issue.

4        MR. WINOGRAD:  Sure.  And for that, Mr. Jonas is

5 going to handle that for us, Your Honor.

6        MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

7 from Brown Rudnick.

8        THE COURT:  Good morning, Mr. Jonas.

9        MR. JONAS:  A pleasure to see you again.  For the

10 record, Your Honor, Jeff Jonas, Brown Rudnick, proposed counsel

11 for the Talc Claimants Committee.

12        Your Honor, we are seeking an order compelling the

13 debtor to produce documents relating to the termination of the

14 2021 funding agreement.

15        The debtor asserts that all such documents are

16 subject to a common interest privilege between the debtor and

17 JLJ -- I'm sorry -- Johnson & Johnson, J&J.

18        As the Court is aware, the debtor and J&J terminated

19 the 2021 funding agreement allegedly because it became, quote,

20 void or voidable, close quote, when the Third Circuit issued

21 its opinion in January 2023 dismissing the first bankruptcy

22 case.

23        Your Honor, I won't restate all of the arguments in

24 our motion, but instead will try to reply to the arguments made

25 in J&J's response in objection and the debtor's objection, both

74

1  filed late yesterday or last night.

2       First, I'd like to make sure parts of the record here

3  are very clear.  Johnson & Johnson, at least twice in its

4  reply, states, quote, The value of the prior funding agreement

5  was the amount of the liability minus the value of the debtor,

6  not $60 billion, and that did not change with the new

7  agreements.

8       Your Honor, this -- this also shows up in the

9  debtor's reply or objection.  This is tortured and misleading.

10 At the preliminary injunction trial on the 18th of April, and

11 among other places, page 66, line 18, through page 67, line 15,

12 Mr. Kim confirmed that J&J's total funding agreement exposure

13 went from $60 billion to $8.9 billion.

14      Also, both J&J and the debtor have refused to answer

15 questions about termination of the funding agreement.  For

16 example, Mr. Kim, at his deposition on April 14th, page 83,

17 line 1, through page 84, line 4 -- I'd just like to read this

18 into the record, Your Honor.  It will be brief.

19      "The parties to the funding agreement are LTL, right?

20      "Answer:  Yes.

21      "Question:  Johnson & Johnson Consumer, Inc., right?

22      "Answer:  Yes.  You're talking about the old --

23      "Question:  Yeah, the old funding agreement and

24 Johnson & Johnson, right?

25      "Answer:  Yes.

1          "Question:  So did you ever discuss with those

2     parties whether they thought the funding agreement was void or

3     voidable?

4          "Answer:  There were discussions among counsel for

5     those parties.

6          "Question:  Well, let me ask you, was Johnson &

7     Johnson or JCI, their view that the agreement was void or

8     voidable?"

9          Ms. Brown interposed, "I think that's going to

10    implicate legal advice and would cause you to speculate as

11    well, so I object.

12         "Can you answer that question without divulging

13    information of other lawyers that you may also have a privilege

14    with under the common interest?

15         "Witness:  No, but --

16         "Ms. Brown:  Okay.  Then I'm just going to instruct

17    you not to answer."

18         Similarly, Your Honor, Mr. Haas at his deposition on

19    April 14th, page 128, line 3 through 23.

20         "Question:  Mr. Haas, who at Johnson & Johnson had

21    any role in agreeing to terminate the 2021 funding agreement

22    prior to April 4th, 2021?

23         "Ms. Brown:  Well, that assumes facts.  I object,

24    lacking foundation.  And to the extent you have that knowledge

25    independent of your role as worldwide head of litigation, you

1 can answer.  If not, I object and instruct.

2          "Answer:  That is covered by an implicated

3 attorney/client privilege and the work product protection.

4          "Question:  Mr. Haas, are you aware, yes or no, of

5 whether J&J and LTL agreed to terminate the 2021 funding

6 agreement while the first LTL bankruptcy was still pending?

7          "Ms. Brown:  I object, privileged.  I instruct him

8 not to answer."

9          I thought it was important to put these into the

10 record, Your Honor, to give some context to what we're talking

11 about today.

12          The Committee has been unable to get at the facts

13 surrounding termination of the 2021 funding agreement, the

14 document which in its first bankruptcy case the debtor extolled

15 the virtues of because it would ensure fair and equitable

16 recoveries of all talc claimants.

17          I think it's also important, Your Honor, to point out

18 that the debtor and J&J carefully planned and instituted using

19 only lawyers in connection with the termination of the funding

20 agreement so as to strategically be able to assert privileges

21 and joint interest to shield any discovery as to what happened

22 here, all to the disadvantage of their creditors, victims, and

23 the TCC.

24          Of course, Your Honor, the debtor and J&J selectively

25 choose when to use privileges and common interest as a shield

1   and when to do so as sword.  For example, notwithstanding

2   opposing production of documents relating to termination of the

3   funding agreement, the debtors have confirmed in writing that

4   at the motion to dismiss trial, they will put forth Mr. Kim as

5   a witness to testify, among other things, about, quote, the

6   material risk of unenforceability of the 2021 funding agreement

7   on and after January 30th, 2023, close quote.

8          And they've also told us they'll put forward Mr.

9   Haas, who will testify about, quote, the position of Johnson &

10  Johnson concerning the unenforceability of the 2021 funding

11  agreement on and after January 30th, '23, close quote.

12         Your Honor, with that background, the common interest

13  is inapplicable here where the parties in question, here the

14  debtor and Johnson & Johnson, are adverse to each other.

15  Johnson & Johnson and the debtor argue that they were not and

16  are not adverse to each other because they are aligned against

17  a, quote, common enemy, close quote.

18         They actually used those words, Your Honor, in

19  referring to talc victims and creditors.  Again, a common

20  enemy.  Yet, they missed a step here, Your Honor.  When the

21  Third Circuit issued its opinion and, according to them, the

22  funding agreement became void or voidable, the debtor and

23  Johnson & Johnson were, in fact, adverse, effectively on

24  opposite sides of the "V."

25         J&J wanted to eliminate or minimize its exposure, and

1  the debtor, a fiduciary to talc victims and its creditors,

2  should have wanted to maintain or maximize Johnson & Johnson's

3  exposure or liability.  Thus, there could be no common

4  interest, at least at that point in time.

5        Even if they were trying to negotiate a resolution

6  relating to termination of the funding agreement, until that

7  was done, they were clearly on opposite sides of the "V" and

8  clearly adverse.

9        Your Honor, I would actually reference a case cited

10  in Johnson & Johnson's reply, the Leslie Controls case, 437

11  B.R. 493, a Judge Sontchi case out of Delaware in 2010, at page

12  501, where the Court said, "The common interest exception does

13  not protect information exchanged among parties simply because

14  they are negotiating toward what they hope will be an

15  agreement.  During negotiations, adverse parties have no common

16  interest and, indeed, their interests are in conflict.  Each

17  party wants to get the best deal from the other.  And to the

18  extent that one is successful in that goal, the other suffers.

19  And as a result, until an agreement is actually reached, it is

20  not objectively reasonable for a negotiating party to believe

21  that a communication of privileged material to other

22  negotiating parties was confidential and thus protected by the

23  common interest privilege, because while negotiating parties

24  may all have hope for a successful outcome, each side is

25  representing its own interest and a successful outcome was not

79

1  assured."

2          And of course, Your Honor, as set forth in Teleglobe,

3  493 F.3d 345, 2007, Third Circuit Court of Appeals,

4  particularly by Judge Ambro, at page 378, stated, "It is not

5  the case that parents and subsidiaries are in a community of

6  interest as a matter of law."

7          He goes on to say that, "A broader rule would wreak

8  havoc."

9          I would also like to point out, Your Honor, that here

10  we are completely in the dark.  We don't even know the who,

11  what, where, or when regarding termination of the 2021 funding

12  agreement.  How can we effectively respond to assert privilege

13  and common interest assertions?  We can't.  We have no

14  privilege logs.  The debtor has not produced any documents for

15  in-camera review.

16          Your Honor, this came up in the Leslie case, which

17  I've already cited, where both of those were required.  And

18  while, Your Honor, I think on its face, and as I've -- I hope

19  I've demonstrated, there should be no common interest permitted

20  here.

21          If that's not your view initially, I would urge the

22  Court to require that privilege logs be produced and that all

23  relevant documents be produced to the Court for in-camera

24  review.

25          My last point, Your Honor, I want to make is even if

80

1  a common interest did apply, which it doesn't, we believe that

2  the crime fraud exception is applicable here, because these

3  communications were made in furtherance of a fraud.

4          Here what has been referred to, I think even by the

5  Court, as potentially the largest fraudulent transfer in U.S.

6  history.  We cite the <u>Chevron</u> case, 633 F.3d 153, a 2011 Third

7  Circuit Court appeals case, Your Honor.

8          Your Honor, for all of those reasons, we urge the

9  Court to compel production of all documents responsive to our

10 request which we've made relating to the termination of the

11 2021 funding agreement.

12         Obviously, Your Honor, we would hope that this would

13 -- this order would also extend to depositions, which will

14 follow production of the documents.

15         Thank you very much, Your Honor.

16         THE COURT:  All right.  Thank you, Mr. Jonas.

17         The Court needs to take a 10-minute break, or else my

18 staff will walk out on me.  So before I turn to Mr. Thompson

19 and then to the debtor, it's 12:03.  Why don't we come back at

20 12:15.  Thank you.

21                      (Recess)

22         THE COURT:  Okay.  It's like a TV production.  We're

23 back.  And if I recall, Mr. Thompson, you had your hand up,

24 before I go to debtor's response.

25         MR. THOMPSON:  Yes.  Thank you, Your Honor.  So what

1  we're seeing here in this assertion of common interest

2  privilege is a complication of what happens when you try to

3  overcome the tort system without the obligations of a

4  bankruptcy filing.  So I'm going to quote to you from a portion

5  of the ABI seminar that I've attached as an exhibit many times.

6          This is page 27.  This is Mr. Gordon speaking:

7          "I've heard judges say that the problem is that

8          you've got the affiliates and the debtor is never

9          going to enforce the funding agreement.  So that's

10         the problem.  You have the funding agreement, but the

11         claimants are now a step removed.  The debtor isn't

12         going to enforce it."

13         This is page 28, line 5:

14         "And my reaction to that is that's the -- that's kind

15         of an insult to the bankruptcy judge.  So we're there

16         in the bankruptcy court.  We're a debtor in

17         possession.  We're a fiduciary.  We elect not -- the

18         other side breaches.  We elect not to enforce.  Is

19         the bankruptcy judge going to not let us get away

20         with that?"

21         So that's April of 2022.  Then before the Third

22  Circuit, Mr. Katyal, who you recall, very prominent lawyer and

23  advocate, before the Third Circuit at page 65 -- this was

24  attached to, I believe, my opposition or joinder to this

25  motion.  "This funding agreement" -- this is Mr. Katyal to the

82

1    Third Circuit:

2            "This funding agreement gives the entire value of

3            JJCI, the entire value, 61 billion, free and clear to

4            the potential claimants so that the entire pot of

5            money is available."

6        Going down to the next paragraph:

7            "The funding agreement -- this is quite important to

8            our argument.  The funding agreement itself bars

9            that.  Or if it occurred, if there was -- if there

10           were any payments to J&J or to shareholders or

11           anything like that, distributions, all of that

12           increases the $61 billion pot.  61 billion is only a

13           floor, not a ceiling."

14       And that's what he said.  It's only a floor, not a

15   ceiling.  $61 billion.  And as Your Honor recalls, Mr. Gordon

16   on February 18th and Mr. Katyal to the Third Circuit said that

17   the funding agreement applied inside and outside of bankruptcy.

18       So then in January we have an opinion by Judge Ambro

19   that says at page 109 or 108 -- at the end of page 108:

20           "From these facts presented by J&J and LTL

21           themselves, we can infer only that LTL at the time of

22           its filing was highly solvent with access to cash to

23           meet comfortable its liabilities as they came due for

24           the foreseeable future."

25       Skipping ahead a little bit.  Further on, on page

83

1  109.  And importantly, Your Honor, this was a part of the

2  opinion that they added specifically on March 31st, four days

3  before J&J filed its second bad-faith bankruptcy.  "This all

4  comports with the theme LTL proclaimed in this case from day

5  one.  It can pay all current and future claim talc claim

6  claimants in full."

7       And then at the next paragraph: "We take J&J and LTL

8  at their word and agree.  LTL has a funding backstop not unlike

9  an ATM."  Your Honor is familiar with that language.

10      And so what's happened here is that J&J tried to

11  outsmart the Bankruptcy Code.  And their arguments to you in

12  February of last year and to the Third Circuit in their

13  briefing and at oral argument was that the funding agreement

14  cured all of the allegations of a fraudulent transfer.  There's

15  no fraudulent transfer, because the funding agreement exists

16  inside and outside of bankruptcy.  And the funding agreement is

17  worth at least $61 billion.

18      So then they lose on that ground.  So now they got a

19  problem, because they've got a funding agreement that's worth

20  61 billion, and the Third Circuit has now found that they filed

21  in bad faith.  So now they've got to commit some fraud.

22      Now, 524(g) is not a menu choice for billionaires.

23  So J&J created LTL Management solely -- the sole purpose of LTL

24  Management's existence is to buy a channeling injunction for

25  its non-debtor controlling parent, Johnson & Johnson.

84

1          So after the Third Circuit takes J&J at its word,

2     takes LTL at its word, takes Mr. Gordon at his word that these

3     funding agreements are enforceable, the bankruptcy judge will

4     not allow these funding agreements to not be enforced or if we

5     try to not enforce them, which is exactly what's happening

6     here.  J&J under your -- or LTL under your jurisdiction has

7     committed fraud, Your Honor.  They did.  They're trying to give

8     away the funding agreement so they can generate financial

9     distress.  And they're doing it in your courtroom under your

10    jurisdiction.

11          And so the talc creditors are entitled to every

12    communication that took place between LTL and J&J that show

13    this fraud.  J&J cannot get a channeling injunction through

14    LTL.  And its only argument in opposition is essentially we've

15    got a common enemy.  The common enemy are plaintiffs

16    represented by people like me who actually have cases that are

17    worth something more than zero in the tort system which the

18    Ad Hoc Committee cannot say.

19          The Ad Hoc Committee doesn't say how many claims they

20    represent.  And for all we can see, all of these cases that

21    they claim they represent are worth zero in the tort system.

22    They're not bringing them in the tort system.

23          So what we see here is J&J buying off lawyers.  The

24    kinds of lawyers that they bashed February before you in your

25    motion to dismiss trial they're now very eager to make a deal

1  with.

2        So they've committed fraud.  The claimants have to be

3  able to see it.  And just saying that, well, we have a common

4  enemy -- the people that we poisoned, they're our enemy.  And

5  we have a common enemy, and because we have a common enemy, you

6  can't see how we committed all the fraud.  Your Honor, it's not

7  right.

8        And this Court has not always agreed with my opinions

9  on things, which I appreciate.  But this is crystal clear.

10 Communications between J&J and LTL under your jurisdiction are

11 discoverable.  The claimants are entitled to see them.

12       There is billions and billions of dollars that LTL

13 gave away after they were leaned on by J&J.  And it's not

14 right.  We have to be able to investigate it, unless, of

15 course, Your Honor would dismiss the case, which I would

16 happily accept as well.  Thank you.

17       THE COURT:  Thank you, Mr. Thompson.

18       Mr. Torborg?

19       MR. TORBORG:  Good afternoon, Your Honor.  Again,

20 David Torborg, Jones Day, on behalf of the debtor.  Before I

21 get into what I was planning to say, I think I need to do a

22 pretty important clarification in response to what Mr. Jonas

23 was arguing.  He was suggesting that we have withheld all

24 communications, all documents that have anything to do with

25 termination and replacement of the funding agreement.  And

86

that's just not accurate.

John Kim and Mr. Haas both were allowed to testify that there were discussions about this issue, when they occurred, and what their positions were. Okay? What we have been withholding are privileged communications. Okay? That's what we're withholding.

And this notion that Mr. Jonas has that we have no idea what their argument is, that's not true. They've seen in our declaration -- first day declaration what our position is and why we believe the agreement was rendered unenforceable. So it's not like they don't have any idea where we're going with this.

It's a legal issue that'll be vetted in the briefing. Okay? It's not a basis to suggest, you know, to vitiate this important privilege.

So that's what I was going to say. Since the corporate restructuring that created LTL and to -- before the first bankruptcy, J&J, LTL, and New JJCI have been parties to a common interest agreement, written common interest agreement that continues in effect today. Corporate affiliates often have common interests. This does not change simply because the corporate affiliates are counterparties to a contractual agreement, the other sides of an agreement.

The Third Circuit seminal opinion in <u>Teleglobe</u> -- which, you know, it's shocking to me that their motion didn't

1    even mention this case -- makes that very clear.  The court

2    stated,

3         "Thus, the community of interest privilege," its

4         terminology for the common interest privilege,

5         "allows attorneys representing different clients with

6         similar legal interests to share information without

7         having to disclose to others.  It applies in civil

8         and criminal litigation and even in purely

9         transactional contexts."

10        Relying on this very language in Teleglobe, the

11   District of New Jersey's decision in the Louisiana Municipal

12   Police Employees case says the same thing:

13        "The fact that parties may be on adverse sides of a

14        business deal does not compel the conclusion that the

15        parties did not share a common legal interest such as

16        when the parties may face the possibility of joint

17        litigation in which they would share a common

18        interest."

19        So and Mr. Jonas' discussion of the Leslie Controls

20   case is -- was completely off.  What he was quoting was the

21   parties' briefing on the other side that was trying to vitiate

22   the privilege.  The court actually found a common interest did

23   exist between people on the other side of a transaction.

24        So getting back to the basic elements.  There are

25   three requirements for the application of the common interest

88

1  protection.  First, the communications were made by separate

2  parties in the course of the matter of common interest.  Two,

3  the communication was designed to further that effort.  And

4  three, the privilege has not otherwise been waived.

5       The communications they're seeking here meet all

6  three of those requirements.  The first two are kind of

7  related, so I'll address those at the same time.

8       As stated in our brief, LTL and J&J share a common

9  interest in effectuating and upholding the fundamental purpose

10 of the 2021 funding agreement in seeking to resolve current and

11 future talc claims through bankruptcy.  The TCC declares in its

12 motion and here today that the potential termination of the

13 funding agreement created adverse interests between LTL and

14 J&J, because any termination would strip LTL of more than $60

15 billion.  That is wrong both factually and legally.

16      First, the termination of the 2021 funding agreement

17 did not strip LTL of $60 million (sic passim).  The value of

18 that agreement is the extent of the talc liability minus the

19 value of the debtor, not $60 million.  The TCC makes no

20 argument in its motion or here today that the talc liability

21 exceeds -- or is at $60 billion.

22      Mr. Jonas suggests, well, we don't need to worry

23 about what it is, because they still have adverse interests.

24 Well, in order to determine whether they are adverse interests,

25 you have to determine what was left after the funding agreement

89

1  was amended and was terminated and replaced.  A new funding

2  agreement was entered into with HoldCo which the record

3  evidence has established has a value of approximately $30

4  billion.  The TCC advances no argument nor any evidence that

5  this amount is insufficient or that LTL was rendered insolvent

6  as a result of its -- of this transaction.

7          On this record, there is simply no basis for what the

8  Third Circuit termed in Teleglobe the exception for adverse

9  litigation.  There, the court noted that the common interest

10 might be overcome where the parties to the common interest sue

11 one another.  That has not occurred.

12         The court also noted that in the parent wholly owned

13 subsidiary context, there might be a divergence of interest if

14 the debtor is -- if the subsidiary is insolvent.  Again,

15 there's no evidence in the motion or on this record to support

16 that.  Teleglobe controls, and it calls for denying the motion.

17         Finally, on the third requirement, waiver, there's no

18 basis in this record to suggest that either LTL or J&J waived

19 its common interest.  As stated in our response, the Third

20 Circuit law on this is very clear in the Rhone-Poulenc

21 decision.  It distinguished a situation where a party places

22 its attorney/client communications directly at issue to support

23 its claim and situations where it doesn't.

24         And the court noted:

25         "Relevance is not the standard for determining

90

1          whether or not evidence should be protected from

2          disclosure as privileged, and that remains the case

3          even if one might conclude the facts to be disclosed

4          are vital, highly probative, directly relevant, or

5          even go to the heart of the issue."

6     Here, neither LTL nor J&J has put the substance of

7 its communications, the attorney/client substance, the work

8 product, at issue to prove its position.  Nor does it intend

9 to.

10     Finally, there's no basis to apply the crime fraud

11 exception.  There's been no showing of a crime here.  It's sort

12 of like a throwaway in their brief.  They don't develop it at

13 all.  There's no evidence to support a fraud.  There's no basis

14 to apply it at this time.

15     For all those reasons, the motion should be denied.

16 I'll be happy to ask any -- happy to answer any questions.

17     THE COURT:  All right.  Thank you.

18     Mr. Jonas, is there any response?

19     MR. JONAS:  I'll be very brief, Your Honor.  Thank

20 you.

21

22     MR. TORBORG:  Excuse me, Your Honor.  I --

23     MR. STARNER:  Yeah.  If I may, Your Honor?

24     THE COURT:  Mr. Stamer?

25     MR. STARNER:  It's Starner.  It's Greg Starner --

1            THE COURT:  I'm sorry.

2            MR. STARNER:  -- on behalf of Johnson & Johnson.  And

3    I'll be brief, if I may?

4            THE COURT:  Yes, please.

5            MR. STARNER:  Thank you, Your Honor.  So just to

6    follow up on a few points that my colleague, Mr. Torborg hit

7    on.  I think, fundamentally, it doesn't sound like there's a

8    real dispute about the common interest underlying the

9    communications at issue.  In fact, we've heard a lot from

10   Mr. Thompson and others loudly complaining about that common

11   interest.  It was suggested at the beginning of their original

12   bankruptcy filing and the original 2021 funding agreement

13   which, in short, was a common interest between LTL and J&J to,

14   you know, together resolve all current and future talc claims

15   in bankruptcy and to fund a settlement trust to achieve that.

16           So that is the common interest that kind of

17   underlines, you know, the communications at issue.  And that

18   was a goal that animated the original filing, as I said, and

19   the original funding agreement.

20           Now, after the Third Circuit ruled, that common

21   interest continued and remained.  And the legal discussions

22   kind of at issue as to what the impact of the Third Circuit

23   decision was, was consistent with and in furtherance of that

24   same common interest.  Indeed, the purpose of the discussions

25   about what the impact and effect of the Third Circuit decision

92

1  was, was about how can the parties continue to achieve that

2  common goal and, indeed, effectuate the intent of the original

3  funding agreement.

4          And so I think what we have here, Your Honor, what we

5  heard, I think, from Mr. Jonas and, I think, as Mr. Torborg

6  noted -- he did read from, I think, a helpful case that we

7  cited to issued by Judge Sontchi from the -- Delaware, the

8  In Re Leslie Controls case.   And Mr. Jonas read from the

9  movant's brief.

10         And in large part, they were asking for, I think,

11 what the TCC is asking for here, which is, in effect, the

12 establishment of a per se rule that parties engaged in

13 negotiations can never share a common interest.  That was the

14 brief he was reading from.  That's what they're asking the

15 judge for there.

16         And that's exactly what the judge rejected.  And,

17 indeed, that court and other courts have recognized that with

18 respect to common interest privilege, parties do not need to

19 have a complete unity of interest.  So, indeed, if parties are

20 on the opposite side of the transaction -- or here, you know,

21 contractual counterparties -- that is not a basis to say they

22 do not otherwise have a common interest.

23         And, indeed, a common interest had been properly

24 recognized where parties may be otherwise adverse, you know, as

25 to other issues.  And that's exactly, I think, what we have

1  here.  You know, to the extent that LTL and J&J were

2  contractual counterparties, that doesn't necessarily mean at

3  all that they weren't entirely appropriate in pursuing their

4  common interest and having some of these legal discussions that

5  are, I think, at issue here.  So I think that really

6  fundamentally is the law on the issue, and I think it is

7  dispositive for the Court.

8          And I just -- I think I would just follow up or, I

9  think, conclude with two additional points, Your Honor.  You

10  know, we've heard a suggestion that there is a -- you know, a

11  sword and shield issue here or a waiver concern.  With respect

12  to the amendment and substitution of the funding agreement, I

13  think, in short, everyone is aware of kind of what the basis

14  and rationale for that was.  You know, the relevant inquiry

15  ties into what the intent and goal of the parties were

16  originally when they entered into the 2021 funding agreement,

17  what the impact and scope of the Third Circuit's decision was

18  on their ability to achieve and effectuate that goal, and what

19  they did in response to that in terms of the only way to effect

20  that intent and goal was, ultimately, to substitute and enter

21  into the new funding agreement.

22          And then, finally, I would just note with respect to

23  the legal scope of the funding agreement, both the original

24  funding agreement and the current one, obviously, that's not

25  before the Court right now.  But, I think, certainly as we note

94

1  in our papers and, I think, it's clear from the documents

2  themselves, the terms of those funding agreements are clear and

3  unambiguous on their face.  So to the extent there's a question

4  about what the funding agreement -- you know, what it covers,

5  it's very clear from the terms.  And, indeed, it only covers,

6  you know, the talc liability at issue, which was the case with

7  the original agreement and continues to be the case with the

8  new agreement.

9        So unless there's any other questions the Court has,

10  we would just, obviously, ask the Court to deny this request.

11  Certainly on this record there is no basis to, you know, enter

12  a sweeping order that says there is no common interest

13  privilege between J&J and LTL.

14        THE COURT:  Thank you, counsel.

15        MR. STARNER:  Thank you.  Sure.

16        THE COURT:  Mr. Jonas?

17        MR. JONAS:  Thank you, Your Honor.  I'll be very

18  brief.  Jeff Jonas, Brown Rudnick, proposed counsel to the TCC.

19  Your Honor, I feel like I'm kind of in Alice in Wonderland

20  today.  All we've heard today is obfuscation.

21        I have no obligation today to prove the amount of

22  talc claims or anything else.  I simply want and am entitled to

23  know what happened, why, how, when my client's fiduciary ended

24  up giving up valuable rights in connection with the funding

25  agreement.  Did Johnson & Johnson threaten LTL with voiding the

funding agreement?  If so, when?  Who did it?  On what basis
was that done?  What was my fiduciary's response?  When did
they make the response?  Who made the response?  Did they
propose anything?

How did we end up where we are with termination of
the funding agreement and J&J, as testified to by Mr. Kim at
the preliminary injunction hearing, J&J off the hook for tens
of billions of dollars?  I think we are entitled to answers to
those questions.  That's all I have to say.  Thank you, Your
Honor.

THE COURT:  Thank you, Mr. Jonas.

Mr. Thompson, briefly?

MR. THOMPSON:  Yeah.  Their common interest is to
commit fraud on the creditors.  I mean, that's what their
common interest is.  What this looks like -- and I think either
Mr. Torborg or Mr. Starner talked about the substance of the
communications.  I mean, what it appears happened from
Mr. Kim's testimony, and I don't know what the conversations
were,  but what we have good basis to surmise is that the J&J
lawyers went to Mr. Kim and said, hey, you got to give away $60
billion, because LTL had access to 61 billion, in or out of
bankruptcy, unconditional.  And now, to the detriment of their
creditors, in a complete breach of their fiduciary duty to the
estate, LTL now only has a conditional promise from J&J for 8
billion and only if J&J gets a permanent injunction.

96

1          There has to be transparency on these issues.  They

2  had a duty to the estate, and they've clearly breached it.  And

3  we need to be able to discover if it was through fraud that

4  they did so.  This is textbook crime fraud exception.  Thank

5  you, Your Honor.

6          THE COURT:  Thank you, counsel.

7          Mr. Gordon?  Raised hand.

8          MR. GORDON:  Thank you, Your Honor.  I wanted to

9  spend two minutes to respond, if I could, since, again, I've

10 been referred to directly.  And, you know, Mr. Thompson likes

11 to quote, and he's done it everywhere, comments I made at the

12 ABA last year.  And, unfortunately, they're usually taken out

13 of context.

14         But I wanted to underscore really just a couple of

15 things quickly.  Number one, it's not accurate to say that --

16 as Mr. Jonas just said, that they need to know what happened.

17 They know exactly what happened.  The witnesses have explained

18 the rationale for the new financing arrangements.  They've

19 explained the -- their views on frustration of purpose.

20 They've explained their views on the need to have agreements

21 that actually effectuated the parties' initial intent, which is

22 to resolve these claims through a trust and a bankruptcy

23 proceeding.

24         What you're hearing today is nothing more than they

25 don't like the answers.  They have the information they need to

1  make the arguments that they're already making.  They have the

2  documents themselves, as Mr. Starner just said.  They have the

3  testimony of these witnesses.

4         And what they're asking you to do, in my judgment, is

5  to go down a road that could set a very dangerous precedent

6  where the -- a common interest that is universally recognized

7  to exist between a parent and its affiliates can be penetrated

8  even though they're acting together and in common with respect

9  to litigation to which a subsidiary is subject.  And I think

10 that is very concerning that they would ask for this kind of

11 sweeping relief.  In my view, that would set a very dangerous

12 precedent for this case and for future cases.

13        And, frankly, where would it end?  I mean, they're

14 basically suggesting that the fact that you're acting in a

15 common interest isn't enough to protect the privilege.  And

16 that just can't be right.  That's not consistent with

17 Teleglobe.

18        And I would strongly urge Your Honor to reject their

19 position.  Thank you.

20        THE COURT:  Thank you, Mr. Gordon.

21        All right.  Well argued.  My ruling is likely to be

22 viewed as somewhat anticlimactic.  In Teleglobe, the circuit

23 makes clear that you apply the common interest doctrine when

24 there's been a communication between two parties, separate

25 parties, but that communication was made in the course of

98

1  pursuing a matter of common interest.  And that communication

2  must be designed to further that common interest.

3          Well, in order to gauge that, I actually believe it's

4  necessary to view the specific document to be able to judge

5  whether there's adversity and the timing and whether the goal

6  is one of a common interest or a separate interest.  I don't

7  know how to do it otherwise.  I am not prepared to come out

8  with a blanket rule on common interest.  I think Mr. Jonas

9  rightly raised this possibility.

10         So my question for Mr. Torborg or Mr. Gordon would be

11 I understand that a certain amount of confidential documents

12 relative to the transaction at issue has been withheld under

13 privilege, under both -- obviously, the common interest

14 privilege and then under an underlying privilege,

15 attorney/client work product.  How long would it take to be

16 able to produce for the Court a log or just the collection of

17 documents with the highlight of the -- of that portion which --

18 or if it's not the whole document, that is for which a

19 privilege is being asserted?  What do you need?

20         MR. TORBORG:  I think, Your Honor -- this is David

21 Torborg again for the debtor.  I think we would need at least a

22 week to do that to make sure we're gathering all the documents.

23         THE COURT:  Then how about by close of business next

24 Tuesday you deliver the log with a copy of the log to the TCC

25 and whichever parties request?  And the Court --

99

1          MR. GORDON:  Your Honor, it's -- I'm sorry.

2          THE COURT:  Yeah.

3          MR. GORDON:  I didn't mean to interrupt.

4          THE COURT:  Go ahead.  Mr. Starner?

5          MR. GORDON:  It's Greg Gordon.

6          THE COURT:  Oh, Mr. Gordon?

7          MR. GORDON:  I just wanted to make the point since we

8  will not have had an opportunity to confer with our clients to

9  respond to your question, I would just ask Your Honor's

10  indulgence to permit us to come back if we determine that it's

11  simply not doable to have this done by next Tuesday.  I don't

12  think either Mr. Torborg --

13          THE COURT:  Well --

14          MR. GORDON:  -- or I really knows necessarily whether

15  that can be done.

16          THE COURT:  This is why I hope to build in a little

17  more time before we get to the actual hearing.  So these are

18  the issues that come up.  I try to be pragmatic.  If there's an

19  issue, you'll come back to me.  Just come back to me sooner

20  than Tuesday at 4 p.m.

21          MR. GORDON:  Understood.

22          THE COURT:  All right.  So with that, we move on to

23  the remaining, I believe, discovery motion.  And I guess my

24  question -- I don't know, is -- Mr. Winograd, are you --

25          MR. WINOGRAD:  I am, Your Honor.

1          THE COURT:  Mr. Molton, are you -- no.  Who is it?

2          MR. MOLTON:  No.

3          MR. WINOGRAD:  Your Honor, this is --

4          MR. MOLTON:  Mr. Winograd, Your Honor.

5          THE COURT:  Oh, I see.

6          MR. WINOGRAD:  This is Mike Winograd.  I'm here.

7          THE COURT:  All right.

8          MR. WINOGRAD:  Yep.

9          THE COURT:  It's so much easier in court.

10         MR. WINOGRAD:  It is.

11         MR. GORDON:  Hey, Your Honor?

12         THE COURT:  What?

13         MR. GORDON:  I'm sorry.  It's Greg Gordon again.

14         THE COURT:  Yes?

15         MR. GORDON:  Can I go back and address one issue with

16  respect to the confidentiality --

17         THE COURT:  Yes.

18         MR. GORDON:  -- motion that we talked about

19  earlier --

20         THE COURT:  Yes.

21         MR. GORDON:  -- that I was apprised of?  I think

22  Mr. Satterley made the point that the only document that would

23  be deemed confidential would be the exhibit to the term sheet.

24  And Your Honor said yes.  What I didn't want to have lost in

25  this is if there were some confidentiality designations that

1    were made that were not the subject of any challenge by the TCC

2     -- such as, there were some medical records, I think, that

3    came up in the discovery.  And I didn't want Your Honor's

4    comments to suggest that you were overriding confidentiality

5    designations that have not been subject to challenge, because

6    there are a few.

7              THE COURT:  I am not doing so blanketly.  If there's

8    an issue, you'll reach out for the Court.  We'll have a call.

9              MR. GORDON:  Thank you, Your Honor.

10             THE COURT:  All right.  Mr. Winograd, my question

11   before we go down this path is, is this a situation where I

12   should follow the lead I did in the last matter?  Take it

13   document by document?  I haven't had the chance, obviously,

14   to -- I see Bates stamp numbered documents, but I haven't

15   perused them or the portions of them.  Is that a more viable

16   approach?  I hate to put more work on myself.

17             MR. WINOGRAD:  Yeah.

18             THE COURT:  But it seems to be the only proper way to

19   do it.

20             MR. WINOGRAD:  Well, so, Your Honor, I think there

21   are two different answers with respect to the redactions here.

22   The one issue with respect to the redactions of claimant lists

23   that are attached to the PSAs, I think that can be handled.  We

24   know what the information is, and that can be handled now.

25             With respect to the redactions that are just in two

1 board presentations -- and, really, Your Honor, those

2 redactions in one board presentation is a subset of those in

3 another.  So we're really only talking about one board

4 presentation.

5         And I think it would be useful to just at least touch

6 on three out of the five groups of those redactions.  And then

7 if Your Honor would like to review in camera, to do so with the

8 benefit of that background.

9         THE COURT:  That's fine.  Go ahead.

10         MR. WINOGRAD:  So, Your Honor, again, there are --

11 again, Michael Winograd of Brown Rudnick, proposed counsel for

12 the TCC.  Your Honor, there are two sets of redactions at

13 issue.  There are, again, two board presentations that have

14 some redactions in them.  And we'll talk about one, because it

15 consumes the subset that's in the second board presentation.

16 And then the PSA -- the exhibit to the PSAs where it attaches

17 claimant lists, there was information given -- personal

18 information and only -- from what we received, only the first

19 name was given to us.  Everything else was redacted.

20         I want to address two things, Your Honor.  One,

21 there's argument in the brief that was filed last night by LTL

22 with respect to a meet and confer as a sort of threshold issue.

23 And then I'll argue on the merits.  And I just want to briefly

24 touch on the meet and confer issue.

25         With respect to the PSA, there absolutely has been --

have been meet and confers.  We've asked repeatedly for the

columns to be unredacted whether it's on a, you know,

professionalized only basis or otherwise.  Because we need

to -- we need that in order to de-duplicate.  We noted it in

the PI hearing.  We noted it in the May 9th hearing.  And we've

said that to them on several occasions.

With respect to the board presentations, we've asked

them, I think a couple of times, to unredact them.  We

clarified in a May 11th email that we understood to have

already asked for this, but if there's any doubt, please

unredact all this.

We never received a response.  Now, their response

date to the document request may not have come, but we said, we

think we covered all this.  And either way, Your Honor -- we've

had a lot of meet and confers with them -- if this specific

issue with respect to the Board presentations, if I neglected

to raise it, and I don't recall specifically having raised it

in one our verbal meet and confers, I apologize.

But I will note that, either way, yesterday, I

reached out and said, we should meet and confer since we have a

lot on the table for Tuesday, and we, in fact, did meet and

confer on this very issue yesterday.  They did not agree to

unredact anything, and they filed the brief in response.  So, I

don't think there's really anything to make of the meet and

confer issue that they led off with.

1          Let me turn to the substance of the argument.  The

2    argument is whether the redactions, based on purported

3    privilege are appropriate.  The cases, again, cited by LTL

4    don't really support their position.  What they are, basically,

5    are just generic cases saying attorneys can assert a privilege

6    or a work product production.  We agree with that.  I think

7    everybody agrees with that.  That's hornbook law.

8          But what you cannot do is redact some privileged

9    information on a topic and not all of the privileged

10   information on that topic.  Teleglobe makes that clear.  We

11   cited that in our brief, Docket 504.  United Jersey Bank vs.

12   Wolosoff, which has been cited by numerous Federal Courts, but

13   a New Jersey State Court case, makes that clear.  We cited that

14   in our brief in Docket 441, on a different issue.

15         You cannot selectively disclose privileged

16   information, because you can't -- and this is to quote -- "you

17   can't divulge whatever information is favorable to you and

18   assert the privilege to preclude disclosure of detrimental

19   facts."  That is what appears to have been done here.

20         And, if we can, Your Honor, I'm just going to

21   highlight three simple examples, and I'm going to ask my

22   colleague, who's in the room with me now, Lydell Benson, to

23   just pull up on the screen -- and what we're looking at, Your

24   Honor, is March 28th, 2023 Board presentation.  You will notice

25   that, most of which, Your Honor, at least two-thirds, if not

1  three-quarters of -- probably three-quarters of which has been

2  unredacted.

3          If you'll notice, in the top right, it's marked

4  privileged and confidential, attorney/client communication,

5  attorney work product.  Jones, Day, who put this together, I

6  believe, saw fit to label this entire presentation privileged,

7  yet they've now disclosed about three-quarters of it and won't

8  disclose the remaining part.  I will note, Your Honor, on this,

9  one other key point, and that is, if you will look at the stamp

10 at the bottom, it appears to be version seven on the title

11 cover page.

12          But if you look at the next page, you'll see at the

13 bottom, the remaining part of this is version six.  Now, I

14 can't -- I can't tell you what that discrepancy is, and that

15 will be the subject of discovery, but I raise it because -- and

16 I'll talk about something in conjunction with that -- there are

17 two reasons that this -- that these portions should be

18 unredacted.  There's the law that says they should be because

19 they're selective disclosure.  And there's circumstantial

20 evidence that really raises serious doubts as to the -- the

21 basis or standard on which these redactions were made in the

22 first place.

23          And so, it's unclear to us whether these were

24 different versions or they put the cover of one on the body of

25 another, and we'll get to that in discovery, but I just wanted

1  to point it out for Your Honor.

2        If you'll flip to -- if you'll flip to page two, you

3  can see that they are talking about the status of LTL's Chapter

4  11 case, and the Third Circuit Panel dismissal opinion.  Now,

5  they later redact what they have to say about that Third

6  Circuit opinion, even though they have listed some stuff here,

7  and on the next page, you can see a few bullets on the Third

8  Circuit opinion.  I'll come back to that.

9        But if we can flip to page four, you'll see that this

10  -- if you look at pages four to six, Your Honor, and this is

11  the first circumstantial point that I'm talking about, there's

12  an update regarding discussions with talc plaintiffs, and it

13  talks about the PSAs.  And if you flip to page five, you see

14  supported plan terms.  And it talks about 8.9 billion dollars

15  is what's being put in and when that money will be paid.

16        And then, for some reason, even though supported plan

17  terms continued on the next page, same subject matter -- they

18  even say it's continued -- they redacted everything.  They,

19  later, several days later, if you flip to the next side,

20  unredacted it.  And if you look, again, it's just conditions

21  and allocations.  There's no apparent basis to have redacted

22  this based on privilege, whatsoever, much less to have redacted

23  this and not the prior couple of pages.

24        If you'll now look, Your Honor, at page seven, here

25  we have, from the original, support of future claimant's

representative, discussions on the FCR, which Your Honor has
heard a lot about in the previous hearing.  If you look at the
next page, in the subsequent filing, they have, for some
reason, redacted this.  So, they've unredacted some and then
redacted a different portion in what they're filing.

And I point this out, Your Honor, because this really
raises a cloud of doubt over the standards that were being used
in redacting any of this.  And if you look at just the
substance, Your Honor, if you can flip to page ten, pages ten
to 12 talk about -- if you look at ten, LTL's options in the
event of dismissal.  And it talks about, you know, a new
Chapter 11 case and recapitalization and sale.  If you'll flip
to the next page, considerations regarding the immediate filing
of a new Chapter 11 case, and they've not redacted this.

The benefits, it's supported by law firms in the FCR,
a prompt filing achieves whatever -- you know, whatever those
considerations are, but then, if you flip to 12, it's suddenly
redacted, considerations regarding the filing in New Jersey.
So, they've given us the options.  They've given us the
considerations for the filing, but for some reason, they
decided that there is something special about the
considerations with respect to venue.

Now, I don't know what it says under there, and if
Your Honor looks at this in camera, Your Honor will see, and
maybe it's embarrassing for them, but that's not a basis to

withhold, certainly not based on a privilege, in the context of
a Power Point where everything else has been, where the
majority or the three-quarters has been unredacted.

If you'll look, Your Honor, at page 13, potential
modifications to the existing funding arrangements, you've got,
that section is continued on the next three pages, but for
whatever reason, the Third Circuit opinion is blacked-out here.
If you flip to the next page, again, it continues on.  They
talk about everything other than the Third Circuit opinion,
upon which all of what you're reading in unredacted form is
based.

And, in fact, they've alleged that they terminated
the 2021 agreement based on their reading of the Third Circuit
opinion, but they won't tell you what that reading is.  But
they'll tell you everything else about it.  It's just, again,
selective disclosure.

We can turn to just two more examples, Your Honor.
If you turn to 17, 17 to 19 are all redacted, and they're all
discussion, potential new Chapter 11 case, following execution
of the plan, support agreements and modification of funding
agreements.  We've talked about all of that.  All of that's
unredacted.  The funding agreements were unredacted.  They
execution of a new support agreement was unredacted, and the
potential filing of a new case was unredacted.  Yet, for some
reason, counsel has deemed these three pages special and

1 redacted them out.

2       Lastly, if you'll turn to page 20, pages 20 through

3 26, Your Honor, seven pages, are all about financial

4 considerations.  And, for some reason, if you flip to page 24,

5 in the midst of all of this, you'll see a handful of lines,

6 four lines, blacked-out, one more -- one more -- there you go.

7 Right in the middle of all this discussion on financial

8 considerations, they blacked-out a few lines.

9       Again, this is precisely the selective redactions

10 that the courts say is impermissible.  I would posit that there

11 is nothing privileged about any of it.  There's nothing unique

12 about any of it, other than the fact that it came from an

13 attorney, but they've already waived that privilege, right.  We

14 know that they marked this, privilege and confidential,

15 attorney work product, attorney/client communication, but they

16 have seen fit to, then, unredact three-quarters of it, and even

17 unredact large portions of the same subject matters of minor

18 stuff that they redacted.

19       With that, Your Honor, unless Your Honor has

20 questions about this presentation, I'll turn to the redactions

21 in the PSAs.

22       THE COURT:  Yes, please.

23       MR. WINOGRAD:  Okay.  So, with respect to the PSAs,

24 Your Honor, and this is really simple, the only ground that

25 they have seen fit to redact information is that it is personal

1   information, and it is.  They redacted the last name of

2   claimants, the date of birth, the date of death, if applicable,

3   and the claim type.  We need that information, even if it's on

4   a professional-eyes-only basis.  We need that information for

5   the duplication.

6          There has been -- we believe, the duplicated here

7   will have a material impact on the number.  We think that there

8   are people who are listed twice, based on the first names and

9   first initial that we've seen.  We think there are people

10  listed on multiple counsels' list where they're co-counsel

11  twice.  And so, we think there will be a material impact.  This

12  could be handled with a confidentiality designation.

13         One final point I'll make is that the Debtor seems to

14  confuse unredacting that information and providing it on a

15  confidential basis with a motion to seal or sealing the

16  information or not providing it at all.  The AHC does have a

17  motion pending, which has -- which was relied on heavily in the

18  brief submitted by the Debtor, but that was a simple motion to

19  seal.  The information, according to that motion, has been

20  provided to the Court already.  Multiple parties have asked for

21  unredacted versions.  I don't recall if it was agreed to with

22  respect to the United States Trustee, but multiple parties,

23  including the UST have asked for it.  And there's just no basis

24  not to provide it to us so we can actually check the number.

25         Again, a simple confidentiality designation can

1  resolve any conceivable concerns.  This is not information

2  we're looking to disclose to the public.  And with that, Your

3  Honor, I think that with respect to the Board presentations,

4  there is simply no basis for that kind of selective disclosure,

5  and Your Honor, I think, would confirm that by reviewing it in

6  camera.

7          And with respect to the PSA, there's just absolutely

8  no basis not to provide us that information so that our experts

9  can run a deep -- you know, just simply deep-dupe it, even if

10  it's marked on a confidential basis.  Nobody has any intention

11  of sharing personal claimant information with the public.

12          Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Winograd.

14          Mr. Torborg?

15          MR. TORBORG:  Thank you, Your Honor.  Again, David

16  Torborg of Jones, Day on behalf of the Debtor.  I want to

17  focus, first, on the meet and confer.  There is no dispute that

18  Mr. Winograd did not -- or anyone for the TCC did not reach out

19  to us to meet and confer before filing this motion yesterday

20  morning.  We had no idea it was coming, and it was, you know,

21  scheduled for today.  The motion is inappropriate, unripe and,

22  as I will discuss, misinformed in many respects.

23  There is no certification on the motion that they met and

24  conferred, as required, by both Bankruptcy Rule 7037 and the

25  Local Rule.  It just doesn't exist.

1          Now, Mr. Winograd said, oh, well, we talked about it

2    yesterday.  Well, we only talked about it because I brought it

3    up that you didn't meet and confer on this, and so, we spent

4    five minutes talking about it, and that's it.  He seems to

5    think it should be excused.  That's not good practice.  It's

6    not fair to the Court.  It's not fair to the parties, and it's

7    just not -- you know, it's not consistent with the rule that

8    requires a certification, okay.

9          Here, it may have mattered.  The parties may have

10   been able to reach an accord before this motion was filed on

11   the -- for example, on the claimant list issue.  They're

12   saying, now, they only want something on a professional-eyes-

13   only basis.  Obviously, I'll need to confer with those at J&J

14   and those on the Ad Hoc Committee to see if that might work.

15   There's another way to deal with this deep duplication issue,

16   other than giving up all this personal information.

17         And, second, on the Board presentations, if you read

18   their motion, they're suggesting that, you know, we've made all

19   these relevance determinations, and that's not true.  I mean,

20   we didn't -- we didn't redact anything because it was not

21   relevant.  We redacted it based on attorney/client privilege.

22   And if we would have had a meet and confer, we probably could

23   have talked about that, and we may have made some progress, in

24   me explaining why it is that some things are privileged in the

25   presentation and some are not without disclosing, obviously,

113

1   the contents.

2          The motion provides no factual or legal basis to

3   vitiate the assertion of the attorney/client privilege.  Mr.

4   Winograd suggests, today, that, oh, well, because the document

5   is stamped in the upper right corner, privileged and

6   confidential, that everything in the presentation is

7   attorney/client privileged and, oh, by -- by not redacting

8   everything, we have waived the privilege.

9          That's a ludicrous position.  I mean, parties stamp

10  documents privileged and confidential, attorney/client

11  privilege all the time, and then later, redact them

12  subjectively.  The purpose, of course, is to signal to people,

13  hey, there might be privileged information in this document

14  before it's produced.  That would set a very bad precedent.

15         And, then, you know, in terms of, he talks about

16  selective waiver.  If you just go through, and I'll share it on

17  the screen, as well, some of the matters that he was discussing

18  -- for example, I'll go to, you know, page three, for example,

19  it's talking about LTL filed a petition for a panel, for a

20  hearing.  It's talking about facts, pure facts.  It would have

21  been inappropriate for us to redact that.

22         And on page two, the previous page, it's just talking

23  about the status of the case and what was going on.  Giving up

24  dates on the status of efforts to get support, factual.

25  Supported plan terms, factual.  Conditions to payment, again,

1 we did unredact this two days later and produced it.  Their

2 motion didn't even acknowledge that.

3       Duties of LTL managers, well, it's not -- it

4 shouldn't be surprising to anybody that discussions of

5 fiduciary duties would be a legal topic, and the Board would be

6 given legal advice about what their duties are.  So, there has

7 been no selective -- in fact, he didn't point to anything

8 specific where we waived something that arguably is privileged,

9 because we haven't.  So, there's no basis for any notion that

10 there's been a selective waiver here.

11       And on the claimants -- the claimant list, you know,

12 we view that as being up for the Court's consideration, in

13 connection with the Ad Hoc Committee's supporting law firm's

14 motion to seal.  So, and we do think there is some way that we

15 can resolve this, outside of having to turn over all of that

16 personal information.

17       So, unless the Court has any questions, that's all I

18 have.  Thank you.

19       THE COURT:  Thank you, Mr. Torborg.

20       Mr. Hansen?

21       MR. HANSEN:  Yes, Your Honor, just briefly, the

22 parties are all correct.  We, as you know, filed our motion to

23 seal the information that we filed in connection with our 2019.

24 It's the same information that is annexed to the PSAs.  It's --

25 so we put it in front of the Court.  So, I would like the

1  opportunity to speak with the TCC's counsel and try to work

2  through that, so Your Honor doesn't have to make a ruling with

3  respect to that.

4      We understand the concerns on the deep duplication,

5  but there is also a concern about who is doing that.

6  Obviously, if there are duplicate names, which there appear to

7  be on the existing schedules, somebody has to figure that out.

8  And figuring that out probably requires client contact, so we

9  have to be careful about that, right.  It's not something that

10 one party should use as a strategic advantage to themselves and

11 use it as some guise to contact the client, et cetera.

12     But I think the parties need to talk to each other.

13 We haven't yet had that opportunity.  Our motion is on for June

14 1st, and this came up today, obviously because of this motion

15 to compel.  So, I do think we need to work out a reasonable way

16 to handle it.  Hopefully, we don't have to bring it back to you

17 after that, but there is a lot of information on there, like

18 last four digits of social security numbers, home addresses,

19 you know, dates of birth, dates of death, type of injury

20 alleged, et cetera.  And we don't think all of that information

21 is necessary in order to do a deep duplication analysis at a

22 high level.  But nevertheless, I think what we should do, and

23 if the counsel is amenable to it, we should talk about an

24 appropriate, either confidentiality agreement or a protective

25 order in order to try to deal with this situation.

1              THE COURT:  Fair enough.  All right.

2              Mr. Winograd, last comments?

3              MR. WINOGRAD:  Yes, Your Honor.

4              THE COURT:  Go ahead.

5              MR. WINOGRAD:  Michael Winograd from Brown, Rudnick,

6    proposed counsel for the TCC.  Your Honor, I just really just

7    want to make -- address a few comments that were made by

8    counsel for the Debtor.

9              The comment that there is no dispute that a meet and

10   confer was never had is just not right.  We did absolutely meet

11   and confer, as I noted, in connection with the PSA lists.

12   We've done that several times, including with Ms. Jones, who I

13   know is not here, but on big groups where we've hashed that

14   position out multiple times.  We did, with respect to the --

15   again, as I noted, with respect to the presentations, we made

16   our position known.

17             We had an email asking for the information on May

18   11th.  And, again, I raised it yesterday, and we -- or I asked

19   for the meet and confer yesterday.  I don't recall who raised

20   this motion.  I said, let's talk about all the motions, and it

21   was discussed yesterday.  Had they wanted to propose

22   unredacting any of it, they could have, but they didn't.  They

23   filed the response instead.

24             Number two, they say that stuff may have been able to

25   be resolved.  That's what counsel argued.  Well, with respect

117

1  to the claimant list, we've asked multiple times for the list.

2  Multiple times over weeks, we've said we can address this

3  through confidentiality.  With multiple attorneys on that side,

4  the answer has always been no or just ignoring us.

5        With respect to the Board presentation, this

6  allegation that we made relevance arguments.  There is one line

7  in paragraph two of our entire motion that just notes, relevant

8  -- and we noted, we don't know why, but there is no apparent

9  basis for any of these redactions.  We just noted that

10 relevance redactions are not appropriate.  It was one line.

11 That's all that would have been saved is one line in our brief.

12       With respect to the actual -- this idea that there is

13 no actual privileged information that was otherwise disclosed,

14 counsel were the ones who marked it attorney/client privilege

15 and communication.  Everything in there is an attorney/client

16 communication, and it is replete with advice of counsel, mental

17 impressions.  The idea that counsel says, there is nothing that

18 was disclosed other than simple facts -- there was discussion

19 of FCR discussions.  There was discussion of supported plan

20 terms.  There were discussions of options in the event of

21 dismissal at page ten, considerations regarding a new file at

22 page 11, potential modifications to the existing funding

23 agreement, a summary of key modifications to the existing

24 funding agreement, financial considerations, next steps.  That

25 is legal advice, Your Honor, all of it.

1          They chose to provide it and unredact it.  They

2     cannot simply take subsets of that and keep it disclosed.

3     Thank you, Your Honor.

4          THE COURT:  Thank you, Counsel.

5          All right.  I'm going to ask counsel to continue

6     their discussions regarding the client lists, and if you can't

7     come to an accord through either a confidentiality agreement or

8     some more limited mechanism, then advise the Court, and I'll

9     call it.

10          With respect to the Board meetings, the best I can

11     suggest is to have the Debtor, within that same one-week

12     period, send me the unredacted version highlighting which

13     portions are in dispute, and the Debtor can, you know, provide

14     a basis for the privilege, a simple notation, attorney/client,

15     work product or anything else they want to add.  You can,

16     obviously, provide that to your adversary, as well, except with

17     the unredacted portion, keep it redacted.  And I'll rule on it

18     as soon as I have it in front of me.

19          Any other issues with respect to discovery?

20          Mr. Molton?

21          MR. MOLTON:  Your Honor, not discovery, just ending

22     with a case management issue, like we began with, but

23     different.

24          THE COURT:  All right.  I did want to raise some case

25     management concerns.  Let me, if I can, and  then I'll see

1 whether or not I hit on anything you wanted to raise.

2          MR. MOLTON:  Thank you, Judge.

3          THE COURT:  We do need certain dates for omnibus

4 dates.  So, right now, we have June 13th.  I've blocked out the

5 June 27th week.  The next omnibus date I'm going to give this

6 case is July 11th.  Needless to say -- and as far as June 13th,

7 we start at 10:00.  The omnibus dates will start at 10:00.

8          If the week blocked out shifts to the week of July

9 11th, then, there will be no need for an omnibus date.  And

10 then, another omnibus date, August 2nd.  That should get us to

11 a point where we see where the case is going.  Obviously, if

12 there are emergent matters, I'll hear those in between.

13          Mention was made earlier -- it seems a long time ago

14 -- regarding mediation.  And Mr. Molton raised issues relative

15 to estimation.  I think it's -- I just got a note.  Before I do

16 that, we have a motion to pay admin expenses from the last

17 bankruptcy case that's scheduled, now, for 6/22.  I'm inclined

18 -- I don't think that we have matters on for 6/22.  I'll move

19 that to an omnibus date, probably the 11th.

20          MR. STOLZ:  It was on for May 22nd.

21          MR. MOLTON:  Your Honor, I'm informed it was May

22 22nd, as Mr. Stolz just chimed up, as well.

23          THE COURT:  Oh, May 22nd?  Then, I can put it on for

24 the 13th.  And, as far as estimation, I have thought about the

25 need to continue with the 706 expert on estimation for purposes

120

1  of plan confirmation or plans, however we proceed.  It is

2  premature at this point.  However, I do believe mediation is

3  appropriate.  I've said that before.  I see no reason to halt

4  or stay or delay mediation.

5          But, now, tying the two together, I do recognize that

6  Mr. Feinberg, as a 706 expert, had put together quite a bit of

7  information and data, and while I am not appointing him in this

8  second case, as of now, I see no reason why the data shouldn't

9  be made available to the mediators, not the parties, but to the

10 mediators to help facilitate their work.

11         So, I will -- I will ask Debtor's counsel to just

12 send down an amended mediation protocol order.  To make it

13 clear, I want to make sure nobody is in the hot seat for

14 providing data.  Whether it be Mr. Feinberg or the FCR's

15 information, that information should be available to the

16 mediators.  Again, let me stress that.  No report's being

17 issued.  No report is being docketed.

18         All right.  Mr. Stolz, did you have your hand up,

19 before I go to Mr. Molton?

20         MR. STOLZ:  Yes, Your Honor, just on scheduling.

21 Your Honor, I think was suggesting that you were going to kick

22 the motion to pay the fees of the first case to June 13th.  I

23 would just note, Your Honor, that that's delaying any retention

24 orders getting entered, and I don't think anybody is going to

25 object to that motion.  So, I'd ask Your Honor to keep it on,

1  at least for calendar purposes for the 22nd.  In the event that

2  there is no objection, the Court can then enter that order, and

3  we can get retained, instead of keeping referring to ourselves

4  as proposed counsel.

5        THE COURT:  Let me hear from my clerk for a second.

6        THE CLERK:  This is different than the retention

7  applications that Mr. Stolz is talking about.  There are two

8  matters we need to check that are scheduled for June 22nd.

9        THE COURT:  What she is saying, what she noted, these

10  are different than the ones related to retention.  These are

11  actually two motions to compel payment that are scheduled for

12  June 22nd.

13        MR. STOLZ:  Okay.  Those are the ones, I think, Mr.

14  Abramowitz filed or somebody filed --

15        THE COURT:  So, we're going to leave those -- I'll

16  move those to an omnibus date.

17        MR. STOLZ:  Okay.  But we're going to leave the

18  Committee professional payment on the 22nd.

19        THE COURT:  Correct, I haven't changed that.

20        MR. STOLZ:  Okay.  Second scheduling item, Your

21  Honor, is, after conversing with Ms. Earl, we put our motion

22  for derivative standing on for the 7th at 10:00 a.m.  Is that

23  going to stay on the 7th or is that going to go to the 13th?

24        THE COURT:  I would move it to the 13th.  I don't

25  need to see you every week.

1        MR. STOLZ:  Okay.  And, lastly, Your Honor, this is

2   just a notation, but about ten days ago, the Debtor filed its

3   applications to retain its professionals and filed the

4   schedules, and I think we've already indicated that they

5   reflect $15,000,000 of payments on April 4th of Debtor

6   professional fees.

7        About ten days ago, I asked Mr. Prieto to send us the

8   bills that resulted in those payments, and he's indicated he

9   has had trouble catching up with his client to have that

10  conversation.  So we're hoping that -- I'm hoping that by

11  mentioning it on the record, he speeds up his connection with

12  his client on that issue, and I hope I don't have to bring it

13  before Your Honor, but I just wanted to make note that we've

14  asked for those bills, and we hope they're going to be produced

15  without us having to burden Your Honor with more discovery.

16        THE COURT:  Well, all right, I take it you're just

17  using my Zoom as a means of communication.  Thank you, Mr.

18  Stolz.

19        Mr. Molton?

20        MR. MOLTON:  Judge, Mr. Stolz stole my thunder.  I

21  was going to mention the standing motion that was on for June

22  7th and suggest it be moved to the 13th, so --

23        THE COURT:  All right.  Then, Mr. Gordon, I see Your

24  Honor.

25        MR. GORDON:  Thank you, Your Honor, Greg Gordon.  I

1  just want to be heard for a moment on the standing motion.  I

2  think, by its terms, and admittedly, I've only read it quickly,

3  that's a conditional motion.  It's basically, the way it's

4  written, I think, is in the event Your Honor determines not to

5  dismiss the case, the Committee wants to proceed with the

6  lawsuit.  And so, based on that, our suggestion would be that

7  you move that behind the dismissal matter, because it is

8  conditional, and we should pick it up after that.

9           THE COURT:  Well, I haven't looked at it, in all

10 fairness.  Why don't I ask that you reach out to the Committee

11 counsel and see if it makes sense?

12          We know that the 13th will be busy enough, so if it's

13 not critical, it would make sense, but why don't you confer

14 with counsel and get back to the Court?

15          MR. GORDON:  Will do.  Thank you, Judge.

16          MR. MOLTON:  Thank you, Judge.  We'll wait for Mr.

17 Gordon to call.

18          THE COURT:  All right.  So we are adjourned.  Thank

19 you, all.  I appreciate your efforts.

20          ALL COUNSEL:  Thank you, Your Honor.

21          (Proceedings concluded at 1:23 p.m.)

22                          *  *  *  *

23

24

25

124

# C E R T I F I C A T I O N

    We, DIPTI PATEL, LORI KNOLLMEYER, LIESL SPRINGER, and JACQUELINE MULLICA, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Dipti Patel
DIPTI PATEL

/s/ Lori Knollmeyer
LORI KNOLLMEYER

/s/ Liesl Springer
LIESL SPRINGER

/s/ Jacqueline Mullica
JACQUELINE MULLICA

J&J COURT TRANSCRIBERS, INC.          DATE:  May 17, 2023