**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Kristopher M. Hansen (*admitted pro hac vice*)

PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)

COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota
Warren A. Usatine
Seth Van Aalten (*admitted pro hac vice*)
Justin Alberto (*admitted pro hac vice*)

PARKINS & RUBIO LLP
700 Milam, Suite 1300
Houston, Texas 77002
Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)

*Counsel to Ad Hoc Committee of Supporting*
*Counsel*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |

## OMNIBUS OBJECTION OF THE AD HOC COMMITTEE OF SUPPORTING COUNSEL TO MOTIONS TO DISMISS

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 2

BACKGROUND ............................................................................................................... 5

LEGAL STANDARD......................................................................................................... 10

ARGUMENT .................................................................................................................... 10

    I.    THE BANKRUPTCY CASE WAS FILED FOR THE PROPER
        PURPOSE OF RESOLVING TALC LIABILITY AS THE CODE
        INTENDED ............................................................................................. 11

    II.   THE TOTALITY OF THE CIRCUMSTANCES SUPPORTS THE
        DEBTOR'S GOOD FAITH IN FILING ITS PETITION ................................... 15

    III.  EVEN IF "CAUSE" IS SHOWN, DISMISSAL WOULD RUN
        CONTRARY TO THE CREDITORS' BEST INTERESTS UNDER
        SECTION 1112(B)(2)............................................................................... 18

CONCLUSION.................................................................................................................. 22

## TABLE OF AUTHORITIES

Page

### Cases

*In re 1121 Pier Village LLC*,
635 B.R. 127 (Bankr. E.D. Pa. 2022) ...............................................................18, 19

*In re 15375 Mem'l Corp.*,
589 F.3d 605 (3d Cir. 2009)................................................................................10

*In re Camden Ordinance Mfg. Co. of Arkansas, Inc.*,
245 B.R. 794 (E.D. Pa. 2000) .............................................................................21

*FCC v. NextWave Pers. Communications Inc.*,
537 U.S. 293 (2003)............................................................................................16

*In re Federal-Mogul Global, Inc.*,
684 F.3d 355 (3d Cir. 2012)..........................................................................11, 12

*In re Global Industries Technologies, Inc.*,
No. 02-21626-JKF, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) ................17

*In re Grossman's Inc.*,
607 F.3d 114 (3d Cir. 2010)................................................................................16

*In re Honx, Inc.*,
No. 90035, 2022 WL 17984313 (S.D. Tex. Dec. 28, 2022)..................................14

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod.
Litig.*,
509 F. Supp. 3d 116 (D.N.J. 2020) .......................................................................15

*In re Korn*,
523 B.R. 453 (Bankr. E.D. Pa. 2014) ...............................................................18, 19

*In re LTL Mgmt., LLC*,
637 B.R. 396 (Bankr. D.N.J. 2022) .....................................................................11

*In re LTL Mgmt., LLC*,
64 F.4th 84 (3d Cir. 2023) ....................................................................................9

*Maritime Electric Co. v. United Jersey Bank*,
959 F.2d 1194 (3d Cir. 1991)................................................................................17

*In re Melendez Concrete, Inc.*,
No. 11-09-12334 JA, 2009 WL 2997920 (Bankr. D.N.M. Sept. 15, 2009) ............19

*In re Muralo Co. Inc.*,
   301 B.R. 690 (Bankr. D.N.J. 2003) ....................................................14

*Ortiz v. Fibreboard Corp.*,
   527 US 815 (1999) ...........................................................................12

*Perlin v. Hitachi Capital*,
   497 F.3d 364 (3d Cir. 2007) ...........................................................10

*In re Promise Healthcare Group, LLC*,
   2023 WL 3026715 (Bankr. D. Del. April 20, 2023) ...................... 16, 17

*In re Remington Rand Corp.*,
   836 F.2d 825 (3d Cir. 1988) ...........................................................16

*In re Roman Catholic Church of Archdiocese of New Orleans*,
   632 B.R. 593 (Bankr. E.D. La. 2021) ...............................................13

*In re Sherwood*,
   No. 04-50584, 2008 WL 2074098 (Bankr. W.D. Mo. May 14, 2008) ...................................20

**Statutes**

11 U.S.C.
   § 101................................................................................................1, 16
   § 112(b)................................................................................................2
   § 349..................................................................................................19
   § 524(g) ....................................................................................... *passim*
   § 1112(b) ..................................................................................... *passim*

The Ad Hoc Committee of Supporting Counsel (the "AHC of Supporting Counsel"), by and through its counsel, Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP, hereby submits this objection (the "Objection") to the *Motion of the Official Committee of Talc Claimants to Dismiss the Second Bankruptcy Petition of LTL Management, LLC* [ECF No. 286] (the "TCC Motion"); *Ad Hoc Group of Mesothelioma Claimants' Motion to Dismiss the Second Bankruptcy Petition of LTL Management* [ECF No. 335] (the "Meso. Motion"); *Motion to Dismiss of Paul Crouch, Individually and as Executor Ad Prosequendum of the Estate of Cynthia Crouch* [ECF No. 346] (the "Crouch Motion"); *Motion of the Ad Hoc Committee of States Holding Consumer Protection Claims to Dismiss Chapter 11 Case* [ECF No. 350] (the "States Motion"); *Mesothelioma Claimants' Joinder to Motion of the Official Committee Of Talc Claimants to Dismiss the Second Bankruptcy Petition of LTL Management, LLC* [ECF No. 352] (the "Meso. Joinder"); *MRHFM's Plaintiffs' Motion to Dismiss the Second Bankruptcy Petition of LTL Management, LLC* [ECF No. 358] (the "MRHFM Motion"); *Motion of the United States Trustee to Dismiss Case Pursuant to 11 U.S.C. § 1112(b)* [ECF No. 379] (the "UST Motion"); *Motion of Arnold & Itkin LLP to Dismiss Bankruptcy Case* [ECF No. 384] (the "Arnold & Itkin Motion"); *Joinder of Motions to Dismiss by Georgia State Court Claimants Represented by the Barnes Law Group, LLC* [ECF No. 473] (the "Georgia Motion"); *Motion of the State of New Mexico and the State of Mississippi to Dismiss the Second Bankruptcy Petition of LTL Management LLC for Cause, Pursuant to Section 1112(B) of the United States Bankruptcy Code (11 U.S.C. §§ 101, Et Seq.), and Joinder in Motions to Dismiss Filed by Certain Other Parties* [ECF No. 480] (the "NM and MS Joinder"); *Motion of the Estate of Melissa Fleming to Dismiss the Case Pursuant to 11*

*U.S.C. § 112(B)* [sic] [Adv. ECF No. 117][2] (the "Fleming Motion"); and *Motion of Robert Gendelman, Executor of the Estate of Sherri Gendelman to Dismiss the Case Pursuant to 11 U.S.C. § 112(B)* [sic] [Adv. ECF No. 118] (the "Gendelman Motion" and together with the TCC Motion, Meso. Motion, Crouch Motion, States Motion, Meso. Joinder, MRHFM Motion, UST Motion, Arnold & Itkin Motion, Georgia Motion, NM and MS Joinder, and Fleming Motion, collectively, the "Motions" of the "Movants").  In support of the Objection, the AHC of Supporting Counsel respectfully submits the *Declaration of James G. Onder In Support of Omnibus Objection of the Ad Hoc Committee Of Supporting Counsel to Motions to Dismiss* (the "Onder Declaration") and *Declaration of Mikal C. Watts In Support of Omnibus Objection of the Ad Hoc Committee Of Supporting Counsel to Motions to Dismiss* ("Watts Declaration"), filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

The fundamental question before the Court is whether this case should go forward to provide an opportunity for Debtor LTL Management, LLC (the "Debtor"), Johnson & Johnson, and all talc victims to reach and implement a settlement that will expeditiously provide them with monetary recovery. The AHC of Supporting Counsel submits, for the reasons that follow, that all such victims are entitled to play a role in how their talc claims are resolved and, therefore, whether to accept a settlement through a chapter 11 plan process.

Less than six weeks after the Petition Date, the Debtor filed a proposed plan of reorganization (including any amendments or modifications, the "Proposed Plan")[4] that it submits

---

[2]   This Objection refers to docket entries in the above-captioned chapter 11 case, No. 23-12825 (MBK), as "[ECF No. __]." References to "[Adv. ECF No. __]" relate to docket entries in adversary proceeding No. 23-1092 (MBK).

[3]   Capitalized terms used but not defined in this preliminary statement have the meanings provided in the remainder of the Objection.

[4]   *See Chapter 11 Plan of Reorganization of LTL Management LLC* [ECF No. 525].

would resolve all current and future talc claims in a fair and equitable manner.  The Debtor and Johnson & Johnson are continuing to engage with the AHC of Supporting Counsel and others in order to resolve outstanding plan issues on a final basis.  If confirmed, the Proposed Plan would deliver $8.9 billion in net present value to those suffering from disease allegedly caused by their use of Johnson & Johnson talc products, which settlement amount would constitute the *largest settlement in any asbestos bankruptcy case* and one of the largest settlements of personal injury claims in U.S. history.

The law firms currently comprising the AHC of Supporting Counsel signed Plan Support Agreements (each a "PSA") pursuant to which such law firms agreed to "do all things reasonably necessary and appropriate in furtherance of confirming" a plan in accordance with their agreement. Representing the *majority* of talc claimants in this proceeding, the AHC of Supporting Counsel is presently in deliberative negotiations with the Debtor and Johnson & Johnson to finalize the specific details of the agreement in principle reflected in the PSAs.  To that end, assuming the final details of the agreement are worked out and agreed to, each law firm that is a member of the AHC of Supporting Counsel will confer with their respective clients and recommend that all such claimants vote in favor of the Proposed Plan in connection with a plan solicitation process.

In an effort to frustrate the consummation of the Proposed Plan, however, the Movants now seek dismissal of the Chapter 11 Case on the basis of their assertion that, despite its changed financial circumstances with a new Funding Agreement, the Debtor is not legitimately or sufficiently distressed to avail itself of the benefits, rights, and obligations afforded by chapter 11. Because the AHC of Supporting Counsel expects the Debtor will address the issue of financial distress in its opposition to the Motions, this Objection instead addresses matters with which the AHC of Supporting Counsel is well-acquainted—*i.e.,* the need for closure of more than a decade

3

of litigation through a negotiated settlement providing recoveries to tens of thousands of tort claimants of the Debtor through a confirmed plan of reorganization that is consistent with 11 U.S.C. § 524(g).

The Motions should be denied for several reasons.  As an initial matter, and as countless courts and scholars have repeatedly found, the bankruptcy process offers an orderly alternative to piecemeal resolution of mass tort claims and should be embraced under the present circumstances as an opportunity to resolve *all* such claims on fair and equitable terms that provide finality and an expedited path toward creditor distributions.  As such, it is clear the Debtor filed this Chapter 11 Case for a proper purpose, and the Movants' arguments with respect to bad faith are simply unavailing.  But even if the Court determines it would be appropriate to dismiss the Chapter 11 Case for cause under section 1112(b)(1) of the Bankruptcy Code, it should not do so under section 1112(b)(2), pursuant to which bankruptcy courts may decline to dismiss a case where (i) unusual circumstances establish that dismissal is not in the best interests of creditors, (ii) there is a reasonable likelihood that a plan will be confirmed, and (iii) any infirmities in a chapter 11 debtor's conduct (or failure to act) were otherwise excusable.

Here, unusual circumstances exist in that the Proposed Plan, once confirmed, will resolve the tens of thousands of outstanding talc claims and thereby result in the largest number of creditors receiving a fair and equitable resolution of their claims in the shortest amount of time.  While not yet a final plan, as this Court knows well, the bankruptcy process is iterative and often produces the best outcomes when parties have the opportunity to reach consensus and compromise.  With the support of the AHC of Supporting Counsel, the Proposed Plan is reasonably likely to be finalized and confirmed.  Furthermore, with respect to the alleged infirmity of the Debtor's decision to file a petition for bankruptcy, there is a reasonable justification for the Debtor's

4

decision to file and the alleged infirmity of such filing will be cured within a reasonable time.  The

Debtor's decision to file was driven both by the need to garner protection for it and its affiliates

from the constantly increasing number of lawsuits being filed against the Debtor and its affiliates

as well as by its desire to pursue the deal set forth in the PSAs.  Further, given the prospect of a

confirmed plan of reorganization that will fully and finally resolve all such lawsuits and provide

fair and equitable compensation to the victims, any alleged infirmity with respect to the decision

to file will be rendered moot.  Therefore, this Chapter 11 Case should not be dismissed and the

Motions should be denied for these reasons and those that follow.

## **BACKGROUND**

1.      The Debtor filed a voluntary petition to commence this chapter 11 bankruptcy case

(the "Chapter 11 Case") on April 4, 2023 (the "Petition Date") for the purpose of resolving all

current and future talc-related claims against LTL and its corporate affiliates, including Johnson

& Johnson.

2.      The Debtor did so in light of materially changed circumstances relative to its initial

filing in October 2021 (the "2021 Chapter 11 Case")[5]—including, most notably, that the Debtor

and the Proposed Plan now have the support of the AHC of Supporting Counsel.  Indeed, the

Debtor, Johnson & Johnson and each member of the AHC of Supporting Counsel entered into a

PSA that includes material terms for a chapter 11 plan through which all claimants would be fairly

and equitably compensated for their talc-related claims.  Onder Declaration at ¶12.

3.      The AHC of Supporting Counsel is comprised of law firms representing more than

58,000 talc claimants in the Chapter 11 Case, thousands of whom commenced lawsuits against the

predecessor of the Debtor and its affiliates, including Johnson & Johnson, prior to the

---

[5]      *See Declaration of John K. Kim in Support of First Day Pleadings* at ¶¶ 71-74, 78-85 [ECF No. 4] (the "First Day Declaration").

commencement of the 2021 Chapter 11 Case.  Onder Declaration at ¶4; *Verified Statement of Paul Hastings LLP, Cole Schotz P.C. and Parkins & Rubio LLP Pursuant to Bankruptcy Rule 2019* [ECF No. 470] (the "Rule 2019 Statement").

4.      The AHC of Supporting Counsel's collective client base, which continues to grow, is currently comprised of tens of thousands of women suffering from epithelial ovarian cancer and other gynecologic cancers, as well as men and women suffering from mesothelioma, all as a result of alleged exposure to and use of Johnson & Johnson talc products.  *See* Rule 2019 Statement; Onder Declaration at ¶6.  The constituent members of the AHC of Supporting Counsel are attorneys with decades of collective experience in mass tort litigation, and certain members have significant experience in talc litigation specifically.

5.      Along with Mr. Majed Nachawati, AHC of Supporting Counsel member Mr. Jim Onder was involved in the 2021 Chapter 11 Case, representing members of the Official Committee of Talc Claimants,[6] and supported the dismissal of the 2021 Chapter 11 Case.  Onder Declaration at ¶8.  He supported dismissal substantially due to the fact that, unlike here, there was never an acceptable proposal from the Debtor that would adequately and equitably compensate all current and future talc claimants.  *Id*. at ¶9.

6.      As experienced counsel in mass tort litigation, the constituent members of the AHC of Supporting Counsel appreciate and have witnessed first-hand the delay and inconsistency inherent in attempting to take thousands of such lawsuits to trial.  Watts Declaration at ¶6.  This is particularly true for talc litigation given both the staggering number of such lawsuits currently pending in state and federal courts across the country, as well as the limited resources and inherent challenges in our judicial system.

---

[6]      *See Order Appointing the Official Committee of Talc Claimants,* No. 21-30589-JCW, [ECF No. 355] (Bankr. W.D.N.C. Nov. 8, 2021).

7.      Litigation against the Debtor's affiliates regarding harm suffered as a result of talc exposure began to explode more than five years ago, following a jury trial in which claimants were awarded $4.69 billion. First Day Declaration at ¶39. Since then, and as of the commencement of the 2021 Chapter 11 Case, approximately 38,000 ovarian cancer claimants and over 400 mesothelioma claimants filed suit against the Debtor's affiliates. *Id.* at ¶¶41-44.

8.      In 2021 *alone*, the Debtor's affiliates apparently were served with over 12,300 ovarian cancer complaints, with such entities on average purportedly being served with "one or more ovarian cancer complaints *every hour of the day, every single day of the week*," from January 2020 to the present. *Informational Brief of LTL Management LLC,* No. 21-30589-JCW, [ECF No. 3] at 125 (Bankr. W.D.N.C. Oct. 14, 2021).

9.      The sheer volume of these filings makes it unrealistic, and practically impossible, to assure the talc victims will get an expeditious trial, let alone an expeditious recovery, given the substantial likelihood that appeals invariably will follow any successful judgment against the Debtor and Johnson & Johnson.

10.     As counsel to many of these aggrieved victims, the members of the AHC of Supporting Counsel have, within or outside of bankruptcy, advocated zealously for their clients' interest in being compensated to the maximum extent for the harm they have suffered and will continue to endure.

11.     To that end, members of the AHC of Supporting Counsel have conferred with the Debtor and other constituents throughout this proceeding to assess whether it would be possible to reach a fair and equitable resolution of *all* current and future talc exposure matters in a more timely fashion. Watts Declaration at ¶8.

12.     Specifically, and appreciating that many of their clients have already waited nearly

a decade to recover for the harm they have suffered, many members of the AHC of Supporting

Counsel, including some like Mr. Onder and Mr. Nachawati who were *aligned* with the TCC and

opposed to such a process in the 2021 Chapter 11 Case, worked to secure the Debtor's agreement

to material terms of a plan of reorganization that would provide for expedited distributions to

affected claimants in a just amount.  *Id.* at ¶¶8-12; Onder Declaration at ¶¶9-11.

13.     The upshot of those discussions was an agreement in principle on material financial

terms to resolve talc claims through a chapter 11 plan, which, upon final agreement and if

confirmed, would constitute the largest settlement in any asbestos bankruptcy case and one of the

largest settlements of personal injury claims in U.S. history.  While the parties continue to work to

resolve certain outstanding issues, the Proposed Plan includes many of the terms agreed to in the

PSA and reflects the parties' substantial progress towards a consensual resolution.   Onder

Declaration at ¶14; Watts Declaration at ¶9-12.

14.     Indeed, as a result of these deliberate negotiations, the Debtor, Johnson & Johnson

and all counsel who now comprise the AHC of Supporting Counsel each entered into a PSA

pursuant to which the parties agreed to work together to finalize deal terms and seek confirmation

of a plan of reorganization that would fund *$8.9 billion* net present value to a trust to satisfy all

talc-related claims, as substantially reflected in the Proposed Plan.  Watts Declaration at ¶9; *see*

Form PSA, § 2.01(a)(iv)(B), [ECF No. 4-3] at 3 (internal pagination) (agreeing to "do all things

reasonably necessary and appropriate in furtherance of confirming" a plan in accordance with the

terms of their agreement).

15.     Through this process, the AHC of Supporting Counsel agreed to support a

settlement that it believes would not only compensate its clients fairly given the harm they have

suffered, but would do so on a timeline that undoubtedly will result in distributions made to *all* talc claimants more quickly here than in the tort system. Onder Declaration at ¶¶10-12; Watts Declaration at ¶11.

16.    To that end, the PSA's negotiated by members of the AHC of Supporting Counsel required that a plan containing the terms to which the parties already have agreed would be filed by May 14, 2023, or as soon thereafter as was feasible, and, consistent with its commitments in this regard, the Debtor on May 15, 2023 filed the Proposed Plan.[7]  Watts Declaration at ¶12; PSA at ¶2.

17.    When appropriate to do so under the circumstances, and subject to reaching agreement on the final terms of the Proposed Plan, the members of the AHC of Supporting Counsel will, consistent with their obligations under the PSA, continue to confer with each of their 58,000 clients and recommend that they vote in favor of the Proposed Plan once final.  Onder Declaration at ¶15; Watts Declaration at ¶13.

18.    Yet, in an effort to frustrate plan voting by the individual victims, the TCC, which speaks on behalf of a minority of talc claimants, has aggressively moved to dismiss this case as expeditiously as possible, and other parties of record have since followed suit.  The AHC of Supporting Counsel does not believe that dismissal of this Chapter 11 Case is in the best interest of the claimants and objects to the Motions for the reasons that follow.

## **LEGAL STANDARD**

19.    A Chapter 11 petition is subject to dismissal for "cause" under 11 U.S.C. § 1112(b) if it was not filed in good faith. *In re LTL Mgmt., LLC*, 64 F.4th 84, 100 (3d Cir. 2023) ("*LTL 1*"). Determining whether a chapter 11 petition was filed in good faith is a fact intensive inquiry, which

---

[7]    *See Chapter 11 Plan of Reorganization of LTL Management LLC* [ECF No. 525].

requires an assessment of where the petition "falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* (citation omitted)*; see also Perlin v. Hitachi Capital*, 497 F.3d 364, 372 (3d Cir. 2007) ("[W]e instructed that courts should assess a debtor's good faith on an 'ad hoc basis,' considering the 'honest intention' of the debtor and 'whether the debtor has abused the provisions, purpose, or spirit of bankruptcy law.'") (quoting *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000)).

## ARGUMENT

20.    Lack of good faith is not an enumerated "cause" under section 1112(b), but is recognized within and outside the Third Circuit as grounds for dismissal of a chapter 11 petition. *See LTL 1*, 64 F.4th at 99-100.  The good faith inquiry considers, as a matter of general focus, "(1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage."  *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (citing *In re SGL Carbon Corp.*, 200 F.3d 154,165 (3d Cir. 1999)) (internal quotations omitted); *LTL 1*, 64 F.4th at 100 ("Because the Code's text neither sets nor bars explicitly a good-faith requirement, we have grounded it in the 'equitable nature of bankruptcy' and the 'purposes underlying Chapter 11.'") (quoting *In re SGL Carbon Corp.*, 200 F.3d at 161-62).

21.    Here, in reliance on the Third Circuit's ruling in *LTL 1*, Movants seek to dismiss this Chapter 11 Case on grounds that, among other things, the Debtor is not legitimately and sufficiently distressed to avail itself of the relief afforded to it in this forum, and that the Debtor has otherwise petitioned for bankruptcy for the purposes of obtaining an unfair litigation advantage.  While the AHC of Supporting Counsel does not address the Debtor's financial distress in this Objection, given that the Debtor is best positioned to do so, the Motions must nonetheless

10

be denied because the Debtor, suffering from the great weight of current and future talc liability, and on the basis of its changed financial circumstances, filed this Chapter 11 Case with a valid bankruptcy purpose.  That valid bankruptcy purpose is to resolve all current and future talc-related claims raised against it on negotiated terms with the AHC of Supporting Counsel that are fair and equitable to all claimants.

## I.   THE BANKRUPTCY CASE WAS FILED FOR THE PROPER PURPOSE OF RESOLVING TALC LIABILITY AS THE CODE INTENDED

22.     Congress created section 524(g) so that "debtor[s] and third parties who are alleged to be liable for [] asbestos claims … [would] be encouraged to participate in a system that will maximize the assets available to pay asbestos claims, present and future, and provide for an equitable distribution and method of payment."   140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994) (statement of Sen. Graham); *see also In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 362 (3d Cir. 2012) (finding that the "trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability").

23.     Here, the Motions should be denied because the Debtor, consistent with this statement of congressional intent and in furtherance of a legitimate bankruptcy purpose, petitioned for bankruptcy with the express goal of using the Bankruptcy Code precisely as Congress intended in enacting section 524(g).

24.     As this Court and others have routinely recognized, in the context of asbestos-related tort claims, the chapter 11 process offers "a meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties."  *In re LTL Mgmt., LLC,* 637 B.R. 396, 414 (Bankr. D.N.J. 2022) ("There is nothing to fear in the migration of tort litigation out of the tort system and into the bankruptcy system. . . . The bankruptcy courts offer a unique opportunity to

compel the participation of all parties in interest . . . in a single forum with an aim of reaching a viable and fair settlement.").

25.    The Third Circuit did not question this general proposition in *LTL 1* and has expressly acknowledged the same benefits in prior precedent.  In *In re Federal-Mogul Global, Inc.*, for example, the Third Circuit recognized that bankruptcy "has proven an attractive alternative to the tort system" for debtors facing mass tort claims *precisely because* "it permits a global resolution and discharge of current and future liability," with claimant's interests in that process sufficiently protected "by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."  684 F.3d at 359 (citation omitted).

26.    The need for such a process is made plain by the overwhelming amount of talc-related and asbestos-related litigation presently in the tort system.  Indeed, as the U.S. Supreme Court acknowledged in this very context, the "most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether."  *Ortiz v. Fibreboard Corp.*, 527 US 815, 821 n.1 (1999) (citing *Amchem Products, Inc.* v. *Windsor,* 521 U.S. 591, 598 (1997)).

27.    As it represents, the Debtor petitioned for bankruptcy with these exact concerns in mind and in light of an already unmanageable litigation docket.  *See* First Day Declaration at ¶43 ("As of the filing of the 2021 Chapter 11 Case, there were almost 40,000 plaintiffs asserting ovarian cancer claims against the Debtor, including almost 36,000 plaintiffs with claims pending in a federal multi-district litigation in New Jersey, and more than 3,800 plaintiffs with claims in multiple state court jurisdictions across the country."); *id.* at ¶44 ("In addition to the ovarian cancer claims,

approximately 470 mesothelioma cases were pending against the Debtor as of the filing of the 2021
Chapter 11 Case … with cases pending in New Jersey, California, Illinois, Missouri, New York and
Ohio.").

28.     Consistent with the financial burdens attendant to the defense of prior chapters of
asbestos-related litigation, and notwithstanding that this wave is still in its nascent stages, the Debtor
represents that it has already incurred "astronomical" costs in response:  "nearly $1 billion in defense
costs on account of cosmetic talc litigation, most of which has been spent in only the five years
immediately before the filing of the 2021 Chapter 11 Case; and over $3.5 billion in indemnity
payments, primarily over the same time period."  *Id.* at ¶36.

29.     And while the TCC and others suggest that the Debtor acted in "bad faith" because it,
among other things, did not wait long enough for the rising costs of defending such matters to wipe it
out completely, no party in this proceeding has so much as suggested that talc litigation will somehow
break the mold of traditional asbestos litigation and be resolved on a more expeditious timeline.  *Id.*
at ¶42 ("Due to the long alleged latency periods for mesothelioma and ovarian cancer, cosmetic talc
litigation against the Debtor is anticipated to continue for decades more, as are the extraordinary costs
of defending and resolving the tens of thousands of expected claims.").

30.     For these reasons, rather than filing for the purposes of obtaining an "unfair"
advantage in this sprawling litigation, the AHC of Supporting Counsel submits that the Debtor sought
instead to equitably resolve in bankruptcy all such matters in light of the resources at its disposal and
on a timeline that would benefit *all* current and future claimants.  *See In re Roman Catholic Church
of Archdiocese of New Orleans*, 632 B.R. 593, 612 (Bankr. E.D. La. 2021) (acknowledging that
"filing for bankruptcy relief to administer and resolve tort claims does not in itself constitute an abuse
of a bankruptcy court's jurisdiction") (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 740-41 (Bankr.

S.D.N.Y. 1984)); *see also In re Muralo Co. Inc.*, 301 B.R. 690, 697 (Bankr. D.N.J. 2003) (finding debtors' "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos … cases" was a "significant factor evidencing the good faith of Debtors' filings").

31.    This is consistent with both the purpose of section 524(g) and the goals and the solutions available for "asbestos bankruptc[ies]" more broadly. *See In re Honx, Inc.*, No. 22-90035, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) ("Congress recognized that while an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-looking solution meant to treat fairly all parties in interest. That is the *hallmark purpose* of Chapter 11. That is not a 'bad faith' motive.") (emphasis added); *see also* Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613, 1639-40 (2008) (by closing the door to all other avenues of recovery against the debtor, asbestos bankruptcies bring all creditors into one "centralized" forum to "resolve competing economic interests in an orderly and effective way").

32.    More importantly still, it is also consistent with the interests of the all talc claimants. Simply stated, the AHC of Supporting Counsel wants its clients to finally be paid. Many talc victims have died while waiting for justice in the tort system, and it is time for them to receive monetary recoveries rather than wait in ever growing lines for trials in the tort system. To ensure as much, the Motions respectfully should be denied.

## II.    THE TOTALITY OF THE CIRCUMSTANCES SUPPORTS THE DEBTOR'S GOOD FAITH IN FILING ITS PETITION

33.    The Debtor's good faith is further established by its affirmative efforts to reach an agreement in principle through the PSAs with certain critical stakeholders to resolve all talc claims held by current and future claimants fairly and equitably in bankruptcy.

34.     Contrary to the assertions of the TCC and other Movants, the clients of the members of the AHC of Supporting Counsel hold valid "claims" as such term is defined in the Bankruptcy Code, and for that reason are entitled to vote on a chapter 11 plan.  And despite asserting to represent all talc victims, the TCC seeks to silence these victims by creating an artificial obstacle to their participation in this Chapter 11 Case.

35.     Specifically, in addressing what it (wrongly) describes as an effort to "stack the voting deck" here, the TCC asserts that the Bankruptcy Court may consider *only* those claimants whose *tort* claims could survive the *Daubert* decision rendered in the talc MDL proceeding.  *See* TCC Motion at 5.  This argument, transparent as it may be to discredit claimants with valid claims whose interest may not align with the TCC, is misguided in multiple respects.

36.     As an initial matter, the TCC paints a misleading and incomplete picture of the District Court's decision, which *only* addressed the extent to which expert opinion regarding certain types of *ovarian* cancers were sufficient to establish a causal link.  The decision is narrow in that it addresses just one type of cancer and does not address any other types of cancer, not even, for example, mesothelioma.  *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 181 (D.N.J. 2020).  As such, this decision, which does not establish, address, or refer to what constitutes a claim for bankruptcy purposes, has no bearing in and of itself on the propriety of any claim asserted in this case.

37.     Indeed, the Court already addressed the TCC's misguided concerns in this regard.  Specifically, in response to argument made by the TCC concerning the rights of certain talc victims to participate in this case, the Court correctly responded that even those "alleged victims of other types of cancer" would have "a claim" in this proceeding, and that the plan would account for such differences by "ascribing a different value or potential compensation scheme" depending "upon the

injury and the nature of the cancer." *See* Exhibit 1 attached to the Declaration of Seth Van Aaltan filed herewith ("Ex."), May 9, 2023 Hr'g, Tr., 34-36.

38.     The Court's response is legally correct and consistent with the breadth of permitted claims under the Bankruptcy Code, "longstanding principles of bankruptcy law and sensible bankruptcy policy[,]" and the "modern chapter 11 practice . . . for plans to be confirmed before the claims reconciliation process has been completed (or sometimes, even begun)." *In re Promise Healthcare Group, LLC,* No. 18-12491 (CTG), 2023 WL 3026715, at *5-7 (Bankr. D. Del. Apr. 20, 2023).

39.     As has long been recognized, it is axiomatic that Congress defined "claim" broadly under title 11. The Bankruptcy Code defines a "debt" as a "liability on a claim,"[8] and a "claim," in turn, includes any "right to payment, whether or not"[9] such right has been reduced to judgment or is liquidated, fixed, matured, disputed, or secured.

40.     In defining "claim" so expansively, Congress made plain that "[b]y this *broadest possible definition* . . . the [Bankruptcy Reform Act of 1978] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case . . . [and] permits the broadest possible relief in the bankruptcy court." *In re Grossman's Inc.,* 607 F.3d 114, 121 (3d Cir. 2010) (citing H.R. Rep. No. 95–595, at 309) (emphasis in original). The Supreme Court and Third Circuit are in accord. *See FCC v. NextWave Pers. Communications Inc.,* 537 U.S. 293, 302 (2003) (claim has "the broadest available definition") (citation omitted); *In re Remington Rand Corp.*, 836 F.2d 825, 827 (3d Cir. 1988) (same).

41.     Further, the Third Circuit has recognized that the "essence of bankruptcy" is the consolidation of "all pre-petition claims against the debtor in one collective proceeding before a

---

[8]     11 U.S.C. § 101(12).
[9]     *Id.* § 101(5).

bankruptcy court[,]" *Maritime Electric Co. v. United Jersey Bank*, 959 F.2d 1194, 1207 (3d Cir. 1991) (citation omitted), and courts acknowledge by extension that the claims allowance process "advances [that] underlying goal of the bankruptcy process[,]" *In re Promise Healthcare Group, LLC,* 2023 WL 3026715, at *6.

42.     These bedrock principles are particularly compelling "in cases involving [a] substantial number of tort claims that . . . follow the model established for asbestos claims in § 524(g) of the Bankruptcy Code, which requires the creation of a trust to resolve claims that are otherwise unliquidated." *Id.* at *7.  Reorganizing under section 524(g) provides remedies for both existing and future claimants and "the validity of all claims is left to the trust to establish in accordance with its guiding principles."  *In re Global Industries Technologies, Inc.,* No. 02-21626-JKF, 2013 WL 587366, at *9 n.14 (Bankr. W.D. Pa. Feb. 13, 2013).

43.     Contrary to this precedent, however, the Movants here assert that the Court should conduct a trial on the merits of each claimants' respective disease at this early stage of the Chapter 11 Case.  In this regard, the Motions to Dismiss are inconsistent with both the undisputed scope of claims in bankruptcy, as well as the process for determining the validity of such claims and handling any potential differences in the severity of such conditions in these circumstances.  Because the Debtor has proposed a settlement construct that, by its material terms and once final, would result in the fair and equitable compensation of all talc claimants in the Chapter 11 Case, faster than in the tort system, there can be no question as to the "good faith" of its petition.

## III.    EVEN IF "CAUSE" IS SHOWN, DISMISSAL WOULD RUN CONTRARY TO THE CREDITORS' BEST INTERESTS UNDER SECTION 1112(B)(2)

44.     Even if "cause" for dismissal is found to exist, section 1112(b)(2) of the Bankruptcy Code gives the court discretion to not dismiss the case if "'unusual circumstances' exist such that conversion or dismissal of the case is not in the best interest of the creditors or the bankruptcy estate

17

and there is a reasonable likelihood that a chapter 11 plan will be confirmed within either a reasonable time or applicable statutory deadlines." *In re 1121 Pier Village LLC,* 635 B.R. 127, 136-37 (Bankr. E.D. Pa. 2022).

45.      The best interests of the talc victims are served when they receive fair and equitable compensation for their claims.  Pursuant to section 1112(b)(2), and upon a finding of "unusual circumstances," the bankruptcy court is given the discretion to not dismiss the chapter 11 case where it is shown that, (i) there is a reasonable likelihood that a plan will be confirmed within a "reasonable period of time", (ii) the grounds for granting dismissal for "cause" include an act or omission for which there is a reasonable justification, and (iii) such act or omission will be cured within a reasonable period of time.

46.      In connection with this analysis, the bankruptcy court retains broad discretion to determine whether "unusual circumstances" exist such that it would be in the "best interest of creditors" to keep the matter in chapter 11.  *See In re Korn,* 523 B.R. 453, 465 (Bankr. E.D. Pa. 2014). And while the Bankruptcy Code does not define "best interests" for the purposes of this inquiry, courts have considered certain of the following factors to guide their analysis:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal,
>
> (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted,
>
> (3) whether the debtor would simply file a further case upon dismissal,
>
> (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors,
>
> (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise,
>
> (6) whether any remaining issues would be better resolved outside the bankruptcy forum,
>
> (7) whether the estate consists of a "single asset,"

18

(8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests,

(9) whether a plan has been confirmed and whether any property remains in the estate to be administered,

(10) whether the appointment of a trustee is desirable to supervise the estate and address possible environment and safety concerns, and

(11) consideration of the effect of dismissal under 11 U.S.C. § 349.

*See In re 1121 Pier Village, LLC*, 635 B.R. at 139-40.  The application of this test, however, "is not a mechanical or mathematical exercise[,]" as not all such factors "may be relevant in a particular case," and "the factors that are relevant may not be entitled to equal weight." *Id.* at 140 (citation omitted).  "Rather, the list of considerations employed by a court in making a decision is simply … a guide to the required inquiry[.]" *Id.*

47.    Consistent with this approach, and in recognition of the fact that the "unusual circumstances" inquiry is largely "result oriented," *see In re Korn,* 523 B.R. at 468 (internal quotations omitted), certain courts have suggested a "simpler, unitary standard" that focuses on facilitating "the course of action that results in the largest number of creditors being paid the largest amount of money in the shortest amount of time."  *In re 1121 Pier Village LLC*, 635 B.R. at 140. (citations omitted). Here, the instant circumstances plainly satisfy the requirements of section 1112(b) and militate in favor of a finding that unusual circumstances exist such that dismissal is not in the best interests of creditors and the estate.

48.    With the support in principle of the AHC of Supporting Counsel, which represents the majority of claimants in this Chapter 11 Case, the Debtor has put forth a Proposed Plan that, once finalized and confirmed, would result in a *historic* settlement for *all* current and future talc claimants. *See In re Melendez Concrete, Inc.,* No. 11-09-12334 JA, 2009 WL 2997920, at *7 (Bankr. D.N.M. Sept. 15, 2009) (denying motion to dismiss and finding unusual circumstances existed where value

of chapter 11 Debtor's assets substantially exceeded amount of secured debt and orderly reorganization would likely pay substantial portion of unsecured claims).

49.     More importantly still, a settlement in this case would, unlike the alternative of piecemeal state and federal court litigation, result in more prompt payment for all of those affected. Given the timely and equitable recoveries currently set forth in the Proposed Plan, as well as the significant amount of time that claimants have already spent waiting for payment to address their harm, dismissal is not in the best interests of creditors and the estate. As the Movants know well, in the event this Chapter 11 Case is dismissed, nearly 40,000 plaintiffs will recommence their lawsuits against the Debtor and its affiliates, taking the next step to continue in a decades-long march to an uncertain potential for a recovery.  As no one to this proceeding disputes, many more will continue to follow.

50.     The magnitude of these unliquidated, disputed, and contingent claims against the Debtor and its affiliates is staggering, and, for that reason, a path to fair and timely distributions to claimants is in the best interests of creditors and the estate under the present circumstances. *See In re Sherwood,* No. 04-50584, 2008 WL 2074098, at *3 (Bankr. W.D. Mo. May 14, 2008) ("[O]verwhelming evidence of unusual circumstances" and that dismissal was not in best interests of creditors and estate, including because "dismissal would result in a significant delay in payment for [vast majority of creditors, who] would likely face protracted litigation in one or more state courts" and "dismissal of the Debtors' case would result in a race to several courthouses and a multiplicity of lawsuits").

51.     As counsel to thousands of such claimants, Mr. Watts already testified regarding his sincere "concern[]" regarding such an outcome, as well as his belief that the deal struck with the Debtor and its affiliates, if confirmed, reflected a "one-time opportunity to get a global deal done that

would get all of [the affected claimants] paid."  Ex. 2 at 60:6-18 (Watts Dep. Tr.) ("I was very concerned, and I think that J&J had made clear, that once we were sent back to the tort system, this was virtually an impossible case to settle for all the ladies who are alleged to have been harmed.  As you know, this has been going on for 10 years, and I think there's been 46 trials …. So a lot of them are dying.  I've seen it on my docket.").

52.    And while the Movants and any other claimants voting on the Proposed Plan have the right to vote to reject it, the AHC of Supporting Counsel respectfully submits that given the progress toward consensus that the parties have thus far made, as well as the parties desire to continue negotiating towards final agreement on all aspects of the Proposed Plan, there is a more than reasonable likelihood the Proposed Plan will be confirmed after votes are solicited.  Ex. 2, at 65:7-11 ("I've negotiated the best deal that I think there is.  I believe it's in the best interests of my clients. I'm willing to recommend it to my clients."); Ex. 2, at 247:15-16 ("[T]o be clear, these clients have the right to say no.  They absolutely do.").

53.    Confirmation of such a plan would undoubtedly justify *and* cure any alleged "bad faith" in connection with the Debtor's filing.  As this Court knows, to confirm a plan of reorganization in this case and obtain a channeling injunction under section 524(g), the Debtor will need to secure support of more than 75% of all outstanding claimants.  And with a super-majority of talc claimants voting in favor of such a deal, it would defy logic to thereafter conclude that the Debtor commenced this case in "bad faith" and achieved an unfair advantage.  Indeed, as has always been undisputed, "creditors are the best judge of their own best interests."  *See In re Camden Ordinance Mfg. Co. of Arkansas, Inc.,* 245 B.R. 794, 802 (E.D. Pa. 2000).

54.    For all of these reasons, the Motions to Dismiss should be denied and the talc victims should have the right to vote on the Proposed Plan.  They need to decide whether the recoveries

proposed to pay talc victims are adequate to garner their vote in support of the Proposed Plan.   And

rather than allowing lawyers with disparate interests to dictate the terms on which these claimants will

be compensated, the true victims in this proceeding should be permitted to assess and vote for or

against.

## **CONCLUSION**

For all the reasons set forth herein, the AHC of Supporting Counsel respectfully requests

that this Court deny the Motions and not dismiss this Chapter 11 Case.

Dated: May 26, 2023                              **COLE SCHOTZ P.C.**

*/s/ Michael D. Sirota*
Michael D. Sirota (NJ Bar No. 014321986)
Warren A. Usatine (NJ Bar No. 025881995)
Seth Van Aalten (*admitted pro hac vice*)
Justin Alberto (*admitted pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, NJ 07602-0800
(201) 489-3000
Email:  msirota@coleschotz.com
            wusatine@coleschotz.com
            svanaalten@coleschotz.com
            jalberto@coleschotz.com

– and –

**PAUL HASTINGS LLP**

Kristopher M. Hansen (*admitted pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Email:   krishansen@paulhastings.com

Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6000

`

22

Email:  mattmurphy@paulhastings.com
        mattmicheli@paulhastings.com

– and –

**PARKINS & RUBIO LLP**

Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)
700 Milam, Suite 1300
Houston, TX 77002
Telephone: (713) 715-1660
Email:   lparkins@parkinsrubio.com
         crubio@parkinsrubio.com

*Counsel to AHC of Supporting Counsel*