**EXHIBIT 1**

```
            IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE DISTRICT OF NEW JERSEY

IN RE:                           .     Case No. 23-12825(MBK)
                                 .
LTL MANAGEMENT LLC,              .
                                 .     U.S. Courthouse
            Debtor.              .     402 East State Street
                                 .     Trenton, NJ 08608
. . . . . . . . . . . . . . . .  .
                                 .
LTL MANAGEMENT LLC,              .     Adv. No. 23-01092(MBK)
                                 .
            Plaintiff,           .
                                 .
      v.                         .
                                 .
THOSE PARTIES LISTED ON          .
APPENDIX A TO COMPLAINT AND      .
JOHN AND JANE DOES 1-1000,       .
                                 .
            Defendants.          .     Tuesday, April 18, 2023
. . . . . . . . . . . . . . . .  .     10:00 a.m.
```

TRANSCRIPT OF HEARING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(a)(3) [DOCKET 71]; AND DEBTOR'S MOTION FOR AN ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND SERVICE PROCEDURES MOTION

**BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                        Kiya Martin

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 3 of 11

Kim - Cross/Jonas                                                 62

1  Q    Sir, very, very important question, okay?  Yes or no.
2  Today, under funding agreement two, the total value available
3  to LTL is tens of billions of dollars less than was available
4  under funding agreement one.  Yes or no?
5  A    That is not true.
6  Q    So you think today, LTL-2 -- no, strike that.  You think
7  that the debtor today under funding agreement two has available
8  to it to satisfy talc claims around $60 billion?
9  A    No, that's not what I said.  What I said was that it's not
10 the -- not tens of billions of dollars less because you have to
11 take into account that because of the Third Circuit decision,
12 funding agreement two was rendered void or voidable, and
13 there's material risk that it was not enforceable.  So
14 therefore, if you're trying to compare those two, I think that
15 statement would not be true.
16 Q    I don't want to compare anything.  I just want -- let's --
17 I'll tell you what.  Let's do it this way.  Funding agreement
18 one, the debtor had $60-odd billion available to it to satisfy
19 my client's claims, right?
20 A    Prior to the Third Circuit decision, I would say yes.
21 Q    Great.  Today, how much does the debtor have available to
22 it under its funding agreement to satisfy talc claims?
23 A    I think there's a calculation about what the value of --
24 an internal valuation of the principal assets of Holdco which
25 is around $30 billion, plus the amounts that LTL has through

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 4 of 11

Kim - Cross/Jonas                                                           64

1  J&J guarantee part of that.  And so when we were entering into
2  funding agreement two, we took out this risk of enforceability
3  and put in a new agreement that would benefit all the parties.
4  Q    Sir, do my clients have the same amount that they can
5  recover from under funding agreement two as under funding
6  agreement one?  Yes or no?
7  A    No, because of the Third Circuit decision, not because of
8  what we did.
9  Q    It's the Third Circuit's fault?
10             MS. BROWN:  Your Honor, I object.  It's
11 argumentative.
12             THE COURT:  Sustained.
13 BY MR. JONAS:
14 Q    Are you saying that the Third Circuit is responsible for
15 my clients having tens of billions of dollars less that they
16 can recover from?
17             MS. BROWN:  Same objection, Judge.
18             MR. JONAS:  I'd like to know, Your Honor.
19             THE COURT:  Overruled.
20             THE WITNESS:  What I'm saying is that when the Third
21 Circuit made its decision, one of the ramifications of the
22 decision was that it frustrated the purpose of the first
23 funding agreement, rendering it void or voidable.  So I don't
24 think -- the Third Circuit didn't meant do that.  I don't blame
25 the Third Circuit for doing that.  It's just a consequence of

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 5 of 11

Kim - Cross/Jonas                                                    68

1  Q    Well, let's wait.
2  A    Yeah.
3  Q    Wait, because at deposition, you wouldn't answer that
4  question.  So let's see whether your counsel now for the first
5  time wants to let you, allow you to answer these types of
6  questions.
7           MS. BROWN:  Well, Your Honor, I think that is also
8  argumentative.  And certainly, what was true in the deposition
9  is true here.  To the extent answering that question is going
10 to reveal attorney/client communications, protected by work
11 product or common interest, then Mr. Kim shouldn't reveal
12 conversations he had with lawyers.  But certainly, he should be
13 able to answer that in the way that he understands he can do
14 without violating the privilege.
15          THE WITNESS:  So what I would say is my understanding
16 -- I had numerous conversations with J&J attorneys.  My
17 understanding from going away with that was that they were
18 asserting that the -- it was -- the contract was void or
19 voidable because of the Third Circuit decision based on a
20 number of legal principals that they had researched, my lawyers
21 had researched.  And ==we came to the conclusion there's a==
22 ==material risk that the contract was void or voidable.==
23          MR. JONAS:  Your Honor, I'm going to move to strike
24 because at deposition, time and time again we were not allowed
25 -- we were told that the only people, and I'll ask questions to

Kim - Cross/Jonas                                                77

1  clients had the benefit of a $60 million funding agreement, the
2  first funding agreement, right?
3  A    At that time, yes.
4  Q    And today, maybe, maybe, I guess if they vote in favor of
5  a plan, they'd have the benefit of funding agreement two which
6  I'm not sure what you said, I think you said $30 billion of
7  value.  Is that right?
8  A    It is.  But then you're missing out that there's a plan
9  proposal on the table that a substantial number of claimants
10 have approved, which would be $8.9 billion, which is fully
11 funded under the funding agreement.
12 Q    Okay.  So that's my client.  Now let's just make sure I
13 got the J&J piece right.  J&J was liable for up to $60 billion
14 under funding agreement one, right?
15 A    Again, J&J, without any obligation, put that in in order
16 to enhance the prospects of a bankruptcy.  So that was why it
17 got put in.  At some point, it becomes void or voidable because
18 the Third Circuit decision.  And then they again committed
19 without having to, to an $8.9 billion support agreement in
20 order to facilitate a resolution.
21 Q    Just to wrap up, today, J&J's maximum liability is $8.9
22 billion, right?
23 A    Under the support agreements that it has.
24 Q    So with -- because of the Third Circuit's decision, J&J
25 got off the hook for $50 billion of talc liability?

**WWW.JJCOURT.COM**

Kim - Redirect/Brown                                              180

1  exposure, of liability.  So it's the amount that they agreed to
2  fund not any, you know, what the exposure.  I think that's what
3  the question that you're getting at is.
4  Q    Well, and in terms of the liability, that was the same
5  under funding agreement one -- in terms of whether -- do you
6  have a view on whether or not the liability changed under
7  funding agreement one and funding agreement two?
8  A    Well, so the talc liability, so I, yeah I see.  The talc
9  liability is enormous.  We don't have an aggregate number for
10 it, but it is, you know, huge.  I think what I would do is
11 refer to all the testimony I gave in the prior proceeding about
12 the liability and adopt that here.
13      That liability, if anything, has gotten bigger.  We know
14 that after a year of being in bankruptcy, we have at least -- I
15 think it almost doubled from what we know from unknown claims.
16 So what I would say is that the liability itself is even much
17 larger than it was when the first bankruptcy was filed.
18 Q    And how does that liability relate to the value of the
19 funding agreement?
20 A    Well, at the end of the day, we believe that we have
21 sufficient funds to meet the liability except for the -- so we
22 believe we're not insolvent, but we do believe that we are in
23 financial distress because of the magnitude of the liability,
24 the wild and unpredictable verdicts, the cost of the
25 litigation, which is ever increasing.

**WWW.JJCOURT.COM**

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 8 of 11

306

1  Let's get it done.
2          MR. BIRCHFIELD:  Good evening, Your Honor.  Andy
3  Birchfield, Beasley Allen.  I know it's late in the day and I
4  appreciate you giving us this opportunity to be heard.  J&J
5  began the day, LTL began the day denigrating me personally in
6  their opening, and my law firm.  And they ended their day in
7  their closing denigrating me personally and my law firm.  Why?
8  To what end?  What relevance does that have to this proceeding?
9          I think there we may have evidence of true
10 frustration of purpose.  It's not me.  It's not me.  There is a
11 committed team, a leadership team of a large member of lawyers
12 and we have held together and we have held firm.  And because
13 we have held together and we have held firm that frustrates
14 J&J's purpose of using the bankruptcy process to coerce
15 plaintiffs to accept deeply discounted values.
16         And as part of the presentation you were given some
17 quotes from my deposition.  Part of those, a significant
18 portion of that dealt with a proposed agreement, a proposal, a
19 draft proposal from September of 2020.  And it was suggested
20 that that proposal was for all ovarian cancer claimants for
21 3.25 billion.  I don't know what relevance, or I don't know
22 where 408 is here.  But you will have the deposition and you
23 will have the agreement.  And I'm going to --
24         I urge you, Your Honor, look at the agreement.  See
25 if the total payments under that agreement are 3.25 or 5.5

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 9 of 11

307

1  billion.  I urge you to review that agreement and see if that
2  is for ovarian cancer claimants only or does it include
3  mesothelioma claimants, does it include A.G. claimants.  It
4  does not.  It is ovarian cancer claimants only.
5         Look at that agreement.  See if it is not a voluntary
6  opt-in proposal for a private QSF outside of bankruptcy.  Only
7  a portion would have been involved in the Emerest and a
8  contribution into the Emerest bankruptcy.  Look at that
9  agreement, see if it was accurately portrayed to Your Honor
10 here.
11         I also want you to remember, Your Honor, and I know
12 you do, from the first proceeding you had an enormous amount of
13 time that was spent on the spike, the huge spike in new claims.
14 There was a tremendous amount of time spent on.  So what is the
15 difference, what is the difference in the number of claims
16 pending in September of 2020 and what is pending today.  So
17 when every proposal, our leadership team on behalf of the
18 ovarian cancer claimants, we have been committed, we have been
19 committed from day one and we have held together and we have
20 encouraged all the lawyers, all the lawyers across the country
21 to hold together, to hold together in insisting that J&J pay
22 reasonable values for their claimants.
23         There is a big difference in the number of claims
24 that would have been, current claims that would have been
25 existed in 2020 and what there are today.

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 10 of 11

308

```
 1           THE COURT:  What is the difference?  We started with
 2  38,000 in the MDL, 3,000 in the State and four or 500 meso
 3  claims.  And now if, just by 40,000 are opposed and 60,000,
 4  we're at 100,000 or more.  Why in a year and a half?
 5           MR. BIRCHFIELD:  Because there is a difference
 6  between filed claims and claims that may be valid claims that
 7  are in lawyer's offices.  So since LTL filed its bankruptcy
 8  there could be no new claims.  But law firms, they are
 9  following the process.
10           What they would do, they would get a client to come
11  into their office, they would begin to investigation that claim
12  and they would look at the statute of limitations.  When is the
13  statute of limitations?  They would gather medical records and
14  they would evaluate that claim and determine whether or not
15  that claim should be filed or not.
16           And so all of that was put on hold in October of 2021
17  when J&J filed bankruptcy.  And so there could be no new filed
18  claims.  But claimants who have used baby powder for years or
19  decades were still getting ovarian cancer claims.  So those
20  claims are still coming into lawyer's offices.  They're still
21  being evaluated.  Their medical records should still be
22  gathered on those claims, but they're not filed.
23           THE COURT:  But then shouldn't the Court take that
24  into account for potential liabilities?  And when we go back to
25  financial distress, that in a year and a half we've had 100
```

Case 23-12825-MBK    Doc 614-2    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 1 to Declaration of Daniel J. Merrett    Page 11 of 11

310

1                MR. BIRCHFIELD:  Yes, Your Honor.

2                THE COURT:  -- in its current form.

3                MR. BIRCHFIELD:  So one of the things -- I mean, another issue, another issue here is what they're saying, if you look at, if you take their argument, if you take their argument then we would not have had a tobacco settlement.  The initial claims, if a company has the wherewithal to avoid paying through settlements or taking verdicts and through appeal, if they can avoid a global settlement for 10 years then case over.  They are entitled to bankruptcy.

11               Tobacco, the tobacco cases, you are talking decades where the tobacco companies were resisting that, resisting any liability.  They were taking the same position that J&J is taking here.  No liability.  But yet they ended up in a $200 billion settlement.  So the mass tort system works.

16               I must address the issue of the losing streak.  You have that.  You have losing streaks, you have winning streaks in virtually every mass tort.  I mean, in the Vioxx litigation you had a couple of wins, you had a significant number of losses.  No claimant was paid.  No claimants were paid for nearly seven or eight years, until there was a global settlement paid.

23               It would be the equivalent here.  Except J&J is stopping short and they're saying cut us out of the tort system, give us a steeply discounted settlement for the