## **EXHIBIT 7**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . | Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtor. | . | |
| | . | April 11, 2023 |
| . . . . . . . . . . . . . . | . | 9:59 a.m. |

TRANSCRIPT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN
ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND
AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED
PRELIMINARY INJUNCTION, AND (II) WAITING THE FOURTEEN DAY STAY
UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(A)(3) [71];
DEBTOR'S MOTION FOR AN ORDER EXTENDING THE TIME WITHIN WHICH IT
MUST FILE ITS (I) SCHEDULES OF ASSETS AND LIABILITIES AND (II)
STATEMENT OF FINANCIAL AFFAIRS [14]; DEBTOR'S MOTION FOR AN
ORDER: (I) APPROVING THE CONTINUED USE OF ITS BANK ACCOUNT AND
BUSINESS FORMS AND (II) AUTHORIZING THE DEBTOR'S BANK TO CHARGE
CERTAIN FEES AND OTHER AMOUNTS [13]; DEBTOR'S APPLICATION
PURSUANT TO 28 U.S.C. § 156(C) AND 11 U.S.C. § 105(A) FOR ENTRY
OF AN ORDER AUTHORIZING THE APPOINTMENT OF EPIQ CORPORATE
RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT NUNC PRO TUNC
TO THE PETITION DATE [11]; DEBTOR'S APPLICATION FOR DESIGNATION
AS COMPLEX CHAPTER 11 CASE [6]; DEBTOR'S MOTION FOR AN ORDER
SUSPENDING ENTRY AND SERVICE OF STANDARD NOTICE OF COMMENCEMENT
[5]; DEBTOR'S MOTION FOR AN ORDER: (I) AUTHORIZING IT TO FILE A
LIST OF THE TOP LAW FIRMS WITH TALC CLAIMS AGAINST THE DEBTOR
IN LIEU OF THE LIST OF THE 20 LARGEST UNSECURED CREDITORS; (II)
APPROVING CERTAIN NOTICE PROCEDURES FOR TALC CLAIMANTS; AND
(III) APPROVING THE FORM AND MANNER OF NOTICE OF COMMENCEMENT
OF THIS CASE [10]; DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 1505
FOR AN ORDER AUTHORIZING IT TO ACT AS FOREIGN REPRESENTATIVE ON
BEHALF OF THE DEBTOR'S ESTATE [12]
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                    Wendy Quiles

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

Case 23-12825-MBK    Doc 614-8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 3 of 13

84

1   her minor children, one with autism who's struggling mightily.

2   And I told Kimberly in her final days when she was asking me

3   what was going on, I told her that just like she told Senator

4   Whitehouse in the U.S. Senate that she would never give up,

5   that she wouldn't quit, I promised her that we wouldn't quit.

6   And we're not going to.  Thank you.

7          MR. BIRCHFIELD:  Good afternoon, Your Honor.  Andy

8   Birchfield with Beasley Allen on behalf of Alishia Landrum.  I

9   think it's time we get back to a PowerPoint, Your Honor.

10         Your Honor, for the record, I want to say that we

11  oppose this bankruptcy.  We consider this to be a sham

12  bankruptcy that is founded on a massive fraudulent conveyance,

13  and we urge that it be dismissed.  I say that for the record

14  because I do not want it to be misconstrued because most of the

15  time that you allow me to have before you today, I want to

16  focus on the proposed deal, the proposed plan that J&J has put

17  forward.

18         We oppose this plan because it is a bad deal for the

19  claimants.  That is the only reason that we oppose this plan.

20  It is bad for the claimants.  And it's bad for many reasons,

21  but that's the only reason that we oppose it is because it's

22  bad for the claimants.  There has been much that's much been

23  said, and Mr. Gordon insinuated with his questions that there

24  must be something else.  He raised that why would a what he

25  describes as a minority of claimants, a handful of law firms,

Case 23-12825-MBK    Doc 614-8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 4 of 13

85

1  oppose this.  The only reason, the only reason that we oppose

2  the proposed deal is because it is bad for claimants.

3           There are statements that are made in the

4  informational brief that all of the leadership firms, all of

5  the leadership firms oppose this deal.  What's that a reference

6  to?  That's a reference to the lawyers and the law firms that

7  litigated this case in this courtroom in the MDL through all of

8  the Daubert proceedings.  It is the lawyers who stood in front

9  of juries across this country.  These are the lawyers that have

10  taken the depositions who know this case.

11           These are the lawyers on behalf of ovarian claimants

12  just like Ms. Kagan said on behalf of the meso claimants.

13  These are the lawyers.  These are the lawyers who have held the

14  hands of their clients as they have walked through in

15  depositions what they have experienced after the diagnosis of

16  ovarian cancer.  These are the lawyers who have held the hands

17  of widows as they described what their wife went through.

18  These are the lawyers who have been in the trenches.

19

20           But is is not just the leadership lawyers.  It is not

21  a handful of firms.  It is not a minority of firms or a

22  minority of the claimants that oppose this deal.  There are

23  over -- well over, well over 100 firms that oppose this

24  proposed plan.  Those firms represent over 40,000 claimants.

25  These are claimants that the majority of those have been filed.

Case 23-12825-MBK   Doc 614-8   Filed 05/26/23   Entered 05/26/23 23:11:45   Desc
Exhibit 7 to Declaration of Daniel J. Merrett   Page 5 of 13

86

1    They are pending.  They were pending before J&J filed its first

2    bankruptcy in October of '21.

3              But to say that this is a bad deal on behalf of

4    claimants, in order to say that, there must be some indicia of

5    what a good deal would look like.  And so I want to walk

6    through in just a few moments, Your Honor, what are some of the

7    indicia of what a reasonable, a fair and equitable agreement

8    would look like on behalf of a claimant.  Some of these factors

9    are objective factors.

10             So if you're looking at a claim and you're evaluating

11   that claim in the tort system, you would look at what are the

12   medical expenses that are involved in treating the injury,

13   whether that is mesothelioma or whether it is ovarian cancer.

14   What are the medical expenses?  That's objective.  What are the

15   lost wages?  Those are objective.  Those are knowable.

16             Pain and suffering, that's subjective.  And the loss

17   of consortium, that's subjective.  The Supreme Court has

18   provided some guidance on punitives, but all of those are

19   elements.  If you're going to assess what is a fair and

20   reasonable deal on behalf of a claimant, we submit you must

21   take into consideration these factors, at least the objective

22   factors.

23             On behalf of ovarian cancer claimants, we know what

24   the average medical cost would be.  And the average medical

25   cost would be over 220,000.  You see here 224,786.  And I

Case 23-12825-MBK   Doc 614-8   Filed 05/26/23   Entered 05/26/23 23:11:45   Desc
Exhibit 7 to Declaration of Daniel J. Merrett   Page 6 of 13

87

1   submit to you that these are conservative figures.  And, of

2   course, these vary based on the stage of diagnosis.  It also

3   varies based on the age of the claimant at the time she's

4   diagnosed.

5           So you would have someone, it may be a 42-year-old

6   that is diagnosed with Stage 4.  The cost of treatment is going

7   to be significantly higher.  Those costs for that young woman

8   who is diagnosed with ovarian cancer often exceed a million

9   dollars.  If you have an 82-year-old that is diagnosed with

10  Stage 1 or Stage 2, the medical costs are going to be

11  significantly less, less than 100,000.

12          But if you look at across the board, if you look at

13  how many claimants are going to be diagnosed with Stage 4 and

14  how many will be diagnosed at Stage 3 and 2 and 1, and you look

15  at how many of those would be diagnosed when they are 40 years

16  old versus when they are 70 to 75 years old, we know those

17  numbers.  We have that analysis.

18          And that weighted average is 224,000.  And I submit

19  that is conservative, and it is supported by what we have seen

20  in the trials.  In the trials of these cases, many times there

21  were stipulations that were entered into by J&J, their lawyers,

22  and the plaintiffs' lawyers representing the victim.  And so

23  you look at these medical bills, these are what was stipulated

24  to once the medical bills were compiled and J&J's lawyers

25  analyzed those, they stipulated that these are the medical

Case 23-12825-MBK   Doc 614-8   Filed 05/26/23   Entered 05/26/23 23:11:45   Desc
Exhibit 7 to Declaration of Daniel J. Merrett   Page 7 of 13

88

1  bills.

2          So you see 854,000, 1.3 million, almost 1.4.  So you

3  see these values.  These show that what I presented to you as

4  an average medical cost, they're conservative.  The lowest -- I

5  do think that this point is worth the Court's consideration, as

6  well.  The lowest compensatory award of any plaintiffs' verdict

7  on the ovarian cancer side was over $2.5 million.  The lowest.

8          When you look at the medical cost, you look at the

9  compensatory awards, these just looking at the objective

10 criteria, you see the significance of what is involved in these

11 cases.  Again, the lost wages, that is another objective

12 criteria.  And, again, you will have someone who is diagnosed

13 at Stage 4, you know, someone who dies as a result of ovarian

14 cancer in their 40s is going to be significantly higher than

15 someone who is diagnosed at a lower stage at age 60.

16         But the weighted average across that span would be

17 over $230,000.  That's lost wages.  You look at the lost wages,

18 you look at the medical expenses, those are objective criteria.

19 But, Your Honor, I want to take you back to and it was

20 referenced earlier, Mr. Henry, Mr. Bill Henry.  When he

21 appeared before the Court I believe by Zoom, he reminded the

22 Court, he reminded us all these claims are about people.  They

23 are not about numbers.  He walked through his 56 years of -- or

24 46 years of wedding and what it was like to lose his wife, the

25 love of his life.

Case 23-12825-MBK    Doc 614-8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 8 of 13

89

1          He says there is -- there's no apologies, there are

2   no do-overs.  Please hear the 38,000 echos of this voice.  We

3   are people, not numbers.  So when I walked through the

4   objective criteria, I don't want to lose sight that we're

5   talking about, we are talking about people.  We are talking

6   about families that have been ripped apart.

7          Now in addition to the objective criteria, you should

8   also take into consideration the pain and suffering.  So what

9   happens when a woman is diagnosed with ovarian cancer?  One of

10  the first steps in the course of treatment is a debulking

11  surgery.  It is a major significant surgery.  The torso is

12  incised and all of the female reproductive organs are removed.

13  That leads to many of these women, may of these women die.

14  They die of starvation because the results of the scarring of

15  their tissue, is a painful painful process.  That's what these

16  women go through.

17          When we look at those medical records, when we look

18  at the medical records and the cost, the debulking surgery then

19  followed by chemo gives a glimpse of the significance, the

20  magnitude of the injury that we're talking about here.  So when

21  we look at the objective criteria, so when I say that we oppose

22  the proposed J&J deal, it is because of these criteria because

23  we know what these women went through.  We know what these

24  families went through.  We know what the men who suffered from

25  mesothelioma went through.

90

1    So against that backdrop, we can say that this is a

2 bad deal and we oppose it.  So what do we know about the deal,

3 the proposed plan that J&J has put forward?  I mean, first,

4 that it includes all ovarian cancer claims and all mesothelioma

5 claims.  It includes not only the current claims but the future

6 claims, as well.  And it includes all of the governmental

7 entity claims, all of the state AG claims.  All of that for a

8 pot of $8.9 billion.

9    And so what has been put forward by Mr. Gordon today

10 that there is a vast majority that support this proposal.  We

11 take issue with the vast majority.  We see, and Mr. Watts

12 addressed this earlier and he referenced, and we see the 13

13 firms that were listed that support this deal.  There are well

14 over 100 firms that oppose this deal for the very reasons that

15 I just described.

16    And here's what we do know about the deal, and Mr.

17 Watts and Mr. Gordon describe this for us.  So look, we see

18 that in the first year, two things would happen.  One, they

19 will pay $5.9 billion and that is to satisfy all current

20 claims.  So here's what we can look at.  One of the things that

21 is the most sinister, and that's saying a lot, one of the

22 things that is the most sinister about this proposed deal is

23 that J&J through this proposal is seeking to engender

24 endfighting.

25    This proposed deal would seek to pit the ovarian

Case 23-12825-MBK   Doc 614-8   Filed 05/26/23   Entered 05/26/23 23:11:45   Desc
Exhibit 7 to Declaration of Daniel J. Merrett   Page 10 of 13

91

1   cancer claimants against the mesothelioma claimants.  This

2   proposed deal would seek to pit the future claimants against

3   the current claimants.  And this proposed deal would seek to

4   pit the state attorney generals against all of the personal

5   injury claimants.

6          But it does even more, and Mr. Watts discussed the

7   debate that we will have and Mr. Watts, I've known Mr. Watts, I

8   have tried cases with Mr. Watts, and we can have a civil debate

9   about the merits and the lack of merits of this proposed deal.

10  One thing that I am confident that Mr. Watts will tell you or

11  would tell anyone that when he talked about the three meetings

12  that we had and in addition to those meetings, we had phone

13  conferences, as well, phone discussions, and I am confident

14  that one thing that Mr. Watts will tell you is while we may

15  disagree on the merits of this deal, the only discussion that

16  we had in regards to a deal was based on the value to the

17  claimants, nothing else.

18          You want to know, well, what would drive the

19  claimants.  I've just described that for you.  It is because of

20  the merits and the value of these claims, and it is nothing

21  more.  And Mr. Watts described -- addressed the issue of side

22  deals.  I have never said and I do not believe that Mr. Watts

23  is engaged in any side deal.  There is a difference based on

24  the merits of these claims.

25          And if Mr. -- I want to walk through very briefly in

92

1  conclusion, Your Honor, I want to walk through the math of this

2  deal and what this deal shows us, what the math of this deal

3  shows us.  If you look at the payment over the 25 years, the

4  nominal payment would be 12.08 billion.  Now J&J has asserted,

5  they have represented they believe there are 90,000 current

6  claims and that they have signed plan support agreements for

7  60,000 of those.  They've said that they have 60,000 plan

8  support agreements.

9           So if you look at this math, at 12.08 billion, if

10  there are 100,000 claims and that would only be 10,000 future

11  claims and I don't believe there's anyone in this room that

12  believes that there would only be 10,000 future claims.  But at

13  10,000 future claims, you're looking at a total of 100,000

14  claims.  That would be 120,000 case average.

15           That's assuming that the state AGs take nothing from

16  this pot.  That's assuming that there is no payment for direct

17  claims from third-party payors.  And it's assuming that the

18  mesos and the ovarians are all taking from the same pot because

19  that is -- that's what this proposal is, is seeking to get

20  60,000 claimants, and maybe there are those claimants like Mr.

21  Watts and Mr. Onder, and Mr. Nachawati represent.  And I

22  understand it.

23           This has been a long hard slog and there may be

24  claimants, maybe it's the lesser injury claimants, maybe there

25  are claimants that just said, look, I'm throwing in the towel,

121

1   were -- they were dismissed based on jurisdiction.  Those cases

2   remain pending today.  Those cases remain pending today.  The

3   statement that Beasley Allen lost every trial is -- it's

4   another -- it's another effort at misleading the Court.

5           Mr. Gordon says, just let the people vote, as if

6   letting a vote go forward now has no harm.  A vote -- a vote

7   means delay.  The debtor had 18 months to allow a plan to go

8   forward for a vote in the first bankruptcy.  They chose not to

9   do it.

10          So to say that let's just let the people vote, that

11  is as if there's no harm.  It is significant harm.  It deprives

12  every one of these claimants, ovarian cancer, mesothelioma

13  claimants, it deprives them of their day in court.  There has

14  been enough delay already.

15          Mr. Gordon asked, you know, how could firms -- how

16  could firms just categorically reject this amount, without even

17  giving it consideration.  Your Honor, we engaged.  We engaged

18  the leadership of the TCC.  The Court ordered -- following your

19  ruling, you ordered mediation.  We engaged in mediation.

20          As part of that process, there were significant

21  discussions among plaintiff's lawyers and with our clients.  We

22  know -- we know what our clients view as a reasonable offer and

23  what would not be adequate to resolve on an equitable basis all

24  of the current claimants.  So we -- it is not as if this

25  proposal is something that was just categorically rejected.  It

122

1  was rejected because we have been through this process, we know

2  what the values are, and we know that this -- that this plan,

3  an $8.9 billion plan to cover all of the present and future

4  ovarian cancer claims, mesothelioma claims, and Attorney

5  General claims is woefully short.

6           Thank you, Your Honor.

7           THE COURT:  Thank you.

8           UNIDENTIFIED SPEAKER:  Your Honor, can I speak from

9  here?

10          THE COURT:  Yes, please.  Yeah.

11          UNIDENTIFIED SPEAKER:  I'm not sure Mr. Gordon

12 answered any of my questions.  So after the Third Circuit

13 handed down its decision, while we were waiting for an en banc

14 determination, is Mr. Gordon saying that he was negotiating

15 with the FCR as a pretext for this bankruptcy?  Yes or no?

16          Did J&J look at any of the medical records for any of

17 Mr. Watts' clients in determining what is a fair deal here and

18 determining who should vote and who's among the 60,000 people

19 that they say they have support for?

20          And lastly, did the giving up of the funding

21 agreement, was that part of any of these post Third Circuit

22 discussions?

23          Thank you.

24          THE COURT:  All right.

25          UNIDENTIFIED SPEAKER:  Very briefly, Your Honor.