IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                           .    Case No. 23-12825(MBK)
                                 .
                                 .    Clarkson S. Fisher U.S.
LTL MANAGEMENT LLC,              .      Courthouse
                                 .    402 East State Street
                                 .    Trenton, NJ 08608
          Debtor.               .
                                 .    Tuesday, May 30, 2023
. . . . . . . . . . . . . . .    .    11:31 a.m.

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE AND MOTION HEARING

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:              Jones Day
                             By:  GREGORY M. GORDON, ESQ.
                             2727 North Harwood Street
                             Suite 500
                             Dallas, TX 75201


For Ad Hoc Committee         Brown Rudnick LLP
of Certain Talc              By:  JEFFREY L. JONAS, ESQ.
Claimants and Ad Hoc              DAVID J. MOLTON, ESQ.
Committee of Creditors:           MICHAEL WINOGRAD, ESQ.
                             7 Times Square
                             New York, NY 10036


For the Office of the        Office of the U.S. Trustee
U.S. Trustee:                By:  LINDA RICHENDERFER, ESQ.
                             J. Caleb Boggs Federal Building
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, DE 19801


Audio Operator:              Kiya Martin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES CONT'D:


Various Talc Personal           Watts Guerra LLP
Injury Claimants:               By:  MIKAL C. WATTS, ESQ.
                                5726 W. Hausman Road, Suite 119
                                San Antonio, TX 78249

For Various Talc                Maune Raichle Hartley Frency &
Claimants:                        Mudd, LLC
                                By:  CLAYTON L. THOMPSON, ESQ.
                                150 West 30th Street, Suite 201
                                New York, NY 10001

For Arnold & Itkin:             Pachulski Stang Ziehl & Jones LLP
                                By:  LAURA DAVIS JONES, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE 19801

For Ad Hoc Committee            Paul Hastings, LLP
of Supporting Counsel:          By:  KRIS HANSEN, ESQ.
                                200 Park Avenue
                                New York, NY 10166

For the Talc                    Massey & Gail LLP
Claimants Committee:            By: JONATHAN S. MASSEY, ESQ.
                                The Wharf
                                1000 Maine Avenue, SW
                                Suite 450
                                Washington, D.C. 20024

3

1          (Proceedings commenced at 11:31 a.m.)

2          THE COURT:  Okay.  Good morning, everyone.  This is

3    Judge Kaplan.  And at the outset, I will give my apologies.  I

4    am under the weather with COVID, and I give my appreciation to

5    the ABI event in New York City last week, so they get all the

6    blame, I think.

7          So I'm going to probably be a little bit more

8    abbreviated and less patient than I try to normally be.  But

9    we'll run through all the issues.  I was also just handed I

10   guess the copy of the Second Circuit's decision in Purdue so

11   I'm anxious to go read it and see what's in store for us all.

12         Let me -- just bear with me.  Needless to say, as we

13   -- sorry.  Let's follow the usual approach on remote hearings.

14   If you wish to be heard, please use the "raise hand" function,

15   and I will do my best to spot you.

16         Mr. Winograd, you have the fastest hands we see.  So

17   -- and then there's Mr. Molton.  All right.  I was going to

18   address some of the more significant issues first, but let me

19   turn, Mr. Winograd, you wish to be heard?

20         MR. WINOGRAD:  Your Honor, I was just offering --

21   and, first of all, thank you for having this while you're under

22   the weather.  I was just going to offer to tell you what I

23   think is on the agenda between the two parties.  But if Your

24   Honor has an idea of what order you'd like to go in, that's

25   obviously fine with us.

4

1          THE COURT:  Well, let me hear from you.  Lay it out

2   for me just to make sure that we're in sync.

3          MR. WINOGRAD:  Sure.  So, you know, and apologies,

4   Your Honor, because this list appears to be growing rather than

5   shrinking.  But as I see it, there are approximately eight

6   issues that the parties have raised with the Court for today.

7   There is the hearing date issue again; the issue of discovery

8   on the transfer of the consumer business; the issue of

9   producing the unredacted claimant lists that we talked about

10  last hearing -- last conference.

11          Number four is the issue of NDAs that still aren't

12  being produced in any form; number five, the list of the

13  hundred-plus law firms that the TCC has offered to provide and

14  we just can't seem to come to agreement on who should be able

15  to see it; the deadline for motion to dismiss replies.  And it

16  was also raised the potential elimination of replies and

17  surreplies as well by the debtor, that's number six.

18          Number seven is the motion to compel that was filed

19  recently by the debtor.  They had mentioned other discovery

20  motions coming down the pike, but that's the only one that

21  we've seen.  Number eight is the in-camera review that Your

22  Honor was provided with documents with respect to the

23  unredacted board presentations.  And then the last thing that I

24  have, number nine, is the in-camera review with respect to the

25  common interest concerning the termination of the 2021 funding

1  agreement.

2          THE COURT:  All right.  That comports with what I

3  have.  And let me start off.  I'm going to just, because I've

4  had the benefit of all of the correspondence, the arguments,

5  the multiple submissions.  And I'm prepared to give certain

6  rulings and then I'll also want to give counsel an opportunity

7  on the more recent issues such as the Committee's May 29th

8  correspondence regarding the release of information and Jones

9  Day involvement.  It goes to, again, the 2021 funding agreement

10  and communications relative to that that were submitted for in-

11  camera review.

12          Let me start with the major items, if I may.  I

13  understand scheduling issues for counsel, for firms, and for

14  competing burdens placed on all of our schedules.  This Court

15  cannot be held hostage to any one attorney's calendar, any one

16  case being handled elsewhere.  We're going to proceed, and I

17  don't mean that pejoratively, it's just that with respect to

18  the Valadez matter, I don't know if it actually will go off or

19  it will continue or how long it will take or whether it will be

20  a break.  And the issues before this Court are too important to

21  defer without any constraints.

22          We're going to begin the four-day hearing on the 27th

23  of June.  And I am confident since most of the issues before

24  this Court involve bankruptcy issues, issues regarding the

25  motion to dismiss, 1112, I am confident that the debtors'

6

1  counsel can handle the presentations and the arguments without

2  -- will be the benefits of having Ms. Brown.

3       Given that scheduling, with respect to briefing, I

4  intend to ask the parties for post-trial findings and

5  conclusions.  I think that would benefit the Court, benefit the

6  parties, and in the long run, expedite the process.  We will

7  schedule that at the conclusion of the hearing.

8       In light of the post-trial (indiscernible), I intend

9  to treat and to view the pretrial submissions as opening

10 statements so, in other words, there is a reply due from the

11 Committee and there would be a surreply.  You are welcome to

12 file those.  The reply needs to be in by close of business June

13 19th.  The surreply needs to be in by close of business -- I'm

14 sorry, by 1 p.m. on June 26th.  Let me correct that, I'm sorry.

15 The reply is in by June 20th close of business.  The surreply

16 is in by 1 p.m. on that Monday, June 26th.

17      Because they are simply in lieu of opening

18 statements, I'll have the benefit of time to read them during

19 the next, the following three or four days.  So you don't need

20 to file them, but if you choose to, those are the deadlines.

21      Let's move on to the in-camera review that the Court

22 undertook with respect to the documents for which the debtor

23 seeks to claim privilege under the common interest -- that has

24 asserted a common interest privilege with respect to the

25 PowerPoints and the various documents that have been submitted.

1          And in that regard, the documents focused on the

2    transaction in which the funding agreement, the 2023 funding

3    agreement was structured both email communications and drafts.

4    The Committee submitted correspondence on May 29th, yesterday,

5    raising issues with respect to Jones Day involvement.

6          Let me see if, Mr. Gordon, do you wish an opportunity

7    to respond to that correspondence?

8          MR. GORDON:  Thank you, Your Honor.  Greg Gordon on

9    behalf of the debtor.  I'm sorry that you're not feeling well

10   today, and I appreciate as well the fact that you're even

11   conducting this hearing.

12         With respect to the letter that came in last night,

13   honestly, I've only had a short period of time to review it.

14   But I think the response to it is rather simple and

15   straightforward, and that is that we don't believe there was a

16   conflict.  And so both sides -- you know, as Your Honor

17   probably knows based on what you've seen, both sides began

18   looking at the issues immediately following the January 30

19   opinion.  Counsel for J&J was involved, counsel for LTL was

20   involved, and that was us, Jones Day.

21         And fundamentally, both sides in taking the look at

22   the issue came to the same conclusions fundamentally about it.

23   And so from our perspective, we don't believe there was a

24   conflict.  And accordingly, the arguments that we should have

25   involved conflicts counsel to exclusively handle those issues

1  we think missed the mark.

2      Now that's not to say that Mr. DeFilippo wasn't

3  involved.  He was.  I don't know whether that would make a

4  difference to the Committee or not.  I doubt that it would.

5  But, again, fundamentally, our response is that in our view,

6  there was no conflict.  Both sides came to the same conclusion.

7  and perhaps in some ways more importantly, the issues

8  Ultimately were rendered moot by the ability of the company and

9  J&J and Holdco to come to agreement on a new set of financing

10 that we believe put the debtor in basically the exact same

11 place it was in before, that its obligation to pay claims was

12 fully covered by the financing in ways that were very similar

13 to if not in some respects, the same as the financing that was

14 in place earlier.

15      THE COURT:  All right.  Thank you.

16      Mr. Winograd or Mr. Jonas, do you want to respond?

17      MR. JONAS:  Yes, Your Honor.

18      It's Jeff Jonas from Brown Rudnick on behalf of the

19 TCC.  I'll be brief, Your Honor.  I think between our initial

20 papers and the letter we recently filed, there's not a lot more

21 to say, but I'll just respond to Mr. Gordon's comment and be

22 brief about it.

23      Your Honor, it's truly an incredibly position that

24 the debtors and Jones Day have now taken that there was no

25 conflict in terminating the first funding agreement by which

1  Johnson & -- and entering into the second funding agreement by

2  which Johnson & Johnson went from a $61-billion-plus obligation

3  to a zero-dollar obligation.

4          Today, Your Honor, under funding agreement two,

5  absent a confirmed plan, J&J has zero obligation, zero

6  exposure.  Certainly, this was a fantastic deal or arrangement

7  for J&J, not so much for LTL.  And to say that there was no

8  conflict and, therefore, no adversity is frankly ridiculous.

9  It's incredible, it's ridiculous, it does not hold water.  And,

10 Your Honor, it takes us to the heart of the issue which was if

11 there was adversity at that point in time where the parties

12 allege the first funding agreement was void or voidable, there

13 had to be adversity.

14         How could it be that J&J went from $61-billion to

15 zero all of which or none of which inures to the benefit of my

16 clients?  How could that not be an adverse situation?  If it

17 was adverse, as we argued the first go-around, there can't be a

18 privilege, and that's the end of it.  I appreciate, Your Honor,

19 obviously I didn't have the benefit of seeing the underlying

20 documents, but I appreciate on its face it was dressed up very

21 nicely for Your Honor.  Boy, look at all these lawyers,

22 communications, emails, memos.  It must be privileged.  It

23 can't be privileged because there was adversity, Your Honor.

24         And with that, Your Honor, obviously, our letter goes

25 into the various comments that both Mr. Gordon made and that

1  the Court put on the record that to the extent there ever was

2  adversity or ever was a conflict, it was clear to everybody in

3  LTL1, of course, Jones Day shouldn't be involved.  So to now

4  recreate history and the only way they can solve for that is to

5  say, oh, there never was adversity, there never was a conflict,

6  it's incredible, Your Honor.  And that's all I'll say at this

7  point.

8         Thank you.  And I do appreciate, notwithstanding you

9  being under the weather, you taking the time to hear us today,

10 Your Honor.  Thank you.

11        THE COURT:  Thank you, Mr. Jonas.

12        All right.  Is there any other comments?

13             (No audible response)

14        THE COURT:  In reviewing the materials in camera and

15 notwithstanding the concern that at some future point, the

16 parties may be adverse with respect to enforceability of either

17 the 2021 or 2023 funding agreements, that potential adversity

18 doesn't vitiate in this Court's view the common law common-

19 interest privilege that upholds the work-product or attorney-

20 client privilege interposed between LTL, J&J, and Holdco.

21        All of those three entities were targets or are

22 targets of talc-related litigation.  They share, in this

23 Court's view, a common legal interest in attempting to have the

24 talc claims addressed through a Chapter 11 with a 524(g)

25 channeling capacity.  They share a substantially similar legal

1   interest in developing a structure of a funding agreement that

2   would be consistent with the Third Circuit's decision

3   dismissing the first Chapter 11 case.

4          The Court rules that communications in furtherance of

5   developing such legal strategy supporting such objectives

6   (audio interference) bad-faith challenges to LTL's bankruptcy

7   fall within the ambit of their common interest and, thus, the

8   attorney-client work-product privileges would attach.

9          If there is a breach of fiduciary obligations by the

10  parties or their counsel, that is for an issue to be determined

11  down the road and if it arises, then we can -- the issues can

12  be addressed.  But I found no basis to vitiate or terminate the

13  attorney-client privilege as a consequence at this juncture.

14         Now having said that, the documents submitted

15  included drafts of agreements with attorney notations, changes,

16  suggestions.  It includes emails reiterating or reflecting such

17  work product and attorney thought processes.  And they are in

18  whole from what I could tell protected with one limited

19  exception and a few that I'll note.

20         With respect to the PowerPoint, the redactions are

21  proper as far as restricting the release of attorney-client

22  privilege information and work product.  The Court reviewed

23  each of the redacted material.  I'm going to make one

24  exception.  Not that I don't believe it falls within the ambit

25  of the attorney-client and work-product privilege, but the

1 slide that it's at Page 12 that references considerations

2 regarding filing in New Jersey, because the lack of

3 transparency would give rise to too much rumination and

4 mischief, I am going to direct that that slide be released.

5          It was intriguing to me to see what considerations

6 there were for filing in New Jersey.  I'm sure it was

7 interesting to others.  And I just think there will be more

8 mischief served, more mischief undertake and I think

9 transparency warrants releasing that slide.  I don't believe

10 there's prejudice to the debtor or J&J in so doing.  That's

11 just a limited exception.

12          I do have questions.  The privilege log provided and

13 those that were provided fell in my view within the

14 protections.  The log identified certain attachments that

15 obviously I didn't have a chance to see.  And I can't rule on

16 what I don't see.  So I'm going to give -- it's about nine of

17 them, and I'm going to ask the debtor to provide the Court with

18 those nine attachments so that I can determine whether or not

19 they too fall within the parameters of the privileges.  Those

20 are the following numbers: 12, 14, 16, 18, 22, 33, 53, 57, and

21 62.

22          If you can provide those to me within 48 hours, I'll

23 take a look at them and determine whether it's consistent with

24 the other rulings or whether they should be released.

25          Moving on to the --

13

1           MR. JONAS:  Your Honor, Jeff Jonas, if I may?

2           THE COURT:  Yes.

3           MR. JONAS:  I just didn't want -- thank you, Your

4    Honor.  I didn't want my silence -- we continue to press our

5    objection.  Obviously, where we go from here, we'll have to

6    discuss.  But I just, for the record, Your Honor, wanted to

7    preserve our continued objection.  And thank you.

8           THE COURT:  Thank you.  Thank you, Mr. Jonas.  Noted.

9           All right.  I don't see anybody else.

10          With respect to the NDAs, I am directing the debtor

11   to produce the NDAs as requested under the restrictions

12   requested as far as limited to attorneys' eyes only as offered

13   by the TCC.

14          As to the list of 100 firms, I am directing that same

15   production for debtors' litigation counsel, both -- and so

16   beyond simply J&J and Jones Day, it should include counsel for

17   AHC as well, the Ad Hoc Committee, and be available for in-

18   house counsel.

19          With respect to the de-duplication and the claimants'

20   lists, I have some reservations about the materiality at this

21   juncture with respect to the motion to dismiss of dwindling

22   down lists from 50,000 to 30,000 to 20,000 to whatever the

23   number or more, whatever it is.  However, if this case survives

24   a motion to dismiss, I could see the relevance in order to

25   assure that the proper creditors are voting.

1    So I am going to take up the suggestion of the Ad Hoc

2 Committee counsel and direct the parties to meet and confer and

3 identify a professional or firm that can de-duplicate all

4 claimants with oversight to be made available and information

5 to be exchanged with all counsel who have filed motions to

6 dismiss and the U.S. Trustee.

7    Let's, if we can, move to the J&J motion for a

8 protective order.

9    MR. WINOGRAD:  Your Honor?

10    THE COURT:  Yeah.

11    MR. WINOGRAD:  This is Michael Winograd of Brown

12 Rudnick.  May I just make a comment on that last -- on the last

13 ruling, the issue Your Honor said de-duplication of all

14 claimants.  This is an issue that there's a subpart to that

15 that simply hasn't been resolved.

16    What we've asked for is de-duplication of lists that

17 have been gathered and provided filed with the Court.  Those

18 are the claimant lists attached to the PSAs and the claimant

19 lists filed with the 2019.  When the AHC sort of subtly says

20 all claimants, they are including within that effectively a

21 request for discovery that we somehow generate a list of

22 everybody else out there.

23    So they've generated and filed lists of claimants

24 purportedly in support of the plan.  They want us to go out and

25 generate.  You know, we just don't have that.  The TCC doesn't

1  have lists.  We've told them that repeatedly.  So I'm not sure

2  if Your Honor means to sort of rule on a discovery motion

3  that's not before the Court, but we can't -- that presents an

4  issue.

5            THE COURT:  Well, let me hear.  I think I wasn't

6  clear, but let me hear.  Mr. Hansen?

7            MR. HANSEN:  Yes, Your Honor.  Kris Hansen with Paul

8  Hastings on behalf of the Ad Hoc Committee.

9            Your Honor, I guess there's a couple of subparts to

10 this.  From the TCC's perspective, they have individual

11 claimants who are members.  Those members have designated

12 counsel to sit in their stead or with them on the Committee.

13 Those counsel, we believe, represent, many other claimants.  As

14 a matter of fact, Mr. Winograd and others on the Brown Rudnick

15 side have banded about 40,000 claim numbers in front of the

16 Court.  They have this list of 100 law firms.  They've said

17 this repeatedly.

18            So the point that we were trying to make is, and we

19 agree with Your Honor, we don't think any de-duplication needs

20 to occur now.  We think it should be done in the context of

21 solicitation of a plan by the claims agent who would be a third

22 party that we think could do it.  But be that as it may, the

23 TCC has said, well, because you complied with Rule 2019 and

24 your clients signed PSAs, we want to de-dupe just yours and, oh

25 by the way, we want more people than just Brown Rudnick to take

16

1  a look at it.

2          So from where we sit, Your Honor, again, when we talk

3  about de-duplication, if that's really the motive here, then it

4  should apply equally to all parties who are supposed to file

5  2019s in this case and who will be putting their claims

6  forward.  Again, the right time to do that is in the context of

7  solicitation.  But if we're going to do it now, it shouldn't be

8  something that is used against a party who actually complies

9  with Rule 2019.

10          It should be equally applicable to everybody who

11 should be filing Rule 2019 statements as well as those parties

12 who represent other claimants in the case who may or may not

13 come under the 2019 standard.  But, again, when you -- the

14 question Mr. Winograd just raised, we have no idea who these

15 people are.  We have no idea who they are.  That's just simply

16 not true.  The reality of the situation is they full well know

17 who they are.  They've cited all these claim numbers.  They've

18 cited a hundred law firms.  They know who the parties are, and

19 it's easy to get those claims and have them all submitted.

20          We can work on an order if you'd like, Your Honor,

21 that you can sign for parties to contribute those claims to the

22 neutral third party.

23          THE COURT:  All right.  Thank you, Mr. Hansen.  I am

24 interested in hearing from Ms. Richenderfer.

25          MS. RICHENDERFER:  Your Honor, can you hear me?

17

1            THE COURT:  I can.  Thank you.

2            MS. RICHENDERFER:  Let me just mute my phone.

3            Your Honor, Linda Richenderfer from the Office of the

4  United States Trustee.  I guess the Office of the United States

5  Trustee is still very confused because we received from the

6  debtor its filed schedules and statements.  And on Schedule

7  E/F, it's supposed to identify all creditors.  And the people

8  that are represented by the attorneys that Mr. Hansen

9  represents are nowhere on that list.

10            And in the view of the United States Trustee's

11  Office, if we were going to do a solicitation tomorrow, the

12  people who would get the ballots would be the people that are

13  on Schedules E and F unless there is a proof of claim

14  obligation in the meantime.  So we're talking about de-duping.

15            But, Your Honor, we get back to the point that the

16  debtor is supposed to identify who it believes is a creditor,

17  who it believes is a claimant.  And we shouldn't have to be

18  going through Mr. Hansen or anyone else to find out.  And the

19  debtor has not done that.  And I think that's what's causing

20  some of the confusion here.

21            E/F is a listing of all of the creditors the debtor

22  was aware of at the start of case number one.  It did not

23  change for case number two.  However, we know that the debtor

24  entered into PSAs and it claims that all those people have

25  claims against it.  But E/F does not reflect that.

18

1          And I think that it becomes a little bit of an issue

2  because we have the debtor taking the position that the

3  majority of the claimants are in favor of the plan and we don't

4  know who those claimants are because the debtor themselves is

5  not identifying them.

6          So I guess part of it is if the debtor's going to

7  make that claim, I think the debtor has to support it and it

8  has not supported it because it's looking at Schedule E/F.  And

9  we're getting into an issue that perhaps is, it's a lot more

10 complicated than I ever thought it would be because -- but it

11 all goes back to the debtor not identifying who it knew had a

12 claim against them as of the date of the second filing.  And

13 that still has not occurred.

14         So I don't know who Mr. Hansen's attorneys represent

15 because to the extent they had PSAs prior to the filing, the

16 debtor has not pointed to them and said these are potential

17 creditors of our estate.

18         THE COURT:  Thank you, Ms. Richenderfer.

19         MS. RICHENDERFER:  I just wanted that to be known on

20 the record, Your Honor.

21         THE COURT:  Thank you.

22         I guess I still need to hear how or have it explained

23 for me how this is relevant for the motion to dismiss or how

24 material it is.  Relevance is an elastic concept, but how

25 material it is for a motion to dismiss.  I'll go back to Mr.

1  Hansen in a second.  Mr. Winograd?

2        MR. WINOGRAD:  Sure.  Your Honor, and let me -- to

3  tackle that question right away, during the context of these

4  proceedings, we have been told about the numbers of claimants,

5  filed and unfiled, that support the term sheet and eventually a

6  plan filed by the debtor.  If Your Honor does not and we don't

7  know -- you know, there are arguments to be made about the

8  quality of those claims and whether they have been made

9  previously and will be made in the future, I'm sure.

10        This exercise was simply to say, well, how many are

11  there.  We just don't know, and let's de-dupe.  You guys, you

12  the other side, has put in in support of these claims of 60,000

13  in support.  They have taken the step of filing not just the

14  2019 that counsel referred to.  They have filed the claimant

15  lists with PSAs.

16        If Your Honor is of the view that it does not matter

17  how many unfiled because filed claimants it's easy to count and

18  know who they are.  If it doesn't matter whether filed or

19  unfiled, in fact, it doesn't matter how many people purport to

20  support or oppose the plan for the motion to dismiss, then this

21  may not be necessary.  But if it is relevant, then they went

22  ahead and made statements and filed lists in support.

23        We're simply asking them -- and they know them, their

24  own FAs, financial advisors, have access to them.  We simply

25  want Brown Rudnick to be able to lay eyes on them and use a

20

1 financial adviser to de-dupe just like they can do.  We've

2 expressly limited.  Their only concerns of harassment, these

3 allegations of harassment, we've said we will not provide them

4 to the plaintiffs' law firms.

5          Now, Your Honor, in ruling on the last issue with

6 respect to the list of 100 law firms, we expressed the same

7 concerns Your Honor said, it can still go to the AHC.  Well, if

8 that's the case, then we should be able to show this list to

9 our, you know, the member reps, as well.

10          But in any event, this is simply a matter of de-

11 duping lists that they have already filed.  That has nothing to

12 do with discovery that they may or may not have propounded or

13 raised with the Court yet.

14          MR. MOLTON:  Your Honor, may I follow up on Mr.

15 Winograd?

16          THE COURT:  Yes.

17          MR. MOLTON:  Okay.  David Molton, proposed -- with

18 Brown Rudnick, proposed counsel for the TCC.  Judge, we hope

19 you're feeling good.  And we're sorry, I've been through it

20 twice and it's no easy thing.  So our best wishes.

21          Your Honor asked the relevance, and I know that Your

22 Honor gave us a homework assignment on 1112(b), and I know Mr.

23 Massey at some point at the end of this is going to raise --

24 going to talk a little bit about how we've already taken a look

25 at that homework assignment and some of our views on it.

1          But to the extent that 1112(b) is relevant here and

2    to the extent that -- and we know from Mr. Hansen's pleading on

3    Friday that they're basing their objection to the motion to

4    dismiss based on that there's an imminent plan that's subject

5    to confirmation and effective date.

6          These issues to the extent Your Honor believes them

7    to be at play in the motion to dismiss -- and I know Mr. Massey

8    when the time is right today is going to talk to you about

9    1112(b), that they would be relevant.  Now it may be, Judge,

10   and I know from our view of 1112(b), we don't view that that

11   has any applicability here under the circumstances.

12         And to the extent Your Honor agrees with that, then I

13   would likely agree with you, Your Honor, that at this point in

14   time, these issues would not be relevant.  But to the extent

15   that they've put that into play and we're dealing with it now,

16   they are relevant to the motion to dismiss.  So I just wanted

17   to add that point for Your Honor.

18         THE COURT:  All right.  Thank you, Mr. Molton.

19         Mr. Thompson?

20         MR. THOMPSON:  Yes.  Thank you.  I'll be brief.

21         I agree with Mr. Molton, I agree with Mr. Winograd.

22   They have put the issue of support at issue for the purposes of

23   the motion to dismiss.  If Your Honor is not going to consider

24   how many claimants allegedly support the plan, then we don't

25   have to do this.  But they, meaning the Ad Hoc Group and the

22

1  debtor, are saying to you that the complaint was filed in good

2  faith because they have X number of claimants that are

3  supporting it.

4          So, number one, how many claimants are there that

5  actually exist; number two, what disease do they have, because

6  if they have a disease that's not connected to talc, that's not

7  ovarian cancer, epithelial ovarian cancer or mesothelioma, it

8  doesn't matter.  And they put these issues, both of them, at

9  issue for the motion to dismiss and, therefore, we're entitled

10  to all of it.  Thank you.

11          THE COURT:  Thank you, Mr. Thompson.

12          Mr. Massey?  I'm sorry, Mr. Massey?

13          MR. MASSEY:  Thank you, Your Honor.  And, again, I

14  hope you feel better soon.  What Mr. Molton was suggesting was

15  that the 1112(b)(2) argument is kind of the premise by which

16  all of the supposed creditor support is coming in.  And it

17  might be -- if Your Honor is inclined, the 1112(b)(2) argument

18  could be framed for the Court earlier than the motion to

19  dismiss trial, if that would be your preference.

20          I mean you've already clearly thought through the

21  schedule and the briefing and how you want the hearing

22  formatted.  But it did occur to us that if you wanted a motion,

23  say, for partial summary judgment on the availability of

24  1112(b)(2), that could be teed up and filed in advance of the

25  hearing and today's discussion is already suggesting that the

1  hearing, sort of the evidence that comes in at the hearing and

2  the arguments at the hearing and the witnesses at the hearing

3  might all be affected by the 1112(b)(2) issue.

4         And if we knew that it was off the table and it was

5  not available as a basis for establishing good faith on the

6  part of the debtor, the debtor's eligibility for bankruptcy,

7  then that would streamline the motion to dismiss and it would

8  benefit the Court and the parties to that extent.

9         But, again, we'd just offer this up as an option for

10 Your Honor.  You obviously have a schedule and a format in

11 mind, but it's something that occurred to us so we thought we'd

12 mention it.

13        THE COURT:  All right.  Well, interesting concept.  I

14 certainly would want to hear from the debtor and their view of

15 it.  Mr. Hansen, your hand is up and then we'll hear from

16 anyone else.

17        MR. HANSEN:  Thank you, Your Honor.  Again, Kris

18 Hansen with Paul Hastings on behalf of the Ad Hoc Committee.

19        Your Honor, just I wanted to respond to a couple of

20 the points that were made.  So the one response is some of our

21 clients' claims actually are on Schedules E and F, those that

22 were previously filed.  I looked at those last week and saw

23 them, so just to respond to Mr. (indiscernible) statement

24 repeatedly that there are no claims contained in the 2019 or

25 the PSAs that are on that list.  There are plenty on there.

24

1        And then with respect to the other point again, Your

2   Honor, just about timing, we continue to have the view that the

3   right time to assess all of this is at the voting time.  But,

4   again, which a solicitation agent can do.  But to the extent

5   that the parties here have raised the point that under 1112(b)

6   I guess where you're looking at the potential confirmability of

7   a plan and you want to understand better what the claimant pool

8   is, you need to understand the entire claimant pool at that

9   point.  You can't just try to look at one part of the claimant

10  pool.

11       The argument about 1112(b) dies when you have to

12  consider the fact of confirmability because you have to have a

13  broader view of the full claimant pool.  And, again, the TCC

14  and other parties on that side of the room have repeatedly said

15  that they have 40,000 or other number of claims that are out

16  there.

17       And so, again, Judge, we think the most fair thing to

18  do is to have people put their 2019s in, have that claimant

19  information given over to a single neutral party, and give

20  "attorneys' eyes only" access to the information across the

21  TCC, the Ad Hoc, and the debtor.  And then that would get to

22  the right result, and I believe people can do it quickly.  And

23  the de-duping seems to be purely a mechanical type of process.

24       In terms of the underlying claims relevance, Your

25  Honor, you addressed this at a prior hearing, the definition of

25

1  claim in the Bankruptcy Code is incredibly broad, and obviously

2  people are alleging claims in terms of assessing what illness

3  is going to receive what recovery, whether or not it even gets

4  a vote.

5          I don't believe you're having an estimation trial in

6  this case with respect to which illnesses are entitled to a

7  vote.  And we believe that under a confirmed plan, the party

8  that administers the trust would be the one conducting that

9  work and determining who is the right party to receive what

10 compensation they're under.

11         And once again, going just back quickly to this point

12 about the plan, somebody made a remark that the debtors and we

13 have asserted that there is a confirmable plan, and we believe

14 that the plan will proceed.  Sure, the debtor has a plan on

15 file.  As I said at the last hearing, we don't necessarily

16 agree with everything that's in it, and we're hard at work with

17 the debtors to try to have an amended plan filed that we do

18 agree with.  But we do believe that if that process proceeds,

19 that the plan will be capable of confirmation and we'll see

20 where it goes.  But that's something that gets decided by Your

21 Honor once all the votes come in and you assess the other legal

22 issues.  Thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Hansen.

24         Mr. Gordon?

25

1          MR. GORDON:  Thank you, Your Honor.

2          A couple of things from me.  With respect to

3  Schedules E and F and Ms. Richenderfer's comments, and she made

4  similar comments in court more or less suggesting I think we're

5  willfully withholding information on the claimant lists.  And

6  the fact is this came up at the -- can you hear me, actually?

7          THE COURT:  Yes, I can.

8          MR. GORDON:  I'm getting something telling me I need

9  to unmute myself.

10         This issue came up at the 341 meeting where we were

11  asked to provide the information and we said we would.  There

12  was a footnote indicating that this information existed, but we

13  elected initially not to include it in part because we know

14  there's sensitivity around the information and Your Honor's

15  seeing now that there's various confidentiality issues and the

16  like that have been raised.

17         But we have agreed to do that.  We've confirmed that

18  with the U.S. Trustee's Office since the 341 meeting.  And we

19  will do that, so it's not really fair, I don't think, to attach

20  us based on a suggestion that we're withholding information

21  because that's simply not true.

22         On the claimant list, on the -- this issue of a de-

23  duplication, that's really a separate and distinct issue from

24  disclosures regarding the list of claimants.  And as Your Honor

25  remembers probably better than I do, you already ruled on what

27

1  disclosures the Ad Hoc Committee should be required to make to

2  back up their claims.  And, in fact, 2019 statements have been

3  filed and the like.

4         And, obviously, the Committee is persisting and it's

5  hard to see a difference in their respective positions when you

6  have the Ad Hoc Committee saying that they have I think it's 17

7  firms or thereabouts representing almost 60,000 claimants and

8  then you have the TCC I think in its motion to dismiss saying

9  that they've got 100 law firms purporting to represent 40,000

10 claimants in opposition.

11        And it just seems to us there's an obvious

12 reciprocity there that there should be similar requirements on

13 each side with respect to that issue because it has been made

14 an issue with respect to good faith in connection with the

15 motions to dismiss.

16        Oh, and the other issue, Your Honor, is the motion

17 for summary judgment suggestion by Mr. Massey.  It seems to us

18 that there's no need to bifurcate one of the legal issues and

19 take that in advance.  It just strikes me with the very heavy

20 schedule that we have, particularly with the hearing starting

21 on June 27th.  And Your Honor's probably aware based on the

22 correspondence the number of depositions that are taking place

23 as we speak today and on into next week and then we're right

24 into expert reports and expert depositions and reply briefs,

25 surreply.

1          It seems to us it would just be an unnecessary

2    distraction to then on top of all of that isolate one of the

3    issues for further briefing.  So I think our reaction would be

4    that Your Honor not adopt that approach.

5          THE COURT:  All right.  Thank you.

6          Before I turn to Ms. Richenderfer again, I guess I

7    have a question because it's not clear to me.  Where there's

8    prejudice to any party, whether it be the Ad Hoc, the debtor,

9    or the TCC or any individual attorney who's participating on

10   behalf of a group of claimants, where would the prejudice be to

11   providing the claimants on a basis that we ensure protection as

12   to personal identification and health issues to provide it to

13   an independent party to verify so we get a handle of how many

14   claimants there are?

15         Aren't we all going to benefit by that information

16   knowing what percentage of claimants one could argue are

17   supporting or not supporting a plan or supporting continued

18   efforts through a bankruptcy?  Where is the harm to the TCC or

19   the debtor in supplying that information as long as access to

20   that information is limited to protect the claimants

21   themselves?

22         Mr. Molton or --

23         MR. WINOGRAD:  Your Honor, may I --

24         THE COURT:  Yeah.

25         MR. WINOGRAD:  Yeah, may I jump in?  This is Michael

1 Winograd from Brown Rudnick, Your Honor.

2       What's important here before I -- with respect to

3 that question is that question is directed to a motion that

4 simply isn't in front of the Court.  The other side has put

5 claimant lists into evidence.  We are simply saying, okay, you

6 put a list into evidence and then you went and you made some

7 comments about that list, but you won't show them to us.  All

8 right.  Contrary to what counsel said, all we know is the first

9 name of a bunch of people.  That's it.

10       We want the ability in the first instance before we

11 even go on to discussing the meritorious, you know, the merit

12 of the claims.  We just want to know if co-counsel are

13 including the same people on their list, for example.  That's

14 all we want to know with respect to lists that were filed.

15       Your question, Your Honor, as to whether I take it

16 members, member representatives of the TCC who certainly have

17 privilege assertions over things that -- over unfiled claimants

18 should be forced to waive that privilege as AHC members did,

19 should be forced to waive that privilege and file lists or

20 produce lists.

21       The answer to that, if that is relevant should be

22 teed up on a motion where both parties can set their arguments.

23 But that is very very different and should not be conflated

24 with what we are teeing up here, Your Honor, which is if a list

25 is filed as it was not just the 2019 but the PSA claimant

1  lists, they have filed it, they have cited to it, we should be

2  able to de-duplicate it.

3       Now, again, I want to reiterate what I said and

4  several others have said.  If Your Honor does not believe the

5  number of claimants in support or opposed is relevant to the

6  motion to dismiss, then we don't really need to worry about

7  this issue.  But, again, if it's relevant, then the only real

8  issue before the Court right now is what to do with lists that

9  have in fact already been put together and filed voluntarily by

10 other parties.

11      And with respect to lists from PSA member -- TCC

12 member reps, that, Your Honor, is just simply not ripe.  We

13 need to confer with folks and we need to -- the other side

14 should put in a motion, and we should have the ability to

15 respond.

16      THE COURT:  So for duplication purposes, you need

17 simply the last name and a first initial?

18      MR. WINOGRAD:  We need the last name, the first

19 initial, the date of birth, and the social security number

20 simply to make sure if there's a John Jones -- I can't tell

21 you, Judge, but those are simple -- and, again, we've said the

22 only people that we've offered, Brown Rudnick, so a lawyer can

23 lay eyes on it and FTI or Compass Lexecon so they can just run

24 the de-duplication.  That's it.  It's a very simple process, a

25 simple ask as to lists that have been filed.

1          THE COURT:  All right.  Mr. Thompson?

2          MR. THOMPSON:  I would make a related request given

3    that if the Court's view is that it's relevant how many

4    claimants support or don't support the plan, that the filed

5    2019 that the Ad Hoc filed, they don't have to change, they

6    don't have to unredact anything on there other than the disease

7    type.  I think it is incredibly relevant if we're going to view

8    the number of claims as relevant that each claimant's claim

9    disease be known to everybody including the TCC and me.

10          And I don't think it breaches any confidentiality for

11   a claimant on that 2019 first name, you know, redacted address,

12   redacted last name, but disease type unredacted.  I think that

13   has to be known.

14          Thank you.

15          THE COURT:  All right.  Thank you, Mr. Thompson.

16          MS. RICHENDERFER:  Thank you, Your Honor.

17          Just one thing I wanted to say in passing with a

18   comment somebody made about people filing 2019's.  Rule 2019

19   only requires a filing by a party in very specific

20   circumstances.

21          There are a lot of law firms out there who represent

22   many talc claimants who do not need to file a 2019 statement,

23   because they're not active in the litigation, they're not

24   putting themselves forth -- I'm sorry -- they're not active in

25   the bankruptcy case, they're not putting themselves forth and

1 taking positions on behalf of their clients.

2          And so this would be expanding -- if Your Honor was

3 to rule, respectfully, that everybody who represented any talc

4 claimants had to file a Rule 2019, it would expand the scope of

5 what this rule is for beyond what is required by it.

6          We have certain law firms who are very involved in

7 this case.  They have filed 2019's or they have promised to

8 file 2019's.  But beyond that, we have a lot of other law firms

9 who haven't filed them and don't need to under the language

10 that's in Rule 2019.

11          So I just wanted to make those remarks, because I

12 don't think requiring anyone who needs to file a 2019 to do so

13 will not capture all potential claimants out there.  It

14 wouldn't even capture everyone who is on Schedule E/F that the

15 debtor has identified.

16          THE COURT:  All right.  Fair enough.

17          Mr. Molton.

18          MR. MOLTON:  Yeah, just a few things, Your Honor.

19          Your Honor is right that normally this sort of

20 activity happens after claims come in in connection either with

21 a bar date or otherwise.  The reason it's relevant here under

22 present circumstances, or for the reason I said before, I take

23 notice of what Ms. Richenderfer said and agree with her on what

24 2019 is and isn't and who needs to file them and not.

25          I take notice of my colleague, Mr. Winograd's

1 statement that there is no motion up there seeking to compel or

2 otherwise folks who haven't done that and don't need to.

3       But that returns me to the issue of 1112(b)(2), Your

4 Honor.  And I know Mr. Massey, who has spoke of it as showing

5 -- allowing for good -- or showing good faith, I don't think

6 that's what it is.  I think an exception to a finding of bad

7 faith that allows this court nonetheless to go forward without

8 dismissing or without appointing a trustee.

9       As you heard today, Your Honor, running down that

10 rabbit hole, you know, is almost an Alice in Wonderland thing,

11 you know, in terms of showing the 1112(b)(2) requisites, which

12 are plenty.

13      And it's our position, Judge, after welcoming your

14 homework assignment, that you never -- as a matter of law, you

15 don't need to get there.  And accordingly, I understand Mr.

16 Gordon's suggestion, let's all take it and go forward.  Nobody

17 wants to put off those hearing dates, Judge, let alone us.  But

18 I think we'd be ready, because we did the homework, and I know

19 that Jones Day has done the homework, because I think we saw

20 them doing that homework even before the dismissal of case one

21 in recent disclosures made to us.

22      But in any event, Judge, it would seem to me that we

23 can have in front of Your Honor a briefing on purely legal.  No

24 need for discovery, no need for anything on this issue, either

25 by way of a motion for partial summary judgment or even a

1   motion in limine, because it would be our argument that none of

2   this evidence should come into the motion to dismiss hearing.

3          We could have that in front of you, allowing for Your

4   Honor and, needless to say, Mr. Gordon, who is well-equipped

5   with a bevy of talented lawyers behind him, likely, as I said,

6   we know they've already done this work, and Your Honor can make

7   a decision, you know, and actually make that hearing for the

8   end of June much more streamlined if Your Honor agrees with our

9   position, much more streamlined dealing with bad faith

10  financial distress and the Third Circuit's decision and not

11  having to move into 1112(b)(2), which we think is inapplicable

12  as a matter of law here.

13         So that would be our suggestion for case management,

14  Your Honor.  Of course, Your Honor makes that decision; I

15  don't.  But we think it would be one that would alleviate a lot

16  of these issues right now, alleviate the need to get to these

17  issues now.  Needless to say, if this case proceeds and goes to

18  plan and voting, these issues will become very important, but

19  we're not there yet.

20         So that is our suggestion, Judge, in light of, you

21  know, our research.  And we don't think it would in any way

22  detract from the good work that everybody is doing.  I know

23  there's depositions going on today, Your Honor.  I know Mr.

24  Winograd and Mr. Jonas had to adjourn those depositions for

25  this hearing, but they'll be going back to them with colleagues

1 from the other side.

2        But that would be our suggestion, Judge, and we would

3 be ready to move -- one of my favorite words, as people who

4 know me know -- with alacrity in terms of, you know, getting

5 papers to Your Honor on this issue, allowing the debtor to do

6 so, and Mr. Hansen on behalf of his committee, should he want

7 to, and Your Honor doing what judges do before a trial, decide

8 what's relevant and not in order to make the trial much more

9 effective, efficient, and streamlined.

10        That's all I have to say, Judge.

11        THE COURT:  All right.  Thank you, Mr. Molton.

12        Mr. Hansen, do you still have -- your hand is up, I'm

13 not sure --

14        MR. HANSEN:  It is, Your Honor, just very briefly.

15 So, Your Honor, again, Kris Hansen with Paul Hastings on behalf

16 of the Ad Hoc Committee.

17        Just with respect -- you asked a very direct

18 question, which was what's wrong with a neutral third party

19 doing a de-duping.  You didn't get an answer.  The answer is

20 there's nothing wrong with a neutral party to do the de-duping.

21 There is no reason why the TCC's experts have to do it.  It can

22 be done by a neutral third party.

23        The second point, in response to you asking what's

24 wrong with this, wasn't nothing.  The answer was, well, we

25 didn't put it at issue.  Somebody needs to bring it on by

1  motion.

2      The reality is that everybody in this case keeps

3  coming up to the podium and talking about how many they have in

4  support and how many they don't.  And so clearly people know

5  who are out there and can easily submit that information.  So

6  reciprocity is pretty important from our perspective.

7      The third point I just wanted to make about 2019,

8  just quickly, we all know what the 2019 standards are.  If you

9  make a notice of appearance in a case and you act on behalf of

10 others, you have to file a 2019 statement when you are

11 representing a group.  That's what the rule says.

12     I understand what Ms. Richenderfer says, but there

13 have been a lot of lawyers that have been appearing in front of

14 Your Honor that have yet to file 2019 statements, and they

15 certainly do represent more than one claimant.  And with

16 respect to the members of the TCC themselves, to the extent

17 that they do represent a multitude of claimants, again, what's

18 wrong with filling all that information into a neutral third

19 party to do the de-dup?  No one is giving you an answer on

20 that.  There is no prejudice to anybody.

21     The answer you get is somebody needs to put it at

22 issue.  You can't just ask for it when someone asks you to put

23 your claim into the de-dup process.

24     So when we come back to it, Judge, I think the only

25 fair result with this is that all the claims go in, they all

1 get de-dup'd, and the lawyers get access to that information

2 and we can move on from there.

3       And to be honest, Judge, if you want, like, from our

4 perspective, everybody here is a professional, but there's a

5 lot of trust at issue in the case, and that's why we suggested

6 a mutual third party, so then that way nobody has the ability

7 to point at anybody else and say, aha, something bad happened

8 as a result of this, you leaked information, you gave it to

9 somebody else, you didn't do a proper de-dup process, because

10 what we're trying to do is neutralize the parties in issue and

11 just move it to a point where nobody can claim that there's

12 partisanship going on anymore.

13       THE COURT:  All right.  Thank you, Mr. Hansen.

14       Mr. Winograd, last comments?

15       MR. WINOGRAD:  Between the mute and the hand raising,

16 sorry, Your Honor.

17       The idea of this neutral third party, again, if we

18 even get there, given Mr. Molton's suggestion and whether this

19 is all, in fact, relevant, but again, it's one thing to say

20 we're going to turn over information to a third party, it's

21 another thing to say the issue -- the only information at issue

22 is information that the other side and its FA's already have

23 access to, we should be able to verify that.

24       If a mistake is made by a third party doing the de-

25 duplication process or who is not running it in a certain way,

38

1  they have the ability with their own FA to test that, and we

2  don't.  If there is an inequity there, it's their information

3  that they already have access to, as do their FA's.

4        The idea that everyone keeps saying numbers is just

5  not true.  We've heard it time and time and time again from the

6  debtors, and they have taken the step of filing PSA claimant

7  lists in support.  Those are the only things at issue.

8        Again, if Your Honor wants to determine relevance and

9  upon a motion, whether it's for Mr. Molton's suggestion or a

10  motion, something needs to be on the table in front of the

11  Court to determine whether the additional discovery where there

12  is no motion on the table should be turned over for these same

13  purposes.

14        THE COURT:  All right.  Thank you.  I have heard

15  counsel, and while I am intrigued by the idea of addressing the

16  1112(b) issue in advance, we are operating under time

17  constraints, and I'm not prepared to start breaking down the

18  various issues separately.

19        So we'll treat that as an issue to be briefed either

20  prior to as part of the reply and surreply or as part of the

21  post-hearing submissions.

22        I am going to change my ruling, alter it a bit.  I'm

23  going to narrow it.  The de-duplication effort will be directed

24  at, if my understanding is correct, the 2019 claimants, simply

25  by limited information.  I'm not requiring health or nature of

1 the disease.  That broadens this to a degree.  That is not

2 necessary for the motion to dismiss in my view.  It could be

3 made available.

4          Let me ask Mr. Winograd, it was proposal that it's

5 limited to Brown Rudnik and BFA?

6          MR. WINOGRAD:  Yes, Brown Rudnick, FTI, and Compass

7 Lexicon were our two FA's who will do the de-duping.

8          THE COURT:  And it's simply a de-duplication of -- to

9 see how -- if there is duplication in the names identified by

10 the -- by the ad hoc as being supportive of the debtor's plan?

11          MR. WINOGRAD:  Correct.  And it's both the ad hoc and

12 the PSA's.  I believe there's a large overlap between those two

13 claimant lists, but I don't know if it's 100 percent.

14          THE COURT:  All right.  I'm going to permit that.

15 Now, I'm doing so under the proviso I am not going to -- it's

16 going to be done without prejudice to the ad hoc, the debtor,

17 or any other party in interest requesting, if the case goes

18 forward, beyond the motion to dismiss, as part of the plan

19 process, that there be an undertaking similar with respect to

20 any claimants for which there are joint representation.  And

21 I'll entertain the motion to see what the needs are for the

22 case to determine how we ensure that those who are voting, if

23 we get there, are properly voting.  And that's ultimately the

24 -- what will be at issue to the extent we're in the plan

25 process.

40

1          Let's move forward to the discovery requested with

2   respect to the transfer of HoldCo's consumer business -- it

3   seems to the Court -- Mr. Winograd?  Okay.

4          MR. WINOGRAD:  Your Honor, I didn't realize my hand

5   was up, but if Your Honor is prepared to rule, that's fine.  I

6   was just going to set the table.

7          THE COURT:  I am pretty confident that I understand

8   the issue as it's been presented and argued with respect to

9   J&J's motion for a protective order.

10         The Court views the issue to be limited -- an area of

11  inquiry that should be limited as to whether or not the

12  transfer of the consumer health business was part of the

13  structuring of the 2023 funding agreement, as well as the

14  decision to refile LTL-2 the second time.  It's a very limited

15  area of inquiry as it relates to the motion to dismiss.

16         Because of that, the discovery sought, in this

17  court's view, is substantially over broad.  There has been no

18  evidence presented, either from the prior case or to date in

19  this case, that the Court has seen that the -- that the

20  transfer of the consumer business was related to the filing of

21  LTL-1, and certainly not LTL-2 at this juncture, but that's for

22  discovery.

23         So the Court will permit limited discovery of LTL's

24  employees and J&J's employees only with respect to that limited

25  inquiry as to whether or not there was -- the decision to

1  transfer the consumer health business out of HoldCo was part of

2  the decision making with respect to the filing of the second

3  Chapter 11 or the manner in which the funding agreement was

4  structured.

5       I do not see a need for third-party discovery in that

6  regard, and certainly any document discovery would be limited

7  to communications that arose after January 30th of '23 through

8  April 4th.

9       So I'm prepared to grant the protective order with

10  that limited proviso that as part of discovery the TCC -- the

11  TCC or other movants can make inquiry into whether or not there

12  is such a relationship or nexus between the decision to

13  transfer the health -- the consumer health business and the

14  subsequent filing or the matter in which the 2023 funding

15  agreement was structured.

16       Mr. Starner?

17       MR. STARNER:  Yes, Your Honor.  Can you hear me okay?

18       THE COURT:  Yes, I can.

19       MR. STARNER:  I also want to thank the Court for

20  hearing us today under the circumstances.

21       Just in terms of clarifying the Court's ruling, I

22  think I understand where the Court has come out on this, but I

23  just don't want to have to be back in front of you about the

24  scope of what really the TCC then comes after us about.

25       In my mind, you know, the record is pretty clear

1  about this is totally unrelated.  Frankly, the calendar is

2  pretty clear in terms of timing.  But, you know, asking a

3  witness to confirm that, that seems fine, even an interrogatory

4  seems like it could be an option.

5          I just don't want to be back in front of you if they

6  say, well, we still want all your communications about this

7  massive transaction for us to determine whether it was related.

8  They can ask the relevant witnesses that the -- you know,

9  whether it be the LTL witnesses who are involved with, you

10  know, substituting the 2023 funding agreement.  They have

11  witnesses to ask those questions to, and I think those

12  witnesses will confirm there is no connection.  And for me,

13  that should be the end of it.

14          THE COURT:  Mr. Winograd?

15          MR. WINOGRAD:  Your Honor, I think Mr. Starner's

16  comments raise a concern that the discovery that I think I

17  heard Your Honor outline is not simply an interrogatory

18  confirming that there was no connection.

19          And one of the -- and one of the bases for that --

20  one of the impacts of that would go to Your Honor, I think,

21  said communications from January 30 forward.  As Your Honor

22  knows, the name change was in December of 2022, and in early

23  January it was the transfer of the business.

24          We would request that the date of communication

25  searched for and the limitation can be narrowed, of course, as

1  they always are, through search terms that apply to linking

2  whether this transfer was in connection with the filing of 2.0

3  or the termination of the -- or the new funding agreement.

4         But I suspect, to the extent that there is an email

5  in late December or early January saying, hey, listen, just in

6  case we lose this thing, let's make sure we get all the main

7  asset out of HoldCo, that is exactly the email that we would

8  want to see, and that is presumably an email that would have

9  taken place in December or early January.

10        So I would request that the date go back to -- you

11  know, to early or mid-December at the very least, Your Honor.

12  And again, with respect to Mr. Starner's concerns, that

13  limitation to abide by Your Honor's ruling would simply be

14  addressed through search terms, I suspect.

15        MR. STARNER:  If I may, Your Honor?

16        THE COURT:  Yes.

17        MR. STARNER:  And I'll be brief.  I think you can

18  appreciate what that would all entail, and I would prefer not

19  to waste the parties' time, the Court's time arguing about the

20  scope of discovery when they have no basis for what they're

21  asking for.  They have no basis.  They have no facts.  They

22  have no allegations.

23        All of the evidence, in fact, points very clearly to

24  the other direction.  As the Court noted, there is undisputed

25  evidence that says this was long planned.  And the timing is

44

1  absolutely clear.

2         Keep in mind, those assets were transferred at the

3  time that the 2021 funding agreement was in place, Your Honor.

4  Right?  So that obviously involves a back stop.  So just the

5  suggestion that that transfer is relevant to anything makes no

6  sense.

7         We've put that in our papers.  I'm not trying to re-

8  argue our papers, Your Honor.  I think you appreciate where

9  we're coming at, because it really -- they had the terms of the

10 funding agreement.  That's all -- those are the operative terms

11 that are kind of in play on this.

12        So I think I would dispute and I have concerns with

13 now what I think that the Committee is trying to do as well,

14 trust us, we need to go back months.  There is no basis for

15 that whatsoever.  And the record can be very clearly addressed,

16 whether it be through a witness or two that they've already got

17 on the table.  Mr. Ping will be deposed this week.  They can

18 ask him this question.  They are going to get a very clear

19 answer.

20        And if they have some other basis, if the testimony

21 is different, then we can be back in front of the Court.  I

22 think until then, I don't think there's any basis for them to

23 go on this expedition that I think the Committee is suggesting.

24        THE COURT:  All right.  Thank you.

25        Mr. Winograd, anything else?

45

1              MR. WINOGRAD:  Very briefly, Your Honor.

2              The idea that there is no basis, it would be a

3    monumental coincidence if the efforts to manufacture financial

4    distress involved transferring the biggest asset of the company

5    that was then coincidentally, months later, named the obligor

6    under the new funding agreement.

7              If there is no basis, if there are no communications,

8    then there will be no burden, there won't be any documents to

9    produce, and this will all be a non-issue.

10             THE COURT:  All right.  Well, the burden is pursuing

11   discovery to produce what is not there.

12             I'm going to set the date restriction at January

13   30th.  If, upon witness testimony, through examination of

14   witnesses, or other documents there is anything to suggest that

15   there is more information that would point to earlier

16   communications, earlier activity, I will hold a call within 24

17   hours and allow further inquiry.  We'll take it in steps.

18             MR. WINOGRAD:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             MR. STARNER:  Thank you, Your Honor.

21             THE COURT:  We have two adjournment requests.  One is

22   with respect to the motion for exclusivity, to terminate

23   exclusivity.  I'm sorry, no.  The leave for -- my head is

24   clouded.

25             UNIDENTIFIED ATTORNEY:  Standing motion, Judge.

46

1          THE COURT:  Standing to pursue the fraudulent

2   transfer, and the other is Mr. Thompson's motion with respect

3   to the claimants.

4          Let's start with the standing motion first.  There's

5   been a request to move it beyond -- there is a request to --

6   it's scheduled for the 13th -- to move it beyond the motion to

7   dismiss.

8          It would seem to make sense.  Let me hear from

9   counsel.  Mr. Molton.

10          MR. MOLTON:  Yeah, Judge.  We took Mr. Gordon's and

11   his client's request on this and discussed it.  I think our

12   view is, you know, a negating issue is the motion to dismiss.

13   The standing motion, we understand, becomes pertinent in the

14   event Your Honor doesn't grant that.

15          But we're of the view, Judge, that even if we put off

16   the hearing date on the standing motion to, say, the omnibus

17   hearing that comes in July, I think it's July 11th, Your Honor,

18   if I'm not wrong, it's the Committee's view that we still think

19   it's important and appropriate for the debtor to put in its

20   objection in advance of that.

21          And to the extent thereby enabling the Committee also

22   to file a reply and get that teed up so that in the event that

23   Your Honor decides against the Committee that this case should

24   remain in bankruptcy, we're ready to go on that fifthwith

25   [sic], another word I like to use, which is even faster than

1  forthwith, and that we're not wasting a month or more doing

2  briefing that is related to the briefing that we're all

3  engaging in now, similar issues, similar facts, doesn't --

4  isn't a burden on the Committee and should not be a burden on

5  the debtor.

6          So we would like, Your Honor, in response to Jones

7  Day's request, to keep the objection date, or to the extent it

8  needs to be moved a little, I don't think we would have an

9  issue with that.  The present objection date is the 6th.  Our

10 reply date is the 12th, I believe, unless Mr. Schultz tells me

11 it's the 9th, or I'm looking at the wrong -- no, I'm looking at

12 the right one.

13         But no matter what, keep the pleading -- the briefing

14 in June, allow the debtor to put in its objection, allow the

15 Committee to put in its reply -- we can all walk and chew gum

16 at the same time -- and be ready in the event that Your Honor

17 has made a decision and that decision is unfavorable to the

18 Committee to deal with this on the 11th of July.

19         And I think that corresponds, Your Honor, with how

20 I'm interpreting some of the timing and how Your Honor views

21 this case as progressing in the event that this case survives a

22 motion to dismiss.  Maybe I'm being a little too presumptuous

23 on that, but that's how we see it.

24         And so I think that the Committee's view is that we

25 would not object to putting hearing date off, but we would ask

48

1    the Court to keep to the briefing schedules or to, if

2    necessary, ameliorate it somewhat, but make sure that that

3    briefing comes in in June before the motion to dismiss.

4              Thank you, Judge.

5              THE COURT:  All right.  Thank you.

6              Mr. Gordon, do you want to respond?

7              MR. GORDON:  Thank you, Your Honor.  Greg Gordon on

8    behalf of the debtor.

9              This is one I just really don't understand how we

10   can't come to an agreement on this.

11             The application they filed or the motion that the TCC

12   filed made clear this was a conditional motion, and the

13   condition was in the event the motions to dismiss were denied,

14   they want to seek authority to move forward with this

15   fraudulent transfer complaint.

16             And now simply to say, well, we kind of acknowledge

17   that's what we said, we're okay with pushing off the date, but

18   hold the debtor to the briefing schedule?  To me it's just

19   punitive.  It's harassing.

20             In other words, they want us to spend a lot of time

21   on this in the midst of the period in which we're having to

22   address the motions to dismiss.  That seems unfair,

23   unnecessary, based on the conditional nature of the motion.

24             And we would just ask, Your Honor, to put this off

25   until after the dismissal ruling.  And then if, in fact, the

1  Court does determine to deny the motions, then let's address

2  scheduling at that point.  I don't see the reason why we have

3  to rush.  I don't understand the point that it would be

4  important to force us to have a brief in before the dismissal

5  hearing.  That seems to be exactly the opposite, in our view,

6  of what should done here.

7          And so we would just request that Your Honor put this

8  off until after the ruling on the dismissal motion.

9          THE COURT:  All right.  Let's move it to July 11th.

10  Let's tentatively require the -- the opposition in -- I don't

11  want to do so close.  I'm not going to say July 5th, the day

12  after the holiday.  Let's have it July 6th.  And the Court will

13  accept up until, you know, 1:00 o'clock on July 10th.

14          I'm saying all of this tentatively.  Once we go

15  through the hearings on the motion to dismiss, I'll have a

16  better sense of how long it will take to -- and we all will

17  have a better sense as far as post-hearing submissions and how

18  quickly I can get a ruling.  And maybe I should just simply

19  move the July 11th date by a week or two to accommodate.  But

20  I'm not in a position to give you that information now.

21          So I'm going to give you these holding dates.  We'll

22  be discussing it in advance.  It's moved to the 11th, the

23  opposition due the 6th, and reply by 1:00 o'clock on the 10th

24  of July.

25          MR. GORDON:  Thanks, Judge.

1          THE COURT:  Thank you.

2          Mr. Thompson, I'm inclined to say the same thing for

3 your motion, but let me hear from you.

4          MR. THOMPSON;  You're inclined to move mine to July?

5          THE COURT:  Yeah.

6          MR. THOMPSON:  Well, I mean, thank you, Your Honor,

7 for the chance to speak.

8          I would ask that, instead of that, let's see what the

9 debtor and the ad hoc group responds to my motion with papers,

10 and let's argue it on June 13th.

11          I filed my motion when I did so that it could be

12 considered and ruled upon before the motion to dismiss hearing.

13 We don't have to argue it today when you have COVID.  So that

14 would be my first request, right?  I mean, we can cut this

15 hearing right now.  We can argue this on the 13th.  Let the

16 debtor brief it.  If the ad hoc group wants to brief it, let's

17 see their arguments.

18          If you're not inclined to do that, then we can

19 discuss the substance of this.  I mean, essentially, Johnson &

20 Johnson's sole argument -- well, not their sole argument, but

21 one of their main arguments for having jurisdiction in

22 bankruptcy court is that this is a good faith filing because

23 60,000 claimants support that plan, right, 60,000 claimants.

24          Well, what's a claimant?  Well, they refuse to say.

25 They refuse to say.  The ad hoc won't tell us what a claimant

1  is either.  They've got a chart that lists first names.  That's

2  what we've got right now.

3        They ask you to take jurisdiction over this case and

4  to stop thousands of cases that actually have value in the tort

5  system, which none of these cases do.  They want to stop all

6  those good cases from moving forward based on a chart of first

7  names.  And they won't even tell us what disease they have.

8        And I suspect that if we found out what disease they

9  have, it's going to be a talc -- it's going to be a disease

10  that's not connected to talc.  There's two types of cancers

11  that were litigated in the tort system that have an evidentiary

12  connection to talc.  It's mesothelioma and epithelial ovarian

13  cancer.  And that's the thrust of my motion is that J&J cannot

14  claim that 60,000 talc claimants support this plan, because

15  talc claimants need to be limited to epithelial ovarian cancer

16  or mesothelioma.  Those are the types of cases they settled.

17        I deposed Mr. Murdica an hour before this -- an hour

18  ago, ten minutes before this hearing.  The only cases that Mr.

19  Murdica and that J&J settled were epithelial ovarian cancer and

20  meso.  So what happened was they came in here in February of

21  2022 and lost, and now they're back and they've found this

22  group of ad hoc lawyers that represent tens of thousands of

23  people that have who knows what, right?

24        We need to know what disease they are claiming they

25  have, and if it's not epithelial ovarian cancer and if it's not

1  meso, then they don't have claimants that support this plan,

2  because those claims that are not those things were not

3  litigated in the tort system.  They never settled those cases.

4         There are no verdicts for people with uterine cancer.

5  There are no verdicts for people with cervical cancer connected

6  to talc.

7         And so I am of the opinion, as I think Your Honor is

8  well aware, that the number of claimants does not matter.  But

9  to the extent that it's relevant in your eyes that there is X

10  amount of people that support a plan, then we've got to know

11  what disease those people have.  And if they don't have a

12  disease that's connected to talc, they don't count.

13        And so I don't understand why we can't argue this on

14  the 13th after they brief it.  After July -- I understand that

15  the inclination is that this is a voting issue.  I think that's

16  what I'm hearing.  The problem is is that the debtor is making

17  it a bad faith/good faith issue.  This is not a voting issue.

18  This is a bad faith/good faith issue.  Therefore, it's relevant

19  to a motion to dismiss.

20        If they are insisting that it's a bad faith/good

21  faith issue, it has to be considered now.  And that's why I

22  filed my motion when I did, so that they have to brief this

23  issue and we have to argue it on June 3rd.

24        THE COURT:  All right.  I guess my question, and

25  maybe I don't have my head around the approach you're taking,

53

1  but my question is are you not seeking essentially a claims

2  allowance process for a whole category of claims based on an

3  oral argument, you know, whether or not -- whether or not a

4  certain category of claims, they may be disputed, may be

5  liquidated or contingent, but under the Code, there's a broad

6  category of claims.

7        Am I expected to make a ruling based on oral argument

8  that a certain type of claims are disallowed at this juncture,

9  without any discovery?  In other words, uterine cancer simply

10  has no connection to talc.  I am not in a position -- maybe you

11  can educate me -- to make that determination based on oral

12  argument, but I don't think.  But if I'm wrong, I'll hear it.

13        Let me hear from -- I'll give you a chance to

14  respond, Mr. Thompson.  Let me hear from the debtor at this

15  juncture.

16        MR. GORDON:  Thank you, Your Honor.  Greg Gordon on

17  behalf of the debtors.

18        So you obviously saw our submission.  The problem we

19  have sort of goes to the last point Your Honor just made.  This

20  is a motion that's untethered to any (audio interference) and

21  now we're hearing it's relevant to the motion to dismiss.

22  Well, why isn't it part of the motion to dismiss?

23        It's potentially relevant to voting.  It's

24  potentially ultimately relevant to confirmation.  Your Honor

25  just made the good point about claims allowance.

54

1        And Mr. Thompson is complaining we haven't defined

2    who a claimant is.  I don't know what he means by that.  The

3    Bankruptcy Code tells us what a claim is.  As Your Honor noted,

4    it's very broad, and it picks up contingent and unliquidated

5    and disputed claims and the like.

6        So this, to me, is just another -- it's sort of a

7    question, I think, of how you want to manage your docket here.

8    But for these individual firms just to come in and file motions

9    asking for blanket rulings on things that are maybe connected

10   to something that's already being briefed and tried or

11   potentially, in a premature way, that affect things in the

12   future, that just seems to me not an effective way to manage

13   your docket, potentially.

14       And we would just request that this be put off until

15   such time that it's appropriate.  And if Mr. Thompson wants to

16   argue these issue as part of dismissal, which it sounds like he

17   does, I don't think there's anything preventing him from doing

18   that.

19       THE COURT:  Mr. Thompson?

20       MR. THOMPSON:  So this is the plan proposal.  This is

21   Docket 525-13, definition number 48, Other talc claim shall

22   mean any individual claim that is not an ovarian cancer claim

23   or a mesothelioma claim.  Okay.

24       And so what I'm saying is that they are making the

25   number of claimants that support this plan relevant to the

1  motion to dismiss, right?  They filed their opposition to

2  dismissal motion over the weekend, which I read.  And, you

3  know, you'll -- you'll read it when you read it.

4          They make repeated assertions the majority of the

5  claimants support this plan, right?  This -- the reason why

6  this is not a bad faith filing is a substantial majority of

7  talc claimants support this plan.  You know, what's different

8  from this one and the prior bad faith bankruptcy is it has the

9  vast majority of talc claimants supporting the plan.

10         And so how do they define talc claimant?  Well, it's

11  a mesothelioma victim, it's an ovarian cancer victim, and then

12  the third category is new.  And it's other talc claimants.  And

13  that is someone that has neither mesothelioma nor ovarian

14  cancer.

15         I mean, for all I know, I'm a talc claimant under

16  their definition.  Anybody on Earth can be a talc claimant

17  under that definition.  It's someone that does not have ovarian

18  cancer or does not have mesothelioma.  And so it's an obvious

19  attempt to stuff the ballot box.  And that's fine, if that's a

20  voting issue.

21         The problem is that they're raising it now as, This

22  is not bad faith, Judge, don't dismiss this case, because the

23  vast majority of claimants support this plan."

24         They are putting it directly at issue in a motion to

25  dismiss format.  Don't dismiss this case because it's filed in

56

1   good faith.  Well, why is it filed in good faith?  How is this

2   not just in open defiance of the Third Circuit's ruling?  Well,

3   it's because most of the claimants support it.

4         Well, what's a claimant?  Well, it could be anybody.

5   And what we have right now is a spreadsheet with some first

6   names on it.  Okay.  And so I think they are the ones that have

7   created this mess, and creditors are going to file motions.

8         I realize Mr. Gordon doesn't like it, that people

9   don't like having their Seventh Amendment rights and uncapped

10  state live damages being trampled on, but they don't like it.

11  My clients don't like it.  And so I'm going to file motions on

12  stuff like this.

13        He has put this at issue for the motion to dismiss,

14  the number of claimants.  Well, who is a claimant, right?  Is a

15  claimant someone that has uterine cancer?  Well, how many of

16  those are there?  Because what we're going to hear in the

17  motion to dismiss trial is a bunch of representations like Mr.

18  Haas makes, which I think he's lying, Mr. Haas is lying about

19  the number of people that support this plan.  There is no way

20  60,000 talc claimants, if it's meso's and ovarians, support it.

21        So rather than sit through a week of trial listening

22  to them talk about majority support, we need to slice that down

23  now.  This is directly relevant to the motion to dismiss.

24        My motion was timely filed.  It was timely noticed.

25  They can easily oppose it.  We can argue it on the 13th and you

57

1 can decide it.  They made this relevant.  It's directly

2 relevant to the motion to dismiss.

3          Thank you.

4          THE COURT:  Thank you.  Thank you, Mr. Thompson.

5          MR. GORDON:  Your Honor, if I could interject with a

6 few sentences.  I just have to say for the record that it's

7 extremely offensive that Mr. Thompson would make that point

8 that Mr. Haas is lying, and we utterly reject that.

9          The second sentence I would make is that, you know,

10 Mr. Onder and the Onder firm is now one of the counsel who

11 supports the plan.  And Your Honor probably recalls that Mr.

12 Onder was on the TCC the first time around, and he had all the

13 types of claims the debtor is subject to, the PSA.

14          So the suggestion that nobody has any idea what these

15 are, that there is some claim other than ones that Mr. Thompson

16 thinks have merit, that there are no others, there is just

17 simply no basis for that.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Mr. Thompson, you are free to make argument as part

21 of the motion to dismiss and to take issue and to examine

22 witnesses and urge the Court to discount any claims that there

23 is plan support.  Not you, every party -- every moving party

24 has that right.

25          The relief you are requesting as part of this motion

58

1   seems more appropriately pointed at either a claims allowance

2   process or a plan process.  I don't think it has a place at

3   this juncture in deciding the motion to dismiss, but I'm not

4   going to restrict your ability to make the arguments on the

5   basis of it.  So -- I couldn't do it anyway.

6          So I am going to -- frankly, scheduling it for July

7   11th is probably nonsensical since we need to see what happens

8   with the motion to dismiss.  I'll put it on for July 11th as a

9   holding date.  We'll talk about what we're going to hear on

10  July 11th when we get to the hearings and I have a sense on how

11  I can -- timing of any ruling.

12         We'll keep the same briefing schedules as the other

13  motion forward for now, but I'm telling you I will probably

14  revisit the scheduling once I get a better grasp on how quickly

15  I can turn around a decision on the pending eight motions, if

16  they're still at eight.

17         What issues are out there that I haven't addressed

18  yet?  I have about 10 percent left of energy, both in computer

19  battery and my own.

20         MR. GORDON:  Your Honor, it's Greg Gordon again.

21         I think Mr. Winograd said at the outset that our

22  motion to compel is up for today.

23         THE COURT:  Yeah.

24         MR. GORDON:  But my understanding is that that's set

25  for the 2nd.  That's what came back from the Court on that.  So

1   we were not prepared to move forward with that today, so I did

2   want to mention that.

3          And then I had two other minor points I wanted to

4   make in response to a couple of Your Honor's earlier rulings.

5   It will take me two minutes or less.

6          THE COURT:  That's fine.

7          Mr. Winograd, does it make sense to address remotely

8   to argue the motion to compel on the 2nd?

9          MR. WINOGRAD:  That's certainly fine, Your Honor.

10  And -- that's certainly fine.

11         THE COURT:  All right.

12         Mr. Gordon?

13         MR. GORDON:  The two other things, Your Honor, were

14  on the -- your ruling on the PowerPoint, slide 12.

15         The only comment I wanted to make there was that

16  we'll want to pay close attention to the form of order on that

17  to make sure that, given Your Honor's recognition that that is

18  privileged information, that doesn't open the door for some

19  sort of broader privilege waiver, and maybe that's 502(d) or

20  some other language in the order.

21         But I did want to just sort of put that out there so

22  that no one is surprised if we suggest that some language be

23  put in that makes clear it doesn't -- couldn't lead to a

24  broader waiver.

25         THE COURT:  And certainly that's not the Court's

1  intent in releasing that one slide.

2          MR. GORDON:  Thank you, Your Honor.

3          And then the other point was you indicated that there

4  were nine attachments that weren't included in the submission

5  we made to Your Honor.

6          I'm advised that, in fact, those documents were

7  included.  And so we will either work through your clerks to

8  identify exactly where they are or we'll just go ahead and

9  resubmit them, but my understanding is they were included.

10         THE COURT:  Okay.  Thank you.  I couldn't find them.

11 And it just may be that it was on our end.

12         MR. GORDON:  Thank you, Your Honor.

13         THE COURT:  All right.

14         Mr. Winograd?

15         MR. WINOGRAD:  Your Honor, I only really have just

16 one question or request for clarification.

17         With respect to motion to dismiss replies -- really

18 two requests, Your Honor.  When you said they would serve as

19 openings, is that to suggest that they will replace openings or

20 that we will still have openings at the motion to dismiss

21 hearing?

22         THE COURT:  Oh, that's a strongly suggest it will

23 replace openings.

24         MR. WINOGRAD:  Okay.  If that is the case, Your Honor

25 -- and I understand you said that it was optional to do them --

1  but the timing, by bumping the statutory date up from the 23rd

2  to the 20th, expert discovery ends on the 20th under the

3  schedule, which means we will be forced to do our reply not

4  only while we're focusing on depositions, but even before

5  depositions end, whereas the surreply will have six days after

6  the close of discovery to prepare.

7        So I would request that the motion to dismiss reply

8  just be bumped back to the statutory date of the 23rd so we can

9  at least digest discovery before -- before filing it.

10       THE COURT:  Well, I contemplated you would capture

11  any new information and what will be important, of course, is

12  what's captured at the trial, not even in the pre-discovery, in

13  the post-hearing submissions.

14       Given that these will be in lieu of opening

15  statements, Mr. Gordon, do you have any concerns?

16       MR. GORDON:  Well, Your Honor, you know, that's three

17  days to put in a surreply.  I mean, this is the problem with

18  trying to do this in advance of the hearing.  You know, we're

19  talking about post-trial submissions.

20       So I guess, Your Honor, we'll take whatever Your

21  Honor's ruling is on this, and we'll do the best we can.

22       THE COURT:  All right.  So, Mr. Winograd, you're

23  looking for the close of business on what date?

24       MR. WINOGRAD:  On June 23.

25       THE COURT:  And discovery ends on June --

62

1          MR. WINOGRAD:  Yeah.

2          THE COURT:  Well, then let's do what I always do,

3  right?  We'll just do it by the close of business on the 22nd,

4  give them another extra day.

5          And Mr. Gordon, I mean, quite candidly, I'm going to

6  start listening to the evidence at the start of the hearing,

7  and if I get your surreply a day after the hearing, it's not

8  going to -- it's going to be read the same way.  All right?

9          MR. GORDON:  Understood.  Thank you, Your Honor.

10          THE COURT:  All right.  I think we're done.  Crossing

11  fingers.  I can go read Purdue and see what marvelous words of

12  wisdom they have.

13          All right.

14          ATTORNEYS:  Thank you, Judge.  Feel better.

15          THE COURT:  Thank you.

16                    *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

63

# C E R T I F I C A T I O N

We, DIPTI PATEL and LORI KNOLLMEYER, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL

/s/ Lori Knollmeyer

LORI KNOLLMEYER

J&J COURT TRANSCRIBERS, INC.       DATE:  May 31, 2023