EXHIBIT 1

**In the Matter Of:**

*IN RE LTL Management LLC*

*ADAM PULASKI*

*April 15, 2023*



1

```
 1              UNITED STATES BANKRUPTCY COURT

 2              DISTRICT OF NEW JERSEY

 3

 4   In Re:  Chapter 11

 5   LTL MANAGEMENT, LLC,    Case No. 23-12825 (MBK)

 6              Debtor.

 7        _____/

 8            ORAL VIDEOTAPED DEPOSITION

 9                 ADAM PULASKI

10                 APRIL 15, 2023

11                 "CONFIDENTIAL"

12                   — — —

13

14        Oral sworn videotaped deposition of

15   ADAM PULASKI, taken remotely, before Patricia R.

16   Frank, Registered Merit Reporter, Certified

17   Realtime Reporter, and Notary Public, commencing

18   at 9:40 a.m. EDT, on the above date.

19

20

21

22

23

24

25   Lexitas Job No. 892935
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

2

```
 1    A P P E A R A N C E S:

 2    (All parties appearing remotely)

 3

      PROPOSED COUNSEL FOR THE OFFICIAL COMMITTEE
 4    OF TALC CLAIMANTS:

 5              OTTERBOURG P.C.
                BY: RICHARD G. HADDAD, ESQUIRE
 6                  MELANIE L. CYGANOWSKI, ESQUIRE
                    DAVID A. CASTLEMAN, ESQUIRE
 7              230 Park Avenue
                New York, NY 10169-0075
 8              212.661.9100
                rhaddad@otterbourg.com
 9              mcyganowski@otterbourg.com
                dcastleman@otterbourg.com
10
                BROWN RUDNICK LLP
11              BY: MICHAEL S. WINOGRAD, ESQUIRE
                    GERARD T. CICERO, ESQUIRE
12              7 Times Square
                New York, NY 10036
13              212.209.4800
                mwinograd@brownrudnick.com
14              gcicero@brownrudnick.com

15

      ATTORNEYS FOR THE WITNESS:
16
                DALY & BLACK, P.C.
17              BY: JOHN BLACK, ESQUIRE
                2211 Norfolk Street, Suite 800
18              Houston, TX 77098
                713.655.1405
19              jblack@dalyblack.com

20

      ATTORNEYS FOR THE DEBTOR:
21
                JONES DAY
22              BY: DAVID S. TORBORG, ESQUIRE
                51  Louisiana Avenue, N.W.
23              Washington, D.C. 20001-2113
                202.879.3939
24              dtorborg@jonesday.com

25    (Appearances cont'd. on next page)
```

3

```
 1    (Appearances cont'd.)

 2    ATTORNEYS FOR THE DEBTOR:

 3            JONES DAY
              BY: JAMES M. JONES, ESQUIRE
 4            250 Vesey Street
              New York, NY 10281
 5            212.326.7838
              jmjones@jonesday.com
 6

 7    ATTORNEYS FOR JOHNSON & JOHNSON:

 8            WHITE & CASE LLP
              BY: MATTHEW E. LINDER, ESQUIRE
 9            111 South Wacker Drive
              Suite 5100
10            Chicago IL 60606-4302
              312.881.5421
11            mlinder@whitecase.com

12
      ATTORNEYS FOR ARNOLD & ITKIN:
13
              PACHULSKI, STANG, ZIEHL & JONES LLP
14            BY: PETER J. KEANE, ESQUIRE
                  LAURA DAVIS JONES, ESQUIRE
15            919 North Market Street, 17th Floor
              Wilmington, DE 19801
16            302.652.4100
              pkeane@pszjlaw.com
17            ljones@pszjlaw.com

18
      ATTORNEYS FOR THE TCC:
19
              GOLOMB SPIRT GRUNFELD PC
20            BY: RICHARD GOLOMB, ESQUIRE
              1835 Market Street, Suite 2900
21            Philadelphia, PA 19103
              215.985.9177
22            rgolomb@golomblegal.com

23

24

25    (Appearances cont'd. on next page)
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

4

```
 1    (Appearances cont'd.)

 2

      ATTORNEYS FOR TCC 1:
 3
              MOTLEY RICE LLC
 4            BY: DANIEL LAPINSKI, ESQUIRE
              210 Lake Drive East
 5            Suite 101
              Cherry Hill, NJ 08002
 6            856.382.4670
              dlapinski@motleyrice.com
 7
              MOTLEY RICE LLC
 8            JAMES A. BADEN, IV, ESQUIRE
              23 Bridgeside Boulevard
 9            Mount Pleasant, SC 29464
              843.216.9000
10            jbaden@motleyrice.com

11
      ATTORNEYS FOR VARIOUS TALC CLAIMANTS:
12
              LEVY KONIGSBERG LLP
13            BY: JEROME H. BLOCK, ESQUIRE
              605 Third Avenue, 33rd Floor
14            New York, NY 10158
              800.315.3806
15            jblock@levylaw.com

16            LAW OFFICES OF MITCHELL J. MALZBERG, LLC
              BY: MITCHELL J. MALZBERG, ESQUIRE
17            6 E. Main Street, Suite 7
              Clinton, NJ 08809
18            908.323.2958
              mmalzberg@mjmalzberglaw.com
19
              WATTS GUERRA LLC
20            BY: MIKAL WATTS, ESQUIRE
              15 Calle 2, Suite 410
21            Guaynabo, PR 00966
              mcwatts@wattsguerra.com
22

23

24

25    (Appearances cont'd. on next page)
```

5

```
 1    (Appearances cont'd.)

 2
      ATTORNEYS FOR THE OFFICIAL TALC CLAIMANTS
 3    COMMITTEE FOR REBECCA LOVE AND OTHER OVARIAN
      CANCER CASES:
 4
              ASHCRAFT & GEREL, LLP
 5            BY: MICHELLE A. PARFITT, ESQUIRE
              1825 K Street NW, Suite 700
 6            Washington, D.C. 20006
              202.783.6400
 7            mparfitt@ashcraftlaw.com

 8
      ATTORNEYS FOR KATHERINE TOLLEFSON AND OTHER
 9    MESOTHELIOMA PLAINTIFFS:

10            MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
              BY: CLAYTON THOMPSON, ESQUIRE
11            150 W. 30th Street, Suite 201
              New York, NY 10001
12            800.234.7997
              cthompson@mrhfmlaw.com

13
14    ATTORNEYS FOR ALISHIA LANDRUM, A MEMBER OF
      THE TCC, AND OTHER TALC CLAIMANTS:
15
              BEASLEY ALLEN LAW FIRM
16            BY: LEIGH O'DELL, ESQUIRE
                  TED MEADOWS, ESQUIRE
17            218 Commerce Street
              Montgomery, AL 36104
18            800.898.2034
              leigh.odell@beasleyallen.com
19            ted.meadows@beasleyallen.com

20
      ATTORNEYS FOR TONYA WHETSEL:
21
              KARST & von OISTE LLC
22            BY: DOUGLAS von OISTE, ESQUIRE
              505 Main Street
23            Port Jefferson, NY 11777
              212.764.3900
24            douglas@vonoiste.com

25    (Appearances cont'd. on next page)
```

6

1    (Appearances cont'd.)

2

     ATTORNEYS FOR THE AD HOC COMMITTEE OF
3    STATE ATTORNEY GENERALS:

4            WOMBLE BOND DICKINSON (US) LLP
             BY: ERICKA F. JOHNSON, ESQUIRE
5               LISA TANCREDI, ESQUIRE
             1313 North Market Street
6            Suite 1200
             Wilmington, DE 19801
7            302.252.4320
             ericka.johnson@wbd-us.com
8            lisa.tancredi@wbd-us.com

9

10   ATTORNEYS FOR THE UNITED STATES TRUSTEE:

11        UNITED STATES DEPARTMENT OF JUSTICE
          OFFICE OF THE UNITED STATES TRUSTEE
12        BY: LINDA RICHENDERFER, ESQUIRE
          844 N. King Street, Suite 2207
13        Wilmington, DE 19801
          302.573.6485
14        linda.richenderfer@usdoj.gov

15        UNITED STATES DEPARTMENT OF JUSTICE
          OFFICE OF THE UNITED STATES TRUSTEE
16        BY: JEFFREY M. SPONDER, ESQUIRE
          One Newark Center, Suite 2100
17        Newark, NJ 07102
          973.645.3014
18        jeffrey.m.sponder@usdoj.gov

19

20   ALSO PRESENT:

21           JIM MURDICA

22           KENNETH ROSEN

23           LISA NATHANSON BUSCH

24           TRACY HUGHES

25           MIGUEL CONCEPCION, Videographer

IN RE LTL Management LLC                                        Adam Pulaski
                          Confidential                         April 15, 2023

7

1                     I N D E X

2

3   Witness                                      Page

4   ADAM PULASKI

5     By Mr. Haddad                              13, 119

6     By Mr. Satterley                           60, 106

7     By Mr. Block                               87, 108

8     By Mr. Tisi                                    102

9     By Mr. Thompson                                111

10

11                  E X H I B I T S

12           (Exhibits attached to transcript

13  in hard copy format and/or electronically.)

14
    Marked for I.D.                              Page
15
    Exhibit 1     Plan Support Agreement           88
16

17                     -- -- --

18

19

20

21

22

23

24

25

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

8

1          OBJECTION - INSTRUCTION NOT TO ANSWER

2                                        Page     Line

3    By Mr. Black                         20       12

4    By Mr. Black                         23        9

5    By Mr. Black                         24       17

6    By Mr. Black                         26        8

7    By Mr. Black                         28        6

8    By Mr. Black                         29       23

9    By Mr. Black                         40        5

10   By Mr. Black                         40        9

11   By Mr. Black                         40       19

12   By Mr. Black                         42        7

13   By Mr. Black                         42       12

14   By Mr. Black                         43       11

15   By Mr. Black                         43       17

16   By Mr. Black                         43       21

17   By Mr. Black                         44       24

18   By Mr. Black                         45        7

19   By Mr. Black                         45       14

20   By Mr. Black                         53        7

21   By Mr. Black                         55       21

22   By Mr. Black                         56       25

23   By Mr. Black                         57        4

24   By Mr. Black                         57        9

25   (Index cont'd. on next page)

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

9

1      OBJECTION - INSTRUCTION NOT TO ANSWER (Cont'd.)

2

3    By Mr. Black                          57      14

     By Mr. Black                          57      21

4    By Mr. Black                          59      11

5    By Mr. Black                          68       1

6    By Mr. Black                          68       9

7    By Mr. Black                          71       4

8    By Mr. Black                          71      18

9    By Mr. Black                          76       7

10   By Mr. Black                          77      16

11   By Mr. Black                          78       8

12   By Mr. Black                          78      24

13   By Mr. Black                          83      16

14   By Mr. Black                          84      20

15   By Mr. Black                          86      12

16   By Mr. Black                          87       8

17   By Mr. Black                          92      22

18   By Mr. Black                          93      12

19   By Mr. Black                          95      14

20   By Mr. Black                          95      24

21   By Mr. Black                          96      18

22   By Mr. Black                          97      20

23

24   (Index cont'd. on next page)

25

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

10

```
 1      OBJECTION - INSTRUCTION NOT TO ANSWER (Cont'd.)

 2
        By Mr. Black                          98        4
 3
        By Mr. Black                          98       11
 4
        By Mr. Black                          99        1
 5
        By Mr. Black                          99       13
 6
        By Mr. Black                          99       17
 7
        By Mr. Black                          99       23
 8
        By Mr. Black                         100       13
 9
        By Mr. Black                         100       23
10
        By Mr. Black                         101        6
11
        By Mr. Black                         101       23
12
        By Mr. Black                         102        5
13
        By Mr. Black                         104       10
14
        By Mr. Black                         104       19
15
        By Mr. Black                         104       22
16
        By Mr. Black                         105        3
17
        By Mr. Black                         105       10
18
        By Mr. Black                         105       17
19
        By Mr. Black                         105       24
20
        By Mr. Black                         107        4
21
        By Mr. Black                         109        8
22
        By Mr. Black                         109       18
23
        By Mr. Black                         110        1
24

25      (Index cont'd. on next page)
```

11

 1      OBJECTION - INSTRUCTION NOT TO ANSWER (Cont'd.)

 2
        By Mr. Black                      110      8
 3
        By Mr. Black                      115      9
 4
        By Mr. Black                      116      7
 5
        By Mr. Black                      116     18
 6
        By Mr. Black                      117      3
 7
        By Mr. Black                      117     21
 8
        By Mr. Black                      119      9
 9

10                          — — —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12

1           THE VIDEOGRAPHER:  Good

2    morning.  We are now on the record.  Today's

3    date is April 15, 2023, and the time is

4    9:40 a.m. Eastern Time.  This is the video

5    deposition of Adam Pulaski in the matter of

6    In Re: LTL Management, LLC Bankruptcy, filed

7    in the United States Bankruptcy Court,

8    District of New Jersey, 23-12825 (MBK).  This

9    deposition is taking place via web video

10   conference with all participants attending

11   remotely.

12           My name is Miguel Concepcion.

13   I'm the videographer representing Lexitas.

14   All appearances will be noted on the

15   stenographic record.  Our court reporter

16   today is Patricia Frank representing Lexitas.

17   The court will now swear in the witness.

18                   — — —

19

20           ADAM PULASKI,

21       having been duly sworn, was examined and

22       testified as follows:

23                   — — —

24           THE VIDEOGRAPHER:  Counsel, you

25   may proceed.

13

```
 1              MR. HADDAD:   Thank you.
 2   BY MR. HADDAD:
 3       Q.     Good morning, Mr. Pulaski.  I'm
 4   Richard Haddad from Otterbourg, and we are
 5   proposed counsel for the Official Committee
 6   of Talc Claimants in the LTL bankruptcy.
 7              Can you hear me this morning,
 8   sir?
 9       A.     Yes.
10       Q.     Sir, is there anyone present in
11   the room with you?
12       A.     No.
13       Q.     And where are you physically
14   located?
15       A.     In my office in Houston, Texas.
16       Q.     Sir, is there any reason that
17   you are unable to testify completely and
18   truthfully this morning?
19       A.     No.
20       Q.     Are you represented by counsel
21   this morning?
22       A.     Yes.  John Black.
23       Q.     Is anyone other than you or
24   your firm paying for Mr. Black's
25   representation?
```

14

 1          A.      No.

 2          Q.      Sir, prior to the October 14,

 3   2021 bankruptcy filing of LTL, how many talc

 4   cases against Johnson & Johnson or LTL had

 5   you filed in court?

 6          A.      I don't know the answer to that

 7   question.

 8          Q.      Had you filed any cases in

 9   court against Johnson & Johnson or LTL for

10   talc prior to October 14, 2021?

11          A.      Had I personally filed them?

12          Q.      You as counsel of record.

13          A.      As counsel of record, I don't

14   know the answer to that question.  It may be

15   that they were before or maybe they were

16   after.  I think there were some before.

17          Q.      Approximately how many before,

18   sir?

19          A.      I don't know the answer to that

20   question.  I would guess that it would be I

21   think somewhat less than 50.

22          Q.      As of the bankruptcy filing of

23   LTL in October of 2021, did you have talc

24   clients with claims against Johnson & Johnson

25   retained by your firm who had not yet filed

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

15

1    in court?

2         A.    Yes.

3         Q.    And how many?

4         A.    Several thousand.  And --

5         Q.    I'm sorry.  Go ahead, sir.

6         A.    Go ahead.  Well, there are

7    several thousand other claims that I

8    co-counseled with -- for instance, with

9    Beasley Allen that had been filed prior to.

10        Q.    And did you personally have

11   retention letters signed by the clients in

12   those several thousand cases with Beasley

13   Allen?

14        A.    Yes.

15        Q.    And did Beasley Allen similarly

16   have signed retention letters with each of

17   those clients?

18        A.    Yes.

19        Q.    And with respect to those

20   clients with which you were co-counsel with

21   Beasley Allen, are you still counsel for

22   those clients?

23        A.    Yes.  As well as other firms.

24        Q.    How many talc clients do you

25   presently have with claims against Johnson &

16

```
1    Johnson or LTL?

2         A.      Including claims that I have

3    with myself and with co-counsel?

4         Q.      Let's start there.

5         A.      Over 10,000.

6         Q.      How many do you have with

7    yourself without co-counsel?

8         A.      I believe it's around 6,000.

9         Q.      For those 6,000 claims that you

10   have for yourself without co-counsel, how

11   many of those had filed lawsuits against

12   Johnson & Johnson or LTL prior to October 14,

13   2021?

14        A.      Well, let's be clear.  Some of

15   those I do have co-counsel but I'm lead

16   counsel so -- but I would say less than 50.

17        Q.      Are you presently with a law

18   firm?

19        A.      Yes.

20        Q.      And which law firm is that?

21        A.      Pulaski Kherkher.

22        Q.      And for how long have you been

23   affiliated with that law firm?

24        A.      With this name?

25        Q.      Yes.
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

17

```
 1        A.      Three or four years.  I can't

 2   remember exactly.

 3        Q.      So since prior to October 14,

 4   2021.

 5        A.      So two years prior to 2021.

 6        Q.      With respect to the

 7   approximately 6,000 clients that you -- that

 8   we were just discussing, are the retention

 9   agreements with you personally or with your

10   law firm?

11        A.      Law firm.

12        Q.      With respect to those

13   approximately 6,000 clients, how many of

14   those have you personally met?

15        A.      I've probably met a few by

16   Zoom.

17        Q.      Have you met any in person?

18        A.      Probably one or two.

19        Q.      When did you meet those two

20   that were -- one or two in person?

21        A.      I can't tell you, because when

22   we have clients that are in Houston,

23   oftentimes they come into the office and ask

24   to meet and I meet with them.

25        Q.      Of the 6,000 -- approximately
```

18

```
 1   6,000 clients, how many of those have you
 2   personally spoken with on the telephone?
 3        A.      Hundreds.
 4        Q.      So there would be at least
 5   5,000 that you have never spoken with on the
 6   telephone?
 7        A.      Personally?
 8        Q.      Yes, sir.
 9        A.      Correct.
10        Q.      Of the 6,000 -- approximately
11   6,000 clients, how many of them have met
12   personally with attorneys from your law firm?
13        A.      Can't answer that question.  I
14   don't know the answer to that question.
15        Q.      Do you know whether all of them
16   have?
17        A.      No.
18             MR. BLACK:  Object to form.
19   BY MR. HADDAD:
20        Q.      Of the 6,000 clients that you
21   presently have, how many were retained in
22   2023?
23        A.      Maybe a few hundred.
24        Q.      How many were retained in 2022?
25        A.      I don't know the answer to that
```

19

```
 1   question, but I can get it to you.  I would

 2   say less than 500 probably.  Maybe less than

 3   that.

 4         Q.     How many were retained after

 5   the LTL bankruptcy filing on October 14,

 6   2021, in the balance of '21?

 7         A.     I would -- I don't know the

 8   answer to that question.  I'd have to

 9   research it and find out for you.

10         Q.     Do you know the diagnosis for

11   all of your talc -- 6,000 talc clients?

12         A.     No.  Do I personally know the

13   diagnosis?  No.

14         Q.     Do you know whether any other

15   attorney in your firm knows the diagnosis for

16   all of your 6,000 clients?

17         A.     For all of the clients?  No.

18   And I believe the answer is probably no.

19         Q.     Does your firm have medical

20   records with respect to all 6,000 of your

21   clients?

22               MR. BLACK:  Objection.

23               THE WITNESS:  All of them?

24               MR. BLACK:  I don't think he

25   can answer that.  It's privileged.  What
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

20

1   documents he has for individual clients is

2   privilege.

3           MR. HADDAD:  I wasn't asking

4   for any individual client.  I was asking for

5   all the clients.

6           MR. BLACK:  I understand.

7   That's really a distinction without a

8   difference.

9           MR. HADDAD:  I don't think it

10  is.  Are you instructing him not to answer,

11  sir?

12          MR. BLACK:  I am, sir.

13          MR. BLOCK:  Hold on.  Hold on a

14  second.  John Black, how are you?  Jerry

15  Block from Levy Konigsberg.

16          MR. BLACK:  Hi, Jerry.

17          MR. BLOCK:  This is a really

18  critical point, and I could tell you we've

19  been on the phone with the judge about

20  discovery.  The judge is very interested in

21  understanding whether there is real support

22  from confirmed talc claimants supporting the

23  bankruptcy plan, and it's going to be really

24  important that we're allowed to know for how

25  many of Pulaski's clients that are being

21

1  called talc clients you guys have some

2  confirmation or not that the person has

3  either mesothelioma or ovarian cancer.

4          So that's a really important

5  point.  We don't think it's privileged.  I'd

6  ask you to consider that as we move on today,

7  okay?

8          MR. BLACK:  Jerry, I appreciate

9  the comments.  And if the Court finds that my

10  objection is inappropriate, you'll get the

11  information that you need.

12          MR. BLOCK:  All right.  Are you

13  an attorney with the Pulaski firm or another

14  firm?

15          MR. BLACK:  No.  Daly & Black.

16          MR. BLOCK:  Okay.  So the

17  Pulaski firm is not going to -- is not going

18  to provide information about whether any of

19  its 6,000 clients have a confirmed diagnosis

20  of ovarian cancer or mesothelioma absent a

21  court order?

22          MR. BLACK:  He's not going to

23  answer that question, the one posed by

24  Mr. Haddad.  That's the limited basis of my

25  instruction.

1        MR. BLOCK:  All right.  So

2   we'll ask more questions and we'll see where

3   it goes.  Thanks.

4        MR. BLACK:  Understand.

5   BY MR. HADDAD:

6        Q.    Prior to April 4, 2023, did you

7   personally take any steps to verify the

8   medical condition of your 6,000 clients?

9        A.    No.

10       Q.    Prior to April 4, 2023, did

11  anyone from your --

12       A.    I'm sorry.  Are you saying

13  prior to or -- I can't understand what you're

14  saying.  Sorry.  Maybe it's the phone.

15       Q.    Sure.  I'll ask it again.

16            Prior to April 4, 2023, did you

17  personally take any steps to verify the

18  medical condition of your 6,000 talc clients?

19       MR. BLACK:  So, same objection.

20  What was personally done on individual files

21  is privileged.

22            MR. HADDAD:  Yeah.  I was just

23  asking for a yes or no question as to whether

24  anything was done.  I wasn't asking

25  specifically as to what was done.  So I don't

23

```
1   believe that your objection is well-founded,

2   counsel.  I ask you to reconsider.

3              MR. BLACK:  I understand.  But

4   what a lawyer does on a docket of cases or

5   individual cases is privileged, so ...

6              MR. HADDAD:  So you're

7   instructing him not to answer that question,

8   sir?

9              MR. BLACK:  I am.

10  BY MR. HADDAD:

11      Q.    Sir, do you know what type of

12  cancer, if any, your 6,000 clients have?

13              MR. BLACK:  I think he answered

14  that.

15              MR. BLOCK:  No, he didn't.

16  Re-ask it and ask for an answer.

17              MR. HADDAD:  Sure.

18              MR. BLACK:  And I would ask

19  that we have one examiner, one person, asking

20  questions at a time if that's okay?

21              MR. HADDAD:  Yeah, I think

22  that's -- I think that's fair.  And I'm going

23  to move forward, and Mr. Block will have his

24  chance.  I'd ask the reporter to kindly read

25  back the last question.
```

24

1              (The court reporter read back

2    the question as follows:  "Sir, do you know

3    what type of cancer, if any, your 6,000

4    clients have?")

5              THE WITNESS:  It's kind of a

6    vague question that really can't even be

7    answered.  But to the extent you're wanting

8    to know whether any of -- whether I know if

9    any of our clients have ovarian cancer, any

10   of them?  Yes.  I don't personally -- I can't

11   tell you personally.  I don't -- I haven't

12   looked at their files today or yesterday or

13   last week.

14   BY MR. HADDAD:

15        Q.    Have you looked at their files,

16   every clients' files, ever, sir?

17              MR. BLACK:  Objection.  Don't

18   answer that.

19              MR. HADDAD:  Well, he just told

20   me he hasn't looked at them today, yesterday,

21   or within the past week so I was --

22              MR. BLACK:  I'm just objecting

23   to the question.  I can't always object to

24   what a witness says.

25              MR. HADDAD:  No.  I'm

25

```
 1   suggesting that I believe the -- to the

 2   extent there is a privilege, which I don't

 3   think there is on that question, it would

 4   have been waived by the witness' answer --

 5            MR. BLACK:  I'm not waiving it.

 6            MR. HADDAD:  -- to the prior

 7   question.

 8            MR. BLACK:  I've objected.

 9            MR. HADDAD:  Are you

10   instructing him not to answer that, sir?

11            MR. BLACK:  I am.  There's no

12   waiver if I object.

13   BY MR. HADDAD:

14       Q.    Sir, how many of your 6,000

15   talc clients used Johnson & Johnson talc

16   products?

17       A.    My understanding is all of

18   them.

19       Q.    And what steps, if any, did you

20   take to verify that?

21       A.    Personally or my firm?

22       Q.    Well, let's start with you

23   personally.

24       A.    Personally I put processes in

25   place in the office to handle certain aspects
```

26

1   of our clients' claims.

2          Q.      And what processes were in

3   place -- let me start again.

4                What processes were in fact

5   undertaken with respect to each of your 6,000

6   talc clients to verify that they each used

7   Johnson & Johnson talc products?

8                MR. BLACK:  Don't answer that

9   question.  It's privileged.

10  BY MR. HADDAD:

11         Q.      Do any of your 6,000 talc

12  clients have lawsuits against manufacturers

13  other than Johnson & Johnson in connection

14  with their cancer?

15         A.      Not that I'm aware of.

16               MR. BLACK:  If you know.

17               THE WITNESS:  Not that I know

18  of.

19               MR. HADDAD:  Sir, I think every

20  question is an "if you know" question.  I'm

21  confident the witness is sufficiently aware

22  to be able to answer questions, if he knows,

23  and to state that he doesn't know if he

24  doesn't know, and he can do that without

25  prompting from his counsel.

27

1    BY MR. HADDAD:

2    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████

████████████████████████████

██████████

████████████████████████████████████

████████████████

████████████████████████████████

██████████████████

████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████

████████████████████

██████████████████████

████████████████████

20    Q.    In what matters other than

21    Johnson & Johnson talc claims have you had

22    dealings with Mr. Murdica?

23    A.    Claims related to the ingestion

24    of Invokana with claims related to a medical

25    device called Attune.

28

1      Q.      Anything else?

2      A.      Currently a claim that is

3  ongoing litigation, Elmiron.

4      Q.      How many clients do you have in

5  connection with the Elmiron matters?

6          MR. BLACK:  You don't need to

7  answer that.  This is about talc, right?

8  BY MR. HADDAD:

9      Q.      Sir, can you please answer the

10  question?

11         MR. BLACK:  Don't answer the

12  question.  It's irrelevant.  It's harassing.

13  This is outside the bounds of, as I

14  understand it, the purpose of this

15  deposition.  What other cases he has, other

16  dockets and dealings, is not the basis of

17  this examination.

18         MR. HADDAD:  Sure.  I think the

19  relations that he has with Mr. Murdica and

20  all other representatives of Johnson &

21  Johnson and LTL are squarely in the middle of

22  this case and --

23         MR. BLACK:  I hear you.

24         MR. HADDAD:  -- and I don't

25  believe, sir, that objections to relevance

29

1 are an appropriate instruction not to answer,

2 particularly given the witness' testimony up

3 to this point.

4 　　　　　MR. BLACK:  Harassing is.  I

5 mean, I let you ask a couple questions.  It's

6 privileged.  What he does on other dockets --

7 　　　　　THE COURT REPORTER:  Sorry.

8 One at a time, please.

9 　　　　　MR. BLACK:  -- is privileged.

10 Other kinds of cases, other dockets, that's

11 not what we're here to talk about today.

12 　　　　　MR. HADDAD:  Sir, I didn't ask

13 what he does.  I asked how many clients.

14 That's for a different question.

15 　　　　　MR. BLACK:  It is a different

16 question but it's still privileged.  It's

17 proprietary to him.  What he's doing on those

18 cases that are not talc is really not the

19 subject of this examination.

20 BY MR. HADDAD:

21 　　　Q.　　Have you filed Elmiron cases in

22 court?

23 　　　　　MR. BLACK:  Don't answer that.

24 That's also public if you want to go find

25 them, but it's privileged.  Well, if it's

30

1   public, it's by definition not privileged,

2   sir.  I'm going to instruct you not to

3   answer.

4                    (Court reporter clarification.)

5                    MR. HADDAD:  Counsel, I'd ask

6   you not to speak over me.  Thank you.

7                    MR. BLACK:  I don't think I

8   have.

9                    MR. HADDAD:  If something is

10  filed in a court, by definition, it's not

11  privileged.  Are you insisting that that

12  question is privileged?

13                   MR. BLACK:  I'm telling you

14  that the actions he takes for other clients

15  on other cases, whether it's filing or

16  picking up the phone, is privileged.  If you

17  want to get the filings, those are public.

18                   MR. HADDAD:  I didn't ask about

19  picking up the phone.  I asked about a

20  number.  That was the extent of my question,

21  sir.

22                   MR. BLACK:  I understand.

23                   MR. HADDAD:  Okay.

24  BY MR. HADDAD:

25  ████████████████████████████████████















38

1        ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████eculate.

5        Q.      Had you heard of the decision

6    from the United States Court of Appeals for

7    the Third Circuit dismissing the bankruptcy

8    case?

9        A.      Have I heard of it?

10       Q.      Yes.

11       A.      Yes, I've heard of it.

12       Q.      When did you hear of that

13   decision for the first time?

14       A.      I guess when it occurred.

15       Q.      Did you read the decision?

16       A.      I've read -- I have read the

17   decision.  I -- when it came out.

18       Q.      Did you view that decision as a

19   good thing or a bad thing for your clients?

20               MR. BLACK:  Objection.  Vague.

21               THE WITNESS:  For our clients,

22   good.  For -- for -- for -- yes.

23   BY MR. HADDAD:

24       ████████████████████████████████

████████████████████████████████████████



39

17     Q.     Did you read the term sheet

18  that was provided to you?

19     A.     I did.

20     Q.     Did you understand it?

21     A.     Yes.

22     Q.     Did your clients qualify for

23  payment under the qualification provisions of

24  the term sheet?

25              MR. BLACK:  I'm going to object

IN RE LTL Management LLC

Confidential

40

```
 1   as privileged.

 2              MR. HADDAD:  By that, are you

 3   instructing him not to answer the

 4   question?

 5              MR. BLACK:  Yes.

 6   BY MR. HADDAD:

 7        Q.    Sir, did you discuss the term

 8   sheet with any of your clients?

 9              MR. BLACK:  Don't answer that.

10   Objection.  Privileged.

11              MR. HADDAD:  That's a yes or no

12   question.

13              MR. BLACK:  I understand.

14   That's privileged.  Did you talk to your

15   client about something is privileged.

16   BY MR. HADDAD:

17        Q.    Did you send the term sheet to

18   your clients?

19              MR. BLACK:  Don't answer that.

20   Privileged.

21              MR. HADDAD:  Sir, if you're

22   asserting a privilege, on a privilege log

23   you'd have to describe the communication, the

24   date, the recipient, the sender, et cetera,

25   and --
```

41

1          MR. BLACK:  That's not true.

2          MR. HADDAD:  -- I'm only --

3          MR. BLACK:  Attorney-client

4   communications --

5          MR. HADDAD:  Yes, sir.

6          MR. BLACK:  -- don't go in a

7   log.

8          MR. HADDAD:  Actually, that's

9   literally what does go in a log, is

10  attorney-client communications to the extent

11  someone is asserting privilege.

12         MR. BLACK:  Right.  Well, my

13  objection stands.  Every time you pick up the

14  phone and talk to a client it doesn't need to

15  go into a privilege log.

16         MR. HADDAD:  Yeah, well,

17  someone else will need to -- people will need

18  to mute their --

19         Yes, sir.  I'm rather confident

20  that the law doesn't talk about telephone

21  calls so much as it does written

22  communications when it comes to privilege

23  logs, and that's what I'm asking for.

24         MR. BLACK:  I understand.  And

25  we may be able to have that fight in front of

42

1   the Court at some point, but for now my

2   objection stands.

3   BY MR. HADDAD:

4        Q.     Between mid-March 2023 and

5   April 4, 2023, how many of your 6,000 clients

6   did you speak with?

7              MR. BLACK:  Same objection.

8   BY MR. HADDAD:

9        Q.     Between mid-March, 2023 and

10  April 4, 2023, did you speak with any of your

11  talc clients, yes or no?

12             MR. BLACK:  Same objection.

13  BY MR. HADDAD:

14       Q.     Have you issued any statements

15  to the press with respect to the proposed

16  settlement?

17       A.     I didn't hear the question.

18  I'm sorry.

19       Q.     Sure.  Did you issue any

20  statements to the press with respect to the

21  proposed settlement?

22       A.     I believe there was one

23  statement.

24       Q.     And what statement was that,

25  sir?

43

```
 1        A.      I don't recall the exact quote

 2   in the statement.  I'm sure if you've seen

 3   it, then you have it.

 4        Q.      Were those statements and that

 5   quote your statements or were they written by

 6   somebody else?

 7        A.      They were mine.

 8        Q.      Okay.  Did you provide the

 9   statement that you issued to the press to

10   your clients?

11              MR. BLACK:  Don't answer that.

12   It's privileged.

13   BY MR. HADDAD:

14        Q.      Do you know whether any of your

15   clients read the statement that you made to

16   the press?

17              MR. BLACK:  Don't answer that.

18   It's privileged.

19   BY MR. HADDAD:

20        Q.      Do you know?

21              MR. BLACK:  Don't answer that.

22   It's privileged.

23   BY MR. HADDAD:

24        Q.      Did you say that women are

25   going to get fair compensation to the press?
```

44

```
 1          A.      I don't recall the statement I

 2   gave to the press.  If you have it and want

 3   to read it to me, I can comment on it.

 4          Q.      Sir, did you issue a statement

 5   that said, quote, after a decade of

 6   litigation, women with ovarian cancer are

 7   going to get fair compensation, unquote?

 8          A.      If that's what my quote was,

 9   then I guess I said that.

10          Q.      Had you been litigating with

11   Johnson & Johnson for a decade as of that

12   time?

13          A.      I think it -- I've been

14   involved in litigation since 2016 with

15   Mr. Birchfield.

16          Q.      Right.  My question said it

17   related to whether you'd been involved in

18   litigation for a decade.

19          A.      I guess that makes it seven

20   years personally.

21          Q.      And what did you do to conclude

22   that the women with ovarian cancer are going

23   to get fair compensation?

24                  MR. BLACK:  Objection.  That's

25   privileged.
```

45

1   BY MR. HADDAD:

2         Q.    Did you believe that statement

3   to be true when you made it?

4         A.    Yes.

5         Q.    What was the basis for your

6   belief that it was true?

7               MR. BLACK:  Objection.  That's

8   privileged.  It's the same question asked a

9   different way.

10  BY MR. HADDAD:

11        Q.    Do you know how much money any

12  of your clients will get from the proposed

13  settlement?

14              MR. BLACK:  Objection.  That's

15  privileged.

16              Did someone just dial in the

17  Zoom call?  Everybody okay?

18              MR. HADDAD:  I think your

19  privilege objections are getting to some

20  folks.

21              MR. BLACK:  Well, I can

22  understand.

23  BY MR. HADDAD:

24  ████████████████████████████████████████
████████████████████████████████████████████





48

1       ▆▆▆▆▆▆▆

        ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

        ▆▆▆▆▆▆▆▆▆

4       Q.      Did you read the Plan Support

5   Agreement?

6       A.      Yes.

7       Q.      Did you understand the Plan

8   Support Agreement?

9       A.      Yes.

10      Q.      Yes or no.  Did you retain

11  counsel to advise you in connection with the

12  Plan Support Agreement?

13      A.      Nope.

14      Q.      Yes or no.  Did you ask any

15  attorney to provide you legal advice in

16  connection with the Plan Support Agreement?

17      A.      No.

18      Q.      When did you sign the Plan

19  Support Agreement?

20      A.      I believe April 3.

21      Q.      That was during the pendency of

22  the first LTL bankruptcy, correct?

23      A.      I can't recall exact dates, but

24  I believe I -- I believe when I looked, I had

25  signed it on April 3.

49

1      Q.      And LTL filed bankruptcy on

2   April 4, 2023.  So if you signed on April 3,

3   it would have been the day before the

4   bankruptcy, the new bankruptcy filing.

5      A.      Correct.

6      Q.      At the time that you signed the

7   Plan Support Agreement, did you know that LTL

8   was going to file bankruptcy immediately

9   after the dismissal of its initial

10  bankruptcy?

11     A.      Not immediately, but I knew

12  they were going to file it at some point

13  after.

14     Q.      And were you aware during the

15  first bankruptcy that LTL had a commitment

16  from Johnson & Johnson for $60 billion of

17  support to pay talc claimants?

18     A.      No.

19     Q.      Did you ever learn that during

20  the first bankruptcy LTL had a commitment

21  from Johnson & Johnson to pay up to

22  $60 billion to support talc claimants?

23     A.      Up to 60 billion.

24     Q.      Yes, sir.

25     A.      Yeah, I knew that number.  My

50

1   understanding was that Johnson & Johnson was

2   never paying $60 billion for talc claims.

3        Q.    What was that understanding

4   based upon?

5             MR. BLACK:  Vague.  If you can

6   reveal it without --

7             THE WITNESS:  I didn't believe

8   Johnson & Johnson would ever pay $60 billion

9   for talc claims.

10  BY MR. HADDAD:

11       Q.    Sure.  And what was the basis

12  for that belief, sir?

13            MR. BLACK:  If you can answer

14  that without revealing privilege, go ahead.

15            THE WITNESS:  That's my --

16  understanding is based upon discussions with

17  others over the last several years and

18  nothing -- no discussion in particular, but

19  certainly I had never heard ever from anyone

20  at Johnson & Johnson that they would agree to

21  pay $60 billion for talc claims.

22  BY MR. HADDAD:

23       Q.    Were you aware --

24       A.    Nor do I think that anyone in

25  leadership had ever been told by Johnson &

51

1   Johnson that they would pay $60 billion for

2   talc claims.

3        Q.      When you say "leadership," to

4   whom are you referring?

5        A.      Anyone in leadership.

6        Q.      Leadership of who?  From who?

7        A.      Of the MDL.

8        Q.      Sir, were you aware that as

9   part of its first bankruptcy filing LTL had

10  secured the commitment of J&J to support up

11  to $60 billion in talc liability?

12       A.      I guess it's the "up to" part

13  that -- I understand that, that there was

14  language with respect to an up to $60 billion

15  at some point.

16       Q.      And you read that in the Third

17  Circuit's opinion, right?

18       A.      It was in the opinion, I

19  believe.

20       Q.      And, sir, do you know how much

21  Johnson & Johnson has committed to support

22  the new bankruptcy filing with?

23       A.      8.9 billion present value, up

24  to $12 billion in future payments total.

25       Q.      And do you think that the

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

52

1  commitment of 8.9 billion is better than the

2  prior commitment of 60 billion for your

3  clients?

4       A.    I believe that's a real

5  commitment.

6       Q.    So the 60 billion was a fake

7  commitment in your view.

8       A.    I don't know.  I wasn't

9  involved in any of those discussions or

10  communications, so I'm not going to comment

11  on what it is or what it isn't.

12       Q.    Well, sir, if Johnson & Johnson

13  makes a representation, is that something

14  that you were prepared to rely upon?

15            MR. BLACK:  Objection.  Vague.

16            THE WITNESS:  If they make a

17  representation to me it is.

18  BY MR. HADDAD:

19       Q.    Well, if they made a

20  representation to the Court that they would

21  back the talc liability up to $60 billion, is

22  that something you can rely on?

23       A.    I'm not going to comment on a

24  statement that's made while I wasn't present

25  or -- but I can tell you what they committed

53

1   to me as part of this plan.

2          Q.     Do you believe that any of your

3   clients have the chance to recover more than

4   they would receive under the Plan Support

5   Agreement if they were to go to trial against

6   Johnson & Johnson?

7                 MR. BLACK:  Objection.  Don't

8   answer that.  It's privileged.

9                 MR. BLOCK:  Mr. Haddad, can we

10  make sure that others have time to question

11  as well, please?  Thank you.

12  BY MR. HADDAD:

13  ████████████████████████████████
    ████████████████████████████████████
    ██████████████████████████████████████
    ███████████████████████████
    █████████████████████████████████████████
    ███████████████████████████████████████████
    ███████████████████████████████████████
    █████████████████████████████████████████
    ██████████████████████████████████████
    █████████████████████████████████████████
    █████████████████████████████████
    ███████████████████████████████████

54



1

17        Q.        Sir, are your clients required

18   to vote for the plan?

19        A.        No one is required to do

20   anything.

21        Q.        Did you agree, sir, to do all

22   things reasonably necessary and appropriate

23   to get your clients to vote in favor of the

24   plan?

25        A.        My responsibility is to provide

55

1  the information to my clients and -- and to

2  propose that they support the plan.

3        Q.    Are your clients bound to the

4  Plan Support Agreement?

5              MR. BLACK:  Objection.  Asked

6  and answered.

7  BY MR. HADDAD:

8        Q.    You can answer, sir.

9        A.    My clients are not bound to

10  anything.

11        Q.    Sir, did you represent and

12  warrant that your clients would be bound to

13  the Plan Support Agreement?

14        A.    My responsibility and my

15  discussions are that I would propose to our

16  clients that they support the plan.

17        Q.    I wasn't asking about your

18  discussions, sir.  I'm asking specifically

19  about the agreement that you signed.  Did

20  that bind each of your talc claimants?

21              MR. BLACK:  Objection.  Asked

22  and answered.  And privileged.  That's

23  privileged.

24              MR. HADDAD:  I'm sorry.  The

25  agreement is privileged?  Is that your --

56

1     MR. BLACK:  Yes.  That's

2  privileged, yes.  Whether it binds his

3  clients is privileged.

4     MR. HADDAD:  If it says on its

5  face that it's binding to each talc claimant,

6  are you taking the position that's

7  privileged, counsel?

8     MR. BLACK:  You're asking him

9  if it binds his clients; and if he thinks so,

10  that's privileged.

11     MR. HADDAD:  Okay.  I had

12  actually asked him if it does, not what he

13  thinks.

14     MR. BLACK:  I understand your

15  argument, counsel.

16  BY MR. HADDAD:

17     Q.    So you're not going to answer

18  the question?

19     MR. BLACK:  If I instruct him

20  not to answer, then he's not.

21  BY MR. HADDAD:

22     Q.    Sir, how many of your clients

23  think the Plan Support Agreement is a good

24  idea?

25     MR. BLACK:  Objection.

57

1   Privileged.

2   BY MR. HADDAD:

3        Q.     Do any?

4              MR. BLACK:   Objection.

5   Privileged.

6   BY MR. HADDAD:

7        Q.     Is the Plan Support Agreement

8   binding or illusory?

9              MR. BLACK:   Objection.

10  Privileged.

11  BY MR. HADDAD:

12       Q.     Do you consider the Plan

13  Support Agreement to be binding?

14             MR. BLACK:   Objection.

15  Privileged.

16  BY MR. HADDAD:

17       Q.     When you signed your name to

18  the Plan Support Agreement, sir, what were

19  you intending to convey?

20       A.     I was intending --

21             MR. BLACK:   I think that's

22  privileged, too.   I mean he signed it, so

23  what he intended as a lawyer is privileged

24  so --

25  BY MR. HADDAD:

58



16  BY MR. HADDAD:

17       Q.    Sir, is there -- do you have

18  any agreement with anyone to pay you legal

19  fees in connection with the bankruptcy case?

20       A.    No.

21       Q.    Sir, did you see the debtor's

22  8-K filed on April 4, 2023?

23       A.    Can you repeat the question,

24  please?

25       Q.    Have you seen the debtor's Form

59

1    8-K filed with the Securities and Exchange

2    Commission on April 4, 2023?

3          A.      I briefly looked at that.

4          Q.      Did you read the sentence that

5    said, quote, LTL also has secured commitments

6    from over 60,000 current claimants to support

7    a global resolution on these terms, unquote?

8          A.      Yes.

9          Q.      Do your 6,000 current claimants

10   support the global resolution on these terms?

11               MR. BLACK:   Objection.

12   Privileged.

13   BY MR. HADDAD:

14         Q.      Does LTL have secured

15   commitments from over 60,000 current

16   claimants to support a global resolution?

17         A.      My understanding is they have

18   commitments from attorneys representing those

19   clients, if not more, and I believe there are

20   probably more with attorneys that are going

21   to recommend that their clients support the

22   agreement.

23         Q.      You would agree with me that

24   there's a difference between a recommendation

25   to support and a commitment to support by the

IN RE LTL Management LLC

Confidential

60

1   claimant itself, correct, sir?

2        A.       Semantics, but, yes.

3        Q.       Semantics?  I misheard -- I'm

4   not sure I heard you.

5        A.       There is a difference.

6                 MR. HADDAD:  All right.  Thank

7   you.  That's all I've got for now.

8   BY MR. SATTERLEY:

9        Q.       Good morning, sir.  This is Joe

10  Satterley.  Do you need to take a break

11  before we begin?  I think I'm going to be the

12  second attorney to go.

13       A.       No.  I'm good, Mr. Satterley.

14  I appreciate it.

15       Q.       Okay.  Can you hear me okay?

16       A.       I can.

17       Q.       Okay.  I represent Mr. Valadez

18  and many other mesothelioma victims.

19                Have you had a chance to log in

20  and watch any of the hearings with Judge

21  Kaplan?

22       A.       I was on the hearing on

23  Wednesday -- Tuesday, Tuesday.

24       Q.       The long hearing, ten o'clock

25  in the morning till about 4:30, were you on

1   that one?

2         A.      Yeah.   I was not on the

3   entirety of the hearing, but I was on some of

4   the hearing.

5         Q.      Did you see me present

6   information about a young man, Mr. Valadez,

7   24 years of age?

8         A.      Did not.   I missed your

9   portion.

10        Q.      Okay.   Do you know if

11   someone -- well, first, before I get to that,

12   these 6,000 people that you represent, do you

13   know how many of them are mesothelioma versus

14   ovarian cancer?

15        A.      I believe three.

16        Q.      Three mesothelioma cases?

17        A.      I believe so.

18        Q.      And the other 5,997 would be

19   some type of other cancer that's not

20   mesothelioma, correct?

21        A.      I can't tell you the exact

22   number, but something to that effect is

23   reasonable, in that neighborhood.

24        Q.      Have you attempted to

25   calculate, using the term sheet, how much





63

1

12       Q.      Okay.  You have a website,

13   correct?

14       A.      I do.

15       Q.      Is all of the information on

16   the website true and accurate?

17       A.      I don't know if any of it is

18   outdated.

19       Q.      Okay.  And on your website --

20       A.      There's a lot of information.

21              THE COURT REPORTER:  Pardon me?

22              THE WITNESS:  I'm just saying

23   there's a lot of information on the website,

24   and whether or not it's all true and nothing

25   has changed that hasn't been updated I can't

64

1   answer.

2   BY MR. SATTERLEY:

3        Q.      Have you ever tried a talc

4   case?

5        A.      I have not tried a talc case.

6        Q.      Have you ever attended a talc

7   trial to watch the evidence presented before

8   a jury?

9        A.      I have not attended a talc

10  trial.

11       Q.      Have you ever taken a corporate

12  representative in a talc case regarding a

13  corporation's knowledge about talc and

14  talc-related diseases?

15       A.      I have not.

16       Q.      Have you ever preserved a

17  client's testimony, a dying client's

18  testimony, regarding their disease and their

19  exposures to talc?

20       A.      I have not.

21       Q.      Have you ever attended a

22  deposition of someone suffering from a

23  talc-induced cancer?

24       A.      I'm trying to recall if I

25  attended a deposition for a talc mesothelioma

65

```
1    client a while back and I don't believe I

2    did.

3         Q.     Have you -- you mentioned early

4    in the deposition that at the time of the

5    filing you had less than 50 cases in suit, is

6    that accurate, talc cases?

7         A.     I believe that's correct.

8         Q.     And did you file those

9    yourself, or did you refer those out and have

10   other folks file those?

11        A.     I'm sorry.  Could you repeat

12   the question.

13        Q.     Did you personally file those

14   cases, or did you have another attorney in a

15   co-counsel situation file the cases?

16        A.     There are over a thousand cases

17   that I believe I have relationships with

18   co-counsel that have been filed and our

19   office, I believe, that another attorney in

20   my office actually filed those cases.

21        Q.     And who is that attorney?

22        A.     But I may have -- I may have

23   signed off on the pleadings.  If you want to

24   know who actually sent everything in, you

25   know, who the paralegal was or -- you know, I
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

66

1  don't know that you really care to know about

2  any of that.

3      Q.    No, I don't care about the

4  paralegal's name. I'm just trying --

5      A.    Okay.

6      Q.    Who's the attorney -- I'm

7  sorry.  Who's the other attorney in your

8  office who would have actually filed those

9  cases meetings?

10     A.    It would have been myself or

11 Darsey Glean.

12     Q.    Are there other attorneys in

13 your office that are sort of I guess

14 primarily handling talc cases other than you

15 and this other person?

16     A.    Primarily, no.

17     Q.    Of the 50 cases you referred to

18 with Mr. Haddad earlier that were filed, are

19 those cases that you or your office actually

20 did the filing themselves?

21     A.    I believe so.

22     Q.    And what jurisdictions did you

23 file those in?

24     A.    In the MDL.

25     Q.    So that would be in New Jersey,

1  correct?

2       A.    Correct.

3       Q.    And you're licensed to practice

4  law in Texas, correct?

5       A.    Correct.

6       Q.    Are you licensed in any other

7  states?

8       A.    No.

9       Q.    Prior to signing the PSA, did

10  you review any of the ethical rules in Texas?

11            MR. BLACK:  Objection.  Vague.

12            MR. SATTERLEY:  I'm sorry?

13            MR. BLACK:  Objection.  Vague.

14            THE WITNESS:  I don't

15  understand your question.

16  BY MR. SATTERLEY:

17       Q.    Sure.  You know there's rules

18  of ethics that have been adopted by the State

19  of Texas, correct?

20       A.    Yes.

21       Q.    And prior to signing the PSA,

22  did you go to those rules and look at them

23  and try to see if there's any ethical issues

24  that might be presented in the -- signing the

25  PSA?

68

```
 1              MR. BLACK:  Don't answer that.

 2   It's privileged.  It's harassing.  I don't

 3   think it's relevant to the injunction, the

 4   issues at hand.  Way out of bounds.

 5   BY MR. SATTERLEY:

 6        Q.     Did you -- yes or no.  Did you

 7   consult with any ethics attorneys with

 8   regards to the PSA?

 9              MR. BLACK:  Same objection.

10   BY MR. SATTERLEY:

11        Q.     Have you ever given a

12   deposition before?

13        A.     Yes.

14        Q.     On how many occasion?

15        A.     I believe one.

16        Q.     And when was that?

17        A.     Sometime probably around ten

18   years ago.

19        Q.     And just generally what was the

20   issue in the deposition you gave?

21        A.     It was related to a lawsuit

22   against Google.

23        Q.     And was it a lawsuit you filed?

24        A.     It was a class case.

25        Q.     Okay.  And I'm not going to go
```

69

1   deep into this.  I just want to sort of

2   understand how it came that you gave a

3   deposition in a class case.

4          A.     I was a class rep.

5          Q.     Okay.  And did you have counsel

6   representing you there?

7          A.     I did.

8          Q.     And who was that?

9          A.     Bob Foote.

10         Q.     I didn't catch that.

11         A.     Bob Foote.

12         Q.     F-O-O-T?

13         A.     F-O-O-T-E.

14         Q.     Okay.  And do you know who was

15  the attorney that took your deposition?

16         A.     I do not.

17  ████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████

██████████████████████████████



71

```
 1          Q.      Have you made a calculation of

 2    what your clients, any of your clients, would

 3    potentially get under the term sheet?

 4               MR. BLACK:  I think that's

 5    privileged, actually, whether he's done a --

 6               MR. SATTERLEY:  I'm not asking

 7    for the -- what the calculation is.  I'm

 8    just -- have you made the calculation.

 9               MR. BLACK:  I understand.  I

10    still think it's privileged.  I get what

11    you're asking, sir.

12               MR. SATTERLEY:  Are you

13    directing him not to answer the question?

14               MR. BLACK:  Yes, sir.

15    BY MR. SATTERLEY:

16          Q.      Do you know the date of

17    diagnosis of each of your 6,000 clients?

18               MR. BLACK:  Same objection.

19    BY MR. SATTERLEY:

20          Q.      Do you know what a channeling

21    injunction is?

22          A.      I -- I understand the premise

23    of the channeling injunction.  I'm going to

24    tell you I am certainly not an expert in

25    bankruptcy litigation, but I understand.
```

72

1        Q.      What's your understanding of

2    what a channeling injunction is?

3        A.      My understanding, it is a tool

4    that is being used in this particular case

5    that would allow for a settlement to occur

6    within the bankruptcy realm that would

7    provide finality, basically, as a basis for

8    this settlement in a way that we wouldn't be

9    able to have that outside of using the

10   channeling injunction.

11       Q.      Do you understand that the

12   intent of this bankruptcy would be to prevent

13   individuals from filing lawsuits and going

14   before a jury in the future?

15       A.      That it would permit that?

16       Q.      No.  Prevent, prevent.

17       A.      Yes.

18       Q.      And you understand that your

19   future clients, that if you were to be

20   retained in the future by somebody else,

21   would forever be barred from going before a

22   jury and asking for damages?

23       A.      I understand for -- I don't --

24   currently I don't represent future clients,

25   so they're future clients --

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

73

```
 1         Q.     Sure, but if --
 2         A.     -- is my understanding.
 3         Q.     But if somebody were to call
 4   you on June the 1st, after this proposed plan
 5   is out there supposedly, and say,
 6   Mr. Pulaski, I want you to represent me, I've
 7   got mesothelioma or I've got ovarian cancer,
 8   you understand this plan, if confirmed, would
 9   bar them from filing a lawsuit and going
10   before a jury.  You understand that, correct?
11         A.     Confirmed, correct.
12         Q.     Okay.  And you understand that,
13   of your 6,000 clients, if 50 of them really
14   wanted to go to trial, they really wanted to
15   have a jury make a decision about their case
16   but yet the plan was confirmed, those 50
17   people would forever be barred from going
18   before a jury.  You understand that, correct?
19         A.     Correct.
20         Q.     Okay.  By the way, I know that
21   there's been some discussions regarding time,
22   time limits today, and we had previously
23   talked about going four hours for each of
24   these depositions we're doing this weekend.
25                Are you comfortable, are you
```

74

1   okay, to go four hours today?

2        A.     I am not.

3             MR. BLACK:  I think that's a

4   discussion that we can have offline, but my

5   understanding was it was a two-hour

6   deposition, and that's what we budgeted.

7             MR. SATTERLEY:  Okay.  So I --

8             MR. BLACK:  So I would say no

9   is the answer.

10             MR. SATTERLEY:  Okay.  Well,

11   let me ask the witness.

12   BY MR. SATTERLEY:

13        Q.     What are your time limits

14   today?

15             MR. BLACK:  He's got two hours.

16   I can answer that.

17             MR. BLOCK:  Let's keep going

18   and see if we have a dispute.

19             MR. BLACK:  So it's 42 minutes,

20   roughly.

21             MR. SATTERLEY:  So I'm going to

22   intentionally cut my questions short so

23   Mr. Block and other folks have questions.

24   I'm going to about I think five or ten more

25   minutes.

```
 1   BY MR. SATTERLEY:

 2        Q.     With regards to Mr. Watts, have

 3   you and Mr. Watts worked together in other

 4   litigations?

 5        A.     Yes.

 6        Q.     On how many different

 7   litigations?

 8        A.     Several.

 9        Q.     When you say "several," is it

10   five or ten or more?

11        A.     I would say five or ten.

12        Q.     Can you just generally give me

13   some of the examples of the other litigations

14   you and Mr. Watts worked together on?

15        A.     We have worked together in the

16   Pradaxa litigation.  We have worked together

17   in Zantac litigation.  We have worked

18   together -- off the top of my head, I can't

19   recall.  But there have been other mass tort

20   litigations that we have worked on.

21             MR. SATTERLEY:  Did you work

22   with him --

23             THE COURT REPORTER:  What was

24   the first one you mentioned?  Did you say

25   Paxil?
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

76

1          THE WITNESS:  Pradaxa,

2   P-R-A-D-A-X-A.  I don't believe I worked with

3   Michael at all on the Paxil litigation.

4   BY MR. SATTERLEY:

5          Q.     Did you work with Mr. Watts on

6   the BP litigation?

7               MR. BLACK:  Don't answer that.

8               THE WITNESS:  I did not.

9               MR. BLACK:  This is going

10  outside the scope of the deposition, and so

11  it's privileged what other litigations he's

12  worked on.

13              MR. SATTERLEY:  I disagree.  So

14  he answered the question he did not, so we

15  can move on.

16  BY MR. SATTERLEY:

17         Q.     With regards to -- did you

18  attend the Vegas conference this week?

19         A.     I did.

20         Q.     And did you attend the session

21  where Mr. Watts spoke on talc issues?

22         A.     I did.

23         Q.     And did you see the PowerPoint

24  presentation he made?

25         A.     I did see the PowerPoint

77

1    presentation he made.

2         Q.    And did you -- is that the

3    first time you had seen that presentation?

4         A.    That is.

5         Q.    Do you know who put that

6    presentation together for him?

7         A.    I do not.

8         Q.    Did you verify the accuracy of

9    any of the information he presented at this

10   Vegas conference?

11        A.    Not his or Mr. Birchfield's or

12   the rest of the panel up there.

13        Q.    Have you read any opinions,

14   published opinions, regarding talc verdicts

15   being affirmed?

16             MR. BLACK:  I think that's

17   privileged whether he's reading -- that would

18   be in connection with his work for his

19   clients, so I'm going to instruct him not

20   answer.

21             MR. SATTERLEY:  I disagree.  I

22   respectfully disagree.

23             MR. BLACK:  I understand.

24   BY MR. SATTERLEY:

25        Q.    Have you reviewed exhibits

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

78

1  admitted in a court in trials involving talc

2  and mesothelioma?

3      A.     Have I reviewed the exhibits?

4      Q.     Sure.

5      A.     You mean have I seen exhibits?

6      Q.     Yeah, reviewed exhibits

7  admitted in court in talc mesothelioma cases.

8          MR. BLACK:  So I'm going to

9  object as vague but also privileged.  I mean,

10  all of that would be in connection with his

11  work on his talc docket as a lawyer.  I don't

12  see how that's not privileged.

13          MR. SATTERLEY:  I disagree.

14          MR. BLACK:  I understand.

15  BY MR. SATTERLEY:

16      Q.     Are you refusing to answer that

17  question?

18          MR. BLACK:  He is if I instruct

19  him to.

20  BY MR. SATTERLEY:

21      Q.     Have you read any trial

22  transcripts from any talc trials?

23          MR. BLACK:  Same objection.

24  BY MR. SATTERLEY:

25      Q.     An individual with ovarian

79

1    cancer who is 47 years of age and has no

2    alternative exposures to any other asbestos

3    other than Johnson's Baby Powder, how much

4    would that individual get under the term

5    sheet?

6         A.    I can't specifically answer

7    that question without looking at it and

8    reviewing it.  And, again, my understanding

9    is the term sheet is kind of a broad

10   construct that is supposedly -- that may move

11   and may change, but I don't know the answer

12   to that question.

13        Q.    Have you been admitted pro hac

14   vice in the jurisdictions where you have

15   co-counseled with others and filed these

16   cases?

17        A.    I have not.  I mean, maybe I

18   have for another case but I have not for

19   this.

20        Q.    I'm specifically talking about

21   talc cases.  Have you been --

22        A.    I have not.

23        Q.    Okay.  So the only jurisdiction

24   that you are licensed or given permission to

25   practice law is Texas, correct?

80

```
1            MR. BLACK:  Objection.  Form.

2   Vague.

3   BY MR. SATTERLEY:

4        Q.     In talc cases.

5            MR. BLACK:  You can answer.

6   You can answer.

7            THE WITNESS:  I'm -- correct.

8   BY MR. SATTERLEY:

9   ████████████████████████████████
```





82



1

11          Q.      Do you believe --

12                  (Court reporter clarification.)

13                  THE WITNESS:  Anything having

14      to do with this.

15      BY MR. SATTERLEY:

16          Q.      Okay.  Do you believe J&J could

17      pay, fully pay, all the talc victims

18      suffering from cancer?

19                  MR. BLACK:  Objection.  Vague.

20                  MR. TORBORG:  Objection.

21      Foundation.

22                  THE WITNESS:  I believe they

23      can pay the 8.9 billion in present value

24      money and to pay 12 billion over time.

25      BY MR. SATTERLEY:

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

83

```
 1          Q.      But my question was a little
 2   bit different than that.
 3                  My question is, do you believe
 4   J&J can fully pay all talc victims suffering
 5   from cancer?
 6                  MR. BLACK:  Objection.  Vague.
 7                  MR. TORBORG:  Objection.
 8   Foundation.
 9   BY MR. SATTERLEY:
10          Q.      Go ahead, sir.
11          A.      I believe that they can make a
12   fair and reasonable settlement.
13          Q.      Have you made an evaluation
14   regarding what you believe J&J can pay with
15   regards to talc victims?
16                  MR. BLACK:  Objection.  Don't
17   answer that.  It's privileged.
18   BY MR. SATTERLEY:
19          Q.      Do you know what tremolite is?
20          A.      Excuse me?
21          Q.      Do you know what tremolite is?
22          A.      What is that?
23          Q.      Is that no, you don't know what
24   tremolite is?
25          A.      No.
```

```
 1                    MR. BLACK:  I think it's a no.

 2   BY MR. SATTERLEY:

 3        Q.     Do you know what anthophyllite

 4   is?

 5        A.     No.

 6        Q.     Do you know what chrysotile is?

 7        A.     These are words that I've

 8   heard, but I'm not going to -- I can't give

 9   you a definition without it being inaccurate

10   so I'm not going to.

11        Q.     Do you know who Dr. Gavin

12   Hildick-Smith is?

13        A.     No.

14        Q.     Can you give me the names of

15   any executives at Johnson & Johnson from the

16   1970s that knew about the hazards of

17   asbestos?

18        A.     Can I give you an answer right

19   now --

20                MR. BLACK:  This is all

21   privileged.  Look, if he knows this stuff,

22   it's in connection with his work on the talc

23   docket.  So, I mean, I've allowed you all the

24   medical stuff, but I'm going to cut it off.

25   BY MR. SATTERLEY:
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

85

```
 1        Q.    Are you refusing to answer that
 2   question?
 3             MR. BLACK:  He is.
 4             MR. SATTERLEY:  Let me look at
 5   my notes real quick.
 6   BY MR. SATTERLEY:
 7        Q.    Oh, do you -- do you believe
 8   that Baby Powder causes ovarian cancer?
 9        A.    I believe it causes an
10   increased risk of ovarian cancer, and, yes, I
11   do.
12        Q.    And on your website you promote
13   and state that talcum powder causes many
14   different types of cancers, correct?
15        A.    That is correct.
16        Q.    And so if I were to print out
17   your website, that's pulaskilawfirm.com,
18   right?
19        A.    That is correct.
20        Q.    And so the information on your
21   website about talc and causing various
22   cancers, that's true, right?
23             MR. BLACK:  Objection.  Asked
24   and answered.
25             THE WITNESS:  If there is
```

86

```
1    something that is on there that has not been

2    updated I don't know, but I don't have the

3    website in front of me, nor have I looked at

4    it recently, but typically the information we

5    put on our website at the time we put it on

6    is true and correct to the best of our

7    knowledge.

8    BY MR. SATTERLEY:

9         Q.     And all the verdicts that

10   you're promoting on your website, you weren't

11   involved in any of those verdicts, correct?

12            MR. BLACK:  Objection.  Don't

13   answer that.  It's just harassing, honestly.

14   You don't need to answer.

15            MR. SATTERLEY:  He can verify

16   one way or the other.

17            MR. BLACK:  I just -- this

18   is --

19   BY MR. SATTERLEY:

20        Q.     Were you involved in any of the

21   verdicts that you put on your website?

22            MR. BLACK:  No more.  This is

23   just way beyond the scope.  I'm sorry.

24   BY MR. SATTERLEY:

25        Q.     Did I get an answer, sir?
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

87

```
 1              MR. BLACK:  Don't answer it.
 2              THE COURT REPORTER:  I didn't
 3    even get the question.  I'm sorry.
 4    BY MR. SATTERLEY:
 5         Q.    The question was, were you
 6    involved in any of the verdicts that you put
 7    on your website, the talc verdicts, sir?
 8              MR. BLACK:  Don't answer it.
 9              MR. SATTERLEY:  Given that I
10    was just told that this is limited to two
11    hours, I'm going to stop asking questions
12    right now and reserve my right once we talk
13    to the Court about this.
14              Mr. Block or who whoever else
15    wants to go next, go ahead.
16    BY MR. BLOCK:
17         Q.    Mr. Pulaski, can you hear me
18    okay?
19         A.    I can, Mr. Block.
20         Q.    Okay.  This is Jerry Block from
21    Levy Konigsberg, and I don't think we've met
22    before.  Have we met?  I don't think so,
23    right?
24         A.    I don't believe so.
25         Q.    Okay.  Well, nice to meet you.
```

88



1   Sorry it's under these circumstances.

2              As a fellow plaintiff's lawyer,

3   are you a member of the AAJ?

4        A.     I am.

5        Q.     Okay.  So am I, but I do have

6   to ask you some questions.

7





91

1















97

10    BY MR. BLOCK:

23    BY MR. BLOCK:

24          Q.    Okay.  Mr. Pulaski, does

25    your -- does your firm have a -- Mr. Pulaski,

98

1   of the 6,000 cases listed on your signed PSA,

2   for how many of them has your law firm

3   ordered medical records?

4               MR. BLACK:  Objection.  Asked

5   and answered and privileged.

6   BY MR. BLOCK:

7       Q.    Has your law firm ordered

8   medical records for even one of the

9   approximate 6,000 cases listed on your signed

10  PSA?

11              MR. BLACK:  Objection.  Asked

12  and answered, privileged, and now harassing.

13              MR. BLOCK:  Just if you're

14  going to instruct not to answer, please state

15  it for the record so we have a clean record

16  of it.

17              MR. BLACK:  I am.  I said

18  previously if I object I'm -- it's equivalent

19  to an instruction not to answer.  I'm trying

20  to keep my objections short for you.

21              MR. BLOCK:  Okay.  All right.

22  BY MR. BLOCK:

23      Q.    Do you have a pathology report

24  confirming diagnosis for any of the ovarian

25  cancer cases listed on your signed PSA?

99

1          MR. BLACK:  Same three previous

2  objections.

3  BY MR. BLOCK:

4          Q.     Okay.  And you understand these

5  are instructions not to answer, and you're

6  complying with that instruction, right,

7  Mr. Pulaski?

8          A.     That is correct.

9          Q.     Okay.  And for the less than

10 five mesothelioma cases that you put on the

11 list, do you have a pathology report

12 confirming diagnosis for any of those?

13         MR. BLACK:  Same objection.

14 BY MR. BLOCK:

15         Q.     Okay.  Do you have any death

16 certificates for the death cases on the list?

17         MR. BLACK:  Same objection.

18 BY MR. BLOCK:

19         Q.     Mr. Pulaski, do you have any

20 sworn statement testifying to the use or

21 exposure to Johnson's Baby Powder for any of

22 your 6,000 cases attached to your signed PSA?

23         MR. BLACK:  Same objection.

24 You guys have 15 minutes, so in the spirit of

25 trying to be transparent, any questions about

1    what's in the files I'll object to.

2              MR. BLOCK:  No, no, no.  We

3    have two hours.

4              MR. BLACK:  No, you don't.  In

5    15 minutes I'm cutting it off absent another

6    court order.  I'm sorry.

7    BY MR. BLOCK:

8         Q.    Mr. Pulaski, of the approximate

9    6,000 cases that are listed on your signed

10   Plan Support Agreement, how many of them are

11   subject to statutes of limitations that have

12   not expired?

13             MR. BLACK:  Don't answer that.

14   Privileged.

15             MR. TISI:  Jerry, I'd like to

16   ask some questions, so if you'd leave me five

17   minutes, I'd appreciate it.

18             MR. BLOCK:  Sure.

19   BY MR. BLOCK:

20        Q.    Mr. Pulaski, do you have a

21   definition of what you would call a talc

22   claimant for a case against J&J or LTL?

23             MR. BLACK:  Objection.  That's

24   privileged.

25   BY MR. BLOCK:

101

1       Q.      Mr. Pulaski, do you represent

2    talc claimants against J&J and LTL?

3       A.      Yes.

4       Q.      And what do you mean by "talc

5    claimant"?

6               MR. BLACK:  Objection.  That's

7    privileged.  Same question asked a different

8    way.

9    BY MR. BLOCK:

10   

25   BY MR. BLOCK:

102



7         MR. BLOCK:  I will pass the

8    questioning over to Mr. Tisi.  Thank you.

9         THE WITNESS:  Thank you,

10   Mr. Block.

11   BY MR. TISI:

12        Q.    Mr. Pulaski, my name is Chris

13   Tisi.  I'm with the firm of Levin Papantonio

14   Rafferty --

15        MR. SATTERLEY:  And, Chris,

16   this is Joe.  I'm sorry to interrupt.  I have

17   one question, so if you'd just leave me 30

18   seconds, I'd appreciate it.

19        MR. TISI:  Sure.  No problem.

20   BY MR. TISI:

21        Q.    I represent ovarian cancer and

22   mesothelioma clients.

23             Very quickly, you've been

24   looking down at your desk, and do you have

25   any notes with you, sir?

1        A.      I have none.

2        Q.      You have none?  Okay.

3                Do you -- do you know who Alice

4   Blount is?

5        A.      I'm sorry?

6        Q.      Do you know who Alice Blount

7   is?

8        A.      No.

9        Q.      Do you know who Johns Hopkins

10  is?

11       A.      Johns Hopkins?

12       Q.      John Hopkins, a person.

13       A.      No.

14       Q.      Do you know who Daniel Cramer

15  is?

16       A.      No.

17       Q.      Do you know who Katie O'Brien

18  is?

19               MR. BLACK:  I'm going to

20  object.  I don't know what the --

21               MR. TISI:  That's okay.

22               MR. BLACK:  -- basis is here

23  but --

24               MR. TISI:  That's okay.

25               MR. BLACK:  I'm going to

104

```
1    instruct him not to answer unless I

2    understand the relevance of the questioning.

3    I'll give you a chance you tell me.

4            MR. TISI:  These are all -- you

5    don't need to understand, counsel.

6            MR. BLACK:  I do, actually.

7    I'm his lawyer.

8            MR. TISI:  No, you don't.  No,

9    you don't.

10            MR. BLACK:  Okay.  Well, then

11    don't answer the questions.

12            MR. TISI:  Okay.

13            MR. BLACK:  That's fine if you

14    don't want to explain it.

15    BY MR. TISI:

16        Q.    Do you know who corporate

17    witness -- J&J corporate witness Susan

18    Nicholson is?

19            MR. BLACK:  Don't answer that.

20    BY MR. TISI:

21        Q.    Do you know who Ed Kuffner is?

22            MR. BLACK:  Don't answer that.

23    BY MR. TISI:

24        Q.    Have you spoken to any economic

25    modeler in connection with your negotiations
```

105

1  with J&J with respect to the proposed

2  settlement plan?

3          MR. BLACK:  Don't answer that.

4  It's privileged.

5  BY MR. TISI:

6      Q.     Have you spoken to any

7  gynecologic oncologists with respect to

8  subtypes of ovarian cancer that are related

9  to talc use?

10          MR. BLACK:  Don't answer that.

11  It's privileged.

12  BY MR. TISI:

13      Q.     Do you know whether or not

14  there's a difference between different types

15  of ovarian cancer and the relationship to

16  talc use?

17          MR. BLACK:  Don't answer that.

18  It's privileged, too.

19  BY MR. TISI:

20      Q.     Did you ask Mr. Birchfield at

21  any time for any access to experts to find

22  out and investigate the relationship between

23  talc and different types of ovarian cancer?

24          MR. BLACK:  Same objection.

25  Don't answer that.

106

```
 1                MR. TISI:   Okay.  I pass the
 2    witness.  Thank you.
 3                MR. BLACK:   Thank you, counsel.
 4                MR. BLOCK:   I had a few
 5    follow-ups.
 6                MR. SATTERLEY:   Jerry, let me
 7    do my little follow-up first.  Sorry about
 8    that.
 9    BY MR. SATTERLEY:
10         Q.     First off, Mr. Pulaski, you and
11    I have never met before, correct?
12         A.     I don't even know who you are.
13         Q.     And I don't know who you are
14    either, so I just wanted to make sure.
15         A.     No.  I don't see a name and I
16    don't see a picture.  So I don't --
17         Q.     This is Joe Satterley.  Can you
18    see me?
19         A.     Oh, now you're up.  Okay.  Now
20    I see you.  Sorry.  I didn't know who was
21    talking.
22         Q.     Sure.  No problem.
23                You and I have never met
24    before, correct?
25         A.     That is correct.
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

107

1      Q.      Okay.  The last area of

2   questioning I have real quick is, have you

3   attended a mediation with regards to talc?

4              MR. BLACK:  Objection.  Don't

5   answer that.  Any follow-ups questions have

6   to relate to new testimony.

7              MR. SATTERLEY:  Well, you

8   objected for mediation, Mr. Black, so I want

9   to find out if there's actually privilege

10  that's exists, because if he didn't ever

11  attend a mediation, I'm sure the judge wants

12  to know this.  Will you not allow him to tell

13  us whether he did a mediation?

14             MR. BLACK:  He can answer the

15  question of whether or not he attended a

16  mediation.  I'll allow that.

17             MR. SATTERLEY:  Thank you.

18             THE WITNESS:  No, I have not

19  attended a mediation.

20  BY MR. SATTERLEY:

21      Q.      Have you spoken to Ken Feinberg

22  about your talc cases?

23      A.      I have not.

24      Q.      And have you spoken to Joel

25  Schneider regarding your talc cases?

108

1          MR. BLACK:  I'm going to cut

2    this off.

3          THE WITNESS:  I have not.

4          MR. SATTERLEY:  And this is my

5    last question.

6          MR. BLACK:  Okay.

7    BY MR. SATTERLEY:

8       Q.    Was that a yes or no?

9          MR. BLACK:  I think he said

10   "no."

11         THE WITNESS:  No.

12         MR. SATTERLEY:  Okay.  No.  All

13   right.  Jerry, go ahead.  I'm sorry.

14         Thank you, Mr. Pulaski.  Sorry

15   we had to ask you these questions on a

16   Saturday morning.

17         THE WITNESS:  That's all right.

18   BY MR. BLOCK:

19      Q.    Mr. Pulaski, hi.  Jerry Block

20   again from Levy Konigsberg.  Just a

21   follow-up.

22         You said that you had listed

23   gynecological cancer as the claim type for

24   nearly all of the cases on the list attached

25   to your signed PSA, right?

```
 1        A.      Correct.
 2        Q.      Okay.  What is -- what are
 3   gynecological cancers?
 4              MR. BLACK:  Objection.  Look,
 5   all of these follow-up questions have to
 6   relate to new testimony.
 7              MR. BLOCK:  What -- okay.
 8              MR. BLACK:  So I'm going to --
 9   objection.  Don't answer that.
10              MR. BLOCK:  I got your
11   instruction.  I'm going to ask another
12   question, okay?
13              MR. BLACK:  Okay.
14   BY MR. BLOCK:
15        Q.      What are the gynecological
16   cancers that your clients have that are on
17   the list attached to your signed PSA?
18              MR. BLACK:  I'm going to object
19   as privileged.  I mean, if you guys have the
20   list, then you've got the list.
21   BY MR. BLOCK:
22        Q.      Mr. Pulaski, how many of the
23   cases on the list attached to your signed PSA
24   are some gynecological cancer other than
25   ovarian cancer?
```

110

1           MR. BLACK:  Same objection.

2     Don't answer.

3     BY MR. BLOCK:

4           Q.    Mr. Pulaski, will you tell us

5     anything about the types of gynecological

6     cancers that the people have that are listed

7     on the attachment to your signed PSA?

8           MR. BLACK:  He'll answer

9     questions that aren't privileged.  That's a

10    privileged question, so don't answer it.

11          MR. BLOCK:  Okay.  Mr. Pulaski,

12    I -- let's -- we didn't talk about your

13    schedule, but we could do that with your

14    counsel.  We don't have to -- or we could do

15    that if everyone is done questioning.  I

16    don't know if anyone else --

17          MR. THOMPSON:  I've got some.

18          THE COURT REPORTER:  Who just

19    said that?

20          MR. THOMPSON:  Clay Thompson.

21    Clay Thompson with Maune Raichle.

22          Jerry, are you done?

23          MR. BLOCK:  Yes.  Well, I'm

24    done subject to getting a court ruling on the

25    objections.

111

```
 1              MR. THOMPSON:  So by my clock,

 2   according to the counsel, we have seven

 3   minutes, and I object to this deposition

 4   being limited and reserve all right.

 5   BY MR. THOMPSON:

 6        Q.      Mr. Pulaski, my name is Clay

 7   Thompson, and I'm at my son's tennis match,

 8   but I'm over in the woods away where no one

 9   can hear me.  That's why I'm looking like

10   this.

11        A.      No problem. I'm a big tennis

12   player, so I appreciate that.

13        Q.      Sir, you represent plaintiffs

14   with claims against companies for various

15   tort claims generally, right?

16        A.      Correct.

17        Q.      And you've negotiated

18   settlements on behalf of plaintiffs with

19   claims against companies just generally in

20   your career, right?

21        A.      Correct.

22        Q.      And you would agree with me,

23   sir, that lawsuits are between parties, not

24   lawyers, meaning that a plaintiff, a sick

25   person making a claim against a company, the
```

112

```
 1    plaintiff is the sick person and the

 2    defendant is the company.  Those two are the

 3    parties to that case.  Would you agree with

 4    me on that?

 5           A.      Correct.

 6           Q.      And the way that you determine

 7    a value of a claim between a plaintiff and a

 8    defendant in that circumstance, number one

 9    could be that the plaintiff and defendant

10    agree to what the value of that claim is.

11                  Would you agree with that?

12           A.      Is that one way?  Is that what

13    you're asking?

14           Q.      That's one way.  That's one way

15    that that can be done, correct?

16           A.      That is correct.

17           Q.      And another way that can be

18    done, if the parties are not able to agree on

19    the value of a claim, is that a jury decides

20    what the value of a claim is.

21                  Do you agree with that?

22           A.      That is correct as well.

23           Q.      And, sir, would you agree with

24    me that Johnson & Johnson has the financial

25    wherewithal to settle all claims against it
```

1   via agreement of the parties for less -- or

2   I'm sorry.  I'll start over.

3                 Would you agree with me that

4   Johnson & Johnson is able to pay all claims

5   in full by agreement between parties, between

6   the individual plaintiffs and the defendant,

7   for the next five years?

8                 MR. BLACK:  Objection.  Vague.

9                 MR. TORBORG:  Objection.

10                 MR. BLACK:  Foundation.

11                 MR. TORBORG:  This is

12   Mr. Torborg.

13   BY MR. THOMPSON:

14        Q.    You can answer.

15        A.    I'm sorry.  I apologize, but I

16   really don't understand your question.

17        Q.    Do you believe that Johnson &

18   Johnson have sufficient funding to settle, at

19   arm's length, all claims pending against it

20   in the tort system, whether by agreement or

21   by jury verdict, for the next five years?

22                 MR. BLACK:  Objection.

23   Foundation.  Vague.

24                 THE WITNESS:  If you're asking

25   me whether or not I believe this will be done

1    in the next five years in the tort system, my

2    answer is no.

3    BY MR. THOMPSON:

4        Q.    No.   Does Johnson & Johnson

5    have enough money to pay all current

6    plaintiffs, whether it's by settlements with

7    those current plaintiffs or verdicts that

8    those plaintiffs obtain against the company?

9            Does J&J have enough money to

10   resolve all pending claims against them,

11   either by settlement or by verdict, in the

12   next five years?  Do they have enough money

13   today to do that?

14           MR. BLACK:  Objection.

15   Foundation.  Vague.  Compound question.

16           THE WITNESS:  I believe the

17   answer to that question is it depends on what

18   negotiations there are and what fair value is

19   to different people.  I mean, I don't know --

20   if you think $5 billion a claim is a fair

21   amount, then obviously they don't have enough

22   money to do that so --

23           THE COURT REPORTER:  Did you

24   say million or billion in your answer?

25           THE WITNESS:  Billion.

```
 1   BY MR. THOMPSON:

 2        Q.    Do you believe that Johnson --

 3        A.    You've asked me a question that

 4   doesn't have boundaries.

 5        Q.    What analysis have you done to

 6   determine, if any, whether Johnson & Johnson

 7   can settle all current claims against it for

 8   less than -- for $8 billion?

 9             MR. BLACK:  Objection.

10   Privileged.  A couple of minutes left,

11   counsel, obviously subject to whatever the

12   Court decides.

13   BY MR. THOMPSON:

14        Q.    Can Johnson & Johnson settle

15   all talc claims against it for less than

16   $30 billion over the next five years?

17             MR. BLACK:  Objection.  Calls

18   for a legal conclusion.  Foundation.

19   BY MR. THOMPSON:

20        Q.    Do you have an opinion on that

21   or anything at all about that?

22        A.    If you're asking me whether or

23   not I think Johnson & Johnson is willing to

24   do something or can do something -- I don't

25   understand what you're asking me.
```

116

```
1          Q.      If Johnson & Johnson took

2    $30 billion out of its piles of cash and said

3    we'd like to settle all the current ovarian

4    cancer and mesothelioma cases against us

5    right now, would that be sufficient to settle

6    all of those cases right now?

7                    MR. BLACK:  Objection --

8                    THE WITNESS:  Johnson &

9    Johnson --

10                   MR. BLACK:  -- foundation, and

11   it calls for a legal opinion.  So don't

12   answer it.  Better wrap it up.

13   BY MR. THOMPSON:

14         Q.      Is Johnson & Johnson

15   financially able to settle or try all claims

16   forever against them?  Do you have any

17   opinion on that?

18                   MR. BLACK:  Same objection.

19   Same objection.  You don't need to answer.

20                   THE WITNESS:  I don't.

21                   MR. BLACK:  It's -- it's

22   privileged.

23   BY MR. THOMPSON:

24         Q.      Have you ever considered

25   Johnson & Johnson's financial ability to pay
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

117

```
1   all claims in full in the tort system?  Has

2   that ever entered into your analysis?

3               MR. BLACK:  Same objection.

4   His analysis is privileged.  Don't answer it.

5               Guys, we're -- one last

6   question here.

7               MR. TORBORG:  Before we go off

8   the record, the debtor needs to make a

9   statement on confidentiality.

10              MR. BLACK:  Go ahead.

11  BY MR. THOMPSON:

12       Q.    You said that the Third Circuit

13  opinion was a good opinion for your clients,

14  and that was because your clients could

15  proceed in the tort system and get paid in

16  full, right?

17              MR. BLACK:  Objection.  That's

18  privileged.

19              THE WITNESS:  That is not what

20  I said.

21              MR. BLACK:  But that's

22  privileged.  So, Adam, you don't need to

23  answer.

24  BY MR. THOMPSON:

25       Q.    That's why it was a good
```

1    result, right, sir?

2              MR. BLACK:  All right.  So no

3    more questions.  We're out of time.

4              MR. THOMPSON:  I deserve to

5    come back and ask later.  The two hours is an

6    arbitrary limit.

7              MR. BLACK:  Counsel, I -- Clay,

8    you and I have never met.  I totally respect

9    that request.  And if the time limits are

10   modified by the Court, I'll -- we'll be back

11   online subject to Mr. Pulaski's schedule as

12   well.  So I'm not trying to be rude.  I'm

13   trying to enforce the time limits as I

14   appreciate them.  So if the debtor needs to

15   make a statement, that's fine.

16             MR. TORBORG:  Yeah, thank you.

17   This is --

18             UNIDENTIFIED SPEAKER:  Can I

19   just ask a question of how much time we

20   actually used on the record from the court

21   reporter, please?

22             THE VIDEOGRAPHER:  Two hours

23   and two minutes.

24             UNIDENTIFIED SPEAKER:  Thank

25   you.

119

```
1              MR. BLACK:  I let you guys go a
2    little over.
3              MR. HADDAD:  Wow.  All right.
4    BY MR. HADDAD:
5         Q.    So, listen, before we wrap up,
6    just to make the record clear, Mr. Pulaski,
7    do you adopt each and every instruction from
8    your counsel not to answer?
9              MR. BLACK:  Objection.  Don't
10   answer that.  Come on.  My role is to object
11   and instruct him not answer if I think it's
12   appropriate, and he doesn't have to tell you
13   whether he adopts it.  He's got a lawyer
14   here --
15             MR. BLOCK:  No, no.  I think he
16   said --
17             MR. BLACK:  That's my job.
18             MR. BLOCK:  I think he said --
19   excuse me.  This is Jerome Block.  I think
20   the witness said throughout the deposition
21   that he would not answer any questions if his
22   attorney instructed him not to answer, and
23   that is exactly what Mr. Pulaski did.
24             MR. BLACK:  Whatever he said on
25   the record he said on the record, but no more
```

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

120

1  questions to Mr. Pulaski.

2           MR. HADDAD:  Sure.  Well, we're

3  prepared to wrap up for the day, sir.  As

4  we've stated throughout the deposition,

5  Mr. Black, your overarching objections and

6  privilege instructions are not well-founded.

7  They've interfered with a proper examination.

8  Our rights are reserved.  We do not --

9           MR. BLACK:  I understand.

10          MR. HADDAD:  We do not consider

11 the examination concluded.

12          MR. BLACK:  I understand your

13 positions.

14          MR. TORBORG:  This is David

15 Torborg for the debtor.  The debtor believes

16 that portions of today's transcripts --

17 transcript constitutes confidential

18 information.  Consistent with the parties'

19 agreement, we will identify those portions of

20 the transcript within 24 hours after receipt

21 of the final.  Until such time, the entirety

22 of this transcript shall be considered and

23 treated as confidential.  Thank you.

24          MR. BLOCK:  That's fine.  And I

25 would just say, sir, Mr. Torborg, that an

121

```
1    objection on privilege grounds and

2    instruction not to answer, in compliance with

3    an instruction not to answer, cannot possibly

4    be confidential.  So I trust you'll be

5    careful and only designate things as

6    confidential that you truly believe in good

7    faith are confidential.

8             MR. SPONDER:  And this is Jeff

9    Sponder from the Office of the United States

10   Trustee.  And that confidentiality is subject

11   to the Court's ruling yesterday.  Thank you.

12            MR. BLACK:  Counsel, thank you

13   so much.  We'll be available to discuss any

14   changes by the Court regarding scheduling or

15   any other issues.

16            MR. SATTERLEY:  Yeah, let me

17   ask that, Mr. Black.  When -- can we talk

18   later today?  Are you available to talk later

19   today?

20            MR. BLACK:  Yes, sir.  In fact,

21   if you guys want, my cell phone is 713 --

22            MR. SATTERLEY:  Just a second.

23   Let me get a pen.  713 --

24            MR. BLACK:  -- 502-8039.  Text

25   me, don't call, because I typically don't
```

122

1   answer calls from numbers that aren't stored,

2   but I'll definitely respond quickly.

3                  UNIDENTIFIED SPEAKER:  Could

4   you give that again?  713 --

5                  MR. BLACK:  Yes.  713 --

6                  UNIDENTIFIED SPEAKER:  502 --

7                  MR. BLACK:  -- 502-8039.

8                  UNIDENTIFIED SPEAKER:  Thanks.

9                  MR. BLACK:  Thank you, counsel.

10                 THE VIDEOGRAPHER:  May we go

11  off the record?

12                 MR. BLACK:  Yes.

13                 THE VIDEOGRAPHER:  Going off

14  the record at 11:45 a.m. Eastern Time.  Thank

15  you.

16     (Today's deposition concluded at 11:45 a.m. EDT.)

17                  *  *  *  *  *

18

19

20

21

22

23

24

25

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

123

1              C E R T I F I C A T I O N

2

3         I, Patricia R. Frank, a Registered Merit

4    Reporter, Certified Realtime Reporter, and Notary

5    Public, do hereby certify that I reported the

6    deposition in the above-captioned matter; that said

7    witness was sworn; that the foregoing is a true and

8    correct transcript of the stenographic notes of

9    testimony taken by me in the above-captioned matter.

10         I further certify that I am not an

11   attorney or counsel for any of the parties, nor a

12   relative or employee of any attorney or counsel

13   connected with the action, nor financially

14   interested in the action.

15

16              _Patricia R. Frank, CCR_

17         Patricia R. Frank, CRR, RMR #9764

18

19   Dated:  April 16, 2023

20

21

22

23

24

25

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

## $

**$12** 51:24

**$30** 115:16 116:2

**$5** 114:20

**$50,000** 62:14

**$60** 49:16,22 50:2,8,21 51:1,11,14
52:21

**$8** 115:8

## 1

**1** 88:11

**10,000** 16:5

**11:45** 122:14,16

**12** 82:24

**14** 14:2,10 16:12 17:3 19:5 53:19

**15** 12:3 99:24 100:5

**1970s** 84:16

**1st** 73:4

## 2

**2016** 44:14

**2019** 27:10,11 30:25 31:9

**2020** 31:18 32:10,11,22

**2021** 14:3,10,23 16:13 17:4,5 19:6
33:2,6,19,25 34:9

**2022** 18:24

**2023** 12:3 18:22 22:6,10,16 31:4
35:4,16 36:23 42:4,5,9,10 49:2 58:22
59:2 89:8

**21** 19:6

**23-12825** 12:8

**24** 61:7 62:9 120:20

## 3

**3** 34:24,25 35:2,8 46:6 48:20,25 49:2
89:8

**30** 102:17

## 4

**4** 22:6,10,16 42:5,10 49:2 58:22 59:2

**42** 74:19

**47** 79:1

**4:30** 60:25

## 5

**5,000** 18:5

**5,997** 61:18

**50** 14:21 16:16 65:5 66:17 73:13,16

**500** 19:2

**502** 122:6

**502-8039** 121:24 122:7

## 6

**6,000** 16:8,9 17:7,13,25 18:1,10,11,
20 19:11,16,20 21:19 22:8,18 23:12
24:3 25:14 26:5,11 42:5 54:6 59:9
61:12 71:17 73:13 92:2,18 93:8,18
94:9 95:22 98:1,9 99:22 100:9

**60** 49:23 52:2,6

**60,000** 59:6,15

## 7

**713** 121:21,23 122:4,5

## 8

**8-K** 58:22 59:1

**8.9** 51:23 52:1 82:23

## 9

**9:40** 12:4

## A

**a.m.** 12:4 122:14,16

**AAJ** 88:3

**ability** 116:25

**absent** 21:20 100:5

**absolutely** 39:10 81:24,25 82:1
94:23

**access** 105:21

**accuracy** 77:8

**accurate** 63:16 65:6 91:24 92:12

**actions** 30:14

**Adam** 12:5,20 117:22

**add** 96:2,4

**addition** 92:13

**additional** 96:4

**admitted** 78:1,7 79:13

**adopt** 119:7

**adopted** 67:18

**adopts** 119:13

**advice** 48:15

**advise** 48:11

**advised** 34:17,21

**affiliated** 16:23

**affirmed** 77:15

**AG** 90:25 91:5

**age** 61:7 62:9 79:1

**agree** 50:20 54:21 59:23 92:25 94:15
102:1 111:22 112:3,10,11,18,21,23
113:3

**agreeing** 81:4

**agreement** 37:12 46:1,6,11 47:6,8,
11,15,20 48:5,8,12,16,19 49:7 53:5,
14,18 54:1 55:4,13,19,25 56:23 57:7,
13,18 58:4,18 59:22 81:4 88:8,19,22
93:11 94:18,22 95:23 97:13,16
100:10 113:1,5,20 120:19

**agreements** 17:9

**ahead** 15:5,6 50:14 70:16 83:10
87:15 108:13 117:10

**Alice** 103:3,6

**Allen** 15:9,13,15,21

**allowed** 20:24 84:23

**alternative** 79:2

**amount** 114:21

**analysis** 115:5 117:2,4

**Andy** 31:19 32:8

**anthophyllite** 84:3

Case 23-12825-MBK    Doc 672-2    Filed 06/02/23    Entered 06/02/23 16:14:38    Desc
Exhibit 1    Page 127 of 137

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

**apologize** 113:15

**Appeals** 38:6

**appearances** 12:14

**applicable** 89:25 95:12

**approximate** 27:9 95:21 98:9 100:8

**approximately** 14:17 17:7,13,25
18:10 92:17 93:18 94:9

**April** 12:3 22:6,10,16 31:18 32:10,11
34:24,25 35:2,8,16 42:5,10 46:6
48:20,25 49:2 58:22 59:2 89:8

**arbitrary** 118:6

**area** 80:9 107:1

**argument** 56:15

**arm's** 113:19

**asbestos** 79:2 84:17

**aspects** 25:25

**asserting** 40:22 41:11

**assume** 38:3

**assuming** 48:2

**attached** 53:25 70:20 90:21 92:19
93:10 95:22 99:22 108:24 109:17,23

**attachment** 110:7

**attempted** 61:24 62:5

**attend** 76:18,20 107:11

**attended** 64:6,9,21,25 107:3,15,19

**attending** 12:10

**attorney** 19:15 21:13 35:23 37:24
47:3 48:15 60:12 65:14,19,21 66:6,7
69:15 119:22

**attorney-client** 41:3,10

**attorneys** 18:12 32:3,16 33:12,15
34:3 59:18,20 66:12 68:7 81:15

**Attune** 27:25

**aware** 26:15,21 49:14 50:23 51:8
58:1

**B**

**Baby** 79:3 85:8 92:11 97:19 99:21

**back** 23:25 24:1 38:24 52:21 65:1
81:10 118:5,10

**bad** 38:19

**balance** 19:6

**bankruptcy** 12:6,7 13:6 14:3,22
19:5 20:23 32:25 33:2,6,13,18,20,21,
24,25 34:4,9,16 38:7 48:22 49:1,4,8,
10,15,20 51:9,22 58:19 71:25 72:6,12
101:12,21 102:2

**bar** 73:9

**barred** 72:21 73:17

**based** 50:4,16

**basically** 72:7

**basis** 21:24 28:16 45:5 50:11 72:7
96:4 103:22

**Beasley** 15:9,12,15,21

**began** 27:4 32:11

**begin** 60:11

**beginning** 37:7

**behalf** 34:18,23 94:19 111:18

**belief** 45:6 50:12

**believes** 96:20 97:7 120:15

**big** 111:11

**billion** 49:16,22,23 50:2,8,21 51:1,
11,14,23,24 52:1,2,6,21 82:23,24
114:20,24,25 115:8,16 116:2

**bind** 55:20

**binding** 56:5 57:8,13

**binds** 56:2,9

**Birchfield** 31:19 32:5,15 33:11 34:5
37:3 44:15 105:20

**Birchfield's** 32:8,21 77:11

**birth** 54:9 89:14

**bit** 83:2

**Black** 13:22 18:18 19:22,24 20:6,12,
14,16 21:8,15,22 22:4,19 23:3,9,13,
18 24:17,22 25:5,8,11 26:8,16 28:6,
11,23 29:4,9,15,23 30:7,13,22 36:9
38:20 39:25 40:5,9,13,19 41:1,3,6,12,
24 42:7,12 43:11,17,21 44:24 45:7,
14,21 50:5,13 52:15 53:7 55:5,21
56:1,8,14,19,25 57:4,9,14,21 59:11
67:11,13 68:1,9 70:11 71:4,9,14,18
74:3,8,15,19 76:7,9 77:16,23 78:8,14,
18,23 80:1,5 82:19 83:6,16 84:1,20
85:3,23 86:12,17,22 87:1,8 92:22
93:12 94:12,15 95:14,24 96:2,8,18
97:4,7,20 98:4,11,17 99:1,13,17,23
100:4,13,23 101:6,14,23 102:5
103:19,22,25 104:6,10,13,19,22

105:3,10,17,24 106:3 107:4,8,14
108:1,6,9 109:4,8,13,18 110:1,8
113:8,10,22 114:14 115:9,17 116:7,
18,21 117:3,10,17,21 118:2,7
119:1,9,17,24 120:5,9,12 121:12,17,
20,24 122:5,7,9,12

**Black's** 13:24

**Block** 20:13,15,17 21:12,16 22:1
23:15,23 46:22,25 53:9 74:17,23
87:14,16,19,20 88:13 92:24 93:14
94:16 95:19,25 96:6,9,13,24 97:10,23
98:6,13,21,22 99:3,14,18 100:2,7,18,
19,25 101:9,18,25 102:7,10 106:4
108:18,19 109:7,10,14,21 110:3,11,
23 119:15,18,19 120:24

**Blount** 103:4,6

**Bob** 69:9,11

**bound** 55:3,9,12

**boundaries** 115:4

**bounds** 28:13 68:4

**BP** 76:6

**break** 60:10

**briefly** 35:18 59:3

**broad** 53:20 62:21 79:9

**budgeted** 74:6

**C**

**calculate** 61:25

**calculation** 62:4,5 71:1,7,8

**call** 35:17,24,25 36:3 45:17 73:3 81:1
100:21 121:25

**called** 21:1 27:25

**calls** 35:18,21 41:21 80:10,11,19
97:21 115:17 116:11 122:1

**cancer** 21:3,20 23:12 24:3,9 26:14
44:6,22 61:14,19 64:23 73:7 79:1
81:14 82:18 83:5 85:8,10 90:22,24
91:10,13 92:8,10 93:2,8,17,25 94:8
97:18 98:25 102:21 105:8,15,23
108:23 109:24,25 116:4

**cancers** 85:14,22 92:3 109:3,16
110:6

**care** 66:1,3

**career** 111:20

**careful** 121:5

**case** 28:22 38:8 54:11 58:19 64:4,5, 12 68:24 69:3 72:4 73:15 79:18 89:12 91:8 92:18 93:10,19 95:10 100:22 112:3

**cases** 14:4,8 15:12 23:4,5 28:15 29:10,18,21 30:15 61:16 65:5,6,14, 15,16,20 66:9,14,17,19 78:7 79:16,21 80:4 91:17 92:6,18 95:13 98:1,9,25 99:10,16,22 100:9 107:22,25 108:24 109:23 116:4,6

**cash** 116:2

**catch** 46:17 69:10 70:15

**categories** 91:2

**category** 90:25

**causing** 85:21

**cell** 121:21

**center** 88:21

**certificates** 99:16

**cetera** 40:24

**chance** 23:24 53:3 60:19 62:25 104:3

**change** 79:11

**changed** 47:18 63:25 82:5,9

**channeling** 34:6 71:20,23 72:2,10

**chest** 62:11

**chief** 58:2

**Chris** 102:12,15

**chrysotile** 84:6

**Circuit** 38:7 117:12

**Circuit's** 51:17

**circumstance** 112:8

**circumstances** 88:1

**claim** 28:2 89:25 90:19 91:5,13 93:3 95:10 108:23 111:25 112:7,10,19,20 114:20

**claimant** 37:25 47:7 56:5 60:1 100:22 101:5

**claimants** 13:6 20:22 32:4 34:18,22 49:17,22 54:1,4,8 55:20 59:6,9,16 94:20 95:5,22 101:2

**claims** 14:24 15:7,25 16:2,9 26:1 27:5,16,21,23,24 31:2,15 50:2,9,21 51:2 91:1,5 95:5 96:12,17 111:14,15, 19 112:25 113:4,19 114:10 115:7,15 116:15 117:1

**clarification** 30:4 35:19 82:12

**class** 33:14 68:24 69:3,4

**Clay** 110:20,21 111:6 118:7

**clean** 98:15

**clear** 16:14 81:20 82:3 119:6

**client** 20:4 40:15 41:14 65:1 69:18 70:13

**client's** 64:17

**clients** 14:24 15:11,17,20,22,24 17:7,13,22 18:1,11,20 19:11,16,17,21 20:1,5,25 21:1,19 22:8,18 23:12 24:4, 9 25:15 26:6,12 28:4 29:13 30:14 35:7 38:19,21 39:22 40:8,18 42:5,11 43:10,15 45:12 52:3 53:3,24 54:13, 15,17,23 55:1,3,9,12,16 56:3,9,22 59:19,21 70:19,21,23 71:2,17 72:19, 24,25 73:13 77:19 81:6 93:9,18 94:1, 9 101:12,16,19 102:3,22 109:16 117:13,14

**clients'** 24:16 26:1 81:5

**clock** 111:1

**co-counsel** 15:20 16:3,7,10,15 32:8 65:15,18

**co-counseled** 15:8 79:15

**column** 89:16,18,19,22,24

**columns** 89:13

**comfortable** 73:25

**comment** 44:3 52:10,23

**comments** 21:9

**Commission** 59:2

**commitment** 49:15,20 51:10 52:1,2, 5,7 59:25 101:16,20

**commitments** 59:5,15,18 101:11

**committed** 51:21 52:25

**Committee** 13:5

**communication** 40:23

**communications** 41:4,10,22 52:10

**companies** 111:14,19

**company** 111:25 112:2 114:8

**compensation** 43:25 44:7,23

**completely** 13:17 62:23

**compliance** 121:2

**complying** 99:6

**Compound** 114:15

**Concepcion** 12:12

**conclude** 44:21

**concluded** 120:11 122:16

**conclusion** 97:21 115:18

**condition** 22:8,18

**conference** 12:10 76:18 77:10

**confident** 26:21 41:19

**confidential** 90:13 120:17,23 121:4, 6,7

**confidentiality** 37:11 117:9 121:10

**confirm** 93:1

**confirmation** 21:2 93:16 94:7

**confirmed** 20:22 21:19 73:8,11,16 93:24

**confirming** 70:2 93:7 98:24 99:12

**confirms** 92:20

**connection** 26:13 27:15 28:5 37:9, 17 48:11,16 58:19 77:18 78:10 84:22 104:25

**considered** 116:24 120:22

**Consistent** 120:18

**constitutes** 120:17

**construct** 62:21 79:10

**constructs** 53:21

**consult** 68:7

**contact** 92:10

**contained** 97:13

**context** 33:9 96:3

**continued** 32:14

**conversation** 31:9,13 36:7 81:3

**conversations** 80:25

**convey** 57:19

**corporate** 64:11 104:16,17

**corporation's** 64:13

**correct** 18:9 48:22 49:5 54:2 60:1 61:20 63:13 65:7 67:1,2,4,5,19 73:10, 11,18,19 79:25 80:7 81:23,25 82:1,7 85:14,15,19 86:6,11 89:10 90:2 92:4 96:14,17,19,20,25 97:3,4,6 99:8 101:22 106:11,24,25 109:1 111:16,21 112:5,15,16,22

Confidential

correctly 46:21

counsel 12:24 13:5,20 14:12,13
15:21 16:16 23:2 26:25 30:5 33:19,
22,24 47:7 48:11 56:7,15 69:5 94:19
104:5 106:3 110:14 111:2 115:11
118:7 119:8 121:12 122:9

counted 92:1

couple 29:5 115:10

court 12:7,15,17 14:5,9 15:1 21:9,21
24:1 29:7,22 30:4,10 35:19 38:6 42:1
52:20 63:8,21 75:23 78:1,7 82:12
87:2,13 97:12,14 100:6 110:18,24
114:23 115:12 118:10,20 121:14

Court's 121:11

Cracken 32:7,15 33:11

Cramer 103:14

critical 20:18

current 59:6,9,15 114:5,7 115:7
116:3

cut 74:22 84:24 108:1

cutting 100:5

D

Daly 21:15

damages 72:22

Daniel 103:14

Darsey 66:11

date 12:3 33:1,2 37:6 40:24 54:8
71:16 89:14,25 95:11

Dated 89:8

dates 48:23

David 120:14

day 34:14 49:3 120:3

dealings 27:22 28:16

deals 81:10

dealt 27:14

death 89:25 95:12 99:15,16

debtor 117:8 118:14 120:15

debtor's 58:1,21,25

debtors 58:9

decade 44:5,11,18

decided 45:25 102:3

decides 112:19 115:12

decision 38:5,13,15,17,18 73:15

deep 69:1

defendant 112:2,8,9 113:6

definition 30:1,10 84:9 100:21

depends 114:17

deposition 12:5,9 28:15 58:6 64:22,
25 65:4 68:12,20 69:3,15 74:6 76:10
94:25 111:3 119:20 120:4 122:16

depositions 73:24

describe 40:23

deserve 118:4

designate 121:5

designated 90:13

desk 102:24

determine 112:6 115:6

device 27:25

diagnosed 81:14

diagnoses 93:17 94:8

diagnosis 19:10,13,15 21:19 71:17
92:21 93:2,7,24 98:24 99:12

dial 45:16

difference 20:8 59:24 60:5 105:14

digits 54:9

directing 71:13

directly 81:8

disagree 76:13 77:21,22 78:13

disclose 96:21

discovery 20:20

discuss 40:7 94:13 121:13

discussing 17:8 34:4 81:4

discussion 50:18 74:4 81:8,13 94:3

discussions 27:12 31:1 32:11 33:5
34:15 35:6,10 37:10,18 39:12 46:5
50:16 52:9 55:15,18 73:21

disease 64:18

diseases 64:14

dismissal 49:9

dismissing 38:7

dispute 74:18

distinction 20:7

District 12:8

docket 23:4 78:11 84:23

dockets 28:16 29:6,10

document 95:17

documents 20:1 33:15

drafting 33:15

duly 12:21

dying 64:17

E

earlier 66:18 81:21 91:16

early 65:3

Eastern 12:4 122:14

economic 104:24

Ed 104:21

EDT 122:16

effect 61:22

Elmiron 28:3,5 29:21

end 35:6

enforce 118:13

engage 34:12

ensured 81:9

entered 117:2

entirety 61:3 120:21

entitled 62:12,17

equivalent 98:18

ethical 67:10,23

ethics 67:18 68:7

evaluate 97:14

evaluation 83:13

evidence 64:7

exact 43:1 48:23 54:5 61:21

examination 28:17 29:19 120:7,11

examined 12:21

examiner 23:19

examples 75:13

Exchange 59:1

Case 23-12825-MBK    Doc 672-2    Filed 06/02/23    Entered 06/02/23 16:14:38    Desc
Exhibit 1    Page 130 of 137

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

**excuse** 27:2 83:20 119:19

**executives** 84:15

**exhibit** 88:11

**exhibits** 77:25 78:3,5,6

**exists** 107:10

**experience** 34:3

**expert** 71:24

**expertise** 33:13

**experts** 105:21

**expired** 100:12

**explain** 104:14

**exposure** 70:5 99:21

**exposures** 64:19 79:2

**extent** 24:7 25:2 30:20 39:13 41:10

**F**

**F-O-O-T** 69:12

**F-O-O-T-E** 69:13

**face** 56:5

**fact** 26:4 121:20

**fair** 23:22 43:25 44:7,23 83:12
11 114:18,20

**faith** 121:7

**fake** 52:6

**fall** 91:4

**falls** 94:11 95:15

**favor** 54:23

**fees** 58:19

**Feinberg** 107:21

**fellow** 88:2

**fight** 41:25

**file** 49:8,12 65:8,10,13,15 66:23

**filed** 12:6 14:5,8,11,25 15:9 16:11
29:21 30:10 34:14 49:1 53:19 58:22
59:1 65:18,20 66:8,18 68:23 79:15

**files** 22:20 24:12,15,16 100:1

**filing** 14:3,22 19:5 30:15 32:25 33:6,
20,25 34:9,16 49:4 51:9,22 65:5
66:20 72:13 73:9

**filings** 30:17

**final** 120:21

**finality** 53:22 62:22 72:7

**financial** 112:24 116:25

**financially** 116:15

**find** 19:9 29:24 89:21 105:21 107:9

**finds** 21:9

**fine** 104:13 118:15 120:24

**firm** 13:24 14:25 16:18,20,23 17:10,
11 18:12 19:15,19 21:13,14,17 25:21
92:15 97:25 98:2,7 102:13

**firm's** 97:15

**firms** 15:23 81:11 95:2

**folks** 45:20 65:10 74:23 80:10

**follow-up** 106:7 108:21 109:5

**follow-ups** 106:5 107:5

**Foote** 69:9,11

**forever** 72:21 73:17 116:16

**form** 18:18 58:25 80:1

**formally** 53:19

**forward** 23:23

**foundation** 82:21 83:8 113:10,23
114:15 115:18 116:10

**Frank** 12:16

**front** 41:25 86:3

**full** 54:8 113:5 117:1,16

**fully** 82:17 83:4

**funding** 113:18

**future** 51:24 63:6 72:14,19,20,24,25

**G**

**gave** 37:22 44:2 68:20 69:2 91:18

**Gavin** 84:11

**generally** 68:19 75:12 81:12 111:15,
19

**give** 27:9 62:8 75:12 80:18 84:8,14,
18 104:3 122:4

**Glean** 66:11

**global** 59:7,10,16

**good** 12:1 13:3 38:19,22 56:23 60:9,
13 117:13,25 121:6

**Google** 68:22

**grounds** 121:1

**guess** 14:20 36:4 38:14 44:9,19
51:12 66:13 69:19 80:13 90:19

**guys** 21:1 36:15 99:24 109:19 117:5
119:1 121:21

**gynecologic** 105:7

**gynecological** 90:24 91:10 92:2
108:23 109:3,15,24 110:5

**H**

**Haas** 35:22 80:12 81:1,9

**Haas'** 94:25

**hac** 79:13

**Haddad** 13:1,2,4 18:19 20:3,9 21:24
22:5,22 23:6,10,17,21 24:14,19,25
25:6,9,13 26:10,19 27:1 28:8,18,24
29:12,20 30:5,9,18,23,24 36:5,12
38:23 40:2,6,11,16,21 41:2,5,8,16
42:3,8,13 43:13,19,23 45:1,10,18,23
47:2 50:10,22 52:18 53:9,12 55:7,24
56:4,11,16,21 57:2,6,11,16,25 58:13,
16 59:13 60:6 66:18 81:21 119:3,4
120:2,10

**hand** 68:4

**handle** 25:25

**handling** 66:14

**harassing** 28:12 29:4 68:2 86:13
98:12

**hazards** 84:16

**He'll** 110:8

**head** 62:13 75:18 81:19

**hear** 13:7 28:23 38:12 42:17 60:15
87:17 111:9

**heard** 38:5,9,11 50:19 60:4 84:8

**hearing** 60:22,24 61:3,4

**hearings** 60:20

**highlighted** 88:25

**Hildick-smith** 84:12

**Hold** 20:13 89:23

**honestly** 86:13

**Hopkins** 103:9,11,12

**hours** 73:23 74:1,15 87:11 100:3
118:5,22 120:20

Confidential

**Houston** 13:15 17:22

**hundred** 18:23

**Hundreds** 18:3

**hypothetical** 62:8

**I**

**idea** 47:9 56:24

**identification** 88:12

**identified** 54:8

**identify** 120:19

**illusory** 57:8

**immediately** 49:8,11

**important** 20:24 21:4

**inaccurate** 84:9

**inappropriate** 21:10

**included** 70:9

**Including** 16:2

**increased** 85:10

**individual** 20:1,4 22:20 23:5 62:1,16
78:25 79:4 101:12 113:6

**individuals** 36:1 62:1 70:8 72:13

**information** 21:11,18 54:12 55:1
61:6 63:15,20,23 69:19,21,23 70:5
77:9 85:20 86:4 92:14 95:10 96:22
97:1,12 120:18

**ingestion** 27:23

**initial** 49:9

**injunction** 34:7 63:9 68:3 71:21,23
72:2,10

**injury** 89:20 94:20 95:4

**insisting** 30:11

**instance** 15:8

**instruct** 30:2 56:19 77:19 78:18
98:14 104:1 119:11

**instructed** 97:2 119:22

**instructing** 20:10 23:7 25:10 40:3
96:1,6

**instruction** 21:25 29:1 98:19 99:6
109:11 119:7 121:2,3

**instructions** 99:5 120:6

**intended** 57:23

**intending** 57:19,20

**intent** 72:12

**intentionally** 74:22

**interested** 20:20

**interfered** 120:7

**interrupt** 102:16

**investigate** 105:22

**Invokana** 27:24

**involved** 32:18 33:19,22,24 44:14,17
52:9 86:11,20 87:6

**involvement** 39:13,15,16

**involving** 78:1

**irrelevant** 28:12

**issue** 42:19 44:4 68:20

**issued** 42:14 43:9

**issues** 67:23 68:4 76:21 121:15

**Itkin** 39:11

**J**

**J&j** 35:24 46:5 51:10 69:19,20,24
70:1,4,7,10,19 82:16 83:4,14 93:4,15,
22 94:6 95:3,5,13,21 96:9,16 100:22
101:2,10 104:17 105:1 114:9

**Jeff** 121:8

**Jerome** 119:19

**Jerry** 20:14,16 21:8 87:20 100:15
106:6 108:13,19 110:22

**Jersey** 12:8 66:25

**Jim** 27:13 31:9,22 32:15 35:11

**job** 119:17

**Joe** 60:9 102:16 106:17

**Joel** 107:24

**John** 13:22 20:14 32:7 103:12

**Johns** 103:9,11

**Johnson** 14:4,9,24 15:25 16:1,12
25:15 26:7,13 27:5,16,21 28:20,21
31:2,14,19,20,21,24 33:5,23 34:11,
12,17,21,22 35:12,13 36:2 38:1 44:11
46:12,13 48:2,3 49:16,21 50:1,8,20,
25 51:1,21 52:12 53:6 80:14 84:15
112:24 113:4,17,18 114:4 115:2,6,14,
23 116:1,8,9,14,25

**Johnson's** 79:3 92:11 97:19 99:21
116:25

**judge** 20:19,20 60:20 107:11

**jump** 89:3,12

**June** 73:4

**jurisdiction** 79:23

**jurisdictions** 66:22 79:14

**jury** 64:8 72:14,22 73:10,15,18
112:19 113:21

**K**

**Kaplan** 60:21

**Katie** 103:17

**Ken** 107:21

**Kendra** 46:15,24,25

**Kherkher** 16:21

**Kim** 58:2

**Kim's** 58:5,11 94:24

**kind** 24:5 79:9

**kindly** 23:24

**kinds** 29:10

**knew** 49:11,25 84:16 93:20

**knowledge** 64:13 86:7

**Konigsberg** 20:15 87:21 108:20

**Kuffner** 104:21

**L**

**L-O-U-N-S-B-E-R-R-Y** 46:20

**language** 51:14

**late** 63:1

**law** 16:17,20,23 17:10,11 18:12 41:20
67:4 79:25 98:2,7

**lawsuit** 68:21,23 73:9

**lawsuits** 16:11 26:12 72:13 111:23

**lawyer** 23:4 57:23 78:11 88:2 96:20
97:2,5 104:7 119:13

**lawyers** 111:24

**lead** 16:15

**leadership** 50:25 51:3,5,6

**learn** 34:11 49:19

Case 23-12825-MBK    Doc 672-2    Filed 06/02/23    Entered 06/02/23 16:14:38    Desc
IN RE LTL Management LLC          Exhibit 1    Page 132 of 137
Confidential

Adam Pulaski
April 15, 2023

**leave** 100:16 102:17

**leaving** 63:2

**left** 115:10

**legal** 48:15 58:2,18 97:21 115:18
116:11

**length** 113:19

**letters** 15:11,16

**Levin** 102:13

**Levy** 20:15 87:21 108:20

**Lexitas** 12:13,16

**liability** 51:11 52:21

**licensed** 67:3,6 79:24

**likelihood** 53:23

**limit** 118:6

**limitations** 100:11

**limited** 21:24 87:10 111:4

**limits** 73:22 74:13 118:9,13

**lining** 62:10

**list** 35:7 54:1 69:18 70:9,20 89:12
90:20 91:4,8,17 92:18 93:10,19 95:3,
10,22 99:11,16 108:24 109:17,20,23

**listed** 92:2 93:9 94:1 97:16 98:1,9,25
100:9 108:22 110:6

**listen** 119:5

**literally** 41:9

**litigating** 44:10

**litigation** 28:3 44:6,14,18 70:25
71:25 75:16,17 76:3,6 81:12

**litigations** 75:4,7,13,20 76:11

**LLC** 12:6

**located** 13:14

**log** 40:22 41:7,9,15 60:19

**logs** 41:23

**long** 16:22 31:11 35:21 60:24

**looked** 24:12,15,20 48:24 59:3 62:6
86:3 88:7

**lot** 63:20,23

**Lounsberry** 46:15,19,25 47:3

**LTL** 12:6 13:6 14:3,4,9,23 16:1,12
19:5 27:5 28:21 31:2,14 33:2,5 35:13
38:1 48:22 49:1,7,15,20 51:9 59:5,14
90:4 91:18 93:15,23 94:7 95:3,6,13,

21 96:10,16 100:22 101:2,10

## M

**mad** 46:21

**made** 43:15 45:3 47:20 52:19,24
71:1,8 76:24 77:1 83:13 95:2 96:16
101:20

**make** 47:22,25 52:16 53:10 73:15
83:11 94:6 106:14 117:8 118:15
119:6

**makes** 44:19 52:13

**making** 111:25

**man** 61:6

**Management** 12:6

**manufacturers** 26:12

**March** 35:4,6,15 36:4,7,23,24 37:1,8,
16,21 80:16,18

**marked** 82:4,9 88:11

**mass** 75:19

**match** 111:7

**matter** 12:5 27:15

**matters** 27:20 28:5 34:4 88:10

**Maune** 110:21

**MBK** 12:8

**MDL** 51:7 66:24

**meaning** 111:24

**mediation** 96:3 107:3,8,11,13,16,19

**mediations** 96:23

**medical** 19:19 22:8,18 27:24 70:2
84:24 92:20 93:6,23 98:3,8

**meet** 17:19,24 87:25

**meeting** 32:2,6,9,21

**meetings** 33:10 66:9

**member** 88:3

**mentioned** 65:3 75:24 80:11

**mesothelioma** 21:3,20 60:18 61:13,
16,20 62:2,9,10,17,19 64:25 73:7
78:2,7 90:22,24 91:10,19 92:11 93:2,
8,25 97:18 99:10 102:22 116:4

**met** 17:14,15,17 18:11 87:21,22
106:11,23 118:8

**Michael** 76:3

**mid-march** 42:4,9

**middle** 28:21

**Miguel** 12:12

**million** 114:24

**mine** 43:7

**minutes** 74:19,25 99:24 100:5,17
111:3 115:10 118:23

**mischaracterizing** 58:11

**misheard** 60:3

**missed** 61:8

**missing** 54:15

**modeler** 104:25

**modified** 118:10

**money** 45:11 82:24 114:5,9,12,22

**morning** 12:2 13:3,7,18,21 60:9,25
108:16

**move** 21:6 23:23 76:15 79:10

**Multiple** 33:7

**Murdica** 27:13,14,22 28:19 31:9,22
32:16 33:11 34:5,16 35:11,22 36:8
37:4,10,18 39:12 46:15 80:12,13,25

**mute** 41:18

## N

**Nachawati** 36:2 80:14

**names** 70:9,19 84:14 91:4 92:1
97:15

**NDA** 46:4 94:10 95:15 96:23

**negotiate** 39:5,7 81:22

**negotiated** 111:17

**negotiation** 47:19

**negotiations** 27:4 31:14 104:25
114:18

**neighborhood** 61:23

**nice** 87:25

**Nicholson** 104:18

**night** 63:2

**non-disclosure** 37:12

**noted** 12:14

**notes** 85:5 102:25

Case 23-12825-MBK   Doc 672-2   Filed 06/02/23   Entered 06/02/23 16:14:38   Desc
Exhibit 1   Page 133 of 137

IN RE LTL Management LLC

Adam Pulaski
April 15, 2023

Confidential

**number** 30:20 33:12 34:18,22 49:25 54:5,10 61:22 69:22 81:13 89:15 95:11 112:8

**numbers** 62:22 122:1

**O**

**O'BRIEN** 103:17

**object** 18:18 24:23 25:12 39:25 58:10 78:9 98:18 100:1 103:20 109:18 111:3 119:10

**objected** 25:8 107:8

**objecting** 24:22 96:5

**objection** 19:22 21:10 22:19 23:1 24:17 36:9 38:20 40:10 41:13 42:2,7, 12 44:24 45:7,14 52:15 53:7 55:5,21 56:25 57:4,9,14 59:11 67:11,13 68:9 70:11 71:18 78:23 80:1 82:19,20 83:6,7,16 85:23 86:12 93:12 94:12 95:14,24 97:20 98:4,11 99:13,17,23 100:23 101:6,14,23 102:5 105:24 107:4 109:4,9 110:1 113:8,9,22 114:14 115:9,17 116:7,18,19 117:3, 17 119:9 121:1

**objections** 28:25 45:19 98:20 99:2 110:25 120:5

**obligations** 53:13,15

**obtain** 114:8

**occasion** 68:14

**occur** 72:5 80:14

**occurred** 38:14

**occurs** 53:23

**October** 14:2,10,23 16:12 17:3 19:5 33:1,6,19,25

**office** 13:15 17:23 25:25 31:19 32:21 65:19,20 66:8,13,19 121:9

**officer** 58:2

**Official** 13:5

**offline** 74:4

**oftentimes** 17:23

**oncologists** 105:7

**Onder** 36:2 80:13

**ongoing** 28:3

**online** 118:11

**opinion** 51:17,18 115:20 116:11,17 117:13

**opinions** 77:13,14

**options** 90:19

**order** 21:21 100:6

**ordered** 98:3,7

**Otterbourg** 13:4

**outdated** 63:18

**ovarian** 21:3,20 24:9 44:6,22 61:14 73:7 78:25 85:8,10 90:22 92:10 93:2, 7,25 97:18 98:24 102:21 105:8,15,23 109:25 116:3

**overarching** 120:5

**P**

**P-R-A-D-A-X-A** 76:2

**paid** 117:15

**panel** 77:12

**Papantonio** 102:13

**paralegal** 65:25

**paralegal's** 66:4

**Pardon** 63:21

**part** 35:11 51:9,12 53:1 70:9 91:8

**participants** 12:10

**participate** 45:25

**parties** 111:23 112:3,18 113:1,5

**parties'** 120:18

**pass** 102:7 106:1

**past** 24:21

**pathology** 98:23 99:11

**Patricia** 12:16

**Paxil** 75:25 76:3

**pay** 49:17,21 50:8,21 51:1 58:18 82:17,23,24 83:4,14 113:4 114:5 116:25

**paying** 13:24 50:2

**payment** 39:23

**payments** 51:24

**pen** 121:23

**pendency** 48:21

**pending** 113:19 114:10

**people** 41:17 61:12 73:17 95:4 97:17 110:6 114:19

**pericardial** 62:18

**peritoneal** 62:10

**permission** 79:24

**permit** 72:15

**person** 17:17,20 21:2 23:19 46:18 63:8 66:15 92:9 103:12 111:25 112:1

**personal** 94:20 95:4

**personally** 14:11 15:10 17:9,14 18:2,7,12 19:12 22:7,17,20 24:10,11 25:21,23,24 44:20 65:13

**phone** 20:19 22:14 30:16,19 41:14 121:21

**physically** 13:13

**pick** 41:13

**picking** 30:16,19

**picture** 106:16

**piles** 116:2

**place** 12:9 25:25 26:3 62:23

**plaintiff** 111:24 112:1,7,9

**plaintiff's** 88:2 95:2

**plaintiffs** 111:13,18 113:6 114:6,7,8

**plan** 20:23 34:5 46:1,10 47:6,7,10,14 48:4,7,12,16,18 49:7 53:1,4,14,19,24, 25 54:18,24 55:2,4,13,16 56:23 57:7, 12,18 58:4 73:4,8,16 81:3,7,16 88:8, 19,21 93:10 94:4,18 95:23 97:13,16 100:10 101:13,17,22 105:2

**played** 39:10

**player** 111:12

**pleadings** 65:23

**point** 20:18 21:5 27:3,7 29:3 32:7,12, 14 37:2 42:1 45:24 49:12 51:15 53:18

**portion** 61:9

**portions** 120:16,19

**posed** 21:23

**position** 56:6

**positions** 120:13

**positive** 39:11

**possibilities** 31:10

**possibly** 96:23 121:3

**potentially** 33:16 71:3

**powder** 79:3 85:8,13 92:12 97:19 99:21

**Powerpoint** 76:23,25

**practice** 67:3 79:25

**Pradaxa** 75:16 76:1

**preliminary** 63:9

**premise** 71:22

**prepared** 52:14 120:3

**present** 13:10 32:2,9 51:23 52:24 61:5 82:23

**presentation** 76:24 77:1,3,6

**presented** 64:7 67:24 77:9

**presently** 15:25 16:17 18:21

**preserved** 64:16

**press** 42:15,20 43:9,16,25 44:2

**prevent** 72:12,16

**previous** 33:10 99:1

**previously** 73:22 98:18

**primarily** 66:14,16

**print** 85:16

**prior** 14:2,10 15:9 16:12 17:3,5 22:6, 10,13,16 25:6 33:6,19,24 34:8,10,16 35:2 36:6,18,20,22,24 52:2 67:9,21

**privilege** 20:2 25:2 40:22 41:11,15, 22 45:19 50:14 96:23 107:9 120:6 121:1

**privileged** 19:25 21:5 22:21 23:5 26:9 29:6,9,16,25 30:1,11,12,16 40:1, 10,14,15,20 43:12,18,22 44:25 45:8, 15 53:8 55:22,23,25 56:2,3,7,10 57:1, 5,10,15,22,23 59:12 68:2 71:5,10 76:11 77:17 78:9,12 83:17 84:21 92:23 93:13 95:16 96:22 97:8,22 98:5,12 100:14,24 101:7,24 102:6 105:4,11,18 109:19 110:9,10 115:10 116:22 117:4,18,22

**pro** 79:13

**problem** 102:19 106:22 111:11

**procedure** 63:3,11

**proceed** 12:25 117:15

**processes** 25:24 26:2,4

**products** 25:16 26:7

**promote** 85:12

**promoting** 86:10

**prompting** 26:25

**proper** 120:7

**propose** 53:23 55:2,15 81:6 101:16

**proposed** 13:5 37:19 42:15,21 45:12 73:4 105:1

**proprietary** 29:17

**provide** 21:18 43:8 48:15 54:25 70:1, 4 72:7 97:1

**provided** 37:19 39:18 46:10 47:5,11, 15 69:19,23

**provisions** 39:23

**PSA** 67:9,21,25 68:8 70:10,20 81:22 90:21 91:8,18 92:19 94:1 98:1,10,25 99:22 108:25 109:17,23 110:7

**public** 29:24 30:1,17 95:18

**published** 77:14

**Pulaski** 12:5,20 13:3 16:21 21:13,17 73:6 87:17 93:1 96:14 97:1,11,24,25 99:7,19 100:8,20 101:1,10 102:12 106:10 108:14,19 109:22 110:4,11 111:6 119:6,23 120:1

**Pulaski's** 20:25 96:11 118:11

**pulaskilawfirm.com** 85:17

**purpose** 28:14

**purposes** 33:17

**put** 25:24 77:5 86:5,21 87:6 91:10,17 99:10

**Q**

**qualification** 39:23

**qualify** 39:22

**question** 14:7,14,20 18:13,14 19:1,8 21:23 22:23 23:7,25 24:2,6,23 25:3,7 26:9,20 28:10,12 29:14,16 30:12,20 40:4,12 42:17 44:16 45:8 53:10 56:18 58:10,23 63:4 65:12 67:15 70:17 71:13 76:14 78:17 79:7,12 83:1,3 85:2 87:3,5 94:18 96:21 101:7 102:17 107:15 108:5 109:12 110:10 113:16 114:15,17 115:3 117:6 118:19

**questioning** 102:8 104:2 107:2 110:15

**questions** 22:2 23:20 26:22 29:5 74:22,23 87:11 88:6 99:25 100:16 104:11 107:5 108:15 109:5 110:9 118:3 119:21 120:1

**quick** 85:5 107:2

**quickly** 102:23 122:2

**quote** 43:1,5 44:5,8 59:5 91:20

**R**

**Rafferty** 102:14

**Raichle** 110:21

**Re-ask** 23:16

**reach** 37:3

**read** 23:24 24:1 38:15,16 39:17 43:15 44:3 48:4 51:16 59:4 77:13 78:21

**reading** 77:17

**real** 20:21 52:4 85:5 107:2

**realm** 33:14 72:6

**reason** 13:16

**reasonable** 61:23 83:12

**reasons** 97:8

**recall** 31:8,18 32:1,7,24 36:19,21 37:23 38:3,4 39:3 43:1 44:1 46:14 47:16,20 48:23 54:5,16 64:24 75:19 80:23,24 81:8,18

**receipt** 120:20

**receive** 39:1 53:4

**received** 46:7 47:21

**recent** 36:7

**recently** 86:4

**recipient** 40:24

**recollect** 34:2

**recollection** 62:15 80:16 90:23

**recommend** 59:21

**recommendation** 59:24

**recommended** 81:15 102:2

**reconsider** 23:2

**record** 12:2,15 14:12,13 89:22 92:20 93:7 98:15 117:8 118:20 119:6,25 122:11,14

**records** 19:20 70:2 93:24 98:3,8

**recover** 53:3

**redacted** 90:4,8

**redlined** 82:4,9

**refer** 65:9

Case 23-12825-MBK    Doc 672-2    Filed 06/02/23    Entered 06/02/23 16:14:38    Desc
Exhibit 1    Page 135 of 137

IN RE LTL Management LLC

Confidential

Adam Pulaski
April 15, 2023

**referred** 66:17

**referring** 51:4

**refresh** 62:15

**refusing** 78:16 85:1

**relate** 107:6 109:6

**related** 27:23,24 44:17 68:21 81:11 105:8

**relations** 28:19

**relationship** 105:15,22

**relationships** 65:17

**relevance** 28:25 104:2

**relevant** 68:3

**relied** 95:1 96:10

**rely** 52:14,22

**remember** 17:2 37:6 81:2

**remotely** 12:11

**rep** 69:4

**repeat** 58:23 65:11 70:17

**report** 98:23 99:11

**reporter** 12:15 23:24 24:1 29:7 30:4 35:19 63:21 75:23 82:12 87:2 110:18 114:23 118:21

**represent** 55:11 60:17 61:12 70:7,8, 10,18 72:24 73:6 95:12,21 101:1 102:21 111:13

**representation** 13:25 52:13,17,20

**representations** 94:6 95:2 96:11,16

**representative** 64:12

**representatives** 28:20

**represented** 13:20 70:24

**representing** 12:13,16 32:4 37:25 59:18 69:6

**request** 118:9

**require** 96:21

**required** 54:17,19

**research** 19:9

**reserve** 87:12 111:4

**reserved** 120:8

**resolution** 31:1,15 37:20 59:7,10,16

**resolve** 114:10

**respect** 15:19 17:6,12 19:20 26:5

31:15 33:15 34:6 36:10 39:14 42:15, 20 51:14 70:24 81:11 82:10 105:1,7 118:8

**respectfully** 77:22

**respond** 122:2

**responsibility** 54:25 55:14

**rest** 77:12

**result** 118:1

**retain** 48:10

**retained** 14:25 18:21,24 19:4 72:20

**retention** 15:11,16 17:8

**reveal** 50:6

**revealing** 50:14

**review** 67:10

**reviewed** 62:24 77:25 78:3,6

**reviewing** 79:8 81:3

**Richard** 13:4

**rights** 120:8

**risk** 85:10

**road** 32:14

**role** 39:10 119:10

**room** 13:11

**roughly** 74:20 92:1

**rude** 118:12

**rules** 67:10,17,22

**ruling** 110:24 121:11


**S**

**sat** 62:24

**Satterley** 46:16 60:8,10,13 64:2 67:12,16 68:5,10 70:14 71:6,12,15,19 74:7,10,12,21 75:1,21 76:4,13,16 77:21,24 78:13,15,20,24 80:3,8 82:15,25 83:9,18 84:2,25 85:4,6 86:8, 15,19,24 87:4,9 91:16 102:15 106:6, 9,17 107:7,17,20 108:4,7,12 121:16, 22

**Saturday** 108:16

**schedule** 63:6 110:13 118:11

**scheduling** 121:14

**Schneider** 107:25

**scope** 76:10 86:23

**screen** 88:15,20 91:9

**seconds** 102:18

**secure** 101:11

**secured** 51:10 59:5,14 101:15

**Securities** 59:1

**Security** 54:10 69:22 89:14 95:11

**Semantics** 60:2,3

**send** 40:17

**sender** 40:24

**sentence** 59:4

**session** 76:20

**set** 62:23

**settle** 27:4 112:25 113:18 115:7,14 116:3,5,15

**settlement** 31:10 33:17 42:16,21 45:13 72:5,8 83:12 105:2 114:11

**settlements** 111:18 114:6

**share** 88:14

**sheet** 37:19,22 38:25 39:5,8,17,24 40:8,17 46:8 53:20 61:25 62:12,18, 21,25 71:3 79:5,9 81:22

**sheets** 38:25 39:1

**short** 74:22 98:20

**sick** 111:24 112:1

**side** 38:1 81:10

**sign** 37:11 48:18 92:6

**signature** 89:3,6

**signed** 15:11,16 46:4,6 47:7 48:25 49:2,6 55:19 57:17,22 65:23 88:8,19 89:3 90:21 91:8,18 92:19 93:10 94:1, 10,22 95:23 98:1,9,25 99:22 100:9 108:25 109:17,23 110:7

**significance** 36:14

**signing** 67:9,21,24

**similarly** 15:15

**sir** 13:8,10,16 14:2,18 15:5 18:8 20:11,12 23:8,11 24:2,16 25:10,14 26:19 27:18 28:9,25 29:12 30:2,21 31:25 33:4,18 35:10 36:13 37:9 38:24 39:4 40:7,21 41:5,19 42:25 44:4 45:24 49:24 50:12 51:8,20 52:12 53:13,16,25 54:3,7,13,17,21 55:8,11, 18 56:22 57:18 58:17,21 60:1,9 70:3,

Confidential

**6** 71:11,14 83:10 86:25 87:7 96:8 102:1,25 111:13,23 112:23 118:1 120:3,25 121:20

**situation** 65:15 82:3

**slew** 32:16

**social** 54:10,15 69:22 89:14 95:11

**somebody's** 62:8

**son's** 111:7

**sort** 66:13 69:1

**speak** 30:6 42:6,10 47:12

**SPEAKER** 118:18,24 122:3,6,8

**speaking** 34:19,23 81:12

**specifically** 22:25 37:23 38:2 55:18 79:6,20 80:24 81:2

**specifics** 80:19

**speculate** 38:4

**spelled** 46:20

**spirit** 99:24

**spoke** 76:21

**spoken** 18:2,5 104:24 105:6 107:21, 24

**Sponder** 121:8,9

**spreadsheet** 69:21

**squarely** 28:21

**stamp** 90:14

**stands** 41:13 42:2

**start** 16:4 25:22 26:3 113:2

**state** 26:23 67:18 85:13 98:14

**stated** 97:9 120:4

**statement** 42:23,24 43:2,9,15 44:1,4 45:2 52:24 99:20 117:9 118:15

**statements** 42:14,20 43:4,5

**states** 12:7 38:6 67:7 121:9

**statutes** 100:11

**stenographic** 12:15

**steps** 22:7,17 25:19

**stop** 32:12 87:11

**stored** 122:1

**stuff** 84:21,24

**subject** 29:19 96:22 100:11 110:24 115:11 118:11 121:10

**submission** 69:18

**submitted** 93:18

**subsequent** 30:25 31:6,7,12

**subtypes** 105:8

**suffering** 64:22 82:18 83:4

**sufficient** 113:18 116:5

**sufficiently** 26:21

**suggesting** 25:1

**suit** 65:5

**supplied** 35:7 89:12

**support** 20:21 46:1,11 47:6,8,11,15 48:4,8,12,16,19 49:7,17,22 51:10,21 53:4,14,17,24 54:1 55:2,4,13,16 56:23 57:7,13,18 58:4 59:6,10,16,21, 25 81:5,7,15 88:8,19,21 93:11 94:18 95:23 97:13,16 100:10 101:12,17,21

**supporting** 20:22

**supposedly** 73:5 79:10

**surgical** 63:3,11

**Susan** 104:17

**swear** 12:17

**sworn** 12:21 99:20

**system** 113:20 114:1 117:1,15

**T**

**takes** 30:14

**taking** 12:9 56:6

**talc** 13:6 14:3,10,23 15:24 19:11 20:22 21:1 22:18 25:15 26:6,7,11 27:4,15,21 28:7 29:18 31:2,15 32:4 34:18,22 36:11,15 37:5,25 42:11 47:7 49:17,22 50:2,9,21 51:2,11 52:21 54:1 55:20 56:5 64:3,5,6,9,12,13,19, 25 65:6 66:14 70:24 76:21 77:14 78:1,7,11,22 79:21 80:4 81:12 82:17 83:4,15 84:22 85:21 87:7 93:3 96:11, 17 100:21 101:2,4 105:9,16,23 107:3, 22,25 115:15

**talc-induced** 64:23

**talc-related** 64:14 94:20

**talcum** 85:13

**talk** 29:11 35:15 40:14 41:14,20 87:12 110:12 121:17,18

**talked** 37:5 73:23

**talking** 79:20 106:21

**telephone** 18:2,6 41:20

**telling** 30:13 63:5 95:3

**ten** 60:24 68:17 74:24 75:10,11

**tennis** 111:7,11

**term** 37:19,22 38:24,25 39:1,5,8,17, 24 40:7,17 46:8 53:20 61:25 62:12, 18,21,25 71:3 79:4,9 81:22

**terms** 39:5,8 59:7,10

**testified** 12:22 58:2

**testify** 13:17

**testifying** 99:20

**testimony** 29:2 58:11 64:17,18 107:6 109:6

**Texas** 13:15 34:12 67:4,10,19 79:25

**Text** 121:24

**thing** 38:19

**things** 54:22 121:5

**thinks** 56:9,13

**Thompson** 110:17,20,21 111:1,5,7 113:13 114:3 115:1,13,19 116:13,23 117:11,24 118:4

**thousand** 15:4,7,12 65:16

**tied** 88:10

**till** 60:25

**time** 12:3,4 23:20 27:3,8 29:8 32:12 33:3 38:13 41:13 44:12 45:25 47:5 49:6 53:10,22 65:4 73:21,22 74:13 77:3 80:22 82:24 86:5 105:21 118:3, 9,13,19 120:21 122:14

**Tisi** 100:15 102:8,11,13,19,20 103:21,24 104:4,8,12,15,20,23 105:5, 12,19 106:1

**today** 12:16 21:6 24:12,20 29:11 63:1 73:22 74:1,14 114:13 121:18,19

**today's** 12:2 120:16 122:16

**told** 24:19 50:25 62:14 87:10 91:15 96:10

**tomorrow** 63:2

**tool** 72:3

**top** 62:13 75:18 81:19

**Torborg** 58:8,9,15 82:20 83:7 113:9, 11,12 117:7 118:16 120:14,15,25

IN RE LTL Management LLC

Adam Pulaski
April 15, 2023

Confidential

**tort** 75:19 111:15 113:20 114:1 117:1,15

**total** 51:24

**totally** 118:8

**transactional** 33:14

**transcript** 58:13 120:17,20,22

**transcripts** 78:22 120:16

**transparent** 99:25

**treated** 120:23

**tremolite** 83:19,21,24

**trial** 53:5 63:9 64:7,10 73:14 78:21

**trials** 78:1,22

**true** 41:1 45:3,6 63:16,24 85:22 86:6

**trust** 121:4

**Trustee** 121:10

**truthfully** 13:18

**Tuesday** 60:23 63:8

**turn** 80:9

**turning** 38:24

**twenty** 34:25

**two-hour** 74:5

**two-step** 34:13

**type** 23:11 24:3 61:19 89:20,25 91:5, 13 92:7 95:11 108:23

**types** 85:14 90:20 105:14,23 110:5

**typically** 86:4 121:25

**U**

**unable** 13:17

**understand** 20:6 22:4,13 23:3 28:14 30:22 39:9,20 40:13 41:24 45:22 48:7 51:13 56:14 67:15 69:2 71:9,22,25 72:11,18,23 73:8,10,12,18 77:23 78:14 95:7 99:4 104:2,5 113:16 115:25 120:9,12

**understanding** 20:21 25:17 50:1,3, 16 59:17 62:20 69:25 72:1,3 73:2 74:5 79:8 91:11,23

**undertaken** 26:5

**UNIDENTIFIED** 118:18,24 122:3,6,8

**uninvolved** 32:13

**United** 12:7 38:6 121:9

**unquote** 44:7 59:7

**updated** 63:25 86:2

**V**

**vague** 24:6 31:11 36:9 38:20 50:5 52:15 67:11,13 70:11 78:9 80:2 82:19 83:6 101:14 113:8,23 114:15

**Valadez** 60:17 61:6

**Vegas** 76:18 77:10

**verdict** 113:21 114:11

**verdicts** 77:14 86:9,11,21 87:6,7 114:7

**verify** 22:7,17 25:20 26:6 77:8 86:15

**version** 47:17,18

**versions** 39:1 47:10,14

**versus** 61:13

**vice** 79:14

**victims** 60:18 82:17 83:4,15

**video** 12:4,9

**view** 38:18 52:7

**vote** 54:18,23

**W**

**waived** 25:4

**waiver** 25:12

**waiving** 25:5

**wanted** 73:14 106:14

**wanting** 24:7

**warrant** 55:12

**watch** 60:20 64:7

**Watts** 35:22 39:9 75:2,3,14 76:5,21 80:12 81:1

**Watts'** 39:15

**web** 12:9

**website** 63:12,16,19,23 85:12,17,21 86:3,5,10,21 87:7

**Wednesday** 60:23

**week** 24:13,21 36:4,6,18,20,22 37:15,21 76:18 80:15,17 88:9

**weekend** 73:24

**well-founded** 23:1 120:6

**wherewithal** 112:25

**wishes** 58:3

**withdraw** 58:3

**witness'** 25:4 29:2

**women** 43:24 44:6,22 81:13

**woods** 111:8

**words** 82:5 84:7

**work** 75:21 76:5 77:18 78:11 84:22

**worked** 75:3,14,15,16,17,20 76:2,12

**Wow** 119:3

**wrap** 116:12 119:5 120:3

**written** 41:21 43:5

**Y**

**years** 17:1,5 44:20 50:17 61:7 62:9 68:18 79:1 113:7,21 114:1,12 115:16

**yellow** 88:25

**yesterday** 24:12,20 58:3 121:11

**young** 61:6

**Z**

**Zantac** 75:17

**Zoom** 17:16 35:17,18,20,21,25 45:17 80:10,11,19 81:1