IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY


IN RE:                          .     Case No. 23-12825(MBK)
                                .
LTL MANAGEMENT LLC,             .
                                .     U.S. Courthouse
          Debtor.              .     402 East State Street
                                .     Trenton, NJ 08608
. . . . . . . . . . . . . . .  .
                                .
LTL MANAGEMENT LLC,             .     Adv. No. 23-01092(MBK)
                                .
          Plaintiff,           .
                                .
      v.                        .
                                .
THOSE PARTIES LISTED ON         .
APPENDIX A TO COMPLAINT AND     .
JOHN AND JANE DOES 1-1000,      .
                                .
          Defendants.          .     Friday, June 2, 2023
. . . . . . . . . . . . . . .  .     11:27 a.m.



TRANSCRIPT OF DEBTOR'S MOTION TO COMPEL [604]; DEBTOR'S
OMNIBUS MOTION TO COMPEL [638]; DEBTOR'S MOTION
FOR A BRIDGE ORDER [147]
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**



Audio Operator:                      Kiya Martin



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

2

APPEARANCES:

For the Debtor:                     Jones Day
                                    By:  GREGORY M. GORDON, ESQ.
                                    2727 North Harwood Street, Suite 500
                                    Dallas, TX  75201

For Ad Hoc Committee                Genova Burns LLC
of Certain Talc                     By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc                494 Broad Street
Committee of Creditors:             Newark, NJ  07102

                                    Brown Rudnick
                                    By:  MICHAEL WINOGRAD, ESQ.
                                         DAVID J. MOLTON, ESQ.
                                    7 Times Square
                                    New York, NY  10036

For Anthony Hernandez               Kazan McClain Satterley & Greenwood
Valadez:                            By:  JOSEPH SATTERLEY, ESQ.
                                    55 Harrison St. Suite 400
                                    Oakland, CA  94607

For Various Talc                    Levy Konigsberg, LLP
Claimants:                          By:  MOSHE MAIMON, ESQ.
                                    101 Grovers Mill Road, Suite 105
                                    Lawrence Township, NJ  08648

For Arnold & Itkin:                 Pachulski Stang Ziehl & Jones LLP
                                    By:  LAURA DAVIS JONES, ESQ.
                                    919 North Market Street
                                    17th Floor
                                    Wilmington, DE 19801

For Paul Crouch,                    Ruckdeschel Law Firm, LLC
individually and on                 By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of                 8357 Main Street
Cynthia Lorraine Crouch:            Ellicott City, MD 21043

For Catherine Forbes:               Cohen, Placitella & Roth, P.C.
                                    By:  CHRISTOPHER M. PLACITELLA, ESQ.
                                    2001 Market St, Suite 2900
                                    Philadelphia, PA  19103

For Paul Crouch:                    The Ruckdeschel Law Firm, LLC
                                    By:  JONATHAN RUCKDESCHEL, ESQ.
                                    8357 Main Street
                                    Ellicott City, MD  21043

APPEARANCES CONTINUED:

| | |
|---|---|
| For Ad Hoc Committee of Supporting Counsel: | Paul Hastings LLP<br>By:  KRIS HANSEN, ESQ.<br>200 Park Avenue<br>New York, NY  10166 |
| For Rebecca Love, Member of OCTC: | Ashcraft & Gerel, LLP<br>By:  MICHELLE A. PARFITT, ESQ.<br>1825 K Street NW, Suite 700<br>Washington, DC  20006 |
| For Claimant Alishia Landrum: | Beasley Allen<br>By:  LEIGH O'DELL, ESQ.<br>218 Commerce St.<br>Montgomery, AL  36104 |
| For Claimants represented by Barnes Law Group, LLC: | McManimon, Scotland & Baumann, LLC<br>By:  SARI B. PLACONA, ESQ.<br>75 Livingston Avenue<br>Roseland, NJ 07068 |

- - - - -

4

1          THE COURT:  Good morning.  This is Judge Kaplan.

2    It's still morning except for Mr. Placitella, who I guess it's

3    close to dinnertime over in France.  I'll let everyone turn on

4    videos if you wish and we can move to the three matters that

5    are on the agenda.

6          I don't want to interfere further with

7    Mr. Placitella's vacation so we can go to the third matter at

8    the outset, which is the debtor request for a bridge order with

9    respect to the automatic stay and the extension of the

10   injunction.

11         I see Mr. Gordon.  I am not inclined to enter the

12   bridge order at this juncture.  I think it's appropriate to

13   have the matter addressed on June 13th, and I'm inclined to

14   allow parties to file opposition by close of business on

15   June 9th.  That's the Friday before the Tuesday hearing.  The

16   reason is I don't see any indication that there's going to be

17   discovery undertaken.

18         I am hoping and I have confidence that plaintiff's

19   counsel and bankruptcy counsel are cognizant of 362(a)(3) and

20   the parameter, 362(k), and the tools available to the Court if

21   there are willful violations of the automatic stay.  And of

22   course the recognition, I think in the Third Circuit, that

23   actions taken in violation of the stay are, let's use a phrase

24   we all have heard, void or voidable.  So with that, I'll hear

25   any other concerns.

1              I'll turn to Mr. Gordon first.

2              MR. GORDON:  Yeah.  Your Honor, just, I mean,

3   obviously I heard your ruling, but I don't think any of the

4   parties, even with the oppositions that were filed, is really

5   contesting the point that these claims against Kenvue and

6   Janssen are subject to the automatic stay.  So, from our

7   perspective, these are clear ongoing violations of the stay and

8   the urgency is really that, and it sounds like Your Honor

9   reviewed everything carefully, but we've got subpoenas for apex

10  depositions that are set to occur within just a couple of days

11  of the 13th.  And that means potentially preparations have to

12  begin in connection with those.

13             And then, perhaps a more overriding concern is that

14  the company's experience has been that when an order, like the

15  order that was entered yesterday, denying the motions to quash

16  occurs, these orders spread throughout the tort system very

17  quickly.  There are a number of other cases where claims like

18  this are attempted to be made against Kenvue and Janssen.  And

19  we could now have sort of real chaos in the next 10 or 11 days.

20  And that was the reason for the urgency.

21             And we kind of looked at it, I guess the opposite way

22  of maybe Your Honor did, which is, is there really any harm to

23  Mr. Placitella's clients by just basically recognizing that the

24  stay does exist until there can be the full hearing that we

25  could have this bridge.  If in fact their position is they're

1  not going to press anything in the meantime, there's certainly

2  no harm for that.  But, again, I understand Your Honor's view.

3            THE COURT:  Well, I'm always somewhat reluctant, even

4  though I have done so in the past.  I'm always reluctant just

5  entering orders which confirm what the Code provides.  And with

6  respect to the automatic stay and the parameter, the parties

7  can read the Code and appreciate it and are cognizant.

8            Mr. Placitella, do you wish to be heard?

9            MR. PLACITELLA:  Yes, Your Honor.  Thank you for

10  accommodating my pre-planned vacation.

11            We are content.  The short answer to your question

12  is, these depositions aren't going to go forward before the

13  hearing on the 13th.  Judge Viscomi has basically put a

14  structure in place that requires coordination on the lead

15  lawyer.  I've been in touch with virtually everybody who's

16  interested.

17            But to be clear, we are contesting ultimately the

18  automatic stay.  We do not believe that it applies to Kenvue or

19  Janssen and we fully intend to brief that.  And we are very

20  concerned about any loose language in an order such as

21  submitted by Mr. Gordon that would suggest that some kind of

22  predetermination has been made that the stay applies.  We're

23  aware of what the Bankruptcy Code provides, but we believe we

24  have the full right to brief that issue and that there should

25  be no loose language as suggested by Mr. Gordon in his order to

1  in any way predetermine that.

2          Just to be clear, I was served with motion papers

3  literally in the middle of the night with no justification.

4  And that was totally contrary to the spirit of the agreement

5  reached with J&J and its affiliates before Judge Viscomi.  We

6  were provided no time to respond with no justification and a

7  total disregard of our client's due process rights.  And for

8  Mr. Gordon to step up here and say, "Oh, it's not contested

9  because we haven't filed anything," that's simply not fair.

10          And the suggestion that we should have done something

11  on less than 24 hours notice substantively is not fair.

12  Johnson and Johnson agreed to a schedule in the state court, in

13  both Atlantic and Middlesex County, that recognized that I

14  would, as a lawyer that was kind of driving this bus but

15  coordinating with others who were just as involved and just as

16  concerned, that I would be out of the country.  They knew it.

17  They agreed to a schedule that accommodated that.  And the

18  thing that you probably don't know, Your Honor, is, we did the

19  same for J&J's counsel.

20          We agreed to not go forward with certain issues and

21  to make accommodations to J&J's New Jersey counsel because he

22  also was going to be out of the country.  And so they knew what

23  was going on.  And then, all of the sudden, to just file

24  something in the middle of the night and ask for things on

25  short notice, I mean, I don't know how it works in Texas, but

1  in New Jersey, civility matters.  And the fact that we went out

2  of our way to have discussions with Johnson & Johnson, its

3  affiliates, two different courts to come up with a schedule

4  that would prejudice no one and to have this happen, I have to

5  just say, Is concerning.  And to then say on the back end of

6  that, and, oh, see Judge, by the way, there's no opposition,

7  that's simply not fair.

8          And I'm happy to go into more detail, but I don't

9  want to litigate the merits of the issue here.  And I hear Your

10 Honor, you want us to look at the Code.  We're aware of the

11 Code.  But we've looked at the case law pretty clearly and we

12 think that when we're given the opportunity to brief this, we

13 will convince the Court that the stay does not apply.

14         And it's also worth noting that when this first came

15 up on April 18th, they already had Mr. Bergeron's complaint in

16 their hands.  Although Mr. Kim couldn't really answer the

17 question about why he was doing what he was doing and where the

18 assets went, they had that complaint in their hands.  They have

19 waited 43 days to make this application.  So yes, we are not

20 prepared right now to address the substance and we would beg

21 the Court's indulgence to give us the time.

22         This is an important issue, not just to Mr. Bergeron,

23 not just to Kimberly Naranjo, but to many other plaintiffs

24 across the country.  And with that being said, I will remain

25 silent and try to carry on my vacation.

1        Thank you.

2        THE COURT:  Thank you, Mr. Placitella.  Mr. Gordon,

3   you can respond if you wish.  I will just note I don't think a

4   response is necessary in that it is my hope and expectation

5   that this Court, maybe we have to coordinate with three courts,

6   that this Court has provided the opportunity to review the law

7   presented and the facts on this issue without having the worry

8   that I have to make quick rulings to prevent discovery from

9   going forward.  In other words, another race.

10        This whole case has been, since April 4th, one race

11  after another.  And there's no need for it.  I certainly

12  haven't prejudged the law on it.  I mean, obviously, the Court

13  is familiar with the parameters of the 362(a)(3), but I'm

14  certainly willing to review the briefing and to see if it

15  applies in this case.  And if the parties will hold up what I

16  would think would be reasonable, hold up limited discovery

17  until we can decide if the stay applies and you can work on a

18  different schedule too.

19        I've given you the June 13th and the June 9th, date.

20  It's up to the parties if you want more time and can agree to

21  delay discovery further.  But I'll let you meet and confer on

22  that.

23        MR. PLACITELLA:  Well, Your Honor, just to allay the

24  Court's concerns, there's no intention to take these deposition

25  in advance of the Court's ruling.  I think I've coordinated

with all the interested counsel who have coordinated these

depositions.  I would like a few more days other than June 9th,

because I don't return until June 10th and this has already

taken up a day and a half of my pre-planned vacation.  And I

appreciate the Court letting me go first.

But, you know, if we could have until the next Monday

or Tuesday with a promise that these depositions will not be

pushed until the Court rules, that would be greatly

appreciated.

THE COURT:  Mr. Gordon, your thoughts?

MR. GORDON:  I just want to make sure I understand

when he says the depositions won't be pushed.  That makes it

sound like they're staying on the same dates.  I think

Mr. Placitella was indicating the opposite, that he's willing

to push them off, move them back so that he has more time and

the Court has time to enter a ruling.  And if that's what's

being offered, we appreciate that very much and that would make

sense to us.

MR. PLACITELLA:  That's exactly what's being offered

because civility is the rule of the day.

THE COURT:  Absolutely.  Especially in New Jersey,

but I'm sure it spreads elsewhere.

Right now, we'll have it on for those that 9th and

13th, but why don't you reach out and see if you want to work

out more amenable days.  All right.

1              MR. PLACITELLA:  Thank you, Your Honor.

2              MR. GORDON:  Thank you, Your Honor.  Just so I'm

3    clear.  I'm not sure, maybe I missed something.  I'm not sure I

4    entirely understand what the 9th is.  Is that a deadline for

5    filing?

6              THE COURT:  Deadline for opposition to the motion.

7              MR. GORDON:  Got it.  Thank you.

8              THE COURT:  And it's just a matter of, I need to give

9    the Court an opportunity to read it, too, so if I do push it up

10   too close to the 13th, then I go in ill-prepared and I don't

11   like that either.  So see if you can work out a scheduling that

12   facilitates each party's needs.  Enjoy the rest of your

13   vacation, Mr. Placitella?

14             MR. PLACITELLA:  Thank you, Your Honor.  Appreciate

15   it.  Thank you.

16             THE COURT:  You're welcome.

17             MR. STOLZ:  Your Honor, I saw some pleading filed

18   with a June 22nd date.  Is that an available date for them just

19   so they have something to target?

20             THE COURT:  I believe, if that's a Thursday, that

21   was, I think Mr. Togut firm's --

22             MR. STOLZ:  Correct.

23             THE COURT:  Yeah, that would be available.

24             MR. PLACITELLA:  That would be wonderful.

25             MR. STOLZ:  Okay.  Thank you, Your Honor.

1          THE COURT:  I mean, we shouldn't lose a day without

2    having an LTL matter in the month of June.

3          MR. GORDON:  Well, there is a Bestwall hearing that

4    day, Your Honor.

5          THE COURT:  Well, again, take some time and see what

6    works.  The Court will accommodate.  I'll do my best to

7    accommodate you all.

8          MR. GORDON:  Thanks, Your Honor.

9          MR. PLACITELLA:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. PLACITELLA:  All right.

12          THE COURT:  All right.

13          Mr. Gordon, let's move to, I guess, the first matter

14    on the agenda, which is the debtor's motion to compel the TCC

15    to supplement certain interrogatory responses and document

16    requests.

17          MR. GORDON:  Yes, Your Honor.  My partner, Dave

18    Torborg, is going to handle that.

19          THE COURT:  Oh, okay.  Mr. Torborg.

20          MR. TORBORG:  (No audible response)

21          THE COURT:  Was he given presenter status?

22          MR. TORBORG:  Can you hear me now?

23          THE COURT:  Yes.

24          MR. TORBORG:  Oh, sorry about that.  I think I got

25    muted.

13

1          Good morning.

2          THE COURT:  Good morning.

3          MR. TORBORG:  Thanks for taking the time to hear

4  this.  It certainly seems like you feel better, at least --

5          THE COURT:  We're getting there.  Yes.

6          MR. TORBORG:  So our motion to compel the TCC seeks

7  two things.  One, any estimate that the TCC has concerning the

8  debtor's talc liability, and, two, the foundational basis for

9  its contention that LTL's board members breached their

10 fiduciary duties to creditors.

11          On the first issue, there is and can be no dispute

12 that the extent of the debtor's talc liability is relevant to

13 the issue of financial distress.  On the one hand, the TCC

14 contends that LTL is not in financial distress.  On the other

15 hand, they say that the $8.9 billion proposed settlement is

16 willfully inadequate.  The letter suggests, of course, that

17 they believe the liability is more than 8.9 billion.  Perhaps,

18 significantly greater than that.

19          Given that, we've asked the TCC to identify any

20 estimate it has of the debtor's talc liability.  In response,

21 the TCC has stated it has no non-privileged documents.  Now, if

22 the TCC intends to put forth expert testimony on that matter,

23 then we'll see it next week in expert reports.  No problem.

24 But it's not clear to us that they are intending to do that.

25 None of the experts that they've disclosed to date have been

14

1  identified to testify on that topic, and none of them appear to

2  have any prior experience on that matter.

3       What the TCC cannot do is simply refuse to state

4  whether it even has estimates of the debtor's liability for

5  talc claims.  Local Bankruptcy Rule 7026-1 is very clear.  It

6  states, "When a party asserts a claim of privilege in response

7  to or objection to a discovery request, the party must identify

8  the nature of the privilege claim and indicate whether, with

9  respect to the privilege, any document exists or any oral

10  communications occurred."  Notwithstanding this clear language,

11  the TCC has refused to simply state whether it has any such

12  estimates.

13       Now, why does the debtor care?  Well, we want it to

14  be perfectly clear in the motion to dismiss record whether the

15  TCC has estimates of the debtor's talc liability but has

16  declined for whatever reason not to provide those estimates to

17  the Court in connection with the motion to dismiss.  It's

18  entirely predictable that the TCC, given its role, does have

19  such an estimate and would intend to use that in connection

20  with plan confirmation proceedings in arguing that the debtor's

21  proposal is inadequate.

22       Let's say, hypothetically, the TCC believes that the

23  debtor's talc liability is in the nature of say, 25 billion.

24  To be clear, I'm making that figure up.  No one has told me

25  that.  That's hypothetical.

1          Well, if that's the case, that would clearly be

2     relevant evidence to whether the debtor is in financial

3     distress.  It would be unfair for the TCC to decline to reveal

4     an estimate now at this stage of the case only to then trot out

5     such an estimate later in connection with plan confirmation.

6     It should either reveal the estimates now or be estopped from

7     relying upon them later.

8          At the very least, the TCC should be compelled to

9     tell the debtor and this Court whether they have an estimate or

10    estimates of the debtor's talc liability, regardless of whether

11    they will use them at the hearing.  That will allow this Court

12    and the Third Circuit to make any inferences that are

13    appropriate.  I have a few points in response to their points,

14    but I'll keep that for rebuttal.  That's the first issue.

15         The second issue is our request in Interrogatory

16    Number 10, that the TCC provide the foundational basis for its

17    contention that the amendments to the financing arrangements

18    between LTL, HoldCo, and J&J breached the LTL member's

19    fiduciary duties to creditors.

20         The TCC's response to date has simply been to refer

21    to the attempted stripping of the 2021 funding agreement and

22    then pointing us to go look at their motion for derivative

23    standing.  But corporations engage in transactions all the time

24    that serve to change the relative balance of their assets and

25    liabilities.  Such transactions may give rise to potential

1  breaches of fiduciary duties only if the corporation is

2  rendered insolvent.

3     In the <u>All Serve</u> (phonetic) decision, this Court

4  extensively discussed New Jersey law on this topic that

5  included the <u>Francis vs. United Jersey Bank</u> case, 87 N.J. 15

6  (1981).  That decision stated, "While directors may owe a

7  fiduciary duty to creditors also, that obligation generally has

8  not been recognized in absence of insolvency."

9     Neither of the TCC's excuses for providing an

10 appropriate response have any merits.  First, they say that

11 this fiduciary duty contention was made in a single line in a

12 brief.  Well, it was was actually two lines, and in any event,

13 it made the statement.  We're entitled to know the basis for

14 it.  It's a relevant issue in the case.

15    And second, they claim that we're asking for their

16 legal analysis of the breach of fiduciary duty claim.  We are

17 not asking for that.  We're asking for the factual basis,

18 including whether they contend that LTL was rendered insolvent

19 as a result of the funding agreement changes.  Solvency is a

20 factual question, not a legal analysis.  In a 2011 decision in

21 the <u>W.R. Grace</u> bankruptcy, 446 B.R. 96 at 105, the Delaware

22 bankruptcy court stated, "We agree that a determination of

23 solvency is a question of fact."  So the TCC cannot refuse to

24 answer on the basis that we're asking for a legal analysis.

25    Unless the Court has any questions, I'll cede the

1  floor to the TCC.  Thank you.

2        THE COURT:  Thank you.  I might have questions, but

3  I'd rather hear from the counsel for the TCC first.  Who will

4  it be?  Mr. Winograd?

5        MR. WINOGRAD:  Yes, Your Honor.  This is Michael

6  Winograd from Brown Rudnick, proposed counsel for the TCC.

7        Your Honor, let me just say a couple of quick things.

8  Counsel for the debtor suggested that he would hold his

9  reaction to our points that were in a brief for rebuttal.  This

10  is the kind of gamesmanship that I'm going to talk about in a

11  moment.  If he wanted to address -- this is like the standard

12  case law on expert opinions.

13        If you know it's an issue, you know all the facts, it

14  should be in an opening, not in a rebuttal.  If he had

15  something to rebut in our briefs, he should do it on his

16  opening, not sort of save it for the last word.  Be that as it

17  may, Your Honor, I'll address each of these in turn.

18        First of all, let me just say something at the

19  outset, Your Honor.  The number of impasses that we have

20  reached in this case on mundane discovery issues has to be

21  unprecedented.  Your Honor said it seems like there's something

22  every day on this case.  We are concerned about the delays and

23  the timing of these motions, and I'll get to each of them in a

24  moment.

25        With respect to this first motion, let me just

address the timing.  This is directed to two TCC responses.
The motion to compel was filed on May 25th.  The responses and
objections were received 10 days earlier on May 15th.  They
waited 10 days after that, including having received
productions on the 18th, but they waited 10 days to file this
motion to dismiss.  And, again, we'll talk about it with
respect to the second motion where it's even more egregious,
but it's really becoming prejudicial.

          With respect to the first issue, Your Honor,
existence of the liability of talc estimates, we responded that
there are no non-privileged analyses that we have.  That's not
to say that we do or don't have anything that's privileged.  We
don't have anything that could be subject to discovery.  That
shouldn't be a surprise.  They're asking us, effectively, if we
have some sort of, I guess, damages estimates.  It's privileged
information.  We've clearly responded we have nothing
non-privileged.

          What I think they want when counsel says, well, you
have to tell us if something exists.  I think they're just
asking for a privilege log, and we have raised this time and
time again with them in meet and confers.  The parties have
simply not exchanged privilege logs.  And to give you an
example, as we cited in our brief, we asked counsel,
Mr. Murdica, who is resolution counsel for J&J, in his
deposition, did you calculate a per case average?  Not what it

1  was, did you do it.  We were told he was instructed not to

2  answer based on privilege.

3          We asked him, did you compare to claimant lists?  He

4  was told, do not answer based on privilege.  We never got an

5  answer.  We never got a privilege.  Those are indistinguishable

6  from the case and the issue at point.  The parties simply

7  haven't been exchanging privilege logs and that, as far as I

8  can hear, is all they're really asking for.

9          And let me just make one other point before I move to

10 the next topic, Your Honor.  It seems like in some respects,

11 this motion is a veiled effort to file some sort of motion in

12 limine to restrict arguments that can be made at a motion to

13 dismiss.  If that is in fact the relief the debtor wants, they

14 should file a motion in limine.  Similar too, there is no

15 difference if they're complaining that information that is

16 privileged shouldn't be able to be used as a sword and shield,

17 just like they wouldn't produce any of the alleged common

18 interest materials concerning the termination of the 2021

19 funding agreement.  If they want to make a motion in limine,

20 they should make it, but they shouldn't do it, sort of subtly

21 underhandedly through this motion to compel.

22         Let me move and unless Your Honor has questions on

23 that topic, I'll move to the next one.

24         THE COURT:  I'm going to hold all questions.

25         MR. WINOGRAD:  Sure.

1          THE COURT:  Go ahead.

2          MR. WINOGRAD:  Smart, Your Honor.

3          Your Honor, the next is, whether it was one line or

4  two lines, it was not even a full sentence.  It was set off by

5  em dashes in a sentence.  It was a part of a sentence in our PI

6  objection that said, "The attempted stripping of LTL's most

7  significant asset in clear breach of LTL's fiduciary duties."

8  That's what's at issue.

9          The debtor says they just want the underlying facts,

10 as though this is sort of a contention interrogatory.  We all

11 know what the underlying facts are.  There was a transfer of

12 the consumer business that represented 50 percent of HoldCo's

13 value.  Then, there was a termination of the 2021 agreement.

14 And then, there was a substitution of that agreement with a new

15 2023 funding agreement that had HoldCo, who had just

16 transferred half of its assets as the sole obligor, and J&J's

17 backstop was gone.

18         We cited to those very explanations, which were

19 fairly detailed, in our objection to the PI and in our standing

20 motion.  The only thing that could possibly be left is an

21 analysis of how those facts constitute a breach of duty.  That

22 is an analysis.  That is a legal analysis.  It is clearly work

23 product.  It's protected by Rule 26 and by Rule 33, which only

24 permits discoverable information under 26.  We cited the Upjohn

25 case.  This is crystal clear and squarely within the privilege.

1              Now, LTL, I know that counsel just cited a whole

2    bunch of cases that were not in its brief and I have not read

3    them.  I can't address them.  Started talking about solvency,

4    which they don't mention.  But what I can tell you, Your Honor,

5    is they cite one case and the one case that they cite that

6    somehow an attorney's legal analysis as to whether something

7    constitutes a breach of duty that was stated in a legal brief

8    in the past, by the way, it's not even a brief in this motion,

9    is somehow subject to discovery.  They cite one case and that

10   was the Barnes case from the district of D.C. in 2010.  And

11   that case undermines their position as we noted in our brief.

12             The court there in discussing and characterizing

13   describing the interrogatory at issue said plaintiff's request

14   essentially asks for defendant's contention as to the accuracy

15   of the detention and strip search data spreadsheet.  This is a

16   contention that relates to a fact.  The court granted the

17   motion because it was a request to verify the accuracy of a

18   date of data in a spreadsheet.  That is not the same as a

19   request for a lawyer's legal analysis that supports its legal

20   position that's set forth in a prior legal brief.

21             Your Honor, this motion should be denied for multiple

22   reasons that I just outlined, Your Honor, out of hand.

23             Thank you.

24             THE COURT:  All right.  Thank you, Mr. Winograd.

25             Sometimes I wonder what it would have been like had I

22

1  just acceded to your request and had all the arguments done on

2  May 23rd.  What would you all have done for the past month?

3          So Mr. Torborg, response.

4          MR. TORBORG:  Yes, I would like to address a couple

5  of points.  Thank you, Your Honor.

6          First, in terms of the timing of when we filed the

7  motion to compel, I mean, we had a meet confer between the time

8  we got the responses.  There's no deadline for us to file any

9  such motion.  We're working as hard as we can.  I think the

10 Court appreciates we have a lot on our plates.  We filed the

11 motion well over a month in advance of the hearing on this

12 case, so I don't see the reason for that complaint.

13         On the first issue, on the estimates, I didn't hear

14 any response to Bankruptcy Rule 7026-1, which I think is

15 dispositive.  We're not looking for a privileged log.  We're

16 looking for an answer to an interrogatory and a production of

17 documents.

18         And then, finally, with respect to the discussion in

19 their brief about instances where counsel has appropriately

20 instructed witnesses not to answer, that has nothing to do with

21 this interrogatory.  It's completely irrelevant.  The fact that

22 they're going to those lengths to respond suggests they don't

23 have much to say in response to the issue here.

24         On the question of the breach fiduciary duty

25 interrogatory, if Your Honor has read our brief, we clearly did

1  cite case law and discussed the issue of insolvency, including

2  Your Honor's opinion in <u>All Serve</u>, but I don't know if

3  Mr. Winograd's been too busy to read the brief, but we clearly

4  discussed that.

5        And then, secondly, I didn't hear any response to our

6  points that we would like to know if they're alleging that LTL

7  was rendered insolvent.  And if so, how?  That's clearly a

8  factual issue and we're entitled to a response on that.

9        So that's all I have.  Thank you.

10       THE COURT:  All right.  Thank you.

11       Mr. Winograd.

12       MR. WINOGRAD:  May I respond, Your Honor?

13       THE COURT:  Yes.

14       THE COURT:  Your Honor, as to the timing, we're

15  talking about 10 days.  It gets even more egregious in the next

16  motion, which we'll talk about.  In terms of this being a month

17  in advance of trial, we have depositions going on.  It's was

18  dropped, and in fact, on their own request, even though it was

19  fully briefed, they delayed the hearing until today.  It's

20  smack dab in the middle of depositions, which we, the TCC, and

21  other counsel are taking.

22       The idea that the exact same instructions not to

23  answer that have never been -- no answers to which have been

24  provided is somehow irrelevant, they are indistinguishable.

25  They're literally indistinguishable as we set out in the brief.

24

1  And the idea that we should be instructed to answer on

2  insolvency, that's simply not what they asked for.  They said

3  "Provide the basis for the contention that LTL board breached

4  fiduciary duties."  That's just simply not at issue here.

5          I would have a separate response for it, Your Honor,

6  but it's simply not what is at issue here.  We have explained

7  to them the factual basis underlying that statement of law.

8  They are simply asking for legal analysis.

9          Thank you, Your Honor.

10          THE COURT:  All right.  Thank you all.

11          With respect to the request for estimates as to the

12  dollar value of the aggregate liability or estimate as to the

13  amount that would be required to resolve the liabilities in the

14  tort system, the Court at this juncture can't imagine that that

15  information wouldn't be subject to work product or

16  attorney-client privilege.  That being said, there is a

17  requirement under both local rules and under the federal rules

18  to identify whether -- the Committee is required to identify

19  whether it has that information or documents.

20          I'm not requiring a privilege log given the

21  restricted and constricted schedule that we have, but the

22  Committee should basically give the converse of the answer it

23  already gave.  It acknowledged it had no non-privileged

24  documents or information.  It should acknowledge that it has

25  information or document, that they are subject to appropriate

privilege.  What that does for the debtor is beyond me.  But
I'm not here to strategize, but I'm not going to, at this
juncture, require any type of privilege log be completed.

It couldn't possibly be compiled or reviewed in
advance of the motion to dismiss.  So I remind everyone that
under Rule 26(b)(1) proportionality, which include the needs of
the case, the relevance of the issues, and the relevance of the
discovery, all are taken into account.  So there should be,
what I'm requiring is simple responses identifying whether or
not the Committee is in possession of information or documents
for which they assert a privilege that would be responsive to
the discovery sought.

With respect to the contention interrogatory, the
Committee is required simply to advise the debtor whether or
not it is in possession of fact beyond which they have included
in their standing motion or PI response.  In other words, are
there any additional facts which support the claim that LTL's
management engaged in a breach of fiduciary duty that are not
included in the information provided to date or referenced in
the responses.

Needless to say, when we get to the hearing on these
matters, we're going to look at what's been provided and what
has not been provided in discovery as to whether evidence at
trial will be admissible or we'll consider it on motions in
limine in advance.

1          I don't believe there are other issues with respect

2    to the motion at Docket 604.  If not, we can move to debtor's

3    omnibus motion to compel plaintiff's firm to supplement their

4    responses to interrogatories and document requests.  I think

5    it's docketed at 638.

6          Mr. Torborg, are you up again?

7          MR. TORBORG:  I am up again, Your Honor.

8          THE COURT:  All right.

9          MR. TORBORG:  Thank you.  Again, David Torborg with

10    Jones Day on behalf of the debtor.

11          This is a motion directed at nine plaintiff law

12    firms.  These law firms either represent individual members of

13    the TCC, have filed motions to dismiss on behalf of one or more

14    clients, or have otherwise been active in these proceedings.

15    I'd like to start with a little bit of histories because I

16    suspect this might be a little confusing.

17          Initially, we served Rule 33 interrogatories and

18    Rule 34 requests for production.  Those discovery requests were

19    directed to certain plaintiff firms and their individual

20    clients.  So, for example, the debtor's interrogatories to the

21    Arnold and Itkin firm were directed to Arnold and Itkin, LLP,

22    and Arnold and Itkin, LLP, acting for Arnold and Itkin talc

23    claimants.  Some of the plaintiff firms to which we served this

24    discovery objected the discovery was improperly served on them,

25    claiming they were not parties to the motion to dismiss

1  proceeding.  Nonetheless, many of the firms did respond to the

2  discovery albeit largely with relevancy and privilege

3  objections.

4         Given the objections to whether they were appropriate

5  parties, the debtor thereafter two days later served Rule 45

6  document subpoenas on these plaintiff firms and three others.

7  The debtor's motion seeks three categories of information.

8  First, we seek information on the total number of talc claims

9  against the debtor, filed and unfiled, for which the law firm

10 served as counsel.  There should be no debate that the number

11 of talc claims faced by the debtor is relevant to the issue of

12 financial distress.  Most of the firms responded simply that

13 the debtor already has information on the number of claims

14 filed against it.

15        That, of course, tells us nothing about the number of

16 unfiled claims.  There's no good reason to withhold requested

17 information.  It should not be hard to provide.  Beasley Allen

18 and Maune Raichle identified the number of unfiled claims for

19 which they serve as counsel in response to the interrogatory.

20 One firm, the Barnes Law Group, argued that it cannot identify

21 how many unfiled claims it has because those claims have not

22 been fully investigated and evaluated.  The TCC, which weighed

23 in on this motion, despite discovery not being directed to it,

24 makes the same point.

25        But we didn't ask how many claims will definitively

28

1  be filed.  We asked the number of claims for which the law firm

2  serves as counsel.  The fact that a claimant has sought counsel

3  concerning the possibility of asserting a claim is relevant to

4  the debtor's talc liability.

5          The TCC seems to argue that the number of claims or

6  potential claims from just nine plaintiff firms is not relevant

7  because there are more than a hundred firms that have such

8  claims.  That may be so, but these firms have taken a

9  leadership role in this case and the information sought is

10 relevant.

11         The TCC further argues that the Court earlier this

12 week declined to order the discovery sought here.  The Court

13 did no such thing.  It certainly has not held that the number

14 of unfiled claims is irrelevant to the question of financial

15 distress in the motion to dismiss proceeding.  Before I move to

16 the next issue, I would like to address again the suggestion

17 that the debtor should have filed this motion weeks ago

18 according to the TCC.  Well, the discovery was not even served

19 until three weeks ago.

20         At the time we filed the motion, the responses that

21 came in were less than two weeks old.  And unlike the TCC's

22 practice, we absolutely endeavor to follow the local rules,

23 meet and confer, send letters outlining our problems with it,

24 and propose compromises.  There's no deadline to file the

25 motion.  And, again, we filed this motion more than a month

1  before the hearing.  So that's the first issue.

2      The second issue is the debtor's request for

3  communications between the nine plaintiff law firms on one hand

4  and any other law firms or claimants on the other relating to

5  the 8.9 billion proposed settlement.  Some seven of the law

6  firms refused to identify or produce any responsive

7  communications, generally asserting privileged objections as

8  stating they have, again, no non-privileged documents.

9      Communications about the proposed settlement are

10  plainly relevant.  Among other things, the communications may

11  lead to the discovery of relevant evidence concerning the level

12  of support for the proposed deal, efforts and motives of law

13  firms to undermine it, and whether the proposed settlement is

14  viewed as adequate.

15      There's no serious challenge to relevance.  We

16  recognize that there well may be some responsive communications

17  that are privileged and subject to common interest protection,

18  substance communications between firms that represent members

19  of the TCC.  But as this Court well knows, not every plaintiff

20  firm holding talc claims against the debtor is aligned when it

21  comes to this bankruptcy and a proposed settlement.  There's no

22  indication that the firms took this request seriously and

23  actually searched their files for responsive communications and

24  assessed the appropriate scope of any permissible common

25  interest protection.  The law firm should be required to do so.

1          The final issue concerns any documents in the law

2   firms' possession that bear on the debtor's financial distress.

3   That's Request for Production Number 15.  The debtor is

4   entitled to whatever documents the firms have or intend to use

5   at the hearing pertinent to that indisputably relevant issue.

6   Non-responses or generic responses to briefs or press releases

7   are not sufficient.  If the firms have nothing to produce,

8   that's fine.  But if they do have information on that issue,

9   such as estimates of the debtor's talc liability, it should be

10  produced.

11         Finally, I would like to respond to the brief that

12  the Ruckdeschel firm filed.  It accuses the debtor and Jones

13  Day of bad faith, sloppiness, carelessness, and the like on the

14  basis that that firm never invoked a claim of privilege.  Our

15  deficiency letter did inadvertently transpose another firm's

16  objections to that firm's objections, but the Ruckdeschel firm

17  did in fact assert a privilege objection in its objection.

18         While the responses did not use the word privilege,

19  the first page of their objection states, "Service of discovery

20  upon counsel for a claimant seeking the thought processes and

21  personal opinions of counsel regarding the proceeding is

22  improper absence of showing of how such discovery relates to an

23  issue in this case and would lead to admissible evidence."

24         It made a similar objection two pages later.  We

25  interpreted this as a general privileged objection and we

1 believe Rule 7026-1 also refers to surgeons of work product

2 protection as a basis for needing to follow the local rule.

3        So unless the Court has any questions, that's all I

4 have.  Thank you.

5        THE COURT:  All right.  Again, let me hear, and I

6 expect I'll be hearing a little bit more this time from more

7 firms.

8        Mr. Ruckdeschel.

9        MR. RUCKDESCHEL:  Thank you, Your Honor.  I had to

10 get the mute.  Now, let me take my hand down.

11        THE COURT:  All right.

12        MR. RUCKDESCHEL:  I'm glad you're feeling better,

13 Judge.

14        THE COURT:  Thank you.

15        MR. RUCKDESCHEL:  I appreciate the time.

16        The first waffly explanation we've heard about the

17 fictional demand letter sent to me by Jones Day happened right

18 now.  They sent a demand letter on May 22nd about the responses

19 that I filed on behalf of my firm.  I have maintained, I did

20 maintain then, and I maintain now, it is improper to serve

21 discovery on counsel asking about counsel's opinions about

22 things that are outside of their representation of a particular

23 client.

24        To the extent that the debtor wanted to seek

25 information from Mr. Crouch about positions Mr. Crouch was

1 going to take, that discovery needed to be served on

2 Mr. Crouch, and he would have responded and he would have

3 asserted whatever appropriate work product or attorney-client

4 privilege that was applicable.  That didn't happen.  The

5 discovery was served on me.

6        And let's be clear.  While there was a stray comment

7 in the interrogatories that were served, they were serving it

8 on the firms and on the individuals represented by the firms,

9 the motion to compel acknowledges that the debtor has no

10 complaint about what my firm did with respect to the

11 interrogatories.  They only raised one issue, tell us how many

12 unfiled claims you have.  And while I don't believe that's

13 appropriate, I don't believe it's discoverable, I don't think

14 it's important, I didn't want to bother the Court with it.

15        And so as I said in my opposition to the motion to

16 compel, I nevertheless told them, while I stand on my

17 objections, I don't want any unnecessary bickering and I don't

18 have any clients that have told me they want to file a claim

19 against the debtor that have not yet filed it.  And they

20 acknowledge in Page 3, Footnote 3, of the motion that that was

21 sufficient.  So there isn't any issue to compel my firm with

22 about the interrogatories.

23        And then we go to the document request, which are

24 only served on my firm.  And, again, the materials that my firm

25 has related to my representation of Mr. Crouch are the property

1  of Mr. Crouch.  You want to do discovery of them, you serve the

2  discovery on Mr. Crouch, he has his rights, he'll raise them.

3  That didn't happen, right.  They served a subpoena on my firm.

4  And when I responded to that, they filed a two-page letter that

5  goes into great detail, including an alleged quotation from the

6  responses that's just fictional, it doesn't appear, that says I

7  asserted a claim of attorney-client privilege.

8        They quote something that doesn't appear in my

9  responses.  They go into their explanation about the local rule

10  and about discoverability.  It's fiction.  It didn't happen.

11  They didn't come back when I pointed this out to them in my

12  letter hours later.  It took just hours for me to respond.  I

13  responded on the same day.  And I said, hey, I didn't raise

14  that objection, so I don't have any idea what you're talking

15  about and I'd like you to withdraw it formally because you've

16  now quoted things that are just fictional.  It doesn't appear.

17        What do I get in response?  Nothing.  Nothing.  What

18  does the motion compel say about this little fiasco?  Nothing.

19  The first time we hear anything about it is counsel's attempt

20  this morning to say, well, we interpreted this language in two

21  sentences in your responses as an assertion of privilege.

22  Well, I didn't hear that when I sent him the letter.  And the

23  letter is pretty strongly worded.  I quoted from it in the

24  opposition.  I attached it for Your Honor.  And it's very clear

25  that I was taking a position that I hadn't raised a claim of

1  privilege.  Period.

2          And nevertheless, no response.  So what's the next

3  thing I get?  May 25th.  Well, as a compromise, we'd like you

4  to do this other stuff.  They never raised these other alleged

5  deficiencies with me.  They raised one objection to the request

6  for production.  You asserted privilege and you didn't give us

7  a log.  Well, I didn't assert privilege.  And it's true, I

8  didn't give them a log because I didn't assert privilege.  And

9  it's improper to serve discovery on me for my personal stuff.

10          And I've got to tell you, Judge, if you're seeking

11  discovery of John Ruckdeschel or the Ruckdeschel Law Firm's

12  personal opinions about things beyond the positions I might

13  take for my client, it's not going to be helpful to anybody,

14  and we're going to have to figure out some ways to be clear

15  that we're not overly colorful because I'm a colorful guy when

16  I talk.  And when I'm expressing my personal opinion, I do it.

17  And that's not relevant to this case.

18          The positions that I take on behalf of my client for

19  my client before this Court are relevant.  And those are his.

20  My personal information, what I personally think about the

21  propriety of this proceeding, about opposing counsel, about

22  settlement offers that haven't been made, or this alleged plan

23  that's been submitted, my personal opinions aren't relevant and

24  are never going to be admissible evidence in this case.

25          But that's the problem.  There hasn't been a meet and

1  confer about this because there was nothing to meet and confer

2  about.  They raised one set of objections in May 22nd to the

3  request for production, and that objection was you asserted

4  privilege and you didn't give us a log.  Well, I responded to

5  them.  I didn't assert privilege.  Done.  I dealt with their

6  only objection that they raised.

7          Three days later, now they've got something else they

8  want to do as a compromise.  Well, what do I have to compromise

9  about?  I did what they asked.  I addressed the concerns that

10  they had.  Is this just going to be an ever shifting, well,

11  we're going to ignore what you said.  We're going to ignore

12  that we messed up and we had a fictional letter we sent you and

13  we're not going to acknowledge it, but now we're going to

14  demand that you do other stuff.  It's inappropriate.  Nothing I

15  have is discoverable other than what I might do on behalf of

16  Mr. Crouch, and they didn't serve discovery on Mr. Crouch for

17  documents.

18          The motion should be denied.  And, Your Honor, the

19  more you let this gamesmanship go on, the more they're going to

20  do it.  Every time.  We've just heard -- in response to the

21  TCC's motion, we've just heard in the preface here, well,

22  there's no deadline and we served it a month ahead, so

23  apparently there's no hurry.  Well, if there's no hurry, why

24  did we have an ex parte request to shorten time?  If we've got

25  another month, why did I have to rush back from taking my wife

1   to the doctor so I can do this hearing here in my kitchen?

2   Because they think we have to shorten time.  And then they come

3   before you and they say to the Court, well, Judge, we've got a

4   whole nother month until the hearing.  Those two things can't

5   be true, and you've got to put an end to it, Judge.  You've got

6   to stop this.

7           Thank you.  The motion should be denied.

8           THE COURT:  All right.  Thank you.

9           I have a question, Mr. Ruckdeschel.  I'm going to ask

10  it of you, but I'm going to hear the answer from counsel for

11  the other firms for whom discovery is sought.

12          MR. RUCKDESCHEL:  Of course.

13          THE COURT:  If there is an interrogatory or if there

14  was a subpoena served on the firm with the intent of drawing

15  out information relevant to financial distress and the subpoena

16  sought information as to the number of clients who have

17  retained the firm to pursue claims for injuries due to use or

18  exposure to talcum powder sold or marketed or distributed by

19  J&J or its affiliate for which a lawsuit has not been filed,

20  why is that not relevant and why would it be privileged?  It's

21  asking for a number.  It's not asking for any communication.

22          MR. RUCKDESCHEL:  Well, I can answer on behalf of

23  myself, Judge.

24          THE COURT:  That's all I'm asking for at this point.

25          MR. RUCKDESCHEL:  And it's easy for me because the

1    Ruckdeschel law firm is me and now my wife has reactivated her

2    license and she's working about halftime with me.  God help

3    her.

4            But I only have a handful of cases.  But what I can

5    tell you is, when clients come to my firm and they retain my

6    firm, the first thing we have to do is investigate.  And we

7    investigate what their potential claims are, both in the tort

8    system and otherwise.  We then investigate what we believe the

9    relative likelihood of success might be, right.  We have to go

10   through all this process with these things, and then we have to

11   make a recommendation to our client as to what we believe the

12   best course of action is for them.

13           And then, and only then, do they then decide what

14   course of action is it that we're going to take.  And I can

15   tell you that there are often months in between the time that a

16   client comes into my firm and retains my firm and the time that

17   we actually make a decision about what we're going to do

18   because the investigation takes a long time.  And that's

19   particularly true in the case of people, women that come in

20   because their exposures are often secondhand, and so it takes

21   more time.  And it's often true in the case of people that have

22   more complicated work histories and exposure histories.  And

23   it's often true in people where we've got to look.

24           And so the fact that you've retained a law firm

25   doesn't mean a lawsuit's going to be filed.  It doesn't even

1  mean a lawsuit's going to likely be filed.

2        THE COURT:  But doesn't that go to the inferences the

3  Court could draw from that evidence or the weight given to the

4  evidence, not as to discovery?

5        MR. RUCKDESCHEL:  Absolutely not.  Absolutely not.

6  And there are two reasons why.

7        One, it's completely irrelevant under the analysis of

8  the Third Circuit in LTL 1, which says, the question here is,

9  is there an immediate financial distress?  And so speculating

10 about things that might happen in the future is not part of

11 what this Court's proper analysis should be.  So for the

12 purposes of the motion to dismiss, that's not the analysis that

13 Your Honor should be doing.

14       And the facts that could be hypothesized as, well, if

15 this happens and that happens and this happens, then there

16 would be another claim filed.  And then if that claim gets

17 filed, and if that happens, this happens, and that happens, and

18 this happens, that's exactly the kind of inferential chain that

19 the Third Circuit said that's not on the table.  That's not

20 what we do here.

21       So that's number one.  It's not relevant and it's not

22 reasonably calculated to lead to the discovery of admissible

23 evidence.

24       But number two is what I went through a minute ago.

25 The fact that somebody hires my firm doesn't mean that I have

1  an expectation that I'm going to sue any particular defendant.

2  And there could be an exception to that, right.  A lifelong guy

3  comes in from Pennsylvania and he worked for U.S. Steel his

4  entire career.  And in Pennsylvania, you can sue the employer,

5  right.  I'm pretty sure when that guy hires me, I'm going to

6  sue U.S. Steel.  But that doesn't happen.  That's a rare case

7  indeed.

8         And so the problem is the fact of retention means

9  nothing with respect to whether a claim is going to be filed.

10 It means nothing as to whether it's more likely than not that a

11 claim will be filed.  It means nothing.  It's just a piece of

12 nonsensical data that means nothing.  In order for it to mean

13 something in this case, you have to take at least three more

14 inferential steps.  And so that's just inherently speculative.

15        If somebody has, and this is the response I gave to

16 them, none of my clients have advised me that I should file a

17 claim against the debtor, right.  That's what I responded, and

18 they accepted that.  So that's fine.  Okay.

19        THE COURT:  All right.

20        MR. RUCKDESCHEL:  So that's my answer, Judge.

21        THE COURT:  All right.  Thank you.

22        Let me move to Mr. Satterley.

23        MR. SATTERLEY:  Good morning, Your Honor.  I guess

24 good afternoon there on the East Coast, and I'm sorry to hear

25 that you've been under the weather and I hope you get well

1  soon.

2          THE COURT:  Thank you.

3          MR. SATTERLEY:  Let me echo some of what

4  Mr. Ruckdeschel has said, and I'm not going to be as long as he

5  is.  He made very good points.  But I want to start with

6  burdening Your Honor.

7          This is unduly burdensome that the debtor has brought

8  this to your -- put this burden upon you because it's basically

9  harassment.  And they brought this to you claiming they've met

10 and conferred when they haven't.  I served responses on

11 May 15th, responses and objections on behalf of my law firm and

12 I produced a document.  I'll talk about the document in a

13 minute.  But I haven't heard a single phone call.  I've been in

14 court in the Valadez case every day for weeks.  We've done

15 opening statements.  We're putting on evidence against many J&J

16 and LTL attorneys, I don't know, 5, 6, 7 there.

17         And at no point in time did anybody say, hey, by the

18 way, Joe, you didn't adequately answer discovery.  Nobody

19 picked up the phone and called me and said, you need to produce

20 some other document.  So I don't even know what

21 letter -- supposedly, somebody from Jones Day wrote a letter to

22 me.  I haven't seen it.  I've been sort somewhere busy lately.

23         So I guess my point is, there's really not been any

24 meet and confer on this issue.  And so for this emergency

25 motion advancing to today I think is just an attempt to harass

41

1  us and to burn the Court.  So let me directly address the three

2  points -- the three items that counsel says my firm should

3  answer.

4          The total number of claims; the first item, the total

5  number of claims filed versus unfiled.  In the response to the

6  discovery, I provide a letter dated April 20, 2023 to Ms.

7  Allison Brown and Alex Calfo.

8          I said, in light of Judge Kaplan's ruling today, at

9  today's hearing -- because Your Honor told us on April 20th, if

10 you intend to file lawsuit, let them know.

11         "In light of Judge Kaplan's ruling at today's

12 hearing, I write as a courtesy to inform you that Kazan firm's

13 clients will file lawsuits against Johnson and Johnson and

14 other protected entities, but not against LTL Management.  Each

15 Complaint-Summons will be served through official channels.

16 The cases that will proceed immediately include at least the

17 following."

18         And I listed all the cases that we intend to file.

19 Any other case beyond that, is work-product privileged,

20 because, as Mr. Ruckdeschel said, we're investigating the

21 merits of the case.

22         And there's many cases that we investigate and decide

23 not to take, not to accept.  My firm has a history, and Johnson

24 and Johnson knows this, that we represent some of the strongest

25 cases you could possibly imagine, you know, they have autopsies

or tissue digestions and exact ingredients are found in the body, right next to the tumor.  We're very, very particular about the type of cases that we select to represent.

So any client that is not on this list is work-product privilege.  And I would reassert what Mr. Ruckdeschel said about if an attorney, or if a client has retained us, that doesn't mean we're actually going to file a lawsuit.  We're still -- the retain to investigate.

So the total number of unfiled claims is privileged and to the except that Your Honor's compels that type of privy information, I'll have to seek Appellate relief because there's, under no circumstances, am I to turn over privileged information.

The second item that they sought is communications that I may have had with other lawyers regarding this topic and I asserted privilege as well.

Co-counsel privilege, I'm co-counsel with Mr. Maimon. The motion I have represented cases against J&J for years.  Any communication I have with my co-counsel is privileged and I'm not going to turn any of that over.

The final issue is, my opinion about financial distress; my views about financial distress are not relevant. And my opinion about the value of each of my cases is privileged.  Now, I did point out in the discovery that I have, they already have the demand letters that I've made on

1    individual cases.

2         They already have what's called a 998 filing.  A 998

3    in California is actual pleading-type documents that serve upon

4    the Defendants, so that when we win the case, if they don't

5    meet that, we could get costs.  And they already have those.

6         So everything that I have that's not privileged has

7    been turned over and everything they're seeking is either

8    harassment or they're seeking privilege.

9         Final point, Your Honor.  The focus at the Motion to

10   Dismiss is not on Joe Satterley or the Kazan law firm's thought

11   processes about the Debtor or Joe Satterley or Kazan law firm's

12   evaluation of each individual case, because I evaluate cases

13   and I have thought process, that's not the focus.

14        The focus is on the Debtor and the Debtor has

15   repeatedly said, in deposition, that they did no analysis, no

16   estimates of their liability.  So that's got to be the focus on

17   the Motion to Dismiss, not on Joe Satterley's thought

18   processes.

19        And with that, I'll submit, Your Honor.  I hope Your

20   Honor gets feeling better.

21        THE COURT:  Thank you, Mr. Satterley.

22        Mr. Winograd?

23        MR. WINOGRAD:  Thank you, Your Honor.

24        Mike Winograd from Brown Rudnick, again, on behalf of

25   the TCC.  And, Your Honor, I will try not to tread ground

44

1   that's already been covered.  And of course, we're -- I'm

2   speaking on behalf of the TCC and not the member

3   representatives that received these subpoenas.

4          First of all, Your Honor, the flippant comments by

5   counsel that somehow the TCC doesn't follow a practice of

6   meeting and conferring is outlandish.

7          I won't say anymore than that, other than to say, in

8   the 20 or 30 issues that have come up, we have affirmatively

9   reached out to them on almost every single one of them.

10         They've cited one instance in the last briefing and

11  again, we reached out to them to discuss that issue, apparently

12  not in some formal meet and confer setting.

13         We were never consulted on this motion before it was

14  filed.  I understand we're not a subject of it, but we're

15  certainly related and when I've reached out, it's been to the

16  entire group on the other side.

17         With respect to the gamesmanship, Your Honor, this

18  motion, and I expressly request that this motion be denied

19  simply based on the timing.  The responses and objections at

20  issue were received on May 17th or earlier.

21         It took them two weeks to file a motion which they

22  filed at 11:20 at night and then, suddenly asked for a hearing

23  two days later.

24         Now, I know counsel says there's no rush here.  Well,

25  if there wasn't a rush as Mr. Ruckdeschel said, well, why the

1  two days' notice?  But in any event, they sat on their hands

2  for two weeks; that alone, warrants denial, Your Honor.

3          In addition to that, not only did they wait two

4  weeks, but they decided to drop the motion in the middle of

5  depositions when the TCC and the counsel on this call are

6  preparing and taking depositions; two, three a day.

7          Tuesday alone, Your Honor, we had three depositions

8  and a hearing with the Court.  And, on Tuesday, when they

9  requested that a fully-briefed motion that they filed and for

10 which they rushed to file a reply brief, be adjourned and put

11 off for another two days until today, they never once mentioned

12 that they, hours later, were going to file another Motion to

13 Dismiss.

14         Now, presumably, they wanted that motion heard before

15 there was a ruling on the other one, but this is the type of

16 gamesmanship and lack of transparency, Your Honor, that should

17 not be countenanced and I request, and on those bases alone,

18 this motion be denied.

19         Your Honor, with respect to the merits, with respect

20 to unfiled claimants, the Court did rule to some extent on that

21 on Tuesday, as we noted in the brief.

22         There were requests by the AHC for lists to know the

23 whole pool of claimants to calculate liability.  Your Honor

24 said, I don't see how its relevant and it doesn't really matter

25 if it's 50,000 or 30,000.

46

1        Your Honor did question the relevance of all of this.

2   And Your Honor did say, you know what, let's come back to this

3   after the Motion to Dismiss.  And that's exactly what should

4   happen here.

5        With respect to the idea that the relevance that they

6   purport, things that the Debtor purports is a pretext.  You

7   know, counsel says, well, we just asked ten people, but we

8   don't have to ask everyone.

9        If they really wanted to figure out who the entire

10  pool is, they would have sent discovery to all of the law

11  firms.  They didn't.  And these law firms, they say, well,

12  these ten law firms happen to have taken a leadership role.

13       These law firms did not sign PSAs.  These law firms

14  did not file claimant lists with the PSAs.  They didn't file

15  lists with the 2019.  It's just completely apples to oranges.

16       And even the AHC apparently, Your Honor, has not

17  disclosed, its own members have not disclosed all of the

18  claims.

19       According to the recent testimony this week from Mr.

20  Nachawati, he things that the PSA is just an agreement to

21  agree, there are lots of issues to work out.  He doesn't think,

22  or doesn't know, if the agreement is good for some claimants,

23  and not for others.  And he does not believe that he even filed

24  or listed his mesothelioma claimants on his list.

25       This idea that we have to have the unfiled claimants

47

1  listed is betrayed by their own conduct.

2          Number 4, Your Honor, as counsel has said, so I won't

3  go back into it deeply, and let me just add to that other

4  point, counsel for -- I see the hand being raised by counsel

5  for the AHC, counsel for the AHC confirmed as much on the call

6  on Tuesday saying, yes, a plan is on file, but as I've said at

7  the last hearing, we don't necessarily agree with everything

8  that's in it and we're hard at work with the Debtors to try and

9  have an amended plan filed that we do agree with.

10          Next, Your Honor, with respect to the privilege

11  issue.  A claim that has not been filed is privileged.  The

12  only communications about it are between a client and its

13  counsel.  It is privileged, it is off-limits.

14          There are no indicia of reliability.  When somebody

15  determines to file a claim and goes ahead and files it, the

16  counsel is subject to Rule 11, has to do due diligence into the

17  merits of those claims.  They are indicia of reliability.

18          The idea that you can ask an attorney, and to use the

19  words of counsel for the TCC, we're not asking how many claims

20  will be filed.  We're just asking how many claimants have

21  sought counsel.

22          The idea that that is somehow not privileged and

23  subject to discovery would contradict every discovery principle

24  I'm aware of, Your Honor.  I'm fairly certain that if I ask

25  White and Case, are there, you know, has J&J approached you

48

1 about any potential lawsuits; have they consulted you, whether

2 or not you've decided to file anything; is way out of bounds,

3 Your Honor.

4      The fact that, and this was in the briefing, that

5 some claimants have disclosed their unfiled claimants; the AHC

6 has filed some, apparently, not all.  Certain firms have

7 responded by providing some does not impact the privilege or

8 decisions of anybody else.

9      Your Honor, on the $8.9 billion being inadequate,

10 they asked for the basis.  They were told by the TCC, we didn't

11 have anything non-privileged.  The law firms, to the extent

12 that, you know, have given them answers, they apparently just

13 don't like the answers.

14      Again, damages analyses are privileged.  There's not

15 much to ask about that that conceivably could be not

16 privileged, or already in the public or within the knowledge of

17 J&J.

18      And the same, Your Honor, is true with respect to the

19 questions about financial distress.  The motion should be

20 denied because of the gamesmanship, Your Honor, and on its

21 merits, it fails as well.  Thank you, Your Honor.

22      THE COURT:  Thank you, Mr. Winograd.

23      Mr. Branham?

24      MR. BRANHAM:  Good morning, Your Honor -- I guess

25 afternoon, now.  I don't have a whole lot to say here, except

49

1   to simply join in what Mr. Satterley, Mr. Ruckdeschel and Mr.

2   Winograd already articulated.

3          You know, our firm is very similar to them in terms

4   of the types of cases that we take, to the case in-firm, an

5   entire analysis that we do.

6          And just because we're hired, doesn't mean we've

7   decided to file something.  I will tell you that I repeatedly,

8   at least twice and maybe three times in my recollection,

9   reached out directly to counsel at Jones Day, asking them, help

10  me understand what the authority is for you to ask for this

11  stuff.  It's privileged; what do you think is not privileged?

12         And the answer was, they are papers; not, let's have

13  a phone call.  Not any of that.  And then, you know, we're

14  dragged up here as a law firm and, by the way, Judge, I'm

15  admitted *pro hac* for a client in this, but not for my law firm.

16         So I just want to raise that because I don't want to

17  create a problem.  But you know, the idea that this needed to

18  be done this fast, that it was effectively done, as you've

19  heard from others, without any meaningful meet and confer, and

20  really without any discussion at all or willingness to discuss

21  the privileged and work product issues.

22         I think at the end of the day, belies what this is

23  actually about, which is, they focused on people who drive hard

24  and maybe that they feel like are thorns in their side, as

25  opposed to any legitimate cases for discovery.  And so, I would

50

1  certainly, on behalf of my law firm, which just all this was

2  directed to, and for the reasons stated by everybody else, ask

3  that you not (indiscernible).

4          THE COURT:  Thank you, Mr. Branham.

5          Mr. Hansen?

6          MR. HANSEN:  Thank you, Your Honor.  Kris Hansen with

7  Paul Hastings on behalf of the Ad Hoc Committee.  Your Honor, I

8  simply wanted to say one thing which was in response to the

9  gratuitous comments from Mr. Winograd about Mr. Nachawati which

10 really had nothing to do with this argument, but they seem to

11 not be able to resist at any point in time.

12          If they wanted to cite the full facts from the

13 deposition, Mr. Nachawati's got about 5,000 claimants on file

14 and they were apparently 50 mesos [sic] that weren't put in

15 there.  So it's not relevant to this point, but I wanted Your

16 Honor to know that.

17          I also wanted to point out to the Court again that

18 we're the only party who has filed a 2019.  If you look around,

19 you're hearing lawyers say, I represent multiple clients; I'm

20 appearing in the case; I'm making arguments in the case.

21          And notwithstanding Ms. Richenderfer's comments from

22 the last week about how she doesn't think everybody has to

23 suddenly comply with 2019, they do and they need to file those

24 2019 statements.

25          I don't have any thing else, Your Honor, I just

1  wanted to give you that factual background.

2           THE COURT:  All right.  Thank you.

3           Ms. Jones?

4           MS. JONES:  Good afternoon, Your Honor.

5           THE COURT:  Good afternoon.

6           MS. JONES:  Laura Davis Jones of Pachulski, Stang,

7  Ziehl and Jones.  First, Your Honor, it's wonderful to see you

8  feeling well.  It's good.

9           THE COURT:  Thank you.

10          MS. JONES:  Your Honor, just one quick comment.  We

11 were referenced Arnold and Itkin was referenced earlier in the

12 hearing and, Your Honor, just because we did have that specific

13 reference, we wanted to make you knew I was listening and going

14 to respond.

15          Your Honor, after all the comments that have been

16 made, I have nothing further to add other than what the TCC has

17 already said, Your Honor.  Thank you.

18          THE COURT:  All right.  Thank you.

19          Mr. Maimon?

20          MR. MAIMON:  Good afternoon, Your Honor.

21          THE COURT:  It's after noon; good afternoon.

22          MR. MAIMON:  It is afternoon.  I'll be brief.  I

23 think that there's a disconnect here between the Jones Day

24 lawyers and the reality of practice as it exists outside of the

25 bankruptcy process.

1          My colleagues have explained the process that we go

2    through with regard to vetting claims and deciding what claims

3    are viable and what claims can be filed and the advice that we

4    give our clients about that, which are clearly privileged.

5          You know, Mr. Ruckdeschel talked about discovery on

6    lawyers as non-parties.  We are non-parties.  Interrogatories

7    and requests for production of documents are discovery vehicles

8    for parties.

9          We do accept the subpoena, because we recognize that

10   you can subpoena a non-party, but (indiscernible) asked for

11   documents.  And then, I would just raise with Your Honor, Your

12   Honor asked the question of Mr. Ruckdeschel about well, what

13   about just talking about the number of people who have come in

14   your door, or the number of people who signed retainers; that

15   number doesn't exist outside of documents.

16         And it's not incumbent upon my firm to start doing

17   work and tabulating things.  One of the things that we do is

18   that we investigate claims and we also assemble documents.  We

19   have to be retained in order to be authorized to get medical

20   records for our clients.

21         We do get medical records for our clients.  We give

22   the pathology reports that confirm whether or not they have the

23   disease that might be filed about.

24         This is in sharp contrast to what a lot of the PSA

25   partners of J&J have indicated in their depositions.  We don't

53

1  have any confirmatory documents or pathology reports.  I have

2  to get those.

3          Those are privileged.  If a client decides not to

4  file a claim, it would be a HIPAA violation for me to start

5  turning those over.  The Jones Day lawyers cite no authority,

6  none whatsoever, for discovery against lawyers as lawyers, as

7  opposed to discovery against parties.

8          And in fact, their application within their motion to

9  not file a memo of law is not, should not be taken by the Court

10 as the bravado that this is all simple, that they get what they

11 get.

12         It's a recognition, quite frankly, on their part,

13 that the law does not support them.  As Mr. Satterley said,

14 I've litigated cases with him, as well as others who are the

15 subject of these motions for years.

16         And our communications about various issues are

17 communications as representatives of members of the committee.

18 Our communications with counsel for the TCC, they're privileged

19 and we shouldn't have to start talking about that.

20         Finally, with regard to the valuation of cases, the

21 subpoena talks about, you know, what is the average amount.

22 There is no average amount.  That's not the way the ethical

23 rules that we have to live under require us to conduct

24 ourselves.

25         Each client has the authority to either accept or

1  reject an offer made to him or her and we cannot impose upon

2  our clients "average settlement values," and we don't approach

3  -- it would be a violation of our ethical rules to approach a

4  one size fits all categorization: you have this disease, this

5  is what you get.

6         That might be ultimately what happens in a bankruptcy

7  because it's imposed on people.  It might be in other types of

8  situations where there's an administrative type of a program

9  where this is the amount that you get, whether it's a tax

10 credit or vouchers or what have you, but litigating our cases,

11 that is against the ethical rules.

12         Finally, with regard to the liability; liability is

13 not only, and the damages that a defendant owes is not simply,

14 a matter of the medical bills or the lost earnings that a

15 plaintiff has or even, quite frankly, the pain and suffering.

16         But the liability of a defendant is impacted also by

17 the strength of the case against it.  And so, yes, for sure, I

18 have a lot of liability documents that J&J has produced to me,

19 but they produced them to me and they know them and it would

20 fill up Your Honor's courtroom more than it's already filled

21 with boxes, to have liability evidence against J&J.

22         But I also have my analyses of that in documents.  My

23 analyses are privileged.  They're work product.  I have the

24 analyses that Mr. Satterley and I have worked together; those

25 are privileged.

55

1          Ms. O'Dell, Ms. Parfitt, in dealing with various

2     issues, we exchange as co-counsel in cases, thoughts and mental

3     processes.

4          These are all privileged and the fact that you have

5     no, absolutely no legal authority put forward by the Debtor

6     that supports this motion, and I'll set aside the knee-jerk

7     reaction that seems to be to just get a short order, a short

8     time-frame motion so that everybody has to come within two days

9     and maybe one could be pulled over on over the Court's eyes.

10          The lack of any authority either for the discovery

11     against lawyers or for the evisceration of the privileged dooms

12     the motion.  I thank the Court for its time.

13          THE COURT:  All right.  Thank you, Mr. Maimon.  Be

14     careful, you don't want to handcuff Mr. Winograd.  We may be

15     having motions on shortened time from him shortly, from what

16     we've been told.

17          Ms. Placona?

18          MS. PLACONA:  Thank you, Your Honor.  Just some few

19     comments, speaking on behalf of the Barnes Law Group.  We echo

20     the comments made by Mr. Ruckdeschel claiming privilege and

21     work product and the Barnes Law Group has reviewed hundreds of

22     cases and decided not to take those.

23          So we repeat those arguments.  I also filed an

24     objection last night on behalf of the firm, Ashcraft & Gerel,

25     so at docket 661 that I just asked that Your Honor take into

1  consideration that I've adopted the objections by the TCC.

2  Thank you.

3           THE COURT:  Thank you, Ms. Placona.

4           Mr. Torborg, we're back to you.

5           MR. TORBORG:  Thank you, Your Honor.  All right.  I'm

6  not going to try to rebut everything that we heard over the

7  last, probably going on an hour.  I do want to hit a couple of

8  things.

9           Start with some procedural things and then, some

10 substance.  First, in terms of the timing of the motion, I

11 mean, Mr. Winograd wasn't involved in all these communications

12 that went back and forth between us and the law firms.

13          Deficiency letters were sent.  We sent our last

14 proposed compromise email on the Thursday before Memorial Day,

15 right?  If we had filed a motion immediately after sending

16 that, we would have been -- and we offered to meet and we

17 offered, we invited law firms to meet and confer with us.  They

18 didn't, okay.

19          If we had filed the motion the next day or over the

20 weekend, or even Monday, we would have been accused of jumping

21 the gun, right.  So we're really trying to be fair to everyone

22 and trying not to burden the Court.

23          We've substantially, you know, limited our requests

24 here.  We heard some argument about requests, we didn't even

25 move to compel upon.  So, you know, I -- and then, also, the

57

1 other procedural issue is the authority question: whether we

2 can serve Rule 33 and Rule 34 discovery on a law firm.

3        Well, you know, we took that off the table by serving

4 the document subpoenas.  So I don't know why we're hearing so

5 much about that.

6        Substantively, we have three issues.  One is the

7 relevance of unfiled claims and whether they're privileged.  I

8 haven't heard any legal basis to say that the number of unfiled

9 claims a law firm may have is privileged and I don't think

10 there is any.

11        And if it was, I would be very surprised that two of

12 the non-Plaintiff firms actually gave that to us.  It is

13 relevant and as your Court, as Your Honor recognized, it goes

14 to, at best, it goes to weight, right.

15        And worst, it goes to weight of the evidence.  How

16 many unfiled claims have been accruing, remember, claims

17 haven't been filed for 18 months because of the bankruptcy,

18 right.

19        So the inventory of claims that's built up is

20 relevant to financial distress.  The fact that there might be

21 some claims that eventually aren't filed, okay.  That doesn't

22 make the number of unfiled claims not relevant.

23        In terms of the request number 2; communications

24 relating to the proposed settlement.  Yeah, we recognize there

25 might be some communications that are privileged, right, but

58

1  there might be communications that are not.

2         It's clearly relevant.  I haven't heard anyone say

3  that it's not relevant.  So we want the law firms to actually

4  search their files for communications with other law firms for

5  which they do not share common interest and produce those.

6         So those are the follow up things I (indiscernible).

7  Thank you.

8         THE COURT:  All right.  Thank you.

9         Mr. Winograd?  You're on mute.

10         MR. WINOGRAD:  Sorry, Your Honor.  Just a few points

11  to address what counsel said.  Number one, with respect to Mr.

12  Nachawati, Mr. Nachawati plainly testified that he had a number

13  of unfiled claims.  He gave that number.  It was approximately

14  whatever it was.  And he then said that he does not believe

15  that any of the meso claims were filed with the 2019.  That was

16  the point that I made.  It is in fact accurate.

17         Number two, Your Honor, with respect to timing, we

18  are all on a break-neck pace.  We all understand that and

19  motions will have to be filed on short notice, absolutely.

20         But to wait two weeks to file one and then, drop it,

21  a motion like this, you know, in the middle of depositions, is

22  a bridge too far, Your Honor.

23         The idea that the claims have to be relevant, they

24  are not claims.  As counsel itself described them, we are

25  talking about consultations by a victim with an attorney.  That

1  is not yet a claim that has any indicia of reliability and

2  anything that has transpired between that client and the

3  attorney is privileged.  It's simply all off limits

4        And I just don't, you know, that counsel really

5  hasn't really addressed that.  I don't know that he rebutted

6  the other points that we've made and for all the reasons that

7  we said earlier, Your Honor, I think this motion should be

8  denied summarily.  Thank you, Your Honor.

9        THE COURT:  All right.  Thank you, Mr. Winograd.

10       Mr. Ruckdeschel, you have further comment, briefly?

11       MR. RUCKDESCHEL:  Yes, Your Honor, very briefly.

12  There was a comment just a minute ago from my colleague at

13  Jones Day that nobody's disputing that this information is

14  relevant with respect to the documents that they're demanding

15  from Plaintiff law firms directly.

16       And that's exactly what we've disputed.  You know, it

17  strikes me as the comment in the hearing with Mr. Placitella a

18  minute ago where the claim was made that, you know, nobody's

19  disputing that the stay applies.

20       And Mr. Placitella has to get up and say, that's

21  exactly what we're disputing.  The stay doesn't apply.

22       We have disputed at every step of the way any

23  relevance of this information coming from the law firms.  There

24  was no argument as to whether it was relevant and I pointed

25  that out in the opposition to the motion.  They cited two cases

1  in the motion with respect to the two requests for production

2  at issue with my firm.

3         Those cases stand for the proposition, if you take

4  their parentheticals correctly, that relevant evidence is

5  discoverable.  Duh, but this evidence isn't relevant.

6         And to then come in and say, well, I don't have a

7  case for you that it's relevant and I could just ask the law

8  firm for whatever they've got beyond what was their clients'

9  and no one's disputing that, it's just ignores the truth.

10        It ignores the papers that have been filed.  It

11  ignores the responses.  It ignores the entire meet and confer

12  process and the responses with respect to that.  And it's just

13  not proper.  You've got to end this, Judge.  Thank you.

14        MS. O'DELL:  Your Honor?  Leigh O'Dell from Beasley

15  Allen.

16        THE COURT:  Yes?

17        MS. O'DELL:  I have my hand up and somehow it's

18  fading in the background.  If I could have a moment?

19        THE COURT:  That's quite all right.

20        MS. O'DELL:  Thank you.  First, I would just join in

21  the comments and arguments that have been made by TCC counsel

22  and others, particularly in relation to estimates of either

23  Beasley Allen's inventory or group of cases, or to the

24  aggregate liability.

25        Clearly those impressions, analyses, evaluation of

61

1   the facts are work product and are privileged and should not be

2   produced.

3          But I wanted to raise my hand and add that there have

4   been comments made Mr. Torborg that the Plaintiff law firms

5   have not participated in this process in good faith, have not

6   looked for documents that might be responsive, that are non-

7   privileged.

8          And that's just not the case.  In relation to

9   communication with other lawyers, communication with co-counsel

10  has been well-described, are privileged.  But in the case of

11  communications with other lawyers that are non-privileged, I

12  can tell you from our firm's perspective, even though we're not

13  a party, even though we have not filed a Motion to Dismiss as a

14  firm, we took steps to make a good faith review and where there

15  was a communication that was not privileged, we produced it.

16         So to suggest somehow that there's been an improper

17  approach to this by Plaintiff's counsel I think is not accurate

18  and I just wanted to let the Court know that.

19         THE COURT:  All right.  Thank you.

20         Ms. Parfitt?

21         MS. PARFITT:  Thank you, Your Honor.  And I, again,

22  am glad that you're feeling better.

23         THE COURT:  Thank you.

24         MS. PARFITT:  Your Honor, points that have not been,

25  perhaps not been raised and discussed by others, but as Ms.

62

1  O'Dell indicated as well, we have taken any and all requests by

2  counsel quite seriously.  That's how we handle all types of

3  requests.

4          We made a search of our files despite the fact that

5  we felt any of the requests the Defendants asked that we had

6  objected to were -- had some type of relevance.

7          We did not.  I'm write down the road from Jones Day

8  and I would have been delighted to receive a request to meet

9  with them and talk with them.  I suspect that would have been a

10 very short meeting, but to suggest that there was an offer,

11 there was not.

12         Also, with regard to investigation of our claims and

13 perhaps very relevant to what we will see down the road -- what

14 our firm does, like all other firms, most of the firms on this

15 recording today is do an investigation of their claims so that,

16 in this particular case, as it pertains to ovarian cancer

17 cases, what we do file are epithelial ovarian cancer cases,

18 cases that are supported by the science and supported by the

19 Daubert ruling of the Honorable Judge Wolfson.

20         So that does take time, and just because someone

21 retains the law firm of Ashcraft & Gerel does not mean -- we

22 ultimately make an assessment that there is this one that need

23 to be filed.

24         And so, those discussions, those investigations are

25 all highly confidential and privileged until such time as a

63

1 case is filed.

2          And then, at the time the case is filed, that's

3 public and available to LTL and any other Defendant in this

4 case.

5          As to the other requests with regard to the 8.9 and

6 any comments, I agree with Mr. Ruckdeschel and others.  I'm

7 sure we are all quite opinionated on 8.9 and when given the

8 opportunity, would love to share those opinions with regard to

9 that type of evaluation of these serious claims and a number

10 that would be so minimal in its ability to compensate these

11 clients.

12          But that said, any and all those types of

13 communications are indeed privileged and are indeed work

14 product, as are the financial distress analysis that we, or any

15 other clients, would make.

16          But I just wanted to, I felt compelled to say, as

17 we've heard quite a bit, the firms that have spoken, the TCC

18 whose opposition we do in fact embrace, I think have been very

19 clear with regard to the type of investigation to make and the

20 seriousness with which we respond to any requests, not only at

21 the Court, but frankly, of counsel.

22          This matter involves women that are dying, women that

23 have died.  And to suggest we would do anything less than that,

24 is an insult.  Thank you, Your Honor.

25          THE COURT:  Thank you.

64

1          Mr. Molton?

2          MR. MOLTON:  Yes, Your Honor.  I didn't expect to

3   speak, but I got a call from Ms. Lisa Busch of the Weitz

4   Luxenberg firm who unfortunately, for whatever reason is not

5   appearing.

6          She had her hand up, but apparently, she's not within

7   the webinar.  So she just asked me lest, Your Honor, as you

8   review the documents, to relay to you that they did file a

9   response last night in opposition and she stands on it for the

10  Weitz Luxenberg firm, as well as the statements made by other

11  colleagues as well as by the TCC and refers you to the fact

12  therein that, as well, they were not properly served.

13         So that's all I have to do, Judge.  I'm just

14  transmitting that from the Weitz Lux firm who, through whatever

15  miscommunication was not on the webinar.  Thank you, Your

16  Honor.

17         THE COURT:  No problem.  I did receive their

18  submission and I hope your daughter's program or event went

19  well.

20         All right.

21         MR. MOLTON:  Your Honor, thank you so much.

22         THE COURT:  Yup.

23         MR. MOLTON:  Thanks so much for the courtesy of

24  extending this.

25         THE COURT:  No problem.

65

1              Mr. Torborg, last comments?

2              MR. TORBORG:  Thank you.  I'll be very quick.  I just

3    want to point out, again, we're talking about, on the first

4    issue, we're talking about individuals that the firm has

5    accepted as clients, not every single person that's walked in

6    their door and discussed the potential filing of a claim.

7              So there has been some filter between just any old

8    person and someone who might actually file a claim.  So we

9    think that information is highly relevant and should be

10   produced.  Thank you.

11             THE COURT:  All right.  Bear with me one second.

12             All right.  So there countervailing issues with

13   respect to any Rule 26(b)(1) context.

14             First that the requested discovery has to be relevant

15   and, as we all know, in 2015, relevancy was changed to

16   incorporate concepts of proportionality and relevancy now is

17   defined as any matter that bears on or that reasonably could

18   lead to other matter that could bear on any party of the claim

19   or defense.  That's very broad.

20             However, the restriction on proportionality then

21   weigh in.  So this Court has to take into account the

22   importance of the discovery in resolving the issues and whether

23   the burden or expense involve in the proposed discovery would

24   outweigh any benefit.

25             In looking at the document demands issued in

66

1   conjunction with the subpoenas, the Court is of the view that

2   the bulk speak privileged information; the range of settlement

3   demands or offers that have been extended, communications with

4   respect to the propriety of the $8.9 billion settlement, the

5   vast bulk of any such communication through document exchange

6   between Plaintiffs' firms would, to this Court, be in all

7   likelihood, while looking at a specific communication, would

8   all likelihood be subject to a privilege.

9         Now, I believe Mr. Torborg is correct.  The Court

10  could endeavor to say, okay, provide such discovery, identify

11  the privileged communications in a log.  That goes to

12  proportionality and the expense and the time that would be

13  associated in doing so as compared to the slim result, slim-

14  numbered result that would produce a non-privileged document.

15        So the Court is not going to direct that.  The Court

16  also takes into account the arguments made with respect to

17  clients that come into the door, through the door.  They may

18  sign retainer agreements, but their claims are under review and

19  investigation and there's, of course, a percentage that do not

20  lead to actual lawsuits being filed.

21        At what point the determination is made between

22  investigation and the decision and determination to bring a

23  suit is a fine line.

24        Mr. Satterley had identified various situations or

25  potential clients where the determination had been made to

1 bring suit but suit has not been brought.  Obviously, the

2 litigation has moved beyond a point in those situations where

3 Mr. Satterley can comfortably identify claims that would be.

4        If we had, of course, if we have a claims bar date

5 most of this would be academic, you know, all creditors would

6 be put to task to file claims and we would be able to see and

7 maybe at some point, we get to that.

8        At this juncture, I am going to direct compliance

9 with the subpoenas in a limited fashion.  The law firms are to

10 produce documents which evidence refer or relate to a number,

11 that number being the number of filed claims or -- and by

12 claims, let me use my language.

13        These would be claims for injury due to use or

14 exposure to talcum powder that had been sold or marketed or

15 distributed by a J&J or any of its affiliates.

16        The law firms are to produce a number of claims that

17 they are handling which have not been filed, but for which a

18 determination has been made to bring suit.

19        So two numbers: those that have been filed, which I'm

20 not sure Johnson & Johnson or the Debtor requires, but if they

21 do, there's no privilege.

22        And the number of claims for which there has been a

23 determination to bring suit but have not yet done so.

24        Now, I'm not looking for individual names or

25 information on those cases.  I do not see a privilege issue

1  with speaking about a number, and that's it.  Beyond that, the

2  motion is denied.

3          MR. RUCKDESCHEL:  Thank you, Your Honor.

4          THE COURT:  Any questions or clarification, Mr.

5  Ruckdeschel?

6          MR. RUCKDESCHEL:  Your Honor, I just want to make

7  sure that based on the motion, the discovery requests that Your

8  Honor's ruling relates to is interrogatory number 1 and that

9  was the one that required, or requested a number of filed or

10 unfiled claims and Your Honor has ruled that, to the extent

11 that there wasn't an answer to interrogatory number 1, you're

12 ordering compliance as just described of an additional answer

13 and only for that discovery request, correct?

14         THE COURT:  It would appear so.

15         Mr. Torborg, you want to weigh in?

16         MR. TORBORG:  Yeah.  I mean, we also had a document

17 request and a subpoena that's pertinent to this as well.

18         THE COURT:  The document was against -- the request

19 was for documents which ended in a number?

20         MR. TORBORG:  Yes, indicia to show.

21         THE COURT:  Again, but I'm -- certainly, the

22 documents are not to include any privileged information or

23 personal privacy information.  It's simply a number.

24         MR. RUCKDESCHEL:  So my concern there, Your Honor,

25 again, Jonathan Ruckdeschel, my concern there is what

1  essentially is being requested, the two document production

2  requests that were addressed in the Motion to Compel did not

3  relate to the document request about number of claims.

4          The discovery request relating to the number of

5  claims, that was the subject of the Motion to Compel is

6  interrogatory number 1 and interrogatory number 1 only.

7          And so, I think that the Court's ruling has to be

8  limited to what was at issue in the motion and the only one

9  that was at issue in the motion with respect to number of

10  claims was interrogatory number 1.

11          And so, I think everybody understands what Your Honor

12  has said about the information that's required to be provided,

13  but because the only thing before the Court in that regard was

14  that one discovery request, I think that the Court's ruling has

15  to be confined to that, undue process grounds, if nothing else.

16          THE COURT:  Well, but maybe there's a clarification.

17  My understanding was that there was a document request

18  associated with the interrogatories.

19          MR. TORBORG:  It is.

20          MR. RUCKDESCHEL:  Not an issue in the Motion to

21  Compel.

22          THE COURT:  Mr. Torborg?

23          MR. TORBORG:  We have a document request for

24  documents that they can show the total number of filed claims,

25  yes.

1          MR. MAIMON:  If I may, Your Honor?

2          THE COURT:  Mr. Maimon?

3          MR. MAIMON:  Yes, Your Honor.  This is an

4    impossibility.  It something that might exist in Jones Day

5    where they keep documents of numbers of cases.

6          But we have retainers from clients.  We have clients'

7    personal information.  We don't have a document which has a

8    number on it of unfiled cases or, quite frankly, filed cases.

9          We have --

10         THE COURT:  Then your response is, we don't have any

11   document that meets that discovery request.

12         MR. MAIMON:  Well, I do have the retainer agreements.

13   I do have the client medical records.

14         THE COURT:  Well --

15         MR. MAIMON:  I don't want to be in violation of Your

16   Honor's Order, so that's why I think Mr.  --

17         THE COURT:  -- I thought I made it clear, I don't

18   expect you to deliver retainer agreements with names or the

19   medical record.

20         If you could use those to answer the interrogatory,

21   then that, as far as the number.

22         MR. MAIMON:  So I think, and that's why I think that

23   Mr. Ruckdeschel's point is really well taken, that the

24   interrogatory asked for the information that Your Honor has

25   ordered us to get, which is, give us the number of filed cases,

1  give us the number of unfiled cases; as Your Honor has defined

2  those.

3          THE COURT:  Right.

4          MR. MAIMON:  But if Your Honor now exceeds to Mr.

5  Torborg's request that, oh, well, we want documents, that opens

6  up a pandora's box and we're never going to get anything done

7  here, right.

8          THE COURT:  Mr. Torborg?  And then --

9          MR. TORBORG:  Yeah.  I just wanted to say, I mean,

10  our motion definitely includes request for production number

11  one, which is documents sufficient to show the number of filed

12  and unfiled claims; paragraph 8 of our motion.

13          THE COURT:  Mr. Satterley?

14          MR. SATTERLEY:  Yes, Your Honor.  I accept Your

15  Honor's ruling with regard to identifying the number.  We can

16  do that, but if Your Honor extends that to documents, first of

17  all, the request is so vague and unduly burdensome and it would

18  literally take me weeks, if not months, to have my staff go

19  through all my files to try to find documents in response to

20  this.

21          I'm in trial right now for a dying mesothelioma.  I'm

22  also trying to assist --

23          THE COURT:  Right.

24          MR. SATTERLEY:  -- with regard to the preparation of

25  the Motion to Dismiss hearing which Your Honor set.  This is

72

1 really harassing.  If I --

2         THE COURT:  I'm going to make it easy, Mr. Satterley.

3 I'm going to make it easy, okay, at least I think I'm going to

4 make it easier for all of you.

5         The only document that has to be produced would be an

6 actual list, if it's maintained, of claims filed and claims to

7 be filed.  Otherwise, I'm going to ask you for the

8 interrogatory response.

9         I'm not looking to amass any piece of paper that

10 wouldn't show a claim.

11         MR. SATTERLEY:  Thank you, Your Honor.

12         THE COURT:  All right. I think we're done for the

13 day. We should be able to figure this out. Thank you, all.

14         MR. SATTERLEY:  Have a good weekend.

15         THE COURT:  Thank you. Take care, everyone.

16         MR. TORBORG:  Bye, now.

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

1
2      We, KAREN WATSON and TRACY E. VERGOLLO, court
3 approved transcribers, certify that the foregoing is a correct
4 transcript from the official electronic sound recording of the
5 proceedings in the above-entitled matter, and to the best of
6 our ability.
7
8 /s/ Karen Watson
9 KAREN WATSON
10
11 /s/ Tracy E. Vergollo
12 TRACY E. VERGOLLO
13 J&J COURT TRANSCRIBERS, INC.        DATE: June 5, 2023
14
15
16
17
18
19
20
21
22
23
24
25