| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Proposed Local Counsel for the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY  10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA  02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* |
| **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Rachel S. Morse, Esq.<br>jmassey@masseygail.com<br>rmorse@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Proposed Special Counsel for the Official Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Richard G. Haddad, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>David A. Castleman, Esq.<br>mcyganowski@otterbourg.com<br>rhaddad@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>dcastleman@otterbourg.com<br>230 Park Avenue<br>New York, NY  10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* |

|  |  |
|---|---|
| In re: | Chapter 11 |
| **LTL MANAGEMENT LLC,** [1] | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

**MOTION OF THE OFFICIAL COMMITTEE OF
TALC CLAIMANTS TO TERMINATE THE DEBTOR'S
EXCLUSIVE PERIOD PURSUANT TO 11 U.S.C. § 1121(d)(1)**

> **THE TCC HAS ASSERTED AND CONTINUES TO ASSERT THAT THE DEBTOR'S CHAPTER 11 CASE WAS FILED IN BAD FAITH AND SHOULD BE DISMISSED. THIS MATTER IS PENDING BEFORE THIS COURT. ANY CHAPTER 11 PLAN THAT MAY BE PROPOSED BY THE TCC ASSUMES, *ARGUENDO*, THAT THE DEBTOR'S CHAPTER 11 CASE IS NOT DISMISSED AS A BAD FAITH FILING. THE TCC RESERVES ALL RIGHTS TO CONTINUE TO ARGUE THAT DISMISSAL IS REQUIRED UNDER THE BANKRUPTCY CODE**.

The Official Committee of Talc Claimants (the "TCC") in the above captioned case, by and through its undersigned counsel, hereby submits this motion (the "Motion") seeking entry of an order substantially in the form attached hereto as **Exhibit A** (the "Order"), terminating the Debtor's exclusivity period, pursuant to section 1121(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), to allow the TCC to file and prosecute a chapter 11 plan. In support of the Motion, the TCC respectfully states as follows.

**INTRODUCTION**

1. The TCC's position remains that LTL's present bankruptcy case was filed in bad faith and that this case, like the one before it, should be dismissed. The TCC along with the United

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2

States Trustee's Office, State Attorneys General, and numerous other parties have moved to dismiss this bankruptcy on the grounds that the Debtor's case was filed in bad faith, which the Third Circuit held is the gateway issue for a Debtor to be entitled to any bankruptcy relief. *In re LTL Mgmt., LLC*, 64 F.4th 84, 102 (3d Cir. 2023). This case should be dismissed.

2. Nevertheless, until such time as this case is dismissed, and with a complete reservation of rights to continue to seek dismissal of this case and all other appropriate relief, the TCC, consistent with its fiduciary duties to all talc claimants, cannot stand idly by while the Debtor attempts to confirm a plan that will result in *de minimis* payments to talc victims without also offering talc claimants an alternative. During LTL's first bankruptcy case, the TCC was of the view that a confirmable plan that paid talc claimants in full and preserved all due process rights was possible, but that such plan would never be propounded by LTL.

3. The TCC devoted substantial time to formulating and drafting that plan and related documents, including a disclosure statement and trust documents. In LTL 1.0, once the Court denied the TCC's motion to dismiss, the TCC was standing by, ready to offer talc victims an alternative solution if or when the Debtor filed J&J's preferred plan and attempted to move forward with solicitation. The Debtor in LTL 1.0 never filed a plan in LTL 1.0, and its case was dismissed by the Third Circuit's mandate. The TCC, thus, had no occasion to unveil its competing plan.

4. Now in LTL 2.0, the Debtor has filed a plan of reorganization to implement J&J's alleged deal with certain law firms that claim to represent talc claimants. The Debtor's new mantra for LTL 2.0 is: **take it to a vote**![2] But if the Court determines that a plan process will proceed and victims are going to vote, they deserve a choice—a real choice.

---

[2] See Apr. 11, 2023 Hr'g Tr. 21:19-24 ("If this opposing handful of firms are so sure that LTL's support is all a fabrication, they should welcome a quick plan confirmation process and an opportunity for claimants, and I say claimants not law firms, to vote on a proposed plan."); and 111:9-10 ("And our response to that, Your Honor, is take it to a vote. Take it to a vote.")

3

5. The TCC is prepared to propose a chapter 11 plan that ensures that talc claimants who are suffering currently, and in the future, receive fair compensation under a comprehensive and transparent distribution scheme. The TCC's plan and related trust distribution procedures establish fixed criteria and common parameters for payments to claimants, ensuring a level playing field for all present and future victims while preserving all the due process rights of all talc claimants. The TCC's plan is consistent with the patterns and practices of trusts established over the past 40 years, adjusted appropriately for the funding available from Holdco and/or J&J.

6. Under the TCC's plan, the Seventh Amendment jury trial rights of talc plaintiffs will remain intact, as they must. All eligible victims who want to settle will be able to do so based on Court-approved procedures that produce consistent outcomes. Victims who are ineligible or who do not want to settle would be permitted to pursue their claims in the tort system. The TCC's plan implements a process that provides meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties.

7. This Court previously ruled in LTL 1.0 that if the Debtor were to file a plan, "the Court is not going to act on that plan for at least 15 days, to allow the Committee to come in and show cause before the Court why there should be competing plans." Hr'g Tr. May 4, 2022 at 90:1-10. About two and a half months later, the Court again previewed its willingness to entertain more than one plan once the case progressed to the plan process stage.[3] And, on May 16, 2023, in LTL 2.0, this Court specifically invited the TCC to file a motion to terminate exclusivity by June 5, 2023 so that the TCC could finally preview its chapter 11 plan to this Court.

---

[3] *See* Hr'g Tr. July 28, 2022 at 15:25-16:4 ("Returning to the plan process, if I do extend exclusivity, I do intend to fully explore the merits of allowing competing plans in which both, or all sides actually, can put forward their best case in seeking votes from the claimants.").

4

8.      The Debtor's first bankruptcy was filed on October 14, 2021—over 18 months ago, which is the maximum period allowed under section 1121(d)(2) of the Bankruptcy Code for extending a debtor's exclusive period for filing a chapter 11 plan. While LTL's re-filing on April 4, 2023 technically reset the clock, LTL's second bankruptcy is effectively an attempt to continue its first bankruptcy—the stated objective remains the same.[4]

9.      Other than deliberately terminating the 2021 Funding Agreement to try to create financial distress, LTL remains the same faceless entity that it has always been—a J&J creation under J&J's absolute control and designed to satisfy J&J's agenda of relieving itself of its independent, non-derivative talc liability for which it has more than enough ability to satisfy in the ordinary course, now and into the future. *See In re LTL Mgmt., LLC*, 64 F.4th 84, 110 (3d Cir. 2023) ("[LTL was] created to file for bankruptcy.").

10.     The TCC is prepared to show why LTL's plan is not confirmable under section 1129 of the Bankruptcy Code and applicable Third Circuit case law. But if LTL is allowed by this Court to move forward with its plan and a vote at some point—and if the views of the talc claimants are truly of paramount importance—then the TCC should be permitted to file a competing plan of reorganization and disclosure statement to give claimants a choice, *i.e.*, to enable a real choice and an informed vote.

11.     LTL cannot credibly claim to support the right of victims to vote and, at the same time, attempt to object to the inclusion of other candidates in the election. Vigorous opposition to this Motion by LTL will only prove that LTL does not actually support a fair vote—LTL wants a

---

[4]  *Compare Decl. of John K. Kim in Support of First Day Pleadings* ("Kim Declaration 1.0") [Dkt. No. 5 in Case No. 21-30589] ("The Debtor further concluded that this chapter 11 case offered the only alternative for equitably and permanently resolving all current and future talc related claims against it."); *with Decl. of John K. Kim in Support of First Day Pleadings* ("Kim Declaration 2.0") [Dkt. No. 4] ("The Debtor is filing for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing: to fully, equitably and efficiently resolve all current and future talc-related claims.").

5

rigged election. The TCC's plan would be vastly superior to LTL's plan and would afford talc claimants—both current and future—with a superior recovery. In this case and under these circumstances, cause exists for the TCC to be permitted to file its chapter 11 plan and disclosure statement.

## JURISDICTION AND VENUE

12. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 1121(d) of the Bankruptcy Code.

## RELIEF REQUESTED

13. By this Motion, the TCC seeks an order, pursuant to section 1121(d)(1) of the Bankruptcy Code, terminating the Debtor's exclusive period to file a chapter 11 plan and solicit acceptances thereof under section 1121(a) so that the TCC can file a chapter 11 plan and disclosure statement and solicit votes.

## ARGUMENT

14. Section 1121 of the Bankruptcy Code clearly recognizes that there comes a point in every chapter 11 case at which the parties should be placed on equal footing. *See* 11 U.S.C. § 1121; *In re Pub. Serv. Co. of New Hampshire*, 99 B.R. 155, 176 (Bankr. D.N.H. 1989) (noting that a "level playing field is essential in the present circumstances of this case to foster a consensual plan."). It is time that the playing field be leveled between LTL (as the entity forged by J&J for the sole purpose of filing this bankruptcy) and the tens of thousands of talc claimants suffering and dying due to the actions of LTL's affiliates, J&J and JJCI. *See LTL Mgmt.,* 64 F.4th at 110 ("[LTL] was] created to file for bankruptcy.").

6

15. As the Court knows, LTL has no purpose other than paying talc claims. One of the fundamental reasons for providing a debtor with exclusive periods—protecting a debtor's reorganization efforts—is therefore inapplicable in this case. *See*, *e.g.*, *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600-01 (Bankr. S.D.N.Y. 2014) (holding no cause to extend exclusive period where the debtor was a "non-operating company" whose sole business was to manage "portfolio … of stock in three technology companies," had "no other assets," and "no business to restructure."); *In re Sharon Steel Corp.*, 78 B.R. 762, 766-67 (Bankr. W.D. Pa. 1987) (holding no cause to extend exclusive period where the debtor's major plant operations were in imminent danger of being shut down).

16. Meanwhile, the resource that exclusivity takes from talc claimants—time—is their very scarcest resource. Claimants have died (and continue to die) with their cases against LTL's affiliates J&J and JJCI on hold since LTL 1.0 was commenced (notwithstanding a brief 131-minute window between dismissal of LTL 1.0 and the filing of LTL 2.0). Even though the injunction issued by this Court in LTL 2.0 is more limited, it still holds the MDL in abeyance and prevents any trials (with one exception).

17. This Court has itself, in LTL 1.0, recognized that LTL should not be granted the statutory maximum exclusivity period. *See* May 4, 2022, Hr'g Tr. 89:16-18 ("Now, I don't even want to think about going to the maximum that the Code allows of 18 months.") Since the date of LTL's first bankruptcy filing, over 18 months have now passed—meaning that the very scenario that this Court did not want to happen has now occurred.

18. LTL contends that its version of "mediation"—namely, negotiations in the shadows away from the TCC and MDL leadership—produced a "settlement" that it is ready to implement through a chapter 11 plan that binds all current and future talc claimants to J&J's desired 25-year

7

payment scheme. But the TCC can and will propose a better plan—a confirmable plan (unlike the Debtor's proposed plan) that affords talc claimants a superior recovery. As set forth below, the current circumstances provide ample "cause" within the meaning of section 1121(d)(1) to terminate exclusivity. The Court should terminate LTL's exclusivity periods and permit the TCC to present its plan to resolve this case.

        **A.**        <u>**Legal Standards Governing Exclusivity Under Section 1121(d)(1)**</u>

19. Section 1121 of the Bankruptcy Code describes who may file a Chapter 11 plan and the period during which that right is reserved for the debtor alone. Although section 1121(b) grants a debtor the exclusive right to file a plan during the first 120 days following the petition date, section 1121(d)(1) further provides that "the court may for cause reduce or increase" the debtor's exclusivity periods. 11 U.S.C. § 1121(d)(1).

20. The Bankruptcy Code does not define "cause" for modifying the exclusivity period, leaving the decision to the discretion of the courts on a case-by-case basis. *See In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995) (Section 1121(d)(1) "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of 'cause.'") (citing *In re Kerns*, 111 B.R. 777, 781 (S.D. Ind. 1990)); *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific."); *In re Lehigh Valley Prof'l Sports Club, Inc.*, No. 00–11296, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under Section 1121(d) is committed to the sound discretion of the bankruptcy judge); *Sharon Steel*, 78 B.R. at 763-64 ("Congress has left the meaning of the phrase 'for cause' to be determined by the facts and circumstances in each individual case.").

8

21. In determining whether cause exists to terminate exclusivity, Courts have identified a variety of factors to consider, including, among others: (1) whether the debtor has made progress in negotiations with stakeholders; (2) whether the debtor has demonstrated the reasonable prospect for the filing of a viable plan; (3) whether terminating exclusivity will move the case forward; and (4) the "principal parties' acrimonious relations," and whether stakeholders have lost confidence in the debtor. *See, e.g., In re Texas Extrusion Corp.*, 68 B.R. 712, 725 (N.D. Tex. 1986), *aff'd sub nom. Matter of Texas Extrusion Corp.*, 836 F.2d 217 (5th Cir. 1988), and *aff'd sub nom. Matter of Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988); *Express One Int'l*, 194 B.R. at 100 (citing *In re Grand Traverse Dev. Co.*, 147 B.R. 418 (Bankr. W.D. Mich. 1992)); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re Wisconsin Barge Line, Inc.,* 78 B.R. 946, 948 (Bankr. E.D. Mo. 1987).

**B.    The Debtor Has Failed to Make Meaningful Progress in Negotiations with Stakeholders**

22. LTL will be quick to claim that it has obtained meaningful progress in negotiations with stakeholders. But this is an illusion, as this Court has become aware. As litigation over the preliminary injunction revealed, not a single talc claimant has signed a plan support agreement. J&J merely has commitments from a hand full of law firms, few of which have ever even filed a talc lawsuit or tried one to verdict or settlement, to recommend to their clients that they support J&J's plan. Moreover, it is far from clear whether the Debtor's proposed plan enjoys the support of law firms that signed Plan Support Agreements. *See* May 16, 2023 Hr'g Tr. 21:13 (statement by Mr. Hansen that "we have issues with" LTL's plan).

23. Assuming, *arguendo* that these clients hold compensable claims against LTL (about which the TCC has considerable doubts), the TCC questions just how much support LTL

9

will be able to garner for J&J's plan, notwithstanding any recommendation from counsel, given how little talc claimants will ultimately recover and when (if ever) payments will be made.

24. It is no secret that J&J conducted the settlement discussions with these law firms even though the Debtor here is LTL. That creates an obvious conflict for LTL, which has a fiduciary duty to obtain the best recovery it can for its creditors. Moreover, several of the settling law firms that have pledged their allegiance to J&J through its contrived subsidiary (the Debtor, LTL) are strangers to the pre-bankruptcy history of this tort, the MDL, or any other consolidated litigation, and have never filed a single talc-related lawsuit against LTL, its predecessor or J&J. Further, J&J, in negotiating with these firms, never asked if the attorneys had reviewed a pathology report or verified that the disease in question is recognized by scientific studies or by the *Daubert* ruling in the MDL that J&J procured. LTL appears to be trying to stuff the voting box by expanding the definition of ovarian cancer to include non-ovarian gynecological cancers for which there is no scientific support or causal link to J&J's talc products. The U.S. Trustee's office, which is highly active in the *Imerys* bankruptcy as well as in this case and is familiar with the personal injury talc claims pool, has similarly expressed doubt as to whether LTL's new claimant numbers could possibly be accurate. *See* Apr. 18, 2023 Hr'g Tr. at 37:20-38:12, 300:3-305:21.

25. In contrast, more than 100 law firms representing ovarian cancer and mesothelioma claimants oppose LTL's plan to save J&J from its own independent liability for injuries J&J directly caused to talc victims. Most of these law firms have been active participants in the federal MDL or state courts for years, have filed talc claims against J&J and its affiliates, and represent talc claimants with cancer diagnoses that have a demonstrated scientific link to exposure to J&J's toxic products. The TCC can confirm that not a single law firm that was placed on the Plaintiffs' Steering Committee in the MDL supports the J&J deal or this bankruptcy case. And only four (4)

10

law firms identified by LTL in the list of the Top 30 Law Firms that represented talc claimants filed in the first bankruptcy—Onder Law, Nachawati Law Group, Johnson Law Group, and Trammell PC—have apparently pledged their allegiance to J&J's plan even if it provides their clients with a materially inferior recovery than the alternatives.

26. Negotiating in the shadows with a minority group does not show substantial progress—just the opposite. The fact that LTL at the behest of J&J ignored its fiduciary duties to creditors and went behind the TCC (which has a fiduciary duty to all the Debtor's talc claimants) to create the illusion of claimant support speaks for itself. However, if LTL truly believes that it has the support of over 75% of the claimants who will be eligible to vote, and that its plan is the best option for talc claimants, then it should welcome and embrace the opportunity to compete with the TCC's plan. If this Court is going to accept LTL's invitation that a vote take place, then the talc claimants should be afforded an opportunity to vote on a creditor plan presented by the committee that represents them, and which creditor plan would provide them with a superior recovery than the plan offered by LTL.

### C. The Debtor Has Not Shown a Reasonable Prospect of Filing a Viable Plan

27. The legal obstacles to confirming LTL's (and J&J's) desired plan are insurmountable. Has LTL explained how J&J can benefit from a channeling injunction for its own direct and independent liability in the face of the Third Circuit's opinion in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004), or how the best interest test under 11 U.S.C. § 1129(a)(7) can be satisfied for a non-consenting talc claimant who would be able to pursue a half-trillion-dollar company absent the Debtor's suggested plan? It seems not.

28. A primary purpose of LTL's bankruptcy is to create delay. Due to the stay preventing any trials (but one) to go forward in state courts and preventing any activities at all in

11

the MDL, J&J benefits from every day LTL spends in bankruptcy. Prior to bankruptcy J&J had not only suffered material defeats on the merits in the tort system, but it was also incurring legal expenses through trial and appeal. Bankruptcy was the perfect refuge. The Texas Two Step is designed to create a "win-win" situation for J&J. Either the victims acquiesce in a pitiful settlement J&J would find acceptable, or J&J uses its shill, LTL, to create years and years of delay, all without the need to address the thousands of sick and dying victims of its toxic product.

29.    While it waits for capitulation, J&J keeps its money, avoids litigation in the tort system, and can continue to pay dividends and operate without any Bankruptcy Court oversight. J&J will not suffer any more adverse rulings or monetary judgments. And, in the meantime, J&J's stock price rises. The tort victims, on the other hand, will continue to suffer and die without receiving compensation. Time is an obvious and significant leverage point for J&J, a company that is already over 135 years old and could theoretically exist in perpetuity, in stark contrast to a terminally ill cancer victim whose days have been involuntarily numbered by J&J's deceptions. J&J currently has no incentive to reach a fair and reasonable agreement given this power dynamic.

30.    Tellingly, J&J's obligation to fund a settlement under the new agreements—executed on April 4th in the two-hours while LTL was briefly outside of bankruptcy—does not arise until there is a final, non-appealable order confirming J&J's desired plan. J&J thus has an incentive to offer a plan that has no chance of surviving appeal but creates further delay and litigation. Terminating exclusivity will change the calculus—if LTL puts forward a placeholder plan that has no hope of being confirmed, the consequence will be that the TCC goes forward with its plan that would actually provide fair and equitable compensation to victims.

12

### D. Allowing the TCC to File a Plan Will Move the Case Forward

31. Allowing the TCC to file a plan and disclosure statement will move the case forward (assuming it is not dismissed). The termination of exclusivity means that J&J would no longer have exclusive control of the case (and the leverage afforded by the disparate impact of the passing of time is mitigated). Of course, the TCC submits—for all the reasons stated on the record—that this case should be dismissed.

32. But if LTL 2.0 survives dismissal, the result cannot be that LTL maintains the exclusive right to file a plan for the next 18 months. This would only enable LTL, and through it, J&J, to achieve 18 more months of delay (36 months in total), clearly well beyond what Congress has stated is the maximum exclusivity period a debtor should have. The only way to avoid this over-reaching by a debtor, and its solvent ultimate parent, is to terminate exclusivity and permit the TCC to file its plan and disclosure statement.

### E. Talc Claimants Do Not Have Confidence in the Debtor

33. The TCC has no confidence in LTL's ability or motivation to steer this case to a value maximizing conclusion. All of Jones Day's Texas Two Step cases have largely followed the same script. *Bestwall*, *Aldrich*, and *DBMP* all filed for bankruptcy following a divisional merger under Texas law. *See In re Bestwall LLC*, Case No 17-31795 in Bankr. W.D. N.C.; *In re Aldrich Pump LLC*, Case No. 20-30608 in Bankr. W.D. N.C.; *In re DBMP LLC*, Case No. 20-30080 in Bankr. W.D. N.C. All three debtors are still in bankruptcy having made no meaningful progress towards the confirmation of a plan. This is by design.

34. LTL is J&J's faceless servant. LTL is incapable of acting in a manner contrary to J&J's interests, which was perhaps most obviously demonstrated by the Debtor's facially absurd conclusion that the 2021 Funding Agreement was "void or voidable" following the Third Circuit's

13

order to dismiss LTL 1.0 for bad faith. LTL has no mind separate and apart from J&J as its personnel are current or former J&J employees. LTL is an entity controlled by J&J, its ultimate parent and has no ability or desire to act on its own. LTL has utterly failed to honor its fiduciary duties to its creditors, preferring J&J's interests over all others. J&J, as the ultimate decisionmaker, has no incentive to make progress or to pay what it and LTL owe talc victims, and certainly has no intention of paying talc claimants what they would recover in the tort system—a cost J&J, with its half-trillion-dollar value, can well afford.

### F. Terminating Exclusivity Will Not Prejudice the Debtor

35. Finally, terminating the exclusivity period will not prejudice LTL because it does not prevent LTL from proposing its own chapter 11 plan; instead, it simply opens the process for competing proposals and levels the playing field. *See In re R.G. Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the exclusive right to file a plan does not affect its concurrent right to file a plan."); *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) (denial of request for extension of the exclusive period is not "a death knell" for a debtor's reorganization; the debtor "remains free to take as long as it feels appropriate to develop and propose its own plan," though from that point onward, creditors have the same rights). In fact, LTL has now filed its plan reflecting its views on how best to compensate talc claimant harmed by J&J's products.

36. If LTL is serious about confirming a chapter 11 plan and believes that the talc claimants should be permitted to vote on the best plan available, then it should welcome the opportunity to prove that its plan is truly the best plan for talc claimants. In the words of Mr. Gordon, "[t]ake it to a vote." *See* Apr. 11, 2023 Hr'g Tr. 111:9-10.

14

### G. The TCC Plan Is Fully Developed and Ready to File

37. Since the Court has yet to terminate exclusivity, the TCC cannot file its plan. But if this Court does enter an order terminating exclusivity, the TCC will file its plan, disclosure statement, trust distribution procedures, trust agreement, solicitation procedures, form of releases, ballots, and all required notices after the entry of such order. The TCC's plan and plan documents can be filed in very short order. The TCC's plan provides a far better resolution for creditors of this estate than LTL's plan, which advances the interests of LTL's corporate family to the detriment of LTL's legitimate creditors and in derogation of its obligations to its creditors.

### WAIVER OF MEMORANDUM OF LAW

38. The TCC respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the TCC relies is incorporated herein and the Motion does not raise any novel issues of law.

### NOTICE

39. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Debtor; (c) the Future Talc Claimants' Representative and her counsel; (d) counsel to the Debtor's non-debtor affiliates, Johnson & Johnson Consumer Inc. and Johnson & Johnson; (e) the fee examiner appointed in this chapter 11 case and his counsel; and (f) any other party entitled to notice. The TCC respectfully submits that no further notice is required.

### NO PRIOR REQUEST

40. The TCC moved to terminate exclusivity in LTL 1.0. No prior request for the relief sought in this Motion has been made in this case—*i.e.*, LTL 2.0.

## **CONCLUSION**

**WHEREFORE**, based on the foregoing, the TCC respectfully requests that this Court (i) terminate the Debtor's exclusive period to file and solicit votes on a plan of reorganization under Section 1121(d)(1) of the Bankruptcy Code, and (ii) grant such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

**GENOVA BURNS, LLC**

By:  */s/ Daniel M. Stolz, Esq.*

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee of Tort Claimants*

16