UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2**

PAUL HASTINGS LLP
Kristopher M. Hansen (*admitted pro hac vice*)
200 Park Avenue
New York, New York 10166
(212) 318-6400

-and-

Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
(312) 499-6018

COLE SCHOTZ P.C.
Court Plaza North
25 Main Street, P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota (NJ Bar No. 014321986)
Warren A. Usatine (NJ Bar No. 025881995)
Seth Van Aalten *(admitted pro hac vice)*
Justin Alberto (*admitted pro hac vice*)
(201) 489-3000

PARKINS & RUBIO LLP
Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)
700 Milam, Suite 1300
Houston, Texas 77002
(713) 715-1666

*Counsel to Ad Hoc Committee of Supporting Counsel*

In re:

LTL Management, LLC,[1]

Debtor.

Case No. 23-12825 (MBK)

Chapter 11

Judge Michael B. Kaplan

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## OBJECTION OF THE AD HOC COMMITTEE OF SUPPORTING COUNSEL TO MOTION TO TERMINATE THE DEBTOR'S EXCLUSIVE PERIOD

The Ad Hoc Committee of Supporting Counsel (the "AHC of Supporting Counsel"), by and through its counsel, Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP, hereby submits this objection (the "Objection") to the *Motion of the Official Committee of Talc Claimants to Terminate the Debtor's Exclusive Period Pursuant to 11 U.S.C. § 1121(d)(1)* [ECF No. 702] (the "Motion") filed by the Official Committee of Talc Claimants (the "TCC"), and in support of this Objection, the AHC of Supporting Counsel respectfully states as follows:

### PRELIMINARY STATEMENT[2]

On May 16, 2023, in the course of denying many unique forms of relief sought by the TCC in a long series of motions, this Court expressed that it would be receptive to hearing arguments on whether to terminate the Debtor's exclusivity.[3] While the AHC of Supporting Counsel[4] recognizes the challenges that this Chapter 11 Case presents, the AHC of Supporting Counsel respectfully submits that terminating exclusivity at this time will not facilitate a resolution to the issues the Debtor is facing in this Chapter 11 Case. To the contrary, it will create a confusing dynamic, whereby the TCC will propose a plan or plans that are not confirmable and will distract the parties in interest from finalizing on voting on an amended version of the current plan on file, (as may be amended or modified, the "Plan").[5] The Plan provides a viable path to confirmation and momentum is building in support of the plan. Therefore, the prudent decision at this stage is

---

[2] Capitalized terms used but not defined in this introductory section have the meanings given below.

[3] This Court did not, as the TCC improperly suggests, express a desire to "preview" any competing plan filed by the TCC.

[4] The AHC of Supporting Counsel is comprised of law firms, including two former representative firms of members of the Official Committee of Talc Claimants in the first bankruptcy case filed by the Debtor, representing more than 58,000 talc claimants in the Chapter 11 Case, thousands of whom commenced lawsuits against the predecessor of the Debtor and its affiliates, including Johnson & Johnson, prior to the commencement of the first bankruptcy case. *See Verified Statement of Paul Hastings LLP, Cole Schotz P.C. and Parkins & Rubio LLP Pursuant to Bankruptcy Rule 2019* [ECF No. 470].

[5] *See Chapter 11 Plan of Reorganization of LTL Management LLC* [ECF No. 525].

2

to deny the Motion and allow the Debtor to continue negotiations and mediation with the TCC and other stakeholders.

Further, terminating the Debtor's exclusivity at this time is not justified, as the TCC makes no showing that would warrant such relief. There are no plausible allegations of a lack of disinterestedness, gross mismanagement, or manipulation of the bankruptcy process—i.e., the kind of allegations that, if proven, serve as the basis to appoint a trustee. In addition, the factors that courts consider when determining whether to extend or reduce exclusivity for "cause" weigh in favor of denying the Motion.

Congress created an exclusive right for debtors to propose and prosecute their own plans for a certain period of time. There is a strong presumption, supported by an important public policy, that, absent truly extraordinary, egregious circumstances, the Debtor is entitled to have "the first shot" at negotiating, formulating, and attempting to confirm a plan, and the terms of such plan are appropriately left to the Debtor's business judgment. It is the TCC's burden to show cause for termination, but it has failed to meet its burden. The analysis for terminating exclusivity weighs heavily in favor of denying the Motion.

What is more, the competing plan that the TCC claims it is ready to "unveil" is not confirmable. It is structured as the functional equivalent of a dismissal of this Chapter 11 Case. While the TCC has not yet provided specific details of its plan (which raises doubts about the viability of any such plan), the limited details gleaned from the Motion suggest that the TCC contemplates a plan that would require the Debtor and its affiliates to fund a trust for the benefit of talc claimants and, at the same time, allow each and every talc claimant to pursue the Debtor and its affiliates in the tort system. Not only would such plan lack the requisite funding to be viable, it disregards the available statutory tools enacted by Congress to fairly and equitably

3

resolve these mass tort claims. Granting the Motion will put an end to any prospect of mediation and will incentivize stakeholders to go to their respective corners to devise alternative competing plans—an outcome that will result in additional delay and litigation to the detriment of all stakeholders.

The Bankruptcy Code provides for a balancing of interests designed to promote a negotiated plan process. The Plan, which has the support of a majority of the creditors in the case, reflects the results of such a negotiated plan process. The Plan establishes a framework to continue to build consensus among all the stakeholders through negotiation and mediation during the Debtor's exclusivity period.

To date, the TCC has refused to engage in productive discussions resolving its issues with the Plan. Instead, the TCC balks at any process under which it does not wrest absolute control, and it attributes nefarious motives to the legitimate exercise by the Debtor of its statutory right to direct the process. The TCC should not be rewarded with termination of exclusivity for its refusal to participate constructively in this Chapter 11 Case.

The real driving force for seeking to file a competing plan is the TCC's conviction that any such plan would be "better" than the Plan that memorializes the settlement set forth in the plan support agreements. This is laid bare in the Motion, where the TCC states that it "cannot stand idly by while the Debtor attempts to confirm a plan." Motion at ¶2. Stated differently, the TCC's fear is not that the Plan is not confirmable. The TCC's real fear, as tacitly stated in the above line from the Motion, is that the Plan is in fact confirmable.

Termination of exclusivity is neither warranted by law nor appropriate under the circumstances of this Chapter 11 Case. The Motion shall be denied.

## ARGUMENT

1.  The exclusivity period is a statutory time period afforded solely to the Debtor under section 1121(b), subject to reduction or extension for "cause" under section 1121(d). 11 U.S.C. § 1121. The exclusivity period grants the Debtor the unqualified and exclusive right to file and solicit acceptances of a plan, providing the Debtor with a critical breathing spell, free of creditor interference. *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 221-222 (1978); *In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 131 (D.N.J. 1995) ("The exclusivity period affords the debtor the opportunity to negotiate the settlement of its debts by proposing and soliciting support for its plan of reorganization without interference—in the form of competing plans—from its creditors or others in interest.").

2.  A party in interest seeking to terminate exclusivity "bears a heavy burden" of proof to establish "cause." *Geriatrics Nursing Home*, 187 B.R. at 132; *In re Lehigh Valley Professional Sports Club, Inc.*, No. 00-11296DWS, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (emphasizing that "the burden is especially heavy"). That burden is even heavier when termination is sought during the initial exclusivity period.[6] *See In Matter of Excel Mar. Carriers Ltd.*, No. 13-23060-RDD, 2013 WL 5155040, at *1 (Bankr. S.D.N.Y. Sept. 13, 2013) (explaining that "terminating exclusivity—particularly during the initial exclusivity period is an extraordinary thing in a bankruptcy case").

---

[6] Without citing any authority, the TCC takes the position that the Debtor is no longer in its initial exclusivity period because this Chapter 11 Case is not the Debtor's first bankruptcy filing. This is not the law. As the Bankruptcy Code makes clear, Congress knew how to modify statutory time periods to account for multiple bankruptcy filings by the same debtor. *See, e.g.*, 11 U.S.C. § 362(c)(3) and (4) (limiting the effect of automatic stay); § 727(a)(8) (limiting bankruptcy discharge). Congress for good reason did not do so under section 1121(b).

I. **Termination of Exclusivity is Justified Only Where the Debtor Has Created a Major Obstacle to a Successful Restructuring.**

3. For starters, the entire thrust of section 1121(b) is to drive the restructuring process toward consensus by channeling negotiations through the debtor, as a steward for the bankruptcy estate, tasked with negotiating with key constituents. This right is the debtor's own—it is the "shield of exclusivity" that is contemplated under the Bankruptcy Code. *In re Eagle-Picher Indus., Inc.*, 176 B.R. 143, 148 (Bankr. S.D. Ohio 1994). The TCC's argument for a "level playing field" is not only fundamentally flawed,[7] but also contradicts considerations that serve as the bedrock of the Bankruptcy Code. *See id.* (expressly rejecting the argument that "a level playing field was what was contemplated by the Bankruptcy Code"). Congress decided when enacting section 1121(b) of the Bankruptcy Code that the debtor is best suited to orchestrate a reorganization process and should therefore have "a clear advantage early on in the case, unfettered by competing plans."[8] *In re Temple Retirement Cmty., Inc.*, 80 B.R. 367, 369 (Bankr. W.D. Tex. 1987); *In re Newark Airport Hotel Ltd. P'ship*, 156 B.R. 444, 451 (Bankr. D.N.J. 1993) ("The purpose of the debtor's exclusivity period is to make a chapter 11 filing attractive enough to encourage ailing businesses to seek reorganization without unduly delaying creditors.").

4. To that end, only the most extraordinary circumstances justify the termination of exclusivity. One court thoroughly examined these circumstances:

> Usually—and it's hard to say "usually" because there are not that many published opinions where exclusivity is terminated during the

---

[7] The Motion just assumes that it is somehow unfair for the Debtor to solicit its own Plan unless the TCC can solicit its competing Plan. *See* Motion at ¶10 ("[I]f LTL is allowed by this Court to move forward with its plan and a vote . . . then the TCC should"). The TCC goes so far as to describe the plan process as an "election" that is open to any "candidate" that is capable of proposing any plan, however unconfirmable, to be solicited alongside the plan proposed by the Debtor during its exclusive period. *Id.* at ¶11. According to the TCC, the claimants "deserve a choice" and a competing plan is the only way to avoid a "rigged election." *Id.* The TCC does not and cannot cite any authority here because its positions, most notably the need to "level[] the playing field," have already been uniformly rejected by courts. *Id.* at ¶14; *see also Eagle-Picher Indus., Inc.*, 176 B.R. at 148.

[8] As recently as 2005, Congress confirmed that, absent extraordinary circumstances, the debtor enjoys exclusivity for up to eighteen months. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-9, §411, 119 Stat. 23, 106-107.

6

> initial exclusive periods—the periods are terminated because of some conduct by the debtor that is short of conduct that would justify the appointment of a trustee (where the statute provides that the exclusive period is terminated automatically), but, still, troubling conduct, for example where the debtor appears to be unable to negotiate a plan because of internal conflicts, or is mismanaging the bankruptcy case short of the need to replace management, or is otherwise using exclusivity in a way that Congress didn't contemplate when it gave debtors in possession the exclusive time to propose and obtain confirmation of a plan.

*Excel Mar. Carriers*, No. 13-23060-RDD, 2013 WL 5155040, at *1. The remedy of termination is reserved for rare situations in which, for example, a debtor's plan "does not offer any serious reorganizational possibilities" or where the debtor has engaged in "gross mismanagement." *See In re Grossinger's Assocs.,* 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990); *see also In re Texaco Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988).

5.  The TCC bears a heavy burden of proof to demonstrate these extraordinary circumstances and gross mismanagement of this Chapter 11 Case. To no surprise, the TCC is unable to meet this burden, and tellingly, offers no evidence whatsoever to support any allegation that the Debtor has mismanaged the bankruptcy case in any way, let alone in an egregious manner as the law requires. Instead, the TCC relies on unsupported allegations that accuse the Debtor of "trying to stuff the ballot box"[9] and takes issue with the J&J–Debtor governance structures that are present in almost any organizational structure.

6.  Put simply, the types of egregious debtor conduct that justifies terminating exclusivity are not even remotely present here. The Debtor engaged extensively with the many major constituencies in this Chapter 11 Case, and those efforts culminated in a deal that has broad support from the tens of thousands of claimants represented through the AHC of Supporting

---

[9] Motion at ¶24. Like most of the TCC's repeated positions, these allegations were already addressed in responses to the many pleadings filed by the TCC. *See, e.g., Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss* [ECF No. 613] at ¶33-43.

Counsel. Maintaining exclusivity ensures that the Debtor remains at the center of its Plan negotiations and invites the TCC and other constituents to present the Debtor with proposals for modifications or otherwise negotiate terms of the Plan.

## II.    Creditor Angst and "Better" Plan Options Are Irrelevant.

7.    The TCC seemingly argues that creditor dissatisfaction is a sufficient basis to terminate exclusivity. None of the exclusivity factors has anything to do with a creditor's views on the Plan. Dissatisfaction with a debtor's plan, the breakdown of negotiations, and the availability of better plans with "superior recoveries" do not justify termination. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 676 (Bankr. S.D.N.Y. 2006) (explaining that "the notion that creditor constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected"); *In re Energy Conversion Devices Inc.*, 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012) (explaining that creditors being "prepared to offer more favorable plans if the court were to terminate the exclusivity period . . . does not constitute sufficient cause to cut short the debtor's window of opportunity opened by Congress"); *Excel Mar. Carriers*, No. 13-23060-RDD, 2013 WL 5155040, at *1 ("The mere fact that key players want to file a competing plan is not sufficient cause to terminate a debtor's exclusive periods."). The policy to keep the Debtor in control is so firmly established that the Debtor need not even prosecute the "best" plan. *See In re Express One Int'l, Inc.*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) (finding it is not relevant "whether some other plan may exist which provides greater recovery").[10]

8.    Further, the TCC appears to argue that "cause" turns on whether the Debtor has made progress in negotiations with the TCC. That is not and cannot be the test. "To hold otherwise

---

[10] Accordingly, the TCC's attempt to extract a rule that claimants must be permitted to vote on "the best plan available" must fail. *See* Motion at ¶36.

would permit litigious creditors to manufacture 'cause' to shorten the exclusivity period through their own unilateral actions." *Lehigh Valley Professional Sports Club*, No. 00-11296DWS, 2000 WL 290187, at *4. In this Chapter 11 Case, it is the TCC's refusal to constructively engage that has stalled progress with the TCC. Instead of rewarding the TCC for that conduct, this Court should deny the Motion, which will hopefully motivate the TCC to resolve its issues through negotiation and not litigation.

9. The TCC hardly disguises its true reasons for seeking to terminate exclusivity: to ensure that the Debtor and its affiliates "no longer have exclusive control of the case." *See* Motion at ¶31. That, of course, is not supported by the law and ignores the significant progress that the Debtor has made since commencing this Chapter 11 Case—progress that was achieved even in the face of the TCC's litigious posture. Granting the Motion would provide the TCC the *de facto* right to manufacture "cause" for termination of exclusivity through refusal to constructively participate in the bankruptcy process.

### III. The Exclusivity Factors Overwhelmingly Support Continued Exclusivity.

10. Although the Bankruptcy Code does not define what constitutes "cause" under section 1121(d), courts often apply the same factors that are considered when deciding whether to terminate exclusivity: (1) the size and complexity of the case; (2) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

9

(9) whether an unresolved contingency exists. *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *Adelphia*, 336 B.R. at 674.  In evaluating these factors, the concept of "cause" should be viewed flexibly in order to allow the debtor to reach an agreement. *See* H.R. Rep. 595, 95th Cong., 2nd Sess. 232 (1978).  The decision is left to the sound discretion of a bankruptcy court, based on the totality of circumstances presented in each case. *See Geriatrics Nursing Home*, 187 B.R. at 132.

11.     Even a cursory analysis of the exclusivity factors shows that the TCC cannot possibly carry this heavy burden, especially at this early stage of this Chapter 11 Case.  What is more, the factors actually cut in favor of preserving (or even extending) the Debtor's exclusivity.

 a. <u>Size and Complexity (Factor 1); Necessity of Time to Negotiate (Factor 2)</u>

12.     The first two factors go hand in hand, and each cuts in favor of the Debtor.  The Debtor filed for bankruptcy relief in order to resolve the tens of thousands of talc claims through the Plan, which, if confirmed, would constitute the largest settlement in any asbestos bankruptcy case, and one of the largest settlements of personal injury claims in U.S. history.  The Plan would deliver $8.9 billion in net present value to those suffering from diseases caused by their use of the talc products.  The Debtor is continuing to engage with the AHC of Supporting Counsel and other key stakeholders in order to achieve full consensus for the Plan.

13.     Given the size and complexity of this Chapter 11 Case, as well as the tens of thousands of tort actions faced by the Debtor, it is critical that the Debtor be given time to seek confirmation of its Plan.  *See In re R & G Props., Inc.*, No. 09-10876, 2009 WL 269696 at *1 (Bankr. D. Vt. Jan. 28, 2009) ("The Court finds that the amount, contentiousness, and nature of

10

the litigation in this case, compressed as it was into a very short time, makes this first factor relevant and causes it to weigh in favor of an extension of time.").[11]

      b. Good-Faith Progress (Factors 3 and 6)

14.    The third and sixth factors weigh heavily in favor of maintaining exclusivity. Less than six weeks after filing this Chapter 11 Case, the Debtor filed the Plan that it proclaims would resolve all current and future talc claims in a fair and equitable manner. The settlement under the Plan, once finalized, has support from the AHC of Supporting Counsel, which represents the majority of talc claimants in this Chapter 11 Case. And, the AHC of Supporting Counsel believes additional parties will end up supporting the Plan as we progress toward a confirmation hearing. This is precisely what "good faith progress" looks like under the third and sixth exclusivity factors. "Progress" does not mean "full agreement," but narrowing issues in good faith, which is what the Debtor has done.[12]

15.    Even if the negotiation efforts for the Plan ultimately were to fail, that is not, in and of itself, a reason to terminate exclusivity.[13] The TCC should not be permitted to point to its own intransigency and unwillingness to be constructive as a basis to terminate exclusivity.

---

[11] The Motion misplaces reliance on *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600-01 (Bankr. S.D.N.Y. 2014). There, the debtors were using the shield of exclusivity as a means to buy time for market forces to one day drive up the value of its speculative investment in a technology company. And, the exclusivity dispute there was brought to the court at the end of the initial exclusivity period. It is not entirely clear how the TCC finds *GMG* helpful to its position—what is clear is that *GMG* is a factually-distinguishable case that has no similarities to this Chapter 11 Case.

[12] To be sure, good faith progress would be more productive if the TCC was willing to engage constructively.

[13] The issues expressed by the TCC in the Motion to justify the rarely-granted remedy of termination of exclusivity are actually confirmation issues, which should not be litigated in the context of an exclusivity motion. *See In re Adelphia Commc'ns Corp.* ("*Adelphia II*"), 352 B.R. 578, 588 n.18 (Bankr. S.D.N.Y. 2006) (explaining that "the merits of the plan are to be examined at confirmation and don't play a meaningful role in the court's decision as to whether or not to terminate exclusivity"). The AHC of Supporting Counsel hesitates to follow the TCC down this rabbit hole, especially because the AHC of Supporting Counsel already responded to these points in other pleadings filed in this Chapter 11 Case. *See, e.g.*, *Ad Hoc Committee of Supporting Counsel's Reply and Statement in Support of the Scheduling Motion* [ECF No. 498]. After all, the only relevant question is whether the TCC has met its "heavy burden" to show cause for terminating exclusivity. The factors' analysis clearly shows that the TCC has not.

11

      c.   Reasonable Prospects (Factor 5)[14]

16.    This factor does not support terminating exclusivity. The bankruptcy process is iterative and often produces the best outcomes when key stakeholders have the opportunity to reach consensus and compromise. The Plan that is on file is the best path to reaching consensus and promoting compromise.

17.    Rather than attempting to reach consensus, the TCC has presented objections on the same speculative and unsupported grounds upon which it has attacked every move by the Debtor and the AHC of Supporting Counsel. The Motion reads like a merit brief against plan confirmation, focusing almost entirely on the legally and factually unsupported (and unsupportable) position that the Plan cannot be confirmed on the merits. Even if the Court were to agree—which it should not—the Debtor would still have the exclusive right to engage with stakeholders and further modify the Plan, saving the estate time and money and obviating the need to start from "square one."

18.    Either the Plan is "viable" and will proceed toward confirmation; or it is not, and the Debtor should be given an opportunity, at least during its initial exclusivity period, to modify the Plan to address any issues this Court or any other stakeholders may have regarding its "viability." *See Adelphia II*, 352 B.R. at 588 ("This factor requires only that a debtor be able to attain confirmation of at least some viable plan, not necessarily the plan currently proposed."). With the support of the AHC of Supporting Counsel, the Plan is reasonably likely to be finalized and confirmed.

---

[14] As an initial matter, the Plan is on file and therefore the focus here is on the Plan's viability, not on the prospect of filing a plan. *See Adelphia II*, 352 B.R. at 588.

        d.    <u>Pressuring Creditors (Factor 8)</u>[15]

19.    Far from pressuring creditors by stalling behind the safeguards of exclusivity, the Debtor has diligently and collaboratively worked to advance this Chapter 11 Case. The momentum that began building in negotiating the plan support agreements, now mostly memorialized in the Plan, continues to build as the Debtor is as close as it has ever been to resolving the remaining Plan issues. Based on the Debtor's track record to date, the Debtor has earned the opportunity to do so without the threat of competing plans being filed that will only serve to complicate this Chapter 11 Case, confuse tens of thousands of claimants, create more needless litigation, and destroy stakeholder value. *See R & G Props.*, No. 09-10876, 2009 WL 269696, at *3 ("Encouraging creditors to mediate differences and negotiate the terms of the plan is a salutary effort that is wholly consistent with how chapter 11 should work; it does not constitute what this Court finds to be an effort to pressure creditors to submit to the debtor's reorganization demands.") (internal quotations omitted).

20.    It is the TCC's burden to show that these factors weigh in favor of terminating exclusivity, but it has failed to meet that burden. The factors heavily weigh in favor of preserving the Debtor's exclusivity period.

**IV.**    <u>**The Plan Creates the Framework to Achieve Consensus.**</u>

21.    The Plan serves as a platform to negotiate, build consensus, and seek to gain support for a comprehensive reorganization that will generate the greatest overall value for all constituents. The claimants are aggrieved victims, and it is not surprising that there has been substantial disagreement in Plan negotiations. Nevertheless, the Plan serves as an important framework (1) to negotiate with the TCC and all other stakeholders and (2) to identify differences that can be

---

[15] As an initial matter, the Debtor is not, at this time, seeking an "extension of exclusivity," but simply opposing termination of its initial, statutorily provided exclusivity period.

13

reconciled and common ground for agreement on substantial, and hopefully all, issues in an effort to achieve unanimous support for the Plan.  That is exactly what exclusivity is intended to foster.

22. While the TCC continues to be vocal about its opposition to the Plan (since even before it saw the Plan), curiously, it also continues to refuse to provide any counterproposal, commentary, or other feedback.  Usually a motion to terminate exclusivity describes the movant's efforts to resolve plan-related issues, the failure of those efforts, and the alternative proposals offered by the movant.  That is far from what is in the Motion, which only provides subtle hints about the purportedly "superior" plan that the TCC claims it is ready to file.  As discussed above, the Debtor is negotiating with stakeholders and has established a framework to facilitate consensus.  It is the TCC that refuses to come to the table.  Terminating exclusivity will end any possibility of productive plan negotiations and will only cause stakeholders to harden their positions and move forward with competing plans to the detriment of all stakeholders.  Maintaining exclusivity is warranted and necessary to further the Bankruptcy Code's policy of encouraging consensual plans.

### V.    Terminating Exclusivity Would Not Move the Bankruptcy Case Forward.

23. "[T]he primary consideration for the court in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward." *Adelphia II,* 352 B.R. at 590.  "[C]ontext is what is most important and . . . [is] the ultimate consideration." *Excel Mar. Carriers*, No. 13-23060-RDD, 2013 WL 5155040, at *2.

24. Putting things into context here, the Debtor and the AHC of Supporting Counsel reached an agreement to permanently, equitably, and efficiently resolve all talc claims.  The breadth of support validates the Plan and provides a clear path toward a prompt resolution of this Chapter 11 Case.  That is a critical milestone that will allow claimants to be compensated for their

injuries expeditiously. The Debtor is ready to move the plan confirmation process forward and allow claimants to vote on the Plan. Terminating exclusivity in the face of such progress would delay this case, not move it forward. *See Adelphia II*, 352 B.R. at 590.

25. Preserving exclusivity would ensure that this Chapter 11 Case does not turn into a chaotic and costly competing plan process, which would be a particularly poor outcome, given the broad support for the Plan and the prospect for other parties to join in that support through the ongoing mediation. A competing plan process would certainly put an end to ongoing mediation and rule out the prospect of any consensual outcome. Now is the time to allow the Plan to move forward without the interference and confusion caused by a competing plan.

**WHEREFORE**, the AHC of Supporting Counsel respectfully requests that this Court deny the Motion and grant such other and further relief as this Court finds just and appropriate.

Dated: June 12, 2023　　　　　　　　　　**COLE SCHOTZ P.C.**

　　　　　　　　　　　　　　　　　　　　*s/ Michael D. Sirota*
　　　　　　　　　　　　　　　　　　　　Michael D. Sirota (NJ Bar No. 014321986)
　　　　　　　　　　　　　　　　　　　　Warren A. Usatine (NJ Bar No. 025881995)
　　　　　　　　　　　　　　　　　　　　Seth Van Aalten (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Justin Alberto (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Court Plaza North, 25 Main Street
　　　　　　　　　　　　　　　　　　　　Hackensack, NJ 07602-0800
　　　　　　　　　　　　　　　　　　　　(201) 489-3000
　　　　　　　　　　　　　　　　　　　　Email:  msirota@coleschotz.com
　　　　　　　　　　　　　　　　　　　　　　　　wusatine@coleschotz.com
　　　　　　　　　　　　　　　　　　　　　　　　svanaalten@coleschotz.com
　　　　　　　　　　　　　　　　　　　　　　　　jalberto@coleschotz.com

　　　　　　　　　　　　　　　　　　　　– and –

`

**PAUL HASTINGS LLP**

Kristopher M. Hansen (*admitted pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Email:  krishansen@paulhastings.com

Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6000
Email:  mattmurphy@paulhastings.com
          mattmicheli@paulhastings.com

– and –

**PARKINS & RUBIO LLP**

Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)
700 Milam, Suite 1300
Houston, TX 77002
Telephone: (713) 715-1660
Email:  lparkins@parkinsrubio.com
          crubio@parkinsrubio.com

*Counsel to AHC of Supporting Counsel*