| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Gregory S. Kinoian, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>gkinoian@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Local Counsel for the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY  10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA  02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Co-Counsel for the Official Committee of Talc Claimants* |
| **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Rachel S. Morse, Esq.<br>jmassey@masseygail.com<br>rmorse@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Proposed Special Counsel for the Official Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Richard G. Haddad, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>David A. Castleman, Esq.<br>mcyganowski@otterbourg.com<br>rhaddad@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>dcastleman@otterbourg.com<br>230 Park Avenue<br>New York, NY  10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* |

|  |  |
|---|---|
| In re:<br><br>**LTL MANAGEMENT LLC,** [1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Honorable Michael B. Kaplan |

**REPLY IN SUPPORT OF
MOTION OF THE OFFICIAL COMMITTEE OF
TALC CLAIMANTS TO TERMINATE THE DEBTOR'S
EXCLUSIVE PERIOD PURSUANT TO 11 U.S.C. § 1121(d)(1)**

> **THE TCC HAS ASSERTED AND CONTINUES TO ASSERT THAT THE DEBTOR'S CHAPTER 11 CASE WAS FILED IN BAD FAITH AND SHOULD BE DISMISSED. THIS MATTER IS PENDING BEFORE THIS COURT. ANY CHAPTER 11 PLAN THAT MAY BE PROPOSED BY THE TCC ASSUMES, *ARGUENDO*, THAT THE DEBTOR'S CHAPTER 11 CASE IS NOT DISMISSED AS A BAD FAITH FILING. THE TCC RESERVES ALL RIGHTS TO CONTINUE TO ARGUE THAT DISMISSAL IS REQUIRED UNDER THE BANKRUPTCY CODE**.

The Official Committee of Talc Claimants (the "TCC") in the above captioned case, by and through its undersigned counsel, hereby submits this reply (the "Reply") in support of its motion seeking entry of an order terminating the Debtor's exclusivity period, pursuant to section 1121(d) of the Bankruptcy Code, to allow the TCC to file and prosecute a chapter 11 plan (Dkt. No. 702) (the "Motion"). In support of the Motion, and in response to LTL's objection (Dkt. No. 753) (the "Objection"), the TCC respectfully states as follows.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2

## INTRODUCTION

1. The TCC is restricted at this time. Until exclusivity is terminated, the TCC cannot file its plan and disclosure statement. If the TCC had done so with its Motion, LTL could have argued that the TCC acted improperly. If the Debtor wants a vote, talc claimants should be afforded an opportunity to make an informed decision as to the plan avenue that is best for them. Clearly and predictably, the Debtor does not want that ever to occur.

2. The TCC expects that LTL's second bankruptcy will be dismissed. But the TCC believes that is it necessary and appropriate for it to address LTL's argument that "[u]nder the funding agreements between and among the Debtor, Johnson & Johnson (NA) Inc. and Johnson & Johnson, ***no funding is available for the TCC's undisclosed plan***." Objection at p. 3 (emphasis added). LTL is incorrect. Through the Funding Agreements, the TCC's plan has access to funding to pay talc claims (present and future) **in full**.

3. Since J&J remains liable for at least $61.5 billion in committed funding (through avoidance of the 2021 Funding Agreement's termination; the 2023 Funding Agreement provides for up to $30 billion or more in funding from Holdco), there is no legitimate reason why talc claimants should be forced to accept a plan that artificially caps the liability of one of the most solvent corporations in the world. The TCC's plan imposes no such cap. Rather, the TCC's plan would provide for the fair and equitable resolution of all talc claims.

4. As LTL represented to the Court, LTL's rights under the Funding Agreements—whether it be the 2023 Funding Agreement and/or the 2021 Funding Agreement (once restored)—can be used to fund a plan proposed by the TCC.[2] LTL's rights under the Funding Agreements

---

[2] *See* Feb. 18, 2022 Hr'g Tr. 64:11-15 ("THE COURT: So just to clarify, if a plan is confirmed and it's a TCC plan as a proponent, the funding agreement – and they can include in that plan the funding agreement? MR. GORDON. Yes. I mean if – THE COURT: Without violating any assignment provision? MR. GORDON: Correct. Because it's not being assigned.").

3

are property of LTL's estate. *See* 11 U.S.C. § 541(a) & (c). Such rights **can** be transferred to a post-confirmation trust **without J&J's or Holdco's consent**. *See* 11 U.S.C. § 1123(a)(5)(B); *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359 (3d Cir. 2012).

5. This Court already held that: "[W]ith the bankruptcy filing, the **bankruptcy estate succeeds to all rights held by [the] Debtor**, with the oversight and jurisdiction of this Court as needed for enforcement. Specifically, the **resources under the Funding Agreement will be available upon confirmation of a plan**—whether or not the plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under § 524(g)." *In re LTL Mgmt., LLC*, 637 B.R. 396, 423 (Bankr. D.N.J. 2022) (emphasis added).

6. Consistent with the Bankruptcy Code, Third Circuit precedent, the Funding Agreements, this Court's rulings, and LTL's admissions in pleadings, in Court and in their witnesses sworn deposition and Court testimony, the TCC's plan can make the resources under both Funding Agreements available to provide a "meaningful opportunity for justice," "comprehensive, equitable, and timely recoveries for injured parties," and a "viable and fair settlement." *Id.* at 414.

7. This Court's objectives can be accomplished using a tried and tested plan structure that transfers LTL's rights under the Funding Agreements to a plan trust consistent with the Third Circuit's holding in *Federal-Mogul*. The TCC's plan—under which J&J and New JJCI/Holdco will be **held to their commitments under the Funding Agreements** to provide the funding necessary to ensure that talc claimants (present and future) receive fair and equitable compensation—is neither complex nor controversial and can be easily confirmed by this Court. LTL's assertions to the contrary are nothing more than wishful thinking.

## REPLY

8. For the Court to understand why the TCC's plan is feasible and has access to funding to pay talc claims, the Court must understand how the TCC's plan addresses two issues: (a) how thousands of talc claims can be liquidated in a fair and efficient manner, and (b) how talc claims once liquidated by final settlement or judgment can be paid using the funding promised under the Funding Agreements.

### A. The Liquidation of Talc Claims by a Chapter 11 Plan Trust

9. Following from decades of mass tort bankruptcies, the talc claims here—like tort claims in nearly every mass tort case where a plan has been confirmed—can be liquidated by a post-confirmation trust. The Third Circuit summarized how this works in *Federal-Mogul*: "The primary bankruptcy innovation for addressing mass tort liability has been the post-confirmation trust, which first appeared in the bankruptcy proceedings of the Johns-Manville Corporation, the largest producer of asbestos-containing products." 684 F.3d at 359.

10. A post-confirmation trust—so called because it springs into existence **post-confirmation** after a chapter 11 plan has been confirmed—assumes the debtor's obligation to pay present and future tort claims. The tort claims are channeled to the trust and the trust assumes the debtor's liability for such claims.

11. As the Third Circuit explained, the trust is "governed by trustees who manage financial affairs, while a committee of advocates, consisting of representatives of current and future claimants, must approve substantial trust activities." *Id.* at 360. The oversight committee typically has no role in how tort claims are processed or liquidated. The trustees are independent and can employ claims administrators to assist with the claims resolution process.

12. Of course, "all trusts have Trust Distribution Procedures (TDPs) to govern how claims are processed, settled, and compensated," which "procedures are approved as part of the bankruptcy reorganization plan[.]" *Id.* TDPs typically include a gating criterion used to determine which claimants are eligible for settlement and compensation. And TDPs often include a claims matrix and scaling factors used to determine the value of eligible claims. As the Third Circuit explained, "[i]n function, the trusts are similar to quasi-administrative remedies that employ valuation grids to compensate injuries, subject to individualized and judicial review." *Id.* at 362.

13. Once a tort claim is submitted and processed, the trust will issue an award, which is the equivalent of a settlement offer. Tort victims can accept the award and enter into a final settlement with the trust (standing in the debtor's shoes). Such a final settlement is similar to a settlement entered into between the claimant and the debtor outside of bankruptcy. In both instances, the settlement is considered voluntary. And in both instances, the settlement fixes or liquidates the debtor's liability to the tort claimant.

14. Claimants can elect to liquidate their claims by a judgment of a court of competent jurisdiction. As this Court found, "[t]he Seventh Amendment jury rights of talc plaintiffs" should "remain intact under a properly drafted and approved plan." *LTL Mgmt.*, 637 B.R. at 413; *accord* 28 U.S.C. § 1411(a) (Title 11 does "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.").

15. This "quasi-administrative scheme," as the Third Circuit called it, has become a staple of virtually every chapter 11 plan confirmed in a mass tort case since *Johns-Manville*, including cases that do not involve asbestos claims. *Federal-Mogul*, 684 F.3d at 360. "There is substantial similarity among the various trusts in structure and function." *Id.*

16. This plan structure is not new. This structure solves a problem common to mass tort cases that this Court identified—how to liquidate a large number of tort claims in an efficient and fair manner without overwhelming the "capacity for the state and federal courts to protect" current claimants and "future claimants, whose claims may surface in the next half century given the acknowledged latency period for the types of cancers at issue." *LTL Mgmt.*, 637 B.R. at 414.

17. In most mass tort cases, the Bankruptcy Court is not asked to rule on the merits of a single tort claim involving personal injury or wrongful death. In fact, doing so would be beyond a Bankruptcy Court's jurisdiction.[3] In most mass tort cases, claims are not liquidated by final settlement or judgment until after the effective date when the bankruptcy proceeding is no longer pending. For this reason, the Bankruptcy Court's role in liquidating claims is limited.

18. The TCC's plan does not reinvent the wheel and would implement the classic trust structure discussed by the Third Circuit in *Federal-Mogul* and used to confirm chapter 11 plans in recent mass tort cases. The TCC's plan would provide for the creation of a post-confirmation trust. The trust would be governed by trustees and an oversight committee consisting of representatives of current and future talc claimants. This committee would have no say in how talc claims are submitted, processed, liquidated, and paid. That would be handled by independent trustees and claims administrators based upon Court-approved documents.

19. The TCC's plan includes TDPs, which procedures would be approved as part of the plan. The TDPs include a gating criterion used to determine which claimants are eligible for compensation. The TDPs include a claims matrix and scaling factors used to determine the value

---

[3] *See* 28 U.S.C. § 157(b)(2)(B) ("liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims" for the "purposes of distribution" is not a core proceeding); 28 U.S.C. § 157(b)(5) (the "district court shall order that personal injury and wrongful death claims shall be tried" in a specified district court).

7

of mesothelioma and ovarian cancer claims. The TDPs also include procedures for resolving governmental talc claims, talc supplier claims, and indirect talc claims.

20. The trustees could not issue awards to claimants who are ineligible for compensation. And the trustees could not issue awards to holders of mesothelioma and ovarian cancer claims that exceed certain maximum amounts—both as prescribed by the TDPs.

21. The TDPs would accomplish the Court's goal of creating "a far simpler and streamlined process—both for present and future cosmetic talc claimants." *LTL Mgmt.*, 637 B.R. at 415. Victims who want to enter into final settlements will be able to do so in accordance with Court-approved procedures that produce fair and consistent outcomes.

22. The TDPs also include a tort out and would "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." 28 U.S.C. § 1411(a). Victims who are ineligible or do not want to settle would be permitted to pursue their talc claims in the tort system against J&J without restriction. To accept a settlement award, however, claimants would be required to execute a release like the release that a claimant would be required to sign if he or she were voluntarily entering into a settlement with LTL outside of bankruptcy.

23. LTL cannot logically object to these aspects of the TCC's plan. Instead, LTL argues that there is no funding available to pay talc claims under the TCC's plan. In LTL's view, the Funding Agreements are not available under a plan proposed by the TCC. But LTL is wrong.

**B.    Using the Resources Available under the Funding Agreements to Pay Talc Claims Once Such Claims Are Liquidated**

24. After discussing the structure of post-confirmation trusts, the Third Circuit went on to address the primary issue in *Federal-Mogul*, which was whether insurance or indemnification

8

rights can be transferred to a trust without the insurer's consent where the contract at issue contain anti-assignment or consent-to-assignment provisions. 684 F.3d 355.

25. The tortfeasor in *Federal-Mogul* had insurance, just like LTL has a Funding Agreement. *Id.* at 363. The insurance in *Federal-Mogul* provided coverage for personal injury claims arising from exposure to asbestos. The personal injury claims could have been liquidated by a judgment against the tortfeasor in the tort system. Or the personal injury claims could have been liquidated by a reasonable settlement. In either event, the insurer could have been required under the policy's terms to reimburse the debtor/insured for the amount of the loss or the liquidated amount of the claims. The insurer's obligation to respond to claims was defined by the policy—*i.e.*, the scope of the coverage and the policy's limits (per claim and aggregate).

26. The issue in *Federal-Mogul* was what happens to a debtor's insurance rights when a debtor files for bankruptcy and the chapter 11 plan provides for the creation of a post-confirmation trust to liquidate and pay tort claims. The insurers wanted a windfall—which was apparent from their objections to the chapter 11 plan. *See id.* at 380-81.

27. If the insurance rights remained with the debtor, but the trust assumed the tort liability, the insurers could argue that the policies could not be triggered. Tort claims liquidated post-effective date after the bankruptcy proceeding was no longer pending would give rise to a claim against the trust and not against the reorganized debtor.

28. The insurers, however, did not want the trust to be able to exercise the insurance rights either. The insurers argued that the anti-assignment provisions in the policies meant that the rights could not be transferred to the plan trust without their consent, which consent the insurers would not provide. *See id.* at 363. The necessary implication of the insurers' position was that they should be relieved of all liability under their policies because of the proposed plan structure.

9

29. The Third Circuit ruled that the insurers were wrong. The Third Circuit held that section 1123(a)(5)(B), which provides that, "[n]otwithstanding any otherwise applicable nonbankrkuptcy law," a plan may "provide adequate means for the plan's implementation," including the "transfer of all or any part of the property of the estate to one or more entities," expressly preempted the anti-assignment clauses in the insurance policies. *Id.* at 369.

30. This mean that the debtor's rights in the policies could be transferred to a post-confirmation trust without the insurers' consent and such rights could be exercised by the trust. And, of course, the Third Circuit's holding applies to any "private contract[]" and not just an asbestos insurance policy. *Id.* at 370 ("We agree with the District Court in rejecting [the] interpretation [that § 1123(a) does not encompass private contracts]. Many of the transactions listed under § 1123(a)(5) implicate contractual rights, and so demonstrate clear congressional intent that the phrase "nonbankruptcy law" encompass private contracts.").

31. This holding comports with the Ninth Circuit's holding in *In re Thorpe Insulation Co.*, 677 F.3d 869, 889-90 (9th Cir. 2012), which was also decided in 2012. The Ninth Circuit, addressing the same issue, held that since a plan trust would be appointed as an "estate representative," it would step into the debtor's shoes and be able to exercise the debtor's rights without any technical assignment. *In re Thorpe Insulation Co.*, 677 F.3d 869, 889-90 (9th Cir. 2012). The plan trust in *Thorpe* had the ability to exercise the debtor's rights under the insurance policies regardless of whether the objecting insurers provided their consent or not.

32. Under *Federal-Mogul* and *Thorpe*, a post-confirmation trust can step into a debtor's shoes and exercise the debtor's rights under the policies. There is no contrary legal authority.

33. The result is that as tort claims are liquidated by a post-confirmation trust—either by final settlement or judgment—the trust can then seek payment from the insurers. The insurers'

obligations to pay, in turn, depends on the policy terms, although insurers obviously could not refuse to pay the trust based on their view that the anti-assignment clause excused their performance since the Third Circuit rejected that argument.

34. The Funding Agreements at issue here—both the 2021 Funding Agreement and the 2023 Funding Agreement—are essentially akin to insurance policies. The Debtor—*i.e.*, the "Payee"—is the insured. J&J and New JJCI/Holdco—*i.e.*, the "Payors"—are the insurers.

35. The scope of the "coverage" that is available to pay talc claims is defined by the Funding Agreements—namely, the definition of "Talc Related Liabilities." And the aggregate limit under the 2023 Funding Agreement is at least $30 billion or the value of Holdco, and the aggregate limit under the 2021 Funding Agreement is at least $61 billion.

36. The scope of the "coverage" that is available under both Funding Agreements is extremely broad. The term "Talc Related Liabilities" is so broad that the definition for this term is set forth on a Schedule to the Funding Agreements, and incorporates the term "Liabilities," which itself is defined using the defined terms "Law," "Contract," "Cause of Action," "Proceeding," which in turn are also defined using other defined terms.

37. The broad scope of this definition is significant. The Payors' obligation to pay under Section 2(a) is tied to the definition of "Permitted Funding Use," which in turn ties back to the definition of "Talc Related Liabilities." Under the Funding Agreements, J&J and New JJCI/Holdco are required to fund "any amounts to satisfy" the "Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee." This is the "<u>(c)(i)</u>" or "<u>C-One</u>" provision.

38. This language in the Funding Agreements puts the Payor on the hook for all talc claims liquidated by a "final settlement" or a "judgment of a court of competent jurisdiction" pre-petition or post-effective date when there is no bankruptcy pending with respect to LTL.[4] These are the critical rights that belong to LTL's estate. The ability of a creditor plan to utilize LTL's rights under the Funding Agreements follows from the Bankruptcy Code.

39. Specifically, sections 541(c) and 1123(a)(5) of the Bankruptcy Code preempt the anti-assignment or consent-to-assignment provisions in the Funding Agreements. Since a post-confirmation trust formed under the TCC's plan would be appointed as a representative of LTL's estate, the trust would step into LTL's shoes and would be able to exercise LTL's rights under the Funding Agreements without any technical assignment.[5]

40. Again, consistent with the Third Circuit's holding in *Federal-Mogul*, this Court held: "[W]ith the bankruptcy filing, **the bankruptcy estate succeeds to all rights held by [the] Debtor**, with the oversight and jurisdiction of this Court as needed for enforcement. Specifically, the resources **under the Funding Agreement** will be available upon confirmation of a plan— **whether or not the plan is acceptable to J&J or New JJCI**, and whether or not the plan offers payors protections under § 524(g)." *LTL Mgmt.*, 637 B.R. at 423 (emphasis added).

41. With LTL's rights under the 2023 Funding Agreement and/or the 2021 Funding Agreement (to the extent restored) transferred to a post-confirmation trust, the TCC's plan is not only feasible, but it is well funded. Talc claims vetted by the trustees and claims administrators

---

[4] The language in C-One is identical in the 2021 Funding Agreement and the 2023 Funding Agreement. For this reason, Holdco is on the hook under the 2023 Funding Agreement in the same manner that J&J and New JJCI are on the hook under the 2021 Funding Agreement.

[5] *See Thorpe*, 677 F.3d at 890; Feb. 18, 2022 Hr'g Tr. 64:11-15 ("THE COURT: So just to clarify, if a plan is confirmed and it's a TCC plan as a proponent, the funding agreement – and they can include in that plan the funding agreement? MR. GORDON. Yes. I mean if – THE COURT: Without violating any assignment provision? MR. GORDON: Correct. Because it's not being assigned.").

12

can be submitted for payment to JJCI/Holdco as payor under the 2023 Funding Agreement post-effective date. If the termination of the 2021 Funding Agreement is avoided and the 2021 Funding Agreement is restored, the trust will submit requests directly to J&J for payment.

42. The TCC believes that many talc claimants will accept the settlement awards generated by the TDPs under the TCC's plan, and the values thereof will be greater than what they could recover under the Debtor's flawed capped plan alternative. Talc claimants who want to have their day in court would be entitled to do so, but no claimant would be forced to endure years in the tort system to receive fair compensation. LTL's stated goal of providing fair and equitable compensation to talc claimants will be achieved.

43. The TCC's plan also satisfies the best interest of creditors test. The TCC's plan does not include nonconsensual third-party releases or attempt to use section 524(g) to protect J&J. This means that the confirmation of the TCC's plan would not involve litigation over whether nonconsensual third-party releases can or should be used in this context.

44. The TCC has designed a plan that establishes a "fixed criteria and common parameters for payments to claimants," and ensures "a level playing field for all present and future victims," while "taking into consideration the significance of preserving all due process rights." *LTL Mgmt.*, 637 B.R. at 415-16. The TCC's plan is a traditional plan that has been tailored to meet this Court's objectives and what is plainly permitted under Third Circuit precedent.

C. **LTL's Relies on the Wrong Part of the Funding Agreements**

45. LTL failure to recognize the fact that there is funding available under the TCC's plan to pay talc claims in full likely arises from its focus on the "(c)(ii)" or "C-Two" provision in the definition of "Permitted Funding Use." LTL's position appears to be that it (and J&J) carefully drafted this provision so that **only a plan approved by J&J could trigger a funding obligation**.

13

Under LTL's logic, the only funding that is available to pay talc claims is the $8.9 billion that J&J has put on the table **if its desired plan is confirmed**. But the TCC's plan does **not** rely on C-Two.

46. The TCC's plan does not require J&J or New JJCI/Holdco to voluntarily fund a trust for the benefit of existing and future claimants in LTL's bankruptcy. Under the TCC's plan, the trust is not receiving a one-time cash contribution from J&J. J&J is not being asked to contribute funds to a trust during the pendency of the bankruptcy.

47. C-Two would apply if J&J were willing to consent to a reasonable settlement and fund a trust with sufficient assets to pay all talc claims in full as they are liquidated over the next 40 to 50 years. J&J is not being asked to consent to anything. No action on the part of J&J or New JJCI/Holdco is required for the Court to confirm the TCC's plan.

48. The trust would step into LTL's shoes by operation of law and exercise LTL's rights under the Funding Agreements in accordance with *Federal-Mogul*. J&J and Holdco are no different here than the insurers in *Federal-Mogul*.

49. J&J, in addition to having its own independent liability for talc claims, is the ultimate insurer of talc claims asserted against LTL. J&J can object through its army of attorneys. But the TCC is **not** asking for J&J's or Holdco's consent because it does not need to. J&J and Holdco signed contracts. LTL's rights under those contracts can be enforced by LTL's estate **and by a post-confirmation trust as this Court already held**.

50. All the tools needed to confirm a chapter 11 plan that meets every objective stated by this Court exist with or without J&J's support. The TCC assumes that J&J will object to the plan. The TCC assumes that J&J and Holdco will not consent to the assignment of LTL's rights under the Funding Agreements to the post-confirmation trust. The TCC assumes that J&J will not write a check to fund a trust within the meaning of C-Two. But J&J cannot keep the TCC's plan

14

from being confirmed and J&J cannot prevent talc claimants from receiving the fair and equitable compensation that they deserve. This became a true statement as a matter of law the moment J&J signed the 2021 Funding Agreement and placed LTL into bankruptcy.

51. If the objective is to fairly compensate talc claimants, then the path forward is obvious. This Court can confirm a *Federal-Mogul* style plan that creates a trust to liquidate talc claims and pay such claims in a manner consistent with the Funding Agreements. If the funding available under the 2023 Funding Agreement is sufficient to pay all talc claims in full as they are liquidated by a final settlement or a judgment, then Holdco will be required to pay.

52. If not, then the 2021 Funding Agreement will be restored through the avoidance claims that will also be assigned to the trust, and J&J will be required to pay. And, as this Court knows, the 2021 Funding Agreement "gives the entire value of JJCI, the entire value, $61 billion [or more] free and clear to the potential claimants so that entire pot of money is available." *In re LTL Mgmt. LLC*, No. 22-2003/22-2004 (3d Cir.) Sept. 19, 2022, Oral Arg. Tr. 65:6-9 (Mr. Katyal).

53. As LTL's counsel explained: "[T]he whole idea with these funding agreements" is for LTL "to be able to say to the Court, to say to the parties, look you haven't been hurt because the entity that was standing behind or the value of assets that were effectively standing behind the liability or were available to pay the liability, that value is fully preserved through that funding agreement. … The only difference is … that instead of having the company there, **you have a funding agreement that provides direct right to those assets through this funding agreement**." Feb. 18, 2022 Hr'g Tr. 59:8-19 (Mr. Gordon) (emphasis added).

54. If what Mr. Katyal and Mr. Gordon said to the Third Circuit and this Court respectively was true (as the duty of candor requires of them), then LTL's estate has direct access to all the funding it needs. The TCC's plan will afford talc claimants with the fair and equitable

15

resolution that LTL claims to want. If the Funding Agreements are illusory—*i.e.*, J&J and Holdco are only required to pay if they are fully and forever released from talc liability in a bankruptcy proceeding in a plan that must be consented to by them—then it is certainly true that J&J orchestrated the largest fraud in United States history.

55. The TCC would not expect a party willing to act with fraudulent intent to propose a plan that is fair and equitable. If the Funding Agreements can be enforced according to their terms—with the oversight and jurisdiction of this Court as needed for enforcement—then the TCC's plan is **fair, feasible and confirmable**. And the TCC's plan offers the only path forward in this case that, absent dismissal, has any chance of providing a "meaningful opportunity for justice," "comprehensive, equitable, and timely recoveries for injured parties," and a "viable and fair settlement." *LTL Mgmt.*, 637 B.R. at 414.

### D.    LTL's Remaining Arguments Are Unavailing

56. The Debtor's remaining arguments are unavailing. The Debtor argues that the TCC must show cause for terminating exclusivity within 120-days of the filing. Objection at p. 3.

57. But the TCC has shown cause. LTL's second bankruptcy is essentially a continuation of the first bankruptcy—the stated objectives are the same. *Compare Decl. of John K. Kim in Support of First Day Pleadings* [Dkt. No. 5 in Case No. 21-30589] ("The Debtor further concluded that this chapter 11 case offered the only alternative for equitably and permanently resolving all current and future talc related claims against it."); *with Decl. of John K. Kim in Support of First Day Pleadings* [Dkt. No. 4] ("The Debtor is filing for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing: to fully, equitably and efficiently resolve all current and future talc-related claims.").

58. Again, this Court previously ruled in LTL 1.0 that if the Debtor were to file a plan, "the Court is not going to act on that plan for at least 15 days, to allow the Committee to come in and show cause before the Court why there should be competing plans." Hr'g Tr. May 4, 2022 at 90:1-10. About two and a half months later, the Court again previewed its willingness to entertain more than one plan once the case progressed to the plan process stage.[6]

59. The LTL triggered the plan process the moment it filed its plan. The talc claimants have already endured **over 18 months in bankruptcy**, which is far more time than LTL should maintain the exclusive right to file a chapter 11 plan section 1121(d)(2) of the Bankruptcy Code.

60. Finally, the Debtor contends that the TCC is impeding progress. Objection at 3. But the TCC is trying to make progress. Rather than relying solely on its motion to dismiss to defend and preserve the rights of talc claimants, the TCC has also worked tirelessly on a competing plan to ensure that if a plan is proposed and confirmed, it is one that truly offers a "meaningful opportunity for justice," "comprehensive, equitable, and timely recoveries for injured parties," and a "viable and fair settlement." *LTL Mgmt.*, 637 B.R. at 414.

61. J&J asserts that its talc products do not cause cancer, which is why J&J's approved plan for LTL essentially pays all talc claimants nuisance value. At this time, it is far from clear whether the Debtor's proposed plan enjoys the support of law firms that signed Plan Support Agreements. *See* May 16, 2023 Hr'g Tr. 21:13 (statement by Mr. Hansen that "we have issues with" LTL's plan). It may be that the clients of the law firms that signed Plan Support Agreement do not want a settlement that pays them nuisance values. If LTL's plan is so widely accepted, why

---

[6] *See* Hr'g Tr. July 28, 2022 at 15:25-16:4 ("Returning to the plan process, if I do extend exclusivity, I do intend to fully explore the merits of allowing competing plans in which both, or all sides actually, can put forward their best case in seeking votes from the claimants.").

17

is ongoing mediation necessary? The TCC seeks an outcome here that all talc claimants will support. It is time for the Debtor's exclusive right to file a plan to end.

## CONCLUSION

The TCC respectfully requests that this Court grant the Motion and permit the TCC to file its plan and disclosure statement.

Respectfully submitted,

**GENOVA BURNS, LLC**

By: */s/ Daniel M. Stolz, Esq.*

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee of Tort Claimants*