IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | June 13, 2023 |
| . . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF

DEBTOR'S MOTION FOR ENTRY OF AN ORDER SEALING THE EXHIBITS TO
THE SUPPLEMENTAL DECLARATION OF JOHN K. KIM REGARDING PLAN
SUPPORT AGREEMENTS [397].  UNITED STATES TRUSTEE'S MOTION TO
COMPEL COMPLIANCE WITH FED. R. BANKR. P. 2019 [467]. AD HOC
COMMITTEE OF SUPPORTING COUNSEL'S MOTION TO FILE UNDER SEAL AND
REDACT CERTAIN INFORMATION IN VERIFIED STATEMENT OF PAUL
HASTINGS LLP, COLE SCHOTZ P.C., AND PARKINS & RUBIO LLP
PURSUANT TO BANKRUPTCY RULE 2019 [471]. DEBTOR'S MOTION FOR AN
ORDER (I) SCHEDULING HEARING ON APPROVAL OF DISCLOSURE
STATEMENT; (II) ESTABLISHING DISCLOSURE STATEMENT OBJECTION
DEADLINE; AND (III) GRANTING RELATED RELIEF [240]

**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

TRANSCRIPT OF (Continued)

DEBTOR'S MOTION FOR AN ORDER AUTHORIZING IT TO ENTER INTO AN
EXPENSE REIMBURSEMENT AGREEMENT WITH AD HOC COMMITTEE OF
SUPPORTING COUNSEL [575]THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS' MOTION TO TERMINATE THE DEBTOR'S EXCLUSIVE PERIOD
PURSUANT TO 11 U.S.C. § 1121(D)(1) [702] DEBTOR'S MOTION FOR A
BRIDGE ORDER CONFIRMING THE AUTOMATIC STAY APPLIES TO CERTAIN
ACTIONS ASSERTED AGAINST AFFILIATES OR TEMPORARILY EXTENDING
THE STAY AND PRELIMINARY INJUNCTION TO SUCH ACTIONS PENDING A
FINAL HEARING ON THE REQUESTED RELIEF [ADV. DKT. 147] DEBTOR'S
MOTION (I) TO EXTEND AND MODIFY THE PRELIMINARY INJUNCTION
ORDER AND (II) FOR CONFIRMATION THAT SUCCESSOR LIABILITY
ACTIONS ARE SUBJECT TO THE AUTOMATIC STAY [ADV.
DKT. 163]

APPEARANCES:

For the Debtor:          Jones Day
                         By:  GREGORY M. GORDON, ESQ.
                         2727 North Harwood Street, Suite 500
                         Dallas, TX  75201


For Various Talc         Levy Konigsberg, LLP
Claimants:               By:  MOSHE MAIMON, ESQ.
                         101 Grovers Mill Road, Suite 105
                         Lawrence Township, NJ  08648


For Catherine Forbes:    Cohen, Placitella & Roth, P.C.
                         By:  CHRISTOPHER M. PLACITELLA, ESQ.
                         2001 Market St, Suite 2900
                         Philadelphia, PA  19103


Proposed for TCC:        Otterbourg, P.C.
                         By:  ADAM SILVERSTEIN, ESQ.
                         230 Park Avenue
                         New York, NY 10169


US Trustee:              Office of United States Trustee
                         By:  LAUREN BIELSKIE, ESQ.
                         Office of The United States Trustee
                         One Newark Center
                         1085 Raymond Boulevard
                         Suite 2100
                         Newark, NJ 07102


For Talc claimant:       Maune Raichle Hartley Frency & MUdd
                         By:  CLAY THOMPSON, ESQ.


For Brandi Carl:         Golomb Spirt Grunfeld
                         By: RICHARD GOLOMB, ESQ.
                         1835 Market Street
                         Suite 2900, Philadelphia, PA 19103


For Ad Hoc Committee     Paul Hastings LLP
of Supporting Counsel:   By:  KRIS HANSEN, ESQ.
                         200 Park Avenue
                         New York, NY  10166


For Ad Hoc Committee     Brown Rudnick
of Certain Talc          By:  DAVID J. MOLTON, ESQ.
Claimants and Ad Hoc     7 Times Square
Committee of Creditors:  New York, NY  10036

4

APPEARANCES CONTINUED:
APPEARING VIA ZOOM:

For Eagles claimants:        Kazan McClain Satterley & Greenwood
                             By:  JOSEPH SATTERLEY, ESQ.
                                  (Via Zoom)
                             55 Harrison St. Suite 400
                             Oakland, CA  94607

For Paul Crouch,             Ruckdeschel Law Firm, LLC
individually and on          By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of          8357 Main Street
Cynthia Lorraine Crouch:     Ellicott City, MD 21043


                       -  -  -  -

1          THE COURT:  Good morning, we will start hearings on

2  today's LTL Management matters. I have the amended agenda, the

3  ever evolving agenda.

4          We did have a request from Mr. Satterley that we

5  address the preliminary injunction bridge order issues first.

6  I'm happy to do so.  Unless anyone has an issue with that.  So

7  that would be, I guess number 7 on today's contested agenda.

8  Mr. Gordon, this is the Debtor's motion, continuing the

9  preliminary injunction and the issues as to the bridge order.

10 My understanding is that there's some agreement with Mr.

11 Placitella to defer a portion to June 22nd.

12          MR. GORDON: Correct.

13          THE COURT:  So I guess those issues we'll address

14 next week.  And so why don't you proceed with what remains for

15 today.

16          MR. GORDON:  Yes, Your Honor.  Well first of all, and

17 I think we do have an understanding with the other side in

18 terms of the order in which we'll take the matters.  Obviously

19 subject to Your Honor's approval.

20          But the first item we would like to take up today is

21 agenda item number 8, which is the motion with respect to the

22 extension of the preliminary injunction order.  And I was going

23 to comment as part of that with respect to item number 7, only

24 because there's a bit of an overlap there.

25          THE COURT:  Sure.

6

1        MR. GORDON:  And we'll clarify that. But we do have

2   an agreement with Mr. Placitella, both about briefing with

3   respect to the issues related to the claims that he's brought

4   in New Jersey, as well as the hearing date on the 22nd, Your

5   Honor, as you indicated.

6        And then I think we've agreed that we would, the next

7   item we would take up is exclusivity.  The motion to terminate

8   exclusivity.  Which I believe is item number 6.

9        THE COURT:  All right.

10        MR. GORDON:  So that's still up. And then we've still

11   got the expense reimbursement to deal with. We've got the

12   disclosure statement hearing issue to deal with as well, Your

13   Honor.

14        THE COURT:  I guess that's why, that explains why

15   lunch was ordered.  Okay.

16        MR. GORDON:  And I think all that's left, there's

17   some uncontested matters which I don't think require any Court

18   attention today.

19        THE COURT:  All right.  That works for the Court.

20   Then --

21        MR. GORDON: I'm ready.

22        THE COURT:  I'm ready.

23        MR. GORDON:  We do have a PowerPoint presentation on

24   the PI.

25        THE COURT:  All right.

7

1          MR. GORDON:  May I approach, Your Honor

2          THE COURT:  Yes, please.  Thank you.

3          MR. GORDON:  All right, can we go to slide number 1,

4  please.  So Your Honor, I'll say at the outset, based on the

5  objection filed by the TCC, there seems to be some confusion in

6  terms of what the Debtor is seeking.  As I read the objection

7  filed by the TCC, they're suggesting that we're asking the

8  Court to nullify the existing preliminary injunction order and

9  replace it with one which is a full throated preliminary

10  injunction order that stops all the litigation. And that's not

11  what we're asking for.

12          As indicated, we're only asking for three things. One

13  is, we're asking Your Honor to extend the existing injunction

14  which only enjoins trials for an additional 90 day period,

15  subject to revisiting for further periods of time.  We're

16  asking for a ruling that you enforce the automatic stay as to

17  successor claims against Holdco, Kenvue and Janssen.  Because

18  those in our view are clearly property of the Estate.

19          And then the third thing is, we're asking for a

20  ruling enforcing the automatic stay as to any claims against

21  Old JJCI and its predecessor JJCCI because those are claims

22  against LTL.

23          And it seems like from our perspective, the TCC

24  objection is more like a motion to lift the stay, because

25  they're suggesting that these claims, Estate property claims

1  can go forward to some degree, even though Your Honor I thought

2  was very clear in your ruling that the automatic stay remains

3  in effect.  You weren't suggesting, I thought, when you entered

4  your order on the preliminary injunction, that there was any

5  modification being made to the automatic stay.

6         So there seems to be a little bit of a disconnect

7  with respect to the relief.  And I'll address that in more

8  detail in a moment.  Next slide, please.

9         And fundamentally, we think the objection that the

10 TCC has lodged should be overruled. Again we're not seeking to

11 expand the existing injunction.  We don't think there's any

12 valid basis to suggest that these successor claims somehow

13 aren't subject to the automatic stay, that they're exempt on

14 some basis from the automatic stay.

15        We think there is a clear prospect for reorganization

16 in this case.  I mean we get it, the motions to dismiss have

17 been filed. But we filed a disclosure statement, we filed a

18 plan.  We did what we said we would do in the plan support

19 agreements, and there is a path forward in this case.

20        We also believe that limited -- you know, the request

21 we're making is limited, both in terms of time and the nature

22 of the injunction that we're seeking.  And the idea that is

23 being proposed by the Committee that it should be shortened

24 further to end on the ruling of the dismissal.  The Court's

25 ruling on the dismissal motions to us doesn't make sure.  And

1  I'll explain why.

2         And they also made the argument again, the Committee

3  did, which has been made before and rejected by this Court

4  before, that you lack jurisdiction to enter the requested

5  relief.  And we obviously disagree with that.  Next slide,

6  please.

7         So I wanted to address --

8         THE COURT:  One second, Mr. Gordon. Mr. Placitella.

9         MR. PLACITELLA:  Yes, Your Honor. I hate to

10 interrupt, but we had an agreement that the successor liability

11 issues would not be on today.

12        THE COURT:  I don't think I'm considering that today.

13        MR. PLACITELLA:  And --

14        MR. GORDON:  But that's why I wanted to address this

15 issue.  Your Honor, the successor liability issues go beyond

16 just the claims of Mr. Placitella.  And what we're going to ask

17 for is that in general with respect to successor liability

18 claims, putting his aside, that Your Honor enter a bridge order

19 to get us to the 22nd that basically imposes an injunction as

20 to the claims elsewhere, without prejudice to Mr. Placitella or

21 anyone else coming in here to argue that these aren't Estate

22 property claims.

23        But we have an agreement with Mr. Placitella to hold

24 everything or to stop the discovery in his cases, but we don't

25 have any protection in all the others. And what I'm going to

1  show you is, there have been literally hundreds of cases now

2  where these same kinds of claims are being made, and where

3  Kenvue and Janssen and Holdco are being named. And so we want

4  some temporary relief.

5         So I will be asking for that.  But we're trying to do

6  it in a way that doesn't jeopardize the ability of Mr.

7  Placitella to make whatever arguments he wants to make.

8         MR. PLACITELLA:  To ask the Court to get involved in

9  substantive issues on claims that we have a written agreement

10 about to delay for a week, when there's no threat to the

11 Debtor, is concerning.

12        THE COURT:  I --

13        MR. PLACITELLA:  I'm glad I showed up today.  I was

14 considering not coming.  I had to come back from France and

15 Italy. But you know, to stand up and hear this, is concerning.

16        THE COURT:  I understand your position.  And I'll get

17 back to you once I hear from the Debtor.

18        MR. GORDON:  So Your Honor, first of all, I wanted to

19 deal with the objection that came in, it was either yesterday

20 or the day before, I can't recall now, from Mr. Satterley on

21 behalf of the Eagles and I think it was denominated in

22 informational brief.  And I don't know whether it's denominated

23 that way because it was late or not, but I think there's a

24 complaint right in the beginning that suggests that the notice

25 was somehow defective which excuses a late filing.  But Your

1    Honor's been clear for quite some time I think we were having

2    this hearing today on the extension.  And so the deadlines were

3    what they were and this is a late filed objection.

4           But more importantly, the information that's in this

5    pleading is simply not true.  It's predicated on the idea, this

6    pleading is predicated on the idea that you should do the same

7    thing basically for the Eagles that you did for Mr. Valadez

8    because there's a preferential trial set and coming up in July.

9           And the truth is, that's not accurate. Because J&J,

10   Old JJCI and Holdco, they were all severed from that

11   preferential trial setting. And that trial setting applied only

12   to parties that were part of this case as of the filing of the

13   motion for preference. And you can see the dates, Your Honor.

14   The case was filed in September of 2022.  The preference was

15   granted in December of 2022.  J&J, Old JJCI and Holdco were not

16   even named as defendants until April 3 and 4 of 2023.  They

17   weren't served until April 20 and 21 of 2023.

18          And so none of them, none of those three entities is

19   included in that preferential trial setting. So the whole basis

20   for what's really a request for Your Honor to allow this trial

21   to proceed is not accurate. And so we wanted to point that out.

22   And we just think this objection should be overruled.

23          Mr. Satterley came before Your Honor many times to

24   say, nobody else is going to try to do the same thing, or has

25   tried to do the same thing that was done with Valadez, and here

1  we are, he himself is trying to do the exact same thing based

2  on statements of facts that simply aren't accurate. Next slide,

3  please.

4          The other thing about this case, just to note, this

5  is a case where there are multiple other exposures. There are

6  multiple other defendants.  This is a plain -- claims, asbestos

7  exposure to the other products based on work in an assembly

8  plant.  So we're talking about asbestos in brakes, asbestos in

9  axles. And he's alleging exposure to talc products other than

10  J&J products. So it's not as if there aren't a host of other

11  defendants from which he's seeking to -- or they're seeking

12  recoveries.  But nonetheless, there is no trial setting in July

13  for which any of these entities is involved. Next slide,

14  please.  Next slide, next.

15          So I think when the issue of the extension of the PI,

16  as I read  the objections that have been filed, for the most

17  part they come down to the question of whether there's a

18  reasonable likelihood of a successful reorganization.  And Your

19  Honor had indicated earlier that to demonstrate the reasonable

20  likelihood a movant need only show the prospect or possibility

21  that he or she will succeed and need not prove same with

22  certainty.

23          There was a similar statement by the Judge in the

24  Bestwall case, establishing the reorganization is likely to be

25  successful is not intended to be a particularly high standard.

13

1   Next slide, please.

2           So since we were last here, Your Honor, or actually

3   since Your Honor entered the last order, we have filed our

4   plan.  We have filed a disclosure statement.  We have requested

5   that a schedule be set for consideration of the disclosure

6   statement.  Negotiations are continuing with the Ad Hoc

7   Committee of Supporting Counsel, to finalize the terms of the

8   plan.

9           We've had an FCR appointed in the case.  Your Honor

10  has appointed co-mediators in the case and discussions with the

11  co-mediators are underway.  So from the Debtor's perspective we

12  made substantial progress.  Obviously the other side is, or I

13  should say the TCC is staunchly opposed to the case.  We get

14  it.  But I think we came to Your Honor from the beginning, told

15  Your Honor what our plan was.  We came in with plan support

16  agreements that were supported by a substantial number of

17  claimants.  We said we'd file a plan by mid-May. We did file a

18  plan by mid-May.

19          I think we indicated clearly that we're committed to

20  moving this case forward promptly and I think everything that's

21  developed so far in this case would confirm that that's our

22  intention.

23          We'll deal with the litigation as it comes. And

24  obviously Your Honor will ultimately decide whether this case

25  continues or not.  But we've done everything in our power to

1  move the case forward.  And we have been moving the case

2  forward.  Next slide, please.

3          Here, Your Honor, just a reminder that the relief

4  that we're seeking is limited.  Your Honor has allowed, by

5  virtue of the prior order, discovery and other pretrial matters

6  to continue.  The only thing that's enjoined at this point is

7  the ability to go forward with trials.  And I think Your Honor

8  even concluded that based on the very limited nature of the

9  relief that you were granting, that the talc claimants would

10  not be harmed.

11          We're in a situation where the motions to dismiss

12  will be resolved in the near term.  And from our perspective,

13  the extension really is critical to continued progress in the

14  case, because this case is about resolving these claims in

15  bankruptcy.  And allowing them instead to be liquidated in

16  State Courts or Federal Courts or wherever around the country

17  in the meantime will adversely affect our ability to achieve a

18  resolution in this case.  And that's something that Your Honor

19  recognized with respect to the entry of the PI.  Next slide,

20  please.

21          We think a 90 day extension is appropriate.  It

22  again, this would allow the Court to consider again relatively

23  shortly whether the Debtor is making sufficient progress to

24  warrant a further extension of the limited injunction.

25          The idea that's being offered by the Committee that

1  you should -- if you're inclined to grant this, end it on the

2  date that the Court rules on a motion to dismiss, from our

3  perspective, doesn't make any sense.  Because if you grant the

4  motions to dismiss, the injunction becomes moot.  If you deny

5  the motions to dismiss, I can't see any reason why you would

6  immediately need to revisit the injunction at that point.

7  There should be no reason to revisit it before the end of the

8  90 day period.

9         And there was a, kind of an offhand statement that

10 this would somehow, by limiting it to the end of the -- to the

11 time of the ruling on the dismissal motion that somehow that

12 would consolidate appellate review.  Well they've already

13 appealed from the PI.  They've signaled they're going to appeal

14 literally every order in the case that doesn't go their way.

15 I'm sort of at a loss to see how it consolidates appellate

16 review given we've already got an appeal that's pending. Next

17 slide, please.

18        With respect to the issues on the automatic stay,

19 again Your Honor I thought made clear that the automatic stay

20 remains in effect.  And we have a quote on the slide, it comes

21 both from the hearing transcript and it's in Your Honor's PI

22 opinion as well. And of course when you start with the

23 automatic stay, we know that's governed by 362(a) which has

24 more than one part.  But it applies to any action or proceeding

25 against the Debtor, and any act to exercise control over

1  property of the Estate. Which is the (a)(3) portion of 362.

2  Next slide, please.

3         So with respect to Old JJCI and JJCCI, those entities

4  no longer exist.  And Your Honor knows this certainly with

5  respect to Old JJCI, that it went out of existence on October

6  12th as part of the corporate restructuring.  JJCCI, its

7  predecessor, ceased to exist in 2015.

8         If you go to the next slide, I mean the point is that

9  fundamentally a claim against these entities is a claim against

10 LTL.  Because LTL is the successor. They no longer exist.  And

11 you can see the problem that you have if the automatic stay

12 isn't enforced.  So here is just an example of a discovery

13 request in one of the cases.  This is in the Barkley case. This

14 was a notice of deposition at Old JJCI.  They're asking for

15 information, or the plaintiff is asking for information

16 pertaining to any and all funding agreements between LTL and

17 any other entity.  The next one asks for any information

18 pertaining indemnity agreements as between LTL and any other

19 person.

20        Now this is getting into -- I mean if this is allowed

21 to continue, we're getting into issues that are issues that are

22 important to this case. And now there's an effort to address

23 them outside of the Bankruptcy Court. Next slide, please.

24        And it's sort of the same thing in terms of the

25 allegations that are being made in these cases, as if there's

1   no automatic stay.  Here's a plaintiff in the Compton case

2   saying he was exposed to fibers, allegedly, exposed to fibers

3   which are manufactured -- well fibers in products manufactured,

4   sold, distributor installed by J&J.  J&J Consumer Inc., that's

5   JJCI formerly known as J&J Consumer Companies, Inc., that's

6   JJCCI.  Next slide, please.

7        I think Your Honor has already addressed this issue,

8   this is in connection with the preliminary injunction with

9   regard to the State claims in the first case.  Where I think

10  you found that actions against all JJCI, the nonexistent JJCI,

11  constitute actions or proceedings against the Debtor, under

12  363(a)(1).

13       And here we are in a situation where we have the

14  automatic stay, we have a limited injunction, yet parties are

15  out there suing these entities in the tort system, which is

16  literally the same as suing the Debtor, LTL. Next slide,

17  please.

18       Now this what I wanted to address on the successor

19  liability actions, which Mr. Placitella is not happy about.

20  But you can see here, we tried to show what's been happening

21  with respect to these successor liability claims.  How they're

22  unfolding over time. So if you go all the way to right, as of

23  today approximately 177 complaints that have been served naming

24  Holdco, Janssen or Kenvue, one or more of Holdco, Janssen or

25  Kenvue.  And on top of the 177, we have 145 motions to amend

1  complaints to name one of those three as well. And that's just

2  in New Jersey.

3        You know, this is the kind of burden that's being put

4  on us by these efforts to use claims that are Estate property

5  to bring in these parties. And these require responses.  I mean

6  this takes time.  It takes money. And that's the prejudice to

7  us.  Next slide, please.

8        So I won't spend a lot of time on this because I

9  recognize that we're going to deal with this on the 22nd. But

10  we believe these claims are automatically stayed.

11        THE COURT:  Right.

12        MR. GORDON:  And we're going to ask Your Honor to

13  make that, reach that conclusion, make that finding when we

14  come back on the 22nd.  But again, from our perspective and

15  what I was going to request today, is that Your Honor, in your

16  order, if you're inclined to grant our request, to include a

17  provision that says that provisionally the automatic stay is

18  deemed to apply between now and June 22nd, in all cases other

19  than Mr. Placitella cases. We have an agreement to maintain the

20  status quo effectively in those cases.  So that we can take

21  away that interim burden until Your Honor can address the issue

22  and can do it in a way that's not prejudicial to Mr.

23  Placitella.

24        So that's the way Your Honor, we're proposing to work

25  our way through the fact that we have an agreement with Mr.

1  Placitella, which we're intending to honor.  But at the same

2  time we need relief with respect to claims that we strongly

3  believe are barred by the automatic stay because we think

4  there's really no question that they are Estate property.

5       I mean they're literally an attack on the divisional

6  merger.  That somehow the divisional merger did not cutoff the

7  liability as Texas Law provides.  That somehow that New JJCI

8  continued to have the liability and that liability then flowed

9  through somehow to Kenvue and it flowed through somehow to

10 Janssen.  Next slide, please.

11      So I won't spend too much time on these, but the TCC

12 and its objection in our view misstates the law again about, on

13 the automatic stay. And these are all issues Your Honor has

14 already addressed before.  But for example, at the top here

15 they've stated again that the 362(a) applies only to Debtors

16 with no exceptions as if 362(a)(3) doesn't really mean

17 anything.  We think Your Honor has already addressed that.

18 There are cases obviously that suggest that that's not correct.

19      And then they also make an argument predicated on the

20 McCartney case, which Your Honor has relied on the past.  But

21 there, you know, that Court I think contrary to what the TCC is

22 suggesting, actually found that the protection under 362(a)

23 would apply to nondebtors, if the Court were to find,

24 quote/unquote, unusual circumstances.  And again Your Honor

25 went through this before. And I'm not going to reiterate what

1   that is. But we think the unusual circumstances here clearly

2   exist.

3           So we think we're kind of passed issues like this,

4   but I wanted to at least have a slide on it to briefly go over

5   ground that we've tread before. Next slide, please.

6           Same thing on jurisdiction.  I'm not going to really

7   spend any time, any significant time on this.  But again

8   there's an argument being advanced by the TCC, notwithstanding

9   your other findings, that there's no jurisdiction.  That you

10  have to have jurisdiction over the underlying talc claims. It's

11  not jurisdiction over the requests that we're making here in

12  Bankruptcy Court.

13          And again I think Your Honor has dealt with this

14  before.  There's unquestionably in our mind related to

15  jurisdiction, and the Court should find -- the Court's found

16  that before, the Court should find that again.  And it's based

17  on a number of things. And it's just not, there's a number of

18  different affects as indicated, affects on the Estate as

19  indicated down at the bottom.

20          And so we think again Your Honor should just reject

21  that argument for the same reasons you rejected it before.

22  Next slide, please.

23          This slide, Your Honor, is just to point out that,

24  there's no question that the focus under these claims is on

25  successor liability.  I mean it has to be the case because none

1  of these three entities Holdco, Kenvue or Janssen ever

2  manufactured or sold any talc products in North America.

3           And of course again, it's an attack on the corporate

4  restructuring given that the talc liability was all allocated

5  to the --

6           THE COURT:  I don't want to go too far into what

7  we'll be discussing on the 22nd.

8           MR. GORDON:  Okay, okay. And then the last point is

9  just to show you an example of one of the pleadings where

10 there's specific references to successor claims.  Next slide.

11          And again I won't spend any time on this, you can

12 just see the similarities in what's being pled and then what

13 you're hearing in the Bankruptcy case.  Next slide.

14          So we think it's important that Your Honor enforce

15 the automatic stay because we're in a situation where

16 potentially issues are going to be litigated outside, and this

17 goes back to the Old JJCI and JJCCI as well.

18          We did attempt to have some of the claims dismissed

19 on the basis that they weren't properly being brought. And that

20 was unsuccessful. And so we've come to Your Honor to enforce

21 the automatic stay so that we can stay focused here on what we

22 need to stay focused on, and to, we want to fully preserve our

23 ability to resolve these claims in the Bankruptcy case.  Next

24 slide, please.

25          So we included here, Your Honor, just a few slides,

1 because you did ask us, at least one time, maybe it was more

2 than once, to address the issues that were raised by the Third

3 Circuit opinion. And I think they were all, as I recall, in a

4 footnote.

5           And so the first was whether the Debtor is obligated

6 to indemnify J&J for J&J's independent conduct post 1979.  The

7 second was whether the indemnity that exists in the case could

8 include punitive damage verdicts against J&J for its conduct.

9 And then whether Old JJCI in fact assumed responsibility for

10 claims relating to Shower to Shower.  And --

11           MR. SATTERLEY:  Your Honor, I hate to interrupt, I

12 apologize, Your Honor.  As I advised Your Honor yesterday, I

13 have to be in State Court for the jury trial of 18 jurors at

14 eight o'clock.  And since Mr. Gordon addressed -- to go early,

15 I was wondering if I could just have five minutes to briefly

16 address that.  And then I apologize, Mr. Gordon, I just want to

17 be able to make a record before I leave. And Mr. Maimon will

18 address any additional questions that Your Honor may have

19 later.

20           THE COURT:  Mr. Gordon --

21           MR. GORDON:  That's fine, Your Honor.

22           THE COURT:  Can we take a pause.

23           MR. GORDON:  Sure.

24           THE COURT:  All right, Mr. Satterley.  Thank you, Mr.

25 Gordon.

23

1          MR. SATTERLEY:  Thank you, Your Honor.  Thank you for

2  allowing me to participate via Zoom and may it please the

3  Court.  I filed a pleading yesterday because quite frankly I

4  was shocked at the TCC's response interpreting the Debtor's

5  motion to stop the litigation in total.  Because I read the

6  motion on the 5th, it was filed 11:30, 11:27 at night, asking

7  for an ex parte and to stop, or to shorten time rather, and

8  require everybody to file a response a couple of days later on

9  the 9th.

10         I read the motion as it related to Mr. Placitella's

11  cases and Kenvue and Janssen.  Nowhere in the motion did it say

12  we want to stop all litigation in total. And the reason why I

13  filed the informational brief is to simply give Your Honor an

14  update that since Your Honor lifted the stay back in April, the

15  State Courts have complied with Your Honor's request not to

16  schedule trials until after June 15th.  And Judge Seabolt with

17  regard to the Eagles' case, purposely did it to June the 20th,

18  set it up for June the 20th, and then we've continued it with

19  Judge Seabolt's agreement so that J&J could have adequate time

20  to prepare for trial.

21         Now what it seems like is going on, is that they're

22  asking for one thing in a motion, and they're seeking something

23  different in an order. And that violates due process to its

24  core.

25         The one thing that Mr. Gordon said that I agree with

24

1  is, he said we will deal with the litigation when it comes.

2  And  J&J has done that for years.  They've been able to deal

3  with this litigation. They've been able to settle cases on the

4  courtroom steps. And they can continue to do that.  They can

5  continue to do that.

6        So, and the other thing I wanted to say is he put a

7  pleading regarding Barkley, Susan Barkley died of mesothelioma,

8  her case is scheduled for trial, autopsy is done, the same

9  ingredients of the products in her tissue.  And that

10  interrogatory relates to their "ability to pay punitive

11  damages".  Because they're playing this shell game on where the

12  money is.  And under State Law we have to prove the ability to

13  pay punitive damages.  So that's, so Mr. Gordon's taking things

14  out of context, that's not in his pleadings. Not in his motion.

15  And trying to trick -- quite frankly, trying to trick the Court

16  to get relief, to get a total stay.

17        And I put it in my papers, irreparable harm will

18  occur to Mr. Eagles, Mr. and Mrs. Eagles, because he will die

19  before his trial if Your Honor grants their stay of litigation.

20  And he's 80 years old.  He's got terminal mesothelioma.  He is

21  not getting any treatment for it, no chemotherapy, there's

22  nothing to prolong his life.  He's simply suffering from this

23  disease.

24        And Your Honor made a well reasoned, well reasoned

25  opinion, back in April to allow J&J sufficient time to prepare

1  for these trials.  And in their motion, they don't address any

2  of the balancing factors whatsoever under <u>MidAtlantic</u>, as it

3  relates to any particular creditor.  They really sort of trick,

4  try to trick Your Honor to say, we're just talking about Kenvue

5  and Janssen and what's going on in Middlesex County.  And at no

6  point in time do they address Mr. Eagles, do they address Susan

7  Barkley, do they address Mr. Raya's case, which is scheduled in

8  August.

9          And so I would urge Your Honor, urge Your Honor to

10  deny, either deny out of hand or to continue it on down the

11  road, let us continue to go to trials and work up our cases

12  because we weren't given adequate notice for a full stay as it

13  relates to everybody, to all trials.

14          The final point I'd make, Your Honor, is not only is

15  this a burden upon individual dying people, and I'm sorry,

16  we're not harassing anybody.  If you hurt a lot of people and

17  kill a lot of people, then you are responsible under the law.

18          The final point is, these courts, these State Court

19  systems are burdened also if you grant the Debtor, the

20  nondebtors relief because they're going to be two trials or

21  maybe three trials for the Eagles' family. In Alameda County

22  Mr. Eagles lives right down the street here.  Born and raised.

23  Spent his whole life here in Alameda County.  The Court system

24  is going to have to try his case two or three times for the co-

25  tortfeasors right now, the other generic talcum powders, the

1    one remaining brake defendant that's left.  And then later for

2    J&J.  And them maybe later for LTL because definitely,

3    eventually is going to be dismissed.

4         So I would urge Your Honor to not grant the full

5    relief they're asking.  To only deal with Janssen and Kenvue,

6    the limited aspect of their motion.  And I'll apologize that

7    I've got a jury trial, I can't be there in person.  I really am

8    passionate for my clients. I love doing this.  And I apologize

9    to the Court that I'm not there. But I want to thank Mr. Gordon

10   for letting me spend a couple of minutes explaining my

11   position.  And my proxy, Moshe Maimon, will address the rest of

12   my issues. Thank you, Your Honor.

13        THE COURT:  All right, thank you Mr. Satterley.

14   Thank you, Mr. Gordon, you may continue.

15        MR. GORDON:  The one thing, Your Honor, I'll respond

16   to is the allegation that we are attempting to trick the Court.

17   That is highly offensive.  And it's highly offensive primarily

18   because you may note, he didn't respond to any of the

19   misrepresentations that we pointed out he made in connection

20   with that case, with the Eagles' case that the J&J or the

21   Holdco, Old JJCI and JJCCI are not even part of the trial

22   that's set to come up in July.

23        But anyway, Your Honor, back to the slides, the, so

24   there were three issues which I went through.  We think it's

25   clear that the Debtor has an obligation to indemnify J&J in

27

1   each of the three instances.  Next slide, please.

2          So first of all, we think the Court was correct when

3   it concluded that our predecessor had assumed all liabilities,

4   including contingent and future product liability claims.

5   Notwithstanding some language in the indemnity itself. And you

6   may remember the language at issue was language that talked

7   about liabilities included in or allocated -- I forget the

8   exact words, on the books or records.

9          And that was really supported in four different

10  respects.  One by the language of the 1979 agreement itself.

11  The circumstances and course of performance between the parties

12  since 1979.  Case law that was very much on point involving

13  factual situations, highly similar. And then the

14  indemnification provisions in the merger support agreement

15  itself.  And I'm talking about the divisional merger support

16  agreement.  Next slide, please.

17         So there are many slides that we provided and there

18  was a significant amount of evidence in the record on this,

19  Your Honor.  But I mean the point is, that the, this was at a

20  point in time, Your Honor may recall, when J&J was basically

21  transferring the entirety of business operations to

22  subsidiaries. It did it with its baby powder business.  And in

23  connection with that, the subsidiary to which the operations

24  were transferred agreed to assume all the liabilities. And just

25  here we've highlighted some of the very, very broad language

1  that was reflected in there.

2          And it was a forever indemnification, it was assuming

3  all debt, all indebtedness, all liabilities of every kind, of

4  every description.  Next slide, please.

5          We had meeting minutes from Board of Directors

6  meetings that said that in furtherance of J&J's longstanding

7  policy of decentralization when they were moving all of these

8  assets out, the 79 agreement was intended to transfer all

9  assets to subsidiaries who in turn would assume the

10  liabilities.

11          And the evidence was, and I think this supported your

12  finding as well, that since the 79 transaction and at all times

13  prior to the 2021 restructuring, all the costs associated with

14  the talc litigation had been borne by all JJCI or its

15  predecessors, and that included defense costs. It included

16  settlements, it included verdicts, whether they had punitive

17  damage aspects to them or not.  It included everything.  Next

18  slide.

19          And then Your Honor probably recalls, there were two

20  cases that we cited.  One was a Third Circuit case, the Bouton

21  case, the other was a Eastern District of Pennsylvania case,

22  the Bippus case, very similar facts to our facts where there

23  are arguments being made that, well the liabilities at issue

24  doesn't, wasn't covered because in the first case it wasn't

25  reflected or reserved against in the financial statements.  And

1  a similar effort, a similar argument was made in the <u>Bippus</u>

2  case about liabilities and obligations reflected on the balance

3  sheet.  And notwithstanding that, the Court said no, the

4  language is broad enough to pick up liabilities that weren't

5  specifically enumerated in the financial records.  Next slide,

6  please.

7          And then of course there was the, as Your Honor

8  knows, the indemnity that was contained in the divisional

9  merger support agreement as well.  So there were four bases on

10 which the Court could make the finding that it did.  I don't

11 know why the Third Circuit raised this issue.  And as I recall

12 kind of highlighted the books and records language.  But to us

13 the facts were clear on this point.  The law was supportive on

14 this point.  And the Court's finding was accurate and in our

15 view does not need to be revisited.  Next slide.

16          So the second issue raised by the Third Circuit is

17 the question of the coverage of punitive damages.  And again I

18 think we can kind of start where I started before with respect

19 to the first issue, which is if the indemnity obligations were

20 broad, there was nothing that suggested they were limiting in

21 any way.  Again the parties' course of conduct was fully

22 consistent with a conclusion that punitive damages were

23 intended to be covered because they were.  I mean they were

24 allocated to and borne by Old JJCI or its predecessors.

25          The other thing I think that's important to remember

1  is that I suppose a policy argument could be advanced, and

2  maybe this is what the Third Circuit had in mind, that it's not

3  appropriate for there to be an indemnity for punitive damages

4  because the wrongdoer shouldn't be able to pass that liability

5  onto another entity.

6          But I think what's important here, even if you

7  believe that that would have some applicability and it would

8  overcome the documents and the intent, here they're all part of

9  the same corporate enterprise.  And so by moving this to, or

10  having a subsidiary with the business cover the obligation,

11  still impacts the ultimate owner.  So ultimately impacts the

12  equity value of J&J. So to me that policy argument wouldn't

13  apply in any event.

14          And the only arguments I think that have ever been

15  advanced to suggest that punitive damages couldn't be

16  indemnified are cases involving either insurance or public

17  entities, and those just have no application here.

18          So again we think the, we think the conclusion here

19  should clearly be that punitive damages are covered.  Next

20  slide, please.

21          And you know, just to take a look at a couple of

22  cases, they're not entirely on point.  But we have this Cozzi

23  case as well as the Lateo (phonetic) case.  And these were

24  situations where the courts were wrestling somewhat with policy

25  issues like what I was referring to.  And in both cases the

31

1    courts found that no, that wasn't enough to overcome what is

2    clearly indicated by the language that was used by the parties.

3    And in our case it's not only the language, it's the multiple

4    years of course of performance as well.  Next slide, please.

5            On the Shower to Shower, again it's not clear to me

6    why the Third Circuit raised an issue with this, because we did

7    put in evidence on this what we had, in terms of going back

8    over a long period of time and showing Your Honor the documents

9    that we did have.  But this maybe a slide that we showed before

10   and I'm not going to spend a lot of time on it.  But you know,

11   ultimately the Shower to Shower products, you know, we kind of

12   worked our way through the time line of how they ultimately,

13   the responsibility for liabilities associated with those

14   products ended up with Old JJCI, you know, through an entity

15   that was called Personal Products Company.  And that started

16   from a transfer that came from J&J where the assets and

17   liabilities of Shower to Shower were transferred to that

18   Personal Products Company.

19           If you go to the next slide, you may recall that we

20   showed some documents like this. There was an internal letter

21   that said that Personal Products Company will take full

22   responsibility for Shower to Shower on January 1, 1978.  And if

23   you go to the next slide, similar, this was in a 10K from 1979

24   referring to Personal Products Company and the products it

25   sold.  And one of them of course was Shower to Shower brand

32

1  baby powder.  That was one of the things that was in the

2  record.  Next slide, please.

3          And then here's an indication in 1987 that the, that

4  that business ended up in Johnson & Johnson Baby Products

5  Company. You can see the reference to Shower to Shower at the

6  bottom and that was one of the predecessors to Old JJCI. Next

7  slide.

8          So just to finish on Shower to Shower, so we provided

9  what we had on Shower to Shower. We had documentation that

10 reflected that the responsibility for that liability had been

11 picked up by Old JJCI through its predecessors.  And we had

12 importantly the course of performance that also showed that

13 liabilities for Shower to Shower had been charged to and paid

14 by Old JJCI and its predecessors over the many year period

15 since 19 -- I guess January 1, 1978.

16         So just to conclude, Your Honor, we would ask that

17 you overrule the Eagles' objection for the reasons I indicted.

18 We would ask that you continue the limited injunction that's

19 currently in effect for an additional 90 days, subject to the

20 Debtor's rights, right to seek further extensions, and

21 obviously Your Honor's ability to review the circumstances at

22 that time and decide whether you think there's still a

23 sufficient prospect for reorganization that it warrants

24 continuing the injunction.

25         We would ask that you enforce the automatic stay

33

1  because of what's happening in the tort system, in the wake of

2  your prior order.  And that you do so by making clear in the

3  order that the stay does apply to claims against Old JJCI and

4  then the JJCCI entity.  And that you also make clear that it

5  apply to successor liability claims.  But again here, just to

6  restate it, this would only be a bridge to get us to the

7  hearing on June 22nd with a clear understanding that the

8  Court's not making any ruling on the merits, it's just to carry

9  us over on a bridge so that Your Honor can then consider the

10 issues fully with any contribution that's made by Mr.

11 Placitella or anyone else on the particular issue.

12         And as I said before, we don't think there's a basis

13 to limit, or to reduce the amount of the 90 day period any

14 further.  And certainly not based on, to limit it to the time

15 of the ruling on the dismissal motions because the ruling is

16 going to be informative either way. There's no need to revisit

17 the injunction at that point.  If you grant the motions the

18 injunction becomes moot.  If you don't, I can't imagine why

19 there'd be a need to revisit the injunction based on a denial

20 of the motions to dismiss.  In our view there would be no

21 reason to do that until the 90 days would come up again.

22         THE COURT:  All right, thank you, Mr. Gordon.

23         MR. GORDON:  Thank you, Your Honor.

24         THE COURT:  Let me turn to those who are in court

25 first before I see hands raised remotely. Anybody wish to be

1 | heard?  Counsel?

2 |          MR. SILVERSTEIN:  Good morning, Your Honor, Adam

3 | Silverstein of Otterbourg PC, proposed counsel for the TCC.

4 | Your Honor, notwithstanding Mr. Gordon's presentation, this is

5 | not a motion to extend the existing preliminary injunction for

6 | 90 days. It's not a motion to preserve the status quo.  It's a

7 | motion to fundamentally alter the status quo that currently

8 | exists.

9 |          Why do I say that?  The Court only needs to look at

10 | the proposed order, which is consistent with Mr. Gordon's

11 | slides, although they are presented in a different way.  But

12 | the proposed order in paragraph 3 says, the PI order as

13 | modified by this order, shall remain effective for 90 days.

14 | That's paragraph 3.

15 |          So what are the modifications that the Debtor seeks

16 | to have this Court order currently.  Let's look at paragraph 5.

17 | In paragraph 5, the Debtor proposes that this Court stay or

18 | enjoin from the commencement and/or continuation of actions

19 | asserting Debtor talc claims against Old JJCI and JJCCI. Old

20 | JJCI is a protected party that this Court took evidence on in

21 | April. And that this Court limited injunctive relief as to.

22 |          The Court said on April 20th in reading its ruling

23 | into the record, claimants who have had over the past 18 months

24 | their claims and litigations stalled during the pendency of the

25 | prior bankruptcy should not lose more valuable time.  Therefore

1  I have determined that the TRO currently in place should be

2  dissolved and replaced with a fare more limited preliminary

3  injunction.  And that limited preliminary injunction that

4  applied to Old JJCI, that applied to New JJCI, now Holdco, that

5  applied to J&J, and a list of other protected parties that this

6  Court all had evidence on and arguments on, allowed the

7  defendants in the adversary proceeding to pursue claims all the

8  way to trial or appeal.  And the Court made clear there would

9  be no cessation of discovery or motion practice or the like.

10        What impact does having a stay or an injunction of

11  all actions asserting claims against Old JJCI have?  Old JJCI

12  is Johnson & Johnson Consumer, Inc.  It's the entity that

13  existed up until October 12th 2021, and it's the only entity

14  other than Johnson & Johnson that manufactured Johnson &

15  Johnson baby powder and Shower to Shower.  So every one of the

16  38,000 lawsuits that were pending as of October 14th 2021,

17  names Old JJCI and Johnson & Johnson as defendants.  They

18  assert claims against Old JJCI and Johnson & Johnson, because

19  those are the only parties that the plaintiffs knew about.

20  Nobody knew about LTL.  Nobody sued LTL.

21        So an injunction or stay at this point that would

22  cease all actions asserting claims against Old JJCI would stop

23  every single lawsuit currently, that's currently pending that

24  was filed as of the first bankruptcy, including in the MDL.

25  That is a complete reversal, a complete change of the status

1   quo that the Court -- reflected in the preliminary injunction

2   that the Court entered on the record on April 20th, and by

3   order on April 25th.

4           The order that the Court entered on April 25th,

5   docket 91, at paragraph 3, provides that the defendants are

6   hereby stayed and enjoined from the commencement or conducting

7   of any trial or appeal of any Debtor talc claims against any of

8   the protected parties.  And the protected parties included Old

9   JJCI.

10          So what are the other modifications that the Debtor

11  is now seeking?  Well let's look at paragraph 6.  The proposed

12  order that the Debtor would have this Court enter provides that

13  the defendants, which are the plaintiffs in the tort actions,

14  but they're defendants in the adversary proceeding, are stayed

15  and enjoined from the commencement and/or continuation of

16  actions asserting Debtor talc claims against Debtor's nondebtor

17  affiliates which included Holdco, which is formerly named New

18  JJCI, again another protected party that the Court had evidence

19  on, had arguments on, in April.  And permitted litigation to

20  proceed up until trial and appeal.

21          And the Debtor's paragraph 7 in their proposed order

22  punctuates all this, because in it it says that the injunction

23  in paragraphs 5 and 6, which I just read from, without

24  limitation, the injunction includes the pursuit of discovery

25  from the nondebtor affiliated protected parties, which includes

1  Old JJCI, which includes New JJCI, which are currently subject

2  to ongoing litigation up to trial and appeal, or their

3  officers, directors, employees, or agents.

4        So read literally if there's an action against J&J

5  today that is continuing in litigation, and an employee of J&J

6  also served as, under a shared services arrangement as an agent

7  or an officer or director of Old JJCI or New JJCI, this

8  proposed order stops all discovery as to that individual, even

9  though they're employed by J&J.

10        It's a complete change of the existing status quo.

11  And yet the Debtor has come forward with not a shred of

12  evidence or legal argument that was not presented or was not

13  available to them when the Court heard the injunction

14  proceeding in April, based on full briefing and a full day

15  evidentiary record.

16        And it's not just the TCC that's saying that.  The

17  United States Trustee's Office says that in their objection.

18  And even the Debtor's friends on the Ad Hoc Committee of

19  Supporting Counsel agree, because in paragraph 6 of their

20  response that they filed yesterday, which is docket 175, the AD

21  Hoc Committee of Supporting Counsel wrote, quote, nothing has

22  changed with respect to the legal and factual predicates that

23  form the basis of the Court's decision to enter the preliminary

24  injunction order, the PI order.

25        So if that's true, Your Honor, and everybody, other

1  than the Debtor agrees that that's true, that there's been no

2  change in circumstances since April, when the Court already

3  entered an order as to these issues, what is the basis for

4  expanding the preliminary injunction order for the next 90

5  days, when this Court is about to hear in two weeks from today,

6  whether this bankruptcy case should even proceed.  Whether it

7  passes the gateway of good faith and it should be permitted to

8  proceed.

9          The arguments I heard from Mr. Gordon are essentially

10 twofold.  One, the Debtor is, has continued to garner support

11 and progress its plan.  I read carefully Your Honor's decision

12 from the bench on April 20th.  And Your Honor explained that

13 the focus is on the Debtor's prospects for succeeding and

14 confirming a plan.  And in the transcript, Your Honor discussed

15 whether the Debtor is likely to satisfy the gateway of

16 financial distress under the Third Circuit's standards, as

17 being critical to the issue of whether the Debtor can confirm a

18 plan.

19         The Court did not focus on how many purported votes

20 the Debtor had seemed to garner.  The Court mused over whether

21 the addition of claims from 40,000 purportedly to 100,000,

22 whether that created financial distress.  And Your Honor said

23 maybe, maybe not.  The Court then went on to say, well do the

24 change in circumstances under the funding agreement, where

25 previously there were $60 billion of commitment, now there's 30

1 billion.  Does that create financial distress.  The Court said,

2 maybe, maybe not.

3        Those were the questions the Court was asking itself.

4 And the Court said it has more questions than answers at that

5 point in time.  Nothing has changed.  The Debtor hasn't

6 provided any better answer to those questions. We're going to

7 hear the answer in two weeks. But nothing has changed that

8 would warrant expanding the preliminary injunction order.

9        If anything, the Debtor's ability to move forward

10 with its plan demonstrates that there is no reason to expand

11 the preliminary injunction order, notwithstanding that lawsuits

12 have been continuing against Old JJCI and New JJCI, now known

13 as Holdco, Kenvue, Janssen.  None of that has deterred the

14 Debtor from moving forward with its plan.

15        It's going to be seeking, you know, in a matter of

16 moments approval of its disclosure statement.  It's going to be

17 moving -- seeking to move forward with its plan.  Nothing

18 that's in the Court's current scope of preliminary injunction

19 order has deterred that.  There's no basis for changing that

20 status quo.

21        The other argument is, and here Mr. Gordon just

22 conflates, as the Court has been doing, all of these entities

23 since October of 2021.  He repeatedly said we, we answered, we

24 made a motion to dismiss.  The Debtor is not a defendant in any

25 of these lawsuits.  Janssen and Kenvue are not the Debtor.  So

1  the Debtor didn't move to dismiss the Janssen and Kenvue

2  litigation. Janssen and Kenvue, nondebtors, are responding to

3  discovery, responding to motion practice.  That's no impact on

4  this Debtor.  No basis for altering the status quo.

5       If anything, for the reasons we articulated in our

6  objection, we're not going to repeat them, we didn't want to

7  repeat all the arguments that this Court has heard back in

8  April and then previously in 2021 by other official committees.

9  If anything, the Court should not extend -- should not grant

10  any injunction relief, particularly when the Court recognized

11  that the Debtor bears an uphill battle in establishing that it

12  satisfies the good faith gateway, which it will have to

13  navigate and pass in the next two weeks.

14       So there's no basis in the TCC's view for there to be

15  any injunction relief.  But at the very least, if the Court is

16  going to extend injunctive relief from this point in, it should

17  be no broader than the scope of the existing preliminary

18  injunction.  And it should be until the point when the Court

19  rules on the motion to dismiss.

20       And we agree with the Court's observations on May 9th

21  which there's always a risk of quoting the Court back to the

22  Court and I apologize for this, but we agree with the Court's

23  observation.  On the May 9th transcript at page 117, the Court

24  said, "we have an injunction, a preliminary injunction that's

25  set to expire on June 15th.  I have a motion to dismiss,

1  several motions, seven I think that will be tried. And as I've

2  said before, if I grant any one of the seven or all seven, I

3  can't imagine picking and choosing, but I grant the motions

4  then it's all academic, there's no case.  If I deny the

5  motions, it doesn't mean the injunction continues, because

6  that's already terminated.  I have to affirmatively extend the

7  injunction which requires a factual showing, probably

8  addressing the very concerns that the Third Circuit identified

9  as being problematic from the first go round.  In which case

10  there's a new order. And I will tell you right now, that in the

11  event I were to deny the motions to dismiss and extend the

12  injunction, I can't see not certifying it for the appeal to the

13  Circuit at that point.  But that's, the Circuit will benefit

14  from the full record.  The Court will benefit from a full

15  record. And the Circuit will benefit from not having issues

16  that are moot.  There will be a new order entering, extending,

17  possibly extending the injunction, based on an evidentiary

18  record that may be in conjunction with the motion to dismiss.

19  We'll have to discuss that or there won't be anything in front

20  of the Circuit because I will dismiss the case."

21          That makes very good sense.

22          THE COURT:  I'm still eloquent.  Go ahead.

23          MR. SILVERSTEIN: I didn't read it as well as Your

24  Honor said it at the time.  But it makes very good sense to the

25  TCC.  If the Court is inclined to extend any injunctive relief

42

1  at this point at all, it should be no broader than the existing

2  preliminary injunction.  It should be extended up until the

3  time that the Court rules on the motion to dismiss, at which

4  point the Court will have a full record that will address both

5  the Debtor's good faith and indubitably all of the issues that

6  the Debtor has raised in its slide presentation. And the Court

7  will have a, at that time, an opportunity to either dismiss the

8  case, at which point the preliminary injunction, as the Court

9  noted, will become moot. Or the Court will deny the motions to

10 dismiss, allow the case to go forward. Have an opportunity to

11 determine whether and on what terms the preliminary injunction

12 should be stayed, extended.  And at that point the Court can,

13 if it so chooses as it indicated, certify all of that to the

14 Third Circuit.

15         We think that, if the Court is going to extend

16 injunction relief, which again we don't think is appropriate,

17 but if the Court is going to do that, it should be no longer

18 than the Court's decision on the motion to dismiss.  Thank you

19 for hearing from us.

20         THE COURT:  Thank you, counsel.  Ms. Bielskie.

21         MS. BIELSKIE:  Good morning, Your Honor, Lauren

22 Bielskie with the Office of the United States Trustee.  I'll be

23 very brief.  For the reasons set forth in our initial

24 objection, we urge the Court not to extend the preliminary

25 injunction beyond June 15th.  Filing a plan that doesn't even

43

1  have the support of the Ad Hoc Committee of Supporting Counsel,

2  who the Debtor has been negotiating with for months, does not

3  indicate a likelihood of success.

4       The Debtor will of course still be covered by the

5  automatic stay, if the Debtor believes there are violations of

6  the existing preliminary injunction order or of the automatic

7  stay by virtue of actions against successors there should be a

8  motion alleging those violations, but that's not what we have

9  going on here.  The Debtor is asking this Court for additional

10 relief.  Thank you, Your Honor.

11      THE COURT:  Thank you, Ms. Bielskie.  Good morning,

12 Mr. Thompson.

13      MR. THOMPSON:  Good morning, Your Honor, as always

14 thank you for your patience and willingness to listen.  Okay.

15 So this case has a zero percent chance of success and it's

16 interesting that Mr. Gordon cites Bestwall, a 2019 case opinion

17 that we need to be looking at the potential for reorganization.

18 Bestwall is going nowhere.  We've moved to dismiss Bestwall.

19 If it's not dismissed we're going to appeal.  And respectfully

20 we're going to win.  Because Bestwall is not in distress and

21 neither is LTL.  And so the idea that we would be trying to do

22 what's going on in Bestwall is ridiculous.

23      A couple of things that are very important about why

24 there's zero chance of success.  LTL agrees, LTL 1.0 agrees

25 that LTL 2.0 is able to pay all current and future claimants in

44

1  full.  Just like the Third Circuit found, Mr. Kim is the chief

2  legal officer.  He said, I read to him, this is the part from

3  Judge Ambro's opinion.  They amended it.  They specifically

4  said they can pay all claimants in full.  And Mr. Kim said,

5  yeah, we can.

6          Well, that's directly against the Third Circuit

7  opinion in this case because Mr. Kim admitted that they,

8  there's no difference.  Mr. Wuesthoff says the funding is the

9  same.  There's no difference.  They can pay everybody in full.

10  Well, that's, the Third Circuit ruled on that.  They say it's

11  critical for the PI for reorganization purposes.  Well, what's

12  the purpose of this reorganization?  It's to resolve all the

13  talc claims.  That purpose was also reviewed by the Third

14  Circuit and the Third Circuit said even if that were sincere,

15  even if it were sincere, that's not enough reason to permit a

16  Debtor into the safe harbor of bankruptcy in the absence of

17  financial distress.

18          So, so far we have no difference in situation between

19  the first case in terms of being able to pay claimants which

20  the Third Circuit directly found, as well as a purpose of

21  reorganization that the Third Circuit already rejected.  Okay,

22  so I'm going to read footnote 16 from the Third Circuit's

23  opinion that was referenced about the PI.

24          Because we arrive at the same result assuming the

25  Bankruptcy Court was correct to determine LTL was responsible

45

1  to indemnify J&J for all talc costs incurs, we need not opine

2  on this conclusion.  Still, we note certain pertinent factors

3  lack full discussion in the Court's analysis of the indemnity

4  agreement relating to Johnson's baby powder in the 1979

5  spinoff.

6          For example, it is not obvious LTL must indemnify J&J

7  for the latter's post 1979 conduct that is the basis of a

8  verdict rendered against it.  Skipping the citations.  It is

9  also not clear the indemnity should be read to reach punitive

10 damages verdicts against J&J for its own conduct.

11         So Third Circuit says not clear, not obvious.  Yet,

12 we have a Debtor in this courtroom demanding to indemnify a

13 nondebtor.  The Debtor has a fiduciary duty as do its lawyers

14 to maximize the assets in the Estate.  We have a Debtor in here

15 demanding to pay stuff, Third Circuit says it's not clear it

16 has to pay.  Now, Mr. Ruckdeschel is going to deal with the New

17 Jersey Law and indemnity more than I will so I won't go into

18 that.

19         And it's all the case because Mr. Kim says it would

20 make no sense for there to be a plan approved in this case if

21 nondebtor, J&J doesn't get an injunction.  So we need to quit

22 pretending that there's some difference between the Debtor and

23 J&J.  There's not.  They're the same.  The Debtor does whatever

24 J&J says.  The problem is, is that the Debtor has clearly

25 breached its fiduciary duties to the Estate.  So they've got to

1  be removed.

2         And that motion is coming if the case isn't dismissed

3  because LTL can't be trusted to mind the store anymore.  They

4  gave away $61 billion.  And giving away $61 billion will have

5  more of an impact on the Estate than allowing 145 cases to

6  proceed in the discovery phase against Kenvue and Holdco and

7  Janssen, right.  This is $450 billion company who has got

8  thousands of lawyers that can represent them.

9         A bigger impact on the Estate is not those lawsuits.

10 It's giving away $61 billion and insisting on indemnifying a

11 $450 billion nonDebtor for liabilities the Third Circuit said

12 it's not clear it has to do. And all of this of course is to

13 benefit J&J who has given away $20 billion since this case was

14 filed. And as it turns out, wrongfully shielded by a

15 preliminary injunction.

16        Substantial majority, I'm not going to cover this too

17 much right now because I think we're going to hear about this

18 more later.  But substantial majority of claimants support the

19 plan.  We hear that a lot.  Substantial progress is being made.

20 Well, who's the Talc claimant?  Well, apparently it's anybody

21 with a first name that's represented by a lawyer who would like

22 to get paid.  That's what we know about a Talc claim.  The

23 first name in a 2019 statement and we don't know what cancer

24 they have.

25        The level of support, what's the support, all of the

47

1  plaintiff's lawyers that we've deposed that make up the Ad Hoc

2  Group say that PSA's aren't binding.  So Mr. Nachawati

3  represents 5,000 clients, won't say what disease they have,

4  doesn't know.  Mr. Watts has over 13,000 claimants, air quotes.

5  He doesn't know yet how many of those are ovarian cancer versus

6  nonovarian cancer.  Mr. Onder who we deposed last week

7  represents 21,000 claimants.  Mr. Onder and Mr. Nachawati both

8  said the plan is a work in progress.  Mr. Onder said the plan

9  that's being worked on it's not, this plan that was filed on

10 May 15th, is not going to be the one voted on.

11         Well, so if Mr. Onder and Mr. Nachawati, that's

12 26,000 claimants, so 60,000 minus 26,000 gives 34,000 and

13 that's assuming that these people exist and actually have a

14 cancer that's linked to talc which there's no evidence that

15 they do.  And so I will try to reserve other comments that

16 aren't directly relevant to the PI.  Thank you.

17         THE COURT: Fair enough, thank you, Mr. Thompson.

18 Anyone else in court.  Mr. Placitella.

19         MR. PLACITELLA:  You want to go first? Beauty before

20 age.

21         ATTORNEY:  No, I'm here for your protection.

22         MR. PLACITELLA:  Well, first I want to apologize to

23 the Court for rising out of turn.  I think it was a combination

24 of jet lag and looking down at the PowerPoint and seeing a

25 quote from my client's pleadings where I thought there was an

48

1 agreement not to go forward --

2          THE COURT:  Understood.

3          MR. PLACITELLA:  -- on our cases.  The successor

4 liability issues will be the subject of the hearing on July

5 22nd.  On April 18th, the Court declined to enter any type of

6 order related to Kenvue or Janssen in the face of it being put

7 in a pleading the night before with no further evidence.  Today

8 we're kind of in the same spot.  It wasn't in the pleading the

9 night before but it ended up in a PowerPoint.  And there's

10 still not further evidence.

11          There is no evidence before the Court to justify

12 extending the stay, even in a bridge order, as it relates to

13 Kenvue and Janssen.  It is worth the Court knowing that while

14 LTL and J&J and affiliates, I guess that's what I call them

15 now, are saying that nothing can go on in State Court they are

16 filing motions to dismiss in violation I guess of the stay.

17 They are asking for hearing dates on their motions in Atlantic

18 County.

19          So it probably could wait until July 22nd.  At that

20 time, we'll actually demonstrate to the Court that there's

21 actually a provision in the Texas merger statute that

22 contemplates liability being assigned to corporations that the

23 law permits to have liability like under New Jersey.  We'll

24 discuss the McCartney case from the Third Circuit and how that

25 supports our position.  And that how LTL has no property rights

1    to the assets of either Kenvue or Janssen that would give them

2    the right to any type of stay under 362(a)(3).

3          So because no further evidence has been demonstrated,

4    I ask the Court not to rule on the substance or comment on the

5    possibilities and just wait for full argument. And I appreciate

6    the Court indulgence in dealing with my personal issues.

7          THE COURT:  Fair enough, thank you.  Counsel?

8          MR. GOLOMB:  Good morning, Your Honor, Richard Golomb

9    for TCC Member Brandi Carl.  I just want to address one point

10   and that is the alleged heavy burden that has been placed on

11   the Debtor by the filing of these 174 new cases in Middlesex

12   and Atlantic County.  There are a number of motions to amend.

13   There are a number of new complaints that have been filed with

14   motions to dismiss.  There are agreements both in Middlesex

15   County on the motions to amend and in Atlantic County on the

16   motion to dismiss because the motion to dismiss has already

17   been ruled on in Middlesex County.  It has been denied.

18         There are motions, there are agreements, that one

19   motion to amend will be heard, one motion to dismiss will be

20   heard and the balance of the cases will be controlled by that

21   order.  There is no, there is no extra burden.  Thank you.

22         THE COURT:  Thank you.  Mr. Hansen, good morning,

23   still morning.

24         MR. HANSEN:  Good morning, Your Honor, Kris Hansen

25   with Paul Hastings on behalf of the Ad Hoc Committee, kind of

50

1  missed my turn earlier so try to be brief, Your Honor.  I

2  really just want to respond to a few points that have been

3  made.  There was an allegation from the TCC that said that the

4  Ad Hoc Committee said nothing changed and therefore our support

5  is limited to the prior injunction and not the current

6  injunction which seeks to expand it a bit.

7          That's not true.  What we meant by nothing has

8  changed, which I'm sure Your Honor understands, is the

9  compelling reasons that the Court found with the injunction in

10 place in the first place still exist.  You are running a

11 process.  You're looking at the motion to dismiss.  You have a

12 plan on file.  You may rule on a motion to set the disclosure

13 statement for approval at some point.  You're hearing lots of

14 things that are happening in this case.

15         There's a motion to terminate exclusivity, on all of

16 those things need to proceed here in this Court with the

17 collateral attack that's presented by the actions that are

18 taking place in State Court.  To the extent that the Debtor

19 believes and we do, that successor liability claims and actions

20 against affiliates will also present a similar collateral

21 attack, then the stay should be extended and it should be put

22 in for a period of time to allow this Court to do what it needs

23 to do and adjudicate what's before the Court.

24         The US Trustee also made a point that said the Ad Hoc

25 Committee doesn't even support the plan any longer.  That's not

1  true, Your Honor.  I've said repeatedly in front of the Court,

2  we've said in our pleadings and the Debtors have said it as

3  well.  We had a term sheet that was part of the plan support

4  agreement.  When you take a term sheet then you go to document

5  that in the form of a plan and trust distribution procedures,

6  et cetera, there are going to be areas of disagreement.  That's

7  the devil in the details.  That's how it always works.  That's

8  in any corporate transaction that happens in connection with

9  any plan of reorganization that's drafted between parties and

10 it's no different than the myriad of cases where you have a

11 term sheet with a PSA that gets filed and everybody needs to

12 bring that to conclusion.

13       So we do expect the Debtors to file an amended plan

14 that has the full support of our Committee and we do support

15 the plan that's on file.  We're just working through it

16 together, to get it to a point where we believe it can go out

17 and be solicited and go to the claimants.  So with that, Your

18 Honor, we support the injunction.

19       THE COURT:  Thank you, Mr. Hansen.  I believe that

20 takes care of those in court.  Mr. Ruckdeschel.

21       MR. RUCKDESCHEL:  Thank you, Your Honor, let me get

22 this hand thing down.  Jonathan Ruckdeschel on behalf of Paul

23 Crouch.  Judge, I appreciate the indulgence in allowing me to

24 appear by Zoom as always, and I kind of feel a little bit like

25 Yogi Berra, right.  It's deja vu all over again.  I filed I

52

1 believe the first pleading for Mr. Crouch June 22nd last year,

2 opposing the extension of the preliminary injunction in LTL 1.

3 And, and I want to start with that because there was something

4 said today that's new, right.  And I was thinking this is all

5 the same old nonsense.

6        But there was something new today because last year,

7 when I appeared before the Court I presented the Court the

8 controlling New Jersey Law that relates to indemnity of a

9 parties' independent liability.  And let's just set the stage

10 once more.  Pre-1979, LTL's predecessor doesn't exist.  There

11 can be no claim legally or factually that anything that

12 happened pre-1979 is anything other than Johnson & Johnson's

13 independent nonderivative liability because it was directly

14 running the talc business.  So 1979.

15        So I came before the Court and I said Your Honor,

16 under controlling New Jersey law and I cited Cozzi versus Owens

17 Corning Fiber Glass 164 A. 2nd 69, Mantilla versus North

18 Carolina Mall Associates 7070 A. 2nd 1144 from 2001.  And there

19 are a host of other cases.  Under New Jersey Law which controls

20 this matter, right, the 1979 indemnity agreement is signed

21 between two New Jersey corporations.  The signature block

22 reflects that it's actually signed physically in New Jersey and

23 there is no law choice provision that says some other law

24 controls.  So New Jersey Law undoubtedly controls.

25        And New Jersey Law requires specific language if you

53

1  are going to indemnify somebody for their own tortious actions.

2  And the case law -- that was ignored.  The Debtor didn't

3  respond to my argument then.  The Debtor didn't produce any New

4  Jersey Law contrary then or now.  So what's new?  And I raised

5  these cases again in the preliminary injunction argument

6  earlier in LTL 2.

7          For the first time today, I believe I heard a

8  citation.  I heard a citation to the <u>Bouton</u> case, 423 F. 2nd

9  643, from the Third Circuit and the <u>Bippus</u> case from the

10  District of New Jersey, 437 F. Supp. 104.

11          And this is the first response that we've gotten.

12  There was a slide.  It said we're going to show you why we're

13  responsible for indemnifying and why the contract covers it and

14  there was pre 79 and post 79 and punitive damages.  They never

15  got to punitive damages and we'll come back to that.  So while

16  I'm here, I pull up <u>Bouton</u>.  And <u>Bouton</u> specifically applies

17  New York Law.  There is, there is a specific discussion "It is

18  undisputed that the contract, although the subject of

19  negotiations is of a general form, oh, I'm sorry.  The Litton

20  contract provides it shall be construed and interpreted

21  according to New York law.  It's undisputed the contract

22  although subject to negotiations is the general form originally

23  prepared by counsel for Litton.  Litton's three contentions

24  must therefore be determined under New York Law."

25          So who cares?  All right.  New Jersey Law controls

54

1  this issue.  And <u>Bippus</u> doesn't say what law it's applying.  It

2  only cites <u>Bouton</u>, all right.  So no response to the

3  controlling New Jersey cases that say you have to have specific

4  not general, right.  So we hear from Mr. Gordon.  Oh, this is

5  broad general language and it's assuming everything.  So what.

6  New Jersey Law controls.  New Jersey Law requires specific

7  language, not broad language, not general language, specific

8  language if you're going to do this.

9        And I know Your Honor is curious about State Law

10 these days because you made some PowerPoint slides Power Point

11 slides and <u>Whittaker Clark</u>, <u>Whittaker Clark</u> argument and I only

12 read the transcript but you know the discussion there that

13 State Law implications with respect to receiver, that's the

14 same issue here.  New Jersey State Law controls this issue.

15 They haven't cited any of it because they're wrong.  They can

16 never, never enforce the 1979 agreement over objection, right.

17       And so what they're doing is well, we'll just agree

18 to do it.  Post 1979, so now post 1979 Your Honor found that

19 the contract was ambiguous.  The Third Circuit said it's by no

20 means clear, right, that they have any indemnity obligation

21 post 79.  And the response to that from the Debtor through Mr.

22 Gordon is I have no idea why the Third Circuit did that.  Well,

23 who cares?  The Third Circuit said what it said and whether Mr.

24 Gordon understands why they did it or not, that's what they

25 said and nothing has changed about that issue.

1          They have independent nonderivative liability and you

2    need only look at the verdicts that have been entered in states

3    where there is apportionment of fault, right, several liability

4    where liability is assigned to Johnson & Johnson and a

5    different amount of liability is assigned to JJCI.  That's

6    their own liability.  It's not derivative because in

7    apportionment of fault states you're only responsible for your

8    own fault.  That has happened repeatedly.  They have their own

9    nonderivative liability.

10          And then punitive damages, right.  I find the

11    punitive damage reference on the slide to be most confusing

12    because Johnson & Johnson is the party in the leading case on

13    this issue in New Jersey.  Aetna versus Johnson & Johnson which

14    we've cited in the papers to the Court before that says you

15    cannot indemnify as a matter of public policy conduct that is

16    reckless, willful, wanton, right.  We're not going to recognize

17    that in New Jersey.

18          And as the Court knows, J&J has been repeatedly held

19    J&J, not JJCI, not LTL, J&J has been repeatedly held

20    responsible for punitive damages.  There cannot be an indemnity

21    there.  So there's no right to indemnity, period.  And the

22    citation to New York, the Court applying New York Law is

23    inappropriate and it doesn't reflect the undisputed facts in

24    this case and it reflects, Your Honor, the casual disregard of

25    the facts that's demonstrated by the Debtor over and over in

this case and I know I've been harping on this a lot very
recently but it has happened again right there, right?  And
we've got a plan forward, right.  We've got to path forward.

Well, that was a bill of nonsense too.  The plan
support agreements, we've taken the depositions now.  Mr. Onder
testified to me last Thursday that he didn't have enough
information as of the plan support agreement to decide whether
he could recommend it to his clients.  He said the information
wasn't present, right.  Mr. Kim testified in your courtroom
that LTL wasn't going to enforce the plan support agreements.
They weren't binding, right.

Mr. Onder, again, we don't have the transcript yet
but Mr. Onder testified last Thursday because there was no
value given for the nonovarian cancer claims, the quit pay
claims under the term sheet, he had no way to tell whether he
could recommend that to his clients or not.  So Mr. Onder may
have generally supported the proposition that I would like to
have a settlement and he may generally support the proposition
that he doesn't care if it's in bankruptcy or not.  But the
suggestion that Mr. Onder at the time of signing the plan
support agreement was supporting the terms in the term sheet
it's rejected by Mr. Hunter right.  And Mr. Nachawati I believe
testified to the same.

So now let's look at the May 15th plan before Your
Honor because again, there, Judge, we got a path forward.

57

1   We're walking down the path forward.  Mr. Onder testified

2   unequivocally last Thursday.  I'm never going to recommend the

3   May 15th plan to my clients because it has been agreed already

4   that it's never going to be submitted.  He said that.  He said

5   we've already got a number of things.  You got to move past

6   that and I'll never have to recommend that to my clients.  I'll

7   never have to even decide if I can recommend it to my clients

8   because we've moved past it.  It will never be submitted.

9         And I found that extremely surprising, Judge.

10  Because the Debtor has never come to the Court and never come

11  to us or the TCC as far as I know and told, or the US Trustee

12  and said hey, I know we submitted this plan on May 15th but you

13  know the guy with 21,000 claims, more than anyone else has

14  already agreed with us that we're never going to submit it for

15  a vote.  We never heard any of that.  So path forward, not

16  according to Mr. Onder's sworn testimony.

17        And that's a problem.  That's a problem, they

18  continue to prey on Your Honor's good faith that maybe if we

19  let this ride out they'll reach a resolution, right.  And

20  that's admirable for the Court.  I've said this to you before.

21  I'm delighted that you have faith in the bankruptcy system.

22  That's what bankruptcy Judges should have.  But your trust is

23  being abused and it's being abused over and over and over

24  again.

25        We're farther away now then we were on April 4th from

58

1  a path forward because they've lost 21,000 votes from Mr. Onder

2  with respect to the May 15th plan.  Mr. Nachawati says it can't

3  figure it out yet, right.  And you've had all the unified

4  support coming in from people all over, different

5  constituencies, the State Attorney General, the US Trustee, Mr.

6  Crouch, Monnie Rackel (phonetic), the Committee, right.  And

7  this all comes back to the question then of well, you know

8  what's the reasonable likelihood of success and with the

9  standard for injunction, the reasonable likelihood for success

10 here is not the question of whether the Debtor LTL could ever

11 come to a resolution of LTL's liability by itself.  Because

12 with respect to LTL, right, J&J is just another unsecured

13 creditor at best, right.

14        So what they're trying to do is get J&J out.  Mr. Kim

15 was absolutely clear about this in his deposition as Mr.

16 Thompson said.  Mr. Kim admitted over and over there wouldn't

17 be any point in doing this if J&J wasn't getting out, right.

18 And the question with respect to reasonable likelihood of

19 success, Your Honor, is whether this Court could ever grant

20 J&J, this massively solvent company that gives away a billion

21 dollars a month, a channeling injunction or the equivalent of a

22 channeling injunction.  Because they decide they want to pay in

23 some money.  And get out for their own independent liability.

24 And the answer to that is no.  There's no reasonable likelihood

25 of that.  It's theoretically possible that if LTL could show

1  that LTL qua LTL was in financial distress and that LTL had a

2  legitimate purpose in bankruptcy because it was overwhelmed

3  that LTL could theoretically put it together and get its own

4  liability out in bankruptcy.

5       But are you ever going to be able to get J&J out?

6  No.  And that's the question for preliminary injunctive relief

7  with respect to J&J that has to be answered.  And Your Honor, I

8  submit to you that it is a head thing to say well, we're making

9  progress.  We've got a path forward.  Well, if you just let it

10 ride out a little longer, we might be able to get people to

11 agree.  That's not the analysis that's relevant to this and

12 with that, Your Honor, I thank you for your indulgence and I'll

13 be quiet.

14      THE COURT:  Thank you, counsel.  Mr. Maimon, and I

15 think I've got it pronounced this time.

16      MR. MAIMON:  Yes, thank you, and I appreciate Mr.

17 Satterley's promising never to call me late for dinner.  I

18 would like to follow up on two areas, Your Honor, and I won't

19 be repetitive.  First of all, with regard to Mr. Satterley

20 asked me to raise three points with regard to the Eagles'

21 matter which I think have been obfuscated by the Debtor's

22 presentation.

23      Number one, just so it's clear to the Court, LTL

24 unlike the Valadez case, LTL is not a party defendant in the

25 Eagles' case.  Mr. Satterley has abided by the automatic stay

60

1 and has not sued and has not even sought relief from the

2 automatic stay to add LTL as a defendant in the Eagles' case.

3 It was only Johnson & Johnson and the retailers.  And

4 therefore, pursuant to the terms that Your Honor put in place

5 in your April 20th preliminary injunction order, there's no

6 problem with the Eagles' case unless you expand the injunction

7 like they're seeking to do.

8 The Eagles' case qualifies under California law as a

9 preference case, as the Valadez case did and Judge Seabolt has

10 set it down for July 24th.  Your Honor knows from your

11 experience with the Valadez case that Judge Seabolt is quick on

12 his feet.  He can adjust trial dates to accommodate the stay

13 that Your Honor is putting in place for a period of time and

14 therefore there's no reason to put out a 90 day stay on trials

15 with regard to it.

16 Finally, with regard to the issue of prejudice, there

17 is not only the normal prejudice that Mr. Eagles and his family

18 face by having their day in court denied to them, but there is

19 an extra prejudice that is being intended by LTL and J&J and

20 the retailers in seeking the stay, because the plan that was

21 set forth, by LTL provides that somebody like Mr. Eagles who

22 has additional asbestos exposure in addition to his J&J

23 exposure gets nothing under the plan, gets zero.  And therefore

24 if the trial goes forward against the non-J&J defendants, which

25 it has to under the preference statute, and the jury allocates

61

1  fault to J&J and its affiliates which it must under California

2  law, thereby reducing the judgment that the Eagles family gets,

3  J&J gets a free ride.  They never have to pay a penny and the

4  Eagles family suffers.

5       And so this is just an attempt to use the legitimate

6  State Law that restricts a plaintiff's ability to recover and

7  now extend a stay under well, we're just trying to do the same

8  thing over again to the detriment.

9       That brings me to the issue of the indemnify.  And

10 Mr. Ruckdeschel talked about the indemnity issue but the only

11 other thing I'll add is that even if there's some, even if

12 there is some theory of indemnity that's valid, which there

13 isn't, it only makes Johnson & Johnson and the other protected

14 parties nonsecured creditors against LTL.  That's all they are.

15       And so they have no preference over the victims.

16 They have no preference.  The Court expressed in its April 20th

17 ruling on the PI order its view regarding the applicability of

18 the automatic stay under 362 to nondebtors, J&J, the retailers.

19 And Your Honor said I believe that it extends the stay that I'm

20 going to, giving my injunction order, I am going to allow for

21 causes of action to be brought, and I'm going to allow for

22 discovery to go forward and I'm going to allow for everything

23 up until trial and I'll get to the June 15th deadline, but

24 that's what I'm going to allow.  And so other nonparties, other

25 people who they seek to have protected parties shouldn't be put

62

1  in a better posture than J&J and the retailers and I think here

2  specifically with regard to Kenvue and Janssen and Holdco.   And

3  I'll get to the adjourned theory in a moment but what

4  distinguishes those and specifically Kenvue from J&J or the

5  protected parties or the retailers, is that there's no claim

6  that JJCI or LTL indemnifies Kenvue.

7          In fact, the undisputed and unquestionable evidence,

8  and it's in the SEC filing so you have to say that there either

9  a violation of SEC regs or they told the truth.   The truth is,

10 is that the indemnity for Kenvue comes from J&J not from LTL.

11         The concept of giving a bridge is another attempt to

12 manipulate the system here and to manipulate the rights.   We

13 relied and we were all on the phone call when Mr. Placitella

14 got up late at night in France because they were trying to pull

15 a fast one with one of these shortened time applications.   We

16 relied on the representation by the Debtor and it's reflected

17 in the TCC opposition brief, that the issues regarding Kenvue,

18 Janssen and Holdco would be dealt with at a later date.   And

19 therefore we didn't file anything with regard to that.

20         The Committee on purpose didn't file anything on that

21 and now Mr. Gordon as a matter of just matter of fact, we just

22 want that bridge order and we'll talk about it today when

23 nobody has had the due process opportunity to raise the issues.

24 And so the only issue of prejudice that they raised in their

25 papers and up until now is what they called the prejudice of

1   Apex (phonetic) depositions that were being ordered and they

2   would like an opportunity to deal with that.

3          Mr. Placitella and everybody involved says we'll put

4   up, I'll put off all depositions and therefore that prejudice

5   isn't there.  They said that Kenvue never manufactured or sold

6   talc in the United States.  We will be able to show Your Honor

7   that that's false also.  But that should really not be here and

8   trying to slip in the Kenvue and Janssen and Holdco bridge

9   really hurts, does tremendous harm because as Mr. Golomb said

10  there are proceedings that are not impacting the Debtor at all

11  going on in State Courts.  Again the indemnity for Kenvue is

12  born by J&J directly, by contract obligation, by J&J to Kenvue

13  and LTL has nothing to do with that.

14         But yet, conflating everything Mr. Gordon says the

15  burden put on us by these motions to dismiss in Kenvue and

16  Janssen.  The time, the money that we have to expend and the

17  prejudice to us and we need to stay focused.  Well, LTL is not

18  a party to those actions.  The plaintiffs have honored the

19  Court's ruling of the automatic stay, have not brought LTL in.

20  LTL has no indemnity obligation and therefore LTL is not

21  staying any if you believe, if you will indulge the fiction

22  that LTL is independent, and that Jones Day is actually working

23  for LTL, neither Jones Day nor LTL are spending a time or a

24  minute on anything having to do with Janssen or Kenvue in the

25  State courts and therefore there's no time, there's no money,

64

1  there's no prejudice and certainly there's no prejudice that

2  should outweigh the ability of these cancer victims to continue

3  in their actions.

4          There continues to be, Your Honor, and I have two

5  more points to make.  There continues to be the

6  misrepresentation by LTL and it was done again today, contrary

7  to the sworn testimony of the lawyers who signed the PSA's that

8  they have claimant support.  Each of these lawyers who have

9  testified who signed PSA's have stated unequivocally that they

10 cannot say that their clients support any plan at this point.

11 They haven't advised their clients about it and their clients

12 haven't weighed in on it.  They haven't made recommendations to

13 their client.  But the insistence in court proceeding after

14 court proceeding to allege that there is "claimant support"

15 when all you have at best, and we know that that's not true

16 either, is lawyer support shouldn't be countenanced.

17         I'll end with this, Your Honor.  I know from having

18 reviewed again the transcript of the April 20th hearing and

19 watching that as Your Honor issued the ruling, that it weighs

20 heavy on this Court's conscience the denial of the Seventh

21 Amendment rights of cancer victims for so long.  The profundity

22 of that prejudice and that denial grows by the day.  And yet,

23 the Debtor is here seeking an expansion of that preliminary

24 injunction and an extension of its time needlessly.

25         And I'll end by reading its opposition to the Third

65

1  Circuit Court of Appeals with regard to the preliminary

2  injunction.  In opposing the writ of mandamus that

3  characterized the writ as an extraordinary remedy reserved for

4  cases in which lower court actions amount to a judicial

5  usurpation of power, "The Bankruptcy Court's modest decision

6  here to grant the preliminary record injunction lasting only 60

7  days and barring only trials, and to decline to sua sponte

8  dismiss the case is a far cry from judicial usurpation."

9          Furthermore, they told the Third Circuit in page 13

10  of their opposition to the mandamus.  Unlike an LTL's first

11  bankruptcy case, (and other asbestos bankruptcies) the

12  Bankruptcy Court issued only an extremely limited by the Debtor

13  stay extension and injunction.  It stays only trials and only

14  for 60 days.  That's what LTL said.  Thus, the Court found the

15  talc claimants will not be harmed.  That's what they said.

16          They seek a 150 percent time extension of the trial

17  ban.  They seek an extension and it's typical of this Debtor to

18  speak out of both sides of its mouth.  Once, when it's arguing

19  to the Third Circuit that you don't have to do anything right

20  now.  We're very limited and we're on a very short time period.

21  But now when they come in front of Your Honor, that's out the

22  window and they're arguing for an extension in scope and an

23  extension in time.  The Court should not grant it.  I

24  appreciate the opportunity to argue.

25          THE COURT:  Thank you, Mr. Maimon.  Mr. Gordon.

1          MR. GORDON:  Greg Gordon, Your Honor, Jones Day on

2    behalf of the Debtor.  So there was a lot said on a number of

3    subjects and I'm not even going to remotely attempt to address

4    all the things.  But I do want to address the overriding tone

5    that is being presented to Your Honor that we're being

6    basically duplicitous, talking out of both sides of our mouth.

7    We haven't done this.  We haven't done that.  We've

8    misrepresented this and misrepresented that.  That is all

9    blatantly false.

10          And the characterizations that I'm hearing of things

11    are almost breathtaking.  The way the spin is coming with

12    respect to snippets of depositions which lawyers are referring

13    to and suggestions that the plan is falling apart.  I mean for

14    Mr. Ruckdeschel to say that we're, we've gone backwards since

15    the last hearing based literally on mischaracterizations to me

16    is just shocking.

17          And you know speaking of Mr. Ruckdeschel, he's so

18    adamant that he's correct and that we're wrong, and he says so

19    many things that are just incorrect.  For him to say that for

20    the first time we presented cases on the issue of the indemnity

21    is just wrong.  I mean we presented those cases back when we

22    were in North Carolina.  They've been part of the briefing from

23    the beginning.  I mean even worse Your Honor, for him to stand

24    here and say what New Jersey Law applies under governing cases

25    and to suggest that it requires, those cases require some

67

1  specific language on the indemnity, that's not what those cases

2  say.

3       I mean those cases say that it's, here's the one, the

4  Mantilla case. "As a matter of well settled legal doctrine, it

5  is clear that indemnity provision is to be construed in

6  accordance with the rules for construction of contracts

7  generally and hence that the judicial task is to ascertain the

8  intention of the parties." That's what that case says.

9       The other cases he cites say the exact same thing.

10 That he's representing in this tirade about the conduct of the

11 Debtor that we're the ones that are misstating the law, that

12 we're ignoring cases that are right on point, cases that he has

13 misstating what those cases hold.

14      And you know Mr. Thompson, same thing, I mean

15 completely mischaracterizing the record and obviously lots of

16 hyperbole. And of course lots of focus on issues that has,

17 they're just raising points that are not even relevant like Mr.

18 Maimon saying that well, there is no indemnity of Kenvue and

19 Janssen. Therefore by the Debtor's own admission there's no

20 basis for any kind of stay relief. Well, that's not our

21 position. He's just making an argument about something that we

22 haven't even presented to Your Honor.

23      But having said all that, what's most striking to me

24 about everything we've heard today, and it probably, Your Honor

25 probably has the same reaction. There's like a complete lack

1  of meeting of the minds as to even what the requested relief

2  is.  And there were statements by TCC counsel about the

3  proposed form of order and criticism of the language and

4  suggestions that some of the language is overly broad.  But I

5  tried to be clear in our presentation what we're seeking.  And

6  what we're seeking is not what you're hearing the other side

7  characterize the relief as.

8          And so we're in this very odd situation or at least I

9  am where I hear points the parties are making and I'm thinking

10  we don't contest those points.  And fundamentally we're not

11  asking for a flat out injunction against all these lawsuits.

12  I've said it now two or three times in my presentation.  That

13  just is being ignored.

14          So I don't know what to say about that.  To me every

15  argument utterly ignored the fact that Your Honor said the

16  automatic stay remains in place.  And in my mind there's two

17  separate issues.  There's the injunction and there's the

18  automatic stay.  And on the injunction just to be clear, we're

19  not seeking an expansion of that.  We heard what Your Honor

20  said.  You limited it to trials only.  We obviously wanted a

21  broader injunction like that but that's where we are.  We are

22  not asking Your Honor to revisit that issue.

23          But what we are asking Your Honor to do is to enforce

24  your ruling that the automatic stay remain in place and it's

25  only for that limited purpose that we've asked for this other

1 relief.

2       So having said all that, we're happy to sit down with

3 the other side to work on the form of the order if they think

4 the language is overly broad and it actually would have Your

5 Honor ordering things that are beyond the scope of the relief

6 we're seeking.

7       But again I've tried to be clear that we're just

8 asking for a 90 day extension of the existing injunction.

9 There's no inconsistency in terms of what we said to the Third

10 Circuit and what we're saying here.  But in addition, because

11 these other issues have come up in these cases which in our

12 view are clear violations of the automatic stay.  We're simply

13 asking Your Honor to enforce the automatic stay as well.

14       THE COURT:  All right, thank you all.  I've heard

15 enough argument, heard plenty.  I will keep you all in suspense

16 for a few hours until I address all of the issues for today's

17 calendar at one time.  Since I learned so much from listening

18 to you all.  We're going to take a break now.  But let me ask

19 this.  So we're done with the preliminary injunction and the

20 bridge order issues.  Do you want to, what's your suggestions?

21 Do you want to take a slightly early lunch break now and just

22 come back and knock those two matters off, or do you want to go

23 through, probably the issue of the Ad Hoc reimbursement would

24 be more quickly addressed than exclusivity and the disclosure

25 statements.  Thoughts?

70

1           MR. MOLTON:  Good almost afternoon, Your Honor.  I

2    see we're two minutes to noon or something like that.  So in

3    any event, David Molton of Brown Rudnick counsel to the

4    official Talc Claimants Committee along with co-counsel.  I

5    think we appreciate a break with lunch now and then we would

6    all be energized to move this, move this train to its

7    conclusion today.

8           THE COURT:  All right.  Mr. Gordon, concur, make

9    sense?

10          MR. GORDON:  My preference would have been to keep

11   going and get exclusivity out of the way before lunch but I'll

12   defer to Your Honor on that.

13          THE COURT:  Well, I know you all.  If you get your

14   lunch at three o'clock, that may work so --

15          MR. RUCKDESCHEL:  In that regard, I would ask the

16   Court's indulgence to read three sentences from the Mantilla

17   decision given the representation of Mr. Gordon that I was

18   misrepresenting it, literally three sentences.

19          THE COURT:  No.  No, you're done.

20          MR. RUCKDESCHEL:  Understood.

21          THE COURT:  I'm sure we'll squeeze it in somewhere

22   along the way over the next few weeks.  So let's take a break

23   folks.  Let's try to be back 40 minutes should be enough.

24   You're not going anywhere.  12:30.  Thank you.

25              (Court stands in recess @ 11:50:58 a.m.)

1          (Court resumes in session @ 12:36:41 p.m.)

2          THE COURT:  Okay.  Let's start up once again and I

3  believe we're going to move to the committee's exclusivity

4  motion.  I guess we're also after that, Mr. Gordon will address

5  the Debtor's disclosure statement hearing?

6          MR. GORDON:  Yes, Your Honor.

7          THE COURT:  Good afternoon.

8          MR. MOLTON:  Good afternoon Your Honor, good

9  afternoon everyone, may it please the Court.  David Molton of

10 Brown Rudnick, co-counsel to the Tort Talc Claimants Committee.

11 Judge, I don't want to disappoint you.  We're not going to be

12 as long as some of the people that were in front of me.  I'm

13 not going to be repeating the case law and arguments that are

14 in the briefs.

15         Your Honor saw our motion.  Your Honor saw the

16 Debtor's and the Ad Hoc Committee's response and Your Honor saw

17 our reply yesterday.  I believe the authorities and arguments

18 are well thought, well put forward and Your Honor will have an

19 opportunity to address them.  So I'm not going to be case law

20 and indeed on this motion right now under these circumstances.

21 I don't think there's, should be any dispute as to what the

22 case law is and at the end of the day, this comes down to Your

23 Honor's decision making and Your Honor's discretion based on

24 the facts in front of you.

25         I want to caveat one thing and then say one other

1  thing.  Needless to say, Judge, is we put a big black box on

2  every one of our papers dealing with things like plan and

3  exclusivity.  We're primed to the motion to dismiss that's

4  coming up.  We believe this case is a bad faith filing for all

5  the reasons you've seen in the various papers.  I need not

6  repeat them here.  And based on Third Circuit precedent we

7  believe there's little way for Your Honor to do anything but

8  dismiss this case as a bad faith filing.

9           Be that as it will, we have no idea what Your Honor

10 will or won't do.  And this case may go forward.  And

11 according, the Committee needs to go forward at that point with

12 it if it does.  But our position is of course without prejudice

13 and everything I say here is without prejudice to the motions.

14          I do want to make one comment.  Other people have

15 said it and I think it's really important.  I know Mr. Gordon

16 gets very upset when he believes people are making

17 mischaracterizations.  He uses the term offended and shocking.

18 One of the first things Mr. Gordon did today and said today as

19 he stood up here again and I think one of the prior folks who

20 had the roster mentioned.  He said a substantial "number of

21 claimants" has supported the Debtor's plan or is already

22 supporting the Debtor's plan.

23          Mr. Gordon knows that's wrong.  Mr. Gordon knows

24 that's inaccurate.  Mr. Gordon knows that every plaintiff

25 lawyer who was asked that question said no, that's not the

1 case.  I may have signed a PSA, plan support agreement that I

2 would recommend a plan that's consistent with this term sheet.

3 But to continue to use this public, public platform to state

4 what he knows is untrue, I would urge him to stop that.  We'll

5 deal with all the issues vigorously but also accurately.  So I

6 just want to put that down.

7         Judge, we believe this issue, and I think I've been

8 waiting for my turn at this roster podium for a year by the way

9 on this issue.  We believe today is a pivotal day and Your

10 Honor's rulings here regarding both exclusivity as well as

11 disclosure statement and timing are going to be pivotal for how

12 this case proceeds.  Ms. Cyganowski will be talking about the

13 disclosure statement issues and scheduling after Mr. Gordon

14 speaks.  You know it's the Committee's belief that nothing

15 should go forward until Your Honor at the very least makes a

16 decision on the motion to dismiss.

17         But those are my preambles and I'm sorry they took as

18 long as they did and now we'll get to the meat of the matter.

19 We believe it's ironic, Judge, wholly ironic that both the

20 Debtor and the Ad Hoc Committee after 20 months, going on 21

21 months in this case, and I say because I'm not counting those

22 two hours and 11 minutes, it's the same case asking for the

23 same relief.  We think it's ironic that they're opposing the

24 Official Committee's request for the end of exclusivity.  We've

25 heard from day one, they came in here in front of Your Honor,

1  Judge, all we want is a vote, Your Honor.  That's all we want

2  is a vote.  It turns out that all they want is a vote on their

3  proposed plan.  That's all they want.  They don't want

4  competition.  They don't want discussion.  They don't want to

5  good faith decision making by the claimants as to where is a

6  better avenue if this case proceeds to a conclusion.

7       And what they want is a vote, a single vote like in

8  those countries that have one party and one candidate for a 25

9  year limited fund capped, the sole purpose of which is to give

10  a get out of jail card "resolve all talc for all time",

11  "resolve all talc for all time" to the most solvent corporation

12  in the United States that can pay full value to every claimant

13  today, today.  Not 25 years from now but today.

14       And what are we know about this plan that has been

15  proposed?  Well, I heard a little bit of Mr. Watts and I'm not

16  going to say I'm quoting him specifically, but I think what he

17  said is he has no idea what talc claimants will actually be

18  paid under the point system, it's a point system their grid,

19  folks would look at it and say those look like dollars, but

20  they're not dollars, they're points.  And they're points that

21  could be worth five cents, 10 cents.  The Debtor says maybe

22  more than a dollar.  I don't think so.

23       But he has no idea what those Debtors, what those

24  claimants, what his clients today will actually be paid.  And

25  what's the claim pool?  That's another question.  Well, Mr.

1  Watts whether I don't know if he has got 13, 15, 17,000, my

2  recollection of his deposition he has no idea what the disease

3  type is of his clients.  He's waiting to receive diagnoses and

4  documents and all this other stuff but he wasn't able to

5  testify under oath just yesterday, I think, seven o'clock in

6  the morning Eastern time, four o'clock in the morning Pacific

7  time.  No idea.

8        Mr. Onder, what did he say about his 21,000, big

9  number, I mean they touted it, they touted it.  Well, he thinks

10 9,000 are ovarian cancer that's connected to a Daubert finding

11 that would allow him to proceed if they went to court in front

12 of a jury.  I believe he said 9,000 are not connected to a

13 Daubert greenlight adjudication.  And I think Mr. Murdica said

14 that J&J never in its history has settled one of those cases by

15 the way.

16       And there's 3,000 I believe he said that he has no

17 idea what they are.  Maybe I got the numbers a little wrong but

18 I think for the purpose of this presentation close is close

19 enough.

20       We heard, you know Debtor has known that the TCC has

21 been examining a plan.  A plan that's based on their own

22 creations, meaning their funding agreement for some time.  We

23 did it last part one and we're here in part two.  Their

24 response to us, well, there's no plan.  Well, Judge, you know,

25 we have to be very careful in this case as Your Honor knows

1 because if we put out a plan without Your Honor allowing us to

2 do so or even a term sheet, I can clearly know what will be

3 coming from me and others on the Committee so we play it very

4 careful under the circumstances of the case where the Debtor

5 allegedly on behalf of its talc claimants sues its talc

6 claimants experts in federal court.

7 So in any event, do we have a plan? Yes. They kind

8 of know what it is. We actually gave Your Honor a little pre-v

9 yesterday. It's not that hard of a plan. It's a confirmable

10 plan and it's one that has two aspects of it, two aspects of

11 it. And you know I'm not here to go through the plan. If Your

12 Honor wants it, we're going to urge Your Honor to allow us to

13 file it. Whatever Your Honor does with scheduling at least

14 allow us to file it so the talc world can see it and start

15 discussing it in the context of what the Debtor has offered

16 after 20 months.

17 But Mr. Goodman here of my office if Your Honor wants

18 today, and I don't know if Your Honor wants it, is prepared to

19 go through a dep that kind of gets in more detail. The plan is

20 two components. It has got a component that utilizes the

21 funding agreement and utilizes the funding agreement, the

22 present funding agreement, the 2023 funding agreement. But it

23 also has a toggle, Judge, and it's going to have a toggle when

24 Your Honor allows us to publicize it, to file it, it's going to

25 have a toggle to allow Johnson & Johnson the defendants through

1  way of a structured dismissal by Your Honor to take advantage

2  of architecture they know exists that could exist outside of

3  bankruptcy that would provide "the resolution of all talc for

4  all time including futures".  They would get, they would be

5  done with it.

6          It would give them that opportunity to do that.

7  Whether they will or won't is going to be up to them but we

8  would give that to them and clearly from our perspective the

9  values with respect to both, both Toggle A and Toggle B of our

10 plan we believe will garner significant creditor support, huge

11 creditor support because these are real numbers we're going to

12 be dealing with based on real values.

13         But I'm going to deal instead right now, Your Honor,

14 and if Your Honor wants to hear about the other, the toggle to

15 the structured dismissal, we've got, we can talk about it but

16 what I'm going to be dealing with his since that's a voluntary

17 alternative, I'm going to be dealing with our bottom up plan.

18 It's a bottom up plan.  It's not a cap.  It's not a capped

19 fund.  It's not a pot.  This is a full value case with the most

20 well off company in America.  And I said if they wanted to

21 could pay every one of these talc claims full value tomorrow

22 and not miss a beat.

23         It's a full value case for all claimants whether it's

24 ovarian cancer, mesothelioma, third party payor, the States, we

25 also offer and will offer or propose to offer real dollar quick

78

1  pays to others but those quick pays will be for real dollars,

2  not for points.

3         It's funded, Your Honor, by the funding agreement,

4  the 2023 funding agreement.  It's back stopped if necessary by

5  a resurrection of the 2021 funding agreement, the avoidance

6  claims will go to the trust, those rights will go to the trust.

7  The enforceability, because I know the Debtors in their

8  opposition yesterday and their objection who know where we're

9  going, said well, we don't have to pay.  Johnson & Johnson

10 doesn't have to pay.

11        That issue and we would be dealing with Section C-1

12 of the funding agreement not C-2, you know and relying on

13 established Third Circuit precedent like <u>Federal Mogul</u>, you

14 know 20 year old case I believe.  The enforceability of that

15 would be determined in the confirmation proceeding.  The

16 enforceability of the obligation under the funding agreement.

17 And if Your Honor found that the defendant's agreement is as

18 they say it was, at least at one time, that can be part of the

19 plan with appropriate injunctions and orders so that funding

20 after so that that issue is adjudicated is what I'm saying.

21        There's no 524(g) channeling in our plan, Your Honor.

22 No nonconsensual releases.  We don't touch <u>Combustion</u>

23 <u>Engineering</u>.  We don't need to go close to that issue.  We have

24 true opt outs to the tort system against J&J and others

25 unfettered, unrestricted for those who want it but we think

1   most people will take under the grids and the plan.  We believe

2   Your Honor, we will garner overwhelming plaintiff support for

3   this plan.  So it's no surprise, Your Honor, no surprise that

4   the Debtor absolutely does not want the TCC plan to be

5   docketed, published, let alone offered to claimants for a vote.

6   That shouldn't be a surprise in light of what we would be

7   offering the claimants.

8          Now, I read the Ad Hoc Committee objection mostly as

9   saying confusion, they'll be confusion.  Two plans, oh my God.

10  Like people can't decide.  They can decide for candidates.

11  They can decide on ballot, ballot proposals but they can't

12  decide on competing plans.  From my perspective, Your Honor,

13  the only confusion really that, the word that the AHC uses is

14  the confusion of the AHC's supporting firm clients who may

15  legitimately ask and wonder why it is that their counsel have

16  contractually agreed with J&J and LTL to recommend and urge

17  them to vote for a plan that provides less actual value than

18  another plan offered by the TCC and that will be enmeshed, I'm

19  talking about the Debtor plan in litigation and appeals for

20  years before it is ever funded by J&J.

21         Again, one of the things, if you read the definitions

22  within the definitions in the PSA and the term sheet from the

23  Debtors, you'll see that what they're talking about J&J's

24  funding obligation is geared to, and I said this before in

25  court, a final nonappealable order.  And simply put, the only

80

1  confusion is that these clients may have of the supporting law

2  firms is why their lawyers are supporting a plan that may not

3  be in their best interests.

4        So I want to just go through very quickly a very

5  quick dec talking about maybe touching upon the legal reasons

6  why Your Honor should release, end exclusivity.  LTL has been

7  in bankruptcy since October 15th, 2021 with an interregnum of

8  we tried, Judge, yesterday we tried to get our reply to their

9  objection to the exclusivity motion and within two hours and 11

10 minutes after they filed their objection.  We didn't do it.  We

11 missed it by about an hour.

12       But the interregnum between those two bankruptcies

13 two hours and 11 minutes.  This exceeds basically we're here

14 and we submit that the maximum period allowed under Section

15 1121(d)(2) of the Bankruptcy Code, if you actually look at the

16 actual what has happened in this case is gone.  Now, I know Mr.

17 Gordon is going to say well, this is a new case, Judge.  It is

18 a new case and we get a new, the clock starts again but this is

19 a court of equity.  And you, Judge, are the master of equity in

20 this Court.  It's you.

21       And we're looking to you as we always have to

22 dispense equity as appropriate under the circumstances of this

23 case.  If this, LTL is not an operating company.  If this case

24 is not dismissed, the key issues should be who is the best

25 plan, who has the best plan for fairly and equitably resolving

81

1  the talc claims?  The answer is obviously the TCC and not LTL.

2        LTL is faceless, Your Honor.  J&J controls it.

3  There's no doubt, Your Honor is going to hear a lot more about

4  that the week after next.  LTL's objection is to obtain in

5  effect a discharge for J&J.  LTL's objective is not to fairly

6  and equitably compensate talc claimants.  We submit, Judge,

7  progress, we've heard progress, progress, progress.  We believe

8  there has been no real meaningful progress.  LTL claims to have

9  made meaningful progress.  The claims of progress and majority

10  support are we believe and submit an illusion.  Other people

11  have talked about it today, I'm not going to repeat that.

12        But Your Honor understands.  I know Your Honor

13  understands.  LTL did not negotiate with or obtain the support

14  of a substantial number of claimants let along a substantial

15  number of claimants who hold claims that can get to a jury in

16  the tort system, meaning pass summary judgment or a motion to

17  dismiss on general causation grounds.

18        More than 100 law firms representing ovarian cancer

19  and mesothelioma cases, Your Honor, including the MDL

20  leadership oppose J&J's plan and represent over 40,000

21  claimants and the majority of the cases have been filed in

22  state, their cases have been filed in State and Federal Court.

23        Most law firms that support J&J's plan are relative

24  strangers to this litigation.  Most law firms that support

25  J&J's plan have never appeared in Imerys or Cyprus

bankruptcies, the MDL or any other of the state consolidated

talc litigation.  Many law firms that have signed the PSA's do

not have a single talc lawsuit filed against J&J, LTL or any of

their affiliates including the 10,000 plus that are within the

files, the empty files it seems of Watts Guerra.

The plan support agreements only require as Your

Honor knows the law firms to recommend that their clients

support the plan.  Many clients we believe, we submit will

likely vote no when the true economics of the deal are

disclosed to them.  Talc claimants would be paid we submit who

would be paid over one million in the tort system, suing and

recovering from J&J, could get less than $10,000 from the

Debtor's proposed plan.

Talc claimants that, a talc claimants with cancer

diagnoses that have demonstrated a scientific link to J&J's

products can be expected, we submit, to oppose J&J's plans.

Indeed the supporting law firms may not support J&J's plan.

You know you've heard about that.  I'm not going to go through

with it.  At the end of the day, we'll see where we are on

that.

Testimony is that the PSA offers a framework for

further negotiations.  Now, I doubt that that's what J&J would

say with respect to their contribution but that's what the law

firms say.

J&J's plan they also say is inconsistent with the

1  term sheet.  Indeed at the present time, it could be fair to

2  say that J&J may have no support right now.  The TCC cannot

3  have any confidence after these 20 months in LTL or J&J.  LTL

4  as you know terminated the 2021 funding agreement with the

5  specific intent and motivation deliberate mens rea of creating

6  financial distress.  I think I said here on day one when I was

7  later accused of libel and slander by the way, that the void or

8  voidable argument does not pass the laugh test.  Your Honor

9  will see more of that in the coming weeks.

10         Your Honor knows, we talked about it last year, no

11  Texas two step has resulted in a confirmed plan, not one.

12  Bestwall seven years, correct, we're going on seven years,

13  folks?  Allowing LTL to exercise exclusive control over the

14  plan process, I used this word last year in terms of estimation

15  untethered to anything else, is a road to nowhere.  Competition

16  is a good thing, Judge.  Competition in competing plans often

17  result in settlements and consensual plans.

18         You know I know my own experience in PG&E that the

19  Judge allowed TCC to put a plan, nothing, didn't even have to

20  go to solicitation.  Debtor came to the table after they were

21  intractable and settled.  LTL's plan is not confirmable on its

22  face, Judge.  We believe the LTL's plan is not viable.  LTL's

23  plan first of all is I think some of the folks who regularly

24  appear on Zoom tell you cannot channel J&J's own independent

25  liability to a trust, see Combustion Engineering Judge Scirica,

1  Chief Judge.  We also submit that LTL's plan flunks the best

2  interest test.  A mesothelioma claimants and I think Mr.

3  Satterley has told you about this a number of times, a

4  mesothelioma claimant that would receive less than $50,000

5  under J&J's plan could receive millions in the tort system from

6  J&J based on J&J's own independent liability.

7          These plan objections can be raised by any talc

8  claimants including those that are not members of an accepting

9  class, not members of our, not associated with our Committee,

10 not associated with the Ad Hoc Committee.  And as I said

11 earlier, just a few number of objectors with a final order,

12 nonappealable order funding requirement can delay payment to

13 talc claimants for another half decade.  We've talked to you

14 before how that maybe in J&J's interest and LTL's interest.

15 See North Carolina.

16         J&J's plan is not a paid in full plan, Your Honor.

17 They'll try to say that and, but it ain't.  Page -- we have a

18 plan ready to be filed, Judge.  To be clear, our position is

19 that this case was filed in bad faith and should be dismissed.

20 I'll say it again.  If this case is not dismissed, we're

21 prepared to move forward very quickly.  I was instructed not to

22 use the word with alacrity so I'll say very quickly.  We're

23 prepared to file a disclosure statement, trust distribution

24 agreements with matrix, a trust agreement, solicitation

25 procedures form of notice and balance.  We expect this plan to

1  have broad support.  We believe all talc claimants can do

2  better, much better, much, much better under a TCC plan.

3  Current claimants can do better.  Future claimants can do

4  better.  Government claimants can do better.  Third party

5  payers can do better.  Everyone can do better than accept a

6  cram down and limited pot that's being offered by J&J and LTL.

7          We believe our plan offers the fair and equitable

8  resolution that LTL is controlled by J&J another offer, that's

9  it.  I'm going to conclude, Judge.  As we approach to the

10  motion, our second motion to dismiss trial and not yet 16 or 17

11  months, I'm going to say again this case, this Court, court of

12  equity with its equitable master in front of me, faces a

13  pivotal moment in this case.  Your Honor may remember last year

14  when I talked about a road to nowhere with estimation

15  untethered to any plan purpose.  Your Honor surprised us with a

16  pick of a 706 expert.  That pivotal moment in the case ran out

17  of time with the dismissal by the Third Circuit and that expert

18  was never able to finish his job.

19          Here, Your Honor has another opportunity to take this

20  case out of the mud and to prevent J&J and the Debtor from

21  sticking to its preferred path to nowhere.  You can shake

22  things up.  We submit it's due.  It's warranted.  It's

23  equitable in this 20 month old case.  What may that entail?

24  Well, it may entail if we, if and when, if there again, caveat

25  motion to dismiss, if and when there is a plan process and

1   competing plans may entail need for estimation for voting and

2   feasibility.  It may need estimation to see whether, what J&J

3   is offering is actually the number of the tort liability.  We

4   believe it's not.

5          And consideration also may be of bar date, bar date

6   motion but at the end, Judge, there needs to be a real choice

7   and a real vote.  I do want to note because I saw it in their

8   papers another misrepresentation and I call it a big lie from

9   the Debtor that the TCC will not negotiate.  That's a mantra,

10  you know we've heard, it's like the vote.  You know Judge, give

11  us the vote.  Well, okay, give everybody the vote.  We're here

12  saying give us the vote too.

13         That's a big lie, Judge, and these are from the folks

14  by the way who stood up in front of Your Honor and the motion

15  to dismiss one and said, funding agreement 2001 exists inside

16  and outside of bankruptcy and even in dismissal.  Thank you,

17  Mr. Gordon.  And told the Third Circuit told Judge Ambro, Neal

18  Katyal, that the funding agreement exists outside of

19  bankruptcy.

20         So when you hear these sort of representations from

21  people who change their positions when it is convenient for

22  them to do that I want you to take that with a little bit of

23  stock and a little bit of skepticism.  We've been dealing with

24  the mediators, Your Honor's mediation order regularly.  I know

25  J&J and LTL knows that.  They know that for part one and part

1  two we've been thinking of innovative and creative solutions

2  that would address J&J's end of all talc for all time while at

3  the same time meeting the needs of all of our constituents.

4  We're here constructive, innovative, flexible and nimble and to

5  say that we will not negotiate is actually the pot, you know,

6  that's the wrong analogy.  It's actually a reflection, Judge,

7  on a stance that may have very little flexibility other than

8  what they've put in their proposed plan.

9        So as we finish, Judge, it is a pivotal day.  We ask

10 Your Honor to do what is good in America, open the playing

11 field.  Let us, let us put forth our solutions, our innovative

12 solutions that will garner support across the entire community

13 of talc claimants.  If there is a vote, Judge, let it be a real

14 vote with real choices for the real parties in this case, the

15 long suffering victims of J&J's talc product who are now

16 looking at their second here coming up in this bankruptcy.

17        Judge, let us file it.  If we go forward with

18 disclosure statement and solicitation, let us do it in

19 accordance with that but let the talc community see it.  Let

20 this not be a one sided show after 20 months going on two

21 years.  That's my presentation, Judge.

22        THE COURT:  All right.  Mr. Molton, I do have a

23 couple questions.  I want to delve a little further.  You

24 touched on it and it's really for both sides.  Because what I

25 hear from both the Debtor and the Committee is that we're ready

88

1  to go.  We can move forward with the plan.  Let's get votes.

2  We're going to have the support.  And that's what intrigues me.

3  I guess I'm skeptical about how quickly this can move forward

4  and we can establish support.  Because who's voting?  This is

5  going to be critical.  And you did touch on it.

6         It is to say we're going to have a vote begs the

7  question.  We have tens of thousands of votes represented by

8  potentially the Ad Hoc Group.  If the Committee is going to

9  confirm a plan, they're going to need the same 75 percent the

10  Debtor is going to need.  Tens of thousands of votes hang in

11  the balance and can preclude, frankly can preclude confirmation

12  of either plan.  We don't have a bar date.  We don't have

13  proofs of claim.  We don't have, we know what we don't have.

14  We don't have, but we have challenges.  We have a motion filed

15  by Mr. Thompson challenging consideration of claims.  We have,

16  am I going to be doing thousands of, doing Daubert hearings on

17  the validity of the science supporting?

18         It's on both sides because my understanding and I've

19  had many a conversation with Judge Wilson.  There were plenty

20  of claims in the MDL that were identified for Bellwether and

21  then were suddenly dismissed.  So there's questions on all

22  sides as to claims.  So what is the process going to be?  How

23  are we going to calculate the denominator and do we need to?

24         MR. MOLTON:  Judge, my view, and again, prefaced by

25  Your Honor needs to rule on the motion to dismiss, that's

1  number one.  Your Honor, and again I'll reiterate again, and I

2  know may sound like a broken record but I'm pretty, I'm pretty

3  succinct.  We see the Third Circuit decision and read it in

4  many ways including 1112(b) as well as the case law on that, is

5  leading right to a dismissal.  That's how we see it.  Whether

6  Your Honor agrees with us or not, we look forward to coming up

7  and arguing those points.

8          But from my perspective, Judge, from my perspective,

9  you can't really have a disclosure statement, you know and I'm

10 just talking as a bankruptcy lawyer, you can't really have a

11 disclosure statement until you resolve the issues that you

12 talked about, right.  We need to know who the claim pool is.

13 We need to know who votes, what is their weight on vote.  And I

14 just want to say because our proposed plan is not a 524(g) plan

15 nor 105 nondebtor release plan.  It's a typical bankruptcy plan

16 and it's confirmable pursuant to typical bankruptcy rules.  So

17 I just want to note that.  So we're looking for the normal --

18          THE COURT:  So you dropped to the 50 percent and two

19 thirds, right.

20          MR. MOLTON:  In 66 percent of the value. But those

21 are important issues.  Those have to be decided before a

22 claimant can understand what am I getting.  You know who's

23 going to be voting, who's eligible, what am I going to be

24 getting.  So you know from our perspective and looking at a

25 plan that, you know what I call the cram down plan, the J&J

1    cram down, you know these are issues that are going to take

2    this Court's time, you know assuming we get through the motion

3    to dismiss, Your Honor, denies it, hopefully Your Honor won't,

4    we'll be convincing enough that Your Honor will grant that

5    motion.

6            But all these things will have to be sequenced and

7    tallied so that you can have adequate disclosure and then

8    voting in accordance with somebody who may be eligible to vote

9    with the proper weight ascribed to that vote.  We have states

10   here, Judge.  We have third, you know we have, we have

11   mesothelioma claimants.  We have ovarian cancer claimants.  We

12   have claimants who as I mentioned may have diseases that at

13   least with respect to talc allegations won't get them to a jury

14   based on existing Daubert.

15           So all those things have to be done and those in

16   terms of getting to that vote, Judge, it's a complicated case

17   and should His Honor decide to go down this path, the first

18   point orders of business before we get to disclosure statement

19   and solicitation need to be as Your Honor said identifying and

20   reconciling those issues.

21           THE COURT:  Has the Committee in formulating its plan

22   engaged with the FCR?  I know there's an appeal that has been

23   filed with respect to the appointment but has there been any

24   engagement with the FCR?

25           MR. MOLTON:  We've talked, in part one, I think we

1  talked with the FCR about this sort of thing and I asked Mr.

2  Falanga anticipating this very question, Judge, I caught Mr.

3  Falanga in the hallway today and asked for a meeting with him

4  just on those reasons for those reasons so.

5          THE COURT:  All right, fair enough, thank you.

6          MR. MOLTON:  If that's it, Judge, I'll sit down.

7          THE COURT:  At this point, that's it.  Mr. Thompson?

8          MR. THOMPSON:  Thank you, Your Honor.  So I think

9  that you've touched on a few of the important issues that need

10  to dismiss this case.  It's a jurisdictional issue.  It's a

11  gating issue.  Bad faith, Debtors are not allowed into the safe

12  harbor and so I agree that the Debtor's motion to prevent, I

13  don't know what's in the TCC plan and so I agree that the

14  Debtor's motion is meritless.

15          But you've identified, I think a number of issues.

16  Who's the claimant, right?  Who's going to decide who a

17  claimant is?  Now, in the tort system J&J seem to believe that

18  a claimant was an epithelial ovarian cancer victim or a

19  mesothelioma victim because the evidence that we're seeking

20  that I think will be on display at the motion to dismiss trial,

21  is those are the only cases they settled.

22          Now, Mr. Onder has 9,000 uterine cancer claims

23  approximately and he believes that uterine cancer is caused by

24  talc.  Maybe it is.  But there's no scientific support yet for

25  that and there has been no Daubert hearing on uterine cancer

92

1   claims.  And so I think what the Debtor is banking on is chaos

2   and the kind of chaos that happens when we allow bad faith

3   Debtors which is what the Third Circuit decided LTL was into

4   the safe harbor bankruptcy.  They're running amok and

5   ultimately the Debtor is wasting your time, Judge.

6         Because any plan that gets confirmed, so let's say

7   that we have mini Daubert hearings in this proceeding and I

8   object to that, you know my position on this are clear.  But

9   let's say we have mini Daubert trials.  And then we have

10  arguments over who's a claimant.  And then we're arguing about

11  what claims are worth and we're doing this.  This can take

12  years and years and years.

13        Whenever the plan is confirmed, if it infringes on

14  any future victims' complete opt out to all State Law remedies,

15  it's going to get tossed on appeal because the future victim is

16  either going to hire me or Joe Satterley or Jerry Black or

17  Ruckdeschel or somebody and they're going to challenge the plan

18  and they're going to win because you can't bind future victims

19  in the absence of a limited fund and there is not a limited

20  fund.  I understand that Ortiz is a class action case.  Ortiz

21  post dated 524(g), okay.

22        They invited Congress to take action.  Congress took

23  no action in response to Ortiz.  All of the policy arguments

24  that these wealthy two steppers make are policy arguments that

25  Congress rejected.  And so there's no plan that's going to be

93

1  confirmable.  By the way, they're never going to agree to that

2  anyway because in <u>Bestwall</u> the Committee proposed a plan that

3  allowed opt outs, opt outs on either side.  If Georgia Pacific

4  disagreed with the offer, they could opt out.  If the claimant

5  disagreed with the offer, they could opt out.

6       <u>Bestwall</u> rejected that, the Debtor out of hand.  So

7  J&J is never going to agree to a plan that is constitutional.

8  They didn't demean themselves with this bankruptcy.  J&J is

9  launching this embarrassing bankruptcy.  They didn't do all

10 this to protect people's rights.

11      Their current plan which they tout is 8.9 billion,

12 it's historic, this historic number.  The Third Circuit found

13 that over the next 24 months J&J's total liabilities for

14 everything, not just talc, 2.4 billion over the next 24 months,

15 that was in their opinion.  That's what the Third Circuit

16 found.  So let's say that their talc liability is about a

17 billion dollars a year.  That's a lot of money but it's not a

18 lot of money when you're worth $500 billion.  So that's, if

19 they're in the tort litigation for 30 years, that's $30 billion

20 total.  They're going to give away $363 billion in dividends

21 over the next 30 years.  It's minuscule.  It doesn't matter.

22 They're not in distress.  Al of this is the chaos of their own

23 creation.

24      They say it's a large, complex case.  Yes, they

25 created it.  They created this dumpster fire and they're

1  demanding that you fix it for them.  And you've identified a

2  number of issues that will come up in all of this stuff and

3  that's why Mr. Molton is absolutely correct.  The cleanest and

4  best way to dispose of this, is to follow the Third Circuit's

5  ruling and say you're not allowed into the safe harbor if

6  you're not in good faith.

7         THE COURT:  That's two weeks from now.  Very finite

8  issue.  I know where you stand on whether this case should go

9  forward.  This is on Committee's motion to terminate

10 exclusivity.

11        MR. THOMPSON:  I am not opposed to the TCC proposing

12 a plan.  Mr. Hoss (phonetic) says that there's a significant

13 minority of firms that oppose the current plan.  So then I

14 asked him in his depo, I quoted him to himself to him, and

15 tried to go into what an individual gets under the current

16 plan.  He didn't like that, okay.  And Mr. Kim, when I went

17 into it with him, he refers to the TDP's.

18        And so the current plan is terrible so I agree with

19 that.  So I'm not opposed to the TCC proposing a plan because

20 the current plan is objectively unconstitutional and

21 unconfirmable for one of many half a dozen reasons is that the

22 individuals asked to vote on this plan don't know what they're

23 going to get because in Article Seven of the TDP, it says that

24 the dollar amount that's going to be assigned to each point is

25 going to range from 50 cents to $2 but it could be less than

1  that.  Well, it's a function of how many claims are filed as

2  you've touched on.  Well, are uterine cancer claimants going to

3  be filed?

4        And the other thing I would say that the TCC if we're

5  going to allow plans let's do the TCC's plan is because who

6  benefits from a trust where a uterine cancer victim it's after

7  attorneys' fees five hundred bucks, right.  It doesn't benefit

8  the uterine cancer victim.  And so what we're seeing here is

9  this Ad Hoc Group that has got tens of thousands of claims

10  worth nothing right now in the tort system that someday maybe

11  the scientific link will be there but right now there is

12  nothing.

13        And so we're going to allow them to vote and we're

14  going to have that plan.  So you understand my positions.  My

15  positions are clear but in terms of the competing plans.  If

16  we're going to have any sort of vote, they're going to have

17  sort of compete, any sort of disclosure and voting, please

18  allow there to be competing plans.  Thank you.

19        THE COURT:  Thank you.  Anyone else in court?  I see

20  -- I have to start worrying about how to pronounce your name,

21  Ruckdeschel?

22        MR. RUCKDESCHEL:  Ruckdeschel.

23        THE COURT:  Ruckdeschel, you're making it all, making

24  it so difficult.  All right.

25        MR. RUCKDESCHEL:  It's how it's spelled, Judge.

1           THE COURT:  Go ahead.

2           MR. RUCKDESCHEL:  Your Honor, look, I fully agree

3   with Mr. Molton that if this case remains before the Court the

4   Debtor cannot be allowed to have exclusivity, that's simple.

5   In fact, if this case remains before the Court after the

6   dismissal we are going to be moving to remove the Debtor as the

7   DIP because it's proven over and over that's incapable of

8   following its fiduciary duty to the Estate as opposed to its

9   duty to its corporate over board.

10          But with that said, right, I haven't seen the TCC's

11  plan so I can't comment on the specifics of it.  I will

12  generally state, however, Your Honor, because I think this is

13  an appropriate issue that a bad faith filing by the Debtor

14  cannot be cured with a plan.  A plan from the TCC, a plan from

15  a creditor, a plan from the Debtor.  You cannot consensually

16  overcome a bad faith filing ab initio.

17          And so my request to the Court is that you table this

18  issue.  You table this motion.  You table the disclosure

19  statement stuff from the Debtor and let's have the ruling on

20  the motion to dismiss.  And then if we have to go forward from

21  there, let's get it on with respect to what it's going to look

22  like going forward because as Your Honor mentioned, it's going

23  to be a complete circus.  And we're going to have to figure out

24  what the rules of that will be but I hope we never get there.

25  And that will be after Your Honor certifies the dismissal

1  ruling and any injunctive ruling that goes with it to a third

2  and we wait and get that decision.

3          That's my request to the Court.  I think it's the

4  cleanest way to approach this and I just wanted to make clear,

5  no matter what, I certainly agree that there are creative ways

6  to handle master liability but it is not this Court's

7  statutorily prescribe role to be that creative person in a

8  situation where there is not an actual limited fund.  Thank

9  you, Judge.

10          THE COURT:  Thank you.  Mr. Gordon.

11          MR. GORDON:  Thank you, Your Honor, Greg Gordon,

12  Jones Day on behalf of the Debtor.  So I think from the

13  Debtor's perspective, Your Honor, there's about five reasons

14  why we believe Your Honor should deny the relief requested by

15  the TCC so I'm just going to start from the top and go through

16  the five.

17          So the first, Your Honor, is the fact that this

18  really is an extraordinary request in the sense that this case

19  has only been pending for a little over two months.  And a plan

20  and disclosure statement have been, have already been filed.

21          Now, I recognize that Mr. Molton is of the view that

22  this is all one and the same case.  But we obviously didn't

23  elect to dismiss the prior case.  That happened by virtue of a

24  Third Circuit ruling.  But more importantly, there's a

25  fundamental difference between the two cases.  And that is that

1    this case began with plan support agreements signed by a number

2    of law firms representing tens of thousands of claimants.  And

3    from the beginning we've made clear our desire is to move

4    forward with that plan on behalf of those claimants and to come

5    in, in light of that not only in about two months after this

6    case was filed but only a month after the plan was filed with

7    that support is extraordinary and it really is unprecedented in

8    a sense that the case, you know case law doesn't support the

9    idea that the four month minimum that is in the Bankruptcy Code

10   for exclusivity should be terminated based on facts like that.

11         And I would submit, Your Honor, and I'm going to get

12   into this more in a moment that this is just another prong in a

13   multi-faceted litigation attack on this case.  This isn't

14   really a real plan.  It's just a litigation strategy.  It's

15   another way for the Committee both to disrupt the case and to

16   effectively seek a dismissal of the case if in fact Your Honor

17   determines not to grant the motions to dismiss.

18                         (music playing)

19         THE COURT:  Sounds better with music background.

20         MR. GORDON:  I probably would have picked different

21   music.  So that's point one.  Point two is the fact that the

22   motion did not include this so called plan that's apparently

23   been in the works for weeks if not months and is basically

24   ready to go, nor does, did the motion or the reply filed

25   yesterday include any description of its financial terms.  So

1 to me that is very, that's very telling that there would be

2 nothing put on file about the plan and certainly nothing about

3 the material terms, the financial terms. And if you read, if

4 you had a chance to read the reply, what you'll see is the

5 Committee saying things like well, sure, we're prepared to

6 share about the plan and we heard more things today something

7 about a toggle which I've said and fully understand.

8          But yesterday it was very general and vague

9 statements like, the plan will establish a trust and the trust

10 will be governing by trustees and there will be a trust

11 advisory committee.  There will be trust distribution

12 procedures.  They'll have gating mechanisms, matrices and there

13 will be a tort opt where the claimants can return to the tort

14 system if they don't like what they get under the plan.

15          I mean something that everything plan has in an

16 asbestos case but that's all meaningless.  That's just like

17 putting in a boilerplate.  That's not providing any meaningful

18 information.  And the fact, Your Honor, that nothing has been

19 said about the economics of the plan, nothing.  Nothing has

20 been said about what the projected funding requirement is.

21 Nothing has been said about what any particular type of claim

22 would be entitled to under the plan and I would say that's

23 deliberate.

24          And I think it's deliberate because they can't

25 disclose this purported plan for fear it jeopardizes their case

on financial distress.  And you know that's because you know

you heard Mr. Molton say it today.  Every creditor constituency

from the claimants to the governmental agencies to the

lienholders they'll do better, not just a little better,

they'll do much better, much, much better.

Okay, fine.  So what are you proposing in the TDP's

for those parties?  What is the, what and what is the number of

claims that you're projecting?  Because I guarantee if it looks

anything like the Imerys plan, and that's what Mr. Molton

referred to today, you're talking about a plan that's probably,

requires funding in the hundreds of billions of dollars.  But

none of that's disclosed.  And I would be willing to bet that

even if Your Honor were to entertain this motion, we feel

strongly that you should not, that although a plan might be

filed, they won't file the TDP's.  I'll bet they'll hold that

into much later because again I think it's clear that they know

full well that what they want, would obviously demonstrate an

absence of financial, it would demonstrate, I'm sorry,

financial distress and they're not going to go there with that.

And it's just the way this case is proceeding up

until now they're attempting I believe to duck an obvious

inconsistency in their position.  On the one hand the Debtor is

not in financial distress.  On the other hand the Debtor has

committed the largest fraudulent transfer on the history of

bankruptcy.  On the other hand our plan is willfully deficient.

1  Willfully deficient.  You heard Mr. Birchfield (phonetic) up

2  here complaining about the plan and how it was providing a

3  small fraction or it would provide a small fraction of the

4  recoveries to which claimants are entitled.

5          And so to me this just shows, this isn't a real plan

6  and it's demonstrated in any number of ways.  I think one

7  reason it's not real is because we haven't seen it.  We haven't

8  seen any description of the financial terms.  It's not real

9  because it doesn't have any funding other than one of two

10 things, either what we viewed as plainly groundless

11 interpretation of the funding agreement or the other is a

12 fraudulent transfer claim which you can't square with their

13 financial distress position.

14          But you know if you think about it on the funding

15 agreement, they're suggesting that a provision that applies

16 outside of bankruptcy, applies to a bankruptcy plan.  And so on

17 the other side of that, the plan or the provision that applies

18 in bankruptcy apparently doesn't apply to a bankruptcy plan.

19 That doesn't, that doesn't make any sense.

20          And the other thing we've learned and the other

21 reason I would submit it's not a real plan is we've heard

22 enough to know it's effectively a dismissal.  It doesn't

23 resolve anything.  You heard Mr. Molton say it's not 524(g).

24 It's not 105.  There's no channeling.  There's no injunction,

25 ergo, there's no resolution at all.  It allows everyone to opt

1    out apparently.  So the way it works as I understand it, is

2    they have, they would have a matrix with inflated values which

3    you could take if you want, I guess or you can just opt out and

4    there's no reasonable of anything.  And again they're not

5    telling us what the inflated values are because they know it's

6    going to jeopardize their case on financial distress.

7            So to me at the end that's not a plan.  That's just

8    another bite at the apple on dismissal if their motions aren't

9    granted.  And because that's all it is, I would strongly

10   suggest that that's not a reason to terminate exclusivity.

11           The third thing I would say and I think this is the

12   reason why Mr. Molton doesn't want to get into the cases today,

13   is the cases would say that it's not an appropriate basis to

14   terminate exclusivity because the constituent or the party

15   doesn't like the plan and wants to propose an alternative plan

16   and we cited a number of cases for that proposition.  I'm not

17   going to go into the detail because I know Your Honor has read

18   the pleadings but there were two that were notable.  I thought

19   the <u>Geriatric Nursing Home</u> case from the District Court,

20   District of New Jersey which to me was interesting because the

21   District Court actually concluded that the Bankruptcy Court

22   abused its discretion in terminating exclusivity to permit an

23   allegedly more favorable plan to be filed.  The District Court

24   said that wasn't enough, that wasn't sufficient to show cause.

25           And a very similar result obtained in <u>EaglePicher</u>

103

1  case, very similar facts, a desire to terminate exclusivity to

2  present a supposedly more beneficial or favorable plan and the

3  Court said that that wasn't enough.

4        The next reason, Your Honor, is that, and perhaps

5  this is the most important is we believe that if Your Honor

6  grants the motion, it's only going to impede progress in the

7  case.  It's only going to create distraction, complexity and

8  cause delay.

9        In essence, in our view, it would only create another

10 litigation track in the case and it would be one with

11 potentially many facets.  One would be that we would be

12 litigating over whether the funding agreement is the equivalent

13 of insurance and therefore can be transferred to a trust.  We

14 would be litigating over whether a plan could be funded through

15 fraudulent transfer litigation.  We would be litigating over

16 whether a plan could be funded through an interpretation of the

17 funding agreement that contends that the bankruptcy funding

18 provision does not apply to a bankruptcy plan.

19       And the related question through all of that is how

20 long will that all take to do that?  It will be a distraction.

21 It will cause delay and the biggest worry that we have is that

22 we are concerned that parties who now are subject to the

23 mediation order in the midst of mediation will be disincented

24 or disincentivized to engage meaningfully in the mediation,

25 will be disincentivized to engage meaningfully in plan

104

1  negotiations.  And in fact we've already seen an impact from

2  that as parties, some parties are saying we want to wait and

3  see.

4         So Your Honor I think has said and we certainly are

5  of the view that this case should move forward promptly.  And I

6  think Your Honor has been endeavoring to do that by having us

7  proceed on parallel tracks and we already have the dismissal

8  track.  We're working on finalizing this plan to push forward

9  on that track.  We have the potential fraudulent transfer

10 track.  Now, we've heard today that apparently we're going to

11 have a motion for trustee track and to add on top of all that,

12 a competing plan track based on a request to shorten the four

13 month period to allow a plan that's largely undisclosed to be

14 filed in some point in the future and probably not filed in

15 full because of the concern about the impact on the financial

16 distress case.

17        So Your Honor, we think the case law indicates that

18 the movant here the Committee has a heavy burden to carry in

19 seeking to shorten exclusivity to even less than the four month

20 period provided in the Code and that burden in our view should

21 be especially heavy in a mass tort case where exclusivity is

22 typically extended multiple times if not typically through the

23 entire maximum 18 month period.

24        Now admittedly as I said before, this is a second

25 filing and we get that.  But this was a filing accompanied by

support, significant support and with a plan and with a

timetable that so far we've met as we said we would.

And the other thing I would say, Your Honor, is that

it's not as if this issue won't be addressed again and couldn't

be addressed again.  In other words, we only have four months

unless we seek an extension.  So in less than two months we'll

be back before Your Honor potentially with a motion to extend

exclusivity at which time Your Honor can decide whether an

extension is warranted or whether at that point in time based

on lack of progress or other reasons that exclusivity should

not be continued.

But from our perspective, where we are in this case

having filed a plan with the support it has, having filed a

disclosure statement, having taken steps to schedule a

disclosure statement hearing and then proceed with solicitation

procedures and the like, an extension would be justified if it

were at that time in the case.  But a termination of

exclusivity certainly would not.  And so Your Honor, we would

request that Your Honor deny the motion of the Committee.

THE COURT:  Thank you, Mr. Gordon.  Mr. Hansen.

MR. HANSEN:  Good afternoon, Your Honor, Kris Hansen

with Paul Hastings on behalf of the Ad Hoc Committee.  Your

Honor, you invited the filing of this motion so it's slightly

awkward to be so opposed to it.  But the Ad Hoc Committee

believes that granting the TCC motion will result in miring

1  everyone in more litigation, not less and wind up with a worse

2  result for all claimants and we're compelled to oppose it.  If

3  you survey what's in front of the Court now, you have a plan on

4  file that we've all said is going to be amended and would like

5  to see it go forward from the Debtor's side and from the Ad Hoc

6  Committee side.

7        Regardless of the non-evidence that keeps getting put

8  before you about the lack of viability of the claims that our

9  clients represent, they're real claims, Judge.  Many of them

10 actually were filed.  You have pleading after pleading on the

11 side of the Court that says those claims were never filed.

12 They were, many of them.  You have selective quotes from

13 depositions that are not evidence.  If they want to put that

14 in, they know the way to do that.  We can make designations

15 come before the Court.  That's not what's happening here.

16       But those are selective quotes.  There were other

17 comments during those depositions.  I don't think it's relevant

18 so I'm not going to get into it.  But the reality is, the plan

19 has significant support from the Ad Hoc Committee.  You have

20 two mediators that you appointed who are in active mediation.

21 You heard Mr. Molton say on their side they talk to the

22 mediators all the time and they're ready, willing and able to

23 negotiate.

24       That's what's before the Court right now.  So the

25 stage is set to do what bankruptcy is designed to do which is

1  to drive a process, either to consensus or to the finish line

2  of confirmation where you decide the issues.  Against this, you

3  have scorched earth litigation tactics including a mandamus

4  attempt, a motion to suspend the case and now we're hearing

5  about a motion to appoint an operating trustee.

6        Exclusivity exists for a reason, Your Honor.  Cutting

7  it off earlier is a dramatic move.  The Supreme Court in <u>203</u>

8  <u>North LaSalle</u> said for example one time that you might want to

9  terminate an exclusivity candidly which you should is where

10 there hasn't been a market test of a new value opportunity

11 that's being provided to a party in interest in the case.

12 Sometimes there's just not progress at all and the Debtor is

13 staling or sometimes courts perceive an abuse of process.  But

14 the overriding balance act in determining whether to terminate

15 exclusivity is a bit of what happens if you do.

16        Will you advance the cases?  Will the cases somehow

17 move in a positive direction as a result of exclusivity

18 termination.  Your Honor, the Ad Hoc Committee submits that

19 what will happen will be the opposite.  These cases will cease.

20 It will turn into even more litigation and trying to figure out

21 what it is that the TCC is proposing from a plan perspective

22 that at least the way Mr. Molton has described it so far isn't

23 even remotely close to being capable of confirmation and will

24 include an enormous amount of litigation itself.

25        Pause for a moment.  What have we heard about the

108

1  plan?  More for everybody.  Everybody gets what they want

2  whether you want to go sue somebody in court and not be a part

3  of the plan.  Whether you want to come into the plan, you'll

4  get much, much more.  And what's the funding source for all of

5  that?  Mr. Molton says the 2023 agreement, good old Fed Mo

6  plan.  What we're going to do is we're going to basically

7  create a plan that acquires this Debtor and then we're going to

8  succeed to all of its rights and use its funding.

9         But read the reply they filed.  They also prepared to

10 file an avoidance action to go after the 2021 funding

11 agreement.  More for everybody.  We'll take the 8.9.  We'll

12 take the rest of it.  We'll get to about 62 billion and we'll

13 just dole that out to everybody.  We're not going to tell you

14 how we're going to do that yet.  But we're going to do that.

15 And we're not going to use a channeling injunction because we

16 want everybody to have their rights in state court too which

17 they can have.

18        But we believe everybody would actually come in and

19 be a part of the plan and they would like it better because

20 there's just so much money for everybody.  That just doesn't

21 happen, Judge.  That's a tremendous amount of litigation, a

22 tremendous amount of litigation to get to that point.  And the

23 underlying issues that the TCC points out about the difficulty

24 of assessing the viability of claims that can vote on a plan,

25 it's the same in their plan.  It's the same issue.

1          So Your Honor, what you have before you from the Ad

2   Hoc Committee's perspective is, put the plan that you have on

3   file and that will be amended that you can prove a disclosure

4   statement on hopefully to a vote.  Give the Debtor the chance.

5   Do not weaponize the TCC even further than it already is to put

6   a nonplan on file and use it to blunt the Debtor's process.

7          On the topic of filing it, you heard Mr. Molton say

8   to Your Honor, even if you don't decide in our favor, just let

9   us put the plan on file.  That way everybody can see it and

10  they can all know what we're talking about.  Your Honor, that's

11  a patent violation of exclusivity.  That's inappropriate.  As

12  the TCC knows, it's commonplace when you move to terminate

13  exclusivity if you actually have an alternative plan to file it

14  under seal, the -- you put it under seal.  You get to see it.

15  Other parties who are litigating, under a, who can sign a

16  protective order or a seal order, they can see it too.

17          And if you have to, you can deal with a hearing by

18  sequestering certain folks to make sure that you have a robust

19  hearing with respect to it.  That's not what happened here.

20  What's happening here is we're getting podium testimony about

21  the more for everybody plan that seems patently unconfirmable.

22  And Your Honor, putting it out there to just put it out there

23  so that everybody can see it in the clear light of day is

24  really just yet again unauthorized solicitation.  It's lobbying

25  claimants in the case to say don't vote for the plan that the

1  Debtor is going to bring forward.  They get their time to do

2  that.  Now, is not the time.

3         Your Honor, again, I started out by saying there were

4  an awful lot of cheap shots that were put out there at the

5  beginning of Mr. Molton's position against members of our

6  Committee.  Again, it's intentionally misleading.  It is not

7  evidence and it is not relevant to the issues before you.  But

8  it does demonstrate a very salient point.  The TCC owes a

9  fiduciary duty to all claimants.  They know full well that

10 members of our Committee have filed claims.  They know full

11 well the members of our Committee served on their Committee in

12 the last case.  And yet, all we had are endless attacks at the

13 Ad Hoc Committee members and the claimants that they represent.

14 That is not satisfaction of a fiduciary duty on behalf of an

15 official committee.

16        What it is, is a one sided attack on a myopic agenda

17 that demonstrates the very risk of granting their motion to

18 terminate exclusivity and again, Your Honor, something so

19 powerful as granting them the right to put on a plan on and

20 prosecute it, you have to think twice about that.  You have to

21 look at the conduct that has happened in this case so far and

22 you have to respect the fact that the Debtor is making

23 progress.

24        The Debtor and the Ad Hoc Committee as I mentioned

25 earlier are hard at work every day.  We are working to try to

1  get an amended plan on file that we want to bring before the

2  Court and we want to ask the Court to put it out for a vote

3  That doesn't mean that they get to have their plan voted on

4  too.  You heard Mr. Molton say why doesn't everybody get a

5  chance to vote?  Everybody does get a chance to vote on the

6  Debtor's plan when it's solicited.

7          Your Honor, once again, they carry a very heavy

8  burden.  We don't think they've met it.  And when you look at

9  the question of what happens if you terminate exclusivity, we

10  believe you're just going to make everything that you deal with

11  all the time worse.  Thank you, Your Honor.

12          THE COURT:  All right, thank you.  Mr. Molton?

13          MR. MOLTON:  Judge, I'm just going to have a couple

14  of remarks.  I don't think there's that much to respond to.

15  Mr. Gordon as I heard him just invited us to file the plan.

16  We'll do it.  Let us do it.  Number one.

17          Number two we appreciate Mr. Gordon's motion to

18  dismiss preview.  He'll have a better opportunity to do that in

19  the right proceeding in a week and a half.

20          You know, I think -- turning to Mr. Hansen he said a

21  lot of things, just be advised he's contractually bound to say

22  that.  So his PSA's of his members contractually bind him to

23  say exactly what he said.  I don't think it's our Committee

24  that, or the claimants that are doing any scorched earth here.

25  Indeed, Your Honor, again that's a reflection from the other

1  side.  I do want to say Mr. Hansen's remarks regarding, you

2  know timing and Mr. Gordon's remarks regarding timing may have

3  been relevant in May, April 2022.  They're not relevant now.

4         But in any event, I'm just going to get to the end of

5  it, Your Honor.  Competition is good.  I think one of the

6  things Mr. Hansen did understand is how we fund the plan.  We

7  fund it using their own words and their own contracts to the

8  extent that $30 billion is not enough.  There's avoidance

9  rights, but in any event, we need not go there now but I think

10 Mr. Hansen got it right, something that Mr. Gordon didn't want

11 to see.

12         In any event, what are they afraid of?  With all due

13 respect at this time, what are they afraid of?  They're afraid

14 of competition.  They're afraid of losing control of the case.

15 Judge, level the playing field.  Do it in a way that's

16 sequential, makes sense from this Court's perspective.  Our

17 focus is on the motion to dismiss.  I want to repeat again from

18 the Committee's perspective and this committee represents all

19 talc claimants, all of them and it's not that unusual for an

20 official Committee to take a position adverse to the interests

21 of an Ad Hoc Group.   It happens.  In any event, we're always

22 willing to talk to Mr. Hansen.  I've done so.  I'll do so

23 again.

24         What are they afraid of Judge?  We think the time has

25 come for Your Honor, as a court of equity, to use equity.  And

1  if this case survives dismissal, and we -- again, our position

2  is this case is an invalid, bad-faith case filed for an

3  improper bankruptcy purpose.  But if this case survives

4  dismissal at that, you know, let us go forward.  Level the

5  playing field.  The whole world is watching, Judge.

6          Thank you.

7          UNIDENTIFIED SPEAKER:  Your Honor, I'll be brief.

8  And then I'm going to leave and get on a train and won't be

9  here this afternoon, I promise.  This is the last you'll see me

10 today.

11         THE COURT:  Well, I'll hold you to that.  Go ahead.

12         UNIDENTIFIED SPEAKER:  This is the last you'll see me

13 today.  So, I think I heard Mr. Hanson say, you know, the plan

14 is not going to pass because it's going -- more for everyone.

15 He's -- is the -- is the Ad Hoc against more money for the Ad

16 Hoc Group of claimants?  The Ad Hoc seems to be implying that

17 it doesn't like opt outs.  Why would an Ad Hoc group allegedly

18 representing claimants be against opt outs?

19         This is an incredible bluff by Mr. Molton.  Like if

20 he doesn't have a plan -- because Mr. Gordon's arguments seem

21 to be it's not a real plan.  It's not confirmable.  Mr. Molton

22 seems -- I don't know what's in the plan, I'm not in the TCC.

23 I eat their sandwiches from time to time, but I don't know

24 what's in their plan.  And Mr. Molton, I think he's got a plan.

25         And so that's an incredible bluff if he doesn't have

114

1  a plan.  So I don't see any reason why they couldn't propose

2  it, especially given that the Ad Hoc and the debtor are

3  amending their existing plan.  Right?  I mean, the the plan

4  that's going to be voted on, I think has now been established.

5  It's not going to be the plan that's on file.  So if we're

6  going to consider plans, and again, I don't think we should,

7  but if we're going to consider plans, I think we ought to

8  consider both of them.

9          And then Mr. Gordon admits that, well, anyone who

10  wants to can opt out and go to the tort system, and that would

11  -- I think he said that would equal a dismissal and that really

12  ultimately is what this is about.  The entire two-step scam is

13  about taking defendants that are not in distress, and treating

14  524(g) like a menu choice.  So, of course, the debtor is

15  against any opt outs.  They don't like people's state law

16  remedies.  If they respected people's state law remedies, they

17  wouldn't have filed this case to begin with.

18          Thank you Judge.

19          THE COURT:  Thank you.

20          MR. MOLTEN:  Judge, --

21          THE COURT:  Have a safe trip.

22          MR. MOLTON:  -- just so that you --

23          UNIDENTIFIED FEMALE SPEAKER:  A one-way ticket.

24          MR. MOLTON:  I just want to be clear.  We are

25  prepared to go forward and in the same way that the debtors

1 plan is on file, we'd appreciate ours to be as well.  But in

2 terms of going forward to disclosure statement, I'll leave that

3 to Ms. Cyganowski and others, my friends on my left, in terms

4 of timing, but I want to be clear that I'm not -- I'm not -- in

5 my last remarks I wasn't saying that -- that we'd like to

6 withhold until that time.

7          THE COURT:  Understood.

8          MR. MOLTON:  Yeah.

9          THE COURT:  Let's move forward to that disclosure

10 statement hearing issue.  Mr. Gordon, I don't know how much

11 you're going to add to what we've been discussing.

12          MR. GORDON:  Greg Gordon, Jones Day, again, on behalf

13 of the debtor.  I don't think we have much to add on this.  The

14 -- I think the relief we were initially seeking was some

15 expedited relief which has become moot by the passage of time.

16 So I think the only request we have of Your Honor is to set a

17 date for a hearing on a disclosure statement.  And we

18 recognize, obviously, there's a lot going on with the dismissal

19 litigation towards the end of the month and thereafter.

20          And our proposal to Your Honor was going to be to set

21 the disclosure statement hearing for the omnibus in August,

22 which I think is the 2nd.  I think, -- obviously, it could be

23 moved, I suppose.  Well, probably not with the notice that has

24 to go out, but the idea was to put it at a date that kept us

25 moving forward, but it was past the dismissal litigation.  So

1  that was our proposal that we set for that date.

2          THE COURT:  All right, thank you.

3          Ms. Cyganowski.

4          MS. CYGANOWSKI:  Thank you, Your Honor.  Melanie

5  Cyganowski, Otterbourg.  Still proposed counsel, co-counsel to

6  the committee.

7          Obviously, this is a little bit of a moving target.

8  But before I begin, something that's just been troubling me as

9  I've been sitting here listening to the accusations flow back

10 and forth, I asked myself, you know, why is the TCC and the

11 others -- creditors, especially the Ad Hocs, who have stood up

12 in opposition, considered to be the bad guys?  You know, we're

13 the bad guys because we're doing scorched -- scorched earth

14 litigation.  We have a myopic agenda.  There were a number of

15 adjectives and adverbs that were thrown around.

16         And when we place this in the context that the debtor

17 brought the case in October of 2021, we went through

18 significant litigation including the dismissal hearing.  We

19 lost.  We continued to work in the case.  And it wasn't until

20 the Third Circuit rendered its decision that the case became

21 dismissed.  And then in a span of 2 hours in 11 minutes, -- I

22 guess we should all get T-shirts with that number on it -- the

23 debtor sheds $30 billion and we call them out for doing that.

24 And for that we're being accused of being bad guys and scorched

25 earth and not playing along with the game.

1       Because at the end of the day, and you're gonna hear

2  this in two weeks, we truly believe that there's a gating issue

3  here of whether or not L2 -- LTL2 has been filed in good faith.

4  And that certainly deals with the motion -- the notion here of

5  should we have a disclosure statement?  Should there be a plan?

6       So our first request is that you adjourn it without

7  date.  Let's wait to see what happens at the motion to dismiss

8  trial.  We're not going to be waiting long.  In two weeks the

9  -- we'll be back.  The evidence is going to be presented to

10  you.  You're gonna make a decision.  It may be the end of the

11  trial, it may be a month later.  It may be sooner or later, but

12  around that time.  So I see no downside and simply adjourning

13  it without date.

14       Obviously, the committee believes strongly that

15  exclusivity should be halted, that we should be given the

16  opportunity to at least put a plan on file so that we can end

17  this veil of mystery that keeps being thrown at us, that we

18  don't really have a plan, that we're afraid to put forward the

19  financials because it's going to undermine our case.  We don't

20  believe that for a nanosecond.  We believe in what we're

21  prepared to put forward.  But we also believe that the gating

22  issue is the dismissal hearing, so we're not urging you to not

23  do dismissal so that you can have a competing plan.  I mean,

24  that's certainly not our game.

25       But I've also been thinking what would I do if I were

118

1   sitting in your shoes and I was facing the potential hearing of

2   a disclosure statement?  And how would I, as the judge

3   determine, does it indeed contain adequate information as

4   you're going to be required to find under 1125.  And we know

5   from the discovery that's taken place, limited as it is, that

6   we have not had one debtor supportive party, who's been able to

7   articulate how much a claimant will receive under the debtors

8   proposed plan.  We know it's a pod plan.  We know it's 8.9

9   billion is a cap, but beyond that, we do not know if a talc

10  claimant is going to receive 1,000, 100 or 10,000 or whatever

11  the number might be.  How can they possibly review the

12  disclosure statement and make a determination as to how they

13  should vote?

14        So in LTL1, you believe that the road to making and

15  helping you make that determination, because you were facing

16  similar issues, albeit not a proposed plan, was to appoint an

17  estimation expert.  We submit that the court believes that the

18  disclosure statement process should go through -- should go

19  forward, that the debtors premise that we must act on this dual

20  parallel path before determining the motions to dismiss, then

21  we believe that you should reappoint Mr. Feinberg.  Reappoint

22  him so that he can begin to unveil the mystery of how many

23  claimants are in this case, and what is the value of their

24  claims.  Perhaps this is also the time, as Mr. Molton alluded

25  to, for the court to consider implementation of a bar date

1  motion, so that we can all point -- and for the purposes of

2  voting, let me be clear, -- so that we can all point to an

3  objective measurement of who is a claimant and what kind of

4  claim do they have.

5       Again, as we said, we believe the motions to dismiss

6  are significant.  We think they're important gating issues.  We

7  do not believe in the urgency that the debtor has been

8  suggesting that we must proceed on, which I frankly find a

9  little bit ironic, because at the end of the day, when one

10 reviews their plan, there isn't one nickel going out to any

11 talc claimant, until all appeals have been exhausted and

12 there's a not-appealable order.  That could be months.  That

13 could be years.

14      But if we're going to proceed down this parallel path

15 and you appoint Mr. Feinberg, let him, let his team continue

16 and let him not only continue his work but complete the work

17 they began.  Perhaps also direct that there be a bar date for

18 voting so that that process can be imposed, so that at some

19 point we will all know the numerators and denominators, I

20 believe is what you refer to before in each class of creditors.

21 Because in the absence of knowing this, I don't know frankly,

22 how you will be able to make the determination that the

23 disclosure statement contains adequate information.  And I

24 don't believe we will have any possibility for any talc

25 claimant to determine with any degree of certainty how much he

1 or she will be paid and when.

2          We have heard numbers bandied around that there's

3 40,000 claimants, 100,000 claimants.  I guess it depends who's

4 at the podium at the moment and who is speaking, but there's no

5 financial house on fire.  This case is as far from Lehman

6 Brothers as -- as one could imagine.  There's no good reason

7 why we need to start the process, but if we do start the

8 process, I believe it needs to start with those two important

9 components being pivotal to the process, because at some point,

10 if the case is not dismissed, we all deserve to know who are

11 the claimants, what type of claim do they have, and what is the

12 value of that claim.

13          Thank you.

14          THE COURT:  Thank you, Ms. Cyganowski.

15          Mr. Sponder.

16          MR. SPONDER:  Good afternoon, Your Honor.  Jeff

17 Sponder from the Office of the United States Trustee.

18          Your Honor, the United States Trustee agrees with the

19 TCC that the disclosure statement hearing should be adjourned

20 without date after decision on the motion to dismiss.  We have

21 heard a few times today that an amended plan will be filed.  So

22 why we're going forward with a disclosure statement hearing

23 when we know an amended complaint is coming doesn't make sense

24 to us.  We agree and we appreciate that the debtor has proposed

25 a date in August.  If that's sufficient time, that's -- that's

121

1  fine.  I just don't know if a date in August would be

2  sufficient time, but at least we're now in August.

3          The other thing, Your Honor, from the United States

4  Trustee's objection was that the original disclosure statement

5  motion had some dates and filing times change a little bit.  It

6  was the objections by -- by parties and interest and claimants

7  that objected to the disclosure statement had less time and the

8  debtor had more time to reply, and I at least want to reserve

9  my rights, the United States Trustee's rights when we get more

10 information on that.

11         THE COURT:  All right, fair enough.  Thank you.

12         MR. SPONDER:  Thank you, Your Honor.

13         THE COURT:  Okay, we're just kicking off these

14 issues.  I've heard enough on that issue.  Do we want to move

15 to the reimbursement of the Ad Hocs -- professionals.

16         MR. PRIETO:  Good afternoon, Your Honor.  Dan Prieto,

17 Jones Day, on behalf of the debtor.

18         Your Honor, the debtors goal in this case is to

19 obtain confirmation of its proposed plan as promptly as

20 possible.  And as you've heard, we entered this case with plan

21 support agreements with law firms representing 60,000 talc

22 claimants.  And while we have the support -- their support for

23 the -- the material terms of a plan, what we need now is

24 assistance from them to finalize the plan, the disclosure

25 statement, and the related documents, including the trust

122

1  distribution procedures in accordance with the plan support

2  agreements.  You've obviously heard we're in the process of

3  doing that and filing an amended plan.

4          These plaintiffs lawyers are very sophisticated, but

5  they're not bankruptcy lawyers.  So consistent with our goal in

6  this case, we negotiated the terms of the reimbursement

7  agreement with the Ad Hoc Committee, which is comprised of I

8  think 15 of the plaintiff law firms who are parties to the plan

9  support agreements.  And the reimbursement agreement permits

10 the Ad Hoc Committee to retain experienced bankruptcy counsel,

11 (indiscernible) things as well as local counsel, that will help

12 finalize the debtor's plan and fully participate in this case.

13 So we believe this agreement is unquestionably beneficial to

14 the debtor's estate and should be approved pursuant to section

15 363(b) of the bankruptcy code.

16         The terms of this reimbursement agreement are very

17 straightforward, Your Honor.  It provides for the reimbursement

18 of the Ad Hoc Committee's bankruptcy and local counsel, fees

19 and expenses as well as the Ad Hoc Committee members' expenses

20 -- you know, documented out-of-pocket expenses.  It also

21 underscores that the Ad Hoc Committee agrees to participate in

22 mediation, which is important to us, as well as continuing to

23 support the debtor's proposed plan.  And each party has the

24 right to terminate the agreement at any time for any reason,

25 effective on ten-day's notice.  So, Your Honor, we submit that

1  for the reasons that we set forth in our motion as well as the

2  Kim declaration, the debtor's entry into this agreement is a

3  proper exercise of the debtor's business judgment.  And that's

4  because the agreement provides very clear and important

5  benefits to the debtor's estate.

6         First, it enables the Ad Hocs to -- you know, to work

7  on our plan as needed, which presents a very significant

8  savings in costs and time, because it avoids the need for us to

9  negotiate individually with the 15 separate law firms on all

10 the issues that would be relevant to a plan and in this case.

11         Second, it permits the Ad Hoc Committee itself to

12 participate in all aspects of this case, including mediation,

13 which ensures that the views of these plaintiff law firms,

14 which represent a significant number of claimants in this case,

15 can be heard.  Your Honor is well aware the TCC is comprised of

16 law firms, and claimants who oppose this case, oppose our plan.

17 So we think it's important that the Ad Hoc Committee and the

18 reimbursement agreement permit the Ad Hoc Committee to provide

19 a counterbalance to the views of the TCC in this case.

20         And then third, Your Honor, the debtor can terminate

21 the agreement if it determines that it no longer is beneficial

22 to the estate, because for instance, the plan process is no

23 longer proceeding or mediation is terminated.

24         Now, Your Honor, the TCC, the US Trustee and Maune

25 Raichle, which are all parties who are seeking to dismiss this

1 case and oppose the debtor's plan, I think, from my

2 perspective, not surprisingly, have objected to this agreement,

3 notwithstanding its clear benefits to the estate.  And what

4 they argue is that you know, at a minimum it shouldn't be

5 entered into right now.  But each of their points, Your Honor,

6 is misguided.  Number one, the TCC and Maune Raichle argue that

7 the motion is premature because of their pending motions to

8 dismiss, but Your Honor has already addressed how this case is

9 going to proceed in connection with the TCC's motion to suspend

10 this case.  I think Your Honor was clear that they were going

11 to do a dual track.  You have the motions to dismiss, but you

12 also have the rest of the case, the plan process, and that you

13 weren't going to, you know, stop one while the other is

14 pending.  So really, that argument is just an effort to have,

15 Your Honor, revisit that ruling and try to disrupt and delay

16 further progress on the debtor's plan in this case.

17         Next, Your Honor, the TCC argues that the agreement

18 is not necessary, because the members of the Ad Hoc Committee

19 have already agreed to support the debtor's plan pursuant to

20 the plan support agreements.  And I think earlier today I heard

21 the opposite, which is apparently there was no support.  It's

22 all illusion.  But if I take them at their word, I acknowledge

23 that we had their support already.  That's evident by their

24 actions in this case, but that misses the point.  I mean, the

25 point is that the whole purpose of this is agreement is to

1  ensure that they'll continue to engage experienced bankruptcy

2  counsel and other professionals to actively participate in

3  finalizing our plan and related documents, participate in the

4  plan process, including, you know, disclosure statement

5  hearings, confirmation hearings, and to -- and to ensure that

6  they can continue to participate with the guidance of

7  professionals in the mediation.  Again without it, Your Honor,

8  there's a material risk that we'll have to negotiate with each

9  member of the Ad Hoc Committee, which would add a level of

10 complexity, inefficiency, and costs to the whole process.

11       And then also, Your Honor, the US Trustee argues that

12 the agreement may not be beneficial to the estate because it

13 can be terminated even if the plan of reorganization is not

14 finalized or confirmed.  But what the US Trustee overlooks is

15 that by providing us the opportunity to finalize the plan, and

16 -- and to mediate with the Ad Hoc Committee, the agreement

17 facilitates progress in this case, which itself constitutes a

18 benefit to our estate.

19       And I think the last set of objections, Your Honor,

20 I'm not going to go into too much detail because they all

21 relate to your authority to approve this agreement under

22 Section 363(b) and that's a topic that you've already addressed

23 in our prior case in connection with our request to enter into

24 a similar agreement with the Ad Hoc Committee estates.  I mean,

25 fundamentally, I think what the US Trustee's position is is

1  that 503(b) and 363(b) are in conflict and we have to use

2  503(b).  Well, that's not the case, as Your Honor previously

3  and found.  Section 503(b) permits a creditor or a committee to

4  request payment of professional fees, typically on a

5  retroactive basis while in contrast 363(b) permits a debtor or

6  trustee to use property of the estate outside of the ordinary

7  course of business where it benefits estates, including by

8  paying fees and expenses of creditors.  Your Honor has already

9  reached that conclusion.  It's supported by the rulings in

10  Purdue, in Mallinckrodt, and Bethlehem Steel.

11       So the only the only other argument on the authority

12  I wanted to briefly address was the TCC's argument that Your

13  Honor does not have the ability to approve this motion because

14  of the decision of the Delaware Bankruptcy Court in the Boy

15  Scouts case, but Your Honor, as we said in our reply or our --

16  yeah, our reply, you know, that case was completely an opposite

17  to our situation here, and frankly, inconsistent with Your

18  Honor's prior ruling.  I say it's an opposite because I think

19  the concern of the court in Boy Scouts was that there was going

20  to be duplication of services and expenses between the Ad Hoc

21  Committee and the official committee in that case.  Well,

22  that's clearly not an issue here.  The Ad Hoc Committee is

23  working with us on our plan and trying to finalize the plan.

24  While the TCC is seeking to dismiss this case, and frustrate

25  and thwart our efforts to to obtain a successful

1  reorganization, and a confirmation of our plan.  So there's not

2  overlapping services.  They're operating distinctly.

3         Also unlike in <u>Boy Scouts</u>, the debtor's proposed plan

4  will fully satisfy the talc claims and the debtor has

5  sufficient resources to provide the necessary trust funding

6  required by the plan, you know, plus to pay all the -- its

7  other obligations in the bankruptcy case.  So there's been no

8  harm articulated by the objectors to this motion as in terms

9  of, you know, what harm would befall them if -- if you allow us

10 to pay these fees, enter into this agreement in order to

11 facilitate our plan process.

12        So, Your Honor, to conclude, I submit that the court

13 should approve the debtor's entry into this reimbursement

14 agreement under Section 363(b).  The court should reject the US

15 Trustee and the TCC's technical arguments that are based on

16 incorrect reading of the bankruptcy code, and authorize the

17 debtor to enter into an agreement that will ensure that the Ad

18 Hoc Committee may continue to work to finalize the debtor's

19 plan and allow us to promptly pursue confirmation of it.

20        Thank you, Your Honor.

21        THE COURT:  All right.  Thank you.

22        Mr. Hansen.

23        MR. HANSEN:  Kris Hansen with Paul Hastings on behalf

24 of the Ad Hoc Committee.

25        Your Honor, if you agree with many other courts that

1  permit a debtor to exercise its business judgment under 363(b)

2  to pay fees and expenses for Ad Hoc Committees, then the

3  determination you need to make is really a question of the

4  reasonableness of that exercise of the debtor's business

5  judgment, which the Ad Hoc Committee posits is a very easy

6  decision.  Business judgment is generally given great deference

7  unless something is patently wrong or patently obviously wrong

8  either in the analysis that led to the decision or in the

9  facial relief that' sought, and neither of those circumstances

10 exists here.  And none of the objectors are really saying that.

11 Really, the questions that are raised predominantly in

12 opposition or whether or not 363(b) should be available or

13 whether a 503(b) is the exclusive provision.  The Ad Hoc

14 Committee does not believe the 503(b) is the exclusive

15 provision for the approval of fees of Ad Hoc Committees or

16 individual creditors.

17        Beyond the cases that were cited in all the briefs,

18 you obviously have the myriad of cases where you have Ad Hocs

19 come in in connection with backstop agreements and other types

20 of plan support agreements who get compensated, not only in

21 their capacity as financing providers, but for their

22 participation in the case.  And those, there are there are

23 probably hundreds of those cases.  So we believe that 363(b) is

24 easily available to the debtor on that front.

25        And the only other real opposition is premised upon

1  the Boy Scouts decision.  Mr. Prieto covered that pretty well,

2  but it was different here in three different ways.  The first

3  is this concept of duplication of effort.  There's no

4  duplication of effort here with the TCC.  I think that's

5  obvious.  It's actually the complete opposite.

6        As I mentioned earlier, you know, from the Ad Hoc

7  Committees perspective, we are continually frustrated by what

8  we feel are attacks by the TCC on the Ad Hoc Committee and the

9  claimants that the members of that committee represent.

10  Pointing it out again the Ad Hoc -- the TCC owes a fiduciary

11  duty to those parties.  And here we are constantly defending

12  ourselves in the face of their actions.  The Ad Hoc Committee

13  has stepped in and is trying to advance the cases and the

14  interests of approximately 60,000 claimants.  The progress is

15  tangible.  There's a plan on file.  We're talking about the

16  disclosure statement and participating in mediation, et cetera.

17        The second major way that it's different from Boy

18  Scouts is the fees paid to the Ad Hoc Committee professionals

19  will not reduce any recoveries provided to the underlying

20  claimants in connection with this case.  So there's no harm to

21  be put upon any party in this case.

22        And third, it appeared that in the Boy Scouts case,

23  certainly the Ad Hoc fees were being paid by state law counsel.

24  They had made representations to that effect, which is not the

25  case here.  So circling back, Your Honor, the debtors -- that

1  we believe that the debtors here exercised their business

2  judgment in a rational and reasonable way, that it should be

3  respected by the court for the multitude of reasons that are

4  highlighted in the pleadings.

5          THE COURT:  Thank you.

6          MR. HANSEN:  Thank you, Your Honor.

7          THE COURT:  Ms. Richenderfer.

8          MS. RICHENDERFER:  Thank you, Your Honor.  Linda

9  Richenderfer from the Office the United States Trustee.  I hope

10 I didn't disrupt anybody.  It's hard to hear Mr. Hansen in the

11 back of the room.  So no one's ever accused me of not speaking

12 loud enough.  So I wanted to move up so I could hear him.

13         Your Honor, I'm going to start at the back and work

14 my way forward, because I'm first going to address 363 and why

15 I think that there are a lot of concerns that arise in this

16 situation, and the reasons why 363, therefore, is not a

17 mechanism by which the court and the US Trustee could perform

18 our duties of determining whether or not fees should be paid to

19 counsel in certain circumstances.  And we've got to start with

20 looking at what is the AHC, the Ad Hoc Committee here?  The Ad

21 Hoc Committee is firms.  They are not creditors of the estate.

22 I think that needs to be very carefully pointed out first.

23         In fact, the Ad Hoc Committee makes clear in its

24 verified statement -- and we mentioned this, Your Honor, in our

25 filing, that they don't represent the claimants and they don't

1  represent the individual firms.  They just represent the Ad Hoc

2  Committee.  So it's the structure, I guess, that they

3  represent.  And if they don't represent the creditors or the

4  claimants and they don't represent the law firms, they just

5  represent the structure.  And then what is the structure doing?

6  The structure is supporting what the debtors are doing.

7         And so there's a reimbursement agreement.  And if

8  there comes a point in time when the structure decides not to

9  follow in lockstep behind the debtor, then the debtor can use

10  the reimbursement agreement, and its ability to terminate for

11  any or no reason and can stop paying the fees and expenses of

12  the Ad Hoc Committee.  And that, to me, Your Honor, creates a

13  dangerous situation.

14         The TCC is appointed by the US Trustee's Office.  It

15  retains counsel.  Counsel files applications.  They're reviewed

16  by Your Honor.  They're reviewed by the US Trustee.  They're

17  reviewed by all parties and interest.  Objections can be filed.

18         To the extent there's more than one firm, we always

19  demand that the order includes some sort of reduction on scope

20  so that we know who is responsible for what duties so that if

21  we get a fee app that shows that three firms are doing the same

22  thing, we can go back and say that's beyond the scope of your

23  responsibilities.  Here we have an Ad Hoc Committee that has

24  two very large firms, Paul Hastings and Cole Schotz, in

25  addition to local counsel, which I'm confused about since Cole

1   Schotz does have a New Jersey office, but we have three law

2   firms.   Under 363, if Your Honor approves this, there's not

3   going to be any ability to look at the applications that are

4   filed and say, oh, you did duplicative of work here or, like,

5   why are all three firms here?   Like, why do we have two

6   partners from Cole Schotz here today, and at least one from

7   Paul Hastings, and one from local counsel?   Or maybe it's two

8   Paul Hastings.   I'm not exactly sure who the fourth gentleman

9   is.

10          So there are questions like that that the court is

11  going to lose the ability to address, that my office is going

12  to lose the ability to address.   They say the money to pay the

13  fees is not going to come out of the recovery.   Well, it's

14  coming from somewhere.   I mean, the if there's a trust for $8.9

15  billion, that doesn't mean more money wouldn't be available if

16  the debtor is making money off of its subsidiary that is

17  supposed to be receiving funds from different agreements that

18  it has for use of trademarks.   If -- the money is coming from

19  somewhere, and it's coming from a place where it could be used

20  to help fund the plan.   So it might not be coming from the 8.9

21  billion that we keep talking -- hearing about that's in the

22  agreement, I guess, between Holdco and the debtor and then

23  between Holdco and J&J, but it's coming from a place that where

24  normally funds with come from to pay off other creditors of the

25  estate.

1          The -- I think I heard debtor's counsel say something

2    about the US Trustee doesn't want the plan to go forward or has

3    already taken a position against the plan.  I think we were

4    lumped in with the TCC.  To be clear, Your Honor, we've taken

5    no position on that plan.  Also be clear, Your Honor, I have

6    been so busy with other matters in this case, I know I haven't

7    read it yet.  I'll be honest.  And I don't know the members of

8    our team have had the chance to sit down and really even

9    analyze it yet.  So I just want to be clear upfront, the US

10   Trustee takes no position at all on the plan that's been filed,

11   other than the fact that, Your Honor, I do listen to the

12   depositions.  And I have heard what the deponents have said.

13   I'm not going to get into an argument up here today, but I know

14   what people have said in the depositions, and I know that the

15   terms of PSA are not all included in the current plan.  I've

16   heard that more than once.  It doesn't mean people are against

17   the current plan, but I've heard more than once one -- a party

18   from one of the 15 firms say that during a deposition.

19          I've also heard that there are no mesothelioma

20   clients who have signed on to the plan.  That even an attorney

21   who represents meso and ovarian cancers made clear he's

22   excluding his mesothelioma claimants from people who are, I

23   guess, indirectly parties to the PSA.  They're not directly

24   parties to the PSA.  So I just want to be clear that, one, we

25   take no position yet on the plan.  And two, let's be clear on

1 what people are really saying during depositions.  I'm giving

2 you just very few quotes that have stuck in my head.

3      I'm not going to get into an argument about who

4 represents majority/minority.  I don't know, but it's very

5 murky.  That's all I can tell Your Honor at this point in time.

6 I know that the people who have signed the PSAs are continuing

7 to work on the amended plan, but I also know that, like I said,

8 terms of the PSA are not all in the plan that was filed.

9      So we go to the fact that -- and I touched upon this

10 briefly -- the firms that make up the structure of the Ad Hoc

11 Committee have fiduciary duties, of course, to their clients.

12 And they have said -- and this is -- I don't think we can argue

13 with this.  They're not going to recommend something to their

14 clients unless they are satisfied with it.  And then I guess

15 for the Ad Hoc, they work for Mr. Hansen.  And again, the

16 debtor can terminate that reimbursement agreement for any

17 reason or no reason.  And then I don't know who is going to pay

18 for the fees of Mr. Hansen if the reimbursement agreement goes

19 away because of what the debtor has decided it likes or doesn't

20 like.

21      When we had the State Attorney General's agreement in

22 the first case, Your Honor, there was a scope that was defined

23 in there that the Ad Hoc Committee's counsel was going to move

24 forward on and there was a limitation of an amount.  We don't

25 have anything of that nature in this agreement right now.  It's

1  a very for any and all reasons and there doesn't appear to be

2  any sort of capping of the amount that would be paid out of the

3  debtor's estate.

4         I've already mentioned that we've got no order that's

5  going to define what each of the firms is going to do.  They

6  will be submitting applications.  I guess then that the court

7  could undertake to hear objections to those applications.  But

8  again, I don't know what standard we're using because it's 363.

9  We have no order.  And they're talking about using the format

10 that's in the court's order regarding payment of legal fees.

11 But I'm not so sure that they've included all of the bells and

12 whistles that go along with that:  reasonableness that there is

13 a limitation to the type of expenses that are incurred, or

14 limitation to the number of people that participate in certain

15 things.  I don't know that that is part of this analysis.

16        To be clear, I'm not saying -- we don't say the 503

17 and 363 are directly adverse to each other.  They're not.  They

18 deal with different things.  363 deals with situations when the

19 debtor has to use its business judgment.  503 specifically

20 deals with a particular situation when you have an Ad Hoc

21 Committee that wants to be paid for work that it did.  It's not

22 a carve out of 363.  It's something totally different.  This is

23 when and how an Ad Hoc Committee gets paid and they get paid at

24 the end of the case after they have been able to show that they

25 have -- they can show a demonstrable benefit to the debtor's

1  estate, and the creditors; an actual benefit, not hypothetical.

2  Don't know yet what the outcome is going to be of the Ad Hoc's

3  involvement.

4          Your Honor, we did mention in a footnote in our

5  pleading -- this is another problem by going this route.  I

6  don't know whether or not Cole Schotz does or doesn't have a

7  conflict.  If this was a case where they were being retained to

8  represent a committee, we certainly would go through a whole

9  host of issues with them and we plan to do so when we do

10 retention applications in the Whittaker case.  They disclosed

11 in the Whittaker case that they did represent this Ad Hoc

12 Committee here, but in the paperwork that was filed here -- the

13 initial paperwork, there was no disclosure of their involvement

14 in representing the Whittaker debtor.

15         And there is a concern that they, in their reply, the

16 Ad Hoc Committee counsel states that there are claimants who

17 have filed suit against both Whittaker and LTL or JJCI or

18 whatever in the same case.  And they don't think that's a

19 conflict.  Well, I don't know.  I haven't asked them.  I

20 haven't been able to ask them about that.  I don't know how

21 many cases we're talking about.  I also know that different

22 states have different laws on joint and several liability.

23         So I don't know if there would be a situation where

24 they would be adverse.  All I know is that Cole Schotz

25 represents the debtor in Whittaker and represents the Ad Hoc

1  Committee in this case.  And to me, Your Honor, that is a

2  situation that we would very much investigate if they were

3  coming in under 1103 as counsel to a committee and we will

4  investigate it in Whittaker where they're coming in as counsel

5  to the debtor under 327(a).

6         The -- we hear time and time again, that the Ad Hoc

7  Committee supports the plan.  They're in favor of the plan.  It

8  looks to me like we've got a locked in group of people.  And

9  that's another concern.  We want everyone to make sure that

10  they have an open mind and are addressing the concerns of their

11  constituencies.  And I think maybe sometimes in order to try to

12  counter what we've heard in deposition, sometimes the Ad Hoc

13  Committee, you know, we're in favor of the plan, we're going to

14  support the plan.  Well, then they're locked into that.  And

15  again, that's another reason why the reimbursement agreement

16  concerns the US Trustee.  That's why you do it after the fact

17  as opposed to before the fact and wait and see whether they

18  make a real contribution to the estate.

19         The -- there's one more point that was made there at

20  the end.  Yeah, people talk about Boy Scouts.  They talk about

21  a lot of other cases that are out there.  Most of them are oral

22  rulings.  We don't know the facts and circumstances.  I think

23  it was in the Ad Hoc or the debtors' -- I'm not sure.  There

24  was a whole paragraph of them.  I have no idea of the

25  circumstances in those cases.  And I think that's because every

138

1  court looks at this and makes a decision based on the

2  circumstances of a case.

3          THE COURT:  I've never been swayed by those

4  paragraphs with a litany of citations.

5          MS. RICHENDERFER:  Yeah.

6          THE COURT:  Sometimes they include me, sometimes they

7  don't --

8          MR. RICHENDERFER:  Right.  Right.  And --

9          THE COURT:  -- where we've ruled in the past.

10         MS. RICHENDERFER:  And, Your Honor, I know how you

11  ruled before in the first case, so I know that one, and that

12  was with the State Attorney General's group.  And again, there

13  was a scope limitation in there.  They -- all they were doing,

14  if I recall correctly, was that they were going to participate

15  in the mediations.  They weren't promising to take one position

16  or another.  They were promising to work in the mediations and

17  try to arrive at a plan and -- that would cover their concerns.

18  And there was a cap on the amount.  And we don't have that

19  here.  And so I think that's distinguishing.  So I will

20  distinguish Your Honor to yourself, and I'll end with that.

21         Thank you, Your Honor.

22         THE COURT:  Thank you.

23         MS. RICHENDERFER:  And if you have any questions, --

24         THE COURT:  No, I don't.  Thank you very much.

25         Mr. Molton?

1          MR. MOLTON:  Judge, I'm not going to present, but I
2   want to introduce you to Eric Goodman from my office, Brown
3   Rudnick, who has been waiting, I think over a year, to take the
4   rostrum here and have a session in front of Your Judge.

5          Thank you, Your Honor.

6          THE COURT:  I'm sure it will be underwhelming.
7   Welcome.

8          MR. GOODMAN:  Thank you, Your Honor.  Eric Goodman,
9   proposed counsel for the talc claims committee, Brown Rudnick,
10  here on behalf of the talc claimants committee.

11         THE COURT:  By the way, I think I've entered those
12  orders.

13         UNIDENTIFIED MALE SPEAKER:  (Indiscernible)
14  proposed?

15         UNIDENTIFIED MALE SPEAKER:  Some of them.

16         THE COURT:  So we could stop with the proposed.

17         UNIDENTIFIED MALE SPEAKER:  Your Honor, I think Brown
18  Rudnick is now counsel but Ms. Cyganowski is still proposed
19  counsel.

20         UNIDENTIFIED MALE SPEAKER:  Oh.

21         THE COURT:  Okay.  Reach out for chambers.  We'll get
22  it entered.

23         MR. GOODMAN:  I keep hearing the word proposed used,
24  so I didn't want to be presumptuous.

25         THE COURT:  That's fair.

1          MR. GOODMAN:  So, but I will -- I'll drop proposed.

2  That's fine.

3          Your Honor, I'm not going to repeat what we've argued

4  in our papers.  I think you have them and I note that Your

5  Honor and your staff seem to do a great job carefully

6  reviewing, you know, the submissions that are brought before

7  the court.

8          I think the one issue that I would like to address

9  just because I find it so jarring to hear is this concept that

10  the official committee doesn't represent all of the talc

11  claimants in this case.  We care deeply about every talc

12  claimant in this case.  Deeply.  That is why we work so hard.

13  That is why we spent so much time in this case, on our papers,

14  our pleadings, our plan, which is real.  It's not a bluff.

15  It's ready to go.  It's 84 pages long.  I just called it up.

16  You know, there's no bluffing here, your honor.

17          We work tirelessly in this case and it doesn't matter

18  to me, which state court counsel represents the victim.  I

19  don't care if -- if -- if it's an Onder firm talk claimant.  I

20  don't care if it's a Beasley Allen talc claimant.  We represent

21  all of them.

22          If they're supporting firms, in some ways, I feel

23  like they almost need us more.  And we work tirelessly for

24  everyone in this case.  So to suggest that there are some folks

25  who are disenfranchised or they're not being heard, I reject

1  that unequivocally, Your Honor.  We are here for all of the top

2  claimants and we will be working our tail off.  We have been

3  through the first case, through this case.  That's not going to

4  end.

5         Nothing further, Your Honor.

6         THE COURT:  Thank you, Counsel, and welcome again.

7         Anyone else?

8                 (No verbal response.)

9         THE COURT:  All right.  Mr. Prieto?

10        MR. PRIETO:  I think I'm good, Your Honor.

11        THE COURT:  All right.  All right.  I think other

12  than the uncontested matters, we're done.  Correct?

13        UNIDENTIFIED MALE SPEAKER:  Yes.

14        THE COURT:  As far as items on the agenda.  Then let

15  me go through with rulings.  I'll go backwards.

16        We'll start with the reimbursement requests for the

17  Ad Hoc Committee.  This court does not look to reverse itself

18  on its analysis as part of the appropriateness of 503(b), or

19  more importantly, the use of 363 in authorizing the debtor in

20  possession to seek to enter into a reimbursement agreement with

21  professionals for the Ad Hoc Committee as it did in the prior

22  case.  The same analysis as far as the legal analysis would

23  come into play.  There are differences here, no doubt, but this

24  court is persuaded that the role of the Ad Hoc Committee in

25  this case, in the present case, is important to assist the

1  debtor in trying to facilitate the -- an agreement with talc

2  claimants, an ultimate agreement with the plan to -- to

3  identify issues of concern to the talc claimant community, and

4  to work to support in this case the debtor's efforts, but also

5  the interests of the bankruptcy estate.  The committee lends a

6  voice to a group of claimants or potentially thousands of

7  claimants who at this juncture, hold a differing view from the

8  direction of this case.  That doesn't mean that views don't

9  change.  Attorney views change, client views change as cases

10 progress.  There is nobody who I ever view as should be locked

11 into a case and I don't expect Mr. Hansen, the Ad Hoc Committee

12 or the underlying claimant council or the underlying claimants

13 be locked in to any position as this case unfolds, to the

14 extent this case of bolts beyond the motion to dismiss.  But

15 there is no reason for this court not to defer to the business

16 judgment of the debtor as recognized by the courts and

17 Mallinckrodt and Purdue and others.

18        I won't disagree with the analysis of Judge

19 Silverstein and in the Boy Scout case.  We have different

20 facts, a different fact pattern here.  There is no -- there's

21 nothing to suggest to this court that reimbursement by the

22 debtor for the fees and expenses of the Ad Hoc group will

23 diminish in any way any recovery by talc -- by claimants in

24 this case.  I hear much to the opposite about how well healed

25 the debtor is and all the affiliates.  So it's -- it is -- it's

1  just nonsensical to believe that the money spent on the

2  professionals will have any meaningful prejudicial impact at

3  all, on the talc claimants.

4         As to potential conflicts, I expect the US Trustee to

5  investigate and can take action in the other wonderful case I'm

6  lucky to have, Whittaker, Clark & Daniels, if it's appropriate

7  with the with the with the Cole Schotz firm or -- or any other

8  potential conflict.  I will require that compensation be

9  consistent with the interim order for professionals in this

10 case, and be subject to a section 330 review, so that there is

11 a standard for review -- a reasonableness standard.  So,

12 counsel can, to the extent appropriate, submit a form of order.

13        With respect to the committee's motion seeking to

14 terminate exclusivity, I am very much guided by -- I think it

15 was Judge Gerber in <u>Adelphi</u> who looked at this -- the critical

16 issue, the critical factor to be whether terminating

17 exclusivity will actually move a case forward; what is the

18 benefit to the overall structure of the case.  In candor, I'm

19 not there yet.  I think I need more information.

20        What I hear on both sides is potential litigation,

21 substantial issues to be resolved on any plan, and doubling it

22 at this juncture may not be prudent, but I'm not prepared to

23 say it's not the right pathway.  I'm just not there yet.  And

24 I'm going to defer and carry this as was suggested until after

25 the motion to dismiss.  I think the motion to dismiss is a

1  gating process, but it's also going to help inform the court as

2  to a host of the issues that have been touched on with respect

3  to the debtor's motivations, plan process, the ability to

4  identify claimants, the number of claimants -- everything that

5  we've been discussing.  And I'm going to carry the exclusivity

6  motion to August 2nd, which is an omnibus date for LTL.

7        Now, why that date?  Because we will be -- we will

8  have completed the trial on the motions to dismiss by the end

9  of that last week in June.  There will be post-trial

10  submissions, and then this court will get on the task of

11  rendering a ruling.  I will have a ruling before the August 2nd

12  hearing.  I think that's fair to the parties in making

13  submissions and should be fair to the court.  Now, I say that

14  and, of course, we don't know what happens.  There can be

15  delays on everybody's end, but that's my goal to have a ruling

16  so I'll be better informed.  And again, whether it would be

17  appropriate to address the -- the reserve motion or the

18  continued motion on next -- on terminating exclusivity after

19  hearing all the evidence during the hearing.

20        I will take up the committee's suggestion.  I think

21  it's appropriate.  Well, no, I'm sorry.  We'll get to that.

22  That's on the preliminary injunction.

23        One of the frustrations of being up here on the bench

24  is you have ideas on how to handle things.  And then all the

25  attorneys who are very -- the most competent professionals we

1  have in this practice, tend to beat me to the punch.   The

2  issues that Mr. Cyganowski brought up are very relevant:  bar

3  date and whether or not we need to estimate claims in total in

4  order to provide the appropriate disclosures to move forward

5  with a plan process or how critical they are to a plan process.

6  What I want to do is that that August 2nd hearing, to the

7  extent the case survives dismissal at that point, is to have a

8  discussion on those issues, not motion practice.  You all can

9  submit letters and -- on your thoughts about whether or not or

10 how to handle the bar date.  We'll try a civil discourse.

11 We'll see if that works without motion practice, and ideas on

12 whether or not to continue with the estimation process and how

13 to how to begin -- how to conclude that.  I think that makes

14 sense and we can address it on the August 2nd date as well.

15        With respect to the debtor's request for -- to move

16 forward with the disclosure statement hearing, we just touched

17 on it.  There are significant issues that need to be addressed.

18 I do not believe the debtors are there yet either with the plan

19 from everything we've heard, but they have filed a plan and

20 they have filed a disclosure statement hearing -- I mean they

21 filed a disclosure statement.  They are entitled to at least

22 have this court fix a date or a disclosure statement hearing,

23 which I am going to set it August 22nd.  That gives us time

24 after I've ruled on the the dismissal motions.

25        I will pick -- I will suggest dates that -- so if we

1  have a hearing on August 22nd, if we actually go forward with

2  the hearing on August 22nd, we all know what happens

3  practically.  I'll have objections to a disclosure statement

4  due August 8th and a response by August 18th.  If you all in

5  meeting and conferring agree on a different schedule, just

6  advise chambers.  I'm just picking those that we have them out

7  there.

8         So it's a disclosure statement hearing on the plan

9  that's been filed or as amended, and we'll deal with that, on

10 August 22nd.  Objections to the disclosure statement due August

11 8th and debtor's response or Ad Hoc Committee response or

12 whoever wishes to respond, August 18th

13         MR. STOLZ:  Your Honor?

14         THE COURT:  Yes.

15         MR. STOLZ:  Shouldn't we set a date by which the

16 debtor has to file an amended disclosure statement plan so that

17 we know how long a period we're going to have?

18         THE COURT:  I think that's a fair request.  Do you

19 have a sense on -- I know you're working on --

20         UNIDENTIFIED FEMALE SPEAKER:  (Indiscernible)

21 objections --

22         THE COURT:  Don't give them too much credit.  It's a

23 blind squirrel.

24         MR. GORDON:  Your Honor, Greg Gordon on behalf of the

25 debtor.  Rather than delaying, I wonder if you could give us

1  time where we can confer with the Ad Hoc Committee and we'll

2  come back within 24 hours or so with a proposal on that?

3          THE COURT:  That's fine.  That's fine.  We'll -- and

4  we'll fix a date.  And keep in mind the need -- it can't be

5  like, you know, August 1st, you know, as an example.

6          MR. GORDON:  I understand.

7          THE COURT:  Ms. Richenderfer?

8          MS. RICHENDERFER:  Yes, Your Honor.  I just wanted to

9  be clear that I'm presuming that the request for the new

10  disclosure statement would also be due and be filing at the

11  same time their solicitation procedures, because that would

12  have to be part and parcel of what we would consider at the

13  hearing?  I would think.

14          THE COURT:  I would think, Counsel.

15          Yes?

16          MR. GORDON:  Yes.  Our view would be that would be on

17  for the same hearing subject to similar deadlines.

18          THE COURT:  Yes.

19          MS. RICHENDERFER:  Thank you.

20          THE COURT:  Thank you.  Thank you for the

21  clarification.

22          Now moving to the debtor's motion.

23          MR. MOLTON:  Judge, before you get there, can I ask a

24  question?

25          THE COURT:  Yes.  Yes.

1         MR. MOLTON:  Regarding exclusivity, it would be very

2    helpful if we were able to file our proposed plan on the

3    docket, And if Your Honor wanted that under seal, So in any

4    event that would be available to the debtors, the Ad Hoc

5    Committee and the mediators and us.  And I think that that's a

6    useful thing to do as we proceed.  I know I suggested it, and

7    from my perspective, we're ready.  You know, we're able to get

8    that moving relatively quickly.  And that's something that we

9    would request.

10        THE COURT:  The question, of course, would be to whom

11   it would be made available?  If it's under seal, it would be

12   made -- who do you expect to have access to it?

13        MR. MOLTON:  Judge, I would expect the mediation

14   parties and maybe I was a little too -- I would include the US

15   Trustee in that as well as the states.  But I would propose

16   that it'd be available to the mediation parties, whoever those

17   might be, but really the debtors, the Ad Hoc Committee, the

18   mediators, you know, ourselves, of course, the US Trustee, the

19   states, and it might be that other Ad Hoc groups including the

20   asbestos mesothelioma group, and others might want to have that

21   but we could agree --

22        THE COURT:  Well, let me suggest this.

23        MR. MOLTON:  -- agree to confidentialities --

24        THE COURT:  Yeah.

25        MR. MOLTON:  -- for that.

1          THE COURT:  I was going to suggest, we're back on

2   June 22nd.  There's no need to have it out before June 22nd.

3   Let's -- why don't the parties meet and confer or at least

4   advise the court of their position on it so that I can digest

5   it?  Once the horse is out of the barn, if I approve it, it's

6   hard to take back.  I'll certainly consider that.  I want to

7   give the debtor an opportunity or the Ad Hoc an opportunity to

8   sit on it and to consider it.  All right?

9          MR. MOLTON:  Thank you, Judge.

10          THE COURT:  With respect to the extension of the

11   current preliminary injunction and the bridge order request,

12   the the only fact that has changed a record since the April

13   hearing on this is that the debtor did, in fact, file their

14   plan and disclosure statements.  That I could take judicial

15   notice of, the docket.  I am going to rely on my prior

16   findings, and decision, and conclusions to take the opportunity

17   to extend the existing preliminary injunction through and

18   including that August 22nd date.  In other words, the existing

19   injunction which enjoins, in effect, simply trial activity,

20   will be extended through August 22nd for the same reasons we've

21   discussed with exclusivity.  It gives the court the opportunity

22   to hear the evidence testimony adduced during the trial on the

23   motion to dismiss to see whether it's academic at that point,

24   depending upon the court's ruling.

25          The court is not going to enter any bridge order at

1  this juncture.  I will on June 22nd decide, after the

2  submissions, whether or not I -- the court is of the view that

3  the successor claims are property of the bankruptcy estate and

4  subject to 362(a)(3).

5        I am overruling Mr. Satterly's objection.  I don't

6  view it as a stay relief motion.

7        Parties are on notice of the parameters of section

8  362.  I've said this before.  Parties act at their own peril

9  with respect to 362.  If creditors wish to have clarity they

10 could bring a motion before me.  If the debtor seeks to have

11 clarity or enforcement, they can bring a specific motion before

12 me with respect to a particular case.  I am loathe to enter

13 general -- generalized orders on matters when we're talking

14 about tens of thousands of matters.

15        At this juncture, the preliminary injunction that's

16 in effect now will continue through August 22nd.  The court

17 will consider adding Janssen Kenvue as protected parties on

18 June 22nd.  The court will rule on successor liability issues.

19 At least it's the court's intention to do that on January --

20 I'm sorry -- on June 22nd.

21        The parties that are protected parties to date, I

22 think all JJCI, Holdco, I think is a protected party.  They

23 remain protected parties and covered by the existing

24 preliminary injunction that will remain in effect.

25        All right.

1          I'll ask counsel for the debtor to submit a form of

2   order and serve it.

3          Before we recess -- I'm looking forward to that --

4   let's talk about the trial coming up, so you have ideas on for

5   June 22nd that we -- we might discuss it again.  We have, I

6   believe, ten motions to dismiss.  I've already suggested that

7   the parties should consider their submissions as opening

8   statements, written submissions.  I don't want ten closings,

9   ten PowerPoints on -- there's got -- there has to be

10  consolidation among -- we'll call it this side of the room.

11  You need to meet and confer to talk about -- I thought about

12  dividing up time.  We've had problems in the past, but actually

13  I thought for the most part the first trial we got through it.

14  We got everybody.

15         I will say this in all candor.  I -- I dislike having

16  to cut people off short.  You've all seen, obviously, I don't

17  like to cut people off short.  As the day progresses and we get

18  toward the end of the day and we're rushing to fill in, you are

19  better off submitting in writing closings or arguments because

20  by 4:00 o'clock you all become Peanuts cartoon characters.

21  That's what I'm hearing at that at that juncture.

22         So the written -- I read everything.  You might want

23  to consider an agreement to make closings through written

24  submissions or -- but or just limit them.  We can't go through

25  what we did with the hearing on the the first preliminary --

152

1  the preliminary injunction hearing this year, where I was it

2  was a quarter to 7:00 and you're like, no, please two more

3  minutes.  It doesn't work.  It's not fair to you all.  It's not

4  fair to the court.  It's not fair to the staff.  Let's try to

5  coordinate, but we could talk about it more specifically as far

6  as time allotments and carving up the days.

7         Oh I also I intend to start at 9:00 o'clock to

8  maximize the days and I will have a hard stop at 5:00 so your

9  transportation will be accommodated.  So with that, we'll

10 certainly work with you all if you need to make any tweaks or

11 changes, but let's -- let's try to avoid the repetition.  As I

12 have tried -- I've said in the past, I pride myself on not

13 being necessarily dense or stupid.  I pick up the argument the

14 first time.  With a second, I just don't need it repeated

15 endlessly.  All right?

16        Anything I can help anyone with?  Counsel?

17        MR. STOLZ:  Is June 22nd Zoom or in person?

18        THE COURT:  I'm fine with -- with Zoom.  Does anybody

19 have a dying -- a need to come to Trenton?

20        UNIDENTIFIED MALE SPEAKER:  No, sir.

21        THE COURT:  I didn't think so.  We'll do Zoom.

22        Thank you, Mr. Stolz.

23        All right.  We're in recess.  Thank you.

24        UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

25        MR. GORDON:  Oh, wait, oh.

153

1          THE COURT:  Mr. Gordon.  There's always one.  What?

2          MR. GORDON:  Sorry, Your Honor.  We were conferring.

3   The one open matter that wasn't addressed, but it's relevant is

4   the Maune Raichle motion on the -- the different types of

5   claimants and whether they're entitled to vote.  And I wonder

6   whether that should be discussed as well at the August 2nd

7   hearing as we talked about the potential bar date and the like.

8          THE COURT:  We carried that to what date?  Do we

9   recall?

10          UNIDENTIFIED MALE SPEAKER:  July, Your Honor.  July

11  omnibus.

12          MR. GORDON:  It might be July 11th.

13          THE COURT:  I think it would make sense to include

14  that.  Of course, --

15          UNIDENTIFIED MALE SPEAKER:  He's not here.

16          THE COURT:  -- Mr. Thompson is not here, but why

17  doesn't somebody reach out for him and just --

18          MR. GORDON:  We'll do that.

19          THE COURT:  -- suggest the August 2nd date would make

20  no sense to.

21          MR. GORDON:  We'll do that.

22          THE COURT:  All right.  Thank you.  Thank you all

23                        * * * * *

24

25

154

# C E R T I F I C A T I O N

We, ROBYN SCHLEY, PATTI POOLE, and CYNTHIA POND,

court approved transcribers, certify that the foregoing is a

correct transcript from the official electronic sound recording

of the proceedings in the above-entitled matter, and to the

best of our ability.


/s/ Robyn Schley

ROBYN SCHLEY


/s/ Patti Poole

PATTI POOLE


/s/ Cynthia Pond

CYNTHIA POND

J&J COURT TRANSCRIBERS, INC.        DATE: June 14, 2023