UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  ljones@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br><div align="right">Debtor. [1]</div> | Chapter 11<br><br>Case No. 23-12825 (MBK)<br><br>**Hearing Date and Time:**<br>June 27, 2023 at 9:00 a.m. ET |

**REPLY IN SUPPORT OF MOTION OF ARNOLD & ITKIN, ON BEHALF OF
CERTAIN TALC CLAIMANTS, TO DISMISS CHAPTER 11 CASE**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## Table of Contents

                                                                  **Page**

I. PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ................................... 1

II. ARGUMENT ................................................................................................................. 13

      A.     The Debtor's Attempt to Undermine Long-Standing Third Circuit Case
              Law Holding that a Chapter 11 Petition Is Subject to Dismissal for Lack of
              Good Faith Is Baseless. ................................................................................ 14

      B.     The Debtor Has the Burden of Proof to Establish its Good Faith ....................... 16

      C.     Under Controlling Third Circuit Precedent, a Chapter 11 Case Filed by a
              Debtor that is Not in Financial Distress Cannot Have a Valid Bankruptcy
              Purpose. ...................................................................................................... 20

      D.     The Debtor Was Not in Financial Distress on the Petition Date. ........................ 21

            1.    The Debtor's Analysis of the Assets Available to Satisfy Talc
                 Claims and Pay Defense Costs Is Incomplete and Conjectural and
                 Does Not Support a Finding of Financial Distress. ................................ 23

            2.    The Debtor's Analysis of Potential Talc Claims Does Not Show
                 that the Debtor is in Financial Distress. ................................................. 28

      E.     The Eve-of-Bankruptcy Termination of the 2021 Funding Agreement Was
              in Bad Faith. ............................................................................................... 34

            1.    The Replacement of the 2021 Funding Agreement with the New
                  Funding Agreements Greatly Diminished the Debtor's Previously
                 Expansive Plan Trust Funding Rights in Order to Give J&J and
                 HoldCo an Unwarranted Plan Veto in This Case ................................... 34

            2.    The Debtor's "Frustration of Purpose" Pretext for Terminating the
                  2021 Funding Agreement Is Untenable ................................................. 35

            3.    There Was No Bona Fide Basis to Question or Challenge the
                  Enforceability of HoldCo and J&J's Broad Plan Trust Funding
                 Obligations in a Chapter 11 Case under the 2021 Funding
                 Agreement. ........................................................................................... 37

            4.    By Terminating the 2021 Funding Agreement, the Debtor
                 Repudiated its Prior Assurances to this Court and the Third Circuit
                 that J&J's Funding Backstop Would Protect Talc Creditors from
                 any Drop in HoldCo's Value Resulting from the Planned Spinoff
                 of its Consumer Business ...................................................................... 41

DOCS_DE:243486.1 05471/003

F.    Fraudulent Transfer Issues are Not Premature and Further Evidence the
Debtor's Bad Faith Conduct Towards Creditors. ...............................................43

    1.    The Termination of the 2021 Funding Agreement was a Transfer
Made with Actual Intent to Hinder or Delay Talc Creditors. .................44

    2.    The Termination of the 2021 Funding Agreement was a
Constructively Fraudulent Transfer.........................................................45

G.    The Debtor Does Not Have a Reasonable Likelihood of Confirming a
Plan..................................................................................................................48

H.    Section 1112(b)(2) Can Not Be Used to Prevent the Dismissal of this
Case..................................................................................................................51

    1.    The Third Circuit's Decision in LTL Mgmt. Precludes the Court
from Invoking Section 1112(b)(2) of the Code to Deny the
Motions to Dismiss...................................................................................51

    2.    Financial Distress is a "Gating Factor" for the Unusual
Circumstances Provision...........................................................................52

    3.    Avoidance Actions and the 2023 Funding Agreement Have Greater
Value Outside Bankruptcy than In Bankruptcy ........................................53

    4.    The Statutory Requirements for the Application of Section
1112(b)(2) Have Not Been Satisfied. .......................................................55

III. CONCLUSION ....................................................................................................62

DOCS_DE:243486.1 05471/003

# TABLE OF AUTHORITIES

**Page**

## CASES

*15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.),*
  589 F.3d 605 (3d Cir. 2009) ...................................................................................14, 21

*718 Arch St. Assocs. v. Blatstein (In re Blatstein),*
  192 F.3d 88 (3d Cir. 1999) ...............................................................................................44

*Adelphia Gateway, LLC v. Pennsylvania Env't Hearing Bd.,*
  62 F.4th 819 (3d Cir. 2023) .............................................................................................17

*Annuity Co. v. Costner,*
  149 N.C. 293 (1908)...........................................................................................................38

*Coleman v. Cmty. Trust Bank (In re Coleman),*
  426 F.3d 719 (4th Cir. 2005) ...........................................................................................18

*Coleman v. Cmty. Trust Bank, N.A. (In re Coleman),*
  299 B.R. 780 (W.D. Va. 2003) ........................................................................................18

*Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC,*
  215 N.C. App. 66 (2011)...................................................................................................37

*Fed. Dep. & Discount Bank v. Domiano (In re Domiano),*
  442 B.R. 97 (Bankr. M.D. Pa. 2010)...............................................................................58

*Glover v. Ins. Co.,*
  228 N.C. 195 (1947)...........................................................................................................38

*Green v. Howard Family Tr. (In re Green),*
  No. 15-1349, 2016 Bankr. LEXIS 3963 (B.A.P. 9th Cir. Nov. 9, 2016) ................................61

*In re 1121 Pier Vill. LLC,*
  635 B.R. 127 (Bankr. E.D. Pa. 2022) ..............................................................................50

*In re Aearo Techs. LLC,*
  No. 23-02890, 2023 Bankr. LEXIS 1519 (Bankr. S.D. Ind. June 9, 2023) ............. 5, 26, 28, 30

*In re Bestwall LLC v. Armstrong World Indus. (In re Bestwall LLC),*
  47 F.4th 233 (3d Cir. 2022) .......................................................................................17, 60

*In re Colonial Realty Inv. Co.,*
  516 F.2d 154 (1st Cir. 1975)..............................................................................................15

*In re Combustion Eng'g, Inc.,*
  391 F.3d 190 (3d Cir. 2004).........................................................................................49, 51

*In re DCNC N.C. I, LLC,*
  407 B.R. 651 (Bankr. E.D. Pa. 2009)...............................................................................50

*In re Ford,*
  No. 12-20094, 2013 Bankr. LEXIS 2317 (Bankr. D. Wy. June 6, 2013) ...............................18

3

*In re Fox,*
    232 B.R. 229 (Bankr. D. Kan. 1999) ....................................................................18

*In re Grasso,*
    497 B.R. 448 (Bankr. E.D. Pa. 2013);................................................................58

*In re Jacobs,*
    644 B.R. 883 (Bankr. D.N.M. 2022)....................................................................60

*In re Joseph Mass,*
    2 Bankr. Ct. Dec. 973 (D. Mass. 1976) ..............................................................16

*In re Mallard Assocs.,*
    463 F. Supp. 1259 (S.D.N.Y. 1979)......................................................................15

*In re McQuillen Place Co., LLC,*
    609 B.R. 823 (Bankr. N.D. Iowa 2019) ..............................................................56

*In re New Century TRS Holdings, Inc.,*
    No. 21-3277, 2023 U.S. App. LEXIS 718 (3d Cir. 2023)......................................17

*In re Obstetric & Gynecologic Assocs.,*
    651 B.R. 1 (Bankr. S.D. Iowa 2023)....................................................................18

*In re Publishing Co.,*
    231 N.C. 395 (1950)............................................................................................38

*In re S-Tek 1, LLC,*
    No. 20-12241, 2023 Bankr. LEXIS 673 (Bankr. D.N.M. 2023) ............................60

*In re Strug-Division, LLC,*
    375 B.R. 445 (Bankr. N.D. Ill. 2007) ..................................................................18

*Ira Haupt & Co. v. Klebanow,*
    348 F.2d 907 (2d Cir. 1965) ...............................................................................16

*Kornegay v. Aspen Asset Grp., LLC,*
    204 N.C. App. 213 (2010) ..................................................................................38

*Leavitt v. Soto (In re Leavitt),*
    209 B.R. 935 (B.A.P. 9th Cir. 1997)....................................................................18

*Marshall v. Marshall (In re Marshall),*
    721 F.3d 1032 (9th Cir. 2013) ............................................................................18

*Moody v. Security Pac. Business Credit,*
    971 F.2d 1056 (3d Cir. 1992) .......................................................................47, 48

*Mumma v. Vara (In re Mann Realty Assocs.),*
    No. 1:18-CV-683, 2019 U.S. Dist. LEXIS 168132 (M.D. Pa. Sept. 30, 2019)......................56

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.),*
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ................................................................44

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),*
    384 F.3d 108 (3d Cir. 2004) ...................................................................14, 17, 21

4

*Rose v. Vulcan Materials Co.*,
   282 N.C. 643 (1973) ........................................................................................38

*Rue v. K-Mart Corp.*,
   713 A.2d 82 (Pa. 1999) ....................................................................................18

*Shapiro v. Wilgus*,
   287 U.S. 348 (1932) ........................................................................................44

*Stage I Land Co. v. United States Hous. & Urban Dev. Dep't*,
   71 B.R. 225 (D. Minn. 1986) ..........................................................................18

*Wilmington Tr., N.A. v. Pinnacle Land Grp., LLC (In re Pinnacle Land Grp., LLC)*,
   No. 17-23339-GLT, 2018 Bankr. LEXIS 2764 (Bankr. W.D. Pa. Sept. 10, 2018) ..................58

## STATUTES

11 U.S.C. § 101(5) ...............................................................................................46

11 U.S.C. § 101(12) .............................................................................................46

11 U.S.C. § 105 ....................................................................................................34

11 U.S.C. § 105(a) ...............................................................................................49

11 U.S.C. § 349(b)(1)(B) .....................................................................................54

11 U.S.C. § 524(g) .........................................................................................passim

11 U.S.C. § 524(g)(4)(ii)(A) ..........................................................................49, 51

11 U.S.C. § 548(a)(1)(B)(ii)(II) ..........................................................................47

11 U.S.C. § 548(a)(1)(B)(ii)(III) ...................................................................46, 47

11 U.S.C. § 766(4) (1977) ...................................................................................15

11 U.S.C. § 872(4) (1977) ...................................................................................15

11 U.S.C. § 1112(b) .......................................................................................passim

11 U.S.C. § 1112(b)(1) ............................................................................14, 18, 19

11 U.S.C. § 1112(b)(2) ...................................................................................passim

11 U.S.C. § 1112(b)(2)(A) ...................................................................................58

11 U.S.C. § 1112(b)(2)(B)(i) ..........................................................................53, 61

11 U.S.C. § 1112(b)(2)(B)(ii) ..............................................................................53

11 U.S.C. § 1112(b)(4)(A) ...................................................................................56

11 U.S.C. § 1121(c) ...............................................................................................7

11 U.S.C. § 1129(a)(10) .......................................................................................50

11 U.S.C. § 1129(b)(2)(B)(ii) ..............................................................................50

DOCS_DE:243486.1 05471/003

**RULES**

F.R.B.P. 1017..............................................................................................................1

DOCS_DE:243486.1 05471/003

The law firm of Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of certain talc personal injury claimants who are represented by Arnold & Itkin (the "Movants"), through the undersigned counsel, hereby submits this reply in support of their motion [LTL II D.I.[2] 384] (the "Motion")[3] for an order pursuant to section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code" or the "Code") and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") dismissing the Debtor's chapter 11 case. In further support of the Motion, the Movants respectfully represent as follows:[4]

## I.

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

1.      The Debtor seeks to use the extraordinary powers afforded to chapter 11 asbestos debtors under section 524(g) of the Code to impose its preferred "settlement" on what are likely to be tens of thousands of dissenting Talc Claimants. Unlike the purpose envisioned by Congress when it enacted section 524(g), the purpose of this chapter 11 case is not to protect an asbestos debtor's ability "to generate stock value and profits that can be used to satisfy claims"[5] – this Debtor is a corporate shell that has none. Rather, the purpose here is the unprecedented one of using section 524(g) to limit the liability of the wealthiest mass tort defendant in history, J&J, to tens of thousands of Talc Claimants.

---

[2] Citations to "LTL II D.I. ___" are to docket entries in the Debtor's second chapter 11 case. Citations to "LTL I D.I. ___" are to docket entries in the Debtor's first chapter 11 case.

[3] Capitalized terms used and not otherwise defined herein have the meaning ascribed to them in the Motion. "Section" refers to a section of the Bankruptcy Code unless otherwise noted.

[4] In support of the Motion, Movants also submitted the *Memorandum of Law in Support of Motion of Arnold & Itkin on Behalf of Certain Talc Claimants to Dismiss Chapter 11 Case* (the "Memo of Law") [LTL II D.I. 384-1] and the *Declaration of Laura Davis Jones in Support of Motion to Dismiss Bankruptcy Case* (the "Jones Dec.") [LTL II D.I. 384-2]. Movants also submit the Declaration of Laura Davis Jones in support of this Reply (the "Jones Reply Dec.").

[5] *See Debtor's Omnibus Objection to Motions to Dismiss Chapter 11 Case* [LTL II D.I. 614] (the "Debtor Objection") at 30.

1

2.     The Debtor cannot use section 524(g) to impose its will on dissenting talc creditors, however, because it did not file this chapter 11 case in good faith. The Debtor is not in financial distress. Even if it was, the ruse that the Debtor employed to place itself in financial distress, and the abusive conduct directed towards talc creditors that preceded this chapter 11 filing, have no analog in any mass tort or asbestos bankruptcy in history, and preclude a finding of good faith.

3.     Two hours before filing this case, the Debtor attempted to manufacture financial distress by eliminating J&J's funding backstop under the 2021 Funding Agreement. In so doing, the Debtor repudiated unqualified assurances that it had previously given this Court and the Third Circuit in the Debtor's first chapter 11 case ("LTL I") about the protection afforded talc creditors by that funding backstop. The Debtor also agreed gratuitously to limit its expansive plan trust-funding rights against J&J and HoldCo, in order to give them a free, *de facto* plan veto and limit the plan options available to talc creditors in this chapter 11 case. Such conduct falls squarely on the "patently abusive" side of the "spectrum ranging from the clearly acceptable to the patently abusive"[6] and precludes the Debtor from carrying its burden of demonstrating good faith.

4.     The burden of proof in this proceeding remains where it was in LTL I – on the Debtor – under binding Third Circuit precedent that this Court does not have the authority to set aside. Moreover, principles of collateral estoppel preclude the Debtor from now challenging the Third Circuit's prior ruling that, "Once at issue, the burden to establish good faith is on the debtor."[7] Even if the burden of proof was on Movants, they have more than satisfied that burden.

---

[6] *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100 (3d Cir. 2023) ("*LTL Mgmt.*").

[7] *LTL Mgmt.*, 64 F.4th at 100. Even if collateral estoppel was not dispositive, the Debtor's reliance on language that was added to section 1112(b) of the Code in 2005 and deleted in 2010 is misplaced.

5.    By its own admission, the Debtor's attempt to manufacture financial distress by terminating the 2021 Funding Agreement and eliminating J&J's funding backstop has fallen short. The Debtor admits that it has sufficient asset value to cover talc costs outside of bankruptcy: "[W]e believe that LTL and HoldCo's assets are sufficient to fund the talc liability *period.*"[8] *See also* Memo of Law [LTL II D.I. 384-1] at 7-8, ¶ 14. Those admissions foreclose a finding of good faith here.

6.    Still, the Debtor claims that it is in "financial distress,"



---

[8] Reporter's Transcript of Deposition of John Kim, June 1, 2023 ("Second Kim Depo. Tr."), a copy of which is attached as **Exhibit 7** to the Jones Reply Dec., at 214:10-12 (emphasis added).

[9]

[10]

[11]

DOCS_DE:243486.1 05471/003

7.



8.

on the fundamentally flawed assumption that the only assets available to satisfy the Debtor's talc litigation costs outside of bankruptcy would consist of the Debtor's assets, including its funding rights against HoldCo under the 2023 Funding Agreement. History belies this assumption. Before LTL I, "J&J functionally made talc payments from its accounts and received an intercompany payable from Old [JJCI] in return."[15] If this bankruptcy case was dismissed, J&J would have every incentive to keep paying talc litigation costs, because it is a co-defendant in every talc suit in which the Debtor is a defendant.[16] There is no evidence that J&J

---

[12] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[13] ▓▓▓▓▓▓▓▓

[14] ▓▓▓▓▓

[15] *LTL Mgmt.*, 64 F.4th at 95.

[16] *See id.* at 94 (referring to the number of "actions . . . pending against Old [JJCI] and J&J when LTL filed its Chapter 11 petition").

will stop funding such costs and expose itself to the attendant risks in the tens of thousands of talc suits in which it is a co-defendant.[17] Any concerns that J&J's litigation support will dry up outside of bankruptcy are purely hypothetical.[18] ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

9.    ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ █ ███

███████████████████████████████████████████████████

████████████████████████████████

10.    Even if the Debtor succeeded in placing itself in financial distress, the Debtor's bad-faith "bankruptcy planning" precludes a finding that its petition was filed in good faith. In agreeing to eliminate J&J's funding backstop under the 2021 Funding Agreement to try to

---

[17] *See In re Aearo Techs. LLC*, No. 23-02890, 2023 Bankr. LEXIS 1519, at *53 (Bankr. S.D. Ind. June 9, 2023) ("*Aearo Techs.*") (noting that debtor's (Aearo's) parent 3M has continued to defend CAEv2 actions and "almost assuredly will continue to do so if Aearo's bankruptcy is dismissed given that 3M has joint and several liability at best, . . .").

[18] *See id.*, 2023 Bankr. LEXIS 1519, at *49.

[19] ████████████████████

manufacture financial distress, the Debtor repudiated its prior assurances to this Court and the

Third Circuit in LTL I that the J&J backstop would protect creditors from any drop in HoldCo's

value resulting from the planned spinoff of its Consumer Business.[20] The Debtor provided such

assurances even after Movants made J&J's funding backstop outside of bankruptcy the centerpiece

of their argument that the Debtor was not in financial distress;[21] and the Debtor never told either

Court that if it dismissed LTL I on this basis (as the Third Circuit later did), J&J's funding backstop

would become "void or voidable." Despite these assurances, after the upstream transfer of

HoldCo's Consumer Business had taken place and cut HoldCo's value in half, the Debtor agreed

to eliminate J&J's funding backstop and the protection it provided, to set the stage for arguing that

it is now in financial distress.

11.    The Debtor's "frustration of purpose" theory cannot serve as a cover for this

duplicity, because that theory is untenable. A key stated "purpose" of J&J's funding backstop, as

reflected in the Debtor's on-the-record assurances to two courts, was to protect creditors from a

drop in HoldCo's value and allay fears about the planned spinoff of its Consumer Business. That

purpose was "frustrated," not by the Third Circuit's ruling, but by the termination of the 2021

Funding Agreement. Moreover, the linchpin of the "frustration of purpose" theory – that the

Debtor and J&J, with their sophisticated counsel, could not reasonably have foreseen the

possibility that claimants would argue, and a court would find, that a Debtor armed with a $61.5

---

[20] *See Debtor's Objection to Motion to Dismiss Chapter 11 Case* [LTL I, D.I. 956] at 25, n.33; 30; *Declaration of Daniel J. Merrett in Support of Debtor's Omnibus Objection to Motion to Dismiss Chapter 11 Case* [LTL II 614-1] ("Merrett Dec."), Exhibit 16 at 58:6-9; Transcript of Oral Argument before the Third Circuit, a copy of which is attached as **Exhibit 4** to the Jones Reply Dec. at 65:5-17; 68:15-21.

[21] *See Reply in Support of Motion to Dismiss Bankruptcy Case* [LTL I D.I. 1354] ¶¶ 2, 4, 8-9, 15-18, 26, 33; Brief for Appellant, a copy of which is attached as **Exhibit 1** to the Jones Reply Dec., at 22-24; Reply Brief for Appellant, a copy of which is attached as **Exhibit 3** to the Jones Reply Dec., at 10.

billion funding backstop from one of the wealthiest corporations in America was not in financial

distress, and could not qualify for chapter 11 relief – borders on the ludicrous.

12.    The Debtor's bad-faith conduct towards talc claimants did not stop there. In

anticipation of filing this case, the Debtor gave up its contractual right under the 2021 Funding

Agreement to up to $61.5 billion to fund a trust for talc claims under a plan that this Court could

have confirmed *whether or not J&J or HoldCo supported the plan or received a release under

section 524(g) of the Code*.[22] This Court itself characterized this right as "significant[]" in denying

the motions to dismiss in LTL I.[23] In exchange, the Debtor received only the limited "right" to

funding for a plan trust in an amount J&J and HoldCo are willing to pay that provides for third

party releases and a channeling injunction to their liking. Because the Debtor had no meaningful

source of payment to Talc Claimants other than its rights under the 2021 Funding Agreement, the

practical effect of this exchange was to give J&J a *de facto* plan veto for free and render creditors'

right to file and seek confirmation of a creditor plan under section 1121(c) a hollow one.

13.    Reinforcing this point, the Debtor just recently invoked this change as a basis for

denying the TCC's motion to terminate the Debtor's plan exclusivity:

> Under the funding arrangements between and among the Debtor, [HoldCo]
> and [J&J], *no funding is available* for the TCC's undisclosed plan.[24]

By design, the newly-created restriction on the Debtor's chapter 11 plan trust funding rights against

J&J and HoldCo ensured that "no funding is available" for any plan put forth by the TCC or

---

[22] *See* Memo of Law [LTL II D.I. 384-1] at 16.

[23] *In re LTL Mgmt. LLC*, 637 B.R. 396, 423 (Bankr. D.N.J. 2022) *rev'd and remanded* by *In re LTL Mgmt. LLC*, 64 F.4th 84 (3d Cir. 2023).

[24] *Debtor's Objection to Motion to Terminate the Debtor's Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereof* [LTL II D.I. 753] at 3 (emphasis added).

creditors[25] (at least not without the successful prosecution of a fraudulent transfer action). The Debtor may take pride in this crafty maneuver, but it is still bad faith.

14.    The Debtor Objection mentions this afternoon-of-bankruptcy cutback in the Debtor's previously expansive plan trust funding rights only in passing[26] and makes no attempt to justify it. Nor can it be justified. The Debtor's theory that the Third Circuit's dismissal of LTL I on the basis of J&J's funding obligation *outside of bankruptcy* "frustrated" the "purpose" of the 2021 Funding Agreement certainly cannot justify truncating J&J's funding obligation *in bankruptcy*.

15.    J&J's obligation to fund the payment of talc liabilities outside of bankruptcy and its obligation to do so in bankruptcy were established by two separate clauses in the definition of "Permitted Funding Use" in the 2021 Funding Agreement and were severable from one another. The Third Circuit's decision was based *solely* on J&J's funding obligation *outside of bankruptcy*; J&J's funding obligation *in bankruptcy* was not implicated in that decision. Accordingly, even if the Debtor's "frustration of purpose" theory rendered J&J's funding obligation *outside of bankruptcy* "void or voidable," J&J's severable and expansive obligation to provide plan trust funding *in a chapter 11 case* remained fully enforceable. The Debtor can hardly argue that the "frustration of purpose" theory would apply to "void" that severable provision, since, according to the Debtor, the purpose of J&J's funding obligation was to facilitate the resolution of talc claims in a chapter 11 case. Hence, there was no *bona fide* justification for the Debtor's agreement to

---

[25] *See also id.* at 10 ("*given the terms of the funding agreement* and the scant information about the TCC's plan provided in the Motion, the Debtor is highly skeptical that it would be confirmable or resolve the Debtor's talc-related claims") (emphasis added).

[26] *See* Debtor Objection [LTL II D.I. 614] at 19.

jettison its expansive plan trust funding rights against J&J and HoldCo under the 2021 Funding Agreement.

16.    The bad faith evidenced by the Debtor's "bankruptcy planning" is compounded by the combined effect of the two made-for-bankruptcy transactions that defined the Debtor's chapter 11 cases. The 2021 Corporate Restructuring, effected two days before LTL I was filed, and the replacement of the 2021 Funding Agreement with the New Funding Agreements, effected just two hours before this case was filed, combined to make Talc Claimants materially worse off than they were before these machinations began. Before the 2021 Corporate Restructuring, assets of Old JJCI valued at over $60 billion that included "many profitable products and brands" and the associated cash flow[27] would have been available to satisfy talc claims, in or out of bankruptcy.

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████    In a chapter 11 case for Old JJCI, a plan acceptable to talc creditors that made these assets available to a plan trust and did not release their claims against J&J or have its support (or that of Old JJCI) could have been confirmed.

17.    Now, following the 2021 Corporate Restructuring and the termination of the 2021 Funding Agreement, the assets available to satisfy talc claims against the Debtor outside of bankruptcy (absent successful fraudulent transfer litigation) have been reduced to interests in

---

[27] *LTL Mgmt.*, 64 F.4th at 95, 106.

[28] ████████████████████████

HoldCo subsidiaries said to be worth about half the value of Old JJCI, and the dividend stream from those subsidiaries – which the Debtor downplays as uncertain. The assets available to satisfy talc claims against the Debtor in a chapter 11 case have been further reduced to those that J&J and HoldCo are willing to provide under a plan they support, or assets that can be recovered through fraudulent transfer and other litigation.

18.    In addition, as long as J&J and HoldCo have a plan veto and represent the only practical source of plan trust funding, it is virtually certain that no plan of reorganization can be confirmed in this case. As evidenced by the *Chapter 11 Plan of Reorganization of LTL Management LLC* filed by the Debtor [LTL II D.I. 525] (the "Plan"), any plan the Debtor files and that J&J and HoldCo will fund and support will include a channeling injunction that extends far beyond the scope of a permissible channeling injunction in a chapter 11 plan for an asbestos debtor under controlling Third Circuit law. This is a narrow issue of law that can be resolved on the face of the Plan, without a complicated evidentiary hearing. Although the Debtor asserts that consideration of this narrow legal issue is "premature" because the Plan may change in the future, the fact is that neither the Debtor, nor J&J, has denied that the only plan they will support is one that includes a channeling injunction whose breadth is comparable to that of the overbroad channeling injunction in the currently-filed Plan. There is no reason to delay the resolution of this legal issue. If Movants are right in their view of the governing law, a confirmable plan in this case is a chimera, and the case should be dismissed. Talc creditors have waited long enough.

19.    The Debtor's bad faith is further evidenced by the fact that the termination of the 2021 Funding Agreement in anticipation of this chapter 11 filing was a transfer made with actual intent to hinder or delay creditors in the imminent second chapter 11 case. If that transfer did place the Debtor in financial distress, it was also constructively fraudulent.

10

20.     This issue is not premature, as the Debtor contends. This was not simply a transfer for less than reasonably equivalent value in an arms' length transaction, untethered to a planned bankruptcy filing. This was an eve-of-bankruptcy transfer to the Debtor's direct and indirect parent entities, which control the Debtor. If such an insider transfer was made with intent to hinder or delay creditors in connection with the upcoming bankruptcy filing or for less than reasonably equivalent value (i.e., the transfer siphoned value from the Debtor to insiders), that is certainly a circumstance relevant to the Debtor's (lack of) good faith.

21.     The Debtor tries to clothe its bad faith conduct in respectability by touting its Plan as "the largest settlement" in any mass tort bankruptcy case and in any asbestos bankruptcy case "ever." Debtor Objection at 2. The Debtor's self-congratulation obfuscates the fact that the surrender of its robust plan trust funding rights under the 2021 Funding Agreement was designed to limit the size of the "settlement" in this case – to prevent it from being higher – by giving J&J a plan veto and foreclosing the option of a creditor plan and an open plan process that could provide for a materially greater recovery to talc creditors.

22.     This point is underscored by considering the settlement of mass tort claims in the chapter 11 case of Pacific Gas and Electric Company ("PG&E"). That settlement, not the proposed settlement in this case, represents "the largest settlement" in any mass tort bankruptcy by a factor of billions of dollars in present value. Under PG&E's confirmed plan, the Fire Victim Trust was funded with $12.15 billion of value on the Plan Effective Date ($5.4 billion in cash and $6.75 billion in stock of the reorganized debtor) and another $1.35 billion in cash within a few years thereafter.[29] This record-breaking mass tort bankruptcy settlement was achieved *only after the*

---

[29] *See* PG&E Chapter 11 Plan §§ 1.6 ("Aggregate Fire Victim Consideration"); 4.26 ("Treatment of Utility Fire Victim Claims"); 6.7 ("The Fire Victim Trust"); 9.5 (deadline for occurrence of Effective Date). A copy of the PG&E Chapter 11 Plan is attached to the Confirmation Order in the PG&E chapter 11 case, a copy of which is attached to the Jones Reply Dec. as **Exhibit 5.**

***bankruptcy court terminated the debtor's plan exclusivity***.[30] This is what happens when there is an open, competitive plan process. Here, in contrast, through an eve-of-bankruptcy insider transaction, the Debtor sought to foreclose such an open plan process and the additional value it could have delivered to talc claimants, and to limit the cost of a settlement to its parents, by giving its parents a plan veto.

23.    Moreover, comparing the proposed settlement here to smaller settlements in other asbestos or mass tort bankruptcy cases produces a misleading narrative, because the circumstances of this case make comparisons to other bankruptcy settlements based on gross dollar amount inapposite. The proposed settlement here includes the release of potential multi-billion dollar fraudulent transfer and other claims against J&J and others. Unlike this Debtor, debtors subject to mass tort claims who are in genuine financial distress and file chapter 11 cases generally do not have funding rights outside of bankruptcy against an affiliate like HoldCo, whose assets have a going concern value of $30 billion. Settlement amounts in mass tort bankruptcies filed by debtors in genuine financial distress are constrained by the availability of assets to satisfy the mass tort claims. Here, the proposed mass tort settlement includes the release of mass tort claims against the wealthiest mass tort defendant in history, J&J.

24.    In another diversion, the Debtor casts aspersions on those who oppose it. *See* Debtor Objection at 3-4. The Debtor knows, however, that Arnold & Itkin has no conflict of interest here. It never "represented to the Court that [it] will ***never*** agree to ***any*** settlement . . ." and it is not a "member[] of the steering committee in the [MDL]." *See id.* (emphasis in original). Moreover, it is rich in irony for ***this*** Debtor to raise issues about alleged "conflicting economic incentive[s]" of

---

[30] *See Order Granting Joint Motion of the Official Committee of Tort Claimants and the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code,* a copy of which is attached to the Jones Reply Dec. as **Exhibit 6**.

law firms that are members of the MDL steering committee. *See id.* at 4. This Debtor is nominally run by Board members and officers hand-picked by J&J who include individuals who are closely affiliated with, and economically beholden to, J&J. This Debtor is represented by the same counsel who advised J&J in crafting the 2021 Funding Agreement[31] and now, on behalf of the Debtor, challenges its own handiwork as "void or voidable" and supports the needless surrender of the Debtor's significant funding rights against J&J.

25.    Finally, if there is cause for dismissal for lack of good faith, section 1112(b)(2) of the Code is not available as a basis for denying the motions to dismiss. Neither the Debtor nor the Ad Hoc Committee of Supporting Counsel ("Ad Hoc Committee") addresses the fact that the Third Circuit reversed this Court's application of section 1112(b)(2) in *LTL Mgmt.* for reasons that preclude the application of section 1112(b)(2) here. Among other reasons, the Court of Appeals explained that the ground for dismissal was LTL's lack of financial distress; that "no 'reasonable justification' validates that missing requirement in this case"; and that the Court of Appeals "cannot currently see how its lack of financial distress could be overcome." *LTL Mgmt.*, 64 F.4th at 110. That holding is dispositive here. Even if it is not, the requirements for the application of section 1112(b)(2) have not been satisfied.

26.    Talc creditors have waited long enough. This case should be dismissed.

## II.

## ARGUMENT

---

[31] *See* Certification of Gregory M. Gordon in Support of Application for Retention of Jones Day, Effective as of October 14, 2021 [LTL I D.I. 541-2] at 4 ("Prior to the Petition Date, Jones Day represented J&J and Old JJCI in connection with the restructuring that led to the formation of the Debtor."). By the time the Debtor was formed, the Funding Agreement had already been drafted and needed only LTL's name and signature added.

13

A.    **The Debtor's Attempt to Undermine Long-Standing Third Circuit Case Law Holding that a Chapter 11 Petition Is Subject to Dismissal for Lack of Good Faith Is Baseless.**

27.    For the first time in its more than 18 month sojourn in chapter 11, the Debtor makes the surprising and remarkable suggestion that the Bankruptcy Code does not actually subject a chapter 11 petition to dismissal for lack of good faith. *See* Debtor Objection at 20-21. If that suggestion had any merit, it is long past time for the Debtor to have raised it; and the Debtor is foreclosed from now doing so by the doctrine of collateral estoppel, explained *infra*. In any case, that suggestion contravenes settled Third Circuit precedent.

28.    It has long been Third Circuit law that a chapter 11 case may be dismissed for "cause" under section 1112(b)(1) of the Code if the petition was not filed in good faith.[32] In the seminal Third Circuit case so holding, the Court in *SGL Carbon* explained that it was guided by four factors: "the permissive language of § 1112(b), viewed in light of its legislative history; the decisions of our sister courts of appeals; the equitable nature of bankruptcy; and the purposes underpinning Chapter 11." *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154 (3d Cir. 1999). The Third Circuit emphatically reiterated these principles in *LTL Mgmt.*[33]

29.    The legislative history cited by the Debtor to try to cast doubt on this established principle consists of a report issued *five years before the Bankruptcy Code was enacted. See* Debtor Objection at 21. By contrast, the legislative history cited in *SGL Carbon* to justify application of

---

[32] *LTL Mgmt.*, 64 F.4th at 100; *15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) ("*15375 Mem'l Corp.*"); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004) ("*Integrated Telecom*"); *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 160 (3d Cir. 1999) ("*SGL Carbon*").

[33] *See LTL Mgmt.*, 64 F.4th at 100-04.

14

the good-faith requirement was *contemporaneous* with the 1978 enactment of the Bankruptcy

Code:

> [The] list [contained in § 1112(b)] is not exhaustive. The court will be able
> to consider other factors as they arise, and to use its equitable powers to
> reach an appropriate result in individual cases.

*SGL Carbon*, 200 F.3d at 160 (*quoting* H.R. REP. NO. 595, at 405 (1977), *reprinted in* 1978

U.S.S.C.A.N. 5963, 6362).

30.    In its attempt to cast doubt on this settled principle, the Debtor cites the fact that

the Bankruptcy Code did not carry over the express requirement under one of the three

reorganization chapters of the former Bankruptcy Act, Chapter X, that each bankruptcy petition

affirmatively show that the petition was "filed in good faith." Debtor Objection at 20. The Debtor's

focus on former Chapter X is, however, too narrow.

31.    The Debtor ignores the fact that the Bankruptcy Act included two other Chapters

for the reorganization of debtors – Chapters XI and XII. As in current chapter 11, "good faith" was

an express condition only to the confirmation of an arrangement under Chapter XI or XII.

Bankruptcy Act §§ 366(4), 472(4), 11 U.S.C. §§ 766(4), 872(4) (1977) (repealed). Unlike Chapter

X, but like current chapter 11, Chapters XI and XII did not expressly condition the continuation

of proceedings on a finding that the petition had been filed in good faith. Nevertheless, courts

applying the Act held that cases filed under Chapter XI or XII could be dismissed for lack of good

faith.[34] There is no evidence that Congress intended to abrogate that principle in cases filed under

chapter 11 of the Code.

---

[34] *See, e.g., In re Colonial Realty Inv. Co.*, 516 F.2d 154, 160-61 (1st Cir. 1975) ("Within a reasonable time … upon motion of a secured creditor, the court should conduct hearings adequate to determine whether the petition of the debtor [under chapter XII] has been filed in good faith, and whether there is a sufficient possibility of a successful arrangement to justify whatever risk to the collateral of the secured parties may be entailed."); *In re Mallard Assocs.*, 463 F. Supp. 1259, 1260-1263 (S.D.N.Y. 1979) (directing bankruptcy court to consider secured creditor's motion to dismiss chapter XII case: "[I]f the policy against fraudulent invocation of the powers of a Chapter XII court is to be efficiently effectuated, the secured creditor should be allowed to dismiss the action before the debtor can take

**B.**     <u>The Debtor Has the Burden of Proof to Establish its Good Faith</u>

32.     As an initial matter, the burden of proof issue is purely academic. It would arise here only if the evidence of LTL's bad faith were in equipoise or if Movants simply had challenged LTL's good faith but supplied no evidence to demonstrate its absence. The record evidence of LTL's unprecedented bad faith vastly exceeds the opposite, so it does not matter to the outcome whether the burden lay initially with Movants or the Debtor.

33.     In any event, the burden of proof for good-faith dismissal is settled law. In directing that LTL I be dismissed, the Third Circuit stated unequivocally that, "Once at issue, the burden to establish good faith is on the debtor." *LTL Mgmt.,* 64 F.4th at 100. This Court does not have the authority to set aside binding Third Circuit precedent.

34.     In addition, the Debtor's belated challenge regarding the burden of proof is long overdue and thus improper. The Debtor never challenged the principle that it has the burden of proof in the prior proceedings in this Court during LTL I or in the Third Circuit appeal, despite ample opportunity to do so. The Debtor cannot now collaterally attack that prior determination in this proceeding.

35.     Under federal law:

> Collateral estoppel prohibits a party from relitigating an issue when: "(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question."

---

advantage of the delay caused by his filing the petition."); *Ira Haupt & Co. v. Klebanow*, 348 F.2d 907, 908 (2d Cir. 1965) (affirming bankruptcy court's dismissal of chapter XI case early in the proceeding on grounds that there was no prospect for rehabilitating the debtor); *In re Joseph Mass*, 2 Bankr. Ct. Dec. 973, 974-75 (D. Mass. 1976) ("[T]he powers of Chapter XII should be awakened only in cases where there are exemplary motives and scrupulous good faith. . . . Congress never contemplated that individuals can clothe themselves in corporate garments to take advantage of the law appertaining thereto, and have title shifted to themselves as individuals if that course seems to offer more advantages. This is true in spite of the absence of the necessity of preliminary good faith hearing in Chapter XII proceeding which is required in Chapter X."(*sic*)).

*In re New Century TRS Holdings, Inc.*, No. 21-3277, 2023 U.S. App. LEXIS 718 at * (3d Cir. 2023), *quoting In re Bestwall LLC v. Armstrong World Indus. (In re Bestwall LLC)*, 47 F.4th 233, 243 (3d Cir. 2022) ("*Bestwall*").

36.    Here, all four requirements to apply collateral estoppel to the Third Circuit's allocation of the burden of proof in *LTL Mgmt.* have been satisfied. First, the "identical issue" – who has the burden of proof – "was decided in a prior adjudication." In LTL I, the Debtor put the burden of proof at issue, but in a different way. It argued – contrary to its current position – that it did bear the burden of proof, albeit only after movants made a *prima facie* case that it lacked good faith. *See Debtor's Objection to Motions to Dismiss Chapter 11 Case* [LTL I D.I. 956] at 13-14. This Court indicated otherwise. *See LTL Mgmt.* 637 B.R. at 405 n.7 ("The bulk of the case law in this Circuit has evolved in the past 42 years without employing this *prima facie* showing requirement."). The Third Circuit then confirmed that the burden of proof on good faith rests with the Debtor. *LTL Mgmt.,* 64 F.4th at 100. [35]

37.    Second, there was a "final judgment on the merits." The Third Circuit's judgment is final and resolved the appeal on the basis that the Debtor had not carried its burden of proof on good faith. Third, "the party against whom the bar is asserted" – the Debtor – was "a party to the prior adjudication." Finally, the Debtor "had a full and fair opportunity to litigate the issue in question." The Debtor could have raised the burden of proof argument that it now advances in the prior proceedings, but failed to do so.[36]

---

[35] In their appeal to the Third Circuit, Movants make clear their position that the Debtor had the burden of proof on the good faith issue. *See* Brief for Appellant, a copy of which is attached as **Exhibit 1** to the Jones Reply Dec., at 17-18 (citing *Integrated Telecom*, 384 F.3d at 118). The Debtor never challenged this position. *See* Brief for the Debtor-Appellee, a copy of which is attached as **Exhibit 2** to the Jones Reply Dec.

[36] *See Bestwall*, 47 F.4th at 246 (asbestos settlement trusts who elected not to litigate issue in prior proceeding, despite having had a full and fair opportunity to do so, were collaterally estopped from raising same issue in subsequent litigation); *Adelphia Gateway, LLC v. Pennsylvania Env't Hearing Bd.*, 62 F.4th 819, 828 (3d Cir. 2023) ("Adelphia further contends that applying issue preclusion was improper because it did not have a full and fair opportunity to litigate the preemption issue in state court. This requirement is met if a party could 'litigate issues in the manner

17

38.     Even if collateral estoppel did not apply, and this Court could revisit binding Third Circuit precedent, the Court should adhere to *LTL Mgmt.*[37] The Debtor's challenge to the Third Circuit's allocation of the burden of proof on good faith is based on the addition of the phrase "if the movant establishes cause" to section 1112(b)(1) of the Code in 2005. Debtor Objection at 23. This language was, however, eliminated from section 1112(b) in 2010. The Debtor argues that this deletion was meaningless; but the legislative history it cites falls short of establishing that this is so.

39.     The Debtor cites a comment to the effect that the 2010 amendment "corrects . . . purely technical errors" (Debtor Objection at 24), but does not explain how the elimination of language that, in its view, imposed the burden of proof on the movant corrected a mere "technical error." If the inclusion of that language in the 2005 Code amendments was a "technical error," that means that the language should never have been there in the first place.

40.     The Debtor also cites a statement that the 2010 amendment was intended to "eliminate an internal redundancy" in section 1112(b). *Id.* But the Debtor cannot identify any

---

available in a court of record' and had a sufficient incentive to do so vigorously in the first proceeding.") (*quoting Rue v. K-Mart Corp.*, 713 A.2d 82, 86 (Pa. 1999)).

[37] Contrary to the Debtor's suggestion (*see* Debtor Objection at 23), courts in the Third Circuit are not alone in holding that the debtor has the burden of proof on good faith. *See, e.g., Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1048 (9th Cir. 2013) ("'Debtor bears the burden of proving that the petition was filed in good faith.'") (*quoting Leavitt v. Soto (In re Leavitt)*, 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997)); *In re Obstetric & Gynecologic Assocs.*, 651 B.R. 1, 3 (Bankr. S.D. Iowa 2023) ("'Once lack of good faith is raised as an issue of cause for dismissal, the debtor bears the burden of proving the filing was made in good faith.'") (*quoting Stage 1 Land Co. v. United States Hous. & Urban Dev. Dep't*, 71 B.R. 225, 229 (D. Minn. 1986)); *In re Fox*, 232 B.R. 229, 233 (Bankr. D. Kan. 1999) ("However, when lack of good faith is raised as a basis for dismissal for cause, the debtor bears the burden of proving the filing was made in good faith."); *In re Ford*, No. 12-20094, 2013 Bankr. LEXIS 2317, at *14-15 (Bankr. D. Wy. June 6, 2013) ("As a general rule, the movant bears the burden of proving by a preponderance of the evidence that cause exists for the dismissal or conversion of a debtor's bankruptcy case. However, when lack of good faith is raised, the debtor bears the burden of proving the filing was made in good faith."); *Coleman v. Cmty. Trust Bank, N.A. (In re Coleman)*, 299 B.R. 780, 790 (W.D. Va. 2003) ("When the issue of good faith is raised, the burden is upon the debtor to demonstrate that she proceeded in good faith."), *aff'd in part and rev'd in part on other grounds, Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719 (4th Cir. 2005); *In re Strug-Division, LLC*, 375 B.R. 445, 448 (Bankr. N.D. Ill. 2007) ("It is the burden of the debtor to establish that the petition was filed in good faith."). Regardless, Third Circuit law controls here.

"redundancy" that was eliminated by removing this phrase. In fact, the "redundancy" in section 1112(b)(2) consisted of duplicative references to "unusual circumstances" in each of sections 1112(b)(1) and 1112(b)(2) that were not consistent with one another.[38] There was no "redundancy" in the phrase "if the movant establishes cause," which appeared only once before being eliminated.

41.    Finally, the Debtor relies on a statement that the 2010 amendments should not be interpreted "to confer, modify or delete any substantive bankruptcy rights." *Id.* at 25 (*quoting* 156 CONG. REC. H7158-01, H7161 (2010)). It is questionable, however, whether the placement of the burden of proof is a "substantive bankruptcy right." More relevant to the analysis than this opaque general reference to "substantive bankruptcy right" is that the only legislative history cited by the Debtor that specifically addressed the amendment to section 1112(b), described above, referred only to the elimination of an "internal redundancy." It is hard to imagine that if Congress understood the deleted phrase "if the movant establishes cause" as creating a "substantive bankruptcy right," it would have left the preservation of the burden of proof allocation to a vague

---

[38] Prior to the enactment of the Bankruptcy Technical Corrections Act of 2010, Bankruptcy Code section 1112(b) read as follows:

(b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, **absent unusual circumstances** specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2) The relief provided in paragraph (1) shall not be granted **absent unusual circumstances** specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that--

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)--
    (i) for which there exists a reasonable justification for the act or omission; and
    (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b) (2009) (amended 2010 by P. L. 111-327, § 2(a)(33), 124 Stat. 3561) (emphasis added).

19

reference to internal redundancy, rather than spelling out explicitly that the deletion of the cited phrase should not affect the burden of proof.

42.    In sum, the Third Circuit's allocation of the burden of proof in a prior chapter 11 case involving this Debtor should be followed.

**C.    Under Controlling Third Circuit Precedent, a Chapter 11 Case Filed by a Debtor that is Not in Financial Distress Cannot Have a Valid Bankruptcy Purpose.**

43.    The Ad Hoc Committee suggests that this chapter 11 case can have a valid bankruptcy purpose even if the Debtor was not in financial distress when this case was filed. *See Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motion to Dismiss* [LTL II D.I. 613] ("Ad Hoc Objection") ¶ 21. The Third Circuit ruled otherwise in *LTL Mgmt.*: "A debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 bankruptcy petition serves a valid bankruptcy purpose supporting good faith." 64 F.4th at 101. The Court went on to explain that, "because LTL was not in financial distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b)." *Id.* at 110.

44.    The Third Circuit's rationale for this limitation is particularly apt here. "[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy tools to do so." *Id.* at 110. Here, the Ad Hoc Committee seeks to assist the Debtor in using "bankruptcy tools" to redefine fundamental rights of dissenting talc claimants (likely thousands or even tens of thousands) against not just the Debtor, but also against J&J and many others, and essentially eliminate fundamental jury trial rights. The bankruptcy toolbox remains locked, however, absent a showing of financial distress – which has not been made here.

45.    The Ad Hoc Committee then argues that dismissal should be denied because the Debtor "petitioned for bankruptcy with the express goal of using the Bankruptcy Code precisely

20

as Congress intended in enacting section 524(g)." Ad Hoc Objection ¶ 23. In other words, according to the Ad Hoc Committee, even if the Debtor is not in financial distress, it should be able to file chapter 11 in order to utilize section 524(g). *See id.* Here again, the Ad Hoc Committee disregards applicable Third Circuit precedent; "a desire to take advantage of the protections of the Code . . . cannot establish *good* faith as a matter of law." *Integrated Telecom,* 384 F.3d at 128 (emphasis in original). Chapter 11's protections are "not *per se* a valid justification for a Chapter 11 filing," but rather "a consequential benefit of an otherwise good faith filing." *Id.* at 128 (internal quotation marks omitted)." "[G]iven the truism that every bankruptcy petition seeks some advantage offered in the Code any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings." *15375 Mem'l Corp.,* 589 F.3d at 620 (internal quotations and citations omitted).

**D.**     **The Debtor Was Not in Financial Distress on the Petition Date.**

46.     In defense of the New Funding Agreements, the Debtor has assured the Court that, "Again, as I've said before, ***we believe the debtor has sufficient asset value to cover talc costs outside of bankruptcy***, again based on the assets of HoldCo [New JJCI] and the debtor." Reporter's Transcript of Proceedings, April 18, 2023 ("4/18/2023 Tr."), a copy of which is attached as **Exhibit B** to the Jones Dec., at 208:12-15 (emphasis added). Its Chief Legal Officer acknowledged that, "[The Debtor] has sufficient assets to pay off its . . . debts currently as they come due." *See* Reporter's Transcript of Deposition of John Kim, April 14, 2023 ("Kim Depo. Tr."), a copy of which is attached as **Exhibit A** to the Jones Dec., at 117:14-16. Mr. Kim recently reaffirmed that, "[W]e believe that LTL and HoldCo's assets are sufficient to fund the talc liability ***period.***" Second Kim Depo Tr. at 214:10-12 (emphasis added).

21

47.    Nevertheless, Mr. Kim claims that the Debtor is in financial distress because HoldCo is in financial distress. He reasons that HoldCo:

> would have to sell the assets and substantially impair its business in order to pay, under the Funding Agreement, the obligations related to the talc liability. So that, in a nutshell, renders LTL and HoldCo financially distressed.

*Id.* at 109:16-22.

48.    The Debtor mistakenly conflates HoldCo's "financial distress" – that it would have to sell assets to fund its obligations to the Debtor – with "financial distress" of the Debtor. This is the same mistake the Debtor made in LTL I, when it argued unsuccessfully that Old JJCI's financial distress mattered. *See LTL Mgmt.* 64 F.4th at 105 ("Only LTL's Financial Condition is Determinative"). As long as "LTL and HoldCo's assets are sufficient to fund the talc liability," as Mr. Kim insists (Second Kim Depo. Tr. at 214:10-12), the fact that a non-chapter 11 debtor would have to liquidate its assets to provide contractually required funding to the Debtor to fund its talc liability is of no moment. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

49.    The various Bankruptcy Code "purposes" to which the Debtor alludes are inapposite here and shed no light on whether financial distress sufficient to support a finding of good faith exists in this case. *See* Debtor Objection at 29, citing *LTL Mgmt.*, 64 F.4th at 102. The Debtor cites the purpose of "avoidance of liquidation;" but the "liquidation" that matters for good faith is liquidation of *the Debtor's* assets, not the liquidation of the assets of a non-debtor like HoldCo. *Cf. LTL Mgmt.*, 64 F.4th at 105-06 (holding that only the Debtor's financial condition, and not that of Old JJCI, is determinative of whether the Debtor is in financial distress). Moreover,

in the absence of financial distress, the "purpose" of "treating creditors and other stakeholders fairly and equitably" (Debtor Objection at 29) cannot establish good faith. *See LTL Mgmt.*, 64 F.4th at 99 (noting Bankruptcy Court's strong conviction that Bankruptcy Court was the optimal venue for redressing the harms of both present and future talc claimants, but finding absence of financial distress determinative).

50.     The Debtor's attempt to tie this case to a concern in mass tort cases that "liquidation of a going-concern business may cut off recoveries for future claimants" (Debtor Objection at 29) is particularly far-fetched, since the Debtor is "essentially a shell company" that has no "going concern" to liquidate. *See LTL Mgmt.*, 64 F.4th at 101, 109. So, too, is the Debtor's attempt to compare itself to "Johns-Manville and other asbestos companies" who could be "forced into liquidation and lose their ability to generate stock value and profits that can be used to satisfy claims." Debtor Objection at 30. Thanks to the 2021 Corporate Restructuring by which it was created, the Debtor has no "stock value and profits that can be used to satisfy claims."

51.     The "fresh start" concept has no bearing on whether this debtor is in financial distress. *See* Debtor Objection at 30. The Debtor is a shell company whose function is to manage and resolve the talc claims that were assigned to it and use funding provided by J&J and HoldCo to do so. It is hard to imagine any purpose that is served in providing such a shell company with a "fresh start."

1.     **The Debtor's Analysis of the Assets Available to Satisfy Talc Claims and Pay Defense Costs Is Incomplete and Conjectural and Does Not Support a <u>Finding of Financial Distress</u>.**

52.     The Debtor claims to be financially distressed because it no longer has access to the $61.5 billion funding commitment by J&J that formed a key element of the Third Circuit's determination that the Debtor was not in financial distress. *See id.* at 31-32. Of course, eliminating that access so that the Debtor could now claim to be in financial distress was the whole point of

23

terminating the 2021 Funding Agreement, which raises a separate set of bad faith issues.[39] Despite

the termination of the 2021 Funding Agreement, however, the Debtor has funding rights against

HoldCo under the 2023 Funding Agreement. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

53.    The Debtor asserts that its talc liability "doesn't approach $30 billion," Second Kim

Depo Tr. at 17:23, ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████

54.    HoldCo may receive substantial dividends on account of its equity interests in

subsidiaries and indirect affiliates that would provide a source of funding to honor its obligations

under the 2023 Funding Agreement. ████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████ *see also* Reporter's Transcript of Deposition of Adam Lisman, May 31, 2023

("Lisman Depo. Tr."), a copy of which is attached as **Exhibit 8** to the Jones Reply Dec., at 118:9-

119:21; 120:4-12; 120:25-121:20; 122:11-17. The Debtor points to "uncertainty" regarding the

amount and timing of any dividends and whether dividends would be sufficient to, or received in

time to, satisfy defense costs, settlements and possible *Ingham*-like verdicts.[40] Debtor Objection

at 38. At this point, however, this is all conjectural.

---

[39] The Debtor's lament about being in financial distress reminds one of the proverbial child who killed his parents and then pled for clemency on the basis that he was an orphan.

[40] The Third Circuit expressed considerable skepticism about the possibility of future *Ingham*-like verdicts. *See LTL Mgmt.*, 64 F.4th at 95 (noting that the *Ingham* verdict was "a liability J&J described in public securities filings as 'unique' and 'not representative of other claims'"); 107 ("Nothing in the record suggests *Ingham* – one of 49 pre-

55. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

56. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

---

bankruptcy trials and described even by J&J as 'unique' and 'not representative . . .' – was the new norm."); 108 (referring to *Ingham* as "an outlier victory for plaintiffs").

25

57.     Historically, J&J paid all such costs: "J&J functionally made talc payments from its accounts and received an intercompany payable from Old [JJCI] in return." *LTL Mgmt.,* 64 F.4th at 95. There is no evidence – no sworn testimony – that J&J would stop this practice if this case was dismissed. Indeed, J&J is a co-defendant in every talc suit against Old JJCI or the Debtor. *See id.* at 94 (referring to "actions . . . pending against Old [JJCI] and J&J when LTL filed its Chapter 11 petition"). As such, J&J has every incentive to continue to pay talc litigation and settlement costs to protect ***itself****. See Aearo Techs.,* 2023 Bankr. LEXIS 1519*, at *53 (dismissing Aearo's bankruptcy for lack of financial distress where 3M, Aearo's parent, had continued to defend CAEv2 actions "and almost assuredly will continue to do so if Aearo's bankruptcy is dismissed given that 3M has joint and several liability at best, . . . "). There is no evidence to support speculation that J&J would stop paying talc litigation and settlement costs and expose itself to the consequential risk in tens of thousands of talc cases in which J&J itself is a defendant. Any concern that J&J's litigation support will end absent or outside of bankruptcy is purely hypothetical. *See id.* at *49. Moreover, the Debtor's suggestion that the Debtor and HoldCo would have to repay J&J for any amounts that it expended for talc litigation costs through asset sales (*see* Debtor Objection at 39) is baseless; there is no evidence that J&J ever forced Old JJCI to repay any intercompany payable through asset sales.

58.     ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

59.    ████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ It is likely that,

collectively, J&J and entities it controls effectively own 100% of the equity in the subsidiaries in

which HoldCo has equity interests. It is also likely that J&J does not have to contend with any

non-affiliated shareholders who are outside the "J&J family." Having an entity or entities other

than J&J affiliates purchase any of HoldCo's equity interests and become minority shareholders

in any such subsidiaries could inhibit the ability of J&J to move cash and other assets around freely

from, to and among those subsidiaries. Avoiding such a scenario provides J&J with yet another

27

incentive to make up any shortfall in talc litigation cost funding, so that HoldCo does not have to sell equity interests in its subsidiaries to "outsiders" to fund any such shortfall.

60.     To support its claim of financial distress in the face of all of these shortcomings in its analysis, the Debtor mischaracterizes *LTL Mgmt.* as having "made clear" that "financial distress is present where a debtor's contingent liabilities create a threat of 'forced liquidation of key business segments.'" Debtor Objection at 38, *quoting LTL Mgmt.*, 64 F.4th at 104. In *LTL Mgmt.*, the Third Circuit referred, not to a "threat" posed by merely "contingent liabilities," but to the fact that but for Johns Manville's chapter 11 filing, it would have been forced to book a $1.9 billion liability reserve, triggering the acceleration of approximately $450 million of "outstanding," *i.e.*, **non-contingent** debt, thereby creating the possibility of a forced liquidation. 64 F.4th at 104. No comparable situation exists or is alleged here. Moreover, the Third Circuit referred to a forced liquidation of assets of a chapter 11 debtor – not of a non-debtor.[41] This Debtor has no "key business segments" to liquidate.

### 2.    The Debtor's Analysis of Potential Talc Claims Does Not Show that the Debtor is in Financial Distress.

61.     The Debtor points to a "huge spike" in the number of talc claims since the petition in LTL I was filed. *Id.* at 32. But the "huge spike" characterization came, not from any evidence, but from the argument of one plaintiffs' law firm. More importantly, however, raw numbers as to the number of claims that might result in lawsuits if this case is dismissed cannot establish financial distress. *See generally Aearo Techs.*, 2023 Bankr. LEXIS 1519, at *10 (granting motion to dismiss

---

[41] Although Royalty A&M is owned by the Debtor, it is hardly a "key business segment;" Royalty A&M is a non-debtor subsidiary of the Debtor that is in the "business" of receiving a passive royalty stream, whose value is less than 1.5% of the value of the Debtor's rights against HoldCo under the 2023 Funding Agreement (*i.e.*, less than 1.5% of $30 billion). In fact, Royalty A&M will contribute nothing to the plan trust under the currently-proposed Plan. The Debtor's "forced liquidation" argument seeks to turn Royalty A&M into the proverbial "tail wagging the dog" on the issue of financial distress.

notwithstanding the pendency of 255,000 cases in the relevant MDL). The outcome of those claims

is simply too conjectural at this point.

62.    In *LTL Mgmt.*, the Third Circuit acknowledged that, in addition to the number of

lawsuits pending as of the petition date in LTL I, "[e]xpectations were for the lawsuits to continue,

with thousands more in decades to come." *LTL Mgmt.*, 64 F.4th at 94. Nevertheless, the Third

Circuit went on to caution that it was wrong to rely on projections that "contradict the record" by

ignoring "the possibility of meaningful settlement, as well as successful defense and dismissal, of

claims." *Id.* at 107.

63.    The "record" on which the Third Circuit relied – and that remains the record here

– shows that:

> [B]efore bankruptcy Old [JJCI] had settled about 6,800 talc-related claims
> for under $1 billion and obtained dismissals of about 1,300 ovarian cancer
> and over 250 mesothelioma claims without payment. And a minority of the
> completed trials resulted in verdicts against it (with some of those verdicts
> reversed on appeal).

*Id.* In addition, the resolution of old and new cases would also be affected by the fact that, "[T]he

progression of the multidistrict litigation on a separate track would continue to sharpen all

interested parties' views of mutually beneficial settlement values." *Id.* at 108.

64.    As a result of the Debtor's 18-month stay in chapter 11 in LTL I, and its rush to file

LTL II two hours after the dismissal of LTL I, no further record on any of these factors has been

developed. As a result, the outcome of any additional claims that may have been asserted in some

fashion since LTL I was filed – as well as that of those pending at that time – remains conjectural.

The absence of a more fully developed record of settlements, dismissals and litigation outcomes,

as well as of any progress that would have been made in the multidistrict litigation absent a stay

of more than 18 months, itself makes this chapter 11 filing premature. *See, generally, id.* at 103

n.13 (noting that in the *A.H. Robins* case, "stakeholders had the benefit of data from 15 years of litigation by A.H. Robins before its filing").

65.    The Debtor cites hyperbole and posturing on behalf of talc claimants about the potential magnitude of talc claims against the Debtor, Debtor Objection at 33-34. This is not, however, evidence of financial distress – it "is just a lawyer's highly optimistic guess." *See Aearo Techs.*, 2023 Bankr. LEXIS 1519, at *52 (responding to argument that "the CAEv2 claimants have, in disclosures made within the MDL, estimated 3M and Aearo's liability to be in the trillions"). The Debtor also points to the "increased possibility of more exorbitant verdicts." *Id.* at 35. But at this point, this is but one of many "possibilities." Because no trials have been permitted since the Debtor filed LTL I, this "increased possibility," too, is conjectural.

66.    The Debtor's claim that it "had no ability – financially or practically – to fully defend against the tens of thousands of claims that would have been unleashed after dismissal of its first bankruptcy case" (Debtor Objection at 40) also falls short. The great majority of pending claims were consolidated in the multi-district litigation, a manageable undertaking, which the Debtor disrupted by filing its first bankruptcy petition. There is no evidence that the Debtor would ever have had to "fully defend" against all such claims, or even against more than a very small percentage of such claims. Indeed, one of the grounds for the Third Circuit's reversal and order that LTL I be dismissed was that this Court erroneously accepted the Debtor's argument about having to "fully defend" against all such claims. *See LTL Mgmt.*, 64 F.4th at 107.

67.    The Debtor also refers to "hundreds of millions of dollars in bonded judgments that were pending appeal." Debtor Objection at 41. ███████████████████████████

████████████████████████████████████████████████

██████████████████████. If the Debtor and J&J prevail on appeal (as has occurred in the past), there

will be no liability on the verdicts. Outside of bankruptcy, some or all of the appeals might be settled. If the Debtor and J&J lose an appeal and the talc claimant proceeds against a bond, there is no evidence to indicate which of the Debtor and J&J is liable to the bonding company. If the judgment is against both J&J and the Debtor and is not bonded, J&J will have to satisfy the judgment in order to protect itself if HoldCo does not provide the Debtor with the funds to do so.

68. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

69. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

31

70. ███████████████████████████████████████████████

71. █████████████████████████████████████████████████

DOCS_DE:243486.1 05471/003

72. ████████████████████████████████████

73. ████████████████████████████████████

DOCS_DE:243486.1 05471/003

74. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████ any financial distress claimed by the Debtor is not

"immediate enough to justify a filing;" it is simply an "'attenuated possibility. . . that [the Debtor]

may need to file for bankruptcy in the future.'" *LTL Mgmt.*, 64 F.4th at 102 (internal quotations

and citations omitted).

E.     **The Eve-of-Bankruptcy Termination of the 2021 Funding Agreement Was in Bad
       Faith.**

       1.     **The Replacement of the 2021 Funding Agreement with the New Funding
              Agreements Greatly Diminished the Debtor's Previously Expansive Plan
              Trust Funding Rights in Order to Give J&J and HoldCo an Unwarranted Plan
              Veto in This Case**

       75.     The Debtor's contention that, "HoldCo's obligations under the 2023 Funding

Agreement as of the Petition Date were fundamentally the same as New JJCI's obligations at the

commencement of [LTL I]" (Debtor Objection at 42) is demonstrably false. HoldCo's obligation

to fund a plan trust in a chapter 11 case under the 2023 Funding Agreement is far more limited

than that under the 2021 Funding Agreement at the commencement of LTL I.

       76.     Under the 2021 Funding Agreement, HoldCo (as well as J&J) was obligated to

provide up to $61.5 billion to fund a trust for talc claimants under a plan confirmed by a final order

of this Court "regardless of whether such plan of reorganization provides that the Payors [J&J and

New JJCI] will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy

34

Code and *regardless of whether the Payors support such plan of reorganization*; . . ."[42] This was

a significant right, and this Court viewed it as such:

> ***Significantly,*** the resources under the Funding Agreement will be available
> upon confirmation of a plan – whether or not the plan is acceptable to J&J
> or New JJCI, and whether or not the plan offers payors protections under §
> 524(g).

*LTL Mgmt.*, 637 B.R. at 423-24 (emphasis added).

77.    In contrast, the 2023 Funding Agreement obligates HoldCo to fund a plan trust *if*

*and only if* J&J and HoldCo support the plan. *See* Memo of Law at 21-22. Moreover, because

J&J's plan trust funding obligation under the J&J Support Agreement is tied to that of HoldCo

under the 2023 Funding Agreement, J&J's plan trust funding obligation is similarly limited to a

plan that J&J and HoldCo support. *See id.* The Debtor's Objection does not challenge this reading

of the New Funding Agreements or explain or justify this dramatic change; the Debtor just ignores

it. This change effectively gave HoldCo and J&J a veto over any plan in this case and limits the

available trust funding to what they are willing to pay, because the 2021 Corporate Restructuring

left the Debtor devoid of any meaningful source of funding other than its funding rights against

J&J and HoldCo under the now-terminated 2021 Funding Agreement.

78.    This dramatic reduction of the Debtor's previously expansive plan trust funding

rights against its parent corporations and the corresponding reduction in the plan options available

to talc creditors cannot be justified and was gratuitous.

**2.    The Debtor's "Frustration of Purpose" Pretext for Terminating the 2021
Funding Agreement Is Untenable**

---

[42] 2021 Funding Agreement (Annex 2 to *Declaration of John K. Kim in Support of First Day Orders* [LTL I, D.I. 5]
("2021 Kim Dec.")), at 6 (definition of "Permitted Funding Use," clause (c)(ii) (emphasis added)). The same was true
of J&J.

79.    The linchpin of the Debtor's attempt to justify replacing the 2021 Funding Agreement with the New Funding Agreements is a convoluted and untenable theory. The Debtor asserts that the Third Circuit's ruling that J&J's $61.5 billion funding backstop *outside of bankruptcy* under the 2021 Funding Agreement precluded a finding of financial distress, thereby requiring the dismissal of LTL I, was a "contingency" that was not foreseeable, resulting in a "material risk" that J&J's obligations under the 2021 Funding Agreement were "rendered void or voidable." *See* Debtor Objection at 47. According to the Debtor, the Third Circuit's ruling gave rise to a potential "frustration of purpose" because the purpose of J&J's funding backstop *outside of bankruptcy* was "to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code." *See* Debtor Objection at 46-48. This far-fetched argument strains credulity every step of the way.

80.    To begin with, the 2021 Funding Agreement expressly contemplated that LTL would pay talc claims and be entitled to funding from its parents to do so outside of bankruptcy. The Debtor provides no coherent explanation of how the purpose of J&J's funding backstop *outside of bankruptcy* could have been to facilitate the goal of resolving talc claims *in bankruptcy*. That goal was facilitated by J&J's separate, robust obligation under the 2021 Funding Agreement to fund a plan trust *in bankruptcy*. Moreover, the Debtor ignores the fact that "voiding" the J&J funding backstop outside of bankruptcy would "frustrate" its stated purpose of protecting talc claimants from any drop in HoldCo's value resulting from the planned spinoff of the Consumer Business. The Debtor's on-the-record assurances to two different courts prevent it from now claiming otherwise. *See infra* § II.E.4.

81.    Moreover, as the Debtor acknowledges, application of the "frustration of purpose" doctrine requires that "the changed condition was not reasonably foreseeable." *See* Debtor

Objection at 49, *quoting Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC,* 215

N.C. App. 66, 79 (2011). It strains credulity to suggest that the Debtor and J&J, with their army of

sophisticated lawyers, could not reasonably have foreseen the possibility that claimants would seek

dismissal on good-faith grounds or that a court would rule in their favor, finding that a debtor with

a $61.5 billion funding backstop from one of the wealthiest corporations in America was not in

financial distress and, therefore, had not filed its chapter 11 petition in good faith.

82.    As the Debtor also acknowledges, the "frustration of purpose" doctrine requires

that, "there was an implied condition in the contract that a changed condition would excuse

performance." *Id.* The "changed condition" here was the dismissal of LTL I. The claim that there

was an "implied condition" that the case would not be dismissed cannot be reconciled with the

express provision of the 2021 Funding Agreement that obligated J&J and HoldCo to provide the

Debtor with funding outside of bankruptcy. That provision would have been meaningless if it was

not intended to apply in the event of a dismissal of LTL I. LTL was in existence for just two days

before it filed LTL I, and probably had no need for a $61.5 billion funding backstop to address

talc-related costs during that two-day period. It would only need that backstop if the case was

dismissed.

3.    **There Was No *Bona Fide* Basis to Question or Challenge the Enforceability of HoldCo and J&J's Broad Plan Trust Funding Obligations in a Chapter 11 Case under the 2021 Funding Agreement.**

83.    Even if applicable to J&J's funding obligations outside of bankruptcy, the Debtor's

"frustration of purpose" theory provided no basis for treating the *entire* 2021 Funding Agreement

as invalid or unenforceable, let alone created a material risk that the entire 2021 Funding

Agreement was "void" or "voidable." At most, the Debtor's "frustration of purpose" theory would

only have affected the enforceability of J&J's funding obligations under the 2021 Funding

Agreement *outside of bankruptcy*. It would not have affected the enforceability of J&J's or

37

HoldCo's severable obligations to provide up to $61.5 billion to fund a plan trust *in bankruptcy*, regardless of whether they supported the plan.

84.    The 2021 Funding Agreement, governed by North Carolina law,[43] contained the following commercially-standard severability clause:

> 12. Severability. If any one or more of the provisions contained in this Agreement are *invalid, illegal or unenforceable* in any respect, *the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired*. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

2021 Kim Dec., Annex 2 (2021 Funding Agreement) at 14, ¶ 12 (emphasis added).

85.    To the extent that the provision relating to funding *outside of bankruptcy* created an invalidity or unenforceability concern,[44] that provision was severable, and that concern did not mandate an entirely new funding arrangement. Under North Carolina law, "[w]hen a contract contains provisions which are severable from an illegal provision and are in no way dependent upon the enforcement of the illegal provision for their validity, such provisions may be enforced." *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 658 (1973) (citing *In re Publishing Co.*, 231 N.C. 395 (1950); *Glover v. Ins. Co.*, 228 N.C. 195 (1947); *Annuity Co. v. Costner*, 149 N.C. 293 (1908). Courts have recognized the validity of severable contracts where the document is "in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be." *Kornegay v. Aspen Asset Grp., LLC*, 204 N.C. App. 213, 226 (2010) (quotation marks omitted).

---

[43] *See* 2021 Kim. Dec., Annex 2 (2021 Funding Agreement) ¶ 9.

[44] As described above and in the Memo of Law, this alleged "concern" is contrived and does not withstand scrutiny. See Memo of Law at 5-7, ¶¶ 10-13.

38

86.     The 2021 Funding Agreement treated J&J's and HoldCo's funding obligations

outside of bankruptcy and those in a chapter 11 case in two separate clauses. Clause (c)(i) of the

definition of "Permitted Funding Use" addressed the funding of any amounts to satisfy:

> (i) the Payee's Talc Related Liabilities established by a judgment of a court
> of competent jurisdiction or final settlement thereof at any time *when there
> is no proceeding under the Bankruptcy Court pending with respect to the
> Payee*;

2021 Kim Dec., Annex 2 (2021 Funding Agreement) at 6 (emphasis added).

87.     Clause (c)(ii) separately addressed the Payors' funding obligation in a bankruptcy

case. It referred to the funding of any amounts to satisfy:

> (ii) *following the commencement of any Bankruptcy Case*, the Payee's
> Talc Related Liabilities in connection with the funding of one or more trusts
> for the benefit of existing and future claimants created pursuant to a plan of
> reorganization for the Payee confirmed by a final, nonappealable order of
> the Bankruptcy Court and, to the extent required, the District Court (for the
> avoidance of doubt, regardless of *whether such plan of reorganization
> provides that the Payors will receive protection pursuant to section 105 or
> section 524(g) of the Bankruptcy Code and regardless of whether the
> Payors support such a plan of reorganization*);

*Id.* (emphasis added).

88.     Clause (c)(iii) of the definition of "Permitted Funding Use" addressed certain

ancillary costs and expenses either outside of bankruptcy under clause (c)(i) or in a bankruptcy

case under clause (c)(ii).

89.     The Third Circuit's ruling was predicated solely on the Debtor's funding rights

under the 2021 Funding Agreement "*outside of bankruptcy,*" *i.e.*, those resulting from clause (c)(i)

of the definition of "Permitted Funding Use." *See LTL Mgmt.*, 64 F.4th at 96, 106 (emphasis

added). The Debtor's plan trust funding rights *in bankruptcy* were not at issue and were not a

factor in the Third Circuit's decision, because J&J's funding obligations in bankruptcy were

irrelevant to the "financial distress" inquiry. There was no credible basis to apply the "frustration

of purpose" doctrine to "void" J&J's severable obligation to fund a plan trust *in bankruptcy.*

90.    According to the Debtor, the very "purpose" of the 2021 Funding Agreement "was

to secure J&J's funding for the Debtor to enable a resolution of all Talc Related Liabilities in

chapter 11." Debtor Objection at 50; *see also id.* at 52 (referring to purpose of equitable resolution

of talc claims in chapter 11 through confirmation of a plan providing for a trust to satisfy such

claims). J&J's obligation to fund a plan trust in bankruptcy was in aid of that purpose. The broader

the obligation, the greater its contribution to fulfilling that purpose.

91.    Thus, at most, the Debtor's "frustration of purpose" theory would provide a basis

only for "voiding" clause (c)(i) of the definition of "Permitted Funding Use" in the 2021 Funding

Agreement, which provides for the Payors' funding obligation outside of bankruptcy, and not

clause (c)(ii), which provides for their plan trust funding obligation in bankruptcy. Under the

severability provision of Section 12, the effect of the "frustration of purpose" doctrine, if applied,

would be that clause (c)(i) would be deleted, as would the reference to clause (c)(i) in clause

(c)(iii). Clause (c)(ii), the basis for the Payors' plan trust funding obligation in bankruptcy, and the

reference to clause (c)(ii) in clause (c)(iii), would remain in place and enforceable. Thus, the

Debtor's agreement to replace its robust plan trust funding rights in chapter 11 under the 2021

Funding Agreement with its sharply diminished plan trust funding rights under the New Funding

Agreements was gratuitous. The transparent purpose of the Debtor's agreement to this change was

simply to give J&J and HoldCo a plan veto and eliminate the option of a creditor plan, not to

address a so-called "voidness" problem. The Debtor's plan trust funding rights in chapter 11 under

the 2021 Funding Agreement remained fully enforceable, and there was no need to swap those

rights for lesser rights under the New Funding Agreements.

4.    **By Terminating the 2021 Funding Agreement, the Debtor Repudiated its Prior Assurances to this Court and the Third Circuit that J&J's Funding Backstop Would Protect Talc Creditors from any Drop in HoldCo's Value Resulting from the Planned Spinoff of its Consumer Business**

92.    The New Funding Agreements also eliminated J&J's obligation to provide up to $61.5 billion in funding for the payment of the Debtor's talc liabilities and related costs outside of bankruptcy. The Debtor offers various pretexts for acceding to this value grab by J&J, but never comes to grips with its bad faith in repudiating assurances it had given to this Court and the Third Circuit in LTL I regarding the important protection provided by J&J's funding backstop.

93.    In opposing the motions to dismiss in LTL I, the Debtor told this Court that an important purpose of having J&J as a co-payor with New JJCI was "providing protection against any theoretical future diminishment of New JJCI's ability to pay Talc Claims." *Debtor's Objection to Motion to Dismiss Chapter 11 Case* [LTL I D.I. 956] at 30. The Debtor assured the Court that J&J's joint funding obligation under the 2021 Funding Agreement "moots any concern about the impact of the proposed spin-off on New JJCI's value." *Id.* at 25, n.33.

94.    Even though J&J's $61.5 billion funding backstop became the centerpiece of Movants' argument to this Court[45] and the Third Circuit[46] that the Debtor was not in financial distress, the Debtor never wavered in this assurance. The Debtor never told either Court that if LTL I was dismissed on the basis that J&J's funding backstop under the 2021 Funding Agreement precluded a finding of financial distress, J&J's funding obligation would become "void or voidable," and that assurance would fall away. To the contrary, the Debtor told this Court that, "If the assets are spun out, if that actually occurs, a transaction like that occurs, *there's full protection*

---

[45] *See, e.g., Reply in Support of Motion to Dismiss Bankruptcy Case* [LTL I D.I. 1354], ¶¶ 2, 7-9, 14-18, 20, 33.

[46] *See* Jones Reply Dec. **Exhibit 1** (Brief for Appellant) at 22-24); **Exhibit 3** (Reply Brief for Appellant,) at 10.

***because J&J is sitting there with an obligation to pay up to the value of Old JJCI.*** Merrett Dec.,

Exh. 16, at 58:6-9 (emphasis added).

95.    Echoing this theme, the Debtor explained to the Third Circuit that:

> Now my friend says maybe JJCI will squander the assets and that's why
> you need bankruptcy court jurisdiction maybe they'll transfer it to equity.
>
> The funding agreement, this is quite important to our argument, the funding
> agreement itself bars that or if it occurred ***if there were any payment to J&J
> or to shareholders or anything like that, distributions, all of that increases
> the $61-billion pot; $61 billion is only a floor, not a ceiling***.
>
> <div align="center">* * *</div>
>
> Here's the most important point about 4619 [the Appendix page number for
> the relevant provisions of the 2021 Funding Agreement]. ***If a hypothetical
> that my friend says happens and it materializes that JJCI does something
> to try and give J&J money to – you know, in the form of distributions or
> something like that, that just bumps up the amount of the funding
> guarantee under the agreement***. That is Page 4319.

Reporter's Transcript of Oral Argument before the Third Circuit, 9/19/22, attached as **Exhibit 4**

to the Jones Reply Dec., at 65:10-17; 66:3-8 (emphasis added).

96.    The Debtor went on to explain that::

> [B]ecause of the funding agreement . . . , you get the full value of the
> company not subject to any creditors or anything like that. It's free and clear
> up to $61 billion, ***and then you get a backstop from J&J.***
>
> And remember my friends, their brief says J&J has better credit than the
> United States government.

*Id.* at 68:15-21 (emphasis added).

97.    Despite all of these assurances, after the upstream transfer of New JJCI's Consumer

Health Business earlier this year produced a sharp drop in New JJCI's value – the very contingency

that, the Debtor assured this Court and the Third Circuit, should be of no concern because of J&J's

funding backstop, the Debtor agreed to eliminate J&J's funding backstop. Now, the Debtor has

the *chutzpah* to tell the Court that the Debtor is in financial distress, because it repudiated the

<div align="center">42</div>

assurances given to two courts regarding the protection afforded by J&J's funding backstop, and

to claim that it is **the Third Circuit** that caused the Debtor's financial distress! *See* Second Kim

Depo. Tr. at 88:24-89:4 ("But the financial distress was caused by the talc liabilities and the Third

Circuit rendering a decision that rendered the first Funding Agreement unenforceable.").

98.     The Debtor attempts to justify its dubious conduct by arguing that J&J's funding

backstop was protection that J&J was never "required to provide to talc claimants" (Debtor

Objection at 43, *quoting LTI Mgmt.,* 64 F.4th at 110-11), that J&J provided out of "generosity."

*Id.* But J&J's funding backstop was not "generosity." It was an effort to blunt the argument that

the 2021 Corporate Restructuring prejudiced creditors and to allay concerns about the previously-

announced spinoff of HoldCo's Consumer Business. *See* Debtor Objection at 46-47 (J&J signed

the 2021 Funding Agreement "to avoid any distraction in the 2021 Chapter 11 Case with respect

to the already announced planned transfer of the Consumer Business from New JJCI.")

**F.     Fraudulent Transfer Issues are Not Premature and Further Evidence the Debtor's
        Bad Faith Conduct Towards Creditors.**

99.     The issue of whether the termination of the 2021 Funding Agreement was a

fraudulent transfer is not "premature," as the Debtor claims. Debtor Objection at 53. If the Debtor

made this transfer to its controlling parent in anticipation of an imminent chapter 11 filing with

actual intent to hinder or delay creditors by qualifying for chapter 11 relief from which the Debtor

would otherwise have been disqualified, or by limiting dissenting creditors' plan options and

creating a coercive plan voting construct, that circumstance evidences bad faith. Even if the

termination of the 2021 Funding Agreement was "only" a constructive fraudulent transfer, that,

too, is relevant to the good faith issue. An eve-of-bankruptcy transfer made to an insider for less

than reasonably equivalent value, in the belief that the transfer would place the Debtor in financial

distress, is the antithesis of good faith.

1.      **The Termination of the 2021 Funding Agreement was a Transfer Made with Actual Intent to Hinder or Delay Talc Creditors.**

100.    An intent to hinder or delay creditors is sufficient to establish an "actual intent" fraudulent transfer, even if the transfer was not intended to defraud creditors.[47] Here, the termination of the 2021 Funding Agreement was intended to hinder or delay talc creditors in multiple respects.

101.    The termination of the 2021 Funding Agreement was intended to hinder or delay talc creditors by enabling the Debtor to claim that it was in financial distress, so that it could qualify for chapter 11 relief from which it would otherwise have been barred by *LTL Mgmt.*, and thereby stay all talc actions against it and seek to stay talc litigation against J&J and others.

102.    The stay was about to end as a result of the Third Circuit's ruling. The Debtor and J&J would have faced the resumption of talc litigation against them, and could only stay that litigation – and hinder and delay talc creditors accordingly – if they took desperate action to circumvent the Third Circuit's ruling that the Debtor should never have been in bankruptcy in the first place. The termination of the 2021 Funding Agreement – the "transfer" – was tailor-made to eliminate the linchpin of the Third Circuit's ruling that the Debtor was not in financial distress and, therefore, had not filed LTL I in good faith. But it was also tailor-made to be a fraudulent transfer. A transfer made to qualify for chapter 11 relief that would otherwise have been unavailable to the Debtor is a transfer made with actual intent to hinder or delay creditors. *See Shapiro v. Wilgus*, 287 U.S. 348 at 354 (where state law did not permit receivership for individuals

---

[47] *See, e.g., Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932); *718 Arch St. Assocs. v. Blatstein (In re Blatstein)*, 192 F.3d 88, 97 (3d Cir. 1999) (court stated that its inquiry under the Pennsylvania USTA was whether the debtor "intended to hinder or delay the creditor. If he did, he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer."); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 408 (Bankr. S.D.N.Y. 2007) ("[A]n admitted intention to delay creditors is not immunized by the transferor's conviction that it is for the creditors' good and the debtor, if only given time, would be able to recover enough to pay them all. The possible reward does not justify the transaction where there is intent to delay creditors.").

but did permit one for a corporation, transfer of assets by individual engaged in business to a newly formed corporation for purposes of instituting a receivership to protect assets from recalcitrant creditors was made with actual intent to hinder or delay creditors).

103.    The nature, impact and timing of the Debtor's "restructuring" of its funding rights against its parents also makes clear that the termination of the 2021 Funding Agreement was intended to hinder and delay talc creditors in the impending, second chapter 11 case. The Debtor's eve-of-bankruptcy agreement to curtail sharply its previously expansive plan trust funding rights against J&J and HoldCo gave them a plan veto; limited creditors' plan options; and made their right to pursue a creditor plan once the Debtor's plan exclusivity expires or is terminated an empty one. That all of this was the intended result is evident from the Debtor already seeking to use the new limitation on J&J's and HoldCo's plan trust funding obligations to block the TCC's motion to terminate plan exclusivity. This fraudulent intent is further confirmed by the Debtor's inability to provide any *bona fide* explanation for surrendering its plan trust funding rights *in bankruptcy* under the 2021 Funding Agreement.

> **2.    The Termination of the 2021 Funding Agreement was a Constructively Fraudulent Transfer.**

104.    The Debtor did not receive reasonably equivalent value for trading its funding rights against J&J and HoldCo under the 2021 Funding Agreement for its vastly reduced funding rights against J&J under the J&J Support Agreement and against HoldCo under the 2023 Funding Agreement. Even if a court accepted the Debtor's dubious "frustration of purpose" theory, the 2021 Funding Agreement, as modified and enforced in accordance with its severability provision, still would have given the Debtor the right to up to $61.5 billion of plan trust funding from J&J and HoldCo, whether or not they supported the plan or received a release. Trading that plan trust funding right for plan trust funding rights against J&J and HoldCo that are restricted to a plan that

they support, in the amount that they are willing to pay, was not an exchange for "reasonably equivalent value," especially when one considers the non-arms'-length nature of this "trade."

105.    The same is true of the Debtor's agreement to relinquish *all* funding rights against J&J outside of bankruptcy in exchange for essentially nothing, based on the dubious "frustration of purpose" theory. There is no reason to believe that this would have been the result in an arms' length transaction by a debtor with independent management advised by truly independent counsel who had not advised J&J in crafting the 2021 Funding Agreement in the first place.

106.    Moreover, if the Debtor believed that this exchange would place it in "financial distress" sufficient to qualify for chapter 11 relief (as it apparently did), then it had to believe that following this exchange, it would "incur debts that would be beyond the debtor's ability to pay as such debts matured" within the meaning of section 548(a)(1)(B)(ii)(III) of the Code. The Code defines "debt" to mean "liability on a claim" (11 U.S.C. § 101(12)), and defines a "claim" broadly to include a right to payment, whether liquidated, unliquidated, fixed, contingent, matured or unmatured. *See id.* § 101(5). Thus, as used in section 548(a)(1)(B)(ii)(III), the term "debt" includes contingent, unliquidated talc liabilities and liability for defense costs as the Debtor incurs liability for such costs.

107.    The thrust of the Debtor's "financial distress" argument seems to be that it believes that, with only the remaining assets of HoldCo and the Debtor's own limited assets to look to following the termination of the 2021 Funding Agreement, the Debtor will, outside of bankruptcy, be unable to pay its contingent, unliquidated talc liabilities (including future talc claims as such claims become "debts") and future liability for defense costs as such debts become due. If the Debtor does not have this belief (or if such a belief is unfounded), then the Debtor is not in financial distress, and this case should be dismissed. But if the Debtor did believe that terminating the 2021

46

Funding Agreement in exchange for the New Funding Agreements would place it in such a precarious financial condition and did so anyway on the eve of its second chapter 11 filing, that belief satisfies the requirements of section 548(a)(1)(B)(ii)(III); and the Debtor's conduct in terminating the 2021 Funding Agreement in the face of that belief further evidences its bad faith.

108.    Moreover, if the Court finds that this revamping of the Debtor's funding rights placed the Debtor in financial distress sufficient to qualify for chapter 11 relief under *LTL Mgmt.*, then it follows that this transfer left the Debtor with "unreasonably small capital" under section 548(a)(1)(B)(ii)(II). Implicit in a finding of "financial distress" would be a finding that the assets available to satisfy the Debtor's talc liabilities and pay related costs—including the Debtor's rights under the 2023 Funding Agreement –represent an unreasonably small capital for the management and resolution of talc claims with which the Debtor has been tasked. In *Moody v. Security Pac. Business Credit*, 971 F.2d 1056 (3d Cir. 1992), the Court held that, "unreasonably small capital denotes a financial condition short of equitable insolvency." *Id.* at 1070. Thus, if the Debtor is in financial distress because the "capital" available to carry out its functions is inadequate, then the "unreasonably small capital" standard is satisfied even if the Debtor is not equitably insolvent.

109.    The Debtor seizes on the Third Circuit's reference to a *Black's Law Dictionary* definition of "capital" as "[a]ccumulated goods, possessions, and assets used for the production of profits and wealth" and the Third Circuit's statement that "[v]iewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations" to argue that the "unreasonably small capital" basis for avoidance cannot apply here. *See* Debtor Objection at 56. The Debtor reads too much into the language it quotes.

110.    The Third Circuit recognized that the debtor's line of credit – an asset not mentioned in the *Black's Law Dictionary* definition of "capital" – could be considered in

47

determining whether the debtor was left with "unreasonably small capital." *Moody,* 971 F.2d at 1071. Likewise, the Debtor's access to third-party funding can be considered in determining whether it has "unreasonably small capital." Moreover, the "viewed in this light" language cited by the Debtor never held that "unreasonably small capital" could refer ***only*** to the inability to generate sufficient profits to sustain operations. Although such a definition might be appropriate in the case of an entity that makes and sells things and is in the business of trying to generate profits, the Third Circuit never held that this limiting definition would apply to a different sort of business – such as the "business" of managing and resolving talc claims.

**G.**    **The Debtor Does Not Have a Reasonable Likelihood of Confirming a Plan.**

111.    As explained by Movants in their Memo of Law, because J&J and HoldCo are now required only to fund a plan trust under a plan they support, and because no plan is feasible as a practical matter without their funding, a plan must have their support to be feasible. *See* Memo of Law at 37, ¶ 84. Movants further expected that the only plan that J&J and HoldCo would support and agree to fund would be one that would be unconfirmable as a matter of law due to the anticipated overbreadth of the third-party channeling injunction that J&J and New JJCI would require. *See id.* at 38-43, ¶¶ 85-96. The Debtor has since filed its Plan and has borne out Movants' prediction: The Plan is indeed unconfirmable as a matter of law under applicable Third Circuit precedent, because it provides for a channeling injunction that exceeds the permissible scope of a channeling injunction in a plan for an asbestos debtor under section 524(g).

112.    The Plan's Channeling Injunction (as defined in the Plan and set forth in Section 11.4.1 of the Plan) provides for a "permanent injunction . . . with respect to Talc Personal Injury Claims against the Protected Parties." Plan § 1.1.22. The "Protected Parties" are defined to include the LTL Corporate Parties (*i.e.*, J&J and its non-Debtor affiliates including HoldCo) and:

48

> all Persons listed on Schedule 3 [to the Plan], each of which is a third party
> retailer that sold Old JJCI's talc-containing products or a third party to
> which the Debtor has contractual indemnification obligations relating to
> Old JJCI's talc containing products.

Plan § 1.1.98 (definition of "Protected Parties"). As set forth in detail in Section IV.F of the Memo

of Law, such a channeling injunction is beyond the scope of a permissible third party channeling

injunction under section 524(g). The Protected Parties include, for example, retailers and parties

to whom the Debtor has indemnification obligations, neither of which falls within the scope of any

of clauses (I) - (IV) of section 524(g)(4)(ii)(A).

113.    Apparently acknowledging that section 524(g) of the Code does not authorize a

Channeling Injunction of such breadth, the Plan invokes section 105(a) as its bootstrapping legal

basis for such a Channeling Injunction. Plan § 11.4.1 ("pursuant to the exercise of the equitable

jurisdiction and power of the Bankruptcy Court and the District Court under sections 524(g) and

105(a) of the Bankruptcy Code"). However, neither Code section provides a permissible basis for

the Channeling Injunction, whether separately or together. The Third Circuit has already held that

section 105(a) does not permit a channeling injunction in an asbestos case where the requirements

of section 524(g) are not satisfied.

> Because § 524(g) expressly contemplates the inclusion of third parties'
> liability within the scope of a channeling injunction – and sets out the
> specific requirements that must be met in order to permit inclusion – *the
> general powers of § 105(a) cannot be used to achieve a result not
> contemplated by the more specific provisions of § 524(g).*

*See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236-37 (3d Cir. 2004) (emphasis added and

footnote omitted); Memo of Law at 43-44, ¶¶ 97-99.

114.    The Debtor refuses to respond to Movants' substantive argument on the merits.

Instead, the Debtor dismisses Movants' objection as a premature "confirmation" objection that

presupposes the final form of the Plan. Tellingly, however, the Debtor does not dispute that any

<center>49</center>

amended plan that it files will have to include such a broad channeling injunction in order to obtain

the support of J&J and HoldCo and trigger their funding commitment. Nor does the Debtor dispute

that this is a narrow issue of law that can be determined based on the plain language of the Plan.

Under these circumstances, submission of a "final" plan is not necessary for this Court to determine

that a plan cannot be confirmed.

115.    "Cause" for dismissal of a chapter 11 case includes the absence of a reasonable

likelihood that a chapter 11 plan can be confirmed. *See generally In re 1121 Pier Vill. LLC*, 635

B.R. 127, 137 n.14 (Bankr. E.D. Pa. 2022) ("It is well settled that a debtor's inability to achieve

confirmation of a plan, by itself, provides sufficient 'cause' for dismissal or conversion of a chapter

11 case"). Assessment of whether a plan can be effectuated in order to evaluate whether a case

must be dismissed necessarily requires considering, prospectively, so-called "confirmation

issues." *See In re DCNC N.C. I, LLC*, 407 B.R. 651, 666 (Bankr. E.D. Pa. 2009). In *DCNC N.C.

I, LLC*, the bankruptcy court did just that – performing a detailed analysis of whether a to-be-filed

plan would run afoul of sections 1129(a)(10) and 1129(b)(2)(B)(ii), considering evidence as to

whether the debtors could carry out their reorganization strategy, and ultimately dismissing the

cases. Here, there is not even any need for "evidence" beyond the plain language of the Plan itself

and the Debtor's inability to deny that any plan the Debtor files and that J&J and HoldCo support

will have to include a channeling injunction whose breadth is comparable to that of the overbroad

Channeling Injunction included in the Plan.

116.    If Movants are correct that the inclusion of certain Protected Parties in the

Channeling Injunction is impermissible in the Third Circuit, this Chapter 11 case serves no purpose

other than further delay in the ability of Talc Claimants to pursue their claims against the Debtor,

J&J and others and receive appropriate compensation. The issue is a narrow legal issue, not a

complicated evidentiary one: Can a channeling injunction that extends beyond the confines of

section 524(g)(4)(ii)(A)(I)-(IV) be included in a plan for a chapter 11 asbestos debtor on the basis

of section 105 of the Code? The Third Circuit has already answered that question, and the answer

is "no." *See Combustion Eng'g*, 391 F.3d at 236-37. There is no reason to delay a decision on this

limited question of law until a plan confirmation trial sometime in the future. To the extent that a

plan that includes a channeling injunction like the Plan's Channeling Injunction cannot be

confirmed, no interest is served by delaying that determination.

**H.**     **Section 1112(b)(2) Can Not Be Used to Prevent the Dismissal of this Case.**

   **1.**     **The Third Circuit's Decision in *LTL Mgmt.* Precludes the Court from Invoking Section 1112(b)(2) of the Code to Deny the Motions to Dismiss.**

117.    In *LTL Mgmt.*, 64 F.4th at 110, the Third Circuit held that the "unusual

circumstances" provision of section 1112(b)(2) of the Code could not be used to sanction LTL's

chapter 11 petition where the Debtor was not in financial distress and cause for dismissal existed.

The Third Circuit's ruling precludes the application of section 1112(b)(2) here. Even if it did not,

the Debtor and the Ad Hoc Committee have failed to demonstrate that all of the requirements for

section 1112(b) to apply have been satisfied.

118.    Section 1112(b)(2) of the Code provides that:

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court *finds and specifically identifies unusual circumstances* establishing that converting or dismissing the case is not in the best interests of creditors and the estate, *and* the debtor or any other party in interest establishes that —
>
> > (A) *there is a reasonable likelihood that a plan will be confirmed within* the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, *within a reasonable period of time; and*

51

> (B) the grounds for converting or dismissing the case include an act
> or omission of the debtor other than under paragraph (4)(A)[48] —
>
>> (i) for which there exists a ***reasonable justification*** for the
>> act or omission; and
>>
>> (ii) that will be ***cured within a reasonable period of time***
>> fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added).

119.    The Debtor cites this Court's ruling in LTL I that "unusual circumstances" existed

establishing that dismissal was not in the best interests of claimants, and argues that any acts or

omissions by the Debtor that form the grounds for finding cause for dismissal here were reasonably

justified and can be cured. *See* Debtor Objection at 64, 66-67. Remarkably, however, neither the

Debtor, nor the Ad Hoc Committee, even mentions, let alone addresses, the Third Circuit's reversal

of the Court's ruling on the applicability of section 1112(b)(2). The Third Circuit rejected the

Court's ruling that the type of "unusual circumstances" required by section 1112(b)(2) even

existed:

> The Bankruptcy Court ruled that "the interests of current tort creditors and
> the absence of viable protections for future tort claimants outside of
> bankruptcy . . . constitute such 'unusual circumstances' as to preclude . . .
> dismissal." . . . But what is unusual instead is that a debtor comes to
> bankruptcy with the insurance accorded LTL.

*LTL Mgmt.*, 64 F.4th at 110.

**2.    Financial Distress is a "Gating Factor" for the Unusual Circumstances
Provision.**

120.    Recently, this Court asked the parties to brief the question whether financial distress

is the "gating factor for § 1112(b)(2)." Recorder's Transcript of Proceedings, 5/16/23 ("R.T.

---

[48] The requirement under section 1112(b)(2)(B), that the grounds for dismissal include an act or omission "other than under paragraph (4)(A)," appears to be satisfied here.

5/16/23"), at 44:20-45:13. The Third Circuit already answered this question in *LTL Mgmt.* The answer is "yes"; the Third Circuit treated financial distress as a gating factor for section 1112(b)(2):

> Our ground for dismissal is LTL's lack of financial distress. ***No "reasonable justification" validates that missing requirement in this case.*** And we cannot currently see how its lack of financial distress could be overcome. For these reasons, we go counter to the Bankruptcy Court's conclusion that "unusual circumstances" sanction LTL's Chapter 11 petition.

*LTL Mgmt.*, 64 F.4th at 110. The Third Circuit's ruling on this point is dispositive.

121.    Without mentioning the Third Circuit's holding, the Debtor tries to argue that financial distress is not a gating factor. In doing so, however, the Debtor tries to convince the Court that it can read section 1112(b)(2) in a way that simply cannot be squared with the Third Circuit's decision holding otherwise. *See* Debtor Objection at 63-64. Similarly, the Debtor's argument that the Court should ignore the "cure" and "justified" provisions of section 1112(b)(2)(B)(i) and (ii) flies in the face of the Third Circuit's holding to the contrary and must be rejected. *See* Debtor Objection at 67.

122.    If the Court finds that the Debtor is in financial distress, but that cause for dismissal exists based on other circumstances evidencing bad faith (such as those described in earlier sections of this Reply), the Third Circuit's decision in *LTL Mgmt.* still precludes the use of section 1112(b)(2) to deny dismissal in this case. The threshold requirement of specifically identified "unusual circumstances" sufficient to preclude dismissal would still remain unsatisfied; and, like the lack of financial distress, there is no "reasonable justification" for bad faith; and bad faith is not a shortcoming that can be cured. Moreover, even if *LTL Mgmt.* is not dispositive, section 1112(b) does not prevent the dismissal of this case.

**3.    Avoidance Actions and the 2023 Funding Agreement Have Greater Value Outside Bankruptcy than In Bankruptcy**

53

123.    With regard to the potential applicability of section 1112(b)(2), the Court has posed

the following question:

> One of the questions I had is if this case were to be dismissed, what happens
> to the causes of action and any claims that there could be or any efforts to
> secure the funding under either the 2021 funding agreement or the 2023
> funding agreement.

R.T. 5/16/23 at 45:1-5. The Debtor did not address that question, and for good reason: the answer

supports dismissal.

124.    An action to avoid the termination of the 2021 Funding Agreement as a fraudulent

transfer has materially greater value outside of bankruptcy than in bankruptcy. Such an action

would seek, among other relief, to reinstate J&J's obligation under that Agreement to provide up

to $61.5 billion in funding for the payment of talc claims and related costs *outside of bankruptcy*.

If this avoidance action was successful, however, ***this reinstated funding obligation would, by its***

***terms, be inoperative as long as the Debtor remained in bankruptcy.*** This is because the reinstated

funding obligation would, by its terms, apply only "when there is no proceeding under the

Bankruptcy Code pending with respect to the Payee." [49] This reinstated funding obligation would

become operative if the case was dismissed; but if this case was dismissed, the avoided transfer –

the termination of the 2021 Funding Agreement – would be reinstated, unless the Court ordered

otherwise for cause. *See* 11 U.S.C. § 349(b)(1)(B). There can be little doubt that if the Court

declined to reinstate that avoided transfer, J&J would appeal. This convoluted and circular process

could be avoided by placing the Debtor "outside of bankruptcy" now, and permitting appropriate

procedural mechanism outside of bankruptcy to be used to challenge the termination of the 2021

Funding Agreement.

---

[49] 2021 Funding Agreement (Annex 2 to 2021 Kim Dec.) at 6 (definition of "Permitted Funding Use," clause (c)(i)).

125.    The 2023 Funding Agreement, too, is more valuable to the Debtor and talc creditors outside of bankruptcy than in bankruptcy (albeit less valuable than the 2021 Funding Agreement was). Outside of bankruptcy, HoldCo has an "uncapped" obligation to fund the payment of Talc Related Liabilities and ancillary costs.[50] Importantly, the Debtor (and, indirectly, Talc Claimants) would have access to this funding, up to HoldCo's full capacity to satisfy its funding obligations, without a release of talc claims against J&J. In contrast, as long as the Debtor is in chapter 11, HoldCo's funding obligation is limited to funding a trust for Talc Claimants under a plan (and in an amount) that J&J and HoldCo support.

126.    The only scenario in which avoiding the termination of the 2021 Funding Agreement might benefit Talc Claimants *in* chapter 11 would be one where J&J's and HoldCo's expansive plan trust funding obligations under that Agreement were reinstated. This scenario is, however, problematic. In this scenario, no Talc Claimant would receive a penny in compensation until after (i) the estate representative prosecuted and successfully resolved what could be hotly contested, multi-year fraudulent transfer litigation through appeals; and (ii) the successful resolution of contested confirmation proceedings for a creditor plan that would also likely include appeals. Meanwhile, talc-related suits against the Debtor would be stayed; and the parties would fight over efforts to extend the stay to non-debtors. In any event, section 1112(b)(2) cannot be used to prevent dismissal here, because the statutory requirements for its application have not been satisfied.

**4.    The Statutory Requirements for the Application of Section 1112(b)(2) Have Not Been Satisfied.**

---

[50] 2023 Funding Agreement (Annex E to 2023 Kim Dec.) at 5 (definition of "Permitted Funding Use," clauses (c)(i), (c)(3)) (emphasis added).

127.    For a court to deny dismissal under section 1112(b)(2) once the court determines that cause for dismissal exists, the party opposing dismissal must demonstrate that "(1) there are 'unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate'; (2) 'there is a reasonable likelihood that a plan will be confirmed' within a 'reasonable period of time'; (3) the grounds for cause are not under Section 1112(b)(4)(A); and (4) the grounds for cause include an act or omission for which there is a 'reasonable justification' and that will be 'cured within a reasonable period of time.'" *Mumma v. Vara (In re Mann Realty Assocs.)*, No. 1:18-CV-683, 2019 U.S. Dist. LEXIS 168132, at *11 (M.D. Pa. Sept. 30, 2019); *see LTL Mgmt.*, 64 F.4th at 110. The Debtor falls short of satisfying these requirements.

128.    *First*, section 1112(b)(2) requires that the Debtor establish that there are "**unusual circumstances** establishing that converting or dismissing the case is not in the best interests of creditors and the estate." *In re McQuillen Place Co., LLC*, 609 B.R. 823, 829 (Bankr. N.D. Iowa 2019) (emphasis in original). It is not enough for the Court to decide that dismissal is not in the best interests of creditors and the estate; the Court must identify "unusual circumstances" that make this the case. *See LTL Mgmt.*, 64 F.4th at 110 ("a court must identify 'unusual circumstances . . .'").

129.    The Debtor claims that "unusual circumstances" exist because it has the ability "to satisfy all prepetition claims and administrative claims in chapter 11, including as a result of a cash infusion from an affiliate." Debtor Objection at 64. This claim is a mischaracterization. J&J and HoldCo have not agreed to fund the payment of all prepetition claims and administrative expenses. They have agreed only to fund a plan trust under a plan they support with a fixed amount, which will be used to pay prepetition and future talc claims only to the extent provided in a claims matrix.

56

The Debtor has no committed access to funds sufficient to pay all prepetition and future talc claims in chapter 11, however many there may be, "in full" in any commonly understood sense of the term. Rather, conditioned on confirmation of a plan that J&J and HoldCo support, the Debtor will have access to a fixed amount to fund a "pot" plan, not a "payment in full" plan. If that "pot" turns out to be insufficient to pay all present and future talc claims even in accordance with the matrix of claim "values," there is no access to additional funding to make up the shortfall.

130.    Indeed, the Debtor has substantially greater access to funding for the payment of talc claims *outside of bankruptcy* than in this chapter 11 case. In a chapter 11 case, the Debtor's access to outside funding is limited to the amount provided under a plan that J&J and HoldCo will support – here, approximately $12 billion over many years, with a present value of $8.9 billion. In contrast, outside of bankruptcy, the Debtor would have a right to funding from an entity whose assets are valued at $30 billion on a going concern basis, without any similar limitation.

131.    It is not "unusual" for a debtor in a mass tort bankruptcy to propose funding a plan trust for mass tort claimants in a fixed amount that imposes the risk of undervaluing claims and trust underfunding on mass tort claimants. *See LTL Mgmt.*, 64 F.4th at 103. Nor is it "unusual" for a plan in a mass tort case to shoehorn the compensation of claimants with wide-ranging degrees of exposure and injury into a claims value matrix. *See id.* What *is* unusual is that a debtor comes to bankruptcy with funding rights outside of bankruptcy against an entity whose assets are valued at $30 billion (HoldCo) and proposes a release of all claims of mass tort claimants against that entity and against one of the wealthiest corporations in America (J&J). *See generally id.* at 110. ("But what is unusual instead is that a debtor comes to bankruptcy with the insurance accorded LTL.")

DOCS_DE:243486.1 05471/003

132.    The Debtor's reference to "widespread claimant support" for its plan (Debtor Objection at 65) is overblown and does not establish "unusual circumstance" either. There is no evidence of "widespread claimant support," only that attorneys who claim to represent large numbers of claimants have agreed to recommend to their clients that they vote for the Plan. There are also attorneys representing large numbers of claimants who oppose the Plan. So does the TCC and so do numerous state attorneys general asserting consumer protection claims against the Debtor. The fact is that the Plan will be hotly contested by multiple parties. "Unusual circumstances" are not demonstrated by showing that in a case involving an uncertain, but very large, number of claims, there is both support for, and opposition to, the Plan on the part of attorneys who collectively represent large numbers of claimants.

133.    *Second*, section 1112(b)(2)(A) also requires the party opposing dismissal to show that there is a reasonable likelihood that a plan will be confirmed in a reasonable period of time. *In re Grasso*, 497 B.R. 448, 455 (Bankr. E.D. Pa. 2013); *Fed. Dep. & Discount Bank v. Domiano (In re Domiano)*, 442 B.R. 97, 107 (Bankr. M.D. Pa. 2010) ("Generally, unusual circumstances require a showing that there is a reasonable likelihood that a Chapter 11 plan will be confirmed within a reasonable period of time."); *Wilmington Tr., N.A. v. Pinnacle Land Grp., LLC (In re Pinnacle Land Grp., LLC)*, No. 17-23339-GLT, 2018 Bankr. LEXIS 2764, at *20 (Bankr. W.D. Pa. Sept. 10, 2018) ("[T]he unusual circumstances exception only applies if. . . there is a reasonable likelihood that a plan will be confirmed within a reasonable time . . . ."). That requirement is not satisfied here.

134.    To begin with, although the Debtor quickly *filed* the Plan, even the Ad Hoc Committee admits that many unspecified elements of the "agreement" proposed to be consummated through the plan remain unresolved. *See* Ad Hoc Objection at 3, 8-9; *see also* R. T.

58

5/16/23 at 21:13 (counsel for Ad Hoc Committee states that "we have issues with" LTL's plan);

Reporter's Transcript of Deposition of James Onder, June 8, 2023 ("Onder Depo. Tr."), attached

as **Exhibit 9** to the Jones Reply Dec., at 85:3-5 ("there are still things… to work out, things we

disagree on").

135.    Mr. Onder, who claims to represent over 21,000 of the 58,000 claimants alleged to

be represented by members of the Ad Hoc Committee,[51] acknowledged that the filed plan is "not

consistent in some ways with the PSA," *id.* at 158:17-18, and that he would have preferred that the

plan "incorporated a lot of the things that we may have discussed and agreed on. Yeah, I would

have liked to see that. *Id.* at 159:13-15. While he viewed LTL's filing of a plan inconsistent with

the PSA as a negotiating strategy, *see id* at 159:18-19, he acknowledged that if he were required

to vote on it now, the current filed plan may not have his support. "If I had to consider my options

right now . . . I don't know which way I would go." *See id.* at 242:23-243:2.

136.    A more fundamental problem is that there is virtually no likelihood – much less a

reasonable one – that a plan will be confirmed in a reasonable time, because the only type of plan

the Debtor will file and that J&J and HoldCo will support and fund will be unconfirmable as a

matter of law. As a result of the 2021 Corporate Restructuring, the only realistic source of funding

for a plan trust is J&J and HoldCo. As a result of the termination of the 2021 Funding Agreement,

however, they are only required to fund a plan trust under a plan they support (unless the

termination of the 2021 Funding Agreement is avoided on fraudulent transfer or other grounds,

which is not likely to take place within a reasonable period of time). As evidenced by the Plan on

file, the only plan they are willing to fund and support is one that includes a channeling injunction

---

[51] *See Verified Statement of Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP pursuant to Bankruptcy Rule 2019* [LTL II D.I. 470], Exhibit A.

that, as shown in the Memo of Law and in the previous section of this Reply, is far broader in scope than that permitted in a section 524(g) plan under applicable Third Circuit precedent. Courts have recognized that a debtor's inability to propose a confirmable plan or to confirm a plan because the filed plan does not comply with the Code is cause for dismissal. *See, In re S-Tek 1, LLC*, No. 20-12241, 2023 Bankr. LEXIS 673, at *19 (Bankr. D.N.M. 2023) (agreeing that "'cause' exists to dismiss this bankruptcy case . . . on the basis that Debtor cannot propose a confirmable plan"); *In re Jacobs*, 644 B.R. 883, 893 (Bankr. D.N.M. 2022) (same).

137.    Other factors corroborate the Debtor's inability to confirm a plan in a reasonable time frame. As the Court is well aware, there is substantial opposition to this chapter 11 case and the Plan. Although the Debtor boldly proclaims that the "overwhelming majority of talc claimants" support the Plan's terms (*see, e.g.*, Debtor Objection at 65), there is no evidence that any talc claimant – as distinguished from counsel for certain talc claimants – supports the Plan's terms. Nor does anyone have the hard numbers to demonstrate that, in the face of widespread opposition to the Plan, counsel who support the Plan represent sufficient claimants who will actually be permitted to vote to reach the daunting "supermajority" voting bar of 75% of all voting talc claimants.

138.    Moreover, history is not on the Debtor's side. ***Not one*** of the earlier filed "Texas two-step" asbestos chapter 11 cases has yet resulted in a confirmed plan, despite having been pending for a number of years.[52]

139.    Finally, lengthy appeals will likely follow before the Plan, or a substantially similar plan, is confirmed by a final order, if such a plan is confirmed at all. Taken together, all of these

---

[52] Bestwall LLC (Case No. 17-31795, Bankr. W.D.N.C. Nov. 2, 2017) filed on November 2, 2017; DBMP LLC (Case No. 20-30080, Bankr. W.D.N.C. Jan. 23, 2020) filed on January 23, 2020; Aldrich Pump LLC (Case No. 20-30608, Bankr. W.D.N.C. June 18, 2020) filed on June 18, 2020.

factors combine to make it exceedingly unlikely that a plan will be confirmed within a reasonable period of time, if at all.

140.    *Third*, to satisfy sections 1112(b)(2)(B)(i) and (ii), the Debtor would have to show that its bad faith was (i) reasonably justified and (ii) capable of being cured within a reasonable period of time. As the Third Circuit ruled in LTL I, if LTL was not in financial distress, this shortcoming cannot be "reasonably justified" or cured. Moreover, if the Court finds that, apart from issues of financial distress, the circumstances chronicled in earlier sections of this Reply evidence the Debtor's bad faith in filing this chapter 11 case, that bad faith cannot be reasonably justified or cured, either. It would be nonsensical to find that the lack of financial distress or the existence of bad faith evidenced by other circumstances could be reasonably justified and cured. "[F]iling a petition in bad faith could never be reasonably justified or curable, *no matter what plan Debtors could now propose*." *Green v. Howard Family Tr. (In re Green)*, No. 15-1349, 2016 Bankr. LEXIS 3963, at *33 (B.A.P. 9th Cir. Nov. 9, 2016) (emphasis added).

141.    Accordingly, section 1112(b)(2) provides no safe harbor for the Debtor, and the Court must dismiss this case.

## III.

## CONCLUSION

For the reasons and based on the authorities set forth in the Memo of Law and herein, this

case should be dismissed. The Debtor's bad faith in filing its second chapter 11 case is even more

pronounced than that in filing its first one.


Dated: June 22, 2023                    **PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Colin R. Robinson*_____
      Laura Davis Jones
      Colin R. Robinson
      Peter J. Keane
      919 N. Market Street, 17th Floor
      P.O. Box 8705
      Wilmington, DE 19899-8705 (Courier 19801)
      Telephone: (302) 652-4100
      Facsimile: (302) 652-4400
      Email: ljones@pszjlaw.com
            crobinson@pszjlaw.com
            pkeane@pszjlaw.com

*Counsel for Arnold & Itkin LLP*

DOCS_DE:243486.1 05471/003