MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com
150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Plaintiff Katherine Tollefson*
*and Certain Mesothelioma Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LTL MANAGEMENT LLC, | ) | |
| | ) | BK Case: 23-12825-MBK |
| Debtor. | ) | |

## MRHFM'S REPLY IN SUPPORT OF MOTION TO DISMISS LTL MANAGEMENT'S SECOND BANKRUPTCY PETITION

# Table of Contents

I.   *Standard of Review* ............................................................................ 2

II.  *LTL Management is Not in Financial Distress* ................................... 3

   A.   **The Third Circuit Already Found LTL Management is Not in Distress and Nothing has Changed.** .......................................................................... 4

   B.   **LTL Says It Can Pay All Talc Claims For Less Than the Value of the 2023 FA and that Its Assets Are Far Greater Than Its Liabilities.** ........................... 7

   C.   **There Isn't an Increase in "Claimants."** ................................................ 9

III. *LTL Management Filed for an Improper Purpose* ........................... 10

   A.   **Johnson & Johnson has Independent Non-Derivative Liability for All Talc Products for All Time.** ......................................................................... 11

   B.   **Filing for Bankruptcy to Obtain an Injunction for Non-Debtor Johnson & Johnson is an Improper Bankruptcy Purpose.** .......................................... 13

   C.   **The Third Circuit Already Found LTL Management's Bankruptcy Purpose—Which is the Same Here—is Improper.** ...................................................... 14

IV.  *Johnson & Johnson's Fraud Proves LTL's Bad Faith* ...................... 16

   A.   **Johnson & Johnson's Misrepresentation to the Courts Shows Bad Faith.** .... 16

      1.   J&J lied about the tort system. ...................................................... 16

      2.   LTL lied about the 2021 Funding Agreement. ................................ 17

      3.   Johnson & Johnson lied about wanting to equitably resolve claims. ....... 18

      4.   J&J tried to manufacture bankruptcy jurisdiction. ......................... 21

      5.   J&J forum shopped. ..................................................................... 22

      6.   J&J treats Section 524(g) as a menu choice for half-a-trillionaires. ...... 23

   B.   **J&J's Fraud on the Parties Shows Bad Faith.** .................................... 24

      1.   J&J and LTL—while bound as the Debtor in Possession to act only for the benefit of the Estate—secretly conspired to give away $61 billion. ........................ 25

      2.   LTL insists on indemnifying J&J contrary to New Jersey state law. ....... 26

      3.   J&J lied about the Third Circuit's decision. .................................. 27

      4.   J&J lied about seeking Supreme Court review. ............................. 29

      5.   J&J lied about the support for its Plan. ........................................ 29

      6.   J&J lied about the United States Trustee. ..................................... 32

V.   *Conclusion* ...................................................................................... 33

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

In re:                   )

                          )   Chapter 11

LTL MANAGEMENT LLC,     )

                          )   BK Case: 23-12825-MBK

Debtor.                )

## MRHFM'S REPLY IN SUPPORT OF MOTION TO DISMISS LTL MANAGEMENT'S SECOND BANKRUPTCY PETITION

MRHFM's plaintiffs urge this Court to follow the Third Circuit's directive to "start, and stay, with good faith." *In re LTL Mgmt., LLC,* 64 F.4th 84, 93 (3d Cir. 2023).[1] For nearly two years, Johnson & Johnson has weaponized the automatic stay and preliminary injunction to mock its talc victims and enrich its shareholders, trampling on plaintiffs' fundamental rights to state law remedies and jury trials. J&J has done this, as its lawyer boasts, to "overcome the tort system" *without* the "obligations of a bankruptcy filing." Ex. 1, ABI, pgs. 40, 50. This Court has power to end J&J's ongoing abuse of the people it poisoned with asbestos. Will the Court police its jurisdiction and close bankruptcy's "safe harbor" to this half-trillionaire and its stooge[2] Debtor? Or will it, again, require a mandate from the Third Circuit to do so? J&J's ongoing assault on the civil jury system will fail, and in the meantime, the only burden is on the sick people.

---

[1] "We start, and stay, with good faith. Good intentions—such as to protect the J&J brand or comprehensively resolve litigation—do not suffice alone. What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes. Only a putative debtor in financial distress can do so. LTL was not. Thus we dismiss its petition."

[2] Defined by Britannica as "a weak or unimportant person who is controlled by a powerful person, organization, etc." https://www.britannica.com/dictionary/stooge

# I.    STANDARD OF REVIEW

Under 11 U.S.C. § 1112(b), this bad faith filing must be dismissed. *LTL Mgmt.*, 64 F.4th at 99 (citing *15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009)). *See In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999);[3] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004). A petition must be filed for a proper bankruptcy purpose and *not* "merely to obtain a tactical litigation advantage." *LTL Mgmt.*, 64 F.4th at 101. The Debtor—not the movants—has the burden to establish good faith. *LTL Mgmt.*, 64 F.4th at 100.

The Debtor references the Bankruptcy Act of 1898, a 1966 case in the Western District of Arkansas, and a law review article in its two page "Argument" introduction, purportedly setting forth what it believes to be the controlling authority. Notably absent? The Third Circuit's rejection of LTL's first bad faith bankruptcy. Debtor Omnibus Objection ("Debtor Obj."), pgs. 20-21, Dkt. 614.

MRHFM's plaintiffs adopt and join in all arguments and evidence contained in the TCC's Motion to Dismiss (Dkt. 286) and its Reply. In the interests of judicial economy MRHFM's plaintiffs limit the scope of their Reply to address the following three independent reasons that compel dismissal: (1) LTL is *not* in financial distress, a

---

[3] In *SGL Carbon*, the Third Circuit held that a "financially healthy company" that filed a Chapter 11 petition in the face of potentially significant civil liability acted outside the purposes of the Code, reversed the bankruptcy court (on "clearly erroneous" review), and remanded for dismissal on bad faith grounds. *In re SGL Carbon*, 200 F.3d at 156, 162–63.

threshold and dispositive issue; (2) LTL filed its petition to obtain tactical litigation advantage, a plainly improper bankruptcy purpose; and (3) J&J's and LTL's fraud on the courts and on the parties—before and during this proceeding—proves bad faith and compels dismissal.

## II.    LTL MANAGEMENT IS NOT IN FINANCIAL DISTRESS

Blackletter law, uniformly applied by the federal appellate courts for over a century, forbids the wielding of bankruptcy courts' powerful equitable weapons by *non*-distressed debtors whose petition was filed for an improper purpose.[4]

---

[4] *See Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (relieving "oppressive indebtedness" a primary purpose of the Bankruptcy Act); *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (emphasis here) ("[W]e have previously defined 'bankruptcy' as the 'subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief…Congress' power under the Bankruptcy Clause contemplate[s] an adjustment of a failing debtor's obligations."); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some sort of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least…face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d 154, 164–66 (3d Cir. 1999) (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith,'" and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280–81 (4th Cir. 2007) (dismissal upheld because debtor was not "experiencing financial difficulties;" the debtor's filings "reveal a solvent business entity," a fact that "alone may justify dismissal of [the debtor's] Chapter 11 petition"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created … to isolate the insolvent property and its creditors, exemplifies … bad faith cases…Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning … was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy

## A.  The Third Circuit Already Found LTL Management is Not in Distress and Nothing has Changed.

LTL flippantly asserts that the "Third Circuit *stands alone* in holding that financial distress is a separate requirement of good faith that must exist at the time of filing." Debtor Obj., pg. 26 (emphasis). The Third Circuit disagrees: "our confidence in the conclusion that financial distress is *vital* to good faith is reinforced by the central role it plays in other courts' inquiries." *LTL Mgmt.*, 64 F.4th at 103-04 n.14 (citing related holdings by other circuit courts of appeal) (emphasis). A good faith requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.'" *SGL Carbon*, 200 F.3d at 161 (citation omitted).[5]

---

company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"); *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which *certain insolvent* debtors can reorder their affairs … But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest *but unfortunate* debtor.'") (emphasis added).

[5] "As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion." *Id.* (citation omitted); *see also In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 624 n.14 (3d Cir. 2009) (debtor's breach of fiduciary duty is "relevant to the good faith inquiry"); *In re Korn*, 523 B.R. 453, 467-68 (Bankr. E.D. Pa. 2014) (Breach of fiduciary duty provides "cause" for dismissal); *In re Kholyavka*, 2008 WL 3887653, *4 (Bankr. E.D. Pa. Aug. 20, 2008) ("performance of . . . fiduciary obligation is a quid pro quo for the protection the debtor enjoys under the reorganization provisions of the Bankruptcy Code").

4

The Third Circuit was well aware of LTL's platitudes about bankruptcy's alleged superiority to the tort system, and the Circuit rejected them. "[G]iven Chapter 11's ability to redefine fundamental rights of third parties"—here talc cancer plaintiffs—"*only* those facing financial distress can call on bankruptcy's tools to do so." *LTL Mgmt*, 64 F.4th at 110 (emphasis). Good faith—financial distress—is not optional, and LTL doesn't have any. Neither does J&J.

For over twenty-months, MRHFM's plaintiffs' fundamental rights have been trampled on by a Company that gives away more than $3,000,000,000 in voluntary dividends each quarter. Texas Two Steps—pending collectively for over a decade without a single asbestos victim paid a dime—show what happens when fully solvent, non-distressed tortfeasors are allowed to litigate, obligation free, in bankruptcy court.

At the end of January 2023, the Circuit found LTL was not in distress and not entitled to bankruptcy relief. The Circuit later added this specific reference to its opinion on March 31st, the day the mandate was issued:

> (emphasis added).  This all comports with the theme LTL proclaimed in this case from day one: it can pay current and future talc claimants in full.  *See* App. 630 (Transcript of N.C. "First Day" Hearing, October 20, 2021) (LTL's counsel telling the North Carolina bankruptcy court in his opening remarks that "[LTL], New [Consumer], and J&J believe that *$2 billion exceeds* any liability [LTL] could reasonably have for talc-related claims . . . ." (emphasis added)).

Ex. 2, Amended Opinion Redline, Case: 22-2003, Dkt. 181-3, pg. 6. *See LTL Mgmt.*, 64 F.4th at 109. What has changed since March 31st? ***Nothing.*** When confronted with this

portion of the decision at his deposition on June 1st, LTL Management's Chief Legal

Officer (John Kim) admits this material fact *remains true today*:

> Q. Reading at page 109…"This comports with the theme LTL proclaimed
> in this case from day one: it can pay all current and future talc claimants in
> full." Did I read that correctly?
> A: You did read that correctly.
> Q: And, sir, do you recall that that part, or at least the second part of that
> that I've highlighted, that was one of the additions that the Third Circuit
> made in its amendment to its opinion on March 31st? Do you remember
> that?
> A. I do.
> Q. And you would agree with me that LTL 2.0 can also pay all current and
> future claimants in full, correct?
> A. I agree.

Ex. 3, Kim Dep., 6/1/23, 228-29.[6] The Debtor doesn't dispute this in opposing the

motions to dismiss, saying it has the "same ability" to satisfy talc expenses under the 2023

FA as it did under the 2021 version. Debtor Obj., pg. 42. These admissions, alone, require

dismissal.

The Debtor fails to show financial distress, let alone the "imminent" and

"immediate" distress the Third Circuit requires. *See LTL Mgmt.*, 64 F.4th at 102, 108. Mr.

Kim says LTL can manage talc liabilities in the tort system for *all time* for less than $30

---

[6] Kim Dep., 228-29: "Q: 'This comports with the theme LTL proclaimed in this case from day one: it can pay
all current and future talc claimants in full.' Did I read that correctly? A: You did read that correctly. Q:
And, sir, do you recall that that part, or at least the second part of that that I've highlighted, that was one
of the additions that the Third Circuit made in its amendment to its opinion on March 31st? Do you
remember that? A. I do. Q. And you would agree with me that LTL 2.0 can also pay all current and future
claimants in full, correct? A. I agree. These both go to the issue that neither LTL 1 or LTL 2 was their
insolvency. There was financial distress but not insolvency. So that goes directly to that point." (admitting
LTL can manage its talc liabilities in the tort system for less than $30 billion total and that it has sufficient
funding to pay all talc liabilities outside of bankruptcy for all time).

billion. *See* Kim Dep., 213, 219-20. Adam Lisman, HoldCo's corporate representative and

a J&J controller, says HoldCo has $29 billion in assets. Ex. 4, Lisman Dep., 5/31/23, 70:4-

11, 193:4-17.

### B. LTL Says It Can Pay All Talc Claims For Less Than the Value of the 2023 FA and that Its Assets Are Far Greater Than Its Liabilities.

"HoldCo is required to pay *whatever* the talc liability is" (Lisman Dep., 156:1-16)

and must do so "inside or outside of bankruptcy." *Id.*, 157:14-16. Does J&J's or LTL's talc

liability exceed $8.9 billion over the next five years in the tort system? Mr. Lisman doesn't

know. Lisman Dep., 240:10-241:8. Nor can he say what it would cost Johnson & Johnson

to manage its talc liabilities in the tort system (243:19-244:2) because, to his knowledge,

J&J didn't do any analysis on this issue. Lisman Dep., 253:18-254:9. The Third Circuit

found that J&J's total liabilities over the next 24 months—including talc—was $2.4 billion.

*LTL Mgmt.*, 64 F.4th at 95. That equates to $1 billion per year. That is a lot of money, but

not for a Company worth 500 times that which gives way $33 million a day in dividends.

Over the next 30 years, the Company will pay $360 billion in dividends, more than ten

times what LTL believes its *total* talc liabilities are for all time. This is money J&J doesn't

need and that it gives away, all while protected by an injunction.

LTL's Chief Financial Officer (Richard Dickinson) admits LTL 2.0 has the same

ability to pay its bills as LTL 1.0 and cannot "identify any financial consequence" to LTL

from terminating the 2021 Funding Agreement ("2021 FA"). Ex. 5, Dickinson Dep.,

4/17/23, 86, 136:21-25 & 161-162. Despite his role for the Debtor, Mr. Dickinson couldn't

provide any information (not allegedly shielded by privilege) about whether he believed LTL's assets exceeded its liabilities. Dickinson Dep., 4/17/23, 160:19-161:6.

LTL's President says the value of the 2021 FA and 2023 Funding Agreement ("2023 FA") is the *same:* "they are equal." Ex. 6, Wuesthoff Dep., 5/30/23, 43:11-44:3.[7] Is there a difference in the financial condition between LTL 1.0 and LTL 2.0? *No*. "I believe [it is the] same. That we are in financial distress in each situation." *Id.*, 43:22-44:6. Mr. Wuesthoff says LTL's total liabilities are less than $8.9 billion, despite not bothering to estimate its liabilities before filing a second bad faith petition. *See* Wuesthoff Dep., 36:10-25, 38:4-7. And he agrees that HoldCo's value is "approximately $28 billion, maybe close to 29," and that LTL can access those assets under the 2023 FA. *Id.*, 79:15-25.

He noted the Debtor has "a lot of money going out the door paying attorney's fees" (Wuesthoff Dep., 24:20-25:11), but because "we don't believe our talc causes cancer there's no reason to believe that [its liability] should be higher" than $8.9 billion. *Id.*, 37:3-38:13. Is there a difference between LTL 1.0 v. LTL 2.0 in terms of the assets available? "I believe it's the same answer as now, that it's the value of the talc liabilities minus the value of LTL." *Id.*, 41:16-24. $29 billion is more than $8.9 billion, so no distress.

---

[7] MRHFM's counsel read this testimony and footnote 16 to the Circuit's opinion to the Court at the hearing on June 13th. Ex. 7, Tr. 6/13/23, 67. Debtor's counsel said "Mr. Thompson is completely mischaracterizing the record…" What was mischaracterized? As usual, Debtor's counsel doesn't say. Just general accusations of misrepresentations aimed at the lawyers opposing this bankruptcy, unable to provide specifics because there are none. MRHFM counsel directly read footnote 16 from the Circuit's opinion and the testimony from Kim referenced above. Nothing was mischaracterized.

### C.   There Isn't an Increase in "Claimants."

According to Mr. Wuesthoff, the number of claims have increased since *LTL1*, but he doesn't know how many of these claimants are really "new," as he relies on the representations of their lawyers. *Id.*, 47:1-48:7. He doesn't know whether the "claimants" allegedly supporting the Plan represent most talc claimants, he just "took our lawyers' words as truthful." *Id.*, 96:20-97:16.

These are not "new" claimants. This Court considered LTL's current and ***future*** liability in *LTL1*, as did the Circuit. The Company anticipated future talc claims and the only thing new is that the parties now know these victims—not yet diagnosed in February 2022—by name. Or at least, by first name. What disease do the cancer claimants have that are represented by AHC's member firms? The AHC won't say and J&J doesn't care.

Mr. Wuesthoff says LTL "is able to pay our bills and meet our liabilities" as they come due, but, obviously prepped to use the magic words LTL "was the same financial distress we were expecting for the first bankruptcy…" *Id.*, 111:24-112:25. But Mr. Wuesthoff has no idea about J&J settling talc claims in the tort system or the amounts. *Id.*, 164:10-165:15. Even the Debtor's expert says the expected costs for defending and resolving its talc liabilities is far below the value of HoldCo alone. Report of Dr. Mullin, pg. 50. *No* distress=*no* relief.

9

3M tried a less egregious bankruptcy abuse of its own, which was recently dismissed. *See In re Aearo Technologies LLC*, No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), *direct appeal certified* (June 14, 2023). In a very thorough opinion, in which Judge Graham referenced the Third Circuit's *LTL* decision frequently, "allowing an otherwise financially healthy debtor" into bankruptcy, let alone one "supported by an even more financially healthy, Fortune 500 multinational conglomerate, exceeds the boundaries of the Court's **limited** jurisdiction." *Id.*, *22 (emphasis).

Bankruptcy isn't for billionaires, especially when the Third Circuit already decided LTL Management is a bad faith debtor and J&J's bankruptcy purposes were invalid.

### III.    LTL MANAGEMENT FILED FOR AN IMPROPER PURPOSE

LTL is not looking to reorganize a financially distressed going concern, but to ensure Johnson & Johnson, a ***non***-debtor worth half-a-trillion dollars, can buy its way out of the tort system. To LTL's Chief Legal Officer, it wouldn't "make any sense" to consider whether J&J has liability for talc separate from that held by LTL. Kim Dep., 164:15-24.

LTL's Officers take their orders from Johnson & Johnson. Erik Haas, the Company's VP of Litigation, admits it was ***J&J*** that first raised the possibility that the 2021 FA was "void or voidable." Ex. 8, Haas Dep., 6/7/23, 29:18-30:7. He says "an equitable and efficient" resolution of all talc claims can "only" be achieved through a

bankruptcy facility. Haas Dep., 31:22-32:11. What was in it for LTL to give up its rights under the 2021 FA? The Debtor won't say.

Wrongly shielded—for now—by an alleged common interest privilege, the only reasonable inference to be drawn from the limited evidence the plaintiffs have discovered is that J&J *forced* LTL to rescind the 2021 FA. Now, "J&J's support is only available in bankruptcy and only if approved by this [Bankruptcy] Court. HoldCo is the sole obligor under the ["2023 FA"]." Kim First-Day Decl., *LTL 2,* ¶ 82. "HoldCo [also] transferred its consumer health business, which represented a substantial portion of its assets, in early January 2023." *Id.*

J&J gives away more than $1,000,000,000.00 to shareholders every 30 days.[8] Mr. Lisman acknowledges the Company's annual voluntary dividend exceeds $12 billion. Lisman Dep., 241:16-242:11. J&J is not in distress, has independent liability for its products, and has not subjected itself to this Court's jurisdiction, yet *J&J* remains the centerpiece of LTL's second bad faith petition.

A. <u>Johnson & Johnson has Independent Non-Derivative Liability for All Talc Products for All Time.</u>

Four times—in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *In re Federal-Mogul Glob. Inc.*, 300 F.3d 382 (3d Cir. 2002), *In re Combustion Eng'g*, 391 F.3d 190 (3d Cir. 2004),

---

[8] The Company has 2,604,286,303 shares of Common Stock outstanding. Johnson & Johnson Annual Report 2022, Form 10-k, available at: https://www.investor.jnj.com/asm/2022-annual-report. The Company gives away $1.13 per share per quarter. This amounted to $4.45 per share in 2022. *See* Johnson & Johnson Dividend History, available at: https://johnsonandjohnson.gcs-web.com/stock-information/dividends-splits. *See* <u>Ex. 9</u>, 2022 Annual Report and <u>Ex. 10</u>, Dividend history.

and *In re W.R. Grace & Co.*, 591 F.3d 164, 174 (3d Cir. 2009)—the Third Circuit rejected efforts to enjoin asbestos suits against non-debtors under circumstances much less egregious than those here. *See* MRHFM Obj. Prelim. Inj., Adv. Pro. Dkts. 60 & 65, and the oppositions to the injunction filed by the TCC (Adv. Pro. Dkt. 39), Paul Crouch (Adv. Pro. Dkts. 57 & 62), Kristie Lynn Doyle (Adv. Pro. Dkt. 43), and the United States Trustee (Adv. Pro. Dkt. 38).[9]

This Court earlier found the 1979 indemnity provision between J&J and the Debtor's predecessor to be "ambiguous," *In re LTL Mgmt., LLC*, 638 B.R. 291, 310 (Bankr. D. N.J. 2020), but the Court failed to construe that ambiguity against the indemnitee (here J&J) as New Jersey law requires. *See Kieffer v. Best Buy*, 14 A.3d 737, 743 (N.J. 2011). Likewise, the Court ignored New Jersey's rule requiring express and unambiguous language to support a promise to indemnify, let alone for one's own negligence. *See Cozzi v. Owens-Corning Fiber Glass Corp.*, 164 A.2d 69 (N.J. Super. 1960); *Mantilla v. NC Mall Assoc.*, 770 A.2d 1144 (N.J. 2001). Johnson & Johnson was found by juries to have engaged

---

[9] The Third Circuit has indicated that a "clear contractual right" to indemnity could confer jurisdiction if liability were "automatic." *W.R. Grace*, 591 F.3d at 173; *see Combustion Eng'g*, 391 F.3d at 226. But it hasn't explained why, and Debtor has adduced no evidence to establish "automatic" liability exists between itself and any non-debtor. Even so, this Court recognized that no "clear" right exists here. It analyzed just one indemnity clause (the 1979 J&J agreement) and found it "to be ambiguous" about "future liability." 638 B.R. at 310. The Court then noted that "any ambiguity" is "construed in favor of … the indemnitor"—that is, *against* indemnification. *Id.* Although the court tried to overcome this textual barrier by relying on *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), and the parties' course of dealing, the contract in *Bouton* involved a far broader transfer of liability, *id.* at 648, while internal allocations are "accounting decision[s]" for "administrative convenience" that do not prove *legal liability* to talc claimants. As debtor in possession and fiduciary of the estate, LTL cannot unilaterally forfeit that potential argument without committing yet another act of bad faith.

in willful, wanton, or reckless conduct warranting punitive damages. Such conduct cannot be indemnified. *See Johnson & Johnson v. Aetna*, 667 A.2d 1087 (NJ Super. 1995). *See also Tryanowski v. Lodi Bd. Of Educ.*, 643 A.2d 1057 (N.J. Super. 1994).

LTL is only liable for a ***portion*** of the damages caused by Johnson's Baby Powder and Shower to Shower. At worst, the Debtor has an excellent argument against indemnification which would reduce the amount of LTL's liability and increase the assets available to the Estate's creditors. But LTL doesn't care what the law says or what the Code requires, it will do—and has done—whatever J&J tells it to.

### B. <u>Filing for Bankruptcy to Obtain an Injunction for Non-Debtor Johnson & Johnson is an Improper Bankruptcy Purpose.</u>

There is no dispute that prior to 1979, Johnson & Johnson held all liabilities for its talc products. The Debtor now insists ***it*** holds all talc liabilities, both before 1979 and after, due to the alleged indemnification agreement. The Third Circuit did not reach whether it was proper to enjoin actions against J&J—the Company's bad faith was too apparent to go beyond that point—but noted "it is not obvious that LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it." *LTL Mgmt.*, 64 F.4th at 108n.16.

Yet, despite the many arguments against indemnification available to LTL under New Jersey law, prior Third Circuit precedent, and the Circuit's reference to this issue in its opinion in this case, the Debtor is adamant that it ***must*** be liable for all J&J talc products for all time. Forcing a "global resolution" of a non-debtor's tort claims is ***not*** a proper

bankruptcy purpose. To LTL's Chief Legal Officer, the Circuit's footnote is merely "dicta"; the Debtor didn't bother to perform any analysis of whether, under New Jersey law, it had to indemnify J&J: "it wasn't considered necessary." Kim Dep., 225:12-226:11.

While aware of allegations that Johnson & Johnson has liability independent of LTL (Kim Dep., 6/1/23, 164:25-166:6)—and which would reduce the amount the Debtor would have to pay to resolve such claims—LTL is indifferent to whether state law imposes talc liability on J&J or LTL or both (Kim Dep., 6/1/23, 168:16-169:2), the Debtor demands "complete relief" for its non-debtor puppeteer. *Id.*, 169:3-19.

> Q. LTL's approach to all of these state law issues, no matter how individual
> states handle liability of multiple tortfeasors in a case, LTL considers all
> claims related to talc as one liability. That's what you are saying, correct?
> A: Yeah. I think LTL's position is that it is one liability. Kim Dep., 192:22-
> 193:8.[10]

Mr. Dickinson also did no analysis into whether LTL must indemnify J&J. Ex. 11, Dickinson Dep., 5/31/23, 109:1-21. The Debtor and its lawyers' continued insistence to indemnify J&J for the latter's independent non-derivative tort liability is grounds for their removal if this case is not dismissed. *See* 11 U.S.C. § 1104.

## C.  The Third Circuit Already Found LTL Management's Bankruptcy Purpose—Which is the Same Here—is Improper.

The Debtor says an injunction for J&J is "critical" to LTL's reorganization because without one, "the purpose of this chapter 11 case" would be defeated. *See* Debtor Motion,

---

[10] LTL wants to bar cancer victims from suing non-debtor retailers like Albertsons and Walgreens, but doesn't expect any retailers to contribute to the trust. Kim Dep., 192:2-7.

Adv. Pro. Dkt. 163-1 ("Motion"), pg. 2.[11] What's the **purpose** of *LTL2*? The "same" as in

*LTL1*: to "try to get in bankruptcy an equitable, efficient, full resolution of the talc

liabilities." Kim Dep., 6/1/23, 33; Wuesthoff Dep., 48-49 ("to permanently, equitably, and

efficiently resolve all current and future talc cases—claims."). This Court agreed with

J&J's purpose and discussed the superiority of bankruptcy to the tort system. *In re LTL*

*Management, LLC*, 637 B.R. 396, 407-13 (Bankr. D.N.J. Feb. 25, 2022).

The Third Circuit reviewed **all** of this already, and held that a desire to

"comprehensively resolve litigation"—even **if** J&J was sincere—is not grounds to access

bankruptcy's "safe harbor" in the absence of financial distress. *LTL Mgmt.*, 64 F.4th at 93.

Johnson & Johnson can never and will never qualify for an essential condition of LTL

Management's bankruptcy: a permanent channeling injunction under §§ 105(a) or 524(g).

Yet the Debtor insists upon seeking relief for its non-debtor parent.

The alleged superiority of the bankruptcy system to address a "more-than-thorny

problem" does not bestow jurisdiction on this Court and the Circuit plainly restricted

"J&J's ability to move thousands of claims out of trial court and into bankruptcy" in the

name of being equitable and efficient. *LTL Mgmt.*, 64 F.4th at 110-11. This Court believed

bankruptcy could be used to address LTL's talc liability. The Third Circuit rejected this

belief, reversed this Court, and ordered dismissal. There is nothing new here: LTL has far

---

[11] MRHFM's plaintiffs join the objections of the Office of the United States Trustee (Adv. Pro. Dkt. 170) and TCC (Adv. Pro. Dkt. 169), and adopt all arguments and evidence therein.

more assets than it has liabilities. The Circuit's ruling on January 30th and mandate of March 31st compels dismissal.

## IV.    JOHNSON & JOHNSON'S FRAUD PROVES LTL'S BAD FAITH

Johnson & Johnson and/or its stooge have now lied to the bankruptcy court in *Imerys*, to this Court, to the Third Circuit, and to the public. LTL and J&J's ongoing fraud shows bad faith.

### A.    <u>Johnson & Johnson's Misrepresentation to the Courts Shows Bad Faith.</u>

The Company's lies and flip-flops throughout its history litigating talc claims are well documented.

#### 1.    *J&J lied about the tort system.*

Johnson & Johnson has taken diametrically opposed positions on litigating talc claims in the tort system. *See* <u>Ex. 12</u>, Appendix of Flip Flops. Only thirty-six months ago, the Company told another bankruptcy judge that talc plaintiffs should "keep their day in court and be assured a full recovery" outside of bankruptcy. *Id.*, No. 1. After all, in a bankruptcy trust, lawyers representing claimants could settle claims "without proving causation and establish their own eligibility criteria." *Id.*, No. 2. Instead, talc plaintiffs were better off in the tort system where J&J stood ready to "pay proven claims in full" (*id.*, No. 3), especially future plaintiffs where "J&J as a source of recovery…is undoubtedly a more certain bet than the standard bankruptcy claims trust." *Id.*, No. 4.

Now, J&J is willing to pay thousands of claims worth ***nothing*** in the tort system if it means it can "capture" all its talc liability. Future victims are no longer assured the "certain bet" of proceeding against J&J in the tort system because their state damages are capped, and their jury trial rights are effectively extinguished under J&J's Plan, which is itself evidence of bad faith. *See* Dkt. 525.

### 2.    *LTL lied about the 2021 Funding Agreement.*

Debtor's Counsel told this Court on February 18, 2022, that the 2021 FA would apply even if the case were dismissed: "[w]hether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. . . It's there to assure this isn't treated or consider[ed] a fraudulent conveyance." Ex. 13, Tr. 2/18/22, 61:5-20. Mr. Kim said the 2021 FA applied outside bankruptcy. Kim First Day Decl., *LTL1,* at ¶ 27 ("at any time when there is no bankruptcy case").

Mr. Kim made the same admission, under oath, in his April 14, 2023, deposition and at the April 18, 2023 hearing. Ex. 14, Kim Dep. Tr. 4/14/23 at 62:15-21, 182:10-17; Ex. 15, Tr.  4/18/23, 61:7-14. Mr. Gordon speaking at the ABI in April 2022, well before briefing and argument to the Circuit, said "… this case is on appeal. Maybe it'll get reversed." ABI, pg 43.

The Debtor told the Third Circuit the 2021 FA applied outside of bankruptcy (Kim Exhibit 9, Ex. 16, Tr. 9/19/22, 83:21-25) and that $61 billion was a floor, not a ceiling. *Id.*, 65:13-17. *See* Kim Dep., 6/1/23, 215:19-217:4.[12] Mr. Kim testified:

> Q: And you were there when [Debtor's appellate counsel] said that to the Third Circuit, correct?
> A: I was.
> Q: And he was correct when he said it, right; that's a true statement about the First Funding Agreement?
> A: At the time with its—under the facts that we knew then, yes.

Then January 30th happened, and it was time for fraud and breached fiduciary duties. LTL says the Circuit's decision had the "exact opposite" effect of what LTL intended. Kim Decl. ¶ 78. LTL now says, post-dismissal, there was material risk that the 2021 FA was no longer enforceable because it was void or voidable. *Id.* In other words, J&J wants talc claims in bankruptcy, so it wanted its $61 billion back. The Circuit took "J&J and LTL at their word" (*LTL Mgmt.*, 64 F.4th at 109), and J&J and LTL have now shown their word is worth ***nothing***. Lying to the Circuit shows bad faith.

### 3. *Johnson & Johnson lied about wanting to equitably resolve claims.*

The Company's oft repeated statements about seeking an "equitable and efficient" resolution are well documented. On July 26, 2022, when this Court was hearing argument

---

[12] Sept. 19, 2022 Third Circuit Oral Arg. Tr. at 83:21-25 ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

on estimation in *LTL1*, the Debtor chided MRHFM for opposing any bankruptcy

resolution when a plan had yet to be filed:

> He doesn't know what values might be offered. So to me, I don't think we
> can put much stock in a position like that where a party's telling you that
> no agreement would be acceptable. We don't care about the aggregate
> value. Well, of course, [MRHFM doesn't] care about the aggregate value.
> They want to know what the claim values are. Ex. 23, 7/26/22, 100.

Last July, the Debtor recognized lawyers representing claimants would want to

know what individual values would be assigned. Now, the Debtor says the Plan's

aggregate value ($8.9 billion) (Dkt. 525) is "historic" and must be accepted. Ex. 24, Tr.

4/18/23 at 197, 231, 242-44. However, on the Plan's face, it's unknowable what individual

plaintiffs will receive until *after* the Trust is established (Dkt. 525-13, pg. 36 of 44):

---

**7.1.2    Description & Application of Points Valuation System**

**A.    In General**

Promptly after the Trust is established, the Trustees, with the consent of the Payor, the TAC, and the FCR, shall establish an initial Point Value for Individual Claims (the "Initial Point Value"). This Initial Point Value shall be calculated on the basis of the initial trust claim submissions, an estimate of future submissions, and the claim valuation procedures outlined in these TDP. The Trust was established with the goal of achieving a Point Value of one dollar ($1) per point and the Debtors believe the Initial Point Value will be between fifty cents ($0.50) and two dollars ($2) per point. Given the uncertainty associated with Individual Claims, and in recognition of the fact that the Trust may increase the Point Value in the future, the Trust shall take a conservative posture in setting the Initial Point Value, and may set a separate Point Value for Mesothelioma and Ovarian Cancer claims.

---

This means an individual plaintiff, today, cannot know what he/she would receive

under the Plan because, at *best*, the Debtor "believes" the dollar range per point would

be $0.50 to $2.00. That's a 400% variance, and if more claims are filed than anticipated—

almost certainly to happen with tort system hurdles removed—a dip below $0.50 per

point is likely. This hasn't stopped Mr. Haas from scolding the lawyers who dare to protect their clients' Constitutional rights and object to this bankruptcy abuse (Ex. 25, Haas Dep. Ex. 11 & Appendix of Statements):

**Statement on TCC Standing Motion to Dismiss**

May 12, 2023 - Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:

This motion is yet another desperate attempt by a small group of plaintiff's law firms—whose financial interests conflict with, diverge from and contravene those of their clients—to deprive all claimants of the right to vote and decide for themselves whether to accept the proposed plan, which a growing and significant majority of claimants already support. The court rulings this week cleared the way for the filing of the plan in the near term, and we will vigorously oppose the effort to derail that filing with this baseless and premature motion.

What does Mr. Haas mean by conflicting financial interests?

As a general matter, any lawyer opposing the settlement is taking an interest that is in conflict with their clients because in the tort system, most claimants receive nothing. They receive zero in the tort system. So by not supporting the proposed plan, the lawyers are inherently in conflict with their clients. Likely because they are seeking the aberrant one-off large verdict, notwithstanding the fact that their clients get nothing. Haas Dep., 110:11-22.

In other words, the $500 billion tortfeasor doesn't think the claims are valid, so anything above zero should be accepted. Johnson & Johnson settled at least 1,098 mesothelioma cases in the tort system at arm's length, including several with MRHFM and its co-counsel, as well as nearly 6,000 ovarian cancer cases. *See LTL1,* MTD Exhibit 161. Mr. Haas knows, or should know, what these cases settled for, including those cases involving the "small group of plaintiff's firms," but he issues these edicts anyway, criticizing the firms that won't be complicit in J&J's fraud.

The Plan itself is evidence of bad faith: it places the burden on the claimant if he/she goes to trial and loses (Dkt. 525-13, pg. 13 (Art. 6.2)), artificially caps the "Maximum Value" that any claimant receives (*id.*, pg. 11), and would pay thousands of "Other Talc Claims" that are neither mesothelioma nor ovarian cancer. *Id.* James Murdica, outside counsel for J&J, testified that prior to bankruptcy, J&J did *not* settle *non*-ovarian gynecological claims. Ex. 26, Murdica Dep., 5/30/23, 54:3-15, 86:22-87:24. Now, J&J wants to buy votes, paying $250-$500 a piece to individual "claimants" whose claims are worth *nothing* in the tort system. Who benefits from a trust where 10,000 uterine cancer victims each receive $250? J&J and a few plaintiff's lawyers. *Not* the sick people, especially not those who cancers are linked to talc and that have value before trial judges and juries.[13]

### 4. J&J tried to manufacture bankruptcy jurisdiction.

LTL's admissions show it is not in financial distress, and the Debtor's efforts to manufacture distress (and it thinks, bankruptcy court jurisdiction) cannot serve as the basis for a good faith filing. The Circuit found LTL had the right—outside of bankruptcy—to cause J&J and New Consumer (jointly and severally) to pay it up to $61.5 billion to satisfy talc claims. *LTL Mgmt.*, 64 F.4th at 106-09. The Circuit held that LTL had a *"duty"* "to access its payment assets." *Id.* at 107. Exchanging an unconditional

---

[13] This is not to diminish in any way the pain and suffering endured by women suffering from uterine or other non-ovarian gynecological cancers. One day there may be scientific basis showing a link between talc and uterine cancer, for example. But it does not exist now. The AHC and J&J are using victims of cancers not linked to talc in order to cram down on the plaintiffs with mesothelioma and epithelial ovarian cancer, which both have been established to be caused by talc exposure.

entitlement to over $61 billion—without consideration—for a conditional promise of $8.9

billion, and only if Johnson & Johnson receives a permanent injunction, is bad faith, and

cannot give this Court subject matter jurisdiction.

### 5.   J&J forum shopped.

Johnson & Johnson tried to avoid the Third Circuit and its precedent. The

Company made LTL file for bankruptcy in North Carolina, which shows bad faith. Mr.

Kim, testified about why J&J decided to file in North Carolina:

> Again, we followed all the rules and did the -took all the appropriate steps
> necessary, because we believed that North Carolina would offer the best
> chance to get a -- an efficient -- so because of the existing case law about
> divisional mergers and these types of transactions, we thought that filing in
> North Carolina would get us the quickest resolution to, again, fairly, you
> know, and efficiently resolve this litigation. So we took all the proper,
> appropriate legal actions to do that. Similar to people who file -- incorporate
> in Delaware even though they have absolutely no presence in Delaware,
> because Delaware has a body of law on corporate governance that is --
> frankly, it's not even that it's better or worse but that it's there, and they
> know what it is. So similarly, in North Carolina, there were some rulings
> there that aren't beneficial, but there were rulings that gave us a roadmap
> about how to -- for example, what a funding agreement should look like.
> And so we utilized that knowledge to come up with the right terms.

Ex. 27, Tr. 2/15/2022, pgs. 170-171.  If no claimants have been paid in Georgia-Pacific's,

CertainTeed's, Trane's or Ingersoll-Rand's manufactured "bankruptcies" (now or as of

October 2021) pending in North Carolina, which Mr. Kim had to have known, then what

exactly was the "roadmap" to the "quickest resolution" that LTL found so appealing in

North Carolina in October? The answer is obvious:  LTL does not want to equitably pay

anyone, let alone efficiently.

Under North Carolina law, which governs the 2021 FA, frustration of purpose is merely an affirmative defense to a breach of contract action. *Brenner v. Little Red School House, Ltd.*, 274 S.E.2d 206, 209 (N.C. 1981). J&J never refused to make a payment under the 2021 FA, so that affirmative defense has no role here.

### 6.   J&J treats Section 524(g) as a menu choice for half-a-trillionaires.

Johnson & Johnson's and the AHC's perversion of 11 U.S.C. § 524(g) stands in stark contrast to the history of asbestos litigation. Johns-Manville filed for protection in 1982; Section 524(g) was added to the Code in 1994; the Supreme Court struck down asbestos class action settlements—for infringing on *future* plaintiffs' Seventh Amendment Rights and capping their damages—in 1997 and 1999.[14]

The Supreme Court did *not* read 524(g) as applying to non-debtors like Fibreboard (then) and would *not* apply it to non-distressed debtors like LTL Management now. During the early 2000s, Congress decided ***against*** several bills proposed to "address" asbestos litigation.[15] During this time several companies filed real (non-Two Step)

---

[14] *See Amchem Prods. v. Windsor*, 521 U.S. 591, 628-29 (1997) ("The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution") and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-46 (1999) (recognizing the "serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale" as "a mandatory settlement-only class action with legal issues and future claimants compromises their Seventh Amendment rights without their consent.").

[15] *See e.g.* The Fairness in Asbestos Injury Resolution Act of 2005 (S. 852, 109th Cong.); The Fairness in Asbestos Compensation Act of 1999 (S. 758, 106th Cong.), the Asbestos Compensation Act of 2000 (H.R. 1283, 106th Cong.), and the Asbestos Claims Criteria and Compensation Act of 2003 (S. 413, 108th Cong.).

asbestos bankruptcies because they (and their lawyers) interpreted all the above the same

way then that MRHFM's plaintiffs does now.[16]

Texas Two Steps have launched a billing bonanza. Unmoored from any concern

about a limited fund to compensate creditors, hundreds of millions in fees have been paid

to bankruptcy lawyers on all sides, but the Two Step is particularly lucrative for its main

players (Ex. 28):

| Case | Jones Day | Bates White |
|---|---|---|
| *Bestwall* | $39,349,295.00 | $39,992.250.29 |
| *DBMP* | $21,579,407.50 | $4,880,798.87 |
| *Aldrich/Murray* | $23,148,505.95 | $6,583,480.72 |
| **Total** | **$84,077,208.45** | **$51,456,529.88** |

Over $120 million was paid to professionals in *LTL1*, and not a dime was offered,

let alone paid, to a single "talc claimant." Ex. 29, *LTL1* Operating Report, 5/22/23, Dkt.

3954.

### B.  J&J's Fraud on the Parties Shows Bad Faith.

LTL has repeatedly breached its fiduciary duty to the plaintiffs to protect the Estate

and J&J and LTL have repeatedly misrepresented their motivations to the public and to

their victims.

---

[16] *See In re WR Grace & Co.,* 729 F.3d 332 (3d Cir. 2013); *In re Armstrong World Indus., Inc.,* 348 B.R. 136 (D. Del. 2006); *In re USG Corp.,* 290 B.R. 223 (Bankr. D. Del. 2003); *In re Fed.-Mogul Glob. Inc.,* 684 F.3d 355 (3d Cir. 2012); *In re Celotex Corp.,* 204 B.R. 586 (Bankr. M.D. Fla. 1996); *In re Nat'l Gypsum Co.,* 257 B.R. 184 (Bankr. N.D. Tex. 2000).

### 1. J&J and LTL—while bound as the Debtor in Possession to act only for the benefit of the Estate—secretly conspired to give away $61 billion.

LTL has a "trustee's" "fiduciary duty ... 'to protect and conserve property in [their] possession for the benefit of creditors.'" *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). A debtor in possession is "bound by all of the fiduciary duties of a bankruptcy trustee." *In re Insilco Tech., Inc.*, 480 F.3d 212, 215 n.3 (3d Cir. 2007). Those duties include "[o]pen, honest and straightforward disclosure to the Court and creditors" and the "duty to protect and conserve property in its possession for the benefit of creditors." *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (internal quotation marks and citations omitted).

To eliminate the alleged "risk" of the 2021 FA being void, LTL, J&J, and HoldCo entered into new financing agreements. Put another way, LTL decided the 2021 FA's existence prevented LTL from manufacturing bankruptcy court jurisdiction. Tellingly, Johnson & Johnson—at least when lawyers were not involved—never refused to honor the 2021 FA. *See* Kim Dep., 4/14/2023, 209:9–17, 210:7–18. And J&J's head of litigation admitted it was *J&J*, not the Debtor, that first raised the "void or voidable" issue. Haas Dep., 29:18-30:7.

The 2023 FA is between LTL and HoldCo (not Johnson & Johnson), and operates in *or out* of bankruptcy. Kim Decl. ¶ 81. A second arrangement, a so-called J&J Support Agreement, is subject to this Court's approval and is operative only in the Chapter 11 case. *Id.* The Debtor contends these changes "resolve the concerns" that lead the Third

25

Circuit to dismiss *LTL1*. **Concerns?** What the Circuit actually said was that "we cannot currently see how [LTL's] lack of financial distress could be overcome." *LTL Mgmt.*, 64 F.4th at 110. Does Mr. Haas have an explanation for how J&J addressed **this** finding of the Circuit? **No.** And asking him draws "harassing" objections. Haas Dep., 98:6-99:24.

Still, LTL's assets, including the 2023 FA, are worth $30 billion "which is greater than any realistic estimate of the Debtor's talc liabilities." Debtor Obj., pgs. 8, 55. According to LTL, the "value of the [Funding] [A]greement" is the aggregate amount of "the Debtor's talc liability"—*i.e.*, the value of the payment obligations—which LTL insists is less than $30 billion. *Id.*, 17-18, 42-44, 47. Even after all the fraud, the Debtor is **not** in financial distress. *See* TCC Reply, "Breach of Fiduciary Duties is Bad Faith."

All the Debtor's machinations took place in secret. It never raised its (J&J's) "void or voidable" theory to the Court, the United States Trusteee, or the TCC. Mr. Wuesthoff thinks his "fiduciary duties are primarily to LTL," rather than to the Estate and its creditors. Wuesthoff Dep., 66:21-68:22. If this case is not dismissed, Mr. Wuesthoff and all the Debtor's Officers and lawyers must be removed. *See* 11 U.S.C. § 1104. LTL Management purports to give away an unconditional promise of $61 billion, and to do so while under this Court's jurisdiction in *LTL1*.

### 2.   *LTL insists on indemnifying J&J contrary to New Jersey state law.*

The Debtor insists it has all liability for all talc products for all time, regardless of what New Jersey law says. LTL demands it must indemnify Johnson & Johnson for the

latter's independent non-derivative state tort liability[17] and now, LTL says claims against non-debtors Kenvue, Janssen, and HoldCo ("Affiliates") must also be enjoined because the Debtor is liable for those, too. After all, says Mr. Kim, "it would make no sense" for the Debtor to resolve its talc liabilities "without a complete resolution of all claims against J&J [ ] and other parties." Kim Dep., 6/1/23, 127-28.

That's not how fiduciary duties—which LTL and its officers owe to the Estate— work. If Johnson & Johnson or the Affiliates have separate liability for Johnson's Baby Powder—as the cancer plaintiffs claim—any recovery from those non-debtors would *reduce* what LTL owes to claimants in this bankruptcy and thus increase the value of the Estate. But protecting claimants isn't this Debtor's style.

### 3.   *J&J lied about the Third Circuit's decision.*

Johnson & Johnson lied about the Third Circuit's holding in announcing its second bankruptcy filing. The Company omitted "financial distress" when quoting the Circuit's discussion about the propriety of bankruptcy to address mass tort liability. *See LTL Mgmt.*, 64 F.4th at 104. J&J's April 4th statement gives the impression that the Circuit

---

[17] Mr. Dickinson, the CFO, didn't bother to do any analysis of what portion of the alleged $8.9 billion "settlement" reflects LTL's liability or J&J's, he just insists that LTL must pay the bill. Dickinson Dep., 5/31/2023, 108-11. The Debtor didn't perform any analysis on this issue before its second bad faith bankruptcy. Kim Dep., 226. Nor did LTL seek to have non-debtor retailers, who also have independent liability, contribute funding to a trust. Kim Dep., 192. LTL doesn't care what state law says—how it apportions fault between co-defendants, for example—it's "all one liability" as far as the Debtor is concerned. Kim Dep., 168 & 192-93.

"agreed" bankruptcy could be used in this way, it's just that J&J's benevolence with the 2021 FA got in the way so the first case was dismissed.

During his deposition, Mr. Haas was shown the slide below in which the Company's Press Release of April 4th (Haas Dep., Ex. 7) and the relevant portion of the Third Circuit opinion (Ex. 30, Haas Dep. Ex. 8), referenced by the press release, were contrasted:



*See* Haas Dep., 6/7/23, 96:8-18.[18] The Company is so eager to protect its reputation—another purpose the Third Circuit *rejected* as improper—that it will pervert

_____

[18] "Q. Okay. The highlighted part in pink says, '[o]n appellate review, the United States Court of Appeals for the Third Circuit agreed that bankruptcy is 'an appropriate forum for a debtor to address mass tort liability.' Do you see where I read that? A. I see where you are reading Mr. Thompson. I'm not here to just endorse your statements. If there is a question please ask it."

524(g) and blatantly misrepresent the Circuit's ruling if it means cramming down on the plaintiffs it poisoned. [19] Financial distress is required, and it does *not* exist here.

### 4.    *J&J lied about seeking Supreme Court review.*

On March 22, 2023, Johnson & Johnson told the public its petition for rehearing—denied that day—"raised significant concerns with the Third Circuit's decision…[including] the impracticality of the Third Circuit's new legal standard. We will immediately move for a stay of this opinion so we can seek review directly from the U.S. Supreme Court." <u>Ex. 17</u>, Appendix of Statements, No. 1.

Turns out that during February and March, while LTL and its *amici* were urging the Circuit to grant *en banc* review and then to stay the mandate, J&J and the Debtor were conspiring about how LTL could rid itself of its $61.5 billion asset. *See* Kim Decl. ¶¶ 78-81 and Termination and Substitution Agreement, Apr. 4, 2023, Dkt. 4-4, Annex D. *See* TCC Reply, "Breach of Fiduciary Duties is Bad Faith."

### 5.    *J&J lied about the support for its Plan.*

Johnson & Johnson's press release, issued April 4th, proclaimed (<u>Ex. 18</u>, Haas Dep. Exhibit 7):

---

[19] Mr. Haas testified that he found the slide[s] "entirely false and misleading and mischaracterized both the statement and opinion in terms of how they were juxtaposed." Haas, 6/7/23, 97:6-22. What exactly was false or misleading about showing an image from the press release against an image of the Circuit opinion? Mr. Haas wouldn't say.  Johnson & Johnson accuses first and verifies never.

**NEW BRUNSWICK, N.J., APRIL 4, 2023, -** Johnson & Johnson (NYSE:JNJ) (the Company) today announced that its subsidiary LTL Management LLC (LTL) has re-filed for voluntary Chapter 11 bankruptcy protection to obtain approval of a reorganization plan that will equitably and efficiently resolve all claims arising from cosmetic talc litigation against the Company and its affiliates in North America. To that end, the Company has agreed to contribute up to a present value of $8.9 billion, payable over 25 years, to resolve all the current and future talc claims, which is an increase of $6.9 billion over the $2 billion previously committed in connection with LTL's initial bankruptcy filing in October 2021. LTL also has secured commitments from over 60,000 current claimants to support a global resolution on these terms.

Who qualifies as a claimant? Mr. Haas won't say.[20] Mr. Kim admits that non-ovarian "gynecological cancers" are compensable under the Plan. Kim Dep., 6/1/23, 281:2-24. *See* Plan, Dkt. 525-13, pgs. 26-27.  These cancers have no scientific or litigation tested connection to talc—and were not at issue in *LTL1* or settled in the tort system—but are now being recognized by J&J. The Company purports to use victims of uterine, vaginal, cervical and other non-ovarian cancers as pawns in its ongoing effort to "overcome the tort system."

The number of "claimants"—whether they have a talc caused cancer or not—that support the Plan doesn't cure bad faith.[21] But it turns out the lawyers representing these "claimants" (the Ad Hoc of Supporting Counsel ("AHC") don't support the Plan, anyway, and there's *zero* evidence that their "claimants" do. Majed Nachawati, who represents close to 5,000 "claimants" (Dkt. 470-1)—he doesn't know how many of these are ovarian cancer or non-ovarian gynecological cancers—testified that the AHC and J&J

---

[20] Haas Dep., 92:2-11 (J&J counsel instructing Mr. Haas not to answer whether someone with pancreatic cancer qualified as a claimant).

[21] The "best interests" test is not an exercise in nose-counting.  The test for what is in the best interests of the creditors and the estate "is not one of majority rule."  7 Collier on Bankruptcy, ¶ 1112.04[7], at p. 1112-49 (16th ed. 2013 & 2023 supp).

are "working with the issues with the idea of a pathway to resolution that I can support and recommend to my clients…" Ex. 19, Nachawati Dep., 5/24/2023, 164. Will he recommend the filed Plan to his clients? Mr. Nachawati can't "fortune tell." *Id.*, 165.

James Onder, who represents over 21,000 "claimants" (Dkt. 470-1), testified that the filed Plan will *not* be voted on. Ex. 20, Onder Dep., 6/8/23, 163:18-164:8. "There will be modifications and adjustments just like Greg Gordon said in court multiple times, and I've said multiple times as well." Onder Dep., 326:20-327:3.

Mikal Watts has not shown the term sheet to a single one of his clients. Ex. 21, Watts Dep., 6/12/23, 81:19-22. Mr. Onder testified that he could not recommend a plan to clients without knowing what the actual compensation numbers would be. Onder Dep., 6/8/23, 334:15-16. Messrs. Watts and Pulaski admit the amounts that would be paid to claimants *cannot* be known until the size of the claimant pool is known. Watts Dep. 83:23-84:18; 6-14-23 and Ex. 22, Pulaski Dep., 6/14/23, 74:4-75:5. And the size of the claimant pool won't be known until *after* a vote.

Johnson & Johnson told the world 60,000 "claimants" supported its Plan on April 4th. This has been proven false. Lies like these are all designed to keep juries from seeing the evidence and to stay hundreds of mesothelioma and thousands of ovarian cancer cases pending in courts of general jurisdiction.

### 6. *J&J lied about the United States Trustee.*

Mr. Haas was at the hearing on April 18th. Hass Dep., 100:6-12. He was aware that there was an argument about whether the TCC and the UST had a common interest *privilege* that shielded discussions between TCC counsel and the UST. Haas Dep., 102:9-23. At no point in Mr. Molton's deposition (which Mr. Haas was on for at least part of) or at the hearing on April 18th was there an assertion that the TCC and UST had a common *fee* agreement. In fact, Linda Richenderfer from the Office of the United States Trustee made clear the UST did *not* have a common interest privilege with the TCC. Ex. 31, Haas Dep. Exhibit 9, Tr. 4/18/23, 14:8-24. Common interest privilege and common interest *fee* agreement are completely different. There could be reasonable conclusion—from Mr. Molton's deposition and the argument on April 18th—that the UST had common interest *fee* agreement with the TCC.

Despite this, on May 2nd, J&J issued a press release asserting:

> **Statement on United States Trustee Motion to Dismiss**
>
> May 2, 2023 - Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:
>
> The Trustee's motion repeats the positions of the small minority of law firms that oppose the plan, whose counsel testified that they entered into a common interest fee agreement with the agency. We consider more compelling the views of the vast majority of the claimants' law firms who support the proposed reorganization plan.

<u>Ex. 32</u>, Haas Dep. Exhibit 10, Dkt. 453.[22] The "agency" is the Office of the United

States Trustee, a component of the Department of Justice whose "mission is to promote

the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders—

debtors, creditors, and the public."[23] The Company later said that "fee" was a typo. That's

quite a typo. For several days visitors to J&J's website were told the DOJ had a financial

incentive to oppose this bankruptcy and to do so against the interests of the "vast majority

of claimants."

Typo aside, the UST believes this case should be dismissed, so the UST has drawn

J&J's ire. The "vast majority" talking points are objectively false given the sworn

admissions of the AHC members referenced above and the complete absence of evidence

about the number of epithelial ovarian cancer and mesothelioma *claimants*—not lawyers

working on a plan—that actually support this "reorganization." J&J keeps repeating

"vast majority" anyway.

## V.   CONCLUSION

The jig is up for the Texas Two Step and the writing is on the wall. J&J has

repeatedly misrepresented the facts, the law, and its intentions to this Court, the Circuit,

and the public. The Company did not demean itself with this second bad faith petition to

fairly compensate victims, as its Plan now makes plain.

---

[22] MRHFM included the press release as an Exhibit to its objection to scheduling a hearing on approval of disclosure statement on May 6th. The statement was corrected before the May 9th hearing.
[23] https://www.justice.gov/ust

Bankruptcy is not a menu choice for billionaires. This is not mediation court. This

is not "efficiency" court. This is not "one liability" court. This is bankruptcy court, and

Johnson & Johnson and its stooge are not allowed into Chapter 11's "safe harbor," nor

are they worthy of this Court's continued time and attention.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

_____
Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhmflaw.com