# Exhibit 11

**In the Matter Of:**

*IN RE LTL Management LLC Bankruptcy*

*RICHARD DICKINSON*

*May 31, 2023*



Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Exhibit   Page 3 of 142
Confidential

Richard Dickinson
May 31, 2023

1

1  UNITED STATES BANKRUPTCY COURT
   DISTRICT OF NEW JERSEY
2  CASE NO. 23-12825 (MBK)
   CHAPTER 11
3  -----------------------------------------x
   IN RE:
4

5  LTL MANAGEMENT LLC BANKRUPTCY,

6                      Debtor,

7  -----------------------------------------x

8

9          VIDEOTAPED DEPOSITION of RICHARD DICKINSON,

10  taken by the Committee, held at 7 Times Square New York,

11  New York 10036, on May 31, 2023, at 1:09 p.m., before a

12  Notary Public of the State of New York.

13

    *********************************************
14

15

16  CONFIDENTIAL***

17

18

19

20

21

22

23

24

25

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Exhibit   Page 4 of 142
Confidential

Richard Dickinson
May 31, 2023

2

```
 1   A P P E A R A N C E S:

 2     BROWN RUDNICK
                 Attorneys for TCC
 3               7 Times Square
                 New York, New York 10036
 4
       BY:       LYDELL BENSON, ESQ.
 5               wlbenson@brownrudnick.com
                 JEFF JONAS, ESQ.
 6               ALEX KASNETZ, ESQ. via Zoom
                 JASNOOR HUNDAL, Summer Associate
 7
       JONES DAY
 8               Attorneys for DEBTOR LTL MANAGEMENT
                 250 Vesey Street
 9               New York, New York 10281

10     BY:       JAMES M. JONES, ESQ. via Zoom
                 jjones@jonesday.com
11               SANDON X. FERNANDES, Summer Associate via Zoom

12


13     THE RUCKDESCHEL LAW FIRM, LLC
                 Attorneys for PAUL CROUCH
14               8357 Main Street
                 Ellicott City, Maryland 21043
15
       BY:       JONATHAN RUCKDESCHEL, ESQ. via Zoom
16               ruck@rucklawfirm.com

17
       MOTLEY RICE
18               Attorneys for TCC
                 210 Lake Drive East, Suite 101
19               Cherry Hill, New Jersey 08002

20     BY:       DANIEL R. LAPINSKI, ESQ. via Zoom
                 dlapinski@motleyrice.com
21


22     WOMBLE BOND DICKINSON LLP
                 Attorneys for AD HOC COMMITTE OF STATES
23               100 Light Street, 26th Floor
                 Baltimore Maryland 21202
24
       BY:       LISA TANCREDI, ESQ.
25               Lisa.tancredi@wbd-us.com
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Exhibit   Page 5 of 142
Confidential

Richard Dickinson
May 31, 2023

3

```
 1    A P P E A R A N C E S   C O N T'D

 2    PAUL HASTINGS LLP
              Attorneys for AD HOC COMMITTEE OF SUPPORTING
 3            COUNSEL
              515 South Flower Street, 25th Floor
 4            Los Angeles California 90071

 5    BY:     WILL C. FARMER, ESQ.
              Willfarmer@paulhastings.com
 6
      OTTERBOURG P.C.
 7            Attorneys for TCC
              230 Park Avenue
 8            New York, New York 10169

 9    BY:     MICHAEL MAIZEL, ESQ.
              mmaizel@otterbourg.com
10            GEORGE ALCHAS, Summer Associate

11    SIMPSON THACHER & BARTLETT LLP
              Attorneys for TRAVELERS CASUALTY & SURETY
12            COMPANY
              425 Lexington Avenue
13            New York, New York 10017

14    BY:     BONNIE JARRETT, ESQ.
              bonnie.jarrett@stblaw.com
15
16    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
              Attorneys for LTL Management
17            One Manhattan West
              New York, New York 10001
18
      BY:     ANDREW M. KARP, ESQ.
19            andrew.karp@skadden.com

20    DEPARTMENT OF JUSTICE

21    BY:     LINDA RICHENDERFER, ESQ.
              linda.richenderfer@usdoj.gov
22            LAUREN BIELSKIE, ESQ.

23    ALSO PRESENT:
      Caylob Suarez-Exhibit Tech (Lexitas)
24    Dmitry Zvonkov- Videographer (Lexitas)
      Will Scheff- Consultant (FTI Consulting)
25    John Kim (LTL)
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 6 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

4

1                           INDEX

2  WITNESS                EXAMINATION BY                PAGE
   Richard Dickinson      Lydell Benson                6
3  Richard Dickinson      Jonathan Ruckdeschel         106
   Richard Dickinson      Lisa Tancredi                113
4  Richard Dickinson      James Jones                  118

5

6                          EXHIBITS
   DICKINSON              DESCRIPTION                   PAGE
7  1                      LinkedIn Page of Richard      14
                          Dickinson
8  2                      LTL 0030612-13                30

9  3                      Monthly Operating Report For LTL  38
                          3/31/23
10 4                      Monthly Operating Report For LTL  49
                          10/31/21
11 5                      LTL 0002300-20                56

12 6                      Declaration of John K. Kim in  64
                          Support of First Day Pleadings,
13                        4/4/23
   7                      Ltlmgmt-00000233-59           74
14
   8                      Chapter 11 Plan of            78
15                        Reorganization of LTL Management
                          LLC 5/15/23
16 9                      Ltlmgmt-00002668-79           87

17 10                     Voluntary Petition For LTL I  88
                          10/14/21
18 11                     Voluntary Petition For LTL Ii 90
                          4/4/23
19 12                     Ltlmgmt-00002628-40           93

20 13                     Ltlmgmt-00013464-65           95

21 14                     Ltlmgmt-00002626-27           97

22 16                     Johnson & Johnson's 8-K 4/4/23  102

23
        (Exhibits retained by Reporter.)
24

25

5

1            THE VIDEOGRAPHER:  Standby, please.

2       We're on the record.  Today's date is May 31,

3       2023, the time on the video is 1:09 p.m.  This

4       is video one in the deposition of Richard

5       Dickinson In Re: LTL Management LLC Bankruptcy

6       Court, District of New Jersey.

7            This deposition is taking place over

8       Zoom and all participants are remote.  The

9       videographer is Dmitry Zvonkov.  The court

10       reporter is Brooke Perry, both with Lexitas.

11            All appearances will be noted on the

12       stenographic record.  Will the reporter please

13       swear in the witness.

14   R I C H A R D   D I C K I N S O N, the witness herein,

15   having been first duly sworn by a Notary Public of the

16   State of New York, was examined and testified as

17   follows:

18            THE REPORTER:  Please state your name

19       for the record.

20            THE WITNESS:  Richard F. Dickinson.

21            THE REPORTER:  Please state your

22       address for the record.

23            THE WITNESS:  Which address?  Where I

24       am currently?

25            THE REPORTER:  That's up to your

6

```
 1        lawyer.

 2              MR. JONES:  You can give the address

 3        where you are currently, go ahead.

 4              THE WITNESS:  501 George Street New

 5        Brunswick, New Jersey 08901.

 6  EXAMINATION BY

 7  MR. BENSON:

 8  Q.    Good afternoon, Mr. Dickinson.

 9  A.    Good afternoon, Mr. Benson.

10  Q.    Can you hear me okay?

11  A.    I can.

12  Q.    How are you?

13  A.    I'm doing fine.  How are you?

14  Q.    I'm doing well.  So I think you know I'm Lydell

15  Benson from Brown Rudnick, we represent the -- TCC in

16  this case.  You and I have met before.

17  A.    Yes.

18  Q.    Mr. Dickinson, you are the CFO for LTL,

19  correct?

20  A.    That is correct.

21  Q.    Are you also the CFO for Royalty Asset

22  Management?

23  A.    I'm the -- the official title is the treasurer.

24  But you can consider it the CFO as well.

25  Q.    And you're represented by counsel today?
```

Case 23-12825-MBK    Doc 855-12    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
IN RE LTL Management LLC Bankruptcy    Page 9 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

7

```
 1   A.      I am, yes.

 2   Q.      Okay.  And you've been deposed twice before?

 3   A.      That is correct.

 4   Q.      Have you been deposed since you and I last met?

 5   A.      I have not.

 6   Q.      All right.  Well, given that, let me just give

 7   you a quick refresher.  That was not too long ago that

 8   we last met.  But I'll just go over this one more time.

 9           So today I'm seeking complete information from

10   you encompassing all personal and factual knowledge that

11   you have on the various topics that we'll cover.  So

12   I'll ask that you give truthful answers regarding

13   everything that you know.  Does that sound good?

14                   MR. JONES:  I object to that

15           characterizations.  He'll only give truthful

16           answers to question posed.  He doesn't owe you

17           everything he knows.

18   Q.      Are you aware of any reason that you cannot

19   testify honestly and accurately today?

20   A.      No.

21   Q.      All right.  Also, I just want to let you know,

22   you know, this isn't a memory test.  So at any point you

23   can't recall or you need a moment to think about

24   something, let me know.  I also want to let you know,

25   I'm not seeking attorney/client communications such as
```

8

1  legal advice given to you from your attorney.

2       You've already been sworn in by our court

3  reporter, Brooke Perry, meaning you're testifying today,

4  under oath to tell the truth throughout the duration of

5  today's examination.

6       Does that sound good?

7  A.    That's what I said earlier, yes.

8  Q.    All right.  And while under oath, it is

9  critical that you provide clear, verbal responses,

10  meaning no head nods, no mm-mm's, no uh-huh, and I'll

11  try to remind you if I see that, but please keep that in

12  mind as we proceed throughout the deposition to make it

13  easier on everyone attending today and including our

14  court reporter.

15       Only one of us should be speaking at a time, it

16  will expedite things and make it easier for our court

17  reporter.  So I'll try my best to let you finish

18  answering a question, and you try your best to let me

19  finish asking the question before you start answering.

20       Does that sound good?

21  A.    That's fine.

22  Q.    And similarly, when your counsel and I have

23  back and forth we'll maintain a professional demeanor

24  and not speak over each other as well.

25       Does that sound good?

9

```
 1   A.       As I would expect it.

 2   Q.       All right.  If you don't understand or can't

 3   hear a question, please just let me know and I'll try my

 4   best, to restate it, have it read back or clarify.  If

 5   at any point today you need a break, feel free to just

 6   let us know.  I only ask that if I'm in the middle of a

 7   question, that you finish answering that question.

 8          If during the deposition you recall something

 9   that changes a previous answer, please let me know.

10   Your counsel may object to certain questions today, if

11   that happens, you should still do your best to answer my

12   question.  If you're instructed by your counsel not to

13   answer, I will ask you if you choose to take the advice

14   of your counsel, and then that will be up to you.

15          Do you understand?

16   A.       I do.

17   Q.       If I say "debtor", you understand that I'm

18   referring to LTL, correct?

19   A.       I do.

20   Q.       And if I say "LTL I" or "LTL's first

21   bankruptcy", you understand I'm referring to the

22   bankruptcy filed on October 14, 2021, correct?

23   A.       I do.

24   Q.       And if I say "LTL II", you understand I'm

25   referring to the April 4, 2023 bankruptcy filing?
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 12 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

10

1   A.      I do.

2   Q.      And if I refer to "Johnson & Johnson" or "J&J",

3   we can agree that I'm referring to the umbrella or

4   parent corporation, right?

5   A.      I understand that you're referring to Johnson &

6   Johnson, correct.

7   Q.      With that, I think we can get started.  I think

8   at the beginning you said you were in New Jersey; is

9   that correct?

10  A.      That is correct.  I'm in my office.

11  Q.      In your office.  And what city and state do you

12  live in, Mr. Dickinson?

13  A.      I live in Pennsylvania.

14  Q.      Is that Newtown, Pennsylvania?

15  A.      That is Newtown, Pennsylvania, correct.

16  Q.      Is there anyone else present in the room with

17  you this afternoon?

18  A.      No.

19  Q.      Is your -- do you have your phone in your

20  pocket or on your desk?

21  A.      It's on my desk.

22  Q.      I just ask that you not review any e-mails or

23  text regarding today's deposition, during today's

24  deposition.  Does that sound good?

25  A.      That sounds good.

11

```
 1   Q.     Do you have any documents with you on your

 2   desk?

 3   A.     I do not.

 4   Q.     All right.  So let's talk about what you did in

 5   preparation for today.  Did you have any meetings in

 6   preparation for today?

 7   A.     I met with a few lawyers.

 8   Q.     How many lawyers?

 9   A.     Roughly two, Jim Jones and John Kim.

10   Q.     How many times did you meet with them?

11   A.     Just a few hours.

12   Q.     Was that one meeting or was that a few hours

13   over several meetings?

14   A.     I wouldn't characterize it as several meetings.

15   It was a meeting and a few minutes.

16   Q.     Was anyone else there?

17   A.     Dan Prieto was at the first 10 minutes of the

18   first meeting.

19   Q.     Was anyone else supposed to be at the meeting

20   that was not there?

21   A.     I don't think so.

22   Q.     Okay.  Did you review any documents in

23   preparation for today's deposition?

24   A.     I did not.

25   Q.     I'm sorry, you said I did not?
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 14 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

12

1   A.      I did not.  I have a general recollection of

2   documents.

3   Q.      So you're saying you didn't review any because

4   you have a general recollection of the documents?

5   A.      That's correct.

6               MR. BENSON:  Okay.  Bear with me for

7           one moment.

8               MR. JONES:  While you're taking a

9           pause, let me just do something before I

10          forget, which is, we're going to designate the

11          record provisionally confidential pursuant to

12          the protective order.  Five days after we

13          receive the final, we will revise that

14          designation and I would imagine get it back

15          considerably.

16              So that's first.  And second, as Lydell

17          you know, Mr. Dickinson sat for a deposition

18          for the preliminary injunction proceeding.  We

19          do not expect today's deposition to be

20          repetitive of the examination conducted in that

21          first deposition and we'll object to the extent

22          it is.

23              MR. BENSON:  All right, your objections

24          will be noted.

25   BY MR. BENSON:

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 15 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

13

1    Q.       Mr. Dickinson, can you think of any reason why

2    you would be unavailable to testify at the upcoming

3    motion to dismiss hearing scheduled for June 26th to

4    June 30th?

5    A.       I haven't been given any dates or timeframe, so

6    I can't answer that at this point.

7    Q.       Okay.  Do you have any plans scheduled for June

8    26th?

9    A.       Not that I know of, but -- not that I know of.

10   Q.       What about the remainder of that week, do you

11   have any plans to be traveling, to be out of the country

12   or anything during that week?

13   A.       I don't believe so.

14   Q.       Other than conversations you've had with

15   counsel, who else did you have conversations with

16   regarding today's deposition?

17   A.       No other person.

18   Q.       Have you spoken with any other LTL officer

19   about your deposition in connection with this matter?

20   A.       I did not.

21   Q.       But you mentioned earlier, you spoke with

22   Mr. Kim, right?

23   A.       That is correct.

24   Q.       Okay.  So you didn't speak with Mr. Deyo?

25   A.       I did not.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 16 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

14

1   Q.      Or Mr. Wuesthoff?

2   A.      Mr. Wuesthoff only in the conversation whether

3   he was back in New Jersey, but not about the deposition

4   or any other --

5   Q.      Can you think of any reason why any officer of

6   LTL would be unavailable to testify at the motion to

7   dismiss hearing schedule from June 26th to June 30th?

8   A.      I can only speak for myself.

9   Q.      Okay.  In preparation for today, did you read

10  any deposition transcripts?

11  A.      I had my deposition transcript and I breezed

12  through it when it was sent, but I didn't review it.

13  Q.      Okay.  Did you read any other deposition

14  transcripts other than your own?

15  A.      I did not.

16  Q.      Did you listen or watch any depositions?

17  A.      I did not.

18                  MR. BENSON:  Can we pull up Tab 1.

19                  Caylob are you able to pull up Tab 1

20          for the folks here on Zoom?

21                  EXHIBIT TECH:  Yes, I will.  Just give

22          me one minute here.

23                  MR. BENSON:  All right, thank you.

24                  (Whereupon, the LinkedIn Page of

25          Richard Dickinson was marked as Dickinson

                                                                    15

1              Exhibit 1, for identification, as of this

2         date.)

3    Q.     Mr. Dickinson, can you see this?

4    A.     I do.

5    Q.     Okay.  It's actually missing your picture, but

6    can you take a moment just to look through this and let

7    me know after you've had a chance to look at it.  I

8    think Caylob is going to drop it in the chat, so you

9    have access to.

10   A.     If it can get scrolled up, that would be --

11              MR. BENSON:  Yeah, Caylob, thank you.

12              MR. JONES:  Are you going to mark this

13        as an exhibit?

14              MR. BENSON:  I will.  Yep.  This will

15        be marked as Dickinson Exhibit 1.

16   Q.     Have you fully reviewed the Exhibit,

17   Mr. Dickinson?

18   A.     I haven't read every word, but it appears that

19   it's from my LinkedIn account so --

20   Q.     All right.  Do you manage your LinkedIn

21   yourself?

22   A.     Yes, I'm not very active on it.

23              MR. BENSON:  Okay.  Caylob can you just

24        scroll down a little bit.

25   Q.     Mr. Dickinson, you worked at Xerox Corporation

16

1    before you were at Aventis, right?

2    A.    I did.

3    Q.    Is there any reason that's not listed on your

4    LinkedIn?

5    A.    It was a short period of time, that's all.

6    Q.    When you were at Xerox, what were your job

7    duties?

8    A.    Just financial analyst.

9    Q.    Did you have any leadership roles at Xerox?

10   A.    Not in particular, no.

11   Q.    While you were there, did you gain any

12   experience resolving talc claims?

13   A.    No.

14   (Reporter clarification)

15   Q.    Did you oversee the operation of any Xerox

16   subsidiaries?

17   A.    I did not.

18   Q.    While you were there, were you involved with

19   managing any revenue streams?

20   A.    It's been a long time ago, I don't recall.

21   Q.    Then you were at Aventis, you joined Aventis in

22   1991 it looks like, right?

23   A.    That is correct.

24   Q.    And you were there for almost 10 years?

25   A.    I was.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 19 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

17

1   Q.      What was your title when you were at Aventis?

2   A.      I held various titles.  I was senior financial

3   analyst, senior financial director.  I'd have to go back

4   and look at the exact titles, but it was mostly in

5   finance and performance measurement.

6   Q.      Okay.  While you were at Aventis, did you have

7   any experience managing talc-related claims?

8   A.      I did not.

9   Q.      Did you have any experience overseeing the

10  operation of any of its subsidiaries?

11  A.      Other than the North America commercial

12  operations.

13  Q.      And what role did you play with respect to

14  that?

15  A.      I was the senior finance director responsible

16  for the financial operations.

17  Q.      Were you involved -- while you were at Aventis,

18  were you involved with any -- managing any revenue

19  streams?

20  A.      Managing revenue streams or I would say I would

21  report it -- report it -- reported on it and analyzed

22  it.

23  Q.      Did you gain any experience managing

24  third-party sales of products while at Aventis?

25  A.      Yes, I was performance measurement manager for

18

1   a short period of time which is in the contract

2   operations group.

3   Q.      What was the nature of your departure from

4   Aventis?

5   A.      They were moving operations and I didn't want

6   to move.  I was adopting my second child, so I didn't

7   think it was fair to my second child, so I didn't move.

8   Q.      And then you joined ETHICON?

9   A.      I joined Johnson & Johnson Ortho-Clinical

10  Diagnostics.

11  Q.      And what was that interview and hiring process

12  like when you joined Ortho-Clinical Diagnostics?

13  A.      It was a normal interview process.  I

14  interviewed.  They sufficiently liked my background and

15  what I could bring to the table and they hired me.

16  Q.      Do you recall how long your interview was?

17  A.      I do not.

18  Q.      Do you recall if your interview was in person

19  or over the phone?

20  A.      It was in person.

21  Q.      Do you recall how long after the interview, you

22  received the offer for the job?

23  A.      Within a few days.

24  Q.      And while you were at Ortho actually --strike

25  that.

                                                                          19

1          While you were at Ortho did you gain any

2    experience with talc-related claims?

3    A.        I did not.

4    Q.        Did you oversee the operation of any Ortho

5    subsidiaries?

6    A.        No, just their main operations.

7    Q.        So you also weren't involved with managing any

8    revenue streams while you were there?

9    A.        Once again, I reported and analyzed on revenue

10   streams, but I wasn't, as you described or maybe

11   intended, responsible for it.

12   Q.        And how would you categorize your time at J&J

13   Ortho-Clinical Diagnostics?

14   A.        It was a great time.  I enjoyed learning about

15   the business.  I put my heart and soul into it.  And,

16   you know, I think Ortho-Clinical Diagnostics was a

17   better place from when I started.

18   Q.        What was the nature of your departure from

19   Ortho?

20   A.        I was promoted to a role within corporate

21   franchise management on the finance side.

22   Q.        But still at the same company?

23   A.        They were reported into Medical Devices and

24   Diagnostics.

25   Q.        And Medical Devices and Diagnostics, that's

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 22 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

20

1   also under the J&J umbrella?

2   A.      That is correct.

3   Q.      Do you recall the interview and hiring process

4   at this job?

5   A.      I do, it was -- it was -- started with a phone

6   call then it was a quick lunch.  And then at the end of

7   lunch, I think it was hey, we -- we think you'd be good

8   for the role.

9   Q.      And who was that that you had the call with and

10  the lunch and then received the offer from?

11  A.      I believe it was Dominic Caruso.

12  Q.      Caruso.  It was just Dominic, no one else?

13  A.      I believe so.

14  Q.      While you were at Medical Devices, did your

15  time there overlap with the company considering

16  bankruptcy?

17  A.      It did not have nothing to do with it.

18  Q.      What about talc-related claims, did you deal

19  about that while at Medical Devices?

20  A.      I did not.

21  Q.      What about overseeing any subsidiaries while

22  you were there, did you do that?

23  A.      No.

24  Q.      Were you involved with managing any revenue

25  streams while you were there?

21

1    A.      Once again, I analyzed and reported on it, but

2    not managing it.

3    Q.      Did you gain any experience managing

4    third-party sales of products while you were at Ortho or

5    Medical Devices, excuse me?

6    A.      Mr. Benson, can you clarify what you mean by

7    "third-party sales".

8    Q.      What's your understanding of third-party sales?

9    A.      I asked you the question of what -- you're

10   asking the question about third-party sales.  What is

11   it?

12   Q.      I'm sorry, could you repeat that?

13   A.      I had asked you --

14                   MR. JONES:  Let me interject, Mr.

15           Dickinson.  Lydell the witness does not

16           understand your question and the use of the

17           term "third-party sales".  If you want to

18           define it for him, he'll try to answer.

19   Q.      Okay.  How would you characterize your first

20   stint at Medical Devices, Mr. Dickinson?

21   A.      My first stint or first day?  I wasn't clear on

22   your --

23   Q.      Your overall time there, how would you describe

24   it?

25   A.      My -- it was -- it was great.  I think I put my

Case 23-12825-MBK    Doc 855-12    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
IN RE LTL Management LLC Bankruptcy    Page 24 of 142
Exhibit    Richard Dickinson
Confidential    May 31, 2023

22

1   heart and soul into it and it was better when I left

2   than when I started.

3   Q.     And what was the nature of your departure from

4   Medical Devices?

5   A.     I was promoted into a strategic planning role

6   at ETHICON.

7   Q.     And what is ETHICON?

8   A.     ETHICON is a subsidiary of Johnson & Johnson

9   and it's a part of what's now MedTech, but Medical

10  Devices and Diagnostics previously.

11  Q.     Outside of being the strategic planning

12  director there, did you have any leadership roles?

13  A.     I led the -- I began after a short period of

14  time leading the divestitures for ETHICON and Medical

15  Devices and Diagnostics.

16  Q.     What did you do in that role with divestitures?

17  A.     Any assets that were deemed to be better off in

18  someone else's hands with regard to the future of that

19  business, we explored strategic alternatives for that

20  business.

21              MR. BENSON:  Caylob can you scroll up

22         on the -- one 1.

23  Q.     Did ETHICON ever consider filing for bankruptcy

24  while you were there?

25  A.     Not to my knowledge.

23

1   Q.      While you were there, did you ever have any

2   experiences with talc-related claims?

3   A.      I did not.

4   Q.      Other than, I guess, divestiture, did you

5   oversee any other operation of ETHICON subsidiaries?

6   A.      I did not.

7   Q.      What was the interview process like at ETHICON?

8   A.      It was very similar to the Medical Devices

9   corporate franchise development.  It was a lunch, you

10  know, shortly afterwards, there was hey, we would like

11  to have you in the role.

12  Q.      You said, "shortly after", how shortly after,

13  approximately?

14  A.      Within a day.

15  Q.      Who was that lunch with that you mentioned?

16  A.      I can't remember.  It may have been the CFO at

17  the time.

18  Q.      Who was the CFO at the time?

19  A.      I believe it was Ken Tompkins, but I'm not

20  sure.  I can't say for certain.

21  Q.      Okay.  Did you manage any revenue streams while

22  you were there?

23  A.      I -- well, I was the strategic planning

24  director, so I didn't manage any revenue streams, no.

25  Q.      Okay.  And how would you categorize your time

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 26 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

24

1   at ETHICON?

2   A.      The same throughout, you know, my career at

3   Johnson & Johnson up to that point.  It was great.  It

4   was -- I left it in a better spot than when I started.

5   Q.      I think you said -- you said your time up until

6   that point was great?

7   A.      My time was great.

8   Q.      Okay.  And what was the nature of your

9   departure from ETHICON?

10  A.      Back to -- so Johnson & Johnson, as you know,

11  is -- has multiple segments for the MedTech.  They asked

12  me to lead business development for Medical Devices and

13  Diagnostics at the beginning and eventually it changed

14  to MedTech.

15  Q.      Okay.  Do you recall the interview and hiring

16  process there?

17  A.      It was very similar to starting with a phone

18  call on that one.  It was -- I had performed well with

19  regard to leading business development and divestitures

20  and it was -- hey, we'd like for you to -- you know,

21  there's some bigger business development opportunities,

22  initiatives, that we want to take forward and based on

23  your performance, we think that you'll do well in the

24  role.

25  Q.      So did you have to actually apply for the job?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 27 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

25

1   A.       I did not.

2   Q.       What about ETHICON, did you have to apply for

3   the job there?

4   A.       I don't recall.  It could have been a normal

5   process.  But I don't recall specifically what the

6   process was at that point in time.  But all my jobs,

7   occurred in a very, very, similar way.  It started with

8   a phone call based on my, you know, vast experience,

9   based on, you know, savvy business partner, savvy

10  business person, you know, I was given the opportunity.

11  Q.       And at this point, you're still at Medical

12  Devices, right?  You're back at Medical Devices?

13  A.       MedTech.

14  Q.       In what role again?  The strategic director, is

15  that what you said?

16  A.       Nope, I was the vice president of new business

17  development.  After ETHICON, the vice president of new

18  business development.

19  Q.       At MedTech.  Was MedTech ever considering

20  bankruptcy while you were there?

21  A.       Not to my knowledge.

22  Q.       Did you gain any experience managing

23  talc-related claims while you were there?

24  A.       I did not.

25  Q.       Were you involved with managing any revenue

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 28 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

26

1    streams while you were there?

2    A.      No.

3    Q.      And how would you describe your time overall at

4    MedTech, same as the others?

5    A.      Same as the others.  We were extremely

6    successful with regard to finding strategic alternatives

7    that provided solutions for that business.  And once

8    again every business development opportunity, whether

9    that was acquisitions, divestitures, licenses, left that

10   business in a much better place.

11   Q.      And what was the nature of your departure from

12   MedTech?

13   A.      I assumed the role of chief financial officer

14   back in October of 2021.

15   Q.      So if we've been keeping -- excuse me?

16                   MR. JONES:  Mr. Lydell, for the record,

17           chief financial officer of what enterprise?

18                   THE WITNESS:  Chief financial officer

19           of LTL and Royalty Acquisition Management.

20   Q.      Okay.  So that was -- so you've had five jobs

21   under the Johnson & Johnson umbrella; is that accurate?

22   A.      That is roughly accurate, correct.

23   Q.      And you've been at Johnson & Johnson -- you've

24   been under the Johnson & Johnson umbrella for over 20

25   years, that's right?

27

1    A.       That is correct.

2    Q.       And when was your first day, I guess, at

3    Johnson & Johnson Services, when was that?

4    A.       I don't recall the exact first day, but

5    sometime around October 7th.

6    Q.       So you were employed at Johnson & Johnson

7    services for a week before LTL filed for bankruptcy,

8    right?

9    A.       Yes.  As I have -- Mr. Benson I have given all

10   this information at my very first deposition.  So I

11   defer to that as my memory -- you know, as far as the

12   specifics, the hours, may have faded, but I'll defer to

13   that for the official answer.

14   Q.       Okay.  Now focusing on your time at J&J

15   Services and LTL -- excuse me, just at J&J Services,

16   excluding the work related to LTL, what was your job

17   title at J&J Services?  Was it also just CFO of LTL or

18   something different?

19   A.       Financial officer of LTL and Royalty

20   Acquisition Management.

21   Q.       So with respect to J&J Services, you don't do

22   anything there?  You work primarily -- excuse me, only

23   for LTL Management, right?

24   A.       I am seconded from Johnson & Johnson Services

25   Inc. to LTL.

28

```
 1   Q.      So technically you're employed by J&J Services?

 2               MR. JONES:  Object to the legal

 3           conclusion.

 4               But you can answer as far as you know.

 5   A.      Yes.

 6   Q.      And how did you -- what was the nature of you

 7   being brought on at J&J Services.  Were you sought out

 8   or what happened there?

 9   A.      I'm going to defer back to my previous

10   deposition.  I received a phone call and it went from

11   there.

12   Q.      Were you interviewed on that phone call?

13               MR. JONES:  Object to the extent this

14           was discussed at his prior deposition as the

15           witness has just indicated it was.

16               MR. BENSON:  You can answer,

17           Mr. Dickinson.

18   Q.      Were you interviewed on that phone call?

19   A.      Mr. Benson, with all due respect, I'm going to

20   defer you to my previous testimony under oath with

21   regard to the discussion.  It was a discussion that --

22   with regard to what LTL was about and, you know, the

23   role that they saw me play.

24   Q.      Okay.  Do you know if any other candidates were

25   interviewed for that job?
```

29

```
 1   A.      I do not.

 2   Q.      You mentioned -- you said it was a discussion.

 3   So I just need to ask you a few questions about that.

 4   In that phone call, when you had that discussion, did

 5   you talk about your Chapter 11 experience?

 6   A.      I don't recall what experience I talked about

 7   or what was asked of me specifically on that day.  I'll

 8   defer you to the prior testimony I gave on the -- my

 9   very first deposition.

10   Q.      During that call, did you discuss any

11   experience regarding advising financially distressed

12   companies?

13               MR. JONES:  He's going to have the same

14          answer, Mr. Benson.  He gave his testimony,

15          either in connection with the October '21

16          filing in the deposition there or the PI

17          hearing, most recently.

18               MR. BENSON:  Okay.  You can answer, Mr.

19          Dickinson, if you know the answer.

20   A.      Mr. Benson, I'm going to give you the same

21   answer.  I defer to -- and if you want to pull it up, we

22   can read it together.

23   Q.      So just to confirm, are you saying you're not

24   answering my question?

25   A.      I already answered that same -- very same
```

30

1    question in the very first deposition that I gave.

2              MR. BENSON:  All right.  I'll take that

3         as a yes.  We can pull this document down.

4              Can we pull up Tab 19.  We'll mark that

5         as Dickinson Exhibit 2.

6              (Whereupon, LTL 0030612-13 was marked

7         as Dickinson Exhibit 2, for identification, as

8         of this date.)

9    Q.    Mr. Dickinson, do you see this document?

10   A.    I do.

11   Q.    Do you recognize it?

12   A.    I do.

13   Q.    What is this?

14   A.    This is my offer to join Johnson & Johnson

15   Services Inc. and be seconded to LTL Management LLC and

16   assigned duties of chief financial officer.

17   Q.    Okay.  And what was your understanding of why

18   you were seconded to LTL?

19   A.    My understanding?

20   Q.    Yes.

21   A.    My understanding is to play a role in

22   effectuating a full and final resolution to the talc

23   liabilities that Johnson & Johnson faced while in

24   bankruptcy.

25   Q.    How long is your secondment to LTL, do you

Confidential

31

1   know?

2   A.      For a period of two years is the agreement, I

3   believe.

4   Q.      So as of this October, what happens?  Do you

5   revert back to J&J Services?  What happens?

6   A.      It's a hypothetical, Mr. Benson, I'm not going

7   to get into that.  But I fully plan to see the full and

8   final resolution of all talc-related liabilities for --

9   that takes into consideration current and future

10  claimants.

11  Q.      Is it your understanding that your employment

12  experience aligned with LTL's purpose?

13  A.      I'm not sure of your question.  You stopped

14  asking it.

15  Q.      Well, earlier, I mean, you were talking about

16  why you were seconded to LTL, which was to help

17  effectuate -- and I don't have the realtime here, so I

18  can't --

19  A.      Yeah, effectuate a full and final resolution.

20  Help assist effectuating a full and final resolution to

21  talc-related liabilities.

22  Q.      And based upon your employment experience, do

23  you think it was aligned with LTL's purpose to, as you

24  put, reach a full and final resolution to talc-related

25  liabilities?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 34 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

32

```
 1    A.       I do.

 2    Q.       Why is that?

 3    A.       I have over 30 years of experience.  I'm a fair

 4    senior executive within Johnson & Johnson and I'm an

 5    independent thinker and can decide on the right -- for

 6    my own, you know, with my own thoughts, you know, what's

 7    the right path forward to reach that full and final

 8    resolution.

 9    Q.       Okay.  Since LTL's second bankruptcy, do you

10    still work full-time there?

11                    MR. BENSON:  And you can take this

12         document down.

13    A.       I currently work full-time for Johnson Service

14    Inc. and as the LTL CFO, of course I do.

15    Q.       Okay.  And where are your offices?  Excuse me,

16    you mentioned New Jersey.

17             You work seven days a week?

18    A.       Seven days a week, but I am always -- I pride

19    myself on my work ethic and being thorough with what I

20    do, I have both responsibilities for LTL and RAM, and

21    some weeks vary how much I work, but it's a full-time

22    position.

23    Q.       How many hours would you say you work per week?

24    A.       It varies.  Sometimes it's 40 hours, sometimes

25    it's multiple more hours after that.
```

33

1    Q.        And how is your time accounted for?

2    A.        Whatever is called for on that day.  There are

3    days where LTL is all-consuming where I'm monitoring the

4    cases, we're in board meetings, we're in ad hoc staff

5    meetings.  I'm reading documents.  I'm monitoring the

6    trials that go on.  I'm paying attention to everything

7    on the LTL and on the Royalty Acquisition and Management

8    side.

9            As you know, and you may or may not know, we

10   signed a deal last year with Aseptic and we're managing

11   that transaction and we're continued to explore other

12   opportunities at seven or eight o'clock last night, I

13   was on the phone with Stifel Bank & Trust working on a

14   potential new acquisition, Royalty Acquisition.

15           So in addition to that, I'm responsible for all

16   of the current liabilities, paying bills that run

17   through LTL and ensuring from a compliance standpoint

18   that we're compliant, that the right approvals are in

19   place, that we're not making mistakes, so as I said, it

20   varies, but it depends on the day.

21   Q.        You mentioned there's some days where you're

22   all-consumed monitoring cases.

23           How many cases are you monitoring?

24   A.        Well, I'm speaking about this case.  But -- and

25   this case only.  But I know within the court system

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 36 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

34

1   there are multiple cases or suits that have been filed.

2   So what remains the purpose, the LTL case.

3   Q.      So just to clarify, there are certain days that

4   you spend all day monitoring this case, in particular?

5   A.      I wouldn't say "all day monitoring this case".

6   The times vary.  There are some days that I'm spending

7   all my time on LTL, and there are some days where I'm

8   spending all my time on RAM.  I can't give you an hour

9   to hour breakdown of, you know, what I'm doing with

10  regard to LTL.  Because as you know, the trials in Judge

11  Kaplan's office start at 10, they finish late sometimes,

12  but I'm always monitoring them.

13  Q.      You also mentioned paying for bills that run

14  through LTL.  What bills run through LTL?

15  A.      Any bills that pertain to the bankruptcy

16  process.  So any legal bills that are with bankruptcy,

17  whether it's on the TCC standpoint or that support LTL.

18  Q.      What other bills are you managing or paying

19  that run through LTL?

20  A.      Any bills that relate to Royalty and

21  Acquisition Management.  Any consultant fees that we pay

22  for anybody assisting us.

23  Q.      Okay.  So in addition to legal bills and RAM

24  consulting fees, what other bills are you paying?

25  A.      Any advisors, financial advisors, Alex Partners

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 37 of 142                Richard Dickinson
Exhibit                                                                    May 31, 2023
Confidential

35

1  on the finance side and any other advisors that assist

2  us that are not -- what I wouldn't call legal fees.

3  Q.     So you pay advisors and one of those advisors

4  is Alex Partners.  Any other advisors?

5  A.     I can't -- unless there's a list in front of

6  me, I can't answer that question.

7              MR. JONES:  And it will be publicly

8         available Lydell, he's told you what he knows.

9  Q.     You mentioned paying bills related to RAM

10 consulting.  Can you describe that for me?

11 A.     Any opportunities that we evaluate and we may

12 use Ernst and Young or a law firm until we evaluate the

13 opportunities and if they charge us for those services,

14 we pay those expenses.

15 Q.     What law firms are you paying related to RAM

16 consulting fees?

17 A.     We've been using Goodwin in the past.

18 Q.     Goodwin.  Any others?

19 A.     I don't believe so.

20 Q.     So just so I make sure I have everything, you

21 said you have legal bills that you pay to your lawyers,

22 you have advisory bills that you pay to advisors such as

23 Alex Partners and then you have RAM consulting bills; is

24 that correct?  Is that all your bills?

25 A.     Yes, when you say all the bills, it's a

36

1   significant amount of bills, the process by which you

2   pay bills is a long drawn out process because you have

3   to ensure compliance.  You have to ensure that the court

4   has approved those expenses.  So it's not just open your

5   checkbook and write whatever invoice is sitting on your

6   desk.

7   Q.    What other expenses do you pay that run through

8   LTL?

9                 MR. JONES:  I think that's been asked

10          and answered.

11                MR. BENSON:  You can answer.

12                MR. JONES:  I think the ones he can

13          remember he shared with you.

14  Q.    You can answer Mr. Dickinson, do you know what

15  other expenses you pay?

16  A.    I think I answered that question.

17  Q.    Okay.  How many calls per day do you receive

18  related to LTL business?

19                MR. JONES:  Lydell, this has been quite

20          a while on background.

21                Can you tell us what this has to do

22          with the motion to dismiss, how many calls he

23          receives on a given day on LTL business?

24                MR. BENSON:  No, I don't think we need

25          to get into that on the record.  Maybe we could

                                                                    37

1              talk about that off line,you know, some other

2              time.  But I would just like to continue with

3              this deposition, if that's okay with you.

4                   MR. JONES:  No, the deposition is

5              becoming harassing with that.  It's completely

6              irrelevant.  And we're not going to do that.

7                   This is the second deposition in this

8              second filing.  Now you're asking about how

9              many phone calls he takes in a day.  It has

10             nothing to do with the motion to dismiss that I

11             can see.  Maybe in conferring with you, if you

12             can tell me how many phone calls he takes has

13             some relevance and what it is to the motion to

14             dismiss, that's fine.  But we need to move on.

15    BY MR. BENSON:

16    Q.    Mr. Dickinson, how many employees are on LTL's

17    payroll?

18    A.    LTL's payroll?  The LTL board and -- but the

19    expenses of LTL include individuals that support us

20    through Johnson & Johnson Services, Mr. Kim and others.

21    Q.    Okay.  And you were part of LTL's board that

22    voted to put LTL I into bankruptcy, correct?

23    A.    Back in October 2021, correct.

24    Q.    Mr. Dickinson, other than LTL, do you serve on

25    any other boards?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Exhibit   Page 40 of 142
Confidential

Richard Dickinson
May 31, 2023

38

```
 1   A.      I do not.

 2                   MR. BENSON:  Can we go to Tab 2.  And

 3           this will be marked -- this is the monthly

 4           operating report for the reporting period ended

 5           March 31, 2023, filed on May 1, 2023.  And

 6           we'll mark this as Dickinson Exhibit 3.

 7                   (Whereupon, the Monthly Operating

 8           Report for LTL 3/31/23 was marked as Dickinson

 9           Exhibit 3, for identification, as of this

10           date.)

11                   MR. BENSON:  Caylob can you scroll

12           through the document so Mr. Dickinson can have

13           a look at it?

14   BY MR. BENSON:

15   Q.      All right.  Mr. Dickinson, do you recognize

16   this document?

17   A.      I do.

18   Q.      Can you tell us what this document is?

19   A.      Monthly operating report.

20   Q.      Is this LTL's monthly operating report?

21   A.      Yes.

22   Q.      Is this LTL's most recent operating report?

23   A.      3/31 -- I believe so.  Not exactly sure when

24   the April operating report has been filed and put in the

25   record.
```

39

1          MR. BENSON:  And if we're going by the

2          page numbers at the bottom of the page, can we

3          go to page nine?  Caylob I think -- this might

4          not be the right one -- okay, this is right.

5          I'm sorry.

6    BY MR. BENSON:

7    Q.     Mr. Dickinson, that's your signature above the

8    word signature of responsible party, right?

9    A.     Yes.

10   Q.     And you signed this as of May 1, 2023, in your

11   role as LTL CFO, correct?

12   A.     I did.

13          MR. BENSON:  Okay.  Let's go through

14          this document.  Can we go to page two, Caylob.

15   Q.     Mr. Dickinson, I'd like to direct your

16   attention to part one, which says "cash receipts and

17   disbursements".  Do you see that?  Do you need it blown

18   up Mr. Dickinson?

19   A.     No, can I see it.

20   Q.     Directing your attention to Row A, it says

21   "cash balance at the beginning of the month", right?

22   A.     Yes.

23   Q.     And then the cash balance at the beginning of

24   the month was $15.8 million, right?

25   A.     That is true.

                                                                    40

1    Q.      And then the next Row, Row B, that says "total

2    receipts (net of transfers between accounts)", right?

3    Right, Mr. Dickinson?  Do you see that?

4    A.      Yes, I'm reading the document.

5    Q.      Take your time and read it, let me know when

6    you're ready?

7    A.      I'm ready.

8    Q.      Okay.  So in Row B, that reflects that the

9    total receipts for the current month was $9 million,

10   right?

11              MR. JONES:  Well, it reads in full,

12         "net of transfers between accounts".

13              MR. BENSON:  Total receipts (net of

14         transfers between accounts)", my apologies, was

15         $9 million, right Mr. Dickinson?

16              THE WITNESS:  Yes, I'm reading it.

17              MR. JONES:  In round numbers, let's be

18         accurate.

19   BY MR. BENSON:

20   Q.      Okay and then total receipts (net of transfers

21   between accounts) cumulative was $137.758 million,

22   right?

23   A.      I can read that, right.

24   Q.      So what this means is, as of March 1, 2023, LTL

25   had received $137 million, right?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy    Page 43 of 142          Richard Dickinson
Exhibit
Confidential                                                   May 31, 2023

41

1    A.      Yes.

2    Q.      Who did LTL receive that money from, do you

3    know?

4    A.      There was a -- well, first off, the reason for

5    the money received was to pay our expenses and there was

6    a funding agreement and we received it from Johnson &

7    Johnson Service Inc. or Johnson & Johnson Consumer Inc.

8    and ultimately Johnson & Johnson.

9    Q.      Looking at Row C, "total disbursements (net of

10   transfers between accounts)", the current month for that

11   was $15 million, right?

12   A.      I see that, yes.

13   Q.      And what does that mean?

14   A.      It just means what -- what expenses we had in

15   that month while disbursements were made.

16   Q.      Okay.  And then looking at total disbursements

17   (net of transfers between accounts), cumulative, that

18   was $133 million, right?

19   A.      In rough numbers as Mr. Jones said, yes.

20   Q.      And then looking at Row D, cash balance at the

21   end of month was $10 million?

22   A.      That's correct.

23   Q.      Now I'd like to direct your attention to Part 2

24   which reads Asset and Liability Status".  Do you see

25   that?

42

```
1   A.      I do.

2   Q.      Looking at Row E which reads "total assets",

3   looks like LTL's total assets were over $2 billion,

4   correct?

5   A.      Yes, that's what it reads.

6   Q.      And looking at Row F which reads post-petition

7   payables excluding taxes, that reflects that LTL had $17

8   million, correct, in post-petition payables, excuse me,

9   excluding taxes for 17 million; right?

10  A.      That is right.

11  Q.      All right.  And going down, looking at total

12  liabilities on Row N, which is the sum of rows J, K, L,

13  and M, that reflects that LTL's total liabilities as of

14  the end of March 2023, was only $25 million, right?

15  A.      That's what Row N says, yes.

16  Q.      And turning your attention to the next Row, Row

17  O which reads ending equity/net worth which is the sum

18  of rows E and N, that reflects that as of two months

19  ago, LTL's net worth was over $2 billion, right?

20  A.      That's what Row 0 (sic) would indicate.

21  Q.      Do you have any reason to believe that this is

22  incorrect?

23  A.      The MOR is correct.

24  Q.      I'd like to direct your attention to Part 3,

25  "Assets Sold Or Transferred".  Do you see that?
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 45 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

43

1    A.        I do.

2    Q.        Looking at Row A, that reflects that in the

3    lifetime of LTL, it hasn't sold or transferred any

4    assets, right?

5    A.        When you said Part C, I think you meant Part 3.

6    Q.        I'm sorry, we're looking at Part 3 Assets Sold

7    or Transferred, Row A.

8    A.        Yes, I can it, zero, zero, zero.

9    Q.        Okay.  And that reflects that in LTL's lifetime

10   it has sold zero assets, right?

11   A.        Sure.

12   Q.        Okay.  And if we look at Part 4 which reads

13   "income statement, statement of operations".  Looking at

14   Row F, it says "other expenses".  Do you see that?

15   A.        I do.

16   Q.        And it's negative $9 million, right?

17   A.        Yes.

18   Q.        And this negative $9 million, this is

19   reflective of income to LTL, correct?

20   A.        Well, it's other expenses that were incurred in

21   that month timeframe.

22   Q.        Other expenses were incurred, do you know what

23   those expenses were?

24   A.        It's a plethora of expenses, anything that --

25   legal fees, fees within -- that we received -- any

44

1   services that we received from Johnson & Johnson Service

2   Inc.

3   Q.      Okay.

4   A.      Mr. Benson, let me stop you right there and

5   push back a little bit.  I rely on a significant amount

6   of financial support for this.  So, you know, if you're

7   going to continue to ask me questions with regard to the

8   exact nature of what the break out behind all these, I

9   know generally, but you, you know, we'll need another

10  day to discuss that.

11                  MR. BENSON:  Okay.

12                  MR. JONES:  We've been at it for an

13          hour, is this a good time to take a break?

14                  MR. BENSON:  This is a good time to

15          take the break, we can go off the record.

16                  MR. JONES:  Let's come back at 20

17          after.

18                  MR. BENSON:  Sure, that works.

19                  THE VIDEOGRAPHER:  This ends Unit 1,

20          we're off the record at 2:13.

21      (Whereupon, a short break was taken.)

22                  THE VIDEOGRAPHER:  Stand by, please.

23          This begins Unit 2.  We're on the record at

24          2:27.

25  BY MR. BENSON:

45

1    Q.      Mr. Dickinson, can you hear me?

2    A.      I can, Mr. Benson.

3    Q.      Just reminding you you're still under oath.

4            During the break, did you speak with your

5    counsel?

6    A.      I did not.

7    Q.      I think before we went on the break, we had up

8    what was marked as Dickinson 3 and we were looking at

9    Part 4.  And Dickinson 3 is the monthly operating report

10   for the period ending March 31, 2023.

11           Mr. Dickinson, I'd like to direct your

12   attention to Part 4, the "Income Statement (Statement of

13   Operations)".  Do you see that?

14   A.      I see it.

15   Q.      Looking at Row J, which says, "reorganization

16   items", that reflects that LTL paid over $10 million in

17   reorganization items; is that right?

18   A.      That's what it says, yes.

19   Q.      And do you know what the reorganization items

20   -- what that reflects?

21   A.      Anything that had to do with the bankruptcy

22   process from an expense standpoint.  For details, we

23   would have to have a separate discussion.

24   Q.      You're saying anything that has to do with the

25   bankruptcy filing, is that it?

46

1                   (Whereupon, the record was read by the

2            reporter.)

3    BY MR. BENSON:

4    Q.      Got it thank you.  Okay.  Mr. Dickinson turning

5    your attention to Row K "Profit (loss)" it says, minus

6    $1.4 million.  Do you see that?

7    A.      I do.

8    Q.      And does this mean that the same month that LTL

9    spent 10.6 million on the bankruptcy matter --

10   reorganization items, that it only had a loss of $1.4

11   million?

12   A.      I never would describe anything as "only".  I

13   would just -- redirecting you to Row K, what it says,

14   negative 1.435,472.

15   Q.      Okay.  And LTL cumulatively it had only lost

16   $11.7 million; is that right?

17   A.      Well, there's -- yes, on a cumulative

18   standpoint, on the profit and loss statement.  But there

19   is many more details that go into this, Mr. Benson as

20   you know.

21                   MR. BENSON:  And if you flip, Caylob,

22            if you flip about -- if you scroll a bit, I'll

23            tell you where to stop, it's a page that says

24            "balance sheet".  Keep going.  It's about 14

25            pages.  Okay.  You passed it, I think you

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 49 of 142       Richard Dickinson
Exhibit
Confidential                                                                     May 31, 2023

47

1        passed it, Caylob.  Go up.  Can you zoom out

2        Caylob, so I can see this full page?

3                Yeah, Caylob, actually, can you go down

4        to the page, it will say 5 of 13 at the top.

5        Keep going, this isn't it.  Actually go up, go

6        up, one more.  That's it.  Thank you.

7   BY MR. BENSON:

8   Q.      Okay Mr. Dickinson, can you see that?

9   A.      I can see it.

10  Q.      And this is LTL's balance sheet for the month

11  ending March 31, 2023, right?

12  A.      Yes.

13  Q.      Okay.  And this reflects that LTL's total

14  assets as of October 14, 2021, was $2.37 billion, right?

15  A.      LTL's assets are what's described in the board

16  meeting minutes, which is cash on hand and omission of

17  RAM, 2 million.  As you know, we had to category certain

18  things in any form that I believe the U.S. trustees

19  directed us on.  The 2 million was a starting point with

20  regard to, you know, the floor, if you will, and the

21  down payment from the -- for the proposed settlement

22  within bankruptcy one.

23                MR. JONES:  Mr. Dickinson, you said

24        million, would it be billion.

25                THE WITNESS:  Billion, sorry.

48

1           But I wouldn't describe LTL's assets as

2       over 2 billion, I would describe LTL's assets

3       of 30 million in cash, approximately, and

4       ownership of RAM.

5   Q.      So let me make sure I'm understanding.  Are you

6   saying the document we're looking at that says LTL's

7   total assets as of October 14, 2021, where it says,

8   2,373.13, you're saying that's wrong?

9   A.      I wouldn't say it's wrong.  I would say that

10  the categorization is based on the form and 2 million,

11  as everybody knows, was the initial down payment that

12  showed good faith effort with reaching a settlement

13  within the bankruptcy process.

14  Q.      Okay.  And LTL's total assets as of April 2,

15  2023, was 2.38 billion; is that right?

16  A.      Once again, I'm going to give you the same

17  answer, Mr. Benson.  You're mischaracterizing the assets

18  of 2.  -- roughly 2.4 billion.  The LTL's assets are

19  roughly 30 million in cash at the time of our board

20  meeting and roughly the value of Royalty Acquisition

21  Management.

22  Q.      So are you saying --

23  A.      I understand what the form says, but I'm --

24  LTL's assets are what I described.

25  Q.      And what is your basis for believing that?

                                                                    49

1            MR. JONES:  Sorry, I didn't understand

2        the question.

3   Q.      You said LTL had -- actually -- strike that.

4   You can move on to the next question.  This also

5   reflects that LTL's total liabilities as of October 14th

6   were 8 million, right?

7   A.      Where are you referring to, Mr. Benson.

8   Q.      I'm looking at total liabilities as of October

9   14, 2021, Caylob can you zoom in on that or --

10  A.      Yeah it's 8 million.

11  Q.      And as of -- and LTL's total liabilities as of

12  April 22, 2023, were 25 million?

13           MR. BENSON:  Can we pull up Tab 3,

14       Caylob.  Tab 3 is the monthly operating report

15       for the period ending 2021 and we'll mark this

16       as Dickinson Exhibit 4.

17           (Whereupon, the Monthly Operating

18       Report for LTL 10/31/21 was marked as Dickinson

19       Exhibit 4, for identification, as of this

20       date.)

21           MR. BENSON:  Caylob can you scroll

22       through this so Mr. Dickinson can orient

23       himself with it.

24  Q.      Mr. Dickinson, let us know when you've oriented

25  yourself with the document?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 52 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

50

 1   A.      Sure.  You'll have to speak to put up the exact

 2   slide because this scrolling is -- while I'm not a fast

 3   reader, I'm not a speed reader.

 4                   MR. BENSON:  Caylob can you drop the

 5            document in the chat for Mr. Dickinson, please.

 6            So he can pull it up and read it.

 7                   EXHIBIT TECH:  Yes, all the exhibits

 8            are in the chat already.

 9   BY MR. BENSON:

10   Q.      Okay.  Mr. Dickinson, you can open it in the

11   chat.  Do you see that?

12   A.      I do.

13   Q.      Do you have it open in front of you,

14   Mr. Dickinson?

15   A.      I do not.  I find it easier for just when

16   you're referring to a document, letting me see it.

17   Q.      Okay.  And as the CFO, were you involved in

18   preparing this document?

19   A.      Does this -- can you walk me -- walk up to the

20   beginning of this MOR.

21                   MR. BENSON:  Caylob, can you go to the

22            very top?

23                   THE WITNESS:  Yes, this is a document

24            that I -- any MOR I believe I signed.

25   Q.      Okay.  And were you involved with the

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 53 of 142
Exhibit                                              Richard Dickinson
Confidential                                         May 31, 2023

51

1   preparation of it?

2   A.      Not initially, no.

3   Q.      Who was involved with preparing it before you?

4   A.      Financial partners and their -- you know, I

5   rely on a support team within Johnson & Johnson's

6   Service Inc. or Alex Partners, but I reviewed this

7   document, so your question with regards to prepare

8   versus reviewing.  I certainly reviewed it.

9                   MR. BENSON:  Okay.  Well, let's go to

10          page two, Caylob, if we can, it will read "Part

11          1, cash receipts and disbursements.

12   BY MR. BENSON:

13   Q.      Do you see that, Mr. Dickinson?

14   A.      I do.

15   Q.      Is that big enough for you?

16   A.      Yes.

17   Q.      Okay.  Looking at Row A, that says cash balance

18   at the beginning of month, that reflects that at the

19   beginning of the month, through October 31, 2021, LTL

20   had $6 million?

21   A.      Yes, I recall that.

22   Q.      Okay.  And looking at Row B, total receipts

23   (net of transfers between accounts) for the current

24   month was zero, right?

25   A.      Correct.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 54 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

52

1   Q.      And looking at total receipts (net of transfers

2   between accounts) cumulative, that was also zero, right?

3   A.      Which one are you referring to?

4   Q.      I'm referring to the line that -- we're looking

5   at Row B, total receipts (net of transfers between

6   accounts), cumulative, that's also zero, right?

7   A.      Correct.

8   Q.      Okay.  Meaning as of October 31, 2021, LTL had

9   zero dollars in income, correct?

10  A.      We had a cash balance beginning, yes, it was 6

11  million.

12  Q.      And Row D reflects that the cash balance at the

13  end of the month was 6 million, right?

14  A.      That is correct.

15  Q.      Okay.  Turning your attention to Part 2, Asset

16  and Liability Status, looking at Row E, total assets.

17  Do you see that?

18  A.      Yes, I see Part 2.

19  Q.      Okay.  Do you see where the total assets are

20  reflected as $2.37 billion?

21  A.      Are you referring to --

22  Q.      I'm referring to Row E, total assets.  Do you

23  see that?

24  A.      I do.  I confirm what I'm looking at on the

25  screen, yes.

53

1   Q.      And what you're looking at reflects that LTL's

2   total assets for the current month in the first monthly

3   operating report reflects that it had $2.37 billion in

4   total assets, right?

5   A.      Yes, the total assets of LTL -- once again,

6   this is the form, and 2 billion is the down payment from

7   Johnson & Johnson to show good faith with regard to

8   reaching a full and final settlement.  The pure assets

9   of LTL was the $6 million and 367 million in RAM.  But I

10  understand what it says on this document as the document

11  was the document that we had to fill out.

12                  (Whereupon, the record was read by the

13          reporter.)

14  Q.      And if we look at Row F, Mr. Dickinson,

15  postpetition payables (excluding taxes) that was $2.4

16  million, correct, that's at least according to this

17  document, correct?

18  A.      Correct.

19  Q.      Do you have any insight as to why the

20  postpetition payables (excluding taxes) in LTL's second

21  bankruptcy were roughly eight times this amount?

22  A.      Long period of time and those payables reflect

23  that work done in support of this in bankruptcy I and

24  bankruptcy II.  But as far as the specific details, you

25  know, I'd have to refer to the financial management team

54

1  and the exact details to give you a proper answer.

2  Q.       Okay.  And directing your attention to Row N,

3  total liabilities and it has debt and then it has the

4  sum of rows J, K, L and M, that was $10.7 million, at

5  least according to this document, right?

6  A.       Yes.

7  Q.       And then the next Row, Row O, which reads,

8  "ending equity/net worth" and it has in parentheses (the

9  sums of rows E and N), that reflects in this document

10 that LTL's net worth was $2.4 billion, correct?

11 A.       You keep trying to put LTL into the wording of

12 your question.  Out of that amount, 2 million was the

13 down payment from Johnson & Johnson so good faith as we

14 entered bankruptcy I to reach a full and final

15 settlement, the intention of that.  The remainder of

16 that, of course, is LTL's assets.

17 Q.       I understand that.  But just focus only on this

18 document.  This document reflects that as of 10/31/21,

19 LTL's net worth was $3.64 billion (sic), right?

20 A.       I understand what that Row O says, ending

21 equity/net worth, 2.364 billion.

22 Q.       Directing your attention to Part 3, Assets Sold

23 or Transferred.  Looking at Row A, total cash sales

24 price for assets sold/transferred outside the ordinary

25 course of business.  That was 0 again, right?

55

1   A.      I'm only seeing Row A, it hasn't scrolled up

2   yet, but yes, I see it.

3              MR. BENSON:  Okay.  Thanks Caylob.

4   Q.      Directing your attention to Part 4, Income

5   Statement (Statements of Operations), looking at Row F,

6   other expenses, that reflect that LTL's other expenses

7   at least according to this document, were -- what is

8   that, $5 million, 5,000?

9   A.      I think thousand.

10  Q.      $5,000, okay.  And then looking at Row J,

11  reorganization items, again that says $2.3 million,

12  right?

13  A.      Yes.

14  Q.      Okay.  And then looking at Row K, profit loss,

15  that's negative $2.4 million, right?

16  A.      Yes, I read what it says.

17  Q.      Okay.  And then looking at Part 4.  Or excuse

18  me, looking at part -- if you turn four pages, you'll

19  see LTL balance sheet.

20         Do you see the balance sheet here,

21  Mr. Dickinson?

22  A.      I do.

23  Q.      And this balance sheet, this reflects that

24  LTL's total assets as of October 31, 2021, were $2.37

25  billion?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 58 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

56

1    A.      Are you posing a question there?

2    Q.      Yeah, I'm asking questions of you today,

3    Mr. Dickinson.  So, yes, that is a question.  The

4    question is -- I'll repeat it.

5           This documents reflects that LTL's total assets

6    as of October 31, 2021, were $2.37 billion?

7    A.      Once again, that is what the form says.

8    Just -- I want to be clear, with regard to what the due

9    from parent is with regard to the 2 billion.  The 2

10   billion was a down payment to show good faith to enable

11   while in bankruptcy a full and final resolution for talc

12   claimants.

13   Q.      Okay.  And directing your attention to total

14   liabilities, you see that, where it says that?

15   A.      Yes.

16   Q.      Okay.  This document reflects that as of

17   October 31, 2021, LTL's total liabilities were 10

18   million?

19   A.      I see that.

20              MR. BENSON:  Can we pull up Tab 14.

21              (Whereupon, LTL 0002300-20 was marked

22         as Dickinson Exhibit 5, for identification, as

23         of this date.)

24   Q.      Okay.  Do you see this Mr. Dickinson?

25   A.      I do.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 59 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

57

1   Q.      Do you need to scroll through it so you can

2   orient yourself with it so --

3   A.      If you can point to the specific section that

4   you're going to question on, that would be very helpful,

5   Mr. Benson.

6   Q.      Sure.  Sure thing.  So this is LTL I's Amended

7   and Restated Funding Agreement.  And this is marked as

8   Dickinson number 5.

9           Have you seen this before?

10  A.      I have.

11  Q.      And what is your understanding of what this

12  document is?

13  A.      It's the October 31, 2021 funding agreement.

14              MR. BENSON:  Caylob, if you can flip to

15          the page, I think it's Bate stamped, 2315.

16  Q.      Do you see this -- sorry.  Do you see this

17  Mr. Dickinson?

18  A.      I see what's on the screen, yes, signatures.

19  Q.      And it reads, "in witness whereof, the parties

20  hereto have executed this agreement as of the date first

21  written above".

22          Is that accurate?  Did I read that right?

23  A.      I can confirm what's on the screen, yes.

24  Q.      And then underneath that it says, "Johnson &

25  Johnson a New Jersey corporation as a payor".

                                                                              58

1              Did I read that correctly?

2    A.     That's what it says on the screen, yes.

3    Q.     And it's executed by Michelle Ryan, correct?

4    A.     Correct.

5    Q.     Do you know whether under this funding

6    agreement Johnson & Johnson was liable -- excuse me, was

7    a payor, whether or not there was a confirmed plan?

8                   MR. JONES:  Object to the form of the

9              question.  If you know the answer, sir.  If you

10             know the answer other than what's set forth in

11             the document, Mr. Dickinson, you can answer.

12             If you don't, you don't.

13   A.     So Mr. Benson, can you repeat the question and

14   talk about -- maybe further describe what you mean by

15   "plan".

16   Q.     Sure.  Under the first funding agreement,

17   Johnson & Johnson was listed as a payor, correct?

18   A.     That's what it says, yes.

19   Q.     Is it your understanding that Johnson & Johnson

20   would remain a payor under this first funding agreement

21   whether or not LTL was in bankruptcy?

22                  MR. JONES:  Object to the form of the

23             question.  You may answer if you can,

24             Mr. Dickinson.  If you have an understanding.

25   A.     If you refer to the exact language, that you're

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 61 of 142                    Richard Dickinson
                        Exhibit                                         May 31, 2023
                        Confidential

59

1   trying -- you want me to refer to or look at and

2   confirm, please bring that part of the agreement up.

3   Q.      No, I'm not directing you to any particular

4   portion of the document.  I'm just asking you, what was

5   your understanding of Johnson & Johnson's status as a

6   payor with respect to LTL's being in bankruptcy or not?

7           The question is, was Johnson & Johnson a payor

8   if LTL remained in bankruptcy under the first funding

9   agreement?  Do you know?

10                      MR. JONES:  Object to form of the

11          question.  The same objection.

12  A.      Mr. Benson, I'm asking you a question, if you

13  want to refer to specific language in this document,

14  I'll either confirm or not confirm.

15  Q.      Does that mean you don't know?

16  A.      I have a general understanding, but I want to

17  make sure I give you full and accurate information.

18  Q.      Well, what's your general understanding?

19  A.      The funding agreement, yes.  Is -- was in and

20  out of bankruptcy.

21  Q.      And when you said the funding agreement was in

22  or out of bankruptcy, you mean Johnson & Johnson would

23  remain the payor under the first funding agreement

24  whether or not LTL was in bankruptcy?

25  A.      Mr. Benson, now you're asking for a legal

                                                                60

1    opinion.  I'm going to defer to Mr. Kim and others for

2    the exact legal interpretation of that.

3    Q.      No, Mr. Dickinson.  I'm asking you what was

4    your understanding.  Was it your understanding --

5    A.      I'll --

6    Q.      Excuse me, only one at a time?

7                  MR. JONES:  Gentleman, one at a time.

8            Mr. Benson, you may ask your question again.

9            The witness has told you, he already answered

10           it, if you want to ask it again, he'll tell you

11           the same thing, but if you want to ask it

12           again, he'll tell you the same thing, but let's

13           not talk over each other.

14                 MR. BENSON:  Okay.  Thank you.  I think

15           you're misrepresenting what he said.  He said

16           that he would defer to Mr. Kim.

17   Q.      I'm not asking what Mr. Kim knows, I'm asking

18   what you know.  My question is, not what you've been

19   told by your attorneys.  What is your independent

20   knowledge of Johnson & Johnson's status as a payor?  If

21   LTL was in bankruptcy, was it your understanding that

22   Johnson & Johnson would remain a payor, yes or no?

23                 MR. JONES:  He has already answered

24           that question, and then he deferred to Mr. Kim

25           for any other legal conclusions you wish to

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 63 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

61

```
 1              elicit.  So I object.

 2   A.    I answered that question, Mr. Benson.

 3   Q.    Continuing to read the document, do you see

 4   that where it says, "Johnson and Johnson Consumer Inc. a

 5   New Jersey Corporation, as a payor"?

 6   A.    I do.

 7   Q.    And what was your understanding of Johnson a

 8   Johnson Consumer Inc.'s assets when LTL filed for

 9   bankruptcy the first time?

10              MR. JONES:  Object to the extent it is

11         a memory test at this point.

12   Q.    Rough estimate.

13   A.    I don't know.

14   Q.    So it's your testimony today that you don't

15   know what Johnson and Johnson Consumer Inc. --

16   A.    I --

17   Q.    Let me finish my question.  Is it your

18   testimony today, as the CFO of the debtor, that you

19   don't know what JJCI's assets were when LTL filed for --

20   you don't know roughly what they were when LTL filed for

21   bankruptcy the first time?

22              MR. JONES:  Object to the form of the

23         question.

24              MR. BENSON:  You may answer.

25   A.    It's a memory test.  I don't particularly
```

                                                                62

1   recall.  The exact number wasn't involved in the

2   valuation.

3   Q.    Mr. Dickinson, does JJCI continue to exist

4   operationally?

5              MR. JONES:  Object to the form of the

6        question.

7              MR. BENSON:  You can answer,

8        Mr. Dickinson.

9   A.    That's a better question for the legal team.  I

10  know the agreement LTL has with Holdco and I generally

11  know the split of but it's a better question for the

12  legal team.

13  Q.    And you see here looking at the document, at

14  the bottom, it says LTL Management LLC, a North Carolina

15  limited liability company as the payee.  You see that,

16  right?

17  A.    I do.

18  Q.    And who negotiated the funding agreement on

19  behalf of LTL?

20             MR. JONES:  Object that this was all

21        delve into in the first bankruptcy, and

22        Mr. Dickinson and others were queried about

23        such matters.  If you have a recollection

24        today, Mr. Dickinson, you can share it with

25        him.  But Mr. Benson, we really don't have time

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 65 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

63

1          in this proceeding to be replowing ground that

2          has been plowed sufficiently for many months.

3    A.     I answered that and I defer to my answer in the

4    first deposition.

5    Q.     Okay?  Just before LTL filed its first

6    bankruptcy, was the funding agreement its most valuable

7    asset?

8                    MR. JONES:  Object to the form of the

9          question.

10                   MR. BENSON:  Excuse me, let me

11         rephrase.

12   Q.     After LTL filed for bankruptcy the first time,

13   was the funding agreement its most valuable asset?

14                   MR. JONES:  Same objection.

15   A.     That's a legal interpretation.  I don't believe

16   it's a financial interpretation.

17   Q.     Well, you were the CFO of the company, right?

18   A.     Yeah -- Mr. Benson, with all due respect, I

19   talked to you about the assets of LTL, LTL has cash in

20   the ownership of RAM, we have funding -- we have a

21   funding agreement, and a support agreement in LTL

22   bankruptcy I and we have the terminated oath and put in

23   place, so the assets from an LTL perspective that are

24   important are the cash and Royalty Acquisition and

25   Management.

                                                                    64

1              MR. BENSON:  Okay.  Can we pull up Tab

2        18 which is the Declaration of John Kim in

3        support of the first day pleadings as a part of

4        LTL II.

5              (Whereupon, the Declaration of John K.

6        Kim In Support of First Day Pleadings, 4/4/23

7        was marked as Dickinson Exhibit 6, for

8        identification, as of this date.)

9              MR. BENSON:  And can you just scroll

10       down a little bit Caylob, so that --

11   Q.    Actually, Mr. Dickinson, do you recognize this

12   document or do you need to see more of it?

13   A.    What's the date of this?

14   Q.    The document is dated April 4, 2023?

15   A.    Yes.

16   Q.    Do you recognize this document?

17   A.    I do.

18   Q.    And what is it?

19   A.    A declaration of John K. Kim support of first

20   day pleadings.

21             MR. BENSON:  And Caylob, if you can

22       jump to Annex D, it's about 70 pages in and

23       you'll see that it's entitled Termination and

24       Substitution Agreement.

25   BY MR. BENSON:

                                                                    65

 1   Q.     Mr. Dickinson, do you recognize this?

 2   A.     Generally recall it, yes.

 3   Q.     And what is this?

 4   A.     Termination and substitution agreement.

 5                  MR. BENSON:  And Caylob if you can turn

 6          to page four of this document.

 7                  MR. JONES:  Let me just make sure the

 8          record is clear.  Have we separately marked the

 9          declaration and/or separately marked this

10          agreement?  I'm just trying to make sure I know

11          what to refer to.

12                  MR. BENSON:  We can mark this entire

13          document as Dickinson Exhibit 6.

14                  MR. JONES:  Thank you.

15                  MR. BENSON:  Caylob if you can go back

16          to Annex D, the Termination and Substitution

17          Agreement, if you just scroll a few pages back

18          to that, I can direct you to where I want.

19          Keep going.  Right there.  Perfect.  Thank you.

20   BY MR. BENSON:

21   Q.     Mr. Dickinson, do you see this?

22   A.     I do.

23   Q.     And it looks like Robert Wuesthoff signed this?

24   A.     It does.

25   Q.     He's the LTL president, right?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 68 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

66

1   A.      Yes.

2   Q.      To your knowledge, was Mr. Wuesthoff involved

3   in preparing this document?

4   A.      It's a better question for Mr. Wuesthoff, but

5   not to my knowledge.

6   Q.      To your knowledge, was any LTL officer involved

7   with the creation of this document?

8   A.      Not for the creation, but we certainly -- I --

9   speaking for myself, I read it.  And materials within it

10  that are relevant that are in our -- either our board

11  minutes, the resolutions or the materials we went over

12  in the board minutes, you know, I certainly, you know,

13  have reviewed in detail.

14  Q.      When did you read this for the first time?

15  A.      When I was -- when it was filed or shortly

16  after.

17  Q.      So it's your testimony that your involvement

18  with this document was reading it and you read it

19  shortly after it was filed?

20  A.      Please don't mischaracterize.  Anything that I

21  believe in this document and any relevant, either

22  resolutions or what we discussed as a board or the

23  materials that we went through, we went through prior to

24  Mr. Kim submitting this.  There's nothing in here that

25  was a surprise to me, if that's where you're getting at.

67

1    Q.      Now who negotiated the terms of this document

2    on behalf of the debtor?

3                    MR. JONES:  Object to foundation.

4    A.      It's a better question of declaration of

5    Mr. Kim, I relied on Mr. Kim, you know, as far as the

6    specifics to writing it.  But nothing in here, once

7    again, was a surprise.  And I'm going to refer back to

8    anything that the board decided on has been discussed in

9    the board minutes, resolutions or materials we used.

10   Q.      Okay.  I've noted to ask Mr. Kim about this,

11   and I noted that this was not a surprise to you.

12           But my question is, do you know who negotiated

13   this agreement on behalf of LTL, the debtor in this

14   case?

15   A.      What agreement are you referring to?

16   Q.      The termination and substitution agreement that

17   we're look being at Mr. Dickinson?

18   A.      I thought this was the -- oh, this, no, I don't

19   know who negotiated it.

20   Q.      Before terminating --

21   A.      Certainly reviewed the document.

22   Q.      Okay.  Go it.  Before terminating the first

23   funding agreement, did LTL's board or anyone on the

24   board's behalf attempt to negotiate with Johnson &

25   Johnson in terms of possibly maintaining Johnson &

68

1   Johnson's liability on the second funding agreement?

2                MR. JONES:  Johnson & Johnson's -- what

3        were the last words.

4                (Whereupon, the record was read by the

5        reporter.)

6                MR. BENSON:  I can rephrase it, no

7        worries.

8   Q.    As far as you know, Mr. Dickinson, did LTL

9   attempt to negotiate with Johnson & Johnson the

10  possibility of retaining Johnson & Johnson as a payor

11  under second funding agreement?

12               MR. JONES:  Object to the form.

13  A.    It's a better question for legal

14  representatives, not me.

15  Q.    Noted.  But I want to know what you know.

16  Mr. Dickinson, to the best of your knowledge, what you

17  know, do you know whether or not LTL's board attempted

18  to negotiate with Johnson & Johnson about staying on as

19  a payor after the termination of the first funding

20  agreement?  Do you know or not?

21               MR. JONES:  Object to form.  You may

22       answer, Mr. Dickinson.

23  A.    Well, I'm part of the board and we didn't

24  negotiate specifically as a board with Johnson &

25  Johnson.

69

1    Q.      Do you know if anyone negotiated on behalf of

2    the board?

3    A.      It's a better question for Mr. Kim.  I do not

4    know.  I don't believe so.

5    Q.      Before LTL terminated the first funding

6    agreement, did it concern you that under the second

7    funding agreement, Johnson & Johnson would no longer be

8    listed as a payor?

9                    MR. JONES:  Object to form.

10   A.      I had no concern with regard to the second --

11   termination of the first funding agreement and the

12   creation of the second funding agreement.  The second

13   funding agreement met all of our objectives to reach

14   while in bankruptcy a fair and equitable resolution as

15   represented by the significant $8.89 billion plan

16   settlement.

17   Q.      Let's take a step back, you said "all of our

18   objectives".  When you say "our", who are you referring

19   to?

20   A.      LTL's board.

21   Q.      Okay.  And when you refer to "all of our

22   objectives", what objectives are you referring to?

23   A.      Very simple to a reach a full and final

24   resolution for all talc claimants current and into the

25   future.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 72 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

70

1    Q.     So just those two objectives?

2    A.     And to mitigate the, you know, substantial risk

3    that was brought forward by the third circuit's ruling

4    that the enforceability on the agreement one, was

5    unenforceable.

6    Q.     Okay.  Any other objectives?

7    A.     I think to ensure that the planned support

8    agreement put in place would, you know, have the funds

9    necessary to settle, to ensure that that occurred in a

10   timely manner.

11   Q.     Okay.  Do you know if any of LTL's creditors

12   were notified before the termination of the first

13   funding agreement?

14   A.     It's a better question for Mr. Kim and the

15   legal team.

16   Q.     Okay.  I've noted that.  For purposes of this

17   deposition, I'm asking you if you know, do you know

18   Richard Dickinson, do you know, whether LTL's creditors

19   were notified before the first funding agreement was

20   terminated?

21   A.     It's a better question for Mr. Kim and if I

22   gave it to you, it would be incomplete and I want to be

23   respectful to you Mr. Benson giving you best possible

24   answer.  So I am going to refer you to Mr. Kim.

25   Q.     Does that mean you don't know if the creditors

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 73 of 142                    Richard Dickinson
                        Exhibit                                        May 31, 2023
                       Confidential

                                                                           71

1  were notified?

2  A.    Mr. Benson, I think I've answered that question

3  that it's a better question for Mr. Kim and the legal

4  team.

5  Q.    Before terminating the first funding agreement,

6  and refiling for bankruptcy, what alternatives did the

7  board actively hear about?

8              MR. JONES:  Objection.  Mr. Dickinson

9         was examine in most recent PI preliminary

10        injunction deposition on the board minutes and

11        presentations in the run up to the second

12        filing and examined -- and within those

13        whatever options, discussion were had, are

14        reflected.  This is repetitive.

15  A.    I confer with that.  We addressed that in the

16  deposition we had several weeks ago.  And I defer once

17  again to the board minutes, the resolutions, the why and

18  the what and the materials that were presented.

19              MR. BENSON:  Okay.  Caylob, if you

20        could scroll four or five pages you should see

21        a page that says funding agreement.

22  Q.    Mr. Dickinson do you see this?

23  A.    I do.

24  Q.    Have you seen this before?

25  A.    I have.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 74 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

72

```
 1   Q.      And what is your understanding of this

 2   document?

 3                   MR. JONES:  Objection to the form of

 4           the question.  But you can answer to the extent

 5           you understand it.

 6   A.      It's a funding agreement, you know, with

 7   Johnson & Johnson and Holdco and the support that

 8   Johnson & Johnson would give, that's the support

 9   agreement, if Holdco is not able to satisfy its

10   obligations to LTL while in bankruptcy.

11                   MR. BENSON:  Caylob, can could you

12           scroll to the page, it will be 13 of 18.

13   Q.      Do you see this Mr. Dickinson?

14   A.      I do.

15   Q.      Glance at this page let me know -- is it

16   correct that according to this page, Johnson & Johnson

17   the umbrella company is no longer listed as a payor?

18   A.      That is true.

19   Q.      Is it also accurate that JJCI is no longer

20   listed as a payor?

21   A.      Mr. Benson, I think you can read this as well

22   as I can, that it says, Johnson & Johnson Holdco.

23   Q.      All right.  Do you know what the value of

24   Holdco's assets were as of the date of this filing

25   roughly?
```

73

1    MR. JONES:  Object to form.

2    A.    I'll defer to the page, I believe it's page

3    nine of our April 2nd, board meeting presentation and

4    assets are roughly 29 million.

5    (Reporter Clarification)

6    Q.    Mr. Dickinson, what's your independent

7    understanding of Holdco's liquidity?

8                    MR. JONES:  Object to form.  You may

9          answer.

10   A.    It's a challenge from a liquidity standpoint,

11   you know, there's governance risk, taxation risks with

12   regard to liquidating the assets.  We are absolutely

13   solvent with regard to -- we're able to pay our

14   foreseeable bills, but from a financial distress

15   standpoint, Holdco is in financial distress.  LTL and

16   Holdco is in financial distress.

17                    MR. BENSON:  Okay.  I would like to

18          pull up Tab 8, which is the presentation to the

19          board of managers of LTL.  Dated March 28,

20          2023.

21                    THE WITNESS:  Mr. Benson, do you mind

22          if we take a short break.

23                    MR. BENSON:  Sure.  How about five

24          minutes, does that work?

25                    THE WITNESS:  It works.

                                                                    74

 1              MR. BENSON:  All right, thank you.

 2              THE VIDEOGRAPHER:  This ends Unit 2,

 3       we're off the record at 3:15.

 4              THE VIDEOGRAPHER:  Stand by, please.

 5       This begins Unit 3, we're on the record at

 6       3:22.

 7  BY MR. BENSON:

 8  Q.      All right.  Mr. Dickinson, just reminding you,

 9  you're still understand oath.  Did you speak to your

10  counsel during the break?

11  A.      I did not.

12  Q.      I think we were at what was introduced as Tab 8

13  and marked as Dickinson Exhibit 7.

14          And you've seen this before, Mr. Dickinson?

15  A.      I have.

16              (Whereupon, LTLMGMT-00000233-59 was

17       marked as Dickinson Exhibit 7, for

18       identification, as of this date.)

19              MR. JONES:  Let me interject.

20       Mr. Benson, he not only has seen it, he saw it

21       in the deposition you took of him on April

22       17th.  It was marked by you, an Exhibit 6 to

23       that deposition, page 63 of the transcript.

24       And unless there are brand new questions here,

25       this will be repetitive as somewhat much of the

75

1          deposition has been today.  This is an order on

2          harassing and at some point we're going to have

3          to terminate the deposition if it continues.

4                    MR. BENSON:  All right, Caylob, can you

5          go to page 24 of this document.

6     BY MR. BENSON:

7     Q.     Mr. Dickinson, do you see this?

8     A.     I do.

9     Q.     Okay.  And do you see where it states that the

10    estimated value of LTL's cash assets was $30 million?

11    A.     I do.  I do.

12    Q.     And do you see where it says that the estimated

13    value of LTL's ownership in RAM was $367 plus million?

14    A.     I do.

15    Q.     And you also see where it says the estimated

16    value of Holdco's assets cash was 400 million, right?

17    A.     Yes.

18    Q.     And the estimate value of hold co's cash was

19    400 million, right?

20    A.     Yes.

21    Q.     Okay.  Speaking of estimates, what's the rough

22    estimate of the dollar amount of LTL's top liability?

23                    MR. JONES:  Object to form and

24          foundation.  It presumes that Mr. Dickinson is

25          aware of one.

                                                                            76

1   A.      I am not aware of one, never seen one in

2   writing.

3   Q.      Have you asked for one in writing?

4   A.      I have not.  I understand what the plan support

5   agreement of 8.9 billion states within the bankruptcy

6   process, bankruptcy II process that we've proposed.  But

7   I haven't seen a written document of -- outside of that,

8   of any talc liabilities.

9   Q.      Do you know how many talc claimants LTL had in

10  its first bankruptcy?

11  A.      I'll defer to my first deposition, but I recall

12  it was, you know, somewhere in the 38 to 40,000 range.

13  Q.      Okay.  And do you know how many new claimants

14  were identified after the first -- after the second

15  bankruptcy filing?

16  A.      It's a better question for the legal team and

17  others.  I've heard north of 80,000.

18  Q.      And do you know if any analysis or

19  investigation was done to determine the voracity of

20  those new claims?

21  A.      Better question for someone other than me.  No.

22  Q.      Okay.  Has anyone -- do you know if anyone on

23  LTL's board has requested a written analysis to

24  determine the voracity of those new claims?

25  A.      I do not.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 79 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

77

1   Q.      Do you know, as of, you know, to date, how many

2   talc claimants have been paid by LTL with respect to the

3   talc injuries?

4   A.      I do not.

5   Q.      Do you know or have a rough estimate of when

6   LTL will be required to make a payment to talc

7   claimants?

8                   MR. JONES:  Object to the form of the

9           question.  You mean in LTL II's bankruptcy?

10                  MR. BENSON:  Yes.

11                  MR. JONES:  In the LTL II bankruptcy,

12          forgive me.

13                  MR. BENSON:  Yes.

14                  THE WITNESS:  Are you specifically

15          referring to the plan support agreement?

16  Q.      No, not -- excuse me.  Not in the bankruptcy.

17  What I'm asking about is more in line with forward

18  looking projections.

19          At what point outside the bankruptcy would LTL

20  be required to make its first payment to a talc

21  claimant?

22                  MR. JONES:  Object to the form of the

23          question.  I do not understand it.

24  A.      One I don't understand your question,

25  Mr. Benson, and two I'm not the right person to ask.

78

1    Q.      Have any future or forward looking projections

2    been done regarding LTL's making any payments to talc

3    claimants?

4    A.      I have not seen anything in writing.

5                    MR. JONES:  Object to the form of the

6            question.

7    Q.      Have you asked for any projections in writing?

8    A.      I think I answered that question, no.

9                    MR. BENSON:  Can we pull up Tab 12

10           which is the Chapter 11 Plan of Reorganization

11           of LTL filed on May 15, 2023.  We can mark this

12           as Dickinson Exhibit 8.

13                   Can you scroll down so Mr. Dickinson

14           can see the rest of the document.

15                   (Whereupon, the Chapter 11 Plan of

16           Reorganization of LTL Management LLC 5/15/23

17           was marked as Dickinson Exhibit 8, for

18           identification, as of this date.)

19   BY MR. BENSON:

20   Q.      Have you seen this before, Mr. Dickinson?

21   A.      Can you go back to the very top?  I believe I

22   have, yes.

23                   MR. BENSON:  Using the numbers at the

24           bottom, Caylob, can you go to page 24.

25   Q.      Okay perfect.  Do you see this Mr. Dickinson,

Case 23-12825-MBK    Doc 855-12    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
IN RE LTL Management LLC Bankruptcy      Page 81 of 142              Richard Dickinson
                                    Exhibit                          May 31, 2023
                                  Confidential

                                                                          79

1  this page?

2  A.      I see what's on the screen, yes.

3  Q.      Okay.  Can you take a second to read 3.2 and

4  let me know when you're done.

5  A.      If you can bring it up a little bit.  I can

6  only see 3.1.

7  Q.      There it is, you have it.  Can you see it now,

8  Mr. Dickinson?

9  A.      I do.

10 Q.      Can you read it and let me know when you're

11 done.

12 A.      Once again, I can only see what's on page 24.

13 Q.      Yeah, that's exactly right.  3.2, can you read

14 that?  Just read that paragraph right there, that's on

15 your screen.  Do you see it?

16 A.      Yep, I'm reading it.  Yes.

17 Q.      What is your understanding of what this means?

18         MR. JONES:  Object to the form of the

19         question.  It's a legal document.

20 A.      Mr. Benson, it's a legal document.  I'm not a

21 lawyer, I'm not going to propose that I understand what

22 the document completely says, it's a better question for

23 Mr. Kim and others.

24 Q.      Do you have an -- independent of any

25 attorney/client communications, do you have an

80

1    independent understanding of this paragraph?

2              MR. JONES:  Asked and answered.

3              MR. BENSON:  You can answer

4         Mr. Dickinson.

5    A.    You asked me the question earlier, and I'm

6    going to defer to Mr. Kim and others who will give you a

7    much clearer better answer than me.

8    Q.    Does that mean you don't know?

9    A.    I think you mischaracterized what I just said.

10   I think the better person to address is Mr. Kim and

11   others.

12   Q.    I appreciate you letting me know who a better

13   person to ask this question --

14   A.    Mr. --

15   Q.    Only one person at a time, Mr. Dickinson.  I

16   appreciate that Mr. Kim might be a better person to ask

17   and that he might know more about this than you do.  But

18   my question to you is, what is your -- independent of

19   any legal counsel, what is your understanding?  We're

20   looking at LTL's Chapter 11 Plan of Reorganization where

21   you are the CFO.

22         What is your independent understanding of this

23   paragraph?  Do you have one or not?

24              MR. JONES:  Object to form.

25              You may answer.

81

```
 1   A.      I understand what it says on the document and
 2   I'll let you read, and I'll defer to what is on the
 3   document, but as far as the legal interpretation or even
 4   any interpretation, it's a better question for Mr. Kim
 5   and others.  I can read exactly what's on the document,
 6   and if you want me to do that, I can do that.  I have a
 7   general understanding of what I'm reading.  But the
 8   question is better posed for Mr. Kim and others.
 9                    MR. BENSON:  Can we scroll down to the
10          top of page 25.
11   Q.      Looking at class four, Mr. Dickinson, do you
12   see that?
13   A.      Yes.
14   Q.      And do you see top personal injury claims for
15   class four designations?
16   A.      Yes.
17   Q.      And do you see where, on the right-hand side
18   under estimated recovery for talc personal injury
19   claims, it says estimated recovery 100 percent?
20   A.      I do.
21   Q.      What is your independent understanding of what
22   that means?
23                    MR. JONES:  Object as asked and
24          answered.  You don't need to answer it again.
25          You told him what you know about this
```

82

1    paragraph.  Please move on, Mr. Benson.

2            MR. RUCKDESCHEL:   This is Jon

3    Ruckdeschel, I object to your consistent

4    speaking objections and coaching the witness

5    that repeatedly has just repeated your words

6    when you have given such coaching instructions.

7    It's improper.  Make your objections without

8    coaching the witness, please.

9            MR. JONES:  I'm not going to engage

10   Jon.

11           MR. BENSON:  Mr. Jones, are you

12   instructing Mr. Dickinson not to answer my

13   question?

14           MR. JONES:  He can answer it one more

15   time.  Please, Mr. Dickinson, tell him your

16   answer one more time.

17           THE WITNESS:  I can read what's on the

18   document that is in front of me, Mr. Benson

19   with all due respect.  What I'll defer to with

20   regard to the legal interpretation is Mr. Kim

21   and others, such as the Jones Day team.  That's

22   the best answer I can give you.  I want to be

23   able to give you an honest answer here.

24           I'm not following anybody's advice.

25   I'm following my own answer, you know

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 85 of 142

Exhibit
Confidential

Richard Dickinson
May 31, 2023

83

1          prerogative on this one.

2                    MR. BENSON:  Okay.  Caylob, can you

3          pull up, I think, Dickinson Exhibit 7.  I think

4          we already introduced this one, I think it was

5          introduced as Tab 8, maybe.

6                    Perfect.  Could you go to page 26.

7    BY MR. BENSON:

8    Q.     All right, do you see this, Mr. Dickinson?

9    A.     I do.

10   Q.     Where it says Financial Considerations

11   Near-Term and Long-Term Liquidity?  We're on the same

12   page?

13   A.     Yes.

14   Q.     And do you see that that first bullet there, it

15   suggests that cash at LTL and Holdco was $430 million?

16   Do you see that?

17   A.     I do.

18   Q.     And underneath that, it say, RAM -- the annual

19   earnings at RAM is $75 million.  Do you see that?

20   A.     I do.

21   Q.     And according to this, Holdco would largely be

22   dependent on -- looking at bullet 3, "Holdco would

23   largely be dependent on dividends to fund amounts due

24   under modified funding arrangements".  Do you see that?

25   A.     I do.

84

1    Q.      Do you have any reason to dispute that?

2    A.      I do not.

3    Q.      Okay.  And looking down at, I guess, what is

4    that?  Is that bullet seven starting "but dividend".  It

5    says "but dividend flow is subject to potential risks".

6            That's what you were referring to earlier?

7    A.      Yes, I was referencing second sub-bullet

8    governance and the third one, tax risk.

9    Q.      And the fourth bullet there, it says, and more

10   than 90 percent of future dividends expected to come

11   from GH Biotech -- bear with me a second.

12   A.      It's a second sub-bullet under your third

13   bullet.

14   Q.      Right.  Do you have any reason to disagree with

15   that?

16   A.      I do not.

17   Q.      Did these risks that you see on the screen now,

18   did they exist under the first funding agreement?

19                   MR. JONES:  Object to the form of the

20            question and the foundation.

21   A.      It didn't matter with regard to -- this is what

22   assets and we have and the operations of Holdco we have

23   in front of us in the second bankruptcy case.

24   Q.      Okay.  So let me just clarify.  Under the

25   second funding agreement, Holdco is now the payor,

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 87 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

85

 1 | correct?

 2 | A.      I think we established that earlier, yes.

 3 | Q.      And Holdco is the payor in place -- replaced,

 4 | if you will, Johnson & Johnson and JJCI, right?

 5 |                 MR. JONES:  Object to the form of the

 6 |             question.  Object to the form of the question.

 7 | A.      Holdco is the payor currently, correct.

 8 | Q.      Under the first funding agreement, was there a

 9 | risk of dividend flow from either JJCI or Johnson &

10 | Johnson as payor?

11 |                 MR. JONES:  Object to form and

12 |             foundation.

13 |                 MR. BENSON:  You can answer,

14 |             Mr. Dickinson.

15 | A.      I can't speak to what risks were associated

16 | with those payors at that point in time.  The -- just to

17 | be clear, this funding arrangement and support

18 | arrangement with Johnson & Johnson satisfies our

19 | intended purposes of being in bankruptcy, which is to

20 | offer a fair and full final settlement which is

21 | evidenced by the $8.9 billion and support agreement.

22 | Q.      Just so I'm clear, I'll go one by one, so under

23 | the first funding agreement, yes or no, was there a

24 | dividend risk?

25 |                 MR. JONES:  Object to form.  And he

86

1          doesn't have to limit his answer to yes or no.

2          If you know the answer, you can tell him.

3   A.     I don't know.

4   Q.     Do you know whether or not there was a

5   governance or treasury risk?

6   A.     I can't speak to the first funding agreement, I

7   understood what the first funding agreement did.  The

8   third circuit ruling frustrated the purpose to that with

9   regard to the funding agreement.  And my concern is and

10  why I voted on it is the second funding agreement, which

11  addresses the third circuit ruling and satisfies all of

12  our objectives, which is once again to offer a -- once

13  and for all to provide a full and final solution to

14  claimants both current and future.

15  Q.     Okay.  Under the first funding agreement, do

16  you know whether or not statutory and tax risks were

17  involved or not?

18               MR. JONES:  Object to the form of the

19          question.

20  A.     Mr. Dickinson you keep referring to the first

21  funding agreement.  The enforceability based on legal

22  counsel and my own review of what they said was

23  unenforceable and it makes no difference in this.  The

24  value, the -- the first funding agreement and the value

25  of the second funding agreement is the same.  It's the

87

1    talc liabilities minus LTL assets.

2              MR. BENSON:  Okay.  Can we go to Tab 9,

3         which is the presentation to LTL's board of

4         managers dated April 2nd.

5              (Whereupon, LTLMGMT-00002668-79 was

6         marked as Dickinson Exhibit 9, for

7         identification, as of this date.)

8              MR. JONES:  And I will note for the

9         record that you examined the witness on this

10        document at page 64 of his deposition a month

11        ago, beginning on that page. Okay.  Can we go

12        to page 24 of this document or -- no -- excuse

13        me, wait, not 24.  Could you scroll down,

14        Caylob.  Wait go back up.  Go back up.  Can you

15        go down one.  One more.  Okay.

16   BY MR. BENSON:

17   Q.    Mr. Dickinson, do you see this page?

18   A.    I do, Mr. Benson.

19   Q.    Directing your attention to the first bullet

20   where it says:

21              "Resolution.  All current and future

22        talc claims (personal injury and AG claims)

23        against LTL and related parties would be

24        resolved for a total contribution from LTL not

25        to exceed 8.9 billion present value."

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 90 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

88

1          Do you see that?

2   A.     I do see that.

3   Q.     Do you know where that 8.9 amount comes from?

4   A.     I know the math.  I don't know how it

5   originated.

6   Q.     What's the math that you know?

7   A.     It's in the next bullet.  It's 12 million at

8   and over 25 years net present value.

9               MR. JONES:  Mr. Benson, can you give me

10          the date of this document again.

11              MR. BENSON:  April 2, 2023.

12              MR. JONES:  Thank you.

13              MR. BENSON:  Can we go to Tab 10 which

14          should be the voluntary petition for LTL I

15          filed on October 14, 2021.  This should be

16          marked as Exhibit 10.

17              (Whereupon, the Voluntary Petition for

18          LTL I 10/14/21 was marked as Dickinson Exhibit

19          10, for identification, as of this date.)

20  BY MR. BENSON:

21  Q.     Mr. Dickinson, you've seen this before, right?

22  A.     Well, you're testing my memory bank, but I

23  generally probably most likely have seen it, yes.

24              MR. BENSON:  Okay.  Can we go to page

25          four of 22, Caylob.

89

1   Q.      And looking at the numbers on the left-hand

2   side starting at 13, with respect to the debtor's --

3   excuse me.  Do you see this document, Mr. Dickinson?

4   A.      Yes.

5   Q.      All right.  With respect to the debtor's

6   estimation of available funds, 13 says, "The funds will

7   be available for distribution to unsecure creditors,"

8   right?  It checks that off, right?

9   A.      Yes.

10  Q.      And the estimated number of creditors in Number

11  14 suggests that the debtor had somewhere between 25,000

12  and 50,000 creditors?

13  A.      I believe -- I'm reading the same thing you're

14  reading, correct.  Yes, it's checked off.

15  Q.      And then the next one, Number 15 say that the

16  debtor has somewhere between 1 billion and 10 billion

17  dollars.  Is that accurate?  Did I read that right?

18  A.      Once again, the -- the 1 billion, the 10

19  billion includes the $2 billion down payment which was

20  to enable support while in bankruptcy for the full and

21  final -- full and fair settlement to come claimants

22  current and future.

23  Q.      And its estimated liabilities were between 1

24  billion and 10 billion, that's accurate?

25  A.      I see what the boxes check, yes.

90

1          MR. BENSON:  Can we pull up Tab 11

2          which is the voluntary petition from LTL II

3          filed on April 4, 2023.  This will be marked as

4          Dickinson, I think, Exhibit 11.

5                    (Whereupon, the Voluntary Petition for

6          LTL II 4/4/23 was marked as Dickinson Exhibit

7          11, for identification, as of this date.)

8   BY MR. BENSON:

9   Q.     You've seen this before, right, Mr. Dickinson?

10  A.     Yes, I believe so.

11         MR. BENSON:  Can we go to page 4 of 24,

12         Caylob.

13  Q.     And looking at the same numbers, you know, 13

14  through 16, Mr. Dickinson, you'll see that compared to

15  the first -- LTL's first voluntary petition, the only

16  difference here is the estimated number of creditors; is

17  that right?

18  A.     That is correct.

19  Q.     Do you know what caused the increase in

20  creditors?  Do you know how that happened?

21  A.     It's a better question for the legal team and

22  others, but I was surprised to see the significant jump

23  in the creditors, which I assume includes claimants.

24         MR. BENSON:  Okay.  Caylob, can we go

25         back to what was already marked as Dickinson

1        Exhibit 6, which is the declaration of John Kim

2        from LTL II.  Can you go to Annex C which

3        should -- it's, like, 55 pages in.  It'll say

4        "form plan support agreement."  Can you scroll

5        to the next page.  Can you scroll to page 11 of

6        this "plan support agreement."  Scroll down.

7        It should be a signature page.

8   Q.   And Mr. Dickinson, you recognize this document,

9   right?

10  A.   Can we go back to the very top?  Just let me

11  confirm.

12  Q.   Yep.  There we go, right there.

13  A.   Yes.

14            MR. BENSON:  Can you scroll back to

15        that signature page, Caylob.

16  Q.   All right.  Do you see this, Mr. Dickinson, the

17  signature page?

18  A.   I do.

19  Q.   All right.  To the best of your knowledge, was

20  anyone other than Mr. Kim involved with negotiating this

21  document?

22            MR. JONES:  Object to form and

23        foundation.  Assumes facts not in evidence.

24  A.   You're going to have to speak to Mr. Kim with

25  regard to he's the best person to ask the question.  I

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 94 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

92

1  will defer back to what I said earlier.  Anything that

2  would be in the plan support agreement, anything that

3  would be in documents that are filed within the court,

4  we have went through in, you know, the board minutes,

5  the resolutions, and in the materials that we were

6  presented.

7  Q.      So do you know who was involved with the

8  preparation of this document, specifically the plan

9  support agreement?

10  A.      It's a better question for Mr. Kim.  I'm

11  assuming it's -- as I stated, I think, three weeks ago,

12  it's representatives, you know, representing LTL.

13  Q.      Okay.  Before LTL filed its second bankruptcy,

14  do you know how many PSA's were signed by plaintiff's

15  firms?

16  A.      That's a better question for Mr. Kim and the

17  legal team.

18  Q.      Did they share that -- they didn't share that

19  information with you, the number of plaintiff's firms

20  that signed the PSA's?

21  A.      I know it was a substantial number of claimant

22  firms that supported that, or represented, you know,

23  55,000-plus claimants.  But, you know, for the exact

24  number, no, you'll have to talk to Mr. Kim.

25  Q.      Were you ever given an exact number of how many

93

1   plaintiff's firms signed PSA's?

2   A.      Once again, I know it's a large number and --

3   but for the exact number, it's a better question for

4   Mr. Kim.  All I know is that there was a large number of

5   firms representing a large number of clients or

6   claimants.  And of course, here we were supportive of

7   that.  Why wouldn't we be?

8                    MR. BENSON:  Bear with me for one

9            moment.  Can we pull up Tab 13, which would be

10           the term sheet, and mark this as Dickinson

11           Exhibit 12.

12                   (Whereupon, LTLMGMT-00002628-40 was

13           marked as Dickinson Exhibit 12, for

14           identification, as of this date.)

15                   MR. JONES:  While that's being done, I

16           would like to add it was also Exhibit 8 to

17           Mr. Dickinson's deposition a month ago, first

18           discussed on page 84 of the transcript.

19                   MR. BENSON:  And if you flip to --

20           we're looking at paragraph 1.  Actually, wait

21           one second.  Bear with me for a moment.

22                   Can you turn to page 2, Caylob.

23   BY MR. BENSON:

24   Q.      And looking at the "payment" section, paragraph

25   1A, it says:

94

1              "The Payment Obligation shall only be

2         required to be made if the Debtor emerges from

3         Bankruptcy with a confirmed Plan of

4         Reorganization and ("Plan Confirmation"), which

5         includes a channeling injunction for all any

6         and all Talc Claimants, whether presently

7         existing or to be made in the future."

8              Do you see that?

9    A.    I do.

10   Q.    To the best of your recollection, under the

11   first funding agreement, was the payment obligation

12   contingent on the debtor emerging from bankruptcy with a

13   confirmed plan of reorganization?

14              MR. JONES:  Object to form and

15         foundation.

16   A.    It's a better question for the legal team,

17   Mr. Benson.

18   Q.    Does that mean you don't know the answer?  Is

19   that what that means?

20   A.    I think I answered that question.  It's a

21   better -- I can read what's on the document and I

22   generally understand what things mean, but it's a better

23   question and calls for a foundation that is better

24   suited for Mr. Kim and others.

25              MR. BENSON:  Can you go to Tab 4, which

95

```
 1              should be the minutes of LTL's board of

 2              managers dated February 23, 2023, and mark this

 3              as Dickinson Exhibit 13.

 4                      (Whereupon, LTLMGMT-00013464-65 was

 5              marked as Dickinson Exhibit 13, for

 6              identification, as of this date.)

 7  BY MR. BENSON:

 8  Q.      Do you see this document, Mr. Dickinson?

 9  A.      I do.

10  Q.      Is this an accurate reflection of the February

11  23, 2023 board meeting minutes?

12  A.      I believe so.  I believe it's the accurate

13  reflection of the top portion of this sheet.

14  Q.      I'm sorry, say that again?

15  A.      I believe it's an accurate reflection of the

16  top portion of the page that I'm looking at.

17  ███████████████████████████████████████████

18  ███████████████████████████████████████████

19  ████████

20  ████████████████████████████

21  ███████████████████████████████████████████

22  ███████████████████████████████████████████

23  ████████████████

24  ███████████████████████████████████████████

25  ██████████████████████████████████
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 98 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

96

1

2

3    Q.      And at these board meetings that, you know, you

4    referenced you're going to, who sets the agenda for

5    these meetings?

6    A.      Well there's a whole lot that goes into our

7    discussion.  There's ad hoc meetings, there's previous

8    board meetings, and Mr. Kim and others set the exact

9    words.  But we generally, you know, it's based on a lot

10   of different factors.  But the agenda is actually set by

11   Mr. Kim and others.

12   Q.      Is the agenda set by anyone else -- any other

13   officer of LTL's board or just Mr. Kim?

14   A.      That's a better question for Mr. Kim.

15   Q.      Is Mr. Kim the only LTL officer involved with

16   the agenda for these board meetings?

17   A.      No, if one of us suggests something to Mr. Kim,

18   Mr. -- either myself that I want to go through a RAM

19   discussion or Mr. Wuesthoff says, hey, we'd like to

20   address this, or I say, Mr. Kim, I'd like to address

21   this, then he follows suit and puts it on the agenda.

22   He's not doing it in a vacuum if that's what you're

23   asking.

24   Q.      And do you know who set contingency planning --

25   who added contingency planning to this agenda, do you

Case 23-12825-MBK    Doc 855-12    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
IN RE LTL Management LLC Bankruptcy    Page 99 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

97

 1   know?

 2   A.      Not specifically, no.  But I know Mr. Prieto

 3   led the discussion.

 4   (Reporter clarification)

 5                    MR. JONES:  P-R-I-E-T-O.

 6                    MR. BENSON:  Mr. Dickinson -- actually,

 7           no -- strike that.  Bear with me for one

 8           moment, almost done here.  Can we go to Tab 5,

 9           which is the minutes of LTL's board and

10           managers, dated March 16th, and mark this as

11           Dickinson Exhibit 14.  And Caylob, can we flip

12           to page 2.

13                    (Whereupon, LTLMGMT-00002626-27 was

14           marked as Dickinson Exhibit 14, for

15           identification, as of this date.)

16                    MR. JONES:  The witness reviewed these

17           minutes with you, Mr. Benson, in his deposition

18           in April starting at page 41.

19   BY MR. BENSON:

20   ████████████████████████████████████████████████████,

21   ████████████████████████████████████████████

22   ████████████████████████

23   ███████████████████████████████████████████

24   █████████████████████████████████████████████

25   ████████████████████████

Confidential

Richard Dickinson
May 31, 2023

98



14   BY MR. BENSON:

99



16          MR. BENSON:  Could we go to Tab 16

17     which is the third circuit's decision filed on

18     January 30, 2023.  And if you'll bear with me

19     Mr. Dickinson, I'm almost done.  I just have a

20     couple of questions I want to get through.

21          THE WITNESS:  Sure.  Thank you,

22     Mr. Benson.

23 Q.     No problem.  And I take it you've seen this

24 document before, right?

25 A.     I have.

100

1    Q.      And can we go to page 22, Caylob and look at

2    the second paragraph, the first sentence there.  And it

3    reads:

4                      "Still, Old Consumer was a highly

5                 valuable enterprise, estimated by LTL to be

6                 worth $61.5 billion (excluding future talc

7                 liabilities) with many profitable products and

8                 brands."

9                      Did I read that right?

10   A.      I can read it.  Thank you, Caylob.

11   Q.      Okay.  Well, let's walk through that first

12   sentence.  Would you disagree or would you -- yeah,

13   would you disagree with the statement that "Old Consumer

14   was a highly valuable enterprise"?

15   A.      I wasn't -- my whole career has been prior to

16   this role of Medical Devices.  So I can't speak to Old

17   Consumer, the valuation or whether it's highly valued.

18   All I know is that the year prior on the annual report,

19   J&J Consumer was losing money as a result of the

20   talc-related liabilities on its books.

21   Q.      Okay.  Then it says "Old Consumer was a highly

22   valuated enterprise estimated by LTL".  Would you

23   disagree with that statement, that Old Consumer was

24   estimated by LTL?

25                      MR. JONES:  Object to foundation.

101

 1  A.     I wasn't involved in the valuation.  I

 2  understand the 60 billion was the cap, but I wasn't

 3  involved in the valuation.  I do know that Consumer was

 4  losing business or losing income as a result of the LTL

 5  liabilities on its books.

 6              MR. BENSON:  Caylob can we go to page

 7        46 and let's look at the third paragraph there.

 8        And if we scroll down so that we can see the

 9        second to last sentence of the third paragraph.

10  Q.     And it says:

11              "The agreement provided LTL a right to

12        cash that was very valuable being likely to

13        grow and minimally conditional."

14              Would you agree with that statement

15        Mr. Dickinson?

16              MR. JONES:  Object to foundation.

17  A.     It's asking for a legal interpretation of this

18  and it's a better question for a lawyer to address that

19  particular question.  I'm not trying to dodge it.  I'm

20  just -- you know, I'm not a lawyer and I can't interpret

21  exactly what it means.

22              MR. BENSON:  And can we go to Tab 17

23        which should be J&J -- and J&J's 8-K filed on

24        April 4, 2023, and mark this as Dickinson

25        Exhibit 16.

102

1            (Whereupon, the Johnson & Johnson's 8-K

2         4/4/23 was marked as Dickinson Exhibit 16, for

3         identification, as of this date.)

4    Q.    Mr. Dickinson, have you seen this before?

5    A.    I generally see the form 8's -- 8-K, but I

6    haven't reviewed it in detail.

7            MR. BENSON:  Caylob, if you could

8         scroll to what should be page 3.

9    Q.    It will say "item 7.01 Regulation FD

10   Disclosure".  Do you see this Mr. Dickinson?

11   A.    I do.

12   Q.    Okay.  And this again references that 8.9

13   billion, the second sentence starting "the company has

14   agreed", this references the 8.9 billion over 25 years

15   that we discussed earlier, right?

16   A.    Yes.

17           MR. BENSON:  All right.  You can take

18        this down now.

19           And just a few more questions for you

20        Mr. Dickinson, and then I'll -- maybe we can

21        take a break, let me look over my note, before

22        I pass it over to Mr. Ruck (sic).

23   Q.    Mr. Dickinson, have you ever heard, in the

24   context of LTL's first bankruptcy filing, have you ever

25   heard the term "divisive merger"?

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 105 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

103

```
 1   A.      Divisive merger?

 2   Q.      Divisive merger.

 3   A.      Are you referring to what occurred at the

 4   beginning of October 2021?

 5   Q.      Yeah, for now I'm just asking have you heard of

 6   that term, divisive merger?

 7   A.      If I did, I don't recall it, the word divisive.

 8   Q.      Have you ever heard of the phrase in bankruptcy

 9   integrated transaction?

10   A.      Yes.

11   Q.      Okay.  And without disclosing any

12   attorney/client communications are you aware that Judge

13   Kaplan found that the divisive merger, or divisive

14   merger -- however you want to phrase it -- the Chapter

15   11 restructuring and the funding agreement 1 to be an

16   integrated transaction?  Were you aware of that?

17                   MR. JONES:  Object to the form of the

18           question.

19   A.      I understand what a integration means.  And I

20   think the best person to ask is Mr. Kim and the lawyers

21   or Judge Kaplan's.

22   Q.      Well, I mean, at the beginning of the

23   deposition you mentioned that there are certain days

24   where you monitor the case, right?

25   A.      I do, Mr. Benson.  And you know, I have great
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 106 of 142          Richard Dickinson
Exhibit
Confidential                                                    May 31, 2023

104

1   respect for lawyers, I have a great respect for their

2   intellect.  I defer to Mr. Kim and others for the

3   interpretation.

4   Q.      Before filing LTL's second bankruptcy, did you

5   or anyone else on the board of LTL analyze whether

6   terminating the first funding agreement would impact any

7   other part of the integrated transaction?

8                       MR. JONES:  Object to form.

9           Foundation.

10  A.      That's a better question to ask Mr. Kim.  But I

11  will say this, Mr. Benson, everything that we did with

12  regard to the second bankruptcy, one, is in the minutes,

13  in the resolutions and in the materials that we

14  presented.  We did it with the same intended purpose,

15  which is a full and final resolution for talc

16  liabilities within the bankruptcy system.

17          The reason we changed the funding agreement and

18  there was a termination based on legal counsel that was

19  explained to me, to address the Third Circuit's ruling.

20  We're solvent.  We can pay our bills in the foreseeable

21  future.  But we're under financial distress as evidenced

22  by the liquidity issue that you appropriately brought up

23  earlier in one of your questions.

24  Q.      So would it be correct to say that before LTL's

25  second bankruptcy filing no one on LTL's board asked for

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy    Page 107 of 142
Exhibit                                                  Richard Dickinson
Confidential                                             May 31, 2023

105

1   an analysis as to what impact the second bankruptcy

2   would have on the integrated transaction; is that

3   accurate?

4                   MR. JONES:  Object to the form of the

5          question.

6                   You can answer.

7   A.     I'm not certain that I understand what you're

8   asking.  And it's a better question with regard to

9   Mr. Kim.  I know we didn't -- the termination and -- the

10  original funding agreement and the new funding agreement

11  had allowed us to address Third Circuit's opinion and

12  allow us to achieve our goals which is the full and fair

13  equitable final resolution for claimants both current

14  and future.  I know I didn't say that eloquently enough,

15  but I think you got the gist.

16                  MR. BENSON:  Can we go off the record

17         for two or three minutes just to so I can

18         review my notes to make sure I'm all done

19         before I pass it over to Mr. Ruck?

20                  MR. JONES:  Let's make it five so we

21         can take a convenience break, if you don't

22         mind.

23                  THE VIDEOGRAPHER:  This ends Unit 3.

24         We're off the record at 4:16.

25           (Whereupon, a short break was taken.)

                                                                    106

1              THE VIDEOGRAPHER:  Stand by, please.

2         This begins Unit 4, we're on the record at

3         4:26.

4              MR. BENSON:  Mr. Dickinson, I have no

5         further questions.  Thank you for your time

6         today.  I will pass it to one of my colleagues

7         on the line.

8    EXAMINATION BY

9    MR. RUCKDESCHEL:

10   Q.    Mr. Dickinson, hi, it's Jon Ruckdeschel, I

11   represent Paul crouch.  I have a few questions for you.

12   Are you ready to continue?

13   A.    Yes, Mr. Ruckdeschel.

14   Q.    Great thanks.  All right, you gave a deposition

15   in the LTL second bankruptcy on April 17, 2023, correct?

16   A.    I did.

17   Q.    And as I understand it, you stand by your

18   testimony from April 17, 2023; is that fair?

19   A.    That is fair.

20   Q.    Is it also fair, sir, that since April 17, you

21   have not come into possession of any new information or

22   documents that would change any of your testimony from

23   April 17th?

24   A.    That is -- that is true.

25   Q.    Great.  Okay.  We're moving on.

107

1          We've talked about the $8.9 billion proposal

2     that has now been put into the form of a proposed plan

3     of reorganization in this bankruptcy proceeding,

4     correct?

5     A.       Correct.

6     Q.       And you understand that the proposed $8.9

7     billion present value plan would channel all claims

8     against not only LTL for any talc liability that it has,

9     but also all claims against Johnson & Johnson, the

10    parent company for any talc liability it has as well as

11    three and a half pages of retailers for any liability

12    they might have for selling Johnson & Johnson brand talc

13    products, correct?

14              MR. JONES:  Objection to the form.

15    A.       It's a better question for the legal team, but

16    I generally understand that, yes.

17    Q.       So sir, I want to ask you, as the CFO of LTL,

18    have you performed or are you aware of any analysis of

19    what portion of that $8.9 billion relates purely to

20    LTL's independent liability as opposed to J&J's

21    liability or any of the retailer's liabilities?

22              MR. JONES:  Object to the form of the

23          question and foundation, calls for a legal

24          conclusion.

25    A.       I confer with what Mr. Jones just said.

108

1    Q.        Are you aware of any analysis that's been done

2    as to what portion of the $8.9 billion reflects

3    liability LTL might have, versus Johnson & Johnson

4    versus the retailers?  Are you aware of it?

5    A.        Let me push back for one second.  It's LTL's

6    responsibility and liability.  And beyond that, I will

7    defer to the lawyers.

8    Q.        Well, are you aware that juries in different

9    parts of the country have found that Johnson & Johnson

10   has independent liability in tort to victims of its talc

11   products?

12   A.        Mr. Ruckdeschel that's a better question for

13   the legal team.  I'm not an expert with regards to other

14   cases or around -- outside of bankruptcy.  I generally

15   have knowledge, but it's a better question for the legal

16   team.

17   Q.        What's the basis of your last answer then, sir,

18   where you said it's LTL's liability?

19   A.        LTL is responsible for the liability of

20   talc-related cases.  I understand that Johnson & Johnson

21   has been named outside of the tort system in select

22   cases.  But as far as the specifics, the 8.9 billion,

23   that's LTL's responsibility.

24   Q.        Why?

25              MR. JONES:  Object to foundation.  If

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 111 of 142

Exhibit

Confidential

Richard Dickinson
May 31, 2023

109

1            you know other than to a communication from

2            counsel, you can share it, sir.

3    A.      I don't.

4    Q.      What analysis are you aware of as to whether it

5    is legal under New Jersey law for LTL to indemnify

6    Johnson & Johnson for conduct that may have been

7    reckless?

8                    MR. JONES:  Object to the form of the

9            question.  If you can answer that, sir, other

10           than--

11                   THE WITNESS:  I can --

12                   MR. JONES:  Let me finish --something

13           you may have learned from a lawyer, you may

14           answer.

15   A.      I cannot.

16   Q.      What is the basis then, sir -- I'm going to

17   come back to it.  What is the basis of your statement

18   that it's LTL's liability?

19   A.      My laymen terms and my board member

20   responsibility and I know that the talc-related

21   liabilities resigned within LTL.

22   Q.      LTL is the successor to the talc liabilities of

23   what was formerly known as Johnson & Johnson Consumer,

24   correct?

25                   MR. JONES:  Object to the form of the

110

1          question, includes a legal term the witness may

2          not understand.

3   A.      I certainly do not understand, you can ask

4   Mr. Kim.  He's a better person to ask.

5   Q.      Did Johnson & Johnson directly own or operate

6   the talc business prior to 1979?

7                    MR. JONES:  Object to foundation.

8   A.      Mr. Ruckdeschel, you're asking me a question

9   way back prior.  I know what happened in 1979, but I

10  can't -- I don't have any foundation from --

11  Q.      Well, sir, what I'm trying to figure out, you

12  said, I'm going to push back a bit and then you said

13  it's LTL's responsibility.  And I'm asking you what is

14  the factual basis for that statement?

15  A.      I think I gave it to you.  It's LTL's

16  liability, through a series of events, integrated events

17  that applies to this point, where LTL -- it's solely

18  LTL's liabilities.

19  Q.      And as a board member of LTL, what

20  investigation have you performed as LTL to investigate

21  whether any promises of indemnity between LTL and

22  Johnson & Johnson are enforceable?

23                    MR. JONES:  He's already answered that

24       one.

25                    MR. RUCKDESCHEL:  No, I've asked him

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 113 of 142                Richard Dickinson
                    Exhibit                                         May 31, 2023
                  Confidential

                                                                        111

1          what investigation he's done, that's what I've

2          asked.

3     A.    I have done -- I rely on the advice of counsel

4     and I rely on their advice with regard to their

5     interpretation of the enforceability.

6     Q.    Given that is the case, is it fair to say, sir,

7     that you are not aware of any evaluation of the amount

8     of money it would take to fund a trust purely with

9     respect to LTL's individual liability leaving apart any

10    discharge of Johnson & Johnson, if this bankruptcy were

11    to proceed?

12              MR. JONES:  Object to the form of the

13          question.  Calls for a legal conclusion.  If

14          you're aware of such analysis, you can tell

15          him.

16              MR. RUCKDESCHEL that's what I'm asking.

17    A.    I'm not aware.

18    Q.    All right.  And you understand that this

19    bankruptcy plan, in order to receive a funding

20    commitment from Johnson & Johnson requires that claims

21    against Johnson & Johnson be channeled to a trust?

22    A.    Yeah, it is -- I understand in general that to

23    be the case.  But the better person to ask is Mr. Kim

24    and the legal team.

25    Q.    All right.  But that is your understanding as

112

1   the CFO, that in order to get the 8.9 billion, the deal

2   has to involve a discharge of Johnson & Johnson's

3   liability as well as LTL's, correct?

4                   MR. JONES:  Object to form.  If you

5          have an understanding.

6   A.     I have an understanding, and I'll defer to

7   Mr. Kim for the legal interpretation.

8   Q.     Sure.  And I don't mean to be picky here.  You

9   have an understanding that that is the case, but you're

10  deferring to Mr. Kim for anymore detailed explanation,

11  fair?

12  A.     Yes.

13                  MR. RUCKDESCHEL:  Okay.  You just said

14         you had an understanding, but you didn't say

15         what the understanding was.  That's all.  I

16         understand it's a picky nuanced question.

17  BY MR. RUCKDESCHEL:

18  Q.     And it's your understanding as the CFO of LTL

19  that while claims against retailers will be channeled to

20  a trust if the plan currently submitted by LTL is

21  approved, you're not aware of any funding being provided

22  by the retailers as part of the 8.9 billion; is that

23  fair?

24  A.     That I don't know and it's a better question

25  for Mr. Kim and others.

113

```
 1              MR. RUCKDESCHEL:  All right.  I don't

 2         have any further questions for you, sir.

 3              MR. JONES:  Thanks Jon.

 4              THE WITNESS:  Thank you,

 5         Mr. Ruckdeschel.

 6              MR. JONES:  I think Ms. Tancredi may

 7         have very few questions.

 8              MS. TANCREDI:  That's right.

 9  EXAMINATION BY

10  MS. TANCREDI:

11  Q.    Good afternoon, Mr. Dickinson.  My name is Lisa

12  Tancredi from the law firm of Womble Bond Dickinson and

13  we represent the ad hoc committee of state the consumer

14  protection claims.

15  A.    Hi, Ms. -- is it Mrs. or Ms. Tancredi?

16  Q.    Either is fine.  Ms. Is fine.

17  A.    I wanted to address you formally.

18              MS. TANCREDI:  Thank you.  Can the

19         court reporter pull up the Exhibit that's been

20         marked as Exhibit No. 2, please.  It should be

21         the letter confirming the secondment agreement,

22         thank you.

23  Q.    Mr. Dickinson, earlier this afternoon, we heard

24  about your employment history at some length.  It

25  sounded like you've been employed by the Johnson &
```

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 116 of 142
Exhibit
Confidential
Richard Dickinson
May 31, 2023

114

1   Johnson Family companies for a number of years.  Would

2   that be fair to say?

3   A.      Yes, 22 years.

4   Q.      Okay.  Do you know what entity owned Johnson &

5   Johnson Services Inc.?

6   A.      I'm not exactly sure what legal entity it

7   reports up to now.

8   Q.      Okay.  Fair enough.  In looking at your offer

9   letter, there's some information that is redacted.  I'm

10  not going to ask for your annualized salary, but I would

11  like to know if you can tell me what your current bonus

12  target percentage is of your annual based salary?  It's

13  the second redaction in the letter?

14  A.      I'm going to --

15              MR. JONES:  The witness is obviously --

16          let me interject.  The witness is obviously

17          uncomfortable about the confidentiality of

18          that.  It's already been redacted from a

19          document.  It was produced, I believe, long

20          ago.

21              Unless there's some demonstration of

22          relevance to the motion to dismiss, Lisa, I

23          suggest we talk about whether we can fill in

24          that blank in some way that makes the witness

25          feel comfortable, if not in a deposition today.

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Exhibit   Page 117 of 142
Confidential
Richard Dickinson
May 31, 2023

115

1      I'm happy to talk to you outside the deposition

2      about why that is or isn't discoverable, but I

3      don't want to take more time today.

4            MS. TANCREDI:  Well, the point is --

5      let me go back without the percentages then.

6  Q.     Who decides whether you get a bonus?

7            MR. JONES:  If you know that

8      Mr. Dickinson, you can share it.

9  A.     Well, it's administered by -- within Johnson &

10  Johnson.  But from a compensation standpoint, as long as

11  we're meeting our objectives that's discussed by the

12  board, then, you know, there's -- percentage of the

13  annual bonus is given.

14  Q.     Who tells you whether or not you've met your

15  objectives?

16  A.     The board and I discuss that.  I do not discuss

17  it with any other entity within Johnson & Johnson.

18  Q.     When you say "the board" you mean the board of

19  LTL?

20  A.     Yes.

21  Q.     So that's you and who Mr. --

22  A.     Mr. Wuesthoff. Mr. Deyo.

23  Q.     Do you discuss each other's bonuses?

24  A.     We don't discuss each other's bonuses.  We

25  discuss our meeting and the objectives and progressing

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 118 of 142
Exhibit                                                  Richard Dickinson
Confidential                                                May 31, 2023

116

```
 1    along.

 2    Q.      So who decides whether you get a bonus?

 3                    MR. JONES:  Object to foundation.

 4                    If you know Mr. Dickinson, you can

 5          share.

 6    A.      I don't know.

 7    Q.      How do you find out if you have received your

 8    bonus?

 9    A.      At the end of the year there's a piece of paper

10    that's communicated to me and at Johnson & Johnson

11    that's -- it typically occurs like that.

12    Q.      And where does that piece of paper come from?

13    A.      It comes from human resources.

14    Q.      Is that Johnson & Johnson human resources?

15    A.      I believe so.  Or Johnson & Johnson Services

16    Inc.

17    Q.      Okay.

18    A.      It's a pretty standard bonus system at Johnson

19    & Johnson.  It's -- you know, unless you're -- you know,

20    left the organization or there's some demonstrative

21    performance deficit, you know, the bonus is paid on a

22    fairly regular basis.

23    Q.      Have you discussed with anyone at Johnson &

24    Johnson what you might do when this bankruptcy case is

25    over?
```

117

1    A.        I have not.

2    Q.        Okay.  I'm going to change topics now.

3    A.        Yeah, let me re -- just -- what I stated

4    earlier.  My full intention and I'm -- as the member of

5    the LTL board is to see this through and to ensure that

6    we, you know, reach our goals which is a full and fair

7    settlement within the bankruptcy process.

8    Q.        Okay.  I didn't ask a question, so -- but thank

9    you for that statement.

10   A.        I know, I just wanted to say that.

11   Q.        Are you aware of any estimate or analysis of

12   the dollar amount of the talc-related consumer

13   protection claims asserted by the State?

14   A.        I am not.  That's a better question for Mr. Kim

15   and others.

16   Q.        Have you requested that any estimate or

17   analysis be prepared with respect to the dollar amount

18   of talc-related consumer protection claims asserted by

19   the State?

20   A.        I did not.

21   Q.        Do you know who employs the president of LTL,

22   Mr. Wuesthoff?

23   A.        Johnson & Johnson Service Inc.

24                 MS. TANCREDI:  That's all I have.

25                 MR. JONES:  Thank you Ms. Tancredi.

118

1           Mr. Dickinson, I have just a couple or

2       a relative few.

3   EXAMINATION BY

4   MR. JONES:

5   Q.      You recall that you answered questions that

6   came from Mr. Benson about a couple or maybe three, but

7   at least a couple monthly operating reports?

8   A.      Yes.

9   Q.      And those are filings with the bankruptcy

10  court, right?

11  A.      That is correct.

12  Q.      And you understand, I think he referred to it

13  that there are instructions and I think what might be

14  determined global notes with regard to how you are to

15  report financial information in those forms?

16  A.      Yes.

17  Q.      And folks that report to you, you have an

18  understanding they review those notes and do their best

19  to follow the rules?

20  A.      Yes, folks that support the process and me in

21  filing those reports, yes.

22  Q.      And they may or may not be the same as

23  financial accounting that isn't involved in a

24  bankruptcy, for an enterprise that is not involved in a

25  bankruptcy; is that right?

119

```
 1   A.      That is true.

 2                   MR. RUCKDESCHEL:  Object to form.

 3   Q.      Let me ask you, sir, you referred to a down

 4   payment a couple of times with respect to questions from

 5   Mr. Benson on the monthly operating reports, questions

 6   in particular addressed to asset line items.

 7           Do you remember that?

 8   A.      I do.

 9   Q.      Have you ever heard the word qualified

10   settlement fund?

11   A.      I do.

12   Q.      Is that what you meant when you referred to the

13   down payment?

14   A.      Yes.

15   Q.      Okay.  Thank you.  Mr. Wuesthoff (sic) you were

16   asked just a few moments ago about your testimony in

17   April of this year by Mr. Ruckdeschel and you answered

18   his questions truthfully, right?

19   A.      I did.

20   Q.      And that goes for the rest of your testimony

21   today, you did your best to be truthful and complete; is

22   that fair?

23   A.      That is true.

24                   MR. JONES:  I have no further

25           questions.
```

120

1          THE WITNESS:  Thank you Mr. Jones.

2          MR. JONES:  Mr. Dickinson, I believe

3    that we are concluded.  In hearing no other

4    suggestions to the contrary, we'll let the

5    witness go and we'll go off the record.  Is

6    that okay with you, Mr. Benson?

7          MR. BENSON:  That's okay. Sounds good.

8          THE REPORTER:  One second, one second.

9    If you would like a copy of the transcript,

10   either please e-mail me or say it right now on

11   the record.

12         MR. JONES:  Mr. Jones, we have a

13   standing order.

14         THE VIDEOGRAPHER:  And what about the

15   video?  Will anybody be ordering the video?

16         MR. JONES:  We also have a standing

17   order for video.  Thank you for the Debtor.

18         THE VIDEOGRAPHER:  Thank you.  This

19   concludes today's proceedings.  Total number of

20   video units used was four.  We're off the

21   record at 4:46.

22         (Time Noted:  4:46 p.m.)

23

24

25

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy    Page 123 of 142
Exhibit

Confidential

Richard Dickinson
May 31, 2023

121

1          A C K N O W L E D G M E N T

2

3    STATE OF NEW YORK      )
                                    :ss
4    COUNTY OF              )

5

6          I, RICHARD DICKINSON, hereby certify that I

7    have read the transcript of my testimony taken under

8    oath in my deposition of the 31st day of May 2023; that

9    the transcript is a true, complete and correct record of

10   my testimony, and that the answers on the record as

11   given by me are true and correct.

12

13

14   _____

15    RICHARD DICKINSON

16

17   Signed and subscribed to before
     me, this                    day
18   of                    , 2023.

19

20   _____
     Notary Public, State of New York

21

22

23

24

25

Case 23-12825-MBK    Doc 855-12    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
IN RE LTL Management LLC Bankruptcy    Page 124 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

                                                              122

1    C E R T I F I C A T E

2   STATE OF NEW YORK      )

3                          ) ss.:

4   COUNTY OF QUEENS )

5

6              I, BROOKE E. PERRY, a Notary Public

7         within and for the State of New York, do hereby

8         certify:

9              That RICHARD DICKINSON, the witness

10        whose deposition is hereinbefore set forth, was

11        duly sworn by me and that such deposition is a

12        true record of the testimony given by such

13        witness.

14             I further certify that I am not related

15        to any of the parties to this action by blood

16        or marriage; and that I am in no way interested

17        in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto set

19        my hand this 31st day of May 2023.

20

21        *Brooke E. Perry*

          -----------------------

22        BROOKE E. PERRY

23

24

25

Case 23-12825-MBK   Doc 855-12   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
IN RE LTL Management LLC Bankruptcy   Page 125 of 142
Exhibit
Confidential

Richard Dickinson
May 31, 2023

123

```
 1                    ERRATA SHEET

 2   CASE NAME:   In Re:  LTL Management LLC Bankruptcy

 3   DATE OF DEPOSITION:  May 31, 2023

 4   WITNESS'S NAME:    RICHARD DICKINSON

 5   PAGE   LINE (S)    CHANGE          REASON

 6   ____|_____|_____|_____

 7   ____|_____|_____|_____

 8   ____|_____|_____|_____

 9   ____|_____|_____|_____

10   ____|_____|_____|_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17

18

19                          RICHARD DICKINSON

20   SUBSCRIBED AND SWORN TO BEFORE ME

21   THIS ____ DAY OF _____, 20__.

22   _____      _____

23   (NOTARY PUBLIC)      MY COMMISSION EXPIRES:

24

25
```

**$**

**$1.4** 46:6,10

**$10** 41:21 45:16

**$10.7** 54:4

**$11.7** 46:16

**$133** 41:18

**$137** 40:25

**$137.758** 40:21

**$15** 41:11

**$15.8** 39:24

**$17** 42:7

**$2** 42:3,19 89:19

**$2.3** 55:11

**$2.37** 47:14 52:20 53:3 55:24 56:6

**$2.4** 53:15 54:10 55:15

**$25** 42:14

**$3.64** 54:19

**$30** 75:10

**$367** 75:13

**$430** 83:15

**$5** 55:8

**$5,000** 55:10

**$6** 51:20 53:9

**$61.5** 100:6

**$75** 83:19

**$8.89** 69:15

**$8.9** 85:21 107:1,6,19 108:2

**$9** 40:9,15 43:16,18

**-**

**--something** 109:12

**--strike** 18:24

**0**

**0** 42:20 54:25

**0002300-20** 56:21

**0030612-13** 30:6

**08901** 6:5

**1**

**1** 14:18,19 15:1,15 22:22 38:5 39:10 40:24 44:19 51:11 89:16,18,23 93:20 95:17 103:15

**1.435,472** 46:14

**10** 11:17 16:24 34:11 56:17 88:13,16, 19 89:16,18,24

**10.6** 46:9

**10/14/21** 88:18

**10/31/21** 49:18 54:18

**100** 81:19

**11** 29:5 78:10,15 80:20 90:1,4,7 91:5 103:15

**12** 78:9 88:7 93:11,13

**13** 47:4 72:12 89:2,6 90:13 93:9 95:3, 5

**14** 9:22 46:24 47:14 48:7 49:9 56:20 88:15 89:11 97:11,14

**14th** 49:5

**15** 78:11 89:15

**16** 90:14 99:16 101:25 102:2

**16th** 97:10

**17** 42:9 101:22 106:15,18,20

**17th** 74:22 106:23

**18** 64:2 72:12

**19** 30:4

**1979** 110:6,9

**1991** 16:22

**1:09** 5:3

**1A** 93:25

**2**

**2** 30:5,7 38:2 41:23 44:23 47:17,19 48:2,10,14,18 52:15,18 53:6 54:12 56:9 74:2 88:11 93:22 97:12 113:20

**2,373.13** 48:8

**2.364** 54:21

**2.38** 48:15

**2.4** 48:18

**20** 26:24 44:16

**2021** 9:22 26:14 37:23 47:14 48:7 49:9,15 51:19 52:8 55:24 56:6,17 57:13 88:15 103:4

**2023** 5:3 9:25 38:5 39:10 40:24 42:14 45:10 47:11 48:15 49:12 64:14 73:20 78:11 88:11 90:3 95:2,11 99:18 101:24 106:15,18

**21** 29:15

**22** 49:12 88:25 100:1 114:3

**23** 95:2,11

**2315** 57:15

**24** 75:5 78:24 79:12 87:12,13 90:11

**25** 49:12 81:10 88:8 102:14

**25,000** 89:11

**26** 83:6

**26th** 13:3,8 14:7

**28** 73:19

**29** 73:4

**2:13** 44:20

**2:27** 44:24

**2nd** 73:3 87:4

**3**

**3** 38:6,9 42:24 43:5,6 45:8,9 49:13,14 54:22 74:5 83:22 102:4 105:23

**3.1** 79:6

**3.2** 79:3,13

**3/31** 38:23

**3/31/23** 38:8

**30** 32:3 48:3,19 99:18

**30th** 13:4 14:7

**31** 5:2 38:5 45:10 47:11 51:19 52:8 55:24 56:6,17 57:13

**367** 53:9

**38** 76:12

**3:15** 74:3

**3:22** 74:6

**4**

**4** 9:25 43:12 45:9,12 49:16,19 55:4,17

64:14 90:3,11 94:25 101:24 106:2

**4/4/23**  64:6 90:6 102:2

**40**  32:24

**40,000**  76:12

**400**  75:16,19

**41**  97:18

**46**  101:7

**4:16**  105:24

**4:26**  106:3

**4:46**  120:21,22

---

**5**

**5**  47:4 56:22 57:8 97:8

**5,000**  55:8

**5/15/23**  78:16

**50,000**  89:12

**501**  6:4

**55**  91:3

**55,000-plus**  92:23

---

**6**

**6**  52:10,13 64:7 65:13 74:22 91:1

**60**  101:2

**63**  74:23

**64**  87:10

---

**7**

**7**  74:13,17 83:3

**7.01**  102:9

**70**  64:22

**7th**  27:5

---

**8**

**8**  49:6,10 73:18 74:12 78:12,17 83:5
93:16

**8's**  102:5

**8-K**  101:23 102:1,5

**8.9**  76:5 87:25 88:3 102:12,14 108:22
112:1,22

**80,000**  76:17

**84**  93:18

---

**9**

**9**  87:2,6

**90**  84:10

---

**A**

**absolutely**  73:12

**access**  15:9

**account**  15:19

**accounted**  33:1

**accounting**  118:23

**accounts**  40:2,12,14,21 41:10,17
51:23 52:2,6

**accurate**  26:21,22 40:18 57:22 59:17
72:19 89:17,24 95:10,12,15 105:3

**accurately**  7:19

**achieve**  105:12

**acquisition**  26:19 27:20 33:7,14
34:21 48:20 63:24

**acquisitions**  26:9

**active**  15:22

**actively**  71:7

**ad**  33:4 96:7 113:13

**add**  93:16

**added**  96:25

**addition**  33:15 34:23

**address**  5:22,23 6:2 80:10 96:20
101:18 104:19 105:11 113:17

**addressed**  71:15 119:6

**addresses**  86:11

**administered**  115:9

**adopting**  18:6

**advice**  8:1 9:13 82:24 111:3,4

**advising**  29:11

**advisors**  34:25 35:1,3,4,22

**advisory**  35:22

**afternoon**  6:8,9 10:17 113:11,23

**AG**  87:22

**agenda**  96:4,10,12,16,21,25

**agree**  10:3 101:14

**agreed**  102:14

**agreement**  31:2 41:6 57:7,13,20
58:6,16,20 59:2,9,19,21,23 62:10,18
63:6,13,21 64:24 65:4,10,17 67:13,
15,16,23 68:1,11,20 69:6,7,11,12,13
70:4,8,13,19 71:5,21 72:6,9 76:5
77:15 84:18,25 85:8,21,23 86:6,7,9,
10,15,21,24,25 91:4,6 92:2,9 94:11
101:11 103:15 104:6,17 105:10
113:21

**ahead**  6:3

**akin**  97:21,22 98:2,10

**Alex**  34:25 35:4,23 51:6

**aligned**  31:12,23

**all-consumed**  33:22

**all-consuming**  33:3

**allowed**  105:11

**alternatives**  22:19 26:6 71:6

**Amended**  57:6

**America**  17:11

**amount**  36:1 44:5 53:21 54:12 75:22
88:3 99:9 111:7 117:12,17

**amounts**  83:23

**analysis**  76:18,23 105:1 107:18
108:1 109:4 111:14 117:11,17

**analyst**  16:8 17:3

**analyze**  104:5

**analyzed**  17:21 19:9 21:1

**and/or**  65:9

**Annex**  64:22 65:16 91:2

**annual**  83:18 100:18 114:12 115:13

**annualized**  114:10

**answering**  8:18,19 9:7 29:24

**answers**  7:12,16

**anybody's**  82:24

**anymore**  112:10

**apologies**  40:14

**appearances**  5:11

**appears**  15:18

**applies**  110:17

**apply** 24:25 25:2

**appropriately** 104:22

**approvals** 33:18

**approved** 36:4 112:21

**approximately** 23:13 48:3

**April** 9:25 38:24 48:14 49:12 64:14 73:3 74:21 87:4 88:11 90:3 97:18 101:24 106:15,18,20,23 119:17

**arrangement** 85:17,18

**arrangements** 83:24

**Aseptic** 33:10

**asserted** 117:13,18

**asset** 6:21 41:24 52:15 63:7,13 119:6

**assets** 22:17 42:2,3,25 43:4,6,10 47:14,15 48:1,2,7,14,17,18,24 52:16, 19,22 53:2,4,5,8 54:16,22,24 55:24 56:5 61:8,19 63:19,23 72:24 73:4,12 75:10,16 84:22 87:1

**assigned** 30:16

**assist** 31:20 35:1

**assisting** 34:22

**assume** 90:23

**assumed** 26:13

**Assumes** 91:23

**assuming** 92:11 98:12

**attempt** 67:24 68:9

**attempted** 68:17

**attending** 8:13

**attention** 33:6 39:16,20 41:23 42:16, 24 45:12 46:5 52:15 54:2,22 55:4 56:13 87:19

**attorney** 8:1

**attorney/client** 7:25 79:25 103:12

**attorneys** 60:19

**Aventis** 16:1,21 17:1,6,17,24 18:4

**aware** 7:18 75:25 76:1 103:12,16 107:18 108:1,4,8 109:4 111:7,14,17 112:21 117:11

**B**

**back** 8:23 9:4 12:14 14:3 17:3 24:10 25:12 26:14 28:9 31:5 37:23 44:5,16 65:15,17 67:7 69:17 78:21 87:14

90:25 91:10,14 92:1 108:5 109:17 110:9,12 115:5

**background** 18:14 36:20

**balance** 39:21,23 41:20 46:24 47:10 51:17 52:10,12 55:19,20,23

**bank** 33:13 88:22

**bankruptcy** 5:5 9:21,22,25 20:16 22:23 25:20 27:7 30:24 32:9 34:15,16 37:22 45:21,25 46:9 47:22 48:13 53:21,23,24 54:14 56:11 58:21 59:6, 8,20,22,24 60:21 61:9,21 62:21 63:6, 12,22 69:14 71:6 72:10 76:5,6,10,15 77:9,11,16,19 84:23 85:19 89:20 92:13 94:3,12 98:22 99:2 102:24 103:8 104:4,12,16,25 105:1 106:15 107:3 108:14 111:10,19 116:24 117:7 118:9,24,25

**based** 24:22 25:8,9 31:22 48:10 86:21 96:9 104:18 114:12

**basis** 48:25 108:17 109:16,17 110:14 116:22

**Bate** 57:15

**bear** 12:6 84:11 93:8,21 97:7 99:18

**began** 22:13

**beginning** 10:8 24:13 39:21,23 50:20 51:18,19 52:10 87:11 103:4,22

**begins** 44:23 74:5 106:2

**behalf** 62:19 67:2,13,24 69:1

**believing** 48:25

**benefits** 98:21,24 99:2,14

**Benson** 6:7,9,15 12:6,23,25 14:18, 23 15:11,14,23 21:6 22:21 27:9 28:16,19 29:14,18,20 30:2 31:6 32:11 36:11,24 37:15 38:2,11,14 39:1,6,13 40:13,19 44:4,11,14,18,25 45:2 46:3, 19,21 47:7 48:17 49:7,13,21 50:4,9, 21 51:9,12 55:3 56:20 57:5,14 58:13 59:12,25 60:8,14 61:2,24 62:7,25 63:10,18 64:1,9,21,25 65:5,12,15,20 68:6 70:23 71:2,19 72:11,21 73:17, 21,23 74:1,7,20 75:4,6 77:10,13,25 78:9,19,23 79:20 80:3 81:9 82:1,11, 18 83:2,7 85:13 87:2,16,18 88:9,11, 13,20,24 90:1,8,11,24 91:14 93:8,19, 23 94:17,25 95:7,21 97:6,17,19 98:8, 14 99:16,22 101:6,22 102:7,17 103:25 104:11 105:16 106:4 118:6 119:5 120:6,7

**big** 51:15

**bigger** 24:21

**billion** 42:3,19 47:14,24,25 48:2,15, 18 52:20 53:3,6 54:10,19,21 55:25 56:6,9,10 69:15 76:5 85:21 87:25 89:16,18,19,24 100:6 101:2 102:13, 14 107:1,7,19 108:2,22 112:1,22

**bills** 33:16 34:13,14,15,16,18,20,23, 24 35:9,21,22,23,24,25 36:1,2 73:14 104:20

**Biotech** 84:11

**bit** 15:24 44:5 46:22 64:10 79:5 97:24 110:12

**blank** 114:24

**blown** 39:17

**board** 33:4 37:18,21 47:15 48:19 66:10,12,22 67:8,9,23 68:17,23,24 69:2,20 71:7,10,17 73:3,19 76:23 87:3 92:4 95:1,11,24 96:3,8,13,16 97:9 104:5,25 109:19 110:19 115:12, 16,18 117:5

**board's** 67:24

**boards** 37:25

**Bond** 113:12

**bonus** 114:11 115:6,13 116:2,8,18, 21

**bonuses** 115:23,24

**books** 100:20 101:5

**bottom** 39:2 62:14 78:24 95:17,22 98:21

**boxes** 89:25

**brand** 74:24 107:12

**brands** 100:8

**break** 9:5 44:8,13,15,21 45:4,7 73:22 74:10 102:21 105:21,25

**breakdown** 34:9

**breezed** 14:11

**bring** 18:15 59:2 79:5 95:20

**Brooke** 5:10 8:3

**brought** 28:7 70:3 104:22

**Brown** 6:15

**Brunswick** 6:5

**bullet** 83:14,22 84:4,9,13 87:19 88:7 97:20,25 98:1,5,20

**business** 19:15 22:19,20 24:12,19, 21 25:9,10,16,18 26:7,8,10 36:18,23

54:25 101:4 110:6

---

## C

**call** 20:6,9 24:18 25:8 28:10,12,18
29:4,10 35:2

**called** 33:2

**calls** 36:17,22 37:9,12 94:23 107:23
111:13

**cancer** 99:13

**candidates** 28:24

**cap** 101:2

**career** 24:2 100:15

**Carolina** 62:14

**Caruso** 20:11,12

**case** 6:16 33:24,25 34:2,4,5 67:14
84:23 103:24 111:6,23 112:9 116:24

**cases** 33:4,22,23 34:1 108:14,20,22

**cash** 39:16,21,23 41:20 47:16 48:3,
19 51:11,17 52:10,12 54:23 63:19,24
75:10,16,18 83:15 101:12

**categorization** 48:10

**categorize** 19:12 23:25

**category** 47:17

**caused** 90:19

**Caylob** 14:19 15:8,11,23 22:21 38:11
39:3,14 46:21 47:1,2,3 49:9,14,21
50:4,21 51:10 55:3 57:14 64:10,21
65:5,15 71:19 72:11 75:4 78:24 83:2
87:14 88:25 90:12,24 91:15 93:22
95:22 97:11,24 100:1,10 101:6 102:7

**CFO** 6:18,21,24 23:16,18 27:17 32:14
39:11 50:17 61:18 63:17 80:21
107:17 112:1,18

**challenge** 73:10

**chance** 15:7

**change** 106:22 117:2

**changed** 24:13 104:17

**channel** 107:7

**channeled** 111:21 112:19

**channeling** 94:5

**Chapter** 29:5 78:10,15 80:20 103:14

**characterizations** 7:15

**characterize** 11:14 21:19

**charge** 35:13

**chat** 15:8 50:5,8,11

**check** 89:25

**checkbook** 36:5

**checked** 89:14

**checks** 89:8

**chief** 26:13,17,18 30:16

**child** 18:6,7

**choose** 9:13

**circuit** 86:8,11

**circuit's** 70:3 99:17 104:19 105:11

**city** 10:11

**claimant** 77:21 92:21

**claimants** 31:10 56:12 69:24 76:9,13
77:2,7 78:3 86:14 89:21 90:23 92:23
93:6 94:6 98:21 99:5,10,15 105:13

**claims** 16:12 17:7 19:2 20:18 23:2
25:23 76:20,24 81:14,19 87:22 99:9
107:7,9 111:20 112:19 113:14
117:13,18

**clarification** 16:14 73:5 97:4

**clarify** 9:4 21:6 34:3 84:24

**class** 81:11,15

**clear** 8:9 21:21 56:8 65:8 85:17,22

**clearer** 80:7

**clients** 93:5

**co's** 75:18

**coaching** 82:4,6,8

**colleagues** 106:6

**comfortable** 114:25

**commercial** 17:11

**commitment** 111:20

**committee** 113:13

**communicated** 116:10

**communication** 109:1

**communications** 7:25 79:25
103:12

**companies** 29:12 114:1

**company** 19:22 20:15 62:15 63:17
72:17 102:13 107:10

**compared** 90:14

**compensation** 115:10

**complete** 7:9 119:21

**completely** 37:5 79:22

**compliance** 33:17 36:3

**compliant** 33:18

**concern** 69:6,10 86:9

**concluded** 120:3

**concludes** 120:19

**conclusion** 28:3 107:24 111:13

**conclusions** 60:25

**conditional** 101:13

**conduct** 109:6

**conducted** 12:20

**confer** 71:15 107:25

**conferring** 37:11

**confidential** 12:11

**confidentiality** 114:17

**confirm** 29:23 52:24 57:23 59:2,14
91:11

**Confirmation** 94:4

**confirmed** 58:7 94:3,13

**confirming** 113:21

**connection** 13:19 29:15

**considerably** 12:15

**consideration** 31:9

**Considerations** 83:10

**consistent** 82:3

**consultant** 34:21

**consulting** 34:24 35:10,16,23

**consumer** 41:7 61:4,8,15 100:4,13,
17,19,21,23 101:3 109:23 113:13
117:12,18

**context** 102:24

**contingency** 95:18,22,25 96:1,24,
25

**contingent** 94:12

**continue** 37:2 44:7 62:3 106:12

**continued** 33:11

**continues** 75:3

**Continuing** 61:3

**contours** 98:6,13,17

**contract** 18:1

**contrary** 120:4

**contribution** 87:24

**convenience** 105:21

**conversation** 14:2

**conversations** 13:14,15

**copy** 120:9

**corporate** 19:20 23:9

**corporation** 10:4 15:25 57:25 61:5

**correct** 6:19,20 7:3 9:18,22 10:6,9,
10,15 12:5 13:23 16:23 20:2 26:22
27:1 35:24 37:22,23 39:11 41:22
42:4,8,23 43:19 51:25 52:7,9,14
53:16,17,18 54:10 58:3,4,17 72:16
85:1,7 89:14 90:18 104:24 106:15
107:4,5,13 109:24 112:3 118:11

**correctly** 58:1

**counsel** 6:25 8:22 9:10,12,14 13:15
45:5 74:10 80:19 86:22 98:12 104:18
109:2 111:3

**country** 13:11 108:9

**couple** 99:20 118:1,6,7 119:4

**court** 5:6,9 8:2,14,16 33:25 36:3 92:3
99:10 113:19 118:10

**cover** 7:11

**creation** 66:7,8 69:12

**creditors** 70:11,18,25 89:7,10,12
90:16,20,23

**critical** 8:9

**crouch** 106:11

**cumulative** 40:21 41:17 46:17 52:2,
6

**cumulatively** 46:15

**current** 31:9 33:16 40:9 41:10 51:23
53:2 69:24 86:14 87:21 89:22 99:5
105:13 114:11

**D**

**Dan** 11:17

**date** 5:2 15:2 30:8 38:10 49:20 56:23
57:20 64:8,13 72:24 74:18 77:1 78:18
87:7 88:10,19 90:7 93:14 95:6 97:15
102:3

**dated** 64:14 73:19 87:4 95:2 97:10

**dates** 13:5

**day** 21:21 23:14 27:2,4 29:7 33:2,20
34:4,5 36:17,23 37:9 44:10 64:3,6,20
82:21

**days** 12:12 18:23 32:17,18 33:3,21
34:3,6,7 103:23

**deal** 20:18 33:10 112:1

**debt** 54:3

**debtor** 9:17 61:18 67:2,13 89:11,16
94:2,12 120:17

**debtor's** 89:2,5

**decide** 32:5

**decided** 67:8

**decides** 115:6 116:2

**decision** 99:17

**declaration** 64:2,5,19 65:9 67:4 91:1

**deemed** 22:17

**defer** 27:11,12 28:9,20 29:8,21 60:1,
16 63:3 71:16 73:2 76:11 80:6 81:2
82:19 92:1 104:2 108:7 112:6

**deferred** 60:24

**deferring** 112:10

**deficit** 116:21

**define** 21:18

**delve** 62:21

**demeanor** 8:23

**demonstration** 114:21

**demonstrative** 116:20

**departure** 18:3 19:18 22:3 24:9
26:11

**dependent** 83:22,23

**depends** 33:20

**deposed** 7:2,4

**deposition** 5:4,7 8:12 9:8 10:23,24
11:23 12:17,19,21 13:16,19 14:3,10,
11,13 27:10 28:10,14 29:9,16 30:1
37:3,4,7 63:4 70:17 71:10,16 74:21,
23 75:1,3 76:11 87:10 93:17 97:17
103:23 106:14 114:25 115:1

**depositions** 14:16

**describe** 21:23 26:3 35:10 46:12

**48:1,2 58:14

**designate** 12:10

**designation** 12:14

**designations** 81:15

**desk** 10:20,21 11:2 36:6

**detail** 66:13 102:6

**detailed** 112:10

**details** 45:22 46:19 53:24 54:1

**determine** 76:19,24

**determined** 118:14

**Developing** 97:21 98:1,10

**development** 23:9 24:12,19,21
25:17,18 26:8

**Devices** 19:23,25 20:14,19 21:5,20
22:4,10,15 23:8 24:12 25:12 100:16

**Deyo** 13:24 115:22

**Diagnostics** 18:10,12 19:13,16,24,
25 22:10,15 24:13

**Dickinson** 5:5,20 6:8,18 10:12 12:17
13:1 14:25 15:3,15,17,25 21:15,20
28:17 29:19 30:5,7,9 36:14 37:16,24
38:6,8,12,15 39:7,15,18 40:3,15 45:1,
8,9,11 46:4 47:8,23 49:16,18,22,24
50:5,10,14 51:13 53:14 55:21 56:3,
22,24 57:8,17 58:11,24 60:3 62:3,8,
22,24 64:7,11 65:1,13,21 67:17 68:8,
16,22 70:18 71:8,22 72:13 73:6 74:8,
13,14,17 75:7,24 78:12,13,17,20,25
79:8 80:4,15 81:11 82:12,15 83:3,8
85:14 86:20 87:6,17 88:18,21 89:3
90:4,6,9,14,25 91:8,16 93:10,13 95:3,
5,8 97:6,11,14,20 99:19 101:15,24
102:2,4,10,20,23 106:4,10 113:11,12,
23 115:8 116:4 118:1 120:2

**Dickinson's** 93:17

**difference** 86:23 90:16

**direct** 39:15 41:23 42:24 45:11 65:18

**directed** 47:19

**directing** 39:20 54:2,22 55:4 56:13
59:3 87:19

**directly** 110:5

**director** 17:3,15 22:12 23:24 25:14

**disagree** 84:14 100:12,13,23

**disbursements** 39:17 41:9,15,16
51:11

discharge 111:10 112:2

disclosing 103:11

Disclosure 102:10

discoverable 115:2

discuss 29:10 44:10 115:16,23,24, 25

discussed 28:14 66:22 67:8 93:18 102:15 115:11 116:23

discussion 28:21 29:2,4 45:23 71:13 96:1,7,19 97:3

dismiss 13:3 14:7 36:22 37:10,14 114:22

dispute 84:1

distress 73:14,15,16 104:21

distressed 29:11

distribution 89:7

District 5:6

divestiture 23:4

divestitures 22:14,16 24:19 26:9

dividend 84:4,5 85:9,24

dividends 83:23 84:10

divisive 102:25 103:1,2,6,7,13

Dmitry 5:9

document 30:3,9 32:12 38:12,16,18 39:14 40:4 48:6 49:25 50:5,16,18,23 51:7 53:10,11,17 54:5,9,18 55:7 56:16 57:12 58:11 59:4,13 61:3 62:13 64:12,14,16 65:6,13 66:3,7,18,21 67:1,21 72:2 75:5 76:7 78:14 79:19, 20,22 81:1,3,5 82:18 87:10,12 88:10 89:3 91:8,21 92:8 94:21 95:8 99:24 114:19

documents 11:1,22 12:2,4 33:5 56:5 92:3 106:22

dodge 101:19

dollar 75:22 117:12,17

dollars 52:9 89:17

Dominic 20:11,12

drawn 36:2

drop 15:8 50:4

due 28:19 56:8 63:18 82:19 83:23

duly 5:15

duration 8:4

duties 16:7 30:16

## E

e-mail 120:10

e-mails 10:22

earlier 8:7 13:21 31:15 80:5 84:6 85:2 92:1 102:15 104:23 113:23 117:4

earnings 83:19

easier 8:13,16 50:15

effectuate 31:17,19

effectuating 30:22 31:20

efficiency 99:3

efficient 99:4

effort 48:12

elicit 61:1

eloquently 105:14

else's 22:18

emerges 94:2

emerging 94:12

employed 27:6 28:1 113:25

employees 37:16

employment 31:11,22 113:24

employs 117:21

enable 56:10 89:20

encompassing 7:10

end 20:6 41:21 42:14 52:13 116:9

ended 38:4

ending 42:17 45:10 47:11 49:15 54:8,20

ends 44:19 74:2 105:23

enforceability 70:4 86:21 111:5

enforceable 110:22

engage 82:9

enjoyed 19:14

ensure 36:3 70:7,9 99:3 117:5

ensuring 33:17

entered 54:14

enterprise 26:17 100:5,14,22 118:24

entire 65:12

entitled 64:23

entity 114:4,6 115:17

equitable 69:14 105:13

equity/net 42:17 54:8,21

Ernst 35:12

established 85:2

estimate 61:12 75:18,22 77:5 117:11,16

estimated 75:10,12,15 81:18,19 89:10,23 90:16 100:5,22,24

estimates 75:21

estimation 89:6

ethic 32:19

ETHICON 18:8 22:6,7,8,14,23 23:5,7 24:1,9 25:2,17

evaluate 35:11,12

evaluation 111:7

events 110:16

eventually 24:13

evidence 91:23 99:12

evidenced 85:21 104:21

exact 17:4 27:4 44:8 50:1 54:1 58:25 60:2 62:1 92:23,25 93:3 96:8 99:3

examination 6:6 8:5 12:20 106:8 113:9 118:3

examine 71:9

examined 5:16 71:12 87:9

exceed 87:25

excluding 27:16 42:7,9 53:15,20 100:6

excuse 21:5 26:15 27:15,22 32:15 42:8 55:17 58:6 60:6 63:10 77:16 87:12 89:3 98:8

executed 57:20 58:3

executive 32:4

exhibit 14:21 15:1,13,15,16 30:5,7 38:6,9 49:16,19 50:7 56:22 64:7 65:13 74:13,17,22 78:12,17 83:3 87:6 88:16,18 90:4,6 91:1 93:11,13,16 95:3,5 97:11,14 101:25 102:2 113:19, 20

exhibits 50:7

**exist** 62:3 84:18

**existing** 94:7

**expand** 97:24

**expect** 9:1 12:19

**expected** 84:10

**expedite** 8:16

**expense** 45:22

**expenses** 35:14 36:4,7,15 37:19 41:5,14 43:14,20,22,23,24 55:6

**experience** 16:12 17:7,9,23 19:2 21:3 25:8,22 29:5,6,11 31:12,22 32:3

**experiences** 23:2

**expert** 108:13

**explained** 104:19

**explanation** 112:10

**explore** 33:11

**explored** 22:19

**extent** 12:21 28:13 61:10 72:4

**extremely** 26:5

F

**faced** 30:23

**fact** 99:12

**factors** 96:10

**facts** 91:23

**factual** 7:10 110:14

**faded** 27:12

**fair** 18:7 32:3 69:14 85:20 89:21 99:5 105:12 106:18,19,20 111:6 112:11,23 114:2,8 117:6 119:22

**fairly** 116:22

**faith** 48:12 53:7 54:13 56:10

**Family** 114:1

**fast** 50:2

**FD** 102:9

**February** 95:2,10

**feel** 9:5 114:25

**fees** 34:21,24 35:2,16 43:25

**figure** 110:11

**filed** 9:22 27:7 34:1 38:5,24 61:8,19,

20 63:5,12 66:15,19 78:11 88:15 90:3 92:3,13 99:17 101:23

**filing** 9:25 22:23 29:16 37:8 45:25 71:12 72:24 76:15 102:24 104:4,25 118:21

**filings** 118:9

**fill** 53:11 114:23

**final** 12:13 30:22 31:8,19,20,24 32:7 53:8 54:14 56:11 69:23 85:20 86:13 89:21 99:14 104:15 105:13

**finance** 17:5,15 19:21 35:1

**financial** 16:8 17:2,3,16 26:13,17,18 27:19 30:16 34:25 44:6 51:4 53:25 63:16 73:14,15,16 83:10 104:21 118:15,23

**financially** 29:11

**find** 50:15 116:7

**finding** 26:6

**fine** 6:13 8:21 37:14 113:16

**finish** 8:17,19 9:7 34:11 61:17 109:12

**firm** 35:12 113:12

**firms** 35:15 92:15,19,22 93:1,5

**flip** 46:21,22 57:14 93:19 97:11

**floor** 47:20

**flow** 84:5 85:9

**focus** 54:17

**focusing** 27:14

**folks** 14:20 118:17,20

**follow** 118:19

**foreseeable** 73:14 104:20

**forget** 12:10

**forgive** 77:12

**form** 47:18 48:10,23 53:6 56:7 58:8, 22 59:10 61:22 62:5 63:8 68:12,21 69:9 72:3 73:1,8 75:23 77:8,22 78:5 79:18 80:24 84:19 85:5,6,11,25 86:18 91:4,22 94:14 102:5 103:17 104:8 105:4 107:2,14,22 109:8,25 111:12 112:4 119:2

**formally** 113:17

**forms** 118:15

**forward** 24:22 32:7 70:3 77:17 78:1

**found** 103:13 108:9

**foundation** 67:3 75:24 84:20 85:12 91:23 94:15,23 100:25 101:16 104:9 107:23 108:25 110:7,10 116:3

**fourth** 84:9

**franchise** 19:21 23:9

**free** 9:5

**front** 35:5 50:13 82:18 84:23

**frustrated** 86:8

**full** 30:22 31:7,19,20,24 32:7 40:11 47:2 53:8 54:14 56:11 59:17 69:23 85:20 86:13 89:20,21 99:4,14 104:15 105:12 117:4,6

**full-time** 32:10,13,21

**fully** 15:16 31:7

**fund** 83:23 111:8 119:10

**funding** 41:6 57:7,13 58:5,16,20 59:8,19,21,23 62:18 63:6,13,20,21 67:23 68:1,11,19 69:5,7,11,12,13 70:13,19 71:5,21 72:6 83:24 84:18,25 85:8,17,23 86:6,7,9,10,15,21,24,25 94:11 103:15 104:6,17 105:10 111:19 112:21

**funds** 70:8 89:6

**future** 22:18 31:9 69:25 78:1 84:10 86:14 87:21 89:22 94:7 99:6 100:6 104:21 105:14

G

**gain** 16:11 17:23 19:1 21:3 25:22

**garnering** 98:5,11,16

**gave** 29:8,14 30:1 70:22 106:14 110:15

**general** 12:1,4 59:16,18 81:7 98:21, 24 99:1,2 111:22

**generally** 44:9 62:10 65:2 88:23 94:22 96:9 102:5 107:16 108:14

**Gentleman** 60:7

**George** 6:4

**GH** 84:11

**gist** 105:15

**give** 6:2 7:6,12,15 14:21 29:20 34:8 48:16 54:1 59:17 72:8 80:6 82:22,23 88:9

**giving** 70:23

**Glance** 72:15

global 118:14

goals 105:12 117:6

good 6:8,9 7:13 8:6,20,25 10:24,25
20:7 44:13,14 48:12 53:7 54:13 56:10
113:11 120:7

Goodwin 35:17,18

governance 73:11 84:8 86:5

great 19:14 21:25 24:3,6,7 103:25
104:1 106:14,25

ground 63:1

group 18:2

grow 101:13

guess 23:4 27:2 84:3

---

**H**

half 107:11

hand 47:16

hands 22:18

happened 28:8 90:20 110:9

happy 115:1

harassing 37:5 75:2

he'll 7:15 21:18 60:10,12

head 8:10

hear 6:10 9:3 45:1 71:7

heard 76:17 102:23,25 103:5,8
113:23 119:9

hearing 13:3 14:7 29:17 120:3

heart 19:15 22:1

held 17:2

helpful 57:4

hereto 57:20

hey 20:7 23:10 24:20 96:19

highly 100:4,14,17,21

hired 18:15

hiring 18:11 20:3 24:15

history 99:8 113:24

hoc 33:4 96:7 113:13

hold 75:18

Holdco 62:10 72:7,9,22 73:15,16
83:15,21,22 84:22,25 85:3,7

Holdco's 72:24 73:7 75:16

honest 82:23

honestly 7:19

hour 34:8,9 44:13

hours 11:11,12 27:12 32:23,24,25

human 116:13,14

hypothetical 31:6

---

**I**

I's 57:6

identification 15:1 30:7 38:9 49:19
56:22 64:8 74:18 78:18 87:7 88:19
90:7 93:14 95:6 97:15 102:3

identified 76:14

II 9:24 53:24 64:4 76:6 77:11 90:2,6
91:2 99:2

II's 77:9

imagine 12:14

impact 104:6 105:1

important 63:24

improper 82:7

Inc.'s 61:8

include 37:19

includes 89:19 90:23 94:5 110:1

including 8:13

income 43:13,19 45:12 52:9 55:4
101:4

incomplete 70:22

incorrect 42:22

increase 90:19

incurred 43:20,22

indemnify 109:5

indemnity 110:21

independent 32:5 60:19 73:6 79:24
80:1,18,22 81:21 107:20 108:10

individual 111:9

individuals 37:19

information 7:9 27:10 59:17 92:19
99:9 106:21 114:9 118:15

initial 48:11

initially 51:2

initiatives 24:22

injunction 12:18 71:10 94:5

injuries 77:3

injury 81:14,18 87:22

insight 53:19

instructed 9:12

instructing 82:12

instructions 82:6 118:13

integrated 103:9,16 104:7 105:2
110:16

integration 103:19

intellect 104:2

intended 19:11 85:19 104:14

intention 54:15 117:4

interject 21:14 74:19 114:16

interpret 101:20

interpretation 60:2 63:15,16 81:3,4
82:20 101:17 104:3 111:5 112:7

interview 18:11,13,16,18,21 20:3
23:7 24:15

interviewed 18:14 28:12,18,25

introduced 74:12 83:4,5

investigate 110:20

investigation 76:19 110:20 111:1

invoice 36:5

involve 112:2

involved 16:18 17:17,18 19:7 20:24
25:25 50:17,25 51:3 62:1 66:2,6
86:17 91:20 92:7 96:15 101:1,3
118:23,24

involvement 66:17

irrelevant 37:6

issue 104:22

item 102:9

items 45:16,17,19 46:10 55:11 119:6

---

**J**

J&j 10:2 19:12 20:1 27:14,15,17,21
28:1,7 31:5 100:19 101:23

J&j's 101:23 107:20

**January** 99:18

**Jersey** 5:6 6:5 10:8 14:3 32:16 57:25 61:5 109:5

**Jim** 11:9

**JJCI** 62:3 72:19 85:4,9

**JJCI's** 61:19

**job** 16:6 18:22 20:4 24:25 25:3 27:16 28:25

**jobs** 25:6 26:20

**John** 11:9 64:2,5,19 91:1

**Johnson** 10:2,5,6 18:9 22:8 24:3,10 26:21,23,24 27:3,6,24 30:14,23 32:4, 13 37:20 41:6,7,8 44:1 51:5 53:7 54:13 57:24,25 58:6,17,19 59:5,7,22 60:20,22 61:4,7,8,15 67:24,25 68:2,9, 10,18,24,25 69:7 72:7,8,16,22 85:4,9, 10,18 102:1 107:9,12 108:3,9,20 109:6,23 110:5,22 111:10,20,21 112:2 113:25 114:1,4,5 115:9,10,17 116:10,14,15,18,19,23,24 117:23

**Johnson's** 51:5 59:5 60:20 68:1,2 102:1 112:2

**join** 30:14

**joined** 16:21 18:8,9,12

**Jon** 82:2,10 106:10 113:3

**Jones** 6:2 7:14 11:9 12:8 15:12 21:14 26:16 28:2,13 29:13 35:7 36:9, 12,19 37:4 40:11,17 41:19 44:12,16 47:23 49:1 58:8,22 59:10 60:7,23 61:10,22 62:5,20 63:8,14 65:7,14 67:3 68:2,12,21 69:9 71:8 72:3 73:1,8 74:19 75:23 77:8,11,22 78:5 79:18 80:2,24 81:23 82:9,11,14,21 84:19 85:5,11,25 86:18 87:8 88:9,12 91:22 93:15 94:14 97:5,16 98:7 100:25 101:16 103:17 104:8 105:4,20 107:14,22,25 108:25 109:8,12,25 110:7,23 111:12 112:4 113:3,6 114:15 115:7 116:3 117:25 118:4 119:24 120:1,2,12,16

**Judge** 34:10 103:12,21

**jump** 64:22 90:22

**June** 13:3,4,7 14:7

**juries** 108:8

**K**

**Kaplan** 103:13

**Kaplan's** 34:11 103:21

**keeping** 26:15

**Ken** 23:19

**Kim** 11:9 13:22 37:20 60:1,16,17,24 64:2,6,19 66:24 67:5,10 69:3 70:14, 21,24 71:3 79:23 80:6,10,16 81:4,8 82:20 91:1,20,24 92:10,16,24 93:4 94:24 96:8,11,13,14,15,17,20 98:18 103:20 104:2,10 105:9 110:4 111:23 112:7,10,25 117:14

**knowledge** 7:10 22:25 25:21 60:20 66:2,5,6 68:16 91:19 108:15

**L**

**language** 58:25 59:13

**large** 93:2,4,5

**largely** 83:21,23

**late** 34:11

**law** 35:12,15 109:5 113:12

**lawyer** 6:1 79:21 101:18,20 109:13

**lawyers** 11:7,8 35:21 103:20 104:1 108:7

**laymen** 109:19

**lead** 24:12

**leadership** 16:9 22:12

**leading** 22:14 24:19

**learned** 109:13

**learning** 19:14

**leaving** 111:9

**led** 22:13 97:3

**left** 22:1 24:4 26:9 116:20

**left-hand** 89:1

**legal** 8:1 28:2 34:16,23 35:2,21 43:25 59:25 60:2,25 62:9,12 63:15 68:13 70:15 71:3 76:16 79:19,20 80:19 81:3 82:20 86:21 90:21 92:17 94:16 98:19 101:17 104:18 107:15,23 108:13,15 109:5 110:1 111:13,24 112:7 114:6

**length** 113:24

**letter** 113:21 114:9,13

**letting** 50:16 80:12

**Lexitas** 5:10

**liabilities** 30:23 31:8,21,25 33:16

42:12,13 49:5,8,11 54:3 56:14,17 76:8 87:1 89:23 100:7,20 101:5 104:16 107:21 109:21,22 110:18

**liability** 41:24 52:16 62:15 68:1 75:22 107:8,10,11,20,21 108:3,6,10, 18,19 109:18 110:16 111:9 112:3

**liable** 58:6

**licenses** 26:9

**lifetime** 43:3,9

**limit** 86:1

**limited** 62:15

**line,you** 37:1

**Linkedin** 14:24 15:19,20 16:4

**liquidating** 73:12

**liquidity** 73:7,10 83:11 104:22

**Lisa** 113:11 114:22

**list** 35:5 98:24

**listed** 16:3 58:17 69:8 72:17,20

**listen** 14:16

**live** 10:12,13

**LLC** 5:5 30:15 62:14 78:16

**long** 7:7 16:20 18:16,21 30:25 36:2 53:22 99:11 114:19 115:10

**Long-term** 83:11

**longer** 69:7 72:17,19

**losing** 100:19 101:4

**loss** 46:5,10,18 55:14

**lost** 46:15

**lot** 96:6,9

**LTL** 5:5 6:18 9:18,20,24 13:18 14:6 26:19 27:7,15,16,17,19,23,25 28:22 30:6,15,18,25 31:16 32:14,20 33:3,7, 17 34:2,7,10,14,17,19 36:8,18,23 37:18,19,22,24 38:8 39:11 40:24 41:2 42:7 43:3,19 45:16 46:8,15 49:3,18 51:19 52:8 53:5,9 54:11 55:19 56:21 57:6 58:21 59:8,24 60:21 61:8,19,20 62:10,14,19 63:5,12,19,21,23 64:4 65:25 66:6 67:13 68:8 69:5 72:10 73:15,19 76:9 77:2,6,9,11,19 78:11, 16 83:15 87:1,23,24 88:14,18 90:2,6 91:2 92:12,13 96:15 98:15 100:5,22, 24 101:4,11 104:5 106:15 107:8,17 108:3,19 109:5,21,22 110:17,19,20, 21 112:18,20 115:19 117:5,21

**LTL's** 9:20 31:12,23 32:9 37:16,18, 21 38:20,22 42:3,13,19 43:9 47:10, 13,15 48:1,2,6,14,18,24 49:5,11 53:1, 20 54:10,16,19 55:6,24 56:5,17 59:6 67:23 68:17 69:20 70:11,18 75:10,13, 22 76:23 78:2 80:20 87:3 90:15 95:1 96:13 97:9 102:24 104:4,24,25 107:20 108:5,18,23 109:18 110:13, 15,18 111:9 112:3

**LTLMGMT-00000233-59** 74:16

**LTLMGMT-00002626-27** 97:13

**LTLMGMT-00002628-40** 93:12

**LTLMGMT-00002668-79** 87:5

**LTLMGMT-00013464-65** 95:4

**lunch** 20:6,7,10 23:9,15

**Lydell** 6:14 12:16 21:15 26:16 35:8 36:19

**M**

**made** 41:15 94:2,7

**main** 19:6

**maintain** 8:23

**maintaining** 67:25

**make** 8:12,16 35:20 48:5 59:17 65:7, 10 77:6,20 82:7 105:18,20

**makes** 86:23 114:24

**making** 33:19 78:2

**manage** 15:20 23:21,24

**management** 5:5 6:22 19:21 26:19 27:20,23 30:15 33:7 34:21 48:21 53:25 62:14 63:25 78:16

**manager** 17:25

**managers** 73:19 87:4 95:2 97:10

**managing** 16:19 17:7,18,20,23 19:7 20:24 21:2,3 25:22,25 33:10 34:18

**manner** 70:10

**March** 38:5 40:24 42:14 45:10 47:11 73:19 97:10

**mark** 15:12 30:4 38:6 49:15 65:12 78:11 93:10 95:2 97:10 101:24

**marked** 14:25 15:15 30:6 38:3,8 45:8 49:18 56:21 57:7 64:7 65:8,9 74:13, 17,22 78:17 87:6 88:16,18 90:3,6,25 93:13 95:5 97:14 102:2 113:20

**materials** 66:9,11,23 67:9 71:18

**math** 88:4,6

**matter** 13:19 46:9 84:21

**matters** 62:23

**meaning** 8:3,10 52:8

**means** 40:24 41:14 79:17 81:22 94:19 98:5 101:21 103:19

**meant** 43:5 119:12

**measurement** 17:5,25

**Medical** 19:23,25 20:14,19 21:5,20 22:4,9,14 23:8 24:12 25:11,12 100:16

**Medtech** 22:9 24:11,14 25:13,19 26:4,12

**meet** 11:10

**meeting** 11:12,15,18,19 47:16 48:20 73:3 95:11,25 115:11,25

**meetings** 11:5,13,14 33:4,5 96:3,5, 7,8,16

**member** 109:19 110:19 117:4

**memory** 7:22 27:11 61:11,25 88:22

**mentioned** 13:21 23:15 29:2 32:16 33:21 34:13 35:9 103:23

**merger** 102:25 103:1,2,6,13,14

**met** 6:16 7:4,8 11:7 115:14

**met all** 69:13

**Michelle** 58:3

**middle** 9:6

**million** 39:24 40:9,15,21,25 41:11, 18,21 42:8,9,14 43:16,18 45:16 46:6, 9,11,16 47:17,19,24 48:3,10,19 49:6, 10,12 51:20 52:11,13 53:9,16 54:4,12 55:8,11,15 56:18 73:4 75:10,13,16,19 83:15,19 88:7

**mind** 8:12 73:21 105:22

**minimally** 101:13

**minus** 46:5 87:1

**minute** 14:22

**minutes** 11:15,17 47:16 66:11,12 67:9 71:10,17 73:24 92:4 95:1,11 97:9,17 104:12 105:17

**mischaracterize** 66:20

**mischaracterized** 80:9

**mischaracterizing** 48:17

**misrepresenting** 60:15

**missing** 15:5

**mistakes** 33:19

**mitigate** 70:2

**mm-mm's** 8:10

**modified** 83:24

**moment** 7:23 12:7 15:6 93:9,21 97:8

**moments** 119:16

**money** 41:2,5 100:19 111:8

**monitor** 103:24

**monitoring** 33:3,5,22,23 34:4,5,12

**month** 39:21,24 40:9 41:10,15,21 43:21 46:8 47:10 51:18,19,24 52:13 53:2 87:10 93:17

**monthly** 38:3,7,19,20 45:9 49:14,17 53:2 118:7 119:5

**months** 42:18 63:2

**MOR** 42:23 50:20,24

**motion** 13:3 14:6 36:22 37:10,13 114:22

**move** 18:6,7 37:14 49:4 82:1

**moving** 18:5 106:25

**multiple** 24:11 32:25 34:1

**N**

**named** 108:21

**nature** 18:3 19:18 22:3 24:8 26:11 28:6 44:8

**Near-term** 83:11

**negative** 43:16,18 46:14 55:15

**negotiate** 67:24 68:9,18,24

**negotiated** 62:18 67:1,12,19 69:1

**negotiating** 91:20

**net** 40:2,12,13,20 41:9,17 42:19 51:23 52:1,5 54:10,19 88:8

**Newtown** 10:14,15

**night** 33:12

**nods** 8:10

**normal** 18:13 25:4

**north** 17:11 62:14 76:17

**Notary** 5:15

**note** 87:8 102:21

**noted** 5:11 12:24 67:10,11 68:15 70:16 120:22

**notes** 105:18 118:14,18

**notified** 70:12,19 71:1

**nuanced** 112:16

**number** 57:8 62:1 89:10,15 90:16 92:19,21,24,25 93:2,3,4,5 114:1 120:19

**numbers** 39:2 40:17 41:19 78:23 89:1 90:13

**O**

**oath** 8:4,8 28:20 45:3 63:22 74:9

**object** 7:14 9:10 12:21 28:2,13 58:8, 22 59:10 61:1,10,22 62:5,20 63:8 67:3 68:12,21 69:9 73:1,8 75:23 77:8, 22 78:5 79:18 80:24 81:23 82:3 84:19 85:5,6,11,25 86:18 91:22 94:14 100:25 101:16 103:17 104:8 105:4 107:22 108:25 109:8,25 110:7 111:12 112:4 116:3 119:2

**objection** 59:11 63:14 71:8 72:3 107:14

**objections** 12:23 82:4,7

**objective** 99:3

**objectives** 69:13,18,22 70:1,6 86:12 115:11,15,25

**obligation** 94:1,11

**obligations** 72:10

**occurred** 25:7 70:9 103:3

**occurs** 116:11

**October** 9:22 26:14 27:5 29:15 31:4 37:23 47:14 48:7 49:5,8 51:19 52:8 55:24 56:6,17 57:13 88:15 103:4

**offer** 18:22 20:10 30:14 85:20 86:12 114:8

**office** 10:10,11 34:11

**officer** 13:18 14:5 26:13,17,18 27:19 30:16 66:6 96:13,15

**offices** 32:15

**official** 6:23 27:13

**omission** 47:16

**open** 36:4 50:10,13

**operate** 110:5

**operating** 38:4,7,19,20,22,24 45:9 49:14,17 53:3 118:7 119:5

**operation** 16:15 17:10 19:4 23:5

**operationally** 62:4

**operations** 17:12,16 18:2,5 19:6 43:13 45:13 55:5 84:22

**opinion** 60:1 105:11

**opportunities** 24:21 33:12 35:11,13

**opportunity** 25:10 26:8

**opposed** 107:20

**options** 71:13

**order** 12:12 75:1 111:19 112:1 120:13,17

**ordering** 120:15

**ordinary** 54:24

**organization** 116:20

**orient** 49:22 57:2

**oriented** 49:24

**original** 105:10

**originated** 88:5

**Ortho** 18:24 19:1,4,19 21:4

**Ortho-clinical** 18:9,12 19:13,16

**other's** 115:23,24

**overlap** 20:15

**oversee** 16:15 19:4 23:5

**overseeing** 17:9 20:21

**owe** 7:16

**owned** 114:4

**ownership** 48:4 63:20 75:13

**P**

**P-R-I-E-T-O** 97:5

**p.m.** 5:3 120:22

**pages** 46:25 55:18 64:22 65:17 71:20 91:3 107:11

**paid** 45:16 77:2 116:21

**paper** 116:9,12

**paragraph** 79:14 80:1,23 82:1

93:20,24 100:2 101:7,9

**parent** 10:4 56:9 107:10

**parentheses** 54:8

**part** 22:9 37:21 39:16 41:23 42:24 43:5,6,12 45:9,12 51:10 52:15,18 54:22 55:4,17,18 59:2 64:3 68:23 104:7 112:22

**participants** 5:8

**parties** 57:19 87:23

**partner** 25:9

**partners** 34:25 35:4,23 51:4,6

**parts** 108:9

**party** 39:8

**pass** 102:22 105:19 106:6

**passed** 46:25 47:1

**past** 35:17

**path** 32:7

**Paul** 106:11

**pause** 12:9

**pay** 34:21 35:3,14,21,22 36:2,7,15 41:5 73:13 104:20

**payables** 42:7,8 53:15,20,22

**payee** 62:15

**paying** 33:6,16 34:13,18,24 35:9,15

**payment** 47:21 48:11 53:6 54:13 56:10 77:6,20 89:19 93:24 94:1,11 119:4,13

**payments** 78:2

**payor** 57:25 58:7,17,20 59:6,7,23 60:20,22 61:5 68:10,19 69:8 72:17,20 84:25 85:3,7,10

**payors** 85:16

**payroll** 37:17,18

**Pennsylvania** 10:13,14,15

**percent** 81:19 84:10

**percentage** 114:12 115:12

**percentages** 115:5

**perfect** 65:19 78:25 83:6

**performance** 17:5,25 24:23 116:21

**performed** 24:18 107:18 110:20

**period** 16:5 18:1 22:13 31:2 38:4 45:10 49:15 53:22

**Perry** 5:10 8:3

**person** 13:17 18:18,20 25:10 77:25 80:10,13,15,16 91:25 103:20 110:4 111:23

**personal** 7:10 81:14,18 87:22

**perspective** 63:23

**pertain** 34:15

**petition** 88:14,17 90:2,5,15

**phone** 10:19 18:19 20:5 24:17 25:8 28:10,12,18 29:4 33:13 37:9,12

**phrase** 103:8,14

**PI** 29:16 71:9

**picky** 112:8,16

**picture** 15:5

**piece** 116:9,12

**place** 5:7 19:17 26:10 33:19 63:23 70:8 85:3

**plaintiff's** 92:14,19 93:1

**plaintiffs** 98:6,11,16

**plan** 31:7 58:7,15 69:15 76:4 77:15 78:10,15 80:20 91:4,6 92:2,8 94:3,4, 13 95:25 98:6,7,8,10,13,17 99:4 107:2,7 111:19 112:20

**planned** 70:7

**planning** 22:5,11 23:23 95:18,23 96:2,24,25

**plans** 13:7,11

**play** 17:13 28:23 30:21

**pleadings** 64:3,6,20

**plethora** 43:24

**plowed** 63:2

**pocket** 10:20

**point** 7:22 9:5 13:6 24:3,6 25:6,11 47:19 57:3 61:11 75:2 77:19 85:16 110:17 115:4

**portion** 59:4 95:13,16 107:19 108:2

**posed** 7:16 81:8

**posing** 56:1

**position** 32:22

**possession** 106:21

**possibility** 68:10

**possibly** 67:25

**post-petition** 42:6,8

**postpetition** 53:15,20

**potential** 33:14 84:5

**preliminary** 12:18 71:9

**prepackaged** 98:10

**preparation** 11:5,6,23 14:9 51:1 92:8

**prepare** 51:7

**prepared** 117:17

**preparing** 50:18 51:3 66:3

**prerogative** 83:1

**present** 10:16 87:25 88:8 107:7

**presentation** 73:3,18 87:3

**presentations** 71:11

**presented** 71:18 92:6 104:14

**presently** 94:6

**president** 25:16,17 65:25 117:21

**presumes** 75:24

**pretty** 116:18

**previous** 9:9 28:9,20 96:7

**previously** 22:10

**price** 54:24

**pride** 32:18

**Prieto** 11:17 97:2

**primarily** 27:22

**print** 97:23

**prior** 28:14 29:8 66:23 100:15,18 110:6,9

**problem** 99:23

**proceed** 8:12 95:24 111:11

**proceeding** 12:18 63:1 107:3

**proceedings** 120:19

**process** 18:11,13 20:3 23:7 24:16 25:5,6 34:16 36:1,2 45:22 48:13 76:6 117:7 118:20

**produced** 114:19

**products** 17:24 21:4 100:7 107:13 108:11

**professional** 8:23

**profit** 46:5,18 55:14

**profitable** 100:7

**progressing** 115:25

**projections** 77:18 78:1,7

**promises** 110:21

**promoted** 19:20 22:5

**proper** 54:1

**proposal** 107:1

**propose** 79:21

**proposed** 47:21 76:6 107:2,6

**protection** 113:14 117:13,18

**protective** 12:12

**provide** 8:9 86:13 99:4

**provided** 26:7 101:11 112:21

**provisionally** 12:11

**PSA's** 92:14,20 93:1

**Public** 5:15

**publicly** 35:7

**pull** 14:18,19 29:21 30:3,4 49:13 50:6 56:20 64:1 73:18 78:9 83:3 90:1 93:9 97:24 113:19

**pure** 53:8

**purely** 107:19 111:8

**purpose** 31:12,23 34:2 86:8 104:14

**purposes** 70:16 85:19

**pursuant** 12:11

**pursuing** 99:14

**push** 44:5 108:5 110:12

**put** 19:15 21:25 31:24 37:22 38:24 50:1 54:11 63:22 70:8 107:2

**puts** 96:21

### Q

**qualified** 119:9

**queried** 62:22

**question** 7:16 8:18,19 9:3,7,12 21:9, 10,16 29:24 30:1 31:13 35:6 36:16 49:2,4 51:7 54:12 56:1,3,4 57:4 58:9, 13,23 59:7,11,12 60:8,18,24 61:2,17, 23 62:6,9,11 63:9 66:4 67:4,12 68:13 69:3 70:14,21 71:2,3 72:4 76:16,21 77:9,23,24 78:6,8 79:19,22 80:5,13, 18 81:4,8 82:13 84:20 85:6 86:19

90:21 91:25 92:10,16 93:3 94:16,20,
23 96:14 98:18 101:18,19 103:18
104:10 105:5,8 107:15,23 108:12,15
109:9 110:1,8 111:13 112:16,24
117:8,14

**questions** 9:10 29:3 44:7 56:2 74:24
99:20 102:19 104:23 106:5,11 113:2,
7 118:5 119:4,5,18,25

**quick** 7:7 20:6

---

**R**

**RAM** 32:20 34:8,23 35:9,15,23 47:17
48:4 53:9 63:20 75:13 83:18,19 96:18

**range** 76:12

**reach** 31:24 32:7 54:14 69:13,23
117:6

**reaching** 48:12 53:8

**read** 9:4 14:9,13 15:18 29:22 40:5,23
46:1 50:6 51:10 53:12 55:16 57:22
58:1 61:3 66:9,14,18 68:4 72:21 79:3,
10,13,14 81:2,5 82:17 89:17 94:21
100:9,10

**reader** 50:3

**reading** 33:5 40:4,16 66:18 79:16
81:7 89:13,14

**reads** 40:11 41:24 42:2,5,6,17 43:12
54:7 57:19 98:9 100:3

**ready** 40:6,7 106:12

**realtime** 31:17

**reason** 7:18 13:1 14:5 16:3 41:4
42:21 84:1,14 104:17

**recall** 7:23 9:8 16:20 18:16,18,21
20:3 24:15 25:4,5 27:4 29:6 51:21
62:1 65:2 76:11 103:7 118:5

**receipts** 39:16 40:2,9,13,20 51:11,22
52:1,5

**receive** 12:13 36:17 41:2 111:19

**received** 18:22 20:10 28:10 40:25
41:5,6 43:25 44:1 116:7

**receives** 36:23

**recent** 38:22 71:9

**recently** 29:17

**reckless** 109:7

**recognize** 30:11 38:15 64:11,16
65:1 91:8

**recollection** 12:1,4 62:23 94:10

**record** 5:2,12,19,22 12:11 26:16
36:25 38:25 44:15,20,23 46:1 53:12
65:8 68:4 74:3,5 87:9 105:16,24
106:2 120:5,11,21

**recovery** 81:18,19

**redacted** 114:9,18

**redaction** 114:13

**redirecting** 46:13

**refer** 10:2 53:25 58:25 59:1,13 65:11
67:7 69:21 70:24

**referenced** 96:4

**references** 102:12,14

**referencing** 84:7

**referred** 118:12 119:3,12

**referring** 9:18,21,25 10:3,5 49:7
50:16 52:3,4,21,22 67:15 69:18,22
77:15 84:6 86:20 103:3

**refiling** 71:6

**reflect** 53:22 55:6

**reflected** 52:20 71:14

**reflection** 95:10,13,15

**reflective** 43:19

**reflects** 40:8 42:7,13,18 43:2,9
45:16,20 47:13 49:5 51:18 52:12
53:1,3 54:9,18 55:23 56:5,16 108:2

**refresher** 7:7

**regard** 22:18 24:19 26:6 28:21,22
34:10 44:7 47:20 53:7 56:8,9 69:10
73:12,13 82:20 84:21 86:9 91:25
104:12 105:8 111:4 118:14

**regular** 116:22

**Regulation** 102:9

**relate** 34:20

**related** 27:16 35:9,15 36:18 87:23

**relates** 107:19

**relative** 118:2

**relevance** 37:13 114:22

**relevant** 66:10,21

**relied** 67:5

**rely** 44:5 51:5 111:3,4

**remain** 58:20 59:23 60:22

**remainder** 13:10 54:15

**remained** 59:8

**remains** 34:2

**remember** 23:16 36:13 119:7

**remind** 8:11

**reminding** 45:3 74:8

**remote** 5:8

**reorganization** 45:15,17,19 46:10
55:11 78:10,16 80:20 94:4,13 107:3

**repeat** 21:12 56:4 58:13

**repeated** 82:5

**repeatedly** 82:5

**repetitive** 12:20 71:14 74:25

**rephrase** 63:11 68:6

**replaced** 85:3

**replowing** 63:1

**report** 17:21 38:4,8,19,20,22,24 45:9
49:14,18 53:3 100:18 118:15,17

**reported** 17:21 19:9,23 21:1

**reporter** 5:10,12,18,21,25 8:3,14,17
16:14 46:2 53:13 68:5 73:5 97:4
113:19 120:8

**reporting** 38:4

**reports** 114:7 118:7,21 119:5

**represent** 6:15 106:11 113:13

**representatives** 68:14 92:12

**represented** 6:25 69:15 92:22

**representing** 92:12 93:5

**requested** 76:23 117:16

**required** 77:6,20 94:2

**requires** 111:20

**resigned** 109:21

**resolution** 30:22 31:8,19,20,24 32:8
56:11 69:14,24 87:21 99:5,14 104:15
105:13

**resolutions** 66:11,22 67:9 71:17
92:5 104:13

**resolved** 87:24

**resolving** 16:12

**resources** 116:13,14

**respect** 17:13 27:21 28:19 59:6
63:18 77:2 82:19 89:2,5 104:1 111:9

117:17 119:4

**respectful** 70:23

**responses** 8:9

**responsibilities** 32:20

**responsibility** 108:6,23 109:20
  110:13

**responsible** 17:15 19:11 33:15 39:8
  108:19

**rest** 78:14 119:20

**restate** 9:4

**Restated** 57:7

**restructuring** 103:15

**result** 100:19 101:4

**retailer's** 107:21

**retailers** 107:11 108:4 112:19,22

**retaining** 68:10

**revenue** 16:19 17:18,20 19:8,9 20:24
  23:21,24 25:25

**revert** 31:5

**review** 10:22 11:22 12:3 14:12 86:22
  105:18 118:18

**reviewed** 15:16 51:6,8 66:13 67:21
  97:16 102:6

**reviewing** 51:8

**revise** 12:13

**Richard** 5:4,20 14:25 70:18

**right-hand** 81:17

**risk** 70:2 73:11 84:8 85:9,24 86:5

**risks** 73:11 84:5,17 85:15 86:16

**Robert** 65:23

**role** 17:13 19:20 20:8 22:5,16 23:11
  24:24 25:14 26:13 28:23 30:21 39:11
  100:16

**roles** 16:9 22:12

**room** 10:16

**rough** 41:19 61:12 75:21 77:5

**roughly** 11:9 26:22 48:18,19,20
  53:21 61:20 72:25 73:4

**round** 40:17

**Row** 39:20 40:1,8 41:9,20 42:2,6,12,
  15,16,20 43:2,7,14 45:15 46:5,13
  51:17,22 52:5,12,16,22 53:14 54:2,7,
  20,23 55:1,5,10,14

**rows** 42:12,18 54:4,9

**Royalty** 6:21 26:19 27:19 33:7,14
  34:20 48:20 63:24

**Ruck** 102:22 105:19

**Ruckdeschel** 82:2,3 106:9,10,13
  108:12 110:8,25 111:16 112:13,17
  113:1,5 119:2,17

**Rudnick** 6:15

**rules** 118:19

**ruling** 70:3 86:8,11 104:19

**run** 33:16 34:13,14,19 36:7 71:11

**Ryan** 58:3

## S

**salary** 114:10,12

**sales** 17:24 21:4,7,8,10,17 54:23

**sat** 12:17

**satisfies** 85:18 86:11

**satisfy** 72:9

**savvy** 25:9

**schedule** 14:7

**scheduled** 13:3,7

**screen** 52:25 57:18,23 58:2 79:2,15
  84:17

**scroll** 15:24 22:21 38:11 46:22 49:21
  57:1 64:9 65:17 71:20 72:12 78:13
  81:9 87:13 91:4,5,6,14 95:21 101:8
  102:8

**scrolled** 15:10 55:1

**scrolling** 50:2

**seconded** 27:24 30:15,18 31:16

**secondment** 30:25 113:21

**section** 57:3 93:24

**seeking** 7:9,25

**segments** 24:11

**select** 108:21

**selling** 107:12

**senior** 17:2,3,15 32:4

**sentence** 100:2,12 101:9 102:13

**separate** 45:23

**separately** 65:8,9

**series** 110:16

**serve** 37:24

**Service** 32:13 41:7 44:1 51:6 117:23

**services** 27:3,7,15,17,21,24 28:1,7
  30:15 31:5 35:13 37:20 44:1 114:5
  116:15

**set** 58:10 96:8,10,12,24

**sets** 96:4

**settle** 70:9

**settlement** 47:21 48:12 53:8 54:15
  69:16 85:20 89:21 117:7 119:10

**share** 62:24 92:18 109:2 115:8 116:5

**shared** 36:13

**sheet** 46:24 47:10 55:19,20,23 93:10
  95:13

**short** 16:5 18:1 22:13 44:21 73:22
  105:25

**shortly** 23:10,12 66:15,19

**show** 53:7 56:10

**showed** 48:12

**sic** 42:20 54:19 102:22 119:15

**side** 19:21 33:8 35:1 81:17 89:2

**signature** 39:7,8 91:7,15,17

**signatures** 57:18

**signed** 33:10 39:10 50:24 65:23
  92:14,20 93:1

**significant** 36:1 44:5 69:15 90:22

**similar** 23:8 24:17 25:7

**similarly** 8:22

**simple** 69:23

**Simply** 98:9

**sir** 58:9 106:20 107:17 108:17 109:2,
  9,16 110:11 111:6 113:2 119:3

**sitting** 36:5

**slide** 50:2

**small** 97:23

**sold** 42:25 43:3,6,10 54:22

**sold/transferred** 54:24

**solely** 110:17

**solution** 86:13

**solutions** 26:7

**solvent** 73:13 104:20

**sought** 28:7

**soul** 19:15 22:1

**sound** 7:13 8:6,20,25 10:24

**sounded** 113:25

**sounds** 10:25 120:7

**speak** 8:24 13:24 14:8 45:4 50:1 74:9
85:15 86:6 91:24 100:16

**speaking** 8:15 33:24 66:9 75:21 82:4

**specific** 53:24 57:3 59:13

**specifically** 25:5 29:7 68:24 77:14
92:8 97:2

**specifics** 27:12 67:6 108:22

**speed** 50:3

**spend** 34:4

**spending** 34:6,8

**spent** 46:9

**split** 62:11

**spoke** 13:21

**spoken** 13:18

**spot** 24:4

**staff** 33:4

**stamped** 57:15

**stand** 44:22 74:4 106:1,17

**standard** 116:18

**Standby** 5:1

**standing** 120:13,16

**standpoint** 33:17 34:17 45:22 46:18
73:10,15 99:7 115:10

**start** 8:19 34:11

**started** 10:7 19:17 20:5 22:2 24:4
25:7

**starting** 24:17 47:19 84:4 89:2
97:18,21 98:1 102:13

**state** 5:16,18,21 10:11 113:13
117:13,19

**stated** 92:11 117:3

**statement** 43:13 45:12 46:18 55:5
100:13,23 101:14 109:17 110:14
117:9

**statements** 55:5

**states** 75:9 76:5

**status** 41:24 52:16 59:5 60:20

**statutory** 86:16

**staying** 68:18

**stenographic** 5:12

**step** 69:17

**Stifel** 33:13

**stint** 21:20,21

**stop** 44:4 46:23

**stopped** 31:13

**strategic** 22:5,11,19 23:23 25:14
26:6

**streams** 16:19 17:19,20 19:8,10
20:25 23:21,24 26:1

**Street** 6:4

**strike** 49:3 97:7

**sub-bullet** 84:7,12

**subject** 84:5

**submitted** 112:20

**submitting** 66:24

**subsidiaries** 16:16 17:10 19:5 20:21
23:5

**subsidiary** 22:8

**substantial** 70:2 92:21

**substitution** 64:24 65:4,16 67:16

**successful** 26:6

**successor** 109:22

**sufficiently** 18:14 63:2

**suggest** 99:13 114:23

**suggestions** 120:4

**suggests** 83:15 89:11 96:17

**suit** 96:21

**suited** 94:24

**suits** 34:1

**sum** 42:12,17 54:4

**sums** 54:9

**support** 34:17 37:19 44:6 51:5 53:23
63:21 64:3,6,19 70:7 72:7,8 76:4
77:15 85:17,21 89:20 91:4,6 92:2,9
98:5,11,16 118:20

**supported** 92:22

**supportive** 93:6

**supposed** 11:19

**surprise** 66:25 67:7,11

**surprised** 90:22

**swear** 5:13

**sworn** 5:15 8:2

**system** 33:25 99:10 104:16 108:21
116:18

**T**

**Tab** 14:18,19 30:4 38:2 49:13,14
56:20 64:1 73:18 74:12 78:9 83:5
87:2 88:13 90:1 93:9 94:25 97:8
99:16 101:22

**table** 18:15

**takes** 31:9 37:9,12

**taking** 5:7 12:8

**talc** 16:12 30:22 56:11 69:24 76:8,9
77:2,3,6,20 78:2 81:18 87:1,22 94:6
99:13 100:6 104:15 107:8,10,12
108:10 109:22 110:6

**talc-related** 17:7 19:2 20:18 23:2
25:23 31:8,21,24 100:20 108:20
109:20 117:12,18

**talk** 11:4 29:5 37:1 58:14 60:13 92:24
114:23 115:1

**talked** 29:6 63:19 107:1

**talking** 31:15

**Tancredi** 113:6,8,10,12,15,18 115:4
117:24,25

**target** 114:12

**tax** 84:8 86:16

**taxation** 73:11

**taxes** 42:7,9 53:15,20

**TCC** 6:15 34:17

**team** 51:5 53:25 62:9,12 70:15 71:4
76:16 82:21 90:21 92:17 94:16 98:19
107:15 108:13,16 111:24

**TECH** 14:21 50:7

**technically** 28:1

**tells** 115:14

**term** 21:17 93:10 102:25 103:6 110:1

**terminate** 75:3

**terminated** 63:22 69:5 70:20

**terminating** 67:20,22 71:5 104:6

**termination** 64:23 65:4,16 67:16 68:19 69:11 70:12 104:18 105:9

**terms** 67:1,25 109:19

**test** 7:22 61:11,25

**testified** 5:16

**testify** 7:19 13:2 14:6

**testifying** 8:3

**testimony** 28:20 29:8,14 61:14,18 66:17 106:18,22 119:16,20

**testing** 88:22

**text** 10:23

**than--** 109:10

**thing** 57:6 60:11,12 89:13

**things** 8:16 47:18 94:22

**thinker** 32:5

**third-party** 17:24 21:4,7,8,10,17

**thought** 67:18

**thoughts** 32:6

**thousand** 55:9

**time** 5:3 7:8 8:15 16:5,20 18:1 19:12, 14 20:15 21:23 22:14 23:17,18,25 24:5,7 25:6 26:3 27:14 33:1 34:7,8 37:2 40:5 44:13,14 48:19 53:22 60:6, 7 61:9,21 62:25 63:12 66:14 80:15 82:15,16 85:16 99:11 106:5 115:3 120:22

**timeframe** 13:5 43:21

**timely** 70:10

**times** 11:10 34:6 53:21 119:4

**timing** 99:7

**title** 6:23 17:1 27:17

**titles** 17:2,4

**today** 6:25 7:9,19 8:3,13 9:5,10 11:5, 6 14:9 56:2 61:14,18 62:24 75:1 106:6 114:25 115:3 119:21

**today's** 5:2 8:5 10:23 11:23 12:19 13:16 120:19

**told** 35:8 60:9,19 81:25

**Tompkins** 23:19

**top** 47:4 50:22 75:22 78:21 81:10,14 91:10 95:13,16

**topics** 7:11 117:2

**tort** 108:10,21

**total** 40:1,9,13,20 41:9,16 42:2,3,11, 13 47:13 48:7,14 49:5,8,11 51:22 52:1,5,16,19,22 53:2,4,5 54:3,23 55:24 56:5,13,17 87:24 120:19

**transaction** 33:11 103:9,16 104:7 105:2

**transcript** 14:11 74:23 93:18 120:9

**transcripts** 14:10,14

**transferred** 42:25 43:3,7 54:23

**transfers** 40:2,12,14,20 41:10,17 51:23 52:1,5

**traveling** 13:11

**treasurer** 6:23

**treasury** 86:5

**tremendous** 99:8

**trial** 99:12

**trials** 33:6 34:10

**true** 39:25 72:18 106:24 119:1,23

**trust** 33:13 111:8,21 112:20

**trustees** 47:18

**truth** 8:4

**truthful** 7:12,15 119:21

**truthfully** 119:18

**turn** 55:18 65:5 93:22

**turning** 42:16 46:4 52:15

**typically** 116:11

**U**

**U.S.** 47:18

**uh-huh** 8:10

**ultimately** 41:8

**umbrella** 10:3 20:1 26:21,24 72:17

**unavailable** 13:2 14:6

**uncomfortable** 114:17

**underneath** 57:24 83:18

**understand** 9:2,15,17,21,24 10:5 21:16 48:23 49:1 53:10 54:17,20 72:5 74:9 76:4 77:23,24 79:21 81:1 94:22 99:8 101:2 103:19 105:7 106:17 107:6,16 108:20 110:2,3 111:18,22

112:16 118:12

**understanding** 21:8 30:17,19,21 31:11 48:5 57:11 58:19,24 59:5,16,18 60:4,21 61:7 72:1 73:7 79:17 80:1,19, 22 81:7,21 98:4,15 99:1,15 111:25 112:5,6,9,14,15,18 118:18

**understood** 86:7

**unenforceable** 70:5 86:23

**Unit** 44:19,23 74:2,5 105:23 106:2

**units** 120:20

**unsecure** 89:7

**upcoming** 13:2

**V**

**vacuum** 96:22

**valuable** 63:6,13 100:5,14 101:12

**valuated** 100:22

**valuation** 62:2 100:17 101:1,3

**valued** 100:17

**varies** 32:24 33:20

**vary** 32:21 34:6

**vast** 25:8

**verbal** 8:9

**versus** 51:8 108:3,4

**vice** 25:16,17

**victims** 108:10

**video** 5:3,4 120:15,17,20

**voluntary** 88:14,17 90:2,5,15

**voracity** 76:19,24

**vote** 95:24

**voted** 37:22 86:10

**W**

**wait** 87:13,14 93:20

**walk** 50:19 100:11

**wanted** 113:17 117:10

**watch** 14:16

**week** 13:10,12 27:7 32:17,18,23

**weeks** 32:21 71:16 92:11

**whereof** 57:19

Case 23-12825-MBK LLC Doc 855-12 Filed 06/22/23 Entered 06/22/23 15:15:28 Desc Dickinson
Exhibit Page 142 of 142
In RE: 23-12825-MBK Doc 855-12
Confidential
Richard Dickinson
May 31, 2023

**Womble** 113:12

**word** 15:18 39:8 103:7 119:9

**wording** 54:11

**words** 68:3 82:5 96:9

**work** 27:16,22 32:10,13,17,19,21,23 53:23 73:24

**worked** 15:25

**working** 33:13

**works** 44:18 73:25

**worries** 68:7

**worth** 42:17,19 54:8,10,19,21 100:6

**write** 36:5

**writing** 67:6 76:2,3 78:4,7

**written** 57:21 76:7,23

**wrong** 48:8,9

**Wuesthoff** 14:1,2 65:23 66:2,4 96:19 115:22 117:22 119:15

---
### X
---

**Xerox** 15:25 16:6,9,15

---
### Y
---

**year** 33:10 100:18 116:9 119:17

**years** 16:24 26:25 31:2 32:3 88:8 102:14 114:1,3

**York** 5:16

**Young** 35:12

---
### Z
---

**zoom** 5:8 14:20 47:1 49:9

**Zvonkov** 5:9