# Exhibit 12

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|---|---|---|---|---|
| 1 | 5/28/2020 | "The holders [of J&J Talc Claims] will keep their day in court and be assured a <u>full recovery</u> of any judgment or settlement, backed by the credit of one of the world's largest companies, J&J." **Exhibit A1**, Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol, *In re: Imerys Talc America, Inc.*, Case 19-10289-LSS, Dkt. 1769, ¶ 4 (emphasis original). | 8/15/2022 | "Worse, the mass-tort system was failing claimants. At the rate cases were being tried, it would have taken hundreds—if not thousands—of years to give all plaintiffs their day in court, to say nothing of the new plaintiffs whose lawsuits were piling up at a staggering rate. And the tort system was yielding results that were becoming increasingly difficult to rationalize. Most plaintiffs got nothing; a handful got tens of millions or billions. Future claimants could be shut out entirely." **Exhibit A2**, Debtor Appellee Brief, pg. 2. |
| 2 | 5/28/2020 | The tort claimants filing claims in *Imerys*, according to J&J, were "seeking [ ] higher and more certain payout[s]" through the *Imerys* bankruptcy in a trust than the in the tort system; in the bankruptcy, groups representing claimants could "inflate values, settle claim amounts for numbers of their own choosing without proving causation, and establish their own eligibility criteria…" *Id.*, ¶ 15. | 9/19/2022 | "And so you are asked to compare two different worlds. One is the baseline of the pre-restructuring, pre-bankruptcy world in which Johnson & Johnson owes nothing, in which some people slowly get paid but that's subject of course to any other claims against Old JJCI, any recovery. And under the restructuring and the funding agreement, instead, you have a very different world, one with a $61-billion plus floor. That money is guaranteed free and clear. You have a faster process so current claimants get paid and future claimants have a voice at the table. They have a representative because that is under 524(g)." **Exhibit A3**, Tr. 9/19/2022, pg. 85. |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 3 | 5/28/2020 | "Even if estimation of mass tort claims may be appropriate in other chapter 11 cases, they are not appropriate when a credit-worthy party is standing ready to take over the claims and pay proven claims in full." *Id.*, ¶ 15. | 12/28/2022 | The "estimation process will facilitate mediation by [ ] requiring the parties to provide support for their respective positions, better understand the positions of the other parties, and focus on the central issue in this case—the extent of the Debtor's liability for talc claims." Debtor Motion to Disclose Funding, Dkt. 3351-1, ¶ 10. |
| 4 | 5/28/2020 | "J&J as a source of recovery for future claimants who can prove their claims is undoubtedly a more certain bet than the standard bankruptcy claims trust." *Id.*, ¶ 17(2). | 9/19/2022 | "Our argument is that each of their tort lawsuits has tunnel vision. It examines only their individual case and delays future ones. It's a home run or a strikeout and precious few get up to bat. The only way to get a system wide resolution that's comprehensive, that protects future claimants, is through bankruptcy. Third, and finally, they ignore several key limiting principles of our argument, particularly Mr. Frederick, and four things make this case unique. First, a latency period of nearly 50 years with many, many future claimants who can't get any relief now and who risk not getting paid." Tr. 9/19/2022, pg. 61 |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|---|---|---|---|---|
| 5 | 5/28/2020 | The individual tort claimants who hold J&J Talc Claims would particularly benefit by taking their claims out of the bankruptcy and restoring to each full due process rights to 'have h[er or his] own day in court.'" *Id.*, ¶ 30 | 9/19/2022 | THE COURT: You contemplate that this plan even though it's not yet in place will allow for any type of opt-out? MR. KATYAL: I don't know that we have gotten that far. I think that's a pre -- to use a word from earlier, I think that's a premature question. But I would say that, you know, 75 percent threshold is of course very daunting. We are highly incentivized to put a good plan together because otherwise we get returned to the mass tort system with all of the uncertainty and all of the problems attendant to it. Tr. 9/19/2022, pgs. 83-84. |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 6 | 5/28/2020 | "[T]he Debtors [Imerys} contend, in four full paragraphs, that J&J may lack the financial wherewithal to meet its obligations. This is the most absurd argument the Debtors make (and the one that most demonstrates that they are grasping at straws). As of the date hereof, J&J has a market capitalization of over $385 billion and extensive insurance coverage of its own. It is one of the top 10 companies in the United States by market value. J&J can provide the claimants far greater protection than the Debtors or the bankruptcy claims trust ever could (as discussed above)." *Id.*, ¶ 41. | 8/15/2022 | "Not even J&J could 'sustain operations and remain viable in the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward.' Although claimants repeatedly cite J&J's significant market capitalization and strong credit rating, they cite no evidence suggesting that J&J had the capacity to pay tens of billions of dollars in defense costs and verdicts for decades without falling into financial distress." Debtor Appellee Brief, pg. 50 (internal citations omitted). |

**Appendix of Several But Not All of Johnson & Johnson's Tort System Flip-Flops**

| No. | Date | Statement | Date | Statement |
|-----|------|-----------|------|-----------|
| 7 | 5/28/2020 | "More importantly, J&J is offering each of those plaintiffs her or his own day in court to attempt to prove her/his allegations—against the Debtors and against J&J… There will be no 'dumping' of thousands of cases into the court system. The suits are already there. J&J, in agreeing to defend the claims, is not taking away anyone's claims or rights. It is J&J's rights that are being denied under the status quo." *Id.*, ¶ 74. | 8/15/2022 | "Worse still, 38,000 claimants could not all get their day in court any time soon, if at all. In Missouri, one of plaintiffs' favored jurisdictions, only 297 civil jury verdicts of any kind were returned in 2019. At that pace, it would have taken 'decades to resolve the currently pending claims in the tort system' and another 10,000 would be added to the backlog each year." Debtor Appellee Brief, pg. 17. |

# Exhibit A1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19–10289 (LSS) |
| **Debtors.** | Jointly Administered |

### JOHNSON & JOHNSON'S OMNIBUS REPLY IN SUPPORT
### OF J&J'S MOTION FOR ENTRY OF ORDER MODIFYING
### AUTOMATIC STAY TO IMPLEMENT TALC LITIGATION PROTOCOL

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

same claim—one as to Imerys and another in the tort system as to J&J—potentially leading to inconsistent results and overcompensation of the claims. If the Motion is not granted, J&J could prevail against a particular plaintiff after a fair and lengthy trial and yet still have to pay that same plaintiff's claims under the Imerys Plan. That is not fair. Or J&J could theoretically lose at trial and pay the plaintiff's full claim and then still have to pay the plaintiff again under the Imerys TDPs, an unjustifiable double recovery.[3]

4.      Through the Motion, to avoid these results, J&J makes an *extraordinary offer*: to take over liability for, and thereby remove from the Debtors' bankruptcy estates, most of the Debtors' liabilities—approximately 90% of the current and future claims against the Debtors. The holders of these claims (the J&J Talc Claims), the very claims that precipitated the Debtors' filing of these Chapter 11 Cases, will be treated as if the Debtors' Chapter 11 Cases were never filed. They will keep their day in court and be assured a <u>full recovery</u> of any judgment or settlement, backed by the credit of one of the world's largest companies, J&J. In the revised proposed order approving the Motion, attached hereto as **Exhibit A** (the "**Revised Proposed Order**"), J&J has also now agreed to pick up <u>**full indemnity**</u> for J&J Talc Claims for **<u>all years</u>**, regardless of the timing of exposure, beyond J&J's alleged obligations even under the most expansive reading of the indemnity agreements.[4] This eliminates one major "issue" raised by the objectors to the Motion. In addition, J&J would waive its claims against the Debtors **and** most of its defenses to indemnity. This will resolve the Unresolved Indemnity Issues, as described in the Motion,

---

[3] While J&J would have rights to set off, this right varies by jurisdiction and the circumstances and timing of the Trust's payments. J&J reserves all rights to assert any claims it may have against the Debtors, the Reorganized Debtors, and/or the Trust, including claims for contribution or set-off, if the Motion is denied.

[4] J&J would indemnify for all years in which the Debtors supplied J&J talc, not merely the years in which it could potentially be owed. Importantly, under the contracts, J&J's indemnity obligations only cover exposure from years up through the year 2000. And, while the 2011 MPA provided that J&J would indemnify Debtors for that calendar year – there was no survival language, thus terminating J&J's obligations upon expiration of the Agreement.

3

15.     Under these circumstances, perhaps it should come as no surprise that the TCC and FCR object to going back to the tort system, apparently seeking for the tort claimants a higher and more certain payout in these Chapter 11 Cases (where they can inflate values, settle claim amounts for numbers of their own choosing without proving causation, and establish their own eligibility criteria) than they would potentially receive outside of chapter 11.  But, as the United States Supreme Court has cautioned, this is an illegitimate expectation.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) (a creditor should not obtain a "windfall merely by reason of the happenstance of bankruptcy"); *see also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 224 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012) ("It is an axiomatic principle of chapter 11 practice that creditors cannot be elevated to a better position than their pre-petition legal entitlements.") (citing *Butner*).  Even if estimation of mass tort claims and settlement through a trust may be appropriate in other chapter 11 cases, they are not appropriate when a credit-worthy

---

2738, Civil Action No. 16-2738 (FLW) (D.N.J. April 27, 2020) [D.I. 13186].  The purposes of this transfer and "centralization" process is to avoid duplication of discovery, to prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel, and the judiciary.  Thereafter, plaintiffs and J&J filed motions challenging the scientific reliability of the opinions of each side's causation experts.  In August of 2019, the Chief Judge of the U.S. District Court for the District of New Jersey, Honorable Freda L. Wolfson, conducted a *Daubert* hearing to determine the admissibility of eight of the challenged experts' opinions.  The Debtors did not participate in this hearing because of the automatic stay.

On April 27, 2020, the court issued a ruling significantly limiting the testimony of two of plaintiffs' key expert witnesses: asbestos testing expert, Dr. William Longo, and biology expert, Dr. Ghassen Saed, finding that these witnesses did not present scientifically sound evidence to support key aspects of their opinions.  Specifically, Judge Wolfson excluded the testimony of plaintiffs' asbestos testing expert, Dr. William Longo regarding the results of his polarized light microscopy (PLM) testing due, in part, to his own prior statements that it was not a reliable methodology.  *Id.* at 56.  Further, and significantly, Judge Wolfson barred Dr. Longo from testifying in any fashion that women who used talcum powder were exposed to any level of asbestos, let alone a level significant enough to cause ovarian cancer because he "fail[ed] to offer any scientific support for his opinion that the use of Defendants' talc products causes exposure, let alone significant exposure, to asbestos."  *Id.* at 59.  Finally, the Court also excluded plaintiffs' theory that inhalation of talc can cause ovarian cancer, citing the "scant" support offered by plaintiffs' experts for that theory.  *Id.* at 96–97.  In addition, Judge Wolfson excluded plaintiff's expert biologist Dr. Saed from testifying that his experiments showed that talc could cause ovarian cancer because the Court found that his opinion that "the use of talc causes ovarian cancer" was "unsupported by the findings of his study" and was an "unreliable" conclusion.  *Id.*  Notably, in the same ruling, Judge Wolfson denied plaintiffs' motion to exclude or limit the opinions and testimony of any of defendants' experts.

party is standing ready to take over the claims and pay proven claims in full. None of the objectors
cite to a single case in which claims were estimated and settled under such circumstances.

16.     Granting J&J's requested relief is thus necessary to protect J&J from hardship. It
will not only eliminate the moral hazard problem, it will ensure that these Chapter 11 Cases are
conducted consistently with the fundamental tenet that bankruptcy cannot be used for improper
purposes. "The conduct of bankruptcy proceedings not only should be right but must seem right."
*Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir. 1966). And the right thing
to do in these cases is to grant the Motion to permit J&J take over the defense to the claims.

### SUMMARY OF ARGUMENT ON *REXENE* FACTORS

17.     Application of the *Rexene* factors and their underlying principles points in favor of
granting the motion, lifting the stay, and permitting J&J to implement the Talc Litigation Protocol.
Unlike a case where a court must compare a burden to the estate against a hardship to the party
seeking to lift the stay, in this case, granting the relief will both lead to benefits to the estate *and*
alleviate hardship to J&J, all without prejudice to individual tort claimants' right to have their day
in court. That is, all the relevant factors point in the same direction: to lifting the stay. And even
if the Court were to find that that there are burdens to the estate, they are incidental and
insignificant, and easily outweighed by the direct and concrete hardship to J&J.

18.     Below is a summary of the main facts supporting application of the *Rexene* factors.

19.     <u>First</u>, the Debtors will benefit from and are not harmed by the relief sought in the
Motion:

1)  <u>Payment in Full of Most Claims and Higher Recoveries for Other Claims.</u> J&J's
proposal essentially guarantees payment in full to holders of J&J Talc Claims who
have successful claims, without the Debtors having to use their assets to pay those
claims. This also benefits the holders of non-J&J Talc Claims, as a greater
percentage of the Debtors' assets will be available to pay those claims.

10

2) <u>Financial Certainty for Future Claims.</u>  For future claimants especially, J&J's offer presents a far superior deal.  J&J as a source of recovery for future claimants who can prove their claims is undoubtedly a more certain bet than the standard bankruptcy claims trust.

3) <u>Preservation of Indemnity Rights.</u>  Without the requested relief, there is a good chance that the holders of talc claims against the Debtors allegedly arising from use of J&J products will lose the benefit of any value of J&J's indemnity agreement with respect to the Debtors' liability given J&J's strong defenses based on the Debtors' actions and the section 524(g) settlement.  Moreover, J&J submits that the Debtors cannot assume the J&J indemnity agreements, which are executory contracts, under section 365 of the Bankruptcy Code because they cannot cure the Debtors' breach of the provision permitting J&J to assume the defense of the claims unless they actually let J&J assume the defense of claims (or their failure to abide by the cooperation provisions or the defense based on non-conforming talc).

4) <u>Waiver of J&J's Indemnity Claims</u>.  The Responses fail to mention J&J's indemnification claims under the 2001 agreement for which J&J filed a proof of claim.  Without the relief requested, J&J will continue to pursue these claims against the Debtors (and will pursue its objections that the Plan does not treat these claims properly).

5) <u>Avoidance of the Unresolved Indemnity Issues</u>.  Granting the Motion resolves complicated litigation that will otherwise be necessary not only to resolve J&J's defenses to the Debtors' indemnity claims, but also the complicated allocation issues relating to J&J's own indemnity claims and gap years.

6) <u>Preservation of Insurance</u>.  Granting the relief will increase the chances that the Debtors' insurance will be available to satisfy Talc Claims.  In contrast, without the requested relief, and to the extent the Debtors are found to have breached their obligations as indemnitees under agreements with J&J, then the Debtors' insurers may argue that the Debtors' actions impairing the indemnification claims against J&J have vitiated the Debtors' claims to insurance with respect to future payouts by the Debtors' insurers.

20.    <u>Second</u>, the issues raised (and exaggerated) in the Responses do not outweigh the

foregoing benefits:

1) J&J now agrees to expand the dates in its proposal to cover all time periods of alleged exposure to J&J products, eliminating one of the issues raised in several Responses.

2) The cooperation provisions are standard and necessary to defend the claims and J&J commits to work with the Debtors to ensure that its requests are reasonable.  In addition, J&J has modified the cooperation provisions in the Revised Proposed Order to eliminate some of the language the objectors criticized.

11

filed their Plan. Deferring the issue of J&J assuming the defense of the claims until confirmation

will potentially result in a great waste of estate resources soliciting a Plan that is not appropriate

in light of J&J's offer and prejudice J&J, as the Debtors will beat the "too late" drum even harder

when they are on the brink of emerging from chapter 11 and have gone through the cost and time

of solicitation. For this reason, now is the best time for the Court to grant the Motion.

### A. Lifting the Stay Will Benefit the Debtors and Their Estates, Not Prejudice Them.

30. J&J has proposed something that any normal debtor would surely welcome: to take

away and pay (in accordance with applicable non-bankruptcy law) the vast majority of the Debtors'

largest liabilities. J&J has offered to assume the defense and indemnify Imerys for *all* J&J Talc

Claims, encompassing (by the Debtors' calculations) 99.8% of the total ovarian cancer claims and

80.1% of the total mesothelioma claims against Debtors.[18] *See* Disclosure Statement 4.1(a). By

assuming those liabilities, J&J's proposal would expand the assets available to the Debtors' estates,

benefitting other creditors. The individual tort claimants who hold J&J Talc Claims would

particularly benefit by taking their claims out of the bankruptcy and restoring to each full due

process rights to "have h[er or his] own day in court." *Taylor* v. *Sturgell*, 553 U.S. 880, 892 (2008)

(quoting *Richards* v. *Jefferson County*, 517 U.S. 793, 798 (1996)).

31. The benefits do not end there. Many other benefits are apparent and detailed in

both the Motion and the summary of the *Rexene* factors section above, but in brief summary, they

include:

---

[18] J&J has not verified these numbers, but notes that to the extent any claimant asserts a claim based on exposure both
to a J&J product and a product not manufactured by J&J, J&J will only assume the defense of and pay for liability
associated with J&J products. Thus, some claimants may continue to assert a claim against the Trust relating to other
products (assuming they can satisfy the Trust's eligibility criteria for those products) while simultaneously proceeding
against J&J in the tort system with respect to claims based on J&J products. This bifurcation, which may only apply
to a small percentage of the claims, is not all that different than the bifurcation that would exist under the Plan for all
the J&J Talc Claims—for the same injury caused by the same product, a plaintiff would simultaneously collect from
the Trust and sue J&J and other manufacturing defendants in the tort system. J&J's proposal consolidates all alleged
liability resulting from a single product.

rights J&J possesses under insurance and indemnity law upon assuming the indemnitee's defense.

Certain insurance carriers negotiated agreed language in J&J's Revised Proposed Order, and their

consent to J&J's requested relief confirms that J&J's proposal merely maintains the status quo

(*i.e.*, that J&J is not waiving any rights it might have under applicable law to those insurance

policies), not increasing any rights J&J might have to insurance policies.  In addition, this argument

completely ignores that (i) these insurance allocation issues already exist in the Plan (*see, e.g.*,

Plan § 11.4.1) and (ii) if avoiding complicated allocation issues is a goal, then granting the Motion

would further it, because, as explained in the Motion, this would resolve the complicated

Unresolved Indemnity Issues relating to the competing indemnity agreements.

41.     *Fifth*, the Debtors contend, in four full paragraphs, that J&J may lack the financial

wherewithal to meet its obligations.  Debtors' Objection ¶¶ 33–38.  This is the most absurd

argument the Debtors make (and the one that most demonstrates that they are grasping at straws).

As of the date hereof, J&J has a market capitalization of <u>over $385 billion</u> and extensive insurance

coverage of its own.  It is one of the top 10 companies in the United States by market value.[25]  J&J

can provide the claimants far greater protection than the Debtors or the bankruptcy claims trust

ever could (as discussed above).  More fundamentally, the Debtors' *own plan* relies on J&J's

ability to pay individual claims.  Even if the risk that the Debtors identified were realistic rather

than fanciful, it thus would provide no reason to deny J&J's motion because the same risk is also

present under the Debtors' own Plan.

42.     Those five arguments lack merit.  But more concerning, and more broadly, the

Debtors' failure to even acknowledge the obvious countervailing *benefits* suggests that the

---

[25]     *See* Bloomberg, JNJ company information and market quotes, available at
https://www.bloomberg.com/quote/JNJ:US.

its rights to access the insurance that would otherwise be available for J&J Talc Claims. As a result, J&J's reservation will not prejudice the estates.

73.      *Fifth*, the TCC asserts that any order must provide that no rights of the Debtors, the TCC, or the Talc Claimants are waived against J&J. TCC Response ¶¶ 26–28. The Talc Litigation Protocol does not seek any such waiver. In fact, J&J is agreeing to take on liability beyond anything it could be contractually obligated to do. J&J is seeking party-in-interest status for the limited purpose of avoiding any negative impact to its right to defend the J&J Talc Claims in the tort system. The TCC and other parties in the case should *prefer* that J&J bring its issues before the Bankruptcy Court, given their purported concern that J&J would simply terminate the indemnity if the Debtors breach. Moreover, the TCC and the FCR have no rights as against J&J— they are not a party to the indemnity agreements, and the agreements are clear that there are no third-party beneficiaries. *See* 1989 SPA § 13.1; 1989 SA § 15(a). Rather, the agreements are for the benefits of the parties thereto. Thus, the TCC and the FCR are losing no rights under the Talc Litigation Protocol.

74.      The TCC's attempts to pull at heartstrings are inapposite. J&J acknowledges that the individual plaintiffs have a terrible disease and are indeed suffering, but J&J firmly believes, and the science demonstrates, that J&J's products did not cause or contribute to those illnesses and instead are safe. More importantly, J&J is offering each of those plaintiffs her or his own day in court to attempt to prove her/his allegations—against the Debtors and against J&J. Because each holder of a current J&J Talc Claim is already suing J&J (and those in the future would similarly sue J&J), granting the Motion does not require any plaintiff to pursue a court case that she or he is not already pursuing. There will be no "dumping" of thousands of cases into the court system.

36

The suits are already there.[35]  J&J, in agreeing to defend the claims, is not taking away anyone's

claims or rights.  It is J&J's rights that are being denied under the status quo.

## III.    The FCR Joinder Fails for Similar Reasons as the TCC Response.

75.    The FCR joined the TCC's response and filed a limited objection to J&J's motion,

argues that the Motion should be denied unless the modifications outlined in the TCC Response

are adopted.  The FCR Joinder lack merit, largely for reasons discussed above.

76.    *First*, the FCR argues that J&J is improperly seeking to force the Debtors to waive

certain rights to assert indemnification and to reserve rights to the Debtors' insurance policies

unilaterally.  J&J is doing no such thing, as previously discussed.  *See supra* ¶ 72.  *Second*, the

FCR argues that J&J does not offer evidence satisfying the *Rexene* factors.  As summarized in

paragraphs 17–21 hereof, J&J has satisfied the *Rexene* factors.  *See supra* ¶¶ 17–21, 30–56.  *Third*,

the FCR argues that J&J should be required to indemnify all claims and demands against the

Debtors and their affiliates for all years.  As explained above, J&J has agreed to cover all years,

but there is no basis to require J&J to cover non-J&J Talc Claims or the Debtors' affiliates.

77.    *Fourth*, the FCR argues that J&J should not be afforded "party-in-interest" standing

in these chapter 11 cases.  Specifically, the FCR asserts that J&J points to no actual or imminent

injury that would afford it standing in these cases.  That is incorrect.  As discussed above, J&J will

need to ensure that its ability to defend the claims is not prejudiced, and J&J ability to police this

issue more closely and raise issues early will actually mitigate the concern raised by the parties

that J&J will somehow seek to cease defending the claims.

---

[35] The tort claims that J&J seeks to assume the defense of all have something in common:  they involve J&J products and already exist in the tort system as against J&J.  J&J is unaware of even a single plaintiff who asserts a J&J Talc Claim against the Debtors while not also naming J&J as a co-defendant.  Thus, irrespective of this Court's decision on J&J's Motion, there will be the same exact number of J&J Talc Claims in the tort system.

# Exhibit A2

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

In The
# United States Court of Appeals
# for the Third Circuit
————————————

In Re: LTL Management, LLC,

*Debtor*

————————————

*Official Committee of Talc Claimants

*Appellant*

*(Amended per Court's Order dated 06/10/2022)

————————————

On direct appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3023

————————————

**BRIEF FOR DEBTOR-APPELLEE**
————————————

Gregory M. Gordon
Brad B. Erens
Dan B. Prieto
Jones Day
2727 North Harwood Street
Dallas, Texas 75201

C. Kevin Marshall
David S. Torborg
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

August 15, 2022

Neal Kumar Katyal
Sean Marotta
William E. Havemann
Jo-Ann Tamila Sagar
Patrick C. Valencia
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Debtor-Appellee*

JJCI was prepared to fight every case filed in the mass-tort system.  And Old JJCI
was almost always successful; many cases were dismissed, and in 32 of the 41
cases that went to verdict, Old JJCI was not found liable, if not with the jury then
on appeal.

Although Old JJCI was being largely vindicated in the tort system, two
concerns loomed large.  First, Old JJCI's vigorous defense did not come cheap;
defense costs alone were projected to run into the billions.  Second, plaintiffs
occasionally hit the jackpot with juries, racking up outlier verdicts in the hundreds
of millions or even billions.  Talc-litigation costs pushed Old JJCI, as well as the
entire Global Consumer Business of which Old JJCI was a part, from profit to a
loss in just one year and cast doubt on whether the company could keep its head
above water.

Worse, the mass-tort system was failing claimants.  At the rate cases were
being tried, it would have taken hundreds—if not thousands—of years to give all
plaintiffs their day in court, to say nothing of the new plaintiffs whose lawsuits
were piling up at a staggering rate.  And the tort system was yielding results that
were becoming increasingly difficult to rationalize.  Most plaintiffs got nothing; a
handful got tens of millions or billions.  Future claimants could be shut out
entirely.  This lottery benefited lawyers and a handful of lucky plaintiffs whose

one part—to book a pre-tax loss of $893.4 million during that 20-month period,

A7227, and swing from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020.

A4.

Based on past outcomes, the Bankruptcy Court estimated that LTL could

expect more than $15 billion in potential liability from its existing inventory of 430

mesothelioma claims, many billions more for the 38,000 existing ovarian-cancer

claims, and yet even more for the not-yet-asserted claims.  A17, 7137-41.  It would

cost Old JJCI $190 billion just to *try* the current claims—as a single ovarian-cancer

trial costs Old JJCI between $2 million and $5 million, A2170—to say nothing of

the costs to defend claims for the next 50 years.  A458.  All told, it would cost Old

JJCI tens to hundreds of billions of dollars to resolve current and future claims.

A34, 37, 40.  On top of that, Old JJCI could owe billions more in indemnification

to its talc suppliers.  A16, 24, 7130.

Worse still, 38,000 claimants could not all get their day in court any time

soon, if at all.  In Missouri, one of plaintiffs' favored jurisdictions, only 297 civil

jury verdicts *of any kind* were returned in 2019.  At that pace, it would have taken

"*decades* to resolve the currently pending claims in the tort system" and another

10,000 would be added to the backlog each year.  A7264.  Although roughly

35,000 claims have been consolidated into a New Jersey multidistrict litigation, the

MDL judge's principal role is to coordinate *pretrial* proceedings, and cases would

by J&J." A&I Br. 41. Talc-related expenses were charged to Old JJCI because it

had legal responsibility for them. A4107 ("[A]ll costs that relate to this talc matter

get sent to, to JJCI"); A8103 ("[T]hese are talc product liability costs that JJCI was

ultimately responsible for, which is why it is showing up as a expense on their

account.").

Claimants also ignore the Bankruptcy Court's finding that Old JJCI's talc

liabilities were so massive that even J&J itself could not satisfy them indefinitely.

A40-41. The court found "that the weight of evidence supports a finding that *J&J*

*and Old JJCI were in fact facing a torrent of significant talc-related liabilities for*

*years to come.*" A40 (emphasis added). It explained that the talc liabilities were

so substantial "that the continued viability of *all J&J companies is imperiled.*"

A36 (emphasis added). Not even J&J could "sustain operations and remain viable

in the long term with juries poised to render nine and ten figure judgments, and

with such litigation anticipated to last decades going forward." A37. Although

claimants repeatedly cite J&J's significant market capitalization and strong credit

rating, *see* TCC Br. 8; A&I Br. 42, they cite no evidence suggesting that J&J had

the capacity to pay tens of billions of dollars in defense costs and verdicts for

decades without falling into financial distress. Even if J&J's financial health were

relevant, the Bankruptcy Court's findings should still be upheld.

# Exhibit A3

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

IN RE:                              .    Case No. 22-2003/22-2004
                                    .
LTL MANAGEMENT LLC,                 .    21400 U.S. Courthouse
               Debtor,              .    601 Market Street
                                    .    Philadelphia, PA 19106
OFFICIAL COMMITTEE OF TALC          .
CLAIMANTS,                          .    Monday, September 19, 2022
               Appellant.          .
. . . . . . . . . . . . . . . ..
IN RE                               .    Case No. 22-2005
                                    .
LTL MANAGEMENT LLC,                 .
               Debtor.              .
                                    .
LTL MANAGEMENT, LLC.                .
                                    .
         v.                         .
                                    .
THOSE PARTIES LISTED ON             .
APPENDIX A TO COMPLAINT AND         .
JOHN AND JANE DOES 1-1000           .
OFFICIAL COMMITTEE OF TALC          .
CLAIMANTS,                          .
               Appellant.          .
. . . . . . . . . . . . . . . ..
IN RE:                              .    Case No. 22-2006/22-2007
                                    .
LTL MANAGEMENT LLC,                 .
               Debtor.              .
                                    .
OFFICIAL COMMITTEE OF TALC          .
CLAIMANTS, ET AL.                   .
               Appellants.         .
. . . . . . . . . . . . . . . ..
IN RE:                              .    Case No. 22-2008
                                    .
LTL MANAGEMENT LLC,                 .
               Debtor.              .
                                    .
LTL MANAGEMENT LLC                  .
                                    .
         v.                         .
                                    .
THIRD PARTIES LISTED ON             .
APPENDIX A TO COMPLAINT AND         .
JOHN AND JANE DOES 1-1000,          .
OFFICIAL COMMITTEE OF TALC          .
CLAIMANTS, ET AL.                   .

```
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS, ET AL.             .
             Appellants.      .
. . . . . . . . . . . . . . . . .
IN RE:                        .    Case No. 22-2009
                              .
LTL MANAGEMENT LLC,           .
             Debtor.          .
                              .
ARNOLD & ITKIN LLP, ON BEHALF .
OF CERTAIN PERSONAL INJURY    .
CLAIMANTS REPRESENTED BY      .
ARNOLD & ITKIN,               .
             Appellant.       .
. . . . . . . . . . . . . . . . .
IN RE:                        .    Case No. 22-2010
                              .
LTL MANAGEMENT LLC,           .
             Debtor.          .
                              .
AYLSTOCK WITKIN KRIES &       .
OVERHOLTZ PLLC, ON BEHALF OF  .
MORE THAN THREE THOUSAND      .
HOLDERS OF TALC CLAIMS,       .
             Appellant.       .
. . . . . . . . . . . . . . . . .
IN RE:                        .    Case No. 22-2011
                              .
LTL MANAGEMENT LLC,           .
             Debtor.          .
                              .
LTL MANAGEMENT LLC            .
                              .
         v.                   .
                              .
THOSE PARTIES LISTED ON       .
APPENDIX A TO COMPLAINT AND   .
JOHN AND JANE DOES 1-1000     .
                              .
AYLSTOCK WITKIN KRIES &       .
OVERHOLTZ, PLLC., ON BEHALF OF.
MORE THAN THREE THOUSAND      .
HOLDERS OF TALC CLAIMS,       .
             Appellant        .
. . . . . . . . . . . . . . . . .
```

```
                  TRANSCRIPT OF ORAL ARGUMENT
                            BEFORE
            THE HONORABLE JUDGE THOMAS L. AMBRO
              UNITED STATES THIRD CIRCUIT JUDGE
              THE HONORABLE L. FELIPE RESTREPO
              UNITED STATES THIRD CIRCUIT JUDGE
               THE HONORABLE JULIO M. FUENTES
              UNITED STATES THIRD CIRCUIT JUDGE

APPEARANCES:

For the Appellants:      MoloLamken
                         By:  JEFFREY A. LAMKEN, ESQ.
                         600 New Hampshire Avenue, N.W.
                         Washington, D.C.  20037

                         Kellogg Hansen Todd Figel & Frederick
                         BY:  DAVID C. FREDERICK, ESQ.
                         1615 M Street, N.W., Suite 400
                         Washington, D.C.  20036

For U.S. Trustee:        U.S. Department of Justice
                         By:  SEAN JANDA, ESQ.
                         Appellate Section
                         Room 7260
                         950 Pennsylvania Avenue, N.W.
                         Washington, D.C.  20530

For Appellees:           Hogan Lovells US
                         By:  NEAL K. KATYAL, ESQ.
                         555 Thirteenth Street, N.W.
                         Washington, D.C.  20004
```

Proceedings recorded by electronic sound recording, transcript
        produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

 1  We absolutely agree.  Judge Kaplan has said time and again his

 2  goal is to move this thing incredibly expeditiously.  My

 3  friends on the other side said they thought this process could

 4  be done as early as the first quarter of next year.

 5        And Judge Kaplan has rejected time and again any

 6  attempt to delay the bankruptcy process which looks very

 7  different, of course, than what's going on in the tort system

 8  as Your Honor was asking my friends on the other side.  Massive

 9  delay, only a few trials to verdict.  And, you know, as Judge

10  Kaplan found, future trials are going to be even more delayed

11  and very few settlements because of the <u>Ingham</u> verdict and

12  other things.

13        And so you are asked to compare two different worlds.

14  One is the baseline of the pre-restructuring, pre-bankruptcy

15  world in which Johnson & Johnson owes nothing, in which some

16  people slowly get paid but that's subject of course to any

17  other claims against Old JJCI, any recovery.  There are huge

18  defense costs, and future claimants risk not getting paid with

19  all the latency.

20        And under the restructuring and the funding

21  agreement, instead, you have a very different world, one with a

22  $61-billion plus floor.  That money is guaranteed free and

23  clear.  You have a faster process so current claimants get paid

24  and future claimants have a voice at the table.  They have a

25  representative because that is under 524(g).  And, of course,

1 restructured and created two entities, New JJCI and LTL. Every

2 dollar that the Old JJCI was liable for, every dollar of its

3 own conduct and anything alleged by J&J, the New JJCI had

4 agreed to pay 100 percent. The restructuring and bankruptcy

5 petition didn't debate anything. It was a full one-to-one

6 placement. Indeed, it was even more than one-to-one for

7 reasons our brief explains.

8 Now my friends say, well, they represent the victims

9 and speak for them. That proves our point and proves

10 Congress's point. They are all current claimants. Our

11 argument is that each of their tort lawsuits has tunnel vision.

12 It examines only their individual case and delays future ones.

13 It's a home run or a strikeout and precious few get up to bat.

14 The only way to get a system wide resolution that's

15 comprehensive, that protects future claimants, is through

16 bankruptcy.

17 Third, and finally, they ignore several key limiting

18 principles of our argument, particularly Mr. Frederick, and

19 four things make this case unique. First, a latency period of

20 nearly 50 years with many, many future claimants who can't get

21 any relief now and who risk not getting paid.

22 Second, wild lottery style judgments like _Ingham_,

23 including some for billions, and a massive number of cases,

24 40,000, with more filed every hour of every day of every year,

25 creating a tsunami of litigation.

1          MR. KATYAL:  Yes.  So I apologize for that.  But our

2  --

3          THE COURT:  What are the opt-outs that are being

4  considered?

5          MR. KATYAL:  So the 524(g) process has --

6          THE COURT:  People who can say I don't want to be

7  part of the bankruptcy, I'm going to opt out and go forward

8  with respect to my litigation.

9          MR. KATYAL:  Yeah.  So, I mean, I think Congress put

10  that into the statute itself saying there has to be a 75

11  percent requirement for the plan and then, of course, there's

12  two-court review.  So there's a lot that has to happen.

13          And I think the most important point about that is --

14          THE COURT:  You contemplate that this plan even

15  though it's not yet in place will allow for any type of opt-

16  out?

17          MR. KATYAL:  I don't know that we have gotten that

18  far.  I think that's a pre -- to use a word from earlier, I

19  think that's a premature question.  But I would say that, you

20  know, 75 percent threshold is of course very daunting.  We are

21  highly incentivized to put a good plan together because

22  otherwise we get returned to the mass tort system with all of

23  the uncertainty and all of the problems attendant to it.

24          And Judge Kaplan -- you know, my friend Mr. Frederick

25  said he wants you to write a decision really about these facts.