# Exhibit 19

**In the Matter Of:**

*In Re: LTL Management LLC*

---

*NABIL MAJED NACHAWATI*

*May 24, 2023*

---



1

```
 1                    CONFIDENTIAL

 2          UNITED STATES BANKRUPTCY COURT

 3             DISTRICT OF NEW JERSEY

 4             CASE NO. 23-12825 (MBK)

 5                    CHAPTER 11

 6   -----------------------------------------

 7   IN RE:

 8   LTL MANAGEMENT LLC BANKRUPTCY,

 9                          Debtor.

10   -----------------------------------------

11

12                ** CONFIDENTIAL **

13

14        REMOTE VIDEOTAPED DEPOSITION OF

15             NABIL MAJED NACHAWATI

16

17

18

19             Wednesday, May 24, 2023

20                 3:03 p.m. (EDT)

21

22

23   Reported By:

24   Joan Ferrara, RMR, FCRR

25   Job No. 2023-898654
```

2

1          CONFIDENTIAL

2

3

4                    May 24, 2023

5                    3:03 p.m. (EDT)

6

7

8

9

10     Confidential Videotaped Deposition of

11   NABIL MAJED NACHAWATI, held remotely via

12   Zoom, before Joan Ferrara, a Registered

13   Merit Reporter, Federal Certified Realtime

14   Reporter and Notary Public.

15

16

17

18

19

20

21

22

23

24

25

```
                                                        3
1                    CONFIDENTIAL

2    REMOTE APPEARANCES:

3

4    ON BEHALF OF THE COMMITTEE:

5    BROWN RUDNICK

6    BY:      ALEX KASNETZ, ESQ.

7             JENNIFER SCHEIN, ESQ.

8             SUSAN SIEGER-GRIMM, ESQ.

9

10

11   ON BEHALF OF THE WITNESS:

12   LAW FIRM OF BRIAN W. HOFMEISTER:

13   BY:      BRIAN HOFMEISTER, ESQ.

14

15

16   ON BEHALF OF DEBTOR LTL MANAGEMENT:

17   JONES DAY

18   BY:      MARK RASMUSSEN, ESQ.

19

20

21   ON BEHALF OF THE AD HOC GROUP OF SUPPORTING

22   COUNSEL:

23   COLE SCHOTZ

24   BY:      JUSTIN ALBERTO, ESQ.

25             SETH VAN AALTEN, ESQ.
```

4

```
1              CONFIDENTIAL

2    REMOTE APPEARANCES:  (Continued)

3

4    ON BEHALF OF THE US TRUSTEE:

5    OFFICE OF THE UNITED STATES TRUSTEE

6    FOR THE UNITED STATES TRUSTEE, ANDREW R.

7    VARA

8    BY:      LINDA RICHENDERFER, ESQ.

9             LAUREN BIELSKIE, ESQ.

10

11

12   ON BEHALF OF THE AD HOC COMMITTEE OF STATES

13   HOLDING CONSUMER PROTECTION CLAIMS:

14   WOMBLE BOND DICKINSON (US) LLP

15   BY:      LISA TANCREDI, ESQ.

16

17

18   ON BEHALF OF PAUL CROUCH:

19   RUCKDESCHEL LAW FIRM, LLC

20   BY:      JONATHAN RUCKDESCHEL, ESQ.

21

22

23

24

25
```

5

```
 1                    CONFIDENTIAL

 2    REMOTE APPEARANCES:   (Continued)

 3

 4    ON BEHALF OF THE AD HOC COMMITTEE OF

 5    SUPPORTING COUNSEL:

 6    PAUL HASTINGS

 7    BY:       RYAN MONTEFUSCO, ESQ.

 8              ABIGAIL WALD, ESQ.

 9              WILLIAM K. WHITNER, ESQ.

10

11

12    ON BEHALF OF REBECCA LOVE AND OTHER OVARIAN

13    CANCER PLAINTIFFS:

14    ASHCRAFT & GEREL

15    BY:       MICHELLE PARFITT, ESQ.

16

17

18    ON BEHALF OF SUE SOMMER-KRESSE, TCC MEMBER:

19    MOTLEY RICE LLC

20    BY:       JOHN BADEN, ESQ.

21

22

23

24

25
```

6

```
 1                    CONFIDENTIAL

 2    REMOTE APPEARANCES:  (Continued)

 3

 4    ON BEHALF OF THE STATES OF MISSISSIPPI AND

 5    NEW MEXICO:

 6    GIBBONS P.C.

 7    BY:      KYLE MCEVILLY, ESQ.

 8

 9

10    ON BEHALF OF JOHNSON & JOHNSON and JOHNSON &

11    JOHNSON HOLDCO:

12    WHITE & CASE LLP

13    BY:      KATHRYN KUETHMAN, ESQ.

14             SAMUEL HERSHEY, ESQ.

15             MATTHEW E. LINDER, ESQ.

16

17

18    ON BEHALF OF OFFICIAL COMMITTEE OF TALC

19    CLAIMANTS:

20    OTTERBOURG PC

21    BY:      ADAM SILVERSTEIN, ESQ.

22             JENNIFER FEENEY, ESQ.

23             JOHN BOUGIAMAS, ESQ.

24

25
```

```
                                                              7
 1                    CONFIDENTIAL

 2    REMOTE APPEARANCES:  (Continued)

 3

 4    ON BEHALF OF KATHERINE TOLLEFSON AND OTHER

 5    MESOTHELIOMA PLAINTIFFS:

 6    MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC

 7    BY:     SUZANNE RATCLIFFE, ESQ.

 8

 9

10    ON BEHALF OF ALISHA LANDRUM AND OTHER TALC

11    CLAIMANTS:

12    BEASLEY ALLEN

13    BY:     TED MEADOWS, ESQ.

14

15

16    ON BEHALF OF THE TCC:

17    GENOVA BURNS, LLC

18    BY:     DANIEL STOLZ, ESQ.

19

20

21    ALSO PRESENT:

22             DEANE CARSTENSEN, Videographer

23             CHAIM ARONOV

24             GEORGE ALCHAS

25             GILLIAN DEERY
```

8

```
 1                  CONFIDENTIAL

 2   REMOTE APPEARANCES:  (Continued)

 3

 4   ALSO PRESENT:

 5           ANDY BIRCHFIELD

 6           CAMERON MOXLEY

 7           CAMERON STEPHENSON

 8           CHARLES RUBIO

 9           DAVID WEINSTEIN

10           ERIK KARST

11           GREG STARNER

12           JACOB EISENBERG

13           JARED QUIGLEY

14           JEFF JONAS

15           JULIA PIKE-FORSTER

16           KATE MULLALEY

17           LENARD PARKINS

18           LYDELL BENSON

19           MICHAEL MAIZEL

20           PETER KEANE

21           RACHEL MORSE

22           RICHARD GOLOMB

23           WILL SCHEFF

24           KATE MULLALEY

25
```

9

```
 1              NACHAWATI - CONFIDENTIAL

 2              THE VIDEOGRAPHER:  We are now on

 3         the record.  Today's date is May 24,

 4         2023.  The time right now is 3:03 p.m.

 5         Eastern Daylight Time.

 6              This is the video deposition of

 7         Majed Nachawati in the matter of LTL

 8         Management, LLC bankruptcy, filed in

 9         the United States Bankruptcy Court,

10         District of New Jersey, Case

11         Number 23-12825 (MBK).

12              This deposition is taking place

13         via web videoconference with all

14         participants attending remotely.

15              My name is Deane Carstensen.  I

16         am the videographer representing

17         Lexitas today.

18              Counsel will be noted on the

19         stenographic record.

20              Our court reporter today is Joan

21         Ferrara, also representing Lexitas.

22              The court reporter can now swear

23         in the witness and then we may

24         proceed.

25   NABIL MAJED NACHAWATI, II,
```

10

1                NACHAWATI - CONFIDENTIAL

2            called as a witness, having been

3            duly sworn by a Notary Public, was

4            examined and testified as follows:

5    EXAMINATION BY

6    MR. SILVERSTEIN:

7        Q    Good afternoon, Mr. Nachawati.

8    This is Adam Silverstein representing the

9    Official Committee of Talc Claimants.

10            Once again, it's good to see

11   you, not under the circumstances I would

12   have expected, but be that as it may.

13            Could you, for the purposes of

14   the record, just please state your full

15   legal name again -- I know you gave it to

16   the videographer -- and your home address?

17       A    Sure.

18            Great to see you again, Adam.

19            Full name -- full legal name is

20   Nabil Majed Nachawati, II.  ███████████████

     █████████████████████████████████████████

     █████████████████████

23       Q    Thank you.

24            I know you're very familiar with

25   depositions.  I want to give you just a few

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 13 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

11

```
 1              NACHAWATI - CONFIDENTIAL

 2     of my rules of the road for today.

 3              One is if I ask any questions

 4     that are unclear to you, please let me know

 5     and I'll try to improve upon it.

 6              If you do not indicate that my

 7     question is unclear, I will assume you will

 8     have understood it and have answered

 9     accordingly.  Okay?

10        A     Sounds fine.

11        Q     If you need a break at any time,

12     also, please let me know and I'll

13     accommodate you, except I would ask that

14     you not ask for a break while there is a

15     question pending.

16        A     I understand.

17        Q     And finally, I do have a good

18     view of your room.  It appears there's

19     nobody else there, right?

20        A     No one else is in here and the

21     door is closed.

22        Q     And it doesn't look like you

23     have anything in front of you.

24              But if at any point you do look

25     at something that's not provided to you by
```

12

1              NACHAWATI - CONFIDENTIAL

2    the videographer on the screen as part of

3    these deposition proceedings, please let me

4    know because I would like to ask you about

5    that since it will be essentially part of

6    the deposition if you were to consult

7    something else.

8         A    Of course.

9         Q    Okay.  Are you represented by

10   counsel today?

11        A    I am.

12        Q    And would you identify who is

13   representing you?

14        A    Yes.  Mr. Brian Hofmeister.

15        Q    And do you have any agreement or

16   understanding with Mr. Hofmeister as to how

17   his fees will be paid in connection with

18   today?

19        A    Yes.  They're paid under a

20   retainer agreement with my firm, directly

21   by my firm.

22        Q    Have you had any discussions

23   with any third party about the

24   reimbursement of your fees that you will

25   incur from Mr. Hofmeister's representation

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC      Exhibit    Page 15 of 266              Nabil Majed Nachawati
Confidential                                            May 24, 2023

13

```
1              NACHAWATI - CONFIDENTIAL

2    of you today?

3         A     No.

4         Q     Could you please provide your

5    educational background beginning with

6    higher education, after high school?

7         A     Sure.  I went to Tarrant County

8    Community College for three years while

9    working full-time, and then I got a

10   transfer scholarship to SMU in Dallas,

11   where I majored in history, graduated while

12   working full-time there at SMU still, and

13   then went immediately to law school at

14   University of Houston Law Center, graduated

15   in law school in 2003.

16        Q     Would you briefly describe your

17   professional employment since graduating

18   from the University of Houston Law School?

19        A     Sure.  I received a

20   post-judicial clerkship for two years for

21   Court of Appeals, the 13th Court of Appeals

22   of Texas.  My recollection is I stayed a

23   little longer until my judge had a

24   replacement for me, as she had two-year

25   tenure clerks.  That was just Linda Yanez,
```

14

1              NACHAWATI - CONFIDENTIAL

2     the 13th Court of Appeals of Texas.

3                Following my clerkship, I've had

4     my firm ever since.  I previously had a

5     partner, but it's now -- my firm was

6     formerly known as Fears Nachawati PLLC.

7     It's now Nachawati Law Group PLLC.

8          Q     All right.  So you've been in

9     practice for yourself or with another

10    partner since you left your clerkship, is

11    that right?

12         A     That's correct.

13         Q     And so that's approximately

14    17 -- 16, 17 years ago?

15         A     A little longer than that, but

16    I'd say more or less, that's pretty

17    accurate.

18         Q     Okay.  And where are you

19    admitted to practice law?

20         A     Texas, Arkansas, New Mexico, DC.

21         Q     Have you been admitted to

22    practice law in any jurisdiction in which

23    you're no longer admitted to practice?

24         A     No.

25         Q     Okay.  Do you or your firm,

15

```
 1            NACHAWATI - CONFIDENTIAL

 2    either now Nachawati Law Group or

 3    previously Fears Nachawati, represent

 4    clients with claims in the multi-district

 5    litigation entitled In Re:  Johnson &

 6    Johnson Talcum Powder Products Marketing

 7    Sales Practices and Products Liability in

 8    the District of New Jersey?

 9         A     Yes.

10         Q     Is it okay with you if we refer

11    to that long MDL as the "MDL"?

12         A     Yes.

13         Q     And if we ever delve into other

14    multi-district litigations, we'll be clear

15    that we're talking about something other

16    than the Johnson & Johnson Talcum Powder

17    MDL.  Okay?

18         A     That's fine.

19         Q     Approximately how many clients

20    does your firm -- and when I say, "your

21    firm" -- just one other point of

22    shorthand -- so that I don't have to repeat

23    either "Nachawati Law Group" or "Fears

24    Nachawati," when I refer to "your firm,"

25    I'm referring to Nachawati Law Group or
```

                                                                    16

1              NACHAWATI - CONFIDENTIAL

2      its -- what I would consider its

3      predecessor, Fears Nachawati, not in a

4      legal sense, but in an informal sense.

5          A     That's fine.

6          Q     Okay.

7                Now, approximately how many

8      claimants with filed claims in the MDL does

9      your firm represent?

10               MR. HOFMEISTER:  Today?

11               MR. SILVERSTEIN:  As of today,

12         yes.

13         A     As of today, you know, I don't

14     have the specific number of filed cases, so

15     I'm not going to know with precision, but

16     my approximation is roughly 3,300 or so of

17     our cases are filed and have been filed

18     prior to the filing of the bankruptcy of

19     LTL I, and we represent another

20     approximate -- approximately 2,500 that

21     have not been filed because of the stay

22     that's primarily been in place during the

23     tenure -- or during the pendency of LTL I.

24         Q     Okay.  Thank you for that.  Not

25     surprisingly, I'm going to ask some

17

```
 1            NACHAWATI - CONFIDENTIAL

 2    follow-ups about all of that.

 3        A    Sure.

 4        Q    With regard to the 3,300 cases

 5    that you approximated were filed and in

 6    which your firm represented a plaintiff,

 7    were all of those cases filed in the MDL or

 8    in a court that subsequently the case was

 9    transferred to the MDL?

10        A    The substantial majority of the

11    cases were filed in the MDL, that's

12    correct.

13            MR. SILVERSTEIN:  Okay.  I think

14        this will be consistent with what you

15        just said, but I'm going to ask Deane

16        to pull up Tab 5, and I'm going to ask

17        the court reporter to mark the

18        document that is shared to the screen

19        now, entitled "Notice of Debtor's

20        Motion for an Order Directing

21        Plaintiff Law Firms to Disclose

22        Third-Party Funding Arrangements," as

23        Nachawati Exhibit 1.

24            (Exhibit 1, document entitled

25        "Notice of Debtor's Motion for an
```

18

```
 1              NACHAWATI - CONFIDENTIAL

 2         Order Directing Plaintiff Law Firms to

 3         Disclose Third-Party Funding

 4         Arrangements," was remotely introduced

 5         and provided electronically to the

 6         reporter, as of this date.)

 7   BY MR. SILVERSTEIN:

 8         Q     Mr. Nachawati, can you see the

 9    first page of this document on your screen

10    okay?

11         A     Sure.

12         Q     And is this a document, if you

13    can tell from looking at the first page,

14    that you've seen before?

15         A     Yes, I think I have.

16               MR. SILVERSTEIN:  I'm going to

17         ask Deane to please go down to page 4

18         of the PDF.

19   BY MR. SILVERSTEIN:

20         Q     This page is entitled "Debtor's

21    Motion for an Order Directing Plaintiff Law

22    Firms to Disclose Third-Party Funding

23    Arrangements."

24               Do you see that?

25         A     I see page 1 of it.
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC       Exhibit     Page 21 of 266          Nabil Majed Nachawati
                              Confidential                              May 24, 2023

19

 1                NACHAWATI - CONFIDENTIAL

 2      Q     Right, page 1 of the motion.

 3      A     Yes, I see page 1 of the motion.

 4      Q     And you understood that this was

 5  a motion that LTL had filed in the first

 6  bankruptcy to compel the disclosure by law

 7  firms, including yours, of any litigation

 8  funding arrangements that may have been in

 9  place concerning talc claims.

10            Did you understand that?

11      A     I understood it.  Our firm has a

12  general line of credit facility, not

13  specific to talc.  That's very common with

14  most firms that operate a plaintiffs' firm.

15            So no, we don't have any

16  third-party funding related to talc that we

17  went out and sought.

18      Q     Okay.  I'm sorry if my question

19  was confusing.  I wasn't focused so much on

20  the type of funding, but rather that you

21  understood that this motion was directed to

22  seeking to compel your firm and others at

23  the time to disclose whatever financing

24  arrangements were in place that were

25  available to you to assist you in

20

```
 1              NACHAWATI - CONFIDENTIAL
 2     prosecuting talc claims.
 3        A     No, that's not the way I
 4     understood it.  I understood it to mean
 5     funding that I specifically sought out for
 6     third-party -- from a third party for talc
 7     litigation.
 8              I mean, if you want to know the
 9     number of credit cards I have and all that,
10     I mean, I don't know how that's relevant to
11     this.
12              So I understood it to mean, did
13     I go out there and seek funding to go get a
14     bunch of talc cases, and the answer to that
15     would be no.
16        Q     I guess let me ask it
17     differently.
18              Did you understand that this
19     motion would, if granted, compel you to
20     disclose anything?
21        A     I understood it, just like I
22     said before, to be a motion that would
23     encompass funding that I sought out
24     specifically for this talc litigation, and
25     that's what I understood it to mean.
```

21

1              NACHAWATI - CONFIDENTIAL

2              I didn't understand it to mean

3    that the Court was interested or would

4    countenance me disclosing every credit card

5    I have with Amex and line of credit with my

6    general bank, I didn't understand it to

7    mean that, no.

8         Q    Right.  So it follows from --

9         A    I think it would be silly, to be

10   frank.

11        Q    And so it follows from your

12   testimony of a few moments ago that if this

13   motion were granted, you understood that

14   you would have nothing to disclose based on

15   what you've just testified to.

16        A    That's correct, unless the bank

17   wants to know about every credit card I

18   have for the firm and line of credit --

19   general line of credit facility.

20        Q    Okay.  I think we understand

21   each other now.

22        A    Sure.

23             MR. SILVERSTEIN:  So I'm going

24        to ask Deane to go down to page 6 of

25        the motion to paragraph 6.

```
                                                         22
 1              NACHAWATI - CONFIDENTIAL

 2   BY MR. SILVERSTEIN:

 3        Q    And I'm going to just read this

 4   paragraph in pertinent part.  It says:

 5   "The Debtor's records reflect that the

 6   Plaintiff Law Firms represented the

 7   following number of talc claimants as of

 8   the Petition Date."

 9              And then at (c), it says:

10   "Fears Nachawati Law Firm - approximately

11   3,500 ovarian cancer claimants."

12              Do you see that?

13        A    Yes.

14        Q    And was that statement by the

15   debtor accurate to the best of your

16   knowledge?

17        A    More or less.

18        Q    Okay.  And so of the

19   approximately 3,300 to 3,500 filed claims

20   that Fears Nachawati was representing

21   clients in connection with regarding talc,

22   those were ovarian cancer claims?

23        A    The substantial majority of them

24   were.

25        Q    Okay.  And when you say,
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC      Exhibit      Page 25 of 266                Nabil Majed Nachawati
Confidential                                                                       May 24, 2023

23

1            NACHAWATI - CONFIDENTIAL

2      "substantial majority," can you share with

3      us what you have in mind when you use that

4      phrase?

5           A     Well, I mean the substantial

6      majority were ovarian cancer claimants and

7      then we had some -- a very small number of

8      mesothelioma claimants we represent as

9      well.

10          Q     And just so I understand, when

11     you say, "substantial majority," do you

12     mean more than three quarters, more than

13     90 percent, you know, what are you

14     referring to?

15          A     I mean, I would say, you know,

16     it was an approximation, and it's just

17     that, an approximation.  85, 90 percent, if

18     not more.  As I sit here today, it's just

19     sort of an approximation.

20          Q     Okay.  And all of the

21     approximately 3,500 claims that we're

22     talking about were filed claims as of

23     October 14, 2021, when the first bankruptcy

24     was filed.

25          A     That's correct.  And let me just

24

1            NACHAWATI - CONFIDENTIAL

2    sort of add one thing.

3            I believe we represented more

4    than that, but I believe in this context,

5    whoever drafted at this document, they

6    probably left that out.  I don't know if it

7    was intentional or not, but I did represent

8    substantially more than that number at that

9    time.  They weren't necessarily filed.

10       Q    Approximately how many clients

11   alleging talc injuries did you represent as

12   of October 14, 2021 with unfiled claims?

13       A    I would say approximately 5,500

14   would be my best guess sitting here today.

15       Q    I'm sorry, approximately 5,500

16   unfiled claims at that time?

17       A    Oh, no.  I'm sorry.  I

18   apologize, Mr. Silverstein.

19            5,500 total at the time of LTL

20   I's filing.

21       Q    Okay.  So --

22       A    5,500 filed.

23       Q    All right.  So approximately

24   2,000 unfiled claims your firm had in its

25   inventory relating to talc as of

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC     Exhibit    Page 27 of 266          Nabil Majed Nachawati
Confidential                                    May 24, 2023

25

1         NACHAWATI - CONFIDENTIAL

2    October 14, 2021, if I understand the math.

3         A      Roughly, yes.

4         Q      Okay.  And of those

5    approximately 2,000 unfiled claims, had you

6    had any tolling agreements in place with

7    Johnson & Johnson or any of its affiliates?

8         A      Our firm does not do tolling

9    agreements in the majority of our cases.

10   We move forward.  We file our cases, and we

11   litigate with the goal of going to trial or

12   settling for a fair resolution.

13        Q      Had you provided any information

14   about any of the unfiled claims in your

15   inventory regarding talc to Johnson &

16   Johnson or any of its affiliates prior to

17   October 14, 2021?

18        A      I don't think so.  I can't

19   recall exactly, but I don't think so.  Not

20   that I recall.

21              I do recall providing some

22   information to the TCC in LTL I.  I do

23   recall that, I believe.

24        Q      Okay.  Of the approximately

25   3,500 filed claims that we are discussing,

26

```
 1            NACHAWATI - CONFIDENTIAL

 2    approximately how many of those were filed

 3    in district courts outside of New Jersey

 4    and were transferred into the MDL?

 5         A     I don't have that information at

 6    my fingertips.  If you really want an

 7    answer to that, I'm happy to provide it

 8    through my counsel.  But I'd be guessing.

 9         Q     Okay.

10         A     I'm sure there were some.  I

11    just don't know how many.

12         Q     Was the vast majority of the

13    3,500 -- withdrawn.

14               Was the vast majority of the

15    substantial majority of 3,500 claims that

16    were pending in the MDL as of the filing of

17    the first bankruptcy case claims that were

18    filed pursuant to short-form complaints in

19    the MDL itself?

20         A     Can you restate that question

21    for me?

22         Q     Were most of the claims pending

23    in the MDL as to which your firm was

24    counsel, as of the first bankruptcy filing,

25    claims that were initiated by short-form
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 29 of 266
Confidential

Nabil Majed Nachawati
May 24, 2023

27

1              NACHAWATI - CONFIDENTIAL

2     complaint in the MDL?

3          A     I'm not sure.  The docket

4     lawyers would handle that.

5          Q     Of the filed claims in the MDL

6     as to which Fears Nachawati was counsel, as

7     of the filing of the first bankruptcy case,

8     approximately how many of those were claims

9     in which Fears Nachawati was the lead firm

10    and signed the complaint?

11         A     The substantial majority of the

12    cases we file, we are the lead lawyers in

13    our case.

14         Q     All right.  Was there some

15    number of cases that you count within the

16    approximately 3,500 filed claims that your

17    firm was associated with at the time of the

18    first bankruptcy filing as to which Fears

19    Nachawati was a co-counsel but not the

20    signing law firm?

21         A     I don't know the details, but

22    what I will say is when we file a case,

23    we're usually the lead.  We may have

24    referral counsel that refer cases in, but

25    when we file a case, we're normally the

                                                                  28

1              NACHAWATI - CONFIDENTIAL

2    lead on our files.

3         Q     Was -- withdrawn.

4              Approximately what percentage of

5    the filed claims that Fears Nachawati had

6    in its inventory -- when I say, "claims,"

7    I'm referring to talc claims -- as of the

8    first bankruptcy filing were claims that

9    were filed prior to Judge Wolfson's Daubert

10   decision on April 27, 2020?

11        A     That's a weeds question.  I

12   don't know the answer to that.

13        Q     Are you able to approximate the

14   percentage of filed claims in Fears

15   Nachawati's inventory as of October 14,

16   2021 that were filed after the Daubert

17   decision as opposed to before the Daubert

18   decision was issued?

19        A     No.

20        Q     Was Ms. Kelly Brewer one of the

21   MDL plaintiffs your firm represented as of

22   the time of the first bankruptcy filing?

23        A     Yes, she was part of the TCC-1

24   and LTL I.

25        Q     Do you still represent

29

1          NACHAWATI - CONFIDENTIAL

2    Ms. Brewer?

3          A     I do.

4          Q     When was the last time that you

5    had any form of communication with her?

6                I'm not looking for the

7    substance, just the timing.

8          A     Sure.  I'd have to check with

9    the attorney, but she's been apprised at

10   all relevant times of all material

11   developments that were important to the

12   case during the pendency of LTL I and

13   following.

14         Q     I'm sorry, which attorney would

15   you check with?

16         A     It would probably be a

17   combination of teams.  I don't have the

18   names specifically off the top of my head,

19   but from time to time, it would be Darren

20   McDowell, and some of his team members, as

21   well as some other lawyers from my firm,

22   myself included.

23         Q     Was Ms. Brewer a client that

24   engaged Fears Nachawati after the Daubert

25   decision was issued by Judge Wolfson?

                                                              30

1              NACHAWATI - CONFIDENTIAL

2       A     I don't have that information in

3    front of me.  So I don't know.

4       Q     Do you have any recollection of

5    approximately how many cases filed in the

6    MDL Fears Nachawati had prior to filing a

7    claim for Ms. Brewer?

8       A     Restate that question, please?

9       Q     Do you have an approximation of

10   how many cases Fears Nachawati had in the

11   MDL before filing a claim for Ms. Brewer?

12      A     Approximately 3,500.

13      Q     So Ms. Brewer was one of your

14   more recent clients prior to the bankruptcy

15   filing?

16      A     As I stated before, I don't have

17   the date at my fingertips.  I'm happy to

18   provide that through counsel, if you need

19   that date.

20      Q     I'm just trying to understand if

21   you can recall whether Ms. Brewer was one

22   of the clients that Fears Nachawati filed

23   an MDL complaint on behalf of relatively

24   early in its involvement with talc, in its,

25   you know, middle stages of Fears

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC      Exhibit     Page 33 of 266      Nabil Majed Nachawati
Confidential                                                    May 24, 2023

31

1              NACHAWATI - CONFIDENTIAL

2    Nachawati's involvement with talc claims,

3    or towards the later stage of its filing

4    talc claims before the bankruptcy filing.

5         A     I'd be guessing.  So no.

6         Q     Okay.  Were you appointed to any

7    leadership role in the MDL?

8         A     No, and nor did I seek any

9    appointment.

10        Q     And by "leadership," just so

11   that we're clear, were you appointed to the

12   executive committee?

13        A     No.

14        Q     Were you appointed to the

15   steering committee?

16        A     No.

17        Q     Did you take any depositions in

18   the MDL?

19        A     No.

20        Q     Did you file -- now, when I say,

21   "you," I'm referring to you or anybody in

22   your firm -- did you or anybody in your

23   firm file any papers in the MDL other than

24   complaints and associated documents like

25   civil cover sheets?

                                                                    32

 1                  NACHAWATI - CONFIDENTIAL

 2        A     Generally speaking, whatever the

 3   Court required us to file, our goal was to

 4   comply with the Court's efforts and file

 5   what we needed to file.

 6              We did have some -- I'm sorry,

 7   did you want to --

 8        Q     I'm sorry, I cut you off.  I

 9   thought you were done.

10        A     Sure.  We did have some State

11   Court cases as well on file in various

12   courts, but it was a small number.

13        Q     Yeah, I'm going to talk about

14   State -- or ask you about State Court cases

15   in a few moments.

16              But with regard to the MDL, do

17   you recall filing any substantive documents

18   in the MDL other than any complaints that

19   your firm filed?

20        A     Could you specify what documents

21   you would be talking about?

22        Q     Either motion papers, opposition

23   to motions, notices of appeal?

24        A     My recollection is we had a few

25   bellwethers -- again, that's an

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 35 of 266          Nabil Majed Nachawati
Confidential                                                  May 24, 2023

33

1               NACHAWATI - CONFIDENTIAL

2      approximation -- we had a few bellwether

3      selections in our talc cases, and we had to

4      enter into a discovery pool that was

5      different, from my recollection, and more

6      intensive than just filing a complaint with

7      the idea that those discovery pool cases

8      that were identified would ultimately be

9      pulled down to trial, cases that were

10     worthy of trial and selected for trial

11     either by order of Court or by consent of

12     parties, by pick of parties, by random

13     selection, or any mix thereof.

14          Q    Okay.  So just to drill down on

15     the sort of separate pool of bellwether

16     cases, did you appear at any depositions in

17     connection with the -- any of the discovery

18     in the bellwether cases?

19          A    Not me personally, but my

20     recollection is, some of my lawyers did

21     with those discovery pool cases.

22          Q    Do you recall the names of any

23     of your clients who were in the bellwether

24     pool?

25          A    I don't here today.

34

1            NACHAWATI - CONFIDENTIAL

2        Q     Do you recall approximately how

3   many clients you had in the bellwether

4   pool?

5        A     I don't have that information

6   right now in front of me, but I'm happy to

7   supplement through my counsel if you want

8   that information.

9        Q     Was it more than one?

10       A     I believe so.

11       Q     Did you -- did you personally

12   participate in any Court conferences in the

13   MDL?

14       A     I believe from time to time.

15       Q     Do you have any recollection of

16   that or you're assuming it?

17            I'm trying to figure out what

18   you recall versus --

19       A     I think from time to time, you

20   know, I'd either listen in or be briefed by

21   my lawyers who were on the docket tasked

22   with following the CMOs coming out of the

23   Court.

24       Q     Did you participate in any of

25   the briefing of the Daubert motion --

35

```
 1              NACHAWATI - CONFIDENTIAL

 2   motions?

 3        A     No.

 4        Q     Were you in court for any part

 5   of the Daubert hearing?

 6        A     No.

 7        Q     Was, to the best of your

 8   knowledge, any attorney in your firm

 9   present for any part of the Daubert

10   hearing, in court?

11        A     They may have been, but I don't

12   have specific knowledge today of that,

13   sitting here.

14        Q     Were you -- withdrawn.

15              Do you have any recollection of

16   being in court at any time when

17   Judge Wolfson called the MDL on the

18   calendar?

19        A     Not that I recall.

20        Q     Did you participate in the

21   drafting of any iteration of the master

22   complaint in the MDL?

23        A     No, because that's usually

24   handled by leadership.

25              We're not allowed.  I would love
```

36

1                NACHAWATI - CONFIDENTIAL

2    to, but I wasn't given that opportunity.

3        Q     Did you -- at any point in time,

4    did you or any attorney in your firm submit

5    any time or expenses to Alan Winikur or any

6    of his successors in connection with the

7    common benefit fund?

8        A     Restate that question?

9        Q     Did you or anyone in your firm

10   prior to the first LTL bankruptcy filing

11   submit any documentation to the

12   Court-ordered common benefit administrator

13   Mr. Winikur or any of his successors for

14   consideration in connection with a common

15   benefit fund?

16       A     No, because my recollection at

17   the time is the draft order was submitted

18   by leadership in pretty self-contained and,

19   in a sense, enured only to the benefit of

20   those appointed in leadership-anointed

21   roles.

22       Q     Did you at any point in time

23   prior to the first bankruptcy filing engage

24   in any settlement --

25                MR. SILVERSTEIN:  I'm sorry, I

37

```
 1              NACHAWATI - CONFIDENTIAL

 2         just heard an echo, so I apologize.

 3         I'm just going to start that over.

 4   BY MR. SILVERSTEIN:

 5         Q    At any point prior to the first

 6    bankruptcy filing, did you participate in

 7    any settlement negotiations over any of the

 8    talc claims in your inventory with any

 9    representative or attorney for Johnson &

10    Johnson or its affiliates?

11         A    Can you restate that question?

12         Q    Yes.

13              At any point in time prior to

14    October 14, 2021, when LTL filed bankruptcy

15    for the first time, had you engaged in any

16    settlement negotiations with any

17    representative or attorney for Johnson &

18    Johnson or its affiliates concerning talc

19    clients you represented?

20         A    From time to time, yes, over the

21    years.  I think it intensified because at

22    one point, many members of this current

23    leadership were appointed to the TCC in the

24    Imerys bankruptcy filing, and my

25    recollection is they cut a tentative deal
```

38

```
 1                NACHAWATI - CONFIDENTIAL

 2    for half of the amount of the money in the

 3    current LTL filing, I think 4-and-a-half

 4    billion, and they were all calling me,

 5    including defense counsel, trying to get me

 6    to vote yes to a $4-and-a-half billion deal

 7    that was supported by many of the members

 8    that are on this deposition right now, and

 9    my firm was one of the few that voted no,

10    and that plan failed.

11        Q     You're referring to the plan

12    proposed in the Imerys bankruptcy?

13        A     I believe so.  That's my

14    recollection.

15        Q     And so with whom on behalf of

16    Johnson & Johnson did you have discussions

17    about the resolution or potential

18    resolution of the Imerys bankruptcy prior

19    to LTL's bankruptcy filing?

20        A     It may have been Jim Murdica.

21        Q     Do you recall having

22    communication or are you speculating?

23        A     More speculation, because the

24    conversations were usually very short.  It

25    was, Are you interested in settling?  And
```

39

1        NACHAWATI - CONFIDENTIAL

2   the answer is, No, and not at $4-and-a-half

3   billion with an 8/12 common benefit

4   assessment.

5        Q    Do you recall anyone --

6   withdrawn.

7             You don't have specific

8   recollection of speaking with Mr. Murdica.

9             Is there anybody at Johnson &

10  Johnson or its affiliates with whom you do

11  specifically recall speaking about the

12  Imerys proposed plan prior to the LTL

13  bankruptcy filing?

14       A    Not that I recall here today.

15       Q    Can you recall anything about

16  the conversations that you participated in

17  with any Johnson & Johnson or affiliated

18  company representative or attorney

19  regarding Imerys other than what you've

20  described?

21       A    No, but I recall several

22  conversations with many of the people in

23  leadership and now on this TCC and LTL II.

24            Do you want me to name those?

25       Q    It sounds like you want to, so

40

1              NACHAWATI - CONFIDENTIAL

2    go ahead.

3        A     I'm not sure who is on the

4    phone, but there were several.  I'd say

5    several current TCC members in LTL II, but

6    I don't want to mess with the mouse, so I

7    don't want to mess up the tech.

8              But there are several that are

9    on TCC 2 that were in favor of a plan at

10   $4-and-a-half billion with an 8/12

11   assessment.

12       Q     And what was your understanding

13   of what the -- what the nature of the plan

14   was that you described as the $4-and-a-half

15   billion plan?

16       A     $4-and-a-half billion plan with

17   an 8/12 assessment to go see claimants

18   filed in the MDL with a proportionate split

19   of that money between the OCs primarily, as

20   well as the mesos, at a proportion that I

21   can't remember but that I disagreed with.

22       Q     And was that a plan, as you

23   understood it -- withdrawn.

24             Do you recall any differences in

25   the nature of the plan that was proposed,

41

1          NACHAWATI - CONFIDENTIAL

2    putting aside the economics, between the

3    plan proposed in Imerys that you voted no

4    to and the plan that's been proposed in

5    this LTL filing?

6         A    My recollection is it was less

7    than half of what the amount is now.  And

8    the current plan as filed in LTL II

9    contemplates no common benefit or EIF,

10   which is a net-net better deal in a massive

11   way for the clients.

12        Q    Which clients are you referring

13   to?

14        A    Particularly the ones in the

15   MDL.

16        Q    Are you talking about your

17   clients or are you talking about some other

18   clients?

19        A    My clients.  I mean, I can't

20   speak for everyone else's clients.  So my

21   clients, most of them.

22        Q    And why would the absence of an

23   EIF be beneficial to your clients?

24        A    Because that's less money that

25   goes to other third parties and

42

```
 1            NACHAWATI - CONFIDENTIAL

 2   theoretically more money that would go in

 3   their pockets, which is in the clients'

 4   best interests.

 5        Q    Have you done an evaluation of

 6   how many of your clients, if any, would

 7   qualify for treatment under an EIF?

 8        A    I haven't done that yet.

 9        Q    And why would the absence of any

10   common benefit funding assist your clients?

11        A    Well, because they're

12   responsible for paying a portion of that

13   8/12 self-serving order that was issued

14   approximately 12 years ago.

15            So if there's no common benefit

16   that they have to pay, then they would net

17   more money because they wouldn't have to

18   pay in bankruptcy because there's a general

19   concept, as you know, Mr. Silverstein, in

20   bankruptcy, there is no common benefit.

21            There is an EIF, but the EIF

22   written, per statute, is usually applied

23   only in the context of post-petition

24   value-added in reaching a resolution past

25   confirmation.
```

43

1              NACHAWATI - CONFIDENTIAL

2       Q     Did you -- in connection with

3  any of your clients who filed claims in the

4  MDL, did you engage any experts?

5       A     Yes.

6       Q     Did any of those experts prepare

7  any reports that were disclosed?

8       A     I don't know.

9       Q     Who at your firm would know

10 that?

11      A     I'd have to get an answer to

12 that, but it would be generally the lawyers

13 handling the docket -- the day-to-day

14 responsibilities and affairs of the docket.

15             And over 12 years, as you can

16 imagine, it would be different people.  So,

17 again, I'm happy to supplement if you

18 request that through my counsel.

19      Q     What's the -- I'm sorry, what's

20 the 12 years that you're referring to?

21      A     The pendency of the MDL -- or

22 actually, more specifically, Allen's first

23 filed case and then everything thereafter.

24             And when I say, "Allen," Allen

25 Smith, who received the first verdict, yes

44

1              NACHAWATI - CONFIDENTIAL

2    for liability, zero on damages.

3        Q    When, to the best of your

4    recollection, did your firm represent its

5    first talc claimant?  What year was that?

6        A    I can't recall specifically, but

7    what I will say is I called Mr. Smith

8    himself and congratulated him on the

9    verdict.

10            It was quite impressive given

11   the challenging venue he was in, and it was

12   a case that I was interested in, that I

13   started looking into based on the experts

14   and most of them were experts that believed

15   in the case, were not what we call "hired"

16   experts just for the case.  Many of them

17   were Harvard -- tenured Harvard professors

18   and well-respected professors that had been

19   researching the science behind this for

20   decades.

21            When I say, "decades," six-plus

22   decades.

23       Q    Going back to the Imerys plan,

24   did you understand whether the Imerys

25   proposed plan, if approved by the

45

1           NACHAWATI - CONFIDENTIAL

2    appropriate number of votes, would have

3    required all talc claimants with claims in

4    the MDL to seek resort to the bankruptcy

5    trust that was being proposed?

6         A     Can you restate that question,

7    Mr. Silverstein?

8         Q     You're familiar with what a

9    channeling injunction is?

10        A     Of course.

11        Q     Did you have any understanding

12   as to whether the proposed Imerys plan

13   involved a channeling injunction?

14        A     As I sit here today, I can't

15   recall.

16             I will say at the time I made my

17   decision and all the clients made their

18   decision, I was more familiar.  Just -- I

19   don't want to say I'm having a senior

20   moment, but it's been quite some time since

21   that plan took place.

22             So I don't have -- I don't

23   recall all the details of it other than it

24   was a plan that was less than half the size

25   of this current plan.

46

1          NACHAWATI - CONFIDENTIAL

2          Q     Do you have a recollection of

3     whether the plan was an opt-in versus an

4     opt-out plan?

5          A     No.

6          Q     Outside the context of whether

7     the proposed Imerys plan should be approved

8     or not, did you have any communications

9     that you can recall with Mr. Murdica or any

10    other representative at Johnson & Johnson

11    regarding a possible settlement of your

12    clients' talc claims prior to October 14,

13    2021?

14         A     I can't recall specifics.  I'm

15    sure he was lurking around asking, but they

16    were very short conversations with me.

17         Q     Is it fair to say that you did

18    not have any substantive, productive

19    settlement conversations with any

20    representative of Johnson & Johnson or its

21    affiliates prior to October 14, 2021

22    regarding a possible resolution of your

23    talc claims outside the context of the

24    Imerys plan?

25              MR. RASMUSSEN:  This is Mark

47

```
 1              NACHAWATI - CONFIDENTIAL

 2         Rasmussen for the debtor.

 3              Objection to the form.

 4         A     I don't recall any.

 5              Just to be frank,

 6    Mr. Silverstein, you know me, I'm not

 7    interested in settlements that I don't

 8    like.  So I can't recall.  But generally,

 9    they would have been short conversations,

10    interested in settlement, and not so kind

11    words on my part, and then a hang-up after

12    that is generally how the format of those

13    calls went.

14         Q     Regarding the Imerys plan, you

15    identified the amount of money to fund the

16    trust.  You identified the common benefit

17    fund.  You identified the EIF.

18              Were there any other features of

19    the proposed Imerys plan that you can

20    recall contributed to your recommending to

21    your clients that they vote no?

22         A     Not as I sit here today.  I'd

23    like to re-review the plan and make a

24    supplemental answer, if you want, through

25    my counsel.  I'm happy to do that for you,
```

48

```
 1            NACHAWATI - CONFIDENTIAL

 2    if you so wish.

 3         Q     When was the last time that you

 4    gave any consideration to -- withdrawn.

 5              When was the last time you

 6    looked at what had been proposed in

 7    connection with Imerys?

 8         A     Very recent -- you know -- and,

 9    again, I would say this is probably covered

10    by mediator's privilege, but, you know, it

11    is a point of discussion in LTL II.

12         Q     Did you -- have you reviewed the

13    Imerys plan in connection with LTL II?

14              MR. MONTEFUSCO:  This is Ryan

15         Montefusco for the Ad Hoc Committee of

16         Supporting Counsel.

17              Mr. Nachawati, I just want to

18         caution you, if something is covered

19         by the issue of privilege, please

20         don't disclose any information along

21         those lines.

22              THE WITNESS:  Okay.

23    BY MR. SILVERSTEIN:

24         Q     Well, all I asked, if you

25    reviewed the Imerys plan.
```

49

1              NACHAWATI - CONFIDENTIAL

2       A      Not recently, but that's on the

3    list -- to-do list.

4       Q      Is it fair that you have not

5    reviewed the Imerys plan subsequent to

6    LTL's second filing?

7       A      Not yet, but I intend to review

8    the original plan as filed, but failed.

9       Q      Switching subjects and going

10   back to the claims that your firm had in

11   its inventory prior to -- prior to the

12   first bankruptcy filing, what was the

13   nature of the claims that were filed in

14   State Court prior to the bankruptcy filing?

15      A      Could you elaborate?

16      Q      Yeah.   In terms of, one, did you

17   have claims filed in State Court?

18      A      We did.

19      Q      What was the nature of the State

20   Court talc claims in which your firm was

21   counsel prior to the first bankruptcy

22   filing?

23      A      Generally, they were claims that

24   were being pursued as one-off trial cases

25   with our general strategy that's common

50

1              NACHAWATI - CONFIDENTIAL

2     amongst many of the participants in this

3     meet -- in this deposition, which is you

4     file in State Court, try to get to trial as

5     soon as you can.  If you can get a

6     preferential setting, great.  And you try

7     the case, if you can.

8              Likewise, you pursue a parallel

9     path in the MDL.  You file your cases

10    there.

11             And that's our general strategy

12    with every court we pursue.

13        Q    Did any of your cases go to

14    trial?

15        A    No.

16        Q    And did you have ovarian cancer

17    cases that were filed in State Court?

18        A    I believe so, yes.

19        Q    Did you have mesothelioma cases

20    that were filed in State Court?

21        A    I think so.

22        Q    You're not sure?

23        A    I believe we did.

24             Let me frame it this way:  Most

25    of our meso cases are filed in State Court,

51

1              NACHAWATI - CONFIDENTIAL

2    not the MDL, where most of the ovarian

3    cancer claims were filed, if that provides

4    any clarity.

5         Q    Either in cases filed in the MDL

6    or cases filed in State Court, did your

7    firm take any depositions of Johnson &

8    Johnson prior to October 14, 2021, to the

9    best of your knowledge?

10        A    I believe it's possible that the

11   lawyers took some depos in the State Court

12   proceedings.

13        Q    And what is your -- what is your

14   belief based on?

15        A    Just by the nature of how we

16   handle the asbestos cases versus the

17   ovarian cancer cases.

18             We had ovarian cancer cases

19   pending in State Court and we had meso

20   cases and lung cancer cases pending in

21   State Court as well.  That's my belief, as

22   I sit here today.

23        Q    All right.  And so I understand

24   your -- with regard to your response that

25   you believe that lawyers in your firm took

52

1          NACHAWATI - CONFIDENTIAL

2    depositions of Johnson & Johnson, that was

3    in connection with your practice with

4    mesothelioma and lung cancer cases?

5          A     Yes.  And so let me sort of

6    re -- let me clarify and then I wasn't

7    thinking about it earlier on, but yes, I

8    mean, in the context of asbestos and meso,

9    those cases are typically filed in State

10   Court where we designate experts, we treat

11   them as single-off cases.

12              But we also had ovarian cancer

13   State Court cases that we were doing the

14   same with but just a different injury.  But

15   those were a small number on the ovarian

16   cancer side and a small number with respect

17   to the mesos in State Court when you

18   compare it to the overall number filed in

19   the MDL, if that makes sense.

20        Q     Do you have any specific

21   recollection of any depositions of Johnson

22   & Johnson being taken by your firm?

23        A     Not as I sit here today.  I'm

24   happy to supplement with the information

25   from the lawyers who would have done that

53

1                  NACHAWATI - CONFIDENTIAL

2     work, if you so choose and if you want

3     that.

4          Q     Do you have any recollection of

5     your firm taking any in extremis

6     depositions of any of your clients prior to

7     October 14, 2021 in connection with talc

8     litigation?

9          A     No.

10         Q     Do you have any recollection of

11    your firm filing any briefs in State

12    Court -- withdrawn.

13               Do you have any recollection of

14    your firm filing any briefs in connection

15    with any of the State Court claims

16    regarding talc that your firm was counsel

17    on?

18         A     You know, as you probably can

19    imagine, in State Court, the litigation,

20    when you have control and an ability to be

21    involved, there are many motions that are

22    filed and responded to.  And so I don't

23    have specific recollections of exactly

24    which ones today.

25               But, again, happy to supplement

54

1              NACHAWATI - CONFIDENTIAL

2    with that flurry of motion and intense

3    paperwork and discovery, if you so choose

4    and you want to read through all those

5    files, we can provide that information

6    under either a Protective Order or redacted

7    format through my counsel.

8         Q     Okay.  We may take you up on

9    that.

10             With regard to your mesothelioma

11   talc claims, prior to October 14, 2021, did

12   you engage in any discussions with any

13   attorney representative of Johnson &

14   Johnson or of any of its affiliates

15   regarding a settlement of any of those

16   claims?

17        A     Not that I recall.  Not me

18   personally.

19        Q     Do you have any recollection of

20   anyone else in your firm being engaged in

21   communication with any attorney

22   representative of Johnson & Johnson

23   regarding a potential settlement of any of

24   the State Court mesothelioma claims prior

25   to October 14, 2021?

                                                                    55

1              NACHAWATI - CONFIDENTIAL

2       A      Not as I sit here today.

3       Q      Okay.  Did you or your firm

4  represent any government units which had

5  filed claims against Johnson & Johnson

6  relating to talc?

7       A      Yes.  We represented the State

8  of New Mexico.

9       Q      And when did your firm begin to

10  represent the State of New Mexico in

11  talc-related litigation against Johnson &

12  Johnson?

13      A      I don't have the specific date

14  in front of me, but I'm happy to provide

15  that, but it's been many years ago.

16             MR. SILVERSTEIN:  Okay.  I'm

17        going to ask Deane to pull up Tab 12,

18        which I'm going to ask the court

19        reporter to mark as Nachawati

20        Exhibit 2.

21             (Exhibit 2, document entitled

22        "Plaintiff's First Amended Complaint

23        for Declaratory Relief, Damages,

24        Restitution and Civil Penalties", was

25        remotely introduced and provided

                                                            56

1              NACHAWATI - CONFIDENTIAL

2          electronically to the reporter, as of

3          this date.)

4    BY MR. SILVERSTEIN:

5          Q     I can represent to you,

6    Mr. Nachawati, that this document -- which

7    I'll ask Deane to scroll down -- but this

8    document was submitted by LTL in the first

9    bankruptcy in connection with its adversary

10   proceeding to extend the automatic stay and

11   preliminary injunction to the claims

12   asserted by the State of New Mexico and the

13   State of Mississippi.

14         A     What's your question?

15         Q     There's no question yet.

16               First, I want to see if you are

17   familiar with this document.

18         A     I'm familiar with this document.

19   This document precedes the bankruptcy that

20   was transferred to New Jersey.

21               And prior to your involvement,

22   Mr. Silverstein, in North Carolina, where

23   the original LTL bankruptcy was filed,

24   prior to being transferred from the North

25   Carolina bankruptcy judge to Judge Kaplan,

57

1              NACHAWATI - CONFIDENTIAL

2    the Texas Attorney General orally, over the

3    phone, and in a wise way, that I thought

4    was very good, asked the judge whether the

5    preliminary injunction, the automatic stay

6    applied to governmental entities.

7              And my hope, although it was

8    different later on, was that would have

9    been the law of the case established by

10   Judge Whitley in North Carolina -- in the

11   North Carolina bankruptcy, which would have

12   carved out the governmental entities.

13             Because I'm a firm believer that

14   they're entitled to their sovereignty and

15   they're entitled to pursue their litigation

16   in their State Court, in their backyard,

17   and I'm absolutely opposed to any idea of a

18   sovereign state being dragged into, either

19   by consent or otherwise, a bankruptcy that

20   should have no relation to.

21             And I still hold that belief

22   today.  And, frankly, I think it's

23   appalling that the debtor could pay counsel

24   for ad hocs of AGs and that it would be

25   advisable to enter into an agreement

58

1          NACHAWATI - CONFIDENTIAL

2     consenting to bankruptcy jurisdiction as a

3     sovereign state.

4             And that's still my position

5     today, and it will always be.

6        Q    Do you see in the upper

7     right-hand corner of this document that it

8     was filed on March 3, 2020?

9        A    I do.

10            MR. SILVERSTEIN:  And, Deane,

11        please scroll down to the signature

12        page.

13            Scroll up.  Okay.

14   BY MR. SILVERSTEIN:

15        Q    Do you see that your firm was on

16    the complaint -- the first amended

17    complaint that was filed on March 3, 2020?

18        A    I do.

19        Q    And do you recall approximately

20    how much prior to the filing of this first

21    amended complaint your firm began

22    representing New Mexico in connection with

23    its claims against Johnson & Johnson?

24        A     I don't.  There's an extensive

25    process you have to go through pursuant to

59

1              NACHAWATI - CONFIDENTIAL

2       the State of New Mexico's Sunshine Laws to

3       make sure there's full transparency and

4       approval because you're dealing with a

5       public entity.  And anytime you're dealing

6       with a public entity, there are certain

7       disclosure requirements and very specific

8       steps you have to follow.

9              So I don't recall here, but

10      suffice it to say, it's very much by the

11      book because it has to be because it's a

12      governmental entity.

13      Q      Does your firm still represent

14      the State of New Mexico in connection with

15      its claims against Johnson & Johnson?

16      A      No, we don't.

17      Q      And when did that status change?

18      A      Approximately a week ago.

19      Q      Did your firm withdraw as

20      counsel?

21             MR. HOFMEISTER:  Objection.

22      A      I don't think I'm at liberty to

23      disclose the circumstances regarding our

24      attorney-client relationship as it existed

25      then or as I sit here today, absent a court

                                                                60

1              NACHAWATI - CONFIDENTIAL

2    order stating otherwise.

3        Q    Okay.  So just so that we're

4    clear, you're not going to answer whether

5    you withdrew as counsel to the State of New

6    Mexico?

7              MR. McEVILLY:  Objection.

8              This is Kyle McEvilly of Gibbons

9         P.C., counsel for the State of New

10        Mexico.

11             I'm going to raise

12        attorney-client privilege and direct

13        you not to answer that question.

14   BY MR. SILVERSTEIN:

15       Q    Switching subjects again, just

16   going back -- and Deane, you can take this

17   down -- with regard to the approximately

18   2,000 unfiled claims that your firm had in

19   its inventory relating to talc as of the

20   first bankruptcy filing, I think you

21   identified them as -- well, withdrawn.  I'm

22   not sure I got this.

23             Of the 2,000 unfiled claims in

24   your firm's inventory relating to talc as

25   of October 14, 2021, approximately how many

61

1             NACHAWATI - CONFIDENTIAL

2    were claims that were mesothelioma or lung

3    cancer claims?

4        A     I don't have that number right

5    here, as I sit here.

6        Q     Was the percentage of your --

7    withdrawn.

8             Did the composition of the

9    unfiled claims in your firm's inventory as

10   of October 14, 2021 parallel the

11   composition of the filed claims in your

12   firm's inventory with regard to claim type?

13            MR. RASMUSSEN:  Object to form.

14       Objection to the form of the question.

15       A     If you can define "claim type."

16            I mean, if you're asking me were

17   the majority of our claimants at all times

18   ovarian cancer in nature as opposed to meso

19   or asbestos related or -- if that's your

20   question, the answer is, it's generally

21   been the case that the majority of our

22   clients are ovarian cancer-related clients.

23       Q     Okay.  And when you say,

24   "ovarian cancer-related," what are you

25   referring to?

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 64 of 266
Confidential

Nabil Majed Nachawati
May 24, 2023

62

1              NACHAWATI - CONFIDENTIAL

2       A     Well, exposure -- gynecological

3   exposure to talc as opposed to inhalation

4   of talc in a meso case.

5       Q     Did your firm have filed claims

6   as of October 14, 2021 in the MDL where the

7   claimant suffered from cervical cancer but

8   not ovarian cancer?

9       A     I don't have that detail in

10  front of me, as I sit here today.

11      Q     Do you know whether any of your

12  clients, either filed or unfiled, had

13  cervical cancer and not ovarian cancer?

14      A     I don't have that information at

15  my fingertips.

16      Q     Do you have any recollection --

17  withdrawn.

18            In the past two months, have you

19  done any work to determine whether any of

20  your talc claimants as of October 14, 2021

21  had a form of cancer other than ovarian

22  cancer or mesothelioma?

23      A     You're asking if we work on our

24  files -- I mean, we're constantly working

25  on our files, getting records, summarizing

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC     Exhibit     Page 65 of 266     Nabil Majed Nachawati
Confidential     May 24, 2023

63

1           NACHAWATI - CONFIDENTIAL

2    the records, doing whatever is required to

3    move the case forward even under the

4    circumstances of a stay.  So we're always

5    working on our case is the best answer I

6    could give you.

7              In terms of me getting in the

8    weeds of a law firm that employs

9    approximately 50 lawyers and, you know, a

10   couple of hundred total employees, no, I'm

11   not there with my microscope every day

12   looking over every document.  That would be

13   impossible, Mr. Silverstein, as you know.

14       Q    Do you know whether any of your

15   clients -- withdrawn.

16             Do you know whether any of your

17   talc clients as of October 14, 2021

18   suffered from fallopian tube cancer and not

19   ovarian cancer?

20       A    I'm sure many suffered from

21   different subtypes of cancer, some that

22   would be related to talc exposure and then,

23   depending on who you ask and depending on

24   what expert you believe, others would not

25   be as related.  So --

64

1               NACHAWATI - CONFIDENTIAL

2        Q     And what is the basis of your

3   belief that you had clients that were of

4   different subtypes of cancer?

5        A     Well, because when you sign up a

6   client, many times they know they have some

7   type of cancer.  They don't know the

8   specific type until we, as their lawyers,

9   request the records.

10              Then once we request the

11  records, we go through, we look at the

12  science, we summarize the medical records,

13  and we determine how related or not their

14  cancers are with our experts, and with the

15  attorney assigned to looking at causation,

16  what their assessment of the file is based

17  on the summary of the records review and

18  their consultation with the experts that we

19  retain on a consulting basis to help us

20  move through the weeds on those matters, at

21  the granular level, if you will.

22       Q     So since you mention it, as of

23  the first LTL bankruptcy filing, could you

24  describe just what the ordinary course

25  practice was in your firm, not with regard

65

```
 1              NACHAWATI - CONFIDENTIAL

 2    to any particular client, but what the

 3    ordinary course practice was with regard to

 4    client intake and doing the analysis that

 5    you just mentioned of getting records and

 6    looking at causation and the like, what

 7    was -- what were the sequence of events

 8    that your firm undertook, in general?

 9         A    And I'd have to object to

10    attorney-client privilege.  I can't tell

11    you what I do in our cases following

12    retention of our clients.

13         Q    Without telling me what your

14    practices were, did you have ordinary

15    course practices as of the first bankruptcy

16    filing with regard to obtaining medical

17    records and analyzing your clients' claims

18    of causation?

19         A    Yes.  From day one, when -- if

20    you're -- prior to the bankruptcy, from day

21    one, when you're retained, generally

22    speaking, you're working on that case when

23    it comes in the door.

24              You request the records,

25    summarize the records, retain experts, mark
```

66

1              NACHAWATI - CONFIDENTIAL

2    the statute of limitations.  It's pretty

3    straightforward, if you will, from a law

4    practice standpoint.

5         Q    Okay.  So your firm will have --

6    withdrawn.

7              Has your firm provided any

8    records to Johnson -- withdrawn.

9              Has your firm provided any

10   medical records to Johnson & Johnson?

11        A    I'm --

12             MR. HOFMEISTER:  Objection to

13        the extent it involves any

14        confidential communications, whether

15        it be in connection with the mediation

16        process.

17        A    As I sit here today, I can't

18   recall, Mr. Silverstein.  But what I will

19   say is it's pretty common when you're in a

20   litigation, as a general matter, to

21   exchange records either pursuant to an

22   agreed protective order by order of Court

23   or records release authorizations agreed to

24   by the parties in advance.

25        Q    In connection with the second

                                                                    67

1              NACHAWATI - CONFIDENTIAL

2    bankruptcy filing of LTL, has your firm

3    provided any either medical records or

4    other substantiation of claims to any

5    representative or attorney of Johnson &

6    Johnson or its affiliates?

7              MR. HOFMEISTER:  Objection.

8       A     I'm not aware.

9              MR. HOFMEISTER:  Same objection.

10      A     I'm not aware of that today, as

11   I sit here.

12             MR. SILVERSTEIN:  Before we

13        switch subjects, we've been going for

14        a bit more than an hour.  I would just

15        suggest a 5-minute break, if that's

16        acceptable to you?

17             THE WITNESS:  Sure.  No problem.

18             MR. SILVERSTEIN:  Okay.

19             THE VIDEOGRAPHER:  Okay.  We are

20        now going off the record.  The time is

21        4:14.

22             (Recess taken 4:14 p.m.)

23             (Resumed 4:22 p.m.)

24             THE VIDEOGRAPHER:  We are now

25        back on the record.  The time is 4:22.

68

1        NACHAWATI - CONFIDENTIAL

2    BY MR. SILVERSTEIN:

3        Q    Mr. Nachawati, prior to

4    October 14, 2021, had you worked on any

5    Johnson & Johnson talc matters with Mikal

6    Watts?

7        A    Not that I recall, no.

8             I tend to -- well, I'll just put

9    it at no.  I like doing my work as a firm.

10       Q    Had you, prior to October 14,

11   2021, done any work on Johnson & Johnson

12   talc matters with Adam Pulaski?

13       A    No.

14            There may be some dual reps that

15   I'm unaware of, but generally speaking,

16   we -- you know, I had no relationships with

17   Mikal Watts or Adam Pulaski in relation to

18   the talc litigation prior to the LTL I

19   filing, if that answers your question.

20       Q    And when you say, "dual reps,"

21   you mean clients that potentially had

22   engaged your firm and had also engaged

23   Mr. Pulaski's or Mr. Watts' firm?

24       A    That's correct.  There may be --

25   you know, in a general sense, without

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 71 of 266                    Nabil Majed Nachawati
                           Confidential                               May 24, 2023

69

1              NACHAWATI - CONFIDENTIAL

2    regard to any specific file, in a general

3    sense, when you have dual rep, there is an

4    issue to be resolved, which is, you know,

5    who gets what percentage, if any, of the

6    fees, expenses, who is handling the case

7    going forward, and you just try to resolve

8    it.

9              So in that vein, because of the

10   number of cases that Mr. Watts, and

11   separately, Mr. Pulaski had in a general

12   sense in the mass torts space, dual reps

13   are common and you -- the attorneys on the

14   dockets deal with those matters as they

15   arise.

16             So that, and we may have had

17   some dealings.  But outside of that, none

18   that I am aware of.

19        Q    Did you have any conversations

20   with Mr. Watts about Johnson & Johnson talc

21   claims prior to October 14, 2021 that you

22   can recall?

23        A    No, not that I can recall

24   sitting here today.

25        Q    Did you have any conversations

70

```
1              NACHAWATI - CONFIDENTIAL

2    with Adam Pulaski about Johnson & Johnson

3    talc claims prior to October 14, 2021?

4        A     Not that I recall sitting here

5    today.

6        Q     Your client Ms. Brewer was

7    appointed to serve on the Official

8    Committee of Talc Claimants in November

9    2021, shortly after the first bankruptcy

10   filing.

11             Do you recall that?

12       A     Yes.

13       Q     And she continued to serve as a

14   member on -- at Official Committee

15   continuously from that time until the

16   dismissal of the first bankruptcy on

17   April 4, 2023, is that right?

18       A     I believe so.

19       Q     During the entirety of her

20   service as a member of the Official

21   Committee of Talc Claimants, which I'll

22   refer to as the "TCC" from now on --

23       A     Sure.

24       Q     -- you served as her

25   representative in connection with TCC
```

71

1              NACHAWATI - CONFIDENTIAL

2    activities, correct?

3         A     Correct.

4         Q     And in that capacity, you

5    participated in TCC virtual and in-person

6    meetings, correct?

7         A     Many.

8         Q     You participated in litigation

9    strategy discussions with other committee

10   representatives and committee counsel?

11        A     That's correct.

12        Q     You participated in mediation

13   strategy discussions with other committee

14   representatives and committee counsel.

15   Fair?

16        A     Generally speaking, that's

17   accurate.

18        Q     And you participated in

19   mediations as a representative of the TCC,

20   correct?

21        A     In a general sense, I think I

22   can answer that question.  That would be

23   yes.

24        Q     When did you cease participating

25   in TCC activities?

72

1           NACHAWATI - CONFIDENTIAL

2      A     Following the dismissal of the

3   LTL I bankruptcy.

4      Q     Did you continue to serve as a

5   representative of the Official Committee of

6   Talc Claimants on behalf of Ms. Brewer up

7   until April 4, 2023?

8           MR. MONTEFUSCO:  Object to form.

9      A     Are you referring to the actual

10  dismissal date?

11     Q     Yes.

12     A     Up to the dismissal date and the

13  dissolution of the TCC in LTL I, that's

14  correct, I believe.

15     Q     Okay.  During the time that you

16  served as a representative of Ms. Brewer as

17  a member of the TCC through the decision

18  that the Third Circuit issued, you were

19  committed to seeing that the first

20  bankruptcy case dismissed as a bad-faith

21  filing, is that fair?

22     A     At that time, yes.

23     Q     And you've spoken and written

24  about that publicly, have you not?

25     A     That's correct.

73

1             NACHAWATI - CONFIDENTIAL

2             Suffice it to say, I'm no fan of

3    it.

4        Q    On May 24, 2022, you gave an

5    interview to Mark York of the mass tort

6    network LegalCast that's available online,

7    did you not?

8        A    I may have.  I don't recall the

9    specifics sitting here today.

10            I do many interviews and I write

11   many articles.  I think it's an important

12   part of my job as a lawyer, not just

13   representing clients, but making this world

14   a better place.

15       Q    And do you recall talking about

16   the LTL filing and the then-pending appeal

17   to the Third Circuit?

18       A    I don't recall specifically.

19       Q    All right.  Let me see if I can

20   refresh your recollection.  Bear with me a

21   moment.

22            So I'm going to share to the

23   screen the -- parts of the -- parts of the

24   interview, and then I'm going to -- I'll

25   also share to the chat the URL address, so

74

1              NACHAWATI - CONFIDENTIAL

2    that everybody can have it, including your

3    counsel.

4            All right.  So I just shared the

5    URL address to the chat.  I'm going to

6    share this to the screen.

7            Can you see on your screen --

8       A    Excuse me?

9            I can see it, if that's your

10   question.

11      Q    It was.  I think -- I'm not sure

12   if somebody asked for a moment.  I wasn't

13   sure if that was the court reporter.

14           I'm just pausing a second on

15   Mr. York.

16           Do you remember Mr. York of the

17   mass tort network, LegalCast?

18      A    I'm familiar with him, yes.

19      Q    All right.  So I'm just going to

20   fast forward.  And, unfortunately, this

21   isn't a particularly flattering screenshot,

22   but this is you where I paused with

23   Mr. York, right?

24      A    That would look like me.  Not

25   the most flattering shot, correct.

75

```
 1       NACHAWATI - CONFIDENTIAL

 2          MR. SILVERSTEIN:  So I'm going

 3    to move forward to 26 minutes and 33

 4    seconds into the interview.  I'm going

 5    to hit play, and I'm going to ask the

 6    court reporter, if she can, to just

 7    transcribe what she hears, not as

 8    testimony by any stretch, but just so

 9    that we have a record of it, if that's

10    possible.

11          So I'm going to just hit play

12    and then stop at 26 minutes and 50

13    seconds.

14          (The following audio clip was

15    played and transcribed as follows:

16          "We're hopeful that the

17    bankruptcy is dismissed ultimately and

18    that we can go back to the tort

19    system.  My firm represents

20    approximately 4 or 5,000 women,

21    ovarian cancer victims, and then, you

22    know, a good number of mesothelioma

23    victims against Johnson & Johnson and

24    we're finding in the bankruptcy right

25    now, I was appointed as one of the
```

76

1           NACHAWATI - CONFIDENTIAL

2           largest creditors of Johnson &

3           Johnson.")

4    BY MR. SILVERSTEIN:

5           Q     All right.  Mr. Nachawati, were

6      you able to hear your own words?

7           A     Yes.

8           Q     Okay.  And the statements that I

9      just played, you believed those statements

10     at the time that you made them on March 24,

11     2022, right?

12                MR. HOFMEISTER:  Object to form.

13          A     Yes.

14          Q     You were hopeful at that point

15     in time that the bankruptcy would be

16     dismissed ultimately and that you could go

17     back to the tort system.

18          A     Yes.

19                MR. HOFMEISTER:  Objection.

20     BY MR. SILVERSTEIN:

21          Q     I'm going to now just scroll

22     forward to 27 minutes and 15 seconds into

23     the interview and play through 28 minutes

24     and 7 seconds, and then ask you some

25     questions.

77

1        NACHAWATI - CONFIDENTIAL

2          MR. SILVERSTEIN:  And, again,

3     I'd ask the court reporter, if she's

4     able, to transcribe what's said,

5     again, not as testimony, but just for

6     the record.

7          (The following audio clip was

8     played and transcribed as follows:

9          "So what I can say at a high

10    level, Mark, in connection with that

11    bankruptcy is we -- I'm attempting to

12    make sure that bankruptcy is

13    dismissed.  We appealed to the Third

14    Circuit Court of Appeals, and right

15    now, they're determining whether

16    Johnson & Johnson can move forward

17    with the bankruptcy or whether the

18    filing was in bad faith, and we are

19    hopeful that the Court of Appeals says

20    that, Hey, this bankruptcy should have

21    never been filed and these cancer

22    victims should be allowed to pursue

23    their claims in traditional State

24    Court venues or Federal Court venues,

25    which would include the multi-district

78

```
 1              NACHAWATI - CONFIDENTIAL

 2         litigation that's currently pending

 3         before Judge Wolfson, which is a

 4         Federal Judge, an Article 3 Judge.

 5              "So that's our goal, is to get

 6         the bankruptcy dismissed.")

 7  BY MR. SILVERSTEIN:

 8      Q    The statements that we just

 9   played, you heard those just now, right?

10      A    Yes.

11      Q    And you made those statements

12   believing them to be true when you made

13   them?

14      A    Yeah, and I'm playing with the

15   hand that's been dealt to me.  It wasn't my

16   choice that they filed bankruptcy.

17      Q    Right.

18              On October -- withdrawn.

19              On March -- withdrawn.

20              On May 24, 2022, you were

21   hopeful that the Third Circuit would say

22   that the bankruptcy should never have been

23   filed and cancer victims should be allowed

24   to pursue their claims in traditional State

25   Court or Federal Court venues.
```

                                                              79

1              NACHAWATI - CONFIDENTIAL

2              MR. HOFMEISTER:  Objection to

3         the form.

4         A     Yes.

5         Q     And your goal at that point in

6    time was to see the bankruptcy case

7    dismissed.  True?

8         A     True.

9              MR. SILVERSTEIN:  Okay.  Moving

10        forward to 30 minutes and 4 seconds

11        in -- or 3 seconds in, I'm going to

12        play it through 30 minutes and

13        20 seconds into the interview.

14             (The following audio clip was

15        played and transcribed as follows:

16             "So one would think that a

17        corporation would do the right thing.

18        In this particular instance, they've

19        done everything but the right thing.

20        In fact, they've don't all the --

21        everything they've done are the wrong

22        things in our opinion, and it's a

23        travesty and, you know, we're going to

24        do everything we can for our clients

25        to get their day in court.")

80

```
 1              NACHAWATI - CONFIDENTIAL

 2    BY MR. SILVERSTEIN:

 3         Q     You believed the statements that

 4    we just listened to together on May 24,

 5    2022 to be true, right?

 6         A     That's correct.

 7         Q     You believed at that time that

 8    Johnson & Johnson had done everything but

 9    the right thing by filing LTL for

10    bankruptcy, correct?

11              MR. HOFMEISTER:  Object to form.

12         A     Generally speaking, yes.

13         Q     And you were committed at that

14    point in time to do everything you could

15    for your clients to get their day in court,

16    correct?

17              MR. HOFMEISTER:  Object to form.

18         A     Correct.

19         Q     And by doing everything you

20    could to get -- for your clients to get

21    their day in court, you were referring to

22    giving them the opportunity, if they so

23    chose, to pursue their claims in what you

24    described as a traditional State or Federal

25    Court venue, right?
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 83 of 266          Nabil Majed Nachawati
Confidential                                                    May 24, 2023

81

1      NACHAWATI - CONFIDENTIAL

2          MR. HOFMEISTER:  Object to form.

3          MR. MONTEFUSCO:  Object to form.

4   A     Correct.

5   Q     Okay.

6          MR. SILVERSTEIN:  Moving forward

7   to 32 minutes and 30 seconds into the

8   interview, I'm going to play until

9   33 minutes and 51 seconds, and then

10  ask some questions.

11         (The following audio clip was

12  played and transcribed as follows:

13         "The laws were enacted for.  The

14  intent of the bankruptcy laws were to

15  provide corporations who were in

16  financial distress or insolvent the

17  ability to get a fresh start and

18  restructure their organization in

19  order to make it profitable.

20         "It was never intended for a

21  company with hundreds of billions of

22  dollars on their balance sheets to

23  file bankruptcy for the sole purpose

24  of getting out of paying these people

25  what they should be entitled to based

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 84 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

82

1       NACHAWATI - CONFIDENTIAL

2    on their injuries.

3         "It's outrageous, Mark, and, you

4    know, I'm hopeful that Third Circuit

5    Court of Appeals or, if necessary, the

6    U.S. Supreme Court weighs in and says,

7    Hey, if you're a multi-billion-dollar

8    company flush with cash on your

9    balance sheets, and you put a

10   dangerous product on the market, our

11   tort laws and our civil justice system

12   is there to make sure that you are

13   held accountable for any and all

14   dangerous products that are put on the

15   market.

16        "And that has always been how

17   its -- how our system has worked.  And

18   only recently had the most

19   reprehensible corporations, including

20   Johnson & Johnson, decided to work the

21   system in ways it wasn't intended all

22   for the sake of denying these cancer

23   victims a fair game court to be heard

24   by a jury.")

25

83

NACHAWATI - CONFIDENTIAL

1

2    BY MR. SILVERSTEIN:

3        Q     Those statements, Mr. Nachawati,

4    that you made on May 24, 2022 that we just

5    listened to, at that time, you believed

6    them fervently to be true, correct?

7            MR. HOFMEISTER:  Objection to

8        the form of the question.

9        A     Correct.

10       Q     At that time, you believed the

11   bankruptcy laws were never intended to

12   allow companies with hundreds of billions

13   of dollars on their balance sheets to get

14   out from paying victims.

15           MR. HOFMEISTER:  Object to form.

16           MR. MONTEFUSCO:  Objection to

17       the form.

18       A     Correct.

19       Q     You were at that time outraged

20   by Johnson & Johnson's conduct in putting

21   LTL into bankruptcy.

22           MR. MONTEFUSCO:  Objection to

23       form.

24       A     Correct.

25       Q     You were hopeful at that time

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 86 of 266    Nabil Majed Nachawati
Confidential                                                      May 24, 2023

84

1          NACHAWATI - CONFIDENTIAL

2    that the Third Circuit or the Supreme

3    Court, if necessary, would say that if you

4    were a multi-billion-dollar company flush

5    with cash on your balance sheet and you put

6    a dangerous product on the market, our tort

7    laws and our civil justice system is there

8    to make sure you are held accountable for

9    any and all dangerous products you put on

10   the market.

11              MR. HOFMEISTER:  Object to form.

12              MR. MONTEFUSCO:  Object to form.

13       A     That's correct, and I'd also say

14   that there needs to be a legislative

15   solution to this issue.

16              In a perfect world, I wish there

17   were.  But the reality we're living in

18   today is there's a second bankruptcy that's

19   been filed, and there's nothing that I can

20   do about that.

21       Q     Well, we're going to come to

22   that.

23              On May 24, 2022, you believed

24   that only recently, the most reprehensible

25   corporations, including Johnson & Johnson,

85

```
 1            NACHAWATI - CONFIDENTIAL

 2    decided to work the system in ways it

 3    wasn't intended at all for the sake of

 4    denying cancer victims a fair day in court

 5    to be heard by a jury.

 6            MR. HOFMEISTER:  Objection to

 7        the form.

 8            MR. MONTEFUSCO:  Objection to

 9        the form.

10        A    I think they're looking for a

11    pathway to resolution.

12        Q    We'll come to that.

13            But on May 24, 2022, that's what

14    you believed, at that time, Johnson &

15    Johnson's conduct was reprehensible and

16    that they were abusing the bankruptcy

17    system, true?

18            MR. MONTEFUSCO:  Object to the

19        form.

20        A    True.

21        Q    And now you believe -- and we'll

22    come to it -- that Johnson & Johnson wants

23    to do better, is that fair?

24            MR. HOFMEISTER:  Object to the

25        form.
```

86

1              NACHAWATI - CONFIDENTIAL

2              MR. MONTEFUSCO:  Object to the

3        form.

4        A     I think that's fair.

5        Q     Okay.  A little bit -- I think

6    one more clip and then we're going to move

7    on from this.

8        A     Hopefully, a flattering one,

9    Mr. Silverstein.

10       Q     I'm going to leave that to the

11   eye of the beholder.

12             MR. SILVERSTEIN:  I'm fast

13        forwarding to 38:05.  I'm sorry.  And

14        I'm going to continue through 38:56.

15             And, again, ask the court

16        reporter to transcribe this, if she's

17        able to.

18             (The following audio clip was

19        played and transcribed as follows:

20             "You know, it's reasonable to

21        move forward and look at what they've

22        done in the recent past, which is

23        decide that it was okay to sell a

24        product in America with asbestos in

25        it, which has caused, you know,

87

1              NACHAWATI - CONFIDENTIAL

2         thousands of deaths and thousands of

3         people being injured.

4              "And what I'm telling you here

5         is we're going to hold them

6         responsible.  We're going to fight

7         every day tooth and nail to send a

8         message to Johnson & Johnson and other

9         corporations that, No, they can't file

10        bankruptcy.  No, it's not all right to

11        shortchange these cancer victims, and

12        we're hopeful that the Third Circuit

13        Court of Appeals does the right thing

14        and the U.S. Supreme Court, if it's

15        appealed there, and there's a similar

16        finding that solvent companies that

17        are not in financial distress should

18        not be able to manipulate the

19        bankruptcy laws to avoid liability in

20        the hundreds of billions of dollars.")

21   BY MR. SILVERSTEIN:

22        Q     Those were statements, again,

23   fervently made by you on May 24, 2022 that

24   you believed in, correct?

25              MR. HOFMEISTER:  Object to form.

                                                                88

1              NACHAWATI - CONFIDENTIAL

2                   MR. MONTEFUSCO:   Objection to

3        the form.

4         A     Correct.

5         Q     I'm sorry, I missed your answer,

6    Mr. Nachawati.

7         A     That's correct.

8         Q     Okay.  And at that time, on

9    May 24, 2022, actually one year ago today,

10   you were hopeful that the Third Circuit and

11   the Supreme Court do the right thing,

12   finding that solvent companies that are not

13   in financial distress should not be

14   permitted to manipulate the bankruptcy laws

15   to avoid liabilities in the hundreds of

16   billions of dollars.

17                  MR. HOFMEISTER:  Object to form.

18        A     That's correct.

19        Q     And you were talking about

20   Johnson & Johnson, correct?

21                  MR. HOFMEISTER:  Objection to

22        form.

23        A     Correct.

24        Q     Okay.  Did you send -- I'm going

25   to stop sharing this to the screen.

89

1          NACHAWATI - CONFIDENTIAL

2              Did you send this interview to

3    any of your clients?

4              MR. HOFMEISTER:  Objection to

5          the extent it involves any

6          attorney-client privilege.

7          A    Not that I can recall.

8          Q    Did you share the view, as a

9    general matter, as a spokesperson, about

10   what had been happening in the bankruptcy

11   with any of your -- with any of your

12   clients?

13             MR. HOFMEISTER:  Objection to

14         the extent it involves attorney-client

15         privileged communications.

16   BY MR. SILVERSTEIN:

17        Q    Yeah, I'm not looking for legal

18   advice.  I'm looking for the public

19   position you took regarding what Johnson &

20   Johnson had done in the bankruptcy system.

21             MR. HOFMEISTER:  Same objection.

22             MR. MONTEFUSCO:  Object to the

23         form.

24        A    In a general sense, we

25   periodically update our clients in a

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 92 of 266         Nabil Majed Nachawati
                                    Confidential                              May 24, 2023

90

 1              NACHAWATI - CONFIDENTIAL

 2      regular form and fashion of what's going on

 3      in the case in chief, in State Court, MDL,

 4      or in the context of bankruptcy, in LTL I

 5      and, in general, LTL II.

 6              MR. RASMUSSEN:  Hey, Adam, just

 7          one clarifying thing.  You mentioned

 8          this at the outset when you started

 9          playing those video clips, but I just

10          want to make it sure that it's clear

11          for the record that anything you play

12          from that video, you're not planning

13          to introduce that as sworn testimony,

14          only the questions that you asked and

15          the answers you got in response to

16          your questions would be his testimony

17          under oath today.  Is that clear?

18              MR. SILVERSTEIN:  Yes.  The

19          video is not testimony.

20              MR. RASMUSSEN:  Thanks.

21              MR. SILVERSTEIN:  It's a

22          testimonial, but it's not testimony.

23              Okay.  Let me move on.  And let

24          me ask Deane to put up Tab 7, which

25          we'll have marked as Nachawati

```
                                                             91
 1              NACHAWATI - CONFIDENTIAL

 2         Exhibit 3.

 3              I'm sorry, I gave you the wrong

 4         one, Deane.  My apologies.  It's

 5         Tab 8.

 6   BY MR. SILVERSTEIN:

 7         Q    Mr. Nachawati, can you see this

 8    okay from where you're sitting?

 9         A    I can see it pretty well.  I'm

10    still in denial about readers, so I don't

11    have a pair of readers yet.

12              MR. SILVERSTEIN:  So, Deane, can

13         you blow it up a little bit so

14         Mr. Nachawati can see it?

15              All right.  So we're going to

16         have -- I'm going to ask the court

17         reporter to mark as Nachawati

18         Exhibit 3, a document with the heading

19         "Federal Appellate Court Rejects

20         Controversial J&J Ploy to Dodge Talc

21         Cancer Lawsuits."  It's dated January

22         31, 2023, and it appears with the

23         Nachawati Law Group banner at the top.

24              (Exhibit 3, article entitled

25         "Federal Appellate Court Rejects
```

                                                            92

1              NACHAWATI - CONFIDENTIAL

2         Controversial J&J Ploy to Dodge Talc

3         Cancer Lawsuits", was remotely

4         introduced and provided electronically

5         to the reporter, as of this date.)

6    BY MR. SILVERSTEIN:

7         Q     Are you familiar with this

8    document, Mr. Nachawati?

9         A     It looks familiar, yes.

10        Q     This was something that was

11   published on your firm's blog or website

12   the day the Third Circuit issued its

13   ruling.

14        A     I don't know that -- the

15   specifics of that, but I'll -- if that's

16   your statement and, you know, question

17   since, I'll take your word for it.

18        Q     Actually, it may have been

19   posted the next day.  It says, Newswire,

20   January 30, 2023, but it may have been

21   posted the next day.

22              But this is a press release your

23   firm issued following the Third Circuit

24   ruling, correct?

25        A     Probably through our publicists,

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC      Exhibit     Page 95 of 266        Nabil Majed Nachawati
Confidential                        May 24, 2023

93

```
 1              NACHAWATI - CONFIDENTIAL

 2   yes, that's correct.

 3        Q    Okay.  And do you stand by the

 4   quotes attributed to you in your firm's

 5   press releases even if prepared by your

 6   firm's publicist?

 7              MR. MONTEFUSCO:  Object to form.

 8              MR. HOFMEISTER:  Object to form.

 9        A    As of the time of that issuance,

10   yes.

11        Q    Okay.  And just scrolling

12   down -- well, actually, withdrawn.

13              Do you recall what your emotions

14   were the day the Third Circuit dismissed

15   the bankruptcy case?

16              MR. MONTEFUSCO:  Object to form.

17        A    Very happy.

18        Q    Did you reach out to Ms. Brewer

19   that day?

20        A    That would be attorney-client

21   privilege.  So I'm not going to answer that

22   question.

23              But Ms. Brewer was informed in a

24   general sense, I can tell you that.

25        Q    Okay.  I want to just scroll
```

94

1            NACHAWATI - CONFIDENTIAL

2    down.  Okay, stop.

3            There's a quote attributed to

4    you.  It says:  "Our clients are grateful

5    that the Appellate Court saw through this

6    cynical attempt by J&J to avoid

7    responsibility.  We will press forward to

8    ensure that jury trials resume, and these

9    women can have the opportunity for justice

10   they deserve."

11           Was that a quote correctly

12   attributed to you on January 31, 2023?

13       A    Yes.

14       Q    And that's what you believed at

15   that time, that your clients were -- were

16   pressed to move forward for jury trials and

17   would have the opportunity for justice.

18           MR. MONTEFUSCO:  Object to form.

19       A    That was the plan at the time,

20   yes.

21       Q    Okay.  And a little bit further

22   down, if your eyes can see this,

23   Mr. Nachawati, there is another quote

24   attributed to you.  It says:  "It's plain

25   and simple:  Profitable corporations like

95

```
 1              NACHAWATI - CONFIDENTIAL

 2    Johnson & Johnson should not be allowed to

 3    use bankruptcy laws to avoid

 4    accountability."

 5              That was another statement that

 6    was correctly attributed to you on

 7    January 31, 2023.  True?

 8        A    True.

 9        Q    And that's what you believed in

10    your heart at that time in the wake of the

11    Third Circuit opinion.  True?

12              MR. HOFMEISTER:  Object to form.

13              MR. MONTEFUSCO:  Object to form.

14    BY MR. SILVERSTEIN:

15        Q    I'm sorry, I missed you.

16              THE WITNESS:  Court reporter, do

17         you have the objections noted?

18              THE COURT REPORTER:  Yes, I do,

19         but I do not have an answer.

20        A    True.

21        Q    Okay.

22              MR. SILVERSTEIN:  And scrolling

23         down further, Deane, please -- okay,

24         here we are.  Thank you.

25
```

96

1              NACHAWATI - CONFIDENTIAL

2    BY MR. SILVERSTEIN:

3         Q     And it says:  "With thousands of

4     lawsuits set to resume, Mr. Nachawati said

5     J&J's liability could exceed the

6     $60 billion it had set aside for the LTL

7     bankruptcy."

8               Do you see that?

9         A     I do.

10        Q     Again, was that fairly and

11    appropriately attributed to you?

12        A     At the time, yes.

13        Q     Okay.  And when you said that

14    with thousands of lawsuits set to resume,

15    J&J's liability could exceed the

16    $60 billion that it had set aside for the

17    LTL bankruptcy, the $60 billion set aside

18    that you were referring to was the first

19    funding agreement that LTL and Johnson &

20    Johnson and old JJCI -- or new JJCI, I

21    should say, had entered into on the way

22    into the first bankruptcy filing, correct?

23              MR. MONTEFUSCO:  Objection to

24         the form.  Foundation.

25        A     Correct.

97

1               NACHAWATI - CONFIDENTIAL

2        Q     And that's how you viewed the

3   first funding agreement, was as Johnson &

4   Johnson setting aside $60 billion to fund

5   talc liabilities.  Fair?

6               MR. MONTEFUSCO:  Objection to

7        the form.

8               MR. HOFMEISTER:  Object to the

9        form.

10       A     At the time, fair.

11       Q     And including claims by your

12  other clients, the State of New Mexico?

13       A     Not with respect to the State of

14  New Mexico.

15       Q     Okay.

16       A     We were one of only two states

17  in the nation at the time that strongly

18  opposed any notion of a sovereign state

19  being sucked into a Bankruptcy Court

20  against their will.

21              And we fought that issue.  We

22  won that issue on appeal in LTL I.

23              MR. SILVERSTEIN:  Deane, let's

24       take this down.

25

98

1              NACHAWATI - CONFIDENTIAL

2   BY MR. SILVERSTEIN:

3        Q    Mr. Nachawati, I'm going to

4    share with you some of your prior thoughts

5    on one more occasion and then we're going

6    to move on to a new subject.

7              MR. SILVERSTEIN:  Deane, could

8         you put up on the screen -- and bear

9         with me a moment -- Tab 4, please.

10             And please make it larger for

11        Mr. Nachawati to see.

12   BY MR. SILVERSTEIN:

13        Q    Mr. Nachawati, I'm going to ask

14    the court reporter to mark this as

15    Nachawati Exhibit 4, I believe.

16             (Exhibit 4, article entitled

17        "Bankrupting the Civil Justice

18        System", was remotely introduced and

19        provided electronically to the

20        reporter, as of this date.)

21   BY MR. SILVERSTEIN:

22        Q    It's a reprint of an article

23    in -- I'm sorry, from the Texas Lawyer by

24    law.com from February 22, 2023 entitled

25    "Bankrupting the Civil Justice System" that

99

```
 1              NACHAWATI - CONFIDENTIAL

 2    was co-authored by yourself and Michael

 3    Gorwitz.

 4              Do you see that?  Do you see the

 5    heading?

 6        A    I do.

 7        Q    Okay.  Do you recall this

 8    article --

 9        A    I do.

10        Q    -- that you and Mr. Gorwitz

11    co-authored?

12        A    I do.

13        Q    Mr. Gorwitz is a lawyer in your

14    firm?

15        A    That's correct.

16        Q    Okay.  And do you stand by the

17    statements that are under your byline in

18    this article as of February 22, 2023?

19        A    Yes.

20        Q    Okay.

21              MR. RASMUSSEN:  Just an

22         objection to the form of the last

23         question.  Sorry.

24              MR. SILVERSTEIN:  I'll rephrase

25         it.
```

100

1                    NACHAWATI - CONFIDENTIAL

2     BY MR. SILVERSTEIN:

3          Q     On February 22, 2023, you stood

4     behind the statements that were published

5     in the Texas Lawyer under your byline.

6     Fair?

7          A     Can we see what we're referring

8     to?  I'm getting the top of the document.

9     Nothing more.

10         Q     Whatever was published on that

11    day under your byline, you stood behind,

12    did you not?

13              MR. HOFMEISTER:  Object to form.

14         If he knows.

15         A     At the time, yes.

16         Q     Okay.

17              MR. SILVERSTEIN:  Let's scroll

18         down, Deane, so that we can see what

19         was said.

20              I'm going to pause.  Deane, I'm

21         going to ask you to go down to the

22         second page, if you would, of this

23         document.

24              And could you scroll down,

25         please?

101

1              NACHAWATI - CONFIDENTIAL

2                 All right.  Stop.

3    BY MR. SILVERSTEIN:

4        Q     You wrote -- I'm referring to

5    the second full paragraph, Mr. Nachawati.

6                 You wrote:  "Financially sound

7    parties who seek to use the bankruptcy

8    system to evade liability rather than

9    achieve a legitimate corporate

10   restructuring constitute bad faith

11   violations of the basic tenets of the

12   bankruptcy system."

13                 You believed that at the time.

14   True?

15                 MR. HOFMEISTER:  Object to form.

16       A     At the time, and I think

17   legislature needs to address this issue.

18       Q     Okay.  And do you still believe

19   that financially sound parties who seek to

20   use the bankruptcy system to evade

21   liability rather than achieve a legitimate

22   corporate restructuring constitute

23   bad-faith violations of the basic tenets of

24   the bankruptcy system?  Has that view

25   changed?

102

1           NACHAWATI - CONFIDENTIAL

2              MR. MONTEFUSCO:  Object to form.

3      A      In a theoretical sense, no.

4      Q      Okay.  And scrolling down -- I'm

5   sorry, you can stay there.

6              It says:  "While these recent

7   rulings reaffirm the integrity of both the

8   bankruptcy and civil-justice systems, the

9   need to remain vigilant against such

10  bad-faith abuses persists.  For example" --

11  and then it goes on to say -- "activist

12  investors have recently pushed for the

13  breakup of Bayer, which would include

14  separating the corporation's crop-sciences

15  and pharma units into distinct corporate

16  entities."

17             But focusing on the first

18  statement about the need to remain vigilant

19  against bad-faith abuses, that was your

20  time -- that was your view on February 22,

21  2023.

22             MR. HOFMEISTER:  Object to form.

23     A      True.

24             MR. SILVERSTEIN:  And scroll

25      down, Deane, towards the end.

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 105 of 266        Nabil Majed Nachawati
Confidential                                              May 24, 2023

103

1          NACHAWATI - CONFIDENTIAL

2    BY MR. SILVERSTEIN:

3          Q      You wrote, Mr. Nachawati, or

4     co-wrote:  "So long as the corporate

5     defendants continue to view the bankruptcy

6     system as a venue for consolidated

7     resolution of civil litigation rather than

8     bona fide internal financial restructuring,

9     parties and courts must continue to guard

10    against misuses of the protections of the

11    bankruptcy system by bad faith actors such

12    as 3M and Johnson & Johnson."

13             That was what you believed at

14    that time on February 22, 2023?

15             MR. MONTEFUSCO:  Object to form.

16       A     That's correct.

17             MR. SILVERSTEIN:  Okay.  Deane,

18       you can take it down.

19    BY MR. SILVERSTEIN:

20       Q     Now, after the Third Circuit

21    decision, you participated in discussions

22    with Ken Feinberg and his colleagues in

23    your capacity as a representative of the

24    TCC, is that true?

25       A     The LTL I TCC?

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 106 of 266    Nabil Majed Nachawati
Confidential                              May 24, 2023

104

1              NACHAWATI - CONFIDENTIAL

2          Q      Yes.

3          A      True.

4          Q      And do you recall how many

5     meetings or discussions with Mr. Feinberg

6     after the Third Circuit decision you

7     personally participated in?

8          A      I can't recall, but I mean --

9              MR. HOFMEISTER:  Are we

10          referring to before the case was

11          closed, Adam?

12              MR. SILVERSTEIN:  I'm sorry, can

13          you repeat that?

14              MR. HOFMEISTER:  Is this before

15          the dismissal of TCC 1?

16              MR. SILVERSTEIN:  Yes, after --

17          TCC 1 -- once the dismissal occurred,

18          the TCC didn't exist at that time, so

19          yes.

20     BY MR. SILVERSTEIN:

21          Q      After you participated in

22     discussions with Mr. Feinberg and his

23     colleagues, after the Third Circuit

24     decision, before the dismissal on April 4,

25     2023, right?

105

1          NACHAWATI - CONFIDENTIAL

2     A     I believe I recall maybe one

3  interaction.  I can't -- I mean, I can't

4  say with 100 percent certainty, but -- I

5  mean, there's so many meetings, as you

6  know, Mr. Silverstein, that it's hard to

7  say.

8          But I recall having many

9  meetings at various times with Mr. Feinberg

10 over Zoom and in person in connection with

11 LTL I.  Timeframes are harder to recall.

12     Q     Okay.  Do you recall when the

13 last time you communicated with

14 Mr. Feinberg or any of his colleagues in

15 connection with the first bankruptcy prior

16 to its dismissal was?  Do you recall which

17 month that was?

18     A     No.

19     Q     Okay.  In connection with your

20 involvement on behalf of the TCC with

21 communications with Mr. Feinberg, did you

22 also participate in strategy communications

23 with other representatives of the first TCC

24 and its counsel about, you know, what would

25 be conveyed to Mr. Feinberg and how?

106

```
1              NACHAWATI - CONFIDENTIAL

2       A      That was a long question.

3              MR. MONTEFUSCO:  Objection.

4       Form.

5    BY MR. SILVERSTEIN:

6       Q      Let me rephrase it.

7              In connection with your

8    involvement with meetings and discussions

9    with Mr. Feinberg after the Third Circuit

10   decision and before the bankruptcy was

11   dismissed, did you also participate in

12   strategy communications with other

13   representatives of other members of the TCC

14   and counsel to the TCC?

15      A      Possibly.

16      Q      Do you recall any such

17   communications?

18      A      Not any one in specific, no.

19      Q      Okay.  Did you also participate

20   during this time period, between the Third

21   Circuit decision and the dismissal of the

22   first case, in discussions or meetings with

23   the Court-ordered mediators Gary Russo and

24   Joel Schneider in your capacity as a

25   representative of the TCC?
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 109 of 266                    Nabil Majed Nachawati
Confidential                                                            May 24, 2023

107

1                NACHAWATI - CONFIDENTIAL

2          A      Prior to the Third circuit's

3     ruling?

4          Q      After the Third Circuit ruling,

5     prior to the dismissal.

6          A      I can't recall, as I sit here

7     today.

8          Q      Did you review any term sheets

9     in your capacity as a -- withdrawn.

10               Did you review any draft term

11    sheets prepared by or on behalf of members

12    of the first TCC in your capacity as a

13    representative of the TCC following the

14    Third Circuit ruling and prior to the

15    dismissal of the case?

16         A      Not that I recall.

17         Q      Okay.  Do you recall having any

18    communications about a term sheet with any

19    other representative -- any other

20    representative of a member of the then TCC

21    who may now be members of the --

22    representatives of members of the new TCC?

23               MR. HOFMEISTER:  Objection.

24               What's the timeframe?

25    BY MR. SILVERSTEIN:

                                                            108

1              NACHAWATI - CONFIDENTIAL

2         Q     Same timeframe, between

3    January 30, 2023 and April 4, 2023.

4         A     Not that I recall, as I sit here

5    today, specifically.

6         Q     Okay.  When was the first time

7    after the Third Circuit ruling that you had

8    any communication with Mr. Murdica

9    regarding a possible resolution of your

10   client's claims outside the context of you

11   serving as a representative of a member of

12   the TCC?

13             MR. HOFMEISTER:  Okay.

14        Objection.

15             I need to get clarification here

16        because there was a non-disclosure

17        agreement signed at some point, and I

18        don't want my client violating that.

19             MR. SILVERSTEIN:  All right.

20        Well, why don't we deal with that

21        first.

22   BY MR. SILVERSTEIN:

23        Q     When did you sign a

24   non-disclosure agreement?

25        A     I can't recall, as I sit here

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 111 of 266         Nabil Majed Nachawati
Confidential                                        May 24, 2023

109

```
 1              NACHAWATI - CONFIDENTIAL

 2    today.

 3              But what I do recall is having a

 4    very specific conversation and full

 5    transparency with Mr. Birchfield that --

 6    you know, on behalf of my clients, not in

 7    my capacity as committee claimant counsel,

 8    but just individually on behalf of my

 9    clients -- that Mr. Murdica had approached

10    me about signing an NDA and possibly

11    looking at a resolution for my individual

12    clients following the dismissal post Third

13    Circuit of my individual docket.

14              And I informed him of that.

15        Q     What month was that?

16        A     I don't know.

17        Q     How did you inform him of that?

18        A     Probably a phone call.

19        Q     Where were you, to the best of

20    your recollection?

21        A     I can't -- I can't recall.

22        Q     Do you recall where you reached

23    him at?

24        A     Where he was at?

25        Q     Yeah.  Did you dial his office,
```

110

                    NACHAWATI - CONFIDENTIAL

1

2    his cell phone?

3        A     I can't recall, but I'm fairly

4    certain it was a phone call.

5        Q     Did you, before signing -- was

6    that before you signed the NDA or

7    afterwards?

8        A     Before I signed the NDA, I

9    wanted to make sure he was clear that I had

10   an intent and an obligation, to be frank,

11   on behalf of my clients to entertain any

12   type of pathway to resolution in my

13   individual capacity on behalf of my

14   individual clients only.

15            And so I was informing him of

16   that in full transparency.

17       Q     Do you believe that you were

18   fully transparent with Mr. Birchfield and

19   other representatives of members of the

20   first TCC at that time?

21            MR. HOFMEISTER:  Objection to

22       the form of the question.

23            MR. MONTEFUSCO:  Objection to

24       form.

25       A     I believe so.

111

1              NACHAWATI - CONFIDENTIAL

2      Q    Okay.  Now, coming back to the

3   signing of the NDA, the case was dismissed

4   on April 4, 2023.

5              You had signed the NDA before

6   that, right?

7      A    I can't recall.  I mean,

8   whatever the NDA says, I refer to you -- I

9   refer to that document as it's ultimately

10  produced or has been produced, and I rely

11  on that.

12     Q    Are you unable to say, as you

13  sit here today, whether you signed the NDA

14  before or after the bankruptcy was

15  dismissed?

16     A    I can't recall, as I sit here

17  today.  I rely on the document.

18     Q    Okay.  Had you had any

19  communications with Mr. Murdica --

20  withdrawn.

21              How did you -- how did you come

22  to learn that you were being asked to sign

23  an NDA?

24     A    I believe Murdica reached out to

25  me, much to my dismay and surprise, and,

112

1              NACHAWATI - CONFIDENTIAL

2     you know, said would I be willing to

3     entertain a resolution of my individual

4     docket.

5              And, obviously, you know, you

6     always have to be open to listening.  So it

7     was a brief conversation and the condition

8     of which was signing an NDA.

9         Q    Did Mr. Murdica wet your

10    whistle, if you will, before you signed the

11    NDA with regarding what he had in mind that

12    he would tell you after you signed it?

13             MR. RASMUSSEN:  Objection to the

14        form.

15             MR. MONTEFUSCO:  Object to form.

16        A    No.  Mr. Murdica and I had

17    pretty hostile communications, if you can

18    imagine.  So, you know, it was a short

19    conversation.  What do you want?  Why are

20    you calling me?  You understand how I am

21    generally by nature.

22             And he said, Just want to talk

23    about a possible resolution of your

24    individual docket under the auspices of an

25    NDA.

113

1               NACHAWATI - CONFIDENTIAL

2          So, obviously, I have an

3    obligation to my individual clients to

4    consider all pathways to resolution.  And

5    so when that very brief conversation

6    happened, I, in turn, let Mr. Birchfield

7    know, because I thought that was the right

8    thing to do, and that's what I did.

9       Q    And because Mr. Murdica's

10   approach to you was much to your dismay and

11   surprise, you remember the conversation

12   clearly?

13      A    But I can't get in -- go ahead.

14      Q    You remember the conversation

15   clearly?

16      A    Not all of it, but parts of it.

17   It was fairly hostile.

18      Q    When was it?

19      A    I don't know exactly.

20      Q    Was it in March?

21      A    I can't recall with specifics.

22          It was following -- following

23   the dismissal and the Third Circuit

24   opinion -- no, no.  It was following the

25   Third Circuit opinion, maybe before

114

1          NACHAWATI - CONFIDENTIAL

2    dismissal.  I can't recall.

3          Q     Was it -- was it in February?

4          A     I don't know.

5          Q     Do you have any documents that

6    would refresh your recollection?

7          A     Not at my disposal right here,

8    as I sit here today, or that I can think

9    of.

10         Q     Was there anybody else that you

11   discussed Mr. Murdica's approach with other

12   than Mr. Birchfield before you signed the

13   NDA?

14         A     I may have, but I can't recall.

15   I mean, it would have been very brief, if

16   anything.  And maybe it was just asking

17   Birchfield had he heard if other -- any

18   other people had been approached.

19               And so I can't recall with

20   specificity.

21         Q     Did you discuss the approach

22   from Mr. Murdica with Mr. Onder before you

23   signed the NDA?

24         A     My recollection is I asked

25   Mr. Birchfield if anyone else had, and he

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 117 of 266         Nabil Majed Nachawati
Confidential                                        May 24, 2023

115

1                NACHAWATI - CONFIDENTIAL

2     said there were other -- my recollection is

3     something to the effect that there were

4     others that had been approached.

5                But I don't -- either I don't

6     recall or he didn't mention who

7     specifically that may have been.  And I

8     don't recall any specific conversation

9     necessarily with Onder.

10         Q     As you sit here now, do you

11    recall one way or the other whether you

12    spoke to Onder before you signed the NDA

13    about Murdica approaching you?

14         A     I don't recall.  I mean, look,

15    the number of calls, Mr. Silverstein, as

16    you know, in these cases are so voluminous.

17    It's just hard to pinpoint any specific

18    one.

19                But suffice it to say, we've had

20    thousands of calls over the last two years.

21    I mean, you know that.  Everyone -- I mean,

22    it's just -- you know, it's amazing how

23    much bankruptcy lawyers bill and how many

24    hours you work.

25                But no, not with any

116

```
 1              NACHAWATI - CONFIDENTIAL
 2    specificity.
 3         Q     Did you discuss -- withdrawn.
 4               Did you have any discussions
 5    with Mr. Watts about J&J talc claims prior
 6    to signing the NDA?
 7         A     I can't recall specifically.  At
 8    some point in time, perhaps Watts floated
 9    into the picture in a high-level way maybe?
10    I can't recall specifics.
11         Q     Did Mr. Watts indicate to you
12    prior to Mr. -- withdrawn.
13               Did Mr. Watts indicate to you
14    prior to you hearing from Mr. Murdica that
15    there might be something in the works, or
16    words to that effect?
17               MR. MONTEFUSCO:  Object to the
18         form of the question.
19               MR. HOFMEISTER:  Is this after
20         the Third Circuit opinion?
21               MR. SILVERSTEIN:  At any time.
22         Any time.
23         A     Well --
24               MR. HOFMEISTER:  Let me -- but
25         before signing the NDA, right?
```

117

```
 1              NACHAWATI - CONFIDENTIAL

 2              MR. SILVERSTEIN:  Yeah, let's

 3        say before signing the NDA.

 4        A      He may have -- I mean, early

 5    on -- I mean, look, Watts, he's heavily

 6    involved with mass tort litigation.  You

 7    know, it's a small circle, if you will, in

 8    the mass tort space.  We talk regularly.

 9              But with respect to this

10    particular case, I didn't have much, if

11    any, interaction with him, from my

12    recollection, until following the dismissal

13    of the case.

14              I don't want to say lone wolf,

15    but, Mr. Silverstein, you know me well.

16        Q      Did you speak with Mr. Haas

17    before signing the NDA?

18        A      No.

19        Q      Did you speak with Mr. Pulaski

20    about talc claims before signing the NDA?

21        A      No.

22        Q      Are you -- between -- withdrawn.

23              At some point in time, you

24    signed a plan support agreement.  True?

25        A      True.
```

118

1              NACHAWATI - CONFIDENTIAL

2       Q      How much time, approximately,

3    elapsed between the signing of the NDA and

4    the signing of the plan support agreement,

5    either before or after?

6       A      I don't know.

7       Q      Did you sign -- is it fair that

8    you signed the NDA before you signed the

9    plan support agreement?

10      A      That's true.

11      Q      Okay.  So -- and between the

12   time that you signed the NDA and the time

13   that you signed the plan support agreement,

14   approximately how many conversations with

15   Mr. Murdica did you have?

16      A      Restate that question?

17      Q      Between the time that you signed

18   the NDA and the time that you signed the

19   plan support agreement, approximately how

20   many conversations about resolving your

21   clients' claims -- talc claim -- did you

22   have with Mr. Murdica?

23      A      I don't know.

24      Q      Was it more than two?

25      A      Maybe.

119

1          NACHAWATI - CONFIDENTIAL

2      Q    Was it more than five?

3      A    Possibly.

4      Q    Was it more than ten?

5      A    I don't know.

6      Q    Okay.  How many --

7      A    Same answer.  I don't know

8  really.

9      Q    How many conversations, if any,

10  did you have with Mr. Haas between the time

11  that you signed the NDA and the time that

12  you -- and the time that you signed the

13  plan support agreement?

14     A    I don't know, as I sit here

15  today.  I can't recall.

16     Q    Was it more than one?

17     A    I don't know.

18     Q    What does the -- in general

19  terms, what does the NDA prevent you from

20  discussing, not the substance, but what --

21  any conversations with Haas or Murdica

22  during that time?  What's the parameters of

23  it, if you recall?

24     A    I'd have to refer to the

25  document, and I don't have that in front of

120

```
 1            NACHAWATI - CONFIDENTIAL

 2    me.

 3        Q     Are you able to answer any

 4    questions about any communications you had

 5    with Mr. Murdica or Mr. Haas between the

 6    time that you signed the NDA and the time

 7    that you signed the plan support agreement?

 8            MR. HOFMEISTER:  Okay, Adam, the

 9         issue for me is, I have not seen a

10         signed copy of the NDA.  Nobody's been

11         able to provide that to me before

12         today's deposition.

13            So I don't know that I can allow

14         him to touch on any of these issues

15         without clarification or a directive

16         from the Court.

17            MR. SILVERSTEIN:  Well, do you

18         have any basis to advise him not to

19         answer questions since you've never

20         seen the NDA?

21            MR. HOFMEISTER:  Well, I've seen

22         a draft unsigned.  So -- and I'm told

23         there is a signed version.

24            So I'm not going to sit here and

25         allow my client to be subject to
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 123 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

121

1          NACHAWATI - CONFIDENTIAL

2          violating something that we can't

3          establish the parameters, as we sit

4          here.

5          A      And, Mr. Silverstein, if the

6     Court so orders me to, I'm happy to comply

7     with the Court's obligations, but I would

8     surmise, without the benefit of the

9     document in front of me, that it's a fairly

10    tight one.  But I'm happy to discuss those

11    matters, if the Court so orders.

12         Q      Okay.  Let me ask you this:

13    When was -- prior to the dismissal of the

14    bankruptcy case, did you discuss with

15    Mr. Murdica -- withdrawn.

16              Prior to the bankruptcy -- the

17    dismissal of the bankruptcy case, did you

18    discuss with anyone the concept of

19    termination of the funding agreement that

20    had been in place during the first

21    bankruptcy case?

22              MR. HOFMEISTER:  Hold on.

23         Objection to the extent it calls for

24         your answer to involve time periods

25         after you've signed the NDA, I'm going

122

1              NACHAWATI - CONFIDENTIAL

2        to object to your answer.

3        A    I mean, in the context of TCC 1,

4   you know, the funding agreement was brought

5   up from time to time, but I couldn't tell

6   you with any specificity when, where, or

7   how.  I mean, it was always the content --

8   it was always the subject of a robust

9   discussion, if you will, Mr. Silverstein,

10  as you know.

11       Q    Did you discuss at any point in

12  time with Mr. Watts the concept of the

13  first funding agreement being terminated?

14       A    I can't recall.  I mean, I can't

15  recall talking to Watts about anything in

16  specific, as I sit here today, other than

17  him floating around, is the way I would

18  describe it.

19       Q    When you signed the plan support

20  agreement, did you have an understanding

21  that the first funding agreement would be

22  terminated?

23       A    I don't know that I can answer

24  that question without time parameters

25  because of the NDA.

123

1          NACHAWATI - CONFIDENTIAL

2              Can you sort of restate your

3    question so I can make sure that I provide

4    you with an accurate answer, to the extent

5    I can?

6      Q    The question is, when you signed

7    the PSA, the plan support agreement, did

8    you have an understanding at that time that

9    the first funding agreement entered into in

10   2021 would be terminated?

11             MR. RASMUSSEN:  Objection to the

12        form.

13     A    Yeah, I'm not comfortable

14   answering that question post NDA.

15     Q    So you're not going to answer

16   it?

17     A    I'm happy to answer it, if the

18   Court so orders.

19     Q    Did you discuss with -- yes or

20   no, this is just a yes or no -- did you

21   discuss the subject of entering into the

22   NDA with Ms. Brewer before you signed it?

23     A    That would be attorney-client

24   privileged.  So I can't discuss that or

25   disclose that information to you.

124

1              NACHAWATI - CONFIDENTIAL

2      Q     The question of the subject

3    matter of the NDA --

4      A      The communications -- any

5    communications with my clients is

6    attorney-client privileged, as you know,

7    Mr. Silverstein.  So I can't answer that

8    question.

9      Q     Does the NDA permit you to

10   disclose any information you learned

11   subject to it to anybody?

12           MR. RASMUSSEN:  Objection to the

13       form.

14           MR. MONTEFUSCO:  Object to form.

15     A     You know, that's a loaded load.

16   That's like, when did you stop beating your

17   wife, right?

18           You know, again, the client, in

19   a general sense, you communicate the

20   material points to your client because

21   that's your obligation, and we try to --

22   and our goal is to attempt to do that in a

23   general sense.

24           But as far as specific

25   communications with my clients, as you

125

1            NACHAWATI - CONFIDENTIAL

2    know, I can't answer that.  It's

3    attorney-client privileged.

4         Q     Does the NDA -- did the NDA

5    prevent you from disclosing any information

6    to Advocate Capital?

7              MR. HOFMEISTER:  Again, the same

8         objection.

9              Without having the signed NDA to

10        review and determine the parameters of

11        it, I don't know how he can answer

12        that.

13   BY MR. SILVERSTEIN:

14        Q     To the best of your knowledge --

15   to the best of your understanding, are you

16   permitted to share -- withdrawn.

17              To the best of your

18   understanding, are you restricted from

19   sharing any information with Advocate

20   Capital about the plan?

21        A     I don't share any information

22   with them.

23        Q     And what is your -- what is the

24   nature of your relationship with Advocate

25   Capital?

126

```
 1              NACHAWATI - CONFIDENTIAL

 2              MR. MONTEFUSCO:  Object to form

 3      and foundation.

 4      A     Where are you going with this?

 5      Q     I'm not really going anywhere.

 6  I'm asking whether you --

 7      A     That's my point, right?  So...

 8      Q     I'm not going any -- I'm

 9  asking --

10      A     I was just going to say, my

11  son's graduation from 2nd grade, I've

12  missed 3 hours of it, and, you know, I

13  understand certain questions and I'm happy

14  to answer the questions I can,

15  Mr. Silverstein.

16              Advocate Capital really has

17  nothing to do with this.  But, you know, if

18  you want to continue to ask me questions

19  that are sort of way off the rabbit trail,

20  you know --

21      Q     Did you --

22      A     I'd like to at least see

23  30 minutes of my son's graduation.

24      Q     All right.  Well, nobody had

25  mentioned that whatsoever as a scheduling
```

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 129 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

127

1          NACHAWATI - CONFIDENTIAL

2   matter.  So let's put that to the side for

3   the moment.

4          But did you discuss signing the

5   plan support agreement with anyone from

6   Advocate Capital?

7       A     No.

8       Q     Did you discuss signing the plan

9   support agreement with anyone from Curiam

10  Capital?

11      A     No.

12      Q     Now, did you -- prior to signing

13  the NDA, did you discuss with Mr. Murdica

14  whether what he was intending to share with

15  you would also resolve the claims that you

16  were counsel of with respect to New Mexico?

17      A     No.

18          Anything involving the

19  governmental entity is very strict.  You

20  can't -- you can't move an arm without

21  clearing it through the client.

22          So at no time was that even on

23  the table.  They'd be very clear about

24  that.

25      Q     Okay.  Were you engaged in

128

```
1              NACHAWATI - CONFIDENTIAL

2    communications with Mr. Murdica following

3    your signature on the non-disclosure

4    agreement during the same time that you

5    were serving as a representative of a

6    member of the Official Committee of Talc

7    Claimants?

8              MR. MONTEFUSCO:  Objection.

9       A     Not that I recall, as I sit here

10   today.

11      Q     So you don't recall --

12   withdrawn.

13             The period of time in which you

14   were communicating with Mr. Murdica,

15   subject to the terms of the non-disclosure

16   agreement, was -- did not overlap with the

17   period of time in which you were serving as

18   a representative of a member of the

19   Official Committee of Talc Claimants?

20             MR. HOFMEISTER:  Objection to

21        the form of the question.

22             That's not what he testified.

23        He said he didn't remember.

24             MR. SILVERSTEIN:  Just an

25        objection to the form is fine.
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 131 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

129

1          NACHAWATI - CONFIDENTIAL

2              MR. HOFMEISTER:  Okay.

3              MR. SILVERSTEIN:  Anything

4        beyond that is really not appropriate.

5    BY MR. SILVERSTEIN:

6          Q     You can answer the question,

7    Mr. Nachawati.

8          A     Okay, sure.

9              I don't recall with specifics

10   prior to signing the NDA and the overlap.

11             What I did testify to earlier is

12   the same sort of line of questioning you're

13   pursuing now, which is I was transparent

14   with Mr. Birchfield, and I told him prior

15   to signing the NDA that I was pursuing that

16   on behalf of my individual clients, which I

17   have a right to do, and an obligation to

18   do, frankly.

19             And I'm not sure of a

20   correlation of the timeframe between that

21   and my service on the TCC and ultimately

22   dismissal either before or after a Third

23   Circuit opinion, but I always have an

24   obligation to my clients.

25             MR. SILVERSTEIN:  I'm going to

130

1            NACHAWATI - CONFIDENTIAL

2         ask Deane to put up on the screen --

3         bear with me a moment, please --

4         Tab 9.

5              This is a document that

6         previously was marked as Murdica

7         Exhibit 3 at Mr. Murdica's deposition.

8    BY MR. SILVERSTEIN:

9         Q    Did you observe Mr. Murdica's

10    deposition?

11             MR. SILVERSTEIN:  Actually, and

12        I guess while we're at it, I didn't

13        realize this before, it's marked

14        "Highly Confidential."  I think it's

15        been filed in the bankruptcy case at

16        this point, but I don't know whether

17        anyone involved representing LTL has

18        anything to say about it.

19             MR. RASMUSSEN:  Adam, I think

20        the term sheet itself is fine to put

21        up here.  It's no longer confidential.

22        But the Exhibit A to the term sheet

23        remains confidential.

24             MR. SILVERSTEIN:  Even as

25        redacted you're saying or not as

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 133 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

131

1       NACHAWATI - CONFIDENTIAL

2    redacted?

3          MR. RASMUSSEN:  I don't think

4    it's redacted.  It just remains

5    confidential.

6          But I think the people

7    participating have agreed to

8    confidentiality restrictions.

9          MR. SILVERSTEIN:  Exhibit A is

10   redacted substantially.  I mean, I'm

11   not sure what -- columns are wholesale

12   redacted, so --

13         MR. RASMUSSEN:  You're thinking

14   of the PSA, I believe.  We're talking

15   about the term sheet.  I believe --

16         MR. SILVERSTEIN:  Oh, okay, fair

17   enough.

18         So you're saying the -- all

19   right, well, I don't -- the Protective

20   Order puts the burden on whoever the

21   producing party was to follow it with

22   regard to whatever protections you

23   want invoked.

24         So, you know, I don't know what

25   to say.  But it doesn't include the

132

```
1              NACHAWATI - CONFIDENTIAL

2         exhibit.

3              MR. RASMUSSEN:  It's my

4         understanding that the people who are

5         attending today have agreed by e-mail

6         or by acknowledging the Protective

7         Order that's in place in this

8         proceeding to the confidentiality

9         provisions that have been proposed and

10        agreed to in the Protective Order.

11             So folks who are attending here,

12        if you have not agreed to those, you

13        should sign off if Mr. Silverstein is

14        going to show Exhibit A.

15             But otherwise, I think you're

16        free to proceed, Adam.

17             MR. SILVERSTEIN:  Okay.  Fair

18        enough.

19   BY MR. SILVERSTEIN:

20        Q    When did you first see this

21   document, Mr. Nachawati?

22        A    I can't recall, as I sit here

23   today, but certainly after the NDA and

24   after the dismissal of LTL I.

25        Q    Your recollection is you did not
```

133

NACHAWATI - CONFIDENTIAL

1

2    see this term sheet until after the

3    dismissal of LTL I on April 4, 2023?

4         A    Yeah, I don't think it was in

5    existence then.  I'm speculating, but I

6    don't -- yeah, I think this was well after

7    the dismissal.

8         Q    Just so that we're clear, the

9    dismissal -- there's a Third Circuit

10   decision --

11        A    Let me answer it this way:  It

12   was before the LTL II filing, but I can't

13   recall with specificity how long.

14             But what I will say is I was

15   surprised at how fast it was filed -- that

16   the LTL II was filed.  I didn't -- it was a

17   short period of time is what I'd say, and I

18   was surprised at the time period.

19        Q    All right.  Just so that we have

20   a common understanding because I think

21   there's a source of confusion, there is the

22   Third Circuit decision in January and then

23   there was the dismissal on April 4, 2023.

24             So when I say the "dismissal,"

25   I'm referring to the actual dismissal of

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 136 of 266
Confidential
Nabil Majed Nachawati
May 24, 2023

134

1           NACHAWATI - CONFIDENTIAL

2    the bankruptcy case, not the Third Circuit

3    decision.

4         A     Right.  You're referring to the

5    dismissal following the Third Circuit

6    decision.

7         Q     Correct.

8         A     Right.  So following the

9    dismissal by Judge Kaplan after the Third

10   Circuit opinion is when I -- and after the

11   NDA is when this became -- came in the

12   picture.

13             What time, day, I couldn't tell

14   you, as I sit here today, but I know that

15   with certainty.

16             What I will say is I was very

17   surprised that once I had agreed to this

18   PSA, at the timing of which the second LTL

19   was filed.

20        Q     All right.  Well, the second --

21   I think it's well-established the second

22   LTL bankruptcy was filed 2 hours and

23   11 minutes after the dismissal of the first

24   bankruptcy filing.

25             So are you saying --

135

1          NACHAWATI - CONFIDENTIAL

2          A     Yes, that was a surprise, is

3     what I was saying.

4          Q     But you're saying that during

5     that window of time was when you first saw

6     this term sheet?

7          A     No -- yes.  I reviewed it.  I

8     saw it as generally acceptable.  And then

9     it was -- you know, J&J -- I did not -- I

10    was not aware of when J&J was going to file

11    their second one.  So I was surprised at

12    the time frame.

13         Q     But it came, you know, very much

14    on the heels of right when you saw this for

15    the first time, right?

16         A     That's fair.

17         Q     And did you see any drafts of

18    this before you saw a final version?

19         A     Not that I recall.

20         Q     All right.  Just yes or no, not

21    substance of any communications, did you

22    share this term sheet with any client of

23    the Nachawati Law Group?

24         A     I can't disclose --

25               MR. HOFMEISTER:  Objection.

136

1           NACHAWATI - CONFIDENTIAL

2      It's disclosure of attorney-client

3      privilege.

4      A     That's correct.  It's

5   attorney-client privileged.  I can't

6   disclose that, Mr. Silverstein.

7      Q     I will disagree because I don't

8   think that -- I think it would go on a log,

9   but I can't force you to answer.

10     A     Mr. Silverstein, I'm happy to

11  answer, if the Court so orders.

12     Q     Did you -- did you discuss the

13  term sheet with Mr. Murdica before -- after

14  you saw it?

15     A     I believe so, yes.

16     Q     How many conversations?

17     A     I don't know.

18     Q     Was it more than one?

19     A     I don't know.

20     Q     Did you discuss the term sheet

21  with Mr. Haas?

22     A     Not that I recall, as I sit here

23  today.

24     Q     Did you discuss the term sheet

25  with Mr. Watts?

137

1              NACHAWATI - CONFIDENTIAL

2        A      Briefly.

3        Q      Tell me what you recall of your

4    conversation with Mr. Watts about the term

5    sheet.

6              MR. HOFMEISTER:  Objection.

7         We're back to the non-disclosure

8         agreement.

9        A      That's correct.  I can't

10   disclose it because of the NDA.

11       Q      Did you discuss it with

12   Mr. Pulaski?

13       A      Never -- well, in that

14   timeframe, never, no.

15             We've had -- we've had --

16   without getting into the substance, I've

17   had communications with Mr. Pulaski

18   following signing the PSA.

19       Q      Did you discuss the term sheet

20   with any representative of either Advocate

21   Capital, Curiam Capital, or any other

22   source of financing to which your firm

23   relies on in operating your legal practice?

24             MR. HOFMEISTER:  Objection to

25        the form.

138

1              NACHAWATI - CONFIDENTIAL

2       A      No.

3       Q      I'm sorry, I missed the answer.

4       A      No.

5       Q      Have you -- this is a "yes" or

6   "no "-- have you made any effort to

7   determine what any of your ovarian cancer

8   clients would receive pursuant to the

9   matrices appended to the term sheet?

10      A      Can you ask that again?

11      Q      Did you make any effort to

12  determine what any of your ovarian cancer

13  clients would receive pursuant to this term

14  sheet if it were implemented in a plan?

15      A      In a general sense, without

16  disclosing specifics, of course.

17      Q      When did you do that?

18      A      With my review of the PSA and

19  the term sheet.

20      Q      Was that before the second

21  bankruptcy filing or after?

22      A      I believe it was before, but I

23  can't recall with specifics.

24      Q      So it was between the time of

25  the first -- withdrawn.

139

NACHAWATI - CONFIDENTIAL

1          It was between -- it was during

2   the time between the dismissal of the first

3   bankruptcy case and the commencement of the

4   second bankruptcy case?

5          MR. MONTEFUSCO:  Object to form.

6      A    I can't recall with specifics,

7   but maybe.

8      Q    But based on the timing of when

9   your recollection is of when you saw the

10  term sheet, it was in that time period?

11         MR. MONTEFUSCO:  Object to form.

12     A    Possibly.

13     Q    Have you undertaken any effort

14  to determine what any of your mesothelioma

15  clients would receive pursuant to this term

16  sheet?

17     A    It was attached as a matrix to

18  the term sheet.

19         MR. SILVERSTEIN:  All right.  So

20      let's scroll down.

21         Scroll down further to

22      Exhibit A.

23         Okay.

24         MR. HOFMEISTER:  Does this make

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 142 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

140

1          NACHAWATI - CONFIDENTIAL

2     sense to mark this as Exhibit 5?

3          MR. SILVERSTEIN:  I apologize.

4     Yes, this should be marked, court

5     reporter, as Nachawati Exhibit 5.

6          (Exhibit 5, term sheet, Bates

7     stamped LTLMGMT-00002628 through 640,

8     was remotely introduced and provided

9     electronically to the reporter, as of

10    this date.)



141

NACHAWATI - CONFIDENTIAL



142

1       NACHAWATI - CONFIDENTIAL



143

NACHAWATI - CONFIDENTIAL



144

```
 1          NACHAWATI - CONFIDENTIAL
```



145

NACHAWATI - CONFIDENTIAL



146

1      NACHAWATI - CONFIDENTIAL

2      ████████████████████████████

3      ██████████

4      ████████████████████████████████

5      ████████████████

6      ████████████████████████████████

7      ████████████

8      Q     Did you ever express to -- at

9      any point in time, prior to signing the

10     NDA, at any point in time, whether it was

11     in connection with the Imerys bankruptcy

12     plan or otherwise, did you ever convey to

13     any attorney or representative of Johnson &

14     Johnson your view as to how much Johnson &

15     Johnson should pay to resolve ovarian

16     cancer claims on average on a per-case

17     basis?

18     A     Possibly.

19     Q     Did you or did you not?

20     A     It's not a did-you or

21     did-you-not response.  It's a possibly.

22           So as I sit here today, it's

23     possible, maybe, but I can't recall any

24     specific conversation.

25           Suffice it to say, Mr. Murdica

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC      Exhibit     Page 149 of 266          Nabil Majed Nachawati
                              Confidential                         May 24, 2023

147

1              NACHAWATI - CONFIDENTIAL

2     and I are not besties.

3          Q     Did you express to anyone --

4     withdrawn.

5                Prior to your serving as a

6     member of the -- a member representative of

7     the TCC in the first bankruptcy, did you

8     express a view to anyone other than a

9     client as to what you believed Johnson &

10    Johnson and its affiliates should pay on a

11    per-ovarian-cancer average basis to resolve

12    the cases?

13         A     That was a long question,

14    Mr. Silverstein.  Can you restate it for

15    me?

16         Q     Did you at any point in time

17    prior to signing the NDA share a view with

18    anyone other than your client and anyone

19    other -- and anyone other than in your

20    capacity as a representative of a member of

21    the TCC a view as to how much Johnson &

22    Johnson, an affiliate, should pay on a

23    per-claim basis to resolve ovarian cancer

24    cases?

25                MR. MONTEFUSCO:  Object to the

148

1          NACHAWATI - CONFIDENTIAL

2       form.

3              MR. HOFMEISTER:  Object to the

4       form.

5       A     Maybe.  I mean, you know,

6    lawyers talk all the time.  You know, maybe

7    is the best answer I could give you there.

8       Q     You have no -- do you have any

9    recollection of doing so?

10      A     Not as I sit here today, but

11   it's quite possible.

12      Q     Did your -- between the time

13   when you signed the PSA and when the first

14   bankruptcy was filed on October 14, 2021,

15   did your view as to what Johnson & Johnson

16   and its affiliates should pay on average

17   per case to resolve ovarian cancer cases

18   change?

19             MR. MONTEFUSCO:  Object to form.

20             MR. HOFMEISTER:  Objection to

21      form.  No foundation.

22      A     I think in general, you know,

23   depending on the developments of a lot of

24   different variables, things change day to

25   day, Mr. Silverstein.  I think that's a

149

```
 1              NACHAWATI - CONFIDENTIAL

 2   fair way to answer the question.

 3        Q    When you signed the PSA, did

 4   your view of what would fairly treat

 5   ovarian cancer patients to resolve their

 6   cases on a per-case basis -- withdrawn.

 7              Did you -- did your view --

 8   withdrawn.

 9              Did you hold a lower --

10   withdrawn.

11              Did you believe comfortably that

12   ovarian cancer cases would fairly be

13   compensated on a per-case basis at a lower

14   amount when you signed the PSA than when

15   the first bankruptcy was filed?

16              MR. HOFMEISTER:  Objection to

17         the form.  No foundation.

18        A    Can you restate that question,

19   Mr. Silverstein?

20        Q    Had your view of what would

21   fairly compensate ovarian cases -- ovarian

22   cancer cases on a per-case basis change

23   between October 14, 2021 and when you

24   signed the PSA such that you believed that

25   Johnson & Johnson's compensation should be
```

150

1              NACHAWATI - CONFIDENTIAL

2    lower to fairly compensate those claimants?

3              MR. MONTEFUSCO:  Same objection

4         to form.

5         A    Yeah, I think that -- I don't

6    know that I would characterize it as lower.

7              I think I would characterize it

8    as if a bankruptcy is filed -- and I have

9    no control over whether it's filed or

10   not -- then the question becomes how do you

11   play the hand you're dealt?  And that, 'til

12   this day, changes day to day.

13             I think that's the best I could

14   do at trying to answer your question.

15             MR. SILVERSTEIN:  All right.

16        Let's -- let's pull this down and,

17        Deane, let's put up -- let's put up

18        Tab 13.

19             (Exhibit 6, Document entitle

20        "Plan Support Agreement," Bates

21        stamped LTLMGMT-00003498 through 646,

22        was remotely introduced and provided

23        electronically to the reporter, as of

24        this date.)

25             MR. SILVERSTEIN:  Again, I just

151

```
1              NACHAWATI - CONFIDENTIAL

2         note this is marked "confidential."

3              This is a document entitled

4         "Plan Support Agreement" that bears

5         Bates numbers LTLMGMT 3498 through

6         3646.

7              Deane, can you go to page 11 of

8         the document?

9    BY MR. SILVERSTEIN:

10        Q    Is that a DocuSign signature of

11    yours, Mr. Nachawati?

12        A    I believe so.

13             THE VIDEOGRAPHER:  Sir, this

14        will be Exhibit No. 6?

15             MR. SILVERSTEIN:  Yes, Nachawati

16        Exhibit No. 6.

17   BY MR. SILVERSTEIN:

18        Q    Why did you sign this agreement?

19             MR. HOFMEISTER:  Objection.

20        This is subject to the non-disclosure.

21             MR. SILVERSTEIN:  Why somebody

22        did something is subject to

23        non-disclosure?

24             MR. HOFMEISTER:  Well, sure, if

25        he's going to disclose discussions he
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 154 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

152

1          NACHAWATI - CONFIDENTIAL

2          had in conversations --

3                MR. SILVERSTEIN:  Well, now

4          you're putting words in his mouth.

5                MR. HOFMEISTER:  Well, you just

6          asked me a question and I'm answering

7          it.  Don't ask me a question if you

8          don't want the answer.

9   BY MR. SILVERSTEIN:

10         Q     Okay.  Mr. Nachawati, are you

11   able to answer -- are you barred from

12   answering by a non-disclosure agreement why

13   you signed this document?

14         A     Let me think about it.

15               So, in a general sense,

16   Mr. Silverstein, the bankruptcy laws had

17   allowed a second bankruptcy to be filed.

18               Whether I disagree with it or

19   not, I signed the plan support agreement

20   because I believe, after a decade of

21   litigation, that I have clients I have to

22   be accountable to and that there has to be

23   some pathway to resolution in their

24   lifetime.  That's my job.

25               So I signed it because I believe

153

1          NACHAWATI - CONFIDENTIAL

2    that there is a pathway to resolution and a

3    plan I can support, is the general idea.

4          Q     What's the pathway you're

5    referring to?

6          A     Okay.  The pathway is the most

7    complex case -- one of the most complex

8    cases, in general, this nation has ever

9    seen, and specifically in Bankruptcy Court,

10   one of the most complex cases that has ever

11   been filed, not just once, but twice.

12             That's what I'm referring to.

13         Q     And what's the pathway that you

14   believe -- withdrawn.

15             By signing this document, what

16   is the pathway that you believed you were

17   facilitating the resolution of your

18   clients' claims by?

19         A     Coming to a plan that I could

20   support and recommend to the appropriate

21   clients and which I represent.

22             Due to complexity of the

23   issuance that -- without going into the

24   substance, there are issues to work

25   through, and through the mediators, we're

154

```
 1              NACHAWATI - CONFIDENTIAL

 2    trying to work through those issues.

 3        Q    What are the issues that you

 4    have identified thus far?

 5        A    I can't go into the substance of

 6    those issues.  They're covered under the

 7    mediator's privilege.  And I'm happy to do

 8    so, if the Court so orders.

 9        Q    Well, before you went into

10    mediation, did you -- withdrawn.

11             When you signed this plan

12    support agreement, there was no mediation

13    by which you were bound, correct?

14             MR. HOFMEISTER:  Objection.

15        There's a non-disclosure agreement.

16             MR. SILVERSTEIN:  I understand.

17        He's already answered about the

18        pathway.  So --

19        A    In a general sense, I answered

20    that question.

21        Q    Right, in a general sense.

22             So the -- when you signed this

23    plan support agreement, what issues were

24    you aware of that you believed had to be

25    worked through in order to get to a
```

155

1          NACHAWATI - CONFIDENTIAL

2    resolution?

3        A     Well, the many details involved

4    in a 100-plus page TDP, in addition to the

5    plan, Mr. Silverstein, as you know, right?

6              I mean, a term sheet is an

7    agreement to agree, right?  The devil is in

8    the details, and that's what we're working

9    through right now through the mediators.

10       Q     What did you understand that you

11   were agreeing to by signing this document?

12       A     I think I already answered that,

13   a pathway to a resolution that I could

14   recommend in support to my clients.

15       Q     Did you understand that you had

16   agreed to support the plan that the debtor

17   just recently filed on May 15th?

18             MR. HOFMEISTER:  Object to form.

19             MR. MONTEFUSCO:  Form.

20       A     A conditional agreement with a

21   right to opt out.

22       Q     And what do you mean by that?

23       A     Exactly what I said.  You know

24   what an opt-out right is, and you know what

25   a conditional agreement is.

156

1                  NACHAWATI - CONFIDENTIAL

2                  You're a lawyer,

3      Mr. Silverstein.

4          Q     I am.

5                  Can you point in the -- where --

6      what you're referring to in the plan

7      support agreement that you signed that

8      gives you the opt-out right that you're

9      referring to?

10         A     Not as I sit here today.

11         Q     But is it your understanding

12     that what you signed gives you the --

13     withdrawn.

14                 Is it your understanding that

15     what you signed is conditional and is --

16     and gives you the right to opt out of the

17     support?

18                 MR. MONTEFUSCO:  Objection.

19         Form.

20                 MR. HOFMEISTER:  Objection.

21         Form.

22     BY MR. SILVERSTEIN:

23         Q     You can answer.

24         A     Yes.  If there's no agreement

25     working through the issues, there's no

157

```
 1              NACHAWATI - CONFIDENTIAL

 2    agreement.  But the idea is, in a general

 3    sense, the pathway to a fair resolution

 4    that I can recommend and support to my

 5    clients.

 6         Q     Do you understand that you have

 7    any obligations under this agreement?

 8              MR. MONTEFUSCO:  Objection to

 9         the form.

10   BY MR. SILVERSTEIN:

11         Q     I'm asking, by you signing this

12    agreement -- I understand what your goal

13    was in signing it.  Now I'm asking a

14    different question.

15              What -- do you have any

16    understanding as to what this agreement

17    obligates you to do?

18              MR. HOFMEISTER:  Objection to

19         the form.  Calls for a legal answer, a

20         legal conclusion.

21         A     Well, I am a lawyer, and I

22    understand what I signed, Mr. Silverstein.

23         Q     Yeah, so what is it --

24         A     To be clear, I've been pretty

25    clear about my position on it.  It's an
```

158

1              NACHAWATI - CONFIDENTIAL

2     agreement to agree.

3              Details have to be worked

4     through.  It's the most complex case that

5     this nation has ever seen, in my opinion,

6     in Bankruptcy Court.

7              So there are many details that

8     we're collaboratively in an adversarial

9     posture working through to a pathway of a

10    plan I can support and recommend to my

11    clients.

12       Q    Okay.  I want to -- when you --

13    withdrawn.

14              When you signed this agreement,

15    did you have an understanding as to whether

16    you were binding your clients to do

17    anything?

18       A    I can't bind my clients to do

19    that in which they do not wish to do.  I

20    can only advise them upon a plan that is

21    submitted for vote -- you know, there's

22    anti-solicitation -- submitted for vote and

23    approved by 75 percent or more, if you want

24    the 524(g) protection.

25              I cannot bind my clients.  It's

159

```
 1            NACHAWATI - CONFIDENTIAL

 2    the will of the voter and the clients, the

 3    victims, that carries the day in this case

 4    should it not be disposed of beforehand.

 5    It's not my decision.  It's the clients'.

 6    And each one has a different set of

 7    circumstances.

 8         Q    Okay.  Let's put this document

 9    down.

10            MR. SILVERSTEIN:  Mr. Nachawati,

11         if you're fine to keep going, I want

12         to leaf through what we have so you

13         can do whatever -- I don't know if

14         it's too late to get to your --

15            THE WITNESS:  It's too late,

16         Mr. Silverstein, but that's okay.  I

17         agreed to the timing, respectfully.

18         So I'm fine.  I'm here.

19            MR. SILVERSTEIN:  All right.

20         Fair enough.  I'll try to be as

21         efficient as I can.

22            THE WITNESS:  Sure.

23            MR. SILVERSTEIN:  Mr. --

24            MR. HOFMEISTER:  Hold on.  Do

25         you have an estimate of how much
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 162 of 266
Confidential
Nabil Majed Nachawati
May 24, 2023

160

1      NACHAWATI - CONFIDENTIAL

2    longer you have?

3         I'm not holding you to it.

4         MR. SILVERSTEIN:  I need to look

5    through what I have left.  I mean,

6    we're in the --

7         MR. HOFMEISTER:  We're in the

8    home stretch?

9         MR. SILVERSTEIN:  It depends how

10   you define it, whether we're talking

11   about a short track or a long track,

12   but, you know, we're in the last few

13   pages of the outline.

14        So, you know, I don't have the

15   exact time just now.  I'd really have

16   to look.

17        MR. HOFMEISTER:  Majed, do you

18   need a break or not?

19        THE WITNESS:  Yeah, I'll take a

20   break, a real quick one.

21        MR. HOFMEISTER:  Can we do five?

22        MR. SILVERSTEIN:  All right.

23        MR. HOFMEISTER:  Is that all

24   right, Mr. Silverstein?

25        MR. SILVERSTEIN:  Yeah,

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 163 of 266                        Nabil Majed Nachawati
                            Confidential                                         May 24, 2023

161

```
 1              NACHAWATI - CONFIDENTIAL

 2        five minutes.

 3              MR. HOFMEISTER:  Thank you.

 4              THE VIDEOGRAPHER:  We are now

 5        going off the record.  The time is

 6        6:01.

 7              (Recess taken 6:01 p.m.)

 8              (Resumed 6:11 p.m.)

 9              THE VIDEOGRAPHER:  We are now

10        back on the record.  The time is 6:11.

11  BY MR. SILVERSTEIN:

12        Q     All right.  Mr. Nachawati,

13   welcome back.

14              I'm going to try to speed

15   through a few more things and then I

16   suspect that some others may have some

17   questions, but hopefully I covered a lot of

18   the terrain.

19              MR. SILVERSTEIN:  So I'm going

20        to ask Deane to put up on the screen

21        Tab 15, which will be marked as

22        Exhibit 7.

23              (Exhibit 7, screenshot of a text

24        exchange, was remotely introduced and

25        provided electronically to the
```

162

```
 1              NACHAWATI - CONFIDENTIAL

 2         reporter, as of this date.)

 3   BY MR. SILVERSTEIN:

 4         Q      This is a screenshot of a text

 5   exchange.

 6   ████████████████████████████████████

 7   ████████████████████████

 8         A      That's correct.

 9         Q      And I can represent to you that

10   this came from the cell phone of Mr. Stolz.

11         A      Sure.

12         Q      On May 10th, you wrote to

13   Mr. Stolz as follows:  "I don't appreciate

14   the subpoenas - I'm not a yes man like you,

15   Andy, who was desperate for a deal at the

16   beginning and my clients will vote yes or

17   no depending on what happens - and your

18   shitty subpoenas don't help the cause, nor

19   does asking for a greedy CBF.  Who charges

20   an 8/12?  As the Bible says, 'Avarice is

21   the root of all evil.'  Think about that

22   next time before your money grab.  And

23   Dan - what I think now about you goes

24   without saying.  Have a great day, gents."

25                Do you see that?
```

163

1              NACHAWATI - CONFIDENTIAL

2      A     I mean, I can read.  I think the

3   exhibit speaks for itself, Mr. Silverstein.

4   And I believe prior, earlier in my

5   deposition, I expressed the same sentiment.

6      Q     Yes, and just so that we're

7   clear, whether your clients vote "yes" or

8   "no" on a plan is uncertain at this point,

9   is that fair?

10              MR. HOFMEISTER:  Objection to

11        the form.

12              MR. RASMUSSEN:  Object to form.

13      A     We are working through issues in

14   a complex situation through the mediators

15   with the idea with respect to the

16   appropriate client getting to a pathway of

17   a plan that I could support and recommend

18   to my clients.

19      Q     And at this point in time,

20   whether your vote -- whether your clients

21   will vote "yes" or "no" to support the

22   debtors' plan will depend on what happens.

23   Fair?

24              MR. MONTEFUSCO:  Object to the

25        form.

164

```
1              NACHAWATI - CONFIDENTIAL

2              MR. HOFMEISTER:  Objection to

3       form.

4       A      That's a fair statement.

5              You know, as you know,

6    Mr. Silverstein, there are hundreds of

7    pages in the TDP, never mind plan, right?

8    It's not just something that one day it's a

9    binary yes or no.  It's a process.  And in

10   this case, it's an unprecedented process.

11   It's the most complex bankruptcy that this

12   nation has ever seen.

13             So you appreciate the magnitude

14   of the complexity.  So what you're trying

15   to ask for is, oh, a yes or no.  It's

16   complex.  We're working with the issues

17   with the idea of a pathway to resolution

18   that I can support and can recommend to my

19   clients, and that's what I've said 100

20   times.  I don't know how many different

21   ways you want me to say it.

22   Q      Well, it follows from what

23   you've testified to and what you have in

24   your text message that at this point in

25   time, none of your clients have committed
```

165

1              NACHAWATI - CONFIDENTIAL

2     to support the debtors' bankruptcy plan, is

3     that true?

4              MR. HOFMEISTER:  Objection.

5         Calls for attorney-client privilege.

6         A     And they don't commit until they

7     vote, and they're going to vote

8     individually.  And the will of each

9     claimant who has a vote will govern, absent

10    any intervention from a dispositive

11    perspective, from a Court of Appeal,

12    Bankruptcy Court, Article 3 judge or

13    otherwise.

14        Q     And whether you recommend to

15    your clients that they vote for the

16    debtor's plan or not also depends on what

17    happens.  Fair?

18        A     Yes.  I can't fortune tell.

19        Q     Okay.  And any statement that

20    your clients have committed at this point

21    in time to support the debtors' bankruptcy

22    plan is untrue.  Is that fair?

23        A     I wouldn't say --

24              MR. RASMUSSEN:  Object to form.

25              MR. HOFMEISTER:  Object to form.

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 168 of 266                    Nabil Majed Nachawati
Confidential                                                              May 24, 2023

166

1          NACHAWATI - CONFIDENTIAL

2      A      I wouldn't say that.  Again, I

3   can't talk about anything following the NDA

4   other than to say in a general sense what

5   I've said 100 times.

6      Q      Well, any statement that your

7   clients will support the plan is an

8   overstatement.  Fair?

9              MR. MONTEFUSCO:  Objection to

10        the form.

11             MR. RASMUSSEN:  Objection to the

12        form.

13     A      I don't think that's fair.  I

14   think it depends on the many variables of

15   which could happen day to day,

16   Mr. Silverstein, as you know.

17     Q      So it depends on what happens in

18   the future.  That's whether your clients

19   will -- whether you will recommend to your

20   clients that they support the plan and

21   whether they decide to follow that

22   recommendation or not.

23             MR. RASMUSSEN:  Objection to the

24        form.

25     A      There's so many variables.  I

167

1                NACHAWATI - CONFIDENTIAL

2     can't answer what happens in the future.  I

3     have to deal with the issues as they arise

4     to the best of my ability and with the

5     intent of doing right by my client and --

6     yeah, I mean, I don't know how else to say

7     it other than that.

8          Q     In connection with signing the

9     plan support agreement, did you -- did you

10    disclose any potential conflicts of

11    interest to any of your clients?

12               MR. HOFMEISTER:  That's

13         attorney-client privileged.

14         A     That's attorney-client.

15         Q     So you won't answer?

16         A     It's attorney-client privilege.

17    I'm happy to answer by order of the Court.

18               MR. HOFMEISTER:  I also just

19         want to note my objection to the form

20         of the question.

21    BY MR. SILVERSTEIN:

22         Q     Did you consult an ethics expert

23     before you signed the plan support

24     agreement?

25               MR. MONTEFUSCO:  Objection to

168

1          NACHAWATI - CONFIDENTIAL

2       the form of the question.

3              MR. HOFMEISTER:  Object to the

4       form.

5       A    It's attorney-client privileged,

6   but we regularly, in a general sense,

7   regularly consult with experts and ethics.

8              And, you know, I would say an

9   8/12 conflict of interest when you have 100

10  cases filed in the MDL, that's the conflict

11  of interest that you should be thinking

12  about, Mr. Silverstein.

13             MR. SILVERSTEIN:  Can you take

14       this down, Deane?

15             Deane, could you put up Tab 2,

16       please?

17             (Exhibit 8, document entitled

18       "Chapter 11 Plan of Reorganization of

19       LTL Management LLC, was remotely

20       introduced and provided electronically

21       to the reporter, as of this date.)

22             MR. SILVERSTEIN:  This is going

23       to be Nachawati Exhibit 8.  It's a

24       long, some might say, voluminous

25       document entitled "Chapter 11 Plan of

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 171 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

169

1          NACHAWATI - CONFIDENTIAL

2          Reorganization of LTL Management LLC."

3          It was filed on the docket on May 15th

4          by the debtors at docket 525.

5     BY MR. SILVERSTEIN:

6          Q     Mr. Nachawati, have you reviewed

7     all or any part of the debtors' proposed

8     Chapter 11 plan?

9          A     I have.

10         Q     I'm sorry?

11         A     I have.

12         Q     Did you review all -- did you

13    review it in its entirety?

14         A     Yes, but there are, you know --

15    in a general sense, right?  Yes, I've read

16    every word of it.

17         Q     Do you understand that the

18    debtors' plan would resolve all of the

19    State of New Mexico's consumer protection

20    actions through the bankruptcy plan?

21              MR. HOFMEISTER:  Objection to

22         the form.

23         A     No.  Actually, if you read it,

24    they're conditionally carved out,

25    Mr. Silverstein, as one of two litigating

170

```
 1              NACHAWATI - CONFIDENTIAL

 2    state entities in their sovereign

 3    territory.

 4         Q     So your understanding of the

 5    plan is that the State of New Mexico would

 6    be carved out from being channeled into a

 7    trust?

 8         A     That's correct, a conditional

 9    carve-out.

10         Q     And what's the conditions that

11    you understand exist under the plan?

12         A     Read the document, it will tell

13    you.

14         Q     I'm asking what your

15    understanding is.

16         A     If there is a resolution outside

17    of the bankruptcy, then they're no longer

18    subject to the possibility of being brought

19    into the bankruptcy.  So they are now

20    conditionally carved out.

21              If, however, they are unable to

22    reach an agreement in their sovereign state

23    court, then J&J has the right to try to

24    suck them into this bankruptcy.

25         Q     So if -- and a resolution
```

171

1              NACHAWATI - CONFIDENTIAL

2      outside of the bankruptcy would involve

3      agreement by Johnson & Johnson, correct?

4          A     It could.

5          Q     Well, you're saying that a

6      resolution would be -- withdrawn.

7                What other resolution do you

8      have in mind other than a consensual

9      resolution that would take place before the

10     bankruptcy plan would be implemented?

11         A     Well, you're asking me to

12     speculate, and I'm unwilling to do that.

13               And to the extent that I would

14     be able to answer any questions in the

15     past, they'd be covered by attorney-client

16     privilege.  So I can't disclose the

17     confidences of my prior client or their

18     wishes, strategies or thoughts in any

19     respect.

20         Q     And do you agree that with

21     regard to this particular plan, because it

22     depends on events that will happen in the

23     future, you are unable to say at this point

24     in time one way or the other whether you

25     will recommend it to your clients?

172

```
 1              NACHAWATI - CONFIDENTIAL

 2                  MR. HOFMEISTER:  Objection to

 3          the form.

 4                  MR. MONTEFUSCO:  Objection to

 5          the form.

 6      BY MR. SILVERSTEIN:

 7          Q     Pardon?

 8                  MR. RASMUSSEN:  We objected to

 9          the form of the question.

10      BY MR. SILVERSTEIN:

11          Q     And can you answer,

12       Mr. Nachawati?

13          A     Sure.

14                  As I've stated more than once,

15       the idea is working through the issues with

16       the mediators and the wrinkles that exist

17       in the most complex bankruptcy in U.S.

18       history to try to create a pathway to

19       resolution for the appropriate type of

20       clients in which I represent.  It's not a

21       one-size-fits-all situation,

22       Mr. Silverstein, as you know.

23          Q     Are you able to answer,

24       Mr. Nachawati, you know, "yes" or "no"

25       whether, sitting here now, do you agree
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 175 of 266              Nabil Majed Nachawati
                                    Confidential                         May 24, 2023

                                                                                   173

```
 1                NACHAWATI - CONFIDENTIAL
 2      that you cannot say one way or the other
 3      because it depends on events that will
 4      happen in the future whether you will
 5      recommend support of this plan, Debtors'
 6      Exhibit 8, to your clients?
 7                MR. RASMUSSEN:  Object to form.
 8                MR. HOFMEISTER:  Object to form.
 9           A     I can't tell the future.  So I'm
10      not going to speculate on what happens
11      tomorrow.
12                But from what you've seen,
13      suffice it to say, anything can happen from
14      what I've experienced so far.
15                MR. SILVERSTEIN:  Okay.  Deane,
16           let me ask you to please put up Tab 6,
17           and this will be Nachawati Exhibit 9.
18                (Exhibit 9, document entitled
19           "Verified Statement of Paul Hastings
20           LLP, Cole Schotz P.C. and Parkin &
21           Rubio LLP Pursuant to Bankruptcy Rule
22           2019, was remotely introduced and
23           provided electronically to the
24           reporter, as of this date.)
25                MR. SILVERSTEIN:  Deane, just
```

174

```
 1              NACHAWATI - CONFIDENTIAL

 2         scroll down a page.

 3              So this document is entitled

 4         "Verified Statement of Paul Hastings

 5         LLP, Cole Schotz P.C. and Parkins &

 6         Rubio LLP Pursuant to Bankruptcy Rule

 7         2019."

 8    BY MR. SILVERSTEIN:

 9         Q    Have you seen this document

10    before?

11         A    I have.

12         Q    Are you familiar with a -- I

13    guess I'll call it an organization, the Ad

14    Hoc Committee of Supporting Counsel?

15              MR. HOFMEISTER:  Object to form.

16         A    I am.

17         Q    Are you a member of that

18    committee?

19         A    I am.

20         Q    And you have attorneys

21    representing that committee who are

22    appearing here today.

23              Are you familiar with that?

24         A    I haven't checked all the

25    participants.  I just see that there are
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 177 of 266                    Nabil Majed Nachawati
                              Confidential                                May 24, 2023

175

1              NACHAWATI - CONFIDENTIAL

2     47.  So I'd surmise that some of them

3     perhaps are on this call.

4          Q     And today, who is responsible

5     for paying the counsel for the Ad Hoc

6     Committee of Supporting Counsel?

7                MR. MONTEFUSCO:  Object to form.

8                To the extent you can answer

9          without revealing privileged

10         information.

11         A     Yeah, I don't know that I can

12    answer that under the NDA.  But,

13    Mr. Silverstein, I'd be happy to disclose

14    that, if the Court so orders.

15         Q     So it's the NDA that's

16    preventing you from answering that

17    question?

18               MR. MONTEFUSCO:  Object to form.

19               Same caution.

20         A     I believe so.

21         Q     Have you made any commitment to

22    pay the legal fees of counsel for the Ad

23    Hoc Committee of Supporting Counsel either

24    directly or conditionally?

25               MR. MONTEFUSCO:  Same objection.

176

1        NACHAWATI - CONFIDENTIAL

2             MR. HOFMEISTER:  Same

3        objections.

4        A    You know, I think that the NDA

5   covers this, but, you know, there's -- as

6   is always the case, there's engagement

7   agreements.

8             To the extent any bankruptcy

9   lawyers or professionals are paid, they

10  have to file their statements with the

11  Bankruptcy Court, as you know,

12  Mr. Silverstein.  So read the docket.

13            MR. SILVERSTEIN:  Okay.  Let's

14       scroll down to page 1 of -- it will

15       say page 1 of 1377.  It's Exhibit A.

16            There we go.

17            And scrolling down, Deane,

18       you'll see that it says "Nachawati Law

19       Firm, it has your name, and then it

20       has a number of claimants 4,949.

21  BY MR. SILVERSTEIN:

22       Q    Do you see that?

23       A    I do.

24       Q    And is that a number that you

25   calculated or your firm calculated?

177

1              NACHAWATI - CONFIDENTIAL

2        A     I believe it's my firm.

3              I would say that number changes

4    daily depending on what's going on.  It's a

5    moving picture.

6        Q     And how did you or your firm go

7    about calculating this number?

8        A     Through our case management

9    software, Mr. Silverstein.

10       Q     And when did you do that?

11       A     I can't recall.

12       Q     Was it --

13       A     I would say prior to submission

14   of this, is an estimation.

15       Q     Was it before the filing of the

16   second bankruptcy case?

17       A     I can't recall.  I don't know.

18             I mean, I think it's generally

19   been known by -- in connection with LTL I,

20   LTL II, there's been an exchange of

21   information between Feinberg, the FCR, the

22   TCC 1, I mean, you know, data flying every

23   which direction.

24             So, you know, for me to tell you

25   right here, I couldn't sit here today and

178

1              NACHAWATI - CONFIDENTIAL

2     tell you with specifics when this number

3     was generated.  But it is a moving picture.

4     It's not static.  It is dynamic.

5                MR. SILVERSTEIN:  Scroll down,

6           Deane, if you can find page 172 of

7           1377.  If you look on the top, that's

8           where it says page 2 of 1377.  If you

9           go down to page 172 of 1377.

10               Okay.  And this is Exhibit H,

11          Nachawati Law Firm.  And what follows

12          is 116 pages of information.

13               Can you scroll down, Deane?

14    BY MR. SILVERSTEIN:

15      Q    It has the first name, the first

16    initial of the second name, then redacted

17    is the date of birth, the Social Security

18    number, date of death and claim type.

19               Do you see that?

20      A    I do.

21      Q    And this information was

22    information that you provided to counsel to

23    the Ad Hoc Committee?

24      A    I'm sorry, I can't hear you

25    because there is someone speaking in the

179

```
1             NACHAWATI - CONFIDENTIAL

2    background.

3         Q     This information was provided by

4    your firm to the Ad Hoc Committee's

5    counsel?

6         A     I believe so.

7         Q     And had you ever provided --

8    withdrawn.

9              Have you provided this

10   information to Johnson & Johnson or any of

11   its affiliates in connection with your

12   signing of the plan support agreement?

13             MR. MONTEFUSCO:  Object to form.

14             MR. HOFMEISTER:  Objection.

15        Involves disclosure under the

16        non-disclosure agreement.

17        A     Right.  I can't remember.

18             But what I can tell you is, you

19   know, there's been all kinds of requests

20   flying five different directions, and I

21   know this one's been hotly contested.

22             So, you know, I don't -- I don't

23   have any specific knowledge one way or the

24   other about this or commentary.

25        Q     How many different claim
```

180

1              NACHAWATI - CONFIDENTIAL

2      types -- withdrawn.

3              How many different claim type

4      categories did your firm utilize in

5      providing the information in the last

6      column?

7              MR. MONTEFUSCO:  Object to form.

8      A     I'd rely on the answer I gave

9      before.  You already asked me a while ago.

10     Q     Just -- I'm sorry, I don't

11     remember what answer you're referring to.

12     A     I mean, I can't recall with

13     details, as I sit here today, or at my

14     fingertips.

15             That's my answer.

16     Q     Do you know whether -- were

17     there claim types other than ovarian and

18     mesothelioma that you provided?

19             MR. MONTEFUSCO:  Object to form.

20     A     I don't know for sure, but I

21     would suspect, yes, because there are many

22     different subtypes.

23     Q     What -- okay.

24     A     There's endometrial, mucinous, I

25     mean, uterine, I mean, epithelial -- I

181

1          NACHAWATI - CONFIDENTIAL

2    could go on and on and on.

3          Q    So the information that you

4    provided to counsel for inclusion in this

5    chart, which is redacted, your recollection

6    is that it has that level of subtype

7    information in it?

8               MR. MONTEFUSCO:  Object to form.

9          Misstates testimony.

10         A    I don't know one way or the

11   other.  I'm just telling you that there are

12   a lot of different subtypes and every

13   client is different.

14              So I'm not going to say one way

15   or the other.  I just can't remember.  But

16   what I can tell you is, you know, there's

17   quite a lot of them and each one of their

18   situations is different.

19              And that list should not include

20   any meso clients, and it certainly doesn't

21   include the State of New Mexico.

22         Q    So there's 4,949.  You're saying

23   of that, those are all ovarian cancer

24   claims and not any meso claims?

25         A    That's my understanding.

                                                                  182

NACHAWATI - CONFIDENTIAL

1

2        Q      And how many -- as of May 9,

3    2023, how many mesothelioma claims does

4    your firm have right now?

5        A      I don't know.

6        Q      Less than 100?

7        A      Yes.

8        Q      Okay.  Less than 50?

9        A      Possibly.

10       Q      Do you have signed retainer

11   agreements for each of the ovarian

12   cancer -- 4,949 ovarian cancer claimants

13   identified by first name in Exhibit H1?

14       A      To the best of my knowledge,

15   yes.

16           MR. SILVERSTEIN:  And let's just

17       go to page 289 of 1377, and go to page

18       290 and 291.

19   BY MR. SILVERSTEIN:

20       Q      Is this your firm -- the form of

21   retainer agreement that you utilize with

22   clients alleging ovarian cancer caused by

23   J&J?

24       A      It looks familiar.

25       Q      And to the best of your

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 185 of 266
Confidential

Nabil Majed Nachawati
May 24, 2023

183

1          NACHAWATI - CONFIDENTIAL

2     knowledge, you have signed retainer

3     agreements with respect to each of the

4     4,949 ovarian cancer claimants mentioned in

5     the -- in Exhibit 9?

6          A     To the best of my knowledge,

7     yes.

8          Q     And when were those engagement

9     letters obtained?

10         A     I'm not following.

11         Q     Was any effort made in the last

12    month to obtain signed engagement letters

13    from ovarian cancer patients that had been

14    in your firm's client management database?

15         A     In a general sense -- it's

16    attorney-client privilege, but I'll try to

17    answer it in a general sense.

18              In a general sense, our retainer

19    agreements are signed by our clients.  We

20    do our best to make sure we are compliant.

21    We have several layers of compliance, case

22    management software, docket attorneys,

23    trial lawyers, paralegals, legal

24    assistants, vendors.

25              And then in Imerys, I recall an

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC     Exhibit     Page 186 of 266     Nabil Majed Nachawati
Confidential     May 24, 2023

184

1              NACHAWATI - CONFIDENTIAL

2     issue with respect to making sure we had

3     our clients, prior to the vote, which we're

4     not even there yet in this bankruptcy, but

5     making sure that we complied with the

6     applicable rules with respect to voting in

7     that judge's specific mandates -- that

8     bankruptcy judge's specific mandates.

9              So there may be supplements and

10    there may be iterations that differ.  But

11    in a general sense, this document, I am

12    familiar with in a general sense.

13         Q    But the question was, was there

14    any effort undertaken in the past month to

15    obtain signatures on an engagement letter

16    signed with Fears Nachawati of clients that

17    had been in the client database of Fears

18    Nachawati?

19              MR. MONTEFUSCO:  Object to form.

20              MR. HOFMEISTER:  Objection.

21        Form.

22         A    If you're asking -- I mean,

23    we -- you know, it's a weird question, but

24    I think I'll try to answer it the best I

25    can.

185

1          NACHAWATI - CONFIDENTIAL

2               Potential clients call our firm

3    every day.  If we think they have a case,

4    we'll engage and sign them as a client, in

5    a general sense.  We regularly communicate

6    with our clients via e-mail, letters,

7    updates.

8               And so that's really what I can

9    tell you about it.  I'm not sure where

10   you're going with this.  But yes, we have

11   retainer agreements.  Yes, we regularly

12   communicate with our clients.  Yes, from

13   time to time, we have to change our

14   agreements or supplement.  It just depends

15   on what's going on, Mr. Silverstein.

16               MR. SILVERSTEIN:  All right.

17          Let's take this down.  A couple of

18          more questions, then I'm going to pass

19          this witness, such as it is.

20   BY MR. SILVERSTEIN:

21       Q     With regard to the Chapter 11

22   plan that was filed and that you read,

23   Mr. Nachawati, do you believe that your

24   clients are more fairly treated under that

25   plan than they are to returning to the tort

186

1          NACHAWATI - CONFIDENTIAL

2    system, like you mentioned was going to be

3    your goal in your May 24, 2022 interview

4    with Mr. York?

5              MR. MONTEFUSCO:  Object to form.

6              MR. HOFMEISTER:  Objection to

7         the form.

8              MR. RASMUSSEN:  Objection to the

9         form.

10        A     Before the common benefit

11   conflict or after, Mr. Silverstein?

12        Q     I'm sorry?

13        A     Before the common benefit

14   conflict of the 8 and 12 or after?

15        Q     Just so that we're clear,

16   because you haven't really answered --

17        A     That's why I'm asking, because

18   it matters.  It matters.

19        Q     So the common benefit fund is

20   what -- withdrawn.

21             Is there any other reason why

22   you would believe that your clients are

23   better treated under the Chapter 11 plan

24   that the debtors proposed and being

25   returned to the tort system other than the

187

1            NACHAWATI - CONFIDENTIAL

2    common benefit fund?

3            MR. HOFMEISTER:  Objection.

4            MR. RASMUSSEN:  Objection to the

5        form.

6            MR. MONTEFUSCO:  Objection to

7        the form.

8        A     There are many reasons that

9    we're working through right now.  I can't

10   tell you what happens in the future, as you

11   know.  But the idea is, I look to my

12   clients for them to have a resolution in

13   their lifetime.

14            Ideally, in a perfect world,

15   that's through the tort system.  I do not

16   control Johnson & Johnson on whether they

17   decide to file bankruptcy.  I have to

18   simply react to what the legislation allows

19   them to do with the judges as the

20   gatekeepers.

21            And so I'm only a part of the

22   system.  And so I'm dealing with the

23   inevitability of a bankruptcy that had been

24   filed.  I'm trying to do right by my client

25   while acknowledging that not one size fits

188

1              NACHAWATI - CONFIDENTIAL

2    all for my clients' situations.

3         Q    And what changed between the

4    first time that LTL filed when you didn't

5    have control over that either and you were

6    in favor of returning your clients to the

7    tort system and this time?

8              MR. MONTEFUSCO:  Objection to

9         form.

10             MR. HOFMEISTER:  Objection to

11        the question and to the extent it may

12        cover non-disclosure agreement or

13        negotiations under the mediation.

14        A    It would -- it touches on many

15   of the issues that we're dealing with in

16   mediation that we're trying to work through

17   with the debtor and the parent, and that's

18   the goal, with the idea to support a plan

19   that I can recommend to my clients.

20             And I don't know how that's

21   going to turn out because I can't tell you

22   what's going to happen tomorrow.

23        Q    All right.  Do you understand

24   that the debtor just filed an application

25   for permission to pay the Ad Hoc

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 191 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

189

1          NACHAWATI - CONFIDENTIAL

2    Committee's counsel -- counsel's fees?

3        A     I think we already covered this,

4    and I said, Read the docket.  So it's clear

5    you've read the docket and you asked me a

6    question.

7              So if the docket -- if it's on

8    the docket, and, as you know, bankruptcy

9    professionals and lawyers have to file

10   their requests for attorney's fees with the

11   Court, yes, I'm generally aware that that's

12   a requirement.

13             So yes.

14       Q     When you say it's a

15   "requirement," what do you mean by that?

16       A     By bankruptcy rules, you have to

17   file your request to be paid as bankruptcy

18   counsel, and the Court has the authority

19   to, in connection with the U.S. Trustee,

20   allow or disallow the fees being charged.

21             But it has to be disclosed with

22   the Court.

23       Q     When --

24       A     Why ask me question you know the

25   answer to, Mr. Silverstein?

190

1            NACHAWATI - CONFIDENTIAL

2       Q    When was the first time that you

3   came to learn that Johnson & Johnson was in

4   discussions to pay bankruptcy counsel for

5   the lawyers that signed the plan support

6   agreement?

7            MR. MONTEFUSCO:  Objection to

8        the form of the question.

9            I'm going to caution the witness

10       not to reveal any privileged

11       communications with counsel for the Ad

12       Hoc Committee.

13           MR. HOFMEISTER:  Objection.

14       A    I mean, I can tell you the first

15   time I became aware of such a dynamic was

16   when the ad hoc groups of AGs in Womble

17   filed their request for fees.  That's when

18   I first realized that a debtor could pay an

19   adversary their bankruptcy counsel bills,

20   in a general sense.

21       Q    And when was the first time that

22   that -- that you learned -- that you heard

23   it discussed in the specific sense of this

24   committee?

25           MR. MONTEFUSCO:  Object to form.

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 193 of 266                    Nabil Majed Nachawati
Confidential                                                                   May 24, 2023

191

1              NACHAWATI - CONFIDENTIAL

2              I have the same caution with

3        respect to privilege.

4              MR. HOFMEISTER:  Objection.

5        A     Yeah, that's more post NDA.  So

6    I can't answer that.  I'm happy to, if the

7    Court so orders.

8              MR. SILVERSTEIN:  All right.

9        I've concluded my examination for now

10       subject to the following, which is

11       Mr. Nachawati has invoked an NDA in

12       not answering I would say fundamental

13       questions regarding the plan support

14       agreement he signed, the term sheet

15       that's associated with it, and other

16       critical aspects of what may or may

17       not be his support for the plan, and

18       including his communications with

19       Johnson & Johnson and others.

20             So this is definitely a matter

21       that we're going to take up with the

22       Court, and we reserve our rights to

23       bring back Mr. Nachawati to ask

24       questions that he has not answered.

25             And with that, I have no further

192

1        NACHAWATI - CONFIDENTIAL

2    questions.

3        MR. HOFMEISTER:  Okay.  This is

4    Brian Hofmeister, and for the record,

5    there were several different types of

6    privileges raised.

7        One was the non-disclosure

8    agreement, and we've just mentioned

9    that, but there's also been refusals

10   to disclose conversations regarding

11   mediation discussions that are

12   privileged as well as discussions with

13   the Ad Hoc Committee that are covered

14   by any privilege regarding the

15   committee, so.

16       MR. SILVERSTEIN:  Yeah, well,

17   all rights are reserved, obviously,

18   all the way around.

19       The NDA is the one that is a

20   blanket.  Anything that happened after

21   the NDA, which nobody seems to know

22   when, and nobody seems to know what it

23   covers, and yet, it's been the basis

24   for, you know, not answering

25   questions.  That's the most

193

```
 1      NACHAWATI - CONFIDENTIAL

 2   problematic.

 3        But, of course, we'll look at

 4   the transcript and see if there is

 5   anything else and we'll raise them

 6   with you.  But the NDA is the one that

 7   was the most blanket and problematic.

 8        Thank you very much.

 9        MR. HOFMEISTER:  Okay.  Thank

10   you.

11        THE WITNESS:  Thank you,

12   Mr. Silverstein.

13        MR. RASMUSSEN:  I do have a

14   couple of questions, if nobody else

15   does, but I'll let others go first.

16        THE WITNESS:  Could you identify

17   yourself for the record, please?

18        MR. McEVILLY:  Can I jump in,

19   Mark.

20        Tom McEvilly on behalf of the

21   State of New Mexico, just on the topic

22   of privileges raised.

23        I would just like to withdraw my

24   two objections earlier.  I

25   misunderstood the line of questioning.
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 196 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

194

NACHAWATI - CONFIDENTIAL

2          Thank you.

3              MR. RASMUSSEN:  Is there anybody

4      else?  Otherwise, I'll go.

5              MS. RATCLIFFE:  Yes, I have some

6      questions.

7   EXAMINATION BY

8   MS. RATCLIFFE:

9      Q     This is Suzanne Ratcliffe of

10   Maune Raichle Hartley French & Mudd.

11     A     Okay.

12     Q     Good afternoon, or I guess good

13   evening, Mr. Nachawati.  I don't think

14   we've had the pleasure.  So it's nice to

15   meet you virtually, and hopefully, I'll be

16   pretty quick so you can get on with your

17   day.

18     A     Sure.

19     Q     I just wanted to clarify based

20   on your previous testimony, sitting here

21   today, you can't tell us how many

22   mesothelioma claims you had in your

23   inventory either in the filed MDL cases,

24   the unfiled MDL cases or even sitting here

25   today, as of today, how many mesothelioma

195

1              NACHAWATI - CONFIDENTIAL

2    cases you have?

3              MR. HOFMEISTER:  Objection to

4         the form of the question, and I

5         believe he --

6              MS. RATCLIFFE:  I can reask.

7         Let me reask the question.  I was

8         trying to make it quick so we could

9         get through this, but I'll reask it.

10   BY MS. RATCLIFFE:

11        Q    Do you know, sitting here today,

12   how many mesothelioma cases you had when

13   you filed your 3,300 cases in the MDL?

14        A    Not with specificity, but none

15   of the meso cases are filed in the MDL,

16   because it's an OC-only MDL.

17        Q    Okay.  Well, in the paragraph 6

18   that was referenced before, it listed

19   around 3,500 ovarian cases and a small

20   number of meso cases.

21              That's what your testimony was,

22   was it not?

23        A    In relation to who I represent?

24        Q    Right.

25        A    Yes, that's accurate.

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 198 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

196

1             NACHAWATI - CONFIDENTIAL

2        Q    Okay.  And you don't know what

3   that small number of mesothelioma cases was

4   at the time of the original filing of the

5   LTL I, correct?

6        A    I had an approximation.  I'd

7   have to look at my notes.

8        Q    And what's your approximation?

9        A    I don't want to guess.

10       Q    Okay.  Nobody wants you to

11   guess.

12            And then you don't know how many

13   mesothelioma cases you had filed in State

14   Court, correct?

15       A    I would be guessing, but there

16   were some filed.

17       Q    Okay.  And when you did that

18   testimonial that we watched earlier in May

19   of '22, you said there was a good number of

20   meso cases, but you don't know what that

21   number was, correct?

22       A    More or less.

23       Q    I mean, if you do, you can tell

24   me.

25       A    I mean, I just -- sitting here

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 199 of 266                    Nabil Majed Nachawati
Confidential                                                             May 24, 2023

197

```
 1                NACHAWATI - CONFIDENTIAL

 2      today, I'm guessing.  I'm approximating.

 3                  Is it in the thousands?  No.

 4                  Is it in the hundreds?  No.

 5          Q     Okay.  And then you testified

 6      earlier that in the verified 2019

 7      statement, that the listing of cases in the

 8      Exhibit A that's redacted does not contain

 9      any mesothelioma cases, is that correct?

10          A     That's my understanding.

11          Q     Okay.  And then in that H1

12      redacted listing of clients, you don't

13      know, sitting here today, how many of those

14      cases are ovarian cases versus non-ovarian

15      cases, correct?

16                  MR. MONTEFUSCO:  Object to form.

17          A     I don't have that information in

18      detail at my fingertips.

19          Q     Okay.  But that list does

20      contain cases that are non-ovarian based,

21      correct?

22          A     I don't know, other than I know

23      of meso cases, my understanding is they are

24      excluded.

25          Q     Okay.  But do you know what is
```

198

```
 1              NACHAWATI - CONFIDENTIAL

 2   actually included in the listing in H1?

 3       A     Ovarian cancer -- generally

 4   speaking, ovarian cancer, just as I sit

 5   here today without any documents to look

 6   at, ovarian cancer and various subtypes,

 7   epithelial, mucinous, some that may not be

 8   compensable, but, you know, no one knows

 9   what tomorrow will hold.

10       Q     Okay.  Does it also include

11   what's been considered as the gynecological

12   cancers?

13       A     Some.

14       Q     Okay.  And you don't know how

15   many in each of the categories, correct?

16       A     Not as I sit here today.

17       Q     Okay.  And I certainly don't

18   want beat a dead horse.  I just want to

19   make sure I have a clear understanding what

20   you know and what you don't know.  Okay?

21       A     Fine.

22       Q     Are you aware of any of the

23   non-ovarian gynecological cancers being

24   compensated in the tort system either by

25   settlement or in a trial?
```

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 201 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

199

Confidential

1              NACHAWATI - CONFIDENTIAL

2        A     Are you referring to meso or

3    asbestos related?

4        Q     I'm saying non-ovarian

5    gynecological cancers.

6              MR. RASMUSSEN:  Just note my

7         objection to the form of the question.

8              THE WITNESS:  You know,

9         Mr. Silverstein, do you want me to

10        answer this?  Because there's stuff

11        that I know from the TCC 1.  I mean...

12              MR. SILVERSTEIN:  Sorry, what's

13        your question?

14              MS. RATCLIFFE:  My question is,

15        is he aware of any non-ovarian

16        gynecological cancers being

17        compensated in a tort system.

18              MR. SILVERSTEIN:  I don't see

19        why there's any issue with you

20        answering "yes" or "no" certainly as

21        to that question.

22              THE WITNESS:  Okay.  I just

23        wanted to make sure because it was

24        stuff I learned in connection with the

25        TCC 1.

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC     Exhibit     Page 202 of 266          Nabil Majed Nachawati
Confidential                                                         May 24, 2023

200

```
 1            NACHAWATI - CONFIDENTIAL

 2                MR. SILVERSTEIN:  It's a

 3        yes-or-no question.  So you can

 4        answer.  I don't know what the answer

 5        is.

 6        A    Yes.

 7        Q    I'm sorry, the answer was "Yes"?

 8        A    Yes.

 9        Q    Okay.  Do you know how many of

10    them?

11        A    I can't recall with specificity.

12        Q    Okay.  And are you in possession

13    of any evidence that non-ovarian

14    gynecological cancers are caused by

15    exposure to talcum powder?

16                MR. MONTEFUSCO:  Object to form.

17        A    Depends on which type of

18    gynecological cancers you're talking about.

19    Some no.  Some yes.  Some more.  Some -- I

20    mean, the science is different for every

21    type of gynecological cancer.

22                So that's the way I would answer

23    that question.

24        Q    Okay.  Are you aware of any

25    literature that supports any claim of any
```

201

```
 1              NACHAWATI - CONFIDENTIAL

 2    non-ovarian gynecological cancers that are

 3    caused by exposure to talcum powder?

 4         A     Are you talking about asbestos?

 5         Q     I'm saying exposure to talcum

 6    powder.

 7         A     I mean, there are certain

 8    gynecological cancers where there's some

 9    evidence, some weaker than others.  It just

10    depends on who you ask.  I mean, there's --

11    you know, you ask two doctors, you get two

12    different answers.

13              So yes, there's literature out

14    there.  It varies with respect to the

15    subtype.  We could sit here all day and

16    talk about it.

17         Q     Okay.  And have you retained any

18    experts in relation to the non-ovarian

19    gynecological cancers?

20         A     I'm sure we have.

21         Q     If the bankruptcy is dismissed

22    ultimately, do you plan to file those

23    non-ovarian gynecological cancers?

24              MR. HOFMEISTER:  Objection to

25         form.
```

202

NACHAWATI - CONFIDENTIAL

1

2       A       I can't predict the future.  So

3   I'm not going to speculate.

4       Q       Okay.  But there's nothing

5   preventing you from filing them, if, in

6   fact, this bankruptcy is dismissed,

7   correct?

8               MR. HOFMEISTER:  Objection to

9       the form of the question.

10      A       I mean, you're asking me a

11  hypothetical.  It would depend on the case.

12      Q       Okay.  And I think we

13  established before that under the original

14  funding agreement in LTL I, there was the

15  potential for a $61 billion fund to

16  compensate victims in addition to

17  whatever -- or let me say this:  There was

18  a $61 billion fund that was available to

19  the claimants in or out of bankruptcy,

20  correct?

21              MR. MONTEFUSCO:  Object to the

22      form.  Misstates testimony.

23  BY MS. RATCLIFFE:

24      Q       Well, is that your understanding

25  of what the first funding agreement said?

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 205 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

203

```
 1              NACHAWATI - CONFIDENTIAL

 2              MR. MONTEFUSCO:  Same objection.

 3       A      The funding agreement is subject

 4   of -- you know, it's public knowledge what

 5   it is.  It's $60 billion in LTL I, is what

 6   it was.

 7       Q      Uh-huh, right.

 8              And you -- we already

 9   established that you were part of the first

10   TCC, correct?

11       A      That's correct.

12       Q      Okay.  And after -- as a part of

13   the TCC, you supported the motion to

14   dismiss and supported a Third Circuit

15   dismissal of the bankruptcy, correct?

16       A      That's correct.

17       Q      Okay.  But now we're sitting

18   here with far less money that's not

19   available in or out of bankruptcy, and yet,

20   you're supporting this plan.  Is that

21   correct?

22              MR. HOFMEISTER:  Objection to

23       form.

24              MR. MONTEFUSCO:  Object to the

25       form of the question.
```

204

1              NACHAWATI - CONFIDENTIAL

2        A     I disagree with that assessment.

3    It depends on what happens tomorrow and the

4    days following.

5              So I can't accurately answer

6    that question today.  It would be

7    speculation.

8        Q     Okay.  You're familiar with the

9    term sheet that was introduced as

10   Nachawati 5, correct?

11       A     Yes.

12       Q     Okay.  And if you need to see it

13   at any point, you let me know.  But

14   certainly, as part of the agreement, there

15   were three qualifications that were

16   necessary, including the future claimant

17   representatives agreement that you will not

18   assign more than a third of the trust

19   corpus to qualifying future claims.

20             Do you recall that?

21       A     That sounds familiar.

22       Q     Okay.  And the terms and

23   conditions of the term sheet are integrated

24   into the current plan, correct?

25       A     Yes.

205

NACHAWATI - CONFIDENTIAL

1

2     Q     Okay.  Have you signed any cases

3  after April 1, 2023?

4     A     I don't know, as I sit here.

5     Q     Let me rephrase.

6           Not any cases, but any cases

7  that would potentially qualify for a filing

8  in this bankruptcy.

9     A     I don't know, as I sit here

10  today.  I mean, we receive a lot of

11  inquiries.  So we regularly sign clients

12  all the time.

13     Q     Okay.  Have those potential

14  claimants been advised that they are only

15  able to -- or only potentially entitled to

16  a third of the trust corpus?

17           MR. HOFMEISTER:  Objection.

18     A     The FCR was just appointed,

19  what, today or yesterday?  Ask her.

20     Q     My understanding, she says she

21  hasn't committed to that, but...

22     A     Well, I've not had a

23  conversation with her, which is, I guess,

24  in essence, what I'm saying.  And that's

25  the FCR's purview, not mine.

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC      Exhibit      Page 208 of 266      Nabil Majed Nachawati
Confidential      May 24, 2023

206

NACHAWATI - CONFIDENTIAL

1

2      Q      Okay.  And just a couple of

3  quick questions.

4            In the PSA, which is

5  Nachawati 6 -- and we can certainly -- oh,

6  I'm sorry, no.  I'm sorry.  It's

7  Nachawati 5.  Still the same document.

8            The exhibits there include the

9  payments to be made for the gynecological

10  cancers, which include ovarian cancers, as

11  well as the mesothelioma claimants,

12  correct?

13      A      Yes, with the exclusion of mine

14  that were not included in the 2019.

15      Q      Okay.  My question is this:

16  Where in the plan is the payment for the

17  non-ovarian, non-mesothelioma claimants?

18            MR. MONTEFUSCO:  Object to form.

19      A      I don't know with specificity

20  without reviewing the document, which I

21  don't have in front of me.

22      Q      Okay.  Do you know offhand how

23  much the gynecological cancers are

24  potentially getting that are non-ovarian?

25      A      Not off the top of my head right

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 209 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

207

```
 1              NACHAWATI - CONFIDENTIAL

 2    now.

 3         Q     Are there any distinctions that

 4    you know of based on the type of

 5    non-gynecological ovarian cancers?

 6         A     Are there any what?

 7         Q     Are there any distinctions or,

 8    you know, differing percentages for each of

 9    the types?

10         A     Yes.  I'd refer you to the

11    document, right?  I think the document

12    speaks for itself.

13         Q     It only includes the ovarian

14    cancers.

15         A     Well, my clients were not

16    included in the 2019.  That's one of the

17    issues that needs to be worked through, and

18    that would be covered by the mediators and

19    whatever happens tomorrow, which I can't

20    speculate.  It's an evolving situation.

21    ████████████████████████████████████

22    ██████████████████████████████████

23    ██████████████████████████████████

24    ████████████████████████████████

25    ████████████████████████████████████
```

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 210 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

208

```
 1              NACHAWATI - CONFIDENTIAL

 2   ████████████████████████████████████████

 3   ██████████████████████████████████

 4   ███████████████████████████████████

 5   █████████████████████████████████

 6   ████████████████████████

 7        Q     Okay.  And under the PSA, the

 8   amount that was -- that amount was left to

 9   the sole discretion of the claims

10   administrator, correct?

11        A     I believe so.  I believe so.

12        Q     Okay.  And that could have been

13   any amount, correct?

14        A     Well, it's not that simplistic,

15   right?  There's a -- the debtors -- there

16   is a plan and the debtor's TDP, right, and

17   that sort of lays out all the specifics.

18              So I'd refer you to that

19   document.

20        Q     Okay.  There were no other side

21   agreements outside of that?

22        A     What do you mean by "side

23   agreement"?

24              MR. HOFMEISTER:  Object to form.

25
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC    Exhibit    Page 211 of 266                Nabil Majed Nachawati
Confidential                                                          May 24, 2023

209

```
 1                NACHAWATI - CONFIDENTIAL

 2    BY MS. RATCLIFFE:

 3        Q     As to what the gynecological

 4    cancers were going to receive.

 5              MR. HOFMEISTER:  Objection.

 6        A     Not that I know of.

 7        Q     Give me one second.

 8              Prior to your non-disclosure

 9    agreement, did you have any agreement or

10    discussions about what the amount for the

11    gynecological cancers would be?

12        A     No.

13              MR. MONTEFUSCO:  Object to form.

14    BY MS. RATCLIFFE:

15        Q     You testified earlier that you

16    signed this PSA -- or wait, let me back up

17    for a second.

18              Your PSA wasn't signed that was

19    introduced as an exhibit today.

20              Do you know why?

21        A     No, I don't know why.

22              I signed the PSA.

23        Q     Do you know when it was signed?

24        A     I don't recall, as I sit here

25    today.
```

210

1          NACHAWATI - CONFIDENTIAL

2              MR. RASMUSSEN:  Can I interject?

3              The PSA is Exhibit 6, and that

4          has a signature on it.

5              MS. RATCLIFFE:  I know it has a

6          signature on it, but it's undated.

7              MR. RASMUSSEN:  You said,

8          "signed."

9              MS. RATCLIFFE:  So then let me

10         withdraw my question.

11     BY MS. RATCLIFFE:

12         Q     Well, I said you signed it, but

13     it's undated.  My question is -- withdrawn.

14             My question is this:  Your PSA

15     is signed, but it's undated, correct?

16         A     Are you referring to the

17     exhibit?

18         Q     Yes.

19         A     Yeah, that's correct.

20         Q     Okay.  And you don't know why

21     it's not signed?

22         A     Well, I think the idea --

23             MR. HOFMEISTER:  Objection.  It

24         is signed.

25             MS. RATCLIFFE:  I'm sorry, not

211

```
 1              NACHAWATI - CONFIDENTIAL

 2         dated.  I'm so sorry.  It's late in

 3         the day.  I'm tired, too.

 4  BY MS. RATCLIFFE:

 5         Q     You don't know why it's undated,

 6    correct?

 7         A     In a general sense, I think the

 8    idea was that everything would coincide

 9    when filed, right?

10              So that's probably why it's

11    undated, is my best answer to that

12    question.

13         Q     Okay.  And I think that we

14    established before that that was signed

15    somewhere in between the dismissal of the

16    bankruptcy and the filing of the new

17    bankruptcy, LTL II, correct?

18              MR. MONTEFUSCO:  Object to form.

19         A     That's correct.

20         Q     Okay.  And you signed the PSA

21    supporting the plan, correct?

22         A     On behalf of certain claimants,

23    correct.

24         Q     Do you support this plan

25    overall?
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 214 of 266                    Nabil Majed Nachawati
Confidential                                              May 24, 2023

212

```
 1              NACHAWATI - CONFIDENTIAL
 2                   MR. MONTEFUSCO:  Objection to
 3         form.
 4         A     There are too many things that
 5    we're working through, through mediators,
 6    with the idea of a pathway to a plan that I
 7    could recommend and support to the clients
 8    that it's appropriate for.
 9         Q     And referring back to the PSA,
10    which is Nachawati 6, in Section 2 of that,
11    the first portion, 2.01(a), indicates that
12    this document shall be binding on the talc
13    claimants.
14              But yet, you're sitting here
15    saying that there are pathways for this to
16    not bind them?
17              MR. HOFMEISTER:  Objection to
18         the form.
19              MR. MONTEFUSCO:  Objection to
20         the form.
21              MR. RASMUSSEN:  Objection to the
22         form.
23         A     They are not bound by what I
24    sign until they vote.  It's their decision.
25         Q     Right.  But you promised your
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 215 of 266        Nabil Majed Nachawati
Confidential                                          May 24, 2023

213

```
1                 NACHAWATI - CONFIDENTIAL

2      support, no?

3                     MR. HOFMEISTER:  Objection to

4            the form.  Asked and answered.

5                     This question has been asked

6            three different ways and it's been

7            answered the same way.

8                     MS. RATCLIFFE:  Okay.  I think

9            it's been answered circuitously,

10           but...

11     BY MS. RATCLIFFE:

12           Q      You support it with conditions,

13     is that correct?

14                    MR. HOFMEISTER:  Object to form.

15           A      We're working through the issues

16     that need to be addressed with the idea of

17     supporting a plan that I can recommend to

18     the clients it's appropriate for.

19                    MS. RATCLIFFE:  Okay.  I don't

20           have any further questions.

21                    Thank you, Mr. Nachawati.  Have

22           a good evening.

23                    THE WITNESS:  You too as well.

24                    MR. RASMUSSEN:  Does anybody

25           else have any before I ask just a few?
```

214

1        NACHAWATI - CONFIDENTIAL

2             MR. SILVERSTEIN:  I have a

3        couple of questions based on the state

4        of New Mexico's withdrawal of their

5        objection to Mr. Nachawati --

6        privilege objection to Mr. Nachawati

7        answering questions about the

8        termination of his services.

9             So I can do that before or

10       after.

11            MR. RASMUSSEN:  Go ahead.

12   EXAMINATION (CONTINUED)

13   BY MR. SILVERSTEIN:

14       Q    Mr. Nachawati, the counsel for

15   New Mexico withdrew any objection made

16   earlier and instruction not to answer my

17   question about your termination -- the

18   cessation of your serving as counsel to the

19   State of New Mexico in connection with the

20   Johnson & Johnson talc claims.

21            Were your services terminated or

22   did you withdraw as counsel?

23       A    The newly elected AG and -- you

24   know, I don't know exactly because I was

25   walled off from that, but the decision was

215

```
 1              NACHAWATI - CONFIDENTIAL

 2    theirs.  My understanding is the decision

 3    was theirs.

 4         Q     And was it based on a conflict

 5    of interest of you signing an agreement

 6    supporting a plan with which -- in a

 7    bankruptcy in which they seek dismissal?

 8              MR. HOFMEISTER:  Objection to

 9         form.

10              MR. MONTEFUSCO:  Objection to

11         form.

12         A     So following the dismissal of

13    LTL I, they're not included in LTL II.

14    They're conditionally carved out.

15              I had concerns of even filing a

16    motion to dismiss from my perspective,

17    because if you're not in there, you know,

18    you can probably file some statement

19    without submitting -- or consenting

20    yourself to the distinction of the

21    Bankruptcy Court.  But that's why the

22    conditional language of the carve-out was

23    there.

24         Q     You're not suggesting that New

25    Mexico requested that language, are you?
```

216

1              NACHAWATI - CONFIDENTIAL

2        A     My understanding of their desire

3    is to be in their State Court litigating

4    their sovereign claims that the AG has the

5    right to pursue.

6        Q     Right.  And they --

7        A     They do not want -- my

8    understanding is they do not want to be

9    involved as an AG in the bankruptcy, not

10   because of an actual conflict of interest,

11   but because of their belief with respect

12   to -- my understanding is, with respect to

13   the idea of the bankruptcy being filed and

14   the inevitably of me having to deal with

15   the situation not having control over

16   whether a bankruptcy is filed or not.

17       Q     Did you -- did you discuss with

18   any representatives of New Mexico your

19   signing a plan support agreement before you

20   did it?

21            MR. HOFMEISTER:  Objection to

22       the question.  It involves

23       communications that would be

24       privileged.

25       A     I was walled off from that,

217

1              NACHAWATI - CONFIDENTIAL

2      those communications.

3           Q      Walled off by who?

4           A      An attorney at my firm.

5           Q      So somebody else from your firm

6      spoke to New Mexico and you didn't, is that

7      what you're saying?

8           A      That's correct.

9                  We have multiple divisions in

10     our firm, and depending on the

11     circumstances, my understanding at a basic

12     level is that they did not believe there

13     was a conflict of interest from a legal

14     perspective.  From an optics perspective

15     and a public policy perspective, they

16     didn't like the idea of the bankruptcy.

17                 And to be frank, you know, I'm

18     not a fan of it either, but it was filed

19     nonetheless.  So, you know, as I said,

20     there's no one size that fits all clients'

21     situations.

22          Q      So New Mexico's views, as you

23     understood it, aligned with your views

24     expressed on May 24, 2022 to Mr. York about

25     the abuse of the bankruptcy system, and

218

1          NACHAWATI - CONFIDENTIAL

2    that did not align with you signing a

3    support -- a plan support agreement?

4               MR. HOFMEISTER:  Objection to

5         the form.

6         A    I'm not going to speculate on

7    what their views were at the time because I

8    believe that interview was in the context

9    of the tort claimants, not the Attorney

10   General case, because I'm not authorized to

11   speak publicly about what the Attorney

12   General may or may not want in its

13   assistance.

14        Q    Were you -- withdrawn.

15             I'm sorry.  I cut you off.

16        A    Well, I was just going to say, I

17   can't -- I can't speak on behalf of New

18   Mexico publicly because they have a

19   communications department.  Much like every

20   Attorney General's office, they handle the

21   communications about what's right for them.

22             So anything I say publicly is

23   only with respect to what I think is right

24   for my clients -- my tort claimant clients.

25        Q    Were you surprised by the

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 221 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

219

1               NACHAWATI - CONFIDENTIAL

2     termination?

3                MR. HOFMEISTER:  Objection to

4          the form.

5          A     I was.

6          Q     Did you have any discussions

7     with Mr. Murdica or anyone else

8     representing or acting on behalf of J&J

9     about your signing on to a plan support

10    agreement while you were counsel to a

11    sovereign state opposed to the bankruptcy?

12         A     I was very --

13               MR. HOFMEISTER:  Objection.

14         Objection to the extent it involves

15         disclosures that would be covered by

16         the NDA.

17         A     I was very clear prior to

18    engaging in any kind of agreement that

19    anything involving New Mexico was off the

20    table because you can't so much as move

21    without talking to them about what's right

22    for them.

23               And what's right for them is not

24    necessarily what's right for the OCs and

25    not necessarily what's right for the mesos

220

1            NACHAWATI - CONFIDENTIAL

2    because they all have different issues.

3        Q    Okay.  In response to a question

4    from prior counsel, you indicated that the

5    plan is not -- that the debtor filed is not

6    appropriate for all of your clients.

7                Which clients of yours is the

8    plan that was filed not appropriate for?

9    What were you referring to?

10               MR. HOFMEISTER:  Objection to

11          the form.

12               MR. MONTEFUSCO:  Object to form.

13          Misstates testimony.

14       A    I just think it's factually

15   specific, which is why I think it's

16   important that each claimant vote

17   individually, right?

18               You have certain gynecological

19   cancers where the causation is not as

20   strong as other cases.  Epithelial has very

21   strong causation.  Uterine, you know,

22   experts may say something different about

23   that.

24               Mesos and asbestos, there's a

25   reason I didn't include them in my 2019,

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC     Exhibit    Page 223 of 266          Nabil Majed Nachawati
                              Confidential                        May 24, 2023

                                                                  221

1               NACHAWATI - CONFIDENTIAL

2    and I was clear about that.  My former

3    representation to the State of New Mexico,

4    I was very clear I could not touch that

5    issue at all.

6               So, again, not a one size fits

7    all.  They all have different issues,

8    different considerations.  Not all of it

9    involves money.  It involves policy.  It

10   involves different considerations.  And

11   it's my job to do right by the client given

12   their certain circumstances.

13              And when I believe there's

14   something that would interfere with my

15   ability or my judgment, then even if it's a

16   perceived conflict, I wall myself off from

17   the situation, in a general sense, and, you

18   know, do what I need to do to make sure

19   that all my clients are adequately

20   represented and that what's right for them,

21   after receiving full disclosure, they can

22   make an informed decision.

23        Q    All right.  Just a couple of

24   follow-ups and then I'll turn it over to

25   Mr. Rasmussen.

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 224 of 266
Confidential
Nabil Majed Nachawati
May 24, 2023

222

1         NACHAWATI - CONFIDENTIAL

2              But you said -- you've said I

3    think a couple of times now that -- you've

4    made the point that your mesos were not

5    included in the 2019 that was filed by the

6    Ad Hoc Committee.

7              Do you have an understanding

8    that the plan that was filed by the debtors

9    on May 15th somehow treats your meso

10   clients differently than other meso

11   clients?

12      A    No.  It's simply that -- again,

13   that's a different partner that handles

14   those clients, but it's the simple fact

15   that what may be right for OCs may not be

16   right for mesos.

17             So in a general sense, that

18   question is posed.  And if the lawyer

19   responsible for that docket that has its

20   own set of considerations says, No, well

21   then they're not going to be on the 2019.

22      Q    So lawyers on your -- lawyers on

23   your -- in your firm who handle meso cases

24   did not support the plan support agreement,

25   is that fair?

223

1          NACHAWATI - CONFIDENTIAL

2               MR. MONTEFUSCO:   Objection to

3      form.

4      A     Not necessarily.  It depends,

5   right?  You're asking me to answer an

6   impossible question.  Just like when on the

7   TCC there are certain mesos that may

8   support a plan and may not.  Depends on

9   what happens.

10     Q     And when you were -- just so

11  that I understand, when you signed the plan

12  support agreement, did you only have

13  ovarian -- only your ovarian cancer clients

14  in mind and that you thought that the meso

15  clients were not -- you were not pledging

16  support on behalf of the meso clients?

17              MR. MONTEFUSCO:   Object to the

18     form.

19     A     It's -- those small number of

20  claimants had their own distinct issues,

21  and the decision, in a general sense, was

22  made not to include them by design because

23  what's right for them may not be right for

24  the OCs and vice versa.

25              So it's conditional depending on

224

NACHAWATI - CONFIDENTIAL

1    the client's situation.  I don't have total

2    visibility once certain things happen, like

3    a bankruptcy is filed, on the whys or the

4    wheres.  I don't have direct.  I have basic

5    understandings.

6           And so I'm trying to answer your

7    questions, but it can be difficult if

8    you're -- you know, you're giving an answer

9    and you follow what's right for that

10   client, but you don't necessarily know all

11   the details as to why.

12        Q    I understand.

13           But just so that we're clear,

14   the schedule -- the schedule to the PSA

15   that had the list of your clients with

16   redacted information that was attached to

17   the PSA, that did not include meso clients

18   either.

19        A    That is my understanding.

20           MR. HOFMEISTER:  Object to the

21        form.

22   BY MR. SILVERSTEIN:

23        Q    Okay.  And so you believed that

24   they were not being -- whatever you were

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
In Re: LTL Management LLC    Exhibit    Page 227 of 266    Nabil Majed Nachawati
Confidential    May 24, 2023

225

```
1               NACHAWATI - CONFIDENTIAL

2     agreeing to in the plan support did not

3     include your meso clients.  That's -- by

4     not including them, that's what you were

5     reflecting.

6               MR. MONTEFUSCO:  Object to form.

7          A     That's my point.

8          Q     Okay.  And just in terms of

9     the -- coming back to the -- what you said

10    before about how the evidence of scientific

11    support of causation between talcum powder

12    and the various gynecological cancer types

13    makes each individual claimant different,

14    did you have any concerns when you signed

15    the plan support agreement that --

16    withdrawn.

17              Did you have any concerns when

18    you read the plan that was filed that women

19    who have less of a basis of a claim because

20    of weak or scientific evidence could be

21    effectively foisting a plan on women who

22    have a stronger basis for their claims by

23    virtue of the number of women who fall into

24    one category versus another?

25              MR. MONTEFUSCO:  Objection to
```

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 228 of 266   Nabil Majed Nachawati
Confidential   May 24, 2023

226

```
                    NACHAWATI - CONFIDENTIAL
 1
 2          the form.
 3                  MR. HOFMEISTER:  Form.
 4          A       There are many things, again,
 5     that we're working through that we're
 6     trying to address with the idea of working
 7     towards plan that I can recommend and
 8     support to my clients.
 9          Q       And at this very instance in
10     time, you're not there yet, is that fair?
11                  MR. MONTEFUSCO:  Object to form.
12                  MR. HOFMEISTER:  Object to the
13          form.
14          A       I don't know because there's too
15     many variables in play.  So I can't answer
16      that, as I sit here today, other than what
17      I've already answered 100 times.
18                  MR. SILVERSTEIN:  Okay.  I have
19          no further questions at this time.
20          Thank you.
21                  MR. RASMUSSEN:  Okay.
22     EXAMINATION BY
23     MR. RASMUSSEN:
24          Q       This is Mark Rasmussen with
25      Jones Day on behalf of the debtor.
```

227

1          NACHAWATI - CONFIDENTIAL

2               Mr. Nachawati, thank you for

3     your patience today, and I'll be brief.

4          A     Sure.

5          Q     Earlier in the deposition, you

6     offered to identify the members of the TCC

7     in this bankruptcy proceeding who were in

8     favor of the proposed Imerys settlement.

9               Could you identify them for us?

10         A     My recollection is -- you know,

11    again, this is my recollection -- I believe

12    the two co-lead firms were in support of

13    the Imerys plan.

14              That's my recollection of the

15    MDL.

16         Q     And do you recall their names,

17    sitting here today?

18         A     I believe it's Beasley Allen and

19    Ashcraft & Gerel.

20         Q     Thank you.

21              I have just a few questions

22    about Exhibit 6, the plan support agreement

23    that you signed.  And if you need to look

24    at it, we can call it up.  I don't think

25    you will to answer these questions, but

228

1          NACHAWATI - CONFIDENTIAL

2     please let me know.

3          A     Sure.

4          Q     Do you agree that the

5     obligations imposed on the parties to the

6     PSA are still in effect today?

7          A     I do.

8          Q     And is it your intent to comply

9     with your obligations under the PSA?

10         A     If we work through the issues,

11    absolutely.

12         Q     Is it your intent to support the

13    debtors' plan consistent with the

14    obligations under the PSA?

15         A     And the conditions subsequent

16    and precedent, yes.

17         Q     It's your intent to comply with

18    the obligations under the PSA as expressed

19    there, correct?

20         A     And work through any mediation,

21    correct.

22              MR. RASMUSSEN:  Thank you.

23         That's all I have.

24              THE VIDEOGRAPHER:  Okay.  This

25         concludes today's deposition --

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
In Re: LTL Management LLC   Exhibit   Page 231 of 266
Confidential
Nabil Majed Nachawati
May 24, 2023

229

1      NACHAWATI - CONFIDENTIAL

2          MR. RASMUSSEN:  Actually, before

3      we go off the record, I'd like to

4      provisionally designate the entire

5      transcript as "Confidential."

6          And let's do what we've done in

7      prior depositions.  If any party wants

8      to designate portions confidential,

9      could we agree to do so in a certain

10     time period after we get the final

11     copy of this?

12         And I'll propose five business

13     days, unless folks want a different

14     schedule.

15         MR. SILVERSTEIN:  I'm sorry,

16     what's in five business -- I'm sorry,

17     Mark, what were you proposing in five

18     business days?

19         MR. RASMUSSEN:  I'm

20     provisionally designating the entire

21     transcript confidential and proposing

22     that any party that wants to go

23     through and mark portions confidential

24     under the Protective Order do so

25     within five business days after

230

1        NACHAWATI - CONFIDENTIAL

2    receiving the final copy of the

3    transcript.

4        MR. SILVERSTEIN:  That's the

5    obligation of parties seeking to

6    designate as confidential?

7        MR. RASMUSSEN:  Correct.

8        MR. SILVERSTEIN:  Is that

9    something different than what's in the

10   Protective Order?  Because I don't

11   recall.

12       MR. RASMUSSEN:  I don't think

13   there's a timeframe.  I think we just

14   kind of agreed to it given the exigent

15   circumstances of other depositions

16   that have occurred.

17       So we can do it longer.  We can

18   do it shorter, whatever.  But I'm

19   going to provisionally designate the

20   entire thing "Confidential," but I

21   will get you final confidentiality

22   designations after receiving the final

23   transcript.

24       MR. SILVERSTEIN:  Well, I'm just

25   going to revert to whatever is in the

231

1          NACHAWATI - CONFIDENTIAL

2    Protective Order that was just

3    recently entered.  I'm not familiar

4    with what it says right now.  But we

5    can take it up off the record, if

6    there's issues.

7          MR. RASMUSSEN:  Sounds good.

8          MR. SILVERSTEIN:  It's been a

9    long day, Mr. Nachawati.  Thank you

10   very much.

11

12          (Continued on next page to

13   include signature and jurat.)

14

15

16

17

18

19

20

21

22

23

24

25

232

1

2              THE WITNESS:  Thank you.

3              THE VIDEOGRAPHER:  This

4        concludes today's deposition.  We are

5        going off the record at 7:25 p.m.

6              (Time noted 7:25 p.m.)

7                      * * *

8

9

10

11                    _____

12                    NABIL MAJED NACHAWATI

13

14

15

16    Subscribed and sworn to

17    before me this     day

18    of            , 20__

19

20    _____

21    NOTARY PUBLIC

22

23

24

25

233

1

2    --------------- I N D E X ----------------

3    WITNESS            EXAMINATION BY        PAGE

4    NACHAWATI

5                      MR. SILVERSTEIN     10, 214

6                      MS. RATCLIFFE         194

7                      MR. RASMUSSEN         226

8

9

10    ------ EXHIBITS FOR IDENTIFICATION ------

11

12    EXHIBIT 1     Document entitled "Notice  17

13                  of Debtor's Motion for an

14                  Order Directing Plaintiff

15                  Law Firms to Disclose

16                  Third-Party Funding

17                  Arrangements"

18

19    EXHIBIT 2     Document entitled          55

20                  "Plaintiff's First

21                  Amended Complaint for

22                  Declaratory Relief,

23                  Damages, Restitution and

24                  Civil Penalties"

25

234

```
---------------- I N D E X -----------------

EXHIBIT 3      Article entitled "Federal   91
               Appellate Court Rejects
               Controversial J&J Ploy to
               Dodge Talc Cancer
               Lawsuits"

EXHIBIT 4      Article entitled          98
               "Bankrupting the Civil
               Justice System"

EXHIBIT 5      Term sheet, Bates stamped 140
               LTLMGMT-00002628 through
               640

EXHIBIT 6      Document entitle "Plan    150
               Support Agreement," Bates
               stamped LTLMGMT-00003498
               through 646

EXHIBIT 7      Screenshot of a text      161
               exchange
```

235

1

2      ---------------- I N D E X -----------------

3

4    EXHIBIT 8      Document entitled        168

5                   "Chapter 11 Plan of

6                   Reorganization of LTL

7                   Management LLC

8

9

10    EXHIBIT 9      Document entitled        173

11                   "Verified Statement of

12                   Paul Hastings LLP, Cole

13                   Schotz P.C. and Parkin &

14                   Rubio LLP Pursuant to

15                   Bankruptcy Rule 2019

16

17

18

19

20

21

22

23

24

25

236

1

2                REPORTER CERTIFICATE

3

4        I, JOAN FERRARA, do hereby certify:

5        That said deposition was taken at the

6    time and place herein named; and that the

7    transcript is a true record of the testimony

8    as reported by me, a disinterested person,

9    and was thereafter transcribed.

10       I further certify that I am not

11   interested in the outcome of the said

12   action, nor connected with, nor related to

13   any of the parties in said action, nor to

14   their respective counsel.

15       IN WITNESS WHEREOF, I have hereunto

16   set my hand this 24th day of May, 2023.

17

18

19

20

21   _____
         JOAN FERRARA, RMR, FCRR
22

23

24

25

237

1

2                    DEPOSITION ERRATA SHEET

3

     Case Caption:

4

          IN RE:  LTL MANAGEMENT LLC BANRUPTCY

5

6

          DECLARATION UNDER PENALTY OF PERJURY

7

8

          I declare under penalty of perjury

9

     that I have read the entire transcript

10

     of my deposition taken in the captioned

11

     matter or the same has been read to me,

12

     and the same is true and accurate, save

13

     and except for changes and/or corrections,

14

     if any, as indicated by me on the

15

     DEPOSITION ERRATA SHEET hereof, with the

16

     understanding that I offer these changes

17

     as if still under oath.

18

19

20     SIGNATURE_____DATE:_____
                NABIL MAJED NACHAWATI

21

22     Subscribed and sworn to on the ____ day of
       _____, 20__ before me,

23     _____
       Notary Public,

24     in and for the State of _____

25

238

1

2                    DEPOSITION ERRATA SHEET

3

4      Page No._____Line No._____Change
       to:_____
5      Reason for
       change:_____
6

7      Page No._____Line No._____Change
       to:_____
8      Reason for
       change:_____
9

10     Page No._____Line No._____Change
       to:_____
11     Reason for
       change:_____
12

13     Page No._____Line No._____Change
       to:_____
14     Reason for
       change:_____
15

16     Page No._____Line No._____Change
       to:_____
17     Reason for
       change:_____
18

19     Page No._____Line No._____Change
       to:_____
20     Reason for
       change:_____
21

22     Page No._____Line No._____Change
       to:_____
23     Reason for
       change:_____
24

25     SIGNATURE:_____DATE:_____
                NABIL MAJED NACHAWATI

239

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change
to:_____
Reason for
change:_____


Page No._____Line No._____Change
to:_____
Reason for
change:_____


Page No._____Line No._____Change
to:_____
Reason for
change:_____


Page No._____Line No._____Change
to:_____
Reason for
change:_____


Page No._____Line No._____Change
to:_____
Reason for
change:_____


Page No._____Line No._____Change
to:_____
Reason for
change:_____


Page No._____Line No._____Change
to:_____
Reason for
change:_____


SIGNATURE:_____DATE:_____
        NABIL MAJED NACHAWATI

## $

**$4-and-a-half** 38:6 39:2 40:10,14,16

**$500,000** 142:16

**$60** 96:6,16,17 97:4 203:5

**$61** 202:15,18

## (

**(c)** 22:9

## 1

**1** 17:23,24 18:25 19:2,3 104:15,17
122:3 176:14,15 177:22 199:11,25
205:3 233:12

**10** 233:5

**100** 105:4 164:19 166:5 168:9 182:6
226:17

**100-plus** 155:4

**10th** 162:12

**11** 134:23 151:7 168:18,25 169:8
185:21 186:23 235:5

**116** 178:12

**12** 42:14 43:15,20 55:17 186:14

**13** 150:18

**1377** 176:15 178:7,8,9 182:17

**13th** 13:21 14:2

**14** 23:23 24:12 25:2,17 28:15 37:14
46:12,21 51:8 53:7 54:11,25 60:25
61:10 62:6,20 63:17 68:4,10 69:21
70:3 148:14 149:23

**140** 234:14

**15** 76:22 161:21

**150** 234:18

**15th** 155:17 169:3 222:9

**16** 14:14

**161** 234:23

**168** 235:4

**17** 14:14 233:12

**172** 178:6,9

**173** 235:10

**194** 233:6

## 2

**2** 40:9 55:20,21 134:22 168:15 178:8
212:10 233:19

**2,000** 24:24 25:5 60:18,23

**2,500** 16:20

**2.01(a)** 212:11

**20** 79:13 232:18

**2003** 13:15

**2019** 141:10 143:11 173:22 174:7
197:6 206:14 207:16 220:25 222:5,21
235:15

**2020** 28:10 58:8,17

**2021** 23:23 24:12 25:2,17 28:16
37:14 46:13,21 51:8 53:7 54:11,25
60:25 61:10 62:6,20 63:17 68:4,11
69:21 70:3,9 123:10 148:14 149:23

**2022** 73:4 76:11 78:20 80:5 83:4
84:23 85:13 87:23 88:9 186:3 217:24

**2023** 9:4 70:17 72:7 91:22 92:20
94:12 95:7 98:24 99:18 100:3 102:21
103:14 104:25 108:3 111:4 133:3,23
182:3 205:3 236:16

**214** 233:5

**214-457-7260** 162:7

**22** 98:24 99:18 100:3 102:20 103:14
196:19

**226** 233:7

**23-12825** 9:11

**24** 9:3 73:4 76:10 78:20 80:4 83:4
84:23 85:13 87:23 88:9 186:3 217:24

**24th** 236:16

**26** 75:3,12

**27** 28:10 76:22

**28** 76:23

**289** 182:17

**290** 182:18

**291** 182:18

**2nd** 126:11

## 3

**3** 58:8,17 78:4 79:11 91:2,18,24
126:12 130:7 165:12 234:4

**3,300** 16:16 17:4 22:19 195:13

**3,500** 22:11,19 23:21 25:25 26:13,15
27:16 30:12 195:19

**30** 79:10,12 81:7 92:20 108:3 126:23

**31** 91:22 94:12 95:7

**32** 81:7

**33** 75:3 81:9

**3498** 151:5

**3646** 151:6

**38:05** 86:13

**38:56** 86:14

**3:03** 9:4

**3M** 103:12

## 4

**4** 18:17 70:17 72:7 75:20 79:10 98:9,
15,16 104:24 108:3 111:4 133:3,23
234:10

**4,949** 176:20 181:22 182:12 183:4

**4-and-a-half** 38:3

**4033** 10:21

**47** 175:2

**4:14** 67:21,22

**4:22** 67:23,25

## 5

**5** 17:16 140:2,5,6 204:10 206:7
234:14

**5,000** 75:20

**5,500** 24:13,15,19,22

**5-minute** 67:15

**50** 63:9 75:12 145:2 182:8

**500** 140:12

**51** 81:9

**524(g)** 158:24

**525** 169:4

**55** 233:19

## 6

**6** 21:24,25 150:19 151:14,16 173:16

195:17 206:5 210:3 212:10 227:22
234:18

**640**  140:7 234:16

**646**  150:21 234:21

**6:01**  161:6,7

**6:11**  161:8,10

―――――――

**7**

**7**  76:24 90:24 161:22,23 234:23

**75**  158:23

**75214**  10:22

**7:25**  232:5,6

―――――――

**8**

**8**  91:5 168:17,23 173:6 186:14 235:4

**8/12**  39:3 40:10,17 42:13 162:20
168:9

**85**  23:17

―――――――

**9**

**9**  130:4 173:17,18 182:2 183:5 235:10

**90**  23:13,17

**91**  234:4

**98**  234:10

―――――――

**A**

**A-1**  143:22

**A3**  141:18

**A4**  141:18

**ability**  53:20 81:17 167:4 221:15

**absence**  41:22 42:9

**absent**  59:25 165:9

**absolutely**  57:17 228:11

**abuse**  217:25

**abuses**  102:10,19

**abusing**  85:16

**accelerated**  208:3

**acceptable**  67:16 135:8

**accommodate**  11:13

**accountability**  95:4

**accountable**  82:13 84:8 152:22

**accurate**  14:17 22:15 71:17 123:4
195:25 208:6

**accurately**  204:5

**achieve**  101:9,21

**acknowledging**  132:6 187:25

**acting**  219:8

**action**  236:12,13

**actions**  169:20

**activist**  102:11

**activities**  71:2,25

**actors**  103:11

**actual**  72:9 133:25 216:10

**ad**  48:15 57:24 174:13 175:5,22
178:23 179:4 188:25 190:11,16
192:13 222:6

**Adam**  10:8,18 68:12,17 70:2 90:6
104:11 120:8 130:19 132:16 140:16

**add**  24:2

**addition**  155:4 202:16

**address**  10:16,20 73:25 74:5 101:17
226:6

**addressed**  213:16

**adequately**  221:19

**administrator**  36:12 208:10

**admitted**  14:19,21,23

**advance**  66:24

**adversarial**  158:8

**adversary**  56:9 190:19

**advice**  89:18

**advisable**  57:25

**advise**  120:18 158:20

**advised**  205:14

**Advocate**  125:6,19,24 126:16 127:6
137:20

**affairs**  43:14

**affiliate**  147:22

**affiliated**  39:17

**affiliates**  25:7,16 37:10,18 39:10
46:21 54:14 67:6 147:10 148:16
179:11

**afternoon**  10:7 194:12

**AG**  214:23 216:4,9

**agree**  155:7 158:2 171:20 172:25
228:4 229:9

**agreed**  66:22,23 131:7 132:5,10,12
134:17 140:19 155:16 159:17 230:14

**agreeing**  155:11 225:2

**agreement**  12:15,20 57:25 96:19
97:3 108:17,24 117:24 118:4,9,13,19
119:13 120:7 121:19 122:4,13,20,21
123:7,9 127:5,9 128:4,16 137:8
150:20 151:4,18 152:12,19 154:12,
15,23 155:7,20,25 156:7,24 157:2,7,
12,16 158:2,14 167:9,24 170:22
171:3 179:12,16 182:21 188:12 190:6
191:14 192:8 202:14,25 203:3
204:14,17 208:23 209:9 215:5 216:19
218:3 219:10,18 222:24 223:12
225:15 227:22 234:19

**agreements**  25:6,9 176:7 182:11
183:3,19 185:11,14 208:21

**AGS**  57:24 190:16

**ahead**  40:2 113:13 142:3 214:11

**Alan**  36:5

**align**  218:2

**aligned**  217:23

**alleging**  24:11 182:22

**Allen**  43:24 227:18

**Allen's**  43:22

**allowed**  35:25 77:22 78:23 95:2
152:17

**amazing**  115:22

**amended**  55:22 58:16,21 233:21

**America**  86:24

**Amex**  21:5

**amount**  38:2 41:7 47:15 149:14
207:22 208:8,13 209:10

**analysis**  65:4 142:9

**analyzing**  65:17

**Andy**  162:15

**answering**  123:14 152:6,12 175:16
191:12 192:24 199:20 214:7

**answers**  68:19 90:15 201:12

**anti-solicitation**  158:22

**anybody's** 140:18

**anytime** 59:5

**apologies** 91:4

**apologize** 24:18 37:2 140:3

**appalling** 57:23

**appeal** 32:23 73:16 97:22 165:11

**appealed** 77:13 87:15

**Appeals** 13:21 14:2 77:14,19 82:5 87:13

**appearing** 174:22

**appears** 11:18 91:22

**Appellate** 91:19,25 94:5 234:5

**appended** 138:9

**applicable** 184:6

**application** 188:24

**applied** 42:22 57:6

**appointed** 31:6,11,14 36:20 37:23 70:7 75:25 205:18

**appointment** 31:9

**apprised** 29:9

**approach** 113:10 114:11,21

**approached** 109:9 114:18 115:4

**approaching** 115:13

**appropriately** 96:11

**approval** 59:4

**approved** 44:25 46:7 158:23

**approximate** 16:20 28:13

**approximated** 17:5

**approximately** 14:13 15:19 16:7,20 22:10,19 23:21 24:10,13,15,23 25:5, 24 26:2 27:8,16 28:4 30:5,12 34:2 42:14 58:19 59:18 60:17,25 63:9 75:20 118:2,14,19 144:10,20 145:14, 23

**approximating** 197:2

**approximation** 16:16 23:16,17,19 30:9 33:2 196:6,8

**April** 28:10 70:17 72:7 104:24 108:3 111:4 133:3,23 205:3

**arise** 69:15 167:3

**Arkansas** 14:20

**arm** 127:20

**arrangements** 17:22 18:4,23 19:8, 24 233:17

**article** 78:4 91:24 98:16,22 99:8,18 165:12 234:4,10

**articles** 73:11

**asbestos** 51:16 52:8 61:19 86:24 199:3 201:4 220:24

**Ashcraft** 227:19

**aspects** 191:16

**asserted** 56:12

**assessment** 39:4 40:11,17 64:16 204:2

**assign** 204:18

**assigned** 64:15

**assist** 19:25 42:10

**assistance** 218:13

**assistants** 183:24

**assume** 11:7

**assuming** 34:16

**attached** 139:18 224:17

**attempt** 94:6 124:22

**attempting** 77:11

**attending** 9:14 132:5,11

**attorney** 29:9,14 35:8 36:4 37:9,17 39:18 54:13,21 57:2 64:15 67:5 146:13 217:4 218:9,11,20

**attorney's** 189:10

**attorney-client** 59:24 60:12 65:10 89:6,14 93:20 123:23 124:6 125:3 136:2,5 165:5 167:13,14,16 168:5 171:15 183:16

**attorneys** 69:13 174:20 183:22

**attributed** 93:4 94:3,12,24 95:6 96:11

**audio** 75:14 77:7 79:14 81:11 86:18

**auspices** 112:24

**authority** 189:18

**authorizations** 66:23

**authorized** 218:10

**automatic** 56:10 57:5

**Avarice** 162:20

**average** 146:16 147:11 148:16

**avoid** 87:19 88:15 94:6 95:3

**aware** 67:8,10 69:18 135:10 143:6 154:24 189:11 190:15 198:22 199:15 200:24

**B**

**back** 44:23 49:10 60:16 67:25 75:18 76:17 111:2 137:7 141:4,18 161:10, 13 191:23 209:16 212:9 225:9

**background** 13:5 179:2

**backyard** 57:16

**bad** 77:18 101:10 103:11

**bad-faith** 72:20 101:23 102:10,19

**balance** 81:22 82:9 83:13 84:5

**bank** 21:6,16

**bankruptcy** 9:8,9 16:18 19:6 23:23 26:17,24 27:7,18 28:8,22 30:14 31:4 36:10,23 37:6,14,24 38:12,18,19 39:13 42:18,20 45:4 49:12,14,21 56:9,19,23,25 57:11,19 58:2 60:20 64:23 65:15,20 67:2 70:9,16 72:3,20 75:17,24 76:15 77:11,12,17,20 78:6, 16,22 79:6 80:10 81:14,23 83:11,21 84:18 85:16 87:10,19 88:14 89:10,20 90:4 93:15 95:3 96:7,17,22 97:19 101:7,12,20,24 102:8 103:5,11 105:15 106:10 111:14 115:23 121:14, 16,17,21 130:15 134:2,22,24 138:21 139:4,5 146:11 147:7 148:14 149:15 150:8 152:16,17 153:9 158:6 164:11 165:2,12,21 169:20 170:17,19,24 171:2,10 172:17 173:21 174:6 176:8, 11 177:16 184:4,8 187:17,23 189:8, 16,17 190:4,19 201:21 202:6,19 203:15,19 205:8 211:16,17 215:7,21 216:9,13,16 217:16,25 219:11 224:4 227:7 235:15

**Bankrupting** 98:17,25 234:11

**banner** 91:23

**barred** 152:11

**based** 21:14 44:13 51:14 64:16 81:25 139:9 194:19 197:20 207:4 214:3 215:4

**basic** 101:11,23 217:11 224:5

**basis** 64:2,19 120:18 146:17 147:11, 23 149:6,13,22 192:23 225:19,22

**Bates** 140:6 150:20 151:5 234:14,19

**Bayer** 102:13

**bear** 73:20 98:8 130:3

**bears** 151:4

**Beasley** 227:18

**beat** 198:18

**beating** 124:16

**began** 58:21

**begin** 55:9

**beginning** 13:5 162:16

**behalf** 30:23 38:15 72:6 105:20 107:11 109:6,8 110:11,13 129:16 193:20 211:22 218:17 219:8 223:16 226:25

**beholder** 86:11

**belief** 51:14,21 57:21 64:3 216:11

**believed** 44:14 76:9 80:3,7 83:5,10 84:23 85:14 87:24 94:14 95:9 101:13 103:13 147:9 149:24 153:16 154:24 224:24

**believer** 57:13

**believing** 78:12

**bellwether** 33:2,15,18,23 34:3

**bellwethers** 32:25

**beneficial** 41:23

**benefit** 36:7,12,15,19 39:3 41:9 42:10,15,20 47:16 121:8 186:10,13, 19 187:2

**besties** 147:2

**Bible** 162:20

**bill** 115:23

**billion** 38:4,6 39:3 40:10,15,16 96:6, 16,17 97:4 202:15,18 203:5

**billions** 81:21 83:12 87:20 88:16

**bills** 190:19

**binary** 164:9

**bind** 158:18,25 212:16

**binding** 158:16 212:12

**Birchfield** 109:5 110:18 113:6 114:12,17,25 129:14

**birth** 178:17

**bit** 67:14 86:5 91:13 94:21

**blanket** 192:20 193:7

**blog** 92:11

**blow** 91:13

**bona** 103:8

**book** 59:11

**bound** 154:13 212:23

**break** 11:11,14 67:15 160:18,20

**breakup** 102:13

**Brewer** 28:20 29:2,23 30:7,11,13,21 70:6 72:6,16 93:18,23 123:22

**Brian** 12:14 192:4

**briefed** 34:20

**briefing** 34:25

**briefly** 13:16 137:2

**briefs** 53:11,14

**bring** 191:23

**brought** 122:4 140:17 170:18

**bunch** 20:14

**burden** 131:20

**business** 229:12,16,18,25

**byline** 99:17 100:5,11

**C**

**calculated** 176:25

**calculating** 177:7

**calendar** 35:18

**call** 44:15 109:18 110:4 174:13 175:3 185:2 227:24

**called** 10:2 35:17 44:7

**calling** 38:4 112:20

**calls** 47:13 115:15,20 121:23 157:19 165:5

**cancer** 22:11,22 23:6 50:16 51:3,17, 18,20 52:4,12,16 61:3,18 62:7,8,13, 21,22 63:18,19,21 64:4,7 75:21 77:21 78:23 82:22 85:4 87:11 91:21 92:3 138:7,12 143:20 144:21 145:24 146:16 147:23 148:17 149:5,12,22 181:23 182:12,22 183:4,13 198:3,4,6 200:21 223:13 225:12 234:7

**cancer-related** 61:22,24

**cancers** 64:14 198:12,23 199:5,16 200:14,18 201:2,8,19,23 206:10,23 207:5,14,24 209:4,11 220:19

**capacity** 71:4 103:23 106:24 107:9, 12 109:7 110:13 147:20

**Capital** 125:6,20,25 126:16 127:6,10 137:21

**carcinoma** 144:22 145:8

**card** 21:4,17

**cards** 20:9

**Carolina** 56:22,25 57:10,11

**carries** 159:3

**Carstensen** 9:15

**carve-out** 170:9 215:22

**carved** 57:12 169:24 170:6,20 215:14

**case** 9:10 17:8 26:17 27:7,13,22,25 29:12 43:23 44:12,15,16 50:7 57:9 61:21 62:4 63:3,5 65:22 69:6 72:20 79:6 90:3 93:15 104:10 106:22 107:15 111:3 117:10,13 121:14,17,21 130:15 134:2 139:4,5 148:17 153:7 158:4 159:3 164:10 176:6 177:8,16 183:21 185:3 202:11 218:10

**cases** 16:14,17 17:4,7,11 20:14 25:9, 10 27:12,15,24 30:5,10 32:11,14 33:3,7,9,16,18,21 49:24 50:9,13,17, 19,25 51:5,6,16,17,18,20 52:4,9,11, 13 65:11 69:10 115:16 144:5 147:12, 24 148:17 149:6,12,21,22 153:8,10 168:10 194:23,24 195:2,12,13,15,19, 20 196:3,13,20 197:7,9,14,15,20,23 205:2,6 220:20 222:23

**cash** 82:8 84:5

**categories** 180:4 198:15

**category** 145:7 225:24

**causation** 64:15 65:6,18 220:19,21 225:11

**caused** 86:25 182:22 200:14 201:3

**caution** 48:18 175:19 190:9 191:2

**CBF** 162:19

**cease** 71:24

**cell** 110:2 162:6,10

**Center** 13:14

**certainty** 105:4 134:15

**CERTIFICATE** 236:2

**certify** 236:4,10

**cervical** 62:7,13

cessation 214:18

challenging 44:11

change 59:17 148:18,24 149:22 185:13

changed 101:25 188:3

channeled 170:6

channeling 45:9,13

Chapter 168:18,25 169:8 185:21 186:23 235:5

characterize 150:6,7

charged 189:20

charges 162:19

chart 181:5

chat 73:25 74:5

check 29:8,15

checked 174:24

chief 90:3

choice 78:16

choose 53:2 54:3

chose 80:23

circle 117:7

Circuit 72:18 73:17 77:14 78:21 82:4 84:2 87:12 88:10 92:12,23 93:14 95:11 103:20 104:6,23 106:9,21 107:4,14 108:7 109:13 113:23,25 116:20 129:23 133:9,22 134:2,5,10 203:14

circuit's 107:2

circuitously 213:9

circumstances 10:11 59:23 63:4 159:7 217:11 221:12 230:15

civil 31:25 55:24 82:11 84:7 98:17,25 103:7 233:24 234:11

civil-justice 102:8

claim 30:7,11 61:12,15 118:21 178:18 179:25 180:3,17 200:25 225:19

claimant 44:5 62:7 109:7 165:9 204:16 218:24 220:16 225:13

claimants 10:9 16:8 22:7,11 23:6,8 40:17 45:3 61:17 62:20 70:8,21 72:6 128:7,19 145:24 150:2 176:20 182:12 183:4 202:19 205:14 206:11,17 211:22 212:13 218:9 223:20

claims 15:4 16:8 19:9 20:2 22:19,22 23:21,22 24:12,16,24 25:5,14,25 26:15,17,22,25 27:5,8,16 28:5,6,7,8, 14 31:2,4 37:8 43:3 45:3 46:12,23 49:10,13,17,20,23 51:3 53:15 54:11, 16,24 55:5 56:11 58:23 59:15 60:18, 23 61:2,3,9,11 62:5 65:17 67:4 69:21 70:3 77:23 78:24 80:23 97:11 108:10 116:5 117:20 118:21 127:15 146:16 153:18 181:24 182:3 194:22 204:19 208:3,9 214:20 216:4 225:22

clarification 108:15 120:15 141:8 142:7

clarify 52:6 194:19

clarifying 90:7

clarity 51:4

clear 15:14 31:11 60:4 90:10,17 110:9 127:23 133:8 157:24,25 163:7 186:15 189:4 198:19 219:17 221:2,4 224:14

clearing 127:21

clerks 13:25

clerkship 13:20 14:3,10

client 29:23 64:6 65:2,4 70:6 108:18 120:25 124:18,20 127:21 135:22 147:9,18 163:16 167:5 171:17 181:13 183:14 184:17 185:4 187:24 221:11 224:11

client's 108:10 224:2

clients 15:4,19 22:21 24:10 30:14,22 33:23 34:3 37:19 41:11,12,17,18,19, 20,21,23 42:6,10 43:3 45:17 47:21 53:6 61:22 62:12 63:15,17 64:3 65:12 68:21 73:13 79:24 80:15,20 89:3,12, 25 94:4,15 97:12 109:6,9,12 110:11, 14 113:3 124:5,25 129:16,24 138:8, 13 139:16 141:11,24 142:10,25 143:8,20 144:11,21 145:6,13 152:21 153:21 155:14 157:5 158:11,16,18,25 159:2 162:16 163:7,18,20 164:19,25 165:15,20 166:7,18,20 167:11 171:25 172:20 173:6 181:20 182:22 183:19 184:3,16 185:2,6,12,24 186:22 187:12 188:6,19 197:12 205:11 207:15 212:7 213:18 218:24 220:6,7 221:19 222:10,11,14 223:13,15,16 224:16,18 225:3 226:8

clients' 42:3 46:12 65:17 118:21 153:18 159:5 188:2 217:20

clip 75:14 77:7 79:14 81:11 86:6,18

clips 90:9

closed 11:21 104:11

CMOS 34:22

co-authored 99:2,11

co-counsel 27:19

co-lead 227:12

co-wrote 103:4

coincide 211:8

Cole 173:20 174:5 235:12

collaboratively 158:8

colleagues 103:22 104:23 105:14

College 13:8

column 180:6

columns 131:11

combination 29:17

comfortable 123:13

comfortably 149:11

commencement 139:4

commentary 179:24

commit 165:6

commitment 175:21

committed 72:19 80:13 164:25 165:20 205:21

committee 10:9 31:12,15 48:15 70:8,14,21 71:9,10,13,14 72:5 109:7 128:6,19 174:14,18,21 175:6,23 178:23 190:12,24 192:13,15 222:6

Committee's 179:4 189:2

common 19:13 36:7,12,14 39:3 41:9 42:10,15,20 47:16 49:25 66:19 69:13 133:20 186:10,13,19 187:2

communicate 124:19 185:5,12

communicated 105:13

communicating 128:14

communication 29:5 38:22 54:21 108:8

communications 46:8 66:14 89:15 105:21,22 106:12,17 107:18 111:19 112:17 120:4 124:4,5,25 128:2 135:21 137:17 190:11 191:18 216:23 217:2 218:19,21

Community 13:8

companies 83:12 87:16 88:12

**company** 39:18 81:21 82:8 84:4

**compare** 52:18

**compel** 19:6,22 20:19

**compensable** 198:8

**compensate** 149:21 150:2 202:16

**compensated** 149:13 198:24 199:17

**compensation** 149:25

**complaint** 27:2,10 30:23 33:6 35:22 55:22 58:16,17,21 233:21

**complaints** 26:18 31:24 32:18

**complex** 153:7,10 158:4 163:14 164:11,16 172:17

**complexity** 153:22 164:14

**compliance** 183:21

**compliant** 183:20

**complied** 184:5

**comply** 32:4 121:6 228:8,17

**component** 145:8

**composition** 61:8,11

**concept** 42:19 121:18 122:12

**concerns** 215:15 225:14,17

**concluded** 191:9

**concludes** 228:25 232:4

**conclusion** 157:20

**condition** 112:7

**conditional** 155:20,25 156:15 170:8 215:22 223:25

**conditionally** 169:24 170:20 175:24 215:14

**conditions** 170:10 204:23 213:12 228:15

**conduct** 83:20 85:15

**conferences** 34:12

**confidences** 171:17

**confidential** 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,14 67:1 68:1 69:1

70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,14,21,23 131:1,5 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1,2 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1,5,8,21,23 230:1,6, 20 231:1

**confidentiality** 131:8 132:8 140:20 230:21

**confirm** 208:5

**confirmation** 42:25

**conflict** 168:9,10 186:11,14 215:4 216:10 217:13 221:16

**conflicts** 167:10

**confusing** 19:19

**confusion** 133:21

**congratulated** 44:8

**connected** 236:12

**connection** 12:17 22:21 33:17 36:6, 14 43:2 48:7,13 52:3 53:7,14 56:9 58:22 59:14 66:15,25 70:25 77:10 105:10,15,19 106:7 141:9 146:11 167:8 177:19 179:11 189:19 199:24 214:19

**consensual** 171:8

**consent** 33:11 57:19

**consenting** 58:2 215:19

**consideration** 36:14 48:4

**considerations** 221:8,10 222:20

**considered** 198:11

**consistent** 17:14 143:2 228:13

**consolidated** 103:6

**constantly** 62:24

**constitute** 101:10,22

**consult** 12:6 167:22 168:7

**consultation** 64:18

**consulting** 64:19

**consumer** 169:19

**contemplates** 41:9

**content** 122:7

**contested** 179:21

**context** 24:4 42:23 46:6,23 52:8 90:4 108:10 122:3 218:8

**continue** 72:4 86:14 103:5,9 126:18

**continued** 70:13 214:12 231:12

**continuously** 70:15

**contributed** 47:20

**control** 53:20 150:9 187:16 188:5 216:15

**Controversial** 91:20 92:2 234:6

**conversation** 109:4 112:7,19 113:5, 11,14 115:8 137:4 146:24 205:23

**conversations** 38:24 39:16,22 46:16,19 47:9 69:19,25 118:14,20 119:9,21 136:16 152:2 192:10

**converted** 208:2

**convey** 142:24 146:12

**conveyed** 105:25

**copy** 120:10 229:11 230:2

**corner** 58:7

**corporate** 101:9,22 102:15 103:4

**corporation** 79:17

**corporation's** 102:14

**corporations** 81:15 82:19 84:25 87:9 94:25

**corpus** 204:19 205:16

**correct** 14:12 17:12 21:16 23:25 68:24 71:2,3,6,11,20 72:14,25 74:25 80:6,10,16,18 81:4 83:6,9,18,24 84:13 87:24 88:4,7,18,20,23 92:24 93:2 96:22,25 99:15 103:16 134:7 136:4 137:9 141:3 154:13 162:7,8

Case 23-12825-MBK Doc 855-20 Filed 06/22/23 Entered 06/22/23 15:15:28 Desc
Exhibit Page 248 of 266

In Re: LTL Management, LLC
Confidential

Nabil Majid Nachawati
May 24, 2023

170:8 171:3 196:5,14,21 197:9,15,21
198:15 202:7,20 203:10,11,15,16,21
204:10,24 206:12 207:24,25 208:10,
13 210:15,19 211:6,17,19,21,23
213:13 217:8 228:19,21 230:7

**correctly** 94:11 95:6

**correlation** 129:20

**counsel** 9:18 12:10 26:8,24 27:6,24
30:18 34:7 38:5 43:18 47:25 48:16
49:21 53:16 54:7 57:23 59:20 60:5,9
71:10,14 74:3 105:24 106:14 109:7
127:16 174:14 175:5,6,22,23 178:22
179:5 181:4 189:2,18 190:4,11,19
214:14,18,22 219:10 220:4 236:14

**counsel's** 189:2

**count** 27:15 140:12

**countenance** 21:4

**County** 13:7

**couple** 63:10 185:17 193:14 206:2
214:3 221:23 222:3

**court** 9:9,20,22 13:21 14:2 17:8,17
21:3 32:3,11,14 33:11 34:12,23 35:4,
10,16 49:14,17,20 50:4,12,17,20,25
51:6,11,19,21 52:10,13,17 53:12,15,
19 54:24 55:18 57:16 59:25 66:22
74:13 75:6 77:3,14,19,24 78:25 79:25
80:15,21,25 82:5,6,23 84:3 85:4
86:15 87:13,14 88:11 90:3 91:16,19,
25 94:5 95:16,18 97:19 98:14 120:16
121:6,11 123:18 136:11 140:4 153:9
154:8 158:6 165:11,12 167:17 170:23
175:14 176:11 189:11,18,22 191:7,22
196:14 215:21 216:3 234:5

**Court's** 32:4 121:7

**Court-ordered** 36:12 106:23

**courts** 26:3 32:12 103:9

**cover** 31:25 188:12

**covered** 48:9,18 154:6 161:17
171:15 189:3 192:13 207:18 219:15

**covers** 176:5 192:23

**create** 172:18

**credit** 19:12 20:9 21:4,5,17,18,19

**creditors** 76:2

**critical** 191:16

**crop-sciences** 102:14

**Curiam** 127:9 137:21

**current** 37:22 38:3 40:5 41:8 45:25

204:24

**cut** 32:8 37:25 218:15

**cynical** 94:6

**D**

**daily** 177:4

**Dallas** 10:21 13:10

**damages** 44:2 55:23 233:23

**Dan** 162:23

**dangerous** 82:10,14 84:6,9

**Darren** 29:19

**data** 177:22

**database** 183:14 184:17

**date** 9:3 18:6 22:8 30:17,19 55:13
56:3 72:10,12 92:5 98:20 140:10
150:24 162:2 168:21 173:24 178:17,
18

**dated** 91:21 211:2

**Daubert** 28:9,16,17 29:24 34:25
35:5,9

**day** 63:11 65:19,20 79:25 80:15,21
85:4 87:7 92:12,19,21 93:14,19
100:11 134:13 148:24,25 150:12
159:3 162:24 164:8 166:15 185:3
194:17 201:15 211:3 226:25 231:9
232:17 236:16

**day-to-day** 43:13

**Daylight** 9:5

**days** 204:4 229:13,18,25

**DC** 14:20

**dead** 198:18

**deal** 37:25 38:6 41:10 69:14 108:20
162:15 167:3 216:14

**dealing** 59:4,5 140:24 144:5,14,19
187:22 188:15

**dealings** 69:17

**dealt** 78:15 150:11

**Deane** 9:15 17:15 18:17 21:24 55:17
56:7 58:10 60:16 90:24 91:4,12 95:23
97:23 98:7 100:18,20 102:25 103:17
130:2 140:15 141:7,14 142:20 143:13
150:17 151:7 161:20 168:14,15
173:15,25 176:17 178:6,13

**death** 178:18

**deaths** 87:2

**debtor** 22:15 47:2 57:23 155:16
188:17,24 190:18 220:5 226:25

**debtor's** 17:19,25 18:20 22:5 165:16
208:16 233:13

**debtors** 169:4 186:24 208:15 222:8

**debtors'** 163:22 165:2,21 169:7,18
173:5 228:13

**decade** 152:20

**decades** 44:20,21,22

**decide** 86:23 166:21 187:17

**decided** 82:20 85:2

**decision** 28:10,17,18 29:25 45:17,18
72:17 103:21 104:6,24 106:10,21
133:10,22 134:3,6 159:5 212:24
214:25 215:2 221:22 223:21

**Declaratory** 55:23 233:22

**defendants** 103:5

**defense** 38:5

**define** 61:15 160:10

**delve** 15:13

**denial** 91:10

**denying** 82:22 85:4

**department** 218:19

**depend** 163:22 202:11

**depending** 63:23 148:23 162:17
177:4 217:10 223:25

**depends** 160:9 165:16 166:14,17
171:22 173:3 185:14 200:17 201:10
204:3 223:4,8

**depos** 51:11

**deposition** 9:6,12 12:3,6 38:8 50:3
120:12 130:7,10 163:5 227:5 228:25
232:4 236:5

**depositions** 10:25 31:17 33:16 51:7
52:2,21 53:6 229:7 230:15

**describe** 13:16 64:24 122:18

**deserve** 94:10

**design** 223:22

**designate** 52:10 229:4,8 230:6,19

**designating** 229:20

**designations** 230:22

**desire** 216:2

Case 23-12825-MBK    Doc 855-20    Filed 06/22/23    Entered 06/22/23 15:15:28    Desc
Exhibit    Page 249 of 266

Re: 23-12825-MBK, LLC
Confidential

Nabil Majed Nachawati
May 24, 2023

desperate 162:15

detail 62:9 197:18

details 27:21 45:23 155:3,8 158:3,7
180:13 224:12

determine 62:19 64:13 125:10
138:7,12 139:15

determining 77:15

developments 29:11 148:23

devil 155:7

diagnostic 143:21 144:11

dial 109:25

did-you 146:20

did-you-not 146:21

differ 184:10

differences 40:24

differently 20:17 222:10

differing 207:8

difficult 224:8

direct 60:12 224:5

directed 19:21

Directing 17:20 18:2,21 233:14

direction 177:23

directions 179:20

directive 120:15

directly 12:20 175:24

disagree 136:7 152:18 204:2

disagreed 40:21

disallow 189:20

disclose 17:21 18:3,22 19:23 20:20
21:14 48:20 59:23 123:25 124:10
135:24 136:6 137:10 151:25 167:10
171:16 175:13 192:10 233:15

disclosed 43:7 141:22 189:21

disclosing 21:4 125:5 138:16 144:4

disclosure 19:6 59:7 136:2 141:10
179:15 221:21

disclosures 219:15

discovery 33:4,7,17,21 54:3

discretion 208:9

discuss 114:21 116:3 121:10,14,18
122:11 123:19,21,24 127:4,8,13
136:12,20,24 137:11,19 216:17

discussed 114:11 190:23

discussing 25:25 119:20

discussion 48:11 122:9

discussions 12:22 38:16 54:12
71:9,13 103:21 104:5,22 106:8,22
116:4 151:25 190:4 192:11,12 209:10
219:6

disinterested 236:8

dismay 111:25 113:10

dismiss 203:14 215:16

dismissal 70:16 72:2,10,12 104:15,
17,24 105:16 106:21 107:5,15 109:12
113:23 114:2 117:12 121:13,17
129:22 132:24 133:3,7,9,23,24,25
134:5,9,23 139:3 203:15 211:15
215:7,12

dismissed 72:20 75:17 76:16 77:13
78:6 79:7 93:14 106:11 111:3,15
201:21 202:6

disposal 114:7

disposed 159:4

dispositive 165:10

dissolution 72:13

distinct 102:15 143:8 223:20

distinction 215:20

distinctions 207:3,7

distress 81:16 87:17 88:13

district 9:10 15:8 26:3

divisions 217:9

docket 27:3 34:21 43:13,14 109:13
112:4,24 169:3,4 176:12 183:22
189:4,5,7,8 222:19

dockets 69:14

doctors 201:11

document 17:18,24 18:9,12 24:5
55:21 56:6,8,17,18,19 58:7 63:12
91:18 92:8 100:8,23 111:9,17 119:25
121:9 130:5 132:21 150:19 151:3,8
152:13 153:15 155:11 159:8 168:17,
25 170:12 173:18 174:3,9 184:11
206:7,20 207:11 208:19 212:12
233:12,19 234:18 235:4,10

documentation 36:11

documents 31:24 32:17,20 114:5
198:5

Docusign 151:10

Dodge 91:20 92:2 234:7

dollars 81:22 83:13 87:20 88:16

door 11:21 65:23

draft 36:17 107:10 120:22

drafted 24:5

drafting 35:21

drafts 135:17

dragged 57:18

drill 33:14

Drive 10:21

dual 68:14,20 69:3,12

Due 153:22

duly 10:3

dynamic 178:4 190:15

E

e-mail 132:5 185:6

e-mails 140:21

earlier 52:7 129:11 163:4 193:24
196:18 197:6 209:15 214:16 227:5

early 30:24 117:4

Eastern 9:5

echo 37:2

economics 41:2

education 13:6

educational 13:5

effect 115:3 116:16 228:6

effectively 225:21

efficient 159:21

effort 138:6,11 139:14 183:11 184:14

efforts 32:4

EIF 41:9,23 42:7,21 47:17

elaborate 49:15

elapsed 118:3

elected 214:23

electronically 18:5 56:2 92:4 98:19
140:9 150:23 161:25 168:20 173:23

else's 41:20

**emotions** 93:13

**employees** 63:10

**employment** 13:17

**employs** 63:8

**enacted** 81:13

**encompass** 20:23

**end** 102:25

**endometrial** 180:24

**engage** 36:23 43:4 54:12 185:4

**engaged** 29:24 37:15 54:20 68:22
  127:25

**engagement** 176:6 183:8,12 184:15

**engaging** 219:18

**ensure** 94:8

**enter** 33:4 57:25

**entered** 96:21 123:9 231:3

**entering** 123:21

**entertain** 110:11 112:3

**entire** 229:4,20 230:20

**entirety** 70:19 169:13

**entities** 57:6,12 102:16 170:2

**entitle** 150:19 234:18

**entitled** 15:5 17:19,24 18:20 55:21
  57:14,15 81:25 91:24 98:16,24 151:3
  168:17,25 173:18 174:3 205:15
  233:12,19 234:4,10 235:4,10

**entity** 59:5,6,12 127:19

**enured** 36:19

**epithelial** 145:8 180:25 198:7 220:20

**essence** 205:24

**essentially** 12:5

**establish** 121:3

**established** 57:9 202:13 203:9
  211:14

**estimate** 159:25

**estimation** 177:14

**ethics** 167:22 168:7

**evade** 101:8,20

**evaluated** 143:19

**evaluation** 42:5

**evening** 194:13 213:22

**events** 65:7 171:22 173:3

**evidence** 200:13 201:9 225:10,20

**evil.'** 162:21

**evolving** 207:20

**exact** 160:15

**examination** 10:5 191:9 194:7
  214:12 226:22 233:3

**examined** 10:4

**exceed** 96:5,15

**exchange** 66:21 161:24 162:5
  177:20 234:24

**excluded** 141:11 143:11 197:24

**exclusion** 206:13

**Excuse** 74:8

**executive** 31:12

**exhibit** 17:23,24 55:20,21 91:2,18,24
  98:15,16 130:7,22 131:9 132:2,14
  139:23 140:2,5,6 143:22 150:19
  151:14,16 161:22,23 163:3 168:17,23
  173:6,17,18 176:15 178:10 182:13
  183:5 197:8 207:23 209:19 210:3,17
  227:22 233:12,19 234:4,10,14,18,23
  235:4,10

**exhibits** 206:8 233:10

**exigent** 230:14

**exist** 104:18 170:11 172:16

**existed** 59:24

**existence** 133:5

**expected** 10:12

**expenses** 36:5 69:6

**experienced** 173:14

**expert** 63:24 167:22

**experts** 43:4,6 44:13,14,16 52:10
  64:14,18 65:25 168:7 201:18 220:22

**exposure** 62:2,3 63:22 200:15
  201:3,5

**express** 146:8 147:3,8

**expressed** 163:5 217:24 228:18

**extend** 56:10

**extensive** 58:24

**extent** 66:13 89:5,14 121:23 123:4
  171:13 175:8 176:8 188:11 219:14

**extremis** 53:5

**eye** 86:11

**eyes** 94:22

---

**F**

**facilitating** 153:17

**facility** 19:12 21:19

**fact** 79:20 202:6 222:14

**factually** 220:14

**failed** 38:10 49:8

**fair** 25:12 46:17 49:4 71:15 72:21
  82:23 85:4,23 86:4 97:5,10 100:6
  118:7 131:16 132:17 135:16 149:2
  157:3 159:20 163:9,23 164:4 165:17,
  22 166:8,13 222:25 226:10

**fairly** 96:10 110:3 113:17 121:9
  149:4,12,21 150:2 185:24

**faith** 77:18 101:10 103:11

**fall** 143:21 225:23

**falling** 145:7

**fallopian** 63:18

**familiar** 10:24 45:8,18 56:17,18
  74:18 92:7,9 174:12,23 182:24
  184:12 204:8,21 231:3

**fan** 73:2 217:18

**fashion** 90:2

**fast** 74:20 86:12 133:15

**favor** 40:9 188:6 227:8

**FCR** 177:21 205:18

**FCR's** 205:25

**FCRR** 236:21

**Fears** 14:6 15:3,23 16:3 22:10,20
  27:6,9,18 28:5,14 29:24 30:6,10,22,
  25 184:16,17

**features** 47:18

**February** 98:24 99:18 100:3 102:20
  103:14 114:3

**Federal** 77:24 78:4,25 80:24 91:19,
  25 234:4

**fees** 12:17,24 69:6 175:22 189:2,10,
  20 190:17

**Feinberg** 103:22 104:5,22 105:9,14,
  21,25 106:9 177:21

**Ferrara** 9:21 236:4,21

**fervently** 83:6 87:23

**fide** 103:8

**fight** 87:6

**figure** 34:17

**file** 25:10 27:12,22,25 31:20,23 32:3, 4,5,11 50:4,9 64:16 69:2 81:23 87:9 135:10 176:10 187:17 189:9,17 201:22 215:18

**filed** 9:8 16:8,14,17,21 17:5,7,11 19:5 22:19 23:22,24 24:9,22 25:25 26:2,18 27:5,16 28:5,9,14,16 30:5,22 32:19 37:14 40:18 41:8 43:3,23 49:8,13,17 50:17,20,25 51:3,5,6 52:9,18 53:22 55:5 56:23 58:8,17 61:11 62:5,12 77:21 78:16,23 84:19 130:15 133:15, 16 134:19,22 148:14 149:15 150:8,9 152:17 153:11 155:17 168:10 169:3 185:22 187:24 188:4,24 190:17 194:23 195:13,15 196:13,16 211:9 216:13,16 217:18 220:5,8 222:5,8 224:4 225:18

**files** 28:2 54:5 62:24,25

**filing** 16:18 24:20 26:16,24 27:7,18 28:8,22 30:6,11,15 31:3,4 32:17 33:6 36:10,23 37:6,24 38:3,19 39:13 41:5 49:6,12,14,22 53:11,14 58:20 60:20 64:23 65:16 67:2 68:19 70:10 72:21 73:16 77:18 80:9 96:22 133:12 134:24 138:21 177:15 196:4 202:5 205:7 211:16 215:15

**final** 135:18 229:10 230:2,21,22

**finally** 11:17

**financial** 81:16 87:17 88:13 103:8 143:7

**financially** 101:6,19

**financing** 19:23 137:22

**find** 178:6

**finding** 75:24 87:16 88:12

**fine** 11:10 15:18 16:5 128:25 130:20 159:11,18 198:21

**fingertips** 26:6 30:17 62:15 145:12 180:14 197:18

**firm** 12:20,21 14:4,5,25 15:20,21,24 16:9 17:6 19:11,14,22 21:18 22:10 24:24 25:8 26:23 27:9,17,20 28:21 29:21 31:22,23 32:19 35:8 36:4,9 38:9 43:9 44:4 49:10,20 51:7,25 52:22 53:5,11,14,16 54:20 55:3,9

57:13 58:15,21 59:13,19 60:18 62:5 63:8 64:25 65:8 66:5,7,9 67:2 68:9, 22,23 75:19 92:23 99:14 137:22 143:8,25 176:19,25 177:2,6 178:11 179:4 180:4 182:4,20 185:2 217:4,5, 10 222:23

**firm's** 60:24 61:9,12 92:11 93:4,6 183:14

**firms** 17:21 18:2,22 19:7,14 22:6 227:12 233:15

**fits** 187:25 217:20 221:6

**flattering** 74:21,25 86:8

**floated** 116:8

**floating** 122:17

**flurry** 54:2

**flush** 82:8 84:4

**flying** 177:22 179:20

**focused** 19:19

**focusing** 102:17

**foisting** 225:21

**folks** 132:11 229:13

**follow** 59:8 131:21 166:21 224:10

**follow-ups** 17:2 221:24

**force** 136:9

**form** 29:5 47:3 61:13,14 62:21 72:8 76:12 79:3 80:11,17 81:2,3 83:8,15, 17,23 84:11,12 85:7,9,19,25 86:3 87:25 88:3,17,22 89:23 90:2 93:7,8, 16 94:18 95:12,13 96:24 97:7,9 99:22 100:13 101:15 102:2,22 103:15 106:4 110:22,24 112:14,15 116:18 123:12 124:13,14 126:2 128:21,25 137:25 139:6,12 146:4 148:2,4,19,21 149:17 150:4 155:18,19 156:19,21 157:9,19 163:11,12,25 164:3 165:24,25 166:10,12,24 167:19 168:2,4 169:22 172:3,5,9 173:7,8 174:15 175:7,18 179:13 180:7,19 181:8 182:20 184:19,21 186:5,7,9 187:5,7 188:9 190:8,25 195:4 197:16 199:7 200:16 201:25 202:9,22 203:23,25 206:18 208:24 209:13 211:18 212:3,18,20,22 213:4,14 215:9,11 218:5 219:4 220:11,12 223:3,18 224:22 225:6 226:2,3,11,13

**format** 47:12 54:7

**fortune** 165:18

**forward** 25:10 63:3 69:7 74:20 75:3

76:22 77:16 79:10 81:6 86:21 94:7,16

**forwarding** 86:13

**fought** 97:21

**foundation** 96:24 126:3 148:21 149:17

**frame** 50:24 135:12 143:9

**frank** 21:10 47:5 110:10 217:17

**frankly** 57:22 129:18

**free** 132:16

**French** 194:10

**fresh** 81:17

**front** 11:23 30:3 34:6 55:14 62:10 119:25 121:9 144:24 145:17 206:21

**full** 10:14,19 59:3 101:5 109:4 110:16 221:21

**full-time** 13:9,12

**fully** 110:18

**fund** 36:7,15 47:15,17 97:4 186:19 187:2 202:15,18

**fundamental** 191:12

**funding** 17:22 18:3,22 19:8,16,20 20:5,13,23 42:10 96:19 97:3 121:19 122:4,13,21 123:9 202:14,25 203:3 233:16

**future** 166:18 167:2 171:23 173:4,9 187:10 202:2 204:16,19

---

                    **G**

**game** 82:23

**Gary** 106:23

**gatekeepers** 187:20

**gave** 10:15 48:4 73:4 91:3 146:6,7 180:8

**general** 19:12 21:6,19 42:18 49:25 50:11 57:2 65:8 66:20 68:25 69:2,11 71:21 89:9,24 90:5 93:24 119:18 124:19,23 138:15 143:6 144:3,13 148:22 152:15 153:3,8 154:19,21 157:2 164:4 168:6 169:15 183:15,17, 18 184:11,12 185:5 190:20 211:7 218:10,12 221:17 222:17 223:21

**General's** 218:20

**generally** 32:2 43:12 47:8,12 49:23 61:20 65:21 68:15 71:16 80:12 112:21 135:8 144:18 177:18 189:11

198:3

**generated** 178:3

**gents** 162:24

**Gerel** 227:19

**Gibbons** 60:8

**give** 10:25 63:6 148:7 209:7

**giving** 80:22 224:9

**goal** 25:11 32:3 78:5 79:5 124:22
157:12 186:3 188:18

**good** 10:7,10 11:17 57:4 75:22
194:12 196:19 213:22 231:7

**Gorwitz** 99:3,10,13

**govern** 165:9

**government** 55:4

**governmental** 57:6,12 59:12 127:19

**grab** 162:22

**grade** 126:11

**graduated** 13:11,14

**graduating** 13:17

**graduation** 126:11,23

**granted** 20:19 21:13

**granular** 64:21

**grateful** 94:4

**great** 10:18 50:6 162:24

**greedy** 162:19

**Group** 14:7 15:2,23,25 91:23 135:23

**groups** 190:16

**guard** 103:9

**guess** 20:16 24:14 130:12 145:4
174:13 194:12 196:9,11 205:23

**guessing** 26:8 31:5 196:15 197:2

**gynecological** 62:2 198:11,23
199:5,16 200:14,18,21 201:2,8,19,23
206:9,23 207:24 209:3,11 220:18
225:12

H

**H1** 182:13 197:11 198:2

**Haas** 117:16 119:10,21 120:5 136:21

**half** 38:2 41:7 45:24

**hand** 78:15 150:11 236:16

**handle** 27:4 51:16 218:20 222:23

**handled** 35:24

**handles** 222:13

**handling** 43:13 69:6

**hang-up** 47:11

**happen** 166:15 171:22 173:4,13
188:22 224:3

**happened** 113:6 192:20

**happening** 89:10

**happy** 26:7 30:17 34:6 43:17 47:25
52:24 53:25 55:14 93:17 121:6,10
123:17 126:13 136:10 154:7 167:17
175:13 191:6

**hard** 105:6 115:17

**harder** 105:11

**Hartley** 194:10

**Harvard** 44:17

**Hastings** 173:19 174:4 235:12

**head** 29:18 206:25

**heading** 91:18 99:5

**hear** 76:6 178:24

**heard** 37:2 78:9 82:23 85:5 114:17
190:22

**hearing** 35:5,10 116:14

**hears** 75:7

**heart** 95:10

**heavily** 117:5

**heels** 135:14

**held** 82:13 84:8

**hereunto** 236:15

**Hey** 77:20 82:7 90:6

**high** 13:6 77:9

**high-level** 116:9

**higher** 13:6

**Highly** 130:14

**hired** 44:15

**history** 13:11 172:18

**hit** 75:5,11

**hoc** 48:15 174:14 175:5,23 178:23
179:4 188:25 190:12,16 192:13 222:6

**hocs** 57:24

**Hofmeister** 12:14,16 16:10 59:21
66:12 67:7,9 76:12,19 79:2 80:11,17
81:2 83:7,15 84:11 85:6,24 87:25
88:17,21 89:4,13,21 93:8 95:12 97:8
100:13 101:15 102:22 104:9,14
107:23 108:13 110:21 116:19,24
120:8,21 121:22 125:7 128:20 129:2
135:25 137:6,24 139:25 142:6 146:2
148:3,20 149:16 151:19,24 152:5
154:14 155:18 156:20 157:18 159:24
160:7,17,21,23 161:3 163:10 164:2
165:4,25 167:12,18 168:3 169:21
172:2 173:8 174:15 176:2 179:14
184:20 186:6 187:3 188:10 190:13
191:4 192:3,4 193:9 195:3 201:24
202:8 203:22 205:17 208:24 209:5
210:23 212:17 213:3,14 215:8 216:21
218:4 219:3,13 220:10 224:21 226:3,
12

**Hofmeister's** 12:25

**hold** 57:21 87:5 121:22 149:9 159:24
198:9

**holding** 160:3

**home** 10:16,20 160:8

**hope** 57:7

**hopeful** 75:16 76:14 77:19 78:21
82:4 83:25 87:12 88:10

**horse** 198:18

**hostile** 112:17 113:17

**hotly** 179:21

**hour** 67:14

**hours** 115:24 126:12 134:22

**Houston** 13:14,18

**hundred** 63:10

**hundreds** 81:21 83:12 87:20 88:15
164:6 197:4

**hypothetical** 202:11

I

**I's** 24:20

**idea** 33:7 57:17 144:14 153:3 157:2
163:15 164:17 172:15 187:11 188:18
210:22 211:8 212:6 213:16 216:13
217:16 226:6

**Ideally** 187:14

**IDENTIFICATION** 233:10

**identified** 33:8 47:15,16,17 60:21
154:4 182:13

**identify** 12:12 144:7 193:16 227:6,9

**II** 9:25 10:20 39:23 40:5 41:8 48:11,13
90:5 133:12,16 177:20 211:17 215:13

**imagine** 43:16 53:19 112:18

**Imerys** 37:24 38:12,18 39:12,19 41:3
44:23,24 45:12 46:7,24 47:14,19
48:7,13,25 49:5 146:11 183:25 227:8,
13

**immediately** 13:13

**implemented** 138:14 171:10

**implications** 143:7

**important** 29:11 73:11 220:16

**imposed** 228:5

**impossible** 63:13 223:6

**impressive** 44:10

**improve** 11:5

**in-person** 71:5

**include** 77:25 102:13 131:25 181:19,
21 198:10 206:8,10 220:25 223:22
224:18 225:3 231:13

**included** 29:22 198:2 206:14 207:16
215:13 222:5

**includes** 207:13

**including** 19:7 38:5 74:2 82:19
84:25 97:11 191:18 204:16 225:4

**inclusion** 181:4

**incur** 12:25

**individual** 109:11,13 110:13,14
112:3,24 113:3 129:16 225:13

**individually** 109:8 165:8 220:17

**inevitability** 187:23

**inevitably** 216:14

**inform** 109:17

**informal** 16:4

**information** 25:13,22 26:5 30:2
34:5,8 48:20 52:24 54:5 62:14 123:25
124:10 125:5,19,21 144:23 145:11,16
175:10 177:21 178:12,21,22 179:3,10
180:5 181:3,7 197:17 224:17

**informed** 93:23 109:14 221:22

**informing** 110:15

**inhalation** 62:3

**initial** 178:16

**initiated** 26:25

**injunction** 45:9,13 56:11 57:5

**injured** 87:3

**injuries** 24:11 82:2

**injury** 52:14

**inquiries** 205:11

**insolvent** 81:16

**instance** 79:18 226:9

**instruction** 144:2 214:16

**intake** 65:4

**integrated** 204:23

**integrity** 102:7

**intend** 49:7

**intended** 81:20 82:21 83:11 85:3

**intending** 127:14

**intense** 54:2

**intensified** 37:21

**intensive** 33:6

**intent** 81:14 110:10 167:5 228:8,12,
17

**intentional** 24:7

**interaction** 105:3 117:11

**interest** 167:11 168:9,11 215:5
216:10 217:13

**interested** 21:3 38:25 44:12 47:7,10
236:11

**interests** 42:4

**interfere** 221:14

**interject** 210:2

**internal** 103:8

**intervention** 165:10

**interview** 73:5,24 75:4 76:23 79:13
81:8 89:2 186:3 218:8

**interviews** 73:10

**introduce** 90:13

**introduced** 18:4 55:25 92:4 98:18
140:8 150:22 161:24 168:20 173:22
204:9 209:19

**inventory** 24:25 25:15 28:6,15 37:8

49:11 60:19,24 61:9,12 194:23

**investors** 102:12

**invoked** 131:23 191:11

**involve** 121:24 171:2

**involved** 45:13 53:21 117:6 130:17
155:3 216:9

**involvement** 30:24 31:2 56:21
105:20 106:8

**involves** 66:13 89:5,14 179:15
216:22 219:14 221:9,10

**involving** 127:18 219:19

**issuance** 93:9 153:23

**issue** 48:19 69:4 84:15 97:21,22
101:17 120:9 184:2 199:19 221:5

**issued** 28:18 29:25 42:13 72:18
92:12,23

**issues** 120:14 153:24 154:2,3,6,23
156:25 163:13 164:16 167:3 172:15
188:15 207:17 213:15 220:2 221:7
223:20 228:10 231:6

**iteration** 35:21

**iterations** 184:10

---

**J**

**J&j** 91:20 92:2 94:6 116:5 135:9,10
170:23 182:23 219:8 234:6

**J&j's** 96:5,15

**January** 91:21 92:20 94:12 95:7
108:3 133:22

**Jersey** 9:10 15:8 26:3 56:20

**Jim** 38:20

**JJCI** 96:20

**Joan** 9:20 236:4,21

**job** 73:12 152:24 221:11

**Joel** 106:24

**Johnson** 15:5,6,16 25:7,15,16 37:9,
10,17,18 38:16 39:9,10,17 46:10,20
51:7,8 52:2,21,22 54:13,14,22 55:5,
11,12 58:23 59:15 66:8,10 67:5,6
68:5,11 69:20 70:2 75:23 76:2,3
77:16 80:8 82:20 83:20 84:25 85:14,
22 87:8 88:20 89:19,20 95:2 96:19,20
97:3,4 103:12 142:23 146:13,14,15
147:9,10,21,22 148:15 149:25 171:3
179:10 187:16 190:3 191:19 214:20

**Johnson's**  83:20 85:15 149:25

**Jones**  226:25

**judge**  13:23 28:9 29:25 35:17 56:25
  57:4,10 78:3,4 134:9 165:12

**judge's**  184:7,8

**judges**  187:19

**judgment**  221:15

**jump**  193:18

**jurat**  231:13

**jurisdiction**  14:22 58:2

**jury**  82:24 85:5 94:8,16

**justice**  82:11 84:7 94:9,17 98:17,25
  234:12

                    **K**

**Kaplan**  56:25 134:9

**Kelly**  28:20

**Ken**  103:22

**kind**  47:10 219:18 230:14

**kinds**  179:19

**knowledge**  22:16 35:8,12 51:9
  125:14 141:9 179:23 182:14 183:2,6
  203:4

**Kyle**  60:8

                    **L**

**language**  215:22,25

**larger**  98:10

**largest**  76:2

**late**  159:14,15 211:2

**law**  13:13,14,15,18 14:7,19,22 15:2,
  23,25 17:21 18:2,21 19:6 22:6,10
  27:20 57:9 63:8 66:3 91:23 135:23
  176:18 177:11 233:15

**law.com**  98:24

**laws**  59:2 81:13,14 82:11 83:11 84:7
  87:19 88:14 95:3 152:16

**lawsuits**  91:21 92:3 96:4,14 234:8

**Lawther**  10:21

**lawyer**  73:12 98:23 99:13 100:5
  156:2 157:21 222:18

**lawyers**  27:4,12 29:21 33:20 34:21
  43:12 51:11,25 52:25 63:9 64:8
  115:23 148:6 176:9 183:23 189:9
  190:5 222:22

**layers**  183:21

**lays**  208:17

**lead**  27:9,12,23 28:2

**leadership**  31:7,10 35:24 36:18
  37:23 39:23

**leadership-anointed**  36:20

**leaf**  159:12

**learn**  111:22 190:3

**learned**  124:10 190:22 199:24

**leave**  86:10

**left**  14:10 24:6 160:5 208:8

**legal**  10:15,19 16:4 89:17 137:23
  157:19,20 175:22 183:23 217:13

**Legalcast**  73:6 74:17

**legislation**  187:18

**legislative**  84:14

**legislature**  101:17

**legitimate**  101:9,21

**letter**  184:15

**letters**  183:9,12 185:6

**level**  64:21 77:10 181:6 217:12

**Lexitas**  9:17,21

**liabilities**  88:15 97:5

**liability**  15:7 44:2 87:19 96:5,15
  101:8,21

**liberty**  59:22

**lifetime**  152:24 187:13

**Likewise**  50:8

**limitations**  66:2

**Linda**  13:25

**lines**  48:21

**list**  49:3 181:19 197:19 224:16

**listed**  195:18

**listen**  34:20

**listened**  80:4 83:5

**listening**  112:6

**listing**  197:7,12 198:2

**literature**  200:25 201:13

**litigate**  25:11

**litigating**  169:25 216:3

**litigation**  15:5 19:7 20:7,24 53:8,19
  55:11 57:15 66:20 68:18 71:8 78:2
  103:7 117:6 152:21

**litigations**  15:14

**living**  84:17

**LLC**  9:8 168:19 169:2 235:7

**LLP**  173:20,21 174:5,6 235:12,14

**load**  124:15

**loaded**  124:15

**log**  136:8

**lone**  117:14

**long**  15:11 103:4 106:2 133:13
  147:13 160:11 168:24 231:9

**longer**  13:23 14:15,23 130:21 160:2
  170:17 230:17

**looked**  48:6

**lot**  148:23 161:17 181:12,17 205:10

**love**  35:25

**lower**  149:9,13 150:2,6

**LTL**  9:7 16:19,23 19:5 24:19 25:22
  28:24 29:12 36:10 37:14 38:3 39:12,
  23 40:5 41:5,8 48:11,13 56:8,23
  64:23 67:2 68:18 72:3,13 73:16 80:9
  83:21 90:4,5 96:6,17,19 97:22 103:25
  105:11 130:17 132:24 133:3,12,16
  134:18,22 168:19 169:2 177:19,20
  188:4 196:5 202:14 203:5 211:17
  215:13 235:6

**LTL's**  38:19 49:6

**LTLMGMT**  151:5

**LTLMGMT-00002628**  140:7 234:15

**LTLMGMT-00003498**  150:21
  234:20

**lung**  51:20 52:4 61:2

**lurking**  46:15

                    **M**

**made**  45:16,17 76:10 78:11,12 83:4
  87:23 138:6 175:21 183:11 206:9
  214:15 222:4 223:22

**magnitude**  164:13

Case 23-12825-MBK Doc 855-20 Filed 06/22/23 Entered 06/22/23 15:15:28 Desc
Exhibit Page 255 of 266
Re: LTL Management LLC
Confidential
Nabil Majed Nachawati
May 24, 2023

**Majed** 9:7,25 10:20 160:17 232:12

**majored** 13:11

**majority** 17:10 22:23 23:2,6,11 25:9 26:12,14,15 27:11 61:17,21

**make** 47:23 59:3 77:12 81:19 82:12 84:8 90:10 98:10 110:9 123:3 138:11 139:25 183:20 195:8 198:19 199:23 221:18,22

**makes** 52:19 143:10 225:13

**making** 73:13 184:2,5

**man** 162:14

**management** 9:8 168:19 169:2 177:8 183:14,22 235:7

**mandates** 184:7,8

**manipulate** 87:18 88:14

**March** 58:8,17 76:10 78:19 113:20

**mark** 17:17 46:25 55:19 65:25 73:5 77:10 82:3 91:17 98:14 140:2 193:19 226:24 229:17,23

**marked** 90:25 130:6,13 140:4 151:2 161:21

**market** 82:10,15 84:6,10

**Marketing** 15:6

**mass** 69:12 73:5 74:17 117:6,8

**massive** 41:10

**master** 35:21

**material** 29:10 124:20

**math** 25:2

**matrices** 138:9

**matrix** 139:18

**matter** 9:7 66:20 89:9 124:3 127:2 191:20

**matters** 64:20 68:5,12 69:14 121:11 186:18

**Maune** 194:10

**MBK** 9:11

**Mcdowell** 29:20

**Mcevilly** 60:7,8 193:18,20

**MDL** 15:11,17 16:8 17:7,9,11 26:4, 16,19,23 27:2,5 28:21 30:6,11,23 31:7,18,23 32:16,18 34:13 35:17,22 40:18 41:15 43:4,21 45:4 50:9 51:2,5 52:19 62:6 90:3 168:10 194:23,24 195:13,15,16 227:15

**mediation** 66:15 71:12 154:10,12 188:13,16 192:11 228:20

**mediations** 71:19

**mediator's** 48:10 154:7

**mediators** 106:23 153:25 155:9 163:14 172:16 207:18 212:5

**medical** 64:12 65:16 66:10 67:3

**meet** 50:3 194:15

**meetings** 71:6 104:5 105:5,9 106:8, 22

**member** 70:14,20 72:17 107:20 108:11 128:6,18 147:6,20 174:17

**members** 29:20 37:22 38:7 40:5 106:13 107:11,21,22 110:19 227:6

**mention** 64:22 115:6

**mentioned** 65:5 90:7 126:25 183:4 186:2 192:8

**meso** 50:25 51:19 52:8 61:18 62:4 141:11,24 181:20,24 195:15,20 196:20 197:23 199:2 222:9,10,23 223:14,16 224:18 225:3

**mesos** 40:20 52:17 140:11,12,25 141:2 143:12 219:25 220:24 222:4,16 223:7

**mesothelioma** 23:8 50:19 52:4 54:10,24 61:2 62:22 75:22 139:15 142:9 180:18 182:3 194:22,25 195:12 196:3,13 197:9 206:11

**mess** 40:6,7

**message** 87:8 164:24

**Mexico** 14:20 55:8,10 56:12 58:22 59:14 60:6,10 97:12,14 127:16 170:5 181:21 193:21 214:15,19 215:25 216:18 217:6 218:18 219:19 221:3

**Mexico's** 59:2 169:19 214:4 217:22

**Michael** 99:2

**microscope** 63:11

**middle** 30:25

**Mikal** 68:5,17

**mind** 23:3 112:11 164:7 171:8 223:14

**mine** 205:25 206:13

**minutes** 75:3,12 76:22,23 79:10,12 81:7,9 126:23 134:23 161:2

**missed** 88:5 95:15 126:12 138:3

**Mississippi** 56:13

**Misstates** 146:5 181:9 202:22 220:13

**misunderstood** 193:25

**misuses** 103:10

**mix** 33:13

**moment** 45:20 73:21 74:12 98:9 127:3 130:3

**moments** 21:12 32:15

**money** 38:2 40:19 41:24 42:2,17 47:15 162:22 203:18 221:9

**Montefusco** 48:14,15 72:8 81:3 83:16,22 84:12 85:8,18 86:2 88:2 89:22 93:7,16 94:18 95:13 96:23 97:6 102:2 103:15 106:3 110:23 112:15 116:17 124:14 126:2 128:8 139:6,12 146:4 147:25 148:19 150:3 155:19 156:18 157:8 163:24 166:9 167:25 172:4 175:7,18,25 179:13 180:7,19 181:8 184:19 186:5 187:6 188:8 190:7,25 197:16 200:16 202:21 203:2,24 206:18 209:13 211:18 212:2,19 215:10 220:12 223:2,17 225:6,25 226:11

**month** 105:17 109:15 183:12 184:14

**months** 62:18

**motion** 17:20,25 18:21 19:2,3,5,21 20:19,22 21:13,25 32:22 34:25 54:2 203:13 215:16 233:13

**motions** 32:23 35:2 53:21

**mouse** 40:6

**mouth** 152:4

**move** 25:10 63:3 64:20 75:3 77:16 86:6,21 90:23 94:16 98:6 127:20 219:20

**moving** 79:9 81:6 177:5 178:3

**mucinous** 180:24 198:7

**Mudd** 194:10

**multi-billion-dollar** 82:7 84:4

**multi-district** 15:4,14 77:25

**multiple** 217:9

**Murdica** 38:20 39:8 46:9 108:8 109:9 111:19,24 112:9,16 114:22 115:13 116:14 118:15,22 119:21 120:5 121:15 127:13 128:2,14 130:6 136:13 146:25 219:7

Case 23-12825-MBK   Doc 855-20   Filed 06/22/23   Entered 06/22/23 15:15:28   Desc
Exhibit   Page 256 of 266

In Re: LTL Management LLC
Confidential

Nabil Majed Nachawati
May 24, 2023

**Murdica's** 113:9 114:11 130:7,9

**N**

**Nabil** 9:25 10:20 232:12

**Nachawati** 9:1,7,25 10:1,7,20 11:1
12:1 13:1 14:1,6,7 15:1,2,3,23,24,25
16:1,3 17:1,23 18:1,8 19:1 20:1 21:1
22:1,10,20 23:1 24:1 25:1 26:1 27:1,
6,9,19 28:1,5 29:1,24 30:1,6,10,22
31:1 32:1 33:1 34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1,17 49:1 50:1 51:1
52:1 53:1 54:1 55:1,19 56:1,6 57:1
58:1 59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1,3 69:1 70:1 71:1
72:1 73:1 74:1 75:1 76:1,5 77:1 78:1
79:1 80:1 81:1 82:1 83:1,3 84:1 85:1
86:1 87:1 88:1,6 89:1 90:1,25 91:1,7,
14,17,23 92:1,8 93:1 94:1,23 95:1
96:1,4 97:1 98:1,3,11,13,15 99:1
100:1 101:1,5 102:1 103:1,3 104:1
105:1 106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1 116:1
117:1 118:1 119:1 120:1 121:1 122:1
123:1 124:1 125:1 126:1 127:1 128:1
129:1,7 130:1 131:1 132:1,21 133:1
134:1 135:1,23 136:1 137:1 138:1
139:1 140:1,5 141:1,17 142:1 143:1,
17 144:1 145:1 146:1 147:1 148:1
149:1 150:1 151:1,11,15 152:1,10
153:1 154:1 155:1 156:1 157:1 158:1
159:1,10 160:1 161:1,12 162:1,6
163:1 164:1 165:1 166:1 167:1 168:1,
23 169:1,6 170:1 171:1 172:1,12,24
173:1,17 174:1 175:1 176:1,18 177:1
178:1,11 179:1 180:1 181:1 182:1
183:1 184:1,16,18 185:1,23 186:1
187:1 188:1 189:1 190:1 191:1,11,23
192:1 193:1 194:1,13 195:1 196:1
197:1 198:1 199:1 200:1 201:1 202:1
203:1 204:1,10 205:1 206:1,5,7 207:1
208:1 209:1 210:1 211:1 212:1,10
213:1,21 214:1,5,6,14 215:1 216:1
217:1 218:1 219:1 220:1 221:1 222:1
223:1 224:1 225:1 226:1 227:1,2
228:1 229:1 230:1 231:1,9 232:12
233:4

**Nachawati's** 28:15 31:2

**nail** 87:7

**named** 236:6

**names** 29:18 33:22 227:16

**nation** 97:17 153:8 158:5 164:12

**nature** 40:13,25 49:13,19 51:15

61:18 112:21 125:24

**NDA** 109:10 110:6,8 111:3,5,8,13,23
112:8,11,25 114:13,23 115:12 116:6,
25 117:3,17,20 118:3,8,12,18 119:11,
19 120:6,10,20 121:25 122:25
123:14,22 124:3,9 125:4,9 127:13
129:10,15 132:23 134:11 137:10
143:4 146:10 147:17 166:3 175:12,15
176:4 191:5,11 192:19,21 193:6
219:16

**necessarily** 24:9 115:9 219:24,25
223:4 224:11

**needed** 32:5

**negotiations** 37:7,16 188:13

**net** 42:16

**net-net** 41:10

**network** 73:6 74:17

**newly** 214:23

**Newswire** 92:19

**nice** 194:14

**Nobody's** 120:10

**non-disclosure** 108:16,24 128:3,15
137:7 151:20,23 152:12 154:15
179:16 188:12 192:7 209:8

**non-gynecological** 207:5

**non-mesothelioma** 206:17

**non-ovarian** 197:14,20 198:23
199:4,15 200:13 201:2,18,23 206:17,
24

**nonetheless** 217:19

**North** 56:22,24 57:10,11

**Notary** 10:3 232:21

**note** 151:2 167:19 199:6

**noted** 9:18 95:17 232:6

**notes** 196:7

**Notice** 17:19,25 233:12

**notices** 32:23

**notion** 97:18

**November** 70:8

**number** 9:11 16:14 20:9 22:7 23:7
24:8 27:15 32:12 45:2 52:15,16,18
61:4 69:10 75:22 115:15 162:7
176:20,24 177:3,7 178:2,18 195:20
196:3,19,21 223:19 225:23

**numbers** 151:5

**O**

**oath** 90:17

**object** 61:13 65:9 72:8 76:12 80:11,
17 81:2,3 83:15 84:11,12 85:18,24
86:2 87:25 88:17 89:22 93:7,8,16
94:18 95:12,13 97:8 100:13 101:15
102:2,22 103:15 112:15 116:17 122:2
124:14 126:2 139:6,12 146:4 147:25
148:3,19 155:18 163:12,24 165:24,25
168:3 173:7,8 174:15 175:7,18
179:13 180:7,19 181:8 184:19 186:5
190:25 197:16 200:16 202:21 203:24
206:18 208:24 209:13 211:18 213:14
220:12 223:17 224:21 225:6 226:11,
12

**objected** 172:8

**objection** 47:3 59:21 60:7 61:14
66:12 67:7,9 76:19 79:2 83:7,16,22
85:6,8 88:2,21 89:4,13,21 96:23 97:6
99:22 106:3 107:23 108:14 110:21,23
112:13 121:23 123:11 124:12 125:8
128:8,20,25 135:25 137:6,24 148:20
149:16 150:3 151:19 154:14 156:18,
20 157:8,18 163:10 164:2 165:4
166:9,11,23 167:19,25 169:21 172:2,
4 175:25 179:14 184:20 186:6,8
187:3,4,6 188:8,10 190:7,13 191:4
195:3 199:7 201:24 202:8 203:2,22
205:17 209:5 210:23 212:2,17,19,21
213:3 214:5,6,15 215:8,10 216:21
218:4 219:3,13,14 220:10 223:2
225:25

**objections** 95:17 176:3 193:24

**obligates** 157:17

**obligation** 110:10 113:3 124:21
129:17,24 230:5

**obligations** 121:7 157:7 228:5,9,14,
18

**observe** 130:9

**obtain** 183:12 184:15

**obtained** 183:9

**obtaining** 65:16

**OC** 140:12

**OC-ONLY** 195:16

**occasion** 98:5

**occurred** 104:17 230:16

**OCS** 40:19 140:25 219:24 222:15 223:24

**October** 23:23 24:12 25:2,17 28:15 37:14 46:12,21 51:8 53:7 54:11,25 60:25 61:10 62:6,20 63:17 68:4,10 69:21 70:3 78:18 148:14 149:23

**offered** 227:6

**offhand** 206:22

**office** 109:25 218:20

**Official** 10:9 70:7,14,20 72:5 128:6, 19

**Onder** 114:22 115:9,12

**one's** 179:21

**one-off** 49:24

**one-size-fits-all** 172:21

**online** 73:6

**open** 112:6

**operate** 19:14

**operating** 137:23

**opinion** 79:22 95:11 113:24,25 116:21 129:23 134:10 158:5

**opportunity** 36:2 80:22 94:9,17

**opposed** 28:17 57:17 61:18 62:3 97:18 219:11

**opposition** 32:22

**opt** 155:21 156:16

**opt-in** 46:3

**opt-out** 46:4 155:24 156:8

**optics** 217:14

**orally** 57:2 142:23

**order** 17:20 18:2,21 33:11 36:17 42:13 54:6 60:2 66:22 81:19 131:20 132:7,10 140:22 154:25 167:17 229:24 230:10 231:2 233:14

**orders** 121:6,11 123:18 136:11 154:8 175:14 191:7

**ordinary** 64:24 65:3,14

**organization** 81:18 174:13

**original** 49:8 56:23 196:4 202:13

**outcome** 236:11

**outline** 160:13

**outraged** 83:19

**outrageous** 82:3

**outset** 90:8

**ovarian** 22:11,22 23:6 50:16 51:2,17, 18 52:12,15 61:18,22,24 62:8,13,21 63:19 75:21 138:7,12 143:20 144:21 145:8,24 146:15 147:23 148:17 149:5,12,21 180:17 181:23 182:11, 12,22 183:4,13 195:19 197:14 198:3, 4,6 206:10 207:5,13 223:13

**overlap** 128:16 129:10

**overstatement** 166:8

**P**

**P.C.** 60:9 173:20 174:5 235:13

**p.m.** 9:4 67:22,23 161:7,8 232:5,6

**pages** 160:13 164:7 178:12

**paid** 12:17,19 176:9 189:17

**pair** 91:11

**papers** 31:23 32:22

**paperwork** 54:3

**paragraph** 21:25 22:4 101:5 195:17

**paralegals** 183:23

**parallel** 50:8 61:10

**parameters** 119:22 121:3 122:24 125:10

**Pardon** 172:7

**parent** 188:17

**Parkin** 173:20 235:13

**Parkins** 174:5

**part** 12:2,5 22:4 28:23 35:4,9 47:11 73:12 169:7 187:21 203:9,12 204:14

**participants** 9:14 50:2 174:25

**participate** 34:12,24 35:20 37:6 105:22 106:11,19

**participated** 39:16 71:5,8,12,18 103:21 104:7,21

**participating** 71:24 131:7

**parties** 33:12 41:25 66:24 101:7,19 103:9 228:5 230:5 236:13

**partner** 14:5,10 222:13

**parts** 73:23 113:16

**party** 12:23 20:6 131:21 229:7,22

**pass** 185:18

**past** 42:24 62:18 86:22 171:15 184:14

**path** 50:9

**pathway** 85:11 110:12 152:23 153:2, 4,6,13,16 154:18 155:13 157:3 158:9 163:16 164:17 172:18 212:6

**pathways** 113:4 212:15

**patience** 227:3

**patients** 149:5 183:13

**Paul** 173:19 174:4 235:12

**pause** 100:20

**paused** 74:22

**pausing** 74:14

**pay** 42:16,18 57:23 146:15 147:10,22 148:16 175:22 188:25 190:4,18 207:23

**paying** 42:12 81:24 83:14 175:5

**payment** 141:23,24 206:16 207:22

**payments** 206:9

**PDF** 18:18

**Penalties** 55:24 233:24

**pendency** 16:23 29:12 43:21

**pending** 11:15 26:16,22 51:19,20 78:2 142:8

**people** 39:22 43:16 81:24 87:3 114:18 131:6 132:4

**per-case** 146:16 149:6,13,22

**per-claim** 147:23

**per-ovarian-cancer** 147:11

**perceived** 221:16

**percent** 23:13,17 105:4 145:2 158:23

**percentage** 28:4,14 61:6 69:5 143:20 144:10,20 145:6,13,23

**percentages** 207:8

**perfect** 84:16 187:14

**period** 106:20 128:13,17 133:17,18 139:11 229:10

**periodically** 89:25

**periods** 121:24

**permission** 188:25

**permit** 124:9

**permitted** 88:14 125:16

**persists** 102:10

**person** 105:10 236:8

**personally** 33:19 34:11 54:18 104:7 143:23,24 145:10

**perspective** 165:11 215:16 217:14, 15

**pertinent** 22:4

**Petition** 22:8

**pharma** 102:15

**phone** 40:4 57:3 109:18 110:2,4 162:6,10

**phrase** 23:4

**pick** 33:12

**picture** 116:9 134:12 177:5 178:3

**pinpoint** 115:17

**place** 9:12 16:22 19:9,24 25:6 45:21 73:14 121:20 132:7 171:9 236:6

**plain** 94:24

**plaintiff** 17:6,21 18:2,21 22:6 233:14

**Plaintiff's** 55:22 233:20

**plaintiffs** 28:21

**plaintiffs'** 19:14

**plan** 38:10,11 39:12 40:9,13,15,16, 22,25 41:3,4,8 44:23,25 45:12,21,24, 25 46:3,4,7,24 47:14,19,23 48:13,25 49:5,8 94:19 117:24 118:4,9,13,19 119:13 120:7 122:19 123:7 125:20 127:5,8 138:14 142:25 146:12 150:20 151:4 152:19 153:3,19 154:11,23 155:5,16 156:6 158:10,20 163:8,17, 22 164:7 165:2,16,22 166:7,20 167:9, 23 168:18,25 169:8,18,20 170:5,11 171:10,21 173:5 179:12 185:22,25 186:23 188:18 190:5 191:13,17 201:22 203:20 204:24 206:16 208:3, 16 211:21,24 212:6 213:17 215:6 216:19 218:3 219:9 220:5,8 222:8,24 223:8,11 225:2,15,18,21 226:7 227:13,22 228:13 234:18 235:5

**planning** 90:12

**play** 75:5,11 76:23 79:12 81:8 90:11 150:11 226:15

**played** 75:15 76:9 77:8 78:9 79:15 81:12 86:19

**playing** 78:14 90:9

**pleasure** 194:14

**pledging** 223:15

**PLLC** 14:6,7

**Ploy** 91:20 92:2 234:6

**pockets** 42:3

**point** 11:24 15:21 36:3,22 37:5,13,22 48:11 76:14 79:5 80:14 108:17 116:8 117:23 122:11 126:7 130:16 146:9,10 147:16 156:5 163:8,19 164:24 165:20 171:23 204:13 222:4 225:7

**points** 124:20

**policy** 217:15 221:9

**pool** 33:4,7,15,21,24 34:4

**portion** 42:12 212:11

**portions** 229:8,23

**posed** 222:18

**position** 58:4 89:19 157:25

**possession** 200:12

**possibility** 170:18

**possibly** 106:15 109:10 119:3 139:13 146:18,21 182:9

**post** 109:12 123:14 143:4 191:5

**post-judicial** 13:20

**post-petition** 42:23

**posted** 92:19,21

**posture** 158:9

**potential** 38:17 54:23 167:10 185:2 202:15 205:13

**potentially** 68:21 205:7,15 206:24

**powder** 15:6,16 200:15 201:3,6 225:11

**practice** 14:9,19,22,23 52:3 64:25 65:3 66:4 137:23

**practices** 15:7 65:14,15

**precedent** 228:16

**precedes** 56:19

**precision** 16:15

**predecessor** 16:3

**predict** 202:2

**preferential** 50:6

**preliminary** 56:11 57:5

**prepare** 43:6

**prepared** 93:5 107:11

**present** 35:9

**press** 92:22 93:5 94:7

**pressed** 94:16

**pretty** 14:16 36:18 66:2,19 91:9 112:17 157:24 194:16

**prevent** 119:19 125:5

**preventing** 175:16 202:5

**previous** 194:20

**previously** 14:4 15:3 130:6

**primarily** 16:22 40:19

**prior** 16:18 25:16 28:9 30:6,14 36:10, 23 37:5,13 38:18 39:12 46:12,21 49:11,14,21 51:8 53:6 54:11,24 56:21,24 58:20 65:20 68:3,10,18 69:21 70:3 98:4 105:15 107:2,5,14 116:5,12,14 121:13,16 127:12 129:10,14 146:9 147:5,17 163:4 171:17 177:13 184:3 209:8 219:17 220:4 229:7

**privilege** 48:10,19 60:12 65:10 89:6 93:21 136:3 154:7 165:5 167:16 171:16 183:16 191:3 192:14 214:6

**privileged** 89:15 123:24 124:6 125:3 136:5 167:13 168:5 175:9 190:10 192:12 216:24

**privileges** 192:6 193:22

**problem** 67:17

**problematic** 193:2,7

**proceed** 9:24 132:16

**proceeding** 56:10 132:8 227:7

**proceedings** 12:3 51:12

**process** 58:25 66:16 164:9,10

**produced** 111:10

**producing** 131:21

**product** 82:10 84:6 86:24

**productive** 46:18

**products** 15:6,7 82:14 84:9

**professional** 13:17

**professionals** 176:9 189:9

**professors** 44:17,18

**profitable** 81:19 94:25

**promised** 212:25

**proportion** 40:20

**proportionate** 40:18

**propose** 229:12

**proposed** 38:12 39:12 40:25 41:3,4 44:25 45:5,12 46:7 47:19 48:6 132:9 169:7 186:24 227:8

**proposing** 229:17,21

**prosecuting** 20:2

**protection** 158:24 169:19

**protections** 103:10 131:22

**protective** 54:6 66:22 131:19 132:6, 10 140:22 229:24 230:10 231:2

**provide** 13:4 26:7 30:18 54:5 55:14 81:15 120:11 123:3

**provided** 11:25 18:5 25:13 55:25 66:7,9 67:3 92:4 98:19 140:8 150:22 161:25 168:20 173:23 178:22 179:3, 7,9 180:18 181:4

**providing** 25:21 180:5

**provisionally** 229:4,20 230:19

**provisions** 132:9 140:20

**PSA** 123:7 131:14 134:18 137:18 138:18 141:10 148:13 149:3,14,24 206:4 207:21 208:7 209:16,18,22 210:3,14 211:20 212:9 224:15,18 228:6,9,14,18

**public** 10:3 59:5,6 89:18 203:4 217:15 232:21

**publicist** 93:6

**publicists** 92:25

**publicly** 72:24 218:11,18,22

**published** 92:11 100:4,10

**Pulaski** 68:12,17 69:11 70:2 117:19 137:12,17

**Pulaski's** 68:23

**pull** 17:16 55:17 150:16

**pulled** 33:9

**purpose** 81:23

**purposes** 10:13

**pursuant** 26:18 58:25 66:21 138:8, 13 139:16 173:21 174:6 235:14

**pursue** 50:8,12 57:15 77:22 78:24 80:23 216:5

**pursued** 49:24

**pursuing** 129:13,15

**purview** 205:25

**pushed** 102:12

**put** 68:8 82:9,14 84:5,9 90:24 98:8 127:2 130:2,20 150:17 159:8 161:20 168:15 173:16

**puts** 131:20

**putting** 41:2 83:20 152:4

**Q**

**qualifications** 204:15

**qualify** 42:7 144:21 145:7,14,24 205:7

**qualifying** 204:19

**quarters** 23:12

**question** 11:7,15 19:18 26:20 28:11 30:8 36:8 37:11 45:6 56:14,15 60:13 61:14,20 68:19 71:22 74:10 83:8 92:16 93:22 99:23 106:2 110:22 116:18 118:16 122:24 123:3,6,14 124:2,8 128:21 129:6 141:20 142:7, 22 144:17 147:13 149:2,18 150:10,14 152:6,7 154:20 157:14 167:20 168:2 172:9 175:17 184:13,23 188:11 189:6,24 190:8 195:4,7 199:7,13,14, 21 200:3,23 202:9 203:25 204:6 206:15 210:10,13,14 211:12 213:5 214:17 216:22 220:3 222:18 223:6

**questioning** 129:12 193:25

**questions** 11:3 76:25 81:10 90:14, 16 120:4,19 126:13,14,18 161:17 171:14 185:18 191:13,24 192:2,25 193:14 194:6 206:3 213:20 214:3,7 224:8 226:19 227:21,25

**quick** 160:20 194:16 195:8 206:3 207:23

**quick-pay** 145:14,25

**quote** 94:3,11,23

**quotes** 93:4

**R**

**rabbit** 126:19

**Raichle** 194:10

**raise** 60:11 193:5

**raised** 192:6 193:22

**random** 33:12

**Rasmussen** 46:25 47:2 61:13 90:6, 20 99:21 112:13 123:11 124:12 130:19 131:3,13 132:3 140:16 163:12 165:24 166:11,23 172:8 173:7 186:8 187:4 193:13 194:3 199:6 210:2,7 212:21 213:24 214:11 221:25 226:21, 23,24 228:22 229:2,19 230:7,12 231:7 233:7

**Ratcliffe** 194:5,8,9 195:6,10 199:14 202:23 209:2,14 210:5,9,11,25 211:4 213:8,11,19 233:6

**re-review** 47:23 208:5

**reach** 93:18 170:22

**reached** 109:22 111:24

**reaching** 42:24

**react** 187:18

**read** 22:3 54:4 163:2 169:15,23 170:12 176:12 185:22 189:4,5 225:18

**readers** 91:10,11

**reaffirm** 102:7

**real** 160:20

**reality** 84:17

**realize** 130:13

**realized** 190:18

**reask** 195:6,7,9

**reason** 186:21 220:25

**reasonable** 86:20

**reasons** 187:8

**recall** 25:19,20,21,23 30:21 32:17 33:22 34:2,18 35:19 38:21 39:5,11, 14,15,21 40:24 44:6 45:15,23 46:9,14 47:4,8,20 54:17 58:19 59:9 66:18 68:7 69:22,23 70:4,11 73:8,15,18 89:7 93:13 99:7 104:4,8 105:2,8,11, 12,16 106:16 107:6,16,17 108:4,25 109:3,21,22 110:3 111:7,16 113:21 114:2,14,19 115:6,8,11,14 116:7,10 119:15,23 122:14,15 128:9,11 129:9 132:22 133:13 135:19 136:22 137:3 138:23 139:7 142:2,4 146:23 177:11, 17 180:12 183:25 200:11 204:20 209:24 227:16 230:11

**receive** 138:8,13 139:16 142:10,25 205:10 209:4

**received** 13:19 43:25

**receiving** 221:21 230:2,22

**recent** 30:14 48:8 86:22 102:6

**recently** 49:2 82:18 84:24 102:12 155:17 231:3

**recess** 67:22 161:7

**recollection** 13:22 30:4 32:24 33:5, 20 34:15 35:15 36:16 37:25 38:14 39:8 41:6 44:4 46:2 52:21 53:4,10,13 54:19 62:16 73:20 109:20 114:6,24 115:2 117:12 132:25 139:10 142:14, 17 144:25 145:5 148:9 181:5 208:4 227:10,11,14

**recollections** 53:23

**recommend** 153:20 155:14 157:4 158:10 163:17 164:18 165:14 166:19 171:25 173:5 188:19 212:7 213:17 226:7

**recommendation** 166:22

**recommending** 47:20

**record** 9:3,19 10:14 67:20,25 75:9 77:6 90:11 161:5,10 192:4 193:17 229:3 231:5 232:5 236:7

**records** 22:5 62:25 63:2 64:9,11,12, 17 65:5,17,24,25 66:8,10,21,23 67:3

**redacted** 54:6 130:25 131:2,4,10,12 178:16 181:5 197:8,12 224:17

**refer** 15:10,24 27:24 70:22 111:8,9 119:24 207:10 208:18

**referenced** 195:18

**referral** 27:24

**referring** 15:25 23:14 28:7 31:21 38:11 41:12 43:20 61:25 72:9 80:21 96:18 100:7 101:4 104:10 133:25 134:4 153:5,12 156:6,9 180:11 199:2 210:16 212:9 220:9

**reflect** 22:5

**reflecting** 225:5

**refresh** 73:20 114:6

**refusals** 192:9

**regard** 17:4 32:16 51:24 54:10 60:17 61:12 64:25 65:3,16 69:2 131:22 171:21 185:21

**regular** 90:2

**regularly** 117:8 168:6,7 185:5,11 205:11

**reimbursement** 12:24

**reiterate** 140:18

**Rejects** 91:19,25 234:5

**related** 19:16 61:19 63:22,25 64:13 199:3 236:12

**relating** 24:25 55:6 60:19,24

**relation** 57:20 68:17 195:23 201:18

**relationship** 59:24 125:24

**relationships** 68:16

**release** 66:23 92:22

**releases** 93:5

**relevant** 20:10 29:10

**Relief** 55:23 233:22

**relies** 137:23

**rely** 111:10,17 180:8

**remain** 102:9,18

**remains** 130:23 131:4

**remember** 40:21 74:16 113:11,14 128:23 179:17 180:11 181:15

**remotely** 9:14 18:4 55:25 92:3 98:18 140:8 150:22 161:24 168:19 173:22

**Reorganization** 168:18 169:2 235:6

**rep** 69:3

**repeat** 15:22 104:13

**rephrase** 99:24 106:6 205:5

**replacement** 13:24

**reported** 236:8

**reporter** 9:20,22 17:17 18:6 55:19 56:2 74:13 75:6 77:3 86:16 91:17 92:5 95:16,18 98:14,20 140:5,9 150:23 162:2 168:21 173:24 236:2

**reports** 43:7

**reprehensible** 82:19 84:24 85:15

**represent** 15:3 16:9,19 23:8 24:7,11 28:25 44:4 55:4,10 56:5 59:13 153:21 162:9 172:20 195:23

**representation** 12:25 221:3

**representative** 37:9,17 39:18 46:10, 20 54:13,22 67:5 70:25 71:19 72:5,16 103:23 106:25 107:13,19,20 108:11 128:5,18 137:20 146:13 147:6,20

**representatives** 71:10,14 105:23 106:13 107:22 110:19 204:17 216:18

**represented** 12:9 17:6 22:6 24:3

28:21 37:19 55:7 143:9 221:20

**representing** 9:16,21 10:8 12:13 22:20 58:22 73:13 130:17 174:21 219:8

**represents** 75:19

**reprint** 98:22

**reps** 68:14,20 69:12

**request** 43:18 64:9,10 65:24 189:17 190:17

**requested** 215:25

**requests** 179:19 189:10

**required** 32:3 45:3 63:2

**requirement** 189:12,15

**requirements** 59:7

**researching** 44:19

**reserve** 191:22

**reserved** 192:17

**resolution** 25:12 38:17,18 42:24 46:22 85:11 103:7 108:9 109:11 110:12 112:3,23 113:4 152:23 153:2, 17 155:2,13 157:3 164:17 170:16,25 171:6,7,9 172:19 187:12

**resolve** 69:7 127:15 146:15 147:11, 23 148:17 149:5 169:18

**resolved** 69:4

**resolving** 118:20

**resort** 45:4

**respect** 52:16 97:13 117:9 127:16 143:7 163:15 171:19 183:3 184:2,6 191:3 201:14 216:11,12 218:23

**respectfully** 159:17

**respective** 236:14

**respond** 143:10

**responded** 53:22

**response** 51:24 90:15 146:21 220:3

**responsibilities** 43:14

**responsibility** 94:7

**responsible** 42:12 87:6 175:4 222:19

**restate** 26:20 30:8 36:8 37:11 45:6 118:16 123:2 147:14 149:18

**Restitution** 55:24 233:23

**restricted** 125:18

restrictions 131:8

restructure 81:18

restructuring 101:10,22 103:8

resume 94:8 96:4,14

resumed 67:23 161:8

retain 64:19 65:25

retained 65:21 201:17

retainer 12:20 182:10,21 183:2,18
  185:11

retention 65:12

returned 186:25

returning 185:25 188:6

reveal 190:10

revealing 175:9

revert 230:25

review 49:7 64:17 107:8,10 125:10
  138:18 169:12,13

reviewed 48:12,25 49:5 135:7 169:6

reviewing 206:20

right-hand 58:7

rights 191:22 192:17

RMR 236:21

road 11:2

robust 122:8

role 31:7

roles 36:21

room 11:18

root 162:21

roughly 16:16 25:3

Rubio 173:21 174:6 235:14

Rule 173:21 174:6 235:15

rules 11:2 184:6 189:16

ruling 92:13,24 107:3,4,14 108:7

rulings 102:7

Russo 106:23

Ryan 48:14

                    S

sake 82:22 85:3

Sales 15:7

schedule 224:15 229:14

scheduling 126:25

Schneider 106:24

scholarship 13:10

school 13:6,13,15,18

Schotz 173:20 174:5 235:13

science 44:19 64:12 200:20

scientific 225:10,20

screen 12:2 17:18 18:9 73:23 74:6,7
  88:25 98:8 130:2 161:20

screenshot 74:21 161:23 162:4
  234:23

scroll 56:7 58:11,13 76:21 93:25
  100:17,24 102:24 139:21,22 174:2
  176:14 178:5,13

scrolling 93:11 95:22 102:4 176:17

seconds 75:4,13 76:22,24 79:10,11,
  13 81:7,9

Section 212:10

Security 178:17

seek 20:13 31:8 45:4 101:7,19 215:7

seeking 19:22 230:5

selected 33:10

selection 33:13

selections 33:3

self-contained 36:18

self-serving 42:13

sell 86:23

send 87:7 88:24 89:2

senior 45:19

sense 16:4 36:19 52:19 68:25 69:3,
  12 71:21 89:24 93:24 102:3 124:19,
  23 138:15 140:2 143:6,10 144:3,13
  152:15 154:19,21 157:3 166:4 168:6
  169:15 183:15,17,18 184:11,12 185:5
  190:20,23 211:7 221:17 222:17
  223:21

sentiment 163:5

separate 33:15

separately 69:11

separating 102:14

sequence 65:7

serve 70:7,13 72:4

served 70:24 72:16

service 70:20 129:21

services 214:8,21

serving 108:11 128:5,17 147:5
  214:18

set 96:4,6,14,16,17 143:8,22 159:6
  222:20 236:16

setting 50:6 97:4

settlement 36:24 37:7,16 46:11,19
  47:10 54:15,23 198:25 227:8

settlements 47:7

settling 25:12 38:25

share 23:2 73:22,25 74:6 89:8 98:4
  125:16,21 127:14 135:22 147:17

shared 17:18 74:4

sharing 88:25 125:19

sheet 84:5 107:18 130:20,22 131:15
  133:2 135:6,22 136:13,20,24 137:5,
  19 138:9,14,19 139:11,17,19 140:6
  141:22 142:11,15 143:2 145:15 155:6
  191:14 204:9,23 234:14

sheets 31:25 81:22 82:9 83:13
  107:8,11

shitty 162:18

short 38:24 46:16 47:9 112:18
  133:17 160:11

short-form 26:18,25

shortchange 87:11

shorter 230:18

shorthand 15:22

shortly 70:9

shot 74:25

show 132:14

side 52:16 127:2 208:20,22

sign 64:5 108:23 111:22 118:7
  132:13 140:23 151:18 185:4 205:11
  212:24

signature 58:11 128:3 151:10 210:4,
  6 231:13

signatures 184:15

signed 27:10 108:17 110:6,8 111:5,
  13 112:10,12 114:12,23 115:12

117:24 118:8,12,13,17,18 119:11,12
120:6,7,10,23 121:25 122:19 123:6,
22 125:9 148:13 149:3,14,24 152:13,
19,25 154:11,22 156:7,12,15 157:22
158:14 167:23 182:10 183:2,12,19
184:16 190:5 191:14 205:2 207:22
209:16,18,22,23 210:8,12,15,21,24
211:14,20 223:11 225:14 227:23

**signing** 27:20 109:10 110:5 111:3
112:8 116:6,25 117:3,17,20 118:3,4
127:4,8,12 129:10,15 137:18 146:9
147:17 153:15 155:11 157:11,13
167:8 179:12 215:5 216:19 218:2
219:9

**silly** 21:9

**Silverstein** 10:6,8 16:11 17:13 18:7,
16,19 21:23 22:2 24:18 36:25 37:4
42:19 45:7 47:6 48:23 55:16 56:4,22
58:10,14 60:14 63:13 66:18 67:12,18
68:2 75:2 76:4,20 77:2 78:7 79:9 80:2
81:6 83:2 86:9,12 87:21 89:16 90:18,
21 91:6,12 92:6 95:14,22 96:2 97:23
98:2,7,12,21 99:24 100:2,17 101:3
102:24 103:2,17,19 104:12,16,20
105:6 106:5 107:25 108:19,22 115:15
116:21 117:2,15 120:17 121:5 122:9
124:7 125:13 126:15 128:24 129:3,5,
25 130:8,11,24 131:9,16 132:13,17,
19 136:6,10 139:20 140:3,14 141:6,
13,15 142:12,19,21 143:13,16 144:16
147:14 148:25 149:19 150:15,25
151:9,15,17,21 152:3,9,16 154:16
155:5 156:3,22 157:10,22 159:10,16,
19,23 160:4,9,22,24,25 161:11,19
162:3 163:3 164:6 166:16 167:21
168:12,13,22 169:5,25 172:6,10,22
173:15,25 174:8 175:13 176:12,13,21
177:9 178:5,14 182:16,19 185:15,16,
20 186:11 189:25 191:8 192:16
193:12 199:9,12,18 200:2 214:2,13
224:23 226:18 229:15 230:4,8,24
231:8 233:5

**similar** 87:15

**simple** 94:25 222:14

**simplistic** 208:14

**simply** 187:18 222:12

**single-off** 52:11

**Sir** 151:13

**sit** 23:18 45:14 47:22 51:22 52:23
55:2 59:25 61:5 62:10 66:17 67:11
107:6 108:4,25 111:13,16 114:8
115:10 119:14 120:24 121:3 122:16
128:9 132:22 134:14 136:22 142:17
144:24 145:10,17 146:22 148:10

156:10 177:25 180:13 198:4,16
201:15 205:4,9 209:24 226:16

**sitting** 24:14 35:13 69:24 70:4 73:9
91:8 172:25 194:20,24 195:11 196:25
197:13 203:17 212:14 227:17

**situation** 163:14 172:21 207:20
216:15 221:17 224:2

**situations** 181:18 188:2 217:21

**six-plus** 44:21

**size** 45:24 187:25 217:20 221:6

**small** 23:7 32:12 52:15,16 117:7
195:19 196:3 223:19

**Smith** 43:25 44:7

**SMU** 13:10,12

**Social** 178:17

**software** 177:9 183:22

**sole** 81:23 208:9

**solution** 84:15

**solvent** 87:16 88:12

**son's** 126:11,23

**sort** 23:19 24:2 33:15 52:5 123:2
126:19 129:12 208:17

**sought** 19:17 20:5,23

**sound** 101:6,19

**sounds** 11:10 39:25 204:21 208:6
231:7

**source** 133:21 137:22

**sovereign** 57:18 58:3 97:18 170:2,
22 216:4 219:11

**sovereignty** 57:14

**space** 69:12 117:8

**speak** 41:20 117:16,19 218:11,17

**speaking** 32:2 39:8,11 65:22 68:15
71:16 80:12 144:18 178:25 198:4

**speaks** 163:3 207:12

**specific** 16:14 19:13 35:12 39:7
52:20 53:23 55:13 59:7 64:8 69:2
106:18 109:4 115:8,17 122:16 124:24
146:24 179:23 184:7,8 190:23 220:15

**specifically** 20:5,24 29:18 39:11
43:22 44:6 73:18 108:5 115:7 116:7
141:10 143:11 153:9

**specificity** 114:20 116:2 122:6
133:13 195:14 200:11 206:19

**specifics** 46:14 73:9 92:15 113:21
116:10 129:9 138:16,23 139:7 144:15
178:2 208:17

**speculate** 145:21 171:12 173:10
202:3 207:20 218:6

**speculating** 38:22 133:5

**speculation** 38:23 204:7

**speed** 161:14

**split** 40:18

**spoke** 115:12 217:6

**spoken** 72:23

**spokesperson** 89:9

**stage** 31:3

**stages** 30:25

**stamped** 140:7 150:21 234:14,20

**stand** 93:3 99:16

**standpoint** 66:4

**start** 37:3 81:17

**started** 44:13 90:8 142:15

**starting** 141:24

**state** 10:14 32:10,14 49:14,17,19
50:4,17,20,25 51:6,11,19,21 52:9,13,
17 53:11,15,19 54:24 55:7,10 56:12,
13 57:16,18 58:3 59:2,14 60:5,9
77:23 78:24 80:24 90:3 97:12,13,18
169:19 170:2,5,22 181:21 193:21
196:13 214:3,19 216:3 219:11 221:3

**stated** 30:16 172:14

**statement** 22:14 92:16 95:5 102:18
164:4 165:19 166:6 173:19 174:4
197:7 215:18 235:11

**statements** 76:8,9 78:8,11 80:3 83:3
87:22 99:17 100:4 176:10

**states** 9:9 97:16

**static** 178:4

**stating** 60:2

**status** 59:17

**statute** 42:22 66:2

**stay** 16:21 56:10 57:5 63:4 102:5

**stayed** 13:22

**steering** 31:15

**stenographic** 9:19

**steps** 59:8

**Stolz** 162:10,13

**stood** 100:3,11

**stop** 75:12 88:25 94:2 101:2 124:16

**straightforward** 66:3

**strategies** 171:18

**strategy** 49:25 50:11 71:9,13 105:22 106:12

**stretch** 75:8 160:8

**strict** 127:19

**strong** 220:20,21

**stronger** 225:22

**strongly** 97:17

**stuff** 199:10,24

**subject** 98:6 120:25 122:8 123:21 124:2,11 128:15 151:20,22 170:18 191:10 203:3

**subjects** 49:9 60:15 67:13

**submission** 177:13

**submit** 36:4,11

**submitted** 36:17 56:8 158:21,22

**submitting** 215:19

**subpoenas** 162:14,18

**Subscribed** 232:16

**subsequent** 49:5 228:15

**subsequently** 17:8

**substance** 29:7 119:20 135:21 137:16 144:4 153:24 154:5

**substantial** 17:10 22:23 23:2,5,11 26:15 27:11

**substantially** 24:8 131:10

**substantiation** 67:4

**substantive** 32:17 46:18

**subtype** 145:9 181:6 201:15

**subtypes** 63:21 64:4 143:21 144:12 180:22 181:12 198:6

**successors** 36:6,13

**suck** 170:24

**sucked** 97:19

**suffered** 62:7 63:18,20

**suffice** 59:10 73:2 115:19 146:25 173:13

**suggest** 67:15

**suggesting** 215:24

**summarize** 64:12 65:25

**summarizing** 62:25

**summary** 64:17

**Sunshine** 59:2

**supplement** 34:7 43:17 52:24 53:25 185:14

**supplemental** 47:24

**supplements** 184:9

**support** 117:24 118:4,9,13,19 119:13 120:7 122:19 123:7 127:5,9 150:20 151:4 152:19 153:3,20 154:12,23 155:14,16 156:7,17 157:4 158:10 163:17,21 164:18 165:2,21 166:7,20 167:9,23 173:5 179:12 188:18 190:5 191:13,17 211:24 212:7 213:2,12 216:19 218:3 219:9 222:24 223:8,12,16 225:2,11,15 226:8 227:12,22 228:12 234:19

**supported** 38:7 203:13,14

**supporting** 48:16 141:9 174:14 175:6,23 203:20 211:21 213:17 215:6

**supports** 200:25

**Supreme** 82:6 84:2 87:14 88:11

**surmise** 121:8 175:2

**surprise** 111:25 113:11 135:2

**surprised** 133:15,18 134:17 135:11 218:25

**surprisingly** 16:25

**suspect** 161:16 180:21

**Suzanne** 194:9

**swear** 9:22

**switch** 67:13

**Switching** 49:9 60:15

**sworn** 10:3 90:13 232:16

**system** 75:19 76:17 82:11,17,21 84:7 85:2,17 89:20 98:18,25 101:8, 12,20,24 103:6,11 186:2,25 187:15, 22 188:7 198:24 199:17 217:25 234:12

**systems** 102:8

**T**

**Tab** 17:16 55:17 90:24 91:5 98:9 130:4 150:18 161:21 168:15 173:16

**table** 127:23 219:20

**taking** 9:12 53:5

**talc** 10:9 19:9,13,16 20:2,6,14,24 22:7,21 24:11,25 25:15 28:7 30:24 31:2,4 33:3 37:8,18 44:5 45:3 46:12, 23 49:20 53:7,16 54:11 55:6 60:19,24 62:3,4,20 63:17,22 68:5,12,18 69:20 70:3,8,21 72:6 91:20 92:2 97:5 116:5 117:20 118:21 128:6,19 212:12 214:20 234:7

**talc-related** 55:11

**talcum** 15:6,16 200:15 201:3,5 225:11

**talk** 32:13 112:22 117:8 143:3 148:6 166:3 201:16

**talking** 15:15 23:22 32:21 41:16,17 73:15 88:19 122:15 131:14 140:11 160:10 200:18 201:4 219:21

**Tarrant** 13:7

**tasked** 34:21

**TCC** 25:22 37:23 39:23 40:5,9 70:22, 25 71:5,19,25 72:13,17 103:24,25 104:15,17,18 105:20,23 106:13,14,25 107:12,13,20,22 108:12 110:20 122:3 129:21 147:7,21 177:22 199:11,25 203:10,13 223:7 227:6

**TCC-1** 28:23

**TDP** 155:4 164:7 208:16

**team** 29:20

**teams** 29:17

**tech** 40:7

**telling** 65:13 87:4 181:11

**ten** 119:4

**tend** 68:8

**tenets** 101:11,23

**tentative** 37:25

**tenure** 13:25 16:23

**tenured** 44:17

**term** 107:8,10,18 130:20,22 131:15 133:2 135:6,22 136:13,20,24 137:4, 19 138:9,13,19 139:11,16,19 140:6 141:22 142:10,15 143:2 145:15 155:6

191:14 204:9,23 234:14

**terminated** 122:13,22 123:10 214:21

**termination** 121:19 214:8,17 219:2

**terms** 49:16 63:7 119:19 128:15
204:22 225:8

**terrain** 161:18

**territory** 170:3

**testified** 10:4 21:15 128:22 164:23
197:5 209:15

**testify** 129:11

**testimonial** 90:22 196:18

**testimony** 21:12 75:8 77:5 90:13,16,
19,22 146:5 181:9 194:20 195:21
202:22 220:13 236:7

**Texas** 10:21 13:22 14:2,20 57:2
98:23 100:5

**text** 161:23 162:4 164:24 234:23

**then-pending** 73:16

**theoretical** 102:3

**theoretically** 42:2

**thereof** 33:13

**thing** 24:2 79:17,19 80:9 87:13 88:11
90:7 113:8 230:20

**things** 79:22 148:24 161:15 212:4
224:3 226:4

**thinking** 52:7 131:13 168:11

**third-party** 17:22 18:3,22 19:16 20:6
233:16

**thought** 32:9 57:3 113:7 142:24
223:14

**thoughts** 98:4 171:18

**thousands** 87:2 96:3,14 115:20
197:3

**tight** 121:10

**til** 150:11

**time** 9:4,5 11:11 19:23 24:9,16,19
27:17 28:22 29:4,19 34:14,19 35:16
36:3,5,17,22 37:13,15,20 45:16,20
48:3,5 67:20,25 70:15 72:15,22
76:10,15 79:6 80:7,14 83:5,10,19,25
85:14 88:8 93:9 94:15,19 95:10 96:12
97:10,17 100:15 101:13,16 102:20
103:14 104:18 105:13 106:20 108:6
110:20 116:8,21,22 117:23 118:2,12,
17,18 119:10,11,12,22 120:6 121:24
122:5,12,24 123:8 127:22 128:4,13,

17 133:17,18 134:13 135:5,12,15
138:24 139:3,11 146:9,10 147:16
148:6,12 160:15 161:5,10 162:22
163:19 164:25 165:21 171:24 185:13
188:4,7 190:2,15,21 196:4 205:12
218:7 226:10,19 229:10 232:6 236:6

**timeframe** 107:24 108:2 129:20
137:14 230:13

**Timeframes** 105:11

**times** 29:10 61:17 64:6 105:9 164:20
166:5 222:3 226:17

**timing** 29:7 134:18 139:9 159:17

**tired** 211:3

**to-do** 49:3

**today** 9:17,20 11:2 12:10,18 13:2
16:10,11,13 23:18 24:14 33:25 35:12
39:14 45:14 47:22 51:22 52:23 53:24
55:2 57:22 58:5 59:25 62:10 66:17
67:10 69:24 70:5 73:9 84:18 88:9
90:17 107:7 108:5 109:2 111:13,17
114:8 119:15 122:16 128:10 132:5,23
134:14 136:23 142:18 144:24 145:10,
17 146:22 148:10 156:10 174:22
175:4 177:25 180:13 194:21,25
195:11 197:2,13 198:5,16 204:6
205:10,19 209:19,25 226:16 227:3,17
228:6

**today's** 9:3 120:12 228:25 232:4

**told** 120:22 129:14

**tolling** 25:6,8

**Tom** 193:20

**tomorrow** 173:11 188:22 198:9
204:3 207:19

**tooth** 87:7

**top** 29:18 91:23 100:8 178:7 206:25

**topic** 193:21

**tort** 73:5 74:17 75:18 76:17 82:11
84:6 117:6,8 185:25 186:25 187:15
188:7 198:24 199:17 218:9,24

**torts** 69:12

**total** 24:19 63:10 224:2

**touch** 120:14 221:4

**touches** 188:14

**track** 144:4 160:11

**traditional** 77:23 78:24 80:24

**trail** 126:19

**transcribe** 75:7 77:4 86:16

**transcribed** 75:15 77:8 79:15 81:12
86:19 236:9

**transcript** 193:4 229:5,21 230:3,23
236:7

**transfer** 13:10

**transferred** 17:9 26:4 56:20,24

**transparency** 59:3 109:5 110:16

**transparent** 110:18 129:13

**travesty** 79:23

**treat** 52:10 149:4

**treated** 185:24 186:23

**treatment** 42:7 145:15,25

**treats** 222:9

**trial** 25:11 33:9,10 49:24 50:4,14
183:23 198:25

**trials** 94:8,16

**true** 78:12 79:7,8 80:5 83:6 85:17,20
95:7,8,11,20 101:14 102:23 103:24
104:3 117:24,25 118:10 165:3 236:7

**trust** 45:5 47:16 170:7 204:18 205:16

**Trustee** 189:19

**tube** 63:18

**turn** 113:6 188:21 221:24

**two-year** 13:24

**type** 19:20 61:12,15 64:7,8 110:12
172:19 178:18 180:3 200:17,21 207:4

**types** 180:2,17 192:5 207:9 225:12

**typically** 52:9

---

**U**

**U.S.** 82:6 87:14 172:17 189:19

**Uh-huh** 203:7

**ultimately** 33:8 75:17 76:16 111:9
129:21 201:22

**unable** 111:12 170:21 171:23

**unaware** 68:15

**uncertain** 163:8

**unclear** 11:4,7

**undated** 210:6,13,15 211:5,11

**understand** 11:16 19:10 20:18 21:2,

6,20 23:10 25:2 30:20 44:24 51:23
112:20 126:13 154:16 155:10,15
157:6,12,22 169:17 170:11 188:23
223:11 224:13

**understanding** 12:16 40:12 45:11
122:20 123:8 125:15,18 132:4 133:20
141:19 156:11,14 157:16 158:15
170:4,15 181:25 197:10,23 198:19
202:24 205:20 215:2 216:2,8,12
217:11 222:7 224:20

**understandings** 224:6

**understood** 11:8 19:4,11,21 20:4,
12,21,25 21:13 40:23 217:23

**undertaken** 139:14 184:14

**undertook** 65:8

**unfiled** 24:12,16,24 25:5,14 60:18,23
61:9 62:12 194:24

**unidentified** 145:9

**United** 9:9

**units** 55:4 102:15

**University** 13:14,18

**unknown** 145:9

**unprecedented** 164:10

**unsigned** 120:22

**untrue** 165:22

**unwilling** 171:12

**update** 89:25

**updates** 185:7

**upper** 58:6

**URL** 73:25 74:5

**uterine** 180:25 220:21

**utilize** 180:4 182:21

─────────────

**V**

**value-added** 42:24

**variables** 148:24 166:14,25 226:15

**varies** 201:14

**vast** 26:12,14

**vein** 69:9

**vendors** 183:24

**venue** 44:11 80:25 103:6

**venues** 77:24 78:25

**verdict** 43:25 44:9

**verified** 173:19 174:4 197:6 235:11

**versa** 223:24

**version** 120:23 135:18

**versus** 34:18 46:3 51:16 197:14
225:24

**vice** 223:24

**victims** 75:21,23 77:22 78:23 82:23
83:14 85:4 87:11 159:3 202:16

**video** 9:6 90:9,12,19

**videoconference** 9:13

**view** 11:18 89:8 101:24 102:20 103:5
146:14 147:8,17,21 148:15 149:4,7,
20

**viewed** 97:2

**viewing** 140:18

**views** 217:22,23 218:7

**vigilant** 102:9,18

**violating** 108:18 121:2

**violations** 101:11,23

**virtual** 71:5

**virtually** 194:15

**virtue** 225:23

**visibility** 224:3

**voluminous** 115:16 168:24

**vote** 38:6 47:21 158:21,22 162:16
163:7,20,21 165:7,9,15 184:3 212:24
220:16

**voted** 38:9 41:3

**voter** 159:2

**votes** 45:2

**voting** 184:6

─────────────

**W**

**wait** 209:16

**wake** 95:10

**wall** 221:16

**walled** 214:25 216:25 217:3

**wanted** 110:9 194:19 199:23

**watched** 196:18

**Watts** 68:6,17 69:10,20 116:5,8,11,
13 117:5 122:12,15 136:25 137:4

**Watts'** 68:23

**ways** 82:21 85:2 164:21 213:6

**weak** 225:20

**weaker** 201:9

**web** 9:13

**website** 92:11

**weeds** 28:11 63:8 64:20

**week** 59:18

**weighs** 82:6

**weird** 184:23

**well-established** 134:21

**well-respected** 44:18

**West** 10:21

**wet** 112:9

**whatsoever** 126:25

**WHEREOF** 236:15

**wheres** 224:5

**whistle** 112:10

**Whitley** 57:10

**wholesale** 131:11

**whys** 224:4

**wife** 124:17

**window** 135:5

**Winikur** 36:5,13

**wise** 57:3

**wishes** 171:18

**withdraw** 59:19 193:23 210:10
214:22

**withdrawal** 214:4

**withdrawn** 26:13 28:3 35:14 39:6
40:23 48:4 53:12 60:21 61:7 62:17
63:15 66:6,8 78:18,19 93:12 107:9
111:20 116:3,12 117:22 121:15
125:16 128:12 138:25 143:18 144:8
147:4 149:6,8,10 153:14 154:10
156:13 158:13 171:6 179:8 180:2
186:20 210:13 218:14 225:16

**withdrew** 60:5 214:15

**wolf** 117:14

**Wolfson** 29:25 35:17 78:3

**Wolfson's** 28:9

**Womble** 190:16

**women** 75:20 94:9 225:18,21,23

**won** 97:22

**word** 92:17 169:16

**words** 47:11 76:6 116:16 152:4

**work** 53:2 62:19,23 68:9,11 82:20
85:2 115:24 143:24 153:24 154:2
188:16 228:10,20

**worked** 68:4 82:17 154:25 158:3
207:17

**working** 13:9,12 62:24 63:5 65:22
155:8 156:25 158:9 163:13 164:16
172:15 187:9 212:5 213:15 226:5,6

**works** 116:15

**world** 73:13 84:16 187:14

**worthy** 33:10

**wrinkles** 172:16

**write** 73:10

**written** 42:22 72:23

**wrong** 79:21 91:3

**wrote** 101:4,6 103:3 162:12

---

### Y

**Yanez** 13:25

**year** 44:5 88:9

**years** 13:8,20 14:14 37:21 42:14
43:15,20 55:15 115:20

**yes-or-no** 142:22 200:3

**yesterday** 205:19

**York** 73:5 74:15,16,23 186:4 217:24

---

### Z

**Zoom** 105:10