# Exhibit 23

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . | . | |
| LTL MANAGEMENT, LLC, | . | Adversary No. 21-3032(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | Clarkson S. Fisher U.S. |
| v. | . |  Courthouse |
| | . | 402 East State Street |
| THOSE PARTIES LISTED ON | . | Trenton, NJ 08608 |
| APPENDIX A TO COMPLAINT | . | |
| and JOHN AND JANE DOES | . | |
| 1 TO 1000, | . | |
| | . | |
| Defendants. | . | Tuesday, July 26, 2022 |
| . . . . . . . . . . . . | . | 10:04 a.m. |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day |
| | By:  GREGORY M. GORDON, ESQ. |
| |     DANIEL B. PRIETO, ESQ. |
| | 2727 North Harwood Street, Suite 500 |
| | Dallas, TX 75201 |
| | |
| For the Official | Otterbourg P.C. |
| Committee of Talc | By:  MELANIE CYGANOWSKI, ESQ. |
| Claimants 1: | 230 Park Avenue |
| | New York, NY  10169 |
| | |
| Audio Operator: | Wendy Quiles |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Official Committee of Talc Claimants 1: | Brown Rudnik, LLP<br>By:  SUNNI BEVILLE, ESQ.<br>     JEFFREY L. JONAS, ESQ.<br>One Financial Center<br>Boston, MA  02111 |
| | Brown Rudnik, LLP<br>By:  DAVID J. MOLTON, ESQ.<br>7 Times Square<br>New York, NY  10036 |
| | Genova Burns LLC<br>By:  DANIEL M. STOLZ, ESQ.<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920 |
| For the U.S. Trustee: | U.S. Department of Justice<br>By:  LINDA RICHENDERFER, ESQ.<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530 |
| For Aylstock, Witkin, Kreiss & Overholtz, PLLC: | Klee, Tuchin, Bogdanoff & Stern, LLP<br>By:  ROBERT J. PFISTER, ESQ.<br>1801 Century Park East, 26th Floor<br>Los Angeles, CA 90067 |
| For the Edley Family: | Cohen Placitella & Roth, P.C.<br>BY:  CHRIS PLACITELLA, ESQ.<br>127 Maple Avenue<br>Red Bank, NJ 07701 |
| For Travelers Casualty and Surety Company: | Simpson Thacher & Bartlett, LLP<br>By:  ANDREW FRANKEL, ESQ.<br>425 Lexington Avenue<br>New York, NY 10017 |
| For Ad Hoc Committee of States Holding Consumer Protection Claims: | Womble Bond Dickinson LLP<br>By:  ERICKA FREDRICKS JOHNSON, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |
| For Arnold & Itkin LLP: | Pachulski Stang Ziehl & Jones<br>BY:  LAURA DAVIS JONES, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |

APPEARANCES (Cont'd):

```
For Creditor Kristie      Kazan McClain Satterley & Greenwood
Lynn Doyle and            BY:  JOSEPH SATTERLEY, ESQ.
Kazan McClain:            55 Harrison Street, Suite 400
                          Oakland, CA 94607


For Paul Crouch,          Ruckdeschel Law Firm, LLC
individually, and as      BY: JONATHAN RUCKDESCHEL, ESQ;
the personal              8357 Main Street
representative of         Ellicott City, MD 21043
Cynthia Crouch's Estate:


For Unnamed Claimants:    Maune Raichle Hartley Frency & Mudd,
                            LLC
                          BY: CLAY THOMPSON, ESQ.
                          1015 Locust Street, Suite 1200
                          St. Louis, MO 63101


For Insurers as           Katten Muchin Rosenman LLP
Plaintiffs in New         BY: TERENCE P. ROSS, ESQ.
Jersey Coverage Action:   2900 K Street NW
                          North Tower - Suite 200
                          Washington, DC 20007


For Randi Ellis as FCR:   Walsh Pizzi O'Reilly Falanga, LLP
                          BY: STEPHEN V. FALANGA, ESQ.
                          Three Gateway Center
                          100 Mulberry Street, 15th Floor
                          Newark, NJ  07102
```

1          (Proceedings commenced at 10:02 a.m.)

2          THE COURT:  All right.  Good morning, everyone.  This

3    is Judge Kaplan.  We will start today's LTL Management, LLC

4    calendar.

5          We've had an off-record -- whoops.  We've had an off-

6    record --

7                          (Echo)

8          THE COURT:  Oh, is my -- that's not good.  Unmute me.

9                      (Echo continues)

10         THE COURT:  Do you want me muted or not?

11         THE CLERK:  (Indiscernible).

12         THE COURT:  You want me muted.  I am muted.  I take

13   that personally, you know.

14                        (Laughter)

15         THE COURT:  All right.  And there's no echo.  Good.

16         Well, I won't push buttons.

17         We had an off-record discussion on the order, and

18   we're going to start with the discussion relative to estimation

19   and the competing positions with respect to whether and how we

20   should move forward with estimation.

21         I've had, let's see, from the briefing, I think the

22   last submission was Mr. -- was the TCC's submission.  So why

23   don't we start from there and start with the debtor and have

24   them respond or make your presentation and then go forward.

25   Unless you wanted a different order.

 1          MR. GORDON:  No, Your Honor.  We're fine with that.

 2          THE COURT:  Okay.

 3          MR. GORDON:  Thank you.

 4          And we do have a PowerPoint presentation.

 5          THE COURT:  Of course you do.

 6                          (Laughter)

 7          MR. GORDON:  And hopefully, we've got someone behind

 8  the scenes here that's going to make that happen.

 9          Greg Gordon again on behalf of the debtor, Your

10  Honor.

11          THE COURT:  Thank you.  Good morning.

12          MR. GORDON:  Good morning.

13          So we in advance of the June hearing had submitted a

14  statement indicating what we thought the appropriate next steps

15  would be for this case.  And I think by the time we got to the

16  June hearing, Your Honor had had an opportunity to read that

17  and we tried to be very thoughtful about a way to move forward

18  with an estimation process that would both be shorter than what

19  we've seen in other cases and also be done in a way that would

20  complement the mediation process and hopefully provide energy

21  to the mediation process.

22          And at the June hearing, Your Honor indicated that

23  you were very seriously thinking about the retention of a Rule

24  706 expert.  And I think I indicated at that hearing that we

25  would go back and think about that.  That was something that

1    had not -- we had not considered before.  And we thought about

2    that, and we thought that that actually would be helpful in a

3    couple of ways.

4           And so when we filed our next pleading with respect

5    to these issues, we did build in the idea of an expert,

6    actually two experts in our view, which I'll go through in more

7    detail.  But again, fundamentally, we're just trying to come up

8    with an approach that we thought would complement the mediation

9    process and at the earliest time promote settlement in this

10   case, put the parties in a position to know a lot more about

11   where they are and hopefully get to a settlement in the near

12   term.

13          So if we go to the next slide, please.

14          So, Your Honor, as I was thinking about this and

15   preparing for today, what we're proposing in my mind is a kind

16   of a hybrid approach or maybe it's some sort of concurrent path

17   approach.  But there are three pieces to it the way I think

18   about it.  One is the estimation piece.  And we do think that

19   that's very important.  Obviously, we'd like to see an early

20   settlement.  We've said that from day one.  I think the parties

21   have seen how we've been acting in mediation.  I think

22   everyone's aware that there's a strong desire to settle as soon

23   as we can.

24          But we think we need -- at the same time we're trying

25   to mediate, we're trying to settle, that we need to have a

7

1  process, a litigation process in the background that will have

2  a number of benefits to the case.  One is it will maintain

3  everyone's focus on what is the primary issue in the case,

4  which is what is the extent of the company's liability for talc

5  claims.

6          The other is it will require the parties as they are

7  negotiating and discussing these issues to build support for

8  their positions, to hopefully get past a circumstance where

9  parties are just throwing numbers out with no real support,

10  with no real analysis.

11          The fact that there will be litigation imposes a

12  discipline and an orderliness to the process that we think will

13  be benefit everyone.  And it will avoid delay.  If mediation is

14  unsuccessful in the near term, we will have at least started

15  down the process to estimation and won't have to do this in a

16  sequential way where we've mediated for a while, then we have

17  to hit a pause and then come back and talk about estimation.

18  So we're advocating that this is a process that should start

19  right away.

20          And then, of course, the second part of what we're

21  proposing is we integrate mediation under the process itself.

22  And what we've tried to do is come up with ideas in terms of

23  where it would be appropriate to insert sort of fixed mediation

24  sessions into the process at key stages of the estimation.

25          And then the last part of our proposal involves using

1  the expertise of court-appointed independent experts to do two

2  things, really, to both facilitate settlement and then assist

3  the Court with the estimation itself and to assist the parties

4  with the estimation itself.

5          And, of course, as Your Honor probably knows from

6  reading our pleading, what we have in mind are subject matter

7  experts, experts who actually are going to bring to bear, you

8  know, real knowledge about the issues that in our minds are key

9  to coming up with an estimate of the company's aggregate

10  liability for talc-related claims.

11          Next slide, please.

12          Now the TCC and others are obviously proposing a very

13  different path.  In our view, there's lots of drawbacks

14  associated with the proposals that are being made.  The one

15  idea is that you allow the stay to be lifted to allow a group

16  of cases to go back to the tort system.  Initially, it was up

17  to 90.  Now it's 12.

18          But whether it's 90 or 12 or somewhere in between, I

19  think as we've pointed out in our papers, they're all cherry-

20  picked.  I mean these are cases that are in our view not

21  representative.  They're not random.  They're younger

22  plaintiffs, as an example.  And by their own admission, the TCC

23  acknowledges they're not going to provide any meaningful

24  information or any helpful information to the parties.

25          We already had I think close to 50 trials.  Doing a

1  few more whether it's 12 or 50 or 90, that's not really going

2  to help anything.  It's going to be a big distraction.  It's

3  going to cause delay.

4          Their other path that they're proposing is a plan

5  process which we believe is premature, and it's premature in

6  our view because there is no agreement at this point on the

7  liability and there's been no estimation of the aggregate

8  liability.

9          And it seems to us based on what we've seen that this

10 is a process that's designed basically to short-circuit the

11 debtor's rights to limit its ability to seek discovery that's

12 been granted in other cases, limit its ability to make its case

13 at confirmation, to make its estimation case.  And we don't

14 think that's the way to go.

15         In addition, it's going to layer on lots of other

16 issues and lots of other distractions with disclosure

17 statements and solicitation procedures and other things that to

18 us will take the parties eye off the ball which is trying to

19 come up with a settlement focused on what the aggregate

20 liability is here.

21         So in our view, fundamentally, the paths that the

22 other side is proposing are just in a way, it's just scorched

23 earth litigation that's going to do nothing in our view but

24 drive the parties farther apart.

25         Next slide, please.

1          So I'm not going to spend a lot of time on the next

2     few slides because I imagine Your Honor is familiar with this.

3     But we're basically proposing concurrent paths.  On the one

4     side, on the left here is the way we're envisioning an

5     estimation path.  And we've broken it into two phases, one

6     being what we call a medical science phase, the other being a

7     quantification phase.

8          And the reason to do that is we think it breaks the

9     issues up in a way that makes the litigation more manageable.

10    It also has the benefit of allowing the discovery with respect

11    to the second phase, the quantification phase, to go forward

12    while we're also making progress on the medical science phase.

13    So this is one of the features that allows us to, in our view,

14    dramatically shorten the process.

15         So on the left, it's really pretty straightforward

16    what we're thinking about in terms of the medical science

17    process.  We have the expert disclosures.  We have exchanges of

18    expert reports.  We then have expert discovery.  And then we

19    envision two separate hearings, one for the ovarian cancer

20    claims and one for the mesothelioma claims because the science

21    is different with respect to those.  And then there would be

22    post-trial briefing and preliminary findings.

23         And so, you know, our belief is that the parties

24    because of their experience in the tort system and the fact

25    that they've tried a number of cases will be in a position to

1 move forward with the medical science piece of the case very

2 quickly.  And so if you had a chance to look at the timeline,

3 you'll see we started virtually immediately.  If we had a go

4 from the Court with estimation this week, we believe the

5 parties are in a position within a couple of weeks to do the

6 expert disclosures and get started right down the path so that

7 we would have these hearings before the end of the year.

8         But at the same time, and hearing what Your Honor was

9 saying, we thought about these independent experts.  And I'm

10 going to come back to this.  We have them inserted into the

11 estimation process.  But maybe more importantly, we were

12 thinking that we would have a separate process moving forward

13 with them, as well, where the parties would be initially in

14 this first phase presenting to these experts their preliminary

15 estimation cases, both on medical science and quantification,

16 and that during this same time period, the phase one time

17 period, these court experts would come back having considered

18 the preliminary cases made by both sides and they provide their

19 preliminary views.

20         And to us, it's important that we have experts who

21 are experts in the subject matter because we believe that the

22 prospect of the parties having to appear in front of subject

23 matter experts to explain their positions and make their cases

24 and then having the opportunity to hear the benefit of their

25 views, that will have a dramatic effect, we believe, on

1  settlement negotiations.

2        And so that's part of the process.  And you can see

3  we have the mediation sessions are inserted all throughout on

4  both sides with respect to both sets of processes.  But the

5  idea is that we'd be using these experts for that benefit.  At

6  the same time, they're also going to be sitting in on the

7  estimation process and providing information to the Court, as

8  well, with respect to the scientific issues and the economic

9  issues that will be presented.

10        Next slide, please.

11        So phase two is very similar in terms of the

12  estimation.  The sequencing is very similar.  Here, there is a

13  fact discovery that we contemplate.  Again, that discovery

14  would start immediately even during the medical science phase.

15  We've talked about what we call the personal injury

16  questionnaires and the trust discovery which we think is

17  discovery that's key here.  We think a number of courts have

18  recognized that it's been found to be relevant and of real

19  importance to addressing the merits of the claims.

20        But, again, if you look at the sequencing very

21  similar the exchange of expert reports, the expert discovery,

22  then you have the quantification hearing on that side.  This

23  still all fits in less than a year under the schedule that

24  we're proposing.  And obviously, we're just throwing out dates

25  at this point.  But we tried to think through what the sequence

1    would look like, what would be a realistic time frame

2    considering the amount of work involved.  And it seem to us it

3    fits, it fits within the year time frame.

4              And then, of course, post-trial briefing, closing

5    arguments, and then a court ruling.  And, again, all of that on

6    that side will be informed by information provided by the

7    experts who not only will be listening to these presentations

8    on the right side of the slide but also will be sitting in

9    receiving the evidence, reviewing the reports, sitting in in

10   the hearings, and the like, with respect to estimation.

11             And then going to the right side of this slide, this

12   we call this independent expert process would continue into the

13   second and third stages.  We had the first stage where the

14   parties make their preliminary presentations in the fall on

15   both issues, both medical science and economic issues.  Now in

16   the second stage, we're further along in the estimation process

17   and, of course, I'm assuming there's not been a settlement by

18   then.

19             Now the parties are making updated case presentations

20   now having the benefit of reviewing the other side's expert

21   reports, having now conducted discovery.  They can update their

22   positions, and then we would ask as part of this that the court

23   experts would come back and provide their updated views based

24   on these new presentations made by the parties.

25             And then the third stage would ultimately come after

14

 1 we have the hearing but before there's a ruling where the court

 2 experts now having sat through the entire estimation process,

 3 still no settlement, would express their final views and where

 4 they are on the issues that have been raised by the parties.

 5 And that would come before a court ruling.  It would create

 6 like a final opportunity before a ruling for another mediation

 7 session in an effort to settle.

 8         So we've got these three phases of the expert

 9 process, each one followed by a mediation, and then we have at

10 the same time the estimation moving forward with mediation

11 sessions inserted into that process so that at all these

12 points, the parties have opportunities to come together based

13 on better information and a better understanding of their own

14 positions and the positions of other parties to see if we can't

15 reach a settlement.

16         Next slide, please.

17         So, again, I won't spend much time on this, but this

18 was our proposed timeline as you look at it from a phase-one

19 perspective.  And the keys are here I think that we're

20 projecting an ovarian hearing in November, a mesothelioma

21 hearing in December, and then post-trial briefing takes us into

22 January with the Court's preliminary filings -- findings, I'm

23 sorry, in mid-January.  And you can see again in the boxes

24 underneath where we insert in that independent expert process.

25         Next slide, please.

1          And then a similar timeline for the phase two, the

2   quantification phase.  You can see it's again sort of the same

3   sequence of events.  We get to a quantification hearing under

4   our proposed schedule in June, then followed by post-trial

5   briefing and a court ruling sometime in July or later.  And

6   then underneath, we're showing the other two phases, phases two

7   and three, how those timelines would fit in.

8          Again, you can see that these are coming after

9   developments in both medical science estimation and the

10  quantification.  And then ultimately, after the quantification

11  hearing is where the experts would express their final views

12  that would come before the post-trial briefing and before any

13  closing arguments.  So, again, that's just fundamentally the

14  way we're thinking about this.

15          We're trying to complement the mediation, and we're

16  trying to take advantage of the fact that we have subject

17  matter experts who should be able to facilitate settlement

18  because they're going to be assisting the parties in firming up

19  their views and finalizing their views.  And then, ultimately,

20  they're obviously assisting the Court, as well, in terms of

21  making the ultimate ruling on estimation.

22          Next slide, please.

23          So I've probably covered a fair amount of this

24  already.  But if you look down on the left, we're using

25  estimation, we believe, in a way that will facilitate mediation

1 and drive consensus.  We've integrated mediation at what we

2 think are the key stages to build momentum towards an

3 agreement.  And then we're using independent experts to develop

4 an understanding by the parties of their positions and the

5 other parties' positions and hopefully providing really

6 critical feedback for the Court as it assesses the positions of

7 the parties.

8         And then on the other side, we think is sort of a

9 list of some of the fundamental problems with what the other

10 side is proposing.  Really from our perspective, this idea of

11 litigating non-representative cases in the tort system, it

12 serves no purpose and we haven't really heard a justification

13 yet by the other side for what benefit that serves other than

14 suggestions that it will just give them leverage.

15         The cramdown process from our perspective, that

16 doesn't make sense, particularly in a situation like here where

17 there's been no prior discovery.  There's been no agreement on

18 liability.  There's been no estimation on liability.

19         And, you know, we think this is all just going to

20 drive the parties apart.  We'll just be engaging in what we

21 would view as unproductive litigation, litigation that's just

22 going to create needless distractions, unwarranted expense.

23 And then ultimately, I think what's most important maybe is the

24 last two boxes, which is we believe our approach will maintain

25 the focus of everyone on the issue we have to solve, which is

1  the aggregate liability here, whereas, the other side's

2  proposal as best we can tell just disregards that.  I mean

3  their plan as we understand it in their proposal is just pay-

4  as-you-go, it's irrelevant what the aggregate liability is, put

5  us in control of the trust, and we'll just run the claims

6  through the trust.  So to them, it's irrelevant apparently what

7  the aggregate liability is.

8           And then at the same time, they're apparently going

9  to propose claim values but do it in a way that minimizes or

10 impairs, I should say, our ability to present our case as to

11 why their claim values are likely inflated, which is what we

12 expect and probably materially inflated.

13          Next slide, please.

14          So I'll go through these quickly.  In these cases, I

15 mean we know what the principle issue is.  We know what the

16 central issue is.  Its been identified by many courts over the

17 last 20 years.  And here in USG, the court said the court's

18 aware that the tension between the positions articulated by the

19 parties concerning the proper mode of valuing the debtor's

20 asbestos liability reveals a fundamental, perhaps the

21 fundamental divide between the parties.  Indeed, the issue may

22 lie at the heart of all asbestos bankruptcies.

23          And through the years, we know that that's true.

24          Next slide, please.

25          And if you think about it, this issue that we want

1    the parties and this process to focus on, it is at the center

2    of everything in the case.  It's the issue that basically is

3    critical to plan negotiations.  It's central to the mediation.

4    It's central to the formulation of a plan.  It's ultimately

5    central to the claimants who have got to decide whether any

6    proposed plan, whether by one side or the other, is acceptable

7    to them.  It's information that's important to them.

8            And it's also what allows the Court ultimately to

9    determine whether a plan that's being proposed is in the

10   claimant's best interest or not.  And any process, in our view,

11   whose intent is to basically minimize the ability of the Court

12   and the debtor to test the proposals, to shed light on the

13   proposals, basically is -- undercuts everything in this case.

14   It's going to put the Court in a position and the parties in a

15   position where they really can't do their jobs the way the Code

16   contemplates they should be done.

17           Next slide, please.

18           All right.  Let's go to the next slide.

19           Next slide, please.

20           So Section 502(c), the statute which provides the

21   authority for the estimation of claims, is mandatory.  We've

22   highlighted the key language that says it shall -- "There shall

23   be estimated for purposes of allowance under this section any

24   contingent or unliquidated claim, the fixing or liquidation of

25   which, as the case may be, would unduly delay the

1  administration of the case."

2          Next slide.

3          We have a number of -- I won't go through each of

4  these, but there's many many cases where estimation has been

5  authorized, and they've been authorized for exactly the reason

6  we're asking for it here.  You know, situations where courts

7  were faced with literally thousands of unliquidated claims and,

8  you know, clear recognition by these courts that liquidation of

9  those claims in the case would cause undue delay.  You see it

10  in G-1, you see it in Federal-Mogul, and most recently, in

11  Bestwall.

12          Next slide, please.

13          I mean estimation has been ordered, you know, I think

14  basically uniformly any time it's been requested in asbestos

15  cases.  Here's a long list on this slide.  There's many others

16  that we could have added.  I mean years ago there was never

17  even any opposition to this, you know, unless there was an

18  agreement when it wasn't asked for.  Now it's become a little

19  more common in the recent cases for the claimants to oppose

20  estimation for basically the reasons you're hearing about it

21  today and reasons personally I haven't fully understood.

22          But from our perspective, we're in a court

23  proceeding.  One of two things need to happen from our

24  perspective.  Either we negotiate an agreement, which we've

25  been trying very very hard to do, or there needs to be a

20

1  process by which the parties' due process rights are respected

2  and they have an opportunity to have their day in court as to

3  what the aggregate liability is that needs to be addressed in

4  the bankruptcy case.

5          THE COURT:  Now I'm sure you're going to address it.

6          MR. GORDON:  Yeah.

7          THE COURT:  Their -- TCC's contention is that if we

8  were to even go down the path of estimation, it could be part

9  and parcel of a confirmation hearing.

10         MR. GORDON:  Right.

11         THE COURT:  So that we're not ignoring that

12  obligation, but why have two separate lengthy convoluted

13  proceedings.

14         MR. GORDON:  Well, I mean there's a couple of --

15         THE COURT:  Does it work as part of confirmation?

16         MR. GORDON:  Yeah.  I think there's a couple of

17  answers to that.  One is unlike cases where that's been done,

18  this is a case where we've had absolutely no discovery.

19         There's been no proceedings at all with respect to

20  this issue.  And now you're talking about I think under their

21  proposal, given their timeline, compressing all that into a

22  much shorter period of time which to me clearly says we're not

23  going to get PIQ discovery, there won't be time, we're not

24  going to get Trust discovery.

25         And we know that they strongly oppose both of those

1  types of discovery in every case.  So it's a way from our

2  perspective to avoid all of that.  And we think that's

3  definitely a problem.

4        The other issue is that you're putting the cart

5  before the horse in the sense that, as Your Honor knows better

6  than me, a confirmation process is very expensive.  And there's

7  lots of pieces to it.  There's disclosure statement.  There's

8  solicitation.  The noticing anymore by itself costs millions of

9  dollars.  It takes time.

10        And you're basically saying we're going to go through

11  all of that before we have any ability to assess whether or not

12  -- whether there's competing plans or one plan, whether any of

13  these proposals is workable or not.  And you're going to be

14  spending a lot of time focusing on those issues as opposed to

15  actually zeroing in on the issue that makes the difference.  So

16  it's really those two things.

17        So I mean if you're talking about I guess a

18  confirmation process that bakes into it an estimation process

19  that gives us the rights to pursue the discovery that we think

20  we're entitled to, discovery that goes to the merits of the

21  claims, basic information that you would need to assess the

22  merits of the claims, that's potentially doable.

23        But, again, it seems wasteful to do that because you

24  could get to the end of that and then realize we don't have

25  anything that's going to move forward here.  Or the parties may

1  be in a position based on what happens to amend their plans,

2  then you're going to have to re-solicit anyway and kind of

3  start over again with disclosure statement and the process.  So

4  --

5          THE COURT:  But the history of discovery disputes

6  relative to the questionnaires, the --

7          MR. GORDON:  Yeah.

8          THE COURT:  -- the trusts and the payments would seem

9  to disrupt the timeline that you suggest.  It's a timeline that

10 seems dependent upon almost all the parties working in sync.

11 And what is there to suggest that that's going to happen given

12 the ratholes that we've seen in other cases as far as

13 contentious litigation over the questionnaires and the forms

14 and the like?

15         MR. GORDON:  That's a very good question, Your Honor.

16         In some respects, it's a matter of if you take the

17 parties at their word.  I mean what we hear at every single

18 hearing is that this is an emergency, time is of the essence,

19 we have to move, we have to move quickly.  And if that's really

20 what the sentiment is, then we should be able to do that a lot

21 faster.

22         The other thing is if orders get entered, the order

23 should be respected.  And I believe that this Court has the

24 power and the ability to enforce those orders and make these

25 things happen so that we're not in such an intractable delay.

23

1          But I mean having said all that, at the end of the

2  day, I obviously hear you.  I think we tried to be clear that

3  we're assuming that parties are motivated to move quickly, that

4  they're acting in good faith, and that they'll abide by court

5  orders.  And if we're wrong about any one of those three

6  things, then obviously the process could be drawn out.

7          But we do think -- I mean I can't overemphasize from

8  our perspective, the discovery is very important.  It's the

9  information our experts need to do the analysis necessary to

10 present our case.

11         And I think, you know, the question for the Court

12 ultimately will be it's a decision between do you try to

13 abbreviate the schedule in some way that potentially impairs

14 the company's ability to make its case or do you do everything

15 you can to give us the opportunity to provide us with the

16 opportunity to obtain the information we need and then do

17 everything in your power to ensure that the schedule is

18 maintained as best as it can be, because, you know, at the end

19 of the day, to us one of the benefits of estimation is that it

20 imposes a process.

21         I mean Your Honor would be authorizing the

22 estimation, you'd be approving presumably a case management

23 order that sets all the deadlines that sets the process.  And,

24 you know, we believe that you have a significant ability to

25 influence the course of events and hopefully to make that

24

1  process run on time.

2          Did I answer your question?

3          THE COURT:  Yes.  Thank you.

4          MR. GORDON:  Thank you.  Next slide, please.

5          This is kind of an obvious slide here, Your Honor.

6  Obviously, given the number of claims we have, it would be

7  literally impossible to have any kind of allowance process with

8  respect to the claims.

9          Next slide, please.

10         All right.  Next.

11         I mean some of this, you know, these issue have been

12 kicking around for a long time.  I mean this comes -- slide

13 comes out of the A.H. Robins case back in 1986.  And here where

14 the Court said:

15         "The interest of all the claimants and the public

16         interest in a reasonable and fair reorganization

17         combine in favor of an effort at an estimation of the

18         Dalkon Shield claims as a basis for formulating a

19         plan and as a possible step in working out a

20         mechanism acceptable to all the claimants for a

21         dispute resolution of their claims without burdening

22         the estate with a tremendous expense of endless

23         litigation."

24         So, you know, this concept of estimation, which

25 really until recently has been relatively routine, goes back a

25

1  long time in mass tort claims, and I think for good reason.

2          Next slide, please.

3          You know, there's been disagreement with the TCC

4  about the impact of estimation, but we think the track record's

5  very clear on this.  And it's just demonstrated by some of the

6  cases that we have up on the slide here.

7          The G-1 case, there was an agreement reached before

8  the estimation hearing was completed.

9          Grace, the agreement was reached shortly before the

10 estimation hearing.

11         USG, agreement was reached after the court-ordered

12 estimation.

13         Garlock, agreement reached after the court had issued

14 an estimation decision.

15         And then Specialty Products, the same thing.

16         And both Garlock and Specialty Products which filed

17 around the same time had a similar experience in the sense that

18 the cases were making no progress or very little progress, the

19 claimants were repeatedly telling the court they would never

20 reach an agreement.  And ultimately, in both cases the courts

21 approved estimation and the estimation ultimately, you know, in

22 our view, and I think it's born out by the record, was the key

23 factor in getting the parties to a settlement.

24         And it's interesting to me that in Specialty

25 Products, the court ultimately or the parties ultimately

1  settled at an amount below the estimation amount.  And in

2  Garlock, it was the opposite, the parties ultimately settled in

3  an amount that was above.  But if you look at the record in

4  both cases, the estimation was key to assisting the parties in

5  getting to an agreement.

6          Next slide, please.

7          Now it's interesting there are a couple of cases that

8  we found where courts did employ an estimation in connection

9  with mediation.  And here, you can see in this Mona Lisa case,

10  the court said, In these adversary proceedings, mediation

11  followed by an estimation is the most efficient and economical

12  method to liquidate the claims and proceed toward confirmation.

13          And next slide, please.

14          It's a similar sentiment in the next case.  This

15  North American Health Care case, It would take years to

16  liquidate, if relief from stay were granted in the state and

17  federal court actions by the tort claimants against the debtors

18  proceeded in their ordinary course, the court agrees that

19  estimation is not simply optional in this case, that it's

20  required.  And there, there was a two-step mediation estimation

21  process.

22          Next slide, please.

23          So we see a number of benefits in proceeding with an

24  estimation.  It will enable the parties to gather information

25  that they need to make their cases.  It will allow them to

27

1  better understand and evaluate the strength of their own case

2  and the cases of others.  It will require the parties, as I

3  said before, to support their position, and they have to do so

4  within a timeline that's been set by the Court.  It would allow

5  the parties to understand realistic bookend, supported bookends

6  for the liability, within which a settlement may be possible.

7          In this case, it would also allow the parties to

8  better assess amounts that have already been discussed in the

9  mediation to date.  And then, with what we're proposing, it

10  would provide the parties with the benefit of the views of

11  independent experts and then ultimately, if we get that far,

12  with the Court's impartial views about an estimation of the

13  liability.

14          And then it would also provide the claimants and the

15  Court with information necessary to evaluate any plan.  So,

16  again, it's important for the claimants because they ultimately

17  are the ones that would have to vote on any plan proposal.

18          Next slide, please.

19          Now there's lots of things that the other side has

20  been saying about our proposal, which frankly they just miss

21  the mark.  We have not proposed that the estimation would set

22  the amounts of the distributions.  I think we've been very

23  clear about that.  We have not said that the estimation would

24  be used to set a hard cap on the amount of trust funding.

25          What we're proposing doesn't violate anyone's

28

1  constitutional rights.  It preserves all due process rights to

2  address the issue that's key to resolving this case.  And

3  they've also argued that our approach will cause significant

4  delay.

5         And, you know, obviously, what we're outlining is a

6  process that we think will take a year and, obviously, I hear

7  what Your Honor is saying about a concern that we may have --

8  it may be prolonged based on discovery fights.  But I think

9  what's important not to lose track of is we've tried to

10  carefully design the process in a way that would facilitate

11  settlement at virtually every step, including as early as the

12  fall of this year.

13         And so the real purpose of this, it's not to set hard

14  caps, it's not to file a cramdown plan, which I guess is what's

15  been suggested.  But instead, it's to drive a successful

16  mediation.  It's to drive a consensual resolution.  And I think

17  everyone in the courtroom should be able to agree that that's

18  the result that's in the best interest of all parties and

19  particularly the claimants.

20         Next slide, please.

21         Next.

22         So here, just a few points on this slide and talking

23  about our process.  Again, we think it's one that the way it's

24  designed would move quickly, you know, particularly, on the

25  medical and science side.

1              There's been arguments made that we're just trying to

2    re-litigate Judge Wolfson's Daubert ruling.  That's not true.

3    And one of the things that's important to recognize, and I

4    think the other side acknowledged it in their reply brief, is

5    there's been significant developments we believe in the

6    scientific world since the evidence that was presented to Judge

7    Wolfson.  And I think that evidence -- I won't get the date

8    right, it either dates back to 2020 or 2019.  Obviously, the

9    ruling was later than that, but the evidence, we're talking

10   about at least a couple of years or longer of developments.

11             But the other point is, and you'll see this in

12   upcoming slides, we're not asking for like -- this wouldn't be

13   asking for an up or down ruling on whether, you know, the

14   science shows this or science shows that.

15             But what it will do is it will put the Court in a

16   position and the independent experts in a position to determine

17   whether these claims are strong or weak or somewhere in

18   between, which is, you know, very important information that

19   Your Honor would need, the experts would need to evaluate

20   ultimately what the estimation should look like because if the

21   view based on the medical science -- and that's what informs

22   these claims -- is that the claims are weak, then you would

23   expect the quantification would be on the low side.

24             On the other hand, if you think there's a strong

25   relationship between the use of these products and causation of

30

1   this disease, which we don't think the evidence will show, then

2   you would come up with a higher estimation.  But in any event,

3   the issue to us is very different than what Judge Wolfson was

4   dealing with in the Daubert -- in her Daubert ruling.  And,

5   again, lots of developments have occurred since the evidence

6   was presented in connection with that.

7           And, again, I think phase two, I've covered all of

8   this.  In both cases, subject matter expert assistance to help

9   out with the process and to also help the parties settle.

10          Next slide, please.

11          And, again, I think I've largely covered this on the

12  overview of the expert process.  We did plug in some dates here

13  just to give you a sense for how this works.  So in that first

14  stage, that preliminary positions on both medical science and

15  quantification, that does happen so that that occurs in the

16  fall, there would be actually feedback provided in the fourth

17  quarter of this year, which is not that far away.

18          And then you can see phases two and three, we're

19  moving then into the second quarter of 2023.  So, you know,

20  this is something on the phasing process with the experts,

21  their actual assistance in trying to help the parties get to a

22  deal.  This would occur very very quickly.  All three stages,

23  frankly, would move pretty rapidly.

24          Next slide, please.

25          This slide is intended, Your Honor, just to reinforce

31

1  the point the discovery we're seeking really is critical.  And,

2  again, I understand Your Honor's concern about the discovery,

3  but the question ultimately of estimating this liability goes

4  to the merits.

5          And the other side in these cases takes the position

6  essentially that the merits are irrelevant.  I don't know what

7  their approach will be exactly in this case, but in other

8  cases, their position has been merits are irrelevant, all you

9  need to do is take a look at what settlements have been paid

10 and extrapolate from those.

11         And the problem with that, of course, is that because

12 there's so many of these cases, most companies don't have the

13 ability to litigate each and everyone one and so they settle

14 many many cases just to avoid or reduce defense costs.  Well,

15 that doesn't have anything to do with liability.  And then, you

16 know, we've learned from other cases that settlement were

17 reached based on an absence of key evidence, evidence that was

18 withheld by the plaintiffs in many cases.  And we've seen this

19 in the asbestos side and the mesothelioma cases.

20         And one of the primary reasons to get the Trust

21 discovery, particularly with respect to the meso claims is to

22 determine whether that happened here.  And that to us is

23 extremely important evidence in the event that the other side

24 would come in here and say all you need to do is use the

25 company's settlement history and extrapolate, and that's how

1  you determine the liability.

2          To us, that's problematic for a lot of reasons, but

3  it's particularly problematic if in fact there is evidence

4  which has been shown in other cases that those settlement were

5  made within complete information because evidence was withheld.

6          THE COURT:  Just a question.

7          MR. GORDON:  Yeah.

8          THE COURT:  It actually goes to the other issues, the

9  extension of the preliminary injunction, the stay relief.  But

10 the new data available according to Johnson & Johnson and the

11 debtor --

12 (Phone ringing)

13         THE COURT:  All right, we've had -- my phone's gone

14 off.  We've had a few phones.  By now, everybody should know to

15 take their phones off.  All right.

16         But if we were -- if I were to release some or all of

17 the dozen identified cases, does that new science come into

18 play or is that -- given that discovery's already been fixed,

19 they were trial ready.  Do those reflect any of the new science

20 as proffered by the debtor?

21         MR. GORDON:  You know, that's a specific question.

22         THE COURT:  And maybe you need to --

23         MR. GORDON:  Yeah, I might need to consult on that.

24         THE COURT:  But when we get to the other issues --

25         MR. GORDON:  Okay.

33

1          THE COURT:  -- I'm curious as to that.

2          MR. GORDON:  Okay.  We'll consult on that.

3          I mean there's obviously other problems that we have

4   with the idea of releasing cases that we view as

5   unrepresentative, but I obviously hear the question you're

6   asking.

7          Okay.  Next slide, please.

8          Again, I won't spend any more time on this.  The only

9   difference between this slide and the earlier slides I showed

10  you was I wanted to be more clear in terms of where the

11  mediation sessions as we were thinking about them get plugged

12  into the estimation process.  And, again, we were thinking that

13  these were some of the key points.  It's after the parties have

14  exchanged expert reports.  It's after each of the hearings.

15  It's after briefing and preliminary findings, you know, key

16  developments in the process.

17         Next slide, please.

18         And then, again, this just shows where mediation

19  plugs in with respect to the expert process, that parallel

20  process that I described earlier.

21         Next slide, please.

22         Now I thought this was a helpful quote from Judge

23  Hodges' opinion in <u>Garlock</u>.  It helps to explain hopefully the

24  point I was trying to make earlier as to what the role of a

25  medical science case is and why it's important here

1   notwithstanding the Daubert ruling.  You can see what Judge

2   Hodges said:

3           "In the tort system, it would be necessary for the

4           jury to resolve issues of causation in a binary

5           fashion yes or no.  But here in making an aggregate

6           estimation, that is not necessary.

7           "Rather, it's sufficient for the Court to find that

8           predominantly Garlock's products expose people to

9           only a low dose of a relatively less potent

10          chrysotile asbestos and almost always in the context

11          where they were exposed to much higher doses of more

12          potent amphibole asbestos.  So across all potential

13          claims, Garlock's liability for mesothelioma should

14          be relatively small."

15          So you can see the benefit that Judge Hodges derived

16  from the medical science evidence that was presented to him.

17  And this went into the relative toxicity of chrysotile asbestos

18  versus amphiboles and the extent to which an individual could

19  have been exposed to this asbestos and the fact that there were

20  other alternative exposures.  So you can see how that helped

21  inform the estimation decision by Judge Hodges.

22          Next slide.

23          So, again, I mean fundamentally with respect to the

24  Judge Wolfson Daubert ruling, here, unlike that, the Court and

25  I guess the independent experts as well are being asked to

1  review the strength of the claims.  Are these strong claims,

2  are they weak claims?  Is there a strong association between

3  the product and incidents of disease or not?  Is there a

4  significant risk or an incontestible risk?

5          And then we've got the developments and the science

6  and literature that I mentioned.  And the other thing just as

7  an aside on Judge Wolfson was that that ruling did not cover

8  mesothelioma.

9          So next slide, please.

10         And then this is probably stating things you already

11 know about quantification.  There's a number of issues that

12 will have to be addressed in connection with this phase, the

13 first of which will be what's the appropriate methodology for

14 quantifying a liability like this.  Is it settlement history?

15 Is it what we call legal liability which is a determination

16 based on the assessment of the merits of the claims?  Is it

17 some other approach?

18         And, of course, ultimately, you have to get into the

19 number of current claims.  And, you know, this is one I'll

20 pause on for a moment.  One of the -- one way in which the PIQs

21 have been very very important in these cases is they've shed a

22 lot of light on the number of claims.  And I think I have a

23 slide coming up here that shows the fact that in each of at

24 least three cases that we've cited.

25         In the wake of the PIQ information, it was determined

1 that the number of pending claims that had to be addressed was

2 substantially less than what was indicated by the companies --

3 these companies' claims databases where they just had -- were

4 tracking every lawsuit that had been filed in many cases,

5 pending for a long time, in some cases more recently.  And as

6 it turned out when the individuals were asked do you have a

7 claim or not, a large percentage said no or were not pursuing

8 it.

9 　　　　　Then, of course, you have to project the future

10 claims.  You got issues about inflation and discount rates to

11 bring those claim values back to present value.  But

12 ultimately, the focus is on quantifying the debtor's liability.

13 　　　　　Next slide, please.

14 　　　　　Okay.  Again, and this is just an attempt to show the

15 phase two process a little differently plugging in the

16 mediation, what we thought about where the mediation sessions

17 would fit in.

18 　　　　　Next slide, please.

19 　　　　　And same thing on the second stage of the expert

20 process, the dates we're thinking of and then where the

21 mediation would fit.

22 　　　　　And then next slide, please.

23 　　　　　Same thing on third stage.

24 　　　　　Again, the idea here in this process is the parties

25 have made their case, they've heard the views of the experts.

1  We think about it as preliminary views, updated views, final

2  views.  And after each set of views is communicated, there's a

3  mediation session following that.

4           Next slide, please.

5           These cases reinforce our point that we believe we

6  should be permitted to develop the evidence that we believe is

7  necessary to make our case for estimation.  And here, it's --

8  the discovery we seek is discovery we believe is critical to

9  assessing the merits of the claims.

10          Next slide, please.

11          So here's what I alluded to earlier, Your Honor;

12  cases where PIQ discovery has been ordered.  And you can see

13  across the top the number of cases where it's been ordered.  It

14  was interesting, Judge Hodges in Garlock recognized the

15  importance of the PIQs.  And as he put it, he said the data

16  gathered is the freshest and most reliable data available;

17  whereas, historic claims data can be stale and not accurate.

18  And what's what was happening in all these cases.

19          And then if you look at the information below for

20  Garlock, Bondex, and Bestwall, I mean look at the number of

21  cases that changed, the pending claims that were no longer

22  valid -- I mean 2,000 of almost 6,000 in Garlock, about 35

23  percent; Bondex 1,500 out of 3,500 at 43 percent; and in

24  Bestwall with a process that's just come to a conclusion, it's

25  almost 65 percent.

1          And if you think about that, these are cases that

2    have, although they had thousands of claims, they didn't have

3    40,000 claims.  And so to my mind, this just illustrates the

4    importance of these questionnaires.  And these questionnaires

5    really are just seeking very basic information about the

6    claims, the first question of which is do you have a claim,

7    what's your disease, and other information that we need.  Are

8    there other exposures, have you received other recoveries with

9    respect to your claim, that sort of thing.

10          Next slide, please.

11          So we've heard it said many times in their pleadings

12   that LTL is just following a script in requesting estimation

13   and indicating it wants this discovery, that this is all

14   intentional on LTL's part to create delay.  And I mean,

15   honestly, what they're using to support this are

16   mischaracterizations of what's been happening in the cases in

17   North Carolina.  There's just no other way to say it.

18          In Bestwall, I mean literally, there's been

19   opposition by the claimant representatives at every turn with

20   respect to estimation.  They've litigated and re-litigated the

21   issue of estimation.  They've litigated and re-litigated

22   efforts to narrow the scope of estimation.  They've litigated

23   and re-litigated opposition to discovery.

24          It's just one thing after another.  They are the ones

25   that continue to request delays in the process.  The company

1  has not been requesting delays.  And it got to the point in

2  Bestwall where their conduct was sanctioned.  And it's been

3  sanctioned more than once for failure to obey court orders.

4        And, unfortunately, the situation is much the same in

5  DBMP and Aldrich, although there hasn't been any sanctioned

6  conduct so far.  But, again, estimation was opposed.  The

7  claimant representatives re-litigated the question of

8  estimation even after it was decided against them in Bestwall.

9  In Aldrich, they re-litigated estimation after it had been

10  decided against them in both DBMP and Bestwall.  And they've

11  litigated against the discovery that Your Honor mentioned,

12  which Judge Whitley in those two cases ordered over their

13  opposition.  And there's been continuing refusals to negotiate.

14        Now there's efforts in DBMP and Aldrich to pursue

15  other litigation to effectively dismiss the cases, but that's

16  the true story of what's happening in these cases.  There is no

17  script by either Jones Day or any of these companies to delay

18  the process.  All of these companies, like LTL here, have a

19  strong desire to resolve the issues as fast as they can and

20  move forward.  And it's just been significant opposition.  It

21  just is what it is.

22        Next slide, please.

23        So based on our review of the other side's proposals,

24  it seems that there's three fundamental paths that are being

25  suggested.  One of the pleadings just came out and said it

40

1    outright, nothing should be done until the Third Circuit

2    decides.  You should just pause the case.  I think that's

3    inconsistent with what Your Honor indicated your intentions

4    were.

5              It's certainly not our desire.  Obviously, the Third

6    Circuit will do whatever it will do.  It will do it on whatever

7    timeline it does it.  But in the meantime, we would like to see

8    this case move forward.

9              And then, of course, the next two options I covered,

10   you know, one is to lift the injunction and proceed to trial on

11   a subset of cases that the other side is selective, they're not

12   representative.  And importantly, part of that is it shuts off

13   at trial.  They don't allow the appeals to go forward.  And

14   they know full well that the company's been very successful in

15   the appeals.  I think some $3.3 billion or so was saved as a

16   result of reversals on appeal.

17             And, in fact, last week there was just a significant

18   reversal in a New York mesothelioma case where the court, the

19   appellate court in New York found that the plaintiffs did not

20   make their causation case.  The evidence did not support it,

21   and that case was reversed.

22             So it's very telling to us.  It just shows how skewed

23   and prejudicial that idea is that initially would be 90 cases

24   or up to 90 to be heard in a year which would be impossible for

25   the company to defend.  Now it's only 12 cases that they want

41

1   to try before the end of the year in a few months.  How is the

2   company even going to be able to do that.  And, of course, that

3   ignores all the preliminary issues that would have to be dealt

4   with in those case.  But, again, no appeals.  That's not

5   covered.

6           And then, of course, the confirmation path that I've

7   talked about, which again, based on what I've seen so far,

8   seems designed to really shortcut our rights to make our case

9   with respect to the liability.

10          Next slide, please.

11          So we've covered some of these points before.  This

12  idea of litigating one-off cases is not going to assist the

13  mediation process or settlement.  It's not going to provide any

14  new information to the parties based on all the litigation

15  that's already occurred.  And it's not going to provide any

16  information at all about debtor's aggregate liability which is

17  what we're here in this courtroom to resolve.

18          It will simply be a distraction.  It will take much

19  more time than the other party's indicating.  And the Court

20  won't have any control over those cases because those cases

21  will proceed on whatever schedule those courts will put them

22  on, and it will just be outside of the province of this Court

23  and the control of this Court with respect to schedule moving

24  forward.

25          Next slide, please.

42

1          I don't know if it's worth saying much more about

2  this, but it appears that the plan that the TCC contemplates is

3  a pay-as-you-go plan.  It just -- although the pleading

4  suggests that this is not a limited-fund case, they basically

5  say -- I think they're saying the funding agreement's just made

6  available indefinitely for claimants to pay themselves under a

7  claim and control trust values that we believe will be

8  substantially inflated.

9          Again, we -- you know, we have concerns about an

10 expert having only 90 days to review claim values that, you

11 know, limit -- any limitations on discovery.  And then at the

12 end of the day, as they say that the claimants are free to

13 reject the claims anyway and return to the tort system.  We

14 have no way of assessing how often that might happen, but we

15 could end up right back pretty much in the same circumstance we

16 were in at the time we filed for bankruptcy, you know, paying

17 hundreds of millions of dollars in fees and indemnity and the

18 like per year.

19          Next slide, please.

20          So ultimately, Your Honor, we would just say that we

21 believe -- you know, we're in a court proceeding.  We believe

22 we have the right to be heard on this issue of the aggregate

23 liability.  We have the right to make our case.  We have the

24 right to pursue discovery and particularly discovery that's

25 been sought in many other cases and authorized in many other

1  cases.

2          And that's important because we think we should be

3  allowed the opportunity to basically weed out claims that have

4  either been abandoned or otherwise invalid or baseless.  And

5  that's particularly important here given the large number of

6  cases that we face.

7          Next slide, please.

8          So all I'll say fundamentally about this slide is we

9  think any plan that overpays claimants is ultimately not

10  confirmable and that -- again, that we should have a full

11  opportunity to challenge whether in fact the plan does overpay

12  claimants.  And so if any kind of process is allowed to go

13  forward, as I said earlier, it seems to us that it has to be

14  done in a way that our rights to pursue the discovery we seek

15  are fully preserved.

16          Next slide.

17          So, Your Honor, just to sum up, we think that what

18  we've offered here, this concurrent process or hybrid process,

19  provides the best resolution for reaching a consensual

20  resolution in this case.  And we think we've designed it in a

21  way that will maximize the prospects that that would occur in

22  the near term.

23          And we're hopeful that the process will complement

24  the work that's been done in mediation to date, that it will

25  re-energize the mediation process, that it's going to provide

1  critical feedback to the parties from subject matter experts,

2  and that it will impose a timeline that's again largely

3  controlled by Your Honor that will mandate that the parties

4  have to focus on the issue and they have to support their

5  positions, again, as opposed to just pulling numbers out of the

6  air or taking some other approach.  They actually have to build

7  support for their positions as to what the company's aggregate

8  liability is.

9        And, you know, we think in stark contrast to that,

10  again, the TCC's proposals would impede the mediation, drive

11  the parties further apart, really provide no new information.

12  And what we're most concerned about is that our rights to make

13  our case are put in jeopardy.

14        Your Honor, if I could have a minute, I see a note.

15        THE COURT:  Sure.

16        MR. GORDON:  -- that's here.

17        THE COURT:  And if I can explore one --

18        MR. GORDON:  Sure.

19        THE COURT:  -- area, one that's been raised in the

20  TCC replies.  If you can go to the prior slide, the fair and

21  equitable.

22        The issue would be whether over -- one of the issues

23  I think the debtor is raising is that overpayment of claims

24  would not be fair and equitable to the debtor -- paying

25  claimants more than they are entitled to.  Now the harm from

45

1  that would be visited upon the debtor and, in theory, I guess

2  the debtor's equityholders.  The equityholder in this case --

3  and you'll have to correct me if I'm wrong, trying to

4  understand the organizational chart -- New JJCI.

5          MR. GORDON:  Right.

6          THE COURT:  New JJCI.

7          MR. GORDON:  That's correct.

8          THE COURT:  So given that the debtor operate simply

9  the royalty stream in its subsidiary, what is the harm I guess

10 from an economic perspective to the equityholders in

11 overpaying?  You know, what's the risk out there?

12         Ordinarily, you're saying the value of the equity

13 shares would be diminished --

14         MR. GORDON:  Right.

15         THE COURT:  -- the equityholders' interest.  But here

16 we're talking about JJCI has an equity interest in LTL which is

17 not operating.  What is that equity interest?  And, again,

18 maybe that's a confirmation issue one day, but it seems to have

19 a bearing on these arguments as to the --

20         MR. GORDON:  Right.

21         THE COURT:  -- a need for estimation.

22         MR. GORDON:  Yeah.

23         Yeah, I obviously saw that argument in their brief,

24 and that's something we'll think more about.  But I guess the

25 way I think about it, I think about that in a more basic level.

46

1  It can't be, as the Committee suggests, that a plan could be

2  crammed down in a situation where values that are proposed to

3  be paid to claimants are not tested.  They're not evaluated.

4          Are they overpayments?  Are they underpayments?

5  Whether it's a fair and equitable, whether it's a question of

6  whether the plan was proposed in good faith, whether it relates

7  to some other standard, I'm not I guess prepared today to give

8  you a sort of final view about that.

9          But to me, it's just beyond belief that in a case

10 like this where the purpose of the filing is to determine a

11 reasonable and fair resolution of the liability, it can't be

12 that the resolution is any number that the claimants says it

13 should be with no party, whether it be equity or the debtor or

14 affiliates or anyone else, having the ability to weigh in on

15 whether that number is unfairly inflated.

16          So I'm very confident that there's a number of

17 reasons why that doesn't work.  I think fair and equitable

18 works because of the way the funding agreement is.  But I

19 recognize the argument.  It is confirmation, but again it's

20 beyond belief to me that that could possibly be the case that

21 Your Honor would be put in a position where you would just be

22 saying, well, the -- because what they're saying fundamentally

23 is the claimants voted for it and there's a funding agreement

24 and that's the end of it.

25          And that's unimaginable to me that in a court of law,

1  that could happen without an evaluation of whether that's a

2  fair and appropriate resolution of the liability.

3          THE COURT:  Thank you.

4          MR. GORDON:  Thank you.

5          THE COURT:  And is there anything else you --

6          MR. GORDON:  Well, the only thing I was going to add,

7  and this is maybe more apropos to the PI, but I had said before

8  I couldn't recall exactly what the evidence was that was in

9  front of Judge Wolfson with respect --

10          THE COURT:  Right.

11          MR. GORDON:  -- to the Daubert.  It actually dated

12  back to 2018, so I was two years too late on that.

13          And then it's also the case that there were cases

14  that have been tried with the updated science, just so Your

15  Honor knows that.  And this indicates that the company won all

16  four cases tried in 2021 with the benefit of the updated

17  science.  Each was a unanimous defense verdict.

18          So that's just another way of saying, and maybe Your

19  Honor was suggesting this or maybe not, I'm not sure, but we

20  don't need to try new one-off cases on the medical science to

21  have information with respect to the significance of the

22  science.  There's already at least four cases where there have

23  been trials with the benefit of that science.

24          And I think that's another way of saying that the --

25  you know, the Daubert ruling obviously was an important ruling

48

1  in the MDL, but it's based on developments.  In our view, we

2  view it as dated.

3          THE COURT:  Fair enough.

4          MR. GORDON:  Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. Gordon.

6          Mr. Molton, before you start -- or you can get to the

7  podium -- I just want talk about scheduling so that everybody

8  can appreciate where we're going today.

9          We're going into the afternoon, needless to say.

10  Hopefully, just the afternoon.  We are going to take a break at

11  12:30.  We'll have a lunch hour 12:30 to 1:30, roughly.  I

12  would anticipate we're not going to get to the PI issue until

13  after lunch.  Given that, we're going to have the TCC's

14  presentation and other parties both here and maybe on Zoom.

15          So the goal would be before lunch to complete the

16  estimation portion of it, if we can.

17          Ms. Cyganowski?

18          MS. CYGANOWSKI:  Yes.

19          Your Honor, i would ask you to respectfully consider

20  reserving decision on the estimation until you've heard

21  argument on the PI.

22          THE COURT:  Already in my mind.

23          MS. CYGANOWSKI:  Thank you.

24          THE COURT:  I want to get the full picture.

25          And I don't want to eat into your time.

49

1              MR. MOLTON:  Your Honor, may I approach?

2              THE COURT:  Sure.

3              Thank you.

4              Good morning, Mr. Molton.

5              MR. MOLTON:  Good morning, Judge.  Always a pleasure

6    to be here.

7              THE COURT:  Thank you.

8              MR. MOLTON:  Beautiful July day.

9              David Molton for the Talc Claimants Committee.  I'm

10   with Brown Rudnick, and with me are all my co-counsel.

11             Judge, we've heard a lot from Mr. Gordon, much of it

12   a repeat of what was in their pleadings.  I'm not intending

13   here to repeat what's in our pleadings.  I think everybody had

14   the opportunity to read all the estimation pleadings, and I

15   think we all had a good time doing so.

16             In any event, Judge, you know, also I will not be

17   conflating as much as I can what Ms. Cyganowski is going to be

18   talking about with what I'm going to be talking about.  But I'm

19   certainly here to answer any questions you may have to the

20   extent I miss a subject or feel that it's been addressed in the

21   pleadings and you have a question about it.

22             Your Honor has noted I think two hearings ago or last

23   full hearing, as well as during our last Zoom hearing, that

24   today's going to be an important day in the case.  We

25   understand that, and that's why you saw all of the

50

1  thoughtfulness go into the TCC's pleadings as well as the other

2  pleadings from plaintiff constituencies.

3          Before I go on, I want to note one point that I think

4  is important from our perspective and really informs everything

5  that we think about and all the proposals that we've made,

6  including the plan opportunity.  And I think it is a real

7  opportunity that we're asking Your Honor to let us go free and

8  let Your Honor see it, let the world see it, let LTL and J&J

9  see it.

10          This is a full-pay case, and I think it's important

11  to note that.  We've all gone through that before from day one.

12  it should be a full-pay case.  We've got a funding agreement

13  that Mr. Gordon just referred to that, yes, is the centerpiece.

14  Assuming this case goes forward and the case is not dismissed -

15  - and we're not talking about that today, Judge -- but there is

16  a funding agreement that many representations were made about,

17  $61 billion.

18          And we've looked at that, and we're using that in

19  terms of how we're proposing to move this case.  The debtors

20  may not like it.  They may not like it at all, but they're the

21  ones who manufactured the foundation for this architecture.

22  They did it, and they made the representations of what it is.

23  They made the -- they've put in the provisions as to $61

24  billion or plus.

25          We're a fork in the road, as Your Honor mentioned.

51

1  We've got two roads, two roads in front of us, Your Honor,

2  again, putting aside what or what not the Third Circuit will

3  do.  We've got a road to nowhere, and the road to nowhere is

4  what my friend Mr. Gordon just laid out to the Court with all

5  of these graphs, those pretty pictures, these schedules, you

6  know, a two-phase, in those phases, different parallel

7  proceedings, et cetera, et cetera, et cetera.

8          Your Honor, simply put, it's a road to delay, it's a

9  road to nowhere.  I do want to go to a point that Mr. Gordon

10 made when he said that our proposal, our view of the case, our

11 view in accordance with what Your Honor asked, how do I move

12 this case.  Move it either to an exit, maybe on a contested

13 confirmation, or move it in a way that gets you to an exit with

14 a consensual confirmation.

15         Mr. Gordon characterized what we've proposed as

16 unproductive litigation.  Well, Your Honor, we believe we can

17 get there in a fraction of the time that's been proposed.  And

18 when Mr. Gordon lays out all these pictures and graphs and time

19 scales, who do they think they're kidding?  Less than a year

20 but a year no matter what.  And that's not even with a plan.

21 That's not even with a plan, Your Honor.

22         And I'm going to go and I'll come back to it at the

23 end, you know, but one of the things -- listen, Judge, I raised

24 my three oldest kids in Montclair, so I can say it.  You know,

25 in New York you say I got a bridge to sell you in Brooklyn.

52

1  Here, I got a bridge to sell in Bayonne.  And that's what we

2  just heard, a bridge to sell in Bayonne.

3          You know, PIQs.  I mean, Your Honor, if Your Honor

4  studied -- and it's apparent Your Honor understands what's

5  going on in North Carolina, and I've got people in this room

6  who could, you know, stand up, put their hand in the air, and

7  tell you what they think of what's going on in North Carolina.

8  PIQs, Mr. Gordon is asking for PIQs from over 40,000 claimants.

9  That's what he wants.

10          And it's our position if you read our briefs, and I

11  know Your Honor has very carefully, that those PIQs, which go

12  to aggregate claims, isn't necessary in this case.  It's a

13  full-pay case.  We've got a funding agreement.  The issue of

14  feasibility of what's put in the trust really which drives

15  estimation in many asbestos cases doesn't exist in this case.

16  So who are they kidding?

17          Take a look at what they're asking for.  Take a look

18  at what they're intending to do, and you're seeing Bestwall 2.

19  In any event, Your Honor, on the other hand, what do we offer

20  as the purpose of here is where are we going to go with this

21  case?  We offer, Your Honor, a road to exit which in sense on

22  the way to that road resolution.

23          And I've said it before, Judge, and I'll say it

24  again.  There's nothing, nothing like competition, competition.

25  They want to put a plan out with our plan, more power to them.

53

1 Let them do so.  Nothing like competition that brings parties

2 together.

3          We're almost -- we'll be in this case almost a year

4 when, you know, we come back on the exclusivity point in

5 September.  And that's an important point to make, a year.

6          Further, Your Honor, our alternative, which could

7 incorporate, utilize a cabin-directed short-term Federal Rule

8 of Evidence 706 appointed expert to assist in claims values we

9 believe, and we've said so in our pleadings, is a constructive

10 way to ameliorate much of what Mr. Gordon says about, well,

11 this is a TCC plan with TCC values written by them.  We'll get

12 to that in a minute.

13          But a 706 expert that can in a directed expeditious

14 way focus on claim values and come out of that in a very short

15 time in a way that those claim values can be used in a plan for

16 solicitation and voting, I think, would be a very constructive

17 thing.

18          In any event, Your Honor, all the while when we're

19 talking about the TCC's view, we're not at all turning our eyes

20 from mediation.  It's an important and vital part of this.  But

21 from what Your Honor knows and what we believe, we believe that

22 a turn in this direction by allowing some competition in this

23 case would have as experience has shown, and we've cited that

24 experience in our papers, tremendous salutary impact on the

25 progress of this case.

54

1          Again, the competition of allowing the TCC to put

2    forward a plan would have salutary impact on the progress of

3    this case to either exit after a contested confirmation hearing

4    -- and God knows, Judge, a bunch of us have been through those

5    before, but we get through them -- or through consensus driven

6    by that competition.

7          Judge, I also have a PowerPoint.  I'm going to ask

8    that it be put up by our --

9          THE COURT:  There it is.

10          MR. MOLTON:  There it is.  Hopefully, Judge -- I

11   don't have any graphs or timetables in here, just some points.

12   And hopefully, I'll be able to run through it pretty quickly.

13          What is the real issue in this case?  Again, it's a

14   full-pay case, so I don't think that the number of claims which

15   drives feasibility issues connected to plan is that relevant

16   here.  The key is what is a talc claim for.  The Court does not

17   need a 502 estimation to answer that question.  Even if it were

18   mandatory, which we submit it isn't and we'll refer you, of

19   course, to the Camden decision which was a transcript decision

20   by Judge -- on the record by Judge -- I'm going to get his --

21          THE COURT:  Poslusny.

22          MR. MOLTON:  -- Poslusny.

23          THE COURT:  We know it here.

24          MR. MOLTON:  Yes.

25          In any event, you know, they always say it's

1  mandatory.  Well, it's not mandatory if there's no delay in the

2  administration of the case and you don't need -- you know, for

3  the purpose of allowance, the fixing of liquidation -- fixing

4  or liquidation of claims would unduly delay the administration.

5  Our view is the administration of this case would not be

6  delayed because those issues would be dealt with by a post-

7  confirmation trust, including the issue of whether a claim is

8  valid or not, is stale or not, should be paid or not.

9          Again, it's a full-pay case.

10          The Court and the parties in interest need to know

11  really the individual claim values in a plan that incorporates

12  a TDP matrix used for settlement of talc claims and whether

13  those are in the -- within the range of reasonableness.

14          What is a fair settlement for an ovarian cancer or a

15  mesothelioma claimant is really the key question that's in

16  front of us all.  Aggregate estimation does not and is not

17  necessary to answer this question.  We submit, Judge -- next

18  page -- aggregate estimation is a tool that is used to create

19  undue delay.  As Your Honor knows, you must have the votes, 75

20  percent of the affected parties, to confirm a 540(g) plan.

21  Cramdown on tort victims is not an option here, and if a court

22  estimates low, the plan gets voted down.  See Garlock.

23          The plan gets voted down.  All that estimation, all

24  that discovery, the plan gets voted down.  And in Garlock, as

25  Your Honor knows, the eventual settlement was four times, four

56

1  times what the court estimated.  If the Court estimates high,

2  by the way, J&J could try to pull the plug on the case.

3  Estimation serves no useful purpose.

4          And I'm going to repeat Judge Poslusny, Estimation

5  for negotiation to facilitate mediation is not a proper purpose

6  under 502(c) even if the negotiation is aimed at the eventual

7  plan formation.  And by the way, as Your Honor knows, LTL is

8  not tied its proposed estimation to really anything else.

9          The debtor, we submit, Judge, is proposing estimation

10 to create delay which is not consistent with but the antipathy

11 of Section 502 of the Bankruptcy Code, 502(c).  Why does

12 J&J/LTL want estimation?  Not so hard to understand.  Delay.

13 Take a look at everything that's going on in North Carolina.  I

14 know Mr. Gordon blames the plaintiffs for everything that's

15 happened in those cases.  What a surprise.

16          Garlock shows that if a defendant actually steps up

17 and agrees to fair values and a fair settlement, the case will

18 settle.  That's the history of Garlock.  Until that happens,

19 we're just going to have delay.  Delay for J&J and LTL is

20 money.  JJCI, as Your Honor knows, operates freely outside of

21 bankruptcy, and J&J invests and dividends out funds from New

22 JJCI operating outside of this courthouse and outside of Your

23 Honor's supervision while this case malingers with a debtor

24 that has absolutely no incentive to exit bankruptcy.

25          J&J wants to forestall a satisfactory settlement to

1  plaintiffs as long as possible because delay means money to

2  them and their shareholders.  Years of delay means cancer

3  victims are stripped, Your Honor, of their rights and perk

4  (phonetic) plaintiffs' objective, real objective, pull away all

5  the platitudes and legal argument, what's really here trying to

6  get them to settle low if they ever want to get paid in their

7  lifetimes.

8         Next.  Next.

9         This is _Garlock_, Your Honor.  This is my one graph.

10 J&J wants to create years of delay to lever cancer victims.

11 The real tortfeasor and operating companies are not in

12 bankruptcy.  LTL is a non-operating company with no business,

13 has no reason whatsoever to exit bankruptcy, get back in the

14 game by reaching a fair and equitable deal with cancer victims.

15        Take a look at _Garlock_, 2010, the petition date.

16 2011, debtor first moves for estimation.  2014, the court

17 adopts debtor's estimation theory and estimates liability at

18 125 million.  Then, the asbestos creditors vote down the

19 debtor's plan based on this estimation.  Eventually, eventually

20 in order to get a plan done under 524(g), $500 million

21 settlement, roughly four times the estimation.

22        By the way, Jones Day as counsel to all Texas Two

23 Steps, have embraced estimation as a path to delay.  Now Mr.

24 Gordon admits they have embraced estimation.  He just won't

25 admit that it's a path to delay.

58

1          Next page, please.

2          None of the Texas Two Step cases have yet exited

3    bankruptcy, and none, Your Honor, has provided a fair and

4    equitable or consensual settlements.  Bestwall, we are five

5    years in, Judge, and we've mentioned before, all the members of

6    the original Bestwall Creditors Committee have passed away.

7    Aldrich Pump, two years pending.  DBMP, two years pending.

8    Here, we're nine months going on one year.

9          For most debtor's counsel, Judge, this Hall of Fame

10    graph would be the mark of failure.  And I haven't gotten my

11    client out of bankruptcy.  But here, on the Texas Two Step

12    world, this is a triumph as a malingering debtor continues to

13    try and lever an insufficient settlement while its solvent

14    affiliates continue to operate without the burden of

15    bankruptcy.

16          Next slide.

17          All Texas Two Step cases have malingered.  That's the

18    point.  All the Texas Two Steps have used estimation as the

19    tool for delay, Your Honor.  We believe this is the point of

20    it.  They create LTL to get the benefits and years of delay but

21    keep J&J and JJCI out of bankruptcy so no burdens of

22    bankruptcy.  Unlike a real mast tort debtor, LTL has no

23    incentive to exit bankruptcy because there's nothing for it to

24    do outside of bankruptcy.

25          The Texas Two Step, whether Garlock or even G-I

1  Holdings, we have delay, we gave delay without the bankruptcy

2  burdens.  These are the mismatched incentives which

3  differentiate real mass tort bankruptcies which eventually do

4  resolve and settle on satisfactory grounds with the parties

5  because all the parties there are incented [sic] to reach a

6  settlement.

7          Estimation by design, as I said, Your Honor, is a

8  road to nowhere.  I know Mr. Gordon disputes it, but that's why

9  he's on that side and I'm on that side.  But we would submit

10  that that's the only conclusion from looking at the facts.

11  Estimation is not needed to formulate a plan.  And I again cite

12  Boy Scouts.  And I know that in their papers, they said, well,

13  Boy Scouts is one of those cases where you had a resolution.

14  Well, tell that to Judge Silverstein who's still working hard.

15          That was a contested confirmation proceeding.  Yes,

16  the debtors had deals with certain plaintiff constituents, but

17  the insurer certainly didn't accept the values and guess where

18  those values were litigated, Judge?  Those values were

19  litigated not in estimation but in the confirmation proceeding

20  with fulsome and fair and full discovery to the parties.

21          LTL cannot identify a single 1129 purpose for

22  estimation.  It doesn't do it.  LTL cannot propose a chapter

23  plan because its real plan is to use estimation to create delay

24  and lever sick and dying plaintiffs.

25          Estimation has rarely, we submit, if ever resulted in

60

1   a settlement.  Now I know Mr. Gordon referred to Garlock, but

2   the real story in Garlock was something else, was the plaintiff

3   voted down the plan that used that estimation.

4          Estimation will not impose discipline or resolve

5   disputes.  Indeed, what we saw from Mr. Gordon is a schedule

6   and procedure and massive discovery into asbestos trusts into

7   40,000 victims that will just create disputes, create delay

8   while our constituency suffers and passes away.

9          How do we move this case forward, Judge?  We must put

10  this on a path to resolution one way or another in six to nine

11  months.  Our constituency demands this and deserves this.  Of

12  course, Your Honor, we maintain that the case should be

13  dismissed.  The appeal will be heard on the 19th.  If it's not

14  dismissed, we believe, Your Honor, a competing plan is the best

15  tool.

16         Either the parties settle or a plan gets confirmed.

17  Giving J&J the benefit of what is in essence a multi-year plan

18  to plan confirmation without even a plan yet filed and where

19  one that the creditors can ever support on its timetable with

20  its discovery means no settlements, means delay, means

21  unbelievable cost, unbelievable taxing on the Court's resource,

22  and a plan that likely gets voted down.

23         So at the end of the day, Mr. Gordon said, well, if

24  the TCC moves its plan, maybe it won't work.  You know, maybe

25  there will be objections and plan objections and, you know --

61

1  but we'll know that, Judge, in the next six months.  We'll know

2  what those are, and we'll be able to deal with those in the

3  next six months.  Here, their proposal doesn't even get a plan

4  in front of Your Honor probably until 2024.

5          We submit, Judge, the Court should terminate

6  exclusivity to provide the tort claimants and the Court with an

7  alternative.  If dismissal is not granted, that will reserve

8  the case with a fair and satisfactory compensation to talc

9  victims in their lifetimes.

10          And, again, Judge, we've filed our motion to

11  terminate.  We're going to have a hearing on it in the next

12  month or so.  And we'll be able to argue that here, but we

13  wanted the world and Your Honor to see we're serious.  We're

14  serious about moving this case.  We're serious about -- you

15  know, we can walk and chew gum at the same time.  You know,

16  yes, there's an appeal, but we're serious in the interim about

17  moving this case and we're serious at the same time about

18  mediating why we have a level playing field.

19          How does our plan work?  As I mentioned at the start

20  of my presentation, Judge, we start with the Texas Two Step and

21  the tools that they provided us.  The funding agreement must be

22  real and obligate J&J to pay valid talc claims.  If not, the

23  Texas Two Step would be a fraud for that reason alone.

24          We assume for today that LTL and its minions told the

25  truth to this Court about the funding agreement and J&J's

1   in-court silence we view is acquiescence to those

2   representations.  The funding agreement obligates J&J to pay

3   talc claims pre-filing or post-effective date when liquidated

4   through a final settlement or judgment of a court of competent

5   jurisdiction.

6           Next page.

7           How does our plan work?  Well, what triggers J&J's

8   payment obligations post-effective date final settlements when

9   LTL's proceeding is no longer pending, post-effective date

10  judgment to a court of competent jurisdiction when LTL's

11  proceeding is not longer proceeding?

12          The TCC's plan is based, Your Honor, on a

13  pay-as-you-go structure.  We believe the funding agreement

14  itself -- the architecture that they provided us when they

15  entered into this bankruptcy provides for such and should be

16  used for such.

17          THE COURT:  May I interrupt for a second question?

18          My reading, when I read through and waded through the

19  funding agreement then, it can be corrected because we know

20  it's not an easy read.  The funding and the obligation to pay

21  by the payers, JJCI and J&J, is explicitly dependent upon

22  exhaustion of all other assets by LTL, by the debtor.  And we

23  may touch on this later when we do get to the insurance issues,

24  but that would include the insurance policies and their

25  interest in those policies.

63

1          We've heard estimates that it could be between one

2     and two billion or more.  How do I allow a plan to go forward

3     in a vacuum without estimation without knowing whether the

4     funding, which this plan that you're describing is bottomed on

5     the funding agreement, whether that kicks in?  The obligations

6     have to exceed one to two billion.  We talk about it as if

7     that's a given, but is it a given?  And what record do I have?

8     I mean, is an estimation needed in that regard?

9          MR. MOLTON:  Judge, I would submit first of all that

10    the allowance of us to file a plan will give us the ability to

11    bring the insurers in and talk to them with the debtor and deal

12    with those issues.  But second of all, Your Honor, I don't

13    think there's any, any dispute that the liability for talc

14    victims exceeds the extent of available insurance plus the

15    royalties.

16         I don't think that's a fair question in dispute, and

17    if that were a question in dispute, that is a question, that's

18    a easy question that can be dealt with in confirmation under

19    the process that I just described, Your Honor.  So in the event

20    that it's $3.5 billion dollars total, and of course, I'm just

21    using this for example --

22         THE COURT:  Right.

23         MR. MOLTON:  -- that goes well beyond, you know, well

24    beyond the liabilities or the available assets to which LTL can

25    touch upon.  And I know Your Honor, in the motion to dismiss

1  decision, without saying you found anything or held anything or

2  adjudicated anything, talked about numbers far greater than

3  that.  I think that's an issue, Judge, that can be folded into

4  the confirmation process.  And for anybody to stand there and

5  say, Judge, we need a two-year estimation, or a one-year

6  estimation, in order to ascertain whether the liability of the

7  talc victims exceeds the amount of available assets, which

8  includes insurance and royalties, I think is a straw man.

9          That would be my response, Judge.  I think that's an

10 issue that has to, of course, be dealt with, but it's one that

11 can be done in the context of plan confirmation.

12          THE COURT:  All right.  Thank you.

13          MR. MOLTON:  Okay.

14          J&J is simply required to pay talc claims as they are

15 liquidated post confirmation.

16          Next slide please.

17          How does it work?  By the way, we believe, meaning

18 the current claimants believe, that future claimants are

19 actually far better off too under our vision since they get the

20 benefit of pay-as-you-go structure.  The risk of underfunding

21 is not placed on future cancer victims.  The full benefit of

22 the funding agreement is preserved for future claimants.

23          J&J, in contrast, in the end, Judge, and if you parse

24 through their pleadings, they say the estimation by itself will

25 not do a fixed fund, but we believe it's their intent to use

1  the estimation to put forward a plan that would fix that

2  liability.  And under those circumstances, it would be fixed.

3  They want a fixed fund.

4          If the trust fund is inadequate, future claimants

5  would have no source of recovery available to them on account

6  of a valid talc claim.  Now, we all may disagree as to the

7  developing science, and I know we've heard repeatedly the

8  mantra, well, yeah, the science was introduced in the last four

9  cases under COVID and Zoom trials were lost.  As Melanie,

10 Ms. Cyganowski, is going to say, okay, let us go at it now in

11 this, hopefully, post-COVID world.  But the developing science,

12 we submit, Judge, which we disagree with Mr. Gordon's

13 recitation of the impact of it, is greater than the present

14 estimate and victims would have no recourse against a solvent

15 J&J under a fixed fund.

16         Again, next page.  How does our plan work?

17         We would have Court-approved trustees to oversee

18 settlements.  As I said, we could bake in the 706 expert now to

19 use to vet and opine on claim settlement matrices.  Values can

20 be vetted prior to solicitation.  There's no need to ask an

21 expert to guess about aggregate values.  Focus on what is

22 reasonable for individual claims, that's what we're interested

23 in.

24         The claims settlement values would be included in a

25 disclosure statement.  It would be our intent, Judge, to

1   include or to utilize or to focus on and to be assisted by the

2   706 expert if relevant and applicable.  And we can get at it.

3   All parties, J&J, JJCI, and LTL, under discovery rules in the

4   Bankruptcy Rules for a contested proceeding, including plan

5   confirmation, have full fulsome rights to relevant discovery so

6   that their interests will be protected and they will be given

7   due process.

8           Notice and opportunity will be afforded to all

9   parties in the confirmation, our insurers included, and that

10  will take place by our schedule.  It can take place six to nine

11  months, now, not, even assuming the best from Mr. Gordon, one

12  year and then plan confirmation going into 2024.

13          Next page.

14          We don't need aggregate estimation.  Your Honor

15  raised the question.  I hope I answered it.  We only need to

16  resolve gating criteria, matrices, values, and scaling factors

17  for individual claims.  And, of course, J&J must honor its

18  contractual obligations.  Or, alternatively, they must admit

19  that the bankruptcy is predicated on a fraud.

20          J&J, JJCI's, and LTL's consent is not required to

21  confirm a TCC plan.  We would hope, at the end of the day, that

22  they would join us after the plan process or during the plan

23  process while the mediation is going on, but it's not required.

24  Indeed, the funding agreement doesn't require it.  Courts can

25  impose a reasonable settlement framework on LTL pursuant to

67

1   1123 and 1129.  That's gone over in the papers.  Those are

2   confirmation issues.  I'm not going to go down those holes now.

3   But the Bankruptcy Code plus the funding agreement, we believe,

4   gives us everything we need.

5        A competing plan and not estimation will resolve this

6   case, Judge.  Absent dismissal, there are three realistic

7   outcomes if exclusivity is terminated.  First, the Court could

8   confirm our plan, the case ends, and the victims are paid.

9   Second, pressure of a competing plan and the loss of

10  availability to use estimation to create undue delay could

11  produce a settlement and the case ends and the victims are

12  paid.  And I would point to PG&E.  And I know that Mr. Gordon

13  has raised PG&E's papers.  We have, too.  He talks about the

14  court ordered estimation there, and that estimation including

15  the Tubbs Fire court tort (indiscernible), by the way.  But it

16  also included the end of exclusivity in a competing plan with

17  bondholders.  And just look at the pleadings and look at the

18  timeline and you'll see what incented the debtor.

19       Third, J&J could try to walk away from or nullify the

20  funding agreement and defeat the TCC's plan.  If possible, the

21  case would end.  Needless to say, there would be litigation and

22  arguments that this whole thing was a fraud.

23       How much is required?  We're ready to go, Judge.

24  We're ready to go.  A plan, disclosure statement, trust

25  distribution procedures, trust agreement, motion to approve

1 solicitation procedures, solicitation procedures themselves,

2 notices, ballots, form of relief, and document agreement, we've

3 all drafted.  We need some cleanup work, of course, and we're

4 going to be guided by whatever Your Honor does today, but we

5 can be ready to file all material documents within the next 30

6 days.

7          And what I'm saying, Judge, is usually in some of

8 these cases, you get plan supplements like, you know, months

9 after the plan is filed.  We're going to eliminate that.  We're

10 going to file all of these documents at the same time.

11          The plan should enjoy, we would predict, broad

12 support from all parties-in-interest, presumably, at the

13 present time, with the exception of LTL and J&J.  The plan

14 further provides that a separate estimation is not necessary

15 and would violate 502 of the Bankruptcy Code.

16          I want to just respond -- I'm on my last slide, but

17 before I get there, I just want to respond to a few things that

18 Mr. Gordon said.  He said, first and foremost, the whole basis

19 of their pleading in terms of viewing our proposed case avenue

20 is that the plan process is premature in the absence of

21 agreement or estimation of liability.  We reject that.  And

22 what I've given you is the path why that should be rejected.

23          What I find amusing and actually remarkable is the

24 statement that they need all this discovery, you know, in order

25 to mediate with us because that's all their estimation is.

1   It's tied to mediation.  Judge, four months ago, they stood

2   here and said, we don't need any discovery to mediate.  Indeed,

3   when we were looking to get the settlement data, which will be

4   very useful because they rely on average case values that they

5   say the settlement data supports in order to sustain their

6   mediation positions.  We think once you pull the onion skin

7   off, you're going to find that those claim values are

8   manipulated in a way based on who these settlements are, what

9   they are, and what they contain.

10          In any event, and I find it just remarkable and

11  outstanding that they're here asking Your Honor, saying the

12  only way to get this case done is to do PIQs on over 40,000

13  sick people.  And Mr. Gordon makes it look like, oh, it's

14  nothing.  It's like a typical proof of claim in a bankruptcy.

15  Who are you?  What's your disease?  What's your claim?  Judge,

16  again, do I have a bridge in Bayonne to sell?

17          In any event, it ain't that way.  And trust discovery

18  on all the asbestos trusts.  There's no limitation of discovery

19  in what we're doing and what we're asking for.  Judge, to say

20  that this multi-layered, you know, one year at a minimum

21  estimation process would be cheaper than getting a plan done in

22  which these issues of claim value can be folded into plan

23  confirmation is really disingenuous.  The confirmation process

24  will be expensive, of course.  But that confirmation process is

25  going to happen anyways.  It's going to have to happen anyways.

1 Let's do it now and avoid the expense and discovery and

2 discovery disputes and acrimony that comes from, yes, I'm going

3 to say it, the Jones Day play book on estimation.

4          And at the end of the day, what does estimation buy

5 us?  It buys us Garlock.  Again, the plaintiffs hold the veto

6 and all they can say, if they say no, there you go.  It's a

7 year of frolic and delay while our clients get sick and pass

8 away.

9          I know Mr. Gordon and no doubt his clients are afraid

10 of overpayment of claims.  Nobody is asking that claims be

11 overpaid.  Indeed, that's what the confirmation discovery and

12 issue is about.  See Camden.  You want to contest values?

13 You've got Your Honor.  You've got discovery.  Let's go at it.

14 See Boy Scouts.  Same thing.

15          I thought at the end, Judge, that I'll get to your

16 question, you know, when you got to some real key, pure

17 bankruptcy issues on plan confirmation.  You know, fair and

18 equitable, all that stuff.  And you asked the question, what is

19 the harm visited on the debtor's equity holders?

20          And I think we saw finally the real Texas Two Step,

21 which is a dance, and because he couldn't answer the question.

22 He couldn't answer the question.  There's no impairment of

23 equity here.  There's no cram down on equity here.  In any

24 event, again, going back to the issue, they don't like the

25 claims values.  They think it's overpayment.  Let's have at it

71

1  in front of Your Honor, in confirmation, with a 706 expert

2  baked in, and full and fulsome discovery.

3          Returning to the question poised in the first slide,

4  Judge, what is the issue in this case?  The issue is claims

5  value.  Can the (indiscernible) and incenting, and from Your

6  Honor's perspective, incenting taking a turn in the fork that

7  will really not separate parties and cause further delay and

8  lever only one group but will create competition and lever

9  everybody.  Can the Chapter 11 plan process, absent dismissal,

10  be used to provide a meaningful opportunity for justice and

11  produce comprehensive, equitable, and timely recoveries for

12  injured parties?  I believe the answer is yes.

13          Is its objective to terminate exclusivity and let the

14  representatives of cancer victims propose a plan and put this

15  case on a fast track to final resolution?  Is this something

16  that should be done?  I submit it's yes.

17          If this is not the objective, Judge, a lengthy

18  estimation proceeding that has no legitimate bankruptcy tie or

19  purpose only then to be followed by a J&J plan will

20  unequivocally deny justice to thousands of victims who will die

21  without receiving any compensation for their injuries while

22  they're alive.

23          Judge, second to last point, we cannot extend,

24  underscore cannot extend, the lives of our constituency, the

25  cancer victims.  Accordingly, if justice is to be done in this

72

1  case, as Your Honor has proffered in your motion to dismiss

2  opinion, the Court should not extend this bankruptcy proceeding

3  beyond what it needs by accepting the estimation play book.

4        Instead, Judge, the Court should focus on getting a

5  plan moving, terminate exclusivity, enabling the TCC plan to be

6  considered on with any plan they want to offer, get it in front

7  of you, solicit it, voted on it, and to the extent the

8  plaintiff support it, confirm it.

9        That's my presentation, Judge.  I hope I've answered

10 questions.

11        THE COURT:  Yeah.

12        MR. MOLTON:  I appreciate the time you've given me.

13        THE COURT:  Thank you Mr. Molton.

14        MR. SATTERLEY:  Your Honor, may I approach?

15        THE COURT:  Yes.  Is that the order you all, or I

16 don't know if you had discussed it in advance.

17        MR. SATTERLEY:  We haven't discussed the order.

18        UNIDENTIFIED SPEAKER:  (Indiscernible)

19        MR. SATTERLEY:  I'm talking estimation.

20        I have just a few comments to make.

21        THE COURT:  Well, proceed.

22        MR. SATTERLEY:  Thank you, Your Honor.

23        Once again, Joe Satterley, Kazan McClain Satterley

24 and Greenwood.  I rise to object to the estimation and to

25 address a few points that Mr. Gordon has raised to set the

73

1  record straight.

2        He said that debtor has a strong desire to settle.

3  As I've advised Your Honor in the past, I've tried cases to

4  verdict against J&J for baby powder in 2018, 2019, 2020, and

5  2021, multiple.  And before any of those trials, they never

6  attempted to negotiate.

7        Still, here in 2022, I've reached out to the debtor

8  and to J&J, through their counsel, begging them on behalf of

9  Mr. Hernandez Valadez, Ms. Johnson, and others, Mr. Hill,

10  please let's negotiate.  Let's settle.  No desire to settle.

11       Instead, what I'm told is that I'm talking my

12  plaintiffs into believing their cancer is caused by baby

13  powder.  I'm told that they will not offer anything to my

14  clients.  So my experience over the last five years has been

15  the exact opposite of what Mr. Gordon tells the Court they're

16  willing to do.

17       Now, given that I've tried six cases to verdict and

18  other cases that mis-tried because of deaths, I object to this

19  estimation plan because it's a waste of time with regards to

20  this medical science.  What debtor's counsel didn't advise you

21  is that courts, not just Judge Wilson, but courts throughout

22  the country have had Daubert hearings every single year.

23  Kentucky, where I'm born and raised, we have Daubert hearings

24  involving J&J.  Evidence was allowed in, we went to verdict.

25       New Jersey, Middlesex County, we had Daubert

1    hearings.  It went to verdict.  Multiple trials went to

2    verdict.  Los Angeles, Oakland, three separate Judges in

3    Oakland have had Daubert hearings, had hearings, allowed the

4    evidence.  The science was sufficient for a jury to decide.

5    Miami, Florida, the State of Washington, Oklahoma City,

6    Indiana, South Carolina, Daubert hearings.  The evidence was

7    allowed in.  There was sufficient evidence.

8         To answer Your Honor's question that you posed to

9    Mr. Gordon about this new science, Your Honor is 100 percent

10   correct.  The new science can come into evidence if Your Honor

11   later this afternoon decides to release some trials.  And

12   Mr. Gordon said there was four defense verdicts.  He didn't

13   tell you that there was -- that 2021, I got the last bonded

14   judgment in the Prudencio case.

15        So this new evidence was out there in the Van Klive

16   case, which was both an ovarian cancer and a mesothelioma case.

17   The science was out there.  The plaintiffs won that case.  The

18   Johnson case -- all in 2021.  So I would tell Your Honor, with

19   regards to a need for a science day, I believe there's no need

20   for that whatsoever.

21        Procedurally, he's proposing one day, a one-day

22   science, first for ovarian cancer, then with mesothelioma.

23   That just would never, never, ever, ever work.  There is

24   epidemiologists that support causation, there's pathologists

25   that support causation, cell biologists that support causation,

1  pulmonologists, genetics, oncologists, toxicologists.  There's

2  literally hundreds of scientific articles and he's proposing

3  that occur in one day.  That's just -- it's not necessary and

4  it's just not feasible.

5          With regards to a couple other points, Your Honor,

6  the personal injury questionnaires.  First of all, all my

7  clients have been deposed, were deposed.  They answered

8  interrogatories.  They voluntarily turned over information in

9  discovery.  J&J already has that.  There's no need to submit

10 personal injury questionnaires to any of the mesothelioma

11 victims that I'm aware of.

12         There's been sufficient and adequate discovery done

13 in all the mesothelioma cases that I'm aware of, that there's

14 no need to have any PIQs or anything like that.

15         Counsel said that it would take decades to resolve

16 these cases.  I believe that's sort of a scare tactic because

17 they've already resolved thousands of cases while in the tort

18 system.  And they've gathered, already gathered through the

19 discovery process, sufficient information for them to evaluate

20 the merits of the cases.

21         The last point I would like to say is, counsel says

22 they don't have the resources to try cases.  I would

23 respectfully disagree.  I've tried cases against J&J where

24 they've had Skadden Arps, Ms. Brown, or King and Spalding,

25 Kirkland Ellis, Drinker Biddle, Lewis Brisboi, Nelson Mullins,

1  and many other firms and they all have defended J&J baby

2  powder.  And those counsel are still approved counsel through

3  the bankruptcy but they have more than sufficient trial counsel

4  to try as many cases as Your Honor will allow to be released.

5          I appreciate the few minutes that I've spoken here

6  today.  Those are all the comments I have right now.  I don't

7  have a PowerPoint, but I will have one this afternoon.

8          THE COURT:  All right.  Thank you.

9          MR. SATTERLEY:  Thank you, Your Honor.

10         THE COURT:  Mr. Falanga?

11         MR. FALANGA:  On behalf of the FCR, Your Honor?

12         THE COURT:  Yes, please.

13         MR. FALANGA:  Good morning, Your Honor.  Steven

14  Falanga, Walsh Pizzi O'Reilly Falanga, along with my colleagues

15  on behalf of Randi Ellis, the FCR.

16         The FCR is not taking the role of Solomon here, Your

17  Honor, but you've read the position statement.

18         THE COURT:  She can have it.

19         MR. FALANGA:  I know.

20         You know, Chapter 11, as Your Honor knows, is in the

21  first instance, a compromise process.  There's sections in the

22  Code that allow for the Court to compel action when the parties

23  don't consent.  But in this particular case, we're seeking

24  compromise.  That's been the goal of the Court since the

25  motions to dismiss were denied earlier this year.

1          As the FCR has noted, at the present time, she sees a

2    global resolution with a fully funded trust as the optimal

3    result for future claimants and she takes that role very

4    seriously.  She supports an estimation process.  She thinks at

5    some point in time, estimation will likely be needed as part of

6    any possible plan that may come before the Court.  But at the

7    same time, the FCR supports allowing exclusivity to be

8    terminated or at a minimum for the Court to consider allowing

9    exclusivity to be terminated in September at the hearing.

10          The TCC plan could be filed.  It could be made

11    public.  It could be exchanged in mediation.  The same with the

12    debtor.  The debtor could propose a plan that doesn't have to

13    be filed just yet.  Your Honor, obviously can control the

14    docket in that regard and decide whether a filed plan goes out

15    to solicitation or not and when.  The goal here being that

16    mediation is the ultimate resolution that -- excuse me,

17    resolution in mediation is the ultimate goal that the FCR is

18    looking to go with right now.  And I think ultimately what the

19    FCR would like is to get back into mediation.

20          You know, the FCR was appointed a little bit later in

21    the case and was able to participate in the in-person

22    mediations but did not have her expert at that time and really

23    was not able to fully participate.  And so, you know, having

24    some mandatory mediation as part of any process sooner, rather

25    than later, not waiting perhaps as the debtor proposes until

1  sometime in December before full mediation is resumed is not

2  something I think the FCR would like to see.  And so we think

3  that that should be the goal ultimately is to see if consensual

4  resolution can be achieved.

5         Essentially, Your Honor, aggregate liability is

6  important, but claims value is also important.  You've heard, I

7  think both sides talk about that.  But I think the FCR also

8  feels like understanding the claims values and what the parties

9  are proposing will be helpful to the FCR in making her

10 determination as to how best to proceed in the case.  So unless

11 Your Honor has any questions, we just wanted to be heard, and

12 we stand on the statement that we previously filed.  We're

13 hoping that we can get back to mediation as part of any process

14 the Court orders.

15         THE COURT:  Thank you, Mr. Falanga.  I appreciate it.

16         Ms. Jones.

17         MS. JONES:  Good afternoon, Your Honor.

18         THE COURT:  Good afternoon.

19         Yeah, close enough.

20         MS. JONES:  Close enough.

21         Your Honor, Laura Davis Jones, Pachulski Stang Ziehl

22 and Jones on behalf of Arnold & Itkin.

23         Your Honor, we have filed a statement with the Court

24 and refer the Court to that and I'm not going to repeat it.

25         Your Honor, we do not need, nor is it appropriate, to

1  have estimation to determine an aggregate number here.

2  Experience and case law teaches us that futures are difficult

3  to predict with accuracy.  Instead, Your Honor, if we're going

4  to estimate anything, the process should be to establish a

5  matrix, to put a value on a disease and the degree of that

6  disease and we'll set a standard to meet the value and have a

7  plan that would be a pay-as-you-go.

8          So the suggestion that somehow during this

9  estimation, an aggregate estimation would not be a cap, Judge,

10  is just incorrect.  If you do aggregate estimation, you're

11  going to have a number that a plan is going to be funded

12  against.  And so you have that fixed amount and claims come in,

13  a trustee is going to have to start withholding.  It's not

14  going to be able to make distributions, it's going to have to

15  see where it's going to go.

16          Your Honor, frankly, that is just so contrary to what

17  the debtor has told us all along, that they are committed to

18  funding here, that there's no issue with funding in full, that

19  they had no concerns about it, and in fact, they made that

20  commitment to the Court.  So very troubling for me to sit here

21  today now and hear when we had days of trial on this.  And now

22  hear, well, maybe it's not enough.  We need to estimate.  Very,

23  very concerning.

24          Your Honor, the debtors propose that they have to

25  have discovery.  They say they have to do discovery.  They have

80

1  to send out questionnaires to find out if the claimant's

2  qualify.  Your Honor, it doesn't have to be done twice.  We

3  should be deciding values of these diseases and the standards

4  that need to be met, get a plan approved and confirmed, and

5  then, because it is a pay-as-you-go plan, we can determine

6  whether a claimant qualifies at the time that they seek a

7  distribution from the plan.  It doesn't have to be done twice.

8  Because to determine if someone can be paid from the plan,

9  we're going to need to know if they're a real claimant and if

10 they qualify under the standards that we will have established.

11         Your Honor, the claims here are serious, and I know

12 the Court knows that.  People are dying.  And if we are going

13 to have estimation, it should be limited to an estimation of

14 the value of claims categorized by disease, the stage of

15 disease, and other appropriate distinguishing factors within

16 such claim categories.

17         The case needs to move along.  This should not drag

18 because of non-essential estimation trials that are promoted by

19 the debtor, which previously cases, as everyone talked about

20 today, only caused delay.  The debtors do not need the

21 questionnaire discovery for the reasons I just talked about.

22 Everyone is well steeped in this area and in these issues.

23 Once a plan is confirmed, information can be obtained as to the

24 veracity of the claims, the degree of illness, et cetera, as

25 these claims are being presented to be paid.

1          Your Honor, if we come back to planet earth and we

2  live in the real world for a moment, claimants are going to

3  vote against a plan if it doesn't reflect values and standards

4  for those values that claimants agree with.  This is where this

5  time should be spent.  We can spend time estimating how many

6  victims will die while we stand around debating unnecessary

7  estimation.  Or we can move forward to agree upon values and

8  matrices and get a plan confirmed.

9          Your Honor, I ask that we move forward in that way.

10  Thank you, Your Honor.

11          THE COURT:  Thank you, Ms. Jones.

12          Mr. Pfister, I know you want to be heard, but let me

13  let those in the courtroom first and then I'll come to you.

14          MR. PFISTER:  Thank you, Your Honor.

15          THE COURT:  All right.  Counsel.

16          MS. JOHNSON:  Thank you, Your Honor.  Ericka Johnson

17  from Womble Bond Dickinson on behalf of the Ad Hoc Committee of

18  States Attorneys Generals.

19          Your Honor, we didn't file position papers on

20  estimation, not because we're not vested in the outcome, but

21  because the parties had all amply briefed the available options

22  and Your Honor had indicated that parties could rise in the

23  courtroom and state positions.

24          The states also want the cases to progress and agree

25  that the status quo isn't currently working and that there

82

1  needs to be some assistance in breaking the log jam.  The

2  states believe that there is a path forward that doesn't put

3  the cases on hold indefinitely for years to come.  To date, the

4  states haven't participated in any in-person mediation but they

5  still believe in the mediation process.  But mediation needs to

6  have some teeth.  And so the states would request that in-

7  person mediation be required by all the case constituents but

8  only after having exchanged position papers or term sheets or

9  something that sets bookends against which the parties are

10  negotiating.

11        And the other part of that teeth is termination of

12  exclusivity.  You have to start the clock ticking in order to

13  find some motivation to negotiate in good faith.  Estimation

14  only delays the process because it has no bearing on moving the

15  case forward unless the tort claimants agree with the ultimate

16  outcome.  It won't establish aggregate liability for plan

17  purposes if there is no consensus from the tort victims.

18        Now, it doesn't appear that the states' claims are

19  included in the estimation process.  It doesn't look like it

20  was built into the schedule in terms of experts or any sort of

21  estimation with respect to those claims.  But the schedule is

22  premised on having established knowledge base.  So it proposes

23  a very quick process based on no science.  That's not the case

24  with respect to the states' claims so the states would be, you

25  know, just starting kind of at a disadvantage if it's proposed

1  to move forward and they're included in that process within 30

2  days.

3         With respect to the states, there have been no trials

4  that have gone forward to date.  However, there are two cases

5  that, you know, are on the cusp of trial and those two cases

6  are Mississippi and New Mexico.  Currently, they're scheduled

7  to go forward in early 2023 and they could serve as test cases

8  for liability with respect to consumer protection claims.  Now,

9  there has been a motion to extend the injunction with respect

10 to those trials and that's not before Your Honor today.  That's

11 not scheduled until August.  But because of the overlapping

12 nature of some of these issues, I did want to raise that as a

13 consideration in terms of a path forward with establishing

14 liability.

15        And also concerning the path forward, I think it's

16 important to recognize that this isn't the typical debtor with

17 no other options, you know, but to seek out bankruptcy

18 protection in order to preserve jobs and preserve an ongoing

19 business.  LTL chose the bankruptcy path and the Bankruptcy

20 Code provides for limited exclusivity unless extended, you

21 know, by the Court for cause.  As a non-operating entity, LTL

22 has no motivation to determine its liabilities quickly.

23 Mandating mediation with terms provided by all sides and

24 terminating exclusivity on a date certain will move the

25 administration of these cases forward and provide a path

84

1    towards confirmation, either consensual or contested.

2            Thank you, Your Honor.

3            THE COURT:  Thank you, counsel.

4            MR. THOMPSON:  Good afternoon, Your Honor.  Clay

5    Thompson with Maune Raichle.  So I'm also presenting on the PI

6    this afternoon so I'll try to be brief and focus on estimation

7    right now.

8            So the central issue in this case from our

9    perspective is that this whole thing is unconstitutional.  All

10   the cases in North Carolina and this case here is

11   unconstitutional.  So the central issue is not aggregate

12   liability.

13           And I think you've heard from everybody here today

14   from our side that none of the victims want estimation.

15   They're all telling you they don't want it.  And Mr. Gordon

16   mentions the scorched earth litigation in bankruptcy court in

17   North Carolina.  Well, why is that?

18           Well, because it's unconstitutional.  That's our

19   position.  And I would point out that my firm is a large firm.

20   We only handle mesothelioma cases.  We are retained by a few

21   hundred clients a year that have mesothelioma.  We only have 61

22   J&J cases.  If we sued J&J, it was because we believed it was a

23   substantial factor in causing our client's disease.  But to

24   address the broader issues here, we have clients in Miramont.

25   We have clients in Paddock.  Those cases resolved.

1          The difference between Paddock and the difference

2   between Miramont and the difference between Jones Day's model

3   is there was no Two Step.  There was a limited fund.  And so

4   when it's in our client's best interest in a limited fund case

5   like Paddock, where there's a company that we could see was in

6   distress and there's no preliminary injunction so we don't have

7   our hands behind our back, we do what's best for our clients,

8   which is to make a resolution.

9          And so I think here we've consistently heard the

10  victims don't want estimation.  And I think the reason that I

11  would put forward specifically is when I go to make

12  recommendations to a client to settle his or her case, I don't

13  go to them and say, well, and I did this, I settled J&J cases.

14          I went to clients and made recommendations to them to

15  settle their cases.  And the recommendation was not based on,

16  well, you know, I believe that J&J's total liability could be

17  as high as $60 billion so you should take X.  It was, this is

18  what's being offered.  These are the risks.  You've got a

19  trial.  This is what could go badly.  These are the other

20  defendants in your case that you've already settled with.

21  That's how you do that.  So I don't care what the total

22  aggregate liability is and I don't think that any of the

23  victims do.  What the victims want is to be heard.

24          If this is an unlimited fund case, my position is

25  this is a non-limited fund case.  I think it's pretty clear.

1  Then, why do we need to estimate?  Is the liability greater

2  than $60 billion?  That's what the funding agreement says, up

3  to $60 billion.  Is it greater than $60 billion?  Then, why are

4  we going to estimate?

5          They say that, and in their reply on estimation, we

6  don't need to estimate for distribution purposes, and that's

7  right.  My clients will liquidate their individual claims

8  before a jury in the U.S. District Court before they will be

9  bound up by an aggregate resolution through a mediation that

10  I'm not invited to.  I keep hearing about mediation.  It's

11  progressing.  It's not progressing.  I don't know that I'm not

12  in mediation.  None of my clients are involved in the

13  mediation.  And so I'm just waiting to hear now what the

14  aggregate number is.  How do I go to a client and recommend,

15  you know what you ought to do?  You ought vote so a useless

16  sheet of paper can reorganize and the total amount in the trust

17  will be 6 billion, whatever the number is.  That's not how I

18  make recommendations to my clients.

19          And then, they say in their briefing, well, you know,

20  Maune Raichle can't prospectively reject offers.  Exactly.  My

21  clients decide to settle the cases and so zero.  Zero is the

22  amount of money that has been offered to my individual clients

23  in 10 years of Two Step bankruptcies.  Zero.  Because that's

24  the model.  The model is we want to deal in aggregate so we're

25  only going to negotiate in mediations for an aggregate

1    resolution in confidential settings.

2         So when Mr. Satterley tried to reach out to them for

3    Mr. Hernandez Valadez, Mr. Prieto stood up and said we couldn't

4    do it because of the order that we begged you to enter.  The

5    stay prohibits us from negotiating.  That's all by design.  So

6    zero clients of mine have had Georgia Pacific or Train or

7    Ingersoll Rand or Certain Teed or J&J come to them and say

8    here's an offer that I can then take to them.

9         And, you know, the history of this litigation is that

10   when J&J was offering, clients were settling, including ours.

11   And so the central issue -- it's really telling that Mr. Gordon

12   would say the central issue is aggregate liability.  Yet to

13   them, it is.  I don't care about aggregate liability.  All of

14   the claimants are universally opposed to estimation.  And

15   what's going on in North Carolina is just a demonstration that

16   we're not making a deal as far as Maune Raichle is concerned.

17   It's unconstitutional, can't be fixed, and we're going to see

18   those sanction orders.  We're going to see how the appellate

19   courts view those and whether the Court had jurisdiction to do

20   that.

21        Last thing.  He brought up the Olson verdicts.  I

22   want to make it very clear.  There's risk.  There's risk in the

23   jury system and that hurts for Mr. Olson.  But he objects to

24   this bankruptcy.  My firm spoke to him, Mr. Block,

25   Ms. Ratcliffe, were in this courtroom who tried that case.  You

88

 1  know what he wants.  He wants accountability from J&J.  He

 2  objects to this bankruptcy, even now.  Even now.

 3          So I'll say this hopefully for the last time that

 4  this needs to be said.  My clients hired Maune Raichle to speak

 5  for them.  They don't need to be spoken for from Jones Day or

 6  Robinson Bradshaw or Orrick or anybody else.  Maune Raichle

 7  speaks for my clients and Levy Konigsberg for the cases that we

 8  have together.  They object to this process.  All the claimants

 9  object to estimation.

10          And so I'm not -- my position is that you really

11  can't get there from here to a resolution so there's no

12  constitutional global resolution that can exist.  But I'd like

13  to see the plan that TCC is proposing.  I don't know if I'm

14  going to like it or not, but I'd like to see it.  And if the

15  objective is to try to get this case resolved, and I think we

16  disagree on how that can happen, but I will say that it would

17  be more instructive from my clients' perspectives to see what

18  the plans are then to do what we've been doing for 10

19  court -- well, nine court years in North Carolina.  Because

20  clearly, that's not working.

21          And I -- last thing I'll end with.  In April, after

22  the trial, Mr. Gordon goes down to the ABI seminar and calls

23  the Two Step, the divisive merger, the greatest innovation in

24  the history of bankruptcy.  Now see, that's a really

25  interesting way to put it because it hasn't worked.  So they

1  tell you, well, we're here for the claimants.  We're saving

2  them from these terrible plaintiff's lawyers.  Plaintiff's bar,

3  lottery, lottery, lottery.  But then, when they're out of

4  bankruptcy court, it's the greatest innovation in the history

5  of bankruptcy.  How can that be?

6        They've paid zero people.  It's never worked.

7  Because that's the point.  It's the greatest innovation from

8  the history of bankruptcy from J&J's perspective, from Georgia

9  Pacific's perspective, from Jones Day's perspective.  Jones Day

10 Bates Whites have been paid $100 million in these cases.  Zero

11 to claimants.

12        Thank you.

13        THE COURT:  You're welcome.

14        Good afternoon.

15        MS. RICHENDERFER:  Good afternoon, Your Honor.  Linda

16 Richenderfer from the Office of the United States Trustee.

17        Your Honor, I'm not rising to take a position.  The

18 U.S. Trustee takes no position on estimation versus plan versus

19 mediation.  We do believe that this case should be run by the

20 parties and the parties experts.

21        Your Honor, the only reason I rise is that baked into

22 the proposals by the debtor, by the TCC, by the FCR, were these

23 concepts of 706 experts and I think it was some sort of an

24 analyst.  I can't remember the exact term of art.  And if Your

25 Honor is going to make a ruling that includes that concept, the

1  U.S. Trustee would like to speak to that concept because we do

2  have a lot of concerns about transparency and neutrality.

3          Having been involved in several of these cases

4  myself, I do question how a neutral 706 expert witness can be

5  found on some of these topics knowing how many asbestos cases

6  there are out there and how many experts are already engaged by

7  debtors versus how many are engaged by TCCs versus how many are

8  engaged by FCRs and the tendencies of those groups to keep

9  within those confines.  And so that would be why, if Your Honor

10  is thinking of the 706 route for any of these proposals, I just

11  rise to make clear that, you know, on 706, the Court on its own

12  motion or on the motion of a party-in-interest can consider

13  that and can appoint an expert that the parties agree on or any

14  of Your Honor's own choosing.

15          But there are various things that the then expert

16  must do for the transparency.  They must advise the parties of

17  all their findings.  They must be available for deposition.

18  They may be called to testify and they may be cross-examined.

19  What I heard from the debtor, what the debtor was describing,

20  was more of the role of what I see as a magistrate or a special

21  master that the experts would sit in front of the neutral or

22  the 706 expert and present their cases and then the 706 expert

23  will then do a report for Your Honor.  That's not what Rule 706

24  provides for.

25          And the concept of having a technical analyst, I

91

1  think is the term of art I see in the cases.  Again, I read the

2  case law and there is a real concern out there amongst the

3  courts regarding the transparency of that process.  And the

4  cases that I saw that went into the transparency and neutrality

5  issues all site to one of the dissenting opinions in the

6  Association of Mexican American Educators case, which is at

7  231 F.3d 572, and it's from George -- I mean, I'm sorry, Judge

8  Tashima, I think is his name.  He's the last dissenting

9  opinion.

10       And he sets forth in very great detail a process that

11  he believes should be undertaken and the limitations on any

12  sort of analyst that the court may engage and how everyone

13  needs to know who the analyst is, have the opportunity to

14  object.  There needs to be disclosures made so even the U.S.

15  Trustee can rise if they think it's necessary that there is an

16  issue of disinterestedness that needs to be addressed.

17       So, Your Honor, we just wanted to put something on

18  the record.  We didn't know how far your rulings today may go.

19            THE COURT:  Who knows?

20       MS. RICHENDERFER:  But we wanted to make sure you

21  were aware of our great concern regarding appointment of

22  experts, analysts, and what role Your Honor may ask them to

23  play in the cases.

24            THE COURT:  Fair enough.  Thank you.

25       MS. RICHENDERFER:  Thank you, Your Honor.

 1            THE COURT:  Anyone else in the courtroom?

 2                      (No audible response)

 3            THE COURT:  Mr. Pfister, it's your spotlight, so to

 4   speak.

 5            MR. PFISTER:  Thank you, Your Honor.  Can you hear

 6   me?

 7            THE COURT:  Yes.

 8            MR. PFISTER:  Excellent.  Good afternoon, Your Honor.

 9   For the record, Rob Pfister from the Klee Tuchin law firm on

10   behalf of AWKO.  I apologize for not being present in the

11   courtroom today.  I've not missed a hearing yet.  But

12   unfortunately, I came down with COVID and therefore cannot

13   travel.

14            THE COURT:  We appreciate the distance.

15                      (Laughter)

16            MR. PFISTER:  Well, thank you for hearing me by Zoom.

17   I do appreciate it.

18            So, Your Honor, there are two fascinating aspects I

19   think of this bankruptcy case.  Perhaps more than two, but two

20   that I will cover.  One is, you know, how does the Texas Two

21   Step structure interact with traditional bankruptcy concepts

22   like the absolute priority rule and other traditional

23   bankruptcy rules and procedures?  I was kind of floored

24   actually to hear Mr. Gordon today say that it was, I wrote down

25   "beyond belief," "unimaginable," that the claimants could vote

93

1  for a plan and that the funding agreement would kick in and

2  fund that plan, that that couldn't possibly work.

3            And the reason I was a bit floored is A, this is the

4  system that -- this is the construct of the structure that

5  Jones Day designed and that the debtor is using and I'm certain

6  Your Honor recalls Mr. Gordon standing before you in February

7  when we were there at the trial on the motion to dismiss saying

8  that, you know, J&J's consent was not necessary for a plan.  So

9  far as I can tell, his comments about how it's unbelievable or

10 beyond belief that, you know, claimants could vote for a plan

11 and it would be funded by the funding agreement, they're kind

12 of predicated on two points.

13            One is this notion that claimants would be overpaid,

14 which no one is proposing, certainly.  And then, second, this

15 kind of vague notion that there's an absolute priority rule

16 issue with equity holders and Your Honor's comment, or

17 questions, touched on that.  Certainly -- I mean, I haven't

18 seen a TCC plan, but I would imagine you could simply reinstate

19 equity.  There would be no impairment.

20            If this is the structure that J&J designed with a

21 synthetic bankruptcy estate, you know, I think they should have

22 to live by the structure they designed.  No one's going to be

23 overpaid and under a full-pay plan, there could be no

24 impairment of equity.

25            Then, the second fascinating aspect I think of this

94

1  bankruptcy case, and I'll tie this to the estimation, I'll tie

2  both points to the estimation in a moment, is that unlike other

3  asbestos bankruptcy cases, I think from the very get go, from

4  the Manville case forward, as well as other mass tort cases,

5  the sex abuse cases, the opioid cases, other cases of this

6  nature, this case is unique in the fact that the debtor admits

7  no liability.  They've stood up from day one and have said, you

8  know, our products don't cause any disease or impairment and,

9  you know, we owe nothing.

10        I don't think other mass tort defendants have taken

11  that position in their bankruptcy cases.  I thought the TCC's

12  comments in its reply brief on the difficulty of negotiating

13  with somebody when that's the construct were very well taken

14  because, you know, if the debtor's position is that the right

15  number here is zero and everything is simply a nuisance

16  settlement or a settlement to avoid defense costs, it doesn't

17  really leave much room for having these matters consensually

18  resolved.  I think that's an important backdrop point.

19        So tying those two points together and how it relates

20  to estimation, number one, I think it's important that we not

21  litigate these important issues about, you know, what should a

22  plan look like, how could a plan work, what limitations might

23  there be as a result of the absolute priority rule or

24  otherwise.  I don't think we should litigate these on the fly.

25  I think the proper way to resolve these questions is to allow

1   the TCC to propose a plan and to, you know, I'm sure LTL will

2   raise any objections it deems appropriate in the context of,

3   for example, motion to approve a disclosure statement.

4          They'll say, no, no, the plan's unconfirmed because,

5   you know, equity will be impaired or whatever Mr. Gordon's

6   argument might be.  I think he said he hadn't thought through

7   the issues and, you know, off the top of his head, he could

8   come up with a few.  Well, we shouldn't be litigating off the

9   top of his head.  We should be litigating in the context of

10  plan proposals.

11         And then, the second point is let's stick with the

12  traditional bankruptcy path.  You know, after bankruptcy

13  petition is filed, after some initial motion practice with

14  respect to motions to dismiss, which of course we had a trial

15  on stay relief and the like, you know, then the parties move to

16  the plan process.  That's kind of how it's done.  That's how

17  disputes are typically done.

18         To the extent there's a need for estimation,

19  Ms. Jones talked about what her view of estimation and how that

20  could work.  The debtor has a theory of estimation that you

21  have to estimate the aggregate.  I don't think you have to

22  estimate aggregate liabilities, but estimation is a tool it's

23  not an end unto itself and I think, you know, if you peel back

24  what the debtor is saying here, and again, take it from the

25  backdrop of the debtor's position is is that it owes zero and

96

1  anything above zero is overpaying.

2          I think if you peel it back, what the debtor is

3  really saying is, is we want you, Judge, to agree that we owe

4  nothing and so we would like to do a year-long estimation

5  process so we can convince you of the science and get you to

6  say we owe nothing.  And they're viewing it as really as a

7  mediation tool.  And, you know, echoing Mr. Molton's comments,

8  I don't think that's an appropriate use of estimation and I

9  don't think it's a path to anywhere in this case.

10          Anyway, thank you, Your Honor.  I appreciate the

11  opportunity to participate by Zoom.

12          THE COURT:  Thank you, Mr. Pfister.  And I hope you

13  get better --

14          MR. PFISTER:  Thank you.

15          THE COURT:  -- and look forward to seeing you on this

16  coast.

17          Anyone else wish to be heard?  Don't feel compelled.

18                          (Laughter)

19          THE COURT:  All right.  Mr. Gordon, did you want to

20  respond?

21          MR. GORDON:  I do, Your Honor.  I can be relatively

22  brief I think.

23          Just starting with a point that Mr. Pfister made and

24  others, there seems to be a number of efforts to try to paint

25  us as changing positions.  And I don't think, Your Honor, that

97

we've changed positions on anything.  Mr. Pfister suggests that

today, we're now arguing that J&J's consent is required for

plan confirmation.  I did not make that argument.

The point I was making is that we're in a judicial

proceeding.  We believe, like the claimants, that we have

rights to be heard, that we have due process rights to make our

case and it was unimaginable to me that we could have a

situation where a plan gets approved based on the claimants

agreeing to their own demands or we don't have a full right to

be heard in terms of what the results of that settlement with

themselves are and without a right to fully defend ourselves.

So there's no change in position.

Also Mr. Pfister said that in his view, this case is

unique because this company has been telling this Court from

the beginning that it owes nothing.  And we do believe we owe

nothing.  If the merits are properly examined with all the

facts, we do believe that's the case.  I can tell Your Honor

that many companies have gone into asbestos cases making the

exact same argument.  It was made in Garlock.  It was made in

Bondex.  That was the view in Kaiser Gypsum.  There, the

arguments were different.  It was based on the fact that the

products at issue had chrysotile asbestos not anthophyl, that

the exposures would not -- that that's a less toxic asbestos,

that the exposures were not sufficient to cause disease and no

liability.  So I just want to say there's nothing unique.

1          But there's a suggestion embedded in what he said

2    which is a suggestion that we're not even proceeding in good

3    faith in this case, that we're not negotiating in good faith,

4    and I assure Your Honor that the debtor and J&J have taken the

5    mediation very seriously.  Significant offers have been made

6    and to imply that maybe there's an unwillingness to make any

7    kind of material offer to resolve this case and move on and be

8    done with it, that's completely incorrect.

9          As to the U.S. Trustee's comments about the Rule 706

10   expert, all I would say there is we gave a lot of thought to

11   those issues as well, did research.  Knowing Your Honor, I know

12   you did too.  And I would say a couple things, and I was remiss

13   probably in not saying something before.  The reason we propose

14   two experts is because we can't envision anyone, any single

15   person, who would have the requisite expertise to address both

16   science issues, medical science issues, and economic issues.

17          We can envision that there are people who have the

18   expertise to advise on all the medical science issues and then

19   on all the economic issues.  So I did want to be clear.  I

20   don't think I said it before.  That's the reason we thought

21   that two were necessary.  We just racked our brains and we just

22   couldn't think of a single individual or type of individual who

23   would provide the expertise across the spectrum of issues who

24   would have to be considered.

25          But with respect to the U.S. Trustee's point

1  specifically, she's right that we found as well there's sort of

2  a pure 706 expert, which is more like an expert witness who

3  writes reports can be cross-examined.  And then the other

4  concept we found was a technical advisor serving more in the

5  role of a technical advisor.  And that seemed to us what Your

6  Honor was thinking about here.  We don't know exactly what Your

7  Honor was thinking about, but at least I think when we were

8  laying out our proposal, that's the way we were thinking about,

9  somebody who could provide technical, scientific, or economic

10 advice to the Court on issues that, you know, are pretty, you

11 know, are pretty complex and not easy to understand for, you

12 know, someone who's not immersed in those issues day-to-day.

13         So we think there is plenty of authority for that.

14 And that would be someone that wouldn't be an expert report,

15 per se, or there wouldn't be cross-examination, per se.  But

16 admittedly, we've seen two different approaches adopted by

17 courts and we don't see either of them falling in the category

18 of a special master.  That's not what we were seeing here.  A

19 special master to us is where the court's basically delegating

20 responsibility to make a decision or recommend a decision.  We

21 didn't see it that way.  We saw it more in terms of providing

22 needed advice to the Court and assessing the issues that would

23 be presented by the experts in the case.

24         Mr. Thompson, the one thing -- I mean, obviously,

25 he's made very clear and his firm has made very clear, they are

1  opposed to the bankruptcy period.  They're opposed to every

2  bankruptcy.  They want to litigate every one of their cases and

3  they argue that every single one of their claimants would

4  rather proceed in court than accept a fixed payout under a

5  plan.  But at the same time, he has to concede he hasn't seen

6  any plan.  He doesn't know what values might be offered.  So to

7  me, I don't think we can put much stock in a position like that

8  where a party's telling you that no agreement would be

9  acceptable.  We don't care about the aggregate value.  Well, of

10 course, they don't care about the aggregate value.  They want

11 to know what the claim values are.

12         But he did attempt, and we've seen this multiple

13 times, to distinguish the _Paddock_ case.  And he said that

14 company was in distress.  That's different.  Well, that

15 company's equity was preserved.  He also said that there was no

16 PI in that case.  That's a totally different case.  Well, there

17 was no PI in that case because there was no litigation in that

18 case.  All their claims were handled under administrative

19 settlement.  So that's just not a fair way to distinguish

20 _Paddock_.  And of course _Paddock_, although a Texas divisional

21 merger wasn't utilized, the equivalent type transaction was

22 done in that case and there was a funding agreement and that

23 sort of thing.

24         Ms. Jones, again, in another effort to paint us as

25 changing our position, said that what she heard today was very

1  troubling because that was contrary to our assertion that we

2  were intending to fund claims in full.  And she was basically

3  suggesting that because we're not, at this point, supportive of

4  a pay-as-you-go plan that that's a change in position.  That's

5  no change in position.  All the parties know that.  We've been

6  very clear from day one in this case that we want a global

7  permanent resolution of this liability.  We want to fund the

8  liability and we want to be done with the liability.

9       And, obviously, what's being proposed by way of cram

10  down is a plan that wouldn't do that.  It basically takes off

11  the table immediately what our objective is in this case.  So

12  that is not a change in position.  The reason we want to focus

13  on the aggregate liability is we want to pay a funding amount

14  that's acceptable to the parties and we want to be done.

15  There's no surprise in that.  There's no change in position.

16       There's also been a lot said by, I think

17  Mr. Satterley made a comment, Mr. Molton made a comment, about

18  the PIQ discovery and the trust discovery.  And, again, we hear

19  this in every case.  I think Mr. Satterley said we don't need

20  the information.  We already have the information.

21       Well, we don't have the information.  I put up the

22  statistics from the other cases to show you that those

23  companies didn't have the information either.  And it's always

24  been beyond me why there's so much opposition to discovery

25  that's intended just to seek the basic information that any

1 court would want to assess the validity of these claims.  Why

2 is there such opposition to that?  Why don't they want to tell

3 us from whom else they're seeking recoveries?  Why don't they

4 want to tell us what other recoveries they've gotten in the

5 same claims?

6         On the trust discovery, why don't they want us to

7 know that they're seeking recoveries from other trusts with

8 respect to the same claims?  That's all we're asking.  We want

9 to know.  These are claims that there's either several

10 liability or joint and several liability.  Aren't we entitled

11 to know whether or not they've actually recovered on those

12 claims already or they're asserting somewhere else that they've

13 been exposed to other companies' products.

14         This was a gigantic battle in the Garlock case and

15 Judge Hodges ultimately said, I think some discovery is

16 permitted.  And I know you've read his opinion.  At the end of

17 the day, he said, look, I limited your discovery, but I looked

18 at 15 cases and in every single one of the case, it was clearly

19 established that the plaintiffs suppressed evidence of having

20 submitted trust claims, that they told the company one thing,

21 I've only been exposed to your product or maybe a couple, but

22 at the same time, they were going to other courts going to

23 trust and saying, I've been exposed to 15 other products or 20.

24 And that was enough for him to say, I don't accept any

25 estimation based on settlements because I don't need to see any

1 more.  If it happened in 15 out of 15, that's enough for me.

2          So that's a long way of saying, Your Honor, that,

3 again, the opposition, I guess, is not surprising based on what

4 we've seen in other cases, but the PIQ, that's very basic

5 discovery about the merits of the claims and trust discovery is

6 very key with respect to alternative exposures.  And remember

7 that the trust discovery is pursued against trusts who all have

8 electronic databases.  It takes them a push of the button to

9 spit that data out to provide it.  There's no burden.  The

10 companies typically offer to pay the costs.  That should not be

11 a problem.

12          Mr. Satterley just misspoke on one point I'll comment

13 on.  He criticized us for proposing that the medical science

14 hearings would be one day.  I mean, our proposal was actually

15 four days for ovarian, three days from mesothelioma, and

16 obviously, that's a proposal we're making.  We think, based on

17 what we know and our experience in the tort system, that would

18 be sufficient.  But we're not saying that it's four and three

19 and that's it, we're not willing to talk about that.

20          I thought you asked an interesting question of

21 Mr. Molton about the value of the insurance and what you would

22 do with that at confirmation.  And his answer, I thought, which

23 I think was the right answer was, well, you're going to have to

24 do an aggregate liability determination at least to show that

25 the liability exceeds one to two billion or three billion.  I

1  think he said three and a half billion as a hypothetical.

2         And that's the point.  There has to be an aggregate

3  liability.  There's no way to shortchange it.  And he was very

4  dismissive of it in the sense he says, oh, well, it'll be easy

5  to show it's over three and a half billion.  That's no problem

6  at all.  Well, based on what?  And following what discovery?

7  And based on what process are we going to determine that?  Is

8  he just going to come into Court and have someone say, well,

9  it's obviously at least 10 billion?  Well, fine, you can do

10 that, but we have a right, I believe, to our discovery and our

11 right to fully challenge any expert who takes that position.

12        The other thing, Your Honor, is we heard multiple

13 lawyers stand up here and say that this is all about delay.

14 Delay, delay, delay.  I think in the slide, Mr. Molton had at

15 least three or four times, maybe in the same sentence.  And I

16 would just ask Your Honor who's been sitting through these

17 hearings, who has been getting reports of some kind about the

18 mediation, whether you believe there's any evidence that we

19 have been delaying things.  I would submit that the record

20 clearly establishes exactly the opposite.  And so it's one

21 thing for Mr. Molton to stand up here and make those

22 assertions.  I didn't hear any evidence to back that up and I

23 submit there is no evidence.

24        These companies want this case to move fast.  We're

25 not interested in delay.  We wish the mediation was over.  We

1  wish it had succeeded by now.  It hasn't happened for reasons

2  that are bothersome to us, but it is what it is.  But we're

3  trying to come up with other ways to focus the parties in the

4  right way and to put them in a position to settle this sooner

5  rather than later.

6           So I guess in the end, Your Honor, I would just say

7  this.  All I hear and all I've heard from these counsel, one by

8  one, is that we have a veto right, we can do what we want.  We

9  make the demand.  We decide.  It's irrelevant what the debtor

10 thinks.  It's irrelevant what J&J thinks.  And, frankly,

11 they're trying to put you, I believe, in a position where it's

12 very difficult for you to determine whether what they decide

13 for themselves works for them is actually fair and appropriate.

14          We're in a court process to try to fairly resolve

15 this liability.  And, you know, we believe that we have rights

16 that we're entitled to to protect our interests in that

17 respect.  And I would just ask Your Honor to take those

18 comments for what they are.  I've heard them in every single

19 case.  We will never agree.  We will never accept anything less

20 than what we demand.  Anything we say goes.  Anything we say

21 will be accepted by the claimants.

22          Well, my answer to that is we have a court process.

23 This Court is here to find the truth and to do justice and

24 that's what we're asking this Court to do.

25          THE COURT:  Thank you, Mr. Gordon.

106

1          MR. GORDON:  Thank you.

2          MR. MOLTON:  Judge, just one point and I'm not

3   going --

4          THE COURT:  Sure.

5          MR. MOLTON:  -- to reply to anything.  You know, we

6   are also cognizant we're here in a court process and we're

7   looking for justice too.  I just need to say something because

8   this isn't the first time it's happened.

9          We heard Mr. Gordon lecture the plaintiff lawyers

10  hear about adherence to Court orders.  We have a mediation

11  order that talks about confidentiality and I've heard just now

12  from Mr. Gordon what I consider to be a breach of that order in

13  terms of talking about whatever offers have been made there and

14  characterizing them.

15         Put it this way, I'm not going to respond to it.  I'm

16  going to adhere to the mediation order which I think we all

17  need to do.  And, again, this isn't the first time.  But be

18  advised, Your Honor, we dispute every, every characterization

19  that was made in front of Your Honor right now on that issue.

20         THE COURT:  All right.  Thank you, Mr. Molton.

21         To quote my favorite auctioneer, are we done?

22         I think we are for now.  Let's try to return about by

23  1:30 and we'll get started again.

24         Thank you.

25         (Recess at 12:46 p.m./Reconvened at 1:40 p.m.)

1          THE COURT:  All right.  Bear with me one second,

2   Ms. Cyganowski.

3                          (Pause)

4          THE COURT:  All right.  My apologies.

5          Ms. Cyganowski.

6          MS. CYGANOWSKI:  No, let me -- and if I may approach

7   before we begin.  Can't be the only one without a PowerPoint.

8          THE COURT:  Heavens.

9          Now, is this in the context of the --

10         MS. CYGANOWSKI:  Of the preliminary junction.

11         THE COURT:  -- preliminary injunction?

12         MS. CYGANOWSKI:  Correct.

13         THE COURT:  Okay.

14         MS. CYGANOWSKI:  That is correct.

15         All right.  Your Honor, for the record, Melanie

16  Cyganowski, Otterbourg, co-counsel to the TCC.

17         Your Honor, let me begin by saying what I am not

18  going to address and what I am not going to do.  I want the

19  record to be abundantly clear that the TCC rests on its

20  previously filed papers opposing the grant to the preliminary

21  injunction.  We are not seeking or attempting to re-litigate

22  issues and arguments that have been previously presented and

23  are now on appeal before the Third Circuit with oral argument

24  scheduled for September 19th.

25         The points raised by the debtor challenging the

1  Court's jurisdiction to modify the stay at this time miss the

2  mark and raise what we believe are straw-man-like arguments.

3  By its order, the original order, the Court expressly reserved

4  its inherent right to modify a preliminary injunction upon an

5  examination every 120 days or so by visiting the changing

6  circumstances of the case and its progress.

7         The Court has been clear and the TCC welcomes the

8  Court's invitation to focus on the parties' progress towards

9  mediation and plan formation.

10         Where are we?  What progress has been made in

11  mediation toward plan formation?  Obviously, the answer is that

12  there's no settlement yet, or it would have been announced.

13         As we noted in our papers, while the details of the

14  negotiations must remain confidential, the reasons for the lack

15  of progress I submit are open and notorious.  From the outset,

16  the debtor and its parent, J&J, have vehemently, vehemently

17  argued that the estate bears no liability whatsoever to the

18  talc claimants.  It's mantra is to shout out that its products

19  are completely safe and that the talc claimants are entitled to

20  nothing from the debtor because their claims are based on junk

21  science and ambulance chasing by the plaintiff's bar.  This

22  morning, we heard Mr. Gordon reiterate this belittling the talc

23  claimants' claims, even calling them baseless at one point.

24         For our part, we strongly disagree and we are equally

25  as vehement that there is a causal nexus between the J&J

1  products, the debtor's products, and the harm suffered by the

2  talc claimants.  We believe that the debtor's products are

3  unsafe, that they knew that they were unsafe, and that the

4  litigations which preceded the bankruptcy together with the

5  Daubert rulings support the plaintiff's view that their cases

6  are jury worthy.

7          Where does this leave us?  How should we proceed?

8  And how should this case proceed?  We believe that the best way

9  to drive all parties to common ground and to a consensual

10 resolution is to put the debtor and the talc claimants to a

11 test of their respective convictions.  Nothing pushes parties

12 closer to settlement more or better than facing and, in fact,

13 realizing that they are at potential risk.

14         The playing field must be level.  No single party

15 should feel so comfortable that it does not perceive risk.  All

16 parties must face uncertainty and they particularly should not

17 be lulled into a year, a year-long discovery, a process that

18 has with it a blanket injunction that protects the parent and

19 more importantly, the non-debtor affiliates from all

20 litigation.

21         The TCC has put forward a subset of 12 cases, which

22 we believe are trial ready.  And if permitted to proceed can be

23 fully tried by year-end with the possible exception of the MDL

24 case, which is mentioned therein.  These cases include venues

25 in seven different states plus the federal MDL.  The debtor may

1  complain that they are cherry picked, but the bottom line is

2  that they are all trial ready.  And the fact that they are

3  trial ready, met the primary criteria, which is regardless of

4  where they are, they are trial ready whether they are in a

5  plaintiff favorable jurisdiction or not.

6        Eight of these cases include plaintiffs with ovarian

7  cancer.  Four are plaintiffs suffering from mesothelioma.

8  Contrary to Mr. Gordon's statements this morning, trying this

9  subset of cases during the next few months will provide

10 meaningful information and insights to the parties, to the

11 courts, and to any court-based expert should there be one.

12       Importantly, nothing pushes parties to settlement

13 faster than going to trial before independent jurors.  The key

14 here is to drive the parties towards successful mediation.  The

15 goal is not to have this Court be faced with hearings in the

16 future after a year of discovery and a year of hearings.  The

17 goal at this pivotal moment is for parties to be forced to come

18 to a resolution and the best way we believe is to create

19 uncertainty and to change the playing field as it exists today.

20       We submit that this is a pivotal point in the

21 progress of the case and the Court should allow multiple

22 parallel pathways to proceed.  The preliminary injunction

23 should be modified to permit these 12 cases to proceed to

24 trial.  Even if the Court appoints an expert under Rule 706,

25 the expert's investigation can run parallel to and use whatever

1 information and data points arise from these 12 trials.

2          The trials can provide a backstop to the expert's

3 investigation as they are expected to be substantially

4 completed by year-end.  And as we have noted, and I know it's

5 not for today, exclusivity can and should be lifted to permit a

6 competing plan to be placed before the parties in interest in

7 this case.

8          The professed fears of over burdening the state

9 courts are avoided by selecting a smaller subset of 12 cases.

10 We do not believe this is a distraction in any way from the

11 proceedings in this case.  These cases are trial ready.  They

12 were made trial ready by counsel who are not burdened with the

13 bankruptcy aspects of this case.  And we don't believe that

14 it'll be a burden on the state courts, not only because it's

15 over many, but because the state courts are now trying to clear

16 their dockets of these cases as well and would like them to

17 move forward.

18          And most importantly, these trials will be heard by a

19 jury.  And the conclusions reached by the jury will be

20 available to the Court appointed expert as I noted and to the

21 Court.  These jury verdicts, unlike any expert's opinion, will

22 not be theoretical constructs.  They will represent the world

23 view of those who are hearing the cases.

24          This bankruptcy case was filed nine months ago.

25 During this time, the debtor has not taken any meaningful steps

112

1   toward plan formation, even though it has enjoyed this complete

2   respite from all pending litigation in state and federal

3   courts.  As Mr. Molton noted this morning, with this blanket

4   injunction in its favor, J&J feels no pressure whatsoever to

5   move this case any faster than the multi-year plan that they've

6   put before the Court this morning.

7        This nine month saga has however not been so kind to

8   the plaintiffs who, because of their ailments and diseases and

9   because of their stay, have been denied their day in court

10  before a jury.  Over 300 plaintiffs have died since the

11  petition was filed on October 14th.  Many more have become

12  grievously ill.  Judge Warren dealt with a similar situation,

13  albeit slightly different, in the Diocese of Rochester case,

14  and I quote him.  "The scales shift over time and the weight of

15  public interest during these later months now tip in favor of

16  the abused survivors who have suffered in silence for so long

17  to be able to seek redress in the state courts from the non-

18  debtor Catholic corporations."

19       So too here, we believe that the Court should permit

20  at least these 12 cases to proceed to trial.  We believe that

21  doing so will allow measures to be taken in smaller steps

22  consistent with the Court's goals.  With the Court's

23  permission, I would like to conclude by briefly highlighting

24  key points for each of these trials and plaintiffs if these

25  slides could be put up.

1         By reviewing the plights of these plaintiffs, I do

2    so, not for the purpose of appealing to the sympathy of the

3    Court, but rather to highlight and focus upon the prejudice

4    suffered by the plaintiffs, which is a significant factor in

5    the Court's analysis.

6         And we start with Shawn Blaze (phonetic).  Shawn's

7    case, which is now being prosecuted by her family, is pending

8    in the state court of Missouri.  An athlete, Shawn was a

9    skilled figure skater.  She was a coach and business owner.

10   She regularly used Johnson and Johnson's Baby Powder during her

11   skating practices and performances.  Shawn was diagnosed with

12   Stage 4 ovarian cancer at the age of 48 and passed two years

13   later.  She is survived by her two sons and husband.  Her case

14   is trial ready in the state court of Missouri.

15        The next one, Diane Brower.  Diane's case is pending

16   in Fulton County in Georgia.  A marketing executive, Diane was

17   diagnosed with Stage 3 ovarian cancer at the age of 62.  Diane

18   began using Johnson and Johnson Baby Powder as a teenager and

19   continued for the next 20 years.  She left behind three sons

20   and her adopted granddaughter, whom she was then raising at the

21   time of her diagnosis.

22        Corin Karina (phonetic) is a speech pathologist and a

23   native of Toms River, New Jersey.  Corin worked with young

24   children for over 30 years.  She was diagnosed with ovarian

25   cancer, Stage 3, at the age of 47, passed away nine years

later.  Corin used Johnson and Johnson's Baby Powder every day

for 33 years.  Her case is pending in Missouri state court and

is ready for trial.  She left behind a loving husband and two

sons.

Gayle Emerson also has a case which is trial ready,

which is pending in Philadelphia, Pennsylvania.  A dedicated

and loving mother and grandmother, Gail was diagnosed with

ovarian cancer, Stage 3, at the age of 64.  She participated in

Relays for Life to raise funds for cancer before she passed.

She passed away four years later.  Gail also regularly and

daily used Johnson and Johnson Baby Powder for 48 years.

Patricia Matthey, her case is pending in Sarasota,

Florida.  A successful jazz aerobics athlete, Patricia opened

her own studio.  She was married to Bernard, had two children

and two grandchildren.  Patricia was a lifelong user of Johnson

and Johnson Baby Powder.  She was diagnosed with Stage 4

ovarian cancer at the age of 69 and passed three years later.

Bernadine Moore was born and raised in Philadelphia.

She was the pillar of her household and active in her church.

She always used Johnson and Johnson's Baby Powder, sometimes

twice a day, for over 50 years.  She was diagnosed with Stage 3

ovarian cancer at 66.  Her pathologist discovered talc presence

in her tissue samples taken from her ovarian tumor.  Bernadine

passed away two years later at the age of 68 leaving a large

and grieving family.

1              Tamara Newsome is a resident of Maryland.  Tamara was

2    a medical sonographer who immediately recognized, and I cannot

3    imagine the tragedy of looking at the image on the ultrasound

4    screen and her diagnosis, realizing that it was Stage 2 ovarian

5    cancer.  Tamara was married for over 23 years and has two

6    children.  Tamara is in remission fearing the return of the

7    cancer.  Her case is one of the MDL Bellwether cases.

8              Deborah Schultz is a resident of Los Angeles and her

9    case is pending there.  A registered nurse, Deborah worked as a

10   neurological ICU nurse at LAC USC Medical Center.  Her husband

11   is a practicing ER physician and together they have two sons

12   and a grandson.  A daily user of Johnson and Johnson Baby

13   Powder and Shower to Shower for over 50 years, Deborah was

14   diagnosed with Stage 4 ovarian cancer.  Her case falls within

15   the state's preference statute and is trial ready.

16             Randy Derouen is a member of our Committee.  He was

17   diagnosed with mesothelioma at the age of 46.  Born in Biloxi,

18   Mississippi, Randy moved to Indiana to accept his dream job as

19   a general manager of Sportsbook at FanDuel.  He has since had

20   to resign that position.  An avid athlete, Randy regularly used

21   Johnson and Johnson Baby Powder and sometimes Shower to Shower

22   for nearly 30 years.  His case is trial ready in Middlesex, New

23   Jersey.

24             Daniel Doyle.  Daniel sadly passed away at 48 after

25   learning six months earlier that he had an aggressive form of

1  biphasic malignant mesothelioma.  A passionate sportsman,

2  Daniel loved his teams at Ohio State, as well as the Cincinnati

3  Reds and Miami Dolphins.  Daniel was a lifelong user of J&J's

4  Baby Powder.  He is survived by his wife of over 18 years,

5  Kristie, and their son.  Christie Doyle is an active member of

6  our Committee.  Daniel's case is also trial ready and is

7  pending in Santa Clara County.

8         Theresa Garcia.  Theresa was 53 years old when she

9  passed after diagnosis with Stage 4 mesothelioma.  Her pain was

10 particularly excruciating since the cancer touched and impacted

11 every nerve near her lungs.  Her surviving family has been

12 crushed by the financial toll.  Her case is trial ready in the

13 state court in Illinois.

14        Brandon Whetsel was a program tester at Teva

15 Pharmaceutical, married to Kristen and father of two daughters.

16 An avid sports athlete, Brandon regularly used Johnson and

17 Johnson's Baby Powder before playing sports.  Brandon was

18 diagnosed at age 36 with peritoneal mesothelioma a year after

19 marrying Kristen.  Brandon's case is trial ready and pending in

20 Jackson County, Missouri.

21        Each of these plaintiffs, Your Honor, led vibrant

22 lives and had loving families.  Each have suffered and some are

23 continuing to suffer immensely.  Each are entitled to a day in

24 court before a jury or an expeditious resolution of this case.

25 We know that the Court is sensitive to their plights and for

1  that, we thank you.  What makes this case unique from the

2  traditional commercial cases is that these claimants have

3  limited windows of time, whether because of illness or the

4  financial plight that befalls the family upon their passing.

5          We agree that mediation is important, but the

6  exigency of their cases and circumstances compel permitting

7  their cases to proceed to trial.  We believe that for these

8  reasons and the others I've noted that the stay should be

9  permitted to permit these cases to proceed.  They will be done

10 we believe and completed by year-end with the exception of the

11 MDL, whether in conjunction with a 706 expert as the Court is

12 contemplating or however the Court wishes to proceed.

13         Thank you.

14         THE COURT:  Thank you.  Actually I just have a couple

15 of questions.

16         MS. CYGANOWSKI:  Yes.

17         THE COURT:  Bear with me.  I want to walk the process

18 through so I have a good understanding what's been requested.

19         Among the named defendants in these suits, obviously

20 I think they all have Johnson & Johnson or the old JJCI.  There

21 are other protected parties, correct?

22         MS. CYGANOWSKI:  There are.  And the view would be --

23 the view would be that they would -- the stay would be lifted

24 with respect to all non-debtor parties in interest.

25         THE COURT:  I'm trying to see what the impact would

1  be on the bankruptcy.  So let's say, I pick a protected party.

2  Walmart.

3          MS. CYGANOWSKI:  Walmart.

4          THE COURT:  And there's a judgment --

5          MS. CYGANOWSKI:  There's a judgment against Walmart.

6          THE COURT:  -- joint and several against Walmart.

7          MS. CYGANOWSKI:  Right.

8          THE COURT:  What happens?

9          MS. CYGANOWSKI:  At that, no judgment would be

10 entered for execution before returning to this court.  And at

11 that point we would see what stage the court -- the case was

12 at.  Presumably, it would be an issue to be litigated whether

13 or not the stay would be lifted against Walmart for all

14 purposes so that execution could take place.

15         THE COURT:  But let's -- let me --

16         MS. CYGANOWSKI:  Or it would be a claim because of

17 the indemnification.

18         THE COURT:  Well, that's where I want to go with the

19 question, the indemnification.  Let's say Walmart has an

20 indemnification right to put it -- put the judgment to Johnson

21 & Johnson.

22         MS. CYGANOWSKI:  Correct.

23         THE COURT:  Or old JJCI.

24         MS. CYGANOWSKI:  Or old JJCI.

25         THE COURT:  And then under the divisive merger plan

1   old JJCI or Johnson & Johnson --

2           MS. CYGANOWSKI:  Conveyed that.

3           THE COURT:  -- put it to --

4           MS. CYGANOWSKI:  The debtor.

5           THE COURT:  -- the debtor.  That comes out of the

6   funding agreement.

7           MS. CYGANOWSKI:  It can.

8           THE COURT:  It's required.  At least my understanding

9   is that the funding agreement requires the debtor to satisfy

10  all indemnification.

11          MS. CYGANOWSKI:  Correct.

12          THE COURT:  So does that then reduce the pot

13  available for other present and future creditors?  That's what

14  I'm trying to glean.

15          MS. CYGANOWSKI:  And I understand the Court's

16  questions and I believe that at this point there's no need to

17  answer it today.  I believe that I -- I -- let me -- let's put

18  this back in context.  First, we're going to trial.  We all

19  know that cases do resolve on the eve of trial, either that

20  individual one or perhaps it could be a catalyst for resolution

21  of all the cases.  So that's one potential outcome.

22          A second potential outcome is that the trial proceeds

23  and there is a jury verdict.  The order lifting the stay would

24  not permit execution on the verdict, but would require the

25  parties to return to this court.  At this time -- at the time

1  that it comes back to this court, we'll know whether or not

2  there's a proposed plan that's pending for confirmation, either

3  one sponsored by the TTC or one sponsored by the debtor or

4  perhaps both are pending competing plans.  And at that point,

5  we'll answer the question.

6          THE COURT:  Would these plaintiffs still be subject

7  to the channeling injunction if it were even under a PPC plan,

8  in other words, a trust?

9          MS. CYGANOWSKI:  These twelve?

10          THE COURT:  Like those that I grant stay relief or

11  relief from the permanent -- from the preliminary injunction.

12  Are they outside the bankruptcy or will there if they secure

13  judgments be able to collect through the trust?

14          MS. CYGANOWSKI:  Again, I think I would leave that

15  question for that day.  And I'm not trying to punt it as much

16  as --

17          THE COURT:  No, that's fair.  I --

18          MS. CYGANOWSKI:  -- I'm trying to predict where we

19  might stand.

20          It's certainly possible.  There's -- I could see

21  one -- one response can be that they're permitted to have the

22  stay lifted for all purposes, they're outside the plan and the

23  channeling injunction and they have the so-called tort out,

24  which has been mentioned from time to time.  I can also see the

25  possibility that the claims -- that the verdict is recognized

1  as the claim in bankruptcy.  That would then be funneled

2  through the trust.

3          I just think that at this point it's too early to say

4  and I don't think it's necessary to answer that, because to put

5  this back in perspective the purpose of allowing the stay to be

6  modified in these instances is to move the case forward.  It

7  has the additional benefit of moving these twelve individual

8  cases forward, but the particular purpose is to move the

9  overall case forward and to allow the parties to revisit where

10 we are and how do we come to a consensual resolution.

11         Obviously, no one can force parties to resolve and if

12 that continues to be what happens, then it's all the more

13 important that there be these parallel paths and for that, we

14 request that the exclusivity be lifted so that the plan be

15 before the Court, so that regardless we have the track of these

16 12 cases proceeding to trial, we have a plan before the Court,

17 and we have a way of managing the case -- not managing the

18 case, but pushing the case through what we hope is a resolution

19 that deals with all 40, 50 or 60,000 claimants, depending on

20 how many there are.

21         THE COURT:  Fair enough.  Thank you, counsel.

22         Mr. Satterley.

23         MR. SATTERLEY:  Good afternoon, Your Honor.  Joe

24 Satterley from Kazan McClain Satterley & Greenwood, on behalf

25 of Anthony Hernandez Valadez and Audra Johnson.

1           I've spoke with Mr. Gordon at lunch break and we've

2    agreed that I should go ahead and go so that he doesn't have to

3    resolve in piecemeal or respond in piecemeal.

4           THE COURT:  Makes sense.  Thank you.

5           MR. SATTERLEY:  First, before I begin on these

6    individual motions to address Your Honor's question, because

7    I've tried cases with both distributors and the manufacturers,

8    many times the distributors are resolved, settled out, and we

9    only proceed to trial against the manufacturer.  In some of the

10   cases, and I'm not speaking to all of them but some of the

11   cases, like I represent Kristie Doyle, Dan Doyle, the only

12   defendants left are Johnson & Johnson, JJCI, so we would only

13   proceed to trial against Johnson & Johnson.

14          In that particular case, that trial has been

15   scheduled three times, continued and the judge is waiting.  As

16   recently as last week wanted to know, "When can I try this

17   case?" and he said he's got a courtroom available in September.

18          But let me switch to the motions that I filed way

19   back in May on these two individuals and we already argued this

20   on June the 14th and I'm incorporating by reference the

21   arguments that I made at that time.  I'm not going to reargue

22   that and I've removed most of the slides and I'm not going to

23   argue in detail the Mid-Atlantic factors, because we've already

24   argued that.

25          But what I want to do, is give Your Honor just an

123

1 update of what has occurred and a few additional reasons why I

2 believe stays should be lifted for these two individuals.

3          I believe these cases will aid the mediation and

4 estimation efforts.  To date J&J, LTL has offered these clients

5 zero.

6          THE COURT:  Let me just stop you for a second.  At

7 some point can you provide chambers with a cop --

8          MR. SATTERLEY:  Oh, I apologize, Your Honor.  I have

9 it right here.

10          THE COURT:  Oh, thanks.

11          MR. SATTERLEY:  And counsel, too.  May I approach,

12 Your Honor?

13          THE COURT:  Yeah, please.

14          MR. SATTERLEY:  I should have known that to give

15 you --

16          THE COURT:  That's all right.  Thank you.

17          MR. SATTERLEY:  I was so caught up in trying to

18 answer the questions about the impact of the trials that I

19 forgot to hand it up to Your Honor.

20          THE COURT:  That's all right.  Thank you.

21          MR. SATTERLEY:  So I'm not talking about mediation

22 here with regards to the offer of zero because I'm not allowed

23 to because of the confidentiality order, but I've attempted to

24 since April this year with many of the J&J's counsel, at least

25 four other counsel, to negotiate these individual cases.  And

1  they've told me they value the case at zero, that I have

2  meritless cases.  They refuse to negotiate.

3          And I think -- you know, going to trial and having a

4  jury assess all this new science that Mr. Gordon wants to --

5  wants the jury to assess, that'd be great.  I'm willing to

6  address the science.  I want the jury to hear the science.  If

7  there's some new science that has occurred that he thinks will

8  cause more defensive verdicts, let's see it.

9          So I think that more jury verdicts without collecting

10  coming back to Your Honor -- as counsel says, coming back to

11  Your Honor before we collect will assist the Court.  It will

12  assist the Court.  It will assist the parties in mediation

13  also.

14          So these are the individuals.  I already told you

15  Anthony is 23 years old.  Audra is now 55.  She was 54 at the

16  time of diagnosis.  I demonstrated this before that we have,

17  you know, photographic evidence of the product usage at the

18  time Anthony was a baby.  I told you that these are not made-up

19  cases.  These are cases where the treating doctors support

20  causation.  It's not something where we were advertising for

21  cases and running around with no experts.  The treating doctors

22  already support the case before the case is even in litigation.

23          I showed you this photograph here.  He hasn't -- he's

24  progressed even worse than he was in June.  Let me just go to

25  this other picture.  This is a picture from last week.  This is

1  the way -- and I don't show this to Your Honor to seek

2  sympathy.  This is reality.  This is what happening.  Anthony

3  sleeps like this because it's the only way he can breathe.  His

4  mesothelioma has progressed.  His doctors have said he has less

5  than five months to live.  I believe he should be permitted to

6  participate in this trial before his death.  And the only

7  citation to law today that is the <u>Mid-Atlantic Handling System</u>,

8  the totality of the circumstances for each particular case.

9          The reason why I say that is the debtor -- they don't

10  address any of the particularities of any other cases.  They

11  just say there's going to be floodgates of cases coming, you

12  know, and we've -- I have specifically only asked for a few

13  cases to be -- the stay to be lifted.

14          In response to the other argument that the -- that

15  it's a lottery, that we're just a lottery, unlike the debtor or

16  J&J or anybody else to pick any other cases anywhere in the

17  country, if they want to pick one of my other cases, I'll go

18  try that case.  So I'll welcome them to pick any other case if

19  they think it will assist, if they think that, oh, he's 23

20  years old, let's pick a 60-year-old or 70-year-old.  Pick of

21  any of them other cases.  I'll try those as well.

22          Turning to Audra Johnson, this is her and her

23  daughter, Marley (phonetic).  She's a single mother.  Her only

24  exposure to asbestos is through J&J talcum powder throughout

25  her life.  We had -- as I told Your Honor in June, we had her

1  bottle tested.  It has asbestos in it.  Undisputed -- well, she

2  got mesothelioma.  It's undisputed the mesothelioma was caused

3  by exposure to asbestos.  This is the high tech procedure she

4  went through and this is her past week.  She's on oxygen almost

5  all the time.  She can't watch her daughter play soccer, can't

6  go to the soccer games, can't go to the -- any of her

7  daughter's events.  She basically stays at home and is on

8  oxygen.

9          Now, since the hearing in June, June the 14th, she's

10  had progressive breathing difficulties.  She was supposed to

11  have a surgery, additional lung surgery for a paralyzed

12  diaphragm.  It was scheduled to occur on July the 20th.  But

13  her employer -- she is on long-term disability right now, but

14  her employer closed the offices.  All the employees were laid

15  off.  Her insurance was cancelled and -- retroactive to May and

16  surgery was cancelled due to lack of insurance.  So she -- and

17  she will personally be liable, responsible for all medical

18  expenses since May.

19          So right now she can't have the surgery that she was

20  supposed to have last week because of no interest and she

21  continues to suffer significant breathing problems due to her

22  mesothelioma.

23          Now, the other reason why I believe the stay should

24  be lifted and, just as Your Honor did and recognized way back

25  in January with the <u>Benson Hill</u> case, we need to gather and

preserve evidence to support our claims against J&J.  At some

point in time there might be some grid, there might be some

system in place, a settlement with -- after mediation where

there's certain things have to be proven.  Well, I want to be

able to have that proven as soon as I can.  I want to be able

to get the pathology, have tissue digestions done.  I want to

be able to gather up documentary evidence.

And so the automatic stay and the fact that we do not

have the subpoena powers of the court eliminates our ability to

do this.  Hospitals won't release pathology, certainly most

hospitals don't release pathology.

THE COURT:  I thought you would have the subpoena

powers once the complaint was filed.  Is that --

MR. SATTERLEY:  Well, Your Honor ordered -- remember,

Your Honor's order said, file the complaint and do nothing

else, and that's what I did.  I filed the complaint, filed and

served it, and I did nothing else.

THE COURT:  Okay.

MR. SATTERLEY:  So if your -- I'm asking Your Honor

if you -- and I'll get to my conclusion in a few minutes in a

few slides, but the subpoena power is absolutely crucial with

regards to developing our evidence for whatever we have to

submit, if there's a consensual resolution.

Also numerous cases, and we cited cases in our

briefs, the passage of time results in fading of memories and

1  loss of evidence.  Courts have held that that is the

2  irreparable harm.

3          So I've already touched upon this.  I've explained to

4  Your Honor the tissue digestion last time.  Basically we would

5  obtain the pathology and be able to demonstrate the exact

6  ingredients in the Johnson baby powder in our client's body.

7  I've done that in numerous cases and numerous jurisdictions.

8          The debtor in its response concedes that modifying

9  the PL order will have no adverse effect on non-debtors and

10 they did that at docket entry 2429 at page 15, footnote 14, and

11 that's a factor that's I think particularly important.  And

12 then they only offer generalities rather than the facts

13 specific to the case and I said that earlier.

14         So all in all, the balance of the harms to the non-

15 debtors and the balancing of the harms to these mesothelioma

16 victims, I believe clearly weighs in favor of allowing them to

17 proceed with discovery and potentially proceeding with a trial.

18         So this was a chart, a timeline that I showed Your

19 Honor last month.  Because we were only allowed to file the

20 complaint, we were not permitted by Your Honor to file a motion

21 of preference yet.  I would like to file a motion as soon as

22 possible.  And so I would like -- I'd request Your Honor to

23 allow me to file a motion for preference, allow me to engage in

24 discovery, and I believe the courts in Alameda County will set

25 the case for trial in September of October, based upon having

129

1  practiced there for now 12 years.

2          The other thing I'd say is I'm willing to --

3          THE COURT:  Is that for both cases or just one -- or

4  just --

5          MR. SATTERLEY:  I believe I get both cases set for

6  trial, but certainly Anthony Hernandez Valadez, because the

7  doctors have already signed the requisite declarations that

8  support the preference statute.  And most of the time when we

9  have doctors' declarations like that, it's undisputed.  The

10 courts set it for trial.

11         Now, with Audra Johnson, because of her surgery and

12 the -- lack of surgery and the complications, I've got to get a

13 subpoena to be able to talk to her doctors about her prognosis

14 now.  So it's clear that I'll be able to get this case to trial

15 September, October for Anthony.  Unclear whether it will be

16 September, October, November and just depends on what we're

17 able to gather in discovery.  So it's my hope that we can get

18 these cases to trial before they pass away.

19         My alternative request for relief, Your Honor, as

20 opposed to say, go try your case, is to let me do discovery and

21 report back to Your Honor in 60 days what has occurred and --

22 or come back to Your Honor before -- you know, allow me to move

23 for trial date to get a trial date set, but not actually go to

24 trial without Your Honor's blessings.  And I say that because

25 I'm willing to come back here every month or twice a month or

1  how often you want me to be here and ask for Your Honor's

2  permission to proceed on behalf of my clients.

3          So last slide I have is a loss of life.  The life

4  expectancy of Anthony Hernandez Valadez, but for the

5  mesothelioma, is 54.13 years and Audra Johnson's life

6  expectancy but for her mesothelioma is 28.85 additional years.

7          With that, Your Honor, I would just request that the

8  balancing factors set forth clearly weigh in favor of the

9  victims, the plaintiffs, the creditors and the -- as relates to

10 the non-debtors.  And as counsel said, we would come back to

11 Your Honor after a jury determination and not execute on any

12 type of judgment without Your Honor's involvement and input.

13 And by that point in time there might -- there may be a plan.

14 The court -- the Third Circuit may have ruled one way or the

15 other.  A lot of things may have occurred, but to not allow us

16 to at least work up the case, gather evidence I think would be

17 irreparable harm to my clients.  Thank you, Your Honor.

18          THE COURT:  Thank you, counsel.

19          Are there other counsel for movants?

20          MR. RUCKDESCHEL:  Good afternoon, Your Honor.

21 Jonathan Ruckdeschel on behalf of Paul Crouch individually as

22 the personal representative of his mother, Cynthia Crouch's

23 estate.

24          We filed a brief objection on behalf of Mr. Crouch to

25 the continuation of the preliminary injunction and I'm going to

1  talk about a couple things that relate to the filing that we

2  made.  But I wanted to start just with a response or an

3  additional comment regarding Your Honor's question to my

4  colleague here regarding, well, what happens with the judgment

5  if they go to judgment against Walmart or you can even use J&J.

6  And counsel is exactly right.  The question of what happens

7  depends.  It depends on a lot of things.

8           While I was sitting here, I pulled up one of the

9  indemnity agreements.  It's the LTL0018923 is the Bates number.

10 It's an agreement signed by J&J on December 21, 1988 with CVS

11 and that agreement does agree to indemnify CVS if they're found

12 to be responsible for selling a J&J product, but not if there's

13 any finding of negligence on behalf of CVS.

14          So it depends.  It's going to depend in all of these

15 cases what's the contract, what's the finding by the jury.

16 There is no automatic liability under any of these indemnity

17 agreements and that would include the 1979 indemnity agreement

18 that J&J claims automatically requires LTL to indemnify it

19 because under New Jersey law you can't have an indemnity

20 contract -- (cell phone rings) -- it's not me.

21          UNIDENTIFIED SPEAKER:  Not me.

22          MR. RUCKDESCHEL:  Better not be me.

23          Under New Jersey law you can't have an indemnity

24 contract that indemnifies someone for willful and wanton

25 behavior.  Johnson & Johnson has been repeatedly found by

1  juries to have acted willfully and wantonly and been hit with

2  punitive damages.  And New Jersey law forbids indemnification

3  contracts for that and insurance coverage, right?  So -- and

4  we've cited those cases in our reply.

5          But additionally New Jersey law looks very

6  disfavorably upon indemnity contracts that indemnify the

7  indemnitee for its own negligence.  And New Jersey has a long

8  and rich history of case law regarding the type of extremely

9  express language that has to be included in the contract if the

10  contract of indemnity is to include indemnity for the

11  individual or entities independent negligence.  Cozi v. Owens

12  Corning Fiberglass back from 1960, 164 A.2d 69; more recently

13  Mantilla v. North Carolina Mall Associates, 770 A.2d 1144.

14  Both from -- that's from the New Jersey highest court.

15          And the contract here does not contain that language.

16  And so, if there is a finding by the jury that Johnson &

17  Johnson has independent negligence, the indemnity contract from

18  '79 is not going to cover it.  So it all depends.  There's no

19  automatic indemnity under the 1979 agreement under New Jersey

20  law.  And the last little bit of that is the contract doesn't

21  contain a choice of law provision.  It's signed by two New

22  Jersey corporations in New Jersey.  Right.  It's notarized.

23  It's actually signed by the attorney and it indicates it was

24  signed in New Jersey.  So New Jersey law is definitely going to

25  control.  So it all depends.  Counsel is exactly right and

1  there's no automatic indemnity.

2          So moving on, I was listening to the Court's comments

3  in the June 14th hearing and the Court made a number of

4  statements about there definitely being a limited fund in this

5  case and there's going to be a competition for dollars at the

6  end of the case.  And it struck me initially that what we've

7  got here, it would appear to me, is an attempt by Johnson &

8  Johnson and the debtor to create a limited fund from what is

9  currently an unlimited fund and then to force us to compete for

10 dollars in this artificially created limited fund.

11         But I took the Court's finding.  When the Court made

12 those comments, the debtor in J&J sat silently.  They have

13 never come to the court and said, no, no, Your Honor, we've got

14 all the money in the world.  There's no limited fund in this

15 case.  Right.  And if there is, in fact, a limited fund in this

16 case then Johnson & Johnson, if it's going to be treated like a

17 debtor and it's going to be extended the protections of the

18 stay through a preliminary injunction, it should be treated

19 like a debtor.  It gives away a billion dollars a month in

20 dividends to its common stock shareholders, voluntary depletion

21 of the limited fund.

22         So if there is a limited fund, Johnson & Johnson

23 can't be giving away a billion dollars a month if what they're

24 demanding in this case is a global resolution that resolves not

25 only the debtor's liability, but also Johnson & Johnson's own

1  independent non-derivative liability.  It's just massively

2  unfair.  It violates all sorts of general principles of

3  bankruptcy law that the equity holders can be getting paid a

4  flood of cash, a billion dollars a month, and our clients

5  suffer and die while they wait, while they wait to see if

6  there's going to be some agreement that globally discharges

7  Johnson & Johnson.

8          And so we're asking the Court -- Mr. Crouch is asking

9  the Court if you're going to extend the preliminary injunction

10 to Johnson & Johnson, make them pay those dividends into a fund

11 for the victims.  If there's extra money left over at the end,

12 fine.  They can get it back.

13         But right now what's happening is we're frozen in

14 time, suffering and dying, and they're just flooding their

15 shareholders, 33 million dollars a day.  In the 20 days that we

16 adjourned this hearing from its July 6 to today, that's another

17 666 million dollars.

18         THE COURT:  Are you limiting that request to Johnson

19 & Johnson as a protective party?

20         MR. RUCKDESCHEL:  Yes.

21         THE COURT:  I could look at CVS --

22         MR. RUCKDESCHEL:  Right.  Just --

23         THE COURT:  -- Rite Aid, 7-Eleven.

24         MR. RUCKDESCHEL:  CVS is not before this Court asking

25 for --

1          THE COURT:  Well, these are all protective parties.

2          MR. RUCKDESCHEL:  I understand.

3          THE COURT:  And it was the debtor that came before

4   the Court to extend the preliminary injunction for the debtor's

5   benefit.  Protected parties didn't come before the Court.

6          MR. RUCKDESCHEL:  And that's why we're not asking

7   about any other retailers.  Right.  If CVS was here saying, you

8   need to protect me, too, I'd probably have a problem with it,

9   but they're not, right?  And we filed a very limited -- a very

10  limited request here.  Condition any extension of the

11  preliminary injunction on J&J not continuing to give money from

12  the fund that could be going to victims to its shareholders.

13         THE COURT:  I'm not asking this tongue in cheek.

14         MR. RUCKDESCHEL:  No.

15         THE COURT:  It's a serious question.  The authority.

16  If I read Mr. Thompson's -- or most of the briefs out there,

17  they talk about what authority I don't have as an Article 1

18  judge.  Now we're talking about as an Article 1 judge I can

19  limit public company's issuance of dividends.  I -- it seems to

20  me that that's an extraordinary power.

21         MR. RUCKDESCHEL:  So you're giving them a choice.  I

22  fully expected to get asked that question.  I didn't think it

23  was tongue in cheek at all, Your Honor.  The reality is

24  injunctive relief is quintessentially equitable relief.  It's

25  within the equitable powers of the Court and you can set

conditions on it.  J&J has to agree that they're going to do it and they don't get it and if that's a problem for them and they won't agree, fine.  They can take their ball and go home.  They don't get their injunction.  And if that means they don't want to be here in front of this Court because their whole scheme is tied up on getting themselves out without filing for bankruptcy so they can go about business as usual as they brag about on their website, that's their choice.  You can give them that choice because you set the rules on what the conditions are for your equitable relief that you're going to give them the opportunity to have.  You don't have to go along with them.

Right now they're saying, well, we're going to hold our breath until you get us a consensual resolution and if you don't -- you know, if you don't play by the rules that we've got, then we'll take our ball and go home.  Okay.  That's fine.

We've had a lot of talk from the debtor today.  A lot of talk about how we want to mediate to a fair and equitable resolution.  We hear this in pleadings.  We've seen it over and over throughout this case.  And I would suggest to the Court that the current situation has taken all of the bargaining power of the dying people.  And there's only one thing we've got to bargain with, the threat of a jury verdict.  Taken it and we've thrown it in the trash, so now we have no leverage.

And in addition to taking away the leverage that we have, the stay and the extension of the preliminary injunction

1  to Johnson & Johnson has taken all of the pressure off of them.

2  Right?  It's like tying our hands behind our back in the boxing

3  ring and giving them brass knuckles, right, and you can level

4  the field.  You can level the field and say, if you want to be

5  treated like a debtor, you want to have a stay against

6  litigation for you because you've got all the money in the

7  world, a billion a month they're just giving away, then you

8  can't give away your money.  And you get to pick, do you want

9  Basket A injunction and no dividends or do you want Basket B,

10 no injunction.

11         THE COURT:  But the injunction is intended, again, to

12 protect the debtor.

13         MR. RUCKDESCHEL:  But it only protects --

14         THE COURT:  But let me just finish and then --

15         MR. RUCKDESCHEL:  Of course.  I apologize.

16         THE COURT:  Even if CVS were to say, we don't want

17 it, we'd rather be able to move and seek indemnification and

18 assert our rights, the idea of the injunction is to protect LTL

19 Management, offensive to many in the room.  I understand that.

20 But it's not these protected parties necessarily that have come

21 before the Court to bargain for protection.  So that's --

22         MR. RUCKDESCHEL:  J&J has -- I'm sorry, Your Honor.

23 I --

24         THE COURT:  No, I --

25         MR. RUCKDESCHEL:  Johnson & Johnson has.  They've

138

1  come before the Court and they've asked for just that and

2  they've asked for it with their partner in crime, LTL, which

3  they created for the purpose of getting themselves in front of

4  this Court --

5       THE COURT:  So I said choice --

6       MR. RUCKDESCHEL:  -- and get an injunction.

7       THE COURT:  The other term I read often is stooge,

8  but go ahead.

9       MR. RUCKDESCHEL:  You know, we had to mix it up a

10  little, keep things fresh.  You hear this a lot.

11       So, you know, Your Honor, you have the authority to

12  impose conditions on something that they're asking you to do.

13  "I'll do this for you if," and if they don't like that, okay.

14  That's their choice.  But to freeze the rights of individuals

15  like my client while the shareholders of J&J continue business

16  as usual, while new JJCI continues business as usual, which you

17  can go to the LTL website and look right on the front, they

18  say, we're going to continue business as usual while we've got

19  the bankruptcy going.

20       Well, you know, you don't have to allow that to be.

21  If they're going to be greeted like a debtor and if they

22  were -- if they were before the Court saying, we're only here

23  to get rid of LTL's liability and not J&J's, right, then we

24  might be having a different discussion, but that's not what

25  they're talking about.  They're talking about having any

1 resolution of this case involved not only resolving LTL's

2 liability, but also Johnson & Johnson's independent non-

3 derivative liability.  There are all kinds of problems with

4 that.  Third Circuit is considering under combustion

5 engineering, and I'm not here to argue about that.

6         What I'm saying is, if that's part of this deal, if

7 what they're trying to do is get J&J out of the tort system,

8 overcome the tort system, as Mr. Gordon said in April, for J&J

9 and the debtor, then treat J&J like the debtor and don't let

10 them continue to flood their equity holders with a billion

11 dollars a month.  It's just wrong.  Thank you, Judge.

12         THE COURT:  Thank you, counsel.

13         MR. PLACITELLA:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MR. PLACITELLA:  So I was sitting here this morning

16 and I was listening to Mr. Gordon say everybody in the room

17 agrees to this, everybody agrees to that.  I'm sitting there

18 saying, I don't agree to it.  But there is one thing we can all

19 agree on; Maria and Rebecca are awesome.

20         THE COURT:  Absolutely.

21         MR. PLACITELLA:  And I wanted to make sure I get this

22 right to start.

23         THE COURT:  Always butter them up.  It gets more

24 benefit than me.

25         MR. PLACITELLA:  In New Jersey a living mesothelioma

1  victim by order of the Administrative Office of the Courts gets

2  an expedited trial and that trial date is usually set at the

3  first case management conference.  And they do that so it's a

4  recognition by the AOC that people should have the right and

5  the opportunity to have their case heard while they are still

6  alive.

7          I spent a lot of time.  I recognize in re-reading

8  this Court's prior decisions that the Court -- this Court

9  believes that a resolution in bankruptcy can provide a prompt,

10 equitable and fair solution for everyone involved.  Accept that

11 as a given.

12         I spent many waking hours and some hours when I

13 should have been sleeping trying to think of a way to convince

14 this court the balance of equities weigh in favor of Kimberly

15 Noranno (phonetic) and others like her for the right to pursue

16 their case now while they're alive and they can meaningfully

17 participate.

18         I thought about arguing how a fair and equitable

19 solution could never be reached by one party or two parties

20 have all the leverage.  I thought about arguing about how the

21 goals of our civil justice system clash with the realities of

22 how Johnson & Johnson is using the laudable goals of the

23 bankruptcy laws to solve a problem on its balance sheets.

24         Ultimately, I decided there was really only one thing

25 I could do today standing before this Court and that is to

1  relate to you the extraordinary story of Kimberly Noranno who,

2  like others -- and she's not the only one; she's just an

3  example -- who asked this Court to reconsider its position, do

4  what is right under all the circumstances and let them move

5  forward with their trials.

6        Kimberly Noranno was born into dysfunction caused by

7  the disease of addiction.  As a young child Kimberly suffered

8  unspeakable abuse and was eventually placed in foster care.  At

9  15 Kimberly was turned out to the streets to fend for herself.

10  Her only dream job -- her only dream in her world was one day

11  to have her own family.

12        Kimberly was eventually rescued by her Aunt Kathy

13  (phonetic) who took her in and adopted her.  Kimberly was

14  blessed with seven wonderful children.  She used Johnson's baby

15  powder on all of them, believing that she was protecting them

16  as advertised.

17        Unfortunately for Kimberly, the disease of addiction

18  that destroyed her mother also took hold of her.  Fearful for

19  the safety of her own children, she transferred custody of

20  those children to her adoptive mother and entered a residential

21  treatment program.  After fighting for 13 hard months to rid

22  herself of her disease she came out and she was reunited with

23  her children.  She put herself through college.  She graduated

24  with high honors with a degree in alcohol and drug addiction

25  counseling.  She went on to become an addiction counselor where

142

1 she would dedicate her life, her professional life to helping

2 others overcome hardships just like her own.

3        Kimberly eventually made enough money to buy what she

4 calls her "forever home" where she would live the life that she

5 dreamed of as a young girl and provide for her children.  Today

6 Kimberly's youngest child is nine, Jace (phonetic), and

7 Angelica 14 suffers from autism.  Three days after beginning

8 her dream job as the head addiction counselor for the City of

9 Salt Lake, Kimberly was diagnosed with mesothelioma.  Since

10 that time, Kimberly lost her income, was forced to sell her

11 forever home, and has no way of supporting her minor children.

12        I would ask the indulgence of the Court for two

13 minutes to listen to Kimberly as she testified in her

14 deposition and she asked that I be able to play it for you.

15 Johnson & Johnson was invited to participate in the deposition

16 and they declined.

17        (Video played)

18        "MS. NORANNO:  So in my profession one thing that I

19 taught my patients is radical acceptance and so I'm through

20 accepting that I'm dying.  Instead of me having a bucket list

21 of things that I want to do before I leave my body is let my

22 closest friends and family, let them know "What is something

23 you would like to do with me to make a memory before I'm gone,"

24 and so I've been fulfilling those wishes, like went stargazing

25 with my oldest daughter.  And my son, who's only nine years

old, his memory that he would like to make with me is just the
simplest.  Making smores on the beach, so that's something the
we still have to do.

"My daughter -- my daughter would like me to go to
school with her all day and so that's something that's been
arranged.  I have a mother/daughter who wants to cook with me
all day (indiscernible).  Some days are heard and some days
aren't.  Today is a hard day.

"My fears are, one, that my nine-year-old won't
remember me; my grandchildren aren't going to remember me; and
I have a fear that my oldest daughter, who's a single mom who's
taking on the responsibility -- we don't have a house anymore.
She works as a hairdresser.  I'm afraid that they're not going
to have somewhere to live.  She's so scared, too.  She's so
scared.

"And my hope is -- I'm a very spiritual person and so
my hope is that everything is going to be okay, my family will
be taken care of, my kids will be taken care of. I will be made
comfortable and my last, however long it takes for me to leave
my body, my hope is that Johnson & Johnson will be responsible
and help with my kids, help with raising my kids and providing
what I will no longer be able to provide because I was
providing them excellent and wonderful, magical life for them
and I made sure that I made memories.  And that's -- and taught
them love and respect and kindness and giving to the world.

1        "And that is my hope that they know that no matter

2   what happens, that we stand up.  We get up, we do what's right,

3   we keep on giving.  That's my hope."

4            (End of playback.)

5            MR. PLACITELLA:  We stand up.  We get up and we do

6   what's right.  My hope is this Court will see the path that the

7   plaintiffs have laid out here for evening the playing field and

8   decide that the equities here lie not with Johnson & Johnson,

9   but with Kimberly and her family, giving them the right and the

10  chance for a compensation that the law allows and every other

11  person adversely affected.

12           Thank you, Your Honor.

13           THE COURT:  Thank you, counsel.

14           Mr. Thompson.

15           MR. THOMPSON:  Good afternoon, Your Honor.

16           THE COURT:  Good afternoon.

17           MR. THOMPSON:  Ray Thompson again.  I'm going to cut

18  out my slides because a lot has been covered.  And when you

19  quote some of the stuff I've written, it means I don't have to

20  cover it here in court, so that's a good thing with that.

21           So one of the things that I heard from Ms. Cyganowski

22  is risk and that's right.  And, see, the problem with all of

23  these two-steps is there's no risk with a non-debtor.  And I

24  briefed extensively on the dividends and how much they pay in

25  dividends.  And in your opinion you noted, well, what burden --

1  you didn't see a burden that J&J and JJCI were avoiding by

2  doing this.  Well, a big one is a billion dollars a month.

3          And so something ought to be done equitably with

4  that.  And especially when I look at that and I realize that

5  J&J settled a super majority of the mesothelioma cases in the

6  jury system for less than one percent of what they paid in

7  dividends during that time period.

8          So that's not irreparable harm to them and it sounds

9  like it's -- our clients are being deprived from resolution and

10 this is money that J&J is throwing out the window.  They don't

11 need it.  This isn't revenue.  This isn't cash on hand.  This

12 isn't assets.  This isn't the royalty stream from Rogaine.

13 This is money they're throwing out the window to their

14 shareholders.

15         So I join in their requests.  None of these cases are

16 even mine.  I would be in favor of lifting the injunction for

17 everybody right now because what would happen if that happened

18 was they'd manage.  They'd resolve the cases and people would

19 be getting paid just like they were doing in the jury system

20 beforehand, all the while dividends were going up.

21         And so in speaking of the injunction specifically and

22 kind of the position we find ourselves in moving forward in

23 this case, Hertz, JCPenney and Garrett Motion were in

24 bankruptcy total 27 months because they didn't want to be in

25 bankruptcy.  Right?  They wanted to be in business.

1          So the two-step model is a stooge that doesn't make

2    anything, doesn't sell anything, doesn't have any employees, no

3    reason to get out of bed in the morning, they want to be in

4    bankruptcy.  They're made to sit in bankruptcy and beat up the

5    plaintiffs' bar.  Then the injunction benefits the wealthy non-

6    debtor and that's how you end up ten years of bankruptcy court

7    time trying to figure out a way to outwit the Seventh

8    Amendment.  And so it doesn't work.  I've been living it.  It

9    doesn't work.

10          As to -- I was going to address this in my

11   estimation, but just about a path forward, my suggestion is

12   that the Third Circuit is going to be -- appears very eager to

13   rule on this case and, you know, you -- on March 30th you

14   recognized that maybe they would be interested in the short

15   term to decide this case.  And I'm grateful that you certified

16   your rulings for the appeal.  They appear to be eager.  They

17   didn't have to take the case.  They took the case.  They're

18   going to rule on the case.  Expedited briefing.  Three months

19   briefing is going to be done, arguments are going to

20   September 19th.  We're going to have a ruling.

21          And so to me it seems like other than lifting the

22   injunction for these people and all the great arguments that

23   were made, not only is it we're going to save 50 million bucks

24   in fees from all sides, whatever the Third Circuit does is

25   going to inform what we do moving forward in this case, I would

1 think.

2         And so the two-step doesn't work, hasn't worked in

3 ten years, it's not going to work in three months.  So let's

4 just pause.  Let's pause for three months and let's save some

5 money.

6         THE COURT:  But is it really three months in fair --

7         MR. THOMPSON:  Yeah.

8         THE COURT:  We know there's an en banc potential.

9 There may be a remand potential.  There may be a further appeal

10 potential.

11         MR. THOMPSON:  We --

12         THE COURT:  What I'm worried about, and I -- a

13 standstill is attractive.  Hell, as much as I love seeing you

14 all, it's attractive, but is it pragmatic and realistic given

15 the different avenues, different rulings that can come out of

16 the circuit?

17         MR. THOMPSON:  Well, there's certainly -- I mean,

18 look, I confess to you I'm not a bankruptcy lawyer, so the

19 number of options that the Third Circuit could do, I can't

20 speak to be an expert on that.

21         We can revisit it.  If we get to the middle of

22 October, I'm not going to hold it against the debtor.  If we

23 get to the middle of October and the Third Circuit hasn't ruled

24 or end of October the Third Circuit hasn't ruled, we could pick

25 back up again, start talking about whatever we're going to be

148

1  doing in this case.

2        But essentially what it seems like we're doing is

3  we're conducting a trial while the summary judgment order is on

4  appeal.  And, you know, Mr. Gordon said, well, I don't know

5  what's going on in mediation.  I don't.  I have no idea.  I

6  don't care because the problem is that they're trying to jam

7  down an aggregate resolution which we, Monte Ray (phonetic),

8  will never accept and so let's see what the Third Circuit does

9  and let that inform how we move this case forward.

10        And one of the things you also noted in your -- it

11 was either your motion to dismiss order or your preliminary

12 injunction order was that the jury rights could be protected in

13 the TDP.  Well, where's that?  Right?  Where's that option?

14 You know, they don't -- I think it's pretty clear they don't

15 want that to be an option.  What they want -- see, this is the

16 problem overall in this case.  They demand and will only accept

17 what no one has power to give them.  That's a problem.  They

18 don't ever want anybody to go in front of a jury about baby

19 powder ever again.

20        Well, there's a problem with that.  It's

21 unconstitutional.  And so we're just going to try to figure out

22 a way to give them the only thing they'll accept.  And so if

23 there's an opt-out that the TTC wants to propose, let's see it.

24 Maybe there is something that can be done.  I think we're not

25 going to hear from them because J&J was settling because they

149

1 were losing and risk -- I'll talk -- I didn't address the

2 Olsen (phonetic) -- he brought up the Olsen verdict.  Yeah,

3 there's risk and that's why most of the time we settle.  I

4 think the -- we got hammered.  The plaintiffs' part got

5 hammered in the motion to dismiss trial like as if we want

6 these verdicts, we want these verdicts.

7          What we want is our clients to be fairly compensated

8 and most of the time that happens because they settle and that

9 is what happened.  That is what happened for our clients.  And

10 so they could take a flash drive.  They've got all this

11 information up in New Brunswick.  They've got a settlement

12 history that has a flash drive of every case they settle.

13 Let's take a look at that, share it with everybody.  We don't

14 need -- that takes a day and a half.

15          We settled a lot more cases than were tried and Olsen

16 wasn't offered any money for the trial.  So if zero is the

17 offer, that's when you go to verdict.  And so I think that the

18 challenge with this case is no one can give them what they

19 require, so let's just stop trying.  Let's stop trying to do it

20 for a few months and let's see what the Third Circuit says.

21          And I would note, you know, the Olsen case, yeah,

22 that's a bad ruling for us and a week ago they would have said,

23 well, that -- it's a great verdict for the plaintiffs, but it's

24 on appeal.  Right?  So we're going to try to go up to the Court

25 of Appeals in New York and see what happens there.  And I would

1  reiterate, however, that Mr. Olsen seems to be the exact person

2  that J&J claims they're worried about, the person who goes to

3  verdict and wins or loses or gets overturned.  And I'm telling

4  you right now, Mr. Olsen objects to this bankruptcy even today.

5          And so unless and until the Seventh Amendment of the

6  United States Constitution is revoked, our clients are going to

7  demand jury trials and if J&J doesn't want them, tough.  You

8  know, my clients don't want to be dying from asbestos exposure

9  and the reason they settled was because juries kept finding

10  asbestos in the baby powder.  Thank you.

11          THE COURT:  You're welcome.

12          Anybody else?  Your side.

13          MR. GORDON:  I do have a PowerPoint, Your Honor.  May

14  I approach?

15          THE COURT:  Yes, please.  Thank you.

16          MR. GORDON:  Hopefully our slides will come up here

17  in a moment.

18          Blaine or Gary, are you working or are you on a lunch

19  break?

20          THE COURT:  Do you need to take -- you can take a few

21  moments.  Do you want to take a five-minute break?

22          MR. GORDON:  Yeah, can we take a break?

23          THE COURT:  Five-minute break.

24          MR. GORDON:  Sorry for the delay, Your Honor.

25          THE COURT:  Sure everybody welcomes it.

1                    (Recess at 2:51 p.m./Reconvened at 3:00 p.m.)

2                    THE COURT:  At your pleasure.

3                    MR. GORDON:  Thank you, Your Honor.  Greg Gordon

4    again on behalf of the debtor and I appreciate the additional

5    time to get our slides in order here.

6                    Before I turn to the slides, though, I did want to

7    say at the outset, obviously through various counsel you heard

8    stories related about a number of individuals with very

9    horrible diseases.  And I just want to note for the record that

10   from our standpoint we are extremely sympathetic and we're

11   sorry for those individuals, but at the same time we have to

12   point out that in doing all that there's an underlying

13   implication that our products are at fault or the cause of

14   those diseases.  And I would just reiterate again for the

15   record, and I know we're criticized for this, we do not believe

16   that, we do not believe our products caused that.  And although

17   these people are deserving of sympathy, we don't believe that

18   that has anything to do with us.  And, in fact, J&J is a

19   company that's all about making products that help people and

20   preserve lives and make people's lives better.

21                   And, you know, from our standpoint we're talking

22   about diverting dollars from those objectives of the company to

23   deal with a situation where we don't believe we're at fault.

24   But notwithstanding that, again, this is a company that's

25   prepared to resolve these issues in a very favorable way for

152

1  the claimants and we want to do it as quickly as possible.  But

2  I -- again, I would be remiss if I just didn't say something

3  about all the time that was spent on individuals.  We just do

4  not believe we're responsible for the diseases that they have.

5          First slide, please.

6          So, Your Honor, I'll go through these fairly quickly

7  and there's not that many because I think I covered a number of

8  these points already today, but we don't think you've really

9  heard any legitimate basis for this concept of lifting the PI

10  order to allow what's now twelve cases to proceed.  And I guess

11  it's not just twelve; it's twelve, plus the two clients that

12  Mr. Satterley represents and perhaps the client that

13  Mr. Placitella represents as well, and I don't think there was

14  a motion filed with respect to that client.

15          But I was just struck by the fact that the arguments

16  that were made were that this will be very helpful to the

17  process if we have these cases.  These are a test and these are

18  allowed -- don't go in to allow the parties to make progress in

19  settlement negotiations.  To me, what's missing from that is

20  they're not a test, in our view, from the standpoint of what

21  we're here to solve, which is the company's aggregate liability

22  for talc claims.  All these will do is provide further

23  information that may inform particular cases, but how that's

24  helpful to a process where we're attempting to use

25  Section 523(g) as it was intended to be used, to resolve these

1 claims on a global basis, is beyond me and I don't think anyone

2 has addressed that point at all.

3        The other point I would say at the outset, I think

4 much of what you heard from the claimants and from the TTC is

5 really an effort just to relitigate issues that Your Honor has

6 already resolved in this case.  And Your Honor had said back in

7 June, as I recall, you didn't want the parties to do that.  But

8 what I heard, particularly from the last few counsel, were just

9 arguments essentially suggesting that you got it wrong when you

10 didn't dismiss the case, you got it wrong when you entered the

11 preliminary injunction, you shouldn't have covered the

12 protected parties.

13        And Mr. Thompson even said, I think on behalf of his

14 client -- or no, maybe it was Mr. Placitella.  The request is

15 that you reconsider your orders.  Well, that's not what we're

16 here for and I'm not going to address that.

17        And as I said earlier today, this is the problem we

18 have in these cases that the plaintiffs will continue to argue

19 and reargue and reargue and reargue in a situation where the

20 company wants to move forward and we want to get to a

21 consensual resolution as soon as we can.

22        And obviously, as opposed to lifting the stay here

23 for whether it's twelve cases or ninety or something in

24 between, we don't think that's the best approach for all the

25 reasons I said this morning.  We think an estimation process

1 set up in the way that we proposed or something like that is

2 the better way to go.

3          Next slide, please.

4          Again, Your Honor, I'm not going to belabor this

5 slide as I think I covered these points today.  These twelve

6 cases that the Committee focuses on have been self-selected.  I

7 think Ms. Cyganowski even acknowledged, well, some of them may

8 be in plaintiff friendly jurisdictions.  And, you know, just

9 think about that from the standpoint of trying to move this

10 case forward.  How is it helpful to allow cases to go forward

11 in jurisdictions that the TCC have meso plaintiffs friendly?

12 What's that going to do, what's that going to change either

13 from the plaintiffs' perspective or the company's perspective

14 in terms of how to resolve this case?

15          Obviously we had no input in terms of this sample or

16 this group of cases that was selected.  And it's not a

17 statistically appropriate sample.  It's not presented as a

18 random sample or representative sample and we would submit,

19 Your Honor, at a minimum if we were to go forward with some

20 sort of group of cases, and we don't think any group is

21 appropriate, it'd be done in a way where it is a true random

22 sample.  It's determined some way -- you know, that's

23 statistically proper, that's scientifically proper.

24          And then, of course, you know, we believe that the

25 Committee is overstating how quickly these cases can move

1 forward because of pretrial issues and discovery and the like

2 that's going to have to proceed in at least some of those

3 cases.

4          Next slide.

5          THE COURT:  Let me just ask a quick question.  This

6 slide when you reference the fact that the average age of

7 proposed meso claimants, approximately 46 years old is 20 years

8 younger, it would suggest that you have data on these, do you

9 have comparable data on the ovarian claimants?  In other words,

10 I'm trying -- I'm going back probably the prior arguments on

11 estimation and what's needed as far as discovery.  It would

12 seem that if you could produce this that there is that data out

13 there.

14          MR. GORDON:  I --

15          THE COURT:  Is that a fair assumption?

16          MR. GORDON:  Yes, we have some data, Your Honor.  I

17 believe that we have a fair amount of data on age, but there's

18 lots of other data that we would not have.  And, you know,

19 we'll be -- if the Court authorizes estimation, we'll be

20 prepared to go through that in some detail in terms of what we

21 have and what we need.

22          THE COURT:  All right.  Thank you.

23          MR. GORDON:  Next slide, please.

24          And Your Honor probably remembers some of the

25 information on this slide from the hearings back in February,

1  but prior to the bankruptcy we were averaging trying about

2  eight cases per year.  Now the suggestion is that we'll try 12

3  cases in about five months, if I heard the TTC right.  And

4  there's just -- there's no evidence or no experience that the

5  parties have to suggest that that could ever be possible or

6  that that could be done in a way that wouldn't be prejudicial

7  to the company.

8          Sure, we have many defense counsel.  I heard

9  Mr. Satterley say that.  But those counsel are involved in

10  different jurisdictions and the like and we've never been in a

11  situation where we've been put on the spot and would have to

12  basically defend, I think what they're proposing is 12 cases at

13  the same time.  But could the courts do that as well?  I think

14  that's highly questionable.  And again, there's various

15  pretrial issues.  Venue is definitely going to be an issue in

16  these cases.

17          And all of that from our point of view, as I said

18  earlier, is just going to divert the attention of the parties

19  in this court from the real issue that we have to confront in

20  order to resolve this case and move forward.

21          Next slide, please.

22          So, you know, this idea that, you know, the

23  suggestion is, as I understand it, that the litigation would go

24  forward only as to protected parties.  In other words, non-

25  debtors, not the debtor, and that shouldn't be a problem

1 because the debtor won't be involved.  But that runs counter, I

2 think, to the finding that Your Honor made when you issued your

3 preliminary injunction order which is, in effect, the debtor is

4 the real party defendant here.  It's going to have to be

5 involved in this litigation.

6          So you just can't separate the two that way.  You

7 can't look at it that way.  It almost sounded when I heard

8 Mr. Satterley and some of the others' counsel that they're

9 suggesting that the -- it's a different liability.  And I think

10 what the -- what we've been able to show and what we did show

11 back when we talked about the preliminary injunction is the

12 liability here that encompasses these protected parties, it's

13 the same liability.  LTL has the liability.  It encompasses --

14 you know, it's the same liability that the retailers potential

15 has, that J&J potentially has, and so there's no way to just

16 parse it out and say there's no impact on the estate.  I think

17 you were asking, what is the impact on the estate, and that

18 goes right back to your finding that the debtor is the real

19 party in interest because they're the same claims.  It's the

20 same liability, same product, same allegations of usage, same

21 time period, same damages.  It's all the same.

22          I mentioned this, this morning, but you can see it

23 now on the slide.  Their proposal entails just cutting off

24 these cases at trial.  Once there's a decision at trial, once

25 that's a verdict, that's it.  These cases don't go any further

1  and they've done that because they recognize that the company

2  has had a significant track record on appeal in overturning

3  verdicts.  So they're saying, well, let's go ahead.  We want to

4  test -- we want to test -- have some tests to inform the

5  parties, but they don't want to complete the test.  They only

6  want to go as far as they think will likely improve their

7  chances, but they don't want to take it through the full

8  process where we'd have the right to seek to overturn the

9  judgments on appeal or the verdicts on appeal.  And you can see

10  again the 3.3 billion-dollar number that I referred to this

11  morning.

12        And then I also alluded this morning to the <u>Olsen</u>

13  case and you heard Mr. Thompson, I think, mention it a couple

14  of times.  Again, that was 120 million-dollar mesothelioma

15  judgment and the appellate court said:

16        "Plaintiffs failed as a matter of law to carry their

17      burden to establish sufficient exposure to a substance to

18      cause the claim adverse health effect.  Case reversed."

19        And that literally just came down about a week ago.

20        Next slide, please.

21        The argument advanced by the Committee and others is

22  that if we litigate these one-off cases that's going to move

23  the case forward because it, again, will be a test.  It will

24  provide additional information.  It will add to the body of

25  data.  But look at what they said in their estimation reply.

1 With respect to this exact same issue, but this is an opposing

2 estimation, they said:

3       "The parties already have substantial information

4       which can be produced and shared immediately.  J&J has

5       been litigating these issues for years in the tort system.

6       Verdicts have been rendered.  Appellate courts have ruled.

7       The parties have been through discovery.  Both sides

8       understand each other fully.  J&J has been settling talc

9       claims for years.  All of this data is presently

10      available."

11      Well, that's what they argue in estimation.  Then

12 they argue the exact opposite when we come to the question of

13 whether the preliminary injunction or the automatic stay should

14 be listed -- lifted and it's just unclear.  How is it that

15 there -- if there's sufficient information so that an

16 estimation proceeding isn't necessary, why is it then there's a

17 need to litigate 12 additional cases to generate additional

18 information?  It's a completely contradictory argument.

19      Next slide.

20      We believe that having some additional cases

21 litigated in addition to I think the almost 50 that were tried

22 in the tort system is not going to inform the parties' views in

23 any meaningful way.  It doesn't address at all the issue of

24 aggregate liability.

25      And I should pause at this point because, you know,

160

1  the Committee is coming in saying, we need to go with this pay-

2  as-you-go idea; we can't imagine why the company wouldn't go

3  for that.  But to my knowledge, Your Honor, I can only think of

4  one asbestos case that didn't involve a complete and final

5  resolution of the liability.  In other words, the case where I

6  believe, as 524(g) contemplates, a company can resolve the

7  liability, put it behind them.  In other words, fund the trust,

8  put it behind them and move on.  And that's why there's so much

9  in 524(g) about the channeling injunctions.

10        The only case I'm aware of that's the exception to

11  that, and I -- someone can prove me wrong -- is the Honeywell

12  case, which I've always thought -- well, it's a case I think

13  all sides would agree didn't have the salutary results that

14  people were looking for on either side in that case.  But every

15  other case, as far as I know, there was a fund that was made

16  available that was paid.  The debtor and its affiliates were

17  permanently enjoined.  The liability was done and the trust

18  took over and managed the claims on a go-forward basis.

19        We think if Your Honor were to lift the injunction

20  that's going to eliminate any incentive for the parties to

21  mediate through that while that process is ongoing.  It's

22  almost, as we say here, a counter motivation.  If both sides

23  then are just going to wait and see if they can obtain some

24  favorable judgment in some individual cases, but that's, from

25  my perspective, a fool's errand because, again, it's only a few

1  more additional cases.  And you heard today we pointed out the

2  fact that the last four ovarian cases where the new science was

3  presented, we won them all; then you heard the other side come

4  up and say, yeah, but we won trials in mesothelioma cases, and

5  then there were settlements.  Nothing is going to change that

6  dynamic or certainly litigating 10 or 12 or 2 or 3 or whatever

7  it might be additional cases in the tort system is not going to

8  change that dynamic.

9         And I guess the last point on this slide is if --

10 again, if we want to move down this road, there should be a

11 true random sample of cases that would be the subject of that

12 litigation, which means we'd have to have a determination about

13 not only how many of those cases there should be, but how that

14 sample would be drawn and that could be litigation in and of

15 itself.  We have that litigation going on in other cases.

16 Okay.  What is a random representative sample, do we need to

17 bring the experts in to opine on issues like that.

18         Next slide.

19         We don't think, Your Honor, that there is any change

20 in circumstance that warrants modifying the injunction or Your

21 Honor's ruling on the automatic stay that this -- at this time.

22 I mean, the only arguments that we've heard advanced to suggest

23 there's been a change in circumstances are ones the court would

24 have taken into account or did take into account in connection

25 with its rulings.  You know, one is, well, now there's the

1  possibility of estimation on the horizon.  Another is, well, a

2  mediation hasn't resolved yet.  That would be a changed

3  circumstance.

4         The fact that more time has gone by, that's a changed

5  circumstance.  I heard today the fact that the appeal was

6  certified, that's a changed circumstance.  I don't think any of

7  those are the types of things that would warrant modifying the

8  injunction because they would have -- all those things could

9  have been taken into account.  None them, in our view, affect

10 any aspect of the underlying reasoning of the Court's decision

11 on the preliminary injunction order.

12        Obviously, again, we would like to have been able to

13 say that we've reached a settlement, but if you step back, the

14 case has only been pending about nine months and the first five

15 months were consumed with litigation that the other side wanted

16 to pursue.  They had every right to pursue it.  As Your Honor

17 remembers, we came in on day one and said we were prepared to

18 mediate right away and do it in parallel.  The Committee

19 resisted that.  Your Honor, I think, rightly so said, look,

20 their heart is just not in it.  There's no point in doing it.

21 Let's get through the litigation and see.

22        That's a long way of saying in a case of this size

23 and this complexity to more or less give up on the injunction

24 ruling and feel like a material modification is necessary

25 because mediation hasn't been reached in four months we submit

1  is not a proper basis to modify the court's judgment.

2          Next slide, please.

3          There are lots of parts of the opinion, the PI

4  opinion I think we could have referred to here, but the court

5  found in the PI order that that order did not prejudice

6  claimants.  The opinions said:

7          "Talc claimants will not be prejudiced through the

8          issuance of a preliminary injunction and will, in fact,

9          benefit from the extension of the automatic stay to the

10         protected parties in the handling of their claims through

11         the bankruptcy process.  This method of dealing with

12         claims also protects the interests of future claimants,

13         prevents a race for proceeds and promotes the quality and

14         distribution."

15         And I would respectfully submit, Your Honor, that

16 nothing is changed with respect to that reasoning.  All the

17 points that Your Honor made back in March of this year apply

18 equally today.

19         Next slide, please.

20         Your Honor, this is just a slide.  I'm not going to

21 spend much time on this.  There's been a lot said about the --

22 in the briefing about the Diocese of Rochester case.  I think

23 what's most noteworthy about that case is that three years had

24 gone by, three years of unsuccessful negotiations.  I think

25 there had been a number of extensions of standstill agreements

1  and the like and I think the court there decided at that time,

2  particularly when the Diocese was threatening a cram-down plan,

3  that enough was enough.  It was time to allow the injunction to

4  lift.

5       That's very different, I would say, that where we are

6  in this case.  Very, very different.  We're at the very

7  beginning of a time spectrum, whereas that case, they were very

8  much further down the road, if not getting towards the end.

9       Next slide.

10      I'm not going to belabor this, Your Honor.  This was

11  raised -- these arguments have been raised both in connection

12  with estimation and the preliminary injunction that we've

13  authored a script dictating the timing and the case is a script

14  that -- whose sole purpose is to promote delay.  And, you know,

15  I don't really know what's appropriate with respect to courts

16  talking to other courts, but certainly from my perspective

17  having you talk with Judge Byer or Judge Whitley --

18           THE COURT:  Well, I'm not talking to him.

19           (Laughter)

20           MR. GORDON:  Did you say you are or you're not.

21           THE COURT:  Oh, we're not talking now.  Just --

22           MR. GORDON:  Well, as I said, no idea.

23      Anyway, and I've made my points about this.  I -- we

24  strongly dispute the idea that anything we've been doing --

25  anything the companies have been doing in those cases has

1 caused the delay in those cases.  And we think the picture

2 that's been painted by the other side is very, very inaccurate.

3           Next slide, please.

4           And this is really more of the same.  Same is true in

5 DBMP and Aldridge, unfortunately, given where we are in those

6 cases.

7           I should note in Aldridge, Your Honor may know this,

8 a settlement has been reached with the FCR in that case.  We

9 have an independent FCR, but to date the Aldridge committee has

10 refused to engage in settlement negotiations notwithstanding an

11 agreement has been reached with the FCR.

12           Next slide, please.

13           So, Your Honor, this is the legal point that I think

14 Ms. Cyganowski was very dismissive of.  And this is the

15 question of whether the appeals have temporarily divested this

16 court of the ability of modifying the injunction as requested

17 by the Committee in any event.  And we've tried to lay out

18 these cases for Your Honor.

19           I never liked telling a court that it doesn't have

20 jurisdiction.  I say that with the most utmost respect.  But

21 from perspective, the Committee chose to appeal an order that

22 permitted Your Honor to revisit the issue every few months.

23 And what they're doing, I think, through their request is

24 essentially asking this Court to revisit issues that are the

25 subject of appeal or otherwise to take action that's not action

1   intended to preserve the status quo or preserve the integrity

2   of the appeal.  So we do think these cases present a problem in

3   terms of what the Court is able to do with the request made by

4   the Committee and the other parties.

5             Next slide, please.

6             And it's really -- again, I'm not going to belabor

7   this.  More on this rule and the interface between this rule

8   and Rule 62(d) of the Federal Rules.

9             Next slide, please.

10           So really just cover a few points just to respond to

11   some of the arguments that were made by the other side that

12   weren't picked up in the slides.  One of the things I heard

13   more than once this afternoon was that Your Honor basically

14   made a mistake when you entered the order as you did back in

15   March because you put the claimants in a situation where they

16   have no leverage.  No leverage.  And the company -- and the

17   other side of it is the company has no incentive to move the

18   bankruptcy forward.

19           And again, I would just reiterate what I said before.

20   I don't think there's any evidence to indicate we've done

21   anything other than attempt to move the case forward quickly.

22           And in terms of the leverage, it seems to me all you

23   have to do is look at 524(g) and the 75 percent consent

24   requirement and reject the point of view that the plaintiffs

25   have no leverage.

1          The other thing, Your Honor, there was a request.  I

2    think it was by Mr. Ruckdeschel that -- and Your Honor

3    obviously made the right point about the extent of your

4    authority, but he stated that J&J should be required to fund

5    its dividends to public shareholders into a trust for the

6    benefit of the victims.  And I was struck by that only because

7    we filed a motion to fund two billion dollars into a QSF months

8    ago for this -- the sole benefit of the plaintiffs and all

9    we've received pretty much in response to that is opposition

10   and more lately now -- or more recently now requests for

11   discovery with respect to that.

12          So it's interesting that you have counsel coming in

13   saying money should be set aside in a trust for the benefit of

14   the plaintiffs and we've been attempting for months, since

15   basically virtually the inception of the case, to put money

16   into a trust and we've received nothing but opposition to that.

17          I think with respect to Mr. Satterley, I would just

18   say that I think the issue -- you know, he says we've never

19   been willing to settle with him and settle these claims of

20   these two individuals.  And of course, the problem we have is,

21   how do you differentiate those individuals from the other

22   40,000 claimants we have in this case and how do you basically

23   justify treating them differently from everyone else who's

24   subject to the injunction.  And I think honestly that's the

25   same issue Your Honor would have to wrestle with in granting

1  specific stay relief as requested by him.  If you grant the

2  stay relief with respect to his two clients, how do you justify

3  denying a similar request from other claimants?  I mean, what

4  would serve to differentiate those cases from any of the other

5  thousands of cases?  It seems to us that's a slippery slope and

6  just a way ultimately to an end where the injunction is just

7  set aside on the basis that you found that a couple were

8  deserving of an exception and there's no real basis to

9  distinguish those situations from the situations of other

10 claimants as well.

11         THE COURT:  Mr. Gordon, what's the status of at

12 least -- and you just may have to remind me -- there had been a

13 protocol agreed to in extremis situations.  Is that still in

14 effect?

15         MR. GORDON:  Yes.

16         THE COURT:  And what's the scope of it?

17         MR. GORDON:  Well --

18         THE COURT:  In other words, what's -- how much is

19 agreed to or consented to as far as actions that can be taken?

20         MR. GORDON:  As I recall, and I'll just confirm

21 this --

22         THE COURT:  Yeah.

23         MR. GORDON:  -- with Mr. Prieto to make sure I don't

24 mess it, but as I recall it was generally focused on

25 preservation testimony for the plaintiffs, that the plaintiffs

1  have the right to preserve -- or that -- plaintiffs' counsel

2  have the right to preserve the testimony of the plaintiffs and

3  that's been happening in many, many cases.

4          THE COURT:  But that -- so that -- it does not extend

5  to third parties or --

6          MR. GORDON:  Let me just confirm that.

7          THE COURT:  -- or anyone else?

8          MR. GORDON:  I don't believe so, Your Honor.

9          (Pause)

10         Yeah, Your Honor.  Mr. Prieto is reminding me.  It

11  also incorporated a similar preservation protocol that was in

12  play in the MDL as well.

13         THE COURT:  Okay.

14         MR. GORDON:  And I don't know the exact contours of

15  that, but that's the extent of it.  But I think generally, no,

16  it did not apply to third-party discovery and I should -- or

17  third parties.  And I should address that because, you know,

18  again Mr. Satterley is making representations that I'm not in a

19  position to dispute about memories can be lost, documents can

20  be lost, evidence could be lost.  But it -- but the point is

21  that if -- if the stay is permitted to be opened now, not only

22  to allow preservation testimony for the plaintiff but any other

23  discovery that plaintiffs' counsel thinks they need or they

24  would like to preserve and you look at that across the spectrum

25  of 40,000 or so cases, I don't know how that's going to be a

1  manageable process.

2          So all I would say to Your Honor is, if that's

3  something that you're seriously considering, I would like on

4  behalf of the debtor to ask that we have an opportunity to sit

5  down and think about that because of the ramifications that

6  that would have across the spectrum of cases which I would

7  worry would make it a very, very unmanageable situation.

8          THE COURT:  All right.  Thank you.

9          MR. GORDON:  And again, I'd like an opportunity also

10 to understand what the real risk as there is -- like if the

11 concern is the hospital records are going to go away, I imagine

12 we can find out how long hospitals keep their records and I

13 imagine it's a long period of time.

14         So I guess from my perspective, I'm somewhat

15 skeptical that there's some kind of emergency step that needs

16 to be taken to preserve testimony like that.  I get it with the

17 plaintiff who's got a terminal disease.  We get that and we've

18 always agreed to that carveout, but taking it another step

19 beyond that to me, at least from our perspective, we'd have to

20 spend more time on that.

21         THE COURT:  All right.  Thank you.

22         MR. GORDON:  Thank you.

23         And I think fundamentally, Your Honor, that's it

24 because I -- I don't want to be repetitive.  Our view is, as

25 Your Honor knows, that you really are faced at this point with

1  two paths to move forward.  One is a path that to us focuses on

2  the issue that needs to be focused on and it brings to bear the

3  expertise of subject matter experts.  It integrates mediation

4  and it does so on a time frame where there's many steps along

5  the way including, and only a couple of months, where there are

6  good opportunities to reach a settlement that's been elusive so

7  far.

8          And that contrasts with a proposal to lift the stay

9  for what we view as a cherry-picked number of cases that will

10  do nothing in terms of providing information the parties don't

11  already have, will provide no information on aggregate

12  liability.  And on -- and I think by the TTC's own admission

13  isn't going to add anything to the knowledge base of the

14  parties, particularly because it just would focus on individual

15  claims.

16          And then otherwise, we've talked about the plan

17  before, the plan process.  We think that's premature.  We

18  understand that it may be appealing to the Court to move down

19  the road with a plan process.  But at a minimum we would say if

20  Your Honor is inclined to do that, we would ask that it be done

21  in a way where we can obtain the discovery that we think is

22  very important for our case, discovery we think -- and

23  information we think Your Honor would want, that the experts

24  would want to evaluate the positions of the parties.  And so we

25  would certainly want to be heard on how that process would be

1  conducted to make sure that we have the opportunity to make the

2  case that we believe that we have a right to make.

3        THE COURT:  All right.  Thank you, Mr. Gordon.

4        MR. GORDON:  Thank you.

5        Ms. Cyganowski.

6        MS. CYGANOWSKI:  Melanie Cyganowski for the

7  Committee.  Just a few points, Your Honor, to in some instances

8  clarify the record.

9        To begin with, the last point just made, no one, no

10  one has asked this Court in connection with the pending matter

11  for discovery to take place in all 40,000-plus cases.  We have

12  asked for the 12 cases to be permitted to be pursued at trial.

13  There's been two or three other parties who have stood up and

14  specifically asked for their cases to be allowed to proceed to

15  trial, but no one today or in prior papers leading up to today

16  has asked for discovery to be lifted in all 40,000 cases.

17        I say that because I also want to make clear, because

18  apparently it wasn't, that the TTC is not seeking

19  reconsideration or reargument of any of the issues regarding

20  the preliminary injunction.  Rather, we are responding to the

21  invitation at the June 14th omnibus hearing, as well as in the

22  Court's prior order that the circumstances be revisited.  And

23  specifically, at the June 14th hearing, the Court indicated

24  that upon its revisitation of the PI order it might consider

25  carving out from the order a "small segment of talc cases to

1  proceed at trial."

2          We took that as an invitation to respond.  We did.

3  We provided this Court with initially a list of 90-plus cases

4  that were across the country.  We were soundly chastised that

5  it was 90 cases, how dare we put forward to the Court the

6  possibility that some or a segment or all of them might go to

7  trial.  We worked on that.  We refined the -- the list to bring

8  it down to a more -- what might be perceived as a more

9  manageable number, and we presented that to the Court.

10          But the point, as I said earlier, the point of these

11  trials is, while it certainly services and benefits those 12

12  plaintiffs in those particular trials, the point of this is to

13  change the status quo.  The status quo is not working.

14          We've been in mediation for weeks, for months, and we

15  haven't reached a resolution.  And I don't believe any party

16  can stand up and say that we're on the cusp of a resolution.

17  We believe that it's important to change the playing field.

18          One way that does that is the old-fashioned way.

19  Let's go to trial.  Let's go trial.  We suggest these 12 cases.

20  We've put them before the Court and the debtor and other

21  parties.

22          I never said that all 12 were in plaintiff-friendly

23  jurisdictions.  If my words were confused, let me be clear.

24  They were chosen regardless of whether they're in plaintiff-

25  friendly jurisdictions.

1        The notion that letting these 12 go to trial impacts

2   LTL is -- is, frankly, difficult for me to comprehend.  We

3   cannot forget that LTL is a shell.  It's not an operating

4   business.  I think it has three of the points, maybe four.

5        The cases that are going to be litigated are going to

6   be litigated by non-debtor companies.  I'm failing to see how

7   it is that these 12 trials, were they to go forward, would

8   suddenly adversely impact this bankruptcy case.

9        The last point that I'd like to just briefly comment

10  upon is this notion of changed science.  Yes, there have been

11  some reversals in several ovarian case judgments.  In some

12  instances, that was due to the Supreme Court case dealing with

13  certain issues of personal jurisdiction.  The parties were

14  prepared to address those issues, and this case was filed and

15  the injunction took place, and so they never were.  So I think

16  it's wrong to leave the implication that somehow it's changed

17  science that has led to these reversals.

18        That's all I have.  Thank you.

19        THE COURT:  All right.  Thank you, Ms. Cyganowski.

20        MR. SATTERLEY:  Good afternoon, Your Honor.  Joe

21  Satterley again.  Just a few comments.

22        First I want to address something that we already

23  argued, but was re-raised again, is Your Honor's jurisdiction

24  to modify the order.  We argued that in June.  I think it's

25  real clear the Ortho Pharmaceutical v. Amgem case, 887 F.2d

1 460, 1989, clearly supports Your Honor's ability to modify the

2 order as you deem fit.  And so they continue to argue that you

3 don't have jurisdiction.  The law is clear on that.

4          I want to just address a few things from Mr. Gordon's

5 PowerPoint.  The bullet point, the average age of proposed

6 mesothelioma claimants approximately 46 years old is 20 years

7 younger than the average age of mesothelioma claimants

8 generally 66 years.  That's on page 3, the fifth bullet point.

9          Well, it's not surprising that when babies are

10 exposed to asbestos when they're six months old or one year

11 old, the latency time frame for the resulting disease, the

12 science is very, very clear that the latency is shorter and

13 they're going to be younger.

14          When I first started trying mesothelioma cases in

15 1997, most of my clients were first exposed when they were in

16 their early twenties, when they were in the workforce and when

17 they're working as pipe fitters or insulators.  And yeah,

18 they're going to be in their sixties or seventies or eighties.

19          So it's not only common sense, the science supports

20 it, that these folks are younger, just because their exposure

21 is so much earlier.  So that makes perfect sense.

22          The second issue that counsel raised that they would

23 challenge venue of these cases.  Well, first of all, in the

24 Doyle case, which is -- they already challenged venue three

25 years ago and lost on that, and they've already lost on every

1  motion to dismiss in Santa Clara County.

2          So that's -- and they have never successfully changed

3  venue in any of the mesothelioma cases, whether it's been in

4  Kentucky, New Jersey, L.A., Oakland, anyplace I've been,

5  they've never been successful at changing venue in any, because

6  I don't forum shop.  There was exposure there.  There's the

7  defendants that reside there.  The cases are where they need to

8  be.

9          Finally -- or not finally, but the next point is

10  counsel says these non-debtors have the same liabilities as the

11  debtor.  That's not true at all with regards to these cases.

12  Having tried these cases, juries put apportionment of liability

13  on it.  Every single case, there is a percentage of

14  responsibility placed.

15          And we put on evidence if the distributor knew about

16  it and didn't do something about it, the jury can assess that.

17  The jury in the most recent verdict, Prudencio, the last bonded

18  judgment, the jury put a certain percentage on J&J and a

19  certain percentage on JJCI.  So -- and they assess that.  And

20  that varies also from state to state, because the law is

21  different in each state.

22          The next point of counsel is that we want to cut off

23  their ability to appeal.  I'm willing, if they want to appeal

24  any of my judgments, we've done it before -- the Leavitt case

25  was affirmed on appeal after -- there was a 2019 judgment

1 against both J&J and JJCI and Cypress.  It went up on appeal.

2 It was affirmed on appeal.  It's final.  It's over with.  The

3 <u>Anderson</u> case, that was a plaintiff's verdict, went on appeal.

4 Oral arguments occurred.  After oral arguments, they

5 immediately settled the case.  Now, I can't tell you the

6 amount, but they settled the case.

7 So, the <u>Prudencio</u> case, it's on appeal and it's

8 bonded.  I've said, let's settle this case.  It's 10 percent

9 interest.  You're paying 10 percent interest.  Let's settle it.

10 So Ms. Prudencio, she's 35 years old, let her get some

11 compensation now.  The response to that is, "We get 14 percent

12 interest in our investments.  We get more interest in our

13 investments than we have to pay Ms. Prudencio on it, so we're

14 not going to negotiate."  That's the response.

15 So I'm willing to -- if counsel wants to modify the

16 order to allow to go to the court of appeals, that's fine with

17 -- that's fine with me.

18 The final point is preservation of testimony and

19 gathering of evidence.  When we were before Judge Whitley in

20 North Carolina, the debtor agreed that we could take

21 depositions of dying plaintiffs, but that's it.  Having done

22 this for a number of years, there's been a lot of cases where

23 key witnesses die in between the time you file the lawsuit and

24 the time that you go to trial.  That happens in lots of cases,

25 and the stay order wherein doesn't -- you know, doesn't allow

1  us to gather that -- those other witnesses' testimony.

2          And with regards to the extremist depositions, J&J or

3  LTL, or none of the -- they don't attend any of the

4  depositions.  They don't -- we have sent out notice to them.

5  They just ignore us.  They don't attend.  And I suspect there

6  might be an argument later that it has less evidentiary value

7  because they weren't there.

8          So for all those reasons, and for the reasons set

9  forth in our written materials, we'd request Your Honor to

10 modify -- modify the PPI order.  We're not asking for a

11 discovery in 40,000 cases.  We've got a very limited request.

12 And I appreciate Your Honor's time.

13         THE COURT:  Thank you.

14         MR. RUCKDESCHEL:  Your Honor, very briefly, Jonathan

15 Ruckdeschel again.  Just to follow up on Mr. Satterley's

16 comments regarding whether it's the same liability as the

17 debtor has argued today, that this is all -- because it's the

18 same bottle of stuff, it's all the same liability, that's

19 simply, with respect to the retailers, not true with respect to

20 state law either.

21         As with Johnson & Johnson, in any state where there's

22 apportionment of fault, the fault that's getting apportioned to

23 a retailer is solely that retailer's fault.  The jury makes

24 that determination.  This portion is your responsibility.

25 That's all they're responsible for.

1          And in joint in several states like Maryland, the law

2    is set up so that the retailer bears the risk of the insolvency

3    of somebody up the chain, including the manufacturer, like LTL

4    has now assumed.  It's independent liability of these

5    companies.  They have their own fault under state law.  And a

6    great example of that is the sealed container defense, which

7    has been enacted by statute in many, many jurisdictions.  And

8    nearly all of the sealed container statutes that I've ever seen

9    that say a retailer who gets a product that's defective in a

10   sealed container that they can't ordinarily or easily determine

11   the defect of who sells it to somebody and they're harmed by it

12   doesn't have liability unless the manufacturer is insolvent in

13   bankruptcy, can't be recovered against it.

14          So there's a carve out in all of these where the

15   states recognize that the retailers have their own liability.

16   Everybody in the chain of distribution is responsible under

17   state law.  It's their own fault.

18          Thank you.

19          THE COURT:  Mr. Placitella.

20          MR. PLACITELLA:  Tell Mrs. Caplan I only saw one soda

21   this afternoon.

22          (Laughter)

23          MR. PLACITELLA:  Kimberly Naranjo's case is pending

24   three blocks from Johnson & Johnson's headquarters.  They can't

25   say that it's cherry picking jurisdictions.  I've seen Mr. Kim

 1  in the courthouse there.  He can walk there.  He doesn't need

 2  car service.  Ms. Brown sat next to me for months in trial.

 3  She knows her way.

 4          So if they want to appeal that judgment when it's

 5  over, we're okay with that.  But there will be no fair

 6  resolution in this case so long as Johnson & Johnson holds all

 7  the cards.

 8          Thank you, Your Honor.

 9          THE COURT:  Thank you, counsel.

10          Anyone on Zoom wish to be heard?

11          (No audible response.)

12          THE COURT:  All right.  Then let's move -- well, let

13  me start.  With respect to the estimation matters and the

14  continuation of the preliminary injunction or the continued

15  extension of the automatic stay, I am going to reserve until

16  Thursday morning, July 28th, that's this Thursday, at 11:00

17  o'clock.  I will announce my rulings.  I will be announcing my

18  rulings on all the matters heard today on Thursday morning.  I

19  want the opportunity to review and consider what's been

20  presented.

21          It will be 11:00 a.m. Thursday morning.  Access will

22  be provided through Zoom link posted.  So you obviously need

23  not come.  We don't want you.

24          (Laughter)

25          THE COURT:  Just appear through Zoom.  There will be

1  no argument.  I'll just be -- I will just be placing my rulings

2  on the record.

3          All right.  Let's get last, but certainly not least,

4  folks, the insurers' arguments.  Are we starting with Travelers

5  or the coverage?  Any preference?

6          MR. FRANKEL:  I think I'm going to be pretty brief,

7  Your Honor.

8          THE COURT:  Sure.

9          MR. FRANKEL:  I think the New Jersey plaintiff

10  insurers will follow with some additional comments.

11          THE COURT:  All right.  Appearances, please.

12          MR. FRANKEL:  Andy Frankel, Simpson Thacher, for

13  Travelers.  And as I said, I am going to be brief, Your Honor.

14          Not only has it been a very long day and Your Honor

15  has shown extraordinary patience.  There's bigger fish to fry

16  than the insurance issues.  But we've already argued and

17  briefed these issues before, back in March.  We filed the

18  motions five months ago.  So I'm just going to hit a couple of

19  the high points and reassess where we are.

20          At the March hearing, I think we showed for Travelers

21  and the other insurers that, in our view, the balance of harm

22  -- harms weighs in favor of lifting this stay.  There's no

23  prejudice to the debtor if the action proceeds.  It's only a

24  suit seeking declaratory relief, it's not seeking money

25  damages, certainly not against the debtor.

1          J&J has been represented by McCarter & English for

2     two years while they were litigating thousands of claims in the

3     tort system.  McCarter & English stands by the ready to

4     continue the litigation.  They have been doing work in this

5     case and they continue to, you know, research coverage issues,

6     deal with discovery.  In fact, they've been engaged, it

7     appears, in some discovery with the TCC on insurance issues

8     while the insurers have been stayed.

9          There has been significant document discovery in the

10    underlying case that doesn't have to be recreated.  There

11    hasn't been significant or any third-party discovery that's

12    been completed.  And there are a number of right issues that

13    can be determined in very short order that might not involve

14    much, if any, discovery.  That's not true for all the issues,

15    but for some of those issues.

16          I think the real key is, Your Honor, that all parties

17    would benefit from obtaining clarity on some of these fairly

18    complex, in some cases, coverage issues.

19          The insurers do believe that we're harmed by the

20    continuation of this stay.  There's obvious uncertainty with

21    having the exposure hanging over insurers' heads to the tune of

22    what they say is about $2 billion.

23          We have parties on all sides of the room talking

24    about how they have rights to that insurance coverage or

25    potential rights to coverage.  All parties are talking about

183

1  ways to resolve the claim, to potentially hand a portion of the

2  bill over to the insurers, while we're not parties to those

3  negotiations and discussions.

4

5          So it makes -- and there are other -- there are other

6  issues that have been addressed in the papers and previously in

7  terms of like loss of evidence, memories fade.  We haven't had

8  the ability to pursue all of our third-party discovery and the

9  like.  There's the issue of potential accumulation of

10 prejudgment interest.

11         So when courts have looked at similar issues in other

12 mass tort bankruptcies, as I think we've indicated before, the

13 norm in these cases is to allow the coverage action to proceed,

14 particularly whereas here there's a preexisting state court

15 action.  It's the norm, and it's usually not even contested.

16         Ultimately, back in March, Your Honor decided that it

17 made more sense to focus the parties on mediation.  There would

18 not be any undue prejudice with a 90-day breathing spell, which

19 turned out to be slightly longer.  But by this point in time,

20 we would have a sense of whether or not there would be a

21 consensual resolution.

22         I don't think I need to explain to the Court where we

23 are on that front.  But what the debtor is basically saying at

24 this point is that, okay, there's no -- there was no mediated

25 resolution, but let's just hold all these insurance issues in

1 abeyance indefinitely.  And we don't think that makes any

2 sense.

3         I think there was an interesting back and forth that

4 might illustrate, you know, some of the problems that Your

5 Honor had about this question of the funding agreement.  And

6 I'm not going to address the funding agreement.  I haven't

7 studied that in quite some time.  But in terms of the responses

8 to Your Honor's questions about that, well, how do we determine

9 if there's insurance coverage is -- is exhausted, I frankly

10 would quibble with both Mr. Molton's and Mr. Gordon's

11 responses.  Both of them suggested that well, we can deal with

12 this during confirmation, and we just need to know the size of

13 the problem.  There's only $2 billion worth of coverage, so if

14 there's, you know, three or five or ten billion or more in

15 liabilities, then insurance is going to be exhausted.

16         And for better or worse, Your Honor, it's not that

17 simple.  There are all kinds of issues that only the state

18 court can determine.  I don't think Your Honor wants to have a

19 mini trial on insurance coverage issues as part of the

20 confirmation hearing, but there are issues like over how long a

21 period are damages allocated, what policies are included in

22 that allocation.

23         There were multiple coverage defenses that might take

24 out of the equation categories of damages and that have

25 coverage implications.  All of these issues, I think only the

1 state court can decide.

2         And so if it turns out that determining these issues

3 is somehow going to be a critical issue in this case, that's

4 all the more reason to lift the stay to allow those issues to

5 get resolved.

6         Frankly, I think in all likelihood it's going to

7 continue to be the case that insurance is a non-issue in this

8 case.  It's not going to bring the parties together for

9 purposes of mediation.  It's, you know, $2 billion for all the

10 insurers.  It's certainly a lot of money.  And my clients in

11 particular would like to get clarity and resolution of those

12 issues.

13         But given the uncertainty as to what coverage

14 potentially exists, the issues that want to get -- we want to

15 get resolved in the declaratory judgment action and in

16 comparison to the magnitude of the -- both the funding

17 agreement and the potential liabilities, it's a fly on the tail

18 of a dog.

19         And, you know, the insurers have not been active

20 participants in the mediation, not for lack of trying, but I

21 think there's just a recognition that it's not going to move

22 the needle, unfortunately.

23         Now that's not to suggest, and I certainly don't want

24 to suggest that what we're asking Your Honor to do is to go off

25 back to New Jersey state court and litigate these issues to the

1  ends of the earth and not participate in mediation.  We would

2  love to be able to continue in mediation.

3         We've had some discussion with the mediators about,

4  you know, if there's a way to resolve coverage issues, and we

5  would certainly be in favor of continuing that.  But it just

6  hasn't been a priority given the size and magnitude of other

7  issues.

8         And so I think -- and my view has always been that

9  having -- when you have so many issues that are complex and

10  separate parties, at least in insurance coverage cases, but

11  this is true for all cases, sometimes having a forum available

12  to narrow those issues and dispute can bring the parties

13  together, incentivize those to settle.

14         So we're certainly proponents of mediation.  We'd

15  like to continue to be part of mediation.  And I think it would

16  be more likely to succeed if we have an ability to get some

17  rulings out of the state court on some of those complex

18  coverage issues.

19         The debtor hasn't really said much at all in its

20  response or its position in July a couple weeks ago as to why

21  the stay ought to be maintained.  You know, I think there was

22  -- there was some suggestion that there were possibly factual

23  issues that overlap and the parties ought to examine, you know,

24  damage -- keep their focus on the big picture in resolving this

25  case.

1              Well, I think the first response to that, Your Honor,

2    is that coverage -- declaratory judgment coverage actions

3    routinely go forward even while the underlying litigation is

4    ongoing.  That happens all the time.  Parties want to get

5    determinations on what their rights and obligations are before

6    the underlying cases are resolved to get that clarity.  In

7    fact, J&J litigated, as I said, with the insurers for some two

8    years, while the underlying cases resolved -- were ongoing and

9    never raised any issue that those cases just have -- or the

10   coverage case has to just stop for that reason.

11             And likewise, bankruptcy cases frequently and

12   routinely proceed while coverage cases go forward.  But it's

13   just not the case.  I mean, the premise of the argument that

14   there are going to be these determinations that are going to

15   either be prejudicial or issue rulings on matters that are

16   before Your Honor, it's just not so, Your Honor.

17             The bank -- the coverage core is not going to make

18   any determinations on valuing or estimating claims.  I think

19   what the debtor was getting at was kind of a thinly veiled

20   effort to kind of resurrect this argument about record taint

21   and this -- you know, this complaint that because insurers have

22   raised, expected and intended that that could somehow come into

23   play and prejudice their position in this court on estimation.

24             And it -- I think we covered that before.  I don't

25   want to belabor the point.  But the point is that in the -- in

188

1  a coverage case, the parties aren't re-litigating, you know,

2  the _Ingham_ lawsuit, for example.  They're not looking at -- to

3  re-litigate aggregate liability or the basis for liability for

4  cases that have already been tried and resulted in judgment.

5

6          It's an analysis of what -- what was determined in

7  those cases that have already -- the 50 cases that have already

8  been tried, and those that resulted in judgments and indemnity

9  and comparing that to the terms of the insurance policies.

10  That's all there is.

11          It's something, frankly, that the state court can

12  probably deal with on summary judgment without any discovery,

13  at least as respects some of the existing claims.

14          So if there's any record taint or collateral estoppel

15  effect, it's not the result of the kind of backward looking

16  coverage case.  It's a result of the underlying tort claims,

17  many of which have already been tried.

18          So other than that, I don't believe the debtor has

19  raised any new arguments.  I think that we're basically in the

20  same position where we were three months ago, more than three

21  months ago and five months.

22          I think that if we proceed with the coverage case,

23  the debtor is -- and McCarter & English is certainly more

24  capable than most debtors that have litigated insurance

25  coverage cases during the pendency of a bankruptcy course.  And

189

1  I really do believe that rulings can both bring parties

2  together for purposes of mediation and settlement and eliminate

3  some of the needless uncertainty.

4        Because some of these issues, if there's no

5  settlement, certainly not with the insurers, of the coverage

6  issues -- and again, we're committed to trying to reach a

7  resolution -- these insurance issues are not just going to go

8  away.  Even if a plan is confirmed, we don't want to be in a

9  position where nine months from now, a year from now, two or

10 three years from now, there's a plan and at that point, parties

11 say, well, now it's time to pay up and we haven't gotten any

12 closer to a resolution of these issues.

13       So I think it would be informative for on all sides

14 of the equation here -- I think there could be rulings that

15 would be informative to the Court, and -- and for those

16 reasons, and the reasons that we argued previously and in our

17 papers, we request that this stay be lifted to allow the New

18 Jersey action to proceed.

19       THE COURT:  All right.  Thank you, Mr. Frankel.

20       MR. ROSS:  Good afternoon, Your Honor.

21       THE COURT:  Good afternoon.

22       MR. ROSS:  Terence Ross with the Katten firm for the

23 so-called moving insurers who are the plaintiffs in the New

24 Jersey coverage action.

25       Your Honor will remember we were here March 30th, and

1  this was carried over.  And just so the record is clear, we

2  incorporate our arguments from that March 30th hearing.

3          Now, a lot has happened -- nobody knows that better

4  than you, Your Honor -- since March 30th.  And we've got some

5  clarity in a couple points, two really important points with

6  respect to these lift stay motions.

7          The first is that the mediation which was the central

8  reason for carrying over our motions give that a chance.  In

9  those four months, it's come to impasse and that's, I believe,

10  Your Honor's word, impasse, not mine.

11         We all recognize that.  We all acknowledge that.

12  People coming at it from different points of view, but it's a

13  fact.  It's out there.  And that was the core reason for not

14  immediately granting us the motion to lift stay at that time.

15         It now seems that at least under one plan, the

16  mediation will be revisited a year or so from now, after an

17  estimation proceeding, under another set of clients.  We'll try

18  some cases, maybe get them done by the end of the year, and

19  then see where we stand to do mediation.

20         But at the time of the March 30th hearing, Your Honor

21  talked about let's give it 90 days or so, and let's see where

22  we are.  Well, we're now talking about another year or another

23  nine months, depending on which way Your Honor goes.  And

24  remember, March 30th wasn't the beginning of the stay that

25  operated against us.  We've been stayed now for nine months.

1          In fact, their petition was filed the day before we

2    were filed summary judgment motion in the New Jersey coverage

3    action.  So we've been waiting on that.  Your Honor, that would

4    have been decided by now.  And that summary judgment motion

5    went to the claim control provisions, a central issue of

6    coverage.  We would have all benefitted from that clarity.

7          The second thing that's happened since then, and I

8    think we all can agree on, is that the insurance coverage has

9    to be decided at some point, not by this court, not in these

10   proceedings.  So we all acknowledge it's got to be done.  I've

11   heard it referred to in the briefs.  I've heard it referred to

12   in argument today.  And not once has anybody suggested that's

13   something that can be done here.  And indeed it can't.  It has

14   go back to the New Jersey court.

15         And so those are the two things that it seems to me

16   we now know in the four months that have gone that it seems

17   like everybody should agree on, that we're at impasse on the

18   mediation, the reason for not lifting stay in the first place,

19   and that we really do need this coverage of litigation decided,

20   and it has to be decided in the New Jersey court.

21         I would argue, Your Honor, that that is all the

22   support that's needed, or under the words of the case law,

23   that's the cause that we are required to show to have the stay

24   lifted.

25         Now, as I offered to do March 30th, and I'll offer

192

1  again here, is we've even offered the Court alternative relief

2  that is not a complete stay lift.  We've asked for a couple

3  things.  Let me just talk briefly about those, and you can ask

4  me questions.

5          The first -- this is really becoming important with

6  the passage of time -- is this third-party discovery.  It's

7  been outstanding since last fall, and it's now nine months, ten

8  months later and we're proposing to carry this -- kick this

9  down the can [sic] another year, or maybe nine months,

10 depending which way the Court goes.  I mean that that's just

11 not reasonable.

12         THE COURT:  That's discovery on what issues?

13         MR. ROSS:  So on all issues in the case --

14         THE COURT:  Like there's the E and I issue.

15         MR. ROSS:  -- that are posed to third parties, posed

16 to third parties.

17         THE COURT:  Okay.  Posed to the third parties on the

18 E and I, on the claims control?

19         MR. ROSS:  Yes, Your Honor.

20         THE COURT:  On Middlesex?

21         MR. ROSS:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MR. ROSS:  And that has already been propounded.

24 It's just the due date for production had not come yet.

25         And so it's been sitting there and that's very

1  worrisome, because those are the sort of things that

2  corporations might lose, might forget, might have employees

3  move on.  And it seems to me there's no reason not to allow

4  that, given the posture we're now in.  And that is a very real

5  prejudice to the insurance defendants -- plaintiffs here.

6          The second part of it is this summary judgment of

7  claims control, which is ready to go.  We ought to allow that

8  to go forward.  And that would really, as Mr Frankel said,

9  inform a lot of decisions that have to be made in this

10  proceeding.  We need to allow that to go forward.  All we have

11  to do is file it.  They'll brief -- debtor will -- J&J will

12  brief it, and the Court will decide it.  There's nothing more

13  that needs to be done there.  So that's the second type of

14  relief we think we ought to get.

15          The third is this Middlesex discovery.  I mean, this

16  is really central to this issue that the TCC has brought up, is

17  how much insurance is out there.  And we just don't know,

18  because we haven't conducted the discovery.  And the reality is

19  regardless, Your Honor, which way you go, the estimation allow

20  the plan, that's going to be discovered.  It just has to be.

21  It's a critical part of what's going to happen in this court.

22  And therefore, we might as well get started on it.

23          We're not inflicting any additional burden, because

24  the TCC has very good lawyers.  They'll get to the bottom of

25  that.  And so we -- we ought to be allowed to do it as well.

1          And then the fourth is this E and I issue.  And I

2   thought Mr. Frankel described very eloquently how that's not

3   really any form of prejudice or harm to the debtor, because

4   again, it's about facts, F-A-C-T-S.  The facts are what they

5   are.  We just want to get them out on the table.

6          And if those facts mean that the E and I provisions

7   of the policies kick in, well, that's too bad for the debtor,

8   but they're facts.  I mean, they're not going to change as a

9   result of discovery.  There's not going to be some sort of

10  collateral estoppel on facts.  They just are whatever they are.

11  Let's find out what they are so everyone here will have that

12  information.  It won't just be cabined up in Middlesex.

13         And so although, Your Honor, I'd really like to see

14  you lift the stay and let's get going on this New Jersey action

15  rather than waiting another year or another nine months, at a

16  minimum, I'd ask you to take into serious consideration

17  granting the alternative relief.

18         If you don't have any other questions, Your Honor,

19  that's all I have.

20         THE COURT:  No, I'm good.  Thank you very much.

21         All right.  For the debtor.  And I guess what gnaws

22  at me, and I would like to hear from both the Committee and the

23  debtor, is an answer or to address don't we have to tackle

24  these issues at some point, since everybody's speaking to the

25  funding obligations under the plan and nobody's dismissing?

1  Yes, we're talking about maybe icing on the cake, but it's

2  still substantial icing.

3          Well, when do we -- when do we get there?

4          MR. PRIETO:  Sure, Your Honor.  Maybe I'll start with

5  that question.

6          THE COURT:  Sure.

7          MR. PRIETO:  This is Dan Prieto, Jones Day, on behalf

8  of the debtor.

9          And Your Honor, just to address whether we need to

10  pursue this litigation in order to resolve this case, I think

11  the answer is squarely no, or at least certainly -- there's

12  certainly many outcomes where that would not be necessary.

13          And if you think about it, I mean, if the answer is

14  yes, then what we're saying is we have to go through years of

15  coverage actions before we can resolve that case.  I don't

16  think anybody believes that we would be held hostage by the

17  insurance coverage action.

18          And if you think about it, there's several

19  alternatives.  One is that we reach a resolution, as we're

20  trying to do in this case, where we agree to fund the trust

21  with cash or other consideration and the insurance -- the

22  insurance rights are maintained by the company.  We would need

23  a resolution of these issues in order to exit this case, if

24  that were the -- if that were the settlement.

25          Alternatively, another option is that maybe the

1  rights get assigned under certain conditions.  You wouldn't

2  necessarily need a resolution of the underlying insurance

3  issues in that circumstance either.

4       So while I understand why, you know, the insurers, I

5  guess, want clarity and that's -- that's their -- as far as I

6  can tell, that's their main harm that they're articulating,

7  they want clarity.  They don't like this cloud overhanging over

8  them.

9       But you have to put that in context of the damage it

10  would due to the process.  So let me just, you know, start by

11  saying that obviously we continue to believe that the insurance

12  coverage action should, you know, remain stayed.  And like

13  everybody else, I'll incorporate all my arguments I made

14  previously.  We filed objections.  We filed a statement.  So

15  I'll try to be brief, Your Honor.

16       But I would say to Your Honor, if anything, given the

17  status of the cases now, I would argue there's even more reason

18  to maintain the stay at this juncture in this case, which I

19  think Your Honor has referred to as a turning point in the

20  case, than there was when we originally addressed these matters

21  back in March.

22       And if you'll recall, Your Honor, at that point, we

23  were on the cusp of starting mediation.  And the parties are

24  correct.  We're not exactly where we would love to be in terms

25  of having reached a resolution.

1          But the point is mediation remains ongoing, including

2     with the insurers.  And we are on the cusp of embarking on a

3     path to, you know, implementing the next steps in this case,

4     based on how Your Honor will ultimately rule.

5          And I would submit to Your Honor that restarting the

6     coverage action at this point would be disruptive and would

7     distract not only the debtor, but the Committee and the FCR.

8     And the Committee, I think you'll hear from them today, they're

9     not in favor of restarting the coverage action.  I think they

10    recognize it would be disruptive to whatever process Your Honor

11    determines is appropriate in terms of how to proceed in this

12    case.

13         And I think, Your Honor, the other point here, and I

14    think it's significant, is you haven't heard any reason why

15    there's a pressing need to restart the action.  The insurers,

16    they're not paying indemnity.  They're not incurring defense

17    costs, because the talc claims are stayed at this time.  And

18    they're disputing coverage.

19         And as I stated out at the outset, it's not necessary

20    in order for this case to resolve that we litigate to a

21    conclusion the issues that are in the coverage case.

22         And I would also say, Your Honor, there's no changed

23    circumstances from when Your Honor issued your ruling saying

24    that the coverage case should be stayed.  It's still the case

25    that lifting the stay will require the litigation of issues

 1  that are central to this case.  And of course, I'm referring to

 2  what the parties have been talking about here, which is the

 3  expected and intended coverage defense that the insurers have

 4  asserted in the action.  And we've discussed that at length in

 5  our objection in -- you know, to the motions.

 6            And I would just remind Your Honor, I think Your

 7  Honor found on the record, when you -- when you ruled that this

 8  matter should be stayed, that there would be prejudice caused

 9  by litigating that defense.  That was in part the basis for

10  your ruling.

11            And, you know, the insurers seem to be arguing that

12  don't worry about it, Your Honor.  It's just based on facts and

13  the debtors should just have to live with the facts, and the

14  parties in this case, you just have to live with the facts as

15  they articulate it.

16            But the point is they're trying to establish as part

17  of that defense that asbestos was in the product and that we

18  knew it was in the product and therefore there's no insurance

19  coverage whatsoever.

20            Well, obviously, that kind of argument -- inquiry

21  decided by a state court outside of this court could have

22  ramifications for this entire case.  And that's the fundamental

23  point.  We're trying to resolve those issues in this case

24  through, the debtor believes, most appropriately an estimation

25  process, but also as part of the mediation.  So, you know,

199

1  forcing us to litigate those issues at this juncture to us

2  would be harmful, Your Honor.

3         Travelers tries to downplay the impact of litigating

4  this defense by arguing that it has been routinely addressed in

5  other cases, even -- you know, I think they even said in other

6  bankruptcy cases while there's -- you know, while the

7  underlying tort claims remain pending.

8         And I don't -- I'm not here to dispute that.  That's

9  probably true.  And I think I covered this last time, but I

10 think that overlooks what makes this case particularly unique,

11 which is we dispute there was ever asbestos even in the

12 product.  And in order for them to pursue that defense and

13 establish that, they're going to have to show that that

14 assertion we make is false.

15        And that's, I think, what makes this case unique.  I

16 don't think that was the situation in other cases.  They may be

17 arguing about the extent to which their products may have

18 caused harm, but I don't think people were arguing there was no

19 asbestos at all in the product.

20        So Your Honor, it's still the case, as it was back in

21 March, that the insurance coverage action is in its early

22 stages, it's still the case that the debtor affirmative claims

23 against insurers are stayed, and it's still the case that the

24 insurers are not incurring any cost at this time, given the

25 stay of the talc litigation.

1          So really what that leaves you with, from my

2    perspective, you have clear harm on the debtor side.  So the

3    question then is have the insurers demonstrated sufficient harm

4    on their side to have Your Honor, you know, change -- change

5    your -- your previous decision to keep the stay and lift the

6    stay.  And I would submit, Your Honor, they haven't identified

7    any real harm at all.

8          And I'm going to real, real briefly just sort of hit

9    their main points that I think they've made today, as well as

10   in their papers, since we didn't have a chance to address them.

11   Just a couple of points.

12         First, they say that somehow by leaving the stay in

13   place, we're depriving them of their rights under the claims

14   control provisions and their policies.  And I think you heard

15   today the insurers argue that has to go forward.  It's

16   critical.  It will determine, you know, how this case proceeds

17   from their perspective.

18         But the talc claims are stayed, so it's not -- really

19   shouldn't be an issue.  In addition, you know, leaving the stay

20   in place doesn't modify whatever contractual rights they

21   believe they have under the policies.  Rather, it just defers

22   litigation regarding any disputes about whether the debtor

23   violated those provisions or not.

24         And if they ultimately believe that some settlement

25   that's reached in this case impacts their rights or violates

1  those provisions, I'm sure they'll assert that as a defense.

2  But leaving the stay in place doesn't impact that issue.

3        The insurers also argue that maintaining the stay

4  increases the risk that a global settlement will be reached

5  without resolution of the coverage action, sort of

6  acknowledging that global resolution could in fact be reached

7  without their issues being addressed.  And again, I would

8  acknowledge that, but that doesn't harm them.  Again, if

9  there's a global resolution that affects their rights, they'll

10 object to it and Your Honor will determine whether they have

11 standing and whether their rights have been impacted in a way

12 that's inappropriate.

13        The insurers also argue that the stay is unfair

14 because the TCC has requested certain information about the

15 insurance coverage action at a time when the insurers are not

16 permitted to pursue their coverage action.

17        Well, it's true.  We did receive information requests

18 from the TCC.  I don't think there's anything unfair about the

19 TCC trying to get up to speed on the insurance coverage action.

20 And it's not like we're asking the insurers to produce new

21 information.  We're simply sharing with the TCC what

22 information has already been produced in underlying coverage

23 action so they could determine where things stand.

24        And then finally, Your Honor, the insurers argue that

25 further delay may harm them because we may seek prejudgment

1 interest in the event that debtor prevails in the coverage

2 action.  Again, I think I just -- I addressed this last time,

3 but counsel did raise it again, that during the pendency of the

4 litigation and the stay, the insurers aren't paying anything

5 that they owe under the policies.  And so the benefits to them

6 of not paying anything has been extended during this period of

7 time.

8          And also, I would just say that concerns about

9 prejudgment interest are premature as the coverage remains in

10 its early stages -- coverage action remains in its early stages

11 and there's not a trial expected, I think at this point, until

12 before 2024.

13          So finally, let me just address the request for a

14 partial lift stay.  As I have read the papers and I heard this

15 morning, what the insurers seem to be contending is that -- as

16 an alternative is that, well, let us go pursue several of our

17 purported defenses that we really want to assert, namely, you

18 know, issues with respect to allocation of Middlesex policies,

19 which would give them a defense to coverage under their

20 policies.  They want to pursue defenses with respect to the

21 claims control provisions.  And, notably, they want to pursue

22 the expected and intended defense.

23          And of course they also want to take third-party

24 discovery, which would require our participation in order to

25 monitor, you know, that discovery.

1          You know, from my perspective, Your Honor, this sort

2    of cherry picking the issues that they want to pursue at this

3    point would be unfair and highly inefficient.  And most

4    importantly, the partial lift stay would burden and distract us

5    for the same reasons I said before, because we'd be having to

6    deal with the issues with respect to the expected and intended

7    defense.

8          So Your Honor, for all those reasons, and the reasons

9    we have previously set forth in our objection and in our

10   papers, their statement in support of the continuing stay, we

11   would respectfully request that Your Honor decline to lift the

12   stay at this time and permit the parties the opportunity to

13   implement the next steps in this case and see if we can

14   ultimately get to a consensual resolution of this case.

15          THE COURT:  All right.  Thank you.

16          MR. PLACITELLA:  Thank you, Your Honor.

17          MR. MOLTON:  Your Honor, David Molton.  I just want

18   to apologize to my co-counsel, Bob Horkovich, who was looking

19   forward -- he's our special insurance counsel.  He was looking

20   forward to coming up here and talking, but because Your Honor's

21   question involves some of what we talked about earlier, he'll

22   have to wait until another day.

23          So, in any event, Judge, we agree with what's been

24   said by I think everybody, the insurers, as well as the

25   defendant, the debtor, that the insurance issue is a very,

1  very, very, very, very small tail on a very, very, very, very,

2  very large dog.

3          I do want to note that, you know, there's been -- J&J

4  have made payments already, including the Ingham payment that

5  may have already arguably exhausted, you know, various

6  policies.

7          But one of the things that I know from my experience

8  is that these sort of issues, especially when this isn't really

9  an insurance play case, it's not contra Boy Scouts or see Boy

10 Scouts for the -- an insurance (indiscernible).  These things

11 can be resolved and dealt with in mediation in a cogent,

12 effective manner.

13         I think the insurers have indicated that they believe

14 and willing to engage in mediation on these issues.  One of the

15 things is the Committee stands ready with the debtor to do that

16 and engage.  And to the extent that there's information sharing

17 -- I'm not going to say full boat discovery as what -- what was

18 requested -- but information sharing from the debtor, from the

19 insurers would be helpful to facilitate that mediation.

20         I think that that's something that the parties should

21 sit down and meet and confer and discuss and see whether that

22 can be done so that we can address this, again, very, very

23 small tail on this very, very large dog and deal with it and

24 hopefully resolve it in a way that it doesn't get in the way of

25 the big game, which I don't think it will.

1          So we had filed a joinder with the Court, with the

2    debtor's objection, and that joinder is still on the record.

3    But from my perspective, listening to what I've heard today and

4    in the context of what Your Honor is going to be considering

5    and giving us some direction on on Thursday, it would seem to

6    me that there can be -- again, we can all walk and chew gum at

7    the same time in this courtroom.  There should be some effort

8    to concentrate on getting the parties what they need at least

9    to have further mediations and try to resolve this as

10   efficiently as possible.

11          Thank you.

12          THE COURT:  Thank you, Mr. Molton.

13          Mr. Frankel?

14          MR. FRANKEL:  Just very briefly, Your Honor, a couple

15   of quick points in response.

16          Your Honor's question about -- or the response to

17   Your Honor's question about don't we have to tackle these

18   issues eventually, I think I could sum up the debtor's position

19   that, you know, as you might not have to, Your Honor, we might

20   have to, and so let's not worry about that.

21          So, for example, if the -- if the debtor agrees to

22   fund a trust with cash and to say, look, we're not even going

23   to ask for any insurance proceeds in connection with that cash

24   payment, I think that might kind of narrow our role in this

25   case in terms of objecting and, you know, making sure our

206

1  rights are preserved.

2         But it doesn't eliminate the coverage issues, because

3  we still have a claim for what the debtor claims is like

4  $5 billion worth of pass costs under those $2 billion worth of

5  policies.

6         So, yes, that would certainly -- you know, we would

7  not object to that approach, and it wouldn't need to involve

8  Your Honor.  But where would it leave the rest of the parties?

9  Just hanging out without a forum until the conclusion, the

10 final conclusion of this bankruptcy case.

11        It's the same with the other alternative that, well,

12 we could just assign our policies to the trust or assign our

13 rights to the trust.  That might involve issues before Your

14 Honor, because there would be no base to determine what the

15 value of that contribution is.  And if they want to rely on

16 that contribution to support a 524(g) injunction, that could be

17 an issue.

18        But even if it's not, even if as Mr. Molton says, and

19 I agree, this is a very, very, very -- there were three or four

20 of them, right? -- small fly on a tail of the dog or whatever

21 it was, where would it leave the rest of the parties?  It would

22 leave them kind of held hostage, the inverse of what Mr. Prieto

23 was suggesting.  It would leave us all hostage to these

24 proceedings.

25        On expected and intended, the insurers have no

1 interest in taking on the mantle of the plaintiffs' bar and

2 arguing that, you know, J&J's, you know, baby products had

3 asbestos for all these years.  I think the best way to think

4 about this is to just really think of it in a concrete way.

5 For example, you have the <u>Ingham</u> judgment, which everybody

6 knows is a multi-billion dollar judgment.  And the jury made

7 findings.  And the Court of Appeals had to review whether

8 punitive damages, for example, were warranted.  And it did that

9 by saying, well, the plaintiffs had to show that J&J expected

10 these injuries.

11        So there's no new -- there's nothing new there.  It's

12 basically, at least with respect to the <u>Ingham</u> claim, the

13 parties would present that to the Court, compare the terms of

14 the policies.  It's not -- I think what Mr. Prieto was kind of

15 trying to do is suggesting that defending against the coverage

16 case is going to be no different than the underlying tort

17 cases.  And that's just not true.

18        I think, you know, one other point to make in

19 response to the TCC's position, and we've heard some of this

20 from the debtor, none of what we're suggesting -- again, and at

21 the risk of repetition, I know it's late in the day -- is to

22 suggest that proceeding in the -- with the coverage case is not

23 inconsistent with mediation.

24        We obviously have an interest in resolving our

25 issues.  This court has provided a mechanism to try to do that,

1 and we would absolutely continue with the mechanism.  So it's

2 not an either/or situation where, you know, we can't resolve

3 any of these uncertain, unknowable issues with insurance

4 because we should pursue mediation.  They're not mutually

5 exclusive.  We would like to be able to do both.

6       I think the debtor downplays the prejudice to the

7 insurers.  It's absolutely the case that to this point in time,

8 the insurers have not been asked to pay additional defense or

9 indemnity.  That obviously can change depending on what a

10 resolution looks like and when that takes place.

11       And at that point, we'd have to resolve all these

12 issues.  I think the continued uncertainty is harm and it

13 doesn't speak to the loss of evidence, particularly the third-

14 party discovery, and the accumulation of prejudgment interest.

15       I spent years litigating cases where prejudgment

16 interest turned out to be the biggest component, the biggest

17 single component of damages when there's a significant delay.

18 And that's what they're asking for here is a significant delay.

19       It would be one thing if the delay was necessary

20 because it would -- it would so complicate the case or it would

21 so tie up the debtor's resources that they couldn't focus on

22 this case at the same time, but that's just not -- that's just

23 not credible, Your Honor, with -- with a company the size of

24 J&J, the fact that this case has been defended against and

25 prosecuted for that matter for many years and with all the

1 capable lawyers.

2          THE COURT:  But just on that issue, you're suggesting

3 that a court down the road is going to award prejudgment

4 interest for the period of time of the delay where arguably the

5 debtor was responsible for the delay by asserting the automatic

6 stay and arguably against continuation.

7          It seems to be improbable that a pragmatic, sensible

8 judge is going to smack you down for the prejudgment interest

9 when you are prevented from continuing going forward and you've

10 repeatedly asked to go forward.

11          MR. FRANKEL:  I could promise you with 100 percent

12 certainty, if that argument is made, I would embrace and

13 advocate --

14          THE COURT:  I'm trying to give you the transcript

15 now.

16          (Laughter)

17          MR. FRANKEL:  I certainly -- and look, maybe we'll

18 reach a stipulation.  If the debtor wants to say that, you

19 know, J&J is not going to seek prejudgment interest, that would

20 remove that potential harm.

21          I have a feeling, however, even based on what we

22 heard this afternoon, that, well, this is -- you know, you've

23 had the benefit of the time value of money, and so we have a

24 right to prejudgment.  It doesn't matter what the reason is.

25          I don't agree with that.  I'm saying it's a potential

1  harm that could -- you know, that could result from the

2  additional delay.

3           THE COURT:  Fair enough.

4           MR. FRANKEL:  Thanks.

5           THE COURT:  Thank you.  Thank you, counsel.

6           MR. ROSS:  Your Honor, just a couple of final points.

7           THE COURT:  Sure.

8           MR. ROSS:  First, this is not going to involve years

9  of litigation, which I believe was the quote.  We can put

10 summary judgment motion on file in two weeks.  It will be

11 decided before any of these 12 trials get started and nine

12 months before they get to the end of their estimation process.

13          That claims control decision will do more to move

14 mediation than anything else this court could possibly do.

15 The fact of the matter is we're -- just like Travelers, we

16 agree, we're committed to mediation, but it's been very

17 unsuccessful.  And the reason is -- that is the claims control

18 provision.

19          We should be in the mediations between the TCC and

20 the debtor.  Our argument, which will be part of the summary

21 judgment motion, is we've been denied that.

22          Now, prejudice.  It has been said that we're just

23 looking for clarity.  That's not prejudice.  We're not just

24 looking for clarity.  There is a very real chance, a spoilation

25 of evidence that goes on, if we have to wait not just the nine

1  months we've waited, but another year and nine months.  That's

2  very real prejudice recognized by the law.

3         Second, we are continuing every day to be deprived of

4  our rights to control the settlement process by this continuing

5  refusal to allow us into their mediation.  That is a right we

6  want to enforce and can only be enforced in the New Jersey

7  courts.  And that's a very real prejudice.

8         Now, finally, I won't get the verys right, but if

9  this is such a very, very, very, very small matter, how is it

10 so distracting and disruptive of the debtor when the lawyers

11 involved aren't even here?  It's a very good, large New Jersey

12 firm for a very, very, very, very small matter.  How is -- out

13 of their own mouths.  How is that disruptive or distracting if

14 it's such a very, very, very, very small matter?

15        It just -- the reality is the debtor doesn't want to

16 face up to what the problems they have under the claims

17 coverage provisions.  They don't want us to get to the end of

18 the day and find out that they don't have any coverage so that

19 they can use the mediation to get something out of us instead

20 of the zero that they're going to get in the New Jersey court.

21        And that's why the mediation won't work until you let

22 us bring the summary judgment motion on claims control.

23        Thank you, Your Honor.

24        THE COURT:  Fair enough.

25        All right.  Thank you.  Thank you, counsel.  I think

1 we've reached the end.

2          One or two housekeeping matters.  So again, I'll read

3 my rulings or announce my rulings on Thursday morning at 11:00.

4 We have omnibus dates set 8/23 and 9/14.  That's September.  I

5 don't know how far into the fall we will go.  October's date, I

6 would like to get a date for October in case there's motion

7 practice being filed.  October gets busy.  We have the NCBJ

8 annual conference, other conferences.

9          I have an October 4th date or an October 25th date.

10 One is three weeks after a prior date.  One would be six weeks

11 after -- or five weeks or so.  I could let you all talk about

12 it.  So these are dates that I would think to put on our

13 calendar, October 4th or October 25th, November 22nd [sic],

14 which is after Thanksgiving, and December 13th.

15          MR. MOLTON:  Judge, the -- if I might?

16          THE COURT:  Yeah.

17          MR. MOLTON:  David Molton again.  The only problem

18 with the 4th is that's what we call era of Yom Kippur Kol Nidre

19 that night.  So, in any event --

20          THE COURT:  I knew I was going to get myself in

21 trouble.

22          MR. MOLTON:  You know, we're going to have people

23 coming from out of town and that may be a problem.

24          THE COURT:  October 25th?

25          MR. MOLTON:  That's great from our perspective,

213

1  Judge.

2          THE COURT:  We'll go October 25th.  I'll go five

3  weeks without you all.  November 22nd [sic] after Thanksgiving.

4  Why don't we just plug that in.  We'll see what the circuit

5  rules and when the circuit rules and all that fun stuff.  We

6  don't even need to pick a December date yet, but keep December

7  13th in the back of your minds.

8          All right.  Safe travels, folks.  I'll speak to you

9  by Zoom on Thursday.

10          UNIDENTIFIED SPEAKER:  Judge, November 22 is

11  (indiscernible).

12          THE COURT:  November 23, not November 22.  November

13  23.  Good to see you all awake.

14          UNIDENTIFIED SPEAKER:  That was a test.

15                          * * * * *

16

17

18

19

20

21

22

23

24

25

214

1          **C E R T I F I C A T I O N**

2          WE, DIPTI PATEL, KAREN K. WATSON, RUTH ANN HAGER and

3     LORI KNOLLMEYER, court approved transcribers, certify that the

4     foregoing is a correct transcript from the official electronic

5     sound recording of the proceedings in the above-entitled matter

6     and to the best of our ability.

7

8     /s/ Dipti Patel

9     DIPTI PATEL

10

11    /s/ Karen K. Watson

12    KAREN K. WATSON

13

14    /s/ Ruth Ann Hager

15    RUTH ANN HAGER

16

17    /s/ Lori Knollmeyer

18    LORI KNOLLMEYER

19    J&J COURT TRANSCRIBERS, INC.    DATE:  July 27, 2022

20

21

22

23

24

25