# Exhibit 27

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                         .     Case No. 21-30589(MBK)
                               .
LTL MANAGEMENT LLC,            .
                               .
          Debtor.             .
. . . . . . . . . . . . .      .
LTL MANAGEMENT, LLC,           .     Adversary No. 21-03032
                               .
          Plaintiff,           .
                               .     Clarkson S. Fisher U.S.
v.                             .       Courthouse
                               .     402 East State Street
THOSE PARTIES LISTED ON        .     Trenton, NJ 08608
APPENDIX A TO THE              .
COMPLAINT, ET AL.,             .
                               .
          Defendants.          .     Tuesday, February 15, 2022
. . . . . . . . . . . . .       .     9:05 a.m.

TRANSCRIPT OF TRIAL DAY TWO
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Jones Day
                           By:  GREGORY M. GORDON, ESQ.
                                DANIEL B. PRIETO, ESQ.
                                AMANDA RUSH, ESQ.
                           2727 North Harwood Street, Suite 500
                           Dallas, TX 75201

                           Skadden, Arps, Slate, Meagher &
                             Flom LLP and Affiliates
                           By:  ALLISON M. BROWN, ESQ.
                           One Manhattan West
                           New York, NY  10001-8602

Audio Operator:            Wendy Romero

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For the Debtor:

| | |
|---|---|
| For the Official Committee of Talc Claimants 1: | Brown Rudnik, LLP<br>By:  JEFF JONAS, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| | Genova Burns, LLC<br>BY:  DANIEL M. STOLZ, ESQ.<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920 |
| For the Official Committee of Talc Claimants 2: | Sherman Silverstein<br>By:  ARTHUR ABRAMOWITZ, ESQ.<br>East Gate Corporate Center<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057 |
| | Cooley, LLP<br>By:  IAN SHAPIRO, ESQ.<br>55 Hudson Yards<br>New York, NY 10001 |
| | Bailey & Glasser, LLP<br>By:  BRIAN GLASSER, ESQ.<br>105 Thomas Jefferson Street NW<br>Suite 540<br>Washington, DC 20007 |
| For Johnson & Johnson: | White & Case LLP<br>By:  JESSICA LAURIA, ESQ.<br>1221 Avenue of the America<br>New York, NY  10020 |
| | Lowenstein Sandler<br>By:  KENNETH ROSEN, ESQ.<br>One Lowenstein Drive<br>Roseland, NJ 07068 |
| | Johnson & Johnson<br>By:  ERIK HAAS, ESQ.<br>    ANDREW WHITE, ESQ.<br>1 Johnson & Johnson Plaza<br>New Brunswick, New Jersey, 08933 |

APPEARANCES (Cont'd):

For the U.S. Trustee:      U.S. Department of Justice
                           By:  LAUREN BIELSKIE, ESQ.
                                LINDA RICHENDERFER, ESQ.
                           One Newark Center, Suite 2100
                           Newark, NJ  07102


For Arnold & Itkin, LLP:   Pachulski Stang Ziehl Young & Jones,
                             PC
                           By:  LAURA DAVIS JONES, ESQ.
                           919 Market Street
                           16th Floor, PO Box 8705
                           Wilmington, DE 19899

For DeSanto Canadian       Lite DePalma Greenberg & Afanador,
Class Action Plaintiffs:     LLC
                           By:  ALLEN JOSEPH UNDERWOOD, II, ESQ.
                           570 Broad Street, Suite 1201
                           Newark, NJ 07102

For Aylstock, Witkin,      Klee, Tuchin, Bogdanoff & Stern, LLP
Kreiss & Overholtz,        By:  ROBERT J. PFISTER, ESQ.
PLLC:                      1801 Century Park East, 26th Floor
                           Los Angeles, CA 90067

                           * * * * *

# **I N D E X**

**WITNESSES**                                                                 **PAGE**

THIBAUT MONGON

  Direct Examination by Mr. Glasser                           12

  Cross-Examination by Ms. Brown                              35

  Redirect Examination by Mr. Glasser                         70

MICHELLE RYAN

  Videotape deposition played                                 78

JOHN KIM

  Direct Examination by Ms. Brown                             79

  Cross-Examination by Mr. Jonas                             158

1          THE COURT:  All right.  We should be good to go.

2    We're also back on Court Solutions.  Anyone appearing on Court

3    Solutions wishes to be heard, please use the "raise hand"

4    function.  Otherwise, we also have streaming through Zoom and,

5    of course, everyone present in the courtroom.

6          Day 2.  Let's do some housekeeping, literally

7    housekeeping.  This isn't Yankee Stadium. Please when you

8    leave, clean up cups, coffee cups.  The difference between

9    Article III judges and Article I, forget what it says in law

10   school.  Article I judges, we don't get the cleaning service as

11   much.

12                         (Laughter)

13          THE COURT:  So we had to go through and kind of

14   straighten up.  We're trying to keep it respectable.

15          Timing.  Let's talk about the chess clock.  I was

16   under the impression that it was essentially a "soup to nuts."

17   In other words, movants' case, opening, witnesses, cross,

18   whatever gets charged to the movant.  The same would be for the

19   debtor, their opening, their closing; that we weren't going to

20   start breaking out time for -- on cross from each side and

21   start allocating cross.

22          So we've just been -- other than the opening

23   statements for the debtor, for instance, or court time,

24   everything so far has been allocated to the movants.  Is that

25   correct or a different understanding?

1          MR. GORDON:  Your Honor, Greg Gordon on behalf of the

2    debtor.   That is actually not correct.

3          THE COURT:  Okay.

4          MR. GORDON:  We agreed to split the time based on the

5    time that people were actually spending advocating for their

6    respective clients.  I mean, obviously, from our perspective,

7    if we did it the way Your Honor articulated, Mr. Glasser would

8    cross-examine our witnesses for 12 hours -- I'm just kidding.

9          MR. GLASSER:  But I might.

10                        (Laughter)

11          MR. GORDON:  But --

12          THE COURT:  Well, then you'd have the chance, too.  I

13   thought it would just even out.

14          MR. GORDON:  Yeah, but we're not unfair like that.

15          THE COURT:  Yeah.

16                        (Laughter)

17          THE COURT:  I know.  You're equitable and efficient.

18   We've got that.

19                        (Laughter)

20          MR. GORDON:  We're also efficient, Your Honor.

21          THE COURT:  So that's fine.  We could break it out by

22   side. Then our numbers that we gave earlier were off, and we'll

23   go ahead and try to do it and give you an idea by lunch time.

24          MR. GLASSER:  So, Your Honor, we sent around our

25   clock last night, and I think the debtors are in agreement with

1  but they can double check but maybe we could just start with

2  that from today.

3          THE COURT:  If you're in agreement with it, we could

4  start from there.

5          MR. GORDON:  It looked generally correct.  We're just

6  going to verify.  But it was certainly in the ballpark of what

7  I was hearing.  We were just kind of double-checking, but we're

8  very close, I think, if not in total agreement.

9          THE COURT:  Okay.  Well, far be it for me to disrupt

10 agreement between you all.

11          All right.  Then, Counsel --

12          MR. JONAS:  Judge, Jeff Jonas, Brown Rudnick, for

13 TCC1.  One other I guess in the nature --

14          THE COURT:  Yeah.

15          MR. JONAS:  -- of housekeeping, we had a brief

16 discussion about this I think last week.  We have on the video

17 issue Ms. Ryan, former treasurer at Johnson & Johnson.  We

18 would like to play, and I heard your admonition about -- I

19 wouldn't call it an admonition -- your caution about the video.

20 But for purposes of our case, we have about, I don't know,

21 40-odd minutes.  I believe Ms. Braun and I have discussed that

22 they have another 10, 15, 20 minutes.  So it's less than an

23 hour.

24          We would like to play in our case-in-chief, like I

25 said, less than an hour.  I think, frankly, it's -- that's how

1  we'd like to put our case on.  I think it actually will -- you

2  won't have to go look at it anywhere else.  It will just be

3  played, and it will be over with.  So that's number one.

4          THE COURT:  That's fine.

5          MR. JONAS:  Thank you, Your Honor.

6          Number two, you may recall there was a curfuffle, I

7  guess, about this deposition -- depositions which took place

8  last Friday of S&P.

9          THE COURT:  Right.

10          MR. JONAS:  We were able to serve a trial subpoena on

11  those witnesses.  We would prefer not to have to bring them,

12  inconvenience them and bring them to trial.  The video -- we

13  have also a short clip of video from their -- they're two, Wong

14  and Kaplan, Mr. Wong and Kaplan, from their depositions.

15  Again, certainly, under an hour, maybe substantially less.

16          The other side agreed with our designations of their

17  depositions.  They have not agreed, I hope they will, that we

18  can also -- again, it being our case, we think it's important,

19  we'd like to play that video as part of our case-in-chief.  All

20  we'll be playing are the designations as agreed to, so I hope

21  there's no issues.  But I just wanted to get -- if we could

22  clear the decks on that so we can plan our case accordingly.  I

23  wanted to alert the Court and make sure that was okay with the

24  Court.

25          THE COURT:  All right.

1          Mr. Gordon, what are your thoughts?

2          MR. GORDON:  Your Honor, a couple of things.  Greg

3    Gordon on behalf of the debtor.  On the Ryan video designation,

4    we thought Your Honor was clear that you didn't want videos,

5    that you were fully capable of just reading designated

6    transcripts.  And so we weren't prepared to deal with that.

7          Obviously, I heard what Mr. Jonas said about wanting

8    to put his case on the way he wants, but that also forces us

9    then to potentially put on a video designation which eats into

10   our time.  So -- in any event, I just wanted to note our

11   objection to that.  I heard Your Honor basically already ruled

12   on it, but I did want to note --

13         THE COURT:  I don't think it's unreasonable.

14         MR. GORDON:  Yeah.

15         THE COURT:  Again, if it expedites matter of whether

16   I read it or --

17         MR. GORDON:  Sure.

18         THE COURT:  -- I watch it, it's going to be the same

19   import.

20         MR. GORDON:  Understood.

21         THE COURT:  So --

22         MR. GORDON:  Understood.

23         THE COURT:  -- I'm not going to do both.

24         MR. GORDON:  Right.

25         THE COURT:  There's enough going on here.  So --

1          MR. GORDON:  And then, Your Honor, the second point

2     on the S&P, we're generally fine except for the fact as I

3     understand it there were two documents that were just forwarded

4     it last night to the parties or in respect of the subpoenas

5     with respect to which we didn't have an opportunity to cross-

6     examine the witnesses at the deposition.

7          So we do have an objection to including those two

8     documents.  Otherwise, again, other than my comment on the

9     video, if they want to use video, we're fine.  But we do object

10    to those -- the admission of those -- or admission or use of

11    those two documents.

12          THE COURT:  All right.

13          Counsel, I think what I'm hearing is video okay but

14    since they haven't had a chance to cross on the documents, the

15    witness -- unless we're going to call the witness for that

16    opportunity, I don't think it would be fair.

17          MR. JONAS:  Your Honor, at least as of last evening,

18    the indication we got from the other side was that they had no

19    objection to the admission of those documents.  And so I don't

20    think we need to -- we'll address that with the debtors during

21    the break or later today with respect to those two documents.

22    But they're obviously not part of the video.

23          THE COURT:  All right.  Then that part of the video,

24    we'll go with the videos when the time appropriate.

25          MR. JONAS:  Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          MR. GLASSER:  Last housekeeping matter, Your Honor.

3          THE COURT:  Yes.

4          MR. GLASSER:  We have a set of exhibits for the Court

5   in the room in there.  It's in boxes.  And then I don't know,

6   they can give you the numbers later, but if the Court at breaks

7   or tonight wants to start reading expert reports, I can give

8   you the exhibit numbers for the two.

9          THE COURT:  For the expert reports?

10          MR. GLASSER:  Yes, sir.  They're in the box, unless

11   you have them.

12          THE COURT:  I have them already.

13          MR. GLASSER:  Okay.  Great.  All right.

14          THE COURT:  Thank you.

15          MR. GLASSER:  We call then Mr. Mongon as our witness.

16          THE COURT:  All right.  Mr. Mongon.

17                              (Pause)

18          THE COURT:  Good morning, Mr. Mongon.  Please raise

19   your right hand.

20          THIBAUT MONGON, MOVANTS' WITNESS, SWORN

21          THE COURT:  All right.  Please have a seat.  State

22   your name for the record with spelling, and feel free to remove

23   the mask if you're comfortable.

24          THE WITNESS:  All right.  My name is Thibaut Mongon.

25          THE COURT:  And spell it, please.

1              THE WITNESS:  T-H-I-B-A-U-T M-O-N-G-O-N.

2              THE COURT:  Thank you.  And let's move maybe the mic

3    a little closer to you or lean in when you're speaking a little

4    bit more.

5              THE WITNESS:  Can you hear me well?

6              THE COURT:  Yeah.

7              MR. GLASSER:  Yes.

8              THE COURT:  Thank you.

9              Proceed.

10                        DIRECT EXAMINATION

11   BY MR. GLASSER:

12   Q    Mr. Mongon, good morning.

13   A    Good morning.

14   Q    You are the worldwide chairman of Johnson & Johnson's

15   consumer health business.  Is that right?

16   A    I am.

17   Q    You are a member of Johnson & Johnson's executive

18   committee?

19   A    I am.

20   Q    The executive committee is the highest executive body of

21   Johnson and Johnson, the Apex Company.  Isn't that so?

22   A    It is the executive committee of Johnson & Johnson, yes.

23   Q    You approved the 2021 corporate reorganization that we're

24   here discussing in this trial, right?

25   A    I was one of the approvers, yes.

Mongon - Direct/Glasser                    13

1  Q    You got the approval memo by -- oh, let me approach.

2       All right.  Well, we'll do it this way.  You -- I'm going

3  to put up on the screen Exhibit 36.  You got the request to

4  approve the transaction by email.  Isn't that right,

5  Mr. Mongon?

6  A    Correct.

7  Q    And we'll blow up the time, but the email was sent by

8  Mr. Chris Andrew, a Johnson & Johnson lawyer, at 8:07 in the

9  morning on October 11, correct?

10 A    Correct.

11          MR. GLASSER:  May I approach, Your Honor?

12          THE COURT:  Yes, please.

13 BY MR. GLASSER:

14 Q    The full documents I'm showing you on the screens are here

15 if you ever need to look at them.

16 A    Okay.

17          MS. BROWN:  Mr. Glasser, would you have a copy for me

18 of the binder?

19          MR. GLASSER:  Yes.

20          MS. BROWN:  Thank you.

21          THE COURT:  And if it's easier if you have another

22 one for the Court?

23          MR. GLASSER:  Yes, sir.

24          THE COURT:  Thank you.

25 BY MR. GLASSER:

Mongon - Direct/Glasser                    14

1  Q    And then you responded with your approval at 9:58 a.m.  Is

2  that correct?

3  A    Correct.

4  Q    So you approved this transaction that day in 1 hour and 51

5  minutes, correct?

6  A    Correct.

7  Q    There was not actually a meeting, Zoom or otherwise, on

8  that day with the approval -- what I'll call the approval

9  committee, correct?

10  A    No.  No, there was not.

11  Q    There's an approval memorandum that we've seen.  It's

12  Exhibit 9.  We'll pull it up on the screen now.  It's also in

13  your book.

14       Do you recognize this approval memorandum?

15  A    I do.

16  Q    There are nine people on this approval memorandum in the

17  "to" line.  Do you see that?

18  A    Uh-huh.  Yes, I do.

19  Q    You are the highest ranking Johnson & Johnson official in

20  this approval memorandum?

21  A    I am.

22  Q    You do not know how this group of nine was constituted?

23  A    No, I don't.

24  Q    You have no idea how the other eight members of this

25  committee were chosen.  Isn't that true?

Mongon - Direct/Glasser                    15

1  A    I can infer based on who they are that they are the right

2  people in terms of area of responsibility to look at this

3  transaction.

4  Q    Until you got this memo, you didn't even know there was a

5  committee.  Isn't that true?

6  A    It's not a committee.  It's a list of people we need to

7  approve the memo.

8  Q    All right.  So you have no idea who chose the other four

9  -- other eight people on this list.  Isn't that true?

10 A    No, I don't.

11 Q    It is true that you do not know?

12 A    I don't know.  But if the --

13 Q    Yes.

14 A    -- the people who sent the memo, other ones who chose,

15 they approved us.

16 Q    But that's -- yes.

17 A    No, it's -- they sent it.  They signed the memo and then

18 sent it to a number of people.  So they picked --

19 Q    All right.  But you don't know who chose Ruh, Decker,

20 Ryan, Weingrod (phonetic), Orlando, Andrew, Deberdeen

21 (phonetic), and McDonald as the key people.  You don't know who

22 made that choice in your company?

23 A    No, I don't.

24 Q    You do, however, recognize many people on the approval

25 memorandum.  Isn't that right?

Mongon - Direct/Glasser                    16

 1  A    Uh-huh.  I do.

 2  Q    Because they all work at Johnson & Johnson with you,

 3  right?  There they are; I pulled them up.

 4       Chris Andrew, he's Johnson & Johnson's general counsel,

 5  right.

 6  A    Yes.  Yeah.

 7  Q    Thibaut Mongon, that's you.  You're the Executive

 8  Vice-President Worldwide Chairman in Consumer Health, right?

 9  A    I am.

10  Q    Paul Ruh, he's the CFO of the Worldwide Consumer Health,

11  right?

12  A    Correct.

13  Q    Robert Decker, he's Johnson & Johnson's corporate

14  controller and chief accounting officer, right?

15  A    Correct.

16  Q    Michelle Ryan, she's the treasurer of the Apex Company,

17  right?

18  A    Correct.

19  Q    Can you look through the rest, I don't want to waste time,

20  and just confirm that you don't disagree with anybody's --

21  anybody on that list?

22  A    No, they're all Johnson & Johnson employees.  Yeah.

23  Q    All right.  So if anybody told this Court that

24  Johnson & Johnson did not approve this transaction, you agree

25  that would not be true?

Mongon - Direct/Glasser                         17

1   A     What do you mean by Johnson & Johnson?

2   Q     Okay.  Do you agree that all these people on the approval

3   memorandum are Johnson & Johnson?

4   A     They're all Johnson & Johnson employees, yes.

5   Q     And these are the people that approved the transaction,

6   right?

7   A     Correct.

8   Q     It follows from that that Johnson & Johnson approved this

9   transaction, correct?

10  A     The only thing I can tell is that the employees of

11  Johnson & Johnson have approved (indiscernible).

12  Q     Can you think of a way a corporation can act except

13  through its employees?

14  A     I cannot think of any now.

15  Q     On Page 2 of the Exhibit 9, there's nine steps in the

16  transaction, right?

17          MR. GLASSER:  Let's go to Page 2, Exhibit 9.  Blow

18  that up for Mr. Mongon.

19  BY MR. GLASSER:

20  Q     Do you see that, Mr. Mongon?

21  A     Yes, I do.

22  Q     I'll represent to you there are 81 deal documents

23  associated with these nine different steps in the transaction,

24  okay?

25  A     Okay.

Mongon - Direct/Glasser                    18

1  Q    You did not have any involvement in negotiating any one of

2  those deal documents, true?

3  A    No.  I have no association, no.

4  Q    No association --

5  A    I didn't negotiate.

6  Q    You didn't have anything to do with negotiating any of

7  those deal documents, correct?

8  A    No.

9  Q    Correct?

10 A    Correct.

11 Q    You did not read any one of those 81 deal documents,

12 correct?

13 A    Correct.

14 Q    It's fair to say that before you approved this

15 transaction, you did not review financial analysis in

16 connection with the creation of each of the companies at each

17 of the nine steps, true?

18 A    Correct.

19 Q    When you approved this transaction, you didn't look at any

20 financial forecasts for any of the entities of any of the nine

21 steps in the transaction.  Isn't that true?

22 A    Correct.

23 Q    In particular, you never reviewed any financial analysis

24 of the ultimate creation of the transaction, LTL, LLC.  Isn't

25 that true?

Mongon - Direct/Glasser                                    19

1   A      Correct.

2   Q      You reviewed no analysis of how the new company could be

3   expected to perform in the future on a pro-forma basis.  Isn't

4   that right?

5   A      I'm sorry.  Can you repeat this question?

6   Q      You reviewed zero analysis of how LTL could be expected to

7   perform on a pro-forma basis, for example, over the next six

8   months?

9   A      Correct.

10  Q      Or any period of time for that matter?

11  A      Correct.

12  Q      Correct?

13  A      Correct.

14  Q      You have no knowledge of any of the parties to any of the

15  nine steps in that nine-step transaction hiring separate

16  counsel.  Isn't that true?

17  A      Correct.

18  Q      You have no knowledge of any of the parties at any of

19  those nine steps hiring separate financial advisers.  Isn't

20  that true?

21  A      Correct.

22  Q      At your deposition, we went through each of your meetings

23  having to do with this restructuring.  Do you recall that?

24  A      I do.

25  Q      Do you agree with me that it's fair to say based on the

Mongon - Direct/Glasser                    20

 1  standard length of meetings that you're used to that you spent

 2  somewhere between 90 minutes and 3 hours working on this

 3  transaction in total?

 4  A    I don't think it's a fair representation of what -- what

 5  we did.  But in terms of actual time in dedicated meeting, you

 6  might be correct.  I don't --

 7  Q    All right.  And the "we" is Johnson & Johnson.  I'm really

 8  just talking about the you, 90 minutes to 3 hours is fair?

 9  A    That's -- you know when you add all the meetings and

10  updates, maybe you are correct.  Yeah.

11  Q    There has been talc litigation going on against

12  Johnson & Johnson for several years now, right?

13  A    Correct.

14  Q    Even though you're the head of the Consumer Health

15  business, you are not responsible for or involved in the

16  decision-making about how to manage that talc litigation.

17  Isn't that true?

18  A    Correct.

19  Q    In the course of that litigation, some large settlements

20  were accomplished?

21  A    Correct.

22  Q    We talked about that at your deposition, right?

23  A    Uh-huh.  Correct.

24  Q    You had no involvement in deciding whether or how much to

25  settle litigation for, right?

Mongon - Direct/Glasser                          21

1  A    Correct.

2  Q    Those deals were done by the law department without

3  consulting you, correct?

4  A    They were done without consulting me.

5  Q    So whoever did it, they didn't ask the business unit head

6  whether they could, right?

7  A    (No audible response)

8  Q    Right?

9  A    Yeah.  Correct.

10 Q    Or should, right?

11 A    Correct.

12 Q    And it, therefore, didn't impinge on your running of the

13 business because it was off the radar, right?

14 A    It was not part of my responsibilities, yes.

15 Q    So, for example, with respect to the $2 billion offered up

16 in a qualified settlement fund in this case, you were not even

17 aware of that at your deposition.  Isn't that true?

18 A    Sorry.  Can you repeat that question?

19 Q    At the time of your deposition, you did not know that $2

20 billion had been offered up in this case.  True?

21 A    Correct.

22 Q    You were not consulted about it at all.  Isn't that true?

23 A    Correct.

24 Q    That's Johnson & Johnson law department business, not

25 operational business.  Right?

Mongon - Direct/Glasser                                    22

1  A    It's not my responsibility, yes.

2  Q    It's on the law side of corporate, not in the operation of

3  the business that you run.  Right?

4  A    Yeah, it's not my -- part of my responsibilities.  Yes.

5  Q    You, in fact, are not aware of a single business person

6  who is not a lawyer at Johnson & Johnson who actually oversees

7  and manages the costs associated with litigation.  Isn't that

8  true?

9  A    I cannot answer this -- this question.

10 Q    As head of Worldwide Health, you have never seen financial

11 projections calculating J&J's talc liabilities.  Isn't that

12 true?

13 A    Correct.

14 Q    Either present liabilities or future liabilities, correct?

15 A    Correct.

16 Q    The division of responsibility that you and I have been

17 discussing lets you run the business without distraction from

18 managing this litigation.  Isn't that true?

19 A    Is that true?  I'm responsible for the operation

20 performance of the business.

21 Q    Litigation management is just outside your command and

22 control structure.  It's somebody else, right?

23 A    Correct.

24 Q    The structure contemplated in the approval memorandum

25 allowed LTL to file bankruptcy without affecting ongoing J&J

Mongon - Direct/Glasser                          23

1  business, correct?

2  A    There was -- I think the memo mentioned the likelihood of

3  LTL filing for bankruptcy and highlighted the fact that the --

4  the business would not be affected.

5  Q    The business of Johnson & Johnson Consumer, right?

6  A    The rest of the -- of the business would not be affected.

7  Q    So the structuring allowed that feature of the rest of the

8  business not being in bankruptcy, right?

9  A    It was -- yeah, the transaction would not be create an

10  impediment for the rest of the business to operate.

11  Q    So that was a feature, not a bug of the structuring,

12  right?

13  A    What do you mean by a bug?

14  Q    Mistake?

15  A    That was my -- that was my understanding.

16  Q    It was intentional, correct?

17  A    That was my understanding.

18  Q    And, indeed, since the bankruptcy, Johnson & Johnson

19  Consumer Health has continued to operate its business as usual,

20  right?

21  A    Continues to operate; yes, absolutely.

22  Q    Now you said a minute ago that bankruptcy was likely.

23  A    Uh-huh.

24  Q    Isn't it more fair honestly to just say it was certain?

25  A    I think the memo was very clear, so when I looked at the

Mongon - Direct/Glasser                                    24

1    memo, it was very clear that the bankruptcy would likely happen

2    but it was not for me to approve it.  It was very clearly

3    stating the memo that the board of LTL would have to ultimately

4    make the decision.

5    Q    So what do you think the percentage chance was that that

6    board wasn't going to do it?  Can we give them a one percent?

7    A    It was -- it was likely.  I don't know.  I wouldn't put a

8    percentage on it.

9    Q    How likely?

10   A    It would likely.

11   Q    In the month after the bankruptcy filing of LTL,

12   Johnson & Johnson announced this plan to spinoff the Consumer

13   Health Division in a separate IPO.

14   A    Uh-huh.

15   Q    You're aware of that, right?

16   A    Yes, I am.

17   Q    And just for the record, you made a public announcement,

18   Exhibit 26.  We looked at it at your deposition.  We can pull

19   it up.

20        Right?

21   A    Correct.

22   Q    As head of Consumer Health, you were obviously involved in

23   the work leading up to this announcement?

24   A    Correct.

25   Q    The spinoff project is known internally at Johnson &

Mongon - Direct/Glasser                          25

1  Johnson as Project Diamond, right?

2  A    Correct.

3  Q    Do you believe -- well, how many years have you been in

4  business?

5  A    Twenty-one-plus years with Johnson & Johnson.

6  Q    And how many years have you been in I'll call it the

7  C-Suite?

8  A    Three years.

9  Q    And what did you do before that?

10 A    I was the head of Consumer Health in Asia Pacific.

11 Q    So do you believe as a knowledgeable and experienced

12 business person that getting a set number for the talc exposure

13 would be helpful or hurtful to Project Diamond when it IPOs?

14 A    Sorry.  Can you repeat the question?

15 Q    As a knowledgeable business person, do you believe it

16 would be helpful to Project Diamond's IPO to have a certain

17 number for talc exposure?

18 A    You know, in my mind, these two projects are not related,

19 so I don't think it would interfere with -- with Project

20 Diamond.

21 Q    All right.  You said a lot there, so let's break it down.

22       In your mind, you say they're not connected.  That's what

23 you just said, right?

24 A    Yeah, correct.

25 Q    All right.  Let me ask you a different question.  In the

Mongon - Direct/Glasser                    26

1  work on Project Diamond, have you seen carve-out financial

2  statements that show Diamond without talc?

3  A    No, I have not.

4  Q    Never?

5  A    Never.

6  Q    Do you even think such things are being made inside your

7  company?

8  A    I cannot answer this question, but I've not seen them.

9  Q    Back to my original question.  As a knowledgeable business

10 person, would it be helpful to know the number to the IPO?

11 A    I think that's very hypothetical.  I -- I never thought

12 about it this way.

13 Q    All right.  Would it be even more helpful to not have the

14 talc in the IPO?

15 A    I think that's, again, hypothetical.

16         MR. GLASSER:  Let's go to the ELMO.

17         THE COURT:  Mr. Mongon, I'm going to ask you to raise

18 your voice when you can.  Speak, project.  Thank you.

19 BY MR. GLASSER:

20 Q    Mr. Mongon, as a public company C-Suite person, you must

21 know that businesses are often valued on multiples of EBITDA,

22 right?

23 A    Correct.

24 Q    And what would be a reasonable multiple of EBITDA to value

25 a consumer health business?  Pick one.  I don't care.

Mongon - Direct/Glasser                              27

1  A    Around 17 to 23.

2  Q    All right.  Let's use 20.  That's right in the middle,

3  okay.  20 times EBITDA, right?  Do you see that?

4  A    No.

5  Q    There we go.  That's a fair multiple for valuing a

6  consumer business, right?

7  A    Correct.

8  Q    Agreed?

9  A    Correct.

10 Q    All right.  And so if, let's say, talc costs was $5

11 billion --

12        MS. BROWN:  Your Honor, at this point I'll just

13 object to the hypotheticals with a fact witness as improper.

14        THE COURT:  Sustained.

15        MR. GLASSER:  All right.

16 BY MR. GLASSER:

17 Q    Do you agree that if you have to pay for talc, it comes

18 off your EBITDA?  Costs reduce EBITDA, right?

19 A    Costs reduce EBITDA, yes.

20 Q    All right.  And for every billion dollars of costs that

21 reduces EBITDA, the valuation of the company goes down by $20

22 billion, correct?

23        MS. BROWN:  Your Honor, same objection to this line

24 of hypothetical questioning of a fact witness.

25        THE COURT:  Ultimately, what are you looking to

Mongon - Direct/Glasser                              28

1  illicit?

2            MR. GLASSER:  I'll ask a question.

3            THE COURT:  Thanks.

4  BY MR. GLASSER:

5  Q    Just for purposes of this question, let's do my math.  You

6  have a $5 billion talc costs.  You knock 100 billion off --

7            THE COURT:  Let me --

8            MS. BROWN:  Okay.  Thanks, Judge.

9            MR. GLASSER:  Okay.

10  BY MR. GLASSER:

11  Q    Do you believe anybody in Johnson & Johnson has enough

12  financial smarts to figure out that you might make more money

13  without talc costs?

14  A    I think there are many people in Johnson & Johnson who can

15  tell that the costs associated with the litigation enormous,

16  yes.

17  Q    And that they would be multiplied through the EBITDA

18  multiple upon the IPO, correct?

19  A    That I cannot answer this --

20            MS. BROWN:  Your Honor, same objections here.

21            THE WITNESS:  That's --

22            THE COURT:  I'm overruling.

23            Go ahead.

24  BY MR. GLASSER:

25  Q    You just told me that the way that IPOs are valued, the

Mongon - Direct/Glasser                              29

1  way that consumer businesses are valued are multiples of

2  EBITDA, right?

3  A    Correct.

4  Q    You just told me that a reasonable multiple of EBITDA for

5  your business is between 17 and 23 times EBITDA, right?

6  A    Correct.

7  Q    We agree that every billion dollars that your EBITDA is

8  affected by talc litigation would knock $20 billion off that

9  valuation, right?

10  A    Sorry.  Can you repeat that?

11  Q    If the company would be valued on its IPO at 20 times

12  EBITDA, you must agree with me that every billion dollars of

13  talc costs knocks $20 billion off the IPO value.  Correct?

14            MS. BROWN:  Your Honor, just one more --

15            THE WITNESS:  I cannot --

16            MS. BROWN:  This all lacks foundation in addition to

17  being an improper hypothetical.

18            THE COURT:  I'm not going to accept into the record

19  these numbers.

20            MR. GLASSER:  Right.

21            THE COURT:  All right.

22            MR. GLASSER:  It's the concept.

23            THE COURT:  It's the concept.

24            MS. BROWN:  Thank you, Your Honor.

25            THE WITNESS:  Yeah.  I can't -- I think it's very

Mongon - Direct/Glasser                          30

1  hypothetical to speak really here on what would be or would not

2  be the value of the asset we plan to separate.

3  BY MR. GLASSER:

4  Q    And so while you said there's no linkage, it is a

5  fortuitous coincidence that a bankruptcy could help manage talc

6  exposure, correct?

7  A    I think they are two different things.  I think the -- the

8  transaction we are talking about today, that's the objective is

9  to find a way to resolve the claims linked to talc.  The other

10 transaction is the plan is to create a new consumer health

11 company, two new leading companies, one focused on life

12 sciences, one focused on consumer health.  They are two

13 distinct projects.

14 Q    And if talc liability isn't in the Consumer Health IPO, do

15 you think the valuation would be higher or lower?

16 A    Again, it's difficult to say at this point in time.

17 Q    Let's talk about Old JJCI for a minute, okay.  Prior to

18 your deposition in this case, you had not in your memory

19 reviewed any financial statements for the legal entity known as

20 Old JJCI on a standalone basis, true?

21 A    Correct.  In my role, I don't review the financial

22 statements of the different legal entities we operate under.

23 Q    At the time of your deposition, you didn't know the

24 percent contribution of Old JJCI to the overall revenue of the

25 consumer sector, right?

1  A    Correct.  But I knew that the Old JJCI was a legal entity

2  we used to operate a majority of our business in the U.S.

3  Q    What else does it have outside from the U.S.?

4  A    Sorry?

5  Q    What does Old JJCI, what did it have outside the United

6  States?

7  A    I don't think it has anything.

8  Q    So to your knowledge, there is no outside the United

9  States Old JJCI, right?

10  A    No.  That -- my understanding that there's no outside the

11  United States.

12  Q    It follows from the fact that prior to your deposition in

13  this case you never looked at JJCI on a standalone financial

14  basis.

15  A    Correct.

16  Q    That you never told a single human being in the world that

17  you thought it was in financial distress, right?

18  A    It's right, I never used these words.

19  Q    In fact, until you saw the 2020 SEC Form 10K published in

20  March of 2021, you did not personally know the magnitude of

21  J&J's corporate allocation of legal costs to the Consumer

22  Health business, correct?

23  A    Not in detail, yes.

24  Q    Not at all, right?

25  A    Correct.

Mongon - Direct/Glasser                                    32

1  Q    So even by the time of your deposition in this case, you

2  could not articulate how much of the consumer sector legal cost

3  had to do with talc as opposed to any other legal cost, right?

4  A    Correct, other than talc is the enormous majority of all

5  litigation costs in Consumer Health.

6  Q    At the time you approved the corporate reorganization, you

7  did not know how many mesothelioma cases were pending, correct?

8  A    Correct.

9  Q    Because no one told you, right?

10 A    Correct.

11 Q    At the time you approved the corporate reorganization, you

12 didn't know how many ovarian cancer cases were pending,

13 correct?

14 A    Correct.

15 Q    Because nobody told you, right?

16 A    Other than I knew that there were thousands of cases

17 pending, but I didn't know the exact numbers.

18 Q    At the time you approved the corporate reorganization, you

19 never asked any details about the then-existing ovarian cancer

20 and mesothelioma cases.  Isn't that right?

21 A    Correct.

22 Q    At the time you approved the corporate reorganization, you

23 did not attempt to look at the likelihood of future verdicts or

24 judgments.  Isn't that right?

25 A    Could you repeat the question?

Mongon - Direct/Glasser                          33

1  Q    At the time you approved the corporate reorganization, you

2  did not personally look at any documentation about the

3  likelihood of future verdicts?

4  A    No, correct.

5  Q    In weighing whether to approve the restructuring, you did

6  not look at or even have knowledge of Johnson & Johnson's prior

7  settlement strategy with respect to these cases, correct?

8  A    I hoped that we tried to settle through the Imerys

9  bankruptcy case, but I'm not aware of any other settlement.

10 Q    What was the number you guys offered in Imerys to settle

11 the whole thing?

12 A    I don't know.

13 Q    Was it higher or lower than $5 billion?

14 A    I don't know.

15 Q    At the time of your deposition in this matter, you had no

16 knowledge of any financial analysis ever having been conducted

17 by Johnson & Johnson, Johnson & Johnson Consumer, Inc., or any

18 of its professionals regarding whether those companies could

19 pay their talc liabilities on a going-forward basis.  True?

20 A    Correct.

21 Q    It's a fact, sir, that you have never ever been party to a

22 conversation with anyone in Johnson & Johnson contemplating the

23 bankruptcy of Old JJCI, correct?

24 A    Correct.

25         MR. GLASSER:  No further questions, Your Honor.

1           THE COURT:  Thank you.

2           Cross?

3           MS. BROWN:  Yes, thank you, Your Honor.

4           Your Honor, I have a slide deck.  May I approach to

5  give you a copy?

6           THE COURT:  Yes, please.

7           MS. BROWN:  Thank you.

8           THE COURT:  Thank you.

9           Continuing objection?

10          MR. JONAS:  Your Honor, before we begin, we just want

11  to renew the same objection.

12          THE COURT:  Yes.

13          MS. BROWN:  I gave him his own copy so he could

14  object, Judge.

15          MR. JONAS:  I appreciate that.  To leading the

16  witness by displaying the slides or displaying slide that have

17  more information than he's going to answer.  I'm not sure why

18  it's necessary, but I understand Your Honor appreciates that.

19          THE COURT:  Thank you.  I will overrule the objection

20  but admonish the -- please refrain from leading the witness.

21          MS. BROWN:  Absolutely, Your Honor.  And I'll be sure

22  to establish the foundation for the witness's knowledge for the

23  information contained in the slides.

24          THE COURT:  And, again, for the reference, the slide

25  decks are not evidence, just demonstrative.

1              MS. BROWN:  Understood.  Thank you very much, Your

2     Honor.

3              May I proceed?

4              THE COURT:  Yes, please.

5              MS. BROWN:  Okay.

6                          CROSS-EXAMINATION

7     BY MS. BROWN:

8     Q    Good morning, Mr. Mongon.

9     A    Good morning.

10    Q    How are you?

11    A    Good.

12    Q    Would you take a moment to introduce yourself to the

13    Court, tell us who you are and where you're from?

14    A    So I'm Thibaut Mongon.  I was born and raised in France,

15    and I'm 52 years old.  And I'm the Executive Vice-President and

16    Worldwide Chairman of Consumer Health.

17    Q    And, Mr. Mongon, I want to take a minute and learn about

18    your education and your work experience.  But before we do

19    that, I want to follow up on a couple of Counsel's questions.

20         You were asked a number of questions this morning about

21    things that you don't have responsibility for.  Is that fair?

22    A    Correct.  Yeah.

23    Q    You were asked questions about number of claims filed

24    against Old JJCI, right?  You were asked questions about

25    whether you were aware of which outside counsel was

1  representing which entity, right?

2  A     Correct.

3  Q     Whether you had looked at financial analyses of certain

4  entities, right?

5  A     Correct.

6  Q     Is any of that within your broad and wide job description?

7  A     No.  And that's why, you know, I was not -- I was able to

8  say no to all these -- these questions.  I'm responsible for

9  the global business on the worldwide basis.  So I rely on

10  colleagues, you know, different functions to do their job and

11  they do it very well in their respective areas of -- of

12  expertise, whether it's legal, financial, and so on and so

13  forth.

14  Q     And do you understand that you're good enough to be

15  appearing here today at the request of the claimants, right?

16  A     Correct.

17  Q     Okay.  They asked for you to come here so they can ask you

18  some questions, right?

19  A     They did, so I'm here.

20  Q     And were you ready and prepared to answer questions about

21  things that aren't within your job responsibility and that you

22  do know?

23  A     I'm fully prepared to talk about things I'm responsible

24  for.

25  Q     Okay.  So let's make sure we get a chance to do that.

Mongon - Cross/Brown                                37

1   A     Uh-huh.

2   Q     But I want to start first if we could go to the PowerPoint

3   presentation.  I want to start -- we'll get it up on the screen

4   and everybody has a copy.  Why don't we start if you could tell

5   us a little bit about your educational background.

6   A     So I am -- as I said, I was born and raised in France.  I

7   did my business school in Bordeaux.  Right after business

8   school, I moved to Morocco.  I worked for the Chamber of

9   Commerce there.  Then I moved back to France, worked for

10  Dannon.  And then after getting married, I moved to Italy to

11  work for an Italian company in marketing.

12      Then I came back to France to do my MBA at INSEAD and was

13  hired by Johnson & Johnson right after my MBA, and I've been

14  with Johnson & Johnson ever since then.

15  Q     Okay.  And I asked you because I was interested.  What did

16  you do when you were at Dannon?

17  A     I was a marketing manager in the glassware division.

18  Q     Okay.  And I'm going to embarrass you a little bit.

19  You've had positions all over the world over the course of your

20  career, right?

21  A     Yes, I have.

22  Q     And as a result, tell us how many languages you speak?

23  A     I speak four languages.

24  Q     Okay.  Tell us what they are.

25  A     A little bit of English, French, Portugese, and Italian.

Mongon - Cross/Brown                                      38

1  Q    And I understand that your boys were born in different

2  countries.  Just tell us a little about that.

3  A    Yeah.  My first son was born in France.  Then we moved to

4  Brazil, and so my secondborn -- my second son was born in

5  Brazil.

6  Q    Okay.  And they're older and gone now?

7  A    Yeah, 30 and 17.

8  Q    Okay.

9  A    So it's college application season now.

10 Q    Got it.  Okay.

11     Well, before we learn about some of your experience at

12 Johnson & Johnson, Mr. Mongon, could you take a moment just

13 tell us a little bit about the company, the history of

14 Johnson & Johnson.

15 A    Yeah.  Johnson & Johnson is the largest healthcare company

16 in the world.  We go back a long way.  We were founded by the

17 Johnson Family at the end of the 19th century.  We have been in

18 New Jersey ever since.  We have been headquartered in New

19 Brunswick, New Jersey ever since.

20     It's a global enterprise with approximately 135,000

21 employees around the world and more than 40,000 are employed in

22 the U.S.

23 Q    And Michelle Goodridge was here yesterday.

24 A    Uh-huh.

25 Q    And she told us a little bit about the way Johnson &

1 Johnson's operational business is organized.

2 A    Okay.

3 Q    And we learned from Ms. Goodridge that there are three

4 sectors --

5 A    Yes.

6 Q    -- and that Johnson & Johnson Consumer, Inc., the entity

7 we're all here talking about is under the Consumer Health

8 sector.  Is that right?

9 A    Correct.  We're organized in three sectors.  There's one

10 worldwide chair of each one of the sectors with responsibility

11 for the operational performance of the sector.  And each sector

12 operates through a number of legal entities in each market

13 around the world.

14 Q    And so tell us what sector do you have responsibility for?

15 A    So I'm responsible for Consumer Health.

16 Q    Okay.  And you were asked a lot of questions about, well,

17 how come you're not focusing on the individual

18 Johnson & Johnson Consumer, Inc.  Is Johnson & Johnson

19 Consumer, Inc., the only legal entity that makes up the global

20 Consumer Health business at Johnson & Johnson?

21 A    No, it's not.  And I don't look at the business through

22 legal entities.  We operate through dozens of legal entities

23 around the world.  So it's for legal and accounting and

24 employee management purposes that we operate this way.  At my

25 level, I don't look at the details of how each legal entity is

1  -- is functioning.  I look at the overall consolidation of the

2  business.

3  Q    Okay.  And we'll talk about this in a second but,

4  nevertheless, have the individual financial responsibilities of

5  Johnson & Johnson Consumer, Inc., made it all the way up to the

6  attention of you at the global Consumer Health level?

7  A    Absolutely.  When -- when -- after the Ingham verdict when

8  we had to book the expenses linked to the verdict, you could

9  see that the litigation costs allocated to JJCI were so

10 enormous that all the good work we are doing globally worldwide

11 from the performance -- operational performance basis got wiped

12 out and more because that year, the Consumer Health sector

13 globally reported financially a loss.

14 Q    And so even though you were asked a lot of questions about

15 what you did or did not know about this legal entity, you

16 actually saw it from a global perspective.  Is that right?

17 A    Absolutely.

18 Q    Why don't you tell us what it is that you do as the leader

19 of the global Consumer Health business?

20 A    So I'm on the executive committee of Johnson & Johnson.  I

21 lead the Consumer Health Leadership Team.  I'm responsible for

22 the operational performance of the business.  It's

23 approximately $14 billion in revenue with global operations in

24 dozens of countries around the world.  And we have

25 approximately 20,000 employees who work in this -- in this

1  sector around the world.

2  Q    And, Mr. Mongon, I was surprised to hear how many of those

3  employees report to you.  Would you share that with us, please?

4  A    Directly around 8,000.  The others are in manufacturing,

5  other areas that do not report directly to me but work on

6  behalf of the business.

7  Q    And would you tell us -- we saw some slides yesterday, but

8  can you give us an idea of some of the products that the

9  Consumer Health sector makes that we might all know about?

10 A    So we have over-the-counter products.  You may know

11 Tylenol, Motrin, Nicorette outside the United States and

12 others.  We have skin health and beauty products, Neutrogena,

13 Aveeno, Lubriderm, and others.  And we have all -- you know,

14 other brands that you may not be as familiar with in other

15 parts of the world; and -- and what we call specialty products

16 or babycare products, Johnson's Baby, what's what we are

17 talking about here today; feminine care products, OB, Carefree,

18 Stayfree; oral health products like Listerine; and wound-care

19 products like Band-Aid.

20 Q    So that sounds like a lot.  Could you estimate how many

21 products?

22 A    Thousands of products.

23 Q    As I understand it, Mr. Mongon, you actually have

24 experience in each one of the three sectors at Johnson &

25 Johnson?

Mongon - Cross/Brown                                    42

1  A    I do.

2  Q    Okay.

3  A    I do.

4  Q    Why don't you tell us a little bit about your experience

5  before you became the worldwide chair of Consumer Health?

6  A    Sure.  Very quickly, so I joined J&J right after my MBA,

7  as I said, in the medical device sector in the vision-care

8  division in France.  So here we are talking about Acuvue

9  contact lenses.

10     Then I was appointed country manager.  Then I moved to

11  Latin America.  I told you about my son who was born in Brazil.

12  And then I moved to Asia Pacific to run the vision business.

13     Then in 2013, I changed geography and business moving to

14  the pharmaceutical sector of Johnson & Johnson in a very

15  different area working with R&D to develop a future pipeline of

16  neuroscience products.  Here you are -- with a focus on

17  depression, Alzheimer's, and schizophrenia.

18  Q    So are these -- these are prescription medicines in this

19  category?

20  A    Prescription medicines.

21  Q    And is this also the part of the business all on our minds

22  these days that would develop the COVID vaccine?

23  A    Absolutely.

24  Q    Okay.

25  A    Our pharmaceutical sector.

1  Q     Okay.

2  A     So I did that, and then I moved to -- I moved back to

3  Asia.  I moved back to Asia and Singapore to take the

4  responsibility of the role of Consumer Health for Asia Pacific

5  region.  I did that for five years.  And then since 1919 --

6  2019, sorry, I'm in my current position as worldwide chair for

7  the entire Consumer Health business globally.

8  Q     Okay.  And you were asked a number of questions about the

9  recent announcement of the anticipated separation of the

10 Consumer Health business.

11 A     Yeah.

12 Q     Do you recall those questions?

13 A     I do.

14 Q     Okay.  And I'm going to guess that's something you know

15 something about as the head of the Consumer Health?

16 A     Absolutely.

17 Q     Okay.

18 A     Yeah.

19 Q     As the most senior person responsible for the global

20 Consumer Health business, can you tell us whether the creation

21 of LTL and the subsequent bankruptcy filing had anything to do

22 with the planned separation?

23 A     No.  It's my understanding that there is no correlation

24 between the two.

25 Q     Did anybody ever send you any documents, any emails, any

1  meetings, any briefings that would suggest to you that one was

2  dependent on the other or had anything to do with each other?

3  A    Not at all.

4  Q    You were asked a number of hypothetical questions about

5  purchase prices with or without talc liability.  Do you

6  remember those?

7  A    Yeah.

8  Q    Okay.

9  A    I do.

10 Q    Would you agree, Mr. Mongon, as somebody with a lot of

11 business experience that the terms of any asset sale, the

12 purchase price depends on the terms of the individual

13 transaction?

14 A    Correct.

15 Q    Do you believe, Mr. Mongon, that a bankruptcy like the one

16 we are here talking about would ever be necessary if you wanted

17 to remove liabilities from an asset before we sold it?

18 A    No, I don't.  There are other ways to deal with this.

19 Q    And in terms of what went on here in your mind, was this

20 identified, this being the LTL bankruptcy, identified as the

21 way to remove those assets from the consumer business before it

22 was spun off?

23 A    No, it was not the case.

24 Q    Let's step back, Mr. Mongon, if we could and I want to ask

25 you some questions --

Mongon - Cross/Brown                                    45

1  A    Uh-huh.

2  Q    -- about things you do know about since you're here.

3  A    Sure.

4  Q    And I want to talk about whether you have knowledge about

5  the ongoing talc litigation, okay?

6  A    I do.

7  Q    Okay.  Tell us how you would have obtained knowledge in

8  your position about this litigation.

9  A    We have regular updates in executive committee meetings

10  about litigation, and so that would be part of it.  We also get

11  -- I also get memos every time there is a pending verdict or an

12  actual verdict either from the Law Department or the

13  Communications Department telling us what happened or what is

14  -- what could happen and telling us any -- about any company

15  statement that -- that we would need to be aware of so we are

16  well prepared to answer any question that may come internally

17  or externally.

18  Q    So are you telling us, Mr. Mongon, that a U.S. litigation

19  from one U.S. subsidiary makes it all the way up to you as the

20  head of the worldwide consumer sector?

21  A    Absolutely.  When you think about the length of this

22  litigation, we are talking about almost a decade now.  And the

23  magnitude of the verdicts that we have seen in this litigation,

24  it's absolutely material for me.

25  Q    And one of the things you mentioned, Mr. Mongon, is in

1  your leadership position, you would from time to time get email

2  updates about some of the litigation?

3  A    Correct.

4  Q    And I want to show you some of those and ask you about the

5  information that you received.  And these documents are already

6  in evidence.  So let's start, if we could, with 2016.

7       Mr. Mongon, this is an email from May of 2016 to you and

8  others.  The subject is "Talc Update."  The importance is high.

9  And the Court might recognize this document because

10 Mr. Wuesthoff is on it, as well, and we took a look at it with

11 him yesterday.

12      First, help us understand how are you and Mr. Wuesthoff on

13 the same document here back in 2016.

14 A    At that time, I was the corporate chair for Asia Pacific

15 and Wuesthoff was the head of supply chain for Consumer Health,

16 so we are part of the same leadership team.

17 Q    And what's that called?  What's that leadership called,

18 team called?

19 A    At that time, it was called the GOC, Group Operating

20 Committee.

21 Q    Group Operating Committee.

22           THE COURT:  Group of what?

23           THE WITNESS:  Operating Committee.

24           Today we call it the CHLT, Consumer Health Leadership

25 Team.

Mongon - Cross/Brown                          47

1  BY MS. BROWN:

2  Q     Okay.  Got a new name.  Same group, new name.

3  A     Yeah, a new name but same thing.

4  Q     Okay.  And it looks like the first sentence you're being

5  informed about a negative verdict awarding the plaintiff

6  $55 million.  And do you remember receiving email updates like

7  this one here, Mr. Mongon?

8  A     Absolutely.  Each time something like this would happen,

9  we would receive an email with the facts.

10  Q     Okay.  Let's take a look at another one, if we could.

11  Again, the Court might recognize this also went to you and Mr.

12  Wuesthoff.  This is from 2017, and the subject is "California

13  Talc Verdict Reversed."  And tell us what information was being

14  told to the Group Operating Committee here.

15  A     So that was a verdict reversal.  So it was, again, another

16  example of a memo coming this time from the Communications

17  Department giving us more information about what just happened

18  so we could answer any question that we may have.

19  Q     One inflection point in the litigation you mentioned to us

20  a moment ago was the Ingham verdict?

21  A     Correct.

22  Q     And do you recall being updated about that, as well?

23  A     Absolutely.

24  Q     And do you recall getting something called the Ingham

25  Verdict Media Monitoring Report that included, in fact, all of

Mongon - Cross/Brown                                          48

1  the press coverage like some of the ones we have on the screen?

2  A    Yeah.  When there is a major event for the company, the

3  Communications Department put together these reports informing

4  us of the media pickup and giving us access to the different

5  articles related to this event.

6  Q    Okay.  And these titles include "J&J hit with $4.7 billion

7  jury verdict in baby powder suit."  Is that right?

8  A    Correct.

9  Q    Yeah.  How do you as a business leader of the consumer

10 health company view press, verdicts, and facts like this?

11 A    Well, at that time I was still in Asia Pacific, but i

12 remember when -- when getting the news, I could tell that this

13 was becoming very very very big, very unpredictable.  And so it

14 was clearly a turning point in this -- in this entire

15 litigation.

16 Q    Okay.  And there's been some suggestion in the briefing

17 and in the testimony that, well, Ingham was an outlier, it was

18 never going to happen again.  And I want to talk to you about

19 some information you received two years after Ingham about a

20 potential case and a potential verdict.

21     Help us understand what this email is and what information

22 was being provided to you.

23 A    So at that time I was the Worldwide Chair of Consumer

24 Health.  And so this -- this email gives me a heads-up that

25 there is a verdict coming up and there's the possibility for

Mongon - Cross/Brown                                    49

1 this verdict to be in the billions of dollars, to -- and so we

2 should be prepared to handle it if something similar to what

3 happened with Ingham was going to get repeated at this -- at

4 this -- in this case.

5 Q    So in 2020 two years after Ingham, folks were making you

6 aware that another multi-billion-dollar judgment could be

7 coming soon?

8 A    Correct.

9 Q    Let's talk a little bit about an email you received

10 shortly after the one we just looked at from a woman named Ms.

11 Kathleen Widmer attaching a PowerPoint called "Johnson's Baby

12 Powder Recommendation."  Do you recognize this email and this

13 document, Mr. Mongon?

14 A    I do.

15 Q    And tell us what it is and what the -- well, first, who is

16 Ms. Widmer?

17 A    Kathy Widmer is the head of North America business.  And

18 so this email was to send me her recommendation to discontinue

19 the sale of Johnson's baby powder in our region.

20 Q    Okay.  And did -- first of all, did the recommendation to

21 discontinue Johnson's baby powder in the spring of 2020 have

22 anything to do with the company's concerns that it might not be

23 safe?

24 A    Not at all.  We have always said and continue to say, we

25 continue to stand behind the quality, the safety of the

1  product.  There were other reasons for recommending the

2  discontinuation of the product.

3  Q    To this day, does the company stand behind the safety of

4  their product?

5  A    Absolutely.

6  Q    And do you, as well, Mr. Mongon?

7  A    Absolutely.

8  Q    What did Mr. Widmer recommend to you in terms of why it

9  was necessary, unfortunately and sadly, to discontinue a

10 product that's been sold since 1894?

11 A    I think they had a couple of points, right, and you have

12 them here.  One is that after so many years of litigation and

13 noise around it in the media and confusion, the sales were

14 plummeting, right.  So when you see that in 2020 you are

15 talking about 26 percent of 30 million, you're talking about 6

16 to 8 million dollars in our business.  It's a very small, very

17 tiny product.  So it's -- I mean very very small.

18      The certain reason is that, yes, a product this iconic has

19 been in the U.S. for decades, but there's so much consumer

20 confusion.  Each time you have a verdict, you have something in

21 the news, consumers get confused, ask questions, go to their

22 retailers, the retailers ask us.  There is continued confusion

23 about it.  And for such a small product, it's basically not

24 worth -- not worth the effort.

25      And the last one is the fact that this will not go away

Mongon - Cross/Brown                          51

1  any time soon because given the intensity of the litigation and

2  the amount of money, the plaintiff attorneys we're spending in

3  advertising which was at the time I think more than $50

4  million, an enormous amount, we could expect to see continued

5  cases coming, continued confusion.  And so the sales would

6  continue to go down, and we would continue to get request

7  questions, confusion from our customers.  It was just not worth

8  -- not worth it.

9  Q    And what was your response to Ms. Widmer's recommendation

10 that the company stop selling this product?

11 A    I agreed.  I agreed.

12 Q    And did the company in the spring of 2020 indeed

13 discontinue Johnson's baby powder?

14 A    Yeah.  I don't recall the exact timeline, but we did

15 discontinue the product shortly after.

16 Q    Are you aware, Mr. Mongon, of the company's efforts to get

17 that Ingham verdict reviewed by appellate courts?

18 A    Absolutely.

19 Q    And tell us about that, please.

20 A    Well, I don't know the exact details of how it works.  But

21 I'm aware that we tried to appeal to the Supreme Court of the

22 State of Missouri.

23 Q    Okay.  And let me show you an email on that and ask you if

24 this is what you're referring to.  This is an email going to

25 you and others in June of 2020, "Loss in Ingham Appeal Talc."

Mongon - Cross/Brown                                    52

1 Is that what you're talking about?

2 A    Yes.

3 Q    And help us understand what's going on here?

4 A    So that's when we learned that Supreme Court in Missouri

5 would not hear the case.  And so it was a big disappointment

6 for -- for us, and it also meant that we had to book

7 financially the amount of -- of the verdict.

8 Q    This email says, "We will continue our appeal in Missouri

9 Supreme Court."  And then ultimately, as I understand it, to

10 the U.S. Supreme Court.  Is that right?

11 A    Correct.  So that's where we were informed that, okay, you

12 know, our case was not heard at the state level.  We're going

13 to go all the way to the Supreme Court to get our case heard.

14 And, unfortunately, that was another disappointment later to

15 hear that the U.S. Supreme Court would not hear the case.

16 Q    And do you recall learning in spring of 2021 that the U.S.

17 Supreme Court refused to review the Ingham case?

18 A    Absolutely.  It was a big disappointment for us.

19 Q    Mr. Mongon, at this point, you were in the Consumer Health

20 business in June of 2021?

21 A    I was.  Yeah.

22 Q    Okay.  You were receiving regular updates about the talc

23 litigation.  Is that correct?

24 A    Correct.

25 Q    Tell us from your vantage point at the global consumer

1  level what you knew and understood about this talc litigation

2  and the effects that it was having?

3  A    You know, my understanding then and still today that it's

4  U.S. litigation that has been going on for a very long time,

5  that has not made a lot of progress in this long period.  I

6  think very few -- when you think about the thousands of cases

7  that are pending, very few have been litigated.  Even fewer

8  have been resolved.

9       My understanding is that the multiple attempts by the

10 company to bring this litigation to a resolution have failed.

11 We just talked about the appeals, the appeal to the Supreme

12 Court.  I talked with the other person about the Imerys

13 settlement.  So over the years, a number of attempts but here

14 we are close to a decade later and very little progress has

15 been made.

16      My other understanding is that the cost while I'm not, you

17 know, purview to the exact details of the costs, the enormous

18 verdicts that we saw, Ingham being Exhibit A of this, but also

19 the ongoing costs linked to litigation are just -- are just

20 enormous.  So that's how I see it from -- from a global

21 perspective.

22 Q    And I want to talk to you a little bit about costs and

23 about the performance of the Consumer Health sector generally.

24 A    Uh-huh.

25 Q    How has the financial health of the Consumer Health sector

Mongon - Cross/Brown                                    54

1   been over the time period of these emails that we've been

2   looking at?

3   A    Look, something we are very proud as a consumer health

4   team that if you look at the operational performance of the

5   Consumer Health segment globally over the past three years

6   since I've been in this role, we have seen sequential

7   improvement which, you know, is very good news and we see our

8   business performing better and better on the global basis.

9   Q    And are you familiar with some of the public filings that

10  talk about the financial performance of the Consumer Health

11  business?

12  A    Absolutely.  We report every quarter.

13  Q    Okay.  And let's take a look at one of them if we could.

14  We have on our screen a 10-K.  Tell us what we're looking at,

15  what the years are, and what information is contained here?

16  A    So on this document, that's our reporting for the period

17  2020 and the comparison to 2019.  We are talking about revenue,

18  so sales, how we are doing with our different segments.  And

19  you can tell that our business has been improving sequentially

20  2020 to 2019.  And if you were to look at a similar document

21  '21, you would see the same kind of improvement 2021 over 2020.

22  Q    Operationally, the business and the people around the

23  world who are working for the business have done a good job?

24  A    Absolutely.  And they continue to do a good job today.

25  Q    Can you get -- is this a comprehensive to look only at

Mongon - Cross/Brown                          55

1  those increase-in-sale numbers, is that a comprehensive view of

2  the finances of the Consumer Health business?

3  A    Well, we disclose all the financials.  We just looked at

4  revenue, but you have all the -- the other financials: income,

5  cash flow, and other financial statements.

6  Q    Okay.  Does this number, this increase in sales, take

7  account for litigation costs?

8  A    No, it doesn't.

9       So what -- what you need to understand is that what our

10 investors want to understand when we report to them about our

11 performance is the first question is what is the underlying

12 performance of the business.  And so that's what I'm

13 responsible for, what we report on and we go in great details

14 to tell them how the business is doing from an operational

15 performance point of view.

16      Then, we add to this what we call the risk associated with

17 -- with the business, which that does include litigation risks,

18 and the other costs, non-operational costs associated with --

19 with the business.  In this case, the costs linked to the talc

20 litigation are part of this non-operational costs.

21 Q    And are you familiar, Mr. Mongon, with what happens to all

22 these gains and all these strides that were made by people

23 around the world when you add in the costs of the talc

24 litigation?

25 A    Yeah.  As I mentioned earlier, in the year 2020, so the

Mongon - Cross/Brown                                    56

1  year of the <u>Ingham</u> verdict, when you combine the <u>Ingham</u> verdict

2  and the ongoing litigation costs in this -- in this report on a

3  global basis --

4  Q    In the same financial filing we have this information?

5  A    Yeah.  So you can tell that the Consumer Health sector

6  reported financially holding a loss of more than a billion

7  dollars when operationally, we were a profitable business.  So

8  that's where -- where it becomes -- it became very very

9  apparent of the magnitude of the cost linked to this litigation

10 and the impact on the business because while you have

11 20-plus-thousand employees doing an excellent job around the

12 world operationally, everything and more get swiped out by the

13 litigation costs in the U.S.

14 Q    And let's see if you can help someone like me who's not as

15 good with financial statements sort of understand what we have

16 going on here.  So this 2020 number in parentheses, tell us

17 what that represents and how it compares to the same number in

18 2019?

19 A    So we're talking about the income, so the profit before

20 tax of the operation really in 2020 and in 2019.  So you can

21 see that in 2019, the Consumer Health sector globally generated

22 a bit more than $2 billion of income.

23 Q    This number right here?

24 A    This number right there.

25 Q    Okay.  And then if I go to --

Mongon - Cross/Brown                                        57

1    A    And on the left -- on the first column --

2    Q    Yeah.

3    A    -- in 2020, the Consumer Health sector reported a billion-

4    plus dollars loss in income before tax.

5    Q    And if we look down at the bottom, it looks like we have

6    some information about what was primarily driving that

7    decrease.  Is that right?

8    A    Absolutely.  So it's -- it's very important to inform

9    shareholders what is driving this.  And so this note explains

10   to shareholders what is driving this -- this loss and this --

11   all these variants between 2020 -- 2019 and 2020.  And so you

12   can see very clearly the different elements leading to this

13   loss, and the vast majority of it is linked to the higher

14   litigation expense primarily associated with the talc

15   settlement.

16   Q    And you were asked a bunch of questions about, well, you

17   don't know what's talc versus other litigations.  You do here

18   in this bullet, right?

19   A    Yeah.  It gives you the -- the total amount and says that

20   it's primarily associated with the talc settlement.

21   Q    Okay.  Now one of the things we've heard, Mr. Mongon, is

22   how much money Johnson & Johnson, the parent, has.  And would

23   you agree that Johnson & Johnson, the parent company, is a very

24   financially health company?

25   A    It is.

1  Q    Okay.  And so what would you say to the suggestion that,

2  well, you know, J&J, the parent, would have just stepped in and

3  funded any kind of losses like this?

4  A    No, it doesn't work this way.

5  Q    Why not?

6  A    Johnson & Johnson is made of a number of different units,

7  right.  We talked about the three sectors, we talked about the

8  different legal entities.  We want to make sure that each

9  operating unit is financially viable, operates at the highest

10 level of performance.  The idea is not to subsidize one unit

11 when it's not -- when it's not performing.  When a unit is not

12 performing, we deal with this particular unit.  That's what --

13 that's what we are here for, and that's what our shareholders

14 expect from us.

15 Q    Were you aware over the course of your career of efforts

16 by the lawyers and others to resolve the talc litigation?

17 A    Absolutely.  As I said, right, for a very long time.  So

18 what -- what you need to understand is that there is nothing

19 wrong with the product, right.  So there's nothing we can do

20 from an operational point of view.  It's purely a litigation

21 issue.

22      And so, of course, the Law Department is the primary lead

23 in this effort.  And over the years, I've seen them, you know,

24 pursuing a number of different avenues to try to resolve this

25 case.  And the first one was to say, hey, you know, there's

1  nothing wrong with the product.  Let's go to court and

2  litigate, right.

3      Over the years, what we have seen is that it takes a long

4  time.  Very few cases are handled, and when you look at the

5  sheer volume of what we are talking about here, thousands,

6  right, of cases, it will take, I don't know, forever.  And I

7  think the turning event was <u>Ingham</u> because that told us that it

8  was highly unpredictable.

9      And so I've seen, yes, the Law Department trying for a

10 very long period of time to get these cases resolved in court,

11 in going to the Supreme Court, the Imerys settlement.  And so

12 when I heard about this potential transaction, I saw it as

13 another attempt to finally solve these cases.

14 Q   Did you feel as somebody who's in charge of the operations

15 of the business, there was something you could do operationally

16 to solve this problem?

17 A   No.  That's what's frustrating about it, right.  There is

18 nothing wrong with the product.  There's nothing I can do

19 operationally.  It's purely a litigation matter that needs to

20 be dealt with as such.

21 Q   At some point, Mr. Mongon, you learned about a potential

22 restructuring of Johnson & Johnson Consumer, Inc.  Is that

23 right?

24 A   Correct.

25 Q   And as the worldwide head of the global Consumer Health

1  business, were you one of the primary people involved in

2  carrying out the mechanics of this restructuring of a United

3  States legal entity?

4  A    No, I was not, as I talked about.  In my role, I'm never

5  part of this work, this type of work.

6  Q    Are you aware about whether or not Johnson & Johnson has a

7  process to approve transactions like the one we're here to talk

8  about?

9  A    Yeah.  And, you know, it's a very well-defined process.

10  Each time we want to conduct a transaction, the memo that we

11  just reviewed this morning, similar memos are put together.

12  They all have the same format with who are the people we need

13  to approve it, what the project is about, and giving the

14  approvers an understanding of the due diligence that has been

15  conducted and their findings.  So when looking at what the

16  project is about, the due diligent findings, you know, we can

17  exert our own judgment and decide whether we approve this memo

18  or not.  So this is something that I see, I wouldn't say

19  routinely, but every time a transaction is happening.

20  Q    Were you surprised to get a memo like this in a format

21  like this asking for your approval for a transaction?

22  A    Not at all.

23  Q    Has that happened to you before at Johnson & Johnson?

24  A    Absolutely.  And since then, you know, I had a couple of

25  those this year alone, right.

Mongon - Cross/Brown                                                61

1  Q    And do the approval memos look substantially similar to

2  the one we have here?

3  A    Yeah.   They always have the same format.

4  Q    Okay.   And do they contain substantially the same

5  information about the purpose of the transaction and who did

6  the due diligence and a request for approval?

7  A    Yeah.   As I said, the format allows you to have a recap of

8  what you are talking about, what the intent of this proposed

9  transaction, who was part of the due diligence, who worked on

10 assessing the visibility of the transaction, and what their

11 findings are so you have in a very condensed way a good

12 overview of what the transaction is all about.

13 Q    Okay.   And we have up on our screen the due diligence

14 section of the approval memo you got and approved.   Tell us

15 what information is contained here.

16 Q    Yeah.   So here you have the members of the team who have

17 been working on the project in their respective areas of

18 responsibility.   So when I look at such a list, it gives me the

19 sense and comfort in the fact that the appropriate departments

20 had their eyes on the transaction, reviewed the visibility of

21 the transaction from their point of view, which as you can tell

22 here, it's always multifaceted.   And I can see their findings

23 in the memo.

24 Q    And did you rely on the work that these folks did well

25 before the approval memo got to your desk to conduct the due

1  diligence on this transaction?

2  A    I always do.  That's how we work at J&J.  We have great

3  employees.  We trust them.  They are experts in their field.

4  They do that on a routine basis.  They know the questions they

5  need to ask, the points they need to review, and we trust them

6  to do their job appropriately.

7  Q    I want to look quickly, Mr. Mongon, at what you were

8  actually asked to approve and ask about your understanding of

9  that.  You were asked to approve a divisional merger that would

10 result in current and future product liability related claims

11 associated with talc allocated to LTL.

12     What did you understand about that, Mr. Mongon?

13 A    That we would create a separate company and we would

14 allocate the talc liability to this company.

15 Q    Okay.  Did you understand that any resources were going to

16 be given to that company to resolve these liabilities?

17 A    Yes.  So we talked about the project to allocate to this

18 company the number of assets that would allow this company to

19 operate and solve the talc liabilities.

20 Q    And are those in fact contained in the last two bullets,

21 the funding agreement, the Royalty A&M business?

22 A    Correct.

23 Q    Did you understand that the purpose and intent of the

24 transaction was to create a bad company with talc liabilities

25 and no ability to resolve them?

Mongon - Cross/Brown                                           63

1   A    Not at all.  I think my understanding that it was just the

2   opposite.  The idea was to create a separate company.  We would

3   allocate the talc liabilities to this company and we would

4   provide this company with the resources to deal with it.  And

5   that's why we looked for assets that we could allocate to this

6   company.

7        And that's when we ended up identifying these royalty

8   streams that were, until then, part of my area of

9   responsibility and, after my approval for this memo, were

10  allocated to the new entity.  And so that's with the royalty

11  stream and the funding agreement, the new entity would be very

12  well-positioned to handle the product liability and solve it.

13  Q    Okay.  And finally, bullet number two asked you to approve

14  giving authority to the Board, the LTL Board, to determine

15  whether to proceed with a voluntary petition under Chapter 11.

16  What was your understanding about who was going to make the

17  decision about Chapter 11?

18  A    It was very clear in the memo that I was asked for

19  approval to create the company.  That's, as I said, it would

20  likely -- it was likely that this company would file for

21  bankruptcy, but I was not through this memo authorizing this.

22  That would be the ultimate responsibility of the LTL Board to

23  make this decisions.  That was not for me to approve it in this

24  memo.  I think it was very clearly laid out.

25  Q    I want to ask you about one final --

1          THE COURT:  Ms. Brown, let me interject a question.

2          MS. BROWN:  Sure.

3          THE COURT:  Mr. Mongon, let's say that the LTL Board

4   of managers opted not to file the Chapter 11.  At this point in

5   time when you're giving approval, did you have an understanding

6   as to what would be the result of and the impact on Project

7   Plato going forward if there were not a bankruptcy.  In other

8   words, was there a Plan B?

9          THE WITNESS:  No.  I was not aware of a Plan B.

10          THE COURT:  Okay.

11  BY MS. BROWN:

12  Q    And picking up on the Court's questions, Mr. Mongon, what

13  did you understand that the Board was going to do?  Did you

14  understand that there was going to be a Board of LTL?

15  A    Yes, I was.

16  Q    Okay.  And was it your understanding pursuant to

17  Paragraph 2, that the Board would be presented with information

18  regarding the talc litigation?

19  A    Correct.  Yes.

20  Q    And that the Board would exercise its judgment in terms of

21  whether or not Chapter 11 was appropriate.

22  A    Correct.  That was their responsibility to look at it and

23  make the decision.

24  Q    Did you have the understanding, though, Mr. Mongon, that

25  even if the Board decided Chapter 11 wasn't right, that --

Mongon - Cross/Brown                              65

1          MR. JONAS:  Objection.  She's leading this guy along.

2          MS. BROWN:  Well, I can rephrase it, Your Honor.

3          THE COURT:  Rephrase it, please.  Thank you.

4          MS. BROWN:  Sure.

5  BY MS. BROWN:

6  Q    Did you have the understanding pursuant to Number 2,

7  Mr. Mongon, that if the Board decided not to file Chapter 11,

8  that Johnson & Johnson would leave the talc liabilities in a

9  subsidiary with no ability to resolve them?

10 A    No, that was not my understanding.  My understanding that

11 this company was equipped with what it would take to try to

12 find resolution for this through, you know, an ongoing revenue

13 stream with the royalty streams and those we allocated to them

14 and the idea that they would look for other royalty streams to

15 augment their asset base and the funding agreement that existed

16 between JJCI, J&J, and the new entity.

17 Q    Yeah.  And did you understand, Mr. Mongon, bankruptcy or

18 not, resources would have been available to LTL?

19 A    Absolutely.

20         MS. BROWN:  Your Honor, do you have any more

21 questions?

22         THE COURT:  No.  Thank you.

23         MS. BROWN:  Okay.  Yeah.

24 BY MS. BROWN:

25 Q    Just one more question about the final paragraph in the

1  approval memo.  It's a sort of a two part sentence.  I want to

2  ask you questions about both.

3      In the approval memo, you were informed that

4  implementation of the steps described in Section 2 will allow

5  New JJCI to continue to operate the Consumer Health business

6  without interruption.  What was your understanding of what was

7  meant by that, Mr. Mongon?

8  A    That the allocation of these royalty streams to the new

9  entity would not have an impact on the overall business of

10 JJCI.  So there was no operational impact on the business of

11 JJCI.

12 Q    Did you understand that a decision was being made not to

13 put all of JJCI as part of this restructuring and bankruptcy?

14 A    Sorry, can you repeat the question?

15 Q    Sure.  Did you have an understanding that New JJCI would

16 not be going into bankruptcy?

17 A    Correct.

18 Q    Okay.  And did you have an understanding of why not?

19 A    I think my understanding is that this transaction would

20 allow on one hand, the new entity to solve the talc liability.

21 On the other hand, the New JJCI to operate without any impact

22 on our employees, on the business, on our customers, so it was

23 a way to separate the two issues.

24 Q    Did you have an understanding though that that was being

25 done to make things better for the folks at New JJCI but worse

1  for the creditors of LTL?

2  A    No.  I think I told the other gentleman.  It was not an

3  idea of making it better or worse.  It was finding a way to

4  create a forum for current claimants.  But I was also told in

5  this case my understanding is that the future claimants would

6  also be included in these efforts to get their case heard and

7  hopefully solved in a more equitable, more efficient, meaning

8  quicker, way than what we have seen happening in the past

9  almost decade.

10 Q    And funny you should say equitably and efficient,

11 Mr. Mongon, because you're not the first witness to say that.

12 And, in fact, that's the second part of this paragraph that I

13 wanted to talk to you about.

14      The approval memo said that this transaction would provide

15 LTL with the opportunity to pursue a process to resolve current

16 and future claims in an equitable and efficient manner.  And,

17 sir, all kidding aside, Mr. Mongon, can you help us understand

18 why every witness who's coming here from Johnson & Johnson or

19 Johnson & Johnson Consumer, Inc., has used those same words,

20 equitable and efficient?

21 A    I don't know how they described it, but that's the way we

22 described it and continue to describe it internally, so I'm not

23 surprised to hear that.

24 Q    And when you say "that's the way we refer to it," what do

25 you mean?

Mongon - Cross/Brown                                68

1  A    In the company, when we, in the updates or in the meeting

2  we had on this project, that's how we always described it and

3  that's how I understood it.  And everything led to show that it

4  was indeed the case.

5  Q    Was that information and that way the project was being

6  described internally, you know, when nobody was looking, was

7  that important for you in ultimately approving the transaction?

8  A    Absolutely.  We all -- I'm not a lawyer, right, so I rely

9  on experts, right, to tell me the implications of the different

10 projects we are working on.  So it's very important for me to

11 understand the intent and that's what this project did.

12 Q    And as we saw sort of at the beginning of your examination

13 today, you approved the restructuring, correct?

14 A    I did.

15 Q    And you did it real quickly.  I think counsel did the

16 math, about an hour and 50 minutes, right?

17 A    Okay.  Yeah.

18 Q    Did you have enough time over the course of your work at

19 Johnson & Johnson to learn about and consider the talc

20 litigation?

21 A    Yeah.  Again, what you should understand is that this memo

22 doesn't appear on my desk one day without having -- me having

23 any understanding of what's going on, right.  It's a very short

24 memo that doesn't take a long time to review and it's based on

25 my overall understanding of what we are talking about.  And so

1  you are talking about the overall litigation, the impact, the

2  cost.  We talked about -- you're talking about years, right.

3  Since I joined Consumer, you could see that every year

4  something or many things are happening around talc.

5      And then, we had -- I had been informed of this project a

6  few months before I received this memo and so I was aware that

7  there was a team working on the due diligence.  So it -- the

8  memo didn't show up as a surprise in my inbox.

9  Q    Were you aware at the time you approved this transaction

10 of any other viable plan that could resolve future and current

11 claims in the tens of thousands that were pending against

12 Johnson & Johnson Consumer, Inc.?

13 A    I don't know about that because I'm not a lawyer, but what

14 I can tell you is that over so many years, our team has been

15 looking at so many different avenues, my understanding is that

16 it was the last avenue we had to really find a way to resolve

17 these cases in a reasonable time frame and appropriately for

18 all claimants.

19 Q    The allegations relevant to this hearing, Mr. Mongon, on

20 was that this restructuring and subsequent bankruptcy filing

21 were done to harm creditors and were not done for a proper

22 purpose.  What's your view on that?

23 A    It's not at all my understanding of what this is about.  I

24 think just the opposite.  The opposite is, as I said, to create

25 this forum that would allow claimants, current and future, no

Mongon - Redirect/Glasser                                70

1  different from where they are today, to get their case heard

2  and with a court reviewing their case and making the

3  appropriate decision about their case in a very efficient way.

4  Q    And after coming to Court at the request of the claimants

5  and answering all of counsel's questions, do you continue to

6  stand by your approval on Monday, October 11, 2021, for the

7  restructuring of Johnson & Johnson Consumer, Inc.?

8  A    I absolutely do.  I believe it's a great way for current

9  and future claimants to get their case heard, resolved in an

10  appropriate and timely manner.

11  Q    Thanks very much for your time, Mr. Mongon.

12  A    Thank you.

13          MS. BROWN:  Thank you, Your Honor.  I have no more

14  questions.

15          THE COURT:  Thank you.

16          Redirect.

17                       REDIRECT EXAMINATION

18  BY MR. GLASSER:

19  Q    Mr. Mongon, I think in response to Ms. Brown's questions,

20  you said several times that there's nothing wrong with the

21  product, right?

22  A    Correct.

23  Q    You believe that today as you sit there on the witness

24  stand, correct?

25  A    I do.

1   Q    You believe there is no asbestos in the product, right?

2   A    I do.

3   Q    And so your view must be then that part of the problem, at

4   least, with these jury verdicts is the perception that it puts

5   on the brand, right?  That's something you don't like.

6   A    I don't like when I talked about the noise, the consumer

7   noise, right.

8   Q    Right.

9   A    Yeah.  Every verdict, right, or trial raises -- creates

10  questions in the minds of consumers and it creates confusion,

11  absolutely.

12  Q    And that confusion hurts the brand, the baby powder brand,

13  right?

14  A    Correct.

15  Q    It hurts the Johnson & Johnson name brand, right?

16  A    The Johnson's baby brand.  Right.

17  Q    And so the tracking of the verdicts, your informational

18  group tracks verdicts and you react to them.  I know there's a

19  financial aspect, but there's also a reputational management

20  aspect to all this monitoring and reacting, right?

21  A    Yes.  Before talking about reputation, it creates

22  questions by consumers, by customers, by health authorities, by

23  journalists that we need to tackle.

24  Q    And so this restructuring was, as you said, the last

25  attempt to get a hold of this problem from a management

Mongon - Redirect/Glasser                                72

1  perspective for the brand, right?

2  A    I think that's the latest attempt to solve these cases.

3  Absolutely.

4  Q    The debtor in this case is LTL.  Do you understand that?

5  A    Huh-uh.

6  Q    Do you understand that LTL manufacturers no baby products?

7  A    Correct.

8  Q    Do you understand that LTL has no advertising budget?

9  A    I'm not aware of what LTL is doing, but.

10  Q    What brand is LTL to protect?

11  A    LTL doesn't have brands.  LTL manages royalty streams.

12  It's a royalty company.

13  Q    So you would agree with me that the Board of LTL should

14  not be trying to protect anybody's brand.

15  A    The Board of LTL should try to solve the talc liabilities

16  and manage through their royalty subsidiary the royalty streams

17  they're in charge of.

18  Q    You understand that the cases, when the juries find that

19  Johnson's Baby Powder caused cancer, negatively impact the

20  brand, right?

21  A    Yes, absolutely.

22  Q    And you talked at length about the Ingham verdict and the

23  Ingham Court of Appeals, but it's a fact that as of the time of

24  your deposition, you had never even read their opinion, right?

25  A    Correct.

Mongon - Redirect/Glasser                                73

1  Q    So to this moment, you don't know why those Honorable

2  Court of Appeals Judges thought that Johnson & Johnson's

3  behavior was reprehensible.  You have no idea why they thought

4  that.

5  A    It's not my job.  I rely on our legal department to

6  analyze and come with their own recommendations.

7  Q    But you do know that now that we're in bankruptcy, the

8  cases have all been stopped, right?

9  A    I do.

10  Q    And juries aren't rendering verdicts that harm Johnson &

11  Johnson's brand right now, are they?

12  A    They are not today.

13  Q    So it's a fortuitous coincidence that the bankruptcy stops

14  the juries harming the brand reputation, right?

15  A    I'm not sure I understand your question.

16  Q    Did you understand when the bankruptcy --

17  A    Is it a question or a --

18  Q    Did you understand that the filing of the bankruptcy would

19  stop all the cases?

20  A    I do.

21  Q    So that was a feature of the bankruptcy, not a mistake.

22  A    Correct.

23         MR. GLASSER:  Can we call up Exhibit 300, please,

24  Rich?

25         MS. BROWN:  Mr. Glasser, do you have a copy for me?

1          MR. GLASSER:  I don't think I have another one.

2          We can call it up on the screen.

3          Can you blow up the middle part, the top half of

4   that, Rich?

5   BY MR. GLASSER:

6   Q    Okay.  This is in the email, Mr. Mongon, that we received

7   after your deposition.

8   A    Okay.

9   Q    The Court ordered it unredacted and that's the part that's

10  (indiscernible).  So when I first got to question you, I didn't

11  have the benefit of having this email, all right.

12  A    Okay.

13  Q    And in the middle, there's a conversation between Michelle

14  Ryan, the Treasurer of Johnson & Johnson, and her deputy, Duane

15  Van Arsdale, who is now the treasurer of Johnson & Johnson,

16  right?

17  A    Correct.  Yeah.

18  Q    And they are discussing Project Diamond.

19  A    Okay.

20  Q    You see that in the middle of the page.

21       Ryan to Van Arsdale, "Okay.  But if Diamond is separated

22  before the Court determines how much needs to be funded into

23  Talc Co., then who will be responsible for the funding of it?"

24       Do you see that question that Ms. Ryan asked Mr. Van

25  Arsdale?

Mongon - Redirect/Glasser                          75

1  A    Yeah, I can see it.

2  Q    All right.  And Mr. Van Arsdale's answer is, "Ultimately,

3  it will be J&J.  The funding agreement is being structured in a

4  way that JJCI can spin out the Diamond assets up the chain or

5  to a new legal entity and be unencumbered going forward."

6       Do you see that?

7  A    I can see it.

8  Q    All right.  Your testimony in this Court was very clear

9  that you understood no linkage between the structuring of the

10 deal and Project Diamond.  That's what you told this Court,

11 right?

12 A    Correct.

13 Q    Is it a shock to you, sir, that the finance arm has

14 structured the transaction so that Diamond Co. can be spun out

15 unencumbered?

16 A    I cannot comment on this.  I'm not familiar with what they

17 are discussing, so I wouldn't be able to tell you.

18 Q    Is this the first moment you ever heard anyone ever say we

19 could spin out Diamond Co. unencumbered?

20 A    I never heard that before.

21       MR. GLASSER:  No further questions, Your Honor.

22       THE COURT:  All right.  Do you have any re --

23       MS. BROWN:  I don't, Your Honor.  Thank you very

24 much.

25       THE COURT:  All right.

1          Mr. Mongon, thank you for your time --

2          THE WITNESS:  Thank you.

3          THE COURT:  -- this morning.

4          My understanding is the next witness -- and you may

5     step down, of course.  Thank you.

6                      (Witness excused)

7          THE COURT:  My understanding is that the next witness

8     is going to be through the video.

9          MR. GLASSER:  Yes, sir.

10          THE COURT:  We'd like to take a five to 10 minute

11     break so we can try to enhance the technology.

12          MR. GLASSER:  That would be great, Your Honor.

13          If we could ask people in the courtroom to get off

14     the internet if they're not necessary for it, I think it would

15     really help.

16          THE COURT:  Wait.

17          MR. GLASSER:  Off the network.

18          THE COURT:  Wait a minute.  There's a car about to be

19     towed on East State Street, maroon color Lexus, four door, New

20     Jersey tag N76-FSV.  If it's your car, get out there.

21          Not a comment that you normally make in Court.

22          (Recess at 10:46 a.m./Reconvened at 11:02 a.m.)

23          MS. BROWN:  Sorry, Your Honor.

24          THE COURT:  No problem.

25          All right.  As a reminder, if it's not necessary,

1  please try to stay off the public wi-fi.  We're slowing

2  everybody down, apparently.  So, if you have hotspots or other

3  avenues, please use it.

4          Counsel.

5          MR. GLASSER:  Thank you, Your Honor.

6          The movants call Michelle Ryan by video deposition.

7          As a housekeeping matter, Your Honor, let me just

8  hand you and Counsel --

9          MS. BROWN:  Thank you.

10          MR. GLASSER:  She will be questioned about

11  Exhibit 106, Your Honor, but you subsequently unredacted it, so

12  I'm giving you the 106 that she had in front of her --

13          THE COURT:  Okay.

14          MR. GLASSER:  that will make sense on the video.  And

15  then, the 106 that has with you later on redacted that we

16  didn't get to talk to her about.

17          And then 300, which I've already given Your Honor

18  from the prior witness, is another one of those.  But there's a

19  box on 300, so you'll be able to tell what she'd see and didn't

20  see at the time of her deposition.

21          Thank you, Your Honor.

22          THE COURT:  All right.

23          UNIDENTIFIED SPEAKER:  Your Honor, if I may?

24          THE COURT:  Yes, please.

25          UNIDENTIFIED SPEAKER:  (Indiscernible)

78

1          THE COURT:  I'm ready to go as soon as you are.

2          UNIDENTIFIED SPEAKER:  All right.

3          THE COURT:  For those on Court Solutions, we'll be

4  going to a video.

5   (Video Deposition of Michelle Ryan played from 11:05:25 a.m.

6                       until 12:18:55 p.m.)

7          MR. GLASSER:  So Your Honor, that included counter

8  designations as well.  So we'll just get the clerk to time what

9  was ours and the time that was theirs.

10          THE COURT:  All right.  It seemed like a long 40

11  minutes.

12                      (Laughter)

13          THE COURT:  All right.  So what -- it's 12:20.  Do

14  you want to take a break?  Do you want to finish?  I assume if

15  there -- what's the plan for the Debtor with respect to this

16  witness?  Anything?

17          MS. BROWN:  Our next witness, Your Honor, will be Mr.

18  Kim.

19          THE COURT:  Okay.  So -- I'm sorry.

20          MR. GLASSER:  We're keeping the record open, Your

21  Honor, because they're going to call Kim and Lisman, we'll

22  cross them, and then we'll probably have Kaplan in the morning,

23  and then everyone will close their evidence.

24          THE COURT:  All right.  Then it's 12:20.  Let's see

25  everybody at 1:30.

Kim - Direct/Brown                                    79

1          ATTORNEYS:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3                          (Recess)

4          THE COURT:  All right.  Back and ready.

5          MS. BROWN:  Ready to go.  Good afternoon, Your Honor.

6  May I approach with --

7          THE COURT:  Yes, please.

8          MS. BROWN:  -- a copy of the, of the dec., and when

9  with the Court's permission, we'd like to call Mr. Kim.

10          THE COURT:  All righty.

11          Mr. Kim, you've seen the routine.

12                   WITNESS JOHN KIM, SWORN

13          THE COURT:  All right.  Have a seat.  Please repeat

14  and spell your name for the record.

15          THE WITNESS:  Good afternoon.  So it's John Kim,

16  J-O-H-N K-I-M.

17          MS. BROWN:  May I proceed, Your Honor?

18          THE COURT:  Yes, you may.

19          MS. BROWN:  Okay.

20                   DIRECT EXAMINATION

21  BY MS. BROWN:

22  Q    Good afternoon, Mr. Kim.

23  A    Good afternoon, Ms. Brown.

24  Q    How are you?

25  A    I'm doing great.

Kim - Direct/Brown                                    80

1  Q    Good.  We have heard a lot about you and read a lot about

2  you so far in this proceeding, but you haven't had a chance to

3  introduce yourself.  Would you please do so?

4  A    Sure.  So I'm John Kim.  I'm a Jersey guy.  I grew up in

5  -- in Northern Jersey, Clifton, Exit 153 off the Parkway.  I

6  now live in Princeton, New Jersey, right about 20 minutes away

7  -- I timed myself this morning -- from the courthouse.  I live

8  there with my -- my lovely wife, who I met in law school, and

9  we raised two boys who are now grown and gone, which gives me

10 more guilt-free time to fly fish and play golf.

11 Q    Okay, Mr. Kim.  You are a lawyer?

12 A    I am.

13 Q    You are currently the chief legal officer at LTL, correct?

14 A    I am.

15 Q    If we could go to your presentation, please.  Mr. Kim,

16 let's start a little bit learning about your education.  Can

17 you tell us where you went to school, please?

18 A    Sure. I got my Juris Doctorate from Fordham University.  I

19 think we're one slide ahead here.

20 Q    Oh, I'm sorry.

21 A    There you go.

22 Q    Okay.  Good?

23 A    Yep.  So I graduated in 1989 from Fordham.  Undergrad I

24 spent in Medford, Mass. at Tufts University, graduated in 1985.

25 Q    Okay.  And why don't you tell us what you did after law

Kim - Direct/Brown                                      81

1  school?

2  A    So after law school, my first job was at Simpson Thatcher

3  & Bartlett, where I was in their litigation group.  The

4  relevant experience for, I guess, these purposes would be I did

5  a number of securities cases, including the fallout from the

6  RJR Nabisco LBO.  I handled a number of bankruptcy cases.  For

7  some reason I wound up doing a lot of -- of airline

8  bankruptcies.  I did -- my first case was the Braniff

9  bankruptcy case.

10          Then I did Continental, too, and Pan-Am.  I also did

11  a lot of insurance work at Simpson.

12  Q    And so you stayed at Simpson for a couple of years; is

13  that right?

14  A    A few years.

15  Q    Twelve years?

16  A    About.

17  Q    About 12.  Okay.  And then at some point you came to

18  Johnson & Johnson; is that right?

19  A    I did.  So I started at Johnson & Johnson in 2001.  In

20  2006 -- at Johnson & Johnson, you start off as a senior

21  counsel.  So if you make it five years, they give you a

22  different title.  You become an assistant general counsel.

23          In 2012, I had my first real substantive change.  I

24  became the practice group lead for the product liability

25  litigation group.

Kim - Direct/Brown                                    82

1    Q    Okay.  And I'll ask you some questions about that.

2              Can you, John, try and move the mic a little closer?

3              Your Honor, can you hear okay?  I wasn't sure.

4              THE COURT:  I can hear.

5              MS. BROWN:  Okay.  Perfect.

6    BY MS. BROWN:

7    Q    So let's talk a little bit, as relevant to our discussions

8    here, let's talk a little bit about your experience leading

9    product liability litigation at J&J.

10             Can you give us some understanding of some of the

11   matters you worked on in that area?

12   A    So basically if the product -- before becoming the product

13   liability group head, I had my own individual matters that I

14   handled in the product liability space.  So for companies like,

15   well, Ethicon Endo-Surgery, I did most of the litigation.

16             The way that the litigation group is set up is that

17   -- well, basically, one of the J&J lawyers would have a client,

18   one of the subsidiaries, and you would handle all the product

19   liability cases for that client.

20             In certain circumstances, when there were mass torts,

21   you may handle for one of the other clients, you know, the mass

22   tort, even though that subsidiary wasn't in your general

23   portfolio.

24             So prior to becoming the group head, I had my own

25   cases.  When I became -- excuse me -- the group head, I then

1  supervised lawyers, six or seven lawyers and paralegals and

2  support staff, who handled sort of day-to-day the litigations

3  for their clients.  But then I would help manage some of the

4  bigger litigations, mass tort litigations.

5  Q    Okay.  And we put together on the slide some of the

6  products, medicines, devices that you worked on litigation for;

7  is that right?

8  A    Correct.  So these are all the mass tort litigations where

9  I either directly managed or managed with someone who reported

10 to me.

11 Q    Okay.  And were -- did any of these mass torts involve

12 multi-district litigation?

13 A    I think virtually all of these involve multi-district

14 litigation except for -- for Risperdal, which for some reason,

15 a lot of plaintiffs are now filing in federal court.

16 Q    And for these mass tort matters, did you try different

17 ways and were you able to achieve resolutions of some of these

18 litigations?

19 A    So for all of the cases on the list, we currently have

20 resolutions or substantial resolutions for most of them, except

21 for the baby powder cases.

22 Q    And at some point in October, you became the chief legal

23 officer for LTL; is that right?

24 A    I did.

25 Q    Okay.  And how did that happen, Mr. Kim, that you came to

Kim - Direct/Brown                                          84

1  be the CLO for LTL?

2  A    So since I became the group head, I've been managing

3  people who had the baby powder litigation for their day-to-day

4  jobs.  And so once it became probably one of the, if not the

5  largest issue that the companies at J&J were facing, I was

6  spending more and more time on those cases, including, as we

7  were trying to resolve these cases, different -- different

8  strategies that we were looking at to -- to deal with them.

9           As we were looking at restructuring options, and we

10 were doing due diligence on whether we could restructure and

11 then with the intent of having the restructured company file

12 bankruptcy, I basically raised my hand and said that I would be

13 interested in taking the chief legal officer position at the --

14 at the restructured organization.

15 Q    You volunteered for the job, Mr. Kim?

16 A    I did volunteer for the job.  I thought -- I thought I

17 would have the best experience, the best fit, all the -- and I

18 knew probably more about it than anyone else in the company,

19 and I felt like I could resolve it.

20           So I volunteered for the position.

21 Q    Let's talk a little bit about how the law department at

22 Johnson &Johnson is structured.

23           Can you help us understand -- you were there for

24 quite a long period of time, over 20 years, 20 years.  Help us

25 understand where the lawyers work and who their clients are.

Kim - Direct/Brown                          85

1  A    So the law department is basically a shared service at the

2  company.  What I mean by that is not all the subsidiaries can

3  have a law department.  I mean, it wouldn't make any sense for

4  that to happen.

5            And so the law department -- all the lawyers are

6  hired by Johnson & Johnson, but then it's like a law firm.  The

7  lawyers in the law department represent their clients and their

8  clients are the various subsidiaries.

9            In fact, every year the lawyers at Johnson & Johnson

10  have to do their, you know, allocation of how much time they

11  spent for each client, and then each client gets billed for --

12  for the services of the -- of the lawyer that was helping them

13  or representing that client.

14  Q    And we have Johnson & Johnson Consumer, Inc., circled

15  here.  As it relates to the talc litigation that we're here

16  discussing, who was your client?

17  A    Well, for the talc litigation, the client is Johnson &

18  Johnson Consumer, Inc.

19  Q    And why is that, Mr. Kim?

20  A    Well, again, we're -- we're lawyers, and like a law firm,

21  we have clients.  And so when the company that's responsible

22  for the product is in litigation, then they are the client that

23  supported -- that the lawyer supports and who gets charged for

24  the law support.

25  Q    Now, Mr. Kim, you've been sitting over here with me this

1  week and you heard Ms. Goodridge testify, you heard Mr.

2  Wuesthoff testify, you heard Mr. Mongon testify, right?

3  A    (No verbal response.)

4  Q    And you saw a number of emails dating back many, many

5  years talking about the talc litigation; is that right?

6  A    That is right.

7  Q    Okay.  I want to start talking to you today and seeing if

8  you can help us understand how we got to where we are now here

9  in this bankruptcy court.  Okay?

10 A    Okay.

11 Q    So, first of all, Mr. Kim, have you -- you and I have been

12 working together to put together some slides to help you talk

13 about this decade-long litigation.

14 A    We have.

15 Q    Okay.  And do we use a lot of information that was

16 contained in your informational brief?

17 A    Both the informational brief and the first day

18 declaration.

19 Q    Okay.  And there were some questions earlier about who

20 wrote the first day declaration, who wrote the informational

21 brief.  Was the informational brief put together at your

22 direction?

23 A    It was.  We did have a group of lawyers -- the talc

24 litigation spans a long period of time.  There are a lot of

25 lawyers involved.  We have two national counsel, one for the

Kim - Direct/Brown                                    87

1  ovarian side, one for the meso side.  They helped write, at my

2  direction, parts of the informational brief, along with Jones

3  Day.

4           And so -- and then they all collaboratively put it

5  together.  I reviewed it, made edits to it, and then it was

6  filed.

7  Q    And to orient us as we walk through how we got here, is

8  the information we're about to talk about and that was

9  contained in the informational brief, is that the information

10 you shared with the board of directors of LTL before they made

11 their decision about bankruptcy?

12 A    Yes.  So first, there was information given to them

13 through -- through presentations.  So, primarily Andrew White,

14 who at that time reported to me and did -- had the day-to-day

15 responsibility for the talc litigation, gave extensive

16 presentations to the board of managers.

17          We then -- we also gave the board of managers drafts

18 of both the information brief and the first day declarations.

19 And then at the board meeting, I went over again the

20 informational -- the material that was covered in presentations

21 and in the declaration -- the first declaration and the

22 information brief.  And so the board of managers had all that

23 information several times in that period.

24 Q    And did the board of LTL, did the directors like Mr.

25 Wuesthoff, who we met earlier this week, did they have the

1  opportunity to ask you questions about the material you were

2  presenting?

3  A    They did.  They asked -- they asked many questions.  It is

4  a lot of material.  I think there's a lot of technical material

5  in there about asbestos and causation, but -- and so they had a

6  lot of questions about that.

7        But the -- you know, the bigger issues, the broader

8  principles of costs and, you know, and the number of cases and

9  things like that, I think they readily understood.

10 Q    Well, let's start with one of those areas, Mr. Kim.  We

11 heard from Mr. Wuesthoff earlier this week that one of the

12 things that was important to him to learn and consider was just

13 the sheer number of cases and the rate that those cases were

14 growing.

15       Is that information you had and you shared with the

16 board?

17 A    It is information I had.  I shared it with the board.

18 It's also in the informational brief and the first day

19 declarations.

20 Q    So did we work together, put together this chart so you

21 could help explain how the litigation started, as we know it,

22 back in 2009, and kind of where we were on the eve of filing in

23 2021?

24 A    Yeah.  So this is just a graphical representation of the

25 numbers that are contained in the information brief, and it

Kim - Direct/Brown                                89

1 just shows from a time line perspective how, you know, in 2009

2 we had one ovarian cancer case.  That was the -- the Berg case.

3 Q    Okay.

4 A    That Berg case, you know, was filed, and then very little

5 was going on while it was being worked up for trial.  It was

6 tried in two thousand --

7 Q    I'm sorry, Mr. Kim.  That's sort of in these intervening

8 years?

9 A    Yeah.  It's from 2009 to 2013.

10 Q    Okay.

11 A    The Berg case is really -- you know, we're prepping it for

12 trial.  In 2013, we tried the Berg case.  It was what I would

13 call a mixed verdict, so -- or a compromise verdict.  The jury

14 in that case found liability, but awarded no damages.  And so

15 that was 2013, which explains why there are no more ovarian

16 cancer cases.

17         But since then, we started getting a trickle of cases

18 in 2004, you know, through 2013, 2014.  And then, you know, as

19 we went forward, we were -- we started trying cases in St.

20 Louis.  And then you see sort of an exponential growth of cases

21 all the way up until -- until the filing here in 2021.

22 Q    And so the bookends of our chart here have one case in

23 2009, filed in the year 2009, and then more than 12,000 cases

24 filed in 2021?

25 A    It's what I would call a classic hockey stick.  Now, I

Kim - Direct/Brown                                        90

1  think others don't like that term.

2  Q    I was going to wait until we got into it.  Okay.  All

3  right.

4  A    But as you can tell, it clearly is an exponential rise in

5  these cases.  It's just a dramatic, you know, wave of cases

6  that -- that got filed and continued to be filed up until the

7  bankruptcy.

8  Q    And in terms of information you've provided to the board

9  and included in the info. brief, did you calculate an average

10 rate of filings from January 2020 to the date of the Chapter 11

11 filing?

12 A    Yeah.  To put it in perspective, we basically calculated

13 that it's -- the company was being served with a complaint

14 every hour, every day, seven days a week.

15 Q    So from January 2020 to October of 2021, every hour of

16 every single day of every day of the week of every week of the

17 year, the company was being sued in ovarian cancer cases?

18 A    Yeah.  That was -- of course, that's an average.  Yes.

19 Q    Did you do some investigation and did you educate the

20 board about what could explain this exponential growth in the

21 rate of filings?

22 A    Yeah.  Our understanding, our belief was that these

23 filings were being prompted by attorney advertising.

24 Q    And did you include information about that in the info.

25 brief?

Kim - Direct/Brown                                91

1  A    Yes.  We have information about that in the information

2  brief.  This is, I think -- I will guarantee you that everyone

3  sitting in this courtroom at some point saw one of these

4  infomercials, these half hour pseudo news shows about talc

5  causing ovarian cancer.

6           And so this is -- this is that infomercial,

7  featuring Dr. Walsh, who actually is not a medical doctor, but

8  --

9  Q    But Dr. Walsh is sitting in one of these chairs; is that

10 right?

11 A    Yes, she is.  She's being interviewed.  The setting is as

12 if it's a news show, news interview.  And Dr. Walsh is

13 basically telling about all the horrors of what she alleges

14 talcum powder is causing, the cancer in women.

15 Q    And it turns out Dr. Walsh is not a medical doctor?

16 A    Not a medical doctor at all, never disclosed.

17 Q    And did you have access to information about how much

18 money plaintiffs' lawyers were spending to purchase these

19 advertisements and run them around the country?

20 A    Yeah.  Since the early times in the St Louis cases, we

21 hired a firm called X Ante, Rusty Silverstein, to monitor the

22 advertising and write reports.  So we've had a number of

23 reports throughout time.

24           This is from the latest report.  And this basically

25 shows the correlation between the amount of advertising and the

1 filings that happen.  And so you can see, you know, from the

2 report, you know, $103 million in advertising has been -- has

3 been placed since 2013.

4 Q    And so tell us what -- the blue line on the screen are the

5 -- is the rate of filings?

6 A    Yes.

7 Q    And the bars --

8 A    The bars are the gray.

9 Q    -- is the amount of money?

10 A    Yeah, the amount of money that's being spent.

11 Q    Okay.  And did you share with the LTL board information

12 about advertising as well?

13 A    Yeah, we did.  We had -- we had advertising information,

14 again, both in the presentation and as you saw in the

15 information brief.

16 Q    And here's some additional information from that report

17 you were referring to.  Tell us what this explains.

18 A    Yes.  Again --

19          MR. JONAS:  Your Honor.

20          THE COURT:  Yes.

21          MR. JONAS:  I object to the use of the slide and the

22 information.  I'm not sure where the report -- I think this

23 comes from Dr. Bell, one of their expert reports, if I'm not

24 wrong.  I don't -- I don't know why -- I don't -- when we hear

25 Dr. Bell, we'll hear what he has to say, but I don't think this

Kim - Direct/Brown                                         93

1 witness can testify to something in one of their expert

2 reports.

3             THE COURT:  I'll sustain.

4             MS. BROWN:  Can I lay the foundation, Your Honor?

5             THE COURT:  Go ahead.

6             MS. BROWN:  Thanks.

7 BY MS. BROWN:

8 Q    You mentioned a moment ago that the company had

9 commissioned some reports about how much lawyers were spending

10 to advertise and where they were advertising.

11 A    Correct.  We -- we hired X Ante for Dr. Bell.  We

12 introduced X Ante and Rusty Silverstein to Dr. Bell.  These are

13 the reports that -- that X Ante generally does for us.

14             This -- the one that Dr. Bell used is just an update

15 of reports that Rusty Silverstein has done for us in the past.

16 Q    And when you say in the past, was that before you even

17 became the chief legal officer?

18 A    Yes.  When I say "we" it's for -- you know, for JJCI in

19 its case.  You know, Rusty -- X Ante has been following media

20 and -- and reporting on it to us.

21 Q    And are you generally familiar with the content of those

22 reports?

23 A    I am.

24 Q    And did you rely on that content in the course of your

25 role at -- working for JJCI?

Kim - Direct/Brown                            94

1  A    I did.

2          MS. BROWN:  Your Honor, may I ask some questions with

3  that condition?

4          THE COURT:  Yes.  Go ahead.

5          MS. BROWN:  Thank you.

6  BY MS. BROWN:

7  Q    And in terms of this particular report that we've been

8  talking about, what information did you learn regarding the

9  average number of ads that have been running every day in this

10 country since 2013?

11 A    Again, this is -- again, to put things in perspective,

12 there's an average of 117 talc ads per day since December 1st,

13 2013.  This is nationwide.

14 Q    Okay.  And did you learn in that very same report any

15 information about some of the law firms and their locations

16 that were buying these advertisements?

17 A    Yeah.  So we learned that the -- you know, the -- and we

18 -- frankly, we knew the spending of the OnderLaw firm.  So we

19 -- we, you know, the report confirms that the OnderLaw firm

20 spent about $11 million on ads.

21          So they're a St. Louis based firm.  And, you know,

22 their spending represents about 11 percent of the estimated

23 spending on all ads.

24 Q    And just to reorient, as the Court has heard quite a bit

25 about the Ingham case --

Kim - Direct/Brown                        95

1  A     Yes.

2  Q     And can you just remind us where the Ingham case was

3  tried?

4  A     The Ingham case was tried in St. Louis.

5  Q     I want to talk about some of the early cases that went to

6  trial.  And, in fact, where did those early ovarian cancer

7  cases try?

8  A     So after the Berg case, we had a series of cases in St.

9  Louis.

10  Q     And tell us about what happened in those cases, the years

11  they tried, and what the verdicts were.

12  A     So, again, this is sort of a representation that tells you

13  exactly what the name of the case was and the verdicts.  I

14  attended all four of these trials in St. Louis.

15         You know, they were -- yeah, they were -- especially

16  the Fox trial, when the Fox verdict came in, it was -- again,

17  that was the first actual monetary verdict that we -- that J&J

18  Company had for ovarian cancer and talc.  That $72 million

19  verdict was a very -- very well -- you know, the media really

20  spent a lot of time on that verdict.  And so it was -- it was

21  very concerning.

22         And then we had these follow-on verdicts that

23  happened in St. Louis with the same judge, in the same

24  courthouse, with the same Plaintiff's lawyer.  You know, with

25  the -- again, with all the advertising that was going on in St.

1  Louis, basically the -- the one thing about advertising, not

2  only did it -- did it increase the number of cases, but we

3  really felt that it affected the jury pool, that there was a

4  lot of jury pollution.

5          In fact, that's the first time we hired Rusty

6  Silverstein at X Ante to write a report on -- on the saturation

7  of advertising in the St. Louis area.

8          And so these -- that trial, we had these verdicts.

9  All of them -- all of them got reversed.  All of them got

10 reversed.

11 Q    So I want to ask you a couple of things about that,

12 because the Court knows that Mr. Wuesthoff was here earlier

13 this week, and he talked a lot about how much it costs to try a

14 case and how much it costs, you know, to generally defend a

15 case.

16         Are those averages that Mr. Wuesthoff provided, are

17 those applicable to these four early cases that we're looking

18 at?

19 A    Yeah.  So the average that we have is about $2 million to

20 $5 million for trial.  So that's just trial work, like once we

21 start, you know, getting a trial date, picking a jury, running

22 the trial.

23         These cases though -- when the cases are early in the

24 -- in the cycle, then they cost more to do because, you know,

25 you're starting everything from scratch.  So my guess is that

1  these trials cost at least $7 million, maybe $10 million each

2  to try.  There were extensive -- you know, they took a long

3  time to try in that jurisdiction.

4  Q    And were these verdicts in each case for individual

5  plaintiffs or for multiple plaintiffs?

6  A    These four were individual plaintiff cases.

7  Q    So, for example, in the Slemp case, a jury awarded an

8  individual plaintiff $110.4 million; is that right?

9  A    That's correct.

10 Q    Okay.  And the company would have not only been

11 responsible for that judgment, but also for the cost to work up

12 the case and to try the case?

13 A    And the cost of appeal once we -- once we got the verdict,

14 which, again, took years to go through, and ultimately we

15 prevailed on appeal.

16 Q    And in terms of how these cases turned out, what happened

17 on appeal with each one of these cases?

18 A    They were all reversed and remanded back.  So basically we

19 spent years on trying cases in St. Louis, millions of dollars,

20 and then basically after the appeal, we're back at square one

21 with these.

22 Q    And just shifting from kind of where the company is, what

23 about where these individual plaintiffs were after the time

24 spent to get these cases to trial, to stand by for an appeal?

25 Where were these individual plaintiffs left at the end of the

Kim - Direct/Brown                                    98

1  day when these cases were reversed?

2  A    Again, I don't know their individual statuses, but again,

3  they would be at ground zero, just as we were.  So basically

4  we'd be right back at the beginning of trying to deal with

5  these cases.

6

7  Q    And Mr. Kim, we're looking at some of these trial dates,

8  you know, back in 2016.  In 2021, were you aware that any of

9  these individual plaintiffs reached final judgment?

10 A    No.  So, again, even with the -- you know, the Fox trial

11 was the first trial, 2016.  It has not been retried.

12 Q    Moving along, Mr. Kim, in our sort of history of the

13 litigation, was this an inflection point?  Did something change

14 in terms of how the plan as far as approaching these cases,

15 having won and then lost all of these?

16 A    You know, the focus of the trials changed in this period.

17 You know, as we -- as we were trying these cases, there was

18 also cases being worked up in New Jersey State Court.

19         And the first two cases up for trial were on summary

20 judgment and -- and summary judgment was granted, mostly

21 because there was no mechanism of action that was -- that was

22 found.

23         And so I think plaintiffs, based on that and other

24 things that were going on, started shifting from -- so these

25 cases were tried on a "talc causes ovarian cancer" theory,

Kim - Direct/Brown                                99

1  right?  So the theory was that talc itself was causing ovarian

2  cancer.

3          Well, you know, as we got more into the science and

4  -- and the New Jersey courts looked at it, that really turned

5  out not to be a viable theory for plaintiffs.  And so they

6  started looking around for an alternative mechanism of action.

7

8  And -- and they discovered -- well, they started putting

9  allegations of asbestos contamination in as -- as a mechanism

10  of action for ovarian cancer.

11          And then once they started putting ovarian -- you

12  know, asbestos as a mechanism of action for ovarian cancer, we

13  started getting a lot more meso cases, because I guess the

14  theory is is that if there's asbestos in talc causing ovarian

15  cancer, then that asbestos must also be causing all this

16  mesothelioma.

17          And so the asbestos theories really started to come

18  to the front in this time period.

19  Q    And what was the first ovarian cancer case that tried

20  under a true asbestos theory?

21  A    That was -- that was the Ingham case that everyone has

22  been talking about.

23  Q    And can you tell us where the Ingham case tried and where

24  the 22 plaintiffs in that case were from?

25  A    So Ingham was tried in St. Louis.  Ingham was part of a --

Kim - Direct/Brown                          100

1  a strategy for filings in -- in Missouri where there would be

2  multi-plaintiff complaints of not more than 99 plaintiffs,

3  because once you hit a hundred, then the Class Action Fairness

4  Act stuff kicks in.

5        And so they're under a hundred plaintiffs, generally

6  with at least a couple from Missouri.  If they could find

7  someone from St. Louis, they would put someone from St. Louis

8  in to get venue.  And also they had included at least one

9  plaintiff from New Jersey so that you could not get diversity

10 jurisdiction, and you couldn't get it removed to federal court.

11        So Ingham was -- was one of those cases that -- that

12 was filed that way.  And so it had 22 plaintiffs from around

13 the country, a couple, a few from -- from Missouri, I think one

14 of them actually from St. Louis, and one plaintiff from New

15 Jersey so that we could not remove it to federal court and put

16 it into the MDL.

17 Q    And the Court well knows the result, but remind us what

18 happened when the jury came back in Ingham.

19 A    It was a $4.69 billion judgment for 22 plaintiffs.

20 Q    Okay.  And how did that -- I want to show you the slide.

21 I think my clicker is not working anymore.  Sorry.

22        Judge, can I have just a moment to switch?

23        THE COURT:  Sure.

24        MS. BROWN:  Thank you.  Okay.  Thank you.

25 BY MS. BROWN:

Kim - Direct/Brown                          101

1  Q    And how did that break down on a per plaintiff basis?

2  A    Yeah, if you do the math, it's about $213 million per

3  plaintiff.  So, but there -- so there are two -- two things,

4  takeaways that we got from that.

5        One is a per plaintiff number.  It is a large per

6  plaintiff number.  But also, you know, the -- having a judgment

7  of $4.69 billion, so having 22 plaintiffs together and having

8  that huge amount of money being awarded by -- by a single jury

9  was staggering.  And so those are sort of the two takeaways

10  from -- from that.

11  Q    And how does a judgment like this $4.69 billion compare to

12  all civil jury trials that happened in the history of archive?

13  A    So my understanding is that the $4.69 billion judgment is

14  the fifth largest in the history of personal injury verdicts in

15  the United States.

16  Q    And in terms of that magnitude, is this information you

17  included in the informational brief --

18  A    Yes.

19  Q    -- and told the board?

20  A    The board was well aware of the status of Ingham and how

21  much it was and how large the verdict was and where it stood.

22  Q    And certainly the 4.69 figure is -- is eye-popping, but if

23  you -- if you look at the Ingham case on a per plaintiff award

24  basis, was JJCI facing other verdicts of that magnitude?

25  A    It was.  So, you know, the -- this is the list of the

Kim - Direct/Brown                                102

1 other large verdicts on a per plaintiff basis.  So, again, you

2 know, the Ingham -- Ingham is an outlier, yes.  But there are

3 other cases on a per plaintiff basis that come very close or

4 exceed Ingham.

5         We haven't had 22 plaintiffs together again, but

6 multi-plaintiff trials still occur.  And, frankly, if one court

7 without reversal was able to do a 22-plaintiff case, then we

8 are afraid that -- that because of the pressure of how many

9 cases there are, that there's going to be pressure for other

10 courts to have, you know, large multi-plaintiff cases, which --

11 which we believe would be due process violations.

12 Q   And so if we just look at this verdict, Mr. Kim, is it the

13 case that even a year after Ingham, on a per plaintiff basis,

14 the Olson jury came back with almost a hundred million dollar

15 greater award than the Ingham jury did?

16 A   Yes, that's correct.  That's correct.

17 Q   And just the year before Ingham, the Echeverria jury came

18 back with almost double the per plaintiff award of Ingham; is

19 that right?

20 A   That is -- that is correct.

21 Q   And what were the indications in your mind, Mr. Kim, about

22 whether plaintiffs were trying their cases in a way that would

23 result or could result in another Ingham verdict?

24 A   Yeah.  So, what we -- what we found -- I think Mr.

25 Wuesthoff may have -- may have mentioned this as well, is that

1  what we do know is that, you know, when the plaintiffs' lawyers

2  are asking juries for awards, they're asking, you know, these

3  -- these very large numbers.

4          So for example, in the <u>Johnson</u> case, which was the

5  case that was tried just before filing, the plaintiff in that

6  case asked for $8.15 billion.  Now, the jury did not award

7  that.  But the thought that -- that, you know, the -- for us,

8  what our belief was that plaintiffs can -- can stand up there,

9  and if they can, with a straight face, ask for these billions

10  of dollars to a jury, then really there's very little that

11  stops a jury from adopting their -- their calculation and

12  awarding this type of -- of figure.

13          So the risk is there that, you know, there could be a

14  repeat of -- of <u>Ingham</u>-like results.

15  Q   There's been some questioning and arguing in this case

16  about the time between the formation of LTL and the board's

17  decision to file for bankruptcy.

18          Am I understanding correctly, Mr. Kim, that on the

19  eve of that decision there was a case going to verdict in which

20  the lawyers were asking for $8 billion for a single plaintiff?

21  A   That -- that is true.  What that really -- what that

22  really shows is that, you know, we understood -- the board

23  understood that the decision to file bankruptcy was something

24  that they wanted to consider.

25          And if they were going to do it, it would only make

1  sense to do it immediately.  You know, there was no sense that

2  -- it would -- it would not make sense with the amount of money

3  we were spending on costs, so that's, you know, $10 billion to

4  $20 billion a year, the verdicts that are -- you know, what

5  they were asking for in verdicts in trials that were going on

6  and would be going on in the future, that it made no sense to,

7  if we're going to do it, to delay it.

8  Q    And I want to shift into that area, Mr. Kim, and talk a

9  little bit about costs now.  Were the costs of defending this

10 litigation a topic that you educated the board of LTL about?

11 A    Very much so.  Yes.

12 Q    And we have some of Mr. Wuesthoff's slides in here, and I

13 want to ask you some additional questions about how much it

14 costs and how much it was projected to cost to remain in the

15 tort system.

16        Mr. Wuesthoff told us that general defense costs were

17 running about $10 million to $20 million a month leading up to

18 the filing; is that right?

19 A    Yeah.  That's an average per month.

20 Q    Okay.  And can you give us an idea of what these general

21 costs involved?  What does it take to work up a case for trial

22 and what kind of things are being expensed?

23 A    Yeah, so these talc trials are very heavily disputed,

24 right?  There is -- there's a dispute about whether there's

25 asbestos in the product.  There's disputes about causation.

Kim - Direct/Brown                                                105

1   There's disputes about, you know, sometimes usage.

2          In other words, you know, that we've had testimony of

3   people saying that they bought product at, for example, Rite

4   Aids.  And you can pull up all the Rite Aid records of someone

5   with a purchasing card and determine whether they -- whether

6   they purchased stuff there.  So there's discovery issues.

7          So, you know, then on the causation, we hire a

8   service.  The service has to contact all medical providers for

9   a patient.  So a single -- a single plaintiff has -- has gone

10  to numerous doctors, because not only are we looking for

11  causation for talc, you know, related -- you know, the talc

12  allegations, but any other alternative allegations --

13  alternative medical issues that we can find.

14         And so basically we have a service that has to get

15  all the medical records from the beginning of time for every

16  plaintiff.  And so you have to pay for medical records and then

17  reviews.

18         You have depositions.  You have the written

19  discovery.  Experts.  You have, you know, again, causation

20  experts that we have to do.  In certain states, when you take a

21  deposition of the plaintiff's expert, you have to pay for that

22  as well.

23         And so, you know, the pretrial costs for any

24  individual case -- so this is not even counting the $2 million

25  to $5 million it takes to try the case, but the -- the lead up

Kim - Direct/Brown                                106

1  expenses for any individual plaintiff are enormous.  And these

2  are just a few examples of it.

3  Q    And for the list of four cases that we looked at in the

4  beginning that first tried in St. Louis and were subsequently

5  reversed, would JJCI have paid the costs of all of these tasks,

6  only to find everybody back at the beginning?

7  A    Yes.  That's what -- that's what happens.  You go -- you

8  go through the cost and then, you know, you do the trial, and

9  then you have the appellate costs.  And the one thing I should

10 note, these are not costs that go to claimants, right?  These

11 are what I would consider -- frankly, what I would call wasted

12 costs to the system.  These are just the transactional costs of

13 doing, you know, the -- going through the processes that you

14 need in order to come to -- to a trial.

15           And so, you know, again, these are not -- these are

16 not costs that -- you know, this is just expended expenditures

17 that are -- that are wasted in the system.

18 Q    And Mr. Wuesthoff told us that once you do all of that,

19 once you go through the months of discovery and you pay the

20 $10 million to $20 million a month, there were trial costs,

21 $2 million to $5 million per trial.

22           And Mr. Wuesthoff did the math for us, that that

23 could take you up to almost $200 billion if all of the cases

24 pending at the time of filing went forward.

25 A    And so this number is -- would be -- this number would

Kim - Direct/Brown                                    107

1  just be for doing the trials.  It doesn't include the workup of

2  38,000, the -- you know, the -- you know, so these are just

3  trial costs for those claims.

4  Q    And included in your informational brief, Mr. Kim, were

5  the amount of defense costs that had been paid at the date of

6  the filing.  And what was that?

7  A    So as of the filing date, that was -- a billion dollars

8  had been spent on costs up to the time of the petition.  But

9  that actually doesn't include -- that doesn't include the MDL

10  costs.  And also, for all the other costs, it doesn't include

11  -- you know, when you're projecting out, it doesn't include

12  futures.

13          So again, remember that the allegation that

14  plaintiffs are making is that there's a 60-year latency period.

15  And so we keep using the 38,000 number, because it's

16  convenient, but there is some number of cases that we don't

17  even know yet that are -- that are -- will be coming to the

18  future that are not even included in this.

19  Q    Did any single plaintiff get a penny of this one billion

20  dollars that JJCI spent working up these cases?

21  A    Again, these are not costs that go to claimants.  These

22  are just the costs expended into the system to get ready for

23  trials.

24  Q    And in many cases, those trials get reversed?

25  A    Get reversed.  And those are -- again, those would be what

Kim - Direct/Brown                                 108

1   I would consider wasted costs.

2   Q    You mentioned this doesn't include MDL costs.  Tell us

3   what you mean by that.

4   A    So we -- we expect, as this suggests, basically a tidal

5   wave of costs as the MDL proceeds, so -- or would have

6   proceeded.  So maybe we could go to the current status of what

7   the MDL is.

8   Q    Okay.  So did we put together -- so as I understand, at

9   the time of the filing, Mr. Kim, how many cases were still in

10  the MDL?

11  A    So as of the filing, there were 35,000 cases in the MDL.

12  Q    And did we try to put together a slide so you could help

13  explain how those cases would proceed and what the expected

14  costs would be?

15  A    Yeah.  So, as it states, since October 4th, 2016, there

16  are now 35,000 cases pending in the MDL.  So yeah, I think

17  people understand, MDLs are put together for pre-trial

18  practices, right?  That's that's the purpose of an MDL, you

19  know, to do the pretrial discovery work.

20          In the -- this MDL, we -- what we did was we focused

21  more on the Daubert issues, because it's so scientifically

22  heavy, these cases, that we wanted to focus -- that both sides

23  agreed to do Daubert first.

24          And so for the 35,000 cases that are pending,

25  virtually no discovery had been done on them, no individual

1 discovery.  There's --

2 Q    Mr. Kim, if I could stop you there.  It looks, though,

3 that the MDL was formed in 2006.

4 A    I'm sorry.  Yes.

5 Q    In '16, 2016.

6 A    '16, yeah.

7 Q    Okay.  And so are you telling us that because the focus

8 was on scientific issues, for five years after that individual

9 discovery wasn't being done?

10 A    That's correct.

11 Q    Okay.

12 A    So there was no individual discovery being done in those

13 cases.  Now that the <u>Daubert</u> decision had been rendered the

14 process that was put into place was that out of the 35,000,

15 1,000 of those cases were selected for what they call plaintiff

16 profile forms.

17      So the plaintiff profile forms are just sort of basic

18 information about the particular case.  And what we were

19 supposed to have done is you take the basic information and

20 then from that, 30 cases -- there'd be a mix between

21 plaintiffs' picks and defense picks -- 30 cases out of the

22 35,000 are selected to do -- were selected.

23      So that process happened, were selected to do individual

24 discovery.  Right.  So out of that discovery what hasn't

25 happened -- hadn't happened yet was that six bellwether cases

1  would have been chosen.  The judge, Judge Wolfson, indicated

2  that she planned to try a handful of the bellwether cases.

3  Q    Um-hum.

4  A    And so after the handful of bellwether cases you still

5  have, you know, 34,000, you know, 940 cases left with no

6  discovery being done.

7  Q    Um-hum.

8  A    Plus the cases that would have been filed in the meantime.

9  Q    Um-hum.

10  A    And generally, the next step is either to do individual

11  discovery in the MDL in waves, which would mean, you know,

12  enormous cost.  We usually do 100 cases at a time for

13  individual discovery.  Or -- and then once that discovery is

14  done, send them back to their jurisdictions of origination, or

15  they could do -- send them back to the jurisdiction of

16  origination and then they'd have to do discovery there, before

17  they could be put -- be ready for trial.

18       So we're talking about, you know, perhaps a years long

19  process, many years long in order for an MDL plaintiff at this

20  point to even -- to even see a trial.

21  Q    And Mr. Kim, when the cases are sent back to the states

22  where they originated is everybody first in line for a trial in

23  their home state?

24  A    I think it's going to --

25  Q    Their state of filing?

Kim - Direct/Brown                                111

1  A    Yeah.  It would depend on the -- it would depend on how

2  the state -- the MDL -- I'm sorry -- the federal judge in the

3  state that it got returned to, how that judge, how she wanted

4  to deal with it.  So you know, maybe they'll get some

5  preference, but generally, I don't think there's any rule for

6  that.  And so it would depend upon the individual judge.

7  Q    And --

8  A    And depend upon how many cases were sent back.

9  Q    And so to finish off our MDL discussion, help us

10 understand how, knowing that these 35,000 cases by and large

11 had not been worked up and were sent -- set to be sent back,

12 how that impacted your view of potential future costs?

13 A    Yeah.  The cost estimation that we were using, the

14 historical information that we had, really, we expected to,

15 again, multiply by, you know, by large factors once the MDL

16 started either doing discovery, or waive discovery or started

17 sending cases back.

18      So you know, we -- whatever we spent was going to be --

19 you know -- we considered it minuscule compared to what we --

20 we might -- we might spend.  And we've seen this before.  So

21 you know, we've -- this has happened to us, for example, in

22 mesh cases and other cases, where the costs of the MDL multiply

23 once -- once it starts doing individual cases and individual

24 discovery.

25 Q    Now, Mr. Kim, up to this point we've been talking a lot

1  about monetary costs, how much you got to pay to work the cases

2  up and to try the cases, but are there also operational,

3  employee costs on the company to support cases like this?

4  A    Yes.  I think -- I think you heard Ms. Goodridge talk

5  about a Dr. Kuffner.

6  Q    And tell us about that?

7  A    So you know, Dr. Kuffner is the chief medical officer.  He

8  -- you know -- his day job -- his main job is coming up with

9  lifesaving products, or you know, life altering products for

10  consumers.  But you know, he got pulled into the top litigation

11  and now spends a large amount of time testifying, you know,

12  preparing for testimony, dealing with the media issues that

13  arise out of the top litigation.

14      So you know, his -- he's being diverted.  There are other

15  people that work for him that are being diverted.  You know,

16  there are people -- you know -- business folks at the companies

17  whose time is being diverted because of this talc litigation.

18  It is a burden on the company, as Ms. Goodridge had testified

19  about.

20  Q    Nevertheless, though, Mr. Kim, did you have an opportunity

21  to read some of the amicus briefs that were submitted in this

22  case?

23  A    I did.  I did read --

24  Q    And do you understand that at least one of them advocates

25  that despite the issues that you've raised about cost and

1  length of time, MDL is the answer?

2  A    I would disagree with their remarks.  So you know, having

3  done probably more MDLs than anyone in the country -- and it's

4  -- for whatever reason, Johnson & Johnson companies have been

5  sued in a tremendous number of MDLs.  What I can tell you is

6  that, first of all, MDLs only deal with federal actions.

7       So there are -- there's a large number of estate actions

8  that would not be covered in the MDL.  Now, the MDL can work

9  for resolving cases in certain circumstances, and what my

10 experience would be that, for example, you know, in a

11 pharmaceutical litigation involving a drug where there's a

12 defined group of people that you know took the drug, and you

13 know that, for example, once they take a drug they're going to

14 have a reaction, an adverse reaction in -- you know -- in 30

15 days, then you can figure out, you know, the universe of people

16 that could be affected and try to effect, you know, a rational

17 resolution of that.  The talc cases are very, very different.

18 Q    Why is that?

19 A    So first, the ubiquity of the use of talc, right.  So talc

20 has been around for a very long time, and virtually everyone in

21 this country can allege that they have been exposed to baby

22 powder.  There's not a single person, I can guarantee you,

23 there's not a single person who can't say in some form or

24 fashion that they haven't been exposed to baby powder.

25      Then there's the latency period, which, again, plaintiffs

Kim - Direct/Brown                                        114

1  say is about 60 years.  And so what that creates is this

2  huge -- this huge risk for us about future claims that really

3  cannot be addressed in an MDL.  Right.  So the MDL does not --

4  unlike a Bankruptcy Court, it doesn't have a future claims

5  representative, for example.

6      And you cannot deal, because of various Supreme Court

7  rulings, you know, you cannot in class actions deal with -- you

8  know -- these claims -- it's unrepresented people, these

9  claimants.  And so, you know, because of that, the talc

10 litigation is very different and I would say that, you know,

11 there's no MDL solution that we could find for these cases.

12 Q    Mr. Kim, did you have the opportunity to read the

13 declarations that were filed in this case from two of the

14 claimants?

15 A    I did.

16 Q    Okay.  I want to ask you a couple of questions about them,

17 but before I do that I want to make sure we're clear.  By

18 talking about the specifics of any individual person's claim,

19 are we in any way meaning to take away from the pain of the

20 horrible disease these folks are suffering for?

21 A    Yeah, absolutely not.  So what I would say is the -- these

22 plaintiffs are seriously injured.  They're ill.  They have, you

23 know, a disease, I think we heard yesterday, that virtually

24 everyone with these cancers will die.  So it is tragic, what's

25 happening to these folks.

1    But you know, I think as people have heard from various

2  witnesses, we do not believe -- we've looked at the science.

3  I've been to all the trials.  Based on all the testimony, I do

4  not believe that there's asbestos in the product or that our

5  products are causing cancer.  But again, we do feel sorry for

6  anyone that has to go through this diagnosis of cancer.

7  Q    I want to ask you some questions about Dr. Love's

8  declaration.  Did you see that Dr. Love raised a concern that

9  this bankruptcy could delay her ability to get resolution to

10  her claim?  And did you have an opportunity to look into Dr.

11  Love's case?

12  A    So I did.  And again, it's tragic that she's -- has to

13  suffer.  And I completely understand that she might be

14  frustrated with what she perceives is what's going on in the

15  bankruptcy.  But you know, Dr. Love, as I explained the process

16  that was being used in the MDL, Dr. Love was not selected to be

17  part of the process for working up claims.

18    So her -- she sits in the MDL like the other 34,000

19  plaintiffs who are not going to be in the bellwether process.

20  And so I'm not sure whether -- I don't know whether she was --

21  it was explained to her, but you know, she would have to -- she

22  has to first wait -- she would have to wait for the bellwether

23  process to get concluded, and then she would have to wait to

24  see what the process -- the next process would be as to how to

25  get her individual discovery done, along with 34,000 whatever

Kim - Direct/Brown                                    116

1  the odd number of other plaintiffs, and then she would have to

2  wait for a trial.

3       And so I -- you know -- I firmly believe that, you know, a

4  bankruptcy resolution would be better for her than having to

5  wait for the MDL, with the added risk of, you know, going to

6  trial and losing, or going to trial, winning, having an appeal

7  go on for years and then getting it reversed.

8       So again, I think, you know, looking at this objectively,

9  I would think that the bankruptcy option would be better for

10 her.  But again, I don't know what her understanding is and her

11 level of frustration, and so you know, I do feel for her.  But

12 you know, objectively speaking, I would say she would be better

13 off in the bankruptcy solution.

14 Q    Mr. Kim, are individual plaintiff claims like Dr. Love the

15 only claims in this area of talc and talc liabilities that Old

16 JJCI affects?

17 A    No.  There's been a lot of other types of actions that

18 have been ongoing in these cases.  So I think Your Honor knows

19 already about the Canadian class actions suits we had, one of

20 the Canadian class plaintiffs come in.  You know, we have

21 attorney general actions.

22      So we wrote -- we had been told that 42 state attorney

23 generals are investigating this -- the talc issue.  Frankly,

24 they're hiring the same plaintiffs' attorneys that are in the

25 mass torts.  And so they are looking -- they have told us that

Kim - Direct/Brown                                    117

1  they are looking at these actions.

2       At least two of them had already sued.  So we have

3  attorney generals actions in Mississippi and in Nevada.  We

4  have -- we had ERISA actions that arose out of the same events,

5  all the same allegations of asbestos in the product causing

6  cancer.

7       Of course, we had the indemnification actions from both

8  the retailers who generally are being sued similarly to naming

9  a New Jersey plaintiff in an action to prevent diversity

10 jurisdiction.  The retailer where the store where the plaintiff

11 bought the product is also being sued and -- to try to defeat

12 diversity.  And we have to indemnify those retailers.

13      We have suppliers that have been indemnified and sued.

14 Imerys is a good example of that.  And again, we have

15 government investigations, shareholder derivative actions, all

16 stemming from the same allegations.  Frankly, most of them,

17 again represented by the same plaintiffs [sic] who are doing

18 the personal injury actions.

19      But again, they -- their allegation is that there's

20 asbestos in the product causing cancer and leading to these

21 actions.

22 Q   Mr. Kim, did you update the board of LTL about these

23 actions, including the personal injury actions?

24 A   Yes.  They were -- they were told about all the other

25 actions that were ongoing.

Kim - Direct/Brown                                    118

1  Q    Okay.  And in terms of your view as probably the person

2  with the most front line experience defending these cases for

3  over a decade, after all of this information, the costs, the

4  time, the appeals, what was your assessment of the scope of

5  this litigation?

6  A    Again, I think as I've testified at my deposition and in

7  North Carolina, this -- the level of litigation here I have

8  never seen before, and frankly, I would think that it would be

9  unsustainable for any company.  I can't think of a company that

10 could deal with this without suffering -- suffering financial

11 distress.

12 Q    Mr. Kim, did you try over the time period you were leading

13 the product liability group on behalf of JJCI, did you try and

14 resolve this litigation?

15 A    We -- there are many, many efforts to resolve this

16 litigation in many ways at different time periods.

17 Q    Was the first just, let's try these cases?

18 A    Yeah.  So again, as I said, you know, we stand behind the

19 product.  I've seen all the experts.  I've seen their expert

20 reports.  I've attended virtually all the trials.  You know,

21 they're -- we wholeheartedly believe that the product is safe,

22 does not contain asbestos and is not causing cancer.

23      So generally, our position, you know, throughout most of

24 the litigation was that we are going to fight this.  We are

25 going to go to trials.  We're going to -- yeah, we're going to

Kim - Direct/Brown                                    119

1  fight these cases in the jury system.

2  Q    Okay.  And in terms of standing up for the safety of this

3  product and for the belief that it's not causing these horrible

4  diseases, from a plaintiff's and a claimant's perspective was

5  that able to resolve cases in any meaningful way for these tens

6  of thousands of mostly women who are bringing these claims?

7  A    So, I mean, what this graphic really illustrates is that

8  they are 49 trials that were -- that were conducted.  Some of

9  them -- most of them resulted in defense verdicts.  Some of

10 them resulted in plaintiffs' verdicts.  Many of the plaintiffs'

11 verdicts that happened were reversed.  So they're back to

12 square one.

13      Basically, over this period of time, if you -- when you

14 think about, you know, how many cases did this -- did the jury

15 trial system actually get rid of, like, how many of these, just

16 a handful.

17 Q    Um-hum.

18 A    You know, a handful of cases that went through this trial

19 system actually had a result at the end of the day.

20 Q    And so if we look at this 49 number, in the course of

21 almost a decade we got 40 cases to trial or to the start of a

22 trial.  Is that right?

23 A    That's correct.

24 Q    And some of those cases mis-tried and never even made it

25 to a jury, right?

Kim - Direct/Brown                                    120

1  A    Never -- or never made it to verdict, yes.

2  Q    Or never made it to verdict.  Some of those cases, most of

3  those cases resulted in defense verdicts, right?

4  A    That's correct.

5  Q    A bunch of those cases went all the way through the jury

6  trial process, the appeal process and got reversed and sent

7  back down, right?

8  A    Correct, so starting at, again, square one.

9  Q    And in the meantime billions of dollars were spent in

10 defense costs?

11 A    Billions -- again, billions of dollars were spent that did

12 not go to claimants, just want to waste into the system.

13 Q    And if we look at it graphically, help us understand, you

14 know, what these verdicts look like and what the resolution

15 was?

16 A    Well, I think people have heard the term "lottery like."

17 By "lottery like" what we mean is that, you know, the process

18 of going through trial is like playing the lottery.  You know,

19 it is -- you get inconsistent results, frankly, in my opinion,

20 a lot of it based on luck of the draw.

21      You get many zeros.  So those are defense verdicts, and

22 you get, you know, numerous cases with a multi -- multi-million

23 dollar -- so if you do it by per plaintiff, you know, 400

24 million -- multi-million dollar results for a handful of

25 plaintiffs.  And so what this -- this really shows sort of the

                         Kim - Direct/Brown                    121

1  inconsistency in the trial system.

2  Q    What about the two cases that were tried right before the

3  bankruptcy filing?  What does that tell you --

4  A    Yeah.

5  Q    -- about the jury trial system as a fair or an equitable

6  way to resolve these cases?

7  A    Yes.  We --

8            THE COURT:  Ms. Brown, we're going to take a break

9  for --

10           MS. BROWN:  Of course.

11           THE COURT:  -- two minutes.  We're having some audio.

12           MS. BROWN:  Of course, Your Honor.

13           THE COURT:  For Zoom and Court Solutions.

14           MS. BROWN:  Sure.

15           THE COURT:  Now, good chance to take a drink, take a

16  breather.

17           MS. BROWN:  Have a glass of water.

18             (Recess at 2:33 p.m., until 2:42 p.m.)

19           MS. BROWN:  But not me, right, Judge?

20           THE COURT:  No.  You stay.

21           MS. BROWN:  Okay.

22                         (Laughter)

23           MS. BROWN:  Okay.  Thank you.

24           THE COURT:  Now, we've lost Court Solutions.  We're

25  just on Zoom.

1          MS. BROWN:  Okay.  You have enough water?

2          THE WITNESS:  I do.  Thank you.

3          THE COURT:  All right.  My apologies.  Continue,

4   please.

5          MS. BROWN:  Thank you very much, Your Honor.

6   BY MS. BROWN:

7   Q     Welcome back, Mr. Kim.

8   A     Thank you.

9   Q     We're coming towards the end of your testimony here.

10  We -- to reorient us, we're talking about efforts to resolve

11  the litigation, and we have been talking about using the jury

12  trial system to resolve these claims.  You had shown us that

13  having done that for a decade you got about 49 cases to trial?

14  A     Right.

15  Q     And half of them were not fully resolved.

16  A     Correct.

17  Q     Is that right?

18  A     That is correct.

19  Q     And tell us in terms of the final two cases to try before

20  the bankruptcy, tell us what we're looking at here on this

21  graph?

22  A     Yeah.  So this is actually talked about in the information

23  brief.  So this is a good example of the inconsistencies, even

24  when you do get a jury verdict.  So in the Prudencio case we

25  had a verdict of compensatory damages of $25 million, with

Kim - Direct/Brown                                      123

1  punitive damages of $100,000.

2       And in the <u>Johnson</u> case where -- virtually the same

3  evidence is always used in these cases, especially with respect

4  to the punitive damages, you got an exactly sort of the

5  reserve.  You got $2.5 million compensatory damages and $25

6  million in punitive damages.

7       And this just shows, sort of exemplifies the

8  inconsistencies that you're getting in the talc verdicts.  Not

9  to mention, you know, we do have verdicts -- defense verdicts,

10  as well.

11  Q    You -- we saw earlier in the case, Mr. Kim, this aggregate

12  settlement data sheet.  Are you familiar with it?

13  A    I am familiar with it.

14  Q    Was pursuing settlement with the lawyers bringing these

15  claims an option that you and your colleagues pursued to try

16  and resolve this litigation?

17  A    So we did try.  I think the problem with using this data

18  for sort of trying to figure out what sort of -- what is the

19  value of these cases is that, you know, these -- this data only

20  reflects cases that we were able to settle.  And settlement

21  often happens because of certain circumstances in either a

22  particular case or a jurisdiction or whether we have witnesses

23  available.

24       What this does not have -- so we don't keep track of all

25  the offers we've made that were rejected, that did not get a

1  settlement.  We don't keep track of, you know, the demands that

2  are made of us to settle cases, which get rejected.  So this is

3  really sort of a skewed data set, and you know, to do this

4  mathematical analysis of multiplying the number of cases that

5  you have remaining by the average numbers that these represent,

6  that's just -- you know -- it's irrelevant.  It doesn't mean

7  anything.

8  Q    Have you had or had interest in settlement discussions

9  with every single plaintiff lawyer bringing cases against JJCI

10  in the talc litigations?

11  A    We have.  So especially with respect to trial cases, at

12  some point virtually ever trial case we try to settle, right.

13  And so we've had negotiations on trial cases.  We've had

14  negotiations -- again, we've talked about the Imerys cases.

15  You know, that didn't come out of thin air.

16      I mean, we'd been talking to plaintiffs' lawyers for a

17  long period of time about resolving cases, and we have not been

18  able to do it.  And even if we could try to come to some

19  resolution with some of these plaintiffs, the problem lies in

20  the future plaintiffs that we don't know who are there.

21      And we don't know what lawyers at that point will be

22  representing these plaintiffs.  You know, the -- because --

23  again, because of the alleged 60-year liability -- the latency

24  period, you're dealing with a category of future plaintiffs

25  that we really don't have a good handle on, and are unable to

Kim - Direct/Brown                                    125

1  settle through conventional means.

2  Q    The suggestion in I believe it was the opening is that if

3  you just do the math here you get about $5 billion.  Did you

4  hear that?

5  A    I did hear that.

6  Q    And from where you sit, Mr. Kim, and where you sat for a

7  decade, did you have the ability to get a global resolution

8  with lawyers you have been negotiating with for $5 billion that

9  you left on the table?

10  A    Yeah.  So what I did not hear is that plaintiffs take that

11  to go -- and everything would go away.  So I'm not sure whether

12  they're -- that's -- that was a representation they're making,

13  but we have tried to settle these cases and we could not come

14  to a resolution.

15  Q    There was some questioning of Mr. Wuesthoff, a suggestion

16  that this information wasn't provided to the board of

17  directors.  Did you view this as a viable effort or means to

18  resolve the litigation that you withheld from the board of LTL?

19  A    So I think I was questioned about this at length at my

20  deposition.  And the question at the deposition was, did you do

21  this calculation of multiplying out the average number that you

22  get from these and multiply it out, and did you tell the board

23  that's how much it would cost.  And I did not do that

24  calculation, you know.  I did not do that calculation.

25      What I did do was I told the board of managers all the

 1  data that we had, the aggregate on settlement.

 2          MR. JONAS:  Your Honor, objection.  Your Honor,

 3  during discovery we were presented with certain board

 4  materials.  There was entire -- all information relating to

 5  costs, trials, settlements, exposure, strategic options,

 6  resolution strategies, all blacked out, all redacted.

 7          So I don't think it's appropriate for the witness now

 8  to testify in fact about -- on these topics what he discussed

 9  with the board.

10          MS. BROWN:  May I be heard on that, Your Honor?

11          THE COURT:  Yes.

12          MS. BROWN:  In the informational brief we of course

13  did disclose the aggregate numbers that were provided, both in

14  the informational brief, and I believe Mr. Kim will tell us, to

15  the board.  So the costs that were disclosed there were $1

16  billion in defense costs, and then $3.5 billion, Your Honor, in

17  settlements and verdicts.  And that's the information that Mr.

18  Kim I believe will testify --

19          THE WITNESS:  Yes.

20          MS. BROWN:  -- provided to the board.  It's fully

21  consistent with evidence we put on the docket the first day.

22          THE COURT:  Is any of his testimony reflected in

23  information that's been redacted?

24          MS. BROWN:  No, Your Honor, it is not.

25          THE COURT:  All right.

1          MS. BROWN:  And in fact, just the opposite.

2          THE COURT:  All right.

3    BY MS. BROWN:

4    Q    And so, Mr. Kim, to clear up the confusion, can you tell

5    us the information you did provide to the board of directors?

6    A    So we did -- we did go over the board -- and frankly, you

7    know, the presentation that was blacked out did not have any

8    information in it.  We basically verbally told the board the

9    issues relating to settlements.  And so, you know, we did tell

10   the board the amount that was paid in the aggregate, and we did

11   tell them that there were a number of cases that were settled.

12        And we did tell them about the settlement negotiations

13   we'd had with various -- in various circumstances, such as the

14   Imerys settlement.  So, you know, we did go over that

15   information with the board.  The board was fully aware that

16   there were attempts to settle, that settlement failed and that

17   we had looked at doing a global resolution, which could not be

18   done.

19          THE COURT:  Ms. Brown, may I inquire?

20          MS. BROWN:  Of course.

21          THE COURT:  Mr. Kim, the MDL's been pending since

22   2016, roughly?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Did Judge Wolfson in overseeing the MDL

25   initiate any settlement mechanisms or procedures or --

Kim - Direct/Brown                     128

1          THE WITNESS:  She did not.  There was no settlement

2    mechanism put into place.

3          THE COURT:  Were there any settlement discussions

4    during that period --

5          THE WITNESS:  Yes.

6          THE COURT:  -- as part of the MDL?

7          THE WITNESS:  Well, at the -- not as part of the MDL,

8    per se.  But when we discussed the Imerys settlement, that

9    settlement would have gotten rid of virtually all the cases in

10   the MDL.  So the -- as we were doing negotiations it was

11   understood that we were negotiating with members of the

12   plaintiffs' steering committee in the MDL so that -- who were

13   also on the TCC at Imerys.  And so that settlement would

14   encompass the MDL cases.

15         THE COURT:  So the settlement discussions that were

16   pursued were through the Imerys bankruptcy?

17         THE WITNESS:  Correct, and especially because in the

18   Imerys bankruptcy we did have the ability to try to deal with

19   the future claims.

20         THE COURT:  All right.  Thank you.  Continue, please.

21         MS. BROWN:  Thanks.  Thanks very much, Your Honor.

22   BY MS. BROWN:

23   Q    And so following up, Mr. Kim, on the Court's question, the

24   MDL, of course, is where the ovarian cancer cases were?

25   A    Correct.

1  Q    Is that right?  And that -- if you look at the claims

2  pending against JJCI, that is the overwhelming majority of

3  claims pending, correct?

4  A    That is the overwhelming majority of claims.

5  Q    And were there efforts consistent with the time period the

6  MDL was going on to globally resolve the ovarian cancer claims,

7  current and future?

8  A    There were.

9  Q    And tell -- and did that have to do with the Imerys, the

10 talc suppliers' bankruptcy?

11 A    It did.

12 Q    Tell us about it, please.

13 A    So thank you.  So in the Imerys bankruptcy, as I was

14 explaining to the judge, we had entered into negotiations with

15 the TCC, which contained, frankly, you know -- again, the

16 members of the TCC also were part of the plaintiffs' steering

17 committee in the MDL.

18     And what we had done was we had come to an agreement with

19 the TCC for a resolution of the -- you know -- of the majority

20 of the claims, which again, would encompass the claims in the

21 MDL, and for -- I have not been told why, but once -- at one

22 point the TCC said that they could deliver the deal that was

23 agreed to.

24     And then at the next moment it was -- it fell through.  We

25 were told that they cannot deliver that deal and it fell

1 through.

2 Q    Okay.  Was your understanding, Mr. Kim, that we had

3 agreement from lawyers representing the plaintiffs that we

4 could globally resolve the ovarian cancer cases through Imerys?

5 A    Yes.  Yes, that was -- that would be part of the -- part

6 of the deal.

7 Q    And your understanding is for some unknown reason that

8 didn't get delivered by the plaintiffs?

9 A    It did not get delivered.  Even though they said that they

10 could do it, they agreed to the terms and it could not get

11 delivered.

12 Q    I want to ask you some questions about some documents that

13 were referred to in opening statement.  Were you here for

14 opening statements, Mr. Kim?

15 A    I was.

16 Q    Okay.  And did you hear some argument in reference to

17 documents that despite Ms. Ryan, treasurer of Johnson &

18 Johnson, sworn testimony under oath that the company did not

19 have an estimate of current and future liability globally in

20 the tort system, but somehow some recently produced documents

21 actually did show that?  Did you hear that?

22 A    I did hear that.

23 Q    Okay.  And did you have an opportunity, number one, to see

24 Ms. Ryan's testimony?

25 A    I did see Ms. Ryan's testimony, yes.

1  Q    Okay.  And is that consistent with your knowledge and

2  understanding of what went on at the company?

3  A    It is consistent.  Ms. Ryan, again, is in the treasury

4  department.  You know, the treasury department is charged with

5  managing the sort of the cash flow and the cash management of

6  the enterprise, because again, not all the subsidiaries have

7  treasury departments, and it would not make sense to have

8  individual subsidiaries dealing with their own bonds and stuff.

9       So that's what the treasury group does.  The treasury

10 group is not a legal group.  They don't analyze, you know,

11 exposures or look at liabilities.  They have to rely on my

12 group, frankly, the product liability group, for any assessment

13 of either future liability or short-term costs, which is what

14 primarily the treasury group is involved with, right.

15      They deal with how much cash do they need on hand to meet

16 certain requirements, to keep up covenants, and so -- so I'm

17 very familiar with what the treasury group would have in terms

18 of exposures.  And I think as I've testified many times, we do

19 not have a calculation of future liability for the talc

20 litigation.

21      What we sometimes have are reserves, short-term reserves

22 for how much costs might be in the near future, in the sort of

23 a two-year period, but we found it very difficult, virtually

24 impossible to come up with an exposure for what the liability

25 is.  So if we can't do that I cannot imagine that the treasury

1  department would do that on its own.

2  Q    Did you have the opportunity to look at some of the

3  documents that were referenced in opening statement to that

4  end?

5  A    I did.

6  Q    Okay.  Let's take a look atone of them.  This is a

7  document that was recently produced by S&P.  And remind us,

8  what is S&P?  S&P is a ratings agency.

9  Q    Okay.  And the date of this document is October 13th,

10  2020.  Do you see that?

11  A    I do see that.

12  Q    Okay.  And the section that I want to ask you some

13  questions about, what's that called?

14  A    The title is "Talc Settlements."

15  Q    Okay.

16        MR. JONAS:  Objection, Your Honor.

17        THE COURT:  Wait one second.  Yes.

18        MR. JONAS:  Objection, Your Honor.  He chose not to

19  bring Ms. Ryan to trial, despite the fact that we wanted her

20  here.  I don't think it's appropriate or fair for this witness

21  to testify about communications between Ms. Ryan and a rating

22  agency that he was not privy to, there's no foundation.  I

23  don't know how he can testify about this, and I think it's

24  inappropriate and prejudicial.

25        MS. BROWN:  May I be heard, Your Honor?

Kim - Direct/Brown                          133

1          THE COURT:  Yes, please.

2          MS. BROWN:  These are documents that pursuant to the

3    claimants' requests were allowed sort of leading right up to

4    the hearing.  Your Honor knows.  You allowed the depositions to

5    go forward.  These documents were not available at the time of

6    Ms. Ryan's testimony.

7          She is a former employee.  Mr. Kim, as the chief

8    legal officer, has reviewed these documents, consistent with

9    Ms. Ryan's sworn testimony about where reserve data would come

10   from, data like the Imerys settlement.

11         Mr. Kim and his group, he has reviewed these

12   documents and is prepared to explain what these numbers were,

13   because they came in part from Mr. Kim and the law department,

14   completely consistent with Ms. Ryan's testimony.

15         THE COURT:  All right.  Thank you.

16         Mr. Glasser.

17         MR. GLASSER:  If you're going to rule against her, I

18   don't want to say anything, but if you're going to help her,

19   I'd like to voir dire the witness --

20                         (Laughter)

21         MS. BROWN:  And Judge, I'm going to reserve my right

22   to have that (indiscernible).

23         THE COURT:  You are -- no.  Unless you can connect

24   Mr. Kim to this document, he can't comment on the document or

25   discuss the document.  You can ask general questions as to his

 1  knowledge.

 2          MS. BROWN:  Sure.  I understand, Your Honor.  Okay.

 3  BY MS. BROWN:

 4  Q    Let's put the document aside.  Mr. Kim, I understand you

 5  were here for opening statement, correct?

 6  A    I was.

 7  Q    And did you hear an argument that there were documents or

 8  there were estimates in the area of about seven or $7.5 billion

 9  in connection with discussions with S&P?

10  A    I did hear that, yes.

11  Q    Okay.  And did you hear the suggestion in opening that

12  that $7.5 billion was --

13          MR. GLASSER:  Object to the leading questions.

14          MS. BROWN:  I'll rephrase.

15          MR. GLASSER:  Could you just ask him where, who,

16  what, how?

17          THE COURT:  Sustained.  Rephrase --

18          MS. BROWN:  I will.

19          THE COURT:  -- and let's take the document down.

20          MS. BROWN:  Yes, Your Honor.

21          THE COURT:  Thank you.

22          MS. BROWN:  Can we just take this down for a second.

23  Oh, you know what, Judge.  I'll just go ahead.

24          THE COURT:  Or go to the next one.

25          MS. BROWN:  Yeah.  Yeah.  I'll just make it easy.

Kim - Direct/Brown                              135

1 | Thank you.  Okay.  We'll stop here, Your Honor.

2 |           THE COURT:  All right.

3 |           MS. BROWN:  Okay.

4 | BY MS. BROWN:

5 | Q    And so, Mr. Kim, what was your understanding when you were

6 | here for opening statement about that reference?

7 | A    So I think one of the counsel suggested that S&P had

8 | documents that showed the total exposure of liability with

9 | respect to litigation of the talc cases.  And yeah, that's --

10 | so that's my understanding of what they said that the data that

11 | they saw reflected.

12 | Q    And based on your knowledge, does such total exposure of

13 | all liability in the tort system data exist?

14 | A    It does not.  Well, I can tell you what does exist.

15 | Q    Yes, please do.

16 | A    What does exist is information about settlements, right.

17 | So if you saw a document that talked about talc settlements,

18 | there are document -- there are -- there is data about

19 | settlements, and the two major points during the 2020 time

20 | period would be the Imerys settlement that we were just talking

21 | about, which was being negotiated, which is roughly in the

22 | order of four to $5 billion, and you would have the Ingham,

23 | Ingham amount that -- again, from a treasury perspective, I

24 | think you heard Ms. Ryan talk about settlements in regard --

25 | what she really meant was judgments.

Kim - Direct/Brown                    136

1     I mean, you know, the -- so that amount, the 2½ billion,

2  would be sort of the amount of money for the <u>Ingham</u> amount that

3  would be reserved.  So you know, when you put those together,

4  you know, you come to about $7 billion, and so that's the

5  information that we had told Ms. Ryan -- the law department had

6  told Ms. Ryan about, sort of, you know, what the -- what

7  potential cash outlays may be necessary for settlements.

8  Q    And so Mr. Kim, it sounded like there were two components

9  of that $7 billion estimate?

10 A    Correct.

11 Q    One you told us was the tentative agreement that was

12 reached with the plaintiffs in Imerys, correct?

13 A    Right.  So at that time it would be -- it would have been

14 negotiations.

15 Q    Um-hum.

16 A    But the negotiations on amount were, you know, drawing in

17 that area.  So at that time there may have probably been more

18 of a range, you know, three to 6 billion to settle -- settle

19 the Imerys cases.  But so that would be one component.

20 Q    And then the other component would be?

21 A    The <u>Ingham</u> verdict that had been reduced.

22 Q    And so if you put the $4½-5 billion together with the two

23 or 2.5, what do you get?

24 A    You have to do the math for me.

25 Q    I'm trying not to lead.

Kim - Direct/Brown                           137

1  A    Seven -- 8 billion, you know, if I had my calculator I

2  would -- you know -- I would trust you about that.

3  Q    Do you get about seven or 7½ billion?

4  A    Yeah, 7 to 7½ billion.

5  Q    Okay.

6  A    Yeah.

7  Q    Did you hear a reference in opening to another document

8  that had another estimate in it of resolution in bankruptcy?

9  A    Yeah.  That was, again, that was a number -- yeah.  It --

10 I'm sorry.  It was shortly after the filing.  And again, that

11 referenced the five -- a $5 billion number.  And again, that --

12 so at that point when the bankruptcy was filed Ingham had

13 already been paid.

14 Q    Um-hum.

15 A    Right.  So 5 billion, so the four -- three to five --

16 three to 6 billion, three to 5 billion, that would be that

17 number.  But I mean, I think the important thing is that these

18 are getting -- I think it's -- the original question was, these

19 are not calculations of what the cost is.

20      What this represent -- what these numbers represent is a

21 settlement.  So it's two parties, again, where one party, us,

22 we believe there's zero liability.  The other party, which is

23 the plaintiffs, believe that there's however billions they

24 think it is.

25      And what these numbers represent is an agreement to -- you

Kim - Direct/Brown                                    138

1  know -- to come to a resolution of those, basically taking out

2  the waste of the litigation system.  So when you look at these

3  numbers, you know, it's a -- really, it's a negotiated amount

4  based upon two parties with different views coming to some kind

5  of accommodation with each other, again, taking out for the

6  cost of litigation and the risk of litigation.

7      So the saying that these numbers represent, you know, the

8  cost to us of litigation, that's just -- that's just wrong.

9  That's just not what these numbers mean.

10 Q    Did you have the opportunity, Mr. Kim, to look at a report

11 commissioned by S&P that related actually to estimates to

12 remain in the tort system, in a future potential liability in

13 the tort system?

14 A    I did.  This is part of the discovery that came out with

15 the S&P.

16      MR. GLASSER:  Yeah, and this is the same objection,

17 Your Honor.  He has no personal knowledge of the report.  He

18 didn't make the report.  He has no foundation to make any

19 testimony about these documents.

20      MS. BROWN:  And Your Honor, if I can, unlike the

21 documents that were just shown and Your Honor sustained, these

22 are not someone's handwritten notes.  These are not emails.

23 This is a report that was commissioned by the rating agency,

24 S&P.  Your Honor provided the claimants the opportunity to

25 depose the individual who commissioned the report.

Kim - Direct/Brown                                    139

1              It was marked as an exhibit at his deposition.  He

2    gave testimony about the report.  Mr. Kim had read that and is

3    relying on that, as well.  And as well, we have agreed, Your

4    Honor, that this document is now in evidence at their request.

5              THE COURT:  Overruled.  Continue.

6              MS. BROWN:  Thank you.

7    BY MS. BROWN:

8    Q    And is this the document that you're referring to?

9    A    This is.

10   Q    Okay.  And it's called, "The Unpredictable Cost of Latent

11   Catastrophes."  Is that right?

12   A    Yes.  So this is --

13   Q    And tell us about it.

14   A    -- this is a report that was referenced in one of the

15   emails that was the subject of the S&P depositions.  And

16   basically, it just confirms that when you're looking out --

17   when you're looking at the tort costs, the costs of litigating

18   claims with all the waste and all, that the liability could

19   total $84 billion.

20        And it says, "Including, but not limited to, products from

21   J&J," but of course, we're talking about talc liability.  And

22   the -- you know, the largest producer of baby powder is

23   basically J&J companies.  So we would -- we would hold the

24   lion's share of that.

25   Q    And so Mr. Kim, to reorient us, we were talking about sort

1  of efforts to resolve the talc litigation.  We spoke about your

2  efforts to try these cases to verdict.  We spoke about some

3  settlements that have been done with some firms.  We spoke

4  about a failed Imerys settlement.  Was the company also trying

5  to get review of the Ingham case?

6  A    It was.  You know, the Ingham case, we had -- we had

7  intermediate review in Missouri, which was very disappointing.

8  I have read the appellate decision and found it lacking.  We

9  were hopeful that -- that the Missouri Supreme Court -- in

10  fact, we were certain the Missouri Supreme Court would take,

11  you know, this appeal.

12      It had taken all of our previous appeals, overturned them.

13  For -- for unknown reasons, it -- the Missouri Supreme Court

14  did not take probably the largest verdict it had ever seen in

15  Missouri and we were left with trying to get cert review.  And

16  unfortunately, the cert review was denied with two justices

17  recusing themselves.

18  Q    And so where did that leave you, Mr. Kim, with Imerys

19  having not been delivered as we expected it was going to be by

20  the plaintiffs, with the Supreme Court not taking cert, with

21  the jury trial system getting well less than 49 cases to final

22  judgment, where did that leave you overseeing this litigation?

23  A    So you know, once -- once we had this cert denial it

24  became clear that, you know, all -- first of all, there were

25  lots of things going on in the State Courts that we thought

1  that the Supreme Court Review would help, you know.  We thought

2  there were a lot of due process violations going on.

3      And you know, once that was denied I think from a

4  financial standpoint what -- the issue would be, look, you

5  already had the Ingham decision come down.  We tried to get it

6  reversed.  You already saw that.  Everyone now is trying to ask

7  for, you know, Ingham like amounts when they're asking the

8  jury.

9      What this did was just -- it made the possibility of

10 having these outlier verdicts no longer outliers.  You know,

11 they became more -- it was -- it was thought that without this

12 review that there -- you know -- it would become more likely

13 that we would get these huge Ingham like verdicts.

14 Q   What were the due process violations that were key to the

15 petition?

16          MR. GLASSER:  I object to this -- to the witness

17 explaining how State Court judges violated his due process.

18 They made their rulings.  They can appeal.

19          MS. BROWN:  I can --

20          THE COURT:  Overruled.

21          MS. BROWN:  Thank you.

22          THE COURT:  He can give his views on what the issues

23 were.

24          MS. BROWN:  Thank you.

25          THE WITNESS:  So thank you, Your Honor.

Kim - Direct/Brown                    142

1          MS. BROWN:  Thank you, Your Honor.

2          THE WITNESS:  I won't go into a diatribe.  I could go

3   on at length about all the abuses that we say existed.  But you

4   know, but primarily for Ingham it was the issue about the 22

5   plaintiffs in one case.  It is hard enough trying, you know,

6   two plaintiffs in one case.

7          Twenty-two plaintiffs in one case, all different

8   types of injuries, right.  So you know, you have people in

9   remission.  You have people -- women who had died,

10  unfortunately.  It -- they're all from different states.

11  Different laws apply.

12          It took five hours, five hours to go through the jury

13  instructions.  And they all received the same amount of money

14  at the end of the day.

15  BY MS. BROWN:

16  Q    What did that tell you, Mr. Kim?

17  A    It told us that the jury could not keep track, could not

18  differentiate the plaintiffs.  There's the phenomenon where,

19  you know, the weak plaintiffs' cases are bolstered by the

20  sympathy that you have for a very strong, you know, very

21  sympathetic plaintiff's case.

22          When you try cases together there's -- even when you try a

23  couple of cases together, on causation there's always -- there

24  becomes a presumption that if 22 plaintiffs are suing for the

25  same thing, it must be that thing causing the disease of the 22

1  plaintiffs.

2      So you know, those are sort of the -- some of the due

3  process issues that we had.  I mean, there were more specific

4  issues like, for example, you know, the law that was chosen on

5  causation was that you actually had to show specific causation

6  for a person.

7      You -- there has to be causation shown and the plaintiffs'

8  lawyer in argument -- because of a very weird feature of

9  Missouri law, the jury verdict form doesn't say that.  Even

10 though the law is that, the jury verdict form doesn't say that.

11 And so the plaintiffs' lawyer told the jury that we were making

12 it up.

13     And again, we're trying to get that appeal.  So you know,

14 you know, again, once -- once the cert denial came we just saw

15 that there were going to be more cases that are going to be

16 tried like the Ingham case, and we saw the possibility of, you

17 know, again, the outlier verdicts increase.

18 Q    Did the company raise due process concerns about forum

19 shopping and excess punitive damages award to the tune of

20 $4.69 billion?

21 A    Yes.  The forum shopping issue, you know, is -- has a long

22 and sordid history.  You know, the -- we had -- most of the

23 cases that we had already gotten reversed dealt with personal

24 jurisdiction issues.  And what it had to do with is that we

25 don't sell -- manufacture the regular product, the Johnson's

1 Baby Powder in Missouri.

2      And so under, you know, the BMS law, the Supreme Court

3 decision, there was no personal jurisdiction.  So shortly after

4 that decision, the plaintiffs in Ingham, who had never alleged

5 before use of a particular product, most of them came forward

6 and said that, oh, now, they remember using Shower to Shower or

7 Shimmer, which is the product that has flecks of specks in them

8 that the Johnson & Johnson companies discontinued because

9 nobody was buying it.  Right.

10      So all of a sudden out of these 22 plaintiffs, I think it

11 was 24 plaintiffs, 22 of them now said that, oh, they must have

12 bought and used this product and 'lo and behold, this product

13 happened to have been bottled in Missouri.

14 Q    Um-hum.

15 A    And this is the one product in the line that was bottled

16 in Missouri.  And some of these plaintiffs -- one of the

17 plaintiffs testified that it came to her in a dream that she

18 must have used the product, and that withstood, you know, the

19 jurisdictional arguments made at the lower court.  And of

20 course, that couldn't get appealed.  And so, again, those

21 issues were presented on personal jurisdiction in Missouri.

22 Q    After all of this, Mr. Kim, what was your view about the

23 ability to resolve this litigation by maintaining the status

24 quo in the tort system?

25 A    Oh, my personal view was that it made a lot of sense to go

Kim - Direct/Brown                                          145

1  through a restructuring, and with the -- to enable, you know,

2  the restructured company to file for bankruptcy and try to get

3  this resolved as quickly as possible, you know, and again, I

4  always -- you know I'm going to say it -- fully, fairly,

5  equitably, you know, in the system, because I mean, it is --

6  it's a shorthand way of saying that the process that we believe

7  will happen in the bankruptcy system is a process where

8  everyone will get a say.

9      There'll be negotiation.  The end result will be something

10 that people can agree on.  There'll be a vote.  And so when we

11 say equitable, that's what we mean.  It's just a short -- it's

12 an easier way to say it.  We could say everything else all the

13 time, but equitable seems to be a nice way to say what the

14 process would be.

15     And the efficiency, again, we could say, you know, that we

16 hope to get this done within a year.  Whereas, in the tort

17 system it could take decades more for 38,000 -- or frankly,

18 with the 60-year legacy period it could take, you know, a

19 tremendous number -- amount of time to resolve these cases.

20     So again, instead of saying that every time we say, that's

21 the efficiency in here.  So basically, you know, it's shorthand

22 that we've been using internally that explains sort of these

23 big concepts.

24 Q   At some point, then, Mr. Kim, did you come to learn about

25 something called Project Plato?

Kim - Direct/Brown                    146

1  A    Yes.  Project Plato was the name that we gave to the due

2  diligence effort.  So you know, we had been talking internally

3  and with outside counsel, various outside counsel, for a period

4  of time about potential restructurings, at some point when we

5  decided that we would start looking into the feasibility of

6  restructuring.

7       So no decision made on whether to restructure or not.

8  There's a ton of work that has to be done with a big company

9  like JJCI on contracts, on tax laws, on, you know, vendor

10 agreements, you know, the bond debenture issues.  So a

11 tremendous work has to be done just to get to the point where

12 you can say, hey, you know what, there's nothing in these

13 agreements, nothing in the regulations, nothing in the tax laws

14 that are going to prevent us from doing the transactions that

15 we could do in designing that transaction if there are

16 impediments to it.  And so that project to figure out if it can

17 be done was named Project Plato.

18 Q    Now, at some point -- I'm just going to skip ahead.  We

19 covered this, Mr. Kim.  On November 12th, 2021, Johnson &

20 Johnson announced plans to separate the consumer business.  Is

21 that right?

22 A    That is right.

23 Q    Okay.  When did you learn about Johnson & Johnson's plans

24 to separate the consumer business?

25 A    Now, I learned about it on the day that it was announced.

Kim - Direct/Brown                                         147

1  Q   As somebody who was involved in Project Plato, who was

2  forming plans about the restructuring, did you know anything

3  about this?

4  A   I knew nothing about this.  Project Plato team that's

5  doing the due diligence that was structuring this had no

6  involvement, never knew about this spinoff, is what it's being

7  called.  That was done wholly separately.  And again, it was

8  done confidentiality, as it should have been done, and there

9  was no overlap between -- between, you know, us doing this

10 Project Plato and the spinoff.

11 Q   You say it was done confidentially, as it should have been

12 done.  Have you heard allegations here and outside the

13 courtroom about a covert, secret team that was operating

14 Project Plato?

15 A   I have heard and read some articles about that, yes.

16 Q   I mean, is that true?  Did JJCI have a covert team that

17 was doing due diligence on a potential restructuring?

18 A   So the insinuation is that there's something nefarious and

19 secret going on.  Every merger, divestiture, acquisition is

20 confidential, and primarily confidential because of insider

21 trading rules.  And so you do not want people involved in a

22 confidential agreement -- in a confidential transaction to be

23 telling other people.

24     And so, you know, it is secret and confidential, but the

25 purpose is because we try to comply with federal securities

1  laws.  The other thing that you want to do is if you were

2  contemplating a transaction that you don't know whether you

3  wanted to do it or not, then the worst thing you can do for

4  both, you know, employee morale, for -- you know -- for rumors

5  to get spread that may not be true, for things, is to have

6  people not sign confidentiality agreements.

7      So basically, confidentiality agreements are standard

8  procedure for any type of divestiture, any type of corporate

9  arrangement where, you know, you don't want people anxious

10 about their jobs, for example, you know, after this am I going

11 to still be hired, especially in situations where you don't

12 know whether you're going to go forward.

13     And so there's nothing nefarious, nothing special about

14 confidential transactions.  Yet, the press for somehow got the

15 impression that there was something nefarious about all this.

16 Q   And in fact, and we -- the Court has seen this.  We've

17 looked at it, but does the approval memo itself contain

18 information about the functions and the individuals who were

19 conducting the due diligence as part of Project Plato?

20 A   Yes.  So what this shows is that there are lots of people

21 that had to do a lot of work to figure out whether the

22 transaction itself is even feasible.

23 Q   Um-hum.

24 A   And so, you know, everyone had to go through, for example,

25 trademark laws, you know, the regulatory laws.  So we -- you

1  know -- a lot of JJCI's products are OTC products, like Tylenol

2  or Motrin.  They're very heavily regulated.  There are lots of

3  rules about -- about the name that you have to have on the

4  package.

5       And so -- and you know, even though the name might be the

6  same, when you transfer it to a different entity there are

7  regulatory filings you have to make in order to make sure the

8  FDA knows that the company that's now selling the product is

9  not the same company that it was before.

10      And so again, there has to be a lot of due diligence done

11 before you can even think about doing a transaction on whether

12 the transaction is feasible.  And so each of these functions

13 has a role to figure out that -- if there's anything in their

14 function that would be an impediment to a transaction.

15 Q    And ultimately, that transaction was recommended and

16 approval was sought?  Is that right?

17 A    It was.

18 Q    Okay.  And ultimately, we heard from Mr. Mongon this

19 morning and we looked at the approval memo.  Mr. Mongon and

20 others approved the transaction, correct?

21 A    They did.

22 Q    And LTL Management, your company was formed, correct?

23 A    It was, yes.

24 Q    And finally, Mr. Kim, I just want to talk a little bit

25 about what your role was in leading up to the formation of LTL

Kim - Direct/Brown                                    150

1  and in the early days of LTL.  And this is a slide we used with

2  Mr. Wuesthoff.  Were you here for opening statements where the

3  argument was made that the board of directors were essentially

4  mushrooms, kept in the dark.  They didn't do anything.  They

5  didn't know anything.  Did you hear that argument?

6  A    I did hear that; I did hear that.

7  Q    And how does that jive with the facts and the truth from

8  your perspective?

9  A    That is just -- that is not true.  That is not true.

10  Q    Tell us why.

11  A    So you know, so I've known -- so I -- I've gotten to know

12  Mr. Dickinson, Mr. Wuesthoff.  I've known Mr. Deyo for a very

13  long time, the former general counsel, and they're not

14  mushrooms.  They did not take this lightly.  When I was first

15  hired by LTL and I knew that we were contemplating going

16  forward with this, you know, my two main responsibilities were,

17  a, to make sure that the board understood sort of the corporate

18  governance processes, to make sure they knew what the process

19  was, what their duties were.

20      I guess I probably did not do enough to instill the

21  definitions of, you know, of duty of loyalty, duty of fair

22  dealing, but I can assure you that the board of managers knew

23  that they were doing this for LTL's sake and that they had to

24  make a decision about what the LTL was doing to do, and that

25  they owed their allegiance to LTL.

1        So it was -- it was going over sort of the corporate

2    responsibilities, and then making sure that they had all the

3    data they needed to make an informed decision about whether to

4    file for bankruptcy or not.  Notwithstanding my personal views

5    on whether they should do it or not, I wanted to make sure,

6    because I knew that this was going to be scrutinized, that they

7    had all the information that they needed to make an informed

8    decision.  And so that's what we set out to do.

9    Q    And what would you say to the argument or the suggestion

10   that the decision was already made and these folks were brought

11   in at the end to rubberstamp the decision of JJCI lawyers,

12   Johnson & Johnson executives?  What do you say to that?

13   A    What I would say is, look, the -- there is -- it was

14   understood that if you look at the facts of the situation, of

15   everything that we've done, the -- what the litigation is right

16   now, that -- that it would be inevitable, you know.  It would

17   be -- I think Mr. Wuesthoff said it was obvious that bankruptcy

18   was the best course.

19        Once you go through the history of what it was, it was

20   obvious.  But we did not -- we knew we did not want to prejudge

21   the issue for that.  We wanted to make sure that they had the

22   information.  They could ask whatever questions they wanted.

23   They could come to their own decisions.  They could push back.

24        And they did ask questions.  They did want to know, you

25   know, what the circumstances are.  And so again, you know, the

1  -- to say -- think that they were mushrooms rubber-stamping

2  something is not true.  You know, they were given all the facts

3  that they needed.  And again, I thought the decision would be

4  an obvious one, and they agreed once they saw everything.

5  Q    Mr. Kim, we're looking at the meeting minutes from the

6  board meeting on October 14th, 2021, and it indicates that you

7  reviewed options with the board of directors about how to

8  resolve current and future talc claims.  Did you do that?

9  A    We did.  We went through three options with them.  One was

10 to stay the course.  One was, look, you know, we can go forward

11 as we are doing, and the -- you know -- but the cost --

12        MR. JONAS:  Objection, Your Honor.  I have a page,

13 strategic options, and it's -- it was not given to us.  I don't

14 think the witness can testify about it.

15        MS. BROWN:  Your Honor, these board meeting minutes

16 were given.  The -- all of the two board of directors who were

17 deposed in this case gave extensive testimony about the three

18 options that Mr. Kim did provide to the board at this meeting.

19 Mr. Kim himself has testified to this in North Carolina and in

20 his depositions.

21        And so all of this information has been provided to

22 claimants with the opportunity to cross-examine, and it's

23 information on which the board relied in making their decision.

24        THE COURT:  Didn't the debtor take the position

25 during discovery that this was subject to attorney/client

1  privilege?

2          MS. BROWN:  Not these three things at all, Your

3  Honor.

4          THE COURT:  The specifics of the options being

5  reviewed?

6          MS. BROWN:  No, Your Honor.  We have always provided

7  that through Mr. Kim's testimony and through all of the board

8  of directors' testimony.  There were three options that were

9  reviewed, and everyone has testified about it.  The minutes

10 have not been redacted.  We are not withholding any of that.

11         THE COURT:  All right.  Overruled.

12         MS. BROWN:  Thank you, Your Honor.

13 BY MS. BROWN:

14 Q    What were the three options?

15 A    So the first option was to stay the course, was to

16 continue on in the tort system as JJCI had been doing.  The

17 second option was -- was an insurance option, which was quickly

18 dismissed.  I think I've described it in North Carolina where

19 we would hire a third party insurance company to take on the

20 liability.

21      That option really was not viable and the final option was

22 the bankruptcy option, and to utilize the Chapter 11 to come up

23 with a fund to, again, efficiently resolve and -- the talc

24 liability for both current and future plaintiffs.  So those are

25 the three options that were discussed.

Kim - Direct/Brown                                    154

1  BY MS. BROWN:

2  Q    And I hear your testimony, Mr. Kim, that the choice was

3  going to be that of the board, but what was the backup plan?

4  If the board didn't file for bankruptcy, what was the backup

5  plan going to be?

6  A    Well, so we'd been looking at this for a very long time.

7  We had gone through, you know, the restructuring with the

8  understanding that the only really logical option -- the only

9  option we had was the bankruptcy option.  If the board decided

10 not to file bankruptcy, then we would be going forward with the

11 -- in the tort system, as we had been.

12      That was the only other -- that was the only other option

13 that was -- was available.  We do not think and did not think

14 that that was a viable option.  We had already looked at this,

15 you know, through the lense of JJCI, but that would have been

16 the result if we did not file for bankruptcy.

17          THE COURT:  Would the funding agreement still have

18 been in effect and pursued outside of the bankruptcy in the

19 tort system?

20          THE WITNESS:  There's actually in the bankruptcy that

21 talks about funding outside of bankruptcy.  There is a

22 provision in the funding agreement that talks about that.

23 BY MS. BROWN:

24 Q    And following up on the Court's question, Mr. Kim, did the

25 board consider and did you talk to the board about staying the

Kim - Direct/Brown                                           155

1  course and using the money available under the funding

2  agreement to try the cases in the tort system as JJCI had been

3  doing for a decade?

4  A    Yeah.  As I testified before, it made no sense.  You know,

5  when you look at that option -- basically, we had been

6  litigating this for decades.  What happened if we get forward

7  is that we would continue to spend money at the -- at least the

8  10- to 20-million-dollar-a-month rate plus whatever MDL costs

9  would be expended.  And again, all wasted costs, because none

10 of that is going to the claimants.  It's all going into the

11 system.

12       Then you had these verdicts that were -- could be given --

13 like the Ingham verdict.  And the same issues that JJCI was

14 facing, LTL would face if it continued to go forward.  And just

15 putting -- throwing money into the system that could be better

16 used in a bankruptcy trust to try to resolve all these claims.

17 So, you know, in discussions, it was, you know, unanimous that

18 that option really did not make sense.

19 Q    In evaluating that, though, Mr. Kim, and thinking about

20 whether they could -- whether LTL could use the funding

21 agreement and stay the course, was the LTL board made aware

22 that just a few days earlier, plaintiffs' lawyers in the

23 Johnson case had requested $8 billion in a single plaintiff

24 verdict?

25 A    Again, the -- everyone wanted to duplicate Ingham.  So

Kim - Direct/Brown                                          156

1  plaintiffs, when they come up for argument asking for damages,

2  are all asking for multibillion-dollar damages.  They obviously

3  think they can do it; they can get it.  And so, you know, our

4  fear is that someday, you know, again, another jury would do

5  that.

6      And so again -- and that would be just for one plaintiff.

7  You now have 34,000 more plaintiffs to go.  That's going to

8  take decades to get through.  And then you have future

9  plaintiffs that are coming in that the system is just not -- in

10 that context, that system is just not a rational way to try to

11 deal with this.  The better way is to file what we thought

12 was -- to file for bankruptcy and come to a complete,

13 efficient -- so meaning very quick resolution to get rid of all

14 the liability both current and future.

15 Q    In the board decision evaluating whether to use the

16 funding agreement and stay the course, were you able to provide

17 the board with a plan by which you could try all 38,000 cases

18 in less than 3,800 years?

19 A    There is no way, rationally, to try all these cases.

20 There -- and --

21 Q    Were you able to provide the board, who was evaluating

22 whether to stay the course and use the funding agreement, were

23 you able to provide them with a plan that you could get more

24 than 49 cases to trial in a decade?

25 A    It is virtually impossible because of the limitations on

1  witnesses, on experts, on -- judges, for example, also have an

2  issue.  You know, there's not enough judges to go around to try

3  all these cases.  It's virtually impossible.

4  Q    Ultimately, the board of LTL voted that Chapter 11 was the

5  best option.  Is that right?

6  A    It did.

7  Q    And, Mr. Kim, we started your examination here today

8  talking about how we got here, talking about the last ten years

9  of trying to resolve these cases in the tort system.  And,

10  finally, I want to ask you as the chief legal officer of LTL,

11  what happens next?  I mean, where do we go from here now?

12  A    Well, you know, I think as we said in the first day

13  hearings in North Carolina, and it stands true today, we are

14  ready and willing and able to go forward to try to resolve

15  these cases in a mediation, coming up with a -- you know, a

16  complete resolution through a trust.  We have the funding

17  agreement available.  As soon as the Judge orders the

18  $2-billion QSF, that'll become available.

19      You know, it is -- I would think it's an easy -- I'm

20  not -- all we -- all I can do is offer to do that.  I mean, I

21  think we're ready, willing and able.  We have the wherewithal

22  to do it.  We have the desire to come up with the resolution,

23  and we hope that the plaintiffs will take us up on this.

24  Q    And based on all of your years being part of the talc

25  litigation, overseeing the talc litigation, were you able to

1  come up with any other plan in your mind that would provide

2  compensation to all of the current and future claimants?

3  A    In the current system, because of the way talc liability

4  is being assessed in terms of the latency period and the

5  futures, it is -- it's impossible -- really, I feel it's

6  impossible to do it outside of the bankruptcy context.

7           MS. BROWN:  Thank you very much, Mr. Kim.

8           Your Honor, I don't have any more questions right

9  now.  Thank you.

10          THE COURT:  Thank you, Ms. Brown.

11          Mr. Jonas?

12          MR. JONAS:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14 BY MR. JONAS:

15 Q    Good afternoon, Mr. Kim.

16 A    Good afternoon, Mr. Jonas.

17 Q    Sir, you just spent -- I think it's almost two hours

18 talking about the history of talc litigation.  Isn't that

19 right?

20 A    I didn't count how much time actually was on that topic.

21 Q    There was a lot of discussion about the history, the

22 details, the cases, but most of your time was spent talking

23 about litigation, right, talc litigation?  I think that's --

24 was the title of the presentation, right?

25 A    Yes, that was the information that was given to the board

Kim - Cross/Jonas                              159

 1  of managers.

 2  Q    But today, you basically told us -- tell me if -- let me

 3  see if I can sum this up, which is Johnson & Johnson feels that

 4  it's been treated unfairly and is facing an onslaught of

 5  litigation.  Isn't that right?

 6  A    That is true.

 7  Q    Okay.  So then isn't it correct that Johnson & Johnson

 8  assigned its talc liability to LTL, and it filed LTL for

 9  bankruptcy to stop the onslaught of litigation?  Isn't that

10  right?

11  A    I would disagree with that.

12  Q    You disagree with that?

13  A    I disagree with that.

14  Q    Okay.  You don't think it's -- let me just get this right.

15  You don't think that the LTL bankruptcy filing was to stop the

16  onslaught of talc litigation?

17  A    No.  I would say that it was filed in order to resolve the

18  litigation -- again, I'm going to say it, and you can make fun

19  of me for it -- but efficiently, you know, and fairly among all

20  the parties.  That's why we filed.

21  Q    Right.  You filed it so that you can try and resolve it in

22  the way that Johnson & Johnson wants to resolve it, right?

23  A    I would say I would resolve it in the way that is the best

24  interest of JJCI and the claimants, frankly.

25  Q    Okay.  We'll talk more about why you're making decisions

Kim - Cross/Jonas                              160

1  for claimants.  But I just want to be clear that the reason LTL

2  filed bankruptcy is because Johnson & Johnson has decided that

3  it's -- the way it want -- it wants to stop the litigation, and

4  it wants to try and settle the litigation in bankruptcy.  Isn't

5  that right?

6  A    I disagree with that.

7  Q    Okay.

8  A    Can I say what it was?

9  Q    No, sir.

10 A    Okay.

11 Q    We'll let you do that on redirect.

12 A    Okay.

13 Q    Another reason that Johnson & Johnson filed LTL for

14 bankruptcy is to reduce the expense of talc litigation, right?

15 A    No.  I would say that, again, because the talc litigation

16 put the company into financial distress, it filed for

17 bankruptcy in order to alleviate that financial distress, which

18 would include the -- you know, the costs of litigation.  Yes.

19 Q    Well, isn't Johnson -- if this is successful, isn't

20 Johnson & Johnson going to save $190 billion?

21 A    It depends.  Because that money, again, the -- and it's

22 not Johnson & Johnson.  It would be JJCI would be saving costs

23 in -- that it's spending in the system, and hopefully it would

24 be spending it, or a portion of it, on a qualified settlement

25 fund that would go to the benefit of claimants.  So I would

1  disagree with your characterization of that.

2  Q    All right.  Let's break it down, sir.  You have a slide

3  that says Johnson & Johnson -- and we'll talk more about who's

4  who, I'll just use Johnson & Johnson -- is at risk and is

5  worried about spending $190 billion.  Isn't that what the slide

6  says?

7  A    No.  The slide -- again, as I said before, what the slide

8  says is that, because of the litigation, JJCI's in financial

9  distress and that it filed its bankruptcy so that instead of

10 spending money on wasted costs in the system it can enter into

11 a qualified settlement fund and spend some of that money on

12 resolving litigation with claimants.

13 Q    Okay.  Let's try it this way.  You put up a slide that

14 says if you stay in the tort system, you might have to spend

15 $190 billion.  Am I reading that slide wrong?

16 A    No.  That's the financial distress I was talking about.

17 Q    I just want to talk about if you stay in the tort system,

18 this slide tells me, and you told the Court, you might have to

19 spend $190 billion, right?

20 A    Yes.  Again, that's the financial distress that I was

21 talking about.

22 Q    Okay.  And let me understand.  If you're successful and

23 LTL is successful in staying in bankruptcy, right, and if, as

24 Mr. Wuesthoff said, maybe you don't even need the $2 billion to

25 resolve everything, the bankruptcy around the edges -- I know

Kim - Cross/Jonas                                162

1  there's some more costs -- will result in a total global

2  resolution of all of Johnson & Johnson, Johnson & Johnson

3  Consumer Products, LTL, everybody will have a global resolution

4  of talc liability for a cost of $2 billion, right?

5  A    Well, I would say that if we were successful -- when I

6  include "we" being the claimants, there will be a qualified

7  settlement fund --

8  Q    Uh-huh.

9  A    -- that's agreed to by all the parties voted on by

10 claimants that will resolve the amount for some amount of money

11 that would be determined.  And so that's what I would say

12 successful resolution looks like.

13 Q    Okay.  I know you heard Mr. Wuesthoff, because you were

14 very careful to go over --

15 A    Uh-huh.

16 Q    -- some of his testimony.  You heard him say -- he's the

17 president of the company, right?

18 A    He is.

19 Q    Right.

20 A    Of LTL, yes.

21 Q    And you told me he pays attention.  He's a smart guy.  All

22 that good stuff, right?

23 A    He is a very smart guy --

24 Q    Okay.

25 A    -- and he does pay attention.

1  Q    He said yesterday he hopes and believes that the whole

2  thing can be resolved for less than the $2 billion.  Did you

3  hear that?

4  A    I did hear that.

5  Q    Okay.  So if he's right -- which because he's a smart guy,

6  I think -- let's assume he's right -- Johnson & Johnson,

7  Johnson & Johnson Consumer Products, Inc., LTL at some point in

8  the future, as you say maybe within a year, it'll be a lot

9  quicker and all that good stuff, for $2 billion will resolve

10 all of its talc liability.  Isn't that right?

11 A    Yeah.  If he's right, then that would be what a confirmed

12 plan that's voted on by the claimants that's accepted by the

13 TCC -- if he's right, then that's what the plan would provide.

14 Q    Right.

15 A    And that would be the amount.

16 Q    And you'll be a hero at Johnson & Johnson, right?  You'll

17 have saved $188 billion?

18 A    Yeah.  That's correct.  I would have been a hero if I

19 could have resolved these cases outside of bankruptcy.  I would

20 have been a bigger hero.

21 Q    Okay.  So the motivation on why we're here today is not so

22 much that you can be a hero but for Johnson & Johnson to save

23 $188 billion.  That's why we're here, right?

24 A    Again, I disagree with that.  As I stated before, we're

25 here because we want to take that money that's wasted in the

1  system and we want to come to a resolution with the plaintiffs

2  to come with a fair and final solution through a trust that

3  would be approved by the Court in a plan voted on by the

4  claimants and that would be fair to everyone.  That's why we're

5  here.

6  Q    You think litigation is a waste?  Is that what you said?

7  A    I said there are processes -- if you can resolve something

8  without the need to do something, I would consider that a

9  waste.  So if you can come to a better resolution without

10 having to spend needless time on other processes, then, yeah, I

11 would consider those processes wastes.

12 Q    Do you believe it's wrong for people to sue a company that

13 makes a product that kills people?  Is that wrong in your

14 opinion, sir?

15 A    Well, I think we have a great dispute as to whether that's

16 happening in this situation.  Generally, I think people

17 absolutely have a right to sue people if they feel that they've

18 been wronged.  That's part of the system.  But I also feel that

19 if there are other ways to come to a resolution that are

20 better, then those should be pursued.

21 Q    Well, let's start at a -- the -- let's start at the

22 bottom.  We'll work our way up.  You agree that if a company

23 puts out a product that kills people, the people that are

24 harmed have a right in this country to bring litigation to seek

25 recompense, right?

Kim - Cross/Jonas                    165

1  A    Yeah.  I think that it's fundamental that people who feel

2  aggrieved have a right to sue.  Whether the suit is successful

3  or is a valid basis, that's a whole other thing.  But I do

4  agree that people have a right to be sued (sic).  But I also

5  believe that there are laws and regulations in place that if

6  they provide alternative means that come to a better result --

7  Q    Uh-huh.

8  A    -- that those should certainly be pursued.

9  Q    You said laws that are in place.  Are you familiar with

10 the United States Constitution?

11 A    I am.

12 Q    Do you understand that it provides a right for people that

13 are harmed that are seeking recompense to have a jury trial by

14 their peers?  Do you understand that?

15 A    I also understand that it has due process rights for

16 defendants that should be observed.  So, yeah, I believe in the

17 jury system if all the due processes procedures are intact.

18 Q    And do you think Johnson & Johnson gets to police the

19 process and decide when the process is fair and not fair and

20 act accordingly?  Is that your view?

21 A    So we're not -- I don't believe we're policing the

22 process.  What I do believe is that we do feel aggrieved in the

23 system, and we're looking for alternatives that come to a

24 better resolution for everyone, and we believe that better

25 resolution process would be through the bankruptcy system.

Kim - Cross/Jonas                                166

1  Q    Sir, you mean a better resolution for Johnson & Johnson.

2  That's what you mean.

3  A    No.  I think --

4  Q    So you can save $188 billion, right?

5  A    No.  So we -- again, we disagree with that.  We have --

6  again, we can go through the -- how the system is working for

7  the claimants, when it's not and how the lottery-like system

8  for these verdicts where a few people at the head of a line are

9  getting lots of money while others are getting nothing and

10 others have to wait decades, whether that system is better.

11 And, again, I think those are objective things that you can

12 look at to come to a determination.

13 Q    Sir, when was the last time you talked to someone who

14 alleges to be harmed by a Johnson & Johnson talc product?  When

15 was that?

16 A    Well, because of attorney/client issues and ethics around

17 talking to people who are represented, I think it's been a very

18 long time since I talked to an unrepresented person who has

19 been harmed by -- or allegedly harmed by a product.

20 Q    So you have no idea how the victims of talc, the

21 claimants, the 38,000 people that have filed claims against

22 Johnson & Johnson and Johnson & Johnson Consumer Products, you

23 haven't asked them how -- what they want to do in the system,

24 whether they're happy in the tort system, whether they want to

25 be in bankruptcy.  You have no idea, do you?

Kim - Cross/Jonas                    167

1  A    Well, I have observed virtually every trial.  I've seen

2  the plaintiffs testify.  I've seen the results of those where

3  most of them got nothing.  I do understand -- I read the

4  declarations that were submitted in this case.  I understand

5  what is going on with the MDL and how the system is working for

6  these plaintiffs.  So I've not spoken to them, but, again,

7  objectively, you can look at the circumstances and make an

8  assessment as to whether these plaintiffs are in a -- what

9  position they're in.

10 Q    Okay.  Well, we're going to come back to that in a minute.

11 Now, you were the litigator coordinating litigation for any

12 and -- any Johnson & Johnson consumer litigation, right?

13 A    I am.  I was.

14 Q    You were.  And then you became head of the product

15 liability practice group, right?

16 A    I did.

17 Q    And in that role, your responsibilities included

18 overseeing all talc cases?

19 A    It did.

20 Q    And for a number of years, you led the tort reform effort

21 for Johnson & Johnson, right?

22 A    I did.

23 Q    You were a member of a number of national organizations

24 agitating for tort reform, right?

25 A    I wouldn't call it agitating.

Kim - Cross/Jonas                                   168

1  Q    Well, you believe, to use your words, that there are

2  abuses in the tort system, right?

3  A    Well, I think that's in the first day declaration and in

4  the informational statement too.  Yes.

5  Q    So the answer is yes?  You believe --

6  A    Oh, yes.

7  Q    -- that there are abuses in the tort system?

8  A    Oh, absolutely.  Yes.

9  Q    And one of those abuses is you think that plaintiffs forum

10 shop?

11 A    Yes.

12 Q    That's bad, right?

13 A    Well, when done in the way that was done, for example, in

14 St. Louis, that would be bad.  So forum shopping in itself is

15 not, you know, in itself an issue if there are proper laws that

16 you're following in order to select some forum that you believe

17 is advantageous.  But in the circumstances that I'm talking

18 about, we're talking about people who have, we believe,

19 misrepresented things in order to gain access to a forum where

20 they don't belong.

21 Q    Let me use your words.  By forum shopping, you mean that

22 it puts -- in this case it was Johnson & Johnson -- in

23 jurisdictions that are favorable to plaintiffs.  That was

24 you -- that was your definition of forum shopping?

25 A    Well, that's a partial definition.

Kim - Cross/Jonas                         169

1  Q    Okay.  But that's -- when you say forum shopping, as a --

2  Johnson & Johnson didn't like being in certain forums chosen by

3  plaintiffs, right?

4  A    No.  When I say forum shopping, what I'm saying is that

5  there are certain plaintiffs who went to extremes to make

6  misrepresentations in order to stay in a forum that was

7  particularly favorable to them.  Ingham is a very good example

8  of that.

9  Q    Extremes?  Let's talk about --

10  A    Well --

11  Q    Let's talk --

12  A    Yeah.

13  Q    -- about extremes.  Johnson & Johnson -- you -- let me get

14  this right.  You formed a company on October 12th, I think.

15  LTL was born on October 12th, right?

16  A    Yes.

17  Q    And you did that by converting -- let's -- let me back up

18  a little bit.  You formed a company in Texas to take advantage

19  of what's been called the Texas Two Step statute so that you

20  could do a divisive merger and put the talc liabilities in one

21  company, and you could put the operating assets in another

22  company.  That's what you did, right?

23  A    Well, I don't know if I would characterize it that way.

24  What I -- what we did do was we did a restructuring transaction

25  utilizing the laws of Texas which are appropriate and followed

Kim - Cross/Jonas                                    170

1  all the rules and regulations in order to create a series of

2  transactions that we've been talking about in this case.

3  Q    Right.  You formed the company in Texas to take advantage

4  of the Texas laws that you liked, right?

5  A    As was allowed under Texas law.  Yes.

6  Q    Okay.  And then, a little bit while later, you converted

7  the Texas company to a new company that was in North Carolina,

8  right?

9  A    Absolutely.  Yes.

10 Q    And you did that so that that company -- I know it was up

11 to the board.  It wasn't a fait accompli yet.  But that company

12 might file bankruptcy, and you wanted to be in North Carolina,

13 right?

14 A    Correct.  Again, we followed all the rules and did the --

15 took all the appropriate steps necessary, because we believed

16 that North Carolina would offer the best chance to get a -- an

17 efficient -- so because of the existing case law about

18 divisional mergers and these types of transactions, we thought

19 that filing in North Carolina would get us the quickest

20 resolution to, again, fairly, you know, and efficiently resolve

21 this litigation.  So we took all the proper, appropriate legal

22 actions to do that.  Similar to people who file -- incorporate

23 in Delaware even though they have absolutely no presence in

24 Delaware, because Delaware has a body of law on corporate

25 governance that is -- frankly, it's not even that it's better

Kim - Cross/Jonas                                171

1  or worse but that it's there, and they know what it is.  So

2  similarly, in North Carolina, there were some rulings there

3  that aren't beneficial, but there were rulings that gave us a

4  roadmap about how to -- for example, what a funding agreement

5  should look like.  And so we utilized that knowledge to come up

6  with the right terms.

7              THE COURT:  Mr. Kim --

8              THE WITNESS:  Sorry.

9              THE COURT:  -- somewhere a while ago, it began as a

10  yes or no answer.

11              THE WITNESS:  Okay.  I'm sorry.

12              THE COURT:  All right?  I'm just going to remind you,

13  it'll go a lot smoother.

14              THE WITNESS:  Okay.  Sorry.  Thank you.

15  BY MR. JONAS:

16  Q    Mr. Kim, Johnson & Johnson chose North Carolina to

17  incorporate LTL, because it wanted to take advantage of law in

18  the Fourth Circuit that made it difficult to dismiss a

19  bankruptcy case based on a lack of good faith, yes or no?

20  A    No.

21  Q    Okay.  Did you do any research when you were deciding

22  where to file?

23  A    Only -- my research -- well, my understanding when we --

24  now, I --

25  Q    I know this is going to be a tough one, because now you

Kim - Cross/Jonas                                    172

1  don't want to talk about it, right?

2  A    No, no, no.  I do want to talk about it.  I do want to

3  talk about it.  That's the problem.  I do want to talk about

4  it, but I don't want to waive privilege.  But I do want to talk

5  about it.

6  Q    I don't think we need an answer, Mr. Kim.

7  A    No.  I do want to talk about it.

8  Q    No, no, no.  I don't think we --

9  A    I do want to talk about it.

10 Q    Mr. Kim --

11 A    I do want to talk about it.

12 Q    That's enough.

13         THE COURT:  Nope.  Nope.  If you want --

14         MR. JONAS:  I don't think we need an answer.

15         THE COURT:  -- your -- it'll be on redirect.

16         THE WITNESS:  Okay.

17 BY MR. JONAS:

18 Q    Okay.  In early October, you became chief litigation

19 officer at LTL, the debtor in this bankruptcy case, right?

20 A    I did.

21 Q    And before you took the position, you agreed on certain

22 compensation, right?

23 A    I did.

24 Q    And that compensation you agreed to you now get from

25 Johnson & Johnson Services, right?

Kim - Cross/Jonas                           173

1  A     I do.

2  Q     And the compensation you're getting now is higher than the

3  compensation you were getting before you took the job at

4  Johnson & Johnson, right?

5  A     Because of a retention bonus.  Yes.

6  Q     Right.  You didn't have any sort of -- that bonus, you

7  didn't have that at Johnson & Johnson, and now you have it that

8  you work for Johnson & Johnson Services?

9  A     I do.

10  Q    And, in fact, by taking this job, you can make hundreds

11  and hundreds of thousands of dollars more than you were making

12  before October 12th, right?

13  A    That's true, but that's not dependent upon --

14  Q    That was a yes or no.  Thank you.

15  A    Yes.  That's true.

16          THE COURT:  It'll be frustrating, but bear with it.

17          THE WITNESS:  Thank you, Your Honor.  Thank you.

18  BY MR. JONAS:

19  Q    In the few years preceding this bankruptcy, Johnson &

20  Johnson -- I'm talking about the parent company -- paid out

21  approximately 3-and-a-half-billion dollars on account of

22  talc-related verdicts and judgments against it and Johnson &

23  Johnson Consumer Products, right?

24  A    No.

25  Q    No?  Okay.

Kim - Cross/Jonas                        174

1  A    Should I explain?

2  Q    Please, please, please.

3  A    So it came out of a cash account by Johnson & Johnson, but

4  in actually, JJCI actually made the payments.

5  Q    Well, let's talk about it.

6  A    Uh-huh.

7  Q    The cash account was a cash account of Johnson & Johnson,

8  right?

9  A    It's a -- yes.  It's a concentration account that Johnson

10  & Johnson takes all the money from all the subsidiaries and

11  puts it into one account for cash management purposes.

12  Q    Okay.  So my question was, in the few years preceding this

13  bankruptcy, Johnson & Johnson paid -- because that's where the

14  money came from, right?  It came from a Johnson & Johnson

15  account, a cash account?

16  A    But all the money that came from those accounts came from

17  the subsidiaries.

18  Q    I understand.  I'm not asking you how the money got into

19  that account.  There was a Johnson & Johnson bank account,

20  right?

21  A    There is, yes.

22  Q    Okay.  And Johnson & Johnson, they wrote checks or however

23  they did it.  They paid 3-and-a-half-billion dollars, right?

24  A    It did.

25  Q    Okay.  And you're familiar that there were verdicts and

Kim - Cross/Jonas                                    175

1  judgments that -- including Ingham, by the way, that ordered

2  Johnson & Johnson -- ordered Johnson & Johnson to pay on

3  account of those judgments, right?

4  A    There were judgments against Johnson & Johnson jointly and

5  severally with JJCI.  Yes.

6  Q    There were orders that ordered Johnson & Johnson to pay

7  money on account of those claims, right?

8  A    I think it's technically either Johnson & Johnson or JJCI

9  if they're held jointly and severally liable, because you can't

10 get money from one co-defendant if the other co-defendant's

11 paid it.  So it's -- I think it's either/or.

12 Q    I think you mentioned this.  I just will be quick about

13 it.  So there was litigation.  You litigated in the tort

14 system, right?

15 A    We did.

16 Q    You settled some cases.  We'll talk about that in a little

17 bit.

18 A    We did.

19 Q    Right?  In the MDL -- I think we talked about this -- or

20 you talked about this.  In the MDL, you -- let me see if I get

21 this right.  Johnson & Johnson had a litigation strategy to

22 Daubert on the issue of the science of the plaintiff's claim,

23 right?

24 A    Yeah.  So again, when you say Johnson & Johnson, I'm going

25 to take that to mean Johnson & Johnson or any of its

Kim - Cross/Jonas                          176

 1 subsidiaries, which is generally what people mean when they say

 2 Johnson & Johnson.

 3 Q    Well, it was Johnson & --

 4 A    If you mean Johnson & Johnson the parent company, if you

 5 could just say Johnson & Johnson the parent company, it would

 6 make it clearer.

 7 Q    Yeah.  The reason I'm saying that is because in all these

 8 cases, Johnson & Johnson was named as a defendant, right?

 9 A    Along with -- well, most of them, I think, along with

10 Johnson & Johnson Consumer, Inc.

11 Q    Yeah.  Okay.  So in this context, you're right.  I'm

12 referring -- I know there's multiple defendants.

13 A    Right.  Right.

14 Q    But I'm using the vernacular Johnson & Johnson for that

15 purpose.

16 A    Okay.  So that would --

17 Q    But --

18 A    -- include all -- including the --

19 Q    Right.

20 A    Okay.

21 Q    You were answering the question about the MDL, and I don't

22 know if you gave me a yes or no on that one.

23 A    Well, so -- oh.  I wouldn't characterize it as a -- I'm

24 sorry.  Litigation strategy for what?

25 Q    Sure.  You --

Kim - Cross/Jonas                                    177

1   A      For --

2   Q      You made an -- let me -- I'll just trying it simply.

3   Please tell me if I'm wrong.

4   A      Uh-huh.

5   Q      You made an effort to have the science of the plaintiff's

6   claims thrown out in the MDL.  Is that fair?

7   A      We did.

8   Q      Okay.  And that wasn't successful?

9   A      Partially.

10  Q      Okay.  And you agree with me that that effort, that's a

11  litigation strategy, right?

12  A      They're motions --

13  Q      Okay.

14  A      -- to do it.  I'm not sure --

15  Q      You're a pretty sophisticated lawyer.  You wouldn't call

16  that a litigation strategy?

17  A      Well, it depends on what you mean by strategy.  It's a

18  process, you know?

19  Q      Let's talk about Imerys.  Sir, we've been asking you,

20  as -- I'm sure your familiar with this.  We've been asking you

21  now for three months at depositions, in requests for admissions

22  and interrogatories.  You're aware that the committees have

23  been asking you for months how much were you going to pay in

24  Imerys.  You're familiar that we've made that request multiple,

25  multiple times?  Yes or no?

Kim - Cross/Jonas                                    178

1  A    I actually don't know.  I thought that it -- that number

2  came from a pleading that the TCC made in North Carolina.

3  Q    You don't recall that at your deposition you were

4  instructed not to answer the question, because it was

5  privileged how much you had offered to settle the Imerys cases?

6  A    I don't recall.

7  Q    Okay.  I'm just going to ask that we look at your

8  transcript.

9  A    Uh-huh.

10 Q    Let me just take a look first, so I don't waste

11 everybody's time.  So let's go to page 102.  This is your

12 February 1st transcript.  We'll pull that up on the screen in

13 front of you.

14 A    Okay.  Could I get a copy?

15 Q    Sure.

16          MR. JONAS:  May I approach, Your Honor?

17          THE COURT:  Yes.

18          THE WITNESS:  Thank you.

19          MR. JONAS:  Sure.

20          MS. BROWN:  Mr. Jonas, do you have a copy for me?

21          MR. JONAS:  Yep.

22          MS. BROWN:  Thank you.

23          THE COURT:  If it's on the screen, I'll see it.

24          MR. JONAS:  Okay.

25          THE COURT:  Thanks.

1          MR. JONAS:  Can I --

2          THE COURT:  Oh, there are other exhibits?

3          MR.  JONAS:  There's other -- yeah.

4          THE COURT:  Okay.

5          MS. BROWN:  You can take my -- okay.

6          MR. JONAS:  Thank you.

7          THE COURT:  Nope.  That's fine.  I thought it was

8   just the one.

9          MR. JONAS:  Thank you.

10          THE COURT:  Thanks.

11                    (Counsel confer)

12   BY MR. JONAS:

13   Q    And if you look -- I'm going to read on page 102.  This

14   was at your deposition.

15   A    Uh-huh.

16   Q    Mr. Glasser asked you -- this is the bottom of 102 on line

17   24: "Is it the case that you -- is it true you never told the

18   board of LTL what the amount of the potential settlement in

19   Imerys was?"

20        You said, "I believe they were told."

21        "When?"

22        "Prior to the board meeting.  Prior to the board meeting,

23   there were conversations about Imerys, potential resolution of

24   Imerys, how that fell through."

25   A    I'm sorry.  I was --

Kim - Cross/Jonas                                    180

1  Q    "In the context of that, I think ranges may have been

2  given in that" --

3            THE COURT:  Wait one second.  One second.

4            MR. JONAS:  I'm sorry.

5            THE COURT:  Are you --

6            THE WITNESS:  I'm sorry.  I'm sorry.  I'm just lost

7  where you are.

8            DEFENDANT ATTORNEY:  It's 103 now, right at the top

9  of 103.

10           THE COURT:  Top of page 103.

11           THE WITNESS:  What date is this one?  Oh --

12  BY MR. JONAS:

13  Q    Oh, I'm sorry.  It's the February 1st one.

14  A    Yeah.

15  Q    It's at tab --

16  A    Okay.

17  Q    -- 11.

18  A    Sorry.  I'm on --

19  Q    No worries.  Take your time.

20  A    -- January 31st.

21  Q    No, no.  Please.  Take all the time you need.

22  A    Good.  Got it.  Thank you.

23  Q    This is about two weeks ago.  Actually, it was two weeks

24  ago.  Boy.  Seems like a year ago.  Just tell me when you're on

25  page 103.

Kim - Cross/Jonas                    181

1  A    I have it.  Yes.

2  Q    Okay.  And at line 9, Mr. Glasser asked you: "What was the

3  highest range given?"  Can you read your answer?

4  A    "That would be privileged."

5  Q    That would be privileged.  And I'll represent to you we've

6  asked in -- multiple people and lots -- every way we possibly

7  could.  And would you agree with me, today is the first time,

8  the first time, that anyone from Johnson & Johnson has told us

9  how much they were willing to settle globally talc litigation

10 for in the Imerys case?  Do you agree with me?

11 A    That may be true.  I don't think I've read all --

12 Q    You don't know?  Okay.

13 A    I don't.  I don't know.  Yeah.

14 Q    So let's talk about that.  Imerys represented an

15 opportunity for Johnson & Johnson, Johnson & Johnson Consumer,

16 Inc. -- well, I guess there wasn't an LTL then -- to settle --

17 globally settle its talc litigation, correct?

18 A    Mostly globally.

19 Q    Okay.  And what was the final number, the final number,

20 that Johnson & Johnson thought it had settled globally its talc

21 litigation for in the Imerys case?  What was that?  I don't

22 need a range.  I want to know the number, the final number you

23 thought you could settle it for.

24 A    So I'm sorry.  The -- do you mean -- okay.  Okay.  I think

25 I can just explain.  So there was a deal for part of the

Kim - Cross/Jonas                                   182

1 settlement.  It's very complicated in how it works, right,

2 because --

3 Q    We have plenty of time.

4 A    Great.  So I think the deal was at an amount of a little

5 over $4 billion for all the varying claims.  But there were

6 conditions where if people opted out, then there would be a

7 refund given on the amount.  So to -- so a final number is a

8 little hard to come to, but it's in the range of $4 billion for

9 the ovarian claims plus a futures component which, sitting here

10 today, I am not -- you know what?  This is my recollection

11 sitting here.  I'd have to look at the term sheet.  But it --

12 you know, it didn't -- it all -- it did not encompass, for

13 example, the meso claims.

14 Q    You never produced the term sheet.  That was privileged,

15 right?  You didn't turn that over to us?

16 A    Yeah.  I don't know.  That may be privileged.

17 Q    Yeah.  Well, I'll tell you, you didn't.

18 A    Okay.

19 Q    Yeah.  Okay.  So I want to know, sir, did you do a writeup

20 internally to say, hey, I'm going to resolve talc liability;

21 this is what it's going to cost us?

22 A    No.  This is --

23 Q    No?

24 A    This is -- no.

25 Q    No approval memo like Mr. Mongon told us you do lots of

Kim - Cross/Jonas                              183

1  approval memos?

2  A    Approval memos are for transactions --

3  Q    I see.

4  A    -- corporate transactions.  The settlement approvals are

5  done basically in person or by, you know, discussion.

6  Q    Okay.  So did you ever sit down with anybody -- who were

7  you reporting to at the time?

8  A    Joe Braunreuther.

9  Q    To who?

10  A    Joe Braunreuther.

11  Q    Okay.

12  A    Or so there's a -- there's a period of time where we're

13  doing negotiations of it.  And during that period, there was a

14  change in my reporting structure.

15  Q    So who were you reporting to when you were on the verge of

16  settling Imerys?

17  A    At the end of the period, it was Eric Haas.

18  Q    Mr. Haas is right over here, right?

19  A    He is.

20  Q    Right.  Maybe he has a better recollection.  We'll have a

21  chance to ask him some questions.

22  A    He would -- I think he would welcome that.

23          MS. BROWN:  We're going to have to --

24          MR. HAAS:  Welcome the opportunity.

25          MS. BROWN:  We're going to have --

 1            THE WITNESS:  I'm happy to cede the floor.

 2   BY MR. JONAS:

 3   Q    So, sir, you never said to anybody or told anybody at

 4   Johnson & Johnson, hey, I'm going to settle --

 5   A    Oh.

 6   Q    -- Imerys, it's going to wrap up all our talc liability,

 7   and this is what it's going to cost us?

 8   A    Oh, yeah.  Many people were informed of about this.

 9   Q    Okay.  And what did you tell them?  How much was the

10   maximum amount it was going to cost Johnson & Johnson?

11   A    Again, now I'm having -- because I hadn't looked at this

12   in a while, I would need to refresh my recollection.  It's in

13   the 4- to $5 billion range.  And that -- again -- it's a little

14   complicated, because you got refunds if people didn't

15   participate.  There was a futures component for future

16   claimants.  And meso was not included.  But there were

17   discussions about meso liability.  So, you know, that -- I'd

18   have to refresh my recollection on the exact amount.

19   Q    Well, sir, you came here today to testify, and you've

20   testified about the Imerys settlement.  You didn't refresh your

21   recollection before you came to testify?

22   A    No.  I just -- no.  I was asked, and I answered questions.

23   Q    You just winged it?

24   A    Yeah, essentially.  I did not --

25   Q    Because --

Kim - Cross/Jonas                                185

1  A    -- refresh my recollection on the exact details of the

2  settlement.

3  Q    Well, what -- let me ask you -- let's -- because I don't

4  want to spend too much time on this.  What do you think today,

5  best recollection, the maximum amount that Johnson & Johnson

6  was going to have to pay in connection with the Imerys global

7  talc settlement?

8  A    I believe it's in the range of 4- to $5 billion.  Again,

9  the amount -- it's a complicated -- it was a complicated

10 arrangement, but -- and this was a negotiation between two

11 parties.  You know, we said zero liability.  They said whatever

12 they had said.  And sitting here today, I -- you know, I

13 believe it's in the 4- to $5 billion range for --

14 Q    Didn't you tell the board 3- to 6-?  I thought's what you

15 said, 3- to 6-.  That's what you told the board.

16 A    Yeah.  It could have been.  Again, it depends on a period

17 of time.  Because it was a series of negotiations.  And how you

18 calculate it, you know, may have changed over a period.

19 Q    Did you tell the board 3- to 6 billion to settle Imerys?

20 The LTL board on the 14th?

21 A    Yeah.

22 Q    You're getting ready -- let me finish, sir.  You're

23 getting ready to make the big decision to file LTL for

24 bankruptcy.  You're having a discussion.  You want to make sure

25 they're fully informed.  I'm sure Mr. Wuesthoff asked --

Kim - Cross/Jonas                          186

1  A    Right.

2  Q    -- lots of questions.  And did you say to him the Imerys

3  settlement was going to cost 3- to 6 billion?  Did you say

4  that?

5  A    I don't recall what I said, because, again, the deal was

6  done by that time.  You know, the deal had been -- had fallen

7  through.  So the -- I was only giving them information

8  historically.  And, again, I don't believe that was a -- that

9  was a data point that we can, A, rely on, because it fell

10 through, and it had nothing to do with future liability.

11 Because, again, it was a negotiated number.  So I may have said

12 3- to 6-.  I may have said 4- to 5-.  But that's around the

13 range that we were discussing in that time period.

14 Q    Let me cut to the chase, because I'm really curious about

15 something.

16 A    Uh-huh.

17 Q    And I bet almost everybody in this courtroom is.  If the

18 LTL thing works out for you, and Mr. Wuesthoff is right -- and

19 he's a smart guy -- and it costs you less than the $2 billion

20 you put in the QSF -- right?  Right?  You with me?

21 A    I am with you so far.

22 Q    Okay.  That's going to save you somewhere between 2- to $4

23 billion, right?

24 A    I disagree with that characterization of saving any

25 company money.  Again, we believe we have zero liability.  We

 1  do have costs in the litigation system that we're avoiding the

 2  wasted cost.  And, again, what we're trying to do is come up

 3  with a confirmed plan that everyone can agree with.  And that

 4  would be the amount of money that was determined to be the

 5  amount of money to pay.  So the concept of saving money I don't

 6  understand.

 7  Q    All right.  Well, let me explain it to you.

 8  A    Yeah.

 9  Q    Imerys global resolution of talc liability could have cost

10  $6 billion, right, up to?

11  A    It -- well, at that time --

12  Q    How about 5 billion?

13  A    At that --

14  Q    We'll use 5 billion.

15  A    Yeah.  At that time, it may have.  Yeah.

16  Q    Okay.

17  A    At that time if the deal came through.

18  Q    And when did that settlement fall apart?

19  A    I want to say May or June time frame.

20  Q    May or June of 2021?

21  A    Correct.

22  Q    Not that long ago, right?

23  A    That's correct.

24  Q    Okay.  So here we are today.  LTL.  Mr. Wuesthoff said,

25  yeah, they're giving us 2 billion bucks; I think that's going

Kim - Cross/Jonas                    188

1 to be more than enough.  Global resolution of talk liability of

2 Johnson & Johnson.  You're a hero.

3 A    Uh-huh.

4 Q    $2 billion, right?  The difference between 2- and 6-,

5 that's $4 billion.  It'll be $4 billion cheaper, cheaper to --

6 if this is successful, than it could have been --

7 A    Yeah.

8 Q    -- less than a year ago, right?

9 A    Yeah.  But that -- those are two hypotheticals.  So you're

10 dealing with one hypothetical that didn't happen, because it

11 got rejected, and then another hypothetical that may or may not

12 happen.  I think Mr. Wuesthoff has consistently testified that

13 2 billion is a substantial amount of money.  Could be more.

14 Could be less.  And so the idea -- you know, whatever the

15 number is, is what -- again, what the plan is going to

16 determine, what a negotiation would come to, that is going to

17 be the number, whatever that number is.  And I don't -- I

18 wouldn't consider it a savings of anything.  I would consider

19 it an amount of money that's being paid to resolve the

20 litigation.

21 Q    Sir, Johnson & Johnson hopes that the $2 billion it's

22 putting in the QSF will be enough and will resolve globally

23 talc liability.  You -- Johnson & Johnson hopes that works,

24 right?

25 A    Yeah.  I don't -- I'm not sure what hopes means.  I think,

Kim - Cross/Jonas                                                  189

1  again, we're looking for -- we understand that there's going to

2  be a negotiation and that there's going to be a determination

3  of a -- of an amount.  I'm not sure where hope falls into it.

4  You know, we -- you know, again, we're ready, willing and able

5  to sit down and try to resolve this litigation quickly and

6  fairly.  That's what our hope is.

7  Q    Well, let me ask you, are you saying that Johnson &

8  Johnson doesn't care what it costs, how much it costs, just

9  doesn't care --

10 A    Not that --

11 Q    -- whether it's 2 billion or -- doesn't matter?

12 A    Not that it doesn't care.  But sitting here today, it

13 can't calculate what that is.

14 Q    Well, let me ask you -- now let's cut to the chase.  Who

15 came up with the $2 billion number?

16 A    Again, I don't know who came up with the $2 billion

17 number.  I do know that I believe that's an appropriate number

18 to put in a QSF.  And, again, the QSF is just a partial amount

19 of the funding agreement.  So it is a substantial number that

20 was put in to show the good faith of the company and try to

21 come to a resolution.  The actual number that it will cost is

22 going to be something that will come out of a negotiation and,

23 again, with a plan and plan confirmation by the Court.  So, you

24 know, 2 billion, I think, is an appropriate amount.  But we

25 don't know that that's going to be the ending number.

Kim - Cross/Jonas                               190

1  Q    I think you said you're the most -- maybe in the world --

2  the most experienced -- certainly at Johnson & Johnson, you're

3  the most experienced person relating to talc litigation, right?

4  A    I believe that's -- longstanding.  I mean, I would say

5  Andrew White also --

6  Q    Okay.

7  A    -- because of his day-to-day duties, has a great

8  understanding of talc litigation.  I think all our counsel.  So

9  I am one of the ones --

10 Q    Okay.

11 A    -- with the most litigation -- I think what I said was I

12 probably have more experience in mass tort litigation than

13 anyone.

14 Q    So when Johnson & Johnson had to figure out how much

15 should we put in the QSF, they didn't talk to you with all

16 of -- as the most experienced person in talc litigation, they

17 didn't have a -- say John, help us figure out how much we

18 should fund the QSF?

19 A    Well, as I said in my deposition, I did talk to people

20 about it.

21 Q    Oh, okay.

22 A    I just did not come up with the number.

23 Q    Oh.  Well, tell me.

24 A    I --

25 Q    Who did you talk --

Kim - Cross/Jonas                          191

1  A    I told the --

2  Q    -- to about funding the QSF?

3  A    Yeah.  Mostly Eric Haas and Andrew White.

4  Q    And what did you talk about?

5  A    We talked about what an appropriate number might be --

6  Q    Oh.

7  A    -- to fund a QSF.

8  Q    Right.  Okay.  And did you suggest 2 billion?

9  A    I thought 2 billion was the appropriate number.  I don't

10 know who came up with the 2 billion or why.

11 Q    But you talked about it?

12 A    We talked about it.

13 Q    Okay.

14 A    But then the decision was made.  I did not make the

15 decision.

16 Q    Okay.  So what -- when was that conversation or

17 conversations?

18 A    I think in the runup as we were doing due diligence.

19 Q    Okay.  It was before October 12th, right?

20 A    Before October 12th?  Likely.  Yes.

21 Q    Okay.  So just so we all understand, before October 12th,

22 you have your hat on, and it's a Johnson & Johnson lawyer hat,

23 right?

24 A    Representing our subsidiaries.

25 Q    Okay.  You have your Johnson & Johnson lawyer hat on, and

Kim - Cross/Jonas                          192

 1  you meet with Mr. Haas and maybe other people, and you're part

 2  of the decision to fund -- that $2 billion is the right number

 3  to fund this QSF, right?

 4  A    I'm part of the discussions on that.

 5  Q    Okay.

 6  A    Yes.

 7  Q    Then on October 14th, now you've got a different hat on.

 8  Now you've got on your chief legal officer of Johnson -- of

 9  LTL.  You walk into a board meeting, and you're advising the

10  board that -- in part that the 2 billion -- that we should file

11  bankruptcy and that the $2 billion QSF, that's appropriate?

12  A    Yeah.  Because, you know, the way that this transaction

13  works, we're all -- we're all part of the same company.  And

14  the fact that I had a -- that I was a Johnson & Johnson

15  employee didn't take away the fact that I'm a lawyer

16  representing all my clients and trying to be fair.  And so I --

17  frankly, the fact that I had discussions in my J&J role about

18  the amount was better, because at my -- in my LTL role, I knew

19  exactly what my discussions were.  And so there's no conflict.

20  I don't see a conflict in those roles at all.

21  Q    Okay.  Let me ask you.  I know we had a little bit of a

22  question before about what constitutes litigation strategy.

23  Let me try this one.  Would you agree with me that appealing a

24  judgment or a verdict, taking an appeal is a litigation

25  strategy?  Would you agree with me?

Kim - Cross/Jonas                          193

1  A    Yeah.  Again, I'm not sure what you mean by -- you know,

2  you seem to have a -- you know, a specific meaning in mind for

3  litigation strategy.  I would -- you know, whether you call it

4  a litigation strategy, it's a -- it's an appeal.  It's a

5  process that you take.  Whether or not to take it is a decision

6  that you make based upon a lot of factors.  Again, I don't know

7  what you mean by litigation, you know, strategy.

8  Q    Just to -- I know we've talked quite a bit about this.

9  I'll try and be quick about it.  Project Plato was being set up

10 and worked on as early as the late spring to summer of 2021,

11 right?

12 A    I believe -- yeah.  I'm not sure when Project Plato

13 started -- it started being called Project Plato.  So, you

14 know, again, if you're defining Project Plato as the due

15 diligence project, I think that happened a little later.  In

16 the early spring, we were definitely looking at restructurings.

17 But I'm not sure that we had called it --

18 Q    All right.

19 A    -- Project Plato at that time.

20 Q    But by July, there were -- you were getting invites to

21 Project Plato due diligence weekly team meetings, right?

22 A    I was.

23 Q    Okay.

24 A    Those were the due diligence meetings among the groups to

25 look at whether the transaction was feasible.

Kim - Cross/Jonas                                  194

1            MR. JONAS:  Okay.  I apologize, Your Honor.  I'm

2   actually trying to expedite, so --

3            THE COURT:  That's all right.

4            MR. JONAS:  -- it's a little shuffling of pages.

5   BY MR. JONAS:

6   Q    So from the very beginning of Project Plato, there was the

7   expectation that LTL would file bankruptcy to resolve talc

8   litigation, correct?

9   A    Yeah.  That's true.

10  Q    And you compared a bankruptcy to other options, right?

11  A    I'm not sure I understand the question.

12  Q    Did you --

13  A    In what time frame?

14  Q    Did you compare bankruptcy to -- I think you testified

15  about it --

16  A    Yeah.

17  Q    -- to other options?  You could --

18  A    Yeah.

19  Q    -- continue in the tort system?  You --

20  A    Yes.  Yes.

21  Q    Okay.

22  A    Absolutely.  Yes.

23  Q    And Johnson & Johnson determined that a bankruptcy of LTL

24  would be the most efficient way for it to settle the talc

25  litigation, correct?

Kim - Cross/Jonas                              195

1  A    Again, if you're calling Johnson & Johnson including JJCI,

2  I would say that the JJCI and Johnson & Johnson did make that

3  determination that it's the most efficient and effective way, a

4  fair way to settle -- to resolve --

5  Q    Right.  I think you said it was the most efficient way to

6  get a full and fair settlement for the parties, right?

7  A    I believe -- is that when you chastised me for not using

8  efficient?

9  Q    I don't remember.

10  A    Okay.

11  Q    But that's what you said, right?

12  A    I think that is what I said.

13  Q    Okay.

14  A    Yes.

15  Q    And that's because -- I want to -- this I want to be very

16  careful about, because these were your words.  And we can look

17  it up if you want.  That's because Johnson & Johnson believed

18  that "using the bankruptcy system" would be a faster way to

19  deal with the number of claims that's part of the litigation,

20  right?

21  A    Those could be my words.  Yeah.

22  Q    You used the words "using the bankruptcy system."  Isn't

23  that what you said?

24  A    Yeah.  Yeah.  I -- that's sort of vernacular.  Yeah, I

25  may -- I may have said that.  Yes.

Kim - Cross/Jonas                                            196

1 Q    Yeah.  Okay.  And that's because using the bankruptcy
2 system could stay the talc litigation and force claimants to
3 resolve their claims in bankruptcy, right?
4 A    Well, I think when you file for Chapter 11, then the
5 process would be that the Chapter 11 rules would apply to
6 claims handling.
7 Q    So that's a yes, right?
8 A    Yeah.  I'm just not sure -- could -- I'm sorry.  Could you
9 repeat the question then?
10 Q    Sure.
11 A    Yeah.
12 Q    Using the bankruptcy system could stay the talc litigation
13 and force talc claimants to resolve their claims in the
14 bankruptcy, right?
15 A    Yeah.  I don't think I would use -- I don't think I said
16 to force claimants.  Yeah.  I --
17 Q    Isn't that what's happened here?
18 A    No.  No.  Because we're not forcing claimants to do
19 anything.  We put them in the bankruptcy system.  Now there is
20 a fair process to go through to come to a resolution that's
21 going to result in a -- you know, a -- you know, again, a vote
22 by the claimants, a negotiation, us setting a trust.  So I'm
23 not sure there's any force being used here.
24 Q    Okay.  Your words.  You put them in the bankruptcy system.
25 That's what you just said, right?

1  A     Well, yeah.  Did --

2  Q     Did you say we put them in the bankruptcy system?

3  A     Yeah.  I'm not sure what I -- I'm not sure if I said those

4  exact words.  I'd have to look again.

5  Q     Okay.  The other reason that Johnson & Johnson believed

6  that using the bankruptcy system would be a faster way to deal

7  with the claims was because it would eliminate jury trials,

8  right?

9  A     I don't think I said that.  No.

10  Q     No.  I'm asking you.  I mean, you --

11  A     Okay.  Yeah.  No.

12  Q     -- you had a lot of horrible --

13  A     Yeah.

14  Q     -- things to say about the jury system.

15  A     Yeah.

16  Q     I'm asking you, isn't one of the benefits of using the

17  bankruptcy system so that you don't have to deal with juries

18  anymore?

19  A     Yeah.  I think that depends on the plan, actually.  So,

20  you know, I think different plans have different requirements,

21  and I don't -- yeah.  I would say -- I would defer to

22  bankruptcy experts on that.  But my understanding would be

23  that's -- that would be part of plan confirmation.

24  Q     You're telling me that you don't see this bankruptcy --

25  you don't see one of the advantages of being here is so that

Kim - Cross/Jonas                              198

1  you can avoid the horribles -- or all the horrors of the jury

2  system that we went through in your slide deck?

3  A    No.  I think, again, as I said, the purpose for our filing

4  was to try to settle the -- resolve these cases in a mediation

5  resulting in a QSF.  That's what the purpose of this is.  How

6  the plan deals with the jury system afterwards, I think that's

7  something that would be negotiated and part of the plan

8  process, so --

9  Q    Another reason you think it would be efficient to use the

10 bankruptcy system is because it could help Johnson & Johnson

11 pay less than it might have to pay in the tort system, right?

12 A    Again, I don't think I said that, and I would disagree

13 with that.  Again, the -- so no.

14 Q    Okay.  So I want to talk a minute about what happened

15 earlier here.  At the beginning of this, the corporate

16 restructuring, Janssen Pharmaceuticals merged JJCI into

17 Currahee Holding Company, Inc., correct?

18 A    I believe that's true.  I'd actually have to defer -- it's

19 been a little while since I've looked at the step chart and --

20 I believe that's right.  But, again, I would defer to the

21 actual agreements.

22 Q    Then Currahee merged JJCI into Chenango Zero, LLC,

23 correct?

24 A    Again, I believe that's true, but I'd have to, again, look

25 at the step plan or -- my first day declaration has the whole

Kim - Cross/Jonas                                    199

1  chart of how the transaction was put together.

2  Q    Then Chenango Zero split up into Chenango One and Chenango

3  Two, right?

4  A    Same answer.  Again, I believe that's true, but I'd have

5  to go and confirm it.  Sitting here right now, I'd have to --

6  I'd like to confirm it before I --

7  Q    Really?  You really -- you're not sure that Chenango Zero,

8  LLC split into Chenango One and Chenango Two?

9  A    Yeah.  Again, I believe that's true.  I -- you know,

10  again, I would defer to the agreements.  I don't have it

11  sitting in front of me.  I -- it's been a while since I've

12  looked at the step chart, but I believe that's true.  Yes.

13  Q    Do you -- are you sure that Chenango One got all the talc

14  liability?

15  A    So I do know what the end result was, and the end result

16  is that LTL has all the talc liability, and we have a new

17  entity, new JJCI that had the remaining assets of old JJCI and

18  that LTL became a North Carolina corporation.  So all the

19  intermediate stuff that happened, and there's a lot of them,

20  they're -- it's in my first day declaration, and I have a chart

21  that can help me through that.  I believe you're right in what

22  you said, but, again, I think what's important to me was what

23  the end result is, and we can do that.

24  Q    Well, let me ask you this.  What happened to Chenango

25  Zero --

1  A     Yeah.  I think you --

2  Q     -- LLC?

3  A     Yeah.  I think you --

4  Q     What happened to it?

5  A     Again, I think you asked me that at my deposition.  And

6  it -- the Chenango -- because -- the way that the restructuring

7  happened, what happened to Chenango Zero was that all its

8  liabilities were split.  Nothing was -- nothing disappeared,

9  right?  So you had the -- whatever liability Chenango Zero had,

10 the talc portion of that was given to one company.  All the

11 other liability was given to another company.  And because of

12 that, there was nothing left in Chenango Zero, and then

13 Chenango Zero disappeared.

14     So it's not like any liability disappeared.  It was given

15 to one or the other entities.  And then when there was nothing

16 left in Chenango Zero, it disappeared.

17 Q     Why did Chenango Zero have to disappear?

18 A     Well, it's part of the Texas restructuring statute.  It

19 allows you to do that.

20 Q     Why?  What's the basis?  What's the benefit of that?

21 A     There's nothing left in it.  Why would it stay?  You know,

22 Chenango Zero, again, is an empty shell at that point.  All its

23 assets and liabilities have been distributed.  They don't --

24 the liabilities and assets don't disappear.  They're all taken

25 up by one of the other companies.  Chenango Zero is now a

Kim - Cross/Jonas                                201

1  shell.  It's got no reason to exist, and so it disappeared.

2  Q    Let me ask you, why -- do you understand that Chenango Two

3  then merged into Currahee --

4  A    Yeah.

5  Q    -- and changed its name back to Johnson & Johnson Consumer

6  Products, Inc.?

7  A    Yes, because -- and do you want to -- I'm sorry.  Yes.

8  Q    And why was it --

9  A    Yeah.

10 Q    -- necessary to change its name back to Johnson & Johnson

11 Consumer Products?

12 A    Yeah.  So as I stated in the first day declaration, the

13 whole purpose of the restructuring was to enable LTL, the

14 company, to file for bankruptcy without subjecting the rest of

15 the assets of JJCI to the bankruptcy procedure.  In order to

16 get there, you had a series of transactions so that the entity

17 that was formerly JJCI and the entity that is the new JJCI were

18 both -- virtually identical except for it no longer had the

19 talc liabilities.  So in order to do that, you had to create

20 other companies, one a New Jersey company, so that once the

21 assets were split, the company that had the non-talc

22 liabilities could merge back into the New Jersey company so

23 that it became another -- a New Jersey company again.  So

24 that's the purpose of the transaction.

25         MR. JONAS:  Your Honor, it's 4:30.

202

1              THE COURT:  Yeah.

2              MR. JONAS:  I'm a little exhausted.  And I'm at a

3  break --

4              THE COURT:  I was going to ask --

5              MR. JONAS:  I'm at a breaking point --

6              THE COURT:  Okay.

7              MR. JONAS:  -- if it would be a convenient point to

8  break.

9              THE COURT:  That's fine.  What do you anticipate for

10  tomorrow as far as time on continuing cross?  And then I'll ask

11  debtor's counsel.

12             MR. JONAS:  Yeah.  Well, I mean -- you mean just with

13  Mr. Kim or --

14             THE COURT:  Yeah.

15             MR. JONAS:  Can I have one second?

16             THE COURT:  Sure.

17                         (Counsel confer)

18             MR. JONAS:  Your Honor, I would think between 30 and

19  60 minutes.  I need to get my thoughts together.  But looking

20  at what I have now, I'd say something in that range.

21             THE COURT:  All right.

22             And then on your end?

23             MS. BROWN:  From my point of view right now, Judge, I

24  got two questions.  So I'm hoping to be real short on redirect.

25             THE COURT:  And then the witnesses for tomorrow, what

1 do we anticipate?

2          MS. BROWN:  We will then call Mr. Adam Lisman as our

3 final fact witness.  And then I believe we'll move into expert

4 witnesses.

5          THE COURT:  Do you agree, Mr. Jonas?

6          MR. JONAS:  Yes.  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. JONAS:  I actually think we're making pretty good

9 time in terms of the clock, so --

10          THE COURT:  All right.  Well, that's good news.

11          All right, everybody.

12          MR. BLOCK:  Your Honor?

13          THE COURT:  Counsel, yeah?

14          MR. BLOCK:  Your Honor?

15          THE COURT:  Yeah?

16          MR. BLOCK:  Can I be heard?

17          THE COURT:  Yes.

18          MR. BLOCK:  Thank you.  Your Honor, good afternoon.

19 Thank you for allowing me to address the Court.  My name's

20 Jerome Block.  I'm with the law firm of Levy Konigsberg.  I

21 represent Randy Duron.  He's living with mesothelioma.  He's a

22 member of TCC2.  And I represent various other talc claimants,

23 nearly a hundred.

24          Your Honor, I've been involved in every deposition in

25 this case.  Today, Mr. Kim, in an attempt to establish that the

1  LTL Board acted in good faith and acted with complete and full

2  information, testified about all the information he provided to

3  the LTL Board.  He provided data in the PowerPoint slides that

4  he provided to the LTL Board about litigation, about cases,

5  about trial costs, about legal expenses and about -- and he

6  testified today that he gave the LTL Board all the information

7  about all the different methods they used to resolve the cases.

8  He testified today that he gave the LTL Board all the

9  information about the strategic options that were attempted to

10  resolve the talc litigation.

11          Your Honor, Exhibit 23 is -- are the LTL Board

12  minutes.  And the reason why those minutes were taken on

13  October 14, 2021, was to document what Mr. Kim actually did

14  tell the board and what he did not.  And in the face of this

15  testimony, what we have, Your Honor, is Exhibit 23.  And

16  there's a redaction in those board minutes, and the redaction

17  is in the section entitled Strategic Options.  It was recorded

18  in the minutes.

19          Mr. Kim testified today that he doesn't necessarily

20  remember everything that was said.  We are demanding, Your

21  Honor, that we have those unredacted minutes, so we can have a

22  fair opportunity to cross Mr. Kim.  He's the one who wrote the

23  board minutes.  He signed the board minutes.

24          And if they're consistent with what he's said, then

25  there's no issues.  If they're inconsistent, we have a due

1 process rights -- our client have a due process rights to

2 cross-examine the witness.  And so that's Exhibit 23.  So we

3 would ask Your Honor to look at those -- at that document in

4 unredacted form in light of the testimony that occurred today

5 and to determine do we have a right to cross-examine the

6 witness about what's documented about what happened at that one

7 meeting when the decision to file the bankruptcy was filed.

8           The other issue is Exhibit 67, Your Honor.

9 Ms. Brown -- so Exhibit 23 is the first one.  Ms. Brown and

10 Mr. Kim worked on a PowerPoint for this hearing.  They went

11 through the slides in the PowerPoint, and with each slide, you

12 can recall, Mr. Kim said, yes, I told the board about that;

13 yes, I told the board about that.

14           And it contained all sorts of information about

15 litigation, numbers, data, about all the options.  But that's

16 not the PowerPoint that the LTL Board was actually shown.  That

17 was a PowerPoint they made for Your Honor.

18           There is a PowerPoint the board was actually shown.

19 That PowerPoint is Exhibit 67.  We have a due process right to

20 cross-examine Mr. Kim about the only PowerPoint that was

21 actually shown to the board.  The problem is, Your Honor, that

22 PowerPoint that was provided to us has pages entitled Costs, so

23 they're redacted.  It has pages entitled Strategic Options.

24 It's redacted.  It has pages entitled Exposure.

25           THE COURT:  Right.  I've reviewed this document --

1          MR. BLOCK:  Right.  But, Your --

2          THE COURT:  -- already, correct?

3          MR. BLOCK:  Your Honor, I know you have.  But now

4    you've heard Mr. Kim come into court.  And we could look at the

5    PowerPoint slide he testified to.  We could look at his

6    testimony.

7          And we should be able to say, okay, Mr. Kim, you said

8    you told the board this information; let's look at the

9    PowerPoint you actually did show the board.  And that's

10   cross-examination.  That's testing the testimony through what

11   the information was that actually was shown to the board.

12         I mean, if -- Mr. Kim didn't hold anything back

13   today, Your Honor.  He testified in a full way about all the

14   information he says was provided to the board.  He talked about

15   numbers he gave to the board about costs, about expenses.  We

16   don't know if there's something in these documents about an

17   option to stay in the litigation system as LTL.  We don't know

18   what he told them about the pros and cons of all these

19   strategic options.

20         So, Your Honor, I understand that you've seen these

21   documents.  But now Mr. Kim has come in and given this

22   testimony.  And I don't know how we can fairly cross-examine

23   him if we can't use the minutes that actually memorialize what

24   was told to the LTL Board, Exhibit 23, and if we can't use the

25   PowerPoint that was actually shown to the LTL Board, and

1  instead we have to rely on cross-examining on the PowerPoint

2  that Ms. Brown made with Mr. Kim to testify in court where he

3  says this is the information we told to the board.

4          So, Your Honor, we think in order to have a full and

5  fair opportunity to cross-examine the witness -- it's not going

6  to be me.  But I do feel strongly about this issue, and I felt

7  like I needed to raise it.  Thank you, Your Honor.

8          MS. BROWN:  May I be heard, Your Honor?

9          THE COURT:  Well, let me see -- let me have you

10 address everybody at once.  So let me hear --

11         UNIDENTIFIED SPEAKER:  Your Honor, just one --

12         MS. BROWN:  Oh, there's more.  Okay.

13         UNIDENTIFIED SPEAKER:  Just one further point on

14 behalf --

15         THE COURT:  Yeah.  I think there's more.

16         MS. BROWN:  There is more.  Okay.

17         UNIDENTIFIED SPEAKER:  Just one further point --

18         THE COURT:  Yes.

19         UNIDENTIFIED SPEAKER:  -- on behalf of the Committee

20 in supplementation of what Mr. -- what Jerry just said, which

21 is that I can't think of a clearer example of subject matter

22 waiver than what took place today where the witness testified

23 at length about the information he provided to the board.  And

24 under those circumstances, I think the documents that reflect

25 what he communicated to the board should fairly be unredacted.

208

1            THE COURT:  All right.  Thank you.

2            Yes --

3            MS. BROWN:  My turn?

4            THE COURT:  Yes.

5            MS. BROWN:  All right.

6            THE COURT:  Your turn.

7            MS. BROWN:  Thanks, Judge.  Your Honor, a couple of

8    things.  The board meeting minutes state quite clearly the

9    information that Mr. Kim provided to the board.  The board

10   meeting minutes at page 3 of 7 indicate that Mr. Kim then

11   reviewed the company's history with the talc-related

12   liabilities.  Mr. Kim's presentation addressed, among other

13   things, the use of talc in products of the company's

14   predecessors, the evolution of talc-related lawsuits in the

15   tort system, the experience of the company's predecessors in

16   the tort system, challenges faced by the company's predecessors

17   in the tort system and historical and forecasted costs and

18   expenses of the company's predecessors and the company

19   respectively associated with talc-related lawsuits.

20           The board meeting minutes, Your Honor, go on to

21   indicate that Mr. Kim, as we called out in the slide deck,

22   reviewed the potential strategic options with the board.  As

23   Your Honor well knows, all of the slides that we talked about

24   today fall within that category and, moreover, Your Honor, are

25   sourced from the 124-page informational brief that was filed on

1  the first day of this bankruptcy.

2           Mr. Kim has testified at length about the information

3  that has been shared with claimants from the very beginning

4  about information that he provided the board, factual

5  information that he provided the board and on which the board

6  relied.  That is consistent with information that is unredacted

7  in these minutes that claimants have had for the entire length

8  of this case, that claimants have had the opportunity to talk

9  to Mr. Kim about; to talk to Mr. Dickinson, a board member,

10  about; to talk to Mr. Wuesthoff about.  Everyone's testimony

11  has been consistent with the facts that are recorded in the

12  board meeting minutes and the facts that are recorded in the

13  informational brief.

14           In addition to the factual background, Your Honor,

15  that we have been fully transparent about, Mr. Kim provided

16  legal advice in his capacity as a lawyer.  There is one

17  sentence in this board meeting minutes that we have redacted,

18  because it implicates legal advice.  Your Honor has already

19  reviewed that in camera and agreed that that one sentence does

20  reveal legal advice.

21           Mr. Kim did not talk about anything on the stand

22  today that speaks anywhere close to what that information is.

23  Moreover, counsel -- Mr. Block is referencing an entirely

24  different presentation put together by a different lawyer which

25  the Court has already reviewed and agreed that the select pages

1 that were redacted were not factual information on which the

2 board relied but were legal advice and analysis of that

3 counsel.

4        And so, Your Honor, in short, all of the facts on

5 which the board relied have been fully disclosed in the meeting

6 minutes, in testimony of no less than three witnesses and in a

7 125-page informational brief.  Any legal advice, including the

8 one sentence here Your Honor has already reviewed and agreed

9 with, and Mr. Kim's testimony here today does not implicate

10 that at all.

11        And so, Your Honor, I would suggest that the facts

12 have been given to plaintiffs.  They have had them.  The legal

13 advice has not been waived.  It has not been revealed, and Your

14 Honor has already reviewed and agreed with that.

15        THE COURT:  All right.  Thank you.

16        MS. BROWN:  Thanks.

17        THE COURT:  I'm not prepared to change my ruling.  I

18 don't find there to be a subject matter waiver.  Request

19 denied.

20        Tomorrow, we'll continue.  I think we're going to --

21 we're set to begin at 9:00 again.  We will probably not use

22 Court Solutions.  We'll probably use Zoom.  I will have a

23 request -- I have a request that you clean up after yourselves

24 in the conference rooms.  And be safe, and I'll see you all

25 tomorrow morning.

211

1          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          UNIDENTIFIED SPEAKER:  Thanks, Judge.

4          MS. BROWN:  Thanks, Your Honor.

5          THE COURT:  Wait.  Mr. Kim, you are -- continue to be

6  on the stand.  Please make sure you don't speak with counsel --

7  any counsel regarding your testimony.

8          THE WITNESS:  Thank you.

9          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11                        *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

212

1                      **C E R T I F I C A T I O N**

2              We, DIPTI PATEL, KAREN WATSON, LORI KNOLLMEYER,

3    ELIZABETH REID-GRIGSBY and LIESL SPRINGER, court approved

4    transcribers, certify that the foregoing is a correct

5    transcript from the official electronic sound recording of the

6    proceedings in the above-entitled matter, and to the best of

7    our ability.

8

9    /s/ Dipti Patel                     /s/ Karen Watson

10   DIPTI PATEL                         KAREN WATSON

11

12   /s/ Lori Knollmeyer                 /s/ Elizabeth Reid-Grigsby

13   LORI KNOLLMEYER                     ELIZABETH REID-GRIGSBY

14

15   /s/ Liesl Springer

16   LIESL SPRINGER

17   J&J COURT TRANSCRIBERS, INC.        Date:  February 16, 2022

18

19

20

21

22

23

24

25