# **EXHIBIT 1**

Nos. 22-2003, 22-2006, 22-2009, 22-2010 (Consolidated)

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔗𝔥𝔦𝔯𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

IN RE: LTL MANAGEMENT, LLC,

*Debtor*,

ARNOLD & ITKIN LLP ON BEHALF OF
APPROXIMATELY 7,000 TALC PERSONAL INJURY CLAIMANTS
WHO ARE REPRESENTED BY ARNOLD & ITKIN LLP,

*Appellant,*

v.

LTL MANAGEMENT, LLC

*Appellee.*

Direct Appeal from the United States Bankruptcy Court
for the District of New Jersey, Chapter 11 No. 21-30589

## BRIEF FOR APPELLANT

Laura Davis Jones
Isaac M. Pachulski
Karen B. Dine
Jeffrey M. Dine
Colin R. Robinson
Peter J. Keane
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
ljones@pszjlaw.com
ipachulski@pszjlaw.com
kdine@pszjlaw.com
jdine@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

David C. Frederick
Gregory G. Rapawy
Ariela M. Migdal
Matthew N. Drecun
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
dfrederick@kellogghansen.com
grapawy@kellogghansen.com
amigdal@kellogghansen.com
mdrecun@kellogghansen.com

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 of the Federal Rules of Appellate Procedure and 26.1 of the Third Circuit Local Appellate Rules, counsel for Appellant hereby state that Johnson & Johnson is the parent company of the Debtor, Appellee LTL Management LLC. In addition, Johnson & Johnson:

(i) has been sued by multiple holders of talc personal injury claims against the Debtor;

(ii) asserts that it has indemnification rights against the Debtor with respect to talc-related claims;

(iii) has obligations to the Debtor under a Funding Agreement, which include obligations with respect to funding a trust for the benefit of holders of talc personal injury claims, if such a trust is established under a plan of reorganization that is confirmed by a final order of the Bankruptcy Court; and

(iv) is one of a number of entities against whom talc-related litigation has been stayed by a preliminary injunction entered by the bankruptcy court.

Dated: June 30, 2022

*/s/ David C. Frederick*
David C. Frederick

i

\

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.....................................................4

STATEMENT OF THE ISSUES..........................................................4

STATEMENT OF RELATED CASES ..................................................5

STATEMENT OF THE CASE .............................................................5

I.      Legal Background.....................................................................5

II.     Factual Background ..................................................................8

III.    Procedural History ................................................................11

STANDARD OF REVIEW ...............................................................15

SUMMARY OF ARGUMENT ..........................................................15

ARGUMENT ...................................................................................17

I.      LTL DID NOT FILE ITS BANKRUPTCY PETITION IN GOOD
        FAITH.....................................................................................17

        A.      A Debtor Must Establish That Its Petition Was Filed In Good
                Faith..............................................................................17

        B.      LTL Did Not File for Chapter 11 in Good Faith.................20

                1.      LTL's bankruptcy does not serve a valid bankruptcy
                        purpose ................................................................20

                2.      LTL was not in immediate financial distress............22

                3.      LTL filed for bankruptcy to obtain a tactical
                        litigation advantage ..............................................24

                4.      The effort to shield Old JJCI's assets evinces bad faith ..........29

II.     THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT LTL
        FILED FOR BANKRUPTCY IN GOOD FAITH .......................31

A.  The Bankruptcy Court Erroneously Found Two Valid
    Bankruptcy Purposes .................................................................. 31

    1.  Bankruptcy does not maximize LTL's value to
        its creditors ............................................................ 32

    2.  Addressing liabilities alone is not a valid
        bankruptcy purpose ................................................. 34

B.  The Bankruptcy Court Erred in Finding Financial Distress .............. 36

    1.  The bankruptcy court erred by not requiring LTL to show
        immediate financial distress ...................................... 36

    2.  The bankruptcy court analyzed financial distress
        incorrectly ............................................................... 39

    3.  The bankruptcy court erred by relying on unrealistic
        hypotheticals ........................................................... 44

C.  The Bankruptcy Court Erred in Its Analysis of The Tactical
    Litigation Advantages LTL and J&J Sought and Gained .................. 47

D.  LTL's Intent to Use Section 524(g) Does Not Establish Good
    Faith ................................................................................... 50

E.  The Bankruptcy Court Erroneously Prioritized Its Preference
    For Bankruptcy Over Tort Litigation ....................................... 52

F.  The Bankruptcy Court Erred In Its Alternative Ruling That
    "Unusual Circumstances" Preclude Dismissal ............................ 54

CONCLUSION ................................................................................ 56

CERTIFICATE OF COMPLIANCE ..................................................... 57

CERTIFICATE OF FILING AND SERVICE ........................................ 58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*15375 Mem'l Corp. v. BEPCO, L.P., In re,*
589 F.3d 605 (3d Cir. 2009) ...................... 2, 6, 15, 18, 19, 20, 21, 24, 25, 27,
32, 33, 40, 43, 48, 53

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
526 U.S. 434 (1999)........................................................................................ 5

*Bestwall LLC, In re,*
605 B.R. 43 (Bankr. W.D.N.C. 2019) ........................................................... 35

*Camden Ordnance Mfg. Co. of Arkansas, Inc., In re,*
245 B.R. 794 (E.D. Pa. 2000).........................................................................55

*Combustion Eng'g, Inc., In re,*
391 F.3d 190 (3d Cir. 2004) .................................................................... 30, 51

*Czyzewski v. Jevic Holding Corp. (Jevic),*
137 S. Ct. 973 (2017)................................................................................ 6, 7, 30

*Domiano, In re,*
442 B.R. 97 (Bankr. M.D. Pa. 2010) ............................................................. 55

*Fed.-Mogul Glob. Inc., In re,*
411 B.R. 148 (Bankr. D. Del. 2008)............................................................... 50

*Fed.-Mogul Glob., Inc., In re,*
684 F.3d 355 (3d Cir. 2012) .......................................................................... 28

*Green, In re,*
2016 WL 6699311 (9th Cir. B.A.P. Nov. 9, 2016) ...................................... 55

*Ingham v. Johnson & Johnson,*
608 S.W.3d 663 (Mo. Ct. App. 2020),
*cert. denied,* 141 S. Ct. 2716 (U.S. June 1, 2021) ......................................... 9

iv

*Integrated Telecom Express, Inc., In re*,
    384 F.3d 108 (3d Cir. 2004) ..................... 2, 8, 15, 18, 19, 20, 22, 24, 26, 32,
                                                33, 34, 36, 48, 50

*Johns-Manville Corp., In re*,
    36 B.R. 727 (Bankr. S.D.N.Y. 1984) ........................................................... 37

*Johns-Manville Corp., In re*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986),
    *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987).............................................................. 51

*Johnson & Johnson v. Ingham*,
    141 S. Ct. 2716 (2021)......................................................................... 9, 10, 25

*Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices
    & Prod. Litig., In re*, 509 F. Supp. 3d 116 (D.N.J. 2020) ........................... 10

*Laguna Assocs. Ltd. P'ship, In re*,
    30 F.3d 734 (6th Cir. 1994)) .................................................................... 3, 30

*Little Creek Dev. Co., In re*,
    779 F.2d 1068 (5th Cir. 1986 ................................................................. 3, 6, 30

*Muralo Co., In re*,
    301 B.R. 690 (Bankr. D.N.J. 2003) ............................................................. 35

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)...................................................................................... 53

*PPI Enters. (U.S.), Inc., In re*,
    324 F.3d 197 (3d Cir. 2003) ....................................................................... 43

*Rent-A-Wreck of Am., Inc., In re*,
    580 B.R. 364 (Bankr. D. Del. 2018)............................................................ 38

*Roman Catholic Church of Archdiocese of New Orleans, In re*,
    632 B.R. 593 (Bankr. E.D. La. 2021).......................................................... 38

*SGL Carbon Corp., In re*,
    200 F.3d 154 (3d Cir. 1999) .................... 2, 6, 7, 8, 15, 18, 19, 22, 24, 28, 29,
                                    33, 34, 35, 36, 37, 39, 41, 43, 48, 53

*Shapiro v. Wilgus*,
    287 U.S. 348 (1932)................................................................. 30

*Soppick, In re*,
    516 B.R. 733 (Bankr. E.D. Pa. 2014) ............................................. 55

*Stern v. Marshall*,
    564 U.S. 462 (2011)................................................................. 53

*Telegroup, Inc., In re*,
    281 F.3d 133 (3d Cir. 2002) .................................................... 6, 26

*Tribune Media Co., In re*,
    799 F.3d 272 (3d Cir. 2015) ....................................................... 28

## STATUTES

11 U.S.C. § 105(a) ........................................................................ 7

11 U.S.C. § 362(a) ........................................................................ 7

11 U.S.C. § 363(b) ........................................................................ 6

11 U.S.C. § 502(c) ........................................................................ 7

11 U.S.C. § 524(g) ........................................... 14, 17, 31, 50, 51, 52

11 U.S.C. § 524(g)(2)(B)(i)(I) ..................................................... 52

11 U.S.C. § 524(g)(2)(B)(i)(II)-(III) ........................................... 51

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)............................................. 7

11 U.S.C. § 1101 ........................................................................... 5

11 U.S.C. § 1106 ........................................................................... 6

11 U.S.C. § 1107(a) ....................................................................... 6

11 U.S.C. § 1112(b) ........................................................... 8, 13, 17

11 U.S.C. § 1112(b)(2)........................................... 5, 14, 17, 54, 55

11 U.S.C. § 1112(b)(2)(A)............................................................ 55

11 U.S.C. § 1112(b)(2)(B) ........................................................... 55

11 U.S.C. § 1121 ......................................................................... 7

11 U.S.C. § 1126(c) ..................................................................... 7

11 U.S.C. § 1129(a) ..................................................................... 7

11 U.S.C. § 1129(b) ..................................................................... 7

11 U.S.C. § 1141 ......................................................................... 7

28 U.S.C. § 157 ........................................................................... 4

28 U.S.C. § 158(d)(2) ............................................................. 4, 14

28 U.S.C. § 158(d)(2)(A)(i) .......................................................... 4

28 U.S.C. § 158(d)(2)(A)(iii) ........................................................ 4

28 U.S.C. § 1334 ......................................................................... 4

28 U.S.C. § 1407 ....................................................................... 54

Tex. Bus. Orgs. Code § 1.002(55)(A) ........................................ 11

## OTHER AUTHORITIES

Bankruptcy Reform Act of 1994,
    Pub. L. No. 103-394, § 111, 108 Stat. 4106 ................................ 50

H.R. Rep. No. 103-835 (1994) ........................................ 7, 50, 51

## **INTRODUCTION**

Petitioners seeking the protections of the Bankruptcy Code must file for bankruptcy in good faith and cannot use bankruptcy provisions merely to gain a tactical advantage in litigation. Johnson & Johnson ("J&J"), one of the world's largest and most robust companies, engineered this bankruptcy to thwart plaintiffs with ovarian cancer or mesothelioma that resulted from using J&J's talc-based Baby Powder products. Though J&J's talc liability is well within its financial means, J&J undertook a complex scheme to separate its business operations from its talc liability and push talc plaintiffs into the bankruptcy system, thereby halting all talc litigation. Using a "divisional merger" under Texas law, J&J divided its consumer-health subsidiary, Johnson & Johnson Consumer Inc. ("JJCI"), into two parts: a special-purpose entity to manage talc liabilities, which immediately filed for bankruptcy; and a new JJCI to handle the consumer health assets, all other liabilities, and all actual business, now insulated from talc plaintiffs.

J&J executed this stratagem in plain view. It named the special-purpose entity "Legacy Talc Litigation Management LLC" ("LTL") and staffed it with longtime J&J employees, who readily admit that LTL exists "to get rid of all the [talc] liability" and to "permanently protect" its parent entities. JA2436; JA464 (¶ 59). LTL was created two days before its bankruptcy filing, soon after setbacks to J&J's other talc litigation strategies.

1

Proceeding in plain view does not mean proceeding in good faith.  Filing for bankruptcy to achieve litigation goals absent immediate financial distress is a bad-faith abuse of the bankruptcy system, as this Court's cases confirm.  *See In re 15375 Mem'l Corp. v. BEPCO, L.P. (BEPCO)*, 589 F.3d 605 (3d Cir. 2009); *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004); *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).  That precedent warns against abuses by defendants facing large-scale litigation who may see bankruptcy as "an inviting safe harbor."  *SGL Carbon*, 200 F.3d at 169.  J&J's use of the divisional merger scheme to segregate talc plaintiffs from assets and other creditors, and to distance business operations from the bankruptcy court's control, further shows bad faith.

The bankruptcy court erred in finding that LTL filed for bankruptcy in good faith.  The court reasoned that bankruptcy would provide the "optimal venue" to resolve the talc litigation against J&J and JJCI and that bankruptcy's superiority to conventional tort litigation was "a far more significant issue" than this Court's good-faith standard.  JA12, JA19.  Focused on the wrong issue, the bankruptcy court reached the wrong result.

The bankruptcy court found that bankruptcy served the purpose of maximizing LTL's asset value for creditors, even though LTL's assets—most notably a "Funding Agreement" with J&J and JJCI—would be more valuable to creditors outside bankruptcy.  The court found that addressing litigation exposure

2

was a valid bankruptcy purpose, contrary to this Court's rulings.  The court

indulged unrealistic hypothetical estimates of future talc liability, ignoring that

they exceeded J&J's own internal estimates and that current obligations from talc

litigation are not nearly large enough to cause immediate financial distress for

LTL, the debtor, or J&J, its funder.  The court viewed LTL's effort to seek

litigation advantages for its corporate parents as beneficial, rather than as grounds

for dismissal under this Court's precedents.

This case differs from others in which mass tort defendants legitimately

sought bankruptcy protections.  Those debtors were themselves the tort defendants,

not new entities created as bankruptcy vehicles to hinder creditors.  Those debtors

genuinely faced immediate financial distress, lacking J&J's massive resources.

And those debtors demonstrated distress through serious analysis, not speculation

based on dubious hypotheticals.

J&J's scheme to create LTL and invoke bankruptcy resembles a different

bankruptcy pattern widely condemned as evincing bad faith:  "new debtor

syndrome," whereby a new entity with no real business or workforce enters

bankruptcy to forestall the rights of a particular creditor.  *See In re Laguna Assocs.*

*Ltd. P'ship*, 30 F.3d 734, 738 (6th Cir. 1994); *In re Little Creek Dev. Co.*, 779 F.2d

1068, 1072-73 (5th Cir. 1986).  J&J's scheme is a sweeping use of that strategy

against all talc claimants, the only creditors subject to LTL's invocation of

bankruptcy.  Because that is the antithesis of good faith, this Court should reverse.

## STATEMENT OF JURISDICTION

Under 28 U.S.C. §§ 157 and 1334, the bankruptcy court had jurisdiction to,

and did, enter a final order denying Appellant Arnold & Itkin LLP's Motion to

Dismiss this Chapter 11 case on March 2, 2022.  JA57.  On April 4, 2022, the

bankruptcy court certified its order for direct appeal under 28 U.S.C.

§ 158(d)(2)(A)(i), (iii).  JA135.  On May 11, 2022, this Court granted permission

to appeal.  JA268-272.  This Court has appellate jurisdiction under 28 U.S.C.

§ 158(d)(2).

## STATEMENT OF THE ISSUES

1.    Should the bankruptcy court have dismissed the Debtor's Chapter 11

petition for lack of good faith because (a) the Debtor's Chapter 11 petition serves

no valid bankruptcy purpose, (b) the Debtor faced no financial distress sufficient to

support a finding of its good faith, (c) the Debtor filed this case to obtain a tactical

litigation advantage, and (d) the circumstances of the divisional merger that

immediately preceded the Debtor's bankruptcy filing evinced a lack of good faith?

JA1792-1803 (raised); JA15-16, JA-33-34, JA41-42, JA-42-44 (ruled upon).

2.      Did the bankruptcy court err in relying on § 1112(b)(2) of the
Bankruptcy Code as an alternative basis for declining to dismiss this case?  JA13
n.8 (ruled upon).

## STATEMENT OF RELATED CASES

This case has not been before this Court previously.  Also pending before
this Court are the following related appeals, which have been consolidated for
briefing and argument:  Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007, 22-
2008, 22-2010, and 22-2011.  The following related appeals are pending, but
stayed, before the United States District Court for the District of New Jersey:  Nos.
22-1280, 22-1289, 22-1339, and 22-1387.  The bankruptcy proceeding for JJCI's
former talc supplier, Imerys Talc America, Inc., and two of its affiliates is pending
in the District of Delaware.  *In re Imerys Talc Am., Inc.*, No. 19-10289-LSS
(Bankr. D. Del.).

## STATEMENT OF THE CASE

### I.      Legal Background

Reorganization under Chapter 11 of the Bankruptcy Code serves two related
policies:  "preserving going concerns and maximizing property available to satisfy
creditors."  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526
U.S. 434, 453 (1999); *see* 11 U.S.C. Ch. 11 (§ 1101 *et seq.*).  The aim of most
Chapter 11 cases is to confirm a reorganization plan that preserves the debtor as a

going concern, so it continues to operate and pay its creditors. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017). Other Chapter 11 cases liquidate the debtor, in which case maximizing the property available to satisfy creditors is paramount. *See BEPCO*, 589 F.3d at 619. Without one of these two goals, a Chapter 11 case lacks a valid bankruptcy purpose. *Id.*

Once a Chapter 11 petition is filed, all property of the debtor becomes property of an "estate" managed by a fiduciary, whose administration of estate assets is subject to creditors' review and the court's control. *Jevic*, 137 S. Ct. at 978; *see* 11 U.S.C. §§ 1106, 1107(a); *see also*, *e.g.*, *id.* § 363(b) (requiring notice and opportunity to object before estate property may be used outside "the ordinary course of business"). In these and other ways, Chapter 11 entails a "balancing process between the interests of debtors and creditors." *SGL Carbon*, 200 F.3d at 161 (quoting *Little Creek*, 779 F.2d at 1072).

The estate's assets are distributed according to the Bankruptcy Code's "basic system of priority," which subordinates shareholders to all creditors. *Jevic*, 137 S. Ct. at 979; *In re Telegroup, Inc.*, 281 F.3d 133, 140 (3d Cir. 2002) ("[B]ecause equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse[.]") (internal quotation marks omitted). This priority system is "fundamental to the Bankruptcy Code's operation," ensuring that assets are distributed "in accordance with established principles rather than on the

6

basis of the inside influence or economic leverage of a particular creditor." *Jevic*,

137 S. Ct. at 984 (quoting H.R. Rep. No. 103-835, at 33 (1994)).

Chapter 11 vests debtors with "considerable powers" that "can impose

significant hardship on particular creditors," often without their consent. *SGL*

*Carbon*, 200 F.3d at 165. Filing a Chapter 11 petition automatically stays all

litigation against the debtor, and the stay can be extended to non-debtors. *See*

11 U.S.C. §§ 105(a), 362(a). Creditors' claims may be subjected to an estimation

of their aggregate value under a reorganization plan. *Id.* § 502(c). For a time, the

debtor has the exclusive right to propose a plan. *Id.* § 1121. It can confirm a

binding plan by a majority vote of creditors in one or more impaired classes, even

when other impaired classes vote to reject it. *See id.* §§ 1126(c), 1129(a) and (b).

The confirmed plan binds each creditor; the debtor is discharged from claims

predating confirmation; and claims against non-debtors may be enjoined. *Id.*

§§ 105(a), 1141.[1] Thus, a creditor's rights can be impaired substantially by a plan

it voted to reject.

To ensure a Chapter 11 debtor's "considerable powers" are not misused,

bankruptcy courts dismiss cases "for cause," including lack of good faith. *See SGL*

---

[1] Section 524(g), concerning asbestos personal-injury claims, allows a 75% vote of asbestos claimants to bind not only claimants who rejected the plan, but also unknown future claimants, who do not get to vote on the plan at all. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb); *see infra* Part II.D.

*Carbon*, 200 F.3d at 165, 160; 11 U.S.C. § 1112(b); *infra* Part I.A. "[T]he good

faith requirement ensures that the Bankruptcy Code's careful balancing of interests

is not undermined by petitioners whose aims are antithetical to the basic purposes

of bankruptcy," such as the aim of using it "as a mechanism to orchestrate pending

litigation." *Integrated Telecom*, 384 F.3d at 119 (internal quotation marks

omitted). Because bankruptcy may appear as "an inviting safe harbor" that

"lure[s]" companies facing large-scale litigation with no real need to reorganize,

the good-faith requirement protects "the integrity of the bankruptcy system and the

rights of all involved" against abuse. *SGL Carbon*, 200 F.3d at 169.

## II.   Factual Background

J&J, LTL's parent company, is among the world's most successful

companies, with a market capitalization of more than $450 billion and an AAA

credit rating. JA35; JA1888 & n.21. J&J has sold baby powder products made

with talcum powder ("talc") since 1894. JA325. After 1979, its subsidiaries,

including JJCI or Old JJCI, produced the talc products, but J&J remained

responsible for health and safety policy decisions. JA1589-1590.

In recent years, increasing numbers of people suffering from ovarian cancer

or mesothelioma (lung cancer caused by asbestos exposure) have sued J&J and

JJCI. JA4. Most of those cases were transferred to a multi-district litigation

("MDL") in the District of New Jersey. *See In re Johnson & Johnson Talcum*

*Powder Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, No. 16-md-02738
(D.N.J.) (Wolfson, J.).

Appellant represents thousands of women who developed ovarian cancer
after using J&J's powders and have sued or plan to sue J&J and its affiliates.
JA1772.  Many women, including many Appellant represents, have died of cancer,
and their estates now prosecute their claims.

In 2018, a Missouri jury found J&J and JJCI liable for the injuries of twenty-
two women with ovarian cancer and awarded punitive damages against both
companies, finding that they "engaged in outrageous conduct because of an evil
motive or reckless indifference" when they knowingly concealed the presence of
asbestos in their talc-based products and rejected safe alternatives, including
cornstarch, as "costly."  *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 715-
17 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (U.S. June 1, 2021).  At least
as early as 1969 and continuing through the 1990s, J&J acknowledged internally
that the talc it used for baby powder contained asbestos.  *Id.* at 715.  For at least as
long, J&J knew asbestos in its talc products endangered consumers, *id.* at 716, but
chose to conceal the asbestos in its talc.  It pushed regulators to adopt testing
protocols not sensitive enough to detect asbestos, and it "attempted to discredit
scientists" who published unfavorable results.  *Id.* at 717.

9

Despite J&J's concealment, scientists found asbestos at high rates in samples of its powders. *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Prod. Litig.*, 509 F. Supp. 3d 116, 147 (D.N.J. 2020) (MDL court denying motion to exclude experts who found asbestos in 69% of 72 samples from 1960s through early 2000s). More than 25 studies since the 1980s have shown that women who use talc face increased risk of ovarian cancer. JA1584 (¶ 9).

Regulators reached the same conclusions. In 2018, Canada's public health agency, Health Canada, found "a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer . . . *indicative of a causal effect*." JA1585 (¶ 12) (emphasis added). In 2019, the U.S. Food and Drug Administration found asbestos in a bottle of Johnson's Baby Powder, leading J&J to recall 33,000 bottles. JA1586 (¶ 14). In 2021, after a challenge by J&J, Health Canada reiterated that a "high degree of consistency" in epidemiological studies supported its conclusion. JA1585 (¶ 13).

On June 1, 2021, the Supreme Court declined to review the *Ingham* judgment, rendering it final. *See Johnson & Johnson v. Ingham*, 141 S. Ct. 2716 (2021). As these events unfolded, J&J stopped selling talc products in the United States and Canada. JA1586 (¶ 14).

### III.   Procedural History

**1**.   A few months after the Supreme Court denied certiorari in *Ingham*,

J&J undertook a complex corporate restructuring to isolate all talc liabilities and

shift them into a bankruptcy intended "to permanently protect" itself and JJCI from

"further talc-related claims."  *See* JA448-456, JA463-464 (¶¶ 16-31, 59).  J&J

employed a Texas "divisional merger" statute that permits an entity to split its

assets and liabilities between two new entities.  *See* Tex. Bus. Orgs. Code

§ 1.002(55)(A).  Following this division, JJCI ("Old JJCI") ceased to exist.  *See*

JA4-5.  Its talc liabilities transferred to a new special-purpose entity:  Legacy Talc

Litigation Management LLC.  JA3417.  Its business assets and all other liabilities

went to a new Johnson & Johnson Consumer Inc. ("New JJCI").  *Id.*; JA448-453

(¶¶ 16-25).

LTL does not make or sell any product or provide any commercial service.

LTL personnel are longtime J&J (or affiliate) employees who receive retention

bonuses from J&J for staying with LTL.  JA445, JA455 (¶¶ 2, 29); JA2101;

JA2453.  LTL's principal function is to manage talc liabilities.  JA446, JA453

(¶¶ 6, 24).  Its primary asset is a Funding Agreement created by J&J, *see* JA451-

453, JA454 (¶¶ 23, 27), which requires J&J and New JJCI to fund LTL's talc

litigation costs up to a level pegged to the corporate value of Old and New JJCI at

the time of the divisional merger—at least $60 billion.  *See* JA454 (¶ 27); JA478-

496; JA10.  The Funding Agreement is enforceable only by LTL.  JA485-486

(§ 2(a)-(d)).  J&J also assigned LTL certain insurance and contract rights, $6

million in cash, and membership interests in Royalty A&M, a new J&J entity

created in the restructuring to receive royalty streams on certain J&J products.

JA450-454 (¶¶ 22-26).

Before the restructuring, J&J charged the cost of defending talc lawsuits, as

well as paying talc settlements and judgments, to Old JJCI pursuant to its internal

accounting policies, including costs associated with claims against J&J itself.  *See*

JA6379 (¶ 8).  J&J actually paid all such costs out of a central account holding

cash generated by all J&J business operations and just charged the costs to Old

JJCI as an intercompany payable.  *See id.*  For example, J&J itself paid the *Ingham*

verdict in full.  *See* JA6380-6381 (¶ 10 & Annex A).  Under the Funding

Agreement, J&J and New JJCI are obligated to pay such talc litigation costs.  *See*

JA483-484 (§ 2(a)).

**2.**    On October 14, 2021, two days after its creation, LTL filed for

bankruptcy.  Neither J&J nor New JJCI joined LTL as debtors.  LTL filed in the

Western District of North Carolina even though LTL operates out of New Jersey

and has no operations in North Carolina.  JA1507.  Four days later, LTL moved to

extend the automatic stay to talc claims against J&J, New JJCI, and other non-

debtor affiliates.  JA542-592.

On November 16, 2021, the North Carolina court transferred the case to the

District of New Jersey.  JA1510.  The court found transfer appropriate because the

vast majority of ovarian cancer cases are pending there in the MDL and because

LTL, New JJCI, and J&J are headquartered in New Jersey.  JA1510-1511.  The

court criticized LTL's attempt to "outsmart" the bankruptcy venue statute and

"manufacture venue" in North Carolina, but it did not consider whether LTL had

filed its Chapter 11 petition in good faith.  JA1514-1515 & n.3.

**3.**    In December 2021, Appellant and others, including the Official

Committee of Talc Claimants, moved to dismiss the bankruptcy for lack of good

faith.  *See* JA 1726; JA1765; JA1864.  The bankruptcy court permitted discovery

and conducted a trial from February 14-18, 2022.  The J&J employees operating

LTL testified, including John Kim, LTL's chief legal officer and longtime counsel

at J&J, who testified that the purpose of creating LTL and putting it in bankruptcy

was "to get rid of all the [talc] liability."  JA2436.

The bankruptcy court denied the motions to dismiss.  *See* JA55.  It

recognized that a Chapter 11 petition must be dismissed under 11 U.S.C. § 1112(b)

if not filed in good faith and recited this Court's good-faith standard.  JA10-12.  It

then identified "a far more significant issue" than that standard:

> [W]hich judicial system—the state/federal court trial system, or a trust
> vehicle established under a chapter 11 reorganization plan structured
> and approved by the United States Bankruptcy Court—serves best the
> interests of this bankruptcy estate, comprised primarily of present and
> future tort claimants with serious financial and physical injuries.

JA12-13.

The bankruptcy court evaluated the financial "risks and burdens" facing Old

JJCI.  JA14.  It found that bankruptcy would "maximize the property available to

satisfy creditors" and that a Chapter 11 case aimed at "addressing the present and

future liabilities associated with ongoing global personal injury claims" was a

proper bankruptcy purpose.  JA15-16.  The court also determined that LTL had not

filed for bankruptcy to secure an unfair tactical litigation advantage but instead had

properly sought to take advantage of § 524(g) of the Bankruptcy Code, among

other provisions.  JA41-53.  It held, in the alternative, that "unusual circumstances"

justified denying the motions to dismiss.  JA13 n.8 (citing 11 U.S.C. § 1112(b)(2)).

The same day, the bankruptcy court extended the automatic stay to enjoin

talc suits against J&J and New JJCI, among others.  JA3659-3712; JA3713; JA194.

Appellant and others requested the case be certified for direct appeal under

28 U.S.C. § 158(d)(2), and the bankruptcy court granted the request.  JA135.  This

Court then granted permission to appeal.  JA268-272.

## STANDARD OF REVIEW

This Court reviews the determination of good faith for abuse of discretion,
which occurs when a bankruptcy court's determination rests on "a clearly
erroneous finding of fact, an errant conclusion of law, or an improper application
of law to fact." *Integrated Telecom*, 384 F.3d at 118.  The Court reviews findings
of fact for clear error and exercises "plenary review over the court's conclusions of
law." *SGL Carbon*, 200 F.3d at 159; *see also BEPCO*, 589 F.3d at 618 ("The
determination of whether the basic and inferred facts of a case support the
conclusion of good faith in the filing of a Chapter 11 bankruptcy petition, *i.e.*,
whether the application of law to fact was proper, is reviewed as an ultimate fact
and is subject to plenary review because it is, essentially, a conclusion of law.").

## SUMMARY OF ARGUMENT

The good-faith standard requires dismissal of a Chapter 11 petition that does
not serve a valid bankruptcy purpose and is filed merely to obtain a tactical
litigation advantage.  The debtor must face immediate financial distress when
filing and cannot file simply to invoke particular Bankruptcy Code provisions.

LTL's bankruptcy fails this standard at every step.  It does not serve a valid
bankruptcy purpose because LTL is not a going concern and its petition will not
maximize the asset value available to creditors.  LTL was not in financial distress
when it filed, nor did it imminently expect to be.  LTL's financial capacity under

the Funding Agreement, at least $60 billion, vastly exceeds its obligations from
talc litigation.  The purpose of LTL's bankruptcy was to gain a litigation advantage
by isolating talc liabilities in bankruptcy:  avoiding juries; halting litigation with
bankruptcy's automatic stay and a preliminary injunction; capping the value of talc
claims; and pressuring claimants to settle by threatening years of delay.  LTL's bad
faith is confirmed by the timing of its petition shortly after J&J and Old JJCI's
major litigation setbacks and by the effort to shield Old JJCI's assets from talc
claimants and the bankruptcy court's control.

The bankruptcy court's contrary conclusion rests on legal errors, each
warranting reversal.  Instead of finding that bankruptcy would maximize the value
of the estate by preserving value lost outside bankruptcy, the court reasoned that
bankruptcy would achieve "balanced recoveries" between current and future talc
claimants.  JA15.  But redistributing the estate among creditors differently does not
maximize the estate's value.  The court also reasoned that reorganization would
result in a settlement trust at lower cost, but these costs are covered by J&J, not
drawn from the estate's assets.

Addressing liabilities is not a valid bankruptcy purpose absent financial
distress.  Here, the court did not assess whether LTL was in immediate financial
distress or require LTL to provide serious analysis of its financial condition.
Instead, the court assessed the financial condition of LTL's dissimilar predecessor,

16

Old JJCI, which is not the debtor, no longer exists, and experienced only paper

losses because J&J paid all talc litigation costs.  And the court focused improperly

on possible future liabilities, which are insufficient on their own to establish good

faith, and which LTL supported only with outlandish hypothetical estimates.

The bankruptcy court further erred in treating the litigation advantages J&J

and its affiliates gained through bankruptcy as a sign of good faith.  That error

arose from the bankruptcy court's policy determination that bankruptcy, not

conventional or multi-district litigation, is the "optimal venue" for resolving mass

tort litigation.  JA19.  That improper determination infected the court's analysis.

So too did its holding that LTL's intent to create a trust under 11 U.S.C. § 524(g)

showed good faith.  J&J's divisional merger scheme flouts that provision's design,

prejudicing talc claimants' rights.  Finally, the court's alternative holding that

"unusual circumstances" preclude dismissal of this case under 11 U.S.C.

§ 1112(b)(2) fails because it did not make the statutorily-required findings.

## **ARGUMENT**

## I.   **LTL DID NOT FILE ITS BANKRUPTCY PETITION IN GOOD FAITH**

### A.   **A Debtor Must Establish That Its Petition Was Filed In Good Faith**

A Chapter 11 petition is "subject to dismissal under 11 U.S.C. § 1112(b)

unless filed in good faith, and the burden is on the bankruptcy petitioner to

establish that its petition has been filed in good faith." *Integrated Telecom*, 384

F.3d at 118.  While the good-faith standard rests on "the totality of the facts and

circumstances," it focuses on two "particularly relevant" questions:  "(1) whether

the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern

or maximizing the value of the debtor's estate, and (2) whether the petition is filed

merely to obtain a tactical litigation advantage." *Id.* at 118-20.  A debtor's

subjective intent is relevant to the good-faith inquiry, but that inquiry is "based

more on objective analysis of whether the debtor has sought to step outside the

'equitable limitations' of Chapter 11." *BEPCO*, 589 F.3d at 618 n.8; *SGL Carbon*,

200 F.3d at 165.  These limitations "deter filings that seek to achieve objectives

outside the legitimate scope of the bankruptcy laws." *Id.*

This Court's decisions in *SGL Carbon*, *Integrated Telecom*, and *BEPCO* set

out the principles governing the good-faith determination.  First, a debtor "may

prove that its petition served a valid bankruptcy purpose by showing that the

petition preserved a going concern." *BEPCO*, 589 F.3d at 619 (brackets and

internal quotation marks omitted).  Second, even if the debtor is not a going

concern, it may establish good faith by showing that bankruptcy will "maximiz[e]

the value of [its] estate." *Id.*

Through either route, "good faith necessarily requires some degree of

financial distress on the part of a debtor." *Integrated Telecom*, 384 F.3d at 121.

Timing is central:  the debtor must face "immediate" financial difficulty "at the

time of the filing." *SGL Carbon*, 200 F.3d at 163, 166.  Possible future liability,

even if "potentially crippling," is not enough; courts "consistently dismiss[]

Chapter 11 petitions filed by financially healthy companies with no need to

reorganize under the protection of Chapter 11." *Id.*

    The same decisions dictate that a party may not use bankruptcy to gain

advantage in pending litigation. *See Integrated Telecom*, 384 F.3d at 125

(rejecting rationale that bankruptcy served a valid bankruptcy purpose by helping

the debtor resolve a class action).  Obtaining an automatic stay of litigation is not

"*per se* a valid justification for a Chapter 11 filing"; rather, it is "a consequential

benefit of an otherwise good faith filing." *Id.* at 128 (internal quotation marks

omitted).  A "classic" example of bad faith is the petitioner whose "only goal is to

use the automatic stay provision to avoid posting an appeal bond in another court."

*Id*.  The valid purpose of "maximizing the value of the debtor's estate" thus cannot

mean using the stay to reduce litigation costs or avoid a bond.  *Id.* at 119-20, 128.

There must be "some value that otherwise would be lost outside of bankruptcy."

*Id.* at 120; *accord BEPCO*, 589 F.3d at 622 (holding bankruptcy not filed in good

faith solely because litigating in bankruptcy court would achieve "an orderly

distribution of assets").  Nor can the efficiency gained from centralizing claims and

consolidating "litigations into a single forum" justify bankruptcy, particularly
where the debtor has resources outside bankruptcy to cover its liability.  *Id.* at 620.

Finally, a party's desire to take advantage of Bankruptcy Code provisions
does not establish good faith.  Because "every bankruptcy petition seeks some
advantage offered in the Code," "any other rule would eviscerate any limitation
that the good faith requirement places on Chapter 11 filings." *Integrated Telecom*,
384 F.3d at 127-28.  Good faith must be established first.  The availability of
Bankruptcy Code provisions to debtors "assume[s] the existence of a valid
bankruptcy, which, in turn, assumes a debtor in financial distress." *Id.*

### B.    LTL Did Not File for Chapter 11 in Good Faith

#### 1.    LTL's bankruptcy does not serve a valid bankruptcy purpose

LTL's bankruptcy did not "preserv[e] a going concern." *Integrated
Telecom*, 384 F.3d at 119-20.  As in *BEPCO*, LTL has virtually "no employees,
offices, or business other than the handling of litigation." 589 F.3d at 619.  LTL's
witnesses conceded it was created specifically to manage talc liabilities in
bankruptcy.  *See* JA450 (¶ 21).

LTL's bankruptcy also does not serve to "maximiz[e] the value of the
debtor's estate." *Integrated Telecom*, 384 F.3d at 119-20.  A bankruptcy filing
must "add or preserve value that would otherwise be unavailable to creditors
outside of bankruptcy." *BEPCO*, 589 F.3d at 620.  Bankruptcy does not preserve

or increase the value to creditors of LTL's principal asset, the Funding Agreement,

so the bankruptcy does not serve an asset-maximizing purpose.  *See id.* at 621 (no

asset-maximizing purpose where the debtors' main assets—insurance policies—

"have always been available outside of bankruptcy without detrimentally

impacting any creditor's recovery").

To the contrary, the Funding Agreement would be *more* valuable and

accessible to talc claimants outside of bankruptcy.  Absent a Chapter 11

proceeding, J&J must fund "any amounts to satisfy . . . [the Debtor's] Talc Related

Liabilities" whenever judgments or settlements occur.  JA483-484 (definition of

"Permitted Funding Use," cl. (c)(i)).  But if LTL is in Chapter 11, J&J need only

fund one or more trusts for talc claimants created under a reorganization plan

"confirmed by a *final, nonappealable order* of the Bankruptcy Court."  JA484 (cl.

(c)(ii)) (emphasis added).  That is, in bankruptcy, J&J's funding obligations take

effect only after appeals of the order confirming the reorganization plan become

final.  That condition enables J&J to delay compensating talc claimants by

appealing a plan confirmation order, and it creates enormous pressure for claimants

not to pursue a plan that J&J would appeal.

As for centralizing talc litigation and reducing litigation costs, neither

function demonstrates good faith because neither shows "some hope of

maximizing the value" of LTL's assets.  *BEPCO*, 589 F.3d at 625 (internal

quotation marks omitted).  Because J&J pays LTL's talc litigation costs under the

Funding Agreement, reducing those costs does nothing to maximize the value of

*LTL*'s assets.  Similarly, if centralization results in capped recoveries for talc

plaintiffs, that does not maximize LTL's asset value either.  It simply reduces

claimants' recoveries and J&J's funding obligations under the Funding Agreement.

### 2.    LTL was not in immediate financial distress

Chapter 11 is a lifeline for "those in genuine financial distress."  *SGL*

*Carbon*, 200 F.3d at 165 (internal quotation marks omitted).  LTL did not face

"immediate financial difficulty . . . at the time of the filing," as good faith requires.

*Id.* at 163.  In *Integrated Telecom*, the debtor was not in financial distress because

its assets were more than $100 million and its liabilities less than $30 million,

making it "highly solvent and cash rich at the time of the bankruptcy filing."  *See*

384 F.3d at 123-24.  In *SGL Carbon*, the debtor was not in financial distress

notwithstanding potential antitrust liability because its assets exceeded its existing

liabilities by $124 million, and no evidence indicated that the debtor "had difficulty

meeting its debts as they came due" or "had any difficulty raising or borrowing

money."  *See* 200 F.3d at 166.

When LTL filed for bankruptcy, the Funding Agreement (formed two days

earlier) gave it ample financial capacity to address talc litigation burdens.  The

Agreement itself disclaimed any financial distress, stating that LTL would have

"financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities." JA479 (Recitals ¶¶ E-F). The Agreement commits at least $60 billion, guaranteed by the AAA-rated J&J parent. JA2776; JA10. There is virtually no chance that J&J will be unable to fulfill that guarantee, much less in the immediate future.[2]

To demonstrate financial distress, LTL would have had to show either the present or imminent threat of owing more than its current capacity to pay. LTL showed neither. When LTL's board voted to file for bankruptcy, it did not know the estimated value of the Funding Agreement or LTL's estimated current and future talc liability. JA3467.

In fact, J&J's funding commitment dwarfed LTL's time-of-filing liabilities. LTL asserted below that talc litigation created $100 to $200 million per year in litigation costs—less than one percent annually of the Funding Agreement's $60 billion value. JA34. LTL also claimed that J&J had paid $3.5 billion in talc judgments over the previous five years and settled approximately 6,800 talc suits for around $1 billion over the same period. JA34 n.22, JA39-40. At filing, J&J's

---

[2] LTL disclaimed immediate financial distress again after the bankruptcy court's ruling. *See* JA3747 (denying "any imminent or even likely need" to invoke the Funding Agreement's maximum).

reserve for "reasonably estimable" near-term litigation costs was only $2.4 billion.
JA2689.

With at least $60 billion in funding available to LTL, these talc liabilities do
not present "immediate financial difficulty." *SGL Carbon*, 200 F.3d at 162-63.[3]
The "mere possibility" of a future financial crunch cannot support a finding of
good faith. *Id.* As in *SGL Carbon*, LTL was "financially healthy despite the
litigation," *id.*, so its bankruptcy filing was not in good faith.

### 3.     LTL filed for bankruptcy to obtain a tactical litigation advantage

LTL filed for bankruptcy "merely to obtain a tactical litigation advantage."
*Integrated Telecom*, 384 F.3d at 119-20. In past cases, this Court found that
improper purpose by assessing both the debtor's motivations and material change
in position it achieved through bankruptcy. In *SGL Carbon*, executives of the
debtor's parent said outright that litigation tactics motivated the bankruptcy. *See*
200 F.3d at 167. In addition, the debtor's proposed plan subjected one specific
class—antitrust plaintiffs—to disparate treatment. *Id.* In *BEPCO*, this Court
inferred tactical purpose from the circumstances, particularly the bankruptcy's
timing relative to pending litigation targeting the debtors' parent entities. *See* 589
F.3d at 626. The debtors and their parents also gained concrete advantages by

---

[3] J&J had already paid the *Ingham* judgment, JA4, so LTL did not bear that
obligation at the time of filing.

using bankruptcy to delay:  the claimant suffered both "the lost time value of money" and diminished "ability to effectively prosecute its claims."  *Id*.

As in *SGL Carbon*, LTL's witnesses admitted their litigation aims.  Mr. Kim, the chief legal officer, declared that LTL's purpose is to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding" and to "permanently protect" the J&J corporate family from talc-related claims.  JA450, JA464 (¶¶ 21, 59).

As in *BEPCO*, the timing of LTL's petition in relation to litigation against J&J and JJCI confirms those underlying litigation motivations.  *See* 589 F.3d at 625 (timing showed petitions "were filed primarily as a litigation tactic to avoid liability").  The Supreme Court denied review in *Ingham* on June 1, 2021.  *See* 141 S. Ct. at 2716.  On July 19, J&J's then-Treasurer Michelle Ryan wrote to a credit rating agency about the "disappointing" result in *Ingham* and discussed "ways of capping our talc liability."  JA1901 (emphasis omitted).  One way was the ploy now before this Court:  "to capture the liability in one subsidiary, and fund that subsidiary for current and future losses, and then basically bankrupt that

subsidiary." *Id.* (emphasis omitted).  LTL was formed and put in bankruptcy by

October 14, within three months.[4]

Ms. Ryan's discussion of "ways of capping our talc liability" reveals that

LTL has the improper aim of using Chapter 11 to limit the value of talc claims

against J&J and its subsidiaries.  *See Integrated Telecom*, 384 F.3d at 125 (debtor's

Chapter 11 plan "capped" claims of securities class at $25 million, suggesting that

it filed "to gain a litigation advantage over the securities class").  Using bankruptcy

to limit these liabilities contravenes the "absolute priority" rule, the fundamental

bankruptcy principle under which creditors must be paid in full before

stockholders.  *See Telegroup*, 281 F.3d at 139.  The good-faith inquiry "is

particularly sensitive where . . . the petition seeks to distribute value directly from a

creditor to a company's shareholders."  *Integrated Telecom*, 384 F.3d at 129.  LTL

aims to establish a trust for talc claimants with a defined contribution from J&J and

New JJCI.  Once this happens, the risk that the capped amount will prove

insufficient to fully compensate all current and future claimants shifts from J&J,

where that risk belongs, to talc claimants.  Meanwhile, J&J—as New JJCI's

---

[4] The Supreme Court's denial of certiorari in *Ingham* followed other failed
litigation strategies:  centralizing talc litigation in the MDL and seeking to defeat it
through *Daubert* motions to exclude plaintiffs' key experts, *supra* at 10; and
resolving talc claims through a global settlement in connection with the bankruptcy
of its former talc supplier, Imerys, *infra* at 45-46 & n.8.

owner—retains the full value of the Old JJCI assets that were transferred to New

JJCI free and clear of talc liability, to the extent that value exceeds the capped

amount of funding for the trust.  J&J thereby benefits at the expense of talc

claimants, in violation of the absolute priority rule.

LTL and its parents obtained other litigation advantages through the

bankruptcy.  *First*, LTL halted thousands of current and future talc lawsuits against

its non-debtor parents by securing an extension of the automatic stay.  Shielding

the debtor's parents and affiliates from litigation by creditors is an improper use of

Chapter 11 for "tactical litigation advantage."  *See BEPCO*, 589 F.3d at 625-26

(finding bad faith where bankruptcy blocked litigation against debtors' parents and

parent-affiliates).

*Second*, the filing and stay permit LTL and its parent entities to avoid the

jury system.  J&J made clear it sees an advantage in avoiding jury trials,

complaining that "[f]inding a jury that has not been exposed to misinformation"—

J&J's term for the evidence accumulating against it—"is nearly impossible."

JA433.  Avoiding jury trials furthers the stated aim of capping talc liability.  LTL's

witnesses testified that they sought bankruptcy to eliminate the possibility of large

jury verdicts against J&J and JJCI.  *See, e.g.*, JA2171 (LTL president "voted for

the bankruptcy" to deal with "lottery-sized judgements [sic]"); JA2667 (Mr. Kim

27

faulting conventional litigation because "the fact is that these juries are awarding these multi-million dollar awards").

*Third*, LTL's bankruptcy increases settlement pressure on talc claimants by threatening years of delay before they receive any compensation.  Filing a Chapter 11 case to pressure creditors to settle is filing for a tactical litigation advantage.  *See SGL Carbon*, 200 F.3d at 167-68 (rejecting "difficulties . . . in reaching a settlement" as a justification for bankruptcy).

As long as LTL is in bankruptcy, talc claimants can recover from LTL only by triggering J&J and New JJCI's obligations under the Funding Agreement.  The Funding Agreement's "final order" condition delays that trigger until the final reorganization plan is confirmed and any appeals of the confirmation order are resolved, both of which could take many years.  *See supra* Part I.B.1; *see, e.g., In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 363 (3d Cir. 2012) (six years between filing and plan confirmation in asbestos bankruptcy, with appeal pending eleven years after filing).[5]  *Bestwall*—another Chapter 11 case involving a Texas

---

[5] Consider the alternative scenario with Old JJCI as the debtor and no Funding Agreement containing a final-order condition.  If talc claimants secured confirmation of a plan that required Old JJCI to fund a trust, Old JJCI would be required to fund it on the plan's effective date.  To delay that outcome, Old JJCI would need to obtain a stay pending appeal and post any required bond.  *See In re Tribune Media Co.*, 799 F.3d 272, 281-82 (3d Cir. 2015).  J&J seeks to avoid that obligation by effecting the divisional merger of Old JJCI and including the final-order condition in the Funding Agreement.

divisional merger, cited approvingly by the bankruptcy court—has been pending
since 2017. The claims-estimation proceeding is set for 2023, with plan
confirmation to follow, leaving claimants waiting years to recover anything. *See*
Am. Case Management Order, *In re Bestwall*, No. 17-31795 (Bankr. W.D.N.C.
Dec. 21, 2021), Dkt. 2315.

*Fourth*, Old JJCI's restructuring and LTL's bankruptcy segregated talc
claimants from all other creditors, who were left unimpaired. Isolating talc
claimants in bankruptcy to force a settlement of only their claims resembles the
maneuver this Court condemned in *SGL Carbon*. *See* 200 F.3d at 167. There, the
debtor proposed to pay all creditors "in full in cash," with the lone exception of
antitrust judgment creditors, who would receive "limited-time credits" to purchase
the debtor's products. *Id.* The plan's "differing treatment of creditors" evinced an
intent to "pressure . . . plaintiffs to accept the company's settlement terms." *Id.* So
too here. LTL's bankruptcy treats talc claimants differently from all other
creditors, with the purpose and effect of pressuring them to accept J&J's preferred
settlement terms.

### 4.    The effort to shield Old JJCI's assets evinces bad faith

LTL's bankruptcy is part of a larger scheme to shield Old JJCI's assets and
revenues, now housed in New JJCI, from the bankruptcy court and from talc
claimants. Bankruptcy involves a "balancing process" among debtors'

creditors' interests, *see Jevic*, 137 S. Ct. at 978, requiring the bankruptcy court to

control the debtor's assets *and* liabilities.  The process is not intended to allow

"non-debtor companies" with no "need to reorganize" "to cleanse themselves of

. . . liability without enduring the rigors of bankruptcy." *In re Combustion Eng'g,*

*Inc.*, 391 F.3d 190, 233, 237 (3d Cir. 2004).  Nor is it intended to permit non-

debtors to create shell entities solely for the purpose of filing for bankruptcy and

forestalling particular creditors' exercise of their rights.  *See Laguna Assocs.*,

30 F.3d at 738 (condemning "new debtor syndrome" bankruptcy filings); *Little*

*Creek*, 779 F.2d at 1072-73 (same).

   This case reflects the same type of "intent to hinder and delay [creditors]" as

the scheme the Supreme Court rejected in *Shapiro v. Wilgus*, 287 U.S. 348, 354

(1932).  There, as here, the debtor corporation was not "legitimately conceived for

a normal business purpose and functioning or designed to function according to

normal business methods." *Id.* at 355-56.  Instead, the debtor was created shortly

before being placed into receivership "for the very purpose of being sued . . . with

a restraining order of the court to give check to the pursuers." *Id.*  LTL's creation

and bankruptcy create obstacles for the affected creditors like those in *Shapiro*.

Because only LTL can enforce the Funding Agreement and funding thereunder is

conditional, the Agreement and the litigation stay interpose barriers between talc

claimants and the real assets of J&J and JJCI, the companies that caused

their injuries.

## II.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT LTL FILED FOR BANKRUPTCY IN GOOD FAITH

The bankruptcy court's good-faith finding is erroneous in multiple respects,

each sufficient for reversal.  The bankruptcy court found valid bankruptcy

purposes by disregarding this Court's precedent.  Its analysis of financial distress

was faulty.  It disregarded the tactical litigation advantages LTL and J&J have

sought and gained.  And it relied improperly on LTL's stated intent to create a trust

under 11 U.S.C. § 524(g), when J&J's divisional merger scheme flouts that

provision's design, prejudicing talc claimants' rights.

Those errors share a common source:  the bankruptcy court's mistaken view

that bankruptcy's supposed superiority for resolving mass tort litigation was "a far

more significant issue" than faithfully applying this Court's good-faith standard.

JA12-13.  By misapprehending its proper focus, the bankruptcy court misapplied

the good-faith standard at every stage.  Those errors warrant reversal.

### A.    The Bankruptcy Court Erroneously Found Two Valid Bankruptcy Purposes

The bankruptcy court erred in holding that the bankruptcy filing "serves to

maximize the property available to satisfy creditors." JA15.  It also erroneously

concluded that "addressing the present and future liabilities associated with

ongoing global personal injury claims to preserve corporate value is

unquestionably a proper purpose under the Bankruptcy Code."  JA16.

### 1.    Bankruptcy does not maximize LTL's value to its creditors

The bankruptcy court did not address whether the bankruptcy process would

"add or preserve value that would otherwise be unavailable to creditors outside of

bankruptcy."  *BEPCO*, 589 F.3d at 620 (quoting *Integrated Telecom*, 384 F.3d at

120-21); *supra* Part I.B.1.  Instead, it reasoned that "a successful reorganization

and implementation of a settlement trust," assuming they occurred, would "ensure

balanced recoveries for present and future claimants" and "dramatically reduce

costs."  JA15.

The bankruptcy court did not—indeed, could not—find that the value of

LTL's assets to talc claimants *as a class* would be greater in bankruptcy than

outside it.  LTL's cash, insurance policies, and royalty stream would have the same

value if this case were dismissed, and the value of the Funding Agreement to

creditors would be greater, because J&J's obligation to fund compensation to talc

victims would be broader and more immediate.  *See supra* Part I.B.1.  Thus, this

case is like *BEPCO*, where the debtors' major assets (insurance policies) had

"always been available outside of bankruptcy without detrimentally impacting any

creditor's recovery."  589 F.3d at 621

The bankruptcy court's speculation about a "settlement trust" does not cure
that error.  True, settling cases usually costs less than litigating them.  But J&J and
its subsidiaries—Old JJCI, and now New JJCI and LTL—have always been free to
settle cases by reaching agreements with talc claimants.  Now that LTL and all J&J
entities are protected by the automatic stay and preliminary injunction, talc
claimants as a class are forced into an inferior position to settle for less than they
would receive outside of bankruptcy.  That result runs afoul of this Court's holding
in *SGL Carbon* that using bankruptcy to "pressure . . . plaintiffs to accept the
company's settlement terms" does not serve a valid bankruptcy purpose.  200 F.3d
at 167.

The bankruptcy court's theory that LTL's Chapter 11 filing would maximize
LTL's asset value by ensuring "balanced recoveries" between present and future
claimants was legally erroneous because it confused value maximization with
value redistribution.  JA15.  This Court has made clear that to "maximize the value
of the debtor's estate," the bankruptcy must "create or preserve some value that
would otherwise be lost—*not merely distributed to a different stakeholder*—
outside of bankruptcy."  *Integrated Telecom*, 384 F.3d at 128-29 (emphasis added);
*see BEPCO*, 589 F.3d at 622 ("[A]n orderly distribution of assets, standing alone,
is not a valid bankruptcy purpose.").  Otherwise, any defendant facing a large
number of claims, whether financially healthy or not, could invoke Chapter 11 on

33

the basis that the Bankruptcy Code's distribution system would be fairer than conventional litigation.

Finally, reducing talc litigation costs does not "maximize the value of *the debtor's* estate for creditors," *Integrated Telecom*, 384 F.3d at 112 (emphasis added), because LTL does not pay talc litigation costs. Under the Funding Agreement, J&J must pay LTL's talc litigation costs, regardless of whether LTL is in bankruptcy. *See* JA483-484 (defining "Permitted Funding Use"). From the perspective of the debtor's estate, which is what matters here, the litigation costs are a wash. If J&J were somehow financially distressed, it could undergo a Chapter 11 process with the goal of reducing its litigation costs. But J&J is not in financial distress, has no desire to use Chapter 11 for itself, and has never suggested it might.

### 2.     Addressing liabilities alone is not a valid bankruptcy purpose

Contrary to the bankruptcy court's rationale, this Court has never held that simply addressing "present and future liabilities . . . to preserve corporate value," JA16, provides a valid bankruptcy purpose. JA16. The lone Third Circuit decision the bankruptcy court cited was *SGL Carbon*'s suggestion that certain debtors facing large litigation liabilities had filed valid Chapter 11 petitions. *Id.*; *see* 200 F.3d at 164. But that suggestion addressed debtors facing litigation "that posed a serious threat to the companies' long term viability" and that caused "serious

34

financial and/or managerial difficulties at the time of filing." 200 F.3d at 164 &

n.15.  Where, as in *SGL Carbon* itself, the debtor has "experienced no financial

difficulty at the time of filing nor any significant managerial distraction," it is

reversible error to find good faith.  *Id.* at 164.  The same result should follow here.

    In addition, the cases discussed in *SGL Carbon* involved debtors with real

businesses.  *See id.* (listing cases).  Those filings served the undisputedly valid

purpose of preserving those going concerns.  But LTL never argued it is a going

concern, and the bankruptcy court did not find it to be one.  Those cases therefore

cannot justify LTL's bankruptcy.

    The other cases on which the bankruptcy court relied are non-binding

bankruptcy court decisions that are likewise distinguishable.  *See* JA16 (citing *In re*

*Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019); *In re Muralo Co.*, 301 B.R.

690 (Bankr. D.N.J. 2003)).  In *Bestwall*, the bankruptcy court found that

reorganization would allow the debtor "to continue as a going concern."  605 B.R.

at 49-50. The bankruptcy court made no such finding here.  In *Muralo*, the debtors'

business operations had been "significantly disrupted"; they were also "tiny,"

having total assets of less than $25 million but facing 60,000 asbestos claims.  301

B.R. at 698, 706.  Neither case is a precedent for treating the use of bankruptcy to

increase corporate value for the debtor's parents by reducing present and future

liabilities as a valid bankruptcy purpose.  And if they were, *SGL Carbon*'s contrary

holding would still be the law of this Circuit.

### B.  The Bankruptcy Court Erred in Finding Financial Distress

The bankruptcy court erred as a matter of law in finding that financial

distress justified LTL's bankruptcy filing.  LTL could not show difficulty meeting

present obligations or that talc liabilities would approach J&J's maximum funding

commitment.  The bankruptcy court discerned financial distress only by incorrectly

analyzing the facts, focusing on unrealistic estimates of hypothetical future talc

liabilities, and disregarding LTL's failure to estimate its talc liabilities reasonably.

Absent present distress, potential future liabilities cannot establish good faith.  And

if they could, the record still would not support the bankruptcy court's findings.

### 1.  The bankruptcy court erred by not requiring LTL to show immediate financial distress

**a.**   The bankruptcy court did not assess "immediate financial difficulty

. . . at the time of the filing" as this Court's precedents require.  *SGL Carbon*,

200 F.3d at 163, 166; *Integrated Telecom*, 384 F.3d at 123-24.  It did not compare

LTL's present financial capacity to its liabilities or examine LTL's ability to meet

current debts, borrow money, or access capital.

Had it done so, the result would be clear.  LTL disclaimed financial distress

in the Funding Agreement.  *See supra* Part I.B.2.  The bankruptcy court itself

found that LTL's financial capacity far exceeds its present liabilities:  $60 billion

or more available under the Funding Agreement, compared to annual litigation
costs of $100 to $200 million, judgments averaging $700 million annually over the
previous five years ($3.5 billion total), and settlements averaging around $200
million annually over the same period ($1 billion total). JA10, JA34 n.22, JA39-
40. Like the debtors in *Integrated Telecom* and *SGL Carbon*, LTL's excess of
financial capacity over liabilities and its ability to meet present obligations mean
that it was and is not in immediate financial difficulty. Without such difficulty,
even "potentially crippling" future liability does not suffice. *SGL Carbon*,
200 F.3d at 163. The bankruptcy court's contrary ruling was reversible error.

  **b.**  The bankruptcy court overlooked LTL's failure to conduct the serious
analysis of financial distress that prior mass tort debtors have done before seeking
bankruptcy relief. In *In re Johns-Manville Corp.*, the seminal asbestos bankruptcy
cited by the bankruptcy court, *see* JA37, the debtor conducted a "lengthy, careful
and detailed analysis" of its asbestos liabilities before it filed. *See* 36 B.R. 727,
734 (Bankr. S.D.N.Y. 1984). That process included two epidemiological studies of
asbestos health costs, *id.*; reliance on "careful, conservative and perhaps
understated projections" from its accounting firm, *id.* at 734-35; and evidence that
booking the $1.9 billion reserve recommended by the accountants would have

accelerated $450 million of outstanding debt, "possibly resulting in a forced

liquidation of key business segments," *id.* at 730.[6]

Here, in stark contrast, LTL's board of directors voted to file the Chapter 11

petition without trying to determine LTL's talc liabilities.  JA2139.  At the vote

meeting, LTL's board received "no numbers" for "forecasted costs and expenses

. . . associated with talc related lawsuits."  JA2140.  LTL's board was not told how

many cases J&J had settled or what it paid to settle them.  *Id.*  Instead, Mr. Kim,

the chief legal officer, presented the board an outlandish hypothetical scenario:

that every one of 38,000 pending ovarian cancer cases would go to trial, each

costing $2 to $5 million to try.  *Id.*  The assumption that every case would go to

trial is contrary to J&J's experience settling 6,800 cases in the past five years and

obtaining dismissal of another 1,550.  *See* JA39-40 (citing Movants' Ex. 161

(JA4548)), JA24-26.  It is also contrary to the opinion of LTL's own expert,

Charles Mullin, that 98% or more of asbestos cases do not go to trial.  *See* JA2912

("More than 98 percent of claimants in asbestos litigation settle with all

defendants, or dismiss their case[].").

---

[6] *See also*, *e.g.*, *In re Roman Catholic Church of Archdiocese of New
Orleans*, 632 B.R. 593, 598 (Bankr. E.D. La. 2021) (debtor demonstrated financial
distress with detailed evidence and expert testimony on revenue streams, liabilities,
and difficulty accessing capital); *cf. In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364,
375-82 (Bankr. D. Del. 2018) (petition dismissed where debtor gave only
inconsistent, "high-level and conclusory" testimony on financial distress).

At trial, Mr. Kim testified it would be "virtually impossible" to estimate future talc liabilities. *See* JA 2614. But LTL has retained economic experts in this case to carry out that very analysis. *See* JA1668 (¶ 5(b)) (LTL retaining firm to "estimat[e] the number and value of . . . present and future talc personal injury claims against the Debtor."). LTL will have to provide such estimates eventually if this bankruptcy reaches claims estimation and plan confirmation.

The bankruptcy court should have required serious, reasoned analysis of financial distress at the outset, and erred in finding that LTL could show good faith without it.

### 2. The bankruptcy court analyzed financial distress incorrectly

**a.** To the extent the bankruptcy court analyzed present financial distress, it misapplied the law to the facts. It analyzed the wrong entity, assessing Old JJCI's financial condition, not LTL's. *See* JA33-34. It focused on the apparent impact of talc litigation on Old JJCI's booked profit and loss, characterizing talc litigation as the "primary driver" of the loss it incurred in 2020. JA33. But the financial distress inquiry concentrates on the debtor. *See SGL Carbon*, 200 F.3d at 166 ("[I]f a *petitioner* has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed.") (emphasis

39

added); *cf. BEPCO*, 589 F.3d at 620-25 (finding bad faith because the bankruptcy

primarily served the interests of non-debtor parents and affiliates).

Because of the divisional merger, Old JJCI no longer exists, and LTL is not

similarly situated. LTL will book no losses from talc litigation costs. The Funding

Agreement obligates J&J and New JJCI to pay those costs, and the divisional

merger separated Old JJCI's business operations from LTL to keep them out of this

bankruptcy. The bankruptcy court's finding that talc litigation "threaten[ed] Old

JJCI's ability to sustain the marketing, distribution, and R&D expenditures needed

to compete in the U.S. market," JA33, has no bearing on LTL, which engages in no

business and competes in no market.

The bankruptcy court sought to justify considering "the financial risks and

burdens facing both Old JJCI and Debtor" because the restructuring and

bankruptcy filing was "a single, pre-planned, integrated transaction." JA14. But it

cited no authority making a non-debtor's purported financial trouble determinative

of a debtor's good faith, on an "integrated transaction" theory or otherwise. Nor

does that approach make sense. The restructuring concededly was engineered to

avoid "subjecting the entire Old JJCI enterprise to a bankruptcy proceeding."

JA450 (¶ 21). LTL should not be permitted to pretend that "the entire Old JJCI

enterprise" is subject to this bankruptcy solely to show financial distress. *Id*. Nor

should LTL be allowed to disregard J&J's promise in the Funding Agreement to pay LTL's talc litigation costs.

**b.**    Even if a focus on Old JJCI's financial condition were proper, Old JJCI's apparent losses were an accounting fiction created by J&J. Before the divisional merger and the Funding Agreement, J&J paid all costs of defense, settlements, and verdicts in the talc litigation out of a central account that collects cash from all J&J subsidiaries. JA2453-2454. J&J then charged those costs— including defense, settlement, and verdict costs against itself—to Old JJCI. *See* JA2680; JA6379, JA6379-6380 (¶¶ 8, 10). For instance, punitive damages against J&J made up $716 million of the *Ingham* judgment, but J&J charged the entire verdict, including those punitive damages, to Old JJCI. *See* JA2681, JA2694 (explaining J&J treated the full amount as a payable owed by Old JJCI).

The loss figures on which the bankruptcy court relied are a made-for-litigation product, not a reliable measure used by Old JJCI's management. This Court looks skeptically on after-the-fact, attorney-driven assertions of financial distress. *See SGL Carbon*, 200 F.3d at 167-68. J&J did not routinely prepare consolidated financial statements for Old JJCI. JA3504; JA2896-2897. It prepared an income statement for Old JJCI only for this litigation, excluding income of Old JJCI's foreign subsidiaries. JA2706-2711.

Other record evidence confirms that Old JJCI's financial condition at the time of the divisional merger was healthy, not distressed.  Old JJCI had no trouble paying its obligations at that time.  JA3620.  J&J's consumer health sales were increasing.  *See* JA38 (consumer health sales had "grown steadily" since 2016, with the 2020 loss due to the "one-off" *Ingham* judgment); JA2824-2826 (value of New JJCI anticipated to grow 3%, or $1.8 billion, per year).  Securities filings assured investors that talc liabilities could be paid in the ordinary course.  *See* JA4506 (July 2021 Form 10Q reporting that product liability exposure was "not expected to have a material adverse effect on the Company's financial position").  And the executives in charge of Old JJCI were unconcerned by talc liabilities.  Old JJCI's president testified that she never discussed putting Old JJCI into bankruptcy.  JA3409-3410.  The chair of J&J's consumer health business likewise testified that talc litigation was managed by attorneys without his involvement.  JA2300-2302.

**c.**      Had Old JJCI needed additional liquidity, it could have borrowed through its parent J&J, a massive company with a stellar credit rating.  *See* JA3619; *see also* JA2900-2901 (J&J's subsidiaries "benefit from the implicit support of the J&J parent company having an AAA credit rating").  At the time of LTL's bankruptcy filing, J&J had $41 billion in cash, marketable securities, and available credit lines.  JA4699.

42

The bankruptcy court deemed evidence of J&J's resources and conduct irrelevant, citing the principle that parents generally are not liable for claims against their subsidiaries. *See* JA35. Its categorical dismissal of evidence concerning the debtor's parent has no basis in this Court's cases. In *BEPCO*, this Court focused on how the debtors' parents controlled the decision to file for bankruptcy and directed it in their own interests. 589 F.3d at 624-25. In *SGL Carbon*, the Court determined the debtor was not in financial distress based partly on the "significant" fact that the debtor's parent had recorded a sizable reserve to cover liabilities in pending litigation but the reserve was "untouched" at the time of the bankruptcy filing. 200 F.3d at 157 n.4, 163. In another case, the Court affirmed a good-faith finding partly because the debtor's parent was dissolving too. *See In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003). The bankruptcy court's approach cannot be squared with those cases' pragmatic consideration of the parents' financial condition and conduct.

To the extent the bankruptcy court briefly addressed whether "J&J would have continued to fund all talc-related obligations of Old JJCI without any bankruptcy filing," it erroneously faulted Appellants' evidence as "supposition." JA38. That improperly shifted the burden of proof from LTL to Appellants. *See BEPCO*, 589 F.3d at 618. LTL provided no evidence, and the bankruptcy court

cited none, that J&J would have ceased its practice of funding talc litigation costs.[7]

Talc suits often named J&J as a defendant, not just Old JJCI, so J&J could not

wholly avoid defense costs or judgments even had it wanted to, as the damages

award in *Ingham* illustrates.

### 3.    The bankruptcy court erred by relying on unrealistic hypotheticals

The bankruptcy court erroneously focused on potential future talc liabilities,

which cannot establish good faith absent immediate financial distress.  *See* JA35-

38; *supra* Part II.B.1.  Worse, the court relied on unrealistic hypotheticals,

projecting costs far greater than J&J itself estimated near the time of LTL's

bankruptcy filing.

For instance, the bankruptcy court accepted an extreme version of the

hypothetical that LTL's board considered when it voted to file for bankruptcy:  that

it would cost "up to $190 billion" to continue litigation in the tort system because

(1) no talc case would settle, (2) every one of 38,000 pending ovarian-cancer cases

would go to trial, and (3) each would cost the highest projected amount to try

($5 million).  *See* JA34 n.22, JA37; *see also* JA2171 (LTL president testifying that

trying 38,000 cases would take "nearly 4,000 years").  The court also assumed

---

[7] Ms. Ryan, formerly J&J's Treasurer, testified that "J&J didn't have an obligation to fund [Old] JJCI forever," JA3611—which may or may not be legally correct—but not that J&J would have stopped in the immediate, or even foreseeable, future.

every talc claimant would achieve the same outcome as the largest recent verdicts,

speculating that all J&J companies were "imperiled" because "[e]ven without a

calculator or abacus, one can multiply multi-million dollar or multi-billion dollar

verdicts by tens of thousands of existing claims."  JA36.

Those speculations cannot withstand scrutiny.  If trying every pending case

would take nearly 4,000 years, as LTL's president testified, the associated financial

burdens would not be immediate.  And J&J and JJCI have successfully settled or

obtained dismissal of thousands of cases, consistent with the testimony of LTL's

expert that more than 98% of asbestos cases are settled or dismissed.  *See supra*

Part II.B.1.  To assume on this record that every case will go to trial and result in a

large plaintiff's verdict ignores reality.

The bankruptcy court also relied on unfounded estimates of possible

indemnification obligations to bankrupt former talc suppliers that LTL inherited.

JA16 (LTL expert estimating $25 to $118.2 billion); JA37.  Those obligations

remain "contested," JA16, and it is speculative that J&J or LTL will ever pay

anything approaching that amount.  The LTL expert's estimates derive from a plan

proposed by J&J's former supplier Imerys in its bankruptcy proceeding.  JA7130

& n.43 (citing *In re Imerys Talc Am., Inc.*, No. 19-10289-LSS (Bankr. D. Del.

Sept. 16, 2021), Dkt. 4099 (proposed tenth amended plan)).  LTL itself criticized

that proposal for its "exponentially inflated" valuation of talc claims.  JA1863.5-.6

n.26.  And that proposal is defunct.  In October 2021, the bankruptcy court rejected votes needed for its approval, and Imerys cancelled the plan confirmation hearing. *See Imerys*, Dkts. 4239, 4243.  By contrast, J&J offered in connection with *Imerys* to settle pending and future ovarian cancer claims in the far smaller range of $4 to $5 billion.  JA2461-2464.[8]

J&J's contemporaneous understanding of present and future talc liabilities at the bankruptcy filing confirms the unrealistic nature of the bankruptcy court's hypotheticals and the absence of immediate financial distress.  After the *Ingham* verdict but before the bankruptcy, J&J told Standard & Poor's that its "worst case scenario" talc liability, including future cases, was $7 to $7.5 billion.  JA3423-3424.  That worst-case figure combined the *Ingham* damages with J&J's settlement offer of $4 to $5 billion in *Imerys*.  JA2415-2417.  It is well below the Funding Agreement's maximum commitment and the outlandish figures the bankruptcy court accepted as plausible.

Finally, the bankruptcy court's doomsday scenario that, outside bankruptcy, tens of thousands of plaintiffs will all refuse to settle and will take every case to trial cannot be squared with the court's assumption that, within bankruptcy, the

---

[8] According to Mr. Kim, the *Imerys* talks "would have gotten rid of virtually all the cases in the MDL" but "fell apart" around June 2021—another development precipitating J&J's turn to a bankruptcy litigation strategy.  JA2408, JA2467.

same plaintiffs will meekly agree to an efficient settlement trust.  *See* JA15, JA20.

The well-founded assumption would have been that, outside bankruptcy, most

plaintiffs would settle.  Had the bankruptcy court taken that fact-based approach, it

could not have found present financial distress at the time of LTL's filing.

### C.    The Bankruptcy Court Erred in Its Analysis of The Tactical Litigation Advantages LTL and J&J Sought and Gained

The bankruptcy court acknowledged that "no one contests that J&J and Old

JJCI looked to the Bankruptcy Code for a way to globally address all talc-related

claims."  JA43.  The court found it "unsurprising that J&J and Old JJCI

management would seek to *limit exposure* to present and future claims" through

bankruptcy.  JA31 (emphasis added).  It touted bankruptcy as "a unique

opportunity to *compel* the participation of all parties in interest . . . in a single

forum."  JA27 (emphasis added).  Channeling all litigation into one forum, capping

liability exposure, and forcing claimants to seek a global resolution on J&J's terms

are attempts to seek litigation advantage, which is not a valid bankruptcy purpose.

*See supra* Part I.B.3.  In concluding otherwise, the bankruptcy court misapplied the

law to clear—indeed, essentially undisputed—facts.

To start, in concluding that LTL did not file for bankruptcy to secure tactical

litigation advantages, the bankruptcy court mischaracterized the "thrust" of

claimants' argument on this issue as "bottomed on the 2021 [Old JJCI]

Restructuring and the use of the Texas divisional merger statute."  JA41.  The

bankruptcy court then relied erroneously on a finding that the divisional merger of

"Old JJCI complied with all requirements under Texas law" to conclude that

LTL's bankruptcy filing did not have an improper tactical purpose. JA41-42.

The good-faith requirement is not a matter of compliance with state

corporate law. Rather, it "ensures that the Bankruptcy Code's careful balancing of

interests is not undermined by petitioners whose aims are antithetical to the basic

purposes of bankruptcy." *Integrated Telecom*, 384 F.3d at 119. To that end, the

bankruptcy court should have assessed whether "the primary, if not sole, purpose

of the filing was a litigation tactic." *BEPCO*, 589 F.3d at 625 (quoting *SGL*

*Carbon*, 200 F.3d at 165). Its findings that the purposes of LTL's filing were to

"limit exposure" and "compel [claimants'] participation" in J&J's chosen forum,

JA31, JA27, established that the filing had just that purpose.

The bankruptcy court also erred in concluding that the talc claimants had not

been "placed in a worse position" by the divisional merger and bankruptcy filing.

JA44. In *BEPCO*, dismissal for lack of good faith was warranted because the

bankruptcy filing caused significant delay, and thus prejudice, to the principal

claimant's litigation against the debtors' parents, in terms of both "the lost time

value of money" and diminished "ability to effectively prosecute its claims" if

witnesses and evidence became unavailable. 589 F.3d at 626. Here, the talc

claimants face similar delay, with the added problem that many of them may not

survive long enough to press their claims in the bankruptcy process.  They lose the ability to sue J&J directly and to choose their preferred forums (including the right to sue in state court or obtain a jury trial).  The bankruptcy court considered none of those sources of prejudice.

That error, like the bankruptcy court's others, stems from its "strong conviction" that the bankruptcy system offers "the optimal venue" for resolving the talc litigation.  JA19.  The bankruptcy court's belief in bankruptcy's superior qualities led it to see only rosy prospects for this bankruptcy proceeding.  For instance, it characterized the Funding Agreement as an "immediate enforcement vehicle" that gave talc claimants "leverage."  JA43-44.  But the Funding Agreement imposes no payment obligation on J&J or New JJCI until a final plan providing a trust for talc victims has been confirmed and the appeals process has concluded, which could take years.  *See supra* Part I.B.3.  There is no guarantee of "immediate" resolution, and by design J&J and LTL hold all the "leverage."

The bankruptcy court added insult to injury by further stating it found the near-universal opposition of talc claimants to the bankruptcy proceeding "inexplicable."  JA43-44.  J&J's sophisticated counsel did not design the divisional merger and immediate Chapter 11 filing by LTL so that their client would pay more money more quickly.  They designed it so their client would pay less money less quickly.  The bankruptcy court called that a "business decision."  JA49.  No

doubt it was.  What it was not, under *SGL Carbon*, *Integrated Telecom*, and

*BEPCO*, was a valid bankruptcy purpose.

### D.    LTL's Intent to Use Section 524(g) Does Not Establish Good Faith

The bankruptcy court relied on LTL's stated intent to create a settlement

trust under 11 U.S.C. § 524(g) in finding LTL's good faith, holding that LTL's

aims were "consistent with congressional objectives" of that provision.  JA49.  But

"a desire to take advantage of the protections of the Code . . . cannot establish *good*

*faith* as a matter of law."  *Integrated Telecom*, 384 F.3d at 127-28.  Chapter 11's

protections are "not *per se* a valid justification for a Chapter 11 filing," but rather

"a consequential benefit of an otherwise good faith filing."  *Id.* at 128 (internal

quotation marks omitted).

Moreover, LTL's aims are not consistent with Congress's objectives.  The

divisional merger giving rise to LTL prejudiced talc claimants' trust funding rights

under § 524(g).  Congress enacted § 524(g) as "an extraordinary remedy for

debtors overwhelmed by asbestos-related liabilities."  *In re Fed.-Mogul Glob. Inc.*,

411 B.R. 148, 166 (Bankr. D. Del. 2008).  Congress modeled § 524(g) on *Johns-*

*Manville*, which established a trust to pay present and future asbestos claims,

coupled with an injunction preventing present and future claimants from suing the

reorganized debtor by channeling all claims to the trust.  *See* Bankruptcy Reform

Act of 1994, Pub. L. No. 103-394, § 111, 108 Stat. 4106; H.R. Rep. No. 103-835,

50

at 3348-49; *In re Johns-Manville Corp.*, 68 B.R. 618, 621-22 (Bankr. S.D.N.Y. 1986) (explaining the trust), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987).  In theory, the "channeling injunction" helps the reorganized debtor return to economic viability, while the trust provides "substantially similar recoveries" to current and future claimants.  *Combustion Eng'g*, 391 F.3d at 234.

Congress drew on the Manville trust's "exceptional precautions" to protect claimants.  H.R. Rep. No. 103-835, at 3349.  One was the trust's "creative solution" to ensure assets remained to pay future claimants:  the reorganized debtor gave its securities, equity, and a share of future earnings to the trust.  *Id.* at 3348-49.  Once "cleansed of asbestos liability," the debtor's reorganized business would provide the trust "an 'evergreen' source of funding to pay future claims." *Combustion Eng'g*, 391 F.3d at 234.  And claimants would benefit from a successful reorganization, "because the company's success would increase both the value of the stock held by the trust and the company profits set aside for it."  H.R. Rep. No. 103-835, at 3349.  Adopting this approach, Congress required the debtor to fund the trust with its securities and future payments, including dividends, and required that the trust own, or have the right to own, "a majority of the voting shares."  11 U.S.C. § 524(g)(2)(B)(i)(II)-(III).

J&J's divisional merger scheme flouted § 524(g)'s design by replacing talc claimants' access to Old JJCI's global consumer health business with a fabricated

debtor that has no business to reorganize.  The divisional merger deprived talc

creditors of the right to a § 524(g) plan trust funded with the equity and future

earnings of that business, sharing in its future success and growth.  *See* JA2824-

2826 (value of New JJCI anticipated to grow 3%, or $1.8 billion, per year).  J&J's

scheme limits trust funding options to a cash contribution from J&J upon final

confirmation of a reorganization plan, which may prove inadequate to satisfy

current and future talc claims.  Meanwhile, J&J's scheme reserves participation in

the growth and success of JJCI to J&J's shareholders.  The bankruptcy court thus

erred in holding that LTL's invocation of § 524(g) accorded with congressional

objectives and demonstrated LTL's good faith.[9]

### E.    The Bankruptcy Court Erroneously Prioritized Its Preference For Bankruptcy Over Tort Litigation

The bankruptcy court erroneously viewed the supposed superiority of

bankruptcy over the tort system for resolving talc litigation as "a far more

significant issue" than applying this Court's good-faith standard.  JA12-13.  The

court even suggested that bankruptcy should be used more often to handle mass

tort litigation, responding to the argument "that allowing this case to proceed will

inevitably 'open the floodgates'" by suggesting that "maybe the gates indeed

---

[9] This error compounds the point, elaborated by other Appellants, that LTL cannot satisfy § 524(g) because it was not "named as a defendant" in any talc personal-injury case at the time of the bankruptcy filing.  *See* 11 U.S.C. § 524(g)(2)(B)(i)(I); *see* Official Committee's Br. at 30.

should be opened." JA52.  The bankruptcy court thereby departed from this

Court's teaching in *BEPCO* that "the creation of a central forum to adjudicate

claims against [debtors] is not enough to satisfy the good faith inquiry,"

particularly when "the same adjudication could have occurred" in a non-

bankruptcy court.  589 F.3d at 622.  It failed to heed this Court's warning in *SGL*

*Carbon* that the "lure" of bankruptcy as "an inviting safe harbor" to companies

facing large-scale litigation obligates courts to "guard[] against" the "possibility of

abuse."  200 F.3d at 169.

By reducing good faith to a subjective assessment of bankruptcy's and tort

litigation's comparative policy merits, the bankruptcy court jeopardized

constitutional interests.  The Constitution assigns common-law causes of action,

such as the personal-injury claims here, to Article III and state courts, not to

Article I tribunals.  *See Stern v. Marshall*, 564 U.S. 462, 482-84 (2011).  The

Seventh Amendment further protects the right to a jury trial in suits at common

law.  Allowing bankruptcy to cut off jury trials for the benefit of a debtor's

corporate parents encroaches on the interests that Article III and the Seventh

Amendment protect.  And compulsory adjudication of rights *en masse*, the goal the

bankruptcy court embraced here, offends "our deep-rooted historic tradition that

everyone should have his own day in court."  *Ortiz v. Fibreboard Corp.*, 527 U.S.

815, 846 (1999) (internal quotation marks omitted).

53

Congress created a different mechanism to handle mass litigation:  multi-district litigation.  *See* 28 U.S.C. § 1407.  The MDL process better accounts for the individual, constitutional, and systemic interests involved.  However sincere their aims, individual bankruptcy courts have no authority to override Congress's decision about how to manage complex mass litigation.

By refusing to dismiss LTL's petition, the bankruptcy court commandeered an existing MDL that made considerable progress resolving talc litigation's common issues.  The court chose to do so because it found "significant challenges and inefficiencies" in multi-district litigation.  JA23.  But that choice was not the bankruptcy court's to make.  By doing so, the court abused its discretion, thus warranting reversal.

### F.    The Bankruptcy Court Erred In Its Alternative Ruling That "Unusual Circumstances" Preclude Dismissal

In a footnote, the bankruptcy court purported to hold in the alternative that, even if LTL had not filed in good faith, "unusual circumstances" precluded dismissal of LTL's petition.  JA13 n.8 (citing 11 U.S.C. § 1112(b)(2)).  Based on "the merits of the competing judicial systems," it concluded that the interests of current and future talc claimants constituted the requisite "unusual circumstances." *Id.*  But talc claimants made clear that their interest was in pursuing their claims outside bankruptcy, and creditors "are the best judge of their own best interests."

54

*In re Soppick*, 516 B.R. 733, 764 (Bankr. E.D. Pa. 2014); *In re Camden Ordnance
Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 802 (E.D. Pa. 2000) (same).

In any event, § 1112(b)(2) requires findings that the bankruptcy court did not

make, so that provision cannot support denial of the motions to dismiss.

*First*, the court must find "a reasonable likelihood" that a plan will be

confirmed "within a reasonable period of time." 11 U.S.C. § 1112(b)(2)(A); *see,
e.g.*, *In re Domiano*, 442 B.R. 97, 107 (Bankr. M.D. Pa. 2010). The bankruptcy

court made no such finding. Nor can a timely resolution be taken for granted.

Talc claimants maintain that they developed fatal cancer from exposure to J&J's

talc-based products. J&J counters that there is no link between talc exposure and

cancer, so all claims are baseless. *See* JA2398-2399. This gulf between positions

may well make confirming a plan—requiring a 75% affirmative vote by talc

claimants—difficult, if not impossible. And J&J has no incentive to move quickly.

*Second*, the court must find that the act or omission constituting grounds for

dismissal had a "reasonable justification" and "will be cured within a reasonable

period of time." 11 U.S.C. § 1112(b)(2)(B). The bankruptcy court did not find

that either, nor could it. The basis for dismissal is LTL's lack of good faith.

"[F]iling a petition in bad faith could never be reasonably justified or curable, no

matter what plan [the Debtor] could now propose." *In re Green*, 2016 WL

6699311, at *11 (9th Cir. B.A.P. Nov. 9, 2016). LTL's bad faith is intrinsic to its

design and to the bankruptcy petition it filed.  J&J contrived both for invalid
purposes and in the absence of immediate financial distress.  Undoing that bad
faith means undoing this bankruptcy.

## **CONCLUSION**

This Court should reverse the bankruptcy court's order denying Appellant's
motion to dismiss.

Dated: June 30, 2022                      Respectfully submitted,

                                          */s/ David C. Frederick*

Laura Davis Jones                         David C. Frederick
Isaac M. Pachulski                        Gregory G. Rapawy
Karen B. Dine                             Ariela M. Migdal
Jeffrey M. Dine                           Matthew N. Drecun
Colin R. Robinson                         KELLOGG, HANSEN, TODD,
Peter J. Keane                               FIGEL & FREDERICK, P.L.L.C.
PACHULSKI STANG ZIEHL & JONES LLP         1615 M Street, N.W., Suite 400
919 N. Market Street, 17th Floor          Washington, D.C. 20036
Wilmington, DE 19801                      Telephone: (202) 326-7900
Telephone: (302) 652-4100                 dfrederick@kellogghansen.com
ljones@pszjlaw.com                        grapawy@kellogghansen.com
ipachulski@pszjlaw.com                    amigdal@kellogghansen.com
kdine@pszjlaw.com                         mdrecun@kellogghansen.com
jdine@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

*Counsel for Appellant*

# **CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limit of Fed. R. App.

P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed.

R. App. P. 32(f), this document contains 12,681 words.

2.     This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word 2013 in 14-point Times New Roman font.  As permitted by Fed.

R. App. P. 32(g), the undersigned has relied upon the word count feature of this

word processing system in preparing this certificate.

3.     In addition, pursuant to 3rd Cir. L.A.R.  31.1(c) (2011), the

undersigned hereby certifies that the text of the electronic brief filed with the Court

is identical to the paper copies, that a virus detection program (CylancePROTECT)

has been run on the electronic file, and that no virus was detected.


Dated: June 30, 2022                     */s/ David C. Frederick*
                                          David C. Frederick

## <u>CERTIFICATE OF FILING AND SERVICE</u>

The undersigned hereby certifies that on June 30, 2020, I caused an

electronic copy of the Brief for Appellant to be electronically filed with the United

States Court of Appeals for the Third Circuit using the CM/ECF system, which

will automatically send notification of such filing to counsel of record.

Dated: June 30, 2022              */s/ David C. Frederick*_____
                                  David C. Frederick

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to 3rd Cir. L.A.R. 28.3(d) and 46.1 (2011), I, David C. Frederick,

hereby certify that I am a member in good standing of the bar of the United States

Court of Appeals for the Third Circuit.


Dated: June 30, 2022                    */s/ David C. Frederick*
                                        David C. Frederick