# **<u>EXHIBIT 2</u>**

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

═══════════════════════════════════════

IN THE

# United States Court of Appeals
# for the Third Circuit

―――――――――――――

IN RE: LTL MANAGEMENT, LLC,

*Debtor*

―――――――――――――

*OFFICIAL COMMITTEE OF TALC CLAIMANTS

*Appellant*

*(Amended per Court's Order dated 06/10/2022)

―――――――――――――

On direct appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3023

―――――――――――――

## BRIEF FOR DEBTOR-APPELLEE

―――――――――――――

GREGORY M. GORDON
BRAD B. ERENS
DAN B. PRIETO
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201

C. KEVIN MARSHALL
DAVID S. TORBORG
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

NEAL KUMAR KATYAL
SEAN MAROTTA
WILLIAM E. HAVEMANN
JO-ANN TAMILA SAGAR
PATRICK C. VALENCIA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Debtor-Appellee*

August 15, 2022

# CORPORATE DISCLOSURE STATEMENT

LTL Management, LLC's direct and indirect parent corporations are DePuy Synthes, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson Consumer Inc.; Johnson & Johnson International; Johnson & Johnson.  Johnson & Johnson, through subsidiaries, holds 10% or more of LTL Management, LLC's stock. There is no publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding.[1]

Future claimants' representative is Randi S. Ellis.  The members of the talc claimants committee (and their individual tort-system lawyers) are listed below.

1.  Rebecca Love
c/o Ashcraft & Gerel, LLP
Attn: Michelle Parfitt
1825 K Street, NW, Suite 700
Washington, DC 20006

2.  Kellie Brewer
c/o Fears Nachawati Law Firm
Attn: Majed Nachawati
5473 Blair Road
Dallas, TX 75231

---

[1] The preliminary injunction issued by the Bankruptcy Court enjoins talc-related claims against identified nondebtor third parties, some of which are publicly held corporations.  Those claims seek to hold such third parties responsible for LTL Management, LLC's alleged liability and are subject to indemnification from LTL. For that reason, LTL does not believe those parties have a financial interest in the outcome of the proceeding.

3.  Tonya Whetsel
c/o Karst von Oiste LLP
Attn: Eric Karst
23923 Gosling Rd., Ste. A
Spring, TX 77389

4.  William A. Henry
c/o Levin Papantonio Rafferty
Attn: Christopher Tisi
316 S Baylen Street, Suite 600
Pensacola, FL 32502

5.  Darlene Evans
c/o OnderLaw, LLC
Attn: James Onder
110 East Lockwood Avenue
St. Louis, MO 63119

6.  Patricia Cook
c/o Weitz & Luxenberg, P.C.
Attn: Perry Weitz
700 Broadway
New York, NY 10083

7.  Alishia Landrum
c/o Beasley Allen Law Firm
Attn: Leigh O'Dell
PO Box 4160
Montgomery, AL 36103

8.  Blue Cross Blue Shield of Massachusetts
c/o Hill Hill Carter Franco Cole & Black, PC
Attn: Elizabeth Carter
425 Perry Street
Montgomery, AL 36104

9.  Kristie Doyle
c/o Kazan, McClain, Satterley & Greenwood PLC
Attn: Steven Kazan
55 Harrison St., Ste. 400
Oakland, CA 94607

10.  Randy Derouen
c/o Levy Konigsberg LLP
Attn: Audrey Raphael
605 Third Avenue, 33rd Fl
New York, NY 10158

11.  April Fair
c/o Robinson Calcagnie, Inc.
Attn: Mark Robinson, Jr.
19 Corporate Plaza Drive
Newport Beach, CA 92660

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT .............................................................8

STATEMENT OF THE ISSUES ..............................................................8

STATEMENT OF THE CASE ................................................................8

    I.     LEGAL BACKGROUND........................................................8

    II.    FACTUAL BACKGROUND ..................................................12

          A.    The Talc Claims ...............................................12

          B.    The Corporate Restructuring.......................................18

    III.   PROCEDURAL HISTORY ...................................................21

STANDARD OF REVIEW ..................................................................26

SUMMARY OF THE ARGUMENT ..........................................................26

ARGUMENT ............................................................................33

    I.     LTL'S CHAPTER 11 PETITION WAS FILED IN GOOD FAITH .......................33

          A.    The Bankruptcy Court Did Not Clearly Err In Finding
               That LTL Was In Financial Distress.............................34

               1.    *The Bankruptcy Court did not clearly err in
                      finding that LTL and Old JJCI faced tens of
                      billions of dollars in potential talc costs and
                      liabilities* ...........................................35

               2.    *Claimants' financial-distress arguments do not
                      withstand scrutiny* ..................................41

# TABLE OF CONTENTS—Continued

Page

B.   LTL's Chapter 11 Filing Serves Valid Bankruptcy
Purposes ........................................................................51

1.   *The bankruptcy maximizes property available
to creditors* ..........................................................52

2.   *The bankruptcy provides more equitable and
timely recovery for current claimants* ...................55

3.   *The bankruptcy ensures equitable treatment
among current and future claimants, as
Congress envisioned in § 524(g)* ..........................57

C.   Old JJCI's Corporate Restructuring Did Not Harm
Talc Claimants And Is Not Evidence Of Bad Faith.......................59

D.   LTL's Chapter 11 Filing Was Not Undertaken To
Secure An Unfair Tactical Litigation Advantage ..........................66

E.   Unusual Circumstances Also Preclude Dismissal .........................74

II.   THE BANKRUPTCY COURT CORRECTLY STAYED TORT
CLAIMS AGAINST LTL'S NONDEBTOR AFFILIATES, INSURERS,
AND THIRD-PARTY RETAILERS ................................................76

A.   The Bankruptcy Court Correctly Concluded That
§ 362(a)'s Automatic Stay Prohibits Prosecution Of
Talc-Related Claims Against LTL's Affiliates,
Insurers, And Third-Party Retailers .............................77

1.   *The Bankruptcy Court correctly held that the
automatic stay can extend to nondebtors like
the Protected Parties* ..........................................78

2.   *The Bankruptcy Court did not clearly err in
applying § 362(a)'s automatic stay to the
Protected Parties* ................................................83

# TABLE OF CONTENTS—Continued

Page

B.    In The Alternative, The Bankruptcy Court Properly Exercised Its Authority Under § 105 To Enjoin The Prosecution Of Talc-Related Claims Against LTL's Affiliates, Insurers, And Third-Party Retailers .............................88

1.    *The Bankruptcy Court correctly analyzed its jurisdiction to enjoin talc claims against the Protected Parties under § 105*.............................................89

2.    *The Bankruptcy Court did not abuse its discretion in concluding that the traditional preliminary-injunction factors favored enjoining talc claims against the Protected Parties under § 105(a)*.........................................93

CONCLUSION ..................................................................................................100

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*ACandS, Inc. v. Travelers Cas. & Sur. Co.*,
435 F.3d 252 (3d Cir. 2006) .........................................................................32, 86

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ....................................................................*passim*

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).............................................................................................58

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999).............................................................................................51

*Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd. P'ship IV*,
229 F.3d 245 (3d Cir. 2000) ..............................................................................73

*Carolin Corp. v. Miller*,
886 F.2d 693 (4th Cir. 1989) ........................................................................34, 95

*Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*,
457 F.3d 312 (3d Cir. 2006) ..............................................................................86

*Federal-Mogul Glob. Inc.*,
300 F.3d 382 (3d Cir. 2002) .........................................................................79, 92

*Ingham v. Johnson & Johnson*,
608 S.W.3d 663 (Mo. Ct. App. 2020) ................................................................16

*Ingham v. Johnson & Johnson*,
No. 1522-CC10417-01 (Mo. Cir. Ct. 2018) .......................................................16

*In re 15375 Mem'l Corp. v. BEPCO, L.P.*,
589 F.3d 605 (3d Cir. 2009) .....................................................................*passim*

*In re A.H. Robins Co.*,
89 B.R. 555 (Bankr. E.D. Va. 1988)...................................................................40

# TABLE OF AUTHORITIES—Continued

Page

*In re A.H. Robins Co.*,
828 F.2d 1023 (4th Cir. 1987) ............................................................81

*In re Aldrich Pump LLC*,
No. 20-30608 (JCW), 2021 WL 3729335 (Bankr. W.D.N.C. Aug.
23, 2021) ....................................................................................*passim*

*In re Am. Film Techs., Inc.*,
175 B.R. 847 (Bankr. D. Del. 1994) ..................................................91

*In re Bestwall LLC*,
605 B.R. 43 (Bankr. W.D.N.C. 2019) .........................................20, 65

*In re Bestwall LLC*,
606 B.R. 243 (Bankr. W.D.N.C. 2019) ................................71, 77, 97

*In re Brier Creek Corp. Ctr. Assocs. Ltd.*,
486 B.R. 681 (Bankr. E.D.N.C. 2013).................................................90

*In re Caesars Entm't Operating Co.*,
561 B.R. 441 (Bankr. N.D. Ill. 2016) .................................................95

*In re Colonial Realty Co.*,
980 F.2d 125 (2d Cir. 1992) ........................................................79, 81

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004) .....................................................*passim*

*In re DBMP LLC*,
No. 20-30080, 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11,
2021) ....................................................................................20, 65, 71

*In re Denby-Peterson*,
941 F.3d 115 (3d Cir. 2019) .............................................................78

*In re Dow Corning Corp.*,
211 B.R. 545 (Bankr. E.D. Mich. 1997)......................................40, 98

# TABLE OF AUTHORITIES—Continued

Page

*In re Dow Corning Corp.*,
86 F.3d 482 (6th Cir. 1996) ................................................................. 92

*In re Eagle-Picher Indus., Inc.*,
963 F.2d 855 (6th Cir. 1992) .............................................................. 94

*In re Energy Future Holdings Corp.*,
949 F.3d 806 (3d Cir. 2020) ............................................................... 58

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) ....................................................... 93, 94

*In re Family Health Servs., Inc.*,
105 B.R. 937 (Bankr. C.D. Cal. 1989) ............................................... 91

*In re Fed-Mogul Glob., Inc.*,
684 F.3d 355 (3d Cir. 2012) ............................................................... 56

*In re Fiber-Span, Inc.*,
40 F.4th 79 (3d Cir. 2022) ........................................................... 34, 35

*In re FPSDA I, LLC*,
No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 26,
2012) .................................................................................................. 90

*In re Garlock Sealing Techs. LLC*,
No. 3:17-cv-00275, 2017 WL 2539412 (W.D.N.C. June 12, 2017) ........... 64, 71

*In re Heating Oil Partners*,
No. 3:08-CV-1976 (CSH), 2009 WL 5110838 (D. Conn. Dec. 17,
2009) .................................................................................................. 84

*In re Heron, Burchette, Ruckert & Rothwell*,
148 B.R. 660 (Bankr. D.D.C. 1992) ................................................... 91

*In re Icarus Holding, LLC*,
391 F.3d 1315 (11th Cir. 2004) ........................................................ 86

# TABLE OF AUTHORITIES—Continued

Page

*In re Imerys Talc Am., Inc.*,
38 F.4th 361 (3d Cir. 2022) ........................................................59, 67

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004) ........................................................*passim*

*In re Ionosphere Clubs, Inc.*,
922 F.2d 984 (2d Cir. 1990) ..............................................................77

*In re Johns-Manville Corp.*,
36 B.R. 727 (Bankr. S.D.N.Y. 1984).........................................40, 47

*In re Korn*,
523 B.R. 453 (Bankr. E.D. Pa. 2014) ..............................................74

*In re Lyondell Chem. Co.*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009)........................................77, 91

*In re Marcus Hook Dev. Park, Inc.*,
943 F.2d 261 (3d Cir. 1991) ..............................................................92

*In re Marshall*,
721 F.3d 1032 (9th Cir. 2013) ..........................................................43

*In re Metal Ctr., Inc.*,
31 B.R. 458 (Bankr. D. Conn. 1983) ................................................83

*In re Monroe Well Serv., Inc.*,
67 B.R. 746 (Bankr. E.D. Pa. 1986) .................................................90

*In re Mountain Laurel Res. Co.*,
210 F.3d 361, 2000 WL 341913 (4th Cir. 2000) (Table) ..................92

*In re Myers*,
491 F.3d 120 (3d Cir. 2007) ..............................................................26

*In re Myerson & Kuhn*,
121 B.R. 145 (Bankr. S.D.N.Y. 1990)...............................................91

# TABLE OF AUTHORITIES—Continued

Page

*In re New York City Asbestos Litig.*,
   No. 2020-04856, 2022 WL 2812015 (N.Y. App. Div. July 19,
   2022) .................................................................................................15

*In re Nortel Networks, Inc.*,
   669 F.3d 128 (3d Cir. 2011) ..............................................................26

*In re Paddock Enters., LLC*,
   2022 WL 1746652 (Bankr. D. Del. May 31, 2022)...........................20

*In re Plant Insulation Co.*,
   734 F.3d 900 (9th Cir. 2013) ...............................................................9

*In re Purdue Pharms. L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) .......................................................91, 95

*In re Quigley Co.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010)...............................................64

*In re Quigley Co.*,
   676 F.3d 45 (2d Cir. 2012) ................................................................87

*In re Saxby's Coffee Worldwide, LLC*,
   440 B.R. 369 (Bankr. E.D. Pa. 2009) ...............................................93

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) ......................................................*passim*

*In re SunEdison, Inc.*,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017)...............................................84

*In re Third Eighty-Ninth Assocs.*,
   138 B.R. 144 (S.D.N.Y. 1992) ..........................................................89

*In re Wedgewood Realty Grp., Ltd.*,
   878 F.2d 693 (3d Cir. 1989) ..............................................................93

*In re W.R. Grace & Co.*,
   13 F.4th 279 (3d Cir. 2021) .........................................................58, 59

## TABLE OF AUTHORITIES—Continued

Page

*In re W.R. Grace & Co.*,
   115 F. App'x 565 (3d Cir. 2004) ................................................................26, 91

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) ............................................................71, 98

*In re W.R. Grace & Co.*,
   591 F.3d 164 (3d Cir. 2009) ......................................................................82, 89

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013) .............................................................................9

*In re W.R. Grace & Co.*,
   900 F.3d 126 (3d Cir. 2018) .............................................................51, 59, 72

*Johnson & Johnson v. Ingham*,
   141 S. Ct. 2716 (2021)...................................................................................16

*McCartney v. Integra Nat'l Bank N.*,
   106 F.3d 506 (3d Cir. 1997) ................................................................ *passim*

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984) ...............................................................79, 90, 91

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d Cir. 2003) ...........................................................................81

*Reliant Energy Servs., Inc. v. Enron Canada Corp.*,
   349 F.3d 816 (5th Cir. 2003) ..........................................................................81

*Ritchie Cap. Mgmt., L.L.C. v. Jeffries*,
   653 F.3d 755 (8th Cir. 2011) ..........................................................................81

*Shapiro v. Wilgus*,
   287 U.S. 348 (1932)......................................................................................69

*Singer Mgmt. Consultants, Inc. v. Milgram*,
   650 F.3d 223 (3d Cir. 2011) (en banc) ................................................33, 94, 97

# TABLE OF AUTHORITIES—Continued

Page

*Stoe v. Flaherty*,
   436 F.3d 209 (3d Cir. 2006) ...................................................30, 78, 90

*Toibb v. Radloff*,
   501 U.S. 157 (1991).............................................................62, 63

*United States v. Bestfoods*,
   524 U.S. 51 (1998)..................................................................49

*United States v. Whiting Pools, Inc.*,
   462 U.S. 198 (1983)..................................................................98

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Villages at Lakeridge, LLC*,
   138 S. Ct. 960 (2018)..............................................................34

**STATUTES:**

11 U.S.C. § 109.......................................................................62

11 U.S.C. § 109(b)....................................................................63

11 U.S.C. § 109(d)....................................................................63

11 U.S.C. § 362(a) ...................................................................30

11 U.S.C. § 362(a)(1)............................................................*passim*

11 U.S.C. § 362(a)(3)...............................................30, 77, 84, 86

11 U.S.C. § 524(g) ...................................................................11

11 U.S.C. § 524(g)(1)...................................................................9

11 U.S.C. § 524(g)(1)(A)..............................................................11

11 U.S.C. § 524(g)(2)...................................................................9

11 U.S.C. § 524(g)(2)(B)(i)(I) ...................................................10, 11

# TABLE OF AUTHORITIES—Continued

Page

11 U.S.C. § 524(g)(2)(B)(i)(II) ....................................................................................10, 11

11 U.S.C. § 524(g)(2)(B)(i)(III) ...................................................................................10, 11

11 U.S.C. § 524(g)(2)(B)(i)(IV) ...................................................................................10, 11

11 U.S.C. § 524(g)(2)(B)(ii)(I) ...........................................................................................10

11 U.S.C. § 524(g)(2)(B)(ii)(II) ..........................................................................................10

11 U.S.C. § 524(g)(2)(B)(ii)(III) .........................................................................................10

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ...........................................................................11, 72

11 U.S.C. § 524(g)(2)(B)(ii)(V) ...................................................................................11, 39

11 U.S.C. § 524(g)(4)(A)(ii) ...............................................................................................71

11 U.S.C. § 524(g)(4)(A)(ii)(I) ...........................................................................................11

11 U.S.C. § 524(g)(4)(A)(ii)(II) ..........................................................................................11

11 U.S.C. § 524(g)(4)(A)(ii)(III) .........................................................................................11

11 U.S.C. § 524(g)(4)(A)(ii)(IV) ..................................................................................11, 71

11 U.S.C. § 524(g)(4)(A)(iii) ..............................................................................................11

11 U.S.C. § 524(g)(4)(B)(i) ................................................................................................11

11 U.S.C. § 524(g)(4)(B)(ii) ...............................................................................................11

11 U.S.C. § 541(a)(1)..........................................................................................................86

11 U.S.C. § 544(b) .......................................................................................................72, 73

11 U.S.C. § 1112(b)(1)........................................................................................................33

11 U.S.C. § 1112(b)(2)...................................................................................................74, 75

11 U.S.C. § 1112(b)(2)(B) ............................................................................................75, 76

# TABLE OF AUTHORITIES—Continued

Page

11 U.S.C. § 1112(b)(4)................................................................................75, 76

11 U.S.C. § 1141(d)(1)(A) ..................................................................................9

28 U.S.C. § 157(a) ..............................................................................................8

28 U.S.C. § 157(b) ..............................................................................................8

28 U.S.C. § 158(d)(2)........................................................................................26

28 U.S.C. § 158(d)(2)(A)....................................................................................8

28 U.S.C. § 158(d)(2)(A)(i)................................................................................8

28 U.S.C. § 158(d)(2)(A)(iii)..............................................................................8

28 U.S.C. § 1334(a) ............................................................................................8

28 U.S.C. § 1334(b) ..........................................................................32, 78, 89

28 U.S.C. § 1407(a) ..........................................................................................18

Ariz. Rev. Stat. Ann. § 29-2601........................................................................20

Del. Code Ann. tit. 6, § 18-217(b) ....................................................................20

Del. Code Ann. tit. 6, § 18-217(c) ....................................................................20

15 Pa. Cons. Stat. § 361 ....................................................................................20

Tex. Bus. Orgs. Code Ann. § 10.001(b) ...........................................................19

Tex. Bus. Orgs. Code Ann. § 10.002 ................................................................19

Tex. Bus. Orgs. Code Ann. § 10.003 ................................................................19

Tex. Bus. Orgs. Code Ann. § 10.008(a)(2) .......................................................19

Tex. Bus. Orgs. Code Ann. § 10.008(a)(3).......................................................19

Tex. Bus. Orgs. Code Ann. § 10.008(a)(4).......................................................19

## TABLE OF AUTHORITIES—Continued

<u>Page</u>

Tex. Bus. Orgs. Code Ann. § 10.151 ......................................................................19

**LEGISLATIVE MATERIAL:**

140 Cong. Rec. S4521, S5423 (daily ed., Apr. 20, 1994) (statement of
   Sen. Graham) ..................................................................................................10

**RULES:**

Fed. R. Civ. P. 25(c)............................................................................................71

Fed. R. Civ. P. 62(b) ...........................................................................................73

**OTHER AUTHORITIES:**

Dietrich Knauth, *Judge appoints Kenneth Feinberg to evaluate J&J
   cancer claims in bankruptcy*, Reuters (July 28, 2022),
   https://tinyurl.com/2y6fv7zz ..........................................................................56

Press Release, Jerry Nadler, Chairman Nadler Statement for
   Subcommittee Hearing on "Oversight of the Bankruptcy Code,
   Part 1: Confronting Abuses of the Chapter 11 System" (July 28,
   2021), *available at* https://tinyurl.com/3btcw63k ............................................66

Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-
   Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045 (2000) ....................58

Georgene Vairo, *Mass Torts Bankruptcies: The Who, the Why and the
   How*, 78 Am. Bankr. L.J. 93 (2004) .................................................................57

## INTRODUCTION

Claimants' briefs tell a made-for-media narrative of an unsavory debtor using a divisional merger and chapter 11 bankruptcy petition to shield assets from suffering tort plaintiffs and obtain bankruptcy's benefits without its burdens. There's just one problem:  The Bankruptcy Court below carefully considered Claimants' breathless assertions at a five-day evidentiary hearing—following months of discovery in two forums—and found them false.  Once Claimants' false framing is set straight, the Bankruptcy Court's finding that this bankruptcy petition was filed in good faith follows as a matter of course.

These are the facts as the Bankruptcy Court found them:  In 1979, Johnson & Johnson ("J&J") transferred its Johnson's Baby Powder business and associated liabilities to a separate subsidiary, which eventually became Johnson & Johnson Consumer, Inc. ("Old JJCI"), a separate, indirectly owned subsidiary of J&J.  This intercompany transfer of assets and liabilities—common in industry and unchallenged on appeal—meant that Old JJCI later became responsible for tens of thousands of claims (carrying with them billions in potential liability) alleging that Johnson's Baby Powder contained asbestos and was causing disease.  In the typical asbestos case, asbestos's presence in a product is undisputed and liability turns primarily on causation.  But Johnson's Baby Powder never contained asbestos, and plaintiffs' experts' contrary opinions rest on faulty science.  For that reason, Old

JJCI was prepared to fight every case filed in the mass-tort system.  And Old JJCI was almost always successful; many cases were dismissed, and in 32 of the 41 cases that went to verdict, Old JJCI was not found liable, if not with the jury then on appeal.

Although Old JJCI was being largely vindicated in the tort system, two concerns loomed large.  First, Old JJCI's vigorous defense did not come cheap; defense costs alone were projected to run into the billions.  Second, plaintiffs occasionally hit the jackpot with juries, racking up outlier verdicts in the hundreds of millions or even billions.  Talc-litigation costs pushed Old JJCI, as well as the entire Global Consumer Business of which Old JJCI was a part, from profit to a loss in just one year and cast doubt on whether the company could keep its head above water.

Worse, the mass-tort system was failing claimants.  At the rate cases were being tried, it would have taken hundreds—if not thousands—of years to give all plaintiffs their day in court, to say nothing of the new plaintiffs whose lawsuits were piling up at a staggering rate.  And the tort system was yielding results that were becoming increasingly difficult to rationalize.  Most plaintiffs got nothing; a handful got tens of millions or billions.  Future claimants could be shut out entirely.  This lottery benefited lawyers and a handful of lucky plaintiffs whose

claims were tried early and before unusually hospitable judges and juries, but not claimants as a whole.

To secure an equitable, efficient, and final resolution for all claimants, present and future, a corporate restructuring and bankruptcy petition were needed. In a single, integrated transaction, Old JJCI split itself in two companies:  LTL Management, LLC ("LTL"), and Johnson & Johnson Consumer, Inc. ("New JJCI"), and  LTL took on Old JJCI's talc liabilities, received certain assets— including insurance policies—and sought chapter 11 protection.  New JJCI in return agreed to fund LTL's bankruptcy case up to the full value of New JJCI, ensuring that claimants were not separated from any value that would have been available absent the restructuring.

In fact, the restructuring *benefited* claimants, because J&J—LTL and New JJCI's ultimate parent—guaranteed New JJCI's performance, even though it had no preexisting obligation to do so.  Though Claimants complain bitterly about J&J's supposed attempt to evade payment of talc liabilities, J&J is evading nothing.  Indeed, although Claimants insisted below that Old JJCI's restructuring constituted a fraudulent conveyance, they all but abandon that assertion on appeal, no doubt because it is plainly incorrect.  Claimants instead now generally assert that J&J itself was required to pay Old JJCI's talc liabilities, which disregards J&J's decades-old intercompany transfer of its baby-powder business and

3

associated liabilities to Old JJCI—a transfer that Claimants do not and cannot challenge.

Claimants moved to dismiss LTL's chapter 11 petition as a bad-faith abuse of the bankruptcy system.  Whether a bankruptcy petition is filed in good faith is centered around factual questions about whether the bankruptcy will treat creditors fairly and maximize value for claimants.  After a five-day evidentiary hearing, complete with 11 witnesses, the Bankruptcy Court found that the restructuring and bankruptcy would not prejudice creditors and would maximize value for all talc claimants.

As the Bankruptcy Court found, Claimants had not "been placed in a worse position" as a result of the restructuring or bankruptcy, and the bankruptcy "is not intended to—and is unlikely to—impair the ability of talc claimants to recover on their claims."  A44.  The Bankruptcy Court also found that the restructuring and bankruptcy conferred a host of benefits, most of which Claimants do not dispute. The bankruptcy maximizes value for claimants by avoiding the massive dead-weight costs associated with litigating tens of thousands of claims through the tort system, which would "likely" cost $100-200 million annually "for decades to come."  A34.  The restructuring and bankruptcy also protect New JJCI's employees, suppliers, and other stakeholders—most of whom have nothing to do with Johnson's Baby Powder—from "dramatically increased costs and risks" that

would have "no palpable benefits" for claimants.  A47.  The bankruptcy avoids the wildly variable outcomes of a tort system that rewards a small handful of plaintiffs with blockbuster verdicts, leaves other similarly situated plaintiffs with nothing, and "has struggled to meet the needs of present claimants in a timely and fair manner."  A24.  And the bankruptcy ensures that future claimants are not shut out from recovery and "receive fair compensation under a comprehensive and transparent distribution scheme."  A49.

The Bankruptcy Court thus arrived at a "strong conviction" that LTL's petition was filed in good faith.  A19.  The court found "no evidence" that the restructuring would prejudice claimants, A23, and "simply [could] not accept the premise that continued litigation in state and federal courts" would serve claimants' best interests.  A20.  The Bankruptcy Court's detailed findings of fact underlying its conclusions were correct, and they were certainly not clearly erroneous—a standard that Claimants give only lip service to.

Claimants' challenges to the Bankruptcy Court's good-faith finding fall apart under scrutiny.  Their assertion that Old JJCI was not experiencing financial distress defies reality.  Old JJCI faced nearly *40,000 claims* at the time of LTL's petition, any one of which could have resulted in a billion-dollar judgment.  A new claim was being filed nearly every hour, of every day, 365 days a year.  As the Bankruptcy Court recognized, Old JJCI had billions in contingent liabilities, A34,

and would spend hundreds of millions in annual defense costs due to "a torrent of significant talc-related liabilities for years to come," A34, 40.  The Bankruptcy Court's fact-bound conclusion that Old JJCI had seen enough to warrant resorting to bankruptcy is not clearly erroneous.

Once the Bankruptcy Court's financial-distress finding is accepted, the rest of Claimants' arguments fall away.  Claimants do not dispute that the bankruptcy will allow LTL to channel hundreds of millions in saved defense costs to talc claimants, that the bankruptcy will spare talc claimants the costs and burdens associated with a sprawling Old JJCI bankruptcy, or that bankruptcy will ensure that current and future talc claimants are treated equitably.  Each is a quintessential proper bankruptcy purpose, and each establishes the good faith of LTL's petition.

Claimants instead principally take issue with Old JJCI's use of the Texas divisional merger statute to restructure in advance of the bankruptcy.  But Claimants have no response to the Bankruptcy Court's finding that the restructuring did not harm claimants.  Indeed, given the funding agreement, some Claimants candidly acknowledge that there "is virtually no chance" they will be separated from assets.  A&I Br. 23.  Although Claimants maintain that Old JJCI should have petitioned for bankruptcy without restructuring and thereby relinquished "control" over its operations to the Bankruptcy Court, the funding agreement ensures that LTL has access to all of Old JJCI's value, and spares both

6

LTL and Claimants from a sprawling bankruptcy that would cost "hundreds of millions of dollars" with "no palpable benefits" for claimants. A47.

Claimants also contend that LTL's bankruptcy will unfairly delay their recovery, but the Bankruptcy Court correctly found that bankruptcy proceedings would be far faster than the tort system. The Bankruptcy Court has made clear that it will work quickly to confirm a plan, and Claimants give no reason to doubt the court's sincerity. Claimants assert that LTL's request for a stay of litigation is evidence that it is stalling, but LTL's bankruptcy cannot succeed if litigation continues while LTL negotiates a settlement trust. Claimants' argument is also vastly overinclusive. *Every* bankruptcy automatic stay halts litigation while bankruptcy proceedings play out, but the automatic stay is a routine and accepted part of bankruptcy practice.

Finally, some Claimants—though not all of them—contend that the Bankruptcy Court erred in staying litigation against LTL's nondebtor affiliates, insurers, and third-party retailers. But if Claimants could circumvent the bankruptcy by suing parties related to LTL, the bankruptcy could not achieve its purpose. Because the petition is proper, the stay's propriety follows as a matter of course.

The Bankruptcy Court's orders should be affirmed.

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a), (b) and 1334(a).  Claimants timely filed notices of appeal on March 7, 2022.  A59-86, 202-218.  On April 4, 2022, the Bankruptcy Court certified its orders for direct appeal under 28 U.S.C. § 158(d)(2)(A)(i), (iii).  A135-139, 262-267.  This Court granted Claimants' timely petitions for direct appeal.  A268-272.  This Court accordingly has jurisdiction under 28 U.S.C. § 158(d)(2)(A).

## STATEMENT OF THE ISSUES

1.      Whether LTL's chapter 11 petition was filed in good faith where (1) LTL faced both the present reality and future prospect of billions of dollars in talc-related liability and (2) LTL filed its chapter 11 petition with the purpose of equitably and efficiently resolving tens, if not hundreds, of thousands of mass-tort claims asserted by present and future claimants.

2.      Whether the Bankruptcy Court properly enjoined talc claims against LTL's nondebtor affiliates, insurers, and third-party retailers where, absent the stay, LTL's bankruptcy could not achieve its stated aims.

## STATEMENT OF THE CASE

### I.      LEGAL BACKGROUND

Tort liability for asbestos exposure poses "unique problems and complexities" for the bankruptcy system.  *In re Combustion Eng'g, Inc.*, 391 F.3d

190, 234 (3d Cir. 2004).  "[G]iven the lengthy latency period of asbestos-related

diseases," a debtor facing extensive asbestos liability typically faces extensive

future demands, meaning that "companies facing asbestos risk have no way finally

to resolve or even effectively estimate their exposure."  *In re Plant Insulation Co.*,

734 F.3d 900, 905-906 (9th Cir. 2013).  Future demands are not "claims" within

the meaning of the Bankruptcy Code, and therefore would not be discharged by an

ordinary chapter 11 filing.  *See* 11 U.S.C. § 1141(d)(1)(A) (permitting discharge of

"debt that arose before the date of ... confirmation").  Moreover, there is an

inherent conflict of interest between current and future claimants:  If current

claimants exhaust a debtor's resources and force it to "collapse and liquidate," then

"untold numbers of future claimants will be left without recovery."  *In re Plant

Insulation Co.*, 734 F.3d at 906.

        To address this problem, Congress enacted Section 524(g) of the Bankruptcy

Code, which is modeled on the "creative solution to asbestos liability developed

during the bankruptcy of the Johns-Manville Corporation."  *In re W.R. Grace &

Co.*, 729 F.3d 311, 320 (3d Cir. 2013) (quotation marks omitted).  Section 524(g)

authorizes bankruptcy courts to enjoin and channel into post-confirmation trusts all

present and future asbestos-related tort claims against the debtor.  The trusts in turn

compensate claimants in a manner that ensures fair and equitable treatment of

present and future claimants.  *See* 11 U.S.C. § 524(g)(1)-(2).  The trust and the

channeling injunction "help[] achieve the purpose of Chapter 11 by facilitating the
reorganization and rehabilitation of the debtor." *Combustion Eng'g*, 391 F.3d at
234.  As one of the legislation's co-sponsors explained, the statute was intended to
provide courts with "injunctive power" to "protect ... debtors and certain third
parties, such as their insurers, from future asbestos product litigation" in exchange
for "submit[ting] to the stringent requirements" for creating a Section 524(g) trust.
140 Cong. Rec. S4521, S5423 (daily ed., Apr. 20, 1994) (statement of Sen.
Graham).

     "To achieve this relief, a debtor must satisfy the prerequisites set forth in
§ 524(g) in addition to the standard plan confirmation requirements." *Combustion
Eng'g*, 391 F.3d at 234 (footnotes omitted).  That is no easy feat.  "There are many
statutory prerequisites imposed by § 524(g)," some of which apply to the debtor
and others that apply to the trust.  *Id*. at 234 n.45.  Among other things, a court
must find that the debtor is likely to be subject to substantial demands in the future
arising out of the same conduct, that the amounts and timing of these future claims
are uncertain, and that permitting the claims to proceed outside the trust would
threaten the plan's ability to equitably resolve current and future demands.  11
U.S.C. § 524(g)(2)(B)(i)(I), (ii)(I-III).  In addition, the trust must assume the
debtor's liabilities for current and future claims, use its assets to pay future claims
and demands, and provide mechanisms for ensuring its ability to value and pay

present and future claimants in substantially the same manner. *Id.*

§ 524(g)(2)(B)(i)(I)-(IV), (ii)(V). A court must also determine that the channeling

injunction is "fair and equitable" to future claimants, *id.* § 524(g)(4)(B)(ii), and

must appoint someone to represent the future claimants' interests, *id.*

§ 524(g)(4)(B)(i). And a 75% supermajority of claimants whose claims are to be

addressed by the trust must vote in favor of the plan. *Id.*

§ 524(g)(2)(B)(ii)(IV)(bb).

If the debtor can clear all of these hurdles, the channeling injunction shields

not only the debtor, but also nondebtor parties who are either identified in the

injunction or otherwise part of a group named in the injunction, including parties

with a financial interest in the debtor; insurers of the debtor or a related party; and

parties involved in a change of the corporate structure or financial condition of the

debtor or related party. *See id.* § 524(g)(4)(A)(ii)(I) to (IV); *see also id.*

§ 524(g)(4)(A)(iii). But if any of these many requirements are not met, then the

channeling injunction cannot issue under § 524(g). The injunctive relief available

under § 524(g) may be exercised only "in connection with" an "order confirming a

plan of reorganization under chapter 11." *Id.* § 524(g)(1)(A). Without the

channeling injunction, claimants post-confirmation may pursue in the tort system

claims that would otherwise have been funneled into bankruptcy.

11

## II.      FACTUAL BACKGROUND

### A.      The Talc Claims

J&J began selling Johnson's Baby Powder when it launched its baby-care line of products in the late 1800s.  A325.  For over 125 years afterwards, Johnson's Baby Powder was a household staple.  A325, 456.

J&J in 1972 established a formal operating division for its baby products business, which included baby powder.  A447.  Seven years later, J&J transferred all assets and liabilities associated with the baby products division to its subsidiary, J&J Baby Products.  A447.  Following this transaction, J&J no longer manufactured or sold, and was no longer responsible for any future liabilities arising from, Johnson's Baby Powder.  A447.

Over the years, J&J Baby Products changed names and transferred its baby-powder assets and liabilities to J&J's consumer-products division, which by 2015 was located in Old JJCI.  A447-448; *see* A2-3.  The upshot of these intercompany transactions was that Old JJCI and its predecessors had been responsible for all baby-powder liabilities since 1979, and had agreed to indemnify J&J for those liabilities.  A2-3, 447-448.  As a parent company, J&J was not responsible for Old JJCI's debts.

Before the 2010s, Johnson's Baby Powder was the subject of only a few product-liability suits.  A457.  That changed in 2013 with a verdict against Old

12

JJCI in favor of a plaintiff who alleged she developed ovarian cancer from exposure to Johnson's Baby Powder.  A3, 457, 896.

The plaintiffs' bar took notice.  By the end of 2015, over 1,300 ovarian-cancer claims had been filed against J&J and Old JJCI.  A3-4, 457.  Then in 2016, a St. Louis jury awarded a plaintiff $72 million which—although overturned on appeal—made talc claims even more appealing to the plaintiffs' bar.  A457.

By 2017, the plaintiffs' bar had begun to argue that Johnson's Baby Powder contained asbestos.  Claims involving Johnson's Baby Powder began to climb even more quickly, at the same time as other asbestos claims were falling due to the phase-out of asbestos from insulation and friction products.  Over the next year and a half, four more cases went to verdict in St. Louis, resulting in three plaintiff verdicts totaling more than $235 million.  A457.  These three verdicts, too, were each reversed on appeal, but the marketing campaign had begun in earnest; misleading commercials, spam emails, and junk science catapulted talc asbestos claims to one of the country's most-popular tort claims, with plaintiff firms spending as much as $4.5 million per month soliciting potential clients.  From January 2020 to October 2021, J&J and Old JJCI were, on average, served with a new ovarian-cancer complaint every hour of every day of every week.  In all, talc claims skyrocketed from almost nothing pre-2010 to over 38,000 cases as of October 14, 2021, with ten thousand or more expected to be filed *per year* for the

next 50 years, the claimed latency period for asbestos-caused cancers.  A3-4, 26,

439-440, 7264.

All the while, there has been no credible evidence of asbestos in Johnson's

Baby Powder.  Starting in the 1970s, Old JJCI performed routine testing of its

baby-powder products, developing a state-of-the-art, industry-leading monitoring

program.  Since 2009, Old JJCI tested for asbestos samples from every hour of

every shift of every work day, and later tested every shipment of talc.  A354-358.

And for years, Old JJCI added an additional layer of testing by engaging an

independent third-party lab.  A354-358.

Nonetheless, in 2019, when an FDA-sponsored test indicated the potential

presence of sub-trace levels of asbestos in samples from a single bottle of

Johnson's Baby Powder, Old JJCI initiated a voluntary recall out of an abundance

of caution.  A353-354.  Old JJCI's subsequent investigation found that there was

no asbestos in the tested bottle.  A comprehensive root-cause analysis involving

more than 150 tests using four distinct testing methods and two testing laboratories

found no asbestos in either the tested bottle or any other Old JJCI product.  *See*

A354; Movants' Trial Ex. 67 at 53 (as identified in Joint Stipulation Regarding

Admission of Exhibits, *In re LTL Mgmt., LLC*, No. 21-30589-MBK (Bankr. D.N.J.

Feb. 16, 2022), ECF No. 1497 at 37).  FDA's contrary result was caused either by

a contaminated test sample, analyst error, or both.  A354.  But the damage was

done; claims alleging ovarian cancer and mesothelioma—a rare, almost-always-fatal cancer—caused by Johnson's Baby Powder skyrocketed. A459. Widespread misinformation in the media further tanked demand for Johnson's Baby Powder, and Old JJCI announced in May 2020 that it would discontinue its talc-based baby powder in the U.S. and Canada. A456-457.

Old JJCI's problems continued to mount. Old JJCI was—and remains—confident in Johnson's Baby Powder's safety, and it was prepared to try as many cases as it had to. Overall, Old JJCI's defense of its product was a sound litigation strategy. A431, 458. More than 1,500 talc suits have been dismissed without Old JJCI paying a dime. Of the 41 talc cases to reach a jury verdict, 32 cases were defense verdicts, mistrials, or judgments for Old JJCI on appeal. *See* A431, 458, 7130-31. That record continues. Less than one month ago, a New York appellate court reversed a $120 million award against Old JJCI because the plaintiffs' expert opinion failed as a matter of law to establish that exposure to Johnson's Baby Powder caused the plaintiffs' mesothelioma. *See In re New York City Asbestos Litig.*, No. 2020-04856, 2022 WL 2812015, at *1 (N.Y. App. Div. July 19, 2022).

But when plaintiffs won, they sometimes won big. Compensatory awards in single-plaintiff ovarian cancer cases have ranged from $5 million to $70 million, with punitive damages between $50 million and $347 million. A36. Plaintiffs in multi-plaintiff trials have done even better, with a St. Louis jury awarding $550

15

million in compensatory damages and $4.14 billion in punitive damages in *Ingham*

*v. Johnson & Johnson*, No. 1522-CC10417-01 (Mo. Cir. Ct. 2018). *See Ingham v.*

*Johnson & Johnson*, 608 S.W.3d 663, 680 (Mo. Ct. App. 2020). That award was

later reduced on appeal, but even the reduced award was a staggering $2.25 billion,

which the Supreme Court declined to review. *Id.* at 724-725; *Johnson & Johnson*

*v. Ingham*, 141 S. Ct. 2716 (2021).

Old JJCI therefore had contingent liabilities—when accounting for potential

jury verdicts and settlements for 40,000 current claims and an unknown number of

future claims—in the tens or even hundreds of billions of dollars, as Claimants'

counsel acknowledged below. A34 & n.22. And those billions in contingent

liabilities did not even include ongoing regulatory investigations by state attorneys

general. A37. At the same time, the prospect of a billion-dollar payday was

leading plaintiffs to flood the system and jockey for their cases to be heard first

before massive verdicts diminished the money available for other successful

plaintiffs.

Old JJCI's defense saddled the company with steep litigation costs. Old

JJCI spent $10-20 million per month in defense costs, A458, and between January

1, 2020 and September 30, 2021, Old JJCI made $3.6 billion in talc-litigation

payments—33% of the company's total sales. A7121-24, 7137-38. Those

expenses caused J&J's Global Consumer Business—of which Old JJCI was just

one part—to book a pre-tax loss of $893.4 million during that 20-month period,
A7227, and swing from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020.
A4.

Based on past outcomes, the Bankruptcy Court estimated that LTL could
expect more than $15 billion in potential liability from its existing inventory of 430
mesothelioma claims, many billions more for the 38,000 existing ovarian-cancer
claims, and yet even more for the not-yet-asserted claims. A17, 7137-41. It would
cost Old JJCI $190 billion just to *try* the current claims—as a single ovarian-cancer
trial costs Old JJCI between $2 million and $5 million, A2170—to say nothing of
the costs to defend claims for the next 50 years. A458. All told, it would cost Old
JJCI tens to hundreds of billions of dollars to resolve current and future claims.
A34, 37, 40. On top of that, Old JJCI could owe billions more in indemnification
to its talc suppliers. A16, 24, 7130.

Worse still, 38,000 claimants could not all get their day in court any time
soon, if at all. In Missouri, one of plaintiffs' favored jurisdictions, only 297 civil
jury verdicts *of any kind* were returned in 2019. At that pace, it would have taken
"*decades* to resolve the currently pending claims in the tort system" and another
10,000 would be added to the backlog each year. A7264. Although roughly
35,000 claims have been consolidated into a New Jersey multidistrict litigation, the
MDL judge's principal role is to coordinate *pretrial* proceedings, and cases would

have been remanded to their home jurisdictions, where Old JJCI would have had to litigate every distinct issue, for every plaintiff, one or a handful of plaintiffs at a time. A23, 635-637, 6101; *see also* 28 U.S.C. § 1407(a) (an action consolidated for multidistrict litigation "shall be remanded by the panel" at the conclusion of pretrial proceedings "to the district from which it was transferred").

Old JJCI would have to try most of these cases, because reasonable settlements for existing claims were elusive, and settlements for future claims were impossible. Old JJCI has tried without success to settle pending cases, A2404, 2408-10, and many cases have lingered for years without settlement. A24, 2407. The outlier jury verdicts complicated matters even more because they made consistent case valuations difficult. Neither Old JJCI nor claimants knew what they could afford to settle for or which plaintiff might hit the jackpot next. A2404.

## B.    The Corporate Restructuring

J&J and Old JJCI were "facing a torrent of significant talc-related liabilities for years to come" and, though solvent now, might become insolvent later. A40. Old JJCI therefore began considering its options under the Bankruptcy Code.

Old JJCI could file for bankruptcy, of course. But Old JJCI manufactured and sold a wide range of products, including baby-care, beauty, oral-care, wound-care, women's health care, and over-the-counter pharmaceutical products. A449. Subjecting all of Old JJCI and its many stakeholders—including thousands of trade

18

creditors, employees, customers, business partners, and even contingent tort

claimants—to a value-destructive, complex, and exponentially more expensive

bankruptcy would have benefited no one.  A7224, 7228, 7234-42, 7248-50.  Most

of these stakeholders have nothing to do with Johnson's Baby Powder, and no

interest would be served by having their relationship with Old JJCI suddenly

managed by a bankruptcy court.  And, importantly, a filing by Old JJCI would not

have benefited Claimants; their claims would still be stayed and Old JJCI would

still be seeking to resolve them globally in the bankruptcy.  Indeed, Claimants

would be worse off because of the potential diminution in value of Old JJCI as a

result of the bankruptcy filing.

Accordingly, in mid-2021, Old JJCI carried out a corporate restructuring

under Texas's 30-year-old divisional-merger statute.  Under the statute, any Texas

business entity can divide itself into two or more new limited liability companies

and can exclusively allocate assets and liabilities to a new entity created by the

transaction.  *See* Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151.

Where the original entity does not survive, "all liabilities and obligations" of the

entity automatically "are allocated to one or more of the ... new organizations in

the manner provided by the plan of merger."  Tex. Bus. Orgs. Code Ann.

§ 10.008(a)(2), (3).  Except as otherwise provided, "no other [entity] created under

the plan of merger is liable for the debt or other obligation."  *Id.* § 10.008(a)(4).

19

Texas is not unique in this regard; several other States have enacted similar

divisional-merger statutes. *See, e.g.*, 15 Pa. Cons. Stat. § 361; Ariz. Rev. Stat.

Ann. § 29-2601; Del. Code Ann. tit. 6, § 18-217(b)-(c).

Companies facing mass tort liabilities often restructure, and four recent

bankruptcies have involved prepetition restructurings much like Old JJCI's. *In re*

*Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019); *In re Paddock Enters., LLC*,

2022 WL 1746652 (Bankr. D. Del. May 31, 2022); *In re DBMP LLC*, No. 20-

30080, 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021); *In re Aldrich Pump*

*LLC*, No. 20-30608 (JCW), 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021).

From the beginning, Old JJCI was transparent that its goal was to "globally resolve

talc-related claims through a chapter 11 reorganization without subjecting the

entire []JJCI enterprise to a bankruptcy proceeding." A450; *see* A15.

Old JJCI split itself into two Texas limited liability companies:  LTL and

New JJCI.  LTL was allocated Old JJCI's talc-related liabilities plus certain assets,

including a royalty-management-and-finance business valued at over $350 million,

and insurance policies potentially worth billions of dollars.  A450-453.  New JJCI

was allocated Old JJCI's other assets and liabilities.  *Id.*  LTL then converted into a

North Carolina limited liability company, while New JJCI merged into a New

Jersey corporation and became LTL's direct parent.  A448.

20

Of course, Old JJCI could not just saddle LTL with its talc-related debts, give New JJCI all of its assets, and call it a day.  Old JJCI made sure that LTL had the same, if not a greater, ability to resolve present and future talc claims.  A450.  LTL, New JJCI, and J&J entered into a funding agreement whereby New JJCI would pay the administrative costs in LTL's contemplated bankruptcy case and any talc-related-liability costs after LTL exhausted its own assets, up to New JJCI's estimated $61 billion full enterprise value.  A450-456, 105-127.  And though the agreement sets a floor of Old JJCI's enterprise value at the time of the divisional merger, the agreement's value is expected to increase as New JJCI's value increases post-restructuring.  A5-6 & n.5, 3085-87, 4232, 4235, 4316, 4319.  J&J and New JJCI also agreed to advance a total of $2 billion into a qualified settlement fund for the exclusive payment of talc claims.  A454-455.

## III.    PROCEDURAL HISTORY

On October 14, 2021, LTL filed for chapter 11 relief in the Western District of North Carolina.  A291.  LTL also commenced an adversary action against Claimants seeking confirmation that the automatic bankruptcy stay applies to talc claims asserted against LTL's affiliates—including J&J and New JJCI—as well as LTL's insurers and third-party retailers, or entry of a preliminary injunction enjoining those claims.  A3798.

After extensive discovery and a two-day evidentiary hearing, the North
Carolina bankruptcy court adopted most of LTL's arguments and entered a
temporary injunction.  A1484-91.  The court determined that "[f]ailure to enjoin"
claims in the tort system would "defeat the purpose of the Chapter 11 Case."
A4198.  And "the injunction [would] ensure that the benefits of a complete and
equitable resolution of talc-related claims against [LTL] flow to all claimants."
A4199.  The court stated that, if it "were keeping the case," it would make the
injunction "more permanent."  A1482.  But the court concluded that the case
should be transferred to New Jersey, and left the injunction temporarily in place
until it could be addressed by the New Jersey bankruptcy judge.  A1-2 & n.1.

After transfer, Claimants moved to dismiss LTL's petition as a bad-faith
filing.  The Bankruptcy Court afforded Claimants months of discovery and held a
five-day trial to address the motions to dismiss and LTL's related adversary action,
hearing testimony from six fact and five expert witnesses.  A7-8.  The Bankruptcy
Court then issued two detailed opinions denying the motions to dismiss and
enjoining talc tort suits against LTL and its affiliates, which include J&J and New
JJCI, insurers, and third party retailers, a group that the Bankruptcy Court
collectively referred to as the Protected Parties.  A1-56, 140-193.

As to dismissal, the Bankruptcy Court set out and employed "the
standards ... followed by other courts within the Third Circuit."  A13.  The court

"acknowledge[d] there is a much more stringent standard for dismissal of a case lacking good faith in the Fourth Circuit, which would have governed a decision" by the North Carolina bankruptcy judge, and "ponder[ed] how a bankruptcy filing" could satisfy the good-faith standard in North Carolina but become a bad-faith filing when transferred to New Jersey.  A13.

The Bankruptcy Court found that dismissal was unwarranted even under this Circuit's bad-faith standard.  On financial distress, the court first found that LTL's financial distress and Old JJCI's financial distress were one and the same, noting that the divisional merger and LTL's subsequent bankruptcy petition occurred as part of a single integrated transaction.  A14.  The court noted that neither LTL nor Old JJCI had the ability to defend or resolve the nearly 40,000 current claims and tens of thousands more future claims, making the companies' financial distress "patently apparent."  A33.  The Bankruptcy Court observed that "[e]ven without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims, and see that the continued viability of all J&J companies is imperiled."  A36.  The court concluded that "[n]o public or private company can sustain operations and remain viable in the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward."  A37.

The Bankruptcy Court further found that LTL's objective of resolving current and future asbestos claims through a post-confirmation trust was "unquestionably a proper purpose under the bankruptcy code." A16, 49. Although not all cases would have gone to trial had LTL not filed for bankruptcy, the evidence established that LTL "likely would be expending annually sums ranging $100-200 million in its defense of the tens of thousands of talc personal injury cases for decades to come." A34, 40. The Bankruptcy Court concluded that LTL's chapter 11 petition will "dramatically reduce costs" by avoiding these expenses, thus preserving assets for talc claimants. A15.

LTL's bankruptcy also preserved value by avoiding the higher administrative costs of an Old JJCI bankruptcy, benefitting New JJCI and LTL's creditors alike. The funding agreement provides claimants with the same or more value than if Old JJCI had petitioned for bankruptcy, but spares Old JJCI's "employees, suppliers, distributors, vendors, landlords, retailers," and other stakeholders from "dramatically increased costs and risks associated with all chapter 11 filings," that would have "no palpable benefits" for talc claimants. A15. The court added that the "hundreds of millions of dollars that would be spent on professional fees alone would be better directed to a settlement trust" for claimants. A47. By contrast, an Old JJCI bankruptcy without restructuring

"would pose potential negative consequences, without offering a positive change in direction or pathway to success in this case." *Id.*

The court further explained that LTL's bankruptcy would provide a faster recovery for current claimants, bypassing the delays plaguing asbestos tort litigation. A20. And LTL's bankruptcy would protect future claimants, who "are wholly ignored by the current rush to secure judgments," resulting in "an uneven, slow-paced race to the courthouse, with winners and losers." A26. Bankruptcy was the "optimal" means "for redressing the harms of both present and future talc claimants in this case—ensuring a meaningful, timely, and equitable recovery." A19.

The Bankruptcy Court also concluded that staying suits against the Protected Parties was appropriate. A140-193. The court explained that an injunction was warranted because LTL shared an identity of interest with the Protected Parties. A156. LTL's available insurance shares a policy limit with the Protected Parties, and LTL "is liable for the talc claims as the result of pre-petition corporate transactions, including the 2021 Corporate Restructuring, and various contractual indemnification obligations." A153, 158-159. As the North Carolina bankruptcy judge had explained, if the stay is *not* extended to the Protected Parties, "it is difficult to envision how a successful reorganization can be achieved in this case." A156.

Claimants requested that the Bankruptcy Court certify its orders for direct appeal, 28 U.S.C. § 158(d)(2), and the Bankruptcy Court did so.  A135, 262.  This Court then granted Claimants' petitions for direct appeal, A268-272, and their motion to consolidate their appeals and to expedite the case.

## STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's findings of fact underlying its good-faith determination for clear error.  *In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999).  The Bankruptcy Court's ultimate good-faith finding "is reviewed for an abuse of discretion."  *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009).  This Court reviews de novo the meaning of § 362's automatic-stay provision, *see In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011), but reviews the Bankruptcy Court's application of that provision to particular facts for abuse of discretion, *see In re Myers*, 491 F.3d 120, 128 (3d Cir. 2007).  This Court likewise reviews the Bankruptcy Court's issuance of a § 105 injunction "for abuse of discretion."  *In re W.R. Grace & Co.*, 115 F. App'x 565, 568 (3d Cir. 2004).

## SUMMARY OF THE ARGUMENT

I.  The Bankruptcy Court correctly concluded that LTL's chapter 11 petition was filed in good faith.  LTL was experiencing financial distress; the petition serves a valid bankruptcy purpose; and the petition does not merely seek to obtain

a tactical litigation advantage. *See In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004).

A. The Bankruptcy Court did not clearly err in finding that LTL's financial distress was "patently apparent." A37. Old JJCI's assets could not cover the liability of tens of thousands of claims alleging that Johnson's Baby Powder caused ovarian cancer or mesothelioma. Even existing claims could amount to tens of billions of dollars in liability against Old JJCI, and new claims were expected to be filed at a rate of 10,000 per year for decades. This Court has recognized that debtors facing comparable mass-tort liability were in financial distress. *See In re SGL Carbon*, 200 F.3d at 164. Claimants attempt to challenge the Bankruptcy Court's factual finding by reweighing the evidence. But the Bankruptcy Court considered Claimants' estimates and reasonably rejected them. The Bankruptcy Court's resolution of the parties' factual disputes was not clearly erroneous.

B. The Bankruptcy Court also correctly held that LTL's chapter 11 filing serves valid bankruptcy purposes. Indeed, Claimants and the U.S. Trustee essentially concede that if this Court affirms the Bankruptcy Court's finding of financial distress, the Bankruptcy Court's good-faith finding follows as a matter of course.

LTL's bankruptcy petition preserves value for claimants by saving tens of millions of dollars in deadweight litigation costs spent annually in defending against talc claims in court—savings that Claimants do not dispute. The bankruptcy petition further ensures that existing Claimants are treated equally and fairly—avoiding the massive delays that beset tort litigation, providing an efficient mechanism for Claimants to recover through a bankruptcy claims process, preserving jury-trial rights for Claimants who choose to litigate, and avoiding the current lottery-like system in which a handful of claimants receive blockbuster awards while others with similar claims receive nothing. And the bankruptcy petition advances one of bankruptcy's principal purposes in the asbestos-liability context—ensuring that future claimants are treated fairly and do not receive less merely because their injuries manifest later. For these reasons, the Bankruptcy Court recognized that bankruptcy provided the optimal means to redress "the harms of both present and future talc claimants in this case—ensuring a meaningful, timely, and equitable recovery." A19.

C. Old-JJCI's use of the Texas divisional merger statute did not prejudice Claimants and is not evidence of bad faith. Although Claimants allege that the divisional merger separated claimants from assets, the Bankruptcy Court carefully considered that allegation and found it false. Claimants have access to the same or more value as before the restructuring thanks to the funding agreement, which

28

guarantees LTL's talc liabilities up to the full value of Old JJCI or New JJCI,

whichever is higher.  Indeed, Claimants essentially concede that the restructuring

did not place any of Old JJCI's value out of their reach when they insist that LTL

should not have filed for bankruptcy because it has access to all the value of either

Old JJCI or New JJCI.  To the extent Claimants argue that the restructuring is

evidence of bad faith even if it did not prejudice them, that claim ignores that

comparable pre-petition restructurings are commonplace and maximize the value

of the estate.

D.  LTL's restructuring and bankruptcy were not undertaken merely to

secure a tactical litigation advantage.  Rather, J&J and LTL "have been candid and

transparent about employing [LTL]'s chapter 11 filing as a vehicle to address the

company's growing talc-related liability exposure and costs in defending the tens

of thousands of pending ovarian cancer claims and hundreds of mesothelioma

cases, as well as future claims."  A15.  Claimants and the U.S. Trustee have no

response to the Bankruptcy Court's conclusion that bankruptcy was the "optimal"

way to promptly and equitably address Old JJCI's growing talc liabilities.  A19.

E.  The Bankruptcy Court did not abuse its discretion in concluding that "the

interests of current tort creditors and the absence of viable protections for future

tort claimants outside of bankruptcy" amounted to "unusual circumstances" that

preclude dismissal even if LTL's petition was not in good faith.  A13 n.8.  The

need to provide timely recoveries for current claimants and to ensure that future

claimants are not prejudiced by the current race to the courthouse independently

requires affirmance.

II.  The Bankruptcy Court also correctly stayed claims against LTL's

nondebtor affiliates, insurers, and retailers.  This Court can affirm the stay either

under § 362(a), which provides that LTL's bankruptcy petition operates as a stay

of proceedings against LTL and of claims that would affect LTL's estate, or under

§ 105, which empowers the bankruptcy court to enjoin litigation that will

undermine LTL's reorganization.

A.  This Court should affirm the Bankruptcy Court's stay order as a proper

exercise of the Bankruptcy Court's power under 11 U.S.C. § 362(a).  The

Bankruptcy Court had jurisdiction to confirm the scope of the automatic stay.

Section 362's automatic stay is a substantive right provided by the Bankruptcy

Code, *see A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999-1000 (4th Cir. 1986),

and is therefore within the Bankruptcy Court's core jurisdiction, *see Stoe v.

Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006).  On the merits, the Bankruptcy Court

correctly concluded that § 362(a)'s automatic stay prohibits not only suits against

LTL, but also talc-related claims made against the Protected Parties. Section 362(a)

provides that a bankruptcy petition "operates as a stay" of any "proceeding against

the debtor that was or could have been commenced before" the petition, 11 U.S.C.

30

§ 362(a)(1), and of "any act to obtain possession of property of the estate,"
regardless of whether the suit is against the debtor or another entity, *id.* §
362(a)(3).

Claimants' contention that the automatic stay cannot apply to nondebtor
third parties is wrong.  Where "there is such identity between the debtor and the
third-party defendant that the debtor may be said to be the real party defendant and
that a judgment against the third-party defendant will in effect be a judgment or
finding against the debtor," courts "appl[y] the automatic stay protection to
nondebtor third parties." *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510
(3d Cir. 1997) (citation omitted).  And here, LTL is the real party defendant in any
talc-related tort claim made against the Protected Parties.  As the Bankruptcy Court
found, LTL is now responsible for Old JJCI's and J&J's talc liabilities.  The
Bankruptcy Court also found that LTL has indemnification obligations to its
retailers that necessarily enmesh LTL in any litigation between claimants and those
entities.  Talc-related tort claims against the Protected Parties are therefore, "in
effect," proceedings against LTL.

The Bankruptcy Court also correctly concluded that § 362(a)'s automatic
stay applies to talc claims against the Protected Parties because allowing talc-
related claims to proceed against them would reduce insurance proceeds available
to LTL.  "[I]nsurance policies are considered part of the property of a bankruptcy

estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir.

2006) (Alito, J.). As the Bankruptcy Court found, the Protected Parties and LTL

are both covered for talc claims under shared insurance policies. Prosecution of

claims against the Protected Parties, as co-insureds, would reduce assets available

to LTL's bankruptcy estate.

B. The Bankruptcy Court also had authority under § 105 to preliminarily

enjoin talc litigation against the Protected Parties. Again, the Bankruptcy Court's

exercise of jurisdiction here was proper. The Bankruptcy Court had "arising

under," "arising in," and "related to" jurisdiction to issue the injunction. 28 U.S.C.

§ 1334(b). First, the § 105(a) injunction against the Protected Parties is necessary

to protect the integrity of the automatic stay, meaning the injunction arises under

title 11. Second, as Claimants do not dispute, injunctive relief under § 105(a) is

unique to bankruptcy, meaning the injunction "arises in" title 11. And third, the

outcome of talc-related claims against the Protected Parties would affect LTL's

estate and reorganization, meaning the injunction is "related to" title 11.

On the merits, the Bankruptcy Court did not abuse its discretion in

concluding that the traditional preliminary-injunction factors favored enjoining talc

claims against the Protected Parties under § 105(a). The Bankruptcy Court

correctly concluded that LTL is likely to successfully reorganize. "[L]ikelihood of

success," in this context, means that a plaintiff has "a reasonable chance" of

32

confirming a plan. *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229

(3d Cir. 2011) (en banc). And because the Bankruptcy Court is better-positioned

than the tort system to quickly and fairly resolve LTL's current and future

liabilities, LTL has a more-than-reasonable chance of success. The Bankruptcy

Court also correctly concluded that the balance of harms favors an injunction.

LTL would likely suffer irreparable harm absent an injunction because the

onslaught of talc-related claims against LTL and the Protected Parties could

otherwise prevent LTL and the Bankruptcy Court from confirming a plan, and

Claimants face only a temporary stay of litigation which ultimately may be much

shorter than the delays they would face in the tort system. Finally, the Bankruptcy

Court correctly concluded that the § 105 injunction serves the public interest

because it facilitates LTL's efforts to treat all talc claimants equitably.

## ARGUMENT

### I.  LTL's Chapter 11 Petition Was Filed In Good Faith.

The Bankruptcy Code provides that a bankruptcy court may dismiss a

chapter 11 petition "for cause." 11 U.S.C. § 1112(b)(1). A chapter 11 petition is

dismissible for cause "unless filed in good faith." *SGL Carbon*, 200 F.3d at 160.

Whether a petition is filed in good faith presents "a fact intensive inquiry"

requiring courts to examine "the totality of facts and circumstances." *Id.* at 162.

Three questions are at the core of any good-faith finding: (1) whether the debtor

was experiencing "financial distress," (2) "whether the petition serves a valid
bankruptcy purpose," and (3) whether the petition seeks "merely to obtain a
tactical litigation advantage." *Integrated Telecom*, 384 F.3d at 119-121.  As the
U.S Trustee acknowledges, each of these determinations ultimately presents
questions of fact that this Court reviews for clear error.  *See* U.S. Trustee Br. 7-8.
The Bankruptcy Court correctly found—and certainly did not clearly err in
finding—that LTL's petition was in good faith under all three criteria.[2]

### A. The Bankruptcy Court Did Not Clearly Err In Finding That LTL Was In Financial Distress.

The Bankruptcy Court's factual finding that LTL was experiencing financial
distress is "reviewable only for clear error—in other words, with a serious thumb
on the scale for the bankruptcy court." *U.S. Bank Nat'l Ass'n ex rel. CWCapital
Asset Mgmt. LLC v. Villages at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018).  In a
"complex case" like this one, "[g]reat care must be exercised ... to defer to" the
bankruptcy court's findings of fact. *In re Fiber-Span, Inc.*, 40 F.4th 79, 94 (3d Cir.

---

[2] In the Fourth Circuit, where LTL's petition was first filed and which LTL
submits applies the proper test for bad faith, a court may dismiss a chapter 11
petition "only with great caution and upon supportable findings both of the
objective futility of any possible reorganization and the subjective bad faith of the
petitioner in invoking this form of bankruptcy protection." *Carolin Corp. v.
Miller*, 886 F.2d 693, 694 (4th Cir. 1989).  Under that standard, the good faith of
LTL's petition is essentially undisputed.

2022).  Claimants' arguments against the Bankruptcy Court's findings fall away in

the face of that deferential standard.

> ### 1. *The Bankruptcy Court did not clearly err in finding that LTL and Old JJCI faced tens of billions of dollars in potential talc costs and liabilities.*

LTL, which faced tens or hundreds of billions of dollars in potential costs

and liabilities from nearly 40,000 pending and untold numbers of future talc

claims, was experiencing sufficient financial distress to seek bankruptcy

protection.  Debtors need not be insolvent to petition for bankruptcy.  *SGL Carbon*,

200 F.3d at 163.  Instead, they may "seek the protections of bankruptcy when faced

with pending litigation that pose[s] a serious threat to the companies' long term

viability."  *Id.*  The Bankruptcy Court did not clearly err in holding that LTL meets

that standard.

The Bankruptcy Court began its evaluation of LTL's financial distress by

looking to Old JJCI's financial condition pre-restructuring.  The divisional merger

and bankruptcy filing were part of an integrated transaction that transferred all of

Old JJCI's talc debts to LTL, and the funding agreement made funds available to

LTL that are at least equal to the value of Old JJCI's assets.  *See* A4444-54, 7135-

36.  LTL thus has the same liabilities as Old JJCI, backed by value at least equal to

Old JJCI's assets.  The Bankruptcy Court accordingly found that it could not

distinguish between the financial burdens facing Old JCCI and LTL, noting that

Claimants' "own experts have acknowledged" that "use of the Texas divisional merger statute and subsequent filing by the newly formed LTL constituted a single integrated transaction." A15. The Bankruptcy Court explained that "Old JJCI's talc liability (and the financial distress that liability caused)" is "now the legal responsibility of [LTL]." A33. Old JJCI and LTL's talc liabilities correspond one-to-one.

The Bankruptcy Court then evaluated Old JJCI's financial condition prior to the divisional merger and found that Old JJCI's financial distress was "patently apparent." A37. Old JJCI was buckling under the weight of nearly 40,000 claims alleging that Johnson's Baby Powder caused ovarian cancer or mesothelioma. During the 21 months preceding LTL's petition, Old JJCI incurred $3.6 billion in talc-claim litigation expenses—33% of the company's *total* sales. A7121-24, 7137-38. As a result of talc-related expenses, Old JJCI suffered a pre-tax loss of $893.4 million in the 21 months leading up to LTL's petition. A7227. The court explained that the company went from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020—a swing of $3.2 billion in just one year. A4. The shift was in part due to *Ingham*, where the jury awarded $4.14 billion in punitive damages, "one of the largest personal injury verdicts ever seen in the United States." A36. Although that award was ultimately reduced on appeal, even the reduced $2.24 billion award was a staggering sum. A36.

The record also showed that Old JJCI's losses would continue into the future.  New claims were being filed against Old JJCI at a rate of one an hour, every day, 365 days a year.  *See* A16, 896.  LTL anticipated that it would be confronted with approximately 10,000 additional claims each year.  A20, 459, 7264.  Any one of these claims could become the next multibillion-dollar verdict.  Although Old JJCI knew its defenses would usually succeed, its forecasting had to face the grim statistical reality that even a very low plaintiff success rate could ruin the company.  As the Bankruptcy Court explained, "[e]ven without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims, and see that the continued viability of all J&J companies is imperiled."  A36.

Even where Old JJCI won, it still cost $2 to $5 million to try each case.  A37, 2170.  And those costs added up:  Trying just the pending ovarian-cancer claims would cost up to $190 billion, A37, 2170, to say nothing of trying the tens of thousands of yet-to-be-filed claims.  Even though some cases would settle, LTL "had contingent liabilities in the billions of dollars and likely would be expending annually sums ranging $100-200 million in its defense of the tens of thousands of talc personal injury cases for decades to come."  A34; *see* A458.  The Bankruptcy Court therefore found that LTL could not "sustain operations and remain viable in

the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward." A37.

The ongoing talc litigation harmed Old JJCI in other ways as well. The longer the litigation dragged on, the longer Old JJCI was the subject of misleading or misinformed press that tarnished Old JJCI's reputation and that of its many consumer-facing brands. *See* A411-413, 7156-60. And, as the Bankruptcy Court also noted, Old JJCI had to "factor in the negative impact of ongoing regulatory investigations by state attorneys general," which could have yielded even more potential liability for LTL. A37.

Against the weight of these liabilities, the Bankruptcy Court concluded that Old JJCI's assets were not sufficient to avoid financial distress. The court credited expert testimony explaining that "Old JJCI was not positioned to continue making substantial Talc Litigation payments from working capital or other readily marketable assets," and that "Old JJCI had no significant excess net current assets available for the satisfaction of future Talc Litigation payments." A36, *see also* A7123. The court acknowledged that LTL had asset value of up to $61 billion because of the funding agreement, but concluded that even these assets were not sufficient to protect LTL from its massive liabilities. A35. And the court explained that it was "of no moment that [LTL], by virtue of the Funding Agreement, was not insolvent on the date of the chapter 11 filing." A35.

38

The Bankruptcy Court's financial-distress conclusions align with this Court's cases. The "Bankruptcy Code *encourages* early filing." *SGL Carbon*, 200 F.3d at 163 (emphasis added). Companies should "file for Chapter 11 before they face a financially hopeless situation," because "going-concern value is likely to be higher than liquidation value." *Integrated Telecom*, 384 F.3d at 120-122 (citation omitted). Debtors may therefore "seek the protections of bankruptcy when faced with pending litigation that pose[s] a serious threat to the companies' long term viability" before they become insolvent. *SGL Carbon*, 200 F.3d at 164.

Early filing is particularly important in asbestos cases implicating future claimants. Section 524(g) of the Bankruptcy Code requires that current and future claimants be treated substantially equally. 11 U.S.C. § 524(g)(2)(B)(ii)(V). If an asbestos defendant waited until it was insolvent to file for chapter 11, it would necessarily be treating current and future claimants differently; claimants who were compensated prior to the bankruptcy would be paid in full, while later claimants would not.

LTL's financial condition was at least as bad as, if not worse than, the distress facing debtors this Court has described as paradigmatic cases of financial distress. In *SGL Carbon*, for instance, the Court highlighted the Johns-Manville bankruptcy, where "[l]arge judgments had already been entered" against the debtor "and the prospect loomed of tens of thousands of asbestos health-related suits over

the course of 20-30 years."  200 F.3d at 164.  In *Integrated Telecom*, the Court

again pointed to Johns-Manville, describing it as a clear case of financial distress

given that the company "faced 'approximately 16,000 lawsuits pending as of the

filing date,' with the prospect of the 'filing of an even more staggering number of

suits over the course of 20-30 years.'"  384 F.3d at 125 (quoting *In re Johns-*

*Manville Corp.*, 36 B.R. 727, 729 (Bankr. S.D.N.Y. 1984)).  The Court has

similarly cited the A.H. Robins bankruptcy, where the debtor settled certain claims

for approximately $530 million and "still faced over five thousand pending cases

in state and federal court," *SGL Carbon*, 200 F.3d at 164 n.15 (quoting *In re A.H.*

*Robins Co.*, 89 B.R. 555, 557 (Bankr. E.D. Va. 1988)), and the Dow Corning

bankruptcy, which involved "more than '19,000 individual'" lawsuits, *id.* (quoting

*In re Dow Corning Corp.*, 211 B.R. 545, 553 (Bankr. E.D. Mich. 1997) ("*Dow*

*Corning II*")).  Summarizing these examples, the Court explained that financial

distress requires there be "some risk of *significant* liability from a *substantial*

*number* of litigations or claimants in bankruptcy."  *BEPCO*, 589 F.3d at 622

(emphases added).

LTL faces exactly this risk, facing billions in potential liability from tens of

thousands of pending claims.  A34.  Indeed, the 16,000 suits pending against

Johns-Manville—which this Court has characterized as "staggering," *Integrated*

*Telecom*, 384 F.3d at 125 (citation omitted)—amounted to *less than half* of the

number of suits pending against LTL, with more suits being filed every day.  LTL
is aware of no mass-tort chapter 11 bankruptcy case that has ever been dismissed
for bad faith, let alone one of this magnitude.

By contrast, LTL's liabilities far exceed the liabilities confronting the
debtors in cases where this Court has found no financial distress.  The debtor in
*SGL Carbon*, for example, sought to avoid liabilities stemming from a single class
action antitrust suit, "six complaints" in federal district court, and "one complaint"
in Canada.   200 F.3d at 157.  In *BEPCO*, the debtors "knew of only six litigations
in which they could conceivably have been held liable for damages," most of
which were minor in scope.  589 F.3d at 622.  These debtors faced nothing like the
potential tidal wave of liability that LTL faces.

### 2. *Claimants' financial-distress arguments do not withstand scrutiny.*

Claimants turn to LTL's financial distress relatively late in their briefs and
have little to say about it.  *See* A&I Br. 36-44; TCC Br. 39-43.  Their scant
arguments do not come close to showing that the Bankruptcy Court clearly erred.

*First*, Claimants maintain that the Bankruptcy Court "analyzed the wrong
entity" when it assessed the financial condition of Old JJCI rather than LTL.  A&I
Br. 39-41; TCC Br. 39-40.  But Claimants never explain how LTL and Old JJCI's
financial conditions differed or even how they *could* differ given that LTL—by
design—had the same liabilities and asset value as Old JJCI.  Although Claimants

41

point to LTL's rights under the funding agreement, the funding agreement exists

only because of the restructuring and bankruptcy.  They were each part of the same

comprehensive effort—what the Bankruptcy Court and the Claimants' own experts

appropriately found to be "a single, preplanned, integrated transaction" A14

(citation omitted)—to resolve Old JJCI's massive liabilities.

Claimants' attempts to distinguish Old JJCI from LTL reveal "a clear

inconsistency" in their argument—a contradiction that "troubled" the Bankruptcy

Court.  A39-40.  On the one hand, Claimants insist that Old JJCI was not in

financial distress.  A39; *see also* TCC Br. 14; A&I Br. 45.  On the other hand,

Claimants cite Old JJCI's use of the divisional-merger statute as evidence that Old

JJCI was trying to shirk what Claimants' counsel characterized as "tens of billions"

or even "$250 billion" in potential liability.  A34, A40; *see also* TCC Br. 40; A&I

Br. 16.  But it cannot both be true that Old JJCI had tens or hundreds of billions in

liability and that LTL was not in financial distress.

*Second*, none of the Claimants dispute—and some begrudgingly admit—that

a debtor need not be insolvent to file for bankruptcy.  *See* TCC Br. 41.  But they all

nonetheless continue to indirectly frame financial distress in insolvency terms,

arguing that LTL was not experiencing financial distress because it could "meet

present obligations," A&I Br. 37, and because LTL has "financial capacity

sufficient to satisfy its obligations as they become due," TCC Br. 42 (quoting

A4229-30).  That simply is not the test.  *SGL Carbon*, 200 F.3d at 163; *see also In re Marshall*, 721 F.3d 1032, 1052 (9th Cir. 2013) ("[I]t is clear that the bankruptcy law does not require that a bankruptcy debtor be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of reorganization.").

Claimants relatedly maintain that the Bankruptcy Court erred by accounting for LTL's "future" liabilities in its evaluation of financial distress, and assert that LTL's financial distress was not sufficiently "immediate."  A&I Br. 22-24; TCC Br. 42.  But the Bankruptcy Court *did* focus on LTL's immediate liabilities.  The court explained that "at the time of the chapter 11 filing," LTL had "contingent liabilities in the billions of dollars." A34.  The Bankruptcy Court then described those liabilities in detail—jury verdicts averaging $36.6 million per claim, plus the defense costs associated with nearly 40,000 pending ovarian-cancer claims and additional mesothelioma claims, plus "pending (although contested) indemnification obligations" estimated at between $25 billion and $118.2 billion. A16.

LTL's current liabilities alone sufficed to show financial distress, but the Bankruptcy Court was allowed to consider future liabilities, too.  In *SGL Carbon*, this Court discussed not only Johns-Mansville's *current* liabilities, but also that the

company would face "tens of thousands of asbestos health-related suits over the course of 20-30 years." 200 F.3d. at 164. The Court invoked *Johns-Manville* again in *Integrated Telecom*, citing not just the "approximately 16,000 lawsuits pending as of the filing date," but also "the prospect of the filing of an even more staggering number of suits over the course of 20-30 years." 384 F.3d at 125 (quotation marks omitted). The Bankruptcy Court did not err in following the same approach here.

*Third*, Claimants charge that the Bankruptcy Court "relied on unrealistic hypotheticals" in assessing LTL's liabilities. A&I Br. 44. They emphasize, for example, that J&J estimated to Standard & Poor's that its talc liabilities would amount to only $7 to $7.5 billion. A&I Br. 46; TCC Br. 43; Mesothelioma Br. 6; U.S. Trustee Br. 9. But uncontroverted witness testimony shows that this was an estimate of the amount it would take to settle claims against Old JJCI as a third-party indemnitor in the pending bankruptcy of Old JJCI's talc supplier Imerys—not an estimate of Old JJCI's full liability. A2414-17. That is why, when the Bankruptcy Court considered the estimate, it concluded that those numbers did not accurately reflect Old JJCI's talc liabilities. *See* A40-41. The court explained that it had "doubts" about whether the estimate given to Standard & Poor's was a projection "of amounts necessary to resolve current and future talc liabilities," or

44

was instead an estimate "of anticipated short-term reserves or bankruptcy
settlements." A41.

Claimants err in asserting that higher estimates credited by the Bankruptcy
Court assumed that "no talc case would settle," or that "each would cost the
highest projected amount to try." A&I Br. 44; *see also* TCC Br. 42-43. To the
contrary, the Bankruptcy Court offered a range for trial costs; it did not assume the
maximum. A34 ("[T]he evidence before the Court establishes that" LTL "likely
would be expending annually sums ranging [from] $100-200 million in its defense
of the tens of thousands of talc personal injury cases for decades to come.").
Additionally, the Bankruptcy Court explicitly found that LTL "had contingent
liabilities in the billions of dollars"—and that figure accounted for both "verdicts
*and settlements*." A34 & n.22 (emphasis added). And the Bankruptcy Court
acknowledged that "6,800 ovarian cancer and mesothelioma claims have been
settled since 2017 for under $1 billion." A40. There is no reasonable way to read
the Bankruptcy Court's opinion and conclude that it did not account for some cases
settling.

To the extent Claimants believe the Bankruptcy Court erred in doubting that
a global settlement could be reached outside of bankruptcy, *see* A&I Br. 46, the
record showed the court's skepticism to be entirely justified. Many cases had been
pending for years and had not yet settled. A24, 2407. And the court heard and

credited testimony from Old JJCI and LTL employees, who explained that they
had tried without success to settle pending cases.  A2404, 2408-10.  With billion-
dollar lottery judgments potentially on offer, the incentive for any particular
claimant to settle—let alone all of them—was markedly weakened.  And the
uncertain scope of LTL's future liability made it difficult for LTL to know how
much it could afford to settle each case for today.  A2404.[3]

*Fourth*, claimants reweigh the evidence and ask this Court to credit their
estimate of LTL's liabilities over the Bankruptcy Court's factual findings.  As
Claimants see it, LTL has in past years incurred "annual litigation costs of $100 to
$200 million," plus "judgments averaging $700 million annually," plus
"settlements averaging around $200 million annually." A&I Br. 36-37.  Claimants
maintain that these annual liabilities would not have imposed financial distress on
LTL in light of the funding agreement.

Again, however, the Bankruptcy Court considered Claimants' estimates and
rejected them.  Claimants' math assumes that the last five years of judgments and
settlements are a reliable measure of future results.  A&I Br. 36-37.  But the

---

[3] Claimants misread the record in arguing that the Bankruptcy Court "relied on
unfounded estimates of possible indemnification obligations."  A&I Br. 45.  The
Bankruptcy Court reasonably found that LTL's "pending (although contested)
indemnification obligations owing to talc suppliers Imerys Talc America, Inc. and
Cyprus Mines Corporation" contributed to LTL's financial distress.  A16.  The
evidence showed Imerys' indemnification claims, if successful, could cost LTL
between $25 and $118.2 billion.  A7130.

Bankruptcy Court provided a host of reasons why LTL's future liabilities could be far more substantial than they had been in the past—including the multibillion-dollar *Ingham* judgment, which "certainly raised the stakes" for Old JJCI and tort plaintiffs, A4, and the U.S. Supreme Court's denial of certiorari in *Ingham*, which further increased Old JJCI's exposure by suggesting that the Supreme Court would not further reduce similar massive awards. A40. The Bankruptcy Court pointed to other "significant events in the timeline which point to greater talc exposure," including, to take just one example, FDA's 2019 "find[ing] of asbestos in Johnson's Baby Powder" that precipitated a "shift by claimants to multi-billion dollar damage demands." A41. The Bankruptcy Court quite reasonably found that early verdicts and settlements could not "serve as dependable guideposts for expectations going forward." A40.

*Fifth*, Claimants are wrong that LTL had to prove that it conducted an exhaustive "serious analysis of financial distress" before petitioning for bankruptcy. A&I Br. 37; TCC Br. 40-41. That objection is an attempt to mint a new evidentiary standard found nowhere in the Bankruptcy Code. Claimants cite the Johns-Manville bankruptcy court's observation that the debtor there undertook a "detailed analysis" before filing for bankruptcy. A&I Br. 37 (citation omitted); *see* TCC Br. 41; *see also Johns-Manville*, 36 B.R. at 734. But that observation was made in response to the argument that the petitions were fraudulent, and the

47

court never suggested some sort of stand-alone serious-analysis requirement.  The court certainly did not hold that a debtor that was plainly in financial distress, as LTL is, could nonetheless be prevented from filing for bankruptcy for supposedly failing to undertake a sufficiently rigorous analysis of a self-evidently dire financial situation.

In any event, LTL did carefully evaluate its financial outlook before petitioning.  As Claimants acknowledge, LTL is "staffed ... with longtime J&J employees" who understood the talc liabilities.  A&I Br. 1.  And although Claimants complain that LTL filed for bankruptcy two days after the restructuring, *see* A&I Br. 1, 12; TCC Br. 9, LTL's board had "hours and hours of briefings and material to read," already knew of the threat the talc liabilities posed from their work with J&J, and "did not walk into the vote blind."  A2172.  Counsel responsible for the talc litigation also made detailed presentations to the board about LTL's talc liabilities.  A2367.  Thus, as one board member explained, he "did a lot of research, a lot of education" in order to "understand about the talc liabilities" before voting to authorize bankruptcy.  A2159.  The board was sufficiently informed.

*Finally*, claimants argue that the Bankruptcy Court erred by failing to inquire whether J&J itself—as opposed to Old JJCI or LTL—was in financial distress.  Claimants go so far as to assert that this bankruptcy was "a complex

48

scheme to separate" J&J's business operations from talc liability.  A&I Br. 1.  But

claimants never grapple with the fact that Old JJCI has been responsible for all talc

liabilities for more than four decades.  Old JJCI has been the manufacturer and

seller of Johnson's Baby Powder since 1979, when it received all of the assets and

assumed all of the liabilities of J&J's Baby Products Division, including any later

claims, and agreed to indemnify J&J for those liabilities.  A2-3.  Because the talc

liabilities were owned by Old JJCI, "J&J (like all parent corporations) had no legal

duty to satisfy the claims against its wholly-owned or affiliated subsidiaries."  A35.

After all, "[i]t is a general principle of corporate law deeply ingrained in our

economic and legal systems that a parent corporation ... is not liable for the acts of

its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation

marks omitted).

Claimants argue that the Bankruptcy Court failed to consider that J&J would

have continued to fund Old JJCI's talc liabilities voluntarily.  A&I Br. 41-43.  But

the Bankruptcy Court noted Claimants' speculation that "J&J would have

continued to fund all talc-related obligations of Old JJCI," and rejected it as

"merely supposition, offered without evidentiary support."  A38, 163-169.

Claimants' assertion was particularly implausible given that Old JJCI's indemnity

meant that *Old JJCI* had to fund *J&J*'s talc liabilities, not the other way around.

A163.  For similar reasons, Old JJCI's losses are not "an accounting fiction created

49

by J&J." A&I Br. 41.  Talc-related expenses were charged to Old JJCI because it

had legal responsibility for them.  A4107 ("[A]ll costs that relate to this talc matter

get sent to, to JJCI"); A8103 ("[T]hese are talc product liability costs that JJCI was

ultimately responsible for, which is why it is showing up as a expense on their

account.").

Claimants also ignore the Bankruptcy Court's finding that Old JJCI's talc

liabilities were so massive that even J&J itself could not satisfy them indefinitely.

A40-41.  The court found "that the weight of evidence supports a finding that *J&J*

*and Old JJCI were in fact facing a torrent of significant talc-related liabilities for*

*years to come.*"  A40 (emphasis added).  It explained that the talc liabilities were

so substantial "that the continued viability of *all J&J companies is imperiled*."

A36 (emphasis added).  Not even J&J could "sustain operations and remain viable

in the long term with juries poised to render nine and ten figure judgments, and

with such litigation anticipated to last decades going forward."  A37.  Although

claimants repeatedly cite J&J's significant market capitalization and strong credit

rating, *see* TCC Br. 8; A&I Br. 42, they cite no evidence suggesting that J&J had

the capacity to pay tens of billions of dollars in defense costs and verdicts for

decades without falling into financial distress.  Even if J&J's financial health were

relevant, the Bankruptcy Court's findings should still be upheld.

## B. LTL's Chapter 11 Filing Serves Valid Bankruptcy Purposes.

Many of the Claimants' and the U.S. Trustee's arguments essentially concede that if this Court affirms the Bankruptcy Court's finding of financial distress, affirmance of the court's good-faith finding follows as a matter of course. *See* TCC Br. 22; U.S. Trustee Br. 14.  Those near-concessions are appropriate; given LTL's financial distress, the validity of LTL's petition is clear.

A good-faith chapter 11 petition must have "a valid reorganizational purpose." *SGL Carbon*, 200 F.3d at 165-166.  Valid reorganizational purposes include "preserving going concerns and maximizing property available to satisfy creditors." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  In the asbestos context specifically, another proper purpose is to distribute the debtor's estate "in a way that is fair for both present *and future* asbestos claimants." *In re W.R. Grace & Co.*, 900 F.3d 126, 130 (3d Cir. 2018) ("*W.R. Grace I*") (emphasis added and citation omitted).

LTL's petition advances these aims.  As the Bankruptcy Court recognized, "the filing of a chapter 11 case with the expressed aim of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code." A16.  The court therefore had "little trouble" finding that LTL's chapter 11 filing "serves to maximize the property available to satisfy creditors by employing

51

the tools available under the Bankruptcy Code to ensure that all present and future

tort claimants will share distributions through the court-administered claims

assessment process." A15. Not only that, but bankruptcy provided the "optimal"

means to redress the harms "of both present and future talc claimants in this case—

ensuring a meaningful, timely, and equitable recovery." A19. The Bankruptcy

Court's proper-purpose finding was a provident exercise of its discretion.

      *1. The bankruptcy maximizes property available to creditors.*

      LTL's bankruptcy petition limits the costs associated with litigating talc

claims—costs that go to defense lawyers instead of claimants. It cost Old JJCI

between $2 million and $5 million to try a single ovarian-cancer claim and there

were nearly 40,000 claims pending at the time of the restructuring. A37, 2170.

Old JJCI incurred $10 million to $20 million *a month* in defense costs prior to the

restructuring. *See* A36, 458. These amounts would have jumped exponentially

when the roughly 35,000 claims that had been consolidated into the New Jersey

multidistrict litigation were remanded to their home jurisdictions after completion

of pretrial proceedings, requiring LTL to try the individual issues in every case.

*See* A23, 459, 6101.

      Bankruptcy is far-more efficient. Rather than litigating causation over and

over and damages case-by-case, bankruptcy allows the Bankruptcy Court to

estimate in one centralized proceeding LTL's "potential personal injury tort

liabilities as an incident of the development of a plan of reorganization." *A.H.*
*Robins*, 788 F.2d at 1012. Estimation of claims through bankruptcy spares the
debtor and claimants "the time and expense" of tens of thousands of "personal
injury trials of the claims," and thus ensures that piecemeal litigation "will not
deplete the estate and leave other creditors with empty judgments." *Id.* at 1012-13
(citation omitted). Given "the realities of modern litigation" and "the stupendous
costs that would be involved if all the claims" had to be tried, if "the claimants as a
whole are to realize reasonable compensation for their claims, it is obviously in the
interest of the class of claimants as a whole to obviate the tremendous expense of
trying these cases separately." *Id.* at 1013 (citation omitted).

Accordingly, as the Bankruptcy Court explained, LTL's petition will
"dramatically reduce costs" by avoiding the expense of adjudicating claims case by
case. A15. Bankruptcy will allow LTL and Claimants to take advantage of "the
efficiencies found in the claims allowance and estimation processes." A17-18. In
bankruptcy, LTL and the Claimants can negotiate a global resolution to talc claims
through a confirmed reorganization plan and settlement trust "that can promptly,
efficiently, and fairly compensate claimants." A9. Claimants then have a choice
"between receiving guaranteed compensation" under the trust or "pursuing
recovery against the trust[] through jury trials." A25. That is, claimants may
proceed through the tort system if they choose, but must adhere to trust-distribution

53

procedures that will typically "place timing restrictions and caps on compensatory and punitive damage recoveries" to facilitate prompt recoveries and ensure that no claimant obtains a grossly disproportionate award at the expense of others.  A25. Bankruptcy therefore strikes a balance—giving all claimants an opportunity for a much faster recovery if they choose while allowing claimants to pursue their claims through the tort system without prejudicing others.

In addition, LTL's chapter 11 petition preserves value for tort claimants by reducing the costs that would have resulted from Old JJCI entering bankruptcy.  As the Bankruptcy Court explained, sending all of Old JJCI into bankruptcy would have imposed "massive disruptions to operations, supply chains, vendor and employee relationships, ongoing scientific research, and banking and retail relationships—just to name a few impacted areas," which would have invariably reduced the assets available for Claimants.  A47.  Most of Old JJCI's business had nothing to do with Johnson's Baby Powder, and sparing it from bankruptcy saves "hundreds of millions of dollars that would be spent on professional fees alone," which "would be better directed to a settlement trust for the benefit of the cancer victims."  *Id.*  Sparing Old JJCI from bankruptcy also avoids the devaluation that could result from sending all of Old JJCI into reorganization.  As the Bankruptcy Court found, much of Old JJCI's value would be "wasted" in bankruptcy, and this "value could be better used" to pay out claims.  *Id.*

> **2.** *The bankruptcy provides more equitable and timely recovery for current claimants.*

As the U.S. Trustee acknowledges, one of the principal purposes of bankruptcy is "to ensure that creditors are treated fairly." U.S. Trustee Br. 7. But talc litigation has yielded uneven results and delays that are deeply unfair to certain claimants and will become increasingly difficult to justify.

Talc litigation has already proven inequitable even for existing claimants. A handful have obtained million-dollar or billion-dollar judgments; others have settled for far less; and many others with functionally identical claims have walked away with nothing. *See* A26. As the Bankruptcy Court acknowledged, "there have been sizable multi-million and multi-billion dollar verdicts in favor of handful of plaintiffs who were fortunate to have their claims brought in front of a jury." A24-25. But these cases were the rare exception, and the huge payoffs obtained by some gave them "preferential treatment in comparison to other similarly situated claimants" who received far less or nothing. *Id.*

The mass-tort system is also beset by unacceptable delays. It would have taken decades or more to resolve LTL's current inventory, A7268, and future claims would drag the claims-resolution process out even further, A20. There is simply no way the tort system could conceivably keep up with, much less clear, the backlog. The Bankruptcy Court therefore correctly recognized that the "tort system has struggled to meet the needs of present claimants in a timely and fair

55

manner," adding that some cases have been "pending for a half dozen or more years and remain years away from trial dates, not to mention the substantial delays they face in the inevitable appeals process." A20, 24.

The Bankruptcy Court, by contrast, has made clear that it intends to proceed "at a far more expeditious pace" than the tort system and that it will not tolerate undue delay or prejudice to claimants. A29. The Bankruptcy Court has already appointed Kenneth Feinberg, one of the nation's leading mass-tort mediators, as an estimation expert to forecast the value of current and future talc claims against LTL—an important step toward developing and approving a plan. Order Identifying Proposed Court-Appointed Expert, *In re LTL Mgmt., LLC*, No. 21-30589-MBK (Bankr. D.N.J. July 28, 2022), ECF No. 2791. And the Bankruptcy Court expects Feinberg to complete his work not years from now, but "before the weather turns cold." Dietrich Knauth, *Judge appoints Kenneth Feinberg to evaluate J&J cancer claims in bankruptcy*, Reuters (July 28, 2022), https://tinyurl.com/2y6f7zz.

Bankruptcy thus will avoid the delays that would prevent many Claimants from recovering in their lifetimes in the tort system and promote equitable recoveries for all Claimants rather than just the lucky few who win the litigation jackpot. This Court and others have noted these benefits. *See, e.g.*, *In re Fed-Mogul Glob., Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an

attractive alternative to the tort system for corporations [facing mass tort claims]
because it permits a global resolution and discharge of current and future liability,
while claimants' interests are protected by the bankruptcy court's power to use
future earnings to compensate similarly situated tort claimants equitably."); *A.H.
Robins*, 788 F.2d at 1012 (Bankruptcy entitles claimants "to have a jury trial of
their claim in the district court," but with the option to collect through bankruptcy,
which avoids the delay caused by "the trial of thousands of personal injury suits in
courts throughout the land spread over an interminable period of time."); *see also*
Georgene Vairo, *Mass Torts Bankruptcies: The Who, the Why and the How*, 78
Am. Bankr. L.J. 93, 98 (2004) (using bankruptcy to resolve mass-tort liabilities
"seeks to provide equality of distribution to creditors in a proceeding that
encompasses the interests of all parties while mitigating the effect that a huge mass
tort liability may have on the worth of a business").  And the Bankruptcy Court
similarly noted these benefits, explaining that claims reconciliation through
bankruptcy places "reduced evidentiary and causation burdens on the injured and
their families," allowing for more-uniform results among claimants and more-
expeditious payments to claimants and their families.  A29.

> 3. *The bankruptcy ensures equitable treatment among current and future claimants, as Congress envisioned in § 524(g).*

The tort system would have proven especially inequitable for future
claimants.  What makes asbestos different than other mass torts is the long latency

period—the lag between when a claimant is first exposed to asbestos and when she

manifests an asbestos-related disease.  Although Old JJCI stopped selling talc-

based baby powder in 2020, talc plaintiffs allege that mesothelioma and ovarian

cancer have a latency period of up to 50 years, which means that new talc suits

may be filed until 2070, creating distinct classes of present and future claimants.

A3-4, 26, 439-440, 7264.

The different incentives motivating current and future claimants "pose

problems for which our civil procedure rules were not designed."  *In re Energy*

*Future Holdings Corp.*, 949 F.3d 806, 811 (3d Cir. 2020).  The "currently injured"

seek "generous immediate payments," but that "goal tugs against the interest" of

future claimants "in ensuring an ample, inflation-protected fund for the future."

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626  (1997).

Section 524(g) "provides an appropriate framework for dealing with these

problems."  Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-*

*Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2056 (2000).  Congress

recognized that debtors facing long-term asbestos liability "may not be able to

emerge from bankruptcy without a true sense of their future liabilities," and "if

these companies cannot emerge from bankruptcy, future claimants may not have

access to redress for asbestos-related harm."  *In re W.R. Grace & Co.*, 13 F.4th

279, 283 (3d Cir. 2021) ("*W.R. Grace II*").  Congress thus enabled "bankruptcy

courts to establish a trust for future claimants as part of a debtor company's

reorganization plan." *Id.* The trust mechanism ensures "that future claimants are

assured restitution," *id.*, and resolves asbestos bankruptcies "in way that is fair for

both present and future asbestos claimants," *W.R. Grace I*, 900 F.3d at 130

(citation omitted). Indeed, Congress included in § 524(g) "a requirement that the

bankruptcy court appoint a legal representative for the purpose of protecting the

rights of future claimants." *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 367 (3d Cir.

2022) (alterations and quotation marks omitted).

As the Bankruptcy Court concluded, LTL's decision "to seek resolution of

the present and future talc claims within the bankruptcy system, through a § 524(g)

asbestos settlement trust in lieu of continued state court litigation, is consistent

with congressional objectives dating back to implementation of the § 524 asbestos

provisions." A49. For that reason, too, LTL's bankruptcy petition was filed in

good faith.

### C. Old JJCI's Corporate Restructuring Did Not Harm Talc Claimants And Is Not Evidence Of Bad Faith.

Lacking arguments about LTL's actual bankruptcy, Claimants principally

attack Old JJCI's pre-petition division into New JJCI and LTL. Claimants assert

that the restructuring seeks to "shield Old JJCI's assets and revenues," A&I Br. 29;

that Old JJCI sought to "protect itself against excessive demands," Mesothelioma

Br. 8 (citation omitted); and that LTL's bankruptcy was "designed to isolate the

59

asbestos claimants from the overall corporate enterprise," AWKO Br. 19-20

(citation omitted).  But these breathless allegations do not survive first contact with

either the record or the Bankruptcy Court's detailed factual findings.

*First*, Old JJCI's restructuring did not separate Claimants from any value.

To the contrary, the funding agreement ensures that Claimants have access to the

enterprise value of Old JJCI "as a floor amount," *plus* "any additional value in

New JJCI."  A44; *see also* A4316 (funding agreement defining "JJCI Value"),

A4319 (funding agreement detailing J&J and JJCI's funding obligation).  J&J itself

has also guaranteed payment, even though it did not have to.  A44; *see also* A454.

Claimants' contrary narrative is unsupported by the facts.  In detailed

findings, the Bankruptcy Court explained that it was "unpersuaded that the tort

claimants have been placed in a worse position" as a result of the bankruptcy.

A44.  The court confirmed the bankruptcy "is not intended to—and is unlikely

to—impair the ability of talc claimants to recover on their claims" because there

was "no evidence" that LTL or Old JJCI "manufactured a limited fund by

undervaluing or limiting assets."  A23.  And the record did "not reflect assets that

have been ring-fenced, concealed, or removed" because "[n]either J&J nor New

JJCI (nor any J&J affiliate for that matter) are to be released from liability, or their

assets placed out of reach of creditors, absent a negotiated settlement under a plan

in which J&J's and New JJCI's roles and funding contributions warrant a release as a matter of both law and fact."  A31.

Claimants and the U.S. Trustee all but concede that the restructuring and bankruptcy did not actually isolate claimants from assets.  In arguing against LTL's financial distress, Claimants acknowledge that "[t]here is virtually no chance that J&J will be unable to fulfill" its obligations under the funding agreement.  A&I Br. 23.  The U.S. Trustee similarly trumpets that "[u]nder the Funding Agreement, [LTL] has access to up to approximately $61 billion to fund" talc liabilities. U.S. Trustee Br. 15.  As already explained, the funding agreement does not change the financial-distress calculus.  *Supra* pp. 38-41.  But Claimants' recognition that talc claimants will have access to all the value—and potentially more—that would have otherwise been at their disposal underscores that the restructuring did not actually place any of Old JJCI's value out of their reach.  This recognition also makes Claimants' later, contradictory warnings about the funding agreement's risks ring hollow.  *See, e.g.*, A&I Br. 26 (warning of "the risk that the capped amount will prove insufficient to fully compensate all current and future claimants").

*Second*, lacking any coherent claim of prejudice, Claimants and the U.S. Trustee insist that Old JJCI should have subjected itself to the "rigors of bankruptcy," A&I Br. 30 (citation omitted), by submitting the company to

bankruptcy-court supervision.  U.S. Trustee Br. 18.  Claimants and the U.S.

Trustee repeatedly assert that use of a pre-petition divisional merger "evades" or

"upends" the Bankruptcy Code's "principles," and "procedural safeguards." *E.g.*,

TCC Br. 2-3, 31-58; AWKO Br. 34-38; U.S. Trustee Br. 17-21 (citation omitted).

But Claimants never describe how placing all of Old JJCI in bankruptcy

would have benefited the bankruptcy process.  And Claimants barely even attempt

to respond to the Bankruptcy Court's holding that putting Old JJCI into bankruptcy

would be a net negative for everyone—including Claimants.  Although they argue

that New JJCI and J&J have done nothing to "subject[]" their assets to the

Bankruptcy Court's "supervision" or "control," *see, e.g.*, TCC Br. 1, both have

submitted themselves Bankruptcy Court jurisdiction as necessary to enforce the

funding agreement.  A4325.  In New JJCI's case, the funding agreement makes *all*

of New JJCI's value available to satisfy LTL's bankruptcy obligations.

*Third*, Claimants' suggestion that LTL cannot be a good-faith debtor

because it was created through a pre-petition restructuring conflicts with the

Bankruptcy Code.  Section 109 defines "who may be a debtor."  *Toibb v. Radloff*,

501 U.S. 157, 160 (1991) (citing 11 U.S.C. § 109).  In that provision, "Congress

took care ... to specify who qualifies—and who does not qualify—as a debtor

under the various chapters of the Code," including chapter 11.  *Id.* at 161.

Congress imposed no requirements regarding the purpose of a debtor's creation or

the duration of its existence.  Section 109 includes limited exceptions to who may

seek to reorganize under chapter 11, but none applies to LTL.  11 U.S.C. § 109(b),

(d).  "The Code contains no ongoing business requirement for reorganization under

Chapter 11," and courts should not, beyond Congress's words, "infer the exclusion

of certain classes of debtors from the protections of Chapter 11."  *Toibb*, 501 U.S.

at 161.  "Absent some showing of harm" to creditors, nothing "warrants an

inference that Congress intended to exclude" debtors other than those Congress

already excluded.  *Id.* at 164-165.

*Fourth*, Claimants ignore that courts have repeatedly upheld the use of a

divisional merger or similar restructuring prior to a bankruptcy filing.  In *Garlock-*

*Coltec*, for example, a company transferred most of its assets to a new subsidiary

while transferring its asbestos liabilities and certain other assets to a different

subsidiary that immediately filed for chapter 11 protection.  *See In re LTL Mgmt.,*

*LLC*, No. 21-30589-MBK (Bankr. D.N.J. July 28, 2022), ECF No. 956-11 at 24-

25.  The restructuring's purpose was to pave the way for a § 524(g) trust while

"avoid[ing] disruption and damage to" to the broader business.  *Id.* at 31.  The

claimant representatives there *supported* the restructuring and the ultimate plan,

and the district court easily concluded that the bankruptcy "has been proposed in

good faith and not by any means forbidden by law," adding that the debtor and

claimants "used their best efforts to negotiate an agreement that will provide a fair

and equitable mechanism for the orderly resolution of all present and future

Asbestos Claims." *In re Garlock Sealing Techs. LLC*, No. 3:17-cv-00275, 2017

WL 2539412, at *18 (W.D.N.C. June 12, 2017).

Likewise, in *Paddock*, a company underwent a corporate restructuring that

separated the company's legacy asbestos liabilities from its active operations,

while maintaining the debtor's ability to access the value of the company's active

operations to support its liabilities. *See* Declaration of David J. Gordon, *In re*

*Paddock Enters., LLC*, No. 20-10028 (Bankr. D. Del. Jan. 6, 2020), ECF No. 2.

The bankruptcy court confirmed a plan jointly proposed by the debtor, the asbestos

committee, and the future claimants' representative. *See* Findings of Fact,

Conclusions of Law, and Order Confirming Third Am. Plan of Reorganization, *In*

*re Paddock Enters. LLC*, No. 20-10028 (Bankr. D. Del. May 26, 2022), ECF No.

1406 ("*Paddock* FOF/COL").

The same was true in *In re Quigley Co.*, where the bankruptcy court

confirmed a plan involving a similar pre-bankruptcy restructuring. *See* 437 B.R.

102, 126 (Bankr. S.D.N.Y. 2010).  Although the claimants and U.S. Trustee moved

to dismiss and made many of the same bad-faith arguments Claimants make here,

the court denied the motion and ultimately approved the plan, necessarily finding

that the bankruptcy petition was filed in good faith.  *See* Findings of Fact,

Conclusions of Law, and Order Confirming Chapter 11 Plan, *In re Quigley Co.*,

No. 04-15739 (Bankr. S.D.N.Y. July 2, 2013), ECF No. 2670.

 *Bestwall*, *DBMP*, and *Aldrich Pump*, meanwhile, used the same Texas

divisional-merger statute Old JJCI did.  In *Bestwall*, the bankruptcy court rejected

arguments virtually identical to the ones pressed here, explaining that, in light of

the funding agreement, the debtor "has the full ability to meet all of its

obligations."  605 B.R. at 49.  The court likewise rejected the argument that the

restructured company "might seek to evade its performance obligations" under the

funding agreement, explaining that these concerns "can be addressed in the plan

confirmation process."  *Id.* at 50.  In both *DBMP* and *Aldrich Pump*, the

bankruptcy court recognized that motions to dismiss for bad faith "would likely

fail" for similar reasons.  *See DBMP*, 2021 WL 3552350, at *23; *Aldrich Pump*,

2021 WL 3729335, at *26.

 Claimants make no effort to distinguish any of these cases or to explain why

the approach approved there is improper here.  Claimants instead effectively ask

this Court to adopt a new bright-line rule prohibiting a good-faith finding in any

bankruptcy involving the grant of third-party releases to the solvent parents of

reorganized subsidiaries, or any bankruptcy that involves a pre-petition

restructuring.  The Court should decline the invitation.  The Code grants the

bankruptcy court discretion to consider all the facts and decide whether, in that

context, the release is evidence of bad faith.  Only Congress can change that

standard.  *Cf.* Press Release, Jerry Nadler, Chairman Nadler Statement for

Subcommittee Hearing on "Oversight of the Bankruptcy Code, Part 1: Confronting

Abuses of the Chapter 11 System" (July 28, 2021), *available at*

https://tinyurl.com/3btcw63k (describing draft legislation that would change the

Bankruptcy Code to prohibit the use of nondebtor releases in bankruptcy

proceedings).

### D. LTL's Chapter 11 Filing Was Not Undertaken To Secure An Unfair Tactical Litigation Advantage.

Filing a chapter 11 petition "merely to obtain tactical litigation advantages is

not within the legitimate scope of the bankruptcy laws."  *SGL Carbon*, 200 F.3d at

165 (quotation marks omitted).  But, as the Bankruptcy Court explained, LTL's

restructuring and bankruptcy were undertaken to comprehensively resolve LTL's

talc liabilities, not merely to secure a tactical litigation advantage.  A15, 37.

Claimants and the U.S. Trustee have no persuasive response.

*First*, Claimants and the U.S. Trustee argue that LTL's petition was

impermissibly filed to stay pending tort litigation.  *See* TCC Br. 13; A&I Br. 16;

Mesothelioma Br. 8.  But LTL did not petition for bankruptcy because of a "desire

to stay pending litigation."  *BEPCO*, 589 F.3d at 620 (quoting *Integrated Telecom*,

384 F.3d at 128).  LTL's bankruptcy petition advances numerous legitimate

bankruptcy purposes, *see supra* pp. 51-59, and a litigation stay is necessary to

achieve them.  Every argument that Claimants and the U.S. Trustee make with respect to LTL's assertedly improper goal could be leveled at any bankruptcy filed to resolve litigation liabilities.  A chapter 11 petition will *always* have the effect of "halt[ing]" suits by "securing an ... automatic stay" as the parties seek to develop a bankruptcy plan.  *See* A&I Br. 27.  *Every* bankruptcy case will "avoid" the tort procedures that would otherwise govern asbestos claims.  *See* TCC Br. 24.  And because *every* case involving an automatic stay will have the effect of temporarily halting litigation outside the bankruptcy system, the case implicates the Seventh Amendment jury-trial right only to the extent that *every* automatic stay implicates that right.  *See* TCC Br. 38-39.  In any event, as the Bankruptcy Court observed, the "Seventh Amendment jury rights of talc plaintiffs would remain intact under a properly drafted and approved plan," A26, and claimants cite no contrary case.

Staying litigation until the Bankruptcy Court can confirm the creation of a § 524(g) trust is particularly important because one of the principal purposes of a § 524(g) trust is to ensure that a race by current claimants to obtain judgments against the debtor does not "unfairly disadvantage future claimants." *Imerys Talc Am.*, 38 F.4th at 367.  Claimants' briefs conspicuously never address that risk, perhaps because they have every incentive to get paid now without worrying about what will be left for others later.  That is precisely the result that Congress created the detailed procedures of § 524(g) to avoid.

*Second,* claimants assert that the Bankruptcy Court rejected their arguments only by making "ad hoc policy judgments" that should be left to Congress.  TCC Br. 26 (capitalization altered); *see also* A&I Br. 17 (faulting court for making a "policy determination"); AKWO Br. 41 (court's conclusions were "largely in the nature of policy choices").  Not at all.  The Bankruptcy Court merely applied this Court's precedent about what qualifies as a valid bankruptcy purpose.  To the extent the requisite analysis involved policy judgments, that is because "the doctrine of 'good faith'" is all about whether a debtor has complied with "the Code's underlying principles."  *SGL Carbon*, 200 F.3d at 161 (citation omitted).

There was accordingly nothing improper or unusual about the Bankruptcy Court observing that "bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case" when considering whether LTL's bankruptcy petition would advance the Bankruptcy Code's purposes.  A19.  Indeed, it would have been improper *not* to consider the issue.  No doubt for that reason, Claimants make the very kinds of policy arguments that they fault the Bankruptcy Court for considering.  *See, e.g.*, TCC Br. 38 (urging this Court to reverse on the ground that this bankruptcy "threatens the public interest" (capitalization altered)).

*Third*, Claimants assert that LTL's bankruptcy resembles cases where this Court and the Supreme Court have found improper purposes. But none of their cases are remotely on point.

Claimants describe this case as "eerily similar" to *Shapiro v. Wilgus*, 287 U.S. 348 (1932). Mesothelioma Br. 2, 8-10; *see also* A&I Br. 30. But *Shapiro* was not even a bankruptcy case. It involved a conveyance to a shell corporation to circumvent a state law prohibiting appointment of a receiver for individually owned businesses. 287 U.S. at 353. The conveyance was designed for the "sole purpose" of divesting "the debtor of his title" and putting title "in such a form and place that levies would be averted." *Id.* at 353-354. And the debtor made this conveyance not to facilitate a global resolution of liabilities through bankruptcy, but instead to delay his creditors based on belief that he would "weather a financial storm" and then "pay his debts in full." *Id.* at 354. *Shapiro* has nothing to do with this case.

Claimants also rely on *BEPCO*. *See* TCC Br. 26 (asserting "*BEPCO* makes this an *a fortiori* case"); *see also* A&I Br. 25; U.S. Trustee Br. 14-16. But in *BEPCO*, unlike here, the bankruptcies "did not add or preserve value that would otherwise be unavailable to creditors outside of bankruptcy." 589 F.3d at 620. Claimants point to *BEPCO*'s statement that the timing of the bankruptcy petitions there suggested that "they were filed primarily as a litigation tactic to avoid

liability" in a pending class action suit, *id.* at 625, and Claimants assert that this case is similar because the bankruptcy here was undertaken in "direct response" to the U.S. Supreme Court's denial of certiorari in *Ingham*.  TCC Br. 25; *see also* A&I Br. 25-26.  But unlike in *BEPCO*—where the debtors sought to *avoid* a particularly substantial judgment—the bankruptcy here occurred after Old JJCI *paid* a massive judgment.  The Supreme Court's decision not to review the *Ingham* $2.1 billion judgment dramatically raised estimates of Old JJCI's talc liability, *see* A434-435, 7123-24, and it should therefore come as no surprise that *Ingham* contributed to the Old JJCI's decision to restructure and seek bankruptcy protection.

*Fourth*, Claimants and the U.S. Trustee are wrong that the "Code's structure and principles" prohibit permanently enjoining talc suits against the Protected Parties, such that a petition brought ultimately to seek such a permanent channeling injunction must be a bad-faith stall tactic.  *See, e.g.*, TCC Br. 31 (capitalization altered); U.S. Trustee Br. 18-19 & n.1.

The Bankruptcy Court can enjoin tort suits against the Protected Parties either by confirming that § 362(a)'s automatic stay applies to them or by preliminarily enjoining them under § 105 until a channeling injunction is entered under § 524(g).  *Infra* pp. 76-99.  A § 524(g) channeling injunction can "bar any action directed against a third party"—that is, a nondebtor—who "is alleged to be

70

directly or indirectly liable for the conduct of, claims against, or demands on the

debtor." 11 U.S.C. § 524(g)(4)(A)(ii). That includes cases where the nondebtors'

alleged liability relates to "the third-party's involvement in a transaction changing

the corporate structure ... of the debtor or a related party." *Id.*

§ 524(g)(4)(A)(ii)(IV). The Bankruptcy Code thus allowed the Bankruptcy Court

to enjoin suits against nondebtor affiliates like J&J and New JJCI.   And for that

reason, in other cases involving pre-petition restructurings analogous to the

restructuring here, courts have concluded that injunctive relief in favor of

nondebtors was appropriate. *See Garlock*, 2017 WL 2539412, at *21 ("each

Asbestos Protected Party falls within the categories of nondebtors protectable

under Section 524(g)"); *In re Bestwall LLC*, 606 B.R. 243, 254-258 (Bankr.

W.D.N.C. 2019); *DBMP*, 2021 WL 3552350, at *41, *43; *Aldrich Pump*, 2021 WL

3729335, at *33, *38; *Paddock* FOF/COL, *supra*.[4]

---

[4] Claimants challenge LTL's ability to confirm a plan by advancing the novel
argument that LTL is ineligible for § 524(g) because it was not substituted as a
defendant in the talc litigation prior to filing bankruptcy. *See* TCC Br. 30; A&I Br.
52 n.9; AWKO Br. 4. That argument fails at the outset because, as the Bankruptcy
Court noted, LTL "in fact has been named in pending suits." A29. Furthermore,
this issue is premature and can be addressed at plan confirmation. *See In re W.R.
Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008) ("The ACC asserts that
Debtors cannot prevail on the merits because BNSF will never be entitled to a
§ 524(g) injunction on the basis of derivative liability. That, however, is not the
test in a bankruptcy reorganization case.") (citation omitted). In any event, the
Court answered Claimants' premature contention by correctly citing Civil Rule
25(c): "The causes of action held by talc plaintiffs are owing by Debtor as

*Finally*, claimants make a host of arguments directed at the perceived injustices of bankruptcy proceedings that haven't happened yet.  Claimants suggest, for example, that LTL's proposed bankruptcy plan will not pay them enough.  But "[m]any statutory prerequisites designed to ensure fairness must be met before a trust is formed and a channeling injunction entered under § 524(g)." *W.R. Grace I*, 900 F.3d at 130.  Chief among them is that claimants "must approve of any plan employing a § 524(g) trust by a 75% super majority."  A32; *see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  LTL has a strong incentive to negotiate a plan that will receive strong support from Claimants; if the bankruptcy fails, LTL will be forced to return to the tort system on future claims.

Some claimants and the U.S. Trustee vaguely suggest either that the funding agreement was a fraudulent conveyance or that some future conveyance may place assets out of LTL's creditors' reach.  *See* U.S. Trustee Br. 21; TCC Br. 33.  This was one of Claimants principal arguments below, but they now all but abandon it.  That is likely because the funding agreement is plainly not fraudulent, because there is no question that LTL will satisfy its obligations, and, most importantly, because this is a question that can be resolved through an adversary proceeding if there are any colorable claims to be made on LTL's behalf.  *See* 11 U.S.C.

---

successor in interest to Old JJCI and, consequently, Debtor substitutes for Old JJCI in all federal actions as a matter of law."  A29.

§ 544(b); *Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd.
P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent
conveyance law is to make available to creditors those assets of the debtor that are
rightfully a part of the bankruptcy estate, even if they have been transferred
away.").  Claimants have had the opportunity to seek to unwind the funding
agreement as a fraudulent transfer, but have conspicuously declined to do so.  The
same goes for any hypothetical future transfer by LTL, New JJCI, and J&J.  *See*
A4325 (New JJCI and J&J submitting themselves to bankruptcy court jurisdiction
to enforce the funding agreement).  The Bankruptcy Court will always have
jurisdiction to protect against fraudulent conveyances.

Claimants object that funding will be "largely unavailable until there is a
confirmed plan after appeals are exhausted."  TCC Br. 22; *see also* A&I Br. 21.
That is also true of tort suits:  Defendants typically post a bond to secure any
judgment entered against them and do not pay until appeals are exhausted.  *See*,
*e.g.*, Fed. R. Civ. P. 62(b).  Claimants' objection to this feature of the funding
agreement is an objection to a feature of tort litigation outside of the bankruptcy
system.

Claimants also suggest that LTL will seek to "pressur[e] claimants to settle
by threatening" to delay the bankruptcy proceedings.  A&I Br. 16; *see also* TCC
Br. 49.  But Claimants do not cite any evidence of LTL using the bankruptcy

proceedings as a delay tactic. And if LTL wanted to stall for time, it would have left claims in the tort system. After all, it "would take *decades* to resolve the currently pending claims in the tort system." A7268.

### E. Unusual Circumstances Also Preclude Dismissal.

Although a bad-faith bankruptcy petition usually must be dismissed, a bankruptcy court "may not" dismiss a case if, among other things, "the court finds and specifically identifies unusual circumstances" showing that dismissal "is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2). The Bankruptcy Court thus "retains discretion in evaluating whether there are unusual circumstances." *In re Korn*, 523 B.R. 453, 465 (Bankr. E.D. Pa. 2014) (quotation marks omitted).

The Bankruptcy Court here held that even if LTL's petition was not in good faith, "the interests of current tort creditors and the absence of viable protections for future tort claimants outside of bankruptcy" would amount to "unusual circumstances" that preclude dismissal. A13 n.8. This finding was reasonable. Even if LTL's petition would not otherwise satisfy this Court's good-faith standard, the need to provide timely recoveries for current claimants, and the compelling interest in ensuring that future claimants are not prejudiced by large payments made to current claimants, would independently require affirmance of the Bankruptcy Court's judgment.

Claimants contend that the Bankruptcy Court did not make all of the findings necessary to support an unusual-circumstances determination. They assert, for example, that "*the court* must find a reasonable likelihood that a plan will be confirmed within a reasonable period of time." A&I Br. 55 (emphasis added and quotation marks omitted); *see also* TCC Br. 45-46. But the statute requires "the debtor or any other party in interest," not "the court," to establish the requisite "reasonable likelihood" that the bankruptcy plan will be approved within a reasonable period, and LTL easily satisfied that minimal obligation. 11 U.S.C. § 1112(b)(2). In any event, the Bankruptcy Court found LTL is likely to successfully reorganize, A186-187, and that it would do so in a "timely" manner. A19.

Claimants maintain that dismissal on bad-faith grounds precludes consideration of unusual circumstances. *See* A&I Br. 55. But that argument misconstrues § 1112(b)(2)(B). When Congress provided that a bankruptcy petition could survive based on "unusual circumstances" where "an act or omission of the debtor" was supported by a "reasonable justification" and could be "cured within a reasonable period of time," it was referring to the sort of "act[s] or omission[s]" specifically enumerated in § 1112(b)(4) as "cause" for dismissal. 11 U.S.C. § 1112(b)(2)(B), (b)(4). Each of these "act[s] or omission[s]" addresses misconduct *during the bankruptcy case*—such as estate mismanagement, failure to

maintain insurance, unauthorized use of collateral.  *Id.*  By contrast, dismissal on

grounds of bad faith in initiating the case is not of that sort and is a "cause"

judicially inferred apart from those in § 1112(b)(4).  Nothing about § 1112(b)(4)

prohibits bankruptcy courts from declining to dismiss what would otherwise be a

bad-faith filing when doing so would be in the creditors' best interest.

## II.    THE BANKRUPTCY COURT CORRECTLY STAYED TORT CLAIMS AGAINST LTL'S NONDEBTOR AFFILIATES, INSURERS, AND THIRD-PARTY RETAILERS.

In the adversary proceeding, the Bankruptcy Court held that the § 362(a)

automatic stay prohibits the commencement or continuation of talc-related claims

against LTL's affiliates, insurers, and third party retailers, a group that the

Bankruptcy Court collectively referred to as the Protected Parties.  A196-197.  The

Bankruptcy Court also concluded that LTL was entitled to a preliminary injunction

staying talc-related claims against the same entities under § 105(a).  A148, 193.

Claimants contend that the Bankruptcy Court lacked the authority to enjoin

actions against the Protected Parties.  TCC Br. 44-61.  But the Claimants do not

dispute the central reason why the relief entered by the Bankruptcy Court is critical

to LTL's reorganization:  Without it, talc plaintiffs will seek to prosecute the same

talc-related lawsuits against the Protected Parties instead of LTL.  Given LTL's

indemnification obligations to the Protected Parties, those suits would "defeat the

purpose of § 362" by preventing "centraliz[ation] [of] all prebankruptcy civil

claims against a debtor in the bankruptcy court." *McCartney*, 106 F.3d at 511.

That is why courts routinely apply the automatic stay in cases like this. *See, e.g.*,

*A.H. Robins*, 788 F.2d at 999-1000; *Bestwall*, 606 B.R. at 254-258; *Aldrich Pump*,

2021 WL 3729335, at *33, *38; *In re Lyondell Chem. Co.*, 402 B.R. 571 (Bankr.

S.D.N.Y. 2009). The Bankruptcy Court's stay should be affirmed.

### A. The Bankruptcy Court Correctly Concluded That § 362(a)'s Automatic Stay Prohibits Prosecution Of Talc-Related Claims Against LTL's Affiliates, Insurers, And Third-Party Retailers.

Section 362(a) of the Bankruptcy Code provides that a bankruptcy petition

"operates as a stay, applicable to all entities, of" any "proceeding against the debtor

that was or could have been commenced before" the petition, and of any attempt

"to recover a claim against the debtor that arose before the commencement of the

case under this title." 11 U.S.C. § 362(a)(1). The petition also automatically stays

"any act to obtain possession of property of the estate ... or to exercise control over

property of the estate," regardless of whether the suit is against the debtor or

another entity. *Id.* § 362(a)(3).

Section 362(a)'s robust automatic stay "allows the bankruptcy court to

centralize all disputes concerning property of the debtor's estate in bankruptcy

court so that reorganization can proceed efficiently, unimpeded by uncoordinated

proceedings in other arenas." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d

Cir. 1990). It protects the debtor by "giving the debtor a respite from creditors and

a chance to attempt a repayment or reorganization plan" and "creditors by

preventing particular creditors from acting unilaterally in self-interest to obtain

payment from a debtor to the detriment of other creditors." *In re Denby-Peterson*,

941 F.3d 115, 122 (3d Cir. 2019) (quotation marks omitted).

The Bankruptcy Court held that § 362's automatic stay enjoined not only

suits against LTL, but also talc-related claims made against the Protected Parties.

As the Bankruptcy Court explained, these suits were stayed under § 362(a)(1)

because "the nondebtor Protected Parties and [LTL] enjoy such an identity of

interests that a lawsuit asserting talc-related claims against the Protected Parties is

essentially a suit against" LTL.  A158.  The suits were also stayed under

§ 362(a)(3) because "the talc claims have an undeniable impact on Debtor's

estate."  A160.  Either alone would justify the stay, and here both were correct.

> 1. *The Bankruptcy Court correctly held that the automatic stay can
> extend to nondebtors like the Protected Parties.*

Some Claimants ask whether there is a jurisdictional basis for the automatic

stay to extend to nondebtors.  TCC Br. 45-46.  But it is elemental that anything

within § 362's scope is within the Bankruptcy Court's core jurisdiction.  The

bankruptcy courts have jurisdiction over all civil proceedings arising under the

Bankruptcy Code.  28 U.S.C. § 1334(b).  A proceeding "arises under" the Code "if

it invokes a substantive right provided by title 11." *Stoe*, 436 F.3d at 216 (citation

omitted).  Section 362's automatic stay is a substantive right. *See A.H. Robins*, 788

F.2d at 999-1000.  The Bankruptcy Court's jurisdiction therefore encompasses the power to declare the automatic stay's scope.  Claimants' "jurisdictional" framing is just a different way of asking, on the merits, what the § 362 stay enjoins.

For that reason, Claimants' cases finding no jurisdiction to enter an injunction under § 105 are inapposite.  *See* TCC Br. 49, 54-55 (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) and *Federal-Mogul Glob. Inc.*, 300 F.3d 382 (3d Cir. 2002)).  A bankruptcy court considering the scope of § 362's automatic stay is always exercising arising-under jurisdiction.

Jurisdiction aside, the automatic stay can enjoin actions against nondebtors in certain circumstances.  *Contra* TCC Br. 44, 57-58.  Section 362(a)(1)'s text provides that any action "against the debtor that was or could have been commenced before the commencement of the case under this title, *or* to recover a claim against the debtor that arose before the commencement of the case under this title" are subject to the automatic stay.  11 U.S.C. § 362(a)(1) (emphasis added).  "The latter category"—recovering a claim against the debtor—"must encompass cases in which the debtor is not a defendant; it would otherwise be totally duplicative of the former category and pure surplusage."  *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992).

Thus, although it is generally true that "section 362(a) stays actions only against a 'debtor,'" in "unusual circumstances" courts can, and often do, "appl[y]

the automatic stay protection to nondebtor third parties." *McCartney*, 106 F.3d at

509-510 (citation omitted).  These "unusual circumstances" include those in which

"there is such identity between the debtor and the third-party defendant that the

debtor may be said to be the real party defendant and that a judgment against the

third-party defendant will in effect be a judgment or finding against the debtor," or

alternatively, "where stay protection is essential to the debtor's efforts of

reorganization." *Id*. at 510 (citation omitted).

For example, in *McCartney*, this Court held that § 362's automatic stay

prevented a state-court action against a nondebtor third party.  106 F.3d at 511.

The debtor was a guarantor for a loan to a nondebtor-borrower, and the nondebtor-

borrower had secured the loan with a parcel of land.  *Id.* at 508.  The debtor-

guarantor argued that the lender's failure to file a deficiency judgment action

discharged the debtor-guarantor's liability, *id.*, but this Court disagreed, explaining

the automatic stay forbid the lender from complying with a state-law deficiency-

judgment-action requirement because "any deficiency judgment recovery from [the

nondebtor-borrower] would have necessarily impacted upon [the debtor-

guarantor's] estate," *id.* at 511.

As the Bankruptcy Court correctly observed, *McCartney* is "an endorsement

of § 362 as an independent basis for extending the stay" to nondebtor third parties.

A149.  Section 362's automatic stay prevented the lender in *McCartney* from filing

80

an action that named the debtor.  106 F.3d at 511.  And it did not make sense for

the lender to file an action naming just the nondebtor-borrower alone.  For one

thing, failing to name the debtor-guarantor would "risk discharging him as a loan

guarantor."  *Id*.  But that aside, because the nondebtor third party "no longer had

any assets," the debtor, "as guarantor, would have been liable for satisfying any

deficiency judgment claim asserted by" the lender.  *Id*.  The lender was therefore

"stayed from pursuing a deficiency judgment action against the [nondebtor-

guarantor] because [the debtor-guarantor] was, in essence, the real party in

interest."  *Id*.  This Court's sister circuits have similarly held that § 362(a) can, in

like circumstances, stay an action against nondebtors.[5]

Claimants' cited cases are not to the contrary.  *Combustion Engineering* and

*W.R. Grace* are distinguishable because the orders there sought to enjoin direct

claims against third parties that were not related to the claims against the debtor.

Those claims related to "different products, involv[ing] different asbestos-

---

[5] *See, e.g.*, *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003)
(automatic stay applied to nondebtor third party corporation "because it is wholly
owned by [debtor], and adjudication of a claim against the corporation will have an
immediate adverse economic impact on [debtor]"); *Colonial Realty*, 980 F.2d at
131-132 (automatic stay applied to nondebtor third party who was recipient of
property that was allegedly fraudulently transferred from debtors); *In re A.H.
Robins Co.*, 828 F.2d 1023, 1024 (4th Cir. 1987) (automatic stay applied to
nondebtor third party insurer of debtor); *see also, e.g.*, *Ritchie Cap. Mgmt., L.L.C.
v. Jeffries*, 653 F.3d 755, 762 (8th Cir. 2011) (acknowledging that bankruptcy court
can stay cases against nondebtors in unusual circumstances); *Reliant Energy
Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (same).

containing materials, [that] were sold to different markets." *Combustion Eng'g*, 391 F.3d at 231. And the debtor "w[ould] not be bound by any judgment against the third party in question." *In re W.R. Grace & Co.*, 591 F.3d 164, 172 (3d Cir. 2009). In contrast, the claims against J&J are the exact same claims asserted against LTL; the Bankruptcy Court found that they involve "the *same* products, *same* time periods, *same* alleged injuries, and *same* evidence." A158 (emphases added); *see also* A3963.

Contrary to Claimants' arguments (TCC Br. 58), the automatic stay can enjoin actions against nondebtors even when the nondebtor has independent liability for the asserted claim. The nondebtor borrower in *McCartney* was, for instance, independently—and primarily—liable for the loan at issue there. *See* 106 F.3d at 508. As guarantor, the debtor was only "secondarily liable for any deficiency entered against" the nondebtor-borrower. *Id.* at 511. The unusual-circumstances exception allowing the automatic stay to extend to nondebtors does not itself except joint tortfeasors.

Nor, contrary to Claimants' assertion (TCC Br. 58), would the Fourth Circuit reach a different result than the Bankruptcy Court below. Although the Fourth Circuit has cited with approval a District of Connecticut bankruptcy court that said the automatic stay did not apply to a "third-party defendant" who "was 'independently liable,'" the Fourth Circuit went on to explain—just two sentences

later and in language Claimants omit—that "where ... a debtor and nondebtor are
so bound by statute or contract that the liability of the nondebtor is imputed to the
debtor by operation of law, then the Congressional intent to provide relief to
debtors would be frustrated by permitting indirectly what is expressly prohibited in
the Code." *A.H. Robins*, 788 F.2d at 999 (quoting *In re Metal Ctr., Inc.*, 31 B.R.
458, 462 (Bankr. D. Conn. 1983)).  In those circumstances, "'[c]learly the debtor's
protection must be extended to enjoin litigation against others if the result would
be binding upon the debtor's estate,' and this is so, whether the debtor is a party or
not." *Id.* (citation omitted).  And here, the Bankruptcy Court found—
notwithstanding the Protected Parties' potential independent liability—that LTL is
so bound to them by contract that LTL's liability cannot be separated from the
Protected Parties'.  A162-163.  Claimants' reference to *A.H. Robins*' joint-
tortfeasor analysis is therefore "misleading." A162.

> 2. *The Bankruptcy Court did not clearly err in applying § 362(a)'s
> automatic stay to the Protected Parties.*

The Bankruptcy Court correctly concluded that § 362(a)'s automatic stay
applies to the Protected Parties because they share such an identity of interests with
LTL in respect to those actions that LTL is, in effect, the real-party defendant. *See
McCartney*, 106 F.3d at 511.  In 1979, Old JJCI became responsible for J&J's
liabilities associated with Johnson's Baby Powder and other allegedly talc-
containing products. *See* A2-3, 447.  Old JJCI no longer exists, and LTL is now

responsible for the talc claims that were previously made against Old JJCI. A450-453. Moreover, LTL has indemnification obligations to the Protected Parties. A158-159, 169-170. Talc claims against the Protected Parties are therefore either (1) actions against LTL "to recover" a prepetition claim, *see* 11 U.S.C. § 362(a)(1); *see also, e.g.*, *In re Heating Oil Partners*, No. 3:08-CV-1976 (CSH), 2009 WL 5110838, at \*6-7 (D. Conn. Dec. 17, 2009) (holding that a default judgment entered as to a predecessor entity of the debtor was automatically stayed upon the successor entity's chapter 11 filing), *aff'd*, 422 F. App'x 15 (2d Cir. 2011), or (2) actions "to exercise control over property of the estate," 11 U.S.C. § 362(a)(3); *see also, e.g.*, *In re SunEdison, Inc.*, 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017) ("Where a third party claim may give rise to a potential indemnification or contribution claim against the estate, the third party claim will have a conceivable effect on the estate, and accordingly, the [c]ourt has the jurisdiction to enjoin it.").

LTL's indemnification obligations are sufficient to "create the required effect on the reorganization." *Contra* TCC Br. 52. As the Bankruptcy Court found, any resolution of Claimants' tort claims against the Protected Parties would necessarily be a drain on LTL's estate because LTL is contractually obligated to pay any judgments entered against the Protected Parties. A160. It would also usurp the Bankruptcy Court's authority because the tort litigation could create an evidentiary record that prejudices LTL or could even bind LTL to a particular

84

result through issue or claim preclusion.  A173-179.  For those reasons, it is

irrelevant whether "claims against non-debtor joint-tortfeasors" could, as the

Claimants argue, "merely replace[] the personal-injury claims of talc claimants

with indemnity claims by affiliates and commercial partners."  TCC Br. 52.  LTL's

liability would have been resolved outside this chapter 11 case, defeating its

purpose and eliminating LTL's chance to reorganize.

Nor are LTL's indemnification obligations to the Protected Parties

"circular."  TCC Br. 52.  For one, once in bankruptcy, LTL can seek funding from

New JJCI or J&J only to fund a § 524(g) trust, not to pay indemnity obligations as

they come due.  *See* A160 (Bankruptcy Court holding); A4234 (funding

agreement).  For another, the funds available under the funding agreement are an

LTL asset.  If the funding-agreement moneys are used to indemnify a Protected

Party, then those moneys are not available to pay the bankruptcy's administrative

expenses or pay claims through a § 524(g) trust.  For a court other than the

Bankruptcy Court to enter a judgment that LTL will have to indemnify makes LTL

essentially the real party in interest in the suit.  And LTL's non-funding-agreement

assets have to be exhausted before it can access the funding agreement.  A160,

4235-27.[6]

---

[6] New Jersey's state law requirement that ambiguity be construed against the
indemnitee cannot save Claimants' argument either.  TCC Br. 53-54.  As permitted

The Bankruptcy Court also correctly concluded that § 362(a)'s automatic stay applies to talc claims against the Protected Parties because allowing talc claims to proceed against them would reduce insurance proceeds available to LTL. A161, 181-184.  Section 362(a)'s stay applies to " any act ... to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held," *id.* § 541(a)(1), meaning that the estate also "includes legal causes of action the debtor had against others at the commencement of the bankruptcy case."  *In re Icarus Holding, LLC*, 391 F.3d 1315, 1319 (11th Cir. 2004).  For that reason, "[i]t has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate."  *ACandS, Inc.*, 435 F.3d at 260 (collecting cases).

As the Bankruptcy Court found, the Protected Parties and LTL are both covered for talc claims under several shared insurance policies.  A181; *see also* A460-462, 1276.  The right to coverage under these policies is property of LTL's

---

by New Jersey law, the Bankruptcy Court found that other record evidence—including "the parties' course of performance" and other "circumstances surrounding the transaction"—resolved any ambiguity in the 1979 agreement. A167 (citation omitted); *see also Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 327-328 (3d Cir. 2006) ("In construing vague provisions, New Jersey courts will imply a reasonable missing term or, if necessary, will receive evidence to provide a basis for such an implication.  In particular, courts will look to, among other things, ... evidence of the parties' course of dealing, usage and course of performance." (quotation marks and citation omitted)).

estate, and prosecution of a claim against the Protected Parties as co-insureds

would deplete proceeds available to LTL and the bankruptcy estate. As the

Bankruptcy Court observed, "it remains *uncontested* that [LTL] shares insurance

policies—which are estate property under 11 U.S.C. § 541(a)—with the Protected

Parties." A153 (emphasis added).

That is a sufficient factual finding "regarding the terms and operation of the"

insurance policies, *Combustion Eng'g*, 391 F.3d at 183, 232-233, to support a stay

of "proceedings against nondebtor co-insureds on the theory that asbestos-related

personal injury claims against the nondebtors will automatically deplete the

insurance proceeds available to the debtor," A183. *Contra* TCC Br. 56-57.

"[W]here litigation" against a nondebtor "would almost certainly result in the

drawing down of insurance policies that are part of the bankruptcy estate of [the

debtor], the exercise of bankruptcy jurisdiction to enjoin these suits [is]

appropriate." *In re Quigley Co.*, 676 F.3d 45, 53-54, 58 (2d Cir. 2012); *see also*

*A.H. Robins*, 788 F.2d at 1001-02 (agreeing with "the weight of authority" that

insurance contracts are property of the estate and that "[a]ccordingly actions

'related to' the bankruptcy proceedings against the insurer ... are to be stayed under

section 362(a)(3)").

The Bankruptcy Court's conclusion that the stay applies to the Protected

Parties is not undermined by the insurers' denial of coverage or Claimants'

allegation that coverage has already been depleted by pre-petition judgments.

*Contra* TCC Br. 56-57.  The Bankruptcy Court examined the insurance coverage

and the pre-petition judgments and made a factual finding that "nearly the entire

policy coverage of $2 billion is potentially still available to [LTL] and J&J."

A182.  And the record supports that finding.  "[O]nly payments made by the

policyholder's insurers erode or exhaust the limits of the policies," and the insurers

have not, so far, made any payments. *Id.* (citation omitted); *see also* A462 (Kim

First Day Declaration).  Additionally, "[a]lthough Old JJCI and J&J have incurred

significant losses from the underlying talc claims," there has been no determination

"regarding the allocation of those talc losses across the policy periods in question."

A182.  Thus, "[t]o the extent suits are permitted to proceed against" Protected

Parties that are insured under LTL's policies, "those parties will incur costs that

will undoubtedly deplete the insurance potentially available to [LTL] for the talc

claims." A183.

### B. In The Alternative, The Bankruptcy Court Properly Exercised Its Authority Under § 105 To Enjoin The Prosecution Of Talc-Related Claims Against LTL's Affiliates, Insurers, And Third-Party Retailers.

Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to

"enjoin parties other than the bankrupt from commencing or continuing litigation"

during the bankruptcy case where such litigation will undermine the debtor's

reorganization. *A.H. Robins*, 788 F.2d at 1002 (quotation marks omitted).  The

Bankruptcy Court here properly enjoined under § 105(a) the talc claims asserted

against LTL and the Protected Parties.  A196.

     *1.  The Bankruptcy Court correctly analyzed its jurisdiction to enjoin
        talc claims against the Protected Parties under § 105.*

Section 105(a) does not provide an independent source of federal subject-

matter jurisdiction, so a court must have another source of jurisdiction before

entering an injunction under it.  *W.R. Grace*, 591 F.3d at 170-171.  The Bankruptcy

Court's § 105(a) injunction here is supported by the court's jurisdiction over "all

civil proceedings arising under title 11, or arising in or related to cases under title

11."  28 U.S.C. § 1334(b); *see also* A151-152 (Bankruptcy Court holding).

*First*, if this Court determines that § 362(a)'s automatic stay does not already

enjoin talc claims against the Protected Parties, then the Bankruptcy Court had

"arising under" jurisdiction to issue the stay because LTL's request for the § 105(a)

injunction is necessary to protect the integrity of the automatic stay, and the

automatic stay is a substantive right under the Bankruptcy Code.  *See A.H. Robins*,

788 F.2d at  999-1000; *supra* pp. 78-79.  The talc claims against the Protected

Parties "are really claims against the debtor and therefore impair the automatic

stay."  *In re Third Eighty-Ninth Assocs.*, 138 B.R. 144, 147 (S.D.N.Y. 1992).

Thus, the § 105 injunction halting claims against the Protected Parties is necessary

to give effect to the § 362 automatic stay protecting LTL.  Given this close link

between the injunction sought and the substantive right in the automatic stay,

"common sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay," as it plainly does, "then it has jurisdiction over a related motion for preliminary injunctive relief." *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *5 (Bankr. E.D.N.Y. Dec. 26, 2012) (quoted in *In re Brier Creek Corp. Ctr. Assocs. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013)) (finding "related to" and "arising under" jurisdiction).

*Second*, the Bankruptcy Court had "arising in" jurisdiction to issue the stay because LTL's request for injunctive relief under § 105(a) is unique to bankruptcy. *See In re Monroe Well Serv., Inc.*, 67 B.R. 746, 753 (Bankr. E.D. Pa. 1986). An injunction tied to and lasting only during a bankruptcy case "by [its] nature, not [its] particular factual circumstance, could only arise in the context of a bankruptcy case." *Stoe*, 436 F.3d at 218. The Bankruptcy Court rested its finding of jurisdiction, in part, on this reasoning. A152-153. Claimants do not refute it.

*Third*, the Bankruptcy Court, at a minimum, had "related to" jurisdiction to enjoin talc claims against the Protected Parties because "the outcome of th[ose] proceedings could conceivably have an[] effect on the estate being administered in bankruptcy." *Pacor*, 743 F.2d at 994. Litigation of talc claims against the Protected Parties outside of bankruptcy court would—more than conceivably—affect LTL's estate and reorganization by materially and adversely drawing down LTL's assets. *Supra* pp. 83-88.

90

As the Bankruptcy Court recognized, "[t]he weight of the case law supports this conclusion."  A153.  Bankruptcy courts invoking § 105's broad authority have consistently stayed claims against nondebtor entities, including a debtor's affiliates, both in mass-tort[7] and non-mass-tort bankruptcies,[8] to maintain the integrity of the debtor's estate and fully effectuate the automatic-stay's protections.

TCC's cases are once more not to the contrary.  TCC Br. 49.  Neither *Pacor* nor *Federal-Mogul* examined bankruptcy-court injunctions against state-court actions; rather, "in both *Pacor* and *Federal-Mogul*, the issue presented was whether the Bankruptcy Court had jurisdiction to remove to the Bankruptcy Court, and thus hear and decide, in the Bankruptcy Court, litigation pending in state court."  *W.R. Grace*, 115 F. App'x at 567; *see also Pacor*, 743 F.2d at 995;

---

[7] *See, e.g.*, Order Granting in Part Mot. for Prelim. Inj., *In re Purdue Pharma L.P.*, No. 19-08289-shl (Bankr. S.D.N.Y. Oct. 11, 2019), ECF No. 82, *aff'd* 619 B.R. 38 (S.D.N.Y. 2020); Order Enjoining Continued Prosecution of Certain Pre-Petition Lawsuits, *In re USA Gymnastics*, No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019), ECF No. 71; Order Granting in Part and Denying in Part Debtors' Mot. for Prelim. Inj., *In re TK Holdings Inc.*, No. 17-50880-BLS (Bankr. D. Del. Aug. 22, 2017), ECF No. 63; *Lyondell Chem. Co.*, 402 B.R. 571; *A.H. Robins*, 788 F.2d at 999-1000.

[8] *See, e.g.*, *In re Am. Film Techs., Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying claims against a debtor's directors); *In re Family Health Servs., Inc.*, 105 B.R. 937, 942-943 (Bankr. C.D. Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor HMO); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that injunction of suits against nondebtor partners should issue); *In re Myerson & Kuhn*, 121 B.R. 145, 160 (Bankr. S.D.N.Y. 1990) (enjoining suits against nondebtor partners).

*Federal-Mogul*, 300 F.3d at 382. Moreover, "[i]t has become clear following *Pacor* that 'automatic' liability is not necessarily a prerequisite for a finding of 'related to' jurisdiction." *In re Dow Corning Corp.*, 86 F.3d 482, 491 (6th Cir. 1996) ("*Dow Corning I*") (citing *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991)). "A key word in [the] test is 'conceivable,' " and any proceeding that "possibl[y] ... may impact on 'the debtor's rights, liabilities, options, or freedom of action' or the 'handling and administration of the bankrupt estate'" creates jurisdiction. *Marcus Hook*, 943 F.2d at 264 (citation omitted).

LTL's indemnification obligations may impact its rights, liabilities, options, or freedom of action by requiring it to dedicate its available funding to paying those claims instead of paying for its bankruptcy and funding a § 524(g) trust. And that conclusion is consistent with other courts that have found "related to" jurisdiction based, at least in part, on a third party's right to indemnification from the debtor. *See, e.g.*, *Dow Corning I*, 86 F.3d at 494 (unfiled and contingent indemnification claims against the debtor arising from third-party litigation against nondebtors "unquestionably could ripen into fixed claims," which "suffices to establish a conceivable impact on the estate"); *In re Mountain Laurel Res. Co.*, 210 F.3d 361, 2000 WL 341913, at *6 (4th Cir. 2000) (Table) (per curiam) ("[A] bankruptcy court has the authority under § 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate ... .").

92

2. *The Bankruptcy Court did not abuse its discretion in concluding that the traditional preliminary-injunction factors favored enjoining talc claims against the Protected Parties under § 105(a).*

Courts considering the propriety of an injunction under § 105(a) apply the traditional four-pronged test for injunctions, tailored to the bankruptcy context. *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1094 (9th Cir. 2007) (collecting cases). Bankruptcy courts thus consider (1) the debtor's reasonable likelihood of a successful reorganization; (2) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (3) the balance of harms between the debtor and its creditors and (4) whether the public interest weighs in favor of an injunction. *See, e.g.*, *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369, 379 (Bankr. E.D. Pa. 2009); *see also In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693, 700-701 (3d Cir. 1989) (applying the same standard in reimposing automatic stay). The Bankruptcy Court did not abuse its discretion in concluding that test is satisfied here. A184-191.

The Bankruptcy Court correctly found that LTL is likely to successfully reorganize. A186-187. LTL has entered bankruptcy in good faith and in an effort to permanently, fully, and equitably resolve current and future talc claims through a § 524(g) trust, just as numerous other companies have successfully done before. *See supra* pp. 63-66. Thanks to the funding agreement, LTL will have sufficient assets to fund the chapter 11 case and a trust in the amount required by any

93

confirmed reorganization plan. *See supra* pp. 59-61. And LTL has favorable

prospects for resolving the talc claims at issue here through a Code-compliant

reorganization.

Although the Bankruptcy Court acknowledged that it could only

"speculat[e]" at this early stage as to the ultimate success of LTL's reorganization,

A186, the court did not invert the burden of proof in finding that LTL's likelihood

of success was sufficient to warrant an injunction. *Contra* TCC Br. 59.

"[L]ikelihood of success" means that a plaintiff has "a reasonable chance, or

probability, of winning." *Singer*, 650 F.3d at 229. It "does not mean more likely

than not." *Id.* It therefore "is not a high burden to show a reasonable likelihood of

success in reorganization." *Excel Innovations*, 502 F.3d at 1097; *see also, e.g.*, *In

re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860 (6th Cir. 1992) (requiring only

"some realistic possibility of successfully reorganizing under Chapter 11," "[i]n

view of the bankruptcy court's protection of [the debtor's] reorganization efforts").

Nor is the Bankruptcy Court's likelihood-of-success finding undermined by

Claimants' current opposition to LTL's petition. *Contra* TCC Br. 30-31. The

Bankruptcy Court's injunction was designed to provide "an *opportunity* to

formulate a plan of reorganization." *A.H. Robins*, 788 F.2d at 998 (emphasis

added). A party's early disagreement with the requested relief therefore cannot

serve as a basis for finding that that Debtor's reorganization is unlikely. *Cf.*

94

*Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989) (stringent bad-faith

dismissal standard supported by policy of not "prejudging" the likelihood of a

successful rehabilitation).  Objecting parties may later change their minds.  *See,*

*e.g.*, *Aldrich Pump*, 2021 WL 3729335, at *35 (rejecting the argument that the

reorganization was unlikely to succeed because "the asbestos claimants will never

agree to a Plan" and explaining that, "[h]aving sat on two other hotly contested and

apparently irreconcilable asbestos bankruptcy cases that wound up with consensual

plans as between these constituencies ... this Court is unable to conclude that our

parties cannot reach an agreement, as well"); *In re Purdue Pharms. L.P.*, 619 B.R.

38, 58 (S.D.N.Y. 2020) (affirming § 105 injunction enjoining mass tort claims

against nondebtors, noting that "Appellants cannot say that a reorganization is

unlikely simply because they intend to object to the plan as presently constituted").

For another, "[o]bjections to the specifics" of the restructuring support agreement

can only "prove that the parties have disagreements about the [restructuring

support agreement], not that a resolution of those disagreements is out of the

question."  *In re Caesars Entm't Operating Co.*, 561 B.R. 441, 452 (Bankr. N.D.

Ill. 2016).

     The Bankruptcy Court also correctly found that LTL would suffer

irreparable harm absent an injunction.  A187.  Claimants oppose the injunction so

that they can pursue in the tort system the exact same claims pending against

LTL—involving the same plaintiffs, "the same products, same time periods, same alleged injuries, and same evidence," A158—against the Protected Parties, thwarting LTL's goal of resolving these claims equitably within the bankruptcy. Irreparable harm here is not merely a possibility; it is a certainty. Denying the injunction also would prevent LTL from treating similar claimants similarly. A189, 191. Absent the injunction, the Claimants could seek to reduce to judgment against Protected Parties the exact same talc claims that exist against LTL in the chapter 11 case, which LTL would have to pay through its indemnification obligations, thereby reducing the assets available to pay other current and future claimants.

The Bankruptcy Court applied the correct legal standard here, too. *Contra* TCC Br. 59. Although the Bankruptcy Court did not find that LTL had previously been precluded or had an evidentiary record tainted by a judgment against one of the Protected Parties, the Bankruptcy Court *did* find a real "risk that litigation against the Protected Parties could result in adverse consequences for [LTL]" and that the risk "weigh[ed] in favor of extending the automatic stay," A180.

Similarly, although the Bankruptcy Court did not find that LTL would certainly face "automatic indemnification obligations" and claims for "insurance proceeds," TCC Br. 59, the court *did* find that LTL "has indemnity obligations assumed from Old JJCI," A160, and the shared insurance "policies are estate

property," A182. The Bankruptcy Court's findings on these points show it is sufficiently likely that LTL will be irreparably harmed without a stay. *See Singer*, 650 F.3d at 229.

The Bankruptcy Court also correctly found that the balance of harms favors an injunction. A187-190. Claimants contend that they will be harmed by their tort suits being stayed while LTL attempts to confirm a § 524(g) settlement trust. TCC Br. 59-60. But claimants *always* make that argument in settlement-trust cases and relief has "uniformly been issued." *Bestwall*, 606 B.R. at 254 & n.12 (collecting cases). For good reason: If Claimants were right, an injunction could *never* issue, because all injunctions—by definition—entail some amount of delay. An injunction does not permanently deprive the Claimants of an opportunity to pursue their talc claims. It merely pauses those claims, giving LTL time to obtain the necessary support for a plan of reorganization. Indeed, because the Bankruptcy Court here pledged to "revisit continuation of the automatic stay and preliminary injunction" every few months, A193, the delay here will not last any longer than necessary.

As a result, the Bankruptcy Court's § 105 injunction does nothing more than place claimants who seek to litigate in the tort system on equal footing with other claimants who seek to work with LTL to establish a settlement trust. *See Combustion Eng'g*, 391 F.3d at 234 (Section 524(g)'s "unique funding mechanism

97

makes it possible for future asbestos claimants to obtain substantially similar

recoveries as current claimants in a manner consistent with due process"); *see also*

A189 ("[A] bankruptcy trust protects the needs of future talc claimants," whose

"interests are largely unrepresented in the tort system").  In the end, as the

Bankruptcy Court found, resolving these claims through bankruptcy is likely to

lead to a speedier resolution than trying each in the courts.  *See* A189.

Finally, the Bankruptcy Court's § 105 injunction is in the public interest.

Courts consistently have recognized the public interest in a successful

reorganization.  *See, e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203-

204 (1983).  A successful reorganization particularly serves the public interest in

the mass-tort context, where "completing the reorganization process ... [will]

resolv[e] thousands of claims in a uniform and equitable manner."  *In re W.R.*

*Grace & Co.*, 386 B.R. 17, 36 (Bankr. D. Del. 2008) (extending injunction to cover

a nondebtor affiliate railroad that transported products of the debtor).  It also is in

the public interest to treat all talc claimants equitably; "it is anything but just when

presenting the identical proofs, one plaintiff suffering nearly identical injuries or

illness[] wins a multimillion dollar verdict against a defendant while another takes

nothing."  *Dow Corning II*, 211 B.R. at 588.

Claimants contend the Bankruptcy Court entered an "extraordinary"

injunction of the type only available "for confirmed plans under § 524(g)," TCC

Br. 61, but similar injunctions are routinely granted under § 105 in mass-tort

bankruptcies like LTL's.  *See supra* nn.8 & 9 (collecting cases).  And, in any

event, this *is* an extraordinary case.  To allow these tens of thousands of pending

tort claims to proceed outside of LTL's chapter 11 case would effectively lift the

§ 362 automatic stay, "defeat[ing] the [petition's] purpose."  *McCartney*, 106 F.3d

at 511.  The Bankruptcy Court did not abuse its discretion in preserving LTL's

ability to reorganize, and the Court should affirm its order.

# CONCLUSION

For the foregoing reasons, the Bankruptcy Court's orders should be affirmed.

Respectfully submitted,

/s/ Neal Kumar Katyal

|  |  |
|---|---|
| GREGORY M. GORDON | NEAL KUMAR KATYAL |
| BRAD B. ERENS | SEAN MAROTTA |
| DAN B. PRIETO | WILLIAM E. HAVEMANN |
| JONES DAY | JO-ANN TAMILA SAGAR |
| 2727 North Harwood Street | PATRICK C. VALENCIA |
| Dallas, Texas 75201 | HOGAN LOVELLS US LLP |
| (214) 220-3939 | 555 Thirteenth Street, N.W. |
|  | Washington, D.C. 20004 |
| C. KEVIN MARSHALL | (202) 637-5600 |
| DAVID S. TORBORG | neal.katyal@hoganlovells.com |
| JONES DAY |  |
| 51 Louisiana Avenue, N.W. |  |
| Washington, D.C. 20001 | *Counsel for Debtor-Appellee* |
| (202) 879-3939 |  |

August 15, 2022

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Neal Kumar
Katyal, am admitted as an attorney and counselor of the United States Court of
Appeals for the Third Circuit.

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

August 15, 2022

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with this Court's order of June 10, 2022 because it contains 23,340 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Malwarebytes Anti-Malware was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

August 15, 2022

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate

CM/ECF system on August 15, 2022.  All counsel of record are registered

CM/ECF users, and service will be accomplished by the CM/ECF system.

<u>/s/ Neal Kumar Katyal</u>
NEAL KUMAR KATYAL
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

August 15, 2022