# **<u>EXHIBIT 4</u>**

```
                    UNITED STATES COURT OF APPEALS
                     FOR THE THIRD CIRCUIT

IN RE:                        .   Case No. 22-2003/22-2004
                              .
LTL MANAGEMENT LLC,           .   21400 U.S. Courthouse
             Debtor,          .   601 Market Street
                              .   Philadelphia, PA 19106
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS,                    .   Monday, September 19, 2022
             Appellant.       .
. . . . . . . . . . . . . . . ..
IN RE                         .   Case No. 22-2005
                              .
LTL MANAGEMENT LLC,           .
             Debtor.          .
                              .
LTL MANAGEMENT, LLC.          .
                              .
         v.                   .
                              .
THOSE PARTIES LISTED ON       .
APPENDIX A TO COMPLAINT AND   .
JOHN AND JANE DOES 1-1000     .
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS,                    .
             Appellant.       .
. . . . . . . . . . . . . . . ..
IN RE:                        .   Case No. 22-2006/22-2007
                              .
LTL MANAGEMENT LLC,           .
             Debtor.          .
                              .
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS, ET AL.             .
             Appellants.      .
. . . . . . . . . . . . . . . ..
IN RE:                        .   Case No. 22-2008
                              .
LTL MANAGEMENT LLC,           .
             Debtor.          .
                              .
LTL MANAGEMENT LLC            .
                              .
         v.                   .
                              .
THIRD PARTIES LISTED ON       .
APPENDIX A TO COMPLAINT AND   .
JOHN AND JANE DOES 1-1000,    .
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS, ET AL.             .
```

```
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS, ET AL.              .
                Appellants.    .
. . . . . . . . . . . . . . . .
IN RE:                         .   Case No. 22-2009
                               .
LTL MANAGEMENT LLC,            .
                Debtor.        .
                               .
ARNOLD & ITKIN LLP, ON BEHALF  .
OF CERTAIN PERSONAL INJURY     .
CLAIMANTS REPRESENTED BY       .
ARNOLD & ITKIN,                .
                Appellant.     .
. . . . . . . . . . . . . . . ..
IN RE:                         .   Case No. 22-2010
                               .
LTL MANAGEMENT LLC,            .
                Debtor.        .
                               .
AYLSTOCK WITKIN KRIES &        .
OVERHOLTZ PLLC, ON BEHALF OF   .
MORE THAN THREE THOUSAND       .
HOLDERS OF TALC CLAIMS,        .
                Appellant.     .
. . . . . . . . . . . . . . . ..
IN RE:                         .   Case No. 22-2011
                               .
LTL MANAGEMENT LLC,            .
                Debtor.        .
                               .
LTL MANAGEMENT LLC             .
                               .
         v.                    .
                               .
THOSE PARTIES LISTED ON        .
APPENDIX A TO COMPLAINT AND    .
JOHN AND JANE DOES 1-1000      .
                               .
AYLSTOCK WITKIN KRIES &        .
OVERHOLTZ, PLLC., ON BEHALF OF .
MORE THAN THREE THOUSAND       .
HOLDERS OF TALC CLAIMS,        .
                Appellant      .
. . . . . . . . . . . . . . . ..
```

3

TRANSCRIPT OF ORAL ARGUMENT
BEFORE
THE HONORABLE JUDGE THOMAS L. AMBRO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE L. FELIPE RESTREPO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE JULIO M. FUENTES
UNITED STATES THIRD CIRCUIT JUDGE

APPEARANCES:

For the Appellants:        MoloLamken
                           By:  JEFFREY A. LAMKEN, ESQ.
                           600 New Hampshire Avenue, N.W.
                           Washington, D.C.  20037

                           Kellogg Hansen Todd Figel & Frederick
                           BY:  DAVID C. FREDERICK, ESQ.
                           1615 M Street, N.W., Suite 400
                           Washington, D.C.  20036

For U.S. Trustee:          U.S. Department of Justice
                           By:  SEAN JANDA, ESQ.
                           Appellate Section
                           Room 7260
                           950 Pennsylvania Avenue, N.W.
                           Washington, D.C.  20530

For Appellees:             Hogan Lovells US
                           By:  NEAL K. KATYAL, ESQ.
                           555 Thirteenth Street, N.W.
                           Washington, D.C.  20004

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

4

# I N D E X

ORAL ARGUMENT                                         **PAGE**

     BY MR. LAMKEN                                 6

     BY MR. JANDA                                 35

     BY MR. FREDERICK                             46

     BY MR. KATYAL                                58

REBUTTAL ARGUMENT

     BY MR. LAMKEN                                101

     BY MR. JANDA                                 115

     BY MR. FREDERICK                             117

1           THE COURT:  Welcome this afternoon.  We have In re
2  LTL Management LLC, Numbers 22-2003, 2004, 2005, 2006, 2007,
3  2008, 2009, 2010, and 2011.  And in connection with the oral
4  arguments today, I had told counsel previously that we would
5  probably go a bit longer than the two hours.  That said, once
6  upon a time, we had an oral argument we started in the morning
7  in a case called Combustion Engineering and we went from about
8  9:30 until about 5:30, 5:45 and I didn't realize we didn't -- I
9  was reminded years later that we only took two 15-minute
10 breaks, which was not fair.

11          Seth Waxman argued and he told me that and somebody
12 was with him at the time.  Now, Judge Craig Goldblatt said that
13 is exactly right.  And I didn't realize that Mr. Waxman doesn't
14 eat on the day of oral argument.  And so in the afternoon, one
15 of my law clerks was feeling a little faint and went and got
16 some M&Ms, and she's sitting over there and she looks at
17 Mr. Waxman and Mr. Waxman looks at her and they both go, open
18 their hands and each had M&Ms in their hands.  So I've learned
19 my lesson.

20          What we will do is we will not go past five o'clock
21 today and we will take a break after the first hour so that
22 everybody can get some time to regroup.  And also if somebody
23 wishes to have a break sooner than that, just give me a little
24 bit of a high sign and we'll go from there.

25          And with that, why don't we begin with Mr. Lamken.

1  And I've promised Mr. Lamken and Mr. -- come on up --

2  Mr. Katyal that similar to what the Supreme Court has been

3  doing the last few years, will have two minutes of

4  uninterrupted time at the beginning of your argument.

5          MR. LAMKEN:  Thank you, Your Honor.  May it please

6  the Court.  If I may reserve 15 minutes for rebuttal.

7          THE COURT:  You certainly may.

8          MR. LAMKEN:  For more than a century, companies

9  facing genuine financial distress have done what companies like

10 Johns-Manville did.  They submit themselves and their assets to

11 the bankruptcy court and to the Code's requirements and

12 creditor protections.  This is an effort to do the opposite.

13 In LTL's words, to put talc-related claims through the

14 Chapter 11 reorganization without subjecting the rest of the

15 assets of JJCI to bankruptcy procedures and to enjoin suits

16 against 670 non-debtors, including affiliates, even though they

17 have independent non-derivative liability.  That subverts at

18 least four different core bankruptcy principles.

19          First, if J&J or JJCI had declared bankruptcy,

20 priority rules would require creditors to be paid in full

21 before equity gets anything.  But here, J&J and JJCI operate

22 outside bankruptcy with Old JJCI's assets, paying billions in

23 dividends to equity, to shareholders.  Last week, J&J announced

24 a $5 billion stock buyback, more for equity.  But talc victims

25 alone are mired in bankruptcy as they die.

1        Old JJCI's trade creditors are compensated in the

2 ordinary course, but the disfavored creditors, talc victims,

3 sit languishing in bankruptcy.  A clearer subversion of the

4 priority rules that ordinarily apply is hard to imagine.

5        Second, debtors-in-possession management ordinarily

6 have a powerful incentive to try and emerge from bankruptcy as

7 quickly as possible so they can get on with their ordinary

8 operations free from bankruptcy supervision.  But here, J&J and

9 JJCI, the tortfeasors funding all of this, have no such

10 interest in swift emergence.  They operate Old JJCI's assets

11 outside of the Bankruptcy Code free and clear of bankruptcy

12 court supervision, paying who they want while talc claimants

13 alone are in bankruptcy.

14        LTL has no incentive.  It exists only for bankruptcy,

15 no operating business, no transactions to engage in.  You need

16 only look at the three other two step bankruptcies to

17 understand exactly what happens to these incentives.  Before

18 bankruptcy, for example, <u>Bestwall</u> had resolved 15,000 asbestos

19 claims.  Now, five years in, not one claimant has received

20 compensation from bankruptcy.  We have no approved plan and all

21 the official committee representatives alive at the case's

22 outset have passed away.  Worse, the delay benefits LTL and

23 JJCI and Johnson and Johnson as talc victims can only get more

24 desperate.  They can only get more likely to cave each day they

25 face unreimbursed medical expenses and they get closer to their

1  own deaths.

2  THE COURT:  Is your principal argument that there is

3  not a proper bankruptcy purpose or that the debtor here is not

4  in financial distress or what?

5  MR. LAMKEN:  So the answer is it's not a proper

6  bankruptcy purpose because evading Bankruptcy Code principles

7  is not a valid bankruptcy principle.  As this Court pointed out

8  in SGL, those who seek relief in bankruptcy have to comport

9  with the underlying Bankruptcy Code principles.  And when the

10  bankruptcy is established for the very purpose of evading the

11  ordinary bankruptcy procedures --

12  THE COURT:  And by the ordinary Bankruptcy Code

13  principles, you mean what?

14  MR. LAMKEN:  I mean, for example, what I started out

15  with, which is the priority rules.  This is structured so that

16  all the dividends, all the equity can be paid while one

17  category of claimants, talc creditors, sit in bankruptcy and

18  don't get paid.  Another principle is that you have to have

19  incentives to come to the bankruptcy to come forward with a

20  reasonable plan in order to emerge swiftly.  But the opposite

21  is true when you take all the operating assets, all the

22  businesses, and you can operate them outside bankruptcy and the

23  only people who are mired in bankruptcy are the talc claimants.

24  THE COURT:  Are you referring to economic relief for

25  the victims?

9

1          MR. LAMKEN:  Yes.  Yeah, that's exactly right.  And

2  the ordinary principle is under the absolute priority rule, the

3  ordinary rule is no equity gets paid until creditors are paid.

4  And we have the exact opposite going on here.

5          THE COURT:  How was that economic relief

6  appropriated?

7          MR. LAMKEN:  I'm sorry, Your Honor.

8          THE COURT:  Is that economic relief delivered to the

9  victims?

10          MR. LAMKEN:  So in the ordinary tort system, the

11 victims bring their lawsuits and they either settle or they go

12 to trial and they get relief.  But they're allowed to proceed

13 and try and seek that compensation through the system that 50

14 states have used for two centuries to compensate victims of

15 misconduct.  But right now --

16          THE COURT:  So you're saying bankruptcy does not

17 allow that to happen?

18          MR. LAMKEN:  Well, bankruptcy delays it while we're

19 going through all the plans and trying to come up with it.  And

20 right now, if you look at how it works when you have these two-

21 step bankruptcies, it goes for Bestwall, five years with nobody

22 getting compensated, no plan, and everybody dying in the

23 meantime.  By contrast, if you don't separate it -- people

24 have, if you don't separate your liabilities and put them off

25 into one entity, an artificial entity with just these talc

1  liabilities and you instead have the people with liabilities

2  and the actual companies in bankruptcy, then there's an

3  incentive to go forward and come up with a plan so people

4  actually get compensated and get compensated promptly because

5  management wants to emerge from bankruptcy.  But right now,

6  there's no incentive actually to do that for J&J and JJCI

7  because they're operating Old JJCI's assets, famous brands of,

8  you know, Tylenol and the like, free and clear of bankruptcy's

9  requirements.

10         Instead, the only ones who are sitting in bankruptcy

11  are the talc claimants.  They pay their ordinary trade

12  creditors, no problem.  Pay them as the money comes due.  Only

13  the talc claimants sit in bankruptcy.  And it's just in that

14  sense like SGL where you've just taken one set of creditors and

15  put them at a disadvantage, talc victims, and everybody else

16  proceeds as before.

17         THE COURT:  If LTL were formed in 1979 to hold the

18  talc products, so instead of it going to baby products, it goes

19  to LTL and LTL operated for a number of years but now is in the

20  process of doing, in effect, an orderly liquidation, would you

21  have a problem?

22         MR. LAMKEN:  So I think that the issue we have in

23  terms of evading the structure of the Bankruptcy Code and all

24  the principles of the Bankruptcy Code, that would be a very

25  difficult argument to make because once you take an entity and

1 you operate it and you have a legitimate business purpose for

2 the structure that the entity has and you're operating it for a

3 number of years, then it has a legitimate non-bankruptcy

4 purpose.  Where you cross the line is, where two days before

5 you declare bankruptcy, you do a divisive merger in order to

6 put the talc claimants into bankruptcy alone and take the

7 assets, the operating businesses, the valuable brands of that

8 former company and put them outside bankruptcy, and it's solely

9 for the purpose to ensure that talc claimants are treated one

10 way and all the assets are outside the bankruptcy.  When you do

11 that two days before bankruptcy, I think that clearly crosses

12 the line.

13         THE COURT:  It sounds from what you're saying is,

14 you're saying it would be a different argument.  But it sounds

15 like if they had done that in '79 and ran the company for a

16 number of years, ultimately decided they couldn't go forward,

17 do a liquidating 11, it would be an acceptable bankruptcy

18 purpose in that particular circumstance.  Is that correct?

19         MR. LAMKEN:  So I would not be able to argue today

20 that this is an evasion of bankruptcy purposes because clearly

21 it was done for a purpose, not evading bankruptcy.  It was done

22 because that was a logical way to operate the business in 1979.

23 It was operated --

24         THE COURT:  So, and then you're saying at the other

25 end of the spectrum, what they did by forming on October 12,

1   2021, filing two days later, it doesn't work.  Where is the
2   line that is crossed in your view?

3          MR. LAMKEN:  So I think the line is when the sole
4   purpose is not a legitimate business purpose of this is a
5   logical way to operate the company, but the sole purpose is to
6   disrupt, to subvert, to frankly, pervert the Bankruptcy Code,
7   to evade its ordinary principles, I think that crosses the
8   line.  And here --

9          THE COURT:  What do we make of the timing here?  And
10  what I mean by the timing is, is I understand that about four
11  months after the Supreme Court denied cert in <u>Ingham</u>, LTL is
12  formed and shortly thereafter, the day after -- they file for
13  bankruptcy shortly thereafter.  What do you make of the timing
14  here?

15         MR. LAMKEN:  So, Your Honor, I think the timing is
16  clear that in essence, J&J had felt failed and they said this,
17  "We felt failed by the tort system."  And so they went to
18  another system they thought would be more favorable.  They went
19  to bankruptcy.  But the problem is, if they want to evade the
20  tort system and move to bankruptcy, if they have financial
21  distress, and I know that's disputed, and if they have a
22  legitimate purposes, that's fine.  But they also don't want to
23  actually face the usual bankruptcy rules because rather than
24  just taking, we have a distressed tortfeasor, JJCI or J&J, and
25  we'll put it into bankruptcy, which is the ordinary way of

1    doing it.  That's how it was done in <u>Johns-Manville</u>.  That's

2    how it's been done for 200 -- well, 100 years since we've had

3    something like a Chapter 11.

4          Rather than do that, they did something fancy and

5    they said we're going to take the talc claimants alone.

6    They're going to go into bankruptcy by themselves and they're

7    the only creditors that will be stuck in bankruptcy.  The

8    assets, these businesses that are producing valuable goods with

9    famous names, those are going to stay outside bankruptcy and

10   that subverts everything that bankruptcy supposed to do.

11         In fact, if I go to the third point is that, you

12   know, the usual rule in bankruptcy is the bankruptcy court has

13   supervision over the debtor's operations to make sure those

14   operations are working for creditor benefit to enforce

15   fiduciary duties towards the creditors.  But if you look at

16   Appendix Page 4463, J&J has now announced it's actually going

17   to spinoff its consumer products division, effectively spinning

18   off JJCI.

19         Now, if J&J or JJCI had declared bankruptcy, the

20   bankruptcy court, under Section 363, would have authority over

21   that non-ordinary course.  Creditors like the talc claimants

22   would then be able to have notice and an opportunity to be

23   heard.  But because they've shifted everything to a new entity

24   and they've only put an artificial entity, a concocted made-

25   for-bankruptcy entity into bankruptcy, none of those

14

1  protections apply.  There's no ability for the bankruptcy court

2  to look and say, yes, you're spinning off JJCI.  Let's make

3  sure that we put everything in escrow.  Let's make sure we do

4  something to make sure that all those funds are available for

5  the creditors for whom they should benefit.

6        THE COURT:  Your concern is principally for the talc

7  victims.  Is that --

8        MR. LAMKEN:  Absolutely, Your Honor.

9        THE COURT:  And your suggestion, if I'm not mistaken,

10  is to take them out of bankruptcy.  Is that --

11        MR. LAMKEN:  Pardon me?

12        THE COURT:  To take those talc victims out of

13  bankruptcy.  They should not be subject to the --

14        MR. LAMKEN:  That's right.

15        THE COURT:  -- bankruptcy requirements?

16        MR. LAMKEN:  Because this is not a good faith

17  bankruptcy, because the purpose of the bankruptcy by its terms

18  is to evade the usual bankruptcy requirements, the bankruptcy

19  should be dismissed.

20        Now, there's a second question --

21        THE COURT:  So it's a bankruptcy to avoid bankruptcy?

22        MR. LAMKEN:  Pardon?

23        THE COURT:  It's a bankruptcy to avoid bankruptcy.

24  Is that what you're saying?

25        MR. LAMKEN:  This is exactly what it is.  It's a

1    bankruptcy designed to avoid the purposes and principles of

2    bankruptcy.  It's been gerrymandered in a sense so as to place

3    only one class of creditors at risk.

4          THE COURT:  You were mentioning the second question,

5    but let me ask you.  If we come to the conclusion this was not

6    done in good faith, this is a bad faith filing, do we need to

7    get to the second question on the stay?

8          MR. LAMKEN:  No, Your Honor, because the mandatory

9    requirement under 1112(b) is if it's not, if there is cause,

10   the Court must dismiss.  It says it shall dismiss.  So if this

11   is not good faith, the standard and only remedy is dismissal.

12         Now, there is an unusual circumstances exception, but

13   there's requirements that have not been met.  One of them is

14   that there was good cause or good justification.  And there's

15   simply no good justification for a bad faith bankruptcy.  And

16   second is that there has to be a cure in a reasonable period of

17   time.  And I think when the entire bankruptcy is structured so

18   that talc victims are on their own in bankruptcy and all the

19   other creditors are outside bankruptcy, when the structure is

20   set up so that talc victims are in bankruptcy but all the

21   assets are outside bankruptcy, there's no cure there that some

22   would come up with and I don't think the bankruptcy court ever

23   suggested there could be a cure.

24         THE COURT:  If you were in the shoes and you call it

25   Old JJCI, I'd probably just call for the sake of people here in

1   the audience, Old Consumer.  So you have Johnson and Johnson,

2   Johnson and Johnson Consumer which took over baby products.  So

3   Consumer doesn't go in, it keeps the other items like, you

4   know, Aveno, Tylenol, et cetera, and you separate out -- it's

5   like good bank, bad bank back in the late '80s when you had

6   -- come in on a Friday night and you separate everything out

7   and you open the bank up on Monday.

8          In light of the verdict in the Ingham case, which I

9   think surprised a lot of people, even though it was ultimately

10  reduced, what would you have advised to do if you were

11  representing J&J Consumer?

12      MR. LAMKEN:  So I think my answer would be the answer

13  that all the companies have confronted for a long time, which

14  is if you're genuinely in financial distress, you can take your

15  company into bankruptcy.  If you're not genuinely in

16  bankruptcy, excuse me, in financial distress, then you may

17  continue your fight.  Yes, you got a bad result in Ingham, but

18  look, after Ingham, what did J&J tell its investors.  After it

19  was denied, it said the facts were "unique and the case is not

20  representative."  That's at Appendix 4 -- excuse me 4404.

21         After the denial in Ingham, what did they tell the

22  investors, that liabilities were "not expected to have a

23  material adverse effect on the company's financial position."

24  Appendix 4506.  And what did it tell the Court about -- what

25  did LTL tell the Court?  It reiterated that there was in light

1 of the liabilities, "no likely need of the debtor to invoke the

2 funding agreement," so that's supposedly $61 billion to its

3 maximum amount or anything close to it." That's at

4 Appendix 3747.

5          This is probably the first planned major bankruptcy,

6 at least the first I've ever heard of, where if you're looking

7 for indicia of financial distress, you don't find any business

8 executive, you don't find any documents at J&J or JJCI before

9 the bankruptcy saying, "Wow, we're financially distressed.

10 We're heading for insolvency." The first time you see that is

11 in the bankruptcy and where is it coming from? It's coming

12 from the lawyers.

13          THE COURT: When you look at financial distress, are

14 you looking at Old Consumer and LTL or just LTL?

15          MR. LAMKEN: So I think that the proper answer since

16 we're -- if we indulge the facade that LTL as a legitimate

17 entity to put into bankruptcy, and mind you --

18          THE COURT: You'll have to raise your voice just a

19 tad when you --

20          MR. LAMKEN: Pardon?

21          THE COURT: Raise your voice just the tad, sir.

22          MR. LAMKEN: Yes.

23          So if we indulge the notion, one that I wouldn't

24 accept, that it's okay to take LTL and put LTL into bankruptcy,

25 I think the answer is you have to look at LTL's liabilities

1  because that's the chosen one, the one they've chosen, and you

2  would ask, can LTL -- is it suffering financial distress?

3          This case is live by the LTL, die by the LTL.

4  They've chosen to designate something LTL, claim it's a

5  separate entity, push it into bankruptcy with just the talc

6  victim claimants.  Well, then you're looking for financial

7  distress, you're going to just look at LTL.

8          THE COURT:  But I thought your initial concern was

9  the optics aren't right in breaking off and keeping out of

10  bankruptcy Good Company, while putting into bankruptcy Bad

11  Company with the liabilities.

12          MR. LAMKEN:  That's exactly right, Your Honor.  And

13  that's why if you're going to indulge the notion, but that's

14  the key thing.

15          THE COURT:  Doesn't that sound as if you're taking

16  Old Consumer into account?  It's almost like, I kept wondering

17  why somebody didn't file like a fraudulent conveyance action.

18          MR. LAMKEN:  So, Your Honor, you know, down the road,

19  if we're legitimately in bankruptcy, there are remedies for

20  certain individual transgressions.  But the fact that there are

21  remedies down the road for individual transgressions doesn't

22  make an otherwise bad faith bankruptcy a good faith bankruptcy

23  to begin with.  Good faith is a threshold requirement at the

24  outset.

25          When the entire structure of your bankruptcy is

1  designed to evade traditional bankruptcy requirements,

2  traditional priority rules, supervision over spinoffs, all the

3  things that courts do to make sure that the money is there for

4  creditors.  When it's designed to do that, well, it's just not

5  a good faith bankruptcy.  You don't even get to something like

6  a fraudulent conveyance.

7       THE COURT:  Let me go back to financial distress and

8  litigation for a minute.  Opposing counsel makes much of the

9  fact that there are 38,000 plus claims being filed, or have

10  been filed and more coming with respect to the talc litigation,

11  can fear or the cost of this litigation qualify as financial

12  distress?

13       MR. LAMKEN:  So, Your Honor, I don't think the

14  supposed efficiency of bankruptcy counts.  I think the Court

15  has said that in cases like <u>SGL</u>, that that isn't, thinking that

16  you're going to be more efficient in bankruptcy, doesn't count.

17  But even so, that still doesn't tell you whether or not it's --

18       THE COURT:  Not so much more efficient, but less

19  exposure.  Or is the exposure the same?

20       MR. LAMKEN:  Yeah.  So I think, Your Honor, the

21  notion that if one is going to be in financial distress, that

22  is the threshold.  You need immediate financial distress.  The

23  notion that you can just reduce your liabilities from yay to

24  lower isn't a sufficient basis.  And so the real question is,

25  looking at LTL, or if you want to indulge fiction and go back

1  to JJCI as the bankruptcy court did, was there legitimate

2  financial distress that they were not going to be able to make

3  their payments, that they really had a need to go into

4  bankruptcy, which is powerful medicine.  People don't get paid.

5  Forty thousand cases around the country get stayed.  That's

6  powerful medicine.  You have to have some significant showing

7  there, and we don't think they got there.

8       But even apart from it, if there is financial

9  distress, that just reinforces my first point which is, if

10  there's financial distress, that's all the more reason you want

11  the traditional bankruptcy protections to be in place.  If

12  there's financial distress, you don't want money going --

13       THE COURT:  But it sounds like what you're saying,

14  you want the traditional bankruptcy protections to be in place

15  for Old Consumer.

16       MR. LAMKEN:  Exactly.  Exactly.  Because if Old

17  Consumer and, you know, as LTL's telling us, you know, even --

18       THE COURT:  But you just said that you're looking

19  primarily at LTL in connection with this case and Old Consumer

20  is kind of off to the side.

21       MR. LAMKEN:  So we would for financial distress look

22  to LTL.  But remember, what is supposedly funding this

23  bankruptcy?  It's an unsecured funding agreement backed by J&J

24  and JJCI.  So if they face legitimate financial distress,

25  there's every reason to be worried about not supervising what

1 they're doing, every reason to believe that they shouldn't be

2 paying equity ahead of injured talc victims.

3        THE COURT:  Well, if you're a claimant, isn't the

4 only thing that you're really concerned with is that they pay

5 up as to what they say they'll pay up for?

6        MR. LAMKEN:  No, Your Honor.  I think who gets paid

7 first is critically important.  If I am left waiting my turn as

8 people are passing away, that's very different than the

9 absolute priority rule where equity doesn't get paid until I'm

10 paid first.  That's a hugely different endeavor.  It's entirely

11 different in terms of the incentives, as I pointed out.  Why is

12 J&J and JJCI going to push this through bankruptcy if they can

13 continue paying equity, if they can spinoff divisions without

14 bankruptcy court supervision?  If they continue their

15 operations just as before, then there's no reason for them to

16 push this through.  And LTL has no reason to push this forward

17 and have a reasonable plan because they're made for bankruptcy.

18 They have no assets, no operations --

19        THE COURT:  So you're saying is through the backdoor,

20 equity is coming out whole.  Whereas, if it had been Old

21 Consumer in bankruptcy, the absolute priority rule would've

22 played out differently.

23        MR. LAMKEN:  It may well be, Your Honor, but we don't

24 have to guess at an answer because the rules are there to make

25 sure that happens.  And we don't just -- and we don't set aside

1  the rules and say, well, we're going to play monkey business

2  with the absolute priority rule and allow this elaborate scheme

3  where you take one set of claimants out because it might work

4  out in the end.  There's no sort of it might work out in the

5  end exception to the absolute priority rule where you get to

6  pay equity as you go and certainly not without consent,

7  certainly not without a bankruptcy court supervising what's

8  going on.  That's what we count on the bankruptcy courts for.

9        THE COURT:  What's your thought about individuals who

10  may be exposed but the exposure is not really realized until

11  years, years down the road?

12        MR. LAMKEN:  Right.  And so look, first, you know, if

13  we're worried about the interests of future claimants, future

14  claimants would be as much protected by a JJCI bankruptcy as an

15  LTL bankruptcy.  That just simply doesn't answer whether or not

16  you should take this concocted made-for-bankruptcy entity and

17  put it in bankruptcy with just the talc claimants alone.  If

18  bankruptcy serves future claimants better --

19        THE COURT:  Your suggestion is that all these cases

20  should be out of bankruptcy?

21        MR. LAMKEN:  Pardon?

22        THE COURT:  Your suggestion is that all of these

23  cases should be out of bankruptcy?

24        MR. LAMKEN:  That's exactly right.

25        Everybody should be treated the same.  Either all the

1　creditors are in bankruptcy or all the creditors are out.

2　Either all the assets are in bankruptcy or all the assets are

3　out of bankruptcy.  And that's for future --

4　　　　　THE COURT:  I assume that would protect people who

5　were exposed years down the road.  They would not be subject to

6　bankruptcy, of course.  But they would be protected.

7　　　　　MR. LAMKEN:  Yes, they would have their claims as

8　they come up and as they realize they're injured.

9　　　　　And look, this is not the first mass tort that has

10　something of a tail to it where people end up getting sick over

11　time at later in time.  There's lots of mass torts like that.

12　There was Vioxx from Merck.  There's the diet drugs litigation.

13　These things happen and the tort system has ways of handling

14　them.

15　　　　　Now, if there is other reasons and a legitimate basis

16　for going into bankruptcy, well, bankruptcy has ways of

17　handling it too.  But concern for future claimants is not

18　itself a reason for bankruptcy.  And there's a little bit of an

19　irony here that we have Johnson and Johnson asserting that it's

20　concerned about future claimants when its position in this

21　litigation is that there was no asbestos, no one was injured,

22　this is just a matter of a litigation lottery and no one should

23　receive anything.

24　　　　　If we really are interested in the interests of talc

25　claimants, listen to the talc claimants.  There's just not one

24

1   here telling you that they'd rather be in bankruptcy, that they

2   really don't want be in the tort system that 50 states have

3   used for nearly 200 years.

4          THE COURT:  Well, let's assume we find or come to the

5   conclusion that it was a good faith filing.  What do we do with

6   the stay?  Did the bankruptcy court exceed its jurisdiction?

7          MR. LAMKEN:  So I think the bankruptcy court did

8   exceed its jurisdiction because even if one assumes that LTL is

9   a proper debtor, and that's our debtor, that has consequences.

10  And that means when you're looking at 362 and an automatic

11  stay, that applies to the debtor.  And what the bankruptcy

12  court did here is it stayed over 670 actions against over 670

13  non-debtors, including debtors that have their own independent,

14  own tortious conduct, non-derivative liability, and that just

15  exceeds its jurisdiction.

16         And to get there, the district court, or excuse me,

17  the bankruptcy court looked at two things.  It talked about

18  mostly supposedly shared insurance and indemnification

19  agreements.  But the key finding on that is on Appendix 159

20  where the court accepts, I'm quoting, that "Any claim of shared

21  identities of interest is based solely on the allocation of

22  agreements to the debtor on the eve of bankruptcy," and here's

23  the cure part, "for the very purpose of extending the stay."

24         The court, in essence said, look, even though the

25  purpose of this indemnification agreement which we allocated to

25

1  LTL, even though the purpose of having shared insurance was to

2  extend the stay, that's a good enough reason to give a stay to

3  companies like Johnson and Johnson that have their own tortious

4  conduct.  And that's just error twice over.

5       Combustion Engineering makes it very clear that

6  contrived agreements for purposes of creating jurisdiction just

7  can't be given that type of weight.  Because otherwise,

8  jurisdiction can be created by consent.

9       THE COURT:  What's the usual way that you would argue

10  that there is jurisdiction?

11       MR. LAMKEN:  For non-debtors?

12       THE COURT:  For a stay under 362 that would affect

13  non-debtors, correct.

14       MR. LAMKEN:  So the usual way you would find that is

15  if you found something that's akin to an identity of interest

16  where, if there's liability by the non-debtor, that is

17  automatic liability for the debtor.  And no ability of the

18  bankruptcy court to intervene and say, yes, I know the non-

19  debtor is liable, but I'm not going to let it dissipate the

20  assets of the debtor.  So --

21       THE COURT:  And in that context, is it core

22  jurisdiction or is it by virtue of arising under or arising in?

23  Or is it related to jurisdiction?

24       MR. LAMKEN:  So I think the better answer is to

25  adhere to the text of the statute, which says only the debtor

1  for 362(a)(1), actions against the debtor, literally.  When you

2  go to --

3       THE COURT:  But we know what courts tend to do,

4  practically speaking.  They tend to use 105 and they say, we're

5  going to extend it because there is this "identity of interest"

6  or there is insurance that's being paid out for the non-debtor

7  that would likely be also covering the debtor itself.

8  Therefore, you don't want to dissipate the insurance so

9  therefore, you fit under 362(a)(3) and we're going to combine

10 the two, (a)(1), (a)(3), along with 105, and go from there.

11 And it looks like a lot of courts just tend to deal with it

12 practically.

13      I was just looking for some cases and we found one by

14 Judge Posner on the Seventh Circuit.  You know, it says, no, it

15 wasn't all that much analysis, it's the right thing to do.

16      MR. LAMKEN:  Yeah, and I think the right-thing-to-do

17 theory really is relying on 105 because 105 is sort of the

18 necessary and proper clause that says, "Well, it's necessary

19 and proper."  But 105 doesn't create its own jurisdiction.  You

20 have to go find jurisdiction under another provision of the

21 Bankruptcy Code.  And the problem with 105 is, and here in

22 particular is, you'd have to have the necessary findings in

23 order to invoke it and the findings just are absent.

24      For example, for indemnification, the ordinary rule

25 is it has to be automatic indemnification.  If you need another

27

1   lawsuit for the indemnification to occur, as under <u>Federal-</u>

2   <u>Mogul</u> and <u>W.R. Grace</u>, if you need another lawsuit, then it

3   doesn't count for 105 because the bankruptcy court can

4   intervene when the other lawsuit is filed against the debtor.

5   And there's simply no finding, and I think LTL concedes this on

6   Page 96, that LTL would certainly face "automatic indemnity

7   obligations."  And so it just falls short under <u>W.R. Grace</u> and

8   under <u>Federal-Mogul</u>.

9          And second, even apart from the fact that these are

10  all eve-of-the bankruptcy indemnifications for the purpose of

11  establishing jurisdiction, the 1979 JJCI agreement, that can't

12  really establish even for Old JJCI an indemnity obligation

13  because that covers only liabilities that are allocated on the

14  books or records of J&J as pertaining to its baby division.

15  But there were no talc liabilities in 1979 allocated to Old

16  JJCI at that point.  And it doesn't really expressly indemnify

17  J&J for its own tortious misconduct.  And to indemnify a

18  company for its own tortious misconduct, you typically have to

19  have language regarding fault, negligence, culpability,

20  something like that in there.  There's no language like that in

21  the 1979 agreement.

22          Finally, I see my red light is on --

23          THE COURT:  That's fine.  You're on our time.

24          I'd like to go into what the benefits and detriments

25  are in considering a 524(g) channeling injunction or trust, if

1   you will, versus the mass tort system because we've had a lot

2   of *amici* file briefs one way or the other.

3        The theme seems to be of the debtor that the 524(g)

4   trust can be set up.  It's adequately funded along with the

5   claims coordinator already in place.  The claims coordinator

6   has a proven track record of ferreting out valid claims from

7   invalid claims and you can do estimations and everything can be

8   resolved in one single venue.  And their point is, what's wrong

9   with that?

10       MR. LAMKEN:  All right.

11       So first, I think you don't get to a remedy like

12  524(g) until you have a legitimate good faith bankruptcy in the

13  first place.  And so that would not solve our problem with the

14  lack of good faith, the fact that we've hived off one set of

15  creditors, talc victims, for differential treatment, the fact

16  that we've taken the actual assets of the entity and put them

17  outside bankruptcy.

18       But one of the problems here is that 524(g) has been

19  distorted by that as well.  Look, for a 524(g) trust, the idea

20  is you take the debtor's securities and you put them in the

21  trust with a right to dividends, it says that in the statute,

22  so that you have sort of that ongoing evergreen source of

23  funding so you can keep coming up with more assets to pay

24  future claimants.  What this court in a footnote referred to or

25  quoted Congress as saying that you have a goose that can "lay

1  golden eggs" and continuously fund those victims.

2         But what happened here is, because we swapped out

3  debtors from J&J and somebody with an actual operating

4  business, Famous Brands, to somebody who's just a made-for-

5  bankruptcy entity, you've swapped out a very different goose

6  and it's a goose that doesn't lay golden eggs.  It just is a

7  goose with a right to have a funding agreement.  It's an

8  unsecured funding agreement, subject to defenses, and that's

9  just inconsistent with Combustion Engineering which says on

10 Page 248, it says, look, implicit in this is that you need an

11 ongoing operating business.

12        And that's reinforced by Section 524(g)(2)(B) because

13 that says that you could only have this sort of 524(g) trust

14 when your debtor was named in litigation at the time of the

15 bankruptcy.  And that forecloses the idea of having --

16        THE COURT:  But that seems to be hyper literal in

17 this case because in the end, the LTL I think probably already

18 has been named in cases, has it not?

19        MR. LAMKEN:  No, Your Honor.  I don't think it's

20 hyper literal in the following sense because it serves an

21 important purpose.  Congress wants the real tortfeasor, the

22 real guy who has an operating business to be the one operating

23 the 524(g) trust because then his securities go into the trust.

24 By requiring somebody to have been named when they declared

25 bankruptcy, it ensures that you have a real company there, not

1 a made-for-bankruptcy debtor like LTL that has no real

2 operations and it has no assets --

3     THE COURT:  But we have a real company and

4 liquidating 11s are allowed, and specifically, <u>Integrated</u>

5 <u>Telecom</u> tells you in Footnote 4 that oftentimes you have

6 liquidating 11s and, in my day, we had quite a number that were

7 filed in the 80s, or at least in the 90s all the time.

8     MR. LAMKEN:  So, Your Honor, you know, it's possible

9 that if you had a consensual plan, people could agree to having

10 something like LTL be putting its securities, whatever those

11 might look like, in a 524(g) trust.  I don't think it's

12 consistent with the statute, but one could conceive of it.  But

13 this deprives the claimants of that choice, right?  Now, the

14 debtor that would put its securities in it is LTL, this made-

15 for-bankruptcy entity that doesn't have operating divisions.

16 And everything that it's guaranteeing, everything that is, you

17 know, sort of pledged in some sense that, you know, there's an

18 unsecured funding agreement, all those assets are now being

19 spun-off by J&J and won't even be assets there until it's

20 funded anymore.  So I think it just completely upsets the whole

21 idea of 524(g) of taking the debtor's actual securities.

22     THE COURT:  But what would be the best approach?  I

23 mean, there are a lot of heartbreaking stories here and it's

24 very difficult to come up with a right game plan for everybody.

25 From your perspective, what would be the best approach --

1         MR. LAMKEN:  I think --

2         THE COURT:  -- for these very difficult cases, these

3 talc related disabilities?

4         MR. LAMKEN:  So I can speak from my perspective and

5 my clients.  And from my perspective and my clients, they are

6 happy to go forward with the traditional tort system that has

7 operated in this country to compensate people for 200 years.

8 But if --

9         THE COURT:  How long would that take?

10        MR. LAMKEN:  Your Honor, I don't know how long it

11 would take, but I know that these things do move very quickly.

12 For example, you know, Judge Robreno downstairs, 186,000 talc

13 resolutions, Vioxx resolved, diet drugs resolved.  The tort

14 system can handle these mass torts.  This is not the first.

15 But that also doesn't in the end tell you, what are you going

16 to have?  Is it okay to just go have a JJCI bankruptcy, or are

17 we going to allow there to be this concocted entity, LTL, with

18 only talc victims, no other creditors and all of Old JJCI's

19 assets sitting outside bankruptcy.  That goes too far.

20        THE COURT:  But I think that -- I mean, part of what

21 Judge Fuentes is asking is which system is better, the MDL

22 system or the bankruptcy system, for resolving these types of

23 claims in an orderly way and getting money as quickly as we can

24 to people with valid claims?

25        MR. LAMKEN:  So under this structure, I can tell you

1  there's a clear answer and it's the tort system, because if you

2  look at <u>Bestwall</u>, when you separate the assets and the ability

3  to operate from the bankruptcy system, when you take only the

4  talc claimants, only the victims and put them alone in

5  bankruptcy, bankruptcy bogs down and you go five years without

6  a plan, without anybody getting compensated.  Before that --

7       THE COURT:  But with <u>Bestwall</u>, it has been five

8  years.  But in this case, we don't know.  If bankruptcy is

9  found to have a valid purpose here and it goes back, I don't

10  know when it's going to be over.  But it does seem, based on

11  what some people have filed, that MDLs take a long time.

12       And well, perhaps you can have Bellwether Trials.

13  Most of what you do is discovery.  You send it back to the

14  other courts.  You hope to somehow at some point you can get a

15  settlement discussions going, but that also can take many

16  years.

17       MR. LAMKEN:  Your Honor, I agree that no system is

18  perfect here.  But we're the ones looking for compensation and

19  we're happy to be in that system, which can sometimes be slow,

20  but it can also move very quickly as the examples I gave you

21  show.

22       But in the end, I don't think courts should be in the

23  position of saying I think bankruptcy is better because it's

24  more efficient or I think tort is better because it's more

25  consistent with other values like having jury trials and

1  individual justice.  I think that the answer is if you have a

2  bankruptcy that has been structured to bypass the traditional

3  bankruptcy protections, which is what you have here, that is

4  not a good faith bankruptcy.  If the purposes are to benefit

5  the parent, the corporate parent, which is the case here, that

6  is not a proper bankruptcy.

7       THE COURT:  So in your world view, any equities with

8  respect to which system is better or worse shouldn't be baked

9  into the equation?

10      MR. LAMKEN:  I don't think that is because it comes

11 very, very close, Your Honor, to litigation advantage, who

12 thinks which system is better.

13      Is this better for the victims?  Is this better for

14 the defendant or the petitioner?  That's just not someplace the

15 court should be.  And one of the reasons for that is you kind

16 of in the end have to ask more efficient, better for whom.  And

17 in this case, if you look at it, there's supposedly $61 billion

18 available for funding.

19      THE COURT:  I mean, the problem if you're a claimant

20 is it looks like in a lot of these cases you either get a home

21 run or a strikeout.

22      MR. LAMKEN:  Well, I think the framers understood

23 that juries can sort those sorts of things out.  And if you get

24 a strike out, it may well be because the jury determined that

25 you didn't have specific causation, that whatever your

34

1 condition is, it was caused by something else.  And that's --

2          THE COURT:  Well, Mr. Feinberg could probably do that

3 much more quickly and much more efficiently than having a full

4 blown trial.

5          MR. LAMKEN:  Well, Your Honor, I think that's right.

6 But the Seventh Amendment tells us that if you want your jury

7 trial, you're entitled that jury trial.  And the framers

8 understood that the community, the people of the United States

9 who sit in the dock and make the decisions, we trust them to

10 sort those things out.  And the fact that some people win and

11 some people lose, we trust that the juries are able to sort

12 that out.  And the notion that somehow bankruptcy may be more

13 efficient, that's just not a good basis for having a bankruptcy

14 case because in the end, even if it's more efficient, who for

15 is it more efficient and who is it benefitting?

16          Here, if there's anything under $61 billion that's

17 ultimately distributed in this bankruptcy, and believe me, when

18 a plan is proposed by J&J, when that happens, if it happens,

19 it's going to be well short of 61 billion.  Anything short of

20 that, all those efficiencies, all that extra, that accrues to

21 equity.  This is not more efficient for claimants.  It's more

22 efficient and better, perhaps, only for equity.

23          If I may reserve any remaining time for my rebuttal.

24 I thank you very much.

25          THE COURT:  We'll give you plenty of time for

1    rebuttal.

2            MR. LAMKEN:  Okay.  If there are further questions,
3    then I'm happy to entertain them.

4            THE COURT:  I've got quite a few, but we'll come
5    back.

6            MR. LAMKEN:  Okay.  I'll brace myself here.

7            THE COURT:  Why don't we get Mr. Frederick, or I
8    guess Mr. Janda --

9            MR. LAMKEN:  Thank you very much.

10           THE COURT:  -- and then, we'll get you back.

11           MR. JANDA:  Thank you, Your Honor.  And may it please
12   the Court.  Sean Janda for the United States Trustee.

13           I think it's helpful to start by just taking a step
14   back to understand what's really happening here.  At bottom,
15   J&J has carved off one set of disfavored creditors' claims,
16   handpicked a selection of assets, and sent only those claims
17   and only those assets into bankruptcy.  If that carefully
18   constructed bankruptcy is permitted to proceed, those claimants
19   will be held hostage against each other with no claimant
20   receiving any money until enough claimants agree to take
21   whatever drips LTL chooses to release from the spigot of the
22   funding agreement.

23           THE COURT:  I'm going to ask you a variation of the
24   question I asked of Mr. Lamken.  Let's assume, instead of 1979,
25   that LTL was formed in 2010 when the first cases really started

1  coming, or maybe 2014 when they saw that the cases were for

2  real.  And so you had good assets, bad assets, LTL gets the

3  liabilities in connection with the talc.  So let's, it's now

4  been since 2014, let's say eight years, would you still be

5  objecting if LTL now filed for bankruptcy in 2022, 2021?

6         MR. JANDA:  So I think there's two different pieces

7  here, Your Honor.  The one piece is the sort of valid

8  reorganizational purpose piece, whether there's the sort of

9  financial distress that makes bankruptcy a legitimate choice.

10 And then the other piece is the sort of subverting the

11 structures and purposes of the Code.

12         And on the second piece, you know, I think it's hard

13 to say exactly where the line is.  In this case, the fact that

14 this scheme was implemented two days before the bankruptcy

15 filing was enacted, it's very obvious --

16         THE COURT:  I get it.  You're saying the optics

17 aren't good here, but I'm trying to -- you're writing an

18 opinion here.  Where's the line?

19         MR. JANDA:  And I think, as Mr. Lamken said, the line

20 is whether these machinations or the scheme was undertaken to

21 try to subvert the principles of the Bankruptcy Code.  And so

22 it might be the case that if it happened in 2014 with

23 bankruptcy on the mind, that might be enough.  It might be the

24 case that if it happened in 2014 with sort of valid business

25 purposes on the mind, it wouldn't be enough.  It's hard to give

1  a very clear line.

2         But this case I think very obviously falls on one

3  side of the line.  And I don't think the Court needs to say too

4  much more than that to find that this sort of integrated

5  transaction very much undermines sort of a number of

6  fundamental purposes and structures of the Code.

7         THE COURT:  Where we left off with Mr. Lamken was the

8  reasons to have a 524 channeling trust versus the mass tort

9  system.  Do you have any thoughts on that?

10         MR. JANDA:  I mean, I think the most important thing

11  is, with all respect to the Court, that's not really the

12  Court's job to make the determination about which system is

13  more equitable or which system is fairer or better.  That's

14  Congress's job.  And Congress has created the 524(g) process

15  that sort of assumes a preexisting valid bankruptcy.  And once

16  you are in bankruptcy, Congress has determined that in certain

17  clearly defined circumstances, a 524(g) trust might be the best

18  resolution in those circumstances.

19         Congress has also implemented, you know, the MDL

20  procedures and other procedures to try to make the resolution

21  of mass claims more efficient to balance, the competing

22  interests in that circumstance.  But the overarching thing is

23  that Congress has determined that the strong medicine of the

24  Bankruptcy Code is necessary or is appropriate in certain

25  circumstances, and really I think the sort of job of the Court

1 is to figure out whether those circumstances are met, not to

2 figure out whether at the end of the day one system or the

3 other system is better or fairer or more efficient.

4       THE COURT: Can the fear of a lot of litigation, tens

5 of thousands of cases and huge jury verdicts, can that satisfy

6 this financial distress concern?

7       MR. JANDA: So it depends on the particular

8 circumstances. I'd point the Court to SGL Carbon which has a

9 very long discussion of this. In SGL Carbon, the test that

10 this Court implemented was sort of an immediate financial

11 difficulty test and so it could be the case that litigation

12 fees or judgments that had been entered are such that there is

13 immediate financial difficulty. But this Court in SGL Carbon

14 sort of specifically rejected the idea that the prospect even

15 of financial and operational ruin from a judgment, at some

16 point in the future, is not enough to satisfy that test.

17       And in this case, as we explain in our briefs, I

18 mean, LTL had access to the $61 billion funding agreement

19 before bankruptcy. I don't think anyone is going to stand up

20 here and tell you that there was any immediate concern that the

21 $61 billion would be exhausted, that it wouldn't be enough to

22 satisfy judgments in the short term or to pay the litigation

23 costs in the short term. And so just under the SGL Carbon test

24 that this Court implemented, LTL was not in financial distress.

25 But --

1        THE COURT:  When you consider financial distress, I

2  asked Mr. Lamken, do you consider Old Consumer and LTL or just

3  LTL?  And he answered LTL, initially.  What do you say?

4        MR. JANDA:  So I think this Court, again, has made

5  clear and Congress has made clear that really bankruptcy is

6  intended to benefit the debtor.  And the debtor here is LTL.

7  And to the extent that LTL, you know, wants to take advantage

8  of carving off this set of claims, I think it has to, as

9  Mr. Lamken suggested, if it's going to live by the sword, it

10  has to die by the sword in that way.

11        And LTL I think narrowly focused (indiscernible) and

12  as I said, no one would tell you, I don't think, that LTL was

13  in any sort of immediate financial difficulty.  That being

14  said, if you zoom out, the question might be --

15        THE COURT:  But wouldn't the argument be that LTL is

16  in financial difficulty, it's just that here it happens to have

17  a very, very big backstop, two backstops, in fact, Old Consumer

18  and Johnson and Johnson?

19        MR. JANDA:  I don't think so, Your Honor.  I mean,

20  the rights under the funding agreement give it access so long

21  as it's not in bankruptcy.  I mean, the money sort of

22  disappears as soon as it files for bankruptcy but give it

23  access when it's not in bankruptcy to $61 billion.  And to the

24  extent that as the bankruptcy court suggested that LTL

25  exercising its rights under that agreement, would have negative

1  effects on J&J or on Old or New JJCI, and I think that just

2  goes to the concern that this bankruptcy is primarily intended

3  to benefit non-debtors who have not submitted themselves to the

4  supervision of the bankruptcy court, who haven't complied with

5  the obligations of the Code, and that as this Court made clear

6  in BEPCO is just not a valid bankruptcy purpose.

7       THE COURT:  So there were some very, one could argue

8  on one side, far out projections by the bankruptcy judge here

9  as to what the potential liability can be or the range of

10 liability, I think at one point, up to 190 billion, which is

11 significantly more than the $61 billion backstop as provided by

12 Johnson and Johnson and Old Consumer.  In that case, would LTL,

13 if that's true, would LTL be in financial distress?

14      MR. JANDA:  No, Your Honor.  And I think -- so the

15 briefs obviously make clear that there are a lot of assumptions

16 baked into that number that are not necessarily valid or

17 supported.  But even assuming it's true, and SGL Carbon makes

18 clear that the test is not all of your potential liability or

19 all of your potential costs sort of stretching out into the

20 future, it's whether there's immediate financial difficulty.

21 And no one is contending, I don't think anyone's going to get

22 up here and tell you that there was that sort of immediate

23 financial difficulty with LTL.

24      THE COURT:  So the key word used in SGL Carbon was

25 premature and your point here is, at this point in time, today,

1 it would be premature for LTL to say it's in financial

2 distress?

3      MR. JANDA:  Correct.  And I think SGL Carbon makes

4 clear that it's not just because it's premature but because in

5 some ways it's speculative, right.  You don't know how suits

6 are going to turn out.  You don't know what costs are going to

7 be in the future.  If you have an operating business, it is

8 sort of --

9      THE COURT:  I think it's just another way of saying

10 premature.  I can speculate but it's not, we don't know.

11      MR. JANDA:  Correct.  But I think thinking about it

12 as speculation helps explain why the bankruptcy court's

13 findings on this are really problematic because they are

14 speculation.  They're based on assumptions that are not

15 necessarily supported and that, you know, may or may not turn

16 out to be true.  But certainly, there's nothing that justified

17 in the short term the invocation of the strong protections of

18 the Bankruptcy Code.

19      THE COURT:  Well, let's assume we reverse the

20 bankruptcy court, what would litigation look like going forward

21 and does J&J have any direct liability?

22      MR. JANDA:  So my understanding, Your Honor, and

23 we're obviously not involved for the most part in the tort

24 cases.  My understanding is that at least some of these

25 judgments have been entered against J&J directly whether sort

42

1  of that's appropriate, whether there will be more, I have no

2  idea. You know, I think if this Court concludes that the

3  bankruptcy petition should have been dismissed, at that point,

4  J&J or JJCI sort of, or LTL merged back into new, I mean, who

5  knows what would happen, they could make a decision whether

6  they wanted to continue in the tort system or whether they

7  thought that they were facing the sort of financial difficulty

8  JJCI to justify invoking the protections of the Bankruptcy

9  Code.

10        At that point, they would submit themselves, all of

11  their assets to the supervision of the bankruptcy court and

12  would comply with the Code's obligations. And, again, that's

13  just sort of fundamentally really the problem here is Congress

14  has given very strong protections to entities facing financial

15  difficulty and has determined that sort of the shield of those

16  protections is necessary and is appropriate in circumstances

17  where the person or the entity taking advantage of them submits

18  itself to the Code, submits itself to the bankruptcy court,

19  complies with the many obligations of the Code.

20        But here, I think sort of LTL or J&J is trying to

21  turn what should be that shield of bankruptcy into a sword by

22  not complying with any of the obligations and by trying to get

23  sort of full resolution indefinitely into the future without

24  undergoing any of those obligations that Congress has

25  determined are required.

1          THE COURT:  Is the biggest concern that the U.S.

2     Trustee's Office has that the optics of this just don't seem

3     normal for the type of bankruptcy that is allowed by the Code

4     in America?

5          MR. JANDA:  So I don't think this is about the optics

6     of this, Your Honor.  It's about just fundamental subversion of

7     the Code.  I mean, the U.S. Trustee cares very deeply about the

8     structure and the integrity of the Code.  And here, I mean, as

9     we explained in our briefs and I'm happy to go through the sort

10    of transaction, the scheme here, just undermines --

11         THE COURT:  So let me try it another way.

12         LTL has existed for a number of years.  LTL has

13    massive liabilities in connection with and potential

14    liabilities in the future, suits being filed every day, with

15    regard to its talc products.  When can LTL be safely assured

16    that there won't be an objection of the Trustee if LTL files

17    for bankruptcy protection?

18         MR. JANDA:  And with apologies, I don't think I can

19    give you an answer that you're going to find satisfactory on

20    that.  I have no idea what in sort of other circumstances the

21    Trustee would or would not decide to object to.  I mean, the

22    key here and we don't think LTL was in financial stress.  We

23    don't think there's a valid reorganizational purpose.  We've

24    made that clear.  But I think the biggest problem from the

25    Trustee's perspective is the subversion of the Code, is the

44

 1 sort of playing games with these really fundamental, important
 2 rules of the Code. And to the extent that a particular
 3 bankruptcy wasn't doing that, I think the Trustee's interest --
 4     THE COURT: And just to sum up, the most important
 5 rules of the Code in your view are?
 6     MR. JANDA: And I think we will focus on three
 7 things. One is the priority rules that creditors and equity
 8 holders have to be treated in a particular way. Equity doesn't
 9 get anything until creditors are paid. And here, equity has
10 been getting stuff all along while creditors languish in
11 bankruptcy.
12     Two is the idea that, I mean at its core, the Code
13 sets up a fundamental quid pro quo where an entity submits
14 itself to a lot of obligations of the Code and the supervision
15 of the bankruptcy court in exchange for the Code's protections.
16 And here, that's just not happening.
17     THE COURT: It sounds to me like you're talking about
18 Old Consumer, you're not talking about LTL.
19     MR. JANDA: So, Your Honor, I think there's sort of
20 two things here. And one is, to the extent that the Court
21 wants to focus sort of just on LTL --
22     THE COURT: No, but I'm just following along with
23 your answer.
24     MR. JANDA: I mean, I think the point is that LTL has
25 filed for bankruptcy I don't think anyone would disagree to

1  benefit JJCI, to benefit J&J, and those sorts of benefits to

2  non-debtors are just not contemplated by the Code.  The Code is

3  for debtors who submit itself to its obligations and the point

4  of this bankruptcy isn't to benefit LTL, it's to benefit the

5  non-debtors who haven't submitted to the Code's obligations,

6  who haven't done the sort of financial disclosures, who haven't

7  had the supervision of the bankruptcy court, who won't have the

8  supervision of the bankruptcy court.  And that's just not an

9  appropriate purpose for the very strong medicine the bankruptcy

10  court provides truly distressed entities, which again, LTL was

11  not at the time that it filed.

12      THE COURT:  And any other bankruptcy principles that

13  you think are violated.  You mentioned two.

14      MR. JANDA:  And then, I mean the third one I think is

15  sort of in with the second one is the idea that in addition to

16  complying with the obligations of the Code, it's the debtor who

17  submits itself to the supervision of the bankruptcy court and

18  sort of ensures that it's acting in a way to maximize creditor

19  returns.  And here, again, J&J, JJCI just haven't submitted to

20  that supervision.  So that, to the extent that it's separate

21  from the second regarding sort of the various other obligations

22  of the Code that J&J and JJCI are not themselves complying

23  with.

24      THE COURT:  If tort litigants prefer to have their

25  day in Court, doesn't it seem wrong that Old JJIC can decide

46

1  otherwise by taking advantage of the bankruptcy system?

2        MR. JANDA:  I think that depends on the particular

3  circumstances, Your Honor.  I mean, obviously --

4        THE COURT:  I think that was a softball.

5                (Laughter)

6        MR. JANDA:  Well, so Congress has constructed the

7  Bankruptcy Code and Old JJCI might well be able to file for

8  bankruptcy and might well have been able to take advantage of

9  Congress' protections even in the face of objections from tort

10  claimants.  I think in this case, obviously, tort claimants are

11  being uniquely disadvantaged relative to equity holders and

12  relative to J&J's other creditors.  And that's something that's

13  just not contemplated by the Code or by, I mean, anything else

14  that Congress has done.  I'd say Congress has established

15  procedures for resolving mass tort litigation, even mass tort

16  litigation that involves substantial liability and has

17  determined that those procedures best balance the relevant

18  interests in the context of mass tort.

19        THE COURT:  Thank you very much.

20        MR. JANDA:  Thank you.

21        THE COURT:  We'll hear from Mr. Frederick and then

22  we'll take a break after that.

23        Welcome.

24        MR. FREDERICK:  Thank you, Your Honors.  And may it

25  please the Court, David Frederick for the Arnold and Itkin

47

 1  appellant.  I'd like to reserve three minutes of time for

 2  rebuttal.

 3          I'd like to emphasize two points in my presentation.

 4  The first is that your cases, Third Circuit cases, should

 5  compel reversal.  <u>BEPCO</u>, <u>SGL Carbon</u>, and <u>Integrated Telecom</u>,

 6  all set out the appropriate tests for determining what is good

 7  faith in a bankruptcy.  In this situation, LTL fails the

 8  relevant tests for financial distress and good faith in

 9  promoting a bankruptcy.  And I'd like to go into that in a

10  minute.

11          But my second point is that there is no limiting

12  principle to LTL's position.  They cannot tell you when any

13  other corporation would be constrained from doing exactly what

14  they have done, not just for a mass tort, but for any

15  significant liability.  Johnson and Johnson is a company with a

16  market capitalization of a half a trillion dollars that throws

17  off dividend income for its shareholders at the rate of $10 to

18  $11 billion a year, that boasts that for 59 straight years, it

19  has increased its dividend.

20          And so if Johnson and Johnson can get away with

21  filing a bankruptcy to hive off its tort liabilities for talc

22  claimants, what's to stop any other company in America from

23  doing the same thing?

24          THE COURT:  It sounds to me like you're saying is if

25  the backstop, instead of 61 billion for these types of claims

1 were, pick a number, 5 billion, then wouldn't LTL be in

2 financial distress enough that it should be able to take

3 advantage of the bankruptcy system?

4       MR. FREDERICK:  Well, I think that you go through the

5 normal test, Judge Ambro, and one of the reasons why I think my

6 colleagues have resisted this hypothetical, which I think

7 you're searching for where is the line to draw.

8       THE COURT:  Right.

9       MR. JANDA:  And I think that the answer to that is

10 that you're going to have to assess was there a good faith

11 purpose and emphasize is the LTL in your hypothesized construct

12 an ongoing concern?  Because one of the purposes of a

13 Chapter 11 is to take a business that has an ongoing economic

14 value and preserve and help through the bankruptcy rules that

15 entity emerge out of bankruptcy.  You don't have that here.

16       THE COURT:  But liquidating 11s are allowed.  I mean,

17 Integrated Telecom tells us that.

18       MR. FREDERICK:  That is true.  But that is also why

19 in this Court's decisions in BEPCO and SGL Carbon, it looked

20 specifically at whether or not the entity claiming bankruptcy

21 in order to use that process to evade certain litigation

22 responsibilities had a parent and that the parent could either

23 provide financing or bail it out of whatever financial

24 difficulty it was in.

25       And so you have exactly that situation here where J&J

1   was paying the talc liabilities and it paid the Ingham

2   judgment.  That's undisputed.  So it was on J&J to pay that.

3   It chose to create an accounting fiction by shifting the

4   liabilities on paper to JJCI.  But Johnson and Johnson did it.

5   Johnson and Johnson paid.  And there's no reason, Judge Ambro,

6   under your hypothesized situation one wouldn't look at the

7   circumstances for that bankrupt entity to determine, yes, it's

8   got a commitment for 5 billion, but is there some other

9   mechanism by which it could get financing in order to pay other

10  claimants?

11          Now, if I could go to some of --

12          THE COURT:  The usual one would be, if in some way it

13  had something going on, like the royalties coming and possibly

14  DIP financing, I don't know.  But I mean, if you are a

15  claimant, it would seem that this bankruptcy is about as good

16  as you can get absent getting punitives to have your claims

17  determined, estimated, and paid.

18          MR. FREDERICK:  Wrong.  I'm sorry, Judge Ambro.

19          THE COURT:  That's fine.

20          MR. FREDERICK:  That is not correct.  Sixty-eight

21  hundred talc claimants have already settled.  There has not

22  been a single settlement since they filed for bankruptcy.  What

23  the bankruptcy does is it bleeds the oxygen out of the room for

24  settlement by making every last claimant wait until there is

25  not just a final plan confirmed but all appeals have been

1   exhausted.  So there might be a --

2          THE COURT:  But that sounds like what you're -- the

3   problem there is, the stay that was given by the Court under

4   362.

5          MR. FREDERICK:  No.  The problem is the funding

6   agreement.  The funding agreement by its plain terms --

7          THE COURT:  And during the course of the appeal, you

8   have a built-in stay without having asked for it.

9          MR. FREDERICK:  That's exactly right.  But the

10  funding agreement also says no money flows until the last

11  appeal has been exhausted.  And so when you deal with any kind

12  of complicated bankruptcy in which there might be multiple

13  plans --

14         THE COURT:  That the last appeal has been exhausted

15  per that individual claim or per the case as a whole?

16         MR. FREDERICK:  The case as a whole.  No money flows.

17         And that's the problem that the funding agreement is

18  not the be-all end-all to this for the claimants.  And, Judge

19  Fuentes, you asked exactly the right question which is, who's

20  better off in such a system.  And there's no reason to think

21  that where J&J, which knew of talc liabilities for asbestos in

22  1969 and was found to have engaged in reprehensible conduct,

23  would not also be liable for judgments for these victims for

24  the asbestos in a product that seemingly is innocent.

25         They've paid more than $92 billion over the last six

51

1  years to their shareholders in dividends and through stock

2  buy-backs.  So there's no question that outside the bankruptcy

3  system in which J&J is being benefitted as a non-debtor that

4  they would be obligated to make payments for their own

5  culpability for these people's problems.

6          THE COURT:  Let's go back to Judge Ambro's

7  hypothetical.  So if you were on this panel, would you venture

8  to write an opinion identifying the line?  Or would you say, on

9  these facts clearly not a legitimate or a good faith

10 bankruptcy?

11         MR. FREDERICK:  Judge Restrepo, I think fairly, I

12 would urge the Court to say the precedents of your Court compel

13 reversal and explain why.  In doing so, some of those features

14 of what constitutes a reasonable way to draw a line will

15 emerge, but I don't think it's appropriate in a case

16 essentially a first impression where you're looking at the

17 Texas two step as the first appellate court to do that.  You're

18 looking at an entity that is not what Johns-Manville did and

19 what was the precursor to 524(g).  But it is a closed-end

20 capped system in which Johnson and Johnson has an incentive to

21 fix the value of the funding agreement by spinning off that

22 agreement which is permitted under the funding agreement itself

23 so you have an entity that is not like any other entity out

24 there.

25         And so to say, preemptively, these would be the

1    circumstances of which that would be permitted, respectfully,

2    feels advisory to me.  It doesn't feel necessary.  And given

3    the creativity that led to the Texas two step phenomenon in

4    which not a single one of these entities has ever emerged with

5    a confirmed plan and in the meantime, we've had victims of all

6    of these various torts go without a remedy, I don't think it

7    would be correct or appropriate for the Court to create a

8    roadmap for corporations to continue to do that.  That should

9    be subject to the warp and woof of litigation.

10           I would like to, though, address Judge Ambro a couple

11   of your questions.

12           THE COURT:  Sure.

13           MR. FREDERICK:  You asked whether it was appropriate

14   to look beyond LTL at JJCI.  I think that the way that you

15   appropriately do it under your cases is to look just at the

16   debtor and you look at the debtor's financial distress at the

17   time of filing.  It is an eminent financial distress test for

18   the debtor.  And the reason why you do that is because the Code

19   instructs that the debtor is going to be subject to the

20   strictures of the Code and the opportunities that the Code

21   presents.  And so looking beyond that is not the way you start.

22           Now, your cases have also looked beyond the actual

23   debtor to determine whether or not such things as financial

24   distress is appropriate and so I can't say you shouldn't do

25   that.  I think it is appropriate in this case to look at what

1  the assets are available by Johnson and Johnson to provide

2  additional liquidity and additional remedies for the debtor.

3  But that's not typically where you start.  The problem here,

4  though, is that as Mr. Lamken pointed out, what LTL is seeking

5  to do is to create a disfavored set of creditors.  It is only

6  the talc victims that are subject to this bankruptcy and the

7  strictures created by the bankruptcy.

8          Now, Judge Ambro, you also ask which system is

9  better.  Now, leaving aside the academic discussions that I'm

10 sure will ensue as soon as you have written --

11         THE COURT:  We've seen them already.

12         MR. FREDERICK:  -- this opinion, I would just say

13 that -- I would say a couple of things.  For settlement and

14 providing remedies to victims, the tort system is

15 unquestionably better.  Why?  Because Johnson and Johnson has

16 every incentive to engage in negotiations that are going to

17 inure to its benefit, but will pay money.  So the 6,800 talc

18 victims that have already received a settlement from Johnson

19 and Johnson was because Johnson and Johnson decided it was time

20 to settle with them.

21         Now, it might have been that the law firm that was

22 the firm superintending those particular claimants proposed a

23 trial threat.  That is a perfectly valid reason for J&J to

24 decide we want to settle with that law firm and get them off

25 the board.

1          THE COURT:  And the tort system pays money also,

2   doesn't it?

3          MR. FREDERICK:  That's what I'm saying.  That's what

4   I'm saying.  You can't do what I just said in bankruptcy.  You

5   can do it in the tort system.  And that has happened in the

6   tort system.  It's no secret that the way that the company

7   would go about doing is from a top down.  We are afraid of this

8   law firm and we do not want to go against them in court.  We're

9   going to resolve those cases for that law firm, or we're not

10  afraid of this law firm, but we think if we can set a low

11  enough floor by settling out cheap, then that becomes the

12  market price.  And companies do that all the time.  It is a

13  perfectly rational way to go about resolving these.

14         That could happen in the mass tort MDL system.  And

15  it does not happen in bankruptcy because of the way the classes

16  of the different creditors are set up and the voting rules that

17  go along with relieving that system from the stricture of the

18  bankruptcy rules.

19         Now --

20         THE COURT:  Just a factual question.  For some

21  reason, I had assumed normally that punitives are not available

22  in bankruptcy.  But when I look at the briefs, there's not a

23  strong statement that that's one way or the other.  Are

24  punitives available in a bankruptcy?

25         MR. FREDERICK:  Well, we're now talking about

1 negotiating.  I think that the question of does a bankruptcy

2 confirmed plan take into account punitive damages, I don't

3 think the law is clear on that point.  There is unsettled --

4         THE COURT:  I agree.

5         MR. FREDERICK:  And so the question then is, what can

6 you negotiate and what is confirmable as a plan?  Here, the

7 anomaly is that Johnson and Johnson was hit with a higher level

8 of punitive damages than Old JJCI.  Why?  Because it was the

9 parent company that was misleading the scientists.  It was the

10 parent company that was dealing with the FDA and other foreign

11 regulators with respect to asbestos.

12         And so the parent company was viewed by juries as

13 more culpable for the reprehensible conduct than the consumer

14 entity.  And so when you look at the multiple upheld by the

15 Missouri Court of Appeals in the _Ingham_ case, that's why

16 Johnson and Johnson was hit with higher punitives.

17         Now, how you would do the valuation of that in a

18 confirmation of a plan, I hope that we never get to that

19 because I would fervently urge you to rule that this was not a

20 good faith bankruptcy.  But I would suggest that that will be a

21 much litigated question that will further delay the

22 finalization of any bankruptcy plan.

23         You asked, Judge Ambro, about what if LTL had been

24 created years earlier?  I think part of the test of what you

25 look at is whether it was still part of the parent company and

56

 1  that the parent company was continuing to finance.  In which

 2  case, I don't think you would find financial distress.  But

 3  again, the test would be under SGL Carbon and Integrated

 4  Telecom, whether there was immediate or imminent financial

 5  distress at the particular time, years later, that it was

 6  seeking to declare bankruptcy.

 7         But the second thing I'd like to say is that under

 8  that construct, one of the reasons why the Texas two step is so

 9  problematic in bankruptcy is that it does not provide for asset

10  maximization for creditors.  It is designed to starve off the

11  claims of creditors who are claimants in the tort system.

12         And that purpose is a very important purpose of a

13  Chapter 11 because the idea of allowing the reorganization is

14  so that you can maximize the assets available to the creditors.

15  But the Texas Divisional Merger Statute, as conceived and

16  implemented in these various cases that are pending, doesn't do

17  that at all.  It tries to create a fixed cap.  And, in fact,

18  that was what the J&J treasurer said in July of, the year that,

19  July of '21, that they were seeking to cap their talc

20  liability.  And so --

21         THE COURT:  Yeah, but if they cap it at 61 billion

22  and it turns out in a lot of the briefing that I've seen from

23  your side that the actual amounts are going to be far less than

24  that, does that make much difference?

25         MR. FREDERICK:  We don't know and that's the problem,

57

1   Judge Ambro.  I can't give you a definitive answer to the

2   question of what the value or what is going to be maximized or

3   not.  What I can tell you is that the incentives for J&J are to

4   drive the number as far down as they can and to wait out the

5   talc claimants who are dying at some, you know, horrible rate

6   every day while we're waiting for this.  And that's where the

7   incentives are being drawn in this case.

8        The problem that you also have with this is that

9   you're targeting one particular class.  So, Judge Ambro, if

10  you're going to talk about any of the features that might go

11  into what would be an acceptable plan for this, you have to

12  take into account the fact that any kind of divisional merger

13  that is seeking to skive off particular liabilities is going to

14  treat all the creditors the same way so that if an entity like

15  LTL goes into bankruptcy at some point in time, it has to meet

16  the financial distress test.  It has to meet the maximizing

17  creditor value test.  It has to have a valid purpose and not be

18  for litigation.  But it also can't target one class over

19  another so that the current creditors of LTL, or J&J for that

20  matter, get benefits that only the talc claimants uniquely

21  suffer from.

22        So I think --

23       THE COURT:  But in the course of a plan, I mean, you

24  would have a classification under 1122 or whatever it is that

25  specifically puts these people into their own class, would you

1  not?

2          MR. FREDERICK:  Well, if you did that, you are

3  talking about an inordinately large class which creates its own

4  confirmation challenges and problems.  And you're also dealing,

5  respectfully, with people of different ages, different

6  conditions, different states of ovarian cancer or situations

7  with respect to mesothelioma.  So you've got -- it's a much

8  more complicated situation and that's why in the tort system,

9  the way these are traditionally done, is that a group of cases

10  will be settled and then a special master will be designated by

11  the court to go through the circumstances of each individual

12  claimant and determine based on that pop that has been achieved

13  what each person is going to get.  That is a much more

14  challenging feature than would I think in the bankruptcy

15  system.

16          THE COURT:  All right.  Thank you.  Then we'll get

17  you back on rebuttal.

18          We'll take a -- do you want a 10-minute break or a

19  15-minute break, gentlemen?

20          UNIDENTIFIED SPEAKER:  Whatever you like.

21          THE COURT:  What do you guys want?

22          UNIDENTIFIED SPEAKER:  Ten.

23          THE COURT:  Ten-minute break.  The boss spoke.

24                        (Recess taken)

25          THE COURT:  Mr. Katyal, whenever you're ready.

1           MR. KATYAL:  Thank you, Judge Ambro.  May it please
2   the Court.

3           I very much appreciate the argument of my three
4   friends and I'd like to start by discussing three interlocking
5   problems with what you just heard.  Now, my friends said a lot
6   and if it's okay with the Court, I'd like to take about four
7   minutes, not two --

8           THE COURT:  Fine.

9           MR. KATYAL:  -- to try and describe these three
10  points because they reinforce each other.

11          First is the narrow scope of your review.  At this
12  point, you're being asked to decide two questions.  First, was
13  the petition filed by LTL made in good faith, and second,
14  should protected party litigation be stayed.

15          Now, my friends' arguments about harm to the
16  claimants is premature.  Those are plan confirmation questions,
17  or at least ones for the 524(g) 75 percent vote.  After all, as
18  Judge Ambro reminded my friends, Congress handcrafted a
19  specific solution to asbestos bankruptcy cases, which among
20  other things requires a super majority to approve a plan.  What
21  my friends are doing is taking all of their complaints about
22  the bankruptcy process and pushing that all into the good faith
23  question.  Those are questions for plan confirmation, not ones
24  for today.

25          What is before you today is the bankruptcy court's

60

1  conclusion that LTL acted in good faith.  That court spent five

2  trial days hearing from witnesses and crafted two detailed

3  opinions, all of which rejects what you just heard.  The

4  standard to overturn Judge Kaplan is daunting.  As the Supreme

5  Court in Lakeridge put it, "Factual findings are reviewable

6  only for clear error with a serious thumb on the scale for the

7  bankruptcy court."

8       Or as this Court just said in I-Fiber (phonetic), "In

9  a complex case where the bankruptcy court does substantial work

10  in seeking to understand the facts, great care must be

11  exercised to defer to those findings."  As for the other

12  questions about protected parties and the stay, the bankruptcy

13  court identified five separate bases for an injunction, and

14  even the U.S. Trustee doesn't dispute them.  That's the first

15  point.

16       The second, the transfer of liability.  Much of my

17  friends' argument hinges on the notion that J&J, not LTL, last

18  year evaded claims by restructuring.  But the key fact is this,

19  J&J didn't owe anything, didn't owe anything for these claims

20  last year.  J&J didn't owe anything the year before.  J&J

21  didn't owe anything for the preceding 43 years.  That is

22  because in 1979, J&J transferred its entire baby business and

23  all of that liability to JJCI, a separate entity.  And JJCI

24  agreed to fully indemnify J&J for all claims.

25       So what actually happened last year?  JJCI

61

1    restructured and created two entities, New JJCI and LTL.  Every

2    dollar that the Old JJCI was liable for, every dollar of its

3    own conduct and anything alleged by J&J, the New JJCI had

4    agreed to pay 100 percent.  The restructuring and bankruptcy

5    petition didn't debate anything.  It was a full one-to-one

6    placement.  Indeed, it was even more than one-to-one for

7    reasons our brief explains.

8           Now my friends say, well, they represent the victims

9    and speak for them.  That proves our point and proves

10   Congress's point.  They are all current claimants.  Our

11   argument is that each of their tort lawsuits has tunnel vision.

12   It examines only their individual case and delays future ones.

13   It's a home run or a strikeout and precious few get up to bat.

14   The only way to get a system wide resolution that's

15   comprehensive, that protects future claimants, is through

16   bankruptcy.

17          Third, and finally, they ignore several key limiting

18   principles of our argument, particularly Mr. Frederick, and

19   four things make this case unique.  First, a latency period of

20   nearly 50 years with many, many future claimants who can't get

21   any relief now and who risk not getting paid.

22          Second, wild lottery style judgments like Ingham,

23   including some for billions, and a massive number of cases,

24   40,000, with more filed every hour of every day of every year,

25   creating a tsunami of litigation.

1          Third, Congress has expressed handcrafted rules for

2   asbestos bankruptcy cases under 524(g), including a 75 percent

3   super majority requirement and a rule that two courts, not one,

4   a bankruptcy court plus a federal district court, must approve

5   the plan and scrutinize it for fairness and equity, and D,

6   finally, all -- or fourth finally, all in the context of a 1979

7   full transfer of liability from J&J to Old JJCI, as well as Old

8   JJCI providing full indemnity back to J&J.

9          So this isn't a case of a parent dumping its

10  liability the day before restructuring or anything like that.

11  J&J has not been liable for decades.  In short, nothing in the

12  restructuring hurts the claimants.  And even if you disagreed,

13  the proper time to evaluate that is far down the road, and here

14  you must just simply decide whether the petition is filed in

15  good faith.

16         THE COURT:  The blank response when you hear about

17  the divisional merger statute and how it's used and people use

18  the name pejoratively, Texas two step, is why didn't you just

19  file Old Consumer?  Life would be so much easier.

20         Now, you might still have a battle as to whether

21  there was financial distress, but it would at least be arguably

22  a cleaner battle.

23         MR. KATYAL:  So, Your Honor, there's several

24  responses, but the most important one is the one that the

25  bankruptcy court gave after listening to the testimony.  And

1 you never really actually heard a response to it from my other

2 side which, as Judge Kaplan found, is if you forced that

3 entity, Old JJCI, to go bankrupt, it would have "a horrific

4 impact" because Old JJCI makes all sorts of -- JJCI makes all

5 sorts of things like, you know, Bandaids, Tylenol, things like

6 that.

7        THE COURT:  It sounds to me like only that's an

8 attempt to preserve goodwill, which of course has been earned

9 over the years.  But it sounds like the argument that's being

10 made from your side is that it's a whole lot of inconvenience,

11 a whole lot of inefficiency, a whole lot of harm to goodwill

12 and why not allow this more creative way to separate out the

13 bad from the good.

14        MR. KATYAL:  Your Honor, that is part of the

15 argument.  It is not by any stretch the whole argument.

16        So just to take a step back, I think what the

17 Bankruptcy Code would ask is the relevant question is, is the

18 bankruptcy petition maximizing the value of the debtor's

19 estate.  That's the goal, the purpose that we are isolating

20 from Page 120 of Integrated Telecom.

21        So I don't think the Bankruptcy Code says you're to

22 burden debtors for their own sake.  You're supposed to do it

23 because in some sense, it's going to maximize the value.  And

24 so one thing, and this is my first answer to you, what Judge

25 Kaplan found is that you are maximizing the value by going

64

1   through the divisional merger statute, because otherwise there

2   will be actually less money available including to claimants

3   because of the loss of goodwill, the loss of all that, you

4   know, forcing the entire company into bankruptcy, all the

5   different findings he found.

6           Now another key part of this is there's two possible

7   reasons I think my friends isolate for why you'd want this

8   larger entity, to force this larger entity to go bankrupt.  One

9   is because you want to guarantee the amount of money that this

10  larger entity, JJCI, has for claimants.  And that's exactly

11  what the funding agreement does.

12          THE COURT:  So does Old JJCI qualify for financial

13  distress?

14          MR. KATYAL:  We believe it does, as does LTL --

15          THE COURT:  So if it --

16          MR. KATYAL:  -- as my friend, the U.S. Trustee --

17          THE COURT:  If it does, then isn't it the real party

18  in interest?

19          MR. KATYAL:  Well, I don't know if it's a real party

20  at this point because LTL is the one that filed the petition.

21  We agree with Judge Kaplan.  Either way you slice it, whether

22  it's LTL or JJCI, there's massive financial distress.  And I

23  can go through that evidence.

24          But I do want to first really deal with your first

25  question because I think it's the heart of what --

65

1          THE COURT:  Excellent.  They're dovetailing together.

2          MR. KATYAL:  Yeah, they dovetail.  But Mr. Lamken

3 really spent a lot of time on this idea that Old JJCI was the

4 entity that had to go bankrupt.

5          And our first point to you is the one main reason why

6 he's isolating is because you want claimants to get paid.  But

7 this funding agreement gives the entire value of JJCI, the

8 entire value, $61 billion free and clear to the potential

9 claimants so that entire pot of money is available.

10         Now my friend says maybe JJCI will squander the

11 assets and that's why you need bankruptcy court jurisdiction,

12 maybe they'll transfer it to equity.

13         The funding agreement, this is quite important to our

14 argument, the funding agreement itself bars that or if it

15 occurred if there were any payment to J&J or to shareholders or

16 anything like that, distributions, all of that increases the

17 $61-billion pot; $61 billion is only a floor, not a ceiling.

18         I'd like to walk you through the language of the

19 funding agreement so that you understand so that it's clear why

20 my friend's argument is wrong.

21         So the funding agreement says that you would take the

22 greater of either, one, the fair market value of Old JJCI

23 immediately prior to the divisional merger.  That amount is

24 $61.56 billion, that's Appendix Page 7422.  Or it says it's the

25 fair market value on the date that LTL and the new JJCI refused

1  to pay under the funding agreement.  That's at Appendix Page

2  4316 and 4619.

3       Here's the most important point about 4619.  If a

4  hypothetical that my friend says happens and it materializes

5  that JJCI does something to try and give J&J money to -- you

6  know, in the form of distributions or something like that, that

7  just bumps up the amount of the funding guarantee under the

8  agreement.  That is Page 4319.

9       So the funding agreement solves for exactly the

10  problem.  We don't think there's anything in the Code that

11  requires, of course, you know, the larger entity to declare

12  bankruptcy.  But to the extent you're worried about it, to the

13  extent you're worried, oh, you know, maybe this is going to

14  create some bad incentive, the funding agreement does that.

15  And here's the second most important point.  J&J guarantees

16  that funding agreement, not just JJCI.

17       In the current world, in the pre-restructuring, pre-

18  bankruptcy baseline world, they could maybe try and sue JJCI.

19  We know those lawsuits take time and so on.  We could talk

20  about that in a moment.  But the most important point is

21  whatever their lawsuits would get, it would only get up to $61

22  billion and not even that because that money is not free and

23  clear.  It would be subject to all of the other creditors that

24  JJCI have and stuff like that.

25       And, of course, there's no J&J guarantee under the

1  pre-restructuring world.

2         THE COURT:  Let me work backwards.  When do funds

3  come out of the funding agreement to pay claimants in a

4  bankruptcy?

5         MR. KATYAL:  So under the terms of the agreement,

6  first, LTL has to pay whatever they have.  And then New JJCI is

7  to pay whatever they have.  And then afterwards, anything else

8  if there's any excess, it goes to --

9         THE COURT:  What about the points Mr. Frederick makes

10  that no monies come out until all the appeals are resolved?

11         MR. KATYAL:  Well, I think that's true of course in

12  the regular tort system in the bonds under Rule 62 of Federal

13  Rules of Civil Procedures.  I don't think that's any different

14  from the standard system.

15         And, of course, here I think you've got to grapple

16  with Judge Kaplan's finding that there are -- you know, 49

17  trials have happened, Your Honor, to date in all of these

18  cases.

19         THE COURT:  Thirty-five have gone to verdict, right?

20         MR. KATYAL:  Yeah, very very few out of --

21         THE COURT:  So 18 you won, 17 you lost?

22         MR. KATYAL:  Yeah.  And then some of those were

23  reversed on appeal.  And as Judge Kaplan said, you know, we

24  have a very good batting rate for all of the reasons that our

25  briefs explain.  But, nonetheless, at the end of the day,

68

1  there's going to be financial distress because of the massive

2  number; 40,000 lawsuits and more being filed every day.

3       THE COURT: Well, let's go back to you said the full

4  amount of all assets of Old JJCI are available to pay

5  claimants. So, once again, you come back to my question. Why

6  not file Old JJCI in the first place?

7       MR. KATYAL: Yeah, for two reasons. One is it would

8  reduce the number of the dollars actually available to

9  claimants because, forcing as Judge Kaplan found, Old JJCI into

10  bankruptcy reduces the value of JJCI.

11       THE COURT: Except you've got a company that has --

12  is ongoing with very very profitable products that have been

13  well earned over decades.

14       MR. KATYAL: And that's exactly Judge Kaplan's point,

15  which is you don't have to -- because of the funding agreement

16  because you get all of the good without the bad, you get the

17  full value of the company not subject to any creditors or

18  anything like that. It's free and clear up to $61 billion, and

19  then you get a backstop from J&J.

20       And remember my friends, their brief says J&J has

21  better credit than the United States government. So in terms

22  of which deal is better for the claimants, for all the

23  claimants, not just my friends sitting at the table but

24  including future claimants, which is a huge chunk as Congress

25  noted in 524(g) because of the latency period for asbestos.

1          THE COURT:  If I understand you correctly, if I'm

2     hearing you correctly, it almost sounds like J&J did this to

3     benefit the claimants.  They had the claimants' best interest

4     at heart and then they do this Texas Two Step.

5          But the timing doesn't suggest that.  The timing

6     suggests that this was really done for a litigation advantage.

7     As I understand it, LTL is created four months after the

8     Supreme Court denies cert in the Missouri litigation, and the

9     next day they declare bankruptcy.

10         So how do you reconcile that for me because I'm a

11    little troubled.

12         MR. KATYAL:  Absolutely, Your Honor.

13         And this is exactly what my friends said to Judge

14    Kaplan, and he rejected it on the facts, not litigation

15    advantage but four separate purposes.

16         The first purpose --

17         THE COURT:  But you concede that there is a

18    litigation advantage by doing this?

19         MR. KATYAL:  Well, I think it's a byproduct of this.

20    Absolutely.

21         THE COURT:  So there is a litigation advantage?

22         MR. KATYAL:  Well, I think it's a byproduct but, as

23    Judge Kaplan found, that wasn't the reason.

24         LTL has been transparent.  There's been lots of

25    discovery on this that Judge Kaplan referred to and said, no,

1  the reason for this is four-fold: First, that there's huge

2  defense costs to the tune of two- to five-million dollars per

3  case multiplied by as many as 40,000 cases.  You didn't hear a

4  word from my friends, they had a lot of time up here, they

5  didn't have an answer to what Judge Kaplan found.  That's a

6  huge deadweight loss.

7        Every one of these cases costs us millions to fight,

8  and even if the claims are meritless.  So that's all money that

9  could be going to the claimants but now is not going to the

10 claimants.  Instead, it's going to pay attorneys.

11       The second is, as I was saying to Judge Ambro, the

12 horrific impact is what Judge Kaplan called the massive

13 disruptions that would endure if Old JJCI was forced into

14 bankruptcy.  That's at Page A-47.

15       Third, the equity concerns for future claimants,

16 which is of particular concern here given Congress' hand-

17 crafted statute in 524(g) and this very long latency period.

18 We understand my friends have to zealously represent their

19 client before this Court.  They represent current clients.

20       What Congress is telling you is there's a worry about

21 latency and about future claimants, and this is a solution

22 that's comprehensive for everyone.

23       And, lastly, Your Honor, it's because Judge Kaplan

24 found that the bankruptcy process is a lot faster than the tort

25 process.  My friend talked about 6,800 settlements but doesn't

71

1  mention what Judge Kaplan said about that, which is he said two

2  things: One, that will be dwarfed by the 40,000 cases that have

3  already been filed and the many more that will come and, also,

4  he said that the past number of settlements won't occur in the

5  future -- and this returns to your question, Your Honor --

6  because of Ingham.

7          What Ingham did was basically create a shiny object

8  for folks to try and keep their cases in the tort system with

9  the hope of a lottery-style big pay day.  Some people will get

10 home runs.  Most people, Judge Kaplan found, don't get a turn

11 at the bat.

12         That's what J&J -- excuse me, that's what LTL was

13 dealing with in this restructuring and that's why the funding

14 agreement is written the way it does.  It provides my friends

15 as well as future claimants a guarantee of at least $61

16 billion.

17         Now, Judge Ambro, I think you pointed out, well,

18 there's some kind of contradictions here, how much are the

19 claims really worth.  You know, and Judge Kaplan, of course,

20 talked about that in his opinion.  He said --

21         THE COURT:  Yeah.  I didn't see any strong defense of

22 his 190 billion.

23         MR. KATYAL:  Well, it's up to 190 billion.  And it

24 was just the defense costs.  And he got it by simply saying two

25 to five million dollars per case multiplied by 40,000 cases.

**WWW.JJCOURT.COM**

72

1              THE COURT:  But it was the high end of every --

2              MR. KATYAL:  Correct.  And we're not defending

3  necessarily --

4              THE COURT:  -- every case.

5              MR. KATYAL:  -- the high end, of course.

6              But we do -- we are defending vehemently Judge

7  Kaplan's conclusion after hearing from expert after expert

8  including Dr. Bell about the level of financial distress that

9  the company faced.  And my friends are asking you to re-weigh

10 the evidence and say, oh, well, these lawsuits actually don't

11 impose as much of a present liability or this or that.

12             Judge Kaplan evaluated all of that and found

13 financial distress, including most significantly in 2019 the

14 Consumer Division had a $2.1 billion profit.  And just the very

15 next year because, Your Honor, because of Ingham along with

16 other talc litigation, they had a $1.1 billion loss in one

17 year.  And talc liability, Judge Kaplan found, was responsible

18 for that.

19             If you look at the years 2018 to 2020 --

20             THE COURT:  Talc liability was responsible for a

21 significant portion of that, wasn't that correct?

22             MR. KATYAL:  Correct.  Yes, a significant portion of

23 that.

24             And the talc litigation, for example, Judge Kaplan

25 found from the years 2018 to 2020 costs 32 -- 27 percent of all

1 costs of Old JJCI and 32 percent in the year 2021.

2          THE COURT:  But coming back to the -- at the outset,

3 if you have a parent company and it has a subsidiary that's

4 changed its name but the subsidiary's been there for 43 years.

5 And the subsidiary has a major problem with one of its products

6 that's caused mass tort litigation and some fear of what could

7 happen in the future.

8          Usually what happens over all these decades is you

9 file the subsidiary and you go from there.  The concern -- and

10 you said that all of the assets of Old JJCI will be put into

11 play for funding the claimants' claims that are valid.  And you

12 look at the next case, I think as Mr. Frederick said, and

13 you're worried about, okay, you don't have a Johnson & Johnson

14 consumer, you have Acme, you know, Acme, Inc.

15          I don't mean the grocery chain, by the way.  I

16 apologize to them.  I'm thinking of the old Warner Brothers

17 cartoons.

18          But that they don't have 61 billion.  They are there

19 with maybe four or five billion at tops.  They're going to run

20 out of things, and they're saying we're going to do this

21 divisional merger and go from there.  And you can see that the

22 slippery slope comes into play and people are saying let's stop

23 this before it really gets out of hand.

24          MR. KATYAL:  Right.  Totally.

25          THE COURT:  That's the concern.

1          MR. KATYAL:  We are very sympathetic to exactly that

2   argument, Your Honor.  So refer to three points.  One is you're

3   exactly right that the ordinary course is a subsidiary would

4   declare bankruptcy.  That's your own opinion joined by Judge

5   Fuentes in In re Owens Corning back in 2005.  That's exactly

6   what happened.  That's what this Court approved.

7          Second, we're not here defending something in the

8   absence of a funding agreement.  If there is no funding

9   agreement, that valid bankruptcy purposes that Judge Kaplan

10  isolated those four look very different.  They look like

11  litigation advantages.

12         But here, if you were to ask what is the litigation

13  advantage that is served that could somehow dwarf Judge

14  Kaplan's four different findings of valid purpose, it would be

15  -- you're hard pressed to do so because this deal gives -- this

16  restructuring and this petition gives actually more to the

17  claimants, now all the claimants including future claimants.

18         And that's what Congress is telling you've got to do.

19         THE COURT:  This funding agreement has a bifurcation.

20  It will fund in bankruptcy and out of bankruptcy.  Isn't that

21  correct?

22         MR. KATYAL:  I believe it only funds in bankruptcy.

23  I mean --

24         THE COURT:  So what's it do outside of bankruptcy?

25         MR. KATYAL:  I don't think it has any life outside of

75

1  the bankruptcy.

2          So, you know, basically it's a --

3          THE COURT:  So in <u>Ingham</u> when Johnson & Johnson

4  stepped up and paid, it did it for what reason?  Because of a

5  judgment was against it?

6          MR. KATYAL:  So, actually, it's just flatly wrong,

7  Your Honor.  <u>Ingham</u> was paid not by Johnson & Johnson.

8          THE COURT:  Okay.

9          MR. KATYAL:  It was paid by JJCI.  I don't know where

10 my friend is getting that from.  And, you know, indeed, I can

11 point you to different parts of the record which directly

12 contradict what he's saying.

13         THE COURT:  Of the 17 verdicts or of the portion of

14 the 17 verdicts not overturned on appeal, how many of those

15 verdicts also were against J&J?

16         MR. KATYAL:  I think some may have been against J&J

17 for derivative liability or something like that.  But all of

18 them were paid for by JJCI or now LTL.  Every one.  Every

19 dollar.

20         And so, you know, the 1979 agreement actually is

21 written to say it's a full transfer of liability to JJCI but it

22 also says full indemnification for J&J and everything has to be

23 paid for by JJCI or now LTL.  So any suit against J&J at any

24 point is always going to be paid by now LTL.  That's the logic

25 behind Judge Kaplan's finding on question two about whether the

1  stay should be extended to protected parties.

2          THE COURT:  One of the questions I asked the other

3  side, more than one counsel, is when you look at this picture,

4  are you taking into account just LTL or LTL and Old JJCI, and

5  their answer uniformly was LTL.

6          It sounds like from what you're saying that part of

7  the equation here is taking into account Old JJCI.

8          MR. KATYAL:  Well, we think actually -- we agree with

9  the U.S. Trustee that the relevant question is actually is

10  whether LTL as the petitioner is facing financial distress, but

11  we can understand why Judge Kaplan also made findings on Old

12  JJCI which --

13          THE COURT:  Yeah, because he specifically -- he

14  meshed them together.

15          MR. KATYAL:  Yes.  He found either way that there was

16  going to be financial distress.  And so we agree with -- you

17  know, we agree with the way Judge Kaplan approached it.  So

18  either way, whether you look at LTL and the litigations they

19  faced or you looked at Old JJCI and the litigations they face,

20  either way it's going to meet this Court's test for financial

21  distress.

22          What Mr. Frederick said is take a look at the three

23  cases that this Court has decided, BEPCO, SGL Carbon, and

24  Integrated Telecom.  We very much want you to look at those

25  cases because all three I think are miles away from this case.

77

1  In <u>BEPCO</u>, there were six litigations in total, six.  In <u>SGL</u>

2  <u>Carbon</u>, six complaints in the United States, one in Canada.

3  <u>Integrated Telecom</u>, a whopping one securities case at issue

4  there.

5          And most importantly, each of those cases --

6          THE COURT:  But in -- let's just take for example <u>SGL</u>

7  <u>Carbon,</u> it looked like what was being done was ultimately to

8  file for bankruptcy and in the end when you have a dissolution,

9  it will be under state law that will return equity back to the

10  equityholders which one would under the absolute priority rule

11  in bankruptcy not see happening.

12          MR. KATYAL:  So I think -- you know, I think <u>SGL</u>

13  <u>Carbon</u> really goes on the notion of few litigations and this is

14  done for litigation advantage.  That's Page 124 and 125 of that

15  decision.

16          Of course, here to the extent you're worried, Your

17  Honor, about what my friends said about somehow money being

18  paid to equity and a violation of the absolute priority rule,

19  as I was saying, the funding agreement captures that because

20  every dollar that goes to J&J from JJCI in the form of a

21  distribution at Page 4319 of the record makes very clear this

22  funding agreement says that just bumps up the value of new

23  JJCI, the amount available to the claimants.

24          THE COURT:  How would you propose in the example I

25  noted that you'd have a much less funded entity in bankruptcy

1  and a much less funded backstop, how would you propose that bad

2  consequences be blunted?

3      MR. KATYAL: Through the Court's review process. So

4  -- and even before the review process, of course, was the

5  524(g) solution because 75 percent of the claimants would have

6  to approve it and, Your Honor, as you said to my friend on the

7  other side, you always have the possibility of filing an

8  adversary action for fraudulent conveyance.

9      And, indeed, they tried some of that language in the

10  bankruptcy court. They tried to suggest this was a fraudulent

11  conveyance. But at this Court as this case comes to the Court,

12  they dropped all of that out because I think it doesn't cut the

13  mustard. Here this funding agreement is --

14      THE COURT: The only answer I got was it's premature

15  to do so now. Let's figure out whether the filing was in good

16  faith and then they'll cross that bridge when they come to it.

17  I mean that's the answer that I got.

18      MR. KATYAL: Yeah. And I just don't think that

19  ultimately answers the question.

20      And I just want to return for a moment to those three

21  cases that my friend was referring to because pointedly they

22  distinguish between those six or seven litigations and the many

23  thousands, I think 16,000 that were at issue in Johns-Manville.

24  And they said that is the kind of -- certainly the kind of

25  flood of litigation that would create financial distress.

1    And here Judge Kaplan looked at the existing 40,000

2 litigations and said that is certainly enough for financial

3 distress given the numbers, the testimony from Dr. Bell that I

4 referred to earlier, and the like.

5    THE COURT:  Is LTL fully capable of satisfying the

6 talc claims?

7    MR. KATYAL:  By itself without a resort to the

8 funding agreement, we think the answer to that is no.  But with

9 the funding agreement, absolutely.

10    Our position, and Judge Kaplan found this too, is

11 that we believe that $61 billion, which is of course only a

12 floor, it could go up, is enough to pay a hundred percent of

13 all valid claims.  And when I say valid claims, it excludes two

14 things.  It excludes the deadweight losses of billions and

15 billions of dollars paid to lawyers for defending against this.

16    So the bankruptcy system avoids that, as Judge Kaplan

17 explained.  And second, this gets to a question that, Your

18 Honor, you asked Mr. Frederick, it excludes lottery-style

19 punitive damages.  You're absolutely right, we spent a long

20 time looking trying to understand does the bankruptcy system

21 bar punitive damages.  I think the answer to that is, no, it

22 doesn't bar them.  And we certainly think that -- but we think

23 that it would even it out to the extent there were any

24 available.

25    The way that I think the process would unfold, Judge

1  Ambro, is there's been an estimation expert appointed by the

2  name of Ken Feinberg, you know, obviously an expert in this

3  field.  He is going to look at the amount of liability and he

4  could, I suppose and probably we'll get briefing on, should

5  punitive damages be part of that estimation process.

6        THE COURT:  Does J&J have any direct liability in

7  this case?  And given the 50-year latency period of these talc

8  claims, right, does J&J have any direct liability or direct

9  exposure?

10       MR. KATYAL:  We don't think they have -- we certainly

11 don't think they have any exposure.  I'll walk you through the

12 language of the 1979 transfer.

13       So it first transfers, quote, all of the business of

14 the Baby Division to this subsidiary, JJCI, and all assets and

15 liabilities.  Judge Kaplan excerpted it at A-163 and A-164.

16 And then it says JJCI, quote, agrees to assume all the

17 indebtedness, liabilities, and obligations of every kind and

18 the subsidiary will forever indemnify and save harmless J&J

19 against all the indebtedness, liabilities, and obligations.

20 That is a very very strong indemnification.

21       So J&J -- and that's why since this has been written

22 in 1979, J&J hasn't paid a dime.  It has always been Old JJCI.

23 Now it's true there was a centralized account which is used in

24 lots of parents and subsidiaries in which J&J initially may

25 have sometimes paid that cash out.  But as the record shows, it

1 was always booked back to Old JJCI.  That's Appendix Pages 4107

2 and Appendix 8103.

3        And, you know, as I say, if you look at who paid

4 Ingham, it was not J&J.  It was JJCI.

5        THE COURT:  Why would punitive damages be a factor to

6 consider?

7        MR. KATYAL:  Because I think -- and Congress was

8 worried about this in 524(g).  Because you have the massive

9 number of future claimants with this long 50-year latency

10 period, you have to worry that a $2-billion verdict in Ingham

11 added to other punitive damage verdicts will take away from the

12 ability of future claimants to recover.

13        That's why we're here, Your Honor.  That's the

14 purpose.  You know, that's what Judge Kaplan found was the

15 purpose based on looking at this evidence.  I know it makes for

16 a good story to say, you know, this big company that has all

17 these profits is somehow trying to evade responsibility or

18 something like that.  And as I said, the agreements from 1979

19 on has always transferred all of that liability.

20        Now, Judge Ambro, you asked my friend on the other

21 side, well, what if this were done in 2014 or what if the

22 restructuring as opposed to now is the use of this Texas

23 divisional merger statute, what is the problem there.

24        And I think the Bankruptcy Code takes the debtor's

25 corporate structure as a given as it comes under state law.

82

1   And we followed here Texas law meticulously.  And I think it

2   would be a very dangerous rule for this Court if you were to

3   start line-drawing.  And I couldn't hear my friend's answer to

4   the questions about line-drawing, is 2014 okay, is last year

5   okay, is two days different or something like that.

6            And so I think that's one important point.  The other

7   is actually that 524(g) itself contemplates pre-petition

8   restructuring, and I would point you to 524(g)(4)(A)(ii)(IV).

9   Sorry about the --

10           THE COURT:  The long statute.

11           MR. KATYAL:  Exactly.  It is a long statute.

12           But it provides that a channeling injunction can bar

13  actions, quote, directed against a third party and arising by

14  reason of its involvement in a transaction changing the

15  corporate structure of the debtor or a related party.

16           And so if Congress thought that a full company is the

17  thing that must declare bankruptcy, I don't think it would have

18  included this provision in it.  Rather, I think Congress

19  anticipated basically that there would be pre-petition

20  restructuring.

21           I think it's notable that my friends for all their

22  saying they say we're inconsistent with the Bankruptcy Code,

23  what provision are we inconsistent with?  What provision are we

24  violating?  There's some meta principle I guess that they're

25  isolating, but they can't point to any particular provision.

1        THE COURT:  They're pointing out the gateway

2   provision that you have to file a bankruptcy in good faith.

3   And they're claiming that this was not done.  So that's what

4   we're talking about.  That's the primary issue today.

5        MR. KATYAL:  And if that's what they're isolating, we

6   think Judge Kaplan found four different reasons why that -- why

7   the valid purpose of bankruptcy has been served.

8        THE COURT:  One just fact question, in terms of the

9   proposal made here to deal with the liabilities of LTL and the

10  funding, were those types of proposals, any variation of that

11  made in connection with the MDL litigation?

12       MR. KATYAL:  I don't believe the funding agreement

13  had anything to do with the MDL litigation.  Rather, as the

14  Court found in --

15       THE COURT:  Yeah, I'm just saying the concept.

16       MR. KATYAL:  Yeah, I don't know about the concept.  I

17  mean I think the only thing I'm aware of is the Court's finding

18  in A15 relying on their own expert that this was a single

19  integrated transaction and so -- with the restructuring and

20  funding agreement.

21       Now you had asked before, Your Honor, I just have to

22  slightly correct something.  I understand that the funding

23  agreement does have provisions for funding outside of

24  bankruptcy.

25       THE COURT:  Yeah, that's what I thought.

1          MR. KATYAL:  Yes.  So I apologize for that.  But our

2  --

3          THE COURT:  What are the opt-outs that are being

4  considered?

5          MR. KATYAL:  So the 524(g) process has --

6          THE COURT:  People who can say I don't want to be

7  part of the bankruptcy, I'm going to opt out and go forward

8  with respect to my litigation.

9          MR. KATYAL:  Yeah.  So, I mean, I think Congress put

10  that into the statute itself saying there has to be a 75

11  percent requirement for the plan and then, of course, there's

12  two-court review.  So there's a lot that has to happen.

13          And I think the most important point about that is --

14          THE COURT:  You contemplate that this plan even

15  though it's not yet in place will allow for any type of opt-

16  out?

17          MR. KATYAL:  I don't know that we have gotten that

18  far.  I think that's a pre -- to use a word from earlier, I

19  think that's a premature question.  But I would say that, you

20  know, 75 percent threshold is of course very daunting.  We are

21  highly incentivized to put a good plan together because

22  otherwise we get returned to the mass tort system with all of

23  the uncertainty and all of the problems attendant to it.

24          And Judge Kaplan -- you know, my friend Mr. Frederick

25  said he wants you to write a decision really about these facts.

1   We absolutely agree.  Judge Kaplan has said time and again his

2   goal is to move this thing incredibly expeditiously.  My

3   friends on the other side said they thought this process could

4   be done as early as the first quarter of next year.

5         And Judge Kaplan has rejected time and again any

6   attempt to delay the bankruptcy process which looks very

7   different, of course, than what's going on in the tort system

8   as Your Honor was asking my friends on the other side.  Massive

9   delay, only a few trials to verdict.  And, you know, as Judge

10  Kaplan found, future trials are going to be even more delayed

11  and very few settlements because of the <u>Ingham</u> verdict and

12  other things.

13        And so you are asked to compare two different worlds.

14  One is the baseline of the pre-restructuring, pre-bankruptcy

15  world in which Johnson & Johnson owes nothing, in which some

16  people slowly get paid but that's subject of course to any

17  other claims against Old JJCI, any recovery.  There are huge

18  defense costs, and future claimants risk not getting paid with

19  all the latency.

20        And under the restructuring and the funding

21  agreement, instead, you have a very different world, one with a

22  $61-billion plus floor.  That money is guaranteed free and

23  clear.  You have a faster process so current claimants get paid

24  and future claimants have a voice at the table.  They have a

25  representative because that is under 524(g).  And, of course,

86

1  the claimants, including everyone sitting at that table, will

2  -- we have to persuade three-quarters of them that this is a

3  fair and equitable solution and then we have to persuade two

4  different courts about that, the bankruptcy court and the

5  district court after that.

6          And we will have, you know, Ken Feinberg's estimation

7  as part of that to start to break what otherwise has been an

8  intractability between the parties.

9          THE COURT:  Is LTL going to continue as a going

10 concern afterwards or is this just a liquidating trust, in

11 effect?

12         MR. KATYAL:  Well, we suspect that, you know, LTL

13 does have, for example a royalty business that will continue.

14         THE COURT:  How much does that bring in a year?

15         MR. KATYAL:  It brings in about $50 million, the

16 record shows, a year and is worth about $350 million.  So by

17 itself, Your Honor, to answer one of your earlier questions,

18 that isn't enough to -- that money isn't enough to avoid

19 financial distress.

20         And so if LTL doesn't restructure and doesn't have

21 the funding agreement available to it, then obviously, it's

22 going to be under water and have all the problems Judge Kaplan

23 referred to.

24         THE COURT:  What do you make of the stay?  Your

25 friends, as you keep referring to them, are adamant that the

 1  Court would exceed its jurisdiction with respect to the stay,
 2  issue number two.
 3          MR. KATYAL:  Yeah.  We think that Judge Kaplan, as I
 4  say, he identified five reasons why there is and crucial to all
 5  five, and they're all independent of one another, they have to
 6  run the table.  But I think one central idea he had is that
 7  this involves the same basic claims during the same time
 8  period.
 9          And what he did is a limited stay against certain
10  parties, and it's a surgical one.  In order for a stay to
11  occur, two things have to happen.  One is --
12          THE COURT:  Surgical with 670 parties?
13          MR. KATYAL:  Yes.
14          THE COURT:  Non-debtors.
15          MR. KATYAL:  Yeah.  Well, but again, Your Honor,
16  we're talking about a massive amount of litigation.  670
17  versus, as I say, 40,000 claims that are currently in
18  existence.  I'll read to you the terms of this --
19          THE COURT:  How many insurers are we talking about of
20  that 670?  Is the whole shooting match 670?
21          MR. KATYAL:  I think it is; the whole shooting match
22  is 670.  The insurers, the list is at Pages A-249 and 250.  I
23  don't think it's very many.  It's like AIG, Prudential, and the
24  like.  Let me read to you the terms --
25          THE COURT:  How many retailers?

1          MR. KATYAL:  The retailers are -- that's a three-page

2    list at A-245 to '48.  There are a number of them.  It

3    includes, you know, CVS and things like that.  And here's what

4    it includes, and then let me tell you what it doesn't include.

5          THE COURT:  Okay.

6          MR. KATYAL:  It includes two things: one, claims --

7    or two things must have to happen.  The claim must first arise

8    from the manufacture or sale of talc-containing products by Old

9    JJCI or J&J and, second, that were asserted against or could

10   have been asserted against Old JJCI.  That's Joint Appendix

11   Page 195.

12          And so it's not, for example, a stay on unrelated

13   things like mesh litigation against J&J or anything like that.

14   And it's done, and this is crucial, it's done for a simple

15   reason, because if you can start suing, Judge Ambro, the

16   retailers like CVS or the insurers, that reduces the overall

17   pot of money that is available to the claimants, both present

18   and future.  And particularly in a world in which Congress has

19   said a 75 percent super majority threshold that we have to

20   convince --

21          THE COURT:  CVS has its own insurance, right?

22          MR. KATYAL:  CVS may have some of its own insurance,

23   but certainly, you know, I think that there will be

24   indemnification obligations that Judge Kaplan found were

25   automatic at Page A-181.  And so -- and I don't think automatic

1  is even the test, but even to the extent you thought it was,

2  there were automatic indemnity obligations.

3      And so I think what Judge -- what the logic behind

4  this stay is is that otherwise that limited amount of money

5  will be going to these other things and, therefore, reduce our

6  ability to actually persuade 75 percent of them to confirm a

7  plan which is of course what Congress is asking for here.

8      Congress looked at the problems with the mass tort

9  system, the problems with the MDL, which by the way here

10 include no state claims, include no meso claims.  It wouldn't

11 include Ingham, for example.  So -- and Congress decided that

12 MDLs wasn't the way to deal with this specific problem.

13     And so return to an earlier question you had, Your

14 Honor, about the precedent that's set, those four limiting

15 principles that I said at the outset we think are crucial here.

16 We're not saying that you can do this in other areas where you

17 don't have a latency problem.  But here you do.  You have a

18 huge number of future claimants, and Congress has isolated

19 specifically that out.

20     THE COURT:  But can be taken into account were one to

21 get a settlement in an MDL.

22     MR. KATYAL:  I'm sorry.  Could you --

23     THE COURT:  That could be taken into account were one

24 to get a global settlement in an MDL --

25     MR. KATYAL:  But an MDL will never give you the stay

1 that --

2          THE COURT:  -- litigation.

3          MR. KATYAL:  An MDL will never give you the stay on

4 litigation that is necessary to craft a kind of comprehensive

5 plan.  All an MDL does is coordinate pretrial proceedings.  And

6 --

7          THE COURT:  But they often do result in settlements.

8          MR. KATYAL:  They may result in settlements, but in

9 order to, Your Honor, I think to go that way, you're going to

10 have to jump over Judge Kaplan's findings about settlements in

11 which he found that because of Ingham and because of a variety

12 of other things, the past settlement rate is no guarantee and,

13 indeed, is not going to happen in the future, that fewer

14 parties are willing to settle because of Ingham and because of

15 other things like the FDA test and things he isolated at Joint

16 Appendix Page A-41.

17          THE COURT:  If settlement is a viable option in the

18 context of a bankruptcy via a plan, of course, why would it not

19 also be a viable option in an MDL?

20          MR. KATYAL:  Because you don't have -- for one thing

21 you don't have future claimants at the table.  So Congress has

22 specifically put in 524 --

23          THE COURT:  But a settlement could have provisions

24 for future claimants.  Could it not?

25          MR. KATYAL:  It could, but they don't have any voice

1  in the process.  And so the incentive is -- as, you know,

2  again, and I don't fault my friends, but their job is to

3  zealously advocate for current claimants, their clients.  There

4  is no -- that's why I think Congress wrote the statute in 524

5  that it did.

6         And, you know, could you imagine some hypothetical

7  world in which the MDLs do actually do all this?  I suppose you

8  could.  It's just there's literally no evidence that that's

9  ever happened in the amici briefs that are before you including

10  I would suggest The National Association of Manufacturers brief

11  at Pages 15 to 16 really goes into detail about the inability

12  of MDLs to actually provide any relief or any settlements,

13  actually, that generate payments to the claimants.

14         And so, again, to return Your Honor to the question

15  you asked my friend on the other side, which is what's the more

16  efficient solution, what's the way.  We've gone through this

17  process for year after year, and it's not working.  Congress

18  has given you a different approach, a different way to go in

19  524(g).  And what we've done is, through the use of this

20  funding agreement, provide a backstop that's much better than

21  they could get under the mass tort system, not for any one of

22  their individual clients but comprehensively and overall.

23         If I could, you had asked about the stay before, as

24  well.  And I'd also point you to I think the language of

25  362(a)(3) and this Court's decision in McCartney, which I think

1 as Judge Kaplan found was square precedent in saying --

2          THE COURT:  How many of the 670 are J&J entities

3 besides J&J itself and J&J Consumer?

4          MR. KATYAL:  I suspect that most of them are not and

5 you know -- are not J&J entities.  And our point is not to

6 benefit --

7          THE COURT:  Roughly how many are?

8          MR. KATYAL:  Your Honor, I haven't looked at those

9 appendix pages.  It would be I think it's Appendix Page 245 to

10 '50 list all of the protected parties.  So I'd point you to

11 those.  I just don't want to characterize them.

12          THE COURT:  It's in the hundreds, is it not?

13          MR. KATYAL:  I think there's many many other

14 entities.  Our point is this stay is not being done to benefit

15 them.  It's not being done to benefit --

16          THE COURT:  Have they been sued in these various 49

17 actions that have gone to trial so far in the United States or

18 almost went to trial, I should say?

19          MR. KATYAL:  I'm not sure if they were sued in them.

20 I'm sorry, Your Honor.  I don't believe so but I'm not

21 positive.  I think there are litigations against them.  And the

22 purpose that we're seeking for the stay is not to benefit them

23 or to benefit J&J.  It's rather to hit pause and make sure that

24 the corpus of funds is not available.

25          And we feel so strongly about this that if we weren't

1    able to get the 362 or 105 stay, this first question about

2    financial distress and valid bankruptcy purpose doesn't help

3    us.  The petition is basically meaningless for the reasons

4    Judge Kaplan found.  We need that stay because otherwise

5    plaintiffs will sue for these very same claims.  They'll sue

6    some other entity, and that will hurt us in forms of the

7    indemnification.

8           THE COURT:  But if it's not Johnson & Johnson or

9    Johnson & Johnson Consumer, which have been involved in

10    connection with this process, how could they possibly win

11    against Johnson & Johnson, you know, Floor Covering or

12    whatever?

13           MR. KATYAL:  They'll be indemnified.  So whoever the

14    entity is that's sued, they'll be indemnified, they'll share

15    insurance policies.

16           THE COURT:  But the point being that the suit's not

17    going to win against them.  I mean Johnson & Johnson was the

18    one involved until 1979 with the talc products  Then it was

19    Baby Products which later became Consumer, and now it's LTL.

20           These other entities in the hundreds, what I don't

21    understand is why this stay is so broad.

22           MR. KATYAL:  Because those are, and Judge Kaplan

23    looked at the claims, the same claims.  It's just a different

24    place in the supply chain.  And it's pretty common in these

25    mass tort cases to sue, you know, everyone in the chain, the

1  insurer, the retailer, and the manufacturer.

2          And to be sure, we think at least with respect to

3  suits against J&J, they wouldn't have viability.  But as Judge

4  Kaplan also found, you know, even a very low success rate is

5  enough to create financial distress.

6          THE COURT:  That's because of the indemnification

7  agreements, correct?  It would bleed --

8          MR. KATYAL:  The indemnification, insurance.

9          THE COURT:  It would bleed the fund.

10         MR. KATYAL:  Exactly.  It would bleed the fund.

11 Exactly.

12         And, again, with a 75 percent threshold that we have

13 to meet in order to confirm a plan, you know, if the fund is

14 bled and insurance proceeds are dropped or things like that,

15 it's very hard.  And then there's also of course the

16 possibility of record taint, as Judge Kaplan also found.

17         So those are all different reasons why the stay looks

18 the way it does.  And, you know, I understand it's a large

19 number of parties, but it's a large number of parties for a

20 very important reason.  There's a large amount of litigation in

21 this space, and 670 is an appropriate amount.

22         Now if you disagree and you're worried about it, as

23 Judge Kaplan also said, I think it's at A-173, he will have the

24 parties come back and have to continually justify the breadth

25 of the stay.  And, of course, anyone can come in and try and

1   lift the stay or something like that.

2        We're incentivized throughout this entire process to

3   make sure that we move expeditiously and quickly to try and

4   develop a plan that 75 percent of them can agree because

5   otherwise, as Judge Kaplan has said, he's going to dismiss the

6   bankruptcy petition.  He said it's really important that this

7   all move incredibly fast, and we are as incentivized as it

8   comes to make sure of that because otherwise, we're stuck in

9   the old pre-restructuring world.

10       THE COURT:  And the U.S. Trustee is saying with

11  respect to that, that's a matter for Congress in terms of

12  picking one system versus the other.

13       MR. KATYAL:  Well, we do think Congress has exactly

14  picked that in 524(g), Your Honor.  And so, you know, to be

15  sure, if we violated some state law, violated the Texas

16  divisional merger statute in some way, shape, or form, that's a

17  problem and Congress would have to fix that by allowing

18  something.

19       But here, we complied with everything in that

20  statute.  And the Bankruptcy Code takes state law as it finds

21  it.  And we understand that there's a way to abuse the

22  divisional merger statute.  We don't doubt that.  It's just

23  that in this case, we think you should write a limited opinion

24  just as the bankruptcy court did that says with this funding

25  agreement, this is a valid purpose and this is an appropriate

1 amount of parties to be stayed.

2 THE COURT: In connection with the stay, which Judge

3 Restrepo brought up, an opening question I have is the

4 jurisdiction of the Court, is it a core proceeding, in other

5 words saying that it's core by virtue of 362(a)(1) dealing with

6 a debtor or 362(a)(3) dealing with the debtor's property or is

7 it related to?

8 I have a dumb question. If it's just related to and,

9 therefore, non-core, doesn't a bankruptcy judge have to go to

10 the district court with a report and recommendation and have

11 the district court sign off?

12 MR. KATYAL: I'm always scared, Your Honor, when you

13 ask a dumb bankruptcy question. I'm starting to get worried,

14 but I think the answer --

15 THE COURT: I've said to a couple of people this is a

16 dumb question, but --

17 MR. KATYAL: No, I think the answer is --

18 THE COURT: -- if it's related to --

19 MR. KATYAL: -- I think you have it exactly right

20 that it is something that the district court would have to

21 approve if it's related-to jurisdiction. Of course, here, it's

22 362 that we're placing predominant emphasis on and also the

23 other parts of 105 under arising-in and arising-under.

24 And if I could walk you through that. So for

25 362(a)(1), there are two different theories the bankruptcy

1 court found.  One is that this is -- these are lawsuits that
2 are virtually against the debtor.  And so he said it fits under
3 the very first clause of a proceeding against the debtor.

4 And then he also said it's, quote, a claim against
5 the debtor under the second part of 362(a)(1).  We think the
6 second part is the right way to think about this, that these
7 lawsuits are in effect for reasons that Your Honor mentioned
8 before effectively against the debtor, and it's a claim against
9 them.

10 And as the Second Circuit said in Colonial Realty,
11 that second part of (a)(1) has to have some meaning.  It can't
12 just literally be suits against the debtor.  It includes third
13 parties.  At least here where the third-party lawsuits involve
14 the same basic claims during the same time period.

15 And then there are questions about 105 and arising-in
16 and arising-under.  And we think there that, you know, the
17 automatic stay is --

18 THE COURT:  Well, arising-in and arising -- it's hard
19 for me to say 105's arising-in or arising-under.  Arising-under
20 means it's explicitly given to you in the Code.  Arising-under
21 means it comes to you as a result of something else that's in
22 the Code.  105 is sort of one of those things that implements
23 something that otherwise may be given to you.  It's --

24 MR. KATYAL:  But I think here the theory is, and many
25 courts have done it, including the court below, is to say that

1  362 is the thing given to you in the Code, the automatic stay.

2          THE COURT:  As for the debtor.

3          MR. KATYAL:  Exactly.

4          And then as -- in order to safeguard the vitality of

5  that and to make that process work, you need a stay against

6  others, not that the Court will adjudicate on the merits, of

7  course, those other cases.  It's just a temporary pause under

8  362 and 105 to make that process work.

9          THE COURT:  My perception based on a lot of anecdotes

10  over the course of years is that most courts just say, okay,

11  we're going to be practical about this, we're going to put this

12  in play and go from there.  Basically it's a pause, we need

13  this pause in order for people to negotiate on and on and on.

14  And --

15          MR. KATYAL:  And we don't --

16          THE COURT:  And they glide over some of the

17  jurisdictional issues.

18          MR. KATYAL:  Yes.  I certainly think that's happened.

19  But I do think like the court in McCartney really did, I think,

20  you know, go into some of those jurisdictional issues.  And of

21  course A.H. Robins in the Fourth Circuit really in detail tried

22  to flesh out these different points.

23          But, Your Honor, absolutely, to the extent this Court

24  is worried about the breadth of this stay, if you don't think

25  it's surgical, we obviously do, but the remedy for that is that

1 very practical one which Judge Kaplan has already said he will

2 do, which is to make sure and police this stay for the

3 protected parties to make sure it is the same claims and that

4 it is justified.

5       Were not here to try and just stop litigation for its

6 own sake. We're doing it in order to protect the integrity of

7 the process. And as I say, it's so important to us. The

8 entire first question is just not helpful to us unless we have

9 this stay in place.

10       THE COURT: You have about -- since you don't get

11 rebuttal, as the appellee, I'm going to give you a chance to do

12 some summing up.

13       MR. KATYAL: Great.

14       And if I could, there's just one -- I want to respond

15 to one other thing my friend said on the other side --

16       THE COURT: Go right ahead.

17       MR. KATYAL: -- which is that JJCI could be spun off,

18 he said, under this and that that will be problematic. But the

19 funding agreement itself says that if there is a spinoff,

20 Paragraph 4(b) of this and this is Appendix Page 4239, says

21 that itself will be considered part of the fair market value.

22       So, again, this is an agreement that increases in

23 value over time as JJCI increases in value. The claimants get

24 the upside of all of it. And if they're -- to the extent

25 they're concerned whether it's distributions or spinoffs, the

1 agreements itself polices those things.

2       And we're asking you here, Your Honor, for a limited

3 ruling to affirm Judge Kaplan based on his factual findings.

4 We know this is a painful case.  We know this is hard for

5 everyone involved.  But Judge Kaplan in the very last page of

6 his second opinion, he said, you know, delay is something that

7 he thinks about all the time as the claimants die.

8       And the best way, the most efficient way to actually

9 provide claimants with relief, both present and future, in an

10 even-handed equitable way that avoids the deadweight losses of

11 millions and millions of dollars being given to lawyers is

12 through this solution.

13       And if you're worried about whether it's fair or not,

14 they have remedies, the 75 percent vote, the two-court review

15 vote.  And that's why we think Judge Kaplan got it right.

16       THE COURT:  Thank you.

17       MR. KATYAL:  Thank you.

18       THE COURT:  What we will do is we'll take about a

19 five-minute break and we'll come back -- well, let's see.

20 We'll come back at 4:30 and be out of here at 5.

21                 (Recess)

22       THE CLERK:  All rise.

23       THE COURT:  Thank you.

24       We'll have rebuttal.  Mr. Lamken?

25       Can I ask you one of the things, and maybe you're not

1  the one to deal with it but if not maybe Mr. Frederick can.

2  How are you going to deal with the future claimants?  How do

3  you propose that be done?

4        MR. LAMKEN:  So, Your Honor, I think that for future

5  claimants, that doesn't tell us what an answer to my

6  fundamental pitch which is it doesn't tell us whether you

7  should have JJCI in bankruptcy or you should have LTL --

8        THE COURT:  I agree.  I agree.  But the point is that

9  if you don't have a bankruptcy, you're going to have an MDL

10 process.  And in an MDL process, how do you make sure that

11 future claimants are dealt with fairly?

12       MR. LAMKEN:  Right.  And I think in cases like the

13 diet drug cases, they did actually come up with a mechanism to

14 deal with future claimants because those cases also have a

15 tail.  There are ways of appointing people in order to

16 represent future claimants and come up with a structured

17 settlement that will handle it consistent with due process.

18       But until we actually have a valid bankruptcy, we

19 don't have a way of dealing with future claimants in

20 bankruptcy.  And I think that's really where I want to start

21 with is, look, the difficulty here is we don't have a good-

22 faith bankruptcy in the first place because the whole thing is

23 structured to evade bankruptcy's principles.

24       THE COURT:  So if we undo the bankruptcy, what

25 happens?  How  does this case go forward?

1          MR. LAMKEN:  There's two options there.  One would be

2   that J&J may decide we're going to put Old JJCI in bankruptcy.

3   And then we actually have just like <u>Johns-Manville</u>, just like

4   every other bankruptcy in history --

5          THE COURT:  But how does that advance the ball for

6   your client?

7          MR. LAMKEN:  Well, it advances the ball in multiple

8   ways.  First, when it comes to the priority rules, it means

9   that equity doesn't get paid ahead of creditors here.  It means

10  that we don't sit in bankruptcy literally dying while billions

11  of dollar go out to equityholders --

12         THE COURT:  But doesn't the funding agreement address

13  that concern?

14         MR. LAMKEN:  Actually, it doesn't.  The funding

15  agreement will increase the amount that's available by the

16  amount that's paid to equity.  But the absolute priority rule

17  doesn't say go ahead and pay equity as long as you have an

18  unsecured promise to pay an equal amount to creditors later on.

19         The absolute priority rule says until you have

20  satisfied your creditors, you don't give anything to equity, at

21  least not without their consent 75 percent and the court

22  approval.  And that is one of the reasons why it just

23  fundamentally undermines the incentives here, because J&J can

24  operate its businesses as before including all the assets of

25  Old JJCI outside bankruptcy without bankruptcy court

1  supervision, paying equity, paying other creditors, while one

2  category of creditors sits in bankruptcy.

3        And I think that's the critical thing is that you've

4  actually taken one set of creditors, injured talc victims, and

5  put them in bankruptcy alone.  Trade creditors get paid ahead

6  of us.  We're behind, and that is a fundamental distortion of

7  the bankruptcy process.

8        Since history, the way to do it is to just simply

9  take your bankrupt company if you're financially distressed and

10 put that company in bankruptcy.  And I think the problem is

11 that --

12       THE COURT:  But their point is that no claimant with

13 a valid claim fairly estimated is going to be out a dollar.

14 Now there may be a significant delay if there is an appeal, but

15 in the end, that full claim will be paid.

16       MR. LAMKEN:  Your Honor, first, I don't think the

17 Bankruptcy Code says you may follow my principles unless you

18 give us an unsecured funding agreement that eventually may pay

19 everybody.  The Bankruptcy Code has structures that are meant

20 to be followed.  And if you've created your structure in order

21 to evade those bankruptcy --

22       THE COURT:  I think what they're saying is that this

23 is a case that's *sui generis*.  We're not talking about the next

24 case.  We're saying that with this, you are never or perhaps

25 almost never ever going to get this kind of backstop again.

1           MR. LAMKEN:  Not only that, Your Honor, but if this

2   goes forward, if J&J can do this, this is actually the model

3   for the future.  Who wouldn't do a build-your-own bankruptcy

4   where you choose, okay, which creditors I'm going to keep

5   outside of bankruptcy and pay them right away, which creditors

6   I'm going to put in bankruptcy and make them wait, which assets

7   am I going to put outside bankruptcy, and which assets will I

8   put in bankruptcy, or will I just put an unsecured funding

9   agreement subject to defenses like if you fail to indemnify me,

10  I can stop paying the funding.

11          Those are dramatically different things and with

12  bankruptcy --

13          THE COURT:  But I think what they're saying is that

14  or the response to that would be, okay, the creditors that we

15  paid before were because we hadn't gone into bankruptcy yet.

16  Once we've gone into bankruptcy, those creditors, those

17  claimants are all going to be treated in a way in which there

18  won't be as many strikeouts as there might otherwise be if

19  there were litigation.

20          MR. LAMKEN:  So, Your Honor, to the extent that

21  sometimes people prevail before juries and sometimes they

22  don't, that's a function of the system that the framers

23  established 200 years ago, where we entrust the common man, 12

24  of them, to make these determinations and to find facts and

25  make determinations.

1     The notion that, well, bankruptcy might actually sort

2  of even out the balance isn't a way of indicting the tort

3  system that 50 states have operated to compensate victims for

4  200 years.  But even setting that aside, that still doesn't

5  answer the question of why LTL as opposed to JJCI?  Why not

6  take the company that was the tortfeasor, that supposedly was

7  in financial distress and put it and its assets into bankruptcy

8  to satisfy the way it's done it before?

9     And what we were told here is, well, the bankruptcy

10 court looked at that and the bankruptcy court said, gee, that's

11 going to be very costly.  And I think the -- actually the court

12 said it's too much value to waste.  But when it comes to the

13 Bankruptcy Code, it's not a waste to enforce the absolute

14 priority rule so that people don't pay equity ahead of

15 creditors.

16     It's not a waste to --

17     THE COURT:  To further round that, I mean maybe it

18 was just an offhand comment that Mr. Katyal made, but -- and

19 I'm going to add on to it.  Almost every right that's given to

20 a creditor in bankruptcy like who is secured, who's not, is

21 something that's outside bankruptcy.  Non-bankruptcy law tells

22 you who has these particular rights inside of a bankruptcy.

23 And that's basically following the Butner case from '79.

24     Transpose that to the corporate area that corporate

25 law is not affected by the bankruptcy.  And corporate law

1    allows for a divisional merger.  And if corporate law allows

2    that so all that we are dealing, as you say, is just LTL

3    itself, why is LTL not in some type of financial distress if

4    that's the only one we're looking to and luckily has somebody

5    who's willing to come to its -- meet all of its funding needs

6    with respect to the future of the bankruptcy?

7            MR. LAMKEN:  So, Judge Ambro, I think from the outset

8    when we say we take the a debtor as we find them, when you're

9    describing, when deciding good faith, under cases like the new

10   debtor syndrome cases, courts ask who's my debtor, where did it

11   come from, and why is he here.

12           And the answer to those questions here is whose my

13   debtor, it's an artificial entity created for bankruptcy; why

14   is he here, he's here so talc claimants will be in a single

15   class by themselves in bankruptcy and everybody else is outside

16   bankruptcy; why is he here, he's here so that JJCI's assets,

17   its operating business is outside bankruptcy beyond the

18   bankruptcy court's reach.

19           And only, only an unsecured funding agreement subject

20   to defenses is available to talc claimants.  That means that,

21   you know, you don't just accept them as they find them when you

22   have that sort of a purpose.  And I think, Judge Ambro, that

23   actually distinguishes the Chapter 11 rundown cases you

24   described.

25           When you have a Chapter 11 rundown case as I

1  understand it, Goodco and Badco are both in the bankruptcy,

2  both subject to the court's supervision.  This is the exact

3  opposite.  One company is in bankruptcy subject to the court

4  bankruptcy -- the bankruptcy court's jurisdiction.  But

5  everything else that happens, all of Old JJCI's assets as

6  they're operated, this spinoff, everything else that happens --

7  THE COURT:  What provisions of the Code if Old JJCI

8  were in bankruptcy, what provisions of the Code do you think

9  would apply that you would want to take into account with

10 respect to Old JJCI?

11 MR. LAMKEN:  So the absolute priority to begin with,

12 which is not a specific provision of the Code, but it's an

13 inflection from history and the structure of the Code where you

14 don't pay creditors, you don't pay equity ahead of creditors.

15 And that puts a lot of pressure on people to come up

16 with a good plan to the benefit of the creditors, and not do

17 what Bestwall is doing now and let things go for five years as

18 people are rapidly failing.

19 The second one would be --

20 THE COURT:  And I should have asked this before.

21 Spin out the absolute priority concept here.  This is not like

22 SGL where they're going to do a state court -- or a state

23 dissolution and have all the money go to equity after the

24 bankruptcy.

25 What monies are going to equity during the course of

1    this bankruptcy?  Are you saying dividends?  Is that what

2    you're talking about?

3            MR. LAMKEN:  Yeah, well, there's dividends and

4    there's also $5 billion for a spinoff that was announced or $5

5    billion for a stock buyback that was announced last week.

6            So -- and the fact that you can continuously in

7    bankruptcy pay equity means that there's far less pressure to

8    actually achieve a plan that the creditors can live with.  You

9    can wait longer and longer just as Bestwall did.

10           But I'd also point to Section 363 which is your non

11   --

12           THE COURT:  Wait, you say stock buyback.  The stock

13   buyback is not for LTL.  The stock buyback is for Old JJCI.

14           MR. LAMKEN:  Exactly.

15           And the divisional merger was structured and the

16   funding agreement is structured specifically to allow J&J to

17   spinoff assets without anybody, any of our creditors, being

18   able to do what they would be able to do under Section 363, if

19   you had put the actual tortfeasor, the people funding this,

20   JJCI -- Old JJCI into bankruptcy, which would be they get

21   notice and an opportunity to be heard.

22           And the bankruptcy court would be able to supervise

23   it and to make sure that those assets are indeed available to

24   the creditors at the end of the day.  None of that, none of

25   that exists because instead of doing what one does ordinarily

1 and putting a bankruptcy -- the whole entity into bankruptcy,

2 they've simply hived off one set of claims, put them into

3 bankruptcy and taken all the assets, all the operating things

4 and all the famous brands and operate them outside of

5 bankruptcy.

6       And just I think the key thing here is <u>Jevec</u> makes it

7 clear from the Supreme Court that it's just not permissible to

8 say I have provided something that I think is better for the

9 creditors.  When you're talking about bankruptcy, the specific

10 provisions of the Code are important.  And the Code here

11 ordinarily requires absolute priority rule, Section 363

12 supervision of spinoffs and other non-ordinary course

13 transactions.

14       And even 524(g) requires that you put in equity

15 securities, securities of the debtor, with a right to

16 dividends.  But we have now swapped out one debtor, a valuable

17 business JJCI with famous brands, for a completely different

18 debtor which is LTL.

19       And I'd like to sort of turn if I could for a moment

20 to the injunction.  And I think the serious problem with the

21 injunction is this.  Section 105 simply doesn't say you can

22 reach out to non-debtors, 670 of them, and enjoin them on the

23 basis of, well, gee, I think it has some relationship to the

24 estate.  You actually have to have a clear right to relief.

25       The problem --

1          THE COURT:  What you're saying is that there's not an

2     identity of interest other than the fact that it has the same

3     corporate parent?

4          MR. LAMKEN:  Exactly, Your Honor.

5          In fact, the record is very clear that you can't do

6     this here because J&J has its own independent liability for its

7     own tortuous misconduct.  For example, in _Ingham_, as we've

8     mentioned, J&J had a higher multiple on punitive damages

9     because.

10          And I'll quote:

11          "Because defendants decision to chart their course of

12          reprehensible conduct began long before JJCI was spun

13          off as a separate entity."

14          J&J made all the health and safety decisions.  It

15     ignored its own scientists for decades on end.  And actually,

16     it worked tirelessly to make sure that industry standards would

17     not change to make asbestos that's otherwise undetectable

18     detectable."

19          That's on Pages 716 to 717 of _Ingham_ and Pages 5841

20     to 5892.  And it personally individually told -- falsely

21     advertised that baby powder does not contain asbestos and never

22     will and that it tested every lot to make sure.

23          And juries have repeatedly found J&J liable

24     separately from JJCI.  This is not a case of derivative

25     liability.  It is an instance of independent liability.  For

1  example, <u>Echeverria</u> in California, 97.8 percent of the

2  liability was given to J&J, not JJCI.

3        If you look at Page -- the verdict sheets on Page

4  4532, 4592, and there's a summary at 4704 and 4627.  They are

5  regularly giving more liability to J&J than JJCI,  This is not

6  a case of derivative liability where J&J because it's the

7  corporate parent has some liability.  This is J&J's own

8  misconduct.  And when one is going to enjoin that type of

9  liability, you need more than what the Court came up with here.

10       For example, and even 524(g), if you want a

11  channeling injunction, it says the channeling injunction and --

12  <u>Combustion Engineering</u> addresses this specific issue -- 524(g)

13  says when you have a channeling injunction, it applies only to

14  the debtor, and you can go beyond the debtor when the liability

15  is derivative because it comes from those corporate

16  relationships.

17       But the liability here isn't from corporate

18  relationships.  It's liability for J&J's own misconduct.  And

19  so you couldn't get a channeling injunction under 524(g) for

20  the liability of J&J.  Why under 105 on a preliminary basis are

21  you going to give that injunction and prevent talc claimants

22  from actually getting satisfaction when waiting for the

23  possibility of a 524(g) plan?  It simply doesn't make sense.

24  It takes those statutory provisions and it sets them on their

25  heads.

1          And the net result is there's simply no ability of

2   tort claimants to come forward and have any ability to pursue a

3   reasonable plan here because they're frozen in their tracks.

4   J&J, it's got all the liability against it frozen.  650 other

5   people, that's frozen.  LTL, our made for bankruptcy debtor,

6   frozen, as well.

7          What is the leverage they have?  Nothing.  It simply

8   shuts everything down.  And you can't do that under 105.  You

9   can't do that under 362(a) when it is its own independent

10  liability.  And there's a key provision here that I don't --

11  key finding by the district court that I don't think I heard

12  Mr. Katyal mention, and it is this.

13         The district court found, and this is again 159,

14  that the shared identities of interest were based on allocation

15  of agreements to the debtor -- that means indemnification

16  agreements that they hived off and gave to the debtor -- shared

17  insurance agreements that they gave to the debtor on the eve of

18  bankruptcy, quote, "for the very purpose of extending the

19  stay."

20         That is an effort to create equity through agreements

21  on the eve of bankruptcy.  And that doesn't work for two

22  reasons.  One is Combustion Engineering saying you can't by

23  agreement establish jurisdiction.  But it also doesn't work as

24  a matter of equity.  As a matter of equity, two parties can't

25  enter into a contrivance and agreements on the eve of

 1  bankruptcy and say, aha, we now have a right to injure third

 2  parties and prevent them from pursuing other parties that have

 3  their own independent liability.

 4        Ultimately, the problem here is that J&J decided to

 5  take a corporate shell, LTL, and put it into bankruptcy.  But

 6  then it turns around and says now that we've put this corporate

 7  shell into bankruptcy, we want an injunction that protects not

 8  just the corporate shell, it protects us from our own

 9  independent liability, that protects retailers from their own

10  independent liability, that protects everybody from their own

11  independent liability.

12        But that's completely topsy-turvy.  If we're going to

13  accept putting LTL in bankruptcy, the automatic stay and any

14  possible stay under 105 would extend to just LTL.  It wouldn't

15  extend to everybody else.  But we really shouldn't be saying

16  we're going to accept LTL as our debtor here because of the

17  very purpose of putting LTL into bankruptcy was to make sure

18  that talc claimants were treated differently or -- treated

19  differently.

20        I know one of the questions that came up here was,

21  well, how do we determine, what if it was, you know, 1994 when

22  they did the divisional merger or what happens if it was 1979.

23  And I think the short answer is two-fold.  One is in this case,

24  it was two days before bankruptcy.  In this case we know

25  exactly why it was done.  It was done to manipulate the

1  bankruptcy.  It was done to make sure that it was structured in

2  a way where JJCI would be out of bankruptcy and -- or its

3  assets would be out of bankruptcy and only talc claimants would

4  be in bankruptcy.

5       And that provides a very clear answer alone.  So it's

6  not just a matter of time; it's a matter of what the purpose

7  was.  If we look back and we have a non-bankruptcy purpose for

8  years on end that says, yeah, we've established this as a

9  meaningful way, we've not only given liabilities, we've

10  actually given them a business and they're operating that

11  business for years and they're building up assets and goodwill.

12  And it's a real company that's operating.

13       That's a very different scenario from saying we've

14  now created a company solely for the purpose of bankruptcy.

15  We've given it all the liabilities for just one set of

16  claimants, and we've done it for the purpose of keeping certain

17  assets out of bankruptcy so we continue to pay dividends,

18  continue to operate the brands, and continue to do so without

19  the bankruptcy court supervision that would otherwise be --

20       THE COURT:  Indeed, what you just said, that's your

21  principle theme, isn't it?

22       MR. LAMKEN:  That is my principle theme, Your Honor.

23  I think that really sums up the problem here.  I think -- and,

24  in addition, I think I should also stress in the end, it can't

25  be both it's all right to put LTL in bankruptcy and then to

1 extend the injunction to everybody else.  By definition, you

2 just end up going way beyond all party -- the parties specified

3 by 362 --

4         THE COURT:  Yeah.

5         MR. LAMKEN:  -- the norm under 105.  You understand.

6         THE COURT:  Thank you.

7         MR. LAMKEN:  Thank you, Your Honor.  I appreciate

8 that.  If there's no further questions, thank you, Your Honor.

9         THE COURT:  No further questions.

10         I know Mr. Frederick reserved some time.

11         Mr. Janda, did you have anything further to say?

12         MR. JANDA:  I did not reserve any time, Your Honor.

13 But if you would like to hear from me?

14         THE COURT:  Yeah, I'll give you two minutes.  Do you

15 want two minutes?  It's your call.

16         MR. JANDA:  Thank you, Your Honor.

17         Just three points I'd like to make real quick.

18         So first is, you know, we've heard a lot of talk

19 today about what system, tort system or the MDL system or the

20 bankruptcy system, is better for which set of parties, current

21 claimants, future claimants, defendants.

22         And I think the point here is just that there's a

23 very complicated admittedly balancing of interests of trying to

24 get claims resolved efficiently, to get claims resolved

25 correctly, to get claims resolved equitably, and to ensure that

1  people are able to exercise the rights that they have, their

2  constitutional rights, their due process rights, their jury

3  trial rights.

4        And that complicated balancing of interests has been

5  done by Congress.  Congress has enacted a number of different

6  aggregation mechanisms and has enacted the Bankruptcy Code.

7  But the Bankruptcy Code Congress has enacted and provides

8  strong tools to defendants only in a limited set of

9  circumstances as this Court said, those strong tools invite

10 abuse.  And it's really up to the courts to police the

11 boundaries of that system to ensure that it's not being used

12 for reasons that Congress didn't intend it be used.

13       And I don't think 524(g) changes the analysis in any

14 way.  524(g) pre-supposes you have a valid bankruptcy and

15 Congress has determined that 524(g) provides an appropriate

16 tool in bankruptcy once you have a bankruptcy to make sort of

17 the best of a bad situation.  But I don't think you can sort of

18 bootstrap your way into bankruptcy to try and take advantage of

19 the tool that pre-supposes the valid bankruptcy in the first

20 place.

21       Second, just very quickly on financial distress, I

22 heard my friend on the other side say two things that I think

23 together could resolve this case on their own.  I mean one is

24 that he says LTL is the appropriate entity and, two, is that in

25 his view or in LTL's view, the total legitimate value of all of

1  the current and future tort claims against it is less than $61

2  billion which he has access to under the funding agreement.

3       You put those two things together and I don't see how

4  you can make any argument that there is a legitimate financial

5  distress here on the part of the debtor that justifies invoking

6  bankruptcy maybe ever and certainly not at this point.

7       And then, third, just very briefly, you know, as we

8  said, bankruptcy provides a lot of tools.  It's a very strong

9  medicine.  It curtails creditors' rights in significant ways

10  including allowing debtors to bind non-consenting creditors,

11  possibly many non-consenting creditors to one particular

12  resolution.

13       And that is appropriate when you have a debtor facing

14  financial distress that needs that time to reorganize its

15  affairs or to pursue an orderly liquidation.  But it's not

16  appropriate every time you just have a lot of tort claims

17  against an entity when those pre-conditions aren't met.  And

18  that's just the case here.

19       THE COURT:  Thank you very much.

20       MR. JANDA:  Thank you, Your Honor.

21       THE COURT:  Mr. Frederick, I know you reserved three

22  minutes.  We'll give you five.  Since you're batting clean-up.

23       MR. FREDERICK:  Thank you very much, Your Honors.

24       I want to start with the trilogy of Third Circuit

25  cases because the main point made on the other side was that

1 | they didn't confront mass torts.  But the <u>SGL Carbon</u> case in

2 | announcing why the good-faith standard was so important had an

3 | extensive discussion of <u>Johns-Manville</u>.

4 |   And the point that it was making was that <u>Johns-</u>

5 | <u>Manville</u> had tried for many many years to pay off claimants and

6 | until it got to a point where it did face imminent financial

7 | distress because --

8 |   THE COURT:  There was no doubt that <u>Johns-Manville</u>

9 | was in financial distress.

10 |   MR. FREDERICK:  And the question here is, is LTL in

11 | financial distress.

12 |   Now you can either take the fundamental contradiction

13 | of their position which is the funding agreement will fund

14 | everything in which case LTL is not in financial distress or

15 | the funding agreement depends on Johnson & Johnson and JJCI, in

16 | which case this is not a proper bankruptcy purpose because

17 | those two entities are not in the bankruptcy.

18 |   Either way, that contradiction should end the case on

19 | as a matter of good faith and the Court need not go further in

20 | order to decide how far it needs to go.

21 |   Now the point is made that after <u>Ingham</u>, it's

22 | impossible to settle these cases.  Our expert said 98 percent

23 | of asbestos cases settle or dismiss.  The bankruptcy law

24 | professors who provided an amicus brief on their side said 97

25 | percent of MDL cases settle or dismiss.  Common sense tells you

1 that you don't have to litigate all 38,000 to judgment.  We

2 weren't born yesterday.  And that point made by the bankruptcy

3 court is on its face not credible and is subject to plenary

4 review by this Court.

5        Now the main argument that they make for financial

6 distress is based on the speculation that they're going to have

7 to pay out many many tens of billions of dollars.  But <u>SGL</u>

8 <u>Carbon</u> says you don't look at speculation for future.  You look

9 at what is imminently before you.  Do you have a present

10 inability to meet present financial obligations?

11        And here, LTL unquestionably did that two days after

12 it was created.  There's no serious issue at the moment it had

13 filed its bankruptcy it was not facing financial distress.

14 Importantly, Mr. Katyal does not deny that not a dime gets paid

15 until the last appeal of the last objector has been resolved.

16 And we know from judgments and settlements in the civil system

17 that money has flowed.

18        Johnson & Johnson shouldn't be permitted to stop that

19 process.  But the spinoff of JJCI which is permitted, and he

20 acknowledges, under the financing agreement is what creates the

21 cap.  As soon as that cap is done, there is no greater value

22 that can be done.  And for that reason, their plan is not

23 consistent with the statute 524(g) that says you have to have

24 an evergreen source of continually growing assets and money to

25 pay the future claimants.  This plan undisputably does not do

1  that.

2        Now he takes me to task for saying that <u>Ingham</u> was

3  paid by Johnson & Johnson.  Look at the Appendix Page 6379.  It

4  was paid out of a central account.  He eventually acknowledges

5  that.  The point is Johnson & Johnson charged back to JJCI as

6  an accounting matter.

7        Now this wouldn't be -- this might be important if

8  JJCI had its own independent shareholders.  It is a wholly

9  owned subsidiary of Johnson & Johnson.  But Johnson & Johnson

10  wanted to be able to say that it's continuing streak of paying

11  higher dividends year after year has continued, so it fobbed

12  off the accounting deficit to JJCI.  I don't know why that

13  should warrant good faith in a bankruptcy.

14        Now he says that there are real limiting principles

15  here based on the facts.  He talks about the latency.  That's

16  true for all asbestos cases, not just those that are created

17  out of talc.  And it is true of many mass torts, as well.  He

18  says there's lottery-style but that's true in any case where

19  there are really good lawyers who know how to try cases and

20  there are really bad lawyers who don't know how to try cases

21  and you have the special problem of specific causation, which

22  is an evident problem and issue in establishing the legitimacy

23  of any person's claim.

24        Their fundamental problem with their 524(g) is that

25  they don't create an evergreen funding mechanism.  And when he

1  talks about the 79 transfer of liability, he doesn't respond

2  that J&J itself was engaged in reprehensible conduct for which

3  people have found them to be liable.

4       Now the last point I'd like to make is that Johnson &

5  Johnson did not go to all of this trouble in order to pay

6  claimants more money.  They went to this trouble to pay

7  claimants less money more slowly.  The civil system is designed

8  with whatever flaws that it has to promptly move along cases

9  and not to stop and stay all action.

10      This particular bankruptcy is intended to benefit

11  non-debtor affiliates.  It is a litigation tactic to stop civil

12  litigation.  And there is no increase in value to the

13  creditors, the tort claimants.  And for all of those reasons,

14  we urge you to reverse the bankruptcy court.

15      THE COURT:  Thank you very very much.

16      I would ask that a transcript be prepared of this

17  oral argument and just split the costs half this side, half

18  that side.

19      And I would also like to thank counsel for extremely

20  well presented arguments not only today but in your briefing

21  and also I should broaden that to thank those who took time to

22  write the amicus briefs, very helpful on both sides.  And we'll

23  take the matter under advisement.

24      Thank you.  It's a privilege having you here.

25      MR. FREDERICK:  Thank you.

1          THE CLERK:  All rise.  Court is adjourned until

2     tomorrow at 9:30 a.m.

3               (Proceedings concluded at 2:21 p.m.)

4                         *  *  *  *  *

5                **C E R T I F I C A T I O N**

6          We, KAREN WATSON and DIPTI PATEL, court approved

7     transcribers, certify that the foregoing is a correct

8     transcript from the official electronic sound recording of the

9     proceedings in the  above-entitled matter, and to the best of

10    our ability.

11

12    /s/ Karen K. Watson

13    KAREN K. WATSON, CET-1039

14

15    /s/ Dipti Patel

16    DIPTI PATEL, CET-997

17    J&J COURT TRANSCRIBERS, INC.      DATE:  September 30, 2022

18

19

20

21

22

23

24

25