**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126
*Local Counsel to the Official Committee of*
*Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
Eric R. Goodman, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
egoodman@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Co-Counsel for the Official Committee of*
*Talc Claimants*

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
Bret Vallacher, Esq.
jmassey@masseygail.com
bvallacher@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467
*Special Counsel for the Official Committee of*
*Talc Claimants*

**OTTERBOURG P.C.**
Melanie L. Cyganowski, Esq.
Richard G. Haddad, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
David A. Castleman, Esq.
mcyganowski@otterbourg.com
rhaddad@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
dcastleman@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
Fax: (212) 682-6104
*Co-Counsel for Official Committee of Talc*
*Claimants*

| | |
|---|---|
| In Re: | Chapter 11 |
| **LTL MANAGEMENT, LLC,**[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

**REPLY IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE
OF TALC CLAIMANTS TO DISMISS SECOND
BANKRUPTCY PETITION OF LTL MANAGEMENT, LLC**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 5

I.    LTL Has the Burden of Establishing Good Faith and Financial Distress ........................... 5

II.   LTL's Unsuccessful Attempt to Manufacture Financial Distress Cannot Create a
      Good Faith Filing. ........................................................................................................... 6

      A.    Any Purported Financial Distress Was Manufactured By J&J ............................. 7

      B.    Manufactured Financial Distress Cannot Provide a Basis for Good Faith,
            Regardless of Whether It Technically Qualifies as a Fraudulent Conveyance ..... 12

            1.    Manufactured Financial Distress is Bad Faith. .......................................... 12

            2.    Breach of Fiduciary Duties Is Bad Faith ................................................... 18

      C.    The 2023 Restructuring Was an Actual Fraudulent Transfer .............................. 20

      D.    LTL's Own Allegations, if Taken as True, Establish That the 2023
            Restructuring Was a Constructive Fraudulent Transfer ....................................... 25

      E.    LTL's Surrender of the 2021 Funding Agreement Requires That the Entire
            Divisive Merger Be Unwound and LTL Relieved of Any Talc Liabilities. ......... 29

      F.    LTL's Justifications for Terminating the 2021 Funding Agreement Lack
            Merit .................................................................................................................. 30

            1.    LTL Cannot Establish the "Frustration of Purpose" Defense ..................... 30

            2.    Debtor Concedes Its Ability to Pay Debts As They Come Due. ................. 37

            3.    LTL's Proposed Plan Cannot Negate Its Bad Faith .................................... 38

III.  LTL Has Failed to Demonstrate Imminent and Immediate Financial Distress ................ 39

      A.    Debtor's Post Hoc Rationales for Financial Distress Are Legally Insufficient .... 40

      B.    Debtor Cannot Meet the Third Circuit's Standard for Financial Distress. ........... 41

            1.    Debtor Concedes Its Assets Exceed Its Liabilities. ................................... 44

            2.    Debtor Concedes Its Ability to Pay Debts As They Come Due. ................. 46

            3.    The Financial Distress of Non-Debtor Affiliates Cannot Establish
                  LTL's Financial Distress Under Controlling Precedent. ............................ 46

            4.    Future "Uncertainty" Does Not Create "Imminent" and "Immediate"
                  Financial Distress ..................................................................................... 48

            5.    Unfiled Talc Cases Do Not Establish Imminent and Immediate
                  Financial Distress In This Case .................................................................. 51

      C.    LTL's Proffered Expert Testimony Undermines Any Assertion of Financial
            Distress ............................................................................................................... 56

IV.   LTL's Second Bankruptcy Filing Displays Additional Indicia of Bad Faith ................. 61

A.  The Petition Was Filed For an Improper Litigation Advantage. .......................... 61

B.  The Petition Impermissibly Evades the Structural Protections of the Code ......... 63

V.  The Exception in Section 1112(b)(2) Is Inapplicable Here ............................................... 65

A.  Section 1112(b)(2) Is a Narrow Exception to the Obligation to Dismiss For Cause. ............................................................................................................................ 65

B.  The Statutory Criteria of Section 1112(b)(2) Cannot Be Met in This Case. ........ 68

CONCLUSION ........................................................................................................................ 80

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
 561 F.3d 199 (3d Cir. 2009) ............................................................... 52

*Aldrich Pump LLC v. Those Parties to Actions Listed on*
 *Appendix A to Complaint (In re Aldrich Pump LLC)*,
 Case No. 20-30608 (JCW), Adv. Proc. No. 20-03041, 2021 WL 3729335
 (Bankr. W.D.N.C. Aug. 23, 2021) ....................................................... 10

*A-Leet Leasing Corp. v. Kingshead Corp.*,
 150 N.J. Super. 384 (N.J. Super. Ct. App. Div. 1977) ......................... 36

*Almendarez-Torres v. United States*,
 523 U.S. 224 (1998) ............................................................................. 74

AmeriCert, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.),
 360 B.R. 398 (Bankr. D.N.H. 2007) .................................................... 66

*ASARCO LLC v. Americas Mining Corp.*,
 396 B.R. 278 (S.D. Tex. 2008) ............................................................ 23

*Ashley Oaks*,
 458 B.R. 280 (Bankr. D.S.C. 2011) ..................................................... 72

*Ashwander v. Tenn. Valley Auth.*,
 297 U.S. 288 (1936) ............................................................................. 74

*Bartenwerfer v. Buckey*,
 143 S.Ct. 665 (2023) ............................................................................ 12

*Basin Elec. Power Co-op. v. Midwest Processing Co.*,
 769 F.2d 483 (8th Cir. 1985) ............................................................... 39

*Bear, Stearns Sec. Corp. v. Gredd*,
 275 B.R. 190 (S.D.N.Y. 2002) ............................................................ 24

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
 455 F.3d 195 (3d Cir. 2006) ................................................................ 31

*Bradford v. Fahey*,
 76 F.2d 628 (4th Cir. 1935) ................................................................. 74

*Bradford v. Fahey*,
 77 F.2d 992 (4th Cir. 1935) ................................................................. 74

*Brenner v. Little Red School House, Ltd.*,
 302 N.C. 207, 274 S.E.2d 206 (N.C. 1981) .............................. 31, 33, 34

*Brown v. Third Nat'l Bank* (*In re Sherman*),
 67 F.3d 1348 (8th Cir. 1995) ......................................................... 21, 24

*Campbell v. Alleghany Corp.*,
 75 F.2d 947 (4th Cir. 1935) ................................................................. 74

*Campbell v. Boston Scientific Corp.*,
  882 F.3d 70 (4th Cir. 2018) .................................................................................. 50

*Caper Corp. v. Wells Fargo Bank, N.A.*,
  578 F. App'x 276 (4th Cir. 2014) ......................................................................... 32

*Carl v. Johnson & Johnson*,
  464 N.J. Super. 446, 237 A.3d 308 (N.J. Super. Ct. App. Div. 2020) ................................. 53

*Clifford v. River Bend Plantation, Inc.*,
  312 N.C. 460, 323 S.E.2d 23 (1984) .................................................................... 36

*Cont'l Ill. Nat'l Bank & Tr, Co. v. Chicago R. I. & P. Ry. Co.*,
  294 U.S. 648 (1935) ............................................................................................ 74

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) ...................................................................................... 63, 64

*Daley v. Chang (In re Joy Recovery Tech. Corp.)*,
  286 B.R. 54 (Bankr. N.D. Ill. 2002) ...................................................................... 27

*Danise v. Saxon Mortg. Servs. Inc.*,
  738 F. App'x 47 (3d Cir. 2018) ............................................................................ 11

*DBMP LLC v. Those Parties Listed on
  Appendix A to Complaint (In re DBMP LLC)*,
  Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350
  (Bankr. W.D.N.C. Aug. 11, 2021) ........................................................................ 10

*De Pierro v. Taddeo (In re Taddeo)*,
  685 F.2d 24 (2d Cir. 1982) .................................................................................. 71

*Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*,
  37 Cal. App. 5th 292 (Cal. Ct. App. 2019) ............................................................ 53

*F.D.I.C. v. Anchor Props.*,
  13 F.3d 27 (1st Cir. 1994) .................................................................................... 21

*Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*,
  715 S.E.2d 273, (N.C. App. 2011) ....................................................................... 34

*Faulconer v. Wysong and Miles Co.*,
  155 N.C.App. 598, 574 S.E.2d 688 (N.C. App. 2002) ........................................... 32

*Fidelity Bond & Mortgage Co. v. Brand (In re Fidelity Bond & Mortg. Co.)*,
  340 B.R. 266 (Bankr. E.D. Pa. 2006) ................................................................... 27

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989) ............................................................................................ 20

*Gallatin Fuels, Inc. v Westchester Fire Ins. Co.*,
  No. CIV.A. 02-2116, 2006 WL 2289789 (W.D. Pa. Jan. 13, 2006) ...................... 31

*Gen. Elec. Cap. Corp. v. Charleston*,
  No. CIV. A. 88-6132, 1989 WL 63213 (E.D. Pa. June 12, 1989),
  *aff'd*, 898 F.2d 140 (3d Cir. 1990) ....................................................................... 36

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ........................................................................................... 52

*Giuliano v. Schnabel* (*In re DSI Renal Holdings, LLC*),
  574 B.R. 446 (Bankr. D. Del. 2017) .................................................................. 23

*Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*,
  No. 19 CVS 13580, 2022 WL 3048320 (Sup. Ct. N.C. Aug. 2, 2022) ................ 34

*Green v. Howard Family Tr.* Dated Aug. 21,1998 (*In re Green)*,
  No. BAP NV-15-1349-Kildo, 2016 WL 6699311 (9th Cir. BAP Nov. 9, 2016) ................ 70

*Greene v. Spivey*,
  236 N.C. 435, 73 S.E.2d 488 (1952) .................................................................. 37

*Hackel v. FDIC*,
  858 F. Supp. 289 (D. Mass. 1994) ..................................................................... 30

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ........................................................................... 22, 23

*Horan v. Dilbet, Inc.*,
  No. CIV. A. 12-2273, 2015 WL 5054856, (D.N.J. Aug. 26, 2015) ..................... 52

*In re 15375 Mem'l Corp. v. BEPCO, L.P.*,
  589 F.3d 605 (3d Cir. 2009) ..................................................................... passim

*In re 3 Ram, Inc.*,
  343 B.R. 113 (Bankr. E.D.Pa. 2006) .................................................................. 66

*In re Aearo Techs. LLC*,
  No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023),
  *direct appeal certified* (June 14, 2023).......................................................... passim

*In re All Phase Roofing & Constr., LLC*,
  No. AP 17-01070, 2020 WL 5512500 (B.A.P. 10th Cir. Sept. 14, 2020) ........... 24

*In re Allen*,
  300 B.R. 105 (Bankr. D.D.C. 2003) ................................................................... 39

*In re Alston*,
  756 F. App'x 160 (3d Cir. 2019), ...................................................................... 72

*In re BP Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*,
  910 F. Supp. 2d 891 (E.D. La. 2012).................................................................. 63

*In re BTS, Inc.*,
  247 B.R. 301 (Bankr. N.D. Okla. 2000) ............................................................. 75

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2005) ................................................................. 34, 64, 79

*In re Congaree Triton Acquisitions, LLC*,
  492 B.R. 843 (Bankr. D.S.C. 2012)................................................................... 71

*In re Congoleum Corp.*,
  627 B.R. 62 (Bankr. D.N.J. 2021) ............................................................... 11, 34

*In re Continental Holdings, Inc.*,
    170 B.R. 919 (Bankr. N.D. Ohio 1994) ................................................................. 75

*In re Diet Drugs Prods. Liab. Litig.*,
    543 F.3d 179 (3d Cir. 2008) ................................................................................. 77

*In re Dr. R.C. Samanta Roy Institute of Science Technology, Inc.*,
    465 F. App'x 93 (3d Cir. 2011) ............................................................................ 70

*In re Enron Corp.*,
    328 B.R. 58 (Bankr. S.D.N.Y. 2005) .................................................................... 22

*In re Federal-Mogul Glob. Inc.*,
    684 F.3d 355 (3d Cir. 2012) ................................................................................. 17

*In re Fleetstar, LLC*,
    614 B.R. 767 (E.D. La. 2020) .............................................................................. 75

*In re Forum Health*,
    451 B.R. 780 (Bankr. N.D. Ohio 2011) ................................................................ 72

*In re Franmar, Inc.*,
    361 B.R. 170 (Bankr. D. Colo. 2006) ................................................................... 68

*In re Hinesley Family Ltd. P'ship No. 1*,
    460 B.R. 547 (Bankr. D. Mont. 2011) .................................................................. 70

*In re Hinsley*,
    201 F.3d 638 (5th Cir. 2000) ............................................................................... 27

*In re Imerys*,
    Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) ............................................. 78

*In re Insilco Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007) ................................................................................. 20

*In re Integrated Telecom Express, Inc.*,
    384 F.3d 108 (3d Cir. 2004) .................................................................. 6, 17, 18, 39

*In re Johnson & Johnson Talcum Powder Prods. Marketing, Sales Practices and Prods. Litig.*,
    509 F. Supp. 3d 116 (D. N.J. 2020) ..................................................................... 53

*In re Keeley & Grabanski Land P'ship*,
    460 B.R. 520 (Bankr. D.N.D. 2011) ..................................................................... 70

*In re Keith*,
    No. 10-61722-11, 2010 WL 3835003 (Bankr. D. Mont. Sept. 29, 2010) ............. 70

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004) ................................................................................... 5

*In re Kesler*,
     No. 12-12716 MBK, 2013 WL 653089 (Bankr. D.N.J. Feb. 21, 2013) ............... 11

*In re Kholyavka*,
    Case No. 08-10653DWS, 2008 WL 3887653 (Bankr. E.D. Pa. Aug. 20, 2008) ... 18

*In re Korn*,
  523 B.R. 453 (Bankr. E.D. Pa. 2014) ...................................................... 18, 68, 70

*In re Little Creek Dev. Co.*,
  779 F.2d 1068 (5th Cir. 1986) ............................................................................ 6

*In re LTL Mgmt., LLC*,
  637 B.R. 396 (Bankr. D.N.J. 2022) ............................................................... 3, 36

*In re LTL Mgmt., LLC*,
  64 F.4th 84 (3d Cir. 2023) ...................................................................... passim

*In re Marvel Ent. Grp., Inc.*,
  140 F.3d 463 (3d Cir. 1998) ............................................................................ 20

*In re McKenna*,
  580 B.R. 1 (Bankr. D.R.I. 2017) ...................................................................... 71

*In re Mushroom Transp. Co.*,
  382 F.3d 325 (3d Cir. 2004 .............................................................................. 63

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ............................................................................ 77

*In re O'Gorman*,
  No. AP 21-01009, 2022 WL 17851422 (B.A.P. 9th Cir. Dec. 21, 2022)............................ 24

*In re Orbit Petroleum, Inc.*,
  395 B.R. 145 (Bankr. D.N.M. 2008) ............................................................... 69

*In re Paddock Enters., LLC*,
  No. 20-10028 (LSS), 2022 WL 1746652 (Bankr. D. Del. May 31, 2022)........................... 49

*In re Pittsfield Weaving Co.*,
  393 B.R. 271 (Bankr. D.N.H. 2008)................................................................ 68

*In re Products Int'l*,
  395 B.R. 109 ............................................................................................... 68

*In Re Purdue Pharma L.P.*,
  No. 22-110-bk(L), 2023 WL 3700458 (2d Cir. May 30, 2023) .............................. 79

*In re Reiman*,
  20 F.Cas. 490 (S.D.N.Y. 1874)...................................................................... 74

*In re Rent-A-Wreck of America, Inc.*,
  580 B.R. 364 (Bankr. D. Del. 2018) ............................................................... 41

*In re Rollaguard Sec., LLC*,
  570 B.R. 859 (Bankr. S.D. Fla. 2017) ............................................................ 24

*In re Roman Catholic Church of Archdiocese of New Orleans*,
  632 B.R. 593 (Bankr. E.D. La. 2021) ............................................................ 41

*In re Scheffler*,
  86 B.R. 576 (Bankr. W.D. Wis. 1986) ............................................................ 13

*In re Scott*,
    227 B.R. 834 (Bankr. S.D. Ind. 1998) ............................................................................ 24

*In re Sentinel Mgmt. Grp., Inc.*,
    728 F.3d 660 (7th Cir. 2013) ................................................................................... 22, 23

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999) .............................................................................. passim

*In re South Beach Sec., Inc.*,
    606 F.3d 366, 371 (7th Cir. 2010 .................................................................................. 12

*In re Superior Sidings & Window, Inc.*,
    14 F.3d 240 (4th Cir. 1994) ........................................................................................... 75

*In re Trib. Co. Fraudulent Conv. Litig.*,
    10 F.4th 147 (2d Cir. 2021) ........................................................................................... 22

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) .............................................................................. 23

*In re Vasvick*,
    604 B.R. 810 (Bankr. D.N.D. 2019) .............................................................................. 24

*In re Visicon S'holders Tr.*,
    478 B.R. 292 (Bankr. S.D. Ohio 2012) ......................................................................... 71

*In re Wallace*,
    No. 09-20496-FLM, 2010 WL 378351 n. 23 (Bankr.D. Id. Jan. 26, 2010) ................... 72

*In re Whetten*,
    473 B.R. 380 (Bankr. D. Colo. 2012) ............................................................................ 70

*In re World Trade Center Disaster Site Litig.*,
    834 F. Supp. 2d 184 (S.D.N.Y. 2011),
    *vacated in part by* 754 F.3d 114 (2d Cir. 2013) .......................................................... 77

*Ingham v. Johnson & Johnson*,
    608 S.W.3d 663 (Mo. App. 2020),
    *cert. denied*, 141 S. Ct. 2716 (2021)................................................................. 49, 53, 60

*Jackson v. Associated Scaffolders & Equip. Co.*,
    152 N.C.App. 687, 568 S.E.2d 666 (N.C. App. 2002) ................................................... 29

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) ........................................................................................... 11

*Lakefront Invs. LLC v. Clarkson*,
    484 B.R. 72 (D. Md. 2012),
    *aff'd*, 520 F. App'x 221 (4th Cir. 2013) ....................................................................... 75

*Lithuanian Com. Corp. v. Sara Lee Hosiery*,
    179 F.R.D. 450 (D.N.J. 1998)......................................................................................... 52

*Marrama v. Citizens Bank of Massachusetts*,
    549 U.S. 365 (2007).................................................................................................. 12, 38

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*,
  926 F.2d 1248 (1st Cir. 1991) .................................................................... 22

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
  945 F.2d 635 (3d Cir. 1991) ...................................................................... 27

*Midlantic Nat'l Bank v. DeSeno* (*In re DeSeno*),
  17 F.3d 642 (3d Cir. 1994) ........................................................................ 71

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
  971 F.2d 1056 (3d Cir. 1992) .................................................................... 25

*Moran v. Davita, Inc.*,
  No. 06 Civ. 5620 (JAP), 2008 WL 4447093 (D.N.J. Sept. 26, 2008) .................. 31

*Moss v. First Premier Bank*,
  No. 2:13-cv-05438 (ERK)(AYS), 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) ........ 30

*Nayak v. Herbison*,
  No. 1:14-CV-02211, 2015 WL 11605255 (M.D. Pa. May 26, 2015) .................... 50

*Norfolk S. Ry. Co. v. Reading Blue Mountain & N. R. Co.*,
  346 F.Supp.2d 720 (M.D. Pa. 2004) ............................................................ 34

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988) ...................................................................... 11

*Opsahl v. Pinehurst Inc.*,
  81 N.C. App. 56, 344 S.E.2d 68 (1986) ........................................................ 37

*Orsatti v. N.J. State Police*,
  71 F.3d 480 (3d Cir.1995) ........................................................................ 52

*Owens Corning v. Credit Suisse First Boston*,
  322 B.R. 719 (D. Del. 2005) ...................................................................... 49

*Passavent Mem'l Homes v. Laurel Highlands Found,* (*In re Laurel Highlands Found., Inc.*),
  473 B.R. 641 (Bankr. W.D. Pa. 2012) .......................................................... 46

*Peltz v. Hatten*,
  279 B.R. 710 (Bankr. D. Del. 2002) ............................................................ 27

*Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va.* (*In re Phoenix Piccadilly, Ltd.*),
  849 F.2d 1393 (11th Cir. 1988) .................................................................. 39

*Prologis Park Gateway Phase II Condo. Ass'n v. Sterling WH Co., LLC*
  (*In re Sterling WH Co., LLC*),
  475 B.R. 481 (Bankr. E.D. Va. 2012) .......................................................... 71

*Ritchie Cap. Mgmt., LLC v. Stoebner*,
  779 F.3d 857 (8th Cir. 2015) ...................................................................... 21

*Rollex Corp. v. Associated Materials, Inc.*
  (*In re Superior Siding & Window, Inc.*),
  14 F.3d 240 (4th Cir. 1994) ...................................................................... 75

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
  81 F.3d 355 (3d Cir. 1996) ........................................................................ 11

*Sprafka v. DePuy Orthapedics, Inc.*,
  No. 22-331 (DWF/DTS), 2022 WL 17414477 (D. Minn. Dec. 5, 2022) .............................. 50

*Stanley v. U.S. Bank Nat'l Ass'n (In re TransTexas Gas Corp.)*,
  597 F.3d 298 (5th Cir. 2010) ............................................................................... 27

*Struble v. New Jersey Brewery Employees' Welfare Tr. Fund*,
  732 F.2d 325 (3d Cir. 1984) ................................................................................ 20

*Swain v. C & N Evans Trucking Co.*,
  126 N.C. App. 332, 484 S.E.2d 845 (1997) ........................................................... 37

*Tavenner v. Smoot*,
  257 F.3d 401 (4th Cir. 2001) ............................................................................... 24

*The Currituck Assocs. v. Hollowell*,
  166 N.C. App. 17 (2004) ..................................................................................... 33

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) ............................................................................................. 69

*Tucker v. Charter Med. Corp.*,
  60 N.C.App. 665, 671, 299 S.E.2d 800, 804 (N.C. App. 1983) ................................ 37

*United Steelworkers of Am., AFL-CIO-CLC v. N. Star Steel Co.*,
  5 F.3d 39 (3d Cir. 1993) ..................................................................................... 69

*Valu-Lodge of Greenville, Inc. v. Branch Banking & Tr. Co.*,
  222 N.C. App. 637, 731 S.E.2d 274 (2012) ........................................................... 37

*Windsor on the River Assocs., Ltd. v. Balcor Real Estate Finance, Inc.
  (In re Windsor on the River Assocs., Ltd.)*,
  7 F.3d 127 (8th Cir. 1993) .................................................................................. 75

*Wright v. Union Cent. Life Ins. Co.*,
  304 U.S. 502 (1938) ........................................................................................... 74

*YBA Nineteen, LLC v. IndyMac Venture, LLC (In re YBA Nineteen, LLC)*,
  505 B.R. 289 (S.D. Cal. 2014) ............................................................................. 70

<u>Statutes</u>

28 U.S.C. § 157 ....................................................................................................... 78

28 U.S.C. § 1334 ..................................................................................................... 78

11 U.S.C. §  363 ...................................................................................................... 63

11 U.S.C. § 365 ....................................................................................................... 71

11 U.S.C. § 524 .................................................................................................. passim

11 U.S.C. § 548 .................................................................................................. passim

11 U.S.C. § 1104 ..................................................................................................... 65

11 U.S.C. § 1110 ..................................................................................................... 71

11 U.S.C. § 1112 ................................................................................................ passim

11 U.S.C. § 1126 ................................................................................................................ 79

11 U.S.C. § 1129 ................................................................................................................ 79

11 U.S.C. § 1168 ................................................................................................................ 71

11 U.S.C. § 1322 ................................................................................................................ 71

119 Stat. 115 (2005) .......................................................................................................... 66

124 Stat. 3561 (2010) ........................................................................................................ 67

N.J. State. Ann. § 25:2-25 (2021) ................................................................................ 26, 74

Other Authorities

140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (Sen. Heflin) .................................... 64

1978 U.S. Code Cong. & Admin. News 5963 .................................................................. 66

5 Collier on Bankruptcy ¶ 548.04 .................................................................................... 24

7 Collier on Bankruptcy, ¶ 1112.01 (16th ed. 2013 & 2023 supp.) .................... 66, 68, 75

Donna Larsen Holleran, Bankruptcy Code Manual § 548:18 (May 2023 update) ...................... 24

H.R. 128, Asbestos Compensation Act of 2000, 106th Cong., 2d Sess. (2000) ............................ 73

H.R. Rep. No. 31, 109th Cong., 1st Sess.442 (2005) ...................................................... 66

H.R. Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977) ............................................... 66

Hon. Eduardo C. Robreno, "The Federal Asbestos Product Liability Multidistrict Litigation
    (MDL-875): Black Hole or New Paradigm?," 23 Widener L. J 97, 100 (2013). ................. 79

Individual Characteristics of Mass Torts Case Congregations, a report to the
    Mass Torts Working Group (Fed. Jud. Ctr. Jan. 1999), available at
    https://www.uscourts.gov/sites/default/files/masstapd_1.pdf ............................ 79

Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical
    Impact.* J CLIN ONCOL 26:5284-5293 (2008) ........................................................ 53

Pub. L. 109-8, § 442(a) ...................................................................................................... 66

Pub. L. 111-327 .................................................................................................................. 67

RESTATEMENT (SECOND) OF TORTS § 8A (1965) ........................................................ 23

Thomas Sheridan, Dictionary of the English Language 124 (1796) ................................ 73

William Perry, The Royal Standard English Dictionary 51 (1777) .................................. 73

The Official Committee of Talc Claimants ("TCC") in the above captioned case, by and through its undersigned counsel, hereby submits this Reply in Support of its Motion to Dismiss the second bankruptcy filing of LTL Management, LLC (the "Debtor," "LTL," or "LTL 2.0"), pursuant to Section 1112(b) of the Bankruptcy Code and Rule 9011 of the Bankruptcy Rules.

## INTRODUCTION

The TCC, joined by some ten additional parties, including the Office of the United States Trustee (Doc. 379) and Ad Hoc Committee of States (Doc. 352), urges this Court to dismiss the Debtor's second bankruptcy filing for cause.[2]   The TCC's Motion to Dismiss (Doc. 286) demonstrated that the Debtor has failed its burden of establishing good faith under the Third Circuit's decision in *In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023).  Debtor's fraudulent attempt to manufacture financial distress by surrendering its rights under the 2021 Funding Agreement cannot provide a basis for good faith, as the Third Circuit warned in footnote 18 of its opinion.  Moreover, even assuming, *arguendo*, the permissibility of the Debtor's machinations, LTL has still failed to provide sufficient proof of "immediate" and "imminent" distress as required by the Third Circuit.  *Id*. at 102, 108.

In its Opposition Brief (Doc. 614) ("LTL Opp."), LTL talks out of both sides of its mouth regarding its financial condition.  To justify its bankruptcy filing, LTL asserts that it faces financial distress, citing supposed limits on its Holdco's liquidity and Holdco's supposed inability to borrow or compel dividends from its subsidiaries.  LTL Opp. at 35–39.  Yet when it comes to defending against fraudulent conveyance claims, LTL insists that "[t]he Debtor had the ability to meet talc expenses under the 2021 Funding Agreement and has the same ability under the 2023 Funding Agreement."  *Id.* at 42.   But if the Debtor has "the same ability" as in the first bankruptcy, then

---

[2] Additional filings in support of dismissal include Docs. 335, 346, 352, 358, 384, 473, 480, and Adv. Pro. No. 23-01092, Docs. 117, 118.

1

the outcome in the Third Circuit in LTL 1.0 should compel the same result here—dismissal. Indeed, all roads lead to dismissal in this case:

(1) If (as LTL asserts) the Debtor faces financial distress, any such distress was artificially manufactured by the Debtor and J&J and cannot provide valid basis for establishing good faith. As foreshadowed by the Third Circuit's footnote, any manufactured financial distress would be the product of fraud, and the underlying fraudulent transactions would be subject to avoidance under both state and federal law—meaning that the assets would be returned to the estate, and the illusion of financial distress would disappear.  Attempting to create financial distress through fraudulent transfer is ultimately self-defeating.  The purpose of bankruptcy is not to allow financially healthy companies to shed disfavored liabilities by manufacturing the appearance of financial distress through self-dealing staged transactions.

(2) Further, even if LTL's machinations were treated as legitimate, they **still** would fail to establish "imminent" and "immediate" financial distress.  *LTL Mgmt.*, 64 F.4th at 102, 108.  LTL concedes it failed to undertake any rigorous or reliable analysis of its alleged talc liabilities prior to the second bankruptcy filing on April 4.  Even now, LTL's president, Mr. Wuesthoff, testified that he does not believe talc liabilities are greater than $8.9 billion.[3] ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ [4]  As the Third Circuit has explained, the only entity whose financial distress is determinative is LTL—whether LTL's draw on its payment rights causes **Holdco** financial distress is simply not relevant.  *See LTL Mgmt.,* 64 F.4th at 107.  LTL has

---

[3] Excerpt of TCC Tr. Ex. 863, at 36:10–25 (May 30, 2023 Wuesthoff Dep. Tr.).  The exhibits to this brief are attached to the accompanying Declaration of Daniel M. Stolz in Support Of The Official Committee Of Talc Claimants' Reply In Support Of Their Motion To Dismiss Second Bankruptcy Petition Of Ltl Management, LLC.

[4] ███████████████████████████

failed to prove that talc liabilities are beyond *its* ability to pay outside bankruptcy or would cause it "imminent" and "immediate" financial distress.

(3) There are additional, independent reasons for finding lack of good faith in this case. LTL's recent assertion that "there is no funding available for [a creditor plan]" (Doc. 753 at 3) under any of the Funding Agreements would mean (if true) that this case is a bad faith litigation tactic, the sole purpose of which is to obtain a complete discharge of J&J's talc liability under terms dictated by J&J.  LTL's assertion that this case is about "fairly and equitably" compensating talc claimants has been exposed as false propaganda.  J&J is using this case improperly to enjoy all the benefits of bankruptcy with none of the burdens.  It seeks to circumvent the structural protections of the Code by depriving this Court of the control and supervision of the very assets connected with the talc liabilities at issue.  LTL's second bankruptcy filings presents in stark relief questions the Third Circuit posed but did not need to resolve in the first case, such as whether LTL's filing was in bad faith as an improper litigation tactic, *LTL Mgmt.,* 64 F.4th at 110 n.19, and whether any "divisional merger to excise the liability and stigma of a product gone bad contradicts the principles and purposes of the Bankruptcy Code." *Id.* at 111.

(4)  The supposed advantages of the bankruptcy system cannot, by themselves, establish good faith.  This Court provided a lengthy exegesis of the advantages of the bankruptcy system in its ruling on the motions to dismiss in the first bankruptcy.  *In re LTL Mgmt., LLC*, 637 B.R. 396, 407–13 (Bankr. D.N.J. 2022).[5]  But the Third Circuit reversed.  It dismissed LTL's petition for lack of good faith, notwithstanding what it described as this Court's "commendable effort to

---

[5] As discussed in Part V-B, the TCC submits that the tort system and MDL procedures serve important values and have many benefits.  Moreover, as this Court has noted, "[t]here is no question that, over time, our bankruptcy courts have witnessed serious abuses and inefficiencies, striking at the heart of the integrity of our bankruptcy courts. . . . In point of fact, there has been a deluge of critical commentary in recent months by academics, commentators, and even policymakers challenging the shortfalls of the bankruptcy system and calling for reform."  637 B.R. at 409–10.  Both the tort and bankruptcy systems have strengths and weaknesses.

resolve a more-than-thorny problem," and this Court's recognition of "the absence of viable protections for future tort claimants outside of bankruptcy." *LTL Mgmt.,* 64 F.4th at 110, 111 (citation omitted). Despite these factors, the Third Circuit opined that the Bankruptcy Code "restricts J&J's ability to move thousands of claims out of trial courts and into bankruptcy court so they may be resolved, in J&J's words, 'equitably' and 'efficiently.'" *Id.* at 110. The desire to resolve mass tort claims via the bankruptcy process is not, standing alone, a valid reorganizational purpose and cannot by itself demonstrate good faith. The Third Circuit explained that, "given Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so." *Id.* The Third Circuit held that good faith and financial distress are fundamental "gateway" requirements for bankruptcy and that, unless these requirements are met, a petition must be dismissed, even if "bankruptcy creates the best of all possible worlds." *Id.* at 102, 111. The Debtor's assertions of claimant support for its plan are similarly irrelevant (as well as illusory).

(5) This Court has asked the parties their views on the applicability of 11 U.S.C. § 1112(b)(2). It is the TCC's position, compelled by the language of that section, the Third Circuit's ruling, and applicable caselaw, that this Court's analysis should be restricted solely to the determination of good faith under Section 1112(b)(1). The Third Circuit has already held Section 1112(b)(2) inapplicable to these circumstances, *see LTL Mgmt.,* 64 F.4th at 110, and Section V of this brief explains in detail the legal flaws in the attempt by LTL and the Ad Hoc Committee of Supporting Counsel ("AHC") (Doc. 613) ("AHC Opp.") to rely on Section 1112(b)(2).

Accordingly, the balance of this brief will focus on "cause" for dismissal under Section 1112(b)(1). Judge Graham's recent decision dismissing the Aearo bankruptcy is highly instructive with respect to the issues before this Court. *See In re Aearo Techs. LLC*, No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), *direct appeal certified* (June 14, 2023). Judge

Graham relied heavily on Third Circuit precedent, *id.* at \*14, \*15–17, which he deemed "persuasive," *id.* at \*17.  He added that the Third Circuit's decision in *LTL* "casts a particularly prominent shadow over Aearo's bankruptcy." *Id.* at \*15.  Judge Graham found that, under this precedent, Aearo's filing could not "serve a valid reorganization purpose" because it "has been, and currently is, financially healthy," "timely meets its obligations," and has "no reported cash flow problems." *Id.* at \*17.  Like LTL, Aearo could draw on a funding agreement to pay its obligations outside bankruptcy. *Id.* at \*18.  Judge Graham noted that, "unlike LTL (and other Texas Two-Step cases), Aearo is a real company with real debts." *Id.* at \*20.  "But unlike the debtors in *Johns-Manville*, *Dow Corning*, and *A.H. Robins*, Aearo is not presently suffering financial problems of the type that warrants Chapter 11 relief.  Nor is Aearo creating or preserving value in these cases that would be lost outside of bankruptcy." *Id.*  "[A]llowing an otherwise financially healthy debtor with no impending solvency issues to remain in bankruptcy, much less one whose liability for most of its debts is supported by an even more financially healthy, Fortune 500 multinational conglomerate, exceeds the boundaries of the Court's limited jurisdiction." *Id.* at \*22.  Dismissal is similarly warranted here.[6]

## ARGUMENT

### I.    LTL Has the Burden of Establishing Good Faith and Financial Distress.

The legal standard in the Third Circuit is clear: Chapter 11 bankruptcy petitions are "subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish [good faith]." *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118

---

[6] Both the Debtor and the AHC continue to denigrate the TCC as supposedly representing only a "minority" of creditors.  That is incorrect.  The members of the TCC are selected by the Office of the U.S. Trustee and appointed by the Court to act with a fiduciary duty to all talc claimants – the AHC's included.  *See, e.g., In re Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004).  Only the TCC can speak for the interest of all claimants.

(3d Cir. 2004)).  The Third Circuit reaffirmed in the prior *LTL* appeal that "[o]nce at issue, the burden to establish good faith is on the debtor."  *LTL Mgmt.,* 64 F.4th at 100.  Good faith necessarily requires a showing of financial distress.  *Id.* at 101–04; *see also In re Integrated Telecom Express*, 384 F.3d at 119.

The Debtor argues that "[h]undreds of courts and eight circuit courts of appeal" are wrong in imposing a good faith test under 11 U.S.C. § 1112(b).  LTL Opp. at 21 n.19 (internal quotation marks and citation omitted).[7]  The Debtor also argues that the Third Circuit is wrong in assigning it the burden of proof.  *Id.* at 25 n.28.  That the Debtor asks this Court to disregard express binding precedent shows its desperation.[8]  In any event, the TCC and other movants would prevail on this motion regardless of which party bears the burden.

## II.    LTL's Unsuccessful Attempt to Manufacture Financial Distress Cannot Create a Good Faith Filing.

The Third Circuit dismissed LTL's first bankruptcy due to LTL's "lack of financial distress" because of its right to access a $61.5 billion 2021 Funding Agreement, which functioned like an "ATM" to pay talc claims outside bankruptcy.  *LTL Mgmt.,* 64 F.4th at 109–110.  The Court of Appeals further could not "see how its lack of financial distress could be overcome," because LTL had a "duty" to "access its payment assets," *id.* at 107, 110, and because a surrender of the Funding Agreement would be subject to challenge as a fraudulent conveyance, *id*. at 109 n.18.

LTL responded to the Third Circuit's ruling by engaging in a pattern of bad faith conduct in an attempt to manufacture financial distress and evade the Court of Appeals' decision.

---

[7] "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for commencement ... of bankruptcy proceedings." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986).  Every court of appeals to consider the issue has held that, post-1978, good faith continues to be a prerequisite for bankruptcy under the Bankruptcy Code.

[8] Debtor's arguments contradict each other.  It urges the Court to accord decisive weight to the 1978 textual change to 11 U.S.C. § 1112(b) (LTL Opp. at 20), but to ignore the 2010 textual change to the statute.  LTL Opp. at 24.

Accordingly, LTL 2.0 should be dismissed for two independently sufficient reasons. First, LTL fails to satisfy the "good faith" requirement because manufactured financial distress is the antithesis of good faith—whether or not it technically qualifies as an actual or constructive fraudulent transfer. Second, LTL's surrender of the 2021 Funding Agreement transaction can be avoided under both state and federal law, which thwarts LTL's attempt to manufacture financial distress. As the U.S. Trustee explains in its motion to dismiss, the "only real consequence of LTL's financial machinations would be to replace a large contract right with a smaller contract right coupled with a large litigation claim," the net effect of which "would be zero." Doc. 379-4, at 13. The fraud issue is not "premature" (LTL Opp. at 53); it warrants immediate dismissal ***now***, with no need to wait for any decision regarding the TCC's derivative standing motion.

### A.    Any Purported Financial Distress Was Manufactured By J&J.

In an attempt to create a justification for the second bankruptcy filing, LTL, J&J and Holdco entered into a termination and substitution agreement under which the 2021 Funding Agreement (with its $61.5+ billion ATM backed by both New JJCI and J&J) was terminated and replaced by two new agreements:

(1) the 2023 Funding Agreement, under which Holdco (but not J&J) is obliged to pay for LTL's asserted talc-related liabilities, both inside and outside bankruptcy. J&J is not an obligor under the 2023 Funding Agreement, and Holdco has now been stripped of the J&J consumer business and cashflow it previously provided, by the January 2023 spin-off to Janssen and Kenvue; and

(2) a J&J support agreement, under which J&J agrees to backstop Holdco's obligations under the 2023 Funding Agreement by treating any amounts not reimbursed as

"deemed to be financed with a loan from J&J to Holdco"—but only inside the context of bankruptcy.[9]

Mr. Kim acknowledged that the sole "***purpose*** of . . . all the agreements" among LTL, J&J, and affiliates, "including the funding agreement, was to enhance LTL's ability to resolve [talc] claims in bankruptcy."[10]  He testified that the Debtor parted with the 2021 Funding Agreement, its most valuable asset, so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third Circuit."[11]  Mr. Kim added that "J&J's support is only available in bankruptcy and only if approved by this [Bankruptcy] Court. Holdco is the sole obligor under the 2023 Funding Agreement."[12]  Mr. Kim also noted that "Holdco transferred its consumer health business, which represented a substantial portion of its assets, in early January 2023."[13]  Although LTL's opposition brief contends that the transfer of the consumer business has "no connection" to the Debtor's second bankruptcy case (LTL Opp. 45) it ignores the fact that Mr. Kim's First-Day Declaration in LTL 2.0 ***cites to the transfer of the consumer business to support LTL's assertion of financial distress***.  Thus, LTL inconsistently asserts that the spin-off of the

---

[9] TCC Tr. Ex. 514 ¶¶ 79–81 (Kim First-Day Decl. LTL 2.0); TCC Tr. Ex. 794, at Annex F, § 2 (J&J Support Agreement); ▮▮▮▮▮▮▮▮▮▮▮▮▮

[10] Excerpt of TCC Tr. Ex. 951, at 181:8–182:9 (4-14-23 Kim. Dep. Tr.) (emphasis added).

[11] TCC Tr. Ex. 514 ¶¶ 78, 83 (Kim First-Day Decl. LTL 2.0).

[12] *Id.* ¶ 82.

[13] Id.

consumer business has nothing to do with this bankruptcy, but also that the spin-off helps establish financial distress by limiting the cashflow available to Holdco.[14]

LTL's Opposition brief confirms that its asserted financial distress was deliberately manufactured through a series of staged transactions.

**First**, LTL contends that, on a stand-alone basis, it lacks sufficient liquidity to pay talc claims in full and must rely on a Funding Agreement for funds. LTL asserts that it has "less than $15 million in cash," which could "be depleted in less than a month by defense costs alone," and that LTL has never received any dividends from Royalty A&M. LTL Opp. at 35. J&J (through the divisive merger) deliberately created this situation, stripping LTL of JJCI's assets and making the Funding Agreement the only vehicle through which LTL could obtain sufficient funding to pay the talc claims that were assigned to it by J&J.

**Second**, LTL asserts that it no longer has access to the J&J "ATM." *Id.* at 31. The J&J "backstop" in the 2021 Funding Agreement that provided LTL with direct access to "J&J's exceptionally strong balance sheet" worth "well over $400 billion in equity value" and "$31 billion in cash and marketable securities" is no longer available to LTL. *Id.* at 15 (quoting *LTL Mgmt.*, 64 F.4th at 106). LTL, by its own admission, deliberately traded the J&J "ATM" for a new Funding Agreement, under which it asserts it has access to at most $400 million in cash—an amount LTL contends would be exhausted "in less than six months" defending talc claims. *Id.* at 35, 40, 41.

LTL misrepresents to this Court what the Third Circuit stated with respect to the 2021 Funding Agreement. Rather than finding that J&J's funding obligation was "gratuitous" (LTL

---

[14] The Court restricted the TCC's ability to pursue discovery into the transactions by which the consumer business was transferred from Holdco to Janssen and Kenvue, and the TCC notes for the record its continuing objection to the restriction of discovery.

Opp. at 47), the Third Circuit held "that J&J's triple A-rated payment obligation for LTL's liabilities, ***which it views as a*** generous protection it was never required to provide to claimants, weakened LTL's case to be in bankruptcy." *LTL Mgmt.,* 64 F.4th at 110–11 (emphasis added). The Debtor previously explained that the terms of the 2021 Funding Agreement were not ***gratuitous*** but intended to avoid legal objections that other Texas Two-Step transactions had encountered in court,[15] and to defend against fraudulent conveyance accusations.[16]  Mr. Gordon told this Court: "***It's there to assure this isn't treated or consider[ed] a fraudulent conveyance***."[17] Despite LTL's present posturing, there was nothing generous about J&J's funding commitment.

**Third**, LTL asserts that Holdco's assets no longer include the consumer business once owned by Old JJCI, which was spun-off in early January 2023.  LTL Opp. at 8.  LTL asserts that Holdco—formerly New JJCI—is now a "holding company with predominantly minority ownership interest in foreign subsidiaries and indirect affiliates." *Id.* at 32.  LTL contends that Holdco has "limited liquidity" and "would have to liquidate assets in order to pay talc costs." *Id.* at 39. LTL alleges that "Holdco has no authority to require its minority-owned subsidiaries to sell their operational or other assets or to declare dividends" and, even if it did, such sales "would undoubtedly be made at significant discounts to going-concern values." *Id.* at 38.  Moreover, LTL asserts that Holdco has no power to compel dividends from any of its subsidiaries or indirect affiliates," and that "even if dividends will from time to time flow up to Holdco, there is substantial

---

[15] *See Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)*, Case No. 20-30608 (JCW), Adv. Proc. No. 20-03041, 2021 WL 3729335, at *1 (Bankr. W.D.N.C. Aug. 23, 2021); *DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350, at *1 (Bankr. W.D.N.C. Aug. 11, 2021).

[16] Excerpt of TCC Tr. Ex. 1011, at 56:1–8 (Feb. 18, 2023 Hearing Tr.).

[17] *Id.*, at 61:5–20 (emphasis added).

uncertainty as to whether they would be sufficient to, or received in time, to satisfy potentially crippling defenses costs, settlements and possible *Ingham*-like verdicts." *Id.* at 38.

But all of these constraints on Holdco's liquidity are imposed by J&J and could be altered by J&J. ███████████████████████████████████████████████
███████████████████████████████████████████[18] And J&J and LTL have presented themselves as a common corporate enterprise when it is in their interest to do so. For example, J&J and LTL have claimed that they act under a "common interest" privilege as corporate affiliates (Doc. 524 at 5–6) making decisions by "consensus," as Mr. Kim testified at the April 18 hearing.[19] Mr. Gordon told this Court that J&J and LTL are "all part of the same corporate enterprise"[20] (therefore that punitive damages against J&J would be covered by the 1979 transfer agreement[21]). LTL's prior representations to this Court prove that J&J bears full responsibility for LTL's financial condition, and the Debtor should be estopped from inconsistently arguing that J&J and LTL act at arm's length, independently from each other.[22]

Thus, LTL's allegations, and its own expert testimony, demonstrate that any asserted financial distress is wholly the product of J&J's own machinations and was deliberately manufactured in an effort to justify the second bankruptcy filing. Fabricated financial distress is

---

[18] ███████████████████████████████████

[19] Excerpt of TCC Tr. Ex. 788, at 75:18 (April 18, 2023 Hearing Tr.).

[20] Excerpt of TCC Tr. Ex. 1020, at 28:11–18 (June 13, 2023 Hearing Tr.).

[21] *Id.*, at 30:8–9.

[22] As this Court has opined, "[t]he Debtor cannot now take a contrary position, which better serves its current interests." *In re Congoleum Corp.*, 627 B.R. 62, 72 (Bankr. D.N.J. 2021); *see also In re Kesler*, No. 12-12716 MBK, 2013 WL 653089, at *6 (Bankr. D.N.J. Feb. 21, 2013) (debtor third-party actions barred by judicial estoppel). The Third Circuit has often judicially estopped litigants from asserting inconsistent positions even when the initial court did not accept the party's prior position. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419–20 (3d Cir. 1988); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47, 50–51 (3d Cir. 2018). Thus, the fact that the Debtor lost first *LTL* bankruptcy does not prevent judicial estoppel from barring its inconsistent positions. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 357 (3d Cir. 1996) (party asserting an inconsistent position need not have benefitted from the earlier position in order to be precluded by judicial estoppel).

not a valid basis for establishing good faith and satisfying the fundamental bankruptcy "gateway"

requirement. *LTL Mgmt.,* 64 F.4th at 102.

### B. Manufactured Financial Distress Cannot Provide a Basis for Good Faith, Regardless of Whether It Technically Qualifies as a Fraudulent Conveyance.

This case cannot satisfy the good faith requirement of the Code and should be dismissed

for cause, regardless of whether the elements of actual and constructive fraud under 11 U.S.C.

§ 548(a) are technically met (and those elements are easily met, as shown in Parts II-C and II-D,

*infra*).  Any financial distress in this case was manufactured in bad faith through deliberately staged

transactions that breached LTL's fiduciary duties under the Bankruptcy Code, in an attempt to

achieve goals that are antithetical to the principles of the bankruptcy system.  That is the opposite

of good faith.

### 1. Manufactured Financial Distress is Bad Faith.

Self-created financial distress does not create a genuine need for reorganization and does

not justify resort to the tools of bankruptcy, which the Third Circuit has noted "can impose

significant hardship on particular creditors." *LTL Mgmt.*, 64 F.4th at 103.  "The principal purpose

of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor." *Marrama*

*v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).   Congress did not enact the Code to

enable debtors to address self-imposed financial distress, much less to use that distress as a pretext

for resolving mass tort (or other disfavored) liabilities.  Indeed, the Supreme Court recently held

that creditor interests can outweigh the debtor's interest in a "fresh start," particularly in cases

involving fraud (even when not committed by the debtor herself). *Bartenwerfer v. Buckey*, 143

S.Ct. 665, 676 (2023).

In *In re South Beach Sec., Inc*., 606 F.3d 366, 371, 376 (7th Cir. 2010), for example, the

Court of Appeals affirmed that the dismissal of bankruptcy filed by a debtor that "was insolvent

as a result of having been directed by [an insider] to borrow money from another [insider-controlled] company," because "[t]he public has an interest in limiting the use of bankruptcy to the purposes for which it is intended." In *South Beach*, the Seventh Circuit relied on *BEPCO*, 589 F.3d at 625–26, for the proposition that, "to make a firm that one controls insolvent in order to . . . shield assets from judgment creditors, is not a proper invocation of bankruptcy law." *South Beach Sec.*, 606 F.3d at 377. That is precisely what J&J seeks to do here.

Where asserted financial distress is really an effort to "unfairly single[ ] out [a] creditor and subject[ ] it to unfair and discriminatory treatment," it "evidence[s] [debtor's] lack of good faith" and warrants dismissal. *In re Scheffler*, 86 B.R. 576, 578–79 (Bankr. W.D. Wis. 1986). "In order for there to be a good faith bankruptcy filing there must be real debts, real creditors, and the debtor must need relief from financial distress." *Id.* at 579. The Debtor has cited no case—and the TCC is not aware of any—where manufactured financial distress of the kind presented here has been upheld as a valid basis for bankruptcy.

J&J's approach would allow even financially healthy companies to shed disfavored liabilities by (i) creating corporate shells with no genuine business activities, (ii) manufacturing "financial distress" through staged transactions, and (iii) invoking the bankruptcy system, while (iv) keeping the operating business connected with that liability safely outside the bankruptcy system (and exposed to the costs only to the extent the parent voluntarily allowed). Mass tort liabilities, environmental liabilities, and other unsecured liabilities (such as employer retiree liabilities) could be resolved or extinguished using the same impermissible strategy. This approach would upset the Code's "balancing process between the interests of debtors and creditors," which

13

the good faith standard is meant to maintain. *In re SGL Carbon Corp.*, 200 F.3d 154, 161–62 (3d Cir. 1999) (citation omitted).

LTL invokes the Third Circuit's statement that, "'when financial distress is present, bankruptcy may be an appropriate forum for a debtor to address mass tort liability.'" LTL Opp. 59 (quoting *LTL Mgmt.*, 64 F.4th at 104) (emphasis added). That truism reflects the fact that bankruptcy may be an available forum when the debtor ***otherwise is properly in bankruptcy***. The Third Circuit ruled out resolving mass tort liability, standing alone, as a valid reorganizational purpose and held that resolving mass torts, even if they are "a more-than-thorny problem," cannot itself justify bankruptcy. *LTL Mgmt.,* 64 F.4th at 111. LTL's argument that financial distress is present because it seeks to resolve mass tort liability turns the Third Circuit's reasoning on its head. The Court of Appeals made clear that the existence of mass tort liability is not equivalent to financial distress.

J&J seeks to manufacture financial distress as a pretext for resolving its talc liability. But the mass tort bankruptcies to which the Third Circuit referred—Johns-Manville, Dow Corning, and Dalkon Shield, *see id.* at 104—are the polar opposite of this case. In those prior mass tort bankruptcies, the debtors filing for bankruptcy were the pre-existing operating companies whose financial distress arose organically, because tort liability had been asserted against them, not because a parent entity had arbitrarily manipulated their assets in an effort to create financial distress. The bankruptcy was intended to preserve and rehabilitate those operating companies. In contrast, LTL was created for the sole purpose of resolving talc claims that ***had not*** been previously asserted against it. Indeed, LTL existed for a mere 48 hours before its first bankruptcy filing. LTL's supposed "financial distress" is wholly a product of J&J's machinations.

Moreover, any "financial distress" was manufactured solely for the benefit of ***J&J***, which is further evidence of bad faith. Here, LTL, the Third Circuit explained, is a "shell company

'formed,' almost exclusively, 'to manage and defend . . . talc-related claims' while insulating . . . the assets" of its affiliates. *Id.* at 109. It has no "going concern" to preserve, nothing to rehabilitate, no employees to protect, no genuine trade relationships to maintain. LTL "faced [no] 'serious financial and/or managerial difficulties' calling for the need to reorganize" to achieve its limited purpose; absent that need to reorganize, "LTL's petition has no valid bankruptcy purpose." *Id.* at 101, 109–10 & n.19; *see also BEPCO,* 589 F.3d at 619 (debtor had "no going concerns to preserve—no employees, offices, or business other than the handling of litigation"). LTL was created, and this bankruptcy was filed, ███████████████████████[23]—to benefit J&J— not to preserve LTL, which has no operations, or to help sick-and-dying claimants, whose cases have been frozen for years by seriatim bankruptcy petitions, as they grow sicker and die. In no other mass tort or asbestos bankruptcy has a parent entity with independent tort liability like J&J been allowed to reap the benefit of the bankruptcy process in this manner.

The Third Circuit has made clear that a petition is in bad faith where it is "primarily concerned with protecting [a non-debtor parent], not the Debtor." *Id.* at 624. The Third Circuit found bad faith in BEPCO because the debtors' managers were "employed by" the non-debtor parent, and that parent "was ultimately in control of whether the Debtors filed" for bankruptcy. *Id.* at 624–25. Bad faith is even clearer here.

All of the relevant transactions in this case have been orchestrated by J&J. Mr. Wuesthoff, LTL's president, admitted he was unaware of J&J's January 2023 transfer of HoldCo's consumer business—which provided LTL cashflow under the 2021 Funding Agreement—until after it happened.[24] Mr. Kim did not learn of the spinoff until "February or March" of 2023.[25] He testified

---

[23] ███████████████████████████████████████
[24] Excerpt of TCC Tr. Ex. 863, at 76:20–23 (May 30, 2023 Wuesthoff Dep. Tr.).
[25] Excerpt of TCC Tr. Ex. 770, at 72:25–73:18–22 (June 1, 2023 Kim Dep. Tr.).

that the $8.9 billion figure in LTL's second bankruptcy filing was negotiated by J&J, not LTL.[26]

Mr. Wuesthoff did not even know how the "$8.9 billion number was arrived at,"[27] or who came

up with the figure.[28]

J&J not only controlled LTL's bankruptcy filing, but LTL's managers—current or former

J&J employees—have forsaken LTL's interests in their effort to serve J&J's.  Mr. Haas testified

that J&J first raised the void-voidable issue.[29]  LTL's Board simply agreed to abandon the 2021

Funding Agreement with no negotiation with J&J.[30]  The Board never discussed J&J's "chances

of success" as to the argument that the 2021 Funding Agreement was "void or voidabl[e]," or

requested that any analysis be performed.[31]  It did not consider obtaining new counsel or advice in

connection with the surrender of the 2021 Founding Agreement.[32]  LTL had 61 billion reasons to

try and hold J&J to its original agreement, but never considered doing so.  As the U.S. Trustee

observed, LTL entered into that "one-sided" transaction to benefit its "parent," J&J, while

embracing a void-or-voidable "theory wholly adverse to LTL's own interests."  Doc. 38 at 11 &

n.4.  LTL went so far as to assert a "common interest" with J&J regarding the surrender of the

2021 Funding Agreement (Doc. 524 at 5–6) completely abdicating its own interests (and those of

its creditors).

Similarly, LTL voluntarily and unquestioningly accepted indemnification obligations with

respect to J&J's independent tort liability and has expressed a consistent unwillingness to assert

any defenses to those obligations, even after the Third Circuit identified several potential grounds

---

[26] *Id.*, at 67:5–68:9.

[27] Excerpt of TCC Tr. Ex. 863, at 116:4–6 (May 30, 2023 Wuesthoff Dep. Tr.).

[28] *Id.*, at 116:14–16.

[29] Excerpt of TCC Tr. Ex. 772, at 29:10–30:10 (June 7, 2023 Haas Dep. Tr.).

[30] Excerpt of TCC Tr. Ex. 863, at 63:17–64:8 (May 30, 2023 Wuesthoff Dep. Tr.); Excerpt of TCC Tr. Ex. 892, at 68:15–25 (May 31, 2023 Dickinson Dep. Tr.).

[31] Excerpt of TCC Tr. Ex. 863, at 121:4–11 (May 30, 2023 Wuesthoff Dep. Tr.).

[32] *Id.*, at 98:15–21.

for LTL to do so. *See LTL Mgmt.*, 64 F.4th at 108 n.16. In short, LTL has exhibited a disturbing

pattern of blindly pursuing J&J's interests as its own.

The resolution of a parent's mass tort liabilities via self-engineered financial distress, with

no debtor to rehabilitate and no genuine ongoing business to preserve, is an objective "outside the

legitimate scope of the bankruptcy laws." *SGL Carbon*, 200 F.3d at 165. "[T]he good-faith

gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief." *LTL*

*Mgmt.*, 64 F.4th at 102. The good faith standard requires that a debtor's petition "serves a valid

bankruptcy purpose," e.g., by "preserv[ing] a going concern or maximiz[ing] the value of the

debtor's estate," rather than "undermin[ing] the legitimate rights and interests of those intended to

benefit by this statutory policy," i.e., creditors. *Id.* at 101 (citation omitted). This bankruptcy

flunks that standard. J&J is pursuing an objective outside the purposes of the Code, and its

approach would dramatically skew the "balancing process between the interests of debtors and

creditors." *SGL Carbon*, 200 F.3d at 161.

LTL also points to the desire to establish a 11 U.S.C. § 524(g) trust. LTL Opp. at 58–59.

But that does not establish good faith. A desire to invoke bankruptcy remedies is insufficient. *See*

*LTL Mgmt.*, 64 F.4th at 101; *Integrated Telecom*, 384 F.3d at 126–129. Section 524(g) is a remedy

in connection with a confirmed plan. *See In re Federal-Mogul Glob. Inc.*, 684 F.3d 355, 359–62

(3d Cir. 2012). The "question of good faith," however, is "antecedent to" any bankruptcy remedy.

*Integrated Telecom*, 384 F.3d at 128. Policy arguments about the supposed fairness or efficiency

of bankruptcy compared to the mass-torts system do not meet that requirement.

LTL urges that things are "differen[t] this time around" because it supposedly has extensive

"support" for its plan of reorganization. LTL Opp. at 60. As discussed in Part V, that "support"

is illusory. But it is irrelevant regardless. Resort to bankruptcy is proper where the debtor has a

"need to reorganize." *LTL Mgmt.*, 64 F.4th at 109. LTL's ability to round up potential claimants

17

(or lawyers) willing to profess support cannot render an improper bankruptcy petition proper.  The gateway to bankruptcy is not a desire to resolve claims, but valid bankruptcy purposes.  Good faith requires " 'some relation' between the filing and the 'reorganization-related purposes that [Chapter 11] was designed to serve,' " *SGL Carbon*, 200 F.3d at 165, a valid "rehabilitative purpose" or "reorganization objective" for the debtor, *Integrated Telecom*, 384 F.3d at 119.  To cross the "good-faith gateway," LTL must show "faces the ***kinds of problems*** that justify Chapter 11 relief." *LTL Mgmt.,* 64 F.4th at 102 (emphasis added).  LTL cannot do that.

## 2.    Breach of Fiduciary Duties Is Bad Faith.

The manner in which LTL undertook the 2023 restructuring transactions also gives rise to an independent basis for finding bad faith, because the transactions were admittedly undertaken to evade the Third Circuit's ruling in violation of the Debtor's fiduciary duties and basic principles of equity.  "[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.'"  *SGL Carbon*, 200 F.3d at 161 (citation omitted).  "As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion."  *Id.* (citation omitted); *see also BEPCO*, 589 F.3d at 624 n.14 (debtor's breach of fiduciary duty is "relevant to the good faith inquiry"); *In re Korn*, 523 B.R. 453, 467–68 (Bankr. E.D. Pa. 2014) (Breach of fiduciary duty provides "cause" for dismissal); *In re Kholyavka*, Case No. 08-10653DWS, 2008 WL 3887653, *4 (Bankr. E.D. Pa. Aug. 20, 2008) ("performance of . . . fiduciary obligation is a *quid pro quo* for the protection the debtor enjoys under the reorganization provisions of the Bankruptcy Code").

This case is rooted in a pattern of misconduct and evasion, which occurred at a time when the Debtor owed a fiduciary duty to its creditors.  Mr. Kim testified that on January 30, 2023, the very day the Third Circuit's decision issued, LTL immediately began discussing next steps,

including "whether we should be refiling for bankruptcy."[33]  On March 16, while LTL was still in

bankruptcy, its Board met to discuss "[a]mending the funding agreement or entering into new

agreements in line with the requirement of the Third Circuit decision."[34]  On March 28, the LTL

Board discussed the Termination and Substitution Agreement to replace the 2021 Funding

Agreement.[35]

  These efforts were undertaken to benefit J&J, not talc claimants.  Mr. Wuesthoff, president

of LTL, refused to acknowledge that he had any fiduciary duties to talc claimants at all.  He

testified that his understanding was that "my fiduciary duties are primarily to LTL," rather than to

creditors.[36]

  Moreover, all these plans and discussions took place in secret.  LTL never raised its "void

or voidable" concern with the TCC, the U.S. Trustee's Office, or this Court (which could have

been asked to provide a declaratory judgment resolving the validity of the 2021 Funding

Agreement).  LTL never publicly suggested it was uncertain about the status of the 2021 Funding

Agreement.  LTL never indicated it was considering replacing it.  Indeed, on March 21, 2023 (only

two weeks before the second bankruptcy filing), LTL filed a monthly operating report, signed by

LTL's CFO and its counsel, indicating that the 2021 Funding Agreement remained in place.[37]

And, as Mr. Kim admitted at the 341 Hearing in this case, J&J continued to honor requests on the

2021 Funding Agreement between January 30, 2023 and April 4, 2023, even though Mr. Kim had

---

[33] Excerpt of TCC Tr. Ex. 951, at 74:23–75:10, 76:3–13; 77:2–18, 82:11–23 (Apr. 14, 2023 Kim Dep. Tr.).

[34] TCC Tr. Ex. 800, at 2 (Mar. 16, 2023 Board Minutes).

[35] TCC Tr. Ex. 801 (Mar. 28, 2023 Board Minutes).

[36] Excerpt of TCC Tr. Ex. 863, at 66:21–68:21 (May 30, 2023 Wuesthoff Dep. Tr.).

[37] TCC Tr. Ex. 858, at 14 (March Monthly Operating Report, Case No. 21-30589-MBK, Doc 3886-1, at 2).  LTL contends that this report was not misleading because "[a]s long as the 2021 Chapter 11 Case remained pending . . . the Debtor had no concerns as to the enforceability of the 2021 Funding Agreement."  LTL Opp. at 57 n.70.  But Mr. Kim testified that he harbored concerns about enforceability as soon as he read the Third Circuit's opinion on January 30. Excerpt of TCC Tr. Ex. 951, at 75:5–10; 4-18-23 Tr. 72:4–14, 73:1–13 (Apr. 14, 2023 Kim Dep. Tr.).

purportedly already concluded that such agreement was "void or voidable."[38]  The LTL Board approved the surrender of the 2021 Funding Agreement and the filing of the second bankruptcy on April 2, while LTL 1.0 was still pending.[39]  The Debtor defends its failure to seek court approval for its termination of the 2021 Funding Agreement and its replacement with the 2023 version on the specious ground that these transactions—although approved on April 2—were deemed to have occurred during the 2-hour-11-minute interval on April 4 between this Court's dismissal order and Debtor's re-filing.  LTL Opp. at 57.  That excuse itself smacks of bad faith.

A debtor in possession is "bound by all of the fiduciary duties of a bankruptcy trustee."  *In re Insilco Techs., Inc.*, 480 F.3d 212, 215 n.3 (3d Cir. 2007).  Those duties include "[o]pen, honest and straightforward disclosure to the Court and creditors" and the "duty to protect and conserve property in its possession for the benefit of creditors."  *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (internal quotation marks and citations omitted).  LTL's conduct falls woefully short of its fiduciary obligations.

LTL's only defense is that the surrender of the 2021 Funding Agreement supposedly "did not harm claimants."  LTL Opp. at 57.  But that is both wrong (as discussed below) and irrelevant.  A breach of fiduciary duties cannot be excused on the ground it has produced a greater good.  "[T]he objective merit of a decision will not cure a fiduciary breach."  *Struble v. New Jersey Brewery Employees' Welfare Tr. Fund*, 732 F.2d 325, 335 (3d Cir. 1984), *disapproved of on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

### C.    The 2023 Restructuring Was an Actual Fraudulent Transfer

The TCC does not concede the truth of LTL's assertions regarding its financial condition.  But, if true, LTL's own assertions would prove the elements of both actual and constructive

---

[38] Excerpt of TCC Tr. Ex. 904, at 25:13–26:22 (341 Hearing Tr.).
[39] Excerpt of TCC Tr. Ex. 951, at 169:25–171:3 (Apr. 14, 2023 Kim Dep. Tr.).

fraudulent conveyance claims.  The fraud issue is not "premature" (LTL Opp. at 53) in any sense.

Further trial proceedings are unnecessary, because LTL's own assertions establish the facts

necessary to satisfy the elements of fraud.[40]  Nor is there any need to wait for the TCC's derivative

standing motion to be heard, because LTL is on the horns of a dilemma, and either horn requires

dismissal.  If LTL's assertions of financial distress are accepted, then it has proven the elements

of actual and constructive fraud, and dismissal is required.  If LTL's assertions of financial distress

are rejected, then dismissal is required under the Third Circuit's decision.  Either way, LTL cannot

meet the "gateway" requirement of good faith, *LTL Mgmt.,* 64 F.4th at 102, and dismissal for cause

is mandated under Section 1112(b)(1).  It would be improper to wait for any decision on the TCC's

derivative standing motion.

LTL's allegations make out a claim of actual fraud under Section 548(a)(1)(A), which

provides that transfers made with the "actual intent to hinder, delay, or defraud" creditors can be

avoided and recovered for the benefit of creditors.  *See* 11 U.S.C. § 548(a)(1)(A).  Here, LTL's

**_only_** creditors are talc claimants.  Prior to April 4, 2023, these creditors had access to the 2021

Funding Agreement—a $61.5+ billion "ATM" backed by both J&J and New JJCI available to pay

talc claims inside **or outside of bankruptcy** (in the event of dismissal).  According to LTL, this

ATM is no more.  Rather, LTL replaced it with the 2023 Funding Agreement that makes Holdco's

balance sheet available to pay talc claims up to the value of Holdco.  But Holdco (according to

---

[40] Even the issue of intent can be decided as a matter of law where, as here, there is no genuine dispute of material
fact.  *E.g.*, *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015); *Brown v. Third Nat'l Bank* (*In re
Sherman*), 67 F.3d 1348, 1355 (8th Cir. 1995); *F.D.I.C. v. Anchor Props.*, 13 F.3d 27, 32 (1st Cir. 1994).

LTL) has only $400 million in cash and cannot compel dividends or require its minority-owned subsidiaries to conduct asset sales.

LTL contends that "Holdco and/or the Debtor" do **not** have the "liquid assets" necessary "to pay talc costs," which is the basis for LTL's contention that it is in "financial distress."  LTL Opp. at 39.  To be sure, as shown in Part III, there is every indication that Holdco can meet its funding obligations based on its current value.  However, assuming for purposes of argument Debtor's position that outside bankruptcy Holdco will exhaust its $400 million in cash before satisfying all talc claims against LTL, Debtor has identified a class of claimants who would **not** be paid anything by LTL under the 2023 Funding Agreement, but who **would** have been paid in full had the 2021 Funding Agreement remained in place.  And LTL confesses that it did this deliberately, to create financial distress, which the Third Circuit found to be absent so long as LTL had "access to cash to meet comfortably its liabilities as they came due for the foreseeable future." *LTL Mgmt.*, 64 F.4th at 108.  If LTL succeeds in creating financial distress based on its assertion that neither LTL nor Holdco has liquid assets sufficient to pay talc claims as they come due beyond $400 million, LTL necessarily acted with the intent to make financial resources required to pay talc claims unavailable to the holders of such claims.  LTL's actions also exhibit unmistakable "badges" of fraud.[41]   The surrender of the 2021 Funding Agreement involved LTL's most significant asset, took place outside the usual course of business, and was not disclosed in advance.

Hence, if LTL's assertions are accepted, this case involves a textbook example of an actual fraudulent transfer: reducing value available to pay claims amounts to actual intent to hinder, delay, or defraud one's creditors.  In *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013),

---

[41] *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 160 (2d Cir. 2021); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991); *In re Enron Corp.*, 328 B.R. 58, 73 (Bankr. S.D.N.Y. 2005).

for example, a debtor investment manager moved $88 million in securities from segregated accounts into a lienable account to provide additional collateral to debtor's secured lender, BNY Mellon. After the debtor filed for bankruptcy, the trustee sued to avoid Sentinel's transfer of funds from the segregated account to the liened account as an intentional fraudulent transfer. *Id.* at 666. At trial, the district court held that Sentinel's actions did not show actual intent, because the transfers were an attempt to stay in business. *Id.* at 667.

The Seventh Circuit reversed. Even if the primary purpose of the transfers was not to render funds unavailable to its creditors, Sentinel "certainly should have seen this result as a natural consequence of its actions." *Id.* Therefore, the Seventh Circuit found that the transfers demonstrated an actual intent to hinder, delay, or defraud its creditors. *Id.* Many other courts have followed the same reasoning.[42]

LTL proclaims that it did not "intend[] to hinder, delay or defraud any entity" but only to "equitably resolve current and future talc claims." LTL Opp. at 53 & n.44. But LTL's actions here are far more egregious than the debtor's action in *Sentinel*, since LTL's intent was to deprive itself of liquidity needed to pay talc claims in the ordinary course of business in an effort to make itself eligible for bankruptcy. And, as in *Sentinel*, LTL's proclamations regarding its supposedly benign intent are irrelevant if the natural consequence of terminating the 2021 Funding Agreement was that, at the moment LTL filed its second bankruptcy, LTL no longer had access to cash

---

[42]  *See, e.g.*, *HBE Leasing v. Frank*, 48 F.3d at 639–40 (actual fraudulent transfer claim survived motion to dismiss where payment of fees depleted assets available to future creditors); *Giuliano v. Schnabel* (*In re DSI Renal Holdings, LLC*), 574 B.R. 446, 467 (Bankr. D. Del. 2017) ("If one acts with knowledge that creditors will be hindered or delayed by a transfer but then intentionally enters the transaction in disregard of this fact, he acts with actual intent to hinder and delay them."); *In re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011) ("If the 'natural consequence' of a debtor's actions is that its creditors were hindered, delayed, or defrauded, a court is more likely to find that an intentional fraudulent transfer occurred."); see also RESTATEMENT (SECOND) OF TORTS § 8A (1965) at cmt. B ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 388 (S.D. Tex. 2008) (applying the Restatement's definition of intent and finding an intentional fraudulent transfer where "AMC knew that payments to some creditors would be hindered and delayed as a result of the transaction, but it closed the transaction anyway.").

sufficient to pay all talc claims in full as they came due for the foreseeable future.  Whether LTL's

ultimate goal was to facilitate a bankruptcy resolution is irrelevant.  "Under § 548(a)(1)(A),

liability can attach even if the party had good intentions and did not intend to cause harm."  Donna

Larsen Holleran, Bankruptcy Code Manual § 548:18 (May 2023 update).[43]

Similarly, LTL's insistence that its post-dismissal machinations have not rendered it

insolvent is also irrelevant.  Insolvency is not an element of actual fraud.  *See* 5 Collier on

Bankruptcy ¶ 548.04[1][b][iii] ("[S]ection 548(a)(1)(A) does not require the trustee to show that

the debtor was insolvent when the transaction occurred or that the transaction rendered the debtor

insolvent.").

LTL proclaims that "the evidence supports that the 2023 Funding Agreement is sufficient

to pay all talc claims in full."  LTL Opp. at 53–54.  But LTL cannot have it both ways.  If the 2023

restructuring had no effect on LTL's ability pay talc claims, and LTL has sufficient assets under

the 2023 Funding Agreement to pay, for the foreseeable future, talc claims in full as they are

liquidated by settlement or final judgment inside or outside of bankruptcy, then LTL is not in

financial distress, and this case must be dismissed.  Otherwise, if the 2023 restructuring reduced

---

[43] *See, e.g.*, *Tavenner v. Smoot*, 257 F.3d 401, 407 (4th Cir. 2001) ("Nothing in § 548 indicates that a trustee must
establish that a fraudulent conveyance actually harmed a creditor. . . . [T]he so-called 'no harm, no foul' approach is
inconsistent with the Bankruptcy Code."); *Sherman*, 67 F.3d at 1355 n.6 ("The Shermans also argue that the transfers
cannot be avoided as fraudulent because no creditor was harmed. However, the bankruptcy court correctly noted that
under § 548(a)(1), actual harm is not required; the trustee must show only that the debtor acted with the intent to
hinder, delay or defraud creditors."); *In re O'Gorman*, No. AP 21-01009, 2022 WL 17851422, at *6 (B.A.P. 9th Cir.
Dec. 21, 2022) (observing that actual harm and actual damages are not an element of a Section 548(a)(1)(a) claim);
*In re All Phase Roofing & Constr., LLC*, No. AP 17-01070, 2020 WL 5512500, at *7 (B.A.P. 10th Cir. Sept. 14, 2020)
("Actual harm to creditors is not an element of a claim under § 548(a)(1)(A)."); *In re Vasvick*, 604 B.R. 810, 821
(Bankr. D.N.D. 2019) (observing that actual harm to creditors is not an element of a fraudulent transfer claim based
on actual intent to hinder, delay, or defraud a creditor); *In re Rollaguard Sec., LLC*, 570 B.R. 859, 877 (Bankr. S.D.
Fla. 2017) ("The plain text of both section 548(a)(1) . . . makes clear that the inquiry is whether the Debtor intended
to hinder, delay, or defraud its present or future creditors when it made the subject transfer, not whether the Debtor's
creditors were actually harmed because the transfer diminished assets later included in the Debtor's bankruptcy
estate."); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 193 (S.D.N.Y. 2002) (collecting cases observing that actual
harm is not required to satisfy Section 548); *In re Scott*, 227 B.R. 834, 843 (Bankr. S.D. Ind. 1998) ("A showing of
actual harm to creditors is not required to set aside a fraudulent transfer under Section 548(a)(1).").

its access to funding (and thus hindered, delayed, or defrauded creditors) in an attempt to create

financial distress, LTL engaged in actual fraud in violation of Section 548(a)(1)(A).  Such fraud

prevents LTL from meeting the Code's "good faith" requirement and also prevents it from showing

financial distress, since the surrender of the 2021 Funding Agreement can be avoided under 11

U.S.C. § 548(a).

### D. LTL's Own Allegations, if Taken as True, Establish That the 2023 Restructuring Was a Constructive Fraudulent Transfer

Under Section 548(a)(1)(B), a transfer can be avoided as constructively fraudulent if it was

made in exchange for less than "reasonably equivalent value" and if one of three financial

conditions is present—*i.e.*, balance sheet insolvent, cash flow insolvency, or unreasonably small

capital.  *See* 11 U.S.C. § 548(a)(1)(B).  LTL argues that it is still solvent on a balance sheet basis

by asserting that Holdco has a $30 billion "going concern" value.

But LTL simultaneously argues that neither LTL nor Holdco have the "liquid assets"

necessary "to pay talc costs," which, again is the basis for LTL's contention that it is in "financial

distress."  LTL Opp. at 39.  This is the definition of cash flow insolvency.  And the Third Circuit

has interpreted "unreasonably small capital" in a way that is indistinguishable from financial

distress.[44]  Thus, LTL's allegations regarding its financial distress, if credited, necessarily prove

---

[44] Compare *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070, 1073 (3d Cir. 1992) (inadequate capital turns on the nature of the debtor's business and whether it is "reasonably foreseeable" that the debtor will be able to "generate sufficient profits to sustain operations"), with *LTL Mgmt.*, 64 F.4th at 108 (LTL was not in financial distress because it had "access to cash" to pay talc claims in full as they come due "for the foreseeable future.").

at least one of the three sufficient financial conditions under section 548(a)(1)(B), as well as under New Jersey law.[45]  LTL's responses lack merit.

**First**, LTL argues that "unreasonably small capital" in this context refers to the "inability to generate sufficient profits to sustain operations," and that there "is no evidence that the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement left the Debtor with insufficient assets to generate proceeds to sustain operations."  LTL Opp. at 56.  But LTL cannot have it both ways.  LTL's only operations are paying talc claims, and its own financial distress allegation indicates that LTL lacks sufficient assets to generate proceeds to sustain such payments: LTL asserts that neither LTL nor Holdco have the "liquid assets" necessary to pay talc claims.  *Id.* at 39.

**Second**, LTL argues that there is "no evidence of belief or intent on the part of the Debtor to incur debts beyond its ability to pay."  *Id.*  But once again, LTL cannot have it both ways.  LTL's only creditors are talc claimants.  LTL asserts that under the 2023 Funding Agreement, neither LTL nor Holdco have the "liquid assets" necessary to pay talc claims.  LTL Opp. at 39.  And LTL admits that it created this economic reality (in which it now has a reduced ability to pay) deliberately.  LTL's allegations of financial distress necessarily meet the predicates for a constructive fraudulent transfer claim.

**Third**, on the issue of reasonably equivalent value, LTL asserts that the funding available under both the 2021 Funding Agreement and the 2023 Funding Agreement is greater than the talc liability.  LTL maintains that "[t]he value of the Debtor's assets, including the 2023 Funding

---

[45] Under the New Jersey fraudulent transfer statute, a transaction is avoidable as a constructive fraudulent transfer if the debtor acted "(1) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due." N.J. State. Ann. § 25:2-25(a)(2) (West 2021).

Agreement, is estimated to be approximately $30 billion [on a going concern basis], which is greater than any realistic estimate of the Debtor's talc liabilities." LTL Opp. at 8, 55. According to LTL, the "value of the [Funding] [A]greement" is the aggregate amount of "the Debtor's talc liability"—*i.e.*, the value of the payment obligations—which LTL insists is less than $30 billion. *Id.* at 17–18, 42–44, 47. Based on this logic, LTL argues that the "value" of the 2023 Funding Agreement and the 2021 Funding Agreement "are the same." *Id.* at 44. LTL's argument lacks merit.

The TCC does not dispute that the funding available under each Funding Agreement is limited to LTL's aggregate talc liability. But this is ***not*** the issue. The issue is ***reasonably equivalent value***. And when it comes to value and reasonably equivalent value, the 2021 Funding Agreement and the 2023 Funding Agreement are not the same.

To determine reasonable equivalent value, the relevant comparison is the cash available to pay talc claims under each agreement.[46] Accordingly, the reasonable equivalent value inquiry is whether the 2023 Funding Agreement has the same ability to fund cash payments to talc claimants as the 2021 Funding Agreement. Despite bearing the burden of proof for showing financial distress, LTL has not performed any estimation of its aggregate talc liability. ██████████

████████████████████████████████████████████████████████

---

[46] *See, e.g.*, *Stanley v. U.S. Bank Nat'l Ass'n* (*In re TransTexas Gas Corp.*), 597 F.3d 298, 306 (5th Cir. 2010) ("[t]o measure reasonably equivalent value, [courts] judge the consideration given for a transfer from the standpoint of creditors.") (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) ("[T]he question whether the debtor received reasonably equivalent value must be determined from the standpoint of the creditors.") (emphasis in original); *Fidelity Bond & Mortgage Co. v. Brand (In re Fidelity Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006) ("Because 'the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors. Thus, the inquiry focuses on what did the debtor give up and what did it receive that could benefit creditors.'") (quoting *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002)); *Peltz v. Hatten*, 279 B.R. 710, 736 (Bankr. D. Del. 2002) (same).



and, therefore, not equivalent in value to the 2021 Funding Agreement, which made at least "$31 billion in cash and marketable securities" available to pay talc claims.  LTL Opp. at 15, 38.

An ATM with $31 billion in cash is not reasonably equivalent in value to an ATM with $400 million in cash and illiquid assets that cannot be liquidated contemporaneously with the liquidation of talc claims (either through settlement or judgment), especially given the constraints on Holdco's liquidity acknowledged by LTL.  *See id.* at 38.

LTL argues that "the **value** of each of the Funding Agreements to the Debtor's estate and to claimants necessarily equals the amount of **liability** minus the value of the Debtor."  *Id.* at 45 (emphasis added).  But **liability** and **value** are **not** the same thing.  Liability is what LTL owes a talc claimant based on a judgment or settlement.  The value of a Funding Agreement depends on LTL's ability to access cash to pay a talc claim after it is liquidated (by judgment or final settlement).

Under the 2021 Funding Agreement, if LTL elected to settle a talc claim, or if a judgment was entered against LTL in a talc lawsuit, LTL could have demanded payment from J&J, and J&J had the ability to satisfy that demand.  The talc claimant under this hypothetical would have been

---

[47]  *See* ███████████████████; *see also* LTL Opp. at 35 (explaining that the $400 million in liquidity would likely be exhausted in "less than six months"); *Id.* at 47 n.52 ("There should be no serious argument in this Chapter 11 Case that the talc liabilities exceed $30 billion.").

[48]  *See* ██████████████████  The TCC does not concede that Holdco lacks the ability to compel dividends.

paid in full when its talc claim was resolved.  But under the 2023 Funding Agreement, if LTL

elects to settle a talc claim, or if a judgment is entered against LTL in a talc lawsuit, LTL would

demand payment from Holdco.  And LTL argues that Holdco might **not** have the ability to satisfy

that demand with cash.  *Id.* at 38–39.  In such a scenario, the talc claim would **not** be paid in the

ordinary course.  In other words, under the 2021 Funding Agreement, talc claimants could have

been paid in full, whereas talc claimants under the 2023 Funding Agreement will not be (assuming,

*arguendo*, the truth of LTL's assertions).  Accordingly, under LTL's own allegations, the value of

the 2021 Funding Agreement and the 2023 Funding Agreement are not equivalent at all, let alone

reasonably equivalent in value from the perspective of talc claimants.

### E.    LTL's Surrender of the 2021 Funding Agreement Requires That the Entire Divisive Merger Be Unwound and LTL Relieved of Any Talc Liabilities.

LTL is not a defendant in a single lawsuit, and its debts arise solely from its assumption of

liabilities through agreements entered into in connection with the divisive merger.  But the

termination of the 2021 Funding Agreement voids the divisive merger as well, and means that LTL

is relieved of any talc liabilities at all.

There is no basis for selectively unwinding only half what LTL itself describes as a "single

integrated transaction."  LTL Opp. at 50.  If the 2021 Funding Agreement (which LTL itself

recognized as necessary to prevent the divisive merger from being a fraudulent conveyance) is

void, then any liabilities that were assigned to LTL as part of that transaction would go back to

J&J and JJCI, and this bankruptcy must be dismissed because LTL (with no talc liabilities) faces

no financial distress.  A party cannot selectively void a single aspect of an integrated transaction;

it must unwind the transaction in its entirety.  *See Jackson v. Associated Scaffolders & Equip. Co.*,

152 N.C.App. 687, 692, 568 S.E.2d 666, 669 (N.C. App. 2002) (invalid provision "render[s] the

entire contract invalid"). When multiple agreements represent a "single, integrated transaction,"

the voiding of one voids the others. *Moss v. First Premier Bank*, No. 2:13-cv-05438 (ERK)(AYS),

2020 WL 5231320, at *5 (E.D.N.Y. Sept. 2, 2020); *see also Hackel v. FDIC*, 858 F. Supp. 289,

292 (D. Mass. 1994) (holding that when a party repudiates a contract that is part of an integrated

transaction, all other agreements that are part of the integrated transaction also become "null and

void").

### F.    **LTL's Justifications for Terminating the 2021 Funding Agreement Lack Merit.**

#### 1.    **LTL Cannot Establish the "Frustration of Purpose" Defense**

LTL's pretextual excuse for terminating the 2021 Funding Agreement is that the Third

Circuit supposedly "changed the law"[49] and issued a decision that "no one" "could have

anticipated,"[50] thereby (allegedly) rendering the Agreement "void or voidable" under the

"frustration of purpose" defense to contract breach.  Mr. Kim told this Court that talc claimants

lost access to $61.5 billion "because of the Third Circuit decision, not because of what we did."[51]

This excuse is deeply flawed for multiple reasons.

**First**, this Court should not even consider LTL's justification because Debtor has refused

to provide relevant discovery regarding its defense.  Mr. Kim testified that a "consensus" was

reached between LTL and J&J "through their lawyers," all of whom were being paid by J&J, to

void the 2021 Funding Agreement.[52]  (Yet Mr. Haas admitted that J&J first raised the issue.[53])

When Mr. Kim was asked for details, he hid behind privilege, with his attorney citing "discussions

about a legal issue [] between lawyers."[54]  This Court denied discovery of communications

---

[49] Excerpt of TCC Tr. Ex. 951, at 78:14 (Apr. 14, 2023 Kim Dep. Tr.).

[50] *Id.*, at 78:6–10, 78:25–79:4.

[51] Excerpt of TCC Tr. Ex. 788, at 64:4–8 (Apr. 18, 2023 Hearing Tr.).

[52] Excerpt of TCC Tr. Ex. 951, at 189:13–190:3, 191:5–8 (Apr. 14, 2023 Kim PI Dep. Tr.); *see also* Excerpt of TCC Tr. Ex. 770, at 46:5–47:7, 48:6–10 (June 1, 2023 Kim Dep. Tr.).

[53] Excerpt of TCC Tr. Ex. 772, at 29:10–30:10 (June 7, 2023 Haas Dep. Tr.).

[54] Excerpt of TCC Tr. Ex. 788, at 68:3–70:3 (April 18, 2023 Hearing Tr.).

between LTL and J&J on the issue on grounds of "common interest" privilege,[55] even though LTL

and J&J were definitionally adverse regarding termination of the 2021 Funding Agreement, which

provided LTL with a $61.5+ billion ATM, inside or outside bankruptcy.   Given the denial of

discovery, LTL should be barred from raising its defense.[56]

 **Second**, LTL's premise is false. The Third Circuit's decision did not "change the law."

The Third Circuit Court painstakingly explained that its decision was compelled by longstanding

circuit precedent.   *LTL Mgmt.*, 64 F.4th at 101–03.   The Third Circuit's ruling accords with

extensive caselaw from other circuits (in fact, every court of appeals to have considered the

financial distress issue), as well as the legislative history of Chapter 11.  *Id.* at 103–04 & n.14.

 **Third**, under North Carolina law, which governs the 2021 Funding Agreement,[57]

frustration of purpose is merely an affirmative defense to a breach of contract action. *Brenner v.*

*Little Red School House, Ltd*., 302 N.C. 207, 210, 274 S.E.2d 206, 209 (N.C. 1981).   That

affirmative defense never came into play, because J&J never refused to make a payment under the

2021 Funding Agreement, and no business person at J&J ever indicated that it would refuse to do

so.   Mr. Kim acknowledged that no business person at J&J reached out to him to say that J&J

---

[55] Excerpt of TCC Tr. Ex. 1018, at 11:4–8 (May 30, 2023 Hearing Tr.).   The TCC notes its continuing objection to this Court's ruling on that issue.

[56] *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 223 n.24 (3d Cir. 2006) ("[T]he attorney-client privilege cannot be used as both a 'shield' and a 'sword': Berckeley cannot rely upon the legal advice it received for the purpose of negating its scienter without permitting Colkitt the opportunity to probe the surrounding circumstances and substance of that advice."); *Moran v. Davita, Inc.*, No. 06 Civ. 5620 (JAP), 2008 WL 4447093, at *6 (D.N.J. Sept. 26, 2008) (precluding evidence and argument where party refused to disclose underlying documents shielded by the attorney-client privilege: "It is impermissible for the Defendants to use the attorney-client privilege as a sword and a shield. Defendants seek to use the privilege as a shield, by refusing to disclose the 409A opinion letter authored by Sheppard, and as a sword, by arguing that they acted upon a good faith business reason when applying 409A to Plaintiff . . . Accordingly, the Court precludes evidence and argument [on the issue]."); *Gallatin Fuels, Inc. v Westchester Fire Ins. Co.*, No. CIV.A. 02-2116, 2006 WL 2289789, at *1 (W.D. Pa. Jan. 13, 2006) (precluding defendant from invoking the "advice of counsel" defense at trial where defendant "has refused to produce any documents or information containing advice of counsel and/or developed by or at the guidance of counsel").

[57] TCC Tr. Ex. 792, at § 9 (2021 Funding Agreement).

would refuse to honor the Funding Agreement.[58]  Mr. Dickinson, LTL's CFO, testified that no

business person at J&J or JJCI ever told him that they believed the 2021 Funding Agreement was

void, voidable, or unenforceable.[59]  J&J never refused to pay anything due under the 2021 Funding

Agreement, including between January 30 and April 4, 2023, when it had allegedly concluded that

such agreement was not enforceable.[60]

    **Fourth**, LTL cannot meet any of the elements of "frustration of purpose" under North

Carolina law.  "Essentially, there must be an implied condition to the contract that a changed

condition would excuse performance; this changed condition causes a failure of consideration or

the expected value of performance; and that the changed condition was not reasonably

foreseeable." *Faulconer v. Wysong and Miles Co.*, 155 N.C.App. 598, 602, 574 S.E.2d 688, 691

(N.C. App. 2002).  "The [frustration] doctrine is a 'narrow one,' and its utility is 'limited to

instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless

to one party[.]'" *Caper Corp. v. Wells Fargo Bank, N.A*., 578 F. App'x 276, 288 (4th Cir. 2014)

(citation omitted).

    <u>No implied condition</u>.  There was no "implied condition" in the Funding Agreement

limiting J&J's funding obligation to a bankruptcy proceeding.  To the contrary, J&J expressly

agreed that its funding obligation would also apply <u>outside</u> bankruptcy.  By its terms, the 2021

Funding Agreement obliges J&J to make payments even "when there is no proceeding under the

Bankruptcy Code."[61]  This feature is no accident and (as noted earlier) was included to avoid legal

objections that other Texas Two-Step transactions had encountered and to defend against

---

[58] Excerpt of TCC Tr. Ex. 951, at 209:9–210:18 (Apr. 14, 2023 Kim Dep. Tr.); Excerpt of TCC Tr. Ex. 788, at 75:8–15 (Apr. 18, 2023 Hearing Tr.).

[59] Excerpt of TCC Tr. Ex. 955, at 151:17–21, 152:18–22 (Dickinson Dep. Tr.).

[60] Excerpt of TCC Tr. Ex. 951, at 207:7–14 (Apr. 14, 2023 Kim Dep. Tr.).

[61] TCC Tr. Ex. 792, at 6 (2021 Funding Agreement).

fraudulent conveyance accusations.  *See* pp. 9–10, *supra*.  Mr. Gordon told this Court, in the presence of Mr. Haas, J&J's head of worldwide litigation, that the Funding Agreement would apply ***even if LTL's case were dismissed***: "[w]hether there was no case filed or ***whether the case is filed or dismissed***, the money's available for that purpose. . . . ***It's there to assure this isn't treated or consider[ed] a fraudulent conveyance***."[62]  During the first bankruptcy, Mr. Kim assured this Court that the 2021 Funding Agreement applied outside bankruptcy.[63]  Mr. Kim made the same admission, under oath, in an April 14, 2023 deposition and at the April 18, 2023 hearing.[64] Mr. Katyal acknowledged the same thing before the Third Circuit.[65]  The doctrine of judicial estoppel precludes LTL from taking a different position now and insisting that the 2021 Funding Agreement is unenforceable.  *See* n.22, *supra*.

Moreover, the fact that the terms of the 2021 Funding Agreement provide for its application outside bankruptcy renders the frustration-of-purpose defense inapplicable.  "[I]f the parties have contracted in reference to the allocation of the risk involved in the frustrating event, they may not invoke the doctrine of frustration to escape their obligations."  *Brenner,* 274 S.E.2d at 209; *The Currituck Assocs. v. Hollowell*, 166 N.C. App. 17, 29 (2004) (frustration doctrine was inapplicable where the party could have protected itself "by the terms of the [] agreement").  LTL and J&J had every opportunity to include language in the 2021 Funding Agreement limiting J&J's funding obligation or making it "void or voidable" in the event of dismissal ***for any reason*** and chose not to do so, which precludes resort to the doctrine of frustration of purpose.  *See Golden Triangle #3,*

---

[62] Excerpt of TCC Tr. Ex. 1011, at 61:5–20 (Feb. 18, 2023 Hearing Tr.) (emphasis added).

[63]  TCC Tr. Ex. 514, ¶ 27 (Kim First Day Decl. LTL 1.0) ("at any time when there is no bankruptcy case").

[64]  Excerpt of TCC Tr. Ex. 951, at 62:15–21, 182:10–17 (Apr. 14, 2023 Kim Dep. Tr.); Excerpt of TCC Tr. Ex. 788, at 61:7–14 (Apr. 18 2023 Hearing Tr.).

[65]  TCC Tr. Ex. 768, at 83:21–25 (Sept. 19, 2022 Third Circuit Oral Arg. Tr.) ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

*LLC v. RMP-Mallard Pointe, LLC*, No. 19 CVS 13580, 2022 WL 3048320, at * 19 (Sup. Ct. N.C. Aug. 2, 2022).  The frustration of purpose doctrine is not an excuse to override the clear terms of a contract.

Judge Ferguson's decision in *In re Congoleum Corp.*, Adv. No. 05-06245, 2007 WL 4571086, *10 (D.N.J. Dec. 28, 2007) ("the Debtor's argument that this Court's interpretation of *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2005) 'frustrates' the principal purpose of the parties is also not persuasive" and "without merit"), is essentially on point.  As in *Congoleum*, LTL and J&J are simply trying to rewrite documents after the fact to include provisions that they do not contain.

Third Circuit's decision was reasonably foreseeable. LTL acknowledged before this Court on April 18, 2023, that dismissal was a "reasonably foreseeable" event and that LTL understood that its case "might be dismissed at some point."[66]  Previous divisive mergers had been challenged, prior to LTL's filing for bankruptcy in October 2021. "If the frustrating event was reasonably foreseeable, the doctrine of frustration is ***not a defense***." *Brenner*, 274 S.E.2d at 209 (emphasis added); *see also Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 715 S.E.2d 273, 284 (N.C. App. 2011) (frustration of purpose defense "is inapplicable where the frustrating event is reasonably foreseeable").  That principle is dispositive here.[67]

LTL contends that, although dismissal was foreseeable, the Third Circuit's rationale was not. But the ***basis*** for the Third Circuit's opinion is irrelevant.  The provisions in the 2021 Funding

---

[66] Excerpt of TCC Tr. Ex. 788, at 209:14–210:5 (Apr. 18, 2023 Hearing Tr.).

[67] LTL cites (*see* LTL Opp. at 49) *Norfolk S. Ry. Co. v. Reading Blue Mountain & N. R. Co.*, 346 F. Supp. 2d 720 (M.D. Pa. 2004), which applied Pennsylvania rather than North Carolina law.  Regardless, Norfolk Southern supports the TCC, not LTL.  It opined that an occurrence does not trigger the frustration of purpose doctrine unless it is "not a realistic possibility." *Id.* at 724.  It is not plausible to contend that the Third Circuit's decision was "not a realistic possibility."  Moreover, Norfolk Southern opined that frustration of purpose applies only where the occurrence "is not fairly to be regarded as within the risks that he assumed under the contract." *Id.* (citation omitted).  In this case, the 2021 Funding Agreement expressly provided that J&J's funding obligation applied inside and outside of bankruptcy.

Agreement under which J&J agreed to provide funding outside of a bankruptcy proceeding are without qualification. As LTL admitted, there are "no conditions or any material conditions on the permitted funding uses under the [2021 Funding Agreement]."[68]    Moreover, the Third Circuit explained that there was no "incongruity" in holding that LTL's "ample financial support" under the 2021 Funding Agreement made it ineligible for a "[bankruptcy] system designed to protect those without" such resources. *LTL Mgmt.*, 64 F.4th at 111. J&J can hardly claim surprise that this Court took LTL "at [its] word" that "there was not 'any imminent or even likely need of [it] to invoke the Funding Agreement to its maximum amount or anything close to it.'" *Id.* at 108–109.

In fact, the *Aearo* bankruptcy court similarly relied on a funding agreement to find that a debtor did not face financial harm from tort litigation (albeit in the context of bankruptcy stay relief rather than a motion to dismiss). *See Aearo*, 642 B.R. at 907 ("the Pending Actions do[] not affect the amount of money Aearo can pay its creditors because the Funding Agreement covers all claims arising from the Pending Actions"). The Third Circuit is not the only court to have found that a parent's funding agreement negates a debtor's assertion of financial harm in bankruptcy.

LTL asserts an inaccurate revisionist reinterpretation of the 2021 Funding Agreement. LTL argues that "J&J's purpose" in making its funding commitment was limited to bankruptcy and made "to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code." LTL Opp. at 46, 50. But the 2021 Funding Agreement does not make J&J's funding obligation depend on whether LTL files for bankruptcy at all, let alone on the confirmation of a plan that includes a section 524(g) injunction. This Court already held that the 2021 Funding Agreement's promise of at least $61.5 billion to pay talc claims was "available upon confirmation of a plan—whether or not the plan is acceptable to J&J or New JJCI,

---

[68] *See* Excerpt of TCC Tr. Ex. 1011, at 60:16–61:20 (Feb. 18, 2022, Hearing Tr.) (Statements of Mr. Gordon).

and whether or not the plan offers payors protections under § 524(g)."  *LTL Mgmt.*, 637 B.R. at 424.

The record also disproves J&J's revisionist history.



[70] He denied that LTL "rubber stamp[ed]" the bankruptcy filing.[71]  Thus, LTL's witness testified that a bankruptcy filing was not preordained, and J&J explicitly did ***not*** tie its funding obligation to a requirement that LTL file for bankruptcy.

In any event, J&J's asserted "purpose" (LTL Opp. at 50) (which is not recited in the Agreement or reflected in its terms) is irrelevant.  The 2021 Funding Agreement contains an "entire agreement" clause,[72] which "excludes from the agreement everything not included in the writing." *Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 464, 323 S.E.2d 23, 25 (1984).  In addition, the absence of an anticipated benefit to a single party is insufficient to form the basis of a frustration-of-purpose defense.  *Gen. Elec. Cap. Corp. v. Charleston*, No. CIV. A. 88-6132, 1989 WL 63213, at *2 (E.D. Pa. June 12, 1989), *aff'd*, 898 F.2d 140 (3d Cir. 1990) ("It is not sufficient that the desires of one party is frustrated, the common purpose of the contract has to be frustrated."); *A-Leet Leasing Corp. v. Kingshead Corp.*, 150 N.J. Super. 384, 397 (N.J. Super. Ct. App. Div. 1977) ("[I]t is not sufficient that the desired object of but one of the contracting parties

---

[69] ████████████████████████████████████

[70] ████████████████████████████████████

[71] Excerpt of TCC Tr. Ex. 1006, at 182:5–183:12 (Feb 14, 2023 Hearing Tr.); *see also id.*, at 179:22–180:24.

[72] TCC Tr. Ex. 792, at § 11 (2021 Funding Agreement).

has been frustrated."). Rather, for the defense to apply, "the subject of the contract must be destroyed." *Tucker v. Charter Med. Corp.*, 60 N.C.App. 665, 671, 299 S.E.2d 800, 804 (N.C. App. 1983) (finding the purpose of a commercial lease was not frustrated). Here, that standard cannot be met, as the 2021 Funding Agreement has full application outside bankruptcy, as the Third Circuit held.

**Fifth**, although Mr. Haas[73] and Mr. Kim[74] have both referred to "mutual mistake" as a basis for voiding that 2021 Funding Agreement, that doctrine has no application here. The Third Circuit decision did not change the law, and it was entirely foreseeable. Moreover, even an anticipated future event cannot qualify as a "mistake of fact." *See Opsahl v. Pinehurst Inc.*, 81 N.C. App. 56, 62, 344 S.E.2d 68, 72 (1986) ("In general, to justify a rescission of a contract for a mutual mistake of fact, the mistake must concern facts as they existed at the time of the making of the contract; reliance on a prediction as to future events will not support a claim for rescission based on mutual mistake of fact."); *Valu-Lodge of Greenville, Inc. v. Branch Banking & Tr. Co.*, 222 N.C. App. 637, 731 S.E.2d 274 (2012) (citing *Opsahl v. Pinehurst Inc.*, 81 N.C. App. 56, 62, 344 S.E.2d 68, 72 (1986)) ("the mistake must be of an existing or past fact which is material"). In addition, "[a] mistake of law ordinarily does not affect the validity of a contract." *Swain v. C & N Evans Trucking Co.*, 126 N.C. App. 332, 484 S.E.2d 845, 848 (1997) (quoting *Greene v. Spivey*, 236 N.C. 435, 444, 73 S.E.2d 488, 495 (1952)) (internal quotation marks omitted).

## 2.      Debtor Concedes Its Ability to Pay Debts As They Come Due.

LTL acknowledges that "it has the means to pay debts as they come due." LTL Opp. at 39. "[T]here is no evidence that the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement left the Debtor with insufficient assets to generate proceeds to sustain

---

[73] *See* Excerpt of TCC Tr. Ex. 772, at 12:14–20 (June 7, 2023 Haas Dep. Tr.).
[74] *See* Excerpt of TCC Tr. Ex. 770, at 106:20–24 (June 1, 2023 Kim Dep. Tr.).

operations." *Id.* at 56.  Mr. Kim testified on April 14 that LTL "has sufficient funds to pay off its debts currently as they come due."[75]  He repeated on April 18 that "at the end of the day, we believe that we have sufficient funds to meet the liability."[76]  Mr. Wuesthoff testified that "we were able to pay our bills and meet our liabilities."[77]  Mr. Dickinson, LTL's CFO, could not "identify any financial consequence to LTL from terminating the 2021 Funding Agreement."[78] He testified that, as of April 4, 2023, LTL was "able to meet its liabilities as they came due."[79] These concessions belie any assertion of financial distress.

### 3.    LTL's Proposed Plan Cannot Negate Its Bad Faith.

LTL also suggests that this Court should overlook its bad faith because it has proposed a plan it contends is worthy of confirmation.  But the Third Circuit described good faith as a "gateway" issue that "asks whether the debtor faces the kinds of problems that *justify* Chapter 11 relief."  *LTL Mgmt.*, 64 F.4th at 102 (emphases added).  The Third Circuit specifically rejected LTL's argument that, notwithstanding the absence of good faith, the Debtor should be permitted "to move thousands of claims out of trial courts and into bankruptcy court so they may be resolved, in J&J's words, 'equitably' and 'efficiently.'"  *Id.* at 110. Even a "sincerely held" belief that "this bankruptcy creates the best of all possible worlds for it and the talc claimants is not enough."  *Id.* at 111.  Because good faith is what makes a debtor eligible for bankruptcy in the first place, this Court cannot simply close its eyes to LTL's bad faith conduct.  *See Marrama*, 549 U.S. at 373–74 ("a ruling that [a debtor's bankruptcy] should be dismissed" because of "bad-faith conduct" is

---

[75] Tr. Ex. 951, at 117:14-15 (Apr. 14, 2023 Kim Dep. Tr.) (emphasis added).

[76] Tr. Ex. 788, at 180:20-21 (Apr. 18, 2023 Hearing Tr.) (emphasis added).

[77] Tr. Ex. 863, at 112:4-5 (May 30, 2023 Wuesthoff Dep. Tr.).

[78] Tr. Ex. 955, at 136.21-25 (Apr. 17, 2023 Dickinson Dep. Tr.).

[79] Tr. Ex. 892, at 162.11-162.17 (May 31, 2023 Dickinson Dep. Tr.).

"tantamount to a ruling that the individual does not qualify as a debtor" and "is not a member of a

class of 'honest but unfortunate debtor[s]' that the bankruptcy laws were enacted to protect").

Thus, the possibility of a successful reorganization cannot overcome the absence of good

faith.  In fact, there was a confirmed plan in *In re Integrated Telecom Express, Inc*., 384 F.3d 108

(3d Cir. 2004).  Yet the Third Circuit ordered the dismissal of the bankruptcy petition regardless,

explaining that "[t]he question of good faith is therefore antecedent to the operation of" the

provisions of the Code.  *Id.* at 128.  If a confirmed plan could have overcome the absence of good

faith, the outcome in *Integrated Telecom Express* would have been different.

In a case cited with approval by the Third Circuit (*see BEPCO*, 589 F.3d at 618 n.7),

another court of appeals has held that "[t]he possibility of a successful reorganization cannot

transform a bad faith filing into one undertaken in good faith."  *Phoenix Piccadilly, Ltd. v. Life

Ins. Co. of Va.* (*In re Phoenix Piccadilly, Ltd.*), 849 F.2d 1393, 1395 (11th Cir. 1988).  In *Phoenix

Piccadilly*, the court of appeals found that the bankruptcy petition had been filed "for the purpose

of delaying and frustrating the efforts of the Secured Creditors to enforce their rights in the

property" and therefore held that "the prospects of a successful reorganization do not override, as

a matter of law, the finding of bad faith in this case or compel, as a matter of fact, a contrary

finding."  *Id*. at 1394.  *See also Basin Elec. Power Co-op. v. Midwest Processing Co.*, 769 F.2d

483, 486 (8th Cir. 1985) ("the wrongful attempt to commence a bankruptcy proceeding" cannot

be cured); *In re Allen*, 300 B.R. 105, 124 (Bankr. D.D.C. 2003) ("Even if reorganization would be

possible, that cannot cure a petition that was filed in bad faith or that otherwise constitutes an abuse

of the bankruptcy system.").

## III.    <u>LTL Has Failed to Demonstrate Imminent and Immediate Financial Distress</u>

LTL cannot meet the Third Circuit's financial distress standard, even assuming, *arguendo*,

that its machinations were legitimate and could be credited.

A.      **Debtor's Post Hoc Rationales for Financial Distress Are Legally Insufficient**

The Third Circuit demands "evidence" of financial distress, rather than "conclusory allegations." *SGL Carbon*, 200 F.3d at 168.  In LTL 1.0, the Debtor failed to perform any detailed analysis of talc liabilities before filing for bankruptcy, and the Third Circuit held that LTL's after-the-fact projections of financial distress did not suffice and lacked reliability.  Indeed, the Third Circuit noted that, pre-bankruptcy, LTL itself made public representations to investors, the SEC, and ratings agencies that were contrary to these projections. *LTL Mgmt.*, 64 F.4th at 95, 107–08

After the Third Circuit took LTL to task for failing to analyze its talc liability sufficiently before seeking bankruptcy protection, LTL did nothing to fix that fatal defect for this new filing. LTL performed no meaningful analysis of its talc liability before re-refiling for bankruptcy on April 4.  Two days before filing the second bankruptcy, LTL's Board acknowledged it had "no estimate or valuation of aggregate talc liability."[80]  Mr. Wuesthoff, Board president, testified that LTL had no estimate of talc liability.[81]  Mr. Kim conceded that, when LTL filed for bankruptcy on April 4, "[w]e did not have a formal estimate [of talc liability]."[82]  Mr. Dickinson, LTL's CFO, testified that he was not aware of any evaluation by LTL after this Court's decision as to how much money it would take to fund a return to litigating talc claims in the tort system over the following 12 months or even three years.[83]

The post hoc evidence that LTL has generated for purposes of the Motion to Dismiss is legally improper and should not be considered.  Bankruptcy should not be a matter of "shoot first, analyze later."  Debtors should be required to meaningfully analyze and establish their "gateway"

---

[80] TCC Tr. Ex. 805, at 10 (Apr. 2, 2023 LTL Board Presentation).

[81] Excerpt of TCC Tr. Ex. 863, at 36:10–13 (May 30, 2023 Wuesthoff Dep. Tr.).

[82] Excerpt of TCC Tr. Ex. 770, at 26:10–19 (June 1, 2023 Kim Dep. Tr.). *See also id.* at 29:5–6 ("we did not do a formal analysis"); *id.* at 64:9–10 ("[a]gain, we did not do a formal estimate"); *id.* at 113:7 ("there is no piece of paper" analyzing talc liability).

[83]  TCC Tr. Ex. 955, at 162:21–163:23 (Apr. 17, 2023 Dickinson Dep Tr.).

eligibility for bankruptcy before filing, not afterwards. In *SGL Carbon*, for example, the Third Circuit dismissed a bankruptcy petition for lack of good faith where the debtor sought to rely on post hoc litigation assertions that "it was forced into Chapter 11 by serious economic difficulty stemming from the litigation," when that rationale was not adequately supported by the "[debtor's] financial disclosure documents" "[p]rior to filing." 200 F.3d at 166–67. In a case on which the Debtor relies, Judge Silverstein dismissed a bankruptcy petition for failure to prove good faith where "Debtors did not analyze their current ability to pay their debts as they came due prior to filing their bankruptcy cases." *In re Rent-A-Wreck of America, Inc*., 580 B.R. 364, 379 (Bankr. D. Del. 2018). "The lack of credible facts demonstrating financial distress supports a finding that these cases were not filed in good faith." *Id*. at 382. Dismissal is similarly warranted here.

Debtor cites (*see* LTL Opp. at 31 n.32) *In re Roman Catholic Church of Archdiocese of New Orleans*, 632 B.R. 593 (Bankr. E.D. La. 2021), but that case helps the TCC. There, the debtor's expert relied on pre-bankruptcy financial analysis and data, including the debtor's own audited financial statements for the past ten years, pre-bankruptcy bond debt covenant calculation workbooks, published financial information, bond ratings, and internal financial statements for the current year. *Id.* at 607. LTL cannot point to anything similar here. It admits there is not a single pre-bankruptcy document analyzing its talc liability exposure after the Third Circuit's decision.

**B.    Debtor Cannot Meet the Third Circuit's Standard for Financial Distress.**

Even if this Court were to consider Debtor's financial distress arguments, the Debtor falls far short of its burden of proving financial distress under the Third Circuit's standard. The Third Circuit held that "casual[]" "back-of-the-envelope forecasts" of talc liabilities were inadequate to prove financial distress. *LTL Mgmt.*, 64 F.4th at 108. It demanded proof of "immediate" and "imminent" financial distress. *Id.* at 102, 108. The Third Circuit referred to "businesses teetering on the verge of a fatal financial plummet" and drew comparisons to other mass tort litigation, such

as the Johns Manville case, where the debtor faced true financial distress, including "'forced liquidation of key business segments.'" *Id*. at 103–04 (citation omitted). And Dalkon Shield, where A.H. Robins "had only $5 million in unrestricted funds and a 'financial picture . . . so bleak that financial institutions were unwilling to lend it money.'" *Id*. at 104 (citation omitted).

Although the Third Circuit refrained from articulating a single test for financial distress, its restraint stemmed from concern for debtors operating ongoing businesses, which may need to file for bankruptcy to "enable a continuation of [their] business and to maintain access to the capital markets." *Id*. at 102. The Court of Appeals recognized that ongoing businesses could be threatened by "the exodus of customers and suppliers wary of a firm's credit-risk." *Id*.

Here, LTL's only genuine "business" is paying talc claims. For it, the primary factors in the financial distress analysis are its solvency and ability to pay its debts as they come due—the very reasons the Third Circuit held that LTL was not in financial distress in LTL 1.0. *Id*. at 108 (Debtor was "highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future").

Remarkably, Debtor insists it can meet that test even though it admits that "the value of the Debtor's assets still exceeds the amount of the talc liabilities as of the Petition Date," LTL Opp. at 32, and "the Debtor believes it has the means to pay debts as they come due." *Id*. at 39. LTL acknowledges that it "had the ability to meet talc expenses under the 2021 Funding Agreement and has the same ability under the 2023 Funding Agreement." *Id*. at 42. It states that "Holdco's

value remains sufficient to meet talc expenses **had the debtor not filed the Chapter 11 Case."** *Id.*
at 44 (emphasis added).

The Debtor's damning admissions are not limited to its brief. Mr. Wuesthoff, the president
of LTL, testified that LTL's financial condition is "the same" as before.[84] With respect to LTL's
litigation costs, he relied on "the same information from LTL 1."[85] Mr. Kim testified that in the
second bankruptcy LTL is asserting the "same basis" for financial distress as in the first.[86] He
added, "I would rely on the testimony from the last proceeding[.]"[87] He asserted, "[r]eally
nothing's changed[.]"[88] But if nothing has changed, the same outcome of the first
proceeding—dismissal—is warranted here.

On May 30, Mr. Gordon (in defending Jones Day's ability to represent LTL with respect
to the termination of the 2021 Funding Agreement), told this Court that the 2023 financing
arrangements "put the debtor in basically the exact same place it was in before, that its obligation
to pay claims was fully covered by the financing in ways that were very similar to if not in some
respects, the same as the financing that was in place earlier."[89] Again, if the debtor is in "the
exact same place," then dismissal is mandated.[90]

Similarly, Mr. Gordon—in defending LTL's payment to Jones Day of more than
$5.8 million during the 2-hour-11-minute interval on April 4 between dismissal and re-filing, even
though LTL made no payments to counsel for the TCC, the fee examiner, or others in the
case—told this Court that "the Debtor was solvent at the time it made this payment to Jones Day"

---

[84] Excerpt of TCC Tr. Ex. 863, at 43:22–44:5 (May 30, 2023 Wuesthoff Dep. Tr.).

[85] *Id.*, at 181:4–10.

[86] Excerpt of TCC Tr. Ex. 951, at 205:14–206:5 (Apr. 14, 2023 Kim Dep. Tr.).

[87] *Id.*, at 205:23–24.

[88] Excerpt of TCC Tr. Ex. 788, at 46:15–16 (Apr. 18, 2023 Hearing Tr.).

[89] Excerpt of TCC Tr. Ex. 1018, at 8:10–14 (May 30, 2023 Hearing Tr.).

[90] *Id.*, at 8:10–11.

and went so far as to quote the Third Circuit's opinion to the effect that that "LTL, at the time of its filing, was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future."  Dock. 427-3, Exhibit C, at 7 (quoting *LTL Mgmt.*, 64 F.4th at 108).  But if LTL was in the same financial position on April 4, 2023 (the time of the Jones Day payment) as the Third Circuit found it was in October 2021, then dismissal is required.  Indeed, LTL has volunteered to pay not only its own professional fees but also the fees and expenses of the Ad Hoc Committee of Supporting Law Firms and has brushed aside any concern that such payments would come at creditors' expense, leading this Court to approve the compensation order on the ground that "I hear much . . .  about how well healed the debtor is[.]"[91]

## 1. <u>Debtor Concedes Its Assets Exceed Its Liabilities.</u>

The Third Circuit opined that a debtor's solvency is "likely always relevant" to financial distress.  *LTL Mgmt.*, 64 F.4th at 102; *id.* at 103 n.14 (bankruptcy "filings usually involve 'impending insolvency'") (citation omitted).  LTL concedes that "the value of Holdco under the 2023 Funding Agreement exceeds the amount of the Talc Related Liabilities by all reasonable estimates."  LTL Opp. at 46.  It adds that the value of LTL's assets are "greater than any realistic estimate of the debtor's talc liabilities."  *Id.* at 55.  LTL's president, Mr. Wuesthoff, testified that he does not believe talc liabilities are greater than $8.9 billion.[92]  Mr. Kim testified on June 1: "I believe LTL and Holdco have sufficient assets to take care of the talc liability . . . [o]utside of bankruptcy."[93]  He "did not believe that the talc liability approached near $30 billion."[94]  He

---

[91] Excerpt of TCC Tr. Ex. 1020, at 142:24–25 (June 13, 2023 Hearing Tr.).

[92] Excerpt of TCC Tr. Ex. 1018, at 36:10–25 (May 30, 2023 Hearing Tr.).

[93] Excerpt of TCC Tr. Ex. 770, at 202:10–20 (June 1, 2023 Kim Dep. Tr.).

[94] *Id.*, at 23:8–9; *id.*, at 218:13–22 ($30 billion "is sufficient to deal with the talc liability . . . outside of bankruptcy"); *id.*, at 219:11–12 ("$30 billion is enough to pay 100 percent of all valid claims").

added that LTL had "no belief . . . that the assets of Holdco were insufficient to fund whatever

liability the talc was."[95]



Although the TCC reserves the

right to challenge any of these numbers, LTL cannot escape that even its own experts' worst-case

scenarios establish that it is solvent.  This concession weighs significantly against a finding of

financial distress.

LTL attempts to rely on "Movants' representations to this Court" suggesting that LTL

could face substantial talc liabilities.  LTL Opp. at 33.  Yet LTL refuses to vouch for the accuracy

of those representations.  In fact, it has vigorously denied them in court.  This curious strategy—of

relying on an opponent's statements while disputing them—is not substitute for LTL's own lack

---

[95] *Id.*, at 27:20–22.

[96] ████████████████████

[97] ██

of evidence.  In *Passavent Mem'l Homes v. Laurel Highlands Found.*  (*In re Laurel Highlands Found., Inc*.), 473 B.R. 641, 656 n.7 (Bankr. W.D. Pa. 2012), for example, the court held that a debtor could not establish financial distress by relying on in-court representations by its opponent, describing the debtor's argument as a "feeble attempt[ ] to establish financial distress" and explaining that the financial distress inquiry "is not bas[ed] . . . on arguments, but rather on evidence."  *Id*. at 656 & n.7.  Judge Graham recently rejected the debtor's attempt to rely on creditor estimates in *Aearo*, 2023 WL 3938436, at *18, calling the creditor estimates simply "a lawyer's highly optimistic guess."

## 2.    Debtor Concedes Its Ability to Pay Debts As They Come Due.

LTL acknowledges that "it has the means to pay debts as they come due."  LTL Opp. at 39.  "[T]here is no evidence that the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement left the Debtor with insufficient assets to generate proceeds to sustain operations." *Id.* at 56.  Mr. Kim testified on April 14 that LTL "has sufficient funds to pay off its . . . debts currently as they come due."[98]  He repeated on April 18 that "at the end of the day, we believe that we have sufficient funds to meet the liability[.]"[99]  Mr. Wuesthoff testified that "we were able to pay our bills and meet our liabilities."[100]  Mr. Dickinson, LTL's CFO, could not "identify any financial consequence to LTL from terminating the 2021 Funding Agreement."[101]  He testified that, as of April 4, 2023, LTL was "able to meet its liabilities as they came due."[102]  These concessions belie any assertion of financial distress.

## 3.    The Financial Distress of Non-Debtor Affiliates Cannot Establish LTL's Financial Distress Under Controlling Precedent.

---

[98] Excerpt of TCC Tr. Ex. 951, at 117:11–15 (Apr. 14, 2023 Kim. Dep. Tr.) (emphasis added).

[99] Excerpt of TCC Tr. Ex. 788, at 180:20–21 (Apr. 18, 2023 Hearing Tr.) (emphasis added).

[100] Excerpt of TCC Tr. Ex. 863, at 112:4–5 (May 30, 2023 Wuesthoff Dep. Tr.).

[101] Excerpt of TCC Tr. Ex. 955, at 136:21–25 (Apr. 17, 2023 Dickinson Dep. Tr.).

[102] *Id.*, at 162:11–17.

LTL relies on Holdco's alleged illiquidity as a basis for financial distress.  LTL Opp. at 37–39.  But that argument fails.  The Third Circuit squarely held that the Debtor (LTL) is the focus of the financial distress, not Holdco or any other non-debtor entity.  *See LTL Mgmt.*, 64 F.4th at 105 ("Only LTL's Financial Condition is Determinative.").  In resisting the TCC's discovery requests directed at Holdco, LTL argued that "[t]he relevant question on the pending motions to dismiss is . . . whether LTL was in financial distress when it filed its chapter 11 petition.  Thus, as a matter of law, the only issue that is pertinent for determining 'bad faith' is the debtor's status at the time of the filing."  (Doc. 629, at 4).

Even if Holdco were forced to liquidate entirely in order to provide sufficient resources to LTL to satisfy its talc liabilities, that does not establish that ***LTL*** faces financial distress.  The Third Circuit specifically allowed for the possibility that "a draw on the payment right [might require] a forced liquidation of New Consumer"—Holdco's old name—"and have a 'horrific impact' on th[at] compan[y]."  *LTL Mgmt.*, 64 F.4th at 107; *see also id*. at 109 ("we cannot say any potential liquidation by LTL of Royalty A&M" "to pay talc costs would amount to financial distress").  Unlike Old JJCI, Holdco is a mere holding company.  The Third Circuit rejected the suggestion that, "out of concern for its affiliates, LTL may avoid drawing on the payment right to its full amount," explaining that such forbearance would "disregard[] the duty of LTL to access its payment assets."  *Id*. at 107.

J&J deliberately kept Holdco (then JJCI) out of bankruptcy when it chose to implement the divisive merger and continues to keep Holdco out of bankruptcy now.  Any illiquidity on Holdco's part is self-inflicted—a product of J&J's cash-management decisions and limits on dividend payments to Holdco.  Any illiquidity is also a result of J&J's spin-off of the consumer business to Kenvue that was undertaken while the first bankruptcy was still pending and deprived LTL of access to what the Third Circuit described as "Old Consumer's cash-flowing brands and products

47

along with the profits they produced." *Id.* at 106. J&J cannot have it both ways—it cannot rely on Holdco's financial condition to support LTL's bankruptcy while avoiding subjecting Holdco assets—current and prior—to the supervision of the bankruptcy court. Of course, if Holdco were in bankruptcy, the transfer of the entire Consumer Health Business out of Holdco in December 2022, for no equivalent value, would expose the transfer to a fraudulent transfer claim.

### 4.   Future "Uncertainty" Does Not Create "Imminent" and "Immediate" Financial Distress.

LTL points to the "considerable uncertainty" about future talc liabilities over the next "decades" and cites to a number of factors that it believes could increase its exposure. LTL Opp. at 40. But this argument is foreclosed by the Third Circuit's decision, which requires a showing of "imminent" and "immediate" financial distress and rejected the kind of speculative forecasts on which LTL now seeks to rely. The Third Circuit found that LTL's conjecture about future liabilities could not justify a filing, as the "'attenuated possibility' that talc litigation may require it to file for bankruptcy in the future does not establish its good faith as of the petition date." *LTL Mgmt.*, 64 F.4th at 109. LTL is engaging in the same "forecasts of hypothetical worst-case scenarios" and "extrapolat[ions]" that the Third Circuit condemned. *Id.* at 107, 108; *see also id.* at 107 ("What these projections ignore is the possibility of meaningful settlement, as well as successful defense and dismissal, of claims by assuming most, if not all, would go to and succeed at trial.").

LTL's projections run headlong into the Third Circuit's holding that its prior filing was "[a]t best . . . premature" because it established only "[t]he 'attenuated possibility' that talc litigation may require [LTL] to file for bankruptcy in the future." *Id.* at 109. The Court of Appeals warned that "[r]isks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy." *Id.* at 103. It noted the benefits of "a longer history of

litigation outside of bankruptcy," which "may provide a court with better guideposts when tackling" estimation and mediation. *Id.*

LTL says litigation may continue "for decades." LTL Opp. at 40. But that timetable makes any financial distress ***less*** "imminent" and "immediate," not more, especially given the availability of decades of cash flows to meet LTL's liability. Further, the Third Circuit saw further talc trials as an aid to fostering a resolution of talc litigation. According to LTL, only 49 talc cases have gone to trial, with 27 resolved.[103] In addition, pre-bankruptcy J&J had settled about 6,800 talc claims and obtained dismissals of about 1,500 more. *LTL Mgmt.*, 64 F.4th at 107. The talc track record pales in comparison with Dalkon Shield, where "the Court and stakeholders had the benefit of data from 15 years of tort litigation by A.H. Robins before its filing." *Id.* at 103 n.13. According to the Third Circuit, the prior Dalkon Shield litigation yielded a "claimants' trust [that] has been recognized as one that functioned effectively and remained solvent for years." *Id.* Even where defendants have ultimately resorted to bankruptcy to resolve latent injury claims, they have typically settled more claims outside bankruptcy first. *See, e.g., In re Paddock Enters., LLC*, No. 20-10028 (LSS), (2022 WL 1746652, at *6 (Bankr. D. Del. May 31, 2022) (over 400,000 claims); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (D. Del. 2005) (over 330,000 claims).

LTL cites to the spectre of *Ingham*, hypothesizing that "[o]ne plaintiff verdict could singlehandedly wipe out any existing liquidity at the Debtor and Holdco." LTL Opp. at 40. Yet the Third Circuit specifically rejected the notion that LTL's talc liabilities could be analyzed by pointing to *Ingham*, which it described as an "outlier." *LTL Mgmt.*, 64 F.4th at 108. J&J itself,

---

[103] TCC Tr. Ex. 1011, at 32:15–16 (Feb. 18, 2022 Hearing Tr.) (emphasis added).

in a Form 10-Q SEC filing, stated that *Ingham* was "not representative of other claims brought against the Company."[104]

LTL predicts that "the MDL will unleash tens of thousands of talc claims to their home jurisdictions." LTL Opp. at 36. No such procedure has been proposed, and as the TCC's experts will testify, the MDL was designed to consolidate litigation in order to reduce costs and provide a workable mechanism for the vast majority of the outstanding claims to enter into a settlement after bellwether trials (which LTL has opposed and successfully sought to stay). LTL's own amici have conceded that 97% of cases in MDL courts over the past half-century ended in settlement or dispositive motion, while only 3% were remanded for trial. CA3 Bankr. Law Profs.' Br. 17–18. Moreover, LTL has stated that only 10 cases could be tried per year, even with "aggressive" scheduling, meaning the costs would continue to be spread out in manageable increments for LTL.[105]

LTL's contention that "consolidated" trials will drive up its defense costs (LTL Opp. at 36) is particularly counterintuitive (and contradicts LTL's own complaint at, LTL Opp. 40, that it would have to "spend $2 million to $5 million to try each of these cases"). Consolidation will *reduce* defense costs, not *increase* them.[106] Nor do the cases cited by LTL with respect to consolidation (which are chiefly employment discrimination actions and therefore of dubious relevance) support its suggestion that consolidation necessarily increases a defendant's liability. Rather, the cases (*Id*. at 36–37 nn.38–40) show that courts decide consolidation on a case-by-case

---

[104] Excerpt of TCC Tr. Ex. 785, at 62 (Johnson & Johnson April 28, 2023 Form 10-Q).

[105] Excerpt of TCC Tr. Ex. 1006, at 180:4–11 (Feb. 14, 2022 Hearing Tr.); *see* Excerpt of TCC Tr. Ex. 1011, at 33:8–11 (Feb. 18, 2022 Hearing Tr.).

[106] *See Campbell v. Boston Scientific Corp.*, 882 F.3d 70, 76 (4th Cir. 2018) ("Both plaintiffs and defendants benefit from lessened litigation costs."); *Nayak v. Herbison*, No. 1:14-CV-02211, 2015 WL 11605255, at *1 (M.D. Pa. May 26, 2015) (consolidating two actions, in part, because "the overall costs of litigation should be reduced"); *Sprafka v. DePuy Orthopedics, Inc.*, No. 22-331 (DWF/DTS), 2022 WL 17414477, at *2 (D. Minn. Dec. 5, 2022) (concluding that consolidation is appropriate, including because "all parties will benefit from the lessened litigation costs").

basis, according to the relevant factors, and deny consolidation where it would prejudice a defendant or disserve judicial economy. No case cited by LTL finds that increased defense liability is generally the result when actions are consolidated. In any event, given that the overwhelming majority of talc cases are in a *pretrial* posture in the MDL, LTL's concern about consolidated ***trials*** simply underscores the speculative and premature nature of its financial distress arguments.

5.    **Unfiled Talc Cases Do Not Establish Imminent and Immediate Financial Distress In This Case.**

LTL cites the "possibility" of higher costs "due to the build-up of claims prior to and during the pendency of the 2021 Chapter 11 Case." *Id*. at 35–36. But Mr. Murdica denied that there has been a "spike" in cases.[107] And LTL's speculation as to future claims cannot provide the basis for finding financial distress. Additional talc cases are not a new development. The original 2021 filing included all current and future talc claims. The Third Circuit was aware that there would be additional cases in the future and accounted for them in its reasoning. *LTL Mgmt.*, 64 F.4th at 102, 108. Even if the unfiled cases were all filed at once, ovarian cancer cases in federal court would be transferred to the MDL where pre-trial proceedings are consolidated and the incremental cost of defense for these "new" cases thus would be minimal.

In any case, this Court should not consider "unfiled cases" as part of its financial distress analysis, because they do not bear sufficient indicia of reliability. Tellingly, J&J's most recent financial statements do not even mention unfiled claims, indicating that J&J does not consider

---

[107] Excerpt of TCC Tr. Ex. 826, at 60:22–61:5 (May 30, 2023 Murdica Dep. Tr.).

them material.[108]   Unfiled claims represent the kind of speculative factor on which a court should

not rely.[109]

This Court has already heard evidence that "unfiled" cases are not a reliable indicator of

liability.   Until a decision is made for an unfiled case to be filed, it may in fact never be filed.[110]

Indeed, there is no evidence that *any* unfiled cases will ever become civil actions.   Mr. Murdica

did not ask for engagement letters, ask whether a complaint had been drafted, ask if the attorney

had reviewed a pathology report, or verify client consent.[111]   Mr. Murdica simply asked the

plaintiff law firms for names, dates of birth, the last four digits of Social Security numbers, and

self-described "claim type[.]"[112]   Mr. Murdica confirmed that he simply accepted the

representations of the signing firms at face value.[113]   In an email dated February 26, 2023, Mr.

Watts told Mr. Murdica, "As we add law firms, we just get them to sign on page 18 with the

number of claimants *they profess to represent*."[114]   The U.S. Trustee's office, which is highly

active in the *Imerys* bankruptcy as well as in this case and is familiar with the personal injury talc

---

[108] Excerpt of TCC Tr. Ex. 772, at 72:15–73:3 (June 7, 2023 Haas Dep. Tr.); Excerpt of TCC Tr. Ex. 785, at 54 (Johnson & Johnson April 28, 2023 Form 10-Q).

[109] *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 457 (D.N.J. 1998) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)) (rejecting "speculation and conjecture"); *Horan v. Dilbet, Inc.*, No. CIV. A. 12-2273, 2015 WL 5054856, at *7 (D.N.J. Aug. 26, 2015) ("mere allegations, conclusions, conjecture, and speculation" should not be considered) (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir.1995)).

[110] Excerpt of TCC Tr. Ex. 1019, at 27:20–22; 37:24–38:1; 39:8–18; 41:19–42:8; 49:6–7; 52:16–53:5; 62:12–63:4 (June 2, 2023 Hearing Tr.); see *id.*, at 47:10–17.

[111] Excerpt of TCC Tr. Ex. 953, at 123:9–124:11, 124:17–24, 127:9–23 (Apr. 16, 2023 Murdica Dep. Tr.).

[112] *Id.*, at 141:5–142:23, 145:11–155:22; *see* Excerpt of TCC Tr. Ex. 951, at 117:11–15 (Apr. 14, 2023 Kim Dep. Tr.).

[113] Excerpt of TCC Tr. Ex. 953, at 34:21–40:16, 41:12 (April 16, 2023 Murdica Dep. Tr.).

[114] TCC Tr. Ex. 766, at 1 (Watts Dep. Ex. 6) (emphasis added).

claims pool, has expressed doubt as to whether LTL's new claimant numbers could possibly be accurate.[115]

Further, there is no evidence that any of these newly unfiled cases are actually compensable, meaning that outside of bankruptcy their effect on LTL's financial distress is nil. This Court has remarked that LTL has offered "only speculation" that the "new claims" purportedly supporting its plan are "viab[le]." PI Op., 4-27-23, at 18. There is no way of ascertaining whether any are timely under the relevant statute of limitations. And it appears many unfiled claims include non-ovarian so-called "gynecological cancers" for which causation has not been established. "Ovarian cancer" claims are personal injury claims involving epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer.[116] These claims have a clear link to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females. Courts have found that ovarian cancer talc claims (along with mesothelioma claims) have scientific support.[117] And these are talc claims for which J&J has been held liable in the tort system.[118]

---

[115] Doc. 379-4, at 12–13; TCC Tr. Ex. 788, at 37:20–38:12, 300:3–305:21 (Hearing Apr. 18, 2023).

[116] The scientific literature describes, and it is generally understood, that epithelial ovarian cancer, fallopian tube cancer and primary peritoneal cancer are the same entity (i.e., epithelial ovarian cancer) and share the same pathogenesis. *See* Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact.* J CLIN ONCOL 26:5284-5293 (2008). A causal connection between the genital application of talcum powder and epithelial ovarian cancer is supported for the following histologic subtypes: serous, endometrioid, clear cell, undifferentiated, mixed, serous borderline and endometrioid borderline.

[117] *See In re Johnson & Johnson Talcum Powder Prods. Marketing, Sales Practices and Prods. Litig.*, 509 F. Supp. 3d 116, 181 (D. N.J. 2020). The Daubert briefing in the MDL proceeding focused on ovarian cancer in particular. Plaintiffs' experts specifically limited their opinions to epithelial ovarian cancer, which added strength to their scientific conclusions. J&J did not substantively discuss non-ovarian gynecological cancers, except to assert that talc "does not" cause "vaginal, cervical, [or] endometrial cancer." Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions, No. 3:16-md-02738-FLW, Doc. 9736, at 88 (D.N.J.).

[118] *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (ovarian cancer judgment against J&J and JJCI for 22 women); *Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292, 323 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation for ovarian cancer). Other state-court appellate cases upholding talc claims have similarly addressed ovarian cancer specifically. *E.g.*, *Carl v. Johnson & Johnson*, 464 N.J. Super. 446, 475, 237 A.3d 308, 326 (N.J. Super. Ct. App. Div. 2020).

But it appears that many unfiled claims involve other unproven types of gynecological cancers, such as endometrial cancer, uterine cancer, vaginal cancer, or cervical cancer. Mr. Kim conceded that the "bona fides" of these new unfiled claims had not been established and clarified that LTL would never consider paying them without intensive scrutiny and verification.[119]



The attorneys who signed plan support agreements appear to have taken many of these non-ovarian, gynecologic claims during the pendency of the bankruptcy proceeding hoping they will be able to flood the vote (suggesting that these claims may never be filed outside of bankruptcy). For example, none of Mr. Watts' alleged 16,000 talc cases have been filed in the tort system.[122] The Debtor's records show that Mr. Pulaski's firm has only one filed talc claim.[123]

Mr. Nachawati testified that his firm's cases include "ovarian cancer and various subtypes, epithelial, mucinous, ***some that may not be compensable***[.]"[124] He would not commit to filing these non-ovarian gynecological claims in the tort system if the bankruptcy were dismissed.[125]

Similarly, Mr. Watts (whose firm is still reviewing medical records and does not yet know the kinds of disease his claimants may have or whether they are even caused by talc)[126] has not

---

[119] Excerpt of TCC Tr. Ex. 951, at 50:1–51:2 (Apr. 14, 2023 Kim Dep. Tr.).
[120] Excerpt of TCC Tr. Ex. 826, at ▮▮▮▮ 86:22–87:24 (May 30, 2023 Murdica Dep. Tr.).
[121] ▮▮▮▮▮▮▮▮▮▮
[122] Excerpt of TCC Tr. Ex. 779, at 42:13–18 (June 12, 2023 Watts Dep. Tr.).
[123] Excerpt of TCC Tr. Ex. 761, at 24:6–26:2, 29:2–31:1, 35:11–18 (June 14, 2023 Pulaski Dep. Tr.).
[124] Excerpt of TCC Tr. Ex. 776, at 198:6–8 (May 24, 2023 Nachawati Dep. Tr.) (emphasis added).
[125] *Id.*, at 201:21–202:11.
[126] Excerpt of TCC Tr. Ex. 779, at 54:1–55:15, 55:20–58:2 (June 12, 2023 Watts Dep. Tr.).

made a determination of any particular number of claims that would actually be filed in court if the bankruptcy were dismissed.[127]

Mr. Onder testified that his firm has 21,000 talc claimants overall, but only "between 8,500 and 9,000 with ovarian cancer of confirmed and documented histologic sub-types that . . . would be the so-to-speak 'good cases[,]'" with the remainder consisting of 9,000 uterine cancer cases and several thousand cases for which his firm is still seeking medical records.[128]  He was unsure of how many of the 21,000 cases had actually been filed.[129]  Mr. Onder referred to the "lesser value[]" non-ovarian cancer claims, "such as cervical, uterine, et cetera[,]" and explained "they are lower valued cases and they're not as supported by—you know, their—association is not as strong in the medical literature."[130]  A mass email communication sent by his firm states: "Many of these claimants have gynecologic cancers that are ***not as convincingly proven*** by science to be related to talc; as such they will receive lesser compensation."[131]  A blogpost on his firm's website provides: "Johnson & Johnson has agreed to pay small settlements to clients with other gynecological cancers, many who were told in the past that their cases ***would not be compensable***."[132]  Debtor's proposed plan implicitly acknowledges the key distinction between ovarian and non-ovarian gynecological cancer.  The latter claims are treated as the lowest category of claims, with no specified point value, and are paid at the discretion of the Claims Administrator under the "Accelerated Evaluation Program."[133]

---

[127] *Id.*, at 43:12–24.

[128] Excerpt of TCC Tr. Ex. 774, at 182:22–25, 186:1–187:2 (June 8, 2023 Onder Dep. Tr.).

[129] *Id.*, at 191:20–23.

[130] *Id.*, at 111:8–9, 111:20–23.

[131] TCC Tr. Ex. 1022, at 1 (OnderLaw, LLC Email Communication).

[132] TCC Tr. Ex. 832, at 2 (June 8, 2023 Onder Dep. Ex. 7) (emphasis added).

[133] TCC Tr. Ex. 760, at 22 (Plan Exhibit M, § 5.2.1) ("Gynecologic Claims other than Ovarian Cancer claims shall only be eligible to receive a Point Value based on the Accelerated Evaluation Process.").

Low-value claims that are unlikely to develop into lawsuits are not a plausible cause for financial distress, especially given LTL's conceded ability to pay its debts as they come due. Unfiled and unverified claims are far too speculative to assist LTL in meeting its burden to prove financial distress under the standard established by the Third Circuit, and they should not be considered as part of the financial distress analysis.

C. **LTL's Proffered Expert Testimony Undermines Any Assertion of Financial Distress.**

Although the TCC disputes the expert testimony offered by LTL's proffered experts,[134]

what is striking about that testimony is that, even taken on its own terms, it *undermines* LTL's claim of financial distress.



But uncertainty prevents LTL from meeting its burden of showing "imminent" and "immediate" financial distress. *LTL Mgmt.*, 64 F.4th at 102, 108.

The Third Circuit held that the variability of costs in the mass tort setting weighs *against* a finding of immediacy, citing to the fifteen years of Dalkon Shield litigation before the establishment of the A.H. Robins trust, and holding that "a

---

[134] The TCC reserves all rights to dispute LTL's expert testimony. The evidence at the Motion to Dismiss trial will show it is inaccurate and unreliable.

[135]

[136]

[137]

longer history of litigation outside of bankruptcy" would assist the bankruptcy process. *LTL Mgmt.*, 64 F.4th at 103; *id.* at 109 (discussing benefits of continued litigation).

**Second**,



[138] As evidence at the Motion to Dismiss trial will show, For example, they assume a maximum of , while Mr. Wuesthoff testified and Mr. Gordon represented to this Court that LTL could not realistically try more than 10 per year. Excerpt of TCC Tr. Ex. 1006, at 180:7–11 (Feb. 14, 2022 Hearing Tr.); Excerpt of TCC Tr. Ex. 1011, at 33:8–11 (Feb. 18, 2022 Hearing Tr.).

[139]
[140]
[141]
[142]



Mr. Lisman testified that J&J has created an in-house bank, which it uses to lend money to affiliates with cash needs.[147]



---

[143] Excerpt of TCC Tr. Ex. 854, at 96:7–104:5 (May 31, 2023 Lisman Dep. Tr.).

[144]

[145]

[146]

[147] Excerpt of TCC Tr. Ex. 854, at 142:25–143:13 (May 31, 2023 Lisman Dep. Tr.).

[148] Although J&J has chosen to condition that loan on the implementation of a bankruptcy plan, J&J could plainly choose not to do so, as Mr. Lisman's testimony confirms. *See* Excerpt of TCC Tr. Ex. 854, at 96:7–104:5 (May 31, 2023 Lisman Dep. Tr.).

[149]

[150]



**Third**, LTL's expert reports (even if taken at face value, *arguendo*) show that the Debtor cannot show "imminent" and "immediate" financial distress. *LTL Mgmt.*, 64 F.4th at 102, 108.











In sum, LTL's own expert testimony undermines any assertion of financial distress.

**IV.**    **LTL's Second Bankruptcy Filing Displays Additional Indicia of Bad Faith**

**A.**    **The Petition Was Filed For an Improper Litigation Advantage.**

Because the Third Circuit found that LTL's final bankruptcy petition "ha[d] no valid bankruptcy purpose" in *LTL I*, it did not reach whether LTL filed that petition for improper litigation advantage. *LTL Mgmt.*, 64 F.4th at 110 & n.19.  Nonetheless, it observed that "filing" for bankruptcy "to change the forum of litigation where there is no financial distress" raises "the specter of 'abuse which must be guarded against to protect the integrity of the bankruptcy



system.'" *Id.* (quoting *SGL Carbon*, 200 F.3d at 169).  LTL's current petition does not merely raise the same specter of abuse; it confirms it.

LTL admits it is pursuing this bankruptcy "because continued litigation in the tort system . . . is not tenable."  LTL Opp. at 3.  LTL levels a broadside against the procedures and constitutional guarantees of the civil justice system.   It criticizes consolidation and similar rules of the tort system, and it is particularly suspicious of juries, which it views as irrational and subject to "bias" and liable to find "guilt by association."  *Id.* at 36 & n.39 (citations omitted).  No doubt, LTL prefers bankruptcy to the tort system.  But that is not a basis for a good faith filing.   In *Aearo*, the debtor similarly initiated bankruptcy to "manage the MDL process," which it described as "broken."  *Aearo*, 2023 WL 3938436, at *20.  Judge Graham correctly found that the debtor was improperly using bankruptcy as "a litigation management tactic and not a rehabilitative effort" and dismissed the bankruptcy for lack of good faith.   *Id.*  The same should happen here.

LTL reiterates that "its purpose is to equitably and efficiently resolve talc claims," "not to obtain a tactical litigation advantage."  LTL Opp. at 61.  But LTL has now declared that there is "no funding available" to pay talc claims in bankruptcy except through J&J's desired plan.  Doc. 753 at p. 3.  If true, then there is no funding available to pay talc claims inside bankruptcy unless J&J's desired plan discharging J&J of its talc liability is confirmed.  The only way out of bankruptcy (according to LTL) is dismissal or confirmation of a plan that caps J&J's liability at an amount of J&J's choosing (i.e., its proposed contribution to the trust).  This makes this case nothing more than a litigation tactic.  To state the obvious:  LTL and J&J could easily create and fund an out-of-court settlement trust to pay talc claimants.  Such a trust could establish an eligibility criteria and uniform and efficient procedures to generate settlement awards.  If the awards were appropriate, a substantial number of talc claimants could elect to settle which would significantly reduce the need for litigation in the tort system.  J&J and LTL have never suggested

that they lack the financial resources necessary to establish such a fund.  In fact, many solvent tortfeasors have elected to pay tort claims in this manner without ever filing for bankruptcy. The $20 billion settlement trust established in response to the Deepwater Horizon Oil Spill is an example.[168]

But LTL's and J&J's true objective has nothing to do with providing fair and equitable compensation to talc claimants.  The true objective here is finality for solvent J&J.  If (as LTL now contends) there is no funding available in bankruptcy except for J&J's own preferred plan, it follows that this bankruptcy filing is nothing more than a litigation ploy.

**B.    The Petition Impermissibly Evades the Structural Protections of the Code**

Bankruptcy petitioners must "act in conformity with the Code's underlying principles," *SGL*, 200 F.3d at 161.  They cannot, consistent with that requirement, "circumvent the Code's procedural safeguards," *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 488 (2017), or "step outside" its "'equitable limitations,'" *BEPCO*, 589 F.3d at 618 n.8.

Far from seeking to effectuate bankruptcy law's purposes, LTL's current bankruptcy (like its last one) seeks to evade the Bankruptcy Code's structure.  The second bankruptcy continues to circumvent the structural protections of the Code and deprive the bankruptcy system of the control and supervision of the very assets connected with the liabilities at issue.  Those assets have now been spun off to Kenvue and Janssen.  Within bankruptcy, Section 363 subjects a debtor to a "trustee's" "fiduciary duty . . . 'to protect and conserve property in [their] possession for the bene-fit of creditors.'"  *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (emphasis added).  Section 363 also requires court approval for non-ordinary-course sales.  11 U.S.C. § 363(c)(1).  LTL contends that the spin-off of the consumer business did not violate the terms of

---

[168] *In re BP Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 904 (E.D. La. 2012).

the Bankruptcy Code, but that is just the point.  By putting LTL rather than JJCI in bankruptcy, J&J evaded the bankruptcy system's ability to control and regulate the assets that gave rise to talc liabilities in the first place.

The Bankruptcy Code also provides detailed priority rules and imposes the "fundamental" command that equity "receive nothing until all . . . creditors have been paid in full." *Jevic*, 580 U.S. at 457.  As in the first bankruptcy, LTL's current bankruptcy frees J&J and New JJCI (now HoldCo) to transfer assets, pay other creditors, and pay dividends to equity holders with impunity, without regard to the Code's priority scheme.

LTL and J&J also seek to defy § 524(g). Trusts created under that provision must be funded with "securities of [the debtor]," including rights to "dividends."  11 U.S.C. § 524(g)(2)(B)(i)(II). That ensures a "reorganized company becomes the goose that lays the golden egg by remaining a ***viable operation*** and maximizing the trust's assets to pay claims." *Combustion Engineering*, 391 F.3d at 248 n.69 (citing 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (Sen. Heflin)) (emphasis added).  As in the first bankruptcy, putting a made-for-bankruptcy shell like LTL into bankruptcy—backed by a Funding Agreement but no productive operations—evades those protections.

The TCC's warnings about the two-step structure—a bankruptcy case where an artificially created debtor has contract payment rights, not assets—have materialized.  While the first bankruptcy was pending, LTL surrendered the $61.5 billion 2021 Funding Agreement and transferred away the consumer business with no court supervision or review of any sort.  Inverting the Bankruptcy Code's priority scheme, tens of billions of dollars have gone to ***equity*** holders in

the form of dividends while talc creditors alone get nothing.  J&J and LTL have impermissibly

stepped outside the Code's equitable limitations and evaded its structural protections for creditors.

**V.**     **The Exception in Section 1112(b)(2) Is Inapplicable Here**

Section 1112(b)(2) provides a narrow exception enabling a bankruptcy court in certain

limited situations to avoid dismissing (or converting) a Chapter 11 bankruptcy where cause is

otherwise found.  11 U.S.C. § 1112(b)(2).  But the Third Circuit has already decided that Section

1112(b)(2) does not provide a basis for avoiding dismissal in this case and has rejected this Court's

reasoning in its ruling on the prior motion to dismiss.  *See LTL Mgmt.*, 64 F.4th at 110 ("'Unusual

Circumstances' Do Not Preclude Dismissal").  The Third Circuit's reasoning continues to apply

here and forecloses any reliance on Section 1112(b)(2) to avoid dismissal.

**A.**     **Section 1112(b)(2) Is a Narrow Exception to the Obligation to Dismiss For
Cause.**

Section 1112(b)(1) speaks in mandatory language, providing that a bankruptcy court

"shall" convert or dismiss a Chapter 11 case upon a finding of cause (unless the court determines

that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of

creditors and the estate).  Section 1112(b)(2) provides a narrow exception to the otherwise

mandatory dismissal or conversion obligation, and this limited exception applies only when a

series of specific conditions is met:

(1)  the court specifically finds that unusual circumstances establish that dismissal or

conversion is not in the best interests of creditors and the estate; <u>and</u>

(2)  the party seeking to avoid dismissal establishes that:

(a)  there is a reasonable likelihood that a plan will be confirmed within a reasonable time;

<u>and</u>

(b) there is a reasonable justification for the act or omission of the debtor constituting cause;

<u>and</u>

(c) the defect will be cured within a reasonable time.

Noted commentators emphasize that the statute uses the conjunctive "and" three times, indicating that each condition must be met in order to trigger the exception to dismissal. *See* 7 <u>Collier on Bankruptcy</u>, ¶ 1112.01[3], at p. 1112-6, ¶ 1112.05[2], at p. 1112-51 (16th ed. 2013 & 2023 supp.).

The legislative history reflects repeated congressional efforts to ***broaden*** the dismissal provision, tighten the ***exception*** to dismissal, and reduce the bankruptcy courts' discretion to deny dismissal.  As adopted in 1978, Section 1112(b) used the permissive "may" rather than "shall" (the court "may dismiss a case under this chapter . . . for cause"), indicating that dismissal was not obligatory. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6361–62 ("Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case when a party in interest requests.").

In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress changed "may" to "shall," making mandatory the duty to dismiss upon a finding of cause.  Pub. L. 109-8, § 442(a); 119 Stat. 115 (2005).  Congress also adopted what it described in the enacted bill as "expanded grounds for dismissal or conversion," in a new version of Section 1112(b) with two subparagraphs.  *Id*.  Court have recognized that these changes were intended to restrict bankruptcy courts' ability to invoke the exception to dismissal.[169]  In Section 1112(b)(1), the

---

[169] *AmeriCert, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.)*, 360 B.R. 398, 401 (Bankr. D.N.H. 2007) ("[A]mended section 1112(b) was changed to afford courts less discretion. Prior to its amendment, the statute provided that a court 'may' dismiss the case upon finding cause, but amended section 1112(b) provides that a court 'shall' dismiss if cause is found, absent unusual circumstances."); *In re 3 Ram, Inc.*, 343 B.R. 113, 117 n.14 (Bankr. E.D.Pa. 2006) (noting that "the bankruptcy bill provision amending § 1112 is titled "Expanded Grounds for Dismissal or Conversion and Appointment of Trustee," H.R. Rep. No. 31, 109th Cong., 1st Sess. 442 (2005) (emphasis added),"

2005 version provided for dismissal for cause "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors." *Id*.  In Section 1112(b)(2), the 2005 version also required dismissal "absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes" "reasonable likelihood" of plan confirmation, "reasonable justification for the act or omission," and cure within a reasonable period of time.   Under the 2005 version of Section 1112(b), both subparagraphs (b)(1) and (b)(2) provided exceptions to the otherwise mandatory duty of dismissal for cause.

In 2010, Congress adopted the current version of the statute and made clear that there is only *one* exception to the mandatory duty of dismissal for cause—an exception (now located exclusively in Section 1112(b)(2)) requiring all three conjunctive conditions to be satisfied.  *See* Pub. L. 111-327, 124 Stat. 3561 (2010). Congress merged the two subparagraphs in the 2005 version of the statute and combined into Section 1112(b)(2) the criteria of "unusual circumstances," "reasonable likelihood" of plan confirmation, "reasonable justification for the act or omission," and cure within a reasonable period of time.  Thus, in 2010 Congress narrowed the statutory language—eliminating one of the two subparagraphs addressing the exception to the mandatory duty of dismissal for cause and clarifying clear that "unusual circumstances" alone were not enough.   Rather, in order to avoid the otherwise mandatory dismissal obligation, a bankruptcy court must find "unusual circumstances" <u>and</u> an objecting party must establish "reasonable likelihood" of plan confirmation <u>and</u> "reasonable justification for the act or omission" <u>and</u> cure within a reasonable period of time.

---

and "the amended provision limits the court's discretion to refuse to dismiss or convert upon a finding of cause seemingly to lower the barrier to dismissal").

B.    **The Statutory Criteria of Section 1112(b)(2) Cannot Be Met in This Case.**

The Third Circuit has already held that the requirements of Section 1112(b)(2) cannot be met in this case, where the "cause" for dismissal is LTL's lack of good faith and financial distress.

***Indeed, no case has ever applied Section 1112(b)(2) to excuse the absence of good faith and financial distress***.  Rather, courts have limited Section 1112(b)(2) to situations involving the kind of the reporting and filing duties set forth in Section 1112(b)(4), rather than to the fundamental requirements of good faith and financial distress, which are basic "gateway" or eligibility requirements of bankruptcy.[170]

The Third Circuit has already held there are no "unusual circumstances" here.  The Court of Appeals rejected this Court's reasoning that "the interests of current tort creditors and the absence of viable protections for future tort claimants outside of bankruptcy . . . constitute such 'unusual circumstances' as to preclude . . . dismissal." *LTL Mgmt.*, 64 F.4th at 110 (quoting MTD Op. at 13 n.8).  The Third Circuit opined that "what is unusual instead is that a debtor comes to bankruptcy with the insurance accorded LTL." *Id.*

The factors cited by the Debtor—"the wildly inconsistent result of the tort system" and the "glacial pace of litigation in the tort system," LTL Opp. at 64—are not "unusual circumstances." At most, they are gripes that would apply in every tort case.  But "the word 'unusual' contemplates facts that are not common to chapter 11 cases generally."  7 Collier on Bankruptcy, ¶ 1112.05[2], at p. 1112–51 (16th ed. 2013 & 2023 supp.).   "Many courts have stated that 'unusual circumstances' under § 1112(b)(2) involve 'conditions that are not common in most chapter 11 cases.' " *Korn*, 523 B.R. at 468; *see also In re Products Int'l*, 395 B.R. at 109 ("the phrase

---

[170] *See, e.g., In re Pittsfield Weaving Co.*, 393 B.R. 271, 275 (Bankr. D.N.H. 2008) (considering whether "unusual circumstances" existed to excuse dismissal for cause where, inter alia, debtor owed more than $180,000 in unpaid postpetition taxes, had been late in filing its monthly operating reports, and failed to pay its monthly health insurance premiums); *In re Franmar, Inc.*, 361 B.R. 170, 178–79 (Bankr. D. Colo. 2006) (debtor did not file certain documents because of the absence of his accountant; documents were ultimately filed).

contemplates conditions that are not common in chapter 11 cases"). Even Debtor concedes that "the phrase contemplates conditions that are not common in chapter 11 cases." LTL Opp. at 63 (citation omitted).

Debtor suggests that the filing of a Chapter 11 plan can serve as an "unusual circumstance." *Id.* at 64. But that suggestion is foreclosed by the 2010 revision to the statute, which makes clear that a court must find both "unusual circumstances" <u>and</u> the probable confirmability of a plan. A court must not effectively read "unusual circumstances" out of the statute by collapsing those two requirements. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotations and citation omitted); *United Steelworkers of Am., AFL-CIO-CLC v. N. Star Steel Co.*, 5 F.3d 39, 42 (3d Cir. 1993) ("we have consistently held that "[c]ourts should avoid a construction of a statute that renders any provision superfluous."). Thus, LTL's reliance on the supposed "widespread claimant support" (LTL Opp. at 65) for its proposed plan (support that is illusory, as discussed below) is irrelevant, because that supposed support cannot qualify as an "unusual circumstance."[171]

<u>The Third Circuit has already held there is no reasonable justification for the absence of financial distress.</u> The Court of Appeals opined: "Our ground for dismissal is LTL's lack of financial distress. No 'reasonable justification' validates that missing requirement in this case." *LTL Mgmt.*, 64 F.4th at 110. In fact, the evidence already in the record shows that LTL has made

---

[171] Debtor's reliance on *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008), is therefore misplaced. *Orbit* is a pre-2010 case that does not account for the 2010 change in the statute requiring that unusual circumstances be considered separately from the confirmability of a plan. Moreover, *Orbit* did not involve a debtor that had filed its petition in bad faith, in the absence of financial distress. Rather, the defect in Orbit was the lack of intent to reorganize, for which the cure was a confirmed plan.

little effort to establish financial distress in a legitimate way.  For example, it is undisputed that,

when LTL filed for bankruptcy on April 4, it had not engaged in any analysis of talc liabilities.

*See* Part III-A, *supra*.

Moreover, "filing a petition in bad faith could never be reasonably justified or curable, no

matter what plan Debtors could now propose."  Green v. Howard Family Tr. Dated Aug. 21,1998

(*In re Green*), No. BAP NV-15-1349-Kildo, 2016 WL 6699311, *11 (9th Cir. BAP Nov. 9, 2016);

*see also In re Hinesley Family Ltd. P'ship No. 1*, 460 B.R. 547, 553 (Bankr. D. Mont. 2011) ("[I]f

cause for conversion or dismissal exists because the debtor filed its chapter 11 case in bad faith,

then section 1112(b)(2) would not apply because, by determining that the debtor filed the case in

bad faith, the court would foreclose a reasonable justification for the filing."); *In re Keith*, No. 10-

61722-11, 2010 WL 3835003, *6 (Bankr. D. Mont. Sept. 29, 2010) (same).  As the U.S. Trustee

argued in the Third Circuit, "LTL could not meet the requirements of § 1112(b)(2) because there

could never be a reasonable justification for filing a petition in bad faith, nor could such a bad-

faith filing ever be cured."[172]

<u>The Third Circuit held there is no basis for finding that the absence of financial distress</u>

<u>can be cured</u>.  The Court of Appeals opined: "we cannot currently see how its lack of financial

---

[172] TCC Tr. Ex. 1014, at 25 (Brief for Andrew R. Vara, United States Trustee, as amicus curiae in support of Appellants and Supporting Reversal).  Even in cases not involving bad faith, "reasonable justification" is a high bar.  In *In re Dr. R.C. Samanta Roy Institute of Science Technology, Inc.*, 465 F. App'x 93, 98 (3d Cir. 2011), for example, Judge Ambro found no reasonable justification for failure to file tax returns even though no tax was due.  In *YBA Nineteen, LLC v. IndyMac Venture, LLC (In re YBA Nineteen, LLC)*, 505 B.R. 289, 303 (S.D. Cal. 2014), the court found no reasonable justification for failure to comply with the court's scheduling order, without demanding proof that the violation was intentional: "[F]ailure to comply with a court order need not be willful, in bad faith, or fraudulent, because a debtor takes on the responsibilities required by the Code in availing himself of its protections." *Id.* at 303 (internal quotation marks and citation omitted).  *See* also *Korn*, 523 B.R. at 469 (no "reasonable justification" for failure to provide accurate schedules and statements); *In re Whetten*, 473 B.R. 380, 383–84 (Bankr. D. Colo. 2012) ("To allow a debtor to sidestep [its] duties simply because he is 'busy' would render the Code's reporting requirements a nullity.... The late filing of catch-up monthly reports does not satisfactorily explain or excuse failure to satisfy a debtor's duties as a chapter 11 debtor."); *In re Keeley & Grabanski Land P'ship*, 460 B.R. 520, 546 (Bankr. D.N.D. 2011) (finding debtor failed to satisfy the "reasonable justification" requirement where "there is no excuse for Debtor's failure to timely file schedules, statement of affairs, and other supporting preliminary documents"); *In re Visicon*

distress could be overcome. For these reasons, we go counter to the Bankruptcy Court's conclusion that 'unusual circumstances' sanction LTL's Chapter 11 petition." *LTL Mgmt.*, 64 F.4th at 110.

Debtor is wrong in suggesting that proposing a confirmable plan that is in the best interest of creditors can "cure" a bad-faith filing. LTL Opp. at 67. To begin, confirmability of a plan and best interests of creditors are each separate elements of the analysis (Sections 1112(b)(2)(A) and (b)(2), respectively) and cannot render superfluous the "cure" requirement of Section 1112(b)(2)(B)(ii). In addition, "cure" has a specific meaning under the Code. "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *De Pierro v. Taddeo* (*In re Taddeo*), 685 F.2d 24, 26–27 (2d Cir. 1982) (citing 11 U.S.C. §§ 365(b), 1110(a), 1168(a)(2), 1322(b)(5)). Proposing a plan does not restore pre-default conditions or otherwise "cure" the debtor's ineligibility for bankruptcy. *See Midlantic Nat'l Bank v. DeSeno* (*In re DeSeno*), 17 F.3d 642, 643–44 (3d Cir. 1994) (explaining that "the concept of 'curing a default' has the same meaning in Chapters 7, 11, and 13," and "[n]either the text of the statute, the legislative history, nor the policies animating the Bankruptcy Code suggest that the concept of 'curing a default' should be ascribed any more than a single, consistent meaning throughout the Code.").[173] The absence of financial distress is not an "act or omission" that can

---

*S'holders Tr.*, 478 B.R. 292, 316 (Bankr. S.D. Ohio 2012) ("There is no reasonable justification for the inadequate monthly operating reports, the payment of pre-petition unsecured debt without court authorization, the retention and payment of professionals without court authorization, and the failure to schedule significant assets owed by insiders to the Debtor."); *In re Congaree Triton Acquisitions, LLC*, 492 B.R. 843, 856 (Bankr. D.S.C. 2012) ("There is no reasonable justification for the Debtor's failure to cooperate with the requests of the Examiner."); *In re McKenna*, 580 B.R. 1, *12 (Bankr. D.R.I. 2017) ("Mr. McKenna's excuses, that he 'forgot' about the meeting because he does not keep a calendar, and lost the paper on which he wrote down the date and time of the meeting, fall far short of reasonable justification.").

[173] Thus, in *Prologis Park Gateway Phase II Condo. Ass'n v. Sterling WH Co., LLC (In re Sterling WH Co., LLC)*, 475 B.R. 481, 484–86 (Bankr. E.D. Va. 2012), the bankruptcy court analyzed whether to dismiss a case under Section

be cured retroactively because under the Third Circuit's decision the relevant time for finding financial distress is the "petition date," *LTL Mgmt.*, 64 F.4th at 109, which was April 4, 2023.

Debtor argues that, if the absence of financial distress cannot be "justified" or "cured," then the "justification" and "cure" prongs of Section 1112(b)(2)(B) should simply be disregarded. LTL Opp. at 67. But the Third Circuit's holding rejecting the Section 1112(b)(2)(B) exception in the first appeal forecloses LTL's argument. Moreover, inability to satisfy statutory requirements is not a basis for ignoring them. Indeed, LTL's argument proves the opposite of what it believes. The fact that the absence of financial distress cannot be justified or cured means that the savings clause of Section 1112(b)(2)(B) is *not available* in cases like this, but rather is available only for technical errors like a failure to file operating reports, pay fees, and similar procedural foot-faults. LTL's argument was squarely rejected in *In re Forum Health*, 451 B.R. 780, 790 (Bankr. N.D. Ohio 2011) ("[T]he Committee equated satisfaction of this second element [of Section 1112(b)(2)(B)] with its non-applicability. This second element simply cannot be satisfied or met under the present circumstances. There is nothing that can be rehabilitated or cured. . . . The Committee's interpretation that this element is satisfied turns the statute on its head."). The cases cited by LTL are inapposite.[174]

The implications of LTL's Section 1112(b)(2)(B) argument are staggering. Under LTL's view, bankruptcy would be available for mass tortfeasors even where the defendant is financially healthy and able to pay all creditors in full on an ongoing basis. Yet good faith and financial

---

1112(b)(2) where a plan had already been confirmed, indicating that a confirmable plan does not serve as a "cure." (Ultimately, the court declined to dismiss based upon debtor's default in failing to make quarterly payments of $1,846.36 owing to objecting creditor, which court found was not material.)

[174] LTL's cite to *In re Alston*, 756 F. App'x 160, 164 n.3 (3d Cir. 2019), misses the mark. Footnote three in *Alston* merely notes a split over whether the entirety of the § 1112(b)(2) exception becomes unavailable if cause is found under § 1112(b)(4)(A), and the citation in support of the notion that the exception still remains available is based on a footnote containing little more than an aside from a court based on the pre-2010 version of § 1112(b). *See Ashley Oaks*, 458 B.R. 280, 287 n.8 (Bankr. D.S.C. 2011) (citing *In re Wallace*, No. 09-20496-FLM, 2010 WL 378351, at *6 n. 23 (Bankr.D. Id. Jan. 26, 2010))).

distress are not mere technicalities but fundamental prerequisites of bankruptcy.  They constitute a "gateway" issue (*LTL Mgmt.*, 64 F.4th at 102) that determines a debtor's eligibility for bankruptcy in the first place, because "[a] valid bankruptcy purpose 'assumes a debtor in financial distress.'"  *Id.* at 101 (citation omitted).  Even a bankruptcy solution "create[ing] the best of all possible worlds" cannot be adopted in the absence of financial distress and good faith.  *Id.* at 111.

Bankruptcy without financial distress is no longer "bankruptcy" but simply an administrative compensation scheme.  But Congress has not created such a system.  Congress might have enacted Section 524(g) as a freestanding statute outside the Bankruptcy Code, making it freely available regardless of a company's financial condition.  But Congress declined to do so.  In fact, Congress has considered (but declined to enact) administrative compensation schemes for asbestos claims (without the requirement of financial distress needed to enter bankruptcy).[175] Under LTL's view, these proposals would have been superfluous since the Bankruptcy Code already would have provided a mechanism for resolving such claims outside the tort system, regardless of financial distress.

LTL's extravagant expansion of the bankruptcy system would raise serious constitutional questions, since Congress's power in this context is limited by the Bankruptcy Clause of Art. I, § 8, which authorizes Congress to enact "uniform Laws on the subject of Bankruptcies."  At the time of the Constitution's framing, "bankruptcies" were understood to involve financial distress.[176]  Since then, courts have shared the understanding that a debtor's financial distress is

---

[175] *E.g.*, H.R. 128, Asbestos Compensation Act of 2000, 106th Cong., 2d Sess. (2000).

[176] William Perry, The Royal Standard English Dictionary 51 (1777) ("Bankrupt . . . one who cannot pay his debts"); *id.* ("Bankruptcy . . . The state of a bankrupt"); Thomas Sheridan, Dictionary of the English Language 124 (1796) ("Bankrupt, In debt beyond the power of payment"); *id.* ("Bankruptcy, The state of a man broken, or bankrupt").

a predicate of Congress's constitutional authority.[177]   Under the canon of constitutional

avoidance, this Court must construe Section 1112(b)(2), "if fairly possible, so as to avoid not only

the conclusion that it is unconstitutional but also grave doubts upon that score."   *Almendarez-*

*Torres v. United States*, 523 U.S. 224, 237–38 (1998) (citations omitted); *see also Ashwander v.*

*Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).   Section 1112(b)(2)

contains no clear statement by Congress authorizing a bankruptcy case in the absence of financial

distress.   Quite the contrary: properly construed, the Code forecloses such a proceeding.

Dismissal or conversion is plainly in the best interests of creditors and the estate.   The value

a trustee would recover from reinstatement of the 2021 Funding Agreement will provide more

value to creditors—who in a Chapter 7 liquidation would also retain the value of their claims

against solvent non-debtors like J&J—than the collusive scheme proposed by LTL.   In addition,

creditors would have standing under state law to avoid the termination of the 2021 Funding

Agreement as a fraudulent transfer, or to attempt to pierce the corporate veil of LTL if it was

intentionally undercapitalized.   *See, e.g.,* ." N.J. State. Ann. § 25:2-25(a)(2) (West 2021).

Dismissal would return claimants to their chosen forums and provide them with a venue capable

of implementing a global settlement if that is what they choose.

---

[177] *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14 (1938) ("The subject of bankruptcies is nothing less than 'the subject of the relations between an *insolvent or nonpaying or fraudulent debtor*, and his creditors, extending to his and their relief.") (citation omitted; emphasis added); *Cont'l Ill. Nat'l Bank & Tr, Co. v. Chicago R. I. & P. Ry. Co.*, 294 U.S. 648, 670 (1935) ("[T]he [constitutional] power was the same as though Congress had been authorized 'to establish uniform laws on the subject of any person's *general inability to pay his debts*.'") (citation omitted; emphasis added); *In re Reiman*, 20 F.Cas. 490, 493–94 (S.D.N.Y. 1874) ("'Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter *are unable or unwilling to pay their debts*. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of *persons failing to pay their debts*.") (quoting Story, J.) (emphasis added); *Campbell v. Alleghany Corp.*, 75 F.2d 947, 952 (4th Cir. 1935) (All phases of the relationship between a debtor *financially embarrassed* and his creditors are brought under the control of Congress by the constitutional grant of power[.]") (emphasis added); *Bradford v. Fahey*, 76 F.2d 628, 631 (4th Cir. 1935), *set aside on rehearing on other grounds*, 77 F.2d 992 (4th Cir. 1935) ("the constitutional grant vests in Congress full power to deal with the relationship existing between debtors *unable or unwilling to pay their debts* and their creditors") (emphasis added).

Debtor asserts that its proposed plan enjoys claimant support, but this as unproven as it is irrelevant. The "best interests" test is not an exercise in nose-counting. The test for what is in the best interests of the creditors and the estate "is not one of majority rule." 7 Collier on Bankruptcy, ¶ 1112.04[7], at p. 1112–49 (16th ed. 2013 & 2023 supp).[178] Moreover, not a single claimant has signed a plan support agreement ("PSA"). LTL merely has "commitments from attorneys representing those clients" to "recommend that their clients support the agreement."[179] Mr. Watts has not shown the term sheet to even a single client.[180] When one of Mr. Onder's clients learned of the Debtor's proposal, he called a TCC attorney and left a voicemail expressing strong opposition to the plan.[181] One of Mr. Onder's co-counsel in talc litigation signed a declaration dated April 7 stating that "I have not consulted with all of my clients since [the April 4 filing], but I have consulted with some and none of those I have talked with support a second bankruptcy."[182]

Attorneys who have signed PSAs have expressed different views as to what their commitment means. Some signers have described their commitment as merely "an agreement to agree" or "a conditional agreement with a right to opt out."[183] When asked whether he would

---

[178] *See also In re Fleetstar, LLC*, 614 B.R. 767, 782 (E.D. La. 2020) (same). The test "is not served by merely tallying the votes of the unsecured creditors and yielding to the majority interest." *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994). "To hold otherwise would be to promote collusion between the debtor and certain creditors to the detriment of other creditors." *In re Continental Holdings, Inc.*, 170 B.R. 919, 937 (Bankr. N.D. Ohio 1994); *see also Windsor on the River Assocs., Ltd. v. Balcor Real Estate Finance, Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 132 (8th Cir. 1993) (one of the "primary functions" of bankruptcy law is to discourage "'side dealing'" between debtor and certain creditors to the detriment of other creditors) (citation omitted). "A court should not simply rule for the majority if the parties disagree" but instead "'must choose the alternative that would be most advantageous to the parties and the estate as a whole.'" *Lakefront Invs. LLC v. Clarkson*, 484 B.R. 72, 82–83 (D. Md. 2012), aff'd, 520 F. App'x 221 (4th Cir. 2013). "In determining whether to convert or dismiss a case, this Court is to make a determination as to what is in 'the best interests of creditors and the estate,' and not to act as a mere counter of votes." *In re BTS, Inc.*, 247 B.R. 301, 311 (Bankr. N.D. Okla. 2000) (quoting *In re Superior Sidings & Window, Inc.*, 14 F.3d 240, 243 (4th Cir. 1994)).
Excerpt of TCC Tr. Ex. 952, at 59:17–22 (April 15, 2023 Pulaski Dep. Tr.).

[180] Excerpt of TCC Tr. Ex. 779, at 81:19–22 (June 12, 2023 Watts Dep. Tr.).

[181] Excerpt of TCC Tr. Ex. 774, at 212:6–215:22 (June 8, 2023 Onder Dep. Tr.).

[182] *Id.*, at 222:12–18; TCC Tr. Ex. 835 ¶ 7 (June 8, 2023 Onder Dep. Ex. 13).

[183] Excerpt of TCC Tr. Ex. 776, at 155:6–25, 157:24–158:2 (May 24, 2023 Nachawati Dep. Tr.).

recommend to his clients that they support the Debtor's plan, Mr. Nachawati refused to commit: "There's so many variables.  I can't answer what happens in the future."[184]  He denied that his firm's mesothelioma clients were even included within the PSA.[185]  Similarly, Mr. Onder testified that the PSA was not contractually binding: "Am I contractually bound?  No."[186]  In an email sent to clients, the Onderlaw firm indicated that "significant modifications to key points of the plan" were needed before "we can eventually recommend the plan's passage[.]"[187]  Mr. Onder testified that he could not recommend a plan to clients without knowing what the actual compensation numbers would be.[188]  Those numbers cannot be calculated until the size of the claimant pool is known.[189]

Now that the case has progressed past the term sheet, it has become clear that the plan the Debtor has actually proposed will not be put to a vote, let alone confirmed.  Mr. Onder testified that "the plan was not consistent in some ways with the PSA[,]" and "that plan is never going to be voted on[.]"[190]  Mr. Onder's firm told its clients that the proposed plan "was significantly different than the terms our firm agreed to support[,]" that it was "disappointed," and that "extensive additional negotiations still need to take place for a plan to pass."[191]

LTL seeks to meet the "best interest" test by suggesting that bankruptcy is necessary to protect "future claimants."  Not so.  Numerous cases in the tort system have produced plans

---

[184] *Id.*, at 166:25–167:2.

[185] *Id.*, at 222:7–225:7.

[186] Excerpt of TCC Tr. Ex. 774, at 340:14 (June 8, 2023 Onder Dep. Tr.).

[187] TCC Tr. Ex. 1012, at 1 (Onder June 20, 2023 Litigation Update).

[188] Excerpt of TCC Tr. Ex. 774, at 334:15–16 (June 8, 2023 Onder Dep. Tr.) ("[T]hat's one of the problems with the plan.").

[189] Excerpt of TCC Tr. Ex. 779, at 83:23–84:18 (June 12, 2023 Watts Dep. Tr.); Excerpt of TCC Tr. Ex. 761, at 92:1–4 (June 14, 2023 Pulaski Dep. Tr.).

[190] Excerpt of TCC Tr. Ex. 774, at 158:17–18, 163:23–164:4 (June 8, 2023 Onder Dep. Tr.).

[191] TCC Tr. Ex. 1012, at 1 (Onder June 20, 2023 Litigation Update); *see also* Excerpt of TCC Tr. Ex. 1017, at 21:13 (May 16, 2023 Hearing Tr.) (statement by Mr. Hansen that "we have issues with" the proposed plan); Excerpt of TCC

compensating past *and future* claimants without bankruptcy, including the NFL concussion litigation, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 432–33 (3d Cir. 2016) (discussing protections for "future claimants"); Diet Drugs litigation, *In re Diet Drugs Prods. Liab. Litig.*, 543 F.3d 179 (3d Cir. 2008); and *In re World Trade Center Disaster Site Litig.*, 834 F. Supp. 2d 184 (S.D.N.Y. 2011), *vacated in part by* 754 F.3d 114 (2d Cir. 2013). In the *National Prescription Opiates* MDL, a J&J affiliate (Janssen), together with the major opioid distributors, successfully resolved their potential liability to 48 states and thousands of localities through a nonclass global master settlement agreement worth up to $26 billion.[192]

MDLs routinely resolve product liability proceedings (such as Roundup) involving latent injuries.  Indeed, 90% of cases in MDLs involve product liability mass tort claims, many of which involve latent harms.[193]  MDLs resolved nearly 14,000 cases in 2019 alone.[194]  And MDLs resolve 97% of cases by settlement or dispositive motion, with only 3% remanded for trial. CA3 Bankr. Law Profs.' Br. 17–18.  Judge Graham found "compelling" evidence that MDLs can successfully resolve personal injury cases, and the *Aearo* MDL is larger than the talc.  *Aearo*, 2023 WL 3938436, at *3 & n.6, *18.

Expert testimony at the Motion to Dismiss trial will show that MDLs create a centralized proceeding that facilitates settlement and global resolution.  Bellwether cases establish facts regarding liability, causation, and damages, so that settlement parameters become clear.  Expert

---

Tr. Ex. 776, at 203:17–204:7, 211:14–212:5 (May 24, 2023 Nachawati Dep. Tr.) (declining to commit to supporting Debtor's plan).

[192] LTL touts the size of its proposed plan (LTL Opp. at 2), but it is smaller than the $21 billion Diet Drugs settlement, the $26 billion national opioids settlement, the $11 billion Roundup settlement, and the $10 billion 9/11 compensation fund, among others.

[193] Amicus brief of civil procedure professors, LTL 1.0, No. 21-30589 (MBK) Doc. 1410, at 8; *see also* United States Judiciary,                                                                                      jpml.uscourts.gov, https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Docket_Type-May-15-2023.pdf    (last visited: June 22, 2023).

[194] Amicus brief of civil procedure professors, Doc. 1410, at 12.

testimony at the Motion to Dismiss trial will establish that the talc litigation can be successfully resolved in an MDL.  Talc is not fundamentally different from the kinds of product liability litigations that have been successfully managed and resolved in MDLs many times before.[195] Indeed, talc is simpler than many product liability cases, because the vast majority of talc claims involve a single product type manufactured by a single defendant that is alleged to have caused two primary disease types.  In 2021, J&J itself touted "the process of efficient adjudication by the MDL court" in the talc litigation[196] and rejected any suggestion that a court "would have to conduct[] individual trials ad infinitum," explaining that "[t]his parade of horribles is ill-conceived and disproven by the fact that thousands of state law claims are currently centralized in the MDL court."[197]  Only after losing its *Daubert* motion did it change its tune.

The AHC cites the history of asbestos litigation, ostensibly to show the need for bankruptcy. AHC Opp. at 1.  But MDL-875, involving asbestos, has resolved over 186,000 individual cases since 2006.[198]  As the Federal Judicial Center has noted, even though asbestos and DES involve "latent claims," "as symptoms of these injuries become manifest, the cases are

---

[195] LTL incorrectly argues that law firms in the talc MDL seek to profit through a "common benefit" fund at their clients' expense. LTL Opp. at 4.  That argument is false.  The MDL Common Benefit Order applies to any bankruptcy resolution as well as in the MDL, and in any event the "common benefit" fee assessment is deducted from the contingent fee percentage of the private counsel.  It does not increase the amount of fee that a client bears.  It simply avoids free-riding and ensures appropriate compensation for value created and benefits provided.  *See* Hon. Eldon E. Fallon. "Common Benefit Fees in Multidistrict Litigation," 74 La. L. Rev. 371, 376 (2014) ("[I]n MDLs, the common benefit fee is extracted from the fee of the primary attorney and not the claimant, as is the case with class actions. Thus in MDLs, the claimant does not pay the common benefit fee; the primary attorney who is the beneficiary of the common benefit work pays it."). Some of the firms participating in the AHC signed the Participation Agreement in the MDL, which makes clear that all of their cases are subject to the common benefit holdback.

[196] *In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019), Doc. 2, Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), at 2–3.

[197] *In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019), Doc. No. 81 (Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), at 38–39.

[198]  United States District Court for the Eastern District of Pennsylvania, paed.uscourts.gov, https://www.paed.uscourts.gov/documents/MDL/MDL875/MDL-875.jun30.2019.pdf. (last visited: June 22, 2023).

routinely filed and, apparently, settled."[199]   In the words of presiding Judge Robreno, "the asbestos paradigm developed in MDL-875 could well inform the resolution of future mass tort litigation in the federal courts."[200]

<u>There is no basis for finding a reasonable likelihood that a plan will be confirmed within a reasonable time</u>.   The U.S. Trustee has described LTL's efforts as "futile" and its prospects for reorganization as "slim to nonexistent."  Adv. Pro. 23-01092, Doc. 38, at 4, 10.  LTL faces legal obstacles that it has not yet even begun to analyze. For example, LTL has not explained how J&J could benefit from a channeling injunction for its own direct and independent liability in the face of the Third Circuit's opinion in *In re Combustion Engineering, Inc*., 391 F.3d 190, 233 (3d Cir. 2004).  LTL does not explain how it can have a successful reorganization when the relief it deems indispensable (Doc. 4 at 38) is statutorily unavailable.[201]   Far from defending its entitlement to a Section 524(g) channeling injunction, LTL told the Third Circuit the issue was "premature."  LTL CA3 Br. 71 n.4.

In addition, LTL must show it can satisfy Section 1129 as well as Section 524(g).  Section 1129(a)(3) requires a debtor to show that the plan has been proposed in good faith and not by any means forbidden by law, and Section 1129(a)(10) requires a showing that at least one impaired class has accepted the plan, defined as approval by "at least two-thirds in amount and more than one-half in number of the ***allowed claims*** of such class held by creditors."  11 U.S.C. § 1126(c) (emphasis added).  As this Court has already noted, estimation, determination of allowed claims,

---

[199] Individual Characteristics of Mass Torts Case Congregations, a report to the Mass Torts Working Group, at 12 (Fed. Jud. Ctr. Jan. 1999), available at https://www.uscourts.gov/sites/default/files/masstapd_1.pdf.

[200] Hon. Eduardo C. Robreno, "The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?," 23 Widener L. J 97, 100 (2013).

[201] *In Re Purdue Pharma L.P*., No. 22-110-bk(L), 2023 WL 3700458 (2d Cir. May 30, 2023), did not involve Section 524(g), and it upheld third-party releases of direct claims only in limited circumstances, under specific factors that J&J cannot satisfy. *Id*. at *19–21.

development of voting procedures, and imposition of a bar date for voting purposes are likely required before any votes can be solicited, let alone valued.[202]  LTL has failed to provide any explanation of how it proposes to navigate this extraordinarily complex process or how it proposes to meet the requirements of Section 1129.

For all these reasons, Section 1112(b)(2) does not provide a basis for avoiding dismissal in this case.

## <u>CONCLUSION</u>

The TCC respectfully requests that this Court enter an order under 11 U.S.C. § 1112(b) dismissing LTL's second bankruptcy petition as not filed in good faith.

Respectfully submitted,

**GENOVA BURNS, LLC**

By:___*Daniel M. Stolz*_____
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee
of Tort Claimants of LTL Management, LLC*

---

[202] TCC Tr. Ex. 1020, at 145:1–24 (explaining that "[t]here are significant issues that need to be addressed").