**In the Matter Of:**

*In Re: LTL Management, LLC*

*ADAM PULASKI*

*June 14, 2023*



Page 21

1 thousand cases open within your office
2 relating to talc, in which your firm is lead
3 counsel, have you run any reports recently to
4 gain an understanding as to the nature of the
5 injuries claimed by those claimants?
6    A.   Again, it's difficult to run a
7 report because it has to be run from six
8 different places, and it's not all housed in
9 one area right now.
10       So, what I can tell you is that I
11 believe -- 9,000 cases are closed.  Which
12 means we rejected it for one reason or
13 another.  Or it was rejected by counsel we are
14 joint venturing with.
15       Of the 6,000-plus that remain open,
16 I know that over 5,000 of them claim to have
17 some type of gynecological cancer that is what
18 some may say are the more compensable cases;
19 right.  Which would be ovarian, or fallopian,
20 or peritoneal cancer.
21       And then less than -- I want to say
22 less than a thousand.  I don't have an exact
23 number for you.  Less than a thousand would be
24 those that are uterine cancer or some other
25 type of cancer that may not be on that list.

Page 22

1    Q.   Okay.  Do you have any open
2 mesothelioma cases?
3    A.   I think we have two that we are
4 looking at.
5    Q.   All right.
6         We're going to come back to some of
7 this.  But just so that I understand, for the
8 closed files, you indicated you looked at
9 closed files as well.  There are 9,000 closed
10 files, approximately?
11    A.   Correct.
12    Q.   And were any of those files closed
13 because they were resolved with
14 Johnson & Johnson or any of its affiliates?
15    A.   No.
16    Q.   Have you resolved any talcum powder
17 related case, regardless of what the injury
18 is, with Johnson & Johnson?
19    A.   Depends on what you mean by
20 resolved.  Some of our clients are part of
21 Mark Lanier's settlement process.  Those are
22 not ones that I'm lead counsel on.
23       At this point, some of them -- and
24 so, I -- they have not been paid yet.  They
25 have not been fully satisfied.  There is no

Page 23

1 release to sign, to my understanding, at this
2 point.
3       And so, I don't really -- I want to
4 answer your question, but I don't know that --
5 they are in a settlement process but I don't
6 believe they have been resolved.
7    Q.   Have any claims of clients that you
8 are lead counsel on, or your firm is lead
9 counsel on, been resolved through a resolution
10 with Johnson & Johnson or any of its
11 affiliates?
12    A.   None.
13    Q.   Okay.
14       Did you look at any other
15 information in the database other than open
16 and closed files?
17    A.   Not particularly.
18    Q.   Okay.
19       And with regard to the 6,000-plus
20 open files, do you have an understanding as to
21 when the files were opened?
22    A.   With respect to the 6,000?
23    Q.   Yes.
24    A.   I would say from 2018 or 2019, to
25 present.  No.  Probably 2019 to present.

Page 24

1    Q.   Do you have any better
2 understanding -- withdrawn.
3       Do you have any more specific
4 understanding as to when the 6,000-plus files
5 were opened?
6       MS. RASMUSSEN:  Objection to the
7    form of the question.
8       THE WITNESS:  I'm sorry.  Can
9    you repeat the question?
10 BY MR. SILVERSTEIN:
11    Q.   Do you have any more specific
12 understanding as to when the 6,000 plus files
13 were opened?
14       MS. RASMUSSEN:  Objection to the
15    form of the question.
16       THE WITNESS:  I want to answer
17    your question, but I don't really know
18    exactly what you're asking me.
19       But assuming if you're asking me
20    like, how many were open in 2019 and how
21    many were open in 2020 and 2021, I am
22    assuming it was pretty evenly spread out.
23       But I can't tell you exactly that
24    that's the case.
25 BY MR. SILVERSTEIN:

Page 25

1  Q. And what -- what leads you to assume
2  that they were evenly spread out?
3      MS. RASMUSSEN: Object to form.
4      THE WITNESS: Just from my
5  recollection of us intaking and getting
6  referred cases over the last three years.
7  BY MR. SILVERSTEIN:
8  Q. Is your recollection that the --
9  your firm's inventory grew at approximately
10 the same pace, year over year, since you began
11 intaking these types of cases?
12 A. I --
13     MS. RASMUSSEN: Objection to the
14 form of the question.
15     And Adam, may we have an agreement
16 that an objection by one is an objection
17 for all?
18     THE WITNESS: Sure.
19     MR. SILVERSTEIN: Yeah. I think
20 that I would -- I would prefer that.
21     MS. RASMUSSEN: Two Adams here.
22     THE WITNESS: Sorry.
23     MR. SILVERSTEIN: All right.
24 So, we'll just agree that the question is
25 objected to in advance. But I'm going to

Page 26

1  ask it again.
2  BY MR. SILVERSTEIN:
3  Q. Mr. Pulaski, is it your recollection
4  that your firm's inventory of
5  Johnson & Johnson cosmetic talcum powder cases
6  grew at approximately the same rate, year over
7  year, since you began intaking those cases?
8  A. I can't tell you that they grew at
9  approximately the same rate. But I can tell
10 you that I am unaware of any significant
11 changes or spikes in the number of cases that
12 were coming in over the last three years.
13 Q. And does your database indicate when
14 the file was opened?
15 A. Yes.
16 Q. Did you run a report indicating
17 the -- the number of Johnson & Johnson
18 cosmetic talcum powder cases opened in any
19 particular year?
20 A. Yes.
21 Q. Have you ever done that?
22 A. No.
23 Q. You also indicated that you read 20
24 or 30 pages from Mr. Watt's deposition from
25 yesterday. What -- in particular, what

Page 27

1  testimony did you review?
2  A. So, honestly, I reviewed the
3  testimony -- probably shouldn't have -- on my
4  phone, while I was driving into the office.
5  So it was sporadic at best, and I kind of just
6  flipped through it.
7      I -- there was testimony about Mikal
8  not being involved over the last months.
9  Because of his absence, there was some
10 testimony about the optimization of the plan,
11 while in his absence.
12     And there was some testimony as it
13 related to his negotiations with Mr. Haas and
14 with JNJ, as it related to the plan itself,
15 and getting to where I guess others began to
16 get involved.
17 Q. I noticed yesterday -- because I
18 listened to the deposition as well -- that
19 you -- somebody with your name was logged on.
20     Did you sit through the deposition?
21 A. No. Actually, I turned the
22 deposition on and I was going to listen to it
23 for a minute. I was probably on for five
24 minutes.
25     And I was out of town for work. I

Page 28

1  walked into the meeting and I actually thought
2  I turned the deposition off. And then an hour
3  and a half through my meeting, I realized that
4  there was a noise coming from my pocket and I
5  hadn't disconnected the Zoom.
6      So I was not really on the Zoom, I
7  don't think longer than five minutes.
8  Q. Where are you today?
9  A. I'm in my office in Houston.
10 Q. And where were you yesterday during
11 the deposition?
12 A. I was in Fort Worth.
13 Q. Okay.
14     You also testified that you reviewed
15 the Plan Support Agreement. Why did you do
16 that?
17     MS. RASMUSSEN: Objection to
18 form.
19     THE WITNESS: I hadn't looked at
20 it in a while. I probably looked at it
21 for two minutes.
22 BY MR. SILVERSTEIN:
23 Q. And was there anything in particular
24 you were looking at?
25 A. No. Because I remember that you

Page 29

1  guys asked me in the first deposition about
2  dates and when things were signed. And
3  honestly, I couldn't remember an exact date,
4  and I didn't want to not have an answer for
5  you. And I think it was April 4th that was
6  signed.
7       So, I was looking to see when it was
8  signed.
9    Q.  And you said you reviewed or at
10 least looked at the plan that the debtor
11 filed?
12   A.  Again, probably for about two
13 minutes.
14   Q.  Was that the first time you had seen
15 the plan?
16   A.  No.
17   Q.  And what were you looking at
18 yesterday?
19   A.  It was this morning.
20   Q.  I'm sorry. What were you looking at
21 this morning?
22   A.  I just flipped through it.
23   Q.  Did you look for, or at, anything in
24 particular?
25   A.  I looked at some of the points that

Page 30

1  were allocated for different things and
2  deductions.
3    Q.  And what things are those that you
4  looked at?
5    A.  Just the --
6    Q.  With points.
7    A.  -- the four or five pages of charts
8  related to ovarian and mesothelioma claims.
9    Q.  Okay. We'll come to that.
10   A.  Okay.
11   Q.  Who is Lynn Hardiman?
12   A.  I don't know.
13   Q.  Have you met somebody named
14 "Lynn Hardiman," to the best of your
15 knowledge?
16   A.  No.
17   Q.  Okay. Does the name ring a bell at
18 all?
19       MS. RASMUSSEN:  Object to the
20    form.
21       THE WITNESS:  No.
22       MR. SILVERSTEIN:  Okay.
23    I'm going to ask the court reporter
24    to mark as Pulaski Exhibit 1, a document
25    that I'm going to ask Lexitas to please

Page 31

1  pull up. It's tab two.
2    (Exhibit 1 marked for identification)
3  BY MR. SILVERSTEIN:
4    Q.  This is a document entitled "Master
5  Creditors List." I can represent to you,
6  Mr. Pulaski, that it was filed on the docket
7  by the debtor on the first day of its first
8  bankruptcy filing, in North Carolina, on
9  October 14th 2021.
10       It's a voluminous document. I'm
11 going to refer you to specific pages. I can
12 have Lexitas scroll down if you'd like. But
13 just from looking at the first page, can you
14 tell whether you've seen this document before?
15   A.  I don't recall if I've seen the
16 document or not, but I probably have seen it.
17   Q.  All right.
18       Do you have an understanding that --
19 that LTL, in its two bankruptcy cases, has
20 filed lists of claimants, of which it is where
21 in connection with its reporting
22 responsibilities to the Bankruptcy Court?
23   A.  Yes.
24   Q.  And have you reviewed any of those
25 lists or schedules?

Page 32

1    A.  If I have, it hasn't been recently.
2  And I don't recall.
3    Q.  All right.
4        Well, I can represent to you that
5  this is a -- a searchable document. And I can
6  also represent to you that when you search the
7  word, "Ashcraft," there are 1,907 hits. When
8  you search the word, "Beasley," there are
9  4,916 hits.
10       When you search the word, "Golomb,"
11 G-O-L-O-M-B, there are 993 hits. And when you
12 search the word, "Pulaski," there are three
13 hits. Including the name, Michelle Pulaski;
14 Adam Pulaski; and the Pulaski law firm.
15       MR. SILVERSTEIN:  So I'm going
16    to, with that representation now, ask
17    Deane to scroll down the page 814 of this
18    PDF.
19 BY MR. SILVERSTEIN:
20   Q.  And, Mr. Pulaski, in the third
21 column, eight entries down, you'll see the
22 name, "Lynn Hardiman, Pulaski Law Firm."
23       Do you see that?
24   A.  Yes.
25   Q.  Okay.

Page 33

1 And, Mr. Pulaski, I can represent to
2 you that Ms. Hardiman is the only claimant
3 identified in this Master Creditors List as
4 having been represented by your law firm,
5 based on a search of the word, "Pulaski."
6     Is that -- is that consistent with
7 your recollection that as of October 14th
8 2021, your firm had one filed cosmetic talcum
9 powder case against Johnson & Johnson or its
10 affiliates?
11     MS. RASMUSSEN:  Objection to
12   form.
13     MR. MONTEFUSCO:  Objection to
14   the form of the question.
15     THE WITNESS:  Well, we had
16   thousands filed through other firms with
17   Beasley Allen with joint ventures.  But
18   particularly with my firm as lead counsel,
19   I believe we had a handful.
20     If it was one, two, or three, I
21   don't recall.
22 BY MR. SILVERSTEIN:
23   Q.  Do you have any reason to believe it
24 was more than one?
25   A.  I can't answer that question right

Page 34

1 now.  I just don't know.
2   Q.  Do you have any reason to believe
3 that the debtor's records regarding cases
4 filed by your firm against Johnson & Johnson
5 or any of its affiliates were incomplete or
6 inaccurate?
7   A.  No.
8   Q.  Do you accept the debtor's schedule
9 reflecting that there was one cosmetic talcum
10 powder case filed by your firm, as of
11 October 14th 2021, of which the debtor was
12 aware?
13     MR. MONTEFUSCO:  Objection to
14   form.
15     MS. RASMUSSEN:  Objection to the
16   form of the question.
17     THE WITNESS:  I can't tell you
18   what they were aware of or not aware of.
19   And if you are showing me there's one on
20   here and that's what they are saying they
21   were aware of, then I guess the document
22   speaks for itself.
23 BY MR. SILVERSTEIN:
24   Q.  And do you have any reason to
25 dispute any of the information that is set

Page 35

1 forth in Pulaski Exhibit 1?
2     MR. MONTEFUSCO:  Objection to
3   form.  Asked and answered.
4     THE WITNESS:  I can't answer
5   your question, because I'd have to go look
6   into the database and have someone pull
7   information and tell you whether or not.
8     I can tell you it's -- like I said,
9   at most, we had a handful of cases filed.
10 BY MR. SILVERSTEIN:
11   Q.  Are you able to identify any case,
12 as you sit there today, that was filed as of
13 October 14th 2021, relating to cosmetic
14 talcum powder, other than this one for
15 Ms. Hardiman identified on Pulaski Exhibit 1?
16   A.  As I sit here right this second?
17   Q.  Yes.
18   A.  No.  Not without looking for it.
19   Q.  And you could do a search in your
20 data -- withdrawn.
21     Could you do a search in your
22 database to determine how many cases were
23 filed as of October 4th -- 14th 2021?
24   A.  Yeah.  I'd probably get my IT guy to
25 do that; but yeah.

Page 36

1     MR. SILVERSTEIN:  All right,
2   Deane.  You can pull that down.
3     I'm going to ask Lexitas to put up
4   on the screen, and to mark as Pulaski
5   Exhibit 2, what Lexitas has as tab four.
6   (Exhibit 2 marked for identification)
7 BY MR. SILVERSTEIN:
8   Q.  And, Mr. Pulaski, I can represent to
9 you that this is a document entitled
10 "Schedules of Assets and Liabilities for LTL
11 Management LLC," that the debtor filed on the
12 docket of the first bankruptcy filing, as
13 docket number 450 -- I'm sorry.  This is --
14 all right.  We'll use this document, then.
15     This will be Exhibit 2, as for -- in
16 the second bankruptcy filing on May 5th
17 2023.  Again, Mr. Pulaski, I can represent
18 this is a -- a searchable document.
19     MR. SILVERSTEIN:  I'm going to
20   ask Lexitas to go to page 95.  And this is
21   the first page of Schedule E/F part two.
22   A list of creditors who have non-priority
23   unsecured claims, filed by LTL on
24   May 5th 2023.
25     I'm going to ask Lexitas to please

Page 81

1 confidential at this time, because they
2 were part of our confidential
3 discussions.
4     But over the last week, there may
5 have been some additional discussions
6 that I was not a part of, because I've
7 been tied up on some other matters.
8 BY MR. SILVERSTEIN:
9   **Q.  Is it fair that when you signed the**
10 **Plan Support Agreement, you understood that**
11 **you were only agreeing to recommend to your**
12 **clients support for a debtor plan, after it**
13 **was satisfactorily negotiated to your and the**
14 **other plan support signatories' satisfaction?**
15   A.  Yeah.  Let me --
16       MS. RASMUSSEN:  Objection to the
17 form of the question.
18       THE WITNESS:  Let me rephrase
19 it.  Right.
20     It is -- it was my intention, when I
21 signed this agreement, to suggest to my
22 clients to support the plan.  And that is
23 still my intention.
24     And throughout this process, we have
25 been negotiating and -- through our

Page 82

1 attorneys, who have been doing a great
2 job working with Jones Day, have been
3 negotiating changes within the plan.
4     And I am confident that I will not
5 change my opinion that my clients should
6 support the plan.
7       MR. SILVERSTEIN:  All right.
8 Let's pull this down and look at the
9 plan.  Let's have the court reporter mark
10 as Exhibit 6, and ask Lexitas to pull up
11 its tab eight.
12     (Exhibit 6 marked for identification)
13 BY MR. SILVERSTEIN:
14   **Q.  This is a document entitled "Chapter**
15 **11 Plan of Reorganization of LTL Management**
16 **LLC," filed on May 15th 2023.**
17     **This is a document that you skimmed**
18 **in preparation for your deposition today?**
19   A.  I did.
20   **Q.  Have you read it previously?**
21   A.  I have read it previously.  I have
22 not read it recently.
23   **Q.  And you read it --**
24   A.  Except for today.
25   **Q.  Have you read it in its entirety?**

Page 83

1   A.  I believe so.
2   **Q.  Have you read it --**
3   A.  I may have skipped the table of
4 contents.
5   **Q.  Have you read it more than once?**
6   A.  I have read the plan after filing at
7 least once.  And before filing, I obviously
8 looked at the Plan Support Agreement that we
9 had signed.
10   **Q.  Have you discussed the plan with**
11 **anybody?**
12   A.  I'm sure I have.
13   **Q.  Has anybody discussed with you what**
14 **your clients would receive monetarily under**
15 **the plan?**
16       MR. HOFMEISTER:  Objection, to
17 the extent it involves any privileged
18 discussions with the mediators.
19     Otherwise, you can answer.
20       MR. SILVERSTEIN:  Well, let's
21 start with yes or no.
22 BY MR. SILVERSTEIN:
23   **Q.  Has anybody discussed with you what**
24 **your clients should expect under the plan?**
25       MS. RASMUSSEN:  Objection to the

Page 84

1 form of the question.
2       THE WITNESS:  Yeah.
3     I can't answer the question the way
4 you phrased it.  I think if you just try
5 and give me a little bit more specifics,
6 I'm happy to answer it.
7     I just don't really know how to
8 answer that.
9 BY MR. SILVERSTEIN:
10   **Q.  Have you had any discussions with**
11 **anybody regarding the range of compensation**
12 **that your clients -- open clients in your**
13 **inventory would receive under this plan?**
14       MS. RASMUSSEN:  Objection to the
15 form of the question.
16       THE WITNESS:  Let me answer it
17 this way.  I haven't had any discussion
18 with anybody as it relates to a specific
19 dollar amount that any one of my clients
20 would have received.
21     I have had discussions with those on
22 the ad hoc committee, without breaching
23 any confidentiality or anything else,
24 or -- you know, and -- and discussions
25 throughout negotiations regarding what's

Page 89

```
 1   women that we represent; their injuries;
 2   what they have claimed; looking at cases
 3   as medical records come in.
 4         Again, going back to the fact that
 5   we closed 9,000 cases and we have 6,000
 6   still open, it's a testament to the fact
 7   that we have been reviewing these and
 8   filtering out cases that we just don't
 9   believe, in good faith, that we can
10    pursue.
11   BY MR. SILVERSTEIN:
12       Q.  Do you have any understanding how
13   much a point under this plan is worth?
14       A.  My understanding is it's somewhere
15   between 58 cents and two dollars.  And I can
16   tell you that, you know, that's part of our
17   discussions.  Part of our discussion has to do
18   with the points and issues we have with
19   deductions for certain things.
20         Again, things that I believe that
21   after negotiations will be changed and will be
22   for the better.
23       Q.  So without disclosing anything
24   specific, is it correct that the amount of
25   compensation that claimants would receive is
```

Page 90

```
 1   being -- is one of the things that's being
 2   negotiated right now?
 3           MR. HOFMEISTER:  Objection, to
 4       the extent it involves the disclosure of
 5       any privileged or other communications
 6       that are covered by any discussions with
 7       the committee -- ad hoc committee, or
 8       during mediation.
 9         Otherwise, you can answer.
10           THE WITNESS:  Again, I don't
11       want to get into specifics of what's being
12       discussed.  I can just tell you that they
13       are -- and it's not to say that JNJ would
14       agree to everything that we're asking for.
15       But there are certain items in there, that
16       we are bringing up to them.
17   BY MR. SILVERSTEIN:
18       Q.  When was the last time there was
19   a -- don't tell me what was said, but when was
20   the last time there was a negotiating session
21   with JNJ over the plan?
22       A.  It is ongoing.  I have been out of
23   town this week, and my recollection is, we had
24   a Zoom sometime last week.  Or there were
25   discussions sometime last week.
```

Page 91

```
 1           MR. SILVERSTEIN:  All right.
 2       I'm going to pass the witness on now to
 3       Mr. Golomb.
 4           THE WITNESS:  Thank you.
 5           MR. SILVERSTEIN:  Thank you,
 6       Mr. Pulaski.
 7   EXAMINATION BY MR. GOLOMB:
 8       Q.  Good morning, Adam.
 9       A.  Good morning.
10       Q.  I represent Brandy Carl, who is a
11   member of the TCC, and I'm a TCC
12   representative.
13         Did you read Jim Onder's testimony
14   last week?
15       A.  I did not.
16       Q.  Okay.  Jim testified that his
17   understanding was that if it was a dollar a
18   point, that the average case value under this
19   deal was $114,000 a case.
20         Is that consistent with your
21   understanding?
22       A.  That would be kind of "averagey."
23   Yes.
24       Q.  What do you mean it would be kind of
25   "averagey?"
```

Page 92

```
 1       A.  I mean, I don't -- I don't think
 2   that we can predict an exact dollar amount
 3   without knowing the exact number of people
 4   that are going to be involved.
 5         And I think we have estimates based
 6   on years of gathering information and going
 7   back as far as when I was in discussions with
 8   Beasley Allen and JNJ, polling literally over
 9   firm in the country to figure out how many
10   cases there were, and everything else.
11         And so, as I sit here today, I can't
12   tell you if $114 is -- I mean, if $114,000 is
13   the right number.
14       Q.  Okay.
15         And you get a lot of information out
16   of Needles of your case management system.
17   Correct?
18       A.  I do.  Yes.
19       Q.  All right.
20         And so, you can do reports out of
21   Needles, that show as an example, how many
22   cases of yours were ovarian cancer cases.
23   Right?
24       A.  Again, depending upon where the
25   information came from, right now, the data is
```

In Re: LTL Management LLC
Exhibit 761
Case 23-12825-MBK Doc 857-6 Filed 06/22/23 Entered 06/22/23 15:25:55 Desc
Confidential Page 8 of 8
Adam Pulaski
June 14, 2023

Page 93

1  stored in multiple different places within --
2  and depending upon where the data came from.
3      If it came from a medical record
4  that we review in-house. A medical record
5  that was reviewed by a nurse paralegal. A
6  death certificate, or different places.
7      Some of them are in note fields,
8  where it's not easy to sort. All right?
9  Because it's not a check box. Some of it's in
10 check boxes. Some of it's in different
11 places.
12     So the bottom line answer is the
13 data is within the database. Pulling the
14 report is not as easy as just pressing a
15 button.
16    Q.  By the way, when Adam Silverstein
17 went through with you the list of your cases
18 and he asked you about Lynn Hardiman; do you
19 recall that?
20    A.  I do.
21    Q.  When he shared that, I had noticed
22 that Lynn Hardiman was there twice. Was
23 under -- one was under your firm and the other
24 was under Seeger Weiss.
25        Did you happen to notice that?

Page 94

1     A.  I did notice that.
2     Q.  What, if anything, did you do, or
3  has your office done, to make sure that none
4  of your 6,200 or so cases are duplicates of
5  what other firms also have?
6     A.  I can tell you that my firm
7  probably, more than almost any other firm in
8  the country, were very diligent in determining
9  whether or not we -- we sent videos out to our
10 clients -- I don't know that we have done it
11 in the talc case recently. It's kind of hard
12 since none of the cases have been able to be
13 filed over the last two years.
14        But, for instance, in other dockets,
15 you know, we are constantly asking our clients
16 to let us know if they have talked to any
17 other law firm; spoken to any other law firm;
18 sent information to any other law firm; hired
19 any other law firm.
20        So that internally, we can deal with
21 an issue before it becomes a problem where we
22 have all worked on a case for three years and
23 we have wasted our time and money.
24        So, to answer your question, in
25 general, we are sending emails. We

Page 95

1  specifically screen all of our clients and
2  discuss that with them on the first several
3  phone calls, whether or not they have hired
4  other law firms.
5         To tell you whether or not do I have
6  any other cases that are represented by other
7  firms, at this time, if there are any, we have
8  already dealt with them that we know of.
9         And if there is any that we don't
10 know of, obviously, I don't know of them at
11 this point.
12    Q.  When you say you dealt with, how do
13 you deal with it?
14    A.  If we have a client that has hired
15 two firms, typically, I'll get on the phone
16 with the client and then I'll get on the phone
17 with the other firm, and we will try to work
18 something out where we are both not working on
19 the same case.
20        And one firm may take lead or just
21 take control of the litigation. And we would
22 inform the client and discuss it with the
23 client and move from there.
24    Q.  Okay.
25        Correct me if I'm wrong. You

Page 96

1  indicated earlier in your deposition -- and
2  I'm not going to -- I may drill down on some
3  things but I'm not going to repeat.
4     A.  That's fine.
5     Q.  I think you said earlier in your
6  deposition that you signed up your first --
7  your first case that you kept, in-house, in
8  2019.
9         Is that right?
10    A.  I believe that is the case.
11    Q.  Right. When did you first -- when
12 did you sign up your first talc case?
13    A.  I want to say it was 2015 or 2016.
14    Q.  Okay.
15        And so, between 2015 and 2019,
16 that's when you -- you got these four to five
17 thousand cases that you referred to Beasley
18 Allen and others?
19    A.  Yeah. We had a joint venture
20 agreement with Beasley Allen on -- and I know
21 this, because I just happened to see it as I
22 was pulling numbers up this morning -- on some
23 fifteen to eighteen hundred cases, of which I
24 think 900-plus are still open in Beasley
25 Allen's office and the rest are closed.