**In the Matter Of:**

*In Re - LTL Management LLC*

*JOHN KIM*

*June 01, 2023*



## Page 1

```
 2  UNITED STATES BANKRUPTCY COURT
    DISTRICT OF NEW JERSEY
 3  ------------------------------------------X
    In Re:
 4
 5  LTL MANAGEMENT, LLC,
 6                              Debtor.
 7
    Case No. 23-12825 (MBK)
 8  ------------------------------------------X
 9          ***CONFIDENTIAL***
10    VIDEOTAPED DEPOSITION OF JOHN KIM

14  DATE:  June 1, 2023
15  TIME:  10:04 a.m.
16  PLACE: ***REMOTE***
17  BEFORE:  Rebecca Schaumloffel, RPR, CCR-NJ
18  JOB NO:  2023-898645
```

## Page 2

```
 2  A P P E A R A N C E S:
 4   ASHCRAFT & GEREL, LLP
         Attorneys for Rebecca Love
 5       1825 K Street NW,
         Suite 700
 6       Washington, DC 20006
         BY:  JAMES GREEN, ESQ.

     BEASLEY ALLEN LAW FIRM
10       Attorneys for Alishia Landrom,
         et al.
11       218 Commerce Street
         Montgomery, Alabama 36104
12       BY:  LEIGH O'DELL, ESQ.

     BROWN RUDNICK
16       Attorneys for the Talc claimants
         7 Times Square
17       New York, New York 10036
         BY:  JEFF JONAS, ESQ.
18            LYDELL BENSON, ESQ.
              DAVID WEINSTEIN, ESQ.
19            GERARD CICERO, ESQ.
              SUSAN SIEGER-GRIMM, ESQ.
20            SHARI DWOSKIN, ESQ.
              MICHAEL REINING, ESQ.

23   BARNES & THORNBERG
         Attorneys for J&J
24       2029 Century Park East
         Suite 300
25       Los Angeles, CA 90067
         BY:  KENDRA LOUNSBERRY, ESQ.
```

## Page 3

```
 2  Appearances (continued:)
 4   COLE SCHOTZ
         1325 Avenue of the Americas
 5       19th Floor
 6       New York, NY 10019
         BY:  SETH VAN AALTEN, ESQ.

 9   GOLOMB SPIRT GRUNFELD, PC
         1835 Market Street
10       Suite 2900
         Philadelphia, PA 19103
11       BY:  RICHARD GOLOMB, ESQ.

     GENOVA BURNS
14       494 Broad Street
         Newark, New Jersey 07102
15       BY:  DAN STOLZ, ESQ.

17   JONES DAY
         Attorneys for the Debtor
18       250 Vesey Street
         Suite 31
19       New York, New York 10281
         BY:  JAMES JONES, ESQ.
20            TIMOTHY VILLARI, ESQ.

     KARST & VON OISTE, LLP
23       Attorneys for Tonya Whetsel
         23923 GOSLING ROAD SUITE A
24       Spring, Texas 77389
         BY:  DOUGLAS VON OISTE, ESQ.
```

## Page 4

```
 2  Appearances (continued:)
 5   LAW OFFICES OF MITCHELL MALZBERG
         Local Counsel to April Fare
 6       6 E. Main Street, Suite 7
         Clinton, New Jersey 08809
 7       BY:  MITCHELL MALZBERG, ESQ.

10   LEVIN PAPANTONIO RAFFERTY
         Attorneys for TCC - William Henry
11       316 South Baylen St.
         Pensacola, FL 32502
12       BY:  CHRIS TISI, ESQ.

16   MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
         Attorneys for Katherine Tolleson,
17       et al.
         777 S Harbour Island Blvd.
18       Suite 310
         Tampa, Florida 33602
19       BY:  CLAY THOMPSON, ESQ.
              CHRIS McKEAN, ESQ.
20            SUSAN RATCLIFFE, ESQ.
              MARCUS RAICHLE JR., ESQ.

     MILLER THOMSON LLP
24       10155 102 Street
         Edmonton, Alberta, Canada
25       T5J 4G8
         BY:  JEFF CARHART, ESQ.
```

Page 21

1          J. KIM
2  liability minus the assets of LTL. And, you
3  know, again, I told you we're aware of what
4  the magnitude of that liability is.
5     Q.  Okay. Thank you. That's helpful.
6         So just to put it another way, to
7  use your words, J&J's cap on its liability
8  was 61 odd billion dollars, correct?
9     A.  I would defer to the documents to
10 what they actually say. But what -- you
11 know, the characterization of that liability.
12 But, again, you know, that's a hypothetical
13 number because there is no -- we don't think
14 there is any possible way that the liability
15 would get to that.
16        I think as explained -- and I'm
17 going to refer to the objection to the
18 omnibus petition that was recently filed --
19 I'm sorry, the objection to the motions to
20 dismiss, the omnibus objection to the motion
21 to dismisses that were filed, that goes
22 through the whole rationale of the Funding
23 Agreement.
24    Q.  Okay. So, again, I just want to
25 get this correct. You believe that J&J's

Page 22

1          J. KIM
2  hypothetical cap on liability under the first
3  Funding Agreement was in the neighborhood of
4  $61 billion.
5         Did I get that right?
6     A.  I think it could be, yes. I would
7  say could be.
8     Q.  Okay. So, now, I want to roll
9  forward a little bit to April 4th of 2023,
10 the date the second bankruptcy petition of
11 LTL was filed.
12        What is your understanding of
13 LTL's assets at the time that it filed
14 bankruptcy about two months ago, give or
15 take?
16    A.  Again, I think I went through this
17 the first deposition. The assets of LTL were
18 the cash on hand, which I think was about
19 $30 million at the time. The value of RAM,
20 the insurance proceeds that it had rights to,
21 and the Funding Agreement with HoldCo -- in
22 bankruptcy, the backstop by the supportive
23 agreement by Johnson & Johnson.
24    Q.  Okay. And what do you believe was
25 the -- on April 4th of 2023, what do you

Page 23

1          J. KIM
2  believe the value of the Funding Agreement --
3  the second Funding Agreement was?
4     A.  The value of the second Funding
5  Agreement was the same of the value of the
6  first Funding Agreement. It is the liability
7  of the talc liability minus the assets of
8  LTL. And, again, we did not believe that the
9  talc liability approached near $30 billion.
10 So that would be the -- you know, the value
11 of the Funding Agreement.
12    Q.  I'm sorry, I lost that. You said
13 "that would be the value"?
14    A.  That would be -- that would be --
15 whatever the liability is, which, again, is a
16 little difficult to determine outside of
17 bankruptcy because, basically, you have the
18 cost, the aberrant verdicts, you know, the
19 settlements that we might enter into. But
20 whatever the liability is -- it's the same
21 value -- let's put it this way, it's the same
22 value as the first one. It is the liability
23 of the talc litigation minus the assets of
24 LTL.
25        What I was -- I further said that

Page 24

1          J. KIM
2  that liability itself, we did not believe
3  neared the $30 billion -- $30 billion which
4  is what the -- the market value of HoldCo
5  was.
6     Q.  Okay. I get it. And that's
7  helpful. Thank you.
8         But in terms of, if, God forbid,
9  you were wrong and the talc liabilities
10 approached $60 billion, under Funding
11 Agreement 1, there would have been available
12 funding to cover that amount of liabilities,
13 correct?
14    A.  I think it's a hypothetical
15 question. You know, the facts are that we do
16 not believe that the liability comes close to
17 $30 billion. In fact, we have an additional
18 data point now which is the $8.9 billion
19 settle- -- proposed settlement, which the
20 majority -- the majority of claimants, we
21 believe, support. So that's another
22 indication in bankruptcy of what the value of
23 the litigation is. Again, which doesn't
24 approach the $30 billion.
25    Q.  Okay. Let's turn to that. My

Page 25

1           J. KIM
2  next question, obviously, is, what was the
3  value or the total amount of LTL's
4  liabilities when it filed bankruptcy on
5  April 4, 2023?
6         So what was the total amount of
7  LTL's liabilities when it filed its second
8  bankruptcy?
9     A.  Again, outside -- so outside of
10 bankruptcy, the liability is both variable
11 and volatile, right.  So it really depends.
12 We know what the expenses were prior to the
13 first filing, which we -- if anything, would
14 increase slightly, or could increase after
15 the passage of time.
16        We know the number of cases where
17 claims that are out there, which, again, has
18 increased -- our knowledge of them has
19 increased over time.  Again, we know that
20 there are aberrant -- there are aberrant jury
21 verdicts.  There are some settlements that we
22 have.  So we did not do a formal analysis of
23 what the -- of what the total liability is,
24 but there are data points.
25        Two of the critical data points

Page 26

1           J. KIM
2  are the $4.2 billion for the ovarian cases,
3  which we had discussed prior.  And we have
4  this $8.9 billion settlement proposal, which
5  has been accepted by lawyers representing the
6  majority of claimants.
7         And so, you know, those give good
8  indicators as to the magnitude of the total
9  talc liability in bankruptcy.
10    Q.  Okay.  So I take it, on April 4,
11 2023, you may have had, I think you said,
12 "data points," but you had no estimate, no
13 formal or otherwise estimate of total talc
14 liabilities of LTL, correct?
15    A.  That is correct.  We did not have
16 a formal estimate, but we have years of
17 experience of data points.  We -- you know,
18 we have a good understanding of this
19 litigation.
20    Q.  Okay.  So based on your years of
21 experience and all of those data points, what
22 did you believe LTL's total talc liabilities
23 to be as of April 4, 2023?
24    A.  I would say, again, it's volatile
25 and it's variable.  The data points that we

Page 27

1           J. KIM
2  had was an $8.9 billion proposal that was
3  accepted by the vast majority of claimants.
4  We had the $4.2 billion proposal that was
5  floated by the plaintiffs, you know, earlier.
6         And so, you know, we had a number
7  of -- the number of cases and they were
8  growing.  So I would -- so we had a good
9  estimate that that's, you know, would be a --
10 indicators as to the magnitude of the
11 liability.
12    Q.  Do you believe that LTL's total
13 talc liabilities on April 4, 2023, exceeded
14 $8.9 billion?
15    A.  I think there was potential for it
16 to exceed $8.9 billion.  Depending -- it
17 varies depending upon aberrant verdicts.  You
18 know, the cost of litigation.  You know, it
19 may -- again, it would fluctuate.  But,
20 again, there was no belief that it would --
21 that the assets of HoldCo were insufficient
22 to fund whatever liability the talc was.
23    Q.  Okay.  So I take it you don't
24 believe that LTL's total talc liability on
25 April 4, 2023, exceeded $30 billion; is that

Page 28

1           J. KIM
2  right?
3     A.  I believe that's right, yes.  We
4  believe -- we believe that LTL and HoldCo
5  were solvent with the arrangement that it had
6  that its -- that it could meet its
7  obligations to fund the litigation.
8     Q.  Okay.  And -- okay.  I want to,
9  for a minute, talk about the petition date
10 again, April 4, 2023, and ask you that, as of
11 that date, you had any estimates or
12 projections of the cost of continuing to
13 litigate in the tort system for LTL?
14        MR. JONES:  Object to the form
15    of the question.  I don't discern a
16    difference between what you just
17    asked.  Maybe you can help us, Jeff.
18        MR. JONAS:  You don't discern a
19    difference between total liability and
20    the actual legal and related costs
21    that it would cost to defend those
22    lawsuits?
23        MR. JONES:  Are you speaking to
24    cost of defense?  Is that all you want
25    to talk about?

Page 29

J. KIM

MR. JONAS: If I was unclear, I apologize.

BY MR. JONAS:

A. Again, we did not do a formal analysis of that. But, again, I think, as I testified to in the first bankruptcy, we do have information about how much it cost to do trials. We have monthly -- at that point, the run rates of the cost of litigation. Those costs would increase over time as the number of cases that have to be prepared increase.

So we have an idea. We did not do a formal analysis, but we do have an idea that the costs are substantial.

Q. And is that all -- I just want to test whether you can give me any more specific amounts or numbers, other than -- is the best you can do is to tell me that you think that the costs of defense of LTL remaining in the tort system, after the first bankruptcy case was dismissed, those costs would be quote, unquote, "substantial"?

Is that all you can say on that

Page 30

J. KIM

topic?

A. Well, no. What I can say is, if you give me a pen and pencil and I go back to the data, I could probably calculate it in ten minutes. If you want to take the time to do it.

The cost -- there is no question about what these costs are. You know, we can get that data easily. We didn't think it was necessary to do that because they were substantial. That's what I'm saying.

Q. When you say "substantial," how do you use that word? What do you mean?

A. Again, I think we were running, you know -- we can go back to the data, you know, of the run rates, a couple million dollars, you know, a month at that time. You know, trials cost a couple million dollars each time you go to trial.

Depending upon -- again, there is variability of volatility because, depending upon how many cases get set for a particular time period, we have more work that has to be done. Any time there are trials set, there

Page 31

J. KIM

is more work. You need to find additional lawyers to do trials. There is additional work. So it is -- it's substantial.

Q. And, sir, what is the best number or approximate amount that you can provide today, sitting here today, as to what LTL's estimates or projections of legal defense costs would have been had it remained in the tort system after April 4, 2023?

A. So I don't have it sitting here today. I can go back to the presentation made at the first motion to dismiss. It was numbered a little higher on April 4 because the increase in cases, but that would be a good indication of what the number is. I don't have that in front of me right now. I can probably try to dig it up if you would like, but the data is there.

Q. Okay. But, again, as the Chief Legal Officer of LTL, sitting here today, you are unable to provide any estimate or approximation of the amount of legal defense costs that LTL would have incurred had it remained in the tort system after April 4,

Page 32

J. KIM

2023?

Have I got that right?

A. Yes, it does --

MR. JONES: Let me object, Mr. Kim.

I object as asked and answered. And he's directed you to where that can be found.

BY MR. JONAS:

A. Sitting here today, without having my notes in front of me, without having the data available to me, I cannot give you a good estimate. But I can easily get it if you give me the opportunity to look through the data.

Q. Yeah, sure. I'm happy -- when we take a break, that would be great. I'll take you up on your offer. You can take the ten minutes you said you needed and that would be wonderful. Thank you, Mr. Kim. I appreciate it.

A. That's ten minutes if I can find the information.

Q. We will find out if you can.

Page 61

1          J. KIM
2       You are also refusing to answer my
3  question as to what other options were
4  discussed between LTL and J&J other than the
5  funding -- second Funding Agreement, which
6  was entered into, correct?
7     A.  On advice of counsel, I'm not -- I
8  do not want to waive privilege on those
9  issues.
10         MR. JONES:  And just to be
11     clear, Jeff, those were discussions
12     between and among counsel, not just
13     any other discussions that he may be
14     aware of that occurred in some other
15     fashion with some other participants.
16         MR. JONAS:  Thank you, Jim.  And
17     I'm not trying to be pedantic here.  I
18     have to build a record for now and
19     future use, as you know, and we have
20     got to do this.
21         So I appreciate you and
22     Mr. Kim's patience with me.  Thank
23     you.
24  BY MR. JONAS:
25     Q.  Okay.  A few more questions in

Page 62

1          J. KIM
2  this regard, Mr. Kim.  And, again, if you --
3  you'll answer as you see fit, and I
4  appreciate that.
5         MR. JONES:  Jeff, before you go,
6     it's over an hour.
7         MR. JONAS:  I'm sorry.  Yeah,
8     let's take a break.  If it's okay with
9     you guys, that's a good idea.
10         MR. JONES:  Yes, I saw you
11     pausing for a minute.  I thought I
12     would take advantage.
13         MR. JONAS:  No, no, no.  It's
14     11:11.  Do you want to come back at
15     11:20?
16         MR. JONES:  Fine.
17         THE VIDEOGRAPHER:  We are now
18     going off the record.  The time is
19     11:11.
20         (Whereupon, a recess was held.)
21         THE VIDEOGRAPHER:  We are now
22     back on the record.  The time is
23     11:23.
24  BY MR. JONAS:
25     Q.  Mr. Kim, first, I wanted to see if

Page 63

1          J. KIM
2  you, during the break, had a chance -- you
3  were going to do some -- you offered, and I
4  took you up on your suggestion, to take a
5  look at talc legal defense costs.
6         Were you able to do that?
7     A.  I'm sorry, I completely forgot.  I
8  did not.  I don't have materials.  I'm
9  sitting at home.  I don't know that I have
10  the materials that I need to do that.
11     Q.  Okay.  Well, I'll remind you
12  before the lunch break and hopefully you can
13  accommodate.
14     A.  Can I talk to my attorneys to get
15  me the materials that I need to do this?
16     Q.  Sure.  Absolutely.  Do whatever
17  you need to do.
18         But just coming back to that --
19  and perhaps I asked this question which led
20  to your offering to do that work.  So -- but
21  if not -- and if I did, I apologize, but let
22  me -- I just -- I want to make sure I cover
23  off on the question, which was, at the time
24  -- and it's probably a slightly different
25  question.

Page 64

1          J. KIM
2       At the time that LTL filed
3  bankruptcy again on April 4, 2023, did you,
4  at that time prior to the filing, have any
5  estimate -- any actual estimate or
6  projections of legal defense costs going
7  forward, whether it was, you know, three
8  months, six months, a year, et cetera?
9     A.  So, no.  Again, we did not do a
10  formal estimate.  But, again, we have the
11  data available from the first bankruptcy
12  where we went through the cost of the
13  litigation.  That was available to us.  The
14  only duty would have been that there were
15  probably additional costs that you would have
16  to account for in additional to renewal that
17  claimants that we knew of.
18     Q.  Okay.  And I'll remind you
19  again -- and maybe we can put a stake in that
20  line of questioning after you have had a
21  chance to look for those materials.
22         So, returning to where we left
23  off, did LTL ever request that J&J's --
24  strike that.  Strike that.
25         Let me ask, J&J's total liability,

In Re: LTL Management LLC
Exhibit 770 Confidential
Case 23-12825-MBK Doc 857-9 Filed 06/22/23 Entered 06/22/23 15:25:55 Desc
Page 7 of 14
John Kim
June 01, 2023

Page 65

1       J. KIM
2  maximum or total cap of liability, under
3  Funding Agreement 2 is $8.9 billion, correct?
4       MR. JONES:  Object to form.
5     A.  Under the Support Agreement, its
6  liability is what the -- is the amount that
7  was part of the Support Agreement, which is
8  the $8.9 billion to fund the full, you know,
9  resolution of the liability.
10    Q.  And do you understand that to be a
11 cap on J&J's liability?
12    A.  Well, it's the amount that they
13 are -- it is an agreed upon amount that J&J
14 and attorneys for the majority of talc
15 claimants have agreed to.  I don't know if
16 you can characterize that as a cap.  That is
17 the amount of money that J&J said that it
18 would put in.
19    Q.  Do you believe that J&J could be
20 obligated to pay more than $8.9 billion under
21 either Funding Agreement 2 or the Support
22 Agreement?
23    A.  I think that's a hypothetical
24 question.  It's the amount of liability --
25 the amount that J&J has committed to pay is

Page 66

1       J. KIM
2  $8.9 billion.
3     Q.  Has LTL done any analysis as to
4  whether or not J&J could be obligated for
5  more than $8.9 billion under Funding
6  Agreement 2 or the Support Agreement?
7     A.  We have not undertaken any
8  analysis.  We reviewed the Agreement.  The
9  Agreement says what it says.
10    Q.  Which is that the maximum
11 liability of J&J is -- under the Funding
12 Agreement 2 and Support Agreement is
13 $8.9 billion, correct?
14    A.  I believe that's correct, yes.
15    Q.  Okay.  So during the, as you refer
16 to it, "discussions" that LTL had with new
17 JJCI and J&J relating to termination of
18 Funding Agreement 1 and entering into Funding
19 Agreement 2, did LTL ever request that J&J's
20 maximum liability be higher than
21 $8.9 billion?
22       MR. JONES:  Objection to the
23    question because it calls for the
24    sharing of what I believe Mr. Kim will
25    confirm are privileged communications

Page 67

1       J. KIM
2  with parties who share a common
3  interest.
4  BY MR. JONAS:
5     A.  My understanding is that the
6  $8.9 million was a negotiated amount between
7  J&J and attorneys representing the majority
8  of claimants.  There was no -- I don't think
9  -- there was no analysis done as to whether
10 wore -- J&J could pay more.  That was a
11 negotiated amount between J&J and the
12 attorneys representing, again, the majority
13 of claimants.
14    Q.  Are you saying that LTL was not
15 involved in the negotiations as to the amount
16 that J&J would be responsible for under
17 Funding Agreement 2 and the Support
18 Agreement?
19    A.  I'm saying LTL was involved, but
20 that amount was a negotiated amount between
21 J&J and attorneys for the majority of
22 claimants.
23    Q.  Are you saying that LTL allowed
24 that amount, that is the maximum amount of
25 J&J's liability to be determined by the

Page 68

1       J. KIM
2  negotiation between plaintiffs' attorneys and
3  J&J?
4     A.  I'm saying that was the amount --
5  that amount was the amount that was
6  negotiated and agreed to between J&J and the
7  attorneys for the majority of claimants.
8  That's the amount to resolve the entire
9  litigation in the bankruptcy.
10    Q.  Let's see.  Do you recall that in
11 the first bankruptcy, J&J had -- new JJCI had
12 agreed to fund a qualified settlement fund,
13 or QSF, in the aggregate amount of
14 $2 billion?
15       Do you recall that?
16    A.  I do.
17    Q.  And how was that -- if you recall,
18 how was the $2 billion amount determined?
19       MR. JONES:  Object to
20    foundation.
21    A.  You know, I'm not sure whether I
22 testified -- I think I did testify to this in
23 the first bankruptcy hearing.  You know, at
24 this point, I don't recall that -- how that
25 amount was determined.  I do recall that it

Page 69

1        J. KIM
2  was, we believed, a fair amount for a QSF.
3  But sitting here today, I have not gone back
4  to refresh my recollection on how that amount
5  was determined.
6        Well, it may be in my first -- it
7  may be in the first deposition. And I'm
8  pretty sure that that question was asked at
9  the first bankruptcy.
10     Q.  Did LTL believe that that
11 $2 billion QSF amount in the first bankruptcy
12 was satisfactory to resolve its talc
13 liability?
14     A.  I think, as I testified, I thought
15 that amount was -- could and should satisfy,
16 but we understood that the plaintiffs -- the
17 Claimants may disagree, and it was not the,
18 you know, full amount that would be
19 available. That it could be supplemented in
20 any negotiated resolution in LTL 1.
21     Q.  Okay. I know you know this,
22 Mr. Kim, but just bear with me because
23 oftentimes, when I take a minute, it actually
24 helps expedite things. So I appreciate that.
25        MR. JONAS: Okay. Let's

Page 70

1        J. KIM
2  introduce what will be Kim number 2,
3  which is tab 7, Deane.
4     Q.  It's your Declaration in this
5  case.
6        (Whereupon, Kim Exhibit 2,
7  DECLARATION OF JOHN K. KIM IN SUPPORT
8  OF FIRST DAY PLEADINGS was marked for
9  identification as of this date by the
10 Reporter.)
11       MR. JONES: It was reviewed with
12 Mr. Kim in April as Kim Exhibit 4.
13       MR. JONAS: Thank you.
14       MR. JONAS: Actually, I take
15 that back. It was Kim Exhibit 5. I
16 apologize.
17       MR. JONAS: Thank you, again.
18 BY MR. JONAS:
19     Q.  Mr. Kim, you should have access to
20 that, I think.
21     A.  I'm downloading it now.
22     Q.  Okay. Just let me know when you
23 are ready.
24     A.  I have it.
25     Q.  Okay. Just to help us through

Page 71

1        J. KIM
2  this line of questioning, first, let me just
3  confirm: This is the Declaration you have
4  filed in this bankruptcy case, that is the
5  second LTL bankruptcy case, on or about
6  April 4, 2023, correct?
7     A.  Yes.
8     Q.  All right.
9        MR. JONAS: And if you turn --
10 again, just to help guide us --
11       If you turn to page 8, Deane, if
12 we could just go to page 8.
13     Q.  And, again, just to confirm, new
14 JJCI is now known as Johnson & Johnson HoldCo
15 NA Inc., correct?
16     A.  That is correct.
17     Q.  Okay. And if I refer to that as
18 "HoldCo," you will understand what I'm
19 talking about?
20     A.  Yes.
21     Q.  Okay. When did you first become
22 aware that the consumer business -- that
23 HoldCo's consumer business was going to be
24 spun out of HoldCo?
25     A.  I think I was generally aware that

Page 72

1        J. KIM
2  the consumer business was going to be spun
3  out of all the J&J entities when that was
4  announced years ago -- over a year ago.
5        I never thought -- I was not
6  thinking about HoldCo in particular or
7  Johnson & Johnson Consumer Inc. and when
8  assets were going to be spun out. And I
9  learned of that as we were going through the
10 process in March of this year of preparing
11 for the board meetings explaining the new
12 transaction.
13     Q.  Okay. I'm sorry, I lost the
14 thread there. What did you learn -- hold on.
15       What did you learn in March
16 relating to HoldCo?
17     A.  That HoldCo's assets -- that the J
18 -- the consumer assets of old JJCI had been
19 spun out of J&J Holdings CI.
20     Q.  Okay. And you became -- I take it
21 you became aware that that had occurred in
22 early January of 2023?
23     A.  It was later than that. I think
24 it was at least February or March that I
25 became aware of that.

Case 23-12825-MBK   Doc 857-9   Filed 06/22/23   Entered 06/22/23 15:25:55   Desc
Exhibit 770   Page 9 of 14

In Re: LTL Management LLC
Confidential

John Kim
June 01, 2023

Page 73

1              J. KIM
2    Q.   No, no, I'm sorry.  I appreciate
3  that.
4        But you became aware that it had
5  occurred in early January, right?
6    A.   Yes.
7    Q.   Okay.
8        MR. JONES:  I think the record
9    is still unclear here, notwithstanding
10   efforts by both of you, about the
11   timing of his awareness and of what he
12   was aware.
13       I believe it's you, Mr. Jonas,
14   whether you wish to clear that up.
15 BY MR. JONAS:
16   Q.   Go ahead, Mr. Kim, if you want to
17 take a shot.
18   A.   So in February or March, I became
19 aware that earlier in January -- early
20 January, that assets -- the consumer assets
21 that were formally held by JJCI had been spun
22 out.
23   Q.   Okay.  And the second Funding
24 Agreement, that agreement is between which
25 parties?

Page 74

1              J. KIM
2    A.   HoldCo and LTL.
3    Q.   Okay.  And then the J&J support or
4  guarantee or however you want to refer to it,
5  that's taken up in a separate document which
6  you have referred to as the Support
7  Agreement, correct?
8    A.   Correct.
9    Q.   Okay.  And, I guess, just to make
10 sure we touched on all the documents, there
11 is a third document, which is the Termination
12 and Replacement Agreement, correct?
13   A.   Correct.
14   Q.   Okay.  So when you -- how was it
15 determined that the only counterparty to LTL
16 under the second Funding Agreement would be
17 HoldCo?
18       MR. JONES:  Object to the
19   question to the extent it calls for
20   the sharing of privileged
21   communication or advice.
22   A.   Again, I'm going to refer to the
23 omnibus objection to the motions to dismiss
24 that goes into details or the history of this
25 and the rationale.

Page 75

1              J. KIM
2    Q.   Okay.  I certainly appreciate
3  that.
4        The reason I'm going to ask the
5  question again is because I don't believe
6  that there is an explanation as to why
7  HoldCo, and only HoldCo, which is my
8  question, was included as a counterparty to
9  the second Funding Agreement.
10       So can you tell me now, at this
11 deposition, why only HoldCo was a
12 counterparty to the second Funding Agreement?
13   A.   Well, as explained in the
14 objection, the Third Circuit decision
15 rendered the Funding Agreement 1 void or
16 voidable.  J&J's position was that it was
17 unenforceable.
18       In order to deal with the
19 unenforceability and also to promote, again
20 -- promote a resolution of all the talc
21 claims that -- in a bankruptcy where we had
22 the support of the majority of claimants, it
23 was the position of the parties that the
24 original Funding Agreement had a guarantee by
25 J&J that was wholly voluntary.

Page 76

1              J. KIM
2        And so, that was no longer
3  something that -- voluntarily that needed to
4  be being the second Funding Agreement.  So,
5  therefore, we thought -- the position was
6  that HoldCo itself had sufficient assets so
7  that it would not be rendered insolvent by
8  being the sole obligor to LTL in the second
9  bankruptcy.
10       To effectuate a resolution in
11 bankruptcy, the Support Agreement by J&J was
12 put in to fund an $8.9 billion resolution
13 that had the support, evidenced by the
14 plaintiffs' Support Agreements, of attorneys
15 representing the majority of claimants.
16       So that's why HoldCo is the sole
17 obligor and J&J is -- has a Support Agreement
18 that puts in the $8.9 billion in a
19 bankruptcy.  That is laid out in our
20 objection, and I would refer to the
21 objection, again, to fully flush that out.
22   Q.   The second Funding Agreement was
23 designed specifically so that LTL would be in
24 financial distress immediately prior to
25 filing bankruptcy for the second time,

## Page 105

1        J. KIM
2        MR. JONES: Object as asked and
3    answered and discussed throughout the
4    morning, at his last deposition, and
5    in the PI hearing. That was in his
6    last deposition and in the PI hearing.
7  BY MR. JONAS:
8     A.    And I'd also add, it's also --
9  again, I want to refer to the omnibus
10 objection that we filed that goes into this
11 in detail and lays out the basis. So, you
12 know, I think I testified to this numerous
13 times.
14       And, again, it is in our omnibus
15 objection, both the factual and legal basis
16 for this statement.
17    Q.    And I'm asking you now, Mr. Kim,
18 for all the bases for your statement that the
19 Debtor believes there was a material risk
20 that the '21 Funding Agreement was not
21 enforceable because it had become void or
22 voided.
23       MR. JONES: Same objections --
24       THE WITNESS: Sorry, Jim, go
25    ahead.

## Page 106

1        J. KIM
2        MR. JONES: Same objections to
3    the omnibus objection.
4  BY MR. JONAS:
5     A.    Okay. So I'm going to incorporate
6  the reference, the omnibus objection, and all
7  the bases that are laid out in there. In
8  summary, but not to be -- again, just
9  referring to the objection for the full
10 accounting of this, because of the Third
11 Circuit opinion in LTL 1, the -- at least the
12 -- the Funding Agreement and at least the J&J
13 support part of that, there was a finding
14 that because it was -- the J&J support was
15 voluntarily given when it was not necessary
16 to be given, instead of enhancing the
17 bankruptcy, as we believed that it did, the
18 Third Circuit ruled that that instead
19 thwarted the bankruptcy.
20       We believe that, under several
21 legal theories including frustration of
22 purpose, mutual mistake, and I know there are
23 others, that the -- J&J took a position that
24 the 2021 Funding Agreement was unenforceable.
25       LTL took the position that it

## Page 107

1        J. KIM
2  agreed that the -- that it frustrated the
3  purpose and that the legal theories presented
4  a material risk that the Funding Agreement
5  was no longer enforceable because it'd become
6  void or voidable.
7     Q.    Thank you.
8        MR. JONAS: Can we just go off
9    the record for a second, Rebecca?
10       THE VIDEOGRAPHER: We are now
11   going off the record. The time is
12   12:20.
13       (Whereupon, a recess was held.)
14       THE VIDEOGRAPHER: We are now
15   back on the record. The time is
16   12:23.
17       MR. JONAS: The parties have
18   discussed and agreed that we will take
19   a break now at 12:23, and we will
20   reconvene at 1:00 p.m. Thank you.
21       THE VIDEOGRAPHER: We are now
22   going off the record. The time is
23   12:23.
24       (Whereupon, a lunch recess was
25   held.)

## Page 108

1        J. KIM
2    ***AFTERNOON SESSION***
3        THE VIDEOGRAPHER: We are now
4    back on the record. The time is 1:02.
5  BY MR. JONAS:
6     Q.    Mr. Kim, I want to quickly try and
7  wrap up comments or questions relating to Kim
8  number 2, your Declaration.
9        So let me ask --
10       MR. JONAS: And if, Deane, we
11   could go to paragraph 83 on page 29.
12    Q.    The last sentence, which says,
13 "The Debtor believes that its pre-filing
14 financial condition is sufficiently
15 distressed to satisfy the standard
16 established by the Third Circuit."
17       I just want to make sure I have,
18 Mr. Kim, from you, because I don't think
19 we've asked about this previously, the bases
20 for that belief.
21    A.    Yes. Okay. A, I would, again,
22 refer you and incorporate by reference the
23 objection that -- the omnibus objection to
24 the motion to dismiss that we filed that goes
25 into this at length.

Case 23-12825-MBK Doc 857-9 Filed 06/22/23 Entered 06/22/23 15:25:55 Desc
Exhibit 770 Page 11 of 14

In Re: LTL Management LLC

Confidential

John Kim
June 01, 2023

Page 109

1  J. KIM
2  The summary would be that after
3  the Third Circuit's decision and rendered the
4  2021 Funding Agreement unenforceable, when we
5  entered into the new agreements, the primary
6  obligor under the Funding Agreement was
7  HoldCo.
8  And while HoldCo has sufficient
9  assets so that the LTL is not rendered
10 insolvent by the talc liabilities, in order
11 to deal with the talc liabilities, well, we
12 believe that HoldCo would be financially
13 distressed, and, therefore, LTL would be
14 financially distressed because HoldCo's
15 assets are not as liquid.
16 And that because of the liquidity
17 issues, it would have to sell the assets and
18 substantially impair its business in order to
19 pay, under the Funding Agreement, the
20 obligations related to the talc liabilities.
21 So that, in a nutshell, renders
22 LTL and HoldCo financially distressed.
23     Q.  Okay.  So let me just try and
24 break that down a little bit.
25     Under the second Funding

Page 110

1  J. KIM
2  Agreement, HoldCo would be obligated or
3  liable to LTL outside of bankruptcy, correct?
4     MR. JONES:  Object as
5     inconsistent with the testimony he
6     just gave.
7     A.  I'm sorry, can you repeat that
8  question?
9     Q.  Sure.  Let me try to make it
10 simpler.  It was a confusing question.
11    After signing the second Funding
12 Agreement, had LTL not filed bankruptcy,
13 would HoldCo have obligations to it?
14    A.  Yes, it would.
15    Q.  And what would those -- strike
16 that.
17    Those obligations would be to fund
18 either cost and/or resolution of talc
19 liability, correct?
20    A.  Correct.
21    Q.  Okay.  And so, I think what you
22 said earlier was, LTL was in financial
23 distress if it had -- because if it had
24 remained outside of bankruptcy, HoldCo would
25 not have the liquidity to satisfy its

Page 111

1  J. KIM
2  obligations under the Funding Agreement; is
3  that right?
4     A.  Well, it would have -- so there is
5  sufficient liquidity, you know -- there is
6  sufficient assets to meet the Funding
7  Agreement, but because of -- again, because
8  of the cost of the talc liability, because of
9  the aberrant jury verdicts, because of
10 potential settlements that we'd have to enter
11 into, the -- HoldCo would, at some point,
12 have to, you know, imminently sell assets in
13 order to pay those obligations.  And that
14 rendered both HoldCo and LTL under financial
15 distress.
16    Q.  Okay.  Thank you.
17    And is the answer you just gave --
18 it takes me back to, I think, your homework
19 assignment, but is the answer you just gave
20 based on some analysis or projections that
21 LTL prepared that showed that, you know, in
22 some period of time, you would have burned up
23 the $400 million of HoldCo liquidity?
24    A.  Well, so -- again, I have tried to
25 do my homework assignment.  I did get a slide

Page 112

1  J. KIM
2  from -- that reminded me that, basically, our
3  burn rate was 10 to $20 million a month.
4     Now, in the -- I just -- all
5  right.  I have not been able to talk to Alli
6  Brown, because, of course, she's on trial who
7  did the first motion to dismiss, but there
8  are other factors that go into it.  The, you
9  know, aberrant, the -- not only the monthly
10 spend, but the -- how much it cost to do a
11 particular trial, how many trials we can do.
12 Or now, because of the bankruptcy proceeding,
13 there has been, sort of, pent up -- I think
14 pent up litigation that we would expect to
15 increase.
16    So, based on all that information,
17 we believe that all contributes to the
18 financial distress, and that would be
19 information that we knew at the time.
20    Q.  Okay.  And that's helpful.  Thank
21 you, Mr. Kim.
22    But, again, now -- now, with that
23 background, which is helpful, let me come to
24 my simpler question.
25    Is there a memo or a piece of

Case 23-12825-MBK    Doc 857-9    Filed 06/22/23    Entered 06/22/23 15:25:55    Desc
Exhibit 770    Page 12 of 14

In Re: LTL Management LLC
Confidential

John Kim
June 01, 2023

## Page 113

1     J. KIM
2  paper or something that -- by way of an
3  analysis that shows what you've said, which
4  is that the $400 million of cash that HoldCo
5  had, you know, wouldn't be sufficient such
6  that LTL would be in financial distress?
7      A.   Again, there is no piece of paper,
8  but we all know this history, including the
9  history of the Ingham verdict.  So there is
10  information that everyone knew that was
11  available that people understood, but there
12  was no piece of paper analysis for future
13  liability.
14     Q.   Okay.  So is there any -- let me
15  -- I want to -- and this is important, so let
16  me make sure I understand.
17          Other than the 10 to $20 million a
18  month legal defense costs, at least based on
19  historical numbers, and fear of adverse jury
20  verdicts, was there --
21     MR. JONES:  Somebody needs to go
22  on mute, please.
23     MR. JONAS:  Thank you.
24     Q.   So let me back up.
25     MR. JONAS:  Anybody -- everybody

## Page 114

1     J. KIM
2  on this call should be on mute, unless
3  you are speaking, which is probably
4  nobody but me.  Thank you.
5     Q.   So let me try it again, Mr. Kim.
6          I want to make sure I understand
7  all the factors that go into or went into
8  LTL's belief that its pre-filing financial
9  condition was sufficiently distressed to
10  satisfy the standards established by the
11  Third Circuit, just to give you the -- set
12  the table.
13          Other than fear of adverse jury
14  verdicts and the at least historical monthly
15  cost figure of 10 to -- defense cost of 10 to
16  $20 million a month, were there any other
17  factors that you -- that went -- that go into
18  LTL's conclusion that it was in sufficient
19  distress?
20     A.   Yes, I would say -- so I would not
21  -- first, I would disagree with your
22  characterization of fear of adverse verdicts.
23  We certainly had a history of adverse
24  verdicts, and we've had a history of aberrant
25  adverse verdicts.  So there is historical

## Page 115

1     J. KIM
2  adverse verdicts that we know about.  It's
3  not just fear of some adverse verdict that
4  may come in the future.
5          So, you know, there's the
6  verdicts, there's the defense cost, there's
7  the increase in litigation.  There is
8  potential settlements that we have to enter
9  into because of the increased pressure.
10  There are, you know, other components of the
11  cost that -- you know, expert fees that may
12  come up.
13          There are -- you know, running
14  these litigations just is -- and the --
15  again, the sheer number of cases that were in
16  the system and are growing.
17          The MDL was just about -- so,
18  remember, the MDL has been in, sort of, a
19  stasis for years doing just expert stuff.  At
20  some point, that MDL is going to -- the MDL
21  Judge will have to take the cases and bring
22  them back into the system.  That is a
23  dramatic increase in cost that, historically,
24  have not been accounted for.
25          I think I mentioned, you know,

## Page 116

1     J. KIM
2  potential settlements.  And all of this
3  pressure puts pressure on the company that,
4  you know, for unrelated reasons, that it
5  can't try all these cases, it may be forced
6  to settle cases from time to time.
7          So there are lots of components of
8  this that we understood were out there.
9     Q.   Okay.  And, again, thank you for
10  the complete answer.
11          But -- and let me just confirm,
12  other than everything you've just mentioned,
13  there is no other factors that led to LTL's
14  belief or conclusion that it was in financial
15  distress after signing Funding Agreement 2,
16  right?
17     A.   I don't know if I've listed every
18  factor that goes into the cost of the
19  litigation or the liability associated with
20  litigation.  But those are the main costs and
21  they were substantial.
22     Q.   Okay.  And, again, no -- neither
23  the company nor any of its professionals,
24  financial advisors, lawyers, no one prepared
25  a formal memo, report, or analysis in the

Page 201

1       J. KIM
2  bankruptcy.  And that's for future --"
3       And then Judge Fuentes, "I assume
4  that would protect people who were exposed
5  years down the road.  They would not be
6  subject to bankruptcy, of course.  But they
7  would be protected."
8       Did I read that correctly?
9    A.  You've read that correctly.
10   Q.  Do you recall Judge Fuentes asking
11 Mr. Lamken those questions?
12   A.  I don't recall those questions.
13   Q.  Okay.  Do you believe -- is a fair
14 interpretation of this client questioning
15 that the way to protect future claimants is
16 to permit them to litigate in the tort
17 system, true?
18   A.  I'm not sure what the Court is
19 suggesting.  If that's what he is saying, I
20 disagree with that.
21   Q.  What steps did you take as the
22 Chief Legal Officer of LTL Management to
23 protect the assets available to future talc
24 claimants?
25   A.  I would say the plan, it protects

Page 202

1       J. KIM
2  future talc claimants.
3    Q.  In what way?
4    A.  The plan provides for future talc
5  claimants.  I think payments go out to
6  25 years.  They are accounted for in the
7  plan.  I think it's a much better protection
8  for plaintiffs in the future than the tort
9  system.
10   Q.  Does LTL Management believe that
11 it will not have -- in the tort system, will
12 not have sufficient funding to litigate and
13 settle talc cases for the next 25 years?
14      MR. JONES:  Object to form.
15 Foundation.
16   A.  I believe LTL and HoldCo have
17 sufficient assets to take care of the talc
18 liability.
19   Q.  In the tort system?
20   A.  Outside of bankruptcy.  But,
21 again, I think there is liquidity issues that
22 are present, but the -- we believe that there
23 is sufficient assets to resolve the talc
24 liabilities so that LTL and HoldCo are not
25 insolvent.

Page 203

1       J. KIM
2      MR. JONES:  Are not insolvent or
3  nonsolvent?
4      THE WITNESS:  Are not insolvent,
5  yeah, I'm sorry.
6      Am I dropping out?  Let me get
7  closer here.
8  BY MR. THOMPSON:
9    A.  Yeah, that LTL and HoldCo are not
10 insolvent.
11     MR. JONES:  Clay, are you there?
12     THE WITNESS:  I think he is
13 frozen.
14     MR. JONES:  Can I be heard, by
15 the way?
16     THE WITNESS:  You can.  Well, at
17 least I can hear you.
18     MR. JONES:  I think Mr. Thompson
19 may be frozen.
20     THE VIDEOGRAPHER:  It looks like
21 he just dropped off as well.
22     MR. JONES:  Let's give him one
23 moment to come back.
24     THE COURT REPORTER:  Counsel, do
25 you still want to stay on the record?

Page 204

1       J. KIM
2      MR. JONES:  Any sign of him?
3      THE COURT REPORTER:  No.
4      MR. JONES:  So, John, do you
5  want to proceed and we'll -- if he
6  comes back, we'll let him finish?
7  I'll leave it to you.
8      MR. RUCKDESCHEL:  Let me just
9  text him real quick and make sure it's
10 not something.
11     The real question is -- can we
12 go off the record for a second?
13     THE VIDEOGRAPHER:  We are now
14 going off the record.  The time is
15 3:17.
16     (Whereupon, a recess was held.)
17     THE VIDEOGRAPHER:  We are now
18 back on the record.  The time is 3:19.
19 EXAMINATION BY
20 MR. RUCKDESCHEL:
21   Q.  Mr. Kim, I'm John Ruckdeschel.  I
22 represent Paul Crouch in this matter.  I have
23 a few questions for you that I think we can
24 move through pretty quickly.
25     In response to one of

Case 23-12825-MBK   Doc 857-9   Filed 06/22/23   Entered 06/22/23 15:25:55   Desc
Exhibit 770   Page 14 of 14

In Re: LTL Management LLC
Confidential

John Kim
June 01, 2023

Page 217

1        J. KIM
2   first Funding Agreement?
3        A.   At the time with its -- under the
4   facts that we knew then, yes.
5        Q.   That the amount of funding
6   available to talc claimants was at least
7   $61 billion; is that right?
8        A.   Well, I think he is just talking
9   about what the backstop is.  I'm talking
10  about the ceiling, you know, the potential
11  cap.  And he is saying that the cap increases
12  depending upon distributions at JJCI.  That's
13  all that says.
14       Q.   And he is also saying that if
15  there is an increase in value of new JJCI or
16  of spun off assets from JJCI, that inures to
17  the benefit of the talc claimants, right?
18            MR. JONES:  Object to form.
19       A.   Well -- yeah, it talks about the
20  cap.  It doesn't ensure -- the liability is
21  always what the liability is, which is what
22  the -- the talc liability.
23            We all think the talc liability
24  approaches $61 million.  But, again, I think,
25  as I've testified, we don't think it

Page 218

1        J. KIM
2   approaches $30 billion.
3            But this is the cap in the Funding
4   Agreement and the cap increases, as stated
5   here.
6        Q.   Under both the first and second
7   Funding Agreement, LTL Management can
8   litigate in the tort system and resolve or
9   try, count cases for less than $60 billion
10  over the next 30 years, right?
11            MR. JONES:  Object to the form
12       of the question.  And a hypothetical.
13       A.   Yeah, again, there is huge
14  variability and volatility.  But we believe
15  that the $30 billion is sufficient to deal
16  with the talc liability.
17       Q.   And that would include outside of
18  the tort system, right?  That's enough money
19  to litigate and settle cases in the tort
20  system, right?
21       A.   That would be outside of
22  bankruptcy, yes.
23       Q.   Okay.  "Our position," -- this is
24  Mr. Katyal again -- "and Judge Kaplan found
25  this, too, is that we believe that $61

Page 219

1        J. KIM
2   billion, which is of course only a floor, it
3   could go up, is enough to pay a
4   hundred percent of all valid claims.  And
5   what I say valid claims, it excludes two
6   things.  It excludes the deadweight losses of
7   billions and billions of dollars paid to
8   lawyers for defending against this."
9            Did I read that correctly?
10       A.   You did.  And I would change that
11  to that $30 billion is enough to pay
12  100 percent of all valid claims.  Again, this
13  is just a cap that was part of that -- of
14  that feature of that Funding Agreement.  But
15  it's different than the value of the Funding
16  Agreement.
17       Q.   Okay.  LTL Management 2.0 under
18  the 2023 Funding Agreement has capacity to
19  pay the talc liabilities whatever they are
20  inside or outside of bankruptcy, right?
21       A.   Well, after the -- inside the
22  bankruptcy, we knew what the liability is.
23  Inside the bankruptcy, the liability is
24  $9.8 billion.
25       Q.   But they have sufficient funding

Page 220

1        J. KIM
2   to pay the liability outside of bankruptcy
3   too, don't they?
4        A.   They do.  They have sufficient
5   assets.  Again, there are liquidity issues,
6   but they have sufficient assets.
7        Q.   Understood.
8            "Now you had asked before, Your
9   Honor, I just have to slightly correct
10  something.  I understand that the funding
11  agreement does have provisions for funding
12  outside of bankruptcy."
13           And then, I believe that's Judge
14  Ambros, said, "Yeah, that's what I thought."
15           Did I read that correctly?
16       A.   You did read that correctly.
17       Q.   And Mr. Katyal was correct when he
18  said this, right?
19       A.   Under the circumstances there --
20  there are circumstances where, outside of
21  bankruptcy, the Funding Agreement is
22  available.
23       Q.   Do you recall when Mr. -- when
24  Judge Ambro asked Mr. --
25            MR. JONES:  I'm sorry, Clay.  I