## In the Matter Of:

*In Re - LTL Management LLC*

*JAMES ONDER*

*June 08, 2023*



## Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
------------------------------------------X
In Re:

LTL MANAGEMENT, LLC,
                        Debtor.

Case No. 23-12825 (MBK)
------------------------------------------X

   VIDEOTAPED DEPOSITION OF JAMES ONDER


DATE:  June 8, 2023
TIME:  10:04 a.m.
PLACE:  ***REMOTE***
BEFORE:  Rebecca Schaumloffel, RPR, CCR-NJ
JOB NO:  2023-899743

## Page 2

A P P E A R A N C E S:

ASHCRAFT & GEREL, LLP
    Attorneys for Rebecca Love
    1825 K Street NW,
    Suite 700
    Washington, DC 20006
    BY:  MICHELLE PARFITT, ESQ.


BARNES & THORNBERG
    Attorneys for J&J
    2029 Century Park East
    Suite 300
    Los Angeles, CA 90067
    BY:  KENDRA LOUNSBERRY, ESQ.


BEASLEY ALLEN LAW FIRM
    Attorneys for Alishia Landrom,
    et al.
    218 Commerce Street
    Montgomery, Alabama 36104
    BY:  LEIGH O'DELL, ESQ.
         ANDY BIRCHFIELD, ESQ.


BROWN RUDNICK
    Attorneys for the Talc Claimants
    7 Times Square
    New York, New York 10036
    BY:  CAMERON MOXLEY, ESQ.
         SUSAN SIEGER-GRIMM, ESQ.
         JENNIFER SCHEIN, ESQ.
         DAVID WEINSTEIN, ESQ.
         GERARD CICERO, ESQ.

## Page 3

Appearances (continued:)


COLE SCHOTZ
    1325 Avenue of the Americas
    19th Floor
    New York, NY 10019
    BY:  SETH VAN AALTEN, ESQ.


GENOVA BURNS, LLC
    494 Broad Street
    Newark, New Jersey 07102
    BY:  DANIEL M. STOLZ, ESQ.



GOLOMB SPIRT GRUNFELD, PC
    1835 Market Street
    Suite 2900
    Philadelphia, PA 19103
    BY:  RICHARD GOLOMB, ESQ.



JONES DAY
    Attorneys for the Debtor
    250 Vesey Street
    Suite 31
    New York, New York 10281
    BY:  MARK RASMUSSEN, ESQ.
         TIM VILLARI, ESQ.

## Page 4

Appearances (continued:)

LAW OFFICES OF MITCHELL MALZBERG
    Attorneys for April Fare
    6 E. Main Street, Suite 7
    Clinton, New Jersey 08809
    BY:  MITCHELL MALZBERG, ESQ.



LAW OFFICES OF BRIAN W. HOFMEISTER, ESQ.
    Attorney for the witness
    3131 Princeton Pike
    Building 5, Suite 110
    Lawrenceville, New Jersey 08648
    BY:  BRIAN W. HOFMEISTER, ESQ.



LEVY KONIGSBERG
    605 3rd Avenue
    33rd floor
    New York, New York 10158
    BY:  JEROME BLOCK, ESQ.



MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
    Attorneys for Katherine Tolleson,
    et al.
    777 S Harbour Island Blvd.
    Suite 310
    Tampa, Florida 33602
    BY:  CLAY THOMPSON, ESQ.
         MARCUS RAICHLE, ESQ.

Page 109

1                J. ONDER
2        So, basically, you know, it really
3    depends on how they are getting cases. This
4    looks like the cancer criteria. If you are
5    going to go buy a case from one of the major
6    companies out there, Broughton Partners,
7    Reliance, whoever.
8        This is the more strict criteria
9    to avoid them paying for a case, a lower
10   valued case.
11           MR. MOXLEY: Let's take that
12       down and let's bring up the "Cases to
13       be declined."
14       Q.  So, Mr. Onder, again, we're still
15   on the same Exhibit 5. This is the criteria,
16   again, "Cases to be declined" section of that
17   document.
18       Do you see that?
19       A.  Right.
20       Q.  Okay. And so if there is no
21   diagnosis of the cancer, that's a declined
22   case, correct?
23       A.  Correct.
24       Q.  Okay. The second one there, use
25   of other talc or powder-based products and

Page 110

1                J. ONDER
2    not J&J baby powder or Shower to Shower.
3        Do you see that?
4        A.  Yes.
5        Q.  Okay. And is that based on --
6    it's, basically, the word of the individual
7    claimant, correct?
8        A.  Correct.
9        Q.  Okay. For the different types of
10   cancer, you go midway through the chart
11   there, you see the diagnosis there of
12   different types of cancer?
13       A.  Yes.
14       Q.  Okay. Why are -- why is cervical
15   cancer among the cases to be declined?
16       A.  Okay. Again, this has -- this is
17   a business decision for the economic benefit
18   of my referring attorneys. If you are going
19   out to, for example, a Broughton Partners and
20   they are doing the advertising and marketing
21   for you and they are charging, you know, $100
22   a case -- or, well, let's use a more
23   realistic number.
24           $5,000 a case, a signed contract.
25   I want my client -- I want the people who are

Page 111

1                J. ONDER
2    referring to me to get the most bang for
3    their buck and make sure that their purchase
4    is cost effective. So that, ultimately,
5    their return on investment will work for
6    them.
7        I don't want them paying that
8    $5,000 on the lesser valued cases; such as
9    cervical, uterine, et cetera.
10       So, again -- so what I do is this
11   is strict criteria that they can handle one
12   of those companies and say, I will not pay X
13   number of dollars per case on these lesser
14   valued cancers, okay.
15       By contrast, if they are running
16   their own ad campaign and it's not costing
17   them any additional advertiser or any
18   additional dollars to sign the extra cases,
19   such as uterine, I would urge them to sign
20   them, realizing that they are lower valued
21   cases and they're not as supported by -- you
22   know, their -- association is not as strong
23   in the medical literature.
24       So I would encourage those to be
25   signed, just as I've always signed them. So

Page 112

1                J. ONDER
2    that they -- so it really depends on what
3    kind of campaign they are running.
4        Right now, if someone comes and
5    says, I'm running a campaign -- you know,
6    there is always -- I have to protect my
7    referring attorneys from not being taken
8    advantage of -- by their advertisers is the
9    bottom line. And that's what this criteria
10   reflects.
11       Q.  This criteria reflects and your
12   last answer reflects that these -- that the
13   cancers that are listed on this "Cases to be
14   declined" chart at Exhibit 5, these are, in
15   your estimation, lower value talc claims,
16   correct?
17       A.  Correct.
18       Q.  Why is that?
19       A.  They have -- they are not as
20   strongly supported by the medical literature.
21       So for example, uterine cancer,
22   you know, there are some studies -- and
23   studies go both ways. One or two or three
24   can't, you know, epidemiologic studies, you
25   know, provide proof of the association.

|  |  |
|---|---|
| Page 157 | Page 159 |

### Page 157

1  J. ONDER
2  out what we face.
3  So my goal has always been the
4  same: Resolution. Right when the case was
5  dismissed and, you know, our -- as the Third
6  Circuit came down, you know, that was, you
7  know, the best path towards resolution.
8  At this point, when we were
9  approached by J&J with this deal, I think
10 it's the best path towards resolution. The
11 other avenue of the path to resolution is to
12 bring everybody on board and have everybody
13 sit down and solve it and solve the problem
14 together, so we are all happy and we all get
15 our needs met. And that's what I support.
16      MR. MOXLEY: Let's take this
17   down, Deane, if we could, please. And
18   let's bring up tab 10 and mark that as
19   Exhibit 8.
20      (Whereupon, Onder Exhibit 8,
21   Chapter 11 Plan of Reorganization of
22   LTL Management LLC was marked for
23   identification as of this date by the
24   Reporter.)
25 BY MR. MOXLEY:

### Page 158

1        J. ONDER
2  Q.  So, Mr. Onder, I've put on the
3  screen what's been marked as Exhibit 8.
4        And you see, sir, that this is the
5  plan that has now been filed by the Debtor,
6  correct?
7  A.  Yes.
8  Q.  And you've reviewed the plan?
9  A.  Yes.
10 Q.  Is it fair to say, Mr. Onder, that
11 you were somewhat discouraged by the plan?
12      MR. HOFMEISTER: Objection to
13   the form of the question.
14 A.  I don't know what you mean. I --
15 we knew through the PSA that this was a path
16 towards resolution. When they filed the
17 plan, the plan was not consistent in some
18 ways with the PSA. I can go through a lot of
19 speculation that I've gone through with the
20 mediators and so forth about why I think it
21 was filed the way it was filed and so forth.
22 But I think the issues of that plan can be
23 resolved if we all work together.
24 Q.  You were disappointed in the plan,
25 were you not?

### Page 159

1         J. ONDER
2      MR. HOFMEISTER: Objection to
3   the form of the question.
4  A.  I don't know if "disappointment"
5  is the word. It wasn't consistent but, by
6  the same token, I understand potential
7  litigation strategies of why things may be
8  done the way they are done, you know, for
9  negotiation purposes.
10      And therefore, I understand -- was
11 I happy with the fact that it did not
12 identically follow the PSA, it incorporated a
13 lot of -- incorporated a lot of the things
14 that we may have discussed and agreed on.
15 Yeah, I would have liked to see that. But
16 the same token, I understood with the plan,
17 why it was done the way it was done, and I
18 suspect that was part of a negotiating
19 strategy.
20      And I can't blame J&J for engaging
21 in a negotiating strategy that they believe
22 will be -- you know, lead to the -- what --
23 everybody, ultimately, getting on board and
24 resolving things.
25      MR. MOXLEY: Let's mark, Deane

### Page 160

1         J. ONDER
2   -- let's bring up tab 11 and let's
3   mark that as our next exhibit, Exhibit
4   9.
5      (Whereupon, Onder Exhibit 9,
6   OnderLaw Referral Network Updates May
7   2023 was marked for identification as
8   of this date by the Reporter.)
9  BY MR. MOXLEY:
10 Q.  Okay. Mr. Onder, you have on the
11 screen what's been marked as Exhibit 9. You
12 see this is a May 19, 2023, e-mail from you.
13      Do you see that, sir?
14 A.  Sure. Yes.
15 Q.  And this is -- there is a logo
16 heading there, "REFERRAL NETWORK UPDATES May
17 2023."
18      Do you see that?
19 A.  Yes.
20 Q.  Okay. So what is your
21 understanding as to who this e-mail would
22 have gone to or who this e-mail --
23 A.  Presumably, our referring
24 attorneys.
25 Q.  Okay.

Page 161

1         J. ONDER
2     MR. MOXLEY: And so, if we can
3   just zoom in on the paragraph there
4   that begins, "Most recently."
5     That's great. That's even
6   better, what you had before. Thanks,
7   Deane. All right, great.
8   BY MR. MOXLEY:
9   Q. You see the paragraph, Mr. Onder,
10  that says, "Most recently"?
11  A. Yeah.
12  Q. Okay. You wrote in this e-mail,
13  "Most recently, we were somewhat discouraged
14  by the $8.9 billion bankruptcy plan LTL
15  submitted to the court. Without getting into
16  details that would compromise negotiations,
17  it fell short of the terms we'd agreed upon."
18      Do you see that, sir?
19  A. Correct. I was starting to get
20  calls -- yeah. The answer is yes, I'm sorry.
21  Q. How did it fall short of the terms
22  you thought you'd agreed upon?
23  A. Like I said, it deviated from the
24  PSA terms, like I just said. But the next
25  line goes on to say, this was -- "This was a

Page 162

1         J. ONDER
2   strategic move on J&J's part and," although
3   "disappointing, not entirely unforeseeable."
4       Again, it's all part of
5   negotiations. You know, we were starting to
6   get calls from clients saying, hey, Jim, what
7   about all this terms and what about this,
8   what about that, what about the other things,
9   and we thought it was important to let our
10  referring attorneys know, our co-counsel
11  know, hey, yeah, you know, we weren't happy
12  with this or that or the other term, too.
13      But it wasn't -- it was not
14  entirely unforeseeable, as I said, and I
15  suspect it goes on to talk about how we are
16  negotiating, we think it's all going to be
17  wrapped up and resolved.
18  Q. Have you calculated, sir --
19      MR. MOXLEY: We can take this
20  down now, Deane, thank you.
21  Q. Excuse me, Mr. Onder.
22      Have you calculated what any of
23  your clients would be entitled to under the
24  plan that's been filed?
25  A. The plan that's filed, no, I have

Page 163

1         J. ONDER
2   not.
3   Q. Okay.
4   A. I didn't do the chart. I did not
5   look -- I did not check that chart. Unless
6   it was the same one as in the PSA.
7   Q. Do you intend to recommend the
8   plan that's been filed to all of your
9   clients?
10      MR. MONTEFUSCO: Object to form.
11  A. I don't think the plan that's been
12  filed is what's going to be submitted to the
13  client. So I think that's, kind of, a -- you
14  know, a moot point or an irrelevant point.
15  Q. Well, setting the relevance and
16  your view about that aside, do you -- my
17  question is -- is a simple one, actually.
18      Do you intend, as you sit here
19  today, to recommend the plan that is on file
20  to your clients?
21      MR. MONTEFUSCO: Object to form.
22  A. I guess the answer is, I know that
23  that's -- I'm not going to be making any
24  recommendation to that plan because I already
25  know multiple aspects of that plan that are

Page 164

1         J. ONDER
2   going to be revised based upon the
3   negotiations that have occurred so far. So
4   that plan is never going to be voted so
5   why -- because that plan is never going to be
6   voted on, will I ever recommend it to them?
7   No, because that's not the plan that's going
8   to be voted on.
9       So that answers your question, I
10  guess.
11  Q. We talked a little bit before --
12  A. Go ahead. I apologize.
13  Q. Okay. Did you have a further
14  clarification or comment?
15  A. No, I'm good.
16  Q. Okay. We talked a little before
17  about the Ad Hoc Committee of Supporting
18  Counsel.
19      MR. MOXLEY: Let me mark as our
20  next exhibit, Exhibit 10, what is tab
21  12.
22      (Whereupon, Onder Exhibit 10,
23  "Verified Statement of Paul Hastings
24  and the other firms "pursuant to
25  Bankruptcy Rule 2019 was marked for

Page 165

1 J. ONDER
2 identification as of this date by the
3 Reporter.)
4 MR. MOXLEY: If you could bring
5 that up, Deane. Tab 12.
6 And, Deane, could you scroll to
7 the second page of this document?
8 Okay.
9 BY MR. MOXLEY:
10 Q. You see, Mr. Onder, this is
11 entitled "VERIFIED STATEMENT OF PAUL
12 HASTINGS" and the other firms "PURSUANT TO
13 BANKRUPTCY RULE 2019."
14 Do you see that?
15 **A. Okay, sure.**
16 Q. Are you familiar with this
17 Verified Statement?
18 **A. No.**
19 Q. Okay.
20 **A. I mean, I know I submitted a list**
21 **of clients under Rule 2019. I don't think**
22 **I've ever seen or reviewed this.**
23 Q. Okay.
24 MR. MOXLEY: Let's turn to page
25 6, if we could, of the document. And

Page 166

1 J. ONDER
2 if we can zoom in on paragraphs 25 and
3 26.
4 Q. You see a reference to your law
5 firm there, sir?
6 **A. Yes.**
7 Q. Okay. And it says that attached
8 is "Exhibit I-1 is a list of the full names,
9 dates of birth, last four digits of their
10 social security numbers, dates of death, if
11 applicable, and information about the
12 diseases from which each Client suffers, for
13 each Client represented by OnderLaw, LLC as
14 of the date of this Verified Statement,
15 together with the nature of the claim, each
16 of which is unliquidated, held by each Client
17 in relation to the Debtor."
18 Do you see that?
19 **A. Yes.**
20 Q. Then paragraph 26, the statement
21 reads, "The information set forth in Exhibit
22 I-1 is based on information provided to
23 OnderLaw, LLC by the OnderLaw, LLC Clients
24 and is intended to comply with Bankruptcy
25 Rule 2019 and not for any other purpose."

Page 167

1 J. ONDER
2 Do you see that?
3 **A. Yes.**
4 Q. How was that information -- and
5 you may have just started to touch on the
6 answer a couple of questions ago -- but how
7 was that information compiled for the purpose
8 of building Exhibit I-1?
9 **A. We were given a spreadsheet of**
10 **information that was needed to comply with**
11 **2019. I turned it over to my attorney in**
12 **charge. You know, obviously, they were all**
13 **fields that we already had in our computer**
14 **system and we populated an Excel spreadsheet**
15 **with the items requested.**
16 Q. So describe for me the computer
17 system that you referenced in your last
18 answer, Mr. Onder.
19 What is that database or computer
20 system comprised of; how does it work?
21 **A. It's the SmartAdvocate system.**
22 **It's the CRM system.**
23 Q. Okay. How is information input
24 into the SmartAdvocate system?
25 **A. It's probably above my pay grade.**

Page 168

1 J. ONDER
2 **I can honestly say that I have never been on**
3 **SmartAdvocate ever myself, which is pretty**
4 **unbelievable. But, you know, as I understand**
5 **it, it's -- information goes -- starts going**
6 **in at the time of the initial client call,**
7 **and then, you know, kind of, proceeds through**
8 **the process and we update various fields as**
9 **we obtain additional information.**
10 **And then, ultimately, I suspect,**
11 **in response to this, I know there is a**
12 **feature within it that we can pull, you know,**
13 **various fields onto an Excel spreadsheet.**
14 **And in my understanding, that's what we did.**
15 Q. Okay. And so, it's part of the
16 ongoing intake process that a person relying
17 on intake questionnaires, interviews,
18 diligence done with respect to the client,
19 puts information into SmartAdvocate and from
20 that, you know, sort of, the clients -- the
21 information about the client and the nature
22 of the claim, et cetera.
23 Is that a fair way of thinking
24 about it?
25 **A. Yes, that's correct.**

Page 181

1 J. ONDER
2 good about asking that question.
3 If the answer comes back, yes, I
4 have talked to another attorney and they told
5 me they would not take my claim, what happens
6 next under Onder's processes?
7 A. Yeah, did they tell you why, what
8 kind of cancer do you have, do you have the
9 pathology report is the key thing we would
10 like to see.
11 And, you know, like I said, one of
12 the major players in this litigation was
13 rejecting good cases left and right. And
14 because they were friends of us, we called
15 them up and pointed it out to them that they
16 really ought to have a doctor review those
17 things as opposed to the paralegals because
18 the paralegals were rejecting a lot of good
19 cases. And they started using our doctor.
20 So, again, I don't -- I never --
21 some of my best cases in the history of my
22 firm are cases that I got were rejected by
23 other firms who just didn't know what they
24 were doing.
25 So, you know, we try to find out

Page 182

1 J. ONDER
2 the basis of it and, hopefully, if they have
3 the pathology report, we ask for that so that
4 we can have our MD's review it.
5 Q. Okay.
6 MR. MOXLEY: Deane, let's take
7 this down.
8 Q. Mr. Onder, I'm going to -- some of
9 my questions, I may refer to that 21,000
10 figure. If you need to see that again for
11 any reason, just let me know, but that's the
12 figure I'm talking about. Okay?
13 A. Sure. Sure.
14 Q. Okay. How many of OnderLaw's
15 21,411 clients that were listed in that
16 exhibit are ovarian cancer clients?
17 A. The exact number, obviously, I
18 don't know for sure because that's -- you
19 know, like I said, it varies from day-to-day.
20 Opens, closed, rejects, et cetera.
21 I know right now we have somewhere
22 between 8,500 and 9,000 with ovarian cancer
23 of confirmed and documented histologic
24 sub-types that, you recall, would vary.
25 There would be the so-to-speak "good cases."

Page 183

1 J. ONDER
2 In the primary chart, we probably
3 have -- at any given time, we will have
4 several thousand cases where we are waiting
5 on medical records and medical records are
6 unavailable and things of that nature.
7 And then the others would be other
8 gynecologic cancers that we are -- we have
9 been hoping the medical literature would
10 advance. You can all move, quote, inventory
11 cases.
12 Early in the litigation we sat
13 down with leadership firms and we all -- all
14 of the early firms evolved, said, okay, what
15 cases do we want to push to trial? What
16 cases do we think should we reject and which
17 cases should we inventory?
18 And my -- my definitions, I think,
19 are completely consistent with the MDL
20 leadership because we all agreed on them.
21 Q. How many of the 21,411 claims
22 identified in that last exhibit are
23 mesothelioma claims?
24 A. Put it this way: It's on the
25 chart, the exact number, because I think we

Page 184

1 J. ONDER
2 identified them as mesos, but it's around a
3 dozen, if I'm not mistaken.
4 Q. Around 12?
5 A. That sounds about right.
6 Q. Okay. What other diagnoses have
7 claimants received among those 21,411 claims?
8 A. Mainly uterine.
9 Q. Do you recall any -- so we've
10 talked about ovarian cancer claims, that's
11 approximately 8,500 to 9,000. 12,
12 approximately, meso claims. And there is
13 uterine claims.
14 What other claims do you recall
15 being among your pool of clients?
16 A. Put it this way: Mucinous, okay,
17 mucinous borderline. That's one that, you
18 know, I think there is a little bit of
19 disagreement about the strength of those
20 cases. I know, you know, some people like
21 Mark Robinson think they are very, very
22 strong cases.
23 I think they are pretty good
24 cases. Some say, eh, they're not as good.
25 So that's one that, kind of, falls in that --

Page 185

```
 1                J. ONDER
 2   in between Category. One of the ones that I
 3   think are good, I think the medical
 4   literature will ultimately advance. And,
 5   therefore, I have been accepting from day one
 6   is uterine. Like I said, I've filed about
 7   two to 3,000 of those, spent over a million
 8   dollars doing that.
 9         Most, you know -- so I have three
10   categories. That one that everybody admits
11   was the best of the best cases. I have a
12   couple thousand, probably, that I'm trying to
13   get medical records on and so forth. And the
14   rest, I would say 99 percent of the rest are
15   uterine.
16         Back when other cases -- back when
17   some firms didn't want to accept uterine, I
18   was willing to accept them and as a result, I
19   think I became, you know -- people from all
20   over the country were referring me uterine
21   cancers.
22      Q.  Okay. So I'm just trying to do
23   some rough math then, if I could, Mr. Onder,
24   with you?
25      A.  Yes.
```

Page 186

```
 1                J. ONDER
 2      Q.  Let's say you're -- let's just
 3   say, for rounding figures, that you have
 4   9,000 ovarian cancer claims.
 5      A.  Okay.
 6      Q.  And let's say you had -- you said
 7   you had two to 3,000 filed uterine claims,
 8   correct?
 9      A.  Those are the filed ones, right.
10      Q.  Oh, yes. So that gets us -- if
11   you do nine plus 3,000, that gets to 12,000,
12   right? So the figure there was 21,411.
13         So is it fair to say that the
14   difference between approximately 12,000 and
15   the 21,000 figure that was identified in the
16   filing, that the remainder of those are 99
17   percent unfiled uterine claims; is that
18   right?
19      A.  99 percent uterine, right,
20   probably.
21      Q.  Okay.
22      A.  If I understood where you were
23   going with that, I mean, I would probably
24   have 9,000 uterine cancer cases. I have
25   9,000 of the other cases of cancer. And I
```

Page 187

```
 1                J. ONDER
 2   have a couple thousand that are still being
 3   reviewed.
 4      Q.  Okay. Tell me -- I'm sorry, just
 5   tell me your breakdown from that. That was
 6   very helpful.
 7         So what is your breakdown? I'm
 8   just trying to understand the facts, sir.
 9         What's your breakdown?
10      A.  I would estimate about 9,000 that
11   are identified as the high value cases that
12   we wanted to push to trial as ovarian cancer
13   leadership.
14         There is probably about 9,000 that
15   are uterine or have supported medical
16   literature, but were ones that we didn't want
17   to push Daubert yet. And there are probably
18   about 3,000 that are under review, waiting
19   for medical reviews, things of that nature.
20      Q.  Okay. Of the 9,000 uterine, you
21   think about two to 3,000 of those have been
22   filed; is that right?
23      A.  At least, yes.
24      Q.  At least, okay.
25         And the 3,000 that are under
```

Page 188

```
 1                J. ONDER
 2   review, those, obviously, haven't been filed
 3   because they being reviewed, correct?
 4      A.  Correct.
 5      Q.  Okay. Does OnderLaw have
 6   engagement agreements with all 21,411 clients
 7   that were identified on that?
 8      A.  We sure should.
 9      Q.  Okay. Is it your expectation that
10   you do?
11      A.  Yes.
12      Q.  Okay.
13      A.  I think they shouldn't be in our
14   system if we don't have a contract with them.
15      Q.  Okay. How many talc clients,
16   approximately, did OnderLaw have at the time
17   that LTL 1 was filed in 2021?
18      A.  Put it this way: I don't remember
19   timeframes. I know at one time we had at
20   least 25,000, 26,000, 27,000 signed.
21         So, again, it's been worked
22   through and reached --
23         THE COURT REPORTER: I'm sorry,
24   the audio is cutting out.
25         THE WITNESS: Oh, I apologize.
```

Page 189

J. ONDER

2  A. I don't know exactly at any given
3  point in time. I know at one time our
4  account was up as high as 26 or 27,000.
5      So if I ever cited anything, it
6  would be anywhere, probably, between 27,000
7  and somewhere, you know, where we are now.
8  Somewhere between 18 and 27 at any given
9  time.
10  Q. Okay.
11      MR. MOXLEY: Let's go off the
12  record for one second, if we could,
13  Rebecca.
14      THE VIDEOGRAPHER: The time
15  1:16 p.m. We are now off the record.
16      (Whereupon, a lunch recess was
17  held.)

Page 190

J. ONDER
2      ***AFTERNOON SESSION***
3      THE VIDEOGRAPHER: The time is
4  1:47 p.m. We are now back on the
5  record.
6  BY MR. MOXLEY:
7  Q. Good afternoon, Mr. Onder.
8  A. Good afternoon.
9  Q. Okay. You can still hear me okay,
10  sir?
11  A. Yes.
12  Q. Okay, terrific.
13      Mr. Onder, before we broke for
14  30 minutes there for a short break, we were
15  talking about the 21,411 claims that were
16  identified on the Ad Hoc Group of Supporting
17  Counsel's Verified Statement.
18      Do you recall that figure?
19  A. Yes.
20  Q. Okay. And then before -- we were
21  talking about that you had given us an
22  estimated breakdown of the types of claims
23  that those 21,411 folks that you represent
24  have.
25      Do you recall that?

Page 191

J. ONDER
2  A. Yes.
3  Q. Okay. I think you had estimated
4  that approximately 9,000 of those were made
5  of ovarian cancer claims, correct?
6  A. Right.
7  Q. And are -- whatever that number
8  is, approximately 9,000, to your knowledge,
9  are all of those filed claims?
10  A. No, they are not.
11  Q. Okay. Do you have an
12  understanding or a rough estimate of how many
13  are filed and how many are not of that 9,000
14  ovarian cancer group?
15  A. Oh, I'm sorry. You were asking
16  ovarian.
17      No, I don't know how many are
18  filed in either group, honestly.
19  Q. Oh, you don't. Okay.
20      So you don't know of the 21,411
21  claims, you are not sure what number are
22  actually filed; is that right?
23  A. Yeah, correct.
24  Q. Okay. For those that are unfiled
25  that are part of that pool, has OnderLaw made

Page 192

J. ONDER
2  the determination about whether they will
3  definitively file those claims?
4  A. Put it this way: The unfiled ones
5  were in tune to be filed based on the statute
6  of limitations. You know, as we are going
7  forward, obviously, it's expensive to file,
8  you know, 20,000 claims.
9      And so we tend to file, you know,
10  three, six months, whatever it is, before the
11  upcoming statute of limitations. And,
12  obviously, when bankruptcy hit, there was,
13  you know, no longer a reason to file or worry
14  about filing.
15      Now, if the bankruptcy would get
16  dismissed, obviously, I would have 30 days to
17  file all of this.
18  Q. Right. And in speaking of -- in
19  speaking of the cases being in queue to be
20  filed, let me just try to clarify.
21      That would not be the case, I take
22  it, you will tell me if I'm wrong, with
23  respect to the 3,000 that you said were still
24  under review; is that right?
25  A. Well, yes, but if we were

Page 209

1           J. ONDER
2       A.  I can tell you as to Imerys, we
3   did cite in-place procedures, yes. I would
4   assume we would do the same here. It depends
5   how the voting structure turns out. We will
6   either do the same here or -- I think the
7   favored method, as I understood it -- as I
8   understand it, is to -- that there has been
9   some talk of a way that we can ask each
10  individual to vote electronically. That
11  might assist in more accurately allowing the
12  clients to express their particular
13  viewpoint.
14      Q.  Let me just ask you, I don't know,
15  obviously, what your processes were in the
16  Imerys case or what your processes have been
17  in other cases.
18          So as a general matter, in
19  developing processes to make sure that you
20  understand client instructions with respect
21  to how to vote, what sources of information
22  would OnderLaw look to to confirm whether or
23  not it's received instructions from a client?
24          And what I mean by that, to help
25  hopefully guide you in understanding the

Page 210

1           J. ONDER
2   question, is, would it be limited to phone
3   calls that came in, to letters that came in,
4   or would you also look at social media posts
5   that clients may have made in response to
6   Facebook posts or blog posts that you've put
7   on your website or on your Facebook page?
8       MR. RASMUSSEN: Objection to the
9       form of the question.
10      A.  Yeah. I, you know -- again,
11  Facebook posts and all that -- let me tell
12  you what we would do -- I mean, what we've
13  done in the past and will presumably do this
14  way depending on how the Court orders us to
15  vote.
16          You know, generally speaking, we
17  will write a letter to the -- a fiscal letter
18  to the client telling what's going on and how
19  to -- you know, what our position on it, pros
20  and cons, and, you know, what we think, the
21  way they should vote. We would also do that
22  by e-mail and we'd give them a text that
23  links to the e-mail, because a lot of people
24  don't check their e-mail.
25          So the three combined, and we give

Page 211

1           J. ONDER
2   them a procedure whereby if they don't agree
3   with our decision, to please contact us and
4   we give them a method to contact us either by
5   text, e-mail, or phone call, that we don't
6   vote their -- you know, their case.
7       Q.  And similarly, Mr. Onder, you
8   would take steps to ensure that no master
9   ballot was filed that would be on behalf of a
10  client who, in one of the forms of
11  communication that you just outlined, had
12  instructed you that they wanted to vote no.
13          You wouldn't have a master ballot
14  vote of yes for that client, correct?
15      A.  That's correct.
16      MR. HOFMEISTER: Objection to
17      the form of the question.
18      A.  And with respect to your comment
19  about social media posts, we do not look at
20  social media posts. I mean, people have
21  access to each other's, you know, accounts.
22  There are all kinds of duplicate accounts,
23  fraudulent accounts. Just the other day, I
24  got a letter that someone was alleging to be
25  me, setting up an account under my name.

Page 212

1           J. ONDER
2       So the bottom line is, we don't
3   look at social media posts because there is
4   no way to verify if it's truly the client who
5   is expressing that opinion.
6       Q.  Mr. Onder, Mr. Coddington actually
7   left a voicemail for one of the attorneys
8   representing the TCC. I would like to play
9   that voicemail for you now.
10      MR. MOXLEY: We are going to
11      mark the audio file that is tab 16 as
12      Exhibit 16.
13          (Whereupon, Onder Exhibit 12,
14      audio file was marked for
15      identification as of this date by the
16      Reporter.)
17      Q.  Mr. Onder, what we will do is I
18  will play you the voicemail that
19  Mr. Coddington left. And on your screen, you
20  will see a running transcript of the message.
21      A.  Sure.
22      Q.  That may be helpful for you to
23  look at as you listen to the voicemail.
24      A.  Okay.
25      MR. MOXLEY: I ask the court

Page 213

J. ONDER

1 reporter, who always does a terrific
2 job, to try to take down the audio as
3 it's being -- as the video -- as the
4 clip is playing. But I'll just note
5 for the court reporter's benefit, as
6 well, that there is a -- if you look
7 at the exhibit itself that we are
8 going to show up here, there is a
9 transcript of the audio, which may
10 help in taking that down.
11 BY MR. MOXLEY:
12 Q. So, Mr. Onder, with that -- --
13         DOCUMENT TECHNICIAN: You want
14 this as Exhibit 16?
15         MR. MOXLEY: What did I mark it
16 as, I'm sorry?
17         THE COURT REPORTER: You said
18 Exhibit 16, but I think you meant 12.
19         MR. MOXLEY: I did mean 12.
20 Exhibit 12, sorry. Tab 16. Exhibit
21 12.
22         MR. HOFMEISTER: And are you
23 going to identify for whom he left the
24 voicemail, the date that he left the

Page 214

J. ONDER

1 voicemail, any particulars about it?
2         MR. MOXLEY: He left the
3 voicemail for TCC attorney Dan Stolz
4 of the Genova Burns firm. And it was
5 left in May of 2023.
6         MR. HOFMEISTER: Can you
7 identify the date?
8         MR. MOXLEY: I will try to do
9 that. I don't have it at my
10 fingertips right now, but we will look
11 into that and I will confirm with you.
12 BY MR. MOXLEY:
13 Q. So with that preface, Mr. Onder,
14 we will play that voicemail now and I will
15 ask you some questions about it.
16         Okay, sir?
17         (Audio played.)
18         "Hi, my name is Terry Joe
19 Coddington. My dad is Terry D.
20 Coddington. We're with the LTL
21 Management of Johnson & Johnson talc
22 claimants/plaintiffs.
23         My mother died from ovarian
24 cancer and she filed with the Court

Page 215

J. ONDER

1 with OnderLaw. We are not real happy
2 with the way things are going, and
3 when I talked to their marketing
4 department, some of the messages they
5 made, I'm -- any way, I don't think we
6 will be voting yes for this. It is
7 clear to them that they should not be
8 saying that all of their clients are
9 voting yes or liking it.
10         I don't like the bankruptcy, the
11 fraud, the -- so many things. It just
12 looked funny to me. But if you could,
13 please call -- -- and I would
14 appreciate it. Thank you, bye."
15         MR. MOXLEY: We can take that
16 down now, Deane.
17 BY MR. MOXLEY:
18 Q. Mr. Onder, were you able to hear
19 and see the transcript as Mr. Coddington's
20 voicemail was played?
21 **A. I believe so, yes.**
22 Q. Okay. And in it, Mr. Coddington
23 references having contacted OnderLaw or parts
24 of its marketing team, as he phrased it.

Page 216

J. ONDER

1         Just to confirm, are you aware of
2 any of that contact that he made?
3         MR. HOFMEISTER: Objection --
4 objection to the question. Any
5 contact with the law firm would be
6 privileged.
7         MR. MOXLEY: I'm not sure it
8 would be any more, but we can cross
9 that bridge if we need to.
10         MR. HOFMEISTER: The phone call
11 may not be because it was sent to
12 Mr. Stolz, but any calls to
13 Mr. Onder's firm would be covered by a
14 privilege. So I'm asserting that and
15 instructing him not to answer where he
16 is going to be disclosing privileged
17 conversations.
18 BY MR. MOXLEY:
19 Q. So without answering the question
20 of whether or not he did, in fact, call your
21 firm or your marketing department, sir, are
22 you aware one way or the other, yes or no, of
23 the answer to that question?
24 **A. Put it this way: I mean, we have**

Page 221

1        J. ONDER
2   least one firm, I got a call saying they
3   don't think it's fair on behalf of their
4   clients. And I assured them that we are
5   negotiating and we need to look at the final
6   deal, not the propaganda being put out by the
7   TCC. I don't know if that's this guy or not,
8   but I know it happened as to one firm.
9       Q.   You see, Mr. Onder, paragraph 6,
10  Mr. Entrekin states, "On April 5, 2023, I
11  learned of the proposed $8,900,000,000
12  settlement and second filed bankruptcy.
13  Neither I nor my clients have been consulted
14  about it, to the present time."
15           Do you see that?
16      A.   What was the date of this?
17           MR. MOXLEY:  The second page,
18      please, Deane.
19           Do you see it's dated April 7th,
20      sir?
21      A.   Okay.
22      Q.   The second bankruptcy filing was
23  on April 4th, correct?
24      A.   Correct.
25      Q.   And he learned about the proposed

Page 222

1        J. ONDER
2   settlement on April 5th, the day after it was
3   filed, correct?
4            MR. MONTEFUSCO:  Object to form.
5       Foundation.
6       A.   Yes.
7       Q.   According to this document.
8            Is that correct, sir?
9       A.   Yes, if you take the truth of the
10  matter asserted that it's accurate, sure, I
11  guess.
12      Q.   And he states in the next
13  paragraph, paragraph 7, "I have not consulted
14  with all of my clients since then, but I have
15  consulted with some and none of those I have
16  talked with support a second bankruptcy."
17           Do you see that?
18      A.   Okay.
19      Q.   Were you aware of the facts that
20  are in this Declaration before I showed it to
21  you, sir?
22           MR. HOFMEISTER:  Objection to
23      the question.  Foundation.  We don't
24      know that this is fact.  All we know
25      is it's a Declaration that you put up

Page 223

1        J. ONDER
2   signed by this attorney. So I don't
3   know that he can answer that.
4            MR. MOXLEY:  I'll withdraw the
5       question, then, and rephrase.
6   BY MR. MOXLEY:
7       Q.   The statements that Mr. Entrekin
8   makes in this Declaration, sir, were you
9   aware of those statements before I showed you
10  this Declaration?
11           MR. RASMUSSEN:  Objection to the
12      form of the question.
13      A.   Not that I know of. I mean,
14  again, other than the one firm that I talked
15  to you about -- and suddenly, he was weeks
16  later, it wasn't days -- it wasn't three days
17  after or whatever, but I can tell you
18  definitively all my referring attorneys and
19  my clients were notified, I believe it was on
20  the 4th, on the day, number one.
21           Number two, I'm not the one who
22  filed the bankruptcy. J&J was filing the
23  bankruptcy with or without me, okay. So the
24  fact they didn't want me to file a
25  bankruptcy, really, I don't know that that's

Page 224

1        J. ONDER
2   really relevant because I had no authority
3   over whether J&J filed this bankruptcy. They
4   were going to file it with or without me.
5            So the fact that I continued to
6   negotiate and do what I thought was in the
7   best interest of the client, I think
8   everybody would authorize me to do that. And
9   even the one firm I did talk to said, yeah, I
10  agree with you, based upon these additional
11  confidential information I gave you, I agree
12  with your course of action.
13           So I really don't know the facts
14  or circumstances surrounding this and, you
15  know, if you give me a list of clients or
16  something, maybe I can have those pulled.
17           But, yeah, that's all I can say.
18      Q.   Well, you anticipated my next
19  question, Mr. Onder. And it's this: So
20  irrespective of what I do, given your
21  testimony previously that you would never
22  want to cast a ballot in a way that was
23  different than a client's intentions or goals
24  or instructions, and given the Declaration
25  that I have shown you, I take it that among

Page 333

1           J. ONDER
2  in the plan there's a number there, I think
3  it's kind of a placeholder number. I don't
4  think that's based on any analysis that I've
5  heard of.
6       Q.   Sure. And so -- and we just --
7  we're going to go to the plan next on the
8  same point, but with respect to the PSA,
9  because that number was not yet determined,
10 you would have needed that information before
11 you could have made a determination whether
12 to recommend to your uterine cancer clients
13 that they should support a plan, fair?
14      A.   That's fair.
15      Q.   All right. And then, if we switch
16 to the plan that's on file that was filed on
17 May 15th, under the plan in Section 5.3.3
18 where you have point values for claimants
19 that would have to do the advanced payment or
20 the expedited payment option, and that
21 includes the gynecological cancers, they
22 would be assigned 500 points, right?
23      A.   Put it this way: That's what the
24 plan says.
25      Q.   Right. And I'm just going to run

Page 334

1           J. ONDER
2  through it real quick. And the goal in
3  Section 7.1 of the plan is to have a point
4  equal a dollar and they say, but it's our
5  expectation it will be at least somewhere
6  between $0.50 on the bottom or $2 on the high
7  end per point, fair?
8       A.   Fair.
9       Q.   And if we do the math, that means
10 a uterine cancer case under the plan with the
11 placeholder value that's in there right now
12 would get somewhere between $250 and $1,000,
13 right?
14      A.   Right. I mean, here's the thing,
15 that's the -- hate to say it, that's one of
16 the problems with the plan. I mean, that's
17 one of the points of negotiation because
18 until we hear from the FCR, we don't know how
19 much money needs to go in -- to get a number
20 that everybody perceives as reasonable. And
21 what is a number that everybody perceives as
22 reasonable?
23           You know, given the state of the
24 medical literature compared to, say, you
25 know, the other ovarian cancers, where does

Page 335

1           J. ONDER
2  it stand? I would love to have your input.
3       Q.   Sure. No. I totally understand
4  that, sir.
5            And just so we are clear, the
6  numbers, at least, as we have gone through,
7  with respect to the plan as it's written
8  right now, that we have reviewed are the
9  numbers that are in the plan now, right?
10      A.   Right.
11      Q.   Okay. And then, the -- and I'll
12 ask you a question that I think Mr. Thompson
13 may have asked you before, but I think it's a
14 little different.
15           As the numbers are in the plan --
16 I think you referred to them a minute ago as
17 a placeholder there -- the 250 to $1,000
18 range would not be acceptable to you for your
19 uterine cancer cases?
20           I'm not asking for anything you've
21 said to a mediator. I'm not asking for
22 anything you have negotiated with anyone
23 else.
24           I'm asking you, 250 bucks to 1,000
25 bucks would not be enough for your uterine

Page 336

1           J. ONDER
2  cancer cases to get your recommendation,
3  would it?
4       MR. MONTEFUSCO:  Object to form.
5       A.   I don't know. I don't know for
6  sure. I mean, the thing is, there's a lot of
7  other factors that go into it, and I -- you
8  know, yeah. I mean, in terms of the numbers
9  that I've recommended and so forth, I'll go
10 into mediator privilege. I think that J&J is
11 open and amenable to discussing those numbers
12 within a reasonable range, and I'm pretty
13 confident we can come to that I do think is
14 fair and reasonable, and that you would think
15 is fair and reasonable, given the totality of
16 the circumstances if we all get together and
17 talk.
18      Q.   All right.
19      MR. RUCKDESCHEL:  I think that's
20   all I've got for you, sir. Thanks.
21      THE WITNESS:  Thanks.
22      MR. THOMPSON:  I've got one last
23   question, Mr. Onder, sorry.
24 CONTINUED EXAMINATION BY
25 MR. THOMPSON:

|  | Page 337 |
|---|---|
| 1 | J. ONDER |
| 2 | Q.   Has -- you mentioned the FCR |
| 3 | there.  Has Ms. Ellis or her lawyers |
| 4 | communicated their position on this plan to |
| 5 | the Ad Hoc Group, as far as you know? |
| 6 | MR. HOFMEISTER:  Objection.  To |
| 7 | the extent you are disclosing any |
| 8 | conversations that were in connection |
| 9 | with the mediation. |
| 10 | A.   Yeah.  I think I may have actually |
| 11 | answered that earlier, but the only |
| 12 | communications about which I'm aware with |
| 13 | Ms. Ellis are things that I've heard through |
| 14 | the mediators. |
| 15 | MR. THOMPSON:  Okay.  Thank you, |
| 16 | sir. |
| 17 | MR. MONTEFUSCO:  Mr. Onder, this |
| 18 | is Ryan Montefusco.  I just need 90 |
| 19 | seconds of your time.  I appreciate |
| 20 | your patience on this. |
| 21 | EXAMINATION BY |
| 22 | MR. MONTEFUSCO: |
| 23 | Q.   Upon entering the PSA, you agreed |
| 24 | to work with the parties in this proceeding |
| 25 | to finalize a plan consistent with the Term |

Page 338
1           J. ONDER
2  Sheet, right?
3     A.   Correct.
4     Q.   Okay.  And since signing the PSA,
5  you have undertaken to do just that, right?
6     A.   Absolutely.
7     Q.   Okay.  And in the event the
8  parties ultimately reach a final agreement
9  consistent with the Term Sheet, you also
10 agreed under the PSA to support confirmation
11 of such a plan, correct?
12    A.   That's correct.
13    Q.   Okay.  And final question, sitting
14 here today, you continue to be bound by the
15 PSA, correct?
16    A.   Yes.  And I think it's all going
17 to be accomplished if everybody works
18 together.
19         MR. MONTEFUSCO:  Thank you very
20    much, Mr. Onder.
21         MR. MOXLEY:  I have one further
22    question in light of that questioning.
23 CONTINUED EXAMINATION BY
24 MR. MOXLEY:
25    Q.   Mr. Onder, it is Cameron Moxley,

Page 339
1           J. ONDER
2  again, from the -- from Brown Rudnick for the
3  TCC.
4     A.   Yeah.
5     Q.   Mr. Montefusco --
6         MR. MOXLEY:  I'm sorry, Ryan, I
7    didn't mean to mispronounce your last
8    name.  I apologize.
9     Q.   Mr. Onder, counsel to the Ad Hoc
10 Group of supporting counsel asked you just
11 now if you continue to be bound by the PSA.
12        Do you recall him asking you that
13 a moment ago?
14    A.   Yes.
15    Q.   Okay.  And I asked you earlier if
16 the -- if the PSA is a document or a contract
17 that you could walk away from today, if you
18 chose to.  And your answer was that you
19 could.
20        Is that still your testimony, sir?
21        MR. MONTEFUSCO:  Object to form.
22    A.   Good point.  Maybe I didn't give
23 enough thought before answering.
24        Here is the thing, I feel a moral
25 commitment or obligation to support the PSA,

Page 340
1           J. ONDER
2  to support the plan and to support putting
3  together a deal.  I chose to support this
4  because I think we can do a deal because I
5  think resolution is in the best interest of
6  everybody.  Okay?
7         I mean, Greg Gordon and the First
8  Day Declaration, Mr. Kim and everything say,
9  hey, everything is subject to negotiation,
10 it's not binding.  But by the same token, I
11 truly believe that this can be resolved if
12 everybody sits down and sits together and
13 talks.
14        Am I contractually bound?  No.
15        Do I feel an obligation to live by
16 my word and do what I think is in the best
17 interest of my clients?  Absolutely.  And
18 that's what I will do, you know, even if
19 other people might disagree with me.
20        So am I bound -- I guess the more
21 accurate question is -- or answer to the
22 previous question is, am I bound?  Well, no,
23 according to -- you know, according to my
24 interpretation and everything else, but by
25 the same token, am I committed to this deal?

Page 341

J. ONDER

1
2  Yes, I'm committed to the deal, and I think
3  we can make it work if everybody works
4  together.
5      Q.  Okay.  And, Mr. Onder, just one
6  final question.  Whatever your contractual
7  obligations or your views as to your moral
8  obligations having signed the PSA, whatever
9  those views are, there is no question that
10 your clients are not bound to do anything by
11 the PSA, correct?
12     MR. RASMUSSEN:  Objection to the
13 form.
14     A.  Yes, that's correct.
15     MR. MOXLEY:  Thank you.  I have
16 nothing further.
17 EXAMINATION BY
18 MR. RASMUSSEN:
19     Q.  Mr. Onder, real quick, let me
20 follow up.  This is Mark Rasmussen, counsel
21 for LTL.
22     A.  Sure.
23     Q.  Do you agree that the PSA has not
24 been terminated?
25     A.  No.  Correct.  I mean, no.  We are

Page 342

J. ONDER

1
2  on board.  Everything is proceeding as it
3  should.  We're negotiating in good faith, and
4  I think we're getting really, really close.
5  And I wish we could have the input of the
6  TCC.
7      MR. RASMUSSEN:  Great.  Thank
8  you.
9      MR. MOXLEY:  I have nothing
10 further, Mr. Onder.  I thank you very
11 much, again, for your time today, sir.
12     THE WITNESS:  Thank you.
13     THE VIDEOGRAPHER:  This
14 concludes the deposition of James
15 Onder.  Going off the record at
16 4:47 p.m.
17     (Whereupon, at 4:47 p.m., the
18 Examination of this Witness was
19 concluded.)
20 _____
              JAMES ONDER
21
   Subscribed and sworn to before me
22 this _____ day of _____, 2023.
23 _____
        NOTARY PUBLIC
24
25

Page 343

E X H I B I T S

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Appeals Court Denies J&J Talc Bankruptcy Strategy | 46 |
| Exhibit 2 | LTLMGMT-00000273 through '0287 | 51 |
| Exhibit 3 | LTLMGMT-00002628 through '2640 | 68 |
| Exhibit 4 | TCC's Objection to DS Scheduling Motion | 88 |
| Exhibit 5 | OnderLaw J&J Criteria | 91 |
| Exhibit 6 | $8.9 Billion K&K Talc Lawsuit Resolution Reached | 123 |
| Exhibit 7 | $8.9 B J&J Talc Resolution: Questions And Answers article | 142 |
| Exhibit 8 | Chapter 11 Plan of Reorganization of LTL Management LLC | 157 |

Page 344

| Exhibit 9 | OnderLaw Referral Network Updates May 2023 | 160 |
|---|---|---|
| Exhibit 10 | "Verified Statement of Paul Hastings and the other firms "pursuant to Bankruptcy Rule 2019 | 164 |
| Exhibit 11 | Coddington Facebook Posts | 205 |
| Exhibit 12 | audio file | 212 |
| Exhibit 13 | DECLARATION PURSUANT TO RULE 80.ARCP | 219 |
| Exhibit 14 | AHC Expense Reimbursment Motion | 229 |