**In the Matter Of:**

*In Re: LTL Management LLC*

*NABIL MAJED NACHAWATI*

*May 24, 2023*



## Page 1

```
 1                   CONFIDENTIAL
 2          UNITED STATES BANKRUPTCY COURT
 3              DISTRICT OF NEW JERSEY
 4            CASE NO. 23-12825 (MBK)
 5                    CHAPTER 11
 6    ----------------------------------------
 7    IN RE:
 8    LTL MANAGEMENT LLC BANKRUPTCY,
 9                           Debtor.
10    ----------------------------------------
11
12             ** CONFIDENTIAL **
13
14       REMOTE VIDEOTAPED DEPOSITION OF
15              NABIL MAJED NACHAWATI
16
17
18
19            Wednesday, May 24, 2023
20                3:03 p.m. (EDT)
21
22
23    Reported By:
24    Joan Ferrara, RMR, FCRR
25    Job No. 2023-898654
```

## Page 2

```
 1                   CONFIDENTIAL
 2
 3
 4                  May 24, 2023
 5                3:03 p.m. (EDT)
 6
 7
 8
 9
10       Confidential Videotaped Deposition of
11    NABIL MAJED NACHAWATI, held remotely via
12    Zoom, before Joan Ferrara, a Registered
13    Merit Reporter, Federal Certified Realtime
14    Reporter and Notary Public.
```

## Page 3

```
 1                   CONFIDENTIAL
 2    REMOTE APPEARANCES:
 3
 4    ON BEHALF OF THE COMMITTEE:
 5    BROWN RUDNICK
 6    BY:      ALEX KASNETZ, ESQ.
 7             JENNIFER SCHEIN, ESQ.
 8             SUSAN SIEGER-GRIMM, ESQ.
 9
10
11    ON BEHALF OF THE WITNESS:
12    LAW FIRM OF BRIAN W. HOFMEISTER:
13    BY:      BRIAN HOFMEISTER, ESQ.
14
15
16    ON BEHALF OF DEBTOR LTL MANAGEMENT:
17    JONES DAY
18    BY:      MARK RASMUSSEN, ESQ.
19
20
21    ON BEHALF OF THE AD HOC GROUP OF SUPPORTING
22    COUNSEL:
23    COLE SCHOTZ
24    BY:      JUSTIN ALBERTO, ESQ.
25             SETH VAN AALTEN, ESQ.
```

## Page 4

```
 1                   CONFIDENTIAL
 2    REMOTE APPEARANCES:  (Continued)
 3
 4    ON BEHALF OF THE US TRUSTEE:
 5    OFFICE OF THE UNITED STATES TRUSTEE
 6    FOR THE UNITED STATES TRUSTEE, ANDREW R.
 7    VARA
 8    BY:      LINDA RICHENDERFER, ESQ.
 9             LAUREN BIELSKIE, ESQ.
10
11
12    ON BEHALF OF THE AD HOC COMMITTEE OF STATES
13    HOLDING CONSUMER PROTECTION CLAIMS:
14    WOMBLE BOND DICKINSON (US) LLP
15    BY:      LISA TANCREDI, ESQ.
16
17
18    ON BEHALF OF PAUL CROUCH:
19    RUCKDESCHEL LAW FIRM, LLC
20    BY:      JONATHAN RUCKDESCHEL, ESQ.
```

Nabil Majed Nachawati
May 24, 2023

Page 153

1         NACHAWATI - CONFIDENTIAL
2   that there is a pathway to resolution and a
3   plan I can support, is the general idea.
4        Q    What's the pathway you're
5   referring to?
6        A    Okay.  The pathway is the most
7   complex case -- one of the most complex
8   cases, in general, this nation has ever
9   seen, and specifically in Bankruptcy Court,
10  one of the most complex cases that has ever
11  been filed, not just once, but twice.
12            That's what I'm referring to.
13       Q    And what's the pathway that you
14  believe -- withdrawn.
15            By signing this document, what
16  is the pathway that you believed you were
17  facilitating the resolution of your
18  clients' claims by?
19       A    Coming to a plan that I could
20  support and recommend to the appropriate
21  clients and which I represent.
22            Due to complexity of the
23  issuance that -- without going into the
24  substance, there are issues to work
25  through, and through the mediators, we're

Page 154

1         NACHAWATI - CONFIDENTIAL
2   trying to work through those issues.
3        Q    What are the issues that you
4   have identified thus far?
5        A    I can't go into the substance of
6   those issues.  They're covered under the
7   mediator's privilege.  And I'm happy to do
8   so, if the Court so orders.
9        Q    Well, before you went into
10  mediation, did you -- withdrawn.
11            When you signed this plan
12  support agreement, there was no mediation
13  by which you were bound, correct?
14            MR. HOFMEISTER:  Objection.
15       There's a non-disclosure agreement.
16            MR. SILVERSTEIN:  I understand.
17       He's already answered about the
18       pathway.  So --
19       A    In a general sense, I answered
20  that question.
21       Q    Right, in a general sense.
22            So the -- when you signed this
23  plan support agreement, what issues were
24  you aware of that you believed had to be
25  worked through in order to get to a

Page 155

1         NACHAWATI - CONFIDENTIAL
2   resolution?
3        A    Well, the many details involved
4   in a 100-plus page TDP, in addition to the
5   plan, Mr. Silverstein, as you know, right?
6            I mean, a term sheet is an
7   agreement to agree, right?  The devil is in
8   the details, and that's what we're working
9   through right now through the mediators.
10       Q    What did you understand that you
11  were agreeing to by signing this document?
12       A    I think I already answered that,
13  a pathway to a resolution that I could
14  recommend in support to my clients.
15       Q    Did you understand that you had
16  agreed to support the plan that the debtor
17  just recently filed on May 15th?
18            MR. HOFMEISTER:  Object to form.
19            MR. MONTEFUSCO:  Form.
20       A    A conditional agreement with a
21  right to opt out.
22       Q    And what do you mean by that?
23       A    Exactly what I said.  You know
24  what an opt-out right is, and you know what
25  a conditional agreement is.

Page 156

1         NACHAWATI - CONFIDENTIAL
2            You're a lawyer,
3   Mr. Silverstein.
4        Q    I am.
5            Can you point in the -- where --
6   what you're referring to in the plan
7   support agreement that you signed that
8   gives you the opt-out right that you're
9   referring to?
10       A    Not as I sit here today.
11       Q    But is it your understanding
12  that what you signed gives you the --
13  withdrawn.
14            Is it your understanding that
15  what you signed is conditional and is --
16  and gives you the right to opt out of the
17  support?
18            MR. MONTEFUSCO:  Objection.
19       Form.
20            MR. HOFMEISTER:  Objection.
21       Form.
22  BY MR. SILVERSTEIN:
23       Q    You can answer.
24       A    Yes.  If there's no agreement
25  working through the issues, there's no

Page 157

1       NACHAWATI - CONFIDENTIAL
2  agreement. But the idea is, in a general
3  sense, the pathway to a fair resolution
4  that I can recommend and support to my
5  clients.
6       Q    Do you understand that you have
7  any obligations under this agreement?
8            MR. MONTEFUSCO: Objection to
9       the form.
10 BY MR. SILVERSTEIN:
11      Q    I'm asking, by you signing this
12 agreement -- I understand what your goal
13 was in signing it. Now I'm asking a
14 different question.
15           What -- do you have any
16 understanding as to what this agreement
17 obligates you to do?
18           MR. HOFMEISTER: Objection to
19      the form. Calls for a legal answer, a
20      legal conclusion.
21      A    Well, I am a lawyer, and I
22 understand what I signed, Mr. Silverstein.
23      Q    Yeah, so what is it --
24      A    To be clear, I've been pretty
25 clear about my position on it. It's an

Page 158

1       NACHAWATI - CONFIDENTIAL
2  agreement to agree.
3            Details have to be worked
4  through. It's the most complex case that
5  this nation has ever seen, in my opinion,
6  in Bankruptcy Court.
7            So there are many details that
8  we're collaboratively in an adversarial
9  posture working through to a pathway of a
10 plan I can support and recommend to my
11 clients.
12      Q    Okay. I want to -- when you --
13 withdrawn.
14           When you signed this agreement,
15 did you have an understanding as to whether
16 you were binding your clients to do
17 anything?
18      A    I can't bind my clients to do
19 that in which they do not wish to do. I
20 can only advise them upon a plan that is
21 submitted for vote -- you know, there's
22 anti-solicitation -- submitted for vote and
23 approved by 75 percent or more, if you want
24 the 524(g) protection.
25           I cannot bind my clients. It's

Page 159

1       NACHAWATI - CONFIDENTIAL
2  the will of the voter and the clients, the
3  victims, that carries the day in this case
4  should it not be disposed of beforehand.
5  It's not my decision. It's the clients'.
6  And each one has a different set of
7  circumstances.
8       Q    Okay. Let's put this document
9  down.
10           MR. SILVERSTEIN: Mr. Nachawati,
11      if you're fine to keep going, I want
12      to leaf through what we have so you
13      can do whatever -- I don't know if
14      it's too late to get to your --
15           THE WITNESS: It's too late,
16      Mr. Silverstein, but that's okay. I
17      agreed to the timing, respectfully.
18      So I'm fine. I'm here.
19           MR. SILVERSTEIN: All right.
20      Fair enough. I'll try to be as
21      efficient as I can.
22           THE WITNESS: Sure.
23           MR. SILVERSTEIN: Mr. --
24           MR. HOFMEISTER: Hold on. Do
25      you have an estimate of how much

Page 160

1       NACHAWATI - CONFIDENTIAL
2  longer you have?
3            I'm not holding you to it.
4            MR. SILVERSTEIN: I need to look
5       through what I have left. I mean,
6       we're in the --
7            MR. HOFMEISTER: We're in the
8       home stretch?
9            MR. SILVERSTEIN: It depends how
10      you define it, whether we're talking
11      about a short track or a long track,
12      but, you know, we're in the last few
13      pages of the outline.
14           So, you know, I don't have the
15      exact time just now. I'd really have
16      to look.
17           MR. HOFMEISTER: Majed, do you
18      need a break or not?
19           THE WITNESS: Yeah, I'll take a
20      break, a real quick one.
21           MR. HOFMEISTER: Can we do five?
22           MR. SILVERSTEIN: All right.
23           MR. HOFMEISTER: Is that all
24      right, Mr. Silverstein?
25           MR. SILVERSTEIN: Yeah,

Page 161

1 NACHAWATI - CONFIDENTIAL
2 five minutes.
3 　　　MR. HOFMEISTER: Thank you.
4 　　　THE VIDEOGRAPHER: We are now
5 going off the record. The time is
6 6:01.
7 　　　(Recess taken 6:01 p.m.)
8 　　　(Resumed 6:11 p.m.)
9 　　　THE VIDEOGRAPHER: We are now
10 back on the record. The time is 6:11.
11 BY MR. SILVERSTEIN:
12 　Q　All right. Mr. Nachawati,
13 welcome back.
14 　　　I'm going to try to speed
15 through a few more things and then I
16 suspect that some others may have some
17 questions, but hopefully I covered a lot of
18 the terrain.
19 　　　MR. SILVERSTEIN: So I'm going
20 to ask Deane to put up on the screen
21 Tab 15, which will be marked as
22 Exhibit 7.
23 　　　(Exhibit 7, screenshot of a text
24 exchange, was remotely introduced and
25 provided electronically to the

Page 162

1 NACHAWATI - CONFIDENTIAL
2 reporter, as of this date.)
3 BY MR. SILVERSTEIN:
4 　Q　This is a screenshot of a text
5 exchange.
6 ████████████████████████████
████████████████████████
8 　A　That's correct.
9 　Q　And I can represent to you that
10 this came from the cell phone of Mr. Stolz.
11 　A　Sure.
12 　Q　On May 10th, you wrote to
13 Mr. Stolz as follows: "I don't appreciate
14 the subpoenas - I'm not a yes man like you,
15 Andy, who was desperate for a deal at the
16 beginning and my clients will vote yes or
17 no depending on what happens - and your
18 shitty subpoenas don't help the cause, nor
19 does asking for a greedy CBF. Who charges
20 an 8/12? As the Bible says, 'Avarice is
21 the root of all evil.' Think about that
22 next time before your money grab. And
23 Dan - what I think now about you goes
24 without saying. Have a great day, gents."
25 　　　Do you see that?

Page 163

1 **NACHAWATI - CONFIDENTIAL**
2 　A　I mean, I can read. I think the
3 exhibit speaks for itself, Mr. Silverstein.
4 And I believe prior, earlier in my
5 deposition, I expressed the same sentiment.
6 　**Q**　**Yes, and just so that we're**
7 **clear, whether your clients vote "yes" or**
8 **"no" on a plan is uncertain at this point,**
9 **is that fair?**
10 　　　MR. HOFMEISTER: Objection to
11 　the form.
12 　　　MR. RASMUSSEN: Object to form.
13 　A　We are working through issues in
14 a complex situation through the mediators
15 with the idea with respect to the
16 appropriate client getting to a pathway of
17 a plan that I could support and recommend
18 to my clients.
19 　**Q**　**And at this point in time,**
20 **whether your vote -- whether your clients**
21 **will vote "yes" or "no" to support the**
22 **debtors' plan will depend on what happens.**
23 **Fair?**
24 　　　MR. MONTEFUSCO: Object to the
25 　form.

Page 164

1 NACHAWATI - CONFIDENTIAL
2 　　　MR. HOFMEISTER: Objection to
3 　form.
4 　A　That's a fair statement.
5 　　　You know, as you know,
6 Mr. Silverstein, there are hundreds of
7 pages in the TDP, never mind plan, right?
8 It's not just something that one day it's a
9 binary yes or no. It's a process. And in
10 this case, it's an unprecedented process.
11 It's the most complex bankruptcy that this
12 nation has ever seen.
13 　　　So you appreciate the magnitude
14 of the complexity. So what you're trying
15 to ask for is, oh, a yes or no. It's
16 complex. We're working with the issues
17 with the idea of a pathway to resolution
18 that I can support and can recommend to my
19 clients, and that's what I've said 100
20 times. I don't know how many different
21 ways you want me to say it.
22 　**Q**　**Well, it follows from what**
23 **you've testified to and what you have in**
24 **your text message that at this point in**
25 **time, none of your clients have committed**

Page 165

1       NACHAWATI - CONFIDENTIAL
2  to support the debtors' bankruptcy plan, is
3  that true?
4          MR. HOFMEISTER:  Objection.
5       Calls for attorney-client privilege.
6       A    And they don't commit until they
7  vote, and they're going to vote
8  individually.  And the will of each
9  claimant who has a vote will govern, absent
10 any intervention from a dispositive
11 perspective, from a Court of Appeal,
12 Bankruptcy Court, Article 3 judge or
13 otherwise.
14      Q    And whether you recommend to
15 your clients that they vote for the
16 debtor's plan or not also depends on what
17 happens.  Fair?
18      A    Yes.  I can't fortune tell.
19      Q    Okay.  And any statement that
20 your clients have committed at this point
21 in time to support the debtors' bankruptcy
22 plan is untrue.  Is that fair?
23      A    I wouldn't say --
24          MR. RASMUSSEN:  Object to form.
25          MR. HOFMEISTER:  Object to form.

Page 166

1       NACHAWATI - CONFIDENTIAL
2       A    I wouldn't say that.  Again, I
3  can't talk about anything following the NDA
4  other than to say in a general sense what
5  I've said 100 times.
6       Q    Well, any statement that your
7  clients will support the plan is an
8  overstatement.  Fair?
9           MR. MONTEFUSCO:  Objection to
10      the form.
11          MR. RASMUSSEN:  Objection to the
12      form.
13      A    I don't think that's fair.  I
14 think it depends on the many variables of
15 which could happen day to day,
16 Mr. Silverstein, as you know.
17      Q    So it depends on what happens in
18 the future.  That's whether your clients
19 will -- whether you will recommend to your
20 clients that they support the plan and
21 whether they decide to follow that
22 recommendation or not.
23          MR. RASMUSSEN:  Objection to the
24      form.
25      A    There's so many variables.  I

Page 167

1       NACHAWATI - CONFIDENTIAL
2  can't answer what happens in the future.  I
3  have to deal with the issues as they arise
4  to the best of my ability and with the
5  intent of doing right by my client and --
6  yeah, I mean, I don't know how else to say
7  it other than that.
8       Q    In connection with signing the
9  plan support agreement, did you -- did you
10 disclose any potential conflicts of
11 interest to any of your clients?
12          MR. HOFMEISTER:  That's
13      attorney-client privileged.
14      A    That's attorney-client.
15      Q    So you won't answer?
16      A    It's attorney-client privilege.
17 I'm happy to answer by order of the Court.
18          MR. HOFMEISTER:  I also just
19      want to note my objection to the form
20      of the question.
21 BY MR. SILVERSTEIN:
22      Q    Did you consult an ethics expert
23 before you signed the plan support
24 agreement?
25          MR. MONTEFUSCO:  Objection to

Page 168

1       NACHAWATI - CONFIDENTIAL
2       the form of the question.
3           MR. HOFMEISTER:  Object to the
4       form.
5       A    It's attorney-client privileged,
6  but we regularly, in a general sense,
7  regularly consult with experts and ethics.
8       And, you know, I would say an
9  8/12 conflict of interest when you have 100
10 cases filed in the MDL, that's the conflict
11 of interest that you should be thinking
12 about, Mr. Silverstein.
13          MR. SILVERSTEIN:  Can you take
14      this down, Deane?
15          Deane, could you put up Tab 2,
16      please?
17          (Exhibit 8, document entitled
18      "Chapter 11 Plan of Reorganization of
19      LTL Management LLC, was remotely
20      introduced and provided electronically
21      to the reporter, as of this date.)
22          MR. SILVERSTEIN:  This is going
23      to be Nachawati Exhibit 8.  It's a
24      long, some might say, voluminous
25      document entitled "Chapter 11 Plan of

Page 169

1   NACHAWATI - CONFIDENTIAL
2   Reorganization of LTL Management LLC."
3   It was filed on the docket on May 15th
4   by the debtors at docket 525.
5   BY MR. SILVERSTEIN:
6       Q   Mr. Nachawati, have you reviewed
7   all or any part of the debtors' proposed
8   Chapter 11 plan?
9       A   I have.
10      Q   I'm sorry?
11      A   I have.
12      Q   Did you review all -- did you
13  review it in its entirety?
14      A   Yes, but there are, you know --
15  in a general sense, right?  Yes, I've read
16  every word of it.
17      Q   Do you understand that the
18  debtors' plan would resolve all of the
19  State of New Mexico's consumer protection
20  actions through the bankruptcy plan?
21      MR. HOFMEISTER:  Objection to
22      the form.
23      A   No.  Actually, if you read it,
24  they're conditionally carved out,
25  Mr. Silverstein, as one of two litigating

Page 170

1       NACHAWATI - CONFIDENTIAL
2   state entities in their sovereign
3   territory.
4       Q   So your understanding of the
5   plan is that the State of New Mexico would
6   be carved out from being channeled into a
7   trust?
8       A   That's correct, a conditional
9   carve-out.
10      Q   And what's the conditions that
11  you understand exist under the plan?
12      A   Read the document, it will tell
13  you.
14      Q   I'm asking what your
15  understanding is.
16      A   If there is a resolution outside
17  of the bankruptcy, then they're no longer
18  subject to the possibility of being brought
19  into the bankruptcy.  So they are now
20  conditionally carved out.
21          If, however, they are unable to
22  reach an agreement in their sovereign state
23  court, then J&J has the right to try to
24  suck them into this bankruptcy.
25      Q   So if -- and a resolution

Page 171

1      NACHAWATI - CONFIDENTIAL
2   outside of the bankruptcy would involve
3   agreement by Johnson & Johnson, correct?
4       A   It could.
5       Q   Well, you're saying that a
6   resolution would be -- withdrawn.
7           What other resolution do you
8   have in mind other than a consensual
9   resolution that would take place before the
10  bankruptcy plan would be implemented?
11      A   Well, you're asking me to
12  speculate, and I'm unwilling to do that.
13          And to the extent that I would
14  be able to answer any questions in the
15  past, they'd be covered by attorney-client
16  privilege.  So I can't disclose the
17  confidences of my prior client or their
18  wishes, strategies or thoughts in any
19  respect.
20      Q   And do you agree that with
21  regard to this particular plan, because it
22  depends on events that will happen in the
23  future, you are unable to say at this point
24  in time one way or the other whether you
25  will recommend it to your clients?

Page 172

1      NACHAWATI - CONFIDENTIAL
2       MR. HOFMEISTER:  Objection to
3       the form.
4       MR. MONTEFUSCO:  Objection to
5       the form.
6   BY MR. SILVERSTEIN:
7       Q   Pardon?
8       MR. RASMUSSEN:  We objected to
9       the form of the question.
10  BY MR. SILVERSTEIN:
11      Q   And can you answer,
12  Mr. Nachawati?
13      A   Sure.
14          As I've stated more than once,
15  the idea is working through the issues with
16  the mediators and the wrinkles that exist
17  in the most complex bankruptcy in U.S.
18  history to try to create a pathway to
19  resolution for the appropriate type of
20  clients in which I represent.  It's not a
21  one-size-fits-all situation,
22  Mr. Silverstein, as you know.
23      Q   Are you able to answer,
24  Mr. Nachawati, you know, "yes" or "no"
25  whether, sitting here now, do you agree

Page 193

1    NACHAWATI - CONFIDENTIAL
2  problematic.
3        But, of course, we'll look at
4  the transcript and see if there is
5  anything else and we'll raise them
6  with you.  But the NDA is the one that
7  was the most blanket and problematic.
8        Thank you very much.
9        MR. HOFMEISTER:  Okay.  Thank
10  you.
11        THE WITNESS:  Thank you,
12  Mr. Silverstein.
13        MR. RASMUSSEN:  I do have a
14  couple of questions, if nobody else
15  does, but I'll let others go first.
16        THE WITNESS:  Could you identify
17  yourself for the record, please?
18        MR. McEVILLY:  Can I jump in,
19  Mark.
20        Tom McEvilly on behalf of the
21  State of New Mexico, just on the topic
22  of privileges raised.
23        I would just like to withdraw my
24  two objections earlier.  I
25  misunderstood the line of questioning.

Page 194

1    NACHAWATI - CONFIDENTIAL
2        Thank you.
3        MR. RASMUSSEN:  Is there anybody
4  else?  Otherwise, I'll go.
5        MS. RATCLIFFE:  Yes, I have some
6  questions.
7  EXAMINATION BY
8  MS. RATCLIFFE:
9     Q   This is Suzanne Ratcliffe of
10  Maune Raichle Hartley French & Mudd.
11     A   Okay.
12     Q   Good afternoon, or I guess good
13  evening, Mr. Nachawati.  I don't think
14  we've had the pleasure.  So it's nice to
15  meet you virtually, and hopefully, I'll be
16  pretty quick so you can get on with your
17  day.
18     A   Sure.
19     Q   I just wanted to clarify based
20  on your previous testimony, sitting here
21  today, you can't tell us how many
22  mesothelioma claims you had in your
23  inventory either in the filed MDL cases,
24  the unfiled MDL cases or even sitting here
25  today, as of today, how many mesothelioma

Page 195

1    NACHAWATI - CONFIDENTIAL
2  cases you have?
3        MR. HOFMEISTER:  Objection to
4  the form of the question, and I
5  believe he --
6        MS. RATCLIFFE:  I can reask.
7  Let me reask the question.  I was
8  trying to make it quick so we could
9  get through this, but I'll reask it.
10  BY MS. RATCLIFFE:
11     Q   Do you know, sitting here today,
12  how many mesothelioma cases you had when
13  you filed your 3,300 cases in the MDL?
14     A   Not with specificity, but none
15  of the meso cases are filed in the MDL,
16  because it's an OC-only MDL.
17     Q   Okay.  Well, in the paragraph 6
18  that was referenced before, it listed
19  around 3,500 ovarian cases and a small
20  number of meso cases.
21        That's what your testimony was,
22  was it not?
23     A   In relation to who I represent?
24     Q   Right.
25     A   Yes, that's accurate.

Page 196

1    NACHAWATI - CONFIDENTIAL
2     Q   Okay.  And you don't know what
3  that small number of mesothelioma cases was
4  at the time of the original filing of the
5  LTL I, correct?
6     A   I had an approximation.  I'd
7  have to look at my notes.
8     Q   And what's your approximation?
9     A   I don't want to guess.
10     Q   Okay.  Nobody wants you to
11  guess.
12        And then you don't know how many
13  mesothelioma cases you had filed in State
14  Court, correct?
15     A   I would be guessing, but there
16  were some filed.
17     Q   Okay.  And when you did that
18  testimonial that we watched earlier in May
19  of '22, you said there was a good number of
20  meso cases, but you don't know what that
21  number was, correct?
22     A   More or less.
23     Q   I mean, if you do, you can tell
24  me.
25     A   I mean, I just -- sitting here

Page 197

1    NACHAWATI - CONFIDENTIAL
2  today, I'm guessing. I'm approximating.
3         Is it in the thousands? No.
4         Is it in the hundreds? No.
5     Q    Okay. And then you testified
6  earlier that in the verified 2019
7  statement, that the listing of cases in the
8  Exhibit A that's redacted does not contain
9  any mesothelioma cases, is that correct?
10    A    That's my understanding.
11    Q    Okay. And then in that H1
12 redacted listing of clients, you don't
13 know, sitting here today, how many of those
14 cases are ovarian cases versus non-ovarian
15 cases, correct?
16        MR. MONTEFUSCO: Object to form.
17    A    I don't have that information in
18 detail at my fingertips.
19    Q    Okay. But that list does
20 contain cases that are non-ovarian based,
21 correct?
22    A    I don't know, other than I know
23 of meso cases, my understanding is they are
24 excluded.
25    Q    Okay. But do you know what is

Page 198

1    NACHAWATI - CONFIDENTIAL
2  actually included in the listing in H1?
3     A    Ovarian cancer -- generally
4  speaking, ovarian cancer, just as I sit
5  here today without any documents to look
6  at, ovarian cancer and various subtypes,
7  epithelial, mucinous, some that may not be
8  compensable, but, you know, no one knows
9  what tomorrow will hold.
10    Q    Okay. Does it also include
11 what's been considered as the gynecological
12 cancers?
13    A    Some.
14    Q    Okay. And you don't know how
15 many in each of the categories, correct?
16    A    Not as I sit here today.
17    Q    Okay. And I certainly don't
18 want beat a dead horse. I just want to
19 make sure I have a clear understanding what
20 you know and what you don't know. Okay?
21    A    Fine.
22    Q    Are you aware of any of the
23 non-ovarian gynecological cancers being
24 compensated in the tort system either by
25 settlement or in a trial?

Page 199

1    NACHAWATI - CONFIDENTIAL
2     A    Are you referring to meso or
3  asbestos related?
4     Q    I'm saying non-ovarian
5  gynecological cancers.
6         MR. RASMUSSEN: Just note my
7  objection to the form of the question.
8         THE WITNESS: You know,
9  Mr. Silverstein, do you want me to
10 answer this? Because there's stuff
11 that I know from the TCC 1. I mean...
12        MR. SILVERSTEIN: Sorry, what's
13 your question?
14        MS. RATCLIFFE: My question is,
15 is he aware of any non-ovarian
16 gynecological cancers being
17 compensated in a tort system.
18        MR. SILVERSTEIN: I don't see
19 why there's any issue with you
20 answering "yes" or "no" certainly as
21 to that question.
22        THE WITNESS: Okay. I just
23 wanted to make sure because it was
24 stuff I learned in connection with the
25 TCC 1.

Page 200

1    NACHAWATI - CONFIDENTIAL
2         MR. SILVERSTEIN: It's a
3  yes-or-no question. So you can
4  answer. I don't know what the answer
5  is.
6     A    Yes.
7     Q    I'm sorry, the answer was "Yes"?
8     A    Yes.
9     Q    Okay. Do you know how many of
10 them?
11    A    I can't recall with specificity.
12    Q    Okay. And are you in possession
13 of any evidence that non-ovarian
14 gynecological cancers are caused by
15 exposure to talcum powder?
16        MR. MONTEFUSCO: Object to form.
17    A    Depends on which type of
18 gynecological cancers you're talking about.
19 Some no. Some yes. Some more. Some -- I
20 mean, the science is different for every
21 type of gynecological cancer.
22        So that's the way I would answer
23 that question.
24    Q    Okay. Are you aware of any
25 literature that supports any claim of any

Page 201

1  NACHAWATI - CONFIDENTIAL
2  non-ovarian gynecological cancers that are
3  caused by exposure to talcum powder?
4      A   Are you talking about asbestos?
5      Q   I'm saying exposure to talcum
6  powder.
7      A   I mean, there are certain
8  gynecological cancers where there's some
9  evidence, some weaker than others.  It just
10 depends on who you ask.  I mean, there's --
11 you know, you ask two doctors, you get two
12 different answers.
13         So yes, there's literature out
14 there.  It varies with respect to the
15 subtype.  We could sit here all day and
16 talk about it.
17     Q   Okay.  And have you retained any
18 experts in relation to the non-ovarian
19 gynecological cancers?
20     A   I'm sure we have.
21     Q   If the bankruptcy is dismissed
22 ultimately, do you plan to file those
23 non-ovarian gynecological cancers?
24         MR. HOFMEISTER:  Objection to
25     form.

Page 202

1      NACHAWATI - CONFIDENTIAL
2      A   I can't predict the future.  So
3  I'm not going to speculate.
4      Q   Okay.  But there's nothing
5  preventing you from filing them, if, in
6  fact, this bankruptcy is dismissed,
7  correct?
8          MR. HOFMEISTER:  Objection to
9      the form of the question.
10     A   I mean, you're asking me a
11 hypothetical.  It would depend on the case.
12     Q   Okay.  And I think we
13 established before that under the original
14 funding agreement in LTL I, there was the
15 potential for a $61 billion fund to
16 compensate victims in addition to
17 whatever -- or let me say this:  There was
18 a $61 billion fund that was available to
19 the claimants in or out of bankruptcy,
20 correct?
21         MR. MONTEFUSCO:  Object to the
22     form.  Misstates testimony.
23 BY MS. RATCLIFFE:
24     Q   Well, is that your understanding
25 of what the first funding agreement said?

Page 203

1      NACHAWATI - CONFIDENTIAL
2          MR. MONTEFUSCO:  Same objection.
3      A   The funding agreement is subject
4  of -- you know, it's public knowledge what
5  it is.  It's $60 billion in LTL I, is what
6  it was.
7      Q   Uh-huh, right.
8          And you -- we already
9  established that you were part of the first
10 TCC, correct?
11     A   That's correct.
12     Q   Okay.  And after -- as a part of
13 the TCC, you supported the motion to
14 dismiss and supported a Third Circuit
15 dismissal of the bankruptcy, correct?
16     A   That's correct.
17     Q   Okay.  But now we're sitting
18 here with far less money that's not
19 available in or out of bankruptcy, and yet,
20 you're supporting this plan.  Is that
21 correct?
22         MR. HOFMEISTER:  Objection to
23     form.
24         MR. MONTEFUSCO:  Object to the
25     form of the question.

Page 204

1      NACHAWATI - CONFIDENTIAL
2      A   I disagree with that assessment.
3  It depends on what happens tomorrow and the
4  days following.
5          So I can't accurately answer
6  that question today.  It would be
7  speculation.
8      Q   Okay.  You're familiar with the
9  term sheet that was introduced as
10 Nachawati 5, correct?
11     A   Yes.
12     Q   Okay.  And if you need to see it
13 at any point, you let me know.  But
14 certainly, as part of the agreement, there
15 were three qualifications that were
16 necessary, including the future claimant
17 representatives agreement that you will not
18 assign more than a third of the trust
19 corpus to qualifying future claims.
20         Do you recall that?
21     A   That sounds familiar.
22     Q   Okay.  And the terms and
23 conditions of the term sheet are integrated
24 into the current plan, correct?
25     A   Yes.

Page 205

1        NACHAWATI - CONFIDENTIAL
2    Q   Okay. Have you signed any cases
3  after April 1, 2023?
4    A   I don't know, as I sit here.
5    Q   Let me rephrase.
6        Not any cases, but any cases
7  that would potentially qualify for a filing
8  in this bankruptcy.
9    A   I don't know, as I sit here
10  today. I mean, we receive a lot of
11  inquiries. So we regularly sign clients
12  all the time.
13    Q   Okay. Have those potential
14  claimants been advised that they are only
15  able to -- or only potentially entitled to
16  a third of the trust corpus?
17       MR. HOFMEISTER: Objection.
18    A   The FCR was just appointed,
19  what, today or yesterday? Ask her.
20    Q   My understanding, she says she
21  hasn't committed to that, but...
22    A   Well, I've not had a
23  conversation with her, which is, I guess,
24  in essence, what I'm saying. And that's
25  the FCR's purview, not mine.

Page 206

1        NACHAWATI - CONFIDENTIAL
2    Q   Okay. And just a couple of
3  quick questions.
4       In the PSA, which is
5  Nachawati 6 -- and we can certainly -- oh,
6  I'm sorry, no. I'm sorry. It's
7  Nachawati 5. Still the same document.
8       The exhibits there include the
9  payments to be made for the gynecological
10  cancers, which include ovarian cancers, as
11  well as the mesothelioma claimants,
12  correct?
13    A   Yes, with the exclusion of mine
14  that were not included in the 2019.
15    Q   Okay. My question is this:
16  Where in the plan is the payment for the
17  non-ovarian, non-mesothelioma claimants?
18       MR. MONTEFUSCO: Object to form.
19    A   I don't know with specificity
20  without reviewing the document, which I
21  don't have in front of me.
22    Q   Okay. Do you know offhand how
23  much the gynecological cancers are
24  potentially getting that are non-ovarian?
25    A   Not off the top of my head right

Page 207

1        NACHAWATI - CONFIDENTIAL
2  now.
3    Q   Are there any distinctions that
4  you know of based on the type of
5  non-gynecological ovarian cancers?
6    A   Are there any what?
7    Q   Are there any distinctions or,
8  you know, differing percentages for each of
9  the types?
10    A   Yes. I'd refer you to the
11  document, right? I think the document
12  speaks for itself.
13    Q   It only includes the ovarian
14  cancers.
15    A   Well, my clients were not
16  included in the 2019. That's one of the
17  issues that needs to be worked through, and
18  that would be covered by the mediators and
19  whatever happens tomorrow, which I can't
20  speculate. It's an evolving situation.
21  [REDACTED]

Page 208

1        NACHAWATI - CONFIDENTIAL
2  [REDACTED]
7    Q   Okay. And under the PSA, the
8  amount that was -- that amount was left to
9  the sole discretion of the claims
10  administrator, correct?
11    A   I believe so. I believe so.
12    Q   Okay. And that could have been
13  any amount, correct?
14    A   Well, it's not that simplistic,
15  right? There's a -- the debtors -- there
16  is a plan and the debtor's TDP, right, and
17  that sort of lays out all the specifics.
18       So I'd refer you to that
19  document.
20    Q   Okay. There were no other side
21  agreements outside of that?
22    A   What do you mean by "side
23  agreement"?
24       MR. HOFMEISTER: Object to form.
25

Page 209

1  NACHAWATI - CONFIDENTIAL
2  BY MS. RATCLIFFE:
3    Q   As to what the gynecological
4  cancers were going to receive.
5        MR. HOFMEISTER:  Objection.
6    A   Not that I know of.
7    Q   Give me one second.
8        Prior to your non-disclosure
9  agreement, did you have any agreement or
10 discussions about what the amount for the
11 gynecological cancers would be?
12   A   No.
13       MR. MONTEFUSCO:  Object to form.
14 BY MS. RATCLIFFE:
15   Q   You testified earlier that you
16 signed this PSA -- or wait, let me back up
17 for a second.
18       Your PSA wasn't signed that was
19 introduced as an exhibit today.
20       Do you know why?
21   A   No, I don't know why.
22       I signed the PSA.
23   Q   Do you know when it was signed?
24   A   I don't recall, as I sit here
25 today.

Page 210

1  NACHAWATI - CONFIDENTIAL
2        MR. RASMUSSEN:  Can I interject?
3        The PSA is Exhibit 6, and that
4  has a signature on it.
5        MS. RATCLIFFE:  I know it has a
6  signature on it, but it's undated.
7        MR. RASMUSSEN:  You said,
8  "signed."
9        MS. RATCLIFFE:  So then let me
10 withdraw my question.
11 BY MS. RATCLIFFE:
12   Q   Well, I said you signed it, but
13 it's undated.  My question is -- withdrawn.
14       My question is this:  Your PSA
15 is signed, but it's undated, correct?
16   A   Are you referring to the
17 exhibit?
18   Q   Yes.
19   A   Yeah, that's correct.
20   Q   Okay.  And you don't know why
21 it's not signed?
22   A   Well, I think the idea --
23       MR. HOFMEISTER:  Objection.  It
24 is signed.
25       MS. RATCLIFFE:  I'm sorry, not

Page 211

1  NACHAWATI - CONFIDENTIAL
2  dated.  I'm so sorry.  It's late in
3  the day.  I'm tired, too.
4  BY MS. RATCLIFFE:
5    Q   You don't know why it's undated,
6  correct?
7    A   In a general sense, I think the
8  idea was that everything would coincide
9  when filed, right?
10       So that's probably why it's
11 undated, is my best answer to that
12 question.
13   Q   Okay.  And I think that we
14 established before that that was signed
15 somewhere in between the dismissal of the
16 bankruptcy and the filing of the new
17 bankruptcy, LTL II, correct?
18       MR. MONTEFUSCO:  Object to form.
19   A   That's correct.
20   Q   Okay.  And you signed the PSA
21 supporting the plan, correct?
22   A   On behalf of certain claimants,
23 correct.
24   Q   Do you support this plan
25 overall?

Page 212

1  NACHAWATI - CONFIDENTIAL
2        MR. MONTEFUSCO:  Objection to
3  form.
4    A   There are too many things that
5  we're working through, through mediators,
6  with the idea of a pathway to a plan that I
7  could recommend and support to the clients
8  that it's appropriate for.
9    Q   And referring back to the PSA,
10 which is Nachawati 6, in Section 2 of that,
11 the first portion, 2.01(a), indicates that
12 this document shall be binding on the talc
13 claimants.
14       But yet, you're sitting here
15 saying that there are pathways for this to
16 not bind them?
17       MR. HOFMEISTER:  Objection to
18 the form.
19       MR. MONTEFUSCO:  Objection to
20 the form.
21       MR. RASMUSSEN:  Objection to the
22 form.
23   A   They are not bound by what I
24 sign until they vote.  It's their decision.
25   Q   Right.  But you promised your

Page 213

1  **NACHAWATI - CONFIDENTIAL**
2  support, no?
3          MR. HOFMEISTER: Objection to
4    the form. Asked and answered.
5          This question has been asked
6    three different ways and it's been
7    answered the same way.
8          MS. RATCLIFFE: Okay. I think
9    it's been answered circuitously,
10         but...
11  BY MS. RATCLIFFE:
12     **Q   You support it with conditions,**
13  **is that correct?**
14         MR. HOFMEISTER: Object to form.
15     A   We're working through the issues
16  that need to be addressed with the idea of
17  supporting a plan that I can recommend to
18  the clients it's appropriate for.
19         MS. RATCLIFFE: Okay. I don't
20    have any further questions.
21         Thank you, Mr. Nachawati. Have
22    a good evening.
23         THE WITNESS: You too as well.
24         MR. RASMUSSEN: Does anybody
25    else have any before I ask just a few?

Page 214

1       NACHAWATI - CONFIDENTIAL
2          MR. SILVERSTEIN: I have a
3    couple of questions based on the state
4    of New Mexico's withdrawal of their
5    objection to Mr. Nachawati --
6    privilege objection to Mr. Nachawati
7    answering questions about the
8    termination of his services.
9          So I can do that before or
10    after.
11         MR. RASMUSSEN: Go ahead.
12  EXAMINATION (CONTINUED)
13  BY MR. SILVERSTEIN:
14     **Q   Mr. Nachawati, the counsel for**
15  **New Mexico withdrew any objection made**
16  **earlier and instruction not to answer my**
17  **question about your termination -- the**
18  **cessation of your serving as counsel to the**
19  **State of New Mexico in connection with the**
20  **Johnson & Johnson talc claims.**
21         **Were your services terminated or**
22  **did you withdraw as counsel?**
23     A   The newly elected AG and -- you
24  know, I don't know exactly because I was
25  walled off from that, but the decision was

Page 215

1       NACHAWATI - CONFIDENTIAL
2    theirs. My understanding is the decision
3    was theirs.
4      **Q   And was it based on a conflict**
5  **of interest of you signing an agreement**
6  **supporting a plan with which -- in a**
7  **bankruptcy in which they seek dismissal?**
8          MR. HOFMEISTER: Objection to
9     form.
10         MR. MONTEFUSCO: Objection to
11    form.
12     A   So following the dismissal of
13  LTL I, they're not included in LTL II.
14  They're conditionally carved out.
15         I had concerns of even filing a
16  motion to dismiss from my perspective,
17  because if you're not in there, you know,
18  you can probably file some statement
19  without submitting -- or consenting
20  yourself to the distinction of the
21  Bankruptcy Court. But that's why the
22  conditional language of the carve-out was
23  there.
24     **Q   You're not suggesting that New**
25  **Mexico requested that language, are you?**

Page 216

1       **NACHAWATI - CONFIDENTIAL**
2      A   My understanding of their desire
3    is to be in their State Court litigating
4    their sovereign claims that the AG has the
5    right to pursue.
6      **Q   Right. And they --**
7      A   They do not want -- my
8    understanding is they do not want to be
9    involved as an AG in the bankruptcy, not
10  because of an actual conflict of interest,
11  but because of their belief with respect
12  to -- my understanding is, with respect to
13  the idea of the bankruptcy being filed and
14  the inevitably of me having to deal with
15  the situation not having control over
16  whether a bankruptcy is filed or not.
17     **Q   Did you -- did you discuss with**
18  **any representatives of New Mexico your**
19  **signing a plan support agreement before you**
20  **did it?**
21         MR. HOFMEISTER: Objection to
22    the question. It involves
23    communications that would be
24    privileged.
25     A   I was walled off from that,

Page 221

1  NACHAWATI - CONFIDENTIAL
2  and I was clear about that. My former
3  representation to the State of New Mexico,
4  I was very clear I could not touch that
5  issue at all.
6      So, again, not a one size fits
7  all. They all have different issues,
8  different considerations. Not all of it
9  involves money. It involves policy. It
10 involves different considerations. And
11 it's my job to do right by the client given
12 their certain circumstances.
13     And when I believe there's
14 something that would interfere with my
15 ability or my judgment, then even if it's a
16 perceived conflict, I wall myself off from
17 the situation, in a general sense, and, you
18 know, do what I need to do to make sure
19 that all my clients are adequately
20 represented and that what's right for them,
21 after receiving full disclosure, they can
22 make an informed decision.
23    Q   All right. Just a couple of
24 follow-ups and then I'll turn it over to
25 Mr. Rasmussen.

Page 222

1  NACHAWATI - CONFIDENTIAL
2      But you said -- you've said I
3  think a couple of times now that -- you've
4  made the point that your mesos were not
5  included in the 2019 that was filed by the
6  Ad Hoc Committee.
7      Do you have an understanding
8  that the plan that was filed by the debtors
9  on May 15th somehow treats your meso
10 clients differently than other meso
11 clients?
12    A   No. It's simply that -- again,
13 that's a different partner that handles
14 those clients, but it's the simple fact
15 that what may be right for OCs may not be
16 right for mesos.
17     So in a general sense, that
18 question is posed. And if the lawyer
19 responsible for that docket that has its
20 own set of considerations says, No, well
21 then they're not going to be on the 2019.
22    Q   So lawyers on your -- lawyers on
23 your -- in your firm who handle meso cases
24 did not support the plan support agreement,
25 is that fair?

Page 223

1  NACHAWATI - CONFIDENTIAL
2      MR. MONTEFUSCO: Objection to
3  form.
4    A   Not necessarily. It depends,
5  right? You're asking me to answer an
6  impossible question. Just like when on the
7  TCC there are certain mesos that may
8  support a plan and may not. Depends on
9  what happens.
10   Q   And when you were -- just so
11 that I understand, when you signed the plan
12 support agreement, did you only have
13 ovarian -- only your ovarian cancer clients
14 in mind and that you thought that the meso
15 clients were not -- you were not pledging
16 support on behalf of the meso clients?
17     MR. MONTEFUSCO: Object to the
18 form.
19   A   It's -- those small number of
20 claimants had their own distinct issues,
21 and the decision, in a general sense, was
22 made not to include them by design because
23 what's right for them may not be right for
24 the OCs and vice versa.
25     So it's conditional depending on

Page 224

1  NACHAWATI - CONFIDENTIAL
2  the client's situation. I don't have total
3  visibility once certain things happen, like
4  a bankruptcy is filed, on the whys or the
5  wheres. I don't have direct. I have basic
6  understandings.
7      And so I'm trying to answer your
8  questions, but it can be difficult if
9  you're -- you know, you're giving an answer
10 and you follow what's right for that
11 client, but you don't necessarily know all
12 the details as to why.
13   Q   I understand.
14     But just so that we're clear,
15 the schedule -- the schedule to the PSA
16 that had the list of your clients with
17 redacted information that was attached to
18 the PSA, that did not include meso clients
19 either.
20   A   That is my understanding.
21     MR. HOFMEISTER: Object to the
22 form.
23 BY MR. SILVERSTEIN:
24   Q   Okay. And so you believed that
25 they were not being -- whatever you were

|  | Page 225 |  | Page 227 |
|---|---|---|---|

Page 225

1 NACHAWATI - CONFIDENTIAL
2 agreeing to in the plan support did not
3 include your meso clients. That's -- by
4 not including them, that's what you were
5 reflecting.
6         MR. MONTEFUSCO: Object to form.
7     A    That's my point.
8     Q    Okay. And just in terms of
9 the -- coming back to the -- what you said
10 before about how the evidence of scientific
11 support of causation between talcum powder
12 and the various gynecological cancer types
13 makes each individual claimant different,
14 did you have any concerns when you signed
15 the plan support agreement that --
16 withdrawn.
17         Did you have any concerns when
18 you read the plan that was filed that women
19 who have less of a basis of a claim because
20 of weak or scientific evidence could be
21 effectively foisting a plan on women who
22 have a stronger basis for their claims by
23 virtue of the number of women who fall into
24 one category versus another?
25         MR. MONTEFUSCO: Objection to

Page 226

1      NACHAWATI - CONFIDENTIAL
2     the form.
3         MR. HOFMEISTER: Form.
4     A    There are many things, again,
5 that we're working through that we're
6 trying to address with the idea of working
7 towards plan that I can recommend and
8 support to my clients.
9     Q    And at this very instance in
10 time, you're not there yet, is that fair?
11        MR. MONTEFUSCO: Object to form.
12        MR. HOFMEISTER: Object to the
13    form.
14    A    I don't know because there's too
15 many variables in play. So I can't answer
16 that, as I sit here today, other than what
17 I've already answered 100 times.
18        MR. SILVERSTEIN: Okay. I have
19    no further questions at this time.
20    Thank you.
21        MR. RASMUSSEN: Okay.
22 EXAMINATION BY
23 MR. RASMUSSEN:
24    Q    This is Mark Rasmussen with
25 Jones Day on behalf of the debtor.

Page 227

1      NACHAWATI - CONFIDENTIAL
2         Mr. Nachawati, thank you for
3 your patience today, and I'll be brief.
4     A    Sure.
5     Q    Earlier in the deposition, you
6 offered to identify the members of the TCC
7 in this bankruptcy proceeding who were in
8 favor of the proposed Imerys settlement.
9         Could you identify them for us?
10    A    My recollection is -- you know,
11 again, this is my recollection -- I believe
12 the two co-lead firms were in support of
13 the Imerys plan.
14        That's my recollection of the
15 MDL.
16    Q    And do you recall their names,
17 sitting here today?
18    A    I believe it's Beasley Allen and
19 Ashcraft & Gerel.
20    Q    Thank you.
21        I have just a few questions
22 about Exhibit 6, the plan support agreement
23 that you signed. And if you need to look
24 at it, we can call it up. I don't think
25 you will to answer these questions, but

Page 228

1      NACHAWATI - CONFIDENTIAL
2 please let me know.
3     A    Sure.
4     Q    Do you agree that the
5 obligations imposed on the parties to the
6 PSA are still in effect today?
7     A    I do.
8     Q    And is it your intent to comply
9 with your obligations under the PSA?
10    A    If we work through the issues,
11 absolutely.
12    Q    Is it your intent to support the
13 debtors' plan consistent with the
14 obligations under the PSA?
15    A    And the conditions subsequent
16 and precedent, yes.
17    Q    It's your intent to comply with
18 the obligations under the PSA as expressed
19 there, correct?
20    A    And work through any mediation,
21 correct.
22        MR. RASMUSSEN: Thank you.
23    That's all I have.
24        THE VIDEOGRAPHER: Okay. This
25    concludes today's deposition --