**In the Matter Of:**

*IN Re: LTL Management, LLC*

*MIKAL WATTS*

*June 12, 2023*



## Page 1

```
 1
 2   UNITED STATES BANKRUPTCY COURT
     DISTRICT OF NEW JERSEY
 3   ---------------------------------------X
     In Re:
 4
 5   LTL MANAGEMENT, LLC,
 6                        Debtor.
 7
     Case No. 23-12825 (MBK)
 8   ---------------------------------------X
 9
10       VIDEOTAPED DEPOSITION OF MIKAL C. WATTS
11
12
13
14         DATE:   Monday, June 12, 2023
15         TIME:   7:05 a.m. - 9:56 a.m.
16         PLACE:  ***REMOTE***
17         BEFORE: Elizabeth M. Kondor, CCR.
18
19
20
21
22
23
24
25   JOB NO:  2023-898643
```

## Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   BEASLEY ALLEN LAW FIRM
           Attorneys for Alishia Landrom,
 5         et al.
           218 Commerce Street
 6         Montgomery, Alabama 36104
           BY:  ANDY BIRCHFIELD, ESQ.
 7
 8
     BROWN RUDNICK, LLP
 9         Attorneys for the Talc Claimants
           7 Times Square
10         New York, New York 10036
           BY:  CAMERON MOXLEY, ESQ.
11              DAVID WEINSTEIN, ESQ.
12
     COLE SCHOTZ, P.C.
13         1325 Avenue of the Americas
           19th Floor
14         New York, NY 10019
           BY:  SETH VAN AALTEN, ESQ.
15
16   GOLOMB SPIRT GRUNFELD, PC
           1835 Market Street
17         Suite 2900
           Philadelphia, PA 19103
18         BY:  RICHARD GOLOMB, ESQ.
19
20   JONES DAY, LLP
           Attorneys for the Debtor
21         250 Vesey Street
           Suite 31
22         New York, New York 10281
           BY:  MARK RASMUSSEN, ESQ.
23              OLIVER D. ROBERTS, ESQ.
24
25
```

## Page 3

```
 1
 2   A p p e a r a n c e s (Continued)
 3
     MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
 4         Attorneys for Katherine Tolleson,
           et al.
 5         777 S Harbour Island Blvd.
           Suite 310
 6         Tampa, Florida 33602
           BY:  MARCUS RAICHLE, ESQ.
 7              CLAY THOMPSON, ESQ.
                CHRIS McKEAN, ESQ.
 8
 9
     OFFICE OF THE UNITED STATES TRUSTEE
10         Attorneys for the United States
           Department of Justice
11         One Newark Center
           Suite 2100
12         Newark, New Jersey 07102
           BY:  LAUREN BIELSKIE, ESQ.
13              JEFFREY SPONDER, ESQ.
14
15   OTTERBOURG, P.C.
           Attorneys for TCC I
16         230 Park Avenue
           30th floor
17         New York, New York 10169
           BY:  JOHN BOUGIAMAS, ESQ.
18              JARED QUIGLEY, ESQ.
                ADAM SILVERSTEIN, ESQ.
19
20   PAUL HASTINGS, LLP
           Attorneys for Ad Hoc Committee of
21         Supporting Counsel
           200 Park Avenue
22         New York, New York 10166
           BY:  WILLIAM K. WHITNER, ESQ.
23              RYAN MONTEFUSCO, ESQ.
24
25
```

## Page 4

```
 1                MIKAL C. WATTS
 2   A p p e a r a n c e s (Continued)
 3
     SIMPSON THACHER & BARTLETT LLP
 4         Attorneys for Travelers Casualty &
           Surety Company
 5         425 Lexington Avenue
           New York, New York 10017
 6         BY:  JARED QUIGLEY, ESQ.
 7
 8   WOMBLE BOND DICKINSON, LLP
           Attorneys for Ad Hoc Committee of
 9         State Attorney Generals
           950 3rd Avenue
10         Suite 2400
           New York, New York 10022
11         BY:  ERICKA JOHNSON, ESQ.
12
13
           ALSO PRESENT:
14
15
           DEANE CARSTENSEN,
16         Document technician
17         BRIAN SMITH, Videographer
18
19
20
21
22
23
24
25
```

Page 41

1        MIKAL C. WATTS
2        And then 14,092 received, but that's
3   not on a per-client basis; that's on a
4   per-record basis.
5      Q.   Okay.
6           And I know, sir, that you testified
7   previously about sort of how you acquired those
8   clients and how you came to represent them in
9   connection with this case. I don't plan to
10  cover ground we've already covered, as I
11  mentioned before. And I know that you -- and
12  I'm providing this more for context for you,
13  sir.
14          I know that you previously testified
15  as well that your first engagement letter was as
16  of March 19, 2022, correct?
17     A.   I think that's roughly correct.
18     Q.   Okay.
19          How many talc clients, if you know,
20  did your firm have as of the Third Circuit's
21  January 30, 2023, decision?
22     A.   15,000.
23     Q.   Okay.
24     A.   Estimate.
25     Q.   Understood.

Page 42

1        MIKAL C. WATTS
2        How many talc clients did your firm
3   have as of the April 4th filing date of the
4   LTL 2?
5        (Interruption by the reporter.)
6      Q.   The question was April 4th filing
7   date of LTL 2.
8      A.   I think the number that's in the
9   exhibit that we just looked at that's still on
10  the screen is probably the best number for that,
11  16,935.
12     Q.   Okay.
13          And of the 16,935 that are identified
14  in the Ad Hoc Committee of Supporting Counsel's
15  Verified Statement on the screen, zero of those
16  are filed claims, correct?
17     A.   Yeah, you can't file claims when
18  there's an administrative stay.
19     Q.   Understood.
20          For the unfiled claims, Mr. Watts,
21  how many has your firm determined that it will
22  file?
23     A.   You mean if the bankruptcy's
24  decision --
25     Q.   Yes, sir.

Page 43

1        MIKAL C. WATTS
2      A.   I mean, I think they're either active
3   or they're DNQ'd, so I think it's more of a
4   subtraction. I can tell you 277 of them will
5   not be filed. And as we continue to go through
6   the process, I would expect that number would go
7   up some. But I think the fractions, you know,
8   that you're looking at, you know, we'll continue
9   to process, and we'll only file the ones that
10  don't get disqualified.
11     Q.   Okay.
12          But as you sit here today, have you
13  made a determination that any particular number
14  of those claims will be filed if there is a
15  dismissal of the bankruptcy?
16     A.   I'm certain that inside the database,
17  there are thousands and thousands and thousands
18  of them. I don't have it at my fingertips right
19  now. It's -- it's more, we're in process, and
20  there are new cases coming in and everything
21  like that, so I don't know the answer as I sit
22  here today. But I could tell you that, you
23  know, based on the review of at least 14,092
24  records, 277 of them have been DQ'd.
25     Q.   Okay.

Page 44

1        MIKAL C. WATTS
2        And beyond that, you have no other
3   estimate of the number of filings that you'll
4   make if the case is dismissed?
5      A.   Not at this time, but to be fair, I
6   haven't been back in the office in a month. You
7   know, it's just Italy, you know, the CLE, this
8   kind of thing. I'm not saying I couldn't
9   improve that number, but I just haven't had
10  time.
11     Q.   For the unfiled claims, are you aware
12  of whether any of those clients were
13  previously -- strike that, sir.
14          These are all unfiled claims, of
15  course, as we just discussed.
16          For any of these claims, are you
17  aware of whether any of those clients were
18  previously declined by other attorneys
19  representing talc claimants?
20     A.   I think that what I'm -- what I'm
21  aware of is, I don't believe that number is very
22  large. We put a trap in during intake with
23  respect to that. I could tell you that 21 of
24  them showed up as dual reps. And what I can't
25  tell you is whether that dual rep number came

Page 45

1  MIKAL C. WATTS
2  from Ms. Lounsberry, which is the whole reason
3  we put in the list of claimants, so that we
4  could get rid of the dual reps. So I just know
5  my database shows 21 dual attorneys.
6      Q.   You mentioned that previously, and I
7  think you also mentioned sort of the breakdown
8  of some of the others.
9           Could you give us that understanding
10 of what the different breakdowns are of the
11 current status of the complaint?
12     A.   Sure. So dual attorneys obviously
13 means somebody's hired -- has been hired twice
14 or three times or four times, you know. So
15 that's 21.
16          And so whenever we do these kind of
17 mass tort resolutions, the first thing that I
18 want to do is create a deal where we get lists
19 by singular identifying numbers so that we can
20 de-dupe, which is what was assigned to
21 Ms. Lounsberry.
22          And I was pleased that there were
23 only 21. It's something that we see in every
24 tort. But that's something obviously that needs
25 to be done is, because people shouldn't get to

Page 46

1  MIKAL C. WATTS
2  vote twice because they've hired two lawyers.
3  You know? And so we've identified 21 of that.
4           In terms of dupes, there's another
5  23. That's different. And let me tell you what
6  that means.
7           Instead of dual attorneys, you have
8  dupes, and that means you have different
9  vendors. There's approximately 10 different
10 marketing vendors that I utilize things out.
11 And sometimes those different marketing vendors
12 will show up with the same case for either
13 nefarious reasons or just, you know, it happens.
14 But 23 on top of that.
15          In terms of intake failure, there
16 are 47.
17          Do you want me to tell you what that
18 means?
19     Q.   Yes, please, sir.
20     A.   Yeah. So anytime you contract with a
21 vendor, you do so pursuant to protocols, rules
22 that they're supposed to follow when they're
23 spending your money to do intake on cases.
24          For better or for worse, some vendors
25 are better and some vendors are worse. And when

Page 47

1  MIKAL C. WATTS
2  people don't follow those rules, they cease
3  being one of my vendors.
4           But we have all sorts of audit traps
5  and quality control, if you will, to make sure
6  that the stuff that is being intaked by the
7  separate vending sources to whom I am paying
8  money are meeting our rules.
9           Forty-seven out of 15,000 of them
10 failed because of intake failure, and so those
11 cases were discarded, and most likely those
12 vendors were discarded as well.
13          Do you want the next one?
14     Q.   Yes, please.
15     A.   Yeah. So no damage is 123. That's
16 the category that my firm uses when we run down
17 all the different medical records, and we can't
18 find medical records that confirm the diagnosed
19 condition that we're looking for as part of the
20 intake criteria. So that's 123.
21          The next one is no interest. And,
22 you know, I see Mr. Birchfield's picture. I
23 mean, we've all got the same issue here, and
24 that is, is that cases come in in response to an
25 ad or some sort of a marketing pitch or Internet

Page 48

1  MIKAL C. WATTS
2  or whatever. Clients think all I got to do is
3  sign up and then I'm going to get paid, and then
4  they realize they have to do work. Most of them
5  will do the work, but some of them won't. And
6  so some of them just throw up their hands and
7  say I don't want to do this. So 61 of the
8  16,000 have said, I don't want to do this, and
9  have been DNQ'd for no interest.
10          And then a subset of that is what we
11 would call "nonresponsive." And that's 15
12 people, where, when the intake firm gets the
13 communications link, either an e-mail or a text
14 number or a phone number and the like, when our
15 people doing the quality control are trying to
16 get ahold of those people, we just can't get
17 them to call us back. And so that's another 15.
18          And so those six categories always
19 altogether comprise the 277 that have been
20 disqualified thus far.
21     Q.   Thank you, sir.
22          As part of the intake process that
23 you just described, do you have or do you
24 require documentation from the client that
25 attests to how the product usage?

Page 49

1  MIKAL C. WATTS
2  A.  Ask that question again.  I didn't
3  hear you.  I'm sorry.
4  Q.  Oh, oh, sure.
5      Can you hear me okay now, sir?
6  A.  That attest to.  I thought you said
7  "test a."  Okay.
8      Yes.  They have to tell me that
9  they've used talcum, and we have an intake
10 criteria, I think it was a minimum of four
11 years, a certain latency period that's escaping
12 me right now.  That's all something they have to
13 tell us on first base, yes.
14 Q.  Okay.
15     And what sort of form does them
16 telling you that take?  Is it in response to a
17 questionnaire, is it an affidavit, what sort of
18 is the documentary form?
19 A.  So it depends on what stage of the
20 case you're in.
21     At initial intake, it's really kind
22 of a decision tree that you design for intake
23 call centers.  If this, then that.  And we build
24 in all sorts of traps, in effect.
25     Have you ever heard of the Minnesota

Page 50

1  MIKAL C. WATTS
2  Multiphasic Personality test, the MMPI and the
3  like?
4  Q.  Yes.
5  A.  You know, I put on a lot of
6  psychologists, you know, in personal injury
7  cases over the years.
8      You're looking to design a script
9  that, in effect, gets all the information you
10 need, has verification traps, has traps for
11 fraud, you know, things that people can't think
12 about that just don't make any sense.
13     And so we design that very carefully
14 in each of these cases because every case that
15 filters through, those 277 don't make anybody
16 any money.  That's a waste of my time.
17     And so we have an intake criteria
18 that, in this case, was borrowed from Mr. Itkin,
19 who borrowed his from Mr. Onder.
20     And it felt like it was important
21 that the three firms all have a similar intake
22 criteria.  And so we used that trap, and then
23 built our own, you know, intake design questions
24 and the like.
25 Q.  Okay.

Page 51

1  MIKAL C. WATTS
2      And you testified in April, and you
3  gave a similar answer sort of just now about
4  wanting to have a process that would allow you
5  to get to a group of cases that are the ones --
6  I think the phrase that you used in April was
7  that "you would want to handle."
8      And just now, you kind of made a
9  similar reference to cases that you would want
10 to sort of -- you would want to be pursuing.
11     What are the types of cases that the
12 Watts firm wants to handle with respect to talc?
13 A.  Cases that meet the intake criteria.
14 Q.  Okay.
15     How many of your firm's approximately
16 16,935 clients are ovarian cancer claims?
17 A.  I think I gave that number in my
18 previous deposition.  And it, you know, I think
19 we've got it looped in, pursuant to Mr. Onder
20 and Mr. Itkin's intake criteria, into a broader
21 gynecologic versus meso.
22     I have not, because we're in the
23 process, gone through and subdivided the
24 gynecologics into ovarian versus this versus
25 that.

Page 52

1  MIKAL C. WATTS
2  Q.  Okay.
3      And that really is where my question
4  is going, Mr. Watts, as you may have
5  anticipated.
6  A.  Sure.
7  Q.  I'm trying to understand, sort of get
8  inside a little bit what the gynecologic
9  category is.
10     And I appreciate the answer that you
11 just gave, but let me ask more precisely, do you
12 know the number of your clients whose disease is
13 uterine cancer?
14 A.  No.  The answer is, is inside the
15 database, there's probably information in that
16 regard, but it's very fluid as we continue to go
17 through these tens of thousands of records.
18     Look, I understand that there is a
19 disagreement among the different constituency as
20 to what should qualify and what doesn't.  And so
21 we are obviously trying to trap that data.
22     But as I sit here today, you know,
23 our intake was based upon a gynecologic criteria
24 that came from Mr. Itkin, which came from
25 Mr. Onder.

Page 53

1  MIKAL C. WATTS
2  Q.  Okay.
3      And if you wanted to, if you wanted
4  to task someone at your firm with the project of
5  coming to a number on the number of clients --
6  the number of your talc clients who had, let's
7  say, for example, cervical cancer as their
8  disease, you could find that information out
9  from your database, correct?
10 A.  Well, it wouldn't -- it wouldn't be
11 very useful right now because we're in process,
12 but at a certain point in time, we will be
13 complete, and then at that point, we can do
14 that.
15     We use a lot of different ways.  You
16 know, there's all sorts of artificial
17 intelligence now that will allow you to go
18 through reams of medical records and look for
19 phrases and this and that on all this stuff.  So
20 we'll utilize that to be able to trap different
21 qualifications, and, of course, you'll have to
22 at the time that the trustee or the special
23 master is allocating, right, because you're
24 going to be in a different point system and the
25 like.

Page 54

1  MIKAL C. WATTS
2      But right now what we're doing is
3  we're going through -- my people are tasked for,
4  you know, I gave you an intake criteria, I need
5  to know the people that have done that.
6      At some point in time, you're
7  absolutely right.  We'll be able to run those
8  traps after all the medical records are in and
9  the like.  Because we've got -- there's a firm
10 called Pattern that we use a lot, which is
11 basically an AI search of medical records.  But
12 there's no point in doing it until the records
13 are all in, right?  So they're more of an
14 records evaluator, as opposed to a records
15 receiver.
16 Q.  And you testified earlier, and in
17 April as well, about the thousands of records
18 that have come in.  When you say just now that
19 it's sort of "in process," is the process that
20 remains somebody, whether it's a person or an AI
21 sort of approach looking at the records that are
22 in?  Is that the process that you're referring
23 to that's left to be done?
24 A.  Well, let me -- we're still in
25 process of ordering additional records, because

Page 55

1  MIKAL C. WATTS
2  with respect to a lot of clients, you get
3  records that lead to a second or a third order.
4      Yeah, it's what mass tort departments
5  do.  There's hundreds of people that do this
6  across 15, 20 different torts at a time, that,
7  you know, receive those records from records
8  retrieval vendors, do a certain evaluation that
9  is, you know, very much something that I'm not
10 particularly familiar with, other than they
11 follow my direction as to what I want them to
12 do, you know.  And then they keep going, and
13 then I get records, like, of what I just got
14 you, number of records received, this, that.
15 You know, I'm more looking at a top-line view.
16 Q.  Let me ask you this, sir.
17     You mentioned that more records are
18 coming in?
19 A.  Sure.
20 Q.  That there's a process that's
21 underway.  You don't know, as you sit here
22 today, the sort of breakdown within the
23 gynecologic, you know, quote/unquote,
24 gynecologic category.
25     What number of the 16,935 claims that

Page 56

1  MIKAL C. WATTS
2  are identified in the exhibit that we're looking
3  at on the screen are you confident, as you sit
4  here today, are valid claims that the Watts
5  Guerra firm has run to ground and says, this is
6  a claim that we will be pursuing?
7      MR. RASMUSSEN:  Objection to the form
8      of the question.
9  Q.  You can answer, sir.
10 A.  Yeah, so if you set forth the very
11 clear division of thought between certain people
12 on the TCC and certain people not on the TCC
13 anymore about what's a valid claim, that leads
14 to the question of what gynecologic cancers that
15 don't meet the Birchfield criteria for
16 particularized epithelial ovarian cancer will
17 qualify.
18     And so we're going to have to have
19 that debate with respect to studies, with
20 respect to different types of endometrial
21 cancer, cervical cancer and the like as to what
22 qualifies.
23     And, typically, you know, in
24 settlements like this, that leads to a debate
25 about what's more compensable.  In other words,

Page 57

1          MIKAL C. WATTS
2 if you were to try this a hundred times, what
3 would more likely be successful a hundred times
4 as opposed to 50 times?  And so maybe the kind
5 of cancer that wins a hundred out of a hundred
6 gets double, the kind of cancer that gets 50 out
7 of a hundred.
8         I'm not saying that should the case
9 here, but that's the point.  You're just
10 basically grid-building.
11        So our job right now is to retrieve
12 data to allow us to place certain cases in
13 certain subparts of the grid.
14        Does that make sense?
15    Q.   I understand your answer.  I
16 understand your answer.
17    A.   Okay.
18    Q.   In terms of -- in terms of medical
19 records that have been ordered, sir, have
20 pathology reports been ordered for all the
21 clients?
22    A.   I don't know that yet because,
23 typically, you don't order a pathology report
24 until you track down the appropriate treater or
25 the appropriate diagnoser, but that's part of

Page 58

1          MIKAL C. WATTS
2 the process for sure.
3    Q.   Okay.
4         So there may -- there may be some --
5 let me just make sure I understand.
6         I take it that there may be some
7 clients, given what you just answered, that you
8 would not think it appropriate to order
9 pathology reports for; is that right?
10   A.   Well, let me put it this way:  If
11 somebody has already signed up with another
12 lawyer, I'm not going to order any records for
13 them, right?  I'm going to de-dupe them.
14        If somebody says, I don't want to do
15 this anymore, we stop ordering records.
16        If, you know, somebody is fraudulent
17 or something, and we just say this isn't a real
18 person, we're not going to order records, we're
19 just going to get them out.
20        So you start off by DNQ'ing people,
21 so we DNQ'd 277 out of however many tens of
22 thousands.  You order records.  You qualify
23 people based on records.  You keep ordering
24 records to keep going.
25        And then eventually you get them

Page 59

1          MIKAL C. WATTS
2 into, hey, I think these are in pot A, these are
3 in pot B, these are in pot C, these don't
4 qualify.
5    Q.   You made reference to this, I think,
6 a couple of answers ago, but there are some
7 types of diseases in the context of this case
8 that were previously, at least, considered not
9 compensable, correct?
10   A.   Well, I wouldn't go that far.  And
11 let me tell you what I mean.
12        And this is with all due respect to
13 the federal judge.  You know, we live in a
14 bicameral system of justice, as well as
15 Legislature.  We have state courts and federal
16 courts.
17        And so in one federal court, there
18 were -- there was a briefing done, decisions
19 made as to what was compensable and what was
20 not.  In other jurisdictions, there may be other
21 decisions that need to be independently, as a
22 matter of just jurisdiction, assessed.
23        You know, we have a lot of people on
24 both sides of this particular debate that work
25 together on other torts, and a federal NDL judge

Page 60

1          MIKAL C. WATTS
2 may say X and state courts say Y.
3         And so the fact that one has said
4 something does not mean that other judges not
5 subject to the jurisdictional requirements of
6 the NDL rule don't have their own say.
7         And, of course, the other thing is,
8 is that decision was made at a certain point in
9 time.  You will get subsequent studies that
10 change and affect the Daubert record, and so all
11 of that will be litigated after these cases are
12 able to be filed.
13   Q.   Right.
14        And just cutting through it, that's
15 sort of where I'm going.  So my question is a
16 little bit, slightly different.  Let me give you
17 the context of where I'm -- where I'm coming
18 from with this question.
19        And I can bring it up on the screen
20 if you'd like to see it.
21        But you testified in April that, and
22 I'm quoting you now, you did a bunch of
23 pre-intake research into this tort, there's no
24 point going after cases that are not
25 compensable.

Page 77

1    MIKAL C. WATTS
2  rules.
3      MR. MOXLEY: Let's mark -- let's
4    bring up Tab 1, Deane, and let's mark that
5    as our next exhibit, which I believe is
6    Exhibit 3.
7      (Watts Exhibit 3, Plan Support
8    Agreement, is received and marked for
9    identification.)
10 BY MR. MOXLEY:
11   Q.  Mr. Watts, what we've marked as
12 Exhibit 3 is the Plan Support Agreement.
13       Do you see that on your screen, sir?
14   A.  I do.
15   Q.  Okay.
16       MR. MOXLEY: And if you could turn to
17    page 11, Deane, of this document.
18   Q.  Mr. Watts, this reflects that you
19 signed this document on April 3rd, correct?
20   A.  Yeah. You'll notice on the first
21 page, it's got March 21st.
22       MR. MOXLEY: Yeah, let's go back to
23    the first page, if we could, Deane.
24   Q.  I didn't mean to interrupt you, sir.
25 Please go ahead.

Page 78

1    MIKAL C. WATTS
2   A.  Yeah. No, I think that, as you know,
3  the way -- particularly in the pandemic, the way
4  most documents are done are through, you know,
5  Zoom negotiations, in effect. I guarantee the
6  first draft of this was March 21st or right
7  around there. And then we changed stuff, and
8  somebody just blew it and forgot to change the
9  date. But the date I signed it was April 3rd.
10   Q.  Well, that was one of my questions,
11 sir, was whether there were earlier drafts of
12 this document or if it sort of came to be in
13 this particular form? I know that you've spoken
14 -- let me just strike all that so we ask a clean
15 question.
16       I know you testified previously about
17 the genesis of the Plan Support Agreement at
18 your prior deposition, correct?
19   A.  Right.
20   Q.  Okay.
21       And, again, I'm not intending to
22 cover ground we've already covered.
23       So just for context, who did you
24 first speak with about the Plan Support
25 Agreement?

Page 79

1    MIKAL C. WATTS
2   A.  As I recall, when I met with Mr. Haas
3  on January the 18th, the subject probably came
4  up, but very, very superficially, as this is the
5  way we did it at PG&E. Sometime in late
6  February - if you want me to pull up my docs, I
7  can get you the exact date - for some reason,
8  February 21 is popping in my head, where I sent
9  them a Plan Support Agreement that was largely a
10 cut and paste from PG&E. And then it sat there
11 for a while.
12       And I don't remember any discussions
13 or negotiations about a Plan Support Agreement
14 at all until after Mr. Haas and I got there on
15 the money.
16       And then at that point we had the
17 money and the timing of the money done, and then
18 it was like, okay, now how are we going to go
19 get the votes that we need? And so the Plan
20 Support Agreement came up.
21       I recall a very specific discussion
22 with Mr. Murdica along the lines of J&J says
23 you're a bad writer, we had to tear it up and
24 start all over again, to which I responded,
25 well -- or Jones Day said, you're a bad writer,

Page 80

1    MIKAL C. WATTS
2  to which I responded, Jones Day is the one that
3  wrote the first draft of PG&E, so call your
4  boss. And, anyway, we moved some stuff and it
5  was different, but it was functionally the same.
6       And so then we had a Zoom meeting, I
7  can't tell you what day, where we kind of went
8  through and moved some stuff around.
9       But the PSA is very skeletal from the
10 standpoint of the only important thing from the
11 PSA, to me, is the attached term sheet, which
12 gives the terms of the deal, right?
13       So I wasn't pencil-whipping the PSA
14 in any substantial way because I just looked at
15 it as a Jones Day billing opportunity to move
16 words around. And I say that with all due
17 respect to my friends at Jones Day, but it's
18 just basically an agreement that says, hey, if I
19 sign this, I agree to support and advocate to my
20 clients that this term sheet is something they
21 should support.
22       MR. MOXLEY: And let's turn to the
23    term sheet. That's page 932 of the PDF,
24    Deane. If we flip to 932.
25   Q.  So this is the term sheet that's

Page 81

1  MIKAL C. WATTS
2  attached -- that's attached to the PSA,
3  Mr. Watts; is that correct?
4  A. Yes.
5  Q. Okay.
6     And there's a grid at the end of
7  this, correct? You had that in mind as well in
8  your last answer?
9  A. Yes.
10 Q. Okay.
11    Mr. Watts, just as a yes-or-no
12 question, did you or your firm send the term
13 sheet attached to the PSA to any clients?
14    (Unidentified voice interruption.)
15    MR. MOXLEY: Sorry, could somebody go
16 on mute, please.
17 Q. Let me just reask that question,
18 Mr. Watts.
19    With respect to the term sheet
20 attached to the PSA, yes or no, did you or your
21 firm send the term sheet to any client?
22 A. No.
23 Q. Again, yes or no, sir, did you or
24 your firm calculate the amount any particular
25 client of yours would receive under the term

Page 82

1  MIKAL C. WATTS
2  sheet's terms?
3  A. It's impossible, no. And you're not
4  allowed to yet in terms of the term sheet.
5  Q. When you say "you're not allowed to,"
6  you're not allowed to run a calculation in
7  terms --
8  A. No, I meant the previous answer.
9  I jumped back.
10    It's my view that under the
11 bankruptcy rules, there's a certain solicitation
12 period, and if somebody starts soliciting -- and
13 the case law, I'll grant you, it's on the fence
14 about whether you can do it with your own
15 clients. But I believe that the more
16 conservative route is to get a solicitation
17 agent the court does under, what is it, 3017(d),
18 get a disclosure statement under 1125, decide
19 when the solicitation period begins under
20 1125(b), and then send it.
21    Because in PG&E, people accused me of
22 soliciting before the solicitation period. They
23 were wrong. But I remember very clearly.
24    And so what I did do is I sent a
25 client update to all of my clients saying we

Page 83

1  MIKAL C. WATTS
2  have a proposed $8.9 billion settlement. We
3  have to go to the court. We have to get past
4  motions to dismiss. We have to litigate what
5  the disclosure statement should look like. And
6  then you're going to get to vote. But you'll be
7  sent a copy of the plan, sent a copy of the
8  disclosure statement, and the like. So they
9  know it's coming, but they haven't gotten it
10 yet.
11 Q. Got it. And so I understand why you
12 were clarifying that now.
13    And let me go back to the second
14 question I was asking, just to make sure the
15 record is clear.
16 A. Yeah.
17 Q. Yes or no, did you or your firm
18 calculate the amount that any particular client
19 of yours would receive under the term sheet's
20 terms?
21 A. No.
22 Q. Okay.
23    Did you calculate what all ovarian
24 cancer clients would receive under the term
25 sheet's terms?

Page 84

1  MIKAL C. WATTS
2  A. You mean all, including other
3  people's clients?
4  Q. Your clients, sir.
5    MR. RASMUSSEN: Objection to the form
6  of the question.
7  A. I don't think you can do that until
8  you know how many people are participating.
9  Now, we have -- we have -- you can do some back
10 of the napkins based on, you know, I've read a
11 lot of about, you know, how many cases there are
12 depending on who you believe. You know, I know
13 the principle division. So you can take a
14 number and divide it by the number of cases and
15 get an average. But as to who is going to get
16 what inside of that average, a lot of that
17 depends on the last two pages of the term sheet
18 and what goes into the plan documents.
19 Q. Okay. Mr. Watts, if it's fine with
20 you, we'll take this down. If you ever need it
21 to be brought back up in the course of the
22 questions, let me know.
23 A. Sure.
24    MR. RASMUSSEN: Gentlemen, gentlemen,
25 was that Exhibit 3? Just wanted to

Page 85

1 MIKAL C. WATTS
2 clarify.
3 (Off the record.)
4 MR. MOXLEY: Thank you,
5 Mr. Rasmussen.
6 Q. Yeah.
7 MR. MOXLEY: Just for the record,
8 Mark, the term sheet was a part of
9 Exhibit 3.
10 MR. RASMUSSEN: Yeah.
11 THE WITNESS: It's Exhibit A to the
12 Plan Support Agreement, which is Exhibit 3.
13 Q. Mr. Watts, what did you understand
14 that you and your firm were agreeing to by
15 signing the Plan Support Agreement?
16 A. So --
17 MR. RASMUSSEN: Objection to the form
18 of the question.
19 MR. WHITNER: Objection to the form
20 of the question.
21 A. Yeah, so there have been a bunch of
22 loaded questions asked in a lot of depositions
23 and, you know, by lawyers that know better.
24 The bottom line is all that we can
25 agree to is as counsel who negotiated a

Page 86

1 MIKAL C. WATTS
2 settlement proposal, to advocate for that
3 proposal for our clients.
4 It's no different than, you know, 25
5 years ago when I would fly to Detroit or Ohio to
6 negotiate a Ford Firestone case. My client
7 wasn't with me. When they got to a number that
8 I thought was fair, I would agree to recommend
9 that to my client. If the client chose not to
10 follow my recommendation, there's no settlement,
11 right? Same thing here, it's just, you know, in
12 massive numbers.
13 Q. And, well, let me ask you this,
14 Mr. Watts, by signing this, do you consider
15 yourself today to be bound to recommend a plan,
16 provided that plan is consistent with the terms
17 of the Plan Support Agreement?
18 A. Yes.
19 MR. RASMUSSEN: Objection to the form
20 of the question.
21 Q. Okay.
22 The answer is yes, sir?
23 A. Yes. That's the purpose of the
24 settlement. You have to agree to bind yourself
25 to what you negotiated.

Page 87

1 MIKAL C. WATTS
2 Q. Right. And if the plans -- if the
3 plan as filed -- strike that.
4 If the plan that the debtor files is
5 inconsistent with the terms of the Plan Support
6 Agreement, you are not bound to recommend it to
7 your clients; is that correct?
8 MR. RASMUSSEN: Objection to the form
9 of the question.
10 A. I agree.
11 Q. As you sit here today, Mr. Watts, are
12 you allowed to withdraw from the PSA if you
13 wish?
14 MR. WHITNER: Objection to the form
15 of the question.
16 MR. RASMUSSEN: And may we have an
17 agreement that an objection by one party is
18 an objection for all, Cameron?
19 MR. MOXLEY: We can indeed.
20 MR. RASMUSSEN: Thank you.
21 Q. Do you have the question in mind,
22 sir? Do you want me to read it back?
23 A. I do. And let me just -- I believe
24 that a man's word is his bond. I gave him my
25 word. So whether the writing allows it, I would

Page 88

1 MIKAL C. WATTS
2 not do it. I've negotiated, drove as hard a
3 bargain as I knew how to drive, got to a number
4 that J&J did not want to pay. And when they
5 agreed to pay it, I had a conversation with Erik
6 Haas that said, if I go to the board and get
7 this, do you promise to support it? And I said
8 yes. And so I'm not going to back off on that
9 commitment that I made.
10 Now, that being said, there are all
11 sorts of ways that an 8- or 9-page term sheet
12 can be improved in a way that's beneficial for
13 everyone. And, you know, I know it was
14 frustrating to some of the members of the TCC
15 when it seemed to be the J&J's stock line, join
16 us, make it better, join us, you know.
17 But the bottom line is just because
18 something changes or is optimized doesn't mean
19 that it blows up the deal, right? So any way to
20 make the term sheet become a plan that is better
21 than what was envisioned in the term sheet, I'm
22 for it.
23 Q. And the Plan Support Agreement --
24 just so the record's clear, the Plan Support
25 Agreement doesn't obligate your client to do