IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | Tuesday, April 18, 2023 |
| . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF HEARING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
PROCEDURE 400l(a)(3) [DOCKET 7l]; AND DEBTOR'S MOTION FOR AN
ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
SERVICE PROCEDURES MOTION
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

For the Debtor:               Jones Day
                              By:  GREGORY M. GORDON, ESQ.
                                   DAN B. PRIETO, ESQ.
                                   AMANDA S. RUSH, ESQ.
                              2727 North Harwood Street, Suite 500
                              Dallas, TX  75201

                              Skadden Arps Slate Meagher &
                                Flom, LLP
                              By:  ALLISON M. BROWN, ESQ.
                              One Manhattan West
                              New York, NY  10001

Various Talc Personal         Watts Guerra LLP
Injury Claimants:             By:  MIKAL C. WATTS, ESQ.
                              5726 W. Hausman Road, Suite 119
                              San Antonio, TX  78249

For Ad Hoc Committee          Genova Burns LLC
of Certain Talc               By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc          494 Broad Street
Committee of Creditors:       Newark, NJ  07102

                              Brown Rudnick
                              By:  JEFFREY L. JONAS, ESQ.
                                   DAVID J. MOLTON, ESQ.
                                   MICHAEL WINOGRAD, ESQ.
                              7 Times Square
                              New York, NY  10036

                              Otterbourg PC
                              By:  MELANIE CYGANOWSKI, ESQ.
                              230 Park Avenue
                              New York, NY  10169-0075

For Anthony Hernandez         Kazan McClain Satterley & Greenwood
Valadez:                      By:  JOSEPH SATTERLEY, ESQ.
                              55 Harrison St. Suite 400
                              Oakland, CA  94607

For the Office of the         Office of the United States Trustee
United States Trustee:        By:  LINDA RICHENDERFER, ESQ.
                                   JEFF SPONDER, ESQ.
                              J. Caleb Boggs Federal Building
                              844 King Street, Suite 2207
                              Lockbox 35
                              Wilmington, DE 19801

APPEARANCES CONT'D:

| | |
|---|---|
| For Various Talc<br>Claimants: | Maune Raichle Hartley Frency &<br>  Mudd, LLC<br>By:  CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |

```
For Various Talc          Maune Raichle Hartley Frency &
Claimants:                   Mudd, LLC
                          By:  CLAYTON L. THOMPSON, ESQ.
                          150 West 30th Street, Suite 201
                          New York, NY 10001

                          Levy Konigsberg, LLP
                          By:  JEROME H. BLOCK, ESQ.
                               MOSHE MAIMON, ESQ.
                          101 Grovers Mill Road, Suite 105
                          Lawrence Township, NJ  08648

                          Simon Greenstone Panatier, PC
                          By:  LEAH CYLIA KAGAN, ESQ.
                          1201 Elm Street, Suite 3400
                          Dallas, TX  75720

For Claimant Alishia      Beasley Allen
Landrum:                  By:  ANDY BIRCHFIELD, ESQ.
                          218 Commerce Street
                          Montgomery, AL  36104

For Arnold & Itkin:       Pachulski Stang Ziehl & Jones LLP
                          By:  LAURA DAVIS JONES, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE 19801

For Paul Crouch,          Ruckdeschel Law Firm, LLC
individually and on       By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of       8357 Main Street
Cynthia Lorraine Crouch:  Ellicott City, MD 21043

For the Ad Hoc Committee  Womble Bond Dickinson
of Attorney Generals:     BY:  ERICKA JOHNSON, ESQ.
                          1313 North Market Street
                          Suite 1200
                          Wilmington, DE, US 19801
```

- - - - -

1 first-day hearing that a fundamental objective of this debtor

2 is to resolve all claims of all talc clients.  Admirable

3 objective, but that doesn't mean they qualify for bankruptcy.

4           And that's the lesson learned in part from the Third

5 Circuit opinion.  And I'll have other lessons in that opinion,

6 but that's one of the lessons from the Third Circuit opinion.

7 That objective alone is not grounds for the filing of a

8 bankruptcy.

9           To bring us back to what we are here today to talk

10 about, there's no debate.  LTL's covered by the stay.  What we

11 are only talking about today is LTL non-debtor affiliates.

12 We're talking about J&J, JJCI, Holdco.  I don't know what all

13 the names are at this point in time, Your Honor.  They've

14 changed since the first case.  But that's what we're talking

15 about.  Whether 362 allows this Court to extend the stay or

16 whether under 105 Your Honor has the power to impose a stay to

17 prevent claims from going forward against non-debtor

18 affiliates.

19           And in order to get the preliminary injunction, I

20 just want to bring us all back to the four elements that the

21 people who want the injunction and stay must prove.  There's no

22 burden of proof on people opposing the preliminary injunction

23 to prove bad faith.  I think that was implied in Mr. Gordon's

24 opening remarks.  There's no objective.  There's no burden

25 today to do that.

37

1          The burden is totally on the movant.  And the movant

2    must prove likelihood of success on the merits that it is in

3    the public interest that when you balance the harms, Your Honor

4    should extend the stay or the preliminary injunction.  And you

5    have to look at the irreparable harm to the ability to

6    reorganize.  That's the way that they have phrased it.

7          In my opening remarks, I'm only going to focus on two

8    or three of these points.  There will be a lot more in the

9    closing after Your Honor has a chance to hear the evidence.

10   Likelihood of success on the merits, remember, this is

11   likelihood of success from the non-debtor affiliates.  Not LTL,

12   non-debtor affiliates.

13         So first we have the issue that we've been talking

14   about and that I've talked about during the first-day hearing,

15   number of people in favor of the plan.  This is not a situation

16   where we have an RSA that the actual creditors have signed on

17   to.  We have a PSA where attorneys have signed on to it,  And

18   as has been mentioned, the attorneys admit it's still up to

19   their clients to vote on the plan.

20         One of the things we tried to determine during

21   discovery and Your Honor will hear evidence of this is to what

22   extent has the number been I'll call it de-duping.  I don't

23   know what else to call it.  I speak from experience in Imerys.

24   I can tell you how many claims were knocked out because more

25   than one attorney thought that they represented the same party.

1  Sometimes it's because the party actually did sign more than

2  one agreement.  It happens.

3          And there were thousands if not tens of thousands of

4  votes that were knocked out because of that.  But nobody here

5  is de-duped.  I don't know whether the number is 60, 70, 80.  I

6  don't know if it's 30 or 40.  I don't know what it is.  But we

7  also don't know how many of those people will ever be able to

8  vote on the plan because we don't know how many of those people

9  have medical records that support the fact that they should be

10 voting on this plan, or how many of these people can show that

11 they had exposure to talc products.  And that's based on the

12 deposition testimony of people like Mr. Watts and Mr. Pulaski.

13         The other issue that comes up on likelihood of

14 success on the merits is will this case survive a

15 jurisdictional challenge.  Will this case survive a motion to

16 dismiss?  And the third issue is if this case survives the

17 challenge, will there be a channeling injunction and a case

18 where LTL and J&J tell us there's no asbestos in their product,

19 or will there be a third-party release in this plan to cover

20 the non-debtor affiliates?

21         That's an important point, Your Honor.  It's an issue

22 that I'm sure Your Honor's well aware how it's pending in front

23 of the Second Circuit yet and hopefully they'll rule any day

24 now in the Purdue case.  But likelihood of success on the

25 merits, we need to focus on the non-debtor affiliates.  And

1    that last point is very important.

2            I'm also going to talk about the public interest

3    here.  I'll allow plaintiffs' counsel and Committee counsel to

4    focus on the balance of harms.  But I need to talk about the

5    public interest here, Your Honor.

6            The Third Circuit, we are well aware of, stated that

7    good intentions of resolving talc claims wasn't enough.  There

8    needed to be financial distress.  And it found that financial

9    distress wasn't present on the record before it.

10           And I've heard during depositions, I've heard during

11   argument that the Third Circuit gave LTL the path forward on

12   how to file the second bankruptcy.  Your Honor, I think it's in

13   the public interest that we make clear the Third Circuit, in no

14   uncertain terms, gave LTL a path forward to turn around two

15   hours and eleven minutes later to file a bankruptcy case after

16   it went through the machinations that it did.

17           And it's important to look at where Footnote 18

18   appears in the Third Circuit's opinion.  Third Circuit said,

19   quote, while LTL inherited massive liabilities, its call on

20   assets to fund them exceeded any reasonable projections

21   available on the record before us.

22           The, quote, attenuated possibility, end quote, that

23   top litigation may require it to file for bankruptcy in the

24   future does not establish its good faith as of the petition

25   date.  At best, the filing was premature.

Kim - Cross/Jonas                                    45

1  A    And the McDonald Worley PC firm, it's listed on your

2  latest petition.  It's not on your earlier petition, correct?

3  A    Again, I'd have to check.  I believe -- if you represent

4  that's true, I'll believe that.

5  Q    Okay.  The Pulaski Kherker firm, it's listed on your

6  latest petition but not on your earlier petition, correct?

7  A    Again, same answer.  I could check if you'd like me to.

8  But I'll take -- I trust your representation.

9  Q    The Reub Stoller & Daniel firm, listed on your latest

10 petition, not your earlier petition, correct?

11 A    Again, same answer.  I will defer to your representation.

12 I'd have to check to make sure.

13 Q    The Watts Guerra firm, listed on your latest petition, not

14 your earlier petition, correct?

15 A    Same -- same answer.

16 Q    Okay.  Now all the firms I just mentioned, they're law

17 firms with which LTL has entered into plan support agreements,

18 right?

19 A    I would have to check the plan support agreements to

20 confirm what you said.  I haven't memorized all the firms.

21 Q    Will you accept my representation on that?

22 A    If you say so.  But again, I'd have to go check to --

23 Q    Okay.

24 A    -- to confirm.

25 Q    All right.  Now let's go back and look at Exhibit 1, the

Kim - Cross/Jonas                                           46

1  petition filed in LTL-1.  You see the Ashcraft & Gerel firm

2  listed there?  Right at the second firm listed.

3  A    I'm sorry.  I'm trying to get to the list.

4  Q    Sure.  It's on Page 16 of 22.

5  A    Okay.

6  Q    Do you see the Ashcraft & Gerel firm?

7  A    I do see that.

8  Q    That firm was a member of the TCC, the Talc Claimants

9  Committee, in the first bankruptcy case.  Wasn't it?

10 A    I actually don't -- don't know what the composition of the

11 TCC was.

12 Q    Okay.  Okay.  You didn't include that firm in your

13 bankruptcy petition this time around, did you?

14 A    Again, I'll take your word for it.  I can check if you'd

15 like me to.

16 Q    The Karst Von Oiste firm that's listed, I think it's,

17 let's see, number 17.  That firm was a member of the Talc

18 Claimants Committee in LTL-1, wasn't it?

19 A    Again, I don't know the composition of the committee.

20 Q    You didn't list that firm here, did you?

21 A    Again, I'll take your -- I'll take your word for it unless

22 you want me to check.

23         MR. JONAS:  I'll tell you what.  Your Honor, may I

24 approach?

25         THE COURT:  Sure.

Kim - Cross/Jonas                                    47

1            MR. JONAS:  Your Honor, I don't have enough copies.

2    So I'll just introduce it.  Hopefully, it will refresh the

3    witness' recollection.  It's an order appointing the Official

4    Committee of Talc claimants, again LTL-1.

5            THE COURT:  Okay.

6    BY MR. JONAS:

7    Q    Mr. Kim, you're looking at -- okay.  You're looking at a

8    list.  And you'll see it's from the North Carolina bankruptcy

9    case.  And it has the representatives.  And I appreciate that

10   the law firms themselves are not members.  But they have

11   clients that are members of the Talc Claimants Committee and

12   they're representatives.

13        And you'll see on there, just to confirm what I've

14   represented to you, you see on there the Ashcraft & Gerel firm,

15   right?

16   A    I see this on this list, yes.

17   Q    And you see the Karst Von Oiste firm, don't you?

18   A    I do see that on the list.

19   Q    You see Weitz & Luxenberg?

20   A    I do see that on this list, yes.

21   Q    Do you see Kazan McClain?

22   A    I do see that on the list.

23   Q    And the Levy Konigsberg firm, do you see that on there?

24   A    I do.

25   Q    Okay.  Now all of the firms I just mentioned that you,

Kim - Cross/Jonas                                              60

1  Q    Do you know if Mr. Murdica had any medical information

2  with respect to the underlying claimants?

3  A    Again, just like every other claim including claims --

4  claimants represented by members of the TCC, we don't ask for

5  that type of material.  We don't vet it.  There's no need to do

6  it at this juncture.  When it comes down to voting, whether

7  it's a valid vote, when it comes down to payment, whether we

8  actually have to pay these people, that's when it makes sense

9  to do that process.

10       It doesn't make sense to take the effort, the cost, the

11 time at this juncture when all we're asking for is an

12 indication of support for a plan.  We did not pay these --

13            THE COURT:  The answer's no.  The answer is no.

14            MR. JONAS:  Sorry, Your Honor.

15 BY MR. JONAS:

16 Q    Last question on this topic, and I promise I won't --

17 Mr. Kim, of these lists you have of claimants, you don't know

18 if there's any duplicate claimants on those lists, do you?

19 A    No.  But what I do know is that when we -- when going

20 through this process, we asked these plaintiffs' lawyers to

21 only give us names of people who they are the main counsel for.

22 Q    That was a no?

23 A    That's a no.

24 Q    Okay.  Okay.  Okay.  In the first day declaration you

25 filed in the first bankruptcy case on October 4th, 2021, you

Kim - Cross/Jonas                                              61

1  state, and I'll quote, the design of the 2021 corporate

2  restructuring insures that the debtor has at least the same, if

3  not greater, ability to fund talc-related claims that -- and

4  other liabilities as old JJCI had before the restructuring.

5  You said that in your first declaration, right?

6  A    I did.

7  Q    And the first funding agreement, I may call it funding

8  agreement one versus funding agreement two, the first funding

9  agreement was available to LTL, the debtor here, both in and

10 outside of bankruptcy, correct?

11 A    Based upon the facts and law that we knew at the time,

12 yes.

13 Q    That's a yes?

14 A    At that time, yes.

15 Q    Under the funding agreement one, there was total value of

16 around, let me -- I think you said around $60 billion available

17 to LTL, correct?

18 A    At the time of the filing, there was.

19 Q    Today, under funding agreement two, the total value

20 available to LTL is tens of billions of dollars less than under

21 funding agreement one, correct?

22 A    That's assuming that funding agreement one was still

23 enforceable and not void or voidable.  If the Third Circuit had

24 not rendered the opinion the way it had, then that would be

25 true.

Kim - Cross/Jonas                                      62

1  Q    Sir, very, very important question, okay?  Yes or no.

2  Today, under funding agreement two, the total value available

3  to LTL is tens of billions of dollars less than was available

4  under funding agreement one.  Yes or no?

5  A    That is not true.

6  Q    So you think today, LTL-2 -- no, strike that.  You think

7  that the debtor today under funding agreement two has available

8  to it to satisfy talc claims around $60 billion?

9  A    No, that's not what I said.  What I said was that it's not

10 the -- not tens of billions of dollars less because you have to

11 take into account that because of the Third Circuit decision,

12 funding agreement two was rendered void or voidable, and

13 there's material risk that it was not enforceable.  So

14 therefore, if you're trying to compare those two, I think that

15 statement would not be true.

16 Q    I don't want to compare anything.  I just want -- let's --

17 I'll tell you what.  Let's do it this way.  Funding agreement

18 one, the debtor had $60-odd billion available to it to satisfy

19 my client's claims, right?

20 A    Prior to the Third Circuit decision, I would say yes.

21 Q    Great.  Today, how much does the debtor have available to

22 it under its funding agreement to satisfy talc claims?

23 A    I think there's a calculation about what the value of --

24 an internal valuation of the principal assets of Holdco which

25 is around $30 billion, plus the amounts that LTL has through

Kim - Cross/Jonas                                    63

1  (indiscernible).

2  Q    Well, pick a number.  Is it 30, is it 40?  I don't know.

3  You're the chief legal officer of the debtor, right?  Let me

4  ask you a few questions.  You're the chief legal officer of the

5  debtor, right?

6  A    I am.

7  Q    Now, do you understand that these funding agreements,

8  they're the most valuable asset of the debtor, right?

9  A    That's true.

10 Q    Do you understand how critically important they are to

11 talc victims who the only way they're going to be able to

12 recover effectively is under the funding agreement?

13 A    I do.

14 Q    Okay.  So when you negotiated funding agreement two, you

15 had that in mind how critically important it was, right?

16 A    Well, when we agreed to funding agreement two, I did.

17 Yes.

18 Q    So did you think to yourself I better make sure I get at

19 least $60 billion of value for these people because I'm a

20 debtor in Chapter 11.  I have fiduciary duties to these people.

21 And I better make sure I get them at least the same amount of

22 value.  Did that go through your mind?

23 A    No, because at the time that -- after the Third Circuit

24 decision, the -- it was clear, there was consensus reached that

25 the first funding agreement was void or voidable, at least the

Kim - Cross/Jonas                                                64

1  J&J guarantee part of that.  And so when we were entering into

2  funding agreement two, we took out this risk of enforceability

3  and put in a new agreement that would benefit all the parties.

4  Q    Sir, do my clients have the same amount that they can

5  recover from under funding agreement two as under funding

6  agreement one?  Yes or no?

7  A    No, because of the Third Circuit decision, not because of

8  what we did.

9  Q    It's the Third Circuit's fault?

10        MS. BROWN:  Your Honor, I object.  It's

11  argumentative.

12        THE COURT:  Sustained.

13  BY MR. JONAS:

14  Q    Are you saying that the Third Circuit is responsible for

15  my clients having tens of billions of dollars less that they

16  can recover from?

17        MS. BROWN:  Same objection, Judge.

18        MR. JONAS:  I'd like to know, Your Honor.

19        THE COURT:  Overruled.

20        THE WITNESS:  What I'm saying is that when the Third

21  Circuit made its decision, one of the ramifications of the

22  decision was that it frustrated the purpose of the first

23  funding agreement, rendering it void or voidable.  So I don't

24  think -- the Third Circuit didn't meant do that.  I don't blame

25  the Third Circuit for doing that.  It's just a consequence of

Kim - Cross/Jonas                                    65

1  how the Third Circuit ruled.

2          Therefore, when we were looking at this, from LTL's

3  position, we're now looking at an agreement, a funding

4  agreement which is the most valuable asset that has been

5  rendered void or voidable.  And so we came up with the solution

6  to try to rectify the situation, get -- get sufficient funding

7  for the claimants, and turn to a plan, a support agreement with

8  J&J where they would provide enough liquidity to come up with

9  the -- a solution to the issue which is embodied in the

10  proposal.

11  BY MR. JONAS:

12  Q    So when you gave up funding agreement one and you entered

13  into funding agreement two, you were trying to take care of my

14  clients?  Is that what you're saying?

15  A    Yes, absolutely, because we did not give up funding

16  agreement one.  Funding agreement one became void or voidable

17  and unenforceable, particularly the J&J guarantee as a result

18  of the Third Circuit decision.

19          What we did, we took that situation and tried to come up

20  with a situation for the benefit of all parties.  So we

21  exchanged an unenforceable funding agreement with an

22  enforceable funding agreement with Holdco, and a plan support

23  agreement that would provide, you know, $8.9 billion in a

24  settlement that has been -- that has the overwhelming support

25  of claimants.

Kim - Cross/Jonas                                          74

1  A     That is true.

2  Q     And your determination was based on a footnote in the

3  Third Circuit's decision, right?

4  A     Well, that was part of it.  It was the entire decision.

5  But the footnote was a good marker for that, yes.

6  Q     And let me ask you, going back to when you first did

7  funding agreement one because again, that was the most valuable

8  asset, right?

9  A     Yes.

10  Q     You knew how important it was, right?

11  A     Yes.

12  Q     You knew it was really important to my clients, right?

13  A     We understood it was important for everyone.

14  Q     So when you negotiated funding agreement one, you hired

15  great counsel, Jones Day, right?

16  A     We did.

17  Q     Yeah.  And you really put a lot of effort into making sure

18  that funding agreement one would be a great agreement.  It

19  would always be available to our clients, right?

20  A     Well, in bankruptcy, yes.

21  Q     I thought you said the funding agreement was available in

22  and out of bankruptcy.

23  A     Well, it's a little complicated because the funding

24  agreement is really in two parts.  There's the part where JJCI

25  has, you know, has given up its agreement to fund up to its

Kim - Cross/Jonas                                     75

1  value.  And then there's the J&J basically backstop.  That

2  backstop really was only intended to deal with things in

3  bankruptcy.

4       The J&J -- the JJCI portion of it, you know, is really a

5  function of the fact that we filed the divisional merger and we

6  had to take all the assets, or we wanted to have the assets of

7  JJCI.

8  Q    Did J&J tell LTL that it would not honor the funding

9  agreement outside of bankruptcy after the Third Circuit's

10 decision?

11 A    No, it didn't get that far because we came to a

12 resolution.  We understood the funding agreement was void or

13 voidable.  We never said to J&J well, you must pay us or else.

14 We both came to the conclusion, and a consensus, that the

15 funding agreement was void or voidable, possibly unenforceable.

16 There's a material risk.

17      And so what we did was we negotiated a solution.  We came

18 to a consensus on a solution to it before having a need to how

19 J&J, you know, refused to fund anything.

20 Q    Did you go to the TCC or any of the talc claimants, the

21 beneficiaries of funding agreement one and say hey guys, let's

22 talk about this.  We've got to figure out a strategy against my

23 counter party J&J because I don't want to lose $60 billion.

24 Did you talk to any of these folks who were the beneficiaries

25 about what to do?

Kim - Cross/Jonas                                    76

1  A    I did not.  I had my own counsel.  And I did my own review

2  and came to my own conclusions.

3  Q    So you thought it was best for you, yourself, to make

4  decision for tens of thousands of talc victims as to how to

5  handle the funding agreement?

6  A    I relied on, again, discussions I had with my counsel.

7  And we came -- and this is the path we chose.

8  Q    Did the board or anybody at LTL examine whether maybe

9  there was a claim against your counsel to what negotiated the

10 first funding agreement?

11         MS. BROWN:  Your Honor, I'm going to object to the

12 extent that implicates legal advice and exploration of legal

13 claims.  I don't think that's proper.

14         THE COURT:  Overruled.

15         THE WITNESS:  I think I did answer this in the

16 deposition.  So again, having been involved in putting together

17 the funding agreement, I was aware of these issues.  There was

18 -- it was clear to me and to others that this was something

19 that was completely unforseen and would be unforseen by all

20 parties.  And there was no question that there was no need to

21 try to look into filing a lawsuit against counsel.

22 BY MR. JONAS:

23 Q    I think everybody's going to get sick of me in about 30

24 seconds.  So I'm going to ask one last question to wrap it up

25 and see if I have it right.  Maybe I do, maybe I don't.  My

Kim - Redirect/Brown                              179

1  questions to clear something up.

2       Earlier this morning, sir, you were asked a number of

3  questions about funding agreement one and funding agreement

4  two.  Do you remember those questions?

5  A    I do.

6  Q    Okay.  And numbers were put on those funding agreements,

7  like $61.5 billion and the like, right, sir?

8  A    Yeah, I recall that.

9  Q    Okay.  But the truth is, sir, that the value of the

10  funding agreements are driven by the talc liability, correct?

11  A    It is.  It would be part of that, the value.

12  Q    Okay.  And so, for example, J&J'S liability is limited to

13  J&J's exposure for the talc liability, correct?

14  A    That would be the -- right.  So when you say -- I think

15  the issues --

16             UNIDENTIFIED SPEAKER:  (Indiscernible)

17             THE COURT:  Leading?

18             UNIDENTIFIED SPEAKER:  Both leading, yes.

19             THE COURT:  Try to avoid the leading if possible.

20             MS. BROWN:  I will, Your Honor.  Just trying to move

21  it along.  But I will, I'll ask an open-ended question.

22  BY MS. BROWN:

23  Q    Mr. Kim, you were going to answer that?

24  A    Yes.  The opening question.  Yeah, the amount of money

25  we're talking about, of course, is the maximum that is, not the

Kim - Redirect/Brown                                    180

1  exposure, of liability.  So it's the amount that they agreed to

2  fund not any, you know, what the exposure.  I think that's what

3  the question that you're getting at is.

4  Q    Well, and in terms of the liability, that was the same

5  under funding agreement one -- in terms of whether -- do you

6  have a view on whether or not the liability changed under

7  funding agreement one and funding agreement two?

8  A    Well, so the talc liability, so I, yeah I see.  The talc

9  liability is enormous.  We don't have an aggregate number for

10 it, but it is, you know, huge.  I think what I would do is

11 refer to all the testimony I gave in the prior proceeding about

12 the liability and adopt that here.

13      That liability, if anything, has gotten bigger.  We know

14 that after a year of being in bankruptcy, we have at least -- I

15 think it almost doubled from what we know from unknown claims.

16 So what I would say is that the liability itself is even much

17 larger than it was when the first bankruptcy was filed.

18 Q    And how does that liability relate to the value of the

19 funding agreement?

20 A    Well, at the end of the day, we believe that we have

21 sufficient funds to meet the liability except for the -- so we

22 believe we're not insolvent, but we do believe that we are in

23 financial distress because of the magnitude of the liability,

24 the wild and unpredictable verdicts, the cost of the

25 litigation, which is ever increasing.

Kim - Redirect/Brown                          181

1  Q    So putting aside the liability and the value of the

2  funding agreements, are you familiar with commitments to fund

3  that J&J and LTL made in the first bankruptcy and in this

4  bankruptcy?

5  A    I am.

6  Q    Okay.  And unlike the amount of the liability, have the

7  commitments changed from the first bankruptcy to this

8  bankruptcy?

9  A    They have.  They're changed in terms of where they're

10 coming from.

11 Q    And was the commitment in the first bankruptcy

12 approximately $2 billion?

13 A    Oh, well, the commitment of $2 billion was the original

14 amount that was going to be put into a qualified trust fund.

15 And that's changed dramatically from the $2 billion.  Now, it's

16 the $8.9 billion in the bankruptcy.

17 Q    Okay.  And so the commitment has gone from 2 billion to

18 8.9 billion now, correct?

19 A    From the first qualified fund in the first bankruptcy to

20 what is now committed in the second bankruptcy has increased to

21 $8.9 billion.

22 Q    Okay.  Thanks very much, Mr. Kim.

23         MS. BROWN:  I have no further questions.

24         THE COURT:  Thank you.

25         Any redirect?

1   these entities at about $30 billion.

2          Next slide, please.

3          So on the fraudulent transfer allegation, you know,

4   we've heard from the beginning that this is the largest

5   fraudulent transfer that's ever occurred in the history of the

6   United States.  But we don't believe there's a basis to find

7   either an actual or a constructive fraudulent transfer.  I

8   don't think there's any question based on the financing

9   arrangements that are in place that the debtor has sufficient

10  funding or sufficient resources to fund the agreed plan.  And

11  in that case, both the funding agreement and the J&J support

12  agreement are available to provide funding.  Again, as I've

13  said before, we believe the debtor has sufficient asset value

14  to cover talc costs outside of bankruptcy, again based on the

15  assets of HoldCo and the debtor.

16         And then the other point I wanted to make here --

17  and, obviously, there's a major disagreement over this, but you

18  heard Mr. Kim answer many, many questions in response on this

19  issue.  We believe -- the debtor believes that there was a

20  serious question, and I think Mr. Kim characterized it as a

21  material risk, that in the wake of the Third Circuit ruling the

22  funding agreement would no longer be enforceable.

23         And, you know, fundamentally, the thinking is that

24  the way the court ruled was not reasonably foreseeable.  It had

25  the effect of frustrating the central purpose of the funding

1  agreements.  We don't believe it was reasonably foreseeable to

2  affect -- to expect that the Third Circuit would find that the

3  funding agreement had the exact opposite effect of what it was

4  intended to do.

5        It was intended to facilitate a bankruptcy.  It

6  wasn't intended to make a bankruptcy unavailable.  Yet, that's

7  where we ended up.

8        THE COURT:  Well, let me ask this --

9        MR. GORDON:  Yeah.

10        THE COURT:  -- Mr. Gordon.  One of the arguments

11  that's been put forward is that the funding agreement clearly

12  provided for a mechanism of payment outside of a bankruptcy.

13        MR. GORDON:  Correct.

14        THE COURT:  So how can it not be reasonably

15  foreseeable to have a situation where the debtor is outside of

16  a bankruptcy as a result of a dismissal of the case by this

17  Court or the reversal?  How is that not foreseeable, and why

18  would it make it void or voidable?

19        MR. GORDON:  Well, the point I'm making -- that's a

20  really good question, Your Honor.  The point I'm making is I'm

21  not saying that a dismissal was not reasonably foreseeable.

22  Obviously, we -- the --

23        THE COURT:  Well, I didn't see it coming, but go

24  ahead.

25        MR. GORDON:  Well, I'm just saying -- I'm talking

1  about in a more general way.  For example, the case -- let's

2  just say we were still here three years later and weren't

3  making much progress.  You could see the case being dismissed.

4  The debtor might dismiss at some point, saying there's just no

5  hope.

6          So we -- there was a recognition that a dismissal

7  could occur.  The point I'm making is that nobody could have

8  expected that the dismissal would be based on the existence of

9  an agreement that was intended to facilitate the bankruptcy.

10  And that's, to us, what raised a material question as to

11  whether the fundamental purpose of that agreement was

12  frustrated, affecting its enforceability, whether there was

13  really any consideration received, for example, by J&J in

14  making its commitment, because its commitment was intended to

15  facilitate a bankruptcy.

16          And Your Honor may remember this, but I remember it

17  very well.  In North Carolina, we were always being criticized

18  in these funding agreements on the basis that what's to stop

19  the (indiscernible) from dividending all its assets up to the

20  parent.  And one of the big justifications or thinking behind

21  this funding agreement or the J&J support was just to take that

22  issue off the table.

23          And, again, it was to facilitate a filing to get

24  parties beyond concerns about fraudulent transfer and then move

25  forward to try to confirm a plan.  And the tables were

211

1  completely turned on us where the Third Circuit came back and

2  said that's exactly the opposite of what you intended.  In

3  fact, it's what disqualified you.  We recognize the irony in

4  our opinion, but that's where we are based on financial

5  distress.

6          Did I answer your question, Your Honor?

7          THE COURT:  It's an answer.

8          MR. GORDON:  I wasn't asking you to comment whether

9  it was a good answer, of course.

10          You know, I think the -- you know, the other thing I

11  want to say about this is one reason we're getting into this

12  point is I think it takes off the table the idea of there's

13  some problem with reasonably equivalent value.  Because from

14  our perspective, we weren't just in a situation where we were

15  saying we're just giving up something for nothing.  We had a

16  concern that there was a material issue about enforceability.

17  And in return for eliminating that risk, we got a new funding

18  agreement and a new support agreement which provided the debtor

19  with the ability, in our view, to satisfy claims both inside

20  the bankruptcy and outside the bankruptcy.

21          And so, from our perspective, there was sufficient

22  value to pay claims both before and after.  And I should

23  comment on that.  I should pause and comment for a second,

24  because there were a lot of questions today about a $60 billion

25  funding agreement versus a $30 billion funding agreement, and

1  whatever, I can't do the math this late at night in claims for

2  a fraudulent conveyance.  And as Mr. Jonas pointed out, under

3  548, there's two provisions in there.  They don't have to prove

4  insolvency under 548, I'm going to get it wrong now, --

5          THE COURT:  A.

6          MS. RICHENDERFER:  8(2)(a).  Thank you, Your Honor.

7  They don't have to prove insolvency.  You have to prove intent

8  and I think we've already heard an awful lot because they

9  intended to get rid of that agreement.  Mr. Kim was very clear.

10 They intended to get rid of that agreement and they did.  They

11 got rid of that agreement.  May have been based on bad, legal

12 advice.  I don't know because I just don't understand how void

13 or voidable, I mean if it's voidable, that means that one of

14 the two parties has to take a step to make a void.  If it's

15 void, then when did it become void?  Was it void ab initio?

16 Did it become void because the Third Circuit said you're not

17 suffering financial distress.  I don't know when allegedly it

18 became void.  But if it's voidable, one of the two parties has

19 to take a step and Mr. Kim doesn't define when that occurred,

20 just people were talking about it and then next thing you know

21 there's no agreements that are in place.

22          These are all issues that go to the success on the

23 merits, Your Honor.  They go to issues that will probably be in

24 front of this Court maybe on May 3rd, I don't know.  I guess it

25 depends on how fast we all can move on appropriate motions to

1  dismiss.  But those are issues that are going to be back in

2  front of this Court.  But when LTL 2.0 came in, it had a lot of

3  money.  And the difference is this, Your Honor.  If we assume,

4  and I'll assume for the sake of argument, that they have 60,000

5  claimants all tied up because their attorneys are going to send

6  in ballots signing their names.  That's what happened in Imerys

7  and we ended up with a huge amount of votes that gone thrown

8  out for one reason or another.  One being absolutely no proof

9  of the claimant themselves, 15,000 of them having a claim and

10 other votes got thrown out because multiple law firms were

11 submitting ballots and it wasn't that the claimants were

12 signing two ballots, it was at two different law firms were

13 submitting a ballot for the same person.

14        So let's just assume that they do have 60,000 claims.

15 I don't know if that's claimants tied up.  I don't know if it's

16 75 percent or not, Your Honor.  I really don't know.  Because

17 of the overwhelming number of claims that Mr. Watts has

18 acquired since the first filing.  I don't know whether or not

19 anybody else has equally acquired the same number of claims.

20        But there's also the State Attorney Generals has

21 substantial claims.  And I heard reference made to claims

22 against Imerys and Cypress.  Well, I'll tell you this, Your

23 Honor.  There have been adversary proceedings pending since,

24 see 2019 is when Imerys filed so probably 2020, adversary

25 proceedings by Imerys against Johnson & Johnson for

1 indemnification claims and also seeking coverage under these

2 insurance policies that are part of the monies that may or may

3 not end up in the pot here for this case.

4          And I will tell you that both Imerys and Cypress also

5 believe they have huge indemnification claims against Johnson &

6 Johnson.  And I believe it was one of the counsel for the

7 debtor, Your Honor, made a comment about how well, you know if

8 claims get covered in the Imerys case.  Your Honor, I went back

9 and I looked and of the 12 primary law firms, that have signed

10 PSA's, all but two of them either had no votes submitted in the

11 Imerys case or had their votes thrown out because there were

12 other law firms claiming the particular claimant as their

13 client.

14          So I don't see that there's going to be a lot of

15 overlap between people that are going to try to get paid

16 through the Imerys trust and people that are going to try to

17 get paid through the J&J or the LTL trust.  And we started off

18 this case back in October 2021 with a pot of money that I will

19 admit is larger than what I can even comprehend.  We now in LTL

20 2.0 have a pot plan, meaning here it is, here's the cutoff.  So

21 all of you tort claimants, all you State Attorney Generals,

22 anybody seeking indemnification from us, insurance carriers,

23 Blue Cross, Blue Shield, here it is.  Divvy it up.

24          There's a huge difference between the two.  And

25 that's the problem here, the pot plan.  There might still be

1  money here but they gave away an awful lot while they were

2  still in bankruptcy and I think that's just the most important

3  point, one of the most important points from my office is that

4  what was the conduct while they were still in bankruptcy.  And

5  we were relying on them in their capacity as fiduciaries for

6  the debtor's estate.

7          This time around, Your Honor, not only do we have the

8  debtors coming into the Court with that hanging over their

9  heads, we have the debtors coming to the Court with the Third

10  Circuit's opinion hanging over their heads.  I will never

11  comprehend how they believed that that gave them permission to

12  get rid of the 2021 funding agreement, how they thought that

13  Judge Ambro was telling them to do that.

14          And maybe when this is all over and done with we can

15  have a drink sometime with Judge Ambro and see if that was

16  really what he had in mind when he wrote that opinion and put

17  (indiscernible) got in there.

18                          (Laughter)

19          MS. RICHENDERFER:  I didn't know I was going to get

20  such a laugh on that one.

21                          (Laughter)

22          THE COURT:  I'll ask at the Third Circuit conference

23  coming up.

24          MS. RICHENDERFER:  Okay, Your Honor.  And then when

25  all this is over, they'll have a drink with you.  Then you can

1  tell us what Judge Ambro says.  But I know that Footnote 18

2  talks about fraudulent conveyances, which to me is saying don't

3  do it.  But I guess minds can differ, that's why lawyers have

4  jobs, because we all disagree about how to interpret things.

5           It's beyond challenge that funding agreement one was

6  available in or outside of bankruptcy.  Mr. Jonas already told

7  you, I think, about the colloquy that went forth between, it

8  was Judge Ambro who asked the question, and appellate counsel

9  for the debtor at first said that it wasn't available outside

10  of bankruptcy.

11           And then one of the co-counsel whispered in his ear

12  and he went up and he corrected himself.  And Judge Ambro said

13  yes, I know that.  I mean, Judge Ambro asked that question

14  knowing the answer, and he got the wrong answer and then got

15  corrected.  So that agreement was available in or out of

16  bankruptcy.

17           Your Honor, the plan.  And Your Honor saw me asking

18  questions of Mr. Kim about this.  A plan in a case like this is

19  going to be 50, 60, 70 pages long.  That's not even including

20  TDP's, that's not even including the trust agreement.  I know

21  Your Honor is very well aware of this whole process.  You've

22  had asbestos cases.  You know how long these things are.  You

23  know how heavily, heavily, heavily negotiated they are.

24  Because this means real dollar and cents.

25           And to take that term sheet and get it into a real

1 plan that each one of the law firms assigned a PSA is going to

2 say okay, that's it, that's what I agree to, that's what I

3 agree to support, we're a long way from that point, Your Honor.

4 We are a long way.

5       You know, I come from the <u>Emerest</u> (phonetic) case

6 where here we are going on, it will be four years.  It is four

7 years, that's right.  It was in February of 2019 that it filed.

8       Nowhere near it.  It's the details.  The devil is in

9 the details in these plans.  And that's where reasonable people

10 differ.  And so the time line that they set out, I'd love to

11 see a plan on May 14th.  I have a feeling though it's going to

12 look like what I saw in <u>Emerest</u>, which was plan number one that

13 was so bereft of details that you didn't even know where to

14 begin in drafting your objection to it.  And it wasn't until we

15 got to the tenth amended plan that it finally was in a state

16 where it could go out for solicitation.

17       So I believe there will be something that we will see

18 filed on May 14th.  But I really question whether it is going

19 to be something that all of us, including Your Honor, will feel

20 is appropriate to send out to the claimants for them to vote

21 on.  I mean, we haven't even had major discussions like okay,

22 how are they going to do the voting.  I mean, that can take

23 days of arguments about do you send it to their attorneys, how

24 do you make sure that they get it, how do you make sure that if

25 they want to vote themselves, they get to vote.

1          So Your Honor, I'm just saying all of this because I

2     think that there's been a heavy emphasis by the debtor on let

3     us go forward, we're going to get this wrapped up like this.

4     And that is not going to occur here.  Reality -- I just want to

5     bring a sense of reality into all of this.

6          And I go back to my opening statement, Your Honor.

7     There are four elements that need to be proved here.  And most

8     of what I just said goes to element number one, success on the

9     merits.  I haven't heard anything discussed as to why J&J and

10    its other nine debtor affiliates get a channeling injunction or

11    why they get a third party release, whatever it ends up being.

12         And I go to the fourth element which is the public

13    interest.  And the public interest is in not allowing opinions

14    of the Third Circuit Court of Appeals to be ignored in this

15    fashion.  To be twisted and turned around in this fashion.  And

16    it is not in holding up people who have not been able to go

17    forward with their claims in the meantime.

18         The details on the claims I've left up to the

19    Committee and plaintiff's counsel that are here to discuss.

20    But the public interest is not allowing J&J to keep them again

21    from their day in court.  Thank you, Your Honor.

22         THE COURT:  Thank you, Ms. Richenderfer.  So you can

23    come up, whoever is next.  It is 6:36.  I am telling you all

24    now, and adjust your arguments accordingly, I am adjourning at

25    7:30.  I owe it to my staff for their health and their safety.

1   Let's get it done.

2          MR. BIRCHFIELD:  Good evening, Your Honor.  Andy

3   Birchfield, Beasley Allen.  I know it's late in the day and I

4   appreciate you giving us this opportunity to be heard.  J&J

5   began the day, LTL began the day denigrating me personally in

6   their opening, and my law firm.  And they ended their day in

7   their closing denigrating me personally and my law firm.  Why?

8   To what end?  What relevance does that have to this proceeding?

9          I think there we may have evidence of true

10  frustration of purpose.  It's not me.  It's not me.  There is a

11  committed team, a leadership team of a large member of lawyers

12  and we have held together and we have held firm.  And because

13  we have held together and we have held firm that frustrates

14  J&J's purpose of using the bankruptcy process to coerce

15  plaintiffs to accept deeply discounted values.

16         And as part of the presentation you were given some

17  quotes from my deposition.  Part of those, a significant

18  portion of that dealt with a proposed agreement, a proposal, a

19  draft proposal from September of 2020.  And it was suggested

20  that that proposal was for all ovarian cancer claimants for

21  3.25 billion.  I don't know what relevance, or I don't know

22  where 408 is here.  But you will have the deposition and you

23  will have the agreement.  And I'm going to --

24         I urge you, Your Honor, look at the agreement.  See

25  if the total payments under that agreement are 3.25 or 5.5