**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>            Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Judge: Michael B. Kaplan |

## DECLARATION OF JOHN K. KIM
## IN SUPPORT OF FIRST DAY PLEADINGS

John K. Kim, being first duly sworn, deposes and states as follows:

1.     I am the Chief Legal Officer of LTL Management LLC, a North Carolina

limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case.  I

have held this position with the Debtor since its formation on October 12, 2021.

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

2.      I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ("J&J").

3.      Prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group, handling a variety of cases ranging from commercial disputes and international arbitrations to product liability litigation.

4.      Prior to my employment with J&J and its affiliates, I was associated with the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001.  There, I handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

5.      I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

6.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings").  As discussed in more detail below, on October 14, 2021, the Debtor previously commenced a chapter 11 case, No. 21-30589 (Bankr. D.N.J.) (the "2021 Chapter 11 Case"), which was dismissed on April 4, 2023.  In connection with the 2021 Chapter 11 Case, I submitted various declarations in support of relief requested by the Debtor, including the *Declaration of John K. Kim in Support of First Day Pleadings* [No. 21-30589, Dkt. 5] (the "2021 First Day Declaration").  I incorporate by

reference the statements I made in my 2021 First Day Declaration and affirm that they remain true and correct.

7.     The Debtor continues to believe that the talc products manufactured and sold by its predecessors were safe and did not cause any of the harms plaintiffs have alleged. Nonetheless, the costs of litigating those claims together with the risk of extraordinarily large plaintiff verdicts and the long latency periods of the cancers alleged to be caused by the products, made the continued defense of this litigation in the tort system untenable.

8.     The Debtor is filing for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing:  to fully, equitably and efficiently resolve all current and future talc-related claims.  This filing is supported by law firms on behalf of more than 60,000 thousands claimants and includes ovarian cancer and mesothelioma claims.[2]  The Debtor, J&J, the Debtor's direct parent company, and these claimants have entered into Plan Support Agreements pursuant to which the parties have agreed to work together to finalize and seek confirmation of a plan of reorganization that would fund $8.9 billion net present value to a trust for the benefit of all talc-related claims.  This amount represents an increase of $6.9 billion over the $2 billion J&J previously agreed to advance to the Debtor to establish a qualified settlement fund in the 2021 Chapter 11 Case.  Based on the breadth of claimant support, the Debtor believes it is well positioned to achieve a prompt resolution of this case.

9.     The 2021 Chapter 11 Case was dismissed on April 4, 2023 at the direction of the United States Court of Appeals for the Third Circuit (the "Third Circuit").  The Third Circuit found that the Debtor was not in financial distress due to its prior financing arrangements

---

[2]     These claimants include individuals who did not have filed claims as of the commencement of the 2021 Chapter 11 Case.

and, therefore, ruled that the filing was not in good faith. Since that decision, the Debtor has

entered into new financing arrangements that, among other things, contain commitments for

funding consistent with the agreed plan terms reflected in the Plan Support Agreements, but also

follow the guidance provided by the Third Circuit in its dismissal opinion. As a result of these

new arrangements, the Debtor believes that this filing satisfies the good faith filing standard

articulated by the Third Circuit in its dismissal opinion.

10.     I submit this Declaration to support the First Day Pleadings and provide

certain information about the Debtor, its decision to commence this chapter 11 case and its

objectives for this case. I have reviewed each of the First Day Pleadings, and it is my belief that

the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor,

(b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth

transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this

case.

11.     As the Chief Legal Officer, I am familiar with the Debtor's day-to-day

operations, assets, financial condition, business affairs and books and records. Except as

otherwise indicated, all facts and statements set forth in this Declaration are based upon: (a) my

personal knowledge; (b) information supplied to me by other members of the Debtor's

management, professionals or employees; (c) my review of relevant documents; and/or (d) my

opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial

condition. If called upon to testify, I could and would testify to the facts and opinions set forth

herein.

12.     Section I of this Declaration provides an overview of the Debtor's history

and corporate structure. Section II describes the circumstances surrounding the commencement

of this case, as well as the Debtor's objectives for this case.  Section III sets forth relevant facts

in support of the First Day Pleadings as well as in support of the Adversary Proceeding (as

defined below) filed by the Debtor.

# I.    THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

## A.    The Debtor's Predecessors and Related Restructurings

13.    The Debtor traces its roots back to Johnson & Johnson Baby Products

Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly

owned subsidiary of J&J.

14.    J&J, a New Jersey company incorporated in 1887, first began selling

JOHNSON'S® Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J

established a formal operating division for its baby products business, which included

JOHNSON'S® Baby Powder.

15.    In 1978, consistent with J&J's policy of decentralizing its business, J&J

transferred all its assets and liabilities associated with the baby products division to J&J Baby

Products.  This was part of a larger restructuring of J&J that included the transfer of assets and

liabilities of seven principal operating divisions to wholly owned subsidiaries.  To effectuate the

transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and

Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"),[3] pursuant to which J&J

transferred all assets and liabilities associated with the baby products division to J&J Baby

Products.  As part of the transfer, J&J Baby Products agreed to indemnify J&J for all claims

relating to the baby products business, including the talc powder products.  Following the

---

[3]    A copy of the 1979 Agreement is attached hereto as Annex A.

1979 Agreement, J&J no longer manufactured or sold baby products, including JOHNSON'S®
Baby Powder.

16.    In 1981, J&J Baby Products transferred all its assets, except those assets
allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned
subsidiary of J&J Baby Products.  In turn, Omni assumed all liabilities of J&J Baby Products
except those liabilities related to its diaper program.  Immediately following the transaction,
J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products
Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[4]

17.    In 1988, Johnson & Johnson Baby Products Company transferred all its
assets in respect of its baby products business to Johnson & Johnson Dental Products Company,
which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products,
Inc.

18.    In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to
Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

19.    In 2015, J&J Consumer Companies merged with and into an affiliate,
which then merged into McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson
Consumer Inc. (including all former names and historical forms, "Old JJCI").

20.    Following these intercompany transactions, Old JJCI became responsible
for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products
cause cancer or other diseases.  Old JJCI also was obligated to indemnify J&J for all claims
relating to the talc products.

---

[4]    In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

21.    Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases. Before J&J's decentralization, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division. Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products.

22.    The operational responsibilities, liabilities and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.

23.    In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant"). Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("Bausch")) entered into an indemnification agreement. Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.

24.    In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021. As a result of that restructuring: Old JJCI ceased to exist and two new entities were created: (a) the Debtor, which was initially formed as a Texas limited liability company and then converted into a North Carolina limited liability company; and (b) another entity, which was initially formed as a Texas

limited liability company and then merged into a New Jersey corporation that was its direct
parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to
Johnson & Johnson Consumer Inc. ("New JJCI").  In the 2021 Corporate Restructuring, the
Debtor was allocated certain of Old JJCI's assets and became solely responsible for the
talc-related liabilities of Old JJCI, and New JJCI was allocated all other assets of Old JJCI and
became solely responsible for all other liabilities of Old JJCI.

25.     Old JJCI implemented the 2021 Corporate Restructuring to facilitate a
chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future
talc-related claims through a plan of reorganization without subjecting the entire Old JJCI
enterprise to a bankruptcy proceeding.  As I will discuss in more detail below, the Debtor in fact
filed for chapter 11 relief in the Western District of North Carolina on October 14, 2021, two
days after the completion of the 2021 Corporate Restructuring.

### B.     New JJCI/Holdco

26.     New JJCI operated its business following the 2021 Corporate
Restructuring.  This included the manufacture and sale of a broad range of products used in the
baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-
counter pharmaceutical products (collectively, the "Consumer Business").  In December 2022,
New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc., a New Jersey Corporation
("Holdco"), and in early January 2023, Holdco transferred its Consumer Business assets to its
parent entity.

27.     Holdco is the direct parent of the Debtor, and the Debtor is the direct
parent of Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company.
Holdco is a holding company with ownership interests in various subsidiaries.  The most
substantial of Holdco's ownership interests are held through its wholly owned subsidiary Apsis

-8-

SAS (France) ("Apsis").  Apsis owns (through its wholly owned subsidiary Johnson & Johnson

Holding GmbH (Germany)) a 36.1% ownership interest in GH Biotech Holdings Limited

(Ireland) ("GH Biotech").  GH Biotech holds ownership interests, either directly or through

wholly owned subsidiaries, in four entities, Janssen Sciences Ireland Unlimited Company,

Janssen Irish Finance Unlimited Company, C Consumer Products Denmark ApS, and Impulse

Dynamics (71% interest).  Apsis also owns, either directly or indirectly, interests in various

limited risk distributors (which distribute J&J products in foreign countries), a German-based

subsidiary that manufactures 3D-printed titanium interbody implants for spinal fusion surgery,

and various other subsidiaries.  A chart depicting the Debtor's corporate structure is attached

hereto as Annex B.

28.     As of the date of this declaration, Holdco has access to approximately

$400 million in cash through J&J's cash management system.

C.     **The Debtor**

29.     The Debtor was formed to manage and defend thousands of talc-related

claims and to oversee the operations of its subsidiary, Royalty A&M.  Royalty A&M owns a

portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales

of CLOROX®, ECOLAB®, ESSITY®, LACTAID®, MYLANTA® / MYLICON®,

ROGAINE®, SPARTAN® and TENA® products.  It reviews royalty monetization opportunities

in the healthcare industry and seeks to grow its business by financing and/or reinvesting the

income from the existing royalty revenue streams into both the acquisition of additional external

royalty revenue streams as well as financings to third parties secured by similar royalty streams.

In June 2022, Royalty A&M entered into a royalty purchase agreement whereby it acquired

rights to certain royalty streams from a third-party.

30. The Debtor also has cash, interests as payee under a funding agreement, which I describe in more detail below, and certain insurance coverage rights.

**D.    J&J**

31. The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being. J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years. That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing.

**E.    Previous Financing Arrangements**

32. As described above, Old JJCI and its affiliates engaged in multiple restructurings through the years, including the 2021 Corporate Restructuring. The 2021 Corporate Restructuring was effectuated through a series of steps, which I described in detail in my 2021 First Day Declaration. See 2021 First Day Decl. ¶¶ 22-27. A key component of the 2021 Corporate Restructuring was a funding agreement between the Debtor, on the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement"). The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by the Debtor. The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (a) the administrative costs of the Debtor's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M were insufficient to pay such costs and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

-10-

33.     In connection with the 2021 Funding Agreement, New JJCI and J&J entered into a commitment and loan agreement, dated October 12, 2021 (the "2021 Commitment and Loan Agreement"), pursuant to which New JJCI and J&J agreed that (a) New JJCI would be the primary obligor under the 2021 Funding Agreement, (b) upon the request of New JJCI, J&J would make revolving credit loans to New JJCI, with the proceeds of the loans to be used by New JJCI solely to satisfy its obligations under the 2021 Funding Agreement, and (c) if New JJCI failed to make any payment to the Debtor required by the 2021 Funding Agreement and instead J&J made such payment under the 2021 Funding Agreement, New JJCI would reimburse J&J for that payment and, if it failed to do so, the amount New JJCI owed would be deemed to be financed with a loan from J&J.

F.     **Other Agreements**

34.     To ensure that the Debtor had access to services it needs to effectively operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered into a services agreement and a secondment agreement with J&J Services, which agreements I described in my 2021 First Day Declaration. Id. ¶¶ 29-30.  Likewise, I described similar agreements that Royalty A&M entered into with J&J Services and the Debtor, respectively, and an intercompany loan facility agreement with J&J. Id. ¶ 30.  As a result of these agreements, the Debtor and Royalty A&M have been able to operate their respective businesses efficiently and effectively.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.    Cosmetic Talc Litigation and Its Associated Costs and Burdens

35.    I described the history of the cosmetic talc litigation and the significant costs and burdens associated with it in my 2021 First Day Declaration, which I incorporate herein by reference.  See 2021 First Day Decl. ¶¶ 31-45.

36.    At the time of the filing of the 2021 Chapter 11 Case, the Debtor was besieged by talc claims premised largely on the false allegation that Johnson's Baby Powder contained asbestos and caused cancer.  Notwithstanding that these claims have no valid scientific basis, a few blockbuster plaintiff verdicts in plaintiff-friendly jurisdictions fueled a boom in talc claims, causing Old JJCI to incur astronomical costs:  nearly $1 billion in defense costs on account of cosmetic talc litigation, most of which has been spent in only the five years immediately before the filing of the 2021 Chapter 11 Case; and over $3.5 billion in indemnity payments, primarily over the same time period.

37.    Although Old JJCI prevailed in most of the claims brought, including securing unanimous defense verdicts in six of the eight claims tried to verdict during the 12 months prior to the 2021 Chapter 11 Case, the costs of this litigation and the intermittent extreme plaintiff verdicts made the litigation of these cases in the tort system for the next 50 years or more (as claimants seek to do) untenable, unsustainable and inequitable.

38.    In addition to the thousands of talc claims pending in the United States as of the 2021 Chapter 11 Case, Old JJCI, J&J, Johnson & Johnson Inc. ("J&J Canada"), a federal corporation incorporated under the laws of Canada, and Bausch are named defendants in one certified class action, three proposed class actions and one individual action in four Canadian provinces (Alberta, British Columbia, Ontario and Quebec).  The certified class action and the

proposed class actions commenced in Alberta, British Columbia, Ontario and Quebec are

brought on behalf of classes (or proposed classes) of Canadian individuals who allege injury or

damages arising from the use or purchase of talc-containing products manufactured, marketed

and/or sold by Old JJCI, J&J, J&J Canada or Bausch.  The individual action was commenced in

British Columbia by an individual who likewise alleges injury arising from the use of

talc-containing products manufactured or sold by Old JJCI, J&J or J&J Canada.  Although

subject to a stay of proceedings arising from the recognition of the 2021 Chapter 11 Case in

Canada in December 2021, 12 additional Ontario-based Canadian claims were served in March

2022 and 26 additional British Columbia-based claims were filed in January and February 2023.

      39.     Furthermore, the States of Mississippi[5] and New Mexico[6] filed actions

against Old JJCI, J&J and certain other parties alleging that Old JJCI and J&J are liable for

claims in connection with the sale, promotion and marketing of talc-containing products,

including making misrepresentations about the safety of the talc products sold by Old JJCI.  The

attorneys general of other states had initiated investigations in their respective states against

Old JJCI and J&J related to the marketing, promotion and sale of the talc products, all based on

allegations of unfair business practices and consumer protection violations similar to those at

issue in the New Mexico and Mississippi actions.  Specifically, the attorneys general for the

states of Arizona, North Carolina, Texas and Washington issued civil investigative demands, and

the Maryland attorney general has issued an Administrative Subpoena for Consumer Protection.

---

[5]    See State of Mississippi ex rel. Hood v. Johnson & Johnson, et al., No. G2014-0001207, in the First
Judicial District Court for the County of Hinds, Mississippi.

[6]    See State of New Mexico ex rel. Balderas v. Johnson & Johnson, et al., No. D-101-CV-2020-00013, in the
First Judicial District Court for the County of Santa Fe, New Mexico.

40.      In the 2021 Chapter 11 Case, forty member states and one district formed an ad hoc committee of states holding consumer protection claims against the Debtor.  The ad hoc committee alleged that its members "hold consumer protection claims that are significant, encompassing civil penalties that, based on the statutory maximum per violation, could in principle run into the trillions of dollars."  See *Motion of the Ad Hoc Committee of States Holding Consumer Protection Claims Seeking Relief With Respect to the Order Establishing Mediation Protocol*, No. 21-30589, Dkt. 1939 ¶ 1.  The Debtor disputes these claims.

41.      On February 8, 2018, a securities action was filed in the United States District Court for the District of New Jersey against certain non-debtor individuals and affiliates of the Debtor.[7]  The central issue in the Securities Action is whether the defendants knew of, concealed and made false or misleading statements regarding the allegation that Old JJCI's talc products contained asbestos or caused cancer.  The defendants in the Securities Action maintain (as does the Debtor) that the talc products were safe and free from asbestos.  Although the Debtor is not a defendant, there is substantial overlap between the claims in the Securities Action and the talc-related claims against the Debtor.

42.      Due to the long alleged latency periods for mesothelioma and ovarian cancer, cosmetic talc litigation against the Debtor is anticipated to continue for decades more, as are the extraordinary costs of defending and resolving the tens of thousands of expected claims.  Plaintiff experts estimate that the latency period for mesothelioma can run as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.  As a result, even though Old JJCI stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020, individuals who develop mesothelioma

---

[7]      See Hall v. Johnson & Johnson, No. 3:18-cv-01833 (D.N.J) (the "Securities Action").

in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.

43.     As of the filing of the 2021 Chapter 11 Case, there were almost 40,000 plaintiffs asserting ovarian cancer claims against the Debtor, including almost 36,000 plaintiffs with claims pending in a federal multi-district litigation in New Jersey, and more than 3,800 plaintiffs with claims in multiple state court jurisdictions across the country.  These claims were all stayed during the pendency of the 2021 Chapter 11 Case.

44.     In addition to the ovarian cancer claims, approximately 470 mesothelioma cases were pending against the Debtor as of the filing of the 2021 Chapter 11 Case.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York and Ohio, and were stayed during the pendency of the 2021 Chapter 11 Case.

45.     The Debtor believes that, absent the 2021 Chapter 11 Case, thousands of additional ovarian cancer and mesothelioma cases would have been filed against it.  Moreover, absent this case, the Debtor expects thousands of additional cases would have been filed for decades to come.

**B.      The Debtor's Insurance Coverage and Related Litigation**

46.     The Debtor believes it has insurance coverage for its talc-related liability. In particular, the Debtor has access to certain primary and excess liability insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[8]

---

[8]     The policies that cover the Debtor were issued to J&J as the Named Insured.  Those policies cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

47.     I provided a general overview of the Debtor's insurance coverage in my 2021 First Day Declaration, which I incorporate herein by reference. <u>See</u> 2021 First Day Decl. ¶¶ 46-52.  In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.

48.     Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to the third-party insurers.  Since then, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid any costs of defense, or indemnified J&J or Old JJCI for settlements or judgments.  Instead, the third-party insurers have asserted coverage defenses.

49.     In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, and their captive insurance affiliate, Middlesex Insurance Company ("<u>Middlesex</u>"), in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "<u>NJ Coverage Action</u>"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020.  J&J, Old JJCI and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants.  Aetna Casualty and Surety Company ("<u>Travelers</u>")[9] and certain other insurers filed cross-claims against J&J, Old JJCI and Middlesex, to which J&J, Old JJCI and Middlesex responded later in 2020.

---

[9]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

50.     In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic stay to permit the NJ Coverage Action to proceed.  This Court denied those motions but permitted certain third-party discovery to occur.  The NJ Coverage Action remains pending.

### C.     Retailers and Third Party Indemnities

51.     Old JJCI had relationships with various retailers who sold Old JJCI's talc-containing products (collectively, the "Retailers").  Old JJCI agreed to indemnify the Retailers for claims related to the sale of Old JJCI's talc-containing products, and these contractual indemnities were allocated to the Debtor in the 2021 Corporate Restructuring.  In addition, to the extent a Retailer is held liable for a claim arising out of the products manufactured and/or sold by Old JJCI, and not by independent actions of the Retailers, certain state laws could require the Debtor to indemnify the Retailers for these liabilities.

52.     Claims asserted against the Retailers for their sale of Old JJCI products are virtually identical to the claims asserted against Old JJCI.  I believe these claims against Retailers are generally brought to defeat removal to federal court based on diversity jurisdiction and the Retailers are often dismissed before trial without payment.

53.     Old JJCI would periodically accept from Retailers tenders of talc-related claims related to the sale of its products.  When a Retailer was sued on a claim related to Old JJCI's talc-containing products, the Retailer would notify Old JJCI by submitting a tender request.  Old JJCI would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender Agreement").  Since the commencement of the talc-related litigation, Old JJCI has agreed to indemnify and assume the defense of nearly 790 talc-related claims against the Retailers pursuant to Tender Agreements.

-17-

54.     In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from talc-containing products sold by Old JJCI.  For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020.  In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated.  Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims related to talc products.  The claims against PTI are generally identical to and based on the claims against Old JJCI.

55.     Further, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to "Shower to Shower" products and for certain other regulatory actions arising out of the manufacture, use or sale of "Shower to Shower" products, as set forth more fully in the agreement.[10]  The claims against Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI.

---

[10]     It is my understanding that "Shower to Shower" products sold in the U.S. and Canada no longer include talc.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contains talc as of 2020.

D.    <u>Chapter 11 Cases of Talc Suppliers</u>

56.    In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and

two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc.

(collectively, "<u>Imerys</u>") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of Delaware (the "<u>Imerys Bankruptcy</u>").  Imerys

has potential liability for personal injury claims arising from exposure to talc it sold to

customers, including Old JJCI.  In its bankruptcy case, Imerys has contended that it has claims

against Old JJCI and J&J for indemnification and joint insurance proceeds, claims alleged to be

in the billions of dollars.  Old JJCI and J&J had settlement discussions with Imerys and other

parties to permanently resolve talc claims against them.  Those discussions ended in May 2021

with no resolution.

57.    In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.

filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking

declaratory judgments with respect to certain indemnification obligations allegedly owed by

Old JJCI and J&J to Imerys.  The Debtor and J&J thereafter filed a motion to dismiss the

adversary proceeding.  In October 2021, the Debtor filed a notice of bankruptcy filing and stay of

proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11

Case applied to this adversary proceeding.  No further activity has taken place in this adversary

proceeding since the filing of the 2021 Chapter 11 Case.

58.    In May 2020, Imerys, its parent Imerys S.A., the tort claimants' committee

and the future claimants' representative (collectively, the "<u>Imerys Plan Proponents</u>") filed a plan

of reorganization and a related disclosure statement. The Plan Proponents subsequently filed

numerous amendments to the plan and disclosure statement.  A hearing on the Plan Proponent's

-19-

disclosure statement was held in January 2021, and the court entered an order approving the disclosure statement, permitting Imerys to proceed with soliciting votes on the plan.

59.     In March 2021, Old JJCI and J&J voted to reject the plan and opted out of the consensual releases in the plan.  In April 2021, the Plan Proponents announced that the plan had received the requisite number of accepting votes to confirm the plan.  Old JJCI and J&J challenged certain portions of the vote based on improprieties that had been discovered and sought to disqualify those votes.  In October 2021, the Imerys bankruptcy court issued a ruling deeming thousands of votes as withdrawn.  In October 2021, Imerys cancelled the confirmation hearing on the plan. The Imerys Bankruptcy remains pending.

60.     Cyprus Mines Corporation and its parent company (together, "Cyprus"), which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary proceeding against Old JJCI, J&J, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. seeking a declaration of indemnity rights under certain contractual agreements.  Old JJCI and J&J denied that any indemnification was owed, and filed a motion to dismiss the adversary complaint.  In February 2021, Cyprus Mines Corporation filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and filed a disclosure statement and plan of reorganization.  The Cyprus plan contemplates a settlement with Imerys and talc claimants where Cyprus would make a monetary contribution to a trust established under the Imerys plan in exchange for an injunction against talc claims asserted against it and certain protected parties.  Cyprus has not yet sought approval of its disclosure statement and plan.  In October 2021, the Debtor filed a notice of bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11 Case applies to the Cyprus adversary proceeding.  The Cyprus

chapter 11 case remains pending and no further activity has taken place in the Cyprus adversary

proceeding since the filing of the 2021 Chapter 11 Case.

**E.    The 2021 Chapter 11 Case**

61.    The Debtor commenced the 2021 Chapter 11 Case on October 14, 2021 by

filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court").  The

Debtor also commenced an adversary proceeding against talc claimants seeking (a) a declaration

that the automatic stay applied to and (b) a preliminary injunction enjoining, claims against the

Debtor's affiliates, including J&J and New JJCI, as well as the Debtor's insurers and third-party

retailers and other indemnified parties, a group referred to as the "Protected Parties."  After

discovery and a two-day evidentiary hearing, on November 15, 2021, the NC Bankruptcy Court

entered an order determining that the automatic stay applied to, and also preliminarily enjoining,

the commencement or continuation of talc claims against the Protected Parties for 60 days

(i.e., until January 14, 2022), subject to modification or extension by this Court.

62.    On November 16, 2021, the NC Bankruptcy Court entered an order

transferring the 2021 Chapter 11 Case to the District of New Jersey, which referred the case to

this Court.

63.    After transfer, the official committee of talc claimants (the "TCC") and

two plaintiff law firms [No. 21-30589, Dkts. 632, 766, 1003] moved to dismiss the 2021

Chapter 11 Case as a bad-faith filing.  On February 25, 2022, following months of discovery and

a five-day trial to address the motions to dismiss and the Debtor's adversary proceeding to enjoin

the talc claims, this Court issued an opinion denying the motions to dismiss [No. 21-30589,

Dkt. 1572] (the "Dismissal Opinion")[11] and a separate opinion granting the stay and injunctive

relief requested by the Debtor (the "PI Opinion") [Adv. Pro. No. 21-3032, Adv. Dkt. 184].[12]

64.    Following the completion of the dismissal and stay litigation in this Court,

the Court entered orders establishing a process to mediate the terms of a plan of reorganization.[13]

Pursuant to the Mediation Order, the Debtor and J&J engaged in a series of negotiations with the

Debtor's key constituencies, including the TCC, the Future Claimants' Representative

(the "FCR"), state attorneys general and the Debtor's insurers.  In support of those efforts, the

Debtor obtained Court approval to enter into an expense reimbursement agreement with an ad

hoc committee of state attorneys general to facilitate their participation in the mediation.  Despite

the efforts of the mediators and the various constituents, at the time of the Third Circuit's ruling,

no agreement had yet been reached on the terms of a plan to consensually resolve the 2021

Chapter 11 Case.

65.    During this same time period and primarily for the purpose of facilitating

the parties' mediation efforts, the Debtor proposed a process to estimate the aggregate value of

the talc claims asserted against it.  The Court later authorized an estimation, ruling that "the need

for transparency and to preserve the integrity of the bankruptcy process and the system requires a

---

[11]    On March 2, 2022, the Court entered an order denying the motions to dismiss [No. 21-30589, Dkt. 1603]
(the "Dismissal Order").

[12]    On March 4, 2022, the Court entered an *Order (I) Declaring That Automatic Stay Applies to Certain
Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Adv. Pro. No. 21-3032,
Adv. Dkt. 187] (the "PI Order").

[13]    On March 18, 2022, the Court entered an Order Establishing Mediation Protocol [No. 21-30589,
Dkt. 1780] and on May 16, 2022, it entered an Amended Order Establishing Mediation Protocol
No. 21-3058, Dkt. 2300] (as amended, the "Mediation Order").  Pursuant to the Mediation Order, the Court
appointed the Honorable Joel Schneider and Gary Russo as co-mediators.  On May 27, 2022, the Court
entered an order [No. 21-30589, Dkt. 2370] appointing Judge Donald Steckroth as a third mediator.

reasonable effort to estimate the debtor's aggregate liability for both present and future claims for both ovarian and meso diseases." See July 28, 2022 Hr'g Tr., 4:13-17.

66.     The Court also indicated that it would appoint an expert (the "Court Expert") under Rule 706 of the Federal Rules of Evidence to prepare and file a report containing his or her opinions on the estimation of the current and future talc claims. See id. at 7:6-10. On August 15, 2022, the Court entered an order appointing Kenneth R. Feinberg, Esq. as the Court Expert [No. 21-30589, Dkt. 2881].

67.     Following his appointment, the Court Expert gathered information from claimants, the Debtor and J&J, engaged in discussions with the TCC, the FCR and the Debtor and J&J, and retained counsel and an economic consulting firm. At the time of the Third Circuit decision, no report had been filed by the Court Expert.

68.     The TCC and two plaintiff law firms, on behalf of talc claimants they represented, filed notices of appeal from the Dismissal Opinion, the Dismissal Order, the PI Opinion and the PI Order. They also filed motions requesting that this Court certify its orders for direct appeal to the Third Circuit. On April 4, 2022, this Court granted the motions for direct appeal [No. 21-30589, Dkt. 1955; Adv. Pro. No. 21-3032, Dkt. 231]. Thereafter, the Third Circuit accepted the direct appeal, and granted the appellants' motion to consolidate their appeals and to expedite the case. The parties briefed the issues and argued the matters before the Third Circuit on September 19, 2022.

F.     **Third Circuit Panel Opinion Dismissing the 2021 Chapter 11 Case**

69.     On January 30, 2023, a panel of the Third Circuit issued an opinion directing this Court to dismiss the 2021 Chapter 11 Case on the basis that it was not filed in good faith. See In re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) as amended by 2023 WL 2726441 (3d Cir. Mar. 31, 2023) (the "Third Circuit Panel Opinion"). Although the Third

Circuit panel recognized that the Debtor "inherited massive liabilities" and faced "thousands" of future claims, it concluded that the Debtor was not in financial distress before the filing.  Third Cir. Panel Op., 762-63.

70.     On February 13, 2023, the Debtor filed a petition for rehearing and rehearing en banc with the Third Circuit.  See In re LTL Mgmt. LLC, No. 22-2003 (3d Cir. Feb. 13, 2023), Dkt. 153.  On March 22, 2023, the Third Circuit entered an order denying the Debtor's petition for rehearing.  That same day, the Debtor filed a motion seeking a stay of the Third Circuit's mandate pending appeal to the United States Supreme Court.  The Third Circuit entered an order denying the stay motion on March 31, 2023, and, on the dame day, issued its mandate directing this Court to dismiss the 2021 Chapter 11 Case.  This Court subsequently entered an order dismissing the 2021 Chapter 11 Case on April 4, 2023.  See No. 21-30589, Dkt. 3938.

G.    **Plan Support Agreements**

71.     Throughout the 2021 Chapter 11 Case, the Debtor participated in court ordered mediation with the Debtor's key constituencies to negotiate a potential consensual resolution of the case.  Despite a multitude of discussions with various parties and the efforts of the mediators, no agreement was reached prior to the Third Circuit's decision to dismiss the 2021 Chapter 11 Case.

72.     Following that ruling, however, and with the assistance of the mediators and the encouragement of this Court, negotiations continued between the Debtor and J&J, and various plaintiff law firms.  Those negotiations ultimately culminated in an agreement with thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's liability for talc-related claims.  That agreement has been memorialized in a series of plan

-24-

support agreements (collectively, the "Plan Support Agreements") that have been executed and delivered by counsel on behalf of over 60,000 claimants and signed by the Debtor, Holdco and J&J.[14]

73.    The Plan Support Agreements provide, among other things, that the Debtor, J&J, Holdco and the claimants will work together to finalize, file and seek confirmation of a plan of reorganization that provides for the establishment of a trust funded in the amount of $8.9 billion on a net present value basis.  The Plan Support Agreements further provide that a plan containing the terms to which the parties have agreed must be filed by May 14, 2023, or as soon thereafter as is feasible.

74.    While there are additional issues that the parties will need to address, the Plan Support Agreements represent significant progress towards a consensual resolution of the Debtor's current and future talc claims.  The Debtor believes the terms of the plan contemplated by the Plan Support Agreements are equitable and in the best interests of all parties, including current and future talc claimants.  Indeed, I understand that the proposed settlement amount of $8.9 billion by the Debtor and J&J would be the largest settlement amount in any asbestos bankruptcy case and one of the largest settlements of personal injury claims in history.

**H.    The Decision to File This Case**

75.    The filing of this second chapter 11 case has the support of thousands of claimants.  That support is evidenced by their entry into the Plan Support Agreements.

76.    This filing also has the continuing support of Holdco and J&J, who have agreed to enter into new financing arrangements with the Debtor that facilitate the confirmation

---

[14]    A copy of a form Plan Support Agreement (without exhibits) is attached hereto as Annex C.

and consummation of a plan of reorganization containing the terms described in the Plan Support Agreements.

77.     In view of the substantial support of talc claimants, Holdco and J&J for both the filing of this case and the material terms of a plan, and taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the cosmetic talc litigation, the Debtor determined that the filing of a second chapter 11 case in this Court was prudent, necessary and in the best interests of all constituents. The Debtor continues to believe, as do Holdco and J&J, that chapter 11 proceedings are the only method through which the Debtor and talc claimants can fully, equitably and permanently resolve all current and future talc-related claims.

### *Termination of 2021 Funding Agreement and Entry Into New Agreements*

78.     The Third Circuit found that the Debtor was not in financial distress as a result of its rights under the 2021 Funding Agreement. That determination defeated the fundamental purpose of that agreement, which purpose was to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code. The Third Circuit determined it had the exact opposite effect; i.e., that it required dismissal of the 2021 Chapter 11 Case. As a result, the Debtor believes there was a material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable. To eliminate that risk and secure funding terms consistent with the terms set forth in the Plan Support Agreements, the Debtor, J&J and Holdco have entered into new financing arrangements. These new arrangements, among other things, (a) address the guidance provided by the Third Circuit in its dismissal opinion, (b) facilitate confirmation and consummation of a plan of reorganization containing the terms supported by thousands of claimants whose counsel have

executed and delivered the Plan Support Agreements and (c) do not adversely affect the interests of talc claimants.

79.    The Debtor, J&J and Holdco effectuated these new financing arrangements by entering into three new agreements.  The Debtor, J&J and Holdco entered into a termination and substitution agreement (the "T&S Agreement") by which the 2021 Funding Agreement and a related intercompany loan were terminated and the parties, in substitution therefor, agreed to enter into two new agreements.[15]  Simultaneously with their entry into the T&S Agreement, the Debtor, J&J and Holdco then entered into these two new agreements: Holdco and the Debtor entered into a new funding agreement (the "2023 Funding Agreement") and the Debtor, Holdco and J&J entered into a separate support agreement (the "J&J Support Agreement").[16]

80.    The 2023 Funding Agreement is similar to the 2021 Funding Agreement. It imposes no repayment obligation on the Debtor and is not a loan.  It obligates Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case filed by the Debtor, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay those costs and expenses.  In addition, the 2023 Funding Agreement requires Holdco to fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a

---

[15]    A copy of the T&S Agreement is attached hereto as Annex D.

[16]    A copy of the 2023 Funding Agreement (without its Schedule 2 that includes confidential bank account information) is attached as Annex E and a copy of the J&J Support Agreement is attached hereto as Annex F. The summaries of the terms of the T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement in this Declaration are provided for the convenience of the Court and parties in interest and are qualified in all respects by the more detailed terms contained in those agreements.

chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of

reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreement, as

such terms may be amended or supplemented with the consent of the parties, in both situations to

the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient

to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's

other assets are insufficient to provide that funding.

81.     The J&J Support Agreement is subject to the approval of the Court and is

operative only in the chapter 11 case.  It obligates J&J to provide the trust funding Holdco is

required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the

funding.  In return, Holdco is obligated to reimburse J&J for any amounts it pays to the trust on

Holdco's behalf, and any amounts that are not reimbursed by Holdco will be deemed to be

financed with a loan from J&J to Holdco.  The Debtor is obligated to use commercially

reasonable efforts to obtain final Court approval of the J&J Support Agreement and to cause a

plan of reorganization containing the terms reflected in the Plan Support Agreements to become

effective, in both cases as soon as reasonably practicable.  The Debtor has the right to enforce

J&J's obligation under the J&J Support Agreement.

82.     The Debtor believes that these new financing arrangements resolve the

concerns that led the Third Circuit to conclude that the 2021 Chapter 11 Case should be

dismissed.  J&J's support is only available in bankruptcy and only if approved by this Court.

Holdco is the sole obligor under the 2023 Funding Agreement.  As I noted above, Holdco

transferred its consumer health business, which represented a substantial portion of its assets, in

early January 2023.  This Court previously found that Old JJCI was in financial distress, and that

was at a time when it was operating its consumer health business.  The performance of J&J's

Consumer Health division, of which Old JJCI was a primary part, had swung from a profit to a

loss due to the costs of the talc litigation.

83.    Since then, Holdco has transferred its consumer health business.  As a

result, not only was J&J's balance sheet not available to the Debtor prior to this filing, but

Holdco's assets, which were prior to this filing (and are) available through the 2023 Funding

Agreement, no longer include the consumer health business.  The Debtor believes that its pre-

filing financial condition is sufficiently distressed to satisfy the standard established by the Third

Circuit.

84.    Nonetheless, the Debtor's new financing arrangements do not harm talc

claimants for at least two reasons.  First, the 2023 Funding Agreement and the J&J Support

Agreement (subject to Court approval) are available in this case to ensure that the Debtor has the

capability to fund a trust consistent with the terms of the Plan Support Agreements.  Second, the

2023 Funding Agreement is also available to fund the Debtor's talc liabilities and related costs

outside bankruptcy.  The Debtor has the financial support it needs to implement the plan outlined

in the Plan Support Agreements.

85.    Bankruptcy is the only forum where the Debtor and the claimants can

fully, equitably and permanently resolve all talc-related claims.  This second chapter 11 filing

and the proposed plan are in the best interests of all parties, including the Debtor and all current

and future talc claimants.

### The Debtor's Objectives for this Case

86.    The Debtor's goal in this chapter 11 case is to finalize, obtain

confirmation of and ultimately consummate a plan of reorganization containing the terms agreed

to in the Plan Support Agreements.  This plan would, among other things, (a) establish and fund

a trust with $8.9 billion on a net present value basis to resolve and pay all current and future talc-

-29-

related claims, including all ovarian cancer claims and all mesothelioma claims, and (b) provide

for the issuance of an injunction that will permanently protect the Debtor, its affiliates and

certain other parties from further talc-related claims arising from products manufactured and/or

sold by Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to

sections 524(g) and/or 105(a) of the Bankruptcy Code.

87.    The Debtor is prepared to immediately engage in good faith negotiations

to finalize the terms of a plan of reorganization consistent with the terms set forth in the Plan

Support Agreements and file a plan by May 14, 2023, as required by the Plan Support

Agreements.  The Debtor will also continue to seek the support of other claimants and

constituents, including the FCR, state attorneys general and the Debtor's insurers, in an effort to

achieve a fully consensual plan.  Given the unprecedented monetary contribution the Debtor and

J&J are prepared to make to resolve the Debtor's liability for all talc-related claims, the Debtor is

confident that a consensual resolution of this chapter 11 case is achievable and in the best

interests of all parties.

## III.    FIRST DAY PLEADINGS AND ADVERSARY PROCEEDING

88.    Concurrently with the filing of this chapter 11 case, the Debtor filed First

Day Pleadings requesting various forms of relief.  In addition, the Debtor has filed an adversary

proceeding seeking injunctive and declaratory relief, as well as an ex parte temporary restraining

order (the "Adversary Proceeding").

89.    The Debtor will move for entry of orders scheduling expedited hearings

on the First Day Pleadings and the Adversary Proceeding.[17]  The Debtor requests that the Court

---

[17]    Capitalized terms used below in the descriptions of the First Day Pleadings and the Adversary Proceeding
and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings
and the Adversary Proceeding filings.

conduct an administrative hearing (the "<u>First Day Hearing</u>") as soon after the commencement of

its chapter 11 case as the Court's schedule will permit, at which the Court will hear and consider

the First Day Pleadings.  The Debtor also anticipates that the Court will consider the relief

requested in the Adversary Proceeding at a later time.  The First Day Pleadings that the Debtor

anticipates will be heard at the First Day Hearing are described in Sections III.A-III.C.  The

Adversary Proceeding is described in Section III.D.

90.    Generally, the purposes of the First Day Pleadings and the Adversary

Proceeding are to:  (a) obtain authorization for the continued use of the Debtor's bank account;

(b) establish procedures for the smooth and efficient administration of this chapter 11 case; and

(c) protect the Debtor's ability to negotiate and ultimately effectuate a section 524(g)

reorganization under chapter 11.  I have reviewed each of the First Day Pleadings and the

Adversary Proceeding filings, including the exhibits thereto, and I believe that the relief sought

in each of the First Day Pleadings and the Adversary Proceeding is tailored to meet the goals

described above and, ultimately, will be critical to the Debtor's ability to achieve a successful

reorganization.

A.    **The Case Administration Motions**

*Appointment of Claims and Noticing Agent*

91.    The Debtor will seek the entry of an order appointing Epiq Corporate

Restructuring, LLC ("<u>Epiq</u>") as claims and noticing agent in this chapter 11 case.  I understand

that Epiq may, among other things:  (a) prepare and serve all notices required in the Debtor's

chapter 11 case, including the notice of the commencement of this case and the meeting of

creditors pursuant to section 341 of the Bankruptcy Code; and (b) maintain the official claims

register.  Epiq previously served as the Debtor's claims, noticing and ballot agent in the 2021

Chapter 11 Case.  The Debtor submits, based on, among other things, Epiq's prior work in the

2021 Chapter 11 Case, that Epiq's rates are competitive and reasonable given Epiq's quality of

services and knowledge regarding the Debtor's creditors and the Court's processes.

### *List of the Top Law Firms With Talc Claims Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Talc Claimants*

92.    I understand that the Top 20 List primarily would be used by the United

States Trustee to understand the types and amounts of unsecured claims against the debtor and

thus evaluate prospective candidates to serve on an official committee in the debtor's case.  I

further understand that an official committee of talc claimants is expected to be appointed.

Because committees in mass tort chapter 11 cases typically consists of plaintiff law firms acting

on behalf of individual talc claimants, the Debtor will seek authority to file and provide

the United States Trustee with a list of the 18 law firms with the most significant representations

of parties with talc claims against the Debtor based on the volume of claims or other related

factors (a "Top Talc Counsel List"), in lieu of listing the individual talc claimants with the

largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors.

The Debtor believes that providing the United States Trustee with a Top Talc Counsel List

would better facilitate the United States Trustee's evaluation of members of an official

committee of talc claimants.

93.    The Debtor also will seek Court approval for certain notice procedures

relating to individuals (collectively, the "Talc Claimants") who are claimants in talc-related

personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all

notices, mailings, filed documents and other communications relating to its chapter 11 case,

including, without limitation, pleadings, in any contested matter or otherwise, seeking relief that

could directly impact Talc Claimants' rights and obligations in this chapter 11 case, on Talc

Claimants in care of their counsel (collectively, the "Talc Firms") at such counsel's address, as

further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Talc Firms in any creditor or service lists, including the creditor matrix provided to the Court or filed in this case, in lieu of listing the contact information of individual Talc Claimants.  To date, the Debtor has communicated solely with the Talc Firms regarding the talc-related claims against the Debtor.  The Debtor in many cases cannot be sure that it has the current addresses (or any addresses) for the Talc Claimants.  Further, consistent with the rules of professional conduct, communicating with an adversary in litigation generally is conducted through counsel.  The Debtor therefore believes that providing notice to Talc Claimants through the Talc Firms, in accordance with past practice, is much more reliable and consistent with the rules of professional conduct.

94.    The notice procedures proposed in the Motion provide for an effective and appropriate noticing process for the Talc Claimants.  Further, implementing the proposed Notice Procedures would alleviate the administrative burden and expense of gathering current contact information for each of the Talc Claimants, which, in many cases, is not readily available or is difficult to verify.  The Debtor has access to the names and addresses of the counsel for the Talc Claimants (including counsel of record in pending lawsuits), but the names and addresses of a significant number of individual Talc Claimants themselves are not readily available.  It would be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this information.  In addition, any contact information for the individual Talc Claimants the Debtor has or is able to obtain may be outdated and unreliable.  Consequently, providing notice in this chapter 11 case in accordance with the Notice Procedures will be more efficient and reliable than providing notice to the individual Talc Claimants directly.

*Extension of Time to File Schedules*

95.     The Debtor believes it will need a brief period of additional time, beyond
the time period allotted under the Bankruptcy Code, to assemble all of the information necessary
to complete and file the required schedules of assets and liabilities and statement of financial
affairs (collectively, the "Schedules").  The Debtor will need the additional time because of
(a) the size and complexity of this chapter 11 case and (b) the volume of materials that must be
compiled and reviewed to complete the Schedules.  Although the Debtor previously submitted
Schedules in the 2021 Chapter 11 Case, the Debtor must update those schedules to reflect the
most current information given the passage of time and new developments since October
14, 2021.  Like the 2021 Chapter 11 Case, this chapter 11 case will involve tens of thousands of
claimants and other parties in interest, and it is my understanding that the Debtor would need to
collect, review and assemble a substantial amount of information to complete the Schedules.

96.     Given (a) the large number of claimants and (b) the critical matters that
the Debtor and its professionals were required to address prior to the commencement of this
chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date,
even with the assistance of professionals.  The Debtor further estimates that, with the many
critical matters to be addressed in the early days of this case, the Debtor will require more than
14 days after the Petition Date to complete the Schedules.

97.     The additional time requested is important to help ensure that
the Schedules are as accurate as possible.  Given the volume of information that is provided in
the Schedules, and the fact that the information must be accurate as of the Petition Date,
additional time to complete the Schedules will help ensure that the relevant information is fully
collected and evaluated and can be incorporated into the relevant filings.  Rushing to complete
the Schedules soon after the Petition Date, on the other hand, could compromise their

completeness.  Accordingly, the Debtor will seek to extend the deadline by which it must file its

Schedules by an additional 30 days, through and including May 18, 2023, without prejudice to

the Debtor's right to seek a further extension for cause.

> **B.      Request to Continue Using Bank Account and Related Relief**

98.      The Debtor will seek approval of the continued use of its prepetition bank

account, as well as authority to open and close bank accounts during the chapter 11 case,

as necessary or appropriate.  In the ordinary course of business, the Debtor maintains a bank

account at Bank of America in Charlotte, North Carolina (the "Bank Account").  All payments

and other funds that are received by the Debtor are deposited into that account, including cash

payments from Holdco under the 2023 Funding Agreement.  The Bank Account also serves as a

disbursement account and is used to pay all of the Debtor's costs and expenses, including

professional fees.

99.      In addition, the Debtor will request authority for Bank of America and any

other bank to charge, and the Debtor to pay or honor, both prepetition and postpetition service

and other fees, costs, charges and expenses to which a bank may be entitled under the terms of

and in accordance with its contractual arrangements with the Debtor.  Further, the Debtor will

request that the Court authorize Bank of America and any other bank to charge back returned

items to the Bank Account in the ordinary course of business.  The Debtor requires this relief to

minimize disruption to its Bank Account and to assist in accomplishing a smooth transition to,

and operation in, chapter 11.

100.      The Bank Account is insured by the United States through the Federal

Deposit Insurance Corporation (the "FDIC") and is maintained at Bank of America, a large,

well-known and well-capitalized institution, which is also a depository approved by the United

States Trustee.

101.    To protect against the possible inadvertent payment of prepetition claims, the Debtor will advise Bank of America not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtor. The Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Account and opening a new one.

### C.    Request to be Appointed Foreign Representative

102.    The Debtor will seek entry of an order authorizing it to act as the foreign representative on behalf of the Debtor's estate in any judicial or other proceedings in Canada to provide an effective mechanism to protect and maximize the value of the Debtor's assets and estate.

103.    The Debtor, as the proposed Foreign Representative (as defined below), will shortly seek ancillary relief in Canada on behalf of behalf of the Debtor's estate pursuant to the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"). In the ancillary proceeding (the "Canadian Proceeding"), the Debtor (as Foreign Representative) would request that the Canadian Court recognize the chapter 11 case as a "foreign main proceeding" under the applicable provisions of the CCAA in order to, among other things, ensure that the protections of the automatic stay are enforced with respect to the Canadian Actions and so that such ancillary relief that the Canadian Court may otherwise consider appropriate can be obtained.

104.    To commence the Canadian Proceeding, the Debtor or another third party needs authority to act as the "foreign representative" on behalf of the Debtor's estate (the "Foreign Representative"). I understand that for the Debtor to be recognized as the Foreign Representative of the Debtor's estate in the Canadian Proceeding, and thereby apply to have the

chapter 11 case recognized by the Canadian Court, this Court must enter the Order authorizing

the Debtor to act as the Foreign Representative in the Canadian Proceeding.  I understand that if

the Order is granted, the Debtor will be able to file the Order with the Canadian Court as the

instrument authorizing the Debtor to act as the Foreign Representative pursuant to section 46 of

the CCAA.

D.      **Adversary Proceedings**

*Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to
Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions and
(III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a
Preliminary Injunction*

105.      Contemporaneously herewith, the Debtor has filed a complaint and related

motion, which seek a declaration that section 362(a) of the Bankruptcy Code prohibits, or is

extended to prohibit, the commencement or continuation of talc-related actions against the

Protected Parties[18] while the chapter 11 case remains pending.  The Debtor also requests a

preliminary injunction under section 105(a) of the Bankruptcy Code.  The injunction will enjoin

the prosecution of actions outside of the chapter 11 case on account of the same talc claims that

exist against the Debtor in the chapter 11 case.  Finally, the Debtor also seeks a temporary

restraining order, entered ex parte, to immediately effectuate the requested declaratory or

injunctive relief pending a final hearing on the motion.  I have read the complaint, and I declare

under penalty of perjury that the factual allegations therein are true and correct.

106.      The defendants sought to be enjoined in the Adversary Proceeding

(collectively, the "Defendants") are all named plaintiffs in talc-related lawsuits against the

---

[18]      As defined in the Debtor's motion, the Protected Parties are:  (a) Old JJCI; (b) certain of the Debtor's non-
debtor affiliates set forth on Appendix B to the complaint, including J&J and Holdco; and (c) third party
retailers who sold Old JJCI's talc-containing products and other third parties whom the Debtor has
indemnified contractually, as listed on Appendix B to the complaint.

Debtor or for which the Debtor is responsible or alleged to be responsible, and John and Jane Does 1 to 1000.  The Defendants, who are listed on Appendix A to the complaint, would be enjoined from prosecuting actions outside of the chapter 11 case seeking to hold a Protected Party liable on account of any "Debtor Talc Claim" while the chapter 11 case remains pending. "Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) Old JJCI[19] on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise).

107.    As I discussed above, the Debtor commenced the chapter 11 case to equitably and permanently resolve all current and future talc-related claims against it through the consummation of a plan of reorganization containing the terms reflected in the Plan Support Agreements.  The relief sought by this Adversary Proceeding is critical to the Debtor's ability to achieve that purpose.  Without the requested declaration or injunction, claimants would be permitted to commence or restart litigation in other forums asserting the exact same talc claims the Debtor is seeking to resolve in this chapter 11 case.  As further explained in the motion, permitting the Defendants to litigate the Debtor Talc Claims against the Protected Parties elsewhere while the Debtor simultaneously works to reorganize by resolving the same claims in its chapter 11 case pursuant to the Bankruptcy Code would (a) defeat the purpose of the Debtor's bankruptcy case, (b) result in irreparable harm to the Debtor's estate, (c) undermine and circumvent the purposes and spirit of the automatic stay and (d) divert the

---

[19]    For the avoidance of doubt, Debtor Talc Claims include all talc personal injury claims and other talc-related claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring.  The Debtor Talc Claims do not include talc-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

Debtor from its reorganization efforts.  Such litigation would undermine a central aim of the plan

terms that have been agreed to by thousands of claimants, which is to treat all similarly situated

claimants in an equivalent manner.

108.    The commencement or continued prosecution of the Debtor Talc Claims

against the Protected Parties risks significant, immediate and irreversible harm to the Debtor and

its estate.  It would create chaos across mass-tort proceedings nationwide, as litigation over tens

of thousands of talc claims resumes, all of which may come grinding to a halt if this Court grants

the Debtor's motion.  Approximately 1,000 individually set ovarian cancer claims (not subject to

docket-wide coordination procedures) are pending in various state courts outside of the federal

MDL and consolidated state proceedings in California and New Jersey.  An additional 470

mesothelioma claims are pending in state courts across the country—in 44 courts, across 25

different states.  None of those cases is coordinated, and many are filed on specialized,

asbestos-specific accelerated dockets.  Each is in the process of suddenly springing back into

activity and proceeding towards trial absent extension of the stay or issuance of a preliminary

injunction.   Many of the cases have proceeded in the interim against other defendants and

without the Debtor's involvement, but suddenly, the Debtor would be thrown into the mix—

potentially significantly impacting the progress, scope and nature of the cases.

109.    There are also at least 20 mesothelioma cases now on the eve of trial or

that could be set for trial imminently (in the next 60 days), all of which would demand

significant investment in expedited, catch-up discovery, expert witness engagement, trial lawyer

time, and other resources.  And this machinery does not run itself.  Addressing these matters will

require the time and attention of key Debtor personnel, diverting estate resources away from

reorganization efforts. These negative effects on the Debtor's estate will only compound as new Debtor Talc Claims are filed against the Protected Parties.

110.    <u>Hernandez-Valadez v. Johnson & Johnson, et.al</u>, Case No. 22CV012759 (the "<u>Valadez Case</u>"), a mesothelioma case venued in the Superior Court of the State of California, Alameda County, should be stayed for all the same reasons that every individual, talcum powder personal injury matter pending across the country should be stayed. But in light of recent, unequivocal statements by counsel to Valadez that leave no doubt he intends to put the 2021 Chapter 11 Case—and indeed the bankruptcy system itself—on trial during the Valadez Case, the risk of permitting the Valadez Case to proceed in the tort system at the very same time that the Debtor and thousands of claimants work towards a consensual resolution of this Chapter 11 Case in this Court are acute.

111.    The Debtor is a defendant in the Valadez Case, which was therefore automatically stayed as to the Debtor by the filing of this chapter 11 case. But it is critical to the Debtor's restructuring efforts that the Valadez Case also be stayed as to the Debtor's co-defendant, J&J. In the next two weeks, the parties are scheduled to undertake 24 depositions of fact witnesses, persons most knowledgeable and experts. These depositions include the continued deposition of the Debtor's person most knowledgeable on a number of topics, some of which indicate that counsel to Valadez will press for irrelevant and, in some instances, privileged information regarding a wide range of topics related to the 2021 Chapter 11 Case and the involvement of both specific members of the J&J legal department and various executive-level personnel to address the same. Beyond these depositions, the parties are embroiled in significant evidentiary disputes over the possible spoliation of key testing materials by the plaintiff's testing

expert and whether or not to proceed with genetic testing of the plaintiff (as advocated by certain of his own expert witnesses).

112.    These activities have served as a distraction to some of the very same counsel and witnesses involved in this chapter 11 case over the past two months and, if allowed to proceed as to J&J, will continue to do so and drain the Debtor's resources during this chapter 11 case.  More significantly, findings in the Valadez Case could jeopardize the success of this chapter 11 case by undermining the terms of the plan set forth in the Plan Support Agreements, contradicting findings by this Court, and threatening the delicate balance now in place as both the Debtor and claimants work to resolve all talc claims on an equitable and permanent basis.  Permitting one talc claimant to proceed to an accelerated trial on the merits of his talc claim, while thousands of other talc claimants work towards a full, equitable and final resolution of all talc claims, risks undermining the Debtor's reorganizational efforts.

113.    These concerns are heightened because counsel to Valadez has unabashedly made clear his intention to put the 2021 Chapter 11 Case on trial during the course of the trial.  According to a March 6 letter to the Alameda County court,[20] Trailblazer Studios, "a production company based in Raleigh, NC, which focuses on documentary filmmaking and post-production services for premium platforms like Netflix, Hulu, National Geographic, Disney + and ESPN," contacted the trial judge in the Valadez Case seeking permission to film the trial. Trailblazers, and its counsel in a letter dated March 21,[21] clarified that Trailblazers intends to produce a for-profit documentary "focused on the ongoing talc bankruptcy saga," and hopes to

---

[20]    A copy of the March 6, 2023 letter from Trailblazers is attached hereto as <u>Annex G</u>.

[21]    A copy of the March 21, 2023 letter from Trailblazers' counsel is attached hereto as <u>Annex H</u>.

include an "unknown" amount of Valadez Case trial footage, to be released at an "unknown"
time, to "unknown" media outlets, in that documentary.

114.    Given the inevitable distraction of allowing a production company into the
courtroom, let alone the well-known and documented prejudicial impact of such activities,
defendants promptly opposed Trailblazers' request.  In response, counsel to Valadez stated that
"Defendants' **bad-faith bankruptcy** and infliction of **further harm** upon mesothelioma victims
. . . is a 'matter of public interest'" such that the Court should permit the trial to be recorded by a
production company.  See Pl.'s Resp. to Defs.' Opp. to Trailblazer Studios' Req. to Record T.
Proceedings, at 2-3 (Mar. 23, 2023) (emphasis added).[22]  I believe that counsel to Valadez has
every intention of turning the Valadez trial into a referendum on the 2021 Chapter 11 Case and
the Debtor's reorganization efforts generally.  Permitting such a "trial within a trial" to proceed
about the propriety of the 2021 Chapter 11 Case, including the rulings by this Court and the
Third Circuit, at the exact same time and on a parallel track to the efforts underway in this Court,
at the same time that the Debtor pursues confirmation of a plan that contains the terms in the
Plan Support Agreements, will harm the Debtor and its estate, including the talc claimants.

115.    The Valadez Case highlights the critical need for an immediate, ex parte
temporary restraining order to avoid exacerbating the very rush to the courthouse that the motion
seeks to prevent.

116.    Without immediate injunctive relief, the Debtor will be compelled to pull
key estate resources away from its reorganization efforts to focus on the Valadez Case and all
other ongoing litigation, hampering the Debtor's reorganization efforts from the outset.  Absent
immediate and specific relief, I believe developments in the Valadez Case risk undermining

---

[22]    A copy of the plaintiff's response is attached hereto as Annex I.

support for a plan in this Chapter 11 Case.  For example, an extreme verdict (i) could make it more difficult for the Debtor to obtain additional support for the proposed plan, and (ii) would potentially result in substantially different treatment of Valadez's claim than all other talc claims under a plan with the terms contained in the Plan Support Agreements.  I further believe that litigants will immediately take all measures available to them to circumvent the protections of the automatic stay through coordinated efforts in proceedings against the Protected Parties with the goal of defeating the purpose of this chapter 11 case and a potential fair and equitable resolution for the benefit of thousands of talc claimants.  A denial of the Debtor's request for a temporary restraining order pending a final hearing on the Debtor's request for declaratory and/or injunctive relief would thus cause the very harm that the Debtor seeks to prevent by the motion and the complaint.

## CONCLUSION

117.    For all the reasons described herein, in the First Day Pleadings and in the filings in the Adversary Proceeding, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings and enter the temporary restraining order requested in the Adversary Proceeding.


Dated:  April 4, 2023                           */s/ John K. Kim*
                                                John K. Kim


NAI-1535638438


-43-

# ANNEX A

**1979 Agreement**

No 269302

AGREEMENT FOR TRANSFER OF ASSETS

AND BILL OF SALE

THIS AGREEMENT effective as of the beginning of
business the first day of January 1979, by and between JOHNSON
& JOHNSON, a corporation organized under the laws of the State
of New Jersey (sometimes hereinafter called "J&J"), and
JOHNSON & JOHNSON BABY PRODUCTS COMPANY, a Subsidiary
corporation of J&J, which is also organized under the laws of
the State of New Jersey (sometimes hereinafter called the
Subsidiary).

WHEREAS, J&J has a number of operating divisions
conducting various lines of business; and

WHEREAS, one of these operating divisions is named
the JOHNSON & JOHNSON BABY PRODUCTS COMPANY Division
(sometimes hereinafter called the "BABY Division"); and

WHEREAS, the Subsidiary corporation, is wholly-owned
by J&J and J&J is desirous of transferring to this Subsidiary
all assets and liabilities which are now allocated to the BABY
Division on the books or records of Johnson & Johnson; and

WHEREAS, such Subsidiary was organized effective as
of August 27, 1970 under the laws of the State of New Jersey;
and

WHEREAS, J&J wishes to transfer to the Subsidiary
the above described assets in return for 188,100,000 shares of

DESTROY
290 ...

the common stock of the Subsidiary, each of which shares has
no par value per share; and

WHEREAS, any excess in value of the above described
assets over $188,100,000 is to be treated as an additional
capital contribution to the Subsidiary by J&J;

NOW, THEREFORE, in consideration of the following
mutual promises, covenants and undertakings contained in THIS
AGREEMENT FOR TRANSFER OF ASSETS AND BILL OF SALE, it is
agreed between the parties that:

1. J&J in consideration of the premises and other
good and valuable consideration, to it paid at or before the
execution and delivery of this Agreement, the receipt and
sufficiency of which are hereby acknowledged, has granted,
bargained, sold, assigned, aliened, remised, released,
conveyed, transferred, set over and confirmed, and by this
Agreement does grant, bargain, sell, assign, alien, remise,
release, convey, transfer, set over and confirm, unto the
Subsidiary,  its successors and assigns, forever, all the
businesses, franchises, properties and assets of every nature
and description, tangible and intangible, wherever located,
which are now allocated on the books or records of J&J to its
BABY Division, the same to include, without limiting the
generality of the foregoing, those assets allocated on the
books or records of J&J to its BABY Division which are more
particulary described as follows:

(i)  All inventories, materials, supplies,
furniture, machinery, equipment, automobiles, trucks and other

tangible personal property, goods and chattels, wheresoever situate at the date of the execution and delivery hereof;

(ii)  All rights, titles, and interest in, to and under all contracts (including leases) pertaining to the BABY Division (except that nothing herein contained shall be deemed to constitute the assignment of any claim against the United States of America or of any contract which is not assignable without the consent of the other party or parties thereto unless and until such consent shall have been obtained);

(iii)  All right, title and interest in, to and under cash on hand and in banks, notes, bonds, inventions, improvements, discoveries and know-how, accounts and bills receivable, books of account, records, agreements, licenses, claims, demands, judgments, equities and choses in action or other intangible property of every nature and description, except trademarks;

(iv)  All real estate, improvements and appurtenances thereon or thereto shall, effective January 1, 1979, be transferred to and be the property of the Subsidiary, as well as all rights and obligations appertaining thereto.

TO HAVE AND TO HOLD all said businesses, franchises, properties and assets hereby assigned, transferred and conveyed (all said franchises, properties, businesses and assets being hereinafter called the "Properties" hereby assigned, transferred and conveyed) unto the Subsidiary, its successors and assigns, to its and their own use and behalf forever.

2.  For the consideration aforesaid, J&J hereby
constitutes and appoints the Subsidiary, its successors and
assigns, the true and lawful attorney or attorneys of J&J,
with full power of substitution, for J&J and in its name and
stead or otherwise, but on behalf and for the benefit of the
Subsidiary, its successors and assigns, to demand and receive
from time to time any and all the Properties hereby assigned,
transferred and conveyed, and to give receipts and releases
for and in respect of the same and any part thereof, and from
time to time to institute and prosecute in the name of J&J or
otherwise, but at the expense and for the benefit of the
Subsidiary, its successors and assigns, any and all
proceedings at law, in equity or otherwise which the
Subsidiary, its successors or assigns, may deem proper in
order to collect, assert or enforce any claim, right or title
of any kind in or to the Properties hereby assigned,
transferred and conveyed, and to defend or compromise any and
all actions, suits or proceedings in respect of any of said
Properties and to do all such acts and things in relation
thereto as the Subsidiary, its successors, or assigns, shall
deem desirable; J&J hereby declaring that the appointment
hereby made and the powers hereby granted are coupled with an
interest and are and shall be irrevocable by J&J in any manner
or from any reason.

3.  For the consideration aforesaid, J&J, for itself
and its successors and assigns, has covenanted, and by this
Agreement does covenant, with the Subsidiary, its successors
and assigns, that it, J&J, and its successors and assigns,

will do, execute and deliver, or will cause to be done,
executed and delivered, all such further acts, transfers,
assignments and conveyances, powers of attorney, and
assurances, for the better assuring, conveying and confirming
unto the Subsidiary, its successors and assigns, all and
singular the Properties hereby assigned, transferred and
conveyed as the Subsidiary, its successors or assigns, shall
reasonably require.

4. In consideration of the assignment, transfer and
conveyance to it of all the Properties above described, the
Subsidiary agrees to assume and hereby does assume and agrees
to pay, perform or discharge, as the case may be, all the
indebtedness, liabilities and obligations of every kind and
description which are allocated on the books or records of J&J
as pertaining to its BABY Division and the Subsidiary hereby
covenants and agrees with J&J that the Subsidiary will forever
indemnify and save harmless J&J against all the indebtedness,
liabilities and obligations aforesaid hereby assumed and
agreed to be paid, performed or discharged, as the case may
be, by the Subsidiary and to assume and complete all pending
contracts of J&J which are allocated on its books or records
to the BABY Division and to indemnify J&J and its officers,
directors and stockholders from any liability under any such
indebtedness, liabilities and obligations.

5. This Agreement and the covenants and agreements
herein contained shall inure to the benefit of and shall bind
the respective parties hereto and their respective successors
and assigns.

-6-

IN WITNESS WHEREOF, said JOHNSON & JOHNSON and
JOHNSON & JOHNSON BABY PRODUCTS COMPANY have caused this
Agreement for Transfer of Assets and Bill of Sale to be
executed in their corporate names and under their corporate
seals as of the 1st day of December, 1978.

ATTEST:                                    JOHNSON & JOHNSON

_____         By _____
     Assistant Secretary                        Vice President


ATTEST:                                    JOHNSON & JOHNSON BABY
                                              PRODUCTS COMPANY

_____         By _____
     Assistant Secretary                          President

STATE OF NEW JERSEY )
                    ) ss.:
COUNTY OF MIDDLESEX )


        On the 1st day of December, 1978, before me

personally came R. C. STITES ,

to me known, who being by me duly sworn, did depose and say:

that he is the ~~Vice~~-President of Johnson & Johnson Baby

Products Company, a New Jersey corporation, the corporation

described in and which executed the foregoing instrument; that

he knows the seal of said corporation; that the seal affixed

to said instrument is such corporate seal; that it was so

affixed by order of the Board of Directors of said Johnson &

Johnson Baby Products Company; and that he signed his name

thereto by like authority.


                                 _____
                                 Notary Public
                                 ATTORNEY-AT-LAW
                                 STATE OF NEW JERSEY

STATE OF NEW JERSEY )
                     ) ss.:
COUNTY OF MIDDLESEX )


On the 1st day of December, 1978, before me personally came John J. Heldrich , to me known, who being by me duly sworn, did depose and say: that he is Vice-President of Johnson & Johnson, a New Jersey corporation, the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said Johnson & Johnson; and that he signed his name thereto by like authority.

Notary Public
ATTORNEY AT LAW
STATE OF N.J.

## **ANNEX B**

**Debtor's Corporate Structure Chart**

**Organizational Structure of LTL Management LLC**





# **ANNEX C**

**Form Plan Support Agreement**

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement, dated as of _____, 2023 (including all exhibits and schedules attached hereto, this "**Agreement**"), is entered into by and among the following parties (each of the foregoing described in the following sub-clauses (1) through (3), a "**Party**" and, collectively, the "**Parties**"):

1.      LTL Management LLC ("**LTL**") (hereinafter, the "**Debtor**");

2.      Johnson & Johnson ("**J&J**") and Johnson & Johnson Holdco (NA) Inc. ("**Holdco**", and together with J&J, the "**J&J Entities**"); and

3.      Counsel on behalf of talc-related personal injury claimants (the "**Talc Claimants**") identified by full name, date of birth, and last four digits of their social security number in **Exhibit A** (the "**Consenting Talc Claimant Counsel**").

Capitalized terms used, but not otherwise defined herein, have the meaning ascribed to them in the Term Sheet (defined below).

## RECITALS

**WHEREAS**, the Debtor is a debtor in a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**");

**WHEREAS**, on March 2, 2022, the Bankruptcy Court denied motions to dismiss the Debtor's chapter 11 case (the "**MTD Order**");

**WHEREAS**, certain parties appealed the MTD Order and, on January 30, 2023, the United States Court of Appeals for the Third Circuit (the "**Third Circuit**"), issued a decision reversing the Bankruptcy Court's MTD Order and directing the Bankruptcy Court to dismiss the chapter 11 case;

**WHEREAS**, the Debtor filed a petition for rehearing with respect to the Third Circuit's decision, which petition remains pending as of the date of this agreement;

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations on the material terms of a chapter 11 plan of reorganization for the Debtor, which are set forth in a term sheet (the "**Term Sheet**"), a copy of which is attached to this Agreement as Exhibit B (the terms described in the Term Sheet and this Agreement are referred to herein as the "**Supported Plan Terms**");

**WHEREAS**, the Debtor and the J&J Entities have agreed to pursue confirmation of a Chapter 11 Plan that includes the Supported Plan Terms in the Debtor's current bankruptcy case or, if that case is dismissed, a subsequent bankruptcy case; and

**WHEREAS**, pursuant to the Supported Plan Terms, the Parties agree to resolve all present and future talc claims (personal injury and governmental entity claims) against all Debtor-related parties for a total contribution from the Debtor not to exceed the present value of Eight Billion, Nine Hundred Million Dollars ($8,900,000,000); and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment with respect to the Supported Plan Terms and other matters set forth in the Term Sheet, in connection with the Debtor's current bankruptcy case or, if that case is dismissed, a subsequent bankruptcy case.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**     *Agreement Effective Date.*   This Agreement will become effective and binding immediately upon all of the Parties having executed and delivered counterpart signatures to this Agreement (the "**Agreement Effective Date**").

**Section 2.**     *Commitments Regarding Chapter 11 Plan.*

2.01   **Commitments of the Parties**.

(a)     During the period in which this Agreement remains in effect, the Parties agree to the following, subject to any conditions or qualifications to such commitments as set forth in the Term Sheet, and the agreement of the Consenting Talc Claimant Counsel (including any amendment thereto) shall be binding on the Talc Claimants:

(i)     Immediately following the execution of this Agreement, the Parties shall use commercially reasonable efforts to negotiate, finalize and file with the Bankruptcy Court a Chapter 11 plan that contains the Supported Plan Terms (the "**Chapter 11 Plan**") by May 14, 2023 or as soon thereafter as feasible;

(ii)     The Debtor will use commercially reasonable efforts to obtain confirmation of the Chapter 11 Plan as soon as reasonably practicable in accordance with the Bankruptcy Code and the Bankruptcy Rules, and on terms consistent with this Agreement;

(iii)     The J&J Entities and the Consenting Talc Claimant Counsel will use commercially reasonable efforts to support the actions taken by the Debtor in bankruptcy, including obtaining and maintaining injunctions to prevent tort claimants against the Debtor from pursuing their claims against

the J&J Entities, any affiliates thereof, or other entities that could liquidate or otherwise affect, directly or indirectly, the tort claims against the Debtor, and to seek confirmation of the Chapter 11 Plan in each case so long as such actions are not inconsistent with the Term Sheet.

(iv)      Without limiting the foregoing, the Parties agree, subject to any conditions or qualifications to such commitments as set forth in the Term Sheet, so long as the Chapter 11 Plan is not inconsistent with the Term Sheet, to:

(A)      (1) use commercially reasonable efforts to confirm and consummate the Chapter 11 Plan; (2) negotiate in good faith the terms of all documents and agreements necessary to confirm and consummate the Chapter 11 Plan; (3) use commercially reasonable efforts to execute and deliver all documents and agreements necessary to confirm and consummate the Chapter 11 Plan; and (4) use commercially reasonable efforts to obtain required regulatory and/or other approvals necessary to confirm and consummate the Chapter 11 Plan, if any;

(B)      do all things reasonably necessary and appropriate in furtherance of confirming the Chapter 11 Plan in accordance with this Agreement, including, as applicable, voting in favor of the Chapter 11 Plan, which voting shall be permitted electronically, supporting approval of a disclosure statement with respect to the Chapter 11 Plan and procedures for the Debtor's solicitation of the Chapter 11 Plan, and opting into any consensual releases thereunder;

(C)      use commercially reasonable efforts to oppose any objections to the Debtor's efforts to confirm the Chapter 11 Plan, including objections to the disclosure statement, solicitation procedures, confirmation of the Chapter 11 Plan or motions filed by the Debtor in connection with any of the foregoing;

(D)      use commercially reasonable efforts to oppose any restructuring proposal or plan of reorganization other than the Chapter 11 Plan and the transactions contemplated thereunder (an "**Alternative Transaction**"), including, without limitation, any motion, application, or request filed with the Bankruptcy Court in connection with, or in anticipation of, any Alternative Transaction;

(E)      to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the confirmation or consummation of the Chapter 11 Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

3

(F)    not seek to amend or modify, or file any pleading seeking authority to amend or modify, the Chapter 11 Plan or any related documents in a manner that is materially inconsistent with this Agreement;

(G)    not file any pleading materially inconsistent with the terms of this Agreement, the Chapter 11 Plan, or the Supported Plan Terms.

(H)    not object to, delay, impede, or take any other action to interfere with acceptance, confirmation, or implementation of the Chapter 11 Plan, including, without limitation, support any request to terminate the Debtors' exclusive periods to file or solicit a plan of reorganization;

(I)    not directly or indirectly solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtor other than the Chapter 11 Plan; and

(J)    not otherwise take any action that would interfere with, delay, impede, or postpone the solicitation of acceptances, consummation, or implementation of the Chapter 11 Plan; and

(K)    use commercially reasonable efforts to negotiate and finalize trust documents for the Talc Trust prior to the voting on the Chapter 11 Plan.

(b)    Nothing in sub-clause (a) of this Section 5.01 will prevent any Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 3.**    *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and will not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

**Section 4.**    *Representations and Warranties.*

4.01    **Representations and Warranties**.  Each Party represents and warrants, severally, and not jointly, to each other Party, as of the date hereof that:

(a)    it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement;

(b)     it, to the extent applicable, is validly existing and in good standing (or equivalent) under the laws of its jurisdiction of organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to, or limiting, creditors' rights generally or by equitable principles relating to enforceability;

(c)     except as expressly provided in the Term Sheet, this Agreement or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to perform its obligations under, this Agreement;

(d)     except as expressly provided in this Agreement, it has (or will have at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to perform its obligations under, this Agreement, including as to the Consenting Talc Claimant Counsel with respect to binding each Talc Claimant;

(e)     except as expressly set forth in this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Supported Plan Terms), the execution, delivery, and performance by it of this Agreement does not, and will not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body;

(f)     it is not a party to any contract, agreement, commitment, understanding, or other obligation (written or oral) with any other person or entity that is in effect with respect to any proposal inconsistent with the Supported Plan Terms or this Agreement, or with respect to an Alternative Transaction; and

(g)     the execution, delivery, and performance of this Agreement does not and will not (a) violate any provision of law, rules, or regulations applicable to it; or (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries.

## Section 5.     *Termination.*

5.01     **Termination**.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among each of the Parties.  In addition:

(a)     This Agreement will automatically terminate upon:

(i)     the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court, which has not been stayed), of any statute, regulation, ruling or order declaring the Chapter 11 Plan or any material portion thereof to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Chapter 11 Plan, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fourteen (14) calendar days after entry;

(ii)     entry of an order appointing a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers and such order has not been stayed, reversed, or vacated, within fourteen (14) calendar days after entry;

(iii)     entry of an order for relief under chapter 7 of the Bankruptcy Code with respect to the Debtor and such order has not been stayed, reversed, or vacated, within fourteen (14) calendar days after entry; or

(iv)     entry of an order in a subsequent chapter 11 case dismissing the case and such order has not been stayed, reversed, or vacated, within fourteen (14) calendar days after issuance.

(b)     The Consenting Talc Claimant Counsel may terminate this Agreement, in each case, upon delivery of written notice to the Debtor and the J&J Entities at any time after the occurrence of or during the continuation of any of the following events (each, a "Claimant Termination Event"):

(i)     the breach by the Debtor or the J&J Entities of any of their obligations, representations, warranties, or covenants set forth in this Agreement;

(ii)     the Debtor and the J&J Entities at any time either (A) fail to take commercially reasonable steps to obtain confirmation and consummation of the Chapter 11 Plan, including entry of a confirmation order that contain the terms that are consistent with this Agreement, or (B) propose, pursue or support a plan or confirmation order inconsistent with the terms set forth in this Agreement; or

(iii)     the Plan is, or is modified to be, inconsistent with this Agreement;

Notwithstanding the foregoing, the Debtor and the J&J Entities shall have ten (10) days from the receipt of any such written notice of termination from the Consenting Talc Claimant Counsel specifying the purported default or Claimant Termination Event to cure any purported default or Claimant Termination Event under this section and no termination of this Agreement shall be effective unless and until the expiration of such ten (10) day period without such purported default or Claimant Termination Event having been waived or cured.

(c)     The Debtor or the J&J Entities may terminate this Agreement upon delivery of written notice to the Consenting Talc Claimant Counsel at any time after the occurrence of or during the continuation of any of the following events (each a "Proponent Termination Event"):

(i)     the breach by the Consenting Talc Claimant Counsel of any of their obligations, representations, warranties, or covenants set forth in this Agreement;

(ii)     the Consenting Talc Claimant Counsel takes any action inconsistent with its obligations under this Agreement or fails to take any action required under this Agreement; or

(iv)     the Debtor or the J&J Entities determine that they will be unable timely to obtain sufficient support for this Agreement from other talc claimant counsel such that the Chapter 11 Plan is likely not confirmable; or

(v)     the failure to meet any conditional terms in the Term Sheet.

Notwithstanding the foregoing, the Consenting Talc Claimant Counsel shall have ten (10) days from the receipt of any such written notice of termination from the Debtor or J&J Entities specifying the purported default or Proponent Termination Event to cure any purported default or Proponent Termination Event under this section and no termination of this Agreement shall be effective unless and until the expiration of such ten (10) day period without such purported default or Proponent Termination Event having been waived or cured.

5.02     **Automatic Stay**.  The Debtor acknowledges that neither the giving of notice of termination by any Party pursuant to this Agreement nor compliance with any provision hereto will be a violation of the automatic stay of section 362 of the Bankruptcy Code

5.03     **Termination Generally**.  No Party may terminate this Agreement based on an event caused by such Party's own failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions).  Upon termination of this Agreement in accordance with section 5.01, all Parties shall be released from any prospective commitments, undertakings, and agreements under or related to this Agreement other than obligations under this Agreement that by their terms expressly survive termination.

**Section 6.     *Amendments.*** This Agreement may not be modified, amended, or supplemented in any manner except as consented to (in writing, with email from the applicable counsel being sufficient) by (i) the Debtor, (ii) the J&J Entities, and (iii) the Consenting Talc Claimant Counsel.

**Section 7.     *Miscellaneous.***

7.01     **Further Assurances**.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the

matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with confirmation of the Chapter 11 Plan.

7.02  **Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

7.03  **Headings**.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

7.04  **GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY**.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES OF THE STATE OF NORTH CAROLINA OR ANY OTHER JURISDICTION.  Each Party hereto agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement in  the Bankruptcy Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under or related to this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

7.05  **Execution of Agreement**.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

7.06  **Interpretation; Representation by Counsel**.  This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, will not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

7.07  **Successors and Assigns; No Third Party Beneficiaries**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other

person or entity without the consent of the other Parties to this Agreement, which consent shall not be unreasonably withheld.

    7.08   **Notices**.  All notices hereunder will be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as will be specified by like notice):

    (a)    if to the Debtor, to the electronic mail addresses and mail addresses set forth below:

    LTL Management LLC
    501 George Street
    New Brunswick, NJ 08933
    Attention: _____
    Email: _____.com

    With a copy (which will not constitute notice) to:

    Jones Day (as counsel to the Debtor)
    2727 North Harwood Street
    Dallas, TX 75201
    Attention:  Gregory M. Gordon
    Email:  gmgordon@jonesday.com

    (b)    if to the J&J Entities, to the electronic mail addresses and mail addresses set forth below:

    JOHNSON & JOHNSON
    One Johnson & Johnson Plaza
    New Brunswick, NJ 08933
    Attention:  Erik Haas
    Email: _____.com

    JOHNSON & JOHNSON HOLDCO (NA) INC.
    One Johnson & Johnson Plaza
    New Brunswick, NJ 08933
    Attention:  Erik Haas
    Email: _____.com

    With a copy to:

    [_____]
    Attention: _____
    Email: _____.com

    (c)    If to a Consenting Talc Claimant Counsel, to the electronic mail addresses and mail addresses set forth in Exhibit A with respect to each **Consenting Talc Claimant Counsel**

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail (electronic or otherwise), or courier will be effective when received.

7.09 **Specific Performance**. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Chosen Court requiring any Party to comply promptly with any of its obligations hereunder. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity will be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

7.10 **Settlement Discussions**. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto will not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. If the Chapter 11 Plan is not consummated, or if this Agreement is terminated for any reason, nothing in this Agreement will be construed as a waiver by any Party of any of such Party's rights, remedies, claims, and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses. This Agreement will in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.

7.11 **Fiduciary Duty**. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement, the Term Sheet or the Chapter 11 Plan shall require the Debtor or the board of managers of the Debtor, after consulting with their respective legal counsel, to take any action or to refrain from taking any action to the extent taking or failing to take such action is or would be inconsistent with applicable law, or the exercise of its respective fiduciary obligations under applicable law and any such action or inaction pursuant to this Section 7.11 shall not be deemed to constitute a breach of this Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank]*

DEBTOR

**LTL MANAGEMENT LLC**


By:  _____
Name:  John K. Kim
Title:  Chief Legal Officer

Date:

J&J ENTITIES

**JOHNSON & JOHNSON**


By:  _____
Name:  Erik Haas
Title:   Chief Legal Officer, Litigation

Date:

**JOHNSON & JOHNSON HOLDCO (NA)
INC.**


By: _____
Name:  Erik Haas
Title:   Chief Legal Officer, Litigation

Date:

**Claimants' Counsel**

Firm:


By: _____
Name:
Title:

Date:

# EXHIBIT A

## CONSENTING TALC CLAIMANTS

## EXHIBIT B

## TERM SHEET

# ANNEX D

**Termination and Substitution Agreement**

# TERMINATION AND SUBSTITUTION AGREEMENT

This TERMINATION AND SUBSTITUTION AGREEMENT, dated April 4, 2023 (this "Agreement"), is by and among LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL"), JOHNSON & JOHNSON HOLDCO (NA) INC., a New Jersey corporation formerly named Johnson & Johnson Consumer Inc. ("Holdco"), and JOHNSON & JOHNSON, a New Jersey corporation ("J&J" and, together with LTL and Holdco, the "Parties").

## RECITALS

A.  On October 12, 2021, the former Johnson & Johnson Consumer Inc. ("Old JJCI") implemented a corporate restructuring (the "2021 Corporate Restructuring") to facilitate a full, permanent and equitable resolution of all current and future talc claims through a reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

B.  Prior to the 2021 Corporate Restructuring, (1) effective January 1, 1979, J&J and Johnson & Johnson Baby Products Company ("J&J Baby Products") entered into an Agreement for Transfer of Assets and Bill of Sale (the "1979 Agreement"), pursuant to which (a) J&J transferred to J&J Baby Products all assets and liabilities then allocated on the books or records of J&J to its baby products operating division and (b) J&J Baby Products agreed, on behalf of itself and its successors and assigns, to forever indemnify and hold harmless J&J against all such liabilities of every kind and description, and (2) through a series of subsequent corporate transactions that occurred between 1981 and 2015, Old JJCI succeeded to J&J Baby Products' rights and obligations under the 1979 Agreement. As a result thereof, from and after January 1, 1979, Old JJCI (including for such purpose its predecessors in interest) bore all financial responsibility for and paid (as reflected in Old JJCI's books and records) all talc claims related to JOHNSON'S® Baby Powder.

C.  Pursuant to the 2021 Corporate Restructuring, (1) Old JJCI ceased to exist and LTL and Holdco were created and (2) LTL received Old JJCI's liability for current and future talc claims and certain assets and Holdco received all other liabilities and assets of Old JJCI.

D.  As part of the 2021 Corporate Restructuring, (1) the Parties entered into the Amended and Restated Funding Agreement, dated October 12, 2021 (the "2021 Funding Agreement"), pursuant to which, on the terms and subject to the conditions set forth therein, Holdco and J&J agreed to provide, on a joint and several basis, funding to LTL for specified uses and (2) Holdco and J&J entered into the Amended and Restated Commitment and Loan Agreement, dated October 12, 2021 (the "2021 Commitment and Loan Agreement"), pursuant to which, on the terms and subject to the conditions set forth therein, Holdco and J&J agreed that (a) Holdco would be the primary obligor under the 2021 Funding Agreement, (b) upon the request of Holdco, J&J would make revolving credit loans to Holdco, with the proceeds of such loans to be used by Holdco solely to satisfy its obligations under the 2021 Funding Agreement, and (c) if Holdco failed to make any payment to LTL required by the 2021 Funding Agreement and instead J&J made such payment under the 2021 Funding Agreement, Holdco would reimburse J&J for such payment and any amount not so reimbursed by Holdco would be deemed to be financed with a loan from J&J to Holdco and Holdco's obligation to make such reimbursement would be discharged and replaced by such loan.

E.      Old JJCI implemented the 2021 Corporate Restructuring and the Parties entered into the related 2021 Funding Agreement and 2021 Commitment and Loan Agreement with the primary purpose of facilitating a full, permanent and equitable resolution of all current and future talc claims against LTL through a chapter 11 bankruptcy case filed by LTL.

F.      On October 14, 2021, LTL filed a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing a chapter 11 bankruptcy case (the "2021 Bankruptcy Case").

G.      On April 4, 2023, the 2021 Bankruptcy Case was dismissed at the direction of the United States Court of Appeals for the Third Circuit (the "Third Circuit"), which had determined that "[b]ecause LTL was not in financial distress" at the time of its bankruptcy filing, "it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b)." *LTL Mgmt., LLC v. Those Parties Listed on App'x A to Compl. (In re LTL Mgmt., LLC)*, 58 F.4th 738, 763 (3d Cir. 2023).

H.      The Third Circuit focused in particular on LTL's financial condition just prior to the bankruptcy filing and observed that LTL's "most important" asset was its "rights as a payee under the [2021] Funding Agreement with J&J and [Holdco]," which "gave LTL direct access to J&J's exceptionally strong balance sheet." *Id.* at 749, 759.

I.      Since the Third Circuit's ruling directing dismissal of the 2021 Bankruptcy Case, attorneys for thousands of talc claimants (collectively, the "Supporting Talc Claimant Counsel") have executed and delivered plan support agreements (collectively, the "Plan Support Agreements") that support confirmation and consummation of a plan of reorganization for LTL with specified terms, which terms are acceptable to LTL, Holdco and J&J.

J.      LTL continues to believe that a resolution of its liability for current and future talc claims through a reorganization under chapter 11 of the Bankruptcy Code is in the best interests of both LTL and the talc claimants, and the Parties continue to support the fundamental goal of obtaining a full, permanent and equitable resolution of all current and future talc claims against LTL through a chapter 11 bankruptcy case.

K.      The Third Circuit's dismissal decision had the effect of defeating the primary purpose of the 2021 Funding Agreement and the 2021 Commitment and Loan Agreement.  Rather than facilitating a bankruptcy resolution of LTL's current and future talc claims, the funding arrangements set forth in these agreements were viewed by the Third Circuit as foreclosing such resolution.  As a result, there is a material risk that the 2021 Funding Agreement and 2021 Commitment and Loan Agreement were rendered void or voidable by that ruling and other developments in the 2021 Bankruptcy Case that were not reasonably foreseeable by the Parties.

L.      To eliminate that risk and secure funding consistent with the plan terms specified in the Plan Support Agreements and supported by the Supporting Talc Claimant Counsel, Holdco and J&J have agreed with LTL to terminate the funding arrangements set forth in the 2021 Funding Agreement and 2021 Commitment and Loan Agreement and, in substitution therefor, enter into new agreements. These new agreements will, among other things, (i) address the guidance provided by the Third Circuit in its dismissal opinion, (ii) facilitate confirmation and

2

consummation of a plan of reorganization containing the terms supported by thousands of talc claimants represented by the Supporting Talc Claimant Counsel who have executed and delivered the Plan Support Agreements, and (c) not adversely affect the interests of talc claimants.

M.      To effectuate their agreement regarding LTL's funding arrangements, the Parties now desire to enter into this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the Parties hereby agree as follows:

1.      Termination of Existing Financial Arrangements.

(a)      2021 Funding Agreement.  The Parties hereby terminate the 2021 Funding Agreement, with each of the Parties being released from all of its obligations thereunder and having no further liability with respect thereto.

(b)      2021 Commitment and Loan Agreement.  Holdco and J&J hereby terminate the 2021 Commitment and Loan Agreement, with each of Holdco and J&J being released from all of its obligations thereunder and having no further liability with respect thereto.

2.      New Financial Arrangements.

(a)      New Funding Agreement.  Contemporaneously with the execution and delivery of this Agreement, each of LTL and Holdco will execute and deliver to the other a Funding Agreement in the form attached hereto as Exhibit A (the "New Funding Agreement"), pursuant to which, on the terms and subject to the conditions set forth therein, Holdco will provide funding to LTL both (i) when there is no proceeding under the Bankruptcy Code pending with respect to LTL and (ii) during the pendency of a voluntary case under chapter 11 of the Bankruptcy Code commenced by LTL.

(b)      Support Agreement.  Contemporaneously with the execution and delivery of this Agreement, each of the Parties will execute and deliver to the others a Support Agreement in the form attached hereto as Exhibit B, pursuant to which, on the terms and subject to the conditions set forth therein, and further subject to approval of the Support Agreement by the applicable bankruptcy court, (i) solely in connection with a voluntary case under chapter 11 of the Bankruptcy Code to be commenced by LTL and only if Holdco fails to make any payment to provide funding for one or more trusts created pursuant a plan of reorganization for LTL that is confirmed in such case as required by the New Funding Agreement, J&J will make such payment to LTL on Holdco's behalf, (ii) Holdco will be obligated to reimburse J&J for any such payment and any amount not so reimbursed by Holdco will be deemed to be financed with a loan from J&J to Holdco thereunder, and Holdco's obligation to make such reimbursement would be discharged and replaced by such loan, and (iii) LTL will have the right to enforce the obligation of J&J thereunder.

3

3. <u>Miscellaneous</u>.

(a)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey.

(b)    <u>Amendments</u>.  No amendment of this Agreement shall be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by each of the Parties.

(c)    <u>Counterparts; Entire Agreement; Electronic Execution</u>.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the Parties relating to the subject matter hereof and supersedes, in its entirety, any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each of the Parties and each of them shall have received counterparts hereof which, when taken together, bear the signatures of each of the Parties, and thereafter shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

(d)    <u>Construction</u>.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  The words "hereby," "hereof" and "hereto" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

[*Signature Page Follows*]

NAI-1535665306

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**LTL MANAGEMENT LLC,**
a North Carolina limited liability company

By: _____
Name:  Robert Wuesthoff
Title:  President

**JOHNSON & JOHNSON HOLDCO (NA) INC.,**
a New Jersey corporation

By: _____
Name:  Laura McFalls
Title:  President

**JOHNSON & JOHNSON,**
a New Jersey corporation

By: _____
Name:  Duane Van Arsdale
Title:  Treasurer

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**LTL MANAGEMENT LLC,**
a North Carolina limited liability company

By: _____
Name:  Robert Wuesthoff
Title:  President

**JOHNSON & JOHNSON HOLDCO (NA) INC.,**
a New Jersey corporation

By: _____
Name:  Laura McFalls
Title:  President

**JOHNSON & JOHNSON,**
a New Jersey corporation

By: _____
Name:  Duane Van Arsdale
Title:  Treasurer

# NEW FUNDING AGREEMENT

See attached.

## SUPPORT AGREEMENT

See attached.

## ANNEX E

**2023 Funding Agreement**

# FUNDING AGREEMENT

This FUNDING AGREEMENT, dated April 4, 2023 (as it may be amended, restated, modified or supplemented from time to time, this "<u>Agreement</u>"), is by and between JOHNSON & JOHNSON HOLDCO (NA) INC., a New Jersey corporation formerly named Johnson & Johnson Consumer Inc. (the "<u>Payor</u>"), and LTL MANAGEMENT LLC, a North Carolina limited liability company (the "<u>Payee</u>").

## RECITALS

A.      The Payor, the Payee and Johnson & Johnson, a New Jersey corporation ("<u>J&J</u>"), have entered into that certain Termination and Substitution Agreement, dated April 4, 2023 (the "<u>Termination and Substitution Agreement</u>"), pursuant to which (1) the Amended and Restated Funding Agreement, dated October 12, 2021 (the "<u>2021 Funding Agreement</u>"), among the Payor, the Payee and J&J and the Amended and Restated Commitment and Loan Agreement, dated October 12, 2021, between J&J and Holdco have been terminated and (2) the Payor, the Payee and J&J have agreed to execute and deliver, in substitution therefor, new agreements the terms of which will, among other things, (a) address the guidance provided by the United States Court of Appeals for the Third Circuit in its January 30, 2023 opinion directing dismissal of the Payee's then pending Bankruptcy Case, (b) facilitate confirmation and consummation of a plan of reorganization for the Payee containing terms supported by thousands of talc claimants whose attorneys ("<u>Supporting Talc Claimant Counsel</u>") have executed and delivered Plan Support Agreements that support confirmation and consummation of a plan of reorganization for the Payee with specified terms, which terms are acceptable to the Payee, the Payor and J&J, and (c) not adversely affect talc claimants.

B.      Contemporaneously with the execution and delivery of this Agreement, pursuant to Section 2(b) of the Termination and Substitution Agreement, the Payee, the Payor and J&J have executed and delivered a Support Agreement, pursuant to which, on the terms and subject to the conditions set forth therein, (1) solely in connection with a voluntary case under chapter 11 of the Bankruptcy Code to be commenced by the Payee and only if the Payor fails to make any Payment to provide the Payee funding for one or more trusts created pursuant to a Supported Plan, J&J will make such Payment to the Payee on the Payor's behalf, (2) the Payor will be obligated to reimburse J&J for any such Payment and any amount not so reimbursed by the Payor will be deemed financed with a loan from J&J to the Payor, and the Payor's obligation to make such reimbursement will be discharged and replaced by such loan, and (3) the Payee will have the right to enforce such obligation of J&J.

C.      Section 2(a) of the Termination and Substitution Agreement provides that the Payor and the Payee will enter into this Agreement to establish the terms and conditions on which the Payor will provide funding to the Payee both (1) when there is no proceeding under the Bankruptcy Code pending with respect to the Payee and (2) during the pendency of any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee.

# AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>2021 Funding Agreement</u>" has the meaning specified in the recitals to this Agreement.

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"<u>Board</u>" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"<u>Business Day</u>" means each day other than a Saturday, a Sunday or a day on which banking institutions in New Brunswick, New Jersey or at a place of payment are authorized by law, regulation or executive order to remain closed.

"<u>Capital Stock</u>" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any

2

other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"<u>Chenango</u>" means Chenango Zero LLC, a Texas limited liability company.

"<u>Contractual Obligation</u>" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"<u>Default</u>" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"<u>District Court</u>" means the United States District Court in the district of the Bankruptcy Court.

"<u>Divisional Merger</u>" means the divisional merger of Chenango pursuant to Chapter 10 of the Texas Business Organizations Code that became effective on October 12, 2021.

"<u>Event of Default</u>" has the meaning specified in <u>Section 6</u>.

"<u>Federal Funds Effective Rate</u>" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"<u>Funding Account</u>" means the account of the Payee listed on <u>Schedule 2</u> to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"<u>Funding Date</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>Funding Request</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>J&J</u>" has the meaning specified in the recitals to this Agreement.

NAI-1535636655

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any controlled Affiliate of the Payee.

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any Affiliate of the Payor, excluding the Payee and any Payee Affiliate.

"Payor Material Adverse Effect" means with respect to the Payor: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Permitted Funding Use" means each of the following:

    (a)    the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

    (b)    the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

NAI-1535636655

(c)    the funding of any amounts to satisfy:

(i)    the Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(ii)    the Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a Supported Plan; and

(iii)    in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

(d)    the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e)    the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f)    the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor, or either of them, of any provision of this Agreement;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Talc Related Liabilities in connection with the funding of such judgment, settlement or trust or trusts, as applicable.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" means the Plan of Divisional Merger that provided for the Divisional Merger.

"Plan Support Agreements" means collectively the Plan Support Agreements, dated as of or prior to the date of this Agreement, by and among the Payee, the Payor, J&J, Supporting Talc Claimant Counsel.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Supported Plan" means a plan of reorganization for the Payee that contains the Supported Plan Terms and is confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court.

"Supported Plan Terms" means, so long as any Plan Support Agreements remain in effect, the terms of a plan of reorganization for the Payee described in such Plan Support Agreements, including the exhibits thereto, as such terms may be modified, amended or supplemented in accordance with such Plan Support Agreements.

"Supporting Talc Claimant Counsel" has the meaning specified in the recitals to this Agreement.

"Talc Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Termination and Substitution Agreement" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      Funding Obligations and Procedures.

(a)      Funding Obligations.  The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for a Permitted Funding Use.  Nothing in this Agreement shall obligate the Payor to make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b)      Funding Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request"). Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)      Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payor shall pay or cause to be paid to the Payee

an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account. In the event that the Payor does not make any Payment within the time period required by this <u>Section 2(c)</u>, the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this <u>Section 2(c)</u> in the next Payment made to the Payee.

(d)     <u>Conditions to Payments</u>. The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment: (i) the representations and warranties of the Payee set forth in <u>Section 3(b)</u> shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in <u>Section 5</u>.

(e)     <u>Automatic Termination</u>. This Agreement will automatically terminate without notice and without any other action by any party hereto at such time as (i) the Payee's Talc Related Liabilities have been satisfied and (ii) there are no remaining Permitted Funding Uses under clause (b) or clause (c) of the definition of "Permitted Funding Uses" in <u>Section 1</u>.

3.     <u>Representations and Warranties</u>.

(a)     <u>Representations and Warranties of the Payor</u>. The Payor represents and warrants to the Payee that:

(i)     <u>Existence, Qualification and Power</u>. The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)     <u>Authorization; No Contravention</u>. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or

7

(C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii) <u>Governmental Authorization; Other Consents</u>. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payor.

(iv) <u>Binding Effect</u>. This Agreement has been duly executed and delivered by the Payor. This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b) <u>Representations and Warranties of the Payee</u>. The Payee represents and warrants to the Payor that:

(i) <u>Existence, Qualification and Power</u>. The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii) <u>Authorization; No Contravention</u>. The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii) <u>Governmental Authorization; Other Consents</u>. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in

NAI-1535636655

connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

(iv)     Binding Effect.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.     Covenants of the Payor.

(a)     Provision of Financial Information.

(i)     No later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), the Payor will furnish to the Payee unaudited annual and quarterly income statements and balance sheets of the Payor prepared in accordance with GAAP and the Payor's historical cost basis of its Subsidiaries, subject to the absence of notes to the financial statements and related disclosures and, with respect to quarterly financial statements, normal year-end adjustments.

(ii)     By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof); _provided_, _however_, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)     Notwithstanding the foregoing, but subject to the last sentence of this Section 4(a)(iii), the financial information required to be furnished as described in Section 4(a)(i) may be, rather than that of the Payor, those of any direct or indirect parent of the Payor.  Notwithstanding the foregoing, the Payor may fulfill the requirement to furnish such financial information by filing the information with the SEC in the applicable time periods required by the SEC.  Subject to the last sentence of this Section 4(a)(iii), the Payor will be deemed to have satisfied the requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing the required information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of the Payor furnishes financial information pursuant to the first sentence of this Section 4(a)(iii) or such parent files a report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent, on the one hand,

and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

      (b)    <u>Successor to the Payor upon Consolidation or Merger</u>.

      (i)    Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; <u>provided</u>, <u>however</u>, that the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of the Payor with an Affiliate thereof solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among the Payor and its Subsidiaries.

      (ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor, under this Agreement with the same effect as if such successor Person had been named herein. In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

      (iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under

this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5. <u>Covenants of the Payee</u>.  The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6. <u>Events of Default</u>.  Each of the following events constitutes an "<u>Event of Default</u>":

(a)     the Payor defaults in the funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b)     the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)     a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7. <u>Remedies</u>.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8. <u>Notices</u>.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable

NAI-1535636655

party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

Johnson & Johnson Holdco (NA) Inc.
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Laura McFalls, President
Email:  lmcfalls@its.jnj.com

Payee:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwhuestho@its.jnj.com

with a copy to:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

9.      Governing Law; Submission to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of New Jersey.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in New Brunswick, New Jersey; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  The Payor and the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10.      No Implied Waiver; Amendments.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure

12

by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.   Counterparts; Entire Agreement; Electronic Execution. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the 2021 Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.   Severability. If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.   Transfer; Assignment. This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns. The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with Section 4(b). The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor. Any purported assignment of rights or obligations under this Agreement other than as permitted by this Section 13 shall be null and void.

14.   Construction. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.   Rights of Parties. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON HOLDCO (NA) INC.**, a New Jersey corporation, as the Payor

By: _____

Name:  Laura McFalls

Title:  President


**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

Name:  Robert Wuesthoff

Title:  President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON HOLDCO (NA) INC.**, a New Jersey corporation, as the Payor

By: _____
Name:  Laura McFalls
Title:  President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____
Name:  Robert Wuesthoff
Title:  President

# SCHEDULE 1

## Definition of Talc Related Liabilities

For purposes of this Agreement, "Talc Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of talc, including talc contained in any product, with asbestos or any other material.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss

of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)  "<u>License</u>" means any license, sublicense, agreement, covenant not to sue or permission.

(g)  "<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)  "<u>Plan</u>" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)  "<u>Proceeding</u>" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

## __ANNEX F__

**J&J Support Agreement**

## SUPPORT AGREEMENT

This SUPPORT AGREEMENT, dated April 4, 2023 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is by and among JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), JOHNSON & JOHNSON HOLDCO (NA) INC., a New Jersey corporation formerly named Johnson & Johnson Consumer Inc. ("Holdco"), and LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL" and, together with J&J and Holdco, the "Parties").

## RECITALS

A.      The Parties have entered into that certain Termination and Substitution Agreement, dated April 4, 2023 (the "Termination and Substitution Agreement"), pursuant to which (1) the Amended and Restated Funding Agreement, dated October 12, 2021 ("2021 Funding Agreement"), among the Parties and the Amended and Restated Commitment and Loan Agreement, dated October 12, 2021, between J&J and Holdco have been terminated and (2) the Parties have agreed to execute and deliver, in substitution therefor, new agreements the terms of which will, among other things, (a) enable LTL to address the guidance provided by the United States Court of Appeals for the Third Circuit in its January 30, 2023 opinion directing dismissal of LTL's then pending chapter 11 case, (b) facilitate confirmation and consummation of a plan of reorganization for LTL with terms supported by thousands of talc claimants whose attorneys have executed and delivered plan support agreements that support confirmation and consummation of a plan of reorganization for LTL with specified terms, which terms are acceptable to the Payee, the Payor and J&J, and (c) not adversely affect talc claimants.

B.      Contemporaneously with the execution and delivery of this Agreement, pursuant to Section 2(a) of the Termination and Substitution Agreement, Holdco and LTL have executed and delivered a Funding Agreement, dated April 4, 2023 (the "New Funding Agreement"), pursuant to which, on the terms and subject to the conditions set forth therein, Holdco will provide funding to LTL both (1) when there is no proceeding under the Bankruptcy Code pending with respect to LTL and (2) during the pendency of a voluntary case under chapter 11 of the Bankruptcy Code commenced by LTL.

C.      Pursuant to Section 2(b) of the Termination and Substitution Agreement, the Parties desire to establish the terms and conditions on which (1) solely in connection with a voluntary case under chapter 11 of the Bankruptcy Code to be commenced by LTL and only if Holdco fails to make any payment to provide LTL funding for one or more trusts created pursuant to a plan reorganization for LTL that is confirmed in such case as required by the New Funding Agreement, J&J will make such payment to LTL on Holdco's behalf, (2) Holdco will be obligated to reimburse J&J for any such payment and any amount not so reimbursed by Holdco will be deemed to be financed with a loan from J&J to Holdco, and Holdco's obligation to make such reimbursement will be discharged and replaced by such loan, and (3) LTL will have the right to enforce such obligation of J&J.

# AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the Parties agree as follows:

1.  **Definitions**.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"2021 Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Agreement" has the meaning specified in the first paragraph hereof.

"Bankruptcy Case" has the meaning specified in Section 2(c).

"Bankruptcy Code" has the meaning given to such term in the New Funding Agreement.

"Bankruptcy Court" has the meaning specified in Section 2(c).

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in New Brunswick, New Jersey or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"District Court" means the United States District Court for the District of New Jersey.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

NAI-1535642684

"Final Order" means an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, to petition for certiorari, to reargue, to rehear or to reconsider shall have been waived in writing by the Person possessing such right, or, in the event that an appeal, writ of certiorari, or reargument, rehearing or reconsideration thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument, rehearing or reconsideration was sought, and the time to take any further appeal, petition for certiorari, or move for reargument, rehearing or reconsideration shall have expired, and no such further appeal, petition for certiorari, or motion for reargument, rehearing or reconsideration shall have been filed.

"Final Support Agreement Order" means a Final Order entered by the Bankruptcy Court in form and substance reasonably satisfactory to J&J, which approves this Agreement on a final basis, as amended, restated, modified or supplemented from time to time with the prior written consent of J&J.

"Funding Account" has the meaning given to such term in the New Funding Agreement.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Holdco" has the meaning specified in the first paragraph hereof.

"Holdco Event of Default" has the meaning specified in Section 3(d).

"Interest Rate" shall mean for any day, an interest rate per annum as calculated in accordance with the latest available J&J Global Methodology posted on the J&J Global Finance Portal as of the Loan Date.

"J&J" has the meaning specified in first paragraph of this Agreement.

"Loan" has the meaning specified in Section 2(b).

"Loan Date" has the meaning specified in Section 2(b).

"Loan Maturity Date", with respect to any Loan, means the date that is five years after the Loan Date of such Loan.

"Material Adverse Effect" means with respect to a Party: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of such Party and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies against such Party under this Agreement, or of the ability of such Party to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against such Party.

"New Funding Agreement" has the meaning specified in the Recitals.

"New Funding Agreement Obligations" has the meaning specified in Section 2(a).

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Parties" has the meaning specified in the first paragraph of this Agreement.

"Payment" has the meaning given to such term in the New Funding Agreement.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Supported Plan" has the meaning given to such term in the New Funding Agreement.

"Talc Related Liabilities" has the meaning given to such term in the New Funding Agreement.

"Termination and Substitution Agreement" has the meaning specified in the Recitals.

"Termination Event" has the meaning specified in Section 6(b).

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.     Support Obligations.

(a)     J&J Obligations.

(i)     From and after the effectiveness of this Agreement as set forth in Section 15, solely in connection with the Bankruptcy Case and only if Holdco fails to timely pay any Payment, the proceeds of which are to be used by LTL solely to fund one or more trusts created pursuant to a Supported Plan as specified in clause (c)(ii) of the definition of "Permitted Funding Use" contained in the New Funding Agreement, owing from Holdco to LTL under the New Funding Agreement (the "New Funding Agreement Obligations") as and when due thereunder, J&J shall promptly pay such Payment to LTL on Holdco's behalf, by disbursing the same directly to the Funding Account.

4

(ii)     J&J's obligation to make any payment pursuant to this <u>Section 2(a)</u> shall be subject to the condition that there shall have been no violation of any covenant set forth in <u>Section 5(a)</u> or <u>Section 5(b)</u>.

(iii)     J&J's obligation to make any payment pursuant to this <u>Section 2(a)</u> shall not be in any way affected by a Holdco Event of Default.

(b)     <u>Holdco Obligations</u>.

(i)     In the event that J&J pays any of the New Funding Agreement Obligations in accordance with <u>Section 2(a)</u>, Holdco shall promptly (and in any event within five Business Days) reimburse J&J for the full amount of any such payment. If Holdco fails to fully reimburse J&J within such five Business Day period, any amount not reimbursed shall automatically be deemed to be financed with a loan (each, a "<u>Loan</u>") in an equivalent amount, with a date as of the date of J&J's payment pursuant to <u>Section 2(a)</u> (each such date, a "<u>Loan Date</u>"), and Holdco's obligation to make such reimbursement shall be discharged and replaced by such Loan.

(ii)     From and after the effectiveness of this Agreement as set forth in <u>Section 15</u>, for each month (or portion thereof) during which J&J is obligated to make payments pursuant to <u>Section 2(a)</u>, Holdco will pay to J&J, promptly following such month, a support fee equal to (i) the product of (A) the amount of accounts receivable in respect of the New Funding Agreement that is reported in Schedule A/B of the Schedule of Assets and Liabilities filed by LTL in the Bankruptcy Case and (B) 0.0275%, divided by (ii) 12 (which support fee will be prorated in the case of partial months).

(c)     <u>LTL Obligations</u>.  LTL will (i) file a voluntary case under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>"), (ii) use its commercially reasonable efforts to obtain a Final Support Agreement Order, and (iii) so long as J&J's obligation to make payments pursuant to <u>Section 2(a)</u> remains in effect, use its commercially reasonable efforts to cause a Supported Plan to become effective, in each case as soon as reasonably practicable.

3.     <u>Loans</u>.

(a)     <u>Repayment and Prepayment</u>.  Holdco hereby unconditionally promises to pay to J&J the then-unpaid principal amount of each Loan on the applicable Loan Maturity Date. Holdco shall have the right at any time and from time to time to prepay any Loan in whole or in part.

(b)     <u>Interest</u>.

(i)     Each Loan shall bear interest at a rate per annum equal to the Interest Rate.

(ii)     Notwithstanding the foregoing, if any principal of or interest on any Loan hereunder is not paid when due, whether at stated maturity, upon acceleration

or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to the Interest Rate plus 2.00%.

(iii)    Accrued interest on each Loan shall be payable in arrears on the last day of each of March, June, September and December and on the applicable Loan Maturity Date; _provided_ that (A) interest accrued pursuant to Section 3(b)(ii) shall be payable on demand and (B) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(iv)    All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    Evidence of Debt.  The records maintained by J&J shall be _prima facie_ evidence of the existence and amounts of the obligations of Holdco in respect of Loans; _provided_ that the failure of J&J to maintain such records or any error therein shall not in any manner affect the obligations of Holdco to pay any amounts due hereunder in accordance with the terms of this Agreement.

(d)    Holdco Events of Default; Remedies.  If at any time any of the following events (each such event, a "Holdco Event of Default") shall occur:

(i)    Holdco shall fail to pay any principal of any Loan when and as the same shall become due and payable;

(ii)    Holdco shall fail to pay any interest on any Loan, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(iii)    any representation or warranty made by Holdco in connection with this Agreement shall prove to have been incorrect in any material respect when so made;

(iv)    Holdco shall fail to observe or perform the covenants set forth in Section 5;

(v)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) liquidation, reorganization or other relief in respect of Holdco or any of its Subsidiaries (other than LTL) or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdco or any of its Subsidiaries (other than LTL) or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(vi)    Holdco or any of its Subsidiaries (other than LTL) shall (A) voluntarily commence any proceeding or file any petition seeking liquidation,

NAI-1535642684

reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (v) of this Section 3(d), (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdco or any of its Subsidiaries (other than LTL) or for a substantial part of its assets, (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (E) make a general assignment for the benefit of creditors; or

(vii)    Holdco or any of its Subsidiaries (other than LTL) shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

then, and in every such event (other than an event with respect to Holdco described in clause (v) or (vi) of this Section 3(d)), and at any time thereafter during the continuance of such event, J&J may, by notice to Holdco, take any or all of the following actions, at the same or different times: (A) declare the Loans then outstanding to be due and payable in whole or in part, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of Holdco hereunder, shall become due and payable immediately and (B) subject to Section 2(a)(iv), exercise all rights and remedies available to it under applicable law, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Holdco; and in the case of any event with respect to Holdco described in clause (v) or (vi) of this Section 3(d), the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of Holdco hereunder, shall immediately and automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Holdco.

4.    Representations and Warranties of each Party.    Each Party represents and warrants to the other Parties that:

(a)    Existence, Qualification and Power.    Such Party (i) is duly formed, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, (ii) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (A) own or lease its material assets and carry on its business and (B) execute, deliver and perform its obligations under this Agreement and (iii) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (ii)(A) or (iii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect with respect to such Party.

(b)    Authorization; No Contravention.    The execution, delivery and performance by such Party of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (i) contravene the terms of its Organizational Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (A) any Contractual Obligation to which it is a party or affecting it or its properties or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is

7

subject, or (iii) violate any applicable law; except in each case referred to in clause (ii) or (iii), to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect with respect to such Party.

(c)     <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by such Party.

(d)     <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by such Party.  This Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

5.     <u>Certain Covenants of Holdco and LTL</u>.

(a)     <u>Amendments to New Funding Agreement</u>.  Holdco and LTL shall not amend, restate, modify or supplement, and Holdco shall not waive any of its rights, powers, privileges or remedies under, the New Funding Agreement without the prior written consent of J&J.

(b)     <u>Assignments of New Funding Agreement</u>.  Neither Holdco nor LTL shall assign its rights or obligations under the New Funding Agreement without the prior written consent of J&J.

(c)     <u>Notices under the New Funding Agreement</u>.  Each of Holdco and LTL shall deliver to J&J any notice or other written communication delivered by it to the other under the New Funding Agreement simultaneously with the delivery of such notice or other written communication under the New Funding Agreement.

6.     <u>Termination</u>

(a)     <u>Automatic Termination</u>.  J&J's obligation to make payments pursuant to <u>Section 2(a)</u> shall terminate automatically at such time as (i) a Supported Plan has become effective and any and all trusts created pursuant to such Supported Plan have been funded in accordance with the terms of such Supported Plan or (ii) a Final Order is entered converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case.

(b)     <u>Termination by J&J</u>.  J&J may terminate its obligation to make payments pursuant to <u>Section 2(a)</u> upon delivery of written notice to LTL at any time after the occurrence or during the continuation of any of the following events (each, a "<u>Termination Event</u>"):

(i)     the material breach by LTL of any of its representations, warranties, covenants or agreements set forth in this Agreement; or

(ii)      (A) LTL shall have applied for or consented to the appointment in the Bankruptcy Case of a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver, or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code; (B) the appointment in the Bankruptcy Case of a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver, or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code; or (C) LTL shall have taken any corporate action for the purpose of authorizing any of the foregoing.

Notwithstanding the foregoing, LTL shall have five (5) Business Days from the receipt of any such written notice of termination from J&J specifying the Termination Event to cure such Termination Event, and no termination of this Agreement shall be effective unless and until the expiration of such five (5) Business Day period without such Termination Event having been being theretofore waived by J&J or cured.

7.      Notices.   All notices required under this Agreement shall be delivered to the applicable Party to this Agreement at the address set forth below.   Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.


J&J:

JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Duane Van Arsdale, Treasurer
Email:  DVanArs@its.jnj.com


Holdco:

JOHNSON & JOHNSON HOLDCO (NA) INC.
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Laura McFalls, President
Email:  lmcfalls@its.jnj.com

9

LTL:

LTL:

LTL MANAGEMENT LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwuestho@its.jnj.com

with a copy to:

LTL MANAGEMENT LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

8.      Governing Law; Submission to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of New Jersey.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought only in the Bankruptcy Court.  Each Party hereby irrevocably and unconditionally submits to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such legal proceeding.

9.      No Implied Waiver; Amendments.  No failure or delay on the part of any Party to exercise any right, power or privilege under this Agreement, and no course of dealing between the Parties shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on any Party in any case shall entitle such Party to any other or further notice or demand in similar or other circumstances. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by any Party therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by each Party, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

10.     Counterparts; Entire Agreement; Electronic Execution.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the Parties relating to the subject matter hereof and supersedes, in its entirety, any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of

10

the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

11.    Severability.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

12.    Transfer; Assignment.  This Agreement shall be binding upon each Party and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of each Party and its successors and assigns.  A Party's rights and obligations under this Agreement may not be assigned or delegated without the prior written consent of the other Parties; provided, however, that J&J may assign its rights or delegate its obligations under this Agreement, in whole or in part, without such consent and upon prior written notice to LTL and Holdco, to one or more of its wholly owned Subsidiaries. No assignment or delegation, including any assignment or delegation by J&J pursuant to the proviso set forth in the immediately preceding sentence, shall relieve the assigning or delegating Party of any of its obligations hereunder unless the non-assigning or non-delegating Parties enter into a novation releasing the assigning or delegating Party of its obligation under this Agreement.  Any purported assignment of rights or delegation of obligations under this Agreement other than as permitted by this Section 12 shall be null and void.

13.    Construction.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  The word "including" means without limitation by reason of enumeration.  The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless specifically stated otherwise, all references to Sections are to the Sections of this Agreement.

14.    Rights of Parties.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

15.    Conditions Precedent.  This Agreement and the obligations of the Parties hereunder shall not become effective unless or until the following conditions precedent have been satisfied:

(a)    this Agreement shall have been executed by each Party and each Party shall have received counterparts hereof;

(b)    a Final Support Agreement Order shall have been entered by the Bankruptcy Court, and such order shall not have been appealed, stayed or modified;

(c)    the New Funding Agreement shall not have been amended, restated, modified or supplemented, and Holdco shall not have waived any of its rights, powers, privileges

NAI-1535642684

or remedies under the New Funding Agreement, in each case without the prior written consent of J&J; and

        (d)      neither Holdco nor LTL shall have assigned its rights or obligations under the New Funding Agreement without the prior written consent of J&J.

*[Signature Page Follows]*

12

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**,
a New Jersey corporation

By:_____
Name:  Duane Van Arsdale
Title:  Treasurer

**JOHNSON & JOHNSON HOLDCO (NA) INC.**,
a New Jersey corporation

By:_____
Name:  Laura McFalls
Title:  President

**LTL MANAGEMENT LLC**,
a North Carolina limited liability company

By:_____
Name:  Robert Wuesthoff
Title:  President

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**,
a New Jersey corporation

By: _____
Name:  Duane Van Arsdale
Title:  Treasurer

**JOHNSON & JOHNSON HOLDCO (NA) INC.**,
a New Jersey corporation

By: _____
Name:  Laura McFalls
Title:  President

**LTL MANAGEMENT LLC**,
a North Carolina limited liability company

By: _____
Name:  Robert Wuesthoff
Title:  President

## ANNEX G

**March 6, 2023 Letter from Trailblazers**



March 6, 2023

Attn: Honorable Judge Richard L. Seabolt
Superior Court of California
County of Alameda
Oakland - Administration Building
Department 18, Floor 3
1221 Oak Street
Oakland, CA 94612

Re:  <u>Permission to film at the VALADEZ vs. JOHNSON & JOHNSON, ET AL. trial</u>

To whom it may concern:

My name is Ashleigh DiTonto and I am the Senior Vice President of Development at Trailblazer Studios, a production company based in Raleigh, NC, which focuses on documentary filmmaking and post-production services for premium platforms like Netflix, Hulu, National Geographic, Disney + and ESPN. This includes our recent documentary, "Rise Again: Tulsa and the Red Summer," directed by award-winning filmmaker Dawn Porter.

I am writing to you today, respectfully, requesting permission to film the court proceedings for the upcoming VALADEZ vs. JOHNSON & JOHNSON, ET AL trial, which is set to come before the Honorable Judge Richard L. Seabolt.

As the first J&J baby powder trial following the 3rd Circuit Court of Appeals decision to dismiss the LTL Management bankruptcy filing, this is a case of significant public interest. Moreover, my company is filming a documentary focused on the ongoing talc bankruptcy saga, which currently involves over 40,000 American families and could leave lasting effects on the legal system and the cosmetic industry. As the bankruptcy proceedings continue, the Valadez case stands out as not only a key part of our story, but also as a remarkable demonstration of the judicial system working together on multiple levels.

Our crew will be small and, thus, will not interrupt the proceedings in any way. My team has filmed extensively in court before and understands the seriousness of the case; moreover, we have tremendous respect for Alameda County Superior Court and Judge Seabolt.

We believe that utilizing footage from this trial would be incredibly valuable to the American public and would make for a powerful piece to our story. We appreciate your time and consideration in this matter and welcome the opportunity to discuss this further with you over the phone, on Zoom, or in person.



Sincerely,

Ashleigh DiTonto
SVP of Development
(201) 893-5109
ashleigh@trailblazerstudios.com
https://www.trailblazerstudios.com

<u>**ANNEX H**</u>

**March 21, 2023 Letter from Trailblazers' Counsel**



March 21, 2023

**VIA E-MAIL ONLY**

Stephanie L. Gumm
*Attorney*
D: 919.783.2819
F: 919.783.1075
sgumm@poynerspruill.com

Scott J. Richman
Nelson Mullins
100 S. Charles Street, Ste 1600
Baltimore, MD 21201
scott.richman@nelsonmullins.com

RE:  Trailblazer Studios' request to record the *Valadez v. Johnson & Johnson, et al.* trial

Dear Scott:

We represent Trailblazer Studios and are in receipt of your requests for clarification of Trailblazer's request to record the trial in *Valadez v. Johnson & Johnson, et al.*  Please find Trailblazer's responses below:

- **Your letter indicates that your "crew will be small and, thus, will not interrupt the proceedings in any way."  Can you please specify:**

    ○ **The number of crewmembers.**  We will have one camera operator and one producer.

    ○ **The equipment they would be utilizing in the courtroom.**  The two crewmembers will bring one camera, one camera tripod and camera batteries. Until we have had a chance to see the courtroom and speak with the appropriate tech/media personnel at the courthouse, we will not be able to determine precisely what gear will be needed for audio.  We will work with the judge and counsel in advance to make sure we are following protocols and everyone is in agreement with the audio setup.

Poyner Spruill LLP

- ○ **What if any equipment will be transported in or out of the courtroom on a daily basis.** We will transport the camera and tripod in and out of the courtroom along with any audio equipment.

- ○ **What if any time requirements will be needed to set up or activate equipment.** We will follow Judge Seabolt and the court's media protocol for setup and activation.

- ○ **What if any power sources will be needed.** No power sources will be needed.

- ○ **What if any sounds or lights emit from the equipment.** No sounds or lights emit from the camera.

- ○ **How much space is anticipated to be needed.** We need enough space for the camera on a tripod and for two people to stand behind the camera.

- **In light of your statement that your company is "filming a documentary focused on the ongoing talc bankruptcy saga," how much trial footage from this case, in terms of volume and substance, do you anticipate utilizing in the documentary?** At this time, it is impossible to know how much trial footage will be used in the documentary.

- **Do you anticipate getting waivers from anyone being audibly and/or visually recorded? If so, when and how do you envision that would occur?** We will not require waivers from anyone recorded in the courtroom.

- **What if any protections do you have to avoid recording jurors?** Our crewmembers will be carefully instructed that jurors are not to be recorded at any time, for any purpose.

- **Will your equipment have the ability to pick up any sound from counsel table? What about conversations at the judge's bench between the judge and counsel?** No. Regarding audio, we will follow the protocols set by Judge Seabolt and the court media personnel.

- **What is your protocol if any for permanently deleting footage if something is recorded such as confidential documents, inadvertently displayed information, or evidence struck from the record?** We will follow all instructions, standard practices, and protocol set by Judge Seabolt and the court media personnel.

- **What if any editing do you anticipate being performed on the trial footage?** At this time, it is impossible to know how the trial footage will be used in the documentary.

- **When do you anticipate the documentary being released?** We do not yet have a release date for the documentary.

Poyner Spruill LLP

- **Do you anticipate interviewing anyone involved with the trial?  If so, who and when?**  We would like to interview individuals involved with the trial, but at this time it is unclear who or when.

- **Where (in terms of media outlet(s) and location) do you anticipate the documentary being released?**  We do not yet have media outlets and locations identified for the release of the documentary.

- **Do you intend to broadcast or otherwise publish anything about the trial while the trial is ongoing?   If so please specify when, where and in format(s)/media outlet(s).**  No, we do not plan to broadcast or otherwise publish anything about the trial while it is ongoing.

- **Do you intend to make any trial footage available to any person or entity outside of Trailblazer Studios while the trial is ongoing?  If so, please specify when, where and what person(s)/entities.**  The only persons outside of Trailblazer Studios personnel who will have access to the footage during the trial will be the producer and camera operator in the courthouse.

- **Is the documentary being produced for profit in any manner?**   Like most media companies, Trailblazer is a for-profit entity, and it is fair to say that this documentary is part of a larger effort to show a profit beyond Trailblazer's operating expenses.  It is unknown at this time whether the documentary will generate a profit.

If you have any questions, please do not hesitate to contact me at 919-783-2819.  Thank you for your assistance in this matter.

Very truly yours,

Stephanie L. Gumm
*Attorney*

cc      Ashleigh DiTonto
         ashleigh@trailblazerstudios.com

# ANNEX I

**Plaintiff's Response to Defendants' Opposition to
Trailblazer Studios' Request to Record Trial Proceedings**

E-SERVICE
69621681
Mar 23 2023
10:52AM
File & ServeXpress

1 Joseph D. Satterley (C.S.B. #286890)
Denyse F. Clancy (C.S.B. #255276)
2 Ian A. Rivamonte (C.S.B. #232663)
  irivamonte@kazanlaw.com
3 KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
4 Jack London Market
55 Harrison Street, Suite 400
5 Oakland, California 94607
Telephone: (510) 302-1000
6 Facsimile:  (510) 835-4913

7 Attorneys for Plaintiff

8                    SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10 ANTHONY HERNANDEZ VALADEZ,           Case No. 22CV012759

11             Plaintiff,              **PREFERENCE MOTION GRANTED**

12     v.                              Assigned for All Pre-Trial Purposes to
                                       Judge Richard Seabolt
13 JOHNSON & JOHNSON, et al.,          Department 18

14             Defendants.            **PLAINTIFF'S RESPONSE TO
                                      DEFENDANTS' OPPOSITION TO
15                                    TRAILBLAZER STUDIOS' REQUEST
                                      TO RECORD TRIAL PROCEEDINGS**

16
                                      Case Filed:   June 15, 2022
17                                    Trial Date:   April 17, 2023

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    This Court has the discretion to permit, refuse, or limit Trailblazer Studios' access to

2   record this case's trial proceedings. [Cal. Rules of Ct., rule 1.150(e); *People v. Dixon* (2007) 148

3   Cal.App.4th 414, 437.] In exercising that discretion, this Court should disregard Defendants'

4   argument that Trailblazer Studios' request is "improper" under Civil Code section 3344(a) because

5   it purportedly "would violate California law prohibiting profit from the use and likeness of an

6   individual absent their consent." [Defendants' Opp. at 8.] Defendants are wrong because

7   subdivision (d) of section 3344 states that matters of "***public affairs***," including this case "***shall***

8   ***not constitute a use for which consent is required under subdivision (a).***" [Civ. Code § 3344(d)

9   (emphasis added).]

10   In California, a plaintiff may allege misappropriation of their name or likeness under Civil

11   Code section 3344(a). However, "no cause of action will lie" under a section 3344 claim for

12   misappropriation "for the '[p]ublication of matters in the public interest, which rests on the right

13   of the public to know and the freedom of the press to tell it.'" [*Montana v. San Jose Mercury*

14   *News, Inc.* (1995) 34 Cal.App.4th 790, 793; *see also Eliott v. Lions Gate Entertainment Corp.*

15   (C.D. Cal., Nov. 8, 2022, No. 221CV08206SSSDFMX) 2022 WL 17408662, at *9 (citing to

16   *Montana,* 34 Cal.App.4th at 793).] Indeed, section 3344(d) states that "[f]or purposes of" section

17   3344, "a use of a name, voice, signature, photograph, or likeness in connection with any news,

18   ***public affairs***, or sports broadcast or account, or any political campaign, ***shall not constitute a use***

19   ***for which consent is required under subdivision (a)***." [Civ. Code § 3344(d) (emphasis added).]

20   For example, in *Eliott*, the plaintiff claimed that the at-issue documentary "suggests that he

21   was a 'recruiter and member of a purported sex cult.'" [*Eliott,* 2022 WL 17408662, at *7.]

22   Applying section 3344 and California authorities interpreting it, the federal district court held that

23   the plaintiff had no valid claim for improper use of his name and likeness because the at-issue

24   documentary involved "a matter of public interest." [*Id.* at *9.] "And as California's courts have

25   held, even private individuals cannot state a claim for misappropriation for their portrayal in a

26   publication concerning a public matter." [*Id.* (citing *Dora v. Frontline Video, Inc.* (1993) 15

27   Cal.App.4th 536, 543).]

28   Defendants' bad-faith bankruptcy and infliction of further harm upon mesothelioma

3247451.1

2

victims like Plaintiff Anthony Hernandez Valadez is a "matter of public interest." [*See, e.g.,*
Spector, M., *Judge Indicates Intention to Dismiss J&J Talc Unit Bankruptcy* (Feb. 14, 2023)
Reuters <https://tinyurl.com/2tum2v4y> (as of Mar. 23, 2023).] Indeed, Mr. Valadez's case is the
only one allowed to proceed to trial despite the bankruptcy stay affecting thousands of other talc
claimants. [Church, S., *J&J Must Face Baby Powder Suit From 24-Year-Old With Cancer* (Feb.
14, 2023) Bloomberg Law <https://tinyurl.com/4jwva59n> (as of Mar. 23, 2023).] Thus,
Defendants' claim that "Court approval" of Trailblazer Studios' "request creates a myriad of legal
concerns and potential liabilities" is unfounded. Their argument also contradicts Rule 1.150 and
Code of Civil Procedure section 124 because, under Defendants' mistaken interpretation of
California law, it creates a presumption against recording or broadcasting court proceedings. [Cal.
Rules of Ct., rule 1.150(a) ("This rule does not create a presumption for or against granting
permission to photograph, record, or broadcast court proceedings."); *see also* Code Civ. Proc.
§ 124 (generally, "the sittings of every court shall be public").]

Defendants' arguments that Civil Code section 3344 "should cause the court additional
concern" are unfounded and inconsistent with the law. Accordingly, Plaintiff requests that this
Court disregard Defendants' section 3344 arguments in exercising its discretion to permit, refuse,
or limit Trailblazer Studios' access to record the trial proceedings in this case.

DATED: March 23, 2023

KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation

By: _____

Ian A. Rivamonte

Attorneys for Plaintiff

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

## PROOF OF SERVICE

### *Anthony Hernandez Valadez v. Johnson & Johnson, et al.*
### Alameda County Superior Court Case No. 22CV012759

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Alameda, State of California. My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

On March 23, 2023, I served true copies of the following document(s) described as:

**PLAINTIFF'S RESPONSE TO DEFENDANTS' OPPOSITION TO TRAILBLAZER STUDIOS' REQUEST TO RECORD TRIAL PROCEEDINGS**

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY ELECTRONIC SERVICE:** I electronically served the document(s) by using the File & ServeXpress system. Participants in the case who are registered users will be served by the File & ServeXpress system. Participants in the case who are not registered users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 23, 2023, at Tracy, California.



E. A. Pawek

**SERVICE LIST**

1

2  BARNES & THORNBURG LLP
   2029 Century Park East, Suite 300
3  Los Angeles CA 90067
   Telephone: (310)284-3880
4  Facsimile: (310)284-3894
   FOR: ALBERTSONS COMPANIES, INC.,
5  ALBERTSONS COMPANIES, INC.sii/pae/et
   LUCKY STORES, INC., LUCKY STORES,
6  INC., SAFEWAY INC., SAVE MART
   SUPERMARKETS , SAVE MART
7  SUPERMARKETS sii/pae/et LUCKY
   STORES, INC., TARGET CORPORATION,
8  WALMART INC.

   KING & SPALDING LLP
   633 West  5th Street,
   Suite 1600
   Los Angeles CA 90071
   Telephone: 213-443-4351
   Facsimile: 213-443-4310
   FOR: JOHNSON & JOHNSON , LTL
   MANAGEMENT LLC, LTL MANAGEMENT
   LLC sii/pae/et JOHNSON & JOHNSON
   BABY PRODUCTS COMPANY, LTL
   MANAGEMENT LLC sii/pae/et JOHNSON &
   JOHNSON CONSUMER INC.

9  SPANOS PRZETAK
   555 12th Street
10 Suite 2060
   Oakland CA 94607
11 Telephone: (510) 250-0200
   Facsimile: (510) 380-6354
12 FOR: DESIGNATED DEFENSE COUNSEL

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com