**In the Matter Of:**

*In Re: LTL Management LLC Bankruptcy*

---

*JAMES MURDICA*

*May 30, 2023*

---



## Page 1

```
 1                    CONFIDENTIAL
 2         UNITED STATES BANKRUPTCY COURT
 3             DISTRICT OF NEW JERSEY
 4            CASE NO. 23-12825 (MBK)
 5                   CHAPTER 11
 6    ------------------------------------------
 7    IN RE:
 8    LTL MANAGEMENT LLC BANRUPTCY,
 9                        Debtor.
10    ------------------------------------------
11
12            ** CONFIDENTIAL **
13
14       REMOTE VIDEOTAPED DEPOSITION OF
15                 JAMES MURDICA
16
17
18
19            Tuesday, May 30, 2023
20               9:30 a.m. (EDT)
21
22
23    Reported By:
24    Joan Ferrara, RMR, FCRR
25    Job No. 2023-898651
```

## Page 2

```
 1                    CONFIDENTIAL
 2
 3
 4               May 30, 2023
 5               9:30 a.m. (EDT)
 6
 7
 8
 9
10       Confidential Videotaped Deposition of
11    JAMES MURDICA, held remotely via Zoom,
12    before Joan Ferrara, a Registered Merit
13    Reporter, Federal Certified Realtime
14    Reporter and Notary Public.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    CONFIDENTIAL
 2    REMOTE APPEARANCES:
 3
 4    ON BEHALF OF THE COMMITTEE:
 5    BROWN RUDNICK
 6    BY:       MICHAEL WINOGRAD, ESQ.
 7              SUSAN SIEGER-GRIMM, ESQ.
 8              CAMERON MOXLEY
 9
10
11    ON BEHALF OF DEBTOR LTL MANAGEMENT:
12    JONES DAY
13    BY:       TIMOTHY M. VILLARI, ESQ.
14              DAVID S. TORBORG
15
16
17    ON BEHALF OF THE AD HOC COMMITTEE OF STATES
18    HOLDING CONSUMER PROTECTION CLAIMS:
19    WOMBLE BOND DICKINSON (US) LLP
20    BY:       LISA TANCREDI, ESQ.
21
22
23    ON BEHALF OF PAUL CROUCH:
24    RUCKDESCHEL LAW FIRM, LLC
25    BY:       JONATHAN RUCKDESCHEL, ESQ.
```

## Page 4

```
 1                    CONFIDENTIAL
 2    REMOTE APPEARANCES:  (Continued)
 3
 4    ON BEHALF OF THE AD HOC COMMITTEE OF
 5    SUPPORTING COUNSEL:
 6    PAUL HASTINGS
 7    BY:       WILLIAM K. WHITNER, ESQ.
 8
 9
10    ON BEHALF OF REBECCA LOVE AND OTHER OVARIAN
11    CANCER PLAINTIFFS:
12    ASHCRAFT & GEREL
13    BY:       MICHELLE PARFITT, ESQ.
14
15
16    ON BEHALF OF SUE SOMMER-KRESSE, TCC MEMBER:
17    MOTLEY RICE LLC
18    BY:       JOHN BADEN, ESQ.
19
20
21    ON BEHALF OF JOHNSON & JOHNSON and JOHNSON &
22    JOHNSON HOLDCO:
23    WHITE & CASE LLP
24    BY:       GREG STARNER, ESQ.
25              MATTHEW E. LINDER, ESQ.
```

Page 53

1          J. MURDICA - CONFIDENTIAL
2      Certainly not -- and, you know,
3    as litigation counsel to J&J on some
4    other matters, if we need to confer,
5    we can do that, Mr. Murdica.
6      A    I'm talking specifically -- I
7    understood your question, Mr. Winograd, to
8    be about talc settlements pre-bankruptcy.
9    Is that right?
10     Q    Pre-bankruptcy in the tort
11   system, has Johnson & Johnson paid out any
12   money for cervical or uterine cancer
13   claimants?
14        MR. STARNER:  So you're not
15    limited to talc claims, is that what
16    you're saying?
17        MR. WINOGRAD:  It is the talc
18    claims, yes.
19        MR. STARNER:  Okay.  Your
20    question was not limited to talc
21    claims.  It sounds like you are
22    limiting it to talc claims.
23        MR. WINOGRAD:  So let me try it
24    again.
25

Page 54

1          J. MURDICA - CONFIDENTIAL
2    BY MR. WINOGRAD:
3



16     Q    Do you agree that certain
17   gynecological cancers have better -- I'm
18   sorry, strike that.
19        Do you believe that the analysis
20   as to causation with respect to certain
21   gynecological cancers is different than
22   others?
23        MR. STARNER:  Objection.
24        One, this is a topic we covered
25    in the last deposition.

Page 55

1          J. MURDICA - CONFIDENTIAL
2        Number two, now you're getting
3    into clearly information covered by a
4    privilege.
5        He's litigation counsel for J&J.
6    So his, you know, legal assessment or
7    knowledge about, you know, causation
8    analysis for claims, that's -- that,
9    obviously, would be off limits.
10        THE WITNESS:  So I'll answer it,
11    though, because I don't want to hear
12    that we stood on any objections.
13     A    Mr. Winograd, from what I've
14   seen to date, I don't think any of those
15   claims are meritorious regardless of the
16   subtype.
17     Q    You don't believe any of what
18   claims are meritorious?
19     A    I don't think any of the talc
20   claims that you just described, whether it
21   be ovarian, uterine or cervical, I don't
22   think -- based on what I've seen, I don't
23   think any of them have merit.
24        So I don't think any are
25   stronger than the other.  I think they're

Page 56

1          J. MURDICA - CONFIDENTIAL
2    all meritless.
3      Q    Well, those are two different
4    things.
5        Do you believe that -- but do
6    you believe -- without getting into any
7    details for the moment, do you believe that
8    the causation is stronger for some than
9    others?
10        MR. STARNER:  Again, same
11    instruction.  I do believe you are
12    going too far afield here, number one.
13        Number two, subject to that
14    instruction, if generally you want to
15    respond, Mr. Murdica, you can.
16     A    Yeah, I don't think any of them
17   have a good causation case or stronger than
18   another.  I think they're all -- this is
19   the least meritorious tort I've worked on
20   in my career, as far as I -- you know, from
21   my point of view.
22     Q    With respect to unfiled claims,
23   do you know how many unfiled claims there
24   are as of right now with respect to talc
25   claims?

Page 57

1    **J. MURDICA - CONFIDENTIAL**
2    A    Again, we sought that discovery
3  from your committee, Mr. Winograd, and you
4  refused to respond.
5        If you tell me yours, I'll tell
6  you mine.
7    **Q    Well, do you know yours, the**
8  **number that -- do you have a number that**
9  **you're aware of, a total number of unfiled**
10 **claims, based on whatever information you**
11 **have?**
12   A    I have the same information you
13 have, Mr. Winograd.
14   **Q    I'm not asking if you have the**
15 **same information that I have, and I don't**
16 **know that you would know what I know.**
17   A    I'd encourage you to respond to
18 discovery or, you know, come join the
19 discussion and we could talk about those
20 things.
21       MR. WINOGRAD:  And I'll move to
22   strike as nonresponsive.
23 BY MR. WINOGRAD:
24   **Q    Do you know how many unfiled**
25 **claims there are with respect to the talc**

Page 58

1    **J. MURDICA - CONFIDENTIAL**
2  **litigation?**
3        MR. STARNER:  Objection.
4    A    I can't give you a better answer
5  than I just gave you.
6    **Q    It's a simple "yes" or "no."**
7  **You either know or you don't.**
8        MR. STARNER:  Objection.
9    A    Well, what I know, I've gained
10 through conversations with counsel and
11 conversations pursuant to mediation.
12       If you ever want to talk about
13 it or you ever want to answer our discovery
14 and give those answers, I'll give you those
15 answers, too, to the extent that I know
16 them.
17   **Q    Do you believe --**
18       MR. RUCKDESCHEL:  Objection.
19   This is Ruckdeschel.
20       I object to the nonresponsive
21   and to the continued speeches from the
22   witness.
23       (Simultaneous cross-talk.)
24       MR. STARNER:  Hold on.  We don't
25   need comments like that.  We're here

Page 59

1    J. MURDICA - CONFIDENTIAL
2  to answer questions and be helpful.
3  So let's just please proceed.  We
4  don't need people chipping in with
5  comments like that.
6        THE WITNESS:  It's a waste of
7  time.  And if anybody else is going to
8  speak other than Mr. Winograd, please
9  state your name, please state who you
10 represent and whether or not you
11 intervened, because I'm not going to
12 respond to all you people.
13       MR. SATTERLEY:  This is Joe
14 Satterley.  I represent Mr. Validez
15 and many other people.  Mr. Starner's
16 statement about wasted time is him and
17 the witness.
18       THE WITNESS:  Have you
19 intervened, Mr. Satterley?
20       MR. STARNER:  Mr. Murdica,
21   please, that's fine.
22       Look, gentleman, you're only
23 taking up your own time here.  Why
24 don't we proceed.  We're here to be
25 helpful and answer questions.  So

Page 60

1        J. MURDICA - CONFIDENTIAL
2  let's please proceed.
3        MR. WINOGRAD:  And I do want to
4  just say, Greg, we are wasting time in
5  part, and I'm not going to dive into
6  whose fault I think that is, but,
7  again, we're not limited to an hour
8  and a half, and we can have that
9  conversation with the Court.
10       MR. STARNER:  Yeah, we don't
11   agree with that.
12       Please proceed.  You're wasting
13   time.
14 BY MR. WINOGRAD:
15   **Q    With respect to the unfiled**
16 **claims, Mr. Murdica, do you believe there's**
17 **been a spike recently in unfiled claims?**
18   A    What is recent?  What do you
19 mean by that?
20       Since you last deposed me,
21 Mr. Winograd?
22   **Q    Let's start with this:  Since**
23 **the filing of the first petition, do you**
24 **believe there's been a spike in unfiled**
25 **claims?**

Page 61

1    J. MURDICA - CONFIDENTIAL
2    A    Since September -- since
3    October 14, 2021, is that your question?
4    Q    Yes.
5    A    I don't think so.
6    Q    Are you familiar with Majed
7    Nachawati?
8    A    Majed Nachawati.
9    Q    Well, M-A-J-E-D, correct?
10    A    Yes.
11    Q    Okay.  Are you familiar with
12    him?
13    A    I am.
14    Q    And are you aware he was deposed
15    on May 24th?
16    A    Yes.
17    Q    Did you listen to that
18    deposition?
19    A    I did not.
20    Q    Have you read the transcript?
21    A    In part.  I skimmed part of it,
22    but I did not read it.
23    Q    Did you listen to Mr. Kim's
24    deposition during the first -- during the
25    PI proceeding?

Page 62

1    J. MURDICA - CONFIDENTIAL
2    A    I can't remember.
3    Q    Will J&J enforce the PSAs to the
4    extent a law firm wants to back out of
5    them?
6    MR. STARNER:  Objection,
7    assuming it calls for any kind of
8    legal conclusion, number one.
9    Number two, to the extent it
10    calls for disclosing privileged
11    communications.
12    But subject to that, you can
13    answer the question.
14    A    Yeah, all I could tell you,
15    Mr. Winograd, is that when your colleagues
16    did what they did to Mr. Robinson, we did
17    not move to enforce it against
18    Mr. Robinson.
19    Q    Do you agree with respect to the
20    PSA that it's meant to facilitate coming to
21    a plan that plaintiffs' law firms could
22    support and recommend to their clients?
23    A    I don't know what you mean by
24    that.
25    Q    Well, do you agree that the PSAs

Page 63

1    J. MURDICA - CONFIDENTIAL
2    are still subject to the parties agreeing
3    on a plan -- a full proposed plan?
4    A    I'm really not understanding
5    your question.
6    The plan has been filed.  The
7    lawyers representing those claimants
8    support it.  So I guess I'm not following
9    what you're asking about a PSA.
10    Q    How do you know that the lawyers
11    representing claimants support the plan as
12    it was filed?
13    A    Because I speak to them.  It's
14    my job.
15    Q    And who have you -- have you
16    spoken to Mr. Nachawati on it, about that?
17    MR. STARNER:  I just want to
18    object to this line of questioning.
19    You've now asked a few questions
20    literally verbatim what you asked the
21    first time around, and I can even
22    quote you the lines, if you want to,
23    and this is, again, a topic you've
24    covered before.
25    So I just want to object that.

Page 64

1    J. MURDICA - CONFIDENTIAL
2    We're covering old ground.
3    But, please, you can answer.
4    MR. WINOGRAD:  Okay.  Let me
5    just respond.
6    I find that hard to believe
7    because I'm quoting from a transcript
8    that -- from a deposition that just
9    took place about six days ago.
10    MR. STARNER:  I thought you were
11    quoting from your prior questions in
12    the prior deposition because that
13    would be more accurate.  I can quote
14    those lines --
15    MR. WINOGRAD:  That's why I
16    discussed Mr. Majed and his
17    deposition.
18    A    Well, the answer is yes.  The
19    answer is yes.
20    Q    And when -- in speaking with
21    Mr. Nachawati, did he say that all of his
22    claimants would support the plan as filed?
23    A    Well, I think you've heard his
24    testimony and, you know, what the ad hoc
25    has represented, and you deposed Mr. Watts



Page 85

1        J. MURDICA - CONFIDENTIAL
2    Mr. Thompson.
3    BY MR. THOMPSON:
4

25    Q    I understand.  And I appreciate

Page 86

1        J. MURDICA - CONFIDENTIAL
2    it's not in front of you.
3        And you were involved in
4    settling most, if not all, of those cases,
5    is that right?
6    A    That's correct.
7

12    Q    And you were involved in those
13    settlements as well, weren't you?
14    A    Yes.
15    Q    Okay.  And to the extent that
16    Johnson & Johnson settled any talc cases in
17    the tort system prior to October 2021, you
18    would be familiar with that, whether for
19    ovarian cancer or mesothelioma, fair?
20    A    There may be a few exceptions
21    from before the beginning of 2020, but yes.
22    Q    Okay.  Did you -- are you aware
23    of an instance where Johnson & Johnson
24    settled a talc case for someone with a
25    gynecologic cancer that was not ovarian

Page 87

1        J. MURDICA - CONFIDENTIAL
2    cancer?
3    A    So I think I was asked this
4    question, Mr. Thompson, by Mr. Winograd.
5        And what I said was, I don't
6    believe we did, or at least not
7    intentionally, based on the settlements
8    that occurred prior to filing.
9    Q    And so, to your knowledge,
10    Johnson & Johnson did not ever settle a
11    lawsuit brought by someone alleging that
12    talc caused their disease for a plaintiff
13    that didn't have either ovarian cancer or
14    mesothelioma --
15        MR. STARNER:  Objection.
16    BY MR. THOMPSON:
17    Q    -- right?
18    A    Well, Mr. Thompson, I'll tell
19    you what I told Mr. Winograd.
20        The claims that -- or cases and
21    claims that we settled pre-filing were for,
22    you know, specific reasons with specific
23    counsel, and I don't believe encompassed
24    any of those.
25        However, thousands of

Page 88

1        J. MURDICA - CONFIDENTIAL
2    non-ovarian -- we'll call them "non-ovarian
3    gynecologic cancers" were on file at the
4    time and have been asserted and continue to
5    be asserted against the company.
6    Q    I understand that.
7        But what I'm getting at is the
8    company never resolved, never compensated
9    anyone at arm's length for a disease that
10    was a gynecologic cancer that was not
11    ovarian cancer, right?
12        MR. STARNER:  Objection.
13    A    I don't think I can do better
14    than I just told you.  Whether -- you know,
15    I don't believe that the company did.  If
16    they did, it would have been unintentional.
17        But that doesn't change the fact
18    that there were thousands filed against the
19    company and people wouldn't just dismiss
20    them.  They're not going away, they haven't
21    gone away and they wouldn't go away before.
22    They're real claims we have to face.
23    Q    Did Johnson & Johnson settle
24    talc claims for mesothelioma -- did J&J
25    settle talc claims brought by mesothelioma