**In the Matter Of:**

*LTL Management LLC Bankruptcy*

*ADAM LISMAN*

*May 31, 2023*



## Page 1

```
 1
 2   UNITED STATES BANKRUPTCY COURT
     DISTRICT OF NEW JERSEY
 3   ------------------------------------------X
     In Re:
 4
 5   LTL MANAGEMENT, LLC,
 6                        Debtor.
 7
     Case No. 21-30589 (MBK)
 8   ------------------------------------------X
 9
10      VIDEOTAPED DEPOSITION OF ADAM LISMAN
11
12
13
14   DATE:  May 31, 2023
15   TIME:  9:34 a.m.
16   PLACE:  ***REMOTE***
17   BEFORE:  Rebecca Schaumloffel, RPR, CCR-NJ
18   JOB NO:  2023-898649
19
20
21
22
23
24
25
```

## Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4
     ASHCRAFT & GEREL, LLP
 5       Attorneys for Rebecca Love
         120 E. Baltimore Street
 6       Suite 1802
         Baltimore, Maryland 21202
 7       BY:  JAMES F. GREEN, ESQ.
              MICHELLE PARFITT, ESQ.
 8
 9
10
11   BEASLEY ALLEN LAW FIRM
         218 COMMERCE STREET
12       Montgomery, Alabama 36104
         BY:  LEIGH O'DELL, ESQ.
13
14
15
16   BROWN RUDNICK
         Attorneys for the Talc claimants
17       7 Times Square
         New York, New York 10036
18       BY:  DAVID WEINSTEIN, ESQ.
              JEFF JONAS, ESQ.
19            LYDELL BENSON, ESQ.
              ALEX KASNETZ, ESQ.
20            GERARD CICERO, ESQ.
              MICHAEL REINING, ESQ.
21            SUNNI BEVILLE, ESQ.
              SUSAN SIEGER-GRIMM, ESQ.
22
23
24
25
```

## Page 3

```
 1
 2   (Appearances:)
 3
 4
     GENOVA BURNS, LLC
 5       494 Broad Street
         Newark, New Jersey 07102
 6       BY:  DANIEL M. STOLZ, ESQ.
 7
 8
 9
10
     JONES DAY
11       Attorneys for the Debtor
         250 Vesey Street
12       Suite 31
         New York, New York 10281
13       BY:  GEOFF GOTTBRECHT, ESQ.
              DAVID S. TORBORG, ESQ.
14
15
16
     KARST & VON OISTE, LLP
17       23923 GOSLING ROAD SUITE A
         Spring, Texas 77389
18       BY:  DOUGLAS VON OISTE, ESQ.
19
20
21   MASSEY & GAIL, LLP
         2000 Maine Avenue SW
22       Washington, D.C. 20024
         BY:  RACHEL MORSE, ESQ.
23
24
25
```

## Page 4

```
 1
 2   Appearances (continued:)
 3
 4
 5   MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
         Attorneys for Katherine Tolleson,
 6       et al.
         777 S Harbour Island Blvd.
 7       Suite 310
         Tampa, Florida 33602
 8       BY:  CLAY THOMPSON, ESQ.
 9
10
11
     MILLER THOMSON LLP
12       10155 102 Street
         Edmonton, Alberta, Canada
13       T5J 4G8
         BY:  JEFF CARHART, ESQ.
14
15
16
17   OFFICE OF THE UNITED STATES TRUSTEE
         Attorneys for the United States
18       Department of Justice
         One Newark Center
19       Suite 2100
         Newark, New Jersey 07102
20       BY:  LAUREN BIELSKIE, ESQ.
              LINDA RICHENDERFER, ESQ.
21            JEFFREY SPONDER, ESQ.
22
23
24
25
```

Page 93

1        A. LISMAN
2   concerns HoldCo's liquidity and ability to
3   meet its obligations under the 2023 Funding
4   Agreement and the Support Agreement.
5        And that included -- in the second
6   part of that topic was any tax, regulatory,
7   or other impediments or constraints to
8   obtaining funds to meet its obligations under
9   the 2023 Funding Agreement.
10       You are designated on that topic
11  today, are you not, sir?
12       A.   Yes.
13       Q.   Okay. And in preparing to testify
14  today on the tax and regulatory restraints
15  that are referenced in that topic, did you
16  educate yourself with respect to the
17  $1.8 billion dividend that we have been
18  talking about?
19       A.   I have, based upon the information
20  that I've already said.
21       Q.   Okay. And this document wasn't
22  among the information that you reviewed in
23  preparing for that topic; is that right?
24       A.   Correct. I have not seen this
25  document until now.

Page 94

1        A. LISMAN
2        Q.   Okay.
3        MR. MOXLEY: Okay. So,
4    Mr. Starner, we may need to revisit
5    whether there is a person that can
6    speak to that topic based on the
7    documentation that was produced to us
8    in connection with this dividend. We
9    will take that up --
10       MR. STARNER: Mr. Moxley, please
11   ask the questions -- those topics,
12   therefore, he can address them. You
13   should ask questions about -- he is --
14       MR. MOXLEY: I'll ask the
15   question again, Mr. Starner, so the
16   record is clear.
17  BY MR. MOXLEY:
18       Q.   Mr. Lisman, are you familiar with
19  step number 1 that's identified on this
20  document?
21       MR. STARNER: And, Mr. Moxley, I
22   think you've already asked those
23   questions. I think ask this witness,
24   generally speaking, about the
25   dividend. He is fully prepared to

Page 95

1        A. LISMAN
2    talk about the dividend, why it wasn't
3    issued. Any questions about
4    historical dividends. He is fully
5    prepared for that.
6        Just the fact that he does not
7    necessarily know the technical aspects
8    of different documents does not
9    necessarily mean he is not prepared to
10   deal with the topic.
11       So I would encourage you to
12   please ask questions about the topic
13   the witness is prepared to answer.
14       MR. MOXLEY: Mr. Starner, I
15   fully intend to continue asking
16   Mr. Lisman questions about the
17   dividend. What I'm flagging for you
18   is that this is a -- this is a bible
19   of documentation with respect to the
20   steps that were taken with respect to
21   the dividend, that the witness is
22   unfamiliar with.
23       We will see how the testimony
24   goes, but it's very meaningful -- it's
25   very meaningful that this witness is

Page 96

1        A. LISMAN
2    not familiar with these documents in
3    connection with that topic.
4        We will address it offline if we
5    need to.
6   BY MR. MOXLEY:
7        Q.   Mr. Lisman, are you aware of the
8   status of the $1.8 billion dividend today?
9        A.   Yes. I'm aware it's remaining
10  with the Apsis company in France.
11       Q.   Okay. Are approvals for -- are
12  approvals internal at Johnson & Johnson
13  currently being sought to transfer that
14  dividend?
15       A.   Not that I'm aware of, no. The
16  dividend remains with the company in France
17  for the reasons I've said. There weren't
18  adequate reserves there.
19       Q.   Does Johnson & Johnson have the
20  ability to capitalize Apsis such that it
21  would have adequate reserves to make this
22  dividend if it chose to?
23       MR. STARNER: Objection.
24       Q.   You can answer.
25       A.   That's a hypothetical question. I

Page 97

1    A. LISMAN
2  would need to understand lots of facts and
3  reasons and amounts around doing that.
4    Q.  Does Johnson & Johnson have
5  $2 billion in cash that it could transfer to
6  Apsis if it chose to?
7    MR. STARNER: Objection.
8    A.  Johnson & Johnson has cash.
9  Whether it can be transferred to another
10 entity or not is a different discussion and I
11 would, again, need to understand the facts
12 and reasons behind it and make sure it's a
13 wise financial decision.
14   Q.  Where does the div- -- so let me
15 make sure I understand, Mr. Lisman.
16       Where does the dividend currently
17 sit?
18   A.  From my understanding, it's
19 sitting with the Apsis company in France.
20   Q.  Okay. So it did not go to Johnson
21 & Johnson, the parent company, correct?
22   A.  From my understanding, no. It is,
23 quote, unquote, "stuck" with the Apsis
24 entity.
25   Q.  And in that status of being stuck

Page 98

1    A. LISMAN
2  with the Apsis entity, does HoldCo have
3  access to it?
4    A.  As far as a liquid asset, no,
5  because it hasn't made it back from France
6  into HoldCo.
7    Q.  Are you able to describe for me
8  the process to determine the size of the
9  dividends that originated with GH Biotech?
10   A.  I'm not aware of the detailed
11 process and calculating the exact number of,
12 I think it was 1.8 billion. I'm not aware of
13 the exact process behind that.
14   Q.  Okay. Are you aware of how
15 dividend strategy is set for GH Biotech?
16   A.  I'm aware of the general dividend
17 strategy for J&J as a whole, which would
18 include all of our entities.
19   Q.  What can you tell me about that,
20 sir?
21   A.  It is part of our ongoing
22 evaluation for cash needs, both inside the
23 U.S. and outside the U.S., to fund different
24 operations, tax liabilities.
25       There is an ongoing process to

Page 99

1    A. LISMAN
2  determine what the ultimate cash needs are
3  is, kind of, step one. And then step two is
4  what is the most capital, tax efficient,
5  regulatory, legal, foreign exchange process
6  to make that happen. So we evaluate a
7  multitude of factors on an ongoing basis.
8    Q.  Okay. So in making that multitude
9  of factors evaluation in a given scenario,
10 let's say HoldCo had a need to have access to
11 that dividend.
12       Steps could be taken under that
13 process that you have just outlined to -- to
14 capitalize Apsis such that it could -- it
15 could transfer that dividend or make that
16 dividend.
17       Is that fair?
18       MR. STARNER: Objection. Calls
19    for speculation.
20   A.  Again, that's a hypothetical. We
21 would need to evaluate what HoldCo's need is.
22 Dividends are approved through the corporate
23 parent. So we would look at how much, why is
24 it needed, how could it be repaid, before
25 doing anything. We --

Page 100

1    A. LISMAN
2    THE COURT REPORTER: I lost the
3    witness.
4    Q.  Yeah, you broke up for a second
5  there.
6        Did you say you would have to
7  evaluate all those factors; is that what you
8  said?
9    A.  Yeah. Sorry. Yes, we would have
10 to evaluate all of those factors, currency,
11 tax withholdings, how much it was, when could
12 it be repaid, what are the other needs of
13 cash in the business. There is over 500
14 entities at J&J all competing for access. We
15 would need to evaluate all of it.
16   Q.  What does Apsis do besides own
17 this 36.1 percent stake in GH Biotech; does
18 it do anything else?
19   A.  I don't know. I believe they are
20 a holding company, as I said before.
21   Q.  Does Apsis have the ability to
22 lend money to HoldCo?
23   A.  I'm not aware of that.
24   Q.  Okay. Taking, I think, one of
25 your last answers said that you would take

Case 23-12825-MBK    Doc 857-24    Filed 06/22/23    Entered 06/22/23 15:25:55    Desc
Exhibit 854    Page 5 of 7

CTL Management, Inc. Bankrupt.                                                      Adam Lisman
                                                                                    May 31, 2023

Page 101

1            A. LISMAN
2  into account what HoldCo's needs were in
3  terms of needing to access the dividend.
4        You referenced that, correct?
5     A.  Yes.
6     Q.  Okay.  If one of its needs was a
7  contractual obligation to make a payment and
8  it needed to access this dividend to do that,
9  a valuation would be undertaken, appropriate
10 approvals could be obtained.  But at the end
11 of the day, if the evaluation was that that
12 money should make its way to HoldCo, the
13 money could make its way to HoldCo; is that
14 correct?
15        MR. STARNER:  Objection.
16    A.  Again, the dividend is stuck with
17 Apsis and not with HoldCo because there were
18 not adequate reserves in Apsis to pass it
19 back up to HoldCo.
20        Whether J&J, as the parent
21 company, evaluated it still wanted to is
22 irrelevant.  If there are local regulatory
23 requirements that couldn't be met to pass the
24 dividend on, there is nothing J&J can do
25 about that.  Those are facts.

Page 102

1            A. LISMAN
2     Q.  Well, that's my question, I guess,
3  Mr. Lisman, is, when you say, "there is
4  nothing J&J can do about that," is there
5  something that is a governmental or
6  regulatory impediment to J&J capitalizing
7  Apsis if it needed to in order to allow Apsis
8  to have enough on reserve under applicable to
9  law to Apsis such that it could make that
10 dividend?
11        MR. STARNER:  Objection.  To be
12    clear, when you say "J&J," are you
13    talking about J&J the parent?
14        MR. MOXLEY:  I am.
15        MR. STARNER:  Okay.
16 BY MR. MOXLEY:
17    A.  Again, J&J and the parent would
18 need to evaluate all of the local
19 requirements and rules.  What does it mean to
20 capitalize the entity?  Are there abilities
21 to abstract value out of that entity?
22        Again, we would need to evaluate a
23 multitude of factors before ever making that
24 decision.
25    Q.  I understand that, Mr. Lisman.  My

Page 103

1            A. LISMAN
2  question is a little bit different.  And I'm
3  not trying to be difficult with you.
4     A.  Yes.
5     Q.  I fully appreciate your response
6  there.  Let me just ask the next question.
7        The next question is, then:
8  Assume with me for the purposes of this
9  question that evaluation has taken place and
10 that the parent company has determined that
11 it is -- it is appropriate to capitalize
12 Apsis so that that dividend can be released
13 and HoldCo can have access to that
14 $1.8 billion.  Assume with me that that
15 evaluation has taken place and the decision
16 has been made.
17        Is there any, external to J&J,
18 reason why J&J couldn't take whatever
19 internal steps it needed to, to allow for
20 HoldCo to have access to that $1.8 billion?
21        MR. STARNER:  Objection.  Calls
22    for speculation.  Incomplete
23    hypothetical.
24    Q.  You can answer the question.
25    A.  If all of those things were done

Page 104

1            A. LISMAN
2  and J&J evaluated all the things that I
3  mentioned, including external factors, I'm
4  not aware of anything that would prevent
5  that, no, besides what I just said.
6     Q.  How was the dividend upstreamed to
7  Apsis?
8     A.  How?  How was it upstreamed?
9     Q.  Yes, sir.
10        MR. STARNER:  Objection.
11        You are talking about --
12    objection.
13        A little unclear on what you're
14    asking about, Mr. Moxley.
15        MR. MOXLEY:  Yeah, sure.  Let me
16    clarify.
17 BY MR. MOXLEY:
18    Q.  Mr. Lisman, the GH Biotech made --
19 let me make sure I have it correct.
20        GH Biotech made a $1.8 billion
21 dividend that is -- to Apsis; is that
22 correct?
23    A.  From what I understand, yes.
24    Q.  Okay.  How did it do that?
25    A.  So as a general matter, when

Page 105

1  A. LISMAN
2  dividends are declared, the paying entity
3  needs to, A, have adequate local reserves to
4  make that happen. They would need to
5  evaluate are there local tax costs of that,
6  and make sure those are accounted for.
7  And then that dividend then would
8  be declared and then paid up the chain to the
9  next entity in the chain. So it would be
10 paid up.
11  Q. Okay. And so then was it
12 upstreamed to Apsis through the Janssen and
13 the Janssen France Treasury Unlimited?
14  A. I don't have the org chart in
15 front of me, but if we had the -- we have an
16 org chart, dividends must pass through each
17 individual entity. So you can't just skip
18 entities in the chain. You need to pass
19 through each ownership's structure.
20  So, off the top of my head, I
21 don't recall if there was an entity or two in
22 the middle, but if there was, the process
23 that I just described would be the same for
24 all of them.
25  MR. STARNER: Would it be

Page 106

1  A. LISMAN
2  helpful to look at the org chart?
3  MR. MOXLEY: Yeah, I was going
4  to -- I was actually just going to
5  call it up, Mr. Starner.
6  Let's bring up tab 7, if we
7  could, and let's mark that as our next
8  exhibit.
9  (Whereupon, Lisman Exhibit 7,
10 LTLMGMT-00013207 was marked for
11 identification as of this date by the
12 Reporter.)
13  MR. STARNER: Mr. Lisman, if you
14 want to use the org chart you have,
15 feel free to. Mr. Moxley has a copy
16 of that also.
17  THE WITNESS: This should be
18 fine.
19 BY MR. MOXLEY:
20  Q. Okay. Can you see this? And we
21 can zoom in as we need to, Mr. Lisman.
22  But let me ask this question,
23 you've seen this document before, yeah?
24  A. I have, yes.
25  Q. Okay. And is this one of the

Page 107

1  A. LISMAN
2  documents that you reviewed in preparing for
3  today?
4  A. It is, yes.
5  Q. Is it one of the documents that
6  was sent over to us in the collection of
7  materials that you had sent to Mr. Starner?
8  A. It is. I just colored in some of
9  the boxes, but, yes.
10  Q. Okay. Okay. Which boxes did you
11 color in? I don't have --
12  A. I colored in boxes where there was
13 value over $100 million in, so I knew where
14 the value was in the org chart.
15  Q. I see. Give me one second.
16  We're going to talk about this
17 exhibit, Mr. Lisman, for a minute. We'll
18 take some steps to bring your document up on
19 the screen so we can --
20  A. Sure.
21  Q. -- see the color coding you did.
22  MR. MOXLEY: So if we could just
23 zoom in.
24  And, Aydaline, I'll appreciate
25 your help, if you could, with this.

Page 108

1  A. LISMAN
2  Can we just zoom in on that center
3  column there, the one that's the
4  tallest in the middle of the chart.
5  There we go. That's great.
6 BY MR. MOXLEY:
7  Q. Okay. So just to orient
8  ourselves, then, Mr. Lisman, you see that the
9  very top box there, "Johnson & Johnson (New
10 Jersey)," that's your employer, correct?
11  A. My actual employer, I believe, is
12 Johnson & Johnson Services, Inc., is the name
13 of my actual employer.
14  Q. Oh, okay. Okay, okay.
15  So the Johnson & Johnson at the
16 top of this org chart, that's the ultimate
17 parent company, correct?
18  A. I don't know if that's the
19 ultimate parent or if there is another one
20 above it, if you look at another macro view
21 of the J&J org chart. This is a piece of the
22 pie.
23  Q. Okay. Going down four boxes, you
24 see, "Johnson & Johnson Holdco (NA) Inc."
25  Do you see that?

Page 141

1    A. LISMAN
2    
11           Did I read those sentences
12   correctly, Mr. Lisman?
13       A.   Yes, you did.
14       Q.   Okay.  Do you know if Apsis sought
15   those approvals with respect to the
16   $1.8 billion dividend?
17       A.   I do not know if they sought
18   approvals.
19           But, to clarify, this is talking
20   about borrowing limits which is different
21   than dividends.
22       Q.   Right.  Understood.  Let me ask a
23   slightly different question, then.
24           I believe your testimony was that
25   the reason the dividend was "stuck," as you

Page 142

1    A. LISMAN
2    put it, at Apsis, was because of Apsis'
3    inadequate reserves under applicable law to
4    it to make the dividend; is that correct?
5        A.   Correct.
6        Q.   Okay.  And so Apsis finds itself
7    in a position where it doesn't have adequate
8    reserves, and it also, I take it, under this
9    policy, can't borrow without seeking proper
10   approvals, correct?
11       A.   I don't know if Apsis seeks
12   ability to borrow, but I would say that the
13   concept of not having reserves available
14   would not be impacted on a calculation basis,
15   even if they did go borrow.
16           So it's an important accounting
17   equation under GAAP to understand how these
18   things are actually calculated.  One being
19   assets minus liabilities equals equity or
20   reserves.
21           Even if Apsis did go borrow and
22   they took out cash as an asset, that would be
23   a payable or a loan, a liability, the math
24   would be the same.
25       Q.   Okay.  It's the case that Johnson

Page 143

1    A. LISMAN
2    & Johnson affiliates can borrow money from
3    J&J's in-house bank, correct?
4        A.   The J&J in-house bank is one of
5    the vehicles that J&J affiliates can borrow,
6    yes.
7        Q.   Okay.  HoldCo, as a J&J affiliate,
8    would be able to access the various
9    intercompany funding arrangements within
10   J&J's corporate structure as well, correct?
11       A.   HoldCo is part of J&J's structure,
12   so all of the policies, procedures, controls
13   are open to them, yes.
14       Q.   Okay.  So we talked a little bit
15   before about how there was a time when HoldCo
16   was referred to as new JJCI.
17           Are you familiar with that?
18       A.   Yes.
19       Q.   Okay.  So when new JJCI, at the
20   time that it was called that, or HoldCo, at
21   the time that it's called that, when that
22   entity made payments, where did that cash
23   come from?
24       A.   When JJCI made payments, where did
25   the cash come from?  Just to make it clear.

Page 144

1    A. LISMAN
2        Q.   That's right, that's the question.
3        A.   So previous -- so are we talking
4    about after the bankruptcy filing or before
5    or during?  Can we just clarify dates?
6        Q.   Sure.  There was a period -- let's
7    say in April, right before the first
8    bankruptcy was dismissed, where would the
9    cash come from then?
10       A.   So HoldCo, from what I understand,
11   had access to or had a claim to cash with the
12   J&J bank.  I think on one of the previous
13   slides we saw HoldCo's listed assets.  There
14   was a number there for cash.  I think the
15   number was 400, right.  That would be
16   HoldCo's claim to cash against the J&J bank
17   at the time.
18           So if HoldCo needed to pay a bill,
19   right, it would draw down or it would use
20   that claim to cash against J&J, the parent,
21   up until the 400,000 on the page.
22       Q.   Does that change -- does what you
23   just described there, does that change in
24   terms of the mechanics, after the April 4th
25   dismissal and before the second bankruptcy