**In the Matter Of:**

*In Re - LTL Management, LLC*

---

*ROBERT WUESTHOFF*

*May 30, 2023*

---



Page 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

-------------------------------------------X

In Re:

LTL MANAGEMENT, LLC,

Debtor.

Case No. 21-30589 (MBK)

------------------------------------------X

***CONFIDENTIAL***

VIDEOTAPED DEPOSITION OF ROBERT WUESTHOFF

DATE: May 30, 2023

TIME: 10:06 a.m.

PLACE: ***REMOTE***

BEFORE: Rebecca Schaumloffel, RPR, CCR-NJ

JOB NO: 2023-898652

Page 2

A P P E A R A N C E S:

ASHCRAFT & GEREL, LLP
Attorneys for Rebecca Love
120 E. Baltimore Street
Suite 1802
Baltimore, Maryland 21202
BY: JAMES F. GREEN, ESQ.

BROWN RUDNICK
Attorneys for the Talc Claimants
7 Times Square
New York, New York 10036
BY: JEFF JONAS, ESQ.
LYDELL BENSON, ESQ.
MICHAEL REINING, ESQ.
ALEX KASNETZ, ESQ.
GERARD CICERO, ESQ.
CAMERON MOXLEY, ESQ.
JENNIFER SCHEIN, ESQ.

GENOVA BURNS, LLC
494 Broad Street
Newark, New Jersey 07102
BY: DANIEL M. STOLZ, ESQ.

Page 3

Appearances (continued:)

JONES DAY
Attorneys for the Debtor
250 Vesey Street
Suite 31
New York, New York 10281
BY: JAMES JONES, ESQ.
OLIVER ROBERTS, ESQ.

MASSEY & GAIL, LLP
2000 Maine Avenue SW
Washington, D.C. 20024
BY: RACHEL MORSE, ESQ.

MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Attorneys for Ad Hoc Committee of mesothelioma claimants
659 Eagle Rock Avenue
Suite 28
West Orange, New Jersey 07052
BY: CLAY THOMPSON, ESQ.
JOSHUA McMAHON, ESQ.

OFFICE OF THE UNITED STATES TRUSTEE
Attorneys for the United States Department of Justice
One Newark Center
Suite 2100
Newark, New Jersey 07102
BY: LAUREN BIELSKIE, ESQ.
LINDA RICHENDERFER, ESQ.

Page 4

Appearances (continued:)

OTTERBOURG
Attorneys for TCC I
230 Park Avenue
30th floor
New York, New York 10169
BY: MICHAEL MAIZEL, ESQ.

PACHULSKI STANG ZIEHL & JONES
Attorneys for Arnold & Itkin
10100 Santa Monica Boulevard
13th floor
Los Angeles, California 90067
BY: (No appearance)

PAUL HASTINGS
Attorneys for Ad Hoc Committee of Supporting Counsel
200 Park Avenue
New York, New York 10166
BY: LANIE MILIOTES, ESQ.

SIMPSON THACHER & BARTLETT LLP
Attorneys for Travelers Casualty & Surety Company
425 Lexington Avenue
New York, New York 10017
BY: BONNIE JARRETT, ESQ.

R. WUESTHOFF

answered.

But you may go ahead.

**A. Again, it varies. Some cases, it's 20, 30, or 40 hours. Some cases, it's 10. Sometimes, frankly, it's less than 10. But it just varies. It ebbs and flows.**

Q. Okay. I want to ask you: What is your understanding, as President of the Debtor, of the Debtor's assets as of its bankruptcy filing, let's see, not quite two months ago in early April of this year?

**A. Yeah, our assets are the assets of LTL and RAM, plus the new Funding Agreement.**

Q. Thank you. And when you say, "the assets" -- let's put the Funding Agreement to the side for a minute. You say, "the assets of LTL and RAM."

What -- more particularly, what are the assets of LTL and RAM, to your understanding?

**A. Yeah, the -- it's -- LTL's cash, I think, approximately 30 million. Some of this is -- so I'm going off of memory, but this is in one of our board decks. But RAM,**



**R. WUESTHOFF**

**30 million cash -- I mean LTL, 30 million cash. The net present value or the value of the royalties for RAM, the 367, plus, again, another 75 or so with the new ones. That's really what LTL has in terms of assets.**

Q. Okay. And then, I think you mentioned the Funding Agreement?

**A. And the Funding Agreement.**

Q. All right. We will talk about that in a minute.

How about liabilities, what's your understanding of the liabilities of LTL when it filed in early April 2023?

**A. We have the talc liabilities.**

Q. Okay. And, to your knowledge, are those the only liabilities that LTL had when it filed bankruptcy?

**A. Well, we have the legal fees that we need to pay and things like that. Again, and Rich has a better understanding of those liabilities than I do. But those are out there as, you know, liabilities that we have.**

Q. And when you say, "talc liabilities," what do you mean by that?



R. WUESTHOFF

**A. I mean it's the value of the talc liabilities that are out there. 40,000 now, maybe 60,000 claims. Yeah, it's the Funding Agreement and the Funding Agreement is the value of those talc liabilities.**

Q. Okay. Again, we will come back to the Funding Agreement in a minute. Hold on one second. Hold on one second, I'll just make a note.

So we'll come back to the Funding Agreement, but I think you said a number of things. I want to make sure I understand.

You said 40 to 60,000 claims. What is the basis of your saying that the talc liabilities are represented by 40 to 60,000 claims?

**A. It's -- back when we filed originally in 2021, it was about 38,000 claims and growing. And right now, my understanding is we have out there some, probably, 60,000 or more that are out there now as claims.**

Q. Okay. And how do you know that?

**A. Well, we know with our Plan**



**R. WUESTHOFF**

**Support Agreement, we have an agreement with lawyers representing some 50 to 60,000, I don't know the exact number, claimants. So we know the number's that big, if not bigger.**

Q. And I think you referred -- I think you said the value of the talc claims.

Do you have an understanding -- strike that.

Does LTL have an estimate of its total talc liabilities?

MR. JONES: Object to form.

**A. We don't have an estimate, but we have no reason to believe that it is much more than the 9 -- $8.9 billion PSA Agreement that is currently out there with the majority -- with lawyers representing the majority of claimants signing up to that deal of $8.9 billion for all current and future claims. That gives us a strong barometer as to what the value of the talc liabilities is.**

Q. So you think that the total -- that LTL's total talc liability does not exceed $8.9 billion; is that right?

**A. Correct.**

**R. WUESTHOFF**

MR. JONES: Object. Form.

Q. Okay.

**A. Yeah, I mean, like I said, that -- that is a strong barometer to us of what that value is. And it's -- you know, it's -- you know, another data point would be: It's over twice, or nearly twice, what the Imerys deal was on the table a couple of years ago. So we have no reason to believe that it would be more than the $8.9 billion.**

Q. Okay.

**A. And I might just add -- and just throw it in there, sorry, but, you know, we don't believe our talc causes cancer. So there's no reason to believe that it should be higher than that.**

Q. Okay. So do you -- so based on your belief that talc doesn't cause cancer, is it your belief that LTL's talc liability is zero?

**A. No, I didn't say that. I said -- we don't -- we believe the value of those talc liabilities is the $8.9 billion deal that's on -- that's currently been**



**R. WUESTHOFF**

**negotiated. I was suggesting why we don't think it's any higher than that.**

Q. Okay. But you -- you would agree that LTL's talc liability could be lower than $8.9 billion, correct?

**A. Could be, yes.**

Q. Okay. So do you think it's fair to say that LTL believes -- you are the President of LTL, so I want to talk about LTL -- that LTL believes its total talc liabilities is somewhere between 0 and $8.9 billion; is that correct?

MR. JONES: Object to form of the question. Asked and answered.

**THE WITNESS: I'm sorry, Jim, when you say "asked and answered," what do you mean?**

MR. JONES: I think he's asked the question before and you've given him your best answer. But if you have a different answer, go ahead.

**THE WITNESS: No, I don't have a different answer.**

BY MR. JONAS:



R. WUESTHOFF

**A. I think it's -- you know, some- -- yeah, somewhere between 0 and 8.9. I don't think it's higher than 8.9.**

Q. Okay. And let me ask you: Do you -- as President of LTL, have you been given -- and, again, I'm not asking you to disclose specific legal advice you've received. I just would like to know whether you have been -- you have access to any documents which would -- strike that. Bad question. So I'll strike it.

Okay. I want to just -- so let's just talk about in one specific context. I think we've talked about the assets and liabilities of LTL as of its latest bankruptcy filing with one exception.

You said there was an additional asset, which was the Funding Agreement, correct?

**A. Correct.**

Q. And can -- would you agree that, for today's deposition, when -- we can talk about the first bankruptcy is the LTL 1 and the second is LTL 2; can we do that?



R. WUESTHOFF

**A. Yes.**

Q. And can we also agree that the Funding Agreement -- we'll talk about the first Funding Agreement as Funding Agreement 1 and the second one is Funding Agreement 2; is that okay?

**A. That's what I like to do. Yes, that's perfect.**

Q. Great. Great. Then we are on the same page.

So let me ask you: Funding Agreement 2, which we are talking about in terms of the second bankruptcy, the Debtor's assets as of the filing, what is your understanding of the value of Funding Agreement 2?

MR. JONES: Object to the form of the question.

To the extent you understand, you can answer.

**A. Yeah, my understanding of the value of the Funding Agreement is the value of the talc liabilities minus the value of LTL.**

R. WUESTHOFF

Q. Okay. So just to see if I understand what you are saying, the value of the Funding Agreement is somewhere between 0 and 8.9 billion less the value of LTL; is that right?

**A. Yes, that would be -- yes, that would be correct.**

Q. Okay. And now, for a minute -- well, strike that.

Okay. We'll talk more about that in a minute.

For a minute, I just want to revert to the LTL 1. That is the first bankruptcy that LTL filed in October of 2021.

What is your understanding of what LTL's assets were as of October 2021, when it first filed for bankruptcy?

MR. JONES: This is not a memory test involved, but if you can answer, Mr. Wuesthoff, please do.

**A. I believe it's the same answer as now, that the value was the value of the talc liabilities minus the value of LTL.**

Q. And just bear with me, I just want



R. WUESTHOFF

to make sure I process what you are saying.

MR. JONES: I think Mr. Jonas asked for the assets of the LTL 1 filing. He didn't ask for -- there may have been disconnect or there may not have been. I leave --

MR. JONAS: Thank you, Jim. Thank you, Jim. That's why I was a little stumped there for a minute. So, thank you.

BY MR. JONAS:

Q. So let me state it again, Mr. Wuesthoff.

What were the assets of LTL when it filed bankruptcy the first time in October of 2021?

**A. Yeah, so maybe I answered the wrong question.**

**The assets were LTL's assets plus Funding Agreement number 1.**

Q. Okay. And when we say, "LTL's assets," let me see if I've got that right.

That was -- it owned RAM, which had some royalty streams, a little bit less



R. WUESTHOFF

than they are today, correct?

**A. Correct.**

Q. And the only other asset was the Funding Agreement -- the Funding Agreement 1, correct?

**A. Correct.**

Q. Okay. And what was the value of Funding Agreement 1? We've talked about 2. Now I want to go back.

What was the value of Funding Agreement 1?

**A. The value of Funding Agreement 1 was the value of the talc liabilities minus the value of LTL.**

Q. Okay. So -- which is, I think you said, is really -- it's really -- do you see any difference in the value of Funding Agreement 1 and Funding Agreement 2?

**A. No. We believe they are equitable. They are equal.**

Q. Okay. So when I look at the financial condition of LTL 1 versus LTL 2, at the time that each of those entities filed bankruptcy, do you believe there is a



R. WUESTHOFF

difference between the financial condition of LTL 1 when it filed and LTL 2 when it filed?

MR. JONES: Object to form.

**A. I believe the same. That we are in financial distress in each situation.**

Q. Okay. And do you see -- do you believe there is -- if you can be more specific.

Is there any difference in the financial distress which existed when you first filed and when you -- the second time you filed?

**A. Yes. My understanding is, there is. We have -- this time, we have all the issues we had last time plus another 20,000-plus cases that we didn't have last time. And we have a Funding Agreement that, my understanding is, now has a material risk of being void or voidable, and that's a big difference.**

Q. So you think the Funding Agreement 2 that LTL has in place today is at risk of being void or voidable?

**A. No. The Funding Agreement 1 -- I**

Page 45

R. WUESTHOFF

**thought we were comparing the value of both.**

Q. Yes.

**A. Yes.**

Q. Funding Agreement 1 has been terminated, correct?

**A. It has.**

Q. Okay. So we don't have to talk about Funding Agreement 1 in the context of the second bankruptcy filing.

I'm simply trying to understand your knowledge as President of LTL of the difference in LTL's financial condition in October '21, when it filed, and April '23, when it filed.

MR. JONES: And to the extent that the question -- I object to instructing the witness not to consider something. He can consider whatever he chooses appropriate. And at the time of that filing, he was telling you what he thought was appropriate.

MR. JONAS: Jim, you can make objections, but I don't think it's --

Page 46

R. WUESTHOFF

speaking objections are appropriate.

BY MR. JONAS:

**A. Okay. I'm sorry, Mr. Jonas, and I hate to do this to you, but can you state the question again?**

Q. Yeah. No, don't be sorry. No problem. I'm always happy to do that for you. So, any time.

My question is, I just want to understand, as President of LTL, what you believe to be the difference in financial condition of LTL 1, when it filed, and -- well, of LTL when it filed its first bankruptcy and LTL when it filed its second bankruptcy?

MR. JONES: Asked and answered.

**A. We were in financial distress in both situations.**

Q. And do you believe there is differences in the nature of LTL's financial distress in October of '21 versus April of '23?

**A. Other than the fact that there are more cases out there than we had before, I**

Page 47

R. WUESTHOFF

**think that would probably be the biggest difference.**

Q. And let me ask you: When you say "there are more cases," when you say "cases," what do you mean by that?

Are those -- strike that.

**A. Claims. Claims. Claims.**

Q. And how do you know there are more cases today, or at the beginning of this bankruptcy case, than there were during the other bankruptcy case?

**A. I know back then, you know, LTL 1, we had some 38,000 cases or claims. And we know it was growing. And we know today, based on the number of claimants that -- the lawyers who have agreed to the PSA represent is in the area of 50, 60,000 or more. So we know the number has grown.**

Q. Do you know that the lawyers that have signed PSAs that allege to represent claimants, that they didn't have those claimants back in October of '21?

**A. I don't have knowledge of any of that.**

Page 48

R. WUESTHOFF

Q. So you don't know if these 60 odd thousand claims are new claims or not, do you?

**A. I don't know, of the 60,000, how many are new and how many were there previously, no.**

Q. Okay. And let me ask you, as President of LTL: What is your understanding of the purpose of LTL's second bankruptcy case?

**A. The purpose is the same as the purpose was the first time. To permanently, equitably, and efficiently resolve all current and future talc cases -- claims.**

Q. Put another way, the purpose was to deal with the talc litigation, correct?

MR. JONES: Object to form.

**A. That might be a legal term, but I'll restate what I said. We had the same mission and objective we had the first time.**

Q. Yeah. Well, before the first bankruptcy, there were many, many cases, litigation cases, court cases that were getting filed, not against LTL because LTL

R. WUESTHOFF

didn't exist, but that were getting filed against related entities, correct?

**A. Correct.**

Q. And the purpose of that first filing was to address all of those cases, right?

MR. JONES: Object to form.

Q. I'm sorry, I didn't hear your answer.

**A. Yes.**

Q. Okay. And that purpose hasn't changed, right?

Again, the reason that LTL has filed bankruptcy is to address all of that litigation and cases, correct?

**A. It's to resolve all of the current and future claims.**

Q. Okay. Okay.

All right. Let me see.

MR. JONAS: I'm going to ask Isaac to pull up document number 4.

Q. And I think you know, Mr. Wuesthoff, I have had some documents loaded -- just so you know what's going on,



R. WUESTHOFF

loaded up by the Lexitas team. And I'll call out numbers, and he can pull them up, and then we can talk about them.

Okay?

**A. Sure, okay.**

Q. Okay.

THE VIDEOGRAPHER: Mr. Jonas, you're saying tab 4?

MR. JONAS: I'm sorry. Tab 4, yes. I'll try and do a better job, Isaac.

MR. JONES: And I believe, Bob, they will be placed in the chat view, and you can download the documents so that you can, yourself, manipulate them from your laptop -- from your desktop.

**THE WITNESS: When I download it, will I lose the video? I'll just see the document, I guess?**

MR. JONES: Well, you can toggle back and forth between the video and the PDF I believe is the way it should work if you download it to your



R. WUESTHOFF

desktop.

**THE WITNESS: Okay. I'll give it a shot.**

MR. JONAS: Yeah. And if anything happens, we will wait for you.

**THE WITNESS: All right.**

(Whereupon, Wuesthoff Exhibit 1, LTL 0002300 through '2320 was marked for identification as of this date by the Reporter.)

**THE WITNESS: So should I be downloading something now?**

MR. JONES: I don't see it yet.

THE VIDEOGRAPHER: It's there.

Hold on. I'm sorry. No, it's not.

4. There we go. It's there now.

MR. JONES: You see it, Bob, in the chat function?

**THE WITNESS: Yep, I see a tab.**

BY MR. JONAS:

**A. Okay. I have it open.**



**R. WUESTHOFF**

Q. All right. Hold on.

Okay. Good. Mr. Wuesthoff, I've asked the court reporter to put up what's been marked as tab 4, which we will mark as Wuesthoff Exhibit Number 1.

And this is the "AMENDED AND RESTATED FUNDING AGREEMENT," dated October 12, 2021.

And if I turn to the back of the document where the signatures are, just want to make sure that's your signature on behalf of --

MR. JONAS: Whoops. Wait a second.

MR. JONES: That was a very busy screen, Jeff.

MR. JONAS: Yes, it was.

BY MR. JONAS:

Q. Can you -- let me just ask, can you see the document, Mr. Wuesthoff?

**A. Well, it's just -- I think I have to download it again, because it opened and then it closed.**

Q. Okay.

Page 61

R. WUESTHOFF

happened next in connection with the ultimate termination of Funding Agreement 1?

**A. I believe, and my understanding is that LTL tried to have that reheard and that was, my understanding, denied, and, ultimately, they -- Third Circuit issued an order to dismiss the bankruptcy.**

Q. Let me ask you: Do you have an understanding, as President of LTL, that the first Funding Agreement obligated Johnson & Johnson whether or not LTL was in bankruptcy?

**A. Yes. My understanding.**

Q. Okay, thank you. So did -- as President of LTL, did you consider seeking to enforce the first Funding Agreement against J&J outside of bankruptcy after the case was dismissed?

**A. To my knowledge, no.**

Q. Okay. And when I -- when I asked you, as President of LTL, I take it the Board didn't consider the possibility of seeking to enforce the first Funding Agreement against Johnson & Johnson after the first bankruptcy case was dismissed, correct?

Page 62

R. WUESTHOFF

**A. Not to my knowledge.**

Q. Okay. And I know you don't know specifically, but, I take it, at some point, and I -- just that I'm not trying to hide anything from you, obviously, there is -- we'll get to some of the board minutes.

It looks like in late February, early March-ish, there was some discussion at the Board level about contingent planning?

Do you recall that?

**A. Yes.**

Q. Okay. And do you recall whether, as part of that contingent planning, that included the possible termination of the first Funding Agreement?

**A. Yes, that was a possibility.**

Q. Okay. And as President of LTL -- strike that.

And I'm not asking you for the specific advice, but I think you said at some point, you were advised about the risk of the Funding Agreement -- the first Funding Agreement being void or voidable, correct?

MR. JONES: Object to the form

Page 63

R. WUESTHOFF

of the question. Calls for the disclosure of legal advice, expressly calls for it.

I think he told you what his understanding was, and his testimony is otherwise whatever it was.

BY MR. JONAS:

**A. Yes, it was my understanding.**

Q. Okay. Did you engage -- strike that.

Did the void or voidability of the Funding Agreement concern you, as President of LTL, cause you some distress?

**A. I wasn't concerned. I took it as matter of fact, based on my understanding.**

Q. And did you -- either as President or at the Board level, did you discuss negotiating with J&J in terms of the possibility of the Funding Agreement being void and void and how that might be resolved?

**A. Not at the Board level. I wasn't aware of or involved in any negotiation.**

Q. Okay. Well, at any level, were you involved in any negotiation?

Page 64

R. WUESTHOFF

**A. No.**

Q. Do you know whether any negotiation with J&J took place on behalf of LTL?

**A. I do not know. I'm not aware.**

Q. Did you ask about that?

**A. No, I did not.**

MR. JONES: I'm sorry, I didn't hear the answer.

**THE WITNESS: I said, "No, I did not."**

MR. JONES: Thank you.

BY MR. JONAS:

Q. So let me -- I just want to -- and I'm certainly not judging, you are a sophisticated business person, and I just want to understand because it's important to my clients.

So would you agree with me that LTL had an asset, which was -- I think you've referred to it as an asset -- which was Funding Agreement 1, correct?

**A. Correct.**

Q. And would you agree with me that

Page 65

R. WUESTHOFF

the value of that asset to LTL could have been as much as $61 billion, correct?

MR. JONES: Object as asked and answered.

**A. I would say "could have," except I was -- and the Board's understanding was that it was not enforceable.**

Q. Okay. And my question is: Were you -- was it -- were you alarmed that, at some point in February or March of 2023, you were advised that the Debtor may have lost or no longer had access to its most valuable asset?

**A. Not necessarily because we were presented with a solution that met our objectives. It eliminated that risk of void or voidability and it supported the terms of the Plan Support Agreement to permanently settle all of our current and future claims.**

**So we looked at that as a very viable solution.**

Q. Do you know if it was Johnson & Johnson or LTL that first raised the void or voidability issue?

Page 66

R. WUESTHOFF

**A. I have no idea.**

Q. Did you ask anyone?

**A. No.**

Q. Did it occur to you that if Johnson & Johnson didn't raise the issue, maybe there was no need to terminate and enter into a new Funding Agreement?

**A. As the Board, we were advised -- not advised. Our understanding was that -- and we knew that the lawyers for LTL and J&J and HoldCo were talking, and that there was a termination -- determination that -- and this was represented back to us by John Kim, that that agreement had a material risk of being void or voidable.**

Q. Well, I understand you are telling me that you were told that there was a material risk, but my question is: As an officer -- strike that.

Do you understand that as an officer and director of LTL, you have fiduciary duties to LTL's creditors?

MR. JONES: Object to the form of the question.

Page 67

R. WUESTHOFF

**A. My understanding is that my fiduciary duties are primarily to LTL. We do take into consideration the claimants, but our primary duties -- you know, duty of good faith, duty of care, duty of loyalty are to LTL's primarily.**

Q. Well, and when you say "LTL," do you mean LTL's equity owner, is that who you are referring to?

**A. No, LTL.**

Q. Okay. Well, let me understand, LTL -- the only things at LTL, the only interests, there are talc claimants, those are creditors, correct?

**A. Yes.**

Q. And there -- there's no other creditors of LTL, right?

**A. There could be. That's a John Kim question. I mean, there are -- there could be others. You know, I don't know.**

Q. You don't know whether there are any other creditors other than talc claimants of LTL?

**A. I think there are -- there could**

Page 68

**R. WUESTHOFF**

**be, but I would be speculating.**

Q. Okay. And other than creditors, the only other interest at LTL are its owners, the equity, correct?

MR. JONES: Object to form.

**A. No. We are a subsidiary. The Board members -- you know, we're accountable to the Board, to ourselves, and we have LTL's interest in mind and those interests, primarily, are to resolve all the claims, current and future.**

Q. Well, let me ask you: Do you believe you have a fiduciary duty to creditors?

MR. JONES: Object as asked and answered.

Q. You can answer.

**A. Like I said before, I believe my primary fiduciary responsibility is to LTL, but we do take into consideration stakeholders, such as claimants.**

Q. Okay. What other stakeholders are there of LTL, other than talc claimants?

**A. There would be other subsidiary --**

Page 69

R. WUESTHOFF

**other areas within J&J.**

Q. What other areas within J&J?

**A. HoldCo, J&J.**

Q. And so, is it your testimony that you believe you have a fiduciary duty to HoldCo and J&J?

**A. No. No. I don't think that's what I said. My primary -- my fiduciary responsibility is to LTL.**

Q. Yeah, and I'm trying to understand who -- what is LTL? When you say you have a fiduciary duty to LTL, LTL -- there is only two constituencies.

There is creditors and there is the owners, right; who else is there?

MR. JONES: He has asked and answered the question.

**A. We are a subsidiary of HoldCo, but we're all -- you know, we're our own subsidiary.**

Q. Okay. So as far as you know -- well, strike that.

What do you know about the discussions between LTL and Hold- -- and J&J

Page 70

R. WUESTHOFF

relating to termination of Funding Agreement 1?

**A. I don't have any direct knowledge of those discussions.**

Q. Okay. You don't know whether -- and just so I understand, and then we can move on, you don't know whether J&J first raised the issue and said, hey, you know, we think the Funding Agreement is void and voidable, you don't know whether it was J&J or LTL, right?

**A. No, I do not.**

Q. You don't know whether LTL pushed back and had a -- and had a negotiation with J&J, right?

**A. I do not know that.**

Q. Okay. Do you know whether anyone at LTL reached out to any of its creditors to discuss the situation with them?

**A. I do not know that.**

Q. Okay. Well, did you inquire about that? Did you ask, should we raise this with our -- with the Talc Claimants Committee or anyone else?

Page 71

R. WUESTHOFF

**A. No, I did not.**

Q. Okay. What -- let me ask you -- and, again, at this point, I'm not asking for the substance.

What analysis were you provided with respect to what you have referred to as "the issue of void or voidability" of Funding Agreement 1?

MR. JONES: I'm going to object and ask for the witness not to share privileged communications with counsel. If there is anything else, you can -- you may certainly share it.

BY MR. JONAS:

**A. The only thing I can share is what I've said before, is: My understanding is that those agreements were void or voidable. That's just my understanding from the lawyers, that there was a material risk that they were void and voidable.**

Q. Okay. Did the Board take into -- take creditors' interests into consideration in connection with terminating the first Funding Agreement?

Page 72

R. WUESTHOFF

**A. Well, from the outset in our objective of equitably and efficiently resolving current and future claims, we are always thinking about claimants.**

**And, you know, I should add that it was also represented to us that we had lawyers representing a majority of the claimants supporting -- supporting our second bankruptcy and the 8.9 billion settlement or resolution, deal, if you will.**

Q. Is it your testimony that the PSAs with lawyers allegedly supporting your deal, those were in place at the time that LTL first began discussing terminating the Funding Agreement with Johnson & Johnson?

**A. I don't know the status of them. I know it was -- those discussions were happening and our understanding was that, you know, high probability that that support was there.**

Q. Okay.

MR. JONAS: We're -- just so -- for everybody on the Zoom here, we're going to -- I'm going to go another

Page 73

R. WUESTHOFF

minute or two and finish this line for now and then we'll take our break.

Just so you know where we are headed, Mr. Wuesthoff, but that's -- plus we have been going for over an hour, so it would be appropriate to take a break anyway.

But let me just finish up with a couple of questions before we break.

BY MR. JONAS:

Q. Just to try and wrap up on one issue, what did -- did the Board evaluate other options to terminating the first Funding Agreement?

**A. No. We were presented with a solution that we thought was sufficient.**

Q. Okay.

MR. JONAS: It's 11:20. Jim, I suggest we resume -- we say we will resume at 12:30.

You know, to the extent the hearing is going, I won't jump back on until that's concluded. I suspect that we will hopefully be done by

Page 74

R. WUESTHOFF

12:30.

If not, we can take it from there, if that's okay?

MR. JONES: I -- yeah, I don't know what -- any other way to manage it, but I think that makes sense, Jeff. Let's try --

THE VIDEOGRAPHER: Do you want to go off the record?

MR. JONES: Yeah, we can go off the record.

MR. JONAS: Yeah, we can go off the record. Thank you.

THE VIDEOGRAPHER: We are going off the record at 11:21 a.m.

(Whereupon, a lunch recess was held.)

Page 75

R. WUESTHOFF

***AFTERNOON SESSION***

THE VIDEOGRAPHER: We are back on the record at 1:11 p.m. Eastern.

BY MR. JONAS:

Q. Mr. Wuesthoff, I hope you had a good lunch. Thank you for your patience with me as we wrapped up the court hearing. I just want to return to a few remaining questions where we left off.

I think you said the lawyers dealt with the termination of the first Funding Agreement. Can you tell me, to the best of your recollection, what lawyers were involved on behalf of the various parties at that time?

MR. JONES: Object to foundation.

**A. I just -- I know John Kim. Actually, I'm not certain, to be honest. I think John Kim, and I think Jones Day, but I honestly don't know.**

Q. Okay. That's the extent of what you know or can recall about which lawyers were representing whom in connection with the

Page 76

R. WUESTHOFF

Funding Agreement termination?

**A. Yes.**

Q. Okay. Let's move on. Just give me a -- just bear with me.

You are aware that -- strike that.

I think you mentioned HoldCo as a party to both the first Funding Agreement and the second agreement.

Have I got that right?

**A. Well, it was JJCI in the first Funding Agreement. In the second Funding Agreement, it's HoldCo.**

Q. Okay. And that's because the new JJCI, there was a name change and its name was changed to "HoldCo"; is that right?

**A. I believe so, yes.**

Q. Okay. And I want to ask you a question.

Are you aware that, in January 2023, HoldCo transferred its consumer business assets to its parent entity?

**A. I was made aware of that.**

Q. Okay. And other than being aware that it happened, do you know anything else

R. WUESTHOFF

about it?

**A. No. I had no involvement with that.**

Q. Okay. And was that something that you knew was going to take place before it happened or were you advised about it and became aware of it only afterwards?

MR. JONES: Object to foundation.

**A. I knew nothing about it and had no involvement until I heard about it after the fact.**

Q. Okay. Did it concern you that HoldCo, as a counterparty to the Funding Agreement, had transferred a significant amount of its assets?

MR. JONES: Object to form.

**A. No. No, I wasn't particularly concerned. I mean, that was outside of anything I would have anything to do with.**

Q. But do you understand that HoldCo was a counterparty or an obligor under the first Funding Agreement?

**A. JJCI was.**



**R. WUESTHOFF**

Q. Okay, JJCI. Well, I guess, what I'm getting at, are you saying it didn't concern you that JJCI was -- would have less assets available after this transfer to satisfy its obligations?

MR. JONES: Object to form.

Q. You can answer.

**A. I thought -- I thought I just did.**

**Can you -- I'm sorry, Mr. Jonas, can you repeat?**

Q. Sure. Strike that.

I think you did answer it well enough and we'll move on.

And do you know the value of the consumer business that HoldCo transferred?

**A. I do not.**

Q. Okay. So you don't know if it's a dollar or $10 million or you don't have any more information or understanding?

**A. I would assume it's more than a dollar, but I don't have an understanding of it, no.**

Q. Okay. Let me ask you: HoldCo is an obligor or counterparty under Funding



R. WUESTHOFF

Agreement 2, correct?

**A. Correct.**

Q. Okay. And do you know the value of HoldCo's assets today?

**A. I know what the assets were back when the board minutes were published some maybe a month or so ago.**

Q. Okay. And we will use -- just to -- that's fair. We will use that date.

What was -- well, about a month ago, that's when the second Funding Agreement was entered into, correct?

**A. Correct.**

Q. Okay. So do you know the value of HoldCo's assets at the time the second Funding Agreement was entered into?

**A. Yeah, it was approximately 28 billion, maybe close to 29.**

Q. Okay. And is it your understanding that LTL, effectively, would be able to access those assets, if necessary, under the Funding Agreement?

MR. JONES: Object to form.

**A. Yes.**



**R. WUESTHOFF**

Q. I'm sorry, there was an objection. If you can answer that.

**A. That's my understanding, yes.**

MR. JONES: Mr. Wuesthoff, let me just give you a second to think about -- give me a second, rather, to object if I need to before you answer. Thank you.

**THE WITNESS: Okay, sure.**

BY MR. JONAS:

Q. Do you know, with any more specificity, what the assets of HoldCo are?

**A. Not other than what's listed in the board minutes.**

Q. Okay. You testified earlier about the talc claims and we talked a little bit about the number of claims.

Do you recall that?

**A. Yes.**

Q. Okay. Do you have any understanding of the specific nature of any of the talc claims against LTL?

**A. I'm not sure I understand the question.**

Page 97

R. WUESTHOFF

representing a majority of talc claimants if you don't know the total amount of talc claimants?

**A. That was my understanding from the lawyers is that that -- the agreements had the support of the lawyers of the majority of the claimants.**

Q. What work did the Board do to confirm that the PSAs represent settlements with a majority -- with lawyers representing a majority of talc claimants?

**A. We took our lawyers' words as truthful. We didn't question our lawyers -- the understanding that they presented with us, we didn't challenge that.**

Q. Did you see any analysis in that regard from anyone, lawyers, financial advisors, independent work by the company, anything at all?

**A. No, we didn't feel the need to. Like I said, we felt these agreements met our objectives.**

Q. Okay. Do you know which law firm negotiated the terms of the first Funding

Page 98

R. WUESTHOFF

Agreement on behalf of LTL?

**A. I do not. I don't recall, and I don't know if I ever did. But no, I don't know.**

Q. Okay. Do you know if the law firm providing advice to LTL's Board in connection with termination of the first Funding Agreement and entering into the second Funding Agreement was the same law firm that represented it on negotiating the first Funding Agreement?

**A. I don't know who was involved on negotiating the first Funding Agreement.**

Q. Okay. Let me ask you: Did the Board consider seeking new or separate advice, counsel, for advice in connection with termination of the first Funding Agreement and entering into the second Funding Agreement?

**A. No, we did not.**

Q. Why not?

**A. As I think I stated, we didn't feel the need to. We felt that the documents -- the termination agreement and the new**

Page 99

**R. WUESTHOFF**

**Funding Agreement and the Support Agreement, that -- that met our objectives. We were satisfied with that.**

Q. Did anyone at the Board ever raise or consider discussing that situation with the company's creditors to see what their views were?

MR. JONES: Object as asked and answered, I believe, earlier today.

MR. JONAS: It might have been, Jim. I've lost track. So I'll let the question stand. I appreciate the objection.

BY MR. JONAS:

Q. But if you can answer that, I appreciate it, Mr. Wuesthoff.

**A. Okay. I'm just listening to you and Jim talking. Rephrase the question.**

Q. Sure. Do you recall whether the -- anyone at the Board ever raised or considered discussing the void or voidability of Funding Agreement 1 with any of the company's creditors or their professionals?

**A. No.**

Page 100

**R. WUESTHOFF**

Q. You don't recall whether that was raised.

Is that -- or are you --

**A. I don't believe it was raised. I certainly don't recall it being raised.**

Q. Okay. Thank you.

MR. JONAS: Last, just so we get the record complete, if we turn to Annex F, Isaac, it's a few pages forward, please.

And you will see this says, "J&J Support Agreement," and of this agreement, if we turn to page 15 of 15.

BY MR. JONAS:

Q. Mr. Wuesthoff, that's your signature at the bottom on behalf of LTL, correct?

**A. Yes, it is.**

Q. Okay. And just to expedite, I take it the details relating to your execution were the same in terms of timing, et cetera, as with respect to the other two related documents we've looked at?

R. WUESTHOFF

"MINUTES OF Board of Managers," "LTL MANAGEMENT LLC," "March 16, 2023."

And, again, I'll represent to you this -- in terms of the minutes that were provided to us, this appears to be the next meeting following February 23rd.

Is that your recollection, that this would have been the next meeting following the February 23rd meeting?

**A. Yes. Yes.**

Q. Okay. And, again, you were present at this meeting, right?

**A. Yes.**



R. WUESTHOFF

Q. Okay. Well, let me ask you: Why did the Board ultimately determine it was appropriate to file another bankruptcy?

**A. Because we believed we weren't financially in distress and filing another bankruptcy was the way to best meet our original objective, which has always been to**



**R. WUESTHOFF**

**equitably and efficiently resolve all current and future talc claims.**

Q. You've said a few times, you've used the words -- that the company, I think -- tell me if I got this right.

I think you said the company was in "financial distress"; is that what you've said?

**A. Yes.**

Q. Okay. And what -- if you can just describe that for me, was the company unable to pay its electric bill? And I'm talking specifically about this time period, March, April 2023, because I think that's what you are talking about.

Was the company unable to pay its utility bills?

**A. No. We were solvent. That was not the issue. The concern was that we were in financial distress.**

Q. Okay. Well, let me break that down a little bit.

When you say the company -- when you use the word "solvent," what do you mean



R. WUESTHOFF

by -- how do you -- when you use the word "solvent," what do you mean?

**A. We were able to pay our bills and meet our liabilities.**

Q. Okay. And so, just to put it in more simple terms for me, the company was able to pay its bills as they were coming due at this point in time, correct?

**A. Correct.**

Q. Okay. And so what was the stress, the financial distress, that the company was experiencing?

**A. It was the same financial distress we were experiencing for the first bankruptcy, which, then, was 38,000 claims. Now, we believe, you know, it was a much higher number than that.**

**The uncertainty of the outcomes, the lottery size awards, the very large settlement requests, the long tale of, you know, 60-year latency period. All of those things were factors then and they are factors now, plus a lot more cases we believe, certainly, than the 38,000.**





R. WUESTHOFF

Q. Okay. Thank you. And let me -- just to isolate.
Other than the fact that you believed that there were more claims, was there anything different about the financial distress the company -- that you have testified to in April of 2023 than in October of '21?
**A. No, the only difference, you know, I think, would be the fact that our takeaway was that the original Funding Agreement was void and voidable.**
Q. Okay. So, again, I just want to make sure I understand.
The two differences between the financial distress that you felt the company was -- experienced in October of '21 versus April of '23 were, one, you believed there might have been more talc claims and, two, you were concerned that the Funding Agreement 1 was void or voidable.
Have I got that right?
**A. Yes, that's correct.**
Q. And if I look at -- if we turn the



R. WUESTHOFF

--
MR. JONAS: I'm sorry, go to the next page, page 2.

Let me ask you: Do you know who the Future Claimants Representative was in LTL's first bankruptcy case?
**A. I knew that name at one point, but the name's escaping me at the moment.**

Do you know whether the Future Claimants Representative in the first LTL bankruptcy case ever, in fact, indicated support for the bankruptcy in the contours of a plan?
**A. And you are talking about LTL 1?**
Q. Yes, the Future Claimants Rep is LTL 1.
Do you know if that Future



R. WUESTHOFF

Claimants Representative ever indicated to the company that the Future Claimants Rep would support a further bankruptcy in contours of a plan?
**A. I don't recall specifically, no.**



**R. WUESTHOFF**

Q. You don't know how that $8.9 billion number was arrived at, do you?
**A. I do not.**
Q. Do you know if anybody at LTL asked the J&J entities on the other side of the second Funding Agreement if they would do a higher amount, they'd commit to a higher amount?
**A. I'm not aware of anybody asking for that, no.**
Q. Okay. Do you know who came up with the $8.9 billion number?
**A. I do not.**
Q. Okay. Do you think it would be better for LTL's creditors if the number was higher?
**A. I guess if you look at the other side, higher would be better, but I don't think it would be justified.**
Q. Okay. And when you say "the other side," I'm sorry, what do you mean by "the other side"?

Page 117

R. WUESTHOFF

**A. So -- so I think when you said, you know, when the creditors want more. Yeah, I guess, you know -- yeah, they might want more. I would be supposing, but I -- based on the fact that the majority of the lawyers representing -- the majority of the claimants are in favor of the 8.9, I don't think they are asking for more. I think it's their decision.**

Q. And I think you said --

MR. JONAS: Rebecca, can you read me back the answer right before this answer, please.

(Record read.)

Q. New question.

When you say you "don't think it would be justified," why do you say that; what's the basis of that statement?

**A. Well, the basis goes back to, you know, an earlier comment I made is, are -- we believe J&J's talc is safe and it does not cause cancer. So that's number one.**

**Number two is, the 8.9 billion resolution is a huge number and with a lot of**

Page 118

**R. WUESTHOFF**

**claimants rep- -- the lawyers representing a lot of claimants saying, yes, this is a good deal, we like it.**

**To me, you know, those two things would say, no, it's -- it would not be warranted for anything higher than that.**

Q. So I just want to speak -- I want to make sure I understand the basis on which the Board decided to enter into the second Funding Agreement and the $8.9 billion number included therein.

Was that a majority of -- was that lawyers representing a majority of talc claimants agreed to that number or supported that number; is that right?

MR. JONES: Object to the form. And asked and answered.

**A. Yeah, that was one reason. The other reason is that all those agreements combined, as I've stated earlier, eliminated the material risk that the first Funding Agreement was not enforceable and, in fact, supported the terms in the Plan Support Agreements that would lead to a resolution**

Page 119

**R. WUESTHOFF**

**with an $8.9 billion payment.**

Q. Okay. And, again, I think you generally testified to this, but I just want to make sure.

You never saw any sort of risk-adjusted analysis that supported termination of Funding Agreement 1 and entering into Funding Agreement 2, correct?

MR. JONES: Object to form.

**A. Correct. I never -- no.**

Q. And neither you nor, as far as you know, the Board ever had -- ever was given any analysis that there was a 10 or a 20 or a 90 percent chance that J&J could declare Funding Agreement 1 void or voidable, right?

MR. JONES: Let me object, Mr. Wuesthoff.

And ask you not to share any communication from counsel.

**A. So, yes, I'm not -- I can't answer.**

MR. JONAS: So, Jim, I'm not asking him for any particular advice. I just want to know whether the Board,

Page 120

R. WUESTHOFF

in making its decisions, those decisions, was -- had at its disposal any sort of percentage analysis, likely of success, whatever you want to call it.

I think that's an appropriate question.

Are you instructing him not to answer?

MR. JONES: I'm not -- I'm instructing him not to answer, not to give away the content of any privileged communication.

If you want to ask him whether he discussed with the Board -- the Board discussed with counsel the likelihood you suggest that's a topic.

I'm not going to ask him -- he is not going to handicap or provide any handicapping that may have been provided. And I can't tell you that I know whether any was.

MR. JONAS: Fair enough.

BY MR. JONAS:

R. WUESTHOFF

Q. Mr. Wuesthoff, I'll take instruction from Mr. Jones.

Did the Board ever discuss, at a board meeting, the chances of success of the -- of the void or voidability issue or argument?

**A. No. We never discussed that.**

Q. Okay. And the Board never requested that that type of analysis be done?

**A. No, it did not.**

Q. Okay. The next bullet says -- and this will be the last bullet we will cover here. It says, "Timing of another" bankru- -- and then we'll, hopefully, take a quick break.

It says, "Timing of another bankruptcy to avoid chaos for both LTL and the claimants."

Do you see that?

**A. Yes, I do.**

Q. Was it your view that another bankruptcy was necessary to avoid chaos?

**A. No. I think this has to do with timing of a bankruptcy.**



**R. WUESTHOFF**

Q. And what do you mean by that?

**A. So my takeaway, after discussions with the lawyers, is that if we were to delay filing for another bankruptcy, in other words, open this back up to the tort system, only to then -- you know, then we file for bankruptcy, that that would be very disruptive to everybody and would -- as it says here, would be "chaos" for everybody.**

**So that's why the timing was important because -- we believed, to limit the chaos for everybody to file quickly.**

Q. Okay, thank you. That's helpful.

MR. JONAS: Jim, if it's okay with you, I'm at a little break. And we have been going, again, for over an hour.

Maybe we could take a five-minute break?

MR. JONES: Yeah, let's take a five-minute break. Sounds right. If everybody is all right with that.

MR. JONAS: Thank you. We'll see you in a couple of minutes.



R. WUESTHOFF

THE VIDEOGRAPHER: We are going off the record at 2:09 p.m. Eastern.

(Whereupon, a recess was held.)

THE VIDEOGRAPHER: We are back on the record at 2:20 p.m. Eastern.

BY MR. JONAS:

Q. Mr. Wuesthoff, just to get you back in the right frame, we had left off at the March 16, 2023, board meeting.

MR. JONAS: And now I'm going to ask that number -- tab number 19 get put up on the screen.

Q. Which you will see in a minute. It will be the minutes for the Board of Managers meeting on March 28, 2023.

So let's just give Isaac a chance to put that -- I see it in the chat there, but let's wait until it comes up on the screen.

(Whereupon, Wuesthoff Exhibit 5, LTLMGMT-00000001 through '0005 was marked for identification as of this date by the Reporter.)

THE COURT REPORTER: And that's



R. WUESTHOFF

Exhibit 5.

MR. JONAS: Thank you. Sorry about that.

THE VIDEOGRAPHER: It's been marked and introduced into LegalView and now I will share the screen. Tab 19.

MR. JONAS: Great, thank you.

BY MR. JONAS:

Q. Okay. Mr. Wuesthoff, we are looking at what's been marked as Wuesthoff 5, which is minutes from the Board of Managers meeting on March 28, 2023.

As best you can recall, would this have been the next LTL Board of Managers meeting after the March 16th meeting?

**A. Yes, it was.**

Q. Okay. And you were present, correct?

**A. Correct.**

Q. Okay. And here, I see in the first paragraph under "INTRODUCTORY REMARKS," it says that there would -- "Mr. Kim reviewed the agenda," including "potential options of

Page 181

R. WUESTHOFF

potential, you know, cost of litigation or whatnot.

Can I just ask, in connection with filing -- in that regard, in connection with filing again for bankruptcy, did you have any new or additional information in that regard or are you simply relying on the same information from LTL 1, the first bankruptcy?

**A. The same information from LTL 1.**

Q. Okay.

MR. JONAS: No further questions. Thank you.

That's all I've got, Jim.

MR. JONES: That's all I have. We appreciate everybody's time today, especially those in the support role, Rebecca and Isaac. Thank you for your help to me in particular, because I didn't ask you in advance to be of assistance.

We hope everybody has a great rest of the afternoon. We will get back to you on confidentiality.

MR. JONAS: Thanks, Rebecca and

Page 182

R. WUESTHOFF

team, and Isaac.

THE VIDEOGRAPHER: Conclude the video, yes?

MR. JONAS: Yes.

THE VIDEOGRAPHER: This concludes today's video deposition. We are going off the record at 3:37 p.m. Eastern.

(Whereupon, at 3:37 p.m., the Examination of this Witness was concluded.)

____________________________
ROBERT WUESTHOFF

Subscribed and sworn to before me this _____ day of _________, 2023.

____________________________
NOTARY PUBLIC

Page 183

E X H I B I T S


| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | LTL 0002300 through '2320 | 51 |
| Exhibit 2 | DECLARATION OF JOHN K. KIM IN SUPPORT OF FIRST DAY PLEADINGS | 88 |
| Exhibit 3 | LTLMGMT-00013464 through '3465 | 103 |
| Exhibit 4 | LTLMGMT-00002626 through '2627 | 107 |
| Exhibit 5 | LTLMGMT-00000001 through '0005 | 123 |
| Exhibit 6 | LTLMGMT-00002641 through '2667 | 133 |
| Exhibit 7 | LTLMGMT-00000006 through '0019 | 144 |
| Exhibit 8 | LTLMGMT-00002668 through '2679 | 148 |


Page 184

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MR. JONAS | 8 |
| MR. THOMPSON | 157 |
| MR. JONES | 166 |
| MR. JONAS | 180 |