# In the Matter Of:

*IN RE LTL Management LLC Bankruptcy*

## JOHN KIM

## April 14, 2023



## Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2                   DISTRICT OF NEW JERSEY
 3
 4   IN RE:                         Chapter 11
 5
 6   LTL MANAGEMENT LLC,      Case No.: 23-12825 (MBK)
 7
 8        Debtor,
 9   _____/
10
11              * C O N F I D E N T I A L *
12               VIDEOTAPED DEPOSITION
13                        OF
14                     JOHN KIM
15              FRIDAY, APRIL 14, 2023
16
17
18
19
20
21
22   Reported by:
23   Bridget Lombardozzi, CSR, RMR, CRR
24   JOB NO. 2023-893116
25
```

## Page 2

```
 1
 2
 3
 4              Stenographic videotaped
 5   deposition of JOHN KIM taken on behalf of the
 6   Official Committee of Talc Claimants 1 and others
 7   similarly situated, commencing at 2:23 p.m., on
 8   Friday, April 14, 2023, at the offices of Skadden,
 9   Arps, Slate, Meagher & Flom LLP, One Manhattan
10   West, New York, New York, before Bridget
11   Lombardozzi, Certified Shorthand Reporter,
12   Registered Merit Reporter, Certified Realtime
13   Reporter, and Notary Public of the State of New
14   York, pursuant to notice.
```

## Page 3

```
 1   A P P E A R A N C E S:
 2
 3   Attorneys for Official Committee of Talc
 4   Claimants 1:
 5
 6      BROWN RUDNICK
 7      7 Times Square
 8      New York, New York 10036
 9   BY: JEFFREY JONAS, ESQ.
10      jjonas@brownrudnick.com
11      MICHAEL S. WINOGRAD, ESQ.
12      mwinograd@brownrudnick.com
13      JENNIFER SCHEIN, ESQ. (Remote)
14      jscheinbrownrudnick.com
15      SUSAN SIEGER-GRIMM, ESQ. (Remote)
16      ssieger-grimm@brownrudnick.com
17      W. LYDELL BENSON, ESQ.
18      WLBenson@brownrudnick.com
19
20      GENOVA BURNS
21   BY: DANIEL M. STOLZ, ESQ. (Remote)
22      Genova Burns
23      494 Broad Street
24      Newark, NJ  07102
25      dstolz@genovaburns.com
```

## Page 4

```
 1   A P P E A R A N C E S (Continued)
 2
 3   ATTORNEYS FOR DEBTORS:
 4      JONES DAY
 5      250 Vesey Street
 6      New York, New York  10281
 7   BY: DAVID S. TORBORG, ESQ. (Remote)
 8      dtorborg@jonesday.com
 9
10   FOR TALC CLAIMANT RANDY DEROUEN AND OTHER TALC
11   CLAIMANTS:
12      JEROME H. BLOCK, ESQ. (Remote)
13      MOSHE MAIMON, ESQ. (Remote)
14      LEVY KONIGSBERG LLP
15      605 Third Avenue, 33rd Floor
16      New York, New York 10158
17
18   COUNSEL FOR KATHERINE TOLLEFSON:
19
20      MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
21   BY: CLAYTON THOMAS, ESQ. (Remote)
22      150 W 30th Street
23      Suite 201
24      New York, NY 10001
25
```

Page 49

1  Mr. Murdica as far as you know or does he do
2  anything to confirm that those are actual
3  claims?
4          MS. BROWN: I object. It
5      lacks foundation and calls for
6      speculation.
7      Q. You can answer.
8          MS. BROWN: If you know, you
9      can answer, Mr. Kim.
10     A. I can answer I think generally. It
11 depends upon what we're doing or why we're getting
12 that information. So as a matter of practice, the
13 standard practice -- for example, settlements in a
14 mass tort -- would be you would be negotiating a
15 settlement based upon representations of a
16 plaintiff's firm as to who they represent. And
17 you would negotiate on -- on that basis.
18         At some point in time, like when it
19 comes down to payment, at that point you might
20 try to start vetting the number of claims they
21 had, but prior to that it would make no sense and
22 there's no rationale and no reason to -- to doubt
23 what -- what the plaintiff's lawyer said.
24         So, for example, in the PSA situation --
25     Q. Mm-hmm. You -- you're stealing my

Page 50

1  thunder. Go ahead.
2      A. Yeah. So in the PSA situation, we have
3  to rely in the first instance on the
4  representations made by counsel and this is the
5  same for virtually every settlement that you enter
6  into in a mass tort setting. You have to rely on
7  that. And it would make no sense at the front
8  end --
9      Q. Mm-hmm.
10     A. -- to spend the time or resources to try
11 to verify each and every one of their plaintiffs.
12 That just -- it's not what happens in the
13 industry. It's not -- it's not what we've done.
14 It's not what we did in the PSA.
15         When it comes to a later point -- for
16 example, voting -- or when it comes to a payment,
17 that's really when you need to verify the --
18 these -- the, you know, bona fides of -- of
19 these -- of these claimants because that's when it
20 makes sense.
21         But at the beginning of the process,
22 when -- especially in the PSA process, when all
23 you're trying to do is gauge the number of
24 claimants that have -- that can support something,
25 there's absolutely no -- no reason to have to go

Page 51

1  through that, that expensive and time-consuming
2  process.
3          In fact, especially because we're not
4  paying people. There's no incentive for a
5  plaintiff's lawyer to tell -- to lie about how
6  many people they represent because they're going
7  to -- they're going to get paid when they have
8  people -- the claims are going to get paid later
9  on if the vote goes through or not.
10     Q. Mm-hmm.
11     A. So -- yeah. So that's -- that's what I
12 would say about vetting processes.
13     Q. So just to put it in your vernacular, is
14 it fair to say that the -- where you are today
15 with the PSAs is the front end? I think that was
16 your term.
17         MS. BROWN: I object;
18     misstates his testimony.
19     A. So what I would say is that in the
20 process of the PSA, when entering into these PSA
21 agreements and getting the -- the reliance --
22 relying -- it would be appropriate, typical, it
23 would be in -- in -- in line with everything we've
24 always done in all these cases to rely on the --
25 you know, the -- the statements that counsel made

Page 52

1  to us about the people that they represent.
2      Q. Okay. So just to use a hypothetical, if
3  the -- the law firms that you've entered into PSAs
4  with, if they told you they had a million claims,
5  you wouldn't do anything to vet or confirm that,
6  would you?
7          MS. BROWN: I object -- I
8      object to the hypothetical.
9          THE WITNESS: Yeah.
10         MS. BROWN: Particularly for
11     a fact witness. I object.
12     Q. You can answer.
13     A. What I would say is there -- of course
14 there are going to be times when you -- if you
15 have doubts, then there are other steps you can
16 take. But generally the people that we -- we deal
17 with in this situation, I rely on -- on -- on
18 counsel to do the initial, you know, do we have
19 any doubts about what this person has? You know,
20 the number of claims they have.
21         We also have some backup, too. I mean,
22 we -- you know, it's -- it's not just, oh, here's
23 my -- here's my word. We ask for, you know -- we
24 do ask at times to see certain data, like their
25 list of clients, which are generally attached to

Page 61

1  **You've seen this document before,**
2  **Mr. Kim?**
3      A.  I have.
4      Q.  And actually I notice Mr. Wuesthoff has
5  signed this agreement.
6          You know Mr. Wuesthoff, right?
7      A.  I do.
8      Q.  And he's -- is he on a business trip or
9  vacation?
10     A.  He is -- has a personal trip.
11     Q.  Personal vacation?
12     A.  I guess it's a vacation.  I actually
13  didn't ask him.  You know, actually I don't know
14  whether it's a vacation or not but he's -- he's
15  away.  I didn't ask that.
16     Q.  Yeah.
17         When did you become aware that he was
18  going to be away?
19     A.  When did I become aware?  I think at
20  some point there was a request for his deposition
21  and at that time I asked him what his schedule was
22  and that's when I became aware.
23     Q.  Okay.  Okay.  I want to look at page 6.
24  We'll be real quick about it because I think
25  people have had all had enough of Funding

Page 62

1  Agreement One in our life.
2      A.  Mm-hmm.
3      Q.  On page 6, I just want to confirm your
4  understanding of some of these words.  In
5  subsection C on page 6, where it says "The funding
6  of any amounts to satisfy," and then 1.(i) talks
7  about the "payee's talc-related liabilities
8  established by a judgment of a court of competent
9  jurisdiction or final settlement thereof at any
10  time when there is no proceeding under the
11  bankruptcy code pending with respect to the
12  payee."
13         Do you see that?
14     A.  Yeah, I do see that.
15     Q.  Okay.  And is that your under -- is
16  that -- is it your understanding that what that
17  section means is that funding agreement, the first
18  funding agreement, was available to LTL if there
19  was no pending bankruptcy cases?
20     A.  To the extent that this agreement was
21  still in force, I would say yes.
22     Q.  Okay.  Okay.  Okay.  Let's take a
23  look -- we're going to mark I guess it will be
24  Kim-4.
25         MR. JONAS:  Kim number 3,

Page 63

1  Deane.
2          (Whereupon, exhibit is
3  received and marked Kim Deposition
4  Exhibit 4 for identification.)
5          MR. JONAS:  Kim Number 4.
6  Oh, what's this one?
7          MR. BENSON:  I gave you two.
8  She takes two.  She keeps one.
9          MR. JONAS:  Oh, she takes
10  two.  See, I didn't know that.  Thank
11  you.
12         THE REPORTER:  Kim 4 for
13  identification.
14         THE WITNESS:  Thank you.
15  BY MR. JONAS:
16     Q.  Okay.  Mr. Kim, again, we'll be quick
17  about this.  This is the declaration of John Kim
18  in support of the first day pleadings that was
19  filed in the first bankruptcy.  It's dated October
20  14th, '21.  I just have a few questions.
21     A.  Mm-hmm.
22     Q.  I want to turn to page 9 of the document
23  at the bottom and it's paragraph 26.  And you said
24  "As I mentioned above, the" --
25     A.  I'm sorry --

Page 64

1      Q.  Sure, take your time.
2      A.  Twenty-six?
3      Q.  Page 9.
4      A.  Got it.
5      Q.  And paragraph 26.  It says "As I
6  mentioned above" -- and the "I" is you, right?
7      A.  Mm-hmm, yes.
8      Q.  "As I mentioned above, the design of the
9  2021 corporate restructuring ensures that the
10  debtor has at least the same, if not greater,
11  ability to fund talc-related claims and other
12  liabilities as Old J -- JJCI had before the
13  restructuring."
14         Do you see that?
15     A.  I do see that.
16     Q.  And is that true today?
17     A.  I'm sorry, is --
18     Q.  Is it true today that the debtor, LTL,
19  has at least the same, if not greater, ability to
20  fund talc-related claims and other liabilities as
21  Old JJCI had before the prior restructuring?
22     A.  I believe it is.
23     Q.  So you think today that -- well, strike
24  that.
25         What is the basis of your belief that

Page 73

1  would have been available to LTL to satisfy talc
2  claims?
3      MS. BROWN: At what point in
4      time? I object.
5   Q. While it was in existence.
6      MS. BROWN: In bankruptcy?
7      MR. JONAS: No, outside of
8      bankruptcy.
9   A. Well --
10  Q. Let me ask you this --
11  A. Outside of bankruptcy, there was a
12 time -- but that was prefiling. It would have
13 been -- again, the fair market value of -- so --
14 so if there was no bankruptcy, no thought of
15 bankruptcy, nothing like that, then it, you know,
16 would be -- it would be the value of JJCI --
17  Q. Yeah.
18  A. -- at that time --
19  Q. Yeah.
20  A. -- solely without any support from J & J
21 --
22  Q. Yeah.
23  A. -- which, again, I think the fair market
24 value of the assets at that time was about $60
25 billion.

Page 74

1   Q. It was actually more than that, wasn't
2  it? It had increased from the time you signed the
3  funding agreement until when the bankruptcy was
4  dismissed. The value of JJCI had increased from
5  $60-odd-billion to something more than that, is
6  that not right?
7   A. I don't -- I don't know.
8   Q. Okay. But just to put a point on it,
9  the moment in time when the bankruptcy -- when
10 Bankruptcy Number One was dismissed and the --
11 before the two hours or so later that you filed
12 Bankruptcy Number Two, there was at least a moment
13 there where you had -- LTL had the benefit of the
14 first funding agreement, right?
15     MS. BROWN: I --
16  A. No, I disagree.
17  Q. You disagree. And why do you disagree
18 with that?
19  A. Because we had -- we had concluded that
20 there was a material risk that the funding
21 agreement was void or voidable as I stated in my
22 -- my declaration.
23  Q. And who made the determination that the
24 funding agreement was void or voidable?
25  A. At the end of the day, I guess I -- I

Page 75

1  made that determination, that there was a material
2  risk that there was -- that the funding agreement
3  was void or voidable and informed the board and
4  the board made that determination.
5   Q. When did you first -- when did it first
6  come into your mind that the funding agreement
7  might be void or voidable?
8   A. I think around -- it must have been
9  right around the time of the Third Circuit
10 decision.
11  Q. Okay. And did anyone else comment to
12 you that, oh, my gosh, the funding agreement might
13 be void or voidable or just something you --
14 you -- you came up with?
15  A. There were numerous discussions about
16 the enforceability of the funding agreement.
17  Q. Okay. Well, I want to drill down on
18 that.
19     The Third Circuit decision comes out and
20 it found that the filing was in bad faith and
21 needed to be dismissed, correct?
22  A. It found that the filing -- that the
23 bankruptcy needed to be dismissed, yes.
24  Q. And that was -- let me get my date
25 right. That was on or about January 30th,

Page 76

1  2023?
2   A. Yes.
3   Q. Okay. So when -- following January
4  30th, 2023, and the Third Circuit decision,
5  approximately when was the first communication you
6  had with anybody about the possibility that the
7  funding agreement was void or voidable? Again,
8  I'm not asking for substance or legal
9  communications. I just want to know when the
10 first communication you had with anybody about the
11 possibility that it was void or voidable, when did
12 that happen?
13  A. I think that day.
14  Q. And had you -- and you had never thought
15 about it prior to that time?
16  A. Never.
17  Q. Never did any analysis of the funding
18 agreement?
19  A. No.
20  Q. What might happen if the bankruptcy's
21 dismissed?
22  A. Not in line -- not -- not in line with
23 what the Third Circuit had said.
24  Q. Hmm. Well, what was it about what the
25 Third Circuit said that made you believe that the

Page 77

1  funding agreement was void or voidable?
2      A.  There was a footnote that suggested that
3  it was ironic that funding -- the guarantee by
4  J & J which was done without -- that was not
5  required by J & J to do caused the bankruptcy to
6  be filed in bad faith.  So that -- that guarantee
7  was specifically put in in order to enhance the
8  prospects of bankruptcy.
9          And so immediately when the Third
10  Circuit said that not -- not only did it not
11  enhance the bankruptcy but, in fact, it thwarted
12  it, we thought that that -- it was unfair, that it
13  made little sense in the scheme of things, but
14  that that would render the guarantee void or
15  voidable because of various legal rationales.
16          So that -- that's on the -- that's why
17  the Third Circuit decision triggered -- triggered
18  that issue.
19      Q.  What -- what law firm advised LTL in
20  connection with the -- the negotiation of the
21  original funding agreement?
22      A.  That was Jones Day.
23      Q.  And has the board investigated or
24  requested other counsel to look at a malpractice
25  claim against Jones Day in connection with

Page 78

1  delivering a funding agreement that became void or
2  voidable?
3      A.  Not -- certainly not.
4      Q.  Why not?
5      A.  Because when I looked at this issue,
6  I -- I think everyone agrees that the Third
7  Circuit decision, A, is wrong.  We believe that
8  the Third Circuit made a mistake.  And -- and, B,
9  that it was something that no one would have --
10  could have anticipated.
11          So, you know, that -- yeah, we -- we
12  thought we did everything correctly, but that
13  because of the Third Circuit's decision, which we
14  believe was in error and changed the law, that --
15  that that caused the purpose -- well, again, there
16  are various legal theories behind it, but that
17  frustrated the purposes of the funding agreement
18  and rendered it void or voidable.
19      Q.  You said everyone agrees that the Third
20  Circuit was wrong.
21      A.  Oh.
22      Q.  Who's -- who's "everyone"?
23      A.  Every -- that's -- that was broad.
24  People that I've spoken to and advises the
25  company.  So the -- the law firms that we've

Page 79

1  discussed this with have indicated that they
2  believe that the Third Circuit -- the Third
3  Circuit was wrong and that it should have been
4  reheard.
5      Q.  What law firms have you discussed this
6  with?
7          MS. BROWN:  Well, I -- yeah,
8      I don't want you to get into any --
9          THE WITNESS:  I know, yeah.
10          MS. BROWN:  You can identify
11      counsel that you have, but beyond that
12      you should not discuss the specifics
13      of discussions about the Third Circuit
14      decision.
15  BY MR. JONAS:
16      Q.  I'm not -- I'm certainly not asking for
17  specifics of discussions.  I just -- you said
18  you've discussed the Third -- in connection with
19  everyone agreeing that the Third Circuit was
20  wrong.
21      A.  Yeah --
22      Q.  Let me finish, please.  Let me finish,
23  please.
24          You said that you discussed that with
25  law firms.  I just want to know which law firms

Page 80

1  have you discussed that with?
2          MS. BROWN:  But if -- if he
3      identifies the law firm, he will then
4      identify the advice or the discussions
5      or the statements.
6          And so if you don't think you
7      can do it without implicating legal
8      discussions, then I'll advise you not
9      to answer.
10      A.  I don't know how I can not divulge.  I
11  mean, it's sort of -- I'm trying to think of a way
12  to phrase it differently.
13          We certainly -- we certainly filed a
14  motion to rehear and there were counsel listed on
15  that motion that supported that position by --
16  by -- by filing.  So that would be Jones Day.
17  That would be Hogan Lovells.  That would be -- I'm
18  not sure who else was actually on that filing.
19  Skadden?  I don't know.
20          But -- but those certainly are -- are
21  ones.  Others I don't want to divulge on client --
22  attorney-client privilege grounds.
23      Q.  Okay.  But the LTL board has not
24  investigated a possible claim against Jones Day in
25  connection with negotiating an agreement which

Page 81

1  became void?
2      MS. BROWN:  He already
3  answered that and, truthfully, it
4  calls for legal advice and divulgement
5  of legal strategies.  So he's not
6  going to answer it a second time.
7      MR. JONAS:  So is that an
8  instruction?
9      MS. BROWN:  Yeah.
10      MR. JONAS:  All right.
11  BY MR. JONAS:
12    Q.  Okay.  So I want to go back.  It's
13  late January.  The Third Circuit issues its
14  decision which you obviously thought was wrong
15  and you start thinking about the -- the risk
16  that the funding agreement was void or voidable,
17  right?
18    A.  Among other -- that was one of the
19  considerations that we -- that we had.
20    Q.  What other considerations did you
21  have?
22    A.  I think we were looking at other
23  contingency -- we were looking at what -- what the
24  ramifications were for -- for dismissal of
25  bankruptcy and -- and other options we could

Page 82

1  take.  That's all put into the board minutes, I
2  think.
3      MS. BROWN:  And, Jeff, when
4  you get to a good spot, can we take a
5  break before you do a new subject?
6      MR. JONAS:  Just give me a
7  couple?
8      MS. BROWN:  Yep.
9      MR. JONAS:  Thank you.
10  BY MR. JONAS:
11    Q.  So when you -- when it first came to
12  your mind that the funding agreement must be void
13  or voidable, what -- what steps did you take in
14  that regard?
15      MS. BROWN:  Without revealing
16  legal advice, Mr. Kim.
17      MR. JONAS:  Yeah.  Yeah.
18  Always the case.
19    A.  I think there were numerous discussions
20  about the enforceability of -- of the funding
21  agreement.  There are certain alternatives to
22  bankruptcy.  You know, the -- the -- whether we
23  should be refiling for bankruptcy.
24    Q.  Well, the funding agreement -- I just
25  want to check.

Page 83

1      The fund -- the parties to the funding
2  agreement are LTL, right?
3    A.  Yes.
4    Q.  Johnson & Johnson Consumer, Inc., right?
5    A.  Yes.  You're talking about the old --
6    Q.  Yeah, the old funding agreement.
7      And Johnson & Johnson, right?
8    A.  Yes.
9    Q.  So did you ever discuss with those
10  parties whether they thought the funding agreement
11  was void or voidable?
12    A.  There were discussions among counsel for
13  those parties.
14    Q.  Well, let me ask you.  Your -- again,
15  was it Johnson & Johnson or JJCI -- JJCI's view
16  that the agreement was void or voidable?
17      MS. BROWN:  I think that's
18  going to implicate legal advice and
19  would cause you to speculate as well,
20  so I object.
21      Can you answer that question
22  without divulging information of other
23  lawyers that you may also have a
24  privilege with under the common
25  interest?

Page 84

1      THE WITNESS:  No, but --
2      MS. BROWN:  Okay.  Then I'm
3  just going to instruct you not to
4  answer.
5    Q.  You know, I'm just -- it's going to be
6  a bad question, Mr. Kim, but I'd like to just cut
7  to the chase because I know we want to take a
8  break.
9      So you're a party -- you're one of the
10  parties to an agreement, right?
11    A.  We are.
12    Q.  And it's a good agreement for you
13  because the other party's going to give you a lot
14  of money, right?
15    A.  Well, it's -- not necessarily, no.  It's
16  a bad agreement because our principal purpose for
17  getting into the -- for -- for entering into all
18  these agreements -- the divisional merger
19  agreements, the funding agreements -- the
20  principal purpose was to try to resolve these
21  lawsuits in -- these talc lawsuits in bankruptcy
22  because that's where we can get a full, fair,
23  final resolution.
24      So if there's something in those
25  agreements that actually -- not -- not enhances

Page 117

1  but is in financial distress --
2      A.  Mm-hmm.
3      Q.  -- what time period were you referring
4  to?
5      A.  At all -- at all times.
6      Q.  At all times.
7      A.  Yes.
8      Q.  Okay.  So I'm referring to at all
9  times.
10     A.  Okay.
11     Q.  What is the basis of your saying that
12 LTL is not -- is not insolvent and -- but is in
13 financial distress?
14     A.  Because it has sufficient funds to pay
15 off its -- its debts currently as they come due.
16 It is not -- I don't think it fits any measure of
17 what's insolvent.  Financial distress is a little
18 tougher because I think, as the Third Circuit
19 pointed out, there's really no definition of
20 financial distress.  But what I would say is that
21 at every point in time -- and I would include even
22 prior to our -- you know, we disagree with the
23 Third Circuit on -- on whether it was in financial
24 distress during LTL 1.
25         But I would say at all points in time

Page 118

1  because of the talc liability, the -- that
2  liability puts the finances of, you know, the
3  operations and business in -- in jeopardy, which I
4  think, you know, would be a definition of
5  financial distress.  So the amount of -- of
6  litigation costs especially and the threat of --
7  of -- of these outsized verdicts, if that happens,
8  and -- and it could happen, it would put the --
9  the business in -- in -- in distress.
10     Q.  But at the time it filed, it had -- LTL
11 had agreements with high-teen number of firms
12 representing, you say, 60,000-odd claims and a
13 plan to resolve all talc claims fairly and
14 equitably with a commitment by J & J entities to
15 fund $8.9 million in the context of a plan.
16         So why was it in financial distress?
17     A.  Well, that's if it did file for
18 bankruptcy.  I think we're looking at the time
19 period just before filing.
20     Q.  I see.
21         So it was in financial distress at the
22 moment before it filed, but it's not in financial
23 distress anymore, right?
24     A.  Well, it's not in financial distress --
25 the way that -- and you know this better than I.

Page 119

1  The -- the way that bankruptcy works is once it
2  goes into bankruptcy, there are automatic stays
3  put in place.  And we're, again, moving for
4  preliminary injunction that would stop the li --
5  the liabilities from -- from becoming -- coming to
6  fruition.
7          So once you file bankruptcy, the concept
8  of financial distress I think is really not
9  something that you can look at.  I think what you
10 have to look at is just before filing bankruptcy
11 what the liabilities are and what the -- the
12 assets are.
13     Q.  And let me ask you.  You in your
14 affidavit -- strike.
15         Part of your declaration was in support
16 of the -- of LTL's request that a preliminary
17 injunction be entered, correct?
18     A.  Correct.
19     Q.  And you -- in your declaration, you said
20 that you needed the preliminary injunction to
21 avoid immediate and irreparable harm, right?
22     A.  Correct.
23     Q.  Okay.  And what is -- what do you
24 believe to be the immediate and irreparable harm
25 to the debtor if a preliminary injunction is not

Page 120

1  entered?
2      A.  I think we covered a lot of this in
3  our -- in the first LTL hearings and, you know, I
4  don't want to repeat myself too much.  But, you
5  know, the -- the preliminary injunction goes to
6  protected parties, and so mostly J & J retailers.
7          You know, the -- the issue there is that
8  the plaintiffs would be bringing claims against
9  the protected parties for the same product, same
10 injury, same plaintiff.  The theories would be
11 identical.  Basically they'd be suing for the same
12 things that they would be suing LTL for.  I think,
13 again, we -- we covered this at -- at length in
14 our prior -- prior case.
15         And that letting things like those cases
16 go forward would really be detrimental, especially
17 in this bankruptcy where we have a plan that we're
18 working on, that's being supported by lawyers that
19 represent 60,000 plaintiffs, having all this
20 ancillary litigation on the same claims, same
21 product, with these same plaintiffs, would
22 clearly be a detriment to the ability to -- to
23 reorganize.
24         There are all these other issues that I
25 think we've gone through at length in the prior

Page 165

1 How long was the March 28th board
2 meeting?
3  A. March 28th board meeting was a couple
4 hours.
5  Q. Okay.
6  A. Maybe three. Two to three hours.
7  Q. And would you say this was the principal
8 meeting where the -- there was substantive
9 discussion about filing a second bankruptcy if the
10 first bankruptcy was dismissed?
11  A. No. I think if you look at the March
12 16th minutes, there was discussion then too.
13  Q. Okay. Similarly, March 16th and there
14 was also discussion about terminating and entering
15 into a new funding agreement?
16  A. I believe there was.
17  Q. Okay. And, again, I'm not asking you
18 for the substance of legal advice, but do you
19 recall if -- whether on the March 16th meeting
20 there was discussion about whether or not
21 terminating the funding agreement was a fraudulent
22 conveyance?
23   MS. BROWN: Objection.
24   If you can't answer that
25   without implicating legal advice --

Page 166

1   THE WITNESS: Yeah.
2   MR. JONAS: I think he can
3   tell me whether he recalls there was
4   discussion.
5   MS. BROWN: Well, but by
6   saying yes or no to that, he's talking
7   about a legal issue and the board
8   minutes at Exhibit 11 reference this
9   discussion was being led by
10   Mr. Prieto.
11   MR. JONAS: Again, I --
12   MS. BROWN: What's the
13   question again?
14   MR. JONAS: The question was:
15   Do you recall whether at the March
16   16th board meeting, there was any
17   discussion with respect to whether the
18   termination of the funding agreement
19   was a fraudulent conveyance?
20   MS. BROWN: Do you recall?
21   Yes or no. You can answer.
22  A. Yes, I recall.
23  Q. And I take it the -- you couldn't tell
24 me anything else about that that would not be
25 covered by the privilege?

Page 167

1  A. Yeah, I think that's right. I think
2 that's right, yeah.
3  Q. Okay. And would that be the same answer
4 for any additional board discussions that took
5 place after March 16th on that topic?
6  A. Yes. Regarding the discussions, yes.
7 Any discussions, yes.
8  Q. Okay. Do you have a belief as to
9 whether or not termination of the funding
10 agreement was a fraudulent conveyance?
11   MS. BROWN: I object. I
12   object to answering that substantively
13   because your opinion is the legal
14   opinion.
15   THE WITNESS: I think he said
16   just do I have a belief? I do.
17 BY MR. JONAS:
18  Q. Okay. Betcha I know the answer.
19   Okay. Let's move along. Let's move
20 along before we all run out of steam.
21   Just take a look at page 24, please.
22  A. Yes.
23  Q. And the -- the -- the block here that
24 shows assets and estimated values, do you see
25 that?

Page 168

1  A. Yes.
2  Q. And this is telling us that LTL had cash
3 of 30 million and the RAM ownership was worth
4 roughly 367 million?
5  A. That is correct.
6  Q. And then why is it showing the value of
7 Holdco, if you know?
8   MS. BROWN: Calls for
9   speculation.
10  A. Because we were discussing Holdco's
11 funding obligation at the time.
12  Q. Okay. And it shows these -- it shows
13 these assets of Holdco. And I tried to understand
14 it when I read the materials. Do you -- can you
15 explain the "2022 GH Biotech dividend"? Because I
16 couldn't understand it.
17  A. I -- I -- I am not the person. This was
18 reported to me. This comes from -- these numbers
19 come from the finance group.
20  Q. Okay.
21  A. They're the ones that would know what
22 they really mean.
23  Q. And what finance group are you referring
24 to?
25  A. The J & J finance group.

Page 169

1  Q. J & J. Okay.
2  A. Their -- their shared service that does
3  treasury services for all of the J & J
4  subsidiaries.
5  Q. And if I look at page 25, I take it when
6  I see the bullet that says "No estimate or
7  valuation of aggregate talc liability," do you see
8  that?
9  A. I do.
10 Q. So LTL, as of this date at least, March
11 28th, didn't have an estimate or a valuation of
12 aggregate talc liability. Is that what that tells
13 me?
14 A. Yes. We only knew that, of course, it
15 was substantial.
16 Q. Okay. Okay. Okay. Let's move on.
17      MR. JONAS: Kim 19, please.
18      (Whereupon, exhibit is
19      received and marked Kim Deposition
20      Exhibit 15 for identification.)
21      THE REPORTER: Kim 15 for
22      identification.
23      THE WITNESS: Thank you.
24 BY MR. JONAS:
25 Q. Okay. Mr. Kim, this is minutes from a

Page 170

1  board meeting on April 2nd, 2023, correct?
2  A. Correct.
3  Q. And you attended?
4  A. I did.
5  Q. Okay. And I see below -- I'm trying to
6  expedite here a little bit -- in the paragraph
7  under "Introductory remarks and call to order," it
8  says "Mr. Kim welcomed the members of the board,"
9  et cetera, right?
10 A. Yes.
11 Q. And then on the agenda was -- Item 3 was
12 a -- a request for board action with proposed next
13 steps, correct?
14 A. Correct.
15 Q. And one of those actions -- or a part of
16 those actions were to, upon dismissal of the
17 bankruptcy case, terminate the existing funding
18 agreement, correct?
19 A. Correct.
20 Q. Enter into a new funding agreement,
21 correct?
22 A. Correct.
23 Q. File -- and -- and file bankruptcy
24 again, correct?
25 A. Correct.

Page 171

1  Q. Okay. And those were approved by the
2  board on April 2nd?
3  A. They were. I'm sorry, April 2nd, yes.
4  Q. Okay. And, you know, if we look at page
5  3, again we see this discussion about ongoing
6  discussions with the future claims representative.
7     Do you see that?
8  A. Yes.
9  Q. And here it tells us that the FCR had
10 determined not to submit a declaration in support
11 of the new case.
12 A. Correct.
13 Q. And I apologize if I asked you, but do
14 you know the reason why she made that decision?
15 A. No. She decided to take no position.
16 Q. Okay. But let me ask you, why wasn't
17 it -- why was there an effort to get her support,
18 if you know?
19      MS. BROWN: Yeah, objection.
20      Calls for speculation.
21      And, Mr. Kim, I think you
22      testified earlier this issue
23      implicated legal advice --
24      THE WITNESS: Yeah.
25      MS. BROWN: -- and so I'll

Page 172

1  instruct you --
2     (Unintelligible cross talk;
3     reporter requests one speaker.)
4     THE REPORTER: So I'll
5     instruct you?
6     MS. BROWN: Not to reveal any
7     legal advice.
8  A. Yeah, it would be privileged.
9  Q. Okay. And last part of this paragraph
10 talks about discussion with risk management
11 personnel of J & J regarding the availability
12 of --
13     MR. JONAS: Can everybody
14     mute, please? Mute. Mute. Mute.
15 Q. The last topic is "Discussions with risk
16 management personnel at J & J regarding the
17 availability of D&O insurance coverage for members
18 of the board."
19     Do you see that?
20 A. I do.
21 Q. Do you remember the nature of that
22 discussion?
23     MS. BROWN: And hold on a
24     second. It's presented by Mr. Prieto,
25     so, again, same instructions.

Page 177

1  A. That comes from my experience in the
2  industry and discussions with counsel.
3  Q. Which counsel?
4  A. Jim Murdica.
5  Q. Okay. But other than that, you -- you
6  have no basis for that statement?
7      MS. BROWN: Objection.
8      Misstates testimony.
9  A. I know how litigation financing works
10 and the prevalence of it in the industry.
11 Q. And do you think that interfered with
12 your ability to settle talc claims?
13 A. It certainly had an effect, yes.
14 Q. What was the effect?
15 A. The -- well, the com -- the common
16 effect is that lawyers that have financing have to
17 pay back their -- their lenders before they make
18 any profit and that affects the settlements, the
19 ability to settle and the amount of settlements.
20 Sort of intellectual property ipse dixit, I
21 guess.
22 Q. We talked about two rescinding firms. I
23 think you said Seeger Weiss and Robinson, is that
24 right?
25 A. Yes.

Page 178

1  Q. Okay. Do -- do you understand as to --
2  well, strike that.
3      Is the Lanier Firm part of the settling
4  firms with Johnson & Johnson or not?
5  A. I -- I don't know. I don't know.
6  Q. Okay.
7      MR. JONAS: Okay. If we take
8      five minutes, I think I can wrap up.
9      MS. BROWN: Okay. Sounds
10     good.
11     THE VIDEOGRAPHER: This ends
12     Unit 5. We're off the record at 6:11.
13     (Whereupon, a recess is
14     taken.)
15     THE VIDEOGRAPHER: This
16     begins Unit 6. We're on the record at
17     6:22.
18     MR. JONAS: And I will turn
19     over the examination to others that
20     are here to participate. I think
21     Mr. Block is going to go first.
22     All yours, Jerry.
23 CROSS-EXAMINATION
24 BY MR. BLOCK:
25 Q. Hello, Mr. Kim. Can you hear me okay?

Page 179

1  A. Hello, Mr. Block. Yes, I can.
2  Q. Okay. As you know, my name is Jerome
3  Block from the law firm of Levy Konigsberg and I
4  represent certain talc claimants.
5      Mr. Kim, LTL was formed on or about
6  October 12th, 2021, correct?
7  A. That is correct.
8  Q. And when LTL was formed, as of the
9  moment it was formed, it had the funding agreement
10 that was backed by J & J, correct?
11     MS. BROWN: Objection to the
12     form.
13 A. So it had -- it had the funding
14 agreement -- it had a funding agreement with New
15 JJCI and J & J.
16 Q. Right.
17     And you've read the Third Circuit
18 opinion on the LTL case, correct?
19 A. I did.
20 Q. And did you see where the Third Circuit
21 actually called the funding agreement a "birth
22 gift" to LTL? It's something that LTL had since
23 day one of its formation, correct?
24 A. I -- I did see that in the -- in the
25 decision, yes.

Page 180

1  Q. Okay. And as of the date of its
2  formation, LTL had access to the funding agreement
3  outside of the bankruptcy even before LTL filed
4  for bankruptcy on October 14th, 2021, correct?
5  A. Yes. For that period of time before
6  filing, it had access to the funding agreement.
7  Q. Okay. And then do you recall, sir,
8  that -- it was either the day before or a couple
9  days before LTL filed for bankruptcy in October
10 14th, 2021. Do you remember there was a board
11 meeting to discuss options including whether to
12 file for bankruptcy?
13 A. I do recall that.
14 Q. Okay. And -- and we've looked at the
15 minutes of that meeting before, correct?
16 A. In the prior proceeding, we did, yes.
17 Q. Okay. And what you explained to us, and
18 what the meetings reflect, was that various
19 options were presented to the LTL board and
20 ultimately you made a recommendation that
21 bankruptcy be filed and the board did decide to
22 file for bankruptcy which was filed on October
23 14th, 2021, correct?
24 A. I believe that's true. I -- I don't
25 have the -- the filing in front of me for the

Page 181

1  date, but I think that -- that sounds right.
2     Q.  Okay. And if LTL -- strike that.
3         And if the board of LTL at that board
4  meeting prior to October 14th, 2021, had decided
5  not to pursue bankruptcy, LTL still would have had
6  that funding agreement that was backed by J & J
7  and JJCI, correct?
8     A.  I would say -- I testified to this in
9  the last proceeding. What I would say is that the
10 purpose for -- for all the transactions, including
11 the funding agreement, including the additional
12 merger, all of that was to enable LTL to file for
13 bankruptcy to resolve these talc claims, you know,
14 efficiently and fully.
15        The -- the thought that LTL would not
16 have filed bankruptcy -- I think I've testified in
17 the prior proceeding everyone expected --
18 there's -- there's no reasonable way to view LTL's
19 situation and -- and not know that it was filing
20 for bankruptcy.
21        So I would say the -- the entire purpose
22 of the entire agree -- all the agreements,
23 including the funding agreement, was to enhance
24 LTL's ability to resolve these claims in
25 bankruptcy including the J & J guarantee. You

Page 182

1  know, the J & J guarantee was there to help the
2  bankruptcy process and the resolution of the
3  claims.
4         And so when the Third Circuit made a
5  decision that said the -- the guarantee not only
6  did not enhance the -- the bankruptcy, but, in
7  fact, was the reason why it shouldn't go forward,
8  I would say that was a frustration of the
9  purpose.
10    Q.  Okay. And we can go back and look at
11 it, but you know that your first day declaration
12 from October of 2021 describes the funding
13 agreement and describes that that funding
14 agreement is available to LTL both inside of
15 bankruptcy and outside of bankruptcy, correct?
16    A.  And I stand by that based upon what we
17 knew at the time.
18    Q.  Okay. And you, sir, you were in court
19 for the motion to dismiss hearing in February of
20 2022, correct?
21    A.  I was.
22    Q.  And you were there when Greg Gordon gave
23 his closing argument in favor of dismissal,
24 correct?
25    A.  I was.

Page 183

1     Q.  And you know that Greg Gordon told Judge
2  Kaplan on the record that the 2021 funding
3  agreement was available to pay talc claims outside
4  of bankruptcy even if the case was dismissed,
5  correct?
6     A.  Correct, based upon the facts and the
7  law that we knew at the time. That's absolutely
8  correct.
9         What -- what changed --
10    Q.  Okay.
11        MS. BROWN:  Let him finish.
12        I'm sorry, Jerry. He's not done.
13        Go ahead.
14    A.  What changed was when the Third Circuit
15 decision came in and said that the -- the fund --
16 basically it took the provision that we were
17 relying on to help LTL in bankruptcy and said that
18 provision actually prevented the LTL bankruptcy.
19 That -- that changed -- that changed everything
20 and -- and so you have to look at Mr. Gordon's
21 statements in that context.
22    Q.  Now, sir, when LTL filed for bankruptcy
23 on October 14th, 2021, you knew that there was a
24 risk that that bankruptcy case would be dismissed,
25 correct?

Page 184

1     A.  There was always a risk, but we did not
2  know that that risk was based upon the very clause
3  that we put in to enhance the bankruptcy.
4     Q.  And when you signed that bankruptcy
5  petition that was filed on October 14th, 2021, why
6  was it that you understood that there was a risk
7  that that bankruptcy would be dismissed?
8     A.  There could be various reasons, but what
9  we did not contemplate was that the bankruptcy
10 would be dismissed because of the clause that we
11 were using to help to enhance the -- the
12 possibility of -- of LTL resolving these --
13 these -- the talc litigation in the bankruptcy.
14    Q.  And when you filed the bankruptcy case
15 for LTL on October 14th, 2021, what were the
16 various ways that you could foresee would be a
17 basis for the dismissal of that bankruptcy when
18 you filed it?
19        MS. BROWN:  And, Mr. Kim, to
20        the extent that's based on legal
21        advice, don't -- don't divulge any
22        legal discussions.
23    A.  I would -- I would say -- yeah, I
24 would say it's all sort of legal conclusions and
25 advice.

Page 201

1  nowhere.
2     A.  I can hear you.
3     Q.  All right.  Great.  I'll get right to
4  it.
5         Mr. Kim, I believe earlier today you
6  testified that LTL continues to believe that it
7  was in financial distress prior to the Third
8  Circuit's ruling, is that correct?
9     A.  We -- we do.
10    Q.  All right.  So even under Funding
11 Agreement One, the 2021 funding agreement, LTL
12 believes even today that it was in financial
13 distress?
14    A.  It does.
15    Q.  Okay.  And -- and LTL believes under
16 Funding Agreement Two that it is not insolvent,
17 but that it remains in financial distress?
18    A.  It does.
19    Q.  All right.  And -- and the basis for
20 that belief of financial distress is the same
21 under Funding Agreement Two as it was under
22 Funding Agreement One.  Is that fair?
23    A.  I'm not sure I can parse that through.
24 Can you -- can you repeat that?
25    Q.  Sure.  Let me come at it a different

Page 202

1  way.
2         You understand that people representing
3  claimants may contend that the rescission of
4  Funding Agreement One and replacement of it with
5  Funding Agreement Two was a fraudulent transfer.
6  You understand that claim may be made?
7     A.  I do.
8     Q.  All right.  And -- and I believe you
9  testified earlier that you do not believe that it
10 was, in fact, a fraudulent transfer.
11    A.  I do.
12    Q.  All right.  And -- and can we agree that
13 it is your belief that the substitution of Funding
14 Agreement Two for Funding Agreement One did not
15 render LTL insolvent?
16    A.  Yes.
17    Q.  All right.  And can we also agree that
18 it is your belief that at least toward the
19 immediate future, the substitution of Funding
20 Agreement Two for Funding Agreement One did not
21 impair LTL's ability to fund its top liabilities
22 inside or outside of bankruptcy?
23    A.  Actually, I don't know that I can give
24 that legal conclusion right now.
25    Q.  Well, so -- so that's part of the

Page 203

1  question of financial distress, whether LTL can
2  fund its liabilities as they're going to be
3  expected to come due.
4         So let me ask you a different question
5  then.  Prior to funding -- filing of LTL 1, what
6  was the annual indemnity and cost to defense
7  stream of payments for the Johnson & Johnson
8  family for talc litigation?
9     A.  Yeah, I -- I don't recall right now.  I
10 testified at length to that in the last
11 proceeding.
12    Q.  Okay.
13    A.  I stand on the record on that.
14    Q.  My -- my question is it was no more --
15 if we exclude the Ingham verdict, it wasn't any
16 more than $2 billion a year.  Is that consistent
17 with your recollection?
18    A.  Actually, sitting here today, I -- I
19 don't recall.  I just -- I'd rely on the -- my
20 last testimony from the prior proceeding.
21    Q.  Whatever that number was, can we agree,
22 Mr. Kim, that if the court dismisses this
23 bankruptcy ten days from now and LTL returns to
24 the court system, for the foreseeable future
25 backed with its own assets, the stream of royalty

Page 204

1  payments and the other assets that you described,
2  and backed with the funding agreement with Holdco,
3  LTL will be able to manage its asbestos talc
4  liabilities for the next three years?
5         MS. BROWN:  Object;
6      hypothetical.
7         THE WITNESS:  Hypothetical.
8         MS. BROWN:  Calls for a legal
9      conclusion.  Incomplete.
10    A.  Yeah, I can't -- I can't answer that.
11    Q.  Would LTL be able to -- so you -- you
12 cannot say as you sit here today that LTL has any
13 evidence that it would not be able to fund its
14 talc liabilities in the tort system for the next
15 two, five or ten years if the court returns it to
16 the tort system?
17        MS. BROWN:  Object.  That
18      misstates his testimony.
19    Q.  Correct?
20    A.  Yeah.  That -- yeah, that misstates my
21 testimony.  It could be that -- you know, again,
22 just looking at -- you're just looking at costs.
23 But, you know -- and the cost -- the cost of what
24 a tort claim is.  There are other litigations
25 going on including AG litigation, including the

Page 205

1  securities litigation, and there's the runaway
2  verdict issue.
3      So, you know, your time frame of -- I
4  think -- I think what you're really getting at is
5  the immanency. I -- I would say that we are in
6  imminent financial distress if we get dismissed.
7      Q. If you get dismissed and other things
8  happen, then there's a possibility --
9      A. No.
10     Q. -- that LTL might not be able to meet
11 its obligations. Is that fair?
12     A. No. I would say we are in imminent
13 financial distress.
14     Q. Okay. So what is the imminent -- what
15 is the factual basis for the imminent financial
16 distress of LTL given the fact that it's backed by
17 Holdco which has a market value of somewhere
18 around $30 billion and LTL's own considerable
19 entity?
20         MS. BROWN: And, again, I'll
21     caution you. Just reveal factual
22     information not legal advice.
23     A. So I would rely on the testimony from
24 the last proceeding that -- where the court found
25 that we were in financial distress just based --

Page 206

1  based upon when -- when it was -- when we had New
2  JJCI funding agreement.
3      Q. All right.
4      A. It's the same -- the same -- the same
5  basis.
6          And, in fact, I think our liabilities
7  probably have increased since then because of
8  the -- you know, the -- the -- the passage of
9  time. And so I think based upon all -- all the
10 factors that were in the prior proceeding would be
11 applicable to the current proceeding.
12     Q. Okay. Mr. Kim, the court that you just
13 referred to in that answer is the bankruptcy
14 court, Judge Kaplan, correct?
15     A. That is.
16     Q. Okay. Great.
17         Different questions.
18         Johnson & Johnson never formally
19 rescinded the funding agreement prior to its
20 rescission and agreement with LTL, correct?
21         MS. BROWN: Objection; vague.
22         I don't understand the question.
23     Q. All right. Let me try it a different
24 way.
25         Did Johnson & Johnson ever refuse to pay

Page 207

1  any amounts under the funding agreement?
2          MS. BROWN: Objection;
3      assumes facts --
4      Q. In its --
5          (Unintelligible cross talk;
6      reporter requests one speaker.)
7      Q. All right. Did Johnson & Johnson ever
8  refuse to pay any amounts requested by LTL under
9  Funding Agreement One?
10         MS. BROWN: Lacks foundation.
11     A. I don't recall. I'd have to --
12     Q. Did --
13     A. Yeah, I'd have to -- yeah, I don't
14 believe that it -- that it refused funding, but
15 that's a different question than whether the
16 funding agreement is voidable.
17     Q. Did Johnson & Johnson ever tell LTL that
18 it would not honor the funding agreement because
19 it considered it to be void or voidable? Not that
20 it might, not that it could be void or voidable.
21 Did Johnson & Johnson ever tell LTL we're not
22 going to pay, you can't make us?
23     A. They're conversations with counsel.
24         MS. BROWN: Okay. To the
25     extent answering this question

Page 208

1      implicates legal discussions, common
2      interest privilege, I'm going to
3      instruct you not to answer.
4      Q. That was a conditional instruction,
5  Mr. Kim. Are you going to not answer at all?
6      A. Yeah, it -- it would implicate legal --
7  legal discussions.
8      Q. So as we sit here today, there's no
9  evidence that Johnson & Johnson ever declared the
10 funding agreement void or -- or rescinded its
11 commitment to honor the funding agreement,
12 correct?
13         MS. BROWN: That -- that
14     misstates his testimony. I object.
15     A. I would say --
16     Q. Is that correct?
17     A. I would say, as I testified, both
18 Johnson & Johnson and LTL concluded that the
19 contract -- there's a material risk that the
20 funding agreement was void or voidable and
21 unenforceable.
22     Q. Okay. The material risk depends on
23 Johnson & Johnson refusing to pay and then LTL
24 attempting to enforce, correct?
25     A. It does not, no.

Page 209

1   MR. RUCKDESCHEL:  Okay.  No
2   further questions from me.
3   CROSS-EXAMINATION
4   BY MR. THOMPSON:
5       Q.  Hello, Mr. Kim.  Clay Thompson with
6   Maune Raichle on behalf of Katherine Tollefson.
7       Can you hear me okay?
8       A.  I can, Mr. Thompson.
9       Q.  Okay.  Just following up on Mr.
10  Ruckdeschel's comments, are you saying that
11  outside of legal conversations with lawyers, you
12  never were told by anyone at Johnson & Johnson
13  that Johnson & Johnson was refusing to honor the
14  funding agreement?
15      A.  Outside of any conversations I may have
16  had, I -- yeah, I don't have any information about
17  that.
18      Q.  What I'm saying is that no one came to
19  you -- you never went to Johnson & Johnson with no
20  lawyers involved and they refused to honor the
21  funding agreement in your capacity as the LTL
22  Management chief legal officer, is that right?
23      A.  I've -- I've never approached anyone at
24  Johnson & Johnson about that, no.
25      Q.  And no one --

Page 210

1       A.  Other than --
2       (Unintelligible cross talk; reporter
3   requests one speaker.)
4       A.  I'm sorry.  I'm sorry.  Other than
5   through lawyers.
6       Q.  Understood.
7       And -- and no one at Johnson & Johnson
8   told you, outside of communications with lawyers
9   that there's some assertion of potential privilege
10  for, no one at Johnson & Johnson ever told you
11  that they refused to honor the funding agreement
12  to LTL Management of which you are the chief legal
13  officer, is that right?
14      MS. BROWN:  Objection; asked
15      and answered.
16      You can --
17      A.  Other than through -- through
18  discussions with lawyers.
19      Q.  Understood.  Okay.
20      The purpose of LTL Management LLC, which
21  was formed in 2021, is to coordinate a mass
22  settlement of both LTL's talc liability and
23  Johnson & Johnson's talc liability in a
24  bankruptcy.  Is that fair?
25      MS. BROWN:  Objection to the

Page 211

1   form.
2       A.  I would say Johnson & Johnson's talc
3   liability is LTL's talc liabil -- talc liability.
4       Q.  Right.
5       And so the purpose that -- LTL's purpose
6   of existence, formed in 2021 and filed for
7   bankruptcy in 2021 and then again three weeks ago,
8   its purpose is to resolve both Johnson & Johnson's
9   talc liability and LTL's talc liability in a
10  bankruptcy, is that correct?
11      A.  No.  Again, I would say that Johnson &
12  Johnson's talc liability is LTL's talc liability.
13  There's no -- I don't believe there's a separate
14  talc liability for Johnson & Johnson.
15      Q.  Right.
16      A.  So it is --
17      Q.  So --
18      (Unintelligible cross talk; reporter
19  requests one speaker.)
20      MS. BROWN:  Okay.
21      Mr. Thompson, he wasn't done.  Let's
22      just let him finish, please.
23      Go ahead.
24      A.  To start over again, I believe that
25  Johnson & Johnson's talc liability is LTL's talc

Page 212

1   liabil -- talc liability and that -- so when you
2   say that we're settling sort of two separate
3   liabilities, I -- I would disagree with that.
4       Q.  I understand.  I understand that that's
5   your -- your position.  And I mean to allow you to
6   finish your answers.  I just -- you know, there's
7   a bit of delay maybe over the Zoom.
8       Would you agree with me that if a plan
9   were confirmed in this case, that it's LTL's
10  intention that because of that, a bankruptcy plan
11  confirmed, that no one will be permitted to sue
12  J & J in the tort system?  Is that a better way to
13  put that?
14      MS. BROWN:  I -- I object and
15      instruct you not to answer to the
16      extent that that implicates legal
17      discussions and legal conclusions.
18      I also object to the
19      hypothetical.
20      Q.  Well, I asked you if -- if the purpose
21  of LTL was to coordinate a settlement of all of
22  J & J's talc liability and you said that you
23  didn't feel that J & J had independent liability.
24  Is that accurate?
25      A.  That is accurate.  I -- I feel like all