**In the Matter Of:**

*LTL Management LLC Bankruptcy*

*JAMES MURDICA*

*April 16, 2023*



### Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2                  DISTRICT OF NEW JERSEY
 3
 4   In Re:  Chapter 11       )
                              )  Case No. 21-30589
 5   LTL MANAGEMENT, LLC,     )  (MBK)
                              )
 6          Debtor.           )
 7
 8
 9
10
11
12
13          VIDEO RECORDED EXAMINATION OF
14                  JAMES MURDICA
15          _____
16                     TAKEN ON
17
             SUNDAY, APRIL 16, 2023
18
19
20
21
22
     CERTIFIED STENOGRAPHER:
23   JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
     CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24   CCR-WA (No. 21007264), CSR-CA (No. 14420),
     REALTIME SYSTEMS ADMINISTRATOR
25   JOB NO.:  893549
```

### Page 2

```
 1
 2
 3         VIDEO RECORDED EXAMINATION of
 4   JAMES MURDICA, taken before JESSICA R. WAACK,
 5   Registered Professional Reporter, Registered
 6   Merit Reporter, Certified Realtime Reporter,
 7   Registered Diplomate Reporter, California
 8   Certified Realtime Reporter, New Jersey
 9   Certified Court Reporter (License No.
10   30XI008238700); Texas Certified Shorthand
11   Reporter (License No. 11958); Washington
12   State Certified Court Reporter (License No.
13   21007264); California Certified Shorthand
14   Reporter (License No. 14420); New York
15   Association Certified Reporter, New York
16   Realtime Court Reporter and Notary Public of
17   Washington, D.C. and the States of New York,
18   Pennsylvania, Delaware, Maryland and
19   Virginia, at Skadden, Arps, Slate, Meagher &
20   Flom, LLP,  One Manhattan West, New York, New
21   York, on Sunday, April 16, 2023, commencing
22   at 1:26 p.m. and concluding at 6:32 p.m.
23
24
25
```

### Page 3

```
 1                  A P P E A R A N C E S
 2
 3   FOR OFFICIAL COMMITTEE OF TALC CLAIMANTS I:
 4       BROWN RUDNICK LLP
 5       BY:  MICHAEL WINOGRAD, ESQ.
 6       BY:  JENNIFER SCHEIN, ESQ.
 7       BY:  DAVID J. MOLTON, ESQ. (Remote)
 8       BY:  JEFF JONAS, ESQ. (Remote)
 9       BY:  ERIC R. GOODMAN, ESQ. (Remote)
10       7 Times Square
11       New York, New York  10036
12       PHONE:  212-209-4917
13       EMAIL:  Mwinograd@brownrudnick.com
14
15   ON BEHALF OF THE DEBTOR LTL AND WITNESS:
16       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
17       BY:  ALLISON M. BROWN, ESQ.
18       One Manhattan West
19       New York, New York  10001-8602
20       PHONE:  212-735-3222
21       EMAIL:  Allison.brown@skadden.com
22
23
24
25
```

### Page 4

```
 1                  A P P E A R A N C E S
 2
 3   REMOTELY ON BEHALF OF JOHNSON & JOHNSON:
 4       WHITE & CASE LLP
 5       BY:  JOSHUA WEEDMAN, ESQ.
 6       BY:  KRISTIN SCHULTZ, ESQ.
 7       BY:  MATT LINDER, ESQ.
 8       BY:  GREG STARNER, ESQ. (In person)
 9       1221 Avenue of the Americas
10       New York, New York  10020-1095
11       PHONE:  212-819-8963
12       EMAIL:  Jweedman@whitecase.com
13
14   ON BEHALF OF VARIOUS TALC CLAIMANTS:
15       LEVY KONIGSBERG
16       BY:  MOSHE MAIMAN, ESQ.
17       BY:  JERRY BLOCK, ESQ. (Remote)
18       605 3rd Avenue, 33rd Floor
19       New York, New York  10158
20       PHONE:  800-315-3806
21
22
23
24
25
```

Page 33

1   going to object and instruct you if
2   that knowledge is from conversations
3   with counsel, not to reveal.  That's
4   privileged.
5   BY MR. WINOGRAD:
6       Q.  I'm not asking for any substance.
7   I'm asking, do you know?
8       A.  I'll make it easy.  I do not
9   know.
10          MR. WINOGRAD:  Can we grab Tab B
11  as in boy.
12          Lexitas, if you can pull up
13  Tab B.
14          (Whereupon, Exhibit 2 is marked
15          for identification.)
16          MR. MAIMAN:  Can you put up the
17  exhibits on the screen?
18          THE STENOGRAPHER:  Juan, do you
19  have the exhibits?  It's the
20  stenographer.
21          ZOOM OPERATOR:  I put a link in
22  the chat where you can download the
23  exhibits.
24          MR. WINOGRAD:  Okay.  Thanks.
25          MR. SATTERLEY:  That should be

Page 34

1   fine.
2           MS. SCHEIN:  The marked ones?
3           MR. WINOGRAD:  Just put them,
4   please, not all at once.  You just need
5   to go exhibit by exhibit.
6           ZOOM OPERATOR:  Correct, correct.
7   I'm only putting the ones you called.
8           MR. WINOGRAD:  Thank you.
9           ZOOM OPERATOR:  You're welcome.
10  BY MR. WINOGRAD:
11      Q.  Mr. Murdica, you've now been
12  handed, I believe, what's been marked as
13  Exhibit 2.
14      A.  Yes.
15      Q.  Have you seen this document
16  before?
17      A.  I think it was a deposition
18  exhibit, and I see it's dated 2023.  And
19  I'm guessing we're going to go look at
20  another list.
21      Q.  Exactly.  So if you could open it
22  up to page 18 of 24, that's ECF page 18 --
23      A.  Yes.
24      Q.  -- you'll see again a list of law
25  firms.

Page 35

1       Q.  Do you see that?
2       A.  Yes.
3       Q.  And have you seen this document
4   before?
5       A.  I have.
6       Q.  Okay.  Did you -- and this is a
7   similar chart to what we just looked at,
8   correct?
9       A.  It looks similar.
10      Q.  But there are --
11      A.  There are less names.
12      Q.  Correct.
13      A.  Yes.
14      Q.  And did you have any role in
15  preparing this chart?
16      A.  I did.
17      Q.  And what was your role in
18  preparing the chart?
19      A.  I was asked who had the most
20  claims in the litigation as I understood
21  it, and that is what became of this chart.
22      Q.  And what information did you
23  provide in response to that question?
24      A.  Just a list of names.
25      Q.  And when you say the list of

Page 36

1   names, what list of names are you referring
2   to?
3       A.  List of firms.
4       Q.  So you provided a list of firms
5   that, to your knowledge, had talc claims --
6   I'm sorry, strike that.
7           Did you provide a list of law
8   firm names that, to your knowledge,
9   represented talc claimants?
10      A.  I provided a list of law firm
11  names that, to my knowledge, represented
12  the most talc claimants by number.
13      Q.  And we're gonna talk about that
14  in a little bit.
15          And did you actually draft this
16  chart?
17      A.  I did not, but I provided the
18  names that appear in this chart.  So I
19  presume that counsel drafted this chart
20  based on the information that I gave them.
21      Q.  Okay.  Did they -- do you know
22  whether any criteria other than the number
23  of claims went into deciding who went on
24  this chart?
25          MS. BROWN:  And I would instruct

Page 37

1  you to answer that only yes or no. Do
2  you know? Beyond that, I'll have a
3  privileged objection.
4      THE WITNESS: Well, I know that
5  the firms that I provided are the firms
6  that have the most talc claims.
7  BY MR. WINOGRAD:
8   Q. Okay. But I'm asking something
9  differently, and we'll just start with a
10 yes-or-no question.
11     Do you know whether there were
12 any other criteria that were used by
13 whoever drafted this document in
14 determining which law firms to put in this
15 chart other than your provision of a list
16 of claimants?
17  A. I can't tell you anything other
18 than at the time that this list was
19 created, the information came from me as to
20 which firms had the most talc claims,
21 period.
22  Q. And in your determining which --
23 in your determining how many claims a
24 particular law firm had, how did you do
25 that?

Page 38

1   A. I knew how many filed claims they
2  had as of the date of the LTL bankruptcy
3  filing. And then if they were firms that I
4  was -- had spoken with for other reasons
5  and they provided me information about
6  their unfiled claims, I included that.
7      And most -- most firms with a
8  significant number of claims have provided
9  that information to me, again, in the
10 context of resolution discussions.
11  Q. Okay. And so you mentioned filed
12 claims. Is that roughly the same 38,000
13 ovarian cancer claims and, you know, 400 or
14 so mesothelioma claims that were filed as
15 of the first petition in this case?
16  A. Are you asking me is that how
17 many filed claims I was looking at?
18  Q. Yes.
19  A. Yes.
20  Q. And with respect to the unfiled
21 claims, you mentioned you got information
22 from law firms that provided it to you.
23     How did you figure out which law
24 firms to ask for that information?
25  A. So, first of all, I didn't

Page 39

1  necessarily ask them for it. Many of them
2  wanted me to know, because they knew that
3  my role here was to discuss, you know,
4  potential resolution paths.
5      And this is information I've
6  gained over the past years including before
7  the LTL filing.
8   Q. Okay. And in terms of
9  calculating the number of claims by a
10 particular law firm, we'll talk about it
11 when we -- a little bit later on.
12     Are you aware of what are known
13 as plan support agreements in connection
14 with the talc claims?
15  A. Yes.
16  Q. And some of those plan support
17 agreements attached a list of claimants,
18 correct?
19  A. Right.
20  Q. Is that the information you got
21 with respect to -- is that the only
22 information you got with respect to a
23 number of claimants for a given law firm?
24  A. Not sure I understand your
25 question, but I think the answer is no.

Page 40

1   Q. Okay. How else did you figure
2  out how many claimants a law firm had?
3   A. I think I just said that in the
4  context of resolution discussions or
5  potential resolution discussions over the
6  past three years, information was provided
7  to me about the -- what I'll call the
8  inventories of the firms.
9      And, you know, firms had
10 significant inventories of unfiled claims,
11 because for a number of reasons, including
12 that some plaintiffs firms -- a lot of
13 plaintiffs firms have taken the view that
14 the statute of limitations didn't start
15 running on their claims until talc was no
16 longer sold in the United States.
17  Q. Okay. So I want to talk about
18 this -- the information that you said where
19 you were given information about the
20 inventory of claims.
21     Setting aside the information
22 that is reflected in the list of claims
23 attached to PSAs, are there -- were there
24 any law firms that came to you and provided
25 you with inventory -- information on their

Page 41

1 inventory of talc claims without providing
2 you an attachment to a PSA?
3     A. That is a difficult question to
4 answer, because we're talking about a
5 three-year period. The PSAs and the
6 exhibits to them, that's a very recent
7 thing, so I'm not sure I understood your
8 question.
9     Q. Okay. Let me go back to the
10 exhibit in front of you.
11     A. Yes.
12     Q. This list -- and, again, I don't
13 want the substance.
14     But how did you -- how did you
15 communicate to -- who did you communicate
16 the information on number of claims to in
17 order for this chart to be generated?
18     A. It was a lawyer.
19     Q. Working for?
20     A. Johnson & Johnson.
21     Q. Okay. Without going into the
22 substance of that communication, did you
23 communicate it to that lawyer in writing?
24     A. I believe I did by phone.
25     Q. So you, by phone, communicated

Page 42

1 law firm by law firm how many claims you
2 believe those law firms had?
3     A. I did not communicate how many
4 claims they had. I simply listed the
5 firms.
6     Q. You listed the firms without
7 providing -- has -- so you listed the firms
8 in order of the number of claims that they
9 had?
10     A. I thought I did, although that's
11 not the order in which it appears here. So
12 it seems that somebody alphabetized it.
13     Q. But you believe you provided it
14 in order from largest number of claims
15 down?
16     A. I can't remember.
17     Q. Okay. Did you provide any --
18 without going into the substance, did you
19 provide any written information on the
20 number of claims these law firms had to
21 whomever was drafting this document?
22     A. I recall speaking to her by
23 phone. There's no writing.
24     Q. I want to take an example of a
25 firm --

Page 43

1     A. Sure.
2     Q. -- in here. And I'm just -- you
3 know, there's a firm that says, you know --
4 let me ask it differently.
5     Do you recall whether there were
6 any law firms for whom you indicated the
7 number of talc claims you believe they had
8 for a law firm that did not provide you
9 with a written list of claimants?
10     MS. BROWN: I object as vague.
11 I'm not sure I understand the question.
12     THE WITNESS: Let me -- let me
13 rephrase it and see if you're --
14 BY MR. WINOGRAD:
15     Q. Sure.
16     A. So I already testified that I
17 didn't provide anybody -- the person who
18 put this together or who I presume put it
19 together did not have information on how
20 many claims there were, because they were
21 relying on me. I gave the information. I
22 didn't say how many claims there were.
23     If you're saying, for example,
24 Arnold & Itkin who -- actually, now I'm
25 just confused.

Page 44

1     Q. All right. So you said law firm
2 X is number 10 on my list. They have --
3 you went through a list of law firms --
4     A. Yes.
5     Q. -- based on the number of claims
6 they had, correct?
7     A. Yes.
8     Q. At some point did you come to a
9 law firm, call it number 10 on the list,
10 where you -- to your knowledge, forget
11 about the information that was conveyed,
12 where that -- where the number of claims
13 that you were attributing to that law firm
14 was based on something other than a written
15 list of claimants that you had received
16 from that law firm?
17     A. Yes.
18     Q. Okay. So were there times where
19 there are law firms on this list where the
20 number of claims you were attributing to
21 them was based on a representation by the
22 law firm that they represent Y number of
23 claims?
24     A. Yes.
25     Q. When you considered the number of

Page 121

1   A.  So, to the best of my knowledge,
2   I think some firms added that, but that was
3   not requested by me.
4   Q.  So you specifically requested the
5   other columns?
6   A.  I did.
7   Q.  And those are just the "Name,"
8   "Date of Birth" and last four of Social?
9   A.  And the "Claim Type." That was
10  requested by me. I thought you were asking
11  about the date of death. I didn't ask for
12  that.
13  Q.  You didn't ask for the date of
14  death?
15  A.  No.
16  Q.  But some of the exhibits have
17  claim type and some do not. I can show you
18  an example, if you would like, of one that
19  does not.
20  A.  I'll take your word for it. I
21  can't explain to you why they wouldn't. I
22  requested that it would be filled in.
23  Q.  Okay. Did you know that some did
24  not come with claim type?
25  A.  No.

Page 122

1   Q.  And what were the options -- did
2   you provide folks with options in terms of
3   terms to use for claim type?
4   A.  Yes. I believe my partner
5   provided it as a dropdown --
6   Q.  Okay.
7   A.  -- where they could select
8   gynecologic cancer, mesothelioma or
9   governmental claim, the three types in the
10  term sheet.
11  Q.  Are you aware of any counsel
12  representing talc claimants who have
13  co-counsel in connection with those talc
14  claimants?
15  A.  Well, yes. We heard yesterday I
16  think that several thousand of
17  Mr. Birchfield's claims and the other
18  clients of yours are co-counsel with
19  Mr. Pulaski.
20  Q.  Okay. How do you know with
21  respect to -- strike that.
22      Do you know with respect to the
23  claim lists that were provided, attached
24  the PSAs, that there was no double counting
25  amongst -- amongst co-counsel?

Page 123

1       MS. BROWN:  Objection. Vague.
2       THE WITNESS:  So I know that the
3   lawyers who signed the PSAs were
4   instructed by me, and I know that they
5   followed the instruction to only list
6   claims for which they were the primary
7   lawyer and had the authority.
8   BY MR. WINOGRAD:
9   Q.  When -- did you ask any of the
10  plaintiffs law firms to see engagement
11  letters for all of their claimants?
12  A.  So I did not. Again, this is a
13  question where you're asking if I break the
14  ethical rules. I did not.
15  Q.  Did you ask whether complaints
16  were drafted for the unfiled claims?
17  A.  I did not, Mr. Winograd. But as
18  you know, in the MDL, there is a short form
19  complaint. It's very simple. It's just a
20  template that people fill in.
21      I imagine that they would have
22  done so if they needed to to timely file
23  them.
24  Q.  Do you know whether any -- strike
25  that.

Page 124

1       Do you know whether the
2   plaintiffs law firms that signed the PSAs
3   have, in fact, drafted complaints for their
4   unfiled cases?
5       MS. BROWN:  Asked and answered.
6       THE WITNESS:  Mr. Winograd, I
7   don't know. But I know them all to be
8   very good lawyers despite what your
9   clients have said about them in the
10  media. And I know that they can draft
11  complaints and have in other cases.
12      I mean, for example, Mr. Onder
13  filed 11,000 cases. He's got the most
14  cases filed in the litigation, and he's
15  in support of the plan.
16  BY MR. WINOGRAD:
17  Q.  Do you know whether the
18  plaintiffs law firms have a pathology
19  report for each of the claimants they
20  represented to you that they have?
21  A.  I do not. But I know that the
22  same is -- same to be for your clients,
23  that they don't have pathology reports for
24  all of them.
25  Q.  Again, I'm asking very simple

Page 125

1  yes-or-no questions. Please refrain
2  from --
3       MS. BROWN: No, he's going to --
4  BY MR. WINOGRAD:
5     Q.  Please refrain from --
6       MS. BROWN: No.
7  BY MR. WINOGRAD:
8     Q.  -- the ad hominem statements.
9       MS. BROWN: Please don't --
10      **THE WITNESS: As you --**
11      MS. BROWN:  -- instruct our
12 witness. He's answering the questions
13 truthfully and accurately. You can ask
14 questions and he will answer.
15      MR. SATTERLEY: Please,
16 Counsel --
17      MS. BROWN: No --
18      (Simultaneous unreportable
19       crosstalk occurs among parties.)
20      MS. BROWN: No, there's going to
21 be no instructions to my witness. He's
22 here to answer questions --
23      MR. SATTERLEY: He's not.
24      MS. BROWN:  -- not take
25 instructions from anybody else.

Page 126

1       MR. WINOGRAD: I am asking him --
2  then you can instruct your own client.
3  I'm asking him to stop with the
4  speeches --
5       MS. BROWN: No.
6       MR. WINOGRAD:  -- and the
7  nonresponsive parts.
8       MS. BROWN: You can't do that.
9       MR. WINOGRAD: The objection's on
10 the record --
11      (Simultaneous unreportable
12       crosstalk occurs among parties.)
13      MR. WINOGRAD: Let's move on.
14      MR. SATTERLEY: We have time
15 limits here. Quit arguing.
16      MR. WINOGRAD: Let's move on.
17 BY MR. WINOGRAD:
18    Q.  Do you know whether the
19 plaintiffs law firms who signed the PSAs
20 have a medical history for each of their
21 purported claimants?
22    **A.  Mr. Winograd, I do not know.**
23 **But, again, I would direct you to the**
24 **information that we do have from the claims**
25 **in the MDL, which includes those from your**

Page 127

1  clients where they have much missing
2  information.
3       I believe that the claims in
4  support of the plan are real claims. And
5  you can see their identity in the claim
6  lists and their claims that will ultimately
7  be eligible to vote and will vote in favor
8  of the plan.
9     Q.  Did you look line by line through
10 all of the attachments?
11    A.  I did not.
12    Q.  Did somebody at your law firm?
13    **A.  For some of the larger ones,**
14 **probably not. For some of the smaller**
15 **ones, they probably did.**
16    Q.  Do you know whether the law firms
17 that signed the PSAs obtained written
18 consent from their clients to sign them?
19    **A.  That would be a question for**
20 **them.**
21    Q.  I'm asking whether you know.
22    **A.  I do not know whether they**
23 **obtained consent to sign them. I don't**
24 **know whether your clients obtained consent**
25 **from their clients to come out against the**

Page 128

1  deal.
2     Q.  Do you know -- do you know what,
3  if anything -- strike that.
4       Did any of the plaintiff law
5  firms tell you what they advised their
6  claimants with respect to obtaining any
7  purported consent to sign the PSAs?
8     **A.  That would be a breach of**
9  **attorney-client privilege if they did, and**
10 **these are all lawyers who don't do that.**
11    Q.  I want to focus on four firms who
12 signed the PSAs. Let's just start with
13 Mr. Watts' firm, Watts Guerra.
14    **A.  Sure.**
15    Q.  Let me just ask you with respect
16 to four firms. Watts, Guerra; Ferrer
17 Poirot, Pulaski's firm and McDonald
18 Worley --
19    **A.  Yes.**
20    Q.  -- do you know whether any of
21 those law firms have signed -- I'm sorry.
22      Do you know if any of those firms
23 have filed a single claim versus J&J or LTL
24 in the talc litigation?
25    **A.  So I can tell you that a large**

Page 137

1 repeatedly. I'm going to try it again.
2 And I'm asking very simple questions --
3   MS. RICHENDERFER: Counsel,
4 Counsel, this is Linda Richenderfer
5 from the Trustee Office. Sir, there
6 are many of us that want to ask
7 questions of this witness including
8 myself.
9   So I would just ask that we be
10 mindful of the time. I think we've
11 been going about two hours now. That's
12 a rough estimate on my part.
13   MR. WINOGRAD: We are -- we
14 are --
15   MS. RICHENDERFER: So I would --
16 I know there are a lot of others on
17 this -- both Mr. Satterley who's
18 sitting in the room there and others
19 who want to ask questions. So I would
20 just please ask you to keep that in
21 mind.
22   MR. WINOGRAD: Counsel, we are
23 very close to finishing, which is why
24 I'm trying to resolve this before we go
25 into a break.

Page 138

1   MR. SATTERLEY: And you are the
2   first attorney.
3   Go ahead. But if you guys want
4   to take a break and cool down --
5   MS. BROWN: Let's just keep
6   going. Ask a question, he'll give you
7   an answer.
8 BY MR. WINOGRAD:
9   Q.  Are there any law firms who
10 signed PSAs who have current claims against
11 Johnson & Johnson unrelated to talc?
12   MS. BROWN: Objection. Calls for
13   speculation. Lacks foundation.
14   **THE WITNESS: You are asking me**
15   **if the lawyers who signed PSAs have**
16   **sued Johnson & Johnson in other cases**
17   **other than talc.**
18 BY MR. WINOGRAD:
19   Q.  That are pending at the moment,
20 yes.
21   **A.  Yes. Probably all of them. And**
22 **all of your clients, for that matter.**
23   Q.  I would...
24   MR. WINOGRAD: Let's go off the
25   record.

Page 139

1   THE VIDEOGRAPHER: We are going
2   off the record.
3   The time is 3:28 p.m.
4   (Whereupon, a recess was taken at
5   3:28 p.m.)
6   THE VIDEOGRAPHER: We are back on
7   the record.
8   The time is 3:44 p.m.
9   MR. WINOGRAD: I have no further
10 questions at the moment, but I reserve
11 the right to ask further questions at
12 the end. But I'll turn it over.
13   Thank you, Mr. Murdica.
14   EXAMINATION
15 BY MR. MAIMAN:
16   Q.  Good afternoon, Mr. Murdica.
17   **A.  Good afternoon, Mr. Maiman.**
18   Q.  My name is Moshe Maiman. You
19 know that I represent plaintiffs who have
20 filed lawsuits against Johnson & Johnson,
21 correct?
22   **A.  I do.**
23   Q.  I would like to start my
24 questions of you with Exhibit 5, which I
25 think is the last exhibit you had in front

Page 140

1 of you. That's the PSA that I believe was
2 signed by Mr. Onder?
3   **A.  Yes.**
4   Q.  Do you have that?
5   **A.  Yes.**
6   Q.  Okay. The first question that I
7 have for you is on the -- with regard to
8 the language on the first page, which is
9 numbered 3. "Counsel on behalf of
10 talc-related personal injury claimants (the
11 'Talc Claimants') identified by full name,
12 date of birth and last four digits of their
13 Social Security number in Exhibit A (the
14 'Consenting Talc Claimant Counsel')."
15   Do you see that?
16   **A.  That -- which page is it on?**
17   MS. BROWN: First page, number 3.
18   **THE WITNESS: Oh, I'm sorry. The**
19   **wrong page.**
20 BY MR. MAIMAN:
21   Q.  Number 3.
22   **A.  Yes, I see number 3. I turned to**
23 **page 3. I apologize, Mr. Maiman.**
24   Q.  And you noted that when you
25 looked at the chart of Exhibit A, it has an

|  Page 141 | Page 143 |
|---|---|
| 1 additional field which is the date of<br>2 death, if applicable, correct?<br>3     A. I -- I saw that today for the<br>4 first time.<br>5     Q. Okay. In any event, the four<br>6 fields which -- the fields which deal with<br>7 name, full name, last name, first name,<br>8 date of birth, last four digits of Social<br>9 Security number, those were the fields that<br>10 you wanted to be filled out, correct?<br>11     A. Those are what I requested.<br>12     Q. Okay. Did you also -- you did<br>13 not request the date of death, if<br>14 applicable, true?<br>15     A. I did not.<br>16     Q. And did you request claim type,<br>17 the field for claim type?<br>18     A. I did. I added that probably<br>19 after create -- after writing these words<br>20 on the first page, because I wanted to know<br>21 how many -- I wanted to be able to know how<br>22 many mesos versus OCs or gynecologic we had<br>23 in our support.<br>24     Q. Understood.<br>25     Did anybody who signed a PSA | 1     Will you agree to appear at the<br>2 hearing in front of Judge Kaplan set for<br>3 Tuesday without the necessity of us<br>4 subpoenaing you to be there?<br>5     MS. BROWN: Well, you can discuss<br>6 that with Mr. Murdica's counsel. I'm<br>7 not going to let him answer that. He's<br>8 not gonna -- he's gonna need to talk to<br>9 his counsel about that, about whether<br>10 you need a subpoena, whether he'll do<br>11 it.<br>12     MR. MAIMAN: He can answer that<br>13 he needs to ask his attorneys. You<br>14 don't need to answer that.<br>15     MS. BROWN: Well, I'm going to<br>16 instruct him not to answer that --<br>17     MR. MAIMAN: Okay.<br>18     MS. BROWN: -- because it<br>19 implicates --<br>20     MR. SATTERLEY: Can we get an<br>21 agreement --<br>22 BY MR. MAIMAN:<br>23     Q. Then we'll get a subpoena, sir,<br>24 I'm sorry, but you'll be served. Not a<br>25 problem. |
| Page 142 | Page 144 |
| 1 represent what you refer to in here as<br>2 governmental claims?<br>3     A. No.<br>4     Q. Okay. The choice of the dropdown<br>5 for claim type --<br>6     A. Yes.<br>7     Q. -- gynecological cancer,<br>8 mesothelioma or governmental claim, were<br>9 those three options the options that you<br>10 gave, or somebody else decided to limit it<br>11 to those options?<br>12     A. I asked -- I don't have any<br>13 sophistication with Excel, so I asked my<br>14 partner to do that. But those were my<br>15 words.<br>16     Q. Okay. Understood. Thank you<br>17 very much.<br>18     So if we look at the chart, last<br>19 name, first name, date of birth, Social<br>20 Security last four and claim type, those<br>21 were the fields of information you<br>22 required, correct?<br>23     A. That's what I requested.<br>24     Q. Okay. Let's -- I forgot to ask<br>25 the most important question first. | 1     MR. SATTERLEY: I mean, can you<br>2 just agree that you'll appear on<br>3 Tuesday? You've been at a lot of<br>4 hearings.<br>5     MS. BROWN: No. We're going to<br>6 talk about it and get back to you.<br>7     MR. MAIMAN: No, you're not going<br>8 to get back to me. He's going to be<br>9 served with a subpoena.<br>10     And I apologize for that, sir.<br>11 BY MR. MAIMAN:<br>12     Q. You've made reference when<br>13 Mr. Winograd was asking you questions to<br>14 his clients.<br>15     Do you recall making references<br>16 like that?<br>17     A. Yes.<br>18     Q. Am I his client? Did you include<br>19 me or my firm when you were referring to<br>20 his clients?<br>21     A. I believe his clients are the TCC<br>22 members.<br>23     Q. I asked you, did you -- when you<br>24 made reference to Mr. Winograd's clients,<br>25 were you referring to me or my firm? |

Page 145

1    A.   I'm trying to -- I referred to
2  his clients several times.  I don't think
3  that I had you in mind specifically as to
4  any of the things that I was referencing.
5    Q.   Did you have Mr. Satterley or his
6  firm in mind when you referred to
7  Mr. Winograd's clients?
8    A.   Sitting here right now, I don't
9  think I was thinking of a specific
10 reference with respect to Mr. Satterley.
11   Q.   Okay.  Let's take a look at
12 page 2 of Exhibit 5, PSA.  And I'm talking
13 about the second whereas clause.  Tell me
14 when you're there.
15   A.   I'm on page 2, the second whereas
16 clause.
17   Q.   It says, "Whereas, pursuant to
18 the supported plan terms, the parties agree
19 to resolve all present and future talc
20 claims, personal injury and governmental
21 entity claims against all debtor-related
22 parties for a total contribution of the
23 debtor not to exceed the present value of
24 $8,900,000,000."
25        Did I read that correctly?

Page 146

1    A.   I think so.
2    Q.   When you negotiated this PSA with
3  the plaintiffs attorneys, the meeting of
4  the minds between you, it was clear to you
5  that no lawyer who signed a PSA had the
6  authority to settle or resolve all present
7  and future claims, correct?
8        MS. BROWN:  Objection.  Calls for
9    speculation.
10       THE WITNESS:  If you mean that
11   because the FCR represents future
12   claimants, I would agree with you.
13 BY MR. MAIMAN:
14   Q.   Well, Mr. Watts by himself could
15 not resolve all present and future claims
16 against the debtor, correct?
17   A.   No.  That's why there's gonna be
18 a vote on this.
19   Q.   Whether or not there's a vote on
20 it, you'll agree with me Mr. Watts could
21 not agree on behalf of clients he doesn't
22 represent, correct?
23   A.   I think you're asking me a basic
24 legal principle.  What Mr. Watts can do is
25 he can represent to me that his claimants,

Page 147

1  when this is put for a vote, are going to
2  vote for this plan.
3    Q.   But he can't represent or commit
4  with regard to any other lawyers' clients,
5  true?
6    A.   As a basic legal principle, I
7  think that's true.
8    Q.   Okay.  So that -- you will agree
9  with me that you knew when you finalized
10 this PSA that no lawyer who signed it had
11 authority to resolve all present and future
12 talc claims, true?
13   A.   So, Mr. Maiman, what -- I don't
14 know if I should be telling you what this
15 means, but I'll try to do it without
16 revealing any privileged information.
17       MS. BROWN:  Well, you shouldn't
18   be interpreting the document at all.
19       THE WITNESS:  Okay.
20       MS. BROWN:  If you can answer the
21   question without that, please do.
22       THE WITNESS:  Can you ask me
23   another question?
24 BY MR. MAIMAN:
25   Q.   Sure.

Page 148

1        You knew that no lawyer who
2  signed a PSA had authority to resolve all
3  present and future talc claims, true?
4    A.   I knew that the lawyers signing
5  the PSA were going -- their clients were
6  going to vote in favor of a plan for
7  $8.9 billion present value that resolves
8  all talc liability.  I did know that.
9        MR. MAIMAN:  Move to strike as
10   nonresponsive.
11 BY MR. MAIMAN:
12   Q.   This was an agreement that was
13 reached between J&J, LTL and the attorneys
14 who signed, true?
15   A.   If that's a contract question, I
16 can't tell you more than the lawyers who
17 are in support of it and representing their
18 claimants are in support of it for the plan
19 as described herein.
20   Q.   Okay.  Thank you.
21       Were you -- did you listen in or
22 watch Mr. Pulaski's deposition yesterday?
23   A.   Most of it.
24   Q.   Were you aware that he testified
25 under oath that he believed that his

Page 149

1 obligations under the PSA that he signed
2 was that when a plan is formally filed,
3 that in all likelihood, he would propose to
4 his firm's clients that they support the
5 plan? Do you recall him saying that?
6    A. I think I was on for that part.
7    Q. And that is a representation that
8 he made to you in the course of your
9 discussions with him, true?
10    A. Mr. Pulaski's client --
11 Mr. Pulaski's claimants will vote in favor
12 of the plan described in this document.
13    Q. Well, you're not Mr. Pulaski's
14 client, are you?
15    A. I am not Mr. Pulaski's client.
16    Q. Okay. Mr. Pulaski represented to
17 you that he will, as he testified yesterday
18 under oath, in all likelihood propose to
19 his firm's clients that they support the
20 plan. That's what he represented to you,
21 true?
22    A. So what I would say about that is
23 that Mr. Pulaski will file ethical --
24 follow his ethical obligations as it
25 relates to how he deals with his own

Page 150

1 clients.
2    But I have a course of dealing
3 with Mr. Pulaski that dates back over a
4 decade. And when he tells me that his
5 claimants will support a settlement, every
6 single time they all have.
7    Q. Okay. With regard to -- if we
8 look at page 3, starting on page 3 and
9 going through page 4, A through K, I would
10 like to talk to you about those terms,
11 okay?
12    A. Okay.
13    Q. These are terms with regard to
14 commitments that were made by the
15 signatories to this plan either to do
16 something or not do something, fair?
17    A. You can describe them how you
18 like. They speak for themselves.
19    Q. Well, number 1, to use
20 commercially reasonable efforts to confirm
21 and consummate the Chapter 11 plan.
22    Do you see that?
23    A. I do.
24    Q. When you entered into this
25 agreement or finalized this agreement with

Page 151

1 any of the signatories to the PSA, did you
2 expect their cancer victim clients to do
3 that?
4    A. So this was about -- as I read
5 it, it's the parties to the agreement
6 agreeing to use commercially reasonable
7 efforts to confirm and consummate the plan.
8 This is a commitment from both sides to
9 move forward with the plan --
10    Q. Can you --
11    A. -- as described.
12    Q. Commitments by LTL and J&J on one
13 side, true?
14    A. Yeah, I guess -- I guess
15 technically. This is a documentation of
16 agreement for both sides to use their best
17 efforts, which includes me using my best
18 efforts as well.
19    Q. You would consider yourself on
20 the J&J side of the agreement, true?
21    A. I'm counsel for J&J.
22    Q. Okay. You're not counsel for any
23 of the cancer victim claimants, true?
24    A. I am not. I am not.
25    Q. The other side would be the

Page 152

1 lawyers who signed, true?
2    And this obligates them to use
3 commercially reasonable efforts to confirm
4 and consummate the Chapter 11 plan, true?
5    MS. BROWN: Mr. Murdica, you can
6   confirm what's written in this
7   document, but you should not be
8   interpreting it as it implicates your
9   legal impressions. And I'll object
10   under privilege.
11 BY MR. MAIMAN:
12    Q. I'm not asking you to interpret.
13 I'm asking you for the meeting of the minds
14 between you and the lawyers who you
15 negotiated this deal with.
16    MS. BROWN: Then I object as
17   speculation. He can testify to his --
18   MR. MAIMAN: His meeting of the
19   minds --
20   MS. BROWN: -- what he -- well --
21   THE WITNESS: I don't know how
22   they viewed this term. You can ask
23   them.
24    What I will tell you is that
25   there is a meeting of the minds that

Page 153

1  the lawyers who signed the plan support
2  agreement, and many more, are going to
3  vote for a plan that is consistent with
4  this agreement.
5  BY MR. MAIMAN:
6      Q.  Okay.  I'm talking about
7  number A, because number A does not talk
8  about only voting.  It's using commercially
9  reasonable efforts to confirm and
10 consummate the Chapter 11 plan.
11         Do you see that?
12     A.  I see the words.
13     Q.  And under this, the lawyer who
14 signed this is binding themselves to do so,
15 true?
16         MS. BROWN:  I object.
17 BY MR. MAIMAN:
18     Q.  That's the way you looked at it
19 when you drafted it?
20     A.  We can argue about it.  What I'm
21 telling you is this document and the terms
22 in it are meant to document that me and the
23 lawyers who are representing claimants who
24 signed PSAs are going to be on this -- on
25 this same page here with regard to the

Page 154

1  terms of this plan and move it forward to a
2  vote so that their claimants can exercise
3  their free will and decide whether or not
4  they want to take a historic settlement.
5      Q.  Thank you.
6          If you look at page 3 H.  "Not to
7  object to, delay, impede or take any other
8  action to interfere with acceptance,
9  confirmation or implementation of the
10 Chapter 11 plan."
11         Do you see that?
12     A.  I do see that.
13     Q.  It was not your intent when you
14 put this clause in to deny any cancer
15 victim claimant the right to vote no, true?
16     A.  What this meant, Mr. Maiman, is
17 that they wouldn't do what you're doing
18 which is trying to get in the way of the
19 clients exercising their free will to vote.
20 That's what they're saying, they're not
21 going to do that.
22         MR. MAIMAN:  Objection.  Move to
23     strike.  Nonresponsive.
24 BY MR. MAIMAN:
25     Q.  Let me ask you again.

Page 155

1          When you put this clause in as
2  the drafter of this document, you did not
3  intend to deny any cancer victim claimant
4  their free vote on whether or not to object
5  to the plan, true?
6          MS. BROWN:  Objection.  Asked and
7      answered.
8          MR. MAIMAN:  No, it wasn't
9      answered.
10 BY MR. MAIMAN:
11     Q.  But go ahead.
12     A.  I can't answer it any better than
13 I did, Mr. Maiman.  The point was that the
14 lawyers who signed the PSA would not do
15 what you are doing, which is trying to
16 stand in between your claimants and their
17 right to vote, which is what you're doing
18 now by this whole proceeding to challenge
19 the ability for your clients to vote on a
20 historic plan.
21         MR. MAIMAN:  Move to strike as
22     nonresponsive.
23 BY MR. MAIMAN:
24     Q.  If one of the cancer claimants --
25 withdrawn.

Page 156

1          The term sheet, which is
2  Exhibit 3, divides the talc claims into
3  three types: ovarian cancer, mesothelioma
4  and governmental claims, correct?
5      A.  We talked about that earlier.
6      Q.  That's correct?
7      A.  Yes.  My testimony earlier, yes.
8      Q.  Okay.  And within those three
9  type of talc claims, the claimants are
10 divided into existing and future claimants,
11 true?
12     A.  You're on Exhibit 3?
13     Q.  I'm on Exhibit 3, starting on
14 page 3.
15     A.  So I'm seeing -- are you on 2(a),
16 existing and future ovarian?
17     Q.  2(a), (b) and (c).
18     A.  Okay.  Would you ask your
19 question again, please?
20     Q.  Sure.  For each of the three type
21 of talc claimants, the term sheet further
22 divides them into existing and future
23 claimants, true?
24     A.  That's why I was confused.  So
25 the term sheet talks about existing and