**In the Matter Of:**

*In Re: LTL Management, LLC*

*RICHARD DICKINSON*

*April 17, 2023*



## Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
------------------------------------------X
In Re:

LTL MANAGEMENT, LLC,
                        Debtor.

Case No. 21-30589 (MBK)
------------------------------------------X
          ***CONFIDENTIAL***

VIDEOTAPED DEPOSITION OF RICHARD DICKINSON

DATE:  April 17, 2023
TIME:  10:02 a.m.
PLACE: ***REMOTE***
BEFORE: Rebecca Schaumloffel, RPR, CCR-NJ
JOB NO: 2023-893393

## Page 2

A P P E A R A N C E S:

BROWN RUDNICK
    Attorneys for the Talc Claimants
    7 Times Square
    New York, New York 10036
    BY:  LYDELL BENSON, ESQ.
         MARK S. BALDWIN, ESQ.

GENOVA BURNS, LLC
    Attorneys for Creditors' Committee
    110 Allen Road, Suite 304
    Basking Ridge, New Jersey
    BY:  DANIEL STOLZ, ESQ.

JONES DAY
    Attorneys for the Debtor
    250 Vesey Street
    Suite 31
    New York, New York 10281
    BY:  JAMES JONES, ESQ.
         MARK RASMUSSEN, ESQ.

LEVY KONIGSBERG
    Attorneys for Talc Claimants
    605 Third Avenue, 33rd floor
    New York, New York 10158
    BY:  JEROME BLOCK, ESQ.

## Page 3

Appearances (continued:)

LOWENSTEIN SANDLER
    1251 Avenue of the Americas
    New York, New York 10020
    BY:  JENN KIMBLE, ESQ.

OFFICE OF THE UNITED STATES TRUSTEE
    Attorneys for the United States
    Department of Justice
    One Newark Center
    Suite 2100
    Newark, New Jersey 07102
    BY:  JEFF SPONDER, ESQ.

PACHULSKI STANG ZIEHL & JONES
    Attorneys for Arnold & Itkin
    10100 Santa Monica Boulevard
    13th floor
    Los Angeles, California 90067
    BY:  KAREN DINE, ESQ.

THE RUCKDESCHEL LAW FIRM, LLC
    Attorneys for Paul Crouch
    8357 Main Street
    Ellicott City, Maryland 21043
    BY:  JONATHAN RUCKDESCHEL, ESQ.

## Page 4

Appearances (continued:)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    Attorneys for the Debtors
    One Manhattan West
    New York, New York 10001
    BY:  (No appearance)

WHITE & CASE
    Attorneys for Johnson & Johnson
    767 Fifth Avenue
    New York, New York 10153
    BY:  JOSHUA WEEDMAN, ESQ.
         KATHYRN KUETHMAN, ESQ.

WOMBLE BOND DICKINSON
    Attorneys for Ad Hoc Committee of
    States Attorney Generals
    100 Light Street
    26th floor
    Baltimore, Maryland 21202
    BY:  LISA TANCREDI, ESQ.

ALSO PRESENT:

    Deane Carstensen, Lexitas
    John Kim, Esq.

            *       *       *

Page 133

1       R. DICKINSON
2  you to believe that LTL was in financial
3  distress on April 4, 2023?
4       MR. JONES:  I caution you not to
5    share a projection you received from
6    counsel.
7    A.   I did not see it.  I did not see
8  anything in writing, but I am certain -- I
9  have a lot of information that was provided
10 to me with regard to the same things, the
11 millions of dollars to litigate, the decades
12 and decades that LTL faced with regard to
13 litigating these matters, and the potential
14 for wild and unpredictable verdicts.
15    Q.   Anything else?
16    A.   I'm sure there is more, but I'll
17 defer to, you know, counsel for that.
18    Q.   Did -- as the Chief Financial
19 Officer of LTL, did the termination of the
20 2021 Funding Agreement on April 4, 2023, have
21 any effect on LTL's financial condition?
22       MR. JONES:  Object.
23       Do not share the views of
24    counsel if they were shared with you,
25    sir.

Page 134

1       R. DICKINSON
2    A.   Yeah, I'm not going to share views
3  with counsel.
4    Q.   As the Chief Financial Officer of
5  LTL, did you have a financial opinion as to
6  whether LTL's termination of the 2021 Funding
7  Agreement on April 4, 2023, affected LTL's
8  financial condition?
9       MR. JONES:  Same caution.
10   A.   I'm going to defer to Mr. Kim and
11 the legal team for that answer.
12   Q.   And you have no independent
13 financial opinion about that, correct?
14   A.   I believe we are in financial
15 distress, but I can't speak to the funding
16 agreement effect or why it was changed.
17   Q.   Did terminating the 2021 Funding
18 Agreement on April 4, 2023, increase LTL's
19 financial distress, decrease LTL's financial
20 distress, or have no effect on LTL's
21 financial condition?
22       MR. JONES:  Object to the form
23    of the question.
24       And if you -- don't share an
25    opinion that was shared with you by

Page 135

1       R. DICKINSON
2    counsel, please.
3    A.   Yes.
4    Q.   Did you have an independent
5  financial opinion about that or are you
6  refusing to answer?
7    A.   I'm not refusing to answer.  I
8  don't have an independent opinion about it.
9    Q.   So just to be clear, as a
10 businessperson, you do not have any opinion
11 about whether the termination of the 2021
12 Funding Agreement had any effect on LTL's
13 financial condition, correct?
14   A.   As a businessperson, I'm smart
15 enough to defer to John Kim and the legal
16 team for why that Funding Agreement was
17 changed.
18   Q.   And is that a fair summary of your
19 opinion on that matter, that you would just
20 defer to John Kim?
21   A.   John Kim and legal team, yes.
22   Q.   Okay.
23   A.   But, Mr. -- Mr. Block, let me be
24 clear, I do believe that there was --
25 we're -- LTL was under financial distress.

Page 136

1       R. DICKINSON
2  So...
3    Q.   Sir, could you identify any
4  financial consequence to LTL from terminating
5  the 2021 Funding Agreement?
6    A.   I'm going to defer to Mr. Kim and
7  the legal team for that answer.
8    Q.   So you, personally, cannot
9  identify any financial consequence to LTL
10 from terminating the 2021 Funding Agreement,
11 true?
12       MR. JONES:  Object as asked and
13    answered.
14   A.   No.
15   Q.   No, you cannot?
16   A.   I already answered that question.
17   Q.   Sir, I just don't want to have a
18 double negative.  You said no.  And I was
19 just trying -- so we're going to have to do
20 that again.
21       Mr. Dickinson, can you,
22 personally, identify any financial
23 consequence to LTL from terminating the 2021
24 Funding Agreement, yes or no?
25   A.   No, I cannot.

Page 137

R. DICKINSON

Q. Thank you.
Can you say that -- strike that.
As the CFO for LTL, can you say whether terminating the 2021 Funding Agreement left LTL in a better or worse financial position?

MR. JONES: Same objections. It's been asked and answered.

A. I already answered that question.

Q. It's a different question. It's a yes or no question. I'll ask it again.
Mr. Dickinson, as the Chief Financial Officer for LTL, do you have an opinion as to whether LTL's termination of the 2021 Funding Agreement left LTL in a better or worse financial position, yes or no?

MR. JONES: Incomplete hypothetical. Same objection.
If you can answer it differently, go ahead, Mr. Dickinson.

A. I don't have an opinion.

Q. As the CFO for LTL, how did the termination of the 2021 -- strike that.

Page 138

R. DICKINSON

Mr. Dickinson, as the Chief Financial Officer of LTL, can you identify anything that was different about LTL's financial condition on April 3, 2023, as compared to April 4, 2023?

A. I cannot.

Q. Okay, sir. Going back to Exhibit 5 to your deposition. And just to refresh your memory, that's the March 28, 2023, board minutes.
Do you see that?

A. I do.

Q. Okay. And one of the things discussed at that meeting were the fiduciary duties of the members of the Board.
Do you see that?

A. I do.

Q. And, sir, did you have a fiduciary duty as a member of LTL's board to preserve the assets of LTL?

MR. JONES: Objection. Calls for -- object. Calls for a legal conclusion.

A. I have a fiduciary duty to LTL.

Page 139

R. DICKINSON

Q. Did you, as the Chief Financial Officer of LTL, understand that, as a member of the Board, you had a duty to preserve the financial assets of LTL?

MR. JONES: Object. Calls for a legal conclusion.

A. Yes, it's a better question to ask the legal team. I have a fiduciary duty to LTL.

Q. And what's your understanding of that?

A. Fiduciary duty to LTL and I take into consideration our key stakeholders when any decisions to be made.

Q. Okay. So did you have any understanding whether or not, as a board member of LTL, you had a legal duty to preserve the assets of LTL?

A. I have a fiduciary duty to LTL.

Q. Does that include preserving the assets of the company as the Chief Financial Officer?

A. That calls for a legal assessment and I'll defer you to Mr. Kim.

Page 140

R. DICKINSON

Q. Okay. Did you think that as an LTL board member and Chief Financial Officer you could just give away assets of LTL?

A. Once again, I wasn't involved in the valuations of what, I believe, you are referring to as some top and bottom number.

Q. No, no. Sir, my question for you is: Did you think, as Chief Financial Officer and a board member of LTL, that you were free to give up assets of LTL?

MR. JONES: Objection. Calls for a legal conclusion.
If you have an answer other than that, Mr. Dickinson, you can share it.

A. I don't. I'm going to stand by the answer I just gave.

Q. Did you think that you could facilitate another party embezzling money away from LTL?

MR. JONES: Same objections, Mr. Dickinson. You can tell him if you know the answer to that.

A. We have a fiduciary duty to LTL.

Q. And does that include making sure

Page 149

1         R. DICKINSON
2    Q.   All right. And was April 2, 2023,
3  the first time that anyone ever told you that
4  there was a risk that the 2021 Funding
5  Agreement was potentially void or voidable?
6         MR. JONES: You can answer that
7     yes or no, sir. Do not reveal
8     communication of counsel.
9         What did you first learn of on
10    that day?
11    A.   I believe so. Formally, yes.
12    Q.   All right. And are you saying
13  that prior to April 2, 2023, -- strike that.
14         Prior to April 2, 2023, did you
15  have any information from anyone that the
16  risk -- that there was a risk that the 2021
17  Funding Agreement was potentially void or
18  voidable by the Third Circuit Opinion?
19    A.   I believe we may have discussed
20  it, but I'll defer to the meeting minutes,
21  the resolutions, and any presentations, you
22  know, as -- over my, maybe, incomplete
23  recollection.
24    Q.   All right. So you would defer to
25  the minutes that -- in terms of what was

Page 150

1         R. DICKINSON
2  discussed at the Board meetings, right?
3    A.   Yes.
4    Q.   Okay. How long have been in the
5  -- how long have you been in business, sir?
6  You have a long business career, right?
7    A.   Plus 30 years.
8    Q.   Plus 30 years, okay.
9         Have you ever had a party to a
10  contract that you were involved in say that
11  an agreement was void?
12    A.   I may have or may not have.
13    Q.   Is this the first time in your
14  career that you have ever been in a situation
15  where a contract that you were a part of, you
16  were told, was potentially void or voidable?
17    A.   I don't believe so. Potentially,
18  there were other times in my career that
19  someone said that provision is unenforceable
20  due to, you know, a certain circumstance.
21    Q.   Okay. Other than Mr. Prieto, did
22  anyone tell you that the 2021 Funding
23  Agreement was not enforceable?
24         MR. JONES: Object to the
25     suggestion that you should reveal what

Page 151

1         R. DICKINSON
2     Mr. Prieto told you.
3         But you can answer the question
4     about other persons.
5  BY MR. BLOCK:
6    Q.   Let me rephrase the question.
7         Other than what is shown here in
8  the minutes about what Mr. Prieto said to you
9  about the risk that the 2021 Funding
10  Agreement was potentially void or voidable,
11  do you have any other information about that?
12    A.   Once again, I'm going to defer to
13  the meeting minutes. There could have been
14  -- more than Mr. Prieto, but I'm going defer
15  to the meeting minutes, resolutions, and the
16  presentations.
17    Q.   Okay. No businessperson at JJCI
18  or J&J ever told you as a businessperson that
19  the 2021 Funding Agreement was void or
20  voidable, correct?
21    A.   That is correct.
22    Q.   No businessperson at J&J or JJCI
23  ever told you that they thought the 2021
24  Funding Agreement was unenforceable, correct?
25         MR. JONES: Are you defining

Page 152

1         R. DICKINSON
2     "businesspersons" other than lawyers?
3         MR. BLOCK: Let's have the
4     question read back.
5         Yes, of course.
6         MR. JONES: All right. There
7     are business lawyers who are
8     credentialed with a JD, Mr. Block.
9         MR. BLOCK: Let's just have the
10     question read back so we can get a
11     clean answer.
12         Actually, let me it ask again.
13     I think it will be quicker.
14         Sorry, Madam reporter.
15  BY MR. BLOCK:
16    Q.   Sir, can you hear me okay?
17    A.   I can.
18    Q.   Okay. Mr. Dickinson, no
19  businessperson at J&J or JJCI ever told you
20  that they believed that the 2021 Funding
21  Agreement was unenforceable, correct?
22    A.   Correct.
23         MR. JONES: Object -- you may
24     share that which is not a privileged
25     communication with counsel, if there

Case 23-12825-MBK   Doc 857-33   Filed 06/22/23   Entered 06/22/23 15:25:55   Desc
Exhibit 955   Page 6 of 8

Page 153

1        R. DICKINSON
2    were any.
3    A.   Correct.
4        MR. BLOCK:  Sir, those are all
5    the questions I have at this time.
6    Thank you.
7        THE WITNESS:  Thank you,
8    Mr. Block.
9        MR. JONES:  Is this a good time
10   for another five-minute break?
11       And could the court reporter or
12   the videographer please tell us how
13   much time we have left?
14       THE VIDEOGRAPHER:  Absolutely.
15   First, we are now going off the
16   record.  The time is 1:07.
17       (Whereupon, a recess was held.)
18       THE VIDEOGRAPHER:  We are now
19   back on the record.  The time is 1:15.
20   EXAMINATION BY
21   MR. RUCKDESCHEL:
22   Q.   Good afternoon, sir.  My name is
23   John Ruckdeschel.  I represent Paul Crouch.
24   I have a few questions for you today.  It's
25   going to jump around a bit because I'm going

Page 154

1        R. DICKINSON
2    to try and not repeat questions that have
3    been asked before.
4        There will obviously be some
5    similarities.  And I think, based on your
6    testimony so far today, we will be able to
7    move through nearly everything I ask you very
8    quickly because it's going to be a lot of --
9    you don't have any -- you don't have any kind
10   of questions.  So that's my preface for you.
11       I want to clarify some questions
12   from Mr. Benson, my colleague, who went
13   first.  And I'll share my screen here, if I
14   can get the window in the right shape.
15       Sir, at the beginning of the
16   deposition, Mr. Benson asked you some
17   questions regarding Mr. Kim's Declaration
18   from the first version of LTL's bankruptcy.
19       Do you recall those questions,
20   generally?
21   A.   Generally.  Seems like --
22   Q.   Yeah.  And so Mr. Benson had
23   showed you paragraph 26 of Mr. Kim's
24   Declaration that was filed on October 14,
25   2021, in the first bankruptcy proceeding and

Page 155

1        R. DICKINSON
2    read to you the sentence:  "As I mentioned
3    above, the design of the 2021 Corporate
4    Restructuring ensures that the Debtor has at
5    least the same, if not greater, ability to
6    fund talc-related claims and other
7    liabilities as Old JJCI had before the
8    restructuring."
9        Do you see that sentence?
10   A.   I do.
11   Q.   Okay.  And my recollection is,
12   Mr. Benson asked you if you agreed with that
13   and you said you deferred to Mr. Kim; is that
14   right?
15   A.   Yes.  Mr. Kim's Declaration, so --
16   Q.   All right.  Here -- I want to ask
17   you a related but slightly different
18   question.
19       Do you, as the CFO of LTL, have
20   any factual information that what Mr. Kim
21   stated here in paragraph 26 of his
22   Declaration from October 2021 was not
23   truthful or accurate?
24   A.   I do not.
25   Q.   Okay, great.

Page 156

1        R. DICKINSON
2        Now, with respect to the
3    restructuring that occurred in connection
4    with the filing of LTL II, the current
5    bankruptcy, I'm going to refer to Funding
6    Agreement I as being the funding arrangements
7    between LTL and the related Johnson & Johnson
8    companies, JJCI and Johnson & Johnson, and
9    then Holdco and Johnson & Johnson, and then
10   the current funding agreements as Funding
11   Agreement II.
12       Is that acceptable?
13   A.   Yes.
14   Q.   All right.  I think Mr. Benson
15   followed up his question about paragraph --
16       MR. JONES:  Joe, let me just
17   object.  The problem with that -- we
18   can try that, but more than -- there
19   was more than a Funding Agreement in
20   the, quote, "restructuring," close
21   quote, that you just mentioned.  There
22   is a support agreement and other
23   things.
24   BY MR. RUCKDESCHEL:
25   Q.   All of the contractual

Page 157

1        R. DICKINSON
2   arrangements that went into the 2023
3   restructuring, I'm going to refer to as
4   funding arrangement II.
5        Do you understand what I'm saying
6   when I tell you I'm referring to that?
7     A.   I guess. You will have to --
8     Q.   All right. Your lawyer just
9   objected that there is more than just the
10  Funding Agreement. There is a support
11  agreement, and there are other collateral
12  agreements --
13    A.   Yes.
14    Q.   -- related to the restructuring.
15       All right. I'm trying to refer
16  to, as a practical matter, the Funding
17  Agreement and related agreements that are
18  currently in place as Funding Agreement II so
19  that we cannot have to list each document
20  every time.
21       Is that acceptable?
22    A.   No. I think if you are going to
23  refer to any specific document in the second
24  bankruptcy filing, then I would appreciate if
25  you show me exactly the document you are

Page 158

1        R. DICKINSON
2   referring to. Lumping all of them together
3   doesn't make sense because I don't see it
4   that way.
5     Q.   Did the restructuring of LTL and
6   its financial arrangements with Holdco and
7   Johnson & Johnson, between April 3 of 2021
8   and April 4 of 2021, impair the ability of
9   LTL to fund talc-related claims?
10       MR. JONES: You said 2021.
11    Object to the form of the question.
12    Calls for a legal conclusion.
13    Q.   Let me rephrase. Let me rephrase.
14       Did the restructuring that
15  occurred of LTL, Holdco, and J&J's financial
16  agreements between April 3, 2023, and
17  April 4, 2023, impair the ability of LTL to
18  fund talc-related claims and other
19  liabilities of LTL?
20       MR. JONES: Object to the form
21    of the question.
22    A.   It asks for a legal opinion on
23  that.
24    Q.   No, I'm asking you for a financial
25  opinion as the CFO, the ability of LTL to

Page 159

1        R. DICKINSON
2   fund its liabilities.
3        Did the restructuring impair LTL's
4   ability to fund its liabilities?
5        MR. JONES: Object to the legal
6     conclusion vetted within the question.
7        If you have a view, other than
8     one form with the advice of counsel,
9     you can share.
10  BY MR. RUCKDESCHEL:
11    A.   I do not.
12    Q.   All right. And so you have no
13  factual information to contradict or dispute
14  any testimony Mr. Kim may have given
15  regarding the effect of the 2023
16  restructuring on LTL's ability to fund its
17  liabilities.
18       Is that fair?
19    A.   I'm not privy to Mr. Kim's
20  testimony, so I can't speak to that. You'll
21  have to ask Mr. Kim. But I don't have any
22  factual information that is different than
23  Mr. Kim.
24    Q.   Okay. So if Mr. Kim, your
25  colleague, testified that the 2023

Page 160

1        R. DICKINSON
2   restructuring did not impair LTL's ability to
3   fund its talc liabilities, you have no
4   factual information to contradict that
5   testimony.
6        Fair?
7     A.   That is fair.
8     Q.   All right. As of April 3, 2023,
9   did LTL's assets exceed the value of its --
10  the value of its assets exceed the value of
11  its liabilities?
12       MR. JONES: Object to
13    foundation.
14       If you know the answer, and you
15    learned it from other than counsel.
16    A.   Yeah. I'll defer it to -- I'll
17  defer to the document that you have that was
18  presented to us.
19    Q.   Sir, I'm asking you as the Chief
20  Financial Officer of LTL.
21       Are you testifying that as the
22  Chief Financial Officer of LTL, you do not
23  know whether on April 3, 2023, LTL's assets
24  exceeded its liabilities?
25       MR. JONES: Same objections.

Page 161

1        R. DICKINSON
2        If you know, other than through
3    counsel.
4        A.  Yeah.  Other than counsel, no, I
5    don't have any other information to provide
6    you.
7        Q.  All right.  So I'm going to ask
8    you some questions about this, other than
9    through counsel.
10           Do you have the information that
11   would be responsive to my question, and are
12   you withholding it because you are saying it
13   was provided to you by counsel?
14       A.  I'm not withholding anything.
15   What I'm withholding -- what I'm giving to
16   you is that we had privileged communication
17   between counsel.  We also had the
18   documentation that was presented.  I'm
19   referring you to that, and I'm referring you
20   to the MOR.  You can have all the information
21   you want in those documents.
22       Q.  I'm asking you, sir, as the Chief
23   Financial Officer of LTL, are you saying you
24   have no knowledge whether LTL's assets, the
25   value of its assets, exceeded the value of

Page 162

1        R. DICKINSON
2    its liabilities on April 3, 2023?
3        A.  Mr. Ruckdeschel, with all due
4    respect, I already answered that question.
5        Q.  You didn't, sir.  You said --
6        A.  I did answer that question.  I
7    just -- I referred you to the document that
8    you make your own conclusion, you know, from
9    the document that was within the -- imbedded
10   in the presentation and in our MOR filings.
11       Q.  On April 3 of 2023, was LPL able
12   to meet its liabilities as they came due?
13       A.  Yes.
14       Q.  All right.  On April 4, after the
15   restructuring, was LTL able to meet its
16   liabilities as they came due?
17       A.  Yes.
18       Q.  All right.  Now, sir, with respect
19   to the restructuring -- I'm sorry, strike
20   that question.
21          With respect to the dismissal of
22   the first bankruptcy, after the dismissal
23   order was entered on January 30th, I believe,
24   of 2023, did LTL perform any evaluation as to
25   how much money it would take to fund a return

Page 163

1        R. DICKINSON
2    to litigating talc claims in the tort system
3    over the following 12 months?
4        A.  I didn't see any written
5    estimation or nor do I know of any.
6        Q.  All right.  And would that -- that
7    would be the same with respect to if I
8    expanded that period over the next -- did
9    LTL, after the January 30 dismissal order
10   from the Third Circuit, did LTL perform any
11   evaluation of how much cash flow it would
12   require to manage its talc liabilities in the
13   tort system over the next three years?
14       A.  I didn't see anything in writing,
15   nor did I do it.
16       Q.  All right.  And you are not aware
17   of any evaluation that was performed -- you,
18   the CFO of LTL, are not aware of any
19   evaluation that was performed to ascertain
20   what the expected cash flow demands would be
21   of returning these cases to the tort system.
22          Fair?
23       A.  That is fair, Mr. Ruckdeschel.
24          MR. RUCKDESCHEL:  All right.
25   And I have no further questions.

Page 164

1        R. DICKINSON
2          THE WITNESS:  Thank you.
3          MR. BENSON:  Does anyone else
4    have any questions?
5          I have a few.  I should be
6    brief.
7          MR. JONES:  Who is speaking?  Is
8    it Lydell, again, I'm sorry?
9          MR. BENSON:  Lydell.
10         MR. JONES:  Okay.
11         MR. BENSON:  It's okay.  Lydell
12   speaking.
13         MR. JONES:  If no others, we
14   will give Lydell one last crack and
15   then we should be done.
16   CONTINUED EXAMINATION BY
17   MR. BENSON:
18       Q.  Mr. Dickinson, can you hear me
19   okay?
20       A.  I can, Mr. Benson.
21       Q.  Okay, great.
22          Earlier today, I asked you a few
23   factual questions, and in response, you
24   deferred to Mr. Kim suggesting that he was a
25   better person to ask.