```
                  UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF NEW JERSEY

IN RE:                        .  Case No. 21-30589(MBK)
                              .
LTL MANAGEMENT LLC,           .
                              .
          Debtor.             .
. . . . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,          .  Adversary No. 21-03032(MBK)
                              .
          Plaintiff,          .
                              .  Clarkson S. Fisher U.S.
     v.                       .     Courthouse
                              .  402 East State Street
THOSE PARTIES LISTED ON       .  Trenton, NJ 08608
APPENDIX A TO THE             .
COMPLAINT, ET AL.,            .
                              .
          Defendants.         .  February 14, 2022
. . . . . . . . . . . . . . . .  9:30 a.m.

                    TRANSCRIPT OF TRIAL DAY ONE
              BEFORE THE HONORABLE MICHAEL B. KAPLAN
                 UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Jones Day
                         By:  GREGORY M. GORDON, ESQ.
                              DANIEL B. PRIETO, ESQ.
                              AMANDA RUSH, ESQ.
                         2727 North Harwood Street, Suite 500
                         Dallas, TX 75201

                         Skadden, Arps, Slate, Meagher &
                           Flom LLP and Affiliates
                         By:  ALLISON M. BROWN, ESQ.
                         One Manhattan West
                         New York, NY  10001-8602

Audio Operator:          Wendy Romero

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjCourt@jjCourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

```
APPEARANCES (Cont'd):

For the Debtor:

For the Official          Brown Rudnik, LLP
Committee of Talc         By:  JEFF JONAS, ESQ.
Claimants 1:              7 Times Square
                          New York, NY 10036

                          Genova Burns, LLC
                          BY:  DANIEL M. STOLZ, ESQ.
                          110 Allen Road, Suite 304
                          Basking Ridge, NJ 07920

For the Official          Sherman Silverstein
Committee of Talc         By:  ARTHUR ABRAMOWITZ, ESQ.
Claimants 2:              East Gate Corporate Center
                          308 Harper Drive, Suite 200
                          Moorestown, NJ 08057

                          Cooley, LLP
                          By:  IAN SHAPIRO, ESQ.
                          55 Hudson Yards
                          New York, NY 10001

                          Bailey & Glasser, LLP
                          By:  BRIAN GLASSER, ESQ.
                          105 Thomas Jefferson Street NW
                          Suite 540
                          Washington, DC 20007

For Johnson & Johnson:    White & Case LLP
                          By:  JESSICA LAURIA, ESQ.
                          1221 Avenue of the America
                          New York, NY  10020

                          Lowenstein Sandler
                          By:  KENNETH ROSEN, ESQ.
                          One Lowenstein Drive
                          Roseland, NJ 07068

                          Johnson & Johnson
                          By:  ERIK HAAS, ESQ.
                               ANDREW WHITE, ESQ.
                          1 Johnson & Johnson Plaza
                          New Brunswick, New Jersey, 08933
```

APPEARANCES (Cont'd):

| | |
|---|---|
| For the U.S. Trustee: | U.S. Department of Justice<br>By: LAUREN BIELSKIE, ESQ.<br>    LINDA RICHENDERFER, ESQ.<br>One Newark Center, Suite 2100<br>Newark, NJ  07102 |
| For Arnold & Itkin, LLP: | Pachulski Stang Ziehl Young & Jones, PC<br>By: LAURA DAVIS JONES, ESQ.<br>919 Market Street<br>16th Floor, PO Box 8705<br>Wilmington, DE 19899<br><br>Pachulski Stang Ziehl Young & Jones, PC<br>By: JOHN MORRIS, ESQ.<br>780 Third Avenue<br>34th Floor<br>New York, NY 10017 |
| For DeSanto Canadian Class Action Plaintiffs: | Lite DePalma Greenberg & Afanador, LLC<br>By: ALLEN JOSEPH UNDERWOOD, II, ESQ.<br>570 Broad Street, Suite 1201<br>Newark, NJ 07102 |
| For Aylstock, Witkin, Kreiss & Overholtz, PLLC: | Klee, Tuchin, Bogdanoff & Stern, LLP<br>By: ROBERT J. PFISTER, ESQ.<br>1801 Century Park East, 26th Floor<br>Los Angeles, CA 90067 |

\* \* \* \* \*

Case 23-12825-MBK Doc 1457-35 Filed 02/15/22 Entered 02/15/22 19:25:55 Desc Main
Document Page 178 of 289
Exhibit 1006 Page 178 of 289

Wuesthoff - Cross/Brown                                          178

1 tune the number, but it's not going to make a difference. It's
2 just so massive.
3 Q    Did you do any education and any learning about whether or
4 not there was a potential for a verdict like Ingham to happen
5 again?
6 A    Absolutely. In fact, some of that was shared with us. So
7 one case, the Johnson case, they asked for $8 billion for one
8 plaintiff, $8 billion for one plaintiff. This was 4.7 for 22.
9 Q    And did you consider that information from Mr. Kim and Mr.
10 White and the informational brief as you evaluated the size of
11 verdicts that Old JJCI was --
12 A    Yes. This was all talked about. This was all looked at.
13 And then subsequent to that, I've learned that about the
14 Forrest and Giese, another huge request.
15        So was Ingham an outlier? Yes, perhaps, but it
16 certainly can happen again. And we've had at least three other
17 requests since Ingham of just massive, massive judgments.
18 Q    And so what does this tell you? When you learn that
19 plaintiffs after Ingham are asking for $8 billion for one
20 plaintiff, what does that tell you about the ability to resolve
21 these claims in the court system?
22 A    It tells you it's just -- one, it's very unpredictable
23 what's going to happen. It's very, very volatile. And again,
24 it's going to take a long time, and I don't know that -- we're
25 concerned, and one reason for the Chapter 11 is financially,

1  it could just be devastating.
2  Q    Let's talk a little bit about costs.  Was some of your
3  learning relating to how much it costs to defend these cases?
4  A    Yes.  So this --
5  Q    Tell us what you learned.
6  A    This was also a very big discovery.  The defense costs,
7  we're spending $20 million to $30 million a month just to
8  defend these cases.  That's a very expensive burn rate and
9  we're burning that money, and that's money that could go to
10 claimants.
11 Q    Did you learn anything about how much it costs to try one
12 of these cases?
13 A    Yes.  To try each case costs a range of $2 million to $5
14 million per case to try.  Two is, I'm told, the lower side.
15 It's more towards the $3 million to $5 million to try each
16 case.
17      And again there, simple math, 38,000 cases, times
18 $2 million a case to $5 million a case, you get a very, very
19 big number, ranging from 76 to almost $200 billion just to try
20 the cases, excluding the judgments, which as we just discussed
21 could be in the multi-multi-billions of dollars as well.
22 Q    Did you evaluate before you made your decision to approve
23 a Chapter 11 filing whether it was possible to stay the course
24 and try these cases, despite the cost and despite the --
25 A    Yeah.  This is probably one of the biggest things that led

1  us to the decision.  Financials aside, through the last --
2  since two thousand, I believe, thirteen, 49 cases have been
3  tried.  There's 38,000 to go.  And there you go.
4           And at a rate of 10 to 12 cases a year, to solve
5  38,000 cases would take nearly 4,000 years.  Again, it's --
6  it's straight math.  And it's very easy math to do.
7           Now I challenged that, frankly, at the board meeting
8  and prior to the board meeting.  Can't we do more than ten a
9  year?  And I'm told, and I believe it's very challenging to do
10 more than ten a year because of witnesses, because of various
11 things that you need, expert testimony and such.
12          But just if you could take it to 20 -- and I'm told
13 you can't -- but if you could take it to 20, again, it's almost
14 2000 years.  So it just struck us as so unfair that of the 49
15 cases to date many, frankly, don't get anything because our
16 talc is, we believe, safe.
17          There's these lottery-sized judgements that a select
18 few get, yet thousands of cases will never, ever get tried.  It
19 just -- it just can't.  It's impossible.
20          So if you put all those things together, the status
21 quo, it just doesn't make sense.  It just doesn't -- it's not
22 good for claimants.  It's not good financially.  It's just a
23 huge waste of resources.  It's just -- so that's why we voted
24 for the bankruptcy.
25 Q    At some point you were asked to make a decision on whether

1 or not Chapter 11 made sense.
2 A    Yeah.
3 Q    Did you feel like you would have been kept in the dark
4 about information about the talc litigation before you had to
5 make that decision?
6 A    No.  Like I said, we had hours and hours of briefings and
7 material to read, the first day declaration, the information
8 brief, lots of information.  We -- we didn't feel any rush to
9 make a decision.
10         In fact, at the board meeting, nothing new really was
11 presented.  It was a recap of information we had all gotten
12 that previous week.
13 Q    Do you think it would be fair to suggest that you didn't
14 know anything and you didn't do anything before you decided
15 that Chapter 11 was the best and only course?
16 A    Please say it again, Ali, please.
17 Q    Well, would it be fair to suggest that you didn't know
18 anything at the time you made this decision?
19 A    I'm sorry.  Didn't know anything?
20 Q    Would it be fair for someone to say you weren't educated,
21 you weren't educated enough?
22 A    Oh, gosh, no. We were very educated.  And we didn't feel
23 a need, again, for anymore information.  It was very, very
24 clear.  And again, there had been people working on this, very
25 knowledgeable people, like John Kim has been working with talc

1  for years and years, Andrew White, for years.
2           So the information, the facts, the background was
3  very, very thorough.  It was provided to us in a very easy way
4  to understand and read.  Yeah.
5  Q    At the board meeting did you consider alternatives to a
6  Chapter 11 filing?
7  A    The main alternative was stay the course.  And as I've
8  said, we said, no, that just doesn't -- that's not tenable.  We
9  talked about insurance, not long, because, even the -- the
10 current insurance policies that JJCI has, those insurers are
11 not owning up to any of that, let alone signing up to some of
12 the liability and exposure we just talked about.  So -- so that
13 -- that option is out.
14          No, unfortunately we -- bankruptcy was the option.  I
15 say unfortunately.  That was -- that was the option to pursue.
16 Q    Did you take that decision seriously?
17 A    Oh my gosh, yes.  Huge.  Yes, very, very serious.
18 Q    Do you feel like other people at other companies had
19 already made that decision and you were just coming in to
20 rubber stamp it?
21 A    No.  No.  We -- the way it was presented to us, the facts
22 and the background, it was as -- as if no decisions have been
23 made at all, here's the evidence, here's the data, and now
24 vote.
25 Q    Do you feel like you had the ability to say no, if you

Case 23-12825-MBK Doc 1457-3 Filed 10/22/23 Entered 10/22/23 19:25:55 Desc Main
Document Page 183 of 289
Exhibit 1006 Page 83 of 189

Wuesthoff - Cross/Brown                                     183

1  thought the answer was no?
2  A    Of course, yes.  I say, of course.  I don't mean to be
3  flip with that.  Absolutely felt that.  And that's how J&J is.
4  J&J will do the right thing.  That's our credo.  And I totally
5  believe this, and other committee members totally believe this
6  is the right thing to do.
7  Q    Did you make the decision to approve a Chapter 11 filing
8  to hurt or harm claimants?
9  A    Absolutely not.  The opposite.
10 Q    Did you make the decision to approve a Chapter 11 filing
11 to protect Johnson & Johnson?
12 A    No.
13 Q    Why did you do it?
14 A    We did it so we could as equitably and efficiently as
15 possible resolve all the current and future claims.
16 Q    Did you just not see another option?
17 A    We did not see another option.
18 Q    You mentioned earlier today information about the safety
19 of talc and your belief about the safety of talc.  Tell us what
20 you meant by that.
21 A    You know, I'm not a scientist, admittedly, but if you look
22 at all the studies that have been done by people outside of
23 J&J, by organizations outside of J&J, it all points to the
24 safety of our talc.
25            And then I know the rigor of our internal quality

1  control being in the supply chain, super rigorous, lots of
2  testing.  No, we are very, very confident that our talc does
3  not contain asbestos and it's safe.
4  Q    If there was any doubt in your mind, would you have taken
5  the position at LTL?
6  A    No.  Absolutely not.
7  Q    Final question, Mr. Wuesthoff.  You are the president of
8  LTL charged with resolving these claims.  What is the next step
9  for you and your company?
10 A    We're ready to go.  I mean, we're ready to mediate.  We've
11 got a funding agreement that is strong.  It's seeded with
12 $2 billion if -- if approved by the bankruptcy court.  We're
13 ready to go.  We're just waiting.
14           And in the meantime, we're burning a lot of money,
15 just -- just being wasted.
16 Q    I thank you very much for your time, Mr. Wuesthoff.
17           Your Honor, I have no further questions.  Thank you.
18           THE COURT:  Thank you, Counsel.
19           Redirect.
20                       REDIRECT EXAMINATION
21 BY MR. JONAS:
22 Q    Can you see that on your screen, Mr. Wuesthoff, 161?
23 A    Again, Mr. Jonas.
24 Q    Okay.  Thank you.  I'm sorry.  I don't have a hard copy
25 right now.