```
              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF NEW JERSEY

IN RE:                           .    Case No. 23-12825(MBK)
                                 .
                                 .    Clarkson S. Fisher U.S.
LTL MANAGEMENT LLC,              .      Courthouse
                                 .    402 East State Street
                                 .    Trenton, NJ 08608
       Debtor.                   .
                                 .    Tuesday, May 30, 2023
. . . . . . . . . . . . . . . .  .    11:31 a.m.

  TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE AND MOTION HEARING

             BEFORE THE HONORABLE MICHAEL B. KAPLAN
               UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES:

For the Debtor:              Jones Day
                             By:  GREGORY M. GORDON, ESQ.
                             2727 North Harwood Street
                             Suite 500
                             Dallas, TX 75201

For Ad Hoc Committee         Brown Rudnick LLP
of Certain Talc              By:  JEFFREY L. JONAS, ESQ.
Claimants and Ad Hoc              DAVID J. MOLTON, ESQ.
Committee of Creditors:           MICHAEL WINOGRAD, ESQ.
                             7 Times Square
                             New York, NY 10036

For the Office of the        Office of the U.S. Trustee
U.S. Trustee:                By:  LINDA RICHENDERFER, ESQ.
                             J. Caleb Boggs Federal Building
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, DE 19801

Audio Operator:              Kiya Martin


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

TELEPHONIC APPEARANCES CONT'D:

| | |
|---|---|
| Various Talc Personal Injury Claimants: | Watts Guerra LLP<br>By: MIKAL C. WATTS, ESQ.<br>5726 W. Hausman Road, Suite 119<br>San Antonio, TX 78249 |
| For Various Talc Claimants: | Maune Raichle Hartley Frency & Mudd, LLC<br>By: CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| For Arnold & Itkin: | Pachulski Stang Ziehl & Jones LLP<br>By: LAURA DAVIS JONES, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |
| For Ad Hoc Committee of Supporting Counsel: | Paul Hastings, LLP<br>By: KRIS HANSEN, ESQ.<br>200 Park Avenue<br>New York, NY 10166 |
| For the Talc Claimants Committee: | Massey & Gail LLP<br>By: JONATHAN S. MASSEY, ESQ.<br>The Wharf<br>1000 Maine Avenue, SW<br>Suite 450<br>Washington, D.C. 20024 |

1            And in that regard, the documents focused on the
2    transaction in which the funding agreement, the 2023 funding
3    agreement was structured both email communications and drafts.
4    The Committee submitted correspondence on May 29th, yesterday,
5    raising issues with respect to Jones Day involvement.
6            Let me see if, Mr. Gordon, do you wish an opportunity
7    to respond to that correspondence?
8            MR. GORDON:  Thank you, Your Honor.  Greg Gordon on
9    behalf of the debtor.  I'm sorry that you're not feeling well
10   today, and I appreciate as well the fact that you're even
11   conducting this hearing.
12           With respect to the letter that came in last night,
13   honestly, I've only had a short period of time to review it.
14   But I think the response to it is rather simple and
15   straightforward, and that is that we don't believe there was a
16   conflict.  And so both sides -- you know, as Your Honor
17   probably knows based on what you've seen, both sides began
18   looking at the issues immediately following the January 30
19   opinion.  Counsel for J&J was involved, counsel for LTL was
20   involved, and that was us, Jones Day.
21           And fundamentally, both sides in taking the look at
22   the issue came to the same conclusions fundamentally about it.
23   And so from our perspective, we don't believe there was a
24   conflict.  And accordingly, the arguments that we should have
25   involved conflicts counsel to exclusively handle those issues

1  we think missed the mark.

2  Now that's not to say that Mr. DeFilippo wasn't
3  involved.  He was.  I don't know whether that would make a
4  difference to the Committee or not.  I doubt that it would.
5  But, again, fundamentally, our response is that in our view,
6  there was no conflict.  Both sides came to the same conclusion.
7  and perhaps in some ways more importantly, the issues
8  Ultimately were rendered moot by the ability of the company and
9  J&J and Holdco to come to agreement on a new set of financing
10 that we believe put the debtor in basically the exact same
11 place it was in before, that its obligation to pay claims was
12 fully covered by the financing in ways that were very similar
13 to if not in some respects, the same as the financing that was
14 in place earlier.

15  THE COURT:  All right.  Thank you.

16  Mr. Winograd or Mr. Jonas, do you want to respond?

17  MR. JONAS:  Yes, Your Honor.

18  It's Jeff Jonas from Brown Rudnick on behalf of the
19 TCC.  I'll be brief, Your Honor.  I think between our initial
20 papers and the letter we recently filed, there's not a lot more
21 to say, but I'll just respond to Mr. Gordon's comment and be
22 brief about it.

23  Your Honor, it's truly an incredibly position that
24 the debtors and Jones Day have now taken that there was no
25 conflict in terminating the first funding agreement by which

1  Johnson & -- and entering into the second funding agreement by
2  which Johnson & Johnson went from a $61-billion-plus obligation
3  to a zero-dollar obligation.
4             Today, Your Honor, under funding agreement two,
5  absent a confirmed plan, J&J has zero obligation, zero
6  exposure.  Certainly, this was a fantastic deal or arrangement
7  for J&J, not so much for LTL.  And to say that there was no
8  conflict and, therefore, no adversity is frankly ridiculous.
9  It's incredible, it's ridiculous, it does not hold water.  And,
10 Your Honor, it takes us to the heart of the issue which was if
11 there was adversity at that point in time where the parties
12 allege the first funding agreement was void or voidable, there
13 had to be adversity.
14            How could it be that J&J went from $61-billion to
15 zero all of which or none of which inures to the benefit of my
16 clients?  How could that not be an adverse situation?  If it
17 was adverse, as we argued the first go-around, there can't be a
18 privilege, and that's the end of it.  I appreciate, Your Honor,
19 obviously I didn't have the benefit of seeing the underlying
20 documents, but I appreciate on its face it was dressed up very
21 nicely for Your Honor.  Boy, look at all these lawyers,
22 communications, emails, memos.  It must be privileged.  It
23 can't be privileged because there was adversity, Your Honor.
24            And with that, Your Honor, obviously, our letter goes
25 into the various comments that both Mr. Gordon made and that

1   the Court put on the record that to the extent there ever was
2   adversity or ever was a conflict, it was clear to everybody in
3   LTL1, of course, Jones Day shouldn't be involved.  So to now
4   recreate history and the only way they can solve for that is to
5   say, oh, there never was adversity, there never was a conflict,
6   it's incredible, Your Honor.  And that's all I'll say at this
7   point.
8           Thank you.  And I do appreciate, notwithstanding you
9   being under the weather, you taking the time to hear us today,
10  Your Honor.  Thank you.
11          THE COURT:  Thank you, Mr. Jonas.
12          All right.  Is there any other comments?
13                      (No audible response)
14          THE COURT:  In reviewing the materials in camera and
15  notwithstanding the concern that at some future point, the
16  parties may be adverse with respect to enforceability of either
17  the 2021 or 2023 funding agreements, that potential adversity
18  doesn't vitiate in this Court's view the common law common-
19  interest privilege that upholds the work-product or attorney-
20  client privilege interposed between LTL, J&J, and Holdco.
21          All of those three entities were targets or are
22  targets of talc-related litigation.  They share, in this
23  Court's view, a common legal interest in attempting to have the
24  talc claims addressed through a Chapter 11 with a 524(g)
25  channeling capacity.  They share a substantially similar legal

1  interest in developing a structure of a funding agreement that
2  would be consistent with the Third Circuit's decision
3  dismissing the first Chapter 11 case.
4          The Court rules that communications in furtherance of
5  developing such legal strategy supporting such objectives
6  (audio interference) bad-faith challenges to LTL's bankruptcy
7  fall within the ambit of their common interest and, thus, the
8  attorney-client work-product privileges would attach.
9          If there is a breach of fiduciary obligations by the
10 parties or their counsel, that is for an issue to be determined
11 down the road and if it arises, then we can -- the issues can
12 be addressed.  But I found no basis to vitiate or terminate the
13 attorney-client privilege as a consequence at this juncture.
14         Now having said that, the documents submitted
15 included drafts of agreements with attorney notations, changes,
16 suggestions.  It includes emails reiterating or reflecting such
17 work product and attorney thought processes.  And they are in
18 whole from what I could tell protected with one limited
19 exception and a few that I'll note.
20         With respect to the PowerPoint, the redactions are
21 proper as far as restricting the release of attorney-client
22 privilege information and work product.  The Court reviewed
23 each of the redacted material.  I'm going to make one
24 exception.  Not that I don't believe it falls within the ambit
25 of the attorney-client and work-product privilege, but the

Case 23-12825-MBK    Doc 857-42    Filed 06/22/23    Entered 06/22/23 15:25:55    Desc
Exhibit 1018    Page 8 of 11

12

1  slide that it's at Page 12 that references considerations
2  regarding filing in New Jersey, because the lack of
3  transparency would give rise to too much rumination and
4  mischief, I am going to direct that that slide be released.
5        It was intriguing to me to see what considerations
6  there were for filing in New Jersey.  I'm sure it was
7  interesting to others.  And I just think there will be more
8  mischief served, more mischief undertake and I think
9  transparency warrants releasing that slide.  I don't believe
10 there's prejudice to the debtor or J&J in so doing.  That's
11 just a limited exception.
12       I do have questions.  The privilege log provided and
13 those that were provided fell in my view within the
14 protections.  The log identified certain attachments that
15 obviously I didn't have a chance to see.  And I can't rule on
16 what I don't see. So I'm going to give -- it's about nine of
17 them, and I'm going to ask the debtor to provide the Court with
18 those nine attachments so that I can determine whether or not
19 they too fall within the parameters of the privileges.  Those
20 are the following numbers: 12, 14, 16, 18, 22, 33, 53, 57, and
21 62.
22       If you can provide those to me within 48 hours, I'll
23 take a look at them and determine whether it's consistent with
24 the other rulings or whether they should be released.
25       Moving on to the --

1  from the other side.
2  But that would be our suggestion, Judge, and we would
3  be ready to move -- one of my favorite words, as people who
4  know me know -- with alacrity in terms of, you know, getting
5  papers to Your Honor on this issue, allowing the debtor to do
6  so, and Mr. Hansen on behalf of his committee, should he want
7  to, and Your Honor doing what judges do before a trial, decide
8  what's relevant and not in order to make the trial much more
9  effective, efficient, and streamlined.
10  That's all I have to say, Judge.
11  THE COURT:  All right.  Thank you, Mr. Molton.
12  Mr. Hansen, do you still have -- your hand is up, I'm
13  not sure --
14  MR. HANSEN:  It is, Your Honor, just very briefly.
15  So, Your Honor, again, Kris Hansen with Paul Hastings on behalf
16  of the Ad Hoc Committee.
17  Just with respect -- you asked a very direct
18  question, which was what's wrong with a neutral third party
19  doing a de-duping.  You didn't get an answer.  The answer is
20  there's nothing wrong with a neutral party to do the de-duping.
21  There is no reason why the TCC's experts have to do it.  It can
22  be done by a neutral third party.
23  The second point, in response to you asking what's
24  wrong with this, wasn't nothing.  The answer was, well, we
25  didn't put it at issue.  Somebody needs to bring it on by

1  motion.

2          The reality is that everybody in this case keeps
3  coming up to the podium and talking about how many they have in
4  support and how many they don't.  And so clearly people know
5  who are out there and can easily submit that information.  So
6  reciprocity is pretty important from our perspective.

7          The third point I just wanted to make about 2019,
8  just quickly, we all know what the 2019 standards are.  If you
9  make a notice of appearance in a case and you act on behalf of
10 others, you have to file a 2019 statement when you are
11 representing a group.  That's what the rule says.

12         I understand what Ms. Richenderfer says, but there
13 have been a lot of lawyers that have been appearing in front of
14 Your Honor that have yet to file 2019 statements, and they
15 certainly do represent more than one claimant.  And with
16 respect to the members of the TCC themselves, to the extent
17 that they do represent a multitude of claimants, again, what's
18 wrong with filling all that information into a neutral third
19 party to do the de-dup?  No one is giving you an answer on
20 that.  There is no prejudice to anybody.

21         The answer you get is somebody needs to put it at
22 issue.  You can't just ask for it when someone asks you to put
23 your claim into the de-dup process.

24         So when we come back to it, Judge, I think the only
25 fair result with this is that all the claims go in, they all

1 get de-dup'd, and the lawyers get access to that information
2 and we can move on from there.
3     And to be honest, Judge, if you want, like, from our
4 perspective, everybody here is a professional, but there's a
5 lot of trust at issue in the case, and that's why we suggested
6 a mutual third party, so then that way nobody has the ability
7 to point at anybody else and say, aha, something bad happened
8 as a result of this, you leaked information, you gave it to
9 somebody else, you didn't do a proper de-dup process, because
10 what we're trying to do is neutralize the parties in issue and
11 just move it to a point where nobody can claim that there's
12 partisanship going on anymore.
13     THE COURT: All right. Thank you, Mr. Hansen.
14     Mr. Winograd, last comments?
15     MR. WINOGRAD: Between the mute and the hand raising,
16 sorry, Your Honor.
17     The idea of this neutral third party, again, if we
18 even get there, given Mr. Molton's suggestion and whether this
19 is all, in fact, relevant, but again, it's one thing to say
20 we're going to turn over information to a third party, it's
21 another thing to say the issue -- the only information at issue
22 is information that the other side and its FA's already have
23 access to, we should be able to verify that.
24     If a mistake is made by a third party doing the de-
25 duplication process or who is not running it in a certain way,