IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | Friday, June 2, 2023 |
| . . . . . . . . . . . . . . . | . | 11:27 a.m. |

TRANSCRIPT OF DEBTOR'S MOTION TO COMPEL [604]; DEBTOR'S
OMNIBUS MOTION TO COMPEL [638]; DEBTOR'S MOTION
FOR A BRIDGE ORDER [147]
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street, Suite 500<br>Dallas, TX  75201 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Genova Burns LLC<br>By:  DANIEL M. STOLZ, ESQ.<br>494 Broad Street<br>Newark, NJ  07102 |
| | Brown Rudnick<br>By:  MICHAEL WINOGRAD, ESQ.<br>     DAVID J. MOLTON, ESQ.<br>7 Times Square<br>New York, NY  10036 |
| For Anthony Hernandez<br>Valadez: | Kazan McClain Satterley & Greenwood<br>By:  JOSEPH SATTERLEY, ESQ.<br>55 Harrison St. Suite 400<br>Oakland, CA  94607 |
| For Various Talc<br>Claimants: | Levy Konigsberg, LLP<br>By:  MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ  08648 |
| For Arnold & Itkin: | Pachulski Stang Ziehl & Jones LLP<br>By:  LAURA DAVIS JONES, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |
| For Paul Crouch,<br>individually and on<br>behalf of Estate of<br>Cynthia Lorraine Crouch: | Ruckdeschel Law Firm, LLC<br>By:  JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For Catherine Forbes: | Cohen, Placitella & Roth, P.C.<br>By:  CHRISTOPHER M. PLACITELLA, ESQ.<br>2001 Market St, Suite 2900<br>Philadelphia, PA  19103 |
| For Paul Crouch: | The Ruckdeschel Law Firm, LLC<br>By:  JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD  21043 |

1          I don't believe there are other issues with respect

2    to the motion at Docket 604.  If not, we can move to debtor's

3    omnibus motion to compel plaintiff's firm to supplement their

4    responses to interrogatories and document requests.  I think

5    it's docketed at 638.

6          Mr. Torborg, are you up again?

7          MR. TORBORG:  I am up again, Your Honor.

8          THE COURT:  All right.

9          MR. TORBORG:  Thank you.  Again, David Torborg with

10   Jones Day on behalf of the debtor.

11         This is a motion directed at nine plaintiff law

12   firms.  These law firms either represent individual members of

13   the TCC, have filed motions to dismiss on behalf of one or more

14   clients, or have otherwise been active in these proceedings.

15   I'd like to start with a little bit of histories because I

16   suspect this might be a little confusing.

17         Initially, we served Rule 33 interrogatories and

18   Rule 34 requests for production.  Those discovery requests were

19   directed to certain plaintiff firms and their individual

20   clients.  So, for example, the debtor's interrogatories to the

21   Arnold and Itkin firm were directed to Arnold and Itkin, LLP,

22   and Arnold and Itkin, LLP, acting for Arnold and Itkin talc

23   claimants.  Some of the plaintiff firms to which we served this

24   discovery objected the discovery was improperly served on them,

25   claiming they were not parties to the motion to dismiss

1  proceeding.  Nonetheless, many of the firms did respond to the

2  discovery albeit largely with relevancy and privilege

3  objections.

4        Given the objections to whether they were appropriate

5  parties, the debtor thereafter two days later served Rule 45

6  document subpoenas on these plaintiff firms and three others.

7  The debtor's motion seeks three categories of information.

8  First, we seek information on the total number of talc claims

9  against the debtor, filed and unfiled, for which the law firm

10  served as counsel.  There should be no debate that the number

11  of talc claims faced by the debtor is relevant to the issue of

12  financial distress.  Most of the firms responded simply that

13  the debtor already has information on the number of claims

14  filed against it.

15        That, of course, tells us nothing about the number of

16  unfiled claims.  There's no good reason to withhold requested

17  information.  It should not be hard to provide.  Beasley Allen

18  and Maune Raichle identified the number of unfiled claims for

19  which they serve as counsel in response to the interrogatory.

20  One firm, the Barnes Law Group, argued that it cannot identify

21  how many unfiled claims it has because those claims have not

22  been fully investigated and evaluated.  The TCC, which weighed

23  in on this motion, despite discovery not being directed to it,

24  makes the same point.

25        But we didn't ask how many claims will definitively

1  be filed.  We asked the number of claims for which the law firm

2  serves as counsel.  The fact that a claimant has sought counsel

3  concerning the possibility of asserting a claim is relevant to

4  the debtor's talc liability.

5        The TCC seems to argue that the number of claims or

6  potential claims from just nine plaintiff firms is not relevant

7  because there are more than a hundred firms that have such

8  claims.  That may be so, but these firms have taken a

9  leadership role in this case and the information sought is

10 relevant.

11       The TCC further argues that the Court earlier this

12 week declined to order the discovery sought here.  The Court

13 did no such thing.  It certainly has not held that the number

14 of unfiled claims is irrelevant to the question of financial

15 distress in the motion to dismiss proceeding.  Before I move to

16 the next issue, I would like to address again the suggestion

17 that the debtor should have filed this motion weeks ago

18 according to the TCC.  Well, the discovery was not even served

19 until three weeks ago.

20       At the time we filed the motion, the responses that

21 came in were less than two weeks old.  And unlike the TCC's

22 practice, we absolutely endeavor to follow the local rules,

23 meet and confer, send letters outlining our problems with it,

24 and propose compromises.  There's no deadline to file the

25 motion.  And, again, we filed this motion more than a month

36

1  to the doctor so I can do this hearing here in my kitchen?

2  Because they think we have to shorten time.  And then they come

3  before you and they say to the Court, well, Judge, we've got a

4  whole nother month until the hearing.  Those two things can't

5  be true, and you've got to put an end to it, Judge.  You've got

6  to stop this.

7          Thank you.  The motion should be denied.

8          THE COURT:  All right.  Thank you.

9          I have a question, Mr. Ruckdeschel.  I'm going to ask

10 it of you, but I'm going to hear the answer from counsel for

11 the other firms for whom discovery is sought.

12         MR. RUCKDESCHEL:  Of course.

13         THE COURT:  If there is an interrogatory or if there

14 was a subpoena served on the firm with the intent of drawing

15 out information relevant to financial distress and the subpoena

16 sought information as to the number of clients who have

17 retained the firm to pursue claims for injuries due to use or

18 exposure to talcum powder sold or marketed or distributed by

19 J&J or its affiliate for which a lawsuit has not been filed,

20 why is that not relevant and why would it be privileged?  It's

21 asking for a number.  It's not asking for any communication.

22         MR. RUCKDESCHEL:  Well, I can answer on behalf of

23 myself, Judge.

24         THE COURT:  That's all I'm asking for at this point.

25         MR. RUCKDESCHEL:  And it's easy for me because the

1  Ruckdeschel law firm is me and now my wife has reactivated her

2  license and she's working about halftime with me.  God help

3  her.

4          But I only have a handful of cases.  But what I can

5  tell you is, when clients come to my firm and they retain my

6  firm, the first thing we have to do is investigate.  And we

7  investigate what their potential claims are, both in the tort

8  system and otherwise.  We then investigate what we believe the

9  relative likelihood of success might be, right.  We have to go

10 through all this process with these things, and then we have to

11 make a recommendation to our client as to what we believe the

12 best course of action is for them.

13         And then, and only then, do they then decide what

14 course of action is it that we're going to take.  And I can

15 tell you that there are often months in between the time that a

16 client comes into my firm and retains my firm and the time that

17 we actually make a decision about what we're going to do

18 because the investigation takes a long time.  And that's

19 particularly true in the case of people, women that come in

20 because their exposures are often secondhand, and so it takes

21 more time.  And it's often true in the case of people that have

22 more complicated work histories and exposure histories.  And

23 it's often true in people where we've got to look.

24         And so the fact that you've retained a law firm

25 doesn't mean a lawsuit's going to be filed.  It doesn't even

1  mean a lawsuit's going to likely be filed.

2          THE COURT:  But doesn't that go to the inferences the

3  Court could draw from that evidence or the weight given to the

4  evidence, not as to discovery?

5          MR. RUCKDESCHEL:  Absolutely not.  Absolutely not.

6  And there are two reasons why.

7          One, it's completely irrelevant under the analysis of

8  the Third Circuit in LTL 1, which says, the question here is,

9  is there an immediate financial distress?  And so speculating

10  about things that might happen in the future is not part of

11  what this Court's proper analysis should be.  So for the

12  purposes of the motion to dismiss, that's not the analysis that

13  Your Honor should be doing.

14          And the facts that could be hypothesized as, well, if

15  this happens and that happens and this happens, then there

16  would be another claim filed.  And then if that claim gets

17  filed, and if that happens, this happens, and that happens, and

18  this happens, that's exactly the kind of inferential chain that

19  the Third Circuit said that's not on the table.  That's not

20  what we do here.

21          So that's number one.  It's not relevant and it's not

22  reasonably calculated to lead to the discovery of admissible

23  evidence.

24          But number two is what I went through a minute ago.

25  The fact that somebody hires my firm doesn't mean that I have

1  an expectation that I'm going to sue any particular defendant.

2  And there could be an exception to that, right.  A lifelong guy

3  comes in from Pennsylvania and he worked for U.S. Steel his

4  entire career.  And in Pennsylvania, you can sue the employer,

5  right.  I'm pretty sure when that guy hires me, I'm going to

6  sue U.S. Steel.  But that doesn't happen.  That's a rare case

7  indeed.

8          And so the problem is the fact of retention means

9  nothing with respect to whether a claim is going to be filed.

10 It means nothing as to whether it's more likely than not that a

11 claim will be filed.  It means nothing.  It's just a piece of

12 nonsensical data that means nothing.  In order for it to mean

13 something in this case, you have to take at least three more

14 inferential steps.  And so that's just inherently speculative.

15         If somebody has, and this is the response I gave to

16 them, none of my clients have advised me that I should file a

17 claim against the debtor, right.  That's what I responded, and

18 they accepted that.  So that's fine.  Okay.

19         THE COURT:  All right.

20         MR. RUCKDESCHEL:  So that's my answer, Judge.

21         THE COURT:  All right.  Thank you.

22         Let me move to Mr. Satterley.

23         MR. SATTERLEY:  Good morning, Your Honor.  I guess

24 good afternoon there on the East Coast, and I'm sorry to hear

25 that you've been under the weather and I hope you get well

40

1  soon.

2         THE COURT:  Thank you.

3         MR. SATTERLEY:  Let me echo some of what

4  Mr. Ruckdeschel has said, and I'm not going to be as long as he

5  is.  He made very good points.  But I want to start with

6  burdening Your Honor.

7         This is unduly burdensome that the debtor has brought

8  this to your -- put this burden upon you because it's basically

9  harassment.  And they brought this to you claiming they've met

10  and conferred when they haven't.  I served responses on

11  May 15th, responses and objections on behalf of my law firm and

12  I produced a document.  I'll talk about the document in a

13  minute.  But I haven't heard a single phone call.  I've been in

14  court in the Valadez case every day for weeks.  We've done

15  opening statements.  We're putting on evidence against many J&J

16  and LTL attorneys, I don't know, 5, 6, 7 there.

17         And at no point in time did anybody say, hey, by the

18  way, Joe, you didn't adequately answer discovery.  Nobody

19  picked up the phone and called me and said, you need to produce

20  some other document.  So I don't even know what

21  letter -- supposedly, somebody from Jones Day wrote a letter to

22  me.  I haven't seen it.  I've been sort somewhere busy lately.

23         So I guess my point is, there's really not been any

24  meet and confer on this issue.  And so for this emergency

25  motion advancing to today I think is just an attempt to harass

1  us and to burn the Court.  So let me directly address the three

2  points -- the three items that counsel says my firm should

3  answer.

4       The total number of claims; the first item, the total

5  number of claims filed versus unfiled.  In the response to the

6  discovery, I provide a letter dated April 20, 2023 to Ms.

7  Allison Brown and Alex Calfo.

8       I said, in light of Judge Kaplan's ruling today, at

9  today's hearing -- because Your Honor told us on April 20th, if

10 you intend to file lawsuit, let them know.

11      "In light of Judge Kaplan's ruling at today's

12 hearing, I write as a courtesy to inform you that Kazan firm's

13 clients will file lawsuits against Johnson and Johnson and

14 other protected entities, but not against LTL Management.  Each

15 Complaint-Summons will be served through official channels.

16 The cases that will proceed immediately include at least the

17 following."

18      And I listed all the cases that we intend to file.

19 Any other case beyond that, is work-product privileged,

20 because, as Mr. Ruckdeschel said, we're investigating the

21 merits of the case.

22      And there's many cases that we investigate and decide

23 not to take, not to accept.  My firm has a history, and Johnson

24 and Johnson knows this, that we represent some of the strongest

25 cases you could possibly imagine, you know, they have autopsies

1  or tissue digestions and exact ingredients are found in the

2  body, right next to the tumor.  We're very, very particular

3  about the type of cases that we select to represent.

4         So any client that is not on this list is work-

5  product privilege.  And I would reassert what Mr. Ruckdeschel

6  said about if an attorney, or if a client has retained us, that

7  doesn't mean we're actually going to file a lawsuit.  We're

8  still -- the retain to investigate.

9         So the total number of unfiled claims is privileged

10  and to the except that Your Honor's compels that type of privy

11  information, I'll have to seek Appellate relief because

12  there's, under no circumstances, am I to turn over privileged

13  information.

14         The second item that they sought is communications

15  that I may have had with other lawyers regarding this topic and

16  I asserted privilege as well.

17         Co-counsel privilege, I'm co-counsel with Mr. Maimon.

18  The motion I have represented cases against J&J for years.  Any

19  communication I have with my co-counsel is privileged and I'm

20  not going to turn any of that over.

21         The final issue is, my opinion about financial

22  distress; my views about financial distress are not relevant.

23  And my opinion about the value of each of my cases is

24  privileged.  Now, I did point out in the discovery that I have,

25  they already have the demand letters that I've made on

1  individual cases.

2          They already have what's called a 998 filing.  A 998

3  in California is actual pleading-type documents that serve upon

4  the Defendants, so that when we win the case, if they don't

5  meet that, we could get costs.  And they already have those.

6          So everything that I have that's not privileged has

7  been turned over and everything they're seeking is either

8  harassment or they're seeking privilege.

9          Final point, Your Honor.  The focus at the Motion to

10 Dismiss is not on Joe Satterley or the Kazan law firm's thought

11 processes about the Debtor or Joe Satterley or Kazan law firm's

12 evaluation of each individual case, because I evaluate cases

13 and I have thought process, that's not the focus.

14         The focus is on the Debtor and the Debtor has

15 repeatedly said, in deposition, that they did no analysis, no

16 estimates of their liability.  So that's got to be the focus on

17 the Motion to Dismiss, not on Joe Satterley's thought

18 processes.

19         And with that, I'll submit, Your Honor.  I hope Your

20 Honor gets feeling better.

21         THE COURT:  Thank you, Mr. Satterley.

22         Mr. Winograd?

23         MR. WINOGRAD:  Thank you, Your Honor.

24         Mike Winograd from Brown Rudnick, again, on behalf of

25 the TCC.  And, Your Honor, I will try not to tread ground

1        Your Honor did question the relevance of all of this.

2   And Your Honor did say, you know what, let's come back to this

3   after the Motion to Dismiss.  And that's exactly what should

4   happen here.

5        With respect to the idea that the relevance that they

6   purport, things that the Debtor purports is a pretext.  You

7   know, counsel says, well, we just asked ten people, but we

8   don't have to ask everyone.

9        If they really wanted to figure out who the entire

10  pool is, they would have sent discovery to all of the law

11  firms.  They didn't.  And these law firms, they say, well,

12  these ten law firms happen to have taken a leadership role.

13       These law firms did not sign PSAs.  These law firms

14  did not file claimant lists with the PSAs.  They didn't file

15  lists with the 2019.  It's just completely apples to oranges.

16       And even the AHC apparently, Your Honor, has not

17  disclosed, its own members have not disclosed all of the

18  claims.

19       According to the recent testimony this week from Mr.

20  Nachawati, he things that the PSA is just an agreement to

21  agree, there are lots of issues to work out.  He doesn't think,

22  or doesn't know, if the agreement is good for some claimants,

23  and not for others.  And he does not believe that he even filed

24  or listed his mesothelioma claimants on his list.

25       This idea that we have to have the unfiled claimants

1  listed is betrayed by their own conduct.

2          Number 4, Your Honor, as counsel has said, so I won't

3  go back into it deeply, and let me just add to that other

4  point, counsel for -- I see the hand being raised by counsel

5  for the AHC, counsel for the AHC confirmed as much on the call

6  on Tuesday saying, yes, a plan is on file, but as I've said at

7  the last hearing, we don't necessarily agree with everything

8  that's in it and we're hard at work with the Debtors to try and

9  have an amended plan filed that we do agree with.

10          Next, Your Honor, with respect to the privilege

11 issue.  A claim that has not been filed is privileged.  The

12 only communications about it are between a client and its

13 counsel.  It is privileged, it is off-limits.

14          There are no indicia of reliability.  When somebody

15 determines to file a claim and goes ahead and files it, the

16 counsel is subject to Rule 11, has to do due diligence into the

17 merits of those claims.  They are indicia of reliability.

18          The idea that you can ask an attorney, and to use the

19 words of counsel for the TCC, we're not asking how many claims

20 will be filed.  We're just asking how many claimants have

21 sought counsel.

22          The idea that that is somehow not privileged and

23 subject to discovery would contradict every discovery principle

24 I'm aware of, Your Honor.  I'm fairly certain that if I ask

25 White and Case, are there, you know, has J&J approached you

1  about any potential lawsuits; have they consulted you, whether

2  or not you've decided to file anything; is way out of bounds,

3  Your Honor.

4        The fact that, and this was in the briefing, that

5  some claimants have disclosed their unfiled claimants; the AHC

6  has filed some, apparently, not all.  Certain firms have

7  responded by providing some does not impact the privilege or

8  decisions of anybody else.

9        Your Honor, on the $8.9 billion being inadequate,

10  they asked for the basis.  They were told by the TCC, we didn't

11  have anything non-privileged.  The law firms, to the extent

12  that, you know, have given them answers, they apparently just

13  don't like the answers.

14        Again, damages analyses are privileged.  There's not

15  much to ask about that that conceivably could be not

16  privileged, or already in the public or within the knowledge of

17  J&J.

18        And the same, Your Honor, is true with respect to the

19  questions about financial distress.  The motion should be

20  denied because of the gamesmanship, Your Honor, and on its

21  merits, it fails as well.  Thank you, Your Honor.

22        THE COURT:  Thank you, Mr. Winograd.

23        Mr. Branham?

24        MR. BRANHAM:  Good morning, Your Honor -- I guess

25  afternoon, now.  I don't have a whole lot to say here, except

1  to simply join in what Mr. Satterley, Mr. Ruckdeschel and Mr.

2  Winograd already articulated.

3          You know, our firm is very similar to them in terms

4  of the types of cases that we take, to the case in-firm, an

5  entire analysis that we do.

6          And just because we're hired, doesn't mean we've

7  decided to file something.  I will tell you that I repeatedly,

8  at least twice and maybe three times in my recollection,

9  reached out directly to counsel at Jones Day, asking them, help

10 me understand what the authority is for you to ask for this

11 stuff.  It's privileged; what do you think is not privileged?

12         And the answer was, they are papers; not, let's have

13 a phone call.  Not any of that.  And then, you know, we're

14 dragged up here as a law firm and, by the way, Judge, I'm

15 admitted *pro hac* for a client in this, but not for my law firm.

16         So I just want to raise that because I don't want to

17 create a problem.  But you know, the idea that this needed to

18 be done this fast, that it was effectively done, as you've

19 heard from others, without any meaningful meet and confer, and

20 really without any discussion at all or willingness to discuss

21 the privileged and work product issues.

22         I think at the end of the day, belies what this is

23 actually about, which is, they focused on people who drive hard

24 and maybe that they feel like are thorns in their side, as

25 opposed to any legitimate cases for discovery.  And so, I would

50

1  certainly, on behalf of my law firm, which just all this was

2  directed to, and for the reasons stated by everybody else, ask

3  that you not (indiscernible).

4          THE COURT:  Thank you, Mr. Branham.

5          Mr. Hansen?

6          MR. HANSEN:  Thank you, Your Honor.  Kris Hansen with

7  Paul Hastings on behalf of the Ad Hoc Committee.  Your Honor, I

8  simply wanted to say one thing which was in response to the

9  gratuitous comments from Mr. Winograd about Mr. Nachawati which

10 really had nothing to do with this argument, but they seem to

11 not be able to resist at any point in time.

12         If they wanted to cite the full facts from the

13 deposition, Mr. Nachawati's got about 5,000 claimants on file

14 and they were apparently 50 mesos [sic] that weren't put in

15 there.  So it's not relevant to this point, but I wanted Your

16 Honor to know that.

17         I also wanted to point out to the Court again that

18 we're the only party who has filed a 2019.  If you look around,

19 you're hearing lawyers say, I represent multiple clients; I'm

20 appearing in the case; I'm making arguments in the case.

21         And notwithstanding Ms. Richenderfer's comments from

22 the last week about how she doesn't think everybody has to

23 suddenly comply with 2019, they do and they need to file those

24 2019 statements.

25         I don't have any thing else, Your Honor, I just

51

1  wanted to give you that factual background.

2          THE COURT:  All right.  Thank you.

3          Ms. Jones?

4          MS. JONES:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MS. JONES:  Laura Davis Jones of Pachulski, Stang,

7  Ziehl and Jones.  First, Your Honor, it's wonderful to see you

8  feeling well.  It's good.

9          THE COURT:  Thank you.

10          MS. JONES:  Your Honor, just one quick comment.  We

11  were referenced Arnold and Itkin was referenced earlier in the

12  hearing and, Your Honor, just because we did have that specific

13  reference, we wanted to make you knew I was listening and going

14  to respond.

15          Your Honor, after all the comments that have been

16  made, I have nothing further to add other than what the TCC has

17  already said, Your Honor.  Thank you.

18          THE COURT:  All right.  Thank you.

19          Mr. Maimon?

20          MR. MAIMON:  Good afternoon, Your Honor.

21          THE COURT:  It's after noon; good afternoon.

22          MR. MAIMON:  It is afternoon.  I'll be brief.  I

23  think that there's a disconnect here between the Jones Day

24  lawyers and the reality of practice as it exists outside of the

25  bankruptcy process.

52

1       My colleagues have explained the process that we go

2 through with regard to vetting claims and deciding what claims

3 are viable and what claims can be filed and the advice that we

4 give our clients about that, which are clearly privileged.

5       You know, Mr. Ruckdeschel talked about discovery on

6 lawyers as non-parties.  We are non-parties.  Interrogatories

7 and requests for production of documents are discovery vehicles

8 for parties.

9       We do accept the subpoena, because we recognize that

10 you can subpoena a non-party, but (indiscernible) asked for

11 documents.  And then, I would just raise with Your Honor, Your

12 Honor asked the question of Mr. Ruckdeschel about well, what

13 about just talking about the number of people who have come in

14 your door, or the number of people who signed retainers; that

15 number doesn't exist outside of documents.

16       And it's not incumbent upon my firm to start doing

17 work and tabulating things.  One of the things that we do is

18 that we investigate claims and we also assemble documents.  We

19 have to be retained in order to be authorized to get medical

20 records for our clients.

21       We do get medical records for our clients.  We give

22 the pathology reports that confirm whether or not they have the

23 disease that might be filed about.

24       This is in sharp contrast to what a lot of the PSA

25 partners of J&J have indicated in their depositions.  We don't

53

1  have any confirmatory documents or pathology reports.  I have

2  to get those.

3          Those are privileged.  If a client decides not to

4  file a claim, it would be a HIPAA violation for me to start

5  turning those over.  The Jones Day lawyers cite no authority,

6  none whatsoever, for discovery against lawyers as lawyers, as

7  opposed to discovery against parties.

8          And in fact, their application within their motion to

9  not file a memo of law is not, should not be taken by the Court

10  as the bravado that this is all simple, that they get what they

11  get.

12          It's a recognition, quite frankly, on their part,

13  that the law does not support them.  As Mr. Satterley said,

14  I've litigated cases with him, as well as others who are the

15  subject of these motions for years.

16          And our communications about various issues are

17  communications as representatives of members of the committee.

18  Our communications with counsel for the TCC, they're privileged

19  and we shouldn't have to start talking about that.

20          Finally, with regard to the valuation of cases, the

21  subpoena talks about, you know, what is the average amount.

22  There is no average amount.  That's not the way the ethical

23  rules that we have to live under require us to conduct

24  ourselves.

25          Each client has the authority to either accept or

1   reject an offer made to him or her and we cannot impose upon

2   our clients "average settlement values," and we don't approach

3   -- it would be a violation of our ethical rules to approach a

4   one size fits all categorization: you have this disease, this

5   is what you get.

6           That might be ultimately what happens in a bankruptcy

7   because it's imposed on people.  It might be in other types of

8   situations where there's an administrative type of a program

9   where this is the amount that you get, whether it's a tax

10  credit or vouchers or what have you, but litigating our cases,

11  that is against the ethical rules.

12          Finally, with regard to the liability; liability is

13  not only, and the damages that a defendant owes is not simply,

14  a matter of the medical bills or the lost earnings that a

15  plaintiff has or even, quite frankly, the pain and suffering.

16          But the liability of a defendant is impacted also by

17  the strength of the case against it.  And so, yes, for sure, I

18  have a lot of liability documents that J&J has produced to me,

19  but they produced them to me and they know them and it would

20  fill up Your Honor's courtroom more than it's already filled

21  with boxes, to have liability evidence against J&J.

22          But I also have my analyses of that in documents.  My

23  analyses are privileged.  They're work product.  I have the

24  analyses that Mr. Satterley and I have worked together; those

25  are privileged.

1  the facts are work product and are privileged and should not be

2  produced.

3         But I wanted to raise my hand and add that there have

4  been comments made Mr. Torborg that the Plaintiff law firms

5  have not participated in this process in good faith, have not

6  looked for documents that might be responsive, that are non-

7  privileged.

8         And that's just not the case.  In relation to

9  communication with other lawyers, communication with co-counsel

10 has been well-described, are privileged.  But in the case of

11 communications with other lawyers that are non-privileged, I

12 can tell you from our firm's perspective, even though we're not

13 a party, even though we have not filed a Motion to Dismiss as a

14 firm, we took steps to make a good faith review and where there

15 was a communication that was not privileged, we produced it.

16        So to suggest somehow that there's been an improper

17 approach to this by Plaintiff's counsel I think is not accurate

18 and I just wanted to let the Court know that.

19        THE COURT:  All right.  Thank you.

20        Ms. Parfitt?

21        MS. PARFITT:  Thank you, Your Honor.  And I, again,

22 am glad that you're feeling better.

23        THE COURT:  Thank you.

24        MS. PARFITT:  Your Honor, points that have not been,

25 perhaps not been raised and discussed by others, but as Ms.

62

1  O'Dell indicated as well, we have taken any and all requests by

2  counsel quite seriously.  That's how we handle all types of

3  requests.

4          We made a search of our files despite the fact that

5  we felt any of the requests the Defendants asked that we had

6  objected to were -- had some type of relevance.

7          We did not.  I'm write down the road from Jones Day

8  and I would have been delighted to receive a request to meet

9  with them and talk with them.  I suspect that would have been a

10 very short meeting, but to suggest that there was an offer,

11 there was not.

12         Also, with regard to investigation of our claims and

13 perhaps very relevant to what we will see down the road -- what

14 our firm does, like all other firms, most of the firms on this

15 recording today is do an investigation of their claims so that,

16 in this particular case, as it pertains to ovarian cancer

17 cases, what we do file are epithelial ovarian cancer cases,

18 cases that are supported by the science and supported by the

19 Daubert ruling of the Honorable Judge Wolfson.

20         So that does take time, and just because someone

21 retains the law firm of Ashcraft & Gerel does not mean -- we

22 ultimately make an assessment that there is this one that need

23 to be filed.

24         And so, those discussions, those investigations are

25 all highly confidential and privileged until such time as a

1  case is filed.

2          And then, at the time the case is filed, that's

3  public and available to LTL and any other Defendant in this

4  case.

5          As to the other requests with regard to the 8.9 and

6  any comments, I agree with Mr. Ruckdeschel and others.  I'm

7  sure we are all quite opinionated on 8.9 and when given the

8  opportunity, would love to share those opinions with regard to

9  that type of evaluation of these serious claims and a number

10 that would be so minimal in its ability to compensate these

11 clients.

12         But that said, any and all those types of

13 communications are indeed privileged and are indeed work

14 product, as are the financial distress analysis that we, or any

15 other clients, would make.

16         But I just wanted to, I felt compelled to say, as

17 we've heard quite a bit, the firms that have spoken, the TCC

18 whose opposition we do in fact embrace, I think have been very

19 clear with regard to the type of investigation to make and the

20 seriousness with which we respond to any requests, not only at

21 the Court, but frankly, of counsel.

22         This matter involves women that are dying, women that

23 have died.  And to suggest we would do anything less than that,

24 is an insult.  Thank you, Your Honor.

25         THE COURT:  Thank you.

64

1          Mr. Molton?

2          MR. MOLTON:  Yes, Your Honor.  I didn't expect to

3  speak, but I got a call from Ms. Lisa Busch of the Weitz

4  Luxenberg firm who unfortunately, for whatever reason is not

5  appearing.

6          She had her hand up, but apparently, she's not within

7  the webinar.  So she just asked me lest, Your Honor, as you

8  review the documents, to relay to you that they did file a

9  response last night in opposition and she stands on it for the

10 Weitz Luxenberg firm, as well as the statements made by other

11 colleagues as well as by the TCC and refers you to the fact

12 therein that, as well, they were not properly served.

13         So that's all I have to do, Judge.  I'm just

14 transmitting that from the Weitz Lux firm who, through whatever

15 miscommunication was not on the webinar.  Thank you, Your

16 Honor.

17         THE COURT:  No problem.  I did receive their

18 submission and I hope your daughter's program or event went

19 well.

20         All right.

21         MR. MOLTON:  Your Honor, thank you so much.

22         THE COURT:  Yup.

23         MR. MOLTON:  Thanks so much for the courtesy of

24 extending this.

25         THE COURT:  No problem.