Levy Konigsberg LLP
650 Third Avenue
New York, NY 10158

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, | ) | |
| | ) | Lead BK Case: 23-12825-MBK |
| Debtor. | ) | |

**Paul Crouch's Motion to Preclude Debtor's Proffered Expert Testimony of Charles H. Mullin and Gregory K. Bell**

Paul Crouch, Individually and as Executor and as Executor Ad Prosequendum of the Estate of Cynthia Lorraine Crouch, files the following Motion to Preclude Debtor's Proffered Expert Testimony of Charles H. Mullin and Gregory K. Bell. As grounds therefore, Mr. Crouch states as follows:

The Debtor has proffered reports from Charles H. Mullin, Ph.D and Gregory K. Bell, Ph.D in purported support of its response to the various Motions to Dismiss filed against it.

"Federal Rule of Evidence 702 governs the admissibility of qualified expert testimony, providing that an expert witness may testify if: '(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.'" *Withrow v. Spears*, 967 F. Supp. 2d 982, 991 (D. Del. 2013) (quoting Fed. R. Evid. 702).

As discussed below, the proffered opinions of the Debtor's experts fail to meet this standard because they are contrary to the law and the facts that control this case and, accordingly will not "help the trier of fact to understand the evidence or determine a fact at issue." Similarly, the opinions discussed below are not only not based "on sufficient facts or data" but are contrary to the repeated admissions of the Debtor regarding the facts and otherwise fail to apply the actual facts that they claim to assume to the opinions they claim to express.

These improper, irrelevant and unsupported opinions are simply a distraction and a waste of time. Allowing them to be presented at the evidentiary hearing on the many motions to dismiss pending before the Court will waste at least a day of precious Court time, countless thousands of dollars of attorneys and expert fees and, ultimately be for naught. The Court cannot give credence to these opinions and they must be excluded.

**1. The Debtor's Proffered Expert Testimony Regarding The Alleged Relative Merits And Flaws Of The Tort System And The Debtor's Proposed Use Of The Bankruptcy Code Are Irrelevant To The Issues Before The Court And Must Be Precluded.**

A significant portion of the Debtor's proffered expert testimony involves opinions regarding the relative merits and defects of the civil justice system vs. the bankruptcy system in connection with tort claims[1]. *See generally*, Mullin Report, June 7, 2023, Sections VI and VII. Mr.

[1] Mr. Mulllin has a PhD in Economics and a BA in Economics and Mathematics – and has taught courses in advanced statistical economic analysis and labor economics. Finally, he has published papers on applied and theoretical econometrics and labor economics. While perhaps impressive in his field, none of this qualifies him as an expert in the relative merits and defects of the civil justice system vs. the bankruptcy system in connection with tort claims. Mr. Mullin has neither the education, training or experience required to qualify as an expert in this topic. Likewise, Mr. Mullin lacks the requisite expertise to give opinions on issues of causation and/or the relative strengths and weaknesses of the claims at issue here. Because this Motion addresses the irrelevance of this entire subject to the Court's decision, these deficiencies are left to another day.

Mullin's Rebuttal Report is nearly entirely related to this issue. *See* Mullin Rebuttal Report, June 14, 2023, p. 1-11 and Appendix B.[2]

The question of the relative merits of the tort system vs bankruptcy is beyond the jurisdiction of the federal courts – including this Court. In *In re Federal Mogul Global,* 684 F.3d 355 (3rd Cir. 2012), the Third Circuit engaged in a lengthy discussion of the challenges posed by tort system litigation of asbestos personal injury claims, the claimed advantages of the bankruptcy system, and the failure of Congress "to create a comprehensive resolution to asbestos litigation." *Id.* at 359. The conclusion of the Third Circuit was not, however, that the Bankruptcy Code could be judicially transformed into the long-sought "comprehensive resolution." Rather, the Third Circuit declared that such a "comprehensive resolution" was for the legislature: "We leave such systemic public policy questions to Congress." *Id.* at 359.

The Third Circuit's recognition that fundamentally restructuring the civil justice system, with all its federalist, Constitutional and statutory implications, is for Congress and not the Courts, is consistent with the repeated pronouncements of the Supreme Court rejecting analogous attempts to use the class-action process to "solve" the asbestos litigation in *Amchem Prods. v. Windsor*, 521 U.S. 591, 628-629 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999).

As Justice Ginsburg, writing for the majority, noted in the conclusion of *Amchem,* "The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution." *Amchem Prods. v.*

[2] The Debtor has designated these materials as confidential. While Mr. Crouch does not agree with this designation, in conformance with the Court's ruling that Mr. Crouch agree to a confidentiality order, these materials will be provided to the Court confidentially.

*Windsor*, 521 U.S. 591 (1997). Reforming the civil justice system is simply not within the constitutional authority of the federal courts.

Two years later, Justices Rehnquist, Kennedy and Scalia's concise concurrence in *Ortiz*, affirmed the same point - civil justice reform is the work of Congress, not the Courts - not even the Supreme Court. Their concurrence is set forth in full below:

> JUSTICE BREYER's dissenting opinion highlights in graphic detail the massive impact of asbestos-related claims on the federal courts. *Post*, at 1-3. Were I devising a system for handling these claims on a clean slate, I would agree entirely with that dissent, which in turn approves the near-heroic efforts of the District Court in this case to make the best of a bad situation. Under the present regime, transactional costs will surely consume more and more of a relatively static amount of money to pay these claims.
>
> But we are not free to devise an ideal system for adjudicating these claims. Unless and until the Federal Rules of Civil Procedure are revised, the Court's opinion correctly states the existing law, and I join it. But the "elephantine mass of asbestos cases," *ante*, at 1, cries out for a legislative solution.

*Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 865 (1999). Since *Ortiz*, Congress has repeatedly introduced and considered legislative "solutions" to asbestos personal injury litigation – and repeatedly declined to adopt any such solution.

Put simply, it is beyond the purview of this court, the Third Circuit, and even the Supreme Court to judicially "solve" perceived inefficiencies in the tort system. This is not a failure of the Courts or of the legislature. Rather, it is a reflection of our deliberately-established system of limited and fragmented governmental authority. Our federalist system of government is *designed* to make it difficult to enact systemic change that can override the rights of the states and of the citizens of this great nation.

The Debtor's arguments regarding the alleged limitations and alleged inefficiencies of the tort system, and the ways in which the Debtor claims the bankruptcy system is a more efficient

or better suited to address personal injury claims are irrelevant to this Court's decision. Such issues are beyond the purview of the federal courts. Accordingly, the Debtor's proffered expert opinions regarding the relative merits (and alleged demerits) of the tort system and bankruptcy system are also irrelevant and a waste of time, money and judicial resources.

Put simply, the opinions of Mr. Mullin on this topic are irrelevant and inadmissible.[3] Moreover, precluding this testimony will eliminate a day, at least, of testimony from the hearing on the Motions to Dismiss as, once the debtors' experts on these issues are precluded, the Movants need to present experts in rebuttal also passes.

**2. The Debtor's Sworn Denials Of Immediate Financial Distress And Admissions It Performed No Analysis Of This Issue Prior To Filing This Petition Cannot be Contradicted By Post-Hoc Expert "Opinions."**

The Debtor's directors and officers have repeatedly affirmatively asserted, under oath, that, even after the (fraudulent) cancelation of the 2021 Funding Agreement and its replacement with the current funding agreement between LTL and Holdco, LTL (a) is not insolvent, (b) that its assets exceed its liabilities, (c) that LTL was and is able to meet its liabilities as they come due, and (d) that LTL's ability to fund its talc liabilities is not changed between the filing of LTL1 and LTL2. LTL further admits that, prior to filing this petition, it did not perform any analysis of the expected cashflow needs it would face if it returned to the tort system to litigate talc claims after the Third Circuit found LTL1 to be a bad-faith bankruptcy. *See e.g.*, Paul Crouch's Supplemental Objection and Designations of Deposition Testimony in Opposition to the Debtor's Preliminary

[3] It does not appear that Mr. Bell will be asked to offer such opinions. However, should the debtor attempt to morph Mr. Bell's opinions into addressing this subject matter, this Motion would apply equally to Mr. Bell.

Injunction Motion, (Doc. 62). Mr. Crouch incorporates his earlier Supplemental Objection herein by reference.

While Mr. Crouch will not re-state here all of the admissions of the Debtor's Officers and Directors, a few examples are warranted.

The debtor's chief legal officer, John Kim, admitted without reservation that LTL's ability to fund its talc related liabilities was unchanged from that of JJCI prior to the filing of LTL1.

> Q. Is it true today that the debtor, LTL, has at least the same, if not greater, ability to fund talc-related claims and other liabilities as Old JJCI had before the prior restructuring?
>
> A. I believe it is.

Kim Deposition, April 14, 2023, p. 64.

Mr. Dickinson, LTL's Chief Financial Officer, similarly admitted:

> Q. Ok. So if Mr. Kim, your colleague, testified that the 2023 restructuring did not impair LTL's ability to fund its talc liabilities, you have no factual information to contradict that testimony. Fair?
>
> A. That is fair.

Dickinson Deposition, April 17, 2023, p. 159.24-160.7.

> Q. On April 3 of 2023, was LTL able to meet its liabilities as they came due?
>
> A. Yes.
>
> Q. On April 4, after the restructuring, was LTL able to meet its liabilities as they came due?
>
> A. Yes.

Dickinson Deposition, April 17, 2023, p. 162.11-162.17.

> Q. With respect to the dismissal of the first bankruptcy, after the dismissal order was entered on January 30th, I believe, of 2023, did LTL perform any evaluation

as to how much money it would take to fund a return to litigating talc claims in the tort system over the following 12 months?

A. I didn't see any written estimation or nor do I know of any.

Q. All right. And would that – that would be the same with respect to if I expanded that period over the next – did LTL, after the January 30 dismissal order from the Third Circuit, did LTL perform any evaluation of how much cash flow it would require to manage its talc liabilities in the tort system over the next three years?

A. I didn't see anything in writing, nor did I do it.

Q. All right. And you are not aware of any evaluation that was performed – you, the CFO of LTL, are not aware of any evaluation that was performed to ascertain what the expected cash flow demands would be of returning these cases to the tort system. Fair?

A. That is fair, Mr. Ruckdeschel.

Dickinson Deposition, April 17, 2023, p. 162.21-163.23.

LTL's repeated, unequivocal and sworn statements of fact are judicial admissions that cannot be opportunistically cast aside by proffering post hoc expert testimony to the contrary. *See generally, Lee v. Smith & Wesson Corp.*, 760 F.3d 523 (6th Cir. 2014)(noting that expert testimony that is contrary to the plain facts must be excluded and examining a situation where the supposed conflict was not preclusive). This is not a situation, like that in *Lee*, where the expert's testimony, while not consistent with the impression of the injured plaintiff, was supported by the physical evidence and provided an alternative explanation for the gun exploding in Mr. Lee's face. Here, the Debtor stands by its factual assertions that it can meet its obligations as they come due and that it has the same ability to meet its obligations as they come due as it did during and prior to LTL1. Those sworn statements are judicial admissions – to which

the Debtor stands by doggedly so as to avoid admitting to fraudulent conveyances – and cannot be casually swept aside with post-hoc expert opinions.

It is all the more inappropriate to allow the debtor's expert testimony to contradict the continued sworn factual claims of the debtor, given the repeated admissions that LTL performed no analysis of what its expected cashflow needs would be if it returned to the tort system prior to filing this petition. *See* Dickinson testimony *supra.*

To allow a party to file for bankruptcy without ever analyzing if it was actually in financial distress (while simultaneously admitting under oath that it can meet its debts as they come due) and to then post-hoc submit "expert" testimony to attempt to justify that filing is improper and would remove a key safeguard protecting the limited jurisdiction of the Courts – Bankruptcy Rule 9011's requirement that a party have an actual factual basis for filing prior to so doing.[4]

The debtor will, undoubtedly, respond that its proffered expert opinions are *not* contrary to its repeated sworn statements that LTL has the ability to meet its debts as they come due. But if that is the case, then the Third Circuit's decision in LTL1 that financial distress must be *immediate* and must be based on facts, not speculation about future events that might or might not come to pass, renders any such expert testimony irrelevant and contrary to controlling law. The Debtor's admissions disprove any immediate financial distress. Either the proffered expert testimony is contrary to the sworn admissions of the Debtor that it can pay its debts as they come due (improper) or it confirms those admissions (irrelevant).

---

[4] The Debtor, Johnson & Johnson and their legion of lawyers from the largest law firms in the world, being paid tens of millions of dollars in this proceeding, cannot reasonably claim that they did not have the time or ability to evaluate the likely demands LTL of returning to the tort system after the Third Circuit's decision was announced in January 2023 and the filing of this petition on April 4, 2023.

"Financial distress must not only be apparent, but it must be immediate enough to justify a filing. '[A]n attenuated possibility standing alone' that a debtor 'may have to file for bankruptcy in the future' does not establish good faith." *In re LTL Mgmt*., 58 F.4th at 755 (citing e.g., *In re SGL Carbon*, 200 F.3d 154, 164 (3rd Cir. 2004). "Put another way, 'Congress designed Chapter 11 to give those businesses teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." *In re LTL Mgmt.*, 58 F.4th at 756 (citing *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000)).

Because the Debtor affirmatively claims that it can meet its liabilities as they come due, that its ability to do so is at least as strong as JJCI's ability prior to LTL1 and that the 2023 restructuring did not impair that ability, it has conceded that there is no basis to allow this Court to find immediate financial distress required by the Third Circuit. Rather, these admissions compel the conclusion that the Third Circuit's ruling in *In re LTL Mgmt*. mandates dismissal.

Moreover, the Debtor's admission that it performed no analysis of what its liabilities would be in the tort system for the next one year, three years or any time period prior to filing this petition demonstrates that, at filing, there was not even a colorable basis to claim that the requirements of the Third Circuit from *In re LTL Mgmt*. had been met. To allow the Debtor to now attempt to backfill this glaring and fatal deficiency with speculative expert testimony contrary to its repeated and continued sworn testimony would not only be an improper abuse of discretion, but would set a dangerous precedent.

**3. The Debtor's Experts Opinions Improperly Purport To Evaluate The Total Liability And Defense Costs For LTL and its Non-Debtor Parent J&J.**

The only debtor in this case is LTL. There can be no reasonable dispute that non-debtor J&J has its own, independent, non-derivative liability for all Johnson & Johnson talc-related products and conduct prior to 1979, when it directly owned and operated its talc-related businesses. *See e.g.*, Objection to the Debtor's Preliminary Injunction Motion and Joinder of Paul Crouch to the Briefs In Opposition (Doc. 57). And with respect to post-1979 conduct, the Third Circuit specifically held that "it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it." *In re LTL Mgmt.*, 58 F.4th 738, 761 n. 16 (3rd Cir. 2023)[5].

The Court is intimately familiar with these issues from the prior briefing and argument, which Mr. Crouch incorporates herein. Under controlling New Jersey law, specific, not general, language is required for an indemnity contract to cover independent tortious action of an alleged indemnitee. *See e.g.*, *Cozzi v. Owens-Corning Fiber Glass Corp.*, 164 A.2d 69 (N.J. Super. 1960); *Mantilla v. NC Mall Assoc.*, 770 A.2d 1144 (NJ 2001). In *Cozzi*, the Court noted:

> The general rule appears to be that where the act of negligence of the indemnitee is the sole cause of the accident, he is not entitled to recover against the indemnitor unless an intent to indemnify is unequivocably spelled out in the contract, the surrounding circumstances, and the objects to be attained by the parties.

Cozzi, 164 A.2d at 71. Four decades later, in 2001, *Mantilla* reaffirmed this principle of New Jersey law, citing *Cozzi,* among other cases:

> "As a matter of well-settled legal doctrine, it is clear that an indemnity provision is to be construed in accordance with the rules for construction of contracts generally, and hence that the judicial task is to ascertain the intention of the

[5] The record in both LTL1 and LTL2 clearly shows that multiple juries have allocated separate and independent liability to J&J – as opposed to JJCI. Verdicts in such cases have been affirmed on appeal and are final. As such, having had full and fair opportunities to litigate this very issue, both the debtor and J&J are collaterally estopped from asserting otherwise.

> parties . . . ." Doloughty v. Blanchard Constr. Co., 139 N.J.Super. 110, 116, 352 A.2d 613 (Law Div.1976); see also Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J.Super. 117, 121, 164 A.2d 69 (App.Div.1960) (stating "[a] contract of indemnity is to be interpreted in accordance with the rules governing the construction of contracts generally"). "When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee." Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 191, 510 A.2d 1152 (1986). **"Thus, a contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms." Ibid**.

*Mantilla*, 167 N.J. at 272-3 (emphasis added).[6]

Similarly, New Jersey law prohibits indemnification agreements for wanton and reckless conduct, *Johnson & Johnson v. Aetna*, 667 A.2d 1087 (N.J. Super. 1995); *Tyranowski v. Lodi Bd. Of Educ.*, 643 A.2d 1057 (N.J. Super 1994), which numerous juries have found non-debtor Johnson & Johnson perpetrated in connection with talc products. *See, e.g., Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 701-02 (Mo. App. 2020), cert. denied, 2021 WL 2194948 (June 1, 2021) (affirming approximately 20 ovarian cancer jury verdicts answered separately as to J&J and JJCI, as well as punitive damages imposed separately as to each, with a greater amount of punitive damages imposed on J&J). Despite this, neither Mr. Mullin nor Mr. Bell provides any analysis of what LTL's liability for indemnity or defense costs would be if it returned to the tort system and faced only its own liability and not also the additional burden of non-debtor J&J's liability and share of the defense costs.

---

[6] At oral argument on June 13, 2023, counsel for the Debtor accused the undersigned of misrepresenting the holdings of *Cozzi* and *Mantilla*, quoting as alleged support of this accusation the first sentence of the quoted language from *Mantilla* here. See Transcript of oral argument June 13, 2023 at 67. In making this false and unsupported accusation, counsel for the debtor deliberately omitted the two immediately following sentences, which reflect precisely the rule of New Jersey law Mr. Crouch has argued repeatedly to this Court. The three sentences above are the three sentences the undersigned requested to present to the Court on June 13, 2023 and which the Court presciently noted "I'm sure well squeeze it in somewhere along the way over the next few weeks." *Id.* at 70.

But the only issue before this Court is whether LTL is, itself, in financial distress from its legal obligations – not its obligations *plus* all of non-debtor J&J's obligations. As noted by the Third Circuit: "the financial state of LTL, a North Carolina limited liability company formed under state law and existing separate from both its predecessor company (Old Consumer) and its newly incorporated counterpart company (New Consumer)[now re-named Holdco] – should be tested independent of any other entity. *LTL*, 58 F.4th at 758. This analysis is governed by controlling state law: "we must evaluate the full set of state-law transactions involving LTL to understand the makeup of its financial rights and obligations that, in turn, dictate its financial condition." *Id.*

Importantly, the Third Circuit rejected this Court's consideration of the negative effect on LTL's non-debtor corporate affiliates if LTL asserted its legal rights to their fullest. "The assumption seems to be that, out of concern for its affiliates, LTL may avoid drawing on the payment right to its full amount. But this is unsupported and disregards the duty of LTL to access its payment assets." *Id.* at 760. This analysis applies equally to LTL's ability to reject demands by J&J that it indemnify J&J for the costs of defense or indemnity related to J&J's own negligence under New Jersey law.

Accordingly, the failure of the Debtor's proffered experts to evaluate or offer opinions regarding LTL's liability – as opposed to the combined liability of LTL, J&J and all the other corporate affiliates of LTL in the J&J family - renders their opinions irrelevant and unhelpful to the Court in its determination of good faith in this matter.[7]

[7] Indeed, while beyond the scope of this Motion, LTL's refusal to assert its state-law defenses to J&J's claims of indemnity and its consistent insistence that it will, in fact, voluntarily assume the obligation to indemnify non-debtor J&J and Mr. Kim's repeated admissions that LTL sees no point in pursuing this bankruptcy unless it also obtains 524g style relief for non-debtor J&J is powerful evidence of bad faith.

**4. Loss Of Value Or Harm To Non-Debtor Holdco Is Legally Irrelevant To This Proceeding And May Not Be Considered Under *LTL1*.**

[redacted]

[redacted] As such, even if Holdco was forced to liquidate at a discount, that "lost value" would not impair LTL's ability to fund its liabilities (and those of J&J which it is not, as noted herein, required to pay). And, of course, the Third Circuit's decision in *In re LTL Mgmt.*, makes clear that harm to LTL's non-debtor corporate family members is not a relevant consideration in the analysis of LTL's financial distress.

**5. LTL's Proffered Testimony Is Irrelevant, Fails To Establish A Basis To Support This Petition, And Must Be Excluded.**

On their face, LTL's proffered experts establish that the minimum hypothetical value available to LTL under the funding agreement exceeds the maximum hypothetical cost of its talc liabilities in the tort system. [REDACTED] Testimony that the debtor - more likely than not - *can meet its obligations* - cannot support a finding of imminent financial distress.

Second, both Mr. Mullin and Mr. Bell's reports are based on speculative assumptions about what might happen under various scenarios - all of which are largely controlled by non-debtor J&J. Hypothetical musings about what might happen in the future and the hypothetical implications of those hypotheticals is simply not consistent with the Third Circuit's admonition in LTL that findings of imminent financial distress be based in reality, not speculation. Moreover, as discussed above, these musings are contrary to the repeated (and continuing) sworn statements of the Debtor that it can meet its obligations as they come due - just as it swore in LTL1.

In sum, the proffered opinions of Mr. Mullin and Mr. Bell cannot "help" the Court understand any "facts at issue" because: (a) the relative merits of the tort system and the

[REDACTED]

bankruptcy system are not relevant to this Court's decision; (b) the opinions improperly assume LTL is legally responsible for 100% of not only its own liabilities, but also the costs and liabilities of J&J for its own, independent tortious conduct; (c) the Debtor has admitted to (and stands by) the material facts that demonstrate it is not in immediate financial distress; and (d) ultimately, Mr. Bell's opinion, which depends entirely on Mr. Mullin's opinions, is that more likely than not, LTL will have enough money to fund its costs and liabilities in the tort system, even assuming it is required to cover J&J's share.

**WHEREFORE**, Mr. Crouch requests that the Court enter an Order precluding the proffered expert testimony of Mr. Mullin and Mr. Bell as legally irrelevant and unhelpful to the trier of fact and as unsupported by and contrary to the established factual evidence.

Respectfully submitted:
LEVY KONIGSBERG LLP
By: /s/ Moshe Maimon
MOSHE MAIMON

DATED: June 21, 2023