**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Kristopher M. Hansen (*admitted pro hac vice*)
Ryan P. Montefusco (*admitted pro hac vice*)

PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)

COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota
Warren A. Usatine
Seth Van Aalten (*admitted pro hac vice*)
Justin Alberto (*admitted pro hac vice*)

PARKINS & RUBIO LLP
700 Milam, Suite 1300
Houston, Texas 77002
Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)

*Counsel to Ad Hoc Committee of Supporting
Counsel*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |

**OMNIBUS RESPONSE OF AD HOC COMMITTEE OF SUPPORTING COUNSEL TO
REPLIES IN SUPPORT OF MOTIONS TO DISMISS**

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 2

ARGUMENT ............................................................................................................ 5

I.    RESOLVING PRESENT AND FUTURE TALC LIABILITY IS A VALID
BANKRUPTCY PURPOSE, AND THE PETITION WAS NOT FILED TO
OBTAIN A TACTICAL LITIGATION ADVANTAGE ................................. 5

II.    EACH ELEMENT OF THE SECTION 1112(B)(2) ANALYSIS IS SATISFIED .......... 8

    A.    LTL 1.0 Does Not Preclude The Application Of Section 1112(b)(2) .................. 9

    B.    Unusual Circumstances Exist Such That Dismissal Is Not In The Best
Interest Of The Creditors And The Estate .......................................................... 10

    C.    There Is A Reasonable Likelihood That The Plan Will Be Confirmed
Within A Reasonable Period Of Time ................................................................ 13

    D.    Any Purported Act Or Omission Constituting Cause, Including Alleged
Bad Faith, Is Justified And Can Be Cured ........................................................ 16

CONCLUSION ............................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1121 Pier Village LLC*,
    635 B.R. 127 (Bankr. E.D. Pa. 2022) ............................................................................ 9, 10

*In re ECV Dev., LLC*,
    No. BAP SC-06-1453-PAMKB,
    2007 WL 7540960 (B.A.P. 9th Cir. June 15, 2007) ......................................................... 16

*In re Energy Future Holdings Corp.*,
    990 F.3d 728 (3d Cir. 2021) ............................................................................................. 16

*In re Federal-Mogul Global, Inc.*,
    684 F.3d 355 (3d Cir. 2012) ......................................................................................... 5, 6, 7

*In re Forest Hill Funeral Home & Mem'l Park*,
    364 B.R. 808 (Bankr. E.D. Okla. 2007) ........................................................................... 16

*In re Green*,
    No. BR 14-15981-ABL, 2016 WL 6699311 (B.A.P. 9th Cir. Nov. 9, 2016) ...................... 16

*In re Hinesley Fam. Ltd. P'ship No. 1*,
    460 B.R. 547 (Bankr. D. Mont. 2011) .............................................................................. 16

*In re Honx, Inc.*,
    No. 22-90035, 2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) .................................. 7

*In re Keith*,
    No. 10-61722-11, 2010 WL 3835003 (Bankr. D. Mont. Sept. 29, 2010) ........................... 16

*In re Korn*,
    523 B.R. 453 (Bankr. E.D. Pa. 2014) ............................................................................... 10

*Layman v. Tennessee State Bank*,
    No. 2:19-CV-233, 2021 WL 6425951 (E.D. Tenn. Feb. 2, 2021) ...................................... 16

*In re LTL Mgmt., LLC*,
    64 F.4th 84 (3d Cir. 2023) ............................................................................................. 6, 9

*In re Muralo Co. Inc.*,
    301 B.R. 690 (Bankr. D.N.J. 2003) .................................................................................... 8

*In re Orbit Petroleum, Inc.*,
    395 B.R. 145 (Bankr. D.N.M. 2008) ................................................................................ 17

*In re Roman Catholic Church of Archdiocese of New Orleans*,
    632 B.R. 593 (Bankr. E.D. La. 2021) ................................................................................. 8

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Sapphire Dev., LLC v. McKay*,
  549 B.R. 556 (D. Conn. 2016) ................................................................................................... 16

*In re Sherwood*,
  No. 04-50584, 2008 WL 2074098 (Bankr. W.D. Mo. May 14, 2008) .................................... 13

*United States v. Cardales-Luna*,
  632 F.3d 731 (1st Cir. 2011) ................................................................................................... 10

**Statutes**

11 U.S.C.
  § 524(g) ............................................................................................................................... 5, 17
  § 1112 ................................................................................................................................. *passim*
  § 1129 ..................................................................................................................................... 15

**Other Authorities**

Fed. R. Civ. P. 23(b)(3) ................................................................................................................ 12

The Ad Hoc Committee of Supporting Counsel (the "AHC of Supporting Counsel"), by and through its counsel, Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP, hereby submits this response (the "Response") to the *Reply in Support of Motion of Official Committee of Talc Claimants to Dismiss Second Bankruptcy Petition of LTL Management, LLC* [ECF No. 857] (the "TCC Reply"); *The Ad Hoc Committee of States Holding Consumer Protection Claims' Reply in Support of Its Motion to Dismiss Chapter 11 Case* [ECF No. 863] (the "States Reply"); *Reply of the United States Trustee to (I) Debtor's Omnibus Objection to Motions to Dismiss Chapter 11 Case and (II) Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss* [ECF No. 862] (the "UST Reply"); *Reply in Support of Motion of Arnold & Itkin, on Behalf of Certain Talc Claimants, to Dismiss Chapter 11 Case* [ECF No. 854] (the "A&I Reply"); *MRHFM's Reply in Support of Motion to Dismiss LTL Management's Second Bankruptcy Petition* [ECF No. 855] (the "MRHFM Reply"); *Ad Hoc Group of Mesothelioma Claimants' Joinder to Motion to Dismiss the Second Bankruptcy Petition of LTL Management and Reply in Support of Motion filed by the Official Committee Of Talc Claimants* [ECF No. 866] (the "Meso. Joinder"); and *The State of New Mexico and the State of Mississippi's: (I) Memorandum of Law in Reply to Debtor's Omnibus Opposition to Motions to Dismiss Debtor's Second Bankruptcy Petition; (II) Joinder in Replies to Debtor's Opposition by Certain Other Parties; and (III) Statement in Lieu of Opening Argument* [ECF No. 872] (the "NM and MS Reply," and together with the TCC Reply, States Reply, UST Reply, A&I Reply, MRHFM Reply, and Meso. Joinder, collectively, the "Replies" of the "Movants").  In support of the Response, the AHC of Supporting Counsel respectfully states as follows:

**PRELIMINARY STATEMENT**[2]

1.      Over one month ago, LTL Management, LLC (the "Debtor") filed its proposed plan of reorganization (including any amendments or modifications, the "Plan")[3] that provided a framework to resolve all current and future talc claims in a fair and equitable manner.  The Plan, a product of ongoing deliberate and good faith negotiations between the Debtor, Johnson & Johnson, and certain member law firms comprising the AHC of Supporting Counsel, has only improved since, and, once final, is expected to receive support from a significant majority of all outstanding claimants.

2.      The law firms currently comprising the AHC of Supporting Counsel signed Plan Support Agreements (each a "PSA") pursuant to which each such law firm agreed to do all things reasonably necessary and appropriate in furtherance of confirming a Plan consistent with the PSAs. In furtherance of their ongoing obligations under the PSA, the AHC of Supporting Counsel has worked diligently with the constituent parties in this case to optimize the contents of the Plan, and expects that the remaining details of this proposed historic settlement will be finalized in short order—at which point, the members of the AHC of Supporting Counsel, comprised of counsel representing a majority of all talc claimants, intend to immediately confer with their clients and recommend voting in favor of confirmation.

3.      The Movants, on the other hand, acting on their mere belief that a potentially higher average recovery *could* be available at some *uncertain* time in the future, have instead rejected the AHC of Supporting Counsel's effort to build consensus and common ground amongst the Debtor's stakeholders.  In this regard, the Movants simply ignore reality.  The vast majority of claimants

---

[2]   Capitalized terms used but not defined in this preliminary statement have the meanings provided in the remainder of the Response.

[3]   *See Chapter 11 Plan of Reorganization of LTL Management LLC* [ECF No. 525].

represented by both the TCC and the AHC of Supporting Counsel have been waiting nearly a decade for a recovery on their claims in the tort system, but nearly all have yet to receive a single penny for their injuries.

4.       Undeterred, however, the Movants assert in their Replies that the Debtor's chapter 11 case (the "Chapter 11 Case") should nonetheless be dismissed on various grounds, including that the Debtor is not in financial distress; that the petition was filed in bad faith (*i.e.* without a valid bankruptcy purpose and to obtain a tactical litigation advantage); and that the section 1112(b)(2) exception to dismissal for "cause" on account of "unusual circumstances" is inapplicable here.   As with its Objection, and because the AHC of Supporting Counsel expects the Debtor will further address the issue of financial distress in its response to the Replies, this Response instead addresses the evidence demonstrating that the filing of the petition was not an unfair litigation tactic and that, pursuant to section 1112(b)(2), the Chapter 11 Case should not be dismissed.  This is so for numerous reasons.

5.       As an initial matter, the Movants do not—because they cannot—establish that the commencement of the Chapter 11 Case was, as they refer to it, a "bad faith litigation tactic" designed to discharge the Debtor's talc liability on unfair terms.   In empty support for this argument, the TCC and others principally rely on their subjective belief that the traditional tort process—in particular the talc litigation MDL pending in the U.S. District Court for the District of New Jersey—is a superior and more-appropriate forum for resolving the myriad issues here presented.

6.       The Movants' arguments in this regard do not withstand scrutiny.   The MDL process is not an adequate substitute for bankruptcy resolution because it cannot properly address the rights of future claimants.  As shown herein, the bankruptcy process is *uniquely suited* to

3

resolve the matters at issue in the Chapter 11 Case precisely because it offers a centralized and accelerated alternative to piecemeal resolution of mass tort claims. This is particularly true because the claims here at issue involve unidentified future claimants and alleged injuries with significant latency periods. Furthermore, it defies logic that a "bad faith litigation tactic" would have the support of a significant majority of the claimants asserting claims against the Debtor; given the support for the Plan of the AHC of Supporting Counsel, the Movants' argument that the filing is simply a coercive litigation tactic is meritless, and the Movants cannot carry their burden to demonstrate a lack of good faith in this regard.

7.      The Movants also fail to demonstrate why this Court, in the event of a determination that the Chapter 11 Case may be dismissed for cause under section 1112(b)(1), should not exercise its discretion and refrain from doing so under section 1112(b)(2). Pursuant to section 1112(b)(2), bankruptcy courts may decline to dismiss a case where, as here, (i) unusual circumstances establish that dismissal is not in the best interests of creditors, (ii) there is a reasonable likelihood that a plan will be confirmed, and (iii) any infirmities in a chapter 11 debtor's conduct (or failure to act) were otherwise excusable and can be cured.

8.      As a threshold matter, and as shown in the AHC of Supporting Counsel's Objection, unusual circumstances plainly exist here. The Chapter 11 Case is of a scope and complexity that is unprecedented, particularly as it relates to the significant number of future claimants and the long latency period in which such injuries may manifest. The Plan is also supported by counsel for a significant majority of talc claimants and, once confirmed, will resolve *all* currently outstanding talc claims and provide a predictable and fair means of resolving future claims. Through this process, and in resolving mass tort liability of unprecedented scope, the largest number of creditors will receive a fair and equitable resolution of their claims in the shortest

amount of time, which itself establishes that declining to dismiss the Chapter 11 Case is in the best interests of all creditors and the estate.

9.       Finally, the Movants also fail to demonstrate that any alleged "bad faith" in the Debtor's filing will not be cured by Plan confirmation itself.  Indeed, the Debtor's decision to file its petition was driven both by the need to garner protection for it and its affiliates from the constantly increasing number of lawsuits being filed against the Debtor and its affiliates, as well as by its desire to pursue the deal set forth in the PSAs.  And, if confirmed, the Debtor will have secured support from over 75% of all outstanding claimants, which in itself refutes the Movants' overarching basis for seeking dismissal:  i.e., that the Debtor seeks through this process to *unfairly* resolve all talc claims that are now or hereafter may be asserted.  Given the prospect of a confirmed plan of reorganization that will fully and finally resolve all such lawsuits and provide fair and equitable compensation to current and future victims, any alleged deficiencies with respect to the decision to file the petition will be rendered moot and cured.  Therefore, this Chapter 11 Case should not be dismissed, and the Motions should be denied for these reasons and those that follow.

## **ARGUMENT**

### I.       **RESOLVING PRESENT AND FUTURE TALC LIABILITY IS A VALID BANKRUPTCY PURPOSE, AND THE PETITION WAS NOT FILED TO OBTAIN A TACTICAL LITIGATION ADVANTAGE**

10.       Unmoored from reality, the Movants wrongly assert that the Chapter 11 Case is nothing more than a "bad faith litigation tactic," the "sole purpose of which" is to discharge all talc liability on "terms dictated by J&J."  TCC Reply, at 3; *see also* States Reply, at ¶¶ 18-20 (alleging Debtor "unilaterally" imposed bankruptcy for "one-sided leverage" and arguing negotiations of the PSAs is evidence of an improper litigation tactic).

11.       In this regard, the Movants' argument is belied by the very purpose of section 524(g), as well as the material support the Debtor already has secured for a resolution of the Chapter 11 Case.

Indeed, as the Movants cannot dispute, Congress created section 524(g) so that "debtor[s] and third parties who are alleged to be liable for [] asbestos claims … [would] be encouraged to participate in a system that will maximize the assets available to pay asbestos claims, present and future, and provide for an equitable distribution and method of payment."  140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994) (statement of Sen. Graham); *see also In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 362 (3d Cir. 2012) (finding that the "trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability").

12.     Consistent with this statement of congressional intent and in furtherance of its legitimate bankruptcy purpose, the Debtor negotiated PSAs with members of the AHC of Supporting Counsel, and others, with the goal of ensuring that present and future talc claimants will receive fair and equitable payments on account of their claims in a centralized and accelerated process.  Contrary to the Movants' assertions, this is hardly a basis for the Court to find that the Chapter 11 Case was initiated only as a coercive litigation tactic and, provided the Debtor obtains, as the AHC of Supporting Counsel expects it will, support from over 75% of all outstanding claimants, it can hardly be said that the Debtor will have accomplished anything but a *fair* resolution of its talc liability overall.[4]

13.     This conclusion is made all the more clear when considering the realities of alternative paths to resolution in the tort system.  As acknowledged by the well-reasoned *Expert Report of Sheila L. Birnbaum* (the "Birnbaum Report"),[5] while the MDL process of "coordinating and consolidating

---

[4]     In fact, a finding that the petition was filed as a bad faith litigation maneuver would be a departure from the Third Circuit's preliminary observations in *LTL 1.0,* wherein the panel did not question the Debtor's "[g]ood intentions" in filing its first bankruptcy case, "such as to protect the J&J brand or comprehensively resolve litigation . . . ."  *In re LTL Mgmt., LLC*, 64 F.4th 84, 93 (3d Cir. 2023).

[5]     The Birnbaum Report is attached as **Exhibit 1** to the Declaration of Seth Van Aaltan filed herewith.

federal cases for pretrial purposes *can* lead to resolutions in cases with particular characteristics …. true *global* settlement" of all MDL claims is "*extraordinarily rare*, notwithstanding commentators' frequent (mis-)statements to the contrary." Birnbaum Report, at 5-6 (emphasis added) (internal quotations and citations omitted). Indeed, according to the Birnbaum Report, this is particularly true for cases like this one involving "mega mass torts" with "latent injury issues" stemming from conduct involving "multiple defendants and multiple products and activities over extended periods of time." *Id.* at 6.

14. The Third Circuit previously acknowledged the same to be true—recognizing that bankruptcy "has proven an attractive alternative to the tort system" for debtors facing mass tort claims *precisely because* "it permits a global resolution and discharge of current and future liability," with claimants' interests in that process sufficiently protected "by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably." *In re Federal-Mogul Global,* 684 F.3d at 359 (citation omitted); *see also* Birnbaum Report, at 8 ("In addition to greater centralization, bankruptcy courts are equipped to address future claimants' injuries and bind them through a court-authorized plan of reorganization. Moreover, the imposition of an automatic stay allows this valuation and resolution process to proceed without subjecting all parties to the most resource-intensive aspects of traditional litigation (i.e., discovery and trials).").

15. The Movants' remaining arguments are similarly unavailing. As an initial matter, the straw man presented by the TCC—that the current funding agreement by its terms presents a scenario where J&J coercively imposes confirmation on unwitting claimants—is meritless and should be disregarded. *See* TCC Reply, at 61-63. The TCC ignores the obvious. J&J will not vote on the Plan, which, if confirmed (as it must be) by a super-majority of claimants, will ensure that *all* claimants, present and future, have a realistic opportunity to receive compensation for their claims while living, as opposed to toiling in the tort system for decades to come.

16.     Similarly, the Ad Hoc Committee of States' attempt to characterize the Debtor's consensus-building efforts before and after the Petition Date as evidence that the petition is a bad faith litigation tactic fails in equal measure.  *See* States Reply, at ¶20.  The Debtor and members of the AHC of Supporting Counsel have for months worked to reach agreement and harness momentum towards a fair and equitable resolution through the Plan that would compensate all claimants on an accelerated basis.  *See* Dep. Tr. of M. Watts (June 12, 2023) at 106:8-15 ("And so is the plan that was filed on [May] 14th going to be the final plan?  I'd be surprised if it is.  Is it going to be something that, you know, is torn up and looks completely different?  I'd be surprised about that.  But is there a bunch of optimization steps that are being negotiated right now?  Sure.").[6]  Hardly evidence of untoward gamesmanship, the negotiation of the PSAs is evidence of the Debtor's good faith intention to comprehensively resolve talc claims equitably and efficiently.

17.     For these reasons, rather than filing for the purposes of obtaining an "unfair" advantage in this nationwide litigation, the AHC of Supporting Counsel submits that the Debtor sought instead to equitably resolve these talc claims on a timeline that would benefit *all* current and future claimants and in a manner consistent with the very purpose of section 524(g).  *See In re Roman Catholic Church of Archdiocese of New Orleans*, 632 B.R. 593, 612 (Bankr. E.D. La. 2021) (acknowledging that "filing for bankruptcy relief to administer and resolve tort claims does not in itself constitute an abuse of a bankruptcy court's jurisdiction") (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 740-41 (Bankr. S.D.N.Y. 1984)); *see also In re Muralo Co. Inc.*, 301 B.R. 690, 697 (Bankr. D.N.J. 2003) (finding debtors' "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos … cases" was a "significant factor evidencing the good faith of Debtors' filings").

---

[6]     Portions of the Watts deposition transcript referenced herein are attached as **Exhibit 2** to the Declaration of Seth Van Aaltan filed herewith.

## II.    EACH ELEMENT OF THE SECTION 1112(B)(2) ANALYSIS IS SATISFIED

18.    The Movants also fail to refute the inescapable conclusion that, if "bad faith" is found here, the Chapter 11 Case should nonetheless continue to confirmation under section 1112(b)(2).  As shown in the Debtor's and AHC of Supporting Counsel's respective Objections, if a bankruptcy court determines "unusual circumstances" exist such that dismissal of a chapter 11 case is not in the best interests of creditors and the estate, the court may exercise its discretion and not dismiss a chapter 11 case where it is also shown that, (i) there is a reasonable likelihood that a plan will be confirmed within a "reasonable period of time," (ii) the grounds for granting dismissal for "cause" include an act or omission for which there is a reasonable justification, and (iii) such act or omission will be cured within a reasonable period of time.  11 U.S.C. § 1112(b)(2); *see also In re 1121 Pier Village LLC,* 635 B.R. 127, 136-37 (Bankr. E.D. Pa. 2022).  Here, to the extent the Court determines that "cause" supporting dismissal under section 1112 exists (none does), the Debtor satisfies each of the foregoing elements of the Bankruptcy Code's exception to dismissal under section 1112(b)(2).

### A.    *LTL 1.0* Does Not Preclude The Application Of Section 1112(b)(2)

19.    The Movants first submit that the "Third Circuit has already held that the requirements of Section 1112(b)(2) cannot be met in this case,"[7] and in so doing overlook that the panel's limited findings were constrained to the then-present facts.  64 F.4th at 110 (limiting findings to "this case" and what the panel "currently" saw on the facts then before them).  Not only do the Movants stretch the Third Circuit's two-paragraph discussion of section 1112(b)(2) far beyond its fair reading, they separately ignore that the facts now before the Court are new, different, and represent a clear departure from the Debtor's first bankruptcy case.

---

[7]    TCC Reply, at 68; *see also* A&I Reply, at ¶117.

20.     Indeed, as discussed at length in its own objection, [ECF No. 614], the Debtor's financial circumstances have since changed substantially, which alone warrant renewed consideration as it relates to section 1112(b)(2).  *See* Debtor's Objection, at 32-42 (noting the Debtor's circumstances are more dire than the "attenuated possibility of the need to file for bankruptcy in the future," as it has limited liquidity due to uncertain dividends and funding availability from its affiliates coupled with significant spikes in talc claimants and climbing current and future defense costs.). Furthermore, with the support of the AHC of Supporting Counsel, the Debtor is now, unlike before, reasonably likely to confirm a plan of reorganization with super-majority support, which in itself serves to justify and cure any alleged "bad faith" in its initial filing.  *See* Response, Section II(C) *infra*.

21.     For these reasons, the Third Circuit's decision in *LTL 1.0* is in this regard not binding on the Court and should serve as no impediment to a finding that section 1112(b)(2) applies here.  *See United States v. Cardales-Luna*, 632 F.3d 731, 735 (1st Cir. 2011) ("[A] decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record.").

### B. Unusual Circumstances Exist Such That Dismissal Is Not In The Best Interest Of The Creditors And The Estate

22.     On the substance, and contrary to the Movants' assertions, the instant circumstances plainly satisfy the requirements of section 1112(b)(2) and support a finding that unusual circumstances strongly weigh against dismissal of the Chapter 11 Case.  As the Movants' cannot dispute, bankruptcy courts retain broad discretion to determine whether "unusual circumstances" exist such that it would be in the "best interest of creditors" and the estate for a case to remain in chapter 11.  *See In re Korn,* 523 B.R. 453, 465 (Bankr. E.D. Pa. 2014).  And because the "unusual circumstances" inquiry is largely "result oriented," *id.* at 468 (internal quotations omitted), courts direct their analysis towards "the course of action that results in the largest number of creditors being

paid the largest amount of money in the shortest amount of time." *In re 1121 Pier Village, LLC*, 635

B.R. at 140 (citations omitted).   Here, given the unique nature of the Debtor's liability and the strong

likelihood that it will resolve the claims of *all* creditors, both current and future, this standard is plainly

met.

23.     ***The Debtor's Case is Entirely Unique.***   As a threshold matter, the Chapter 11 Case

was brought to address mass tort liability that is nearly incomparable in scope and complexity.   The

products giving rise to the claims here at issue were sold by "a company that . . . conducts business in

virtually all countries in the world,"[8] and, although talc-based baby power is no longer sold by

affiliates of the Debtor in North America, the resulting talc litigation, like all asbestos related litigation

before it, will involve tens of thousands of plaintiffs over many decades to come.[9]   Thus, not only is

"the pending count of claims . . . likely between 80,000 to 100,000[,]"[10] the latency periods for ovarian

cancer and mesothelioma, which some plaintiffs' experts estimate may run as long as sixty years,

"will result in thousands of [additional] future claims."[11]

24.     As past precedent shows, the tort system is simply far less equipped to achieve a global

resolution of a case as singular as this one and under the circumstances here presented.   The TCC's

own experts admit that the ████████████████████████████████

████████████████████████████████████████████████████

██████ and in that sense are aligned with the Debtor's concern that, "[i]n these talc cases, courts are

confronted with both future injuries and unidentifiable future plaintiffs."[13]   Indeed, like the asbestos

---

[8]     *Declaration of John K. Kim in Support of First Day Pleadings*, at ¶¶ 31 [ECF No. 4] (the "First Day Declaration").
[9]     *See Expert Report of Gregory K. Bell*, *Ph.D.*, at ¶33 (the "Bell Report").   The Bell Report is attached as **Exhibit 3** to the Declaration of Seth Van Aaltan filed herewith.
[10]    *Expert Report of Charles H. Mullin, Ph.D*, at ¶21 (the "Mullin Report").   The Mullin Report is attached as **Exhibit 4** to the Declaration of Seth Van Aaltan filed herewith.
[11]    *Id.*
[12]    *Expert Report of D. Theodore Rave*, at ¶84 (the "Rave Report").   The Rave Report is attached as **Exhibit 5** to the Declaration of Seth Van Aaltan filed herewith
[13]    Birnbaum Report, at 9.

litigation before, here, it is nearly impossible to know how many more claims the future may hold,[14] and, as shown by the asbestos cases, "the procedures available in bankruptcy provide better mechanisms for resolution of these future claims."[15]  For these reasons, the ability of this court to centralize all talc claims and accelerate their resolution firmly establishes that the bankruptcy process is well suited to resolve the "unusual" matter before it.

25.    In a transparent effort to downplay the unusual nature of this litigation, however, the Movants' experts, Professor Rave and Judge Furgeson (ret.), ██████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ ███████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████  Indeed, unlike in the *NFL* matter, where class members were readily identifiable, claimants here, "as in most asbestos and other latent injury cases," cannot be specifically identified and a Rule 23(b)(3) class settlement is therefore unattainable.[17]

26.    ***The Plan Will Likely Have Overwhelming Claimant Support.***  Adding to the unusual nature of this proceeding is the fact that the Debtor filed for bankruptcy with the support of counsel representing a significant *majority* of outstanding claimants.  Debtor's Objection at 64 ("One common situation where courts have found unusual circumstances is the ability of the debtor to satisfy all

---

[14]    Birnbaum Report, at 19.
[15]    *Id.* at 19-20.
[16]    *Id.* at 11-12, 16-17.
[17]    *Id.* at 11-12.

prepetition claims and administrative claims in chapter 11, including as a result of a cash infusion from an affiliate."). As discussed more fully below with respect to the reasonable likelihood the Plan will be confirmed within a reasonable time, the Debtor has put forth a proposed Plan that, once finalized and confirmed, would result in a *historic* settlement for *all* current and future talc claimants.

27.    For these reasons, and given the magnitude of unliquidated, disputed, and contingent claims against the Debtor and its affiliates, a well-supported path to fair and timely distributions to claimants is itself "unusual" under the circumstances simply because it is so clearly in the best interests of creditors and the estate. *See In re Sherwood*, No. 04-50584, 2008 WL 2074098, at *3 (Bankr. W.D. Mo. May 14, 2008) ("[O]verwhelming evidence of unusual circumstances" and that dismissal was not in best interests of creditors and estate, including because "dismissal would result in a significant delay in payment for [the vast majority of creditors, who] would likely face protracted litigation in one or more state courts" and "dismissal of the Debtors' case would result in a race to several courthouses and a multiplicity of lawsuits").

### C. There Is A Reasonable Likelihood That The Plan Will Be Confirmed Within Reasonable Period Of Time

28.    While the TCC and others have resorted to scorched-earth litigation tactics to attempt to deprive this Court of even the *opportunity* to consider whether a plan might be confirmed in this case, the Debtor and the AHC of Supporting Counsel have been working diligently to optimize a plan that would fairly and equitably compensate *all* creditors. Given such progress, as the AHC of Supporting Counsel members are prepared to testify, both the Debtor and the AHC of Supporting Counsel reasonably expect that such a Plan will be finalized and confirmed at the appropriate time.

29.    Since the filing of the Objection by the AHC of Supporting Counsel, members of the AHC of Supporting Counsel continue to be engaged with the mediators appointed by the Court, counsel to the Debtors, and any other interested party that wishes to engage in discussions, including

counsel to members of the TCC. *Cf. Declaration of Mikal C. Watts in Support of Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss,* [ECF No. 613-2] at ¶9 ("[The] parties agreed to work together to finalize and seek confirmation of a plan of reorganization.") (the "<u>Watts Declaration</u>"); *Declaration of James G. Onder in Support of Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss,* [ECF No. 613-1] at ¶14 ("While the parties continue to work to resolve certain outstanding issues, the Proposed Plan includes many of the terms agreed to in the PSA and reflects the parties' substantial progress towards a consensual resolution.") (the "<u>Onder Declaration</u>").

30.     Amidst and regarding those ongoing efforts, the AHC of Supporting Counsel members have provided testimony concerning their support for, and expectations with respect to, a confirmable plan in the Chapter 11 Case. *See* Dep. Tr. of J. Onder (June 8, 2023), at 308:12-21 ("I have worked with all the numbers of the old TCC to go through to try to establish how many cases there are, who had how many cases, who had what kind of cases, what quality of cases….and based upon TCC privilege, there is some – there is some information that – from which I can estimate that, yes, we have 75 percent.");[18] *id.* at 306:23-307:18 ("I know there are a number of firms out there that plan on supporting the deal that don't want to, basically, be in the spot light and be shot at. But, again, my only read . . . on whether we really have 75 percent or not – I think we do, but . . . if you were confident we didn't have 75 percent, I would think by now, all the TCC . . . and everybody else who are allegedly against it would have given their list to the Court and said, court, look they really only have 10 percent or whatever it is."); Dep. Tr. of M. Watts (June 12, 2023), at 110:3-8 ("As a practical matter . . . I do think, given the history that Mr. Murdica has discussed, that these things tend to get almost universal approval of clients when recommended by

---

[18]    Portions of the Onder deposition transcript referenced herein are attached as **<u>Exhibit 6</u>** to the Declaration of Seth Van Aaltan filed herewith.

the lawyers."); Dep. Tr. of A. Pulaski (Apr. 15, 2023), at 59:17-22 ("My understanding is they
have commitments from attorneys representing those clients, if not more, and I believe there are
probably more with attorneys that are going to recommend that their clients support the
agreement.").[19]

31.    And while the Movants and any other claimants voting on the Plan have the right to
vote to reject it, the AHC of Supporting Counsel respectfully submits that, given the progress toward
consensus that the parties have thus far made, as well as the parties' desire to continue negotiating
towards final agreement on all aspects of the Plan, there is a more than reasonable likelihood the Plan
will be confirmed after votes are solicited.  Onder Decl., at ¶15 ("When appropriate to do so under
the circumstances and with proper Bankruptcy Court authority, all conditioned upon reaching final
definitive agreement on the Proposed Plan regarding certain plan terms with the Debtor, which
additional terms will be incorporated into the Proposed Plan, I intend to confer with my clients and
recommend that they vote in favor of the Proposed Plan."); Watts Decl., at ¶13 ("When appropriate
to do so under the circumstances, and subject to reaching agreement on the final terms of the Proposed
Plan, I intend to confer with my clients and recommend that they vote in favor of the Proposed Plan
once final.").

### D. Any Purported Act Or Omission Constituting Cause, Including Alleged Bad Faith, Is Justified And Can Be Cured

32.    Lacking a meaningful response to the Debtor's and AHC of Supporting Counsel's
assertions that super-majority support for the Plan would justify and cure any alleged bad faith in its
filing, the Movants rely instead on sweeping statements of law along the lines that alleged bad faith
can *never*—under any circumstances—be cured.  The authority cited for this proposition is plainly

---

[19]    Portions of the Pulaski deposition transcript referenced herein are attached as **Exhibit 7** to the Declaration of
Seth Van Aaltan filed herewith.

distinguishable from the facts of this case,[20] and the Movants' reliance on such authority thus runs

contrary to the well-established proposition that bankruptcy courts, sitting in equity, are in all cases

required to consider the specific facts there presented.  *See In re Energy Future Holdings Corp.*, 990

F.3d 728, 742 n.8 (3d Cir. 2021) (noting a bankruptcy court sits as a court of equity and has power to

"sift the circumstances" in overseeing administration of the estate).

33.    Contrary to the blanket approach for which the Movants now advocate, the specific

facts here at issue demonstrate that confirmation of the Plan by votes of a significant majority of

claimants would undoubtedly justify *and* cure any alleged "bad faith" or other purported "cause" for

dismissal in connection with the Debtor's filing.  As this Court knows, to confirm a plan of

reorganization in this case and obtain a channeling injunction under section 524(g), the Debtor will

need to secure support of more than 75% of all outstanding claimants.  And with a super-majority of

talc claimants voting in favor of such a deal, it would defy logic to thereafter conclude that the Debtor

---

[20]   The cases cited by the Movants are inapposite.  Not one of the authorities is controlling or bears any persuasive similarities to a complex mass tort bankruptcy where a plan has been filed with substantial claimant support.  Instead, the Movants rely on cases with individual or small corporate debtors that have unquestionably committed a serious fraud or otherwise failed to prosecute one's bankruptcy case consistent with the Bankruptcy Code.  *See e.g., In re Green*, No. BR 14-15981-ABL, 2016 WL 6699311, at *1, *11  (B.A.P. 9th Cir. Nov. 9, 2016) (co-debtor spouses committed egregious misappropriation of a trust and filed for bankruptcy to avoid resulting civil judgment); *Layman v. Tennessee State Bank*, No. 2:19-CV-233, 2021 WL 6425951, at *2, *8 (E.D. Tenn. Feb. 2, 2021) (individual debtors had two bankruptcy cases pending at once and verbally threatened creditors); *In re Forest Hill Funeral Home & Mem'l Park*, 364 B.R. 808, 812, 823-24 (Bankr. E.D. Okla. 2007) (debtor's principals filed petition to avoid a state enforcement action concerning alleged mismanagement and misappropriation of client funds); *Sapphire Dev., LLC v. McKay*, 549 B.R. 556, 576 (D. Conn. 2016) (debtor filed petition one day before a state court trial was to begin); *In re ECV Dev., LLC*, No. BAP SC-06-1453-PAMKB, 2007 WL 7540960, *8-9 (B.A.P. 9th Cir. June 15, 2007) (debtor did not file a plan, had only a few unsecured creditors, and only one major asset, and court undertook no analysis of whether the case could be cured under 1112(b)(2)).

Further, in addition to being factually irrelevant, the two cases cited out of the Bankruptcy Court for the District of Montana, respectfully, merely parrot a paragraph relying upon an obsolete section from Collier's on Bankruptcy and do not otherwise perform any thoughtful analysis of section 1112(b)(2) in the bad faith dismissal context, nor make a factual finding or precedential holding. *See, e.g., In re Hinesley Fam. Ltd. P'ship No. 1*, 460 B.R. 547, 552-54 (Bankr. D. Mont. 2011) (conversion to chapter 7 warranted where debtor withheld information regarding significant assets and failed to propose a plan of reorganization for a year); *In re Keith*, No. 10-61722-11, 2010 WL 3835003, at *6-7 (Bankr. D. Mont. Sept. 29, 2010) (individual debtor committed perjury by repeatedly filing inaccurate schedules).

commenced this case in "bad faith" and, for example, filed the petition only to obtain a tactical litigation advantage.

34.     Purporting to speak for *all* claimants, the Movants hold out hope, uncertain as it may be, that potentially higher recoveries for a minority of fortunate claimants might hereafter be obtained in the tort system.  Weighed against the uncertain prospects of a return to protracted litigation, the Movants ask the creditor-body to speculate and gamble with the certainty of fair payment and swift resolution that the Plan, if confirmed, will provide.  A global settlement under the Plan would, unlike the alternative of piecemeal state and federal court litigation, result in more prompt payment for *all* of those affected.  And confirmation of the Plan, once final, thus provides a reasonable justification for the Debtor filing the petition with the support of the AHC of Supporting Counsel—a singular opportunity to compensate all claimants promptly, avoiding the years-long slog of litigation in state and federal courts and the inconsistent outcomes that result.  *See In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008) (filing of plan which proposed to pay all creditors in full constituted unusual circumstances).

35.     Accordingly, for all of the foregoing reasons, the AHC of Supporting Counsel submits that, to the extent the Court should determine that "cause" exists to dismiss the Chapter 11 Case (none does), including on the purported basis that the petition was not filed with good faith, all elements of section 1112(b)(2) have been satisfied and unusual circumstances exist such that the Chapter 11 Case should not be dismissed.

## **CONCLUSION**

For all the reasons set forth herein, the AHC of Supporting Counsel respectfully requests that this Court deny the Motions and not dismiss this Chapter 11 Case.

Dated: June 26, 2023

**COLE SCHOTZ P.C.**

*/s/ Michael D. Sirota*
Michael D. Sirota (NJ Bar No. 014321986)
Warren A. Usatine (NJ Bar No. 025881995)
Seth Van Aalten (*admitted pro hac vice*)
Justin Alberto (*admitted pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, NJ 07602-0800
(201) 489-3000
Email:  msirota@coleschotz.com
        wusatine@coleschotz.com
        svanaalten@coleschotz.com
        jalberto@coleschotz.com

– and –

**PAUL HASTINGS LLP**

Kristopher M. Hansen (*admitted pro hac vice*)
Ryan P. Montefusco (*admitted pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Email:  krishansen@paulhastings.com
        ryanmontefusco@paulhastings.com

Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6000
Email:  mattmurphy@paulhastings.com
        mattmicheli@paulhastings.com

– and –

**PARKINS & RUBIO LLP**

Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)
700 Milam, Suite 1300
Houston, TX 77002
Telephone: (713) 715-1660

18

Email:   lparkins@parkinsrubio.com
crubio@parkinsrubio.com

*Counsel to AHC of Supporting Counsel*