brownrudnick

MICHAEL S. WINOGRAD
Phone: (212) 209-4917
Email: mwinograd@brownrudnick.com

June 26, 2023

Honorable Michael B. Kaplan
U.S. Bankruptcy Judge
U.S. Bankruptcy Court for the
District of New Jersey
402 East State Street
Trenton, New Jersey 08608
chambers_of_mbk@njb.uscourts.gov

**Re: In re LTL Management LLC, No. 23-12825 (MBK)**

Dear Judge Kaplan:

We are co-counsel for the Official Committee of Talc Claimants ("**TCC**") in the above-referenced proceeding. We write regarding the *Declaration of James Murdica* (the "**Declaration**") proposed to be submitted as Mr. Murdica's direct testimony as a fact witness for the Debtor at the upcoming motion to dismiss trial set to begin June 27, 2023.

Mr. Murdica has been offered by LTL as a fact witness. Mr. Murdica is J&J's "resolution" counsel. Yet his declaration is no more than (i) an inadmissible opinion on the merits of arbitration vs. the tort system to settle cases, (ii) inadmissible argument concerning settlement communications that are protected by FRCP 408, (iii) legal opinion on the mechanics of a trust; (iv) and argument on the purported benefits of the Debtor's proposed plan. In addition, many of his statements are also inadmissible as hearsay, speculation, and just plain relevance.

For example, a substantial portion of the Declaration is dedicated to Mr. Murdica's opinion that bankruptcy is a better forum for resolving mass tort claims than MDLs or the tort system generally (a topic already covered by *two* Debtor experts, Charles Mullin and Sheila Birnbaum) (*See, e.g.*, ¶¶ 12-19). For instance, Mr. Murdica opines that "the MDL process lacks the necessary tools to resolve mass torts like the talc litigation which involves latent diseases and a large, diffuse population of unknown future claimants" (¶ 30). Further, Mr. Murdica submits that "***none of the talc claims are supported by the relevant science***" (¶ 67) (emphasis added), as if he were qualified as an expert scientific researcher or physician.

Similarly, the Declaration contains legal argument as though written for a rebuttal legal brief. Mr. Murdica argues, for example, that cases that the TCC cites in its pleadings are "irrelevant" and "inapposite" implying, of course, that the Court shouldn't consider them here (*See* ¶¶ 27-28). Paragraph 22 contains merely Mr. Murdica's interpretation of Supreme Court cases and their alleged impact on talc litigation. Moreover, substantially all of Section V is dedicated to arguing and opining that the Debtor's proposed plan is superior to alternatives (the section is titled



"The Proposed Plan is Designed to Efficiently and Equitably Compensate Talc Claimants") (*See* ¶¶ 62-72).

Other portions of the Declaration are speculative, not based on Mr. Murdica's personal knowledge, and/or lack proper foundation. For instance, Mr. Murdica conjectures that "many, if not most, of the [talc] claims would not recover anything in the tort system" (¶ 68). Others still are hearsay: for example, Mr. Murdica states that "[a] number of additional law firms have indicated to me they support the proposed plan and will recommend the proposed plan to their clients even though they have not executed a PSA" (¶ 43) and that "Mr. Watts acknowledged to me that the dismissal of the bankruptcy case would have a negative impact on the parties' ability to negotiate and consummate a global settlement of the talc litigation" (¶ 41).

Discussion of protected settlement negotiations and communications is near ubiquitous. For example, Mr. Murdica discusses (and attaches as an exhibit) an email sent by TCC counsel to counsel for the Debtor and J&J which contains, at the top in all caps, the preface "CONFIDENTIAL – RULE 408 COMMUNICATION" (*See, e.g.*, ¶ 42; Ex. A). He goes on to completely mischaracterize that email in an effort to support his argument on bankruptcy vs. the tort system. Further, paragraphs 48 and 52 go into specific detail on "prior settlement negotiations," listing parties, dates, and proposed terms.

The above sets out only a small sample of the Declaration's evidentiary impropriety. Attached as <u>Exhibit A</u> is a chart detailing the ubiquity of evidentiary infirmities in the Declaration.

These evidentiary defects in Mr. Murdica's declaration are flagrant, pervasive, and entirely inadmissible on multiple grounds. *See, e.g.*, Fed. R. Evid. 401, 408, 501, 602, 701, 802, 1002. Mr. Murdica's declaration must be stricken in its entirety. *See, e.g.*, *Daniels v. Delaware*, No. 01-3954, 2002 WL 31716422 (3d Cir. Dec. 4, 2002) ("obviously a court would abuse its discretion if it admitted inadmissible evidence"). Moreover, striking the Declaration will not prejudice the Debtors, as Mr. Murdica is set to testify live. The TCC respectfully requests that the Court enter an order striking Mr. Murdica's Declaration.

Respectfully,

Michael S. Winograd

cc: All counsel of record

# Exhibit A

# Evidentiary Objections

| Material Objected To[1] | Grounds |
|---|---|
| I have represented J&J in connection with various product liability and personal injury tort claims and mass tort litigations since approximately 2004. For the last decade, my role has principally been in connection with the negotiation of settlements and seeking to resolve product liability and personal injury tort claims against J&J, including mass tort actions. Over the course of my representation of J&J, I have successfully resolved more than 100,000 tort claims and resolved more than 20 major mass tort actions, including claims involving the prescription medications Levaquin, Risperdal, Topamax and Invokana, and medical devices including morcellators, surgical staplers, and prosthetic hips and knees. A number of the actions I helped to resolve were federal multidistrict litigation ("MDL") proceedings and others involved large-scale coordinated proceedings in the California Judicial Council Coordination Proceedings (JCCP) and/or Pennsylvania PCCP. (¶ 6) | Improper opinion (FRE 701). Lack of foundation (FRE 602). Argumentative (FRE 401). |
| I have been engaged by J&J since in or around early 2020 to assist with efforts to manage, resolve, and settle product liability and personal injury claims alleged to be connected to cosmetic talc (principally related to two talc-containing products: JOHNSON'S® Baby Powder and Shower to Shower). It is and has been J&J and LTL's position throughout the talc litigation and in settlements that the talc products manufactured and sold by LTL's predecessors were safe and did not cause any of the harms talc claimants have alleged based on junk science fabricated by experts paid by plaintiffs | Improper opinion (FRE 701). Lack of foundation and personal knowledge, speculative (FRE 602). Argumentative (FRE 401). |

1 The excerpts from the Declaration herein include citations to the appropriate paragraph from the Declaration, but do not always excerpt the entire paragraph.



| | |
|---|---|
| lawyers (backed by litigation financing). For that reason, J&J and LTL's predecessors have litigated talc claims and prevailed in the majority of cases that have gone to trial, including in six out of the eight talc cases that were tried in the year before LTL filed the first bankruptcy. Likewise, LTL has brought suit against Dr. Jacqueline Moline (a purported expert retained by plaintiffs firms to prop up baseless talc claims) for product disparagement. (¶ 7) | |
| The number of talc claims filed against J&J and its affiliates since 2019 has steadily increased, and as of LTL filing for relief under chapter 11 of the Bankruptcy Code in 2021 (the "2021 Chapter 11 Case"), there were almost 40,000 plaintiffs with filed ovarian cancer claims3 against LTL (including its predecessor Johnson & Johnson Consumer Inc. ("Old JJCI")) and J&J, including almost 36,000 plaintiffs with claims pending in the MDL in New Jersey District Court, and more than 3,800 plaintiffs with claims in multiple state court jurisdictions across the country. (¶ 8) | Lacks foundation, lacks personal knowledge (FRE 602). |
| In addition to the ovarian cancer claims, approximately 470 mesothelioma cases were pending against LTL and J&J as of the filing of the 2021 Chapter 11 Case. These claims were largely pending in state courts across the U.S., including in New Jersey, California, Illinois, Missouri, New York, and Ohio. (¶ 9) | Lacks foundation, lacks personal knowledge (FRE 602). |
| Since the filing of the 2021 Chapter 11 Case, plaintiff law firms have continued to solicit and recruit talc claimants. At this point, based on my discussions with various plaintiff law firms and the disclosures made by plaintiff law firms in these proceedings, I understand there are approximately 100,000 current talc claims outstanding, which includes both filed and unfiled claims. (¶ 10) | Lack of foundation and personal knowledge, speculative (FRE 602). Hearsay (FRE 802). |

| | |
|---|---|
| For example, I engaged in settlement discussions with many of the principal law firms handling the majority of the talc litigation, including the law firms that made up the MDL leadership. In connection with those negotiations, in or around August of 2020, the lead plaintiffs' counsel in the MDL proposed to resolve all current and future ovarian talc claims through a settlement in the bankruptcy of the talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys"). The proposed settlement was not consummated, but it was an early recognition that a global resolution of the talc litigation would need to be effectuated in a bankruptcy in order to be successful. (¶ 12) | Settlement discussions (FRE 408). Improper opinion (FRE 701). Lacks foundation, lacks personal knowledge (FRE 602). |
| In connection with seeking to resolve the talc claims against LTL and J&J, it became readily apparent to me that it would be impossible to achieve a global resolution of present and future talc claims in the tort system—whether in an MDL proceeding or otherwise—and certainly not with any real efficiency and equity. (¶ 13) | Argumentative (FRE 401). Improper opinion (FRE 701). |
| First, the tort system does not provide any viable mechanism for resolving the claims of future claimants with latent injuries. (¶ 14). | Improper opinion (FRE 701). |
| With respect to the talc litigation at issue, plaintiff experts have alleged the latency period for mesothelioma can run for decades and have also alleged extended latency periods for ovarian cancer allegedly caused by asbestos exposure. (¶ 15) | Lacks foundation, lacks personal knowledge (FRE 602). Hearsay (FRE 802). |
| There will likely be thousands if not tens of thousands of future claims asserted by currently unidentifiable future claimants, potentially drawing out the litigation for decades. (¶ 16). | Speculative, lacks foundation, lacks personal knowledge (FRE 602). Improper opinion (FRE 701). |



| | |
|---|---|
| Moreover, because talc is a non-prescription consumer product, there is no record or proof of use as there typically is in other mass tort cases involving prescription drugs or medical devices. Therefore, there is no way to identify the pool of potential future talc claimants. (¶ 17). | Speculative, lacks foundation, lacks personal knowledge (FRE 602). Improper opinion (FRE 701). |
| In my efforts to resolve the talc liability in the tort system, there was simply no way to resolve the future claims held by currently unidentifiable plaintiffs that may manifest an injury many years after use of talc-based JOHNSON'S® Baby Powder or Shower to Shower. (¶ 18). | Speculative (FRE 602). Improper opinion (FRE 701). |
| Second, even though a number of ovarian and gynecological cancer claims are pending in the MDL in New Jersey District Court, there was no realistic path to a global resolution of all talc claims in that MDL. MDLs—like the tort system in general—do not provide any mechanism to resolve future personal injury claims held by unidentifiable individuals. Moreover, the MDL does not include mesothelioma claims, rendering it impossible to resolve even all current talc claims in the MDL. (¶ 19) | Improper opinion (FRE 701). Speculative, lacks foundation, lacks personal knowledge (FRE 602). |
| Nor can MDLs centralize cases pending in state court, as is the case here where there are thousands of talc-related cases pending against LTL and J&J in state courts throughout the country. (¶ 20) | Lacks foundation, lacks personal knowledge (FRE 602). Improper opinion (FRE 701). |
| In addition, a settlement of the MDL litigation cannot bind all the plaintiffs in the MDL absent such plaintiffs' consent. Indeed, any settlement achieved in any MDL proceeding cannot mandate or require all plaintiffs in such proceeding to join in the settlement. Here, where there are tens of thousands of talc claims, even a small percentage of holdout plaintiffs would leave hundreds or thousands of claims to still be resolved. (¶ 21) | Improper opinion (FRE 701). Speculative, lacks foundation, lacks personal knowledge (FRE 602). |



| | |
|---|---|
| Nor would the class action settlement mechanisms under Federal Rule of Civil Procedure 23 be available with respect to the talc litigation in light of the Supreme Court's rulings in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) which made clear that proposed settlement classes involving potential future claimants with latent injuries like in asbestos personal injury mass torts are not permitted under Rule 23. (¶ 22) | Improper opinion (FRE 701). Argumentative (FRE 401). Speculative, lacks foundation, lacks personal knowledge (FRE 602). |
| Third, the talc litigation involves tort actions pending all over the country. While a large portion of the pending ovarian cancer claims were pending in the MDL in New Jersey when LTL filed the 2021 Chapter 11 Case, a number of ovarian cancer claims are pending in state courts scattered across at least 22 states. Similarly, hundreds of mesothelioma cases are pending in mostly state courts in 27 different states. (¶ 23) | Speculative, lacks foundation, lacks personal knowledge (FRE 602). |
| Accordingly, even if it were feasible to achieve a global resolution of the talc cases filed in the MDL proceeding (which it is not), such resolution would not resolve all of the many talc-related litigations and claims pending in various state courts throughout the country. (¶ 24) | Improper opinion (FRE 701). Argumentative (FRE 401). Speculative, lacks foundation, lacks personal knowledge (FRE 602). |
| Fourth, there are a number of additional complexities that made the prospect of settlement in the tort system untenable. Based on my extensive discussions with plaintiffs' law firms handling talc claims, there is a large number of unfiled talc claims that would not be addressed as part of any settlement in the tort system. There is also a large number of pending and threatened talc related claims by at least 42 state attorneys general, who are represented by the same lawyers as the talc claimants. LTL and J&J also faced potentially billions of dollars in indemnification claims from their talc supplier *Imerys*. These additional challenges made it even less feasible to achieve a global resolution in the tort system (through the MDL or otherwise). (¶ 25). | Improper opinion (FRE 701). Argumentative (FRE 401). Hearsay (FRE 802). |



| | |
|---|---|
| While I have successfully resolved and settled other mass tort actions in MDL proceedings, those actions did not involve the type of latent injury or unidentifiable future claimants at issue with the talc litigation. They also did not involve the different types of alleged injuries at issue here. (¶ 26) | Improper opinion (FRE 701). Argumentative (FRE 401). Lacks foundation (FRE 602). |
| In this way, references by the Official Committee of Talc Claimants (the "TCC") to other MDL proceedings like the *In re Nat'l Football League Players Concussion Litigation* ("In re NFL"), the *Vioxx* cases, or the "fen-phen" cases (*In re Diet Drugs Prods Liability Litigation* ("Diet Drugs")) are irrelevant. *In re NFL* did not involve disparate, unidentifiable future claimants. Instead, it involved a readily identifiable, known population of claimants who might develop the same type of future injuries and who were able to participate in the MDL process directly or via a class. (¶ 27) | Improper opinion (FRE 701). Argumentative (FRE 401). Lacks foundation, lacks personal knowledge, speculation (FRE 602). |
| The settlements in the *Vioxx* or *Diet Drugs* MDL proceedings are likewise inapposite because neither MDL involved latency or future claimants of the type at issue with the talc litigation. (¶ 28) | Improper opinion (FRE 701). Lacks foundation, lacks personal knowledge (FRE 602). |
| Similarly, the BP oil spill class action settlement involved a specific and limited class of claimants being compensated for a single event (the 2010 Deepwater Horizon oil spill in the Gulf of Mexico). The *In re National Prescription Opiate Litigation* is not a personal injury proceeding but instead involves thousands of claims—mostly brought by government entities and not individuals—seeking reimbursement for expenses they incurred because of the nation's opioid crisis. Neither proceeding involved the same indeterminate future claimants with latent injury issues present in the talc litigation. (¶ 29) | Improper opinion (FRE 701). Lacks foundation, lacks personal knowledge (FRE 602). |
| In sum, the MDL process lacks the necessary tools to resolve mass torts like the talc litigation which involves latent diseases and a large, diffuse population of unknown future claimants. (¶ 30) | Improper opinion (FRE 701). |



| | |
|---|---|
| Based on my experience trying to resolve the talc litigation in the tort system, only the bankruptcy court provides a forum capable of finally resolving all current and future talc claims of all disease types, including all unknown, future claims. (¶ 31) | Improper opinion (FRE 701). |
| Bankruptcy courts are able to centralize the administration and compensation of claims asserted in both federal and state court, and, most significantly, address future claimants' injuries and bind them to the terms of a global resolution under a plan of reorganization. The bankruptcy court is able to issue a "channeling injunction" that directs future talc claims to a trust created for the benefit of talc claimants. See 11 U.S.C. §§ 105(a) and 524(g). Compensation to future claimants is further protected through the appointment of a future claimants' representative within the bankruptcy, as the Court here has done in appointing Randi Ellis as the Future Claims Representative with responsibility to represent and protect the rights of future talc claimants and their recoveries under the proposed plan pursuant to section 524(g) of the Bankruptcy Code. (¶ 32) | Improper opinion (FRE 701). Argumentative (FRE 401). |
| The bankruptcy court also provides tools to resolve and overcome a small minority of objecting claimants seeking to holdup a global resolution. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV) (requiring that 75% of asbestos claimants whose claims will be addressed by a trust created under a plan of reorganization vote in favor of the plan). (¶ 33). | Argumentative (FRE 401). |
| While the bankruptcy court in Aearo granted a motion to dismiss that chapter 11 petition, the underlying personal injury claims at issue in that case did not involve a latent disease of the type at issue here which can only be resolved in bankruptcy and thereby preserve value for the benefit of the debtor's estate and creditors. (¶ 34). | Improper opinion (FRE 701). Lacks foundation, lacks personal knowledge (FRE 602). |



| | |
|---|---|
| Lead counsel for the TCC has acknowledged that the bankruptcy court is the only forum that can provide a global resolution of the talc litigation. Indeed, David Molton of the law firm Brown Rudnick LLP made a proposal on March 24, 2023 to settle all present and future ovarian cancer claims, which necessarily contemplated a settlement in bankruptcy as the only forum able to resolve all present and future talc claims. *See* Ex. A, Email from David J. Molton to Gregory M. Gordon and Jessica C. Lauria dated March 24, 2023 (stating that "the ovarian cancer representatives of the TCC have prepared a proposal that would resolve present and future ovarian cancer claims"). (¶ 35) | Settlement discussions (FRE 408). Lacks personal knowledge, speculation (FRE 602). Hearsay (FRE 802). Documents speak for themselves and are the best evidence of their contents (FRE 1002). |
| Plaintiffs' lead counsel in the MDL has likewise recognized that a global resolution of talc claims can only happen in bankruptcy. Specifically, Andrew Birchfield, of the Beasley Allen Law Firm, which is one of the lead counsel in the MDL, previously proposed a global resolution of all current and future ovarian talc claims through the *Imerys* bankruptcy, with a channeling injunction. (¶ 36). | Hearsay (FRE 802). Improper opinion (FRE 701). Lacks foundation, lacks personal knowledge (FRE 602). |
| One of the chief impediments to reaching a resolution has been the inherent conflicts that many of the plaintiff law firms have vis-a-vis their clients. Among other things, objectors from MDL leadership have acknowledged that they (and other similarly situated law firms) have an economic disincentive to resolve their clients' talc claims in bankruptcy because they stand to recover from the MDL common benefit fund in the tort system but would not in bankruptcy.[8] Plaintiff law firms are also fundamentally conflicted to the extent they are seeking aberrant, one-off, large verdicts notwithstanding that most plaintiffs recover nothing in the tort system. (¶ 39) | Improper opinion (FRE 701). Hearsay (FRE 802). Argumentative (FRE 401). |



| | |
|---|---|
| Following the Third Circuit's ruling, however, and with the assistance of the mediators, I participated in continued negotiations between the Debtor, J&J, and various plaintiff law firms. In that period, Mikal Watts, of the law firm Watts Guerra LLP, contacted me to continue negotiations regarding a potential resolution of the talc litigation. I had been engaged in various discussions with Mr. Watts regarding the talc litigation since approximately 2021. (¶ 40) | Settlement discussions (FRE 408). |
| Mr. Watts acknowledged to me that the dismissal of the bankruptcy case would have a negative impact on the parties' ability to negotiate and consummate a global settlement of the talc litigation. He acknowledged that a final, global resolution of the talc liability including all present and future claims was only feasible through a bankruptcy. (¶ 41). | Hearsay (FRE 802). Settlement discussions (FRE 408). |
| This was a sentiment shared by other claimant constituencies. Indeed, in addition to Mr. Watts and the other law firms representing nearly 60,000 claimants that ultimately entered into the PSAs, the TCC also continued to negotiate for a resolution of the talc litigation in bankruptcy even after the Third Circuit issued its opinion dismissing the case. Specifically, as noted above, counsel to the TCC, David Molton of the law firm Brown Rudnick LLP, made a proposal on March 24, 2023 to settle all present and future ovarian cancer claims which could only be implemented in a bankruptcy. *See* Ex. A. (¶ 42) | Settlement discussions (408). Lack of foundation and personal knowledge, speculative (FRE 602). |



| | |
|---|---|
| My negotiations with Mr. Watts and others ultimately culminated in an agreement with plaintiff law firms representing nearly 60,000 claimants regarding terms for a plan of reorganization, that, if confirmed and consummated, would fully resolve all current and future talc claims. The agreement was memorialized in a series of PSAs, the terms of which, at this point, are supported by counsel representing nearly 60,000 claimants. A number of additional law firms have indicated to me they support the proposed plan and will recommend the proposed plan to their clients even though they have not executed a PSA. (¶ 43) | Speculative (FRE 602). Hearsay (FRE 802). |
| Furthermore, contrary to the objecting parties' efforts to mischaracterize the broad support for the Debtor's proposed plan, the supporting law firms represent a significant number of filed claims (which I understand to be on the order of approximately 16,000 claims) and also a significant number of mesothelioma claimants (Watts Guerra LLP alone represents approximately 500 mesothelioma claimants).[11] (¶ 45) | Argumentative (FRE 401). Improper opinion (FRE 701). |
| Based on my negotiations with Mr. Watts and others, I modified the draft agreement previously provided to me by Mr. Watts, and prepared a term sheet that reflected our discussions regarding the general terms of a global resolution of all current and future talc claims. The PSA and term sheet provide for a plan of reorganization that provides for the establishment of a trust funded in the amount of $8.9 billion on a net present value basis. See Kim Decl., Exs. A-V (and attached term sheets). (¶ 47) | Settlement discussions (FRE 408). |



| | |
|---|---|
| A number of aspects of the proposed deal were based on prior negotiations that I had with other plaintiff law firms and lawyers representing talc claimants, including with Andrew Birchfield, of the Beasley Allen Law Firm, which acts as one of the lead counsel in the pending MDL. Specifically, in or around August 2020, Mr. Birchfield proposed to settle all current and future ovarian cancer talc claims in the *Imerys* bankruptcy for a total amount of $3.25 billion. That is less than half the amount of what LTL is proposing to pay to resolve all current and future ovarian cancer talc claims.[12] Mr. Birchfield and other plaintiff law firms representing talc claimants in the MDL also previously proposed a payment matrix that specified how talc claims would be paid, which I largely incorporated into the terms attached to the PSA, and which also provided the basis for the terms in the proposed plan. (¶ 48) | Settlement discussions (FRE 408). |
| I understand that the proposed settlement amount of $8.9 billion would be the largest settlement amount in any asbestos bankruptcy case and one of the largest settlements of personal injury claims in history. (¶ 49) | Lacks foundation, lacks personal knowledge (FRE 602). |
| It is also the same approach employed by objecting plaintiff law firms in prior settlement negotiations. For example, the Beasley Allen Law Firm previously proposed to settle all current and future ovarian claims. In connection with that proposed settlement, the Beasley Allen Law Firm only required other plaintiff law firms to evince their support by providing consent and a list of their claimants. Similar to the PSAs, the settlement agreement proposed by Beasley Allen included representations by the supporting plaintiff law firms regarding the number of claimants they represent as to which the law firms agreed to recommend the settlement.[13] (¶ 52) | Settlement discussions (FRE 408). Hearsay (FRE 802). |



| | |
|---|---|
| My understanding that the plaintiff law firms that support the proposed plan represent the majority of talc claimants is based on the representations made to me by the plaintiff law firms that executed PSAs or otherwise have indicated they support the proposed plan and also the disclosures made by the plaintiff law firms representing members of the TCC and other claimants that have indicated they oppose the proposed plan or moved to dismiss the bankruptcy. Specifically, the plaintiff law firms constituting the Ad Hoc Committee of Supporting Counsel have represented that they represent approximately 60,000 talc claimants, whereas counsel for the TCC and objecting law firms has represented that they represent no more than 40,000 talc claimants (though I have not seen any disclosures from the TCC or objecting plaintiff law firms to support this number). (¶ 55). | Hearsay (FRE 802). |
| The plaintiff law firms that have executed PSAs have committed to support the proposed plan consistent with the terms therein, and to recommend the proposed plan to their clients. (¶ 56) | Hearsay (FRE 802). |
| In my experience, and based on my prior dealings with them, when these plaintiff law firms have agreed to recommend a settlement to their clients, they have consistently lived up to their commitments and their clients have agreed to the proposed settlement being recommended. (¶ 57) | Improper opinion (FRE 701). |
| My confidence that the talc claimants represented by the plaintiff law firms that executed PSAs (and other claimants represented by plaintiff law firms that have indicated they also support the proposed plan but have not executed PSAs) will support the proposed plan is further supported by logic and common sense based on the proposed treatment of talc claims under the proposed plan, which will provide compensation to claimants, most of whom would otherwise be stuck litigating in the tort system for years, with no guarantee that they will every recover a dime. (¶ 58) | Improper opinion (FRE 701). Speculation, lack of personal knowledge (FRE 602). Argumentative (FRE 401). |



| | |
|---|---|
| Based on the support of the plaintiff law firms representing the majority of claimants as expressed in the PSAs, I believe that there is a reasonable likelihood that the proposed plan would be confirmed. (¶ 59) | Improper opinion (FRE 701). Speculative (FRE 602). |
| It is [my] [*sic*] expectation that additional plaintiff law firms representing talc claimants—and ultimately the talc claimants themselves—will support the proposed plan once they appreciate that the proposed plan's incredibly favorable terms are in claimants' best interests. (¶ 60). | Improper opinion (FRE 701). Speculative (FRE 602). Argumentative (FRE 401). |
| Contrary to the TCC's and other objecting plaintiff law firms' assertion that lien claims of all kinds would deplete the trust and that each talc claimant would have large amounts in lien liability and thus recover nothing,[14] we now know that lien liability is a small and defined portion of the trust. I helped to negotiate an agreement with the representatives of the vast majority of the relevant insurers (which I expect additional insurers will join) pursuant to which insurer lien claims will be resolved by the trust pursuant to the proposed plan. The settlement with the insurers provides certainty as to the amount of lien-related private payor claims of the insurers against individuals asserting all non-mesothelioma talc personal injury claims who retained counsel before June 1, 2023. This insurer settlement allows claimants to recover sooner on their claims under the relevant trust provisions. In other words, talc claimants will not have to wait for their individual liens to be resolved before they are paid under the proposed plan. (¶ 61) | Speculative, lacks foundation, lacks personal knowledge (FRE 602). Improper opinion (FRE 701). |
| The proposed plan includes certain procedures designed to efficiently resolve and equitably value all similarly situated talc claims, establish clear and objective qualification and valuation criteria, and prevent fraud. (¶ 62) | Improper opinion (FRE 701). Improper secondary evidence of documents; the plan speaks for itself (FRE 1002). |



| | |
|---|---|
| Specifically, the proposed plan will establish trust distribution procedure that set out the method by which a qualifying claimant may seek allowance and distribution on account of their talc claim from the trust. (¶ 63) | Improper opinion (FRE 701). Speculative (FRE 602). Improper secondary evidence of documents; the plan speaks for itself (FRE 1002). |
| The Claims Administrator will utilize a multi-stage valuation process to determine the value of each qualifying claim, taking into account the particular factors associated with a particular claimant. (¶ 64) | Improper opinion (FRE 701). Speculative, lacks personal knowledge (FRE 602). Improper secondary evidence of documents; the plan speaks for itself (FRE 1002). |
| I understand there have also been certain questions raised regarding the types of personal injury claims subject to the proposed plan. Specifically, counsel for certain objecting talc claimants contend talc claims premised on gynecological cancers that are not epithelial ovarian cancers are not cognizable, compensable claims against the Debtor.(¶ 65) | Hearsay (FRE 802). Lacks foundation, lacks personal knowledge (FRE 602). Improper secondary evidence of documents; the plan speaks for itself (FRE 1002). |
| As an initial matter, the Debtor's proposed plan uses the same definition of talc claims used throughout the first bankruptcy. The talc claims that fall within that definition include filed claims that include all the disease types referenced in the proposed plan. (¶ 66) | Improper opinion (FRE 701). Lacks foundation (FRE 602). Improper secondary evidence of documents; the plan speaks for itself (FRE 1002). |
| In any case, it is and has been J&J and LTL's position that the talc products manufactured and sold by LTL's predecessors were safe and did not cause any of the harms that talc claimants have alleged. Thus, any contention that certain talc claims may have more merit than others is a red herring, and none of the talc claims are supported by the relevant science. The purpose of the bankruptcy, however, is to fully and finally resolve all talc claims, regardless of the nature of the injuries asserted. While the vast majority of talc claims asserted to date relate to ovarian cancer or mesothelioma, certain individuals have asserted that talc products caused non-ovarian gynecological cancers and non-epithelial ovarian cancer.[15] (¶ 67) | Improper opinion (FRE 701). Speculative, lacks foundation, lacks personal knowledge (FRE 602). Argumentative (FRE 401). |



| | |
|---|---|
| The proposed treatment and recovery of talc claims under the proposed plan is particularly equitable and reasonable when compared with the high likelihood that many, if not most, of the claims would not recover anything in the tort system. (¶ 68) | Improper opinion (FRE 701). Speculative, lacks personal knowledge (FRE 602). |
| Mr. Birchfield has asserted the proposed settlement amount of $8.9 billion is "woefully inadequate," but the talc claimants represented by Mr. Birchfield and the Beasley Allen Law Firm have not benefited from the tort system. In this way, Beasley Allen's clients are representative of other talc claimants and reflect the likelihood that most talc claimants will not recover anything in the tort system even when they eventually are able to have their case tried. (¶ 71) | Improper opinion (FRE 701). Speculative, lacks personal knowledge (FRE 602). |