MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com
150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Plaintiff Katherine Tollefson*
*and Certain Mesothelioma Plaintiffs*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| LTL MANAGEMENT LLC, | ) |
| | ) Case: 23-12825-MBK |
| Debtor. | ) |

### MRHFM'S PLAINTIFFS' JOINDER TO PAUL CROUCH'S
### MOTION TO PRECLUDE TESTIMONY OF CHARLES H. MULLIN AND
### GREGORY K. BELL AND OBJECTION TO
### TO PROFERRED EXPERT TESTIMONY OF DR. MULLIN

MRHFM joins Mr. Crouch's Motion to Preclude (Dkt. 875) and Objection (Dkt. 890). The Jones Day/Bates White[1] road show has been very lucrative for both firms in bad faith billionaire "bankruptcies," generating over $130 million in fees in North Carolina Two Steps alone. *See* MRHFM Reply MTD., Dkt. 855, pg. 24. But none of Dr. Mullin's opinions about the tort system are admissible, and because Dr. Bell relies upon Dr.

---

[1] Dr. Mullin is a partner at Bates White, Dr. Bell is not.

1

Mullin's conclusions, none of Dr. Bell's opinions are admissible either.

Dr. Mullin's view—that trusts are more efficient and "superior" to the tort system—is irrelevant to what this Court has been charged to do: "start, and stay, with good faith." *In re LTL Mgmt., LLC,* 64 F.4th 84, 93 (3d Cir. 2023). Relevant to this Court's determination is the totality of the circumstances, including financial distress, ***at the time of filing*** on April 4, 2023. *LTL Mgmt.*, 64 F.4th at 108 ("we can only infer that LTL, at the time of its filing, was highly solvent…"); *In re SGL Carbon*, 200 F.3d 154, 164 (3d Cir. 1999) (noting that if the debtor was facing "serious financial and/or managerial difficulties at the time of filing" the result may have been different).

The Debtor cannot backfill its evidentiary deficiencies—i.e., the testimony of its own officers about what they considered when LTL filed its second petition—with *post hoc* pontifications from its experts about the horrors of the tort system. This is especially so here, given the Circuit's holding that J&J's "belief" that bankruptcy is "best of all possible worlds" is not enough to survive dismissal; LTL "was in no financial distress ***when*** it sought Chapter 11 protection" and this was grounds for dismissal. *LTL Mgmt.*, 64 F.4th at 111 (emphasis). The Third Circuit didn't consider J&J's view of the tort system in deciding this case, so this Court should refrain from doing so.

As noted by Mr. Crouch, weighing the relative merits of the tort system versus the bankruptcy system are outside of this Court's power. The opinions expressed by Drs. Mullin and Bell are largely policy arguments, of the type Congress rejected 20 years ago.

*See* Exhibit 1. MRHFM has briefed this at length. *See* MRHFM Reply, pg. 23; *LTL1*, MRHFM Obj. Prelim. Inj., Dkt. 2564. It makes perfect sense that Dr. Mullin has flip flopped from the positions he took in *Imerys*. *See* Crouch Obj., Exhibit 2 (Mullin Report). So has Johnson & Johnson.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**

_____
Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhmflaw.com

# Exhibit 1

good practice. It is not permitted and should not have been allowed. Amazingly, these are only the latest in a long list of deficiencies with the Youth Services Administration that stretches back at least 19 years. Indeed, it was 19 years ago this month the Public Defender Service filed a complaint against the District for failure to protect youth under its custody. Year after year, the city has fallen short of the court's "Jerry M. Decree," which is the name of the court decree, and is now facing the prospect of being taken over by a court receiver. Equally amazing, some estimates are it costs nearly $90,000 a year to house a child at Oak Hill. But even more astounding than that is when I visited this facility a little over a week ago and asked the interim administrator and the interim special counsel from the Youth Services Administration who gave me the tour how much it cost to house a child there, they simply could not give me an answer. Their answer was they did not break out how much it cost to run Oak Hill from a total cost of the whole Youth Services Administration.

I find that to be astounding frankly. They did not know. They could not give me a breakout so they couldn't tell us what Oak Hill cost to run a year and therefore obviously they couldn't tell us whether the $90,000-a-year figure, which is what we believe it costs to house a child there for a year, is an accurate figure.

I visited many youth detention facilities in Ohio in my public career. I was Lieutenant Governor of the State of Ohio and had the opportunity to visit, I think, all of our juvenile facilities during the 4 years when I was Lieutenant Governor. I was a county prosecuting attorney. I learned a lot about these types of centers. I know what they do well and what they do not do well. I can tell you with certainty there are several things they are not doing very well at Oak Hill right now.

The buildings are decrepit. They are falling apart. Important services such as substance abuse treatment programs are certainly piecemeal at best. Children who are detained and awaiting trial are commingled with those who are committed offenders. In fact, I learned one girl who was committed merely because she is a truant has been housed with committed delinquents since October. This, I understand, is in violation of the D.C. Code.

What is particularly troubling is what happens sometimes is the teenagers who are in foster care or group homes run away because they are being victimized by other youths in the same home or they run away for other reasons. Once these children run away or are truant from school, for example, they are labeled delinquents and they are often picked up and sent to Oak Hill. So neglected youths who are failed by a broken foster care system now find themselves locked up and labeled juvenile delinquents and then are commingled in Oak Hill with dangerous delinquents at a place where they are currently able to get ready access to illicit drugs. What a horrible situation.

The Federal Government contributes about $15 million annually to the District's Youth Services Administration, which administers Oak Hill. The YSA would be eligible for even more Federal funding if it had a qualified drug treatment program in place. A large number of the children at Oak Hill have a substance abuse problem. That should not surprise us. It is what I would expect. What I did not expect is to go to Oak Hill and find very little, if any, substance abuse treatment in place.

In all fairness, when we went out there we were told substance abuse treatment was on the way, that a program was going to be started. But there was not much going on at all when we were there and there was a promise of something happening in the future. But that is what it was, a promise.

Clearly, Congress has a vested interest in assuring the proper use of the money we provide. We have, more importantly, a moral interest in ensuring the proper treatment of youths at Oak Hill.

After touring the facility and after hearing from expert witnesses and after reading the November 6, 2001, recommendation of the Blue Ribbon Commission on Youth Safety and Juvenile Justice Reform in the District, I believe Oak Hill should be closed. The children of the District of Columbia deserve better. The communities to which these youths will one day be returned deserve better. It is our duty to work hard to rehabilitate these young offenders who have, frankly, often been failed by their parents and, yes, overlooked by their communities.

Not only do I recommend that Oak Hill be demolished, but I expect to see the Mayor develop a comprehensive plan afterward so the problems at Oak Hill are not repeated elsewhere. Just this past Thursday, Judge Dixon of the Superior Court of the District of Columbia found that the District is in contempt of court regarding Oak Hill having violated numerous provisions of the "Jerry M. Decree." Because of this contempt finding, the city will be fined $1,000 per day and may be subject to additional sanctions.

It is our hope these sanctions and this court order will push the city towards addressing the intractable problems at Oak Hill. As I have already stated, trying to fix this broken facility is, in my opinion, a waste of time and a waste of money and is futile. We have waited 19 years for improvements. Yet no one has stepped up to take the lead. If no one does, the problems at Oak Hill will continue.

The blue ribbon commission recommended that Oak Hill be shut down. Judges have recommended that it be shut down. And now it is time for the District to step to the plate, take the lead, and shut this place down once and for all.

Let me make one final comment in conclusion. When I was the Governor of Ohio, I visited every juvenile facility and every adult facility in Ohio. I don't pretend to be an expert in this area, but I think I know something about it. What has happened at Oak Hill over the last few years is that the District knows the place eventually is going to be closed. So every problem they see, they look at it and they say, Well, there is no reason to put money into fixing this problem or to fix that problem. So it keeps getting worse and worse. It is sort of like a house you know you are going to bulldoze down in a few months, and you are not going to fix anything. Yet the District, for some inexplicable reason, does not have the will to shut this place down—to pull the plug and say enough is enough.

After touring this facility, I am saying enough is enough. It is not fair to the kids who are being sent out there. It is not fair to the employees who have to work out there. And it is not fair to the taxpayers to continue to put money into this facility. This facility has to be shut down. The District has to move forward. It is in the best interests of the children of the District of Columbia to do so.

I thank the Chair. I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Utah.

Mr. HATCH. Mr. President, I ask unanimous consent that I be permitted to speak for as long as I need.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

THE FAIRNESS IN ASBESTOS RESOLUTION ACT OF 2004

Mr. HATCH. Mr. President, I rise in support of S. 2290, the bipartisan Fairness in Asbestos Injury Resolution Act, appropriately called the FAIR Act. Let me talk about the problems for a minute. I think I am stating the obvious, but it bears repeating.

Our country is faced with an asbestos litigation crisis of unparalleled magnitude. Something is terribly wrong when asbestos victims who suffer from debilitating injuries recover mere pennies on the dollar while people who are not sick and never have been sick a day in their lives from asbestos recover millions. Something is terribly wrong when scores of companies, many which never produced a shred of asbestos fiber, are forced into bankruptcy triggering lost jobs and depleting pensions for those who lost their jobs. Something is terribly wrong when the only real winners in the current system are the handful of personal injury lawyers who walk to the bank with billions of dollars in fees.

Members may have heard the statistics before, but I will say them again so that everyone knows the scope of the problem facing this country. According to the Rand Institute for Civil Justice, more than 730,000 people have filed claims, with a sharp increase in filing

in the last 10 years. More than one million claims are expected to be filed in the near future. The Rand study states the reason for this dramatic rise in claims is that through the 1980s, claims were filed only by the manifestly ill. Beginning in the 1990s, about two-thirds of the existing claims were and still are filed by people who are unimpaired, who are not sick. Listeners, you heard correctly. Astonishingly, the great majority of asbestos lawsuits are brought by those who are not even sick.

This has led to an unacceptable division of resources to the wrong people. Nonmalignant claimants take over 60 percent of the compensation, leaving mesothelioma victims with only 20 percent. Worse yet, many mesothelioma victims are not able to recover any money at all because the companies they would have sued are insolvent.

The fact is, unscrupulous personal injury lawyers are abusing the system and getting a windfall in fees. They know the companies, even ones with the most remote connections to asbestos, are fearful of runaway verdicts. They exploit the uncertainty these tangential companies face in the current system by overwhelming them with huge numbers of unimpaired claims in order to force massive settlements. I might add that many of these companies have never had anything to do with asbestos, but they are stuck defending themselves at a tremendous, humongous cost because of what is going on. The result is the personal injury lawyers—and it is a small percentage of the American Trial Lawyers Association, a very small percentage of these personal injury lawyers—are reaping huge portions for themselves: over $20 billion so far in attorney's fees alone in asbestos litigation thus far.

One actuarial firm estimates that personal injury lawyers are expected to siphon more than $60 billion out of asbestos litigation before it is over. It is no wonder that the personal injury lawyers are fighting tooth and nail to keep the golden goose alive. These fees detract from the moneys that should go to those who are truly sick, especially the mesothelioma victims. Their tactics are not just about buying private planes and sport teams and huge mansions while the personal injury lawyers are busy making themselves into millionaires, multimillionaires, in some cases billionaires; they are depriving the truly sick of available resources.

Let me tell Members about a pipefitter from Illinois. I learned his story from his daughter who lives in the State of Washington. A World War II Navy veteran, he joined the pipefitters union in Chicago and worked at several locations in the Midwest, including sites in Illinois, Indiana, Michigan, and Wisconsin. It was during this period that he was repeatedly exposed to asbestos. Eighteen years ago, at the age of 61, he learned he had mesothelioma. Understanding the medical quagmire he faced and the consequences for his family, he quickly filed suit against those he believed were responsible for his exposure. Sadly, just months later, as with all mesothelioma victims of this virulent form of cancer, he died.

His case was lumped together with others, many of whom were not as sick as he, and some of whom were not sick at all. For years, nothing happened. It simply gathered dust on the docket. Eventually, it was transferred from Illinois to Pennsylvania. It has now been 17 years since his case was filed. Think about that. He never got to have his day in court. His widow is still waiting, 17 years later.

What would happen in his case if S. 2290 is enacted? First, because he had mesothelioma, his estate would be paid $1 million. It would be paid on an expedited basis. Second, his claim would have been evaluated and processed in a matter of months, not decades. Third, he would not be forced to give up half of the awards—moneys desperately needed for medical bills, treatment, and all of the economic and personal losses that afflicted his family—to his lawyers.

What is wrong with the asbestos litigation system? This Navy veteran with mesothelioma got zero out of this tort system. Out of the FAIR Act, he would get $1 million. He would not even need an attorney to get it. He would not have to pay 50 percent to attorneys. That is the way it should work.

Let me mention the case of Rick Napier who suffers from asbestosis. He has trouble breathing. He cannot even walk without great difficulty because of the disease. He no longer has the lung capacity he needs for physical labor, let alone normal, everyday activities. Rick Napier worked for W.R. Grace for 3½ years until he was laid off. He was a skip operator. He ran small cars that carried ore up and down the hills of Libby, MT. He has lived in Libby for 55 years and knows, as do his neighbors, that asbestos is everywhere in the area. It is in the gardens and yards of places at work, homes, playgrounds. It is everywhere.

Four years ago, Rick was diagnosed with asbestosis. He filed a lawsuit but was told, despite his illness, there was really nothing that could be done. W.R. Grace has gone bankrupt. There is no one left to sue, no one left to compensate him for his illness. The current tort system has failed Rick Napier. Unless we pass this legislation for a national, privately funded trust for compensation based on illness and not on the solvency of the defendant company, we continue to fail Rick Napier and many others like him. Without it, we leave Rick Napier and the rest of the victims in Libby, MT, with no resource, no relief, and no hope.

What is wrong with asbestos litigation? Compensation for victims like Rick Napier under the current tort system is not always available if the company he could sue to receive some compensation is bankrupt. Under the FAIR Act, he would get compensation even though he is no longer with us. It is high time we put victims first.

I would be remiss not to mention the staggering toll the asbestos litigation problem has also inflicted on our economy. As the number of claims continues to rise, at least 70 companies to date have already been forced into bankruptcy. Meanwhile, the number of companies pulled into the web of this abusive litigation is on the rise, many of which have little, if any, culpability. These business bankruptcies translate directly into lost jobs, lost pensions, and weaker financial markets. It is a detriment to our country.

According to a letter from the nonpartisan Academy of Actuaries:

. . . bankruptcies of corporate asbestos defendants have affected 47 states, resulting in the loss of 52,000–60,000 jobs, with each displaced worker losing $25,000-$50,000 in wages and 25% of their 401(k).

I ask unanimous consent this letter from the American Academy of Actuaries be printed in the RECORD.

AMERICAN ACADEMY OF ACTUARIES,
*Washington, DC, March 24, 2004.*
Re asbestos.
Senator BILL FRIST,
*Marjority Leader, U.S. Senate,*
*Washington, DC.*

DEAR SENATOR FRIST: The Mass Torts Subcommittee of the American Academy of Actuaries published a monograph, "Overview of Asbestos Issues and Trends" in December 2001. The Academy monograph is currently being updated. Meanwhile, as S. 1125 nears debate on the Senate floor, I am pleased to provide this letter, which provides a brief summary of some of the key points regarding asbestos litigation.

The asbestos problem, initially recognized decades ago, is not going away.

Exposure to asbestos has been linked to malignant diseases including mesothelioma, lung and other cancers, as well as nonmalignant conditions such as asbestosis and pleural injuries.

Asbestos use was widespread in the United States for decades, and although exposure levels have declined significantly since OSHA requirements were implemented, asbestos use is still legal in the United States today.

The number of claimants filing lawsuits annually has increased dramatically in recent years and shows no signs of a return to prior levels experienced during the 1990s. Most of the increase in claim filings relate to individuals who are not functionally impaired.

Approximately 730,000 claims were filed through 2002 and estimates of the ultimate number of claimants range from 1 million to 3 million.

Many believe that some current claimants are not being compensated fairly or promptly. Additionally, there are widespread concerns that funds will not be available to compensate future claimants.

The size of recent awards made to settle claims has also increased. In turn, contributions paid by individual corporate defendants and their insurers/reinsurers have increased. Additionally, demands against solvent defendants have reflected upward pressure to cover amounts that are no longer funded by defendants that have sought protection from asbestos litigation through Chapter 11 bankruptcy petitions.

At least 70 companies have sought bankruptcy protection due to asbestos litigation

to date. Further, recent bankruptcy filings (i.e., pre-packaged petitions) have exacerbated inequities in the asbestos litigation system.

The number of corporations named as defendants in the litigation has grown dramatically. Asbestos claimants typically name 60 to 70 defendants in each lawsuit. While approximately 300 companies were sued in the 1980s, RAND estimates that approximately 8,400 companies had been sued as of 2002. The potential culpability of this expanded list of defendants is significantly different from the initial group of companies that mined or manufactured asbestos products, knew of it dangers, and failed to protect and/or warn their workers.

Direct costs are significant—estimates of ultimate costs relating to U.S. exposure to asbestos range from $200 billion to $265 billion. More than half of the costs relate to plaintiff and defense attorney fees.

Indirect costs are also large: Bankruptcies of corporate asbestos defendants have affected 47 states, resulting in the loss of 52,000–60,000 jobs, with each displaced worker losing $25,000–$50,000 in wages and 25% of the value of their 401(k); For every 10 jobs lost in an asbestos-related bankruptcy, an additional 8 jobs are lost in the surrounding community; and Failure to enact legislative reform could reduce economic growth by $2.4 billion per year and cost 30,770 jobs annually.

The U.S. Supreme Court has twice overturned efforts to resolve the litigation through class action settlements (Georgine and Fibreboard) and has called upon Congress to address the situation.

Various reform measures have been enacted or are being considered at the state level, such as: Imposing medical criteria to bring a claim; Creating inactive docket systems to preserve the rights of individuals who are not currently impaired; and Addressing consolidation, joint and several liability, and venue issues.

However, it is difficult to implement meaningful changes on a state-by-state basis, and as long as some states are perceived as plaintiff friendly jurisdictions and claims remain portable, forum shopping will be a problem.

Several asbestos-related bills were introduced in the 108th Congress, and the issue of federal reform to the asbestos litigation crisis deserves careful attention. Thank you very much for your consideration of the information presented herein. Please do not hesitate to contact Greg Vass, the Academy's Senior Casualty Policy Analyst, at (202) 223–8196 if you have any questions or would like additional details.

Sincerely,
JENNIFER L. BIGGS, FCAS, MAAA,
*Chairperson, Mass Torts Subcommittee.*

Mr. HATCH. The Rand Institute estimates this litigation eventually will result in 430,000 lost jobs. These are pretty good jobs. In fact, very good jobs. It is because of the very serious problems that I stand here today to express my steadfast support for the legislation we are on the verge of considering, if our friends on the other side will allow us to consider.

We will make a motion to proceed, and hopefully they will not block a motion to proceed because we ought to debate, we ought to look at amendments, we ought to do what has to be done. We ought to perfect this bill if we can. It is about as perfect as I think we can get it under the process so far. It is a darn good bill and would certainly do a lot of good for people.

I turn for a moment to the comparison of the current tort system and the FAIR Act. This is why we should pass the FAIR Act. Under the current tort system, even the Supreme Court Justices have described it as jackpot justice; under the FAIR Act we have certainty.

Under the tort system, we have a litigation lottery really, in real terms. Under the FAIR Act, it is a no-fault system. You do not even need attorneys to recover. Under the tort system, you have "magic" jurisdictions; in other words, jurisdictions where you can go where the judges are corrupt and the juries do not care how much they award the people who don't deserve it. In other words, there are special jurisdictions in this country where that happens.

Under the FAIR Act, you have a system of fairness. Under the tort system, we are pushing companies into bankruptcy. Mr. President, 8,400 companies have been sued, with over 300,000 claims, as I have mentioned. Many of those companies are going to have to go into bankruptcy if we do not solve this problem, which even the Supreme Court has asked us to do. Under the FAIR Act, these companies would remain solvent.

Under the current tort system, we have decades of delays, as I have mentioned. Under the FAIR Act, we would have expedited payments in a number of months.

It is hard to imagine that anyone cannot see the benefits of the FAIR Act over the current system. I understand why the personal injury lawyers who are handling these asbestos cases do not want this to happen. Of course, they are going to make upwards of $60 billion, right out of the pockets of the people who deserve those moneys, where we give them to the people who are injured.

Let me talk about the particulars of what the bill does. S. 2290 would provide fair and timely compensation to asbestos victims and certainty to American workers, retirees, shareholders, and, of course, our whole U.S. economy. Hardly anything would do more for our economy than the FAIR Act right now. It would establish a privately funded, no-fault, national asbestos victims compensation fund to replace the broken tort system and ensure that individuals who are truly sick receive compensation quickly, fairly, and efficiently.

The legislation retains the bipartisan agreement on medical criteria that was approved by a unanimous vote in the Judiciary Committee. These criteria form the basis of a no-fault victims compensation fund that will stop the flow of resources to the unimpaired and ensure that the truly ill will be paid quickly and fairly. S. 2290 also contains improvements made to its predecessor, S. 1125, that have been developed over the last several months during extensive negotiations by the stakeholders.

S. 2290 includes a number of new provisions that ensure the fund will be set up, processing and paying claims quickly. First, it places the office within the Department of Labor in order to utilize its existing infrastructure and experienced personnel to facilitate a faster startup. In order to allow the office to begin accepting and processing claims in short order, the legislation requires the enactment of interim regulations and procedures within 90 days after the date of enactment, including the expedited processing of exigent claims.

To avoid potential delays associated with the appointment process, the legislation grants interim authority to an existing Assistant Secretary of the Department of Labor until the new Administrator is appointed. To ensure that adequate initial funding will be available to meet demand, the bill provides for up-front funding from fund participants, as well as increased borrowing authority. These new provisions address concerns that claimants must have speedy access to the fund while halting the admittedly broken tort system that continues to divert scarce resources away from the sick to the unimpaired.

S. 2290 also includes revised funding provisions. It establishes a fund that can pay $114 billion in claims, with an additional $10 billion in contingent funding available from defendant companies—these 8,400 companies. Money required to go to the fund from defendants and insurers is assured over a period of 27 years.

Defendant participants, for example, guarantee their funding obligations through a grant of authority to the Administrator to impose a surcharge in any year where moneys received fall short of the annual requirements. In addition, S. 2290 provides up to $300 million annually in hardship and inequity adjustments that may be granted by the Administrator among defendant participants. Money from insurers is front-loaded for the early years of the fund where the most stress on the system is anticipated.

Enforcement provisions have been strengthened to help the Administrator go after recalcitrant participants. Additional safeguards to insure the funding have also been added, such as establishing a priority for payment obligations to the fund in State insurance receivership proceedings.

Based on the funding now available under S. 2290, increased compensation will go to claimants. Claims values have been increased in several disease categories over the levels approved by the Judiciary Committee in an overwhelmingly bipartisan vote. We have even gone beyond those claims values. Furthermore, S. 2290 now provides reimbursement for out-of-pocket costs of physical examinations by claimants' physicians, as well as costs for x rays and pulmonary function testing for level I claimants.

Let me talk about the bill.

Unfortunately, some Members on the other side of the aisle want to block us

from proceeding to the bill—even proceeding to the bill. Even on a motion to proceed, we have heard there may be a filibuster. Well, I am not surprised by these obstructive tactics. We have been getting used to them over the last 3½ years. I find it truly regrettable, given the tremendous importance of this legislation to our country.

I find this type of obstruction particularly troubling because without the FAIR Act more and more Americans are certain to lose their jobs. Anyone who is serious about preserving jobs should be actively helping us move forward to the consideration of this bill. I have heard a lot of mouthing off by Presidential contenders in this matter, that jobs are the most important issue. Where are they when it comes to voting for jobs that this bill would provide and for the preservation of jobs that this bill would provide?

Anyone who is serious about preserving jobs should be actively helping us on this bill. They should not be standing in its way. But the personal injury lawyers are a powerful force, and some on the other side of the aisle are willing to hear the voice of the personal injury bar over hard-working Americans who want to keep their jobs and pensions.

I might mention that a lot of trial lawyers are very unnerved by this. They see the injustices going on here and they themselves decry it. It is a small percentage of the American Trial Lawyers Association who are doing this. Many other top-notch trial lawyers are very concerned.

Now, to legitimize the obstructive tactics of these lawyers and the other opponents, opponents of this bill argue the legislation is completely different from the one we reported from the committee last year. This argument particularly lacks merit because the bill retains the core features of the legislation that was introduced as S. 1125 and subsequently marked up in the Judiciary Committee.

Again, we have taken steps to ensure the solvency of the fund. As I mentioned, we replaced some contingent funding by calling for more up-front funding, extended borrowing authority and guarantees for funding, among other added funding safeguards—all of which are additional strengths to the bill that we passed out of the committee.

The fact is, this bill we are about to bring up continues to create a fair and efficient alternative compensation system to resolve the claims for injury caused by asbestos exposure. The fund is still capitalized through private contributions from defendants and insurers, and compensates victims under the very same medical criteria that we reached on a bipartisan basis last year. The bill still brings uniformity and rationality to a broken system so that resources are more effectively directed towards those who are truly sick.

Indeed, this bill still preserves no less than 53 compromise measures demanded by Democrats last year when this bill moved through committee—53 changes we made in the bill that we thought was pretty good to begin with, all to accommodate our friends on the other side. In fact, it adds many more provisions requested by Democrats and labor unions. And while this bill contains certain modifications from earlier versions, the modifications represent dramatic improvements to controversial measures that all interested parties had ample opportunity to discuss and work out after S. 1125 was reported from the Judiciary Committee.

While the Judiciary Committee reported S. 1125 favorably from the committee on a near party-line vote, the markup produced some measures that required retooling. These measures jeopardized any meaningful chances of getting the bill passed into law. If not for the tireless efforts of our distinguished majority leader and Senator SPECTER, this bill would have achieved what its opponents have yearned for all along—a dead bill.

But through the stewardship of Senator SPECTER and Chief Judge Emeritus of the Third Circuit, Edward R. Becker, we were able to provide a forum through which the major stakeholders provided invaluable expertise and solutions with respect to the remaining controversial issues left on the legislation, such as fund reversion, startup, and administrative process.

This group, which included representatives from labor unions and industry, among others, met dozens of times in the last 8 months. Our staff was there throughout working with them. This process proved to be not only insightful but also very helpful in resolving many of the key differences in this legislation. Through the leadership of Senator FRIST, we were able to get the insurers and the defendants to agree on an even more equitable funding allocation and, among other things, provide for more flexible borrowing authority and front-loaded funding to address the anticipated flood of claims that would come through the fund during its early years, something we would have liked to have done before but which we have done now.

Opponents of this bill have also justified their obstructive tactics by passing misinformation about this bill. First, some Members on the other side of the aisle have stated repeatedly that bill does not provide enough money. I find these statements to be misleading and a stark contrast to several studies of future asbestos-related costs under the current system. For example, one study shows the highest reasonable estimate of prospective costs, the Milliman study, would result in approximately $92 billion for victims after attorney's fees and expenses.

In yet another study, commissioned by Tillinghast-Towers & Perrin, future amounts to compensate victims are estimated at $61 billion after attorney's fees and expenses.

As you can see from this chart, Asbestos Victims Compensation, this is in billions. Under the current tort system, the dark blue, $41 billion—let's take the Tillinghast figure, the top circle on that side—will go to trial lawyers for fees. Twenty-eight billion will go to defendant lawyers for defending these cases. Better than half the money is going to go to lawyers. Those are the Tillinghast estimates, which I believe are quite accurate. Only $61 billion will go to potential future plaintiff compensation or to those who are really sick and some who aren't sick.

Let's take the bottom, the Milliman study, $61 billion will go to the attorneys, the personal injury lawyers; $42 billion would go to the defense lawyers, defending these companies and insurance companies, although there are very few insurance companies involved; $92 billion would go to the victims.

Under the FAIR Act, only $2.5 billion would go to the trial lawyers, and the full $111.5 billion would go to the victims. I don't see how anybody could argue against that. I might add, on top of that would be another $10 billion in contingencies, if the $111.5 billion or the total of the $114 billion does not solve the problem.

These other two say it would solve the problem, that lesser amounts—and these are estimates by top-flight actuarial firms—that it would solve the problem with lesser amounts than what we are willing to put in the trust fund. Under the FAIR Act it is estimated claimants will receive 95 percent or more of the total funds under the no-fault nonadversarial system this bill amounts to. This means the FAIR Act fund, which would be able to pay more than $120 billion in awards, will allow claimants to take home well over $100 billion. This is more total money than they are projected to receive under the current tort system.

But it is not just more money in the pockets of victims. It is faster and more compensation as well. The difference is, the personal injury lawyers won't get as much money out of it, but there is still $2.5 billion there for them for cases that are like rolling off a log. We anticipate the claimants will not have to endure years of discovery battles between the defense and plaintiffs' lawyers and endless litigation before they get paid. As I have shown in one case, 17 years old; others are up to 20 years old and still no compensation for the victims who have died long since and the families have suffered all those years.

Currently, whether some victims get paid depends on the solvency of the business. But under the FAIR Act, these victims will no longer have to go without payment. These are the ones where their companies were insolvent.

It is time to end the current system of jackpot justice where only some win and many lose. The some who win in many cases don't deserve to win because these personal injury lawyers go into renegade areas where they know the judges are either corrupt or totally in their pocket and they know there

are runaway juries. That is how everybody loses except for those who are not sick or getting these huge multimillion dollar awards out of these unfair jurisdictions.

Opponents of this bill have also argued there are inadequate safeguards to insure the solvency of the fund. My response to this is very simple: Baloney. This fund, which is funded at the highest reasonable claim rate scenario, is equipped with many mechanisms to ensure the pay-in and payout requirements are met. Once again, this includes more flexible borrowing authority against future contributions, front-loaded contributions from insurers, and contingency funding of $10 billion additional to the $114 billion. To be absolutely certain, this bill also includes guaranteed surcharge and orphan-share reserve accounts which set aside money to grow and pay for unexpected shortfalls and empowers the Attorney General to enforce contribution obligations. On top of all these safeguards, if the fund still becomes insolvent, claims would revert back to the tort system, a provision Democrats insisted be part of the bill as the ultimate protection. It is not going to be needed, but it is in the bill, trying to accommodate, once more, demands on the other side.

Given that this bill is a clear net monetary gain for legitimate victims and provides payments faster and with more certainty, I am at a loss to explain why anybody would object to this bill. The unions that continue to oppose the bill risk throwing away the last best chance to compensate fairly those who are truly sick and provide some protection to those whose jobs and pensions are at risk because of the asbestos litigation crisis, because their pensions are going to be lost as more companies go into bankruptcy, forced into it by the phony system we currently are undergoing.

Quite frankly, the only entity that stands to lose under this bill is the handful—and it is a handful—of personal injury lawyers who have guzzled more than $20 billion of the costs incurred on this issue as of the last year—$20 billion. No wonder they want this gravy train to keep going. If the improved FAIR Act is passed, they will not be able to leverage unimpaired claims anymore to squeeze a projected $41 billion more for themselves from remotely connected companies by refusing a broken system. I am talking about the personal injuries lawyers. Defense lawyers who have to defend these cases are going to pull a huge amount of money out, too, as these cases go on for 20 years or more. I am all in support of compensating attorneys for the value of their work—no question about that—but when the lawyers get rich while diverting the valuable resources away from sick victims, something is wrong with the system.

You don't need me to tell you this. The Supreme Court thinks that is the case. Think tanks and other nonpartisan commentators have been saying that for years.

We have a serious problem on our hands that demands this body's full attention. I applaud our distinguished majority leader for his work in helping us this far and in bringing this bill to the floor because the time to act is now.

We have studied the asbestos problem at length for decades. We have held numerous hearings, considered various legislative proposals, and we even underwent several marathon markups in the Judiciary Committee last June. Over the past year, we met with our Democratic counterparts to assuage their concerns about the bill.

We have provided a meaningful 8-month mediation forum through which the major stakeholders could bridge different recommendations on issues critical to the bill. We provided one of the finest Federal judges in the country to preside over the negotiation. Judge Becker has done an excellent job. To the extent we were able to reach consensus on issues, the appropriate language is embodied in the bill before us. To the extent there are issues that remain unresolved, we ought to openly debate them on the floor of the Senate.

The time has come to stop talking about doing something and to take decisive action. Every day that passes is a day we withhold meaningful recovery to truly sick victims. Every day that passes is a day in which hard-working Americans at companies that had little or nothing to do with asbestos face decreased pensions and an uncertain employment future, with a real potential for loss of jobs. Every day that passes is a day we deny consideration of a comprehensive solution to one of the most plaguing civil justice issues of our time.

Mr. President, I have heard that some on the other side have said the one reason they really don't want to go ahead with the bill is not because they doubt its efficacy, or that it is right, or that they doubt the words I have been saying today; the real reason behind it, some have said, is that the personal injury lawyers are expected to put up at least $50 million or more for their Presidential candidate. It is not hard to figure out where they are going to get the money. It is going to be right out of the hides of these asbestos victims, many of whom have died. I hope that is not the case. I hope that is just a set of rumors, but it is coming up all too frequently.

Is that why we cannot even proceed to the bill? I have been here a long time and very few motions to proceed have been filibustered, except for a delay of a day or 2, and even then we have had very few. We have always been able to proceed to the bill.

I suspect the reason they are going to filibuster the motion to proceed is because it is a little more difficult to figure out by the general public that you are not on the bill yet, so a motion to proceed is just a procedural gimmick or gibberish. No, it is serious stuff. If we cannot proceed to the bill, we cannot get to the bill. Why would folks on the other side not want to get to the bill and try to improve it if they have improvements they would like to put up for a vote? We can vote on them. I am sure they will win on some of their improvements—if they are improvements—or even some things they want that are not improvements but might be deleterious to this bill.

Let's go to the bill and not continue this feckless filibustering of everything in the Senate, making a supermajority vote the absolute premise for everything they are doing. This is an important bill. We have worked as hard as we can with everybody concerned with it, from the trial lawyers, the personal injury lawyers, to the unions, businesses, insurance companies, to the victims. We have worked our tails off. There are some unions that support this bill. They realize their people will lose jobs and they will never get as much money. They realize the attorneys are taking too much out of this process. They realize it takes years and years to get just compensation—if that—to the women and children who are left behind from the mesothelioma victims. Most of those victims are already dead. Most of them work for companies that have already gone bankrupt. Their pensions are gone, their jobs are gone. Think about it.

In our medical criteria, we have provided hundreds of thousands of dollars for central categories of people who will never get mesothelioma, many of whom are not sick, many of whom have cancer but were ardent smokers most of their lives, where 99-to-1 their cancer came from smoking and not from exposure to asbestos. But in this bill, we give them the benefit of the doubt. Not only do those union members lose out on these moneys that will be very easy to obtain once they meet certain minimum medical criteria that everybody agreed to—Democrats and Republicans—but they will do it without huge attorney fees, and they will do it without knowing that their injuries came from asbestos exposure, when they probably did come from the excessive smoking they did all their lives. But we have given them the benefit of the doubt. They will do it without losing their pensions, their jobs. Their families will be better off.

To some of my colleagues on the other side, there is never going to be enough money, no matter what you do. But there are limits to what these companies can pay without going into bankruptcy. Like I said, 70 have already gone into bankruptcy and there will be many more if they don't resolve these problems. This bill will resolve them. It does it in a reasonable, decent, honorable way, and still provides $2.5 billion for lawyer fees. That is a lot of money for a no-fault system, even though those who have been raking in the billions of dollars—the very few

lawyers—are giving other trial lawyers a bad image and are ripping off the system.

Having said that, there are trial lawyers in this country who deserve our respect, who are honest, who do not buy off judges, who do not abuse the system, who do not forum shop into these jurisdictions that you know are going to violate the basic strictures of society, giving huge verdicts to those who don't even deserve anything. These trial lawyers are people who basically help keep society straight. Many of them were people who basically sued the companies that were most responsible for these problems.

But now we are coming down to a lot of personal injury lawyers who really should be ashamed of themselves. You have seen the ads in the newspapers and so forth. They are as trumped up as anything I have ever seen, and they are even on television. Nobody should exploit the suffering of others, including ourselves. We are trying to do our very best to make sure everybody who truly suffered gets just compensation under the circumstances. That is what this bill will do. We have worked hard to get it here and it is time that we pass it.

I hope my colleagues on the other side don't filibuster the motion to proceed. That should not be done on something this important.

Mr. President, I yield the floor and suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. WYDEN. Mr. President, I ask unanimous consent the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

## GAS PRICES

Mr. WYDEN. Mr. President, like you, I was home over the last few days and very much enjoyed being with you, and I particularly enjoyed the honor we received from the Classroom Law Project. It has been a tremendous privilege to be able to team up with you on those kinds of initiatives.

I want to discuss one of the issues about which I heard a great deal and I am sure you did as well when we were home. Gas prices in Oregon have now hit an all-time high. Over this past weekend, folks in Eugene and Medford in particular were paying more than $2 a gallon. Of course in our State this works a tremendous economic hardship. Folks have to drive long distances in many communities, and particularly for small businesses it is of tremendous economic concern at this time.

In light of what I saw last night on the news program "60 Minutes," I want to talk for a few moments about a resolution I have introduced recently calling on President Bush to put some real heat on the Saudis and OPEC to increase oil production in order to help the kind of people I saw over this last week in Oregon who are getting mugged at the gas pump.

When I introduced this resolution recently, to put some real pressure, a full-court press on OPEC to increase oil production, I wrote a resolution that mirrored what a number of our colleagues offered during the years when Bill Clinton was President.

There was an objection to the Senate considering my resolution to start putting some pressure on OPEC and the Saudis to increase production. It seems to me given what a lot of us saw on "60 Minutes" last night, I hope some of our colleagues and friends on the other side of the aisle would now reconsider my resolution and reconsider their objection to it.

In an interview last night on the CBS news magazine, the Washington Post's Bob Woodward talked about the substance of a reported conversation between our President and Saudi Arabia's Ambassador to the United States, Prince Bandar. Reading a portion of Mr. Woodward's new book, correspondent Mike Wallace said last night, "Bandar wanted Bush to know that the Saudis hoped to fine-tune oil prices to prime the economy 2004. What was key, Bandar understood, were the economic conditions before a Presidential election."

I want to start my discussion this afternoon with the question, Should the United States allow a foreign power to decide our Nation's energy security? Certainly this is a troubling question.

It seems to me the pieces of the gas price puzzle are beginning to come together. I will tell you that I believe it forms a very troubling picture.

On March 31, the New York Times reported a senior official in an OPEC country as having said the United States is placing "very little" pressure on the oil cartel to increase gas prices. The Saudi official continued by saying of OPEC's discussions with the United States, "We're telling them, keep your mouth shut."

Days later, OPEC moved to ratify a 1-million-barrel-per-day production cut that would further drive up gasoline prices in our country. The Reuters news service then reported the Saudi Foreign Minister was asked whether the United States had expressed any disappointment over OPEC's production cut. The Saudi Foreign Minister said, "I didn't hear from this Bush administration. I'm hearing it from you that they are disappointed."

Last night on "60 Minutes," Bob Woodward told us the Saudi Ambassador indicated to the President that "certainly over the summer, or as we get closer to the election, they could increase production several million barrels a day and the price would drop significantly."

I can understand why the Saudis would want to cut production right before the heavy summer driving season, the period that is coming upon us. The Saudis want to boost their profits. I have always said OPEC is going to stand up for OPEC. Anybody who thinks OPEC stands up for the American consumer thinks Colonel Sanders stands up for chickens.

I understand the Saudis and that country are going to be interested in everything that will boost their profits. I can understand why any President would want gas prices to be low with an election coming fast. But what about what the American families want?

We know what the Saudis want. We know about the climate before a Presidential election. While the Saudis count the profits and the President counts on the word of the Saudis, American consumers are counting out more and more of their hard-earned dollars just to fill up at the gas pump.

When the market opened this morning, U.S. crude oil futures were $37.74 a barrel, which is about $8.50—or about 30 percent—higher than a year ago.

As I noted over this last weekend, Oregon families were paying an all-time high for gasoline. A number of our communities have seen prices of over $2 a gallon.

With gas prices through the roof, the administration should have pressured OPEC ahead of the cartel's planned reduction cut, and the President should have used his relationship with the Saudis to bring relief to American consumers.

Let me repeat that. You have the prices soaring through the roof. You have the administration with an opportunity ahead of time to put pressure on OPEC ahead of their planned production cut. Certainly the President has had the kind of relationship with the Saudis that would ensure they listen seriously, and yet we saw this morning's report indicating the White House had different priorities when it came to gasoline prices, OPEC, and the Saudis.

My view is there just isn't any substitute for leadership when our families are hurting financially. Unfortunately, we haven't seen it in recent days.

I call on the Senate once again to send a clear message that the American people come first. The President ought to be using his relationship with the Saudis to help reduce gasoline prices now—not at a time of his choosing or the Saudis' choosing. It ought to be at a time when it best meets the needs of our consumers, and that is right now.

I ask the Senate to once again consider my simple resolution. It parallels the one that was authored by our friends and colleagues now in the Cabinet, Senator Abraham and Senator Ashcroft, who were then serving in this distinguished body. The resolution I authored mirrors theirs to bring pressure to bear on OPEC and the Saudis to increase production. The Senate ought to be able to act at least as quickly on my resolution as it did on the one that passed in 2000. That was good enough