**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

In re:

LTL MANAGEMENT LLC,[1]

Debtor.

Chapter 11

Case No.: 23-12825 (MBK)

Judge: Michael B. Kaplan

**Hearing Date and Time:**
June 27, 2023 at 9:00 a.m.

# DEBTOR'S SUR-REPLY IN FURTHER SUPPORT OF OMNIBUS OBJECTION TO MOTIONS TO DISMISS CHAPTER 11 CASE

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

LTL Management LLC (the "Debtor"), the debtor in the above-captioned case (the "Chapter 11 Case"), files this sur-reply (the "Sur-Reply") in further support of the *Debtor's Omnibus Objection to the Motions to Dismiss Chapter 11 Case* [Dkt. 614] (the "Objection")[1] and in response to the replies and related joinders (collectively, the "Replies") filed by the following parties (collectively, the "Movants"): (a) the Official Committee of Talc Claimants (the "TCC") [Dkt. 857] (the "TCC Reply"); (b) the Ad Hoc Group of Mesothelioma Claimants [Dkt. 866]; (c) the Ad Hoc Committee of States Holding Consumer Protection Claims [Dkt. 863] (the "States Reply"); (d) Maune Raichle Hartley French & Mudd, LLC [Dkt. 855] (the "MRHFM Reply"); (e) the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") [Dkt. 862] (the "UST Reply"); (f) Arnold & Itkin LLP ("Arnold & Itkin") [Dkt. 854] (the "A&I Reply"); and (g) the States of New Mexico and Mississippi [Dkt. 872] (the "NM/MS Reply").

In support of this Sur-Reply, the Debtor incorporates the *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 4] (the "First Day Declaration") and the *Supplemental Declaration of Daniel J. Merrett* (the "Supplemental Declaration"),[2] filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT

Notwithstanding their vehement opposition to this Chapter 11 Case and the Debtor's proposed plan of reorganization (the "Plan"), the Movants offer no evidence to support their misguided arguments in favor of dismissal of this case. While they forcefully assert that the Debtor was not in financial distress when it commenced this case, the Movants provide no

1 Capitalized terms not otherwise defined herein have the meanings given to them in the Objection.

2 All citations to exhibits herein refer to the applicable exhibits attached to the Supplemental Declaration.

estimate or forecast of the Debtor's costs associated with defending and resolving the talc litigation. In sharp contrast, the Debtor will show through detailed cost estimates and cashflow forecasts prepared by its experts—predicated on an irrefutable factual record—that [REDACTED]

The Movants also tout the benefits of the MDL pending in the District Court, arguing that it can efficiently and equitably resolve the Debtor's talc liability. But the Movants again offer no support for this position. One of the TCC's own experts [REDACTED], and both experts [REDACTED]. Unlike the TCC's experts, the Debtor's experts will [REDACTED].

Notwithstanding the TCC's contention to the contrary,[3] the evidence in the record will show that the Movants do not speak for the majority of the claimants. That majority supports this case, opposes dismissal, and has agreed to the terms of a plan that (i) provides for the unprecedented payment of $8.9 billion on a net-present-value basis to resolve all current and future claims and (ii) serves as a template to also resolve the Imerys and Cyprus chapter 11 cases.

The Movants continue to assert that this support and the agreement on the Plan are "illusory," but the evidence will refute that assertion. Indeed, the claim-count information Movants just produced—pursuant to the Court's order and over their objection—affirms that the number of claims they represent (both filed and unfiled) are far less than those represented by the

[3] TCC Reply, 5 n.6.

Ad Hoc Committee of Supporting Counsel. Moreover, the Movants contended that the expert analysis they demanded, and that the Court allowed, would show the approximately 60,000 claimants represented by Ad Hoc Committee are substantially overstated because they include duplicates. But that recently-completed analysis shows instead that only 1,100 out of close to 60,000 claims are duplicates.[4] With no evidence to support their positions, it is only the Movants' arguments that are "illusory."

As comprised largely of plaintiff firms representing just a minority of claimants,[5] the Movants unsurprisingly cannot show that dismissal of this case is in the claimants' best interests. That showing cannot be made because: (i) it would take decades to try the pending claims in the tort system and, based on the trial record to date, most claimants will recover nothing, while, in stark contrast; and (ii) the Debtor's Plan provides a near-term settlement of all claims in the amount of $8.9 billion plus favorable resolution of their lien obligations (as well as any additional amounts recovered through the related Imerys and Cyprus bankruptcies).

Thus, the Movants efforts to impede progress in this Chapter 11 Case and block the Debtor and the majority of claimants from putting their agreed plan to a vote, which efforts are not in the interests of the claimants, are more likely driven by the opposing firms' view that a dismissal is in ***their*** interests. As the evidence will demonstrate, many of the Movants sit on the steering committee in the pending MDL and would be entitled to hundreds of millions in a

---

4 See Ex. 1 (Memorandum, dated June 23, 2023, from Compass Lexecon to Mr. Winograd) (confirming only approximately 1,100 suspected duplicates were identified based upon comparison of four identifying fields).

5 The U.S, Trustee appointed a TCC that did not include a single representative from the firms that support the Debtor's Plan. See Dkt. 162 (notice of appointment of official committee of talc claimants). The U.S. Trustee and the TCC are so closely aligned that counsel for the TCC took the position that he would not answer questions about discussions between the TCC and the U.S. Trustee on the basis that they shared a common interest. See Ex. 2 (Apr. 17, 2023 Molton Dep. Tr.), 47:25-48:9 (instruction not to answer based on alleged common interest between the TCC and the U.S. Trustee); id. at 51:8-52:53:24 (same); id. at 54:7-15 (same); id. at 56:22-57:10 (same); id. at 99:6-100:4 (same); id. at 101:4-24 (same).

common benefit fund if a settlement like this could occur in the MDL rather than in this Chapter 11 Case.[6] Moreover, all the opposing firms likely believe that dismissal is better for them because they have the potential to receive substantial fees if a lottery-like verdict can be secured and survive appeal. This self-interest was not lost on the Fourth Circuit when it upheld the preliminary injunction in the case of Bestwall LLC in an opinion issued just last week:

> It is not clear why Claimant Representatives' counsel have relentlessly attempted to circumvent the bankruptcy proceeding, but we note that aspirational greater fees that could be awarded to the claimants' counsel in the state-court proceedings is not a valid reason to object to the processing of the claims in the bankruptcy proceeding.[7]

The Fourth Circuit's observation has equal application here. Whatever the relationship between these conflicted law firms and their own clients, the firms should not be allowed to impose their will on the majority of claimants.

The Movants argue that this case must be dismissed because, even if the Debtor is in financial distress, the Debtor and J&J purportedly "manufactured" this distress in contravention of the Third Circuit's ruling. But the Debtor's financial distress has been and continues to be caused by the tsunami of talc litigation that swamped Old JJCI in the five years leading up to the first bankruptcy filing—litigation that alone caused Old JJCI's consumer health business to swing from a profit to a loss prior to the filing. Old JJCI was unequivocally in financial distress prior to the 2021 Corporate Restructuring, and the Third Circuit did not find otherwise. The Debtor was likewise in financial distress prior to the filing of this Chapter 11 Case.

---

6 See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation, No. 16-2738, Dkts. 73 (Dec. 2, 2016), 9676 (Apr. 30, 2019) and 26586 (Dec. 8, 2022). See also Ex. 3 (Apr. 17, 2023 Birchfield Dep. Tr.), 19:16-23:23, 25:6-24 (discussing Beasley Allen's seat on the MDL steering committee and entitlement to common benefit funds).

7 Bestwall LLC v. Official Comm. of Asbestos Claimants (In re Bestwall LLC), 2023 WL 4066848, at *9 (4th Cir. June 20, 2023)

Contrary to the Movants' assertions, the Third Circuit's ruling supports a finding that the Debtor was in immediate financial distress as of the filing of this case. Although the Debtor was subject to the same unrelenting costs of litigation faced by Old JJCI, the Third Circuit concluded that the J&J backstop put in place at the time of the Debtor's prior chapter 11 case eliminated the Debtor's financial distress.[8] But J&J agreed to backstop the funding of the Debtor under the 2021 Funding Agreement even though "it was never required to provide [the backstop] to claimants," to facilitate and support the Debtor's reorganization in chapter 11.[9] The Third Circuit's ruling frustrated and defeated the primary purpose of the J&J backstop, causing J&J to take the position that its backstop was void or voidable, and the Third Circuit itself to note the "irony" that its decision rendered an agreement intended to facilitate the Debtor's bankruptcy filing to actually prevent the Debtor from accessing bankruptcy.[10] By definition, "irony" is the opposite of what is intended.

The material risk that the J&J backstop was rendered void or voidable by the Third Circuit opinion only increased the extant financial distress. And that distress has only continued to grow as evidenced by the increase in the number of current claims from approximately 40,000 claims pending at the time of the 2021 Chapter 11 Case to upwards of 100,000 claims pending now.

The Debtor's entry into the new funding arrangement in connection with this case not only eliminated this risk but returned responsibility for the Debtor's talc liability solely to New JJCI, now Holdco, which responsibility had existed and continued uninterrupted for more than

8 In re LTL Mgmt., LLC, 64 F.4th 84, 110–11 (3d Cir. 2023).

9 Id.

10 Id.

42 years prior to the commencement of the 2021 Chapter 11 Case, other than the last two days. That result can hardly be characterized as "manufactured."

Contrary to the Movants suggestions, the Third Circuit did not "warn" the Debtor in footnote 18 of its opinion not to change its financing arrangements. Rather, the Third Circuit simply forecast that a change in the funding backstop might be made and then pointed out that, if a change was made, it could be subject to challenge as a fraudulent transfer.[11] Not only was the change that was ultimately made not a fraudulent transfer, it ensured the Debtor had sufficient funds to implement the proposed Plan. The settlement the Debtor and J&J had reached with the supporting law firms ***could only be implemented in bankruptcy***. The new financing arrangements made certain that the agreement could be consummated as agreed.

In fact, the Movants appear to agree based on their strident arguments that the Debtor was not in financial distress at the time it filed this Chapter 11 Case. If the Debtor was not in financial distress, then by the Movants own arguments (in fact, their lead argument), the changes to the financing arrangements did no harm, and the Debtor continues to have sufficient resources to pay all talc claims in full.

In making their arguments on financial distress, the Movants continue to conflate financial distress with insolvency. They argue that the Debtor is not in financial distress because [redacted]. But insolvency is not the standard, as the Third Circuit expressly pointed out.[12]

---

11 The new funding arrangement did not render the Debtor insolvent outside of bankruptcy, and as the evidence shows, was not effectuated to delay, hinder or defraud the talc claimants. To the contrary, the new funding arrangement was and is intended to enable an efficient and equitable resolution of all talc claims, which can be accomplished only through a bankruptcy reorganization. In the words of the Third Circuit, the new arrangement therefore provides the same "reasonably equivalent value" to the Debtor, its estate and creditors as the prior. Nor could a fraudulent transfer claim ever yield any additional recovery for talc claimants, whose claims will be satisfied in full under the proposed Plan.

12 Id. at 102 ("insolvency is not strictly required").

The Debtor's expert presents [redacted] .

The uncertainty of the timing and extent of the talc costs and the material destruction of value that Holdco would have suffered as a result would have jeopardized the Debtor's ability to pay talc claims, including future claims. That impact on the Debtor clearly constitutes financial distress.

But despite this distress, the Debtor was not equitably insolvent nor did it have unreasonably small capital. Financial distress and insolvency in any form are not the same, as the Third Circuit held, and the financial distress standard is not the equivalent of the unreasonably small capital prong of a fraudulent transfer claim. Finally, Arnold & Itkin's suggestion that any financial distress would have been cured by J&J has no factual basis and indeed is belied by the facts. As the Third Circuit stated, J&J had and has no obligation to bail out the Debtor or Holdco just as it had no obligation to bail out Old JJCI or the Debtor (twice). A bailout of Holdco to pay the talc liability would not have been in J&J's economic interest.

Some of the Movants also argue that the Court has no ability to exercise its discretion not to dismiss the Chapter 11 Case under section 1112(b)(2) of the Bankruptcy Code. They claim that the Debtor's Plan cannot constitute the requisite "unusual circumstances" because there is a separate requirement under the statute that a plan be confirmed within a "reasonable period of time." But the agreed Plan can satisfy both requirements because it will pay claimants in full. Moreover, the record again refutes any assertion that the Plan cannot be confirmed in a reasonable period of time. The Debtor has presented a Plan that is in the process of being finalized. The Plan presents a unique opportunity for all claimants to be paid equivalent amounts

through the establishment of a trust that can quickly and efficiently process and pay claims. Any delay is a consequence of the Movants' efforts to derail the process; as the Fourth Circuit recently held, supra, efforts to circumvent the bankruptcy process based on an aspiration of higher fees in the tort system are not a valid basis to oppose the process or a plan.

Further, contrary to the Movants' contention, the Third Circuit's opinion does not foreclose that application of section 1112(b)(2). At the time of the Third Circuit's ruling, there was no agreement on the material terms of a plan with a majority of the claimants, much less an agreed plan that will pay all current and future talc claims in full. Finally, to the extent there is any argument that financial distress was manufactured here (it was not), that can be "cured" by (i) allowing a vote on the Plan and/or (ii) granting the TCC derivative standing to prosecute fraudulent transfer claims in a single proceeding for the benefit of all claimants.

The Dismissal Motions should be denied.

## ARGUMENT

### I. THE DEBTOR IS IN FINANCIAL DISTRESS.

#### A. The Debtor's Financial Distress Arises From That of Old JJCI and as a Result of the Third Circuit's Decision.

The Debtor's financial distress exists as a result of tens of thousands of unliquidated, disputed talc claims (now 100,000) that were pending and threatened against Old JJCI and allocated to the Debtor in the 2021 Corporate Restructuring. The pursuit of those claims caused Old JJCI to incur $1 billion in defense costs over the five years prior to the 2021 Chapter 11 Case and approximately $3.5 billion in indemnity payments in connection with settlements and

verdicts.[13] This Court determined that the financial distress of Old JJCI and the Debtor was "patently apparent,"[14] and—as to Old JJCI—that finding was not disturbed by the Third Circuit.

In dismissing the 2021 Chapter 11 Case, the Third Circuit did not determine that these claims were speculative or that Old JJCI lacked financial distress. Rather, the Third Circuit reasoned that the backstop J&J provided through the 2021 Funding Agreement to satisfy talc liabilities in a chapter 11 bankruptcy negated the Debtor's financial distress.[15] The Third Circuit acknowledged this Court's findings that the 2021 Funding Agreement was executed as part of a "single-integrated transaction" that included the filing of the 2021 Chapter 11 Case and was designed to effectuate an efficient and equitable resolution of claims therein.[16] But notwithstanding that purpose and intent, the Third Circuit ruled that, because the funding agreement was effective for two days before the 2021 Chapter 11 Case was filed, the backstop eliminated the Debtor's financial distress for that two-day period and, thereby, foreclosed chapter 11 relief.[17]

The Third Circuit expressly highlighted the "irony" of its ruling: "that J&J's triple A-rated payment obligation for LTL's liabilities, which it views as a generous protection it was never required to provide to claimants, weakened LTL's case to be in bankruptcy."[18] The Oxford Languages dictionary defines an "irony" as "a state of affairs or an event that

---

13 First Day Decl. ¶ 36.

14 In re LTL Mgmt. LLC, 637 B.R. 396, 419 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt. LLC, 64 F.4th 84 (3d. Cir. 2023).

15 LTL Mgmt., 64 F.4th at 106.

16 Id. *at* 99.

17 Id. *at* 105.

18 Id. at 110-111.

seems deliberately contrary to what one expects."[19] Likewise, the Merriam-Webster dictionary defines "irony" as "incongruity between the actual result of a sequence of events and the normal or expected result."[20] Those definitions are apposite, as the Third Circuit's decision afforded the 2021 Funding Agreement exactly the opposite of its intended effect, thereby entirely frustrating its intended purpose and, from J&J's perspective, rendering it void and voidable by J&J as a matter of law.

That is exactly the conclusion that J&J reached and the position it took upon a review of the Third Circuit's decision.[21] Faced with that position, the Debtor's management appropriately entered into new funding arrangements designed to achieve the same intent and purpose of the old.[22] It did this by substituting the 2023 Funding Agreement and J&J Support Agreement for the 2021 Funding Agreement—a substitution that ensured that the Debtor had enforceable financing arrangements that provided it with the funding needed to pay the substantial costs of the bankruptcy case and implement the agreed Plan, including as it might be amended.[23]

This case is, therefore, a far cry from the situation contemplated in South Beach,[24] relied upon by the TCC, where the court stated that it would be improper for a controlling parent to invoke bankruptcy by rendering its shell subsidiary "insolvent in order to make it judgment

---

19 See Irony, Oxford English Dictionary (3rd ed. 2013), https://www.oed.com/view/Entry/99565?rskey =E42X4z&result=1&isAdvanced=false#eid (accessed June 26, 2023).

20 See Irony, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/irony (accessed June 26, 2023).

21 Ex. 4 (June 7, 2023 Haas Depo. Tr.), 12:14-20; 87:5-12.

22 See Ex. 5 (Declaration of John K. Kim, dated June 23, 2023) (the "Kim Decl."), ¶¶ 24-26, 32, 34, 50-53.

23 See also infra Arg. § II.A.

24 In re S. Beach Sec., Inc., 606 F.3d 366 (7th Cir. 2010).

proof, or to otherwise shield assets from judgment creditors."[25] Nor is there any relation between this case and Scheffler, where the debtor's chapter 11 filing targeted a single secured creditor.[26]

The Debtor's predecessor was indisputably in "organic[]"[27] financial distress prior to the 2021 Corporate Restructuring. Pre-existing financial distress is no more "manufactured" by a divisional merger than such a transaction can manufacture bankruptcy jurisdiction, as some Movants allege.[28] And, as the Fourth Circuit confirmed in Bestwall last week, jurisdiction is not manufactured where the same liabilities would have been within the jurisdiction of the bankruptcy court if, instead of the debtor, its predecessor had filed a petition for relief.[29]

### B. The Debtor's Financial Distress Is Demonstrable and "Immediate."

The Movants assert that any distress the Debtor was experiencing was not sufficiently "immediate" or "imminent" to warrant a bankruptcy filing. That position is unsupported and will be refuted by the evidence.

The Debtor was in financial distress as of the Petition Date. Among other things, based on unrebutted evidence, [REDACTED].

---

25 Id. at 377. The alleged judgment creditors in South Beach were also non-existent. The case was actually dismissed because the debtor had no non-insider creditors and thus no one to vote on any chapter 11 plan. Id. at 378-79.

26 In re Scheffler, 86 B.R. 576, 578–79 (Bankr. W.D. Wis. 1986).

27 TCC Reply, 14.

28 See States Reply, 7-8; MRHFM Reply 21-22.

29 See Bestwall, 2023 WL 4066848, at *7 ("Old GP, New GP, and Bestwall did not manufacture jurisdiction via their Texas divisional merger. This is evident because without the restructuring, the asbestos claims would have remained with Old GP. And, if Old GP had filed for bankruptcy, the bankruptcy court would have had jurisdiction over those claims as it does over the same claims here.").

[redacted].

The Debtor's financial distress is supported by the opinions of Charles H. Mullin, Ph.D. and Gregory K. Bell, Ph.D. Dr. Mullin will opine that, [redacted]

[redacted]

---

30 Ex. 6 (Expert Report of Charles H. Mullin, Ph.D., dated June 7, 2023) (the "Mullin Rep."), ¶ 12.

31 Ex. 7 (Expert Report of Gregory K. Bell, Ph.D., dated June 7, 2023) (the "Bell Rep."), ¶¶ 14, 84.

32 Id. ¶ 14, 84.

33 Ex. 8 (Supplemental Expert Report of Gregory K. Bell, Ph.D., dated June 20, 2023) (the "Bell Suppl. Rep."), ¶¶ 8-9



[redacted]

Based upon these analyses, Dr. Bell concludes that [redacted] It is thus, [redacted]

Dr. Bell's analysis is consistent with the guidance provided in court opinions on financial distress.[38] Moreover, it does not impute, as the Movants allege, Holdco's financial distress to the Debtor.[39] Rather, because the Debtor's rights under the 2023 Funding Agreement represents its

---

34 Mullin Rep. ¶¶ 19, 104, 109-110. Dr. Mullin assumed the governmental entities' claims could be resolved for the $400 million set aside for such claims in the proposed plan. The Ad Hoc Committee of States has stated its view that "$400 million is woefully inadequate to satisfy governmental entities' talc-related claims." States Motion, ¶ 55.

35 Bell Rep. ¶ 58. The TCC's expert witness, Saul Burian, similarl [redacted] Ex. 9 (Expert Report of Saul E. Burian, dated June 7, 2023), 42.

36 Bell Rep. ¶ 90.

37 Id.

38 See Obj., 28-31 (collecting cases).

39 See TCC Reply, 46; A&I Reply, 22.

largest asset,[40] consistent with the Third Circuit's opinion, any potential impairment of those rights "informs our view of the financial condition of LTL itself."[41] [redacted]

The Movants will offer no contrary evidence of the short- or long-term amounts of the Debtor's talc costs.[42] Instead, they argue that the Debtor lacks financial distress because the estimated value of the Debtor's and Holdco's assets exceeds the Debtor's estimates of the talc liability and, [redacted][43] In so doing, they retreat to their arguments that insolvency under the provisions of section 548(a)(1)(B)(ii) of the Bankruptcy Code is identical to financial distress.[44] No court has so held. To the contrary, a

---

40 See Bell Rep. ¶ 41 [redacted].

41 LTL Mgmt., 64 F.4th at 106.

42 The burden of proof to show cause is on the Movants. See Obj., 22-26; see also Ex. 10 (Robert S. Brady and Patrick A. Jackson, Dismissal for Bad-Faith Filing Under §1112(b)(1): Whose Burden Is It, Anyway? Dec/Jan 2009 AM. BANKR. INST. (2009)) (allocating the burden of proof to the debtor would mean "that a movant could merely recite '§1112(b)' and 'bad faith' in a motion to dismiss, and the debtor would be forced to respond at the peril of the ultimate sanction of dismissal of its chapter 11 case"). Arnold & Itkin asserts that the Debtor is collaterally estopped from challenging the allocation of the burden of proof here because the issue was raised in the prior dismissal proceedings and appeal. A&I Reply, 16-19. This argument ignores that the allocation of burden was not contested before this Court or the Third Circuit in the 2021 Chapter 11 Case. In any event, the "party seeking to effectuate an estoppel has the burden of demonstrating the propriety of its application." Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000). Even accepting the standard for collateral estoppel set forth by Arnold & Itkin, Arnold & Itkin has not met its burden to demonstrate the propriety of applying collateral estoppel here.

Similarly, the U.S. Trustee's argument that the applicable burden of proof was raised by the TCC and Arnold & Itkin, UST Reply, 7 n.4, fails because, as acknowledged by the U.S. Trustee, the Debtor did not actually litigate the issue in the 2021 Chapter 11 Case. See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 254 (3d Cir. 2006); see also Olin Corp. v. American Home Assur. Co., 704 F.3d 89, 98 (2d Cir. 2012) (collateral estoppel did not apply because the issue was neither actually litigated nor decided in the earlier proceedings.).

43 See, e.g., TCC Reply, 57-59. The TCC ignores that [redacted]. See Ex. 11 (Rebuttal Expert Report of Charles H. Mullin, Ph.D., dated June 14, 2023) (the "Mullin Rebuttal Rep."), ¶ 13.

44 See, e.g., A&I Reply, 46; UST Reply, 11-12.

wealth of authority, including the Third Circuit's January 30th opinion, makes clear that insolvency is not required to access chapter 11 relief.[45] The Movants arguments contravene that clear precedent.

The Movants also argue that uncertainty as to the specific amount and timing of talc litigation costs, which Dr. Mullin [REDACTED], precludes a finding of financial distress.[46] This attempt to add a certainty requirement to financial distress, however, again disregards what the Third Circuit said. The Third Circuit was clear that "[f]inancial distress must . . . be apparent, . . . immediate enough to justify a filing" and more than "an attenuated possibility."[47] But "uncertain and unliquidated future liabilities" may nevertheless justify a filing in appropriate circumstances.[48] In fact, section 524(g) exists specifically to provide relief for debtors that are "likely to be subject of substantial future demands," "the actual amounts, numbers, and timing of [which] cannot be determined . . . ."[49] The inherent uncertainty of "amounts, numbers and timing" of mass tort claims creates risk that

---

45 See 64 F.4th at 102; see also In re SGL Carbon Corp., 200 F.3d 154, 163 (3rd Cir. 1999) ("[I]t is well established a debtor need not be insolvent before filing for bankruptcy protection."); In re Stolrow's Inc., 84 B.R. 167 (9th Cir. BAP 1988) (citation omitted) ("[n]either insolvency nor inability to pay debts is a prerequisite to seeking voluntary relief under the Bankruptcy Code."); In re Mid-Valley, Inc., 305 B.R. 425, 429-31 (Bankr. W.D. Pa. 2004) ("fact of solvency does not require a finding that the bankruptcy filing was in bad faith"); In re Johns-Manville Corp., 36 B.R. 727, 732 (Bankr. S.D.N.Y. 1984) ("it should also be noted that neither Section 109 nor any other provision relating to voluntary petitions by companies contains any insolvency requirement").

46 See, e.g., TCC Reply, 48, 56; A&I Reply, 24, 33

47 LTL Mgmt., 64 F.4th at 102.

48 Id.

49 11 U.S.C. § 524(g)(1)(B)(ii). Mr. Burian admitted that he that he had no experience in asbestos-related bankruptcies or of valuing asbestos-related personal injury claims. Ex. 12 (June 22, 2023 Burian Dep. Tr.) at 29:4-19. He denied that "the likelihood, extent, and uncertainty of threatened litigation" was even a relevant factor for a court to consider in determining financial distress. Id. at 75:5-6 ("It wouldn't be one of my factors."). Mr. Burian's opinion is inconsistent with section 524(g) and governing precedent acknowledging that Congress intended for section 524(g) to provide relief to Debtors "likely to be subject to substantial demands for payment in the future arising out of the same or similar conduct," even when the amounts and timing of such future claims are uncertain." In re Grossman's Inc., 607 F.3d 114, 126 (3d Cir. 2010) (quoting In Combustion Engineering, Inc., 391 F.3d 190, 234 n. 45 (3d Cir. 2005)).

causes financial distress. The substantial uncertainty that exists here does not belie financial distress; instead, it is a key driver of the Debtor's financial distress. And the distress is apparent, immediate and unattenuated because there are approximately 100,000 claims pending currently, there would have been a flood of litigation immediately following a dismissal, and the costs to defend and resolve claims over the first three years would have been in the billions.[50]

There is no evidence to support Arnold & Itkin's repeated allegation that the Debtor lacks financial distress because J&J would simply have funded the payment of talc litigation costs to protect itself and the value of its equity in Holdco.[51] There was no historic practice of J&J satisfying talc litigation costs, as Arnold & Itkin alleges.[52] Rather, consistent with Old JJCI's—and since the 2021 Corporate Restructuring, the Debtor's—indemnification obligations, talc litigation costs have always been borne by Old JJCI.[53] Solely for administrative convenience and pursuant to company policy, J&J initially paid such amounts through the integrated, centralized cash management system it shared with Old JJCI, before charging 100% of those costs to Old JJCI.[54] In addition, there is no evidence to support the proposition that J&J would have changed its approach and begun to pay the Debtor's talc obligations. First, J&J had no obligation to pay the Debtor's talc liability prior to bankruptcy.[55] Second, J&J's actions to date demonstrate that J&J would not have paid the costs since J&J was unwilling to make payments

---

50 "Attenuated" may be defined as "lessened or weakened (as in amount, force, or magnitude)." Attenuated, Merriam-Webster.com Dictionary, Merriam-Webster, https://www merriam-webster.com/dictionary/attenuated (accessed June 23, 2023).

51 See A&I Reply, 5, 22, 26-27.

52 Id. at 26.

53 Ex. 13 (Decl. of Adam Lisman, dated November 2, 2021), ¶ 8.

54 Id.

55 LTL Mgmt., 64 B.R. at 106-07 ("And, of course, J&J's primary, contractual obligation to fund talc costs was one never owed to Old [JJCI] (save for the short moment during the restructuring that it was technically a party to the Funding Agreement).").

to avoid the Debtor's current and prior chapter 11 filings. Instead, the evidence establishes that, if Holdco was not able to timely pay talc costs, J&J would not, as before, provide its own funding.

## II. THE DEBTOR'S CONDUCT WAS NOT IN BAD FAITH AND DID NOT GIVE RISE TO A FRAUDULENT TRANSFER.

Movants attempt to bolster their previous arguments that the Debtor's actions in restructuring the Funding Agreements were in bad faith and independently support dismissal of this Chapter 11 Case—either because the restructuring of the Funding Agreements constituted alleged manufactured financial distress or an actual or constructive fraudulent transfer and/or a breach of fiduciary duty.[56] But, as previously set forth in the Objection,[57] and as will be further demonstrated by the evidence, these arguments continue to mischaracterize the facts and rely on incorrect assumptions.

### A. The Changes to the Financing Arrangements Were Necessary to Mitigate the Risk that J&J's Backstop Was Not Enforceable and to Ensure a Successful Reorganization.

The TCC, along with Arnold & Itkin, assert that the Debtor's "purported excuse" for terminating the 2021 Funding Agreement is "false" and a "pretext," and that the Debtor cannot establish that the Third Circuit's ruling frustrated the purpose of the 2021 Funding Agreement.[58] This disregards the evidence demonstrating the basis for the Debtor's good faith belief that a material risk existed that J&J's backstop in the 2021 Funding Agreement had been rendered void or voidable, which risk the Debtor eliminated by entering into the 2023 Funding Agreement and

---

56 See, e.g., TCC Reply, 12-38; A&I Reply, 34-47; UST Reply, 14-17; States Reply, 4, 7-8, 12-13; MRHFM Reply 21-22, 24-26; NM/MS Reply, 8.

57 See Obj., 42-58.

58 See, e.g., TCC Reply, 30-37; A&I Reply, 36-40.

a new J&J backstop agreement. By doing so, the Debtor ensured that it has the financial support it needs to implement a resolution of this Chapter 11 Case.

The basis for the Third Circuit's decision dismissing the 2021 Chapter 11 Case was not reasonably foreseeable, as the Movants claim.[59] Rather than constituting cause for dismissal, under the dismissal standard applicable in the Fourth Circuit, where the Debtor originally sought chapter 11 relief, the existence of J&J's backstop support ***would have dictated denial of a motion to dismiss***.[60] In Bestwall,[61] for example, the financial support that the debtor received under its funding agreement was key to the North Carolina bankruptcy court's denial of a motion to dismiss. In that case, the court found that the debtor's filing was not objectively futile under the Fourth Circuit's dismissal standard because "Bestwall has substantial assets, owns ongoing active businesses, and receives substantial cash flow. Most importantly, Bestwall has the full ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement, and to continue as a going concern."[62]

Even the Third Circuit acknowledged the "apparent irony" in its decision finding that the Debtor was not in financial distress.[63] J&J's entry into the 2021 Funding Agreement, which was done for the purpose of facilitating the Debtor's goal of resolving all current and future talc

---

59 See, e.g., TCC Reply, 34-35; A&I Reply, 36.

60 Bestwall, 2023 WL 4066848, at *8 ("[A]s the Third Circuit recognized in LTL Management, [the Fourth Circuit] applies a more comprehensive standard to a request for dismissal of a bankruptcy petition for lack of good faith; that is, the complaining party must show both 'subjective bad faith' and the 'objective futility of any possible reorganization.'") (citing LTL Mgmt., 64 F.4th at 98 n.8).

61 In re Bestwall LLC, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019).

62 Id. at 49; see also id. (finding volume of current asbestos claims that Bestwall faced as of the Petition Date, coupled with the projected number of claims to be filed through 2050 and beyond, was sufficient financial distress for Bestwall to seek resolution under section 524(g) of the Bankruptcy Code).

63 LTL Mgmt., 64 F.4th at 110.

claims pursuant to section 524(g) of the Bankruptcy Code, actually "weakened LTL's case to be in bankruptcy."[64] This acknowledgement demonstrates that the ***basis*** for the Third Circuit's ruling was not foreseeable—even if dismissal itself was.[65] Were the outcome foreseeable, there would have been no irony.[66]

Because J&J took the position that its obligations under the 2021 Funding Agreement were no longer enforceable due to the Third Circuit's ruling frustrating and defeating the primary purpose of the J&J backstop,[67] a material risk existed to enforcement of the backstop (whether or not it was in fact void or voidable). J&J's position was not a single spontaneous comment by J&J, but was repeated by counsel to J&J and Holdco to the Debtor's officers multiple times and, as a result, the risk of such voidability was carefully considered by the Debtor and its Board of Managers.[68] The record shows that, after the issue was raised, the Debtor's board considered the material risk that the J&J backstop had become void or voidable at three separate meetings (March 16, March 28 and April 2, 2023),[69] and then determined to enter into the 2023 Funding Agreement in order to eliminate any uncertainty as to funding given J&J's position.[70] Contrary

---

64 Id. at 111.

65 See TCC Reply, 34.

66 There is no merit to TCC's argument that the parties must have contemplated use of the 2021 Funding Agreement outside of chapter 11 simply because the members of the Debtor's board did not "rubber stamp" the filing. TCC Reply, 36. The Debtor and J&J are separate entities. The Debtor's board was aware of the benefits of chapter 11 and the clear expectation by all parties that the filing would be authorized. The board's fulfillment of its duties and conducting of appropriate due diligence before authorizing the filing in no way supports the suggestion that the Debtor might not have sought chapter 11 relief or that the 2021 Corporate Restructuring and the bankruptcy filing were not part of a single integrated transaction.

67 Ex. 4 (June 7, 2023 Haas Depo. Tr.), 12:14-20; 87:5-12.

68 See Kim Decl. ¶¶ 24-26, 32, 34, 50-53.

69 Id. ¶¶ 32-34.

70 Id. ¶ 52; see also Ex. 14 (Declaration of Robert Wuesthoff, dated June 23, 2023) (the "Wuesthoff Decl."), ¶¶ 18-19, 21.

to the TCC's suggestion,[71] the fact that J&J raised the issue of enforceability first only supports that a material risk existed that required evaluation and consideration.

Although the TCC continues to rely on In re Congoleum Corp.,[72] that case supports the Debtor's position. While the Congoleum court found that a frustration of purpose defense was not available in that matter, the basis for its decision was the absence of a common purpose between the debtor and its contract counterparties.[73] Here, there is no dispute that the Debtor and J&J had a common purpose in entering the 2021 Funding Agreement.[74] In fact, the Court previously found that, with respect to the transaction, the Debtor, J&J and Holdco "share, in this Court's view, a common legal interest in attempting to have the talc claims addressed through a Chapter 11 with a 524(g) channeling capacity."[75] And, given J&J's position on frustration of purpose as a result of the Third Circuit's ruling, which the Third Circuit itself recognized as ironic, the substitution of funding arrangements was appropriate in order to avoid the material risk as to enforcement.

**B. The Debtor's Entry Into the New Financing Arrangements Was Neither an Actual Fraudulent Transfer Nor a Constructive Fraudulent Transfer.**

Certain of the Movants revisit the argument that the restructuring of the Funding Agreements is some form of fraudulent transfer.[76] No evidence in the record supports such

---

71 TCC Reply, 30.

72 2007 WL 4571086 (D.N.J. Dec. 28, 2007).

73 Id. at *10; see also Obj., 51-52 ("According to the court, the settling claimants' purpose was simply to 'receive payment for their claims in exchange for granting a release to the Debtor' not, as alleged by the debtor, to effectuate an 'orderly resolution of asbestos claims and reorganization of the Debtor pursuant to a 524(g) plan.' Id. To that extent, the bankruptcy court ruled that the debtor was 'attempting to ascribe its own motives . . . to the [claimants].' Id. There was no evidence in the record that the claimants' primary purpose was for the debtor to reorganize successfully. Id.").

74 See Obj., 52.

75 Ex. 15 (May 30, 2023 Hr'g Tr.), 10:22-25.

76 See e.g., TCC Reply, 20-29; A&I Reply, 43-48; MRHFM Reply, 25-26.

assertions, which continue to be premature and the subject of the TCC's motion for derivative standing [Dkt. 489] pending before the Court.

With regard to actual fraudulent transfer claims, no Movant has presented any evidence that the Debtor intended to deprive itself of assets and liquidity needed to pay talc claimants in an attempt to actually hinder or delay such payments. Lacking this evidence, the TCC asserts it is not needed. Instead, according to the TCC, the Debtor should have seen its possible liquidity issues "as a natural consequence of its actions," with such potential consequence sufficient to demonstrate an actual intent to hinder and defraud claimants.[77]

The TCC's reliance on the Sentinel case is misplaced. In Sentinel, the Seventh Circuit found that the insolvent debtor's exposure of its "clients to a substantial risk of loss of which they were unaware" in an unlawful manner was sufficient conduct to "demonstrate an actual intent to hinder, delay, or defraud," notwithstanding that the debtor's specific intent was to remain in business.[78] Here, in contrast, the Debtor is solvent, has not violated any law and, because the Debtor's ability to satisfy its liability remains the same under either funding agreement, there has been no loss of value.[79] Sentinel has no application here.[80]

The Movants' assertions of constructive fraudulent transfer also fail. None of the Movants is willing to assert that the restructuring of the Funding Agreements rendered the Debtor insolvent. And the reason for that is clear, because an admission of insolvency would

---

77 See TCC Reply, 22-23 (citing to In re Sentinel Mgmt. Grp., Inc., 728 F.3d 660 (7th Cir. 2013)).

78 Sentinel, 728 F.3d at 667-69.

79 See Obj., 44-46; Kim Decl. ¶ 53.

80 Arnold & Itkin takes a different approach and asserts that the restructuring of the Funding Agreements was intended to hinder and delay creditors in the Chapter 11 Case because it effectively allows J&J and Holdco a plan veto. A&I Reply, 44-45. It is not clear to the Debtor how this is evidence of an intent to hinder or delay creditors, even if true. There is no evidence that the "Supported Plan" provisions of the 2023 Funding Agreement constitutes an attempt to hinder and delay recoveries to claimants. Moreover, there is a valid basis for those provisions, which do not protect only J&J, as discussed below.

overturn the Movants' arguments that the Debtor is not in financial distress. Further, even after discovery, no Movant has presented any approximation of the value of defending and resolving the talc litigation in the tort system to support such an assertion. Indeed, in response to discovery, the TCC has represented that it "has no estimates of talc liability" at all—whether aggregate or on a per-claim basis.[81] In any event, together, the Mullins and Bell expert reports establish that the Debtor is solvent, albeit in financial distress.[82]

Movants continue to argue that the Debtor's entry into the new financing arrangements supports a finding of constructive fraudulent transfer based upon the diminishment in market value of Holdco following the spin-off of the consumer business. This argument is flawed because any difference in value is relevant to the question of insolvency only if the value of the talc liability exceeds the value of the combined assets of the Debtor and Holdco. The Debtor's expert reports demonstrate it is not, and the Movants do not dispute that.[83]

---

[81] See Ex. 16 (response to Debtor's interrogatory No. 2 and further email response from S. Dwoskin to M. Rasmussen, dated June 23, 2023).

[82] See Bell Rep. ¶ 14, 58 (stating the Debtor is solvent from a balance-sheet perspective).

[83] See Kim Decl. ¶ 53 ("And the Board was aware of no reasonable approximation of the value of defending and resolving the talc litigation in the tort system that approaches $29 billion."); Wuesthoff Decl. ¶ 26 ("Both had the capacity to pay their debts as they became due for the foreseeable future, and, in no event, was the dollar-value of the costs to defend and resolve talc claims in the tort system believed to approach the $29 billion asset value of Holdco.").

Both the TCC and Arnold & Itkin also focus on "unreasonably small capital" to bolster their arguments of constructive fraudulent transfer. TCC Reply, 26; A&I Reply, 47-48. As explained in the Objection, however, there is no evidence that the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement left the Debtor with insufficient assets to generate proceeds to sustain operations. Obj., 55-56. The Debtor entered into the 2023 Funding Agreement precisely to ensure it had sufficient funding for a resolution of this Chapter 11 Case. See Kim Decl. ¶ 52 ("Nor could it ignore that the uncertainty of its existing funding had been resolved through the negotiation of favorable new financing arrangements that would support the Plan Support Agreements and the chapter 11-based resolution of all claims, current and future, that these agreements contemplated."); Wuesthoff Decl. ¶ 35 ("the Board authorized LTL's entry into the 2023 Funding Arrangements to eliminate the material risk that the 2021 Funding Agreement had been rendered void or voidable and to assure that LTL had funding sufficient to satisfy the financial terms set out in the Plan Support Agreements.").

### C. The Debtor's Entry Into the New Financing Arrangements Has No Impact on the Divisional Merger.

The TCC's argument that termination of the 2021 Funding Agreement voided the divisional merger[84] is meritless and disregards that the 2021 Funding Agreement was consensually replaced with the 2023 Funding Agreement and the J&J Support Agreement. This arrangement reinforced the intent of the parties in effectuating the 2021 Corporate Restructuring rather than repudiating it, as was done in the Hackel case cited by the TCC.[85] The replacement of the first set of financing documents with the new ones had no impact on the divisional merger.

## III. This Chapter 11 Case, Pursuing the Largest Settlement Fund in Asbestos-Trust History, Is Not a Litigation Tactic.

The Debtor's objective in this case and the 2021 Chapter 11 Case has always been the same—a final, equitable and efficient resolution of all current and future talc claims for the benefit of all parties.[86] Rather than "goals that are antithetical to the principles of the bankruptcy system,"[87] the Debtor's goal furthers the bankruptcy purposes of preserving value, treating creditors fairly and equitably and avoiding a race to the courthouse that could harm future claimants.[88]

---

84 TCC Reply, 29-30. The TCC cites to Jackson v. Associated Scaffolders & Equip. Co., 152 N.C. App. 687, 692 (N.C. App. 2002) to support its assertion that a "party cannot selectively void a single aspect of an integrated transaction." There was no integrated transaction at issue in Jackson. Rather, the court found that an unenforceable indemnification provision rendered a rental agreement invalid. And Moss v. First Premier Bank, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) is also distinguishable as the district court found that the class waiver provisions in both a loan application and note were unenforceable due to usurious interest rates. Id. at *5.

85 See TCC Reply, 30 (citing to Hackel v. F.D.I.C., 858 F. Supp. 289, 292-93 (D. Mass. 1994) (finding that, when FDIC disaffirmed lease, it repudiated the entire agreement of which a note and limited guaranty were also part, such that plaintiff would not be required to continue to make payments to the FDIC)).

86 See Kim Decl. ¶ 22 ("The Debtor's aim is to achieve a final, equitable, and efficient resolution of all talc claims, current and future, for the benefit of all parties, including the claimants, LTL, and its affiliates.").

87 TCC Reply, 12-18.

88 See Obj., 29-30 (explaining the purposes of the Bankruptcy Code in the mass tort context).

The Debtor now stands at the cusp of achieving that goal for the benefit of all stakeholders with a growing wave of support among claimant representatives for confirmation of its Plan, which will provide claimants the largest settlement fund in asbestos-trust history. There is no evidence that the Debtor is abusing the bankruptcy process to delay or frustrate claimants' efforts to enforce their rights.[89] The Debtor has support for this process from the majority of the approximately 100,000 claimants holding current claims. Moreover, there is minimal risk of delay because there is no current restriction on claimants pursuing their claims against any Protected Party up to commencement of trial.

The Movants, who collectively represent a minority of claimants, allege without support that a significant portion of the approximately 60,000 clients of Plan Support Agreement signatories have non-compensable claims barred by Daubert rulings in the MDL.[90] They further attack the likelihood that the claimants will vote in favor of the Plan.[91] But, as the TCC acknowledges,[92] the Daubert rulings in the MDL did not bar any claims and did not even address diseases other than ovarian cancers.[93]

---

89 See, e.g., TCC Reply, 39; States Reply, 4.

90 See TCC Reply, 51-56; MRHFM Reply, 9, 21, 29-31; States Reply, 2-3, 7.

91 Id.

92 TCC Reply, 53 n.117 (recognizing that the "Daubert briefing in the MDL proceeding focused on ovarian cancer in particular" and how "[p]laintiffs' experts specifically limited their opinions to epithelial ovarian cancer.").

93 See Kim Decl. ¶ 21; see also Ex. 17 (Declaration of James G. Onder in Support of Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss, dated June 23, 2023) (the "Onder Decl."), ¶¶ 15-16 ("Epithelial ovarian cancer, for example, was demonstrated to have a causal connection with talc usage sufficient to satisfy the Daubert standard applied in the ovarian cancer-related multi-district litigation. The same is likely true for clients suffering from fallopian tube and primary peritoneal cancer as a result of talc use. In varying degrees, however, medical literature also supports a causal association between cosmetic application of talc products and other types of cancers, including uterine cancer and mucinous ovarian cancer. For that reason, well before the prospect of any bankruptcy involving Johnson & Johnson or the Debtor, my law firm accepted clients suffering from those types of cancers with the intent to pursue recovery on their behalf in the tort system").

The reliability of the claims supporting the Plan is itself supported by the intake and referral procedures of the law firms that have signed Plan Support Agreements. Those procedures should be well known to the TCC since the signatory law firms include several firms that were members of the talc claimant committee in the 2021 Chapter 11 Case. These procedures typically include: (i) disclosure of information regarding talc use and diagnosis; (ii) an interview seeking corroborating information; and (iii) the ordering and review of medical records.[94] Moreover, it is common and routine practice in mass torts for claimant counsel to negotiate settlements and recommend them to their clients—and for their clients to accept.[95]

The Movants' characterization of the Debtor's efforts to resolve its talc liability through the tools available in chapter 11 as an improper litigation tactic would, if adopted, undermine every mass tort bankruptcy.[96] Inherent in every such case is a debtor seeking to reorganize and resolve its mass tort liabilities outside of the tort system. Courts, including the Third Circuit, have repeatedly acknowledged the benefits of a bankruptcy-court resolution of current and future mass tort claims, particularly, as here, in the context of alleged injuries with potential long latency periods.[97] As the Fourth Circuit recently pointed out in another asbestos bankruptcy, bankruptcy has procedures that "promote the equitable, streamlined, and timely resolution of

94 Onder Decl. ¶¶ 9-13; see also Ex. 18 (Declaration of Mikal C. Watts in Support of Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss, dated June 23, 2023), ¶¶ 9-19.

95 See Ex. 19 (Declaration of James Murdica, dated June 22, 2023), ¶¶ 50-58. In fact, Mr. Birchfield admits that his proposal to settle Old JJCI and J&J's talc liability in the Imerys case similarly was based upon commitments from law firms, and that he did not obtain supporting affidavits from the applicable claimants. Ex. 3 (Apr. 17, 2023 Birchfield Dep. Tr.), 72:23-75:10.

96 TCC Reply, 62; see also UST Reply, 16; MRHFM Reply 16; A&I Reply 12; States Reply 9.

97 See, e.g., In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 362 (3d Cir. 2012) ("[O]bservers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution.") (citing various sources); In re Bestwall LLC, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019) ("[A] section 524(g) trust will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims.").

claims in one central place compared to the state tort system, which can and has caused delays in getting payment for legitimate claimants."[98] It is no litigation tactic to pursue those global benefits.

The TCC cites to Aearo, which was recently dismissed by the United States Bankruptcy Court for the Southern District of Indiana,[99] as purported support for its argument that the Debtor and J&J are using this Chapter 11 Case as "a litigation management tactic" because no funding is available for a trust under the 2023 Funding Agreement except in connection with a chapter 11 plan approved by J&J.[100] The 2023 Funding Agreement, however, provides funding for a "Supported Plan," which means, the Plan or an amended Plan that is acceptable, not just to the Debtor, J&J and Holdco, but also to every counsel that has entered into a Plan Support Agreement given the agreements on plan terms that have been reached. See 2023 Funding Agreement, 5-6. As such, the provision is necessary and appropriate to protect the rights of all parties who have come to agreement so far and to ensure that any plan that receives J&J and Holdco's financial support achieves a final and equitable resolution of talc-related liabilities, satisfactory to all parties that executed Plan Support Agreements.

Rather than supporting the Movants' position, the Aearo case actually reinforces the Debtor's arguments against dismissal. Aearo involved no future claims with long latency periods. Indeed, the Aearo court acknowledged that a debtor should be entitled to chapter 11 relief if it has a "need" that the Bankruptcy Code can address.[101] The court recognized that Congress "intervene[d]" via section 524(g) to provide a means to resolve mass-tort asbestos

---

98 Bestwall, 2023 WL 4066848, at *9.

99 In re Aearo Tech. LLC, 2023 WL 3938436 (Bankr. S.D. Ind., June 9, 2023).

100 TCC Reply, 62-63; see also A&I Reply, 44-45 (arguing the "Supported Plan" provisions give J&J a "veto right" constituting evidence of intent to hinder and delay creditors).

101 Id. at *15.

litigation, where long latency periods create the challenge of significant future claims.[102] The debtor in Aearo had no such need, however, because it had no future claims. In contrast, the underlying cancers forming the basis for the Debtor's talc-related liability in this Chapter 11 Case may have a latency period of 60 years or more.[103] Even though the Debtor stopped selling its talc-based Johnson's Baby Powder in North America in 2020, individuals may continue to bring talc-related suits against the Debtor through 2080 and beyond. Unlike the Aearo debtor, the Debtor in this Chapter 11 Case has a clear need for the relief that only chapter 11 can provide.

Moreover, the debtor in Aearo had never paid any judgment or defense costs arising from the underlying multidistrict litigation. Instead, the debtor made clear "[f]rom the very beginning of these cases," that "the filings were not prompted by concerns over financial distress or impending insolvency but were initiated to manage the MDL process."[104] The court found that filing as a pure litigation management tactic and not a rehabilitative effort warranted dismissal.[105] The contrast with this Chapter 11 Case is clear. As of the commencement of the 2021 Chapter 11 Case, the Debtor or its predecessor, Old JJCI, were defendants in tens of thousands of talc-related lawsuits and had themselves paid nearly $1 billion in defense costs and over $3.5 billion in indemnity payments over the previous five years.[106] For the reasons addressed above, the Debtor's financial distress is apparent and not attenuated, and the Aearo case is clearly distinguishable.

---

102 Id. at *21 n.24.

103 First Day Decl. ¶ 42.

104 Aearo, 2023 WL 3938436, at *20.

105 Id.

106 See First Day Decl. ¶ 36.

The TCC's citation to successful multidistrict litigation proceedings like NFL, Diet Drugs and WTC does nothing to undercut the proper purpose of this Chapter 11 Case for this Debtor. [redacted][108] Similarly, WTC,[109] which was not a multidistrict litigation and is [redacted] did not involve provision for unknown claimants.[111] And in Diet Drugs,[112] [redacted][113]

The Roundup MDL referenced by the TCC provides a strong example of the limitations of using a non-bankruptcy forum to resolve a tort liability involving latent injuries. [redacted]

---

107 See In re Nat'l Football League Players Concussion Litig., 821 F.3d 410 (3d Cir. 2016).

108 See Ex. 20 (Expert Report of Sheila L. Birnbaum, dated June 14, 2023) (the "Birnbaum Rebuttal Rep."), 7-8.

109 See In re World Trade Center Disaster Site Litig., 834 F. Supp. 2d 184 (2011) (S.D.N.Y. 2011), vacated in part, 754 F.3d 114 (2d Cir. 2014).

110 See Birnbaum Rebuttal Rep. at 17 n.51.

111 See 834 F. Supp. 2d 184.

112 See In re Diet Drugs Prods. Liab. Litig., 2000 WL 1222042, at *46 (E.D. Pa. Aug. 28, 2000).

113 Birnbaum Rebuttal Rep. 12-13.

114 Id. at 13.

115 Id. at 13-14 [redacted].



As Dr. Mullin opined in his rebuttal report,

## IV. All Sovereign Immunity Arguments Are Misplaced and Premature.

The States of New Mexico and Mississippi's argument that the mere filing of the Debtor's petition is an affront to their sovereignty, somehow rendering the Debtor's filing in bad faith, is both premature and groundless.[118] "[T]he Bankruptcy Code unequivocally abrogates the sovereign immunity of any and every government."[119] This Congressionally enacted abrogation of immunity applies generally to "proceedings brought pursuant to "Laws on the subject of Bankruptcies."[120] Proceedings to dismiss a case brought under chapter 11 of the Bankruptcy Code—to determine whether or not such a case may proceed under the Code—are a paragon of

---

116 Id.

117 Mullin Rebuttal Rep. ¶ 4.

118 NM/MI Reply, 2, 8 ("[T]his case . . . occasion[s] an affront to [the States'] Eleventh Amendment sovereign immunity").

119 Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, No. 22-227, 2023 WL 4002952, at *4 (U.S. June 15, 2023).

120 Cent. Virginia Cmty. Coll. v. Katz, 546 U.S. 356, 377 (2006).

such proceedings.[121] New Mexico and Mississippi cite no case making sovereign immunity relevant to a for-cause dismissal proceeding, nor could they, because sovereign immunity is not implicated by this proceeding.

If the States believe that a future proceeding, such as for injunctive relief or confirmation of a plan, will raise the issue of sovereign immunity,[122] they will be free, at such time, to raise any such argument. To address the issue here would be to ignore Supreme Court precedent addressing what types of proceedings implicate sovereign immunity. This one does not.

## V. Estate Causes of Action Better Serve Claimants in Chapter 11.

In response to a question by the Court, Arnold & Itkin offers a confusing argument as to why it believes estate causes of action, such as fraudulent transfer claims seeking to unwind termination of the 2021 Funding Agreement, should revert to individual claimants for pursuit outside of this Chapter 11 Case.[123] On the following page of the A&I Reply, however, Arnold & Itkin concedes that any such claim would be beneficial to the Debtor's estate; it merely believes that pursuit of such causes of action would be contested, potentially entailing delay, which would be no less true in any forum.[124]

The Debtor disagrees that avoidance causes of action should revert to individual claimants to be pursued over and over again on a case by case basis. And, although the Debtor disputes that its estate has viable causes of action with respect to the termination and substitution

---

121 See id. at 371 (even proceedings "merely ancillary to the bankruptcy court's exercise of its in rem jurisdiction" do "not implicate sovereign immunity"); see also Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 445 (2004) (certain bankruptcy proceedings simply "do[] not implicate a State's Eleventh Amendment immunity").

122 NM/MI Reply, 8, 10 (casting doubt on the likelihood of injunctive relief and confirmability of a plan).

123 A&I Reply, 54.

124 Id. at 55. Arnold & Itkin does not explain why it believes pursuit of fraudulent transfer claims in bankruptcy court would be more contested and involve more delay than other courts.

of the 2021 Funding Agreement for all of the reasons articulated in the Objection and above, to the extent they exist, they can most equitably and efficiently be resolved for the benefit of all claimants in this Chapter 11 Case. Moreover, upon consummation of the Debtor's Plan providing for full payment of all claimants, all such causes of action will become moot. Retention of these causes of action with the Debtor's estate is thus in the best interests of all claimants.

## VI. Section 1112(b)(2) Applies to Prevent Dismissal.

### A. Unusual Circumstances Exist.

The Movants' allegations that there are no unusual circumstances establishing that converting or dismissing this Chapter 11 Case is not in the best interests of creditors and the estate cannot be taken seriously. In fact, it is hard to conceive of circumstances where the interests of claimants and the Debtor's estates would stand to benefit more by allowing this Chapter 11 Case to proceed in the near term.

The constituency of current and potential future claimants in this Chapter 11 Case consists primarily of users of talc-containing Johnson's Baby Powder, one of the most ubiquitous consumer health products that was sold in North America for over 100 years until 2020.[125] This fact, combined with potential latency periods of 60 years or more described above, creates a constituency of 100,000 current claimants and many thousands more future claimants, many of whom future claimants likely could not readily be identified or provided with notice. As recently as last week, this Court recognized "the unique qualities of asbestos-related bankruptcies,

[125] See First Day Decl. ¶ 14.

Congressional intent in structuring a scheme under 11 U.S.C. § 524(g) to address such claims and the considerable interests of future, unidentified claimants."[126]

The Debtor and J&J vigorously dispute that they have any liability for talc claims, which have no valid scientific basis.[127] As a result, after lengthy delays in the tort system, the vast majority of claimants receive nothing, while occasional blockbuster verdicts in plaintiff-friendly jurisdictions impose a substantial financial burden on the Debtor.[128] Nevertheless, the Debtor—with the financial support of J&J upon approval by the Court—has agreed on the terms of a settlement with representatives of the vast majority of its claimant constituency. It has filed a chapter 11 plan within weeks of commencing this case, which is intended to pay all current and future claimants in full consistent with the terms of that settlement, and has scheduled a hearing on approval of its disclosure statement and solicitation procedures for August 22, 2023.

**B. Reasonable Likelihood of Plan Confirmation in a Reasonable Time**

The hearing on solicitation of the Debtor's Plan is scheduled for August 22, 2023. The Debtor will continue to secure support for the Plan from law firms that have not already signed Plan Support Agreements. With or without that additional support, the Debtor has no doubt that sufficient claimants will vote in favor of the Plan when presented with the opportunity. The Debtor also believes that the Plan satisfies the requirements for confirmation under sections 1129, 524(g) and 105(a) of the Bankruptcy Code.

The Debtor has been candid that it is continuing to negotiate the detailed terms of its Plan with the Plan Support Agreement signatories and other parties. That does not mean there is no

---

126 In re Whittaker, Clark & Daniels, Inc., No. 23-13575, 2023 WL 4111338, at *8 (Bankr. D.N.J. June 20, 2023).

127 See id. ¶ 36.

128 See id.

agreement as the Movants allege. Rather, it simply shows the plan process is moving forward in the manner to be expected. As is typical in large, complex chapter 11 cases, the form of the chapter 11 plan that will be solicited and presented for confirmation will not be identical in all respects to the Plan currently on file. Thus, every indicator before the Court suggests that the Debtor will be able to confirm its chapter 11 plan within a reasonable time. Moreover, the case should not be dismissed based on speculation about potential delays in confirmation caused by Movants' scorched-earth litigation tactics and "relentless[] attempt[s] to circumvent the bankruptcy proceeding."[129]

Meanwhile, the TCC has sought to terminate exclusivity to propose its own plan that it claims is ready to move forward.[130] Thus, even if—as the Movants claim—the Debtor, J&J and the majority of claimants were to be unsuccessful in confirming a chapter 11 plan, the TCC—if it is to be believed— claims it is fully prepared to step in and do so.

**C. Justification and Cure**

The Movants cite cases for the proposition that a bad-faith filing could never be reasonably justified or curable.[131] But the Movants' cases do not involve a purported lack of financial distress and, thus, are clearly distinguishable.[132] The Third Circuit did not rule that the

---

129 Bestwall LLC, 2023 WL 4066848, at *9.

130 See Dkt. 702; see also Ex. 21 (June 13, 2023 Hr'g Tr.) at 84:17-21 (TCC counsel: "we have a plan ready to be filed, Judge. . . . If this case is not dismissed, we're prepared to move forward very quickly.").

131 TCC Reply, 70 (citing Green v. Howard Family Tr. (In re Green), No. 15-1349, 2016 WL 6699311, at *11 (B.A.P. 9th Cir. Nov. 9, 2016); In re Hinesley Family Ltd. P'ship No. 1, 460 B.R. 547, 553 (Bankr. D. Mont. 2011) and In re Keith, No. 10-61722-11, 2010 WL 3835003, at *6 (Bankr. D. Mont. Sept. 29, 2010)); A&I Reply, 61 (citing Green).

132 See Green, 2016 WL 6699311, at *8 (bad faith based on filing solely to harass judgment creditor); Hinesley Family, 460 B.R. at 553-54 (bad faith based on gross mismanagement of financial affairs and failure to disclose encumbrance and dispute with governmental entity); Keith, 2010 WL 3835003 at *7 (bad faith based on, among other things, perjury).

absence of financial distress is unjustifiable or uncurable, as some Movants allege.[133] Rather, the court said "it cannot ***currently*** see how [the Debtor's] lack of financial distress could be overcome" and held that no reasonable justification for that distress was available "***in this case***."[134]

But at the time the Third Circuit entered its opinion, the Debtor had not yet obtained the support of representatives of the overwhelming majority of claimants or proceeded forward with the confirmation process. If, despite the evidence provided by the Debtor and its experts, the Court finds that the case should be dismissed as a bad faith filing due to a lack of financial distress, confirmation of the Debtor's Plan will provide the requisite justification and cure. Moreover, if the Court were concerned that the Debtor's acts or omissions in the prepetition termination and substitution of its financing arrangements were a basis for cause, as alleged by the Movants, those acts or omissions could be cured by granting the TCC derivative standing (as it has requested) to pursue its proposed fraudulent conveyance claims in this Chapter 11 Case for the benefit of all claimants. Finally, for the reasons set forth in the Objection, if the Court finds that the absence of financial distress is incurable, then the requirements of section 1112(b)(2)(B)(ii) should not apply.[135]

## CONCLUSION

For all of the foregoing reasons, the Dismissal Motions should be denied.

133 See TCC Reply, 70-71; A&I Reply, 61.

134 LTL Mgmt., 64 F.4th at 110 (emphasis added).

135 See Obj., 67-68.

Dated: June 26, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*