IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                          .    Case No. 23-12825(MBK)
                                .
LTL MANAGEMENT LLC,             .
                                .    U.S. Courthouse
        Debtor.                 .    402 East State Street
                                .    Trenton, NJ 08608
. . . . . . . . . . . . . . .   .
                                .
LTL MANAGEMENT LLC,             .    Adv. No. 23-01092(MBK)
                                .
        Plaintiff,              .
                                .
    v.                          .
                                .
THOSE PARTIES LISTED ON         .
APPENDIX A TO COMPLAINT AND     .
JOHN AND JANE DOES 1-1000,      .
                                .
        Defendants.             .    Tuesday, June 27, 2023
. . . . . . . . . . . . . . .   .    9:20 a.m.


    TRANSCRIPT OF MOTION OF TO DISMISS THE SECOND BANKRUPTCY
            PETITION OF LTL MANAGEMENT LLC

        BEFORE THE HONORABLE MICHAEL B. KAPLAN
        UNITED STATES BANKRUPTCY COURT JUDGE


Audio Operator:            Kiya Martin




Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES VIA ZOOM:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street<br>Suite 500<br>Dallas, TX 75201 |
| | Jones Day<br>By:  EMILY C. BAKER, ESQ.<br>1221 Peachtree Street, N.E.,<br>Suite 400<br>Atlanta, GA 30361 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Brown Rudnick<br>By:  JEFFREY L. JONAS, ESQ.<br>     W. LYDELL BENSON, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| For the Ad Hoc Committee<br>of State Attorneys<br>General: | Womble Bond Dickinson<br>BY:  ERICKA F. JOHNSON, ESQ.<br>1313 North Market Street<br>Suite 1200<br>Wilmington, DE 19801 |
| For the Office of the<br>United States Trustee: | Office of the United States Trustee<br>By:  LINDA RICHENDERFER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |
| For Various Talc<br>Claimants: | Maune Raichle Hartley Frency &<br>   Mudd, LLC<br>By:  CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Levy Konigsberg, LLP<br>By:  MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ 08648 |
| For Justin Bergeron<br>and Others: | Cohen, Placitella & Roth, P.C.<br>By:  CHRISTOPHER M. PLACITELLA, ESQ.<br>2001 Market St, Suite 2900<br>Philadelphia, PA  19103 |

APPEARANCES CONT'D:

```
For States of New Mexico  Gibbons, P.C.
and Mississippi:          By:  ROBERT K. MALONE, ESQ.
                          One Gateway Center
                          Newark, NJ 07102
```

## INDEX

**WITNESSES**                                                    **PAGE**

**FOR THE DEBTOR:**

ROBERT WUESTHOFF
    Direct Examination by Ms. Baker                        21
    Cross-Examination by Mr. Maimon                        22
    Cross-Examination by Mr. Jonas                         45
    Cross-Examination by Mr. Thompson                      94
    Redirect Examination by Ms. Baker                      95
    Recross-Examination by Mr. Jonas                      107
    Recross-Examination by Mr. Maimon                     113
    Recross-Examination by Mr. Malone                     120
    Further Redirect Examination by Ms. Baker             123

RICHARD DICKINSON
    Direct Examination by Ms. Baker                       125
    Cross-Examination by Mr. Benson                       127
    Cross-Examination by Mr. Maimon                       132
    Cross-Examination by Mr. Malone                       166

JOHN KIM
    Direct Examination by Ms. Baker                       178
    Cross-Examination by Mr. Jonas                        179
    Cross-Examination by Ms. Johnson                      217
    Cross-Examination by Mr. Malone                       221
    Cross-Examination by Mr. Thompson                     231
    Cross-Examination by Ms. Richenderfer                 235
    Cross-Examination by Mr. Maimon                       238
    Redirect Examination by Ms. Baker                     256
    Recross-Examination by Mr. Maimon                     265
    Recross-Examination by Mr. Jonas                      269
    Recross-Examination by Ms. Richenderfer               280
    Recross-Examination by Mr. Malone                     284
    Further Redirect Examination by Ms. Baker             288
    Further Recross-Examination by Mr. Maimon             291

**EXHIBITS**                                              **ID**   **EVD**

**FOR THE DEBTOR:**

D-1  Declaration of John Kim                          179   179
D-2  Declaration of Richard Dickinson                 126   126
D-3  Declaration of Robert Wuesthoff                   22    22

1          (Proceedings commenced at 9:20 a.m.)

2          THE COURT:  Okay.  Good morning again.  We'll proceed

3    on the pending motions to dismiss.  We'll address the

4    preliminary matters first.  You all were busy through last

5    evening.  All right.  Let's see.  We have filings at all the

6    way up to about 11:40 last night, most of the evidentiary

7    issues.

8          Understandably, these are important issues.  But

9    there's no pragmatic way for the Court to review all these

10   objections this morning.  And I don't want to defer the

11   opportunity to get the trial testimony on and the evidence in.

12         My intention would be -- and let's see, as a

13   pragmatic matter, most of the expert testimony and even some of

14   the factual testimony to which there have been objections

15   raised have been referenced in the text, then the footnotes in

16   the several hundred pages of briefing that you've given me and

17   that I've read.

18         So I'm familiar with the testimony and the issues.

19   And it would be nonsensical to spend the time going over each

20   of the portion of the proffered testimony to weigh in on

21   admissibility.  What I intend to do is allow the testimony and

22   subject to, on a condition basis with respect to the expert

23   testimony.  And prior to closing the record, I will rule on the

24   evidentiary objections.

25         That gives me the opportunity over the next several

6

1  days to evaluate the objections and not to hold up the thrust

2  of what we need to accomplish over the next four days.  I think

3  that makes the most sense.  We can address specific evidentiary

4  issues as they arise in the course of the testimony.

5          I understand that the tens of thousands of documents

6  that were downloaded jointly overloaded the tablets that were

7  going to be provided.  I think they overloaded our court

8  computer, as well.  So we will do the best to accommodate going

9  forward.

10          So with that, I do want to spend first, before we

11  proceed to the motions to dismiss, I wanted to take about ten

12  minutes or so and render my ruling with respect to the debtor's

13  motion to extend the preliminary injunction to Kenvue and

14  Janssen, and for enforcement of the automatic stay.  I've

15  prepared a few notes, and so we can then focus on the motions

16  to dismiss.

17          So with respect to the debtor's motion seeking to

18  enforce the automatic stay as to actions directed against

19  Kenvue and Janssen or to include those entities as protected

20  parties for purposes of the preliminary injunction or the

21  extension of the automatic stay, there are certain I think

22  uncontested facts that we can agree on.

23          Number one, that plaintiffs represented by

24  Mr. Placitella, I don't know if I see him.  Oh, there you are.

25  Good morning.

1    MR. PLACITELLA:  Good morning, Your Honor.

2    THE COURT:  Good morning.  Plaintiffs, represented by

3    Mr. Placitella, seek recovery for injuries that allegedly arose

4    from use of the J&J talc-based products including baby powder

5    that Old JJCI would have held that liability for the

6    manufacture, distribution, and/or sale of the products, that as

7    a result of the divisional merger in the 2021 corporate

8    restructuring, Old JJCI was merged into Chenango Zero, LLC, a

9    Texas LLC, and then thereafter divided into two Texas LLCs,

10    Chenango Two which ultimately merged into Currahee and became

11    New JJCI, and ultimately became HoldCo, and Chenango One which

12    ultimately became LTL.

13    As a result of the divisional merger, Old JJCI ceased

14    to exist.  LTL became solely responsible for Old JJCI's

15    liabilities rising from talc-related claims, and was allocated

16    certain assets which included approximately $6 million in cash,

17    interest in a funding agreement, all contracts related to the

18    talc litigation, equity in A&M, and certain causes of action

19    and proceedings that seek to hold specifically I think the

20    language any person responsible for the talc-related

21    liabilities.

22    The predecessor to New JJCI which is now HoldCo

23    again, received all other assets and liabilities.  And under

24    the divisional plan of merger, LTL was obligated to hold

25    harmless and indemnify New JJCI and any of its affiliates for

1  talc-related liabilities.  This is in addition to the

2  indemnification obligations owing by Old JJCI under the 1979

3  agreement with J&J which also was allocated to LTL.

4      Subsequently, New JJCI was renamed HoldCo.  And

5  certain assets, specifically the consumer product operations,

6  were transferred from HoldCo to its parent Janssen, and then to

7  a new New Jersey LLC, Kenvue.

8      Plaintiff seeks to hold Janssen and Kenvue liable

9  contending generally that having been the transferee of the

10 consumer product operations, plaintiff holds direct claims

11 under New Jersey law against Janssen and Kenvue, and thus

12 should be permitted to pursue those claims notwithstanding the

13 LTL bankruptcy.

14     Debtor challenges plaintiff's indemnification of its

15 claim as a direct claim against Janssen and Kenvue and argues

16 that at best, and as a result of the divisional merger, the

17 claims are either a direct claim against LTL only, or at worst

18 a derivative claim such as successor liability, alter ego, or

19 fraudulent transfer.

20     Further, debtor argues that the derivative claims

21 would be assets of the bankruptcy estate, having been allocated

22 to LTL under the divisional merger, and thus plaintiff should

23 be stayed under 362(a)(3).

24     Now, the relevant language of the allocation of the

25 asset, what we're talking about is Chenango One causes of

1  action.  And it includes all such causes of action proceedings

2  that seek to hold any person responsible for talc-related

3  liabilities.

4       So initially, this Court notes that it's previously

5  ruled on the bona fides of the divisional merger under Texas

6  law.  And the Court does maintain certain reservation or doubts

7  that liabilities for talc-related injuries which were never

8  allocated to New JJCI, at the time a Texas limited liability

9  company, somehow could be revived merely because New JJCI

10 transferred certain assets to two new New Jersey corporations.

11 This would wholly ignore application of Texas law to Texas

12 entities.

13      The Court further questions whether Kenvue and

14 Janssen can be deemed the same company as HoldCo for purposes

15 of establishing direct liability.  But this Court isn't tasked

16 with deciding the underlying merits.  Simply put, this Court

17 need only decide if the automatic stay applies to the pending

18 claims against Johnson and Kenvue, or whether the automatic

19 stay should be extended, or the claim should be subject to the

20 existing injunction as to the current protected parties that is

21 in effect until August 22nd.

22      As to the debtor's argument that the claims are

23 property of the estate and protected under Section 362(a)(3).

24 Such argument is unconvincing.  I can find no legal or factual

25 basis upon which LTL could ever pursue a claim against an

1 | affiliate under the language which I just referenced in

2 | Schedule 5(b)i of the plan of divisional merger.

3 |        Yes, on the surface such language is broad.  But

4 | under what circumstances could LTL sue Johnson or Kenvue for

5 | the talc-related liabilities?  It, LTL, is solely responsible

6 | for such liabilities under the plan of merger.  Indeed, it has

7 | indemnification obligations towards its affiliates.

8 |        This is not to say that the state of LTL cannot

9 | pursue valid fraudulent transfer or alter ego claims, or even a

10 | successor liability claim, but only if the defendant is

11 | actually a successor of LTL.  This Court reads the language

12 | that I've just referenced as reflecting claims against other

13 | co-defendants in talc litigation for contribution,

14 | indemnification, et cetera, such as Imerys or other non-

15 | affiliated corporations.

16 |        So when we speak of including all such causes of

17 | action proceedings that seek to hold any person responsible for

18 | the talc-related claims, the Court views that that would be

19 | limited to situations where there was co-defendant liability.

20 |        Having said all this, the Court wants to revisit the

21 | existing injunction as to the protected parties which has been

22 | bottom primarily on such factors as shared insurance, the

23 | fixing of debtor's liability, indemnification obligations, and

24 | the risk of record taint, and generally the interference with

25 | the debtor's reorganization.

11

1             As acknowledged by Counsel for the plaintiffs, to the

2    extent Janssen or Kenvue are to be held liable for talc-related

3    claims, they maintain the ability to look to and hold J&J

4    responsible.  This Court has already determined that J&J has

5    the right to seek indemnification from the debtor for all talc-

6    related liabilities.  Thus, we are back in the same position as

7    with all other protected parties.

8             This Court incorporates its prior holdings and

9    rulings, and to the extent that Janssen and Kenvue are

10   protected parties for purposes of the pending litigation, they

11   should be subject to the same protections that are currently in

12   place.  So in effect, I have determined that the automatic stay

13   does not apply, but that Janssen and Kenvue are protected

14   parties based primarily on the obligation, their right to look

15   to Johnson & Johnson, and Johnson & Johnson's ability to look

16   to LTL for indemnification.

17            And therefore, as protected parties, they will

18   benefit from the extension of the automatic stay and the

19   current preliminary injunction that's in effect until August

20   22nd of this year.

21            The Court will, I am sure, revisit the scope of the

22   preliminary injunction one way or the other.  Or actually may

23   not even have to depending on how this trial goes.  But that's

24   my ruling.  I'll ask debtor's Counsel to submit the form of

25   order.

12

 1              Mr. Placitella?

 2              MR. PLACITELLA:  Can I just ask a question, Your

 3     Honor?

 4              THE COURT:  Yes.

 5              MR. PLACITELLA:  So the proceedings in the state

 6     court and discovery can go forward consistent with your prior

 7     order?

 8              THE COURT:  They are to be treated no differently

 9     than any of the protected parties.

10              MR. PLACITELLA:  Including all the deposition ordered

11     by the Middlesex County Court?

12              THE COURT:  They are to be treated no differently.  I

13     don't want to get into specifics.

14              MR. PLACITELLA:  Thank you, Your Honor.

15              THE COURT:  Thank you.  All right.  Are there any

16     issues that we wish to address, that either party wants to

17     address before we start in on the motion to dismiss?  Good

18     morning, Mr. Gordon.

19              MR. GORDON:  Good morning, Your Honor.  Greg Gordon

20     on behalf of the debtor.  I did want to say at the outset, I

21     think Your Honor's comments about getting to the evidence right

22     away, I think we actually agree on that.  We're all of the same

23     view.  And so --

24              THE COURT:  You should have stopped there.

25              MR. GORDON:  None of us was prepared to start arguing

1  the various motions or exhibit issues and the like.  What I did

2  want to do, though, just to frame things up is talk about

3  potential milestones because we obviously have limited time to

4  do this trial.  We've got about, well we've got four days.

5          But as you know from the stipulation, we've agreed to

6  four hours, four and a quarter hours, I'm sorry, in total for

7  closing which means we've got about three and a half days,

8  maybe a little less than that.  So as we looked at the witness

9  list, we've got seven fact witnesses and five expert witnesses.

10          So from our perspective, to have any chance in making

11  the schedule, we need to get through Wuesthoff, Dickinson, and

12  Kim today, and even begin Murdica today.  If we get through

13  Murdica today, that would be great.  That leaves either three

14  or four tomorrow.  We've got Watts, Onder, and Lisman coming up

15  after that, which then allows experts on Thursday bleeding into

16  Friday.

17          So I just want to throw that out there not to ask for

18  a ruling, but from our perspective unless we can get through at

19  least the three, and probably as well into Mr. Murdica, we're

20  going to have a hard time making the schedule.

21          THE COURT:  Understood.  Mr. Jonas?

22          MR. GORDON:  I should say one other thing, Your

23  Honor, before I cede to Mr. Jonas.  The other thing is we have

24  video deposition designations.  And by our count, we're at

25  about an hour and a quarter on those.  And I think both sides

14

1  have agreed to sort of reserve on that for now to see if we're

2  going to have time to actually play those videos or not.

3          So that's something, again, we wouldn't deal with

4  now.  We'd just take it up in due course as the trial moves

5  forward.  And I think we all have the benefit of Your Honor's

6  views on video designations based on the last hearing.

7          THE COURT:  Do it during lunch.  Mr. Jonas, good

8  morning.

9          MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

10  from Brown Rudnick for the Official Committee of Talc

11  Claimants.  Your Honor, as you saw from the stipulation

12  earlier, I think we have worked pretty well.  We have a little

13  experience doing one of these trials before you.  So I don't

14  take issue with what Mr. Gordon said.  Obviously, we have to

15  see how things go.

16          I will say, Your Honor, just so you have some

17  expectation, on our side obviously I only represent one movant.

18  However, I've tried to herd the ten movants.  And while I can't

19  speak for them and I can't guarantee anything, they have

20  clients who they have to represent, I think we have a

21  cooperative agreement in terms of trying to limit multiple

22  examinations.

23          To that end, for example, with Mr. Wuesthoff,

24  Mr. Maimon is going to begin, is going to be discreet on one

25  topic that I won't cover.  And then I'll do the rest of our

15

1    examination.  Not sure if others will have anything after that.

2    But again, we've talked multiple times.  I'm hopeful that, you

3    know, we'll be able to keep to the schedule and get through

4    this.

5            So I just wanted to give you a heads up, there may be

6    multiple examinations, hopefully limited, and hopefully not

7    duplicative.

8            THE COURT:  All right.

9            MR. JONAS:  Thank you.

10           THE COURT:  Mr. Maimon?

11           MR. MAIMON:  Thank you, Your Honor.  I just want to

12   comment on the timing issue.  And as one of the individuals who

13   actually filed motions in front of Your Honor and objections,

14   and I appreciate and understand the Court's comments on it, one

15   of the things that a motion in limine does is it alleviates

16   potentially the need for cross-examination on a subject so that

17   if the Court is going to reserve on various subjects, in order

18   for us not to waive our rights and waive our objections as to

19   them, and if the Court considers them, we have to go into them

20   with cross-examination into that stuff, one point.

21           But I'm all for getting it done by the end of Friday,

22   1,000 percent.  I will try my best on my part.  The second

23   thing, Your Honor, is that fitting schedules with witnesses is

24   highly dependent on witnesses answering the questions that are

25   posed to them.  And I know that Your Honor is cognizant of

1  that.

2          THE COURT:  Thank you.  Let me throw out this issue

3  to see if there's an effort to save time.  Much of the

4  evidentiary objections focused on what I'll call the policy

5  argument of where should these issues be decided, in the tort

6  system, MDLs, state court, or bankruptcy.

7          And of course, the Court addressed that issue in its

8  initial opinion I guess about 15 months ago.  And I'll note

9  that I addressed it because I viewed it then, and I view it

10 now, as part of one of the factors to be considered as far as a

11 proper bankruptcy purpose.

12         But also, let me be candid.  I thought it had to be

13 addressed because movants in the first trial were supported by

14 several amicus briefs by law professors and others touting,

15 defending where these cases are best litigated, the strengths

16 and weaknesses on both sides.  So I thought it had to be

17 addressed.

18         Well, I addressed it.  And then we've had, over the

19 last 15 months, a nice national debate on the merits and, I

20 think somebody used the term in briefings recently, demerits of

21 the tort system and the strengths or weaknesses of the

22 bankruptcy system.

23         I believe it's been fodder for a number of law review

24 articles and blogs.  It's given rise to quite a few of you

25 doing speaking tours.  I think three of you yesterday were in

1  New Brunswick touching on these issues.

2          And I kind of wonder if you all expect me, based on

3  trial, to make a factual determination as to which is the best

4  system because that's not going to happen.  I may express views

5  on policy.  But policy is usually never subject to factual

6  determinations at trial.

7          Would there be a consensus on allowing the experts'

8  submissions because I know you've gone through the effort on

9  each side of addressing these issues with your experts and your

10 witnesses, to allowing the expert testimony on that subject.

11 And I'm not talking about the cost of litigating.  That's

12 relevant.  I'm just talking about in general the merits of

13 where these should be litigated, taking into account all of the

14 issues and arguments that have been raised.

15         I want you to be able to argue those in your closings

16 and in your post trial submissions.  But do we need to spend

17 the time on cross and direct and cross testimony and

18 evidentiary submissions during the trial on what is essentially

19 policy issues.  Thoughts?

20         MR. MAIMON:  Yes, Your Honor.

21         THE COURT:  You can speak from there.

22         MR. MAIMON:  Thank you.  As --

23         THE COURT:  At least how I can see you.

24         MR. MAIMON:  Thank you.  I appreciate that.  As the

25 movant on one of these issues, if it's something that Your

1  Honor is going to consider, and we believe as we've set

2  forward, and plenty of times Your Honor has ruled against us,

3  other judges have ruled against me plenty of times in my

4  career, so I take no offense.

5        But to the extent that the Court is going to take

6  into consideration these policy issues as articulated by these

7  experts, we have a right and we're not going to waive our right

8  to cross-examine them.  And not only to put in contrary expert

9  testimony or proof or whatever, but to actually cross-examine

10 and get down to the biases and assumptions, unfounded

11 assumptions that underlie those policy determinations.

12       And so I think it's a great idea, but I don't think

13 anyone's here, at least for the client that I represent, not

14 willing to waive my right to cross-examination.

15       MR. JONAS:  Your Honor, I just, I was just going to

16 say it's something that obviously we've heard you.  I'd like to

17 think about it, I'd like to talk to others on our side.  And

18 obviously we're not going to get to those today, and probably

19 not tomorrow.  So we have a little bit of time.  But I

20 appreciate the comments, and let us talk about it.

21       THE COURT:  I kind of hope that it would just give

22 rise to some discussions among counsel.  I didn't expect any

23 commitments at this point.  Mr. Gordon?

24       MR. GORDON:  Your Honor, we'll take it up with the

25 client, as well.  I think from our perspective, at least from

19

1 mine, it's more than a policy issue, though.  It goes to I

2 think at a minimum the debtor's good faith.  It goes under

3 11.12(b)(2) to what's in the best interest of the creditors and

4 the estate.

5          And so I think from our perspective, we do believe

6 these are points that are important for the record.  But having

7 said that, I'll obviously talk to the client.

8          THE COURT:  Let it be said I didn't try.  All right.

9 Then let's start, my only other proviso on timing, and just so

10 that you know, unfortunately this trial had been scheduled and

11 rescheduled and extended.  I committed to speaking on a panel

12 not on mass torts, it's complex sales under 363, on Friday at

13 12 o'clock to 1:15 remotely.

14          So you'll have an extended lunch during that.  You're

15 welcome to listen, but I'll be inside on a panel.  So we'll

16 have to factor that in, as well.  All right?

17          MR. GORDON:  Your Honor, I want to do one more thing.

18 I wanted to introduce to you my partner, Emily Baker, who has

19 been added to the team for purposes of this.  She is in our

20 Atlanta office.

21          MS. BAKER:  Good morning, Your Honor.

22          THE COURT:  Welcome.

23          MS. BAKER:  It's good to be here.

24          THE COURT:  Thank you.  All right.  Ready for the

25 evidence.  Who are we addressing first?

1          MR. JONAS:  Your Honor, our side will call Robert

2    Wuesthoff.  And as I mentioned, Mr. Maimon will start.

3          THE COURT:  All right, thank you.  Mr. Wuesthoff?

4          MS. BAKER:  And, Your Honor, just before we begin, I

5    believe we have an agreement, and assuming it meets with Your

6    Honor's approval, that before -- initially, Mr. Wuesthoff would

7    take the stand.  We would admit his direct examination by

8    declaration, and then the cross-examination can promptly begin.

9          THE COURT:  That's fine.

10         MS. BAKER:  All right.  Thank you, Your Honor.

11         MR. JONAS:  No problem, Your Honor.

12         THE COURT:  All right.  And what are we doing with

13   respect to the actual documents themselves?  Do we know where

14   we stand?

15         MR. MAIMON:  So I think we had stipulations, Your

16   Honor.  I don't know if the Court's ordered them with regard to

17   the evidence in prior proceedings, both in LTL 1 as well as PI.

18   Those exhibits coming into evidence, being part of the evidence

19   and the testimony.  And I think to the extent that there's

20   anything new, we'll be offering it as we go.

21         MR. JONAS:  Your Honor, I understand there may be an

22   issue with the tablets.  We were prepared to do it with paper.

23         THE COURT:  That's fine.

24         MR. JONAS:  So let's --

25         THE COURT:  All right.  So much for technology.

1         Mr. Wuesthoff?  Please come up here.  All right.

2   Good morning.

3         MR. WUESTHOFF:  Good morning.

4         THE COURT:  Would you please raise your right hand?

5          ROBERT WUESTHOFF, DEBTOR'S WITNESS, SWORN

6         THE WITNESS:  I do.

7         THE COURT:  Thank you.  Please state your name and

8   business address for the record.

9         THE WITNESS:  Robert Wuesthoff, New Brunswick, New

10  Jersey.

11        MS. BAKER:  All right.  And again, Emily Baker on

12  behalf of the debtor.  May I approach the witness, Your Honor?

13        THE COURT:  Yes, please.

14                    DIRECT EXAMINATION

15  BY MS. BAKER:

16  Q    All right.  Good morning, Mr. Wuesthoff.

17  A    Good morning.

18  Q    How are you, sir?

19  A    I'm well.

20  Q    Good.  You understand that your direct examination is

21  being offered by declaration in lieu of live testimony?

22  A    Yes.

23  Q    Okay.  And I believe you have a copy of your declaration

24  in front of you.  Would you take a look at that?

25  A    Yes.  This is it.

1  Q    Okay.  You can confirm that that is indeed your

2  declaration?

3  A    Yes.

4  Q    All right.  And if you would, well let me ask you, do you

5  stand by the testimony offered in your sworn declaration as if

6  you gave it live here in this courtroom?

7  A    I do.

8  Q    All right.  And if you could, sir, please read for us,

9  there's an exhibit sticker on the first page.  Could you read

10  that into the record?

11  A    Yes.  D-3.

12          MS. BAKER:  All right, thank you.  And, Your Honor,

13  at this point we would offer Mr. Wuesthoff's declaration marked

14  as Exhibit D-3 into the record.

15          MR. MAIMON:  No objection, Your Honor.

16          THE COURT:  All right, thank you.

17          MS. BAKER:  Thank you, Your Honor.

18          THE COURT:  It will be admitted.

19      (Debtor's Exhibit D-3 admitted into evidence)

20          THE COURT:  Mr. Maimon, you may continue.

21          MR. MAIMON:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23  BY MR. MAIMON:

24  Q    Good morning, Mr. Wuesthoff.

25  A    Good morning.

Wuesthoff - Cross/Maimon                    23

1  Q    You and I have never met before, have we?

2  A    I don't believe so.

3  Q    I don't believe so either.  I didn't have the pleasure of

4  attending the first hearing a year or so ago.  The declaration

5  that you have in front of you, that was written by the

6  attorneys, correct?

7  A    With me.

8  Q    Understood.

9  A    Yes.

10  Q    They drafted it, right?

11  A    No.  We worked together on it.

12  Q    Okay.  I'd like to establish your sworn testimony on a few

13  issues.  And please, with all due respect, don't worry if you

14  feel that I am not believing you.  That's not what this is

15  about.  But it's important that we have an understanding and a

16  record of what you as the president of LTL say is true.

17  Understood?

18  A    Understood.

19         MR. MAIMON:  Okay.  May I approach, Your Honor?

20         THE COURT:  Yes.

21         THE WITNESS:  Thank you.

22         MR. MAIMON:  Mr. Jonas made them, so I take no

23  responsibility.

24         MS. BAKER:  Can I get a copy, please?

25         MR. MAIMON:  Of course.

1          MS. BAKER:  Thank you.  Thank you.

2    BY MR. MAIMON:

3    Q    So within the binder, if you'll take a look at your

4    declaration, sir.  On Paragraph 9, you reference your testimony

5    at the hearing on the motion to dismiss in the first

6    bankruptcy.  Is that correct?

7    A    On Page 9?

8    Q    Paragraph 9, Page 3.

9    A    Paragraph 9, sorry.  Yes, correct.

10   Q    And what we've done is we've put your testimony together

11   with, your testimony from the hearing together with the

12   deposition testimonies that you've given so that if you have to

13   make reference to it to refresh your recollection as what

14   you've testified to in the past is true, you have it in front

15   of you.  Fair?

16   A    Fair.

17   Q    Okay.  And the format of my questioning to you is going to

18   be to take a look at that testimony to having read that

19   testimony to ask you whether or not certain things are true or

20   false on a discreet issue, and have you confirm what you've

21   testified to as being part of those binders.

22   A    Okay.

23   Q    Do you understand that?

24   A    Yes.

25   Q    Okay.  So let's get into it and let's start.  Your name is

Wuesthoff - Cross/Maimon                          25

1  Robert Wuesthoff.  Is that correct?

2  A     Correct.

3  Q     And you are the president of LTL, correct?

4  A     Correct.

5  Q     Okay.  Now, you would agree, would you not, sir, that LTL

6  is not insolvent.  True or false?

7  A     False.  LTL is solvent.

8  Q     So I have it -- maybe take a look at it again.  LTL is not

9  insolvent, true or false?

10  A    It is not true today.  It was not true then.  I frankly

11  misspoke.

12  Q     So you're saying that LTL is insolvent?

13  A     No, no.  LTL is solvent.

14  Q     Okay.  It's not insolvent.

15  A     It's not insolvent.

16  Q     Okay.  So that's going to be true.  Okay.  Next --

17  A     Oh, I'm sorry.  Yes, yes.

18  Q     Okay.

19  A     I misunderstood.  Okay.

20              THE COURT:  It's the double negative.

21              THE WITNESS:  I understand now.  Okay.

22  BY MR. MAIMON:

23  Q    Having read a few bankruptcy cases, I now learn some of

24  the terms that have to be used.

25  A     Okay.

Wuesthoff - Cross/Maimon                          26

1  Q    LTL is able to pay its bills and meet its liabilities,

2  true or false?

3  A    True.

4  Q    You believe, sir, as the president of LTL, that LTL is in

5  financial distress, true?

6  A    True.

7  Q    And it's true, is it not, sir, that you believed in

8  October of 2021 that LTL was then in financial distress, true?

9  A    True.

10 Q    Okay.  Let's go to the next.  According to your testimony,

11 sir, the differences between the financial distress in April of

12 2023, as of the filing of the second bankruptcy, and October of

13 2021, the filing of the first bankruptcy, was number one, you

14 believe there were more talc claims, and number two, you were

15 concerned that the funding agreement in case one was void or

16 voidable.  True?

17 A    True.

18 Q    Okay.  And it's true, is it not, sir, that you believe or

19 believed when you voted to bring LTL into bankruptcy a second

20 time, that based on the Third Circuit ruling, there was a

21 material risk that the funding agreement one, number one, was

22 void or voidable, true?

23 A    True.

24 Q    Okay.  Now, let's go back in time.  In September of 2021,

25 approximately 21st, Mr. Haas and Mr. Oman (phonetic) asked you

Wuesthoff - Cross/Maimon                    27

1  if you would be interested in being president of a subsidiary

2  that J&J was considering creating, which ultimately became LTL,

3  true?

4  A    True.

5  Q    And it's true, is it not also, that the business of LTL as

6  represented to you by Mr. Haas and Mr. Oman was to oversee and

7  help resolve the talc cases that were sitting in Old JJCI,

8  true?

9  A    There's more to it.  But yes, that is part of it.

10 Q    Okay.  Now, Mr. Haas and Mr. Oman, when they approached

11 you did not say that the entity that was being created which we

12 now know turned out to be LTL was going to file bankruptcy.

13 They said it was a possibility, true?

14 A    True.

15 Q    On approximately October 6, 2021, you verbally accepted

16 their offer, correct?

17 A    I would say approximately.  I don't remember the exact

18 date.

19 Q    Okay.

20 A    So, yes.

21 Q    Well, your testimony from the first trial is going to be

22 part here.  So --

23 A    Okay.

24 Q    -- if that's what you said, it's true, right?

25 A    True.

Wuesthoff - Cross/Maimon                    28

1  Q    Okay.  And what you accepted is to be president of both

2  LTL and RAM.  LTL to oversee resolution of the talc claims, and

3  RAM as far as growing the royalty monetization business, true?

4  A    True.

5  Q    Okay.  Now, RAM is 100 percent owned by LTL, true?

6  A    True.

7  Q    There is an inter-company facility agreement which

8  provides funding to RAM of approximately $50 million, correct?

9  A    Yes.  True.

10 Q    And that is one of the things that RAM does is acquire

11 royalty streams, true?

12 A    True.

13 Q    Now, in the first two conversations that you had with

14 Mr. Haas and Mr. Oman, bankruptcy was mentioned as an option to

15 pursue and nothing further was spoken about with regard to the

16 entity eventually filing for bankruptcy, true?

17 A    True.

18 Q    Moving on from Mr. Haas and Mr. Oman, the next person you

19 spoke to that had the possibility of bankruptcy in the

20 conversation was Mr. Kim around October 8th, 2021.  And in your

21 words, that was not a deep discussion, true?

22 A    True.

23 Q    Now, on October 8th, 2021, you actually signed the

24 document to become president of LTL and RAM.  You signed the

25 acceptance of their offer, correct?

Wuesthoff - Cross/Maimon                              29

1 A     True.

2 Q     And as of October 8th, 2021, you yourself had not

3 concluded that LTL was going to file bankruptcy, true?

4 A     I don't recall the dates.

5 Q     Okay.  If you take a look at the transcript, it's Tab 4 in

6 the binder that I gave you.  And if you turn to Page 53--

7          MR. MAIMON:  There are four to a page.  Can you get

8 that up there?  Well, let's do it the old-fashioned way.

9          THE WITNESS:  So the answer is true.

10          MR. MAIMON:  Okay.  Mr. Gordon thanks you for the

11 time that you saved.  October 11th --

12          That's all right.  Let's go back to the

13 (indiscernible).

14 BY MR. MAIMON:

15 Q     October 11th which is the day before LTL was formed --

16 October 11th, 2021, you formally became the president of RAM,

17 true?

18 A     I believe so, yes.

19 Q     Okay.  And on October 12th, 2021, LTL was formed and you

20 formally became the president of LTL, true?

21 A     True as I recall.  And, yes.

22 Q     Okay.  Now, next slide.  You yourself did not reach the

23 conclusion that LTL was going to file bankruptcy until you

24 voted on it and was confirmed at the LTL Board meeting on

25 October 14th, 2021, true?

1  A     True.

2  Q     And it's also true that between your discussion with

3  Mr. Kim on the 8th and the board meeting on the 14th, you spent

4  about seven hours in discussions on talc issues, and not a lot

5  of that was focused on bankruptcy issues or analysis, true?

6  A     Yes.

7  Q     Okay.  I'd like to move to the October 14th board meeting.

8  Present at the board meeting were the board members, yourself,

9  Mr. Dale (phonetic) and Mr. Dickinson, Mr. Kim who was the

10 secretary and chief legal officer, as well as about five

11 lawyers from Jones Day, true?

12 A     Sounds true, yeah.

13 Q     And at the board meeting on October 14th, 2021, you all

14 discussed the pros and cons of LTL filing for bankruptcy, true?

15 A     True.

16 Q     Now, if you look at Tab 19 in your binder, this is a copy

17 of the minutes of the board of LTL Management for October 14th,

18 2021.  Do you see that?

19 A     I don't -- yes.  Yeah.

20 Q     Okay.  And the board meeting minutes, these board meeting

21 minutes fairly and accurately describe what occurred in this

22 90-minute meeting on October 14th, 2021, true?

23 A     True.

24 Q     Okay.  So now I'd like to fast forward on a few issues out

25 of format.  If we could go to the next.  In general, this was a

1  90-minute meeting, correct?

2  A    Correct.

3  Q    You recapped and reviewed the restructuring, true?

4  A    True.

5  Q    You reviewed the talc liabilities and the history of the

6  talc claims, right?

7  A    True.

8  Q    You discussed the new company protocols, LTL, how it

9  needed to operate, right?

10  A    True.

11  Q    And you talked about options to resolve the talc claims,

12  right?

13  A    True.

14  Q    And then you voted on the resolution to bring the company

15  to bankruptcy, fair?

16  A    Fair.

17  Q    Okay.  Now let's talk about the second to the last,

18  options to resolve talc claims.  One of the options that was

19  discussed was to stay the course and continue to litigate or

20  address the cases in the tort system, correct?

21  A    Correct.

22  Q    And that was the main alternative that you all discussed

23  with regard to bankruptcy, right?

24  A    Yes.

25  Q    There was another alternative, if we can go to the next

Wuesthoff - Cross/Maimon                                    32

1  slide.  There was another alternative which was the insurance

2  option.  And that was to tender the defense of the talc claims

3  to your insurance companies and let them deal with it.  But

4  that was quite brief because, in your words, there was no way

5  the pencils and insurance companies would cover any sort of

6  liability moving forward in anything close to affordable, fair?

7  A    True.

8  Q    Okay.  Were you aware at that time that you made that

9  determination what was the status of insurance litigation that

10 Johnson & Johnson and JJCI was involved in with regards to its

11 insurance?

12 A    I don't know specifically.

13 Q    Okay.  Were you told when you had this meeting about the

14 complaints that the insurance companies had about how Johnson &

15 Johnson and JJCI had handled the talc litigation up until then

16 without tendering, without getting permission from the

17 insurance companies?  Were you told about that?

18 A    Not specifically.

19 Q    Okay.  The third option was filing for bankruptcy, true?

20 A    True.

21 Q    Okay.  Next slide.  When you were asked to be president of

22 LTL, LTL taking on the talc liabilities was not an option,

23 correct?

24 A    When I was asked to be president of LTL -- by not an

25 option -- yes, that was part of why LTL was formed.

Wuesthoff - Cross/Maimon                    33

1  Q    It was a foregone conclusion, true?

2  A    Yes.

3  Q    It was how LTL was structured, true?

4  A    I can't say it was how LTL was structured.

5  Q    Take a look at that same transcript, Page 79.

6  A    Page 79.  I'm sorry, which section?

7          THE COURT:  Which tab?

8          MR. MAIMON:  This is Tab number 4.  And if we can

9  look at Lines 11 through 16.

10          THE COURT:  Page number?

11          THE WITNESS:  Page 79.

12          MR. MAIMON:  Page number 79.

13  BY MR. MAIMON:

14  Q    You were asked the following question.  Okay, it was a

15  foregone conclusion that it was going to take on the talc

16  liabilities, correct.  And your answer under oath was yes,

17  that's how it was structured in the divisional merger.  That's

18  how that was structured, yes.

19  A    Yes, okay.

20  Q    Okay.  Next, the only reason LTL was formed was to take on

21  the talc liabilities, true?

22  A    True.

23  Q    The only reason LTL had for being was to take on the talc

24  liabilities, true?

25  A    True.

Wuesthoff - Cross/Maimon                    34

1  Q    And that was determined and dictated by Johnson & Johnson,

2  correct?

3  A    Can you show me that?

4  Q    Sure.  Look at Tab number 2, Page 135.  And look at Line

5  20 if you could, at the bottom.  Question, you told me you

6  didn't have any choice, you had to take the talc liabilities,

7  right.  And you answered yes.  You see that?

8  A    Yeah.

9           MS. BAKER:  Your Honor --

10           MR. MAIMON:  You were asked --

11           MS. BAKER:  Sorry.  Under the rule of completeness, I

12  would ask that Lines 14, or yes, 14 through 16 be read.

13           MR. MAIMON:  Sure.  Let's start at 14.  Well, let's

14  start at 10.

15  BY MR. MAIMON:

16  Q    And as president of LTL, you had no choice as to whether

17  or not LTL would take on Johnson & Johnson's talc liabilities,

18  right.  And you answered correct.

19  A    Correct.

20  Q    And that foregone conclusion and the reason you had no

21  choice was dictated by Johnson & Johnson, correct?  And you

22  said no.  Do you see that?

23  A    Yeah.

24  Q    And then you were asked well who made you take the talc

25  liabilities.  And you said well LTL was formed, yes, we took on

Wuesthoff - Cross/Maimon                                    35

1  the talc liabilities.  But the rest, please rephrase the

2  question.  You asked for a rephrasal, right?

3  A    Uh-huh.

4  Q    And then it was asked sure, you told me you didn't have

5  any choice, you had to take the talc liabilities, right.  You

6  answered yes.  You see that?

7  A    I do.

8  Q    And then you were asked and the reason for that was

9  because the only reason LTL had for being was to take those

10 talc liabilities, right?

11 A    Yes.

12 Q    And you see on Page 136 you answered yes to that question.

13 A    Yeah.

14 Q    And then you were asked and that was determined by or

15 dictated by Johnson & Johnson, right.  And you said I would --

16 yes.

17 A    Uh-huh.

18 Q    And you were asked you don't know, do you.  And you said

19 yes, I would say yes, correct?

20 A    Yeah.  So it's true.

21 Q    True.  Very good.  Now, you were, at that time in the

22 beginning days of LTL, you were concerned with the growth and

23 cost of the talc claims, true?

24 A    True.

25 Q    And as president, however, you were not worried about

Wuesthoff - Cross/Maimon                              36

1  taking on the talc liabilities because the funding agreement

2  was there as an asset for LTL to resolve cases, true?

3  A    True.

4  Q    As far as you were concerned as president, when you became

5  president, the advantage LTL had over Old JJCI was the funding

6  agreement backed by New JJCI and J&J, true?

7  A    True.

8  Q    And as far as you were concerned as president, LTL was in

9  a stronger position than Old JJCI would have had on its own,

10 true?

11 A    True.

12 Q    Let's go October 14th.  As president of LTL on that day,

13 first board meeting, you understood that the value of LTL

14 consisted of $6 million in the bank, RAM royalties valued at

15 $367 million, and a funding agreement the value of which was

16 New JJCI, true?

17 A    True.

18 Q    Now, next, J&J prepared the funding agreement, or their

19 lawyers did, and they sent it to you on October 10th, 2021.

20 True?

21 A    I would assume the date's accurate.

22 Q    And you reviewed it, you were comfortable with it, and you

23 signed without making any changes, true?

24 A    True.

25 Q    And according to you, the language was quite clear.  It

Wuesthoff - Cross/Maimon                              37

1  was well written and quite understandable, true?

2  A    True.

3  Q    I hope it's true because you said it, okay?  Now,

4  immediately after LTL came into existence that same day, that's

5  when you signed the funding agreement on behalf of LTL.  True?

6  A    True.

7  Q    And as we stated before, you reviewed, discussed, and

8  signed it before the October 14th board meeting, true?

9  A    True.

10  Q    Now, on October 14th, you recognized that the funding

11  agreement was the most important asset that LTL had, true?

12  A    True.

13  Q    And you understood at that time that under the funding

14  agreement, under funding agreement number one, Johnson &

15  Johnson could have been liable for upwards of $61 billion,

16  correct?

17  A    Yes, that was the cap.

18  Q    You understood as president of LTL that the funding

19  agreement number one obligated J&J whether or not LTL was in

20  bankruptcy.  That was your understanding, true?

21  A    True.

22  Q    Now, you entered -- there were three agreements.  One was

23  the funding agreement, two was the services agreement, and

24  three was the secondment agreement, right?

25  A    Correct.

1  Q    Okay.  Let's talk about those in turn.  The funding

2  agreement would provide LTL with the funds it would need to

3  resolve all current and future claims, true?

4  A    True.

5        MR. MAIMON:  And if I might approach, Your Honor.

6        THE COURT:  Yes.

7  BY MR. MAIMON:

8  Q    I just want to make sure we're clear.  You see on this

9  board I put the same thing that was in the slide, fair?

10  A    Fair.

11  Q    Okay.  Now, the services agreement was needed to run and

12  operate and know how LTL would operate, correct?

13  A    Correct.

14  Q    That's true?

15  A    True.

16  Q    The secondment agreement was needed to -- next.  Next.

17  The secondment agreement was needed so that LTL could staff

18  itself, including people like you, right?

19  A    True.

20  Q    Okay.  Now, those three agreements that we spoke about,

21  finance agreement, the funding agreement, the source, the what

22  did we call it, the services agreement and the secondment

23  agreement, before you signed on as president of LTL, you knew

24  that those things would be in place, true?

25  A    Before I signed on as president?

Wuesthoff - Cross/Maimon                    39

1  Q    Before you formally --

2  A    Yes.

3  Q    -- became president, right?

4  A    Yes.

5  Q    All right.

6  A    I knew they would be in place.

7  Q    And they were important to you, correct?

8  A    Correct.

9  Q    Okay.  Now, when you signed the funding agreement, you

10 didn't know the exact value of JJCI, true?

11 A    True.

12 Q    However, to be fair, you still signed the funding

13 agreement because you knew that LTL had at least what Old JJCI

14 had, and with the funding agreement, LTL also had the backing

15 of a co-obligor or co-payer, J&J, on top of New JJCI, true?

16 A    True.

17 Q    And that was very important to you as president, right?

18 A    True.

19 Q    Okay.  Now, it was your understanding when you became

20 president that LTL was going to be responsible for resolving

21 the talc liability.  And through the funding agreement, JJCI

22 and J&J committed to help fund that resolution, true?

23 A    True.

24 Q    Back to the October 14th board meeting.  You considered

25 alternatives to filing for Chapter 11, true?

Wuesthoff - Cross/Maimon                                40

1  A    True.

2  Q    And you took the decision to authorize the bankruptcy

3  filing very seriously, true?

4  A    True.

5  Q    According to your testimony, sir, you did not feel a sense

6  of urgency to file bankruptcy, true?

7  A    If I testified, then it's true.

8  Q    Well, I don't want to put words in your mouth.  Turn to

9  Tab 4 and go to Page 61.  Look at Lines 18 through 20 and see

10 if that refreshes your recollection that you did not feel a

11 sense of urgency to file bankruptcy.

12 A    Yeah.  And it goes on to say why wait.

13 Q    I understand.  But you didn't feel a sense of urgency,

14 correct?

15 A    Correct.

16 Q    Okay.  And according to you, you weren't pressured, true?

17 A    (No audible response)

18 Q    Nobody pressured you into doing it, right?

19 A    Correct.

20 Q    And according to you, you didn't feel you were under

21 duress in doing so, correct?

22 A    Correct.

23 Q    Okay.  You did not feel -- let's go back.  You did not

24 feel that other people, according to your testimony, at other

25 companies had already made the decision, and the LTL Board was

1  just coming to rubber stamp it.  That's true, is it not?

2  A    That is true.

3  Q    It's true, is it not, sir, that the LTL Board and you had

4  the ability to say no to the bankruptcy filing, true?

5  A    True.

6  Q    Now, we talked about the six million in the bank.  No one

7  threatened to take away the six million in the bank if you

8  voted no on the bankruptcy option, true?

9  A    True.

10  Q    And you didn't feel that you were at risk of losing that

11  $6 million in the bank if you voted no on the bankruptcy

12  option, true?

13  A    True.

14  Q    As president of LTL, you had signed, and RAM, you had

15  signed four purchase and sale agreements for RAM to buy certain

16  royalty streams, true?

17  A    True.

18  Q    No one threatened to take away RAM, it's value, and its

19  royalty streams if you voted no on the bankruptcy, true?

20  A    True.

21  Q    And you didn't feel that there was a risk that that would

22  be taken away from you or you would lose it if you voted no on

23  the bankruptcy, correct?

24  A    Correct.

25  Q    No one threatened to take away the funding agreement,

Wuesthoff - Cross/Maimon                              42

1  which was the value of JJCI, if you voted no on the bankruptcy

2  option, true?

3  A    True.

4  Q    And you didn't feel that you were at risk of losing the

5  funding agreement if you independently voted no to the

6  bankruptcy option, true?

7  A    true.

8  Q    Now, would you agree that it's your testimony under oath

9  that you and the LTL Board had the independence to vote no on

10  the bankruptcy option and still have the six million in the

11  bank, the RAM royalties and company valued at 367 million, and

12  the funding agreement which was up to the value of New JJCI?

13  A    True.

14  Q    And if you had voted no, you still would have performed

15  your duties as president and used these to do the business of

16  LTL, true?

17  A    True.

18  Q    November 12th, 2021, J&J announced plans to separate the

19  consumer health business.  You were aware of that, true?

20  A    I believe that's the date, yes.

21  Q    Okay.  And when you heard about that, as president of LTL,

22  your consideration was that the funding agreement remained

23  intact despite the separation, true?

24  A    True.

25  Q    And it was your expectation, sir, as president of LTL,

1  that J&J would honor its commitments under the funding

2  agreement, true?

3  A     True.

4  Q     And you had that expectation based on the integrity of

5  J&J's executives, true?

6  A     That was one reason, yes.

7          MR. MAIMON:  Okay.  I'm sorry to that.  Mr. Jonas

8  will now ask you some questions.

9          MR. JONAS:  Your Honor, can I ask for just maybe a

10  five-minute break?  We've been going about an hour and a half,

11  and I'm going to be a while, if that makes sense.

12          THE COURT:  Sure.

13          MR. JONAS:  And, Your Honor, I should have asked at

14  the top, I'd ask -- I see Mr. Kim here.  I don't know about

15  Mr. Dickinson.  I'd ask that we'd like to invoke the rule and

16  have them not be present for the remainder of Mr. Wuesthoff's

17  testimony.

18          THE COURT:  Counsel?

19          MS. BAKER:  Yes.  Mr. Dickinson is not in the room.

20  Mr. Kim, as Your Honor knows, is a corporate representative.

21  And as such, he can remain here even when the rule is invoked.

22          MR. JONAS:  Your Honor, we've been through -- I think

23  we had this exact same argument in the first trial.  And at

24  that point, we were successful in invoking the rule.  I'm

25  trying to do it again.  I think there's -- did we not?

44

1          MS. BAKER:  I don't believe so, Your Honor.  I

2   believe Mr. Kim was here for the entirety of the hearing in

3   LTL 1.

4          THE COURT:  That's my recollection, as well.  I'd

5   have to look back at the transcripts, but that was my

6   recollection.

7          MR. JONAS:  Your Honor, we're also asking that it

8   apply.  There are other live witnesses that will be here,

9   Mr. Murdica, Mr. Onder, et cetera.  We'd ask that the same

10  apply for them.

11         THE COURT:  For each witness --

12         MR. JONAS:  Correct.

13         THE COURT:  -- I'll address.  I don't have a problem

14  invoking the rule but for Mr. Kim --

15         MR. JONAS:  Okay.  Thank you, Your Honor.

16         THE COURT:  -- as we did last time.  You need five

17  minutes?

18         MR. JONAS:  Just, yes.  That would be fine.

19         THE COURT:  That's fine.

20         MR. JONAS:  Thank you, Your Honor.

21         THE COURT:  Thank you.  You may step down, and please

22  don't discuss your testimony.

23         (Recess at 10:19 a.m./Reconvene at 10:31 a.m.)

24         THE COURT:  Mr. Thompson.

25         MR. THOMPSON:  Yeah.  So just briefly, Your Honor.

1 Mr. Jonas was nice enough to let me say.

2           So when these declarations, they say we don't object,

3 I had filed some objections to the declarations.

4           THE COURT:  Right.

5           MR. THOMPSON:  I'm not waiving the objections subject

6 to your ruling that you said you were going to rule on later.

7 So if someone's saying we don't object, I had objected.

8           THE COURT:  They only object subject to the

9 objections that have been made.

10           MR. THOMPSON:  That's right.  That's right.  Subject

11 to --

12           THE COURT:  Okay.

13           MR. THOMPSON:  Yeah.

14           MR. JONAS:  Ready, Your Honor?

15           THE COURT:  Yes, please.  Continue.

16           MR. JONAS:  Thank you.

17           THE COURT:  Thank you.

18           MR. JONAS:  Jeff Jonas from Brown Rudnick for the

19 TCC.

20                         CROSS-EXAMINATION

21 BY MR. JONAS:

22 Q    Good morning, Mr. Wuesthoff.

23 A    Good morning, Mr. Jonas.

24 Q    Nice to see you, again.

25 A    You, too.

Wuesthoff - Cross/Jonas                                46

1  Q    Just a couple of very, very brief background questions,

2  then we can get into it.

3       You're the president of the debtor, LTL Management LLC,

4  correct?

5  A    Correct.

6  Q    And you are a member of the board of managers of the

7  debtor, right?

8  A    Correct.

9  Q    The other two members of the board of managers are

10 Mr. Deyo and Mr. Dickinson, correct?

11 A    Correct.

12 Q    And Mr. Dickinson also is the CFO of the debtor?

13 A    Correct.

14 Q    And Mr. Kim is the chief legal officer of the debtor,

15 correct?

16 A    Correct.

17 Q    The debtor has no other board members, officers, or

18 employees, correct?

19 A    John Kim's an officer, but yes.

20 Q    Okay.  Other than the three gentlemen I mentioned.

21 A    Yeah.

22 Q    Okay.  And each of the debtor's officers, you,

23 Mr. Dickinson, and Mr. Kim are succumbed to the debtor by the

24 company you work for, Johnson and Johnson Services, Inc.,

25 correct?

1  A     Correct

2  Q     And Johnson and Johnson Services, Inc., is a subsidiary of

3  Johnson and Johnson, correct?

4  A     Correct.

5  Q     The debtor has no actual employees, correct?

6  A     Correct.

7  Q     Mr. Deyo is a former general counsel at Johnson and

8  Johnson, correct?

9  A     Correct.

10 Q     Until early October 2021, Mr. Dickinson was a vice

11 president at Johnson and Johnson, correct?

12 A     Yes.

13 Q     And until early October 2021, Mr. Kim was an attorney in

14 the legal department at Johnson and Johnson, correct?

15 A     Yes.

16 Q     And he was Johnson and Johnson's lawyer responsible for

17 all talc litigation, correct?

18 A     That's my understanding.

19 Q     And you worked at Johnson and Johnson off and on since

20 1982 or 1983, correct?

21 A     Correct.

22 Q     And that includes you working at Johnson and Johnson for

23 the past eight or nine years, correct?

24 A     Correct.

25 Q     And you ran the Johnson and Johnson Enterprise

Wuesthoff - Cross/Jonas                                                        48

1  Acceleration Program for the supply chain of Johnson and

2  Johnson until early October 2021, correct?

3  A    That was just prior to this position, yes.

4  Q    All right.

5       I'd like to show you Tab 16 in your binder.  It's been

6  marked for identification as Exhibit 511.  This is from the

7  first MTD trial.

8            MR. JONAS:    (Indiscernible), do you have that?

9  BY MR. JONAS:

10 Q    That's Tab 16.

11      You may remember it.  You'll see in the bottom of this

12 page there's an email from Michelle Ryan at JJCUS to Michael

13 Levesque at Moody's.  It's dated July 19, 2021, and she says,

14 "Michael, sorry, it has taken me a while to follow-up on this

15 question.  We are looking at a number of ways capping our talc

16 liability, especially with the recent disappointing Supreme

17 Court inaction on our case.  One scenario being considered

18 would be to capture the liability in one subsidiary and fund

19 that subsidiary for current and future losses and then

20 basically bankrupt that subsidiary."

21      Do you see that?

22 A    I do.

23 Q    And you understand that this was Johnson and Johnson's

24 strategy when you became president of LTL, correct?

25 A    LTL was set up to use bankruptcy to settle the claims if

Wuesthoff - Cross/Jonas                                    49

1  it so decided that was the right course.

2  Q    But do you understand that Johnson and Johnson's strategy,

3  as set forth in Ms. Ryan, her email, that was -- I'm just

4  asking for your understanding.  Was that Johnson and Johnson's

5  strategy in putting together LTL?

6  A    I can't comment on their strategy.  I wasn't part of that.

7  Q    Okay.  One of the reasons you thought it was obvious that

8  LTL should file for bankruptcy was because, to quote from the

9  first trial, "it would be a way to settle the talc litigation

10 cases," right?

11 A    I think I corrected it to say, "resolve."  But, yes,

12 resolve the talc cases.

13 Q    Okay.  Now LTL has the same mission and objective when it

14 filed bankruptcy the second time as when it filed bankruptcy

15 the first time, right?

16 A    Correct.

17 Q    And that mission and objective was to address the talc

18 litigation cases, correct?

19 A    To equitably and efficiently resolve them, current and

20 future.

21 Q    And when I deposed you in LTL's first bankruptcy case, you

22 acknowledged that you didn't know what the term "fiduciary

23 duty" meant, right?

24 A    Yes.

25 Q    And you weren't familiar with what "duty of care" meant,

Wuesthoff - Cross/Jonas                          50

1  right?

2  A    Not literally, correct.

3  Q    And you're not familiar, you weren't familiar with what

4  "duty of loyalty" was, correct?

5  A    Not literally.

6  Q    Today, you think your fiduciary responsibility is to LTL,

7  correct?

8  A    Correct.

9  Q    Who owns LTL?

10 A    We're a subsidiary of J&J, of HoldCo.

11 Q    Okay.  So you believe your fiduciary duty is to J&J,

12 correct?

13 A    No, it's to LTL.

14 Q    To LTL.  Okay.

15      Your job as president of LTL is a full-time job, right?

16 A    Yes.

17 Q    But some weeks you work less than 10 hours, correct?

18 A    Yes.

19 Q    When was the last time you visited LTL's office space?

20 A    It was last year.

21 Q    And the only business operations of LTL is to own RAM, its

22 subsidiary, right?

23 A    Well, we've really two operations.  One is to resolve the

24 talc claims, current and future.  The other operation is the

25 RAM equity business.  I mean --

Wuesthoff - Cross/Jonas                        51

1  Q    I want to talk about the debtor's assets.  The debtor's

2  assets at the time it filed bankruptcy on April 4, 2023, were

3  about $30 million of cash, plus its ownership of RAM, and the

4  second funding agreement, correct?

5  A    Correct.

6  Q    The value of RAM is approximately $400 million?

7  A    Correct.

8  Q    And since LTL's last bankruptcy, RAM has actually done

9  well, right?

10 A    We've done okay.

11 Q    RAM bought four additional royalty streams worth about $75

12 million, correct?

13 A    No, that -- I might have misstated that earlier.  It's

14 worth, at present value, 30.

15 Q    Okay.  It's resulted in about 25 percent more revenues at

16 RAM, right?

17 A    I misstated that as well.  I didn't have the facts.  It's

18 about 10 percent.

19 Q    Oh, 10 percent.  Okay.

20      When did you come to realize that you made a mistake with

21 respect to how many, or the revenue and the percentage increase

22 of RAM's revenues when you testified at your deposition?

23 A    I talked to Rich Dickinson, our CFO, to clarify my

24 understanding.

25 Q    Well, the debtor did so well last year, you got a

Wuesthoff - Cross/Jonas                                    52

1  performance bonus, right?

2  A    I got a bonus, yes.

3  Q    And your base compensation was increased, right?

4  A    Slightly, yes.

5  Q    Okay.  Let's turn to the funding agreement.  The funding

6  agreement, initially, the first funding agreement and now the

7  second funding agreement, is LTL's most important asset,

8  correct?

9  A    Uh-huh.

10 Q    And under the second funding agreement, if necessary, LTL

11 could access HoldCo's assets of approximately $29 billion

12 dollars, correct?

13 A    Correct.

14 Q    And under the first funding agreement, Johnson and Johnson

15 could have been liable for upwards of $61 billion, correct?

16 A    Yes.  That would've been a cap.

17 Q    Today, under the second funding agreement and the support

18 agreement, Johnson and Johnson, today, has zero exposure,

19 correct?

20 A    I'm not sure zero is correct.

21 Q    It doesn't have any obligation today to fund or pay any

22 talc liabilities, correct?

23 A    Out of bankruptcy.  In bankruptcy, yes.

24 Q    Do you think that J&J is obligated today to fund and pay

25 talc liabilities?

Wuesthoff - Cross/Jonas                          53

1  A    There's a PSA agreement for $8.9 billion that HoldCo will

2  fund, but J&J will fund if for any reason HoldCo cannot.

3  Q    Doesn't there have to be a confirmed plan of

4  reorganization that's acceptable to Johnson and Johnson before

5  Johnson and Johnson has any liability to fund or pay talc

6  claims?

7  A    That sounds like a legal question.  I don't know that

8  answer.

9  Q    Sir, you signed the second funding agreement, correct?

10  A    Correct.

11  Q    You understand that's the debtor's most important asset,

12  correct?

13  A    Correct.

14  Q    And you can't tell me today whether Johnson and Johnson is

15  liable, notwithstanding as to whether there is or there isn't a

16  confirmed plan of reorganization?

17  A    If there's a confirmed plan, then yes, they will fund the

18  PSA 8.9 billion.

19  Q    But they won't if there's not a confirmed plan that's

20  acceptable to Johnson and Johnson, correct?

21  A    I don't know about acceptable to Johnson and Johnson.  I

22  know if there's no confirmed plan, that would be with LTL.

23  Q    Okay.  Now, even when there is a confirmed plan, if that's

24  a condition, then J&J'S maximum liability is only $8.9 billion,

25  correct?

Wuesthoff - Cross/Jonas                                    54

1  A    I believe so.

2  Q    So from --

3  A    But --

4  Q    Please.

5  A    -- if, in bankruptcy, HoldCo, you know, I'm not clear,

6  so -- yes, for sure, the 8.9.

7  Q    Sir, you don't know if J&J'S liability is capped under the

8  funding agreement and its support agreement to $8.9 billion?

9  Do you know?

10 A    I know HoldCo is capped at the 29 billion.

11 Q    HoldCo is capped at 29 billion?

12 A    Yes.

13 Q    Because that's the value of its assets, right?

14 A    Correct.

15 Q    Okay.  I want to just talk about J&J.

16 A    Okay.

17 Q    J&J has effectively a guaranty under the support

18 agreement, correct?

19 A    To support HoldCo.

20 Q    Okay.  And I'm asking you, do you know the maximum

21 liability of Johnson and Johnson under that support agreement?

22 A    It's the 8.9 billion for the PSA, and beyond that, HoldCo,

23 we have no reason to believe that HoldCo can't fund everything

24 else in bankruptcy.  So I would think J&J would not have any

25 exposure there.

Wuesthoff - Cross/Jonas                               55

1  Q    Okay.  But we agree that the maximum liability of J&J in

2  connection with the second funding agreement and the support

3  agreement is roughly $8.9 billion, right?

4  A    As I just stated, I can't confirm that, frankly.

5  Q    Do you think if the plan is being negotiated and it ends

6  up it's a $15 billion obligation, is J&J obligated to pay that,

7  or you don't know?

8  A    I don't know.

9  Q    Okay.  Well, let me ask you this.  Let's try it a

10 different way.

11      Would you agree with me that from the first funding

12 agreement to the second funding agreement, J&J got off the hook

13 for more than $50 billion?  Yes or no?

14 A    I can't.  No.  I don't -- no.

15 Q    No?  Or you don't know?

16 A    No.  That $50 billion, I don't know that number.

17 Q    Well, let's try it again.  You told me the first funding

18 agreement, J&J's obligation was at least $61 billion, right?

19 A    Uh-huh.

20 Q    And is the reason you can't answer the question because

21 you don't know what J&J's obligation is under the second

22 funding agreement?

23 A    It's because I don't know specifically beyond the 8.9.

24 Q    Okay.  Well, let's try it this way.  If I represent to you

25 that under the second funding agreement in papers which have

Wuesthoff - Cross/Jonas                              56

1  been filed by the debtor, it indicates that J&J's maximum

2  liability under the support agreement is $8.9 billion.  Accept

3  that.  Would you agree with me then that in connection with

4  these arrangements, J&J got off the hook for more than $50

5  billion?

6  A    I would not characterize it as off the hook.

7  Q    How would you characterize it?

8  A    I'll just characterize it as this is the new agreement

9  that we have.

10 Q    New deal, and if it results with J&J getting off the hook,

11 that's the way it is, right?

12 A    I'm not -- no, I wouldn't testify to that.

13 Q    Mr. Wuesthoff, you are aware that in January 2023, HoldCo

14 or its predecessor, New JJCI, an obligor or counter party under

15 the first funding agreement and now under the second funding

16 agreement, transferred its consumer health business, correct?

17 A    Correct.

18 Q    You only heard about HoldCo's transfer of its consumer

19 health business after it was completed, correct?

20 A    Correct.

21 Q    You knew nothing about it before it happened, correct?

22 A    Correct.

23 Q    It didn't concern you that HoldCo, as an obligor or

24 counter party to the funding agreement, had transferred its

25 assets because, "that was outside of anything I would have

Wuesthoff - Cross/Jonas                                57

1  anything to do with," correct?

2  A    That is correct.  I had nothing to do with that

3  transaction.

4  Q    You understand that whatever the value was of the consumer

5  business, which HoldCo transferred away, would no longer be

6  available to LTL under what was then the first funding

7  agreement and now the second funding agreement, right?

8  A    Under the new funding agreement, yes, it would not be

9  available.

10 Q    The reason HoldCo's maximum obligation or exposure is 29

11 billion is because that's all it's worth now, right?

12 A    That's what its assets are valued at, yes.

13 Q    It used to be worth more than 61 billion, right?

14 A    Well, yes, JJCI was --

15 Q    Okay.

16 A    -- and HoldCo, yes.

17 Q    Sir, you don't know the value of the consumer health

18 business which HoldCo transferred, correct?

19 A    Correct.

20 Q    You don't know if the value of the consumer health

21 business that HoldCo transferred was $1 or $40 billion, do you?

22 A    I know it wasn't $1.

23 Q    You know it wasn't $1.  Okay.

24      Do you know if it was -- but beyond that, you don't know

25 anything else?

1  A    I don't.

2  Q    You don't know that it was $40 billion, do you?

3  A    I do not.

4  Q    Okay.

5      You believe the value of the second funding agreement is

6  "the value of the talc liabilities minus the value of LTL,"

7  correct?

8  A    Correct.

9  Q    We'll talk about LTL's talc liabilities more in a few

10 minutes, but LTL's total talc liabilities, according to you,

11 are not more than $8.9 billion, right?

12 A    We have no reason to believe that it's more than that.

13 Q    Sir, you don't believe, LTL doesn't believe that it's talc

14 liabilities exceed $8.9 billion, right?

15 A    At this point, nothing that we see would indicate that

16 it's more.

17 Q    Sir, you -- okay.  Let's leave it at that.

18     That means that the value, according to the way you

19 structure it or think about it, the value of the second funding

20 agreement is less than $8.9 billion, right?

21 A    Oh, because that minus that.  Well, but there's also

22 expenses that have to be paid for, the ongoing --

23 Q    Okay.

24 A    -- so there's more money than just the 8.9.

25 Q    It's less than $10 billion, right?

Wuesthoff - Cross/Jonas                          59

1  A     It's legal fees, et cetera.

2        I don't know.  I don't have a number.

3  Q     But am I in the ballpark?  Because the way you said you do

4  it is you take the value of the talc liabilities, which you say

5  can't exceed roughly $8.9 billion, less the value of LTL, which

6  is I don't know, a couple hundred million dollars, and that's

7  what you say today the value of the second funding agreement

8  is, correct?

9  A     Plus whatever litigation, whatever --

10 Q     Okay.

11 A     -- fees, all that on top of that.

12 Q     Okay.  So for a proxy, I'm just going to use $10 million.

13 A     Okay.

14 Q     $10 billion.

15       Today, you believe today that the value of the first

16 funding agreement also was the value of the talc liabilities

17 minus the value of LTL, correct?

18 A     Correct.

19 Q     So today, you believe the value of the first and second

20 funding agreements is equal, correct?

21 A     Correct.

22 Q     Sir, you've changed your story with respect to the value

23 of the funding agreement in order to make it seem that

24 terminating the first funding agreement didn't hurt LTL's

25 creditors, correct?

1  A    Incorrect.

2  Q    Sir, a few minutes ago, Mr. Maimon asked you questions and

3  he was confirming your testimony from the first motion to

4  dismiss trial, and he asked you if the value of the first

5  funding agreement was the value of New JJCI, and you said yes.

6  A    Yes.

7  Q    $61 billion.

8  A    I said that was the cap.  The cap.

9  Q    No, sir.  You said that was the value.

10  A    Back in a year ago.

11  Q    Yeah.

12  A    Yes.  Yes.

13  Q    Okay.  Do you understand that at the first motion to

14  dismiss trial, your testimony with respect to the value of the

15  first funding agreement, that that was effectively adopted by

16  both this Court and ultimately the Third Circuit Court of

17  Appeals, and they found that the first funding agreement was, I

18  think they said a $61 billion ATM?  Do you understand that?

19  A    Yes.

20  Q    But today, your testimony is different.  Today, you say,

21  well, the second funding agreement's worth 8.9, 9, 10, whatever

22  you want, and it's equal to the first funding agreement.  But

23  that's not true, is it, sir?

24  A    What I had meant to say in the first one is that 61

25  billion, which by the way, I didn't know the number at the

Wuesthoff - Cross/Jonas                                61

1  time, was the value, but has since been determined, 61 billion,

2  that was a cap.  The funding agreement is there to fund the

3  talc liabilities and we believe the talc liabilities are no

4  more than $10 billion.  The two are equal in that regard.

5  Q    Sir, you're not telling this Court today that the first

6  and second funding agreement are equal, are you?

7  A    I'm saying the value of them.

8  Q    You think the value of the first funding agreement and the

9  second funding agreement are equal?

10 A    Yes.

11 Q    Let me ask you, if under the first funding agreement, LTL,

12 the company of which you're president, had done a deal to

13 settle the talc liabilities at $45 billion, J&J would have been

14 responsible for that $45 billion, right?

15        MS. BAKER:  Objection to the hypothetical, Your

16 Honor.  This is a fact witness.

17        THE COURT:  Sustained.

18 BY MR. JONAS:

19 Q    Well, let me ask you, sir, as president of LTL, charged

20 with resolving the talc liabilities, what did you think the

21 maximum amount was under the first funding agreement that you

22 could sell the talc liabilities for?

23 A    If we needed to, it was up to the cap of 61 billion.

24 Q    $61 billion.  So LTL could have drawn, effectively, $61

25 billion under the first funding agreement?

Wuesthoff - Cross/Jonas                                    62

1  A    If it needed to, yes.

2  Q    Okay.  And how much can it draw if it needs to under the

3  second funding agreement?

4  A    30 billion.

5  Q    Okay.  So roughly $30 billion, or more, less, right?

6  A    Yes.

7  Q    Okay.  So can we now agree that they're not equal?

8  A    The value is the same.  The value is the value -- the

9  agreements state that the value is the value of the talc

10 liabilities, that the funding agreements need to fund the talc

11 liabilities.  If the talc liabilities are no more than 10

12 billion, which we believe is true, then they're the same.

13 Q    Well, they're no more than 10 billion because you say

14 they're no more than 10 billion, right?

15 A    Just because we have no evidence, no data point to say

16 that it's more than that.  There's a PSA agreement with the

17 lawyers representing the majority of the claimants who think

18 that's an adequate resolution.

19 Q    So when you terminated the first funding agreement on

20 behalf of LTL, LTL lost the ability to collect more than $30

21 billion to make that available for talc liabilities, correct?

22 A    I would say incorrect.  It wasn't, it was the Third

23 Circuit Court's decision which said that funding agreement was

24 void or voidable.  We had already lost that.

25 Q    Sir, simple question.  I just am trying to review the

Wuesthoff - Cross/Jonas                                63

1  testimony that we've already gone through today.

2      I think you told me under the first funding agreement, if

3  it was necessary, you could have drawn to settle talc

4  liabilities or resolve talc liabilities more than $61 billion,

5  right?

6  A    Not more, but up to.

7  Q    Up to.  Okay.

8      Under the second funding agreement, I think you told me,

9  tell me if I'm wrong, that you could draw up to 29 or the value

10 of HoldCo, 29 to 30 billion dollars, right?

11 A    Yes.

12 Q    Okay.  Up until April 4th, you had the benefit of the

13 first funding agreement, correct?

14 A    No.  We don't believe we did.

15 Q    Well, you didn't terminate it until April 4th, so let's go

16 to April 3rd.  On April 3rd, you still had the first funding

17 agreement.  It hadn't been terminated, right?

18 A    Technically, yes.

19 Q    Okay.  So on April 3rd, had you been successful in

20 resolving talc liabilities, you could have drawn up to $61

21 billion, right?

22 A    Theoretically, yes.

23 Q    Okay.  And on April 4th, after you terminated the funding

24 agreement, you could only draw roughly $30 billion, right?

25 A    After the agreement was terminated.  When you say, "we

Wuesthoff - Cross/Jonas                                              64

1  terminated," yes, we did technically terminate, but the Third

2  Circuit Court ruling, we, and my understanding was, resulted in

3  a material risk that that agreement was void or voidable.

4  Q    Well, the Third Circuit didn't terminate the first funding

5  agreement, did it?

6  A    No.  But they made it void or voidable, is my

7  understanding.

8  Q    The Third Circuit made the first funding agreement void or

9  voidable.  That's your testimony?

10 A    They're ruling.

11 Q    Okay.  But you, sir, signed the termination and

12 substitution agreement?

13 A    Correct.

14 Q    And you, sir, signed the new support agreement, right?

15 A    Yes.

16 Q    And you, sir, signed the second funding agreement?

17 A    Along with others, yes.

18 Q    Okay.  And I think we've covered off on the value in one

19 respect.  I just want to close this line with, as to J&J on

20 April 3rd, had you needed to draw from J&J, J&J would have been

21 liable for up to $61 billion, right?

22 A    I'm not sure.

23 Q    Okay.

24 A    Based on the Third Circuit's ruling, I'm not sure.

25 Q    Okay.  And on April 4th, do you know what the maximum

Wuesthoff - Cross/Jonas                                    65

1  liability of J&J is under the new arrangements?  I think we've

2  been over it, but let's try and close it one more --

3  A    I don't know.

4  Q    You don't know?

5  A    We've been over that.

6  Q    And you don't know?

7  A    Beyond the 9 billion, I'm not certain.

8  Q    Okay.  At your deposition on May 30, 2023, you testified

9  that, "We don't believe our talc causes cancer."  Do you recall

10 that?

11 A    Yes.

12 Q    And when you used the words "we" and "our," you were

13 referring to Johnson and Johnson, right?

14 A    LTL, Johnson and Johnson, yes.

15 Q    Well, LTL never manufactured talc products, did it?

16 A    No.  But we're all part of the same company.

17 Q    All part of the same company.  Okay.

18      As president of LTL, your primary responsibility is to

19 seek permanent, equitable, and efficient resolution to all talc

20 claims, correct?

21 A    Correct.

22 Q    To that end, and as full-time president, you've done your

23 best to review all relevant information, ask appropriate

24 questions, and understand the debtor's talc liability, correct?

25 A    Yes.

Wuesthoff - Cross/Jonas                                66

1  Q    And notwithstanding that you don't believe that talc

2  causes cancer, the debtor, LTL, believes its total talc

3  liability is between zero and $8.9 billion, correct?

4  A    Correct.

5  Q    LTL's total talc liability is not more than $8.9 billion,

6  correct?

7  A    We don't believe so, no.

8  Q    And if my client, the TCC, tells the Court that LTL's

9  total talc liability is higher than 8.9 billion, they'd be

10 wrong, right?

11 A    We would disagree.

12 Q    And if any experts, maybe Mr. Mullin or Mr. Bell, LTL's

13 experts, if they assume for purposes of their analysis and

14 their opinions that LTL's total talc liability is higher than

15 8.9, they'd be wrong, correct?

16 A    We'd have a difference of opinion.

17 Q    And when you say "we," it's not you.  You're speaking as

18 president of LTL, correct?

19 A    I'm speaking for the -- excuse me, I'm speaking for the

20 board.

21 Q    For the board of LTL.

22 A    Yeah.

23 Q    Okay.

24      When the LTL board was considering this second bankruptcy

25 filing, LTL had cash of about $30 million, correct?

1  A    Yes.

2  Q    And HoldCo, which was obligated to LTL under the second

3  funding agreement, had cash of about $400 million, right?

4  A    Yes.

5  Q    And the board was aware that HoldCo could be paid

6  substantial dividends from its subsidiaries in the amount of

7  billions of dollars, correct?

8  A    1.8 billion, yes.

9  Q    You don't think it was more than 1.8?  Over time, didn't

10  HoldCo have the ability to collect more than 1.8 billion?

11  A    It could be more.  We didn't know how much.

12  Q    Okay.  And the board, in fact, was aware that certain

13  substantial dividends had been projected "in the near term,"

14  correct?

15  A    Correct.

16  Q    In fact, that happened last week and HoldCo received a

17  dividend payment of $912 million, correct?

18  A    I don't know.

19  Q    Sir, you don't know whether HoldCo received a dividend

20  last week of $912 million?

21  A    I do not.

22  Q    Nobody's told you that?

23  A    No.

24  Q    Okay.  Let me show you at Tab 18, which is one of LTL's

25  experts, Mr. Bell --

Wuesthoff - Cross/Jonas                              68

1           MS. BAKER:  Your Honor, I would object on foundation

2  grounds.  This is a fact witness.

3           THE COURT:  Overruled.

4  BY MR. JONAS:

5  Q    I just want to -- we'll be very quick about it.  If you

6  take a look at Mr. Bell's -- you know Mr. Bell is an expert

7  working for your company, correct?

8  A    I'm not familiar with Mr. Bell.

9  Q    You don't know Mr. Bell?

10 A    I do not.

11 Q    Do you know who the company's experts are in this case?

12 A    I don't.

13 Q    No.  Okay.

14         Let's take a look at the second, it's actually Page 1,

15 Paragraph 3.  Mr. Bell says, apparently he knew.  He said, "I

16 understand that the $912 million dividend expected to be

17 received by HoldCo on June 22, 2023, is the dividend that had

18 been previously anticipated to be $1.8 billion, subject to

19 certain contingencies and risks."

20         Do you see that?

21 A    I see that.

22 Q    And, sir, let me ask you, before you put together your

23 declaration, which was on Friday, I think the 23rd, right, did

24 you try and ascertain, make sure you had complete information

25 so that your declaration that you filed as your direct

Wuesthoff - Cross/Jonas                                    69

1  testimony in this case would be truthful and complete?

2  A    I've relied on the information in our board materials.

3  Q    Okay.  Well, let me ask you, the board materials indicated

4  that there would be a dividend payable to HoldCo in the near

5  term, right?

6  A    1.8 billion.

7  Q    Okay.  And, sir, before you sign your declaration and

8  submitted your direct testimony to this Court in which you say

9  that HoldCo has cash of $400 million.  You state that, right?

10 A    Yes.

11 Q    Did you ask anybody whether that was accurate?

12 A    No, I took it as accurate.  The information that was

13 provided, I took as accurate.

14 Q    Took from whom?  Who did you take that information from?

15 A    It was provided by our attorneys.

16 Q    Well, let me ask you, if instead of HoldCo having $400

17 million last week before you signed your declaration, it had

18 $1.4 billion because it had received a dividend of $912

19 million, is that important to you as the president of LTL that

20 your obligor has cash of almost a billion dollars more?  Is

21 that important to you?

22 A    It would be important to know, yes.

23 Q    Okay.  You didn't ask anybody before you filed your

24 declaration that said HoldCo has $400 million.  You didn't ask

25 anybody whether that was accurate?

Wuesthoff - Cross/Jonas                    70

1  A    No.  We relied on the board minutes and that information

2  that was in there.

3  Q    Sir, which lawyers, I'm not asking for any details, who

4  did you work with to prepare that declaration?

5  A    Outside counsel.

6  Q    Which counsel?  What's the name of the firm?

7  A    Jones Day.

8  Q    Okay.  And, again --

9  A    And John Kim, our internal.

10  Q    And Mr. Kim?

11  A    Yes.

12  Q    Okay.  So I guess we'll find out from Mr. Kim whether he

13  knew that HoldCo had $1.4 billion instead of $400 million.

14  We'll leave it at that.

15      But let me ask you, if it's true that HoldCo -- so let me

16  strike that.

17      So you don't know whether when it got the dividend, HoldCo

18  lent the $912 million to Johnson and Johnson?  You don't know

19  that?

20  A    No.

21  Q    And you don't know that if they did do that loan and it

22  was a demand loan so they could get it right back, you don't

23  know the circumstances of that?

24  A    No.

25  Q    Okay.

1    Immediately prior to LTL filing bankruptcy on April 4th,

2  the company was solvent, correct?

3  A    Yes.

4  Q    And, at that time, LTL was able to pay its bills, correct?

5  A    Correct.

6  Q    At that time, the company was able to meet its

7  liabilities, correct?

8  A    Correct.

9  Q    At that time, the company was able to pay its bills as

10  they were coming due, correct?

11  A    Correct.

12  Q    And the company had sufficient liquidity to meet its

13  obligations, correct?

14  A    Correct.

15  Q    The only alleged financial distress, which existed on

16  April 4, 2023, was "the same financial distress" as the company

17  was experiencing at the time the company filed its first

18  bankruptcy, except you thought there might be more talc claims,

19  right?

20  A    Yes.  And the funding agreement issue of not being

21  enforceable.

22  Q    Okay.  Now, LTL's financial distress that was

23  substantially the same both times the company filed, that in

24  your opinion was the uncertainty of the talc litigation

25  outcomes, right?

Wuesthoff - Cross/Jonas                      72

1  A    That was one of the reasons.

2  Q    You were worried about lottery size awards, to use your

3  words, right?

4  A    Yes.

5  Q    And you were worried about the talc latency period, right?

6  A    Yes.

7  Q    Now, other than your belief that there might be more talc

8  claims, again, you've said this, the only other difference

9  regarding the company's financial condition from the first to

10 the second filing was you had the second funding agreement

11 instead of the first funding agreement, right?

12 A    Correct.

13 Q    And you believe the second funding agreement is sufficient

14 to be able to satisfy all of the company's talc liabilities,

15 right?

16 A    Yes.

17 Q    And, again, that's because the value of HoldCo is

18 approximately $30 billion, right?

19 A    Yes.

20 Q    Now, when the board made the decision on April 4, 2023, to

21 file LTL for a second bankruptcy, you did not have an estimate

22 or valuation of LTL's aggregate talc liabilities, correct?

23 A    Correct, other than the data point of the PSA, which we

24 believed, like I said, was the value of those talc liabilities.

25 Q    Very important, sir.  When the board made the decision on

Wuesthoff - Cross/Jonas                          73

1   April 4, 2023, to file bankruptcy a second time, you did not

2   have an estimate or valuation of LTL's aggregate talc

3   liabilities, correct?

4   A    Correct.

5   Q    And the board was told that costs were anticipated to

6   increase, right?

7   A    Yes.

8   Q    You didn't have any understanding of the basis of that

9   statement, did you?

10  A    Well, I had the understanding of what was written in the

11  board minutes, the causes of that, yes.

12  Q    Sir, let's take a look at Tab 5, which is Exhibit 863,

13  which is your deposition transcript, your most recent

14  deposition.

15  A    I'm sorry, what page number?

16  Q    I will tell you in one second.

17       I'm going to be on, sorry, Page 140, Line 20.

18  A    Okay.  I have it.  Yeah.

19  Q    Okay.  Hold on one second.

20       And if you look on Page 141 at Line 7, I said, "The

21  statement that costs are anticipated to increase and continue

22  for decades, do you know the basis of that statement?"

23       You said, "That particular statement?"

24       I said, "Yes."

25       And you said, "I don't, other than I'd be speculating, so

Wuesthoff - Cross/Jonas                          74

1  no, I don't know."

2      Correct?

3  A    I need to back up and read.

4  Q    Go ahead.  Take your time.

5  A    Yeah.  I don't know why I would have said that because I

6  understood why.

7  Q    But that's what you said.  You told me not that many weeks

8  ago that the board was told that costs were anticipated to

9  increase.  And I asked you and you said you didn't have any

10 understanding of the basis of that statement, correct?  That's

11 what you said on May 30th, right?

12 A    I'm sorry.  I must have misspoke because I --

13 Q    Misspoke, okay.

14 A    -- clearly knew.

15 Q    Well, the board was told that defense costs are

16 substantial and increasing, right?

17 A    Yes.

18 Q    And you didn't have any more additional information with

19 respect to defense costs, correct?

20 A    That is correct.

21 Q    And the board was told that settlement demands are

22 increasing, right?

23 A    Yes.

24 Q    The board wasn't provided with any additional information

25 in that regard, correct?

Wuesthoff - Cross/Jonas                     75

1  A    No.

2  Q    You had additional information?

3  A    No.

4  Q    No.

5  A    We knew they were escalating.

6  Q    Okay.  The board wasn't provided, I'm sorry.

7       The only information you had in that regard was the same

8  information you had when LTL had filed the first time, right?

9  A    I don't know.

10 Q    Okay.  Let's take a look.  Same tab, your deposition

11 transcript, Page 141.

12      Hold on one second.

13      And if you look, I'm on Page 141, Line 15, I asked you the

14 question, "Okay.  And it goes on to say that defense costs are

15 substantial and increasing."

16      And I asked you, "Was the board presented with any more

17 information with respect to defense costs?"

18      You said, "Not that I recall."

19      And I said, "Okay.  And settlement demands are

20 increasing."

21 A    Yeah.

22 Q    "Were you provided with any more additional information in

23 that regard?"

24      And can you read your answer?

25 A    Yeah.  "Nothing more than we had for LTL."

Wuesthoff - Cross/Jonas                          76

1      That is true.

2  Q    Okay.  So the only information you had in that regard was

3  what you had the first time?

4  A    Yeah.

5  Q    Okay.  In early April, when the board determined to file

6  LTL for a second bankruptcy, the board didn't see and was not

7  presented with any specific financial projections of what the

8  company going back into the tort system might look like,

9  correct?

10  A    Correct.

11  Q    The board was never presented with any projection showing

12  the impact on LTL if it were to go back into the tort system

13  after dismissal of the first bankruptcy, correct?

14  A    Correct.

15  Q    The board, in considering whether it might be facing

16  financial distress, had no projections for what being in the

17  tort system might subject the company to in say, the

18  immediately following year, right?

19  A    Correct.

20  Q    Or for the next three years?

21  A    Correct.

22  Q    Or for the next five?  You didn't have any projections at

23  all?

24  A    No.

25  Q    Okay.  The board didn't even ask any of its professionals

Wuesthoff - Cross/Jonas                               77

1  to provide any detailed analysis with respect to the financial

2  impact of LTL going back into the tort system after its first

3  bankruptcy case was dismissed, correct?

4  A    Correct.

5  Q    In fact, with respect to the potential costs of talc

6  litigation, the board didn't have any new or additional

7  information and simply relied on the same information it had

8  when it filed LTL for bankruptcy the first time, correct?

9  A    Generally, true.

10 Q    Now, LTL's historical cost to try a talc case, I think you

11 told me it was between two and $5 million.  I believe so.  And

12 10 to 20 million a year.

13 A    Okay.  So the 10 to 20 million --

14 Q    I mean a month.

15 A    A month.  I would have corrected you, so thank you.

16      So let me just make sure I understand your testimony.

17 LTL, or it's predecessor, historically, but LTL believes that

18 to defend itself against talc litigation, its total spend is 10

19 to $20 million, a lot of money, 10 to $20 million every month,

20 right?

21 A    Yes.

22 Q    So on an annual basis, that's, let's see --

23 A    120 to 240.

24 Q    Okay.  120 to $240 million to defend talc litigation.

25 Okay.

Wuesthoff - Cross/Jonas                                78

1  A     That, of course, excludes any judgments.

2  Q     Yeah.  I'm just talking about if LCL just said we're going

3  to defend our talc litigation, it would have to spend no more

4  than $240 million a month, right?

5  A     That's an assumption.

6  Q     Okay.  But that's what the board understood and that's

7  what your understanding is, right?

8  A     Yes.  Yes.

9  Q     Okay.  Now, I think in your declaration, you made a

10  statement that "LTL's and HoldCo's combined cash position could

11  support defense costs upon a return to the tort system for only

12  a limited period of time."  That was a statement in your latest

13  declaration that was filed Friday, correct?

14  A     Correct.

15  Q     And tell me if I'm wrong, when you said support defense

16  costs, defense costs are no more than $240 million a year,

17  right?

18  A     Yes.

19  Q     Okay.  So now I want to understand the cash position so we

20  can understand where you were coming out on this.  When you

21  made this statement, what did you understand the cash position

22  to be that could support the payment of defense costs?

23  A     We had 430 million, approximately.

24  Q     Okay.  So you, just so I understand your statement.  I

25  can't do the math that quickly, but it's something like a year

1  and a half or something like that, right?

2  A    A year to two years.

3  Q    Year to two years, okay.  So the basis of your testimony

4  as president of LTL as to why LTL was in financial distress if

5  it went back into the tort system is because it was concerned

6  that it could only support defense costs in the tort system for

7  between one and two years, right?

8  A    That was only one reason.

9  Q    Okay.  All right.  Let me finish the line.  We'll come

10 back.

11      Sir, if I were to tell you, I'm making reference back to

12 the dividend that we talked about.  I understand you can't say

13 much about it because you don't know about it.  But if in fact,

14 HoldCo had cash or like cash of 1.4 billion, that would support

15 LTL being able to defend itself in the tort system for

16 something like five years, correct?

17 A    Excludes any judgments?

18 Q    Sir, I'm not talking about judgments.

19 A    But the --

20 Q    We'll have a chance to talk about judgments.

21 A    Okay.

22 Q    I'm asking you a question.  You say here, you don't talk

23 about judgments.  You say "LTL and HoldCo's combined cash

24 position could support defense costs upon a return to the tort

25 system for only a limited period of time."

1  A    True.  True as stated.

2  Q    Okay.  But if I told you that in fact today, let's assume

3  you were mistaken when you filed your declaration, and in fact

4  HoldCo didn't have $400 million.  It had almost 1.3 or $1.4

5  billion because it had received a dividend of $912 million.

6  A    Uh-huh.

7  Q    Do you agree with me that under those facts, LTL could

8  support defense costs upon a return to the tort system for

9  something like five years?

10  A    Literally, unless we had a big judgment come in that ate

11  that cash up and then we wouldn't have enough for defense

12  costs.

13  Q    Sir, I'm just asking you about defense costs, right?

14  A    Yes.  Literally, yes.

15  Q    Okay.

16      Let me ask you, sir, if you find out, because I assume

17  you're going to ask after this because it's important to LTL,

18  the debtor, how much the co-obligor has.  If you find out that

19  HoldCo has 1.3, $1.4 billion, I assume you would want to

20  correct your declaration, correct?

21  A    I would consider that, yes.

22  Q    Okay.

23      Now, you signed the first funding agreement and the second

24  funding agreement, correct?

25  A    Yes.

Wuesthoff - Cross/Jonas                    81

1  Q    Now, you are aware that the Third Circuit appeals decision

2  dismissing LTL's first bankruptcy case was issued on or about

3  January 30, 2023, correct?

4  A    Correct.

5  Q    Now, based on the Third Circuit's decision, you were told

6  that there was a material risk that the first funding agreement

7  was void or voidable, correct?

8  A    Correct.

9  Q    Now, you weren't concerned at all about the funding

10 agreement being void or voidable, correct?

11 A    I wouldn't say at all.

12 Q    Okay.  But you weren't concerned.

13 A    Because -- but, yes.

14 Q    Well, we'll get to that.

15 A    Okay.

16 Q    You were not concerned when you found out that the first

17 funding agreement under which LTL could access up to $61-plus

18 billion.  When you heard about this issue about void or

19 voidability, you were not concerned, right?

20 A    That's what I testified, yes.

21 Q    You took it as just a matter of fact, correct.

22 A    I wouldn't express it that way, but yes, that's what I

23 said.

24 Q    That's what you said.  That's how you expressed it to me.

25 When I asked you why, you said, oh, it was just a matter of

1  fact.

2  A    Yes.

3  Q    Okay.  The funding agreement was the debtor's most

4  important asset, correct?

5  A    Correct.

6  Q    Under the funding agreement, the debtor could have

7  compelled J&J to pay at least $61 billion in or outside of

8  bankruptcy, correct?

9  A    Correct.

10 Q    Now, that clause, the ability to pursue J&J and make them

11 pay under the first funding agreement, in or outside of

12 bankruptcy, LTL made sure that the first funding agreement was

13 enforceable outside of bankruptcy in case the bankruptcy case

14 was dismissed, right?

15 A    It was worded that way, yes, because --

16 Q    Yeah.  I mean, that's something you thought about.  It's

17 something that you wanted to protect creditors, right?  That

18 was the whole point of the funding agreement, to protect

19 creditors, right?

20 A    To protect stakeholders, yes.

21 Q    Stakeholders.

22 A    Fiduciary for LTL, yes, that was important.

23 Q    So before you signed the funding agreement, you read it,

24 you understood it, right?

25 A    Yes.

Wuesthoff – Cross/Jonas                                    83

1  Q    And, again, you thought it was important that the

2  protections in there, that the ability to collect from J&J, you

3  could do that in bankruptcy or out of bankruptcy, right?

4  A    Yes.

5  Q    Whether the case was dismissed or not, correct?

6  A    Yes.

7  Q    Okay.

8      Neither you nor the board considered seeking to enforce

9  the first funding agreement against J&J outside of bankruptcy

10 after LTL's first bankruptcy case was dismissed, correct?

11 A    Correct.

12 Q    Neither you nor the board discussed negotiating with J&J

13 in terms of the possibility that the funding agreement wasn't

14 void or voidable, correct?

15 A    Not that I'm aware of.

16 Q    Neither you nor the board discussed negotiating with J&J

17 about how we can resolve the void or voidability issue, right?

18 A    Correct.

19 Q    You don't know if any negotiations took place between J&J

20 and LTL, correct?

21 A    Correct.

22 Q    You never even asked about that, did you?

23 A    Correct.

24 Q    You don't know if Johnson and Johnson or LTL first raised

25 the void or voidability issue, do you?

Wuesthoff - Cross/Jonas                              84

1  A    No, I do not.

2  Q    You didn't ask anyone about that?

3  A    No.

4  Q    In fact, you have no knowledge whatsoever about any

5  discussions between LTL and J&J relating to termination of the

6  first funding agreement, correct?

7  A    I'm not close to this, so I don't know what those

8  conversations were directly, no.

9  Q    You don't know if LTL pushed back against J&J at all

10 regarding the void or voidability issue, correct?

11 A    Correct.

12 Q    You don't know whether anyone at LTL reached out to any of

13 its creditors to discuss the situation with them, correct?

14 A    Correct.

15 Q    You never asked about that?

16 A    No.

17 Q    The board never evaluated other options to terminating the

18 first funding agreement, correct?

19 A    Correct.

20 Q    Never evaluated any other options, right?

21 A    Correct.

22 Q    Because it was a matter of fact, right?

23 A    No.

24 Q    Okay.  You don't know which lawyers dealt with termination

25 of the funding agreement, correct?

Wuesthoff - Cross/Jonas                          85

1  A    I think I do.

2  Q    You do now, I take it, because when I asked you at the

3  deposition, you said, actually, I'm not certain.

4  A    I wasn't certain.  I know now.

5  Q    Okay.  You never received any analysis about the strength

6  of the void or voidability argument relating to the first

7  funding agreement, correct?

8  A    Correct.

9  Q    You never saw any sort of risk adjusted analysis that

10  supported termination of the first funding agreement and

11  entering into the second funding agreement, correct?

12  A    Correct.

13  Q    The board never discussed the chances of success of the

14  void or voidability issue or argument, correct?

15  A    Correct.

16  Q    The board never requested that type of analysis, correct?

17  A    Correct.

18  Q    So you don't know, and I take it the board didn't know,

19  whether the chance of successfully enforcing the first funding

20  agreement against J&J according to its terms was 50 percent?

21  You don't know that, right?

22  A    (No audible response)

23  Q    You don't know whether maybe it was 75 percent chance of

24  success of enforcing the full funding agreement, right?

25  A    No.

Wuesthoff - Cross/Jonas                              86

1  Q    You don't know if it was 100 percent chance of success?

2  A    No.

3  Q    You understand that if LTL was able to enforce the first

4  funding agreement against J&J, LTL's creditors, talc claimants,

5  would be able to recover $61 billion.  You understand that,

6  right?

7  A    That would be the cap, yes.

8  Q    Sir, you wanted LTL to be in financial distress on

9  April 4, 2023, when it filed bankruptcy for the second time,

10 correct?

11 A    No.

12 Q    Terminating the first funding agreement and entering into

13 the second funding agreement, with HoldCo having only 50

14 percent of the value it had before transferring the consumer

15 products business and no J&J guaranty, that was designed, that

16 structure was designed so that LTL would be in financial

17 distress, correct?

18 A    I don't -- I can't say yes to that.

19 Q    You don't know?

20 A    No.

21 Q    Okay.  The first board meeting at which modifications to

22 the first funding agreement was discussed was March 28, 2023,

23 correct?

24 A    It might have been discussed earlier, but, yes, then for

25 sure.

1  Q    Well, when I asked you at your deposition, you told me

2  that the first time at the board meeting that modifications to

3  the funding agreement were discussed was March 28, 2023, right?

4  A    It could have also been March 16th, also.

5  Q    Okay.

6       In any regard, you understand, do you know now that

7  Mr. Kim and Mr. Haas, sitting right over here, were having

8  discussions about the void or voidability of the first funding

9  agreement on January 30th when the decision came down from the

10 Third Circuit?  Are you aware of that?

11 A    I don't know when those discussions started.

12 Q    Okay.  Well, would you be surprised that they started

13 having those discussions on January 30th, and you and the board

14 didn't know about it for six or eight weeks later?

15 A    I can't comment on the appropriateness of knowing that or

16 not knowing it --

17 Q    Well, do you think --

18 A    -- or that it occurred.

19 Q    I'm sorry.  I apologize.

20 A    I don't know what occurred.

21 Q    Well, if that's the case, do you think that's appropriate

22 that the board of the debtor in dealing with a $61 billion

23 asset didn't know anything about this issue for six or eight

24 weeks?

25 A    I'd be speculating.  Did it happen?  Did it not happen?

Wuesthoff - Cross/Jonas                                    88

1  The discussion?  And I'm sure we would be told when it's

2  appropriate, but I --

3  Q    Who gets to decide when it was appropriate to tell the

4  board that maybe J&J has said, hey, that's not enforceable.

5  A    I don't know that answer.

6  Q    I'm asking you, when, as a president of a debtor, and you

7  were in Chapter 11, at this period of time, you were operating

8  under Chapter 11, the auspices of this bankruptcy Court.  Do

9  you understand that?

10 A    Yes.

11 Q    And so when do you think, if in fact there were

12 discussions going on about the void or voidability of the

13 debtor's largest, most important, $61 billion asset, when do

14 you think it would be appropriate for you as president of the

15 debtor to find out about that?

16 A    I would expect -- I would say when it was, when there was

17 a higher probability that that was the case versus just a

18 speculation that that might be the case.

19 Q    Well, so what you're saying, what that there -- are you

20 saying a higher probability that it was void or voidable?

21 A    If there was some specificity around it being void or

22 voidable, then yes.  But if it's just, if it just comes up as a

23 thought, then maybe not appropriate.  I'm not --

24 Q    Well, do you think there would be a high level of

25 specificity if Mr. Haas on January 30th called Mr. Kim and

Wuesthoff - Cross/Jonas                                    89

1  said, hey, your $61 billion asset, don't come to us because

2  that's unenforceable now?  If that happened, and I think we're

3  going to be able to prove that happened, when would you have

4  liked to have known, as the president of the debtor, when would

5  you have liked to have known about that?

6  A    I honestly wouldn't need to know until I needed to make a

7  decision on something.

8  Q    Okay.  And when you had to make a decision at a board

9  meeting, you didn't ask for any analysis about it, did you?

10 A    No.

11 Q    No.  Okay.

12      No member of the board suggested that LTL should seek to

13 obtain better terms than what ended up being the second funding

14 agreement, right?

15 A    Correct.

16 Q    After March 28th, the next board meeting was April 2,

17 2023, correct?

18 A    Correct.

19 Q    That's the meeting, while still in the first bankruptcy,

20 that the board voted to file the second bankruptcy, right?

21 A    Yes.  You haven't even read the proposed plan of

22 reorganization which the debtor, the company of which you are

23 president, has filed in this bankruptcy case, have you?

24 A    I have read it.

25 Q    When did you do that?

Wuesthoff - Cross/Jonas                    90

1  A    Last couple weeks.

2  Q    Okay.  When I asked you on May 30th, you had not read it,

3  correct?

4  A    Correct.

5  Q    Okay.  And at least when I asked you at your deposition on

6  May 30th, you weren't aware that the debtor's proposed plan

7  includes a resolution of talc claims in the <u>Imerys</u> and the

8  <u>Cyprus</u> bankruptcy cases, right?

9  A    Correct.

10 Q    And you're not familiar with the talc claims in either of

11 those bankruptcy cases, right?

12 A    Not in any detail.

13 Q    You don't have any idea how much any particular talc claim

14 will receive under the debtor's proposed plan, right?

15 A    Correct.

16 Q    And in connection with the debtor's proposed plan, you

17 understand that under the plan support agreements, which the

18 debtor has signed with certain plaintiff's lawyers, the debtors

19 agreed to pay $8.9 billion, right?

20 A    Yes.

21 Q    You don't know how that $8.9 billion number was arrived

22 at, do you?

23 A    It was negotiated.

24 Q    Well, when I asked you at your deposition, you didn't know

25 how that $8.9 billion was arrived at, correct?

1  A    Yes.

2  Q    And you don't, at least at your deposition, May 30th, you

3  didn't know who came up with the $8.9 billion, did you?

4  A    I just know that was the end result --

5  Q    Okay.

6  A    -- of the negotiation.

7  Q    Now, a higher number, that would be better for LTL's

8  creditors, wouldn't it?

9  A    Yeah, higher is always better on that side of the

10 equation, yes.

11 Q    Well, nobody at LTL asked the J&J entities on the other

12 side of the second funding agreement if they would commit to a

13 higher amount, did you?  Did anybody do that?

14 A    Not that I'm aware of.

15 Q    Okay.  You weren't involved in any of the negotiations of

16 any plan support agreements, correct?

17 A    Correct.

18 Q    And, at least when I asked you before you, no officer or

19 director of the debtor was involved in negotiation of the plan

20 support agreements, correct?

21 A    Correct.

22 Q    You don't know how many plan support agreements the debtor

23 has entered into, do you?

24 A    I do not.

25 Q    You've never read the term sheet, which is attached to the

Wuesthoff - Cross/Jonas                                    92

1  plan support agreements which the debtor has entered into,

2  correct?

3  A    I've read the plan support agreements and something called

4  the term sheet.  I don't know if it's one in the same with

5  whatever term sheet you're referring to.

6  Q    You don't know the basis of the debtor's belief that the

7  terms contemplated by the plan support agreements are in the

8  best interest of all parties, correct?

9  A    I'm sorry, could you say that again?

10 Q    You don't know the basis of the debtor's belief that the

11 terms contemplated by the plan support agreement are in the

12 best interest of all parties, correct?

13 A    I think I might.  Well, it would be an assumption.

14 Q    I don't want assumptions.  You don't know the basis for

15 the debtor's belief that the terms contemplated by the plan

16 support agreements are in the best interest of all parties,

17 correct?

18 A    My belief is that, yes, it is in the best interest because

19 the lawyers representing the majority of the claimants say it's

20 in their best interest.

21 Q    Sir, let's take a look, Tab 5.  It's Exhibit 863.  We're

22 going to look at Page 87, Line 5.

23 A    I'm sorry, Page Number 87?

24 Q    Yeah, hold on one second.  Page 87, I'll read the

25 question, Line 5.

1    Okay.  So other than without speculating, you don't know

2 what the basis of the company's belief is that the terms

3 contemplated by the PSAs are equitable "in the best interest of

4 all parties, correct?"

5    And you said, "Yeah, okay."  Right?

6 A    Uh-huh.

7 Q    So when I asked you at your deposition, you didn't know

8 the basis as I've asked you, correct?

9 A    Maybe I didn't understand the question well enough.

10 Q    Okay.

11        MR. JONAS:  Your Honor, could I just have one minute?

12        THE COURT:  Sure.

13 BY MR. JONAS:

14 Q    Mr. Wuesthoff, I just want to come back to something you

15 said earlier to make sure I have it.  You don't have any reason

16 to believe that HoldCo can't fund $8.9 billion, correct?

17 A    In bankruptcy, I have no reason to believe they can't.  Or

18 if they can't, J&J will.

19 Q    Okay.  Why do you say in bankruptcy?  I'm confused.

20 A    Because that's what the agreement says.

21 Q    Okay.  But is it your testimony that HoldCo is only

22 responsible for funding the $8.9 billion in bankruptcy?

23 A    That's my understanding.

24 Q    And as to J&J, it's only responsibility is to fund

25 payments in bankruptcy?

Wuesthoff - Cross/Thompson                           94

1  A    That's my understanding.

2  Q    Okay.

3           MR. JONAS:  Your Honor, I'll pass the witness.

4           THE COURT:  All right.  Thank you, Mr. Jonas.

5           Before we turn to the debtor, can I assume there are

6  no other movants who are going to in effect cross?

7           MR. THOMPSON:  Briefly.

8                        CROSS-EXAMINATION

9  BY MR. THOMPSON:

10 Q    Good morning, Mr. Wuesthoff.  I'll be very brief.  Neither

11 you nor any of the LTL board ever undertook research into

12 whether LTL's promise to indemnify J&J is valid under New

13 Jersey law, correct?

14 A    Correct.

15 Q    And the board never discussed whether it would indemnify

16 J&J if the 1979 agreement were found to be unenforceable,

17 correct?

18 A    Correct.

19           MR. THOMPSON:  Okay.  Thank you.

20           THE COURT:  Thank you, Mr. Thompson.

21           Ms. Baker?

22           MS. BAKER:  Yes.  Thank you, Your Honor.

23           THE COURT:  I anticipate going until 12:30 for lunch.

24 Does that work with your redirect, or --

25           MS. BAKER:  It does, Your Honor.  I don't think we'll

Wuesthoff - Redirect/Baker                          95

1  get anywhere near that.

2            THE COURT:  Okay.  I've heard that before.

3            MS. BAKER:  Okay.  I know.  Famous last words from a

4  lawyer.

5            THE COURT:  Yes.

6            MS. BAKER:  I understand, Your Honor.  Thank you.

7  And may I proceed?

8            THE COURT:  Yes.  Absolutely.

9            MS. BAKER:  Thank you.

10                      REDIRECT EXAMINATION

11 BY MS. BAKER:

12 Q    So I want to talk a little bit, Mr. -- well, first of all,

13 good morning --

14 A    Good morning.

15 Q    -- Mr. Wuesthoff.

16 A    Good morning.

17 Q    And thank you for -- again, thank you for appearing today.

18 I want to ask you some questions.  You had a lot of questions

19 for Mr. Jonas about talc liabilities.

20 A    Yes.

21 Q    Okay?  You recall that series of questions, right?

22 A    Yes.

23 Q    All right.  And would you agree when talking about talc

24 liabilities, it's important to know whether we're talking about

25 talc liabilities inside bankruptcy or outside of bankruptcy?

Wuesthoff - Redirect/Baker                          96

1  A    Yes.

2           MR. MAIMON:  Objection.  Leading.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes.

5  BY MS. BAKER:

6  Q    All right.  And so I believe you were asked a question --

7  or you provided a response that LTL had talc liabilities of 8.9

8  billion.  Do you recall that at least in -- generally speaking?

9  A    I recall that discussion.  Yes.

10 Q    All right.

11 A    Yes.

12 Q    And so what was your basis for saying talc liabilities

13 were 8.9 billion?  What were you referring to?

14 A    First off, we have no indication that it's any different

15 than that, certainly not higher.  We believe that's a really

16 strong data point as to what the talc liabilities are, because

17 the attorneys representing the majority of the claimants agree

18 that that is the appropriate amount to settle all and resolve

19 all current and future claims.

20 Q    Okay.  And so saying that, when you refer to 8.9 billion,

21 are you referring to in bankruptcy or in the tort system?

22 A    In bankruptcy.

23 Q    And this $8.9 billion -- you and Mr. Jonas talked a little

24 bit about this at the end -- is that a number that is reflected

25 as -- in the plan support agreements?

1  A    Yes.

2           MR. MAIMON:  Objection.  Leading.

3           THE COURT:  Overruled.

4           THE WITNESS:  It is.

5           MR. MAIMON:  Mr. Satterley told me to.

6           THE COURT:  I don't take offense.  We're just going

7  to get it out.

8  BY MS. BAKER:

9  Q    All right.  I think at one point you, in response to a

10 question from Mr. Jonas, said that you didn't believe the talc

11 liabilities were any more than $10 billion.  And I think you

12 guys were using an estimate there.  Do you recall that?

13 A    Yes.

14 Q    All right.  And so, again, what were you referring to

15 there when -- talking about that number, what were you

16 referring to there?

17 A    That was the number to -- of the -- the PSA 8.9 plus any

18 other monies for attorney fees and such that would be required.

19 Q    Right.  And just to put a finer --

20 A    And we rounded up to 10-.

21 Q    Understood.  To put a finer point on it, though, were you

22 referring to inside bankruptcy or outside of -- in the --

23 A    Inside.

24 Q    -- inside bankruptcy or in the tort system?

25 A    Inside bankruptcy.

1  Q    All right.  You were asked some questions about defense

2  costs.  Do you recall that?

3  A    Yes.

4  Q    And I think that Mr. Jonas was actually -- he was

5  referring to some testimony in your deposition when he was

6  actually reading -- the testimony from the deposition referred

7  to something that came out of a board meeting, an LTL board

8  meeting.

9  A    Yes.

10 Q    Do you recall the discussion about defense costs at an LTL

11 board meeting this past spring?

12 A    Yes.

13 Q    All right.  And so let me ask you, when we're talking

14 about -- well, let me ask you first.  Outside of bankruptcy --

15 A    Uh-huh.

16 Q    -- in the tort system --

17 A    Uh-huh.

18 Q    -- talc liabilities would be based on not just defense

19 costs --

20 A    No.  Defense costs --

21          MR. MAIMON:  Objection.  Leading.

22          THE COURT:  Ms. --

23          THE WITNESS:  Defense costs --

24          THE COURT:  Oh, wait.

25          THE WITNESS:  Sorry.

1          THE COURT:  Ms. Baker, I'm very lax but not so lax.

2          MS. BAKER:  I appreciate it, Your Honor.  I'll --

3          THE COURT:  Sustained.

4          MS. BAKER:  I will rephrase the question.

5          THE COURT:  Okay.  Thank you.

6    BY MS. BAKER:

7    Q    In the tort system, talc -- what are talc liabilities

8    based on?

9    A    Talc liabilities are based on the cost to defend -- our

10   defense costs, the costs to pay for judgments, the cost to pay

11   for any settlements that might come about.  All those costs.

12   Q    And so when just talking about one of those pieces, right,

13   would you be considering all the possible talc liabilities in

14   the tort system?

15   A    Yeah.  All.  Yes.

16   Q    Let me ask the question again.  If you're just talking

17   about defense costs --

18   A    Yeah.

19   Q    -- are you considering -- to the exclusion of verdicts and

20   settlements, are you talking about all the potential talc

21   liabilities in the tort system?

22   A    I would refer to it as all costs.  It's not just --

23   it's -- I may have said defense costs, but it's really you

24   defend, you pay judgments.  It's all those costs.

25   Q    Okay.

1  A    Yes.

2  Q    Let me ask you, Mr. Wuesthoff, could the talc liabilities

3  outside of bankruptcy -- and, again, I think there might have

4  been some confusion when you were getting some questions from

5  Mr. Jonas about whether there -- the question referred to in

6  the tort system or in bankruptcy.  But outside of --

7           MR. MAIMON:  Your Honor, I object to the comment

8  about whether she thinks he was confused or not.  It's

9  irrelevant.

10          THE COURT:  Sustained.

11          MS. BAKER:  Okay.  Understood, Your Honor.

12 BY MS. BAKER:

13 Q    Let me ask you -- let me ask the question just very, very

14 simply then.  Outside of bankruptcy, could the talc liabilities

15 be different?

16 A    Yes.

17 Q    Could they be larger?

18 A    Yes.

19 Q    Do you know --

20 A    But we still don't believe more than $30 billion.  We --

21 Q    Do you -- yes.  And I didn't mean to interrupt you.  Do

22 you know exactly what the amount of liabilities are outside of

23 bankruptcy?

24 A    I do not.

25 Q    You were asked some questions about -- a series of

Wuesthoff - Redirect/Baker                    101

1  questions about enforcing the 2021 funding agreement against

2  Johnson & Johnson.  Do you recall that line of questions?

3  A    Yes.  Yes.

4  Q    All right.  And what was your understanding -- as the

5  president of LTL, as a board member of LTL, what was your

6  understanding of Johnson & Johnson's position on the

7  enforceability of the 2021 funding agreement after the Third

8  Circuit decision?

9        MR. MAIMON:  Your Honor, I object to this.  This has

10 been shielded from us with regard to attorney/client privilege

11 and what the Jones Day lawyers were telling all these officers

12 in the board meetings, and we weren't allowed to ask these

13 questions at his deposition.  So to ask him what his

14 understanding was, which was based on what the lawyers told

15 him, and then to shield him from cross-examination about what

16 the lawyers told him is an improper use of the privilege.  So

17 it's either waived, or I object to the question.

18       MS. BAKER:  It's not waived, Your Honor.  Of course

19 this witness had an understanding.  There was extensive

20 discussion at board meetings which are reflected in the board

21 meeting minutes which have been produced to the other side that

22 address the enforceability of the 2021 funding agreement.  So

23 it was neither waived nor is the question improper.

24       MR. MAIMON:  And the board meetings are redacted, so

25 they have shielded those parts which form part of his

Wuesthoff - Redirect/Baker                     102

1   understanding, which he said that --

2           THE COURT:  Objection overruled.  He can testify as

3   to his understanding.

4   BY MS. BAKER:

5   Q    Would you like for me to repeat the question?

6   A    Yeah.

7           THE COURT:  Repeat the question asked, please.

8           THE WITNESS:  Please.  Please.

9   BY MS. BAKER:

10  Q    What was your understanding, Mr. Wuesthoff, of J&J's

11  position on the enforceability of the 2021 funding agreement

12  after the Third Circuit decision?

13  A    My understanding is J&J's position was that the funding

14  agreement was not enforceable.

15  Q    And you were asked some questions about conversations with

16  J&J and when and where and who was having them.  Who, for LTL,

17  was having conversations with J&J regarding the enforceability

18  of the 2021 funding agreement?

19  A    John Kim was.  Our outside counsel, Jones Day, was along

20  with J&J.

21  Q    And so as to the particulars of those conversations and

22  when they happened, you -- that's something you would defer to

23  Mr. Kim --

24  A    Correct.

25  Q    -- in that situation?

Wuesthoff - Redirect/Baker                    103

1  A    Correct.

2  Q    All right.  You were asked some questions about whether

3  the board had before it an -- I think the word used was

4  "analysis" of the void and voidability issues.  Do you recall

5  those questions?

6  A    I do.

7  Q    Okay.  Now, to be clear, was there extensive discussion at

8  the board level about the enforceability of the 2021 funding

9  agreement?

10 A    We discussed it.  We believed based on -- and our

11 understanding based on what was shared is that it was deemed to

12 not be enforceable.  It's void or voidable, a material risk.

13 And that was an analysis that the -- and a conclusion the

14 attorneys had come to.

15 Q    And was this discussion -- the discussion had about the

16 enforceability of the 2021 funding agreement, was that had over

17 a series of board meetings this past spring?

18 A    It was discussed several times, yes.

19 Q    Okay.  And I know there was -- you may recall -- or let me

20 ask you.  Do you recall there were some questions about when

21 Mr. Kim may have known about J&J's position concerning the

22 enforceability of the 2021 funding agreement?

23 A    I recall the question.

24 Q    And when the board was informed?

25 A    Yes.

Wuesthoff - Redirect/Baker                104

1  Q    Do you recall that?

2  A    I recall that.  And I -- I don't specifically recall

3  exactly when the board was -- first shared that information,

4  but it was shared.

5  Q    And I was going to ask you, do you know or can you recall

6  when precisely you as a member of the board were informed that

7  that was J&J's position that the 2021 funding agreement was not

8  enforceable?

9          MR. MAIMON:  Same objection as before, Your Honor.

10 They claimed privilege and --

11         THE COURT:  Overruled.

12         MS. BAKER:  I'm asking --

13         THE WITNESS:  Yeah.

14         MS. BAKER:  Thank you, Your Honor.

15         THE WITNESS:  I don't recall specifically when.

16 BY MS. BAKER:

17 Q    Okay.  You do recall that the board met -- well, let me

18 ask you, do you know when the date of the Third Circuit

19 decision was?

20 A    Well, they made the ruling on January 30th.

21 Q    Okay.  And the board -- there was a board meeting on

22 February 23rd?

23 A    Correct.

24 Q    Okay.  And at that board meeting, among other things, the

25 board discussed -- or let me ask you, do you recall what the

Wuesthoff - Redirect/Baker                    105

1  board discussed at that meeting?  Just at a general level, do

2  you recall what was discussed at that meeting?

3  A    Yeah.  We did contingent -- there was contingency

4  discussions.

5  Q    In light of the Third Circuit's decision?

6  A    In light of the Third Circuit decision.

7  Q    Mr. Wuesthoff, let me ask you just in a very

8  straightforward fashion, why did the board look to secure new

9  funding as a result of the discussions that it had regarding

10  the enforceability of the 2021 funding agreement?

11  A    Because we knew without the original funding agreement we

12  did need funding support.  We needed at least $8.9 billion to

13  fund the PSA.  We needed funding for our attorneys -- you know,

14  attorney fees in bankruptcy.  But certainly out of bankruptcy

15  we needed funding.

16  Q    And what -- you mentioned the PSAs.  And let me ask you

17  this.  Because you were asked some questions about the PSAs.

18  The board was given information.  We're referring them to as

19  PSAs.

20  A    Yes.

21  Q    What are those?

22  A    Plan support agreements.

23  Q    Okay.  And what was your understanding?  What information

24  was provided to the board about these plan support agreements?

25  A    We were told on numerous occasions that the lawyers

Wuesthoff - Redirect/Baker                    106

1  representing the majority of the claimants supported the plan

2  support agreement terms and the figure of $8.9 billion that

3  went with that.

4  Q    Ultimately, after a series of board meetings, information

5  presented at these board meetings, including board

6  presentations, the board decided to authorize the filing of

7  this Chapter 11 case?

8  A    Yes.

9  Q    Why did the board authorize the filing of this case?

10 A    One, we were in financial distress.  Two, we believed that

11 that -- the agreements that we -- the previous agreements that

12 would be in support of filing for the bankruptcy met our

13 objectives of, one, eliminating the risk of the

14 nonenforceability of the first funding agreement and agreeing

15 to the terms of the PSA to settle all these claims, current and

16 future.

17 Q    How did -- again, you mentioned the plan support

18 agreements.  How did the fact that the -- this case, the 2023

19 filing, had support of counsel for the majority of claimants,

20 how did that reenforce the board's decision to authorize this

21 filing?

22         MR. MAIMON:  Objection.  Assumes facts not in

23 evidence.

24         THE COURT:  Sustained.  Rephrase it.

25 BY MS. BAKER:

1  Q    Let me -- then I'll ask it this way, Mr. Wuesthoff.  How

2  did the plan support agreements, the information the board was

3  provided about the plan support agreements, how did that

4  reenforce the board's decision to authorize the filing of this

5  case?

6  A    It was a very strong data point.  I mean, we had a good

7  funding agreement.  We had started the support agreements and

8  such.  But that was a really strong factor that -- the fact

9  that the majority of the claimants out there felt that $8.9

10 billion was a fair resolution to all current and future claims,

11 that was very big for us.

12        MS. BAKER:  All right.  Thank you, Mr. Wuesthoff.  I

13 have no further questions at this time.

14        THE COURT:  Thank you, counsel.

15        Mr. Jonas?

16        MR. JONAS:  Recross, Your Honor?

17        THE COURT:  Yes.

18                        RECROSS-EXAMINATION

19 BY MR. JONAS:

20 Q   Mr. Wuesthoff, I -- very important question.  And I want

21 to make sure I understand.  Do you recall when I deposed you on

22 May 30th, I asked you multiple questions about LTL's total talc

23 liability, and you told me that it was between zero and $8.9

24 billion, right?

25 A    Yes.

Wuesthoff - Recross/Jonas                          108

1  Q    You never said once there was any distinction at all

2  between in bankruptcy or out of bankruptcy, correct?

3  A    Yeah.  I don't think it was asked.  I didn't -- yes.

4  Q    Well, I asked you what is LTL's --

5  A    Yeah.

6  Q    -- total talc liability.

7  A    Yeah.  8.9 --

8  Q    And you told me --

9  A    It's 8.9 --

10 Q    Let me finish, sir.  And you told me it was between zero

11 and $8.9 billion.  That's what you told me, right?

12 A    I think I said 8.9.  And then we evolved into, yes, zero

13 to 8.9.

14 Q    Yeah.  And you said it's total talc liability, right?

15 A    I may have said that, yes.

16 Q    So are you saying, sir, today that what you meant was it

17 was 8.9 billion in bankruptcy, and it's some other number

18 outside of bankruptcy?  Is that what you're saying?

19 A    No.  That may be -- the value of the talc liabilities

20 is -- well, I'm not sure exactly what the value is.  I know we

21 have a PSA of 8.9 which would be a strong data point as what

22 the value of the talc liabilities are, but I don't actually

23 know what the value of the talc liabilities are.

24 Q    Well, but you do, sir.  Let's look at tab 5, Exhibit 863,

25 page 38.  Just let me know when you get there, Mr. Wuesthoff.

Wuesthoff - Recross/Jonas                        109

1  A      I'm sorry.  What page?

2  Q      Page --

3           THE COURT:  Page 38.

4  BY MR. JONAS:

5  Q      Page 38.

6  A      Thank you.

7  Q      Are you there?

8  A      Yep.

9  Q      I'm just going to -- I just want to look at line 4.  And I

10 asked you, "You would agree that LTL's talc liability could be

11 lower than $8.9 billion, correct"?  And what did you say?

12 A      "Could be.  Yes."

13 Q      And then I said, "Okay.  So do you think it's fair to say

14 that LTL believes -- you are the president of LTL, so I want to

15 talk about LTL, that LTL believes its total talc liabilities is

16 somewhere between zero and $8.9 billion.  Is that correct?"

17 There was an objection.

18 A      Uh-huh.

19 Q      And if you drop down to line 23, you said, "No, I don't

20 have a different answer."  But just to be sure --

21 A      Yeah.

22 Q      -- the top of the next page I asked, "I think it's, you

23 know" -- I'm sorry.  You continued to be -- you wanted to be

24 clear.  You said, "I think it's, you know, somewhere -- yeah,

25 somewhere between zero and 8.9.  I don't think it's higher than

Wuesthoff - Recross/Jonas                    110

1  8.9"  Correct?

2  A    Correct.

3  Q    And you didn't mention anything about a different number

4  in bankruptcy or out of bankruptcy.  You told me as the

5  president of LTL whose charge you told me -- I think your

6  primary responsibility is seeking a fair and equitable

7  resolution of talc liabilities.

8  A    Yep.

9  Q    You told me that LTL's total talc liability does not

10 exceed $8.9 billion, correct?

11 A    I said that was my belief.  Yes.

12 Q    Okay.  Defense costs.  I was a little -- I have just three

13 topics.  We finished one already, so.  Number two, defense

14 costs.  I was a little confused, so I just want to be sure.

15 LTL's total monthly defense costs, if it defends itself in the

16 tort system, that's all I want to focus on.  Litigation.  It's

17 got to pay a lot of lawyers.

18 A    Yep.

19 Q    It's between 10- and $20 a month, right?  I'm sorry.  10-

20 and 20 million --

21 A    You guys are expensive.

22 Q    What's that?

23 A    Our lawyers are expensive.

24 Q    Lawyers are expensive.  I agree.  So it's between 10- and

25 $20 million a month in defense costs if LTL goes back into the

Wuesthoff - Recross/Jonas                    111

1  tort system, right?

2  A    Based on the information we had and what we were paying

3  prior to the first bankruptcy.

4  Q    Yeah.  Okay.  And that's all the information you had when

5  you -- on April 4th, you were trying to figure out --

6  A    Yeah.

7  Q    -- are we in financial distress, are we going to file

8  bankruptcy.

9  A    Yeah.

10 Q    And the information you had was that --

11 A    Yes.

12 Q    -- the estimate or whatever you want to call it for --

13 A    Yes.

14 Q    -- defending is 10- to $20 million per month, right?

15 A    Yes.

16 Q    Okay.  Last topic.  What were you told -- well, strike

17 that.  Just to confirm, the first board meeting at which

18 modifications to the funding agreement was discussed was

19 March 28, 2023, about one week before LTL filed bankruptcy,

20 correct?

21 A    I think they might have been discussed on the 16th as

22 well.

23 Q    Okay.

24 A    Maybe not specifically, but discussed.

25 Q    Let's take a look at tab 5 again, Exhibit 863, page 130.

Wuesthoff - Recross/Jonas                          112

1    I'm going to read at line 13.  Just let me know when you get to

2    page 130.

3    A    Got it.

4    Q    And I asked you, "Okay.  And then the next topic,

5    'potential modifications to existing funding arrangements,' was

6    this -- as best you can recall, was this" --

7    A    I'm sorry.  I'm sorry, Mr. Jonas.  What line?

8    Q    I'm reading at line 13.

9    A    Okay.

10   Q    You with me?

11   A    Yep.

12   Q    "Okay.  And then the next topic, 'potential modifications

13   to existing funding arrangements,' was this -- as best you can

14   recall, was this the first time at a board meeting, that is

15   March 28, 2023, that modifications to the funding agreement was

16   discussed?"

17        And what was your answer?

18   A    I said, "I believe so."

19   Q    Okay.

20   A    I wasn't certain, but I believe so.

21   Q    Okay.  Sir, last topic.  What were you told about LTL's

22   chances of being able to enforce the first funding agreement at

23   the board meetings that you mentioned or board meeting?

24   A    I was told there was a material risk that they could not

25   be enforced.

1  Q    And that's all you were told?

2  A    Yes.

3  Q    Okay.  Again, no analysis.  You didn't see any memos,

4  right?

5  A    No memos.

6  Q    Not told any chance of success?

7  A    No.

8  Q    Okay.  And you didn't ask -- you didn't pry on -- you

9  didn't press on that?  You didn't ask any questions about that?

10  A    No.

11         MR. JONAS:  Okay.  I'll pass the witness, Your Honor.

12         MR. MAIMON:  May I, Your Honor?

13         THE COURT:  Yes.

14         MR. MAIMON:  Thank you.

15                    RECROSS-EXAMINATION

16  BY MR. MAIMON:

17  Q    I'd like to start with some comments that you made about

18  your understanding of the PSAs.  Okay, sir?

19  A    Sure.

20  Q    Now, you referred to -- you know, the PSAs were signed by

21  people for J&J, correct?

22  A    Yes.

23  Q    They were signed from people for LTL, right?

24  A    Yes.

25  Q    And they were also signed by lawyers who claimed to

1  represent plaintiffs, correct?  The --

2  A    Yes.

3  Q    Okay.

4  A    The ad hoc committee.  Yes.

5  Q    Right.  Well, there was no ad hoc committee then, was

6  there?

7  A    I don't know when it was --

8  Q    Okay.

9  A    -- formed, but --

10 Q    Fine.  No problem.  You -- the entire basis for your

11 repeated statements that the lawyers who signed those PSA

12 agreements represent a majority of claimants is what you've

13 been told by other people, correct?

14 A    Correct.

15       MR. MAIMON:  Okay.  Move to strike it, Your Honor.

16 That's rank hearsay.

17                    (Counsel confer)

18       THE COURT:  Let me hear --

19       MS. BAKER:  May I just briefly respond?

20       THE COURT:  Yeah.

21       MS. BAKER:  The witness has personal knowledge that

22 he's gained from information provided to him at board meetings.

23 It's not -- I mean, what he just testified to is not hearsay.

24       MR. MAIMON:  Hearsay, by definition under the rules,

25 is an out-of-court statement offered for the truth of the

Wuesthoff - Recross/Maimon                    115

1  matter asserted.  He's offering -- he's saying that it's --

2          THE COURT:  But what truth?

3          MR. MAIMON:  That they were represented by the

4  majority of the -- that they represent the majority of the

5  claimants.  He stated it as a fact.  And it's hearsay.  It

6  doesn't matter if his understanding is based on hearsay.  It's

7  hearsay.

8          THE COURT:  It's hearsay as to whether they are the

9  majority?

10         MR. MAIMON:  Yes.

11         THE COURT:  Okay.  I'll strike that portion --

12         MR. MAIMON:  Thank you.

13         THE COURT:  -- as to his knowledge.

14         MR. MAIMON:  Thank you.

15  BY MR. MAIMON:

16  Q    Let's now go to -- you spoke with Mr. Jonas about defense

17  costs, right?

18  A    Yes.

19  Q    You were not affiliated with LTL at a time -- withdrawn.

20  LTL has never been sued in the -- withdrawn.  Prior to the

21  bankruptcy, LTL was never sued in the tort system, correct?

22  A    Which bankruptcy?

23  Q    The first bankruptcy?

24  A    No.  Because everything was stayed.

25  Q    Well, prior to the bankruptcy, nothing was stayed, was it?

Wuesthoff - Recross/Maimon                    116

1  A    No.  But LTL didn't exist.

2  Q    Okay.  You were never associated with JJCI, correct?

3  A    No.  I was.

4  Q    You were -- were you involved in overseeing the litigation

5  of talc claims in JJCI?

6  A    Nothing to do with talc, but --

7  Q    Okay.

8  A    -- at one point I worked for JJCI.

9  Q    One of the things that you do as president of the company

10 is, even though you have a CFO, part of your responsibility is

11 to make sure that the company is run in a fiscally responsible

12 way, correct?

13 A    Correct.

14 Q    Would you agree with me, sir, that in order to keep your

15 responsibilities as president, you have to differentiate

16 between what something costs on one hand and what somebody

17 spends for it on another?

18 A    Generally, yes.

19 Q    And one of the things that you do when you authorize --

20 for instance, in a RAM royalty deal where you authorize lawyers

21 to do work is you look at their bills and say is this

22 reasonable for the work I'm having them do, correct?

23 A    Correct.

24 Q    You've made no such analysis of the defense costs that

25 JJCI incurred prior to the bankruptcy to see whether or not

Wuesthoff - Recross/Maimon                    117

1  they're reasonable or not, have you?

2  A    I have not.

3  Q    Okay.  That's number two.  Number three, your

4  understanding of J&J's position regarding the enforceability of

5  the funding agreement, funding agreement number one.  You

6  recall talking about that?

7  A    Yes.

8  Q    And your -- again, your understanding about what J&J's

9  position was comes exclusively from what you were told by other

10 people, correct?

11 A    By lawyers.

12 Q    By lawyers.  Okay.

13        MR. MAIMON:  Your Honor, I again move to strike it.

14 If he's -- if the understanding is based on what lawyers told

15 him, and we can't ask what the lawyers actually told him, and

16 we can't see the minutes about what the lawyers actually said,

17 the due process rights of the movants have been obliterated in

18 this regard with regard to the denial of cross-examination.

19        THE COURT:  Overruled.

20        MR. MAIMON:  Thank you.

21 BY MR. MAIMON:

22 Q    What did the lawyers from Jones Day tell you about the

23 enforceability of the funding agreement, J&J's position on it?

24        MS. BAKER:  Objection, Your Honor.

25        THE COURT:  Sustained.

1          MS. BAKER:  Calls for privileged communication.

2          THE COURT:  Sustained.

3          MR. MAIMON:  Thank you.

4    BY MR. MAIMON:

5    Q    Mr. Kim, he also spoke about this, correct?

6    A    Yes.

7    Q    What did he tell you?

8          MS. BAKER:  Same objection, Your Honor.

9          THE COURT:  Sustained.

10         MR. MAIMON:  Thank you.

11         THE COURT:  Got it.

12   BY MR. MAIMON:

13   Q    Now, let's go to this slide.  The last slide that I had up

14   that you answered true to, you stated under oath that you

15   expected that J&J would honor its commitments under the funding

16   agreement based on the integrity of its executives.  You recall

17   that?

18   A    True.  Yes.

19   Q    Okay.  After you were informed -- withdrawn.  You said

20   that the Third Circuit decision said the -- I wrote this down

21   after you said it -- said the funding agreement was void or

22   voidable.  Do you recall giving that testimony?

23   A    Yes.  They didn't say it.

24   Q    They didn't say it all, did they?

25   A    Right.

1  Q    No.

2  A    They didn't use -- they didn't say it.

3  Q    Right.  They didn't make the agreement void or voidable,

4  did they?

5  A    Their ruling, as I understand it, made it voidable.

6  Q    How exactly?

7  A    Because it frustrated the purpose of the J&J backstop

8  which was to facilitate a successful bankruptcy resolution of

9  the claims, and that frustrated that purpose, and that's what

10 made it void or voidable, is my understanding.

11 Q    But you could have said no.  You told us you could have

12 said no to bankruptcy and you still would have had the funding

13 agreement.  True?

14 A    I believed it was not enforceable.

15 Q    No, no, no.  When you voted in October of 2021 in favor of

16 the bankruptcy, you swore under oath in front of Judge Kaplan

17 just this morning that you could have said no and you still

18 would have had the funding agreement.

19 A    In 2021.

20 Q    True?  In 2021.  True?

21 A    Yes.  Yes.

22 Q    Okay.  The ruling by the Third Circuit didn't mention the

23 words "void or voidable," did it?

24 A    Not to my knowledge.  No.

25 Q    Okay.  Again, you expected that J&J would honor its

1 commitments under the funding agreement based on the integrity

2 of its executives.  True?

3 A    Yeah.  J&J honors its commitments.

4 Q    After the first meeting that Mr. Jonas talked to you

5 about, May 28 -- March 28th where this issue was discussed, did

6 you pick up the phone to Mr. Haas, Mr. Duato, and J&J executive

7 whose integrity you trusted and say, hey, I'm the president of

8 LTL, we have this funding agreement, I expect you're going to

9 honor your commitment?  Did you do that, sir?

10 A    No.

11        MR. MAIMON:  Okay.  Thank you very much.  No further

12 questions.

13        THE COURT:  Mr. Malone?

14        MR. MALONE:  Your Honor, could I just have some time?

15 Two minutes, maybe three questions total.

16                    RECROSS-EXAMINATION

17 BY MR. MALONE:

18 Q    Mr. Wuesthoff, good afternoon.  My name is Robert Malone

19 from Gibbons.  I represent the States of Mississippi and New

20 Mexico in this matter.

21 A    Okay.

22 Q    You testified that "8.9 billion was a sufficient number to

23 settle the talc claims."  Is that correct?

24 A    Correct.

25 Q    And what was the basis?  Who told you that that was the

1  number?

2  A    The -- our counsel told me that.

3  Q    You weren't told by anybody else, non-lawyers?

4  A    No.

5  Q    Okay.  And when you talk about talc liabilities, is that

6  inclusive or exclusive of the state consumer protection claims?

7  A    That would be a question for John Kim legally, but I

8  believe that's the case.

9  Q    So that 8.9 billion includes everybody, not just the talc

10 claimants?

11 A    My qualified answer would be, yes, that's my

12 understanding.

13 Q    You talked about a meeting.  I guess it -- I don't know if

14 it was a board meeting or a meeting where J&J's counsel -- you

15 had discussions about the enforceability of the prior

16 agreement -- funding agreement.  Is that correct?

17 A    Yes.

18 Q    And who was your counsel at that meeting?

19 A    I'm sorry.  Restate the question, please.

20 Q    There was a meeting between --

21 A    Yeah.

22 Q    -- J&J and LTL to discuss the enforceability of the prior

23 funding agreement, correct?

24 A    I don't know about any specific meetings.

25 Q    Well, didn't you testify that there were conversations as

1  to the enforceability?  Were you present at those meetings?

2  A    No.

3  Q    So anything you learned about as to the enforceability of

4  the prior funding agreement you heard from somebody else?

5  A    I heard from our lawyers.  Yes.

6  Q    And do you understand if there was a meeting between

7  lawyers from Jones Day and another law firm to discuss that?

8  A    I don't have knowledge of that.

9  Q    Who represents J&J with respect to those discussions?  Is

10 that White & Case?

11 A    It's -- no.  It's John Kim, and it's Jones Day.

12 Q    And there is no lawyer for Johnson & Johnson in these

13 discussions?

14 A    Representing LTL?

15 Q    No.  Representing J&J.  J&J is --

16 A    Yes.

17 Q    -- the one who questioned the enforceability, correct?

18 A    I assume there is.  I don't know who that would be.

19 Q    You had no interaction with anybody else at J&J that's

20 non-legal with respect to the enforceability of --

21 A    No.

22 Q    -- these agreements?

23 A    No.

24         MR. MALONE:  Okay.  That's all I have, Your Honor.

25         THE COURT:  Thank you.

Wuesthoff - Further Redirect/Baker                123

1              Any re-redirect?

2              MS. BAKER:  Yes, Your Honor.  I think just one

3  question.  Okay.

4                   FURTHER REDIRECT EXAMINATION

5  BY MS. BAKER:

6  Q    All right, Mr. Wuesthoff.  As I said, hopefully just one

7  question, and then we may be finished.  You were again asked

8  some questions I think at the very outset when Mr. Jonas stood

9  up to ask you some additional questions about your deposition

10 testimony and this $8.9 billion figure.

11 A    Yes.

12 Q    You recall those?

13 A    Yes.

14 Q    Okay.  In May, when you were deposed, when you gave that

15 testimony --

16 A    Yes.

17 Q    -- was LTL in bankruptcy?

18 A    Yes.

19             MS. BAKER:  All right.  Nothing further, Your Honor.

20             THE COURT:  Thank you.

21             MR. JONAS:  Nothing further, Your Honor.

22             THE COURT:  All right.  Mr. Wuesthoff, you may step

23 down.

24             THE WITNESS:  Thank you.

25             THE COURT:  The Court thanks you.

Wuesthoff - Further Redirect/Baker                    124

1          THE WITNESS:  Thank you.

2          THE COURT:  I think it's a good time to take a break.

3  Who would be the next witness?

4          MR. JONAS:  Mr. Dickinson, Your Honor.

5          THE COURT:  Mr. Dickinson?

6          MR. JONAS:  Yes.

7          THE COURT:  I --

8          MR. JONAS:  Yeah.  Relatively short.

9          THE COURT:  Well, I mean, is it likely we're going

10  to -- it's ten after 12.  If I --

11          MR. JONAS:  No, I don't think so.

12          THE COURT:  It's better to take a break?

13          MR. JONAS:  Yes.

14          THE COURT:  Then let's --

15          MR. JONAS:  Yes, Your Honor.

16          THE COURT:  Let's come back -- can we come back at a

17  quarter of 1, 40 minutes?  Which means by the time we actually

18  start, it'll be 1.  Thank you.

19          MR. JONAS:  Thank you, Your Honor.

20          (Recess at 12:07 p.m./Reconvened at 12:57 p.m.)

21                  (Court and clerk confer)

22          THE COURT:  We're good?  All right.  Thank you,

23  counsel.

24          MR. BAKER:  I think Mr. Dickinson --

25          THE COURT:  Mr. Dickinson?  Good afternoon.

Dickinson - Direct/Baker                    125

1           MR. DICKINSON:  Good afternoon.

2           THE COURT:  Could you please raise your right hand?

3            RICHARD DICKINSON, DEBTOR'S WITNESS, SWORN

4           THE COURT:  Have a seat.  Please give your name and

5   business address for the record.

6                         (Counsel confer)

7           THE WITNESS:  Richard F. Dickinson.  501 George

8   Street, New Brunswick, Pennsylvania.

9           MS. BAKER:  Good afternoon --

10          THE WITNESS:  Or New Jersey.

11          MS. BAKER:  Good afternoon, Your Honor.  May I

12  approach the witness?

13          THE COURT:  Yes, please.

14                       DIRECT EXAMINATION

15  BY MS. BAKER:

16  Q    Good afternoon, Mr. Dickinson.

17  A    Good afternoon.

18  Q    Thank you for appearing today.  I've handed you -- well,

19  let me ask you.  I've handed you a notebook.  What is contained

20  in that notebook?

21  A    It is my declaration.

22  Q    And do you understand that your testimony by direct

23  examination is being offered by declaration in lieu of live

24  testimony in the courtroom?

25  A    I do.

Dickinson - Direct/Baker                    126

1  Q    Okay.  And do you stand by the testimony in your

2  declaration as if you testified to it live here in front of the

3  Court?

4  A    I do.

5  Q    All right.  And if you could, could you read the exhibit?

6  There should be a sticker on the first page.  What is that

7  exhibit number?

8  A    Debtor Exhibit D-2.

9        MS. BAKER:  Okay.  Your Honor, at this time we would

10 offer Debtor's Exhibit 2, D-2, into evidence.

11       THE COURT:  Well, all right.  Any objection?

12       PLAINTIFF ATT:  No objection.

13       THE COURT:  All right.  Thank you.  It is admitted.

14       (Debtor's Exhibit D-2 admitted into evidence)

15       MS. BAKER:  Thank you, Your Honor.  And I have

16 nothing further at this time.

17       THE COURT:  Thank you.

18       Mr. Benson?

19       MR. BENSON:  Your Honor, before I get started, we

20 actually have a witness binder similar to the ones that were

21 handed out earlier.

22       THE COURT:  All right.

23       MR. BENSON:  Can we hand those out?

24       THE COURT:  Yes, please.

25       And, Becca, can you come up for a second?

Dickinson - Cross/Benson                    127

1              (Court and clerk confer)

2          MR. BENSON:  All right.

3          THE COURT:  Thank you.

4          MR. BENSON:  May I begin?

5          THE COURT:  Yes.  Absolutely.

6          MR. BENSON:  All right.

7                     CROSS-EXAMINATION

8  BY MR. BENSON:

9  Q    Good afternoon, Mr. Dickinson.

10 A    Good afternoon, Mr. Benson.

11 Q    Nice to see you again.

12 A    Good to see you again.

13 Q    Mr. Dickinson, you're currently employed by J&J Services,

14 Inc. and seconded to LTL, correct?

15 A    That is correct.

16 Q    At LTL, you're the chief financial officer and on the

17 board, correct?

18 A    That is correct.

19 Q    You were part of the board that twice voted to put LTL

20 into bankruptcy, correct?

21 A    That is correct.

22 Q    You're familiar with the termination of the first funding

23 agreement, correct?

24 A    I am.

25 Q    You are familiar with LTL's assets and liabilities,

1  correct?

2  A    Generally, yes, I am.

3  Q    Mr. Dickinson, LTL is solvent, correct?

4  A    That is correct.

5  Q    LTL can pay its bills for the foreseeable future, correct?

6  A    LTL can.

7  Q    Mr. Dickinson, you didn't any financial analysis in

8  connection with terminating the first funding agreement,

9  correct?

10  A    No.

11  Q    In fact, as far as you know, there was no financial

12  analysis done in connection with terminating the first funding

13  agreement, correct?

14  A    No.

15  Q    No, that's correct?

16  A    That is correct.

17  Q    Before terminating the first funding agreement, you were

18  unaware of any cash flow issues within LTL, correct?

19          MS. RICHENDERFER:  Your Honor, if I may?

20          THE COURT:  Yes.

21          MS. RICHENDERFER:  I hate to interrupt.  Linda

22  Richenderfer, U.S. Trustee's Office.  If the witness could

23  please speak up louder?  It's very hard to hear him in the back

24  of the room.

25          THE WITNESS:  Sure.

Dickinson - Cross/Benson                    129

1          THE COURT:  All right.

2          THE WITNESS:  Okay.  Thank you.

3          THE COURT:  Thank you.

4          MR. BENSON:  I'll repeat the question.

5    BY MR. BENSON:

6    Q    Mr. Dickinson, before terminating the first funding

7    agreement, you were unaware of any cash flow issues within LTL,

8    correct?

9    A    Cash flow issues within LTL?

10   Q    Yes.

11   A    There were -- I know LTL was in financial distress in the

12   first funding -- with the first funding agreement.

13   Q    Okay.  We'll get to that.  My question is a little

14   different.  My question is, before you terminated the first

15   funding agreement, you were unaware of any cash flow issues

16   within LTL, correct?

17   A    Within LTL, no.

18   Q    On April 3, 2023, before voting to file LTL for a second

19   bankruptcy, you hadn't seen any financial projections of LTL's

20   talc liabilities leading you to believe that LTL was in

21   financial distress, correct?

22   A    I didn't see any financial analysis, nor did I, to know

23   that they were in financial distress.

24   Q    You hadn't seen any evaluations of LTL's expected cash

25   flow demands if the talc claims were to return to the tort

Dickinson - Cross/Benson                         130

1  system, correct?

2  A    I did not.

3  Q    In fact, you were not even aware of any such evaluations,

4  correct?

5  A    I didn't see anything in writing.  But once again, I

6  didn't ask, and I didn't need to.

7  Q    And you weren't aware of any, correct?

8  A    I was not.

9  Q    You hadn't seen any rough estimates of LTL's talc

10  liability, correct?

11  A    That is correct.

12  Q    In fact, you never even asked for that, correct?

13  A    I didn't ask, and I didn't need to.

14  Q    You hadn't seen any further projections identifying when

15  LTL would be required to make payments to talc claimants,

16  correct?

17  A    I didn't see anything in writing, no.

18  Q    And you didn't ask for anything in writing, did you?

19  A    I didn't ask, and I didn't need to.

20  Q    And you hadn't see any written estimation regarding the

21  costs of LTL of litigating talc claims within the tort system,

22  had you?

23  A    Can you repeat that question, Mr. Benson?

24  Q    Sure.  The question is, and you hadn't seen any written

25  estimation regarding the cost to LTL of litigating talc claims

Dickinson - Cross/Benson                          131

1  within the tort system, correct?

2  A    I didn't see anything in writing, but I had a tremendous

3  amount of discussions from the inception of LTL 1 with regard

4  to the cost to litigate and the potential verdicts, the wild

5  and unpredictable verdicts, so --

6  Q    Okay.  Mr. Dickinson, as LTL's chief financial officer,

7  you cannot identify anything that was different about LTL's

8  financial condition on April 3, 2023, when the first funding

9  agreement was still in place as compared to April 4, 2023,

10  correct?

11  A    As far as paying our bills, we could pay our bills.  There

12  was nothing different.  The -- there was nothing different from

13  that time to the previous.

14          MR. BENSON:  All right.  Pass the witness.

15                  (Counsel confer)

16          THE COURT:  Before you start, Mr. Maimon, I see a

17  hand raised, Joe Covington (phonetic).

18          MR. MAIMON:  Oh, I'm happy to cede.

19          THE COURT:  Is that -- no, is that -- oh, maybe not.

20  Why don't you continue.

21          MR. MAIMON:  If someone on Zoom wants to jump in, I'm

22  happy to sit.

23          THE COURT:  Well, that's going to make it unwieldy,

24  but go ahead.

25          MR. MAIMON:  Okay.  All right.

1                    CROSS-EXAMINATION

2  BY MR. MAIMON:

3  Q    Good afternoon, Mr. Dickinson.

4  A    Good afternoon.

5  Q    My name is Moshe Maimon.  You and I have never met before,

6  have we?

7  A    We have not.

8  Q    Were you here when I examined Mr. Wuesthoff, the president

9  of your company?

10 A    I was not.

11 Q    Okay.  So you have a binder in front of you.  Do you see

12 that?

13 A    I do.

14 Q    We've put your deposition transcripts, things that you've

15 testified to under oath before, right?  And I just want you to

16 know that the format of the questions that I'm going to ask you

17 is I'm going to refer to statements and ask you if they're true

18 or false.  And if you need refreshing from what you've

19 testified before, we'll go to the -- to those pages.  Okay?

20 A    Understood.

21 Q    Okay.  So let's start.  You are the chief financial

22 officer at LTL, correct?

23 A    That is correct.

24 Q    And you'll agree with me, it's true LTL -- oh.  Oh, very

25 good.  Your fiduciary duty to LTL is to ensure that LTL has the

Dickinson - Cross/Maimon                      133

1  financial wherewithal to satisfy its liabilities, true?

2  A    My fiduciary responsibilities is to LTL, correct.   In

3  everything I do, I take into consideration the key

4  stakeholders, including talc claimants.

5  Q    Well, if you could take a look at your binder and look at

6  tab 2 --

7  A    Sure.

8  Q    -- page 141.

9  A    130?

10  Q    And then go -- 141.

11  A    I'm there.

12  Q    And on line 5, the question was put to you at that time:

13  "Okay.  And could you describe at all in your own words what

14  you understood your fiduciary duty of LTL to be?"

15       And this was your answer: "Yes.  To manage.  To ensure

16  that we have, you know, the financial wherewithal to satisfy

17  our talc liabilities."

18       Do you see that?

19  A    Yes.

20  Q    And that's all you said at the time, right?

21  A    Yes.

22  Q    And so you would agree with me, would you not, that it's

23  true that your financial duty to LTL is to ensure that LTL has

24  the financial wherewithal to satisfy its liabilities?

25  A    My fiduciary responsibilities is to LTL and to ensure that

Dickinson - Cross/Maimon                                    134

1  we have the wherewithal to manage our liabilities in the

2  foreseeable future and into the future.

3  Q    Okay.  And so what I put on here is true, and it's

4  consistent with what you've testified to in the past.  Fair?

5  A    Fair.

6           MR. MAIMON:  Okay.  May I approach, Your Honor?

7           THE COURT:  Yes.

8  BY MR. MAIMON:

9  Q    And we're going to talk a little bit about your -- your

10 fiduciary duties as we go along.  But if we go to the next one.

11 True, LTL is not insolvent?

12 A    LTL is solvent.

13 Q    Is solvent?

14 A    Correct.

15 Q    And let's talk about LTL -- the second bankruptcy filing.

16 On April 3, 2003 (sic), the day before it filed, it was able to

17 meet its liabilities as they came due, true?

18 A    The foreseeable liabilities, correct.

19 Q    Okay.  And on April 4th, after the restructuring, LTL was

20 able to meet its liabilities as they came due, true?

21 A    The foreseeable liabilities, correct.

22 Q    Okay.  As chief financial office, you cannot say that the

23 2023 restructuring of all the agreements impaired LTL's ability

24 to fund its talc liabilities, true?

25 A    I cannot say that.

Dickinson - Cross/Maimon                     135

1  Q    Okay.  And you would not contradict the sworn testimony of

2  Mr. Kim that the 2023 corporate restructuring did not impair

3  LTL's ability to fund its talc liabilities, true?  You wouldn't

4  contradict that?

5  A    I would say that for the foreseeable future, LTL was

6  HoldCo's support.  It can fund foreseeable future liabilities.

7  Q    Thank you.  Now, you have not seen and are not aware of an

8  estimate, even a rough one, of the dollar amount of LTL's total

9  liability, true?

10 A    That is correct.

11 Q    And you have not seen any future or forward-looking

12 projections regarding LTL's making payments to talc claimants,

13 true?

14 A    That is true.

15 Q    And I think as Mr. Benson established, you didn't even ask

16 for any in your role as CFO, correct?

17 A    I think I said I didn't ask, and I didn't need to based on

18 my familiarity with the historical spend to litigate, the wild

19 and unpredictable verdicts, and I didn't see that changing

20 anytime soon.

21 Q    Mr. Wuesthoff is the president of the company, right?

22 A    He's a president of LTL and a independent board member --

23 Q    Right.  And you --

24 A    -- just as I am.

25 Q    You're a CFO, the CFO and an independent member -- and a

Dickinson - Cross/Maimon                    136

1  member of the board, correct?

2  A    Correct.

3  Q    Okay.  One of your responsibilities as chief financial

4  officer is to make sure that the company acts in a fiscally

5  responsible way, true?

6  A    Sure.

7  Q    One of the things that LTL does by virtue of owning RAM is

8  it acquires royalty streams, correct?

9  A    That's one aspect.  We evaluate, and if the opportunity

10 benefits RAM and its key stakeholders, we pursue it.

11 Q    And one of the things that you do as CFO is you evaluate

12 the reasonableness of all those types of transactions, the

13 costs of doing them, the profitability of doing them.  You

14 analyze those things as chief financial officer, true?

15 A    Sure.

16 Q    Okay.  And one of the things that you take into account

17 when you do that analysis is the difference between what

18 something costs and what you can spend on it, right?

19 A    I'm not sure I understand your question.

20 Q    Sure.  When somebody comes to you in the company and says,

21 Mr. Dickinson, I purchased this for X amount of dollars, and

22 you know that they could have purchased it for much less, that

23 doesn't mean the cost of the item is what they spent on it.

24 All it means is they spent what they spent, right?

25 A    Okay.

Dickinson - Cross/Maimon                    137

1  Q    You agree?

2  A    Yeah.

3  Q    Okay.  And so with regard to your knowledge about what the

4  defense costs were before the filing of LTL 1, you have never

5  made any evaluation as to the reasonableness of what JJCI spent

6  in defense costs as compared to what it really could have cost

7  them to do it had they not chosen the choices they made, true?

8  You never make that evaluation?

9  A    All I know is what they did spend.

10 Q    Right.  And but different from what you would do if

11 someone was spending on an acquisition of a royalty stream, you

12 never did an evaluation of what the real cost was as opposed to

13 what somebody authorized that they could spend, true?

14         MS. BAKER:  Objection.

15         THE COURT:  Sustained.

16         MR. MAIMON:  Okay.

17 BY MR. MAIMON:

18 Q    Now, when the consideration was being made to file a

19 second bankruptcy, you were not asked to provide any

20 information with regard to the filing on April 4, 2023, true?

21 A    If you can clarify that question?  That was --

22 Q    Sure.

23 A    It was a little bit confusing.

24 Q    If you take a look at tab 2 --

25 A    Yep.

Dickinson - Cross/Maimon                     138

1  Q    -- page 114.

2          BY MS. BAKER:  Your Honor, I think the witness has

3  asked for a clarification of the question.  I think we're going

4  to his transcript, and I don't --

5          MR. MAIMON:  Well, he --

6          MS. BAKER:  That would be --

7          MR. MAIMON:  -- didn't need clarification then, Your

8  Honor.

9          MS. BAKER:  Well --

10         THE COURT:  Well, you -- we could do it two ways.  We

11  could go through the exercise of the transcript, or you can

12  clarify it.  If the transcript doesn't clarify it, you're still

13  going to have to clarify it.

14         MR. MAIMON:  Sure.

15         THE COURT:  So --

16  BY MR. MAIMON:

17  Q    If you could take a look at page 114, sir.

18  A    I'm there.

19  Q    Line 10.  You see there's a question: "Were you asked to

20  provide any information from anyone with regard to this

21  bankruptcy petition filed on April 4, 2023?"

22         Do you see that question?

23  A    I was asked to review any documents that were put in front

24  of me that we ask questions about with regard to the April 2nd

25  decision to file the second bankruptcy.

Dickinson - Cross/Maimon                    139

1  Q    Okay.  Take a look at the transcript: "Were you asked to

2  provide any information from anyone with regard to this

3  bankruptcy petition filed on April 4, 2023?"

4        My question is, do you see that question?

5  A    I do.

6  Q    Okay.  And you answered that question, true?

7            THE COURT:  Line 19.

8            MR. MAIMON:  Line 19.

9            THE WITNESS:  Yeah.  I said no.

10 BY MR. MAIMON:

11 Q    You said no, right?  You didn't -- in the beginning of the

12 deposition, the lawyers asked you and instructed you that if

13 you didn't understand something, you could ask for

14 clarification.  Do you recall that?

15 A    I do.

16 Q    Okay.  You didn't ask for any clarification here, did you?

17 A    I didn't.

18 Q    Okay.  And you answered a simple no to the question of:

19 "Were you asked to provide any information from anyone with

20 regard to this bankruptcy petition filed on April 4, 2023?"

21       Do you see that?

22 A    I do see it.

23 Q    Okay.  Is your testimony different?  Are you changing your

24 testimony from what you swore to under oath on April 17, 2023?

25 A    I am not.

Dickinson - Cross/Maimon                    140

1  Q    Okay.  You believe -- and I think you stated in your prior

2  testimony, you believe that LTL was in financial distress when

3  it filed for bankruptcy on April 4, 2023, true?

4  A    I do.  I did.

5  Q    And you -- however, you did not see any financial

6  projection of LTL's talc liabilities that led you to believe

7  that LTL was in financial distress on April 4, 2023, true?

8  A    True.

9  Q    Now, your belief at that time that LTL was in financial

10  distress was based on millions of dollars to litigate and

11  unpredictable verdicts and decades to litigate and the cost and

12  uncertainty with that.  Those are your words, true?

13  A    True.

14  Q    Okay.  That rationale for the -- or that basis of

15  concluding financial distress is similar to the conclusion that

16  you reached that LTL was in financial distress when it first

17  filed for bankruptcy in 2021, true?

18  A    That's -- that was the basis.

19  Q    Similar both times, right?

20  A    Yes.

21  Q    Okay.  Now, you did not perform any financial analysis in

22  connection with amending the first funding agreement, true?

23  A    I did not do any financial analysis.  No.

24  Q    And you don't know of any -- if any financial analysis was

25  done in connection with amending it, true?

Dickinson - Cross/Maimon                    141

1  A     No.

2  Q     True?

3  A     I didn't see anything in writing.

4  Q     So that's true?

5  A     True.

6  Q     It was your general understanding that Johnson & Johnson

7  as a payor of the funding agreement was -- I'm sorry.

8  Withdrawn.  It was your general understanding that Johnson &

9  Johnson was a payor of the funding agreement whether LTL was in

10 or out of bankruptcy, true?

11 A     Are you speaking to the original funding agreement?

12 Q     Yes, sir.

13 A     Yes.  I don't have perfect recall with regard to the

14 language, but I generally understand that to be the case.

15 Q     Okay.  Now, with regard to the second funding agreement,

16 HoldCo replaced J&J as the payor for the second funding

17 agreement, true?

18 A     True.

19 Q     And the LTL board did not negotiate with Johnson & Johnson

20 about staying on as payor after the termination of the funding

21 agreement, true?

22 A     We did not.

23 Q     And you did not personally, right?

24 A     I did not personally.

25 Q     You don't know and you don't believe that anyone

Dickinson - Cross/Maimon                    142

1  negotiated on behalf of the board for J&J to stay on as a payor

2  after the termination of the first funding agreement, true?

3  A    That is true.

4  Q    Now, if you'll turn -- I don't know what tab this is at.

5        MR. MAIMON:  Oh, thanks.

6  BY MR. MAIMON:

7  Q    If you'll turn to tab 10.  And can you confirm for us that

8  these are the minutes of the LTL board on March 16, 2023?

9  A    It says March 28th at the top.  10, right?  10.  I'm

10 sorry.

11 Q    Tab 10.

12 A    Just looking at the wrong one.  March 16th, correct.

13 Q    You got it?  Okay.  And this was a board meeting that you

14 attended, correct?

15 A    I did.

16 Q    Okay.  As of March 16th, this board meeting, you had not

17 reached out to anyone at J&J to determine whether they were

18 considering voiding the funding agreement, true?

19 A    I did not.  Nor did I need to.

20       MR. MAIMON:  Move to strike everything after "I did

21 not."

22       THE COURT:  Granted.

23       MR. MAIMON:  Thank you.

24 BY MR. MAIMON:

25 Q    Now, take a look at -- take a look at tab 11.

Dickinson - Cross/Maimon                    143

1  A     Okay.

2  Q     And these are the board minutes -- board meeting minutes

3  for March 28, 2023, true?

4  A     True.  I can see that.

5  Q     And if you take a look at tab 14, this is a presentation,

6  a PowerPoint presentation that was made to the board for its

7  consideration on March 28, 2023, correct?

8  A     Correct.

9  Q     Now, one of the things that -- withdrawn.  One of the

10 things that you based your decision to vote in favor of

11 bringing LTL back into bankruptcy for this second bankruptcy

12 was the information that you received at these board meetings,

13 correct?

14 A     It was either in these board meeting minutes or ad hoc

15 minutes or my own personal research.

16 Q     But you relied on what was -- what information you

17 received at the board meeting, in addition to other things, to

18 support your vote to bring LTL back into bankruptcy, true?

19 A     Yes.

20 Q     Okay.  If you'll take a look at the PowerPoint

21 presentation, page 6.

22         MS. BAKER:  What tab?

23         THE COURT:  Which tab?

24         MR. MAIMON:  This is tab 14.

25         UNIDENTIFIED SPEAKER:  Exhibit?  What exhibit?

Dickinson - Cross/Maimon                    144

1          MR. MAIMON:  Oh, sorry.  Exhibit 803.

2          MS. BAKER:  Your Honor, I would object to any

3  questions regarding this page of the PowerPoint.  It is

4  redacted in accordance -- and which Your Honor has already

5  ruled on.  And so I don't think there's a good-faith basis for

6  any questions regarding this slide in the PowerPoint.

7          MR. MAIMON:  Well, Your Honor might overrule -- might

8  grant the -- you know, affirm the objection.  It doesn't mean I

9  don't have a good-faith basis to ask the question.

10         THE COURT:  What is your question?

11  BY MR. MAIMON:

12  Q    So, first of all, turn to page 5.  Do you see this is

13  talking about "Supported Plan Terms"?  Do you see that?

14  A    I do.

15  Q    And this is information that was provided to you at the

16  meeting, true?

17  A    That is correct.

18  Q    Who provided this information?  And if you need to look at

19  the minutes, the minutes are on tab 11.

20  A    I think I know.  I just wanted to give you my --

21  Q    Sure.

22  A    -- perfect answer.  It was either Dan Prieto or someone

23  from the Jones Day team.

24  Q    Okay.  Somebody from the Jones Day team actually gave you

25  this information that's on page 5, correct?

Dickinson - Cross/Maimon                    145

1  A    They reviewed the information with me, correct.

2  Q    And you didn't have this information before that meeting,

3  did you?

4  A    I don't believe I did yet.

5  Q    Okay.

6  A    No.

7  Q    Go on to -- you see the heading there is "Supported Plan

8  Terms."  Do you see that?

9  A    What page?

10  Q    Do you see that?

11  A    Which page?

12  Q    Look on the screen.  "Supported Plan Terms."  That's the

13  heading of this section --

14  A    Yes.

15  Q    -- of the presentation, right?

16  A    Yes.

17  Q    And you have the first two bullet points of what the Jones

18  Day lawyers told you, right?

19  A    They reviewed it with me.  Yes.

20  Q    Okay.  Turn to the next page, page 6.  You see there's

21  another bullet point there, maybe even two.  But everything is

22  blocked out.  You see that?

23  A    I do.

24  Q    Okay.  You've told us what they told you partially.  Now I

25  want you to tell us what they told you on the page that's

Dickinson - Cross/Maimon                    146

1  blocked out.

2        MS. BAKER:  Objection.  Calls for privileged

3  communications.

4        MR. MAIMON:  It's waived, Your Honor.  You can't

5  waive part of a privilege.  That's clear federal -- I'm sorry.

6  I'm sorry.  You can't -- selective waiver is not legitimate in

7  federal court.

8        THE COURT:  Okay.  The Court's already addressed this

9  previously.  Objection sustained.

10        MR. MAIMON:  Okay.

11  BY MR. MAIMON:

12  Q    And if I asked you to -- looking at page 8.

13        MS. BAKER:  Same objection, Your Honor.

14        MR. MAIMON:  I haven't asked the question, Your

15  Honor.  Please.

16        MS. BAKER:  Again, Your --

17        THE COURT:  He's building a record.  Let him build a

18  record.

19        MS. BAKER:  Understood, Your Honor.

20  BY MR. MAIMON:

21  Q    Do you see page 8?

22  A    I do.

23  Q    It says, "Duties of LTL Managers."  Do you see that?

24  A    I do.

25  Q    Okay.  Who are the LTL managers that are referred to here?

Dickinson - Cross/Maimon                147

1   A    Well, the LTL managers are the board members.

2   Q    So you're one of the board members, right?

3   A    I am.

4   Q    And you at that time had a fiduciary duty to ensure that

5   LTL had the financial wherewithal to satisfy its liabilities,

6   true?

7   A    Yes.

8   Q    Okay.  And it's talking about your -- protections for LTL

9   managers, right?

10  A    It's redacted, so --

11  Q    What protections -- don't tell me what the lawyers say --

12  said.  But what protections were necessary for you as an LTL

13  manager in discussing bringing the company into a second

14  bankruptcy?

15          MS. BAKER:  Objection, Your Honor.  Calls for

16  privileged communications.

17  BY MR. MAIMON:

18  Q    As far as you were concerned?

19          THE COURT:  You can answer the question to the extent

20  you don't rely on information provided to or from counsel.

21          THE WITNESS:  Yeah.  If you're referring to the

22  protections for LTL members --

23  BY MR. MAIMON:

24  Q    Managers?

25  A    Managers, board members.  There might have been a

Dickinson - Cross/Maimon                    148

1  discussion about it.  I wasn't concerned about it with regard

2  to the protection to LTL board members.

3  Q    Okay.  What was your understanding -- since we're talking

4  about understanding being admissible, what was your

5  understanding of the protections for LTL managers that was

6  discussed at the meeting?

7              MS. BAKER:  This --

8              THE COURT:  Again --

9              MS. BAKER:  This is all privileged, Your Honor.  And

10 Your Honor has already ruled on this.

11             THE COURT:  If you have an understanding apart from

12 what you were advised by counsel, you can discuss it.

13             THE WITNESS:  I do not.

14             THE COURT:  Other than that, it's privileged.

15             THE WITNESS:  I do not.

16             MR. MAIMON:  Okay.

17             THE COURT:  Objection sustained.

18             MR. MAIMON:  Thank you.

19 BY MR. MAIMON:

20 Q    Turn to page 12.  "Considerations Regarding Filing in New

21 Jersey."  Do you see that?

22 A    I do.

23 Q    Did you as a board member consider filing the second

24 bankruptcy in a different state?

25 A    Not to my knowledge, no.

Dickinson - Cross/Maimon                    149

1  Q    Did any other board member advance -- did any other board

2  member advance a discussion about filing the second

3  bankruptcy --

4           THE COURT:  Wait.  Hold on one second, Mr. Maimon.

5  BY MR. MAIMON:

6  Q    -- in a different state?

7           MS. BAKER:  Yes, Your Honor.  Thank you.  I believe

8  Your Honor -- I believe this -- they later received -- he

9  should have a copy of this in an unredacted form, this

10  particular slide.

11           THE COURT:  Was unredacted?

12           MS. BAKER:  I believe so, Your Honor.

13           THE COURT:  Well, I know it was provided to the Court

14  as part of the package.  I don't know.  Was it --

15           MR. MOSHE:  I don't have it, but I'll move on then.

16           THE COURT:  Okay.

17  BY MR. MAIMON:

18  Q    But let me ask the question.  Did any other board member

19  advance a possibility of filing in a different state?

20  A    I don't believe so.

21  Q    Okay.  Turn to page 13.  "Potential Modifications to

22  Existing Funding Arrangements."  You see that?

23  A    I do.

24  Q    And that's something that happened.  The original funding

25  agreement was terminated, and the second one was put in place,

Dickinson - Cross/Maimon                    150

1  true?

2  A    There's a funding agreement and a support agreement, yes.

3  Q    Okay.  And did you do any analysis independent of what

4  lawyers told you about the need to terminate the first funding

5  agreement and replace it with the second?

6  A    I did a tremendous amount of my own independent thinking

7  and of the materials, what I knew historically, what I knew

8  currently, and I made my own independent decisions.

9  Q    Okay.  But that's not what I asked you.  I asked you

10 whether or not you did any analysis of the need to terminate

11 the first funding agreement and replace it with the second, of

12 that in particular.

13 A    Well, the analysis was my own independent thinking.

14 Q    Okay.  So tell us about your analysis.  What was the

15 analysis that you did?

16 A    There was a material risk of the first funding agreement

17 being void or voidable.  That made sense to me from my own 35

18 years of business experience, from counsel -- legal counsel

19 advice, and the opinion that -- you know, they shared with me

20 that that was Johnson & Johnson's opinion.  And then, two,

21 it -- the original funding agreement was never intended outside

22 of bankruptcy, in my opinion.

23 Q    Okay.  Did --

24 A    And on the basis of that, we needed a new funding

25 agreement to pay for the foreseeable future cost to litigate

Dickinson - Cross/Maimon                    151

1  and potential verdicts.

2  Q    Okay.  So I think you just said that the lawyers told you

3  about the Johnson & Johnson position, right?

4  A    That they did.

5  Q    What did they tell you?

6  A    That it was --

7        MS. BAKER:  Objection, Your Honor.  Again, I --

8  there's not a good-faith basis when he's asking for counsel's

9  advice.  There's just not a good-faith basis for those

10 questions.

11       MR. MAIMON:  He opened the door.  He said that his

12 analysis was based on what the lawyers told him.

13       MS. BAKER:  No.  He said that there was the -- he

14 mentioned the fact of counsel's advice.  That doesn't open the

15 door.  That doesn't waive privilege.  That he can say without

16 any waiver of any kind.  He --

17       MR. MAIMON:  I asked him what his analysis was, and

18 he said he did it based on -- he -- his own analysis plus what

19 was told to him by the lawyers.  The record is the record, Your

20 Honor.  We don't have to argue what it is.

21       THE COURT:  Objection sustained.

22       MR. MAIMON:  Okay.

23 BY MR. MAIMON:

24 Q    In the original -- I asked Mr. Wuesthoff this morning, and

25 it's not a test between the two of you.

Dickinson - Cross/Maimon                    152

1  A    Sure.

2  Q    I asked him this morning whether or not he felt that the

3  LTL board in October of 2021 had the independent ability to

4  vote no on bankruptcy.  Do you believe they had the independent

5  ability to vote no on bankruptcy?

6  A    Yes.

7  Q    Okay.  And I asked Mr. Wuesthoff whether or not if they

8  voted no on bankruptcy he would have done his job as president

9  of the company with the cash in hand, the RAM royalties, and

10 the funding agreement that was assigned and in place, and he

11 said he would have.  I'd just like you to assume that.  Would

12 you have done your job as CFO with those things in place had

13 the board voted no on bankruptcy?

14 A    Yes.

15 Q    Okay.  Let's -- as of March 28th, this presentation, you

16 had not heard from J&J about their intent to void the funding

17 agreement, true?

18 A    That is true.

19 Q    When the lawyers told you what they told you, did you say

20 I need to look at a written analysis?  If we're going to be

21 giving up a funding agreement worth $61 billion, as chief

22 financial officer with a fiduciary duty to ensure that LTL has

23 the financial wherewithal to satisfy its liabilities, did you

24 say I need to see a written analysis of this before I decide?

25 A    I did not.

Dickinson - Cross/Maimon                    153

1  Q    Okay.  Turn, if you would, to tab 12.  And do you see

2  these are the board minutes from April 2, 2023?

3  A    I do see that.

4  Q    And if you take a look at tab 15, this is the PowerPoint

5  presentation of that exact meeting, true?

6  A    Yes.

7  Q    And if you take a look at page 10 of the PowerPoint

8  presentation.  This is Exhibit 805.  This is titled "Review of

9  Financial Considerations."  Do you see that?

10 A    I do.

11 Q    And you were the chief financial officer, right?

12 A    I still am.

13 Q    Okay.  And the major bullet point is "LTL and HoldCo

14 Liabilities," right?

15 A    Correct.

16 Q    And -- sorry.  And this is the materials that you

17 considered.  This was the date where the vote was taken to file

18 the second bankruptcy, right?

19 A    That is true.

20 Q    And the material in the presentation are materials that

21 you as a board member took into account in reaching your final

22 determination to vote yes on the second bankruptcy, true?

23 A    One of many slides and information and data, yes.

24 Q    Including the materials that are redacted on this page,

25 true?

Dickinson - Cross/Maimon                    154

1  A    I believe so, but that --

2  Q    Tell me what was included in the materials that's

3  redacted.

4           MS. BAKER:  Objection, Your Honor.  Privileged.

5           THE COURT:  Sustained.

6           MR. MAIMON:  Okay.  Back to the PowerPoint again.

7  BY MR. MAIMON:

8  Q    April 2 --

9           MR. MAIMON:  One back, please.

10  BY MR. MAIMON:

11  Q    April 2, 2023, was the first time anyone formally told you

12  that there was a risk that the 2021 funding agreement was

13  potentially void or voidable, true?

14  A    I can't recall the exact date that someone told me that,

15  but from -- as I mentioned earlier, I had my own independent

16  thought that it would be void or voidable.

17  Q    If you'd take a look at tab 2, and go to page 149.  And

18  look at the first question on the page there.  Tell me when

19  you're there.  Are you there?

20  A    Page?

21  Q    149, line 2.  Are you there, sir?

22  A    I am here.

23  Q    You were asked the following question:  And was April 2,

24  2023, the first time that anyone ever told you that there was a

25  risk that the 2021 funding agreement was potentially void or

Dickinson - Cross/Maimon                    155

1  voidable?

2          Do you see that question?

3  A    Yes.

4  Q    And what was your answer under oath at that time?

5  A    I believe so, formally, yes.

6  Q    Okay.  And so --

7          MS. BAKER:  Your Honor, under the rule of

8  completeness, I would ask that lines 12 through 23 be read.

9  BY MR. MAIMON:

10  Q    Let's go further.  All right.  And you're saying -- oh, I

11  mean 14.

12          Prior to April 2, 2023 --

13          MS. BAKER:  No.  Oh, sorry.

14  BY MR. MAIMON:

15  Q    Prior to April 2, 2023, did anyone have any information --

16  I'm sorry.  Let me start that again.

17          Prior to April 2, 2023, did you have any information

18  from anyone that the risk -- that there was a risk that the

19  2021 funding agreement was potentially void or voidable by the

20  Third Circuit opinion?

21          Answer:  I believe we may have discussed it, but I'll

22  defer to the meeting minutes, the resolutions, and any

23  presentations, you know, over my maybe incomplete recollection.

24          Is that what you said?

25  A    Yes, that is what I said.

Dickinson - Cross/Maimon                    156

1  Q    But let's go back to the PowerPoint, to my question to

2  you, sir.  Forget about incomplete recollections.  Go back one.

3          April 2, 2023, was the first time anyone formally

4  told you, that you can recall, that there was a risk that the

5  2021 funding agreement was potentially void or voidable, true?

6          MS. BAKER:  Your Honor, the witness has already

7  answered this question.  And we just read from the transcript

8  about how he answered it in full.

9          THE COURT:  I see it.  True, checkmark.

10          MR. MAIMON:  Okay.  Thank you.  Good.

11          MS. BAKER:  I don't believe that was the witness's

12  answer.  We just --

13          MR. MAIMON:  Then we should gt a clarification.

14          THE COURT:  Well, it's subject to the testimony at

15  his deposition, which clarified it.

16          MR. MAIMON:  Thank you.

17          MS. BAKER:  Thank you, Your Honor.

18  BY MR. MAIMON:

19  Q    Next.  At the April 2, 2023, LTL board meeting, the board

20  did not discuss J&J's intent to void the funding agreement,

21  true?

22  A    Well, there was a discussion that there was a material

23  risk with regard to the void or voidability of that agreement.

24  Q    Go back to the same deposition, page 75, sir.  Let me know

25  when you're there.  Are you there?

Dickinson - Cross/Maimon                    157

1   A     Yes.

2   Q     Line 9.  At that April 2nd board meeting, did the board

3   discuss J&J's intent to void the funding agreement?

4             What was your answer?

5   A     I believe I said no at first and then --

6   Q     Well, you don't believe you said no, you did say no,

7   correct?

8   A     And then I -- I think I clarified that and said yes.

9   Q     Well --

10  A     Yes, I'm sorry.

11  Q     -- hold on a minute.

12  A     Yes, I said no.

13  Q     You said no, right?  And so let's go back to the

14  PowerPoint.  Does this refresh your recollection that at the

15  board meeting of April 2, 2023 [sic], the board did not discuss

16  J&J's intent to void the funding agreement, or was your

17  deposition testimony inaccurate?

18  A     J&J's intent to void --

19  Q     Yes.  Yes.

20  A     -- the funding -- it was -- we discussed that it was a

21  material risk.

22  Q     I understand that.  I'm asking you a specific question

23  here, and you answered it in your deposition already.  At the

24  April 2, 2023, [sic] LTL board meeting, did the board -- the

25  board did not discuss J&J's attempt to void the funding

Dickinson - Cross/Maimon                    158

1    agreement, true?

2    A    True.

3    Q    As of April 2nd, that board meeting, you had not heard

4    from anyone at J&J about its intent to void the funding

5    agreement, true?

6    A    Not -- not specifically to void it, that there was a

7    material risk.

8    Q    Sir, I'm asking you, as of April 2nd, it's true, is it

9    not, that you had not heard from anyone at J&J?

10   A    That is true.

11   Q    Okay.  As of April 2nd, the board meeting, you hadn't

12   reached out to J&J to confirm whether they intended to void the

13   funding agreement, true?

14   A    True.

15   Q    When you-all were discussing the material risk that the

16   funding agreement was void or voidable, did you, in keeping

17   with your fiduciary duty to ensure that LTL had the financial

18   wherewithal to satisfy its liabilities, reach out to somebody,

19   anybody at J&J, and say, hey, do you intend to void this

20   funding agreement?  Did you do that?

21   A    I did not.

22   Q    Okay.  Do you know if anybody from the board -- did any of

23   your co-board members say, hey, you know, I reached out to J&J,

24   or, I'm going to reach out to J&J to find out if this is true,

25   whether or not they are going to void this funding agreement?

Dickinson - Cross/Maimon                    159

1  A    I know Mr. Kim had discussions with counsel representing

2  Jones Day, representing Johnson & Johnson, about the material

3  risk, and my definition of material, based on my experience, is

4  a highly likely event.

5        MR. MAIMON:  Move to strike.  We've had privilege

6  asserted about what Mr. Kim told people.

7        THE COURT:  Sustained.

8        MR. MAIMON:  Thank you.

9  BY MR. MAIMON:

10 Q    Now, you're not aware -- not only not reaching out, but

11 you're not aware -- you're not aware of any other LTL board

12 meeting [sic] hearing from J&J of an intent to void the funding

13 agreement, true?  Board member.

14 A    Board member, no.

15 Q    It's true?  Sir?

16 A    True.

17 Q    Now, let's put lawyers aside.  No businessperson at J&J or

18 JJCI ever told you that the 2021 funding agreement was void or

19 voidable, true?

20 A    They did not.

21 Q    No businessperson at J&J or JJCI ever told you that the

22 2021 funding agreement was unenforceable, true?

23 A    True.

24 Q    Now, we've been talking about April 2nd.  Two days later,

25 April 4th, the funding agreement was terminated, true?

Dickinson - Cross/Maimon                    160

1  A    True.

2  Q    And it was terminated -- did you sign on the termination?

3  I know Mr. Wuesthoff did.  Did you sign also on that?

4  A    No.

5  Q    Did you agree to it?

6  A    I did.

7  Q    And you did so fully aware of your fiduciary duties to

8  ensure that LTL had the financial wherewithal to satisfy its

9  liabilities?

10 A    For that exact reason, I agreed to it, yes.

11 Q    Okay.  Now -- next slide.  Now, of your own personal

12 knowledge -- I'm not talking about what anyone else told you,

13 but of your own personal knowledge, you don't know if J&J ever

14 indicated an intent to void the funding agreement at any time

15 after it was entered into, true?

16 A    Not to my personal knowledge.

17 Q    Thank you.  Now, you are the chief financial officer, and

18 would you say that that makes you a little bit more

19 knowledgeable of the assets and liabilities of LTL?

20 A    I would.

21 Q    If you'll turn to tab 8.  That is Exhibit 1023.  Can you

22 confirm that this is the monthly operating report for LTL,

23 ending with the period of May 31, 2023?

24 A    I can see that, yes.

25 Q    Okay.  And you have responsibility as chief financial

Dickinson - Cross/Maimon                    161

1  officer with regard to the accuracy of the information that

2  comes into the monthly operating report, true?

3  A    True.

4  Q    Okay.  The estimated value of LTL's cash assets was 30

5  million, the estimated value of its ownership of RAM was 367-

6  plus million, and the estimated value of HoldCo's cash assets

7  was 400 million; true?

8  A    Yes.  You're referring to --

9  Q    I'm actually looking at your testimony.

10       THE COURT:  Refer him to the page of the monthly

11  operating report.

12  BY MR. MAIMON:

13  Q    If you'll take a look at tab -- tab 3, page 75.  And tab 3

14  is your deposition of May 31, 2023, [sic], the same days as the

15  monthly operating report.

16  A    Page 75, tab 3.

17  Q    Yes.  Let me know when you're there.

18  A    I'm here.

19  Q    Line 9.  Do you see where it states that the estimated

20  value of LTL's cash assets was 30 million, and you say, "I do"?

21  A    I do, yes.

22  Q    And you say -- on 12, do you see where it says that the

23  estimated value of LTL's ownership in RAM was 367-plus million,

24  and you said, "I do"?

25  A    I do.

Dickinson - Cross/Maimon                    162

1  Q    And line 15, And do you see where it says the estimated

2  value of HoldCo's assets cash was 400 million?  And you

3  answered, Yes.

4           Right?

5  A    Yes.

6  Q    $400 million, right?

7  A    Cash.

8  Q    Cash.  Now, at that time, were you aware of the dividend

9  that HoldCo was getting in June?

10 A    Yes, that it was entitled to $1.8 billion in dividend.

11 Q    Now, is that million with an "m" or billion with a "b"?

12 A    It's billion.

13 Q    Sorry?

14 A    Billion.

15 Q    With a "b"?

16 A    Yes.

17 Q    Okay.  Now, after the Third Circuit order, and prior to

18 the filing of this bankruptcy, LTL did not perform any

19 evaluation as to how much money it would take to fund a return

20 to litigating talc claims in the tort system over the following

21 12 months, true?

22 A    True.

23 Q    And prior to the refiling, there was no analysis done by

24 the board members of the relative strengths and weaknesses of

25 any particular strategy that LTL could employ if it went back

Dickinson - Cross/Maimon                          163

1  into the tort system, true?

2  A    True.

3  Q    Were you aware that prior to the filing of the first

4  bankruptcy, the determination of strategy within the tort

5  system was controlled by J&J?

6  A    I'm assuming Johnson & Johnson and Johnson & Johnson

7  Consumer.

8  Q    What did you say?

9  A    Johnson & Johnson and Johnson & Johnson Consumer, Inc.

10 Q    And between the two, do you know that it was Johnson &

11 Johnson that controlled the strategy?

12 A    I wasn't aware of --

13 Q    "I don't know" is a perfectly acceptable answer, sir.

14 A    I'm assuming it was Johnson & Johnson.

15 Q    Okay.

16 A    And Johnson & Johnson Consumer, Inc.

17 Q    Next slide.  After the Third Circuit order of January

18 30th, and before the refiling of the bankruptcy, LTL did not

19 perform any evaluation of how much cash flow it would require

20 to manage its talc liabilities in the tort system over the next

21 three years, true?

22 A    True.

23 Q    And after the Third Circuit opinion of January 30th and

24 before the refiling, LTL did not perform any evaluation of how

25 much cash flow it would require to manage its talc liabilities

Dickinson - Cross/Maimon                    164

1  in the tort system at any point into the future, true?

2  A    True.

3  Q    Now, after the Third Circuit order of January 30th, 2023,

4  and before the refiling, LTL did not perform any evaluation of

5  the amount of money it would take to fund a trust purely with

6  respect to LTL's individual liability, leaving apart any

7  discharge of J&J if the bankruptcy were to proceed, true?

8  A    Let me just read this for a second.

9  Q    Sure.  And if you need to, page 111 of tab 3, if you need

10  it.

11  A    We did not.

12  Q    That's true.  You are not aware of any evaluation of the

13  amount of money it would take to fund purely with respect to

14  LTL's individual liability, leaving apart any discharge of J&J,

15  if the bankruptcy were to proceed, true?

16  A    I haven't seen anything in writing, no.

17  Q    As chief financial officer, you understand that in order

18  for LTL to receive a funding commitment from Johnson & Johnson,

19  this bankruptcy plan requires that claims against J&J be

20  channeled to a trust?

21  A    I understand that generally true, yes.

22  Q    And as CFO, you understand that in order for LTL to get

23  the $8.9 billion, the deal has to involve a discharge of J&J's

24  liability, as well as LTL's, true?

25  A    That is -- in the case it's through a support agreement if

Dickinson - Cross/Malone                    165

1  LTL proves that it's in financial distress and the liquidity

2  issues that present itself become a reality, yes.

3  Q    J&J has to get a discharge in order for LTL to get the

4  $8.9 billion, right, in the bankruptcy?

5  A    Yes.

6  Q    Next, you're not aware of any estimate or analysis of the

7  dollar amount of the talc-related consumer protection claims by

8  the states, true?

9  A    No.

10 Q    True?

11 A    True.

12 Q    And you're not -- and you've not requested any estimate or

13 analysis of the dollar amount of the talc-related consumer

14 protection claims by the states, true?

15 A    True.

16         MR. MAIMON:  I appreciate your time with me, Mr.

17 Dickinson.

18         Your Honor, I have no further questions.

19         THE COURT:  You're passing the witness?

20         MR. MAIMON:  Yes, Your Honor.

21         THE COURT:  Okay.  Is there anyone else?

22         MR. MALONE:  Judge, if I could have a minute with Mr.

23 Jonas.  I may or may not have some questions.

24         THE COURT:  All right.

25         UNIDENTIFIED SPEAKER:  Your Honor, that Mr. Covington

Dickinson - Cross/Malone                166

1  who was raising his hand, I knew the name sounded familiar.  I

2  believe he's an individual plaintiff.

3          THE COURT:  Okay.  That's fine.  Thank you.

4                      CROSS-EXAMINATION

5  BY MR. MALONE:

6  Q    Good afternoon, Mr. Dickinson.

7  A    Good afternoon.

8  Q    My name is Robert Malone with the Gibbons firm,

9  representing the states of New Mexico and Mississippi.  I don't

10 believe you and I have ever spoken before today.

11 A    We have not.

12 Q    A couple of things.  Let me just go over these first, and

13 then I have a couple more questions.

14          You testified that the first funding agreement was

15 never intended to be available outside the bankruptcy; is that

16 correct?

17 A    That is correct.

18 Q    So let me read something to you, paragraph 27 from Mr.

19 Kim's first day declaration.  Have you ever seen that

20 declaration before today?

21 A    I have.

22 Q    So paragraph 27.

23          MS. BAKER:  Do you have a copy?

24          UNIDENTIFIED SPEAKER:  Exhibit 514.

25          MR. MALONE:  Yeah, at the top, it's document 5.

Dickinson - Cross/Malone                              167

1  BY MR. MALONE:

2  Q    So paragraph 27.  Significantly, the funding agreement

3  imposes no repayment obligation on the debtor.  It is not

4  alone.  It obligates New JJCI and J&J on a joint and several

5  basis to provide funding up to the full value of New JJCI to

6  pay the cost, expenses of the debtor incurred in the normal

7  course of business, A, at any time where there is no bankruptcy

8  case; B, during the pendency of any Chapter 11, including the

9  cost of administering the Chapter 11 case in both situations,

10 to the extent there is any cash distribution received by the

11 debtor from Royalty A&M are insufficient to pay such costs and

12 expenses.  In addition, the funding agreement requires New JJCI

13 and J&J to, up to the full value of New JJCI, full amounts

14 necessary, A, to satisfy the debtor's talc-related liabilities

15 at any time when there is no bankruptcy case, and, B, in the

16 event of a Chapter 11 filing, to provide the funding for a

17 trust in both situations to the extent that any cash

18 distribution received by the debtor from Royalty A&M are

19 insufficient to pay such costs and expenses, and, further, in

20 the case of the funding of a trust, the debtor's other assets

21 are insufficient to provide the funding.

22         Okay.  Now, you've heard the statement, and you can

23 see it on the screen.

24 A    I can.

25 Q    Okay.  Do you believe Mr. Kim's statement in paragraph 27

Dickinson - Cross/Malone                    168

1  to be false?

2          MS. BAKER:  Your Honor, it is completely improper to

3  ask a witness to comment on the credibility of another witness.

4          THE COURT:  Rephrase the question.

5          MR. MALONE:  Of his understanding, Your Honor, is

6  whether or not that statement is true or false.

7          THE COURT:  Well, just --

8          MR. MALONE:  I'll ask him that.

9          THE COURT:  -- ask it that way, then.

10  BY MR. MALONE:

11  Q    Do you believe that statement to be true or false?

12          MS. BAKER:  Same objection, Your Honor.

13          THE COURT:  Overruled.

14  BY MR. MALONE:

15  A    I can read the words, and I understand what the language

16  said.  It was my opinion at that point in time that the funding

17  agreement that Johnson & Johnson entered into was to facilitate

18  our bankruptcy proceedings, because in 2020, Consumer suffered

19  a loss, and it was in financial distress.

20          And I understood why Johnson & Johnson had the

21  funding agreement in place.  I understand what the language

22  says here, and I understand what the language says in the

23  agreement.

24          MR. MAIMON:  Your Honor, I would respectfully move to

25  strike the witness's testimony that LTL was in financial

Dickinson - Cross/Malone                    169

1  distress.  There has been a finding as a matter of law by the

2  Third Circuit that it was not, and it's improper for --

3          THE COURT:  Overruled.

4  BY MR. MALONE:

5  Q    So let me understand this.  By its terms, the first

6  funding agreement was operative and enforceable outside of the

7  bankruptcy?

8  A    I understand what the language says.

9  Q    Well, what's your understanding?  Not what the language

10 is.  What's your understanding?

11         MS. BAKER:  Objection.  Asked and answered.

12         THE COURT:  Yeah, I don't -- where are we going with

13 this?

14         MR. MALONE:  We're going someplace, Your Honor, but I

15 don't know if the witness --

16         THE COURT:  Not now.  Let's just move forward.  Thank

17 you.

18 BY MR. MALONE:

19 Q    All right.  Let me turn to something else.  I believe this

20 is from Exhibit 1011.  And I'd like to read a statement from

21 your counsel, Mr. Greg Gordon.  It was made at the first day

22 hearing on February 18th, 2022.  And I guess this is at the

23 first motion to dismiss trial.

24         "So there is basically two different scenarios where

25 funding is available.  The first is funding in the tort system.

Dickinson - Cross/Malone                                    170

1  And as you would expect, what that funding says is that the

2  payor are obligated to pay the liabilities to the extent

3  they're established by a judgment or a settlement in the tort

4  system.  That's what you would expect, and that's what happens.

5  You want funds available to pay settlements, to pay judgments

6  in the tort system.  So it makes it very clear that this is

7  what we're talking about if there is no proceeding in a

8  bankruptcy.  Whether there was no case filed, or whether the

9  case is filed or dismissed, the money is available for that

10 purpose.  And you can imagine, Your Honor, by the way, the hue

11 and the cry would have heard if you -- if this provision

12 weren't in there, because they would have said that they were

13 manipulated the whole system because you filed bankruptcy and

14 now you're going to tell the Court, you can't dismiss our case,

15 because there is no money available if we go back in the tort

16 system.  So this is there to protect the claimants.  It's there

17 to assure that there isn't treatment or considered a fraudulent

18 conveyance.  The idea was that the intent was the claimants are

19 covered either way, in bankruptcy or out."

20         Do you believe that statement to hold true in this

21 bankruptcy?

22         MS. BAKER:  Objection, Your Honor.  This is improper.

23 Whether it's impeachment or otherwise, it's an improper

24 question.

25         THE COURT:  Overruled.

Dickinson - Cross/Malone                    171

1 BY MR. MALONE:

2 A    I understand what the words said here.  I understand what

3 the agreement says, that it survived in or out of bankruptcy.

4 The intent, in my opinion, was solely with regard to

5 facilitating our bankruptcy process reaching a full and final

6 resolution.  I still believe that to this day.

7           And when I understood that the material -- that there

8 was a material risk that it was void or voidable based on the

9 Third Circuit ruling, we moved forward, because we had to.

10 Q    So back when that statement was made, the first funding

11 agreement, was it your understanding it was intended to be

12 available if that first bankruptcy was dismissed?

13 A    I understood -- I understood the language, but I

14 understood that the intent wasn't to facilitate our bankruptcy

15 prospects.

16 Q    Let's turn to the meeting of April 2nd, 2023.  It was a

17 board meeting.  Were you present in person at that board

18 meeting?

19 A    I was.

20 Q    Who else was present at that board meeting?

21 A    I think if we can go to the record, it gives you --

22 Q    Well, were all the other directors present?

23 A    All the other board members, correct, and the officer.

24 Q    And at the end of that board meeting, was there a

25 resolution prepared?

Dickinson - Cross/Malone                    172

1  A    I think alternatives were discussed.  Resolutions -- I

2  don't think we formally voted on resolutions.

3  Q    You didn't vote on a formal resolution at that time?

4  A    On April 2nd.

5  Q    Did you have occasion to review the Chapter 11 bankruptcy

6  petition for -- I'll call it LTL 2.0 -- before it was filed

7  with the Court?

8  A    The -- repeat the question.

9  Q    Did you have an opportunity to review the Chapter 11

10  bankruptcy petition, this bankruptcy, what we refer to as LTL

11  2.0, before it was filed?

12  A    Yes.  I reviewed the resolutions, the determinations, and

13  -- the determinations and what those were.  I reviewed the

14  board meeting minutes.  I reviewed the board meeting

15  presentations.

16        And I'm sure I didn't review every word of all those

17  files.

18  Q    Have you ever served on any boards besides the LTL board?

19  A    Historically, yes.

20  Q    How many boards?

21  A    Two or three boards.

22  Q    And when board resolutions are passed, have you been asked

23  to sign those board resolutions?

24  A    In some cases, yes; some cases, no.  It depends on if I

25  was the signatory.  These were local boards --

Dickinson - Cross/Malone                    173

1  Q    I'm talking about a corporate board.

2  A    Yeah, no corporate board.

3  Q    In the case of LTL 2.0, did you sign any resolution

4  authorizing the filing of this Chapter 11?

5  A    I voted on the resolution.

6  Q    That's not my question.  My question is simply yes or no.

7  Did you sign a resolution authorizing this debtor to file

8  bankruptcy?

9  A    Mr. Wuesthoff signs the --

10 Q    Did Mr. Wuesthoff sign it?

11 A    Yes.

12 Q    He did?  Would it surprise you if I pulled up the

13 bankruptcy petition on this case, there were no signatures

14 entered?

15 A    I'm assuming whatever was filed and that required Mr.

16 Wuesthoff's signature.

17 Q    You're sure or are you speculating, sir?

18 A    I'm assuming.

19 Q    You're assuming.  So you don't know if the board

20 resolution was signed by any of the directors?  It's a yes or

21 no question.

22 A    I -- no.

23 Q    You don't know that?

24 A    I know he -- I know he signed --

25 Q    That's not my question.

Dickinson - Cross/Malone                    174

1  A    -- the documents necessary --

2  Q    My question is with respect to the resolution that

3  authorized this debtor to file bankruptcy, there was a

4  resolution that's dated April 2nd, and you said -- your

5  testimony before was, "We didn't vote on April 2nd" --

6  A    I didn't say that.  I said --

7  Q    -- "for" -- from the read back of the record, you said

8  that there was no vote with respect to, on the April 2nd

9  meeting, to file bankruptcy.

10        MS. BAKER:  Objection to the argument with the

11 witness.

12        THE COURT:  Sustained.

13        Repeat your question if you have a question now.

14 BY MR. MALONE:

15 Q    On April 2nd, 2023, was there any vote for the resolution

16 to file Chapter 11?

17 A    Yes.

18 Q    And what was the vote?

19 A    Affirmative.

20 Q    By all members?

21 A    By all members, yes.

22 Q    Do you know or are you guessing?

23 A    No, I know that.

24 Q    And, as you said, you don't know if anyone signed that

25 resolution.

Dickinson - Cross/Malone                      175

1  A    I'm assuming Mr. Wuesthoff did, and if I --

2  Q    Well, if I told you that no one signed it, would you

3  believe it, or do we have to maybe pull out a copy of the

4  petition for you to review it for your recollection?

5         MS. BAKER:  Objection.  I just to make sure the

6  witness has an opportunity to answer his answers completely.

7         THE COURT:  As you sit here, can you state whether

8  you know that the resolution was signed by the board members?

9         THE WITNESS:  By the board members, no.  By Mr.

10  Wuesthoff, I'm almost certain that he did.

11         MR. MALONE:  Well, I'm going to reserve the right,

12  Your Honor, to call Mr. Wuesthoff back to the stand when we're

13  done with this witness.

14         THE COURT:  Well, just -- why don't we just get the

15  document?

16         MR. MALONE:  Well, it's a public record.

17         THE COURT:  Right.  So --

18         MR. MALONE:  I don't have the petition in front of

19  me.

20         THE COURT:  -- it is what it is.

21         MR. MALONE:  Right.

22         THE COURT:  So if it's signed, it's signed.

23         MR. MALONE:  We'll take judicial notice of it, Your

24  Honor.

25         THE COURT:  Thank you.

Dickinson - Cross/Malone                    176

1              MR. MALONE:  Thank you.

2  BY MR. MALONE:

3  Q    You know that LTL is considered a debtor in possession?

4  A    Yes.

5  Q    What is your understanding of the fiduciary duties of a

6  debtor in possession?

7  A    Fiduciary -- LTL has fiduciary -- LTL board members have

8  fiduciary responsibility to LTL and, as I mentioned before, any

9  decision we take, we take into consideration all key

10  stakeholders.

11  Q    I'm going to ask you a yes or no question.  Do you believe

12  that as a member -- as an officer and director of the debtor in

13  possession, you owe a fiduciary duty to the debtor's estate and

14  its creditors?  Yes or no?

15  A    My understanding from a legal perspective is I have

16  fiduciary responsibility to LTL, and every decision we make, I

17  take into consideration -- I take into consideration all key

18  stakeholders, including talc claimants.

19              MR. MALONE:  I have no further questions of the

20  witness, Your Honor.

21              THE COURT:  Thank you, Mr. Malone.

22              Counsel?

23              MS. BAKER:  Yes, Your Honor.  I have no redirect

24  examination for this witness.

25              THE COURT:  All right.  Mr. Dickinson, thank you for

Kim - Direct/Baker                    177

1  your time.  You may step down.

2          MR. DICKINSON:  Thank you.

3          THE COURT:  And our next witness?

4          Kiya, do you need a break?

5          COURTROOM DEPUTY:  I'm good.

6          THE COURT:  You're good?  Okay.

7          COURTROOM DEPUTY:  Thank you.

8          THE COURT:  Mr. Jonas, our next witness?

9          MR. JONAS:  We'll call Mr. Kim, Your Honor.

10         THE COURT:  Mr. Kim.  Good afternoon.

11         MR. KIM:  Good afternoon.

12         THE COURT:  Please raise your right hand.

13             JOHN KIM, DEBTOR'S WITNESS, SWORN

14         THE COURT:  Please have a seat.  Now, Mr. Kim, you

15 and I have spent a lot of time over here the last 20 months.  I

16 have special instructions for you.

17         THE WITNESS:  Judge, I know what the instructions

18 are.

19         THE COURT:  You know what's coming.

20         THE WITNESS:  And I know -- and I know my --

21         THE COURT:  Yes or no answers are fine.

22         THE WITNESS:  I do know that.  Yes, sir.

23         THE COURT:  Don't elaborate.

24         THE WITNESS:  Your Honor, I --

25         THE COURT:  Don't fight.

Kim - Direct/Baker                    178

1          THE WITNESS:  I did forewarn, even before stepping on

2     the stand.

3               THE COURT:  All right.  Thank you.

4               MS. BAKER:  May I approach the witness, Your Honor?

5               THE COURT:  Yes, please.

6                         DIRECT EXAMINATION

7     BY MS. BAKER:

8     Q    All right, Mr. Kim, how are you?

9     A    Well, I'm doing fine.  Thank you.

10    Q    All right.  You understand that your direct examination is

11    being offered by declaration in this case?

12    A    I do.

13    Q    In lieu of live testimony?

14    A    Yes.

15    Q    All right.  And I have handed you three notebooks.  They

16    are numbered one, two, and three, and I think you have notebook

17    number one in front of you.

18    A    I do.

19    Q    Okay.  And can you confirm that what you have in those

20    three notebooks is your declaration and all of the exhibits to

21    your declaration?

22    A    It is.

23    Q    Okay.  And feel free to take a moment if you need it.

24    A    Yes, I can affirm that.  Yes.

25    Q    All right.  And on the very first page of notebook one,

Kim - Cross/Jonas                          179

1  can you read the exhibit number into the record?

2  A    Debtor Exhibit D-1.

3          MS. BAKER:  All right.  And so, Your Honor, with

4  that, we would offer D-1, which is Mr. Kim's declaration, and

5  all of the exhibits thereto, into evidence.

6          THE COURT:  All right.  Any objection?

7                    (No response)

8          THE COURT:  They are so admitted.  Thank you.

9            (DEBTOR'S EXHIBIT D-1 RECEIVED)

10          MS. BAKER:  Thank you, Your Honor.

11          THE COURT:  Thank you, Counsel.

12          MR. JONAS:  Your Honor, may we just approach with the

13  binder?

14          THE COURT:  Yes.

15          MR. JONAS:  Thank you.

16          THE COURT:  Thank you.  What happened to all the

17  documents on those nifty tablets?

18          MR. JONAS:  Thank you, Your Honor.  Nick Jonas from

19  Brown Rudnick for TCC.

20                    CROSS-EXAMINATION

21  BY MR. JONAS:

22  Q    Hello, Mr. Kim.

23  A    Hello, Mr. Jonas.

24  Q    Here we are again.

25  A    Yes.

Kim - Cross/Jonas                    180

1 Q    Mr. Kim, you've worked at Johnson & Johnson since 2001,

2 right?

3 A    Yes.

4 Q    And you started in 2001 as senior counsel, doing

5 litigation, correct?

6 A    Correct.

7 Q    Then in about 2006 you became assistant general counsel,

8 correct?

9 A    I did.

10 Q    Then about eight years ago, the law department reorganized

11 itself into practice groups, and one of your responsibilities

12 became being litigation liaison to the consumer sector,

13 correct?

14 A    Yes.

15 Q    You were the litigator coordinating litigation for any

16 Johnson & Johnson consumer litigation, correct?

17 A    Yes, I was.

18 Q    Then you became head of the product liability practice

19 group, correct?

20 A    I did.

21 Q    In that role, your responsibilities included overseeing

22 all talc cases, right?

23 A    It did.

24 Q    For a number of years, you also led tort reform efforts

25 for Johnson & Johnson, correct?

Kim - Cross/Jonas                    181

1  A    I did.

2  Q    And Johnson & Johnson believes that there are abuses in

3  the tort system, right?

4  A    They do.

5  Q    And Johnson & Johnson chose North Carolina for its first

6  bankruptcy filing because it wanted to take advantage of a law

7  in the Fourth Circuit that made it difficult to dismiss a

8  bankruptcy case based on a lack of good faith, correct?

9  A    I would not agree with that, no.

10 Q    You don't agree with that?  Okay.

11       In early October of 2021, you became chief litigation

12 officer at LTL Management, Inc., the debtor in this bankruptcy

13 case.

14 A    I did.

15 Q    Okay.  Now, in the years preceding this bankruptcy,

16 Johnson & Johnson paid out a considerable amount of money on

17 account of talc-related verdicts and judgments against it and

18 Johnson & Johnson Consumer Products, correct?

19 A    Yes.

20 Q    And those funds were paid by Johnson & Johnson, correct?

21 A    In the first instance, yes.

22 Q    And Johnson & Johnson also spent a fair amount of money

23 litigating talc-related cases, correct?

24 A    Yes, as an entity.

25 Q    And prior to this bankruptcy case, Johnson & Johnson also

Kim - Cross/Jonas                              182

1  settled some talc-related cases, right?

2  A    Yes, although can you just clarify, when you say Johnson &

3  Johnson, I assume you're talking about the (indiscernible)?

4  Q    I am.

5  A    Thank you.

6  Q    Thank you.  Thank you for clarifying.

7        You're familiar with the Imerys bankruptcy case,

8  right?

9  A    I am.

10 Q    And generally, in Imerys, talc claims or liability was

11 asserted against Johnson & Johnson, correct?

12 A    I'm not -- could you rephrase that?

13 Q    Sure.  Do you know, were talc claims asserted against

14 Johnson & Johnson in the Imerys bankruptcy case?

15 A    Well, in the Imerys bankruptcy, the things were asserted

16 against Imerys.  There are claims that Imerys has against

17 Johnson & Johnson for indemnification, but not for the

18 underlying talc claims, so...

19 Q    Okay.  But Johnson & Johnson at one point had hopes of

20 using the Imerys bankruptcy as a global resolution for talc

21 liability, correct?

22 A    It did.

23 Q    And using the Imerys bankruptcy to globally resolve

24 Johnson & Johnson's talc liability was not successful.  I think

25 at one point you said it fell through, correct?

Kim - Cross/Jonas                                    183

1  A    It did.

2  Q    And prior to the LTL board voting to put LTL into

3  bankruptcy, the board was told about the potential resolution

4  of Imerys and how that fell through, correct?

5  A    It was.

6  Q    Turning to Ingham, you're familiar with the Ingham case,

7  right?

8  A    I am.

9  Q    And you attended most of the Ingham trial in St. Louis?

10 A    I did.

11 Q    That trial resulted in a multi-billion dollar verdict

12 against Johnson & Johnson and JCI, correct?

13 A    It did.

14 Q    And Johnson & Johnson appealed Ingham ultimately to the

15 Supreme Court of the United States, right?

16 A    I did.

17 Q    Cert was denied on Ingham in the spring of 2021, correct?

18 A    Yes.

19 Q    And after cert was denied in Ingham in the spring of 2021,

20 Johnson & Johnson ultimately paid out two and a half billion

21 dollars on that judgment, right?

22 A    It did.

23 Q    And that's when Project Plato, as it was called, got

24 underway, with the expectation that LTL would file bankruptcy

25 to resolve talc -- that talc litigation, correct?

1  A    The timing sounds about right.

2  Q    Okay.

3  A    I have no reason to doubt that.  I'd have to -- I haven't

4  refreshed my recollection on those events.

5  Q    It sounds about right?

6  A    It sounds about right, yes.

7  Q    Okay.  Now, Johnson & Johnson determined that a bankruptcy

8  of LTL would be the -- I think you said the most efficient way

9  for it to settle the talc litigation, correct?

10 A    Correct.

11 Q    And that's because, again, your words, using the

12 bankruptcy system could help Johnson & Johnson cap its talc

13 liability, correct?

14 A    If I said that, I said that.  I think it's generally true.

15 Q    Okay.  Okay, Mr. Kim, when LTL filed bankruptcy the first

16 time in October of 2021, the most important and valuable asset

17 was the first funding agreement, correct?

18 A    It was.

19 Q    And at your deposition in this bankruptcy case on June

20 1st, 2023, second bankruptcy case, you testified that the value

21 of the first funding agreement, of course, is whatever the

22 value of the talc liability was, minus those assets, meaning

23 LTL's other assets, correct?

24 A    Correct.

25 Q    And more specifically, you said, the value of the funding

Kim - Cross/Jonas                    185

1  agreement itself, again, is the liability of the talc -- is the

2  talc liability, minus the assets for LTL.  And you know, again,

3  I'm told we're aware of what the magnitude of that liability

4  is.

5          Do you remember that?

6  A    I remember that, yes.

7  Q    Okay.  And you testified that the magnitude of liability

8  was something in the neighborhood of eight, nine, ten billion

9  dollars, correct?

10 A    I gave those as a magnitude figure, yes.

11 Q    Yeah.  So your testimony in this bankruptcy case is that

12 the value of the first funding agreement was eight to ten

13 billion dollars, give or take, right?

14 A    I disagree with that.

15 Q    You disagree with that.  Well, you told me that the value

16 of the first funding agreement is the talc liability minus

17 LTL's assets; is that correct?

18 A    That is correct.

19 Q    Okay.  And the magnitude of the talc liability in the

20 neighborhood -- let's us 10 million [sic], just to make it

21 convenient -- you think is about $10 billion, right?

22 A    Well, that's an example of a magnitude.  I think -- yes, I

23 agree --

24 Q    Okay.

25 A    -- that that's a magnitude.

Kim - Cross/Jonas                    186

1  Q    And the assets for LTL around $400 million?

2  A    Yes.

3  Q    Okay.  So $10 billion, minus $400 million, that's

4  $9.6 billion, that's what, based on what you just told us,

5  that's what you think the value of the first funding agreement

6  was, right?

7  A    In very rudimentary terms.

8  Q    Okay.

9  A    But again, I think -- well, yes, in very rudimentary --

10 Q    I'll accept rudimentary.  So you believe -- based on that,

11 you believe that the value of the first and the second funding

12 agreements are the same, right?

13 A    I do.

14 Q    Okay.  And you heard me ask Mr. Wuesthoff.  I'm going to

15 ask you.  The idea that the value of the first and the second

16 funding agreement is an important part of the defense, the

17 debtor's defense to this motion to dismiss, correct?

18 A    I don't remember you asking that to Mr. Wuesthoff.

19 Q    Well, let me ask you.  You read pleadings before they get

20 filed?

21 A    I do.

22 Q    Okay.  I'm just going to read you something from page 17

23 of the -- the debtor's reply to the motion to dismiss.  It said

24 that retaining the same level of funding -- it's in bold, by

25 the way.  "Retaining the same level of funding available to

Kim - Cross/Jonas                    187

1  talc claimants," that was your -- I think that's what was being

2  said, but I'm asking you, was that one of the arguments why the

3  motion to dismiss should be denied is that no harm, no foul.

4  We had a funding agreement, now we have a new funding

5  agreement, and the values are the same, right?  Isn't that the

6  argument?

7  A    Well, I agree with that, but just so you -- I did not get

8  a chance to read the reply, because it was done in such a short

9  period of time, and I was busy trying to prepare for this

10 trial.  So I had not reviewed that in depth.

11 Q    Okay.  But you get my point, right?

12 A    I do.

13 Q    The argument -- one of the debtor's principal, important,

14 put in bold, an important argument, Judge, don't be -- yeah, we

15 terminated the first one, but no harm, no foul, we have a new

16 one, and they're of equal value.  Isn't that the argument?

17 Have I got it right?

18 A    Well, I think there's more to the legal argument about --

19 Q    Okay.  I agree.

20 A    -- whether there is -- whether there is -- I believe

21 there's more to it than that.

22 Q    There's lots of legal arguments.  But simply put, is it or

23 is it not an important part of the defense that the first and

24 the second funding agreement are of equal value?

25 A    It is one defense that we have --

Kim - Cross/Jonas                    188

1  Q    Okay.

2  A    -- put forth.

3  Q    Now, Mr. Kim -- and you heard me ask Mr. Wuesthoff, so you

4  see it coming.  But you came up with this new explanation for

5  the value of the first funding agreement as part of a defense

6  to a possible fraudulent conveyance, right?

7  A    I would disagree with that.

8  Q    Okay.  Well, at the motion to dismiss trial, in LTL's

9  first bankruptcy case -- and I'll show you the language, if

10 need be, but let me try it without it -- you told the Court the

11 value of the funding agreement is tied to the value of New

12 JJCI.

13        Do you remember that?

14 A    It is tied to it.  Yes, I agree with that.

15 Q    Okay.  And what is the -- what was, I guess, because it's

16 a lot less now, but what was the value of New JJCI?

17 A    At that point, I think it was determined to be around

18 $61 billion.

19 Q    Okay.  So the value of the funding agreement, you said it

20 was tied to the value of New JJCI, $61 billion, correct?

21 A    Yes.  It is tied to that, yes.

22 Q    Well, are you aware that the Third Circuit, having heard,

23 among other things, your testimony and Mr. Wuesthoff's

24 testimony, the Third Circuit made a finding -- and I think the

25 bankruptcy court did, too -- but the words stick in my mind

Kim - Cross/Jonas                              189

1  that the Third Circuit said that you guys -- "you guys" being

2  LTL in the first bankruptcy case -- you had a $61 billion ATM.

3          Do you remember reading that in the opinion?

4  A    I do remember reading that, yes.

5          THE COURT:  That was definitely Third Circuit

6  language.

7          THE WITNESS:  Correct, Your Honor.

8                        (Laughter)

9  BY MR. JONAS:

10 Q    Your testimony also in the first bankruptcy case was that

11 the value of the first funding agreement was $61 billion, it

12 was consistent with your deposition testimony in the first

13 bankruptcy when you testified, whatever the value of Old JJCI,

14 JJCI was at that time, that was what was available to LTL,

15 therefore putting creditors in at least the same position, but

16 better, because on top of that value, there was a backstop of

17 Johnson & Johnson.

18         Do you remember that?

19 A    I do.

20 Q    Okay.  And your testimony -- I want to pull up on the

21 screen, and if you're looking at tab 7 --

22         MS. BAKER:  So, I would object to improper

23 impeachment.  If he has a question for the witness, he can ask

24 the witness, but I don't --

25         MR. JONAS:  I wasn't trying to impeach him.  If I

Kim - Cross/Jonas                    190

1  did, I apologize.  I'm just asking questions.

2              THE COURT:  Let's hear the question.

3              MR. JONAS:  Okay.

4  BY MR. JONAS:

5  Q    So I want to show you something.  I want to show you your

6  declaration from October 14th, 2021, that you filed in North

7  Carolina.  That's where you filed, right, in North Carolina,

8  the first time?

9  A    It is.

10 Q    The first time.  Okay.  So let's pull that up on the

11 screen.  Paragraph -- this is, by the way, Exhibit 514, for the

12 record.  It's paragraph 27.  Let's just wait until it comes up

13 on the screen, but it's tab 7.

14             MR. JONAS:  Okay.  Your Honor, do you have your

15 binder?

16             THE COURT:  Yes.

17             MR. JONAS:  Okay.  We've looked at this.  Mr. Malone

18 had identified this.

19 BY MR. JONAS:

20 Q    And you have a binder, right, Mr. Kim?

21 A    I do have a binder, yes.

22 Q    Okay.  So in paragraph 27 --

23 A    Sorry --

24             THE COURT:  It's tab 7.

25 BY MR. JONAS:

Kim - Cross/Jonas                      191

1   Q    I'm sorry.  Tab 7.

2   A    It's always good to rely on the screens.

3   Q    And just bear with me, Mr. Kim.  It's really, really

4   important, so I'm going to read in the paragraph.  Okay.

5        Paragraph 27, "Significantly, the funding agreement

6   imposes no repayment obligations on the debtor.  It is not

7   alone.  It obligates New JJCI and J&J on a joint and several

8   basis to provide funding up to the full value of New JJCI to

9   pay for costs and expenses of debtor incurred in the normal

10  course of its business, A, at any time when there is no

11  bankruptcy case, and, B, during the pendency of any Chapter 11

12  case, including the costs of administering the Chapter 11

13  case," et cetera, et cetera.

14        Next sentence.  "In addition, the funding agreement

15  requires New JJCI and J&J to, up to the full value of New JJCI,

16  fund amounts necessary, A, to satisfy the debtor's talc-related

17  liabilities at any time when there is no bankruptcy case, and,

18  B, in the event of a Chapter 11 filing," et cetera.

19        So when you were -- in your declaration, when you

20  were saying that this obligated J&J and New JJCI to fund up to

21  the value of New JJCI, that was $61 billion, correct?

22  A    It was.

23  Q    Okay.  And so, just to be clear, LTL could have settled

24  its talc liabilities for up to $61 billion, and New JJCI or

25  J&J, either one, would be obligated to fund that settlement,

Kim - Cross/Jonas                              192

1  correct?

2  A    Hypothetically.

3  Q    Hypothetically.  Okay.

4  A    Hypothetically.

5  Q    But the funding agreement was only worth $8 billion,

6  right, the first funding agreement?

7  A    Yeah.  This says nothing about value.  This says what the

8  obligations were.  The value of the funding agreement is the

9  same.

10 Q    Yeah.  Of course.  The judge will figure out the value.

11 But I want to just make sure.  Even though the debtor could

12 have gone to J&J and said, "Give me $61 billion," you think it

13 was only worth -- the value to the debtor was only $10 billion,

14 that's your testimony?

15 A    Yes.  The value --

16 Q    Okay.

17 A    The value, yes.

18 Q    Excellent.  So just like the first funding agreement, the

19 value of the second funding agreement is tied to the value of

20 New JJCI, which is now known as HoldCo, correct?

21 A    It is.

22 Q    That value is approximately 29, 30 billion dollars, right?

23 A    Yes.

24 Q    And so when it was signed, the first funding agreement was

25 -- LTL could have called up to $61 billion, right?

Kim - Cross/Jonas                    193

1  A     Yes.

2  Q     In the second funding agreement, they can only call up to

3  $30 billion, right?

4  A     Hypothetically, yes.

5  Q     And under the first funding agreement, J&J was obligated

6  to fund, at least prior to the, according to you, the Third

7  Circuit decision, and they were obligated to fund the

8  $61 billion, right?

9  A     That's correct.

10 Q     Today, under the second funding agreement, because there's

11 no court order confirming a plan, J&J has no obligation to fund

12 a dime, correct?

13 A     Outside of bankruptcy.

14 Q     Outside of bankruptcy.  Well, are you saying that today

15 J&J has an obligation to fund --

16 A     I'm sorry.  I misheard you.  Can you repeat the question?

17 I'm sorry.

18 Q     Sure.  Today, under the second funding agreement, because

19 there is no court order confirming a plan, J&J has no

20 obligation to fund anything, correct?

21 A     Prior to any court order, yes.  True.

22 Q     And even if a court order enters confirming a plan that

23 J&J approves, J&J's maximum liability today, under the second

24 funding agreement, and the support agreement, is $8.9 billion,

25 right?

Kim - Cross/Jonas                    194

1  A    I disagree with the way that you phrased that.

2  Q    Okay.  You think it's more than that?  Less than that?

3  What do you think?

4  A    What I think -- what I think is that -- so, as you said,

5  if there's a court-ordered -- court-ordered plan that everyone

6  agreed to, that plan could contain an amount higher than the

7  8.9 if J&J had approved to the ordered plan.

8         So -- so it's not limited to 8.9.  It depends on what

9  the plan is and what the parties, J&J and, you know, the Ad Hoc

10 Committee, and the vote says.  So...

11 Q    Fair point.  Fair point.  J&J could change the existing

12 support agreement and agree to pay more, right?

13 A    Well, if there's a plan that's approved, then everyone has

14 to -- not only J&J, but all the other parties have to approve

15 the plan, and that plan could provide for a greater amount.

16 Q    Yeah.  J&J can always decide to throw more money at this

17 problem, right?

18 A    Well, again, I think under the terms of the agreement,

19 because it's all dependent upon a confirmed plan, if there is a

20 plan that everyone agrees on that has a higher amount, then it

21 would be obligated to pay the higher amount.

22 Q    And the -- the provision I read to you from your

23 declaration where you were referring to the terms, and the

24 terms of the funding agreement, which you referenced in your

25 declaration, provided that -- that the first funding agreement

Kim - Cross/Jonas                                195

1  by its terms was enforceable and operative if there was no

2  bankruptcy case, do you remember that?  We talked about that.

3  A    Based upon the foreseeable facts that we knew at that

4  time, yes.

5  Q    Oh, I didn't see that in your declaration.  You said that

6  it was -- that obligation was based on -- only on foreseeable

7  facts that we knew about at that time?

8  A    Well, that's always understood.  You don't foresee the

9  unforeseeable.

10 Q    Okay.  Well, let me ask you -- and we went through this

11 earlier, but I'm going to do it as well, because I want to know

12 -- I want to get your understanding, because it's very

13 important that this court and ultimately the Third Circuit have

14 accurate facts.

15        When Mr. Gordon from LTL's law firm, at the first MTD

16 trial, when he said, [As read:] So there's basically two

17 different scenarios where funding is available, two different

18 scenarios, the first is funding in the tort system.  And as you

19 would expect, what the funding agreement says is that payors

20 are obligated to pay the liabilities, to the extent they are

21 established by a judgment or settlement in the tort system.

22 That's what you would expect, and that's what happens.  You

23 want funds available to pay settlements, to pay judgments in

24 the tort system.  So it makes very clear, this is what we're

25 talking about if there's no proceeding in bankruptcy, whether

Kim - Cross/Jonas                          196

1  there was no case filed or whether the case is filed or

2  dismissed, the money is available for that purpose. And you can

3  imagine, Your Honor, by the way, the hue and cry you would have

4  heard if this provision weren't in there, because they would

5  have said we're manipulating the whole system, because you

6  filed bankruptcy, and now you're going to tell the Court you

7  can't dismiss because there's no money available if we go back

8  in the tort system.  So this is there to protect claimants.

9  It's there to assure this isn't treated or considered a

10  fraudulent conveyance.  The idea was and the intent -- intent

11  was the claimants are covered either way, in bankruptcy or

12  outside.

13          You were in court when Mr. Gordon told that to this

14  court on February 18th, 2022, right?

15  A    I was.

16  Q    Okay.  Was he speaking falsely when Mr. Gordon made those

17  comments?

18  A    No.

19          MS. BAKER:  Objection, Your Honor

20  BY MR. JONAS:

21  Q    Did he ask --

22          THE COURT:  Sustained.  Ask it a different way.

23          MR. JONAS:  Fair enough.

24  BY MR. JONAS:

25  Q    Did Mr. Gordon accurately reflect the intent of the

1 parties to the first funding agreement when he made those

2 statements?

3 A    Based upon the facts and what was known at the time, I

4 believe that was true.

5         MR. JONAS:  Give me one second, Your Honor.

6 BY MR. JONAS:

7 Q    Okay.  On January 30th, 2023, the day the Third Circuit

8 decision issued requiring LTL's first bankruptcy case to be

9 dismissed, you determined that there was a risk that the first

10 funding agreement was void or voidable, correct?

11 A    I did.

12 Q    You think, quote, everyone agrees that the Third Circuit

13 decision is wrong, the Third Circuit made a mistake, and it was

14 something that no one could have anticipated.

15         Correct?  That's what -- that's your belief?

16 A    That's -- yes.  Yes, that's what I said.

17 Q    Surely after the Third Circuit's decision on January 30th,

18 2023, Johnson & Johnson, maybe even that day, I think, Johnson

19 & Johnson told LTL that the first funding agreement was

20 unenforceable, and it was void, and about the void/voidable

21 issue, right?

22 A    It did.

23 Q    And Mr. Haas told you that, right?

24 A    Well, it was in a group meeting, yes.

25 Q    Group meeting.  And it was on January 30th, wasn't it?

Kim - Cross/Jonas                              198

1  A    I believe that's true.

2  Q    After J&J asserted that the first funding agreement was

3  unenforceable, there were no negotiations between J&J and LTL

4  with respect to that and the void/voidability issue, correct?

5  A    Correct.  There were discussions.

6  Q    Discussions.  No negotiations?

7  A    I would characterize them more as discussions.

8  Q    Discussions.  Okay.  Well -- okay.  J&J believed that the

9  first funding agreement was void or voidable, and LTL believed

10 there was a material risk of unenforceability, right?

11 A    Correct.

12 Q    Okay.  The second funding agreement specifically was

13 designed to support the position that LTL was in financial

14 distress when it filed its second bankruptcy case, correct?

15 A    I disagree with that.

16 Q    Well, wasn't the second funding agreement designed to

17 effectuate a resolution in bankruptcy?  How about that?  Do you

18 agree with that?  That's what you told me at your deposition.

19 A    Yes, I believe that's true.

20 Q    And more particularly, in connection with the signing of

21 the second funding agreement, you, quote/unquote, took guidance

22 from the Third Circuit's decision, right?

23 A    I did.

24 Q    And when LTL signed the first funding agreement, New JJCI,

25 as it became HoldCo, had a value in excess of $60 billion,

Kim - Cross/Jonas                          199

1  correct?

2  A    I'm sorry.  Could you repeat the question?

3  Q    Sure.  When you signed the first funding agreement, New

4  JJCI, which became HoldCo, had a value in excess of

5  $60 billion?

6  A    Correct.

7  Q    And when LTL signed the second funding agreement, HoldCo's

8  value was approximately $30 billion, right?

9  A    Yes.

10 Q    And that's because HoldCo had transferred or spun off its

11 consumer health business, right?

12 A    That's correct.

13 Q    And that happened in early January of 2023, right?

14 A    That is true.

15 Q    And based on this happening, the value of HoldCo, the

16 primary obligor to LTL under the first funding agreement, went

17 from more than $61 billion to about $30 billion, right?

18 A    Correct.

19 Q    You didn't know until February or maybe March that the

20 HoldCo transfer of its $30 billion consumer health business had

21 occurred, right?

22 A    That's true.

23 Q    And let me ask you -- so if you look at tab 1, in

24 paragraph -- you don't have to, because I'm going to read it,

25 but in case you want to, in paragraph 44 on page 16 of your

Kim - Cross/Jonas                          200

1  declaration, you state, The board determined that LTL and

2  HoldCo would each be financially distressed were LTL forced to

3  return to the tort system, and the board also determined that

4  neither would be insolvent.

5          Right?

6  A    Correct.

7  Q    Now, Mr. Kim, you're a litigation attorney, right?

8  A    I am.

9  Q    You're not a financial expert?

10 A    I am not.

11 Q    At the LTL board meetings on March 28th and April 2nd, LTL

12 didn't have any financial advisor or any investment banker

13 present on the issues before the board, right?

14 A    That's true.

15 Q    And in connection with the second funding agreement, LTL

16 didn't request any entity other than HoldCo as a counter-party

17 under the second funding agreement, right?

18 A    That's true.

19 Q    And in entering into the second funding agreement, you

20 knew that after doing so, LTL would be in financial distress,

21 right?

22 A    Yes.

23 Q    And LTL didn't request a stronger counter-party or an

24 additional counter-party, because LTL wanted to be in financial

25 distress, correct?

Kim - Cross/Jonas                    201

1  A    I disagree.

2  Q    Disagree.  Well, did you -- did you ask -- did you say to

3  J&J, Geez, you know, we used to have HoldCo, it had

4  $61 billion, and you transferred that whole business out of

5  there, and now it's only worth $30 billion, can you guys top us

6  up or give us some other -- another entity?  Did you ask?

7  A    I did not ask.

8  Q    Okay.  Did you ask that J&J give you a guarantee like it

9  did the first time?

10  A    Of course not.

11  Q    You didn't?  Okay.

12  A    No.

13  Q    Do you think -- let me ask you, do you think that not

14  requesting a stronger counterparty, do you think that was

15  maximizing value for creditors?

16  A    Yes.

17  Q    It was?

18  A    It was.

19  Q    Okay.  And not asking J&J to provide a full guarantee, was

20  that maximizing value for creditors?

21  A    I do.

22  Q    Okay.  And when you entered into the second funding

23  agreement, you believed LTL was not insolvent but was in

24  financial distress, right?

25  A    Yes.

1  Q    And prior to entering into the second funding agreement,

2  LTL had performed no analysis with respect to the value of

3  HoldCo, correct?

4  A    I'm sorry.  Can you repeat that question?

5  Q    Sure.  Prior to entering into the second funding

6  agreement, LTL performed no analysis with respect to the value

7  of HoldCo, correct?

8  A    Not correct.

9  Q    Not correct?

10 A    Not correct.

11 Q    Okay.  So let's take a look at your deposition of June

12 1st.  It's Tab 21.  It's Exhibit 770.  Tab 21, Exhibit 770.

13 We're going to go to Page 89, Line 5.  Just let me know when

14 you're there.  I'll read the question, you could read the

15 answer.  Are you ready?

16 A    Yes.

17 Q    "Prior to entering into the second funding agreement, what

18 analysis of the value of HoldCo did LTL perform or conduct?"

19      Can you read your answer?

20 A    It says, "I don't believe there was an analysis conducted

21 because HoldCo was already the primary obligor under the first

22 funding agreement.  Whatever HoldCo's value was is what

23 HoldCo's value was."

24      Can I --

25 Q    No.

Kim - Cross/Jonas                               203

1  A     Okay.

2  Q     Thank  you, though.

3        So if HoldCo's --

4             THE COURT:  You're learning, good.

5             MR. JONAS:  If HoldCo -- he's getting better at it.

6             THE COURT:  He's getting better.

7             THE WITNESS:  I'm asking -- at least I'll ask first.

8  BY MR. JONAS:

9  Q     Even if HoldCo's value was $1, it didn't matter, LTL would

10 have signed up the second funding agreement with HoldCo as the

11 primary obligor.  Correct?

12 A     Not correct.

13 Q     Back to Page 89.  Now I'm going to go to Line 13.

14       "So if HoldCo had a value of a dollar, didn't matter,  You

15 would have just signed it up to the funding agreement, right?"

16 A     I'm sorry.  I'm sorry.  What page?  Where are you?

17 Q     89.

18            THE COURT:  It should also be on your screen.

19 BY MR. JONAS:

20 Q     Tab 21.

21 A     Got it.

22 Q     Exhibit 770.

23       "So if HoldCo had a value of a dollar, didn't matter, you

24 would have just signed them up to the funding agreement,

25 right?"

Kim - Cross/Jonas                                204

1      Can you read your answer?

2  A    I said, "We would have had that as a primary obligor."

3  Q    Okay.  You don't know who prepared the first draft of the

4  second funding agreement, right?

5  A    I do not.

6  Q    You don't know how many drafts, if there were any drafts?

7  There were, right?  You don't know?

8  A    I do not know.

9  Q    Same answers with respect to the termination and

10 substitution agreement?

11 A    Correct.

12 Q    Same answers with respect to the support agreement?

13 A    Correct.

14         MR. JONAS:  Just one second, Your Honor.

15 BY MR. JONAS:

16 Q    As of April 4th, 2023 when LTL filed its second

17 bankruptcy, there was no estimate, formal or otherwise, of

18 LTL's total talc liabilities, right?

19 A    There was no formal estimate.

20 Q    As of April 4th, 2023, when LTL filed its second

21 bankruptcy, there was no formal analysis or projections with

22 respect to the cost of continuing to litigate in the tort

23 system, correct?

24 A    No incrementally new, yeah, analysis done.

25 Q    You had the same information you had the last time?

Kim - Cross/Jonas                          205

1  A    Based on the same information that we had the last time,

2  yes.

3  Q    So you didn't have -- you were sitting there trying to

4  figure out if you're in financial distress, are you going to

5  file bankruptcy.  You didn't have projections looking out over

6  the next year as to -- in that type of analysis?

7  A    No, we only knew that it was getting worse.

8  Q    Okay.  And since you're here, it makes it easier for me.

9  You heard Mr. Wuesthoff say that LTL's historical cost of

10  defending itself, of litigating in the tort system was 10 to 20

11  million dollars per month.  Did you hear his testimony?

12  A    Back -- yes, for that period back then.

13  Q    Well, that's all the information you had, right?  You

14  didn't --

15  A    Well, we have more information than that now but that --

16  Q    Well, you --

17  A    -- back then.

18  Q    Hold on.  Let's get this right.  Historically, you had the

19  information.  You knew that LTL's cost of litigating in the

20  tort system was 10 to 20 million dollars a month, right?

21  A    Right, back then.

22  Q    Hold on.  I just asked you.  I said did you have any --

23  A    I'm sorry.  Go ahead.

24  Q    I asked you did you have any estimates, any analysis, any

25  projections going forward, and you said you didn't.

Kim - Cross/Jonas                                         206

1  A    I said except that we knew that things were getting worse

2  which is reflected in the board presentation.

3  Q    Things were getting worse.

4  A    Yes.

5  Q    Okay.  That's okay.  But let's talk about real numbers,

6  right, because that's important.  That's Third Circuit look at

7  that.  We got to really focus on it.  You can't do back-of-the-

8  envelope stuff.

9       So all you had when you were going to file a second time

10 was the same information as to the cost of litigating in the

11 court system that you had the first time.  And I guess you

12 thought things might be getting worse.  That's --

13 A    We -- we knew things were getting worse.

14 Q    Okay.  Okay.  The costs, 10 to 20 -- let's focus -- 10 to

15 20 million dollars a month, correct?

16 A    Well, again, based upon the information from back then

17 which was based on assumptions that we had about how many cases

18 that were being tried, the cost of the litigation back then.

19 But, again, as we said in the board presentation, all those

20 numbers were getting worse.

21 Q    Do you agree with Mr. Wuesthoff's testimony that the only

22 information you had and only -- whether it's projections or

23 historical or whatnot, was that the cost to LTL using real

24 numbers to litigate in the tort system if it defended all of

25 its talc liability was going to be 10 to 20 million dollars per

Kim - Cross/Jonas                                    207

1  month?  Did you agree with his testimony?

2  A    No.

3         MS. BAKER:  Asked and answered, Your Honor.

4         THE COURT:  Before you answer -- I'm sorry

5         MS. BAKER:  Objection.  Asked and answered.

6         THE COURT:  Can you answer that, please?

7         THE WITNESS:  I disagree with that.

8  BY MR. JONAS:

9  Q    You disagree with Mr. Wuesthoff's testimony?

10 A    Yes.

11 Q    Okay.  All right.

12      Okay.  I want to look at your new declaration.  You caught

13 me off guard.  That's a first.

14      This is at Tab 8.  It's Exhibit 1073.  And we're going to

15 look at Paragraph 43 on Page 16.

16         THE COURT:  Again, it comes up on the screen if it's

17 easier.

18         THE WITNESS:  All right, thank you.

19 BY MR. JONAS:

20 Q    The first line of Paragraph 43, just let me read it to you

21 so we can orientate ourselves.

22      "LTL's and HoldCo's combined cash position could support

23 defense costs upon a return to the tort system for only a

24 limited period of time, certainly less than one year."  Right?

25 A    Yes.

Kim - Cross/Jonas                               208

1  Q    So I want to know the variables when you came up with

2  this.  I want to know your variables, right.  The cost to

3  litigate 10 to 20 million a month, right?

4  A    Again, there are -- I don't have those precise numbers in

5  mind.  But it's around that.

6  Q    Around that, okay.  We'll go with that.  We'll go with

7  around that.  So that's at most 240 million, and I'm not

8  minimizing.  It's a lot of money.  But we'll talk about the

9  context.  That's $240 million a year to litigate in the tort

10 system, right?

11 A    At minimum, yes.

12 Q    Okay.  And when you were talking about LTL and HoldCo's

13 combined cash position, what was it?  What was the cash

14 position?

15 A    At that time, I think it was around $400 million.

16 Q    Well, that's interesting because you filed this on Friday,

17 the 23rd.

18 A    Yes.

19 Q    But you're aware that prior to you signing and filing your

20 declaration, a dividend of $912 million was paid to HoldCo,

21 right?

22 A    No.  At this time, I did not know that.

23 Q    So you're sitting there working with your lawyers to file

24 a declaration for this trial and no one had told you that

25 within the days preceding your expert, Mr. Bell, a few days

Kim - Cross/Jonas                                   209

1  earlier had filed an expert supplement because it was important

2  to tell the world.  He filed it in this Court that a $912

3  million dividend had been paid to HoldCo and you didn't know

4  about it?

5  A    I knew that there was a dividend.  That was presented in

6  the board minutes.  I knew that the possibility was there.  At

7  the time that I filed this, I didn't know the status of where

8  that dividend process was.

9  Q    Mr. Kim, you're a lawyer.  You know it's really important

10 that when you testify, and this is your testimony, that you be

11 truthful, of course, and complete so the Court can make the

12 right decision, right?

13 A    Yes.  So, again, when I signed this, when we put this

14 together, we actually put it together the day before we filed

15 it.  So at the time that this was put together and at the time

16 that it got filed, I was unaware that that dividend had been

17 actually --

18 Q    Okay.

19 A    And I frankly did not know whether that dividend even

20 though it was declared had even reached (indiscernible) yet.

21 Q    Okay.

22 A    So there are lots of variables in there about where that

23 dividend may have been.

24 Q    Well, let me ask you something.  How do you -- J&J has

25 pretty good credit, right?

Kim - Cross/Jonas                    210

1  A    I believe it does.

2  Q    Yeah.  I've heard it's one of the few companies in the

3  United States that has a better credit rating than the United

4  States of America.  Have you heard that?

5  A    I have heard that.

6  Q    Okay.  So if I made a loan to J&J, would you consider that

7  to be pretty close to cash, as good as cash?

8  A    I don't think I can answer.

9  Q    You can't?

10 A    No.

11 Q    If I made a demand loan so that I could call up J&J and

12 say, hey, do you remember that dollar I gave you yesterday, I

13 want it back, pretty good chance I'm going to get it back,

14 right?

15 A    Again, I think it depends on lots of things.

16 Q    I mean if they honor the terms of the agreement, they'd

17 pay it back to me, right?

18 A    Well, it would depend on what the terms were.

19 Q    Right.  If it was foreseeable.

20 A    Well, if the -- yeah, absolutely.  If there was some --

21 Q    Yeah.  If it wasn't foreseeable --

22 A    If there was some --

23 Q    -- they may not pay it back, okay.

24 A    Certainly, if there was some issue in the terms.

25 Q    I'm just having fun with you, Mr. Kim.

Kim - Cross/Jonas                           211

1  A    Okay.

2  Q    Okay.  So let's do the math.  You put a statement in here

3  that, "Upon return to the tort system, LTL and HoldCo's

4  combined cash position could only support or return

5  (indiscernible) for a limited period of time, certainly less

6  than one year."

7      I'm confused by that because you told us that the cash

8  position was $440 million.  You told us that the cost of

9  defending, the cost of being in the tort system are maximum

10 $240 million.  So I don't understand how you came up with less

11 than a year.

12 A    Yeah, I'm not sure I said maximum.  I said -- and, again,

13 I think I said at minimum, those are the numbers and it was

14 getting worse.  So I think we were looking at using higher

15 numbers --

16 Q    Do you want me to show you the slide from the first

17 bankruptcy that Ms. Brown put up that was your -- I think it

18 was either your -- it was your testimony.  It said 10 to 20

19 million dollars a month.  That's what -- and that's the only

20 information you had when you went into the second bankruptcy,

21 only financial either projection analysis, that's what you had,

22 right?

23 A    But it was -- we told the board several times --

24 Q    Okay.

25 A    -- that the situation was getting worse.

Kim - Cross/Jonas                    212

1  Q    Okay.

2  A    That there were more cases.

3  Q    But just take me through the math.  If it's $440 million

4  of cash, so are you saying the cost even though you thought

5  they would be 10 to 20 a month, they were going to be more than

6  $440 million for costs of defense?

7  A    Yeah, I think what we were thinking was that there was --

8  if we were back in the tort system, the cost would be

9  magnitudes higher than what we previously had.

10  Q    Mr. Kim, I hate to -- I don't mean to be vulgar about it,

11  but you guys just kind of made that up, didn't you?  You didn't

12  have any investment bankers, you didn't have any financial

13  advisors.  You just -- you can't give us a number.  You

14  previously testified it was 10 to 20 million, and now you're

15  just saying it was going to be more, it was going to be a lot

16  more than that.  And you put in a declaration testimony that

17  you didn't think they could make it -- it was going to be less

18  than a year.

19          MS. BAKER:  Objection.  Argumentative.

20          THE COURT:  Sustained.

21          MR. JONAS:  I'll move on, kind of.

22  BY MR. JONAS:

23  Q    So let's do some more math.  If instead of 440 million, I

24  have to do some math here.  If instead of 440 million, HoldCo

25  has cash or access to cash of $1.4 billion, how long do you

Kim - Cross/Jonas                    213

1  think you could defend yourself in the tort system with $1.4

2  billion in cash?

3          MS. BAKER:  Object to the hypothetical.

4          THE COURT:  Sustained.

5  BY MR. JONAS:

6  Q    Do you think it's important for the Court to today in

7  assessing financial distress to know how much cash or cash like

8  or better than cash LTL and HoldCo have access to?

9  A    Yes.  And I believe they're contained in all the expert

10 reports now.

11 Q    Okay.  So what's the number?  How much cash or access to

12 cash does LTL and HoldCo have available to them today?

13 A    Yeah.  I actually don't know that number right now, but I

14 know that they were in the expert report including the Bell

15 report that you referenced.

16 Q    Well, do you know now that HoldCo got a $912 million

17 dividend?

18 A    I do understand that it got a dividend that was lower than

19 it was expected when we met with the board.

20 Q    Was it $912 million?

21 A    I think that's in that category but again I'd have to --

22 Q    Sounds about right?

23 A    Yeah.

24 Q    Okay.

25 A    I only have a broad understanding of that.  I think Adam

1  Lisman is the one that has been following those things.

2  Q    Don't you think it's important for somebody at LTL -- you

3  don't know, Mr. Wuesthoff doesn't know.  We should have asked

4  Mr. Dickinson.  I bet he doesn't know.  Don't you think it's

5  important that somebody know how much cash is available if

6  you're making a decision if you're going to defend yourself in

7  the tort system?

8  A    Yeah.

9           MS. BAKER:  Objection.  Argumentative.

10          MR. JONAS:  I don't think it's argumentative.

11          THE COURT:  Actually, I'll overrule that.

12

13          THE WITNESS:  I don't think it particularly

14 important, no.  I think -- yeah, I don't think it's

15 particularly important, no.

16 BY MR. JONAS:

17 Q    With respect to whether LTL has entered into PSAs with

18 plaintiffs' lawyers representing a majority of talc claimants,

19 you don't have any independent knowledge and rely on Mr.

20 Murdica, correct?

21 A    For the most part.  I do have -- I think for the most

22 part, that's true.

23 Q    Any understanding you have in that regard is based on

24 conversations with Mr. Murdica, correct?

25 A    Mostly.

Kim - Cross/Jonas                    215

1  Q    You don't know the total number of talc claimants, total

2  number, correct?

3  A    Correct.

4  Q    You did nothing to verify any assertions by plaintiffs'

5  attorneys regarding the number of their clients that they

6  supposedly represented, right?

7  A    That's not true.

8  Q    What did you do to verify the number of clients that an

9  individual settling plaintiffs' attorney had?

10  A    Well, I directed that we took a look -- take a look at

11  these claimants and I know that we directed audits being done

12  at this point.  I know a third party has gone through and

13  looked at de-duplication.

14  Q    You did nothing to verify whether these plaintiffs'

15  attorneys had collected pathology reports or confirmatory

16  medical records, correct?

17  A    That's correct.

18  Q    You did nothing to verify whether these purported

19  claimants actually had talc-related injuries, correct?

20  A    That's correct.

21  Q    You did nothing to verify whether these purported

22  claimants' claims were timely under any applicable statutes of

23  limitations, correct?

24  A    That's correct.

25  Q    Of the claimants whose lawyers have signed PSAs, you don't

Kim - Cross/Johnson                    216

1  know how many of those claimants allege non-ovarian

2  gynecological cancer, correct?

3  A     That's correct.

4           MR. JONAS:  I'll pass the witness, Your Honor.  Thank

5  you.

6           THE COURT:  All right.  Mr. Maimon?

7           MR. MAIMON:  I don't mean to jump in front of anybody

8  else.

9           THE COURT:  Can I get a sense who else is going to be

10 -- a lot of hands.

11          UNIDENTIFIED SPEAKER:  Are we going to -- I'm just

12 wondering what the schedule is for a break, Your Honor.

13          UNIDENTIFIED SPEAKER:  I could use a break now, but.

14          THE COURT:  Well, more important --

15          UNIDENTIFIED SPEAKER:  I was doing it for -- I was

16 asking for her, Your Honor.

17          THE COURT:  Very nice.  Nice touch.  We'll take a

18 break now for ten minutes.

19          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          (Recess at 2:59 p.m./Reconvened at 3:13 p.m.)

22          MS. JOHNSON:  Good afternoon, Your Honor.

23          THE COURT:  Wait, let's get us on record.

24          All righty.  Kiya, are you ready?

25          THE CLERK:  Yes, sir.

1            Ms. Johnson, good afternoon.

2            MS. JOHNSON:  Good afternoon, Your Honor.  Ericka

3   Johnson for the Ad Hoc Committee of State Attorney Generals.

4                        CROSS-EXAMINATION

5   BY MS. JOHNSON:

6   Q    I guess I drew the short straw in being able to go next,

7   Mr. Kim, and ask a few questions.

8   A    Sure.

9   Q    Mr. Kim, you've said the total talc liability's $8.9

10  billion.  Is that correct?

11  A    No, that's not correct.

12  Q    And what do you estimate the total talc liability to be?

13  A    You know, the -- so there are two figures, outside of

14  bankruptcy and inside of bankruptcy.  Of course, inside of

15  bankruptcy there is a deal that we have for $8.9 billion to

16  resolve all the talc liabilities.

17        Outside the bankruptcy, you know, talc liability is

18  variable and volatile.  There are lots of data points that we

19  have, you know, including some of the bankruptcy-related

20  numbers like the settlement in Imerys and stuff.  So I think

21  the best you could do today is go to sort of the analysis that

22  we have our experts have done, Charlie Mullin, who has a range

23  of between 11 to 20 billion dollars.  So that's what I would --

24  Q    Okay.  So the 8.9 billion is the number that you say is in

25  bankruptcy, that would be the total talc liability.  Is that

Kim - Cross/Johnson                              218

1  correct?

2  A    Yes.  That would be -- that would be the -- you know, the

3  proposed plan number that -- that we've submitted.

4  Q    Okay.  And that's based on the PSAs.  Is that right?

5  A    Well, now it's based on the plan.  Now it's based on the

6  -- the plan that was filed, the amended plan that was filed

7  yesterday.

8  Q    And the amended plan was based on the PSAs.  Is that

9  correct?

10 A    As a starting point, yes.

11 Q    The PSA had the $8.9 billion number.  Is that right?

12 A    It did.

13 Q    And then the plan also has the $8.9 billion number,

14 correct?

15 A    It does.

16 Q    And that total includes government unit claims.  Is that

17 right?

18 A    It does.  There's an allocation for government unit

19 claims.

20 Q    And the government unit claims by your understanding, does

21 that include state consumer protection claims, as well?

22 A    They do.

23 Q    Now the plan allocates no more than $400 million to

24 satisfy all the government unit claims.  Is that right?

25 A    That is true.

Kim - Cross/Johnson                    219

1  Q    And the PSAs were not negotiated with any of the states.

2  Is that right?

3  A    The PSAs are not with any of the states, that's correct.

4  Q    And they weren't negotiated with any of the states.  Is

5  that right?

6  A    I think there were negotiations.  I think the government

7  just did not join in on the PSAs, so I think there may have

8  been negotiations.

9  Q    Is that understanding based on your conversations with Mr.

10  Murdica?

11  A    Yes.

12  Q    Do you have any independent knowledge of those

13  negotiations?

14  A    No.

15  Q    None of the states have agreed to the $400 million,

16  correct?

17  A    I believe that's true.

18  Q    Did LTL conduct any analysis into the value of the

19  consumer protection claims before setting the value at $400

20  million?

21  A    Well, yeah, we believe that the consumer protection plans

22  are worth zero.  But what we have done is put in an amount to

23  try to resolve them.

24  Q    And so that amount was just a negotiated amount, right?

25  A    Well, that's an amount that we -- yeah, that was

Kim - Cross/Malone                           220

1  negotiated.  But, again, I think outside of bankruptcy, we

2  would value those claims as zero.

3  Q    Okay.  And when I say negotiate, just to be clear, that's

4  not negotiated with the states.  That was an amount that was

5  set by Mr. Murdica.  Is that right?

6  A    Well, that was an amount that was negotiated with

7  attorneys that represented -- you know, that signed PSAs and,

8  again, I believe there were discussions with -- with the AG

9  group at some point.

10 Q    Okay.  And that --

11 A    But, again --

12 Q    -- what you believed to be discussions you have no

13 independent knowledge of?

14 A    Correct.  And as you said, I don't believe the AG group

15 agreed to that amount, but that was -- there were discussions.

16 Q    And so when you say it's a negotiated amount, just to be

17 clear, it's a negotiated amount between the plaintiff law firms

18 that have entered into the PSAs and Mr. Murdica on behalf of

19 LTL.  Is that right?

20 A    Well, on behalf of LTL and J&J, yes.

21          MS. JOHNSON:  Thank you, Your Honor.

22          THE COURT:  Thank you, Ms. Johnson.

23          MS. JOHNSON:  Thank you, Mr. Kim.

24          THE COURT:  Mr. Malone?

25          MR. MALONE:  Good afternoon.  Robert Malone, Gibbons

Kim - Cross/Malone                    221

1  PC, on behalf of the States of New Mexico and Mississippi.

2                          CROSS-EXAMINATION

3  BY MR. MALONE:

4  Q    Good afternoon, Mr. Kim.

5  A    Good afternoon.

6  Q    Fair to say, Mr. Kim, you've been a practicing attorney

7  for over 30 years?

8  A    Yes.

9  Q    And in that time, you've done cases involving both

10 bankruptcy and securities?

11 A    I have.

12 Q    Okay.  You signed your declaration on June 23rd.  Is that

13 correct?

14 A    Yes.

15 Q    Since June 23rd until today, and I don't want to hear

16 about conversations with counsel, what have you done to prepare

17 for today's testimony?

18 A    I reviewed some documents, deposition transcripts.  When

19 you exclude conversations with counsel, I mean, you know, there

20 were prep sessions with counsel.

21 Q    Right.  I know that.

22 A    Okay.

23 Q    That's why I had said it so I wouldn't get into

24 (indiscernible) --

25 A    Okay.

Kim - Cross/Malone                          222

1  Q    -- from this side of the room.

2  A    Okay.  So, yeah, I reviewed -- I reviewed some documents

3  and some, you know, my deposition transcripts.  Yeah, I believe

4  that's it.

5  Q    Did you review any recent public filings made by J&J?

6  A    No.

7  Q    Did you review any expert reports?

8  A    Yes, I did review our expert -- debtor's expert reports.

9  I don't --

10 Q    Specifically, which expert reports did you review?

11 A    I reviewed the Mullin report.  I reviewed -- so, I'm

12 sorry, going back, that's sort of part of my job so I'm not

13 sure I did that in preparation for this hearing.

14 Q    Well, my question was very specific.  It was you signed

15 your declaration on June 23rd.

16 A    Yes.

17 Q    And today's the 27th, right?

18 A    Yes.

19 Q    We can all agree to that.  I don't think I'll get an

20 objection to that.  So between the 23rd and the 27th, I'm

21 asking you what did you do to prepare.  And one of the

22 questions I'm asking you to make it more clear is did you

23 review anybody's expert reports in preparation for today's

24 hearing.

25 A    Not in preparation for today's hearing.  I reviewed expert

Kim - Cross/Malone                                  223

1  reports as part of my duties in LTL to review pleadings and

2  things before being filed.

3  Q    Is there anything that sitting here in court today that

4  you would change from your declaration that was filed on the

5  23rd of June?

6  A    I don't believe so based on the, you know, what was true

7  on the date that I signed the declaration.  I don't think

8  there's anything that's changed.

9  Q    Well, have you learned any other additional information

10 since the 23rd to today that would change your testimony in any

11 way?

12 A    I don't -- I don't believe so, but -- yeah, I don't

13 believe so.  I just don't have anything in mind right now.

14 Q    Nothing about the dividend?  Would that change your

15 testimony in any way?

16 A    Again, I haven't studied the dividend so all I know about

17 the dividend is discussion I had that there was a dividend that

18 was declared.  Other than that, I know nothing about whether

19 the actual dividend hit any books, any -- you know, where it

20 stands.  I had some general knowledge of the amount of the

21 dividend, but that's it.  That's basically all I know about the

22 dividend.

23 Q    So you didn't think it was important to learn more about

24 it before you took the stand today?

25 A    No, I did not.  No.

Kim - Cross/Malone                               224

1  Q    One of the things you testified about is there's no

2  obligation by J&J to fund outside of bankruptcy under the

3  second funding agreement.  Is that correct?

4  A    That is correct.

5  Q    And I think you also testified that the $8.9 billion PSA

6  includes the states in that figure?

7  A    The --

8  Q    The amount, the 8.9 --

9  A    The 8.9 billion, a portion of that has been allocated to

10  the states.

11  Q    And that's $400 million, correct?

12  A    That is true.

13  Q    So if we do simple math, there's 50 states, correct, last

14  I checked?

15  A    There are.

16  Q    Okay.  It's a yes or no question.

17  A    I do.  But I'm not sure where you're going with that

18  because not all those 50 states --

19  Q    We're going to go.

20  A    -- are in --

21  Q    We're not even going to count Guam or any other, Puerto

22  Rico or any other territory.

23  A    Right.

24  Q    We're going to take 50 states.

25  A    Okay.

Kim - Cross/Malone                    225

1  Q    Okay.  In your head, take 50 into 400 million.  What

2  number do you get?

3  A    Twenty -- look, I don't want to sit here and do math.

4  But, again --

5  Q    Well, if I give you the answer, maybe you could tell me if

6  I'm right.

7  A    Sure.

8  Q    Would it come out to about eight million per state?

9  A    Per state, that sounds about right, yeah.

10 Q    Okay.  And you feel based on the information and data that

11 you've been given that $8 million per state would satisfy all

12 the consumer protection claims?

13 A    Should more than satisfy them.

14 Q    More than satisfy.  And what's the basis for that?

15 A    So the basis is that the consumer protection claims are

16 the very exact same claims that are being brought by consumers,

17 the plaintiffs that are -- that are claimants in this lawsuit.

18 So basically, consumer protection claims are actually just

19 double-counting whatever damage that was done or potential

20 damage that was done to a plaintiff, they're recovering.

21 They're recovering under this plan.

22     And so for now, the state to come in and say, oh yeah, we

23 want money too, we don't think that's fair or equitable.  So we

24 say that, you know, because it's the same damage issue and

25 there's really no -- anyone that was actually injured by our

Kim - Cross/Malone                              226

1  product is going to recover in the bankruptcy, we just see the

2  state claims as duplicative.

3       So that's the basis for what we (indiscernible) --

4  Q     And have you or anybody else in your legal department done

5  a canvas of the 50 states' consumer protection laws prior to

6  filing the Chapter 11?

7  A     No, but we did do your two states.

8  Q     And did you read the state consumer protection laws?

9  A     We have read the consumer protection laws.

10 Q     And were those state laws passed prior to the LTL

11 bankruptcy?

12 A     They were.

13 Q     Thank you.  With respect to the "$400 million negotiated

14 with the states," who was that negotiated with?  Which states?

15 A     Again, I think as I testified just now, the -- I'm not

16 privy to the -- I don't know what the actual negotiations were.

17 I know that there were discussions that Mr. Murdica had with

18 some representatives from the state AG's offices.

19 Q     Did anyone speak to the representatives of the State of

20 New Mexico?

21 A     Again, I don't have the details of all the states that

22 were discussed -- that were --

23 Q     One of the attorney, I guess are you familiar with --

24 strike that.

25      Are you familiar with the attorneys that make up the Ad

1  Hoc Group of Law Firms?

2  A     No.

3  Q     No.

4  A     No.

5  Q     Do you know any of the people who are the law firms that

6  have made up that group?

7  A     Personally?

8  Q     No, just you're familiar with the names of the law firms?

9  A     I think I am familiar with some of the names of the law

10 firms.

11 Q     And was it your decision also to agree to fund the Ad Hoc

12 Committee for their legal fees in this case?

13 A     I approved the motion that we filed to fund the Ad Hoc

14 Committee --

15 Q     Was it at your direction?

16 A     I -- yes, I guess it was.  I approved the filing of the

17 motion, yes.

18 Q     Whose idea was it to come up with the funding for the Ad

19 Hoc Group?

20 A     I'm not sure what that question --

21 Q     Whose idea was it to decide let's pay the legal fees for

22 the Ad Hoc Group of Law Firms who support us on the PSA?

23 A     I think there was a request made.  It came to me as a

24 request, and I had discussions with -- with counsel.  And we

25 decided to agree to fund.

Kim - Cross/Malone                    228

1  Q    Okay.  Does the name Majid Nathwani (phonetic) mean

2  anything to you?

3  A    No.

4  Q    If I told you he was one of the lawyers who signed on to

5  the Ad Hoc Committee, would that make any more familiarity to

6  you or no?

7  A    No.

8  Q    Okay.  Do you know if Mr, Murdica had discussions with him

9  on behalf of the State of New Mexico?

10  A    I do not know.

11  Q    Okay.  Now, again, you said I think your testimony was

12  that there was no obligation to fund outside the bankruptcy

13  under the second funding agreement.  So would it be fair to say

14  that let's say there's a plan of reorganization, it goes out

15  for votes.  There's acceptances, rejections.  The final veto

16  rests with Johnson & Johnson whether or not this plan would go

17  forward?

18  A    I don't believe so, no.

19  Q    Well, why not?  If they can make a decision to fund or not

20  fund inside the bankruptcy beyond the $8.9 billion, they don't

21  have to fund, correct?

22  A    I think the decision is I think all the parties have to

23  agree.

24  Q    But can anyone force Johnson & Johnson to fund if they

25  say, nope, we're not doing it?

Kim - Cross/Malone                                    229

1  A     Yeah, I don't -- I don't understand the hypothetical.

2  Q     Okay.  Here's the question.  You said that there's no

3  obligation to fund outside of bankruptcy.  Inside the

4  bankruptcy, there's an obligation you're claiming for 8.9

5  billion.

6  A     Well, as part of this current plan.

7  Q     Current plan, you mean the plan that was filed yesterday

8  evening?

9  A     Well, both the plan that was filed earlier and the plan

10  that was filed yesterday.

11  Q     And did you read that plan before it got filed?

12  A     I did.

13  Q     And you approved it to be filed?

14  A     I did.

15  Q     And is there anything in there that would give an

16  obligation by J&J to go beyond the $8.9 billion?

17  A     Well, right now it's the current plan.  That's the amount

18  that's in the plan.

19  Q     I'm asking in that plan, is there anything that would

20  obligate them to go beyond $8.9 billion?

21  A     Well, no, because that's the deal that we have.

22  Q     So if the claims come in that for some reason go higher

23  than that, J&J could say, nope, not doing it, pulling the

24  funding agreement?

25  A     So the way the plan works, that situation can't happen.

Kim - Cross/Malone                    230

1  Q    It can't happen.  Why can't it happen?

2  A    Because the plan distributes the amount of money that's

3  put in.  It's not -- you don't get -- it's not a plan where you

4  figure out how much money you need to put in and then it gets

5  distributed.

6      It distributes the amount of money that -- so you can't

7  have a plan -- you can't have a vote or anything that comes in

8  and the number of people that come in and that increases the

9  amount of any pot.  So that's --

10 Q    Do you understand how confirmation of a plan works as far

11 as numbers and classes?

12 A    Generally.

13 Q    Generally.  Do you have an agreement with any other

14 constituency but the Ad Hoc Committee of Law Firms?  That's a

15 yes or no question.

16 A    Yes.

17 Q    Who is it?

18 A    We have a lienholders agreement now.

19 Q    With the insurance carriers, correct?

20 A    Well, with -- yeah, with certain groupings of insurance

21 carrier that make up --

22 Q    And that's it?

23 A    That's it?  I'm sorry.

24 Q    I mean that's the only other group, right?

25 A    I believe that's all that we have consummated at this

Kim - Cross/Thompson                          231

1  point.

2  Q    There are other groups in the case besides those two

3  groups, correct?

4  A    Yes, that we're not yet finished our negotiations with.

5  Q    Who came up with the determination as to the values under

6  the funding agreement?  Is that Johnson & Johnson or LTL?

7  A    The funding agreement --

8  Q    Well, it gives $8.9 billion.  Who came up with that

9  number?

10  A    Well, that's -- well, that's in the support agreement.

11  Q    Okay.

12  A    And that's tied to the plan, so the number comes from the

13  negotiated amount that we have with members of the Ad Hoc

14  Committee.  They negotiated 8.9, and so the support agreement

15  takes that number and says, yes, Johnson & Johnson will be

16  liable for that number if HoldCo can't pay it in the bankruptcy

17  under a plan.  So that number comes from the negotiated number

18  in the PSAs.

19  Q    Okay.  Thank you.

20            THE COURT:  Thank you, Mr. Malone.

21            Mr. Thompson?

22                      CROSS-EXAMINATION

23  BY MR. THOMPSON:

24  Q    Hi, Mr. Kim.

25  A    Hi, Mr. Thompson.

Kim - Cross/Thompson                          232

1  Q    I'm going to be brief.  I think I'm only going to refer to

2  parts of your deposition from June 1st which I believe is Tab

3  21.  You'd agree with me, sir, that the amount to be paid to an

4  individual claimant under the plan depends upon how much -- how

5  many claims are filed, correct?

6  A    Correct.

7  Q    And my individual claimants have no say over how many

8  claims are filed, correct?

9  A    They don't have -- correct.

10 Q    Okay.  As chief legal officer of LTL, you never performed

11 any analysis about whether LTL's promise to indemnify J&J is

12 valid under New Jersey law, right?

13 A    I did not.

14 Q    LTL's never performed any analysis of what liability, if

15 any, J&J has which is independent of LTL's liability, right?

16 A    We don't believe there is any.

17 Q    But you as the chief legal officer of LTL never performed

18 any analysis of what liability, if any, J&J has that's

19 independent of LTL, correct?

20 A    Not a formal analysis.  But, again, we've lived through

21 these cases.

22 Q    Right.  You're familiar with the briefing that was filed

23 in the Third Circuit, correct?

24 A    Correct.  I am.

25 Q    And we covered the opinion that came out on January 30th

Kim - Cross/Thompson                    233

1 on this issue at your deposition, right?

2 A    We did.

3 Q    You're aware that this is an issue that's contested by the

4 litigants in this case including me, right?

5 A    I do.

6 Q    Okay.  But LTL never did an independent analysis into what

7 J&J's liability would be separate and apart from LTL, right?

8 A    Again, we think that would be non-sensical, yes.

9 Q    But it wasn't done.

10 A    Correct.

11 Q    And LTL has not evaluated how much it would cost for a

12 plan that would not channel J&J and the retailers' liabilities

13 to a trust, correct?

14 A    Correct.

15 Q    And it would make no sense to you as the chief legal

16 officer of LTL for LTL to have a plan of reorganization that

17 did not channel claims against J&J to a trust, right?

18 A    Correct.

19 Q    The purpose of LTL's bankruptcy filing is to ensure that

20 J&J's claims are also funneled to a trust, correct?

21 A    I would say part of that is necessary for -- to get

22 complete relief, yes.

23 Q    That's a necessary condition of LTL's bankruptcy, right,

24 sir?

25 A    It is true.

Kim - Cross/Richenderfer                234

1  Q    Regardless of how different state law apportions

2  liability, J&J's talc liability and LTL's talc liability are

3  one and the same as far as you're concerned, correct?

4  A    I believe that to be a fact, yes.

5  Q    As of June 1st, you didn't know how many of these new

6  claim -- you were talking about new claimants earlier.  As of

7  June 1st when we talked in your deposition, you weren't aware

8  of how many of those new claimants had either epithelial

9  ovarian cancer or mesothelioma, right?

10 A    That's true.

11 Q    And LTL didn't consider that when it decided to file the

12 second bankruptcy on April 4th, right?

13 A    True.

14 Q    And, sir, you would agree with me that LTL 2.0 of which

15 you are the chief legal officer and which filed for bankruptcy

16 on April 4th, that entity can pay all current and future

17 claimants in full, right?

18 A    Correct.

19 Q    Thank you.  That's all I have.

20          THE COURT:  Thank you, Mr. Thompson.

21          Ms. Richenderfer?

22          MS. RICHENDERFER:  Your Honor, I could not leave

23 today without asking Mr. Kim a couple of questions.  For the

24 record --

25          THE COURT:  Please proceed.

1          MS. RICHENDERFER:  -- Linda Richenderfer from the

2   Office of the United States Trustee.

3                     CROSS-EXAMINATION

4   BY MS. RICHENDERFER:

5   Q    Good afternoon, Mr. Kim.

6   A    Good afternoon, Ms. Richenderfer.

7   Q    I want to say a quick questions, and I mean it this time.

8   You talked just now about how there is an agreement with I

9   think you said certain of the insurance carriers regarding

10  indemnification claims.  Do I have that correct?

11  A    No.  The lienholder claims.

12  Q    Lienholders, okay.

13  A    Yes.  Those are lienholder claims.

14  Q    Okay.  Okay, I'll call them that, then.

15       And with respect to the lienholder claims, who did those

16  negotiations?

17  A    Those were done by Mr. Murdica.

18  Q    And who did he negotiate with?

19  A    I think there were various insurance companies that are

20  lienholders, and also with Medicare/Medicaid.

21  Q    Is it your understanding then that Mr. Murdica has reached

22  a settlement with Medicare/Medicaid?

23  A    So I know that they were consulted.  I don't know that a

24  final decision was made, in fact.  Yeah, so I think if you look

25  at the amended plan, there's a whole section on who's included

Kim - Cross/Richenderfer                          236

1  and who's not included and for what claims.  So sitting here

2  today, I'm not sure that Medicaid and Medicare are included

3  right now, but I think that the intent would be to include

4  them.

5  Q    The intent though, only if an agreement is reached

6  ultimately.

7  A    Oh, correct.

8  Q    Correct?

9  A    Yes.

10 Q    Okay.  And there were also discussions, I think you

11 mentioned, regarding the $400-million figure for the state

12 attorney generals.  And I think you said you thought that Mr.

13 Murdica had discussions with representatives of certain of the

14 state attorney generals.  Do I have that correct?

15 A    Yeah, I believe that during, as we were negotiating these,

16 he -- he consulted with certain of the attorneys to see if they

17 were interested.  And so I think, yeah, there were negotiations

18 and I think there may still be ongoing negotiations.  But,

19 again, I think Mr. Murdica is the right person that has more

20 information about that.  That's my general understanding.

21 Q    Has Mr. Murdica -- let me put a time frame on this.  Since

22 January 1st, 2023, has Mr. Murdica attended any board meetings

23 of LTL?

24 A    No.

25 Q    So is Mr. Murdica, therefore -- strike that.

Kim - Cross/Richenderfer                     237

1  A    Since January 1st of 20-?

2  Q    '23.

3  A    2023.  He did attend some board meetings.  I know that he

4  attended certain board meetings, but I can't recall the time

5  frame.

6  Q    Let me make this easier.  Maybe this is a better way of

7  putting it.  Has Mr. Murdica, to your knowledge, attended any

8  LTL board meetings after issuance of the Third Circuit opinion?

9  A    Oh no.

10 Q    Okay.  So would it be fair to say then that Mr. Murdica

11 has not in person or via, I guess these things occurred during

12 Zoom or whatever hearings, that Mr. Murdica has not personally

13 advised the LTL Board regarding these negotiations that he's

14 out there doing on behalf of the debtor?

15 A    Well, he's -- he has not done -- he has not appeared at a

16 board meeting.  And who he is negotiating on behalf of, that's

17 something you can -- you know, we can talk about.

18 Q    During the board meetings that led up to the second

19 bankruptcy filing, was the board advised that the person that

20 was out there negotiating the PSAs was John Murdica, counsel

21 for J&J?

22 A    I think they were advised that Jim Murdica was negotiating

23 on behalf of -- at the end that he was an attorney for J&J but

24 he was working -- had the same interest, had our interest in

25 mind, as well.

Kim - Cross/Maimon                    238

1  Q    But if J&J's potential liability is capped at 8.9 million

2  only if there is a confirmed plan and only if HoldCo and LTL

3  can't come up with the cash, what is the basis of your

4  conclusion that his interests are aligned with the debtor?

5  A    The interests of both parties are to resolve these -- the

6  talc litigation.  And so I would say that that common interest

7  is aligned.

8  Q    Who authorized Mr. Murdica to go out and to do

9  negotiations on behalf of LTL and J&J?

10 A    I guess that's me.  That would be me.

11 Q    And did you advise the board that you gave Mr. Murdica

12 that authority to speak on behalf of LTL?

13 A    The board was aware of that.  I'm not sure that I

14 specifically talked about my giving authority to that.  I know

15 that the board was aware that he was doing that on our behalf.

16 Q    Well, as a debtor-in-possession, this debtor has not

17 retained Mr. Murdica, correct?

18 A    That's correct.

19 Q    I have no further questions.  Thank you.

20 A    Sure.

21         THE COURT:  Thank you, Ms. Richenderfer.

22         Mr. Maimon?

23         MR. MAIMON:  Thank you, Your Honor.

24                    CROSS-EXAMINATION

25 BY MR. MAIMON:

Kim - Cross/Maimon                        239

1  Q    Good afternoon, Mr. Kim.

2  A    Good afternoon.

3  Q    You were asked about consumer protection claims, right?

4  A    I was.

5  Q    You're a lawyer here in New Jersey, are you not?

6  A    I -- I have a what they call in-house counsel bar

7  admission.

8  Q    Are you familiar with the consumer protection laws here in

9  New Jersey?

10 A    Somewhat.

11 Q    Do you know whether or not somebody has to get cancer or

12 get sick in order for a state to have a consumer protection

13 lawsuit against a manufacturer?

14 A    No, but they have to have some cognizable injury.

15 Q    Yes.  So the state has to have an ascertainable loss,

16 correct?

17 A    Correct.

18 Q    But you don't know of any requirement that there be an

19 underlying personal injury lawsuit in order to enable a

20 consumer protection action to be brought, correct?

21 A    Correct, but they are based on the same underlying facts.

22 So, you know, if someone did not have injury from the product,

23 I'm not sure how you can find an ascertainable loss.

24 Q    What are the damages here in New Jersey for a consumer

25 protection lawsuit?

Kim - Cross/Maimon                    240

1  A    Now you're testing my legal knowledge.  I'm sure there are

2  fines involved, as well.

3  Q    You don't know whether or not they're the same as a

4  personal injury case, do you?

5  A    The damage claims may be -- the damage amounts may be

6  different, but the underlying causes of action I think are the

7  same.

8  Q    And you're basing that based on your extensive knowledge

9  of the consumer protection laws here in New Jersey?

10 A    Well, I think generally my general knowledge of consumer

11 protection laws across the states.

12 Q    Oh, okay.  All right.

13      You have retained, you LTL have retained outside counsel

14 to act on your behalf within this bankruptcy, correct?

15 A    I have.

16 Q    One of those attorneys are the Jones Day firm, correct?

17 A    Yes.

18 Q    One of those firms are the Faegre Drinker Biddle firm,

19 correct?

20 A    In certain -- yes, in certain talc liabilities.

21 Q    I see they submit their bills.

22 A    Yes.

23 Q    Right?

24 A    Yes.

25 Q    Okay.  You're familiar with an attorney there by the name

Kim - Cross/Maimon                         241

 1  of Susan Sharko?

 2  A    I am.

 3  Q    Ms. Sharko has been involved in the defense of Johnson &

 4  Johnson and talc litigation for over 20 years.  You're aware of

 5  that?

 6  A    I am.

 7  Q    Okay.  And she's probably one of the longest-standing J&J

 8  litigation lawyers in the talc litigation anywhere in the

 9  country, correct?

10  A    That's correct.

11  Q    Okay.  Now I'd like to talk a little bit about the funding

12  agreement.  And it's at Tab 9 in front of you, Exhibit 792.

13            MR. MAIMON:  And if we can go to Page 5 on it.

14            THE COURT:  And, again, it may be easier to see it on

15  the screen.

16            THE WITNESS:  Right.  Thank you.

17            MR. MAIMON:  At the bottom.  Bottom, permissible

18  funding use.

19            THE WITNESS:  Well, I'm just trying to orient myself

20  on which funding agreement this is.

21  BY MR. MAIMON:

22  Q    2021, the first funding agreement.

23  A    Yes, got it.

24  Q    Are you with me?

25  A    Yes, I am.

Kim - Cross/Maimon                    242

1  Q    Page 5.

2  A    Yes.

3  Q    Mr. -- now I've got some follow-up questions to what Mr.

4  Jonas asked you.  It says, "The payment of any and all costs

5  and expenses of the payee" -- payee would be LTL, right?

6  A    Yes.  I'm sorry.  The problem with the screen is that it's

7  covered up by -- I apologize.  I need to move this little

8  window here.

9  Q    Well, you could take a look at the actual document if you

10 want.

11 A    Okay.

12 Q    The bottom of Page 5.

13 A    Okay, got it.

14 Q    You got it?

15     "The payment of any and all costs and expenses of the

16 payee," do you see that?

17 A    Yes.

18 Q    The payee is LTL, correct?

19 A    That is correct.

20 Q    -- "incurred in the normal course of its business,

21 incurring the payment of any indemnification or other

22 obligations of the payee owing to any managers or officers of

23 the payee at any time" -- and let's go on to the next page --

24 "when there is no proceeding under the Bankruptcy Code pending

25 with respect to the payee."

Kim - Cross/Maimon                    243

1      Do you see that?

2  A    I do.

3  Q    Now this was drafted, Mr. -- well, Mr. Wuesthoff told us

4  ths morning and you were here that this was sent to him

5  directly by attorneys from Johnson & Johnson.  Do you recall

6  that?

7  A    I believe that's true, yes.

8  Q    And you have no reason to doubt that, the voracity of that

9  statement, do you?

10  A    No.

11  Q    Okay.  And there were attorneys from Johnson & Johnson who

12  were drafting and responsible for getting this over to him,

13  correct?

14  A    Yes, there were Johnson & Johnson lawyers.  Yes.

15  Q    Okay.  And they had outside counsel, and they had Mr. Haas

16  who was inside counsel, correct?

17  A    That's true.

18  Q    Okay.  On the other side, you at LTL had yourself and you

19  had your retained counsel, the Jones Day lawyers, right?

20  A    I believe that's -- I'm just -- I'm not sure what the

21  dates were when these were put together, whether LTL was

22  actually formed at that time.

23  Q    Well, are you saying -- this is dated October 12th, 2021,

24  right?

25  A    Yes.

Kim - Cross/Maimon                    244

1  Q    And Mr. Wuesthoff told us that he signed it on October

2  12th, 2021.  Do you recall that?

3  A    Yes, I do.

4  Q    Are you saying that Mr. Wuesthoff signed that without

5  lawyers for LTL having looked at this?

6  A    No.

7  Q    Okay.

8  A    What I'm saying is that the -- when I say lawyers for J&J,

9  so in-house counsel for J&J actually represent all J&J's

10  subsidiaries.  So --

11 Q    Are you saying that Mr. Haas represents LTL?

12 A    He could in certain circumstances, yes.

13 Q    Okay.  But J&J's outside counsel is J&J's outside counsel,

14 right?

15 A    Correct.

16 Q    And we know that Jones Day is retained by the debtor in

17 this case, correct?

18 A    Correct.

19 Q    Even though when they started the discussions about

20 bankruptcy to J&J, they represented J&J, right?

21 A    Correct, which is why there's a little bit of a confusion

22 as to when this was signed, lawyers for whom -- you know, who

23 is lawyering for who at that point.

24 Q    Well, who was lawyering for LTL when this was signed?

25 A    Again, because LTL is a subsidiary, at some points, the

Kim - Cross/Maimon                    245

1 lawyers for Johnson & Johnson, for example, Chris Andrew who is

2 a Johnson & Johnson lawyer, actually was LTL's counsel during

3 this process.  I think we explained all this in our last

4 hearing.

5     The lawyers for Johnson & Johnson, the in-house counsel at

6 J&J represent, they're like a law firm.

7 Q   So this agreement, what you're saying is this agreement

8 between two independent corporations, it was almost like a

9 three-card monty game in Manhattan about who represents who?

10 A   No.  What I'm saying is this is a subsidiary of Johnson &

11 Johnson.  Their interests are aligned, and so lawyers acting on

12 behalf of all the entities helped put these agreements together

13 and got them executed.

14 Q   Who was the independent lawyer for LTL who looked at this

15 who was not also representing J&J?

16 A   I believe I looked at this.  Even though Chris Andrew was

17 a J&J attorney, I believe he was working on behalf of LTL at

18 that time.  But, again, I'd have to go back to my -- you know,

19 it was a --

20 Q   Well, which hat did he have on, the J&J hat or the LTL hat

21 --

22 A   He could have had --

23 Q   -- when he drafted this one or did he have both on?

24 A   He could have both on, yeah.

25 Q   Oh, he had both on?

Kim - Cross/Maimon                              246

1   A    Yeah.

2   Q    Okay.  In any event, this language here that it applies at

3   any time when there was no proceeding under the Bankruptcy Code

4   pending with respect to the payee, that's not a mistake in

5   there, is it?

6   A    Based on what we knew at the time, it is not a mistake.

7   Q    Well, we'll get to what you knew at the time.  But that

8   wasn't like a mistake where somebody took an old agreement and

9   just cut and paste and said, oh, I didn't realize that that was

10  in.  That was purposely there, correct?

11  A    That's correct, yes.

12  Q    Okay.  And another thing that's there is if you turn to

13  Paragraph 10 which is on Page 14, this is -- and if you look at

14  the second half of that Paragraph 10 where on the right-hand

15  side, it says, "No amendment."  Do you see that?

16  A    I do.

17  Q    Okay.  And it says, "No amendment or waiver of any

18  provision of this agreement nor consent to any departure by the

19  payee therefrom shall in any event be effective unless the same

20  shall be in writing, specifically refer to this agreement, and

21  be signed by the payors and the payee and then such amendment

22  or waiver shall be effective only in the specific instance and

23  for the specific purpose for which given."

24       That was part of the agreement, right?

25  A    It was.

1 Q   And eventually that's what happened with the termination

2 and substitution of the funding agreement in LTL2, right?

3 A   That's correct.

4 Q   Let's go on.

5     "A waiver on any such occasion shall not be construed as a

6 bar to or waiver of any such right or remedy on any future

7 occasion."  That's also purposely put there, right?

8 A   That is.

9 Q   And that was agreed to, correct?

10 A   It was.

11     MR. MAIMON:  Let's go on to Paragraph 11.  And we'll

12 only take the first half of that.  Good.

13 BY MR. MAIMON:

14 Q   "This agreement may be executed in separate counterparts{

15 -- and it was, correct?

16 A   It was.

17 Q   -- "each of which shall constitute an original but all of

18 which when taken together shall constitute a single contract."

19 And that's what happened, right?

20 A   It is.

21 Q   It then goes on to state the following, "This agreement

22 constitutes the entire contract among the parties hereto

23 relating to the subject matter hereof and supersedes in its

24 entirety the original funding agreement and any and all

25 previous agreements and understandings, oral or written,

Kim - Cross/Maimon                                    248

1  relating to the subject matter hereof."

2       That was purposely put in there, right?

3  A    It was.

4  Q    And so whatever understandings you all had, this agreement

5  right here signed by LTL and J&J says that this constitutes the

6  entire agreement and supersedes any other understandings.

7  Doesn't it say that?

8  A    It does.

9  Q    Okay, thank you.

10      Now you have your declaration with you from LTL1.  It's

11 Tab 7.  Are you there?

12 A    I am.

13 Q    Okay.  And if we can go to Page 10, Paragraph 27.  That's

14 the one we've been dealing with.

15      Also in your -- on Paragraph 27, in your first-day

16 declaration in LTL1, you state that the obligation of J&J and

17 JJCI on a joint and several basis to provide the funding is, A,

18 at any time when there is no bankruptcy case.  Correct?

19 A    Yes.

20 Q    Okay.  Now take a look at tab -- I don't know what tab it

21 is, it's Exhibit 1011.

22      It's the hearing at the motion to dismiss.  LTL-1.  Well,

23 we'll put it up on the board and I'll give it to Counsel, if

24 she needs it.

25           UNIDENTIFIED SPEAKER:  The tab number would help.

1          MR. MAIMON:  I know, but I don't have the tab number.

2  So I apologize.

3          UNIDENTIFIED SPEAKER:  What's the exhibit number?

4          MR. MAIMON:  1081 -- I mean 1011.  Anyway, if we

5  could go to page 60.

6          UNIDENTIFIED SPEAKER:  (Indiscernible) --

7          MR. MAIMON:  They want a tab number.

8          UNIDENTIFIED SPEAKER:  No, what is the document.

9          MR. MAIMON:  We have it.

10          UNIDENTIFIED SPEAKER:  Oh, okay.

11          UNIDENTIFIED SPEAKER:  Well, we don't have it.

12          MR. MAIMON:  I'm going to give it to you right now.

13  BY MR. MAIMON:

14  Q    Let's take a look at what you were asked about, if we

15  could just go straight to page 61, the top paragraph.  There

16  you go.  Page 61, top paragraph, 61.

17       Now, Mr. Gordon -- and we covered this during the

18  preliminary injunction hearing -- Mr. Gordon was the attorney

19  representing LTL at that hearing; correct?

20  A    He was.

21  Q    He was authorized to speak on behalf of LTL; correct?

22  A    He was.

23  Q    And you were present when he spoke on behalf of LTL;

24  correct?

25  A    I was.

Kim - Cross/Maimon                          250

1  Q    And, as the chief legal officer of LTL, you did not tell

2  him, hey, you misspoke, you said something was wrong, did you?

3  A    I did not.

4  Q    Okay.  He says the first fund -- "first is funding in the

5  tort system and, as you would expect, what that funding says is

6  that the payers are obligated to pay the liability to the

7  extent they're established by a judgment or a settlement in the

8  tort system," period.

9        Do you see that?

10 A    I do.

11 Q    And then he said, "That's what you would expect and that's

12 what happens.  We want funds available to pay settlements, to

13 pay judgments in the tort system."

14       That's what he said; correct?

15 A    It is.

16 Q    It then goes on to say, "So it makes very clear this is

17 what we're talking about if there's no bankruptcy proceeding."

18 Right?  Okay.

19 A    Yes.

20 Q    I want to stop there -- well, let's go one more sentence.

21 "Whether there was no case filed, or whether the case is filed

22 or dismissed, the money is available for that purpose."  Right?

23 A    I see that, yes.

24 Q    Okay.  So let's talk about the first instance here, no

25 case filed.  Do you see that?

Kim - Cross/Maimon                    251

1  A    I do.

2  Q    Were you here this morning when Mr. Wuesthoff said that he

3  felt that he was free in October of 2014 to vote no on the

4  bankruptcy option?

5  A    I was here, yes.

6  Q    And would you say that he was wrong?

7  A    No, he was free, he was free to --

8  Q    Okay, good.  And were you here when he said he didn't feel

9  under duress to vote yes on the bankruptcy option?

10  A    I was.

11  Q    And would you agree that that's also true?

12  A    That is true.

13  Q    Were you here -- now, first of all, you had no vote;

14  right?

15  A    I had no vote.

16  Q    Okay.  Were you here when Mr. Dickinson testified that he

17  felt free and not under duress to vote no on the bankruptcy

18  option?

19  A    I was here.

20  Q    And were you here when both of them said that if the vote

21  had been no to bankruptcy they would have fulfilled their

22  obligations as president and CFO of LTL to do the business of

23  LTL with the cash in hand, the RAM royalties, and the funding

24  agreement?

25  A    I was here when they said that.

Kim - Cross/Maimon                               252

1  Q    Do you have any reason to doubt the veracity of their

2  statements that the would have done so if the vote had been no?

3  A    No.

4  Q    Okay.  You were present in the Third Circuit when Neal

5  Katyal on behalf of LTL argued to the Third Circuit; correct?

6  A    I was.

7  Q    And he was authorized to make statements on behalf of the

8  company; correct?

9  A    He was, yes.

10 Q    And you were there when Neal Katyal told the judges on the

11 Third Circuit panel that the obligation to pay under Funding

12 Agreement Number 1 existed outside of the bankruptcy; correct?

13 A    I was.

14 Q    And you did not correct Mr. Katyal --

15 A    I did not.

16 Q    -- right?

17 A    I did not.

18 Q    Okay.  Now, now we come full circle and we've got the

19 dismissal of LTL I, and now -- you can take that down -- and

20 now we're going to have LTL II, and part of that was the

21 drafting of the 2023 funding agreement, which is tab number 2

22 in your binder; right?

23          THE COURT:  Oh, the funding agreement, I believe, is

24 tab 5.

25          THE WITNESS:  Thank you, Your Honor.

Kim - Cross/Maimon                    253

1          MR. MAIMON:  The termination and substitution

2    agreement?

3          THE COURT:  Well, the funding agreement.

4          MR. MAIMON:  Oh.  Let's turn to tab 2.  My bad.

5    BY MR. MAIMON:

6    Q    Are you with me?

7    A    I am.

8    Q    Okay.  So this was also something that was drafted by the

9    lawyers at Johnson & Johnson and then executed by Mr. Wuesthoff

10   on behalf of LTL and individuals by HoldCo, as well as Johnson

11   & Johnson; correct?

12   A    Again, I'm not sure who did the original draft -- yeah,

13   I'm not sure who did the original draft.

14   Q    But the lawyers for J&J were involved in drafting this;

15   correct?

16   A    The lawyers for J&J were involved, yes; I don't know if

17   they did the first draft, though.

18   Q    They didn't sign this without their lawyers painstakingly

19   going through it; correct?

20   A    I don't know, but, again, I just don't know who did the

21   first draft.

22   Q    Okay, but LTL lawyers -- I'm sorry, LTL lawyers were

23   involved; correct?

24   A    Yes.

25   Q    And J&J lawyers were involved; correct?

Kim - Cross/Maimon                          254

1  A    Correct.

2  Q    Okay.  Now, let's take a look at paragraph -- under the

3  recitals, paragraph D, as in dog.

4      Oh, no, no, page 3, paragraph 2(b), support agreement.

5  I'm sorry, page 3, support agreement on the bottom.

6      Here, it's saying under -- let's see, under roman numeral

7  small (i).  Do you see that?  That J&J's obligation here is

8  solely in connection with a voluntary case under Chapter 11

9  under the Bankruptcy Code to be commenced by LTL and only if

10 HoldCo fails to make any payment to provide funding; right?

11 A    Correct.

12 Q    So when J&J wanted to make it clear that its obligations

13 under the funding agreement was only in bankruptcy, it made it

14 clear right here; correct?

15 A    It included this paragraph, correct.

16 Q    Okay.  The funding agreement, funding agreement number 1,

17 provided nothing, no limitations, and it had the entire

18 agreement paragraph saying it supersedes any other

19 understandings; right?  Do you remember that?

20 A    It did, yes.

21 Q    Okay.  Now, when the board was voting in October of 2021

22 to take LTL into bankruptcy, you were present; correct?

23 A    I was.

24 Q    You did not warn any of the LTL board members that, if

25 they voted no on the bankruptcy option, that would frustrate

Kim - Cross/Maimon                    255

1  the purpose of funding agreement number 1 and risked it being

2  void or voidable; true?

3  A    I'm sorry, could you repeat that?

4  Q    Sure.  Let's go slowly on this.

5  A    Yeah, let's go slowly with this.

6  Q    In October of 2021, you as the chief legal officer did not

7  warn any of the board members that, if they voted no on the

8  bankruptcy resolution, that would frustrate the purpose of the

9  funding agreement and they risked it being void or voidable,

10 you never told anyone that?

11 A    I never told anyone that, no.

12 Q    And you didn't tell any one of the board members of LTL in

13 October of 2021 that, if they voted no on the bankruptcy

14 resolution, that would frustrate the purpose of the funding

15 agreement and risked it being enforceable, you never told

16 anyone that either --

17 A    I did not.

18 Q    -- did you?

19 A    I did not.

20 Q    You did not.  The Judge told me, when the point is made,

21 to sit down.

22         MR. MAIMON:  Right, Your Honor?

23         THE COURT:  Everybody is learning from the first time

24 around.

25                    (Laughter)

Kim - Redirect/Baker                    256

1           MR. MAIMON:  Wait, wait one second.

2           THE COURT:  Wait.

3           MR. MAIMON:  Thank you.

4           UNIDENTIFIED SPEAKER:  Any time.

5           THE WITNESS:  Do you want to try it?

6           MR. MAIMON:  I pay more attention there than I do

7    here.

8                      (Laughter)

9           THE COURT:  All right.  Thank you.

10          Ms. Baker?

11          MS. BAKER:  Thank you, Your Honor.

12                REDIRECT EXAMINATION

13   BY MS. BAKER:

14   Q    All right.  Good afternoon, Mr. Kim.

15   A    Good afternoon, Ms. Baker.

16   Q    All right.  I know you've had a number of questions this

17   afternoon, I'm not going to go nearly as long as some of the

18   other folks.  All right?  But I do want to follow up on a few

19   things you were asked.  Okay?

20   A    Sure.

21   Q    You were asked some questions -- this was earlier this

22   afternoon, you were asked some questions about whether LTL

23   requested a different counterparty or explored pursuing a

24   different counterparty in 2023 after the Third Circuit decision

25   --

1  A    Correct.

2  Q    -- do you recall that line of questions?

3  A    I do recall that line of questioning.

4  Q    All right.  And you were also asked as part of that line

5  of questions about whether the fact that you did not do that,

6  whether you viewed that as maximizing value for creditors; do

7  you recall that?

8  A    I do.

9  Q    And you said it did?

10 A    Correct.

11 Q    Explain.

12 A    So on the first question of whether we asked for a

13 different counterparty, that would make no sense.  The original

14 counterparty was HoldCo, you know, the new JJCI in the old

15 funding agreement, the new counterparty is the same party, it

16 would make no sense for us to try to find another party, nor

17 would we have the ability to force another party into an

18 agreement.

19      So, you know, we had a counterparty and there was -- J&J

20 had made its position clear that it believed that the funding

21 agreement was non-enforceable, it would make no -- we had no

22 ability to ask for or get, we had no bargaining power, we had

23 no ability to get any other party in the agreement.  But it

24 also, on the other hand, it maximized value because with the

25 substitution and termination agreement and the new funding

Kim - Redirect/Baker                                                    258

1  agreement, we knew that we would be able to fulfill the

2  obligations of the PSA because at the same time we had

3  agreements to try to resolve the entire litigation for an

4  amount of money that was unprecedented in bankruptcy

5  settlements.

6       So it maximized value because, A, we were enforcing an

7  unenforceable agreement, we got a new agreement with the right

8  counterparty, and it gave the ability to consummate a plan

9  that's been accepted by lawyers representing a majority of the

10  claim holders.  So that's why I believe it absolutely maximized

11  value.

12 Q    All right, I want to switch gears.

13      You were also asked -- you were I think shown some

14 testimony from your deposition by Mr. Jonas about whether LTL

15 performed an analysis of the value of HoldCo.  Do you remember

16 him reading that portion of the deposition --

17 A    I do.

18 Q    -- to you?  Okay.

19 A    I do.

20 Q    And you had something -- you had an explanation, something

21 you -- context --

22 A    Yes.

23 Q    -- you wanted to provide to the answer given in our

24 deposition?

25 A    I did.

Kim - Redirect/Baker                                      259

1  Q    Okay.  And what is that, sir?

2  A    So even later in that deposition I had remembered that at

3  the board meeting there was an analysis done of HoldCo that is

4  in the board presentation that has the amounts that HoldCo had,

5  the dividend issues, you know, all the issues relating to the

6  liquidity issues that HoldCo had.  And so -- and also, as a

7  matter of -- there is a backup to that valuation that was done

8  by third parties, which Mr. Jonas and I discussed at the

9  deposition.

10       So there is certainly analysis done that was present.  So,

11 later on in the deposition, I recalled that and we talked about

12 it at that deposition.

13 Q    All right.  You -- I want to switch gears again -- you

14 were asked a series of questions about costs associated with

15 litigating talc claims in the tort system.  Do you recall that?

16 A    I do.

17 Q    And I think it was with Mr. Jonas, you were talking about

18 the fact that -- and I think you were saying this was reflected

19 in the March 28th board presentation that those costs were

20 expected to get worse?

21 A    Yes.

22 Q    All right.

23 A    There's a specific bullet that we went over the board

24 with.

25 Q    From that board presentation on March 28th?

Kim - Redirect/Baker                          260

1  A    Yes.

2  Q    And, when you say you expected things to get worse or that

3  things were getting worse, what did you mean?

4  A    What I meant was that we knew that, for example, there

5  were consolidating cases.  So even in the bankruptcy, now that

6  the stay has been lifted, we have cases in New Jersey that are

7  being consolidated.  We know that there are more filings, we

8  know that there's been a pent-up number of cases ready to go to

9  trial.

10      So, while we had an assumption in the first bankruptcy

11 that we would try, you know, I think it was like maybe 20 cases

12 a year or something like that, I can't remember the exact

13 number, but we understand that the game plan of the plaintiffs'

14 lawyers is to flood the courts with our trial.  So we expect a

15 huge increase in trial costs.

16      So all these things that are sort of part of our

17 explanation of why increased costs have to be factored in and

18 known and contemplated at the time of the bankruptcy.

19 Q    Are there lawyers here in this courtroom who have

20 requested consolidated trials --

21 A    There --

22 Q    -- for their claimants?

23 A    -- there are, yes, there are.

24      THE COURT:  Let me ask a question, please -- well,

25 before you get -- Mr. Maimon --

1          MR. MAIMON:  I have, yes.

2          THE COURT:  I believe a couple of the reply briefs

3    referenced this.  Can you explain why consolidation increases

4    the costs going forward in attorney time as opposed to reducing

5    the costs, given the consolidated nature of the litigation?

6          THE WITNESS:  So consolidated trials require larger

7    trial teams, for one, just on the cost side that when you have

8    multiple plaintiffs that have, for example, different doctors.

9    So, if you have 20 plaintiffs, each one of them has a different

10   doctor involved, they may have different experts involved for

11   each of them and they have the right to bring in their own sort

12   of proof, and so the cost just of now defending that has

13   increased because you have to deal with all these ancillary

14   issues.

15          So, on the cost side, there's an increase in the

16   expenditures that you have to make for any particular trial

17   that may have been borne over a longer period of time.  So now

18   they're all front-loaded in one effort.

19          The other real problem on the indemnity side of

20   consolidated trials is we have literature that shows that the

21   likelihood of winning a consolidated trial is much less than

22   winning a single trial.  So, if there's one plaintiff that

23   presents to a jury that says I used talc and I got cancer, the

24   jury sees it one way, if then you have ten other people that

25   come in front of the same jury and each one of them says, hey,

Kim - Redirect/Baker                                262

1  talc caused my cancer, then the likelihood of a defense that

2  talc doesn't cause cancer that, you know, it goes down.  So we

3  see indemnity costs exponentially rising in those situations as

4  well.

5           THE COURT:  All right.  Thank you.

6           MS. BAKER:  Thank you, Your Honor.

7  BY MS. BAKER:

8  Q    And, Mr. Kim, beyond just the cost of larger trial teams

9  and the indemnity cost that you just referenced, what do you

10 also know about verdicts in consolidated cases?

11 A    Well, as I was just saying, the verdicts are higher

12 because, A, it's no longer -- you know, when you have a mass of

13 people, jurors tend to side with the mass of plaintiffs as

14 opposed to an individual plaintiff.  And then on -- you know,

15 then you have punitive damages that go to trial in a

16 consolidated trial and because -- while it may not be legally

17 right, each of the plaintiffs asks for a punitive damage

18 amount, and so that compounds the punitive damages even for,

19 you know, the same operative facts by one defendant.  So that

20 increases verdict amounts as well.

21 Q    You were sticking with increasing costs, things getting

22 worse.  You were asked about whether you disagreed -- you know

23 where I'm going here --

24 A    I do.

25 Q    -- you were asked about whether you disagreed with some of

1  Mr. Wuesthoff's testimony from this morning.  Do you recall

2  that question?

3  A    I do recall that.

4  Q    Okay.  Explain your answer.

5  A    So the reason I disagree with the testimony was not

6  because Mr. Wuesthoff did anything wrong, these were -- he was

7  answering leading questions with an assumption that was wrong.

8  I mean, all the assumptions that the questioner asked were

9  based upon the old data from the first hearing about, you know,

10 the number of cases that may be tried, the cost of each trial.

11     Again, we believe that everything was increasing, as

12 indicated in the board presentation.  And so the numbers that

13 Mr. Wuesthoff was using, based upon the assumptions that Mr.

14 Jonas was giving him, I disagree with, I think they're much

15 higher now than that was testified by Mr. Wuesthoff.

16 Q    And for all of the reasons you and I have discussed?

17 A    Correct.

18 Q    All right, switching gears again.  You were asked some

19 questions about whether LTL had a financial adviser or an

20 investment banker or the like at a board meeting; right?

21 A    Yes.

22 Q    And I think you indicated that LTL did not?

23 A    It did not.

24 Q    Why not?

25 A    We didn't think there was a need for it at that time.  I

Kim - Redirect/Baker                                          264

1  mean, I think -- so the board had already gone through the

2  first motion to dismiss in the first case and they saw all the

3  data, they understood all the background information.  Nothing

4  has changed except things have gotten worse in this go-around.

5      So based upon the -- on all the background that we had,

6  all the data points, we felt that it was really -- it's sort of

7  -- it's an easy decision to determine that we were under

8  financial distress and we didn't feel that we had a need to

9  bring in asset experts at that point to go through that.

10 Q    All right.  So I think, closer to the end of your cross-

11 examination, you were shown the 2021 funding agreement, you

12 went through several provisions from that, you were shown a

13 statement from Mr. Gordon.  You remember those questions;

14 right?

15 A    I do.

16 Q    All right.  Let me ask you, Mr. Kim, what was the purpose

17 of the 2021 funding agreement?  What was it intended to

18 facilitate?

19 A    The funding agreement was specifically intended to

20 facilitate a resolution of these talc liabilities in a

21 bankruptcy.  It would make no sense to go through a divisional

22 merger with all its complications and put in these funding

23 arrangements if the company was not going to file bankruptcy

24 and try to resolve the cases in a bankruptcy.  It's clear from

25 all the agreements and the sequence of events that the -- you

Kim - Recross/Maimon                    265

 1  know, that that was all the single, integrated transaction

 2  where you -- which would have resulted in the bankruptcy and

 3  resolution of these cases in a bankruptcy.

 4  Q    All right.  Thank you, Mr. Kim.

 5          MS. BAKER:  I have no further questions, Your Honor.

 6          THE COURT:  Thank you, Counsel.

 7          Mr. Jonas?

 8          MR. JONAS:  Do you want to go first?

 9          THE COURT:  Mr. Maimon?

10          MR. MAIMON:  Yes, may I?  Can I have the transcript

11  back?  We're at Exhibit 1011, page 61.

12                       RECROSS-EXAMINATION

13  BY MR. MAIMON:

14  Q    While we get that up, you talked about consolidated

15  trials, J&J had consolidated trials before the bankruptcy;

16  correct?

17  A    Concerning the talc cases?

18  Q    Yes.

19  A    Yes, one.

20  Q    No, they had more than one.

21  A    Oh, I'm sorry, yes -- no, no, yes --

22  Q    No, they had four.

23  A    I stand corrected, yes.

24  Q    Right.  They won two of them; didn't they?

25  A    They won two of them -- they did.

Kim - Recross/Maimon                     266

1  Q    And, on a per-plaintiff basis, the cost was lower than

2  single-plaintiff trials; true?

3  A    I don't believe that's true.

4  Q    Didn't you read that in Mr. Mullin's report?

5  A    I'd have to go back and see.

6  Q    You don't know, do you?

7  A    Sitting here, I don't recall that to be true, but I'd have

8  to go back.

9  Q    But you don't know?

10 A    Sitting here, I do not know.  I have --

11 Q    Are you going to be here when Dr. Mullin is going to

12 testify?

13 A    I think I am, yes.

14 Q    Okay.  So we'll revisit that then, okay?

15 A    Okay.

16 Q    Okay.

17         MR. MAIMON:  Can we get 1011 up?  Page 61, the first

18 paragraph.

19         Okay.  May I approach the screen, Your Honor?

20         THE COURT:  Sure.

21 BY MR. MAIMON:

22 Q    I just want to make sure we're all reading the same thing

23 here.  Mr. Gordon, on behalf of LTL, told Judge Kaplan, "So it

24 makes very clear this is what we're talking about, if there's

25 no proceeding in bankruptcy" -- no proceeding, right?  Do you

Kim - Recross/Maimon                        267

1  see that?

2  A    I do.

3          MS. BAKER:  Objection, Your Honor.

4  BY MR. MAIMON:

5  Q    That would be -- I'm sorry --

6          MS. BAKER:  Excuse me --

7          THE COURT:  What's the objection?

8          MS. BAKER:  -- objection.  This is cumulative; we've

9  already covered this.

10         MR. MAIMON:  This was covered on --

11         THE COURT:  Overruled.

12 BY MR. MAIMON:

13 Q    That is an option that the LTL board had to vote no on the

14 bankruptcy option; correct?

15 A    It was an option, yes.

16 Q    And Mr. Gordon, on behalf of LTL, says "this is what we're

17 talking about, if there's no proceeding in bankruptcy."  That's

18 what he said, right?

19 A    It is exactly what he said.

20 Q    And he clarified it.  He said, "whether there was no case

21 filed, or whether the case is filed or dismissed."  Right?

22 A    That's what he said.

23 Q    Two options.  So the funding agreement whereby J&J

24 obligated itself to up to $61.5 billion outside of the

25 bankruptcy, in Mr. Gordon's words, was whether there was no

1 case filed, or whether the case was filed or dismissed; right?

2 A    I can read what it says, yes.

3 Q    And the case was dismissed; wasn't it?

4 A    For a particular ground, yes.

5 Q    Yes, by the Third Circuit; correct?

6 A    Correct.

7 Q    And, as the chief legal officer, sir, you review the

8 filings, you told us, that your company is making; correct?

9 A    I do.

10 Q    That includes the submissions to the Third Circuit; right?

11 A    I did.

12 Q    After the Third Circuit issued its opinion and you came to

13 this epiphany of void and voidable, your company filed a motion

14 for reconsideration and *en banc* review to the Third Circuit.

15 Do you recall that?

16 A    I do.

17 Q    And, after that was denied, your company filed a motion to

18 stay the mandate pending a petition for certiorari to the

19 Supreme Court of the United States; correct?

20 A    It did.

21 Q    In neither of those instances, it's true, Mr. Kim, in

22 neither of those instances did your company tell the Third

23 Circuit Court of Appeals, hey, your decision made the funding

24 agreement that you relied upon to dismiss the case void,

25 voidable, or unenforceable; that was nowhere in your pleadings,

1 correct, to the Third Circuit?

2 A    Of course not.

3 Q    Of course not.  I agree.

4            MR. MAIMON:  Thank you.  No more further questions.

5            MR. JONAS:  Just a few questions, Your Honor.

6                         RECROSS-EXAMINATION

7 BY MR. JONAS:

8 Q    Mr. Kim, you said that after J&J had declared the first

9 funding agreement unenforceable, you said that we, I think you

10 meant LTL, had, quote, "no bargaining power," close quote.

11 What did you mean by that?

12 A    So LTL is a company that has immense liability and has RAM

13 as an asset, neither -- we could not force either J&J --

14 remember, in the first funding agreement, J&J's backstop, as

15 the Third Circuit made quite clear, was completely voluntary,

16 right?  As an entity that just has debt, we cannot force any

17 entity, whether a J&J affiliate or any third party, to come in

18 and bail us out, just there's no -- we have no bargaining power

19 to do that and it would make no sense.

20      Plus the fact that, in discussions with J&J, we had a

21 solution, you know, we had a new funding agreement that

22 accomplished all the purposes that we were interested in, which

23 is to get a full and fair and final resolution in bankruptcy.

24 So we had a funding agreement and plus with the added benefit,

25 following the Third Circuit guidance, we did not create a

Kim - Recross/Jonas                                    270

1  fraudulent transfer.

2       And so because of all those things there would be no

3  reason for us or could we go to anybody else to get a different

4  party, more money, none of these things.  It just -- it makes

5  no sense for us to even try to do something like that.

6  Q    Well, did you go to J&J and threaten to sue them to come

7  back to this Judge to enforce -- I think the Judge actually --

8  I'll read you some testimony someday -- the Judge actually

9  said, if you ever have a problem, come back and see me for --

10 he actually said that for the enforcement of the funding

11 agreement.

12      So let me ask you, when you say you had no bargaining

13 power, why didn't you -- you had a company with $400 million,

14 right?  Yes?

15 A    Yeah, but that's already owed to -- so we have no

16 additional bargaining power for a third party --

17 Q    No, I know, but --

18 A    -- or for J&J, I mean --

19 Q    -- you didn't need a third party --

20 A    Well, or even for J&J.  Just because we're --

21           MS. BAKER:  Your Honor --

22           THE WITNESS:  I'm sorry.

23           MS. BAKER:  -- sorry, objection.

24           MR. JONAS:  I'm sorry, my --

25           MS. BAKER:  I just want to make sure -- thank you --

Kim - Recross/Jonas                                    271

1  I just want to make sure the witness is allowed to answer the

2  question.

3          MR. JONAS:  My apologies.  Go ahead.

4          THE WITNESS:  We had -- when we say we had no

5  bargaining power, even though we had some cash, we had much

6  more debt.  And so, again -- and, again, nobody else has an

7  obligation.  So J&J did not have an obligation in the first

8  instance to provide a backstop, it certainly doesn't have an

9  obligation now to provide a backstop, and there's really

10 nothing we could do.  As to going to the court and going to

11 litigation, that is an option to go through years of litigation

12 where you might lose, but we had a solution that was, again,

13 met all the criteria that we needed and it was a good solution.

14          So, from a business perspective, it just made sense

15 to enter into the termination and substitution agreement.

16 BY MR. JONAS:

17 Q    I apologize because I haven't been clear, so let me -- I'm

18 going to break it down and try and be clear, more clear.

19 A    Sure.

20 Q    If a party -- if there's two parties to a contract -- and

21 I know you're a lawyer, you have your experience -- if one

22 party says, hey, I'm not going to perform, isn't it an option

23 to the other party to say what do you mean, you're not going to

24 perform?  If I have to, I'll -- and we had a judge who happened

25 to be sitting here -- I'll go see the Judge, we're going to

Kim - Recross/Jonas                                             272

1  figure out this dispute.  It's very simple, it's a very simple

2  dispute, they either were obligated to perform or not to

3  perform.

4      So I'm confused when you say no bargaining power, why --

5  and it has nothing to do with debt, how much debt you have, it

6  has nothing to do with what they -- I think you said they had

7  no obligation -- they had contracted -- let me finish -- they

8  had contracted themselves to pay $61 billion.

9      So I just want to understand because I don't understand,

10 why didn't you either -- never mind, maybe you would never have

11 to come before the Judge -- did you have a negotiation and say,

12 hey, guys, I think you're still on the hook?

13 A   We had -- again, we had numerous discussions with J&J; we

14 looked at the issues, people did legal research.  We're not

15 going to get to -- my understanding based upon that was that

16 there was a material risk that they were right.  We agreed with

17 them that it frustrated the purpose.  At that point, it makes

18 sense to negotiate a resolution, which we did, that was to the

19 benefit of all parties, including the claimants.

20     So that's the sequence of events and that's where we ended

21 up where we were.

22 Q   Would you agree with me that, in the end, it turned out to

23 be an awfully good deal for J&J, would you agree with me on

24 that, the way -- from the first funding agreement to the second

25 funding agreement?

Kim - Recross/Jonas                    273

1  A    No, I disagree with that.

2  Q    You disagree.

3  A    I disagree with that.

4  Q    The first funding agreement, they might have been

5  obligated to pay 61 billion; correct?  Yes or no.  Correct?

6  A    Hypothetically, that could be a cap, yes.

7  Q    They could have paid $61 billion?

8  A    Correct, that's a hypothetical cap.

9  Q    And today, today they have -- they're not obligated at

10 all, correct, today?

11 A    Until there's a -- until there's --

12 Q    Okay.  And when there's a confirmed plan?

13 A    Correct.

14 Q    When there's a confirmed plan that they like?

15 A    Correct.

16 Q    And they get a channeling injunction, right, that's a

17 requirement?

18 A    Correct.

19 Q    They have to get off the hook?

20 A    Well, I wouldn't call it getting off the hook.

21 Q    A channeling injunction, okay.  When that happens, they're

22 only liable to pay anything if HoldCo doesn't pay it first,

23 right?

24 A    Correct.

25 Q    So -- and you think HoldCo has enough -- I know, you know,

Kim - Recross/Jonas                                        274

 1  we did some math there, but you think HoldCo can satisfy the

 2  obligation?

 3  A    HoldCo can satisfy the obligation --

 4  Q    Right, so --

 5  A    -- but it would be in financial distress having to do so.

 6  Q    Okay.  Well, I'm not worried about HoldCo, they're not

 7  here.  They can come back and file another day.  Okay?  So

 8  let's put HoldCo aside.

 9       So LTL, --

10            THE COURT:  Where are they incorporated?

11            MR. JONAS:  That's a good question.

12                          (Laughter)

13            MR. JONAS:  I bet North Carolina, that's another

14  thing.

15                          (Laughter)

16  BY MR. JONAS:

17  Q    So I just want to understand, if things go according to

18  your plan, a plan will get confirmed here, right?  HoldCo will

19  pay, if it can, and J&J won't pay -- there's a chance that

20  under this new deal they made J&J won't pay a single dime,

21  they'll get a full release from all talc liabilities and they

22  won't pay a dime; isn't that likely to happen?

23  A    So I disagree with your premises about J&J not being --

24  not paying a dime and that means nothing.

25       So, again, HoldCo is a J&J subsidiary, right?  If HoldCo

Kim - Recross/Jonas                                                                 275

1  has to pay $8.9 billion, when you look at it from an

2  enterprise-wide view, you know, J&J has lost the use of money

3  from a subsidiary of $8.9 billion.  So, at the end of the day,

4  what the focus should be is that the J&J companies, including

5  LTL, are paying an unprecedented amount of money in a

6  bankruptcy settlement to resolve all these cases fully, fairly,

7  and equitably, in a time period that is far better for

8  claimants than being in the tort system.  I think that's the

9  way I looked at it.

10 Q    So I want to talk about April 4th, when LTL made the

11 decision to re-file, and you have said you thought that it was

12 in financial distress.  The only numbers that you had with

13 respect to costs and going back into the tort system were the

14 ten to twenty dollars a month, I guess we'll call it historical

15 that you testified in the previous bankruptcy, right?  Those

16 are the only numbers you had.

17 A    Well, we knew that things were increasing and --

18 Q    What numbers did you have that supported that --

19 A    Well --

20 Q    -- on the cost side?

21 A    -- you know, again, we didn't do a formal analysis, but,

22 again, we believed we were in financial distress during LTL I,

23 we believed that it only got worse in LTL II; therefore, we

24 believed, yeah, that's the basis of our financial distress.

25 Q    Okay, but let me just confirm, the only numbers, real

Kim - Recross/Jonas                                      276

1  numbers you had were what it had cost you over the last five

2  years before you filed, which was ten to $20 million a month,

3  those were the litigation, the talc defense costs; correct?

4  A    Yes.

5  Q    Okay.

6  A    And the judgment amounts.

7  Q    I'm just talking about costs of defense --

8  A    Right, but we're not --

9  Q    -- cost of defense --

10  A    -- I agree -- I understand that.

11  Q    -- because the declaration just talks about you were in

12  financial distress because of the cost of the defense.

13  A    No, I don't --

14  Q    So I want to focus on that, I want to just focus on cost

15  of defense.

16  A    Yeah, I disagree that's what the declaration says.

17  Q    Okay.  So you didn't have any formal projections or

18  analysis; right?

19  A    Correct.

20  Q    So I want to just know if I got the time line right.

21       The board meets, you have the ten to twenty, and that's

22  the basis on which -- that's the only numbers they had.  You

23  thought, you had this idea -- I think I wrote it down -- things

24  have gotten worse, which we'll talk about in a minute.  And

25  then, once the bankruptcy filed, you went out and hired

Kim - Recross/Jonas                          277

1  experts, and did you tell them that they're supposed to come up

2  with expert opinions that support what you thought, the

3  financial distress you had when you filed bankruptcy?

4       Because that's what happened, right, you now have expert

5  reports that we're going to hear from certain experts that are

6  going to say you guys were right, look, we really -- look at

7  these -- oh, much more costs and all kinds of stuff, right?

8            MS. BAKER:  Your Honor, are we going to get a

9  question at any point?

10            MR. JONAS:  I think I asked a question.

11            THE COURT:  I can't tell you what question you asked.

12            MR. JONAS:  No?

13            THE COURT:  Repeat it again, please.

14            MR. JONAS:  Okay.

15            THE WITNESS:  Was there a question?

16  BY MR. JONAS:

17  Q   After you filed bankruptcy, you went out and you hired Mr.

18  Mullin and Mr. Bell; correct?

19  A   After the motions to dismiss were filed --

20  Q   Right --

21  A   -- right --

22  Q   -- that's exactly right.

23  A   -- that's -- right --

24  Q   Right.

25  A   -- that was the genesis of all the proceedings.

Kim - Recross/Jonas                                    278

1  Q    And their job, their job is to come up with an analysis

2  that supports that the company was in financial distress on

3  April 4th; right?

4  A    I disagree with that.

5  Q    Okay.

6         MR. JONAS:  No further questions, Your Honor.  I do

7  have -- I just want to raise, I apologize for doing this, one

8  technical matter.  I have a bunch of exhibits, mostly that were

9  attached to Mr. Kim's declaration.

10        THE COURT:  Right.

11        MR. JONAS:  I just -- I'm just worried, eventually,

12 when he gets off the stand and we lose him -- and I didn't want

13 to surprise the folks on this side of the aisle, I made a

14 little list -- all I'd ask is they take a look at the list.  My

15 guess is they're not going to have any objection to any of

16 these exhibits being entered.

17        THE COURT:  Stipulate to the exhibits?

18        MR. JONAS:  What's that?

19        THE COURT:  Stipulate to the exhibits?

20        MR. JONAS:  Yeah, and then I just -- I'd ask that if

21 God forbid there's an issue and I know he'll be here tomorrow,

22 we could simply recall -- I could go through them now and say

23 did you see the exhibit which was the amended funding

24 agreement, did you see your declaration, and it --

25        UNIDENTIFIED SPEAKER:  Don't do that.

1                    (Laughter)

2           THE COURT:  Give them the list.

3           MS. BAKER:  Yeah, we're happy to -- first, we're

4    happy to take a look at the list, but I think the other thing

5    is that if these are mostly exhibits --

6           MR. JONAS:  Yes.

7           MS. BAKER:  -- to Mr. Kim's declaration, those have

8    already been admitted and --

9           MR. JONAS:  Well, I'm not sure they have.  That's the

10   problem, Your Honor, I don't know if there -- was there any --

11          MS. BAKER:  Well, I admitted it when he --

12          MR. JONAS:  Ah, okay.

13          MS. BAKER:  -- first took the stand.

14          MR. JONAS:  My apologies.  So, again, to the extent

15   there's one or two other ones, I think there are, Your Honor, I

16   would simply ask that if we just have an opportunity to -- it

17   will probably take five minutes, but before we lose Mr. Kim, I

18   just don't want him to be dismissed and then --

19          THE COURT:  He's going to find his way back here.

20                    (Laughter)

21          MR. JONAS:  Thank you, Your Honor.  I'll pass the

22   witness.

23          THE COURT:  Thank you.

24          MS. BAKER:  Thank you, Your Honor.  I just have a few

25   questions.

Kim - Recross/Richenderfer                    280

 1              THE COURT:  Wait, wait --

 2              MS. BAKER:  All right.

 3              THE COURT:  -- Ms. Richenderfer.

 4              MS. BAKER:  I see that.

 5                      RECROSS-EXAMINATION

 6  BY MS. RICHENDERFER:

 7  Q    Hello again, Mr. Kim.  Linda Richenderfer, Office of the

 8  United States Trustee.

 9       So I just want to make sure I understand this time line

10  then.  So LTL, a debtor-in-possession, in February and March of

11  this year, negotiated a deal by which it no longer had the 2021

12  funding agreement?

13  A    I disagree with the negotiation part.  We had discussions

14  on issues relating to the un-enforceability of an agreement and

15  how that could be resolved.  The way that it was resolved was

16  that, after the bankruptcy got dismissed, we entered into new

17  agreements that substituted the old agreements and with new

18  funding agreements.

19  Q    Now, I don't have them here in front of me.  I know that

20  there's several new agreements, though, and my guesstimate

21  would be at least 50, 60 pages between the three of them.

22  Would you agree with that?

23  A    I don't think there are that many pages --

24  Q    Okay.

25  A    -- yeah.

Kim - Recross/Richenderfer                    281

1  Q    Well, we've got the agreement with HoldCo; correct?

2  A    Correct.

3  Q    And the new funding agreement?

4  A    Correct.

5  Q    We have some sort of a termination agreement with J&J;

6  correct?

7  A    Correct.

8  Q    And then we have this support agreement; correct?

9  A    Correct, correct.

10 Q    So are you telling me that those documents were created in

11 two hours and 11 minutes?

12 A    No, they were discussed and they were put together, and

13 then it was agreed that they would not become effective until

14 after the first bankruptcy was dismissed.

15 Q    Okay.  But during the time when J&J is saying to you, no,

16 no, it's not effective, it's void, it's voidable -- and you

17 understand as a lawyer, sir, right, that there's a difference

18 between a contract being void versus voidable?

19 A    I think technically there may be, yes.

20 Q    Technically, you think, okay, but you're not sure.  It's

21 just void or voidable?

22 A    Yeah, we put them together for ease of reference.

23 Q    Okay.  So you're being told that the 2021 agreement, no

24 good, void, voidable, and you're still in bankruptcy and we're

25 still having hearings in front of Judge Kaplan.  And in fact in

Kim - Recross/Richenderfer                282

1  one of them, in March, he says to the parties, I urge you, go

2  talk to the mediators.

3      And we're still within the four corners of this Court, we

4  still have a debtor-in-possession, and we have somebody

5  threatening to take away this debtor-in-possession's main asset

6  and LTL decided not to bring that to the Court's attention?

7  A    Yes, that's true.  That's --

8  Q    Okay.

9  A    -- true, yes.

10 Q    And LTL came into existence as LTL on October 12th, 2021.

11 Do I have that right?

12 A    Around that.  I think it's probably a little -- a little

13 before that, potentially --

14 Q    I get a little confused with the name changes, so give or

15 take a day or two.

16     And it became laden with debt at that point in time;

17 correct?

18 A    It had all the talc liabilities assigned to it, yes.

19 Q    Right.  And, before that, LTL didn't exist?

20 A    That's correct.

21 Q    And so, before that, there was no LTL that had any talc

22 liabilities?

23 A    There was no LTL that had talc liabilities --

24 Q    Right.

25 A    -- correct, yes.

1  Q    Okay.   There was a JJCI that had talc liabilities;

2  correct?

3  A    Correct.

4  Q    Okay.   And then there are different combinations --

5  corporate law I'm not saying was ever my expertise, but there's

6  different back and forth, there's paperwork, a lot of

7  paperwork, and we end up with LTL holding all the talc

8  liabilities; correct?

9  A    That is correct.

10  Q    And in exchange for that wasn't one of the things that LTL

11  got the 2021 funding agreement?

12  A    It was --

13  Q    Okay.

14  A    -- that was one of the assets that it was given.

15  Q    Okay.   So when J&J says we're taking back that agreement,

16  why doesn't LTL give back the talc liabilities?

17  A    Well, it didn't say it's taking back the agreement, it

18  said that the -- because of the Third Circuit ruling, that

19  agreement, at least the backstop of that became unenforceable.

20  Q    Okay.

21  A    So, clearly, there may have been other ways to try to deal

22  with it, but, again, the solution that presented itself was a

23  termination and substitution agreement that was for the benefit

24  of all parties, including the talc claimants, that would

25  resolve the talc liability in the bankruptcy system fully and

Kim - Recross/Malone                    284

1  fairly and finally.  So that was the option that we chose.

2  Q    Okay.  So you chose not to come back to the Court in

3  February and March, but you chose to come back to the Court in

4  April with a second filing; is that correct?

5  A    Yes, that's true.

6  Q    Okay, thank you.

7          MS. RICHENDERFER:  That's all.

8          THE COURT:  Mr. Malone.

9                    RECROSS-EXAMINATION

10  BY MR. MALONE:

11  Q    Mr. Kim, I'm just trying to get some clarifications on a

12  couple of issues.

13      Number one, were you involved in the divisional merger

14  that created LTL?

15  A    Yes.

16  Q    So one of the assets that was given to LTL was the first

17  funding agreement; am I correct?

18  A    I think we just went over that, yes.

19  Q    I'm just clarifying some things.  At that time, did the

20  debtor, this debtor, have its own financial adviser?

21  A    No.

22  Q    Did Johnson & Johnson have one?

23  A    No.

24  Q    You talked about filing the second one that you didn't

25  feel the need to have a financial adviser; is that correct?

Kim - Recross/Malone                    285

1  A    Correct.

2  Q    All right.  Were there any financial reports prepared

3  internally that you relied upon?

4  A    There's, I think, one or two reports about HoldCo that

5  Jones Day reviewed.

6  Q    I'm not asking that, that's not my question.

7  A    Oh.

8  Q    Did you have anybody internally, meaning a financial

9  person within LTL, prepare any kind of financial analysis that

10  you relied upon in --

11  A    No.

12  Q    -- making the decision?  No --

13  A    No.

14  Q    -- there was none?

15  A    No.

16  Q    Okay.  Did you get a fairness opinion with respect to the

17  possibility of a fraudulent conveyance if you negotiated away

18  the $61 billion funding agreement?

19  A    No.

20  Q    Did you feel that that was a fraudulent -- could be

21  considered a fraudulent conveyance?

22  A    No.

23  Q    I think there's the U.S. Trustee's -- well, let me ask one

24  other question.  I asked this earlier to another witness.

25      You're a lawyer, you've done some bankruptcy, you

Kim - Recross/Malone                          286

 1  understand the fiduciary duties of a debtor-in-possession?

 2  A    Yes.

 3  Q    When you filed the first bankruptcy, I don't know if you

 4  got to it in the second one, did you have a first meeting with

 5  the U.S. Trustee's Office?

 6  A    I did.

 7  Q    And during that meeting did they explain to you what your

 8  fiduciary duties were with respect to being a debtor-in-

 9  possession?

10  A    I don't recall.

11  Q    You don't recall, okay.

12       During the first bankruptcy, was there a creditors

13  committee in place?

14  A    Other than the talc committee?

15  Q    Well, the talc committee --

16  A    Yes.

17  Q    -- an official committee?

18  A    There was an official committee of talc claimants.

19  Q    And there came a time when there was a decision made that,

20  hey, we're going to undo the $61 billion funding agreement;

21  correct?

22  A    Yes, when the bankruptcy got dismissed.

23  Q    No, but you had -- you just testified you had discussions

24  before the first one was dismissed; correct?

25  A    Correct, we had discussions that it would not --

Kim - Recross/Malone                              287

1  Q    So you were a debtor-in-possession?

2  A    Yes.

3  Q    Did you at any point in time notify anybody at Brown

4  Rudnick or anybody else saying, hey, look, Johnson & Johnson is

5  going to pull on this funding agreement so that they could

6  opine or get involved, they're saying, hey, you can't -- you've

7  got to either bring a lawsuit or we have to have the ability to

8  go into court and bring a lawsuit on behalf of the estate to

9  prevent this fraudulent conveyance?

10         MS. BAKER:  Objection, Your Honor, asked and

11  answered.  This is all cumulative.

12         THE COURT:  Sustained.  We've gone through -- we've

13  gone through this area.

14  BY MR. MALONE:

15  Q    Were the documents -- when were the documents created for

16  the second funding agreement, time period?

17  A    I don't recall, I don't recall when they were --

18  Q    Were they prepared in February of 2023?

19         MS. BAKER:  Asked and answered, Your Honor.

20         MR. MALONE:  I'm asking --

21         THE COURT:  Overruled.

22         MR. MALONE:  -- the time line.

23         THE WITNESS:  I don't recall when they were prepared.

24  I don't recall when the first draft was or who did the first

25  draft or --

Kim - Redirect/Baker                    288

1  BY MR. MALONE:

2  Q    But it's fair to say they were prepared while you were a

3  debtor-in-possession in LTL 1.0; correct?

4  A    They were, yes.

5  Q    Thank you, yes.

6           THE COURT:  Thank you, Mr. Malone.

7           Re-redirect?  No?

8           MS. BAKER:  Yes, very briefly.  I know, I know, Your

9  Honor.

10          THE WITNESS:  Thanks for trying, Your Honor.

11          MS. BAKER:  This should be it.  All right.

12          THE COURT:  It just feeds into more.

13          MS. BAKER:  That's true, that's true.

14                  FURTHER REDIRECT-EXAMINATION

15 BY MS. BAKER:

16 Q    All right.  Mr. Kim, just a few questions, all right?

17 A    Yes.

18 Q    You were asked at the beginning, I guess of your recross-

19 examination, you were asked about consolidated trials?

20 A    Correct.

21 Q    Okay.  And I want to ask you -- well, let me ask you, what

22 was the largest consolidated trial that you managed?

23 A    Probably the <u>Ingham</u> trial.

24 Q    And how many plaintiffs were consolidated in that case?

25 A    Now you're testing me.  I think it was like 22?

Kim - Redirect/Baker                    289

1  Q    I think that's right.  And, I may test you again, what was

2  the verdict in that case, in that 22-plaintiff consolidated

3  case?

4  A    I think it was around 4.2 billion or four --

5            THE COURT:  Four point six.

6            THE WITNESS:  Four point six billion, yeah.  Thank

7  you, Your Honor.

8                         (Laughter)

9            THE WITNESS:  Four point six billion, yeah.

10           MS. BAKER:  Your Honor has heard about this case a

11  few times.

12  BY MS. BAKER:

13  Q    All right.  When I was asking you, when I stood up here

14  before and had the chance to ask you questions and I was asking

15  about whether lawyers in this room had requested consolidated

16  trials, Mr. Maimon raised his hand, didn't he?

17  A    He did.

18  Q    All right.  And are you aware of the consolidated case

19  that he's requested?

20  A    Yeah, in front of Judge Viscomi in New Jersey, yes.

21  Q    All right.  And how many plaintiffs are in that case?

22  A    Actually, I don't.  I've lost count of that.

23  Q    Do you know if it's north of 20?

24  A    I think it was a large, a very large number of plaintiffs.

25  Q    All right.  And regarding litigation costs because that, I

Kim - Redirect/Baker                                    290

1  think, came up again in your recross-examination, have you

2  managed -- let me ask you, over the years, how many cases have

3  you managed and settled, approximately?

4  A    That is a tremendous number, you know, I mean, probably

5  north of 500,000.

6  Q    All right.  Have you ever needed a financial adviser or an

7  investment banker or anything like that to help you figure out

8  costs related to litigation?

9  A    No.

10  Q    All right.  You were asked -- I think just a couple more

11  questions, Mr. Kim -- you were asked by the Trustee why LTL

12  didn't come to court when having discussions earlier this

13  spring about the enforceability of the 2021 funding agreement

14  and the possibility of a new funding agreement and plan, do you

15  recall those questions?

16  A    I do recall those questions.

17  Q    All right.  At that time, was LTL or were the parties

18  discussing with the court-appointed mediators, were they having

19  discussions with the court-appointed mediators?

20  A    We were having discussions with the court-appointed

21  mediators.  Again, we were also negotiating these PSAs where

22  the resolution of this -- of the talc liabilities in bankruptcy

23  was being discussed for, you know, the $8.9 billion.  And so

24  all of that helped in terms of supporting a support and

25  termination agreement where we could enter into a new

Kim - Redirect/Baker                    291

1  bankruptcy and resolve these cases quickly, efficiently, and

2  fairly.

3  Q    All right.  I have no further questions, Mr. Kim.

4         MS. BAKER:  Thank you, Your Honor.

5         THE COURT:  Thank you, Counsel.

6         MR. MAIMON:  Briefly from here, Your Honor?

7                FURTHER RECROSS-EXAMINATION

8  BY MR. MAIMON:

9  Q    Ingham had 22 cases, right?

10  A    Plaintiffs, I believe so, yes.

11  Q    Is it going to surprise you when Mr. Mullin testifies that

12  the cost per plaintiff to defend that case was lower than other

13  single-plaintiff cases?

14  A    Yeah, I think it depends on what the -- I'm not sure what

15  he compared, so it would surprise me --

16  Q    It would?

17  A    -- if he says that's an -- that that's true for

18  consolidated cases in general.  So, again, I don't know which

19  -- what --

20  Q    You'll wait to hear, right?

21  A    I will.

22  Q    And then the complaints about consolidation, those were

23  rejected by the Missouri courts and the Supreme Court refused

24  to hear your certification for -- your petition for certiorari

25  exactly on the consolidation point; correct?

Kim - Redirect/Baker                          292

1  A    That is -- that could be true, yeah.  I'd have to see what

2  the decision was, yeah.

3  Q    Yeah, okay.

4            MR. MAIMON:  Thank you.  That's all.

5            THE COURT:  I think we're done.  Thank you, Mr. Kim.

6            THE WITNESS:  Thank you.

7            THE COURT:  You may step down.  Thank you for your

8  time.

9                    (Witness excused)

10           THE COURT:  Well, what is it, 4:45.  What's your

11  pleasure, folks?

12           MR. JONAS:  Your Honor, I have a suggestion.  It

13  would be helpful -- the next witness we would call is Mr.

14  Murdica.

15           THE COURT:  Right.

16           MR. JONAS:  We have filed -- I lost track of time,

17  but we've objected to Mr. Murdica's declaration.  It would be

18  helpful if we could have a very brief argument on that, so that

19  you could either, you know, make a decision or tell us prior to

20  his testimony.  It would help us a great deal to know whether,

21  you know, he's got -- it's his direct testimony, so if parts of

22  it are stricken or if it's stricken, both sides can actually

23  plan better for tomorrow, which would be Mr. Murdica's

24  testimony.

25           So that would be my -- so we don't lose minutes, we

1  can maybe use the few minutes we have to just -- for you to

2  hear argument on that or however you want to proceed.

3          THE COURT:  Well, let me ask -- thank you -- let me

4  ask this.  I know White & Case submitted opposition on behalf

5  of -- correct?

6          MR. STARNER:  Your Honor, Greg Starner, White & Case,

7  on behalf of the Johnson & Johnson parties.  We stand on our

8  papers and it just feels like this is kind of -- another kind

9  of end-run to address what we addressed this morning.

10          I think our view is consistent with the Court's view

11  that we should go forward, but we would stand on our papers.

12          THE COURT:  All right, thank you.

13          Does LTL want to take a position?

14          MR. STARNER:  And just to be clear, Mr. Murdica is --

15  Mr. Murdica is here, we're happy to proceed.  I think you

16  mentioned you might want to go a little bit later.  I don't

17  know how much time they need with him, but we're happy to

18  proceed and at least start with hi.

19          THE COURT:  Mr. Gordon?

20          MR. GORDON:  Our position is the same, Your Honor.

21  We think the paper was filed, we're good with that.  Our

22  feeling is we need to move forward with the evidence.  As I

23  indicated earlier, we're not going to get this done if we have

24  delays for argument, and Mr. Murdica is here, we'd like to see

25  it go forward.

1          THE COURT:  Mr. Winograd?

2          MR. WINOGRAD:  Good afternoon, Your Honor, Michael

3    Winograd from Brown Rudnick on behalf of the TCC.

4          Your Honor, two things.  Mr. Murdica certainly won't

5    be completed today and, you know, the strong preference is to

6    wait until tomorrow.  It will give us a chance both to

7    streamline based on what people have already testified to, but

8    in addition, with respect to the papers, they weren't papers,

9    right?  There was an objection deadline.  There weren't

10   motions, this was just simply objections, which we expected, as

11   is the case with all of the others and why we're not bring up

12   the other issues, where it was a line here, a paragraph here.

13         This is an entire declaration that is effectively

14   legal opinion and expert testimony, and I think we can point

15   that out in a very brief argument and I think it would be very

16   helpful to hear that, Your Honor.  And if Your Honor could

17   either rule today or at least in the morning, or at least give

18   us some direction, and I think that would even further

19   streamline what we'd be able to do with Mr. Murdica tomorrow,

20   Your Honor.

21         MR. MAIMON:  One more thing, Your Honor.  I did file

22   a motion to preclude specifically with regard to Mr. Murdica's

23   declaration any discussion of this alleged third party payer

24   insurance lien settlement for a whole host of reasons.  And,

25   again, if it's not going to be addressed, we don't have to

1 spend the time on cross; if Your Honor overrules the objection,

2 then we will spend time on cross, but it helps to know so that

3 we can be efficient.

4           THE COURT:  All right.  Mr. Gordon?

5           MR. GORDON:  I would point out that there's already

6 been testimony about Mr. Murdica, there's already been

7 testimony about the lien settlement.  We're glad to file -- the

8 lien settlement objection that came in last night, our plan is

9 to file a paper on that and Your Honor can take that up in due

10 course.  But, again, our feeling is it's just best to move

11 forward and Your Honor can decide ultimately whether you think

12 these things should come in in whole or in part.

13           MR. MAIMON:  So we're going to have full cross-

14 examinations for hours on end and then Your Honor may say, you

15 know what, you're right, I shouldn't take it into

16 consideration?  That's not judicial economy.

17           MR. WINOGRAD:  Your Honor, this is Michael Winograd.

18 What I would suggest is these are pretty, I think, on-their-

19 face.  You know, we are talking about, for example with the

20 lien settlement, there's a paragraph in Mr. Murdica's

21 declaration that is on its face, reading it for three minutes,

22 just legal argument about what the impact is of a document.

23           And I will tell you, and if we argue this today, that

24 he's absolutely wrong on the facts, and just read the document

25 and I think it's -- I would hope that it's not intentionally

1  misleading.  But in any event, at a cursory glance of his

2  declaration, it is set up, Your Honor, as a massive diatribe on

3  MDL versus bankruptcy and the benefits of one versus another,

4  and similar types of inadmissible --

5          THE COURT:  Well, I'm going to surprise you all

6  because I did read the objections, I read the White & Case

7  response, and I'm going -- I don't need oral argument, so as to

8  allow you all to prepare -- I am going to allow the declaration

9  in.  I'm striking that portion or any testimony regarding the

10 lien -- the amendments to the plan.  I don't think it furthers

11 the issues today at this hearing.

12         There has been an amended plan, the plan encompasses

13 a potential settlement.  Beyond that, I don't think we need to

14 delve into it.  But the other aspects of the declaration can

15 come in and we'll go forward, you can cross-examine on it.

16         MR. STARNER:  Thank you, Your Honor.  Do you want us

17 to start today or start tomorrow?  Again, Mr. Murdica is here,

18 we can move the declaration in and they can get started with

19 their cross-examination.

20         THE COURT:  I mean, my wife is in Florida visiting

21 her mother, I go home --

22                         (Laughter)

23         THE COURT:  -- I'm eating Chinese food and watching

24 "Godfather" again for the thousandth time.

25                         (Laughter)

1          THE COURT:  I don't really care, but it is getting

2   late and I'm not really sure if it's going to further -- I

3   mean, we might save an hour or so, but I'll put you to task

4   then.

5                     (End of recording)

6                      *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 **C E R T I F I C A T I O N**

2      We, DIPTI PATEL, KAREN K. WATSON, LIESL SPRINGER,

3 LORI KNOLLMEYER, and TRACEY WILLIAMS, court approved

4 transcribers, certify that the foregoing is a correct

5 transcript from the official electronic sound recording of the

6 proceedings in the above-entitled matter, and to the best of

7 our ability.

8

9 /s/ Dipti Patel

10 DIPTI PATEL

11

12 /s/ Karen K. Watson

13 KAREN K. WATSON

14

15 /s/ Liesl Springer

16 LIESL SPRINGER

17

18 /s/ Lori Knollmeyer

19 LORI KNOLLMEYER

20

21 /s/ Tracey Williams

22 TRACEY WILLIAMS

23 J&J COURT TRANSCRIBERS, INC.          DATE:  June 28, 2023

24

25