IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Wednesday, June 28, 2023 |
| Defendants. | . | AM SESSION |
| . . . . . . . . . . . . . . . | . | 9:08 a.m. |

TRANSCRIPT OF MOTION OF TO DISMISS THE SECOND BANKRUPTCY
PETITION OF LTL MANAGEMENT LLC

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES VIA ZOOM:

For the Debtor:              Jones Day
                             By:  GREGORY M. GORDON, ESQ.
                             2727 North Harwood Street
                             Suite 500
                             Dallas, TX 75201

                             Jones Day
                             By:  EMILY C. BAKER, ESQ.
                             1221 Peachtree Street, N.E.,
                             Suite 400
                             Atlanta, GA 30361

For Ad Hoc Committee         Brown Rudnick
of Certain Talc              By:  JEFFREY L. JONAS, ESQ.
Claimants and Ad Hoc              W. LYDELL BENSON, ESQ.
Committee of Creditors:           MICHAEL WINOGRAD, ESQ.
                             7 Times Square
                             New York, NY 10036

For the Ad Hoc Committee     Womble Bond Dickinson
of State Attorneys           BY:  ERICKA F. JOHNSON, ESQ.
General:                     1313 North Market Street
                             Suite 1200
                             Wilmington, DE 19801

For the Office of the        Office of the United States Trustee
United States Trustee:       By:  LINDA RICHENDERFER, ESQ.
                             J. Caleb Boggs Federal Building
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, DE 19801

For Various Talc             Maune Raichle Hartley Frency &
Claimants:                      Mudd, LLC
                             By:  CLAYTON L. THOMPSON, ESQ.
                             150 West 30th Street, Suite 201
                             New York, NY 10001

                             Levy Konigsberg, LLP
                             By:  MOSHE MAIMON, ESQ.
                             101 Grovers Mill Road, Suite 105
                             Lawrence Township, NJ 08648

For Justin Bergeron          Cohen, Placitella & Roth, P.C.
and Others:                  By:  CHRISTOPHER M. PLACITELLA, ESQ.
                             2001 Market St, Suite 2900
                             Philadelphia, PA  19103

APPEARANCES CONT'D:

For States of New Mexico     Gibbons, P.C.
and Mississippi:             By:   ROBERT K. MALONE, ESQ.
                             One Gateway Center
                             Newark, NJ 07102


For Paul Crouch,             Ruckdeschel Law Firm, LLC
individually and on          By:   JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of          8357 Main Street
Cynthia Lorraine Crouch:     Ellicott City, MD 21043


For Johnson & Johnson        White & Case LLP
and Johnson & Johnson        By:   GREGORY STARNER, ESQ.
HoldCo (NA), Inc.:           1221 Avenue of the Americas
                             New York, NY 10020

4

**INDEX**

**WITNESSES**                                                    **PAGE**

FOR THE TCC:

JAMES MURDICA

    Direct Examination by Mr. Starner                    5
    Cross-Examination by Mr. Winograd                    7
    Cross-Examination by Ms. Richenderfer               55
    Cross-Examination by Mr. Ruckdeschel                59
    Cross-Examination by Mr. Maimon                     68
    Cross-Examination by Mr. Malone                    121
    Cross-Examination by Mr. Ruckdeschel               126
    Cross-Examination by Mr. Thompson                  131
    Redirect Examination by Mr. Starner                132
    Recross-Examination by Mr. Winograd                166


**EXHIBITS**                                            **ID**    **EVD**

FOR THE DEBTOR:

D-5     Declaration of James Murdica                     5       6

```
 1                    (Proceedings commenced at 9:08 a.m.)

 2              THE COURT:  All right.  What's on the agenda, folks?

 3              MR. MASSEY:  Your Honor, I think we're ready for

 4    witnesses.

 5              THE COURT:  And would it be Mr. Murdica?

 6              MR. MASSEY:  It will, Your Honor.  The TCC calls

 7    James Murdica, Your Honor.

 8              THE COURT:  Mr. Murdica, good morning.

 9              MR. MURDICA:  Good morning, Your Honor.

10              THE COURT:  Just have a seat.  First please raise

11    your right hand.

12                    JAMES MURDICA, TCC'S WITNESS, SWORN

13              THE COURT:  Thank you.  Please state your name and

14    business address for the record.  We'll get you set up.

15              THE WITNESS:  My name's James Murdica.  My business

16    address is 1 North Wacker in Chicago.

17              MR. STARNER:  Good morning, Your Honor.  Greg

18    Starner, White & Case, on behalf of the J&J parties.

19              If I may approach the witness?

20              THE COURT:  Yes, please.

21              MR. STARNER:  Thank you, Your Honor.

22                        DIRECT EXAMINATION

23    BY MR. STARNER:

24    Q   Mr. Murdica, can you take a look at what I have handed to

25    you, which is marked as Debtor's Exhibit 5?
```

1  A    Yes.

2  Q    Do you recognize this?

3  A    I do.

4  Q    What is this?

5  A    This is the declaration I submitted before this hearing.

6  Q    Okay.  And do you understand this is intended to be

7  introduced into evidence and reflect your direct testimony as

8  you would have given it here today under oath?

9  A    I do.

10          MR. STARNER:  Your Honor, we submit Defendant's

11 Exhibit 5 into evidence subject to the Court's ruling

12 yesterday.  So that would just apply to Paragraph 61 of his

13 declaration.

14          THE COURT:  All right, thank you.  Any objection?

15          MR. WINOGRAD:  No objection, Your Honor.

16          THE COURT:  All right, thank you.

17          UNIDENTIFIED SPEAKER:  Aside from the ones we've

18 already lodged.

19          THE COURT:  Right.

20          UNIDENTIFIED SPEAKER:  We're not waiving the --

21          THE COURT:  We'll regard it as a continuing

22 objection.

23          UNIDENTIFIED SPEAKER:  Thank you.

24          (Debtor's Exhibit 5 admitted into evidence)

25          MR. WINOGRAD:  Your Honor, Michael Winograd, Brown

Murdica - Cross/Winograd                          7

1    Rudnick, on behalf of the TCC.  May I proceed, Your Honor?

2              THE COURT:  Yes, please.

3                      CROSS-EXAMINATION

4    BY MR. WINOGRAD:

5    Q    Good morning, Mr. Murdica.

6    A    Good morning, Mr. Winograd.

7    Q    I just want to start with a little bit of background.  You

8    are an attorney, correct?

9    A    I am.

10   Q    And you've been an attorney for almost 20 years?

11   A    That's correct.

12   Q    And you've worked on J&J matters for your entire legal

13   career, right?

14   A    That is correct.

15   Q    Even as a summer intern during law school, right?

16   A    Yes.  More than 20 years if you count that.

17   Q    And in fact, over the last 20 years, you've worked

18   primarily on Johnson & Johnson matters as its outside counsel,

19   right?

20   A    That's correct.

21   Q    I want to talk a little bit about talc claims.  You

22   represent J&J in connection with the talc claims, right?

23   A    I do.

24   Q    And you began assisting J&J with respect to the talc

25   claims in or about 2019.  Is that right?

1  A     That sounds correct.

2  Q     And with respect to your assisting J&J, they didn't send

3  you a separate engagement letter in connection with talc,

4  right?

5  A     No.

6  Q     Because that's not the nature of the relationship you have

7  with Johnson & Johnson, correct?

8  A     I'm not sure how to answer that.  I've been fortunate to

9  work for J&J my whole legal career.  And so I work on multiple

10 matters at the same time and don't formalize each separate

11 matter.

12 Q     Okay.  And so they don't send you a new engagement letter

13 and say okay, today you're -- strike that.  As a practice, they

14 don't send you a new engagement letter for each matter that you

15 assist them on, correct?

16 A     They do not.

17 Q     And with respect to talc, they didn't send you a new

18 matter and say okay, now you're -- a new engagement letter and

19 say now you're working on talc, right?

20 A     No, sir.

21 Q     With respect to talc specifically, your primary role for

22 J&J is assisting J&J in resolving the talc claims, right?

23 A     That's what I've done for the last three and a half years

24 or so.

25 Q     And you have, in fact, you've referred to yourself, right,

Murdica - Cross/Winograd                              9

1  as J&J's resolution counsel, correct?

2  A    I'm sure that I have.  Settlement counsel, resolution

3  counsel.

4  Q    And with respect to this bankruptcy generally, you

5  represent J&J in whatever they need you, correct?

6  A    I think the only role I've had in the bankruptcy has been

7  to try to put together the plan.  But if they ask me for other

8  things, I would certainly do them.

9  Q    But would you characterize your role with respect to the

10  bankruptcy as representing J&J in whatever way they need you?

11  A    I don't know how else to say it.  I would do whatever I

12  was asked.  To date, I think the only role I've had here has

13  been putting together the plan and all the settlement efforts

14  from the first bankruptcy.

15  Q    Okay.  So I want to go back to now your specific role as

16  resolution counsel.  You believe that the most accurate

17  calculation of the cost to settle all of the talc liabilities,

18  both present and future, is $8.9 billion, correct?

19  A    It depends.  There's several ways to calculate it.  The

20  actual cost, the actual value of the claims I believe is zero.

21  But if you're talking about if this plan was put to a vote

22  today, in bankruptcy it would pass overwhelmingly for $8.9

23  billion.  So that would be our cost.  If we're back in the tort

24  system, it's a totally different calculation because of there's

25  a lot more to it, which I'm happy to explain if you want me to.

1          MR. MAIMON:  Your Honor, I'd move to strike his

2   testimony about what would happen if it went out for a vote.

3   That's up to voters, not Mr. Murdica.

4          THE COURT:  Overruled.

5          MR. WINOGRAD:  Your Honor, may I approach?  And I

6   apologize for not doing this in the beginning, but I do have a

7   couple binders including his deposition transcript.

8          THE COURT:  That's fine.

9          MR. WINOGRAD:  I'm handing now a book of just

10  exhibits.

11         THE WITNESS:  Thank you.

12         MR. WINOGRAD:  And this is a binder of just your

13  deposition transcripts.

14         THE WITNESS:  Thank you.

15  BY MR. WINOGRAD:

16  Q    So, Mr. Murdica, if you could open up the binder labeled

17  deposition transcripts.

18  A    Yes, sir.

19  Q    And you were deposed twice recently, right?  Once in

20  conjunction with the preliminary junction proceeding and once

21  in connection with the motion to dismiss?

22  A    Yes.  I learned that's possible in bankruptcy, and you

23  deposed me twice.

24  Q    Okay.  Do you think that's an inefficiency?

25  A    I've never been -- I had never been deposed before in my

Murdica - Cross/Winograd                        11

1  legal career.  So it was surprising.

2  Q    Surprising that you were deposed, or that you were deposed

3  twice?

4  A    Both.

5  Q    So with respect to Tab A in what you have is the first

6  deposition from April.  And Tab B is the second deposition from

7  May.  If you could open up Tab B.

8  A    Yes, sir.

9  Q    And just turn to Page 68.

10 A    Transcript Page 68?

11 Q    Yes.

12 A    I'm there.

13 Q    Just give me one moment.

14         MR. WINOGRAD:  I apologize, Your Honor.

15         THE COURT:  That's all right.

16         MR. WINOGRAD:  I just don't have my glasses with me.

17 But I will get through this.  Yeah, we'll come back to that in

18 a moment.

19                         (Pause)

20         MR. WINOGRAD:  Okay.  It's right where I left it the

21 first time, Your Honor.  I apologize.

22 BY MR. WINOGRAD:

23 Q    So, Mr. Murdica, if you could look at the question

24 beginning at Line 6 on Page 68?

25 A    Yes, sir.

1  Q    And I asked you, "Have you done any calculations or

2  estimates concerning the cost to settle the MDL cases."  And

3  there was an objection by Mr. Starner.  And you answered,

4  "Well, the cost to settle all of the talc liabilities, present

5  and future, is 8.9 billion.  That's the calculation I think is

6  the most accurate."

7          MR. STARNER:  Objection, Your Honor.

8          THE COURT:  What's the objection?

9          MR. STARNER:  It's an improper impeachment.  It's

10 entirely consistent with his past answer.

11         THE COURT:  What's the purpose of the question?

12         MR. WINOGRAD:  The purpose is that the most accurate

13 calculation of liabilities in his mind was $8.9 billion.

14         MR. STARNER:  Well, objection twice over.  That's now

15 a mischaracterization of his testimony.

16         MR. WINOGRAD:  I'm sorry.  Your Honor, I asked, "Do

17 you believe the most accurate calculation of the cost to settle

18 all of the talc liabilities present and future is 8.9 billion."

19 That was the question.  And he gave me a long answer.  It was

20 the same question I asked him there and he said yes, that's the

21 most --

22         THE COURT:  Overruled.

23         MR. WINOGRAD:  -- accurate calculation.

24 BY MR. WINOGRAD:

25 Q    Now have you estimated how many future talc claims there

1  will be?

2  A    I have some ideas, but that's not my role.  The FCR is

3  doing that.

4  Q    Well, have you actually estimated how many future talc

5  claims there are?

6  A    Me personally, no.

7  Q    When you say you have an idea of how many there will be,

8  where does that idea come from?

9  A    Well, one of the unique things about this litigation is

10 because it's a latent tort, we have it's impossible to predict

11 how many claims will come in the future.  All you can do is

12 your best job.  And because unlike other mass torts, drugs,

13 medical device cases, you have no way to know what claimants

14 are going to come forward and say they used talc because

15 there's no way to prove or disprove that they did.  So it's

16 very difficult to estimate.

17          MR. WINOGRAD:  Your Honor, I would move to strike

18 that as non-responsive.

19          THE COURT:  Overruled.

20 BY MR. WINOGRAD:

21 Q    While we're talking on settlements, you state in your

22 declaration that in August 2020, there was a settlement

23 proposal in Imerys.  Do you recall that?

24 A    In August -- well, over the course of the summer of 2020,

25 there were proposals from the TCC claimants now both outside

1  and inside of Imerys, I believe.

2  Q    Are you suggesting that the TCC claimants in this case

3  made a proposal in Imerys?

4  A    They made several proposals to me, yes.

5  Q    But when you say TCC, do you mean claimants in Imerys that

6  were also claimants here?

7  A    The lawyers who are representing the claimants on this

8  Tort Claimants Committee were involved in active settlement

9  discussions with me in August of 2020.

10 Q    Okay.  And you go on to discuss the actual number of one

11 of those proposals in August of 2020 in your declaration,

12 correct?

13 A    I believe so.

14        MR. WINOGRAD:  And, Your Honor, I would just again

15 reserve our objection to the use of a settlement number which

16 is clearly protected by Rule 408 and I think irrelevant here.

17 But since it's in evidence, Your Honor, I'd like to ask

18 questions without waiving our objection.

19        THE COURT:  That's fine.

20 BY MR. WINOGRAD:

21 Q    In fact, in your declaration, you say that the proposal,

22 there was a proposal to settle all current and future ovarian

23 cancer talc claims in the Imerys bankruptcy for a total of 3.25

24 billion, correct?

25 A    Yes.

Murdica - Cross/Winograd                                15

1  Q     And now that's not true, is it?

2  A     There were several proposals that summer.  They were all

3  bankruptcy proposals in one way or another.  The lawyers on the

4  TCC now hired bankruptcy counsel, a gentleman named Sandy

5  Esserman.  And he made proposals to me along with Mr.

6  Birchfield.  There were numerous proposals.

7  Q     Okay.  But you talk about one specific proposal in your

8  declaration, right?

9  A     I'll answer questions about any of them that you want.

10  There were multiple bankruptcy proposals.

11  Q     Well, that's not what I asked you, sir.  I asked you, you

12  talked about one specific proposal in your declaration,

13  correct?

14  A     I believe I talked about the $3.25 billion proposal --

15  Q     Okay.

16  A     -- specifically.

17  Q     Did you draft your declaration?

18  A     Yes.

19  Q     So why don't we open it up --

20  A     I revised -- I revised it.

21  Q     Why don't we open it up to Page 48.  And if you could just

22  read on Page 13, Paragraph 48.  If you can just read to

23  yourself the sentence that carries over from Page 13 to 14.

24  Does that refresh your recollection of this specific August

25  2020 proposal that you just --

Murdica - Cross/Winograd                    16

1              THE COURT:  What page?

2              MR. WINOGRAD:  Page 13, Your Honor.

3              THE COURT:  Page 13?

4              MR. WINOGRAD:  And it's the bottom sentence.  It

5    begins specifically --

6              THE COURT:  Paragraph 48, okay.

7    BY MR. WINOGRAD:

8    Q    And that's a specific proposal you're talking about,

9    correct?

10   A    That is one.  As I said, during that summer, there were --

11   it was ongoing negotiations literally every day.  Numerous

12   proposals.  This is one of them that I talked about.

13             MR. WINOGRAD:  Your Honor, I'd move to strike.

14             THE COURT:  Sustained.  I'm going to give you the

15   same instruction you would give your clients on the stand.

16   Answer the questions yes or no.  Don't volunteer.

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Thank you.

19   BY MR. WINOGRAD:

20   Q    So with respect to this specific settlement, that $3.25

21   billion, that was for a qualified settlement fund, correct?

22   A    I can't answer that yes or no.  And I don't want to

23   violate the Judge's rule.

24             THE COURT:  Well, answer it to the best you can.

25             THE WITNESS:  Okay.

1              THE COURT:  It's going to be a long day, folks.

2              THE WITNESS:  To my best recollection, there were

3    multiple components of this.  There was a futures component

4    proposed for the Imerys bankruptcy.  And the lawyers wanted to

5    settle their ovarian claims at this point in time outside of

6    bankruptcy for a number of reasons.  So the majority of them

7    would settle in a QSF outside of bankruptcy.  Ninety-five

8    percent or more would have to.  And then the remainder would be

9    settled in bankruptcy.

10   BY MR. WINOGRAD:

11   Q    Okay.  But the $3.25 billion that you talk about, that was

12   just for the qualified settlement fund, correct?

13   A    To the best of my recollection, that included the futures

14   component.  But sitting here today, I don't remember because

15   there were so many different proposals.

16   Q    Well, let me -- but you chose this one to put in a

17   declaration that you signed, correct?

18   A    Yes.

19   Q    Let me see if I can refresh your recollection.  In that

20   settlement proposal that you're discussing in your declaration

21   that you don't seem to remember the details about, there was

22   also a trust component, correct, in addition to the QSF

23   component.  Is that right?

24   A    I believe I just said that.

25   Q    And that trust component had an additional $2 billion for

Murdica - Cross/Winograd                    18

1  it, correct?

2  A    No.   That's not correct.

3  Q    That's not correct?

4  A    To the best of my recollection that is not correct.

5  Q    Okay.  Did you attach anything to your declaration to

6  substantiate that that $3.25 billion included both the QSF and

7  the trust component?

8  A    I didn't attach anything.  But I did the negotiations.

9  Q    Okay.  But you don't really remember the settlement you

10 testified about earlier, correct?

11 A    I know that there was never $5.25 billion on the table.

12 The first time any amount of money, anything like that came

13 into play was with this bankruptcy.

14 Q    And at the time that this settlement was entered into,

15 there were less than 20,000 pending ovarian cancer claims,

16 right?

17 A    I think you mean filed cases because no, there were more

18 than 20,000.

19 Q    I mean pending as in filed, yes.

20 A    Yes.  But there were more claims than that.

21 Q    Meaning what?

22 A    Meaning that --

23 Q    Future claims?

24 A    -- there were -- no.  There were unfiled presently signed

25 claims just like there are now.

Murdica - Cross/Winograd                          19

1  Q    Let me just -- there were less than 20,000 ovarian cancer

2  claims that had been filed in court, correct?

3  A    I don't know that off the top of my head.  But there were

4  more than, way more than 20,000 claims at the time.

5  Q    And I want to go back to the QSF that you mentioned

6  before, which you don't recall whether that alone counted for

7  the $3.25 billion.  But that QSF, that was a voluntary opt-in

8  proposal, correct?

9  A    It was a 95 percent minimum with the remainder being

10 settled in bankruptcy.

11 Q    Okay.  Let me ask it again.  That was a voluntary opt-in

12 proposal, correct?

13 A    No, sir.

14 Q    It was not?

15 A    It was what I just said.

16 Q    So people did not have the option to opt into that QSF

17 settlement?  So in other words, if somebody decided that had a

18 claim in Imerys, an ovarian cancer claim, that decided they did

19 not want to participate in that settlement, they could not

20 effectively not opt in and then go litigate against Johnson &

21 Johnson in the tort system?  That's your understanding?

22 A    To the best of my recollection, sir, if they did not

23 opt-in, they would be part of bankruptcy component of it.  But

24 again, if you have it, I'll look at it.  There were numerous

25 proposals back in 2020.

1  Q    Okay.  Well, as your declaration that you put in, it seems

2  that your recollection is a little fuzzy about that.

3  A    It's not fuzzy, sir.  I've been working on this for --

4           MR. STARNER:  Objection, Your Honor.  Argumentative.

5           THE WITNESS:  -- three years --

6           THE COURT:  Sustained.  Mr. Winograd, I'm just going

7  to ask, the additional --

8           MR. WINOGRAD:  Understood, Your Honor.

9           THE COURT:  -- comments characterizing testimony is

10 just going to delay the --

11          MR. WINOGRAD:  Understood.

12          THE COURT:  -- process.

13          MR. WINOGRAD:  Understood, Your Honor.

14 BY MR. WINOGRAD:

15 Q    One other point about your declaration, Mr. Murdica, in

16 Paragraph 39 you opine on the economic disincentives of law

17 firms to enter into settlements in bankruptcy, right?

18 A    Will you just give me one moment to read it?

19 Q    Sure.

20 A    Yes.

21 Q    And that economic incentive is effective you're discussing

22 the common benefit fee, correct?

23 A    That's one of the things, yes.

24 Q    And the common benefit fee, that is a fee that certain law

25 firms get in a situation like this because they're doing the

Murdica - Cross/Winograd                                21

1  lion's share of the work, right?

2  A    There's more to it than that.  I don't want to break the

3  Judge's rule.  I wouldn't say it's that simplistic.

4  Q    All right.  Well let me ask a different question then.

5  The common fee, that comes out of the lawyer's fees, right?  It

6  doesn't come out of any recovery that would go to a claimant,

7  correct?

8  A    That's incorrect, sir.

9  Q    And why is that?

10 A    Because in the MDL, there's two components to a common

11 benefit.  Normally, there's a cost component that comes out of

12 the claimant's recovery, and a fee component that comes out of

13 the attorney's recovery.

14 Q    Okay.  And so let me just say it again.  I was speaking

15 specifically about common benefit fees which I think was my

16 question.  With respect to common benefit fees, a fee that goes

17 to a lawyer not to reimburse him for costs but the fee that

18 goes to the lawyer, that comes out -- that does not come out of

19 the pool that goes to claimants.  That comes out of a pool that

20 would otherwise be going to different lawyers, correct?

21 A    Sir, I can't agree to that because as an MDL practitioner

22 which I am, when you say common benefit fee, everyone knows

23 it's the two components.  It's the part that comes out of the

24 claimant's recovery and the part that comes out of the lawyer's

25 fee.

**WWW.JJCOURT.COM**

Murdica - Cross/Winograd                                22

1  Q    So by fee, you're referring to fee and costs.

2  A    That's how everybody refers to it that's a practitioner.

3  Q    But I want you to just accept my question in the way that

4  I defined it in terms of fees.  Separating costs, to reimburse

5  for costs, just fees, for an attorney's fees, hourly rate or

6  contingency fee, the fees that go to the -- in the common sense

7  of the word, the fees that go to the attorneys, that comes out

8  of the pool that otherwise would go to attorneys, not out of

9  the pool that would go to clients, right?

10 A    Because I'm under oath and because this is what I do for a

11 living, I can't agree to that because it's just wrong the way

12 you're saying it, and this is the area that I practice in.

13 Q    There was an order in the MDL and talc with respect to

14 common benefit fees, right?

15 A    Yes.

16 Q    And orders are recognized in -- common benefit orders are

17 recognized in bankruptcy, correct?

18 A    I do not know that.

19 Q    Okay.  Well, do you know if they've been recognized in

20 Purdue?

21 A    What I've been told is that there are three examples of

22 bankruptcies that allowed small common benefit fees on the

23 order of three or four percent versus the talc common benefit

24 fee which is twelve percent.

25          MR. WINOGRAD:  Your Honor, I'd move to strike as

Murdica - Cross/Winograd                                23

1  hearsay.

2          MR. STARNER:  Objection, Your Honor.  He's a

3  practitioner in this space.  He has experience and expertise.

4  That's his understanding.  I think it's well within his

5  perspective.

6          THE COURT:  Sustained.

7  BY MR. WINOGRAD:

8  Q    Do you know if there was a common benefit fee recognized

9  in the Purdue bankruptcy?

10 A    Mr. Winograd, I believe there was for three percent or so

11 versus 12 percent in talc.

12 Q    Do you know if there was a common benefit fee recognized

13 in the Takata bankruptcy?

14 A    If that's one -- I've referenced that I've been told there

15 are three at three or four percent.  If that's one of the

16 others, I accept that.

17 Q    I want to go back to LTL now.  If these cases, the talc

18 cases return to the tort system, you would not recommend to J&J

19 that it settle the cases in the tort system, right?

20 A    I don't believe they could --

21         MR. STARNER:  Objection, Your Honor.  Calls for

22 speculation.  It's a hypothetical.  And also, I think it would

23 potentially infringe upon his role as litigation counsel to

24 J&J.  So I would object to that question.

25         THE COURT:  Overruled.

1          THE WITNESS:  I don't believe this could be settled

2    in the tort system.

3    BY MR. WINOGRAD:

4    Q    So you would not recommend to J&J that it settle these

5    cases if it went back to the tort system, correct?

6    A    As things are now, as the law is now, I don't believe it

7    can be settled in the tort system, so I would not.

8    Q    And with respect to your role as resolution counsel, that

9    role involves conversations with law firms that represent talc

10   claimants, right?

11   A    Numerous, every day.

12   Q    And to do that, you need to know which firms represent

13   talc claimants, right?

14   A    Sure.

15   Q    And you know that from your role and experience in

16   litigation generally, correct?

17   A    Yes, sir, and from other settlements as well in this

18   litigation.

19   Q    In fact, you could probably tell us which firms have which

20   claims filed or unfiled in just about any litigation that

21   involves personal injury in mass tort, correct?

22   A    In summary, yeah.

23   Q    Now, you also represent J&J in connection with mass tort

24   claims other than talc claims, right?

25   A    I do.

1  Q    And you assist J&J in resolving those cases too, correct?

2  A    I am fortunate to have that opportunity, yes.

3  Q    Unfortunate, did you say?

4  A    I am fortunate to have that opportunity.

5  Q    And there's overlap between the firms representing talc

6  claimants against J&J and firms representing non-talc claimants

7  against J&J, correct?

8  A    Sure.  There's so many firms in talc.  There's overlap

9  between many torts.  They're not direct overlap, but some firms

10 in talc are in some of my litigation, some are in others.

11 Q    And you're familiar with the AHC of supporting counsel in

12 this case, right?

13 A    Yes.

14 Q    And they have approximately 15 members.  Is that correct?

15 A    Fifteen to twenty.

16 Q    And approximately 11, we can refresh your recollection,

17 but does it sound right that approximately 11 out of 15 of

18 their members are currently working with you on non-talc cases?

19 A    If I said that at my deposition, I agree.  I'd have to --

20 Q    Okay.

21 A    -- do the math in my head.  That sounds about right.

22 Q    Okay.  With respect to unfiled claims, LTL filed its

23 second bankruptcy on April 2nd of -- on April 4th of 2023,

24 correct?

25 A    Yes, sir.

Murdica - Cross/Winograd                    26

1  Q    And when it filed its petition for bankruptcy, that

2  included a purported chart of law firms with the most number of

3  talc claims, right?

4  A    Yes.

5  Q    And you provided the information for that chart, correct?

6  A    Yes.

7  Q    And you were asked simply who had the most claims in the

8  talc litigation with respect to law firms, right?

9  A    That's right.

10 Q    Who asked you that?

11 A    I can't remember which lawyer.  One of the lawyers

12 representing LTL.

13 Q    From Jones Day?

14 A    It was either from Jones Day or -- yeah, it was from Jones

15 Day.

16 Q    And what you did in response to that was just to provide a

17 list of law firms, right, law firm names?

18 A    Correct.

19 Q    And in determining the number of claims that each of those

20 law firms had, you included both filed and unfiled claims,

21 right?

22 A    I did.

23 Q    So you were deposed on April 16th in connection with the

24 preliminary injunction in this case, right?  We talked about

25 that earlier?

Murdica - Cross/Winograd                                    27

1  A    The first deposition, yes.

2  Q    Right.  And at that time, you believed there were more

3  than 70,000 claimants for sure that supported the plan as it

4  was being set forth in the term sheet by J&J, correct?

5  A    Yes, sir.

6  Q    And you thought it may have been 80,000 at the time,

7  right?

8  A    Yes.

9  Q    And at the second deposition which was May 30th, at that

10  time you thought it was more in the range of 90,000 that

11  supported the term sheet, right?

12  A    I don't know if it was 90,000 claimants or 90 percent of

13  the claims.  But yes, support had increased.

14  Q    So I want to talk -- well, do you have a specific -- so

15  you had said it was 70 or 80.  Do you have a specific

16  recollection of saying it was in the 90,000 range?

17  A    I haven't looked at that -- I never looked at the

18  deposition after I gave it.  I think I was saying that more

19  than 90 percent of the claimants would support the plan at that

20  point.  But I'm not going to quibble with you.

21  Q    Well, I just want to make sure that we're clear about it.

22  So if you could just, I could probably help you out.  If you

23  could just -- because I want to actually talk about the 90,000.

24  If you would just open up that Tab B from your deposition, the

25  B transcript, and just turn to Page 32.  And just take a look

Murdica - Cross/Winograd                                  28

1  at Line 17.  And if you can just read a little bit through

2  that, does that refresh your recollection?

3  A    Yes, sir.  I said more than 75 percent.  Probably, you

4  know, in the 90s.

5  Q    So it was approximately, at the time you thought there was

6  approximately 90,000 or in the 90,000 range that supported,

7  correct?

8  A    Mr. Winograd, I think I meant in the 90s, the vote would

9  be in the 90s percentage in favor of the plan.  But I also

10 think that there's 90,000 claimants in support now anyway.  So

11 either way you want to do it is fine.

12 Q    Well I just, I don't mean to dwell on this.  I just want

13 to talk about that 90,000 number.  So I just want to make sure

14 we're clear that that in fact was what it was.

15 A    Well, I --

16 Q    And so if you look on Page 32, we're talking in Line 2,

17 now as of your last deposition, if you recall, I'll represent

18 to you that you stated more than 70,000 for sure, maybe 80,000

19 claimants support the plan as set forth in the term sheet.  Do

20 you recall saying something like that.

21     You say that sounds about right.  Is it still when you, as

22 of today, when you say it's -- would you say it's the same

23 number of claimants that support the term sheet.  So I would

24 say if there was a vote today, there would be more.  And then

25 you go on to give the 90,000.  Does that sound --

Murdica - Cross/Winograd                                29

1           MR. STARNER:  Objection, Your Honor.

2           MR. WINOGRAD:  Does that sound familiar?

3           MR. STARNER:  Mischaracterizes the testimony.

4           THE COURT:  Sustained.

5           MR. STARNER:  Thank you, Your Honor.

6    BY MR. WINOGRAD:

7    Q    With respect to the more than 80,000 claimants that

8    support the -- that you believed at the time supported the

9    plan, some of those were represented by counsel who had signed

10   PSAs, correct?

11   A    That's right.

12   Q    And some of those were represented by counsel who had not

13   signed PSAs, right?

14   A    Or that I hadn't asked to sign PSAs, correct.

15   Q    And but -- I'm sorry.  Do you remember it was

16   approximately 60,000 at the time that you believed had signed

17   PSAs, correct?

18   A    Yes, sir.

19   Q    And then with respect to the additional, whether it's

20   20,000 or more, those claimants were represented by law firms

21   who had not signed PSAs, correct?

22   A    That's correct.

23   Q    And with respect to the unfiled claims, you believe those

24   claims are real claims, correct?

25   A    Yes.

**WWW.JJCOURT.COM**

1  Q    Now, you didn't ask any of those firms if they had

2  engagement letters with any of the unfiled claimants, correct?

3  A    No.

4  Q    And you didn't ask if they had any complaints actually

5  drafted for any of the unfiled claimants, right?

6  A    I wouldn't.

7  Q    And you don't know, and you didn't know if they had

8  pathology reports for any of the unfiled claimants, right?

9  A    No, not for anybody.

10  Q    And you didn't know if they had any medical records for

11  any of the unfiled claimants, right?

12  A    I presume all of that, but no.

13  Q    You just took the representation of the law firms that

14  they're representing those clients and they're real claims,

15  right?

16  A    It's been my job for the last 20 years, Mr. Winograd.

17  Q    I want to talk a little bit about subtypes of claims.  We

18  discussed the PSAs.  And some of those had claimant lists

19  attached to them, correct?

20  A    Yes.

21  Q    And have you seen those claimant lists?

22  A    Not in detail.  As you probably remember, some of them are

23  very long.  But I know what you're referring to.

24  Q    You mean you didn't look through them line-by-line.

25  A    Correct.

Murdica - Cross/Winograd                              31

1  Q    And did you see them in unredacted form?

2  A    Again, probably.  But I did not look at them in any

3  detail.  That was not really part of what I was doing.

4  Q    And did you see the list of claimants that was filed by

5  the Ad Hoc Committee of Supporting Counsel in this case with

6  their 2019 filings?

7  A    No.

8  Q    So let's just talk about the PSA.  With respect to the

9  PSA, that list on the claimant list, that only had options for

10 either gynecological cancer or mesothelioma cancer.  And then

11 there was another option for I think governmental claims that

12 nobody checked, correct?

13 A    That sounds correct.

14 Q    And for gynecological cancers, you don't know the subtype

15 of gynecological cancer with respect to any of those claimants,

16 right?

17 A    If they're filed, possibly because about 40 percent, well

18 about 20 percent of the MDL claims filed plaintiff fact sheets.

19 And about 40 percent of those actually knew the subtype.  So

20 overall, maybe ten percent of the filed cases, people know the

21 subtype.  And if they were unfiled, I wouldn't know unless I

22 asked, which I didn't.

23 Q    Okay.  And with respect to filed claims, by filed that

24 means that there was a complaint filed asserting that claim,

25 right?

1  A    Prior to the bankruptcy.

2  Q    And that complaint is subject to, for example, Rule 11,

3  right?

4  A    Should be.

5  Q    With respect to the unfiled claims, you don't know what

6  those cancer subtypes are, correct?

7  A    We don't know what the subtypes are for the filed claims,

8  as well.  And nobody could file a lawsuit after October of

9  2021.

10 Q    Yeah.  Well, are you saying that you've reviewed all of

11 the complaints that were filed to see whether they specifically

12 state what their subtype of cancer is?

13 A    Yes.  In that the complainants themselves don't say the

14 subtype.  But there is discovery in the MDL.  And there were

15 plaintiff fact sheets that were filed for about 12,000 cases.

16 And the vast majority of those either didn't know the subtype

17 or they were a non -- they were non-epithelial ovarian cancer.

18 Q    Got it.  So you don't know the subtype for unfiled claims,

19 and you only know the subtype for a portion of the filed

20 claims.

21 A    A very small portion, yes.

22 Q    And in terms of subtypes, there are ovarian cancer

23 gynecological cancers, correct?

24 A    Many different kind so of ovarian, yes.

25 Q    And then there are non-ovarian cancer gynecological

Murdica - Cross/Winograd                                          33

1  cancers, right?

2  A    There's nuances there because some of the lawyers on your

3  committee would consider peritoneal cancer and fallopian tube

4  cancer the same as ovarian.  But there's a number of types.  So

5  you've got ovarian.  Within ovarian you've got epithelial and

6  non-epithelial.  Outside of ovarian you've got fallopian tube,

7  you've got cancer of the peritoneum, you've got cervical

8  cancer, endometrial cancer, uterine cancer.  There's probably

9  some others, but those are all part of the MDL in filed cases

10 there.

11 Q    Okay.  So just because the easier ones for me to remember,

12 uterine cancer and cervical cancer are non-ovarian cancer

13 gynecological cancers, correct?

14 A    Yes.  I would say that.

15 Q    Now, the term sheet, with respect to there was a term

16 sheet attached to the PSAs, correct?

17 A    Prior to the plan, yes.  There was --

18 Q    Right.  Right, prior to the plans.  And you drafted that

19 term sheet, correct?

20 A    Yes.

21 Q    And J&J signed it?

22 A    I can't remember who the signatories were.  I think there

23 were multiple.

24 Q    But somebody signed it on behalf of --

25 A    Somebody signed it.

Murdica - Cross/Winograd                          34

1  Q    And that term sheet pays ovarian cancer victims or

2  claimants different than it pays non-ovarian cancer

3  gynecological claimants, correct?

4  A    Not really because there are types of ovarian cancer that

5  are paid like the uterine cancers and the cervical cancers.

6  Q    There is a different -- in looking at the term sheet,

7  there is a different methodology for calculating ovarian

8  cancers.  They are listed separately from non-ovarian cancer

9  gynecological cancers, right?

10  A    I don't know if you want me to explain, but that's not

11  accurate.

12  Q    Why don't we turn to the TDPs.  We can let that document

13  speak for itself.  With respect to the TDPs, there were TDPs in

14  two plans filed recently by LTL, right?

15  A    Correct.

16  Q    And in the May 15th plan, there was a separate section in

17  which payments for non-ovarian cancer claimants would fall for

18  calculation of what they'd be owed under that plan, right?

19  A    No.  So again, if you want me to explain, I could tell you

20  where you're wrong on that.  But I don't want to violate the

21  Judge's rule.

22  Q    Why don't we take a look at if we go back to your

23  deposition transcript at B and Page 71.  And if you can just

24  read from 17 to 7, does that refresh your recollection as to

25  whether non-ovarian cancer subtypes are paid differently than

Murdica - Cross/Winograd                                35

1  ovarian cancer subtypes?

2  A    Mr. Winograd, Page 71, Lines 17 to what?

3  Q    Page 17, Line 72 to Page 72, Line 7.

4  A    No, that's not what you're talking about.

5  Q    So is this just you're stating that certain subtypes are

6  paid more than others?

7  A    Correct.

8  Q    And under the May 15th plan, do you know or recall how

9  much it was anticipated that non-ovarian cancer subtypes would

10  get paid?

11  A    So there was a quick pay option.  And that was for some

12  ovarian cancers.  It depended what subtype.  And for some other

13  non-ovarian cancers.

14  Q    Did all non-ovarian cancers fall into the quick pay?

15  A    Aside from mesothelioma, yes.

16  Q    And under that quick pay, did claimants receive, based on

17  the estimation that was set forth in that plan between $250 and

18  $1,000 per claim?

19  A    Based on the points, that sounds right at the time.  But

20  of course there's a new plan and there will be a new disclosure

21  statement.

22  Q    Okay.  So now with respect to the new plan, that was filed

23  on June 26th, right?

24  A    Yes.

25  Q    And with respect to that plan, non-ovarian cancer

1 gynecological cancer claimants, they'll receive $1,000 per

2 claim, correct?

3 A    Non-ovarian gynecologic cancers.  I'd have to look.  I was

4 actually on family vacation.

5 Q    Sure.  Why don't we take a look.  If you could open up

6 your binder with the exhibits to Tab 7.  I'm sorry, Tab 6.

7 A    Yes, sir.

8 Q    And if you could just turn to Section 5.3.3.  That's on

9 Page 39.  And it says --

10 A    I see it.

11 Q    -- other talc claims that become other approved claims

12 shall have a scheduled value of $1,000.00.  Do you see that?

13 A    I do see that.

14 Q    And does that refresh your recollection that non-ovarian

15 gynecological claims will receive $1,000?

16 A    I see what you're saying.  I'm just making sure that

17 there's no other section.  I don't know that that's what that

18 section applies to.  And I would need to look at this in more

19 detail.  This is -- I'd have to talk to my partner and look at

20 this in more detail.  Would you like me to?

21 Q    Do you feel comfortable enough to look at a couple of

22 other -- you know, why don't we come back to it.  So you're not

23 sure if Section 5.3.3 applies to non-ovarian cancer

24 gynecological claims.  That's what you're saying to me here

25 today?

1  A    All I'm not sure about, Mr. Winograd, is whether that

2  particular section would capture something like uterine cancer.

3  It may, and you may be completely correct.  And I just, I don't

4  want to be imprecise.  And I haven't looked at the amended plan

5  in detail because I was not the partner at my firm that handled

6  this.

7  Q    Why don't we take a look at your deposition transcript,

8  again Tab B, 109.  See of that helps you remember.  Tab B, Page

9  109.

10  A    I can tell you it's not going to help me remember because

11  this plan was filed a couple days ago.

12  Q    So 109, Line 13.

13  A    Yes, sir.

14  Q    All right.

15  "Q    All right.  And because non-ovarian gynecological cancers

16  have to be submitted for approve for accelerated claims, they

17  don't fall under 5.3.1.  They fall under 5.3.3.  Is that fair?

18  "A    You know, that's how I read it."

19        MR. STARNER:  Objection, Your Honor.  This was a

20  deposition that was taken before the amended plan.  So I'm

21  confused.

22        THE COURT:  It could assist the witness.  Overruled.

23        MR. WINOGRAD:  It's the same section.  Your Honor, if

24  we need to, we can take out the redline of one plan against

25  another and --

1          MR. STARNER:  Are you representing that all the

2    references of those provisions have not been changed?  Is that

3    your representation?

4          MR. WINOGRAD:  I'm representing that the Section 5.3

5    that we're talking about --

6          MR. STARNER:  I just don't think, it's not a gotcha

7    game.  If the amended plan says certain things and amendments

8    have been made, I think it's fair --

9          THE COURT:  The amended plan speaks for itself.  If

10   the witness can comment on it, he can.  If you can't comment,

11   you'll say that.

12   BY MR. WINOGRAD:

13   Q    Does that refresh your recollection?

14   A    It refreshes my recollection about my testimony on the

15   original plan.  I agree with you that it looks like 5.3.3 is

16   talking about the same thing.  I really can't say as to this

17   plan.  I don't want to say something imprecise.

18   Q    Okay.  What's your billing rate for the work that you do

19   for J&J?

20   A    Seven eighty an hour, I believe.  Much less than you guys.

21   Q    So J&J has paid you -- I'll come back to that in a second.

22   But J&J has paid you more to come to court today than it would

23   pay a claimant under this specific section, correct?

24   A    I don't know, Mr. Winograd.

25   Q    Well, are they paying you more than $1,000 to be in court

Murdica - Cross/Winograd                    39

1  today?

2  A    Yes.

3  Q    And you asked about our fees.  But the TCC's clients

4  aren't the one that filed this bankruptcy, right?

5  A    Well, kind of.  They sort of are.  I mean, we're here in

6  this bankruptcy because the claimants lawyers came to me and

7  said once the third circuit decision came down we need to

8  resolve this or talc's never going to get resolved.  And they

9  came to me with this plan.  So that's why we're here.

10 Q    I'm sorry --

11 A    The talc claimants.

12 Q    I'm sorry.  You're saying, so J&J filed this bankruptcy

13 because plaintiffs' lawyers asked them to?  That's your

14 understanding?

15 A    J&J filed this second bankruptcy because everybody --

16 aside from the committee of objectors that you're representing,

17 the lawyers representing the vast majority of the claimants

18 came to me and said we got to do something.  If we don't, talc

19 is never going to be settled and it's going to be more than

20 another decade.

21        MR. MAIMON:  I'd like to object and move to strike

22 his term the committee of objectors.  The pejorative is not

23 necessary here, Your Honor.

24        THE WITNESS:  I didn't mean it that way.

25        THE COURT:  Sustained.

1          MR. MAIMON:  Thank you.

2   BY MR. WINOGRAD:

3   Q    So I just want to be clear.  Johnson & Johnson, in your

4   view, filed this bankruptcy because of the plaintiff's, certain

5   plaintiffs' lawyers told them to.  Is that your testimony?

6   A    I'm not saying that about -- what I'm saying is the reason

7   we're here today, you asked me if we're here for the benefit of

8   the claimants.  It's really the claimants who supported this.

9          MR. WINOGRAD:  Your Honor, I move to strike.  That's

10  not --

11         THE COURT:  You opened the door for this.

12         MR. WINOGRAD:  It's not the question.

13         THE COURT:  Let me remind -- I understand the points

14  you're making.  Let's move on.  Thank you.

15  BY MR. WINOGRAD:

16  Q    Pre-2021, before the 2021 filing of bankruptcy, J&J

17  settled cases, correct, in the talc litigation?

18  A    It did.

19  Q    It settled approximately, it settled over 1,000 meso

20  cases, correct?

21  A    Correct.

22  Q    And approximately 6,000 ovarian cancer cases?

23  A    That's correct.

24  Q    And you were involved in settling those, right?

25  A    I was.

Murdica - Cross/Winograd                              41

1  Q    J&J has not settled a single non-ovarian cancer

2  gynecological cancer case, right?

3  A    TO date, I believe that's true.

4  Q    And to date, J&J's never compensated, well to date, J&J

5  has never compensated anyone for non-ovarian gynecological

6  cancer, right?

7  A    I think that's right.

8  Q    Just one more small point about unfiled claims.  Some

9  firms, in your view, have significant inventories of unfiled

10  claims, right?

11  A    I'm not going to characterize it.  But there are several

12  firms with many unfiled claims in the hundreds and thousands.

13  Q    And one of the reasons that they have unfiled claims is a

14  lot of plaintiffs firms have taken the view that the statute of

15  limitations did not start running until talc was no longer sold

16  in the U.S., right?

17  A    That's my understanding from talking to plaintiffs

18  lawyers.

19  Q    And you're not aware of whether J&J has challenged any of

20  those claims on the basis -- strike that.  You're not aware of

21  whether J&J has challenged claims based on statute of

22  limitations arguments, right?

23  A    I believe they did in the underlying litigation.  But not

24  based on what you're talking about, the cessation of sales in

25  2020.

Murdica - Cross/Winograd                    42

1  Q    All right.  So I'm not sure I understood.  You're not

2  aware of whether J&J has challenged claims on the basis of

3  statute of limitation arguments, correct?

4  A    I don't want -- if I said that, I'll stand by it because

5  maybe it -- did I answer that at my deposition?  It's a

6  decade-long litigation.  I'm sure they filed statute of

7  limitations motions.  But I can't think of a specific one.

8  Q    Okay.  Depending on how the statute of limitations -- in

9  your view, depending on how the statute of limitations issue is

10 determined, certain unfiled claims that you've included in

11 your, whether it's 80,000 or whatnot numbers, may not get any

12 payment under the plan, correct?

13 A    Filed claims, as well.  There are statute of limitations

14 provisions in the proposed plan.

15 Q    I want to talk about the PSAs, the plan support

16 agreements.  The plan support agreements were based on a

17 template that was given to you by a plaintiff's lawyer, Mikal

18 Watts, correct?

19 A    Yes, Mikal Watts.

20 Q    Right, Mikal, M-I-K-A-L, right?

21 A    That's correct.

22 Q    And he's a plaintiff's lawyer, right?

23 A    He's generally considered to be one of the best trial

24 lawyers in the country.

25 Q    And he's a member of the AHC?

Murdica - Cross/Winograd                          43

1  A    Yes.

2  Q    And then you took his template and then you edited it,

3  right?

4  A    I did.

5  Q    And all the PSAs that were signed are effectively the same

6  in substance other than the signature blocks, right?

7  A    Yes.

8  Q    And the PSAs were signed by the plaintiffs' law firms, not

9  the actual claimants, right?

10  A    That's correct.

11  Q    And your view is that actual claimants are free to vote

12  for or against any plan that's put in front of them, correct?

13  A    Yes.  They'll get a recommendation from their counsel and

14  then they'll vote.

15  Q    Okay.  But I understand they may get a recommendation from

16  their counsel.  But in your view, actual claimants are free to

17  vote for or against any plan put in front of them, correct?

18  A    I agree with you.

19  Q    And the lawyers that you've been speaking with, they never

20  told you they had commitments from their clients to support a

21  claim, correct?

22  A    No.  They told me they would recommend this plan to their

23  clients.

24  Q    And you've never spoken with any talc claimants, correct?

25  A    That would be unethical.

Murdica - Cross/Winograd                    44

1  Q    And you've never seen anything signed by a talc claimant

2  pledging support for the term sheet for example, correct?

3  A    I've neither seen that, nor anyone pledging support

4  against it.

5  Q    And do you know if -- and you don't know if counsel

6  actually had consent from the clients, from their clients to

7  sign those PSAs, right?

8  A    Well, we do know that now because for the ad hoc group,

9  the Court ordered them to disclose to their clients both that

10  they were representing them in bankruptcy, and that they were

11  supporting the plan, and they did that.  So all ad hoc clients

12  are now -- have been informed that they're supporting the plan

13  of bankruptcy.

14  Q    In your experience, every time you've been told by a

15  lawyer that their claimants will support a plan, their

16  claimants support the plan, right?

17  A    I've never been -- I've never done that with a plan.  But

18  in all of my settlement work which I think is in my

19  declaration, I've settled more than 30 mass torts, when a

20  lawyer recommends to their client that they settle, it's

21  usually because it's worth -- it's usually worth settling.  And

22  they follow their lawyer's recommendation.

23  Q    And here you spoke with the lawyers in support of that's

24  on the PSAs and you got their representations that they would

25  recommend it to their clients?

Murdica - Cross/Winograd                    45

1  A    I did.

2  Q    Now, are you familiar with Mr. Nachawati?

3  A    Majed Nachawati.

4  Q    And he's a plaintiff's lawyer as well, correct?

5  A    Yes.

6  Q    And he signed the PSA?

7  A    Yes.

8  Q    And did he also represent to you that his clients would

9  support the term sheet and the eventual plan that came from it?

10 A    Yes.

11 Q    And are you aware of whether Mr. Nachawati was deposed in

12 this case?

13 A    I know he was.  I did not attend it.

14 Q    Have you heard or read his testimony?

15 A    No.

16 Q    Okay.  We'll hear from him later in this case.  Now, you

17 also, do you know James Onder?

18 A    Yes.

19 Q    He's also a plaintiff's lawyer, right?

20 A    Correct.

21 Q    And he also signed the PSA, correct?

22 A    He did.

23 Q    And did he also express to you that his claimants would

24 support the term sheet and the eventual plan that came from it?

25 A    He did.  And I spoke to both of them recently.  And they

1  both support the plan.

2  Q    Okay.  And are you aware of whether Mr. Onder was deposed

3  in this case?

4  A    Yes.

5  Q    And have you heard or read his testimony?

6  A    I did not.  But I know he's testifying today.  And I know

7  that he and his claimants will support the plan.

8  Q    Okay.  So we'll hear from him later today, as well.

9  A    Yes.

10  Q    And did you attend, do you recall, and I know dates are

11  difficult because there have been a lot of hearings.  But do

12  you recall attending a May 30, 2023 hearing in this case?

13  A    Did I?

14  Q    Yeah, let me ask a different thing.  Do you generally

15  attend the hearings in this case?

16  A    I do generally, in person.  I think I've missed one or

17  two, and a couple of the Zoom ones we've had recently.  I was

18  with my kids and I remember listening to one with one earbud in

19  touring the crown jewels in the Tower of London when you

20  weren't supposed to have a phone on.

21  Q    Well, I don't know if you just admitted to -- we won't

22  tell the British government.

23  A    I try.  I try to listen.

24  Q    Have you heard, and I'll represent to you this is straight

25  from the transcript on May 30th, are you aware of whether the

Murdica - Cross/Winograd                    47

1  counsel for the Ad Hoc Committee of Supporting Counsel stated

2  to this Court sure, the debtor has a plan on file.  As I said

3  at the last hearing, we don't necessarily agree with everything

4  that's in it, and we're hard at work with the debtors to try

5  and have an amended plan filed that we do agree with.  Do you

6  recall that?

7  A    Yeah.  I think that's why you see there's a new plan and

8  all the changes that they wanted.

9  Q    Right.  So I just want to go back for a moment to May

10 30th.  As of May 30th, you had been deposed on May 30th,

11 correct?

12 A    I know that --

13 Q    That was the day that --

14 A    -- I know --

15 Q    -- of your second deposition.

16 A    Oh, okay.

17 Q    The date of your second deposition was May 30th, right?

18 A    Okay.

19 Q    So does it sound to you like as of that date, the AHC

20 counsel didn't yet agree with the terms in the term sheet?

21 A    No, they did.  You have to understand, I talk to them

22 virtually every day, or my partner Kendra does.  This has been

23 a collaborative process we've been working on literally every

24 day.  They've supported it all along.  They want to improve the

25 plan.  Kudos to them, they've made the plan a lot better for

1 claimants.  And now, you know, with the recent additions, it's

2 even better for claimants.

3 Q    We're going to talk about that in a moment.  So do you

4 think that counsel for the AHC mischaracterized or misspoke

5 when he said on behalf of his clients we don't necessarily

6 agree with everything that's in the current plan?

7 A    No.  I think they were negotiating.  I think that was part

8 of trying to make the plan better.

9 Q    Okay.  Great.  So you mentioned now the new plan.  That's

10 the new plan that was filed on -- there's now a new plan, the

11 most recent plan on June 26th, correct?

12 A    Yes.

13 Q    And that's what I think you were referring to is this sort

14 of the new, the latest and greatest?

15 A    Yes.

16 Q    And if you could open to Tab 6 in your exhibit binder.

17 A    Yes.

18 Q    And I will represent to you that this is just an excerpt.

19 I didn't want to take up all the paper and kill too many trees.

20 So if you look at the cover page, that is the amended Chapter

21 11 plan that was filed on the docket.  You can see the ECF line

22 at the top on June 26th, correct?

23 A    Got it.  I didn't realize that before.  So you took the

24 cover of the plan, and then --

25 Q    And then --

Murdica - Cross/Winograd                    49

1  A    -- part of the TDPs --

2  Q    And then just went to Exhibit M as in Mary.

3  A    Got it.

4  Q    And that Exhibit M is the TDP, correct?

5  A    Yes.

6  Q    Now, we didn't get a chance to discuss this in the

7  deposition, right, because this was just filed a couple of days

8  ago, right?

9  A    This particular version of the plan, correct.

10  Q    And if you look, what this is, it's a redline showing the

11  changes from the prior plan, correct?

12  A    I'll take your word for it.  It definitely looks like it.

13  Q    And if you could turn to Page 43.

14  A    Of the TDPs?

15  Q    Yes.  Page 43 of Exhibit M.

16  A    I'm there.

17  Q    And if you look at Section 7.1, you see that's under the

18  Article 7 individual claims payment process.

19  A    Yes.

20  Q    And then 7.1 is point based monetary values.  Did you see

21  that?

22  A    Yes.  I do.

23  Q    And if you could just look at the bottom page, you see

24  where that sentence is deleted?

25  A    The --

Murdica - Cross/Winograd                    50

1  Q    The trust was, and it carries over?

2  A    Yes.

3            MR. WINOGRAD:  And, Ryan, could you just pull up that

4  first demonstrative?  I've just tried to make it easier for

5  folks.  I've just blown that portion up.

6  BY MR. WINOGRAD:

7  Q    And if you read the deleted part, there you go.  If you

8  read the deleted part it says the trust was established with

9  the goal of achieving a point value of one dollar per point.

10 And the debtors believe that an initial point value will be

11 between 50 cents and two dollars per point.  Let's just stop

12 there for a moment, right?

13           So if you look at 7.1, there's a points-based distribution

14 for claims, correct?

15 A    Right.

16 Q    And each point is allocated eventually a certain dollar

17 amount, right?

18 A    Correct.

19 Q    Now, in the June 15th plan, it allocated fifty cents to

20 two dollars per point, right?  That was what was expected.

21 That was the expected initial value?

22 A    Yeah.  I believe that was the prediction which will now be

23 in the disclosure statement.

24 Q    And that's been deleted in this plan, right?

25 A    Because it's going to be in the disclosure statement.

1          MR. WINOGRAD:  I move to strike as to what -- it's

2    been deleted in the plan that's been filed with the Court,

3    correct?

4          THE WITNESS:  Yes, sir.

5    BY MR. WINOGRAD:

6    Q    And if you look at Page -- now if you read the rest of

7    that, it says the factors, the value for each point will be set

8    forth in Section 7.1.2(d).  Do you see that?

9    A    I don't.

10   Q    I'm sorry.

11   A    I lost you.

12   Q    Yeah.

13   A    But it's okay.

14   Q    So if you just --

15   A    I believe you.  I believe you.

16   Q    I'll point you to it.  If you look at the sentence, it

17   starts with the trust was established.  And then we talked

18   about that's all deleted.  If you see what's been added at that

19   sentence, in lieu of estimated cash value for points, it says

20   and the factors set forth in Section 7.1(d)(b) below.  Do you

21   see that?

22   A    Yes.

23   Q    And that suggests that those factors are going to be used

24   to determine cash values for points, right?

25   A    Or -- yes, probably by the trust if I were to guess.

1          MR. WINOGRAD:  Okay.  And let's just take a look at

2   those factors.  If we can just go into the next demo, Ryan.

3   And that's on Page 45.

4   BY MR. WINOGRAD:

5   Q    Here's 7.1.2(d), factors to determine cash value of a

6   point.  Do you see that?

7   A    Yes.

8   Q    And then it says the Trustee shall consider the following

9   factors in determining the cash value of a point, including the

10  initial cash value of a point and any changes to the cash value

11  of a point if applicable.  Do you see that?

12  A    Yes, sir.

13  Q    And then the factors are blank, right?

14  A    Unless it's referring to the next section.  As I testified

15  earlier, I was on vacation with my kids.  So my partner was the

16  one who was making these changes with the Ad Hoc, not myself.

17  Q    Okay.  But I'm just asking you to look at this.  You've

18  testified about the plan.  You actually have an entire section

19  in your declaration talking about the proposed plan, correct?

20  A    Yes.  And I'm talking now about the amended plan.  And

21  what I'm telling you, Mr. Winograd, is I don't know if that's

22  intentionally a blank or if you're supposed to go into the next

23  section where you calculate all the factors.

24  Q    Well, the next section says general guidelines for

25  liquidating and paying allowed claims, correct?

1  A    Yes.

2  Q    So I just want to stick to 7.1.1(d).  That says factors to

3  determine cash value of a point, correct?

4  A    It does.

5  Q    I'm not misreading that, am I?

6  A    No.

7  Q    And then it talks about the Trustee shall consider the

8  following factors in determining the cash value of a point,

9  including the initial cash value of a point, and any changes to

10 the cash value of a point if applicable calling --

11 A    Yes, it says that.

12 Q    -- and then it's blank, right?

13 A    There is a dot, yes.

14 Q    And this is the current plan on file, right?

15 A    It is.

16 Q    A couple of other quick questions on this plan that's on

17 file.  And if you look at Section 5 of your declaration, and

18 that's titled proposed plan is designed to efficiently and

19 equitably compensate talc claimants.  Do you recall that?

20 A    Yes.

21 Q    You've negotiated numerous settlements for J&J over the

22 last ten to twenty years, right?

23 A    I have.

24 Q    And those have been primarily MDL settlements, right?

25 A    I'd say half.

Murdica - Cross/Winograd                                54

1  Q     Would you, in your words, would you use the word primarily

2  that those settlements over the last ten to twenty years have

3  been primarily MDL settlements?

4  A     I wouldn't because, for example, I settled the Invokana

5  MDL which started in this courthouse and was just terminated

6  last month.  But also, the mesh MCLs which are not MDLs.  So

7  I'm not trying to split hairs.  The majority -- they're all

8  mass torts, but only about half of them have been federal MDLs.

9  Q     Okay.  So if you could open up again B.  I think actually

10 A, your transcript A to Page 222.  And if you could just look

11 at Lines 2 through 17.

12 "Q     You have never -- none of the dealings that you made with

13 Mr. Watts or Glass or anything like that ever had anything to

14 do with bankruptcy court at all, correct?

15      Objection by Ms. Brown.

16      And then you say, "I want to be careful not to go into

17 other past DLs but to keep it simple.  I'll tell you again that

18 the other settlements that I've done which have been primarily

19 -- which have primarily been MDL settlements of non-latent

20 torts that had not been pending for ten years that did not have

21 40,000 claimants that would not have necessitated a channeling

22 injunction."

23      So I'm just trying -- in your words, would you say that in

24 the past ten to twenty years of these numerous settlements

25 you've negotiated for J&J, those have primarily been MDL

Murdica - Cross/Richenderfer                     55

1  settlements.

2  A    I testified imprecisely.  I'm trying to just explain to

3  you, I'm not trying to quibble with you.  But not everything is

4  an MDL.  That's only federal court.  So in New Jersey, we have

5  multi-county litigations, we have MCLs.  And I've settled

6  several of those, too, including three that are pending before

7  Judge Porto right now.

8  Q    None of the MDL, none of the settlements that you've done

9  for J&J over the last ten to twenty years have involved a

10 litigation of this size like the talc litigation, right?

11 A    Some had been in the tens of thousands of claims.  But

12 none this many, I agree.

13 Q    And none of those, none of the settlements that you've

14 done for J&J have involved a plan, a Chapter 11 plan, right?  I

15 think you said that earlier.

16 A    That is true.

17 Q    And you're not a bankruptcy lawyer, correct?

18 A    Kind of wish I was now that I know your rates.  But no.

19          MR. WINOGRAD:  I have nothing further, Your Honor.

20 Thank you.

21          THE COURT:  Ms. Richenderfer?

22                    CROSS-EXAMINATION

23 BY MS. RICHENDERFER:

24 Q    Good morning, Mr. Murdica.  Linda Richenderfer for Office

25 of the United States Trustee.

Murdica - Cross/Richenderfer                              56

1  A    Good morning, Ms. --

2  Q    I think I actually only have one question.

3  A    Sure.

4  Q    I think at least twice you said that you'd have to talk to

5  your partner about certain sections of the amended plan.  Who

6  is that person?

7  A    Ms. Kendra Lounsberry.

8  Q    And is she a bankruptcy attorney?

9  A    She is not a bankruptcy attorney.

10 Q    To your knowledge, has she ever been involved in a case

11 before where there was --- strike that.  Let me start over

12 again.  To your knowledge, has she ever worked on a bankruptcy

13 plan before?

14 A    She has not.  But she is one of the best settlement

15 attorneys in the United States.  She's sitting right next to

16 you, three people over.

17 Q    Okay.

18 A    She has extensive experience doing this.

19 Q    Okay.  Okay, thank you.  I wondered who that was back

20 there.  Thank you.  Okay.  So a lot of settlement experience.

21 Hasn't worked on a plan before.  Your firm, though, does have a

22 bankruptcy department, doesn't it?

23 A    It does.

24 Q    And have you involved any of the bankruptcy attorneys at

25 your firm in working on the plan for LTL?

Murdica - Cross/Richenderfer                    57

1  A    I have not.

2  Q    The other statement, and it's still a little early in the

3  morning for me.  I'm not a morning person.  So I just want, I

4  think I wrote this down correctly.  I think you said when you

5  were asked questions about the claimants are represented by the

6  attorneys who are in the Ad Hoc Committee, I think you said

7  that they've been informed that they're supporting the plan.

8  Do you recall stating that?

9  A    I believe what I said, Ms. Richenderfer, is that the Court

10 ordered that the Ad Hoc lawyers tell all of their claimants

11 both one, that they were representing them in the bankruptcy

12 court, and that two, they were representing them on the side of

13 the group supporting the plan.

14      So if my recollection is correct, and I believe it is,

15 everyone who is a claimant that is a claimant for an Ad Hoc

16 lawyer has been told both that their lawyer is here

17 representing them in court, and that they're supporting the

18 plan.  The flip side, Ms. Richenderfer, is that none of the

19 people purporting to object, none of those claimants have been

20 informed of the same thing, which is concerning to me.

21           MR. MAIMON:  Objection.  Move to strike, Your Honor.

22           THE COURT:  Sustained.

23           MS. RICHENDERFER:  Thank you.  I won't have to ask a

24 follow-up question then.

25 BY MS. RICHENDERFER:

1  Q    And so the claimants have been told that their attorneys

2  are supporting the plan.  And by that I mean the claimants are

3  represented by members of the Ad Hoc Committee, correct?

4  A    I think that they're supporting the plan on their behalf.

5  Q    That's not the --

6         THE COURT:  I think your question uses the term they

7  as to who it referred to, whether the claimants --

8         MS. RICHENDERFER:  Okay.

9         THE COURT:  Or the attorneys.

10         MS. RICHENDERFER:  Let me start.

11  BY MS. RICHENDERFER:

12  Q    You mentioned that the Court wanted the claimants

13  represented by those law firms who are members of the Ad Hoc

14  Committee of Supporting Counsel to receive notification.  And

15  you mentioned there was two things that were to be in the

16  notification.  Can you repeat those again?

17  A    Sure.  And I'm just going to tell you to the best of my

18  recollection.  I haven't looked at this in a long time.

19  Q    Exactly.

20  A    But my recollection is that they were telling the

21  claimants one, that the lawyer, the Ad Hoc lawyer is

22  representing them in this bankruptcy versus just representing

23  them in the tort system or whatever was before.  That was

24  number one.  And the two, that the Ad Hoc lawyer's position in

25  the bankruptcy was in support of the plan.  That's my best

Murdica - Cross/Ruckdeschel                          59

1    recollection.  If I'm wrong, I'm wrong.  But that's how I

2    recall it.

3          MS. RICHENDERFER:  Okay.  Thank you, sir.  That's all

4    I have.

5          THE COURT:  Thank you.  Good morning.

6          MR. RUCKDESCHEL:  Good morning, Your Honor.  Jonathan

7    Ruckdeschel on behalf of Paul Crouch.  May I approach?

8          THE COURT:  Yes.

9          THE WITNESS:  Good morning, Mr. Ruckdeschel.

10          MR. RUCKDESCHEL:  Good morning.

11                      CROSS-EXAMINATION

12    BY MR. RUCKDESCHEL:

13    Q    Mr. Murdica, I'm Jon Ruckdeschel.  I don't think we've met

14    before.  Is that your recollection?

15    A    You deposed me twice by Zoom, I believe.

16    Q    Right.  But we haven't been here in the same place.  And I

17    think in one of your depositions, I was just observing.  But

18    that's all right.  I have some questions for you about the

19    Linear settlement agreement that I've just given you a copy of.

20    I'm going to try and roll through it really quickly.  I don't

21    think we're going to disagree about anything.

22          If I ever say something and you want to read more of it

23    into the record or you want to go farther, just let me know and

24    we'll make sure that we're covering whatever you think is

25    appropriate.

1  A    Yeah.  I thought this was protected.  I certainly agreed

2  to keep this confidential.

3  Q    Yeah.  It was produced to us.  It's part of Dr. Mullin's

4  reliance materials.  And so I'm going to ask you some questions

5  about it.

6  A    Okay.

7  Q    So first question, this is a document you're familiar

8  with?

9  A    I have to see which one this is.  But yes.  I did all

10 these settlements.

11 Q    All right.  And just for the record, the copy you have in

12 front of you on the bottom of the first page has the Bates

13 Number LTL MGMT 00015917, correct?

14 A    Yes.

15 Q    First page.

16 A    Yes.

17 Q    All right.  And if we flip it to the back and look at the

18 last page that has a number, the Bates Numbers end 15951,

19 correct?

20 A    Yeah.

21 Q    All right.  And if you go back one more page to Page 33,

22 we see your signature, yes?

23 A    Yes.

24 Q    All right.  Great.  And if you go to the first page, this

25 document bears a date of December 30, 2020, correct?

1  A    The document itself does.  I believe this was done in

2  either August or September 2020.

3  Q    Okay.  In terms of Linear and master settlement agreements

4  for ovarian cancers, this was the first one, correct?

5  A    For a group ovarian cancer settlement, yes.

6  Q    Okay.  And then there was a second one in October of 2021,

7  correct?

8  A    That sounds right.

9  Q    All right.  Fair enough.  Now, if we open this up, I'm

10  just going to run through some sections of it and ask you some

11  questions briefly about what they are.  So in the second page

12  here, we see that all of the claimants that were covered by

13  this settlement agreement had alleged a diagnosis of epithelial

14  ovarian cancer resulting from the use of talc products, yes?

15  A    Sorry, where are you reading from?

16  Q    II(A).

17  A    Thank you.  II(A).  I'm sorry.  I'm looking at the wrong

18  part because I'm --

19         THE COURT:  Page 2.

20  BY MR. RUCKDESCHEL:

21  Q    Page 2, Roman II, recitals, large A.

22  A    Yes.

23  Q    Okay.  And so if somebody had been alleging endometrial or

24  a cervical or a uterine cancer, they would have not been

25  covered by this agreement --

1  A    Or --

2  Q    -- on its terms.

3  A    Or other types of ovarian.  And I think if you look later,

4  you'll see specifically borderline cancers were excluded, which

5  are a lot of the cancers that are alleged in this litigation.

6  Q    Right.  And we'll get to that.  And I appreciate it.  That

7  will make it quicker if we go on.  And in doing this, if you

8  look down at C, the second sentence here, the parties have

9  further concluded that this agreement is fair, reasonable, and

10 adequate.  Right?  That's what it says?

11 A    That's the only way you can ethically settle.

12 Q    Understood.  Okay.  And if you turn to the next page, it

13 indicates this settlement covered 2017 claimants, correct?

14 A    Yes.

15 Q    All right.  Moving to the fourth page, F, individual

16 allocations.  There was a procedure set up that we'll talk

17 about in a little bit in this settlement where the individual

18 allocation of settlement funds was going to be determined by a

19 third-party neutral special master, yes?

20 A    Correct.

21 Q    All right.  Great.  Now, there was a recognition here that

22 while the claimants had alleged an epithelial ovarian cancer

23 caused by talc use, that they were going to have to present

24 evidence defined in the agreement to document various

25 conditions in order to qualify, yes?

Murdica - Cross/Ruckdeschel                    63

1   A    Yes.  Very much like the trust plan here.

2   Q    All right.  And the qualification criteria had six points.

3   They had to show that they were a resident of the United

4   States.  This is on Page 8.

5   A    I'm with you.

6   Q    So resident of the United States, yes?

7   A    Yes.

8   Q    And then proof of regular use of talc products for at

9   least five years, and there were some details.

10  A    Yes.  And then there's a term accounting for latency, as

11  well.

12  Q    Right.  The talc use had to start at least ten years

13  before the diagnosis.

14  A    Right.

15  Q    Okay.  And then they had to prove that they had a

16  definitive diagnosis of epithelial ovarian cancer, and it

17  specifically notes in a footnote that borderline cancers do not

18  satisfy that criteria.

19  A    Correct.

20  Q    All right.  The plan that has just been filed on June 26th

21  specifically includes borderline cancers, yes?

22  A    Yes, because the TCC lawyers who represent ovarian

23  claimants, that's a big point of contention for them.  They

24  want them paid because the ovarian objectors have large

25  quantities of borderline cancers.

1          MR. RUCKDESCHEL:  Move to strike everything after

2  yes, especially the speculative parts regarding what the TCC

3  lawyers want or intend.

4          THE COURT:  Sustained.  Actually, will either of you

5  clarify for the Court the reference to borderline.  Is that a

6  term of art?

7          MR. RUCKDESCHEL:  Yes.  It says here diagnoses of

8  borderline --

9          THE COURT:  I see the footnote.

10          MR. RUCKDESCHEL:  Right.

11          THE COURT:  But the term borderline is --

12          MR. RUCKDESCHEL:  Right.  So --

13          THE COURT:  -- accepted within the industry?

14          MR. RUCKDESCHEL:  So, Your Honor, pathologists use

15  different terms like radiologists do that indicate the level of

16  certainty they have with respect to what the cells are looking

17  like underneath the microscope.  And so something can be

18  definitively cancerous, it could be borderline cancerous, it

19  could be non-malignant as far as they can tell.  And so the

20  footnote, as you can see, excludes borderline.

21          THE COURT:  All right, thank you.

22  BY MR. RUCKDESCHEL:

23  Q    The fourth characteristic, they have to produce medical

24  records about other risk factors for ovarian cancer including

25  genetic if they're available.  Yes?

1  A    Yes.

2  Q    All right.  And if they're dead, they have to give you the

3  death certificate, and they have to show that their claim

4  wouldn't have been barred by the statute of limitations, right?

5  A    Right.

6  Q    Okay.  Now, as part of this agreement on Page 11, there's

7  a section titled solicitation of additional potential

8  claimants.  Yes?

9  A    Yes.

10  Q    All right.  And this section starts by saying everything

11  we're talking about here is subject to whatever the ethical

12  rules are, right?

13  A    Right.

14  Q    Okay.  And then if you look down on the sixth line, it

15  says claimant's counsel represent to the extent consistent with

16  its ethical obligations, it will not advertise, solicit, or

17  represent new clients for the purpose of bringing claims

18  against J&J and any other release person as defined in this

19  release and the attachment to the release related to injuries

20  allegedly associated with the use or exposure to talc products

21  with the sole exception of cases in which the plaintiff alleges

22  that he or she developed malignant mesothelioma as a result of

23  exposure to talc products, yes?

24  A    You read it correctly.

25  Q    All right.  And so here, Mr. Linear is agreeing that with

Murdica - Cross/Ruckdeschel                                    66

1  the exception of mesothelioma cases, he's not going to

2  represent new clients for ovarian cancer cases to the extent

3  that that's ethical.

4  A    To the extent the Missouri rules permit that.

5  Q    Got it.  All right.  And then the next sentence, Mr.

6  Linear agrees also that he's not going to do that, he's not

7  going to get involved in other people's talc cases as well,

8  right?

9  A    To the extent the rules permit that.

10  Q    Got it.

11  A    And at the present, it's a -- it's a present intent

12  standard.

13  Q    All right.  And in fact, that's the language that gets

14  used in the 2021 agreement with Mr. Linear for the 3,000

15  clients, he has no present intent of bringing new cases and no

16  present intent of working with other people in their cases,

17  right?

18  A    Those are the current ethical standards in bar opinions as

19  to what the extent, the limit of what you're allowed to agree

20  to in settlement.

21  Q    Super.  All right.  And then in Section D there on Page 11

22  carrying over to 12, they agree to stop advertising for new

23  talc claims?

24  A    Right.

25  Q    Including stuff on the internet, right?

1  A     Yeah.

2  Q     Okay.  And then in Page 13 and 14, there is a discussion

3  of the special master and how they are going to allocate values

4  for individuals and the process that the individual who doesn't

5  like the allocation can object to that and ask for

6  reconsideration, right?

7  A     Right.

8  Q     And at the end of that process, the individual would have

9  the ability to accept or reject that allocation, correct?

10 A     Theoretically.

11 Q     All right.  And the agreement further provides that if the

12 claimant objects to the allocation and rejects it, to the

13 extent ethical, Mr. Lanier would withdraw?

14 A     Theoretically.  That never happens in practice.

15 Q     Okay.  But that's what the agreement says, yes?

16 A     Those are the words on the page.

17 Q     All right.  Great.

18       And then, if we go down to Page 30, at the bottom, there's

19 the entire agreement clause that makes clear that there aren't

20 any side agreements or a wink and a nudge that go around the

21 plain language of this document, correct?

22 A     It's a standard clause, yes.

23 Q     All right.  And that's what it means.  There isn't some

24 other agreement that's unsaid on paper that is part of this

25 deal that binds Mr. Lanier or binds your clients, right?

Murdica - Cross/Maimon                          68

1  A    Yeah.  It's a standard contract language.

2  Q    Okay.  Thank you very much, sir.

3            MR. MAIMON:  May I, Your Honor?

4            THE COURT:  Mr. Maimon, do you need a break?

5            MR. MAIMON:  No.

6            THE COURT:  Kiya, are you okay?

7            THE CLERK:  (No audible response)

8            MR. RUCKDESCHEL:  I'm sorry, Your Honor.  I have one

9  more question.  I apologize.  And it's not a Columbo moment, I

10 promise.

11           THE COURT:  Okay.

12 BY MR. RUCKDESCHEL:

13 Q    Mr. Murdica, the 5,000 clients covered by, or 5,017,

14 covered by the two master settlements with Lanier were not part

15 of the MDL, is that correct?

16 A    That is not correct.

17 Q    Okay.  So some of those folks were in the MDL and some

18 were not?

19 A    That is my best recollection.

20 Q    All right.  So it was two questions.  Thank you, sir.

21                         CROSS-EXAMINATION

22 BY MR. MAIMON:

23 Q    Good morning, Mr. Murdica.

24 A    Good morning, Mr. Maimon.

25 Q    We have met before, correct?

Murdica - Cross/Maimon                    69

1  A     We have.

2  Q     Okay.  I'd like to go through a few discreet areas with

3  you.

4         First of all, you're with the firm of Barnes and

5  Thornburg.  Is that correct?

6  A     I am.

7  Q     And I think you testified initially that over the course

8  of your career, at least the last decade or so, your work has

9  been primarily on behalf of Johnson and Johnson.  Is that

10 correct?

11 A     Right.

12 Q     What percentage of your work is on matters in which

13 Johnson and Johnson retains you?

14 A     More than 95 percent.

15 Q     Okay.  So what I'd like to do is I'd like to go through a

16 few aspects and I'd like to start with talking about the term

17 sheet, which is Tab 4 in the binder that I gave you.  Okay?

18 A     Yes.

19 Q     And I'd like to talk about, first of all, you negotiated

20 the terms of this term sheet with Mikal Watts, correct?

21 A     And others, yes.

22 Q     And while others were also involved, Mr. Watts, on the

23 side of claimants, was the primary lawyer that you dealt with.

24 Fair?

25 A     I'd say so.

1  Q    Okay.  And I'd like to talk to you about three aspects of

2  the term sheet.

3        First of all, it has within it a split of the funds that

4  are available between current and future claims contemplating

5  an allocation of two-thirds to current claimants and one-third

6  to future claimants.  True?

7  A    It did then.  It's been supplanted by the plan.

8  Q    Well, we'll get to the plan in a moment.  But that was the

9  term sheet, right?

10 A    At that time, back then, yes.

11 Q    Okay.  And then also there was a split as between ovarian

12 cancer claims and mesothelioma claims with 6.5 billion going to

13 ovarian cancer cases, 2 billion to mesothelioma claims, and the

14 400 million allocated to the governmental actions, right?

15 A    At that time.

16 Q    Okay.  And then, finally, there's a demarcation of current

17 versus future ovarian cancer claims, and that date of

18 demarcation was set at April 1, 2023.  Is that fair?

19 A    All of this has changed, but yes.

20 Q    That's what it was in the term sheet, right?

21 A    Back then, yes.

22 Q    And you negotiated that primarily with Mr. Watts, true?

23 A    Primarily, but he wasn't the only person who had an

24 imprint on this.

25 Q    Understood.  Understood.

1    Okay.  So let's go to the first one.  The split is between

2  futures and present claimants.  On the first page, it says,

3  "The qualification and payment terms contemplated below and

4  attached are contingent on," and then, Number 3 there, going on

5  to the second page, is that, "The future claims

6  representative's agreement, that she will not assign more than

7  one-third of the trust corpus to qualifying future claims."

8    Do you see that?

9  A    I do.

10 Q    And I just realized this myself, but while I asked you

11 that the split was two-thirds, one-third, it's two-thirds or

12 more against one-third or less, right?  She will not assign

13 more than one-third, right?

14 A    I guess you can look at it that way.

15 Q    Okay.  The second term that we talked about was the split

16 as between ovarian cancer claims and mesothelioma claims, and

17 this is on Page 3, the ovarian cancer 283, which is a minimum

18 of $6.5 billion for the ovarian cancer claims, true?

19 A    At the time.

20 Q    And with regard to the mesothelioma claims, if we go to

21 2(b)(3) on Page 4, it's a minimum of $2 billion to the

22 mesothelioma qualifying claims, correct?

23 A    Yeah, at the time.

24 Q    Okay.  And then, finally, there is the demarcation, and

25 that is 2(a)(1) and (2), whereby existing claims, existing

Murdica - Cross/Maimon                                          72

1  ovarian cancer claims are defined as someone who has an ovarian

2  cancer diagnosis prior to April 1, 2023, and if they're

3  retained by an attorney, they executed that retention agreement

4  prior to April 1, 2023.

5        Do you see that?

6  A    I see it on the screen.

7  Q    Okay.

8  A    I didn't find it here, but that's okay.

9  Q    Sure.  On Page 3, 2(a)(1) and 2(a)(2).

10 A    Got it.

11 Q    Okay.  And that's what was in the term sheet that you

12 negotiated with the claimant's counsel, correct?

13 A    Yeah, the original plan.  The original term document, not

14 the plan.

15 Q    Okay.  The term sheet, right?

16 A    The original term sheet.

17 Q    Okay.  And then future ovarian cancer claimants are those

18 whose cancer diagnoses came after April 1st, 2023, true?

19 A    Well, yeah.  Beyond April 1st didn't exist at this time,

20 so that would be the future, right.  This was April 2023.

21 Q    I understand that, but for definitional purposes, anyone

22 who was diagnosed after April 1, 2023, is considered, under the

23 term sheet, a future ovarian cancer claimant?

24 A    In that document from three months ago, yes.

25 Q    Okay.  Now, this was something that was negotiated between

Murdica - Cross/Maimon                                           73

1  yourself, Mr. Watts, and the other attorneys who signed the

2  PSAs under non-disclosure agreements, correct?

3  A    Yes.

4  Q    And nobody could get a copy of the term sheet unless they

5  signed the non-disclosure agreement, correct?

6  A    Right.  If they asked me to see it, I would have sent them

7  a non-disclosure.

8  Q    And you wouldn't send it without the non-disclosure

9  executed, true?

10  A    Right.  But nobody ever said they wouldn't sign the NDA.

11  If anybody asked me, I gave it to them.

12         THE COURT:  Yes or no.

13  BY MR. MAIMON:

14  Q    My question is simple.

15         THE COURT:  Make it easier.

16  BY MR. MAIMON:

17  Q    Everybody who you sent the term sheet to had signed an

18  NDA, correct?

19  A    (No audible response)

20  Q    Right?

21  A    Yes.

22  Q    Okay.  And so what that meant is, pursuant to the terms of

23  the NDA, they, and only they, aside from the people on your

24  side, were the only ones who knew about this April 1, 2023,

25  demarcation between existing and future ovarian cancer

Murdica - Cross/Maimon                                74

 1  claimants.  Is that true?

 2  A    At that time, yes.

 3  Q    Okay.  And this wasn't made public until after April 1,

 4  2023.  In fact, it wasn't made public until LTL filed its

 5  second bankruptcy.  Is that true?

 6  A    Well, three days later.  But Mr. Maimon, I don't believe

 7  that term even exists anymore.

 8  Q    Okay.

 9         MR. MAIMON:  I'm going to move to strike.  I asked a

10  simple question, Your Honor.

11         THE COURT:  Sustained.

12         MR. MAIMON:  Okay.

13  BY MR. MAIMON:

14  Q    This was not made public and available to people other

15  than the signatories to the PSAs until after the filing of the

16  plan, correct?

17  A    Right.

18  Q    Okay.  Now, you mentioned you were deposed in the PI

19  proceeding.  Do you recall that?

20  A    My first deposition?

21  Q    Yes.

22  A    Yes.

23  Q    And others were deposed in connection with that proceeding

24  as well, correct?

25  A    Yes.

Murdica - Cross/Maimon                    75

1  Q    And I noticed because I attended some by Zoom that you

2  attended some by Zoom, as well, correct?

3  A    When I could, yes.

4  Q    You were there for Mikal Watts' deposition?

5  A    Only part of it.

6  Q    Okay.  In Mr. Watts' deposition, he talked about this

7  April 1, 2023, demarcation.  And I asked him, "So April 1,

8  2023, is the delineation date as between existing and future

9  ovarian cancer claim, as per this term sheet?"

10      He said, "Yes."

11      I said, "Did you discuss that in particular with

12  Mr. Murdica?"

13      And he said, "Yeah.  In fact, I recommended it.  And let

14  me just kind of tell you why."

15      Now I would like to stop there.

16      Do you recall, in your negotiations with Mr. Watts, him

17  recommending the April 1, 2023, demarcation date?

18  A    I recall him recommending that we have one.  I don't

19  recall it being April 1st.

20  Q    And you acceded to his request for a demarcation date in

21  your negotiations with him, correct?

22  A    Yeah.  I believe I thought it was a good idea at the time.

23  Q    Okay.  And he explained himself to you, correct?

24  A    I'm sure that he did.  I don't remember those discussions.

25  Q    Well, let's see.  Because he said, "So this April 1st

1  thing with respect to the ovarians is designed to prevent a

2  massive dilution by way of marketers going and signing up a

3  bunch of cases right after they hear 8.9 billion and to push

4  those cases in into the future so that the existing class, the

5  existing cases, are not being diluted by progressive

6  marketing."

7      Do you see that testimony about Mr. Watts?

8  A    I do.

9  Q    And is that consistent with what he explained to you as to

10 why he wanted that date of demarcation?

11 A    I don't doubt that he -- if he said he said that to me, I

12 don't doubt it.  To me, it makes sense.  That's a rational

13 reason to do that.

14 Q    Now, again, aside from Mr. Watts and the people who signed

15 the NDAs and the PSAs, nobody else, no other lawyer in the

16 country was aware of this April 1st demarcation date, correct?

17 A    Well, not until three days later.

18 Q    Okay.  Do you know what a preference is in bankruptcy?

19 A    Nope.

20 Q    Okay.  Do you believe -- withdrawn.

21     It's true, is it not, that Mr. Watts and the other lawyers

22 who signed the PSAs had inside information that wasn't

23 available to the public about what the demarcation was going to

24 be and could sign up cases during that period of time because

25 the term is "retained prior to April 1, 2023," when no one else

Murdica - Cross/Maimon                              77

1  in the country knew about it?

2  A    I don't think so, Mr. Maimon, because we're talking about

3  a matter of days and they weren't doing that.

4  Q    Well, this was in -- well, first of all, you don't know

5  what they were doing, do you, by your own personal knowledge?

6  A    Well, I do Mr. Maimon, because these are people I deal

7  with every day across multiple torts.

8  Q    I understand that they tell you things.  That's called

9  hearsay.  I'm saying from your own personal knowledge, you

10  don't know the inner workings of their law firms, do you?

11  A    Actually, it's my business to.

12         MR. STARNER:  Objection, Your Honor.  I think we can

13  drop the colloquy from counsel, I think.

14         MR. MAIMON:  Your Honor, I move to strike as based on

15  hearsay.

16         MR. STARNER:  Move your question?  Are you moving to

17  strike your question or is --

18         MR. MAIMON:  No, I move to strike the answer.

19         THE COURT:  Well, you asked him what Mr. Watts knew

20  and was doing, so I'm not sure that that was a proper.  So why

21  don't we rephrase it?

22         MR. MAIMON:  Sure.

23  BY MR. MAIMON:

24  Q    This term sheet had been in discussion between you and

25  Mr. Watts and the other lawyers who signed it for some time

1  prior to its being filed with the Court, correct?

2  A    Not very long.  And I think this was added at the very

3  end.

4  Q    So what you're saying is that you don't think that the

5  impact of the inside information that Mr. Watts and the other

6  PSA signatories had was that significant?

7  A    I don't --

8  Q    You don't?

9  A    I don't think it existed, Mr. Maimon.  I mean, that same

10 theory you could use when anybody knew we were going to a

11 mediation.  You know, anytime you have knowledge.  The TCC

12 could have done that when they thought we were close last June.

13 Q    Well, Mr. --

14        MR. MAIMON:  Move to strike as non-responsive.

15        THE COURT:  Overruled.

16 BY MR. MAIMON:

17 Q    Mr. Watts is saying that his motivation in recommending

18 this demarcation to you was to make sure other people weren't

19 able to sign up a bunch of clients and dilute the existing

20 claims, correct?

21 A    Well, that's what he said.  I mean, if you do mass torts,

22 you understand that he's saying that people could be motivated

23 by hearing about $9 billion and go out and advertise, which

24 could make it difficult.  It would make more claims.

25 Q    Right.  In the course of a year's time, less than a year's

Murdica - Cross/Maimon                                    79

1  time, Mr. Watts had accumulated approximately 17,000 claims,

2  correct?

3  A    I don't think that that's accurate in terms of how long it

4  took for him to get (indiscernible) --

5  Q    Well, he's going to testify next, so we'll ask him.

6  A    Ask him.

7  Q    But he'll know better than you, right?

8  A    About exactly when he got them?

9  Q    Yes.

10  A    Yes.

11  Q    Okay.  So what he's trying to do here is he was trying to

12  prevent others from doing what he did and consequently dilute

13  his claims.  Fair?

14  A    No, not fair, because there was nothing that caused him to

15  start gathering claims.

16  Q    Well --

17  A    I'm not even understanding the parallel you're making.

18  Q    -- in your declaration, you spoke about the fact that you

19  had been dealing and speaking to Mr. Watts about talc

20  litigation for some time.  Is that correct?

21  A    I have been dealing with Mr. Watts for almost a decade and

22  I am sure we talked about talc claims.  I was trying for a long

23  time to talk him out of getting into talc because, you know,

24  Mr. Lanier was in talc and he is a great trial lawyer and

25  Mr. Watts is on the same level.  And for the sake of my client,

Murdica - Cross/Maimon                           80

 1  I didn't want Mr. Watts in talc litigation because he is such a

 2  good lawyer.

 3  Q    And you were trying to do your client a solid by keeping

 4  him out, weren't you?

 5  A    I was trying to talk him out of it.

 6  Q    Okay.  In your declaration, you said you had been engaged

 7  in various discussions with Mr. Watts regarding the talc

 8  litigation since approximately 2021.  Is that fair to say?

 9  A    Yeah, it's possible we talked about it earlier because I

10  know he was working with Mr. Itkin on talc claims as well.

11  Q    To the best of your knowledge, what you said in your

12  declaration is accurate, true?

13  A    Yes.

14  Q    Okay.  And so, when Mr. Watts began accumulating claims

15  and accumulated approximately 17,000 claims by the time the

16  bankruptcy was filed, he negotiated with you a term that

17  prevented the dilution of his claims by other claims being

18  signed up after that, true?

19  A    Well, it's not just his claims.  It was all present

20  claims, including the ones of the clients you represent.

21  Q    I'm sorry.

22  A    It's all claims, not just his claims.  It would prevent --

23  so, first of all, this doesn't exist anymore.  But it would

24  have prevented dilution of your client's claims as well.

25  Q    Are you saying that the April 1, 2023, demarcation date

1  does not survive into the plan?

2  A    That's my best recollection.

3  Q    Okay.  Well, we'll see about that.

4  A    If I'm -- yeah.  If I'm wrong, I'm wrong.  But my best

5  recollection is it doesn't have that.

6  Q    Okay.

7  A    If it does --

8  Q    If it does, it does, right?

9  A    -- you'll (indiscernible) me.

10        If it does, it does.

11  Q    Okay.  Let's go on to the next subject.  And that is, this

12  is a copy of a chart that was put on, I think it was Ms. Brown.

13  It might have been Mr. Gordon in their closing argument for the

14  for the PI.  And this is a list of firms that had signed PSAs.

15        Do you see that?

16  A    Yes.

17  Q    And it gives the approximate number of claims and then

18  breaks them out as to filed and unfiled, right?

19  A    Yeah.  That was at that time.

20  Q    I'd like to concentrate on four of those firms, the Fears

21  Nachawati firm, the Onder firm, the Pulaski Firm, and Watts

22  Geurra firm.

23  A    Yes, sir.

24  Q    Okay.  Do you see I've boxed those in?

25  A    I do see that.

1  Q    Okay.  So you mentioned before that there are firms who

2  have publicly stated that they support the plan, and those are

3  the ones who have signed PSAs, correct?

4  A    Yes.

5  Q    You also stated that there are people who have not signed

6  PSAs who have told you they'll support the plan --

7  A    That's correct.

8  Q    -- true?

9  A    Yes.

10 Q    And who are those firms?

11 A    I'm not going to disclose those for the reasons I told you

12 at my deposition when you asked.

13          MR. MAIMON:  Your Honor, I move to strike all his

14 testimony about it if you won't disclose it.  Can't have a fair

15 trial and have cross-examination if the witness is going to say

16 something and then not be able to be cross-examined on it.

17          MR. STARNER:  Your Honor, this is an issue that I

18 think we've struggled with also.  I think this witness has

19 indicated that he's concerned about disclosing the names of

20 certain law firms and their support would result in harassment

21 and intimidation of them.  So I think to the extent that the

22 Court would like to hear those details, I think we could talk

23 about how to maybe do that, whether *in camera* or otherwise.  So

24 we would defer to the Court how the Court would like to handle

25 that.

1          MR. MAIMON:  This is my chance to cross-examine, Your

2    Honor, and I'm not harassing anybody.

3          THE COURT:  I'm going to overrule the objection.

4    Continue with your --

5    BY MR. MAIMON:

6    Q    Who are they, Mr. Murdica?

7    A    Mr. Maimon, I have raised this with the U.S. Trustee that

8    I'm concerned because of the intimidation that has happened

9    against some of the lawyers who supported this plan to disclose

10   further names.  And, you know, I left a message for the U.S.

11   Trustee after she asked me to, and they haven't contacted me.

12   I brought it up at my second deposition.

13         That is information I am happy to explain why and the

14   threats that have been made against the members of the ad hoc.

15   But I don't think it's in anybody's best interest for me to do

16   that.  This is my job, Mr. Maimon.  I assure you, and you can

17   judge my credibility or not, that there is far more support for

18   the plan than just the people who signed the PSAs.

19         MR. MAIMON:  Move to strike as non-responsive.

20   BY MR. MAIMON:

21   Q    Are you refusing to answer my question, sir?

22   A    (No audible response)

23         MR. MAIMON:  I'd like a ruling on it.

24         THE COURT:  All right.

25         To the extent you're unwilling to identify those

Murdica - Cross/Maimon                              84

1 firms, we'll strike any reference in your testimony to those

2 firms or any --

3              MR. MAIMON:  Additional support.

4              THE COURT:  -- any additional support.

5              MR. MAIMON:  Thank you, Your Honor.

6 BY MR. MAIMON:

7 Q     Now --

8              THE COURT:  Continue with the --

9              MR. MAIMON:  Thank you.  Let's --

10             THE COURT:  -- examination.

11 BY MR. MAIMON:

12 Q    Let's talk about these firms a moment.  Let's talk about

13 Mikal Watts' clients, okay.  You ready?

14 A    Okay.

15 Q    Okay.  Mr. Watts testified that, I asked him yes or no,

16 "You have never committed to Mr. Murdica or Mr. Haas that your

17 clients would vote in favor of the plan," and he said that's

18 true.

19     Do you see that?

20 A    I can read it.

21 Q    And that's accurate.  Mr. Watts never committed to you

22 that his clients would vote in favor of the plan, true?

23 A    At that time, as you just heard me testify in response to

24 Ms. Richenderfer.  The clients are now aware that they're in

25 bankruptcy supporting the plan.

Murdica - Cross/Maimon                          85

1  Q    Is it your testimony that Mr. Watts' clients support this
2  plan?
3  A    My testimony is what I just said, Mr. Maimon.  They've
4  been informed --
5  Q    Have they authorized Mr. Watts to support the plan as
6  filed?
7  A    You can ask him later, today.
8  Q    Okay.  But I'm asking you, sir, has Mr. Watts ever told
9  you, personally, that his clients have committed to vote in
10  favor of the plan?
11  A    Mr. --
12  Q    And I'm going to ask him when you're done.  So I just
13  wanted to be fair.
14  A    I'd ask him, but my understanding is he has informed his
15  clients that he's representing them in the bankruptcy in favor
16  of the plan.
17  Q    Right.  Has he ever committed to you that they will vote
18  in favor of the plan?
19  A    No.  He can't do that.
20  Q    Okay.  Good.
21       In his second deposition, Mr. Watts was asked, "What do
22  you understand you and your firm were agreeing to by signing
23  the plan?"
24       And this was his deposition on June 12th, so the plan was
25  already on file by then.  Do you understand that?

Murdica - Cross/Maimon                                        86

1  A    Okay.

2  Q    Okay.  And he answered, "The bottom line is that all we

3  can agree to as counsel who negotiated a settlement proposal to

4  advocate for that proposal for our clients.  It's no different

5  than, you know, 25 years ago when I would fly to Detroit or

6  Ohio to negotiate a Ford Firestone case.  My client wasn't with

7  me.  When they got to a number that I thought was fair, I would

8  agree to recommend that to my client.  If the client chose not

9  to follow my recommendation, there's no settlement, right?

10 Same thing here.  It's just, you know, in massive numbers."

11      Did Mr. Watts ever represent anything different to you

12 than what he testified to at his deposition?

13 A    Not a representation, Mr. Maimon, but I have a course of

14 dealing with Mr. Watts, and this is not the first agreement

15 we've had.

16         MR. MAIMON:  Move to Strike is non-responsive.

17         THE COURT:  Can you answer the question?  Or do you

18 need to repeat it?

19         THE WITNESS:  Can you repeat it?  I'm sorry.

20 BY MR. MAIMON:

21 Q    Sure.  Did Mr. Watts ever represent to you anything

22 different than his testimony that I'm showing you here?

23 A    No.

24 Q    Okay.  He was asked, "And the plan support agreement, just

25 to be clear, just so the record's clear, the plan support

Murdica - Cross/Maimon                            87

1  agreement doesn't obligate your client to do anything."

2       And his answer was, "It did not."

3       Do you see that?

4  A    I do.

5  Q    Did he ever represent to you anything contrary to that

6  testimony?

7  A    No.

8  Q    Thank you.

9       He was asked, "Would you agree with me, the same thing

10 with respect to LTL's counsel?"

11      Stated, with respect to LTL's counsel, stated at the first

12 day hearing when there was a reference, "supported by over

13 60,000 claimants who have signed and delivered plan support

14 agreements.  That statement, too, would be more accurate if it

15 was reflected that it was lawyers who had made those

16 commitments, not claimants themselves, correct?"

17      And he said, "I agree."

18      Do you see that?

19 A    Right.  But, Mr. Maimon, it's different now because now

20 the clients know that they're being represented in the

21 bankruptcy in favor of the plan.

22 Q    They know that -- well, first of all, His Honor's rule

23 about what the notice had to be from the AHC members to their

24 clients is what it was, right?

25 A    Well, it happened after this.

1  Q    I understand that.  And whatever notice they gave to their

2  clients was in keeping, and they confirmed that they did

3  exactly as the Court required, right?

4  A    Right.

5  Q    Okay.  And we're happy with the record of what the Court

6  required.

7       You see, he was asked, "Did you hear that statement made

8  on the first day?  When you heard, did you say anything to

9  anyone along the lines of, you should clarify that?  It's not

10 the claimants themselves, it's the lawyers who represent them."

11      And Mr. Watt says, "As I recall, I clarified it when I

12 spoke to Judge Kaplan briefly.  But I may be wrong, but yeah.

13 Look, you don't have an argument with me.  I think under the

14 ethical rules, when a lawyer negotiates a settlement, it is a

15 proposed settlement until the client signs off on it."

16      Do you see that?

17 A    I do.

18 Q    Has Mr. Watts ever told you that his clients have signed

19 off on the plan?

20 A    I can't improve my answers I already gave you Mr. Maimon.

21 Q    Okay.

22      This statement that J&J filed with its SEC filing saying,

23 "LTL also has secured," and this was in -- what tab is this?

24 This is Tab 5, which is dated April 4, 2023.  And attached to

25 it is a press release by J&J that says, among other things,

Murdica - Cross/Maimon                                    89

1  "LTL also has secured commitments from over 60,000 current

2  claimants to support a global resolution on these terms."

3      Do you see that?

4  A    I do.

5  Q    And those, with regard to commitments from current

6  claimants by Mr. Watts' testimony that you've seen, that would

7  not include his clients, true?

8  A    I disagree with that.

9  Q    Okay.  Let's move on to Mr. Pulaski.  He's another one who

10 signed the PSAs, right?

11 A    Right.

12 Q    Okay.  And Mr. Pulaski was asked what his obligations are

13 under the plan, and he says, "I'm in support of the agreement.

14 I'm going to at some point after May 14th, when a plan is

15 formally filed, and I believe the term sheet will in broad

16 constructs right now, I believe when there's finality to that

17 and at such time that that occurs when I will, in all

18 likelihood, propose to our clients that they support the plan."

19     Do you see that?

20 A    I do.

21 Q    Has Mr. Pulaski indicated to you anything different than

22 what he testified under oath as far as whether his clients have

23 already indicated a support for the plan?

24 A    Well, I would say that his support for the plan and his

25 recommendation is stronger today than it was then based on my

Murdica - Cross/Maimon                                    90

1  conversations with him.

2  Q    But that's not what I asked you, sir.

3       What I asked you is has he ever told you that his clients

4  have affirmatively indicated to him that they support the plan?

5  A    My understanding is they can't at this point.  But you

6  read -- Mr. Maimon, you read "in all likelihood."  Well it's

7  completely likely now.  He's in support of the plan.

8  Q    Well, if he testifies, we'll ask him.  But --

9  A    I'm telling you --

10 Q    -- to the best of your knowledge -- well --

11 A    I'm telling you based on my own personal conversation with

12 him, he is completely in support of the plan and will be

13 recommending it to his clients.

14          MR. MAIMON:  Objection.  Move to strike.  It's also

15 hearsay.

16          THE WITNESS:  I had that conversation.

17          MR. MAIMON:  That's called hearsay.

18          THE COURT:  Counsel.

19                    (Laughter)

20          THE COURT:  Question and answers are hearsay.

21          So you can sit down.  Thanks.  Thank you,

22 Mr. Starner.

23          The question was whether Mr. Pulaski represented to

24 you that his clients have agreed or something, not whether he's

25 gung ho for it, and I'll use that, it's my term.

Murdica - Cross/Maimon                    91

1              THE WITNESS:  Sure.

2              THE COURT:  And the answer is no, correct?

3              THE WITNESS:  Right.

4              THE COURT:  That's all that's needed.  Thank you.

5              THE WITNESS:  Thank you, Your Honor.

6    BY MR. MAIMON:

7    Q    He said, "Sir, are your clients required to vote for this

8    plan?"

9         And he said, "No one is required to do anything."

10        Has he indicated to you that his clients have committed to

11   vote to the plan?

12   A    Mr. Maimon, everyone is free to vote however they want.

13   Q    Thank you.

14        We can move on then to -- let me ask you this.  Given your

15   answers, would you agree with me that the statement by Johnson

16   and Johnson on April 4, 2023, in its SEC filing, that it has

17   secured commitments from over 60,000 current claimants to

18   support a global resolution on these terms, does not include

19   Mr. Pulaski's clients?

20   A    I would not agree with you.

21   Q    Thank you.

22        Let's go on, Mr. Nachawati.  Mr. Nachawati, "Are you

23   aware," and I put this as Tab 2.  This is a news press release

24   by the Nachawati Firm on January 30, 2023, and in the fourth

25   paragraph, Mr. Nachawati is quoted as saying, "Our clients are

Murdica - Cross/Maimon                                    92

1 grateful that the Appellate Court saw through this cynical

2 attempt by J&J to avoid responsibility.  We will press forward

3 to ensure that jury trials resume and these women can have the

4 opportunity for justice they deserve."

5      First of all, in your discussions with Mr. Nachawati, did

6 he express this sentiment to you?

7 A    I believe that was the day it happened, and yes.

8 Q    Okay.

9 A    He was very happy that the Third Circuit dismissed the

10 bankruptcy.

11 Q    Two paragraphs later, "It's plain and simple.  Profitable

12 corporations like Johnson and Johnson should not be allowed to

13 use bankruptcy laws to avoid accountability," Mr. Nachawati

14 said.  Do you see that?

15 A    I do.  I actually saw him say the same thing in person in

16 Tucson, Arizona, at a presentation as well.

17 Q    And did he express those -- aside from you seeing him, did

18 he express those sentiments to you?

19 A    I don't think -- I don't recall that.  I remember him

20 celebrating when the Third Circuit dismissed the case.

21 Q    Okay.  Now, Mr. Nachawati, at his deposition, he was asked

22 at that time, "Do you believe the bankruptcy laws were never

23 intended to allow companies with hundreds of billions of

24 dollars on their balance sheets to get out from paying

25 victims?"

Murdica - Cross/Maimon                          93

1      And he said, "Correct."

2      Do you see that?

3  A    I do.

4  Q    And he says, "You were at that time outraged by Johnson

5  and Johnson conduct in putting LTL into bankruptcy, correct?"

6  And he said, "Correct."

7  A    You read correctly, Mr. Maimon.

8  Q    Okay.  Now --

9           MR. STARNER:  Objection, Your Honor.  What are we

10  doing here?  We're reading somebody else's deposition

11  transcript?

12          THE COURT:  I'd like to know as well.

13          MR. MAIMON:  Sure, because I'm going to get to the

14  negotiations that Mr. Murdica had with Mr. Nachawati in a

15  moment.

16          THE COURT:  So you're just laying the foundation?

17          MR. MAIMON:  Yes, Your Honor.

18          THE COURT:  All right.  Thank you.

19          MR. MAIMON:  Thank you.  And I'm not going to go

20  further.

21  BY MR. MAIMON:

22  Q    He was asked, "When you signed the plan support agreement,

23  what issues were you aware of that you believe had to be worked

24  through in order to get a resolution?"

25      He said, "Well, the many details involved a 100-plus page

Murdica - Cross/Maimon                    94

1  TDP in addition to the plan.  Mr. Silverstein, you know right?

2  I mean, a term sheet is an agreement to agree, right?  The

3  devil is in the details and that's what's we're working through

4  right now through the mediators."

5      Do you see that?

6  A    You read it correctly.

7  Q    And then, he said, "What did you understand that you were

8  agreeing to by signing this document?"

9      He said, "I think I already answered that.  A pathway to a

10 resolution that I could recommend in support to my clients."

11     Do you see that?

12 A    Right.

13 Q    And did Mr. Nachawati ever tell you that he actually

14 recommended voting in favor of the plan to his clients?

15 A    I believe he complied with the Court's subsequent order.

16 Q    That wasn't my question.

17     Did Mr. Nachawati ever tell you, in so many words, that he

18 had recommended to his clients to vote in favor of the plan?

19 A    I can't give you a better answer.  He told me he complied

20 with the Court's order, which would have required him to inform

21 the claimants about his position on the bankruptcy and the

22 plan.

23 Q    Well, it would have required him to comply with the

24 Court's order, right?

25 A    I just said that.

Murdica - Cross/Maimon                    95

1  Q    Okay.  Well, I think you said more, but that's okay.

2       He said, "Did you understand that you had agreed to

3  support the plan that the debtor just recently filed on

4  May 15th?"

5       He said, "A conditional agreement with a right to opt

6  out."

7       Do you see that?

8  A    Yes.  Mr. Maimon, we went through this at my deposition.

9  Anybody who wants to withdraw their support can.  They're not

10  going to.  Everybody's in support of the plan.

11            MR. MAIMON:  Okay.  Move to strike the answer.

12            THE COURT:  Sustained.

13  BY MR. MAIMON:

14  Q    Did Mr. Nachawati --

15            THE COURT:  He's asking you to just read the language

16  and agree what it says.

17            THE WITNESS:  He's reading great.  He's a great

18  reader.

19            MR. MAIMON:  I appreciate that.

20  BY MR. MAIMON:

21  Q    Did Mr. Nachawati tell you in his negotiations with you

22  that he had the right to opt out?

23  A    He didn't tell me that, but sure.  I would tell him that.

24  Nobody's forcing anybody into anything.

25  Q    He referred to the agreement that he signed as a

Murdica - Cross/Maimon                              96

1  conditional agreement.  Did you view it as a conditional

2  agreement?

3  A    Mr. Maimon, if he wanted to back out today, we're not

4  going to hold him to it.  But he's not going to, so this is all

5  irrelevant.

6          MR. MAIMON:  Move to strike as non-responsive.

7          THE COURT:  Sustained.

8  BY MR. MAIMON:

9  Q    My question, sir, is did you view it as a conditional

10  agreement?

11  A    I viewed it as an agreement the same way I do with anybody

12  I settle with, that both parties are going to keep their word.

13  Q    Okay.

14      Page 156 to 157, "Is it your understanding that what you

15  signed is a conditional agreement and gives you the right to

16  opt out of support?"

17      His answer, "Yes.  If there's no agreement working through

18  the issues, there's no agreement.  But the idea is, in general

19  sense, the pathway to a fair resolution that I can recommend

20  and support to my clients."

21      Do you see that?

22  A    You read it correctly, again.

23  Q    And, again, Mr. Nachawati has not told you in so many

24  words that he has recommended to his clients to support the

25  plan, true?

1  A    That's not true.  He's told me he is going to recommend

2  this plan that's on file to his clients.

3  Q    That's different than what I asked you, but that's fine.

4      He's asked, "When you signed this agreement, did you have

5  an understanding as to whether you were binding your clients to

6  do that?"

7      He said, "I can't bind my clients to do that in which they

8  do not wish to do.  I can only advise them upon a plan that is

9  submitted for a vote.  You know, there's anti-solicitation.

10 Submitted for a vote and approved by 75 percent or more if you

11 want 524(g) protection.  I cannot bind my clients.  It's the

12 will of the voter and the clients, the victims, that carries

13 the day in this case should it not be disposed of beforehand.

14 It's not my decision.  It's the clients, and each one has a

15 different set of circumstances."

16     He was then asked, "At this point in time, whether your

17 clients will vote yes or no in support of the debtor's plan

18 will depend what on what happens, fair?"

19     And he says, "That's a fair statement."

20     Has he ever indicated to you anything different than he

21 testified to under oath?

22 A    I just answered these questions, Mr. Maimon.  I can't do

23 any better than I've already answered.

24 Q    Would it be fair to say, Mr. Murdica, that on April 4,

25 2023, when Johnson and Johnson stated in its statement to the

1 SEC that over 60,000 current claimants support a global

2 resolution on these terms, that Mr. Nachawati's clients were

3 not involved, were not among those who had secured commitments

4 to support the plan?

5 A    As before, I disagree with your interpretation of that

6 document.

7 Q    Okay.  We're going to go to Mr. Onder now for a moment.

8 But in your declaration, I think you referred to Mr. Nachawati

9 and Mr. Onder as having been on the TCC of LTL 1.

10     Do you recall that?

11 A    They were.  Yes.

12 Q    Okay.  Now, have you read the submissions by the U.S.

13 Trustee in response to some of the pleadings by the AHC?

14 A    I've read a lot of submissions.  You'd have to tell me

15 which one you're referring to.

16 Q    Did you see the admonition from the U.S. Trustee's office

17 reminding AHC counsel that neither Mr. Onder nor Mr. Nachawati

18 were a member of any Talc Claimants Committee?

19 A    I didn't see that.  They were definitely a member of the

20 Talc Claimants Committee.

21 Q    Well, no, they weren't.

22 A    Their --

23 Q    Their clients were members, correct?

24 A    -- clients were, yes.

25 Q    Okay.  So when you keep saying that they were members,

Murdica - Cross/Maimon                        99

1  you're being inaccurate and it's not being truthful, correct?

2  A    The attorneys, they were attorneys representing members of

3  the TCC, but they were part of the TCC that we would see in

4  every mediation and every Court hearing.

5  Q    Well, they're not the TCC, they represented clients who

6  were on the TCC, true?

7  A    Just like you.

8  Q    I don't know if that's a yes, but I'll take it as a yes.

9       Do you know whether or not the clients that they

10 represented -- withdrawn.

11      Are the clients that they represented in the TCC of the

12 first bankruptcy, are those clients members of the Ad Hoc

13 Committee?

14 A    The clients aren't.  The Ad Hoc Committee is composed of

15 lawyers.

16 Q    Okay.  So you have the Ad Hoc Committee that's composed of

17 lawyers.  You have the Talc Claimants Committee that's composed

18 of talc claimants, correct.

19 A    But -- yes, but represented by lawyers.  The claimants

20 don't show up.  The lawyers do.

21 Q    Well, have you been to a TCC meeting?

22 A    You would know if I had.

23 Q    Have you seen the participation of our clients at the TCC

24 meetings?

25 A    I have only heard about it through, I can't remember who

Murdica - Cross/Maimon                    100

1  said something about it in Court here.  It might have been

2  Ms. Richenderfer.

3  Q    So you really don't know to what extent TCC members appear

4  or participate in the TCC meetings, do you?

5  A    Not the meetings only what I see here.

6  Q    Okay.  Do you know where the TCC members live?

7  A    I don't.

8  Q    Do you know whether or not they appear by Zoom and they're

9  on here watching right now?

10  A    I've heard that some of them are sometimes.

11  Q    Okay.  Thank you.

12      Mr. Onder (*sic*), you mentioned before that you haven't

13  seen, I think Mr. Winograd asked you, have you spoken to any

14  claimants, and you said it would be unethical.  And then he

15  said, "But you don't know whether or not any claimants

16  represented by any of these law firms actually will not oppose

17  the plan," right?

18      Do you recall that?

19  A    Yeah, I think you have a double negative in there.

20      Can you ask your question again?

21  Q    Sure.  You have not heard of any particular claimant's

22  either support or opposition to the plan, a particular person,

23  correct?

24  A    No.  I think that you or somebody else brought up one or

25  two claimants in Mr. Onder's deposition.

**WWW.JJCOURT.COM**

Murdica - Cross/Maimon                    101

1  Q    Right.  So this was marked as an exhibit in Mr. Onder's

2  deposition, and this was a voice mail from a gentleman by the

3  name of Terry Joe Coddington, who on May of 2023 stated as

4  follows.

5       "Hi, my name is Terry Joe Coddington.  My dad is Terry D.

6  Coddington.  We're with the LTL Management of Johnson and

7  Johnson talc claimants."

8       Do you see that?

9            MR. STARNER:  Just objection, Your Honor.  I think

10  there's been some references to hearsay.  And I think, is he

11  trying to use an out-of-court statement?  There's no, I have no

12  basis to know about the authenticity of this.  I don't know

13  where this is from.  There's no foundation.

14            MR. MAIMON:  This was marked as an exhibit in

15  Mr. Onder's deposition.  Mr. Onder will be here.  But

16  Mr. Murdica made an affirmative statement that he knows of

17  nobody who is opposed.

18            THE WITNESS:  That is not what I said.

19            MR. MAIMON:  I'd like to explore that.

20            THE COURT:  I think you could explore with Mr. Onder

21  who would know better.

22            MR. MAIMON:  Okay.

23  BY MR. MAIMON:

24  Q    If one of Mr. Onder's clients actually stated publicly

25  that he will not vote in favor of the plan and he wants

1  Mr. Onder to stop saying that all of his clients are likely to

2  vote for the plan, that would be the first and only claimant

3  that you know of who has expressed a particular view about the

4  plan, true?

5  A    I didn't hear the voice mail except when it was

6  accidentally playing at the beginning of the hearing, so yeah,

7  that would be one vote against, and I expect when we have the

8  vote, there will be some votes against.

9  Q    That would be the one and only particular specific

10  claimant who you've heard voice either support or opposition to

11  the plan, true?

12  A    It's possible.

13  Q    Okay.  We'll go through it.  Mr. Onder sent a letter to

14  his clients saying, "Most recently, J&J filed a plan in Court

15  that was significantly different than the terms our firm agreed

16  to support."

17      Were you aware that Mr. Onder sent this letter to his

18  clients?

19  A    I don't know that I was, but you'll see in the amended

20  plan a lot of changes and those are reflective of the things

21  Mr. Onder, in particular, wanted to improve the plan, and we

22  did.

23          MR. MAIMON:  Move to strike everything to after "I

24  was aware."

25          THE COURT:  Sustained.

1              MR. MAIMON:  Thank you.

2   BY MR. MAIMON:

3   Q    He then goes on to say, "While we are disappointed, we

4   remain in active discussions with both J&J and the two Court-

5   appointed mediators.  In a hearing held on Tuesday, May 16th,

6   Judge Kaplan, the Judge in charge of talc bankruptcy, urged the

7   parties to continue settlement discussions.  In his comments,

8   he placed significant pressure on J&J."

9         Do you see that?

10  A    You read that correctly.

11  Q    And has Mr. Onder expressed those sentiments to you?

12  A    I talked to Mr. Onder recently, and he's happy with the

13  plan that's on file now, and fully in support.

14  Q    We'll see when he comes.

15  A    Exactly.

16  Q    Has Mr. Onder ever expressed to you that his clients have

17  told him that they're in favor of the plan?

18  A    I would give you the same answer that I gave you on the

19  other law firms.

20  Q    And that's he's never told you that, correct?

21  A    Not that he's talked to every single one of them and every

22  single one of them is going to vote for the plan, that he's

23  going to recommend it to all of his clients.

24  Q    And has he told you that any client has told him that they

25  will support the plan?

Murdica - Cross/Maimon                104

1  A    I am sure that they have.  You can ask him this afternoon.

2  Q    No, I'm asking has he told you that?

3  A    I don't think so.

4  Q    Okay.  And so, when J&J said on April 4, 2023, that it had

5  secured commitments from over 60,000 current claimants to

6  support a global resolution on these terms, that also wouldn't

7  include Mr. Onder's clients, correct?

8  A    I disagree with you, Mr. Maimon.  There's a lot more

9  support than this now and I don't -- your interpretation of the

10 document is wrong.  I can explain if you want, or I can do it

11 on redirect.

12         MR. MAIMON:  So I'm going to move to strike the

13 portion that "there's more support for this now" consistent

14 with the Court's prior rulings.

15         THE COURT:  Sustained.

16         MR. MAIMON:  Thank you.

17 BY MR. MAIMON:

18 Q    Now, let's talk a little bit about the numbers here.  The

19 numbers here put the Fears Nachawati claims when the case was

20 filed at 4,956.  Do you see that?

21 A    I see it on the document.

22 Q    And for the Onder firm, 21,099.  Do you see that?

23 A    I see it.

24 Q    And for the Pulaski firm, 6,275, correct?

25 A    Right.

Murdica - Cross/Maimon                    105

1      I said, right.

2  Q    And then for the Watts firm, 16,924, right?

3  A    Yeah.

4  Q    Those are the four largest groups of cases among the

5  lawyers who signed and executed PSAs, correct?

6  A    I don't know that I can agree with you now, because this

7  is missing five PSAs, one of which was pretty significant that

8  came subsequent.

9  Q    At the time --

10  A    Oh, at the time?

11  Q    At the time, those were the four largest, right?

12  A    I agree with you.

13  Q    And I added them up and they add up to 49,254.  You trust

14  my math?

15  A    Sure.

16  Q    And I divided that by the total number of claims there,

17  and that would represent 88 percent of the total claims that

18  had been claimed by J&J as support, right?

19  A    Yeah, it makes sense to me.  Those are the four biggest

20  claim holders.

21  Q    Okay.  So now, let's talk a little bit about settlements.

22  You were involved before the filing of the bankruptcy --

23          THE COURT:  Mr. Maimon, let me just stop you for a

24  second.

25          MR. MAIMON:  Sure.

Murdica - Cross/Maimon                    106

1          THE COURT:  Do you have an estimate how much longer

2  we're at a stopping point?

3          MR. MAIMON:  Fifteen minutes, Your Honor.

4          THE COURT:  Kiya, how are you doing?

5          COURT CLERK:  I'm doing okay, Judge, thank you.

6          THE COURT:  Well, we're going to take a break after

7  Mr. Maimon's done.

8          MR. MAIMON:  Thank you, Your Honor.

9          THE COURT:  I just wanted to get a sense.

10  BY MR. MAIMON:

11  Q    Before the bankruptcy, you had been involved in pursuing

12  settlements on behalf of J&J in talc litigation, correct?

13  A    In some -- yes, I was.

14  Q    Okay.  That's not to say that you were the first person

15  who was involved on behalf of J&J in pursuing settlements of

16  talc litigation, correct?

17  A    I don't know.

18  Q    Well, you do know that cases had settled with J&J in talc

19  litigation before you got involved and were dealt with by other

20  lawyers around the country?

21  A    Maybe a handful.

22  Q    I don't know how many, but I know for instance, in 2017,

23  J&J settled talc cases.  Is that correct?

24  A    Sure.  I mean --

25  Q    2018?

1  A    Mr. Maimon, if there were cases -- I think there were a

2  few cases settled before I became involved.

3  Q    Okay.

4  A    But we're talking a handful.

5  Q    Okay.  They are what they are, right?

6  A    They are what they are.

7  Q    Okay.

8  A    It's less than 100, that's for sure.

9  Q    In any event, in 2020, you became involved, and one of the

10 things that we've heard about, that you negotiated master

11 settlement agreements with various plaintiff's attorneys, and

12 Mr. Ruckdeschel asked you about one of them.

13     Do you recall that?

14 A    Yes.

15 Q    Okay.  You also made reference to a proposal or

16 discussions that you had with Mr. Birchfield in the MDL.  Is

17 that right?

18 A    And others, yes.

19 Q    Okay.  And the proposal that you had referenced with

20 regard to the MDL, that was for ovarian cancer only.  Is that

21 correct?

22 A    That one, yes.

23 Q    Did not include mesothelioma claims, correct?

24 A    If you're talking about the $3 billion one, I don't think

25 it did.

Murdica - Cross/Maimon                    108

1  Q    The one that you called, 3.25 billion.

2  A    I don't think that did.

3  Q    And did not include cases by the Attorney Generals of the

4  states, correct?

5  A    Yeah, I believe there was only one at the time.

6  Q    But it didn't include it, correct?

7  A    It didn't include it.

8  Q    Okay.  And it required claimants to sign declarations and

9  affidavits concerning their use of the product and their

10 diagnosis.  Do you recall that as a term?

11 A    I think that was one of -- yeah, that was one of the

12 things we were contemplating.

13 Q    And one of the things that was required is that the women

14 who signed it or their state representative she had passed, was

15 saying not only that they had used the Johnson and Johnson

16 product for the requisite period of time, but that they had a

17 diagnosis of ovarian cancer.

18      Do you recall that?

19 A    Yeah.  And Mr. Birchfield drafted those terms.

20 Q    Okay.  And that settlement included as I think a $3.25

21 billion QSF, right?

22 A    I'm going from memory.  I testified about this earlier.

23 Q    Okay.  Also, there was $2 billion to be paid for future

24 claims, right, for the trust?

25 A    I already said, no.

1  Q    No?

2  A    You asked -- I was asked this earlier.

3  Q    Do you recall that there was an additional $250 million to

4  be set aside for administrative costs?

5  A    I don't recall that.

6  Q    Okay.

7       You yourself have been involved in -- withdrawn.

8       You yourself in the settlements that you've reached,

9  you've reached settlements of cases where the allegation was

10 exposure to J&J products only, correct?

11 A    Yeah, primarily.

12 Q    You've been involved in settling cases where the

13 allegations were of exposure to J&J products as well as other

14 talc products, correct?

15 A    There were probably some.

16 Q    You were involved in cases where there was alleged

17 exposure to J&J as well as other occupational or industrial

18 asbestos exposure, true?

19 A    I was asked this at my deposition.  I don't think so.  You

20 guys think so, maybe it snuck through.

21 Q    Well, have you read Dr. Mullin's report?

22 A    Not -- I don't think so.

23 Q    You negotiated a settlement of the cases of the Gori

24 Julian firm, correct?

25 A    Well, I did, but some -- well, many of them were dismissed

Murdica - Cross/Maimon                    110

1  for nothing.  So they weren't paid.

2  Q    That might be true, but you also paid on cases where there

3  was both J&J exposure as well as other occupational industrial

4  asbestos exposure, true?

5  A    Yeah, for Gori Julian, that's possible.

6  Q    Okay.  You remember that there was a case that went up on

7  appeal in California called the Anderson case?

8  A    Yes.

9  Q    Anderson was a case that there was approximately a $20

10 million verdict.  Do you recall that?

11 A    I think somebody brought this up at my deposition and they

12 told me that there was also a (indiscernible) exposure there.

13 I did settle that case after the trial, maybe on appeal, maybe

14 after the appeal.  I don't remember.

15 Q    Okay.  You've settled cases of ovarian cancer, correct?

16 A    Yes.

17 Q    You've settled cases of mesothelioma, correct?

18 A    Yes, correct.

19 Q    You've settled cases where the claim was lung cancer,

20 correct?

21 A    No.

22 Q    No?

23 A    No.

24 Q    Okay.  Well, we'll see if Mr. Mullin's data that he has

25 tells us differently.

Murdica - Cross/Maimon                    111

1  A    Well, I didn't -- Mr. Maimon, if a lung cancer case was

2  settled, it was a mistake on my part.  We did not settle lung

3  cancer cases and would not.

4  Q    Okay.  It's true is it not that Johnson and Johnson never

5  paid any settlement money on non-ovarian cancer gynecological

6  cases, true?

7  A    If you're asking me the same questions I was asked before,

8  unless it was inadvertent, we were paying non-borderline

9  epithelial ovarian cancer, or more strict than that in the few

10  ovarian settlements I did in the tort system.  Some of them, it

11  was not just epithelial.  It had to be a specific histologic

12  pathology called Sirius.

13  Q    And so the answer to my question was, yes.  Johnson and

14  Johnson never knowingly paid on a claim for a non-ovarian

15  gynecological cancer, true?

16  A    I believe that that's true, and I believe I gave that same

17  answer earlier this morning.

18  Q    Okay.  You did settle thousands of ovarian cancer cases in

19  the tort system, correct?

20  A    Primarily with Mark Lanier.

21  Q    And you paid millions of dollars in the tort system for

22  those settlements, correct?

23  A    To Mark Lanier, who's probably the greatest trial lawyer

24  that ever lived.

25  Q    You settled other ovarian cancer cases?

Murdica - Cross/Maimon                    112

1  A    Well --

2           MR. MAIMON:  I'm not moving to strike that.

3                      (Laughter)

4  BY MR. MAIMON:

5  Q    You settled other ovarian cancer cases with other firms,

6  true?

7  A    Few.

8  Q    Okay.  You settled mesothelioma claims, over 1,000,

9  correct?

10 A    Yes.

11 Q    And millions of dollars for those mesothelioma settlements

12 in the tort system, correct?

13 A    Not on average, but yes, overall.

14 Q    Total, yes?

15 A    Yes.

16 Q    And, in fact, the mesothelioma settlements reduced

17 significantly the number of pending cases from before you got

18 involved in doing that until the time of the filing of the

19 bankruptcy, correct?

20 A    Over time, yes.

21 Q    Okay.  You did master settlement agreements, you spoke

22 with Mr. Ruckdeschel about the Lanier one, and you entered into

23 those on behalf of Johnson and Johnson with other firms, as

24 well.  Is that correct?

25 A    I'm sorry, I lost you there.  You're talking about --

Murdica - Cross/Maimon                    113

1  Q    In the settlement --

2  A    -- non-mesothelioma?

3  Q    No, in the settlements that you did in the tort system --

4  A    Yes.

5  Q    Let's take the mesothelioma ones because you already dealt

6  with Mr. Lanier and the ovarian cancer.  You entered into

7  master settlement agreements on behalf of J&J with the firms

8  you settled with, right?

9  A    Yes.

10  Q    Okay.  And those master settlement agreements not only

11  dealt with settling their pending caseload of cases, but also

12  set a framework for dealing with future cases and with

13  provisions that J&J wouldn't be sued, but those cases would be

14  presented to J&J periodically for discussion and possible

15  settlement, fair?

16  A    Not with -- only -- there were some.

17  Q    Okay.

18  A    Not with everybody.

19  Q    The ones who you had those agreements with, those firms

20  honored those agreements, correct?

21  A    Not entirely.

22  Q    They sued you when they promised not to?

23  A    Some firms participated in litigation or their

24  claimants -- well, it's hard to say, Mr. Maimon, because those

25  didn't get the chance to play out.  But no, there were -- I was

Murdica - Cross/Maimon                114

1  encountering problems with them.

2  Q    Well, did any law firm who you entered into a future

3  agreement with breach it by way of filing a lawsuit against

4  J&J, contrary to the terms of their agreement?

5  A    They would have had there not been this bankruptcy, yes.

6          MR. MAIMON:  Move to strike as speculative.

7          THE WITNESS:  No, it's not speculative, it's the

8  truth.

9          THE COURT:  Overruled.

10                     (Laughter)

11         THE COURT:  It's his understanding of it.  Overruled.

12         MR. MAIMON:  Okay.

13 MR. MAIMON:

14 Q    If that's your understanding of it, sir.

15 A    It's a fact.

16 Q    Okay.

17         MR. MAIMON:  Move to strike as not -- Your Honor.

18         THE WITNESS:  You're just wrong.  I mean --

19         MR. MAIMON:  I think you got the point.  Very good.

20         THE COURT:  It's not going to rise or fall on this.

21         MR. MAIMON:  Yes.

22                     (Laughter)

23 BY MR. MAIMON:

24 Q    The PSA partners that J&J has their claims, part of the

25 process was putting gynecological cancer in the chart.

Murdica - Cross/Maimon                    115

1      Do you recall that?

2  A    I wouldn't say it the way you said it.

3  Q    Well, that was one of the choices when they filled out --

4  A    Correct.

5  Q    -- the chart, right?

6  A    Correct.

7  Q    Okay.  And there are cervical cancers included, correct?

8  A    Yeah, I went through this before Mr. Maimon.  It's --

9  Q    I've got a slight different question.

10 A    It's many.  It's not just cervical and uterine.

11 Q    I understand that.

12 A    Yeah.

13 Q    Cervical is included, correct?

14 A    All of the cancers that are filed in the MDL are included

15 within gynecological.

16 Q    Cervical cancer is one of the cancers that the lawyers who

17 represent, who are part of the AHC represent, true?

18 A    And every lawyer in this room that has non-mesothelioma

19 claims, correct.

20 Q    Well, you don't know that, do you?

21 A    Well, I do from MDL filings, yes.

22 Q    Well, you don't know that, for instance, for my firm, do

23 you?

24 A    But you don't have those.

25 Q    How do you know that?

1  A     Well, (indiscernible) --

2  Q     Do you know that my firm hasn't filed ovarian cancer cases

3  in Atlantic County, New Jersey?

4  A     Oh, the recent ones.

5  Q     No, not the recent ones.

6  A     Okay.

7  Q     You just don't know.  You're making it up as you go along,

8  aren't you, Mr. Murdica?

9             THE COURT:  Counsel.

10            MR. MAIMON:  Okay.  I'm sorry.  I apologize.

11            THE COURT:  Thank you.

12  BY MR. MAIMON:

13  Q     Were you aware that Mr. Onder testified under oath that

14  between his 21,000 claims, 9,000 he knows are uterine cancer,

15  9,000 he knows are ovarian cancer, and 3,000, he doesn't know

16  what type of cancer they are?  Are you aware of that?

17  A     Yeah, I saw that in his declaration.

18  Q     Okay.  So among the people who signed the PSAs, there's a

19  portion of them where the cancer, the type of cancer is unknown

20  as well, correct?

21  A     Yeah.  And I testified earlier that it's more than 45

22  percent of the MDL as well.

23  Q     Now, I was a little unclear and just if you could help me

24  clarify for that.  You said that a certain percentage of the

25  claims in the MDL had plaintiff fact sheets that were required.

Murdica - Cross/Maimon                          117

1  Is that right?

2  A    That's my recollection, pre-bankruptcy.

3  Q    Pre-bankruptcy.  And you think that was on the order of

4  12,000 PFAs, PFSs?

5  A    That's my recollection.  There was a separate -- there was

6  a more specific pool of 1,000 that I think the bellwethers were

7  selected from so they (indiscernible) --

8  Q    That's fine.  Let's take your 12,000.  So you don't know

9  anything about the other 28,000 if we use the 40,000 number,

10  correct?

11  A    I personally do not.

12  Q    Okay.  Among those 12,000, you said the vast majority did

13  not disclose the type of cancer, correct?

14  A    My recollection is not that they didn't disclose the type,

15  they didn't disclose the histologic subtype either because they

16  didn't know, didn't have records, or it didn't exist.

17  Q    Fair enough.

18  A    Some of them, it doesn't exist.

19  Q    Fair enough.  Fair enough.

20       I just wanted to make sure I had heard.

21  A    Yeah.

22  Q    That's right.

23       In addition to the types of cancers, one of the issues

24  that you dealt with in the term sheet and in the plan is

25  applicable statute of limitations that might impact the

Murdica - Cross/Maimon                       118

1  compensability of any claim, correct?

2  A    Right.

3  Q    Okay.  Now, it's true is it not that in the plan, as

4  filed, your firm, Barnes and Thornburg is designated as the

5  payor's agent for a claims audit program?

6  A    Yeah, I think there's a lot more auditing than this, but

7  this is our, this is the debtor and J&J'S audit, right.

8  Q    And the payor is the debtor, right?  Or is the payor J&J?

9  A    I'd have to look at plan definitions.

10 Q    And have you negotiated the amount of payment --

11          MR. STARNER:  Sorry.

12          THE COURT:  Mr. Starner.

13          MR. STARNER:  Sorry, not to interrupt.  Can I just

14 confirm?  Is this the amended --

15          MR. MAIMON:  Original plan.

16          MR. STARNER:  -- plan?

17          MR. MAIMON:  Original plan.

18          MR. STARNER:  Just for the record.  Thank you.

19          MR. MAIMON:  I didn't want to get all the blue lines,

20 but it's still there in the amended.

21 BY MR. MAIMON:

22 Q    Have you negotiated the amount of money you'll be paid,

23 your firm will be paid as the payor's agent for the claims

24 audit program?

25 A    No, because I think it's optional anyway.  It's not a

1  mandatory program, it's an option.

2  Q    Well, it says any claims audit program pursuant to this

3  section shall be implemented by Barnes and Thornburg --

4  A    But it says --

5  Q    -- (indiscernible), right?

6  A    -- up to 10 percent, Mr. Maimon.

7  Q    But that's --

8  A    In other words, it could be zero.

9  Q    Well, that's -- the plan speaks for itself.

10           MR. MAIMON:  Thank you, Your Honor.

11           I appreciate your time, Mr. Murdica.

12           THE WITNESS:  Thank you, Mr. Maimon.

13           THE COURT:  Thank you.  We're going to take a 10-

14  minute break.

15           During the break, maybe counsel can start thinking

16  about where we stand as far as witnesses and timing in order to

17  be done by Friday.  And, specifically, I know we're

18  contemplating putting several attorneys on the stand.  How many

19  do we need before we're duplicating the same testimony and the

20  same points?

21           All right.  Thank you.

22        (Recess at 11:28 a.m./Reconvened at 11:41 a.m.)

23           THE COURT:  Waiting for Mr. Malone?

24           UNIDENTIFIED SPEAKER:  We are.

25           MR. RUCKDESCHEL:  Yeah.  Your Honor, I have a limited

120

1  amount of follow up from Mr. Maimon's questions.  I could do it

2  after the counsel goes, or I could go before.  It's probably

3  three minutes of questions.

4          THE COURT:  Mr. Starner?

5          MR. STARNER:  I think I'd probably have to object.  I

6  mean, we have to have some order here.  So I don't think it's

7  proper for counsel to ask questions and then follow-up on other

8  counsel's questions.  I don't think that'd be appropriate.

9          MR. RUCKDESCHEL:  I think it'll move things along,

10 Your Honor, and it's relevant (indiscernible) --

11         THE COURT:  Although then he's going to talk to

12 Mr. Maimon, who's going to come back, and we're going to

13 come -- do it anyway.

14         MR. STARNER:  Does he agree not to further ask any

15 questions after this?

16         THE COURT:  Well, we're going to put a limit on it.

17 We'll do -- and can you just -- Mr. Maimon, can you please --

18 Maimon, Myman or Meeman?  Which -- how are we doing this?

19         MR. MAIMON:  I told you on Zoom, Judge, anything but

20 late for dinner.  But it's Maimon.

21         THE COURT:  Maimon.  All right.

22         MR. MAIMON:  Yes.

23         THE COURT:  Thank you.

24         MR. MAIMON:  No problem.

25         MR. RUCKDESCHEL:  You've been saying it right, Judge.

Murdica - Cross/Malone                    121

1                THE COURT:  Okay.

2                MR. RUCKDESCHEL:  And I have a Post-It on my computer

3    now to remind me, and I've known Moshe for 20 years.

4                THE COURT:  Okay.  Well, why don't you -- let's start

5    with Mr. Malone, and then we'll have back --

6                MR. MALONE:  Judge, I have less than five minutes.

7                THE COURT:  Thank you.

8                MR. MALONE:  So I will keep this brief, and we'll

9    keep this moving along.  For the record, Robert Malone,

10   Gibbons, attorney for the States of New Mexico and Mississippi.

11                          CROSS-EXAMINATION

12   BY MR. MALONE:

13   Q    Good morning, Mr. Murdica.

14   A    Good morning, Mr. Malone.

15   Q    You and I have never spoken before today, have we?

16   A    I don't think I knew that you were involved in the case.

17   Q    Never sent you an email on this case --

18   A    No.

19   Q    -- or anything else, right?  Okay.  And you've been

20   involved in both LTL 1 and LTL 2?

21   A    Correct.

22   Q    And you were aware back in August there was a preliminary

23   injunction brought against the States of New Mexico and

24   Mississippi?

25   A    Yes.

Murdica - Cross/Malone                    122

1  Q    Okay.  And you knew I was counsel of record at that time,

2  correct?

3  A    I apologize to say I did not.

4  Q    Okay.  Your charge in this case has been to try to

5  negotiate settlements with both the talc claimants and the

6  states.  Is that correct?

7  A    Yes.

8  Q    Okay.  And who from LTL has been involved with those

9  negotiations with you?

10  A    Dan Prieto from Jones Day, primarily.

11  Q    So he's been involved in every meeting that you've had

12  with each of these parties?

13  A    I talk to Dan a lot.

14  Q    Or you pretty much do it on your own?

15  A    No.  I stay in touch with Dan and John Kim through Dan

16  regularly.

17  Q    But when you have conversations, let's say, with

18  Mr. Nachawati, those are primarily between you and

19  Mr. Nachawati?

20  A    Majed Nachawati.

21  Q    Yes.

22  A    Both.  Now that Majed is part of the ad hoc group,

23  sometimes they talk with Dan without me.

24  Q    Okay.  So you negotiated with him with respect to the talc

25  claimants, correct?

Murdica - Cross/Malone                     123

1  A    Are you referring to Mr. Nachawati?

2  Q    Yes.  That's who I'm going to refer to.

3  A    Oh, yes.

4  Q    And did you at any time speak to him about the claims by

5  the State of New Mexico?

6  A    I did.

7  Q    And what were the context of those negotiations?  When did

8  you speak to him?

9  A    So it wasn't just him.  It was also Ms. Parfitt --

10  Q    Okay.

11  A    -- from the Ashcraft Firm.

12  Q    Okay.

13  A    They were co-counsel for the State of New Mexico.  And I

14  also spoke to -- I called them the Brians, the -- Brian McMath

15  and Brian -- I'm blanking on his name -- who work in the

16  attorney general's office for the State of New Mexico.  I had

17  negotiations directly with the AG's office.

18  Q    But you never spoke to me at any time as counsel for --

19  counsel of record in this case?

20  A    No.

21  Q    Okay.  With respect to the $400 million allocation for the

22  government claims -- I'll call them government claims, state

23  claims -- do you know who came up with that allocation?

24  A    It was negotiated.

25  Q    Negotiated with whom?

1  A    It was negotiated among the plan supporters with input

2  from myself based on my negotiations with Mississippi and New

3  Mexico, primarily.

4  Q    And you had agreement from New Mexico and Mississippi and

5  other states as to $400 million?

6  A    No, not agreement.  I could tell you where that came from

7  if you want.

8  Q    I would like you to enlighten us.

9  A    Sure.  As to Mississippi, I went to Jackson, Mississippi.

10 I went to the attorney general's office.  I met with their

11 staff.  I had settlement negotiations there and with outside

12 counsel.  I stayed in touch with them, you know, as part of

13 negotiations.  I had negotiations directly with the State of

14 New Mexico and also with outside counsel.  So I had a good idea

15 of what people were demanding.

16      Once there was an ad hoc committee of the other states, I

17 had settlement negotiations and discussions with their

18 representative.  I had discussions with a representative for

19 the State of Louisiana who's not part of that group.

20      I've settled in the last six months AG cases brought by

21 the State of New Mexico and the State of Mississippi in other

22 litigation, so I know what they settled for.  I know how their

23 talc claims, which are essentially duplicative of the

24 underlying tort claims, compare to those.  So I have a pretty

25 good idea of what those claims are worth in the aggregate.

Murdica - Cross/Malone                    125

1        And I think that $400 million is a fair negotiated

2    resolution for those.  We don't have agreement on that at this

3    point.  But those were the data points that -- those were the

4    inputs that were used to get to that number by myself.  The ad

5    hoc also --

6    Q    So there's no agreement as to the $400 million number, is

7    there?

8    A    Not to date.

9    Q    Okay.  And when was the last time you had these

10   discussions with the states?

11   A    I don't know what I'm supposed to reveal.  There are

12   ongoing negotiations directly with your clients right now.

13   Q    But you haven't involved me at all, have you?

14   A    I did not know to.  Nobody -- they didn't suggest that you

15   should be involved.

16   Q    Have you seen the objections that have been filed in this

17   case in the motion to dismiss?

18   A    By you?  I have not.

19   Q    Well, you said you read regularly the docket in this case.

20   A    I try to keep up.  I don't know if you read them all.  But

21   just in the past two weeks, there's probably been 1,000

22   filings.

23            MR. MALONE:  All right.  No further questions.

24            THE COURT:  Thank you.

25            Good morning again.

1          MR. RUCKDESCHEL:  Thank you, Your Honor.  Jonathan

2    Ruckdeschel again.

3                        CROSS-EXAMINATION

4    BY MR. RUCKDESCHEL:

5    Q    Mr. Murdica, I -- for the Court's understanding of things,

6    I just wanted to spend two seconds with you about epithelial

7    ovarian cancer.

8    A    Yes, sir.

9    Q    So when you settled ovarian cancer cases with The Lanier

10   Firm, any epithelial ovarian cancer could qualify if they met

11   the other criteria, correct?

12   A    As long as it wasn't a borderline.

13   Q    Right.  As long as it was a definitive diagnosis?

14   A    Right.

15   Q    All right.  A subset of that large group of epithelial

16   ovarian cancer would be the settlements that you had with like

17   the Cheek Law Firm or the Gori Firm with respect to ovarian

18   cancers where they would be only be able to settle serous

19   ovarian cancers, serous fallopian tube cancers, or serous

20   primary perineal cancers, correct?

21   A    You have that right.

22   Q    All right.  And so just for the Court's understanding,

23   those settlements involved -- all those claims would get paid

24   under the Lanier deal, but there were claims under the Lanier

25   deal that would not get paid under the Gori deal?

Murdica - Cross/Ruckdeschel                127

1  A    That's correct.

2  Q    Great.  Okay.  Thank you.  The current plan contains a

3  criteria that for mesothelioma claimants only if there is any

4  non-talc exposure, they don't qualify, correct?

5  A    Yeah.  I'm not sure exactly.  It's a heavy discount if

6  not.  The claims that would be compensated by the plan

7  primarily are those that are historically idiopathic mesos, the

8  ones that have no known cause or known exposure to asbestos.

9  Q    Just if this refreshes your recollection, Section 4.3.5

10 submission requirements requires an affidavit of lack of

11 asbestos exposure where the claimant attests that they don't

12 have any other non-talc exposure and will not so allege in the

13 future.  You're familiar with that --

14 A    Yeah.  Those were the affidavits for the tort settlements

15 that Mr. Maimon was asking me about.  That's what the claimants

16 signed in order to settle in the tort system.

17 Q    Okay.  And there's -- the criteria qualification criteria

18 have the same language.  There has to be no non-talc exposure

19 under the plan --

20 A    Yeah.

21 Q    -- for mesos?

22 A    That's to prevent trust fraud, so they don't a settlement

23 here and then allege that they were exposed to -- you know,

24 that they were a Navy boilermaker worker or something like

25 that.

Murdica - Cross/Ruckdeschel                    128

1  Q    Right.  But it does have that requirement?  If there's a

2  non-talc exposure, they don't qualify under the plan?

3  A    I'll take your word for it.  That sounds right.  I mean --

4  Q    It says what it says?

5  A    Yeah.

6  Q    All right.  And with respect to the master settlement

7  agreements that you had, for example, with the Gori Firm, there

8  was a large group of mesothelioma claimants that settled in

9  July 29th of 2020 with the Gori Firm, yes?

10 A    So that -- Mr. Maimon refreshed my recollection on that.

11 Outside of the Gori settlement, to the best I can recall,

12 anyone who was settling had to sign those affidavits that said

13 they had no other exposure.

14 Q    We can look at the -- I'm trying to do this quickly,

15 because I told the Judge we would.

16 A    Right.

17 Q    The master settlement agreements that you entered into

18 with various law firms for mesothelioma claims contain the

19 qualification criteria set forth in those agreements, correct?

20 A    Right.

21 Q    And each of those agreements contains an entire agreement

22 clause like the one we went over in the Lanier settlement?

23 A    I'm sure it does.

24 Q    All right.  And so the qualification criteria in those

25 plans, if it doesn't contain a requirement that there's no

Murdica - Cross/Ruckdeschel                    129

1  non-talc exposure to qualify, there was no such requirement,

2  because it has the entire agreement clause, right?

3  A    I believe they have that, but --

4  Q    Okay.  But if it's not there, that wasn't a requirement --

5  A    If you --

6  Q    -- contractually?

7  A    If you have one you want to ask me about, ask me about it.

8  Q    Okay.  The Gori Firm on September 23 -- well, let me back

9  up.  The 2020 settlement with the Gori Firm contained a

10  provision that for the next three years the Gori Firm could

11  present 12 mesothelioma claims for payment each of the years,

12  correct?

13  A    I don't know.

14  Q    Okay.

15  A    Do you have it?  Do you have --

16  Q    We have it in the record.

17  A    Okay.

18  Q    And we can agree, Mr. Murdica, that the settlement

19  agreements say what they say?

20  A    Right.

21  Q    All right.  Fair enough.  With respect to the bankruptcy

22  system, would you agree that from Johnson & Johnson's

23  perspective, a primary advantage of the bankruptcy system and

24  524(g) style relief is that a resolution can bind all future

25  claimants to the terms before they have a chance to decide for

Murdica - Cross/Ruckdeschel                    130

1  themselves as an individual it they would prefer to litigate in

2  the tort system?  In other words, there are no opt-outs for

3  futures?

4  A     You can't accomplish a resolution of a latent tort with an

5  unidentified future class of claimants in the tort system today

6  under existing law.  It can only be accomplished in bankruptcy.

7  Q     And that's one of the -- that's the -- a prime advantage

8  of being here as opposed to in the tort system?

9  A     It's the only way to completely settle talc in our current

10  system until Congress amends 1407.

11  Q     And you would agree that that type of settlement removes

12  from a person who gets diagnosed three or five years from now

13  the ability to vote on whether that's what they want and the

14  ability to choose the tort system over a settlement?

15  A     No.  I disagree, because one of the things about the

16  bankruptcy system is it allows for the appointment of a

17  fiduciary, which is Randi Ellis in this case, to guard the

18  rights of those claimants.

19  Q     Does the futures claimant have the right to vote on a

20  plan?

21  A     Yes.

22  Q     Okay.

23  A     Via the FCR.  That's how it works.

24  Q     It's your belief that the FCR will vote on whether the

25  plan can be approved?

Murdica - Cross/Thompson                    131

1   A    The FCR will vote either in favor or against the plan.

2              MR. RUCKDESCHEL:  Okay.  No further questions.

3              THE COURT:  I saw you, Mr. Thompson.  You looked

4   anxious.

5              MR. THOMPSON:  Sorry.  I'll be quick.

6              THE COURT:  That's all right.

7                        CROSS-EXAMINATION

8   BY MR. THOMPSON:

9   Q    Mr. Murdica?

10  A    Yes, sir.

11  Q    A person that gets sick three years from now, we don't

12  know who that is, right?  We have no idea who that's going to

13  be --

14  A    I mean --

15  Q    -- with mesothelioma, correct?

16  A    Today?  No, we don't.

17  Q    Yeah.  That's right.  That person's not identifiable to

18  anybody in this room, is she?

19  A    That's part of the -- right.

20  Q    Right?

21  A    Right.

22  Q    And that person, if that person gets to -- the benefit to

23  J&J of this entire bankruptcy is that it can capture that

24  person's case without that person's consent, correct?

25  A    I think it's a benefit to the claimant, Mr. Thompson.

1  Q    A decision made by J&J and claimants today that binds

2  someone that isn't sick yet, correct?

3  A    And a fiduciary appointed by the Court to represent that

4  person.  Correct.

5  Q    Okay.  The person that gets sick in three years has no

6  vote in this plan.  Is that correct?

7  A    So I disagree with you for the same reason --

8  Q    Okay.

9  A    -- I just answered those questions.

10         MR. THOMPSON:  I understand.  Thank you.

11         THE COURT:  Thank you, Mr. Thompson.

12         Mr. Starner?

13         MR. STARNER:  Anybody else?

14         THE COURT:  I think not.

15         MR. STARNER:  Okay.

16         THE COURT:  Let's not push it.

17         UNIDENTIFIED SPEAKER:  We heard Your Honor.

18                    REDIRECT EXAMINATION

19  BY Mr. STARNER:

20  Q    Mr. Murdica, I'll try to be surgical.

21  A    Okay.

22  Q    There are a lot of issues that were raised that I wanted

23  to cover with you.

24  A    Sure.

25  Q    Let me start first with you had a lot of questions about

1  settlement discussions you had with Mr. Birchfield in 2020.  Do

2  you recall those questions?

3  A    I do.

4  Q    Okay.  And you got a lot of questions about the terms of

5  the proposed settlement that he had proposed at that point in

6  time, right?

7  A    Yes.

8  Q    Okay.  I thought maybe we could take a look at that

9  settlement and maybe clear up a few of the issues that were

10  raised with you.

11         MR. STARNER:  So if we could, I'd like to bring up

12  Exhibit 504.  This is Debtor's Exhibit 504.  There we go.

13  Thank you.  If we go to the next page --

14  BY MR. STARNER:

15  Q    Well, first off, if you take a look at this page, you'll

16  see it's an email from a Mr. Birchfield to you dated September

17  5, 2020?

18  A    Right.

19  Q    Do you recognize this correspondence?

20  A    I do.

21  Q    What does this look like?

22  A    This was Andy Birchfield sending me a settlement proposal.

23  Q    Okay.  And who prepared this?

24  A    I believe Mr. Birchfield and his bankruptcy counsel.

25  Q    Okay.  Let's take a look at a few of the provisions I

Murdica - Redirect/Starner                    134

1 think that maybe some of the cross-examination hit on.  First

2 off, let me just ask you, what did this proposal encompass in

3 terms of what claims were covered?

4 A    I believe it was all present and future non-mesothelioma

5 claims.

6 Q    Okay.  And you got some questions, I think, about -- as to

7 what forum the settlement was proposed to be implemented in.

8 What is your understanding as to how this settlement would be

9 implemented in terms of what forum?

10 A    Well, it was essentially an Imerys bankruptcy proposal.

11 There was a -- the -- Mr. Birchfield and, I guess, the other

12 claimants wanted the money outside of a bankruptcy trust so

13 they could have control of it, so they wanted it in a QSF.  But

14 it was essentially a bankruptcy proposal.

15 Q    Let's take a look at page 4 of the attachment to the

16 email, which is D-505.4.  And if you take a look at the

17 definitions, it says -- there's reference to plan.  That's

18 definition BB.  Do you see that?

19 A    Yes.

20 Q    And do you see a reference there to the Imerys bankruptcy?

21 A    Right.

22 Q    Is that consistent with your understanding of what the --

23 was being proposed here in terms of what forum the settlement

24 would be implemented in?

25 A    Yep.  That was my recollection.

Murdica - Redirect/Starner                135

1  Q    And there was a reference there at the end there to a

2  channeling injunction.  What is that?

3  A    The proposal here was to bind all of the -- I believe all

4  the non-mesothelioma claimants in bankruptcy to a settlement

5  in -- with a trust or a QSF trust through 524(g) which is a

6  statute that allows a channeling injunction for claims

7  involving asbestos.

8  Q    And is a channeling injunction like that available outside

9  of bankruptcy?

10  A    It is not.

11  Q    Okay.  And just to be clear, when we're talking about

12  Mr. Birchfield, is he representing any of the members of the

13  TCC?

14  A    Yes.

15  Q    Okay.  Was he also involved with the former TCC in LTL

16  1.0?

17  A    Mr. Birchfield or another representative of his firm -- I

18  can't remember -- represents clients that are part of the

19  Imerys TCC, LTL 1 TCC, LTL 2 TCC, and his partner is also

20  co-lead of the talc MDL.

21  Q    If we could take a look now -- if we can jump forward a

22  little bit.  Let's take a look at page 8 of this exhibit, if we

23  could.  And if you look at the section called "Confidentiality

24  and Nonsolicitation of Talc Claims," do you see that?

25  A    Yes.

Murdica - Redirect/Starner                    136

1  Q    Just generally, what's this referring to, this section

2  called confidentiality?

3  A    Just like when he had an NDA with the PSAs here,

4  Mr. Birchfield and his group wanted to make sure that nobody

5  knew about this.

6  Q    Okay.  So you got a lot of questions about the NDAs

7  (indiscernible) connection with the PSAs.  I think there was a

8  suggestion that somehow that was improper or that gave

9  non-public information to the counterparties you were

10  negotiating with.  Is a provision like this typical or standard

11  in your experience?

12  A    It's very standard in settlement negotiations and

13  settlement agreements.  This is -- Mr. Birchfield was making

14  sure the same rule applied here that applied via the NDA in our

15  negotiations.

16  Q    Right.  Because these are provisions that he was proposing

17  to you, correct?

18  A    This was his document and his bankruptcy counsel, yes.

19  Q    Let's go to the next page on -- this is page 9, and this

20  is section B: "Nonsolicitation of Talc Claims."  Do you see

21  this?

22  A    Yes.

23  Q    What is this referring to?

24  A    This is similar to what Mr. Ruckdeschel walked me through

25  with the Lanier settlement.  This was the same, you know,

Murdica - Redirect/Starner                          137

1  within the ethical limits.  Mr. Birchfield and his group

2  weren't going to represent any future talc clients.

3  Q    Okay.  And just in terms of -- I think you testified about

4  this previously, but just so we're clear, what was the proposed

5  amount that would be paid as part of this proposed settlement?

6  A    My recollection was 3.25 billion for all the claims.

7  Q    Okay.  And how does that amount compare to the amount

8  that's been proposed in this bankruptcy?

9  A    It's a little less than a third.

10 Q    Okay.  And let's take a look at page 10 of this, if we

11 could.  And let me ask you, in connection with this proposal,

12 what was your understanding as to what Mr. Birchfield was

13 proposing in terms of how talc claimants or their law firms

14 would indicate support for this proposed proposal -- or

15 proposed settlement?

16 A    If you look at, let's see, 42, he was just going to

17 provide a Excel spreadsheet with the name of the firm and how

18 many claimants they have.

19 Q    Okay.  Was there any requirement for those law firms to

20 provide any additional medical records?

21 A    No, not at this point.  You know, if the claims turned out

22 to not be verifiable, they wouldn't get paid.  It's exactly the

23 same as the proposal here and what we did here with identifying

24 claimants.

25 Q    Right.  And was there any requirement that claimants would

Murdica - Redirect/Starner                    138

1   need to indicate their commitment in writing or otherwise with

2   respect to the settlement at this point in time?

3   A    No.  As you can see here, it's just the commitment of the

4   lawyers representing them, because the way settlements work is

5   when the lawyers recommend to their clients to accept the

6   resolution, it almost always happens.

7   Q    Okay.  So in terms of what kind of commitments were

8   expected from the law firms that were supporting this proposal,

9   to what extent were those the same as that you used and relied

10  upon in connection with negotiating the PSAs?

11  A    It's the same except here now we have the court's order as

12  well, which we've talked about earlier, that had requirements

13  on the counsel recommending it to their clients that they tell

14  them they're representing them here in bankruptcy.

15  Q    Okay.  Let me just jump to that while we're on that topic.

16  You were asked a lot of questions about Mr. Pulaski, Mr. Onder,

17  Mr. Nachawati regarding their support for the proposed plan.

18  Do you recall those questions?

19  A    I do.

20  Q    Okay.  And there was -- we had a lot of deposition

21  testimony that was read to us.  First of all, let me ask you,

22  those depositions, were they taken before the plan was amended?

23  A    They were.

24  Q    Okay.  And can you just explain to the Court, what's your

25  understanding of the process by which the plan was amended?

Murdica - Redirect/Starner                    139

1   A    Well, since the time that the support was announced,

2   there's been ongoing negotiations to improve the plan.  There

3   were things that the lawyers wanted on behalf of their

4   claimants, the ad hoc lawyers, and we've had regular calls,

5   regular negotiations, regular amendments.  And what's filed now

6   represents all of the improvements that the ad hoc primarily,

7   you know, wanted for the plan.

8   Q    And just to be clear, as part of -- when you say ad hoc,

9   who are you referring to?

10  A    I'm referring to the lawyers on the ad hoc committee of

11  supporting counsel.

12  Q    And does that include Mr. Pulaski?

13  A    It includes all of them.  And they are all -- despite any

14  doubts raised by deposition testimony from two months ago, they

15  are all firmly in support of the plan and will all recommend it

16  to their clients.

17  Q    And let me just --

18          MR. MOSHE:  Objection, Your Honor.  Move to strike.

19  He's not competent to say what they'll do.

20          THE COURT:  Overruled.

21          MR. STARNER:  I don't think that's appropriate at

22  all.  He was asked questions about what he --

23          THE COURT:  I overruled it.

24          MR. STARNER:  Thank you, Your Honor.

25          THE COURT:  Thank you.

Murdica - Redirect/Starner                          140

1  BY MR. STARNER:

2  Q    Let me just unpack that a little bit, Mr. Murdica, because

3  you were asked a lot of questions about what Mr. Onder would or

4  wouldn't do, what Mr. Nachawati would or wouldn't do.  And I

5  just want to make sure I understand.  At this point in time,

6  sitting here today with the amended plan, what is your

7  understanding regarding their support for the currently

8  proposed amended plan?

9  A    Based on my conversations with them, they're all

10 completely in support of the plan as it stands now.

11 Q    Okay.  And what does that mean to you in terms of how does

12 that relate to your expectation that their claimants that they

13 will represent will vote in favor of the plan?

14 A    Based on my experience dealing with -- I've dealt with

15 each of them in the past --

16            MR. MAIMON:  Same objection, Your Honor.

17            THE COURT:  Overruled.  Thank you.

18            THE WITNESS:  I've dealt with each of them in the

19 past on other settlements and some of them multiple times.  And

20 when they tell me that they're going to recommend a settlement,

21 in the past every time all of their claimants have, I guess you

22 could say, supported, have gone through the settlement and

23 released the claims.  I have all the confidence in the world

24 based on my experience doing this that that's going to happen

25 here.

1  Q    Is that any different than what your expectations were in

2  connection with negotiating, you know, with any other plaintiff

3  law firms that now are opposing the plan?

4  A    I --

5            MR. MAIMON:  Objection.  Vague.

6            THE COURT:  Sustained.

7            MR. STARNER:  Okay.  I'll move on.

8  BY MR. STARNER:

9  Q    So let me just ask you, in terms of the amended plan, what

10 do you consider to be some of the more material changes or

11 additions to the plan that have been made?

12 A    Well, one of the biggest hurdles to the plan in the past

13 and that was raised by a number of the counsel in this room was

14 the lien claims and --

15           MR. MAIMON:  Objection, Your Honor.

16           THE WITNESS:  -- how great they would be.

17           MR. MAIMON:  Your Honor struck this.

18           THE COURT:  Sustained.

19           MR. STARNER:  Your Honor, I mean, I think this is a

20 fact witness, and I'm asking him what recently -- and they put

21 at issue the support for the plan.

22           MR. MAIMON:  We had a ruling yesterday, Your Honor.

23           MR. STARNER:  If I may, Your Honor?

24           THE COURT:  Apart from --

25           MR. STARNER:  Yeah.  Sorry.  Please.

1          THE COURT:  You can testify apart from anything with

2    respect to the lien claims.  First of all, the focus here is on

3    dismissal and good faith as of the date of the petition.  So

4    subsequent negotiations in the plan might have some relevance

5    on some of the issues but minimal.  So let's focus on other

6    aspects.

7          MR. STARNER:  Very good, Your Honor.

8    BY MR. STARNER:

9    Q    Okay.  So I'll just -- maybe I'll just briefly then hit on

10   one or two things really just -- you were asked some questions

11   about the plan, so I thought I would probably at least visit

12   some of them that I think were a little bit off-kilter.

13         MR. STARNER:  Can we pull up -- I think it's

14   Defendant's Exhibit 562, which is the amended plan.  That was

15   part of your -- the binder you had with Mr. Winograd's

16   examination.  I think it's tab 6, I believe.

17         UNIDENTIFIED SPEAKER: I think it was 6.

18         MR. STARNER:  Yeah.  Thank you.

19         MR. GORDON:  Your Honor?

20         THE COURT:  Yeah.

21         MR. GORDON:  Greg Gordon.  I just want to note for

22   the record -- obviously, I heard what Your Honor said about the

23   lien settlement.  We actually do view this as highly relevant,

24   both the 1112(b)(2) argument and to the fact that the other

25   side's put at issue our ability to confirm a plan in a

1  reasonable time frame generally, and the fact that that

2  settlement has now been reached in a process that just doesn't

3  come to a halt because we had dismissal proceedings, to us, we

4  think is not appropriate.  So obviously I heard Your Honor.

5  But I just wanted to note that -- you know, our objection to

6  that.  We think it's highly relevant.

7         THE COURT:  Understood.  And I have indicated that it

8  has some relevance on some aspects of what's at issue here.

9  But the plan has been amended.  It's on the docket.

10         MR. GORDON:  Right.

11         THE COURT:  We're not going to determine

12  confirmability today or whether it's -- will be confirmed.  But

13  I understand the 1112(b)(2) issues --

14         MR. GORDON:  Right.

15         THE COURT:  -- that have been raised.

16         MR. GORDON:  But they've also, Your Honor, asked an

17  extraordinary number of questions about the plan today, both

18  the prior form and the amended version.  And it just comes down

19  to we have to make our case that, in fact, we have a high

20  likelihood that we can confirm a plan in a reasonable time

21  frame.

22         And the other thing about the lien claim is it has --

23  it's a development that can be done only in bankruptcy.  It has

24  high significance in a bankruptcy case and a tremendous benefit

25  to claimants.  And by making this ruling, you're not going to

1  hear the evidence on that point either.

2        MR. MAIMON:  Your Honor, this is the third time

3  they've come back for reconsideration, number one.  Number two,

4  I'm flattered that Mr. Gordon thought that our cross was

5  extraordinary.

6        However, in all events, Mr. Murdica is not qualified

7  to speak about liens.  He could talk about what he did

8  theoretically, but we made a motion about that.  Your Honor

9  granted the motion, struck it from the declaration.

10       THE COURT:  From the declaration.

11       MR. MAIMON:  We should move on.  We shouldn't be

12  wasting time rearguing that.

13       MR. STARNER:  If I may, Your Honor?  I think one of

14  the objections to the declaration was that he was making

15  certain -- providing certain commentary about the significance

16  of the settlement.  I mean, I think certainly at the very least

17  this is a fact witness.  This is the primary fact witness who

18  knows about the negotiations of the lien, the lien settlement

19  with, you know, the relevant insurers.

20       So to the extent that -- you know, to echo

21  Mr. Gordon's point, this is the witness that we would put that

22  on through.  And I do think it is fair game.  They've opened

23  the door, if nothing else, because they've focused so much on

24  the plan.  What does it provide?  Who supports it?  Who doesn't

25  support it?  This is certainly a relevant piece.

1          And, indeed, I believe that the members of the AHC

2    will confirm that this is, again, a material improvement to the

3    plan.

4          MR. MAIMON:  Your Honor, we filed a motion to

5    preclude any testimony or evidence or consideration of this

6    issue.  Your Honor ruled on it.  We've abided by the ruling.

7    The debtor obviously doesn't feel that -- because they don't

8    like it they can reargue all the time.  It's --

9          MR. STARNER:  Well --

10          MR. MAIMON:  It was sprung on us at the last minute.

11    We haven't had a chance to take any discovery.  All we have is

12    a one-and-a-half page description.  We would be entitled to

13    take all sorts of discovery on it.  It shouldn't be considered.

14          THE COURT:  Let's move forward.  I've ruled with

15    respect to evidence and testimony on the lien claim.  Does it

16    stop argument based on the value of its role in the bankruptcy?

17    No.  That you can brief in post-confirmation -- I mean,

18    post-trial submissions.

19          MR. GORDON:  Thank you.

20          MR. MAIMON:  Thank you, Your Honor.

21          MR. STARNER:  Very good, Your Honor.

22    BY MR. STARNER:

23    Q    Well, with respect to the provisions of the plan that you

24    were asked about -- and let's take a look at some of those.

25          MR. WINOGRAD:  Your Honor?

1          THE COURT:  Yes?

2          MR. WINOGRAD:  I would object on speculation grounds.

3  I believe that the witness testified he was traveling with his

4  kids and hadn't even reviewed the latest plan.

5          MR. STARNER:  You hadn't -- first off, I haven't

6  asked a question yet, number one.

7          MR. WINOGRAD:  So all we're going to -- can I just

8  finish, Greg?

9          All we're going to get now, if he doesn't have a

10 recollection as he testified earlier, is just reading a

11 document and asking a fact witness to interpret a -- what --

12 words on the page.

13         THE COURT:  Overruled.

14         MR. STARNER:  Thank you, Your Honor.

15         THE COURT:  Continue.  Thank you.

16 BY MR. STARNER:

17 Q   So let's take a look at the amended plan.  If we can take

18 a look at page 39 of Debtor's Exhibit 562.  Pardon me.  Sorry.

19 Strike that.  Make that page 45.

20         THE COURT:  I'm sorry.  What tab is it?

21         MR. STARNER:  This is tab 6 of the black binder, Your

22 Honor.

23 BY MR. STARNER:

24 Q   And just tell me when you're there, Mr. Murdica.

25 A   I'm here.

Murdica - Redirect/Starner                    147

1  Q    All right.  Good.

2            MR. STARNER:  Your Honor, are you there with us?

3            THE COURT:  Yes.

4  BY MR. STARNER:

5  Q    Mr. Murdica, you were asked a number of questions about

6  this section D on page 45.

7  A    Yes.

8  Q    Factors to determine cash value of a point.  You see that?

9  A    Yes.

10 Q    And there is, I think, a suggestion that there was

11 something incomplete.  This is -- there's a dot there, and

12 there's something missing here.  Do you see that?

13 A    Right.

14 Q    Okay.  Can you just go up and look with me to section C?

15 A    Yes.

16 Q    Do you see that's titled "Determination of Cash Value of a

17 Point"?

18 A    Yes.

19 Q    You see that?  Okay.  And then if you just look at that

20 first paragraph, it talks about the trustee assessment of

21 claims, do you see that, and the cash value of a point.  Do you

22 see that?

23 A    Right.

24 Q    And do you see the types of things that the trustee can

25 take into account there when making that determination?

Murdica - Redirect/Starner                148

1  A     Yes.

2  Q     Okay.  And so just looking at those two sections, does

3  that reflect factors in connection with making a determination

4  on the cash value of a point?

5           MR. MAIMON:  Objection.  This was in the original

6  plan.  It's not redlined.

7           MR. GORDON:  Then put up the red --

8           MR. STARNER:  That's right.

9           MR. GORDON:  He's got the wrong document up.

10           MR. STARNER:  I'm sorry.  The --

11           THE COURT:  Overruled.

12           MR. STARNER:  Yeah.  Thank you, Your Honor.

13           MR. GORDON:  He's got the wrong document up.  That's

14  all.

15           MR. STARNER:  Thank you, Your Honor.  Thank you, Your

16  Honor.

17           UNIDENTIFIED SPEAKER:  He's on the wrong document.

18           MS. RICHENDERFER:  Your Honor?

19           MR. MAIMON:  No.  I'm looking at it.

20           MR. STARNER:  No.  The objection was overruled.

21  We're fine.  Thank you, Your Honor.

22           MS. RICHENDERFER:  I -- Your Honor, Linda

23  Richenderfer, Office of the United States Trustee.  I also

24  object.  This witness has stated he's not a bankruptcy

25  attorney.  His firm hasn't even -- his -- excuse me, bankruptcy

1  department hasn't looked at it.  And the question, I believe,

2  calls for an opinion, quite frankly.

3          THE COURT:  Wasn't this raised on direct?

4          MS. RICHENDERFER:  Your Honor, I (indiscernible) --

5          THE COURT:  He was pointed -- this was put before

6  him, and he was asked about it, and there were no objections.

7  So I'm going to allow it.  Thank you.

8          MR. STARNER:  Thank you, Your Honor.

9          THE WITNESS:  And I said I wasn't sure that anything

10  was actually missing by that dot.  And I can see -- and I said

11  it might be in this section or the next section.  And I see

12  above that there are factors there.

13  BY MR. STARNER:

14  Q    Okay.  Could -- that section D, could that be a typo?

15  This was an amended plan that was filed --

16          MR. MAIMON:  Objection.

17          UNIDENTIFIED SPEAKER:  Speculation.

18          MR. MAIMON:  Objection.

19          THE COURT:  Sustained.

20          MR. STARNER:  All right.  Thank you, Your Honor.

21  BY MR. STARNER:

22  Q    Let's now talk about another topic.  I think you were

23  asked a number of questions on the plan.  This had to deal with

24  the retention date.  Do you recall those questions?

25  A    I do.

Murdica - Redirect/Starner                    150

1  Q    Okay.  Let's take a look at the amended plan, if you

2  would, with respect to that.  If you look to page 31.  Right

3  there.  Sorry.  I'm jumping around a little bit.

4                        (Counsel confer)

5  BY MR. STARNER:

6  Q    Oh, sorry.  Page 5.  I'm being corrected.  Sorry.  This is

7  the very beginning of the document, page 5 of Debtor's 562.  If

8  you look at the definitions section.  And if you look with me

9  to number 31, we have existing ovarian cancer claimants.  And

10 if you take a look at that definition, and you'll see there's a

11 reference to -- there's some language that's struck out.  So

12 just to frame this -- sorry.  Let me back for a minute.

13      You were asked a number of questions about the retention

14 date for lawyers representing claimants.  Do you recall those

15 questions?

16 A    I do.

17 Q    Okay.  Looking at this amended plan and this definition,

18 what does that indicate to you regarding that term and to what

19 extent it's even included anymore in the amended plan?

20 A    Well, it's what I testified to earlier.  But my

21 recollection was that it wasn't included anymore, and it's not.

22 So the notion that anyone could have had an advantage for three

23 days to retain claims doesn't -- isn't born out by this plan,

24 because all this involves now are claimants who are diagnosed

25 prior to April 1, 2023.

Murdica - Redirect/Starner                    151

1  Q    Okay.  Thank you.  And just to address the objection and

2  some questions you got from the U.S. Trustee, there were some

3  questions about who from your firm was involved with the

4  amended plan and working on the amended plan.  Do you recall

5  those questions?

6  A    I recall about -- yeah, about my partner.  But she wasn't

7  the only person working on this.

8  Q    You anticipated by my question.  Just to be clear, who on

9  behalf of the debtors and J&J were involved with the

10  negotiations around amending the plan and the amendment of the

11  plan?

12  A    Frankly, I wasn't involved in a lot of it.  It was Kendra

13  Lounsberry, Dan Prieto, numerous attorneys, I think, from Jones

14  Day and the ad hoc committee.

15  Q    And those included bankruptcy lawyers from Jones Day?

16  A    They were all bankruptcy lawyers.  Yes.

17  Q    Okay.  I want to back up a little bit.  You were asked a

18  number of questions about, you know, some of the diligence you

19  did in connection with negotiating the PSAs.  Do you recall

20  those questions?

21  A    Yes.

22  Q    Okay.  And so I just want to kind of walk through, you

23  know, what it is that you did in connection with negotiating

24  PSAs to verify the claims that were represented by the law

25  firms you were negotiating with.

1  A    Okay.  You want me to tell you?

2  Q    Please.

3  A    First, as I testified to earlier, I have a history with

4  almost all of the firms that are part of the plan support

5  agreements.  Aside from that history, specific to talc, I've

6  been trying to negotiate a talc resolution for three-and-a-half

7  years.

8      I've had numerous conversations with these firms through

9  mediators, through negotiations outside of mediation.  Along

10 the way, I've stayed in touch with them.  I've kept track

11 through conversations of how many filed cases they have, how

12 many claimants they say that they represent.  I've tracked

13 along the way advertising.  So if somebody said I have 10,000

14 claims, well, if they hadn't ever been advertising for them or

15 I couldn't trace any advertising to them, I'd have a real

16 question.

17     But these lawyers, the ad hoc lawyers, two of them were

18 representing clients on the former TCC.  They had 16,000 filed

19 claims between them, and they had been participating in

20 litigation, the majority of them.  So I had a lot of background

21 information on who they were, how they operate, whether it made

22 any sense that they had the number of claimants they purported

23 to have.

24 Q    And in your experience as a resolution counsel settling,

25 you know, mass tort actions and otherwise, is that typical in

Murdica - Redirect/Starner                    153

1  terms of your negotiations with law firms, what they claim to

2  represent in terms of number of claimants?

3          MR. MAIMON:  Objection.  Relevance.

4          THE COURT:  Overruled.

5          THE WITNESS:  Because I'm interacting with these

6  lawyers on multiple torts all the time, if they lie to me, I'm

7  going to figure it out in that tort, and then they're going to

8  have no credibility in the future.  These lawyers I've settled

9  cases with before.  They've made representations before.

10  They've borne out.  They have credibility.  I have no doubt

11  that they have what they say that they have.

12  BY MR. STARNER:

13  Q    And you were asked a number of questions about what type

14  of information that you get or require from the law firms

15  you're negotiating with.  Do you require the law firms to

16  submit medical records to you for their claims?

17  A    Well, not until the claims are being qualified to see if

18  they're going to pay.  But, here, normally I would just get the

19  first name, last name and maybe the date of birth.  Here, we

20  also required the social security number just to be sure that

21  these were real claimants that they were including and not just

22  names.

23  Q    And how did that compare to the type of information you

24  received in connection with prior negotiations with

25  Mr. Birchfield we talked about earlier?

1            MR. MAIMON:  Objection.  Relevance.

2            THE WITNESS:  In --

3            THE COURT:  Overruled.

4            THE WITNESS:  In prior negotiations, I -- well,

5  specifically with Mr. Birchfield, I just took his

6  representations at his word about how many claimants each law

7  firm represented.

8  BY MR. STARNER:

9  Q    Okay.  And do you have -- are you familiar with the intake

10 process that any of the PSA firms you were negotiating with

11 employed?

12           MR. MAIMON:  Objection, Your Honor.

13           THE COURT:  That's sustained.

14           MR. STARNER:  I mean, Your Honor, to the extent that

15 they're challenging, you know, the diligence done for the types

16 of -- you know, for the claimants and who was represented by

17 these law firms, I would think the intake process that the law

18 firms employ would be relevant.

19           THE COURT:  From my understanding, we're going to

20 have the testimony of some of these lawyers.

21           MR. STARNER:  Very good.

22           THE COURT:  We'll find out from them.

23           MR. STARNER:  Very good, Your Honor.

24 BY MR. STARNER:

25 Q    Let me just ask you -- you know, we've talked a lot about

1  the support that you understand and believe that claimants have

2  for the proposed plan.  What is the basis for your view that

3  the majority of claimants support the proposed plan?

4  A    What I testified to earlier, which is that I've been

5  tracking who has what claims, any significant number of claims

6  for three-and-a-half years.  And so I know how many claims are

7  out there.  I have conversations with talc counsel every day,

8  multiple.  It consumes most of my life, I'm sad to say.

9      So I know where the claims are.  I know who's in support.

10 And I know that this group of counsel that we have supporting

11 the plan is significant, represents the majority.  And beyond

12 that, I know of additional lawyers who are going to support

13 the -- or going to recommend support of the plan.

14        MR. MAIMON:  So I object and move to strike the

15 answer on several grounds.  First of all, conversations

16 about -- as a basis for his knowledge is hearsay and

17 inadmissible.  Second of all, he's again violated the Court's

18 ruling about when the Court struck his discussion about

19 majority or others.

20        THE COURT:  I'll sustain the objection only with the

21 last regarding those that he anticipates to be supporting.

22 BY MR. STARNER:

23 Q    Let me just touch on that last piece, Mr. Murdica.  You

24 were asked some questions about other law firms that have

25 indicated to you -- law firms that are not signed up to PSAs

Murdica - Redirect/Starner                     156

 1  indicated to you that they would support the amended plan.

 2          MR. MAIMON:  I object, Your Honor.

 3          MR. STARNER:  If I may?

 4          THE COURT:  Let me hear the question.

 5  BY MR. STARNER:

 6  Q    But when you were asked to identify those law firms, you

 7  declined.  So in that context, can you just explain to the

 8  Court why is it you have concerns about disclosing the names of

 9  those law firms?

10  A    Sure.

11          MR. MAIMON:  Objection.

12          UNIDENTIFIED SPEAKER:  Objection.

13          MR. MAIMON:  Relevance, Your Honor.  He refused to

14  answer.  Your Honor struck it.  And why is it irrelevant to why

15  he wouldn't testify and the Court's ruling?

16          THE WITNESS:  Well, explain why, because it --

17          THE COURT:  No.

18          THE WITNESS:  -- involves criminal activity.

19          THE COURT:  No, no, no, no, no, no.

20          MR. MAIMON:  Please.

21          THE COURT:  The objections are sustained.  Let's move

22  on.  Thank you.

23  BY MR. STARNER:

24  Q    Let's talk about -- you were asked a lot of questions

25  about the type of claims that are represented by various law

Murdica - Redirect/Starner                           157

1  firms and claimants.  And do you recall all those questions?

2  A    I do.

3  Q    Okay.  Let's just start, generally speaking, what -- you

4  know, in terms of the amended plan that's currently on file,

5  how were the claims that are covered in that plan -- how were

6  they determined?

7  A    The claims that are covered in the plan are claims that

8  have been asserted against the debtor and J&J in the tort

9  system which includes all of the different types of cancer

10 beyond ovarian cancer, the ones that we've been calling

11 non-gynecological cancer -- non-ovarian gynecological cancers,

12 all the different types of ovarian cancer within that, and

13 mesothelioma claimants.

14 Q    And why did you include those claims?

15 A    Well, one, we -- claimants filed all these different kinds

16 of claims in the tort system.  We can't control that.  That's

17 what they filed.  They believe they have evidence to support

18 all of them.

19      You know, to me, this is a little bit of a red herring,

20 because --

21          MR. MAIMON:  Objection.

22          THE WITNESS:  -- all of the claims --

23          MR. MAIMON:  Objection.

24          MR. STARNER:  Your Honor, if I may insist --

25          MR. MAIMON:  Whether it's --

Murdica - Redirect/Starner                    158

1            MR. STARNER:  -- counsel cannot --

2            MR. MAIMON:  Whether it's a red herring --

3            MR. STARNER:  -- stop a witness during --

4            THE COURT:  Overruled.

5            MR. STARNER:  -- their testimony.  Thank you, Your

6  Honor.

7            THE COURT:  Continue, please.

8            THE WITNESS:  The notion that we're going to try to

9  compare which claims are better than the other are the red

10  herring, because all of the claims, we believe, have no merit.

11  So to try to compare one to the other, it doesn't really make

12  any sense.

13       All of them were brought against us in the tort system.

14  In order to get a complete resolution, all of them have to be

15  resolved.  And it's not just like there's one or two.  There's

16  thousands.

17       And so, you know, I've heard in this courtroom lots of

18  completeness representations about what happened in the MDL as

19  to Daubert and as -- you know, as to the 702 standard and what

20  claims passed.  And there's been representations that these

21  other claims didn't survive Daubert, that they were determined

22  to be non-credible.  That's just not true.  The only thing

23  addressed by Daubert was epithelial ovarian cancer.

24       And so -- and the ones they're complaining about, the --

25            THE COURT:  Wait.  Do you have an objection?

Murdica - Redirect/Starner                    159

1            MR. MAIMON:  Your Honor, this is -- this is just

2     legal opinion.  He's now giving his legal opinion on <u>Daubert</u>.

3            MR. STARNER:  That's absolutely not the case, Your

4     Honor.  I mean, that -- I've asked him how is it the claims

5     were determined.  This is the basis for the claims they

6     include.

7            THE COURT:  Overruled.  Please continue.

8            MR. STARNER:  Thank you, Your Honor.

9            THE WITNESS:  Okay.  So the only thing the <u>Daubert</u>

10    decision evaluated was epithelial ovarian cancer.  It didn't

11    disqualify the others.  The non-ovarian gynecologic cancers in

12    a lot of ways are like the mesotheliomas.  Neither of them have

13    ever been subject to any scrutiny.  Both the -- cancers like

14    uterine that they're talking about, you know, they have never

15    been subject to <u>Daubert</u>.  Neither has meso.  No mesothelioma

16    claims have been filed in federal court, because nobody wants

17    the <u>Daubert</u> standard to challenge those cases.

18            So we have to include all of them to get a complete

19    settlement, and that's why they're all included, and they're

20    all filed that way in this -- in the tort system as well.

21    BY MR. STARNER:

22    Q    In the definition --

23            MR. MAIMON:  I'm going to object and move to strike

24    specifically with his speculation about why plaintiffs file in

25    different places.  He's not competent to do this.  And the

Murdica - Redirect/Starner                    160

1  opinions that he's expressed are inconsistent with being a fact

2  witness.  I object.

3            THE COURT:  Overruled.

4            MR. STARNER:  Thank you, Your Honor.

5  BY MR. STARNER:

6  Q    With respect to the definition of talc-related claims in

7  the amended plan, what's your understanding of how it compares

8  to the definition of talc-related claims in the prior

9  bankruptcy?

10 A    It's the same claims that existed before.

11 Q    And in terms of like how that -- you know, the terminology

12 is used, how is that generally used, in your experience, in

13 connection with talc litigation?

14           MR. MAIMON:  Objection.  Vague.

15           THE COURT:  Could you be more specific?

16           MR. STARNER:  Sure.

17 BY MR. STARNER:

18 Q    You were involved with the first bankruptcy?

19 A    I was.

20 Q    And there was a lot of reference to ovarian cancer types,

21 correct?

22 A    Right.

23 Q    And in connection with those references, did you have an

24 understanding of whether or not that included all of the claims

25 that now we're talking about as subtypes?

Murdica - Redirect/Starner                    161

1  A    Yeah.  The parlance that everybody was using in mediation

2  and court was you had mesothelioma claims and you had ovarian

3  cancer claims.  The ovarian cancer claims encompassed

4  everything that was filed in the MDL, which is far beyond

5  ovarian cancer, but that was basically shorthand.

6  Q    And is that consistent with your understanding of how

7  ovarian cancer claims were considered in connection with prior

8  negotiations you had with respect to, you know, talc

9  litigation?

10  A    Yeah.

11        MR. MAIMON:  Objection.  He can probably speak as to

12  what he considered but not what others considered.

13        THE COURT:  Fair enough.  Speak to his -- your

14  understanding.

15        THE WITNESS:  My understanding from when I first

16  became involved in trying to resolve this litigation is that we

17  had to resolve the entire litigation which included all of the

18  claims beyond epithelial ovarian cancer.

19  BY MR. STARNER:

20  Q    Okay.  And then I think close to final question.  Just in

21  terms of your expectations about, you know, why claimants will

22  vote yes for the plan, can you just articulate that for us?

23  A    Sure.  There's logic and reason, as number one.  It's a

24  good deal for the claimants.  They are going to recover more

25  than the settlements did in the tort system, in my opinion, in

1  my calculations, based on the plan.  I'm not allowed, I guess,

2  to talk about another reason why it's superior to the

3  claimants, but there's a real benefit there.

4      And so they're going to vote for the plan for that reason

5  but also because their lawyers are going to recommend it to

6  them.  And they've been waiting for ten years, some of them,

7  they've been clients in this litigation, and they've gotten no

8  recovery.  And this is their -- this is a chance to finally

9  resolve talc that's not going to exist in the tort system,

10 because we don't have a law that allows an appointment of a

11 fiduciary to handle the futures in the tort system.

12         MR. MAIMON:  Objection not only to, again, reference

13 to what he shouldn't be and he knows he shouldn't be

14 referencing, but this opinion testimony is inadmissible from a

15 fact witness.

16         THE COURT:  The thrust of the objection is the same

17 ones that were raised in your objection to exclude the

18 declaration.

19         MR. MAIMON:  Yes, Your Honor.

20         THE COURT:  So I note a continuing objection, and the

21 objection is overruled.

22         MR. MAIMON:  Thank you.

23         MR. STARNER:  Thank you, Your Honor.

24 BY MR. STARNER:

25 Q   And just a few last questions on that point.  You were

Murdica - Redirect/Starner                                    163

1   asked a number of questions about a settlement -- one or two

2   settlements you had with the Lanier Law Firm.  Do you recall

3   those questions?

4   A    I do.

5   Q    And there were some questions about provisions in those

6   settlement agreements about future claims.  Do you recall those

7   questions?

8   A    I don't know if it was for Lanier, but yes.

9   Q    But you were -- I think you were asked some questions

10  about provisions, and I believe you testified that the

11  provisions indicated certain present intent commitments by the

12  plaintiff's law firms.  Do you recall those questions?

13  A    I do.

14  Q    Okay.  And just can you explain to us, what was the

15  context for that?

16  A    Sure.  Lawyers are ethically allowed in most states to say

17  that beyond the claimants they represent, they have no present

18  intent to represent any claimants in the future.  You can't

19  bind them to it, but they're ethically allowed to make that

20  promise.

21  Q    And does a lawyer's present intent not to bring future

22  claims, does that stop anybody else from bringing claims?

23  A    No, it doesn't.  That's --

24            MR. MAIMON:  Objection, Your Honor.

25            THE WITNESS:  That's the problem with --

1          MR. MAIMON:  Objection, Your Honor.  He's not a --

2     he's not an ethics expert.  He's not a legal expert.

3          THE COURT:  Overruled.  He's giving your -- his

4     understanding of it.

5          MR. STARNER:  Thank you, Your Honor.

6     BY MR. STARNER:

7     Q    So in the context of your negotiations of all the talc

8     settlement -- all these talc settlements, your efforts to

9     resolve talc litigation, in that context, that type of

10    provision where a law firm may, in a particular settlement,

11    represent that they have no present intent to bring future

12    claims, does that have any impact on the volume of talc

13    litigation that would be brought by the law firms?

14    A    No.  It can't bind the lawyer that makes the

15    representation, and it certainly can't bind anybody else.  In

16    fact, the settlement with this latency and this number of

17    future litigants, it will just stimulate litigation.  It will

18    just cause more.

19         MR. MAIMON:  Objection.

20    BY MR. STARNER:

21    Q    So that type of --

22         MR. MAIMON:  Objection.  Speculation.

23         THE COURT:  Sustained.

24    BY MR. STARNER:

25    Q    Just to kind of tie this off, that type of provision, does

Murdica - Redirect/Starner                    165

1  that allow for the ability to settle, you know, future talc

2  claimants?

3  A    No.

4  Q    Why not?

5  A    In that agreement, it doesn't permit the settlement of

6  future claimants.

7  Q    But that type of provision in any agreement, Mr. Murdica?

8  A    Right.  Maybe I'm not following your question.  I

9  apologize.

10 Q    No.  So that type of revision, would that be a way to

11 settle, you know, future talc claims?

12 A    No.

13 Q    Why not?

14 A    Because it doesn't prohibit those lawyers from getting new

15 claimants, and it certainly doesn't prohibit other lawyers in

16 the future who many not even be known to us from getting

17 claimants 20 years from now.

18         MR. STARNER:  If I may, Your Honor?  Just a moment?

19         THE COURT:  Yes.

20         MR. STARNER:  No further questions, Your Honor.

21 Thank you.

22         THE COURT:  All right.  Thank you.

23         MR. WINOGRAD:  Your Honor, very brief --

24         THE COURT:  Yes.

25         MR. WINOGRAD:  It's been a while since I've been back

Murdica - Cross/Winograd                    166

1   here.  Your Honor, Michael Winograd from Brown Rudnick for the

2   TCC.  I just have a few follow-up questions based on the

3   redirect.

4                    (Counsel confer)

5            MR. WINOGRAD:  Can we just pull that back up, the

6   504?

7                    CROSS-EXAMINATION

8   BY MR. WINOGRAD:

9   Q    Your counsel, Mr. Murdica, while that's being pulled up,

10  just talked to you a little bit about that proposed settlement

11  that you had discussed earlier with me, right, in the day, in

12  connection with the August 2020 proposal?

13  A    Yes.

14  Q    And that was where we were discussing whether it was $3.25

15  billion, in fact?

16  A    Right.

17  Q    Remember that?

18  A    I remember those questions.

19           MR. WINOGRAD:  So can we just -- can we go to page 1

20  of the exhibit?

21  BY MR. WINOGRAD:

22  Q    While that's being pulled up, remember we were talking

23  about whether there was a $2 billion additional amount of money

24  for a trust?

25  A    Right.

 1                    (Counsel confer)

 2  BY MR. WINOGRAD:

 3  Q    So if you look here on page 1, do you see where it says

 4  capital B at the bottom, Annual Trust Payment Cap?

 5  A    Yeah.

 6  Q    And that refers to a cumulative cap on annual trust

 7  payments of $2 billion.  Do you see that?

 8  A    Yes.

 9  Q    So that's a separate -- that's separate from the QSF,

10  correct?

11  A    It's not.  I can assure you, Mr. Winograd, there was never

12  $5.25 billion dollars on the table, because only a couple

13  months later we tried to pass a plan in the Imerys bankruptcy

14  for $4.2 billion.  It's -- your -- I don't know how you're

15  reading it or what you're misreading, but that's not correct.

16  Q    Okay.  Well, let's go to page 22, if we could.  And if you

17  look there at number 1, Mr. Maimon was talking to you about a

18  $250 million payment, right?  And that's that payment, right,

19  that QSF and trust administration -- administrative expense

20  fund will be funded with $250 million by J&J.  You see that?

21  And then it says, "Apart from the corpus of the QSF and trust,"

22  right?

23  A    I see those words.

24  Q    Okay.  And if you look on page 44, please.  If you look

25  about three or four paragraphs down, you see where it says, "I

Murdica - Cross/Winograd                    168

1  declare that I have been diagnosed with ovarian cancer"?

2  A    Yes.

3  Q    That's because this was ovarian cancer only, correct?

4  A    I think that was my testimony, that it -- anything but

5  mesothelioma.

6        MR. WINOGRAD:  Okay.  I have nothing further, Your

7  Honor.  Thank you.

8        THE COURT:  Thank you, Mr. Winograd.

9        It's quiet.  All right.  Thank you.  You may step

10 down.

11       THE WITNESS:  Thank you, Your Honor.

12       THE COURT:  Thank you, Mr. Murdica.

13       We're going to take a lunch break.  Let's come back

14 at -- let's start up by -- well, let's start up by 1:30.  All

15 right, folks?

16       UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

17       THE COURT:  Thank you.

18       (Recess at 12:37 p.m./Reconvened at 1:33 p.m.)

19                    * * * * *

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

1

2          We, DIPTI PATEL, KAREN K. WATSON, and LIESL SPRINGER,

3  court approved transcribers, certify that the foregoing is a

4  correct transcript from the official electronic sound recording

5  of the proceedings in the above-entitled matter, and to the

6  best of our ability.

7

8  /s/ Dipti Patel

9  DIPTI PATEL

10

11  /s/ Karen K. Watson

12  KAREN K. WATSON

13

14  /s/ Liesl Springer

15  LIESL SPRINGER

16  J&J COURT TRANSCRIBERS, INC.          DATE:  June 29, 2023

17