IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Wednesday, June 28, 2023 |
| Defendants. | . | PM SESSION |
| . . . . . . . . . . . . . . . | . | 1:33 p.m. |

TRANSCRIPT OF MOTION OF TO DISMISS THE SECOND BANKRUPTCY
PETITION OF LTL MANAGEMENT LLC

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:             Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES VIA ZOOM:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street, Suite 500<br>Dallas, TX 75201 |
| | Jones Day<br>By:  EMILY C. BAKER, ESQ.<br>1221 Peachtree Street, N.E., Suite 400<br>Atlanta, GA 30361 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Brown Rudnick<br>By:  JEFFREY L. JONAS, ESQ.<br>    W. LYDELL BENSON, ESQ.<br>    MICHAEL WINOGRAD, ESQ.<br>    CAMERON MOXLEY, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| For the Ad Hoc Committee<br>of State Attorneys<br>General: | Womble Bond Dickinson<br>BY:  ERICKA F. JOHNSON, ESQ.<br>1313 North Market Street, Suite 1200<br>Wilmington, DE 19801 |
| For the Office of the<br>United States Trustee: | Office of the United States Trustee<br>By:  LINDA RICHENDERFER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |
| For Various Talc<br>Claimants: | Maune Raichle Hartley Frency &<br>    Mudd, LLC<br>By:  CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Levy Konigsberg, LLP<br>By:  MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ 08648 |
| For Justin Bergeron<br>and Others: | Cohen, Placitella & Roth, P.C.<br>By:  CHRISTOPHER M. PLACITELLA, ESQ.<br>2001 Market Street, Suite 2900<br>Philadelphia, PA  19103 |

APPEARANCES CONT'D:

```
For States of New Mexico   Gibbons, P.C.
and Mississippi:           By:  ROBERT K. MALONE, ESQ.
                           One Gateway Center
                           Newark, NJ 07102


For Paul Crouch,           Ruckdeschel Law Firm, LLC
individually and on        By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of        8357 Main Street
Cynthia Lorraine Crouch:   Ellicott City, MD 21043


For Johnson & Johnson      White & Case LLP
and Johnson & Johnson      By:  GREGORY STARNER, ESQ.
HoldCo (NA), Inc.:         1221 Avenue of the Americas
                           New York, NY 10020


For the Ad Hoc             Paul Hastings LLP
Committee of Supporting    By:  KRIS HANSEN, ESQ.
Counsel:                   200 Park Avenue
                           New York, NY  10166


                           Paul Hastings LLP
                           By:  WILLIAM K. WHITNER, ESQ.
                           1170 Peachtree Street, N.E., Suite 100
                           Atlanta, GA  30309
```

## INDEX

**WITNESSES**                                                      **PAGE**

FOR THE DEBTOR:

MIKAL WATTS
     Direct Examination by Mr. Whitner                        15
     Cross-Examination by Mr. Moxley                          16
     Cross-Examination by Mr. Maimon                          27
     Redirect Examination by Mr. Whitner                      54

JAMES ONDER
     Direct Examination by Mr. Whitner                        60
     Cross-Examination by Mr. Moxley                          61
     Cross-Examination by Mr. Maimon                          89
     Cross-Examination by Mr. Thompson                       100
     Cross-Examination by Ms. Richenderfer                   103
     Cross-Examination by Mr. Whitner                        112
     Recross-Examination by Mr. Maimon                       125
     Recross-Examination by Ms. Richenderfer                 130
     Recross-Examination by Mr. Ruckdeschel                  132
     Recross-Examination by Mr. Gordon                       134
     Recross-Examination by Mr. Moxley                       136

ADAM LISMAN
     Direct Examination by Mr. Starner                       139
     Cross-Examination by Mr. Moxley                         141
     Cross-Examination by Mr. Maimon                         172
     Cross-Examination by Mr. Ruckdeschel                    188
     Redirect Examination by Mr. Starner                     189
     Recross-Examination by Mr. Thompson                     194
     Recross-Examination by Mr. Moxley                       196

**EXHIBITS**                                               **ID**   **EVD**

FOR THE DEBTOR:
     D-4  Declaration of Adam Jacob Lisman                --   141
     D-6  Declaration of Mikal Watts                      --    17
     D-7  Declaration of James Onder                      --    62

1          THE COURT:  All right.  We're ready, Kiya?

2          THE CLERK:  Yes, Your Honor.

3          THE COURT:  All right.  Are we unmuted?

4          THE CLERK:  Yes.

5          THE COURT:  Okay.  Mr. Jonas, what are your thoughts

6  on the plan for the afternoon?

7          MR. JONAS:  Your Honor, and to be fair, I've

8  discussed this with Mr. Gordon and group, and some others among

9  the movants.  Not quite everybody, but almost.  But I thought I

10 would just let you know where we're at and what our thinking is

11 and see how maybe the Court wants to proceed.  And obviously,

12 Mr. Gordon can speak for himself.

13         First of all, I mean, we are cognizant of some of the

14 comments you've made and of timing, and I think all of the

15 parties very much appreciate the need to really complete this

16 by Friday.  So that being said, our thinking was, and I think

17 we actually have agreement on one point, which is there's about

18 an hour, an hour and a half of video clips that I think, at

19 least as between me and Mr. Gordon -- and again, I don't want

20 to speak for other parties -- we would agree, although I think

21 it's kind of all tied together, so I don't want to make

22 agreements in part.

23         But on that one, at least Mr. Gordon and I, for now,

24 subject to the rest of this, would suggest that the videos be

25 viewed by the Court at its leisure and we not use Court time to

6

1 do that.

2 　　　　　THE COURT:  So I won't be watching Godfather II

3 tonight?

4 　　　　　　　　　　　　(Laughter)

5 　　　　　MR. JONAS:  Well, that's up to you, Your Honor.

6 　　　　　And some of the other ideas we've had were the

7 following.  And, again, they're all -- I don't want to say

8 they're tied together, but they are and we just need to feel

9 our way along.  But I'm just going to put them out there.

10 　　　　　THE COURT:  Sure.

11 　　　　　MR. JONAS:  We would with Mr. Watts and Mr. Onder,

12 like we've done with other witnesses, frankly, the reason we

13 felt compelled to have Mr. Watts and Onder testify live was

14 they submitted declarations, and so we felt we needed to

15 respond to those or counter those.  But in light of where we

16 are, we had proposed that Mr. Watts and Mr. Onder we would not

17 call them live, but simply have the ability to go back and

18 designate depo transcripts effectively to respond, but their

19 decks can come in --

20 　　　　　THE COURT:  Right.

21 　　　　　MR. JONAS:  -- and we'll just designate deposition

22 testimony and that would be the extent of Mr. Watts and Onder.

23 Even though Mr. Watts bought a new suit for today, I'm told.

24 　　　　　MR. WATTS:  The socks were sold out.

25 　　　　　MR. JONAS:  That's one suggestion.

7

1           Another, on what I call, and I think you've referred

2   to as the MDL part of the case.  Our thinking was that we would

3   permit the expert reports to come in.  We would also, both

4   sides could designate deposition testimony, hopefully in a

5   limited fashion and that we would simply submit that part of

6   the case in that way and not have live testimony.  That would

7   mean, if that were either agreed or ordered by the Court, that

8   would eliminate live testimony from, on our side, Judge

9   Furguson, Royal Furguson, who's here, Your Honor, retired

10  federal judge from Texas, and Professor Rave on our side and

11  Sheila Birnbaum, who's a matching expert, if you will, on the

12  other side.

13          Mr. Mullin has some testimony relating what I'll call

14  to the MDL part of the case.

15          THE COURT:  Right.

16          MR. JONAS:  We would not cross-examine him on that.

17  Again, that whole part of the case, our suggestion was and is

18  to just have it come in on the papers, if you will.

19          That's how we -- again, I don't want to characterize

20  it and I'll let Mr. Gordon speak to it, but we thought with

21  those changes, if that was all implemented, we would then be

22  able to proceed to Mr. Lisman who is the financial person at, I

23  forget his title.  But he's a financial person at J&J.

24          That would close, effectively, the fact part of the

25  case.  We would then go to call Mr. Burian from Houlihan Lokey.

1  And I believe the other side would call Mr. Mullin and

2  Mr. Bell.

3        And obviously, optimistic maybe we could even finish

4  all the testimony tomorrow and close on Friday morning.  But

5  whatever.  That's the thinking.  So that was our proposal and

6  I'll certainly let Mr. Gordon or others comment or respond.

7        Thank you, Your Honor.

8        THE COURT:  All right.  Thank you.  Thank you,

9  Mr. Jonas.

10        Mr. Gordon.

11        MR. GORDON:  Thank you, Your Honor.  Greg Gordon on

12  behalf of the debtor.

13        So we very much appreciate, obviously, the proposal

14  that's been made by the other side, and we have talked about

15  it.  And we certainly agree on the video, and I suppose that's

16  kind of the low hanging fruit in some respects.  But as to the

17  rest, I mean, first of all, I would note that Mr. Watts and

18  Mr. Onder are witnesses obviously of the AHC and their views

19  need to be heard.  But our feeling is from the debtor's

20  perspective that their testimony is quite important.

21        It's quite important because they're part of the

22  plan.  They're the ones that actually came to us with the plan

23  proposal.  We think that any testimony they provide is

24  extremely important.  I think their motives have been attacked.

25  The extent of their relationships with their clients and the

1  extent of their support have been the subject of a great deal

2  of testimony.   There's lots of testimony today about the

3  amended plan and things like that occurred after the

4  depositions occurred.

5       And so from our perspective, it's kind of late to be

6  making such a change in course here.   The witnesses are here.

7  Mr. Lisman is not here right now, so it's not as if we could

8  call him right now anyway.   Now, I'm not sure how quickly he

9  could be here.   He can definitely be here today, but he's not

10  here at the moment.

11       So for those reasons, Your Honor, we're opposed to

12  that.   And the other thing I'll say Your Honor is, we don't

13  have any idea even how long they're planning with these

14  witnesses in any event.   There's been no discussion about that.

15  I said to Your Honor yesterday we should have some milestones.

16  I think we're slightly behind what we were hoping for, but we

17  still have a sense that there's a way to get through the rest

18  of the, we have three witnesses to get through today to stay on

19  the milestone track that I proposed yesterday.   And we would

20  think our time is better spent just them being efficient in

21  terms of doing their cross-examinations.

22       THE COURT:   What are your thoughts, and it comports

23  with what I had suggested at the outset, on the, well, I'll

24  call it the policy arguments.

25       MR. GORDON:   Right.   Which I dispute.

1          THE COURT:  But I'm cognizant of what the issues are.

2          MR. GORDON:  I understand.

3          THE COURT:  So rather than take up the time with the

4  expert testimony on those aspects.  The financial we obviously

5  have to go through and it doesn't preclude briefing, closings,

6  et cetera, on it.  What about the expert?

7          And my suggestion would also -- do we need, and nope,

8  this is not to disparage anybody, do we need both Mr. Onder and

9  Mr. Watts?  Mr. Watts seemed to be more, have more input in the

10 process.  Why don't we just do Mr. Watts and do the deposition

11 transcripts on Mr. Onder?

12         MR. GORDON:  Well, again, we still have the issue.

13 The depositions are dated based on developments that have

14 occurred since.  Mr. Onder was the subject of a lot of

15 testimony alone today as well.  I mean, there are two names

16 you've heard quite a bit.  And you heard argument from

17 Mr. Maimon as to whether or not they were technically on the

18 Committee or not on the Committee.  That applied to Mr. Onder.

19 So, again, to me if they can just be judicious in their cross,

20 this shouldn't be an issue at all.

21         On the MDLs, our feeling there is, and obviously, I'm

22 listening very carefully to what Your Honor says and I hear

23 what you're saying, but we view that testimony as important to

24 1112(b)(2), important to establish our good faith.  But most

25 importantly, we don't see that taking very long.  In other

11

1  words, we have the reports, we've done the depositions, we have

2  some targeted points that we want to make through

3  cross-examination of their witnesses.  I'm sure they want to do

4  the same with ours.  So we see that going fairly promptly.

5          And you may recall at the last dismissal hearing that

6  we were concerned that we weren't going to get done in time

7  because of where we were with the fact witnesses and then the

8  expert witnesses went much faster than people anticipated, and

9  I would expect that would be the case here as well, so.

10          THE COURT:  Thank you.  Let me hear from the Ad Hoc.

11          MR. GORDON:  Sure.

12          MR. WHITNER:  Your Honor, K Whitner, Paul Hastings,

13  on behalf of the Ad Hoc Committee.  And I echo Mr. Gordon's

14  points, but I think designating depo designations at a time

15  before the new plan was in place, the context of those depo

16  designations would not make a lot of sense to the Court in the

17  argument that's being made now.  Both of these witnesses, Onder

18  and Watts, have been brought up in testimony repeatedly today

19  and I think they need an opportunity to explain or give context

20  to any deposition testimony that was pointed to earlier today.

21          And then, I think the larger point, Your Honor, the

22  declarations that were prepared in this case for their direct

23  testimony was prepared with the understanding they were going

24  to be here live, that they were going to be crossed.  And so

25  those declarations in some sense, are not as complete as they

1  might otherwise have been if we were just going to stand on

2  their declarations.  And so we would object, Your Honor, to not

3  allowing those witnesses to be called.

4         If they don't want to do cross, then we should at

5  least have some opportunity to do some direct on them to clean

6  up some of the earlier testimony and bring their testimony

7  current to today.

8         THE COURT:  All right.  Thank you.

9         Mr. Jonas.

10         MR. JONAS:  Yeah, just briefly, Your Honor.  I would

11  just say, they chose to put in declarations on Friday night of

12  these two witnesses.  So I don't know.  Everything changes

13  every day, of course it does.  But the point is, they've

14  testified.  Their decks are in so I don't think they're

15  entitled necessarily to now call them.  We've had witness

16  lists.  They've submitted their testimony.

17         All we're asking for I guess, is we won't cross them.

18  We just want to designate and submit some depo testimony since

19  we didn't technically have that opportunity because we were

20  going to do it live.  If we do that, I don't know that we have

21  to ask anybody for anything.  That's all.

22         We don't want to call them live.  We'll submit depo

23  designations.  They can cross designate.  We're not trying to

24  deny them that right.  And that will be the end of it.  We'll

25  save two witnesses.

1    Thank you, Your Honor.

2    THE COURT:  Mr. Hansen.

3    MR. HANSEN:  Your Honor, I'm sorry to tag team.  I

4    know I complaint about it.  Your Honor, Kris Hansen with Paul

5    Hastings on behalf of the Ad Hoc.

6    We had an agreement.  The agreement was that they

7    would cross-examine the witnesses.  Now, they want to just

8    designate.  If they don't want to cross them, they shouldn't

9    get to designate.  The declarations should come in.  We'll

10   clean up and we'll move on.  That's one.

11   Two, Your Honor, not a popular comment here for many

12   of the people who like to hear a lot of speaking in the

13   courtroom.  Nobody needs to do closings in this case.  You had

14   originally suggested that there be written closings, that they

15   be by written submission.  There are going to be post-trial

16   briefings anyway.  If you want to save five hours in this

17   process that we have, nobody needs to close.

18   We should move through the witnesses so the Court can

19   hear the live testimony.  And we think that this process that

20   the TCC is suggesting is inappropriate.

21   THE COURT:  All right.  So --

22   MR. GORDON:  Your Honor, I just --

23   THE COURT:  We're losing the valuable time that we

24   were going to be gaining.

25   (Laughter)

14

1              MR. GORDON:  I was just going to make a suggestion in

2    an effort to make it easier.  We've heard what you said on the

3    MDLs.

4              THE COURT:  I think we're --

5              MR. GORDON:  I was going to say, the way I would like

6    to leave it is to say, look, we will be happy to consider that

7    again if we're getting into tomorrow and it looks like we're

8    under a real time crunch, then I think we'd be prepared to do

9    what's being suggested.  We're just not prepared to do it today

10   because we don't know exactly where we're going to be.

11             THE COURT:  All right.  I'm going to take what I can

12   get.  And we have an agreement on what I'll be spending my off-

13   time doing, looking at the videos.  I assume that they're, they

14   will be, or they are --

15             MR. JONAS:  They're prepared.  I know they're --

16             THE COURT:  Are they downloaded on this, or?

17             MR. JONAS:  Not yet, but they've agreed, and they

18   will be, Your Honor.

19             THE COURT:  They will be.  All right.

20             MR. WHITNER:  While I appreciate, Your Honor,

21   fairness.  In fairness, we shouldn't spend the night preparing

22   and then wait until tomorrow morning and say, sorry, we decided

23   not to.  They should make a decision.

24             THE COURT:  Let's decide before we leave today, and

25   we'll see how this goes.  We'll proceed with Mr. Watts.

**WWW.JJCOURT.COM**

Watts - Direct/Whitner                    15

1          Please raise your right hand.

2              MIKAL WATTS, DEBTOR'S WITNESS, SWORN

3          THE COURT:  Thank you.

4          Please state your name and business address for the

5    record.

6          THE WITNESS:  Sure.  It's Mikal Watts, M-I-K-A-L

7    W-A-T-T-S.  My address is 200 Dorado Beach, Number 3612,

8    Dorado, Puerto Rico 00646.

9          MR. WHITNER:  Good.  Your Honor, K Whitner with Paul

10   Hastings on behalf of AHC.  May I approach?

11         THE COURT:  Yes, please.

12         MR. WHITNER:  Your Honor, while I'm here, do you mind

13   if we take Mr. Dickinson's poster down?

14         THE COURT:  By all means.

15                      DIRECT EXAMINATION

16   BY MR. WHITNER:

17   Q    Mr. Watts, I've handed you what's been marked as debtor's

18   Exhibit 6.  Do you recognize this document?

19   A    I do.  It's my declaration from last Friday night.

20   Q    Okay.  And do you understand that we intend to introduce

21   your declaration as your direct testimony in this matter?

22   A    I do.

23   Q    You're okay with that?

24   A    I'm fine.

25         MR. WHITNER:  Your Honor, we'd like to move Debtor's

Watts - Cross/Moxley                              16

1  Exhibit 6 into evidence.

2              THE COURT:  No objection?

3              UNIDENTIFIED SPEAKER:  No objection.

4              THE COURT:  Okay.  Thank you.

5              Admitted.

6               (Debtor's Exhibit 6 admitted to evidence)

7              MR. MOXLEY:  Good afternoon, Your Honor.  It's my

8  first opportunity to address the Court.  My name is Cameron

9  Moxley.  I'm with Brown Rudnick for the TCC.

10             THE COURT:  Welcome.  Thank you.

11             MR. MOXLEY:  It's my first opportunity in this

12 courtroom, Your Honor, as well.  It's good to be with you

13 today.  Thank you.

14             Judge, I have some binders for the Court and for the

15 witness, if I may.

16             THE COURT:  Of course you do.

17                        (Laughter)

18             MR. MOXLEY:  Thank you.

19                     CROSS-EXAMINATION

20 BY MR. MOXLEY:

21 Q    Good afternoon, Mr. Watts.

22 A    Good afternoon.

23 Q    You and I had a chance to meet by video very early one

24 morning recently for your deposition, correct?

25 A    We did, and I appreciate the accommodation.

Watts - Cross/Moxley                    17

1  Q    Of course.

2       We may in the course of the discussion this afternoon,

3  Mr. Watts, refer to some materials.  They'll be on your screen

4  as well.  You have your declaration binder your counsel gave

5  you as well, correct?

6  A    Sure.

7  Q    Okay.  And you heard the discussion about timing, so I'll

8  try to be targeted in my questioning.

9  A    I'll try to be targeted in my answers.

10 Q    Thank you, sir.

11      Your firm represents approximately 17,000 talc claimants,

12 correct?

13 A    Yes.

14 Q    Okay.  And you signed your first talc claimant on

15 March 19, 2022, right?

16 A    Yes.

17 Q    You describe at a high level your intake procedures and

18 some of the reasons why your firm may decide to "reject"

19 claimants at Paragraph 12 in your declaration, correct?

20      Take an opportunity to review that if you'd like, sir.

21 A    In part, yeah.  It's cursory level, but yeah.

22 Q    Right.  A high level, correct?

23 A    Sure.

24 Q    Okay.  And there are multiple reasons your firm may make

25 the determination to disqualify, I think that's the word that

Watts - Cross/Moxley                        18

1  you used in your deposition, to disqualify a client's claim.

2  And let me just list out, if I could, some of them, and you

3  tell me if I'm right --

4  A    Sure.

5  Q    -- that these are some of the reasons why your firm would

6  not take on a claim, okay?

7  A    Okay.

8  Q    So one is no damage, and by that you meant no proof of

9  damage and that you couldn't find medical records that

10 confirmed the diagnosed condition, right?

11 A    True.

12 Q    And then another one was dual reps.  And by that you meant

13 the claimant has hired multiple lawyers, right?

14 A    Yes, or inadvertently ended up in multiple lawyers' case

15 lists.

16 Q    And by dupes, you meant -- it's something different than

17 dual reps.  Dupes were different marketing vendors who you had

18 acquired cases from, had sent you the same client, correct?

19 A    Yes.

20 Q    Okay.  And then, intake failures was another reason you

21 may disqualify a client, correct?

22 A    In other words, a failure for the intake vendor to follow

23 the written procedures and protocols that are the policy of the

24 firm.

25 Q    And another reason you may disqualify a client from your

Watts - Cross/Moxley                              19

1  firm taking them on would be no interest, meaning the client is

2  unwilling to, as you put it, do the work, right?

3  A    Sure.

4  Q    Okay.  And another reason was non-responsive, meaning the

5  people aren't responding when people associated with your firm

6  is trying to reach out to them to get information, correct?

7  A    Right.

8  Q    Of course, none of your clients have filed talc claims in

9  the tort system, correct?

10 A    Yeah, they're not allowed to by order of this Court.

11 Q    Client information is maintained in a database that your

12 firm utilizes, right?

13 A    Yes.

14 Q    Okay.  Now, in your declaration, Mr. Watts, at

15 Paragraph 15, if you want to turn to that so you can see that

16 as I --

17 A    Sure.

18 Q    -- as I read it with you.  You say in Paragraph 15, "from

19 my law firm's approximately 17,000 talc clients, we have

20 ordered and received over 30,000 medical records."  And you go

21 on to explain in the next paragraph, sir, that the number of

22 records ordered and received exceeds the current number of talc

23 clients because claimants oftentimes have consulted with

24 multiple doctors.  And in some cases may have sets of records

25 in their own personal possession, right?

1  A    Yeah.  I mean, primarily, it's because you have different

2  treaters versus diagnosing physicians and you need both.

3  Q    Right.  But you don't know as you sit here today, how many

4  of your approximately 17,000 clients you have no medical

5  records for yet, correct?

6  A    So with respect to the clients for whom we have already

7  requested records from the applicable medical facilities, and

8  if they come back without the appropriate medical records,

9  there are 128 that have been rejected for that.

10 Q    I understand.  My question is, I think a little bit

11 different, Mr. Watts.  My question is, I understand that you've

12 received 30,000 medical records, pieces of records --

13 A    35,678.

14 Q    Thank you for clarifying the specific number.

15     My question, though, is do you know, as you sit here

16 today, how many clients of yours you have no medical records

17 for at all?

18 A    Yeah, my database knows, but I don't.

19 Q    You don't?

20 A    Yeah.

21 Q    And you have made no determination -- strike that.  I

22 apologize.  Strike that.

23     You state in Paragraph 18 of your declaration that "To the

24 extent my law firm's talc clients cleared my firm's intake

25 procedures with supporting medical records, I believe them to

Case 23-12825-MBK    Doc 957    Filed 06/30/23    Entered 06/30/23 08:40:12    Desc Main
Document    Page 21 of 199

Watts - Cross/Moxley                                        21

1  be credible and compensable talc claims."

2      Do you see that?

3  A    Yes.

4  Q    Okay.  But you have made no determination, you or your law

5  firm, have made no determination at this time that any

6  particular number of your approximate 17,000 claims will be

7  filed in the tort system if this bankruptcy case were

8  dismissed, correct?

9  A    Well, all of them will be filed in the tort system if this

10  is dismissed, if they're not disqualified under the decision

11  tree that we have.

12  Q    Right.  And I appreciate that.  Thank you.

13      My question though is as you sit here today, you haven't

14  made the determination as to the number of the 17,000 clients

15  you represent that will be filed in the tort system if the case

16  were dismissed, correct?

17  A    Well, all of them.  It's kind of like the joke when you

18  drive by a cemetery, how many of those people are dead?  All of

19  them are dead.

20      But so the point is this.  Every one of them that gets

21  through the protocol --

22  Q    Right.

23  A    -- will be filed.  They're in various stages of the

24  protocol.  You asked this question in my deposition, how many

25  of them are in the ends?  I said, I didn't have the number.  Is

Watts - Cross/Moxley                          22

1  it more than 1,000?  Yes.  Is it more than that?  I said I can

2  get you the number.

3      I can give you all the data that I've got as of yesterday

4  if you'd like it.  But the bottom line is is that it is a

5  process that we follow and that process is underway.

6  Q    I understand.  My question, though is, the data that I

7  want today --

8  A    Yeah.

9  Q    -- is the data that's in your head at this moment in this

10 witness box, what number of the 17,000 do you know for certain

11 you will file in the tort system if this case is dismissed?

12 A    Thousands.  I don't have a precise number.

13 Q    You know that for certain?

14 A    Sure.

15 Q    And of those approximately 17,000 clients that you have,

16 at least 277 of them you've already made the determination to

17 disqualify for one of the reasons we talked about?

18 A    As of yesterday, it's 298 out of 17,214 have been rejected

19 for one of those six reasons.

20 Q    Okay.  And so you anticipated my next question, actually,

21 which is you expect the number of disqualified clients to go

22 up --

23 A    Sure.

24 Q    -- as you go through the process, correct?

25 A    Sure.

Watts - Cross/Moxley                     23

1  Q    Yes?

2  A    Yeah.

3  Q    You have approximately five --

4  A    And so will the new cases that are being intaked.

5  Q    Thank you, Mr. Watts.

6  A    Yeah.

7  Q    You have approximately 500 talc clients whose diagnosis is

8  mesothelioma, correct?

9  A    555 people who have told me they have mesothelioma who are

10 in the process.

11 Q    Okay.  And your remaining talc clients of the 17,000,

12 those are gynecologic cancer diagnoses, correct?

13 A    Yes.

14 Q    Okay.  As of the time that I asked you questions at your

15 deposition on June 12th, You did not know the breakdown of

16 those types of gynecological cancer diagnoses, correct?

17 A    Yeah, I do now if you want them.

18 Q    My question was, as of --

19 A    Fair enough.

20 Q    June 12th, you didn't know, correct?

21 A    Yeah.  You deposed me in my airplane hangar, once and at

22 my ranch the other time.  Monday, to get ready for this, I have

23 the data if you'd like it.

24 Q    Okay.  The science, you would agree with me, Mr. Watts,

25 the science is better for some types of talc claims than

Watts - Cross/Moxley                    24

1  others, right?

2  A    Sure.

3  Q    You negotiated the term sheet and the PSA with the debtor,

4  correct?

5  A    I did.

6  Q    Okay.  And appreciating the prospect ahead, of going from

7  a PSA term sheet to detailed plan documents, that's why you

8  suggested the forming an ad hoc committee of supporting

9  counsel, which would be represented by experienced bankruptcy

10 counsel, was a good idea, right?

11 A    Yes.

12 Q    Okay.  Now in signing the PSA, all you could agree to as

13 counsel who negotiated it, is to advocate for the proposal with

14 your clients, right?

15 A    Yeah.  In other words, the term sheet and the PSA is an

16 agreement between myself on the one hand, Mr. Murdica and

17 Mr. Haas on the other hand, that if the plan documents have the

18 core features of the term sheet, I commit to support it and to

19 recommend that my clients accept it.

20 Q    Right, you as the attorney, it doesn't obligate your

21 clients --

22 A    Of course not.

23 Q    -- correct?

24      And you would agree with me, Mr. Watts, that if the

25 debtor's plan that is ultimately proposed is inconsistent with

Watts - Cross/Moxley                                    25

1  the terms of the PSA, you're not bound to recommend it to your

2  clients, correct?

3  A    It's kind of a one-sided option that I have.  If they make

4  it worse than the PSA, then I can walk.  If they make it

5  better, which we've been working hard to do, then of course

6  we'll accept that.  As you know, plans are amended all the time

7  and the whole purpose of getting the first draft out in effect

8  by May 14th was partially my schedule, but mostly so that you

9  guys could all fire missiles at it and it can be optimized,

10  kind of an iron sharpens iron thing.  And so the amended plan

11  is more relevant now than the one that we started with.

12  Q    In your current declaration, Mr. Watts, I'll just for

13  reference, it's at Paragraph 33, you wrote that you understood

14  that the debtor intended to file an amended plan and trust

15  distribution procedures that reflect, as you put it, the

16  current state of our negotiations, correct?

17  A    True.

18  Q    And you of course know that the debtor did that on

19  June 26th, right?

20  A    Yes.

21  Q    Okay.  And with respect to the TDPs and the claim

22  recoveries, the amended plan that was filed on June 26th is

23  what you said it would be, right?  It's a reflection of the

24  current state of negotiations, correct?

25  A    Yes.

Watts - Cross/Moxley                              26

1  Q    You don't think that is a plan that is actually going to

2  be voted on, correct?

3  A    Well, I think not necessarily.  And when I answered that

4  question yes, in my deposition, I knew that there was going to

5  be an amended plan.  I can't promise you there will be a second

6  amended plan.  But if there is and the Court decides to

7  preliminarily approve it, then that'll be what gets voted on as

8  opposed to the first amended plan.

9  Q    Well, we could look at it if we need to and if we need to,

10 just let me know.

11 A    Yeah.

12 Q    But the current plan on file right now has some blanks in

13 it, correct?  Like it couldn't actually be the plan that is

14 voted on, correct?

15 A    Yeah.  I think it's a situation where we feel like we're

16 on the two yard line.  There are still some minor things that

17 need to be worked out.  But nothing that I would consider to be

18 material.

19 Q    Right.

20 A    And that's not the case between the first plan and the

21 amended plan.

22 Q    And I know you told me that.0

23 A    Yeah.

24 Q    So I'm going to quote you back to yourself.

25 A    Go ahead.

Watts - Cross/Maimon                          27

1  Q    But I know that if J&J starts deviating or trying to make

2  something better for J&J and works for the plaintiffs, they've

3  got a problem with Michael Watts, right?

4  A    They do, absolutely.

5  Q    Thank you, sir.

6         MR. MOXLEY:  I have no further questions at this

7  time.

8         THE WITNESS:  Okay.

9         THE COURT:  Thank you, counsel.

10        Mr. Maimon.

11        THE COURT:  So your hangar and ranch, huh?

12        THE WITNESS:  (Witness giggles) Yeah.

13        THE COURT:  I knew I was doing something wrong.

14                         (Laughter)

15        THE WITNESS:  I've got a terrible story yesterday

16  that makes it far less glamorous than it sounds.

17                    CROSS-EXAMINATION

18  BY MR. MAIMON:

19  Q    Good afternoon, Mr. Watts.

20  A    Good afternoon.

21  Q    My name is Moshe Maimon.  We've met --

22  A    Of course.

23  Q    -- in person once and a couple times by Zoom.  Good to see

24  you here.

25  A    And by your reputation.

Watts - Cross/Maimon                    28

1  Q    Thank you.

2        But you're just as good as Mark Lanier we heard this

3  morning, so I can't even match that.  But I know --

4  A    I would dispute that.

5  Q    I know we're going to hear it, so why don't you give us

6  the breakdown of your cases.

7  A    Sure.  The date --

8  Q    You've got one of those cheat sheets there?

9  A    I do, and you're welcome to see it.

10 Q    No problem.  No problem.

11 A    In the database, 15,052 ovarian cancers, 555 mesos, 112

12 uterine, 216 fallopian, 55 cervical, 27 that I would call

13 ambiguous that it's --

14 Q    How many was that?

15 A    Twenty-seven that I would just call ambiguous.  It's hard

16 to tell which.  And there are another 1,197 that are not yet in

17 the firm that are still in the external vendor stage.  When you

18 add all that up, it adds up to 17,214.

19 Q    Now, within the ovarian cancer section that you have

20 there, so that's 15,052?

21 A    No.  Oh, yes.  I'm sorry.  Yes, sir.

22 Q    Do those have pathology reports that you have in-house for

23 all of those?

24 A    I wouldn't say all of them.  They've all been ordered.  I

25 don't know what the status is with respect to that.

1  Q    Do you know how the determination was made by your

2  analysis people that they actually have a confirmed diagnosis

3  of ovarian cancer?

4  A    Yeah.  The answer is yes and no.  There's a protocol for

5  that determination.  I don't know what it is.

6  Q    Ah.

7  A    Let me just be honest.

8  Q    Okay.

9  A    Okay.

10  Q    Same thing true with all the rest of the diagnostic

11  categories, correct?

12  A    Sure.  If you take the intake criteria, which are in

13  writing, you can figure all that out.  But I don't have it on

14  the top of my head.

15  Q    The intake criteria that you have to categorize something

16  as an ovarian cancer, what histologic subtype does it have to

17  be to be an ovarian cancer?

18  A    So, you know, obviously epithelial ovarian cancer is what

19  everybody's shooting for.  There are other kinds.  The data

20  that I gave you does not break it out, and I asked that

21  question on Monday.

22  Q    So, for instance, we heard this morning about

23  undifferentiated, or borderline, I'm sorry, borderline.  Would

24  that be included in the 15,052?

25  A    So you heard this morning I was outside, and the answer

Watts - Cross/Maimon                                    30

1  is, I don't know.

2  Q    Okay.  So aside from saying that it's been reported to you

3  that 15,052 of your 17,000 approximately cases are ovarian

4  cancer, you can't tell us anything more about what exactly

5  confirmed that?

6  A    Yeah, I think I told you in my first deposition, I've

7  never actually been in my database, don't know how to turn it

8  on.

9  Q    I haven't been in mine either, sir, so don't --

10 A    Yeah, it's pursuant to protocols that are set up at the

11 start and you wanted the data and I felt foolish not being able

12 to give Cameron the data at the last deposition, so I asked for

13 it.  That's where I'm at.

14 Q    Anything else on your cheat sheet?

15 A    Yeah.  If you have questions about my intake.

16 Q    I don't.

17 A    Okay.  If you want to know how many times we've

18 communicated with the clients.  I got asked questions about

19 that.  I've got all of that.

20 Q    Don't.

21 A    If you want to know about the six material improvements

22 from the first plan to the admitted plan, I've got some

23 discussions about that.

24      And then I've got, you've already heard about the 298

25 rejections.  I've got updated numbers on records received,

Watts - Cross/Maimon                                      31

1  records ordered, money spent, the like.  Whatever you need.

2  Q    Okay.  Thanks a lot.

3       Now, you were talking about the fact -- well, let's talk a

4  little bit about your cases, and it helps if I turn it on.

5       In February of 2022, which was the start of the first

6  motion to dismiss trial in LTL 1, you had zero retained cases,

7  true?

8  A    I think that's right.

9  Q    Okay.

10  A    Can't swear to it, but it's around that time.

11  Q    And, actually, you were in Trenton during that trial,

12  correct?

13  A    I did.  I came for one day.  I think I was in --

14  Q    You came for something else, right?

15  A    Yeah.  I think I was in New York for something.  I heard

16  it was going on.

17  Q    Okay.

18  A    Wanted to lay an eye on the Judge.  No offense.

19  Q    Had a chance to talk to Mr. Murdica?

20  A    I probably saw him.

21  Q    Okay.

22  A    Yeah.

23  Q    Now, when Judge Kaplan denied the motion to dismiss, you

24  still had no retained clients, true?

25  A    I think that's correct.

Watts - Cross/Maimon                                      32

1  Q    Okay.  The first retained client, and I read your

2  deposition, so the first retained client you told us was on

3  March 19, 2022, fair?

4  A    If my database is right, that's fair.

5  Q    Okay.  And then, going forward in time, in January of

6  2023, you had a meeting with Mr. Hass and Mr. Murdica which

7  eventually led to the PSAs and the term sheet being executed.

8  A    I wouldn't say that meeting led to it, but it was a

9  meeting and it was about talc and then they ignored me for

10  about three weeks and then we started talking end of February

11  and specifics in the middle of March.

12  Q    That was the first time you had spoken to Mr. Haas

13  specifically about talc litigation, fair?

14  A    About talc litigation, yes.

15  Q    Okay.  And you didn't tell us how many cases you had at

16  that point in time, so I put a slash there.

17  A    I think it was around 15,000.

18  Q    Very good, because on January 30, 2023, when the Third

19  Circuit ordered the dismissal, you had around 15,000 cases,

20  right?

21  A    Right.

22  Q    So within the scope of approximately 10 months plus a week

23  or two, you accumulated 15,000 cases, correct?

24  A    Yes.

25  Q    Okay.  And then when LTL 2 was filed, the number of cases

Watts - Cross/Maimon                                    33

1  that you had were 16,935, fair?

2  A    Yes.

3  Q    Okay.  And so what happened is during that month, or that

4  three month approximately period of time, your intake brought

5  in about 2,000 cases?

6  A    Let me clarify it just a tad.  I'm not certain how

7  accurate the 15,000 is or when I pulled it, but the math is the

8  math and so I'd say approximately so.

9  Q    Approximately is good enough.

10 A    Sure.

11 Q    Fair?

12 A    Yeah.

13 Q    Okay.  And then, a day before your first deposition, you

14 gave us accurate numbers, and you said that that number was

15 down to 16,925, right?

16 A    Yeah, but I don't think it ever went down.  I think I

17 testified to that.  I agree with you.  But I think that there

18 was some external sources that hadn't been counted yet.

19 Q    Okay.  I thought maybe it was one of those things that the

20 process, you know, somebody said, I'm not interested, or maybe

21 it went down by 10 or something like that.

22 A    No, it's going to go down because of rejection, sure.

23 Q    Okay.  But roughly the same number, right?

24 A    Yeah.

25 Q    And then, your second deposition on June 12th, around

Watts - Cross/Maimon                            34

1  17,000 claimants you told us, right?

2  A    Yes.

3  Q    And that's a pretty good estimation of what we're at now,

4  right?

5  A    17,214 is yesterday's number.

6  Q    Okay.

7  A    Yeah.

8  Q    Now, with regard to these clients, none of them, for none

9  of them, have you filed any cases, true?

10 A    You can't.

11 Q    Well, you can.  You can sue J&J because Judge Kaplan said

12 that you can.  He lifted the stay on filing those cases.  But

13 you have not filed any of your cases --

14 A    Not yet.

15 Q    -- against Johnson and Johnson --

16 A    Right.

17 Q    -- true?

18 A    Right.

19 Q    Okay.  And have you been in contact with your clients to

20 discuss whether or not, because you can file them, whether you

21 should be filing them?

22 A    We're in process of having those communications, you bet.

23 Q    Okay.  Now, you told us this is -- I created the slide

24 before I knew that you'd have the exact numbers.

25 A    Okay.

Watts - Cross/Maimon                        35

1  Q    You told us what you have, ovarian, cervical, uterine.  I

2  guess the ambiguous would be what I called unknown.  I didn't

3  have anything for fallopian tube.  I want to ask you about

4  pathological confirmation.  You've ordered pathology reports,

5  correct?

6  A    Sure.  Medical, pathology, everything.

7  Q    But again, you don't know how many pathology reports that

8  actually diagnose the cancer in the categories that you have

9  then you have, correct?

10 A    I don't.

11 Q    Okay.  And with regard to mesotheliomas --

12 A    Sure.

13 Q    -- you don't know how many of the, was it 500 and how

14 many?

15 A    555 (indiscernible).

16 Q    555.  That should be a simple number for me to remember.

17 A    Sure.

18 Q    You don't know for how many of those -- withdrawn.

19      You don't know whether or not you have pathology reports

20 for any of those mesotheliomas, correct?

21 A    I know I have them all ordered.  I don't know which I have

22 and which I don't.

23 Q    Right.  And, again, so you have them categorized as

24 mesotheliomas because somebody reported that it's a

25 mesothelioma, correct?

Watts - Cross/Maimon                           36

1  A    Sure.  About 3.5 percent of the clients reported they have

2  meso and 555 with the amount of money we spent last year, just

3  assume 2,500 new mesos a year.

4  Q    Now, you talked about the intake procedure and a lot of

5  the cases that you get are sent to you from other firms,

6  correct?

7  A    Yes.  Used to be.

8  Q    And you have criteria that they have to follow in order to

9  bring them in, right?

10 A    Or I won't bring them in, right.

11 Q    Understood.  The information that you have about the

12 diagnosis of mesothelioma, is that something that the client

13 provides or the referring lawyer supplies?

14 A    The clients provide it in an intake questionnaire.  It's

15 about 15 pages long.

16 Q    Okay.  And have you ever seen a pathology report that

17 discusses a questionable diagnosis of mesothelioma?

18 A    Sure.

19 Q    Okay.  And you're aware that sometimes there could be a

20 differential diagnosis of mesothelioma.  The client might think

21 that they have it, but it turns out, thank God that they don't,

22 right?

23 A    Sure.

24 Q    Okay.  And, again, you don't know, out of the 555 how many

25 might fall into that category?

1    A    No.

2    Q    Okay.  For the mesothelioma cases, on your intake, do you

3    question about other asbestos exposure aside from Johnson and

4    Johnson Baby Powder?

5    A    Yes.

6    Q    Okay.  And can you tell us with regard to the 555

7    mesotheliomas in your database, how many of them have reported

8    other asbestos exposure?

9    A    So what I know is the intake criteria deselects a lot of

10   those people with other asbestos criteria from this particular

11   project.

12   Q    What do you mean deselects?

13   A    In other words, if somebody worked in a rubber plant their

14   whole life, as a guy who tries a lot of cases, I'm not going to

15   face off against Jim Murdica and blame it on talc.  This kind

16   of thing.

17        So there's kind of a decision tree on all these intake

18   criteria to try to eliminate stuff where it's more likely than

19   not it's a compensable claim against somebody else.

20   Q    Do you know whether or not any of the mesothelioma cases

21   that you have among your 555 have been handled in litigation by

22   other lawyers?

23   A    So, that's a good question.  And --

24   Q    Thank you.

25   A    Yeah.  And the answer is we look for that.  The last thing

Watts - Cross/Maimon                                        38

1  I want to do is be in a duplicate sign up question and in a

2  situation where they've made a previous claim to a trust and

3  the like.  And so the exhibit to the PSA where all the clients

4  are listed was very much my idea and Ms. Lansbury was for it so

5  that you could, A, de-dupe and, B, compare it to other

6  databases and the like.

7  Q    Okay.  Good enough.

8       With regard to those mesothelioma cases, but again, you

9  don't know whether or not you might have a de-selection process

10 that somebody worked as a shipyard worker --

11 A    Sure.

12 Q    -- or a factory worker.  But with regard to other asbestos

13 exposure, you don't know categorically how many, if any of

14 those, have other asbestos exposure in their histories.

15 A    Well, I know that they're telling me that they don't.  and

16 of course, we've all had clients that disappoint us in that

17 regard.  But if they know your name and they know Peter

18 Angelas' name, I deselect them.  I mean why would we go through

19 that exercise.

20 Q    Understood.

21      You understand, do you not, that the plan of

22 reorganization disqualifies any mesothelioma clients who have

23 other asbestos exposure?

24 A    Conceptually, yes.  I mean, directionally, yes, I guess.

25 Q    Well, that's what it says, right?

1  A     Yeah.  But the idea was is that Johnson and Johnson

2  doesn't want to pay for mesothelioma that somebody else's

3  product caused.

4  Q     Understood.

5  A     Yeah.

6  Q     You've litigated cases against multiple tortfeasors in the

7  same case, correct?

8  A     I have.

9  Q     And part of your business model is to understand that

10 there can be multiple responsible parties or multiple

11 tortfeasors for the same damage, correct?

12 A     Absolutely.

13 Q     Okay.  And so it might be that somebody else might be

14 primarily responsible, but that doesn't eliminate all

15 tortfeasors being responsible, agree?

16 A     Agree.

17 Q     Okay.  So with regard to statute of limitations, tell us

18 with regard to -- let's start with the mesothelioma claims.

19 Are all of the diagnoses for the mesotheliomas within the last

20 five years, say?

21 A     Not necessarily.  I don't believe that's true.

22 Q     Do you know how many of them are?

23 A     No, I haven't stratified that.  But what I did do, and I

24 think you saw this in the term sheet.  There were previous

25 iterations of settlement proposals that had specific language

1  with respect to statute of limitations.  My read on that and a

2  lot of people I've talked to is it unfairly punished plaintiffs

3  from so-called discovery-rule states.  And so, in effect, the

4  issue of statute of limitations in the plan was something

5  that's going to be in effect litigated by the trust.

6      You know, you'll go in and you argue why you're entitled

7  to the discovery rule or some sort of equitable tolling and the

8  like, and then the trust, in preserving assets, will presumably

9  take a hard line in states that don't have it.

10 Q    And for those who have a diagnosis prior to the time that

11 they would have in the tort system, a cognizable claim for

12 statute of limitations, those theoretically could be eliminated

13 from payment from the trust, correct?

14 A    Well, and frankly, in the intake criteria, there's a 50-

15 state grid that we follow.  If you're from this state, the rule

16 is X.  If you're from that state, the rule is Y.  So we try to

17 deselect everything we can at the intake level.  So what's the

18 point of ordering medical records on somebody from a particular

19 state where the substantive law of that state has already

20 excluded it?

21 Q    And so --

22 A    So to the extent that we've got that 50-state right, and

23 I've got three law lawyers that keep up, you know, in all the

24 mass torts, keep up with it, then presumably we've already

25 sifted out all of the statute-barred cases and are only

1  spending firm resources to pursue those that still have an

2  opportunity in the court system.

3  Q    Okay.  But, again, you can't tell us the range -- the way

4  that you've broken down types of cancer, you can't breakdown

5  for us, these people were diagnosed here, these people here,

6  these people --

7  A    Yeah.

8  Q    -- way back.

9  A    If I had been asked that in my deposition, I probably

10 could.  But I wasn't asked, so I didn't go on Monday.  But my

11 point is is this.  I think if you'd like to see it, there's a

12 50-state grid about if you're from this state and there's a

13 series of questions that come up with respect to, you know, are

14 you eligible under that state's statute of limitations.

15 Q    Had I been thinking at the time, I would've asked it, but

16 we're at the evidentiary hearing, so we'll (indiscernible) all

17 that.

18 A    Yeah.  And you know that whenever I didn't have an answer,

19 the second deposition, I tried to have the answers.  Now, I'm

20 trying to --

21 Q    Fair enough, but this is the last chance.

22 A    Yeah.  I got it.

23           MR. MAIMON:  Right, Judge.

24           THE COURT:  Oh, yes.

25           MR. MAIMON:  Okay.

Watts - Cross/Maimon                              42

1                          (Laughter)

2   BY MR. MAIMON:

3   Q     In taking on the responsibility to litigate 17,000 cases,

4   I think you told us that you looked into the science of ovarian

5   cancer, mesothelioma, and things like that, correct?

6   A     Sure.

7   Q     And are you familiar with the epidemiological literature

8   that shows a relationship between asbestos exposure and ovarian

9   cancer?

10  A     Yes.

11  Q     Okay.  And you're familiar with the epidemiological

12  literature that deals with ovarian cancer as opposed to other

13  subtypes, but ovarian cancer and talc use?

14  A     Sure.

15  Q     Okay.  Are there studies that you've looked at that show a

16  statistically significant increased risk of cervical cancer

17  from asbestos exposure?

18  A     Yes.

19  Q     Which ones?

20  A     I listed them in the second deposition.  There's three.

21  And I will --

22  Q     We're talking about asbestos exposure, sir.

23  A     Yeah.

24  Q     Yeah.

25  A     Well, okay.  So you're stratifying normal asbestos versus

1  talc?

2  Q    Yes.

3  A    I need to go back and read that study.  I don't want to be

4  on the record.

5  Q    Okay.

6  A    I'm not positive which one I'm referring to, but I've got

7  a series of three studies that talk about the other

8  gynecological cancers, but it's been a while since I've read

9  them.

10  Q    And you mentioned them in the second deposition?

11  A    I did.

12  Q    Okay.  I'll take --

13  A    Okay.

14  Q    -- a closer look at that.

15  A    Yeah.

16  Q    Same thing with uterine cancer.  Are you aware of any

17  epidemiological literature that shows that asbestos causes

18  uterine cancer?

19  A    Same answer.  There are studies that talk about it in this

20  context, and I need to go review them before I go on the record

21  that it's asbestos versus talc.

22  Q    Fair enough.

23       With regard to any gynecological cancer that's not ovarian

24  cancer, would the same answer be true with regard to

25  epidemiological literature showing asbestos causing that

1  cancer?

2  A    As opposed to talc causing it?

3  Q    Correct.

4  A    Yeah, I think that's right.

5  Q    Okay.

6  A    But talc has asbestos in it if you believe our side, which

7  I do.

8  Q    Well, we're right, aren't we?

9  A    Yeah.

10  Q    Okay.  Yeah.

11         UNIDENTIFIED SPEAKER:  Objection.  (Indiscernible).

12         THE WITNESS:  Mr. Haas would disagree, but I agree

13  with you.

14  BY MR. MAIMON:

15  Q    No, I understand that.

16      If you could take a look at Tab 5 that I've put in front

17  of you.

18  A    Yes.

19  Q    This is a 2020 pooled analysis of prospective studies in

20  cancer epidemiology titled "Genital Powder Use and Risk of

21  Uterine Cancer, A Pooled Analysis of Prospective Studies."

22  A    Yes.

23  Q    Do you see that?

24  A    Yes.

25  Q    Are you familiar with this?

Watts - Cross/Maimon                          45

1  A    I'm familiar with, it seems like almost everything that

2  Katie O'Brien has written is harmful.

3  Q    Okay.

4  A    So, yeah, I've read it all.

5  Q    Well, some of her early stuff actually said that it looks

6  promising, right?

7  A    Her recent stuff is what I'm referring to.

8  Q    Okay.  And she concluded that uterine cancer, there is no

9  scientific reliability study for uterine cancer being caused by

10  talc?

11  A    Yeah.  I think all of her recent stuff is very harmful to

12  us --

13  Q    Okay.

14  A    -- on all the different cancers.

15  Q    But in contrast to that, if you take a look at Tab

16  Number 7, this is an editorial commentary by Egilman, Madigan,

17  Yimam, and Tran, Evidence that Cosmetic Talc is a Cause of

18  Ovarian Cancer, right?

19  A    Sure.

20  Q    And that's part of the literature that you cited, right?

21  Yeah, I note that, I mean, Egilman and Madigan are well known

22  players in this litigation as well.  So, but yeah, there's

23  science on both sides for sure.

24  Q    Okay.  Let's take a look at the term sheet, and the term

25  sheet is on Tab Number 1.

1  A    Okay.

2  Q    I don't think we'll need to look a lot at it, but I wanted

3  to talk to you a little bit about it.  In your meeting with

4  Mr. Haas, and then, as relayed to you by Mr. Murdica, who

5  Mr. Haas has hired, it was told to you that, except for a

6  bankruptcy, J&J will not otherwise settle these cases globally,

7  correct?

8  A    Yeah, it was more -- yes, that was said.  There was some

9  context if you want it, but if not, it's fine.

10 Q    What's that?

11 A    I said.  The meeting was one that I asked for, and my

12 reading was, we had a difference of opinion as to what the

13 Third Circuit would do that I've discussed.  My reading was

14 that there were timing opportunities that existed while this

15 was in bankruptcy that would not exist after.  After the

16 meeting to answer your question directly, I was convinced that

17 without some ability to use 524(g) to capture the futures, that

18 there was no way to settle this case.

19 Q    In fact, you told us in your first deposition that J&J

20 made it clear that once back in the tort system, this was

21 virtually impossible to settle, right?

22 A    Yeah.  On a global basis, I agree.

23 Q    You felt that it was an opportune time to explore

24 settlement with them, right?

25 A    I did.

Watts - Cross/Maimon                              47

1  Q    And according to J&J, you were left with the impression

2  that it was a one-time opportunity.  Those are your words,

3  right?

4  A    Well, I don't know whether it was my perception from them,

5  but it was my view walking in that if they weren't going to

6  settle the case without 524(g), that without 524(g), we were

7  back in the tort system.  And unfortunately, you'd be in a

8  situation where certain clients for certain very good law firms

9  would get paid and lots and lots and lots of clients for other

10 people would never see a dime.

11 Q    Let's go to Number 2.  One of your goals in discussing

12 settlement with these gentlemen was to get the most money

13 possible, correct?

14 A    Sure.

15 Q    And you believe that you accomplished that goal with the

16 $8.9 billion and was represented to you that there's not a

17 penny more?

18 A    Well, I think there's a penny more in Footnote 1 and 2

19 coming from Imerys.  I'm hopeful.  And then, of course, I think

20 we achieved deficiencies with, you know, the lien resolution

21 that I'm told I shouldn't talk about.

22 Q    We're not going to talk about that.

23 A    I got it.  I got it.  But I --

24 Q    But as far as the (indiscernible) --

25 A    But in terms of net dollars, those are the two items.

Watts - Cross/Maimon                                         48

1  Q    -- dollars from J&J --

2  A    Yeah.

3  Q    The dollars from J&J, you've been told $8.9 billion,

4  that's it.  Right?

5  A    I was told worse than that.  I was told there's no way I'm

6  going to pay $8.9 billion.  And then, eventually, you know, a

7  little cajoling, a little beating on them, a little, come on,

8  Eric, you know.

9  Q    And based on your --

10 A    Yeah, I think it's the most they're going to voluntarily

11 pay.

12 Q    Understood.  And then you were also told, and this goes

13 back to Number 1, that without a channeling injunction for J&J,

14 this is a non-start and it's non-negotiable, right?

15 A    Yeah, because of the 34 years of latency.

16 Q    Understood.  Okay.  So let's take a look, in the term

17 sheet, and I went over this with Mr. Murdica earlier, there are

18 three terms that I'd like to talk to you about.  First is,

19 there was a term in this term sheet -- there was a term in the

20 term sheet, yes, for a split between current and future

21 claimants, two-thirds current and one-third future, right?

22 A    Can you point that to me?

23 Q    Sure.  It's at the bottom of Page 1.  If you look before

24 the numbers, it says "The qualification and payment terms

25 contemplated below and attached are contingent on."

Case 23-12825-MBK    Doc 957    Filed 06/30/23    Entered 06/30/23 08:40:12    Desc Main
Document      Page 49 of 199

1    Do you see that?

2  A    Yes.

3  Q    And then, if you go to Number 3 on the next page, "The

4  futures claim representative's agreement that she will not

5  assign more than one-third of the trust corpus to qualifying

6  future claims."

7  A    Yes.

8  Q    Okay.  And that's something that you negotiated with

9  Mr. Murdica, correct?

10 A    Well, yes, and the reason was is that we had a pretty good

11 idea what existed now and we had a pretty good idea of the

12 power of future money over the course of the latency.  So in

13 other words, most of the negotiation with Mr. Haas was, and I

14 think I understand the disconnect between he and Mr. Murdica.

15      And I think Mr. Murdica, to a certain extent, was right,

16 that it wasn't worth what everybody was thinking it was worth

17 because of present value.  So we spent a lot of time talking

18 about discount rates and paying future amounts of money that

19 would satisfy in future dollars what's necessary to pay the

20 future claimants.

21 Q    With regard to your 17,000 cases, how many of them have

22 been diagnosed within the last five years?

23 A    I don't know.

24 Q    And with regard to the ovarian cancer cases, how many of

25 them have been diagnosed within the last five years?

Watts - Cross/Maimon                        50

1  A    Same answer.  I could find it, but I don't have it.

2  Q    With regard to the 17,000 cases that you accumulated, put

3  aside the mesos for a moment --

4  A    Sure.

5  Q    -- ovarian cancer, other gynecological cancer, since the

6  time that you got retained in your first one, how many of them

7  were diagnosed during that year?

8  A    I could find that for you.  I don't have it.

9  Q    Okay.

10 A    In other words, I have diagnoses dates in the database.

11 Q    Understood.

12 A    (indiscernible) tip.

13 Q    You see the two-thirds, one-third split here, right?

14 A    I do.

15 Q    Okay.  Let's go to the next one.  And if you want to see

16 where it is, it is on Page 3.

17 A    Yes.  2(a)(3).

18 Q    2(a)(3), 6.5 billion for ovarian.

19      Do you see that?

20 A    Yeah.

21 Q    And if you go to 2(b)(2), 2(b)(3) on the next page, 2

22 million for mesotheliomas, right?

23 A    Two billion.

24 Q    Two billion, right?

25      Okay.  You also have 400 million for the for the

 1 government claimants, correct?

 2 A    Yes.

 3 Q    You didn't have any input into that, did you?

 4 A    No.  Although, an important between plan and amended plan,

 5 I think we've got more control over that than we did before.

 6 Q    Understood.  But you didn't have any input into that,

 7 correct?

 8 A    I didn't.  I was told that was what was going to be

 9 necessary and I (indiscernible).

10 Q    Told by Mr. Murdica, right?

11 A    Yes.

12 Q    Okay.  Third thing, a demarcation of current versus future

13 ovarian cancer claims, both diagnosis and executed retainer if

14 it is, before April 1, 2023, and that's on Page 2, 2(a)(1) and

15 (2), correct?

16 A    Yes.

17 Q    Okay.  And you and I spoke about this at your first

18 deposition, right?

19 A    Right.

20 Q    Okay.  So I'd like to see if we can agree.  The first

21 thing, the split between current and future claims, two-thirds,

22 one-third.  Is that in the current plan?

23 A    I haven't looked at it.  I'm not sure.

24 Q    I looked and I didn't see it.

25 A    Okay.

Watts - Cross/Maimon                                            52

1  Q    Would that surprise you?

2  A    If it's not in there, I don't want to say I'd be

3  surprised.  But, you know the schedule I've been keeping, I

4  don't know whether it's in there or not.

5  Q    Okay.  But that was something that you particularly

6  negotiated with Mr. Murdica, correct?

7  A    Yes.

8  Q    Okay.  If it's not there, the split between ovarian cancer

9  and mesothelioma claims, that's also not there in the plan,

10 correct?

11 A    I don't believe it's set out that way in the amended plan.

12 Q    Okay.  And with regard to the third, that's been changed

13 to simply have a diagnosis date prior to April 1, 2023,

14 correct?

15 A    I don't know that, but I understand the discussions with

16 respect to the change and why people wanted it.

17 Q    Okay.  So I asked you a pointed question at your first

18 deposition.  And I asked you, you have never committed to

19 Mr. Murdica or Mr. Haas that your clients would vote in favor

20 of the plan, true?  And you said that's true.

21 A    Absolutely true.  I don't have the right to do that.

22 Q    And it's as true today as it was then, correct?

23 A    Absolutely.

24 Q    And you have never told Mr. Murdica, Mr. Haas, or anyone

25 else from J&J that your clients are committed to voting yes for

Watts - Cross/Maimon                        53

1  the plan, true?

2  A    Right.  I think it would be a violation of solicitation

3  rules.

4  Q    I think so, too.

5      So when J&J put out its press release in April of 2023,

6  and they said they have secured commitments from over 60,000

7  current claimants to support a global resolution on these

8  terms, those were not including -- Mikal Watts' clients, were

9  not included in current claimants from whom they received

10  secured commitments, true?

11  A    If you're asking me what I think happened, I think the PR

12  department didn't talk to legal.  It's sloppy.

13  Q    In an SEC statement, right?

14  A    Yeah.

15  Q    Okay.

16  A    The lawyers for 60,000 clients had committed to support

17  the plan and recommended it to their clients.

18  Q    Recommended it, right?  Yeah.  Thanks.  That's what I

19  thought.

20  A    Okay.

21  Q    Appreciate your time, sir.

22  A    You bet.

23         THE COURT:  Before I turn to the Ad Hoc, is there

24  anyone else?

25                    (No audible response)

Watts - Redirect/Whitner                              54

1          THE COURT:  Boy, they're treating you gently.

2          THE WITNESS:  I'm telling you.  Murdica softened them

3  up.

4          THE COURT:  Counsel.

5          MR. WHITNER:  Judge, thank you.

6                        REDIRECT EXAMINATION

7  BY MR. WHITNER:

8  Q    Mr. Watts, just a few follow up.

9       You were asked about medical records and you are getting

10 medical records for the claimants that you have.  Does that

11 cost you money?

12 A    Tens of millions of dollars.

13 Q    Okay.  And why would you spend that kind of money to

14 obtain those medical records?

15 A    Well, if you spend money to pay marketing vendors to get

16 clients in the door and you can't prove them into compensable

17 cases, you've just wasted a whole bunch of money.  So, as part

18 of the business plan in any tort, you better have marketing

19 spend.  You better have a retrieval or record evaluation spend.

20 You better have filing fees.  You better have experts and the

21 like.  It's all part of it.

22 Q    Would you spend that money for claims that you didn't

23 believe were compensable?

24 A    No.  And that's why you have such stark intake procedures

25 to try to ferret out non-compensable claims before you start

1  spending money.  So we have very specific 15-page

2  questionnaires, recorded telephone calls, embedded traps like

3  an MMPI where you can try to find people that aren't telling

4  you the truth.  You don't want to blow money for affidavits and

5  no record.

6  Q    The current plan, right, so you've talked about support

7  for the plan and what you can commit your clients to.

8  A    Sure.

9  Q    Let's talk about you and your support for the plan as it

10 stands now.  Is it a plan that you would recommend that your

11 clients vote in favor of?

12 A    Yes.

13 Q    Okay.  And has the negotiation and evolution of the plan,

14 has that been consistent with what you expected?

15 A    Yeah.  I mean, what happened was is that I negotiated the

16 money with Mr. Haas, negotiated the term sheet with Jones Day

17 and Mr. Murdica, and I very clearly said we must have a plan

18 out by May 14.  You know, I was going to Italy with my wife for

19 three weeks.  These things can last six, eight months if you

20 don't have a deadline.  And there's always an amended plan.

21 People will fire missiles at it.  You'll fix it, there will be

22 negotiations, you amend the plan and make it better and better

23 and better.

24     I settled the PG&E fires case for $13.5 billion on

25 December 6, 2019, and there were two amended plans for things

Watts - Redirect/Whitner                              56

1  that we never even thought about.  And the final plan that was

2  voted on wasn't finalized until April of 2020.  I knew that was

3  going to happen here, so I support the deal that I negotiated

4  with Mr. Murdica and Mr. Haas, but I knew it had to be

5  amplified.

6      And one of the reasons that I wanted you all and an ad hoc

7  committee is, frankly, there's a different skill set in terms

8  of bankruptcy knowledge about what's going to fly with him

9  that, you know, I've got a skill set in terms of, I've been

10 through it a couple times, Purdue, PG&E, and the like.  But you

11 guys do this every day.

12     And so there's been a lot of negotiations.  I've been on a

13 lot of calls between May 15 and yesterday with respect to how

14 to optimize what the first plan was versus an amended plan

15 that's better, that solves problems that we hadn't even

16 envisioned at the time.

17 Q   And is it your goal to reach a plan that's in your

18 client's best interest?

19 A   Absolutely.

20 Q   And you think you're there?

21 A   I think we're on the two yard line.

22 Q   Okay.  And why do you say that?  Why do you think the plan

23 that's been negotiated is in your client's best interest?

24 A   Well, number one, I believe it's in my client's best

25 interest, and I believe it's in the best interest of this group

1  of plaintiffs because it's money in a year in a case where

2  Johnson and Johnson has been more successful than unsuccessful,

3  in a case where Mark Lanier is out, and frankly, we brought up

4  Katie O'Brien.  I don't think the recent science has been very

5  helpful to our side.

6      It doesn't mean that I couldn't file these cases with a

7  straight face and litigate all day long with Mr. Murdica, but

8  they certainly have cognizant defenses.  These things are a dog

9  fight, as Mr. Satterley is watching right now.  I'm not saying

10 he's not going to win.  He's a great lawyer.  But there's great

11 lawyers on both sides.  These are hard cases.  They're

12 expensive.  The tort system's only put 46 of them through in 10

13 years.  About 38,000 women who have filed lawsuits have been

14 waiting around for over a decade and haven't received a dollar.

15 Q    Did you follow this Court's direction and provide notice

16 to your clients that you were participating in this bankruptcy

17 and representing them?

18 A    The day that he ordered it.

19 Q    Okay.  And have you received any negative response from

20 your clients as a result of that notification?

21 A    No.  The overwhelming response is not a question of what

22 did you do to me?  It's a question of when do I get my money?

23 Q    And so when you, if you get to a point where you actually

24 do recommend the plan to your client, do you expect they will

25 follow your recommendation?

Watts - Redirect/Whitner                        58

1  A    Yeah.  Although, you know, again, I want to be real clear

2  about this, I learned from the school of hard knocks and PG&E,

3  be careful what you ask your clients for before he signs off on

4  a solicitation statement.

5       And so I've given them the broad contours.  The answer to

6  your question is I got a very positive response.  But the Judge

7  and the Judge alone is going to decide what the solicitation

8  statement is and when we can start talking to them about it.

9  And at that point, if that plan looks anything like the one

10 we've negotiated, I will not only support it, but

11 wholeheartedly recommend it to all of my clients.

12 Q    And in your experience, when you recommend a plan or

13 settlement to your clients, do they usually follow your advice?

14 A    In the tort system, most aggregate settlements in effect,

15 require a participation threshold.  Those thresholds can be,

16 you know, they used to be about 95 percent pretty typically.

17 If we were lucky, it was only 90 percent, but we usually

18 deliver about 99 percent of the clients because I won't sign

19 off on a plan that I don't believe is their -- not in their

20 best interest.

21           MR. WHITNER:  One second, Your Honor.

22           No more questions, Your Honor.

23           THE COURT:  All right.  Thank you.

24           Does anyone else have any further questions?

25                     (No audible response)

**WWW.JJCOURT.COM**

Onder - Direct/Whitner                    59

1          THE COURT:  Well then, thank you Mr. Watts.  You are

2    excused.

3                    (Witness excused)

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  By the way, I watched and listened to you

6    on Mass Tort Network.  Be nice.

7          Thank you.  It's on YouTube.

8          THE WITNESS:  Thanks, Judge.

9          THE COURT:  All right.  I need to take a five minute

10   break.

11         We'll recess for five minutes.

12         MULTIPLE RESPONSE:  Thank you, Your Honor.

13         (Recess at 2:35 p.m./Reconvened at 2:41 p.m.)

14

15         THE COURT:  Good afternoon.  All right.  And we are

16   on?

17         THE CLERK:  Yes, Your Honor.

18         THE COURT:  All right.  We'll start.

19         Please raise your right hand.

20           JAMES ONDER, MOVANT'S WITNESS, SWORN

21         THE COURT:  Thank you.  Please give your name and

22   business address.

23         THE WITNESS:  James G. Onder, Sr.  110 East Lockwood,

24   St. Louis, Missouri, 63119.

25         MR. WHITNER:  Ready to proceed, Your Honor?

Onder - Direct/Whitner                          60

1          THE COURT:  Yes, please.

2          MR. WHITNER:  Again, K. Whitner of Paul Hastings on

3  behalf of AHC.  May I approach?  More binders.

4          THE COURT:  The Trenton school system greatly

5  appreciates all your contributions of binders.  Thank you.

6                        DIRECT EXAMINATION

7  BY MR. WHITNER:

8  Q    Mr. Onder, I've shown you what's been marked as Debtor's

9  Exhibit 7.  Do you recognize this document in this binder?

10 A    Yes, I do.

11 Q    And what is it?

12 A    It's my declaration in -- you know, in support of -- or in

13 opposition to the motion to dismiss.

14 Q    Okay.  And do you understand that we intend to introduce

15 your declaration as your direct testimony?

16 A    Yes, I do.

17 Q    As if you were testifying here live to the words on your

18 declaration?

19 A    Yes, that's my understanding.

20 Q    And you're good with that?

21 A    Yes.

22         MR. WHITNER:  Okay.  Your Honor, we'd like to move

23 Debtor's Exhibit 7 into evidence.

24         THE COURT:  All right.  No objection?  Thank you.

25 Accepted into evidence.  Thank you.

Onder - Cross/Moxley                         61

1          (Debtor's Exhibit D-7 admitted into evidence)

2              MR. MOXLEY:  Good afternoon, Your Honor.

3              Good afternoon, Mr. Onder.

4              Your Honor, once again, more binders.  May I

5    approach?

6              THE COURT:  Sure.

7                    (Counsel confer)

8              THE COURT:  Thank you.  That's fine.  Thank you.

9                    CROSS-EXAMINATION

10   BY MR. MOXLEY:

11   Q    Good afternoon, Mr. Onder.  Cameron Moxley again with

12   Brown Rudnick for the TCC.  You and I had a chance to meet by

13   video at your deposition, right, sir?

14   A    Yes.

15   Q    Nice to see you again.

16   A    Likewise.

17   Q    Mr. Onder, we may in the course of our discussion this

18   afternoon refer to some documents.  You have the binder in

19   front of you.  Things will appear on the screen as well if

20   that's easier for you.  Let me know if you need to look at any

21   documents or you can't see anything on your screen.  Just let

22   me know if there are any issues, okay?

23   A    Fair enough.

24   Q    Okay.  Mr. Onder, your law firm, OnderLaw, represents

25   approximately 21,411 talc claimants, right?

Onder - Cross/Moxley                    62

1  A    Correct.

2  Q    Okay.  And your clients suffer -- and I'm quoting now from

3  your declaration at paragraph 7, just for your reference.  They

4  "Suffer from ovarian cancer, gynecologic cancers, and/or

5  mesothelioma as a result of their use of and exposure to

6  Johnson & Johnson products."  Right?

7  A    Yes.

8  Q    Let's go through the breakdown of your clients' diagnoses,

9  of your approximately 21,411 clients.  And I'm looking, just

10 for reference, Mr. Onder, at paragraph 14 of your declaration.

11 Okay, sir?

12 A    Okay.

13 Q    Okay.  You have -- you represent, excuse me, approximately

14 9,000 clients who suffer from epithelial ovarian cancer,

15 correct?

16 A    That's correct.

17 Q    And you represent approximately 9,000 clients who suffer

18 from uterine cancer, correct?

19 A    Correct.

20 Q    And approximately 3,000 of your clients you don't yet have

21 medical records regarding their specific cancer type, correct?

22 A    That's correct.

23 Q    Okay.  And you have approximately ten mesothelioma

24 clients, right?

25 A    Correct.

Onder - Cross/Moxley                          63

1  Q    Okay.  Your firm utilizes a database to keep track of

2  clients and their information, and that's where the number

3  21,411 comes from, right?

4  A    That's correct.

5  Q    Okay.  And not all of the 21,411 claimants have filed

6  claims in the tort system right now, correct?

7  A    That's correct.

8  Q    Okay.  Thousands are unfiled, I believe you said, right?

9  A    That's correct.

10 Q    Okay.  Now, if a client is in your database, your

11 expectation is that they have a signed engagement letter with

12 your firm, right?

13

14 A    Yes.

15 Q    Okay.  Signing someone as a client does not necessarily

16 mean that you will ultimately file a case for that claimant in

17 the tort system, correct?

18 A    That's correct.

19 Q    Part of the process is that you order the client's medical

20 records, and you constantly reject cases once you've dug into

21 the facts for a particular claimant, right?

22 A    That's correct.

23 Q    You and your firm have not yet made a determination

24 whether to file the unfiled cases that you have, right, of the

25 clients that you have, right?

Onder - Cross/Moxley                           64

1  A    Yes and no.   There was a whole group -- at the time of the

2  first dismissal, we were looking into that 30-day window we had

3  to get ready to file.   So, you know, we had gone through, and

4  there were a good number that we had specifically already

5  drafted complaints on.

6  Q    So as you sit here today, can you tell the Court the

7  number of your clients who, if this case were dismissed, you

8  would file claims for in the tort system?

9  A    I remember the number we said we had to file within 30

10 days was somewhere on the order of 5- to 6,000.

11 Q    Okay.   The number of clients in -- that your firm

12 represents, the 21,411 figure, that's really a number that the

13 database generates based on whether or not a claimant has an

14 open file in your system, right?

15 A    That's correct.

16 Q    Okay.   That claim could still be subject to ongoing facts

17 gathering, diligence, documents coming and the like, right?

18 A    Absolutely.

19 Q    Okay.   And you state that you -- and this I'm reading from

20 paragraph 15 of your declaration.   You state that you

21 appreciate that there are differences of opinion regarding the

22 strength of certain talc claims, right?

23 A    Correct.

24 Q    Now, you phrase it in paragraph 15 of your declaration as

25 "differences of opinion."   But in terms of what those opinions

Onder - Cross/Moxley                                65

1  are based on, sir, you would agree that some gynecologic

2  cancers are not as convincingly proven by science to be related

3  to talc, right?

4  A    Absolutely.

5  Q    It's fair to say that you estimate that somewhere between

6  8,500 and 9,000 of your talc clients are "ovarian cancer of

7  confirmed and documented histological subtypes" that would be

8  the, so to speak, good cases, right?

9  A    Yes.

10 Q    Okay.  Some cancers -- or strike that.  Some cases are

11 stronger than others, right?

12 A    Correct.

13 Q    And that's because -- that some cases are stronger than

14 others, that's because some diagnoses have a weaker association

15 with talc, right?

16 A    Correct.

17 Q    Okay.  And complaints are not drafted for your unfiled

18 claims -- for all of your unfiled claims, because you typically

19 wait, I think as your answer a few questions ago mentioned,

20 until you get closer to the statute of limitations running out,

21 right?

22 A    Correct.

23 Q    Okay.  Let's look at tab 3 in your binder, if you could,

24 sir.  And that, for the record, is marked for identification

25 purposes as Trial Exhibit **829.

Onder - Cross/Moxley                          66

1          MR. MOXLEY:  And what I'd like to do, if we could

2    bring that up, Brian?  And what I'd like to do, if we could, is

3    turn -- just for the benefit of the screen, it's Exhibit A to

4    that document.  The third page from the end, I think.

5    BY MR. MOXLEY:

6    Q    Do you see Exhibit A in your binder, sir?

7    A    I think so.

8    Q    Okay.  It's now on the screen as well, if you --

9    A    Okay.  Great.

10   Q    -- can look and -- which -- and look at whichever is

11   easier for you.  Okay?

12   A    Right.

13   Q    Okay.  So this is an email from your firm to a network of

14   attorneys who may refer you talc cases, correct?

15   A    I'm assuming that that's what it is.

16   Q    Sure.  Well, we looked at this at your deposition and --

17   A    Okay.  This is --

18   Q    Right.

19   A    -- the one --

20   Q    It is the one from your deposition, yes.

21   A    What we send to the clients versus referring attorneys are

22   sometimes similar, sometimes not.  And it doesn't say

23   specifically who it's addressed to.  But if that's what I said

24   at my deposition, I suspect that's correct.

25   Q    Fair enough.  Let me show you this.  You see how at the

Onder - Cross/Moxley                              67

1  second page of this there's a portion there that says, "You can

2  click here for our latest criteria"?  Do you see that?

3  A    Okay.  Yep.  You're correct.  That would be the referring

4  attorney one.  Yeah.

5  Q    That's the signifier for you, right?

6  A    Exactly.

7  Q    Okay.  Great.  In response to the question -- you see it

8  on the first page, you know, the middle of your email there:

9  "How much will claimants get?"  Do you see that headline?

10  A    Yes.

11  Q    So the second sentence states, "Many of these claimants

12  have gynecologic cancers that are not as convincingly proven by

13  science to be related to talc.  As such, they will receive

14  lesser compensation."  Correct?

15  A    Correct.

16  Q    And the cancers that will receive lesser compensation

17  referred to in that sentence are uterine cancer and cervical

18  cancer, among others, correct?

19  A    Correct.

20  Q    And the science that's referred to in that sentence is to

21  the relevant medical literature, right?

22  A    Correct.

23  Q    You're the sole partner at OnderLaw, correct?

24  A    That's correct.

25  Q    And you, of course, take responsibility for what is in

Onder - Cross/Moxley                          68

1  your -- is on your firm's website and what is sent out under

2  your name, correct?

3  A    Yes.

4  Q    Your picture is in this email, correct?

5  A    Not that that means I wrote it, but yes, that's correct.

6  Q    Fair enough.  You see where there is the ability, and we

7  just talked about it, to click on that link to see your latest

8  criteria?  You see that?

9  A    Yes.

10 Q    Okay.  So if you turn in your binder to tab 4.  And this

11 is marked as -- for identification purposes as Trial Exhibit

12 **830.  And you may recall, Mr. Onder, that we looked at this

13 at your deposition as well.

14 A    Right.

15 Q    That's what comes up when you click on that link?

16 A    Okay.

17 Q    You recall that?

18 A    Okay.

19 Q    Okay.  And if you see, the document states on the top,

20 "Talcum Powder Ovarian Cancer Litigation."  Do you see that?

21 Very top of the document, sir?

22 A    Oh, sure.  Yes.

23 Q    Okay.  And then, yeah, Brian may highlight things for us,

24 but you can look --

25 A    I will just look at the screen instead.  I apologize.

Onder - Cross/Moxley                                    69

1  Q    Very good.  And then right below that headline you see

2  your name and your contact information, correct?

3  A    Correct.

4  Q    Okay.  Now, your criteria for which types of talc claims

5  you would take on has evolved over time, right?

6  A    That's correct.

7  Q    Okay.  In fact, over time, it was stable for a long time,

8  and then more recently it changed as you started to get a sense

9  for what's going to be paid or not paid, right?

10 A    Correct.

11 Q    Okay.  Looking at the criteria that you sent to your

12 attorney referral network in this Trial Exhibit 830, cervical

13 cancer is listed among the cases to be declined.  And that's

14 because you don't want your referring attorneys to pay $5,000

15 on a lesser-valued case like a cervical cancer case, right?

16 A    That's correct.

17 Q    Someone trying to sell a cervical cancer claim to your

18 referring attorney would be taking advantage of your attorney

19 buying that claim, right?

20 A    I don't know that they sell, per se.  I think that's, you

21 know -- but the bottom line is -- well, here's -- we'll give a

22 company money to advertise.  And there's an estimated cost per

23 claim.  You wouldn't necessarily want to pay, using your

24 example, $5,000 for a cervical or a uterine case.  If you're

25 going to -- if that's the set price, if the price is high, and

Onder - Cross/Moxley                          70

1   it's set, you know, fixed number of dollars, fixed number of

2   guaranteed cases, you don't want to be paying the higher dollar

3   amount.

4        As I explained in my deposition, when I do my own

5   advertising in house and so forth, we accept those uterine and

6   mucinous and some of the lesser cancers, because it's not

7   costing us any additional to sign up those clients.

8   Q    And just to be clear, Mr. Onder, the $5,000 example, that

9   was your example that you gave in your deposition, right?

10  A    Maybe it was.  Maybe it was.

11  Q    Should we take a look at that, or do you have a memory of

12  that?

13  A    No.  No, I believe you.  That --

14  Q    Okay.

15  A    That's in the --

16  Q    Do you have a memory of giving me that example?

17  A    Yes.

18  Q    Okay.

19  A    Yeah.  Or --

20  Q    And the types of cases to be declined that are on this

21  list in your criteria that we're looking at that's trial

22  Exhibit 830, the cases that are listed to be declined are on

23  there because, in your estimation, they are lower-value talc

24  claims, right?

25  A    That's correct.

Onder - Cross/Moxley                                    71

1  Q    And they're lower-value talc claims because they are not

2  as strongly supported by the medical literature, right?

3  A    That's correct.

4  Q    In signing the plan support agreement or the PSA,

5  Mr. Onder, in your view, you agreed to use commercially

6  reasonable efforts to work with the debtor to negotiate and

7  support the confirmation of a plan that is consistent with the

8  PSA, right?

9  A    That's correct.

10 Q    You viewed signing on early as a way to be able to

11 negotiate and have the power of the pen, I think you told me,

12 right?

13 A    Yes.

14 Q    In form or substance, did Mr. Murdica ever convey to you

15 at any time on or after the Third Circuit's January 30, 2023,

16 decision that a second bankruptcy would be filed and that if

17 you were not willing to engage you'd be left out in the cold

18 somehow?

19 A    I think the consensus was that a second bankruptcy was

20 going to be filed.  Witness the fact everybody's using the term

21 "Chapter 22."  But, ultimately, Mr. Murdica requested -- or,

22 well, requested that I continue to negotiate on behalf of my

23 clients and, ultimately, if I saw those -- it appropriate on

24 behalf of everybody to try to move the case toward resolution.

25 Q    As of April 4th, the date that the second bankruptcy case

Onder - Cross/Moxley                          72

1  was filed, the case that we're in hearing on today, what you

2  had in hand at that time was, I think you told me, the grid

3  from the PSA, which you knew was something that needed to be

4  discussed and worked on further, right?

5  A    Correct.

6  Q    Your firm's website has public posts about this case, and

7  you consider those posts to be marketing and advertising,

8  right?

9  A    That's correct.

10 Q    Okay.  They're designed to encourage claimants to bring

11 their claims to your firm?

12 A    Absolutely.

13 Q    Let's look at tab 5 in your binder now, sir.

14       MR. MOXLEY:  And this is marked as -- for

15 identification purposes, Your Honor, as Trial Exhibit **832.

16 BY MR. MOXLEY:

17 Q    And I think we'll bring that on the screen as well,

18 Mr. Onder.

19 A    Great.

20                         (Counsel confer)

21 BY MR. MOXLEY:

22 Q    Do you see it in your binder, sir?  We can start there.

23 And if we can get the screen to be more --

24 A    Sure.  That's fine.

25 Q    That's great.  Okay.  So this was a blog post on your

Onder - Cross/Moxley                               73

1  firm's website on April 13th of 2023.  Do you see the date on

2  the document?  It may be a little hard to see.

3  A     Sure.  Yes.  I believe you.

4                         (Counsel confer)

5  BY MR. MOXLEY:

6  Q     So can you see the dates --

7  A     I do --

8  Q     -- in the middle of the --

9  A     I do see the date here.  Yes.

10 Q     Okay.  I just wanted to make sure we got the date there.

11 Okay.  Great.  And it states that this agreement is -- sorry.

12 Strike that.  A few days after the bankruptcy filing, which was

13 on April 4th, this post appears on April 13th, and the headline

14 of the post is "$8.9 Billion J&J Talc Resolution Questions and

15 Answers," right?

16 A     Correct.

17 Q     Okay.  And in that April 13, 2023, post it states, "This

18 agreement is tentative and still has quite a bit to hammer

19 out."  Do you recall that?

20 A     Yes.

21 Q     Okay.  And you let people know that J&J's position on what

22 they are going to pay on, what they are not going to pay on has

23 deviated over time, right?

24 A     That's correct.

25 Q     And in your April 13th post, Trial Exhibit 832, what you

Onder - Cross/Moxley                                    74

1  consider -- which is what you consider advertising material,

2  right?

3  A    Yes.  The idea was to educate the public about what's

4  going on.  And, hopefully, they would call in with additional

5  questions.

6  Q    There's a question that reads, "Am I getting any money?"

7  Do you see that?  It's the second question on the second page.

8  A    If I can --

9         MR. MOXLEY:  Oh, we have the screen now.  Great.  So

10 the second page there, if we can just blow up the second

11 question.

12 BY MR. MOXLEY:

13 Q    It says, "Am I getting any money?"  Do you see that?  It's

14 on your screen now, sir, if that helps.

15 A    Yes.  I see that.

16 Q    Okay.  And the -- part of the response there to the

17 question am I getting any money is "Johnson & Johnson has

18 agreed to pay small settlements to clients with other

19 gynecological cancers, many who were told in the past that

20 their cases would not be compensable."  Right?

21 A    Correct.

22 Q    Now, in your declaration, after describing your intake and

23 referral procedures, you state at paragraph 11 of your

24 declaration "Pursuant to these intake and referral procedures,

25 my law firm rejected over 80,000 potential claimants, including

Onder - Cross/Moxley                              75

1  individuals who, one, were diagnosed with types of cancer that

2  medical literature identifies as having negligible or more

3  limited degrees of association with talc usage."  Right?

4  A    Yes.

5  Q    But your firm put up on the April 13, 2023, post to tell

6  potential claimants who you might -- who you may have

7  previously rejected to get back in touch with you, right?

8  A    Yes.

9  Q    And you -- now, Mr. Onder, you could withdraw from the PSA

10 today if you chose to, correct?

11 A    I'm sorry?

12 Q    I'm sorry, sir.  You could withdraw from the PSA today if

13 you chose to, correct?

14 A    Yes.

15 Q    And you've discussed that fact that you could withdraw if

16 you chose to today with everybody, I think you told me, right,

17 everybody involved?

18 A    Everybody is a broad term, but --

19 Q    Every --

20 A    -- generally speaking, I think that's a given.  We had an

21 agreement -- a commitment to that, to work toward a settlement,

22 and obviously if the terms went way -- one way or the other,

23 you can, you know, modify it.

24 Q    The debtor has, of course, filed a plan now, correct?

25 A    Yes.

Onder - Cross/Moxley                                76

1  Q    Okay.  And in your declaration, you describe the plan the

2  debtor filed as in many ways -- the original plan now: "in many

3  ways consistent with the" -- strike that.  I'm sorry.  I didn't

4  mean to mislead you.  I misspoke.  In your declaration at

5  paragraph 32, you're referring to the anticipated amended plan

6  that will be filed, correct?

7  A    Yes.

8  Q    Okay.

9  A    Or, no.  No.  As of the time that declaration was filed,

10  the only one out there was the original.  I mean, as of the

11  time that it was drafted, the only one out there was the

12  original.

13  Q    Right.  And, Mr. Onder, I asked an unclear question.

14  Let's take a look at your deposition at paragraph 32 just so

15  we're very clear.  And as you just said, sir, this declaration

16  was filed before the amended plan was filed, correct?

17  A    I believe so.  Yes, that's correct.

18  Q    Okay.  Okay.  So at paragraph -- so you discussed the

19  original plan, and then you discussed the amended plan that you

20  anticipated.  So at paragraph 32, you discuss the original

21  plan, and then you say that it was in many ways consistent with

22  the term sheet in the PSA but still required work by and among

23  the parties to reach final consensus of all material terms,

24  right?

25  A    That's correct.

Onder - Cross/Moxley                              77

1  Q    In considering the plan that the debtor has filed, there

2  are still -- there were still, with the May 15th plan, details

3  to work out and areas of disagreement, right?

4  A    Correct.

5  Q    And, in fact, the plan was not consistent in some ways

6  with the PSA.  That's what you told me at your deposition,

7  right, the original plan?

8  A    That's correct.  That's what -- we've been working through

9  those issues and others --

10 Q    And there --

11 A    -- ever since.

12 Q    And there are negotiations that are currently going on,

13 correct?

14 A    Absolutely.

15 Q    Yeah.  Let's look at tab 6 in your binder, sir?  So tab 6

16 for the record is identified as Trial Exhibit **765.

17 Mr. Onder, you've seen this before, correct?

18 A    Yes.

19 Q    Okay.  This is an email from you to your attorney referral

20 network again dated May 19, 2023.  So again just to orient you,

21 it's four days after the original plan was filed but before the

22 current amended plan that's on file now was filed, correct?

23 A    Yes.

24 Q    Okay.  And on this May 19th communication, you let your

25 attorney referral network know that the filed plan fell short

Onder - Cross/Moxley                                           78

1  of the terms you had agreed upon in the PSA, right?

2  A    Yes.

3  Q    And you did not plan to recommend the plan originally

4  filed on May 15th to your clients, because you believed it

5  would be amended, right?

6  A    Right.  I mean --

7  Q    That's one of the reasons?

8  A    -- that's just kind of how it works.  You negotiate and

9  continue to negotiate, as I understand it, until the bitter

10 end.

11 Q    But if you had been pressed on the original -- the first

12 filed plan on whether to recommend that plan or not to your

13 clients, you would have to give that, you said, some long, hard

14 thought, and, ultimately, you would not recommend it, but you'd

15 leave it up to the clients at that point, correct?

16 A    That sounds like a reasonable approach given the terms

17 deviated from the PSA.  So we -- but you got to understand,

18 we've been working on things the entire time.  You know, what I

19 know -- you know, what I know, the full valuation of what I

20 know, where the negotiations are going and where everything is

21 heading isn't necessarily reflected on a piece of paper in

22 front of me.  But that is correct.  It's a correct statement.

23 Q    One of the things you disliked about the original filed

24 plan on May 15th was that the current grid was too low, and it

25 capped out the maximum you can recover, right?

Onder - Cross/Moxley                          79

1  A     Yes.

2  Q     Okay.  Your firm has co-counsel arrangements with other

3  lawyers who represent talc claimants, right?

4  A     Yes.

5  Q     Mr. Entrekin is one of your co-counsel, correct?

6  A     Yes, I believe so.

7  Q     Okay.  Let's look at tab 8 if we could in your binder,

8  sir.  I'm sorry.  That's the wrong tab number.  It's tab 10.

9         MR. MOXLEY:  Tab 10 for -- is marked for

10 identification purposes as Trial Exhibit **835, Your Honor.

11 MR. MOXLEY:

12 Q     Mr. Onder, you've seen this declaration at your deposition

13 previously, correct?

14 A     Yes, I believe so.

15 Q     You see at paragraph 5 -- this is the declaration, for the

16 record, by Attorney Lance Entrekin.  Do you see that, sir?

17 A     Yes.

18 Q     Do you see at paragraph 5 of his declaration that

19 Mr. Entrekin writes "On August 3, 2021, I signed a co-counsel

20 agreement with the OnderLaw firm, communicating directly with

21 its founder.  The OnderLaw firm" --

22         MR. WHITNER:  Your Honor, I'm going to object to this

23 document.  It's hearsay.  We've not seen this Mr. Entrekin.  We

24 had no chance to depose him, question him.  I mean, it's

25 just --

Onder - Cross/Moxley                          80

1          MR. MOXLEY:  Your Honor, I haven't moved --

2          MR. WHITNER:  It's just a declaration --

3          MR. MOXLEY:  I'm sorry.  Please continue.

4          MR. WHITNER:  -- but you're introducing it by --

5    through your testimony to the Court.  There's no reason for the

6    Court to hear this declaration of a declarant who's not been

7    before the parties to understand what's real about this

8    declaration or not.

9          MR. MOXLEY:  Your Honor, I haven't yet moved the

10   document into evidence, and I may not.  I'm showing the

11   document to the witness in connection with the fact that he's

12   already testified that Mr. Entrekin is his co-counsel with

13   respect to certain talc claimants.  And I'd like to ask him

14   some questions about --

15         THE COURT:  You may ask him about his understanding

16   of it or his familiarity with it but not the contents, not

17   specific contents.

18         MR. MOXLEY:  Thank you, Your Honor.

19   BY MR. MOXLEY:

20   Q    Mr. Onder, did you communicate prior to the filing of the

21   second LTL bankruptcy, this bankruptcy case, with your

22   co-counsel that you had signed the PSA and that you were

23   supporting a second bankruptcy?  Did you communicate that to

24   your co-counsel?

25   A    Well, it depends on what time frame.  I mean, we were

Onder - Cross/Moxley                              81

1  under a confidentiality during that -- you know, in the days

2  before.  But the same day as the filing -- I believe it was

3  same day, next day, within days at least, you know, within 24,

4  48 hours, a letter went out to every client and every referring

5  attorney.

6  Q    Right.  Just not before the filing, correct?

7  A    Correct.

8  Q    Okay.  Let me show you what's been marked as Trial Exhibit

9  **1012.  This is at tab 9 of your binder, sir.  And, Mr. Onder,

10 looking --

11         MR. MOXLEY:  And it's marked -- I think I said this,

12 but just for the record to be clear, it's Exhibit -- it's

13 marked as Trial Exhibit 1012 for identification purposes, Your

14 Honor.

15 BY MR. MOXLEY:

16 Q    Mr. Onder, you see at the top of this document your law

17 firm's logo, correct?

18 A    Yes.

19 Q    Okay.  And do you recognize this as your law firm's

20 letterhead?

21 A    Yes.

22 Q    Your name's on the bottom of the letter, correct?

23 A    Yes.

24 Q    Okay.  The letter is undated, but you'll see in the third

25 paragraph there's a reference there to the "recently filed

1  plan."  So would you agree with me that it must have been

2  sometime after the May 15th plan filing?

3  A    Yes.

4  Q    Okay.  In the first paragraph, the third sentence, your

5  letter states, "Regardless of any numbers you may have read or

6  heard, please know that the dollar amounts have not been

7  finalized and extensive additional negotiations still need to

8  take place for a plan to pass."  Right?

9  A    Correct.

10  Q    And at the end of the second paragraph, you write, "Our

11  group is speaking directly with J&J to hammer out key pieces of

12  the plan."  Do you see that?

13  A    Correct.

14  Q    Now, while I note your declaration characterized the filed

15  plan, and this is in paragraph 32 of your declaration, that it

16  was in many ways consistent with the term sheet and the PSA,

17  here, in this exhibit, Exhibit 1012, in the third paragraph you

18  characterize that same plan as "significantly different than

19  the terms our firm agreed to support."  Right?

20  A    Yes.  Yes.

21  Q    And in the next statement, you state that "Discussions are

22  ongoing," but also that "We are disappointed in the filed

23  plan."  Right?  That's what you wrote?

24  A    We had an understanding of what the terms were going to

25  be, and when we got it, they -- it looked like they had almost

Onder - Cross/Moxley                                83

1  forgot to swap some things out.  But so, yeah, we were

2  disappointed by that.  Absolutely.

3  Q    And looking ahead, you write that "We continue to push for

4  significant modifications to key points of the plan," and you

5  describe your outlook as "cautiously optimistic," right?

6  A    Correct.

7  Q    With respect to the discussion by the -- excuse me.

8        MR. MOXLEY:  We can take that down now, Brian.  Thank

9  you.

10 BY MR. MOXLEY:

11 Q    Mr. Onder, with respect to the discussion by the debtor in

12 court and elsewhere to the effect that 75 percent of claimants

13 are in support of a settlement reflected in the PSAs, you would

14 agree that the more accurate way of referring to that support

15 is that the support is from counsel representing those

16 claimants, not the claimants themselves, right?

17 A    Correct.

18 Q    The fact that you signed the PSA doesn't obligate your

19 clients to do anything, right?

20 A    Correct.

21 Q    In your June 23rd declaration, your declaration that

22 you've submitted for today's purposes, at paragraph 33 you

23 wrote that you understand the debtor intends to file an amended

24 plan and trust distribution procedures that reflect the current

25 state of our negotiations, right?

Onder - Cross/Moxley                         84

1  A    That's correct.

2  Q    Okay.  And you're aware the debtor, of course, filed that

3  amended plan a couple of days ago?

4  A    Yes.

5  Q    And with respect to the TDPs, the trust distribution

6  procedures that are attached to that amended plan and the claim

7  recoveries, the amended plan that was filed is what you said it

8  would be, right, a plan that reflects the current state of

9  negotiations?

10 A    Correct.

11 Q    You're aware, Mr. Onder -- let me just make sure you've --

12 you're familiar with the amended plan that was filed, correct?

13 A    Yes.

14 Q    Okay.  You're aware, sir, that the use definitions in --

15 the "use definitions" in the amended TDPs that refer to the use

16 of 50 times per year for a minimum of four consecutive years,

17 you're familiar with those definitions?

18 A    Yes.

19 Q    Okay.  Have you -- and we can look at them if you need to,

20 sir, to refresh your memory.

21 A    No.  I'm familiar with them.

22 Q    You're familiar with them.  Have you seen a study that

23 supports use of 50 times per year as causing cancer?

24 A    Put it this way, regular use for four years is what is the

25 general term.  The issue is what constitutes regular use.  You

Onder - Cross/Moxley                    85

1  know, part of what was going -- what's going on here with all

2  of those use terms -- you know, as I believe I said in my

3  deposition, I wasn't in favor of the use terms, because I was

4  concerned about how that would affect things.

5       And it -- and, you know, again, negotiation -- you know,

6  it's a process of negotiation.  And we discussed back and forth

7  the use terms.  We discussed the effects.  We -- they pointed

8  out, you know, hey, dose response is important.  You know, the

9  more you use, the more likely you are to get cancer and

10 suggested that that was a more logical approach to actually

11 include use restrictions, quantity of use, things of that

12 nature in order to approximate the medical literature in terms

13 of dose response.

14 Q   So, Mr. Onder, my question was a little different.  And

15 just ask for just a direct answer if I could too.

16 A   Yeah.

17 Q   The question is, have you -- are you familiar with any

18 study that shows that the -- the use amount that is used in

19 those use definitions in the current amended plan is enough to

20 cause cancer?  Are you familiar with a study?

21 A   I am not sure what the studies say in terms of the number

22 of times per year constituting regular use.  I'm -- off the top

23 of my head, I don't know.

24 Q   Okay.  Article 8 of the plan -- and, again, we can look at

25 it if you need to, but I take it you're familiar with it.

1 Article 8 of the plan sets forth provisions concerning

2 conditions precedent to confirmation of the plan, right?

3 A    Okay.

4 Q    Are you familiar with that?

5 A    Sure.

6 Q    Okay.  And if we look at -- well, actually, you know what?

7 Just so we're clear, let's just look at that very quickly if we

8 could.  So this will be tab 12 in your binder there.

9         MR. MOXLEY:  And we can bring it up on the screen, if

10 we could.  This is the amended plan, Brian.  If you could bring

11 that up, please.

12 BY MR. MOXLEY:

13 Q    And what we're going to do is look at page 55 of 149.  And

14 I think we're going to try to bring that up on the screen there

15 for you.

16         MR. MOXLEY:  Yeah.  That's great, Brian.  Thank you.

17 BY MR. MOXLEY:

18 Q    So, Mr. Onder, look in your binder or look on the screen,

19 whichever is easier for you.  You see Article 8 there is

20 Conditions Precedent to --

21 A    Sure.

22 Q    -- Confirmation and Consummation of the Plan?  You see

23 that?

24 A    Yes.

25 Q    Okay.  And then at Section 8.1G, this is at page 61 of

Onder - Cross/Moxley                    87

 1 149 --

 2 A    Okay.

 3 Q    Are you with me, sir, at 8.1G?

 4 A    It's on page 61?

 5 Q    It's in the top -- sorry.  In the standing by the Court --

 6 A    If you just highlight it --

 7         THE COURT:  I believe it's 65.

 8         THE WITNESS:  If you just highlight it there, we're

 9 happy to look at it.

10 BY MR. MOXLEY:

11 Q    Yeah.  You're looking at 8.1G?

12 A    Apparently not.

13         MR. MOXLEY:  Brian, can we bring up -- it's not

14 working?

15         THE COURT:  I think it's page 55.

16         THE WITNESS:  55?  Okay.

17         MR. MOXLEY:  I think it's page 55 of the document.

18 Yes, Your Honor.

19         THE WITNESS:  Okay.

20 BY MR. MOXLEY:

21 Q    I --

22 A    I'm sorry.  I thought you said 61.  I apologize.

23 Q    I did.  I was using the pagination that's stamped at the

24 top.

25 A    Sounds good.

Onder - Cross/Moxley                              88

1  Q    And there's a page 55 at the bottom of --

2  A    Fair enough.

3  Q    Okay.  So you're looking at 8.1G, yes?

4  A    Yes.

5  Q    Okay.  You see that provides that a settlement in the

6  Imerys case is a condition precedent?

7  A    Yes.

8  Q    Okay.  And if we can go to Section 8.3, which should be

9  just, I think, seven pages later.  Are you looking at Section

10  8.3?

11  A    Yes.

12  Q    It's entitled Waiver of Conditions Precedent.  Do you see

13  that?

14  A    Correct.

15  Q    And there's language there that's added that says that the

16  Imerys settlement conditions precedent -- condition precedent

17  cannot be waived without the consent of Johnson & Johnson and

18  the ad hoc committee of support counsel, right?

19  A    That's correct.

20  Q    Okay.  Imerys is not settled, right?

21  A    No.

22  Q    Okay.

23  A    No.  Imerys refused to discuss settlement until after the

24  motion to dismiss hearing.

25          MR. MOXLEY:  Mr. Onder, I have nothing further.

Onder - Cross/Maimon                        89

1   Thank you very much.

2               THE WITNESS:  Thank you.

3               THE COURT:  Thank you, counsel.

4               MR. MOXLEY:  Thank you.

5               Mr. Maimon?

6               MR. MAIMON:  May I, Your Honor?  No binders.

7               THE WITNESS:  Sounds good, Moshe.

8                       CROSS-EXAMINATION

9   BY MR. MAIMON:

10  Q    How are you, Jim?

11  A    Good.  Good.

12  Q    Good afternoon, Mr. Onder.  I'd like to follow up on a few

13  issues.  First of all, the breakdown that I think you told us

14  about in your inventory of cases is approximately 9,000

15  ovarian, 9,000 uterine, and 3,000 currently unknown, fair?

16  A    That's correct.

17  Q    Okay.  And with regard to the ovarian cancer cases, do you

18  have a breakdown of the histologic subtype among them?

19  A    Yes.

20  Q    Okay.  And what are they?

21  A    Oh, do I know it off the of my head?

22  Q    Yeah.  Or do you have a cheat sheet like Mikal Watts does?

23  A    No.  I was told not to bring anything.

24  Q    No problem.  But you just don't have it here with you?

25  A    Yeah.  But if you look at the plan, the TDP, the basic

Onder - Cross/Maimon                                90

1  histologic subtype categories, that would be them.

2  Q    Okay.  But those histologic subtypes within the plan,

3  depending on the histologic subtype, they can get different

4  recoveries, correct?

5  A    Correct.

6  Q    Okay.  So I'd like to talk a little bit about the

7  negotiations that you had with Mr. Murdica and specifically the

8  ones that occurred before the filing of this current

9  bankruptcy, okay?

10  A    Okay.

11  Q    Okay.  And I think you told us that you entered into them

12  on behalf of your clients, true?

13  A    During which period of time you're talking to?  I mean --

14  Q    Before the -- before --

15  A    Before -- after the first but before the second or --

16  Q    After --

17  A    -- after the --

18  Q    After January 30th --

19  A    -- Third Circuit or --

20  Q    -- and before the filing of the second.

21  A    Okay.  January 30th is which date, just for reference?

22  Q    Third Circuit opinion.

23  A    Okay.

24          THE COURT:  Between January 30th and April 4th.

25          THE WITNESS:  Okay.  There we go.  Okay.

Onder - Cross/Maimon                          91

1  BY MR. MAIMON:

2  Q    Okay?

3  A    Fair enough.

4  Q    During that period of time --

5  A    Yes.

6  Q    -- you engaged in negotiations with Mr. Murdica, correct?

7  A    I don't know so much -- you could say that, yes.

8  Q    Well, you signed the PSA, right?

9  A    Right.  Exactly.

10  Q    And you spoke to him about it, right?

11  A    Absolutely.

12  Q    Okay.  And I think you told us that you did so on behalf

13  of your clients, correct?

14  A    Correct.

15  Q    And you did so on behalf of all your clients, right?

16  A    Correct.

17  Q    And I think you also told us that in addition that you

18  also did it on behalf and to benefit all talc claimants, right?

19  A    You know, as we went into negotiations, one of the

20  understandings I had with Mr. Murdica -- we were asked to sign

21  a nondisclosure, and I -- with Mr. Murdica, I just messaged

22  with him.  Hey, you know, I'm on the TCC 1.  To the extent, as

23  I start to learn things, if there's something important that I

24  think is important and needs to be passed on to TCC, you know

25  what, I'm going to ask your permission and ask to do that.

Onder - Cross/Maimon                                    92

1  Because, you know, obviously, I don't want to breach any duties

2  to the TCC.

3  Q    I'm not talking about breaching duties.

4  A    Okay.

5  Q    I'm not talking about that at all.  What I'm saying is

6  that when you went into those negotiations and spoke to

7  Mr. Murdica, you had in mind to do the best by all your

8  clients, right?

9  A    Correct.

10 Q    And you also had in mind to benefit all talc claimants,

11 correct?

12 A    Yes.

13 Q    Okay.  And now, let me take you before January 30th.

14 Before January 30th, you also had had discussions with

15 Mr. Murdica about talc claimants, correct?

16 A    Correct.

17 Q    Okay.  And they had gone on for many years, right?

18 A    Correct.

19 Q    Okay.  And during those negotiations before January 30th

20 of this year, Mr. Murdica made clear to you that J&J would

21 never pay on uterine cancer claims, correct?

22 A    He said that.  We would argue about it regularly.  You

23 know --

24 Q    I'm not saying he meant it, but that's what he said,

25 right?

Onder - Cross/Maimon                          93

1   A     Yes.

2   Q     Okay.  And he said that they would never pay on cervical

3   cancer claims, right?

4   A     Just as he said they wouldn't pay on ovarian.

5   Q     Well, you knew that they did pay on ovarian cancer claims,

6   right?

7   A     Depending which time frame.  I knew they settled Lanier's

8   docket.

9   Q     Well, you knew that they settled Lanier's docket.  You

10  knew they settled other cases as well, correct?

11  A     I'm not aware of any other than Lanier.

12  Q     Okay.  Then but you did know that in the tort system they

13  settled ovarian cancer cases, correct?

14  A     Correct.

15  Q     Okay.  But the -- he told you that never uterine, right?

16  A     Correct.

17  Q     He told you never cervical, right?

18  A     Correct.

19  Q     You broke down for us between your case load of the

20  gynecological cancers 9,000 uterine, 9,000 ovarian, 3,000

21  unknown.  Do you have cervical cancers in your -- in your

22  inventory?

23  A     For the most part, I do not.  I'm not saying there isn't a

24  single one there, but --

25  Q     Fair --

Onder - Cross/Maimon                    94

1  A    -- for the most part --

2  Q    Fair enough.  Fair enough.  So when this deal came up --

3  now I'm talking about January 30th to April 4th, when this deal

4  came up, Mr. Murdica was giving you something that he said he'd

5  never give you in the tort system, namely that uterine cancers

6  would be eligible for some payment within the bankruptcy that

7  he was proposing, correct?

8  A    Correct.

9  Q    Okay.  And now, within the inventory of the cases that you

10 have, you can't say how many will qualify under the TDPs and

11 how many will not qualify, fair?

12 A    I can tell you that the approximately 9,000 will

13 absolutely qualify, because I have their path reports.  I've

14 had it physician reviewed, giving the histologic subtype and,

15 you know, stage.

16 Q    You're talking about the 9,000 ovarian, correct?

17 A    Correct.

18 Q    Okay.  So 9,000, you're confident, will qualify under the

19 plan --

20 A    Correct.

21 Q    -- even under the use that they have now, right?

22 A    Yes.

23 Q    Okay.  But the other 12,000, you don't know how many of

24 those will or will not qualify under the plan.  Fair enough?

25 A    Fair enough.

Onder - Cross/Maimon                                    95

1  Q    Okay.  And you never told Mr. Murdica that your clients

2  would vote yes on the plan, have you?

3  A    I told him that I would recommend --

4  Q    I understand that.  But there's a different.  You never

5  told him that your clients would vote yes, have you?

6  A    Obviously, no, I can't guaranty it.

7  Q    Okay.  And none of your clients have committed to voting

8  yes on the plan as of yet, correct?

9  A    Well, I can't say that, because I get emails, letters, and

10  phone messages and everything on a regular basis saying, yes

11  or --

12  Q    Well --

13  A    -- saying, hey, no matter what you say, Jim, I'm with you,

14  I'll do whatever you say.

15  Q    Understood.  But they don't -- they haven't seen the plan,

16  have they?

17  A    Correct.

18  Q    Okay.  And one of the things --

19        MR. MAIMON:  Can we -- Brian, can we get that up?

20  BY MR. MAIMON:

21  Q    You were shown this part of marketing material from your

22  firm.  And let's just get that up.  Let's hope we can get it

23  up.  Am I getting any money, right?

24  A    Yes.

25  Q    Do you see that?

Onder - Cross/Maimon                                96

1   A    Yes.

2   Q    And the response was "If you are a current talc claimant,

3   yes, you are part of this resolution."  Now, in that, did you

4   mean to exclude future claimants?

5   A    You know what?  When he read it a minute ago, it doesn't

6   make the most sense, you know, from the -- the person who wrote

7   it doesn't make the most sense.

8   Q    Okay.

9   A    I agree with you.

10  Q    Anyway, it says, "In addition, Johnson & Johnson has

11  agreed to pay small settlements to clients with other

12  gynecological cancers, many of who (sic) -- many who were told

13  in the past that their cases would not be compensable."  Do you

14  see that?

15  A    Right.  This is --

16  Q    So that's --

17  A    -- advertising --

18  Q    That's the --

19  A    This is an advertising piece.  We want those people who

20  were rejected by some of the other firms to come talk to us.

21  Correct.

22  Q    Understood.  But that where you talk about Johnson &

23  Johnson having said in the past that their cases would not be

24  compensable, that's the same thing Mr. Murdica had told you in

25  the past, right?

Onder - Cross/Maimon                              97

1  A    Right.

2  Q    Okay.  Now, the current claimants that you're talking

3  about here, if you're a current claimant, yes, you are part of

4  this resolution, period, right?

5  A    Sure.

6  Q    Then you say, in addition to that, J&J will pay small

7  settlements to clients with other gynecological cancers.  And

8  by that you meant other than ovarian cancer, right?

9  A    Correct.

10 Q    Okay.  So now, in answering this question -- and you've

11 been on -- a member of the AHC committee, correct?

12 A    Yes.

13 Q    And you have had negotiations concerning the first plan,

14 right?

15 A    Yes.

16 Q    And negotiations concerning the second plan, right?

17 A    Yes.

18 Q    And in neither plan is there a dollar amount for a client

19 that you can tell your clients this is how much money you're

20 getting, correct?

21 A    That's correct.  Until we hear from the future claims rep,

22 I don't think you can ever put a number on it.

23 Q    Right.  You can't --

24 A    Right?

25 Q    You can't call up a client and say, hey, I know you said

Onder - Cross/Maimon                                              98

1  you're with me --

2  A    Right.

3  Q    -- but I got good news for you, here's how much money you

4  get, I want authority to settle.  You can't do that now, can

5  you?

6  A    That's correct.

7  Q    In fact, the most you can do is you can say, hey, I got

8  news for you, you got 720 points, right?

9  A    Right.  Or -- and --

10 Q    Or whatever points.  But you don't know, because it hasn't

11 been determined, how many points equals a dollar or how many

12 dollars equals a point, true?

13 A    Without the input of the FCR, you can't tell with

14 certainty.  We can estimate, but correct.

15 Q    And, therefore, you can't say that for any specific client

16 that's enough money that you feel is right to compensate them

17 as you sit here today, correct?

18 A    That's really not true.  I mean, as you know, you know, I

19 have a rough estimate of -- well, we know basically how much is

20 going to ovarian, how much to meso, roughly.  We know what we

21 think the FCR will do, but we don't know for sure.  We know

22 roughly -- or I -- everybody can estimate the number of people

23 that they think will fall in the ovarian category.  We could

24 estimate how many we think will fall in the other gynecologic

25 category.  And from there, we can, you know, provide estimates

1 if a client would ask.

2      Obviously, as a plaintiff lawyer, as you know, you never

3 want to give estimates to your clients until it's finalized,

4 because you sure don't want to be wrong and overestimate.

5 Q    Well, there's one thing that you said that I -- that

6 struck me as odd.  Mr. Watts was in here, and we discussed the

7 term sheet had put a split as between future and current

8 claimants.  Do you recall that in the term sheet?

9 A    Yes.

10 Q   That's not anywhere in the plan or the amended plan,

11 right?

12 A    That's correct.

13 Q   And the term sheet put a split as between mesothelioma and

14 ovarian cancer claims.  Do you recall that?

15 A    Correct.

16 Q   And that split is nowhere in the plans as filed, correct?

17 A    That's correct.

18 Q   And so those two factors that you just mentioned that we

19 could use to start kind of guess -- and guesstimate where a

20 client might end up, those are totally missing in the plan as

21 currently filed, correct?

22 A    But, again, -- correct.  But you can estimate it.  I

23 mean --

24 Q   You could guess --

25 A    -- we -- we've gone --

Onder - Cross/Thompson                          100

1  Q    -- about what it is, correct?

2  A    -- we've gone through -- I mean, I've worked with the TCC

3  the entire time.  We've -- the whole issue has always been what

4  is the universe of cases.  You know, we've taken polls.  We've

5  taken surveys.  We've estimated, you know, how many of the

6  ovarians, how many of the other cancers.  I mean, we have

7  reasonable estimates, I would think.

8  Q    Have you heard from -- have you heard Mr. Kim's testimony

9  in these proceedings in LTL 2 where he said that, well, in LTL

10 1 we thought we had so many cancer cases, but now there are so,

11 so many more?  Have you heard that?

12 A    Obviously, I was -- wasn't allowed to hear the testimony,

13 but that would make sense.

14          MR. MAIMON:  Okay.  Thanks.  No further questions.

15          THE COURT:  Mr. Thompson?

16                    CROSS-EXAMINATION

17 BY MR. THOMPSON:

18 Q    Hi, Mr. Onder.  Clay Thompson with Maune Raichle.

19 A    Hi, Clay.

20 Q    Nice to see you again.  Briefly.  So of the 9,000 uterine

21 cancer cases, I think you said in your deposition you're not

22 eager to put those in the tort system, because you're concerned

23 about surviving a Daubert challenge, right?

24 A    Well, I put about 2- to 3,000 -- I -- put it this way, I

25 don't believe that the average person in the litigation had the

Onder - Cross/Thompson                    101

1  optimism about them that I did.  I put 2- to 3,000 in there.  I

2  was willing to put my big boy pants on, put my money where my

3  mouth is, work up the experts, and fight Daubert.  Yes, I was

4  willing to.

5  Q    You're not actively pushing those cases to trial because

6  of Daubert challenges, right?

7  A    Well, the -- you know, obviously, the -- as we all do in

8  mass tort litigations, we get together as a committee.  I mean,

9  I worked hand in hand with every member of the TCC and --

10  Q    Well --

11  A    -- MDL and came up with, hey, which ones are we going to

12  push first.  We obviously decided to push the uterine cancer

13  first.  And you hold back on your -- I'm sorry, the ovarian

14  cancer first.  Hold back on your uterine, because you don't

15  want them in the potential bellwether pool to be chosen.

16  Q    Sir, did you or did you not testify in your deposition

17  that you didn't want to push the uterine cancer cases because

18  of Daubert issues?

19  A    Sure.

20  Q    Okay.

21  A    I mean, that --

22  Q    I --

23  A    -- that makes sense.  I mean, they're not as strong as the

24  other ones.  I agree.

25  Q    Yeah.  You're not --

Onder - Cross/Thompson                    102

1  A    And we don't want them picked as a bellwether by J&J.

2  Q    Yeah.  And you're not -- so that's a concern for you that

3  in the tort system you're not going to survive a <u>Daubert</u>

4  challenge in uterine cancer cases, right?

5  A    That certainly a possibility.

6  Q    And Mr. Maimon established with you that you're not going

7  to get paid by J&J for uterine cases in the tort system.

8  That's what Mr. Murdica told you, right?

9  A    Well, he also told me we weren't going to get paid for

10 mucinous, but yet he paid -- you know, he paid Lanier for

11 mucinous, so --

12 Q    I understand.

13 A    -- what does that mean?

14 Q    And as of right now, there's not a single dollar amount --

15 I can't go to any of my mesothelioma clients under the current

16 plan and tell them you're going to receive X amount in this

17 plan.  I can't do that, can I?

18 A    Not with any certainty.

19 Q    Okay.  And no one can, can they?

20 A    Not right now.

21 Q    All right.  In the tort system, if any of your cases

22 settle, there's a common benefit fee that you have to pay 6

23 percent of your fee to, correct?

24 A    Correct.

25 Q    And so if a case settles in the tort system, if your

Onder - Cross/Richenderfer                          103

1  standard retainer is 40 percent, if the case settles in the

2  tort system, you're going to get 34 percent fee on that case,

3  right?

4  A    Correct.

5  Q    And if this bankruptcy case settles, you're going to get

6  the full 40 percent of all the settlements with the trust,

7  because you're not subject to the common benefit fee, right?

8  A    That's true.  But the reality is, I probably have more

9  common benefit hours than I would ever pay out.  The reality

10 is, I'm probably the only one in this room who stands to lose

11 money by a loss of common benefit.

12 Q    I understand, sir.

13            MR. THOMPSON:  Move to strike everything after yes.

14 Thank you.

15            THE COURT:  Sustained.

16            Ms. Richenderfer?

17                       CROSS-EXAMINATION

18 BY MS. RICHENDERFER:

19 Q    Good afternoon, Mr. Onder.  I'm Linda Richenderfer from

20 the Office of the United States Trustee.

21 A    Yes.

22 Q    I don't think we've ever met in person.  I have seen you,

23 though, in your depositions.  And I am also, just so you know,

24 the U.S. Trustee trial attorney assigned to the Imerys and

25 Cyprus bankruptcy cases.

Onder - Cross/Richenderfer                104

1  A    Yes.

2  Q    And you piqued my interest, because I heard you talk about

3  Imerys --

4  A    Yes.

5  Q    -- while I was sitting back there.  I believe you made a

6  statement Imerys refuses to discuss settlement until after the

7  motion to dismiss.  Do I have that correct?

8  A    Yes.  That's my understanding.

9  Q    Okay.  And how did you gain that understanding?

10  A    I gained that understanding -- well, I was advised by

11  legal counsel for the TCC and advised by Johnson & Johnson to

12  that, number one.  And I am on the Imerys TCC.  But anything as

13  to that is confidential.  I'm not in a position to state it.

14  It was never specifically discussed in the TCC, though.  But

15  there were discussions put on hold.

16  Q    Okay.  The first individual or entity that you identified

17  was legal counsel for the TCC.  Which TCC are you talking

18  about?

19  A    TCC 2.

20  Q    In this case?

21  A    Or I'm sorry.  I misspoke.  Our legal counsel for the ad

22  hoc committee.

23  Q    Okay.  Okay.  So you're talking then about Paul Hastings?

24  A    Our -- oh, you know, Parkins & Rubio or one of the other

25  firms, yes.

Onder - Cross/Richenderfer                    105

1  Q    Right.  Or Cole Schotz, correct?

2  A    Exactly.

3  Q    Okay.  And then you said J&J.  And --

4  A    Yes.

5  Q    -- who do you mean by that?  Is there an individual?

6  A    That was in the context of a mediator privilege.

7  Q    Okay.  That's fine.  That's fine.  And then you said the

8  Imerys TCC.  Now, you represent somebody who's on the Imerys

9  TCC, correct?

10 A    Correct.

11 Q    And you represent quite a few claimants who actually voted

12 on the Imerys confirmation plan, right?

13 A    That's correct.

14 Q    Okay.  And I forget the number now.  I looked it up, and

15 now I can't remember.  Do you recall how many claimants you

16 have that voted as part of the solicitation process in the

17 Imerys TCC -- in, I'm sorry, in the Imerys case?

18 A    I don't.  And the reason I don't is my original contract

19 never -- I had never done a bankruptcy like this before, so I

20 didn't have in my contract authority to vote.  So what I did is

21 I sent out authorizations to every one of my clients.  The ones

22 I had it back on by the deadline, I voted as a group.  The ones

23 I didn't, individual notices were sent out to those people.  So

24 I don't know exactly how many voted.  And, frankly, I don't

25 recall how many were in the group that had given me the power

Onder - Cross/Richenderfer                         106

1   of attorney to vote for them.

2   Q    Okay.  Would you say it was over 20,000?

3   A    No.

4   Q    Okay.  I'm going -- have you read the amended plan that

5   was filed on June 26, 2023, in this case?

6   A    Yes.

7   Q    Okay.  And did you have any role in the development of

8   that amended plan?

9   A    Yes.  We've been in constant negotiations ever since the

10  first plan was filed.

11  Q    Okay.  I'm going to ask you about a certain provision.

12  And if I've communicated correctly, it's going to appear up on

13  the screen.  It's Exhibit 12 in your binder.  And it is -- we

14  actually have to go all the way back to page 55 of 89 of the

15  document to see the heading.  It says, "Article 8.  Conditions

16  Precedent to Confirmation and Consummation of a Plan.  Section

17  8.1.  Conditions Precedent to the Confirmation of the Plan."

18       And then I'm going to ask you a question about Subsection

19  G, which is a new provision.  Now --

20            THE COURT:  What section is this?

21            MS. RICHENDERFER:  It's Section 8.1, Your Honor.

22            THE COURT:  8.1?

23            MS. RICHENDERFER:  It starts on page 55 of 89.

24            UNIDENTIFIED SPEAKER:  The top stamp, Your Honor.

25            THE COURT:  Okay.

1          MS. RICHENDERFER:  Yeah.  Yeah.  I'm sorry, Your

2     Honor.  It's not actually the plan.  It's the docket stamping

3     system.  And it's entitled Conditions Precedent to Confirmation

4     of the Plan.  And I point that out, because I'm going to ask

5     the witness about one of those conditions.

6          THE WITNESS:  It's Section G in blue on page 55.

7          THE COURT:  Oh, don't wait for me.  I'm --

8          THE WITNESS:  Oh.  Oh, okay.

9          MS. RICHENDERFER:  Oh.  Oh, okay.  I'm sorry, Your

10    Honor.  I was waiting.  Okay.  Okay.  Sounds like the witness

11    and I --

12         THE COURT:  I've got it in front of me here.

13         MS. RICHENDERFER:  Okay.  Okay.  And, yeah, the

14    witness and I -- and they have put that up on the screen for

15    me.

16    BY MS. RICHENDERFER:

17    Q    So this new provision in the amended plan says that one of

18    the conditions precedent is that the debtor shall have entered

19    into a settlement agreement with Imerys Talc America

20    Incorporated and such other Imerys Cyprus parties as may be

21    necessary or appropriate in form and substance acceptable to

22    the debtor, J&J, and the AHC of supporting counsel -- let me

23    just pause there for a second.  I'm presuming that's the ad hoc

24    committee of supporting counsel?

25    A    Correct.

Onder - Cross/Richenderfer                    108

1  Q    Okay.  "Pursuant to which a contribution shall be made to

2  the talc personal injury trust by or on behalf of the Imerys

3  Cyprus parties."  So the talc personal injury trust that's

4  mentioned there, is that the talc personal injury trust that

5  would be set up for the LTL case?

6  A    No.  What this -- this is -- well, this is referring to --

7  there are indemnities back and forth between J&J and Imerys

8  Cyprus.  What it's talking about is there's two aspects of

9  payment from the Imerys -- or there's two Imerys sources of

10 money to claimants.  Number one is the individual based upon

11 the current insurance money, the contribution by Imerys itself,

12 and so forth.  There's X number of dollars, whatever that is.

13 And pursuant to the terms of the Imerys plan --

14 Q    I just caution you, sir, right now the Imerys plan is in

15 mediation, and there's a mediation privilege.  So I don't want

16 you to --

17 A    No.  This --

18 Q    -- in any way please --

19 A    This is -- this is very generic.  This is very generic.

20 Q    Okay.

21 A    As we all know, whether it's the original plan, whatever

22 the people would be paid under an Imerys plan, okay, J&J is

23 seeking to have a release that includes both J&J and Imerys.

24 Now that it has -- if it gets a release on behalf of all these

25 claimants, it would have the right to go back and make those

Onder - Cross/Richenderfer                    109

1  claims in the Imerys trust to come over and pull that money

2  back to J&J.

3       Part of the provision is that that money goes into a pot

4  for the -- additional pot of money for the benefit of

5  claimants.  Okay?  There's a second part of the Imerys deal

6  which involves the extra contractual claims that Imerys might

7  have against J&J.

8  Q    All right.

9  A    In other words, for the -- you know, J&J didn't honor its

10 duty to indemnify Imerys on -- you know, under its contract,

11 and as a result it went into bankruptcy and suffered damages

12 and loss of existence as a going concern.  That's a claim that

13 has significant value.  Okay?

14           That claim, the issue is, how much is that claim

15 worth?  My concern is I wanted to make sure that J&J wouldn't

16 be able to take these payments and just walk away without

17 paying anything under that Imerys -- or indemnification

18 agreement.  That's the extra contractual claims.  The bottom

19 line is that needs to be resolved one way or another in terms

20 of what's going to happen with those extra contractual claims

21 to ensure that J&J -- or that claimants are compensated whether

22 through Imerys or through -- by the money passing through to

23 J&J.

24 Q    From the perspective of this case, LTL --

25 A    Yes.

Onder - Cross/Richenderfer                    110

1  Q    -- is that -- are those issues resolved in this amended

2  plan that was filed on -- I'm sorry, on June 26th?

3  A    No.

4  Q    Okay.  So that's something that still needs to be done,

5  correct?

6  A    We're still negotiating on that.  And, hopefully, as soon

7  as this -- there's a ruling here, we'll be able to.

8  Q    Okay.  And negotiations have not started on those topics

9  yet with Imerys, have they?

10 A    As I understand it, no.

11 Q    Okay.  And you represent claimants who are going to seek

12 to be paid from the Imerys trust and also claimants who are

13 going to be -- seek to be paid in some form or fashion from the

14 LTL trust?

15 A    As does everybody.  All claimants --

16 Q    Okay.

17 A    -- who have a claim under both.

18 Q    Okay.  But you have signed a plan support agreement in the

19 LTL case, correct?

20 A    Correct.

21 Q    Okay.  And you have signed an NDA with J&J in LTL,

22 correct?

23 A    Yes.  I don't think there's anything that is -- at this

24 point, nothing left of the MDA that isn't publicly known, but

25 yes.

Onder - Cross/Richenderfer                    111

1 Q    I don't know that, because there's an NDA.  So I

2 couldn't -- I don't know whether -- I'll take your word for

3 that then.

4 A    Okay.

5 Q    And you still represent somebody who is on the Imerys TCC,

6 correct?

7 A    Yes.  We set in place policies and procedures within the

8 TCC to deal with that as to myself and some of the other issues

9 potentially from being on both the Imerys and Cyprus, you know,

10 committees.  So we have conflict petitions and how to deal with

11 those and -- when they come in.

12 Q    But right now, you're the only one who has somebody on the

13 Imerys TCC who has also signed a plan support agreement in the

14 LTL case, correct?

15 A    That's correct.

16        MS. RICHENDERFER:  Okay.  Thank you, Your Honor.  I

17 have no other questions.

18        THE COURT:  All right.  Thank you.

19        Anyone else?  All right.

20        Mr. Onder, thank you very much for your --

21        MR. WHITNER:  Your Honor, I have a --

22        THE COURT:  Oh.  Oh, you are.

23        MR. WHITNER:  I do.

24        THE COURT:  I was too quick on the gun.

25        THE WITNESS:  Exactly.

1      MR. WHITNER:  Your Honor, may we just have a few

2  minutes?

3      THE COURT:  Sure.

4      Do you need to take a break?

5      THE WITNESS:  What's that?

6      THE COURT:  Do you need to take a break?

7      THE WITNESS:  No.  I'm fine.  I'm fine.

8      THE COURT:  Okay.

9      THE WITNESS:  But I'll say I do if you have to.

10     THE COURT:  No.  I'm fine.  Because I know 5-minute

11  breaks go into 15, into 20.

12     THE WITNESS:  Exactly.

13                    (Counsel confer)

14     MR. WHITNER:  Can I proceed, Your Honor?

15     THE COURT:  Absolutely.

16                  REDIRECT EXAMINATION

17  BY MR. WHITNER:

18  Q   Mr. Onder, I just want to go over a couple things you were

19  just talking about.  Is the goal for Imerys to make a

20  contribution to the PI trust in LTL so that Imerys can be

21  covered by the protected party provision in the LTL plan?

22  A   That's the issue is whether or not they are going to

23  become a protected party such that the money would flow into

24  the LTL trust or if it's going to be independently, you know,

25  kept as is.  The problem with the Imerys trust is, you know,

Onder - Redirect/Whitner                              113

1  and one of the things I alluded to that we worry about here

2  that could blow the whole thing up is the future claims rep.

3  The future claims rep in Imerys, as is public knowledge, have

4  exceedingly, exceedingly high number of future claims so that I

5  think it would be very difficult to ever pass a plan in the

6  LTL.

7       So it's a potential benefit to the Imerys claimants to

8  have the money flow into here if they like all the other terms

9  and conditions.  That's why we've encouraged everybody to

10 participate and please help both the Imerys people as well as

11 the TCC people.  I think it's really important to get

12 everybody's input.

13 Q    And am I correct that the AHC has a vote on whether any

14 Imerys settlement satisfies the LTL plan condition?

15 A    Correct, nothing can go through without ad hoc committee

16 support because of the concerns I expressed.

17 Q    So you were talking about filing cases within that 30-day

18 window with the statute and you mentioned we had gone through

19 and looked at cases.  Who's the we that you're talking about?

20 A    You mean the initial setting of criteria or my internal

21 team deciding which cases needed to be filed?

22 Q    So this is your -- I believe you were talking about just

23 your initial set of criteria, and what cases you would take and

24 which cases you would push forward, which cases you would file,

25 but you mentioned we had discussions and it wasn't clear who

1  you were talking about.

2  A    Right, it was myself and MDL leadership, early on, all the

3  firms involved.  I filed the second case in the United States;

4  Alan Smith had tried the first case, I filed the second.  Soon

5  thereafter, Beasley Allen got on board, Ashcraft & Gerel, and

6  some other firms.

7       The early firms, we all worked together, we made -- we

8  decided we were going to do a coordinated litigation in the

9  City of St. Louis, Missouri, which we were allowed to do before

10 the BMS opinion.  So, throughout the process, we would get

11 together and we would decide which of the cases do we want to

12 file, which are we going to accept, which are we going to

13 reject.

14      So the bottom line is, you know, my criteria was

15 essentially the same as every member of the TCC.  Now, of

16 course, over time it varied and we always all had the ones that

17 we wanted to immediately file and push for trial, bellwether

18 trials, and then we had our what we called inventory cases that

19 we wanted to hold back and see what happens with the medical

20 literature and so on.  But everybody -- you know, everybody in

21 this room, every lawyer in this room involved in the litigation

22 has probably the same ratio as I do, about 50-50 between the

23 gynecologic cancer versus the uterine.  It's not like anybody

24 is going to stuff the ballot box with these uterine cancer

25 cases because everybody has them, everybody has probably about

Onder - Redirect/Whitner                            115

1   50 percent.

2   Q    You also said that you would -- that you probably stood to

3   lose the most money with the loss of the common benefit fund in

4   the bankruptcy proceeding.  What did you mean by that?

5   A    During the MDL process there would be a common benefit

6   fund of six percent of all attorneys' fees and then there would

7   be money for expenses that would come from the client's

8   portion.  That six percent could be, potentially, hundreds of

9   millions of dollars.  What would happen is that money would be

10  divided among everybody who worked on the cases, tried the

11  cases, et cetera.  I was the second case in the United States.

12       The first -- you know, every verdict, over 308 million in

13  the four trials, $308 million of verdicts in the City of St.

14  Louis, my firm was actively involved in every one of those;

15  they weren't necessarily my cases, but we did all the law and

16  briefing, we did, you know, jury selection.  I mean, we worked

17  hand-in-hand with Beasley Allen, Alan Smith; Porter, Ballou; at

18  times with Ashcraft & Gerel and all the other TCC firms, we all

19  worked hand-in-hand.  Everybody would get credit for those

20  hours when it came to distributing any common benefit funds.

21       So the bottom line is, I would be entitled to common

22  benefit funds, okay, the same as everybody else.  If you

23  compare what would my six percent be versus what would the

24  common benefits be, I suspect my six percent, my common benefit

25  funds are probably more than the six percent that I'm losing by

Onder - Redirect/Whitner                              116

1  virtue of having to contribute to it.

2      There are a lot of other firms that only have a couple

3  hundred cases that really care about common benefit.  They've

4  worked hours and hours and hours and, you know, in the MDL, but

5  they only have a couple hundred cases.  So that they might have

6  secondary concerns that in a bankruptcy situation, if there's

7  no common benefit fee, that they're not going to be adequately

8  compensated for all their time and efforts.  And for that

9  reason, I'm encouraging everybody on the TCC, please, come in,

10 become part of the process.  Let's talk about what's fair,

11 let's talk about what's reasonable.

12     And I basically told -- no one from the TCC 1 will talk to

13 me anymore, so I assume that's at the advice of legal counsel,

14 but I would love their input and I would love their suggestion

15 on how to resolve that piece if we want them to be treated

16 fairly.

17 Q   Now, let me ask you about your communications with counsel

18 for members of the TCC.  Before you had your discussions with

19 Jim Murdica, did you tell anyone that you were having those

20 discussions, that you were about to enter into negotiations,

21 any conversation?

22 A   Yes.  I mean, I --

23          THE COURT:  Wait, wait.  Ms. Richenderfer?

24          MS. RICHENDERFER:  Your Honor, I just wanted to

25 object to the form of the question because we've been talking

1  about TCCs now with both cases, Imerys and this case, and if we

2  could just make it clear that this is --

3          THE COURT:  Some clarity as to which TCC, TCC in LTL

4  I, LTL II, or Imerys.

5          MS. RICHENDERFER:  Exactly.

6          THE COURT:  And I think sometimes you may have

7  referred to TCC for the MDL steering committee.

8          THE WITNESS:  I --

9          MS. RICHENDERFER:  Right.

10          THE COURT:  So we need just to clarify.

11  BY MR. WHITNER:

12  Q    So let's talk about the current TCC --

13  A    Okay.

14  Q    -- for LTL II.

15  A    Correct.

16  Q    Did you have any discussions before you entered into

17  discussions with Jim Murdica, before you entered into the PSA,

18  that you were having any discussions with the debtor?

19  A    Yes.

20  Q    Okay.

21  A    We were all having discussions with the debtor.  I mean,

22  that was part of TCC 1.  After the -- obviously, the mediators

23  were involved, the mediators were involved throughout.  We were

24  having constant discussions back and forth and it was, you

25  know, becoming more and more clear that we weren't going to be

Onder - Redirect/Whitner                    118

1  able to reach an agreement.

2  Q    Okay, but did you tell them you were going to enter into

3  negotiations with the debtor?

4  A    The TCC 1 knew I was talking to Jim Murdica, knew about

5  that I signed a nondisclosure, and, likewise, Mr. Murdica and

6  J&J knew that to the extent anything I felt was necessary or

7  would be helpful to this TCC, I was going to ask permission to

8  share it with them, and that's what I did.  Everything was done

9  with full disclosure to both sides.

10 Q    Okay.  And who specifically on TCC 2 did you have those

11 discussions with?

12        MR. MOXLEY:  Objection, Your Honor.  The time frame

13 we're talking about, the TCC 2 didn't exist.  I think there's

14 some confusion on that.

15        THE COURT:  Yeah, let's --

16        MR. WHITNER:  TCC 1, I'm sorry.

17        THE COURT:  -- clarify because we have TCC 1 and TCC

18 2 in the first case --

19        MR. WHITNER:  TCC 1.

20        THE COURT:  -- TCC 1 in LTL I?

21        MR. WHITNER:  Yes, Your Honor.

22        THE WITNESS:  I think that probably invades the TCC 1

23 privilege, including attorney-client privilege, as well as

24 internal privilege.

25 BY MR. WHITNER:

Onder - Redirect/Whitner                   119

1  Q    Okay.  You were asked about the first plan after you

2  signed the PSA and you were asked about your displeasure with

3  that plan; do you remember that?

4  A    Yes.

5  Q    And now there's an amended plan and you've reviewed that

6  amended plan; correct?

7  A    Correct.

8  Q    And has your position on the amended plan changed from

9  your expressions of displeasure with the initial plan?

10 A    Yes.

11 Q    Okay.  Why so?

12 A    The bottom line is, it's been a constant series of

13 communications and apparently, when they filed the first plan,

14 we were in the part of communications that I thought we were

15 pretty much in agreement, but apparently it wasn't finalized or

16 final authority wasn't there or whatever, so the plan was filed

17 with the old version.  Afterwards, we got into discussions, we

18 started talking about the things that bothered me.

19     And, you know, immediately things advanced to the point

20 that they changed and they weren't compliant with my

21 understanding of what was supposed to be in the first plan,

22 that's number one.  In addition, though, since then there have

23 been multiple other issues that we've talked about, resolved,

24 working through.  There's still a couple more issues that we're

25 working through.

Onder - Redirect/Whitner                 120

1      But, again, we've been working very, very, very well

2   together throughout the process and I think it's been working

3   well, you know.

4   Q    What are some of the significant issues you believe have

5   been resolved?

6   A    For example, you know, one of the big issues we were all

7   concerned about is timing of payment to the clients.  I mean,

8   these women have been waiting, some of them almost a decade,

9   and we wanted -- money had to come in quickly to these people.

10  The fact that we were able to resolve the medical liens, that's

11  going to save a year, 18 months, two years in some cases.  It's

12  the bane of the mass tort profession that when you have to

13  negotiate liens and hire an Archer and Epiq to negotiate those

14  liens, it could take six, 12, 18 months, sometimes two years to

15  get those liens negotiated, and these women wouldn't get paid.

16  By virtue of having negotiated a global deal, I mean, that's

17  going to save years off the timing of money getting into the

18  women's pockets, and I know it was a major concern to

19  everybody.

20       MR. MAIMON:  Your Honor, I didn't want to interrupt

21  Mr. Onder mid-sentence, and I'm always happy to talk to you,

22  Jim, but I'd move to strike all reference to the liens pursuant

23  to Your Honor's order.

24       MR. WHITNER:  And, Your Honor, his testimony and my

25  question was not aimed at negotiation of the liens, just what

Onder - Redirect/Whitner                    121

1 advancements that have happened, and that's in the document.

2 He's just explained why he considers that to be significant for

3 his change of heart about the plan.  He was asked about his

4 displeasure with the original plan, he's changed his heart and

5 is now pleased with the plan, I think it's important to

6 understand what has happened to get him there.

7         MR. MAIMON:  This is exactly the argument that was

8 advanced with Mr. Murdica, exactly what happened with Mr.

9 Watts, I'm just asking for the same ruling here.

10         THE COURT:  This one I'm going to overrule.  It's

11 referenced in the document, we're not going into -- too much

12 into it.

13 BY MR. WHITNER:

14 Q    Now, Mr. Onder, you testified that you could withdraw from

15 the PSA if you wanted to --

16 A    Yes.

17 Q    -- do you remember that testimony?

18       And is that your position if the PSA is inconsistent -- if

19 the plan is inconsistent with the PSA that you negotiated?

20 A    I think that's a hundred percent true, but, you know,

21 there's also the provision that says, hey, you're bound by the

22 ethics to your clients to do what's in the best interests of

23 the clients.  And the reality is, you know, as we negotiate

24 through each one of these issues, if things -- you know, we're

25 down to only a few major issues.  If one of them goes totally

Onder - Redirect/Whitner                                122

1  sideways and all of a sudden, you know, we're pulling $5

2  billion out of the pot to pay some unknown thing and then money

3  falls to zero, I have an absolute right to drop out; I have an

4  obligation to my clients to drop out.

5        So, I mean -- but I don't foresee that happening.  I mean,

6  we're moving in a great trajectory, we're working hand-in-hand,

7  we're solving problems, and I'm pretty darn confident it's

8  going to get to the point that we're all going to recommend it

9  to our clients.

10 Q    Right, but I just want to make sure we're clear, when you

11 say you can walk away from or you don't have to sign it, you're

12 talking about if it's not consistent with what you committed to

13 negotiating in good faith towards a resolution; correct?

14 A    Correct.

15 Q    And that resolution, for you, you deem to be in the best

16 interest of your clients; right?

17 A    Yes, I do.

18 Q    And why is that?  Why do you believe the plan that you're

19 negotiating would be in the best interest of your clients?

20 A    When we look at a settlement and what's --

21             THE COURT:  Wait.

22             MR. MAIMON:  I'm sorry, I'm just going to object for

23 the record as to the relevance of what Mr. Onder feels is in

24 the best interest of his clients.

25             THE COURT:  Overruled.

1          MR. MAIMON:  Thank you, Your Honor.

2          THE WITNESS:  I think we have to look at our

3    alternatives and we need to -- you know, and look at the

4    factors that you consider in a settlement.  I know my clients

5    consider three major factors:  number one, have we solved the

6    problem, have we made a difference in this world, and is my

7    loved one's death going to be in vain.

8          When J&J pulled talc from the market, we eliminated

9    that concern.  My clients now know that they've made a

10   difference, that they've changed the way the company is doing

11   business, and others won't be hurt into the future.  That's an

12   enormous, enormous factor of why my clients pursued the

13   litigation in the beginning.

14         Number two is, obviously, compensation for

15   themselves, but what I found is number one and number three,

16   the third one is making sure their daughters, their

17   granddaughters, and their great granddaughters who they told to

18   use talc, that if, heaven forbid, they develop ovarian cancer

19   as well that there's a mechanism that they can get compensated

20   immediately, as opposed to having to wait a decade for

21   recovery, which is what's happened to many of my current

22   clients.

23   BY MR. WHITNER:

24   Q    And you said your close and negotiations are still

25   ongoing, but as you sit here today, would you recommend this

Onder - Redirect/Whitner                    124

1  plan to your clients?

2  A    If the negotiations on those final points go as I expect

3  them to go and as -- and consistent with our discussions to

4  date, I would -- you know, my goal was to recommend -- be able

5  to recommend it to everybody.  If those negotiations go

6  sideways and go in some unanticipated direction, obviously, I

7  would owe an obligation to my clients to not recommend it or to

8  leave the option up to them which way they wanted to go.

9  Q    And do you have any reason to expect the negotiations to

10  go in any way other than the direction they've been headed?

11          MR. MAIMON:  Objection, speculation.

12          THE COURT:  Sustained.

13          THE WITNESS:  No, I mean, every --

14          MR. WHITNER:  That's opinion --

15          THE WITNESS:  Oh, I apologize, I didn't hear --

16          THE COURT:  I'm sorry.

17          THE WITNESS:  -- I didn't hear the ruling.  I'm

18  sorry.

19  BY MR. WHITNER:

20  Q    Now, you were asked a question about your uterine cases

21  and Daubert; right?

22  A    Yes.

23  Q    Am I correct the Daubert that you're referring to, that's

24  a Federal standard; correct?

25  A    Correct.

Onder - Recross/Maimon                      125

1  Q    That doesn't impact your ability to bring those cases in

2  the state court system; correct?

3  A    That's correct.

4           MR. WHITNER:  No more questions, Your Honor.

5           MR. MAIMON:  May I, Your Honor?

6           THE COURT:  Well, you have to wait in line.

7                     RECROSS-EXAMINATION

8  BY MR. MAIMON:

9  Q    You have cases pending in the state courts; correct?

10 A    Yes.

11 Q    Since the lifting of the stay, have you moved for those

12 cases to proceed to trial?

13 A    No.

14 Q    Okay.  You said -- we talked a little bit about the Imerys

15 addition to the amended plan.

16          MR. MAIMON:  Brian, can we get that up?

17 BY MR. MAIMON:

18 Q    And you see on page -- actually, page 49 of the document,

19 it's talking about conditions precedent to the confirmation and

20 consummation of the plan; right?

21 A    Correct.

22 Q    And a condition precedent is something that has to happen

23 in order for the plan to be confirmed; right?

24 A    Correct.

25 Q    Okay.  And what this says is one of those conditions

Onder - Recross/Maimon                        126

1  precedent has two parts.  Number one is the debtor shall have

2  entered into a settlement agreement with Imerys Talc America

3  and Imerys/Cyprus as may be necessary as acceptable -- in form

4  and substance acceptable to the debtor, J&J, and the AHC;

5  right?

6  A    Correct.

7  Q    So number one is that there's an actual settlement

8  agreement that this plan is contingent on; right?

9  A    Correct.

10 Q    Number two is that, pursuant to that settlement,

11 contribution shall be made to the Talc Personal Injury Trust by

12 or on behalf of the Imerys/Cyprus parties.  Do you see that?

13 A    Yes.

14 Q    So that means that the Imerys/Cyprus parties are the ones

15 making the contribution or it's being made on their behalf;

16 correct?

17 A    Correct.

18 Q    And that contribution is coming over from the

19 Imerys/Cyprus side and coming over to the LTL side, that's what

20 it says?

21 A    Right, that's what it says.

22 Q    Okay.  Imerys/Cyprus --

23 A    Yes.

24 Q    -- Ms. Richenderfer was asking you that's subject to a

25 mediation there?

Onder - Recross/Maimon                            127

1   A     Right.

2   Q     Do you know when the Judge overseeing the Imerys/Cyprus

3   bankruptcies ordered that mediation?

4   A     I'll put it this way:  I don't know when it was ordered,

5   it was a long time ago.

6   Q     A long time, but how long has it been going -- just the

7   mediation as between themselves, to reach an agreement between

8   themselves, how long has that been going on?

9   A     Well, since you're on the committee right alongside me,

10  it's been going on for a while.

11  Q     A long time.  And so what we're saying is that while

12  that's taking so long, this plan is contingent not only on them

13  getting their act together to settle something, but then for

14  them to enter into a settlement with J&J and LTL and pay money

15  to J&J and LTL?

16  A     But all that can be bypassed with --

17          MR. MAIMON:  Brian, can we put that back on?

18          THE WITNESS:  But all that can be bypassed by making

19  them a protected party.

20  BY MR. MAIMON:

21  Q     Have they applied to this Court to become a protected

22  party?

23  A     Not that I know of.

24  Q     Okay.  How long has the Imerys bankruptcy been pending?

25  A     You tell me.  It's been a long time.

Onder - Recross/Maimon                    128

1  Q    It interrupted a partner of mine's trial in 2019, that's

2  -- that's --

3  A    Then I defer to you.

4  Q    -- four years, right?

5  A    I defer to you.

6  Q    And we don't know whether or not Imerys and Cyprus will

7  enter -- will actually settle with LTL, do we?

8  A    We don't know.

9  Q    And we don't know, if they do, which money the way -- the

10 flow of the money is going to go, whether it's going to go from

11 Imerys and Cyprus to LTL or whether or not it's going to go the

12 other way and over to Imerys/Cyprus; we don't know, right?

13 A    Or both ways, right.

14 Q    Or both ways.  And we don't know what the net is going to

15 be either, do we?

16 A    Not yet.

17 Q    And that's another reason why we can only talk about

18 points and we can't tell clients how much money they're going

19 to get; right?

20 A    In part.

21 Q    Okay.  Thank you.

22         MR. MAIMON:  That's all I have.

23         THE COURT:  Ms. Richenderfer?

24         MS. RICHENDERFER:  I raced to the head of the line so

25 I get to --

1          THE COURT:  You beat Mr. Ruckdeschel.

2          MS. RICHENDERFER:  -- be next.

3          MR. MAIMON:  Oh, I had one more question.  May I?

4          THE COURT:  You can do it from there.

5          MR. MAIMON:  Sure.

6     BY MR. MAIMON:

7     Q    You talked about the importance, Mr. Onder, and I credit

8     that you really mean this, the importance of making sure that

9     our daughters, our granddaughters, and our great granddaughters

10    can make claims if, heaven forbid, they should get sick.  Do

11    you recall that?

12    A    Correct.

13    Q    And that is coming from a place and a committee that only

14    wanted to give one third or less to the future claimants;

15    right?

16    A    Well, of course, but it actually -- it ends up being equal

17    because, if you take a third of the money with interest, at the

18    current interest rates over time -- I mean, I don't think it

19    needs to be a third, personally.

20    Q    It's $12 billion capped, total, over 25 years; right?

21    That's how much J&J promised; right?

22    A    Well, but here's the thing, if the total amount needed is

23    whatever, and you take that 25 percent or a third and bear it

24    out over time and accumulate it with the interest, the bottom

25    line is the amount paid to futures should be the same as the

Onder - Recross/Richenderfer                130

1  amount paid by currents.

2  Q    It's not paid now, it's paid over time over 25 years;

3  right?

4  A    Well, right.  Therefore, you need -- that's why you only

5  need 25 percent as much money or a third -- 25 or a third of

6  the money is because you'll get the benefit of interest growing

7  over time because most of those claims aren't going to come for

8  ten, fifteen years.

9  Q    But you don't know how many people are going to be

10  diagnosed with ovarian cancer and mesothelioma over that period

11  of time, do you?

12  A    We know what the medical literature suggests.

13  Q    What does it suggest?

14  A    There's 25,000 new diagnoses a year, 15,000 deaths per

15  year, and about ten percent of them are related to talc.

16  Q    Okay.  Thank you.

17       MS. RICHENDERFER:  Your Honor, thank you.

18                      RECROSS-EXAMINATION

19  BY MS. RICHENDERFER:

20  Q    Mr. Onder, Linda Richenderfer, again, from the U.S.

21  Trustee's Office.

22       I didn't come up here with this question, but I have to

23  ask this question now as a follow-up to that.  You're talking

24  about the money earning interest over time.  I've looked at the

25  payment sheet, the 12 million gets paid out in different lump

Onder - Recross/Richenderfer                              131

1  sums over 25 years.  So it's not like the 12 million -- or 12

2  billion goes into a fund and it earns interest while you wait

3  for the futures to come in, there's just X number of dollars

4  going in every so often into the fund; correct?

5  A    Right, but that's -- you have to understand, the

6  commitment was to settle for $8.9 billion, present --

7  Q    Net present value --

8  A    -- value, right.

9  Q    -- right.

10  A    And when we talk about the percentage of that allocated --

11  percentage allocated to futures, it's the percentage of the

12  8.9.  So -- and since most of that money will presumably be

13  going out in the first year or two, the bulk of the difference

14  between that 8.9 and the 12, which is, what, $3 billion, will

15  be paid to the futures, in addition to the current money

16  allocated to the futures.

17       So, at the end of the day, everybody will be paid the

18  same, under the same grid.

19  Q    I could ask you a lot more questions, but this isn't a

20  confirmation hearing, so I'll pass on that.

21       MS. RICHENDERFER:  And I know that we're not talking

22  about liens, but, Your Honor, I have to ask a follow-up

23  question because of something the witness said on the stand as

24  a fact and I need to ask this question.

25  BY MS. RICHENDERFER:

WWW.JJCOURT.COM

Onder - Cross/Ruckdeschel                    132

1  Q    Mr. Onder, isn't it true that no settlement has been

2  reached with respect to Federal health care reimbursement

3  claims of CMS and the VA?

4  A    I'd love to answer that for you, but I think it's subject

5  to mediator privilege and negotiation privilege.  But it's my

6  understanding that they're very close, but --

7  Q    But there is no settlement; correct?

8  A    That's my understanding, but -- okay, yes.

9          MS. RICHENDERFER:  I'm sorry, Your Honor, I have DOJ

10  attorneys emailing me that there is no settlement and, when

11  they heard Mr. Onder represent that there was a settlement of

12  all third party claims, that's a very important issue.

13          Thank you.

14          THE COURT:  Mr. Ruckdeschel?

15          MR. RUCKDESCHEL:  Thank you.  I'll be very brief,

16  Your Honor.

17                      RECROSS-EXAMINATION

18  BY MR. RUCKDESCHEL:

19  Q    Mr. Onder, there are -- in addition to the questions that

20  Mr. Maimon asked you about the many things that would have to

21  happen until we know whether there will be an Imerys settlement

22  that relates to this case --

23  A    Right.

24  Q    -- there are many other factors that prevent us now from

25  knowing how much any claimant would get under the proposed plan

Onder - Cross/Ruckdeschel                    133

1  that's before the Court today; yes?

2  A    I would agree.

3  Q    All right, thanks.

4          THE COURT:  On behalf of the ad hoc, is there a

5  motion or --

6          MR. WHITNER:  No more questions.

7          THE COURT:  -- questions?

8          MR. WHITNER:  No, we're done, Your Honor.

9          THE COURT:  No?

10         MR. MOXLEY:  Your Honor, just before the witness is

11 excused -- may I address the Court from counsel table?

12         THE COURT:  Yes, please.

13         MR. MOXLEY:  Your Honor, just before he's excused,

14 with respect to the exhibits, we know Your Honor made a ruling

15 with respect to the Exhibit 835, not moving that into evidence,

16 but the remainder of the exhibits I'd like to move into

17 evidence, Your Honor.  I don't think there's an objection, but

18 I'll list them out.  It's Exhibit 765, 829, 830, 832, and 1012,

19 Your Honor.

20         THE COURT:  Have you --

21         MR. MOXLEY:  Move those into evidence.

22         THE COURT:  Have you had a chance to review these?

23         MR. GORDON:  We have not, Your Honor.

24         MR. MOXLEY:  Your Honor, they're the exhibits that I

25 used with the witness.

1          THE COURT:  Why don't you take a look.  You don't

2    need the witness for it at this point?

3          MR. MOXLEY:  I suspect not, as long as there's not an

4    objection, Your Honor.

5          MR. GORDON:  I had a question or two, Your Honor,

6    based on just following up --

7          THE COURT:  Yes, Mr. Gordon.

8          MR. GORDON:  -- on the lien settlements, since that's

9    come up.

10                    RECROSS-EXAMINATION

11   BY MR. GORDON:

12   Q    You mentioned you didn't -- you couldn't say much about a

13   mediation, you didn't have a settlement with certain Federal

14   authorities, I guess.

15   A    Correct.

16   Q    Who do you have a settlement with?

17   A    We have a settlement with all private lienholders, as I

18   understand it.

19   Q    Do you have any idea in terms of a number?

20   A    I mean, as I understand it, the overwhelming -- I thought

21   I heard statistics something like 85 or 90 percent of all

22   claimants are covered by the private lienholders.

23   Q    Okay.  Thank you, sir.  And would you explain again -- you

24   talked before about the benefit of that and would you explain

25   again what the benefit is in your understanding of that

Onder - Recross/Gordon                                                        135

1  settlement, please?

2  A     Sure.  Liens are a thing that always plagued our

3  profession as a mass tort lawyer.  Typically, if we settle a

4  case on day one, you know, we know there's a settlement, that's

5  great; we know what the lawyer's fee is, that's great; we know

6  what our expenses are, that's great; but, ultimately, you have

7  the liens and, you know, out of a $100,000 settlement,

8  sometimes the medical bills will be $200,000.  So -- and then

9  there's a fight of what's related, what's not related, how much

10 will they discount, how much will they not discounted.  So we

11 always hire a company like Archer to go in and negotiate those

12 and try to reduce them as much as they can.

13     The problem is, it overwhelms anybody who tries.  I mean,

14 it's not at all uncommon for it to take 12, 18 months, two

15 years.  I have one that it's almost three years and -- or some

16 clients that it's almost been three years, we're still waiting

17 for lien negotiations.

18     So the idea of being able to, you know, negotiate or

19 solve, even if governmental entities aren't involved and it's

20 90 percent of all the medical liens, and save these women a

21 year or two or three years in terms of the time to get their

22 money, you know, into their pockets.  That's enormous and it's

23 one of the goals that we've had, and Mr. Watts had and Mr.

24 Pulaski and, I imagine, all of us had from day one is money

25 quickly into the hands of the clients.

Onder - Recross/Moxley                    136

1          MR. MAIMON:  Objection -- again, I object, Your

2   Honor.  We haven't had a chance to do any discovery into this

3   as to the accuracy of any of it and it's really prejudicial for

4   the Court to consider substantive testimony about what this

5   alleged settlement, which isn't even a final settlement

6   according to the paper we got, might be.

7          MR. GORDON:  Your Honor, I just -- we are just

8   following up on questions that were asked by Mr. Maimon and by

9   Ms. Richenderfer --

10          MR. MAIMON:  I didn't ask a single question about a

11  lien.

12          THE COURT:  The testimony was generic as far as how

13  do the liens operate, I'm going to let it in.

14          MR. GORDON:  Thank you, Your Honor.

15          THE COURT:  Thank you.  Objection overruled, for the

16  record.

17          MR. MOXLEY:  Your Honor, I have one final question,

18  if I may.

19          THE COURT:  Yes.

20          MR. MOXLEY:  Again, Cameron Moxley of Brown Rudnick

21  for the TCC.

22                      RECROSS-EXAMINATION

23  BY MR. MOXLEY:

24  Q   Mr. Onder, the settlement that you referenced, am I right

25  that that is an agreement by counsel for approximately 53

137

1  lienholders to recommend a settlement and that the term sheet

2  specifically says that no lienholder has agreed to it?

3  A    Put it this way, I have not seen the term sheet.  As I

4  understand it from legal counsel and counsel for J&J and so

5  forth, I understand it to be a done deal, but if -- I assume

6  anything is subject to final bankruptcy approval and the court

7  approval, I would assume.  But, again, I haven't seen the term

8  sheet, I don't know.

9  Q    You don't know; correct?

10 A    Correct.

11 Q    Okay.

12      MR. MOXLEY:  Thank you, Your Honor.  Nothing further.

13      THE COURT:  Well, now I'm very confused as to who

14 wants to discuss liens and who doesn't want to discuss liens.

15      MR. MAIMON:  I certainly do not.

16      THE COURT:  I recognize that, but apparently you're

17 flying solo over there.

18                    (Laughter)

19      THE COURT:  All right.  No other questions.  Mr.

20 Onder, thank you for your time today.

21      THE WITNESS:  Thank you, Your Honor.

22      MR. MOXLEY:  Yeah, just before the witness leaves.

23      THE COURT:  And the documents, are there --

24      UNIDENTIFIED SPEAKER:  We need the numbers.

25      MR. MOXLEY:  Sure.  Just for the record --

1          THE COURT:  Have a seat just for a second.

2          MR. MOXLEY:  Just for the record, the numbers of

3    exhibits that I'm -- that the TCC is moving into evidence are

4    765, 829, 830, 832, and 1012.  These were all -- just for the

5    record, these were all documents that we showed Mr. Onder and

6    that were discussed in the course of his examination.

7          MR. WHITNER:  Your Honor, if we can just discuss it

8    over break.  I don't want to take up more court time.  We

9    didn't follow the exhibit numbers, so --

10         THE COURT:  If we need Mr. Onder --

11         MR. MOXLEY:  I can tell you the tab numbers, if --

12         THE COURT:  -- we'll bring him by Zoom at some point

13   just to authenticate.  That's fine, thank you.

14         And I'm going to rely on all of you to, at the

15   conclusion, clarify which exhibits are in.  I mean, I know what

16   we've already accepted as far as with the declarations, but as

17   far as the cross and the like.  So take the time, confer, and I

18   don't foresee an issue.

19         MR. MOXLEY:  Thank you, Your Honor.

20         THE COURT:  All right.  What's next on the menu,

21   folks?

22         MR. MOXLEY:  Mr. Lisman, Your Honor, is our next

23   witness.

24         THE COURT:  Is Mr. Lisman here?

25         UNIDENTIFIED SPEAKER:  He is, Your Honor.  Do you

Lisman - Direct/Starner                    139

1  want to bring him out or do you want a quick five-minute break?

2          THE COURT:  I think a break would be worthwhile.  Why

3  don't we take just a ten-minute break.  Thank you.

4          (Recess at 4:10 p.m./Reconvened at 4:25 p.m.)

5          THE COURT:  Good afternoon, Mr. Lisman.

6          MR. LISMAN:  Good afternoon.

7          THE COURT:  Please raise your -- are we on?  Please

8  raise your right hand.

9              *ADAM JACOB LISMAN, WITNESS, SWORN

10          THE COURT:  Thank you.  Please state your name and

11 business address for the record.

12          THE WITNESS:  Adam Jacob Lisman, and it's 1 Johnson &

13 Johnson Plaza in New Brunswick, New Jersey.

14          MR. STARNER:  Your Honor, may I approach?

15          THE COURT:  Absolutely.

16                      DIRECT EXAMINATION

17 BY MR. STARNER:

18 Q    Good afternoon, Mr. Lisman.

19 A    Good afternoon.

20 Q    Could you open up the binder I just gave you and take a

21 look at that?  That's a document that's been marked Debtor's

22 Exhibit 4.  Do you recognize that?

23 A    Yes, I do.

24 Q    What is this?

25 A    This is my declaration and the various exhibits attached

Lisman - Direct/Starner                      140

1  to it.

2  Q    Do you understand this to be what we are proposing to

3  submit to the Court as your direct testimony that you would

4  otherwise have given here in court under oath today?

5  A    Yes, I do.

6  Q    Does this comport with your testimony that you would

7  otherwise give under oath today?

8  A    Yes, it does.

9         MR. STARNER:  With that, Your Honor, we Debtor's

10  Exhibit 4 into evidence.

11         THE COURT:  All right.  Any objection?

12         MR. MOXLEY:  No objection, Your Honor.

13         THE COURT:  Thank you, it's deemed admitted.

14          (Debtor's Exhibit 4 received in evidence)

15         MR. MOXLEY:  Your Honor, again, Cameron Moxley of

16  Brown Rudnick for the TCC.

17         UNIDENTIFIED SPEAKER:  Could you speak up a little

18  bit?

19         MR. MOXLEY:  Yes.  Cameron Moxley of Brown Rudnick

20  for the TCC, Your Honor.

21         THE COURT:  All right.

22         MR. MOXLEY:  May I approach?

23         THE COURT:  Absolutely.

24         MR. MOXLEY:  Thank you.

25                        *CROSS-EXAMINATION

Lisman - Cross/Moxley                    141

1  BY MR. MOXLEY:

2  Q    Good afternoon, Mr. Lisman.

3  A    Good afternoon.

4  Q    Cameron Moxley of Brown Rudnick on behalf of the TCC.

5  And, Mr. Lisman, you and I had a chance to meet at your

6  deposition twice by video; right?

7  A    Yes, correct.

8  Q    Great to see you in person, sir.

9  A    Good to see you.

10 Q    Today we may, in the course of discussion, use some

11 documents.  They'll appear on your screen and you have a binder

12 that we've given you in front of you as well.  And, of course,

13 Mr. Starner just introduced your declaration as well; correct?

14 A    Yes, correct.

15 Q    Mr. Lisman, you are employed by Johnson & Johnson

16 Services, Inc., which is a subsidiary of parent company Johnson

17 & Johnson; correct?

18 A    Yes, correct.

19 Q    Your title is vice president and assistant corporate

20 controller of J&J?

21 A    Yes, correct.

22 Q    You joined J&J in the summer of 2018 and you've worked

23 there for approximately five years?

24 A    Correct.

25 Q    Your responsibilities, as you put it in paragraph 1, just

1  for reference, Mr. Lisman, of your declaration, quote, "Require

2  consideration of, among other things, J&J's competitive

3  position and profitable growth, generation of sustainable cash

4  flow, and allocation of capital among J&J subsidiaries to

5  maximize value creation, achieve tax efficiency, ensure

6  adherence to accounting and reporting requirements, and manage

7  risk across J&J's global enterprise."  Correct?

8  A    Correct.

9  Q    In your current role, one area you are responsible for is

10 J&J's U.S. GAAP Consolidated External SEC Reporting; correct?

11 A    Correct.

12 Q    And I take it, Mr. Lisman, from paragraph 1 of your

13 declaration that you are familiar with short and long-term cash

14 requirements across J&J's global entities, as well as J&J's

15 internal policies on dividends, borrowing, capital

16 appropriation, approval responsibilities, intercompany

17 accounting, mergers and acquisitions, and other financial

18 matters; right?

19 A    Correct.

20 Q    And you are of course familiar with Johnson & Johnson

21 HoldCo N.A., Inc., including its subsidiaries, indirect

22 affiliates, corporate structure, and finances; correct?

23 A    Correct.

24 Q    And if I reference HoldCo today in my questioning, Mr.

25 Lisman, you'll know I'm referring to that entity; correct?

Lisman - Cross/Moxley                    143

1   A    Yes, correct.

2   Q    And your responsibilities at J&J have been essentially the

3   same since 2019; right?

4   A    Yes, correct.

5   Q    And who do you report to, sir?

6   A    Bob Decker.

7   Q    And what is his role?

8   A    He is the corporate controller.

9   Q    And who does Mr. Decker report to?

10  A    Joe Wolk.

11  Q    And what is his title?

12  A    CFO.

13  Q    Looking at your declaration, Mr. Lisman, and just for

14  reference, I'm looking specifically at paragraphs 11 through

15  16, and that's in front of you, to the extent you want to look

16  at it or reference it.

17  A    Yes.

18  Q    You provide a summary at paragraphs 11 through 16 of LTL's

19  assets; correct?

20  A    Correct.

21  Q    And you state at paragraph 12 that in April 2023 the fair

22  market value of LTL's assets totaled approximately $380

23  million.  And you note that figure is without consideration of

24  disputed insurance coverage and outside of LTL's rights under

25  the 2023 funding agreement; correct?

1  A    Correct.

2  Q    And in paragraphs 17 through 20 you discuss LTL's talc

3  liabilities; right?

4  A    Yes.

5  Q    As of the first quarter of 2023, J&J's reserve for talc

6  liabilities is $8.9 billion; correct?

7  A    Correct, it is.

8  Q    And the $8.9 billion reserve for aggregate talc claim

9  liability that has been disclosed in J&J's recent 10-Q, Mr.

10  Lisman, that's tied to the bankruptcy case; right?

11  A    It is.

12  Q    And untethered to the bankruptcy, or outside of the

13  bankruptcy case, J&J has no aggregate estimate of talc

14  liability, to your knowledge; right?

15  A    Correct.

16  Q    You discuss in paragraph 21 of your declaration, sir, new

17  JJCI's name change to HoldCo in December of 2022, and then

18  Holdco's subsequent transfer of its consumer business assets to

19  its immediate parent company, Janssen Pharmaceuticals, Inc.;

20  right?

21  A    Correct.

22  Q    You do not know what value, if any, HoldCo received in

23  exchange for transferring its consumer business assets, do you?

24  A    No, I don't.

25  Q    Collectively, the estimated fair market value of the

Lisman - Cross/Moxley                        145

1  subsidiaries and indirect affiliates within the HoldCo

2  structure approximate $30 billion; right?

3  A    Yes, as disclosed in Figure 1, yes.

4  Q    Figure 1 of your declaration; correct, sir?

5  A    Correct, yes.

6  Q    Now, in your declaration, you state at paragraph 29 that,

7  as of April 4th, 2023, HoldCo had a net intercompany receivable

8  of approximately $300 million relating to cash held within the

9  J&J treasury, and that comprised $400 million deposited on

10 account of HoldCo within the J&J treasury, less an intercompany

11 payable of approximately $100 million; right?

12 A    Correct.

13 Q    With respect to the mechanics of Holdco's cash, what

14 HoldCo actually has is a claim against J&J's in-house bank in

15 that amount; right?

16 A    Correct.

17 Q    Mr. Lisman, you do not know why it is that Holdco's cash

18 is approximately $400 million, as opposed to, for example, $600

19 million or $200 million; right?

20 A    Correct.

21 Q    HoldCo owns approximately 36.1 percent of Gh Biotech

22 Holdings, Limited; right?

23 A    Yes.

24 Q    HoldCo has not borrowed money on an intercompany basis

25 before; is that right?

1  A    Not that I'm aware of, no.

2  Q    J&J affiliates can borrow money from J&J's in-house bank;

3  right?

4  A    It is an option, yes.

5  Q    But HoldCo hasn't explored borrowing money; right?

6  A    Not that I'm aware of.

7  Q    HoldCo is part of J&J's structure; right?

8  A    HoldCo is a wholly-owned sub of J&J, yes.

9  Q    So HoldCo would be able to access the various intercompany

10 funding arrangements under all of the policies and procedures

11 within J&J's corporate structure; right?

12 A    They're afforded the options that J&J offers, but every

13 ability for J&J to loan money or invest capital is evaluated on

14 an as-needed basis.

15 Q    No HoldCo liquidation value analysis has been done, to

16 your knowledge; right?

17 A    Not that I'm aware of, no.

18 Q    And you don't have any idea how much value would come from

19 a HoldCo liquidation; right?

20 A    I would need to look at a multitude of factors to even

21 give a value.

22 Q    Right.  As you sit here today, you don't have that?

23 A    No, no, I don't.

24 Q    And you're not aware of any valuations of entities in the

25 HoldCo structure outside of those that we discussed at your

Lisman - Cross/Moxley                    147

1  deposition and were produced to us, to the TCC in discovery;

2  correct?

3  A    Correct.

4  Q    Am I right that HoldCo has not affirmatively requested a

5  dividend to be paid to it?

6  A    I'm not aware either way.

7  Q    Am I right that HoldCo has not attempted to sell any

8  asset?

9  A    Not that I'm aware of.

10  Q    HoldCo made no attempt to monetize its equity interest

11  before this second bankruptcy was filed; correct?

12  A    Not that I'm aware of.

13  Q    Let's look at -- well, I say let's look at, you're welcome

14  to look at it or not, sir.

15  A    Right.

16  Q    You probably know your declaration pretty well, fair to

17  say?

18  A    Sure, yes.

19  Q    Okay.  At paragraph 30 of your declaration, you discuss

20  how Holdco's ability to generate cash in the ordinary course of

21  business relies on receiving dividends on account of its

22  largely minority ownership interest in foreign subsidiaries and

23  indirect affiliates; right?

24  A    Correct.

25  Q    And you state that the receipt of such dividends is

Lisman - Cross/Moxley                              148

1  uncertain and depending on several factors beyond Holdco's

2  control; right?

3  A    Correct.

4  Q    You state at paragraph 31 of your declaration that the

5  payment of dividends by entities within the HoldCo structure is

6  governed by J&J's worldwide financial procedures and, more

7  directly, J&J's worldwide dividend policy, which is attached as

8  Exhibit G to your declaration; right?

9  A    Yes, correct.

10 Q    Now, for non-U.S. affiliates, corporate tax, corporate

11 treasury services, and the regional treasury service centers

12 are responsible for developing annual preliminary dividend

13 forecasts; right?

14 A    Correct.

15 Q    And these forecasts are based on the ongoing needs of the

16 J&J global enterprise; right?

17 A    Correct.

18 Q    Speaking of the global J&J enterprise, Mr. Lisman, you saw

19 that Dr. Bell uses the phrase in his report -- and, before I go

20 on, you're familiar with Dr. Bell's report --

21 A    Yes.

22 Q    -- correct?  Okay.  Both his original report and his

23 supplemental report?

24 A    Correct, yes.

25 Q    Okay.  And you saw that Dr. Bell uses the phrase J&J's

Lisman - Cross/Moxley                                    149

1  global cash ecosystem; do you recall that?

2  A    Yes.

3  Q    Okay.  And you understand, given your experience and role

4  at J&J, what Dr. Bell is referring to when he uses that

5  ecosystem phrase, but I believe the phrase that you said you

6  would use is the broader J&J network; right?

7  A    Yes.

8  Q    Now, a number of considerations go into dividend payment

9  decisions and you list some of those considerations at

10 paragraph 32 of your declaration; right?

11 A    Yes, correct.

12 Q    Now, in accordance with J&J's worldwide dividend policy,

13 whether any non-U.S. affiliate declares a dividend depends on

14 any number of variable designed to optimize value across the

15 global LTL enterprise; right?

16 A    Correct.

17 Q    And those variables include, among other things, the cash

18 needs of J&J's various business operations; right?

19 A    Yes.

20 Q    And you list a number of other variables that go into

21 whether a non-U.S. affiliate declares a dividend, and you do

22 that at paragraph 33 of your declaration; right?

23 A    Yes.

24 Q    Now, Exhibit G to your declaration, Mr. Lisman, that's

25 J&J's worldwide dividend policy and it's in your binder in

1  front of you; correct?

2  A    Yes, yes.

3  Q    Let's take a look at Exhibit G.  And we'll have --

4        MR. MOXLEY:  -- Brian, if you could bring that up on

5  the screen as well for the benefit of the witness and the

6  Court.

7  BY MR. MOXLEY:

8  Q    Okay, so we're looking at Exhibit G to your declaration,

9  sir, J&J's worldwide dividend policy.  Do you have that in

10 front of you?

11 A    Yes, I do.

12 Q    Okay.  At section 2(a) of that dividend policy, the second

13 sentence provides non-U.S. affiliate dividends affect U.S.

14 income taxes and must -- and must is underlined -- be approved

15 by corporate treasury services and corporate tax; right?

16 A    Correct.

17 Q    The next sentence in section 2(a) states, "Prior to

18 submission for approval, the Regional Treasury Service Center,

19 RTSC, will coordinate and align with the local finance and tax

20 teams."  Right?

21 A    Yes.

22 Q    Now, J&J puts a lot of time and effort to make things as

23 clear as possible in policies for its foreign subsidiaries;

24 right?

25 A    We try, yes.

Lisman - Cross/Moxley                    151

1  Q    J&J has policies in place and people are expected to

2  follow them; correct?

3  A    Absolutely.

4  Q    It would surprise you if J&J policies were not complied

5  with; right?

6  A    It would surprise me, yes.

7  Q    Under section 3 of the worldwide dividend policy, if we

8  could take a look at that, sir.

9  A    Yep.

10  Q    Okay.  It's entitled "Responsibilities," do you see that?

11  A    Yes.

12  Q    Okay.  The first bullet under responsibilities in the

13  worldwide dividend policies states, "Corporate tax, corporate

14  treasury services, and the regional treasury service centers

15  are responsible for developing an annual preliminary dividend

16  forecast for first tier and lower tier non-U.S. affiliates

17  during the annual business plan process."  Correct?

18  A    Yes.

19  Q    The business plan for the upcoming fiscal year is done at

20  a macro level for J&J; right?

21  A    Correct -- at first, yes.

22  Q    As part of the business plan, as you work your way through

23  the J&J organization, every J&J company or operating entity has

24  a set of financial goals, objectives, targets, budgets, growth

25  rates that make its way across the company, in total; right?

Lisman - Cross/Moxley                    152

1  A    Correct.

2  Q    One of the outcomes from the business plan efforts is that

3  each of the operating entities have a plan or a target or a

4  budget that they are trying to work toward; right?

5  A    Yes.

6  Q    People from corporate tax participate in formulating the

7  annual business plan; right?

8  A    They play a role, yes.

9  Q    And people from corporate treasury also play a role;

10 correct?

11 A    Correct.

12 Q    And the regional treasury service centers participate in

13 formulating an annual business plan as well; right?

14 A    Correct.

15 Q    The annual business plan process commences in October or

16 November each year and is typically finalized in January;

17 right?

18 A    Typically, yes.

19 Q    Now, looking back at your declaration again, Mr. Lisman,

20 let's look at paragraph 34, if we could, please, sir?

21 A    Yes.

22 Q    There you explain in paragraph 34 that any -- pardon me,

23 there you explain that any dividends paid by Holdco's indirect

24 operating affiliates must pass through various parent entities

25 before they might ultimately be paid to HoldCo; right?

Lisman - Cross/Moxley                  153

1  A    Yes.

2  Q    In paragraph 34 of your declaration, the last sentence

3  that begins on the top of page 14 of your declaration --

4  A    Yep.

5  Q    -- it states that the dividend must be authorized by that

6  entity's leadership; it's self-bound by fiduciary duties

7  outside of the control of J&J, the ultimate parent company;

8  right?

9  A    Correct.

10 Q    Did you write that sentence, sir?

11 A    I put this together in conjunction with counsel, yes.

12 Q    That particular sentence, do you have a memory of writing

13 that or did counsel write that sentence?

14 A    I don't recall.

15 Q    Okay.  Well, you're not a lawyer; right?

16 A    No, I'm not.

17 Q    Okay.  And you have no basis to answer what fiduciary

18 duties are owed by any particular entities, executives, or

19 board members, or to whom any such fiduciary duties are owed;

20 right?

21 A    I'm in a position to give guidance and thought to local

22 accounting and requirement rules of an individual country.  I'm

23 generally aware that each country has its own laws and rules

24 around dividends and, if I'm a member of that company in the

25 country, I'm aware that they need to follow those rules.

1  Q    Do you recall that on this past Sunday you and I spent an

2  hour on a video deposition; correct?

3  A    Correct.

4  Q    Okay.  So that was on June 25th.  Let's look at that

5  transcript, if we could, sir, please, and that is at -- let me

6  tell you where that's at in your binder, just give me one

7  second.  Your June 25th transcript is at Tab 5, sir.

8       Just let me know when you're there.  And I'll ask you,

9  when you get there, to turn to page 43.  I'm sorry, you

10 probably have a condensed version of your transcript.

11 A    That's okay.

12 Q    It would be page -- it would be the page that has pages 41

13 through 44 on it -- or do you have the full --

14 A    I've got the full one, I think, yeah.

15 Q    Oh, okay.  Pardon me, I apologize.  Okay.

16 A    That's okay.  Go ahead.

17 Q    So go to page 43 then, sir.

18 A    Yeah.

19 Q    Okay.  And you see on page 43, I asked you at line 5, "Mr.

20 Lisman, you're not a lawyer," do you see that?

21 A    Yes.

22 Q    And you said you were not; correct?

23 A    Correct.

24 Q    And then I asked you beginning at line 8, "If a board

25 member or executive at an entity owes fiduciary duties, do you

Lisman - Cross/Moxley                     155

1  know to whom that board member or executive owes those

2  fiduciary duties?"

3      And Mr. Starner interposed an objection and said, "It

4  calls for a legal conclusion.  You just asked him whether he's

5  a lawyer, he said no, so I object."

6      I asked you to go ahead and your answer was, "I can't

7  comment on who a hypothetical local employee owes fiduciary

8  responsibilities to, I have no basis to answer that."  Correct?

9  A    Correct.

10  Q    And that testimony was truthful; correct?

11  A    Yes.

12         MR. STARNER:  That testimony is entirely consistent

13  with his testimony today.  So that's improper impeachment, I

14  object.

15         THE COURT:  Is this the basis or foundation for

16  future questions or --

17         MR. MOXLEY:  Yes, I'm going through some questions

18  about whether he -- the witness has a basis to make the

19  statement in his declaration, which he had -- I think he wasn't

20  sure if he wrote it or not, about whether or not an

21  intermediary entity has fiduciary duties.  That was the basis.

22         MR. STARNER:  I'm not sure why we're reading --

23         THE COURT:  All right, sustained.

24         MR. STARNER:  Thank you, Your Honor.

25  BY MR. MOXLEY:

Lisman - Cross/Moxley                    156

1  Q    Let me ask you this question, Mr. Lisman.  Do you know who

2  Apsis -- strike that.

3       You're familiar with a French entity called Apsis;

4  correct?

5  A    Yes, I am.

6  Q    Okay.  Do you know who the executives or members of --

7  board members of Apsis owe fiduciary duties to?

8  A    No, I don't.

9  Q    Okay.  So you discuss at paragraph 37 of your declaration

10 Gh Biotech's dividend in 2022; correct?

11 A    Yes.

12 Q    Now, taking a step back, Mr. Lisman, Gh Biotech is a

13 German holding company; right?

14 A    Correct.

15 Q    And Apsis, we just discussed, is a French holding company;

16 right?

17 A    Correct.

18 Q    And Janssen Sciences Ireland, Unlimited -- we can refer to

19 that as JSI -- you're familiar with that entity?

20 A    Yes, I am.

21 Q    And JSI is a pharmaceutical operating company that also

22 engages in research and development, or R&D; right?

23 A    Correct.

24 Q    In November of 2022, Gh Biotech declared and paid a $5

25 billion dividend, of which approximately $1.8 billion was paid

Lisman - Cross/Moxley                    157

1  to Holdco's direct and indirect subsidiaries, in line with

2  Holdco's 36.1 percent interest in Gh Biotech; right?

3  A    Yes, correct.

4  Q    To get from Gh Biotech to HoldCo, that $1.8 billion

5  dividend would need to pass through Johnson & Johnson Holding,

6  GMBH, and then Apsis; right?

7  A    Yes, the subs that are in line, yes.

8  Q    Right.  Apsis did not have what I think you called

9  sufficient cash reserves, or distributable reserves, I think

10 was the phrase you used --

11 A    Correct.

12 Q    -- under French law, right, to declare and pay the

13 approximately $1.8 billion dividend on to HoldCo at that time;

14 right?

15 A    That's what I was told, yes.

16 Q    Okay.  And who told you?

17 A    J&J tax counsel.

18 Q    Was that Mr. McGraw?

19 A    It was, it was.

20 Q    Those adequate reserve restrictions are government or

21 regulatory restrictions; right?

22 A    Typically, yes.

23 Q    And they are in this case as well; right?

24 A    I believe so.

25 Q    And they're not Johnson & Johnson's restrictions; right?

Lisman - Cross/Moxley                    158

1  A    No, they would be local regulatory rules around capital

2  requirements.  And the word I used was distributable reserves,

3  the word distributable is very important because that's how

4  much is actually able to be paid up, yes.

5  Q    Thank you, sir.

6       Since Apsis could not pay $1.8 billion dividend it

7  received in 2022 on to its parent HoldCo, instead, Apsis loaned

8  that money to Janssen Finance Treasury, Unlimited Company, an

9  Irish entity; right?

10  A    That's what I was told, yes.

11  Q    Were you told that Mr. McGraw as well?

12  A    Correct.

13  Q    You do not know anything about the terms or interest rate

14  of the $1.8 billion loan by Apsis to Janssen Finance Treasury,

15  Unlimited Company, or why Apsis was able to make that loan

16  under French rule, do you?

17  A    I don't know why the loan was allowed under French law,

18  no.

19  Q    And you don't know if Apsis has any type of claim to the

20  $1.8 billion that it loaned to Janssen; right?

21  A    If it's a loan, then they've loaned the money out with the

22  expectation of it being paid back.

23  Q    Right, but you don't know what the terms of that loan are?

24  I think we just discussed that.

25  A    I couldn't recall the length of time or the rate, no, but

Lisman - Cross/Moxley                    159

1  being an accountant and understanding what a loan is, it's

2  expected to be paid back.

3  Q    Okay, okay.  Interest rates on intercompany loans within

4  the broader J&J network, those need to be market-based; right?

5  A    Yes.

6  Q    Now, let's shift gears a bit, Mr. Lisman, to the June 2023

7  dividend, the dividend that just happened.

8  A    Sure.

9  Q    Okay.  You've reviewed Dr. Gregory Bell's supplemental

10 expert report that was dated June 20th, 2023; right?

11 A    I have.

12 Q    Now, Dr. Bell sets forth his understanding of certain

13 facts concerning a Gh Biotech dividend that at the time of his

14 report, which, again, was June 20th, was expected to be paid to

15 Gh Biotech shareholders on June 22nd; right?

16 A    Correct.

17 Q    And Dr. Bell cites to, quote, "conversations with J&J

18 controller and tax function June 19 and June 20th, 2023," end

19 quote, for many of those facts.  And those were conversations

20 with you for the controller function and Donald McGraw for the

21 tax function; right?

22 A    Correct.

23 Q    Okay.  Now, those conversations among Dr. Bell, you, and

24 Mr. McGraw were all set up through counsel, through either Mr.

25 Starner, the White & Case firm, or Jones Day, or Andrew White

Lisman - Cross/Moxley                    160

1  as part of J&J; right?

2  A    Correct.

3  Q    You're of course familiar with the Gh Biotech entity;

4  right?  We talked about that.

5  A    Yes.

6  Q    Okay.  And that Gh Biotech dividend that Dr. Bell's

7  supplemental expert report stated was expected to be paid on

8  June 22nd was actually paid on that date; right?

9  A    Correct.

10 Q    Johnson & Johnson GMBH -- the German entity, right?

11 A    Uh-huh.

12 Q    Okay, it owns approximately 36 percent of Gh Biotech;

13 right?

14 A    Correct.

15 Q    Johnson & Johnson Holding GMBH paid the dividend that it

16 received from Gh Biotech to the French entity Apsis, correct,

17 this June 22nd dividend?

18 A    I believe so, yes.

19 Q    And then Apsis paid a $912 million dividend to HoldCo on

20 June 22nd as well; right?

21 A    Correct.

22 Q    This June 2023 dividend by Gh Biotech and the subsequent

23 declarations and payments of dividends was all undertaken in

24 accordance with J&J's worldwide dividend policy; right?

25 A    I would assume so, yes.

Lisman - Cross/Moxley                    161

1  Q    And your understanding is the June 2023 dividend that Gh

2  Biotech made and that then went up the chain to HoldCo was

3  forecasted during the last annual business plan process that

4  concluded in January of this year; right?

5  A    Yes, I reviewed at some point a slide deck that called out

6  that it was contemplated in January of 2023.

7  Q    Looking again, Mr. Lisman, at the J&J worldwide dividend

8  policy, do you have that in front of you, sir?  Can you get --

9  A    That's G, right?

10 Q    Yes, Exhibit G, that's right.

11 A    I gotcha.

12 Q    Exhibit G to your declaration.

13 A    I've got it, yes.

14 Q    Do you have that in front of you, sir?

15 A    Yes.

16 Q    Turn to page 3 of the document, which is section 3, the

17 responsibilities section again.

18 A    Yes.

19 Q    Okay.  The second bullet under the responsibilities

20 section of the J&J worldwide dividend policy states, "Corporate

21 Treasury Services is responsible for coordinating with the

22 Regional Treasury Services Center and the RTSC will communicate

23 the approved dividend amount to the affiliates and align on the

24 appropriate timing for payment."  Do you see that?

25 A    Yes.

Lisman - Cross/Moxley                    162

1  Q    And it was only approximately two weeks ago that you

2  learned the amount of money the Gh Biotech dividend would be

3  and the amount of money the Apsis dividend to HoldCo would be;

4  right?

5  A    Yes.

6  Q    At your May 31st deposition that I took of you by video,

7  you were designated by Johnson & Johnson HoldCo to testify as

8  to certain noticed deposition topics, subject, of course, to

9  certain responses and objections made by HoldCo; right?

10 A    Yes.

11 Q    And at that deposition on May 31st, you did not know until

12 approx -- you did not know the amount of the contemplated

13 dividend that would be paid this year, correct, to HoldCo?

14 A    I don't know if I recall the exact phrase I used.  I may

15 have mentioned that it was anticipated to be the 1.8, but I

16 don't recall exactly.

17 Q    Okay.  And I believe you told me at one point, Mr. Lisman,

18 that in the context of J&J, which is 500 legal entities

19 operating in almost every single country in the world, with a

20 balance sheet the size of yours, that these types of

21 transactions like the $912 million, nearly $1 billion dividend,

22 that those happen quite often; right?

23 A    Dividends are declared and paid throughout J&J in normal

24 course operations, as well as at a broader macro level, if

25 there's an effort or a need or requirement to repatriate a more

Lisman - Cross/Moxley                    163

1  significant amount of cash from overseas into the U.S.; all are

2  done interchangeably.

3  Q    Okay.  And it was Andrew White who told you a couple of

4  weeks ago that a $912 million dividend would be paid to HoldCo;

5  right?

6  A    I heard it from Andrew, yes.

7  Q    In terms of the strategy, formulation, and approval

8  process for dividends, it's documented and outlined in J&J

9  policies and what that process is; right?

10 A    Correct.

11 Q    After HoldCo received the $912 million dividend a few days

12 ago, it then loaned that money to Johnson & Johnson; right?

13 A    Correct.

14 Q    And it made that loan because that loan was, I think what

15 you told me was, part of the process of moving the economic

16 value through the entities from Gh Biotech all the way to J&J;

17 right?

18 A    Yes.

19 Q    And that's all part of the discussions among corporate tax

20 and corporate treasury on how J&J executes dividends across the

21 network of J&J entities in any given year; right?

22 A    Correct.

23 Q    So looking ahead now to 2024, the annual business plan

24 work for 2024 at this point has only started at a high level,

25 it hasn't really kicked off; right?

Lisman - Cross/Moxley                    164

1   A     Correct.

2   Q     You do not know if there is any expectation of what Gh

3   Biotech's dividend will be in 2024; right?

4   A     I do not know.

5   Q     J&J policies provide that J&J take into account a

6   multitude of facts in making decisions like whether an entity

7   within the structure is to make a dividend to another entity

8   within the structure; right?

9   A     Yes.

10  Q     Tax consequences are among the factors to be considered in

11  making money management decisions; right?

12  A     Yes.

13  Q     Cash needs, including what purpose is behind the needs for

14  the cash, is another factor to be considered in making money

15  management decisions; right?

16  A     Correct.

17  Q     And that's all for the broader -- money management

18  decisions for the broader J&J network; right?

19  A     Throughout the network and what the individual operating

20  entities across the globe may need.  If we're launching a new

21  product in a given country, the capital requirement there might

22  be higher or lower any given year.  It's maximizing value of

23  where the capital needs to be sent, yes.

24  Q     In those making money management assessments in the

25  broader J&J network are people from corporate tax and people in

Lisman - Cross/Moxley                          165

1   the controller function like yourself; right?

2   A    Correct.

3   Q    Money management decisions within the broader J&J network

4   are made pursuant to and in accordance with J&J's carefully-

5   crafted policies; right?

6   A    Correct.

7   Q    In making money management decisions, J&J would evaluate

8   all the factors that those within J&J making money management

9   assessments are aware of that are being raised by those

10  involved in the process who have the knowledge and the

11  expertise to raise questions and concerns; right?

12  A    If we're discussing business plan targets, for example,

13  amongst the group of folks that are responsible and the

14  accountants have a concern, or the tax team has a concern or

15  the treasury team does, yes, we discuss those things.

16  Q    Right.  And I think we talked about this earlier, but just

17  to make sure we're clear, HoldCo is an entity within the

18  broader J&J network; right?

19  A    It's a wholly-owned subsidiary, yes.

20  Q    Do you know whether it would cause J&J reputational harm

21  to allow its subsidiary HoldCo to default on obligations to

22  fund payments to talc victims?

23  A    You need to define harm and what that would mean.  Are you

24  talking about financial harm or --

25  Q    Reputational harm, sir.

Lisman - Cross/Moxley                166

1  A    I would assume so.

2  Q    Your testimony, Mr. Lisman, is you don't know -- strike

3  that, I'm sorry.

4       In your controller function role, you are aware of the

5  general dividend strategy for J&J as a whole, which would

6  include all J&J entities; right?

7  A    I'm aware of the dividend strategy as the parent company,

8  for one, and I'm aware of dividends are declared and paid

9  amongst the entities in any given year.  So, yes.

10 Q    And step one of J&J's dividend strategy is, I think you

11 told me, an ongoing evaluation for cash needs both inside the

12 U.S. and outside the U.S. to fund different operations and to

13 deal with tax liabilities; right?

14 A    Yeah, it could be tax liabilities, it could be debt

15 obligations, it could be any kind of cash need.

16 Q    That's step one, right?

17 A    Generally.

18 Q    And in step two of J&J's dividend strategy is what is the

19 most capital, tax-efficient, regulatory, legal, foreign

20 exchange process to make that happen, and J&J evaluates a

21 multitude of factors on an ongoing basis in that regard; right?

22 A    Yes.  I'm not sure I'd put it step one, step two.  All the

23 steps work together, I don't think one has priority over

24 another.

25 Q    Okay.  Just to make sure that we're clear, Mr. Lisman,

Lisman - Cross/Moxley                    167

1  take a quick look, if you could, at your May 31st deposition

2  transcript.

3  A    Which page?

4  Q    I apologize.  The May 31st transcript will be at Tab 6.

5       And I'd just ask you to turn to Page 98.

6            THE COURT:  90 what?

7            MR. MOXLEY:  98.

8            THE COURT:  98.

9            MR. MOXLEY:  I apologize, Your Honor.  98.

10           THE WITNESS:  Mine ends at 89.  You mean 98 on the

11 multiple pages?

12 BY MR. MOXLEY:

13 Q    Yeah, on the multiple pages.

14 A    Okay.  All right.

15 Q    Oh, sorry.  No, on the multiple pages, it's the page that

16 has Pages 97 through 100 on it.

17 A    Okay.  Sorry.  Okay, yeah.

18 Q    Okay.  And then if you look at Line 14, do you see I asked

19 you the question, "Are you aware of how dividend strategy is

20 set for GH Biotech?"

21 A    Correct.

22 Q    And your answer was, "I'm aware of the general dividend

23 strategy for J&J as a whole which would include all of our

24 entities."  Do you see that?

25 A    Yes.

Lisman - Cross/Moxley                    168

1  Q    And then I asked you, "What can you tell me about that,

2  sir?"  And your answer was, "It is part of our ongoing

3  evaluation for cash needs both inside the US and outside the US

4  to fund it from operations, tax liabilities."

5  A    Yes.

6  Q    "There is an ongoing process to determine what the

7  ultimate cash needs are is kind of step one.  And then step two

8  is what is the most capital tax efficient regulatory legal

9  foreign exchange process to make that happen, so we evaluate a

10  multitude of factors on an ongoing basis."

11      So I think you described it to me as sort of two steps,

12  right?

13  A    Okay.  Yep, sure.

14  Q    Fair enough?

15  A    Fair.

16  Q    Okay.  And dividends are approved through the corporate

17  parent, right?

18  A    Dividends are approved as outlined in the policy which

19  we've talked about, yes.

20  Q    All right.  Well, let's take one more look at your, again,

21  your May 31st transcript.  And I'd ask you to turn to Page -- I

22  think the same page, 99, this time.

23  A    Uh-huh.

24  Q    And at Page 99, do you see at Line 22 in your answer?

25  A    Yes.

1  Q    "Dividends are approved through the corporate parent."  Do

2  you see that?

3  A    Yes.

4  Q    Okay, that was accurate, right?

5  A    Yes.

6  Q    Okay.  In making the determination of whether to approve a

7  dividend, J&J would need to evaluate a multitude of factors.

8  We talked about some of those today, right?

9  A    Yes.

10 Q    And those multitude of factors would include evaluating

11 all of the local requirements and rules, right?

12 A    Yes.

13 Q    Evaluating what it means to capitalize the entity, whether

14 there are means to extract value, and other factors, right?

15 A    Yes.

16 Q    Assume with me that that evaluation has taken place and

17 that the parent company has determined that it is appropriate

18 to capitalize, let's say, Apsis so that a dividend could be

19 released and HoldCo could have access to a dividend from Apsis.

20     Assuming that the evaluation with a multitude of factors

21 has taken place within J&J and the decision has been made that

22 that capitalization of Apsis should take place, there's no

23 reason external to J&J why J&J could not take whatever internal

24 steps it needed to allow for HoldCo to have access to such a

25 dividend, right?

Lisman - Cross/Moxley                    170

1          THE COURT:  One second.

2          MR. STARNER:  Objection.  This is a hypothetical

3  question.  This is a fact witness.  I object on that basis and

4  could be hypothetical.  It's a fact witness.

5          MR. MOXLEY:  Your Honor, it's not -- I'm sorry.  Go

6  ahead, Your Honor.

7          THE COURT:  I'm going to overrule.  It's going to the

8  mechanics of how they operate.

9          MR. MOXLEY:  Thank you, Judge.

10 BY MR. MOXLEY:

11 Q    Go ahead, MR. Lisman.

12 A    So in a hypothetical world, if we did all of the

13 evaluations and there was no legal or tax requirement that

14 would prevent us from doing it, we would consider it.  But,

15 again, we would need to evaluate what is the best economic uses

16 of J&J's capital.

17 Q    Right.

18 A    For example, we don't capitalize companies that are not

19 operating well.  So if a business is running out of money and

20 the business isn't doing well, we at times make decisions to

21 walk away from that business which I have gave a few examples

22 of where that has happened.

23      So we would need to look at the need of the capital and

24 the requirement.  And if it was a good economic decision could

25 we do it?  Yes, we could, but we need to evaluate whether it's

Lisman - Cross/Maimon                    171

1    a good use or not.

2    Q    Right.  And in making that determination, J&J would take

3    into account both quantitative and qualitative factors,

4    correct?

5    A    Yes.

6    Q    Okay.  And a qualitative factor could be reputational

7    harm, correct?

8    A    It could be, yes.

9    Q    Other than LTL, you've never seen a J&J company file for

10   bankruptcy, right?

11   A    No.

12   Q    Give me one second, Mr. Lisman.

13   A    Sure.

14                         (Pause)

15        MR. MOXLEY:  Mr. Lisman, thanks for your patience.

16        And, Your Honor, thank you for your patience.  I have

17   nothing further.  I pass the witness.  Thank you.

18        THE COURT:  Thank you.

19        MR. MAIMON:  May I, Your Honor?

20        THE COURT:  Yes.

21        MR. MAIMON:  Thank you.

22        I apologize.

23        THE WITNESS:  That's okay.

24        MR. MAIMON:  (Indiscernible).

25        THE WITNESS:  No worries.

Lisman - Cross/Maimon                                    172

1            MR. MAIMON:  You won't use 99 percent of this.

2            THE WITNESS:  Okay, no problem.

3                      CROSS-EXAMINATION

4   BY MR. MAIMON:

5   Q    Good afternoon, Mr. Lisman.

6   A    Good afternoon.

7   Q    You and I have never met before, have we?

8   A    I don't think so.

9   Q    Okay.  My name's Moshe Maimon.  I have a few questions for

10  you.

11           THE COURT:  Don't mind me.  Go ahead.

12           MR. MAIMON:  Did I miss something, Your Honor?

13           THE COURT:  No.  Thanks.

14           MR. MAIMON:  May I?

15           THE COURT:  Yes, please.

16           MR. MAIMON:  Thank you.

17  BY MR. MAIMON:

18  Q    As you stated before, you're the Vice-President and

19  Assistant Corporate Controller of Johnson & Johnson.  Is that

20  correct?

21  A    Correct.

22  Q    Okay.  So I'd like to get a little structure down.  You

23  spoke a little bit about the corporate restructuring that

24  occurred during this last year coming from New JJCI, Holdco,

25  Janssen, and eventually it's now Kenvue.  Right?

1 A     Kenvue is now the parent company of the entire global

2 consumer business.

3 Q     Consumer Health, right?

4 A     Consumer Health business, yes.

5 Q     Okay.  And it's true, is it not, that in December of 2022,

6 JJCI changed its name to HoldCo, correct?

7 A     That's what I was told, yes.

8 Q     But other than that, you don't know of any other

9 differences between the two companies at that time.  They still

10 had the same assets, the same operated business.  Correct?

11 A     I'm aware that the name changed.  That's it.

12 Q     Okay.  In January of 2023, HoldCo transferred the consumer

13 business to its parent, Janssen, correct?

14 A     That's what I was told, yes.

15 Q     Okay.  And then in February of 2023, and we'll go over

16 this, Kenvue came out with a prospectus for an IPO, correct?

17 A     Correct.

18 Q     Okay.  So any time before December of 2022, we're talking

19 about -- if we're talking about the Consumer Health business,

20 we're talking about JJCI, right?

21 A     JJCI was the North America or the US consumer business.

22 As I mentioned, Kenvue is the global Consumer Health business.

23 Q     What happened with Kenvue was called a separation, that

24 was the technical term for the separation of the Consumer

25 Health business out of -- that J&J structured, that's the way

Lisman - Cross/Maimon                              174

1  it structured it, right?

2  A    That's not correct.  We have yet to actually separate the

3  business.  J&J still owns 90 percent.

4  Q    Right.  But the anticipated transaction was a separation

5  from J&J, and we'll get to how much J&J owns in a bit, okay?

6  A    Sure.

7  Q    Okay.  So what I'd like to do is I'd like to bring your

8  attention to Tab 16 of the binder that I gave you.  And you see

9  this is a -- it started with a certification from Moody's

10  Investors Service attesting to the fact that the documents that

11  they're producing are business records and kept in the ordinary

12  course of business?

13  A    Okay.

14  Q    Do you see that?

15  A    Sure, yes.

16  Q    And then it has the second page or Page 3, Exhibit A, and

17  then it starts with a series of documents.  Do you see that?

18  A    Yes.

19         MR. MAIMON:  Your Honor, this is marked as Exhibit

20  1148.  We would offer it into evidence.

21         MR. STARNER:  Your Honor, I don't know if I've seen

22  this before.

23         MR. MAIMON:  It was produced the same time as it was

24  produced to the debtor by Moody's pursuant to the subpoena.

25

Lisman - Cross/Maimon                    175

1          MR. STARNER:  I don't think we necessarily have an

2    objection to --

3          THE COURT:  This is dated October 19th, 2022?

4          MR. MAIMON:  The certification is June 21st, 2023.

5          THE COURT:  I was looking at the document.

6          MR. MAIMON:  Tab 16.  There are several documents

7    within here, Your Honor.

8          THE COURT:  Okay.

9          MR. MAIMON:  This was an entire production by them of

10   the documents concerning this that they keep in the ordinary

11   course of business.

12         THE COURT:  All right.  We'll, we're still reviewing

13   the last witness's document.

14         MR. MAIMON:  Okay.  May I --

15         THE COURT:  Subject to meeting and conferring.

16         MR. MAIMON:  Okay.

17         MR. STARNER:  Thank you, Your Honor.

18   BY MR. MAIMON:

19   Q    So let's take a look at the first document here.  It

20   starts on what's Bates paged on the bottom right-hand corner as

21   001.  Do you see that?

22        And it's titled "Rating Agency Presentation."  Do you see

23   that?

24   A    I see it, yeah.

25   Q    And it's dated October 19th, 2022.  Correct?

Lisman - Cross/Maimon                    176

1  A    Yes.

2  Q    Okay.  And what I'd like to focus on is if you turn to

3  Page 009, this talks about the fact that the company, namely

4  Kenvue, is going to raise $9 billion of debt with proceeds to

5  be utilized to pay J&J as partial consideration for the

6  Consumer Health business that J&J is transferring to the

7  company in connection with the separation.  Do you see that?

8  A    That's what it says, yes.

9  Q    And where it says on the right-hand side new debt that's

10 nine-point -- it says $9.4 billion, correct?

11 A    Yes.

12 Q    Okay.  And you told us before that you don't know if

13 HoldCo was paid a dime for the Consumer Health business that

14 was taken away from it and transferred up to Janssen, right?

15 A    Correct.

16 Q    Okay.  And then in addition to that $9.4 billion of debt,

17 it says that there's cash on the balance sheet if $1.5 billion.

18 Correct?

19         THE COURT:  One second.

20         MR. STARNER:  I just object, Your Honor.  I don't

21 think that he's laid any foundation.  I don't think this

22 witness has testified that he's seen this document before,

23 number one.  Number two, I also question the relevance of this

24 as to what extent that we're going to be talking about

25 Kenvue's, the value of Kenvue and its business.

Lisman - Cross/Maimon                    177

1        But, nonetheless, I object on lack of foundation with

2    this witness with this document.

3            MR. MAIMON:  Well --

4            THE COURT:  Well, this witness isn't authenticating

5    this document.

6            MR. MAIMON:  No, that's the certification.

7            THE COURT:  Right.  And he's asking the witness about

8    the transaction, if the witness --

9            MR. STARNER:  So same objections; lack of foundation.

10   This is Kenvue, Your Honor.  So I think we're going very far

11   afield.  This is not HoldCo we're talking about.  So, one, lack

12   of foundation, and relevance, Your Honor.

13           THE COURT:  Overruled.

14           MR. MAIMON:  Thank you.

15   BY MR. MAIMON:

16   Q    We know that you are the Vice-President and Assistant

17   Corporate Controller for entire J&J, all of its affiliates,

18   right?

19   A    I am.

20   Q    And Kenvue is an affiliate, right?

21   A    They are.

22   Q    And HoldCo is an affiliate, right?

23   A    They are.

24   Q    And Janssen's an affiliate?

25   A    Correct.

Lisman - Cross/Maimon                    178

1  Q    And LTL is an affiliate, correct?

2  A    Correct.

3  Q    Okay.  And we know what happened, that in December of

4  2022, JJCI changed its name to HoldCo, right?

5  A    Yep.

6  Q    In January, HoldCo transferred the Consumer Health

7  business to Janssen, right?

8  A    Yes.

9  Q    And since that time, Kenvue has gone out for public

10 offering, right?

11 A    They have.

12 Q    Pursuant to the prospectus?

13 A    They have.

14 Q    Okay.  So now we know that as they are making the

15 presentation to the rating agency in October of 2022, which is

16 before any all those other things happened, they're

17 representing that they're taking out $9 billion, actually $9.4

18 billion in debt to pay J&J partial consideration for the

19 transferring of the company in connection with the separation,

20 correct?

21 A    Correct.

22 Q    Okay.  And they're representing to the credit agencies

23 that they have cash on the balance sheet of $1.5 billion.

24 Correct?

25 A    That Kenvue does?  Yes.

Lisman - Cross/Maimon                              179

1  Q    Yes.  Now there's no Kenvue then, is there?

2       It's October of 2022.  There is no Kenvue.

3  A    It says "anticipated capital structure overview."  So --

4  Q    Right.

5  A    -- a prospectus is giving you a prospective look on what

6  the transaction will be.  Whether or not Kenvue, Inc., was set

7  up yet or populated with entities, that's not the point of this

8  document.

9  Q    I understand.  But they are making representations to the

10 rating agencies because they know that they're going to make a

11 public offering, correct?

12 A    I wasn't in the meeting, so I can't comment on what was

13 discussed.  I can comment on what I see on the page and what

14 actually happened.

15 Q    Okay.  Well, you see that this is a rating agency

16 presentation, correct?

17 A    That's what it says, yes.

18 Q    And you see that within there, they talk about the capital

19 structure overview and the anticipated capital structure

20 overview and talk about taking out a $9.4-billion loan to pay

21 J&J for the transfer partially, right?

22 A    That's what it says.

23 Q    And then they say also, and they make the calculation

24 about cash on the balance sheet of $1.5 billion.  Correct?

25 A    That's what it says, yes.

Lisman - Cross/Maimon                    180

1  Q    Okay.  And they go on on Page -- I'm sorry, Bates Page

2  054.  When you get there, let me know.

3  A    I got it, yeah.

4  Q    They talk about the profit, the net income for the three

5  years before then, '19, '20, and '21.  Right?

6  A    That's what it looks like, yes.

7  Q    In 2019, they had a profit of $1,435,000,000.  Right?

8  A    That's what it says, yes.

9  Q    Okay.  A loss in 2020 of 879 million, right?

10 A    Yes.

11 Q    And in 2021, a profit of 2,031,000,000, right?

12      THE COURT:  When you say profit and loss and you say

13 "they," let's be specific.  What is the "they" entity?

14 BY MR. MAIMON:

15 Q    Well, the "they" can't be Kenvue because Kenvue wasn't in

16 existence, right?

17 A    So we need to be clear what these statements represent.

18      So in order to do an IPO out of J&J, J&J had to prepare

19 what is called carveout financial statements, which is

20 basically saying if consumer business was a stand-alone

21 publicly-traded company, what would its financial statements

22 look like.

23      That process is a hypothetical careveout analysis of what

24 a stand-alone company would look like.  There are SEC rules

25 governing how that is done.  You create a company showing what

Case 23-12825-MBK    Doc 957    Filed 06/30/23    Entered 06/30/23 08:40:12    Desc Main
Document        Page 181 of 199

                    Lisman - Cross/Maimon                    181

1  it will look like on a stand-alone basis, and it's audited by

2  PwC.  It's been filed with the SEC.  We went through dozens

3  overviews with the staff of the SEC.

4      The numbers that you see here are the numbers that were

5  filed representing what a stand-alone company would look like

6  on a hypothetical stand-alone basis.  That is what this is.

7          THE COURT:  Stand-alone consumer operations?

8          THE WITNESS:  Correct.  Whether you call it Consumer

9  Health or Kenvue or Company X is irrelevant.

10 BY MR. MAIMON:

11 Q    Thank you.  I appreciate that you told us that.  But this

12 is not only doing an expected, this is doing an expected

13 lookback.  If we would have separated it out given the

14 consolidated financials that Johnson & Johnson have and what we

15 know about the consumer business, this is what we're telling

16 the credit agencies what it would have looked like had it been

17 a stand-alone company, right?

18 A    We're saying we prepared carveout financial statements,

19 like I just explained, and this was the result.

20 Q    Okay.  And for that estimation that Johnson & Johnson made

21 for those careveout financials, these were the numbers, $1.435

22 billion of net income in '19 and $870 million loss in '20 and a

23 $2.031 billion profit in 2021.  Right?

24 A    Those, that is the carveout net income of the global

25 Consumer Health business.

Lisman - Cross/Maimon                    182

1  Q    And that would be a total of, if we took all three

2  together, that would be a total profit of $2.5 billion over

3  three years.  Correct?

4  A    I'll trust your math, but yes.

5  Q    Okay.  And if you take a look a couple of pages earlier at

6  Page 040 --

7  A    Yep.

8  Q    -- where they talk about the compelling financial profile,

9  do you see that?

10 A    Yes.

11 Q    They are estimating an expectation but they're expecting,

12 and this was for Kenvue, two to three billion dollars of annual

13 free cash flow per year between 2023 and 2026.  Correct?

14 A    That's what it says, yes.

15 Q    Okay.  And if you take a look at -- just a couple of more

16 questions.

17 A    Sure.

18 Q    If you take a look at Page, Bates Page 332 at the bottom.

19 Do you see this is the cover page of the Kenvue prospectus

20 filed with the SEC?

21 A    Yeah, I'm getting there.  Hang on.

22 Q    Oh, sorry.

23 A    That's okay.

24          THE COURT:  Oh, 332?

25          MR. MAIMON:  332.

Lisman - Cross/Maimon                183

1              THE WITNESS:  Yep, this is the cover of the S-1.

2   Correct.

3   BY MR. MAIMON:

4   Q    Correct.  Okay.  And if you look at the second page of it,

5   it gives you the completion date of February 3, 2023.  Do you

6   see that?  It's a little faded up on the top.

7   A    It says subject to completion, yes.

8   Q    Right.  Dated February --

9   A    Yep, February --

10  Q    -- 3, 2023 for this, right?

11  A    Correct.

12  Q    Okay.  So this -- and if we take a look just at the second

13  page there, it says,

14       "Upon completion of this offering, Johnson & Johnson will

15  continue to own X percent of the voting power of our shares of

16  common stock eligible to vote in the election of our directors

17  or blank percent if the underwriters exercise in full their

18  option to purchase additional shares of our common stock from

19  us to cover over allotments.

20       "As a result, we will be a controlled company as defined

21  under the corporate governance rules of the NYSE."

22       Is that what it says?

23  A    That's what it says, yes.

24  Q    And then what it does is -- and why do I not have this?

25       It says, "As long as Johnson & Johnson beneficially owns a

Lisman - Cross/Maimon                    184

1  majority of the voting power of our expanding shares of stock,

2  Johnson & Johnson will generally be able to control the outcome

3  of matters submitted to our shareholders for approval including

4  the election of directors without the approval of our other

5  shareholders."  Right?

6  A    That's what it says, yeah.

7  Q    Okay.  And there was talk -- it was talking about Johnson

8  & Johnson owning a majority.  And in the first part of the

9  prospectus, the amount of stock owned by Johnson & Johnson of

10 Kenvue was in blank.  Do you recall that?

11 A    It's blank, yes.

12 Q    Okay.  If you take a look at Tab 10.

13 A    Okay.

14 Q    And this is a publication by Bernstein which was produced

15 to us pursuant to a subpoena on May 3rd, 2003.  It's titled

16 "Kenvue/J&J What do you need to Ken from the S-1?"  Right?

17 A    It's what it say.

18 Q    Okay.  And if we take a look at -- just one second, I'm

19 sorry.

20                     (Pause)

21           MR. MAIMON:  I apologize.  One second, Your Honor.

22           THE WITNESS:  It's okay.

23           MR. MAIMON:  Thank you.

24           THE COURT:  Better be hell of a question.

25                     (Laughter)

1          MR. MAIMON:  It's really just the thing I was

2    confirming.

3    BY MR. MAIMON:

4    Q    Well, Mr. Lisman, can you confirm that J&J owns around 90

5    percent of the ownership of Kenvue stock?

6    A    I can confirm that after the IPO which completed in May of

7    2023, about last month, that J&J owns, still owns approximately

8    90 percent, yes.

9    Q    Oh, I actually found it.  I just didn't highlight it.

10   It's the first page of the document, last two paragraphs before

11   the italics.  Do you see that "Talc liabilities?"

12   A    Yeah.

13   Q    Okay.  "Talc liabilities related to the baby powder

14   products which are part of the Kenvue spinoff are likely to be

15   a big focus area for investors.  J&J has undertaken to

16   indemnify Kenvue from any US-Canadian talc liabilities.

17   However, any international liabilities will fall upon Kenvue.

18        "Johnson & Johnson or J&J maintains around 90 percent

19   ownership stake in Kenvue but intends to distribute this stage

20   to its shareholders over time following a six-month lockup."

21        Is that right?

22   A    It's what it says.

23   Q    And so what happened here is what was intended to happen

24   is that Kenvue was to take out a loan of around $9 billion as

25   partial consideration to J&J for the separation and in addition

Lisman - Cross/Maimon                    186

1  to that, J&J owned about 90 percent of the stock of Kenvue

2  which they were going to distribute to their shareholders.  Do

3  I have that right?

4  A    I would say it a little bit differently.  I would say that

5  in any business on a stand-alone basis to properly capitalize

6  the company with an appropriate equity structure, companies

7  take out debt.  So J&J, we typically, we don't push down

8  parent-level debt to the OpCos.

9       So the consumer business, to be a representative stand-

10 alone public-traded company, would need to have debt as part of

11 its capital structure.  The bond offering which you referred to

12 was that transaction.  Consumer taking out debt on its own

13 accord, that was one step.

14 Q    And that was given over to J&J as partial consideration

15 for the transfer, right?

16 A    A component of the cash received from the Kenvue bond

17 offering was paid up to J&J, yes.

18 Q    And now separate and apart from that, J&J owns around 90

19 percent of the stock which they've expressed an intention to

20 distribute to their shareholders over time, right?

21 A    Yes.  In May, we sold approximately 10 percent of our

22 ownership stake in Kenvue in the IPO, and the remaining balance

23 which we still own as of today is 90 percent.  We've publicly

24 disclosed that we intend to execute the rest of the deal by the

25 end of the year.

Lisman - Cross/Ruckdeschel                    187

Q    And that money, according to this, was going to go to

J&J's shareholders over time, right?

A    That's not what it says.

Q    "Intends to distribute this stake to its shareholders over

time."  Right?

A    It doesn't say anything about money, though.

Q    So they could give stock to their shareholders, right?

A    There are different forms.  We can get into the different

forms of how this transaction can take.  There will be

multiples of ways of which we can execute the final stage of

the deal which we're evaluating all of them.

Q    And nothing that you know in the deal gives any of that

money or stock to either HoldCo or LTL, correct?

A    I haven't evaluated that.

Q    Nothing that you know gives any of that to HoldCo or LTL,

correct?

A    I haven't evaluated it.

Q    Thank you.

          MR. MAIMON:  No further questions.

          THE COURT:  Can we --

          MR. MAIMON:  I would offer that last exhibit into

evidence, Your Honor.  It's Exhibit, I'm sorry --

          THE COURT:  I would expect --

          MR. RUCKDESCHEL:  We have one question.

          THE COURT:  Well, you can come up.  As to the

Lisman - Cross/Ruckdeschel                 188

 1  exhibits, I would anticipate --

 2           UNIDENTIFIED SPEAKER:  For the record --

 3           THE COURT:  -- we'll resolve all of these at the same

 4  time.

 5           UNIDENTIFIED SPEAKER:  It's 11:42, just for the

 6  record.

 7           THE COURT:  Okay.

 8           UNIDENTIFIED SPEAKER:  Thank you.

 9                    *CROSS-EXAMINATION

10  BY MR. RUCKDESCHEL:

11  Q    Good afternoon, sir.  I think I have one question for you.

12  A    Sure.

13  Q    Would you agree that at sort of a 10,000-foot view that

14  ultimately Johnson & Johnson controls whether and how much cash

15  is made available to HoldCo in terms of paying up dividends

16  from other J&J companies?

17  A    I would answer that the way I answered the first

18  questions, that we have policies in place that govern how

19  dividends are paid and executed upon.  That's how I would

20  answer it.

21  Q    Right.  And J&J sets what those policies are and J&J makes

22  determinations what will be most efficient and profitable for

23  the overall J&J --

24  A    J&J --

25  Q    -- family of companies when making those decisions, yes?

1  A    J&J sets its own policies, correct.  Whether a decision is

2  profitable or not is a factor, a factor, never the only factor.

3  Q    Right.  And the entity doing that consideration is Johnson

4  & Johnson?

5  A    The parent company sets the policies, as we've discussed.

6  Q    Great, thanks.

7          THE COURT:  Mr. Starner?

8          MR. STARNER:  I'll be brief, Your Honor.  Thank you.

9              REDIRECT EXAMINATION

10 BY MR. STARNER:

11 Q    Just a few questions, Mr. Lisman.

12 A    Sure.

13 Q    Thanks for your time.

14      The first question I have for you was about the dividend.

15 You were asked a number of questions about the most recent

16 dividend that was received by HoldCo.  Can you explain to us

17 about the timing for that dividend?

18 A    Sure.  One of the requirements when paying dividends

19 internationally, particularly in Europe, is to finalize the

20 local statutory accounting financial statements under their

21 local version of GAAP.

22      So in order for a dividend ever to be paid up the chain,

23 the financial statements in the given country need to be

24 audited, certified, and approved by the board.  It's one of the

25 factors and one of the variables you need to even determine

1  what the dividend could be.

2      Dividends cannot be paid without those.  In France, that

3  deadline is the end of June.  So the fact that this happened

4  the end of June is normal course.

5  Q    Okay.  And you were asked a lot of questions about the

6  Consumer Health business and the transfer of certain Consumer

7  Health business assets from HoldCo.  Do you recall those

8  questions?

9  A    Yes.

10 Q    I want to start by asking you with respect to the transfer

11 of those assets from HoldCo and more generally the spend, at

12 what point in time was that something that was being planned by

13 J&J?

14 A    We've been planning the ultimate separation, me

15 personally, from the fall of 2020.  We publicly announced the

16 intention to separate Consumer I believe in November of 2021.

17 I was involved the year before that, and I know through further

18 discussions colleagues of mine were involved for years prior to

19 that.

20 Q    And so the plan to separate the Consumer Health business

21 didn't have anything at all whatsoever to do with the formation

22 of LTL or the ultimate bankruptcy of LTL?

23 A    Absolutely not.

24 Q    You were asked a number of questions about Kenvue and I

25 think you were shown a number of documents from rating agencies

Lisman - Redirect/Starner                    191

1  that you had not seen before, correct?

2  A    Correct.

3  Q    And you were not involved in any of those presentations to

4  the rating agencies?

5  A    I was not.

6  Q    Okay.  Now is Kenvue the same entity as HoldCo?

7  A    No.

8  Q    And with respect to some of those pro formas we looked at,

9  those were pro formas with respect to the Kenvue business

10 representing the global Consumer Health business, right?

11 A    Absolutely.

12 Q    Okay.  And that hypothetical analysis that we looked at

13 with respect to Kenvue, did that have anything at all

14 whatsoever to do with US and Canada talc liability?

15 A    No.

16 Q    Okay.  And I think you were shown some other things from I

17 think the Kenvue prospectus.  You were asked a few questions

18 about that.  And I think there was a reference to talc

19 liability.

20      Just to be clear, with respect to Kenvue entities, does

21 that hold any US or Canada talc liability whatsoever?

22 A    No, it does not.

23           MR. MAIMON:  Objection.  Not that it's --

24           THE COURT:  What's the objection?

25           MR. MAIMON:  He's a controller.  He doesn't know --

Lisman - Redirect/Starner                          192

1  he's not a lawyer.  He's not a legal expert.  He doesn't know

2  what liabilities any company owns or holds.

3           THE COURT:  Overruled.

4           MR. STARNER:  Thank you, Your Honor.

5  BY MR. STARNER:

6  Q    Can you answer that question again for me?  I think you

7  were about to answer.  So my question to you was with respect

8  to the prospectus we looked at in Kenvue, does Kenvue hold US

9  or Canadian talc liability?

10 A    No.

11 Q    Any Canadian or talc liability whatsoever?

12 A    No, it does not.

13           MR. STARNER:  May I have a moment, Your Honor?

14           THE COURT:  That's fine.

15           Let me ask a question.  The exhibit, we don't need to

16 pull it up, that included the ratings presentation that

17 included information on carved out revenues, profits and

18 losses, that was for a Kenvue entity which would be global or

19 was it the Hold -- and is that different from the consumer

20 products business that was transferred from HoldCo?

21           THE WITNESS:  The carveout financial statements --

22           THE COURT:  Yeah.

23           THE WITNESS:  -- represented the international global

24 everything of the Consumer Health business of J&J.  Inclusive

25 of that is the North American consumer business.  It's the

Lisman - Cross/Thompson                    193

 1  global business.

 2          THE COURT:  What was transferred from HoldCo was the

 3  North American business, correct?

 4          THE WITNESS:  Exactly.  Correct.

 5          THE COURT:  So those numbers would include both gain

 6  and loss far more than simply the North American entity?

 7          THE WITNESS:  Absolutely.

 8  BY MR. STARNER:

 9  Q    And then last question, with respect to Kenvue, have they

10  ever manufactured talc in Canada or North America?

11          MR. MAIMON:  Objection, foundation.  He's not in

12  manufacturing.  He's a controller.

13          THE COURT:  Sustained.

14  BY MR. STARNER:

15  Q    You can answer.

16  A    No.

17          THE COURT:  No, no.  I sustained the objection.

18          MR. MAIMON:  He sustained it.

19          MR. STARNER:  I'm sorry.

20                      (Laughter)

21          MR. STARNER:  I'm sorry.  And Your Honor?

22          THE COURT:  I'll be clearer next time.

23          MR. STARNER:  Then may I be heard?

24          THE COURT:  Yes.

25          MR. STARNER:  Your Honor, he was asked questions

Lisman - Cross/Thompson                    194

1  about Kenvue -- well, I'm certainly happy to ask him

2  foundation.

3  BY MR. STARNER:

4  Q    Mr. Lisman, do you know whether or not Kenvue has ever

5  manufactured talc with respect to US or Canadian talc?

6  A    I don't know.

7            MR. MAIMON:  Objection.  If it's based on hearsay --

8            THE COURT:  Well, we can get into that.  Do you know?

9            THE WITNESS:  I don't know.

10           THE COURT:  Well, we've ended it.

11           MR. MAIMON:  Thank you.

12           MR. STARNER:  Thank you, Your Honor.

13                        (Laugher)

14           MR. THOMPSON:  Just a couple of questions, Your

15  Honor, if I may?

16           THE COURT:  Yes.

17           MR. STARNER:  I'm sorry, Mr. Thompson.  Go ahead.

18           MR. THOMPSON:  I apologize, Your Honor.

19                      *RECROSS-EXAMINATION

20  BY MR. THOMPSON:

21  Q    Sir, as the vice-president/controller for the entire J&J

22  entity, one of them, correct?

23  A    I'd say it's the controller.

24  Q    Okay, thank you.  I try to give you a promotion but --

25           Johnson & Johnson pays a quarterly dividend of

Lisman - Cross/Thompson                    195

1  approximately $1.19 per share, correct?

2  A    Sounds right.

3  Q    Companies --

4          MR. STARNER:  Your Honor, I should object.  Scope.  I

5  know we've been a little bit lax about this, but I was very

6  discrete about what I asked about.

7          MR. THOMPSON:  I'm laying a foundation, Your Honor,

8  to get back to where he was going.  That's all.

9          MR. STARNER:  I wasn't going anywhere.  I went to --

10

11          MR. THOMPSON:  Well --

12          MR. STARNER:  -- two very small places.

13          MR. THOMPSON:  Continue, Mr. Thompson.

14  BY MR. THOMPSON:

15  Q    Sir, nothing that's going to happen in the LTL case is

16  going to prevent Johnson & Johnson from paying over $12 billion

17  in dividends this year, correct?

18  A    I can never say that.

19  Q    Okay.  So you're saying that a dismissal in this case or

20  non-dismissal would impact whether the company's going to issue

21  dividends this year?

22          MR. STARNER:  Objection.  I think it --

23          THE COURT:  Sustained.

24          MR. STARNER:  Thank you, Your Honor.

25          MR. THOMPSON:  Okay.  That's all.

Lisman - Recross/Moxley                    196

                    RECROSS-EXAMINATION

BY MR. MOXLEY:

Q     Good afternoon again, Mr. Lisman.

      So it's going to be, this is in your declaration, I think
it's Paragraph 37, the GH Biotech dividend from 2022, that was
declared in November of 2022, right?

A     I believe so, yeah.

Q     Okay.  And the most recent dividend was declared in June
of 2022, correct?

A     I believe so.

Q     Okay.  And you don't know anything about the planning of
the timeline for the June 2022 dividend with respect to the
lead up to that dividend or how it was determined that it would
be made in June of 2022 other than the fact that of the French
calendar issue that you discussed, correct?  There's nothing
else that you're aware of.

A     I think I mentioned I reviewed a slide deck at some point
that talked about the dividend being contemplated.  That was in
January of 2023.  And I know that it was executed and paid that
we talked about in June.

Q     Do you recall in your response to Mr. Starner's question
about whether this -- I think in regards to Mr. Starner's
question about the timing of the 2023 dividend you gave as part
of your answer that this was in the normal course.  Do you
remember using that phrase?

Lisman - Recross/Moxley                197

1   A    Yeah.  It was in connection with filing the Apsis

2   statutory financial statements, yes.

3   Q    Right.  When you said in response to that question that it

4   was within the normal course, you meant that just limited to

5   the fact that the June 30th deadline is coming up under the

6   French regulatory rules and they took this action given that.

7   You were not speaking with respect to how far in advance there

8   was planning on this other than the slide deck that you

9   referenced, correct?

10  A    No.  I was referring to I know that finalizing the

11  statutory accounts is required in June, and that's part of the

12  dividend and it happened at the same time.  And that's the

13  normal course to me.

14  Q    Thank you, Mr. Lisman.

15  A    Yeah.

16          THE COURT:  All right.  Thank you, Mr. Lisman.

17          THE WITNESS:  Sure.

18          THE COURT:  You may step down.

19          I believe and I hope we are done for the day.  We are

20  in recess.  We will see you all 9 a.m. tomorrow.

21          MR. JONAS:  Thank you, Your Honor.

22          MR. MAIMON:  Before we --

23          UNIDENTIFIED SPEAKER:  No, no, no.  One second, Your

24  Honor.

25          MR. MAIMON:  Can we know whether or not we're going

198

1  to have the MDL experts, the policy experts?

2          UNIDENTIFIED SPEAKER:  The MDL experts.

3          UNIDENTIFIED SPEAKER:  They're supposed to tell us

4  today.

5          MR. GORDON:  From our perspective, Your Honor, we're

6  on schedule and so we would expect to have them.

7          UNIDENTIFIED SPEAKER:  Correct.

8          THE COURT:  So for tomorrow --

9          UNIDENTIFIED SPEAKER:  We'll need a decision until

10 tomorrow.

11         MR. GORDON:  No, I understand.  But basically we got

12 all the way through all of our fact witnesses.

13         THE COURT:  We endured this today so that they could

14 do it tomorrow.

15         MR. GORDON:  We appreciate the sacrifice.

16         THE COURT:  All right.  So as planned --

17         MR. MAIMON:  Thank you, Your Honor.

18         THE COURT:  -- with experts.  Thank you.

19             (Proceedings adjourned at 5:35 p.m.)

20                     *  *  *  *  *

21

22

23

24

25

1        **C E R T I F I C A T I O N**

2            We, KAREN K. WATSON, LIESL SPRINGER, TRACEY WILLIAMS,

3    and DIPTI PATEL, court approved transcribers, certify that the

4    foregoing is a correct transcript from the official electronic

5    sound recording of the proceedings in the above-entitled

6    matter, and to the best of our ability.

7

8    /s/ Dipti Patel

9    DIPTI PATEL

10

11   /s/ Karen K. Watson

12   KAREN K. WATSON

13

14   /s/ Liesl Springer

15   LIESL SPRINGER

16

17   /s/ Tracey Williams

18   TRACEY WILLIAMS

19   J&J COURT TRANSCRIBERS, INC.          DATE:  June 30, 2023

20

21

22

23

24

25