IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Thursday, June 29, 2023 |
| Defendants. | . | AM SESSION |
| . . . . . . . . . . . . . . . . | . | 9:02 a.m. |

TRANSCRIPT OF MOTION OF TO DISMISS THE SECOND BANKRUPTCY
PETITION OF LTL MANAGEMENT LLC

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:            Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES VIA ZOOM:

For the Debtor:              Jones Day
                             By:  GREGORY M. GORDON, ESQ.
                             2727 North Harwood Street
                             Suite 500
                             Dallas, TX 75201

                             Jones Day
                             By:  EMILY C. BAKER, ESQ.
                             1221 Peachtree Street, N.E.,
                             Suite 400
                             Atlanta, GA 30361

                             Jones Day
                             By:  BRIDGE K. O'CONNOR, ESQ.
                             51 Louisiana Avenue, N.W.
                             Washington, D.C. 20001

                             Jones Day
                             By:  JAMES M. JONES, ESQ.
                             250 Vesey Street
                             New York, NY 10281

For Ad Hoc Committee         Brown Rudnick
of Certain Talc              By:  JEFFREY L. JONAS, ESQ.
Claimants and Ad Hoc              W. LYDELL BENSON, ESQ.
Committee of Creditors:           MICHAEL WINOGRAD, ESQ.
                             7 Times Square
                             New York, NY 10036

                             Otterbourg PC
                             By:  ADAM SILVERSTEIN, ESQ.
                             230 Park Avenue
                             New York, NY 10169

For the Ad Hoc Committee     Womble Bond Dickinson
of State Attorneys           BY:  ERICKA F. JOHNSON, ESQ.
General:                     1313 North Market Street
                             Suite 1200
                             Wilmington, DE 19801

For the Office of the        Office of the United States Trustee
United States Trustee:       By:  LINDA RICHENDERFER, ESQ.
                             J. Caleb Boggs Federal Building
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, DE 19801

3

APPEARANCES CONT'D:

| | |
|---|---|
| For Various Talc Claimants: | Maune Raichle Hartley Frency & Mudd, LLC<br>By:  CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Levy Konigsberg, LLP<br>By:  MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ 08648 |
| For Justin Bergeron and Others: | Cohen, Placitella & Roth, P.C.<br>By:  CHRISTOPHER M. PLACITELLA, ESQ.<br>2001 Market St, Suite 2900<br>Philadelphia, PA  19103 |
| For States of New Mexico and Mississippi: | Gibbons, P.C.<br>By:  ROBERT K. MALONE, ESQ.<br>One Gateway Center<br>Newark, NJ 07102 |
| For Paul Crouch, individually and on behalf of Estate of Cynthia Lorraine Crouch: | Ruckdeschel Law Firm, LLC<br>By:  JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For Johnson & Johnson and Johnson & Johnson HoldCo (NA), Inc.: | White & Case LLP<br>By:  GREGORY STARNER, ESQ.<br>1221 Avenue of the Americas<br>New York, NY 10020 |

## INDEX

**WITNESSES**                                                    **PAGE**

FOR THE DEBTOR:

SHEILA BIRNBAUM
    Direct Examination by Ms. O'Connor              57
    Cross-Examination by Mr. Silverstein            58
    Cross-Examination by Mr. Maimon                 77
    Cross-Examination by Mr. Thompson               79
    Redirect Examination by Ms. O'Connor            81
    Recross-Examination by Mr. Silverstein          91
    Recross-Examination by Mr. Maimon               94

CHARLES MULLIN
    Direct Examination by Mr. Jones                 97
    Cross-Examination by Mr. Silverstein           101
    Cross-Examination by Mr. Maimon                111
    Redirect Examination by Mr. Jones              118
    Recross-Examination by Mr. Silverstein         130


FOR TCC:

THEODORE RAVE
    Direct Examination by Mr. Silverstein            7
    Cross-Examination by Ms. O'Connor                8
    Redirect Examination by Mr. Silverstein         20
    Recross-Examination by Ms. O'Connor             39

ROYAL FERGUSON
    Direct Examination by Mr. Silverstein           47
    Cross-Examination by Ms. O'Connor               47
    Redirect Examination by Mr. Silverstein         49

**EXHIBITS**                                         **ID**   **EVD**

FOR THE DEBTOR:

D-68   Rebuttal Expert Report of Sheila Birnbaum     57    58


FOR TCC:

966    Expert Report of Theodore Rave                 7     8
967    Rebuttal Expert Report of Theodore Rave        7     8
980    Expert Report of Royal Ferguson               46    47

1          (Proceedings commenced at 9:02 a.m.)

2          THE COURT:  Okay.  Good morning, everyone.

3          Mr. Gordon, good morning.

4          MR. GORDON:  Good morning, Your Honor.  Greg Gordon,

5  Jones Day, on behalf of the debtor.  So Mr. Jonas and Mr.

6  Winograd and I had some conversations last night about

7  logistics for today, and we have a proposal to make to Your

8  Honor.

9          THE COURT:  Negotiation.

10          MR. GORDON:  Or actually, an agreement.  It's a good

11  day.  So what we thought made sense was to put the MDL experts

12  together.

13          THE COURT:  Yeah.

14          MR. GORDON:  And then have the financial experts

15  after that.  So what we've agreed to, subject to Your Honor's

16  approval, is to go with witnesses in the order of Rave,

17  Ferguson.  And then we'll go to our witness Birnbaum, and

18  Moline, but Moline just on the MDL piece of his report.  And

19  then we would come back in the afternoon and then do Burian,

20  Mullin on his financial analysis, and then Bell.

21          THE COURT:  All right.

22          MR. GORDON:  So you get the topics --

23          THE COURT:  I think it makes sense.  It's a lot on

24  our plate.

25          MR. GORDON:  Yes.

1          THE COURT:  All right.  Then with whom are we

2   starting?

3          MR. GORDON:  I should also make an introduction, Your

4   Honor.  We have another new team member to my left here which

5   is Bridget O'Connor.  She is a partner in our Washington, D.C.

6   office.

7          THE COURT:  Welcome.  Welcome aboard.

8          MR. SILVERSTEIN:  Good morning, Your Honor.  Adam

9   Silverstein of Otterbourg PC for the Official Committee of Talc

10  Claimants.  At this time we call professor Theodore Rave as an

11  expert witness to the stand.

12         THE COURT:  Professor Rave.

13         MR. SILVERSTEIN:  And, Your Honor, as Professor Rave

14  settles on the stand, may we add to the Court's binder

15  collection?

16         THE COURT:  Absolutely.  Professor, let me have you

17  raise your right hand.

18            THEODORE RAVE, TCC'S WITNESS, SWORN

19         THE COURT:  Thank you.  Please have a seat.

20         THE WITNESS:  Thank you.

21         THE COURT:  Give your name and address, business

22  address for the record.

23         THE WITNESS:  Yeah.  My name is Theodore Rave.

24  Business address is 727 East Dean Keeton Street, Austin, Texas.

25         THE COURT:  Thank you very much.

1                    DIRECT EXAMINATION

2    BY MR. SILVERSTEIN:

3    Q    Good morning, Professor Rave.  You have before you a

4    binder with two tabs in it.  Could you turn to Tab 1 which

5    contains Exhibit 966.

6    A    Yeah.

7    Q    Could you tell the Court what Exhibit 966 is?

8    A    Yes.  This is the expert report I submitted in this case.

9    Q    And do you understand that your expert report is being

10   offered as if it were your direct testimony being delivered

11   live in court today under oath?

12   A    I do.

13            MR. SILVERSTEIN:  Your Honor, at this time we offer

14   into evidence Exhibit 966.

15            THE COURT:  All right.  Any objection?

16            MS. O'CONNOR:  No objection.

17   BY MR. SILVERSTEIN:

18   Q    Also, Professor Rave, let me just turn your attention to

19   Tab 2 which is Exhibit 967.  Could you identify for the Court

20   what 967 is?

21   A    This is the supplemental or rebuttal report that I put in

22   in this case.

23   Q    And, Professor Rave, do you understand that the

24   supplemental or rebuttal report as Exhibit 967 is also being

25   offered as testimony that you would be as if you were giving it

1  live in court under oath today?

2  A    Yes, I do.

3          MR. SILVERSTEIN:  Your Honor, at this point we offer

4  into evidence Exhibit 967.

5          THE COURT:  I assume no objection?

6          MS. O'CONNOR:  No objection, Your Honor.

7          THE COURT:  All right, thank you.  Both 966 and 967

8  are admitted into evidence.  Thank you.

9       (TCC's Exhibits 966 and 967 admitted into evidence)

10         MS. O'CONNOR:  May I proceed?

11         THE COURT:  Absolutely.

12                        CROSS-EXAMINATION

13 BY MS. O'CONNOR:

14 Q    Good morning, Professor Rave.

15 A    Good morning.

16 Q    Nice to meet you in person.

17 A    Yes, nice to see you in person.

18 Q    Professor Rave, you've never served as an expert witness

19 before, correct?

20 A    That's correct.

21 Q    And after law school and after your clerkship, you spent

22 about three years in private practice, is that right, at a law

23 firm?

24 A    That's correct, yes.

25 Q    And other than that brief stint at the law firm, you've no

Rave - Cross/O'Connor                                9

1  experience representing a party in mass tort litigation,

2  correct?

3  A    That's correct.

4  Q    And you have no experience representing a party in a mass

5  tort settlement, right?

6  A    That's correct.

7  Q    Professor Rave, you're not offering an opinion on

8  bankruptcy or the prospect of the bankruptcy system for

9  resolving mass tort claims, right?

10 A    No, I was not asked to offer an opinion on bankruptcy.

11 Q    But you acknowledge that the MDL assumes that there's

12 enough money to go around, but if there's not enough money,

13 then the rules change, right?

14 A    No.  I don't think that's an assumption of the MDL.

15 Q    Well, let me understand.  I think I asked you and you

16 agreed that the MDL assumes that there's enough money to go

17 around.  Do you agree with that, right?

18 A    No.  I don't think that's an assumption of the MDL.

19          MS. O'CONNOR:  Okay.  Could I see, please, Professor

20 Rave's deposition at Page 128, Lines 19 to 22, please?

21          THE COURT:  And are these in a binder?

22          MS. O'CONNOR:  Yes.  And I'll hand you --

23          THE COURT:  Both for the witness and --

24          MS. O'CONNOR:  Yes.

25          THE COURT:  -- for the Court.  Thank you.

1          THE WITNESS:  Thank you.

2    BY MS. O'CONNOR:

3    Q    Okay.  Again, that's at Page 19, sorry, Page 128, Lines 19

4    to 22.

5    A    Sorry, which -- we're in the first tab here?  One second.

6    128 you said?

7    Q    Yes.

8    A    Okay.  Got it.

9    Q    And I asked you what about the bankruptcy court's ability

10   to bind potential opt-out claimants in order to achieve

11   financial finality, is that available in the MDL court.  And

12   you responded, as I said before, bankruptcy has lots of tools

13   to assure mandatory treatment and to bind claimants

14   involuntarily.  In doing so, it disrupts their financial

15   rights.  MDL doesn't --

16          THE WITNESS:  Excuse me, Your Honor.

17          MS. O'CONNOR:  MDL doesn't --

18          THE WITNESS:  I'm sorry.  Ms. O'Connor misread the

19   statement --

20          THE COURT:  I have it.  Thank you.

21   BY MS. O'CONNOR:

22   Q    MDL doesn't have those tools because MDL assumes that

23   there is enough money to go around.  Do you see that, Professor

24   Rave?

25   A    I do.

1  Q    Okay.  Do you remember agreeing that the MDL assumes that

2  there is enough money to go around?

3  A    I don't specifically remember.  But I'm certainly not

4  going to dispute it.

5  Q    Okay.  Have you changed your understanding about whether

6  the MDL assumes that there's enough money to go around?

7  A    I don't think my understanding has changed.  I think I was

8  answering a question about assumptions of the bankruptcy

9  system.  I think very often, MDL deals with cases where there

10 is enough money to go around.  If there's not enough money to

11 go around in the MDL system, there are tools to deal with that.

12      You could see a situation where you might have a limited

13 fund class action which could be -- could mandatorily bind

14 claimants.  Or at that point, maybe another system is

15 available.

16 Q    Okay.  And that system, when there is not enough money to

17 go around, you agreed that the rules change, correct?

18 A    When there's not enough money to go around, yes, then

19 we're in a situation where traditionally equity has provided

20 for equitable distribution.  If there's not enough money to go

21 around, you do things differently from when there is.

22 Q    Okay.  All right.  Professor Rave, you agree that latency

23 and future claims complicate the resolution of any mass tort in

24 any form, right?

25 A    Yes.

1  Q    And in fact, you would agree with me that long latency

2  period and number of people exposed are the biggest challenges

3  for talc litigation, right?

4  A    I think so, yes.

5  Q    In fact, you co-authored an article entitled A

6  Hub-and-Spoke Model of Multidistrict Litigation with Professor

7  Francis McGovern that addressed this very topic, correct?

8  A    It was one of the topics, yes.

9  Q    And in that article you wrote, quote, but in "mega mass

10 torts"--those involving multiple defendants and multiple

11 products and activities over extended periods of time (for

12 example, asbestos, silicone gel breast implants,

13 opioids)--comprehensive resolution has proven elusive.

14 Correct?

15 A    I don't have it in front of me.  But that sounds correct,

16 yes.

17 Q    Right.  You don't dispute that you wrote that, right?

18 A    Certainly not.

19 Q    And you don't disagree with those words today, right?

20 A    No, I do not.

21 Q    Okay.  But in your work in this case, you did not consider

22 the asbestos litigation as one of the comparison MDL cases that

23 you discussed in either of your expert reports, correct?

24 A    I don't think it's correct to say that I didn't consider

25 it.

1  Q    Well, you didn't discuss it in the text, in the body of

2  your report, in either of the reports other than a cite and a

3  footnote, right?

4  A    I did discuss it in a footnote.  But I think it's more,

5  you know, in terms of considering, yes I considered it.  It's

6  part of the knowledge that I have of the mass tort system and

7  MDLs.  What I was asked to provide in this case was an expert

8  opinion on tools that the MDL process has for resolving mass

9  tort cases.  And so asbestos was not one of the examples that I

10 used for providing tools.

11 Q    Okay.  So it was not one of the examples that you

12 considered as the MDL tools, correct?

13 A    Sorry.  I just, I considered it.  It was not one of my

14 examples of tools for providing resolution.

15 Q    Because a global resolution was not achieved in the

16 asbestos cases, correct?

17 A    That is correct.  A global resolution was not achieved in

18 the asbestos cases.  The asbestos cases were ultimately

19 resolved, but not through a global resolution.

20 Q    You also did not consider the Roundup cases in your

21 initial expert report, correct?

22 A    again, I considered it as part of the base -- general base

23 of knowledge I have about mass torts and MDLs.  I did not use

24 Roundup as an example in my report.

25 Q    And you didn't discuss or address them in your report.

1  A    I did not, no.

2  Q    But you know that there was a proposed settlement

3  agreement in Roundup?

4  A    Yes.

5  Q    And that big settlement announced was ultimately rejected

6  by the Court.

7  A    A class action settlement proposal in Roundup was rejected

8  by the Court, yes.

9  Q    And today, the Roundup litigation is still massively

10 ongoing, correct?

11 A    As far as I'm aware, Roundup is ongoing.

12 Q    And you agree that in the Roundup cases, non-Hodgkin's

13 Lymphoma has a long latency period, right?

14 A    I do.

15 Q    And that in order to try to account for the future claims,

16 the proposed settlement in Roundup included two classes, those

17 who had already been diagnosed with non-Hodgkin's Lymphoma and

18 those who had been exposed but not yet diagnosed, right?

19 A    Yes.  I think that was (indiscernible) class.

20 Q    But you're aware that the Court in Roundup ultimately

21 rejected the proposed settlement.

22 A    Yes.

23 Q    Okay.  And then finally, you also did not analyze the

24 silicone breast implant litigation.  And by that I mean you

25 didn't discuss it or write about it in your expert reports,

Rave - Cross/O'Connor                                   15

1  right?

2  A    I think I mentioned it, but it was not something that I

3  discussed in depth.

4  Q    But you acknowledge that the silicone breast implant cases

5  also involved latent injuries and unknown future claimants,

6  right?

7  A    Yes.

8  Q    And you're also aware that no global settlement was

9  achieved in those cases.

10 A    So the resolution in silicone gel breast implant was

11 resolved through several different settlements.  One of the

12 defendants resolved its liability in bankruptcy.  Excuse me.  I

13 believe that was Dow Corning.  Others of the defendants

14 resolved their liability through various settlement structures

15 in the MDL process.

16 Q    Well, and to be clear, you didn't discuss or consider the

17 Dow Corning bankruptcy in your report either, right?

18 A    Again, I considered it as part of the general base.  But

19 no, it wasn't one of my examples.

20 Q    And you didn't discuss any of the settlements or attempts

21 to resolve the silicone breast implant cases in your report.

22 A    Not in detail.

23 Q    Okay.  But what you did discuss in your expert report with

24 respect to cases that involved latency, your focus was on the

25 NFL concussion case, correct?

1  A    That was one of the examples I used, yes.

2  Q    Okay.  And you acknowledge that one of the differences

3  between the NFL concussion case and the talc litigation is that

4  the universe of potential claimants in the NFL litigation is

5  more knowable than what we have in the talc litigation,

6  correct?

7  A    Yes.

8  Q    And that's because the future plaintiffs in the NFL

9  concussion litigation were a group of retired football players.

10 And here in the talc litigation, we have a group of consumers

11 who purchased an over-the-counter product, right?

12 A    Yes.

13 Q    And so the NFL would have better records of who was

14 employed by them versus people who got talc products in stores

15 --

16 A    Yes.

17 Q    -- over the years, right?

18 A    Yes.

19 Q    So turning then, we touched on bankruptcy.  In assessing

20 the ability of the MDL system to provide fair and efficient

21 resolution of mass torts disputes, you did not discuss or

22 assess, offer opinions on examples of mass tort defendants that

23 filed for bankruptcy despite efforts to achieve global

24 resolution of their cases in the MDLs, correct?

25 A    I think that's correct, yes.

Rave - Cross/O'Connor                               17

1  Q    And so you did not discuss or assess the example of W.R.

2  Grace, a defendant in the asbestos cases.

3  A    I did not.

4  Q    And in fact, as of the time of your deposition in this

5  case, you were not aware that W.R. Grace was a defendant in the

6  asbestos cases.

7  A    I was not aware of the specifics of the W.R. Grace

8  litigation.  I knew they manufactured asbestos, but I didn't

9  know where they fit generally in the larger asbestos

10 controversy.

11 Q    And we already touched on Dow Corning.  But you also did

12 not address or discuss the Purdue Pharma bankruptcy filing

13 following its involvement as a defendant in the opioids MDL,

14 correct?

15 A    I didn't discuss Purdue Pharma.  Specifically, I think I

16 did point out that Purdue Pharma, that while one defendant

17 filed for bankruptcy in the -- well, not one.  There were

18 multiple.  But Purdue Pharma was one of the defendants that

19 resolved its opioid liability through bankruptcy.  Many other

20 defendants in the opioid litigation were able to

21 comprehensively resolve their liability in the MDL process.

22 Q    But you did not discuss the bankruptcy aspect of that

23 opioids outcome in your report, correct?

24 A    No, I did not.  Again --

25 Q    Right.

1  A    -- I was not offering an opinion on --

2  Q    That was my question.

3  A    Sorry.

4  Q    Professor Rave, you agree that MDL courts generally do not

5  approve or deny approval for settlement agreements, correct?

6  A    They -- if it's a non-class settlement agreement,

7  generally the MDL court will not approve or reject formally.

8  Sometimes the judges weigh in informally on the merits of the

9  settlement.  If it's a class action settlement, Rule 23

10 requires the Court to assess the fairness.

11 Q    And you also agree that MDL courts do not have the power

12 to bind parties to a settlement?

13 A    If it's a class action settlement -- if it were a

14 mandatory class action settlement like a limited fund, they

15 would have the power to bind parties.  If it's an opt-out

16 class, then they have the power to bind parties who don't opt

17 out.  If it's a non-class settlement, then it's an opt-in model

18 and they don't have the power to bind parties who do not opt

19 in.

20 Q    Okay.  So for a non-class settlement, you agree that MDL

21 courts do not have the power to bind parties to a settlement?

22 A    Yes.

23 Q    And whereas you're aware that bankruptcy courts, and you

24 agree that bankruptcy courts can act in a mandatory manner.

25 A    Yes.

Rave - Cross/O'Connor                                    19

1  Q    You also recognize that MDLs do not have the ability to

2  bind all claimants beyond the scope of the MDL proceeding

3  itself other than federal parties to any settlement that's

4  achieved through the MDL process.

5  A    So I just, I want to be precise here.  So the MDL -- if

6  parties who were not -- if entities or individuals enter into a

7  settlement and they were not parties in the federal MDL but the

8  settlement is negotiated in the MDL --

9  Q    No, that's not my question.

10 A    Okay.

11 Q    So I'll --

12 A    Sorry.  Then I didn't understand.

13 Q    Right.  So we've got the MDL proceeding itself.  It has

14 federal parties to that MDL proceeding.

15 A    Yeah.

16 Q    If there's a settlement among those MDL parties, that, the

17 MDL court does not have the ability to bind other claimants

18 outside that MDL proceeding to that settlement, correct?

19 A    The settlement could bind the parties to the settlement.

20 Many MDL settlements include parties who were not in the MDL

21 proceeding.  But the MDL -- I think where you're going with

22 this generally is the MDL judge doesn't have the power to reach

23 out and bring everyone in.  But if the settlement is broader

24 than just the parties in the MDL, then the MDL judge would have

25 the power to enforce that settlement, yes.

Rave - Redirect/Silverstein                      20

1  Q    That was my question.  And the MDL does not in fact have

2  any procedural tools that require state courts to coordinate

3  with the federal MDL, correct?

4  A    Require, no.  MDL judges frequently work cooperatively

5  with state court judges.

6  Q    In fact, you've written law review articles on this very

7  topic, right?

8  A    I have, indeed.

9  Q    And in an article entitled MDL in the States, you detailed

10 that roughly half of the states do not have a corollary

11 procedure to the federal MDL mechanism, correct?

12 A    That is correct, yes.

13 Q    So, Professor Rave, you agree that the bankruptcy court,

14 unlike the MDL court, can bind all claimants, right?

15 A    Yes, I think so.

16 Q    Okay.  Thank you, Professor Rave.

17        MS. O'CONNOR:  That's all I have.

18        THE WITNESS:  Thanks.

19                    REDIRECT EXAMINATION

20 BY MR. SILVERSTEIN:

21 Q    Good morning, Professor Rave.

22 A    Good morning.

23 Q    Have you testified in Court before?

24 A    I have not.

25 Q    Okay.  I'm going to ask you some questions, and I would

Rave - Redirect/Silverstein                    21

1  like to start with following up on Ms. O'Connor's questions to

2  you about your experience.

3      Ms. O'Connor asked you some questions about your

4  experience as a young lawyer at a firm and in connection with

5  mass tort.  Could you just take a minute to describe your

6  background to the Court?

7  A    Sure.  So I graduated law school in 2006 and clerked for

8  two federal judges, and then worked at a law firm.  The one

9  you're referring to I think is Jones Day.  I was a lawyer at

10 Jones Day for about three years in the appellate practice.  I

11 did very little work in mass torts.  Some, but not much.  And I

12 certainly didn't negotiate any settlements.

13     Then I did a fellowship at NYU School of Law and went into

14 teaching.  And for eight years I was a professor at the

15 University of Houston Law Center.  The last two years I've been

16 a professor at the University of Texas.  And I've spent the

17 past decade studying and teaching and writing about complex

18 litigation, specifically multi-district litigation and mass

19 tort litigation.

20 Q    Have you been sitting in court during this trial?

21 A    I have, yes.  Except for the end of yesterday.

22 Q    Did you hear Judge Kaplan's concerns or questions about

23 having live testimony over a policy debate between the MDL

24 system and the bankruptcy system?

25 A    I did, yes.

Rave - Redirect/Silverstein                          22

1  Q    are you offering any opinions on a policy debate between

2  the MDL system and the bankruptcy system?

3  A    I don't think I am.  I don't think we're having a policy

4  debate.  I was asked in this case to offer an opinion on the

5  tools that the MDL system has for resolving mass tort cases.  I

6  never understood my job to be a comparative job.

7  Q    And do you have an opinion as to whether the tools in the

8  MDL afford the parties in the talc litigation to achieve a fair

9  and efficient and equitable resolution of the claims?

10 A    I do.  I think the tools are there in MDL.  And MDL is

11 extraordinarily flexible and has lots of different tools that

12 the parties might use.  And the tools are there to provide

13 resolution, yes.

14 Q    As you've sat in court this week, have you heard or

15 observed anything during the trial, including Ms. O'Connor's

16 cross examination of you, that has led you to alter or change

17 any of the opinions you rendered in your expert reports?

18 A    No.

19 Q    Now, Ms. O'Connor asked you some questions about the

20 handling of mass tort disputes involving future claims with

21 latencies.  Do you --

22 A    Yes.

23 Q    -- remember those questions in general?

24 A    Generally, yes.

25 Q    Do you have an opinion as to whether parties can

Rave - Redirect/Silverstein                    23

1  equitably, efficiently, and comprehensively resolve mass tort

2  disputes involving future claims with long latency periods in

3  the tort system?

4  A     I do, yes.

5  Q     And what is your opinion?

6  A     I think that the tort system gives parties the tools to

7  resolve these claims.  You could do it through a class action

8  like we saw in the NFL concussion case which involved latent

9  injuries and future claimants.  And if you don't use a class

10 action, there are other tools, as well.

11 Q     Throughout the first bankruptcy of LTL and now in this

12 bankruptcy, there's been some discussion about the Supreme

13 Court decisions in Amchem and Ortiz, and the impact that those

14 decisions have on the ability to resolve claims, future claims

15 with long latencies in the tort system.

16       So first, can you take one minute to describe what the

17 holding of Amchem and Ortiz was, and then I'm going to ask you

18 a follow up question.

19 A     It seems like you're opening this up as a classroom.  So

20 I'll be very brief on these cases.  I'm sure everyone in the

21 room has read them.  So the holding of Amchem is that you

22 cannot use a class action to bind future claimants when there

23 are no structural assurance of adequate representation for

24 those future claimants.

25       And the problem in Amchem was that the class action that

Rave - Redirect/Silverstein                          24

1  was designed to resolve the asbestos litigation, litigation

2  involving -- that particular settlement I think involved over

3  20 defendants.  And we're talking about a multitude of

4  different products that may have contained asbestos over a long

5  period of time.

6       The class action settlement in that case lumped the future

7  claimants and the present claimants into a single class and

8  didn't have separate representation.  And that was the biggest

9  problem in that case.  And the Court said you can't do that.

10 You can't bind future claimants unless you have structural

11 assurance that they'll be adequately represented.

12 Q    And what was the holding on Ortiz?

13 A    Ortiz was also an asbestos settlement.  Ortiz was

14 different from Amchem.  It was a mandatory class action, a

15 23(b)(1)(B) limited fund class action.  And the holding on

16 Ortiz is that the parties can't agree on the definition of the

17 limited fund.

18      So the settlement in Ortiz, basically the proposed fund

19 was the pot of money that was the settlement of the defendant's

20 insurance coverage dispute.  And the Court held that when

21 you're going to use a mandatory process like a 23(b)(1)(B)

22 class action, the fund has to be actually limited, not limited

23 by the agreement of the parties.  And the defendant has to put

24 all of its equity on the table.

25      So that was the biggest problem in Ortiz.  Also, it didn't

Rave - Redirect/Silverstein                    25

1  -- it also had a sub-classing problem as well.  There was no

2  structural assurances for adequate representation of future

3  claimants.

4  Q    All right.  So in your opinion, how are the parties in a

5  mass tort dispute involving future claims and long latencies

6  able to resolve their disputes through a settlement class

7  action following Amchem and Ortiz?

8  A    I think that Amchem and Ortiz certainly don't foreclose

9  this.  If you design the class action settlement to provide the

10  structural assurances of adequate representation that were

11  missing in those cases, then a class action isn't available to

12  them.

13  Q    Are there any settlement class actions that have been

14  approved by courts involving long latencies in future claims?

15  A    This is the -- so yes is the answer.  The NFL concussion

16  litigation involved long latency period and future claims.  And

17  the parties and the Court there recognized the future claims

18  problem, and very early in the litigation appointed class

19  counsel for the subclass of future claimants.

20       And so that class counsel was then able to be present in

21  the settlement negotiations.  And the district court certified

22  the class with two subclasses, one subclass of currently

23  injured NFL players and one subclass of future claimants who

24  might develop injury down the road, certified the class,

25  approved the settlement, and the Third Circuit affirmed it.

1          THE COURT:  If I may just interject?

2          MR. SILVERSTEIN:  Sure.  Of course.

3          THE COURT:  Professor, an you describe a structural

4    mechanism for future unidentifiable claimants?  Again the

5    difference would be --

6          THE WITNESS:  Yeah.

7          THE COURT:  What would be an example of a structural

8    mechanism to address future claimants who cannot be identified

9    at this juncture?

10          THE WITNESS:  Yeah.  So I think the structural

11    mechanism is the same, right.  You would have -- you would

12    appoint -- you would have a subclass for future claimants.  And

13    then that subclass would have separate representation, separate

14    subclass counsel.

15          The challenge with unidentifiable claimants, I don't

16    think so much is a structural challenge.  I think the challenge

17    there is more a notice challenge.

18          THE COURT:  Notice.  So would that structural format

19    address the concerns in Amchem?

20          THE WITNESS:  So I think it certainly addresses the

21    concerns in Amchem, right.  The biggest problem in Amchem was

22    there was no one looking out for the futures, and so the deal

23    looks like it's selling out the future claimants.

24          So if you have that structure in place where you have

25    someone whose job it is to represent the future claimants, and

Rave - Redirect/Silverstein                          27

1    who actually has a financial incentive to do so, right.  So the

2    attorney fee award for the future subclass counsel is going to

3    be based on the recovery of the futures.

4            It address that, right.  There's still -- the notice

5            THE COURT:  Notice issue.

6            THE WITNESS:  -- challenge -- the notice is a

7    separate challenge.  I don't think notice is an insurmountable

8    challenge.  We have lots and lots of class actions where it's

9    hard to identify the class of people that you're giving notice

10   to.

11           So, like, think of your sort of ordinary consumer

12   class action or your ordinary anti-trust class action.  You

13   have a class of people that are very difficult to identify,

14   right.  It's not like you have a list of names that you can

15   just mail to.

16           And there are lots and lots of notice programs that

17   are designed to get at that problem.  So you do a multimedia

18   kind of notice.  You would do print ads and TV ads and internet

19   advertising over a long period of time to make sure that the

20   message is getting out there.

21           And an additional challenge, I think, in Amchem and

22   Ortiz, well not Ortiz because that was mandatory.  But in

23   Amchem, an additional challenge was that when you're talking

24   about the presence of -- when you're talking about asbestos,

25   asbestos was in hundreds of different products.  And people

1  didn't know whether they were ever exposed to asbestos.

2        The difference here, we're talking about a consumer

3  product that people know if they've used or not used.  If you

4  put out a notice that said have you used Johnson's Baby Powder,

5  that's going to get people's attention in a way that have you

6  been exposed to asbestos isn't going to get their attention.

7        THE COURT:  All right, thank you.

8        MR. SILVERSTEIN:  And, Your Honor, can I follow up on

9  that because you anticipated what I was going to ask Professor

10 Rave.

11 BY MR. SILVERSTEIN:

12 Q    So can we turn to Roundup because Roundup is an action

13 where the Court rejected a settlement class action involving a

14 large class of unidentified future claimants.  Does Roundup

15 foreclose a settlement class action involving a large class of

16 unidentified claimants?

17 A    No, I don't think it does.

18 Q    And why is that?

19 A    Well, I think the biggest problem in Roundup was not the

20 way the class was structured.  The biggest problem in Roundup

21 was that the Judge thought it was a bad deal.  The Judge

22 thought that it didn't provide enough money for future

23 claimants.

24    And Roundup -- so Roundup involved a latency period for

25 non-Hodgkin's lymphoma that was, I don't know exactly, more

Rave - Redirect/Silverstein                                    29

1    than a decade, a long latency period.  The proposed settlement

2    in Roundup involved a medical monitoring program that was going

3    to last for I think four years, and a compensation fund that

4    was going to last for four years.

5         And the Judge thought that that didn't provide nearly

6    enough protection for future claimants because they might not

7    get sick for ten to fifteen years, but they only have four

8    years of medical monitoring and four years to make a claim.  So

9    I think the primary problem in Roundup was the substance of the

10   settlement, not -- not the use of a class action in any future

11   case.

12   Q    But didn't the Court in Roundup comment on the challenges

13   of providing notice to a large unidentified class of future

14   claimants?

15   A    Yes.  So again, notice -- we're back to the notice issue.

16   Notice is a challenge in these cases.  And the Court in Roundup

17   acknowledged that.  But again, I think the biggest problem in

18   Roundup were the specifics of the notice.

19        So the notice in Roundup said something like exposed to

20   weed killers?  You may be entitled to compensation.  If you

21   have non-Hodgkin's lymphoma, you get some -- you may be

22   entitled to up to some large settlement amount.

23        And the Judge said that notice is not well-designed to

24   reach the people who have been exposed and don't know if their

25   risk.  Something -- and the Judge, you know, was quite clear in

1  the transcript of the argument which he incorporates by

2  reference into his decision that he's not saying that you could

3  never use a class action for a case like this.

4      This particular class action settlement wasn't good, and

5  the notice wasn't good.  And notice that said something more

6  like exposed to weed killers?  You could get cancer.  This

7  settlement could affect your rights, would do a lot more to get

8  the attention of the unidentifiable class of people.

9  Q    Couple of more follow ups on the subject of settlement

10 class actions.  And then I want to switch the subject.  Were

11 you in court when Mr. Murdica testified yesterday that in his

12 view, bankruptcy is the only form in which a fiduciary can be

13 appointed to represent the interest of future claimants?

14 A    I was in court then, yes.

15 Q    And do you agree with that assessment by Mr. Murdica?

16 A    No.  I don't agree with that assessment.

17 Q    And why is that?

18 A    As I think I mentioned to Judge Kaplan earlier, in a class

19 action you would have a future claimant subclass.  And that

20 future claimant subclass would have separate class counsel

21 appointed to represent that future claimant subclass.  That

22 class counsel would have a fiduciary obligation to represent

23 the interest of the future claimants.

24      And beyond just the fiduciary obligation, it would also

25 have an economic incentive to do a good job representing the

Rave - Redirect/Silverstein                                31

1  future class because the award of attorneys fees is going to

2  depend on how well the future class does.

3  Q    Let's talk about the asbestos MDL because that involved

4  long latencies and future claims.  And Ms. O'Connor asked you

5  some questions about that.  Does the activity or lack of

6  activity in the asbestos MDL change any of your opinions that

7  the MDL has the tools available to it to resolve the talc

8  claims?

9  A    No.  It doesn't.  I think that the asbestos MDL is very

10 different from this situation that we're looking at here.

11 Earlier, Ms. O'Connor asked me about the idea of mega mass

12 torts that I talked about in my article with Professor

13 McGovern.

14      What we mean by mega mass torts is like the asbestos MDL,

15 mass torts involving many, many different defendants with many,

16 many different products over a long period of time.  These

17 disputes are just far more complicated.  And I don't mean to

18 minimize the complication of this dispute.  This is -- this is

19 obviously a challenging mass tort.  But it's not anywhere near

20 the complexity of the asbestos MDL.

21 Q    Are there tools available in the tort system for resolving

22 mass torts with future claims and latencies other than through

23 a settlement class action?

24 A    There are, yes.

25 Q    And what tools are available to parties to

Rave - Redirect/Silverstein                                      32

1  comprehensively, equitably, and efficiently resolve mass tort

2  disputes involving future claims with long latencies outside

3  the context of settlement class action?

4  A    So as I talk about a little bit in the report, one of the

5  advantages of a class action is it's an opt-out model.  But you

6  can also design settlements on an opt-in model.  So you could

7  have either a series of master settlement agreements or a

8  global master settlement agreement that resolves claims like

9  this.

10      You could -- if you want to -- if you're looking to

11  resolve future claims, you can have a model that pairs up front

12  benefits like medical monitoring with back end benefits like an

13  insurance component like we saw in the World Trade Center

14  settlement.  And you use the up front benefits like medical

15  monitoring to incentivize people to opt-in to the program.  And

16  then you have the back end compensation if it turns out that

17  they get sick.

18      I mean, one of the advantages of using medical monitoring

19  is it also mitigates the harm.  If you catch lots of diseases

20  early, then the people don't get as sick.  So that's an

21  advantage, as well.  If you make the settlement program

22  attractive, people will opt in.

23  Q    Are there any other tools available besides a World Trade

24  trust-like model?

25  A    Sure.  You know, one of the advantages of the MDL system

Rave - Redirect/Silverstein                                    33

1  is its flexibility.  There are lots and lots of different ways

2  that you could -- that you could structure these sorts of

3  settlements.  And you don't have to do it all in one

4  transaction.  You can -- you can use multiple tools at the same

5  time.  And there -- there are ways that you can -- that you can

6  set this up.

7  Q    Are there any examples of MDLs involving future claims and

8  long latencies that were comprehensively involved -- I'm sorry,

9  comprehensively resolved simply by just resolving the present

10 claims, even though there were future claims as well?

11 A    Yes.  Yes, there were.  So, I mean, one example is the

12 Actos litigation.  So Actos involved a diabetes drug that had a

13 long latency period I think of more than a decade of latency.

14 And the parties in the Actos litigation reached a global

15 non-class master settlement agreement that resolved all of the

16 presently-pending claims.  It didn't expressly deal with the

17 future claims.  It resolved all of the present claims.

18    It had some provisions in it that made it less attractive

19 for lawyers to pursue those claims in the future.  And the

20 Actos settlement seems to have worked.  It resolved I think

21 about 9 or 10,000 currently pending claims.  And there's no

22 Actos litigation to speak of today.

23 Q    Okay.  A couple of more questions, and then I'll conclude.

24 Ms. O'Connor asked you about examples of companies that file

25 for bankruptcy after being defendants in an MDL.  And there are

1  examples of that, right?  You were asked about that.

2  A    Certainly, yes.

3  Q    And Ms. O'Connor asked you about W.R. Grace, Dow Corning,

4  Purdue Pharma as examples.  Are there companies that have many

5  defendants in the asbestos MDL, the silicone breast implant

6  MDL, and the opioid MDL that have managed their litigation in

7  the MDL without filing for bankruptcy?

8  A    Yes.  In each of those cases, some of the defendants used

9  bankruptcy to resolve their liability while other defendants

10  involved in the same litigation did not.  They resolved their

11  liability through the MDL system.

12       You know, we've talked a lot about asbestos.  Asbestos is

13  a very complicated MDL, complicated mass tort.  It's bigger

14  than just the MDL.  Bankruptcy didn't resolve asbestos either.

15  Even after many of the companies filed for bankruptcy, there

16  was still ongoing asbestos litigation in the MDL.

17       And I think as of, I want to get the dates right.  I think

18  as of 2009 when Judge Robreno took over the asbestos MDL, I

19  think there was something in the order of 185,000 cases still

20  pending in the asbestos MDL.

21       And Judge Robreno looked at it and said well, it seems

22  like we're not going to have a global settlement here, and so

23  we're just going to move forward with the litigation.  And he

24  started simplifying cases and setting them on schedules towards

25  remand.

1     And within I think about three years, he successfully

2   resolved the vast, vast majority of those 185,000 claims.

3   There's something on the order of 750 remands to transferor

4   courts.  Nowhere -- I don't know the exact number, but nowhere

5   near 750 of those went to trial.  And today, there are -- the

6   MDL is closed.  There are no -- there's no ongoing asbestos

7   MDL.

8   Q    And what's the percentage of MDL cases that are resolved

9   in the MDL court without being remanded?

10  A    It's more than 97 percent of cases that have been

11  transferred into an MDL are resolved in the MDL district, so

12  either by dismissal or motion, or quite often by settlement.

13  Something less than three percent are ever remanded to the

14  transferor courts.

15  Q    Okay.  One last question.  Ms. O'Connor showed you your

16  deposition testimony from earlier this month and asked you

17  questions about whether the MDL assumes that there's enough

18  money to go around.  And I know you gave an answer to that.

19  But could you elaborate on when bankruptcy is appropriate

20  following an MDL as you've, in your opinion, as you've seen it?

21  A    Yeah.  And again, I don't claim expertise on bankruptcy.

22  But as I understand it, bankruptcy has -- and I'm not doing a

23  comparison, right.  I don't -- I didn't view my role in this as

24  participating in a policy debate.  I have no doubt that

25  bankruptcy also has powerful tools for resolving claims.

1      One of the things that makes those tools so powerful is

2   that they can alter or modify or infringe the fundamental

3   rights of litigants.  And my understanding is you only get to

4   do that when there's not enough money to go around.

5          MR. SILVERSTEIN:  Your Honor, I have no further

6   questions.  Thank you, Professor Rave.

7          THE COURT:  All right.  Before, Ms. O'Connor, let me

8   just ask another question.  When you just said infringe the

9   rights of litigants, talking about jury trials?

10         THE WITNESS:  So I'm talking -- so maybe infringes

11  isn't right.  So --

12         THE COURT:  Because I was struck by the fact that you

13  said --

14         THE WITNESS:  Yeah.

15         THE COURT:  -- in the end, only three percent

16  actually go to trial, or at least are remanded back.  And even

17  those settle.  So --

18         THE WITNESS:  Yeah, so --

19         THE COURT:  -- we're not talking about a significant

20  --

21         THE WITNESS:  So I think it's more than just trial,

22  right.  It's the right to decide what to do with your case.

23  And so you have the right in the tort system to go to jury

24  trial.  And very often, that's not going to be the best use of

25  your right.  Right?  The settlement is going to be better for

Rave - Redirect/Silverstein                    37

1  everyone involved.  And you have the right to choose whether to

2  settle or to press forward with your claim.

3         And most parties choose to settle because usually

4  settlement is a better deal.  And I think that's one way that

5  we can be confident that the settlement that's negotiated in

6  that system is a good deal for everyone involved.  So I don't

7  really have any doubt that bankruptcy can create a lot of

8  value.

9         Where I worry is how that value gets distributed,

10  right.  Is it just creating value for the defendant, or is

11  there some mechanism to make sure that the claimants are going

12  to share in that value?  And I think the mechanism in the tort

13  system to make sure is that claimants have to consent to a

14  settlement.

15         So they've had to decide that this is a good deal.

16  This isn't just a good deal for the defendant.  This is a good

17  deal for everyone.  And so I'm a lot more confident there that

18  they're sharing that value.  And I think that's an important

19  part of the right that's protected.

20         THE COURT:  If you sat in on yesterday's hearing, my

21  sympathies.  A lot of what was discussed was the variations in

22  the types of cancers that are being addressed both of the MDL

23  and of the tort system and as part of a potential settlement

24  within the bankruptcy.  And I learned of a term borderline

25  cancers --

1          THE WITNESS:  Yeah, I learned that, too.

2          THE COURT:  -- that were not addressed in the MDL.

3    Does the fact that there seem to be at least half a dozen

4    significant types of cancer that are not being addressed in the

5    MDL, does that change your analysis or impact your analysis on

6    the ability of MDL to address the talc claims as far as notice

7    and confusion and talking about giving notice, and also

8    comprehensiveness.

9          THE WITNESS:  So I don't think it changes my opinion.

10   I think the defendants' position is that those claims are not

11   compensable, right.  And I think we have to -- when we're

12   talking about parties' rights and what they have rights to, I

13   think we have to do that by reference to the substantive law.

14         And how we figure that out in the tort system is we

15   have the litigation process.  And sometimes that leads to

16   consensual resolution.  And if it doesn't, it's going to lead

17   to adjudication.  And the consensual resolution's all done in

18   the shadow of that.

19         An dso if these claims are not compensable in the

20   tort system because the plaintiffs have no right to recover,

21   then they shouldn't get compensation.  And so, you know, that,

22   the MDL system has filters built in for that to make sure that

23   its claims that are valid claims are getting paid, and ones

24   that are not are not.

25         THE COURT:  Fair enough.  Thank you.  Ms. O'Connor?

Rave - Recross/O'Connor                              39

1          MS. O'CONNOR:  Yes, Your Honor.  I'm not going to say

2    I have just one question.  Some redirect.

3                        RECROSS-EXAMINATION

4    BY MS. O'CONNOR:

5    Q    And you were just talking about the points of settlement

6    being, in the MDL context, being consensual.  I want to follow

7    up on that.  With respect to -- well, let me start here.  Your

8    assertion is that it's still possible to resolve the tough

9    litigation through a class action settlement, through a class

10   settlement in the MDL process, correct?

11   A    Yes.

12   Q    But you have not provided, other than the NFL concussion

13   case which does not involve unknown future claimants, you have

14   not provided any example of where this has been done

15   post-Amchem or Ortiz.

16   A    Well, I mean, I think the NFL is a pretty big example.

17   But I haven't provided another example, no.

18   Q    Right.  It's a pretty big -- it's an example that has a

19   key difference insofar as the future claimants are known in

20   that case, correct?

21   A    So yes, we have -- we have lots and lots of class actions

22   that deal with that other problem.  I think we have two

23   different problems here, right --

24   Q    My question is have you provided an example of a case,

25   post-Amchem or Ortiz, where there are unknown future claimants

Rave - Recross/O'Connor                                    40

1  and that has settled through a class settlement?

2  A    Unknown future claimants with latent injuries.

3  Q    Correct.

4  A    No.  I don't have another example.

5  Q    Okay.  Now, when it comes to Your Honor's key question

6  focusing on the ability to provide notice to these unknown

7  future claimants, you concede that there is no way to provide

8  notice to plaintiffs who have yet to manifest their disease at

9  this point, correct?

10 A    No.

11 Q    Well, your suggestion is that you can run commercials,

12 correct?

13 A    You could do a big multimedia notice campaign, yes.

14 Q    And so is it your suggestion then that you would then run

15 the commercials or the advertisements every year for decades

16 going forward?

17 A    That would -- that could be -- no, you wouldn't have to do

18 that.  You would do it up to the opt-out date.

19 Q    Well, so for those individuals who don't know that they

20 could or would be injured at the time of seeing those

21 advertisements, those are unknown future claimants where

22 there's latent injuries.  They wouldn't be aware of those

23 injuries, correct?

24 A    They would know whether they used talc, and that would be

25 what the notice would be targeted at.  They wouldn't know yet

1  whether they're injured or not.

2  Q    So under your proposal, you would not achieve finality in

3  the near term, correct?

4  A    No.  I don't think that's correct.  If we're talking about

5  a class action, it would -- you could do an opt-out class

6  action, and then you would have a program to hand out money

7  over an ongoing period of time.

8  Q    You'd hand out money over an ongoing period of time --

9  A    It wouldn't be any different from a bankruptcy trust,

10  right.  The bankruptcy trust isn't going to hand out money to

11  everyone tomorrow.  It's going to hand out money to people when

12  they get sick.

13  Q    Based on submitting claims prior to an opt-out deadline,

14  according to your suggestion here today.  This is not laid out

15  in your report, correct?  And you're not a bankruptcy expert,

16  correct?

17  A    No, I'm not a bankruptcy expert.  But let's talk about the

18  class action.  So it would be you would have -- there would be

19  an opt-out date.  And if you didn't opt out by that date, then

20  your claims would be channeled into the settlement and you

21  would submit a claim form when you got sick.

22  Q    You talked about the opt-in model.  If a party chooses to

23  opt out in the MDL, the court has no ability to bind that party

24  to the settlement, correct?

25  A    Correct.

Rave - Recross/O'Connor                              42

1  Q    And conversely, the court has no ability to compel a party

2  to opt into the settlement.

3  A    Correct.

4  Q    Right?  There's therefore no finality achieved if a party

5  opt out or if parties do not opt into a settlement in the MDL,

6  correct?

7  A    You may not get every single claimant.  But you could get

8  enough of the claimants to participate that it would be -- that

9  it would substantially resolve the dispute.  It would be

10 sufficient finality.

11 Q    If you got a global resolution, correct?

12 A    Yes.  If you got a global resolution.

13 Q    If.  But there's no guarantees, right?

14 A    No.  There's -- like I said before, this is premised on

15 making sure that the deal is attractive enough that people want

16 to participate in it.

17 Q    But you're aware that there are many examples where that

18 hasn't happened, but those examples that we talked about today

19 that aren't discussed in your reports, correct?

20 A    The -- I mean, I can't sit here and tell you that every

21 case is going to settle on particular terms.  Sometimes the

22 parties reach a deal and sometimes they don't.

23 Q    Okay.  You talked today about the Roundup case.  Again,

24 that wasn't addressed in your report.  But you don't know if

25 another longer period would have sufficed to the Court in that

Rave - Recross/O'Connor                                    43

1 case, correct?

2 A    No.  I don't think anyone could know that.  The Court left

3 the door open to that.  The Court said -- you know, I'm not

4 saying here no class action could ever be settled -- could ever

5 be certified in this case.  The one that is before me is not

6 going to work.

7 Q    So what you know today is that the class that was proposed

8 was rejected.

9 A    Yes.

10 Q    Okay.  And the speculation today that was not included in

11 your report is that it needed a longer period, or what another

12 proposal might be, you haven't addressed that in your report,

13 and it wasn't included in the court decision, correct?

14 A    The court decision discussed the problems with the

15 currently proposed settlement.  The court decision only decided

16 that it was not going to certify the class and approve the

17 settlement that was proposed to it.

18      The court doesn't say anything to foreclose the use of

19 class actions in another settlement.  And as I said, the court

20 decision incorporates by reference the transcript of the

21 hearing.  And at the hearing, Judge Chhabria was very

22 thoughtful about this.

23      He asked the parties, you know, trying to drill down on

24 the question is this a problem with the notice here, or is this

25 an insurmountable problem with notice in any case.  And Judge

Rave - Recross/O'Connor                               44

1  Chhabria indicated that he -- that for him, it was that the

2  problem was the notice in this case.

3  Q    Right.  Because as we stand here today, and as you've

4  already conceded, we don't have an example post Amchem or Ortiz

5  of a case with unknown future claimants and latency issues

6  where the class has approved a class settlement like the one

7  that you've suggested is possible, correct?

8  A    We don't have a -- we don't have an example with both

9  future claimants and latency and an unknown class.  We have

10 examples of many class actions that deal with unknown classes

11 of people, and we have a very good example I think in NFL of a

12 personal injury with a long latency period.

13 Q    Okay.  And on the topic of personal injury, I'm glad you

14 mentioned that.  The opioid settlements that you mentioned,

15 those did not resolve product liability claims, correct?

16 A    They were not personal injury claims.  These were

17 primarily -- primarily a nuisance claim.  Well, there were a

18 lot of causes of action, but they were not -- not the kind of

19 product liability claim we're talking about here.

20 Q    Those settlements were actually with states,

21 municipalities, other subdivisions for abatement relief and

22 claims of that nature, correct?

23 A    For the most part, yes.

24 Q    Yeah.  And those claims also did not have future claims

25 issues, correct?

1  A    I don't think I would characterize it that way.  There was

2  a future claims problem there.  There was not a latency

3  problem.  But one of the big concerns in opioids was if you

4  settle with some municipalities, other municipalities may bring

5  claims in the future.  And so the opioid settlements were

6  designed to disincentivize lawyers from taking on the claims of

7  other municipalities in the future.

8  Q    All right.  And then I think lastly, when we were talking

9  about the settlements in the MDL context and the ability to --

10 their dependency on whether folks can opt out, the dependency,

11 they rely on an opt-in model.  You've agreed that the MDL court

12 cannot bind parties to opt in, correct?

13 A    Correct.

14 Q    Cannot prevent parties from opting out.

15 A    Correct.

16 Q    And you have no basis, as you sit here today, to opine on

17 the extent to which parties in the talc litigation would opt in

18 or opt out to any settlement as you sit here today.

19 A    I don't have a crystal ball.  I can't tell you how the

20 talc litigation would be resolved.  I think the tools are there

21 to do it.  It may take some creative lawyering to get it done,

22 but probably not as much creativity as the Texas two-step.

23            MR. GORDON:  Move to strike.

24            THE COURT:  Sustained, even if (indiscernible).

25                        (Laughter)

46

1          MS. O'CONNOR:  Thank you, Professor Rave.

2          MR. SILVERSTEIN:  No further questions, Your

3  Honor.

4          THE COURT:  Thank you, Professor, for your time

5  today.

6          THE WITNESS:  Thank you, Judge.

7          MR. SILVERSTEIN:  Your Honor, Adam Silverstein again

8  from Otterbourg.  At this point, the TCC calls as an expert

9  witness Mr. Royal Ferguson.

10         THE COURT:  Good morning, Judge.  How are you?

11         JUDGE FERGUSON:  Fine, Your Honor.  Thank you.

12         MR. SILVERSTEIN:  Your Honor, again, while -- should

13 we wait for the witness to swear in before we hand out

14 additional binders?

15         THE COURT:  You get your binders ready, I'll swear

16 him in.

17           ROYAL FERGUSON, TCC'S WITNESS, SWORN

18         THE COURT:  Thank you, Judge.  Have a seat.  And just

19 for anybody's benefit, I don't have an issue with referring to

20 the witness as Judge.

21         MR. SILVERSTEIN:  I'm going to try at Mr. Ferguson's

22 request to refer to him as Mr. Ferguson, but I wan switch.

23 It's not easy.

24         THE COURT:  However you're comfortable.

25         THE WITNESS:  Thank you, sir.

1                         DIRECT EXAMINATION

2    BY MR. SILVERSTEIN:

3    Q    Mr. Ferguson, good morning.  You have in front of you a

4    binder with one tab.  And behind that tab is Exhibit 980.

5    Would you please identify for the Court what Exhibit 980 is?

6    A    It's my expert report.

7    Q    And do you understand that your expert report is being

8    offered in court today as if it were your live testimony on

9    direct under oath?

10   A    I do.

11           MR. SILVERSTEIN:  Your Honor, at this point we offer

12   into evidence Exhibit 980.

13           THE COURT:  Any objection?

14           MS. O'CONNOR:  No objection.

15           THE COURT:  All right.  It will be admitted.  Thank

16   you.

17         (TCC's Exhibit 980 admitted into evidence)

18                         CROSS-EXAMINATION

19   BY MS. O'CONNOR:

20   Q    Good morning, Judge Ferguson.

21   A    Good morning, Ms. O'Connor.  How are you today?

22   Q    Good, thanks.

23   A    Great.

24   Q    When you served on the district court in the Western and

25   Northern Districts of Texas, you had only one MDL case assigned

Ferguson - Cross/O'Connor                                     48

1  to you, correct?

2  A    That's correct.

3  Q    And that case was a class action that settled fairly

4  shortly after it started, and was not tried, correct?

5  A    That's correct.

6  Q    In your time as a practitioner before your service on the

7  bench, you never represented a party in MDL litigation.  Is

8  that correct?

9  A    That's correct.

10 Q    And you've never represented a party or been involved with

11 efforts to settle MDL litigation.

12 A    That's correct.

13 Q    Judge Ferguson, you agree that your expert report does not

14 discuss the talc litigation, right?

15 A    Correct.

16 Q    And you don't talk about the talc cases in your report

17 because you're not familiar with the talc cases, right?

18 A    Right.

19 Q    And indeed, you've admitted that you don't know anything

20 about the talc litigation, right?

21 A    Right.

22 Q    And your expert report also does not address LTL

23 Management or the prospect of its restructuring.  Is that

24 right?

25 A    Right.

 1          MS. O'CONNOR:  Okay.  Thank you, Judge Ferguson.

 2   That's all I have.

 3                    REDIRECT EXAMINATION

 4   BY MR. SILVERSTEIN:

 5   Q    Good morning again, Mr. Ferguson.

 6   A    Good morning.

 7   Q    Why did you not address the talc litigation in your expert

 8   report?

 9   A    I wasn't asked to do so.

10   Q    And what were you asked to do?

11   A    I was asked to talk about the MDL process under the

12   statute 28 U.S. Code Section 1407.

13   Q    And could you briefly describe your background and your

14   source of knowledge for giving opinions on the MDL system under

15   Section 1407?

16   A    Well, I grew up in Lubbock, Texas, went to Texas Tech.  I

17   had to deal with the draft, so I was an ROTC grad.  Went to law

18   school at Austin.  Then I had a two-year commitment to the

19   Army, first year in Aberdeen Proving Ground, second year in

20   Vietnam where I tell people I carried a typewriter so they knew

21   that I wasn't carrying a rifle.

22          Then clerked for a federal judge.  Then spent 24 years

23   trying cases in El Paso, Texas.  Then was appointed to the

24   bench in 1994.  In 2008, I became a member of the Judicial

25   Panel for Multidistrict Litigation.  I retired from the bench

Ferguson - Redirect/Silverstein                    50

1  in 2013.

2       And in an interesting move, I became a dean of the newest

3  public law school in Texas.  I did that for five years.  We got

4  provisional accreditation.  And then I retired.  And now I

5  practice law with my wife.

6  Q    Were you asked to offer an opinion, and do you offer an

7  opinion on a policy debate as to which court, bankruptcy or

8  courts in the tort system, are superior for resolving mass tort

9  disputes?

10 A    I wasn't asked to do that.  I have never understood that

11 in the real world, that's a debate that we're having.  I think

12 it's pretty clear how the law works in these areas.  So I

13 didn't understand a debate was occurring, at least in the real

14 world.

15 Q    Okay.  Have you read the Third Circuit's opinion rendered

16 earlier this year in this case?

17 A    I read Judge Ambro's opinion, yes.

18 Q    And did you see the Court's discussion of concerns about

19 redefining fundamental rights of claimants that may arise when

20 a bankruptcy is filed prematurely?

21 A    I read that.  Judge Ambro said that we should not disturb

22 those fundamental rights except under other circumstances.  And

23 that other circumstance was he was talking about the financial

24 distress of a company and its ability to go into bankruptcy.

25           MS. O'CONNOR:  Objection, Your Honor.  I think I

1 established on cross that Judge Ferguson did not discuss this

2 case in his report.  It was generally about the MDL process and

3 not at all about this case.

4          MR. SILVERSTEIN:  I was going to use it as a segue to

5 the next question about the MDL, Your Honor.

6          THE COURT:  All right.  It will be -- I'll strike

7 that portion.  Thank you.

8 BY MR. SILVERSTEIN:

9 Q    Judge Ferguson, Mr. Ferguson, how does the JPML and MDL

10 process deal with the concerns expressed by the Third Circuit

11 in the decision rendered in January in carrying out Congress'

12 intent in Section 1407 to promote just and efficient conduct of

13 the litigations in the MDL?

14          MS. O'CONNOR:  Objection, Your Honor, on the same

15 basis.

16          THE COURT:  If we took out the sentence addressing

17 the concerns of the Third Circuit and just --

18          MR. SILVERSTEIN:  How --

19          THE COURT:  -- continue with the question.

20          THE WITNESS:  Yes, sir.

21 BY MR. SILVERSTEIN:

22 Q    How does the JPML and MDL process carry out the mandate by

23 Congress in Section 1407 in promoting the just and efficient

24 conduct of actions?

25 A    We'll start at the beginning.  The statute was passed in

Ferguson - Redirect/Silverstein                    52

1  1968.  The district conference wanted a statute, not a rule.

2  As you know, class action rule came a little bit earlier, and

3  it was made to be a rule.  But the conference wanted a law, a

4  statute.  And so after lots of effort, 1407 was passed by

5  Congress.

6       It was then law writ large as you might say.  It

7  anticipated this growth of mass torts in our system.  It

8  created a judicial panel for multidistrict litigation, seven

9  judges from different circuits.  And their job was to take

10 cases pending in multiple courts and centralize them for the, I

11 think the statute said for the just and efficient resolution of

12 those cases.

13      And so that was the beginning.  Over time, the JPML slowly

14 but surely began to develop programs where they would appoint,

15 they would centralize cases, appoint transferee judges into

16 those cases.  And over time, the whole process grew.

17      The job of the JPML is really two elements.  One, to

18 centralize the case.  If there should be a case brought into

19 one transferee court, the JPML makes that decision.  And then

20 its second decision is to choose the transferee judge.  A very

21 important decision because it's a very important job that that

22 transferee judge will have because that judge will have to

23 handle that case along with their other docket.

24      And so it's, as I say, a very careful decision.  And

25 fortunately, the federal courts have a deep bench, and we have

Ferguson - Redirect/Silverstein                    53

1  really outstanding judges to handle these very difficult cases.

2       After that's done it goes to the transferee judge.  And

3  there, the transferee judge must get the case organized.

4  Really, the first thing the transferee judge is to organize the

5  lawyers.  You don't have to do much organization on the defense

6  side because the defendants already have their lawyers, and

7  they are organized.

8       But on the plaintiffs' side, there's a need for

9  organization.  And so the judge normally assembles a plaintiff

10 steering committee.  And that plaintiff steering committee is

11 normally composed of outstanding lawyers because they have to

12 be outstanding because the lawyers on the other side are

13 outstanding.

14      And with that kind of basic foundation, the case can

15 start.  We know that only federal cases go into the

16 multidistrict litigation under 1407.  And so the judge will

17 find out whether there's state cases.  If there are state

18 cases, the judge will reach out to those state judges to try to

19 see if there could be coordination so that there can be a very

20 thoughtful way of proceeding.

21      Then we just use the rules of civil procedure in a

22 creative way.  First we've got to make sure that these claims

23 are sufficient or accurate.  So there's normally plaintiffs,

24 excuse my voice.  There are normally plaintiffs fact sheets

25 prepared.  We've got to organize all the documents.  There's

Ferguson - Redirect/Silverstein                    54

1  normally a document depository prepared.

2      That's normally coordinated with the state courts if there

3  are state cases.  From there, we need to make sure that the

4  witnesses aren't deposed over and over again.  So that's

5  coordinated, again often with state judges.

6      You've got all the problems with the science and with the

7  experts.  And that has to be dealt with.  That's very important

8  because sometimes in cases, the courts find that the experts

9  are insufficient.  The cases for the plaintiffs basically go

10 away because the science does not support the case.

11     After all that's done, then normally the court will set up

12 bellwether trials.  Those are trials by jury, and except in the

13 Deepwater Horizon case because it was an admiralty, those cases

14 weren't by jury.  But normally, they're jury trials.

15     And we've used jury trials forever to assess cases, to

16 assess the value of cases.  You know, I started trying

17 insurance intersection collision cases with juries, and that's

18 the way we would assess the value of those cases.  And that's

19 still the way to assess value of cases.

20     And so the bellwether trials I think are very important.

21 They're also important because it implicates the 7th Amendment.

22 And the 7th Amendment, of course, is fundamental to the way

23 that we make sure there is the just resolution of cases.

24     And then from there, the parties begin the settlement

25 process.  When I was serving on the Judicial Panel for

1  Multidistrict Litigation, we really never thought much about

2  settlement.  We thought about getting the cases organized under

3  a transferee judge.  And we knew that cases almost always

4  settle.

5      There's always some kind of resolution.  And so the real

6  concern we had was to make sure that organization occurred, and

7  that these cases were being handled in a fair and efficient way

8  for the litigants.

9  Q    And --

10         MS. O'CONNOR:  Your Honor, sorry to -- I just wanted

11  to mention that most of the -- all of this is in his report

12  which has been submitted to Your Honor and admitted.  And my

13  understanding was that that was going to be the process, then

14  we had cross, and this would be redirect.  So I just mention

15  that for our time purposes.

16         MR. SILVERSTEIN:  Yeah.  I have one or two more

17  questions.

18         THE COURT:  All right.  Well, proceed.  Thank you.

19  BY MR. SILVERSTEIN:

20  Q    Was the MDL process designed, and is it implemented as a

21  plaintiffs process?

22  A    Not at all.  I mean, our system is built on fairness,

23  beginning and ending built on fairness.  It's going to be fair

24  to both sides.  It's always, in my view, always fair to both

25  sides.  And there are many instances in the MDL process where

56

1  defendants are dismissed, taken out of the case because there's

2  not a cause of action really stated against them.  Our system

3  is fair to both sides, always.

4       MR. SILVERSTEIN:  Your Honor, I have no further

5  questions.  Thank you.

6       THE COURT:  Any recross?

7       MS. O'CONNOR:  No, Your Honor.

8       THE COURT:  Judge Ferguson, thank you for your time.

9       THE WITNESS:  Thank you, sir.

10       THE COURT:  All right.  Wendy, how are you doing?

11  Need a break?  We'll take a five, ten-minute break.

12       Who's next?  Who will be --

13       MS. O'CONNOR:  Your Honor, we'll be calling Sheila

14  Birnbaum.

15       THE COURT:  Okay.

16       MR. SILVERSTEIN:  Thank you, Your Honor.

17       THE COURT:  We'll start up by 10:30.  Thank you.

18       (Recess at 10:20 a.m./Reconvene at 10:31 a.m.)

19       THE COURT:  Good morning.

20       MS. BIRNBAUM:  Good morning, Your Honor.

21        SHEILA BIRNBAUM, DEBTOR'S WITNESS, SWORN

22       THE COURT:  Please have a seat.

23       THE WITNESS:  Thank you.

24       THE COURT:  And when you're set up, please give your

25  name and business address for the record.

Birnbaum - Direct/O'Connor                         57

1              THE WITNESS:  Sheila Birnbaum, 3 Bryant Park, New

2   York City, New York.

3              THE COURT:  Clearly New York.

4              MS. O'CONNOR:  I'm sorry, one moment.

5              THE COURT:  No problem.

6              MS. O'CONNOR:  I'm just going to hand these out.  I'm

7   going to hand these out.

8              THE COURT:  Thank you.

9              THE WITNESS:  Thank you.

10                       DIRECT EXAMINATION

11  BY MS. O'CONNOR:

12  Q     Good morning, Ms. Birnbaum.

13  A     Still morning?  Still morning?

14  Q     How are you?

15  A     Very well, thanks.

16  Q     Did you submit a rebuttal expert report in this case?

17  A     I did.

18  Q     And do you understand that by the parties' agreement, your

19  rebuttal expert report is being offered into evidence in lieu

20  of your live direct testimony?

21  A     I do.

22  Q     And do you have a copy of your rebuttal expert report

23  there in front of you?

24  A     I do.

25  Q     And would you please confirm that the document you're

Birnbaum - Direct/O'Connor                              58

1 holding is indeed your rebuttal expert report?

2 A    It is.

3 Q    Does that rebuttal expert report contain the opinions you

4 intend to offer in this case as if you presented those opinions

5 live during your testimony here in the courtroom today?

6 A    Yes.

7 Q    Would you please read for the record the exhibit sticker

8 on the first page of the rebuttal expert report?

9 A    D-68.

10         MS. O'CONNOR:  All right.  Thank you, Ms. Birnbaum.

11         Your Honor, at this point, we offer Ms. Sheila

12 Birnbaum's rebuttal expert report marked as Exhibit D-68 into

13 the record.

14         THE COURT:  All right.

15         MR. SILVERSTEIN:  No objection from the TCC.

16         THE COURT:  Thank you.  Then D-68 is admitted.

17         (Debtor's Exhibit D-68 admitted into evidence)

18         MR. SILVERSTEIN:  Your Honor, with apologies to the

19 environment in advance, can we hand out some additional

20 binders?

21         THE COURT:  Thank you.

22         THE WITNESS:  Thank you.

23                     CROSS EXAMINATION

24 BY MR. SILVERSTEIN:

25 Q    Good morning, Ms. Birnbaum.

Birnbaum - Cross/Silverstein                    59

1  A    Good morning.

2  Q    You are a products liability mass tort defense attorney.

3  A    I am.

4  Q    And you have been a products liability and mass tort

5  defense attorney for the past more than 55 years.

6  A    That's a long time.

7  Q    You have not represented a plaintiff in a product

8  liability case in some 40-odd years.

9  A    That's probably true.

10 Q    You were a chair of Skadden product liability and mass

11 tort group from 1985 through 2013.

12 A    Yes.

13 Q    For nearly 30 years?

14 A    Yes.

15 Q    You were co-chair of Quinn Emanuel's global product

16 liability and mass tort practice from 2013 through 2018.

17 A    Yes.

18 Q    And since 2018, you have been co-chair of Dechert's

19 product liability and mass tort practice.

20 A    Yes.

21 Q    And because of your decades of experience with products

22 liability and mass tort defense, you have been called the queen

23 of toxic torts.

24 A    Some mass tort people have called me that.

25 Q    Johnson & Johnson is a client of your law firm, Dechert.

Birnbaum - Cross/Silverstein                    60

1  A    From time to time, yes.

2  Q    Well, Kimberly Branscome, one of your co-chairs of the

3  products liability and mass tort practice at Dechert, has tried

4  talcum powder cases on behalf of Johnson & Johnson, true?

5  A    Before she was a partner at Dechert, when she was at

6  Kirland.

7  Q    And she's -- is it your testimony that she no longer

8  represents Johnson & Johnson?

9  A    No.  I didn't say that.

10 Q    Okay.  So she represents Johnson & Johnson currently.  And

11 prior to the 2021 bankruptcy filing, she had tried talc cases

12 on behalf of Johnson & Johnson, true?

13 A    I don't know how many talc -- I think she tried one case,

14 but I'm not sure.  I have no idea.

15 Q    And Dechert touts on its website the fact that Ms.

16 Bramscome and her team have achieved defense verdicts in talc

17 cases, true?

18 A    I would assume so.

19 Q    The Dechert's website also touts that its healthcare group

20 won the 2015 healthcare collaboration deal of the year for

21 Johnson & Johnson and its subsidiary, Ethicon, right?

22 A    If it's there, then that's true.

23 Q    And we looked at that at your deposition.

24 A    Yes, we did.

25 Q    Okay.  And you don't dispute that that's on Dechert's

Birnbaum - Cross/Silverstein                            61

1  website, and that it's accurate.

2  A    No.

3  Q    And Dechert's crisis management practice of which you are

4  a member touts on Dechert's website that when it had a high

5  profile event that threatened to irrevocably damage its brand,

6  Johnson & Johnson turned to Dechert to lead it through that

7  crisis, true?

8  A    I don't know what time, period of time that was related

9  to.  But it's on the website.

10  Q    In fact, you were approached as serving as an expert in

11  this case by the National Coordinating Counsel for Johnson &

12  Johnson's talc docket, Kristen Fornier of King & Spaulding.

13  A    Yes.

14  Q    Now, you are not a bankruptcy lawyer, correct?

15  A    I am not.

16  Q    In fact, it's fair to say there is no area of bankruptcy

17  that you consider yourself to be an expert in.

18  A    That's true.

19  Q    And yet it's your expert opinion in this case that this

20  bankruptcy court in New Jersey is a better forum within which

21  it resolve LTL's talc claims than the MDL in district court.

22  A    Yes.

23  Q    And that's because in your opinion, in bankruptcy,

24  resolution can be done comprehensively, fairly, and equitably.

25  A    Yes.

Birnbaum - Cross/Silverstein                        62

1  Q    But although you hold that opinion, you're not opining on

2  any bankruptcy issues in this case, right?

3  A    That's true.

4  Q    Okay.  Now, you don't believe that bankruptcy was a

5  superior form within which to resolve LTL's talc liabilities in

6  2016 when the MDL was formed, correct?

7  A    I have no opinion on that.

8  Q    And in fact, there's no point in time when you can say one

9  forum was or is superior to another for resolving talcs, LTL's

10 talc claims, true?

11 A    When I talk about a point in time, we're talking about

12 where the better mechanisms rest to try to resolve future and

13 latent talc claims.

14 Q    And there's no point in time that you can say when

15 bankruptcy became a better forum for resolving talc claims than

16 the MDL system.

17 A    It just generally, it's a better forum.

18 Q    So you can't say, and you're not offering the opinion

19 whether bankruptcy was a superior forum within which to resolve

20 LTL's talc liabilities in 2016, 2017, 2018, and so on up until

21 the point that LTL filed for bankruptcy on October 14th --

22 A    I'm not.

23 Q    -- 2021.  Correct?

24 A    Yes.

25 Q    And so it follows from that that you don't disagree that

Birnbaum - Cross/Silverstein                              63

1  up until the moment that LTL filed for bankruptcy for the first

2  time on October 14th, 2021, the MDL was as good if not better a

3  forum to resolve LTL's talc liabilities than bankruptcy was.

4  A    No, I don't agree with that.

5  Q    Well, if you don't have an opinion as to when bankruptcy

6  became a superior forum, doesn't it follow that you don't have

7  an opinion as to whether the MDL was as good, if not better

8  than bankruptcy at any point up to the bankruptcy filing?

9  A    No, because generally latent claims like this with future

10 unknown claimants cannot be readily resolved in MDLs, and have

11 not been.

12 Q    But with regard to this specific mass tort of LTL's talc

13 liabilities, you don't have an opinion as to whether at any

14 point in time up to the filing of LTL's bankruptcy on October

15 14th, 2021, whether it was superior to resolve those claims in

16 one forum or another, true?

17 A    I do have an opinion.  My opinion is it would always, in

18 this situation that we are confronted with, with so many

19 potential future claimants and latent injuries, the MDL is not

20 a forum that can get resolution.

21 Q    Ms. Birnbaum, in the black binder, in Tab 1 is your

22 deposition.

23 A    Tab 1?

24 Q    Yes.

25         MS. O'CONNOR:  What page are we heading to?

Birnbaum - Cross/Silverstein                    64

1          MR. SILVERSTEIN:  Page 120.

2          THE WITNESS:  Yes.

3    BY MR. SILVERSTEIN:

4    Q    All right.  And, Ms. Birnbaum, at your deposition, I asked

5    you: "Is it your opinion that a bankruptcy court's ability to

6    centralize all claims to approve procedures and accelerate the

7    process by which claims are valued and compensated and to

8    account for and protect and bind future claimants makes it a

9    superior forum in which to resolve LTL's talc claims?"

10         And you answered: "Yes."

11         And then I asked: "Was bankruptcy a superior forum in

12   which to resolve LTL's talc claims in 2016 after the MDL was

13   formed?"

14         You asked me to repeat the question, which I did.  And you

15   said: "Probably not.  Not immediately, until there was lots

16   more information."  True?

17   A    That's true.

18   Q    Okay.  And at page 129, at line 11, I asked you --

19         MS. O'CONNOR:  Just a second.  Can I get there,

20   please.

21   BY MR. SILVERSTEIN:

22   Q    "Do you have an opinion on whether LTL should have filed

23   for bankruptcy and availed itself of the" --

24         MS. O'CONNOR:  Objection, Your Honor.  This is not

25   impeachment anymore.  This is consistent with her testimony.

1          THE COURT:  The portion coming up --

2          MS. O'CONNOR:  Yeah.

3          THE COURT:  -- on 129?

4          MS. O'CONNOR:  Yeah.  Yes, Your Honor.

5          THE COURT:  Let me hear the question.

6  BY MR. SILVERSTEIN:

7  Q    "Do you have an opinion on whether LTL should have filed

8  for bankruptcy and availed itself of the tools of bankruptcy

9  court earlier than October 14, 2021?"

10      "I have no opinion."

11         THE COURT:  I'm going to overrule the objection.

12  BY MR. SILVERSTEIN:

13  Q    You were asked that question, and you have that answer,

14  correct?

15  A    That's correct.

16  Q    Now, Ms. Birnbaum, you agree that as far as Johnson &

17  Johnson is concerned, had Johnson & Johnson won the Daubert

18  motion in the MDL, precluding the plaintiff's causation

19  experts, in that case the MDL would have been the more

20  efficient forum for Johnson & Johnson than bankruptcy, true?

21  A    I don't know what you mean by efficient there.  It would

22  certainly be a great result and a better forum --

23  Q    And it would have --

24  A    -- at that point, because the case would be dismissed.

25  Q    And all the claims would have been resolved at that point?

Birnbaum - Cross/Silverstein                    66

1  A     That's right.

2  Q     So in the case of a granting of the Daubert motion, MDL

3  was the more efficient forum for J&J to resolve all of its

4  liabilities, true?

5  A     I wouldn't use the word "efficient."  It would certainly

6  be the better forum.

7  Q     And it would have gotten to that result of resolving all

8  claims faster, because that would have happened in 2020?

9  A     Absolutely.

10 Q     Okay.  Now, it's your opinion that today a bankruptcy

11 court's ability to centralize all claims to approve procedures

12 and accelerate the process by which claims are valued and

13 compensated and to account for and protect and bind future

14 claimants makes it a superior forum in which to resolve LTL's

15 talc claims, right?

16 A     Yes.

17 Q     But that's your opinion only if LTL is eligible to be in

18 bankruptcy, right?

19 A     Yes.

20 Q     And you agree that bankruptcy tools like centralization,

21 automatic stay, bar date, and estimation don't render

22 bankruptcy a superior forum to MDL in all mass torts, right?

23 A     Yes.

24 Q     Because not all mass torts require the use of all of these

25 tools?

Birnbaum - Cross/Silverstein                          67

1  A    Yes.

2  Q    And so you agree that there are certain circumstances

3  under which resolving mass tort claims in bankruptcy is not

4  necessarily superior to resolving them in an MDL?

5  A    Absolutely.

6  Q    And so it's the existence of latencies and future claims

7  that, in your opinion, render bankruptcy a superior forum to

8  resolve the mass tort disputes like talc, right?

9  A    Yes.

10  Q    Now, one of the principal reasons you believe bankruptcy

11  is superior to the MDL process for resolving the talc claims is

12  because bankruptcy can force all claimants into a settlement

13  without opt-outs, true?

14  A    Yes.

15  Q    And in other words, talc claimants can be bound by a

16  resolution in bankruptcy whether they vote for it or not?

17  A    Well, there had to be a vote -- there would certainly have

18  to be a vote in the bankruptcy to get a plan of reorganization.

19  Q    But claimants who don't vote or who oppose the plan can be

20  bound by the resolution even if they disagree with it.  That's

21  one of the reasons why you believe bankruptcy is superior?

22  A    Yes.

23  Q    And as to those claimants who are -- or who would be bound

24  by a settlement in a bankruptcy that are not in favor of it,

25  you did not take into account that their fundamental rights

Birnbaum - Cross/Silverstein                         68

1  would be redefined in bankruptcy in that circumstance, did you?

2  A    Every settlement redefines fundamental rights in the sense

3  that people give up a right to continue the litigation and to

4  try the cases.

5  Q    And now I'm talking about claimants who opposed the

6  settlement.  You did not take into account for those claimants

7  who would oppose a resolution in bankruptcy the fact that their

8  fundamental rights in bankruptcy would be redefined in

9  determining that bankruptcy is a superior forum, true?

10 A    I did consider that, yes.

11 Q    Well, you testified that --

12           MS. O'CONNOR:  Objection.

13           MR. SILVERSTEIN:  All right.  I'll withdraw it.

14 BY MR. SILVERSTEIN:

15 Q    The fact that claimants bound by a bankruptcy resolution

16 who oppose that resolution are forfeiting their fundamental

17 right to a jury trial merits no weight in your analysis,

18 because, in your words, the right to a jury trial is ephemeral,

19 true?

20 A    In most instances, the answer to that is yes.  Most cases

21 do not get tried in the civil system.  Most cases do not get

22 tried in the MDL system.

23 Q    And so there wasn't a lot of weight that you based on the

24 fact that resolving talc and powder liabilities through this

25 bankruptcy will impair claimants' right to prove to a jury of

1  their peers injuries they claim to be caused by the talcum

2  powder, true?

3

4  A    True.

5  Q    Because the seventh amendment right to a jury trial is

6  ephemeral in your view, true?

7  A    It's not ephemeral.  It's not usually in any of these mass

8  torts something that most people or few people ever try any of

9  these cases in any MDL.  You have a couple of bellwether trials

10 that get done, maybe 6, 12, whatever.  And nobody else tries

11 their cases.

12 Q    And so, Ms. Birnbaum, will you agree that at your

13 deposition you testified repeatedly that the right to a jury

14 trial is ephemeral, using that specific word?

15 A    In settlements, yes.

16 Q    Would you agree that you referred to the jury trial right

17 as ephemeral?  Those were your words?

18 A    No.  It's a right that everybody can have, has, and should

19 have.  But in reality, there are very few cases tried in MDLs

20 or in the civil system.

21 Q    Now, you're not testifying that the MDL process is not

22 capable of achieving a comprehensive resolution and closure of

23 mass tort disputes involving future claimants and long latency

24 periods, correct?

25 A    Well, I don't know what you mean by capable --

Birnbaum - Cross/Silverstein                    70

1  Q    Well --

2  A    -- in that respect.  Can it be done at all?  Under these

3  circumstances, I would doubt it.  You cannot use a class action

4  to get these cases settled since Amchem and Ortiz.

5  Q    Ms. Birnbaum, I'm going to refer you back to tab 1 and ask

6  you to turn to page 59.

7  A    To what page, sir?

8  Q    59 at line 24.  Do you recall that I asked you: "Are MDLs

9  capable of achieving comprehensive resolution and closure of

10 mass tort disputes involving future claimants and long latency

11 periods?"

12     Answer: "I don't think you can describe it that way of

13 MDLs as not capable.  MDL is a process.  It's a gathering

14 together of cases in one federal forum.  It doesn't include

15 state cases.  It may exclude other kind of cases.  So I

16 wouldn't talk -- I wouldn't use the language as you're using

17 it.  It's a process.  It's a procedure of bringing cases

18 together for pretrial purposes."

19     And then I asked you at line 16 on page 60: "Are parties

20 capable through the MDL process of achieving comprehensive

21 resolution and closure of mass tort disputes involving future

22 claimants and long latency periods in your opinion?"

23         MS. O'CONNOR:  Objection, Your Honor.  Again, this is

24 not an impeachment.  This is exactly consistent with what she

25 just testified to.  She --

Birnbaum - Cross/Silverstein                    71

1          MS. SILVERSTEIN:  Well --

2          MS. O'CONNOR:  -- said literally, again, I'm not sure

3   what you mean by capable --

4          THE COURT:  It --

5          MS. O'CONNOR:  -- this is exactly consistent with --

6          MR. SILVERSTEIN:  And --

7          MS. O'CONNOR:  -- her testimony today.

8          MR. SILVERSTEIN:  And then it continues, Your Honor.

9          MS. O'CONNOR:  Well, she --

10          MR. SILVERSTEIN:  Can --

11          MS. O'CONNOR:  He's reading through paragraphs.

12          MR. SILVERSTEIN:  "Can a settlement be done that has

13   latency in it?"

14          MS. O'CONNOR:  Well --

15          MR. SILVERSTEIN:  I (sic) answered: "Yes, it could.

16   It may be able to be done, but it has not been accomplished

17   very well in the situations where it has come up since --

18          THE COURT:  Let me --

19          MR. SILVERSTEIN:  -- Amchem and Ortiz."

20          THE COURT:  Let me rule on the objection.  There are

21   many elements that are consistent with her testimony.  The

22   wording may be different.  I'm just going to allow her to --

23   I'm going to allow him to ask -- allow the -- to ask the

24   question to clarify it.

25   BY MR. SILVERSTEIN:

Birnbaum - Cross/Silverstein                    72

1  Q    Ms. Birnbaum, when I asked you: "Are parties capable

2  through the MDL process of achieving comprehensive resolution

3  and closure of mass tort disputes involving future claimants

4  and long latency periods, in your opinion," you answered: "I'm

5  not sure what you mean by capable."

6       But then you went on to say: "Can a settlement be done

7  that has latency in it?  It could.  It may be able to be done.

8  But it has not been accomplished very well in the situations

9  where it has come up since Amchem and Ortiz."

10 A    That's a --

11 Q    That's your -- that was your testimony then?

12 A    It's my testimony then.  It's my testimony now.

13 Q    Okay.  So the parties are capable of achieving a

14 comprehensive resolution in the MDL of a mass tort dispute

15 involving long latencies and future claims?

16 A    No.  Not since Amchem or Ortiz.  There have been none.

17 You cannot point to one class action settlement that has

18 handled and resolved future claimants such as those here and

19 latent injuries.  And the only exception was NFL, which is a

20 very different case.

21 Q    So when you testified that it could be done but it's not

22 done very well after Amchem and Ortiz, you were incorrect then?

23 A    No.

24 Q    Okay.

25 A    It's -- I'm saying the same thing.

Birnbaum - Cross/Silverstein                          73

1  Q    It can be done?

2  A    It can't -- can be done but not in light of Amchem and

3  Ortiz.  So it can't be done through a settlement class.  There

4  have been no settlement classes since Amchem or Ortiz since

5  1998 and 1999.  If we could do it, we'd be doing it.

6  Q    Well, let me --

7  A    It is a lot easier to do a settlement class than --

8  there -- after Amchem and Ortiz, most academics and

9  practitioners agreed that class action settlements in these

10 types of situations of personal injury cases were the death

11 knell.  And there have been none.

12 Q    Well, let me ask it this way, Ms. Birnbaum.  Am I right

13 that you're -- you are not testifying that bankruptcy is the

14 only forum within which to resolve talcum powder liabilities?

15 A    I am not.

16 Q    You are not?  Bankruptcy is not the only forum within

17 which to resolve the talcum --

18 A    I --

19 Q    -- powder liabilities, correct?

20 A    Let me go back.  It is the only forum that likely can be

21 done, because there is no mechanism that we know of that can

22 get it done otherwise, because the class action settlement has

23 not been done since Amchem or Ortiz.  And believe me, if it

24 could have been done, there are lots of really, really smart

25 people that could have made it happen.  That's 20 -- that's

Birnbaum - Cross/Silverstein                        74

1   decades we're talking about now.

2   Q    Ms. Birnbaum, back to your deposition at 108, line 25.

3   A    108?

4   Q    Yeah.  I apologize.  110.

5   A    110?  Got it.

6   Q    Line 21.  Ms. Birnbaum, I asked you: "So am I right,

7   Ms. Birnbaum, that your opinion is not that bankruptcy is a

8   superior forum within which to resolve the talcum powder

9   liabilities, but it's the only forum within which to resolve

10  the talcum powder liabilities?"

11      And your answer was: "I'm not suggesting it's the only

12  forum.  It's certainly the superior forum, but I haven't seen a

13  case like that settled where -- in such latency through the MDL

14  except for NFL, which as I said is very different."

15      Your testimony is it's superior, but it's not the only

16  forum within which to resolve these liabilities, correct?

17  A    It's the superior forum.

18  Q    Okay.  That's your opinion, that it's the superior forum?

19  A    Yes.

20  Q    But you would agree that it's not the only forum within

21  which to resolve these liabilities?

22  A    As I said before, there has been no cases that have

23  settled these types of cases in the MDLs for the last decades.

24  Q    Well, let me ask this, Ms. Birnbaum.  If this case is

25  dismissed, you don't know how many trials will result in the

Birnbaum - Cross/Silverstein                    75

1  tort system?

2  A    I have no idea.

3  Q    And in your view, nobody can determine how many trials

4  there would be?

5  A    Nope.

6  Q    Correct?

7  A    Yes.

8  Q    And you have no basis to disagree with Professor Rave's

9  statistic that 90 percent -- 97 percent of all MDL cases are

10 resolved in the MDL chancery court without remand, true?

11 A    No.

12 Q    You have no basis --

13 A    No, I have no -- I don't disagree with that.

14 Q    And you don't dispute Professor Rave's statistic that over

15 99 percent of all federal products liability cases are resolved

16 without trial?

17 A    No, I don't disagree.

18 Q    You agree that very few cases ever get tried?

19 A    Yes, I agree to that.

20 Q    Now, you -- in your expert report at page 6, you state at

21 the bottom that there are several examples of cases with

22 latency issues that could not be settled in an MDL but had to

23 be settled through the bankruptcy process?

24 A    Yes.

25 Q    And you're talking about asbestos companies like W.R.

Birnbaum - Cross/Silverstein                                    76

1  Grace and silicone breast companies like Dow Corning, true?

2  A    Yes.

3  Q    You're not giving the opinion that those examples filed

4  for bankruptcy without having the requisite financial distress,

5  are you?

6  A    I am not.

7  Q    And you agree that there are defendants in this -- the

8  asbestos MDL that have managed their liability in the MDL

9  without resort to bankruptcy, true?

10 A    For administrative -- through administrative settlements

11 where they pay certain amounts each year and work out their

12 arrangements with plaintiff's lawyers.  They have the smaller

13 defendants, not any of the larger defendants who are all in

14 bankruptcy.

15 Q    Similar to a bankruptcy trust?

16 A    It's not really a trust.  It's --

17 Q    All right.  But the --

18 A    But it's an administrative process.

19 Q    Okay.  And are you aware of how trust distribution

20 procedures operate?

21 A    Not -- just generally.

22 Q    Okay.  And there are defendants in silicone breast

23 implants -- the silicone breast implants MDL other than Dow

24 Corning that have resolved their liability with resorting to

25 bankruptcy, true?

Birnbaum - Cross/Maimon                     77

1   A     Yes.  They were not the prime defendants.  They had

2   different relationships with the product.  The prime defendant

3   was Dow Corning.

4   Q     There are companies that settled opioids exposure in the

5   MDL without resorting to bankruptcy, true?

6   A     Yes.  But those are not personal injury or latency cases.

7   Q     You're aware that Johnson & Johnson resolved its opioids

8   exposure in the MDL without resort to bankruptcy, true?

9   A     Yes, because it's not a personal injury latency case.

10             MR. SILVERSTEIN:  No further questions.  Thank you.

11             THE WITNESS:  Thank you.

12             MR. MAIMON:  May I, Your Honor?

13             THE COURT:  Thank you.

14             Mr. Maimon?

15             MR. MAIMON:  Thank you.

16                          CROSS-EXAMINATION

17  BY MR. MAIMON:

18  Q     Good morning, Ms. Birnbaum.  My name is Moshe Maimon.  We

19  haven't had the pleasure of meeting.  Today, I only have a few

20  questions for you.

21  A     Okay.

22  Q     The lawyers who retained you from Johnson & Johnson, did

23  they tell you that in 2020 they stood in front of the Imerys

24  bankruptcy court and told that court that the tort system was

25  the proper place to revolve -- resolve its liability?

Birnbaum - Cross/Maimon                           78

1  A    They did not.

2  Q    They did not tell you that?

3  A    No.

4  Q    Okay.  We talked -- you talked a little bit about the

5  seventh amendment right to a jury trial.  You'll agree that

6  that right is in the constitution, correct?

7  A    Absolutely.

8  Q    And you'll agree with me, won't you, that that right is

9  also in the constitutions of the 50 states?

10 A    Yes.

11 Q    Do you -- the right to vote is in the constitution,

12 correct?

13 A    Thank God.  Yes.

14 Q    If you -- thank God.  Yes.  And if most people don't vote,

15 can we take it away?

16 A    No, we don't.

17 Q    Okay.  Good.  Can you tell me where in the Constitution of

18 the United States or in any constitution of any state it says

19 that a company has a right to a global resolution of its

20 liabilities?

21 A    There's no such thing.

22         MR. MAIMON:  Thank you so much.

23         MR. THOMPSON:  Your Honor, briefly.  Thank you.

24         THE COURT:  Good morning, Mr. Thompson.

25         MR. THOMPSON:  Clay Thompson, Maune Raichle.

1                           CROSS-EXAMINATION

2   BY MR. THOMPSON:

3   Q    I always let Mr. Maimon go first, because he does a better

4   job and covers what I --

5   A    I'm sure you'll do a great job too.

6            MR. MAIMON:  I'm older.

7            MR. THOMPSON:  That's true.

8   BY MR. THOMPSON:

9   Q    Good morning, ma'am.  We've not met before either, I don't

10  believe.  You know that J&J filed a _Daubert_ motion in the

11  Imerys --

12  A    I did not --

13  Q    I'm sorry.

14  A    I didn't follow that.

15  Q    You know that J&J filed a _Daubert_ motion in the MDL,

16  correct?

17  A    I assume so.

18  Q    And --

19  A    I didn't look into that very --

20  Q    And you're aware that J&J in that instance liked the tort

21  system, because they could challenge the legal and scientific

22  theories of the plaintiffs in the MDL, right?

23  A    Yes.

24  Q    You cited _Ortiz_.  That's a case you're familiar with,

25  right?

Birnbaum - Cross/Thompson                    80

1  A    Yes.

2  Q    And you know that in footnote 23 of that what the Supreme

3  Court noted was that: "It is no answer in this case that the

4  settlement agreement provided for a limited back-end opt-out in

5  the form of a right on the part of class members eventually to

6  take their case to court is dissatisfied with the amount

7  provided by the trust.  The opt-out in this case requires

8  claimants to exhaust a variety of alternative dispute

9  mechanisms to bring suit against the trust and not against

10 Fibreboard and it limits damages to $500,000 to be paid out in

11 installments over five to ten years despite multimillion dollar

12 jury verdicts sometimes reached in asbestos suits."

13     You're familiar with that from _Ortiz_?

14 A    I'm not.  I don't have it in front of me.  I'm sure it's

15 in the case.

16 Q    But it's a case that you referred to several times today,

17 correct?

18 A    Yes.  It's one of the leading cases on class actions.

19 Q    And have you seen the plan that's been proposed in this

20 case --

21 A    I have not.

22          MR. THOMPSON:  Okay.  Thank you.

23          THE COURT:  Thank you, Mr. Thompson.

24          Anyone else?

25          Any redirect?

1          MS. O'CONNOR:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3   BY MS. O'CONNOR:

4   Q    Ms. Birnbaum, in your expert report, you address the

5   effect of latent injuries on the ability to resolve mass torts.

6   Can you please describe what effect latent injuries have on

7   those efforts in your experience?

8   A    The problem is it's impossible to identify who the

9   plaintiffs are going to eventually be, because they have no

10  injury at the moment, and their injury may manifest years after

11  their exposure to a particular product, substance, or device.

12  Q    How about the effect of unknown future claimants on the

13  ability to resolve mass torts?

14  A    That's a very big problem in the fact of due process.

15  That is one of the reasons that settlements through class

16  actions after Amchem and Ortiz just never continued because of

17  the problems of a -- of notice, of due process, of having

18  people understanding the ability to opt out or even know

19  they've been exposed.

20  Q    And in preparing your rebuttal expert report in this case,

21  you considered a number of MDL case examples involving mass

22  torts where settlement efforts were attempted.  Is that

23  correct?

24  A    Yes.

25  Q    And in preparing for your testimony today, did you assist

Birnbaum - Redirect/O'Connor                    82

1 in the preparation of a demonstrative that lays out those case

2 examples that you considered?

3 A    I did.

4        MS. O'CONNOR:  If I could see demonstrative SB-1,

5 please?

6 BY MS. O'CONNOR:

7 Q    Is this the demonstrative that you prepared?

8 A    Yes.

9 Q    Okay.  Can you please describe what this chart shows with

10 respect to the cases you considered and discussed in your

11 expert report?

12 A    Yes.  I looked at the issue of latent injuries and unknown

13 future claimants and, in doing that, tried to determine where

14 the cases were resolved.  And I think this chart tries to show

15 that.  A lot of nice green and red.  But that's -- this is an

16 attempt to try to put it into a graphic.

17 Q    Okay.  And you mentioned the green and the red.  So what

18 are the takeaways in terms of your opinions from the green

19 checkmarks versus the red Xs in the third column versus the

20 first two columns with the green checkmarks?

21 A    Okay.  The closest paradigm to these talc cases are the

22 asbestos cases.  And they have latent injuries and unknown

23 future claimants, and there have been 120 asbestos companies

24 that have gone into bankruptcy to resolve their asbestos

25 liabilities.

1     The Roundup case was spoken about before this.  There was

2  an attempt to settle a futures class, and that failed in part

3  because of the fact of the inability to give notice which the

4  judge talked about and the fact that it was not a sufficient

5  amount.

6     The silicone breast implant cases was another case that

7  was attempted to be a settlement class that also failed.  And

8  Dow Corning went into bankruptcy to resolve its latent injury

9  and unknown future claims.

10         MS. O'CONNOR:  Okay.  And if I could see the next

11  step in the --

12  BY MS. O'CONNOR:

13  Q     Those three cases that you just discussed, those are shown

14  in the yellow highlighted area there --

15  A     Yes.

16  Q     -- across the top?  Let's walk through those three cases.

17  The asbestos litigation.  Why did you consider the asbestos

18  litigation?

19  A     Well, for many reasons.  First of all, some of the

20  plaintiffs here in this -- in the talc case say that there's

21  asbestos in the talc products.  So that would be a real close

22  paradigm.  Some of the plaintiffs here are trying to recover

23  for mesothelioma, which is an asbestos signature disease.  So

24  that makes it a close contact as well.  So I think those cases

25  are really relevant in determining where is the best superior

Birnbaum - Redirect/O'Connor                                      84

1  methodology to get these kinds of latent unknown future claims

2  resolved.

3  Q    And what type of injuries were at issue in the asbestos

4  cases?

5  A    Mesothelioma, pleural plaques.

6  Q    Mesothelioma like in the talc cases, correct?

7  A    Right.

8  Q    Were unknown future claimants involved in asbestos cases?

9  A    Yes.

10 Q    And was global resolution achieved in the asbestos cases?

11 A    Yes.  Not -- in the bankruptcies there was global

12 resolution for many, many of the defendants.

13 Q    Okay.  So as it's broken out here in the demonstrative aid

14 in the separate charts, global resolution in the context of the

15 MDL is shown with a red X, correct?

16 A    Yes.

17 Q    But in the separate column for bankruptcy, there's a green

18 check for bankruptcy, correct?

19 A    Yes.

20 Q    Now, and -- what -- and turning then to the Roundup case.

21 What type of injuries were sustained in that case?

22 A    Non-Hodgkin's Lymphoma.

23 Q    And were latent injuries involved there?

24 A    Yes.  10 to 15 years of latency.

25 Q    Were unknown future claimants involved --

Birnbaum - Redirect/O'Connor                    85

1  A     Yes.

2  Q     -- in Roundup?  And was global -- has global resolution

3  been achieved there?

4  A     It has not.  The settlement did not go through.

5  Q     And what is happening with the Roundup litigation

6  currently?

7  A     The cases continue to be tried, settled.

8  Q     All right.  And then, finally, the silicone breast implant

9  cases that you discussed in your report, what types of injuries

10 were sustained in those cases?

11 A     Those were autoimmune injuries as a result of the silicone

12 breast implants.

13 Q     Were there unknown future claimants involved in those

14 cases?

15 A     Yes.

16 Q     And was global resolution achieved in the MDL in those

17 cases?

18 A     It was not.  It failed.

19 Q     Were there bankruptcies filed by defendants --

20 A     Yes.

21 Q     -- in those cases?  Let's turn then to the case that

22 Professor Rave focused on, the NFL concussion case.

23        MS. O'CONNOR:  If I could see the next step in the

24 demonstrative, please?

25 BY MS. O'CONNOR:

Birnbaum - Redirect/O'Connor                    86

1  Q    The NFL concussion case, Ms. Birnbaum, how would you

2  describe the type of injuries that were sustained in that case?

3  A    Those were latent injuries.  These were brain injuries,

4  Parkinson's Disease, related brain injuries.

5  Q    Was the group of future claimants in that case unknown?

6  A    No.  They were very much known.  They were defined.  They

7  are identified.  They could be given notice.  There were 10- to

8  20,000 of them, and each one had a name and had an opportunity

9  to have -- to opt out of the class.  It's a very unusual kind

10 of situation.

11 Q    By the way, how are you familiar with the NFL concussion

12 case?

13 A    I was involved in that case.

14 Q    From your perspective, why is the NFL concussion case

15 different from the talc cases?

16 A    Because all of the -- they are not unknown claimants.

17 They all knew that they had -- that they had the -- that they

18 had been what they call sub-concussions over the years and that

19 they all had an opportunity to get proper notice, to get due

20 process notice, and an opportunity to opt out.

21 Q    Okay.  And we heard your discussion during cross about the

22 Amchem and Ortiz cases with respect to the prospect of

23 achieving a resolution in the -- in an MDL for the talc

24 litigation.  Why was a class resolution possible in the NFL

25 concussion case?

Birnbaum - Redirect/O'Connor                    87

1  A    I'm sorry?

2  Q    Why was a class settlement possible for the NFL concussion

3  case?

4  A    Why was it possible?

5  Q    Yes.

6  A    Because of the ability -- there were no unknown future

7  claimants.  They were all known future claimants.

8  Q    So that difference was significant to that case?

9  A    Oh, it was what made all the difference.

10 Q    All right.  Now, let's turn then to the Deepwater Horizon

11 case.  You're aware that that's a case that Judge Ferguson

12 discussed in his report as an MDL success story.  Is that

13 correct?

14 A    Yes.  That was not really a personal injury case.  That

15 was more an economic loss case.

16 Q    Was there a global resolution in that case?

17 A    There was no global resolution of -- there was a

18 resolution of the property damage and the economic loss cases.

19 There was no resolution of -- and there was a resolution of

20 personal injury cases of people who had immediate injuries as a

21 result of cleaning up the spill.  But there was no resolution

22 of latent injuries in that case, and those cases are still

23 continuing.

24 Q    And were there unknown future claimants in the Deepwater

25 Horizon cases?

Birnbaum - Redirect/O'Connor                    88

1  A    No.

2  Q    The <u>Fen-Phen Diet Drugs</u> cases --

3  A    Those are not latent injury cases.  Those were cases in

4  which there was alleged valvular injuries as a result of

5  ingestion of the drug very soon after that.

6  Q    Okay.  But there was a global resolution in those cases,

7  correct?

8  A    Yes, there was.

9  Q    And then, finally, the <u>Vioxx</u> cases.  Can you take us

10  through the criteria for those as well?

11  A    Yes.  <u>Vioxx</u> also was not a latent injury case.  It was an

12  injury case that was a global resolution, but it had not -- no

13  issues of the futures and latent injuries.

14  Q    Okay.

15  A    And that was resolved in the MDL.

16  Q    Okay.  So before we turn then to the couple of

17  non-personal injury cases that were discussed in the TCC's

18  expert reports, I just want to ask you about the statistics

19  that you were asked about on cross from Professor Rave's

20  reports, the 97 percent of cases that are remanded in MDL cases

21  and the 99 percent of MDL cases that are resolved without

22  trial.  Ms. Birnbaum, do those statistics account for the

23  presence of latency issues or unknown future claimants?

24  A    They do not?

25  Q    For the non-personal-injury cases that have -- are

Birnbaum - Redirect/O'Connor                                89

1  discussed in the expert reports, the Chinese drywall cases,

2  what type of injuries are present in those cases?

3  A    Those were property damage cases.

4  Q    And are those cases applicable or helpful to your analysis

5  here?

6  A    Not at all.

7  Q    Can you explain why?

8  A    They're just not personal injury.  They're not latent

9  injuries.  They're not unknown.  Everybody knows that they've

10 had this in their properties.  It's just not relevant.

11 Q    Okay.  And then how about the opioids cases?  Can you

12 explain how those cases relate to your analysis?

13 A    They are -- they're very different.  Those are not

14 personal injury cases either.  Those are cases by governmental

15 entities in public nuisance in order to recover for abatement.

16 Q    Okay.  All right.  Then turning back to your rebuttal

17 report, Ms. Birnbaum.  Can you please describe the futures of

18 bankruptcy that you describe that made it, and as you described

19 it, the best suited for resolving mass torts when they involve

20 latent injuries and unknown future claims?

21 A    Well, they -- you can get a comprehensive resolution in

22 which everybody can be treated fairly and the same.  Part of

23 the problem is that when you're in an MDL and there are trials,

24 some people are winners, and some people are losers.  Some win.

25 Some lose.  This is an ability to treat futures and present

Birnbaum - Redirect/O'Connor                          90

1  claimants similarly situated, similarly, fairly, and equitably

2  and has many of the tools which the MDL does not provide.

3  Q    I think you mentioned this in the context of one of your

4  responses on cross, but I just want to follow up on this.  When

5  were the Amchem and Ortiz decisions decided?

6  A    I believe it was 1998, 1999.

7  Q    Okay.

8  A    About that period of time.

9  Q    All right.  And since that time -- and you've been working

10 on this directly in your work in the context of MDL resolution

11 work.  Is that correct?

12 A    Yes.

13 Q    So since that time, there have been, to your knowledge, no

14 examples of MDL case resolutions where the cases involved

15 latent claims and unknown future claimants?

16 A    That's true.

17         MS. O'CONNOR:  Okay.  Thank you, Ms. Birnbaum.

18         THE WITNESS:  Thank you.

19         THE COURT:  Mr. Silverstein, let me just ask a quick

20 question.

21         THE WITNESS:  Yes?

22         THE COURT:  Ms. Birnbaum, it has been referenced in

23 many of the pre-hearing submissions pleadings but not discussed

24 today the 3M earplugs Aearo Technologies case that has been

25 dismissed in bankruptcy.  Do you have a view as to whether or

1   not that litigation is of a type that is resolvable in the MDL?

2            THE WITNESS:  I do not, Your Honor.

3            THE COURT:  Okay.  Thank you.

4            THE WITNESS:  Thank you.

5                    RECROSS-EXAMINATION

6   BY MR. SILVERSTEIN:

7   Q    Ms. Birnbaum, Dechert represents 3M in the MDL, true?

8   A    Yes.

9   Q    And Dechert has taken the position that even though there

10  are no latencies with earplugs in the MDL the case should still

11  be resolved in bankruptcy, right?

12  A    I have not had -- I am not involved in that case, and I

13  have had nothing to do with that case.

14  Q    So as the co-chair of the department, you have no idea

15  what Dechert's position is on a question of the -- as

16  significant as 230,000 claims in an MDL?

17  A    This is -- we have a wall.  I don't have anything to do

18  with that case.

19  Q    And what -- you're walled off from that case?

20  A    Yes.

21  Q    And is that because of this?

22  A    No.

23  Q    Now, you're aware that the asbestos MDL is closed, right?

24  A    Yes.

25  Q    And are you aware of any asbestos defendant with a AAA

Birnbaum - Recross/Silverstein                          92

1  credit rating that filed for bankruptcy to resolve its claims?

2  A    I don't know that.

3  Q    Can you think of any?

4  A    No.  I have -- I just have no idea.

5  Q    Now, with regard to Roundup, you've read Judge Chhabria's

6  decision, right?

7  A    Yes.

8  Q    And that's tab 11 of your black binder.  You've read this

9  decision?

10 A    Yes.

11 Q    And you're aware that at page 4, Judge Chhabria

12 specifically recognized that the defendant in that case was

13 "not a situation where the defendant is at risk of going

14 bankrupt such that only the first set of plaintiffs will ever

15 be able to recover.  Bayer, which recently acquired Monsanto,

16 is a massive, wealthy company, and it continues to make money

17 specifically from Roundup sales."

18      That was part of the decision, wasn't it?

19 A    It was in the decision.

20 Q    And you're also aware -- withdrawn.  Have you read the

21 transcript of the argument on approval of class settlement?

22 A    No.

23 Q    Are you aware of any of the comments that Judge Chhabria

24 made about giving notice in a situation where there are

25 unidentified future claimants?

Birnbaum - Recross/Silverstein                    93

1  A    Just what's in his decision.

2  Q    All right.  And so -- and the decision incorporates and

3  assumes that the reader has read the transcript, correct?

4  A    No, I don't think anybody thinks that the reader has read

5  a transcript when you read an opinion.

6  Q    Well, did you read in the very first paragraph that Judge

7  Chhabria wrote: "The ruling assumes that the reader has

8  reviewed a transcript on the hearing on the motion for

9  preliminary approval"?

10  A    I don't even know where you might get the transcript.

11  Q    Pardon?

12  A    I don't even know where you might get the transcript.

13  Q    Well, it's at page -- it's at tab 12.

14  A    Here it is, yes, but I haven't read it.

15  Q    Okay.  So you have no idea what Judge Chhabria said --

16  A    No, I do not.

17  Q    -- about the possibility of giving notice to an

18  unidentified future claimant?

19  A    I did not read that.

20  Q    Okay.  And if giving notice is problematic in the MDL to a

21  large, unidentified class of claimants, how do you resolve it

22  in bankruptcy?

23  A    It's a different process.

24  Q    And what -- do you know how --

25  A    I don't know how you do -- you -- that's the -- the

1 bankruptcy process gives notice.

2 Q    Do you know how due process is given in bankruptcy?

3 A    I am not an expert on it.

4           MR. SILVERSTEIN:  I have no further questions.

5           THE WITNESS:  Thank you.

6           MR. MAIMON:  Briefly, Your Honor?

7           THE COURT:  Mr. Maimon?

8                    RECROSS-EXAMINATION

9 BY MR. MAIMON:

10 Q    Ms. Birnbaum, you and I, when I first questioned you, we

11 discussed the seventh amendment and the state constitutions'

12 right to a jury trial.  You recall that?

13 A    Yes.

14 Q    And when you were asked by counsel for the debtor, you

15 discussed due process rights of individuals who get sick in the

16 future.

17 A    Right.

18 Q    Do you recall that?

19 A    Yes.

20 Q    And you and I also discussed and you agreed that there is

21 no right in any constitution that you're aware of for a company

22 to globally resolve its liabilities.  You recall that?

23 A    Yes.

24 Q    But still, as a retained witness for Johnson & Johnson,

25 you say that it's okay to exterminate the seventh amendment and

Birnbaum - Recross/Maimon                    95

1    due process rights of a minority through -- of present cancer

2    victims and future -- and all future cancer victims through a

3    bankruptcy because global resolution can be achieved?  Is that

4    your opinion?

5             MS. O'CONNOR:  Objection, Your Honor.

6             THE WITNESS:  No.  My opinion was that --

7             THE COURT:  Wait.  Wait, wait, wait, wait.

8             THE WITNESS:  That is not my opinion.

9             THE COURT:  Wait, wait.

10             THE WITNESS:  Sorry, Judge.

11             THE COURT:  Ms. Birnbaum, just wait.

12             MS. O'CONNOR:  Objection, Your Honor.  The phrasing

13   of that question wasn't remotely --

14             THE COURT:  Sustained.

15             MS. O'CONNOR:  -- what she has testified to.

16   BY MR. MAIMON:

17   Q    Is it okay to do away with the seventh amendment and due

18   process rights of a minority through -- a minority of present

19   cancer victims and future cancer victims through a bankruptcy

20   just because global resolution can be achieved?

21   A    That's not what I'm saying at all.

22   Q    But and you would agree that it's not okay, would you?

23   A    I wouldn't agree one way or another.  The bankruptcy

24   process is the bankruptcy process.

25   Q    So you wouldn't agree with that one way or the other?

Birnbaum - Recross/Maimon                    96

1  A    No.

2          MR. MAIMON:  Thank you.

3          THE COURT:  All right.  Any other questions?

4          MS. O'CONNOR:  No, Your Honor.

5          THE COURT:  Ms. Birnbaum, thank you for your time

6  today.

7          THE WITNESS:  Thank you very much.

8          THE COURT:  You may step down.

9          And --

10          MR. JONES:  Good morning, Your Honor.  Jim Jones for

11  the debtor.  I believe the order of operations is that Dr.

12  Mullin takes the stand now and will address part of his report.

13          THE COURT:  Correct.  Dr. Mullin?

14          Maybe if we can, you know, move the binders, return

15  them.  Thank you.

16          Good -- still morning.  Good morning, Dr. Mullin.

17  Please raise your right hand.

18          MR. MULLIN:  Thank you.

19            CHARLES MULLIN, DEBTOR'S WITNESS, SWORN

20          THE COURT:  Thank you.  Please have a seat and

21  provide the Court with your name and business address.

22          THE WITNESS:  Charles Henry Mullin, 2001 K Street NW,

23  Suite 500, Washington, D.C.

24                          DIRECT EXAMINATION

25  BY MR. JONES:

1  Q    Good morning, Dr. Mullin.  Would you please take a look at

2  what has been placed before you.  I believe you're going to

3  find there are two binders.  The first will contain, I believe,

4  your June 7, 2023, report marked as Exhibit 64.  Do you have

5  that before you?

6  A    I do.

7  Q    And is, in fact, Exhibit 64 your report of that date?

8  A    Yes.

9  Q    And I think the second binder will include your report of

10  June 14, 2023, just a week later.  And if all has gone well, it

11  should be marked Exhibit 65.

12  A    It is.

13  Q    And that is a true and accurate copy of the rebuttal

14  report.  Is that right?

15  A    It appears to be.

16        MR. JONES:  Your Honor, I will ask Mr. Mullin one

17  more question on this point after I make sure that he's got

18  hydration.

19        Thanks, Tim.

20  BY MR. JONES:

21  Q    And that is, Dr. Mullin, do you take -- adopt, rather,

22  these two reports as your testimony here today as if it were

23  given on direct and/or rebuttal examination?

24  A    I do.

25        MR. JONES:  Thank you.

1          We move the two reports into evidence, Your Honor, at

2  this time.

3          MR. MAIMON:  I object, Your Honor.  May I be heard?

4          THE COURT:  Yes.

5          MR. JONES:  Your Honor, I thought we were reserving

6  objections.

7          THE COURT:  Well, let me just hear the objection.

8          MR. MAIMON:  I think I have to make my objection at

9  this point.  We filed an objection to this witness's testimony.

10 Aside from the substantive objections that we made to the

11 opinions that he has by way of relevance and by way of

12 contradicting case law, the witness in his report sets forth

13 his education, training, and experience.  We challenge this

14 witness on Daubert grounds that this witness is not qualified

15 to render an opinion on the issues that he's about to.  I'm not

16 talking about his later testimony.  But on these issues, he is

17 not qualified under federal court case law by way of either

18 education, training, or experience.  And I invite the Court to

19 voir dire or allow us to voir dire on that, because he's simply

20 not qualified to give those opinions, and no foundation has

21 been laid for him to do so.

22         THE COURT:  Okay.

23         MR. JONES:  Your Honor, for the debtor.  I believe we

24 have exchanged papers on this.  They have been filed.  And the

25 agreement was to reserve these kinds of objections and take the

1  testimony conditioned upon that reservation.  I would suggest

2  we proceed in that way unless you have a different view today,

3  Your Honor.

4          MR. MAIMON:  I didn't agree to reserve any

5  objections, Your Honor, so I don't think that it's fair that

6  counsel state an agreement that my clients did not enter into.

7          THE COURT:  Okay.

8          MR. MAIMON:  We have a right to pose the objection.

9  We also have a right to challenge the qualifications on

10  cross-examination, which I'm happy to do, but I don't want to

11  waste the Court's time --

12          THE COURT:  No.

13          MR. MAIMON:  -- if the Court is going to --

14          THE COURT:  No.  I --

15          MR. MAIMON:  -- if he testifies.

16          THE COURT:  I appreciate the objections.

17          MR. MAIMON:  Thank you.

18          THE COURT:  I've actually -- I've read through the

19  objections.  I'm going to conditionally allow the testimony in

20  on both aspects subject to the right to cross, subject to the

21  existing objection.  There's much that the Court can learn

22  and -- from hearing the context and cross-examination.  But

23  counsel is free to explore the initial qualifications as well

24  on cross.

25          MR. MAIMON:  Thank you, Your Honor.

1           THE COURT:  Thank you.

2           MR. JONES:  Thank you, Your Honor.

3           MR. SILVERSTEIN:  All right.  Judge, it's with regret

4    that we have more binders.

5           THE COURT:  Wait.  One second.

6           Ms. Richenderfer?

7           MS. RICHENDERFER:  Your Honor, I hate to interrupt,

8    but once again I think those of us in the back row -- I don't

9    know if it's based on my age or what.  We're having trouble

10   hearing the witnesses today.  I don't know if the microphone is

11   turned on or off.  I'm getting agreement from back here.  Or

12   maybe the witnesses just need to speak --

13          THE COURT:  Well --

14          MS. RICHENDERFER:  -- closer to the microphone.

15          THE COURT:  I'll ask you to point the microphone a

16   little closer to you, but make an effort to speak into it.  I'm

17   looking at our -- let me --

18          MS. RICHENDERFER:  Your Honor, you're not coming

19   across as loud as you usually do also.  I mean --

20          THE COURT:  Oh, I can take that so many ways, but

21   here --

22          MS. RICHENDERFER:  Your Honor, I'm not getting enough

23   sleep these days.

24          THE COURT:  That's okay.  I just raised the volume,

25   because I thought it was a little -- there.  Just ask, and

Mullin - Cross/Silverstein                101

1   it -- and you'll get it.

2          MS. RICHENDERFER:  And that's why, Your Honor, I was

3   waiting for a break (indiscernible).

4          THE COURT:  That's fine.

5          MS. RICHENDERFER:  Okay.  Very much appreciate that.

6   Thank you, Your Honor.

7          THE COURT:  Okay.  Won't be loud.

8          Counsel?

9          MR. SILVERSTEIN:  Your Honor, may I hand out some

10  binders?

11         THE COURT:  Yes, please.  Thank you.

12                    CROSS-EXAMINATION

13  BY MR. SILVERSTEIN:

14  Q    Dr. Mullin, good morning.

15  A    Good morning.

16  Q    Approximately how many expert reports in cases governed by

17  the Federal Rules of Civil Procedure have you signed?

18  A    I haven't done the math that way.  Some are state court.

19  Some are federal.  Some of the federal -- or some of the state,

20  I think, have adopted federal rules, so I'm not sure.  I

21  probably have over a hundred expert reports at this point, but

22  I couldn't break it down federal versus state.

23  Q    And you understand in this case that your expert report --

24  withdrawn.  You understood when you prepared your expert report

25  that it would serve as your direct testimony, true?

1  A     I was aware that it was a possibility.

2  Q     And this isn't the first time that you've prepared an

3  expert report where the report served in lieu of live direct

4  testimony, is it?

5  A     On a limited number of occasions that's happened.

6  Q     Now, I want to ask you some questions about your direct

7  testimony as opposed to your rebuttal testimony.  Okay?

8  A     Okay.

9  Q     In your direct testimony, your direct report, which is

10  Exhibit D-64, you discuss the comparative efficiencies and

11  equities of the bankruptcy versus the tort system on pages 54

12  through 67 of your report, paragraphs 113 through 142, correct?

13  A     Correct.

14  Q     And you agree, Dr. Mullin, that the comparison of the two

15  systems only becomes relevant if a debtor has the requisite

16  financial distress for file -- to file for bankruptcy, true?

17  A     You can always make the comparison.  I guess it's only a

18  salient question if both avenues are potentially available.

19  Q     Well, Dr. Mullin, before LTL ever filed for bankruptcy on

20  October 14, 2021, you testified that to be in bankruptcy and

21  avail yourself of the tools in bankruptcy, an entity does not

22  need to be insolvent.  You just need to be in financial

23  distress, true?

24  A     In the context of a different matter.  I think you showed

25  me some deposition testimony where that was part of my answer.

1  Q    You testified to that, correct, that you don't need to be

2  insolvent.  You just need to be in financial distress to be in

3  bankruptcy, correct?

4  A    I gave that as part of an answer to a question.  That's

5  correct.

6  Q    Okay.  And are you suggesting that whether you need to

7  be -- whether you need to have financial distress and to be in

8  bankruptcy is applicable in one case and not in another?

9  A    I didn't define what financial distress meant in that

10 answer.  I gave an answer to a question in a context.  And I'm

11 not offering there or here a legal opinion.  I gave an answer,

12 and I gave my understanding.

13 Q    Now, on pages 62 to 67, paragraphs 136 to 142 of your

14 opening report, you state opinions as to why bankruptcy

15 reorganization provides a more equitable avenue to resolve tort

16 claims, right?

17 A    Correct.

18 Q    And your opinions in those paragraphs are based on your

19 comparison of a bankruptcy paradigm on the one hand with a tort

20 system paradigm on the other, true?

21 A    It's a relative comparison.  Correct.

22 Q    And the relative comparison is on the one hand a

23 negotiated plan of reorganization where all tort claims are

24 channeled to a trust with no unimpaired opt-out rights against

25 the debtor receiving a super majority vote, true?

Mullin - Cross/Silverstein                    104

1  A    And there's a plan that's confirmed subject to the rules

2  of bankruptcy, correct.

3  Q    That's the one -- that's one point of comparison that you

4  make, true?

5  A    Correct.

6  Q    And then the other point of comparison is tort claims are

7  tried in what you call lottery -- to lottery-like verdicts,

8  true?

9  A    That comparison is made.  Correct.

10 Q    And based on your comparison of an overwhelmingly

11 consensual bankruptcy trust versus cases going to verdict into

12 the tort system, you conclude in paragraph 142 that the

13 processing and payment of claims by a bankruptcy trust is

14 superior in equity terms to the lottery-like outcomes

15 experienced in the tort system, fair?

16 A    That is an element that went into that conclusion,

17 correct?

18 Q    And but you agree, Dr. Mullin, that 99 percent of cases in

19 the tort system are eventually resolved without trial, true?

20 A    Generically across all cases, true.

21 Q    99 percent of the cases are settled, right?

22 A    Not necessarily for a given tort but across all torts in

23 general, true.

24 Q    And yet, Dr. Mullin, you don't in that direct testimony

25 anywhere in comparing the two paradigms ever discuss

Mullin - Cross/Silverstein                    105

1  settlement, correct?

2  A    As we discussed in my deposition, I somehow lost the

3  paragraph or two that normally discusses that.  It's not there.

4  It's covered in the rebuttal reports.  But that was

5  inadvertently omitted.  That's correct.

6  Q    So in your direct -- in your expert report that you

7  understood would be your direct testimony, you inadvertently

8  excluded any reference to the fact that in the tort system,

9  horizontal equity can be achieved through one or more master

10 settlement agreements, correct?

11 A    I disagree with that conclusion.  You just said horizontal

12 equity --

13 Q    Okay.

14 A    -- could be obtained.  I think as we just heard earlier

15 today, even -- and to me, Professor Rave's testimony

16 underscored the difference.  He talked about Actos.

17 Q    Let me --

18 A    The settlement resolved the pending claims and put

19 disincentives for future -- for lawyers to file future claims.

20 And then apparently they didn't.  So a successful settlement

21 was one where the future claims don't even get represented or

22 filed.  That underscores the inequity.  The future claimants

23 aren't being treated the same as the pendings.  So horizontal

24 equity is a very different question than can you reach a

25 settlement.

Mullin - Cross/Silverstein                    106

1  Q    And none of that is discussed in your direct testimony, is

2  it?  Your direct testimony compares exclusively a bankruptcy

3  trust to lottery-like verdicts, true?

4  A    It's correct that those paragraphs were omitted.

5  Q    Okay.  And how many hours did you and your team spend on

6  the report?

7  A    I couldn't give you a count sitting here.

8  Q    Tens of hours, true?

9  A    Probably hundreds of hours.

10 Q    Now, in your conclusion in paragraph 142, you state that

11 in contrast to the tort system, a trust established through

12 bankruptcy reorganization specifies a common set of rules for

13 payment of claims, right?

14 A    Correct.

15 Q    You agree that a master global settlement in the tort

16 system can specify a common set of rules for determining the

17 payment of claims as well, true?

18 A    If you have a single global resolution for all claimants,

19 yes.

20 Q    So it's not in contrast entirely to the tort system, is

21 it?

22 A    I'm aware of the Vioxx settlement that was truly global.

23 The others generally are series of master settlement agreements

24 struck on a law-firm-by-law-firm basis.  And those don't have

25 the property of horizontal equity.

1  Q    Because claimants are being treated horizontally within

2  their group as opposed to across every single claimant, right?

3  A    Based on the identity of their plaintiff's attorney as

4  opposed to maybe the merits of the case.

5  Q    All right.  Now, you also agree -- you also state in

6  paragraph 142 that the rules pertaining to the bankruptcy trust

7  system reflect the objective factors the bankruptcy court

8  recognizes as materially affecting claim values such as the

9  claimant's injury, age, lost income, alternative exposure

10 sources, dependents, and life status, right?

11 A    I do give a series of examples.

12 Q    And you agree that a global master settlement agreement in

13 the tort system can reflect the objective factors that the

14 parties recognize as materially affecting claim values such as

15 claimant's injury, age, lost income, and the like, right?

16 A    Correct.

17 Q    And so master global settlements in the tort system can

18 also pay claimants based on a grid or point system like a

19 trust, correct?

20 A    It can.

21 Q    Now, just to come back to your wording about the lottery-

22 like results, your view is that litigation in the tort system

23 operates akin to a lottery; true?

24 A    It can.

25 Q    And that's because different juries can reach different

Mullin - Cross/Silverstein                          108

1  results based on a similar set of issues; right?

2  A    Correct, that's one aspect of it.

3  Q    In other words, juries can differ from each other on an

4  outcome; correct?

5  A    Correct.

6  Q    And you agree that judges also can differ on opinion on a

7  similar set of issues; correct?

8  A    It's a trait of human beings generally.

9  Q    So -- but have you ever called the bankruptcy system a

10  lottery-like system?

11  A    It's -- I don't think I've referred to that as a lottery-

12  like system, no.

13  Q    All right.  Now, in comparing the equity of a bankruptcy

14  trust on the one hand and resolution of the tort system on the

15  other, you didn't put explicit weight on the cost to claimants

16  in the bankruptcy system of forfeiting their Seventh Amendment

17  right to a jury trial; correct?

18  A    I'm aware there's still a jury trial option through

19  trusts, but I did not put a dollar weight on that figure.

20  Q    And that's because, in your view, nobody exercises that

21  right in any setting, it's impractical and in every setting

22  almost everybody ends up with a negotiated settlement; true?

23  A    In the context of mass torts with tens of thousands or

24  hundreds of thousands of claims, that's true.

25  Q    You put no weight on the cost to claimants of forfeiting

Mullin - Cross/Silverstein                    109

1  their jury rights because, in your words, 99 percent settle and

2  the vast, vast majority are going to settle through a

3  negotiated framework, it's the only thing that's practical in

4  mass torts; right?

5  A    I don't think I put no weight.  I didn't put a monetary

6  value on it.  I'm aware that there's a difference between the

7  systems, so I'm aware that that difference exists.  When you

8  say put weight on it, in terms of the efficiency and equity

9  arguments, it doesn't change the conclusions on those two

10 arguments.

11 Q    Dr. Mullin, it follows from your testimony that, if this

12 bankruptcy case is dismissed, you believe the only thing that's

13 practical is that the vast, vast majority of Johnson &

14 Johnson's and LTL's talc claims will settle through a

15 negotiated framework; true?

16 A    Ultimately, you can't try a hundred thousand cases, so

17 they aren't going to resolve through a hundred thousand trials.

18 There's not the capacity in the tort system for that, so it has

19 to have an ulterior resolution route, whether that's settlement

20 or some form of dismissal.

21 Q    Now, it's your opinion that the bankruptcy system is

22 superior to the tort system for resolving LTL's talcum powder

23 claims; true?

24 A    Given the facts of this litigation, yes.

25 Q    And the reason for that relates to the existence of future

Mullin - Cross/Silverstein                    110

1  claims and long latencies, primarily; correct?

2  A    That's a key distinguishing feature in this matter, yes.

3  Q    And there were future claims and long latencies when the

4  MDL was formed in 2016; right?

5  A    There was still an open question of whether or not general

6  causation had been (indiscernible) forward.  So, if there's no

7  general causation, in essence, there's no latency.  So that's

8  tied, which is the only hesitation.

9       So, conditioned on plaintiffs prevailing on a causal

10 argument, there's latency.

11 Q    So it's your view that if J&J believed in 2016 it had high

12 odds of winning the Daubert motion that the MDL might have been

13 the preferred method for resolving this case; correct?

14 A    Well, the preferred method for addressing that particular

15 legal defense.

16 Q    If J&J believed in 2016 that it had high odds of winning

17 the Daubert motion, remaining in the MDL may have been the

18 preferred method to filing for bankruptcy protection; true?

19 A    So, at least through the resolution of the Daubert issue,

20 that could be true.

21 Q    So take the case through Daubert, see how that happens,

22 then decide whether to file for bankruptcy or not; correct?

23 A    The facts change at that point.  As a pure economic

24 decision, the circumstances would shift and the resolution of

25 that.

1  Q    Dr. Mullin, you can't testify when bankruptcy became a

2  superior form within which to resolve LTL's talc claims, can

3  you?

4  A    I wasn't asked to try to put a date on that question.

5  Q    And so, logically, it follows from that that you cannot

6  conclude today that up until the moment that LTL filed for

7  bankruptcy on October 14th, 2021, the MDL was as good, if not

8  superior, to bankruptcy for resolving LTL's claims; right?

9  A    I don't believe that's true.

10  Q    If you can't point to any time in which bankruptcy became

11  a superior option for resolving the claims, doesn't it follow

12  that you can't point to a time when the MDL stopped being as

13  good, if not better, a form to resolve the claims than

14  bankruptcy?

15  A    That logic is flawed, no.  I'm happy --

16              MR. SILVERSTEIN:  I have no further questions.

17              THE WITNESS:  -- to explain, if you'd like.

18              THE COURT:  No further questions?

19              MR. SILVERSTEIN:  No, thank you.

20              THE COURT:  Mr. Maimon?

21              MR. MAIMON:  Yes, thank you, Your Honor.

22                          CROSS-EXAMINATION

23  BY MR. MAIMON:

24  Q    It's still good morning, Dr. Mullin.  I'll be brief.

25  A    Good morning.

1  Q    You have a -- I'm just looking at your profile on your

2  website -- you have a B.A. in mathematics and economics from

3  the University of California Berkeley?

4  A    Correct.

5  Q    And you have a PhD in economics from the University of

6  Chicago; correct?

7  A    Correct.

8  Q    By way of education, did either of those educational paths

9  that you took deal at all with bankruptcy law?

10 A    I don't remember all the course detail well enough.  At

11 times you touch on law in economics topics, but there wasn't a

12 course focused on bankruptcy law.

13 Q    And there wasn't a course and you didn't take courses

14 dealing with multi-district litigation and how it works when

15 you were either in your undergraduate or in your PhD program;

16 correct?

17 A    Correct.

18 Q    You are not a lawyer, are you?

19 A    Correct.

20 Q    You didn't go to law school?

21 A    I did not.

22 Q    You're certainly not a judge, are you?

23 A    No.

24 Q    Have you ever practiced in -- you've never practiced in

25 Bankruptcy Court; correct?

Mullin - Cross/Maimon                    113

1  A    Practiced law?

2  Q    Yes.

3  A    No.

4  Q    Have you ever been appointed by a judge in any court as an

5  independent expert?

6  A    I think technically every expert is an independent expert

7  in the British system and I've done some cases in the British

8  system.  Other than that --

9  Q    How about -- let's talk --

10 A    -- technicality --

11 Q    -- about the United States --

12 A    -- no.

13 Q    -- of America.

14       MR. JONES:  Your Honor, will he let the witness

15 finish his answer, please?

16       MR. MAIMON:  I thought he did.  I'm sorry.

17       THE COURT:  Have you completed your answer?

18       THE WITNESS:  Yes.

19       THE COURT:  Okay.

20 BY MR. MAIMON:

21 Q    In the United States of America, you've never been

22 appointed as an independent expert by a judge; correct?

23 A    Correct.

24 Q    You talked about lottery-size verdicts and those are

25 verdicts that are rendered by jurors, correct, that you're

Mullin - Cross/Maimon                          114

1  referring to?

2  A    Correct.

3  Q    You're aware, are you not, that sometimes in the civil

4  litigation system there are bench trials that are decided by

5  judges?

6  A    There can be.

7  Q    And you're aware that different judges view it different

8  when they sit as finders of fact, they view things differently

9  and come to different outcomes even though, to an outside

10 observer like yourself, they might be a similar set of issues?

11 A    Yes.

12 Q    So you might have a cancer victim who has a bench trial

13 who receives X from one judge and X plus Y from another judge;

14 right?

15 A    You could.

16 Q    That doesn't make the X-plus-Y judge's verdict a lottery,

17 does it?

18 A    I mean, none of them are lotteries explicitly.  It's an

19 analogy talking about the variability and the outcomes, and the

20 vast variability of outcomes that you see.  It's not meant to

21 be taken literally as you have a lottery ticket --

22 Q    Yeah.

23 A    -- it's simply an analogy.

24 Q    Having cancer is not a lottery ticket, is it?

25 A    Having cancer?

1  Q    Having cancer is not a lottery ticket, is it?

2  A    It's a negative outcome.  So no, in that sense.

3  Q    And you're not suggesting that any of the plaintiffs are

4  out to win a lottery by bringing their lawsuits; are you?

5  A    Quite to the contrary.  Most plaintiffs would prefer the

6  expected value over the same number in expectation with a lot

7  of variance about it.  People buy insurance to avoid risk.

8  Q    Have you ever spoken to a plaintiff in talc litigation?

9  A    A plaintiff in talc litigation, no.

10 Q    Have you ever spoken to a mesothelioma victim?

11 A    No.

12 Q    Why do you presume to tell this Court what you think they

13 want?

14 A    From risk aversion and settlement?  There's --

15 Q    No, why do you presume to tell this Court what you think

16 they want?

17        MR. JONES:  Objection, Your Honor.  I don't think

18 that's a part of any opinion Mr. Mullin --

19        MR. MAIMON:  He just said that they want.

20        THE COURT:  Overruled.

21        THE WITNESS:  There's a whole branch of the economics

22 literature that looks at choices and behavior, and looks at

23 risk avoidance, and there's huge -- lots of literature, people

24 prefer to avoid risk across a wide variety of environments.

25 And so, if the idea is, you have a ten percent chance of

Mullin - Cross/Maimon                                    116

1   winning a million dollars at trial, or you can get $100,000 for

2   free, from an economic perspective, that's the same thing as

3   betting $100,000 at ten-to-one odds.  People don't do that,

4   behaviorally, across a wide variety.  From an economic

5   perspective, they're better off taking the certain sum of the

6   expected value.

7   BY MR. MAIMON:

8   Q    And so you're speaking from an economic perspective;

9   right?

10  A    Correct.

11  Q    Because that's your area of expertise; correct?

12  A    Correct.

13  Q    Okay.  And you talk about horizontal equity; right?  And

14  that means treating similarly-situated people similarly; right?

15  A    Correct.

16  Q    Okay.  Who's the judge of whether or not two people are

17  similarly situated?

18  A    Those are typically negotiated across the parties in the

19  rules of the trust.

20  Q    You are not the arbiter of what two individuals are

21  similarly situated; are you?

22  A    Not myself personally, no.

23  Q    Okay.  And to -- horizontal equity eliminates a jury's

24  analysis of the individual circumstances of a specific, unique

25  human being; correct?

1  A    Eliminate, I think, is going a little too far.  You're not

2  -- so if you -- the same individual is going to -- if they go

3  to a jury trial, a jury will be empaneled.  If they went three

4  weeks later, they'd get a different jury.  Those two juries may

5  come to very different conclusions.  So you're not eliminating

6  the second jury because you went to the first, you're not

7  eliminating the first because you went to the second.  You're

8  getting one read from one group of jurors about an outcome for

9  that person that other jurors may give completely different

10 reads to.

11      And so it's, when you're saying eliminate, any settlement

12 context, yes, you're no longer pooling a jury and asking what

13 are they valuing that particular case at, that is correct.

14 Q    Well, most cases in the United States, most tort cases are

15 negotiated on an individual basis, correct, not on a mass tort

16 basis?

17 A    Well, by count, most are a mass tort.  So, on count, most

18 are actually negotiated in a mass tort framework because

19 there's a limited number of mass torts, which are a very large

20 fraction of the cases.

21 Q    Automobile accident cases, they negotiate them one at a

22 time; right, usually?

23 A    Typically, yes.

24 Q    Okay.  And what I'm asking you is, if you take all of them

25 and determine what the similarly-situated plaintiffs are and

Mullin - Redirect/Jones                    118

1  require horizontal equity, what you've done is you've

2  eliminated a jury's consideration and analysis of the

3  individual circumstances of specific, unique human beings;

4  correct?

5  A    If you create any type of master settlement framework

6  where people aren't going to a jury any longer, you're no

7  longer asking the jury that, that's correct.

8  Q    Correct.  And if you force that upon people and don't give

9  them the right to opt out, you've taken away their right to be

10 considered for their specific, unique human characteristics and

11 situations; correct?

12 A    If there's no jury trial option available, that would be

13 correct.

14 Q    Thank you.

15         MR. MAIMON:  Those are all the questions I have.

16         THE COURT:  Thank you.

17         Other counsel?  Redirect?

18         MR. JONES:  Very few, Your Honor.

19                    REDIRECT EXAMINATION

20 BY MR. JONES:

21 Q    Dr. Mullin, your accurate CV is attached to your opening

22 report, which I believe is Exhibit 64.

23 A    Yes.

24 Q    And it remains accurate and explains your academic and

25 other professional background as of today?

Mullin - Redirect/Jones                    119

1  A    I don't --

2             THE COURT:  I'm sorry, where is the CV?

3             MR. JONES:  It should be Appendix A to the --

4             THE COURT:  To his report?

5             MR. JONES:  His report.

6             THE COURT:  Oh, I'm sorry, it's in the initial

7  report.

8             MR. JONES:  Appendix A, curriculum vitae of Charles

9  H. Mullin, page A-1.

10 BY MR. JONES:

11 Q    Is it in your notebook, at least, Dr. Mullin?

12 A    Yes, it's D-64.74.

13            THE COURT:  Thank you.

14            MR. JONES:  Are you there, Your Honor.

15            THE COURT:  I am here.

16            MR. JONES:  All right, thank you.  I'm just asking

17 Dr. Mullin if it remains a true and accurate copy of his

18 curriculum vitae today, and his academic background and

19 professional experience.

20            THE WITNESS:  Yes.

21 BY MR. JONES:

22 Q    Thank you, Dr. Mullin.  And, Dr. Mullin, you have, as your

23 report indicates, testified before in matters in Federal Court

24 and Bankruptcy Court?

25 A    Correct.

Mullin - Redirect/Jones                    120

1  Q    And you have been qualified to so testify as an expert in

2  economic statistics and economic modeling?

3  A    Correct.

4  Q    A number of times?

5  A    Yes.

6  Q    Indeed, you testified in this courtroom, in this

7  courthouse, in February of '22 by report and by cross-

8  examination?

9  A    I'll trust you on the date, but, yes, I was in this

10 courthouse.

11 Q    And you testified in the Federal Bankruptcy Court in North

12 Carolina in the first iteration of this bankruptcy proceeding,

13 or in LTL 1, as people have referred to it over the last few

14 days, in or about October of '21 on issues similar to your

15 report here today?

16 A    Correct.

17 Q    And Judge Whitley qualified you to do so on that day, or

18 at least you were permitted to do so on that day?

19 A    Correct.

20 Q    And you frequently also testify on matters that relate to

21 the valuation of mass tort liabilities --

22 A    Correct.

23 Q    -- in Bankruptcy and in Federal Court?

24 A    Correct.

25 Q    And you frequently testify about the tools available in

Mullin - Redirect/Jones                      121

1  MDL proceedings, in the tort system more broadly, and the tools

2  available in bankruptcy to resolve mass tort liability from an

3  economics and statistical and economic modeling perspective?

4  A    Correct.

5  Q    And you have done that from time to time in Bankruptcy

6  Court at least?

7  A    Correct.

8  Q    And, sir, in your experience testifying on these matters

9  as an expert witness have you ever had your testimony either

10  stricken, to your knowledge, or have you ever been the subject

11  of a successful motion to disqualify you from so testifying, to

12  your knowledge?

13          THE COURT:  Wait, wait.  Don't answer.

14          MR. MAIMON:  I object, Your Honor.  Those aren't

15  binding on Your Honor.  Your Honor is the gatekeeper in this

16  court and what other courts have done is irrelevant.

17          THE COURT:  Objection overruled.  I understand.

18  BY MR. JONES:

19  Q    You may answer, sir.

20  A    I have been permitted to testify in all the prior

21  instances.

22  Q    Thank you, Dr. Mullin.

23      Dr. Mullin, you heard an earlier witness today discuss the

24  ACTOS case and you mentioned it briefly on cross-examination.

25  And in fact, I think at one point you were giving at least a

Mullin - Redirect/Jones                                    122

1  partial explanation of why the ACTOS lawyers, those

2  representing claimants in that case, may have been

3  disincentivized to file or pursue future claims.  Do you recall

4  that testimony, first from the earlier witness today and from

5  your own cross-examination a few moments ago?

6  A    Yes.

7  Q    Could you explain what you meant by what you said and

8  otherwise please react to the earlier witness' testimony?

9  A    So, to me, Professor Rave's description of both the ACTOS

10 matter and then opioids where there were disincentives for

11 attorneys to either bring future ACTOS claims or to represent

12 future municipalities as a way of curtailing the unknown future

13 claims, it curtails them by setting them to zero.  No one

14 represents them, so they don't come forward, which, as an

15 economist, is a very inequitable outcome.

16      And so while I took from his testimony this morning that

17 Professor Rave viewed that as a success story and that that

18 agreement resulted in very little, if any, ongoing ACTOS

19 litigation.  So the pending claimants and the defendant strike

20 a deal, and the future claimants don't get representation or

21 come forward.  That doesn't strike me as equitable as an

22 economist; you're setting to zero the value of future claims.

23      Setting future municipalities to zero by discouraging

24 people from representing them also doesn't strike me as

25 equitable.  You're getting inequitable outcomes across your

Mullin - Redirect/Jones                              123

1  future claimant group and your pending claimant group, as

2  Professor Rave described those two outcomes.

3  Q    Thank you, Dr. Mullin.

4       Dr. Mullin, you also heard mention earlier today -- you

5  were in the courtroom all morning?

6  A    Yes.

7  Q    And you also mentioned today the Aearo case, at least on

8  the examination of Ms. Birnbaum.  Are you familiar with the

9  Aearo case?

10 A    I am.

11 Q    And do you have a view about the Aearo case and its facts

12 and this case?

13 A    I have to be careful because I've got to just make sure I

14 don't say anything that's confidential in that.

15      So, as the key distinguishing factor in terms of latent

16 injury, there -- while there may be latent claims in Aearo, as

17 for active military there's stays on statute of limitations, so

18 there may be future claimants, there's not an argument of

19 latent injury.  So you don't have the late manifestation of

20 injury problem that you have here, and so that distinguishes

21 those two.

22 Q    Thank you, Dr. Mullin.

23      Back to ACTOS for a minute.  I think it was your view that

24 there would be discouragement of future claim pursuit; how is

25 that the case -- why is that the case?

1  A     So, as Professor Rave was describing it earlier today, he

2  said there were economic incentives or disincentives for

3  plaintiffs' counsel to represent future claimants were put into

4  those agreements.  I'm going to off of his testimony as he

5  described it this morning, those are not settlement agreements

6  that I have read.

7  Q     All right.  Thank you, Dr. Mullin.

8        At the end of one of your questions on cross-examination,

9  I think it was Mr. Silverstein, to my right, was inquiring of

10  you concerning your view about the superiority of the

11  bankruptcy system to the tort system in resolving claims like

12  talc claims, and he was questioning you about when in time or

13  on what date would it have been apparent that the bankruptcy

14  system was superior, and I thought you were trying to explain

15  an answer and did not proceed.  Could you explain the answer

16  now, if you care to?

17  A     So, while I wasn't asked to find a specific date and I

18  don't have a specific date as to when that transition occurred,

19  there -- in mass torts where there's a general causation

20  argument, playing out general causation through the tort system

21  and seeing if general causation can go to trial or not, in the

22  fact pattern where you believe you have a material chance of

23  winning that you can't establish general causation, resolving

24  that issue first makes complete sense because that could

25  potentially end the entire litigation in one fell swoop and

Mullin - Redirect/Jones                                    125

1  then you -- when the plaintiffs prevail on that issue, you've

2  passed over a hurdle that's a gate-keeping function to go

3  forward.  Now you have the tens of thousands of claims, now you

4  have the tens of thousands of potential future claims, and the

5  mechanism -- I think it was in Professor Rave's report, but I

6  may be confusing the two experts -- even talked about the fact

7  that there's that ability for a defendant to get a universal

8  victory, but not really an ability for a plaintiff to get a

9  universal victory in those early stages of the MDL.

10      So it makes sense to play that out.  In terms of the exact

11  timing of transition, I am aware that LTL was trying to attach

12  itself to the Imerys bankruptcy.  So it had already

13  transitioned to try to resolve it through bankruptcy -- not

14  through its own bankruptcy filing, but through attaching itself

15  to the Imerys bankruptcy, you know, that predates by a

16  substantial period of time the filing in 2021.

17  Q    Thank you, Dr. Mullin.

18      You were asked about an omitted paragraph or paragraphs

19  from your initial report regarding horizontal equity, I think

20  was the topic, and settlements, and I just want to make sure

21  that for His Honor that the record is clear.  Your opinions on

22  that matter are indeed contained in your rebuttal report; is

23  that fair?

24  A    Correct.  The substance of those appears in the rebuttal

25  report, that's correct.

Mullin - Redirect/Jones                    126

1   Q    Thank you.  It was a bit of housekeeping, I appreciate it.

2        Dr. Mullin, you were asked a time or two about the

3   percentage of cases that resolve without trial in the tort

4   system and I think your answer was that you could not disagree

5   with the view that it as 98 or 99 percent; do you recall

6   testimony or that inquiry, in any event?

7   A    Yes.

8   Q    And at one point I thought maybe the question moved from

9   resolved in the tort system to settled or that -- and I want to

10  ask you if those, in your view, are the same thing and what

11  that means for the percentage that you discussed with your

12  examiner.

13  A    Well, I generally use the term settled to mean settled

14  with payment, while resolved is the case is terminated for any

15  reason, which would include settlement, but could also include

16  dismissals without payment.

17  Q    Thank you, Dr. Mullin.

18       You heard others discuss today the NFL concussion case,

19  and you understand that case to figure prominently in the

20  reports of certain of the experts for the TCC or the claimants

21  in this case.  Both did you hear that testimony and am I right

22  about figuring prominently?

23  A    They both use it as an example.  I try to avoid adjectives

24  and adverbs, usually --

25  Q    All right.

Mullin - Redirect/Jones                    127

1 A    -- but they both use it as an example.

2 Q    I appreciate your willingness to constrain yourself.  Let
3 me ask you this question about that.

4      And I don't want you to, you know, unnecessarily repeat
5 testimony that His Honor has already heard, but your reaction
6 to that use, that is the use of the NFL concussion case, as an
7 example of -- in the reports of the experts that you reviewed
8 and heard testify today?

9 A    It's factually very distinct.  There's about 20,000 former
10 NFL players, the NFL knows exactly who they all are; they are
11 their former players from rosters, they know in general how to
12 contact them.  So your ability to identify and give notice is
13 fundamentally different than, you know, a product you buy on a
14 grocery store shelf in terms of who are the potential
15 claimants, and I think about one percent of them did opt out
16 after receiving notice.

17 Q    And you also heard mention this morning, earlier in the
18 morning of the asbestos MDL and testimony to the effect that
19 certain defendants, apparently, resolved both shortly after the
20 MDL was dispatched or maybe during it, and you have seen that
21 used as a comparator to this case in the reports of experts in
22 this case; am I right?

23 A    Yes.

24 Q    So you heard the testimony and you're aware of the
25 comparison?

1  A    Yes.

2  Q    And could you share with us your view of that comparison?

3  I think it's mentioned in your report, but could you share with

4  us your view of that comparison?

5  A    So the mesothelioma claimants in this are really a direct

6  extension of asbestos litigation.  The allegation is an

7  asbestos taint within the talcum powder that leads to the

8  development of the claimants' mesothelioma.  So it's just

9  another asbestos-containing product, like the myriad of

10  asbestos-containing products that have been through the history

11  of the tort now for going on half a century.

12      The ovarian cancer claims share very similar

13  characteristics with the long latency for disease potentially.

14  And so when you look at what's the most applicable analogy, to

15  me, it really is the asbestos shows the fact pattern and, while

16  that MDL is closed, the MDL didn't result in the termination of

17  asbestos litigation for any defendant in the MDL.  So it didn't

18  wrap up the tort, it just reverted back and they're all in

19  state court.

20  Q    And certain are not in the state court for other reasons;

21  is that right?  Certain of the defendants in that MDL are not

22  in state court or any court at this moment because they were

23  resolved otherwise; correct?

24  A    Well, so I think it's depending on how you want to count

25  an asbestos bankruptcy, people count them different ways, but

Mullin - Redirect/Jones                                    129

1  like the Crowell & Moring list that's up on their website

2  lists, I think, about 140 entities now that set up 524(g)

3  trusts as part of a bankruptcy reorganization.  Not all of them

4  went in necessarily because of asbestos liabilities as the

5  motivating filing, but many of those were explicitly because of

6  asbestos claims was the motivation for the filing.

7  Q    You were in the courtroom when one of the experts for the

8  claimants here mentioned notice of class-wide settlement as a

9  procedure through which unknown future claimants could be

10 apprised of a pending resolution; did you hear that testimony?

11 A    I did.

12 Q    And in fact the Judge inquired about notice.  Could you

13 share with us your views of notice in that setting for purposes

14 --

15      MR. SILVERSTEIN:  Your Honor, we've all given this a

16 lot of latitude.  At this point, Dr. Mullin, who's an

17 economist, is being asked about notice in class actions.  I

18 think we're well outside of his expertise and I object.

19      MR. JONES:  Your Honor, it involves the underpinnings

20 for his opinion about the extent to which, as a matter of

21 economics, one or the other resolution systems is more

22 efficient, and I'm asking the question for that reason.

23      THE COURT:  I'll sustain the objection.

24      MR. JONES:  All right.

25                         (Pause)

Mullin - Recross/Silverstein                    130

1                MR. JONES:  That's all I have, Your Honor.

2                THE COURT:  All right, thank you.

3                Any recross?

4                MR. SILVERSTEIN:  Yeah, very few, just to clear up a

5        few items.

6                          RECROSS-EXAMINATION

7        BY MR. SILVERSTEIN:

8        Q    First, Dr. Mullin, you're not disputing that at your

9        deposition you said 99 percent of mass tort cases settle;

10       right?

11       A    If that's what it says in my deposition.

12       Q    Well, you can turn to page 193 of your testimony, which is

13       Tab 1 in the black binder.  And let me know when you're there,

14       please.

15       A    Tab 1 in my binder?

16                THE COURT:  Tab A or --

17       BY MR. SILVERSTEIN:

18       Q    Page 193, Tab 1 of your --

19       A    It's not Tab 1.

20                THE COURT:  Yeah, it's either Tab A or B.

21                MR. SILVERSTEIN:  I'm sorry, A.  I apologize.

22                THE COURT:  And page 191?

23                MR. SILVERSTEIN:  193.

24                THE COURT:  193.

25                MR. SILVERSTEIN:  Oh, my --

1            THE COURT:  Tab B.

2            MR. SILVERSTEIN:  It's Tab B.

3            THE COURT:  Tab B.

4   BY MR. SILVERSTEIN:

5   Q    So let me know when you're there, Dr. Mullin.

6        You're not disputing that when you were asked about the

7   weight that you put on claimants not being able to exercise

8   their Seventh Amendment rights in bankruptcy, you testified --

9   when I asked you, "Hardly anyone avails themselves of a jury

10  trial, is that what you're saying?"

11       "We talked about this earlier, 99 percent settle."

12       That's what you said?

13  A    Yes.

14  Q    Okay.  Now, another point of clarification, in the Aearo

15  bankruptcy there were thousands of respirator claims alleging

16  silicosis and other diseases, including from exposure to

17  asbestos in that case, where there were latencies; correct?

18  A    I don't know the count.  My retention didn't cover the

19  respirator claims.  I'm aware the respirator claims were a part

20  of it and they would have latent injuries.

21  Q    And those claims were dismissed as part of the bankruptcy,

22  you understand that?

23       I'm sorry, the bankruptcy resolution of those claims was

24  dismissed with the rest of the bankruptcy?

25  A    Correct.

Mullin - Recross/Silverstein                    132

1  Q    With regard to <u>ACTOS</u>, future claimants were entitled to

2  hire lawyers to represent them if they developed illness;

3  correct?

4  A    Correct.

5  Q    Okay.  And you've given a lot of testimony about equity

6  from a law and economics perspective.  You would agree that

7  giving claimants the choice to decide whether to resolve their

8  claims or not is equitable; correct?

9  A    In an ideal world, when you have a hundred thousand

10 claims, there's a practical reality that, if all hundred

11 thousand elect the choice of wanting to try their case, it

12 can't -- the systems can't handle it.

13 Q    But we know that doesn't happen --

14 A    Well --

15 Q    -- because 99 percent settle; right?

16 A    Ninety nine percent across all torts eventually resolve

17 their cases without trial, correct.

18 Q    And that's what's likely to happen here?

19 A    I don't think you can draw that conclusion given the

20 litigation history that's gone on in this case.

21         MR. SILVERSTEIN:  No further questions.

22         MR. MAIMON:  Nothing further, Your Honor.

23         THE COURT:  All right.  Dr. Mullin, until this

24 afternoon, thank you, you may step down.

25         THE WITNESS:  Thank you.

Mullin - Recross/Silverstein                    133

1          THE COURT:  Perfect time for lunch.  Let's come back

2    and start by 1:15.

3          MR. JONES:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5                    (Recessed at 12:19 p.m.)

6

7              **C E R T I F I C A T I O N**

8          We, DIPTI PATEL, LIESL SPRINGER, and TRACEY WILLIAMS,

9    court approved transcribers, certify that the foregoing is a

10   correct transcript from the official electronic sound recording

11   of the proceedings in the above-entitled matter, and to the

12   best of our ability.

13

14   /s/ Dipti Patel_____

15   DIPTI PATEL

16

17   /s/ Liesl Springer_____

18   LIESL SPRINGER

19

20   /s/ Tracey Williams_____

21   TRACEY WILLIAMS

22   J&J COURT TRANSCRIBERS, INC.          DATE:  June 30, 2023

23

24

25