IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | Thursday, June 29, 2023 |
| Defendants. | . | PM SESSION |
| . . . . . . . . . . . . . . . | . | 1:16 p.m. |

TRANSCRIPT OF MOTION OF TO DISMISS THE SECOND BANKRUPTCY
PETITION OF LTL MANAGEMENT LLC

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:          Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES VIA ZOOM:

For the Debtor:                Jones Day
                               By:  GREGORY M. GORDON, ESQ.
                               2727 North Harwood Street, Suite 500
                               Dallas, TX 75201

                               Jones Day
                               By:  DAVID S. TORBORG, ESQ.
                               51 Louisiana Avenue, N.W.
                               Washington, D.C. 20001


For Ad Hoc Committee           Brown Rudnick
of Certain Talc                By:  JEFFREY L. JONAS, ESQ.
Claimants and Ad Hoc                W. LYDELL BENSON, ESQ.
Committee of Creditors:             MICHAEL WINOGRAD, ESQ.
                                    CAMERON MOXLEY, ESQ.
                               7 Times Square
                               New York, NY 10036

For the Ad Hoc Committee       Womble Bond Dickinson
of State Attorneys             BY:  ERICKA F. JOHNSON, ESQ.
General:                       1313 North Market Street, Suite 1200
                               Wilmington, DE 19801

For the Office of the          Office of the United States Trustee
United States Trustee:         By:  LINDA RICHENDERFER, ESQ.
                               J. Caleb Boggs Federal Building
                               844 King Street, Suite 2207
                               Lockbox 35
                               Wilmington, DE 19801

For Various Talc               Maune Raichle Hartley Frency &
Claimants:                       Mudd, LLC
                               By:  CLAYTON L. THOMPSON, ESQ.
                               150 West 30th Street, Suite 201
                               New York, NY 10001

                               Levy Konigsberg, LLP
                               By:  MOSHE MAIMON, ESQ.
                               101 Grovers Mill Road, Suite 105
                               Lawrence Township, NJ 08648

For Justin Bergeron            Cohen, Placitella & Roth, P.C.
and Others:                    By:  CHRISTOPHER M. PLACITELLA, ESQ.
                               2001 Market Street, Suite 2900
                               Philadelphia, PA  19103

Document    Page 3 of 159

3

APPEARANCES CONT'D:

For States of New Mexico     Gibbons, P.C.
and Mississippi:             By:  ROBERT K. MALONE, ESQ.
                             One Gateway Center
                             Newark, NJ 07102

For Paul Crouch,             Ruckdeschel Law Firm, LLC
individually and on          By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of          8357 Main Street
Cynthia Lorraine Crouch:     Ellicott City, MD 21043

For Johnson & Johnson        White & Case LLP
and Johnson & Johnson        By:  GREGORY STARNER, ESQ.
HoldCo (NA), Inc.:           1221 Avenue of the Americas
                             New York, NY 10020

For the Ad Hoc               Paul Hastings LLP
Committee of Supporting      By:  KRIS HANSEN, ESQ.
Counsel:                     200 Park Avenue
                             New York, NY  10166

                             Paul Hastings LLP
                             By:  WILLIAM K. WHITNER, ESQ.
                             1170 Peachtree Street, N.E., Suite 100
                             Atlanta, GA  30309

4

# INDEX

| WITNESSES | PAGE |
|---|---|

FOR THE DEBTOR:

SAUL BURIAN

| | |
|---|---|
| Direct Examination by Mr. Winograd | 6 |
| Cross-Examination by Mr. Torborg | 7 |
| Examination by the Court | 41 |
| Direct Examination by Mr. Winograd | 42 |
| Cross-Examination by Mr. Torborg | 63 |
| Redirect Examination by Mr. Winograd | 67 |

CHARLES H. MULLIN, Ph.D.

| | |
|---|---|
| Cross-Examination by Mr. Jonas | 75 |
| Cross-Examination by Mr. Winograd | 81 |
| Cross-Examination by Mr. Ruckdeschel | 103 |
| Cross-Examination by Mr. Maimon | 119 |
| Cross-Examination by Ms. Johnson | 147 |
| Redirect Examination by Mr. Jones | 151 |
| Recross Examination by Mr Winograd | 154 |

| EXHIBITS | | ID | EVD |
|---|---|---|---|
| 876 | Report | | 7 |
| 1112 | Report | | 7 |

1          THE COURT: All right.  We are ready to proceed.

2          MR. WINOGRAD:  Good afternoon, Your Honor.  Michael

3    Winograd, Brown Rudnick, for TCC.  Your Honor, the TCC calls

4    Saul Burian.

5          THE COURT: Good afternoon, Mr. Burian.

6          MR. BURIAN: Good afternoon, Your Honor.

7              TCC WITNESS, SAUL BURIAN, AFFIRMED

8          THE COURT: Thank you.  Please have a seat.  And

9    provide the Court with your name and business address.

10          THE WITNESS: Saul Elliot Burian.  245 Park Avenue,

11   New York, New York.

12          MR. WINOGRAD: Your Honor, may I approach?

13          THE COURT: Of course.

14          MR. WINOGRAD: Your Honor, I'm assuming this, I'm

15   assuming -- this is not your copy, is it?

16          THE COURT: No.  We can just leave it for -- there

17   will be a return with it.

18          MR. WINOGRAD: Your Honor, I don't know if it would

19   help the Court for us to do a 30, 60, 90 to introduce Mr.

20   Burian.  I know the Court already knows him, but I'll leave

21   that to Your Honor's discretion.

22          THE COURT: I'm well aware of Mr. Burian and his

23   qualifications and background.

24          MR. WINOGRAD: Okay.  Thank you, Your Honor.  May I

25   proceed?

Burian - Direct/Winograd                                6

1            THE COURT: Yes, please.

2                    DIRECT EXAMINATION

3    BY MR. WINOGRAD:

4    Q    Mr. Burian, I handed you a binder.  Could you just open it

5    up for a minute, please?

6    A    I have.

7    Q    And you see that there are two reports in there?

8    A    I do.

9    Q    And do you know what reports those are?

10   A    They look like my expert report delivered in June.  And my

11   rebuttal report, delivered later in June in this case.

12   Q    And are the opinions that you've expressed in there the

13   same opinions that you would have expressed had you given live

14   testimony on direct examination?

15   A    They are.

16            MR. WINOGRAD: All right.  Your Honor, given the

17   agreements by the parties, I'd like to move those two reports

18   into evidence.  I believe they're Exhibits 876 and 1112.

19            THE COURT:  Any objection?

20            MR. GORDON: No objection.

21            THE COURT:  Both exhibits are accepted into evidence.

22   Thank you.

23            (Exhibits 876 and 1112 admitted into evidence)

24            MR. WINOGRAD: Thank you, Your Honor.

25            MR. TORBORG: Good afternoon, Your Honor.

Burian - Cross/Torborg                              7

1              THE COURT: Good afternoon.

2              MR. TORBORG:  David Torborg, Jones Day, on behalf of

3  the Debtor.  May I proceed with some items?

4              THE COURT:  Yes, please.

5                        CROSS-EXAMINATION

6  BY MR. TORBORG:

7  Q    Good afternoon, Mr. Burian.

8  A    Good afternoon.

9  Q    I've provided you with a tab binder, with a handful of

10 documents I may use today.  We'll also be showing the

11 documents, and perhaps other materials on the screen.  You

12 might find it easier to follow along with the screen.  But feel

13 free to use the binder.  It's your choice.

14             Mr. Burian, it is your opinion that LTL 2.0 is just

15 the latest step in a single integrated transaction that began

16 with the divisional merger of Old JJCI to LTL's first

17 bankruptcy, correct?

18 A    Yes.

19 Q    Likewise, in the expert report you submitted in 2022, you

20 opined the division merger of Old JJCI, the 2021 Funding

21 Agreement, and the filing of the initial bankruptcy, were all a

22 part of a single, preplanned, integrated transaction.  Correct?

23 A    Yes.  So, that was clearly all preplanned at the same time

24 as the LTL 2 was a reaction to the intervening events.  So,

25 it's not the same as the first question as to whether LTL 2 was

Burian - Cross/Torborg                                           8

1  part of a preplanned transaction.  I believe it's part of a

2  continuation plan.  I think I said in my deposition, in the

3  NBA, of trying to manufacture a bankrupt, in order to deal with

4  Talc separate from the Holdco operating assets.

5  Q    Is the answer to my question, yes?

6  A    The second question, the answer is yes.  The first

7  question I provided an explanation.

8  Q    Behind Tab 10 is your 2022 Report?

9  A    I think I have it now in two different binders, so I'll

10 look.  But --

11 Q    This is the 2022 Report.  Specifically slide seven.

12 A    This is one from LTL 1, you're saying?

13 Q    Yes, sir.

14 A    Okay.

15 Q    Okay.  Are you at slide seven?

16 A    I will momentarily.  I am there.

17 Q    You wrote beside Number 1, "The LTL transaction is a

18 single, preplanned, integrated transaction comprised of five

19 related interdependent steps."  That was your opinion in 2022,

20 correct?

21 A    Correct.

22 Q    And if you go to pages 9 and 10 of that same document,

23 these slides show the five interdependent steps, correct?

24 A    Yes.

25 Q    And that includes the divisional merger, the execution of

Burian - Cross/Torborg                                    9

1  the funding agreement, and the filing of the LTL 1.0

2  bankruptcy, correct?

3  A     There were two other steps, but yes.

4  Q     Thank you.  When you testified at the 2022 motion to

5  dismiss hearing, at the divisional merger of Old JJCI, the 2021

6  Funding Agreement, and the filing of the initial LTL bankruptcy

7  were all interdependent steps, correct?

8  A     Yes.

9  Q     It was your opinion that the company would not have done

10 any one of those steps without also doing all of the other

11 steps, correct?

12 A     Yes, they were a package.

13 Q     And that means, in your view, that the 2021 Funding

14 Agreement would not have existed if not for the division merger

15 of Old JJCI and the LTL 1.0 bankruptcy, correct?

16 A     Yes.

17 Q     Mr. Burian, if you could go back to Tab 1 in the binder,

18 that is your expert report, your first expert report in this

19 matter.  This matter referring to LTL 2.0.

20 A     Okay.

21 Q     If you forward to slide 14 for me.

22 A     I am there.

23 Q     Now, this slide is titled, J&J's and LTL's Financial

24 Engineering deprived claimants of access for approximately

25 $42.5 billion dollars in value.  Did I read that right?

Burian - Cross/Torborg                    10

1  A    Yes.

2  Q    Okay.  And according to your report, Step 1 of this

3  financial engineering was to transfer the Consumer Health

4  Business, correct?

5  A    Yes.

6  Q    When you wrote this report, and you rendered this opinion,

7  you had no proof that the transfer of the Consumer Health

8  Business to Holdco's Parent in 2023 was in, any way, connected

9  with a plan to deprive claimants of access to value.  Correct?

10 A    Correct.  I talked about the affect of the transfer not

11 the motivation, at the time.

12 Q    Okay.  So, the answer to my question is, correct.  Yes,

13 right?

14 A    It was yes, with an explanation.  So it wouldn't be

15 misleading.

16 Q    And if we go to slide 16, so two slides forward, the title

17 of this slide is also titled, J&J's LTL's Financial Engineering

18 deprived claimants of access of approximately $42.5 billion

19 dollars in value.  Did I read that right?

20 A    Yes, it's the same header on the page as what you read

21 before.

22 Q    And Step 2 of the alleged financial engineering is the

23 replacement of the funding agreement, correct?

24 A    Correct.

25 Q    When you wrote this report, and you rendered this opinion,

1 | you were not aware of any evidence that Step 1 and Step 2 were

2 | connected.  Correct?

3 | A    I think it's evident that it was designed at the same

4 | time, and connected that way.  Or that the results were

5 | connected.  It was the idea that the replacement of the Funding

6 | Agreement, the transfer of the assets without any inter-company

7 | claim or value back to Holdco is connected to the transfer of

8 | the assets.

9 |     So, you're using the word broadly.  They were connected.

10 | When you say do I have evidence that someone sat down, and at

11 | the time of the transfer from Holdco, knew, or thought that

12 | this engineering would be necessary for LTL 2.0, my

13 | understanding is, the Third Circuit hadn't ruled yet.  So that

14 | they were not, they may not have been preplanned.  But they

15 | were connected.

16 | Q    Mr. Burian, if you go behind Tab 2, there's a copy of your

17 | transcript.  And specifically if you go to page 224.

18 | A    Page what, sir?

19 | Q    224.

20 | A    I am --

21 | Q    Line 18.

22 | A    -- almost there.  I'm having trouble turning pages.  I

23 | apologize.

24 | Q    It's okay.

25 | A    224, line 18?

Burian - Cross/Torborg                                    12

1  Q    Yes.  I asked, "Okay --", bad habit of mine, "are you

2  saying that Steps 1 and Steps 2 are connected?"  Answer, "I

3  told you before we had this conversation that I don't know if

4  they were connected.  I hope not.  But it's pretty suspicious.

5  But I don't have evidence of that, one way or the other."  Is

6  that your testimony, sir?

7  A    Yes, this is consistent with what I just said, which is, I

8  don't have evidence it was preplanned at the time of the

9  transfer.  Clearly, however, at the time of the modification

10 and Funding Agreement, the Third Circuit decision was known,

11 and the transfer was known, and the impact on creditors was

12 known.  So, in that respect it's connected in a plan to

13 deprive, potentially deprive people of value.

14 Q    Mr. Burian, if you can answer my questions yes or no.  I

15 just asked you, was that your testimony.  All you have to do is

16 say yes.  Unless I read it wrong.

17         THE COURT:  Mr. Winograd?

18         MR. WINOGRAD:  Your Honor, in addition to the

19 argumentativeness, I would ask for Mr. Torborg to just

20 completely read what he read from.  If he just didn't stop in

21 the middle of the sentence.  There's a clause right after the

22 comment that says, "But I am discussing the impact of these two

23 steps, these two activities that denied LTL and Holdco the

24 value of the Consumer Health Business, which I think is what

25 Mr. Burian just testified to.

Burian - Cross/Torborg                      13

1  Q    Mr. Burian, directing you back to your expert report, Tab

2  1, specifically slide 3.  4, I'm sorry.

3  A    Slide 4?

4  Q    Yes, sir.  Are you with me, sir?

5  A    I am.  The scope of the report?

6  Q    Yes, sir.  This sets forth the stated scope of your

7  report, correct?

8  A    Yes.

9  Q    And your report reports to address, among other things,

10 whether LTL was in financial distress the time it filed for

11 bankruptcy on April 4th, 2023.  Correct?

12 A    Yes.

13 Q    Okay.  You believe the two most obvious metrics of

14 financial distress are whether a company is insolvent, and

15 whether on a cash flow basis it can meets its' obligations.

16 Correct?

17 A    In part.  I think we discussed in my deposition that I

18 look at those two very important criteria, and analyze the

19 facts and circumstances of the impact on the underlying

20 business.  They're not just hanging out there on their own.

21 They're most relevant.

22 Q    Okay.  LTL's liabilities are talc related liabilities,

23 correct?

24 A    I've been told that.

25 Q    Now, Mr. Burian, you do not have any experience estimating

Burian - Cross/Torborg                                    14

1  the value of asbestos related personal injury claims, correct?

2  A    I am not a claim's evaluator.

3  Q    Okay.  And you would not consider yourself an expert in

4  evaluating personal injury claims relating to talcum powder

5  use, correct?

6  A    Correct.

7  Q    For purposes of your expert report, you did not

8  independently perform or provide any opinion on the estimate of

9  LTL's liability for talc claims.  Correct?

10  A    I did provide an analysis of opinions provided by others

11  with respect to whether they appeared to be exaggerated or not.

12  Certainly within a narrow time frame.  But I did not provide an

13  independent valuation or estimation of the talc liabilities

14  themselves.

15  Q    And your additional report does not include any estimate

16  of LTL's talc liability, whether performed by you, or anyone

17  else.  Correct?

18  A    I believe you are right.  I know we talked about the

19  company's estimates.  I don't remember sitting here, if it's in

20  this report, or the rebuttal report.  I'm happy to take your

21  representation of that.

22  Q    Well, you don't recall, in your first report, referencing

23  any estimate.  Correct?

24  A    Sitting here right now, I don't remember if that's in my

25  first report, or second report.

Burian - Cross/Torborg                    15

1  Q    Very good.  Mr. Burian, you're aware that the TCC retained

2  FTI Consulting and the Brattle Group as professional advisors

3  in LTL 1, correct?

4  A    I am aware.

5  Q    Okay.  And one of the reasons they were retained was to

6  perform claims estimation work on the LTL talc claims, correct?

7  A    I'm not sure.

8  Q    What you do know is Houlihan Lokey was not engaged to do

9  that work for LTL 1, correct?

10  A    Correct.

11  Q    Mr. Burian, if you would go to Tab 5 in your binder --

12        MR. TORBORG: For the record, this is FTI's Interim

13  Fee Application for the period June 1, 2022 through September

14  30th, 2022.  It's Debtor's Exhibit 544.

15  Q    Mr. Burian, if you would go to, there's a, should be a

16  post-it note to assist you in getting to the page I'd like to

17  ask you about.  Are you there?

18  A    The post-it note appears to be on Paragraph 33?

19  Q    Yes, sir.

20        MR. WINOGRAD: Your Honor, I would object.  This is an

21  Interim Application filed by another entity.  And it appears

22  from the tab that Mr. Torborg intends to ask this witness about

23  what was filed by another entity.

24        THE COURT: Well, let's see what the question is.

25  Thank you.

Burian - Cross/Torborg                          16

1  Q    If you go to the bottom of the page, there's a code 28,

2  talc estimation, 3,728.9 hours.  Do you see that?

3  A    Yeah, that's right before Paragraph 33.

4  Q    Yes.  And then Paragraph 33 says, "During the third

5  interim period, the applicant reviewed and analyzed historical

6  trust distribution procedures, asbestos trust personal injury

7  questionnaires and verdicts, to assist the Committee in

8  understanding the debtor's talc liability.

9       The applicant also conducted research and prepared various

10 analysis regarding future talc claims in connection with the

11 debtor's talc liability.  The applicant also spent time

12 preparing presentations for the Rule 706 Expert and the

13 Committee, regarding the debtor's current and future talc claim

14 estimates, as well as comparing statistical models in

15 connection with the forecast of future claims."  Do you see

16 that?

17 A    Yes, future talc claims.  But yes, I see that.

18      Q    Okay.  Thank you.  Your report did not address or

19 consider the talc liability estimation work that FTI had spent

20 at least 3,728.9 hours performing on behalf of the TCC,

21 correct?

22 A    I do not reference FTI's work.

23      Q    Okay.  Now --

24      MR. WINOGRAD: Your Honor, I object again.  I don't, I

25 don't understand the line of questioning.  He's asking about --

Burian - Cross/Torborg                    17

1  There's no foundation for this document.  It's a document that

2  was filed with the Court by another company.  And I don't

3  understand the line --

4          THE COURT:  And it's not being offered for the truth

5  of the -- It's whether he's aware that they did work, and did

6  his report reference it.

7          MR. WINOGRAD:  If they did work.

8          THE COURT:  Well, he can answer that.

9          MR. WINOGRAD:  Okay.

10         MR. TORBORG:  Thank you, Your Honor.

11         THE WITNESS:  -- answer --

12         THE COURT:  That's the ruling.

13         MR. TORBORG:  I missed the exchange.  I missed that.

14 BY MR. TORBORG:

15 Q    The Rule 706 expert was Mr. Feinberg, correct?

16 A    I know Mr. Feinberg was retained by the Court to estimate

17 talc related liabilities.  I'm not familiar with what Rule 706

18 refers to.  So, I don't know that that's Mr. Feinberg.  But

19 again, I'm happy to take your word for it.

20 Q    I thought you were a lawyer.  I thought you might know

21 that.

22 A    I haven't practiced in 22 years.

23 Q    Fair enough.  You had multiple meetings with Mr. Feinberg,

24 correct?

25 A    Obviously they were not that memorable, since in my

Burian - Cross/Torborg                        18

1  deposition I only remembered one or two of them.  But I had

2  multiple meetings with Mr. Feinberg.

3  Q    If we could go to the next tab, Tab 6.  Mr. Burian, for

4  the record, this is a Fee Application from the Brattle Group

5  for the same period of time, June 1, 2022 through September 30,

6  2022.

7        MR. TORBORG:  For the record, it's Debtor's Exhibit

8  543.

9  Q    If you would got to the third page of the document.  At

10  the top it's titled, Section 2, Summary of

11  Services.  Do you see that?

12  A    There are no page numbers, but you have a sticker.  And

13  opposite the sticker, by paragraph 14 -- Is that what you're

14  directing me to?

15  Q    Not at first.

16        THE COURT:  Oh, okay.

17  Q    I'm going to go with -- If you just flip to the next page.

18  Flip that page, and it will be the one on your right.

19  Subsection 2 at the top.

20  A    The next page says, Compliance with Guidelines and

21  Conclusion.

22  Q    That's unfortunate.  Are we on slide -- Are we on Tab 6?

23  A    Yes.

24  Q    Okay.

25  A    Just tell me what paragraph number.  There are paragraph

Burian - Cross/Torborg                    19

1  numbers.

2  Q    You have to go back to the beginning.

3         THE COURT: Go to page --  Start at the beginning.

4  Q    Back to the beginning.  There's a chart there.  If you

5  look at the screen it might just make this easier.

6  A    Oh.

7  Q    If you want to.

8  A    But you don't know where that comes from.  That makes me

9  nervous.  So, Brattle's Monthly Fee Statements?

10        THE COURT:  No, no.  Go to your first page.

11        THE WITNESS:  First page.

12        THE COURT:  That's not -- Nope.

13        THE WITNESS:  Oh, first -- This page?

14        THE COURT:  Yes.

15        THE WITNESS:  Okay.

16        THE COURT:  Now, turn the first page.

17        THE WITNESS:  Okay.

18        THE COURT:  On the right.  Right there on your right.

19        THE WITNESS:  I am there.  Thank you.

20        MR. TORBORG:  There.

21        THE WITNESS:  I went to your sticker.  I thought we

22  were so prepared.

23        MR. TORBORG:  I thought you told me you were a

24  certified skipper.

25        THE WITNESS:  A skipper.

1          MR. TORBORG:  At deposition.  I thought you would be

2    able to navigate these things.

3          THE WITNESS:  That's why I skipped these pages.

4          MR. TORBORG:  Okay.

5    BY MR. TORBORG:

6    Q    So, the largest item down there is, hours wise, is

7    Research and Analysis, 747 hours.  Do you see that?

8    A    I do.

9    Q    Okay.  Now, if you go where the sticky is, Paragraph 17 --

10   A    I'm there.

11        Q    Okay.  Under the section, Research and Analysis, it

12   states, "This category reflects time spent analyzing the number

13   in value of ovarian cancer claims in connection with the

14   debtor's talc liabilities."  Do you see that?

15   A    I do.

16        Q    Okay.  Now, did your report address or consider the

17   talc liability estimation work that the Brattle Group did on

18   behalf of the TCC?

19        MR. WINOGRAD:  Your Honor, I would object.  That's

20   not what was just read.  Notwithstanding the fact that this,

21   again, is not Mr. Burian's documents.  It does not say that

22   there was an estimation.  It says there was time spent

23   analyzing, very different.

24        THE COURT:  Rephrase the question.

25   Q    Mr. Burian, did your work in this matter review any of the

1  work that the Brattle Group had done on analyzing the number in

2  value of ovarian cancer claims?

3  A    No.

4  Q    Thank you.  When you were asked to evaluate whether LTL

5  was in financial distress, counsel for the TCC did not provide

6  you with any of the work that FTI or the Brattle Group had done

7  on claim's estimation in LTL 1, correct?

8  A    Correct.

9  Q    And we didn't ask you that either, correct?

10  A    I don't remember if I did or didn't.  But I don't have it.

11  And I didn't use it.

12  Q    So, you didn't think to yourself, hey, didn't we spend

13  like 4,000 hours in LTL 1 estimating talc claims?  Maybe I

14  should look at that when I'm supposed to do a report on

15  financial distress.  Not something you thought of?

16         MR. WINOGRAD:  Your Honor, objection.  He just said

17  is this, that we spent all of this time.  I'm not sure if royal

18  rule, but I object.

19         THE COURT:  Sustained.  Were you aware of the time

20  spent?

21         THE WITNESS:  No.

22         THE COURT:  By either of those entities?

23         THE WITNESS:  Correct.

24         THE COURT:  Okay.  You weren't aware of any of the

25  time spent?

Burian - Cross/Torborg                                    22

1          THE WITNESS:  If you're asking me if I knew they

2    spent 4,000 hours, Your Honor. I had no idea.

3          THE COURT:  But you did know --

4          THE WITNESS:  I know that they were retained to look

5    at issues in preparation, or in some manner, with the work that

6    was done by the Rule 704 expert.  I knew that.  But I don't

7    know what the product was.  I never saw anything of them.  And

8    to the best of my knowledge, there is no estimation or final

9    document.  I just don't know.

10   BY MR. TORBORG:

11   Q    You do recall being provided in the court, from FTI, on

12   claim's estimation, which you opened, started to peruse, and

13   then decided it had nothing to do with your work.  Correct?

14   A    What I said in my deposition, and remains true, that I do

15   remember that there was a call about trust mechanics and other

16   items, where FTI had done a presentation regarding claims.  And

17   I dropped off after a few minutes, because it wasn't something

18   to do with me.  I'm not even sure what the topic of that report

19   was.  I joined thinking it was a plan call, and not about

20   estimation of claims call.

21   Q    Okay.  And if it was a plan call, you would have stayed

22   around, because you were involved in planning, correct?

23   A    I was actively involved in trying to find a solution to

24   this mess.  And therefore understanding the different planned

25   dynamics were important.  I was also active in some portions

Burian - Cross/Torborg                                    23

1  of, as I still am today, in some portions of what would be a

2  TCC plan.  But I would not be involved in things like

3  estimation of torte claims.

4  Q    Okay.  You do recall seeing some proposed values of talc

5  related claims from the Imerys case, correct?

6  A    I think I testified, and it still remains true, that

7  someone has been talking about what the Committee, TDP, looked

8  like in Imerys, in a plan that was never confirmed.

9       And I said that was the extent of my knowledge or

10 participation in that issue.  I'm not sure if you're --  I'm

11 not sure that rises to the level of being aware of any analysis

12 of claim events.

13 Q    So, have you seen amounts regarding the value of claims,

14 correct?  From Imerys?

15 A    One more time.  I have not seen amounts.  I've seen a TDP

16 that was filed in the Imerys case by the TCC, that had a whole

17 grid with some numbers in it that someone told me, at one

18 point, that there was, for the highest level, there was X

19 amount that might be due.

20 Q    If you would go to page 129 of your transcript, which

21 again, is Tab 2.

22 A    Page 129 of the transcript?

23 Q    Yes, sir.

24 A    I am there.

25 Q    Okay.  I asked you, starting at line 18, "Okay, do you

1 recall just knowing what the general number was, regardless of

2 what you saw at presentation?"  Answer, "I mean, number of

3 claims, we talked about before.  Value of claims, I've seen.

4 You know, I've seen the Imerys Grid.  Never got confirmed.

5 I've seen other things.  I've seen all the work that Mullin

6 did.  So, I guess I've seen book ends of the value of claims,

7 but I don't have any special knowledge or information that J&J

8 doesn't have."

9 A    Thank you.

10 Q    Was that your testimony?

11 A    Yes.  And it's still accurate.  I forgot when answering

12 your question that I read the Mullin report.  And the Mullin

13 report has an estimate of claims in the report.  So, I guess

14 and cross references Imerys.  So in that regard, it's another

15 data point that I've had regarding Imerys.

16 Q    For your work in this case, you did not use any of the

17 Imerys values, or anything else you saw, in evaluating whether

18 LTL was in financial distress.  And I'm speaking of your

19 initial report.

20 A    So, just to be clear, you're asking me if I used a draft

21 TDP in a plan that was never confirmed, that I only saw

22 briefly, in an expert report in this case?

23 Q    That's what I'm asking, yes.

24 A    As you can tell from the tone of voice, no, I didn't.  And

25 nor would I.

Burian - Cross/Torborg                    25

1  Q    Okay.  You were happy just to rely on the Debtor's expert

2  on the valuation of claims, correct?

3  A    We knew the Debtor was going to do an estimate.  And we, I

4  did not do one on my own.

5  Q    Now, Mr. Burian, you are aware that the TCC is preparing,

6  or has prepared a plan of reorganization.  Right?

7  A    Yes.

8  Q    Okay.  No one has shared with you any of the terms of that

9  plan, including any proposed claim values of the type that you

10 saw in the Imerys case, correct?

11         MR. WINOGRAD:  Your Honor, I would just caution the

12 witness not to answer to the extent that anything is

13 privileged.  Although I think this would be civil

14 A    You said any.  And then you said including.  Just to be

15 perfectly clear, I have discussed terms of a plan of

16 reorganization, but none that relate to the value of individual

17 claims or a TDP Grid.

18 Q    Okay.  So, if there is a TDP Grid, or a schedule of

19 values, you haven't seen it.  Correct?

20 A    Not yet.

21 Q    Did you hear anyone say that it exists?

22 A    I don't know.

23 Q    So again, Mr. Burian, you did not conduct a valuation of

24 talc claims in evaluating financial distress, correct?

25 A    Correct.

Burian - Cross/Torborg                                    26

1  Q    And in you initial report, you did not perform any

2  independent cash flow analysis to evaluate whether LTL was in

3  financial distress.  Correct?

4  A    What I said at my deposition is that we didn't do a full

5  blown cash analysis of Holdco.  But obviously my report has

6  cash flow materials regarding subsidiaries of Holdco and

7  Holdco, itself.  As well as LTL.  But we didn't put that all

8  together and make our own independent forecast.

9       Q    Fair.  Thank you.  Now, you submitted a rebuttal

10  report in this matter.  Correct?

11  A    I did.

12      Q    And in that report, you made certain changes to the

13  assumptions made by Dr. Mullin and Dr. Bell, correct?

14  A    I --

15  Q    You made those changes?

16  A    When you say, made, I didn't go into their model and

17  change it.  I did illustrate what those modifications, the

18  impact of what those modifications would be.

19  Q    Now, with respect to Dr. Mullin, you had what you

20  characterized as some minor criticisms, correct?

21  A    It's up to the Court to determine whether they're minor or

22  major.  I have a list of four or five items, which we can

23  review.

24  Q    Well, at your deposition you told me you had some minor

25  criticisms.  Right?

Burian - Cross/Torborg                           27

1  A    What I was referring to is, we do not dispute the bulk of

2  the work done by Dr. Mullin regarding his valuation of the

3  claims, his statistical analysis of the claims, his attribution

4  of future claims.  Though most of the, my judgement, most of

5  the work by Dr. Mullin really isn't in those areas.

6      The areas that we did discuss were not directly related to

7  the value of the underlying torte claims.  And that's why I

8  called those minor versus major.

9  Q    Okay.  You'll have an opportunity to elaborate when Mr.

10 Winograd asks you some questions.  But do you recall referring

11 to your criticisms of Mr. Mullin's assumptions to be minor

12 criticisms?

13 A    Only directly to the question you asked me a few minutes

14 before.

15 Q    Okay.  Now again, you're not an expert in the estimation

16 of asbestos related personal injury claims, correct?

17 A    This may be the fourth time you asked me.

18 Q    Second.

19 A    Um no, I think it's the fourth.  I've been counting how

20 many times you've asked that, and how many times I say yes or

21 no to a question.  I want brownie points at the end.

22 Q    And, in fact --

23 A    Well, let me answer the question.

24      THE COURT:  Is it going to differ from the other

25 three times?

Burian - Cross/Torborg                              28

1              THE WITNESS:  No.  But I'm entitled to say, correct,

2    one more time, and get brownie points for saying yes or no, or

3    correct or not correct.

4    Q    And you have no material experience in asbestos related

5    tort litigation, correct?

6    A    Correct.

7    Q    Okay.  You do take issue with Dr. Mullin's assumption that

8    LTL could face up to a hundred trials a year, right?

9    A    Absolutely.

10   Q    Okay.  And you have not done an independent assessment of

11   the number of talc related claims, or trials, excuse me, LTL

12   could have faced if it hadn't filed a second bankruptcy case,

13   correct?

14   A    You need to define assessment for me.  I've listened to

15   the court hearings, proceedings in this courtroom.  I've read

16   representations by the Debtor.  And I've listened and carefully

17   considered arguments in other cases I've been involved in where

18   debtors have had strong views about how many cases they can

19   litigate simultaneously.  I don't know if that rises to a level

20   of assessment in your mind, or not.

21   Q    You didn't speak with any lawyers representing members of

22   the TCC for their views about how many trials could occur on an

23   annual basis, correct?

24   A    Yes and no.  The answer is, I've not specifically spoken

25   to a tort claimants members about that issue.

1  Q    Okay.  And you didn't read Mr. Birchfield's testimony,

2  when you submitted your rebuttal report.  Correct?

3  A    No.

4  Q    Okay.  In the case of Dr. Mullin's assumptions, all of the

5  changes that you made serve to decrease the near term costs of

6  talc litigation.  Correct?

7  A    Yes.

8  Q    If you'd flip to Tab 12.

9  A    Can I just go back and make sure that that's right?   I

10 think that's right.  I'm not one hundred percent positive

11 that's right about the fourth and fifth one, if you turn to

12 page 11 in my rebuttal report.  It probably has the same

13 impact, but I want to be clear.  Because I want to be clear.

14     Allocation of liability is not served as a modification

15 regarding reduction of liability.  Frankly, in light of J&J's

16 exposure to punitive damages, it could increase the liability.

17 So, we just point out that there's no allocation.  I'm not sure

18 that's fair to say that's an increase or decrease.

19     With respect to settlement values, I do point out that Dr.

20 Mullin claims that his estimates -- That would also be a

21 decrease.  He claims they're high.  And I point that out.  So,

22 I guess you're right.  That one we don't increase the

23 allocations.  So, the last one is not necessarily a decrease.

24 In some respects it could be an increase.

25 Q    In terms of the way that you ran the numbers, you don't

Burian - Cross/Torborg                    30

1  know how it came out.  Right?  When you ran your new analysis?

2  You talk about, in your rebuttal report, you don't know if it

3  increased or decreased the amount of yearly spending.  As you

4  sit here today?

5  A    Again, ignoring the allocation of liability as to J&J's

6  portion of it, we treated the liabilities monolithic, as if

7  they're all LTL's, which is probably not true.  We pointed that

8  out, to be clear, that we were trying to limit issues in

9  dispute.  And even under those analysis, there's no financial

10 distress.

11      But ignoring that issue, because I want to be clear, the

12 other modifications I made decrease the liability.

13 Q    Let's go to Tab 12.

14          THE WITNESS:  It was the sanitizer, not the Bible,

15 Your Honor, that fell.

16 Q    Let me know when you're there.

17 A    I am there.  That looks like a plan of reorganization for

18 Imerys.

19 Q    Yes, sir.  Can you go to the last page?  This is an

20 excerpt.

21          MR. TORBORG:  For the record, this is an excerpt of

22 Debtor's Exhibit 493.  In the interest of saving paper, and

23 getting these in the binder that I could carry, we just have

24 the pages.

25          THE COURT:  There are additional pages.  The Court

1  accepts.

2          MR. TORBORG:  Yes.

3          MR. WINOGRAD:  Your Honor, may I just ask, I just --

4  Is this the entire, at least the entire section that's on here?

5  It's hard to tell if this is the end of the section.  Just that

6  it ends with a table.

7          MR. TORBORG:  I believe it is.  But I can't

8  (indiscernible) --

9          MR. WINOGRAD:  Is there --

10         MR. TORBORG:  I don't have a, I don't have the full

11 copy here right now.

12         MR. WINOGRAD:  Is there a way to confirm that?  I

13 mean, it's difficult to -- It's difficult to look at a chart.

14         THE COURT:  Well, let me hear what the question is

15 before we go through that exercise.

16         MR. TORBORG:  Yes, it's not going to be material to

17 the question.

18 BY MR. TORBORG:

19 Q    So, this has a, what you're looking at is what you refer

20 to as a TDP Grid.  Right?

21 A    There's no label on this.  But that's what it looks like.

22 Q    And when you did your adjustments to Dr. Mullin's

23 assumptions, including the settlement values, you didn't

24 consider putting some of these values in your rebuttal report.

25 Correct?

Burian - Cross/Torborg                                    32

1  A    The question makes no sense.  I can't answer yes or no.

2  Since I made no adjustments to Dr. Mullin's settlement values.

3  Q    Right.

4  A    Just make sure I understand the question.  I did not

5  change any of Mr. Mullin's analysis about his estimation of

6  underlying claim settlement values.

7  Q    You could have done that.  But you didn't, correct?

8  A    It sounds like you want me to be damned if I do, or damned

9  if I don't.  But no, I don't think I'm qualified to have done

10 that.

11 Q    Okay.  And with respect to your changes to Dr. Bell's

12 assumptions, all of your adjustments to cash inflows serve to

13 increase cash flow.  Correct?

14 A    Yes.

15 Q    Okay.  One of your adjustments is to assume that a $1.8

16 billion dividend issued by G.H. Biotech in 2022 would make its'

17 way up to Holdco in 2023.  Correct?

18 A    It was illustrative.  But yes.

19 Q    But you don't pretend to know that this dividend will, in

20 fact, be paid to Holdco in 2023.  Correct?

21 A    That's beside the point.  But correct.

22 Q    Right.  Can you go to --

23 A    The chart does not say it will be received.  Nor does the

24 chart represent that I know it will be received.  The chart is

25 illustrative as to the ability of Holdco to receive cash.

Burian - Cross/Torborg                                          33

1  Q    Back to your --

2          THE COURT:  The process will be smoother if we just

3  stick to yes or no to answer the question.

4  Q    Go to Tab 7, Mr. Burian.

5  A    This is in your binder still?

6  Q    It is in my binder.  Yes, sir.  Rebuttal Report.  You can

7  use the other one if you'd like.  It doesn't matter to me.

8  A    I'm on Tab 7.  And my rebuttal report in this LTL 2.0.

9  Q    Okay.  If you'd go to slide 26.

10 A    Yes.

11 Q    The second to last bullet, you wrote, "Bell admits that

12 four one hundred percent Holdco owned operative subsidiaries

13 are expected to generate an average of $302 billion in cash

14 flows for each of the next five years, and pursuantly beyond."

15 Do you see that?

16 A    I do.

17 Q    Okay.  Now, Dr. Bell's scenarios do include future cash

18 flow with respect to these wholly owned subsidiaries, correct?

19 A    They do.

20    Q    Mr. Burian, you believe a company can be insolvent

21 from a balance sheet perspective, but still not be in financial

22 distress, correct?

23 A    Correct.

24 Q    The likelihood, extent, and uncertainty of threatened

25 litigation would not be a factor you'd consider in assessing

Burian - Cross/Torborg                        34

1  whether a company is in financial distress.  Correct?

2  A    Standing alone, just because a company faces litigation,

3  and may be hard to value is not an independent factor of

4  financial distress.

5  Q    It wouldn't be one of your factors at all, correct?

6  A    I think we had a discussion, it was a philosophical

7  discussion as when is something a factor that you discount as

8  zero, or when is something a cause or an impact, and you look

9  to see whether it has, it becomes a factor.  Right?  That's

10 nuance in financial analysis.

11 Q    Why don't we go to your deposition.  Tab 2, again.

12 A    Yes.  Is there a page number?

13      Q    Page 73.  You're getting better at navigating.

14 You're faster than I expected.

15 A    Yes.

16 Q    I asked you the question, so line 23, page 73.  "Next

17 factor you list is the likelihood, extent, and uncertainty of

18 threatened litigation.  Is that, do you agree that that's a

19 factor that should be considered in assessing whether an entity

20 is in financial distress?"  You answered, "Listen, the man --",

21 and you're referring to Dr. Bell, "-- cites nothing.  He's

22 clearly making up factors to try to fit within this case.  And

23 he's trying to say that I have to look at these potential

24 liabilities on litigations as a factor.

25      I've said earlier that threatened litigation is relevant

Burian - Cross/Torborg                                    35

1  if it's certain and near term to meet the Third Circuit test."

2  And then you go on for a while.  And you finish by saying, "It

3  wouldn't be one of my factors."  Correct?

4  A    Yes.  I stand by my answer.  That is, what I said was,

5  just because you have threatened litigation that's uncertain

6  does not, is not directly a factor of distress.  There are many

7  business that have tons of litigation that are not in financial

8  distress.

9      I think that I said here, or a little later in the

10 deposition, is that if you have threatened litigation, that

11 impairs, impacts, diminishes value today, so you have a

12 connection to a business that's being impaired, the, of course,

13 you look at what degree the impairment a factor of distress.

14     Impairment can come from many different areas.  I don't

15 think you necessarily look at it as a -- That just because of a

16 likelihood that someone gets sued, well the uncertainty of the

17 extent of that potential threatened litigation is in, and of

18 itself, a check the box, that's a factor, we're now one for

19 four that you're in financial distress.  I don't believe that.

20 Q    So, it's not a factor at all?

21 A    One more time, now we're getting back to philosophy.  What

22 I said to you before is, you can call it a factor, or you can

23 say it's a cause of another impact of financial distress.  If

24 threatened litigation meant that you're a government contractor

25 and you can't get bonded, or you can't operate your business --

1    I can give you examples of things I've worked on where

2  that could be a problem.  Then you would be causing financial

3  distress.  In my mind, the factor would be, you can't get a

4  government contract.  You can't get an escrow.  You can't get

5  an LC.  You can't sign an indemnity agreement with a 20 or 30

6  year term to people who don't trust that you'll be around.

7  Those would be the factors.  And the litigation would be a

8  cause impacting those factors.

9          But somewhere in this deposition I said to you, if

10  you want to call it a factor, then I'll give it a zero value in

11  the LTL case.  Feel free to call it a factor.

12          MR. WINOGRAD:  Your Honor --

13          THE COURT:  Mr. Winograd, I didn't know if you wanted

14  me to stop him or not.

15          MR. WINOGRAD:  I did not, Your Honor.  And I realize

16  I absolutely did not.  And I really, just for the benefit of

17  the Court, because I saw some confusion.  The question in that,

18  the question was, I think it artfully asked in the deposition,

19  and if you look previously, it wasn't a factor that Mr. Burian

20  listed.  They were discussing factors that Mr. Bell --

21          THE COURT:  Bell.

22          MR. WINOGRAD:  -- had listed in his report.

23          THE WITNESS:  There's a typo in the question.  Or the

24  question was asked wrong.  I knew what David meant.  What

25  (indiscernible) meant.

1          THE COURT:  I knew the witness and the question.

2   BY MR. TORBORG:

3   Q    But for LTL's bankruptcy filing, you agree that it's very,

4   very, very likely that a substantial number of additional talc

5   claims will be filed against LTC in the future, correct?

6   A    I'm not an expert.  I've been sitting in these courtrooms,

7   and I understand that there's an inventory of claims, that if

8   the automatic stay were lifted, would be filed.

9   Q    But you don't know how many claims would be filed,

10  correct?

11  A    I've heard, bits and pieces of other people's testimony.

12  But a lot of the work has not yet been done,  I understand, on

13  these backlogged claims that might rise to a verified

14  complaint.  So, there would be no way for me to estimate how

15  many of those claims are real or not real.

16  Q    Mr. Burian, if you assumed there was an 80 percent chance

17  -- You know where I'm going with this, because this is your

18  language.  If there was an 80 percent chance that a company

19  would be insolvent three years from now, but today is paying

20  its' employees, has vendor issues, has no solvency issues, and

21  is currently making money, you would conclude that that company

22  is not in financial distress, under your interpretation of the

23  Third Circuit Standards.  Correct?

24  A    I think you meant to say, no vendor issues?

25  Q    No vendor issues, yes.

Burian - Cross/Torborg                                              38

1  A    Yeah, I believe what I said to you in my deposition is

2  that you've got to look at the --

3  Q    That's all I need.  Thank you.  In your view --

4         THE COURT:  Your attorney will elicit any other

5  additional information.

6         THE WITNESS:  I'm not even sure if I answered the

7  question.  But let's go on.  If you're happy, I'm happy.

8         MR. TORBORG:  Could I hear the answer back?  Because

9  now he's getting me nervous I didn't get the answer that I

10 needed.  Could I get the answer read back?  No?  Okay.

11        THE COURT:  We haven't done that in years.

12 BY MR. TORBORG:

13 Q    In your view, Mr. Burian, whether the correct estimate of

14 LTL's talc liability is today, assume we know what it is, okay?

15 Whether it's 8.9 billion, 22.5 billion, or 50 billion, wouldn't

16 change your fundamental analysis of whether LTL is in financial

17 distress today.  Correct?

18 A    If it did not impact the business today, or immediate to

19 whatever the Third Circuit Standard was, that is correct.

20 Q    Okay.

21 A    Immediate to an apparent, I think it was.

22 Q    In evaluating whether an entity like LTL facing

23 significant future torte liability is in financial distress,

24 you do not think the standard for financial distress should

25 include assessment of whether future claims will be able to

Burian - Cross/Torborg                                              39

1  cover other claims.  Correct?

2  A    It's the same conversation we had before.  So, it's the

3  same answer.  It's a --

4  Q    Yes, correct?  That's your view?

5  A    It's something that would only be looked at in connection

6  with it's impact on another factor.

7  Q    Okay.  Mr. Burian, you've --

8  A    (indiscernible) -- it's not.

9  Q    Mr. Burian, you've been involved in bankruptcy related

10  matters for more than 25 years, correct?

11  A    Correct.

12  Q    But the LTL bankruptcies are your only experience with a

13  bankruptcy where a debtor is facing a mass amount of future

14  asbestos related personal injury claims, correct?

15  A    When it comes to asbestos, that's correct.

16  Q    Dr. Bell's report stated that a possible need to liquidate

17  significant assets would be a factor to consider in assessing

18  whether a company is in financial distress, correct?

19  A    I remember him saying that.

20  Q    Okay.  And you believe that to be a fairly ridiculous and

21  contrived factor, correct?

22  A    It sounds like something I might say.

23  Q    Well --

24  A    I don't remember saying that.  It does sound like me.

25  You're going to show me the deposition where I said it, so I'm

Burian - Cross/Torborg                          40

1   happy to move this forward and say it sounds like me.  I do

2   believe that Mr. Bell's factor in that regard, as it relates to

3   Holdco, is not relevant in these circumstances.

4        Whether I used those pejorative terms about the analysis,

5   I might of.  I was getting worked up.

6   Q    You testified at the motion, at the hearing on the motion

7   to dismiss in the Aearo case, correct?

8   A    I'm sorry, I lost something there.

9   Q    You testified at the hearing on the motion to dismiss, the

10  bankruptcy, in the Aearo case?  Correct?

11  A    I like to refer to it as the successful motion to dismiss.

12  Q    In that case, one of the reasons you believed Aearo was

13  not in financial distress was because it would never be in a

14  position of having to liquidate its assets at a discount,

15  correct?

16  A    The Debtor is who we were referring to at the time.  And I

17  did say that the -- Which, by the way was an operating

18  business, had operating assets.  And I did say that if it were

19  forced to liquidate its' operating assets, as the Debtor, that

20  could be something to be considered.

21  Q    Okay.  Thank you, Mr. Burian.

22       MR. TORBORG:  I have no further questions.  Before I,

23  should I move in exhibits now?  Are we doing it now, or --

24       THE COURT:  We're going to do that all at the end.

25       MR. TORBORG:  Very good.  Thank you.

Burian - The Court                          41

1          THE COURT:  Let me just ask a quick question before

2    you start.

3          MR. WINOGRAD:  Sure.  Absolutely, Judge.

4          THE COURT:  Mr. Burian, is it your understanding that

5    the Third Circuit laid out a standard for what financial

6    distress is?  For immediate and imminent?  Or a type of

7    financial distress for which a debtor should be able to file

8    bankruptcy, a Chapter 11 case?

9          In other words, is financial distress dependent upon

10   imminence or immediacy?  Or is that simply required to file

11   Chapter 11?  I'm just trying to understand that there's a

12   distinction.

13         THE WITNESS:  So, I'm not a lawyer.  And I'm not

14   going to be arguing --

15         THE COURT: But you've been discussing the Third

16   Circuit Standards, so I want to know what your understanding

17   is.

18         THE WITNESS: I just want to be careful.  I think the

19   Third Circuit had a very thoughtful approach that if there's

20   immediate and apparent financial distress, e.g., there's a

21   cognizable almost apparent, almost obvious impact on the

22   Debtor, on the Debtor, then you need recognize that.  And that

23   could be because of potential future events.

24         But it has to be, it has to have a degree of distress

25   today, tomorrow, in the very near future, that is, that is

Burian - Redirect/Winograd                              42

1  granular, that is real.  Not just imagined.  And the Third

2  Circuit continues to talk about threatened litigation as being

3  inherently uncertain, and not real enough to meet that standard

4  without an impact on the business today.

5          And I'm not an expert in this area with respect to

6  all of the legal arguments, but the Aearo Judge did a full

7  review of all of the case law, and my understanding, adopted a

8  facts and circumstance test that was in line with the Third

9  Circuit and said that you'd have to find a near term business

10 issue.  It can't just be, the sky may fall 20 years from now.

11 Or five years from now.  Is that responsive?

12          THE COURT:  It is.  Thank you.  Mr. Winograd.

13          THE WITNESS:  And it wasn't a yes or no question.

14          THE COURT:  I get the luxury of not having to limit

15 myself to yes or no.

16          MR. WINOGRAD:  Your Honor, Michael Winograd of Brown

17 Rudnick for the TCC.  And Your Honor, I would like to just pick

18 up just where you, where you left off.

19                       REDIRECT EXAMINATION

20 BY MR. WINOGRAD:

21 Q   Mr. Burian, you just discussed with the Judge the standard

22 that came out of the Third Circuit.  Did you analyze, setting

23 aside the Third Circuit standard and whatever that may say as a

24 legal matter, did you analyze financial distress in a practical

25 sense based on your experience?

Burian - Redirect/Winograd                                    43

1   A    Yeah, I've been doing this for 35 years and my job is to

2   represent creditors and debtors analyze whether they're in

3   financial distress, why they're in financial distress, how they

4   became in financial distress and what is the solution to

5   maximize value.  And I used all those skills to look at LTL as

6   a debtor to determine whether in the full light of its facts

7   and circumstances it was in financial distress.

8   Q    And you were asked earlier about valuation of whether you

9   value asbestos claims and I think you said that's one of the

10  reasons you didn't look at a TDP.  I think you were shown and

11  talked about not changing the estimates for Mr. Mullin.  Do you

12  do any valuations?  Do you have experience in doing valuations?

13  A    All the time.

14  Q    And are you able to look at the valuations that were done

15  in this process and the assumptions that were done as a

16  procedural matter or otherwise and make an assessment as to

17  those?

18  A    I think I'm a very strong observer.  I think I have the

19  background and the skills to review valuation work, comment

20  upon it and look at LTL to determine whether or not it's in

21  financial distress.

22  Q    You were asked about a hypothetical about the potential

23  ability, a factor relating to the ability of futures to

24  recover.  Do you recall that?

25  A    The futures?

Burian - Redirect/Winograd                              44

1  Q    You were asked a hypothetical about the ability of future

2  claimants to recover whether that would impact your financial

3  distress analysis of the company now.  You remember that?

4  A    I think so.

5  Q    With respect to LTL is there, are there any signs that LTL

6  will not be able to pay its current debts or future debts as

7  they become due as of right now?

8  A    Well, as of today, there's absolutely no sign nor is there

9  any reason to believe that all claimants within any of the

10 ranges of valuation I've seen won't be paid in full.

11 Q    And so setting aside claimants, is there, is there, with

12 respect to any hypothetical that you could come up with,

13 including the one you weren't sure about how it was asked,

14 looking at LTL, the actual LTL today, do you see based on your

15 experience any signs of financial distress?

16 A    No.

17 Q    And why is that?

18 A    Well, it's not losing contracts.  It's not operating

19 inefficiently.  It doesn't have employees that are leaving or

20 quitting, vendors' or customers' issues.  It's paying its debts

21 as they come due.  It has no problem collecting on the

22 royalties that a subsidiary provides, it even invested in a

23 couple of royalties.  There's no operating distress whatsoever.

24 There's no financial, that's circular.  There's no operating

25 distress.  There's no balance sheet, there's no distress

1  anywhere in the system today that reflects any problems with

2  the underlying business.

3  Q    If you could open up your opening report.  I don't recall

4  which, either binder again.  If you could open up to slide 40.

5  And while you're going there, you were asked whether you've

6  done any independent analysis of cash flow.  Do you recall

7  that?

8  A    Yes.

9  Q    Can you tell me, if you look at slide 40, do you see the

10  little box with the balance sheet on it?

11  A    I do.

12  Q    Can you explain to me what that was, what that is and

13  whether that impacts any need for you to have done an

14  independent analysis at the time of cash flows?

15  A    So Your Honor, you need to have a tiny bit of context.

16  We've been denied all access to provide the kind of work we

17  would typically do with respect to an operating business.  And

18  everything is either through document dumps through discovery

19  or our understanding of Dr. Bell's conversation with unnamed

20  people in his reports.  One of the items we got in response to

21  what is the liquidity in assets of Holdco is the balance sheet

22  you see on page 40 which is very interesting because later Mr.

23  Lisman and others dispute their own numbers.

24      But if you look at it, it says LTL has cash of 30 million

25  and the royalties of roughly 367.  Then you see has cash of 400

Burian - Redirect/Winograd                                    46

1  million.  They've later learned that's only net 300 million.

2         THE COURT:  Holdco has cash.

3  A    Holdco has cash of 400 million.  We've learned later that

4  there may be an intercompany payable so it's a net 300 million.

5  Then you'll see the interest, the minority interest in the

6  foreign subsidiary which is basically Janssen Pharmaceuticals

7  indirectly of $20 billion in evaluation.  Then you'll see if

8  you skip a line, other subsidiaries, $6 billion, e.g., those

9  are the illiquidity interest in less liquid interest in the

10  subsidiaries hold by Holdco.

11         Then what do you see in the balance sheet right above

12  that, that I skipped?  You see 1.8 billion 2022 dividend from

13  GH Biotech.  It doesn't say interest in a subsidiary.  It

14  doesn't say dividend, I don't know if it might or might not

15  ever show up or be available.  It doesn't say never mind,

16  that's not real.

17         On the balance sheet it provides another $1.8 billion of

18  dividend.  Dividend was cash, we knew that.  So when I'm asked

19  did you do this complicated analysis of cash flows, at a

20  company with minimum 30 million in cash and 50 million a year

21  coming up at a RAM and if necessary 400 million in proceeds for

22  the sale of RAM, out of Holdco that has an interest in

23  entities, we'll get to later that pay dividends, even Mr. Bell,

24  Dr. Bell confirms that the expectation is dividends coming up

25  from a hundred percent owned subsidiaries.

1  We know that there was a plan for another $5 billion

2 dividend of which only a portion would get to Holdco which we

3 can discuss in a minute.  I didn't have some of those details

4 when the report was issued and we knew that there was another

5 1.7 something billion dollars that Holdco had and now find out

6 well, it doesn't really have, it might have had.  In my left

7 pocket it had, in my right pocket it didn't have.

8  When you're talking about year term cash flow liabilities,

9 right, even Dr. Bell doesn't presume, in the worst of his worst

10 case scenarios that this money would be necessary in the short

11 term.  So there was no analysis to be done.

12 Q So I would like to, --

13  MR. WINOGRAD:  Your Honor, may I approach?

14  THE COURT:  Yes.

15 Q I would like to hand you the declaration of Adam Lisman.

16  MR. WINOGRAD:  I just printed another copy, Your

17 Honor.  I didn't know if it would be handy for folks.

18 A Yes, I've seen this.

19 Q Okay.  So have you had a chance to review this?

20 A This is the declaration Lisman filed shortly before the

21 start of the trial, mentioning me in a bunch of paragraphs,

22 yes.

23 Q Okay.  And if you could open up to page 16.  This is where

24 he says responses to certain Mr. Burian's assumptions and

25 conclusions, correct?

Burian - Redirect/Winograd                              48

1  A    Yes.

2  Q    Now, I just want to, I just want to be clear about

3  something.  Did you, did you do an analysis as to whether there

4  would be financial distress at LTL taking Mr. Mullin's

5  scenarios and numbers and, Dr. Mullin's numbers and scenarios

6  and Dr. Bell's number and scenarios without adjusting anything,

7  just taking their numbers for what they are, did you do an

8  analysis of financial distress based on that?

9  A    Yes.

10 Q    And what did you determine?

11 A    Without any modification whatsoever it does not rise to

12 the level of what a practitioner would call financial distress

13 nor would the Third Circuit define as financial distress for

14 purposes of being titled to invoke the powers of bankruptcy.

15 Q    If you look at paragraphs 41 to 42, you can see that Dr.

16 Mullin discusses, strike that.  So after doing that analysis,

17 did you then do an analysis where you actually looked at some

18 of the assumptions underlying Dr. Bell's liability, sorry,

19 strike that, Dr. Mullin's liability analysis and Dr. Bell's

20 cash flow analysis?

21 A    I had the pleasure of doing it twice since Dr. Bell

22 changed his analysis shortly before the trial.

23 Q    And when you did those analysis, so you did one analysis

24 just taking their numbers for what they are, when you then

25 looked at their assumptions, did you challenge some of their

Burian - Redirect/Winograd                                49

1 assumptions that you believed were faulty?

2 A    I did.

3 Q    Again here in paragraphs 41 and 42, there are some

4 criticism of one of those challenges to assumptions that Mr.

5 Lisman makes, do you see that?

6 A    I do.

7 Q    Do you have a response to Mr. Lisman in these paragraphs?

8 A    Yes.  I don't want to quibble with my own counsel but 41

9 and 42 is a much more broader point than just the analysis of

10 Dr. Bell and Dr. Mullin.  The point that Mr. Lisman is making

11 is I have no right to assume that J&J will support its

12 subsidiaries if it has a liability  that is due for which it

13 does not have immediate cash to pay.

14     And he points out that a), the only document I received

15 that discusses J&J's policies in this regard specifically says

16 it will support distressed subsidiaries.  He says no, that's

17 not true.  That actually there are three occasions when, I

18 almost said Purdue again, when J&J would have not continued the

19 business or support a subsidiary.  And he cites Allios and he

20 cites SightBox and XBiotech.

21 Q    And what is your view on those entities that he cites?

22 A    This is thoroughly nonresponsive.  This is if not

23 purposely intended to mislead the Judge, it's pretty close.

24 These are three businesses that J&J invested in that didn't

25 work out.  So you know what they did?  They shot him down.  And

Burian - Redirect/Winograd                    50

1  you know what they also did?  They paid all of their

2  liabilities, no bankruptcies, no unpaid employees, no scientist

3  going home to his wife and saying my research didn't work out.

4  I didn't get paid today, right?

5       These are situations where J&J conducted itself like every

6  other pharmaceutical company that develops drugs, some work,

7  some don't work.  They're still in the contact lens business.

8  They're just not in that contact lens business.  They're still

9  in the drug business.  They're just not in this drug, it didn't

10 work out.  But as far as I can tell from the search of the

11 discovery from the search on the Internet and Google and all

12 the rest, there has never been a bankruptcy an affiliate of

13 J&J, there has never been that J&J abandoned the business and

14 did not pay its debts and liabilities as contracted and as it

15 was due and owing.  They may not like it at times but they paid

16 their bills.

17 Q    If you look at paragraphs 43 and 44 of Mr. Lisman's

18 declaration, this is a second criticism with respect to where

19 he's talking about your reports, assumptions concerning

20 dividends, do you see that?

21 A    Yes --

22 Q    Did, what's your response to Mr. Lisman's criticism there?

23 A    Your Honor, Mr. Lisman makes the point that a parent

24 company is not owed a dividend.  It's not a debt.  It's not

25 owed and that he makes the comment that J&J has all sorts of

Burian - Redirect/Winograd                    51

1   priorities and the money may have (indiscernible) for other

2   reasons and therefore may not get paid in the future.  That's

3   basically O-43 and they've been giving it too much credit,

4   that's the point he's trying to make in 43 and 44.  There are

5   two or three responses, one is, one is, Your Honor, the balance

6   sheet we received says an asset is $1.7 billion of the dividend

7   that was recently paid.  It sort of looks like it's owed and

8   that it's there.

9        Number two, even if it's not directly owed, J&J has a long

10  course of conduct of billions upon billions of dollars coming

11  up to one of two sources from foreign and domestic

12  subsidiaries.  Either dividends or where they want to avoid

13  transfer pricing issues or tax issues, they make them into

14  company loans.  They just lend it to the master -- The parent

15  is paying ten plus billion dollars in dividends a year shared

16  buy backs of billions of dollars, they are an enormous consumer

17  of cash.  Where does that cash come from?  Not because they

18  leave the money in subsidiaries around the world and just stock

19  pile it.  And let's look at the evidence I had at the time when

20  I wrote my report.

21       One is, the subsidiary that creates all the cash behind

22  Holdco that Holdco only owns one third of roughly, has a

23  subsidiary beneath it to which all the cash has been provided

24  over $20 billion.  And you know what happened to that cash?

25  All lent to J&J through intercompany claims.  It all found its

Burian - Redirect/Winograd                    52

1  way, the J&J treasure when J&J actually issued the $1.7 billion

2  dividend, five billion of which 1.7 belonged to Holdco.  You

3  know what happened to that money?  They're right.  It's not at

4  Holdco.  It was provided to a wholly owned subsidiary of Holdco

5  indirectly and subsidiary of Absys (phonetic) which you may

6  hear about.  You know what happened to that money?  You're

7  right.  Intercompany loan back to J&J used for coronate

8  purposes.

9      They have no problem accessing cash when they want to.  So

10 Mr. Lisman makes the point, Mr. Burian makes believe that a

11 dividend is owe, ignoring the fact that that's the balance

12 sheet I received, with respect to that one dividend, ignoring

13 that Mr. Bell assumes dividends out into the future in

14 perpetuity or at least for the three year period he analyzes

15 and ignoring the fact that there's always been access to cash

16 when it's necessary in the history of J&J.  I think that this

17 is at best misleading that I, my report depends on the payment

18 of these specific dividends.

19          MR. WINOGRAD:  May I approach, Your Honor?

20          THE COURT:  Yes, please.  Oh, thank you.

21 Q   Now, Mr. Burian, you mentioned a little earlier that after

22 you had done your rebuttal report Dr. Bell submitted a

23 supplemental report and that accounted for, well, that's right,

24 correct?

25 A   Yes.

1  Q    Do you know why he submitted a supplemental report?

2           MR. TORBORG:  Excuse me, Your Honor.  Was this

3  produced to us?

4           MR. WINOGRAD:  It's a demonstrative.

5           MR. TORBORG:  Is the information, the data produced

6  to us in advance of today?

7           MR. WINOGRAD:  No, it's a demonstrative and I'm going

8  to explain exactly what it is.  It's the same chart that was in

9  his initial report, in his rebuttal report --

10          THE COURT:  You say his, Dr. Bell?

11          MR. WINOGRAD:  I'm sorry, apology, Your Honor.  It is

12 the same chart that was in Mr. Burian's rebuttal report that is

13 simply adjusted based on the supplemental report that came in,

14 you know well after all the reports have been filed.

15          MR. TORBORG:  I object to this going into evidence or

16 any consideration of it.  It has his numbers on it.  It should

17 have been produced to us so we could look at it and evaluate

18 it.

19          MR. WINOGRAD:  Your Honor, --

20          MR. TORBORG:  It's fully improper.

21          MR. WINOGRAD:  Your Honor, the --

22          THE COURT:  It's not coming into evidence.  You can

23 testify based on it.

24          MR. WINOGRAD:  Okay.

25 BY MR. WINOGRAD:

Burian - Redirect/Winograd                    54

1  Q    So Mr. Burian, do you remember the data in which Dr. Bell

2  submitted his supplemental report?

3  A    I do not.  I remember I was quite worked up about it but I

4  don't remember the date.

5  Q    Does June 20th, of 2023 sound familiar?

6  A    I take your representation, I don't know.

7  Q    So I want to just talk, just flip through these.  There's

8  only three sheets.  If you could take a look at page 1.  This

9  is the original scenarios that Dr. Bell had, correct?

10 A    Yes.

11 Q    And these are the scenarios that are in, this is the table

12 that you had in your opening report, correct?

13 A    This is the data from which the tables is drawn.  This is

14 Dr. Bell's assumptions regarding how he analyzes Dr. Mullin's

15 information.

16 Q    And now if you look at the second page, these are adjusted

17 dividend scenario assumptions, correct?

18 A    Yes, these are the new scenarios that Dr. Bell dropped

19 one, notice the one that Dr. Bell dropped is the one that

20 assumed no dividends, right.  He accepts the fact that

21 dividends have been paid and these are the updated scenarios

22 that Dr. Bell uses for analyzing financial distress.

23 Q    And what do you, what do you, what conclusions do you draw

24 from this, from this table?

25 A    Well, I draw a lot of conclusions.  I'm not sure how many

Burian - Redirect/Winograd                    55

1 you want me to say in open court.  So Your Honor, if you look

2 at page, the first page, you'll notice that in scenario one Dr.

3 Bell after chatting multiple, multiple times and relying in his

4 report on conversations with the accountants and lawyers and

5 cash management people at J&J concluded that 25 percent of his

6 scenarios would have no dividend, zero dividends, right.

7         THE COURT:  Dividend from, be specific.

8 A     Dividend going to Holdco --

9         THE COURT:  From --

10 A     -- from GH Biotech.

11        THE COURT:  GH Biotech, okay.

12 A     And Janssen.  At that time, according to the testimony I'm

13 supposed to believe J&J was actively planning a dividend and

14 then made the dividend after the expert reports were due that

15 Dr. Bell says he knew nothing of.  So just to keep in mind that

16 either they did not tell Dr. Bell what they were planning or

17 Dr. Bell has serious trouble with his scenario analysis

18 including a scenario that ignored what he was told that

19 dividends would be paying.

20     But ignoring that for a minute, we have four scenarios

21 here, all of them show significant cash flow coming up from the

22 100 percent owned subsidiaries and then it has different

23 assumptions after the cash flow to Holdco with regard to the GH

24 Biotech Janssen entities.  In three of the four, in one of them

25 he merely had the 1.77 billion that at least I thought and I

1 believe he thought was already paid or about to be paid and the

2 other ones have continuing dividends.

3       The second page, are oops, this is what I really meant in

4 my scenarios and here are the three scenarios.  In year one,

5 Dr. Bell continues to ignore the $1.7 billion paid in 2023,

6 2022 that was on the balance sheet of Holdco and Mr. Wuesthoff

7 testified that he relied on.  He ignores that as an asset

8 completely.  It doesn't exist.  I think the explanation is it

9 was lent to J&J and therefore it was no longer available which

10 of course we know is not true so that J&J pays their

11 obligations and it's a demand note but ignoring that minor

12 detail.

13       He includes 912 million in year one.  You see that, Your

14 Honor?

15            THE COURT:  I see it.

16 A    Where does $912 million come from?  Well, Holdco

17 indirectly received $1.8 billion dividends, 912 made its way to

18 Holdco.  And again what happened to that money?  It was lent to

19 J&J to be consumed in their cash management system.  You know

20 what happened to the other $912 million which is not listed as

21 an asset of Holdco?  It went to that same subsiday I told you

22 about before that's one hundred percent owned by Holdco and

23 then was once again there's a theme, lent to J&J from the

24 hundred percent owned entity controlled by Holdco.  So he only

25 includes 912, which okay, because that is a Holdco asset,

Burian - Redirect/Winograd                                    57

1  although it's now an intercompany claim against J&J.  He

2  ignores the fact that the wholly owned subsidiary is owed 912

3  million on a demand note that can be recovered.

4       The other thing he ignores is the 1.7 billion paid the

5  year before.  We now found out at about the same time as we got

6  the report from Dr. Bell is also in that wholly owned indirect

7  subsidiary of Holdco and also lent to J&J.  So Holdco is

8  sitting on a pocket besides all its other assets in my report,

9  it's sitting on an entity that has $2.7 billion of what we

10 understand are demand notes against J&J.

11      Now, they'll tell you yeah, but that money can't be

12 dividended to Holdco.  Mr. Lisman will "paragraphs 40 to 40

13 whatever" in testimony and they may be right.  There may be

14 transfer restrictions or worse yet, and this is a horrible

15 thing, Your Honor, they complain it may be taxed inefficient.

16 They may actually have to pay taxes on the money they earned,

17 which I know is an anathema to J&J and many corporates.

18      I pay taxes.  When my wife wants to pay a car, I pay

19 taxes, then buy the car.  They seem to believe that it's

20 financial distress to upstream money to Holdco to pay its

21 legitimate liabilities if that's going to cost taxes.  Your

22 Honor, this money, company is so wealthy and so rich, it can

23 pay its taxes and still --

24           THE COURT:  I'm going to stop you.  I'm going to stop

25 you.  We've gone way beyond.

Burian - Redirect/Winograd                    58

1          THE WITNESS:  I was stopped.

2   Q    So Mr. Burian, as of right now, just looking at the cash

3   available to Holdco, and the $912 million demand note, how much

4   effective liquid assets are available to Holdco as of right

5   now?

6   A    Well, I don't have a full up to speed, we talked about the

7   400 million less 100 million of intercompany claim unclear they

8   really set off against each other or not so it's a minimum of

9   300 million maybe more.  Holdco has the 900 million demand note

10  that we know of, right.  And then if we're acting independently

11  and acting in the best interest of Holdco at a minimum, it

12  could direct Absys to direct the wholly owned treasury

13  subsidiary to collect on its intercompany claim and then it

14  would have to engage lawyers and either upstream the money and

15  pay the tax or find another way to lend the money to Holdco to

16  pay its obligations.

17      We have not been given access to the company to understand

18  those what that tax would be or what the capital sufficiency of

19  that entity would be.

20  Q    And if you turn to the last page of this demonstrative,

21  can you explain to us what we're looking at here?

22  A    Sure.  So Your Honor, what you see is on the top left

23  corner, unadjusted scenarios in Mr. Bell's new report.  What

24  Mr. Bell concludes is it's a 50/50 chance that maybe in the

25  future Holdco will be unable to pay its debts.  Ignoring for a

1  moment whether that may emanate to the parent financial

2  distress and remembering this is Holdco not even LTL, right.

3  This is Holdco, not the debtor.  He concludes on his best

4  analysis it's a 50/50 toss up as to whether they'll be able to

5  their debts.

6       But that's unweighted.  It's 50/50 based on the three

7  analysis.  He never opines which of these analyses are more

8  likely than not.  There's no judgment being provided.  There's

9  no expert analysis being provided.  It's I make up, well, it

10 went from a hundred and something to 81 or 82 scenarios.  In 82

11 scenarios I dreamed up, 41 of them there may be a capital

12 insufficiency.  May, may, 50/50.

13      And by the way many of them it's like $200 million, for

14 you and me a lot of money.  In J&J world, we're talking about a

15 pittance.  So in those 10 of the 40 scenarios, they're

16 insolvent by 200 million or less.  I then merely took his work

17 that's a 50/50 toss up and tried to give you as much

18 information as the Court would like to have as to how those

19 percentages change on small variations.  If you go down the

20 page, I go from 100 trials to 10 trials.  If someone doesn't

21 like 10 trials, I have with me 15, 20, 25, 30, 35, 40.  Any

22 number the Court would like, I'm happy to provide.

23      Instead of taking the upper echelons or the assumptions of

24 trials, which there is no basis in fact or testimony, we took

25 what we think looks like a high estimate, ignoring economies of

Burian - Redirect/Winograd                        60

1  scale, ignoring the fact that they're doing the same thing over

2  and over again.  We took the three and a half million dollar

3  numbers, the midpoint of their range and then we took the

4  historical average of nonlitigation and what we provided for

5  Your Honor on the first column is not touching any of Bell's

6  scenarios, not ignoring everything I've said about the money

7  and the system, how likely is it with no weighting, no

8  judgment, how likely is it that Holdco not the debtor can't pay

9  their debts?  And the answer is somewhere between 50 percent,

10 sorry.  They make, they have no problem the next three years 50

11 to 67 percent of the time.

12        MR. TORBORG:  Your Honor, if we could get back to a

13 question and answer format here, it would probably be more

14 productive.

15        MR. WINOGRAD:  Your Honor, he was just explaining, he

16 was explaining the chart, happy to walk through some of that.

17 A    I only did the X access.  I didn't do the Y access.

18 Q    So Mr. Burian, can you just briefly explain for the Court

19 the Y access?

20 A    Sure, I would be happy to.  Your Honor, on the right side,

21 all I did was the same thing in my expert report but applied it

22 to the now lower numbers in the Bell report because he takes

23 out the 1.77 dividend which I don't think is appropriate.

24 Don't be confused.  The 1.77 in my adjusted one is this year's,

25 is last year's, not this year's.  There are two of them of the

Burian - Redirect/Winograd                          61

1  same amount.

2         And it doesn't necessarily have to be a dividend.  I'm

3  just making the point that Holdco has access to cash flow

4  arising from the dividend, whether an intercompany claim or any

5  other way that Holdco can get money.  If you nearly make small

6  adjustments that Holdco if necessary could go to Absys and say

7  I want my 2.7 billion and I'll pay the taxes.  I'll do an

8  intercompany note.  I'll figure it out.  You know the J&J

9  lawyers are smart enough.

10        All you need to do is get a portion of that money and you

11 go to 80 percent to 90 percent that there's no problem for

12 Holdco three years out.  And then if you assume that, you know,

13 Holdco is a rich company, if you assume you merely monetized 10

14 percent of its assets, a pittance of its assets, you get to 96

15 close to 100 percent of the time they're fine.

16        The only way they attempt to manufacture financial

17 distress is saying that a 50/50 risk that is totally and

18 completely manufactured and in J&J's control, might pause

19 Holdco not to pay its debt and have to sell an asset, and oh my

20 God, might suffer a discount or pay a tax.  Holdco is not in

21 bankruptcy and even if it were, the fact that Holdco paid a tax

22 wouldn't disturb me that much when it has legitimate

23 obligations and women who are suffering and dying every day who

24 deserve to be compensated.

25 Q    So Mr. Burian, just two final questions.  With respect to

Burian - Redirect/Winograd                                          62

1   what you just said, the hypothetical 50/50, 50 percent of the

2   time Holdco may not be able to pay LTL.  Despite that whether

3   it's a hypothetical or a probability, whatever it is, does

4   that, has that uncertainty or probability or possibility, has

5   that impacted LTL either today or as of more importantly April

6   4th, 2023 from what you've been able to see in any way?

7   A   Absolutely, positively, no.

8   Q   And just to clarify, if you look at the 49 percent where

9   you're saying it's 50/50 percent of the time, that is just from

10  cash flows, correct?

11  A   Yes.

12  Q   So what does that not account for, any possibility of?

13  A   Well, under Mr. Bell's analysis it does not include any of

14  the money sitting in either the wholly owned or partially owned

15  subsidiaries of Holdco.  We talked about Absys, its

16  intercompany claims, nor does it include any monetization

17  whatsoever of assets or any continuing cash flow from Janssen

18  or the other operating businesses beyond the discounted

19  dividends that Mr. Bell includes.

20  Q   Does it include any potential financing or loan from J&J?

21  A   It does not include financing or loans or insurance or

22  anything from J&J or any third party.

23          MR. WINOGRAD:  I have nothing further, Your Honor.

24  Thank you.

25          THE COURT:  Thank you, Mr. Winograd.

Burian - Recross/Torborg                                    63

1                          RECROSS-EXAMINATION

2   BY MR. TORBORG:

3   Q    I'll endeavor to be brief.

4   A    Me too.

5   Q    Mr. Burian, your fundamental proposition here is that J&J

6   would support Holdco if Holdco needs the funds, correct?

7   A    No.

8   Q    But you do have that proposition, right?  You said that?

9   A    I believe Holdco independently can protect itself and at a

10  minimum J&J would get out of the way.  But yes, I agree with

11  you that I do believe that J&J both historically and going

12  forward and everything I've seen would pay and allow its

13  subsidiaries to pay its debts as they come due.  And would

14  never, ever allow me to be in control of Holdco and succeed to

15  Holdco's rights as a representative of creditors.  And it would

16  rather pay its debts and allow that to happen.

17  Q    And you relied upon a document you referenced that

18  suggested that J&J would not allow a company to go into

19  bankruptcy, right?  You referenced that in your testimony,

20  right?

21  A    Yes, said several, it said several things but that

22  included.

23  Q    And you're aware of the fact that J&J actually did put an

24  entity in bankruptcy, it's called LTL, right?  It's why we're

25  here.

Burian - Recross/Torborg                    64

1   A    One and two, has not paid --

2   Q    Thank you.

3   A    One second.

4          THE COURT:  No, no.

5   A    Has never --

6          MR. TORBORG:  No, that's it.

7          THE COURT:  No, you don't get to that.  He controls

8   the questions.

9   Q    And you do not render an opinion that all J&J subsidiaries

10  are alter egos of each other, correct?

11  A    I do not render that opinion.

12  Q    And you're not aware of any legal obligation that requires

13  LTL, requires J&J to lend either Holdco or LTL money, correct?

14  A    Wrong, not correct.

15  Q    Now, you acknowledge that there was a dividend, a $1.8

16  billion dividend that might not get to Holdco --

17  A    Just for clarity, you know I said not correct, right?

18  Q    Yeah, I do.

19  A    Okay, just want to make sure.

20  Q    And you acknowledge that there was a $1.8 billion dividend

21  that might not get to Holdco, correct?

22  A    Which one are you referring to, sir?

23  Q    The $1.8 billion one that you talked about.

24  A    There are two of them I talked about.

25  Q    Okay.  The first one, 2022.  I believe that's the one that

Burian - Recross/Torborg                                    65

1  you're referring to.  That was my understanding.

2  A    And what's the question now that I know which one you're

3  referring to.

4  Q    Okay.  You testified that it may not, it might not get to

5  Holdco.

6  A    As a dividend.

7  Q    Correct, right?

8  A    As a dividend, correct.

9  Q    And Mr. Lisman provided some testimony about how, about

10 why the dividend, why that amount did not make it up to Holdco,

11 correct?  There were foreign restrictions on distributable

12 returns, correct?

13 A    I don't remember Mr. Lisman talking about that particular

14 dividend.  I remember him talking generally as to why dividends

15 may not end up at a domestic entity.  I was not --

16 Q    Now, you --

17 A    For the record, I was not here for a large portion of Mr.

18 Lisman's testimony so I can't be held accountable for what he

19 said or didn't say when I was not here.

20 Q    Now, you criticized Mr. Bell for not weighing the various

21 scenarios, right?

22 A    Correct.

23 Q    So he could have weighed those scenarios that supported

24 financial distress higher and you would have criticized him for

25 that, wouldn't you?

Burian - Recross/Torborg                                        66

1  A    (no audible response)

2  Q    So he could have said I'm going to weigh all equal so I

3  can't be accused of bias, right?

4  A    I think that is bias.  I don't think that's not being

5  accused.  I think making up scenarios that try to show

6  financial distress in circumstances that he admits in

7  retrospect were unreasonable is bias.  And no, I would not have

8  criticized someone doing something unless I thought it was

9  worthy of criticism.

10 Q    Now, none of the analysis that you did and that you have

11 included in this updated demonstrative includes any estimates

12 from the TCC about what they believe the talc liability expense

13 and total liability would be, correct?

14 A    The total liability is not part of the chart, right?

15 Because this is the three year period so neither Dr. Bell's nor

16 this chart includes that issue so I'm consistent in that

17 allowance and then when it comes to the committee's view about

18 what potential litigation cost, it actually does include my

19 best understanding and my advice to my committee as to based on

20 the company's reputations what those costs are likely to be.

21 Q    And my question is a little different, right?  Your

22 analysis and your what I'll call mark up of Dr. Bell's

23 scenarios, does not, is not informed at all by what your client

24 believes the talc liability is, correct?

25 A    We discussed that, correct.  I do not have an estimate of

1  the aggregate future Talc liabilities.

2          MR. TORBORG:  That's all the questions I have.  Thank

3  you.

4          THE WITNESS:  Beyond, beyond what's in Mr. Mullin's

5  report.  I don't have from the TCC.

6          MR. TORBORG:  Thank you.

7          THE COURT:  Thank you.

8          MR. WINOGRAD:  Your Honor, I just have one, --

9          THE COURT:  All right.

10          MR. WINOGRAD:  -- maybe two questions.

11                  FURTHER REDIRECT EXAMINATION

12  BY MR. WINOGRAD:

13  Q    Mr. Burian, in his redirect a moment ago, Mr. Torborg

14  asked you if you knew of any companies that J&J put into

15  bankruptcy.  Do you recall that?

16  A    I do.

17  Q    And then he pointed out that LTL was in fact put into

18  bankruptcy, correct?

19  A    Twice.

20  Q    Do you know why LTL was put, strike that, Your Honor.  Do

21  you know why LTL was created?

22  A    I do, I think I do.

23          MR. TORBORG:  Objection, foundation.

24          THE COURT:  I don't even think it's needed.

25                          (laughing)

Burian - Further Redirect/Winograd                            68

1          THE COURT:  Everybody in this room can answer the

2   question.

3          MR. WINOGRAD:  I concur.

4          THE COURT:  Efficiently and effectively.

5                         (laughing)

6   Q    Mr. Burian, Holdco on the other hand, Holdco is the

7   successor of J&JCI, correct?

8   A    Through name changes and the rest basically, yes.

9   Q    J&JCI was the company involved in the Texas Two Step,

10  correct?

11  A    One of them, yes.

12  Q    Was, did Johnson & Johnson put J&JCI into bankruptcy?

13  A    No.

14         MR. WINOGRAD:  I have nothing further, Your Honor.

15  Thank you.

16         THE COURT:  All right.  We done?  All right.  We're

17  done.  Thank you, Mr. Burian, for your time today.

18         THE WITNESS:  Thank you very much.  No references to

19  offers.  Do I take this with me or leave it here?

20         THE COURT:  Just leave it unless you want a souvenir.

21  We will take, let's return at three o'clock.  And we have Mr.

22  Bell.

23         UNIDENTIFIED SPEAKER:  Dr. Bell, Dr. Mullin.

24         (Recess from 2:52:27 p.m. until 3:09:05 p.m.)

25         MR. WINOGRAD:  Your Honor, may we just have a quick

1  two minutes?

2          THE COURT:  Sure.

3          MR. WINOGRAD:  Thank you.

4          MR. JONAS:  Your Honor, we're ready to proceed.

5          THE COURT:  All right.  Let me, are we ready, Wendy?

6          THE CLERK:  Yes, ready, Judge.

7          THE COURT:  There we go.

8          MR. JONAS:  Your Honor, Jim Jonas again, from Jones

9  Day and for the debtor.  I think the next witness to be called

10 is from our side and we call Dr. Mullin back to the stand and

11 I'm going to with leave return to him in case he doesn't have

12 his reports up there, his initial and his rebuttal report.

13         THE COURT:  All right.  Thank you.  Dr. Mullin, you

14 are still under oath.

15           DR. CHARLES H. MULLIN, RESUMES THE STAND

16         THE WITNESS:  Understood.  Thank you.

17         MR. JONAS:  Your Honor, at this time we have no

18 questions for Dr. Mullin.

19         THE COURT:  I'm waiting for that shoe to drop.  I was

20 looking back at Mr. Thompson.

21         MR. JONAS:  Your Honor, we've canvassed on our side.

22 I don't think there will be any questions.

23         THE COURT:  All right.

24         UNIDENTIFIED SPEAKER:  Have a nice day.

25         MR. JONAS:  Thank you, Dr. Mullin.

70

1          THE COURT:  Do you want to take some time to talk?

2          UNIDENTIFIED:  Let's give ourselves two minutes, Your

3   Honor.

4          MR. WINOGRAD:  Talk about what?

5          THE COURT:  Nine holes this afternoon is looking

6   better.

7                     (laughing)

8          UNIDENTIFIED:  Ms. Kaplan is still not back in town.

9          THE COURT:  Yes.

10         UNIDENTIFIED:  Very few questions, Your Honor.  Your

11  Honor --

12         UNIDENTIFIED:  I'm sorry, Mike, go ahead.

13         UNIDENTIFIED:  No, go ahead.

14         UNIDENTIFIED:  Your Honor, he has had his direct.

15  There was no cross.  I don't think they're entitled to ask any

16  additional questions.  Your Honor, the rules of redirect have

17  been fairly loosely applied here today.  I will not be, and

18  without objection from time to time and we don't plan to be

19  long.

20         THE COURT:  I think it will be limited.

21         MR. WINOGRAD:  Your Honor, if the other, --

22         MR. JONAS:  Mike, Your Honor, to say that it was

23  difficult achieving what we achieve this afternoon would be,

24  would not do it justice.  So we've managed to do that based on

25  an assumption --

1          THE COURT:  That they would not be asking questions.

2          MR. JONAS:  And that's how we, so we think the rules

3    are.  And so unless the rules have changed, we would oppose, we

4    would oppose any redirect.  They're not entitled to any.  His,

5    he has submitted his direct testimony.

6          UNIDENTIFIED:  Your Honor, if I may.  Mr. Burian from

7    whom you heard at some length today, rendered a rebuttal report

8    about what you heard to which Dr. Mullin has not had a chance

9    to respond.  Our redirect would be limited to that rebuttal

10   report and could be conducted in a matter of very few minutes.

11         MR. WINOGRAD:  One last question.  Your Honor,

12   setting aside the obvious that if they are going to ask

13   questions, then I don't, you know, it's not within the rules.

14   We came to an agreement which they've enforced with us multiple

15   times.  The agreement was that directs for fact witnesses would

16   be done by declaration and directs for expert reports would be

17   done through reports and that's what was done.  There's just no

18   basis to say they now want a second bite at the apple to go

19   after a witness who testified this morning.

20         MR. JONAS:  Your Honor, I really have nothing more to

21   say than --

22         THE COURT:  I know.

23         MR. JONAS:  -- you may be interested in the answer to

24   these questions and we would like to ask them in as abbreviated

25   fashion as can be done.

1          MR. WINOGRAD:  And Your Honor, if you're going to

2    permit that, respectfully I would need to, I think we're

3    entitled to regroup.  We reached an understanding in reliance

4    on rules.

5          THE COURT:  Well, if I allow them to inquire into the

6    rebuttal report only and limit it, you're recross.

7          MR. JONAS:  I disagree, Your Honor respectfully.

8          THE COURT:  Why?

9          MR. JONAS:  Because I in reliance on certain rules

10   that we think out of the rules, I don't think anybody is even

11   disagreeing with that, our side I was able to get agreement on

12   our side not to do any cross examination.  And if in fact the

13   rules have changed, then they're going to get to do what they

14   say is a limited redirect.  I'm not saying as an absolute but I

15   think, I at least owe it to the movants to have a discussion to

16   see whether we want to change course and per our right do a

17   cross, do crosses.  So that's all I would ask Your Honor.  If

18   you're going to allow them to do it, I need just a few minutes

19   to canvas.

20         THE COURT:  Okay.

21         MR. JONAS:  Thank you.

22         THE COURT:  Then why don't you canvas?

23         MR. JONAS:  And Your Honor, I will limit the

24   examination, I would hope to conduct to the scope of Dr.

25   Mullin's response to the rebuttal report of Dr. Burian, or Mr.

1  Burian.

2          MR. WINOGRAD:  Your Honor?

3          MR. MAIMON:  I don't believe --

4          MR. WINOGRAD:  Hold on, --

5          MR. MAIMON:  -- that the rules allow for reports,

6  rebuttal reports and you don't get a surrebuttal report.

7  That's not the rule.  But they don't get --

8          THE COURT:  Well, it's not --

9          MR. MAIMON:  They don't get a surrebuttal report

10 because then as we say, there's no end to the matter.  So

11 either, either we're going to do a cross or we're not going to

12 do a cross but we're not going to be limited by what they want

13 to do now.

14          MR. WINOGRAD:  Sorry, Judge.  Your Honor, the idea

15 that the scope of a response to Mr. Burian's rebuttal report is

16 somehow limited is just, it's just a fallacy.  That is a

17 substantive report that would open the door for them to ask I

18 suspect an entire line of questioning that they would do in any

19 event.

20          MR. JONAS:  Your Honor, my last piece to be spoken

21 here is that you saw earlier this morning that Judge Ferguson

22 went, I would say liberally beyond the scope of the cross

23 examination which may have been no questions or a question or

24 two.  So whatever rules we are suggesting are in play have been

25 honored in the breach by my colleagues at table to my right.  I

1 leave it to your discretion, Your Honor.

2        THE COURT:  All right.  Well, what I'm struggling

3 with is what I would like to see happen and my desire to have a

4 complete record.  So you can caucus, you don't need not caucus,

5 you can cross examine as you wish.  You can decide what you

6 will do.

7        MR. JONAS:  May we have a moment, Your Honor?

8        THE COURT:  Yes.

9        MR. JONAS:  Just two minutes, Your Honor.

10        THE COURT:  No, that's fine.  I'll make it easy for

11 you.  I'll be back in five minutes.  Everybody take a break.

12        (Pause from 3:17:05 p.m to 3:20:57 p.m.)

13        MR. JONAS:  -- It still shows no microphone up there.

14 Okay.  Judge, I think you said that our, if you call it a

15 cross, that they would be allowed to do a redirect.  We would

16 then, our cross would not be necessarily would not be limited

17 to their redirect.  And if that's what you said and those are

18 the rules, Your Honor, we're prepared to move forward and we'll

19 see how, we'll see how it goes as to whether or not we would do

20 any crosses after.  We'll see how this goes and proceed from

21 there.

22        THE COURT:  That would be the proposal.  You still

23 want to go forward?

24        MR. JONAS:  We do Your Honor.  Very good, thank you

25 Your Honor.

1            THE COURT:  All right.

2                        CROSS-EXAMINATION

3  BY MR. JONAS:

4  Q    Dr. Mullin thank you for returning to the stand.  We

5  pardon the interruption.  I'm going to hand you --

6            MR. JONAS:  If I may approach Your Honor.

7  Q    A copy of Mr. Burian's rebuttal report that has been

8  previously discussed with Mr. Burian today.

9  A    Thank you.

10            THE COURT:  Thank you.

11  Q    Dr. Mullin you've seen Mr. Burian's rebuttal report?

12  A    I have.

13  Q    And you have before you a copy of it?

14  A    Yes.

15  Q    And I'd like you to turn to page 9, slide 9 of the report.

16  Apparently it's Exhibit 1112.  Can you turn to that page with

17  me briefly.

18  A    I am there.

19  Q    And you see that at the top of the page Mr. Burian has

20  written, uncertainty is the key theme, underscoring that

21  Mullin's estimations are unreliable.  And just beneath that Mr.

22  Burian has written, the Mullin report uses the appearance of

23  mathematical complexity to obfuscate a clear lack of financial

24  distress.  Do you see that?

25  A    I do.

Mullin - Cross/Jonas                              76

1  Q    And could you tell us your response to that charge?

2  A    So there is a fair amount of uncertainty.  Uncertainty is

3  common in a mass tort.  And when you estimate them whether it's

4  for SEC disclosure purposes, a bankruptcy proceeding, insurance

5  coverage, you are reducing that to mathematical formulas.  And

6  you give scenarios and ranges.  It doesn't mean the work is

7  unreliable, you're just properly characterizing the amount of

8  uncertainty that exists by providing scenarios that

9  characterize a range.

10 Q    And is that what economists do?

11 A    In the face of uncertainty, that is frequently what

12 economists do.

13 Q    Thank you Dr. Mullin.  Will you turn to page 11 of Mr.

14 Burian's report, rebuttal report.  And you see at page 11 he

15 lists another page, almost a page full of critiques of your

16 opinions.  Do you see that?

17 A    I do.

18 Q    And in part the slide reads, at the top, and what seems to

19 be obscured by my staple and something called, there it is, in

20 the corner of the screen.  It says "Many of Mullin's

21 assumptions are unreasonable.  Modifications to them further

22 demonstrate that LTL was not in financial distress, do you see

23 that?

24 A    I do.

25 Q    And then there are some boxes along the left or near boxes

1 along the left margin of the rebuttal report page 11 in which

2 he sets out his critique and summary, critiques, plural, in

3 summary fashion.  Do you see that?

4 A    I do.

5 Q    Can you, and the first one is that Mullin's liability

6 cases, plural, assume that, assume rather between 20 trials per

7 year, 60 trials over three years for the selective low case and

8 100 trials per year, 300 trials over three years for the

9 litigate all and selective high cases.  Could you share with us

10 your view about whether that critique is fair and accurate in

11 your view.

12 A    I don't feel it is fair and accurate.  There is

13 uncharacterizing a range.  How the MVL was trying zero cases

14 for ovarian cancer there were trying around 12 cases a year.

15 And so two of those typically ovarian cancer cases and about 10

16 of them mesothelioma cases.

17      So once the cases become active or available for trial

18 from an MVL setting, that will go up.  There's also a backlog

19 in that nothing's been tried from the last couple of years as

20 LTL-1 and LTL-2 have stayed those trials.

21 Q    Dr. Mullin the next critique is cost for trial.  I'm

22 sorry, yes, cost for trial.  And here Mr. Burian claims that

23 all of Mullin's liability cases, litigate all, selective low

24 and selective high assume trial costs would be five million per

25 trial.  And then his sub-bullets state that the Debtor and its

1  professionals have indicated a historical cost range of two to

2  five million per trial and Mullin does not account for any

3  economies of scale or other reductions in trial spend in

4  litigating hundreds of trials.  Could you share with the Court

5  your response to that critique?

6  A    So the historical trial cost range that, where he's

7  quoting some representatives of the Debtor aren't inconsistent

8  with the five million.  The five million is coming from actual

9  underlying records that are recorded to an individual claimant.

10       The trial itself is a subset of those costs.  So it's

11 common for the trial itself to be, if you say from day one of

12 trial commencing through the verdict to be two to five million

13 dollars.  But there's another million and a half dollars in

14 pretrial costs associated with the claim on average.  There's

15 almost a million dollars of expenses associated with the claim

16 on average.  And there's a little bit over half a million

17 dollars of post trial costs associated with the claim.

18       So this is more just ships passing in the night and

19 understanding the underlying data.  So start to finish, a case

20 that's taken to trial through appeals is averaging around $5

21 million.  But two to five of that is the trial itself.

22 Q    Next, thank you Dr. Mullin.  Mr. Burian suggests that your

23 non-trial litigation costs scenarios or cases take historical

24 non-trial costs and multiply that number by 250 percent without

25 a concrete basis for inflating the costs in that manner.  Is

Mullin - Cross/Jonas                              79

1  that a fair criticism?

2  A    The bases are described in the report.  There again, as

3  the MDL moves out of a Daubert phase into actually evaluating

4  individual cases for the ovarian cancer claims, those costs

5  should increase.  By exactly how much has uncertainty.

6       So I did a range of from the low end of 75 percent to a

7  high end of 250 percent.  Those ranges are taken off of the

8  nominal values of expenditure from back, to this point if I

9  average about four or five years ago, with no adjustment for

10  inflation.

11      So if you were to take into account the inflation of legal

12  fees, it's probably more, inflation adjusted, about a doubling

13  of costs to about 50 percent of costs on the low end.

14      But there's, there is a fair amount of uncertainty

15  particularly as to what will happen on the ovarian cancer

16  claims in the MDL.

17  Q    Thank you Dr. Mullin.  Do you know whether Mr. Burian had

18  access to the underlying litigation cost information that you

19  have?

20  A    I know it was produced to me.  I know that it was produced

21  along with my initial expert report, so it was available.  I

22  don't know if he actually ever received it or not.

23  Q    Thank you Dr. Mullin.  His next criticism is of your

24  estimated settlement ranges.  Can you respond to that for us?

25  A    So there's an assertion that I'm extrapolating from one

Mullin - Cross/Jonas                                                    80

1  early settlement.  And while I believe that's reference to the

2  first Lanier master settlement agreement in the ovarian cancer

3  claims.  And while I do look at that master settlement

4  agreement and the values, I look at the second Ms. Armstrong

5  for Lanier.  I look at the four master settlement agreements

6  with four other law firms as well as a comparability analysis.

7  So there's multiple lines of analysis that are going into that

8  value.  It's not simply an extrapolation of one.

9      And the Mesothelioma claims, there is a broad range of

10 value.  95 percent of the historical payments are to claims

11 that received more than $200,000.  And so if you want to try to

12 estimate what is roughly going to be the cash flows going out

13 the door in the next three years, you really can focus on where

14 95 percent of the money is being incurred which is what the

15 report does.

16     So it focuses on those claims that are worth more than

17 200,000.  And then it does gross up and add the other five

18 percent back in, but it doesn't do a formal forecast to the

19 other five percent.

20 Q    Thank you Dr. Mullin.  And last Mr. Burian critiques your

21 opinions and he mentioned it again here today I believe if I'm

22 not mistaken, failure to ascribe in his view allocation of talc

23 liability to an enterprises other than LTL.  Do you have a

24 response to that?

25 A    I was maintaining the historical accounting and what I

Mullin - Cross/Winograd                    81

1 believe is the position of LTL that the liabilities all do

2 ultimately reside with LTL.  And the, as far as other

3 defendants, there haven't been any recoveries from other

4 defendants.

5      So while in release we'll typically release LTL, we'll

6 release (indiscernible).  It may release lots of retailers or

7 different entities.  There's never to my knowledge any recovery

8 from any of those other entities.

9 Q    Thank you Dr. Mullin.  I have no other questions.

10          THE COURT:  All right, thank you.

11          MR. WINOGRAD:  Your Honor, Michael Winograd, Brown

12 Rudnick for the TCC.  Your Honor I'm going to try my best as we

13 go to streamline this.

14          UNIDENTIFIED:  I tried Your Honor.

15                    CROSS-EXAMINATION

16 BY MR. WINOGRAD:

17 Q    Dr. Mullin I just want to talk, the first thing that your,

18 that counsel talked to you about was uncertainty.  Do you

19 recall that?

20 A    Yes.

21 Q    And you do, just so we have some context, you did two

22 analyses, correct, in terms of predicting the balance sheet

23 long term and cash flows in the short term, correct?

24 A    Correct.

25 Q    And you try and estimate the personal injury talc

1  liabilities in both of those scenarios, right?

2  A    The balance sheet tests is really, should be viewed as an

3  upper bound on those liabilities.  It's not trying to estimate

4  an unbiased number.  It's trying to see, if anything err on the

5  high side because I understood its purpose was to check for

6  solvency.

7  Q    Okay.  And so with respect, let's start with that, the

8  balance sheet, the long term.  That includes both current and

9  future claims, correct?

10  A    Correct.

11  Q    And it includes all the unfiled claims we know about,

12  correct?

13  A    Correct.

14  Q    And you, and again the future claims that you have a

15  section devoted to as to any future claims, correct?

16  A    Correct.

17  Q    And then like you said you came up with the high end

18  estimate, right?

19  A    Correct.

20  Q    And that's not an unbiased middle of the road estimate,

21  right?

22  A    Correct.

23  Q    But intentionally skews things high, correct?

24  A    On the balance sheet, that's correct.

25  Q    And, on the balance sheet.  And that estimated range is

Mullin - Cross/Winograd                               83

1  $11 billion to $20 billion for the personal injury liability,

2  right?

3  A    I wouldn't do it as a range.  I did a stress test that

4  went up to 20 billion.  So there is a stress test at 20

5  billion.  There's an estimate that I think skews high, but it's

6  not what I'd call a stress test.

7  Q    Okay, so let's talk -- but by the way, we'll talk about

8  that in a second.  So, because I want to talk about, in

9  addition to that because the Court may hear different numbers

10 like 11 to 21.  In addition you estimate that the NAD, the net,

11 for the government claims is less than a billion dollars,

12 correct?

13 A    NPV?

14 Q    I'm sorry, net present value, sorry.

15 A    Okay, that's what I thought you meant.  I was just making

16 sure.

17 Q    Yeah, I apologize, thank you.  The NPV for the government

18 claims is less than a billion dollars, correct?

19 A    Correct.

20 Q    All right.  So I want to talk about that low end of the

21 range.  Again that low end of the range to account for

22 uncertainty has assumptions in there that likely overvalue what

23 you believe the liability would likely be, correct?

24 A    Correct.

25 Q    And for example with respect to the ovarian cancer claims,

1   with respect to the uncertainty you make assumptions that will

2   likely overvalue.  And with respect to the meso claims you make

3   assumptions that likely overstate the number of core claims and

4   average payment, right?

5   A    Correct.

6   Q    And the high end range you said, notwithstanding that the

7   low end of the range already you believe is above expectations,

8   the high end goes to a high end stress test that is even at a

9   higher end, correct?

10  A    Correct.

11  Q    Now I just want to talk about the cash flow analysis very

12  briefly again in this topic of uncertainty.  The cash flow

13  analysis in the first three years, there is still significant

14  uncertainty about what the total LTL expenditure would be even

15  just for that three year term, correct?

16  A    Correct.

17  Q    So I want to now talk about trials.  You talked about 100

18  trials per year in, a little while ago, a range of 20 to 100

19  trials per year.  So you have three scenarios, correct, in your

20  analysis of cash flows, right?

21  A    Correct.

22  Q    And you have, one is litigate all.  That means that the

23  company decides to go and litigate everything, correct?

24  A    Yes.

25  Q    And not settle anything.

Mullin - Cross/Winograd                                85

1  A     Correct.

2  Q     And so for example in, strike that.  And then you have

3  another one that's selective, low, correct?  Where they

4  litigate some and they also settle some, correct?

5  A     Correct.

6  Q     And then you have a selective high where they litigate the

7  same number of trials as the litigate all but at the same time

8  they settle on a higher level as well, correct?

9  A     Correct.

10  Q     And so with respect to trials in your scenarios two out of

11  those three scenarios have 100 trials per year, correct?

12  A     One caveat.

13  Q     Sure.

14  A     The two do, but the two that have 100 are the litigate all

15  and the high end.

16  Q     Correct.

17  A     I think the way you phrased the question before and I said

18  yes too quickly had the middle scenario of 100 trial.

19  Q     Okay, I didn't mean to suggest that.

20  A     So that one is the one at 20.

21  Q     Okay, all right.  So it's 100 for litigate all, 20 for the

22  middle scenario selected low and then back to 100 for selective

23  high, right?

24  A     Correct.

25  Q     And you don't think even in those two scenarios that use

Mullin - Cross/Winograd                                    86

1  100 trials a year, you don't think those 100 trials, that's not

2  a maximum, right?

3  A    No, there's been examples where entities, like the Dow

4  Corning references 90 trials slated in the six months right

5  before they filed for bankruptcy.

6  Q    Okay.  Well we're going to come back to that in a moment.

7  We're going to come back to that.  If you are going to, but in

8  your opinion if you're going to do a high range to see where

9  expenses could go, 100 trials seems, as a high end, seems very

10 appropriate to you, correct?

11 A    Correct.

12 Q    But you admit that doing 100 trials a year would be

13 difficult, right?

14 A    Correct.

15 Q    And if you look at your report at paragraph 67 you offer a

16 citation as dockets, as an example of cases that have, of a

17 case that has actually done more than 100 trials and year.  And

18 you say at paragraph 67, "During the mid 1990s a single

19 asbestos, Owens Corning, tried more than 200 cases per year",

20 correct?

21 A    Correct.

22 Q    And that's what you relied on in that report, right?

23 A    That they tried more than 200 cases, yes.

24 Q    And that's at paragraph, that's paragraph 67 and at the

25 bottom of that page footnote 80, correct?

Mullin - Cross/Winograd                           87

1  A    Correct.

2  Q    But you don't actually know how many trials Owens Corning

3  did in any given year, right?

4  A    We know they tried more than 200 cases in many years.  But

5  they may have had a number of them consolidated into, in a

6  consolidated, trial framework.  So the statement in the report

7  is they tried a number of cases per year.

8       And you're correct as we discussed in the deposition, the

9  citation with the number of plaintiff verdicts.

10 Q    Right.

11 A    Multiple of which could occur in a single trial.

12 Q    Uh hum.

13 A    So you could have consolidated a number of those cases

14 into a common trial.  But the statement of the number of cases

15 is correct.

16 Q    Who's statement of the number of cases is correct?

17 A    The statement in my report about how many cases they tried

18 in a year.

19 Q    Okay.  In your report, let's take a, let's open up your

20 report.  Do you have that in front of you?

21 A    I do.

22 Q    If you could go to paragraph 69.

23 A    I'm there.

24 Q    I'm sorry 67, I apologize.  So if we take a look at

25 paragraph 67 you say, "The asbestos trial docket provides

Mullin - Cross/Winograd                                    88

1  another illustrative example.  During the mid 1990s a single

2  asbestos, Owens Corning, tried more than 200 cases per year."

3  Do you see that?

4  A    Yes.

5  Q    And in your footnote, is footnote 80.  And if you go down

6  there you cite to an expert report of Dr. Peterson, correct?

7  A    Yes.

8  Q    Now Dr. Peterson, in fact you cite specifically to a

9  table, table 2 at page 5, correct?

10 A    Correct.

11 Q    Now that table 2 at page 5 does not provide a number of

12 trials per year, correct?

13 A    It provides the number of claims or cases that were tried

14 to a plaintiff verdict.

15 Q    Okay, why don't --

16 A    It understates the actual number of cases because any

17 defense verdicts aren't listed.

18 Q    Why don't --

19 A    These are lower bound on the number of cases they tried

20 that resulted in a plaintiff verdict.

21        MR. WINOGRAD:  Your Honor may I approach?

22        THE COURT:  Yes.

23 Q    I've handed you, this is Peterson report from October

24 15th, 2004 that you relied on, correct?

25 A    Correct.

Mullin - Cross/Winograd                                      89

1  Q    And if you open up to page 5 of that report you'll see

2  table 2.  You see that?

3  A    I do.

4  Q    And that's the table you cited in your report, right?

5  A    Correct.

6  Q    And that table by definition talks about plaintiff's

7  verdicts, correct?

8  A    Correct.

9  Q    It does not talk about trials, right?

10 A    Correct.

11 Q    And if you -- and in fact you are sure that some of these

12 verdicts came from trials where they were consolidated into one

13 trial, right?

14 A    Correct.

15 Q    And so when the cases are consolidated for trials the

16 number of cases that are consolidated into one trial can vary,

17 right?

18 A    Correct.

19 Q    And at times there have been hundreds consolidated into

20 one trial, right?

21 A    On occasion, yes.

22 Q    And you think that in the 1990s which is, includes what

23 this chart is going over, you think in the 1990s there were

24 asbestos trials with more than 1,000 claims consolidated into

25 one trial, right?

Mullin - Cross/Winograd                                    90

1  A    I think everything's slated.  I don't know if those went

2  to verdict.  I'd have to go back and check.  But there were

3  some very large consolidations back in the 1990s.

4  Q    Okay, so where in this chart does it support your

5  proposition that Owens Corning was doing 200 trials in any of

6  these years?

7  A    The report doesn't say that.  The report says they tried

8  more than 200 cases per year.  So if you have 20 cases

9  consolidated in a trial, in one trial you could try 200, you

10  can try 20 cases.

11  Q    Okay.

12  A    So the report, the report language doesn't say 200 trials,

13  it says they tried 200 cases.  And this provides support for

14  trying more than 200 cases.

15  Q    So when you say that they could try more than 200 cases,

16  are you suggesting that they could try, that they could, that

17  they could complete 200 trials?  Strike that.  Are you

18  suggesting now that in your report by suggesting that Owens

19  Corning tried 200 cases a year, that they did not in fact have

20  200 trials in a year but rather resolved 200 cases through

21  however many trials they had?

22  A    So the report I don't think I ever says how many trials

23  they had in a year.  So when you say what am I suggesting in

24  that regard in the report, I don't say how many trials they had

25  in a year in the report.  I say how many cases they tried.  And

Mullin - Cross/Winograd                                          91

1  this shows me a lower bound on that because it's the number of

2  cases they tried that resulted in a plaintiff verdict.

3  Q    Okay, so you're suggesting that if for example 1,000 cases

4  were consolidated into one trial, all thousands of those cases

5  would cost $5 million each under your math, is that what you're

6  saying?

7  A    No.

8  Q    In your report you suggest that the cost per trial, trial

9  costs for a single case is $5 million, right?

10  A    That has been the average cost at 2017 to 2021 bill rates,

11  that was the average cost.

12  Q    Okay, so I want you to assume that there are two cases,

13  case A and case B.  If case A goes through trial you're

14  suggesting that the trial cost for that case, it just goes

15  through alone, is $5 million, right?

16  A    There's a range, but on average that's been the --

17  Q    That's an average.  And the same thing for trial B.  If it

18  goes through a trial on its own the average is $5 million,

19  correct?

20  A    Correct.

21  Q    What I'm asking you is if you combine A and B, you

22  consolidate them and both of those go, but there's only one

23  trial, they both get consolidated and go through are you

24  suggesting that the cost for those two on average would be $10

25  million?

Mullin - Cross/Winograd                                      92

1  A    It would be more than five, less than 10.  And based on

2  the cost breakdown data probably around eight.  You'd get a 20

3  percent savings if you were to break it down.  But that's

4  looking at, if the trial gets longer.  The pretrial costs don't

5  change that much because you're working up individual

6  claimants.  You can work through the pieces, so there's some

7  economy there.

8      But it doesn't stay five million when you start adding

9  additional claimants.

10 Q    Okay, but in your report you don't give a, you don't

11 suggest any, you don't offer any estimation of what a

12 consolidated trial would cost, correct?

13 A    No, I ran a scenario to illustrate where the expenditures

14 could go if you had to try a large number of cases.

15 Q    And in your math, when you come up with your range, you

16 assume for example litigate all, you assume 100 trials,

17 correct?

18 A    I modeled that as 100 trials at five million a trial.

19 Q    Okay.  So you were assuming that none of those, that, you

20 were, in your math you were assuming none of those 100 trials

21 were consolidated, correct?

22 A    You're probably taking the scenario a bit too literally.

23 But the literal scenario as written is 100 trials at five

24 million each.  If you start consolidating and try 200 claimants

25 in 50 trials, consolidating them in groups of four, the

Mullin - Cross/Winograd                              93

1  expenditure is probably higher.

2      But there's different ways of getting there.  It's just a

3  scenario to illustrate where the expenditure could go, not to

4  be taken literally there'll be exactly 100 trials.

5  Q    Okay, can you open up your report to page 34 and you'll

6  see a figure of 20 there.  You there?

7  A    Yes.

8  Q    And again just let's take a look at litigate all.  You see

9  where it says trial costs?

10  A    I do.

11  Q    Now you have $1.5 billion for trial costs, right?

12  A    I do.

13  Q    And 1.5 billion, that's for 100 trials, correct?

14  A    No, that's for 300 trials.

15  Q    100 trials per year for three years, correct?

16  A    300 trials over three years.  There's different timing

17  considerations later in the report as to exactly when those

18  costs could get incurred.

19  Q    Okay, but it's 300 trials per year because you have

20  assumed in litigate all that it's 100 trials per year, correct?

21  A    Yes, with what you misspoke in the beginning because you

22  said 300 per year.

23  Q    No, I understand that.  I took your point and I tried to

24  correct myself.  So you assumed 100 trials per year in litigate

25  all over a three year period totaling 300 trials, right?

Mullin - Cross/Winograd                          94

1  A    In, so, I've assumed 300 trials.  And then the timing

2  spreads them in different ways across years under the different

3  timing scenarios.

4  Q    We'll come back to that in a moment.  300 trials times $5

5  million a trial comes to $1.5 million, right?

6  A    1.5 billion.

7  Q    1.5 billion.  And that's the number you have on this

8  figure 20, right?

9  A    Correct.

10 Q    There's no discount there for any consolidation, correct?

11 A    Again I didn't inflate for increasing go rates over a five

12 year period.  There's lots of things you could do to make

13 changes.  If you want to try to probably add more precise then

14 we could.  There's uncertainty.

15     I'm characterizing a range that goes from three billion to

16 seven billion.  You can get too detailed on any given component

17 of it.  It doesn't help your overall accuracy.

18 Q    The litigate all scenario that in your view was the

19 strategy from 2019, 2013 to 2019 in the talc litigation on

20 behalf of J&J, correct?

21 A    It was the practice so there weren't settlements during

22 that period of time.

23 Q    And during that period they never tried more than 10,

24 maybe 12 cases in a year, correct?

25 A    It was in that neighborhood, correct.

Mullin - Cross/Winograd                                95

1  Q    And we'll see these later on, but LTL itself has stated

2  that it only believes it could do a maximum of 10 trials per

3  year, correct?

4  A    That's not how I understood that testimony.  So I

5  understood that, for them to say it would be difficult, not

6  that it would be impossible.

7  Q    So they thought it would be difficult to do more than 10,

8  correct?

9  A    And they've done 12 in a year.

10 Q    And they said but they can't do 20, right?  Is that

11 correct?

12 A    I don't view 20 as a hard constraint for any defendant.

13 But if they, they may have made that representation that they

14 can't do more than 20.  I think we had this discussion too in

15 my deposition.  I don't think if they were told to have 30,

16 they'd take a default judgment on 10 of them if they could get

17 a legal team in front of it.

18 Q    Okay.  And why don't --

19         MR. WINOGRAD:  May I approach Your Honor?

20         THE COURT:  Yes.  Thank you.

21 Q    I've handed you a demonstrative that's gone up to the

22 slide in Mr. Burian's rebuttal report.  This is a quote from

23 Mr. Wuesthoff before this Court on February 14th, 2022.  And he

24 says, "I believe it's very challenging to do more than 10 a

25 year because of witnesses, because of various things that you

Mullin - Cross/Winograd                                    96

1  need, expert testimony and such." Do you see that?

2  A    I do.

3  Q    And he said, "But just if you could take it to 20 and I'm

4  told you can", correct?

5  A    I see that.

6  Q    But you're sure and I think you just testified to this,

7  you're sure that LTL would make arguments to the Court about

8  not being able to do that many trials fairly, right?

9  A    I mean defendants take positions. If they lose the

10  rulings and have more than 20 trials, they'll manage to get

11  legal teams in front of them. I haven't seen defendants taking

12  default judgments when they lose those arguments.

13  Q    You've never seen a defendant take a default judgment?

14  A    For losing these arguments?

15  Q    You believe it may be true that having so many trials, 20,

16  30, 40, 100 trials in a year, would impair LTL's ability to

17  have a fair trial, correct?

18  A    Defendants frequently make that argument.

19  Q    But you believe it's true that it may be true, correct?

20  A    I don't know the facts of the availability of for example

21  corporate witnesses or things along those lines to know with

22  certainty. But that appears to be their representations.

23          MR. WINOGRAD: Your Honor may I approach?

24  Q    Handing you a binder. And if you would take a look,

25  there's a tab A and B.

1      MR. WINOGRAD:  Your Honor I believe you already have

2  it.  They were handed out earlier.  It's the same ones that we

3  handed out this morning during Dr. Mullin's –

4      THE COURT:  The black binder from --

5      UNIDENTIFIED:  Thank you, thank you.

6  Q   It should be tabs A and B.  So A was a morning, the

7  transcript was just (indiscernible) by a court reporter.  And

8  if you can turn to paragraph, page 66.  And turn to, look at

9  line 24.  You say, "So it may be true that it impairs their

10 ability to have a fair trial", correct?

11 A   Correct.

12 Q   And that's, so it may be true that this would impair the

13 ability to have a fair trial, right?

14 A   Correct.

15 Q   And any prejudice from not being able to get, you know,

16 not getting the right witnesses or the like, that would be on

17 top of what you term the expense and burden and stress and

18 difficulty of not, of trying to put on this many trials,

19 correct?

20 A   I didn't follow that question.

21 Q   Sure, let me go back.  You think trying 100 trials is

22 expensive, right?

23 A   It's definitely expensive.

24 Q   You think it's burdensome, right?

25 A   I said they've represented doing more than 10 is

1 burdensome.

2 Q    Okay, but in your opinion were they to have to do 100

3 trials in a year you think it would be burdensome, correct?

4 A    That's always a fact specific question.  So based on the

5 representations and the fact witnesses and the expert witnesses

6 they assert they can bring to bear, they're asserting that's

7 burdensome.  I haven't done independent due diligence on their

8 ability to put a trial team together.

9 Q    So you have no idea how many trial teams they could put

10 together to litigate these claims because you haven't done an

11 independent analysis, right?

12 A    I don't know what the outer limit of that would be, no.

13          MR. WINOGRAD:  May I approach Your Honor?

14          THE COURT:  Yes.  Thank you.

15 Q    So I've handed you, this was a, again in Mr. Burian's

16 report, his rebuttal report.  This is a quote by Mr. Gordon.

17 Do you know who that is?

18 A    I do.

19 Q    By the way, do you know who Mr. Westoff is?

20 A    I don't believe I've ever met him.

21 Q    And you didn't, and as of our deposition, you didn't even

22 know who he was, correct?

23 A    Correct.

24 Q    Mr. Gordon, you know who he is, correct?

25 A    Yes.

Mullin - Cross/Winograd                              99

1  Q    And he says, "JJCI was very aggressive in trying cases",

2  do you see that?

3  A    I do.

4  Q    They had numerous trial teams throughout the country

5  trying these cases as quickly and efficient as they possibly

6  could.  But about 10 trials a year is about the best that can

7  be done."  You see that?

8  A    I do.

9  Q    But you think Mr. Gordon is wrong as well, right?

10 A    I think they could try more than 10 cases a year, that's

11 correct.

12         THE COURT:  Mr. Kim's having a heart attack over

13 there.

14 Q    And if you look at page 9 of your expert report.

15 A    Give me a moment, it's getting crowded.

16 Q    I'm sorry page 4, slide 4 of your expert report.  You

17 there?

18 A    I am.

19 Q    Can you see figure 1, basic parameters for potential tort

20 system cash flow scenarios?

21 A    I do.

22 Q    And then you say trial costs, you see that?

23 A    I do.

24 Q    And you say litigate all, 100 trial per year.

25 A    Yes.

Mullin - Cross/Winograd                     100

1  Q    And that's 10 times what Mr. Gordon told this Court could

2  be done, right?

3  A    Correct.

4  Q    Now I want to talk, you also talked about non-trial

5  litigation costs, do you recall that on your direct here today?

6  A    Yes.

7  Q    And prefiling LTL incurred on average $40 million of these

8  non-trial litigation costs per quarter, right?

9  A    Correct.

10 Q    So that's on average 160 million per year, right?

11 A    Correct.

12 Q    Now if you just flip to paragraph 20 of your report.  I'm

13 sorry, paragraph 69 of your report.

14       MR. WINOGRAD:  We'll get it right at some point Your

15 Honor, I apologize.

16 Q    Paragraph 73, you estimate in the litigate all and

17 selective high, you multiple that number, the 160 a year by 2.5

18 and you get to $40 million a year, correct, in the non-trial

19 litigation costs?

20 A    Correct.

21 Q    And that's based on the assumption that the amount of

22 work, the number of cases that need to be individually worked

23 up is going to increase, correct?

24 A    Yes, that corresponds to a scenario in which individual

25 cases in the MDL need to start being worked up.

Mullin - Cross/Winograd                101

1  Q    And you don't know what the MDL is going to actually do,

2  correct?

3  A    That's one of the reasons there's a range.

4  Q    And in fact whether it's in trial or out of trial, there

5  are still constraints on lawyers and witnesses, right?

6  A    Yes.

7  Q    Just one more topic.  You talked earlier with counsel

8  about settlement ranges, right?  And your estimation of an

9  ovarian cancer average settlement cost would be?

10  A    I think, just specifically that it wasn't relying on only

11  the first Lanier MSA.

12  Q    Okay.  So it was relying on the first Lanier MSA and then

13  you said the second MSA and then additional ones after that,

14  right?

15  A    As well as other lines of analysis, yes.

16  Q    And you came to the conclusion that the average was about

17  50,000 per year, right?  I'm sorry, 50,000 per claim, correct?

18  A    Correct.

19  Q    And you also estimated the average value in the <u>Imerys</u>

20  case, right?

21  A    Correct.

22  Q    And there you only had the Lanier settlement and you

23  didn't have the first Lanier settlement, you didn't have the

24  second Lanier settlement or other settlements after that,

25  right?

Mullin - Cross/Winograd                    102

1  A    That's correct.

2  Q    And your estimate in <u>Imerys</u> was the exact same 50,000 per

3  claim, right?

4  A    I said there was the comparability analysis but yes, the

5  subsequent settlements affirmed and strengthen the opinion that

6  50,000 was correct.

7  Q    And by the way the settlement in Lanier that you relied

8  on, that settlement excluded non-ovarian gynecological cancers,

9  right?  They didn't qualify for any money in settlement,

10 correct?

11 A    You had a set of qualifying cancers, that's correct.

12 Q    And one of those qualifications required that it, it

13 eliminated from qualification non-ovarian gynecological

14 cancers, correct?

15 A    I'd have to go look at the exact terms, but it definitely

16 had a diagnostic restriction.

17 Q    If you go to your report at page 16, note 35.  You

18 actually cited the qualifications for Lanier, that first Lanier

19 MSA, correct?

20 A    Correct.

21 Q    And if you look in that footnote you'll see that you need

22 a product use affidavit, that's number 2.  And then number 3

23 and 4 require medical records.  And then if you look at number

24 3 it requires epithelial ovarian cancer (borderline ovarian

25 tumors and/or cancer shall not satisfy this criteria), right?

Mullin - Cross/Ruckdeschel                    103

1   A    Correct.

2   Q    But you're not a medical doctor, right?

3   A    I am not.

4   Q    But to you it sounds there like cervical cancer would not

5   qualify in the Lanier settlement, right?

6          UNIDENTIFIED:  Object to foundation Your Honor.

7          THE COURT:  Sustained.

8          MR. WINOGRAD:  Nothing further Your Honor.

9          UNIDENTIFIED:  Your Honor, I just have a very few

10  questions.  And I will hold for Mr. -- and Mr. Ruckdeschel.

11                        CROSS-EXAMINATION

12  BY MR. RUCKDESCHEL:

13  Q    Good afternoon Dr. Mullin.

14  A    Good afternoon.

15  Q    All right, I'm going to try and move very quickly through

16  this.  You're an expert in U.S. bankruptcy, we've established

17  that, yes?

18  A    I was retained and filed a report in that bankruptcy.

19  Q    And you were truthful when you gave your opinions in the

20  MRS report.

21  A    Correct.

22  Q    And you relied on your MRS in formulating your opinions in

23  this case.

24  A    I do make reference to it, yes.

25  Q    Okay.  Now you've reviewed all of the master settlement

1 agreements that Johnson & Johnson and JJCI entered into prior

2 to filing the first bankruptcy, yes?

3 A    Yes, I believe I have a copy of each of those.

4 Q    All right.  And those are in your reliance materials in

5 this case.  And you relied on them in formulating your opinions

6 such as footnote 35 of your report where you talk about the

7 Lanier master settlement?

8 A    Yes.

9 Q    And all of the master settlement agreements that you

10 reviewed had criteria for what claims would qualify, correct?

11 A    correct.

12 Q    And in the ovarian cancer master settlement agreements

13 there was always a requirement that they have a definitive

14 diagnosis of epilthethal ovarian cancer.  That's how it was

15 worked in Lanier, correct?

16 A    That is how it's worded in Lanier.

17 Q    All right.  And then there were some that a subset of

18 epithelial ovarian cancers only.  Those were the serous

19 carcinomas in like the Cheek (phonetic) and the Gori law firm.

20 Do you recall that?

21 A    I'd have to go look at the specifics.

22 Q    Can we agree they say what they say?

23 A    We can always agree on that.

24      MR. RUCKDESCHEL:  Then I'm going to move all of the

25 master settlement agreements into evidence and we'll work out

Mullin - Cross/Ruckdeschel                              105

1  the details with counsel and the record will be clear.  So we

2  can move on.

3          MR. JONAS:  Your Honor, objection as reserved, to

4  moving in all of his reliance materials and the relevance

5  thereof.

6  Q    All right, we talked in your deposition, you assumed that

7  there are somewhere between 80,000 and 100,000 ovarian cancer

8  claims pending now?

9  A    Yes.

10 Q    All right.  And the 80,000, if we look at your report,

11 when you attempted to do any analysis of the 55,000 claims

12 represented by firms that have filed PSAs and the pending

13 claims and figure out what kind of overlap it was, the 40,000

14 or so pending claims.  You said there are at least 80,000,

15 right.  And that was as definitive as you could be.

16 A    Correct, I don't have the data to do a real definitive

17 match.

18 Q    Yeah, and you recognize that in your report.  The closest

19 you could get in terms of a hard number from looking at the

20 data was 80,000 or more.

21 A    Even to 95,000 if you started taking 55,000 plus 40,000.

22 Q    Right.  But you acknowledge there was overlap between the,

23 for example the members of the PSA signing firms and the folks

24 that had cases in the MDL.

25 A    There appears to be a strong possibility of that.  So I

Mullin - Cross/Ruckdeschel                    106

1  didn't, the upper end counts all of them.  But there appears to

2  be a strong possibility based on name matching.  But you don't

3  have Social Security numbers or the other things to affirm that

4  they're definitively duplicates.  But it does appear that

5  there's duplication.

6  Q    All right, and for example Mr. Onder is, has a lot of

7  cases in the MDL, correct?

8  A    I don't know accounts by lawyer.

9  Q    All right.  Did you hear Mr. Onder's testimony?

10 A    No.

11 Q    Okay, great.  Now you treat all, so when you do your

12 estimation of how much the ovarian cancer cases are going to

13 cost in the various scenarios you look at, you use 100,000.

14 A    For the stress test.

15 Q    You use that in your evaluation of the cash flow test as

16 well.

17 A    100,000?

18 Q    I'm sorry, the cash flow is 55,000, right?  You're using

19 all the PSA folks getting settled.

20 A    Sorry?  In value or claim count?

21 Q    Let's stick with, let's stick with the claim count for

22 now.

23 A    Okay.

24 Q    When you do the aggregate value you pick 100,000 as the

25 number of currently pending ovarian cancer claims.

Mullin - Cross/Ruckdeschel                  107

1  A    On the high end, correct.

2  Q    Right.  But that's the number that you plug in when you

3  calculate the six point, the six billion bucks or whatever it

4  is that you say that net aggregate value is, right?  The 5.6.

5  A    5.6 billion.

6  Q    All right.  So that's based on the 100,000 assumption.

7  A    Correct.

8  Q    You talk about a range but when you crunch the numbers you

9  use the 100,000.

10  A    For the high end, correct.

11  Q    Yes, all right.  And you don't give the low end?

12  A    I do a scenario at 80,000.

13  Q    Do you run the numbers at 80,000?

14  A    Yes, that's the middle scenario for the indemnity

15  expenditures.

16  Q    Okay, there you go.  And with respect to those 100,000,

17  you assume that 64 percent of them will get paid in the court

18  system.

19  A    I, so in that place the only, I'm taking the pay rate that

20  came out of the Lanier settlement.

21  Q    Right.

22  A    As the only settlement where you can do that calculation

23  at the moment.  So it's the sole data point we have, having a

24  64 percent pay rate.

25  Q    Right.

Mullin - Cross/Ruckdeschel                          108

1  A    So I have used that pay rate for the remaining claims,

2  that's correct.

3  Q    Right.  And we know from what we've looked at with Mr.

4  Linear's settlement that all of those clients had epithelial, a

5  definitive diagnosis epithelial ovarian cancer in order to get

6  paid.

7  A    The, correct.  The presumption is that they actually

8  satisfied the criteria.

9  Q    All right.  And --

10         MR. RUCKDESCHEL:  May I approach Your Honor?

11         THE COURT:  Yes.

12 Q    This is the Linear master settlement agreement in December

13 2020.  I'd like you to look at the second page, recitals (a).

14 All right, now you see here in recitals (a) it says each of the

15 claimants identified in Exhibits A and B has asserted a claim

16 against J&J alleging that he or she has developed and been

17 diagnosed with epithelial ovarian cancer resulting from use

18 and/or exposure to talc products, right?

19 A    I see that.

20 Q    Okay.  And then (b) says the parties have conducted a

21 thorough examination and investigation into the facts and all

22 related claims, blah, blah, blah, right?

23 A    Blah, blah, blah?

24 Q    Yeah, it goes on.

25 A    Yes, it does.

Mullin - Cross/Ruckdeschel                    109

1  Q    All right.  So what we know is that not only to get paid

2  would they have to have ovarian, epithelial ovarian cancer and

3  a definitive diagnosis of it, but every one of these people was

4  alleging it, whether they got paid or not.  That's what it

5  says, right?

6  A    That's what recital (a) says.

7  Q    All right.  And you don't have any evidence that any of

8  Lanier's clients at this time of settlement had been diagnosed

9  with uterine edometrial cervical cancer?

10 A    At the time of the settlement?

11 Q    Yeah.

12 A    I don't have independent data that says what their

13 diagnosis was.

14 Q    And you didn't have that data about the mix of claims that

15 are pending in the MDL.

16 A    We had limited information on the specific medical

17 impairment.

18 Q    And you know acknowledged to Mr. Winograd in your

19 testimony and your deposition that you don't have knowledge

20 sufficient to allow you to look at the 80,000 to 100,000

21 current claims and figure out how any are epithelial ovarian

22 cancer, how many are uterine, how many are cervical?  You just

23 don't have that data.

24 A    That data's not available.

25 Q    All right.  So when you calculate the values, you use the

Mullin - Cross/Ruckdeschel                                110

1  50,000 value for all gynecological cancers whether they're

2  uterine or ovarian or cervical.

3  A    I assume the qualification rate would be similar to the

4  Lanier settlement.  So 36 percent go to zero.  Those don't

5  qualify.  And of ones that qualify, they average the 50,000 per

6  claim.

7  Q    And the 36 percent comes from the Lanier clients who

8  believe they had epithelial ovarian cancer and nevertheless

9  didn't get paid, right?  We just went through that.

10 A    There's a recitation here.  There is the census forms.

11 And the information on the Lanier claimants in the census

12 forms, what is present, doesn't look materially different from

13 the other inventories that are on the MDL.

14     Now they don't get specific about the disease.  You can

15 look at a limited set of information.

16 Q    You use the $50,000 number for the value for all of the

17 claims that are currently pending.  And then you adjust it by

18 how many are going to qualify for payment by using the Lanier

19 qualification rate.

20 A    Correct.

21 Q    All right.  And you acknowledged that, in your deposition,

22 that you don't have data to allow you to determine how many

23 ovarian, how many, strike that.  You don't know whether Lanier

24 ever signed up anybody other than ovarian cancer client,

25 correct?  You don't know?

Mullin - Cross/Ruckdeschel                111

1  A    All we know is that 36 percent of them don't satisfy.  We

2  don't know why.

3  Q    You don't know, you don't know that Mr. Lanier has ever

4  represented somebody alleging a uterine cancer claim?

5  A    I don't have that data.

6  Q    Or a cervical cancer claim, right?

7  A    Don't have that data.

8  Q    All you know is that for his clients that alleged ovarian

9  cancer, only 64 percent of them could meet the other criteria

10 and followed through, right?

11 A    We see 64 percent got paid under the criteria.

12 Q    Yeah, right.  And you acknowledged to me in your

13 deposition that you don't know whether the 36 percent that

14 didn't get paid just dropped out and didn't respond or whether

15 they didn't have the right disease or couldn't meet the

16 exposure criteria.  That you don't know why they didn't

17 qualify?

18 A    For the majority that's correct.  Because the majority

19 were just withdrawn.  They weren't submitted without a reason

20 given as to why.  The minority were submitted audited by the

21 defendant's side and then rejected.

22      So the small minority where there's a record, but the

23 majority they were just not submitted and you don't know for

24 what reason.

25 Q    Right.  So let's do the math, all right.  When you do the

Mullin - Cross/Ruckdeschel                    112

1  aggregate value, you take 100,000 claims, you multiply it by

2  $50,000 a claim.  And you end up with the aggregate value for

3  the entire 100,000.

4  A    No.

5  Q    That's just the first step, right?  And then you multiply

6  that by .64 as to how many of them get paid, is that right?

7  A    I don't view those as steps because, if he's going to get

8  paid you usually do first and then how much they get paid

9  second.

10 Q    All right, well okay, fine.  So you take 100,000.  You

11 multiply it by .64 and then you multiply that by 50,000.

12 A    Correct, at the high end, for the high end of the

13 forecast.  That's what's being done.

14 Q    Okay.  And so Mr., just to break this out, included in

15 that would be the, all 55,000 of the claims that are

16 represented by people that signed PSAs, correct?

17 A    You can think of it that way.  You can think it's the

18 100,000 claims.  Presumably there's some claims for people who

19 didn't sign PSAs that they also are now representing that they

20 weren't as of October 2021.

21      So there's claims outside of depending, the 40,000 plus

22 the 55,000.

23 Q    Right.

24 A    So I've modeled it as 100,000 at the high end, inclusive

25 of all those claims.

Mullin - Cross/Ruckdeschel                          113

1  Q    Sir my question was included in the 100,000 are the 55,000

2  represented by the folks that signed PSAs.

3  A    It's not that explicit.  So you could think of it as that

4  plus 5,000 from all the other lawyers.  You could think about

5  it as 45,000 from them and 15,000 from all the other lawyers

6  that aren't signing plan support agreements where we don't have

7  a count for how many claims they've acquired or now represent

8  that weren't filed against the Debtor as of its 2021 petition

9  date.  Because the 40,000, those that were filed on the docket

10 as of the October petition date back in 2021.  So the non-PSA

11 firms aren't stagnate either.  They presumably have more

12 claims, I just don't have a count for them.

13 Q    But you're including all the 55,000 that you know of as

14 current claims, yes?

15 A    As current claims, yes.

16 Q    That's all I'm asking, right.  And then when you do your

17 present value of the entire, current and future, you include

18 the assumption that there are 100,000 present claims, right?

19 A    Correct.

20 Q    All right.  And you value them all at $50,000?

21 A    Again, no.  There's a dismissal rate.  So of the ones that

22 get paid, they get paid 50,000.  The ones that don't get paid

23 are zero.  So I'm not valuing all of them at 50,000.

24 Q    Right.  But the, you don't -- that's fine.  Okay, so now

25 let's talk about the cash flow analysis.  You do three

Mullin - Cross/Ruckdeschel                    114

1  scenarios, one where they litigate all, one where they

2  selectively litigate and they settle a smaller number of claims

3  and one where they selectively litigate and they settle more

4  claims, yes?

5  A    Correct.

6  Q    All right.  And I'm going to call the selective litigate

7  and lower number of settlements scenario 2 because that's where

8  it appears in the chart And settle more claims, scenario 3,

9  okay?

10 A    Okay.

11 Q    All right.  In scenario 2 you assume that in the first

12 three years after returning to the tort system, LTL and J&J

13 will settle 75 percent of the claims represented by law firms

14 with PSAs, correct?

15 A    I believe that's correct.

16 Q    It's on page 4.

17        THE COURT:  I'm sorry, what page?

18        MR. RUCKDESCHEL:  Four, Your Honor.

19 Q    So in scenario 2, 75 percent of the 55,000 claims for

20 firms represented with PSAs settle in the first three years,

21 correct?

22 A    Correct.

23 Q    And then 64 percent of those get paid under your

24 assumption.

25 A    Correct.

Mullin - Cross/Ruckdeschel                    115

1  Q    Okay.  And then in figure, in scenario 3, you assume that

2  100 percent of the claimants represented by law firms with PSAs

3  settle in the first three years.  And again 64 percent of those

4  get paid.

5  A    Correct.

6  Q    And the payment amount that you assume for the payment

7  people there is $50,000.

8  A    Correct.

9  Q    And you don't distinguish by disease.

10  A    There's no data to do that, no.  So no I did not.

11  Q    All right.  And you're aware from looking at the master

12  settlement agreements that J&J entered in the tort system that

13  prior to enter bankruptcy, J&J never settled any claims that

14  were not epithelial ovarian cancer claims.

15  A    Again I don't have all the terms of each of the master

16  settlement agreements memorized.  But they each specify exactly

17  what's a qualifying disease.

18  Q    And you agree what they say?  They say what they say.

19  A    Correct.

20  Q    All right.  And if that's the case then we have a data

21  point for potential value of those claims from the tort system

22  history of zero.

23  A    To the degree those claims were included and got releases

24  for zero, then yes.

25  Q    All right.  And if they never got paid in the tort system

1 you have no basis to use any historical data other than zero,

2 correct?

3 A    If that's been dismissed, I don't have a basis to put zero

4 on them.  So there's a question whether they are resolved --

5 Q    So you just have a big question mark?

6 A    So they're, to the degree they have value presumably

7 they're not as valuable as the ones that are being paid and

8 liquidated through the settlements.

9 Q    All right.  What is the plan that's currently pending

10 before the Court value uterine cancer cases then?

11 A    That was updated a day or two ago.  It doesn't have a,

12 maybe it has a specific dollar value.  I'd have to go look.

13 Q    All right.  If I represent to you that Section 5.3.3 gives

14 them a value of $1,000, does that sound familiar to what you

15 reviewed?

16 A    I remember some things are $500, some things are $1,000,

17 other things are on points. I don't --

18 Q    Okay.

19 A    I know 1,000's in there.  I couldn't tell you exactly

20 which ones they were.

21 Q    Fair enough.  All right, well then we're going to let His

22 Honor look at that in briefing.  In terms of your aggregate

23 analysis sir when you're looking at, well lets look at the

24 PSAs, the cash flow analysis.  You told me in your deposition

25 you did not ask LTL or Johnson & Johnson and they did not

Mullin - Cross/Ruckdeschel                117

1 provide to you any information about what they would have done

2 had they returned to the tort system rather than refiling

3 bankruptcy, in terms of settling cases, correct?

4 A    That's correct.

5 Q    They didn't tell you, you didn't ask them look, I got

6 these three scenarios, which one would you have done, right?

7 A    Correct.

8 Q    And you didn't ask them, hey, are you going to change your

9 historical practice and start paying ovarian cancer, uterine

10 cancer cases, right?

11 A    Correct.

12 Q    And nobody ever came and told you, hey, we're going to

13 change our practice.  We're going to start paying cervical

14 cancers, right?

15 A    Correct.

16 Q    Okay.  So you have no information that a uterine case or a

17 cervical cancer case has ever gotten a penny in settlement in

18 the tort system from J&J, correct?

19 A    I haven't seen the individual claimants that got paid

20 under the MSA.  So I have, to the degree one has been, I have

21 no knowledge of it.

22 Q    All right.  And if the MSAs all say we only pay on

23 definitive epithelial cervical cancer or ovarian cancers,

24 that's what they say, right?

25 A    Correct.

1  Q    Okay.  And with respect to, to the extender that Mr. Onder

2  has 21,000 cases included in the 55,000 that you assume in

3  scenario 2 and 3 on page 4 are going to resolve here, 75

4  percent of 100 percent, and he has 9,000 uterine cancer cases,

5  you're applying a value of $50,000 to those uterine cancer

6  cases.  And the only adjustment you have is 36 percent of

7  Lanier's ovarian cases didn't get paid, right?

8  A    So I have two adjustments.  That's one.  The other is

9  there's a range as to how many pending claims there are between

10  80,000 and 100,000.  So on the high scenario it does treat

11  100,000 pending claims and 64 percent of them getting paid, so

12  64,000 paid claims.

13      And now your scenario it says 80,000 pending claims.  Why

14  the other 15,000 go away, it's agnostic about it.  It's saying

15  at low end let's assume there's only 80,000, 60,000 of those

16  get resolved.  Now you're down to, if 80,000 goes to 60,000 and

17  then you take two thirds of that.  So you're down to about

18  40,000 paid claims.

19  Q    You've gone back to aggregate value. I'm asking about the

20  cash flow analysis on page 4.  On page 4 in scenario 2 you say

21  75 percent of the claimants represented by law firms with PSAs

22  are going to settle their claims with Johnson & Johnson in the

23  first three years back in the tort system, right?

24  A    Correct.

25  Q    And currently the number you have in your report for the

Mullin - Cross/Maimon                          119

1  number of claimants with PSAs, firms with PSAs is 55,000,

2  right?

3  A    Correct.

4  Q    All right.  And Mr. Onder's 21,000 cases, if I'm

5  representing to you correctly that he is a PSA firm, are

6  included in that 55,000, correct?

7  A    Correct.

8  Q    All right.  And in scenario 3 you assume all 100 percent

9  of them, adjusted for 64 percent pay, are going to get paid,

10 settled in the tort system in the first three years, right?

11 A    Right, 64 percent of them will get settled for payment.

12 Q    And the value you give to that is 50,000 a claim?

13 A    Correct.

14 Q    And you don't know whether of the 55,000, 80 percent of

15 them are ovarian cancers, 50 percent of them ovarian cancers or

16 30 percent of them are ovarian cancers.  You just don't have

17 that data.

18 A    That data's not available.

19 Q    Thank you.

20          THE COURT:  Uh oh, he's bringing a box.

21          MR. MAIMON:  Hopefully we won't need the box.

22                    CROSS-EXAMINATION

23 BY MR. MAIMON:

24 Q    Dr. Mullin, Mr. Ruckdeschel was talking to you about

25 scenarios 2 and 3, do you recall that?

1  A    Yes.

2  Q    I'm going to talk to you about scenario 1 just so we know

3  that, okay?

4           MR. JONAS:  Your Honor before we start, these two

5  gentlemen represent the same client.

6           MR. MAIMON:  No.

7           MR. JONAS:  Mr. Ruckdeschel and Mr. Maimon both

8  represent Mr. Croach if memory serves.

9           MR. MAIMON:  No, no.

10          MR. JONAS:  Do (indiscernible) pleadings for Mr.

11  Croach?

12          MR. MAIMON:  I do.

13          MR. JONAS:  Mr. Ruckdeschel do you have

14  (indiscernible) to Mr. Croach?

15          MR. MAIMON:  And I've appeared on behalf of the

16  Levitt (phonetic) family as well as the Schmitz (phonetic)

17  family who have wrongful death claims against Johnson & Johnson

18  and submitted pleadings on their behalf as well.

19          MR. JONAS:  In this bankruptcy.

20          MR. MAIMON:  Yes, sir, yes, sir.

21          MR. JONAS:  It's up to you Your Honor.

22          THE COURT:  It was up to you, so.

23  BY MR. MAIMON:

24  Q    Okay, do you have in mind that I'm going to talk to you

25  about scenario number 1?

Mullin - Cross/Maimon                          121

1  A    Yes.

2  Q    That's the litigate all, right?

3  A    Correct.

4  Q    And you said in your deposition and you actually said in

5  your report that a litigate all strategy would not be

6  unreasonable, true?

7  A    Correct.

8  Q    Okay.  But again you didn't ask anyone from J&J what their

9  strategy would be, correct?

10 A    Correct.

11 Q    You didn't ask the lawyers who retained you, say help me

12 out a little bit.  Tell me which way you think it will go if

13 you go back into the tort system, right?

14 A    I've been doing this for a long time and I've learned to

15 not put a lot of weight on what the lawyers tell me and what

16 they might do when they go back in the tort system.  I look at

17 the economic incentives that are in play and the forces.

18 Q    And --

19 A    And what they've actually done in the past when forced

20 with those same decision.  And as an economist relying on the

21 actual choices people make to see how they would react to a set

22 of economic pressures is typically more reliable than a

23 representation they may give you of what they might do in the

24 future.

25 Q    I'm going to ask you to look --

Mullin - Cross/Maimon                    122

1  A    As they did in the past.

2  Q    Sure.  I'm going to ask you to look at this clip and see

3  if that is consistent with what you consider to be a reasonable

4  approach when J&J goes back in the tort system, okay?

5  A    Okay.

6  Q    Go ahead.

7        MR. JONAS:  Your Honor.

8        THE COURT:  Yes.

9        MR. JONAS:  Can we have an instruction as to what

10  this may or may not be.

11        MR. MAIMON:  I'd like you to assume that this is a

12  presentation at a mass tort seminar on June 26th by a Susan

13  Sharko the longest standing asbestos, longest standing defense

14  lawyer for J&J according to the testimony.

15        THE COURT:  Counsel.

16        MR. JONAS:  Your Honor I object.  We have no way of

17  knowing what this is, when it was done.  We don't even have a

18  date.

19        MR. MAIMON:  We do, it's right down there.  6/26 mass

20  tort seminar.

21        MR. JONAS:  Okay.

22        THE COURT:  He can show him anything and ask an

23  opinion.

24      (Recording paused from 4:29:50 p.m. to 4:30:00 p.m.)

25        (Video played from 4:30:10 p.m. to 4:31:11 p.m.)

Mullin - Cross/Maimon                                123

1  Q    That would be consistent with your litigate all scenario,
2  correct?
3  A    That's her personal opinion, it seems to be consistent
4  with that scenario.
5  Q    Okay, so let's talk a little bit about that.  You, for
6  that, you as we said have assumed 100 trials per year, correct?
7  A    In the formal modelings 100 trials per year.
8  Q    And you base that on the experience that you saw in the
9  report of 100, of 200 verdicts by Owens Corning, correct?  In
10 the mid 1990s.
11 A    I have a broader experience than that.  That is the
12 citation I gave as an example in support of it, but it's not
13 the sole thing in my experience that led me to model that
14 scenario.
15 Q    Understood.  How many states in the union was Owens
16 Corning litigated in?
17 A    Owens Corning, I'd have to go back and look in the 1990s.
18 I don't remember the count of states.
19 Q    And the more states that they were litigating in, the more
20 opportunities there were for courts to have trials, correct?
21 A    We would have more courtrooms available, that's correct.
22 Q    Okay.  And with regard to asbestos litigation in general
23 that you reference in your report, how many states are asbestos
24 cases being tried in every year?
25 A    That's become a smaller set through time, so I haven't

Mullin - Cross/Maimon                                   124

1  gone back and refreshed my memory in the '90s.  So there's,

2  Texas and Mississippi were common in the '90s.  You don't

3  really see trials in Mississippi for asbestos cases like you

4  did in the '90s.  So that's, that has changed through time.

5  Q    But again you don't know how many states currently

6  asbestos cases are being tried in in the union, correct?

7  A    I haven't done a recent tabulation.  It's in the 10s.

8  Q    Okay.  So now you assume, by assuming 100 trials per year,

9  over three years you have 300 trials.  And a $5 million per

10 trial you come up with your $1.5 billion number, right?

11 A    Correct.

12 Q    Now do you think based on the information that you've been

13 given by Johnson & Johnson that it's fair to say that the

14 ovarian cancer claims primarily are located in four courts in

15 the country, the District Court here in New Jersey where the

16 MDL is that Ms. Sharko was talking about, the MDL Court in

17 Atlantic County in New Jersey which has the MDL coordinated

18 litigation in New Jersey, the California coordinated docket and

19 the Missouri coordinated docket.  Is that consistent with what

20 your understanding is of where most of the ovarian cancer cases

21 are pending?

22 A    So of the ones that have actually been filed, the vast

23 majority are on the Federal MDL.

24 Q    Okay.

25 A    It's only been about a few thousand of them.

Mullin - Cross/Maimon                          125

1  Q     Now --

2  A     Of the ones that haven't been filed, they, we don't know

3  where they would file if you returned to the tort system.

4  Q     And with regard, let's take the MDL as an example.  Were

5  you aware that prior to the filing of this bankruptcy, four

6  cases had been designated to be tried as Bellwether cases?

7  A     I was aware that there was a Bellwether process.  I

8  didn't, I don't remember the exact number.

9  Q     And if this case was dismissed it would be a fair

10 assumption from an economic point of view that that process

11 would continue in the MDL court, correct?

12 A     My understanding is there's a new judge, so I don't

13 presume the new judge will necessarily follow the direction the

14 prior judges had, but --

15 Q     So --

16 A     It may.  The judge may.

17 Q     So you really can't say with any type of certainty when

18 the first trial would be held in the MDL after the dismissal of

19 this case, can you?

20 A     No, it's one of the reasons there's a broad range.

21 Q     And if Judge Shipp who's now the Judge in charge of the

22 MDL follows what Judge Wolfson did and takes a very discrete

23 number of ovarian cancer cases and tries them as Bellwethers,

24 you don't have any idea of how many trials the MDL court could

25 have in that one year, correct?

Mullin - Cross/Maimon                    126

1  A    The MDL in isolation?

2  Q    Yeah, where the vast majority of claims are filed.

3  A    You could get through four cases pretty quickly.  There's

4  only MDLs that have tried more than four cases in a year.  So

5  if they're going to look at four, they could get through the

6  four cases relatively quickly.

7  Q    Okay, how many days?

8  A    I'm not thinking about it in terms of days.  Could you, in

9  a year or two years, get through them, yes.

10 Q    Judge Kaplan gave us four days for this hearing because

11 he's a busy man and he's got a lot to do.  Do you know what

12 Judge Shipp's docket is to allow him to try multiple trials

13 during a year?

14 A    Okay, I didn't realize you were constraining the trials to

15 have to be performed in that one courtroom, because that's not

16 always what's been done in MDLs.

17 Q    It's not, but do you know what Judge Shipp's availability

18 is?

19 A    I do not.

20 Q    Okay.  And do you know what the Judge in Atlantic County

21 has as far as his ability to try multiple trials in a year?

22 A    No.

23 Q    Do you know what the California coordinated docket has and

24 its ability?

25 A    No.

Mullin - Cross/Maimon                                127

1  Q    How about the Missouri coordinated docket?

2  A    No.

3  Q    So you have absolutely no basis to say with reasonable

4  certainty that there will likely be 100 trials per year.

5  That's just a number that you've hypothesized, fair?

6  A    There is a range.  I was looking for a number at the

7  higher end of the range.  The plaintiffs have many options at

8  this point.  So if none of those are moving, the 50,000 or

9  however many claims there turns out to be that aren't file

10 anywhere, can choose to file in a different location.

11 Q    Okay.

12 A    There are options besides just going to these four

13 locations.

14 Q    How long did it take the MDL to get up to speed on the

15 ovarian cancer litigation before it was ready to actually set

16 its first case down for trial?

17 A    I don't remember the exact information.

18 Q    I'm sorry.  You have no idea how long it would take a

19 judge in a District or in a Court that never had a talc ovarian

20 cancer case to get ready and up to speed to be ready to try a

21 single trial let alone multiple trials, true?

22 A    So our focus here seems to be all on the ovarian cancer

23 claims and not the Mesothelioma claims.

24 Q    We'll get to the Mesotheliomas in a moment.

25 A    Would be, the count of claims that could go to trial is

Mullin - Cross/Maimon                                    128

1  the two combined. So I don't want to create the impression that

2  my testimony is we'll have 100 ovarian cancer claims and zero

3  Mesothelioma claims.  That's not.  There's many courts around

4  the country that are already up to speed to try Mesothelioma

5  claims.

6      As is illustrated by asbestos litigation generally, the

7  plaintiffs' do file those all around the country, in the venues

8  where they can get to trial relatively quickly.  So there's an

9  ability to have a large number of Mesothelioma claims.  There's

10 much more uncertainty about the number ovarian cancer claims.

11     And as I said in my deposition, if you want to look at the

12 low end, it very well may be 15 Mesothelioma claims and five

13 ovarian cancer claims.

14 Q    Okay.

15 A    And that's it on the ovarian cancer claim side.

16 Q    You done?

17 A    Yes.

18 Q    Where are there currently the most number of pending

19 mesothelioma claims?  What state?  I'll give you a hint.

20 A    Well, they're largely in New York, New Jersey, and

21 pending?

22 Q    Pending?  From your report.  I'll give you a hint.

23     New Jersey, right?

24 A    I see you pointing at New Jersey.

25 Q    Fair?

Mullin - Cross/Maimon                    129

1  A    I don't remember the exact number.  I know a couple states

2  had material numbers.

3  Q    How many judges in the state of New Jersey try asbestos

4  cases?

5  A    I don't know.

6  Q    I'd like you to assume there's one.  The Judge in

7  Middlesex County who's been assigned them by our Supreme Court

8  Justice, Justice Rabner.

9      How many are the most trials in a year that have been

10  tried in Middlesex County in the last 10 years?

11  A    I don't know the answer to that specific of a question.

12  Q    So that you have no idea for the most populous as far as

13  pending cases, you have no idea how many total cases that court

14  tries in a year, let alone how many of the subset of Johnson

15  and Johnson trials can happen, right?

16  A    For a particular jurisdiction like that, no.

17  Q    Okay.  Let's move on.

18      You put your litigate-all scenario and I've boxed it in

19  red.  Do you see that?

20  A    I do.

21  Q    Okay.  And we've talked about the number of trials.  I'd

22  like now to talk to you about the trial costs, okay?

23  A    Yes.

24  Q    You talked to us, you said that the average is $5 million

25  per case.  Is that right?

Mullin - Cross/Maimon                    130

1  A    Correct.

2  Q    Okay.  Now, you had in your reliance materials a chart of

3  the talc trial costs, right?

4  A    Correct.

5  Q    You had it in an Excel spreadsheet form, correct?

6  A    That is highly likely.

7  Q    Okay.  What I did is I summed up horizontally for each

8  case what the total cost that you accounted for are.

9       Do you see that?

10 A    Yes.

11 Q    Okay.  And what I've done with the highlighting is if it's

12 a mesothelioma case, I put it in yellow, and if it's an ovarian

13 cancer case, I put it in pink.

14      Do you see that?

15 A    I do.

16 Q    Okay.  And it is true, is it not that, forget about the --

17 wait a minute.

18      On the second column there, or the third column is total

19 fees.  Do you see that?

20 A    Yes.

21 Q    That is the time as reported in the summaries that you

22 looked at for the charge of the attorneys and staff at trial,

23 right?

24 A    Correct.

25 Q    And then, on the final one in your chart, are the

Mullin - Cross/Maimon                     131

1  expenses, the trial were actually the case expenses, right?

2  A    Yes.

3  Q    Okay.  And in the middle you have pre-trial costs as well

4  as post-trial costs, as well as appeal costs, right?

5  A    Yes.

6  Q    When you talked about the average being 5 million, you did

7  not include the three middle columns, pre-trial, post-trial,

8  and appeals, right?

9       You were saying trial, which would be total fees and

10 expenses, right?

11 A    I believe it's a breakdown, a summary of all of them.

12 Q    Okay.  But when you told the Court that the average trial

13 cost is $5 million, you did not include that pre-trial cost,

14 right?  Because you said there's also pre-trial costs.

15 A    The trial itself averages less than 5 million.  The total

16 process is at 5 million.  The reality is this understates that

17 total cost as you can see.  We know that these records are

18 incomplete.  There's footnotes to the report to this effect,

19 but you can see it, for example, by looking at the fourth row

20 for Berg (phonetic), there is zero pretrial cost listed.

21      It's not that there was nothing done, it's just the time

22 records weren't categorized where that could be pulled out.  So

23 we're understating the actual costs incurred and we still get

24 an average of 5 million, but it's the fees that are tracked to

25 that case and its expenses within two months of trial.

Mullin - Cross/Maimon                    132

1  Q    You mentioned time records.  You didn't actually see real

2  time records, did you?

3  A    No.  We got summaries from counsel.

4  Q    So the attorneys prepared summaries for you, and that's

5  what you relied on for your chart, correct?

6  A    Correct.

7  Q    Okay.  Let's just take a look at the last column, the one

8  that I put together summing it up with my Excel excellence.

9      It's true is it not that 29 out of the 47 trials that you

10 accounted for had total costs of less than $5 million?

11 A    It may be, but you really can't do that entirely from this

12 chart.  As I said, this chart understates total costs for many

13 of these cases.

14 Q    All I have is the chart that you prepared, sir, okay?

15 A    And pay attention to the footnotes that explain what it

16 represents.  Because when you have no pretrial costs associated

17 with a claim, it's not because no one did anything pretrial.

18 It's because counsel couldn't break those out for me and

19 provide me that number.  And so this chart treats that as

20 though it's a zero.

21 Q    Understood.

22 A    And the report is clear that this is causing us to

23 understate the actual costs of trying these cases.  So it's

24 understating that.  So you can't look at that row for Berg,

25 take it all the way across and get a number just under a

Mullin - Cross/Maimon                              133

1  million dollars and say the total cost of that case was just

2  under a million to try it.  We know that's incomplete.

3  Q    But you don't know how much more it is, do you?

4  A    No.  That's what the caveats in the report are, that the 5

5  million is understating the actual cost on average of taking a

6  claim all the way through trial.

7  Q    Right.  For the majority of the cases where you have total

8  costs on this chart, over $5 million are mesothelioma trials,

9  correct?

10 A    Well, the majority of the cases are mesothelioma, so I

11 would expect that to be true.

12 Q    Well, not only are the majority of the trials

13 mesothelioma, but the majority of those -- all the cases with

14 costs over $5 million are mesothelioma cases, correct?

15 A    As I said, I didn't do the tabulation that way, so I don't

16 have that at my fingertips to answer.

17 Q    But what this chart does is this takes the averages,

18 including the mesothelioma cases, and applies them to the

19 ovarian cancer cases, correct, as an average?  Yes or no?

20 A    So it's taking an average that's mixing both mesothelioma

21 and ovarian cancer cases and it's applying that to the mixture,

22 which would include both mesothelioma and ovarian cases in the

23 future.

24 Q    Right.  And what's the percentage of pending cases,

25 ovarian cancer versus mesothelioma?  If we want to know if they

Mullin - Cross/Maimon                           134

1  have to try, litigate, try every case, how many ovarian cancer

2  cases are they going to have for every one mesothelioma trial?

3  A    There's many more pending claims.  As the history tells

4  you, that's not always how the trial dockets work out.

5  Q    I understand that.  But if we're looking towards the

6  future, we have a lot more ovarian cancer trials than we have

7  mesothelioma trials if they move to trial and judges say, I

8  want to clear my docket, like you've assumed, right?

9  A    No.  I've assumed that both of those would saturate the

10 docket, in essence.  So the number of claims you have when you

11 have fifty, 100,000 thousand claims, whether you settle half of

12 them and only have 50,000 left or 100,000 doesn't really change

13 the trial capacity for the next three years.  So I really

14 assume that they both could -- they have enough claims to

15 potentially saturate the trial dates that are available for

16 them.

17 Q    And you don't know from the Court's point of view as far

18 as Court availability how many trials are available, correct?

19 A    That's correct.

20 Q    Okay.  What I did here is I took out the ovarian cancer

21 cases, and I'd like to first start with three cases that you've

22 listed, the Blaze (phonetic) case, the Guise (phonetic) case,

23 and the Ingham case.

24      Do you see that?

25 A    I do.

Mullin - Cross/Maimon                                135

1  Q     Those were cases that had consolidations, correct?  And I

2  put the number of plaintiffs in the consolidation in there.

3  A     Okay.

4  Q     And if we take the Blaze case as an example, while the

5  total cost there was $2.9 million, if we divide it by the three

6  plaintiffs on a per-plaintiff average, that's only 967,000 per

7  plaintiff, correct?

8  A     Correct.

9  Q     And the Guise case, even though we have an appeal not

10 applicable, the total cost there was 451,000, and divided by

11 three, that's 150,000, right?

12 A     It's almost assuredly incomplete records.

13 Q     But you don't know because you weren't given all the data,

14 correct?  So you can't say with reasonable certainty how much,

15 if anything more than that it would've been, correct?

16 A     I took the 5 million, caveated in the report that this is

17 missing a number of expenses.  It's obvious by looking at some

18 of the cases that they're missing.  Others, there's

19 uncertainty.  When it costs 10 million, maybe it's still

20 missing a million or 2 million of fees.  Maybe it's missing

21 nothing.

22        So there's a reason it's treated as a lower bound on the

23 costs when you look at this on average.  Doing the analysis

24 claim by claim like this when you know your records aren't

25 complete can be very misleading.  There's a reason I

Mullin - Cross/Maimon                    136

1  intentionally don't do things claim by claim and I'm looking at

2  more of a global average.

3  Q    On the Ingham case, 22 cases, the total cost listed for

4  you was $10 million.  If I divide that by 22, I only have

5  459,000 per plaintiff, correct?

6  A    Correct.

7  Q    Okay.  But let's forget about consolidations.  The average

8  for these ovarian cancer cases was $3.7 million, correct, per

9  trial, according to the data, right?

10  A    Of the fees that they could associate with the cases,

11  that's correct.

12  Q    Okay.  And just the trial time, and let's take a look at a

13  few of these.  The Echeverria case was one trial, $12.7

14  million, right?

15  A    Correct.

16  Q    The Ingham case was 22 cases together, $10 million.

17  A    In identified fees, that's correct.

18  Q    The Echeverria case lists $5.2 million for pretrial costs,

19  right?

20  A    Correct.

21  Q    Did you see anything near that, anything near that on any

22  other ovarian cancer case?  The next closest is Ingham of 22,

23  plaintiffs for $3 million, right?

24  A    Correct.

25  Q    What were they spending on in the Echeverria case that

Mullin - Cross/Maimon                    137

1  makes you think that that's indicative of what would happen in

2  the future because you're projecting from this onto the future?

3  A    Again, there's a reason you're taking an average over a

4  large number of cases, and you're spreading those costs across.

5  To try to do this claim by claim and look at all the underlying

6  detailed time records, you could try to do that.  It's not

7  going to materially alter the results at the end of the day.

8  Q    For your $1.5 billion for trial costs over three years, if

9  the number of trials is reduced in half, that number is reduced

10 in half, correct?

11 A    If it's reduced and has to be a consolidation, no.  If

12 it's reduced in half and you're just doing half as much work,

13 then yes.

14 Q    In your scenario, correct?

15 A    Right.

16 Q    If you would've only projected 50 trials instead of 100,

17 you would've come out with 750 million instead of 1.5 billion,

18 correct?

19 A    Correct.

20 Q    Okay.  And if the per-case average trial cost is less for

21 the trials that go forward, that will also reduce that $2.07

22 million, which was the total aggregate for the litigate-all

23 scenario, right?

24 A    The assumption necessitates the conclusion, yes.

25 Q    And it will do it for every single one.  Those things will

Mullin - Cross/Maimon                           138

1  act synergistically, not only the number of trials reduced but

2  the cost per trial reduced will significantly reduce that

3  number, correct?

4  A    If you're multiplying A by B and you decrease both A and

5  B, the product goes down, too.  That's true.

6  Q    Okay.  So let's talk a little bit about claim values and

7  I'll move on very quickly from here.

8       You put your core mesothelioma value at 750,000 a case,

9  correct?

10 A    Correct.

11 Q    You acknowledged that where there is alternative or

12 contributing causes, other asbestos exposure in particular,

13 that would, in your mind, result in a discount for the

14 anticipated value of that case, true?

15 A    So, no.  Historically, those claims have received less

16 than 5 percent of the total money, so I modeled where the 95

17 percent of the money was and then grossed up for the remaining

18 five --

19 Q    Right.  But on a --

20 A    -- which is a common modeling technique.

21 Q    Going into the future, according to your projections, to

22 the extent that there's what I'll call mixed exposure as

23 opposed to talc only, that would be a discount in the value,

24 correct?

25 A    Just as it has been in the past, yes.

Mullin - Cross/Maimon                          139

1  Q    Okay.  Now, I want to bring to your attention a case that

2  was tried in California by my co-counsel, Joe Satterley, in

3  which the jury allocated responsibility, 40 percent to Colgate,

4  40 percent to Johnson and Johnson, and 20 percent to Avon.

5       Do you see that?  That's straight out of the court

6  opinion.  Do you see that?

7  A    I do.

8  Q    Okay.  Now, I'm just going to represent to you that

9  Colgate and Avon are talc manufacturers, okay?

10 A    (No audible response)

11 Q    You got that?

12 A    Yes.

13 Q    Are they talc only?  Are they talc only or are they mixed

14 exposure, according to your scenario?

15 A    Those are still talc claims.

16 Q    Okay.

17 A    So I mean, Colgate also made talcum powder products, so

18 it's still a talcum powder claim.  There's not an alternative

19 exposure from, for example, a traditional asbestos containing

20 product.

21 Q    And one of the things that Mr. Burian was critical of you

22 about is that you didn't take into account the contribution

23 from other defendants.  And here, there would be a 60 percent

24 contribution from other defendants, right?

25 A    The preamble I strongly disagree with, but then you had a

Mullin - Cross/Maimon                                        140

1  question after the preamble.  So I'm not sure --

2  Q    You responded when LTL's counsel to various criticisms

3  that Mr. Burian had of you.  Do you recall that?

4  A    Yes.

5  Q    And you went by the slide and it said, "Ascribes all talc

6  liability to LTL without allocation or apportionment of

7  liability between LTL and other defendants."

8       Do you recall that?

9  A    So that's true on ovarian cancer claims.  On mesothelioma

10 claims, I'm extrapolating their $750,000 settlement value,

11 which to the degree they're also collecting money from other

12 claimants, that's not being included.

13 Q    Okay.  And for ovarian cancer claims, you talked to

14 Mr. Ruckdeschel about the 50,000, that's not discounted for any

15 alternative or contributing cause, correct?

16 A    It's an average.  So now how it gets allocated to

17 individual claimants may well do that, but the average recovery

18 and how the master settlement agreements were set up, there's

19 an allocation on the back end that at least I haven't seen yet,

20 so some claimants may get 75,000, others may get 50 --

21 Q    I'm not talking about that.

22 A    -- maybe 25.

23 Q    I'm talking about whether or not, for instance, any of

24 Mr. Lanier's case or any of the Ferraro firm case or any of the

25 Cheek firm's case had a contributing factor other than the J&J

Mullin - Cross/Maimon                                    141

1  talc product, you didn't take that into account, correct?

2  A     For ovarian cancer?  Yes.

3  Q     For ovarian cancer.  Come up with your 50,000, correct?

4  A     That's correct.  The vast majority name just LTL/J&J in

5  the tort system and Imerys.

6  Q     And to the extent that there were other alternative

7  contributing causes that might result in a further discount,

8  correct?

9  A     If you had a claimant who asserted they used almost

10 exclusively Colgate, or say Colgate 90 percent of the time, you

11 could see a discount on that individual claim.

12 Q     Okay.  Thank you.

13       Let's talk a little bit about values of claims.  Did you

14 review the voluntary petition where Johnson and Johnson -- I'm

15 sorry.  Did you -- withdrawn.

16       Did you review the voluntary petition where the chief

17 legal officer of LTL signed his name to the bankruptcy petition

18 and said that the estimated liabilities was between 1 and $10

19 billion?

20 A     No.

21 Q     Okay.  Let's talk about Johnson and Johnson versus JJCI

22 for just a moment.  You have operated under the assumption that

23 all of the liability in following the accounting practices that

24 they've employed up until now, all of the liability finds its

25 way onto JJCI or LTL now, and there is no independent liability

Mullin - Cross/Maimon                              142

1  that would contribute to the plaintiff recovery for J&J alone,

2  correct.

3  A    No independent liability that wouldn't fall under an

4  indemnification agreement --

5  Q    Okay.

6  A    -- is what I understand.

7  Q    You have not reviewed the indemnification agreements,

8  correct?

9  A    I'm aware of its existence, but I wouldn't try to

10  interpret the legal document when I haven't read it.

11  Q    You can just say, "correct," or you could just say, "I

12  didn't read it."

13       You didn't read it, did you?

14  A    No, I didn't read it.

15  Q    Okay.  And you're not qualified to lend a legal opinion

16  about the enforceability or applicability of those indemnity

17  agreements, are you?

18  A    No.

19  Q    You just assumed for purposes of your projections that

20  those indemnity agreements bring all the liability over to LTL

21  and none of it onto Johnson and Johnson, correct?

22  A    I maintain the historical practice.

23  Q    Well, the historical accounting practice, right?

24  A    Correct.

25  Q    Okay.  Because what you've ignored is the historical

Mullin - Cross/Maimon                    143

1  practice in the courts of our country.  Here are two judgments

2  that were rendered here in New Jersey that have allocation

3  ascribed to both Johnson and Johnson and JJCI.

4       So for instance, in the Etheridge (phonetic) case, J&J was

5  held 80 percent liable, whereas JJCI was 20 percent liable.  Do

6  you see that?

7  A    Yes.

8  Q    And in the McNeil case, it was the reverse.  Johnson and

9  Johnson Consumer, Inc., was 80 percent and Johnson and Johnson

10 was 20 percent.  Do you see that?

11 A    I see most.  I don't see everything on the screen because

12 there's video covering one side.

13 Q    If you need, that's what's in the box.

14 A    I can see enough of it.  It's fine.

15 Q    In the Barden case, Johnson and Johnson was held 80

16 percent responsible and JJCI 20 responsible.  Do you see that?

17 A    I do.

18 Q    And in the Ronnie (phonetic) case, it was split 50/50,

19 right?

20 A    I see that.

21 Q    And you don't know -- by the way, did you know that that

22 was a single jury that made those determinations?

23 A    Across these --

24 Q    Four.

25 A    -- four?

Mullin - Cross/Maimon                    144

1        At a point in time, I may have, but I didn't carry that in

2   my head.

3   Q    You don't know what factors at trial led to the jury to

4   say, we're putting X percent on this defendant versus Y percent

5   on the other defendant, do you?

6   A    No.

7   Q    Okay.  Now, I'm not going to go into it because I don't

8   want to spend more time, but when multiple tortfeasors are in a

9   single case and the question becomes what's the liability of

10  each, there are many factors that go into that determination,

11  fair?

12  A    There can be.

13  Q    And as a company, or as two companies that are talking

14  about the values of cases, those companies can reasonably, from

15  an economic point of view, look to various factors to say, I

16  should be paying X and you should be paying Y, fair?

17  A    The company's could talk to each other about that, yes.

18  Q    And over the course of a litigation, as a litigation

19  matures and the evidence comes out and people know what juries

20  have told them, companies can make more educated guesses or

21  educated choices from an economic point of view about what they

22  really should be paying and what percentage of liability is

23  really theirs in a given case, fair?

24  A    So we're talking about two independent companies with no

25  indemnification agreements?

Mullin - Cross/Maimon                                                145

1  Q    Forget about indemnification.  Fair?

2  A    Yes.

3  Q    Okay.  And one of the issues that companies who are

4  responsible in litigating and responsible towards their

5  company, responsible to their shareholders, will be cognizant

6  of is that juries take a look at the reprehensibility, the

7  relative reprehensibility of the conduct of the two companies.

8  One might be slightly at fault, but another is really, really

9  bad, and that might result in more liability being ascribed to

10 them.   That's from an economic point of view, an important

11 factor to take into account, true?

12 A    Corporate behavior is looked at by juries.

13 Q    And you don't know, although you do know because you've

14 read some things, but, for instance, the Ingham case, the

15 Missouri courts held that Johnson and Johnson's conduct was

16 tremendously more reprehensible, deserving a higher punitive

17 damage verdict, than JJCI?  You're aware of that, correct?

18 A    I haven't reread it recently, so I (indiscernible) --

19 Q    But you would agree with me, Dr. Mullin, that for every

20 bit of percentage, forget about indemnity, that Johnson and

21 Johnson would be responsible, LTL's share would go down

22 correspondingly?

23 A    If it was determined that Johnson and Johnson was the

24 responsible party and not LTL, by simple subtraction, yes,

25 there would be a tradeoff between --

Mullin - Cross/Maimon                          146

1  Q    Well, it's not an either/or.  It could be both and the

2  percentage can be different for each, correct?  Multiple

3  tortfeasors.

4  A    What?

5  Q    They could both be liable, but in different percentages,

6  like the jury in the <u>Barden</u> and <u>Ronnie</u> determined, right?

7  A    Correct.

8  Q    Okay.  And for every percent that Johnson and Johnson is

9  responsible and not LTL, your projections go down by that

10 percent, correct?

11 A    There's the settlements and the settlement framework and

12 there's jury trials.  Most of the money is moving through a

13 settlement framework in the -- well, most of the money actually

14 moves through the <u>Ingham</u> trial in this case, historically.  But

15 in general, most of the cases are settling in the split of the

16 money.

17      So in a jury verdict, as we saw with the one, maybe it's

18 Colgate that goes -- if J&J goes down, maybe Colgate goes up,

19 and LTL or JJCI stays in the same place.  If there's just the

20 two of them, then by construction, if one goes down a

21 percentage point and they're allocating, the other must go up.

22 Q    Thank you.

23      MR. MAIMON:  Those are all the questions I have, Your

24 Honor.

25      Didn't use anything in the box.

1                              CROSS-EXAMINATION

2    BY MS. JOHNSON:

3    Q    Good afternoon, Dr. Mullin.  My name is Ericka Johnson.  I

4    represent the Ad Hoc Committee of State Attorneys General.

5         I wanted to ask you some questions about how you treated

6    government action claims in the balance sheet analysis that you

7    conducted.

8         In your balance sheet, you calculated net present value of

9    defending and resolving the government action claims at less

10   than $1 billion, correct?

11   A    Correct.

12   Q    And that was calculated based on two components.  One, the

13   settlement value and, two, the defense costs, correct?

14   A    Correct.

15   Q    And in calculating the settlement value, counsel

16   instructed you to assume that the settlement value of the

17   government action claims would be between $0 and $400 million.

18   Is that correct?

19   A    That is correct.

20   Q    And you followed counsel's instructions, correct?

21   A    Correct.

22   Q    You didn't conduct any independent analysis of what you

23   thought the value of the consumer protection claims would be,

24   correct?

25   A    That's correct.

Mullin - Cross/Johnson                    148

1  Q    The other component to the net present value for the

2  government action claims was defense costs, right?

3  A    Yes.

4  Q    And J&J hasn't tried any consumer protection claim for

5  talc, historically, correct?

6  A    That's correct.

7  Q    And so there's no historic data for which you could rely

8  on in making your calculations, right?

9  A    That is specifically this case going to trial, no.

10 Q    And so instead, what you did is you looked at the historic

11 cost for a personal injury claim that LTL -- well, LTL, the

12 predecessor, LTL really, had defended in the past, correct?

13 A    As informative in that there's a lot of overlapping issues

14 that would be tried.

15 Q    Is that correct?  That's how you, that's the data that you

16 used to calculate what --

17 A    Yes.

18 Q    -- the defense cost would be?

19      And specifically, what you did in Footnote 126 is take the

20 most expensive personal injury matter that LTL had ever

21 defended, which cost $17 million, correct?

22 A    Correct.

23 Q    And then from that $17 million, you added an amount to say

24 that on average it would cost $25 million to defend the

25 consumer protection claims, correct?

Mullin - Cross/Johnson                    149

1  A    Well, the balance sheet test was intended to, if anything,

2  overstate.  And so on this, I wanted a number on the defense

3  costs that I was confident that if we had 20 states go through

4  trial at 25 million each for $500 million, that that would be

5  ample money for handling the defense costs of that.

6  Q    Okay.  So --

7  A    It's not supposed to set an unbiased estimate of where you

8  would be.  It's more for that balance sheet test where you're

9  looking at solvency, what's a number you have a high degree of

10 confidence you'll be under.

11 Q    So it's correct that you took the $17 million and

12 increased it to 25 million to say that would be the average

13 cost to defend the consumer protection claims for purposes of

14 your analysis, right?

15 A    Correct.

16 Q    And then you assumed that, at most, 20 states would

17 litigate, or government units would litigate those claims,

18 correct?

19 A    Correct.

20 Q    And so you took the 25 million, multiply it by the 20

21 states to come up with a $500 million total defense cost --

22 A    Correct.

23 Q    -- assumption.  Okay.

24     So the $400 million that were the settlement value was an

25 assumption, right?

Mullin - Cross/Johnson                          150

1  A    That was the direction from counsel, correct.

2  Q    Okay.  And then the $500 million in defense costs was also

3  based on assumptions.

4  A    It's an extrapolation from available data, so there's a

5  combination of some of it, you know, based on cases that had

6  some overlapping issues and trying to get a sense of a number

7  that it would very likely cost less than.

8  Q    Okay.  So that extrapolation was based, number one, on the

9  assumption that the cost to defend a consumer protection claim

10 would be a little higher than the highest cost, was five times

11 higher than the current average cost that J&J incurs in

12 defending a personal injury claim, right.

13 A    That's how I modeled it, correct.

14 Q    And then it was also based on the assumption that it would

15 be 20 states or government units defending?

16 A    That there would be no more than 20 states.

17 Q    No more than that, correct?

18 A    Correct.

19 Q    All right.

20       MS. JOHNSON:  No further questions, Your Honor.

21       THE COURT:  Thank you.

22       Let me have, what's your pleasure?

23       MR. JONES:  Your Honor, the proposal is, I have very

24 few questions that will take less than five minutes, and on our

25 end, we'll be done.

1          THE COURT:  All right.

2          MR. JONES:  That's --

3          THE COURT:  Otherwise, I have to take a break.  So --

4          MR. JONES:  I'll go that fast, Your Honor.

5                      REDIRECT EXAMINATION

6   BY MR. JONES:

7   Q    Dr. Mullin, just a very few questions in follow-up.

8        You are aware that MDL courts, including the MDL court

9   sitting in this district that is handling the talc litigation,

10  can, at their pleasure, remand cases to trial in other

11  jurisdictions, or the jurisdictions in which the cases were

12  originally filed.  Are you aware of that?

13  A    There is the ability to remand cases, yes.

14  Q    And those states, rather, those federal district courts

15  could sit in any state.  Is that fair?

16  A    Correct.

17  Q    To which a case can be remanded?

18  A    Correct.

19  Q    And as I'm hearing the examination that we just heard, are

20  you aware of any member of the plaintiff's bar or any group of

21  plaintiff's lawyers in the talc litigation who have offered to

22  limit the number of trials they would request upon remand?

23  A    I'm not aware of that.

24  Q    And are you aware that counsel who cross-examined you,

25  Mr. Maimon, has indeed asked the New Jersey asbestos forum

Mullin - Redirect/Jones                              152

1   judge to bring in more judges to try cases?

2           MR. MAIMON:  I'll stipulate to that.

3           MR. JONES:  Thank you.

4   BY MR. JONES:

5   Q    And have you also become aware that his firm has asked

6   judges to consolidate up to 22 plaintiffs in a single case?

7           MR. MAIMON:  I'll stipulate to that, too.

8           MR. JONES:  Thank you.

9   BY MR. JONES:

10  Q    And speaking of consolidated trials, have you ever known a

11  talc defendant to advocate for consolidated trials?

12  A    On the defendant's side?

13  Q    On the defendant's side.

14  A    I'm not aware of one.

15  Q    And consolidating trials, Dr. Mullin, does that mean there

16  will be fewer trials in any given year?

17  A    It could, but it doesn't necessarily mean that.

18  Q    And you're aware of the backlog of trials, or the backlog

19  of cases that have been stayed in this litigation that may go

20  forward to trial, fair?

21  A    Yes.

22  Q    And are you aware of any impact consolidated trials as an

23  economic matter have on outcomes and the likelihood of

24  outcomes?

25          MR. MAIMON:  Objection.  Speculative.  Not qualified.

Mullin - Redirect/Jones                                        153

1          THE COURT:  Overruled.

2          THE WITNESS:  There is a literature that looks at

3    that question.  I think Professor Ingall (phonetic) at CalTech

4    studies that topic.  I think I cited some of his work.  But

5    that literature in general shows that when you consolidate

6    trials, the likelihood of a plaintiff verdict rises and

7    conditional (indiscernible) plaintiff verdict, the damages on

8    average that get awarded also rise.

9          MR. JONES:  That's all I have, Your Honor.

10         Thank you.

11         THE COURT:  All right.

12         MR. WINOGRAD:  Your Honor, I have equally very, very

13   short, if it's okay.

14         THE COURT:  Based on the redirect?

15         MR. WINOGRAD:  Yes, Your Honor.  And just one or two

16   things to clarify based on testimony that's come out.  it's --

17         THE COURT:  No, just based on the redirect.

18         MR. WINOGRAD:  Well, Your Honor, he discussed values

19   and I'd just like to clarify something with respect to values.

20         MR. JONES:  I discussed consolidated trials, Your

21   Honor.

22         MR. WINOGRAD:  Your Honor, I tried to keep it very

23   narrow the first time and address only what had come up.  And

24   this would be literally just one topic for less than 90

25   seconds.

Mullin - Recross/Winograd                    154

1          THE COURT:  I'm not going to let you go beyond 90

2    seconds.  Go ahead.

3          MR. WINOGRAD:  Well, I promise, Your Honor.

4          Your Honor, Michael Winograd on behalf Brown Rudnick

5    on behalf of the TCC.  I just have a very few questions.

6                         RECROSS EXAMINATION

7    BY MR. WINOGRAD:

8    Q    Dr. Mullin, we've talked about the values, the 11 to $21

9    billion high and stress range over the long term, the 3 to 7

10   billion estimation with respect to the first three years,

11   correct?

12   A    Yes.

13   Q    And I just want to clear up one thing.  That analysis

14   accounts for any potential Imerys indemnification obligations,

15   correct?

16   A    Correct.

17   Q    Okay.

18         MR. WINOGRAD:  Thank you, Your Honor.

19         THE COURT:  Very good.

20         Even less than the 90 seconds.

21         MR. WINOGRAD:  I did my best.

22         THE COURT:  I assume we're done.

23         MR. JONES:  We are from this end.

24         THE COURT:  Thank you, Dr. Mullin.

25         THE WITNESS:  Thank you.

1          THE COURT:  I appreciate your time today.

2          So what's our expectations now?  We have Dr. Bell,

3 but it's a quarter after 5:00.  We have four and a half hours

4 roughly of closing tomorrow.  We should be able to accomplish

5 both tomorrow?

6          MR. JONAS:  Excuse me, Your Honor --

7          THE COURT:  Yes.

8          MR. JONAS:  May I ask one question?

9               (Counsel confer off record)

10          MR. JONAS:  We'll try again, Your Honor.

11               (Counsel confer off record)

12          MR. JONAS:  Your Honor, if the answer is yes, then

13 I --

14          THE COURT:  I'm anticipating.

15          MR. JONAS:  Yeah.  And then I assume we could just,

16 unless there's anything else, what I would recommend is in the

17 morning -- tonight, we'll work just to get the exhibit list

18 together.

19          THE COURT:  Right.

20          MR. JONAS:  We could just submit that and then go

21 right to closings.

22          THE COURT:  That's fine.  I'll give a ruling on the

23 objections to Dr. Mullin's report --

24          MR. JONAS:  Thank you, Your Honor.

25          THE COURT:  -- in the morning.

156

1          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2                    (Counsel confer off record)

3          MR. JONES:  So I understand we have an agreement,

4    Your Honor, and we'll call Dr. Bell.  He will be introduced,

5    his reports will be proffered, and I think we will be done for

6    the day.

7          THE COURT:  Do we have to even do that?  Can we just

8    stipulate it?

9          MR. JONES:  We can stipulate, Your Honor.

10          THE COURT:  Thank you.  I mean, I don't need the

11   charade.

12                         (Laughter)

13          UNIDENTIFIED SPEAKER:  But Dr. Bell came.

14          THE COURT:  My apologies for Dr. Bell.

15          All right.  Well, Dr. Bell, I appreciate your bearing

16   through all this.  I appreciate the professionalism of counsel

17   in agreeing.  So that leaves us for closing tomorrow and the

18   evidentiary issues.

19          Do you want more time?  I mean, what I said I'm

20   participating in a seminar from 10:00 to 12:00 to 1:15.  So we

21   have before that and then we have after that to finish the

22   closings.  Do you need more time to go over the evidentiary

23   issues in the morning or do you want to start at 9:00?

24          That's what I'm getting at.  Do you want to start at

25   9:00?

1          MR. JONAS:  I don't believe so, Your Honor.  I don't

2  believe so.  I think we could start --

3          THE COURT:  All right.

4          MR. JONAS:  Start with closings at 9:00 and then deal

5  with the evidence.

6          THE COURT:  I have one question.  I don't necessarily

7  need an answer unless it's obvious and you can say so.

8          We've missed Mr. Satterley here these days because

9  he's been trying the Valadez case in California.  To the

10 extent, and they're close to, I think probably winding up.  To

11 the extent that the decision comes down and it's $0 or $500

12 million -- I'm just picking a number -- will that have any

13 bearing on this going forward and arguments?

14         UNIDENTIFIED SPEAKER:  Just logistically, Your Honor,

15 I can tell I have contact with Mr. Satterley.  They're

16 expecting to close evidence today.  They're expecting for Judge

17 Seabolt to charge the jury today, and then they're breaking

18 until July 10th to have closing arguments.

19         THE COURT:  Well, I guess then it's not going to

20 be -- what I wanted to avoid is arguments in the future about

21 whether it's going to be included in supplemental submissions

22 to the Court.  It doesn't seem to me that that's going to

23 happen.  Then that makes it easier.  If anybody thinks

24 otherwise, we'll discuss it.

25         MR. MAIMON:  Thank you, Your Honor.

158

1          MULTIPLE PERSONS:  Thank you, Your Honor.

2          THE COURT:  All right.  Well, then thank you all and

3    we're adjourned.

4              (Proceedings concluded at 5:17 p.m.)

5                        *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

159

**C E R T I F I C A T I O N**

1

2          We, LINDA SCHERZINGER, ROBYN SCHLEY, JUNE KAUFMAN,

3    and KAREN K. WATSON, court approved transcribers, certify that

4    the foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    entitled matter, and to the best of our ability.

7

8    /s/ Linda Scherzinger

9    LINDA SCHERZINGER

10

11   /s/ Robyn Schley

12   ROBYN SCHLEY

13

14   /s/ June Kaufman

15   JUNE KAUFMAN

16

17   /s/ Karen K. Watson

18   KAREN K. WATSON

19   J&J COURT TRANSCRIBERS, INC.          DATE:  June 30, 2023

20

21

22

23

24

25