IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | Friday, June 30, 2023 |
| . . . . . . . . . . . . . . . . | . | 9:00 a.m. |

TRANSCRIPT OF MOTION OF TO DISMISS THE SECOND BANKRUPTCY
PETITION OF LTL MANAGEMENT LLC

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:              Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES VIA ZOOM:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street<br>Suite 500<br>Dallas, TX 75201 |
| | Jones Day<br>By:  EMILY C. BAKER, ESQ.<br>1221 Peachtree Street, N.E.,<br>Suite 400<br>Atlanta, GA 30361 |
| | Jones Day<br>By:  DAVID S. TORBORG, ESQ.<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Brown Rudnick<br>By:  JEFFREY L. JONAS, ESQ.<br>     W. LYDELL BENSON, ESQ.<br>     MICHAEL WINOGRAD, ESQ.<br>     CAMERON MOXLEY, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| For the Ad Hoc Committee<br>of State Attorneys<br>General: | Womble Bond Dickinson<br>BY:  ERICKA F. JOHNSON, ESQ.<br>1313 North Market Street<br>Suite 1200<br>Wilmington, DE 19801 |
| For the Office of the<br>United States Trustee: | Office of the United States Trustee<br>By:  LINDA RICHENDERFER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |
| For Various Talc<br>Claimants: | Maune Raichle Hartley Frency &<br>  Mudd, LLC<br>By:  CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Levy Konigsberg, LLP<br>By:  MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ 08648 |

3

```
APPEARANCES CONT'D:

For Justin Bergeron         Cohen, Placitella & Roth, P.C.
and Others:                 By:  CHRISTOPHER M. PLACITELLA, ESQ.
                            2001 Market St, Suite 2900
                            Philadelphia, PA  19103


For States of New Mexico    Gibbons, P.C.
and Mississippi:            By:  ROBERT K. MALONE, ESQ.
                            One Gateway Center
                            Newark, NJ 07102


For Paul Crouch,            Ruckdeschel Law Firm, LLC
individually and on         By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of         8357 Main Street
Cynthia Lorraine Crouch:    Ellicott City, MD 21043


For Johnson & Johnson       White & Case LLP
and Johnson & Johnson       By:  GREGORY STARNER, ESQ.
HoldCo (NA), Inc.:          1221 Avenue of the Americas
                            New York, NY 10020


For the Ad Hoc              Paul Hastings LLP
Committee of Supporting     By:  KRIS HANSEN, ESQ.
Counsel:                    200 Park Avenue
                            New York, NY  10166

                            Paul Hastings LLP
                            By:  WILLIAM K. WHITNER, ESQ.
                            1170 Peachtree Street, N.E., Suite 100
                            Atlanta, GA  30309
```

1          (Proceedings commenced at 9:00 a.m.)

2          THE COURT:  All right.  We are ready for closings

3   today.  Let me address some of the evidentiary issues.  With

4   respect to the objections that have been raised to the lay

5   witnesses, and let's see if I can go from memory:

6   Mr. Wuesthoff, Mr. Dickinson, Mr. Murdica, Mr. Kim, and

7   Mr. Watts -- I won't reference the videotape deposition

8   testimony -- the objections are being overruled.

9          They were primarily bottomed on foundation and

10  relevance.  And I am satisfied as to both of those.  The

11  specific hearsay objections I am overruling based on a variety

12  of bases that I won't go into at this point.  We addressed much

13  of them during the cross and redirect and recross, et cetera.

14         As to the expert testimony, with respect to

15  Mr. Mullin's report and testimony, there are two sections of

16  his report I want to focus on.  Section 6 which is entitled

17  bankruptcy reorganization provides a more efficient avenue for

18  to resolve tort claims.  And Section 7, bankruptcy

19  reorganization provides a more equitable avenue to resolve the

20  core claims.

21         Based on his expertise, his qualifications, his

22  experience on a whole, I am overruling the objection to all but

23  Section 7 which is with respect to his testimony on the

24  equitable benefits of bankruptcy.  I do not find that they are

25  assisting me as far as being the trier of fact.  It's the

1   limited portions in Section 7.

2         With respect to his supplemental report, much of the

3   report is phrased as addressing both the efficiency of the

4   bankruptcy system to resolve tort claims as well as the

5   equitable benefits.  I am limiting, I am striking and will not

6   consider those aspects which go to benefits.  But I will accept

7   both testimony and the report with respect to efficiency.

8         To the extent it's a close call as to both, I will

9   just give it the appropriate weight.  I don't believe

10  Mr. Bell's testimony through the report and the declaration is

11  dependent upon that latter aspect.  So Mr. Bell's report comes

12  in.  And the other expert reports I don't believe there have

13  been objections to, but they come in, as well.

14        As to specific documents, I assume counsel have

15  conferred or are in the process of it.  And we'll discuss the

16  exhibit lists that are coming in.  Are there any issues now, or

17  do you want to raise it at the end?

18        MR. GORDON:  Greg Gordon, Your Honor.  I would

19  suggest we raise it at the end.  I think everybody was too

20  tired last night to confer.  There was no conferring done as

21  far as I know.  So we can just defer that.

22        THE COURT:  And it can be after the fact, too.

23        MR. GORDON:  Yeah.

24        THE COURT:  The record will be closed as of the end

25  today.  But if there are specific concerns, we can address them

6

1  even during the upcoming week.

2          MR. WINOGRAD:  Yeah, I think that makes the most -- I

3  think there's one thing that we're still talking about, but I

4  don't know that it's ripe to burden the Court with yet.

5          THE COURT:  Okay, thank you. All right.  Then we are

6  ready for closings.  Oh, as far as today's time frame, again,

7  unfortunately I have to leave you all for, you'll have about an

8  hour and a half lunch from quarter 'til 12 to 1:15.  Take the

9  opportunity to see our bankruptcy historical exhibit down on

10 the first floor.  Or walk around Trenton in pairs.

11         MR. JONAS:  All set, Your Honor?

12         THE COURT:  All set.  Thank you.

13         MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

14 from Brown Rudnick for the TCC.

15         First, Your Honor, I want to thank you and your staff

16 for all of your assistance and your patience with us.  A lot of

17 patience.  It has been, as it always is, a true pleasure to be

18 able to appear before you.

19         Second, I want to recognize my colleagues here with

20 me from Brown Rudnick, Otterbourg, Massey Gail, and Genova

21 Burns, and of course our TCC members and member

22 representatives.

23         No slides today, Your Honor.  Just an old-fashioned,

24 impassioned closing argument.  Your Honor, I would like to

25 reserve five minutes or so of my time for rebuttal.  I will say

1  we've had I think, although I haven't been at the middle of it,

2  a fair amount of cooperation and have divided up our time

3  appropriately.

4       Your Honor, I want to make three fundamental

5  arguments in support of dismissal.  First, this case was filed

6  in bad faith.  Second, LTL is not in financial distress.  And

7  third, talc claimants can resolve their claims outside of

8  bankruptcy.

9       This bankruptcy case was not filed in good faith both

10 because this debtor is not in financial distress, and because

11 there are other overwhelming conditia of bad faith.  At the PI

12 hearing I said that the emperor wasn't wearing any clothes.

13 That remains true today.  As has often been said, the world is

14 watching, I believe, in disbelief to see if the Court will

15 countenance the arrogant, self-serving, bad faith behavior of

16 one of the richest corporations in America.

17       We can have the best lawyers in the country put on a

18 trial with sophisticated experts digging into all kinds of data

19 and analysis regarding whether the debtor was in financial

20 distress when it filed its second bankruptcy two hours and

21 eleven minutes after its first bankruptcy was dismissed for

22 lack of good faith as determined by the Third Circuit.  But the

23 relatively simple, uncontroverted facts as proven over the last

24 few days support dismissal because they demonstrate

25 overwhelming bad faith by this debtor and its master parent

1  Johnson & Johnson.

2         Your Honor, the Cambridge Dictionary defines bad

3  faith as dishonest or unacceptable behavior.  Dishonest or

4  unacceptable behavior.  J&J's actions following the Third

5  Circuit Court of Appeals decision could not be more dishonest

6  or unacceptable, as I will explain.

7         But first, let me be clear.  The facts from the first

8  bankruptcy case supporting bad faith remain.  A debtor created

9  days before filing to take on the talc liabilities of Johnson &

10 Johnson.  Officers and directors employed by and beholden to

11 J&J who did anything and everything as directed by and for the

12 benefit of J&J, the debtor's ultimate sole owner.

13        No real operating business and no legitimate

14 corporate or restructuring purpose for bankruptcy, a bankruptcy

15 filing on the heals of large verdicts, failed settlement

16 efforts including in other bankruptcy cases, and the U.S.

17 Supreme Court's unwillingness to review adverse verdicts.

18 LTL's bankruptcies are just another litigation tactic or

19 strategy seeking to leverage talc victims in order to get the

20 best result possible for J&J.

21        Now we have the second bankruptcy case with new facts

22 which prove beyond any doubt the bad faith not only of the

23 first case, but of the second case.  The second bankruptcy case

24 mocks this Court, as I'll explain, the Third Circuit, and

25 frankly the Rule of Law.

1          As you know, Your Honor, the Third Circuit has

2   determined that a Chapter 11 petition shall be dismissed for

3   bad faith, one, if it does not serve a valid reorganizational

4   purpose, or two, if the petition is filed merely to obtain a

5   tactical litigation advantage as set forth in <u>SGL Carbon</u> and

6   <u>BEPCO</u>.

7          The resolution of a parent's mass tort liabilities

8   via self-engineered financial distress with no debtor to

9   rehabilitate and no genuine, ongoing business to preserve is

10  not a valid reorganization, a reorganizational purpose.  It is

11  bad faith.

12         In fact, the Third Circuit in <u>BEPCO</u> held that a

13  bankruptcy filing to shield the non-debtor parent from

14  litigation liability is filed in bad faith.  In that case, like

15  here, the debtor's managers were employed by the non-debtor

16  parent, and the parent was ultimately in control of whether the

17  debtor filed for bankruptcy.

18         The debtors say wait a minute, we have a plan.

19  Creditors support the plan.  Not so fast, Your Honor.  The

20  filing of a plan with or without creditor support is not a get

21  out of jail free card.  It does not magically dispel the

22  threshold gating issue of whether the case was filed in bad

23  faith.

24         But more than that, the Third Circuit has held that

25  before considering the legitimacy of a proposed plan, or

1 support for a plan, it must first answer the inquiry whether

2 the petition and the plan are filed in bad faith as in

3 Integrated Telecom.

4        Your Honor, although it was in the context -- I

5 actually think I might have referenced this quote in my closing

6 in the first bankruptcy case.  Although it was in the context

7 of a plan being proposed in good faith, I think it's applicable

8 here.  One bankruptcy court said, quote, sometimes a bankruptcy

9 judge's nose tells him or her that something doesn't smell

10 right, and further inquiry is warranted.

11        Sometimes a bankruptcy judge's stomach may turn when

12 he or she is preparing to sign a particular judgment or order.

13 This queasiness is reflective of the judge's sense that for

14 some, perhaps inarticulable reason, it just isn't right to

15 grant the relief requested.  In the context of plan

16 confirmation in bankruptcy cases when this is the way the judge

17 feels, it may be because the plan has not been proposed in good

18 faith.

19        In short, the reading of the law should be tempered

20 by the judge's sense of equity.  What is just in the

21 circumstances of the case?  If there are objective facts to

22 support this feeling, perhaps the plan cannot be confirmed.

23 Dow Corning, 244 B.R. 673.

24        Your Honor, there are many, but let me just tell you

25 how I perceive the three big lies in this case which underlie

11

1  bad faith here.  First, the lies being that LTL for bankruptcy

2  in good faith.  This is false.  Second, that LTL is in

3  immediate financial distress.  This is false.  And third, that

4  bankruptcy is the only forum for talc claimants to resolve

5  their claims, also false.

6        Big lie number one, that LTL filed for bankruptcy in

7  good faith.  J&J, LTL's parent, now has manufactured two

8  bankruptcies for its own benefit to cap its talc liabilities on

9  its own terms.  After the Third Circuit's January 30th, 2023

10 dismissal decision, faced with having to make good on the first

11 funding agreement to the tune of more than $61 billion, J&J

12 concocted a new strategy carried out by lawyers, Mr. Haas at

13 J&J and Mr. Kim at the debtor, with the help of plenty of

14 outside lawyers all allegedly working together under a common

15 interest so as to take advantage of, I would say abuse,

16 attorney/client privileges and shield matters from the light of

17 day.

18        Fortunately, while we have only limited information,

19 we know enough.  And as an aside, and hopefully not for another

20 day, but it is suspect that a common interest exists between a

21 debtor-in-possession and its parent where there is clear

22 adversity of interest which I think has now been demonstrated,

23 and the fiduciary duty no longer runs in favor of the parent

24 but instead to the debtor's creditors.

25        So effectively together, J&J and the Chapter 11

12

1  debtor declared the first funding agreement unenforceable and

2  void or voidable, supposedly because its purpose was

3  frustrating.  His purpose allegedly was the resolution of talc

4  claims in and only in bankruptcy.

5       On or about the same day of the Third Circuit

6  decision, Mr. Haas and Mr. Kim decided that J&J's $61 billion

7  promise in the first funding agreement was unenforceable.  And

8  guess what, over the coming weeks and months while J&J and LTL,

9  only by and through lawyers, carried out plans leading to the

10 second bankruptcy, no one told the Chapter 11 debtors board

11 which didn't know about the scheme and modifications to the

12 funding agreement until late March, a few days or a week or so

13 before they voted to launch the debtor back into bankruptcy.

14      As Mr. Wuesthoff testified with respect to

15 termination of the debtor's $61 billion ATM, quote, no other

16 options were considered.  There was no negotiating, no

17 pushback, no analysis, none.  He just accepted it, the board

18 voted, and that was the end of it.

19      The debtor's board effectively, under the auspices of

20 this Court, with fiduciary duties to creditors, approved

21 termination of the first funding agreement.  The debtor let J&J

22 off the hook for a $61 billion funding obligation, and it

23 replaced it with J&J today, today having a zero dollar funding

24 obligation, and frankly likely never having to fund anything.

25      All of this happened during the prior Chapter 11

1  case.  The debtor says no it didn't, it happened during the two

2  hours and eleven minutes after the case was dismissed and

3  before we filed the second time.  But as you've now seen, Your

4  Honor, 99.9 percent of the transaction, because that's what it

5  is or was, whereby J&J and the debtor terminated the first

6  funding agreement and replaced it with a second funding

7  agreement and so called support agreement by J&J was put in

8  place during the prior Chapter 11 case.  There's no question

9  about that now.

10       I can't imagine any more of a non-ordinary course

11  transaction than this.  Yet, it was done under the cover of

12  darkness with no notice whatsoever, certainly no 363 motion,

13  nothing.  Judge, respectfully, we were all played.

14       I suppose J&J and the debtors now will argue these

15  actions somehow are protected by the business judgment rule.

16  Nothing could be further from the truth.  First of all, the

17  debtor started having I think Mr. Kim said discussions with J&J

18  about terminating the first funding agreement.  When it started

19  those on January 30th, it was a debtor-in-possession with

20  fiduciary duties to preserve corporate assets for the benefit

21  of creditors.

22       The first funding agreement was indisputably the most

23  valuable asset of LTL.  To quote the Supreme Court, this is

24  Commodity Futures Trading vs. Weintraub, 471 U.S. 343, 1985, a

25  case I think almost every lawyer knows.  One of the painful

1  facts of bankruptcy is that the interests of shareholders

2  become subordinated to the interests of creditors.

3         Even if you suspend credulity and accept the fiction

4  that the whole termination of the first funding agreement

5  happened in the two hours and eleven minutes after dismissal of

6  the first bankruptcy, and even if you accept Mr. Kim's

7  testimony that LTL considered whether terminating the first

8  funding agreement and entering into the second funding

9  agreement was an appropriate response to the material risk, so

10 called which I'll get to, that the first funding agreement was

11 void or voidable, this is an insider transaction between a

12 corporation and its controlling shareholder.

13        J&J doesn't even pretend that LTL's board was

14 disinterested or independent.  Entire fairness, not the

15 business judgment rule, governs.

16        So the question is whether the transaction was

17 conducted, quote from First Union Corp. v. SunTrust Banks, 2001

18 Westlaw 1885686, a North Carolina case, 2001, quote, in the

19 manner in which the same transaction would be conducted between

20 the corporation and a third party on the open market.  I'll let

21 you decide whether that's what happened, Your Honor.

22        J&J and the debtor's justifications or defenses did

23 not pass the straight face test.  First, they argue that the

24 value of the first funding agreement and the second funding

25 agreement are equal.  So no harm, no foul.  Huh?  Under the

1  first funding agreement, the debtor had $61 billion guaranteed

2  by J&J available for it to satisfy talc claims.

3       Today under the second funding agreement, at best LTL

4  has a $30 billion obligation from HoldCo that is not guaranteed

5  by J&J to satisfy talc claims.  The debtor's position is that

6  the value of both of these are the same because both in October

7  of 2021 when they had $61 billion available and in April 2023

8  when they have $30 billion available, there's ample funding to

9  satisfy the total amount of liabilities.

10       This is sophistry.  An asset's value is not

11  determined by reference to claims against it.  I guess I'd ask

12  was the first funding agreement worth $2 billion when they

13  thought that was the amount that was going to satisfy talc

14  claims in the QSF?  I don't think so.

15       Your Honor, if you accept the debtor's position that

16  there is more than enough funding to satisfy all talc claims,

17  there's no financial distress.  Exactly the same circumstances

18  under which the third circuit found no financial distress when

19  it dismissed the first bankruptcy in which case the second

20  bankruptcy case must also be dismissed.

21       If there is alleged financial distress because the

22  debtor is now incapable for whatever reason, it appears

23  liquidity issues at HoldCo which I'll get to, of paying all

24  talc claims in full inside or outside of bankruptcy, then this

25  second bankruptcy is an outright fraud perpetrated on talc

1    claimants and is subjectively filed in bad faith in which case,

2    again, the case should be dismissed.

3            So J&J was stuck.  It had to find a way to justify

4    the termination of its $61 billion ATM.  J&J and LTL's attempt

5    to justify termination was because its purpose was frustrated.

6    J&J and the debtors say the intended purpose of the first

7    funding agreement was only to resolve talc claims in bankruptcy

8    so that when the Third Circuit dismissed the bankruptcy case,

9    J&J could declare its contract unenforceable, which it did.

10           And they say that because J&J unilaterally determined

11   that its obligations were unenforceable, that alone created a

12   material risk of unenforceability whether or not the contract

13   was in fact void or voidable.  But by its terms, the plain

14   language of the first funding agreement provided, as you know,

15   that J&J had to pay on account of talc claims whether LTL was

16   in or out of bankruptcy.

17           And the debtor and its lawyers repeatedly represented

18   to this Court and the Third Circuit that this was so.  And

19   those representations were relied on.  Mr. Gordon himself at

20   the first motion to dismiss trial in February, February 18th,

21   2022, it's at the transcript at Page 60, Line 24 through Page

22   61, Line 20.  Mr. Gordon said so, there's basically two

23   different scenarios where funding is available.

24           The first is funding in the tort system.  And as you

25   would expect, what that funding says is that the payers are

17

1 obligated to pay the liabilities to the extent they're

2 established by a judgment or a settlement in the tort system.

3 That's what you would expect, and that's what happens.

4        You want funds available to pay settlements, to pay

5 judgments in the tort system.  So it makes very clear that what

6 we're talking about if there's no proceeding in bankruptcy.

7 Whether there was no case filed or whether the case is filed or

8 dismissed, the money's available for that purpose.

9        And you can imagine, and he goes on, and you could

10 imagine, Your Honor, by the way, the hue and cry you would have

11 heard if this provision weren't in there, this is my favorite

12 part, because they would have said that we've manipulated the

13 whole system because you filed bankruptcy and now you're going

14 to tell the Court you can't dismiss our case because there's no

15 money available if we go back into the tort system.  That's

16 pretty much what happened in some ways.

17        So going on, so this is there to protect claimants.

18 It's there to assure this isn't treated or considered a

19 fraudulent conveyance.  The idea was and the intent, the intent

20 was the claimants are covered either way in bankruptcy or

21 outside.

22        So Mr. Gordon acknowledged that the first funding

23 agreement is and was intended by the parties to apply both

24 inside and outside of bankruptcy.  It's in the language.  It's

25 very clear in the contract.  So how is the purpose of this

1  funding agreement which is governed by North Carolina law

2  frustrated?

3  　　　　Mr. Kim says that no matter what the contract said, I

4  think he said everybody knew, everybody knew that LTL was

5  always going to file for bankruptcy.  No matter what the

6  contract said, the ultimate goal was for J&J to get its

7  channeling injunction which could only be done in bankruptcy.

8  　　　　But, Your Honor, the terms of the contract do matter.

9  In North Carolina, if the parties have contracted the

10 allocation of the risk involved in the frustrating event or if

11 the party could have protected itself by the terms of the

12 agreement, they can't invoke the doctrine of frustration to

13 escape their obligations.  Supreme Court of North Carolina,

14 <u>Brenner v. Little Red School House</u>, 302 North Carolina 207,

15 1981.

16 　　　　I will say, Your Honor, having read many of the North

17 Carolina cases on frustration of purpose, most of them involve

18 probably less than a few dollars.  It would be amazing, amazing

19 for frustration of purpose to be determined to be appropriate

20 in connection with this $61 billion contract.

21 　　　　The refrain that there was a material risk that the

22 first funding agreement was unenforceable is simply wrong and

23 untrue.  Here, the parties entered into a contract.  They did

24 allocate the risk of dismissal of the bankruptcy case to J&J.

25 The terms of the first funding agreement are clear and

1  explicit.  They obligate J&J to pay outside of bankruptcy.

2  These were not unforeseeable circumstances.

3       The single integrated transaction you've heard so

4  much about expressly contemplated, and one might say foresaw, a

5  circumstance in which J&J may be responsible outside of

6  bankruptcy.  For example, as Mr. Gordon cited to the Court over

7  a year ago, and Mr. Kim confirmed a few days ago, dismissal of

8  the bankruptcy case, it was something that was reasonably

9  anticipated.

10      The first funding agreement in J&J's obligation

11 remain in place.  But J&J got off the hook from a $61 billion

12 obligation, and today has no obligations effectively.  It also

13 achieved its longstanding goal of spinning off its consumer

14 health business free of talc liability, further diminishing

15 assets available to the debtor to satisfy talc claims.

16      This alone, this alone, a non-debtor parent's control

17 and manipulation of a Chapter 11 debtor whose board is either

18 ignorant of their fiduciary duties, doesn't care about their

19 fiduciary duties, or purposely breached their fiduciary duties,

20 take your pick, causing grave harm to creditors evidences bad

21 faith and warrants dismissal.

22      This Court can and must now conclude that this

23 scheme, conspiracy, and fraud constitutes bad faith.  We really

24 need go no further.  This case should be over, dismissal, just

25 as I asked at the PI hearing a few days into this case.

1           That said, Your Honor, I want to make a few more

2   arguments.  J&J understood that it could not make LTL insolvent

3   for fear of further exposing itself to a constructive

4   fraudulent conveyance attack.  But of course, it needed LTL to

5   be in financial distress per the Third Circuit's decision.

6           The Third Circuit, as far back as SGL Carbon and most

7   recently in LTL, recognizes that the purpose of the financial

8   distress requirement is to safeguard abuse of the bankruptcy

9   system by debtors who do not need it so as to not open the

10  gates for abuse which brings us to big lie number two, that LTL

11  is in immediate financial distress.  This is not true.

12          The testimony and evidence are clear.  LTL can pay

13  its debts as they become due now, and into the future.  You've

14  heard the debtor's oft repeated mantra that LTL was not

15  insolvent but was in financial distress.  First of all,

16  apparently the debtor's board didn't know this when they

17  approved the second bankruptcy filing.  They couldn't have.

18  They had no financial projections, no financial projections

19  regarding potential talc liability or costs of defending in the

20  tort system.

21          This was only later drummed up, improperly as we'll

22  see, by the debtor's experts.  They argue that HoldCo, the sole

23  counter party obligor under the second funding agreement,

24  although worth $30 billion, would not have enough liquidity to

25  pay the cost of LTL going back into the tort system to deal

21

 1  with what LTL believes to be talc liability of between zero and

 2  $8.9 billion.

 3          And I'm not going to let them off the hook, Your

 4  Honor.  The president of LTL testified that it was zero to $8.9

 5  billion.  I know they tried to clean that up a little bit, but

 6  that's very clear.  And they have assets of $30 billion to

 7  satisfy liabilities between zero and $8.9 billion.

 8          The Third Circuit was clear, financial distress must

 9  not only be apparent, but it must be immediate enough to

10  justify a filing.  An attenuated possibility standing alone

11  that a debtor may have to file for bankruptcy in the future

12  does not establish good faith, 64 F.4th at 102.

13          The debtor makes up new arguments about on the one

14  hand, increased costs in the tort system, and on the other hand

15  the for sale of assets and inability to compel dividends.  When

16  the LTL board met to consider its second bankruptcy filing, the

17  only information they had about the talc liability and the

18  costs of defending themselves in the tort system was the same

19  information they had when they filed the first time.  They told

20  us that.

21          They claim that it cost between $10 and $20 million a

22  month to defend themself in the tort system.  That's $120 to

23  $240 million a year.  And it cost additionally $2 to $5 million

24  per trial for no more than ten trials per year.

25          In fact, Mr. Wuesthoff, it was in his prior

22

1  testimony, he said he actually challenged that at a board

2  meeting and said gee, can't we do 20.  Said no, no way.  Ten

3  maximum.  So at a maximum, LTL, if it goes back into the tort

4  system to defend itself, would have to spend $290 million a

5  year.  I appreciate that's a lot of money, but let's look at

6  the asset side.

7          LTL's or HoldCo's cash which it could access was more

8  than -- and this is at the time the board made the decision,

9  was more than $400 million.  And it knew, the board knew that

10 HoldCo was due dividends in the billions of dollars.

11         Messrs. Wuesthoff and Kim filed, to be polite,

12 inaccurate declarations stating that LTL was in financial

13 distress because with only $400 million in cash and assuming

14 defense costs increased, although they had no projections, no

15 information, didn't give us any numbers, it could only fund

16 defense costs for a short period of time, and thus it's in

17 financial distress.

18         Your Honor, last week HoldCo received almost a

19 billion dollar dividend which it lent to J&J at about five

20 percent interest on a demand basis.  That is as good if not

21 better than cash.  So in fact, LTL has or has access to more

22 than $1.3 billion in cash, never mind billions in dividends and

23 $30 billion in assets to fund defense costs in the tort system.

24         And J&J's own experts say don't worry about paying

25 judgments.  We're going to appeal those for the next three

1  years.  By my math, that's more than four years of runway based

2  solely on cash today without regard to the billions in

3  dividends and billions in assets.  How is this possibly

4  immediate financial distress?  It's not.

5         I know it's simple, Your Honor, but it literally is

6  that simple.  You've heard the testimony of Mr. Burian of

7  Houlihan Lokey who has more than 30 years of bankruptcy

8  experience including analyzing whether a debtor is in financial

9  distress as he most recently did successfully in the Aearo 3M

10  bankruptcy case.  Mr. Burian concluded LTL is not in financial

11  distress including because HoldCo can access cash to satisfy

12  its funding agreement obligations, and LTL can defend, pay its

13  talc liabilities for years to come.

14         He determined that claims of HoldCo's discounted

15  value and illiquidity are unsubstantiated, and in any event

16  immaterial for financial distress purposes because any

17  obstacles can be swept away by J&J which controls the entire

18  capital structure, billions of dollars in dividends are already

19  owed and/or will be paid to HoldCo, and even with discounts,

20  HoldCo could sell its interests for substantial amounts at

21  least between 17 and $26 billion.  And last, HoldCo could

22  borrow, either externally or from J&J.

23         Mr. Burian also concluded that there remains no

24  legitimate corporate or restructuring purpose for LTL's

25  bankruptcy.  Remember, this is a company with no operations, no

1  employees, no business purpose other than to manage talc

2  liabilities.  It's a company that pays its bills as they become

3  due.

4          Neither Mr. Mullin nor Mr. Bell credibly contradicted

5  Mr. Burian's testimony and conclusions.  Clearly, Mr. Mullin

6  was paid to backfill for the alleged financial distress.  But

7  like often happens when an expert stretches to reach a

8  preordained conclusion, his, and again I'll be polite, mistakes

9  become obvious.

10         Contrary to Mr. Wuesthoff's and Mr. Kim's testimony,

11  and Mr. Gordon's representations to the Court that the debtor

12  can only conduct ten trials per year, Mr. Mullin projected 100

13  trials per year, a 1,000 percent increase.  He also, again

14  contrary to Mr. Wuesthoff's and Mr. Kim's testimony, increased

15  non-trial costs by 250 percent.

16         Mr. Bell apparently didn't even know about the almost

17  billion dollar dividend paid to HoldCo last week so that well

18  after experts reports were due, he had to file a supplemental

19  report.  J&J tells us they had that dividend in the works for

20  months, since January.

21         In any event, his own analysis supports no financial

22  distress.  In effect, Your Honor, as you can tell by our

23  limited cross-examinations, and to some extent we can rely on

24  their reports and still not get to financial distress.  The

25  debtor has no more proven financial distress here than it did

1  the first time as determined by the Third Circuit.

2  Big lie number three, bankruptcy is the only forum

3  for talc claimants to resolve their claims.  Really?  Forcing

4  talc claimants out of their chosen forum into bankruptcy court

5  is better for them, or is it better for the debtor and is it

6  better for J&J?

7  J&J and LTL filed in bad faith.  They know that LTL

8  is not in financial distress.  And how do they overcome that?

9  They allege claimant support.  Well, not actually claimant.

10  They found plaintiffs lawyers, some of whom only acquired their

11  clients in anticipation of the first bankruptcy being dismissed

12  willing to sign plan support agreements.

13  Let me repeat, there is no actual claimant support,

14  simply lawyers who say they will discus with and possibly

15  recommend to their clients the debtor's proposed plan which

16  only became to their liking a few days ago.  The testimony of

17  Mr. Onder, Mr. Watts, Mr. Nachawati, and Mr. Pulaski make it

18  clear that the plan is still a work in progress.

19  It is also clear that J&J and the debtor, and at

20  least some of these lawyers who represent large groups of

21  claimants with unfiled claims, know very little about their

22  clients and the nature of their claims.  And as you heard, J&J

23  now is willing for the first time to pay on claims which it

24  never paid on before in the tort system, specifically non-

25  ovarian gynecological claims.

26

1        Whether this is being done to flood the vote so as to

2   disenfranchise legitimate compensable claims, or assure

3   finality remains to be seen.  Your Honor, the game of buying

4   votes based on suspect claims is not new.  I dealt with it in

5   Quigly in 2008.  These issues do not need to be determined now,

6   and hopefully will never need to be considered.

7        So that brings us to 1112(b)(2).  This is the

8   debtor's effort to cure its good faith and have the Court find

9   an exception.  It fails.  1112(b)(2) is a narrow exception to

10  the mandatory obligation to dismiss for cause under (b)(1).  No

11  case has ever applied 1112(b)(2) to excuse the absence of good

12  faith.

13       LTL is asking this Court to be the first.  Until now,

14  courts have limited 1112(b)(2) to mistakes like failing to file

15  timely operating reports or pay post-petition taxes or fees,

16  not failure to comply with the fundamental requirements of good

17  faith and financial distress which are basic gateway or

18  eligibility requirements of bankruptcy.

19       The debtor asked the Court to take an unprecedented

20  1112(b)(2) leap in the face of the Third Circuit's decision

21  which is already held that Section 1112(b)(2) is unavailable in

22  this case because there can't be reasonable justification for

23  lack of good faith and financial distress, and it can't be

24  cured after the fact.

25       LTL is wrong in arguing that this bankruptcy is

1  different because it supposedly has claimant support for its

2  plan.  That's beside the point.  Doesn't provide a reasonable

3  justification, and it doesn't cure the absence of good faith

4  and financial distress.

5        In fact, as part of its 1112(b)(2) holding, the Third

6  Circuit rejected the argument that, quote, the interest of

7  current tort creditors in the absence of viable protections to

8  future tort claimants outside of bankruptcy, close quote, could

9  provide a basis for invoking 1112(b)(2).

10        Tied to this is the debtor's effort to convince the

11  Court that bankruptcy is the only forum which can resolve mass

12  torts such as cancer-causing talc.  This is wrong on numerous

13  levels as has been demonstrated by the expert testimony of

14  Professor Rave and Judge Ferguson.

15        They explain that MDL's work to resolve mass tort

16  such as this.  While Ms. Birnbaum suggests that the tort system

17  can't address future claims, it's not true.  As explained by

18  Professor Rave and Judge Ferguson, the MDL mechanisms can and

19  do address future claims.

20        When you asked, Professor Rave detailed at length how

21  MDL settlements can provide closure for future claimants.  The

22  NFL concussion settlement used separate sub-classes, separate

23  sub-class representation, medical monitoring, and the ability

24  to seek back end compensation if injuries worsen over time.

25        There is no evidence that these strategies could not

1   be used here.  As Professor Rave noted, if you build an

2   attractive settlement program, claimants will come.  The MDL

3   system works.  It works, as Judge Ferguson said, for all

4   litigants, plaintiffs and defendants.

5           In any event, we're not here for this Court to

6   determine whether bankruptcy courts are better than other

7   federal and state courts, especially when that conclusion

8   results in trampling constitutional rights, including the right

9   to a jury trial.  But I appreciate that this Court might

10  believe that bankruptcy affords a unique opportunity to resolve

11  one of the largest mass torts in history.  The Court's beliefs

12  and good intentions cannot displace proper application of Third

13  Circuit law to these facts.

14          Last, Your Honor, and I'll conclude soon, let's not

15  lose sight of the fact that while one of the richest

16  corporations in America plots and schemes to save itself and

17  save itself money, victims of its products are sick and dying.

18  Your Honor, I close where I began.  The words of the Third

19  Circuit can't be ignored.

20          I'll quote, resort to Chapter 11 is appropriate only

21  for entities facing financial distress.  This safeguard ensures

22  that claimant's pre-bankruptcy remedies, here the chance to

23  prove to a jury of their peers injuries claimed to be caused by

24  a consumer product, are disrupted only when necessary.

25          As the Third Circuit also teaches, the burden to

 1  establish good faith is on the debtor.  Please, it's time to

 2  level the playing field.  Allow victims to exercise their

 3  constitutional right to a jury trial and pursue their claims

 4  against a tortfeasor who has shown its true colors for all to

 5  see.

 6          It will scheme, conspire, fabricate lies in its

 7  efforts to manipulate the bankruptcy system for illegitimate

 8  ends.  The TCC implores this Court, based on the facts proven

 9  at trial and the law, to grant the TCC's motion and dismiss

10  this bad faith bankruptcy.  Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Jonas.

12          For the benefit of those in the courtroom, I

13  understand it's a bit warm.  Feel free if you want to remove

14  jackets, get comfortable.  I don't take offense.

15          MS. JONES:  It is warm, Your Honor.  Good morning,

16  Your Honor.

17          THE COURT:  Good morning.

18          MS. JONES:  Laura Davis Jones on behalf of Arnold &

19  Itkin.  Your Honor, let me echo the thanks to you and your

20  staff for your patience, and frankly your friendly humor over

21  the last four days.  Your Honor, it's been helpful in what is a

22  very serious subject for us to all move through this, and we

23  appreciate that, Your Honor.

24          You've heard a lot, and you've seen a lot.  And you

25  have and will continue to have a lot of reading to do as you

30

continue to tackle the briefing that's before you.  Despite

all, Your Honor, the conclusion is clear.  This case must be

dismissed.  Nothing that I've heard this week changes that

result.

Let's revisit the evidence and discuss what has not

been provided, what this Court has not seen or heard.  The

debtor presented no evidence that J&J would stop funding the

payment of talc litigation costs if this case is dismissed, and

no evidence to counter the evidence of J&J's compelling

incentives to continue funding such costs following dismissal.

After three and one-half days of trial, it remains

undisputed that as found by the Third Circuit, J&J functionally

made talc payments from its account.  Although the debtors

claim that the talc litigation costs have always been borne by

old JJCI.  The Third Circuit found that such costs were borne

by old JJCI only as an accounting matter, not as a cash flow

matter.

It is also undisputed that J&J is a co-defendant in

every talc suit in which old JJCI or the debtor is a defendant.

There is no evidence that J&J would stop funding the talc

litigation costs and expose itself to the intendant risk in the

tens of thousands of talc suits in which it is a co-defendant

if HoldCo was unable to honor its obligations under the 2023

funding agreement.  Indeed, the evidence was to the contrary.

The debtor also failed to present any evidence to

31

1  rebut the evidence provided by its own expert that J&J will

2  fund the payment of talc litigation costs if HoldCo cannot do

3  so because it will then be playing with house money and losing

4  value on its own equity interest in HoldCo.

5            In it's surreply, the debtor argues that J&J was

6  unwilling to make payments to avoid the debtor's current and

7  prior Chapter 11 filings.  Your Honor, this argument is a non

8  sequitur.  J&J had no desire to avoid the debtor's current and

9  prior Chapter 11 filings.

10            To the contrary, J&J wanted those Chapter 11 filings

11  so that it could move thousands of claims out of trial courts

12  and into the bankruptcy court.  The debtor cannot get around

13  its failure to present any testimony from a J&J representative

14  that if this case was dismissed, J&J would stop funding talc

15  litigation costs.

16            In its surreply, relying on a statement in the Third

17  Circuit's decision taken out of context, the debtor argues

18  that, quote, uncertain and unliquidated future liabilities may

19  nevertheless justify a filing in appropriate circumstances.

20  What the Third Circuit actually said was, quote, for instance,

21  uncertain and unliquidated future liabilities could pose an

22  obstacle to a debtor, effectively obtaining financing and

23  investing, end quote.

24            The debtor has shown no business operations that

25  require financing, or in which anyone would invest.  The Third

1    Circuit also referred to the possibility in other cases of,

2    quote, serious managerial difficulties or the, quote, the

3    exodus of customers and suppliers worry of the firm's credit

4    risk.  But the debtor has provided no evidence that it has any

5    serious managerial difficulties, and the debtor has no

6    customers or suppliers who could be the subject of an exodus.

7         The debtor presented no evidence to justify its eve

8    of bankruptcy agreement to reduce its plan trust funding,

9    rights against HoldCo and J&J in a Chapter 11 case, and no

10   evidence that this change had any purpose other than to limit

11   the plan options available to talc creditors.

12        The debtor has provided no credible basis to tie its

13   frustration or purpose theory to HoldCo's funding obligations

14   under the 2021 funding agreement, whether in a Chapter 11 case

15   or outside of bankruptcy.  The debtor has done just the

16   opposite.  The debtor has made clear that the frustration of

17   purpose theory applies only to J&J's funding, backstop.  There

18   is no evidence that the Third Circuit decision provided any

19   basis for avoiding any of HoldCo's obligations under the 2021

20   funding agreement.

21        The debtor is yet to follow any cogent connection

22   between its frustration of purpose theory and J&J's trust

23   funding obligations in a Chapter 11 case under the 2021 funding

24   agreement.  Similarly, the debtor still has not addressed the

25   severability of J&J's funding obligations under the 2021

1 funding agreement outside of bankruptcy from those in a

2 bankruptcy case.

3        Your Honor, there was no legitimate basis for the

4 debtor's eve of bankruptcy agreement to eliminate J&J's broad

5 plan trust funding obligations in a Chapter 11 case under the

6 2021 funding agreement and replace them with J&J's highly

7 restricted plan trust funding obligations under the J&J support

8 agreement.

9        The debtor has presented no evidence to support its

10 baseless claim that it will pay talc claims in full.  The

11 debtor continues to assert without any evidentiary basis that

12 the terms of its plan will pay all current and future talc

13 claims in full.  This statement is baseless.

14        The trust distribution procedures under the proposed

15 plan would value individual talc claims by according them a

16 certain number of points.  But no one knows the cash value of a

17 point.  And the debtor has presented no evidence of the cash

18 value of a point.

19        Not only is there no basis to claim that the plan

20 will pay talc claims in full, but it appears that no member of

21 the Ad Hoc Committee can even tell any of those clients to whom

22 counsel will recommend a vote in favor of the plan, what the

23 client will receive under the plan, or even provide an

24 approximation of that amount.

25        The debtor and the Ad Hoc Committee contend that

26 unusual circumstances exist because this case has the

1  characteristics of a typical asbestos mass tort case, and they

2  contend asbestos mass tort cases are unusual.  The debtor

3  provided evidence that there were potential long latency

4  periods  and unknown future claimants, but it had to stop

5  there.

6       That is not enough to demonstrate unusual

7  circumstances.  All asbestos Chapter 11 cases involve long

8  latency periods, tens of hundreds of thousands of current

9  claimants, and many thousands of future claimants to whom

10  notice cannot readily be provided.

11       The debtor wishing that Section 1112(b)(2) of the

12  code enables any asbestos mass tort to debtor to gain access to

13  Chapter 11, and the extraordinary powers afforded an asbestos

14  debtor under Section 524(g) of the code, even if the asbestos

15  debtor was not in financial distress or otherwise did not file

16  its Chapter 11 case in good faith, does not make it so.

17       The debtor, J&J, and the Ad Hoc group are trying to

18  use this case, this Court to change the laws of our country.

19  In pressing for such a definition of usual circumstances, the

20  debtor and the Ad Hoc Committee seek to convert the asbestos

21  claims resolution procedures that are unique to Bankruptcy Code

22  524(g) of the code into generally available asbestos mass tort

23  claims resolution procedures.

24       Congress has declined to enact such a generally

25  applicable asbestos claims resolution regime, and this Court

1  must reject such an attempt also.

2          As set forth in the Arnold & Itkin memorandum of law

3  and our reply, the only plan that J&J and HoldCo will support

4  and agree to fund is one that will be unconfirmable as a matter

5  of law under applicable Third Circuit precedent due to the over

6  breadth of the third party channeling injunction that J&J and

7  HoldCo require.

8          As a practical matter, Your Honor, no plan in this

9  case is feasible without funding from J&J and HoldCo because

10  the 2021 corporate restructuring left the debtor devoid of any

11  meaningful assets to fund a plan trust for talc claimants other

12  than the debtor's funding rights against J&J and HoldCo.

13          J&J and HoldCo are, however, now required to fund

14  only a plan trust under a plan they support as long as that

15  remains the case and they insist that a plan included at

16  channeling injunction exceeds the permissible scope of a

17  challenging injunction in a plan for an asbestos debtor under

18  524(g) of the code under applicable Third Circuit precedent.

19  No confirmable plan here is feasible.

20          Lastly, Your Honor, the debtor claims in substance

21  that a lack of financial distress or a lack of good faith can

22  be justified and cured by confirming a Chapter 11 plan.  But if

23  the debtor was not entitled to be in Chapter 11 in the first

24  place because it was not in financial distress or otherwise did

25  not file its Chapter 11 case in good faith, then it should not

1  have a right to use Section 524(g) to impose a plan and third

2  party releases on dissenting creditors.

3         Using Chapter 11 powers, which the debtor never

4  should have enjoyed, to confirm a plan cannot cure the fact

5  that the debtor should never have enjoyed those Chapter 11

6  powers in the first place.  Contrary to the debtor's theory,

7  the ends justifies the means has not yet become a principal of

8  bankruptcy law, generally, or good faith jurisprudence in

9  particular.

10        The end of confirming a Chapter 11 plan cannot

11 justify the means of allowing a debtor who had no business in

12 Chapter 11 to use bankruptcy tools to impose in settlement on

13 dissenting creditors whether or not counsel to the majority of

14 creditors or alleged majority of creditors support the debtor's

15 tactics.

16        Your Honor, we respectfully request that the Court

17 grant our motion to dismiss.  Thank you.

18        THE COURT:  Thank you, Ms. Jones.

19        Good morning.

20        MS. JOHNSON:  Good morning, Your Honor.  Erica

21 Johnson from Womble Bond Dickinson on behalf of the Ad Hoc

22 Committee of State Attorney Generals.

23        Full, fair, and final resolution.  We've all heard

24 that phrase or variations of that phrase used throughout this

25 bankruptcy case, including in Mr. Kim's testimony this week.

1  The phrase has been used to justify LTL's bad faith bankruptcy

2  filing.

3         Full, fair, and final resolution are easy words to

4  toss around.  And on their face, they seem like noble goals.

5  But LTL's ability to get full, fair, and final resolution means

6  that the counter parties to the deal, the claimants, are being

7  stripped of substantive rights.

8         The claimants must lose for LTL to gain.  That is why

9  the Third Circuit stated in its LTL decision that good

10  intentions, including to comprehensively resolve litigation,

11  does not suffice alone.  To access the bankruptcy code safe

12  harbor, a debtor must be in financial distress, which LTL is

13  not.

14         The law in this circuit is clear.  As <u>SGL Carbon</u>

15  instructs, a debtor must need to use the tools afforded under

16  Chapter 11, not merely want to use them because they are

17  powerful and expedient.

18         For LTL to get full and final resolution for its

19  tortious, false, and misleading acts, claimants including the

20  governmental units lose the right to choose.  They lose the

21  right to choose how their claims are adjudicated, and they lose

22  the ability to seek recoveries higher than the amounts set

23  forth in the pot plan that LTL has proposed.

24         If LTL is successful, governmental units would lose

25  the ability to enforce their police powers, and would be unable

1  to hold J&J and the other proposed protected parties

2  accountable for violations of state consumer protection laws.

3  These are rights that the states possess if LTL seeks to

4  eliminate in pursuit of full and final resolution of claims

5  that are the result of LTL's own choices, omissions, and

6  actions.

7           On the other hand, as Ms. Murian (phonetic)

8  testified, LTL has no constitutional right to full resolution

9  of its talc liability.  This is an ability that LTL's gaining

10 through it's improper use of the bankruptcy process, a

11 litigation advantage.  What is fair to one party is relative to

12 what is sacrificed by the other parties.

13          In this case, LTL seeks to cap government unit

14 recoveries to $400 million.  LTL's offered no basis for setting

15 its maximum liability at 400 million other than this is the

16 number that J&J's counsel and certain plaintiff firms, not the

17 states or other governmental units, has decided is fair.

18          Capping liability in one-sided decisions reflects

19 LTL's use of the bankruptcy process to gain an unjust

20 advantage, the definitional opposite of fair.  Again, a

21 litigation advantage.

22          With respect to the consumer protection claim

23 specifically, LTL's narrative as testified to by Mr. Kim and

24 Mr. Murdica this week is that the state's consumer protection

25 claims are the exact same claims that are being brought by talc

39

claimants, and therefore $500 million is a fair cap on
potential recoveries.  This narrative lacks merit.

State level consumer protection laws often refer to
its Unfair and Deceptive Acts and Practices statutes, or UDAP,
constitute the main lines of defense in protecting consumers
from unfair, misleading, deceptive, and otherwise
unconscionable business practices.  Every state has a UDAP
statute.

These statutes empower state attorney generals to sue
companies to stop conduct that violates UDAP statutes, and to
obtain relief including, Your Honor, injunctive relief,
restitution, and civil penalties.  Overall, the purpose of
these acts is to protect consumers from any deceptive trade
practice made in connection with the offer or sale of goods and
services.

These laws are designed to keep companies honest and
accountable to protect the public.  Prohibiting false or
deceptive trade practices prevent harm from coming to
consumers, and discloses risks to consumers.  When companies
break UDAP laws, the states are able to hold them accountable
to deter future bad conduct, and to obtain injunctive relief to
prevent continuing harm.

Unlike in private causes of action or tort law,
attorneys general do not need to prove actual deception,
reliance, actual injury to any consumer, wrongful intent, or

40

1  causation to establish a violation of a UDAP statute.  Both

2  truthful statements and failures to disclose may be misleading

3  in certain contexts, and such can be actionable.

4       To be clear, state UDAP laws do not require intent to

5  defraud.  In many instances, attorney generals need only show

6  that a statement or failure to disclose had the capacity,

7  tendency, or effect of deceiving or misleading consumers.

8       In this case, Your Honor, with respect to J&J talc

9  products, all that needs to be proven is that LTL could not

10 guarantee that its talc products were asbestos-free.  If LTL

11 could not do this, then the public should have been informed of

12 the risk.

13      Enforcement actions are of the utmost importance in

14 protecting consumers across the country.  And LTL's attempts to

15 minimize and conflate consumer protection claims with talc

16 personal injury claims exemplifies LTL's bad faith and

17 unwillingness to actually resolve consumer protection claims.

18 Instead, LTL seeks to use the bankruptcy process to create

19 litigation advantages.

20      If the Court decides that notwithstanding LTL's lack

21 of financial distress and bad faith in filing the bankruptcy,

22 that it wants to examine LTL's ability to confirm a plan in a

23 reasonable time, I want to address a few reasons why the plan

24 is not confirmable with respect to the states, and how it

25 demonstrates that this plan is yet another litigation tactic.

1          LTL has emphasized the settlement it reached with

2 certain plaintiff law firms to support its ability to confirm a

3 plan and to justify the second bankruptcy filing.  LTL and the

4 settling plaintiff law firms negotiated on behalf of the

5 governmental units to establish a cap for governmental claims.

6          This is not a settlement.  A settlement requires a

7 meeting of the minds and agreement amongst the settling

8 parties.  The states did not sign MDAs.  The states did not

9 negotiate the plan support agreements.  In his testimony,

10 Mr. Murdica suggests that he developed the $400 million

11 allocation in part from settlement negotiations and discussions

12 with the Ad Hoc Committee of Sate Attorney Generals, but he's

13 careful.  He's careful not to state when the discussions

14 occurred because no discussion occurred until after the second

15 bankruptcy filing when a deal was already set.

16          This is not a negotiation.  That's directing a

17 result.  The states did not and do not agree to the $400

18 million cap as payment for all the governmental units, and a

19 determination of the appropriate value that will be required

20 before a plan can be solicited.  Doing otherwise would result

21 in solicitation of a plan without a disclosure statement that

22 may be materially misleading.

23          The number of claims, the amount of claims need to be

24 understood, as Ms. Davis discussed, for the plan payments to be

25 known, the claimants to understand what they would be receiving

1  under the plan.  And that's because it's a pop plan as proposed

2  by LTL.  LTL's assertion that Class 4 under the amended plan,

3  which does include governmental units, are paid in full is

4  premised on the false assumption that LTL's able to

5  unilaterally cap the claim values.

6        Until the universe of claims are understood, LTL

7  cannot estimate whether a claim is impaired, unimpaired, and

8  what the percentage recoveries that the claimant can expect.

9  Further, LTL classifies all talc claims, including governmental

10  unit claims, within Class 4.

11        However, LTL is proposing disparate treatment to the

12  claims within the same class because even though it says all

13  claims will receive 100 percent payout, it allocates funding to

14  various claims in different amounts, the governmental units

15  getting $400 million, and all other talc claims getting $8.5

16  billion.  This violates Bankruptcy Code Section 1123(a)(4),

17  claims within the same class are treated disparately.  Not only

18  are creditors not being paid in full, but equity is retaining

19  interest in violation of the absolute priority rule.

20        Finally, LTL cannot show that its plan satisfies the

21  best interest test because LTL cannot show that creditors would

22  receive more under the plan than in a Chapter 7 liquidation.

23  For these reasons, and others, the plan is not proposed in good

24  faith, and it cannot be confirmed.

25        Your Honor, the purpose of bankruptcy as recognized

1  by the Third Circuit in the LTL decision is to address a

2  situation where, quote, the system of individual creditor

3  remedies may be bad for the creditors as a group when there are

4  not enough assets to go around.  That's not the case here.

5        LTL is not in financial distress.  To the extent it

6  is in financial distress, it manufactured its own distress, and

7  LTL should not be permitted to avail itself of the powerful

8  tools of the bankruptcy code to the detriment of creditors.

9  Accordingly, Your Honor, LTL's bankruptcy case should be

10  dismissed.

11        THE COURT:  Thank you, Ms. Johnson.

12        Mr. Malone?

13        MR. MALONE:  Your Honor, Robert Malone of Gibbons

14  P.C. on behalf of the States of New Mexico and Mississippi.  I

15  am not going to belabor the record.  The counsel up here for

16  them have already been heard.  Erica's done quite the job of

17  being eloquent to this Court.  We adopt those arguments.

18        We also adopt the arguments that we put in our

19  pretrial briefing, and reserve our rights for the post-trial

20  briefing to put more into the record with respect to this case.

21  But let me just highlight some things for the Court.  And I

22  don't want to belabor the record of what's been done by

23  Mr. Jones or anybody else.

24        So, but Your Honor, bad faith cannot be cured, as I

25  think we've already heard, by the mere filing of a plan and

44

1  amended plans, and the other things that you've heard today.

2  You know, it's supported by law firms in a very highly

3  unorthodox procedure that I've never seen where law firms

4  actually, not even the claimants, have a law firm committee

5  that are really no more than paid mercenaries to support what

6  they want to do here.  That does not cure bad faith.

7            As to the states, LTL cannot just simply ignore the

8  11th Amendment and merely say well, we're going to short trip

9  it.  Why?  Because the 11th Amendment here grants the states

10 their sovereign immunity in this case.  You cannot just come to

11 a court and say well, we're going to propose rules on a one-

12 ended side, as pointed out, no negotiation with the parties

13 here.  And there is, with respect to he way this is set up,

14 there's a trust distribution procedure that basically requires

15 the states to participate.

16           Our states have not taken the position that we have

17 claims against LTL at this point.  LTL was not in existence

18 when there was violations of the consumer protection.  So

19 they're trying to drag the States of Mississippi and New Mexico

20 before this Court in order to resolve their issues.  I don't

21 think this Court has the jurisdiction to deal with other things

22 and other monetary.

23           This Court cannot devise or grant any kind of relief

24 that we may be seeking that's non-monetary, and I think that

25 was what we argued in LTL 1 with respect to what states may

45

1  look for as other results in this case.

2          Finally, one of the things I think the Court can look

3  at is you've heard the testimony of Mr. Dickinson who is the

4  CFO, and Mr. Kim.   And during the cross I asked him about their

5  fiduciary duties.   And they seemed to both have some trouble

6  comprehending what their duties were as debtors-in-possessions.

7          And I think the reason for that, Your Honor, is quite

8  clear.   Their fiduciary duty is not to the estate and to its

9  creditors.   It's to Johnson & Johnson.   That's who they're

10  there to please, that's who they take their orders from.   They

11  are not independent in any way, shape, or form.

12          I think this court has enough before it to make the

13  finding that this case could be dismissed under 1112(b).   But

14  if this Court, for any reason, thinks that notwithstanding you

15  asked everybody to brief it that it can, despite the bad faith,

16  continue to let this Chapter 11 continue.

17          Well, this Court has the power under 1104(a)(2) to

18  appoint a Chapter 11 Trustee sua sponte.   U.S. Mineral Products

19  is a Third Circuit case which appealed that right.   So even

20  though there's no motion before this Court at the moment, it's

21  clear from this record that if this case is not dismissed,

22  which I believe overwhelming it's been proven that it should,

23  this Court is left with no other choice than to take this

24  debtor out of possession if it thinks that anything can be done

25  because the interests that are being pursued by this debtor are

46

1  not in the best interest of creditors or this estate.

2          Again, I wanted to be brief, and I will cede the

3  podium.

4          THE COURT:  Thank you, Mr. Malone.

5          All right.  Ruckdeschel?  Mr. Ruckdeschel.

6          MR. RUCKDESCHEL:  Yes, Your Honor.  I believe I'm

7  next.  Let's make sure my tech is working okay.

8          THE COURT:  That's fine.  Before you start, Whitney,

9  are you okay?  Okay.

10          MR. RUCKDESCHEL:  All right.  Can you see the

11  presentation, Your Honor?

12          THE COURT:  Yes, I can.

13          MR. RUCKDESCHEL:  Your Honor, I want to thank you and

14  your staff Maria for all the help, everybody else there, I

15  appreciate it.  I want to get right to it.  I'm going to get

16  granular with Dr. Mullin and discuss with the Court what's

17  going on here and what evidence you do and do not have.

18          And I'm going to start with what the Third Circuit

19  said, financial distress, right, when they were talking about

20  this.  It cannot be based upon back-of-the-envelope forecasts

21  of hypothetical worst-case scenarios.  And that's the phrase

22  that I want, hypothetical worst-case scenarios.  I'd like you

23  to keep that in mind.

24          And the inference is that experts can draw, if their

25  testimony is going to be admissible, helpful to the Court, have

47

1  to be permissibly drawn from actual evidence, right, stuff

2  that's in the record that's admissible evidence.  It's not

3  speculative.

4  And LTL, as Mr. Jonas says, they affirmatively

5  assert, they deny the facts needed to show immediate, non-

6  speculative distress.  They say they have the same ability to

7  pay as JJCI before the first filing which was $61 billion.

8  They deny funding agreement two diminishes it.

9  They say the same basis for financial distress is in

10  LTL 1 and just say well, the Third Circuit was wrong, and they

11  can pay their liabilities, their balance sheet's solvent, they

12  didn't do any analysis prior to filing.  All this testimony is

13  in the record, you've heard it.  We submitted it in adversary

14  proceeding Docket Number 61.

15  All right.  And so they post hoc backfill with

16  speculative experts like Mr. Jonas pointed out.  And they don't

17  analyze this before filing.  This is a significant problem,

18  Your Honor, with respect to Rule 9011 and the duty of a party

19  to investigate and have a factual basis for filing their claim.

20  And as we've discussed, and as the Third Circuit

21  found, the Court cannot backfill gaps for them, and so they try

22  and do it here.  Having failed to do it in LTL 1, they try and

23  do it here with speculative experts who have improper using of

24  experts because you can't use an expert to reject your judicial

25  admissions.

1          And over and over and over again, the officers of

2  LTL, the lawyers for LTL have represented to this Court all of

3  the facts that are necessary to reject the finding of imminent

4  financial distress.  And it is an improper use of experts to

5  just backfill against your own judicial admissions.  There's no

6  reliable data, methodology, or application.  And while I'm

7  focusing on Dr. Mullin, Bell's opinions are entirely dependent

8  on Dr. Mullin.  So when Mullin falls, Bell falls.

9          So Mullin admits he intentionally created a

10  hypothetical worst-case scenario.  He admits it over and over

11  in his report that he intentionally overstated high end

12  projections.  And he admitted it over and over in his testimony

13  yesterday.  And again, Bell's analysis depends on Mullin's

14  hypothetical worst-case scenario.

15          So this is the chart I talked about with Dr. Mullin

16  yesterday.  Your Honor was looking at it.  And I'm just going

17  to go through some of these analyses and make sure that Your

18  Honor knows that this is all just made up.  We've talked about

19  the trials, but I want to talk about the effect of that.  It's

20  $1.5 billion in the analysis, ten times the historical average

21  of trials.  No analysis of the Court's abilities to set 100

22  cases for trial, zero evidence that you could have 100 cases

23  set in the first year that this case comes back.

24          What's the data we've got?  The only data we have is

25  that there's one trial, the Valdez case.  Nobody else has come

1  to this Court saying well I need to have it because my clients

2  have to have their trial immediately.  No one else has sought

3  to have the lift stayed other than Mr. Satterley.

4         So where's the data?  There's nothing but

5  speculation, right.  Johnson & Johnson represents we can do ten

6  max.  This is the whole foundation of their this is better than

7  the tort system because it's going to take a thousand years for

8  anybody to get any money argument that you remember hearing

9  over and over last time.

10        And while we talk about well, does J&J have the

11  staffing to try this, I want to look at this from a different

12  perspective.  Who are the plaintiff firms that are going to

13  come up with 300 trial-ready cases in the next three years?

14  What have you heard about that?  Absolutely nothing.  There is

15  not a shred of data in this record that there are plaintiff

16  firms capable of putting 100 cases into trial in the next year,

17  let alone every year for the next three years.

18        Lanier they were settling.  The PSA firms under

19  Mullin's analysis, as we're about to get to talk to, all of

20  them are going to be out.  They're going to all be settled.

21  The MDL has six cases set for trial.  And prior to filing the

22  mesothelioma trials, we're looking at about six a year.  And

23  that information's in Dr. Mullin's report.  You can look at the

24  number of trials and when they were tried.

25        So where's the data to support 100 trials for a year?

50

1   There's just nothing there, and that's a billion and a half

2   dollars in his estimate.  There's no reliability there.  Two

3   hundred and fifty percent increase of historic pretrial costs.

4   Dr. Mullin says right in his report I took that number, I just

5   multiplied it by 250 percent.

6           And the last part, the 100 trials and this, the

7   pretrial costs, this applies to both scenarios one and three in

8   Dr. Mullin's analysis, $1.2 billion which he acknowledges is

9   deliberately inflated to a hypothetical worst-case scenario,

10  exactly what the Third Circuit says you can't do.  It's just a

11  made up no.  There's no methodology for this, Judge.  There's

12  no factual basis.

13          You can look at his report at Paragraphs 71 to 73.

14  The only basis for this 250 percent is a hypothetical musing

15  about what could happen in the MDL.  If the MDL decided to do

16  this, and if this happened and if that happened, then our costs

17  could go up.  There's not a shred of actual non-speculative

18  evidence to support this, Judge.  Paragraphs 71 to 73 of the

19  report.

20          The next analysis, 100 percent of the claimants

21  represented by the law firms with PSAs settle in the next three

22  years.  Now, I just, you're not going to believe what

23  Dr. Mullin has done here.  It's unbelievable.  So he assumes

24  there are 100,000 claims with the PSA firms.  That's Paragraph

25  77 of his report, footnote 89, right.

51

1          Now, yesterday we talked about this.  In his report,

2  he says if you add up the PSAs, the number of claims that they

3  say in the PSAs, it's 55,000 claims.  And he testified about

4  those 55,000 claims with me repeatedly yesterday.  But in his

5  report when he runs the numbers, it's 100,000 claims.

6          His report in Paragraph 27 says there may be as many

7  as 60,000.  The 55 might be 60, but we have limited data about

8  how many.  But in scenarios two and three, he assumes that the

9  PSA firms have 100,000 claimants.  It's just 45,000 imaginary

10 people.  They don't exist.  They exist only in Dr. Mullin's

11 chart.

12         So we got 100,000 cases.  And I did the formula with

13 Dr. Mullin, and I just want to lay it out here, Judge.  A

14 hundred thousand cases all treated as ovarian cancer, 100

15 percent of the cases settle in the first three years at 50,000

16 a claim, 64 percent of them get paid which is the rate that

17 Lanier got paid, the greatest trial lawyer in the history of

18 America, right, the history of the world.

19         A hundred thousand times fifty thousand times sixty-

20 four percent is $3.2 billion.  It's just an imaginary number.

21 These are imaginary claimants getting paid imaginary numbers.

22 And let's go through it.

23         So he assumes all 100,000 settle in three years.

24 Well, what's the data for that?  All time in history, Johnson &

25 Johnson has settled fewer than 6,000 ovarian cancer cases, and

52

1  over 5,000 of those are with Lanier, the greatest trial lawyer

2  ever.  Was there a change of plan?  Do we have any evidence

3  that they were going to change this plan and all of a sudden

4  settle 100,000 cases in the next three years?

5          Did Mr. Murdica testify about that, Mr. Kim, Watts,

6  or Onder?  Did Mullin?  Mullin said I didn't ask.  I didn't

7  ask.  I don't ask, I don't know.  I don't tell.  It's a

8  hypothetical, made-up worst case scenario.

9          So he assumes that LTL's going to do this

10 voluntarily.  These are settlements, Judge.  So despite the

11 alleged liquidity issues, his assumption is that LTL is going

12 to decide to take on $3.2 billion of liability now that it

13 wouldn't have to otherwise do.

14         And in scenario two, it's 75 percent of that.

15 They're going to settle with 75,000 of these people, which is

16 billions and billions of dollars of voluntary debt that Mullin

17 hypothesizes LTL would voluntarily go to in the face of their

18 alleged financial distress.  It's nonsense.

19         He assumes they're all ovarian cancer, right.  What's

20 the data that we have?  Only definitive diagnoses of epithelial

21 ovarian cancer settled.  Murdica testified to this, it's in all

22 the MSAs, the master settlement agreements are all in evidence.

23         Mullin admits he has no data what percentage of his

24 hypothetical 100,000 are ovarian cancer.  I asked him, 30

25 percent, 50, 70.  He doesn't know.  He doesn't have any data.

53

1   It's a hypothetical situation made up for a worst-case scenario

2   just as forbidden by the Third Circuit.  There's no evidence in

3   this case, Judge, that LTL would have settled any non-ovarian

4   cancer claims with anyone ever, let alone in the next three

5   years.  Right.

6           So again, so what's the data?  In the tort system,

7   none of these cases get paid.  None of these firms, ovarian

8   cancer or not, none of the PSA firms were getting paid in the

9   tort system.  There's no testimony in this case that there was

10  going to be a change of plan.  There's no evidence that Johnson

11  & Johnson was anticipating changing its litigation management

12  if the bankruptcy failed, right.

13          And the PSAs deny, they're in evidence too, the PSAs

14  deny any side deals, Judge.  Right.  Murdica, I went through

15  with him.  You may have wondered why I was wasting time on the

16  entire agreement clause in the PSAs.  There's no side deal.

17  There's no winky-wink, nudge, nudge report us and if we don't

18  win here, we'll just pay you on the outside.

19          There's not a shred of evidence about that.  There's

20  no testimony about it from Mr. Murdica or Mr. Watts or

21  Mr. Onder.  And the agreements reject that proposition.  There

22  are no other agreements.

23          And what's the evidence that any of these cases would

24  require for a reasonable company a settlement within three

25  years?  In the MDL, the Bellwethers are just starting.  The

1  non-ovarian cases in the MDL aren't moving.  Onder talked about

2  that.  He's avoiding a Daubert ruling.

3          And most of the 100,000 imaginary claims are unfiled.

4  We got 45,000 that are just a figment of Mr. Mullin's

5  imagination.  And Mr. Watts testified he hasn't filed a single

6  one of his 17,000 cases.  What's the evidence that any of those

7  would be in a position where a reasonable company would

8  determine to settle them, let alone for 50,000 a claim in the

9  next three years.  It doesn't exist.  It's a figment of

10  Mr. Mullin's creation.

11          Fifty thousand a claim based on Lanier's epithelial

12  ovarian cancer numbers, there's no evidence that the uterine or

13  cervical cancer cases have any present value.  And I want to be

14  clear, it may well be that somewhere down the line, Mr. Onder

15  believes he's got enough scientific evidence to support a

16  Daubert hearing on those uterine cases.  But it's not now.  And

17  it's not in the next three years based on any evidence before

18  this Court.

19          There's no evidence that any of those cases have any

20  present value in the tort system.  And there's no evidence

21  which percentage of them are ovarian cancers.  Mullin can't say

22  for the MDL, he can't say for the 55,000 in the PSAs.  I asked

23  those questions specifically yesterday.  And the other 45,000

24  claimants are imaginary.

25          So the entire calculation falls apart.  Right.  And

55

1  let's just run the math as an example.  For Mr. Onder, he's got

2  12,000 claimants who are uterine or unknown.  In Mullin's

3  analysis, those claims are worth $384 million, 12 times 50,000

4  is 600 million times 64 percent.  $384 million, that's what's

5  included in Dr. Mullin's estimate for those claims.

6       How many of them are epithelial ovarian?  He's got no

7  data.  So what's the data on the present value of the uterine

8  or undetermined cancer cases, those 12,000?  Well, for Mullin

9  it's $384 million.  In the tort system, the present value is

10  zero.  None of them have ever been paid a penny.  There's no

11  historical data that there is any settlement value in those

12  cases currently.

13       And the max value in the plan, $12 million.  So

14  Mullin's report, right, because it's 1,000 a claim in Section

15  5.3.3 for non-ovarian cancers.  That's the only dollar figure,

16  by the way, in the proposed plan.  And it's $1,000 a claim.  So

17  you have two data points for the value of these 12,000 claims.

18  One is tort system history, zero.  And two is the plan that

19  Mr. Onder is allegedly supporting which pays him $1,000.

20       So Mullin's report overstates the data, the high-end

21  value of the data for this by $372 million.  There's nothing

22  else.  There's no other data, Judge.  Right.  No back-of-the-

23  envelope forecast of hypothetical worst-case scenarios.  That's

24  deliberately, it's expressly what Mullin did.  Right.

25       So hypothetical worst-case scenario, every element of

1  his analysis is deliberately fabricated to intentionally get a

2  worst-case scenario.  $1.5 billion for 100 trials a year times

3  three years.  There's no evidence of it.  Even if you take the

4  inflated rage of $5 million a case, if you use the historic

5  data, it's 30 trials.

6        Let's say it's 40, right.  You're going to save over

7  a billion dollars in reality off of what Mullin includes in his

8  analysis that Bell depends on for his analysis.  $1.2 billion

9  for the inflation of the pretrial costs by 250 percent.  Just

10 use the actual data, right.

11       So it's going to go down hundreds of millions of

12 dollars.  And $3.2 billion to settle now, 100,000 mostly

13 imaginary and unfiled PSA claimants for which there is zero

14 data that they have any present value or any expectation that

15 they would have realistically settled in the first three years.

16       Add it up, $5.9 billion in expressly hypothetical

17 worst-case scenario.  And Mullin said it over and over and

18 over, in writing his report and yesterday on the testimony.

19 It's directly forbidden by the Third Circuit, and it's the only

20 evidence you have.

21       Your Honor, I submit that the amount of evidence that

22 Your Honor relied upon in LTL 1 in looking at what the

23 potential costs were, that the Third Circuit found was

24 insufficiently grounded in the facts, was far more grounded in

25 the facts than Dr. Mullin.  Right.

1                And it is exactly, deliberately, expressly,

2     admittedly what the Third Circuit says you can't do.  And if

3     you get rid of Mullin, Bell falls.  And if you get rid of Bell,

4     the case falls because the admissions of the party, the actual

5     evidence from the witnesses is that they're not in distress as

6     defined by the Third Circuit.

7                This case is an abomination, Judge.  I know you and I

8     have disagreed about things over the last year and a half.  But

9     we share one thing.  I am a believer in the law, I'm a law

10    geek.  I have one case, Judge, one.  I have spent hundreds of

11    hours on this for no compensation.

12               This is wrong.  And you have the ability to stop it.

13    And the court has made clear, the Third Circuit has made clear,

14    what the rules of the road are.  And J&J hasn't gone by them.

15    They've given you nothing to allow you to find that there is

16    actual financial distress based on anything other than the

17    hypothetical musings and wild imagination of Dr. Mullin.

18               It's not right.  You can stop it.  And I know, Judge,

19    you don't rise to where you are in this bar, you don't serve as

20    long as you have served and give up what you've given up in

21    order to wear that robe and to serve our country in your

22    position if you don't believe in the system.  I know you'll

23    apply the law to the facts and I trust you'll dismiss this

24    case.  Thank you.

25               THE COURT:  Thank you.  Thank you, Counsel.

58

1              You can come up, Ms. Thomas.

2              But for all, both sides, all sides, anybody

3  submitting a PowerPoint, I would like chambers to get it

4  eventually by email.  All right?  Thank you.

5              Mr. Thompson, good morning.

6              MR. THOMPSON:  Yes, let me just --

7              THE COURT:  Wendy, you'll let me know, are you all

8  right?

9              THE CLERK:  Yeah, I'm all right.

10             THE COURT:  Okay. okay.  Eventually, I won't give you

11 a choice.

12             MR. THOMPSON:  Okay.  It should be playing.  Sorry.

13             THE COURT:  That's all right.

14                        (Pause)

15             MR. THOMPSON:  Okay.  All right.

16             Good morning, your Honor.

17             THE COURT:  Good morning.

18             MR. THOMPSON:  I'll try to be brief here.  I think

19 we're on target with our timing here.  Thank you for always

20 your patience and you've always been willing to listen, even if

21 it meant staying till 7:30 at night, and I'm grateful for that.

22 This is a very important case and it's important for everyone

23 to be heard and you've always allowed us to do that.

24             So I'm going to urge you to start and stay with good

25 faith, because that's what the Third Circuit did.  And they

1  can't fix it, whatever the situation was on April 4th under

2  Integrated Telecom and SGL Carbon and LTL Management, if they

3  weren't in distress on April 4, 2023, they can't cure it, and

4  they can't come in in bad faith and wash themselves to exit in

5  good faith through some sort of a plan.  It doesn't work that

6  way.  You can't get to the safe harbor of bankruptcy if you

7  don't come in in good faith.

8         One of the reasons the Third Circuit ruled the way it

9  did on March 31st, they added -- this is a filed red line on

10  the docket to illustrate what they added.  And one of the

11  things that they thought was important enough to add to their

12  opinion was the testimony and the statements of LTL in the

13  first case, that they can pay all current and future claimants

14  in full.

15         Mr. Kim, right there, on Tuesday said the same thing.

16  LTL Management can pay all current and future claimants in

17  full, and he had to say it on Tuesday because he said it in his

18  deposition.  This reason by itself is grounds to dismiss this

19  case.  The Third Circuit said that that evidence by itself

20  dismisses this case.  These are dividends.  Companies that give

21  away $12 billion a year are not in financial distress, and it's

22  very obvious that J&J is in charge.

23         In the first case, they were trying to act like

24  there's a division.  There's not.  Mr. Haas is at counsel

25  table.  Mr. Haas is directing Mr. Gordon.  They're conferring

1  with Mr. Haas.  J&J is in control.  Okay.  So we need to talk

2  about J&J.  This is what they settle cases for in the tort

3  system.  Fractions of what they take and put in bags and throw

4  out the window to their shareholders.  They don't need that

5  money and they give it away.

6       So here's what was not enough to cure a lack of

7  financial distress, good intentions.  Assuming that J&J has

8  good intentions, and they don't, but if they do have good

9  intentions, not enough.  J&J's belief that they can equitably

10 pay people.  They don't believe that.  Even if they do believe

11 that, that's not enough to cure this.  Your Honor's commendable

12 effort, you have spent a ton of time on this case.  You have

13 dedicated a great deal of time and attention.  That's not

14 enough to cure the lack of good faith.  Their desire to resolve

15 equitably.

16       Here's what bad faith is.  So they said -- this is

17 their slide from the first trial.  No mass tort case has ever

18 been dismissed.  Well, the reason for that is that no one ever

19 did a Texas Two Step and came in and filed a mass tort

20 bankruptcy.  That's why.  This illusion that you can have the

21 puppet master and the stooge debtor being controlled by them

22 had never been attempted before.  Third Circuit said, you're

23 not in distress.  And, Judge, I've got a lot of great arguments

24 and I've ranted and raved about them over the last 18 months.

25 Third Circuit didn't get to any of that stuff because they

1 stopped at the gate and they said, if you're not in distress,

2 you can't come in.

3        Mr. Haas issues these edicts on the website about how

4 a small minority of plaintiff's firms are against their

5 client's interests.  That sounds pretty serious.  So I asked

6 him about that in his deposition.  I got a stern lecture from

7 him about what he means.  What he means is is that claims are

8 worth zero in the tort system.  So basically anything other

9 than zero, I need to go to my client and tell them.  Now, of

10 course he's wrong.  J&J settled nearly 7,000 cases in the tort

11 system, including 1100 mesothelioma cases.  So they are

12 settling cases in the tort system, as he well knows.

13        The other thing he says is we're seeking aberrant

14 one-off large verdicts.  And remember this one, Your Honor,

15 lottery verdicts?  We say how offensive that is for our clients

16 to hear that, they keep saying it anyway.  J&J has a duty to

17 its shareholders.  That's why they settle cases.

18        No tortfeasor ever comes into court and says, you

19 know what, we feel terrible.  We want to pay everybody what we

20 think we owe them.  Never.  That's never going to happen.

21 That's not how it works.  The reason they settle cases is

22 because they have a duty to their shareholders.

23        Now, the LTL officers, they breached all their

24 fiduciary duties.  But the duties that J&J takes seriously are

25 the duties to their shareholders, and that's why they settle.

62

1  So you see those verdicts?  That's assuming $3 billion in

2  verdicts, okay?  I think the number is actually lower now in

3  terms of what J&J actually paid.

4        So what you see there is $66 billion in dividends

5  from 2017 to today.  The reason why J&J settles cases is

6  because they can settle cases at arms length where individual

7  victims can accept individual amounts of money for less than

8  they would lose with verdicts.  And, Your Honor, they're going

9  to win some verdicts.  They're going to win some.  That's why

10 we settle, too.  I can't guaranty that my client is going to

11 win every single case.  When fair money is offered, nearly all

12 clients will accept it, but it's never going to happen if

13 there's not any risk on both sides.

14       I'm old enough to remember when J&J didn't like

15 lawyer advertising.  Remember this?  They came in and they said

16 all these ads and however many there are a day and all these

17 plaintiffs lawyers are advertising to get cases.  Now, they

18 like it.  Now, they like a bunch of unfiled cases.

19       Mr. Watts has got 15,000 of them.  He got them all

20 after your order.  You denied the motion to dismiss in

21 February, and then Mr. Watts sees an opportunity, and now he's

22 got 15,000 cases that he can get paid in trust that he can't

23 get paid in the tort system.

24       This is Ms. Brown with John Kim last time.  And he

25 was talking about the advertisements.  There's Mr. Onder.  They

63

1  didn't like Mr. Onder in the first case because he was

2  advertising and getting cases.  See now, they like him because

3  he's willing to sell everybody out to get $1,000 a piece for

4  his uterine cancer cases.

5          So this is Mr. Murdica.  You can capture the person's

6  cases without the person's consent, right?  Mr. Murdica said,

7  "Well, that's their benefit."  That's the benefit to the future

8  claimants in this bad-faith bankruptcy.  Well, Mr. Murdica is

9  the one who drafted the term sheet.

10         So Mr. Murdica tells you on Wednesday, we're doing

11 this for the claimant's benefit.  Well, Mr. Murdica's idea was,

12 we're going to take $8.5 billion and we're going to give two-

13 thirds of it to the people right now to get their lawyers to

14 sign off, and then we're going to preserve a third of it for

15 the next 30 years.  That's what Mr. Murdica wanted to do, okay.

16 It's unclear what Ms. Ellis's role in that was.  But

17 Mr. Murdica wanted to do that.

18         Then of course, he espouses the view, oh, if we took

19 it to a vote, overwhelmingly, they'll support this vote.  And

20 all of this is indicia of bad faith.  Okay.  They're not in

21 distress, they can't be in here even if they had good

22 intentions.  The Third Circuit assumed that they had good

23 intentions.  The Third Circuit, as it said, took them at their

24 word and assumed their intentions were good.

25         They don't have good intentions, Judge.  All of this

64

1  is indicia of bad faith.  So you'll hear this refrain, "Let the

2  women vote.  Let these people vote."  No one knows what they're

3  voting on.  No one knows what they're voting on.  This is the

4  TDP of the first plan.  The new plan doesn't have specific

5  amounts.  But regardless of whatever plan it is that is ever

6  going to go out for a vote, which it should never be allowed to

7  go out for a vote, it's always going to be unclear what the

8  person receives.

9          In the tort system, I can go to Kate Tolleson and I

10  can say, J&J is offering you X amount.  What would you like to

11  do?  And you heard the cross-examination yesterday where

12  counsel for the debtor said something about you can't compel

13  settlements in the MDL.  Yeah, you can't, because the

14  constitution doesn't allow that.  You can't compel people to

15  settle if they don't want to settle.  J&J wants to do that.

16          This plan that is on file right now and any plan

17  that -- J&J did not do this embarrassing bankruptcy to give the

18  claimants their rights, okay.  J&J did all this to cram down

19  claimants.  And so the plan that is on file right now and will

20  not change in these material terms is unconfirmable.  A

21  unnecessary condition, as Mr. Kim says, to protect a non-debtor

22  third-party, J&J, that's going to get tossed under Combustion

23  Engineering, W.R. Grace, and Federal-Mogul.

24          It would make no sense to challenge the indemnity.

25  Of course not.  Why would you?  Why would LTL contest the fact

1   that they have to reimburse J&J for J&J's independent

2   liability?  They didn't consider it.  They're taking their

3   orders from J&J.  They don't pay mixed exposure cases.  In the

4   tort system, they settle cases.  People that use baby powder,

5   people that had (indiscernible) exposure.  Under the plan, they

6   don't do that.  They want to compel settlement.  They want to

7   capture and bind all the futures right now.

8            This is <u>Ortiz</u>.  The opt-out provisions.  The Supreme

9   Court said there's not good enough.  In <u>Fibreboard</u>, a lot worse

10  financial situation than J&J, Judge.  <u>Fibreboard</u> could not do a

11  limited fund class action and the opt out that was permitted

12  didn't cure the problem because it capped damages and you had

13  to go through mediation first.  This is their plan.  Maximum

14  judgment award, maximum value.  You've got to go through all of

15  the alternative dispute resolution.  And so 20 years ago, plus,

16  the Supreme Court said you can't bind future claimants to

17  capped damages and capped judgments.  And that's exactly what

18  this plan is trying to do and that's the only plan that's ever

19  going to be acceptable to them, even if we were to proceed

20  along this case.

21           I'll end with this.  This is Kate Tolleson, okay.  I

22  represent 80 people that have mesothelioma.  They have

23  fundamental rights to decide for themselves, to decide for

24  themselves whether to file a lawsuit, whether to settle,

25  whether to go to trial.  That is a fundamental right under the

66

1  state constitutions and the United States Constitution.  And

2  Judge Ambro wrote, "Given Chapter 11's ability to redefine

3  fundamental rights of third parties," who are my clients, "only

4  those facing financial distress can call on bankruptcy's tools

5  to do so."

6         So the safeguard to protect the people whose claims

7  have been stayed is financial distress.  They are not in

8  financial distress.  They are not before you in good faith.

9  And what we're seeing in this case is what happens when we

10 contemplate allowing bad faith debtors into the safe harbor of

11 bankruptcy.

12        Thank you, Judge.

13        THE COURT:  Thank you, Mr. Thompson.

14        If I'm correct, I believe we have Ms. Richenderfer.

15        MS. RICHENDERFER:  Yes, Your Honor.

16        THE COURT:  First, Ms. Richenderfer, obviously, our

17 deepest sympathies and condolences.

18        MS. RICHENDERFER:  Thank you, Your Honor.  And I

19 appreciate the Court's willingness to allow me at the last

20 minute to make these arrangements to do this telephonically.  I

21 had been looking forward to closing out the trial in Court with

22 everyone.  I very much appreciate the Court's -- I think

23 somebody mentioned your good humor.  I know that I have caused

24 a laugh or two in the courtroom throughout this trial.  And I

25 very much appreciate the way that we have been able to get

1 through the last three and a half days together.

2          Just for the record, Linda Richenderfer, counsel to

3 the United States Trustee.

4          As this Court is aware, this is not a Court of

5 general jurisdiction.  We are a specialized Court.  I represent

6 the United States Trustee's Office.  It's a very specialized

7 portion of the Department of Justice and Your Honor is a

8 bankruptcy judge.  And access to this Court is governed in

9 general by the Bankruptcy Code, and if I was there, I'd be

10 holding up a copy of it, the bankruptcy rules, and relevant

11 case law.

12          And here, we have the benefit of a very, very

13 specific on-point, factually and legally, opinion, precedential

14 opinion from the Third Circuit, In re LTL Management LLC,

15 64 F.4th 84 (3d Cir. January 30, 2023).  And I'm going to go

16 through the opinion a little bit here because I believe that 90

17 to 95 percent of what the court wrote in this opinion is still

18 applicable today, regardless of the machinations that were

19 carried out through the months of February, March, and early

20 April.

21          As the court starts its opinion in LTL Management, it

22 states, "We start and stay with good faith.  Good intentions

23 such as to protect the J&J brand or comprehensively resolve

24 litigation do not suffice alone, but counts to access the

25 Bankruptcy Code safe harbor as to meet its intended purposes.

1    Only a punitive debtor in financial distress can do so.  LTL

2    was not.  Thus, we dismissed its position."

3          Your Honor, the same is true today.  LTL was not in

4    financial distress on April 4, 2023.  The opinion that is

5    written by the Third Circuit also cites liberally to other

6    Third Circuit precedent that applies here.  <u>SGL Carbon</u>,

7    <u>Integrated Telecom</u>.  In the <u>LTL</u> case, the Third Circuit wrote

8    on Page 101, "The theme is clear.  Absent financial distress,

9    there is no reason for Chapter 11 and no valid bankruptcy

10   purpose."

11         At one point, I believe it's in Mr. Kim's declaration

12   for his direct testimony where he believes that there is a

13   valid bankruptcy purpose in a resolution of claims through a

14   bankruptcy trust.  That was Paragraph 60 of his direct

15   testimony declaration.

16         Well, the Third Circuit already made very clear.  No,

17   that's not a valid bankruptcy purpose.  Valid bankruptcy

18   purpose is financial distress.  And we go back to looking at

19   financial distress.

20         Sorry, Your Honor, I lost my place in my notes.

21   <u>Integrated Telecom</u> made clear that absent financial distress, a

22   desired benefit from certain Code provisions cannot justify a

23   filing.  Extremely important here when we hear so much about a

24   524(g) trust.  And this financial distress must be apparent and

25   immediate enough to justify the filing.

1          The Third Circuit looked at the information as part

2 of the record and said that the projections ignored the

3 possibility of settlement or a successful defense of a case or

4 dismissal of claims, that the projections that were relied upon

5 in LTL 1 all assumed the cases would go to trial.  And I'm

6 grateful for the fact that others have gone through all of

7 those numbers and Mr. Mullin's report and the extremely large

8 numbers that he comes up with of cases that he thinks are all

9 of a sudden going to hit the docket and lead to extreme

10 financial distress on the part of this particular debtor.

11          There is a failure here to take into account what the

12 history shows us.  And, again, the history for this case is the

13 same as the history for Case Number 1, because it didn't change

14 because they have been in bankruptcy all this time.  It is the

15 same history of lost verdicts, I mean, I'm sorry, plaintiffs

16 losing cases and of settlements.

17          Mr. Kim testified that the financial distress he

18 thought arose from this extreme and ceaseless financial burden

19 of the defense of the talc litigation.  Again, that burden has

20 already been ruled on by the Third Circuit where the Third

21 Circuit said, but you have to take into account these other

22 features.  And I'm just looking now at what makes up the

23 liability.  I'm not looking yet at what makes up the assets

24 that are available to meet that liability.

25          I believe this is mentioned already by someone, but I

1   wanted to point this out too, that when we look at financial

2   distress, we must keep in mind, LTL has no operations.  It has

3   no assets, no employees.  It doesn't produce anything.  This

4   isn't a case where the debtor is seeking to turn around and

5   reorganize.  It's not going to come out the other end.  It's

6   not here to save jobs.  It's not here to continue to market a

7   particular product.  It is here only to carry forward with the

8   debt that first belonged to J&J, went to JJCI if we believe the

9   information that J&J presented regarding the scope of the

10  indemnification agreement, and then went from JJCI to LTL.

11  There was what was called the divisive merger, Texas Two Step.

12  And while it was amusing when I asked the question of Mr. Kim,

13  I meant it seriously.

14         LTL was born out of that divisive merger.  There were

15  a lot of papers that went across the table, most of them all

16  generated by the same law firm, but they went to LTL, they went

17  to JJCI, they went to J&J.  And at the end result of all of

18  this configurations that went on was LTL holding all of the

19  talc liability.  And in exchange for that, it was given a very

20  valuable asset.  And during LTL 1, we heard testimony that the

21  most valuable asset that it had was the funding agreement from

22  J&J.

23         Then once we move forward and LTL wants to have the

24  world believe that this is a legitimate transaction that took

25  place, it legitimately took on the liabilities and it therefore

1  was given this wonderful piece of paper.  It emphasized to the

2  world that this piece of paper was worth $61.5 billion, if

3  necessary, regardless of whether they were in or out of

4  bankruptcy.

5        And one and a half years later, that funding

6  agreement disappeared and it disappeared while this case was

7  under the jurisdiction of this Court.  It disappeared in front

8  of the eyes of Your Honor.  It disappeared in front of the U.S.

9  Trustee's Office.  It disappeared in front of the TCC that was

10 appointed in the first case.  As a debtor-in-possession, LTL

11 owed a fiduciary duty to its creditors up through April 4,

12 2023, at two o'clock p.m., I think it was, when the dismissal

13 order hit the docket.

14        And little did we know that starting on January 30th,

15 Mr. Kim is talking to Mr. Murdica and others at J&J, and they

16 are going through efforts to take away this debtor's biggest

17 asset from the first case.  In some ways, Your Honor, it was a

18 violation of the automatic stay.  J&J came in and said, void or

19 voidable, we don't think it is of any value anymore.  We don't

20 think it's enforceable.  White flag goes up by the LTL board.

21 And they say, okay, we're not going to go.  We're not going to

22 do anything.  They sit down and they get another agreement.

23        Your Honor, a debtor in a bankruptcy case does not

24 have the right to give away such an asset while it is within

25 the jurisdiction of this Court.  And I mention these and stress

72

1  these items because I think these are also indicia of bad

2  faith.   Putting aside the financial distress argument, these

3  are indicia of bad faith.

4        Mr. Wuesthoff, excuse me, testified he was the source

5  of the statement that funding agreement one was the most

6  important asset.  He testified to that during the first case.

7  He testified during this case that he did not feel threatened

8  that the funding agreement from J&J would go away if the board

9  voted not to file for bankruptcy.

10       Little did he know though, that once the Third

11 Circuit ruled, that J&J was going to come back and threaten to

12 take away that agreement.  They should have come back to this

13 Court.  There were also inconsistencies that were presented to

14 the Court.  Mr. Wuesthoff disagreed with the experts,

15 Doctor Bell and Mullin.  Doctors Bell and Mullin said that the

16 liabilities were greater than $8.9 billion.  Mr. Wuesthoff, a

17 member of the Board of Managers, who's supposed to be kept up

18 to speed, he's also the president of the company, he disagreed

19 with them.  He disagreed they were above $8.9 billion.

20       And then we have Mr. Kim coming in who was supposed

21 to advise Mr. Wuesthoff and the rest of the board of managers,

22 and Mr. Kim disagrees with the figures Mr. Wuesthoff gives us

23 as to what the cost of a case is.  So got to get our hands

24 around the liabilities here.  And we have the people who manage

25 the company disagreeing with the experts, and we have the

1 people who manage the company disagreeing with each other.

2           When questioned by, I think it was counsel for LTL,

3 Mr. Wuesthoff said that, okay, even if the liability is greater

4 when the case is not in bankruptcy, it is not going to be

5 greater than $30 billion, which brings us to the current

6 funding that is available to this debtor.  It has cash assets,

7 or cash it can gain access to, that at this point, should be

8 over a billion dollars because HoldCo should have kept that

9 dividend.  But HoldCo allegedly can go back and get that

10 dividend at a moment's notice.  It's supposed to be an on-the-

11 demand loan.  We haven't seen the paperwork, but allegedly

12 that's what it is.

13           And in addition, we have the assets that HoldCo owns,

14 which we're told are worth $29 billion.  So Mr. Wuesthoff even

15 says that he does not believe, outside of bankruptcy, and he's

16 the one, he's on the board of managers and he's the president

17 of the company.  He speaks for the company.  He speaks for the

18 debtor, that they would not be greater than 30 billion outside

19 of bankruptcy.

20           While J&J may have pulled its funding agreement, it

21 didn't stop trying to direct the actions of this debtor.  Every

22 time we tried to find out, well, okay, what about all these

23 agreements that are supposed to be in place here now that the

24 debtor wants to rely upon to jump over the gating issue of

25 financial distress and just get right into the middle of a

1  bankruptcy case.  Who's the architect of this?  Who drafted the

2  PSA documents and negotiated them?  Mr. Murdica, outside

3  counsel for J&J, never retained by LTL.  Who negotiated some

4  type of alleged third-party payor, lienholder, whatever

5  agreement?  Mr. Murdica.  We haven't seen hide nor hair of what

6  that this is or isn't.

7          The state attorney general's figure, and I believe

8  that Ms. Johnson also already addressed this, where does that

9  figure come from?  Mr. Murdica.  Mr. Murdica is the one that's

10 out there operating and he's not reporting back to the board

11 and he has not been appointed by the board either.

12         Your Honor, I'm not going to comment on the merits of

13 MDL versus bankruptcy because to me that's not an issue for

14 this Court.  I don't think that that's a relevant issue.  The

15 issue is, can this entity be in bankruptcy?  Has it met the

16 gating issue?  The U.S. Trustee's Office job is to protect the

17 integrity of the bankruptcy system.  And we, therefore, often

18 take positions in cases even when all the other parties-in-

19 interest may disagree with us.

20         Reading through the surreplies last night, I noted

21 that the debtor is still trying to imply that there's some sort

22 of, I don't know, agreement or something untoward going on

23 between the U.S. Trustee's Office and the TCC.  Your Honor, if

24 for once somebody else, another party-in-interest is arguing

25 the same position as the U.S. Trustee's Office, that doesn't

1  mean that there is any sort of conspiracy.  It just means that

2  there are a lot of people who read the Bankruptcy Code the same

3  way and know that there is this gating issue.

4        I also took great offense when I saw it in the

5  debtor,'s surreply in Footnote Number 5, that they're alleging

6  that we did not put on the TCC anybody whose attorney had

7  submitted, I'm sorry, anybody whose attorney had signed a PSA.

8        Your Honor, we were served with discovery requests in

9  this case, and we responded, and we answered them.  And

10 Question Number 2 asked us why nobody was on the Committee, why

11 no one whose attorney had signed a PSA was on this Committee.

12 And we responded and we told them we didn't get any

13 questionnaires.  To our knowledge, no attorney whose client,

14 I'm sorry, I'm going to say this backwards again.  No client

15 whose attorney signed a PSA submitted a questionnaire to be on

16 this TCC.  That's why there's nobody on the TCC.

17       What would have occurred if they did?  I don't know.

18 But I do know that nobody tried to get on the TCC.  So

19 hopefully me saying this in public now will put it to rest

20 because I've heard this way too many times from debtor's

21 counsel and they're trying to make something of it.  There's

22 nothing to be made.  We can't appoint people to committees when

23 they don't voluntarily come forward and fill out

24 questionnaires.

25       The Ad Hoc Committee, when I read their surreply,

1  Your Honor, in some strange way, it reminded me of creditors

2  trying to file an involuntary.  Like, we're all in agreement.

3  We want this thing to go forward.  We want this plan, and so

4  therefore, you must keep this debtor in bankruptcy.  Well, you

5  can't file an involuntary unless the debtor is in financial

6  distress.  It meets the test.  It gets past the gating issues,

7  and that's the same response I have here to the Ad Hoc

8  Committee.  You can't get past that just because there's a

9  group of predators who have sat down and agreed to some sort of

10 structure.  That is not sufficient.

11         In conclusion, Your Honor, the U.S. Trustee filed its

12 motion this time as part of its duties as the watchdog for the

13 bankruptcy system.  And we believe in precedent being followed

14 by the courts.  The Third Circuit has spoken so clearly on this

15 issue.  The only difference between now and then is this piece

16 of paper from J&J.

17         There are a lot of other arguments that can be raised

18 about the disappearance of that particular piece of paper.  But

19 at the end of the day, we heard the fact witnesses testify that

20 LTL can meet its current obligations in or outside of the

21 bankruptcy system, between the cash it has available and with

22 the value of HoldCo.  There is no immediate near term, I'm

23 forgetting an adjective here, but financial distress is not on

24 the horizon.  This doesn't meet the test that Third Circuit

25 tried to warn of in Footnote 18.

1          This is the same scenario.  Went from 61 to 29.  Same

2  thing though.  And at the end of the day, LTL just cannot meet

3  the financial distress test.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Ms. Richenderfer.

6          All right.  Mr. Maimon.

7          MR. MAIMON:  Yes.  I'm happy you go now, Your Honor,

8  or if you --

9          THE COURT:  Well, have you timed your presentation?

10          MR. MAIMON:  I did.  I've got about 20 minutes or so

11  and I'm going to reserve for rebuttal as well.

12          THE COURT:  All right that's fine.  Like I said, I

13  have to get off the bench at a quarter of.  Do we want --

14          MR. MAIMON:  Well, we'll be done before then.

15          THE COURT:  Are you the last one?

16          MR. MAIMON:  Yes, Your Honor.

17          THE COURT:  Wendy, do you want to take a five minute?

18  I think the math works?

19          THE CLERK:  I'm fine, Judge.

20          THE COURT:  What?

21          THE CLERK:  I'm fine, Judge.

22          THE COURT:  We good?

23          THE CLERK:  I'm fine.  Yeah.

24          THE COURT:  Gosh, you're killing me.

25                    (Laughter)

78

1          THE COURT:  All right.

2          Mr. Maimon.  I'm not going to ask for one.

3          THE COURT:  I think I should stop drinking.

4          MR. MAIMON:  May I, Your Honor?

5          THE COURT:  Yes, please.

6          MR. MAIMON:  Thank you, Your Honor.  May it please

7     the Court.

8          You've heard from the movants on the motions to

9     dismiss and, quite frankly, there are too many grounds,

10    independent and joint grounds, that mandate dismissal of the

11    sham bankruptcy to list.  So I'd like to concentrate on two

12    specific issues, and I'm going to use -- I'm sorry -- the

13    boards that I prepared and used during the testimony of

14    Mr. Wuesthoff, the president, and Mr. Dickinson, the CFO of

15    LTL.

16         According to Mr. Wuesthoff, there are two differences

17    that distinguish this from LTL 1, where the rule of law in this

18    circuit is that they filed in bad faith and had to be dismissed

19    for the lack of financial distress.  Number one is his belief

20    that there are more talc claims now than there were, and number

21    two, the concern that the funding agreement was void or

22    voidable.

23         But LTL 1 covered all present and future claims.

24    LTL 2 covers all present and future claims.  And there is

25    nothing greater than all.  In fact, the Court appointed

79

1  estimation expert accumulated all of Mr. Watts' claims

2  accumulated all of Mr. Onder's claims, Mr. Nachawati's claims,

3  Mr. Slater's claims, all the ones that are now with the Ad Hoc

4  Committee.  Those were all in LTL 1.

5         But one thing wasn't in LTL 1.  In LTL 1, and prior

6  to that, Mr. Murdica had made it clear to Mr. Onder that he

7  would never pay a uterine cancer claim.  He would never pay a

8  cervical cancer claim.  And to Mr. Murdica's credit then, he

9  was telling the truth because LTL, JJCI, J&J never ever settled

10 a uterine or cervical cancer or a gynecological, non-epithelial

11 ovarian cancer claim.  And so I asked Mr. Onder, so what

12 happened here is the deal that Mr. Murdica came to him with

13 gave him something that he never had before.

14        If you agree with me and come into bankruptcy with

15 me, I'll pay you on claims you would never be paid in the tort

16 system, and he said, correct.  That's right.  So not that they

17 found more claims, they found more votes.  But even with all of

18 the claims, there's no financial distress.  Even crediting

19 everything that the defense experts said, which it's been shown

20 to be unreliable speculation, and worst case scenario,

21 projections that the Third Circuit said he can't do.

22        Let's just take a look at what their worst-case

23 scenario projections were.  According to Dr. Mullin, it was

24 between 11 billion and his worst, worst, worst case scenario,

25 $21 billion.  That's in his report.  That's the range.  It

1  ain't higher.  For the short term liability, he projected and

2  Mr. Ruckdeschel walked through why this is horribly unsupported

3  and purely speculative, between 3 billion and 7 billion within

4  the next three years.

5         But it's undisputed that HoldCo has over $30 billion

6  in assets.  And what makes things worse, according to the

7  debtor's own expert, Dr. Bell, $22.7 billion is available to

8  pay talc liabilities.  That was the top number he was

9  able -- the bottom number -- I'm sorry -- the bottom number he

10  was able to get to.  And so if the top, top worst case scenario

11  with all of these speculative and improper projections and

12  assumptions is 21 billion and they have $22.7 billion according

13  to their own expert, by definition, they're not in financial

14  distress.

15         And so, what do they do?  They say, well, don't look

16  at that.  But take a look and say, yes, we had a funding

17  agreement that the circuit provided its opinion based on, and

18  they gave us some guidance.  I haven't heard anything more

19  offensive in my legal career than the audacity to say that the

20  Third Circuit Court of Appeals was telling them how to do it

21  right the next time.  It is premised on the theory that the

22  purpose of the funding agreement was frustrated.

23         We know from Mr. Wuesthoff what the purpose of the

24  funding agreement was, to provide LTL with the funds it would

25  need to resolve all current and future claims.  Plain and

81

1  simple.  This idea of frustration of purpose is legally wrong.

2  Mr. Jonas addressed it.  You'll see it in the motion papers and

3  I'm sure you'll see it in the post-trial briefing.

4          In addition, it's contractually wrong, we're going to

5  see.  And then, finally, as the proof unrebutted in this

6  hearing proved, it is factually impossible, the debtor's claim.

7  Let's talk about it.  The contract itself says that the payment

8  is when there is no proceeding under the Bankruptcy Code

9  pending.  It says it is clear as day.  And despite the fact

10  that Mr. Kim and Mr. Dickinson said, well, we understood as we

11  were sitting there that the real purpose was for bankruptcy,

12  the contract itself has a counterparts, an entire agreement

13  clause, which says that this, the language here, supersedes in

14  its entirety, any understandings.

15          And so, as a matter of contract, and forget about

16  construction under North Carolina law, and frustration of

17  purpose under North Carolina law.  No one of those

18  understandings can be taken into account by the Court because

19  it's the contract which J&J drafted.  According to

20  Mr. Wuesthoff, they drafted it.  All inferences have to be

21  given against the drafter.

22          And that's what it is.  He said he was concerned

23  about the growth and cost of the talc claims, but he wasn't

24  worried because he had the funding agreement as an asset for

25  LTL to resolve the cases.  And he understood as the president

1  of LTL, who agreed under these terms to become president, that

2  J&J was obligated whether or not LTL was in bankruptcy.

3          And it gets worse.  His understanding was J&J was the

4  payor in or out of bankruptcy.  When he voted, that was his

5  understanding.  That was the board's understanding.  The

6  Circuit said very clear, it was their (indiscernible) had the

7  right outside of bankruptcy.  Mr. Gordon in front of you, as an

8  authorized agent of the debtor, admitted this.  They can't walk

9  away from that under the law.

10         Mr. Katyal, as an authorized agent of the debtor, in

11  front of the Third Circuit, admitted this.  They can't walk

12  away from that.  In their *en banc* petition to the Third

13  Circuit, they failed to raise this issue.  They failed to

14  raise, hey, senior members of the panel, you have made the

15  funding agreement void or voidable, and therefore, by your own

16  opinion, we are in financial distress.

17         Having had that opportunity to go to the Circuit on

18  that and failed to do so, they've waived it.  Having done

19  similarly, a motion for stay, we want to bring this to the

20  Supreme Court.  The Third Circuit has created the financial

21  distress.  They waived it, and by waiving a cert petition to

22  the Supreme Court, they have waived it.  It is legally

23  impossible.  It's also factually impossible.

24         On October 14, Mr. Wuesthoff told us that they

25  considered alternatives to Chapter 11.  He said that they had

1  the ability to say no.  He said that no one threatened to take

2  the funding agreement if they voted no.  There was no risk of

3  losing the funding agreement if they independently voted no.

4  And, again, we're giving them the benefit of the doubt, which

5  we all know is not the case, that they were independent and had

6  the right to say no.  But giving them that benefit of the

7  doubt, Mr. Wuesthoff said we were independent, we had the right

8  to do it, and there was no risk of losing it if we voted no.

9      Mr. Kim, the chief legal officer didn't warn anybody

10  and say hey, hey, hey, the purpose of our funding agreement is

11  to take us into bankruptcy, and if you vote not to take us into

12  bankruptcy, that would be a frustration of the purpose of the

13  funding agreement and we risk it being void, voidable, or

14  unenforceable.

15      He didn't do that because the scheme hadn't been

16  hatched at that point.  And so Mr. Wuesthoff admitted that the

17  board had the independence to say no.  They would have been out

18  of bankruptcy and they still would have had the 6 million in

19  cash, the RAM 367 million, and the value of New JJCI in the

20  funding agreement.

21      The purpose was to resolve the claims and he would

22  have had it outside of bankruptcy, and so the purpose couldn't

23  have been bankruptcy.  And he said he still would have

24  performed his duties as president and Mr. Dickinson agreed and

25  used the funding agreement for its purpose, to resolve current

1   and future claims.  And so, yes, there is Footnote 18 in the

2   Circuit opinion, which warned them not to do what they did

3   here, although they want to reinterpret it and say, oh, this is

4   a wink and a nod of the Circuit telling us how to do it.  But

5   it doesn't matter who came up with the scheme.

6          The scheme to terminate funding agreement one and

7   remove J&J as the ATM backstop, it doesn't really matter

8   whether or not it was Mr. Haas sitting at headquarters, or

9   Mr. Gordon, or Mr. Kim who says he came about it an epiphany.

10  It doesn't matter because it's factually impossible for the

11  purpose of the funding agreement to go into bankruptcy and only

12  bankruptcy if Mr. Wuesthoff said they could have still had it

13  had they voted no on bankruptcy.

14         I know that there's a lot of cognitive dissonance

15  that goes along in bankruptcy court.  Are they a real debtor?

16  Aren't they a real debtor?  Are they a puppet?  Aren't they a

17  real puppet?  We're going to imagine.  We're going to pretend

18  that they are.  But there is no amount of cognitive dissidence

19  that can reconcile those two.  And so the premise of the theory

20  that underlies the entire basis of this bankruptcy is legally

21  wrong, contractually wrong, and factually impossible.

22         And so what are we left with?  We are left with bad

23  faith through and through.  The Circuit said we start and end

24  with good faith.  J&J and LTL start and end with bad faith.  On

25  November 12, 2021, Mr. Wuesthoff, the president of LTL, who had

 1  the fiduciary duty to see that his business ran and his

 2  business, the purpose, was to resolve the talc claims.

 3          Mr. Dickinson, who testified under oath that his

 4  fiduciary duty was to ensure that LTL had the financial

 5  wherewithal to satisfy its liabilities, the announcement comes

 6  that J&J is separating out the consumer health business.  And,

 7  Your Honor, probably wondered why I was asking Mr. Lisman about

 8  Kenvue when Kenvue includes both global as well as North

 9  America.  Well, the S1 that's in evidence shows according to

10  them that North America accounts for 50 percent of the

11  business.  And so North America, what used to be HoldCo, what

12  used to be New JJCI, was supposed to be the backstop.  The

13  guaranty of funding the talc claims is 50 percent of that, $9

14  billion loan straight to J&J.  Two to $3 billion a year of free

15  cash free cash flow, none of it coming to HoldCo, none of it

16  going to LTL.

17          And so when Mr. Wuesthoff sees this, his reaction,

18  I'm not worried.  I've got funding agreement number one.  It

19  remains intact despite the separation.  And what did he expect

20  as the president of LTL who had been approached by Mr. Haas and

21  Mr. Olman (phonetic) to be its president, to manage the talc

22  liabilities that had been sitting in JJCI.  He expected that

23  J&J would honor its commitments under the funding agreement,

24  and he had every reason to do so because the contract that he

25  signed on the funding agreement provided for it, and he did so

1 based on the integrity of its executives.

2          When I asked him that and put the true sign then, I

3 don't know if Your Honor heard, I told him I was very sorry for

4 that.  I should have asked him does he feel foolish now for

5 having trusted the integrity of J&J and its executives.

6 Because when it comes to the talc problem, from the beginning

7 of time until this very moment in this courtroom, we know, and

8 Mr. Burian confirmed it yesterday on the stand, that unlike how

9 they deal with every other aspect of their business, their

10 executives have zero integrity.

11          ELECTRONIC VOICE:  I'm not sure I understand.

12          MR. MAIMON:  I don't think I understand either.

13                    (Laughter)

14          MR. MAIMON:  I think executives have no integrity

15 whatsoever because when it comes to every other aspect of their

16 business, they pay the affiliates what they need.  But when it

17 comes to making sure that LTL has not enough money so they

18 can't be in Your Honor's Court, they don't.  When it comes to

19 HoldCo, when it comes to taking away $40 billion of value, they

20 don't.  And when it comes to how they're going to maneuver the

21 cash flow with regard to the dividends and with regard to the

22 cash that's owed, they don't either.

23          Why this one, one, one affiliate of J&J worldwide do

24 they act differently and without integrity of honoring their

25 commitments.  LTL, bad faith, unquestionably.  They undeniably

87

1   failed to reach out to insist or even ask J&J to honor its

2   commitment.  The question is, why?  Why did they fail?  And the

3   answer is clear.  Because J&J didn't want them to.  Because the

4   entire purpose of this bankruptcy is not about LTL.  It's for

5   J&J to solve its talc problem in a global and final way.  That

6   is not a legitimate bankruptcy purpose.

7           Reserving the rest of my time, Your Honor, I

8   respectfully thank the Court for its indulgence and its

9   indulgence with me personally and indulgence with all of us.

10  Thank you.

11          THE COURT:  Thank you, Mr. Maimon.

12          All right.  Then, that I understand concludes the

13  movants' closings --

14          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

15          THE COURT:  -- apart from rebuttal.

16          Then we made good time, folks.  It's 11:24.  Let's

17  try to get back by 1:15.  I'll try to rush off the panel and

18  we'll continue from there.

19          All right.  We're adjourned.

20          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21          (Recess at 11:24 a.m./Reconvened at 1:22 p.m.)

22          THE COURT:  Why does there seem to be more people in

23  here?

24          MR. GORDON:  I think that's obvious, Your Honor.

25                          (Laughter)

1            THE COURT:  You're a big draw.

2            While they work on this, I heard that there was a

3    request to discuss calendar.

4            MR. STOLZ:  Could we do that, Your Honor?

5            THE COURT:  Just trying to be productive.

6            MR. STOLZ:  Judge, the issue -- Daniel Stolz, Genova

7    Burns, on behalf of the TCC.  The issue is the matters that are

8    on the calendar for July 11th and most of them are going to be

9    unopposed.  The one that is in question is the debtor's motion

10   to create a bar date for certain creditors which is really a

11   plan related issue.  And we have some other thoughts about that

12   if the case is not dismissed, and our thought was that should

13   be pushed to an August date, either August 2nd or August 22nd.

14           We understand the debtor is not consenting and wants

15   to proceed, to use one of Mr. Gordon's terms, it's our

16   perspective that everything involving or related to a plan

17   should be kicked back into August after Your Honor renders your

18   ruling on the present motion.

19           So that's the issue in controversy.

20           THE COURT:  Okay.

21           Mr. Gordon.

22           MR. GORDON:  It's just kind of a standard bar date

23   motion for non-personal injury claims, which we have to have in

24   the case.  And from our perspective, it's sort of the sooner

25   the better because if the plan process does move forward, we

1  want to make sure we capture the universe of claims.

2          With that said, I understand obviously the point

3  about there will likely not be a ruling by the Court on the

4  dismissal motion by then, so we would just defer to Your Honor

5  on that.  We thought it was a non-controversial motion.  We

6  thought there wouldn't be any opposition to it, and we could

7  just get it out of the way.

8          THE COURT:  Well, let's work on the assumption that I

9  don't dismiss the case.  Because obviously, if I dismiss the

10  case, it's moot.

11          MR. GORDON:  Right.

12          THE COURT:  So if the case is not dismissed, is there

13  a contention as to whether there needs to be a bar date?

14  That's the issue.

15          MR. GORDON:  The issue as I understand it is, we just

16  want a general bar date for non-personal injury claims --

17          THE COURT:  For non-personal injury.

18          MR. GORDON:  What we've been told in the twist is

19  that the Committee wants a bar date for personal injury claims,

20  which I've never seen a Committee ask for something like that.

21  Which is fine.  They can do what they want.  But they're asking

22  us to continue the hearing on a general bar date so they can

23  have it heard at the same time as the PI bar date.

24          And from our perspective, those are two completely

25  different things and one's not really related to the other.  I

90

1  don't think there's really even objection to just a general bar

2  date.  So our reaction to that was, well, let's just go ahead

3  and have the general bar date hearing and get it out of the

4  way.  If you want to file and ask for a personal injury claim

5  bar date, all power to you and we'll respond to that once you

6  file.

7           THE COURT:  What would be the next step after if I

8  were to approve -- because I haven't read the motion.

9           MR. GORDON:  Right.

10           THE COURT:  So if I were to approve the general bar

11  date, is --

12           MR. STOLZ:  Your Honor, can I respond just briefly so

13  you can understand where we're coming from?

14           We thought it was odd that the debtor sought to only

15  create a bar date for certain categories of claims.  If we're

16  going into a plan process, we've discussed with Your Honor that

17  there needs to be a quantification of claims, valuation of

18  claims, the issue of whether Mr. Feinberg comes back in.  Those

19  are all combined together.

20           If the matter wasn't adjourned, we would be probably

21  be filing a cross-motion to deal with that.  It seems like a

22  waste of time since we're not dealing with any of the plan

23  issues, who's filing the plan, how the process is going to

24  work?  If Your Honor doesn't dismiss, I would think all of

25  those issues need to be shaped in common.  It doesn't make any

1   sense to us to make certain creditors file proofs of claim and

2   others not at this stage of the case.

3          From what we were told all along, there's almost no

4   creditors other than the talc claimants so we find it kind of

5   odd and when I asked Mr. Prieto why, he said it's a plan issue.

6   So if it's a plan issue, then it should go with all the other

7   plan issues sometime after Your Honor has made his ruling, and

8   then we can talk about all the options about how creditors

9   claims are filed, how we figure out the number, how we figure

10  out the values, are we going to burden any creditors who filing

11  a proof of claim?  Are we going to use Mr. Feinberg.  It just

12  seems to me to make no sense to pick one particular area and

13  say, okay, we're going to have that heard on July 11th, but the

14  rest of the issues will be heard sometime later on.

15          THE COURT:  Mr. Malone.

16          MR. MALONE:  Yes, Your Honor, we have the states of

17  New Mexico and Mississippi.  I have maybe a slightly

18  different -- number one, I think it's misleading to call it

19  general bar date.  But the other thing is, right now, until we

20  see your decision, I think our position has been that we don't

21  have (indiscernible) claims in this particular case.  Maybe

22  your decision makes us make that decision that we do file

23  claims here.  But right now, we are not, except as an

24  interested party here.  We have not consented.  We have not

25  filed a proof of claim that you say, well, on the grand

1 financier, Mr. Malone, you client now has to go through all the

2 steps of the mediation and everything else.

3          Right now, our position is no.  You can't because of

4 the Eleventh Amendment, our sovereign rights, we don't consent

5 to having the adjudication of the claims that we believe are

6 against J&J dragged into this Court.  Maybe we change our

7 position after this Court makes a decision, maybe we don't.

8 But to put the cart before the horse and let them set the bar

9 date now is unfair and is inequitable to what is going on here.

10          They're trying to get the process going on the plan

11 before this Court has made a decision on the motion to dismiss.

12 The Court needs to make that decision before we go forward on

13 anything that deals with the plan process.  If they want to

14 talk negotiations with people while they're waiting for your

15 decision, I'm sure that's going to go on, but we're not going

16 to let them decide they're going to put the leverage on

17 everybody that we start setting a bar date, we start moving

18 ahead with disclosure statements, or anything else in this case

19 until this Court makes a decision on that.

20          And I think it's very unfair and I will file a formal

21 objection, but there is no reason whatsoever.  They're not

22 being prejudiced by not setting that bar date.  They know the

23 universe of claims.  They know who the states are.  It's not

24 like they're going to get ahead of it.  There's only 50 states,

25 okay.  There are probably even more government things, but it's

93

1  not going to delay this process until after you make your

2  decision.

3        So I think all this has to be adjourned until the

4  Court renders its decision.

5        THE COURT:  All right.

6        Does the bar date -- I'm at a disadvantage not having

7  read the motion.  Did you select a date in the papers?

8        UNIDENTIFIED SPEAKER:  It's 60 days, Judge.

9        MR. MALONE:  Sixty days, Your Honor.  If you don't

10  come out with a decision.

11        THE COURT:  All right.  Well --

12        MR. MALONE:  I think we can wait on it.  There is a

13  rush.  It's a rush to judgment by them.

14        UNIDENTIFIED SPEAKER:  It's two weeks.  Isn't it two

15  weeks, or three weeks.  With respect, Your Honor indicated a

16  hope that the decision would be rendered before August 2nd.

17  And so --

18        THE COURT:  Is it doable?  I'm looking at my law

19  clerks.

20                    (Laughter)

21        MR. GORDON:  They're both shaking their head.

22        MR. MALONE:  Judge, there's no reason not to put

23  it -- they can hear the motion on the August omnibus and we can

24  deal with it them.  There's absolutely no prejudice to the

25  debtor at this point.

1              THE COURT:  I wouldn't authorize notice going out

2     until I decide whether the case is going forward.

3              MR. GORDON:  Understood.

4              THE COURT:  So I'm also -- I don't see the harm in

5     granting a motion to have a bar date as long as the notice

6     isn't out and we're not fixing the date yet.  I mean, there

7     would have to be a bar date.

8              MR. MALONE:  There would have to be a bar date, but

9     at this point, as you know, Your Honor, if someone doesn't file

10    a proof of claim, they may not necessarily have consented to

11    the jurisdiction of this Court.

12             THE COURT:  What's our date?  August 8th?

13             MR. MAIMON:  August 2nd.

14             THE COURT:  August 2nd?  We'll just move it to

15    August 2nd.

16             MR. MALONE:  Thank you.

17             THE COURT:  Now, the burden really is on us.

18             MR. MALONE:  Judge, and the objection date would be

19    moved corresponding with that date as well, right?

20             THE COURT:  Oh, yes.

21             MR. MALONE:  Thanks.

22             THE COURT:  Seven days before.

23             MR. MALONE:  Right.  Thank you.

24             THE COURT:  That was the easy one, right?

25             MR. GORDON:  It looks like it.

1          So Greg Gordon, Your Honor, on behalf of the debtor.

2   And I appreciate the fact the room's much cooler now.  I was

3   also going to say that we were prepared to thank Your Honor and

4   your clerks as well, but given that everyone on the other side

5   said the same, I don't feel like I can agree to that anymore.

6                          (Laughter)

7          THE COURT:  Well, we appreciate it.

8          MR. GORDON:  I don't want to be fake.

9                          (Laughter)

10         MR. GORDON:  So a couple of things I just wanted to

11  say before we start on the PowerPoint presentation.

12         One is that you heard a lot of very impassioned

13  argument.  And a fair amount of it was arguments we've heard

14  from the very beginning of this filing about fraud and bad

15  faith and breach of fiduciary duty and things happening in the

16  dark.  And what's striking to me about that is that story is

17  continuing to be spun even though the record doesn't support

18  it.  And what's happened is, as Your Honor knows, we've had

19  significant discovery.

20         Every witness that you heard on the stand had his or

21  her deposition taken one or two times.  There's been all kinds

22  of document discovery.  You heard testimony over three days in

23  this Court.  And it's as if it didn't happen.  The same story

24  is being spun about all the bad behavior of LTL and J&J.  I'm

25  going to go through that in my presentation.

1          The other thing that strikes me is the complete

2    incongruity in the position that's being taken by the other

3    side, which is they say it's 100 percent certain that there's

4    no financial distress.  It's a given, wildly solved, but at the

5    same time, they're saying we've manufactured financial

6    distress.  So basically what they're saying is we manufactured

7    no financial distress or we manufactured solvency.  It doesn't

8    even make any sense.  You can't even reconcile the positions

9    that are being offered.

10          So there's lots of rhetoric about improper behavior

11   and breach of fiduciary duties and fraud and the like in the

12   context of a situation where they're telling Your Honor there's

13   no financial distress.  That means no harm.  That means no

14   fraud, no fraudulent transfer, no largest fraudulent transfer

15   in the history of the United States, which you've heard a few

16   times.  I didn't hear it today although it's in the motions to

17   dismiss.  So I just want to kind of plant those seeds before I

18   start.

19          The other thing I would just say is we are really

20   going to focus on the record that's been developed because we

21   recognize we've got findings and conclusions that we're going

22   to file later.  So this will be a little lighter on the law

23   than what we've done before, but I do have some comments on the

24   law that I want to make as I go forward.

25          Okay.  It's not moving.

1          THE COURT:  There you go.

2          MR. GORDON:  All right.  So we're going to start with

3   the basics, Your Honor.  And that is why are we here?

4          So in our view, based on the record, there's four

5   reasons why we're here and they're all undisputed.  The first

6   is that we're here because counsel for claimants came to us

7   after the dismissal ruling by the Third Circuit and proposed to

8   settle.

9          Number two is, and I'm going to come back to this,

10  this settlement that was proposed by the other side and was

11  ultimately negotiated, the TCC was advised about that.  So

12  notwithstanding Mr. Jonas standing up here again today and

13  saying this all transpired under cover of darkness and

14  Ms. Richenderfer, same thing, we know now from the record those

15  statements aren't true.  That plan has been heavily negotiated.

16  And I'm going to show you that from the record.  And the record

17  is undisputed that we need a bankruptcy court in order to

18  implement that plan.

19         Those are the four reasons why we're here.

20         So on the point about counsel proposing a settlement,

21  we had Mr. Murdica on the witness stand.  And Mr. Murdica said

22  we're here in this bankruptcy because the claimant's lawyers

23  came to me and said, once the Third Circuit decision came down,

24  we need to resolve this, or talcs are never going to get

25  resolved.  And they came to me with this plan.  So that's why

1 we're here.

2         So you heard Mr. Maimon say again today, that
3 Mr. Murdica went to Mr. Onder.  He's saying that as part of the
4 story spinning.  The facts belie what he told Your Honor.

5         We had Mr. Watts on the stand as well, who basically
6 corroborated what Mr. Murdica said.  I began discussions with
7 Jim Murdica.  That's how this case was started.

8         We heard from the record from Mr. Murdica again that
9 the template for the plan agreements, the PSAs, was provided by
10 Mr. Watts to Mr. Murdica.

11         We know that this was a plan, or an agreement I
12 should say, that was negotiated with the assistance of the
13 mediators, and this was pursuant to Your Honor's orders in the
14 first case.  And even after dismissal, encouragement from Your
15 Honor that we continue to work on a settlement.  And, again,
16 that's what this is about.  And what we've heard from the
17 beginning of this case is how improper it was for the company
18 to continue to attempt to negotiate a resolution of these
19 claims.

20         Then, we had testimony from both Mr. Watts and
21 Mr. Murdica about the negotiations of the term sheet that
22 ultimately was attached to the PSAs.  And Your Honor will
23 recall, the PSAs were filed at the very inception of this case.
24 We advised everyone right at the beginning of the case that we
25 had reached a term sheet that outlined the economics of a

1  settlement of this case.

2          Now, we know from the record, contrary to what you've

3  been told time and time again, that the TCC knew about this.

4  We heard it from Mr. Onder.  "I was going to ask permission."

5  This is what he said when he was negotiating with Mr. Murdica.

6  "I was going to ask permission to share it with them," them is

7  the TCC, "and that's what I did.  Everything was total full

8  disclosure to both sides."

9          And he said that because he was sensitive to the fact

10 that he was a member of TCC 1.  Mr. Nachawati who you didn't

11 see in Court, but his deposition was taken, said the same

12 thing.  He said, "I, in turn, let Mr. Birchfield

13 know" -- That's Andy Birchfield who you saw.  He's been up to

14 the podium a few times in this case -- "because I thought that

15 was the right thing to do, and that's what I did."  So, again,

16 recall all we heard hearing after hearing about this nefarious

17 activity going on in secret to the harm of everyone, that's now

18 been proven to be false.

19         And the TCC -- I keep forgetting about this, but you

20 may recall that the TCC 1 filed a very unusual document before

21 the case was even dismissed.  This was their, I think it was

22 end of case statement, where they said that, "We must now

23 advise this Court and the public that J&J and/or its affiliates

24 has threatened a second bankruptcy filing."  They knew.

25 Nothing was done in secret.

1           Again, we had more testimony from Mr. Watts about

2    this settlement having been heavily negotiated.  He talks

3    about -- and so there's been lots of negotiations, lots of

4    calls, and he talks about May 15.  And that's the other thing,

5    Your Honor.  We came in on the first day with these plan

6    support agreements.  We made a commitment to file a plan of

7    reorganization by May 14th.  We filed the plan on May 15th with

8    a disclosure statement.

9           You had Mr. Onder say the same thing.  "Yes, we've

10   been in constant negotiations ever since the first plan was

11   filed."  So there's been heavy criticism leveled that this

12   isn't a real plan.  We filed a plan.  These parties are

13   conceding that this isn't going to be the final plan.  Well,

14   you've been through a lot of these cases, Your Honor.  You know

15   plans go through amendments.  And I think what's important to

16   know is this record reflects and it's undisputed, that there

17   have been constant negotiations to finalize that plan.  And

18   there was a new plan that's just been filed based on those

19   negotiations.

20          We've been very transparent.  That plan is not

21   complete.  There's still open issues to be resolved.  Mr. Onder

22   admitted that, or acknowledged that.  So did Mr. Watts.  I

23   think Mr. Murdica did as well.  But we are making progress and

24   we're doing what we need to do to get to the point where we can

25   actually solicit that plan.

1          And this is interesting, too.  This is the only place

2   that we can come to where we can get a final resolution that

3   will allow us to go forward with this plan.  And I'm going to

4   come back to this, but you know, you heard Mr. Jonas, I think

5   the third component of his argument today was that there are

6   options, and he talked about Professor Rave's testimony, and

7   I'll come back to that.  There aren't options and the record

8   doesn't support that there are.

9          In fact, Ms. Birnbaum you heard from her and she's a

10  practitioner in this area, and I know Your Honor knows this

11  anyway.  As she says, "Bankruptcy's the only forum where it

12  likely can be done because there's no mechanism that we know of

13  that can get it done otherwise.  Mr. Murdica on the prior slide

14  said the same thing.

15         Mr. Rave, all he basically said was, "Well, as an

16  academic, I believe this hasn't been foreclosed.  I believe

17  there's some possibilities that maybe a notice can be crafted

18  in a certain way, or maybe a class action can be done in a

19  certain way."  But he had to acknowledge that it couldn't be

20  done without either opt-ins or opt-out.

21         And his notice point didn't make any sense because he

22  said you can do the notice all at once.  Well, how does

23  somebody who hasn't been born yet get notice?  Or how does

24  somebody who's three years old at this point get notice?  You'd

25  have to go at least out 20 years to get notice that would

1  survive any due process attack.

2         So with all due respect to Professor Rave, he doesn't

3  know.  He's just saying as an academic, he thinks it's

4  possible.  And Ms. Birnbaum made the point that since those two

5  cases, Amchem and Ortiz, there hasn't been a single situation

6  like this where claims with long latency periods and

7  unidentified plaintiffs have ever been settled in the tort

8  system and it's not possible.  And that's well recognized.

9         Mr. Onder said the same thing.  And his quote I

10  thought was particularly compelling.  He says, "The third one

11  is making sure their daughters, the plaintiff's daughters,

12  their granddaughters, and their great great granddaughters who

13  they told to use talc, that if, heaven forbid, they develop

14  ovarian cancer as well, that there's a mechanism that they can

15  get compensated immediately as opposed to having to wait a

16  decade for recovery, which is what's happening to many of my

17  current clients."  And Your Honor's aware of that.  Many of

18  these cases have been sitting for years and years with no

19  resolution in the tort system, and that was well prior to the

20  first bankruptcy filing.

21         This may be in the wrong spot so I'm going to come

22  back to this, Your Honor.  I want to tackle this in a different

23  section.  I think it's been misplaced here as best I can tell.

24         Okay.  All right.  So I'm going to start with

25  financial distress.

1          So I wanted to talk a bit about the law here.  So we

2    obviously have the Third Circuit decision on September 30.  And

3    the first thing to acknowledge is they still made clear that

4    financial distress isn't the equivalent of insolvency.  Now

5    from the other side's briefs, I think from their arguments,

6    they conflate the two.  To them, they're the same thing, one in

7    the same.  You can't have financial distress unless you're

8    insolvent.  And that to me defies the Third Circuit opinion,

9    not only this one, but prior Third Circuit decisions as well.

10          And the court went on to say, "Financial health can

11   be threatened in other ways.  For instance, uncertain and

12   unliquidated future liabilities could pose an obstacle to a

13   debtor efficiently obtaining financing and investment."  And

14   look at the quote above, about halfway down.  It says, "We

15   cannot ignore that a debtor's balance sheet and solvency or

16   insufficient cash flows to pay liabilities," importantly, "or

17   the future likelihood of these issues occurring are likely

18   always relevant."

19          And I thought Your Honor asked a good question to

20   Mr. Burian about this in terms of what the Third Circuit was

21   really saying.  Were they saying it had to be imminent and it

22   had to be immediate, or was that, I think I understood your

23   question correctly, was that a kind of financial distress or

24   were there other kinds of financial distress?  And I would

25   submit to Your Honor, the Third Circuit was not foreclosing the

1   possibility that you could have financial distress that

2   qualifies even though it relates to a future likelihood of

3   problems, likelihood of future problems.

4        So I think that's important.  I think it's too

5   simplistic just to come up here and say there's an ability to

6   pay debts as they mature tomorrow or the next day or next week

7   or even next month.  And particularly in the context of a mass

8   tort and an asbestos mass tort where we know Congress's primary

9   concern is about futures and what happens to future claimants.

10  And I do not believe the Third Circuit opinion on financial

11  distress rules out that kind of analysis.

12       I think it's requiring that there has to be facts

13  today that shows there's a likely problem in the future.  But

14  they're not saying it has to be facts today that means there

15  has to be, if you're talking about the future, it's got to be

16  the next day or the next week.  I don't see any language in the

17  Third Circuit opinion that is that narrow.

18       And, again, going on, although a debtor need not be

19  an extremist in order to file, it must at least face such

20  financial difficulty that if it did not file at that time, it

21  could anticipate the need to file in the future.  So, again,

22  that's not saying the problem has to be immediate.  It just has

23  to be in financial difficulty at the time that suggested it

24  could anticipate the need to file in the future.  And I think

25  the evidence that you've heard overwhelmingly establishes that.

1            Okay.  So in terms of what we have in the record.

2   It's really three primary points.  Number one, Old JJCI was in

3   financial distress and we're not going to go through that

4   evidence again, but Your Honor found that.  The Third Circuit

5   did not disturb that.  And there was a myriad of reasons, I

6   think, or a myriad of facts that supported that based on what

7   had occurred in the tort system in only about five years

8   leading up to the filing, a huge ramp up in claims and the fact

9   that the entire consumer health business had swung from a

10  profit to a loss based simply on the talc liability.  So we

11  have that, number one.

12           Number two, we have evidence now in the record that

13  the distress is getting worse.  We have evidence of increasing

14  claims, which I'm going to come back to, of the associated

15  rising costs.  And the other thing we have is the threat of

16  consolidation.  And you heard it through various witnesses and

17  you heard it through stipulations from Mr. Maimon.  Oh, yes, I

18  stipulate that I've asked for 22 plaintiffs to be consolidated.

19  I stipulate that I've asked for extra judges in New Jersey.

20           Then the last is the fact that HoldCo provides the

21  support under the funding agreement, that doesn't cure the

22  financial distress and that's shown by the reports of Dr. Bell

23  and Dr. Mullin.

24           So again, back to the Third Circuit opinion.  What

25  the Third Circuit had to say was that, "Courts must always

1  weigh, not just the scope of liabilities the debtor faces, but

2  also the capacity it has to meet them."  So for Mr. Kim, we

3  know that the number of claims has doubled.  And I think Your

4  Honor has seen enough of the back and forth among the lawyers

5  in the Court to know that's happened.  So we're now at the

6  point of approximately 100,000 current filed and unfiled

7  claims.  And, again, there's another quote in the box from

8  Mr. Kim to the same effect.

9       You've got the rising cost, the fact there's an

10  expected huge increase in trial costs.  And I'll come back to

11  Dr. Mullin on this, but it makes common sense that that would

12  happen given that claims have been pent up now for not quite

13  two years, over a year and a half, I guess, in the tort system.

14  You've heard from the attorneys themselves.  I mean, they're

15  raring to go to get to trial.

16       The cases are being prepared for trial at the current

17  time.  And there's going to be a deluge of claims if this case

18  is dismissed.  And to us, the record is just, there can't be

19  any dispute.  It's indisputable, there's going to be a huge

20  increase in the trial costs.

21       So in the threat of consolidations, Your Honor heard

22  some testimony about this.  But you're familiar with Ingham.

23  That was 22 plaintiffs that were consolidated, a huge verdict

24  there.  Then you have Mr. Maimon's consolidation with four

25  plaintiffs.  This was back in February 2020.  It led to a

1  $787.3 million verdict.  And then of course the 22 lawsuits

2  he's seeking to consolidate in New Jersey, and I understand

3  that that motion is pending or the issue is pending in that

4  case.

5        And you heard from Dr. Mullin, by the way, that

6  there's literature and it was cited in his report that shows

7  that basically the consolidation of cases leads to larger

8  verdicts.  And it explains why.  That literature explains why.

9  It's in his opinion, higher cost and higher verdicts.

10        So you ended up not hearing from Mr. Bell.  I think

11  Your Honor was probably happy about that.  It was the end of

12  the day.  But he's provided an analysis.  He provided a cash

13  flow analysis and it was built upon Dr. Mullin's analysis of

14  the scope of the liability.  And he looked at the cash flows

15  that may or may not be available to HoldCo and obviously opined

16  about their variability, their uncertainty, and then he

17  prepared what he called a scenario analysis where he ran a

18  number of different scenarios to basically test the situation

19  and he was focused on cash flow.

20        And you may recall that Dr. Mullin said in the first

21  three years, under three different scenarios, which were a

22  range, the range should go anywhere from approximately 3

23  billion to 7 billion, and he basically modeled that under that

24  scenario analysis and found that, I think in his updated

25  version, based on the fact the dividend had come in, the $912

1 million dividend had come in, that over 50 percent of the cases

2 showed there would be insufficient cash flow.  And accordingly,

3 a need by HoldCo to liquidate its assets.

4          He also said in his report that J&J had no obligation

5 to fund.  You heard Ms. Jones say today that J&J has an

6 obligation to fund, or it certainly would fund.  Mr. Burian was

7 very animated about, of course, they have an obligation to fund

8 because from Mr. Burian's perspective, corporate forum doesn't

9 mean anything.  He's basically taking the position that all the

10 entities within Johnson and Johnson are alter egos, or the veil

11 should be assumed to be pierced, and any money that's anywhere

12 in the corporate structure is available to HoldCo.

13          Not only is that wrong legally, but there's nothing

14 in the record to support it.  And I would say to you generally

15 that the testimony that he gave was completely unsupported by

16 any evidence in the record.  That was just primarily a former

17 lawyer making arguments about where Your Honor should come out.

18          THE COURT:  Let me take a minute.

19                        (Pause)

20          THE COURT:  He's going to hit me up for a raise.

21                      (Laughter)

22          MR. GORDON:  They're going to say, "No."

23 I would say, "Yes."

24                      (Laughter)

25          MR. GORDON:  So the other point he made, it wasn't

1   only a matter, by the way, of HoldCo liquidating assets.  But

2   given the types of assets it has, they would be liquidating

3   those at a substantial discount.  And, again, he has an

4   economic analysis of that in his report.

5          And if you just think of it from a pure cash flow

6   perspective, we know from the evidence, we know from the record

7   that HoldCo has 300 million in cash.  We know from Dr. Mullin

8   that in the first three years, the talc costs are projected to

9   be between three and $7 billion.  And I'm going to come back by

10  the way, to Dr. Mullin's report because there were a lot of

11  mistakes made by Mr. Ruckdeschel with respect to his

12  understanding of that report.

13         And then of course, there was also analysis in

14  Dr. Mullin's report about the aggregate talc costs, which are

15  in a range of 11 to 20 billion, with the 20 billion being a

16  stress tested high case.  And so that's just intended to show

17  that, again, HoldCo would have to liquidate assets at a

18  discount in order to cover the cost.  Now, the other side will

19  say, well, you're focused on the wrong entity.  The focus is on

20  LTL.  But this is the entity that supports LTL.  And what this

21  means is a value that's available to LTL would be shrinking as

22  a part of this process.

23         So maybe the Third Circuit would say, we don't care,

24  per se, what happens to HoldCo.  But they did say it was

25  relevant that the financial impacts on the payor are relevant

1  to the financial viability of the debtor.  And that's what

2  we're attempting to show here.  Now, the other thing you're

3  probably going to hear is the other side's going to say, well,

4  you're lying because it's not 300 million, it's 1.2 billion

5  because of the $912 million dividend that came in.

6       And all I would say about that is the reason we

7  haven't added it is because this is as of the date of the

8  filing of the petition, which is the relevant time frame.  But

9  frankly, even if you add in the 912, it makes the same point.

10 And even if you take the 1.8, which is what was originally

11 projected, the $1.8 billion dividend which did not come in, it

12 still shows.  You reach the same conclusion either way, but I

13 didn't want to pass by that without mentioning that.

14      And I should say, as well, there was a lot of

15 complaining about the dividend and suggestions that that was

16 all manipulated by the company.  You know, how convenient that

17 the dividend came in just a few days before the trial.  But

18 again, the record was indisputable on that.  You heard from

19 Mr. Lisman.  That was simply a matter of a fiscal year end time

20 overseas.  June 30 was the date.  Typically, the

21 reconciliations and the like that have to be done to allow the

22 money to move were done and then that dividend was declared a

23 few days in advance of June 30.

24      So this is just a short summary on Dr. Mullin.

25 Again, talking about expenditures, the 2.7 to 7 billion, and

1   that includes not only defense costs, but indemnity payments as

2   well during that period.  And this is the just a summary chart

3   of his aggregate costs is 11.5 billion to the 21.2 billion.

4   And the box shows the breakdown in the low and the high cases

5   that he had.

6          So let's talk about Mr. Ruckdeschel for a minute.  So

7   he spent a lot of time making accusations against Dr. Mullin

8   about using a worst-case analysis to project the talc costs.

9   And he was mixing up the balance sheet analysis and the cash

10  flow analysis.  But the bottom line response to Mr. Ruckdeschel

11  is that Dr. Mullin presented a range.  He presented a

12  litigation case only, and then he presented two cases of a

13  combination of litigation and settlements, which to him made

14  sense based on what he could foresee would happen.  And he had

15  a low case and a high case and that was so that you would have

16  the range.

17         He was very candid about the fact that he does a

18  range because there's uncertainty.  It's not surprising these

19  are disputed claims that are unliquidated.  There's elements of

20  the claims, many elements that are uncertain, and he was

21  attacked for that, you may recall.  Mr. Burian said his

22  analysis wasn't credible because he used the word uncertainty

23  multiple times.  And you heard Dr. Mullin say, well, that's

24  what you have to do.  It's not unreliable.  As an economist,

25  that's how you deal with uncertainty.  You look at potential

1  scenarios and you come up with a range.  And that's the range

2  to which he opined based on the information that he had.

3        Mr. Ruckdeschel was basically trying to take a range

4  and say, definitively, see, he can't support this number or

5  that number.  And that's just a complete misunderstanding of

6  what Dr. Mullin was attempting to do with his report.  And he

7  came back on this 100,000 claim points.  I think he made the

8  same mistake yesterday with his cross-examination of

9  Dr. Mullin.

10        He says that Dr. Mullin's case assumed resolution of

11  100,000 claims with the PSA parties or the Ad Hoc parties in

12  the first three years.  And as the report says, and as I

13  believe Dr. Mullin testified yesterday, no, it's 60,000 PSA

14  claims, which is what we have.  And then up to 40,000 other

15  claims from other law firms.  That's what he was assuming for

16  purposes of his analysis.

17        So, again, what Mr. Ruckdeschel was saying about the

18  Dr. Mullin report is simply incorrect.  And to use words like

19  it's so -- well, I'll move on.  I mean, just to suggest it's a

20  completely fabricated report in effect is simply way off base.

21        Now you heard this come up again today and we heard

22  it in some cross-examination and we thought this was

23  straightened out.  The claim is that Mr. Wuesthoff said that

24  the debtor's liability in the tort system was between $0 and

25  $8.9 billion.  But we know from the testimony that's not what

1 he was talking about.  He was talking about in bankruptcy, and

2 that's hardly surprising when there's an $8.9 billion plan

3 that's on the table, or at that time it was a settlement that

4 had been reached.

5        Now you have to ask yourself, Your Honor, I think

6 what do the movants have on these points?  And they literally

7 don't have anything.  So you have Mr. Burian who didn't even

8 attempt to estimate talc costs.  And to me, what's particularly

9 noticeable about that is, as we showed you, FTI and Brattle

10 Group hired by the TCC, both spent thousands of hours preparing

11 claims estimates and Mr. Burian was aware of that, but he never

12 asked to see the estimates.

13        He claims he never saw the estimates and I find it

14 absolutely remarkable that he would do a financial distress

15 analysis without making any analysis at all of what the talc

16 liability is.  So all he simply does is look at Dr. Mullin's

17 report and say, oh, I think you got it wrong.  But he

18 represents clients who were involved in an estimation process,

19 who were involved in an mediation process where the focus was

20 on the extent of the liability, and he didn't present anything.

21        And why wasn't FTI called as a witness?  Why wasn't

22 Brattle Group called as a witness?  To me, that's very telling.

23 And I think the reason is is because what they would have shown

24 is an analysis that says the liability is much higher than what

25 Dr. Mullin said.  So it's to me quite noticeable.

1            And he didn't do a cash flow analysis either.  So he

2   didn't estimate the talc costs, he didn't do a cash flow

3   analysis.  He simply assumes that there's clearly no problem,

4   there's no insolvency because J&J will bail it out.  And then

5   he bases that on various misstatements about dividends that

6   occurred.  He talked about a 2022 dividend that should have

7   been sent to HoldCo but wasn't because J&J just decided to move

8   that cash elsewhere.

9            Why would you say to Your Honor, just again, look at

10  the evidence in the record, look at Mr. Lisman's declaration,

11  his Court testimony, his two depositions.  He explains what

12  that, what happened with the 2022 dividend.  It had nothing to

13  do with J&J directing the money elsewhere.  It had to do with

14  the fact that, I think it was in France, there were capital

15  requirements that had to be met and they couldn't be met, and

16  so the money could not be moved.  So he's very passionate about

17  that, how J&J could fix all this right away, and J&J's behaving

18  improperly and it's outrageous.  But he's basing it on facts

19  that don't exist.

20           And the other thing about Mr. Burian, I would say,

21  and Your Honor asked him a question.  To me, he was basically

22  saying insolvency and distress are the same.  And in fact it

23  was even worse.  He said that a company could be insolvent and

24  not in financial distress.  That's his view of the Third

25  Circuit.  And I would submit that that can't possibly be right

1  and there's no basis for that position.

2          And he was asked directly when he came up with the

3  money, it sort of, it just splashes around in various places in

4  the empire and it's all available.  So he was asked, did you

5  render an opinion as to whether J&J's subsidiaries are alter

6  egos of each other, and his answer was no.  He didn't do that.

7  So he basically is assumed they were all alter egos.  He

8  basically assumed that J&J was basically one gigantic company

9  and treated it that way.  And he knows better.  That's not

10 proper.

11         So I'm just coming back to this dividend issue.

12 Again, in order to try to show that there is no financial

13 distress, he said that $1.8 billion dividend was on the balance

14 sheet.  And so it's not my fault.  The company put it on the

15 balance sheet.  If it's on the balance sheet, it must be true

16 that that's an asset, even though it says of course, dividend.

17 Well, what was his balance sheet?  His balance sheet was this

18 chart out of the board presentation.  That's not a balance

19 sheet.  That was his support.

20         Again, back to the $912 million dividend.  LTL

21 concealed that dividend due from Gh Biotech.  But the evidence

22 in the record is from Mr. Lisman.  "It was only approximately

23 two weeks ago that you learned the amount of money the Gh

24 Biotech dividend would be and the amount of money that the

25 Apsis dividend to HoldCo would be, right?"

116

1          "Yes."  That's what happened.  That's what's in the

2   record.

3          Now, there have been suggestions -- well, more than

4   suggestions -- arguments that the decision to dismiss the <u>Aearo</u>

5   case applies equally here.  And I would submit to Your Honor

6   that the cases are very different.  <u>Aearo</u> is very much

7   distinguishable.  Did <u>Aearo</u> have future claimants?  No.  Was it

8   an asbestos case?  No.  Did <u>Aearo</u> ever pay a single dollar of

9   defense costs?  No.  Did the claims have long latency periods?

10  No.  Were there indemnity claims paid?  No.

11         And Ms. Jones stood up here today and said that

12  HoldCo or JJCI had never made any of the talc payments, that

13  J&J has always made the payments and it was simply accounting.

14  That's not true.  All that's happened, and you heard this in

15  the first trial, is that J&J operates as a bank for the rest of

16  the companies.  The payments of talc costs have always been

17  from the beginning for 40 years, pushed down and paid by JJCI.

18  That's why the consumer health business swung from a profit to

19  a loss.  So those statements, again, have no support in the

20  record.

21         Now, let's talk about manufacturing financial

22  distress.  And, again, this is in the context of parties

23  arguing that there is no financial distress.  So they're saying

24  there is no financial distress, wild solvency, yet we

25  manufactured financial distress.  So you've heard from Mr. Kim,

1  the funding agreement was intended to facilitate a resolution

2  of these talc liabilities.

3       So the single integrated transaction point is

4  significant because there's now being a suggestion made from

5  the other side.  Well, it wasn't a single integrated

6  transaction because the board of LTL had an opportunity to do

7  some diligence and decide whether to file for bankruptcy.  So

8  they're now taking the position that none of this was a single

9  integrated transaction.  When I say single integrated

10 transaction, I'm talking about the divisional merger, the

11 funding agreement, the bankruptcy filing.

12      You heard from Mr. Dickinson.  He was pretty

13 straightforward about it.  He said, "I understand what the word

14 said."  He's talking about the funding agreement.  "I

15 understand what the agreement says, that it survived in or out

16 of bankruptcy.  The intent in my opinion was solely with

17 regarding to facilitating our bankruptcy process reading a full

18 and final resolution."

19      But you don't have to take his word for it.  You

20 heard from Mr. Burian.  In his report in the prior case, he

21 said that the LTL transaction is a "single, pre-planned

22 integrated transaction comprised of five interrelated steps."

23 And those included, of course, the divisional merger, the

24 funding agreement, and the bankruptcy case.

25      He was asked about this again in his testimony

1  yesterday.  The question was, "It's your opinion that LTL 2.0

2  is just the latest step in a single integrated transaction that

3  began with the divisional merger of Old JJCI and LTL's first

4  bankruptcy, correct?"

5          "Yes."

6          Clear testimony from Mr. Burian, the only financial

7  expert they've offered in this trial that this was all part of

8  a single integrated transaction.  And he went on, "It was your

9  opinion that the company would not have done any of these steps

10 or would not have done any one of these steps without also

11 doing all the other steps, correct?"

12         "Yes, they were a package."

13         "And that means, in your view, that the 2021 funding

14 agreement would not have existed if not for the divisional

15 merger of Old JJCI and the LTL 1.0 bankruptcy, correct?"

16         "Yes."  So to him they were all interdependent steps.

17 Very important.

18         The other thing I want to focus on is and we had that

19 slide earlier that was in the wrong place, but there's been a

20 lot made of comments I made to Your Honor and maybe even before

21 Judge Whitley about the funding agreement and about the inside

22 and the outside, well, working inside of bankruptcy and

23 outside, and how I'm contradicting myself for being dishonest.

24 But I wanted to go back and show Your Honor what I said to

25 Judge Whitley at the very beginning and what I said to Your

1   Honor at the very beginning about the funding agreement.  And

2   in particular, the J&J backstop.

3        And if you look down at the highlighted language

4   towards the bottom, what I said was, "In here, we're hoping

5   that through the addition of J&J to the funding agreement, that

6   that fact will alleviate concerns about hypothetical

7   transactions like that, dividends, for example, sales for

8   example, because the ultimate parent company, J&J, has agreed

9   to be jointly and severally liable under the funding agreement

10  to the full extent of the value of New JJCI."

11       And then, if you look at what I said on February 18th

12  in this Court, I guess at the last hearing, we try to learn

13  from the other cases, this is towards the bottom, and we

14  thought, let's take that issue off the table.  We'll actually

15  have an obligation from the ultimate parent.  We tried to learn

16  from those issues and actually address some of those issues in

17  how things were designed in connection with the restructuring.

18       And what I was referring to, Your Honor, was the fact

19  that in the cases in Charlotte, one of the main criticisms of

20  the Texas divisional merger and the funding agreement was we

21  don't have any protection against the payor in those cases,

22  simply dividending all its assets no matter how impractical or

23  illegal that would be, or any protection against it entering

24  into non-arm's length sales transaction or forgiving

25  intercompany debt, and we heard it over and we tried to learn

1  from these cases.

2           And so the idea was, for purposes of a bankruptcy --

3  and that's why this important -- this J&J backstop was added,

4  it was to take that issue off the table.  So you don't have to

5  worry about dividends, you don't have to worry about a consumer

6  health spin transaction because J&J is there under that

7  agreement.

8           And I should say one thing further.  There would be

9  no need to do that outside of bankruptcy.  Outside of

10 bankruptcy, you had HoldCo, HoldCo had plenty of value to

11 satisfy the talc claims.  So this was strictly to alleviate

12 concerns that the borrower might have and, again, hopefully,

13 take a potential dispute off the table that we were having in

14 the other case.

15          So this just sums up our points.  There's no need or

16 reason to have the backstop outside.  The new J&J obligation

17 already ensured that the divisional merger would not be a

18 fraudulent transfer because we set it up in a way where the

19 full value was still available through the funding agreement.

20 And, again, the purpose was to facilitate the bankruptcy case

21 by eliminating those concerns that I described.

22          So I want to talk about void or voidable, and it's

23 really void.  I think the remedy is actually that the agreement

24 becomes void, but it's really in a way supported by the

25 rationale or the findings in the Third Circuit's opinion

1   itself.  It recognized, the court recognized the, quote-

2   unquote, "apparent irony" in finding the J&J backstop, a

3   generous protection J&J was never required to provide to

4   claimants, in fact, weakened LTL case to be in bankruptcy.  So

5   they found that to be ironic, an ironic result.

6          And that's important because what does irony mean?

7   Under the Oxford English Dictionary, it means a state of

8   affairs or an event that seems deliberately contrary to what

9   one expects; or, from Merriam Webster, incongruity between the

10  actual result of the sequence of events and the normal or

11  expected result.

12         So the Third Circuit itself recognized the irony in

13  what it was doing.  And in fact it was ironic, when you think

14  about it, that you had an entity that was in distress, it had

15  had the liability for all those years, it put in place a series

16  of transactions as a single integrated transaction to file for

17  bankruptcy, and the only thing that prevented it from filing

18  was the fact that it added a backstop that was technically

19  available to the debtor for the two days prior to the filing.

20         So just think about that for a moment.  Your Honor

21  has probably had cases where there's been, for example, a DIP

22  financing that's actually entered into pre-bankruptcy.  That

23  would potentially, under the Third Circuit opinion, disqualify

24  that entity or prevent that entity from filing for bankruptcy

25  because it was available in the period of time before the

122

1   bankruptcy.  It would be no problem if it was subject to

2   bankruptcy approval or not effective until the bankruptcy was

3   filed.

4           So we think the evidence clearly shows that the

5   funding backstop was only there to support the Chapter 11

6   relief.  As I tried to show in prior slides, it would have had

7   no purpose outside of bankruptcy.  And so, again, we have a

8   situation where the exact opposite occurred.

9           And just going back to cite from the <u>Bestwall</u> case --

10  let me spend a little more time on this.  So this is important

11  because, again, we learned from the prior cases, <u>Bestwall</u> --

12  and of course we filed in the Fourth Circuit, initially, but in

13  <u>Bestwall</u> we had a motion to dismiss, and the motion to dismiss

14  was denied because the movants couldn't establish objective

15  futility; that was one of the two prongs of the standard.  I

16  know you know this well.  And the primary reason for that was

17  the funding agreement.

18          And so it was not reasonably foreseeable,

19  particularly at the time we were filing in the Fourth Circuit,

20  that a backstop that was put in place for purposes of

21  facilitating a filing in fact would have made it a lock, there

22  wouldn't have been a dismissal in the Fourth Circuit, because

23  you couldn't satisfy the objective futility standard would end

24  up being the cause of a dismissal of the case.  That's what's

25  not reasonably foreseeable.

123

1          So, from our perspective, it's too simplistic just to

2   say, well, the agreement was available outside of bankruptcy.

3   And, undoubtedly, it was.  If a case had been filed and later

4   dismissed for failure to confirm a plan or some other reason,

5   it would have been available, that was foreseeable.  What

6   wasn't foreseeable was that the fact we even added it, that it

7   was effective for only two days, that that would have actually

8   caused -- or prevented LTL from filing for bankruptcy.

9          So the point is -- or the accusation is that the

10  debtor caused financial distress, that the changes in the

11  funding agreements caused financial distress, but you kind of

12  have to go back to the beginning when that's said and say, what

13  is the source of the financial distress.  The source is and

14  always has been the talc litigation.

15         And it reminded us of this recent Bestwall decision,

16  it's not on point exactly, but there was an argument there by

17  the plaintiffs' bar that the case should be thrown out

18  effectively because, through the divisional merger, you

19  manufactured jurisdiction.  That argument was made in

20  opposition to a preliminary injunction in that case.  And the

21  Fourth Circuit said old GP, that's old Georgia-Pacific, new

22  Georgia-Pacific, and Bestwall did not manufacture jurisdiction

23  to either Texas divisional merger.  This is evident because,

24  without the restructuring, the asbestos claims would have

25  remained with old GP and, if old GP had filed for bankruptcy,

1   the Bankruptcy Court would have had jurisdiction over those

2   claims, as it did over the same claims here.  Again, it's a

3   different scenario, but it's a similar concept of manufacturing

4   and that's the accusation that's being made here.

5           One other thing I should say about manufacturing.

6   The two sides have a completely different reading of the Third

7   Circuit opinion and particularly footnote 18.  And there's

8   similar language as well and I know Your Honor has read that

9   opinion very carefully, but their contention is, is that the

10  Third Circuit said you have a problem that can't be fixed;

11  other than if you have major costs down the road maybe you

12  could reconsider, but there's nothing you can do to make

13  yourself fit for bankruptcy.

14          So their position would be that, even though we

15  reached an agreement that we believe is beneficial to everyone,

16  that we have no option, we are completely foreclosed from

17  filing for bankruptcy in order to attempt to implement a plan

18  that's supported by the majority of claimants.  Because they

19  would say, if we made no changes, the case should be dismissed

20  for the exact reasons the first case was dismissed, and then

21  they would say, if any changes were made, if there are any

22  differences which had any impact at all, the case should be

23  dismissed.  And so nothing could be done, in their view, that

24  wouldn't basically violate the Third Circuit decision.

25          And we don't read footnote 18 that way.  What we see

1   is a court who is saying we anticipate, based on the logic of

2   this opinion, that someone might do this, but as a caution it

3   would need to be tested under fraudulent transfer law.

4          And what's interesting about that, of course, is Mr.

5   Burian is saying and they're whole side is now saying there's

6   no financial distress, there's wild solvency.  So we apparently

7   passed the fraudulent transfer test in the Third Circuit.

8          So, obviously, Your Honor has his own views about the

9   Third Circuit opinion and what that footnote means, but there's

10  at least two places, I think the second place is in the

11  conclusion where the court talks about a subsidiary being fit

12  for filing and the fact that a parent company that provides too

13  much, it might render the affiliate or subsidiary unfit and, to

14  them, that's not fixable.

15         Okay.  So we've heard a lot said about the void or

16  voidable.  I think we've heard that it's nonsensical,

17  ridiculous, and here what we heard is it's post hoc, pretext,

18  cooked up by LTL's lawyers as a last-minute excuse to

19  manufacture financial distress and, again, from parties who say

20  there is no financial distress, but the evidence says

21  otherwise.  Mr. Haas, who you see here in the courtroom, who

22  was deposed twice and he said very clearly that the company,

23  J&J took the position shortly after the January 30 opinion came

24  down with respect to the void or voidability of the contract

25  and, in particular, the J&J support.  And that was corroborated

1  by the testimony of Mr. Kim, advising that he had heard from

2  J&J as early as January 30th about this potential problem.

3       The other thing is, like Ms. Richenderfer and others

4  have been saying that, since this was going on in bankruptcy,

5  we had an obligation to bring this to the Court and to the

6  parties if we thought this was an issue.  And I'm struck by

7  that because this would only occur if the case was dismissed,

8  and of course we were fighting it at the time.  And I guess the

9  suggestion is we should have asked Your Honor for an advisory

10  opinion, which I doubt that you would have provided, but the

11  point is that's what came down.  There was contingency planning

12  happening during the course of the case; at the same time, more

13  importantly, negotiations were continuing and we reached an

14  agreement.

15       And I would just ask Your Honor to step back and

16  think about the situation that we were in, which is we've been

17  trying hard for months to reach an agreement, made progress

18  some days, went backwards other days.  And while we were

19  working on trying to get that Third Circuit opinion reversed or

20  reviewed further, lo and behold, we reached a settlement and we

21  reached it with a majority of the claimants, and I'm going to

22  come back to the claim counts.  And the other side now is

23  noticeably silent about majority claims or minority, you're not

24  hearing anything from them about that anymore, but we're in

25  that situation.

1       We strongly believe that this plan is in the best

2  interests of the claimants; maybe not in the best interests of

3  the plaintiffs' bar, I'm not sure I understand why, but in the

4  best interests of the claimants.  It requires a bankruptcy.  We

5  thought about doing it -- we would have done it in LTL 1, if we

6  could have, but we felt we had an obligation to move forward

7  with LTL 2, if we could do it in a way that made us fit for

8  filing in the Third Circuit.

9       And so to suggest, again, that all of this is

10  nefarious and improper and some grand conspiracy to harm

11  claimants, and to mock -- I think I heard today, mock this

12  Court and mock the Third Circuit, there's absolutely no support

13  in the record for that, none, and it's belied totally by the

14  fact that we have all these claimants and a committee that

15  supports this bankruptcy and supports this plan.

16       Just a couple of things, I said I would have a couple

17  of slides on the law.  On this point about the frustration of

18  purpose.  The Congoleum case, to us, is surprisingly similar on

19  the facts where there was an argument that a supervening

20  decision, actually Combustion Engineering by the Third Circuit,

21  frustrated the purpose of some settlement agreements with

22  insurers.  And, ultimately, the court found that that argument

23  should be rejected, but it wasn't because it wasn't a valid

24  argument, it's because there wasn't a common interest between

25  the parties to that agreement as to what the purpose of that

1  agreement was because some of the parties were claimants and

2  their purpose was to be paid.  Congoleum, on the other hand,

3  was saying our purpose was to facilitate a bankruptcy filing.

4  And the court said it can't be that -- it doesn't apply if only

5  one party has that purpose and another doesn't.  Well, in this

6  case, the parties share the same purpose.  Your Honor has

7  already found that there's a common legal interest between the

8  parties and there is because they had a common interest in

9  resolving in a bankruptcy proceeding the current and future

10 talc claims.

11        And in the other case it's interesting, also

12 surprisingly close on the facts, but not ultimately a ruling on

13 this, was this Union County Utilities case, which is a District

14 of New Jersey, Federal District of New Jersey case from 1998,

15 involved waste disposal contracts and there, contracts that

16 applied to transportation, I think, and purchases and sales of

17 waste products had been -- the statute had been held

18 unconstitutional.  And the problem with that -- and it was

19 basically made immediate, there was an attempt to delay the

20 impact, but it impacted the parties in a way where the economic

21 impact would be borne by one side and the other side would get

22 a windfall.  And the court actually said there are a few

23 doctrines that might apply to suggest that that's not a fair

24 result and it shouldn't come out that way, one of which is

25 frustration of purpose.

1          And this was interesting too because it also talked

2     about the fact that the frustration might just relate to a

3     particular contractual provision, but not the entirety of the

4     contract, but if that was an important provision in the

5     contract, the whole contract would become void or voidable,

6     based on frustration of purpose.

7          Now, the court here ultimately remanded back to the

8     state court to determine whether frustration of purpose would

9     apply and the trail ends there.  We've tried to find out what

10    ultimately happened on remand.  But, again, a surprisingly

11    similar case.  Both involved Third Circuit opinions that had

12    the impact of upsetting the intent of at least one of the

13    parties in the <u>Congoleum</u> case.  Here, where you had one parties

14    where one party benefitted, one side benefitted and one party

15    was harmed, and the court recognized that there was a

16    frustration of purpose argument that could be made.

17         So I wanted to point those out.  We'll obviously

18    develop this more in our briefing, but I just wanted to put a

19    little up because, again, I think Mr. Jonas said these things

20    don't pass the laugh test, and we've heard all of this.  We're

21    way past the laugh test here and, from the perspective of this

22    board, they determined that there was a material risk that this

23    was a problem.  You can agree or disagree on that, but what you

24    can't disagree with is the fact that the problem was remedied,

25    and it was remedied through a substitution agreement and new

1  financing agreements that the board determined provided the

2  company with everything it needed to both confirm a plan in

3  this case in accordance with the PSAs or how they might be

4  amended, and also to allow the company to move forward and pay

5  claims in the tort system.

6          That's the other thing we should remember.  We have a

7  funding agreement that largely went through these two cases the

8  same, the real difference is the J&J support, and the

9  difference there is that in the first case it was available

10 generally, in the second case it's generally in bankruptcy and,

11 from their perspective, that's all bad faith, that's all

12 manufactured; that, by itself, is a reason to dismiss the case.

13         So, again, we'll develop this further, but I submit

14 to Your Honor there's no legitimate basis to say that this

15 doesn't even pass the laugh test.  I think anyone who takes a

16 close look at this would agree that there was a material risk

17 here, and the good news is the parties worked together to come

18 up with an agreement that would work.

19         Now, Ms. Jones was critical of the agreement because

20 -- and everyone was because it says -- they said, well, J&J has

21 to approve.  And that's true, but they've only taken one part

22 of it.  What it says is the funding is available if the parties

23 all agree and, in a scenario where we have an agreement as to a

24 plan, that seemed like the appropriate thing to do to send a

25 message to all the parties, we're all working together to this

1  plan.  And we recognize, in a way, we put all our eggs in one

2  basket here.  This plan is either going to go forward, amended

3  or otherwise or not, and, you know, we're taking our shot to

4  implement an agreement that the other side has asked us -- or

5  that the PSA parties or the ad hoc committee wanted, and that's

6  why it's set up that way.

7       This is just intended to show -- I mean, Your Honor

8  heard many, many times, less so today in the closing arguments,

9  about this engineered transfer of the consumer health business

10 and this was all part of this fraud that was basically

11 perpetrated to create financial distress that isn't financial

12 distress, but Your Honor knows from having sat through the

13 testimony that that's not true.  Mr. Lisman testified that that

14 spin had been planned years in advance, John Kim said the same

15 thing.  Your Honor heard about it, I think, fairly early on in

16 the first case.  There was public notice given, you know, SEC

17 documents and the like were filed.  This was no surprise.  This

18 has absolutely nothing to do with the bankruptcy and in fact

19 the transfer of assets into Janssen occurred before the Third

20 Circuit opinion came down; it had nothing to do with it.

21      All right, now I'll go to the last module here --

22 well, it's not the last, but the next in this part.

23      So LTL, I think Your Honor can say, at least based on

24 the record you have, or can conclude that LTL is not insolvent.

25 And we made the point here on this slide again that there is a

132

difference between financial distress and insolvency.  Mr.

Burian seems to disagree with this, although maybe it goes the

other way with him because you can be insolvent, but not in

financial distress.  And the <u>SGL Carbon</u> case, Third Circuit

case, talked about a series threat to the company's long-term

viability.

So, here, this shows -- this is an attempt to show

that LTL is solvent.  You can see the talc costs were measured

at 11 to 20 or so billion, and that was the high-end stress

test, and you've got the 60 billion and the 30 billion, but the

key line is the amount of the funding agreement, which is equal

to, as Your Honor knows -- or it's available to the extent of

the talc liabilities.  So you can see that there is solvency

there.

If that weren't enough, you have the report of Mr.

Bell -- or Dr. Bell, you have the report from Dr. Mullin.  And,

you know, in the Bell report, he did do -- I don't know if Your

Honor had a chance to see it, there's obviously a lot of paper

here, but he did an analysis where he looked at the potential

discounts of a liquidation of HoldCo and that brought down the

value from 30 billion to 22 billion.  So you can see that the

cushion obviously was smaller, but it still showed balance

sheet solvency and, of course, the cash flow forecasts showed

solvency as well.  And of course, from the other side's

perspective, that's the end of the story.

1          Again, we heard that the funding agreement is a bald

2    attempt to manufacture financial distress and cook up the

3    largest intentional fraudulent transfer in history.  That comes

4    out of the TCC motion to dismiss.  Very dramatic, largest in

5    history, but look what Mr. Burian had to say.

6          With respect to LTL, are there any signs that LTL

7    will not be able to pay its current debts or future debts as

8    they come due as of right now?

9          Well, as of today, there is obviously no sign or is

10   there any reason to believe that all claimants within any of

11   the ranges of the valuation I've seen wont' be paid in full.

12         So there's no basis for that fraudulent transfer

13   allegation and it's interesting that that would be made in a

14   context where the plan was to argue significant lack of

15   financial distress at this hearing.

16         Okay, so let's talk about this issue on 1112(b)(2).

17   So there's various requirements under this subsection of 1112,

18   the first is there have be unreasonable -- I'm sorry, unusual

19   circumstances that would make it not in the best interest of

20   claimants to dismiss the case.  Here, we've got support from

21   law firms representing approximately 60,000 talc claimants;

22   we've got a plan that has a net present value of $8.9 billion,

23   which would be the largest asbestos settlement that's ever

24   occurred.

25         We also have a situation, which is unusual in my

134

1  experience, that we have a very limited stay in place at this

2  point.  In other words, while we're trying to go forward

3  quickly on a plan that the majority of claimants support, the

4  claimants who oppose are able to move forward with their cases

5  all the way up until trial.  And the other thing that's unusual

6  about this, and you heard this in the testimony, is this case

7  has the possibility of resolving Imerys and Cyprus as well, and

8  you heard some testimony about that from Mr. Onder, I guess the

9  day before yesterday.  In fact, it's right here.

10       Question:  "You see that provides a settlement in the

11  Imerys case as a condition?

12       "Yes.

13       "And there's language there that's added that says,

14  if the Imerys settlement condition precedent cannot be waived

15  without the consent of Johnson & Johnson and the ad hoc

16  committee of counsel; right?

17       "That's correct."

18       The thing that's interesting about Imerys and Cyprus

19  is the claims are largely the same, and that's the opportunity

20  that's presented by this case.  And you know that this plan

21  basically provides that if additional money comes in from

22  Imerys and Cyprus, it's added, it's added to the pot here.

23       And so you would expect the cases to be combined

24  because it's the same claims in both cases, and Mr. Onder is on

25  the committee in that case, as Your Honor heard.  So there's

1  every reason to believe that can be -- that can happen and you

2  heard from the testimony that the only reason it hasn't

3  happened is that they're waiting to hear whether this case

4  survives dismissal or not.

5          On the counts, so there was lots of argument about

6  our counts aren't real, there's lots of duplicates, they're not

7  real claims, but, again, look at the evidence.  We know what

8  the counts are:  58,392 -- and I'm going to spend more time on

9  this -- there are 1100 duplicates, 57,292 claims that are

10 represented by the firms on the ad hoc committee.

11         And here is the allegation.  There has been, we

12 believe, duplicated here will have a material impact on the

13 number.  We think that there are people who are listed twice

14 based on the first names and first initials we've received, we

15 think there are people listed on multiple counsel's lists where

16 there are co-counsel twice, and so we think there will be a

17 material impact.

18         What do we know from the facts?  Your Honor allowed

19 the other side to do their own de-duplication exercise after we

20 told them we'd already done it.  Compass Lexecon came back,

21 they found 1100 duplicates, that was it, which is consistent

22 with what we had found.

23         And then, on the other side, what do we know about

24 the law firms who represent these objecting parties?  First of

25 all, it's been very hard to get any information out of them in

1  terms of filed and unfiled claims, but this is what we have

2  from the discovery requests:  25,797 claimants.  And this is

3  against a backdrop where they were telling you don't have the

4  majority, tens of thousands of claimants oppose, everyone

5  opposes, this is a small minority that's supporting this plan.

6  We now know it's the exact opposite, the record establishes

7  this.  Sixty nine percent of the claims are represented by

8  lawyers on the AHC, thirty one percent by the objectors.

9        And that's, by the way, just accepting everything

10 from the objectors at face value.  There's been no effort to --

11 there's been no support provided, no information provided by

12 which they've attempted to demonstrate to us or to Your Honor

13 that those claims are real or they're not duplicates.

14       And this is another point, Your Honor, that came up

15 which has not been addressed at all by the other side.  Mr.

16 Onder, I imagine you remember this, but everyone you know,

17 everybody in this room, every lawyer in this room involved with

18 the litigation has probably the same ratio as I do, about 50-50

19 between the gynecological cancer versus the uterine.  It's not

20 like anybody is going to stuff the ballot box with these

21 uterine cancer cases because everybody has probably about 50

22 percent; you didn't hear anybody say that that was wrong.

23       The other thing about these cases, Your Honor, it's

24 not as if -- you're telling you now, Mr. Thompson is telling

25 you now these cases aren't worth anything.  It's not like the

137

1  company is seeing a lot of dismissals be filed where these

2  claims are being dismissed.  These have been filed in the tort

3  system against the company just like all these other cancer

4  cases.  We don't think any of them has merit, but they're

5  filed, they're unfiled, and they should all be addressed and

6  that's why they're being addressed.  There's no conspiracy here

7  of any kind.  But it's very telling that Mr. Onder would say

8  that everybody has these cases anyway because you're not

9  hearing that.  What you're hearing is that it's only these law

10  firms that have them on the AHC and the suggestion is that's

11  virtually all they have.

12        The other thing, Your Honor, I should comment about

13  the U.S. Trustee and Ms. Richenderfer.  The one thing that also

14  came out of the record was that Mr. Murdica had indicated that

15  he was reluctant to provide the names of additional firms that

16  support because of threats, and that those threats had been

17  happening.  And he testified that in fact he had reported that

18  to the U.S. Trustee and asked the U.S. Trustee to step in and

19  look into that.  There's never been any response from the U.S.

20  Trustee's Office to that.

21        And, obviously, Your Honor refused to allow Mr.

22  Murdica to testify, but the U.S. Trustee, who said today that

23  their role is to protect the integrity of the process, hasn't

24  taken any steps that we know of to address a concern that was

25  raised weeks, if not months ago in this case.

138

1          Are we doing okay?  Do we need a break or --

2          THE COURT:  Well, what's your time frame?

3          MR. GORDON:  Your Honor, I've probably got, I would

4  say, 15 minutes more.

5          THE COURT:  Fifteen minutes?  Why don't we plow

6  through it.

7          MR. GORDON:  Yeah, Chris Hansen is going to speak to

8  you.

9          THE COURT:  Well, I was going to take a break after

10  you're done.

11          MR. GORDON:  Yeah, I've got ten or fifteen minutes, I

12  think.

13          THE COURT:  Okay.  Are you okay, Wendy?

14          THE ECRO:  Yes, I'm fine, Judge.

15          MR. GORDON:  She's always okay.

16                      (Laughter)

17          MR. GORDON:  So the other thing about the -- you

18  know, you've heard lots about the claim counts, why they're not

19  real, and one of the big arguments has been that, well, they

20  don't have the claimants, they just have the law firms.  And

21  everyone on this side knows that in situations like this what

22  we have is what you typically have; they know that, but they're

23  suggesting otherwise.

24          So Mr. Murdica -- and now the record supports it, Mr.

25  Murdica testified.  Because on interacting with these lawyers

139

1  on multiple torts all the time, if they lie to me, I'm going to

2  figure it out in that tort, and then they're going to have no

3  credibility in the future.  These lawyers I've settled cases

4  with before, they've made representations before they've borne

5  out, they have credibility; I have no doubt that they have what

6  they say they have.

7       And look at what we have for the AHC claims compared

8  to the objectors.  We have evidence that they have intake, an

9  intake process, that they require a history of talc product

10  use, that they have medical records that there's a diagnostic

11  -- a determination of a diagnostic category, that there's

12  vetting of the allegations, and then there are thousands of

13  cases that are actually rejected, we have that; on their side,

14  we have none of that, nothing, just bare allegations.

15       The other thing we have with respect to the

16  supporting firms is that we have now an initial 2019 statement

17  that's been verified and a supplemental statement.  We have

18  certifications under penalty of perjury affirming that members

19  are authorized to represent their client in this case, have

20  given their notice to their clients of the representation, and

21  of their support of a plan.  Your Honor ordered that, you heard

22  very clear testimony that that's been done, and we heard

23  testimony about claims having been audited as well.  We have

24  none of that from the other side.

25       Now, Mr. Watts testified about the plan itself and

1  what he saw, some of the benefits that he saw.  He said,

2  unfortunately, you would be in a situation where certain

3  clients for certain very good law firms would get paid, and

4  lots and lots and lots of clients for other people would never

5  see a dime.  He was commenting on his experience in the tort

6  system.

7          He talked about the fact that recent scientific

8  analysis has not been going the way of the plaintiffs.  He

9  says, yeah, I think all of her recent stuff -- he's talking

10  about Katie Bryan in a report on genital powder use -- is very

11  harmful to us on all the different occasion.  I don't think the

12  recent science has been very helpful to our side.

13          And this is the point I made earlier about they're

14  telling you that it's so unusual and they're surprised and

15  amazed that the claimants themselves, there's no evidence that

16  the claimants themselves have signed up.  But we did a

17  comparison of Mr. Birchfield's proposal that there was an

18  examination Mr. Murdica about, that $3.25 billion settlement,

19  and then the settlement proposal here.

20          And look at it, it's the same all the way through.

21  Both of them were to be implemented in bankruptcy, both had

22  channeling injunctions; both involved counsel representations

23  about claimants with a spreadsheet of claimants, nothing

24  directly from the claimants, that was true in both cases.  They

25  both involved NDAs.  You heard a lot about the NDAs how there

1  was some impropriety that there were NDAs, even though Mr.

2  Onder and Mr. Nachawati said they asked for permission to share

3  the information with the TCC anyway, and then both had non-

4  solicitation clauses.

5        So everything you've heard about what we've done is

6  improper, under cover of darkness, it's never done that way,

7  it's exactly the way it was proposed to be done in Mr.

8  Birchfield's proposal back before TCC 1.

9        You heard about the medical liens, you said we could

10  argue this.  I've only got one slide.  And of course some

11  evidence did come in any way, but look at what Mr. Onder had to

12  say about the medical liens settlement.  The fact that we were

13  able to resolve the medical liens, that's going to save a year,

14  18 months, two years in some cases; it's the bane of the mass

15  tort profession.  By virtue of having negotiated a global deal,

16  I mean, that's going to save ten years off the timing of money

17  getting into the women's pockets, and I know it was a major

18  concern to everybody.

19        That's why we were saying that was such an important

20  breakthrough.  That's a resolution with about 50 insurers, it's

21  a discounted result, and so it not only saves money, it saves a

22  huge amount of time.  That can only be done in bankruptcy.

23        This is Mr. Murdica again about the likelihood of

24  plan confirmation.  And, again, he's talking about the fact

25  that you have a lawyer recommendation and the lawyer is going

1  to recommend the plan -- or the settlement to his clients,

2  that's usually good.  He says, when a lawyer recommends to

3  their client that they settle, it's usually because it's worth

4  -- it's usually worth settling and they follow their lawyer's

5  recommendation.

6        Mr. Watts corroborated that.  He said but we usually

7  deliver about 99 percent of the clients because I won't sign

8  off on a plan that I don't believe is in their -- not in their

9  best interest.

10        Mr. Watts talked about where we were in the process.

11  He said, you probably remember this, I think we are on the 2-

12  yard line.  We're getting close.  I mean, we have some issues

13  to tackle, but, with the claimants, we're getting very close.

14        Mr. Onder talked about the feedback he's actually

15  been getting from some of his clients, although he hasn't asked

16  for their authorization or approval.  No matter what you say,

17  Jim, I'm with you, Jim; I'll do what you say.  Just, again, to

18  reaffirm that he recommends this deal to his clients, he's very

19  confident that his clients will agree with that recommendation.

20        So there is, obviously, a part of this section of the

21  Code that talks about actions or omissions that constitute the

22  cause.  And then the question is, can those be cured.  And it's

23  kind of an odd fit to this case, but we think, to the extent

24  that provision applies, it applies for two reasons.  One, that

25  voting on a plan will promptly cure any act or omission that

1   you could identify relating to bad faith, and the other is

2   that, if the act or omission is some impropriety in connection

3   with the financing agreements and those arguably led to

4   insolvency or harm, which of course the other side is saying it

5   didn't, that could be cured by granting derivative standing.

6          And Your Honor mentioned this at a hearing a few

7   weeks back and the one benefit here -- and it's sort of an

8   unusual circumstance, in a way, is that there is some

9   impropriety -- there would be a benefit to the estate to have

10  that litigated in this Court for the benefit of everyone, by

11  representatives of everyone for the benefit of everyone.

12         The other part of this statute is that the plan,

13  there should not only be a reasonable likelihood of plan

14  confirmation, but also confirmation in a reasonable time.

15  That's a schedule that we've put up, you know, we put it up at

16  the beginning.  We have a disclosure statement hearing set

17  right now for August 22nd.  This shows we filed a plan, we

18  filed a disclosure statement, we filed solicitation procedures,

19  we filed an amended plan, and negotiations are ongoing.  So

20  we're going to continue to move forward.  We recognize we have

21  to obviously have a favorable ruling on the dismissal motions,

22  but that's the time line, and I would submit that does suggest

23  we can confirm a plan within a reasonable time -- and, again,

24  particularly in a case where the stay has been lifted to a

25  large degree.

1           And I just wanted to point this out, Your Honor.

2   I've had to sit here through many hearings in the prior case

3   and in this case to hear plaintiff lawyers come to the podium

4   to say this is just another part of the Jones Day play book,

5   the debtors' play book; they filed these cases solely for the

6   purpose of delay.  All they're trying to do is get leverage

7   over the claimants, they're trying to push this off.

8           And, Your Honor probably saw this, the Fourth Circuit

9   had a different opinion about this when it affirmed the

10  preliminary injunction in the Bestwall case, I think two weeks

11  ago  It said the main interference with the timely resolution

12  of the claims in Bestwall's bankruptcy proceeding appears to be

13  claimant representatives' challenge to the preliminary

14  injunction, thereby prolonging the bankruptcy process and

15  preventing the claimants from obtaining prompt relief.  They

16  put the delay at the feet of the claimant representatives.

17          Similarly, in Bestwall, Judge Beyer -- this is back

18  in March of '22 -- the present -- she's talking to Mr. Waldrip,

19  who represented a number of the plaintiffs' firms in that case

20  -- "The present claimants are most harmed by delay and those

21  are your clients, Mr. Waldrip, and I believe that the tactic

22  that you are taking regarding the Exhibit A" -- this is the

23  PIQs -- "is unnecessary and it's dilatory and it stands to harm

24  your clients more than anybody else.

25          "And, again, I also indicated at that time that this

1  PIQ order process has been going on long enough and I really

2  all but begged for compliance, but that apparently fell on deaf

3  ears, at least for some clients and their attorneys."

4          You can sense the frustration of Judge Beyer with

5  what was happening.

6          And then, lastly, from the PI opinion in the Fourth

7  Circuit.  "It's not clear why claimant representatives' counsel

8  have relentlessly attempted to circumvent the bankruptcy

9  proceeding, but we note that aspirational greater fees that

10 could be awarded to the claimants' counsel in the state court

11 proceedings is not a valid reason to object to the processing

12 of claims in the bankruptcy proceeding."

13         We would submit that that's what's happening here.

14         So, to conclude, Your Honor, the purpose of this

15 case, from our perspective, is simple, it's to pursue

16 confirmation of a consensual plan, a plan that the claimants

17 came to us with.  It's supported by the majority of claimants,

18 that's now clear from the record; it already includes a

19 resolution of lien claims with about 50 insurers.  And, if the

20 case is dismissed, Your Honor, any opportunity to consummate a

21 consensual plan, which we think is plainly better for the

22 claimants, will be lost.  And what that will mean is that the

23 firms representing a minority of the claimants in this case

24 will have succeeded in blocking the will of the firms with the

25 majority and disenfranchising all claimants, including their

1  own clients, from deciding for themselves whether this plan is

2  in their best interests or not.

3          And so we would submit, Your Honor, that the motions

4  to dismiss should be denied.

5          So there is one other thing we wanted to do, I think

6  it's about a three-minute clip.  You've heard throughout these

7  proceedings, and you heard it again from Mr. Thompson, lots of

8  criticism directed at Mr. Haas.  And he said today, he talked

9  about challenges today that Mr. Haas has made about conflicts

10  of interest that he doesn't like, but Mr. Haas has been deposed

11  twice in this case.  So we wanted to play a short video at the

12  end, it's about three minutes, so you could hear from Mr. Haas

13  directly.

14              (Video deposition of Erik Haas played)

15          THE COURT:  Mr. Jonas?

16          MR. JONAS:  Well, Your Honor, it's a tough call

17  because, on the one hand I actually think the video was quite

18  good for us to demonstrate what we're up against in this case.

19                          (Laughter)

20          MR. JONAS:  On the other hand, I take the rules of

21  engagement seriously.  I really -- I don't really care, I don't

22  think that means anything, it's irrelevant, but we agreed that

23  video depositions would be designated and then submitted to

24  Your Honor.  So --

25          THE COURT:  It's not coming into evidence.  That's

1  not --

2          MR. JONAS:  I understand --

3          THE COURT:  -- even on their PowerPoint, I mean, it's

4  not going to -- and I haven't memorized it --

5          MR. JONAS:  Well, it did come into evidence, you

6  heard it.

7          UNIDENTIFIED COUNSEL:  It's in the transcript, Your

8  Honor.  It should be stricken.

9          MR. JONAS:  It should be stricken from -- if you want

10  to view the video, you can view the video.  But again, Your

11  Honor, I don't -- the substance of it, I could care less --

12  again, I think it was helpful, but --

13          THE COURT:  I mean, it's like closing statements are

14  not evidence.  I mean --

15          MR. JONAS:  Well, when I reach an agreement with

16  somebody --

17          THE COURT:  --  counsel can get up and make -- he

18  could have --

19          MR. JONAS:  -- and we say we're not -- we agree we're

20  not going to play video depositions and I have to sit here and

21  watch a video deposition, that seems unfair to me.  But, Your

22  Honor, you -- I know you appreciate our view.  Thank you.

23          THE COURT:  No, I understand the view.

24          MR. MALONE:  Your Honor, just to add, Mr. Haas is in-

25  house counsel, okay?  They have counsel.  They can't have him

1  effectively stand up before this Court, when he's sitting right

2  here, and have it be part of this record.  It's going to be

3  part of the transcript, it should be all stricken.  They had

4  their opportunity to put him on that stand if they really

5  wanted him to make these points.  It is wholly unorthodox for

6  anyone to add a video clip like this to their closing argument,

7  so it has to be stricken.

8           THE COURT:  Well, I'm not --

9           MR. HAAS:  Your Honor, if I may?

10           THE COURT:  Yes.

11           MR. HAAS:  Thank you.  I have made an appearance in

12  this case as litigation counsel on behalf of J&J.  On his

13  direct, Mr. Thompson asked -- you know, showed a question that

14  that answer was responsive to.  So he introduced it in his

15  closing argument and that was the response to the question that

16  he put up before this Court.

17           THE COURT:  All right.

18           MR. HAAS:  And on top of that --

19           MR. JONAS:  Your Honor, I object.  He can't speak

20  when he's representing --

21           MR. HAAS:  Would you please --

22           MR. JONAS:  -- he's the corporate counsel, he's not

23  allowed to --

24           MR. HAAS:  No, I am not.  I am litigation counsel,

25  I'm litigating this case.

149

1          THE COURT:  Counsel, Counsel.  Finish quickly.

2          MR. HAAS:  One more point, Your Honor.  The

3  deposition transcript is in evidence in this case, it's already

4  been -- it's one of the deposition designations.  They took my

5  deposition twice, they designated my testimony, that was a

6  counter designation.  It's in evidence.  Thank you, Your Honor.

7          THE COURT:  All right, thank you.

8          UNIDENTIFIED COUNSEL:  Are we taking a break, Your

9  Honor?

10          THE COURT:  Oh, yeah.

11                    (Laughter)

12          THE COURT:  Thank you.

13          MR. GORDON:  Thank you.

14          THE COURT:  Let's see, it's 3:02, ten minutes.

15     (Recessed at 3:02 p.m./Reconvened at 3:13 p.m.)

16          THE COURT:  Let me just address where we left off

17  with respect to the motion made to strike that portion of the

18  closing, it is overruled.  If I recall, Mr. Maimon included in

19  his closing a short videotape of -- in other words, a seminar,

20  somebody speaking at a seminar.

21          MR. MAIMON:  That was during cross, Your Honor.

22          THE COURT:  Was it?

23          UNIDENTIFIED COUNSEL:  (Indiscernible) during his

24  cross.

25          THE COURT:  It was during cross?

1          UNIDENTIFIED COUNSEL:  Yes.

2          MR. MAIMON:  But that's okay.

3          THE COURT:  The same point was going to be that it

4  came -- actually, I just evidenced my point, I can't even

5  remember it.

6                        (Laughter)

7          THE COURT:  So I'm sure, by the time I get in my car

8  leaving here today, I will have forgotten much of what -- no

9  disrespect intended -- of what was said.

10          MR. GORDON:  Please don't forget that, Your Honor,

11  please.

12          THE COURT:  But in any event, if it's otherwise in

13  the record as part of evidence, it's there, and if it's not,

14  it's not evidence as part of the closing.

15          So, with that being said, Mr. Hansen, you have the

16  podium.

17          MR. HANSEN:  Thank you, Your Honor.  I'm not sure

18  with that intro that there's an awful lot to say, hopefully,

19  this will be memorable for you.

20                        (Laughter)

21          MR. HANSEN:  Your Honor, Kris Hansen with Paul

22  Hastings on behalf of the Ad Hoc Committee of Supporting

23  Counsel.

24          First, let me just say that the ad hoc committee

25  echoes the many statements of gratitude to the Court and its

1  staff, and it appreciates the generosity and the patience that

2  all of you have given to all of us.

3         Your Honor, let me start by saying that this case

4  absolutely has a valid bankruptcy purpose.  One of the members

5  of the Ad Hoc Committee of Supporting Counsel, Mr. Onder, who

6  was one of the first lawyers in this country to prosecute talc

7  claims to a verdict and who represented a claimant on the TCC

8  in LTL 1, told Your Honor what that purpose was when he

9  testified to why he agreed to drive this settlement in

10 bankruptcy:  to ensure fair compensation for all present

11 claimants and their families who are suffering or who have died

12 from exposure to talc products, and to ensure that future

13 claimants, the daughters and granddaughters that Mr. Onder

14 referenced, have a mechanism to recover for their injuries as

15 well.

16        Neither of those outcomes is guaranteed if this case

17 is dismissed.  In fact, both of those outcomes are unlikely.

18        There is unequivocal testimony in the record that LTL

19 and Johnson & Johnson will take their cases to trial where

20 their track record is very good.  And you heard from the TCC's

21 own expert, Mr. Burian, as well as the TCC's counsel on endless

22 cross-examination, that they believe that no more than ten to

23 twenty cases a year will make it to trial.

24        Somehow, however, Your Honor, they also say that the

25 MDL process is efficient and can resolve the current estimate

1    of a hundred thousand claims and the thousands more to come, as

2    well as those that don't even exist today.  The AHC does not

3    believe it and neither should you.

4          Trials result in inconsistent judgments for some and

5    no justice for virtually all.  To quote Dr. King, Your Honor,

6    justice long delayed is justice denied.  No one wants that

7    outcome, Your Honor, not one lawyer in this room wants that

8    outcome for their clients, and the AHC does not believe that

9    the Third Circuit wants that outcome either.

10         Ironically, according to the Third Circuit's -- well,

11   to the TCC's interpretation of the Third Circuit's ruling, the

12   greater the ability of a debtor to fund a historic settlement

13   for all present and future claimants is, the less likely it is

14   that that debtor should be able to access the only process,

15   Chapter 11, that makes that settlement possible.

16         From a policy perspective, being able to implement a

17   settlement that utilizes an express provision of the Bankruptcy

18   Code, which ensures fairness in its application and treatment

19   to all present and future claimants, is about as proper of a

20   use of Chapter 11 as there can be.

21         To that point, Your Honor, Congress amended the

22   Bankruptcy Code in 1994 to include Section 524(g) to codify the

23   trust and injunction procedures used in the Johns Manville and

24   U&R cases, and to specifically enable a Bankruptcy Court to

25   confirm a plan containing a trust, and to utilize the

153

1  Bankruptcy Code's very broad definition of claim to issue a

2  channeling injunction to bring all claims, present and future,

3  to the trust.

4        As we also note, the Bankruptcy Code does not contain

5  any Chapter 11 entry requirement of immediate and serious

6  financial distress.  As noted earlier, deploying the logic of

7  the Third Circuit, a mass tort debtor would have to wait until

8  its resources had dwindled and it was overwhelmed by

9  litigation, the proverbial low point in its value and its

10  ability to compensate claimants, to gain entry to Chapter 11

11  and be able to avail itself of the trust and injunction

12  procedures and process set forth explicitly in 524(g), to the

13  detriment of the parties that that provision is designed to

14  compensate, the claimants.  That is nonsensical, a nonsensical

15  outcome, Your Honor.

16        The ad hoc committee believes that the facts of this

17  case, the one that is before you now, should be compelling to

18  Your Honor and the Third Circuit.  In this case, there is a

19  settlement that is supported by counsel for almost 60,000

20  claimants who have said that they support the plan that

21  embodies that settlement, and they will recommend it to their

22  clients and they will recommend that they vote for the plan.

23        Dismissing this case now never lets the claimants

24  themselves exercise their will, it never lets other claimants

25  vote on the plan, and it never lets the Chapter 11 plan

1 process, which you and I know is one of the most powerful

2 mediums for reaching true global consensus, play out.

3         You have uncontroverted testimony and an amended plan

4 on file that demonstrates exactly what Mr. Murdica, Mr. Onder,

5 and Mr. Watts all testified to.  There have been constant

6 negotiations to improve the terms of the plan for the

7 claimants, and there is now a funding guarantee from Johnson &

8 Johnson to the extent that LTL does not satisfy its plan

9 obligations; an immediate funding mechanism in the plan that

10 will accrue interest and finance the setup of the trust and the

11 work of the claims administrator to expedite claims resolution

12 and provide a recovery to the claimants, which is the paramount

13 goal; a medical lien sub-trust that is a fraction of the

14 expense predicted by the TCC and its supporters that guarantees

15 the fast-tracking of claimant recoveries; a real ceiling on the

16 dilution of the personal injury trust to fund a settlement with

17 government claims; and a substantially revised set of trust

18 distribution procedures that have been designed to streamline

19 recoveries to claimants.

20         This case absolutely should not be dismissed by this

21 Court.  All claimants should have the right to vote on whether

22 they want the settlement embodied in the plan, and the plan

23 process and the tools that are already in place and surrounded

24 in this Court, like the presence of two mediators, should be

25 used to see if there is a way to bring about an uncontested

1  vote.  But if that's not possible, the Court should let all the

2  claimants vote.

3          When it comes to financial distress, the ad hoc

4  committee will not repeat the arguments made by the debtor, nor

5  the arguments in its papers.  Suffice it to say that the ad hoc

6  committee believes that there is overwhelming and convincing

7  evidence in the record of the costs of defending a growing

8  number of talc claims and of funding potential judgments that

9  clearly create a financial burden, and the presence of the new

10  funding agreement does not change that fact.

11          I will, however, focus the Court on Section

12  1112(b)(2), which provides the Court with an alternative avenue

13  to keep this case where it belongs, right here, so a plan

14  process can be advanced and the claimants themselves can vote n

15  their own future.

16          In brief, Your Honor, the historic settlement

17  presently before the Court and the benefits that flow from it,

18  juxtaposed with the uncertainty and the inability to satisfy

19  all claims in the MDL or other forums, are truly unusual

20  circumstances.  The plan on file, given the likely support of

21  nearly 60,000 claimants already, creates a real likelihood that

22  the plan will be confirmed and that confirmation will clearly

23  cure any purported lack of financial distress as defined by the

24  Third Circuit.

25          Elaborating further, this case is unusual in every

1  respect and, thus, satisfies the first prong of 1112(b)(2).

2  This settlement provides for present claimants and future

3  claimants, which is a really critical point, Your Honor.

4        Due to the nature of the talc products as off-the-

5  shelf and often used, but not tracked, we're faced with both a

6  long latency period and the virtual impossibility of

7  identifying future claimants and, thus, we need a process with

8  a representative that protects those future claimants now.

9        You heard this week from multiple witnesses that the

10 MDL system fundamentally cannot account for unknown future,

11 latent injuries.  Ms. Birnbaum's unrebutted testimony was

12 clear, no global settlement can be reached in the tort system

13 because future claimants who are not currently identifiable

14 could not be provided notice, due process, and an understanding

15 of their ability to opt out of a class settlement, a

16 requirement under Rule 23.

17       And one notable reason that the Roundup MDL, a mass

18 tort case involving the existence of substantial latent

19 periods, remains unresolved.

20       The TCC's own expert, Your Honor, Professor Rave, had

21 no response to your questions about whether there was a

22 structural mechanism for future unidentifiable claimants in the

23 MDL system, and he couldn't identify a single MDL settlement

24 that involved future unknown claimants with a significant

25 latency period and ultimately conceded that, unlike in the

1   bankruptcy system, an MDL court would have no ability to compel

2   a party to opt in to a settlement.  And on that basis,

3   Professor Rave essentially acknowledged that there was no way

4   that and MDL process could ever result in a global settlement.

5          Accordingly, it's very clear that LTL's entry into

6   the plan support agreements and the filing of the plan based on

7   them, and the prospect of resolving all claims, both present

8   and future, on a final basis, when balanced against the

9   inability of the MDL or other court processes to provide an

10  equitable recovery for the same claimants, satisfies the first

11  element of 1112(b)(2).

12         The next prong of the test requires the Court to

13  determine that dismissing the case is not in the best interests

14  of creditors and the estate, and the ad hoc committee submits

15  that this is a very easy answer as well, Your Honor.

16         As I noted earlier, dismissal pushes the claimants

17  back into the inefficient and painfully slow tort system that

18  has no real ability to deal with future claims.  Mr. Watts and

19  Mr. Onder, who together represent nearly 38,000 claimants,

20  noted that there have been only 46 trials since 2013 with

21  nearly 40,000 filed lawsuits, putting sick women in a position

22  where they have been waiting over a decade with no compensation

23  for their injuries.

24         Simply put, trials are few and successes are fewer.

25  Even a dramatic increase in the pace of trials will never come

1  close to addressing the tens of thousands of pending claims and

2  the thousands more to come, and claimants will be left to

3  language in the tort system absent this resolution.

4          Staying here and advancing the plan process gives the

5  claimants the right to vote on the plan, the chance to utilize

6  a consolidating process to potentially achieve global

7  consensus, and the possibility of confirming the plan and

8  delivering a final resolution for all claimants.

9          As I noted earlier, these goals, as the Court knows,

10  are not fantasy, they're the very real steps that are the

11  hallmark of a Chapter 11 process and they are present here.

12          Think about the improvements to the plan that I

13  discussed before.  It has been improved in many ways through

14  tough and constant negotiation.  That lien settlement is really

15  important, it expedites claimant recovery, and the mediators

16  are on standby to help continue to drive consensus.  And, if

17  that's not possible, the ad hoc committee believes that the 75-

18  percent vote threshold will be met and the near 60,000 claims

19  that its members represent go a long way to getting there.

20          While noting the claims, the ad hoc committee would

21  be remiss if it did not highlight a few points.

22          As the debtors pointed out, there was much focus on

23  the de-duplication that turned out to be a nonevent, so much so

24  that you haven't heard a word about it.  There have also been

25  endless attacks on the validity of claims held by the clients

1  of the AHC members and that fizzled out as well.

2         Mr. Onder and Mr. Watts testified credibly to their

3  intake procedures, the costs associated with obtaining tens of

4  thousands of medical records, and getting their cases trial-

5  ready.  And, from Mr. Watts, his intention to file most of his

6  claims in the event that these cases are dismissed, and Mr.

7  Onder has thousands of claims on file.

8         As Mr. Onder testified, every lawyer in this room has

9  probably the same ratio of claim makeup as he does and no one

10 challenged that statement, which summarily eliminates any

11 argument about stuffing the ballot box.

12        I've already noted the support that everyone says is

13 lacking from ad hoc committee members.  Mr. Onder and Mr. Watts

14 both testified to it, noting that we are on the 2 yard line.

15 They expect the plan to be finalized soon and they will

16 recommend it to their clients.  And, as required by this Court,

17 each member of the ad hoc committee has already notified their

18 clients of their participation in this proceeding and their

19 signing on to the plan support agreement.

20        Moving to the next two prongs of 1112(b)(2), Your

21 Honor, the Court needs to find that there's a reasonable

22 prospect that the plan will be confirmed and that whatever

23 deficiency exists that would otherwise cause the dismissal of

24 the case will be cured in a reasonable period of time.

25        Notwithstanding any alleged cause, the debtor came to

1  this Court at the time of filing of this case with agreements

2  from counsel representing a substantial majority of claimants,

3  and that those claimants would recommend that their clients --

4  I'm sorry, that those lawyers would recommend that those

5  claimants would vote in support of the plan.  So it's that

6  committed support of counsel on the petition date that

7  reasonably justifies the debtors' alleged bad faith in filing

8  and confirmation of that plan is a cure.

9        As this Court knows, to successfully confirm a plan

10 in this case, the debtor needs to obtain support from more than

11 75 percent of all outstanding claimants.  The ad hoc committee

12 submits that, based on the evidence received in this trial,

13 getting to a 75-percent positive vote is reasonably likely, and

14 the schedule permits it in a reasonable amount of time.

15       Once such an outcome is secured with a super majority

16 of all affected claimants voting in favor of the deal, there

17 will be no room left to crush the debtors' motive in this case

18 and alleged deficiencies in the filing would be cured.  Indeed,

19 Your Honor, at that point, the vast majority of claimants will

20 have themselves consented to a cure of any alleged bad faith in

21 the debtors' filing and the women, the victims, can finally and

22 fairly be on their way to being compensated, and future

23 claimants will not suffer the uncertainty and delay of

24 resolving claims in the tort system for decades to come.

25       For all of these reasons, we submit that the evidence

1    adduced at trial demonstrates an absolute proper purpose for

2    being here, and also satisfies firmly the requirements of

3    1112(b)(2).

4              On a more fundamental policy level, Your Honor, you

5    shouldn't dismiss this case; you should let the plan process

6    play out.  As I said at the outset, the debtor filed this

7    petition consistent with the purpose and text of 524(g), which

8    Congress itself created so that, in the worlds of Senator

9    Graham in 1994, debtors and third parties who are alleged to be

10   liable for asbestos claims would be encouraged to participate

11   in a system that will maximize the assets available to pay

12   asbestos claims, present and future, and provide for an

13   equitable distribution and method of payment.

14             That's the legislative history you find behind

15   524(g).  Relying on that provision is an absolute proper

16   purpose of bankruptcy.  It's also a proper purpose to

17   consolidate claims and administer them through the explicit

18   provisions of the Code designed exclusively for cases like this

19   one.

20             Let's return for a moment to Mr. Onder's goals:  to

21   compensate present victims, and ensure that their daughters and

22   granddaughters also have access to immediate compensation in

23   the awful event that they too suffer injuries in the future.

24   This process, the one before you, Your Honor, is the only

25   process that meets these noble goals on behalf of all

1  claimants.

2          Your Honor, I know you believe in the power of the

3  Chapter 11 process and the myriad benefits it brings, so many

4  of which are on display in this case.  Those benefits are why

5  this case should remain here and why the motions to dismiss

6  should be denied.  If there's a court that's going to dismiss

7  this case, let it be the Third Circuit, Your Honor.  Let that

8  court look freshly upon the settlement and directly into the

9  eyes of the near 60,000 claimants represented by my clients

10  and, if they're so inclined, let the Third Circuit tell those

11  claimants they have to return to a process where they will not

12  receive justice because it will be delayed and, thus, denied.

13          Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Hansen.

15          All right.  Welcome back, Mr. Jonas.

16  *      MR. JONAS:  Thank you, Your Honor, I appreciate it.

17  I'll be relatively brief, I hope.

18          Your Honor, I forgot earlier to compliment my

19  adversary Mr. Gordon.  I'm always amazed because he's a very,

20  very smart guy, to be able to come up here with responses to

21  the facts that I think we've proven here and truly make it seem

22  convincing.  Sometimes, I have to check myself.

23          I also take it as a compliment that he spent so much

24  time on frustration of purpose, which proves they know this is

25  a weak link which causes the entire case to fail.

1            Their overall approach seems to be, better to ask for

2       forgiveness, not permission.  What I mean by that, in our view,

3       they improperly terminate the funding agreement, but now they

4       say, don't worry, now we have a new one.  They filed the case

5       in bad faith, but they say, don't worry, we have a plan.  I

6       don't think that's the way this should be done.

7            We heard lots of discussion, many slides, about --

8       and we heard Mr. Hansen --  about the settlement with certain

9       plaintiffs' lawyers and the proposed plan.  Respectfully, Your

10      Honor, I think it's largely, largely irrelevant, as was Mr.

11      Haas's video, except I think the only part of which it might be

12      relevant is with respect to 1112(b)(2), which I'll get to in a

13      minute.

14           First, termination of the first funding agreement.

15      Your Honor, there was no response -- they went to great length

16      to respond, there was no response to the board not being told

17      about what was happening for six to eight weeks, and almost

18      immediately before the filing.  There was no response to there

19      being no negotiation at all between those two parties.  There

20      was no response to there being no push-back against J&J; there

21      was no response to the fact that there was no analysis done as

22      to the merits, the legal weight or ability or chances of

23      success with respect to the issues; there was no response with

24      respect to the fact that there were no other options considered

25      at all; there was no response to what happened being a non-

1    ordinary course transaction, which it was in large part; and

2    there was no response to the board breaching its fiduciary

3    duties.

4          That's what I mean, Your Honor, by being under the

5    cover of darkness and being nefarious, it was.  The facts as

6    I've outlined, to which there was no response, that's what I

7    mean by under the cover of darkness and nefarious.

8          There also, Your Honor, was no real answer to the

9    language of the funding agreement that says that it's available

10   in and outside of bankruptcy.  I know Mr. Gordon tried, but I

11   did not hear really an answer to respond to that.

12         And, Your Honor, I learned now why it's great to have

13   only employees -- and we warned of this in the first bankruptcy

14   case -- it's great to have only employees, your employees, on

15   all sides of a transaction because, when you get in a pinch and

16   you need something to be said, you've got an employee

17   available, Mr. Dickinson.  He sat here and he said -- and

18   you'll decide whether you think it's credible or believable, I

19   don't -- he said he thought the intent of the first funding

20   agreement was to only be available in bankruptcy.  Your Honor,

21   respectfully, Mr. Dickinson and Wuestoff seem like very nice

22   men, but I think it's obvious -- and I hope it's obvious to

23   you, the most important person -- I think it's obvious to most

24   in this courtroom that they're barely paying attention and they

25   do what they're told.

1          Your Honor, I think it's intellectual dishonesty to

2   say that, oh, we can terminate the funding agreement because

3   this is an integrated transaction.  And we're not getting the

4   benefit of bankruptcy, which is part of the integrated

5   transaction, so we're off the hook on the funding agreement.

6   Well, where was my debtor, LTL, why didn't they say, oh, okay,

7   you're out of the funding agreement?  Well, you remember when I

8   took on and you dumped the talc liabilities on me?  What I got

9   for doing that was the funding agreement.  So, if you're going

10  to take away my funding agreement, take back the talc

11  liabilities, or at least take the position they're not liable

12  for the talc liabilities.  Why didn't that happen?  Where's the

13  discussion of that?

14          Your Honor, the Third Circuit was clear, quote,

15  "Financial distress must not only be apparent, but it must be

16  immediate enough to justify a filing.  An attenuated

17  possibility, standing alone, that a debtor may have to file for

18  bankruptcy in the future does not establish good faith."

19          So let's talk about it, the evidence.  The evidence

20  from the fact witnesses -- not the experts hired after the fact

21  to backfill, fact witnesses -- ten trials per year at $5

22  million per trial.  One hundred and twenty to two hundred and

23  forty -- and I think there's some confusion over this, Your

24  Honor, as to whether the 120 to 240 million includes the 50

25  million for trials or not.  Frankly, from my point of view, it

1  doesn't really matter.  The evidence is 120 to $240 million in

2  defense costs.  Those are the facts.

3          The only way they could get to -- that Mr. Mullin got

4  where he needed to go, on which Mr. Bell relied, was to assume

5  100 trials per year, a 1,000 percent increase, and a 250

6  percent increase on the annual other defense costs.

7          Your Honor, that's the end of that story.  There's no

8  basis to accept any of the numbers of Mr. Mullin or Mr. Bell,

9  but we're willing to accept them.  Why?  Because, even if you

10 accept those numbers, there's no financial distress.  You have

11 -- on the one hand, you have now $1.3 billion in cash, you have

12 $30 billion of assets, which Mr. Bell said, at liquidation

13 value, is $22.7 billion.

14         And it's not our debtor's concern what happens to

15 HoldCo.  If they made a contract -- if HoldCo has to liquidate

16 tomorrow and turn over $22.7 billion to LTL, that's great.

17 That's not our concern.  We could take the $22.7 billion

18 tomorrow, we can satisfy, according to Mr. Bell -- which I

19 don't accept, as you know -- Mr. Bell said the total talc

20 liabilities are 11 billion, which he says are above

21 expectations -- Mullin, sorry, but he says the talc liabilities

22 are 11 to $20 billion.

23         One comment on that, Your Honor.  The talc liability

24 numbers seem to be whatever is convenient to J&J.  In the first

25 trial, it was two billion.  They funded two billion into a QSF

1    and they said that's all we need, two billion, that's what the

2    talc liability is.

3           Then we heard from Mr. Wuestoff, who they say was

4    confused, but I asked at his deposition four times, I asked him

5    on the stand a few times, he says it's between zero and 8.9

6    billion.  Now we hear from their experts, who say it's 11 to 20

7    billion.

8           So, what is it?  But it doesn't matter because under

9    any of those scenarios there's enough assets and enough cash

10   flow even in the short term to satisfy the tort liabilities.

11          So a few odds and ends before I get to 1112(b).

12          Mr. Gordon made much of our -- or alleged that we

13   were arguing or Mr. Burian was arguing J&J alter egos and you

14   can't expect J&J to -- they're independent.  I have to say,

15   Your Honor, if I was sitting here and I was a settling

16   plaintiffs' lawyer, I'd be awful concerned because what they're

17   saying is, it's basically a veiled threat that J&J, after

18   putting HoldCo in place to support LTL for the benefit of talc

19   claimants, they're going to leave it bereft.  Oh, they're going

20   -- if they can't get the dividends there, they won't; if they

21   can't repay a loan, they won't.  They're independent, there's

22   no alter ego, there's no nothing.  J&J has no obligation to

23   support HoldCo.  Well, that's the entity that's there to

24   support LTL.

25          So I guess my point is, Your Honor, I think that -- I

1  don't think the alter ego argument -- well, frankly, I don't

2  even think we really were making it, I just think it's a non

3  sequitur; I do think it is cause for concern.

4          I'd also say that in terms of financial support --

5  again, remember, there's a $1.8 billion dividend in '22, there

6  is a $1.8 billion dividend in '23, $912 million was paid last

7  week.  It's another example, Your Honor.  We get a report ten

8  days ago, two weeks ago from Mr. Bell, and of course it suited

9  him.  He made much about concern about dividends getting paid.

10 Well, that suited them because they wanted to show there's

11 going to be cash flow problems, there's going to be financial

12 distress, you can't count on that.  Lo and behold, a week

13 later, a billion dollars shows up, proving partly what we're

14 saying, which there is cash flow, there are billions of dollars

15 of dividends, and they're going to get paid.

16         Your Honor, I think my last point, 1112(b)(2).

17 Really, this is the only relevance, in my opinion, of much of

18 what -- much of the closing and Mr. Hansen's closing spent on

19 we have a plan, we have support, the plan is going to be well-

20 funded and, therefore, we should stay in bankruptcy.

21         Your Honor, as I've said, 1112(b)(2) is a narrow

22 exception; it can't excuse lack of good faith, it can't excuse

23 a lack of financial distress.

24         Your Honor, if you do this and if you look at the

25 cases, as I said earlier, the cases are for technical mistakes

169

1 or things of the like, they're certainly not for something like

2 this, and you doing this will really be -- you'll be one of the

3 first Bankruptcy Judges to open the door, which effectively

4 could allow the exception to swallow the rule.  I think that's

5 dangerous.

6       We heard Mr. Hansen that the Court should let people

7 vote, don't delay justice, a parade of horribles about future

8 claims, but if this case was filed in bad faith, including

9 because it is based on a fraud, that being the insider

10 termination of the first funding agreement, yes, under the

11 cover of darkness, to the detriment of creditors; and, second,

12 the fact that there is no financial distress and if that's --

13 that can't be cured, that's not a basis -- no matter what

14 support there is for a plan, no matter how great a plan, that's

15 not a basis on which to overcome those infirmities.

16       And the ends, as described, really should not justify

17 the means.  The case should be dismissed, Your Honor.

18       And, last, I just want to do a little bit of a

19 reality check because I think sometimes we get lost in the

20 weeds of people talking about what's going to happen and the

21 horrors of being in the tort system.  Well, from what I learned

22 here at this trial, if this case is dismissed, it will go back

23 to the MDL, and the odds tell us, the odds tell us, there's a

24 98-percent chance that it will settle.  Of course, J&J would

25 rather be here where it perceives it can best cap its talc

1  liability and control the outcome.  It's all about control and

2  leverage.

3            And, frankly, from what I saw and I think you saw,

4  Mr. Haas is used to being in control, he demands it, but the

5  law requires that this case be dismissed and maybe victims

6  finally get some leverage themselves, which might be exactly

7  what is needed for a resolution.  Maybe J&J will have to pay a

8  little more.

9            But please, Your Honor, let the system work.  Don't

10 put your thumb on the scale, we believe improperly, we believe

11 ultimately the Third Circuit would find it to be improper, and

12 we ask that you, please, Your Honor, allow the TCC's motion and

13 dismiss this case.

14           Thank you.

15           THE COURT:  Thank you, Mr. Jonas.

16           Mr. Maimon.

17 *         MR. MAIMON:  Thank you, Your Honor.

18           THE COURT:  I'm impressed, rebuttal PowerPoints.

19                        (Laughter)

20           MR. MAIMON:  I'd like to start, Your Honor, I'd like

21 -- sometime I'll explain --

22                        (Laughter)

23           MR. MAIMON:  I'd like to start with some of the

24 criticism that debtors' counsel lodged at us.  The TCC didn't

25 show you this, the TCC didn't show you that; the claimants'

1  counsel didn't do this, the claimants' counsel didn't do that.

2  It's not our burden.

3        The Third Circuit makes it very clear, once at issue,

4  the burden to establish good fath is on the debtor and,

5  therefore, Your Honor, it wasn't up to Mr. Burian to do

6  anything to prove their case.

7        And an hour ago -- it's a little more because we had

8  that little outburst and we had a little break -- an hour ago

9  he stood up and said the funding agreement had no purpose

10 outside of bankruptcy.  Well, his own client contradicted that.

11 His own client, the president of LTL -- if you're going to

12 indulge the fiction that LTL is an independent company and Mr.

13 Wuestoff is not just another stooge of the corporate executives

14 who have no integrity at J&J -- he understood that it obligated

15 J&J whether or not inside or outside of bankruptcy, that J&J

16 was a payor in or out of bankruptcy, and that before he signed

17 it, before he signed it, he made sure that it was in place

18 because he believed, at least he said he did, that he had the

19 independence to vote no and would still have the funding

20 agreement.

21        Second, this whole idea that they're not in financial

22 distress.  We went through this earlier, but here's the

23 important point.  Mr. Ruckdeschel explained to Your Honor that

24 Dr. Mullin's numbers are games to come up with the worst-case

25 scenario projections.  And Mr. Gordon criticizes him saying,

1  no, you've got it wrong, it's not the PSAs -- plaintiffs whose

2  cases are being settled, Mr. Ruckdeschel, but just take a look.

3  Under his scenario number 3, on the bottom, settling or varying

4  cancer claims, 100 percent of claimants represented by law

5  firms with PSAs.  It's easy if you make up a PowerPoint where

6  you insert the words, as opposed to having what your expert

7  actually said to misrepresent it.

8         More.  Mr. Bell, $22.7 billion was his discounted

9  number.  It's not that he had a number that had to be further

10 discounted.  Twenty two point seven billion dollars.

11        Mr. Jonas just said, it's a moving target with this

12 company depending on what's convenient.  Is the liability two

13 billion?  Is it 8.2 billion?  Or actually is it what Mr. Kim,

14 the chief legal officer, under penalty by the Bankruptcy Code,

15 attested to on the petition for bankruptcy here that it's one

16 to $10 billion.

17        And when that doesn't work because when they go to

18 Mr. Bell and say we need to know from you what you're going to

19 say we have available to pay, and he says, well, worst day in

20 the world, you have to liquidate everything at a discount,

21 you've got $22.7 billion.  Then they backtrack on everything

22 else and got Dr. Mullin with absurd and unsupported,

23 hypothetical worst-case scenario, one hundred trials a year,

24 250 times of percent of an -- of the costs, that's the way they

25 get around what their own officers have done.  They are on the

1  second -- two-yard line, but they're on their own two-yard line

2  because they are not in financial distress.

3        The entire purpose of this bankruptcy is for J&J to

4  solve its talc problem.  That's why you have Mr. Haas giving

5  the last word, he's in-house counsel for J&J.  He may have made

6  an appearance, but that's who pays his salary.  When Mr. Watts

7  went to negotiate, he didn't go to negotiate with a litigation

8  counsel in the bankruptcy, he went to in-house counsel at J&J

9  who holds the purse strings, who holds the strategy, who Mr.

10  Kim acknowledged that the strategy of litigation comes from

11  J&J.

12        The motions to dismiss.  Why -- I ask myself, why is

13  this a hard ask?  It seems so straightforward.  It seems

14  absurd, it seems so outrageous what's happened here.  Why is

15  this -- and I feel it's a hard ask, Your Honor; I'm honestly

16  telling you, I feel it's a hard ask.  Is it because Johnson &

17  Johnson is a corporate bully, with Mr. Haas disparaging lawyers

18  who represent their clients?

19        You know, we meet our clients in their homes, we

20  visit them in the hospital, we go to their funerals.  To say

21  that we're in conflict with our clients, that Mr. Sadderly, who

22  has taken verdict against verdict on behalf of his clients

23  against Johnson & Johnson, and Johnson & Johnson has settled

24  his claims sometimes, that he's in conflict with his clients?

25  That's absurd.

1           The rules don't apply to Johnson & Johnson, they

2    believe.  Why?  Your Honor ruled explicitly that the testimony

3    from Mr. Onder about liens is generic as far as how the liens

4    operate, that's what you were going to let it in for, and yet

5    you hear on argument from both the counsel, as well as the AHC

6    counsel, now let us tell you about this great settlement.

7           We'll put in at the appropriate what the settlement

8    term sheet is; it's not an agreement, it's not a settlement,

9    it's not with a hundred percent, it's not global, it's not the

10   government.  Medicare, Medicaid, the biggest insurers in this

11   country, are not part of the settlement, but we'll get there.

12          Is it to normalize the outrageous -- the outrageous

13   claim, this is the Circuit's fault?

14          Is it to dehumanize the victims?  I asked Mr. Mullin,

15   this what you're talking about, horizontal equity, it sounds

16   very, very highbrow.  Horizontal equity, that eliminates from a

17   jury's consideration of the individual circumstances of

18   specific, unique human beings.  That's correct, that's what

19   they want to do.  They want to make you just a number, they

20   want to make you just a statistic because, to J&J, when they

21   count their claims, when they count their votes, that's all

22   these people are.

23          He said -- you will have taken away their right to be

24   considered for their specific human characteristics and

25   situations?  And he said, if there is no jury option trial

1  available, that would be correct.  That is what they're trying

2  to do here.

3            Your Honor asked Dr. Rave, what about the fact that

4  only three percent actually go back to trial?  What about the

5  fact that most people don't try their cases?  Is it just the

6  Seventh Amendment?  And he answered Your Honor -- and I think

7  this is at the core -- he said it's more than just a trial

8  right, it's the right to decide what to do with your case.

9  They talk -- let the people vote, let our clients have their

10  choices.  If they don't want to settle, don't force them to.

11  Do not take away their rights.  They have the right to choose,

12  for the parties to choose.

13            And you know what J&J did before they filed this

14  bankruptcy?  They settled 15 percent of their cases in the tort

15  system.  There were 6800 settlements, according to Dr. Mullin,

16  and at the time of the filing of this case there were

17  approximately 40,000 pending cases.  I just did the math on my

18  phone, that's 15 percent.  They're able to settle these cases,

19  if they want to.  It's that the corporate bully wants to draw a

20  line in the sand and say my way or the highway, and that's

21  wrong.

22            And so the entire premise of the J&J bankruptcy is

23  its sense of entitlement to a global resolution.  And yet I

24  asked Ms. Birnbaum, we have the right to vote, we don't take

25  that away because a majority of people don't vote.  Where in

1    the Constitution is the right for a company to have a global

2    resolution of its liabilities?  There is no such thing and yet

3    that's all you hear, that's the bankruptcy purpose here to have

4    a global resolution.

5           LTL is the J&J, by its architect, who you heard wants

6    to have the last word, Erik Haas, is its strategy for a final

7    global resolution of its talc problem.

8           And so I asked Ms. Birnbaum, who talked all about

9    global resolution, this is the only place that you could do

10   global resolution -- global resolution was the most common

11   phrase in her entire testimony -- and I say, is it okay to do

12   away with the Seventh Amendment and due process rights of a

13   minority of present cancer victims, even if you assume that

14   we're in the minority, and all future cancer victims through a

15   bankruptcy just because global resolution can be achieved?  And

16   she said she wouldn't agree one way or the other.  That is the

17   expert that Johnson & Johnson brought before Your Honor.

18          Make no mistake about it, they seek to exterminate

19   the Seventh Amendment and due process rights of untold future

20   cancer victims without their consent.  Somebody who gets cancer

21   four years from now, they don't want them to have a choice.

22   They're clambering, let people vote, what about the future

23   victims that you have taken away their voice, you have taken

24   away their rights?

25          And it says it's okay because it believes that only a

177

1 minority of the current victims object.  How many does it take

2 to make it wrong?  They said, oh, they only have 25,000.  Is

3 one too many?  Ten?  Twenty five thousand?  What percent makes

4 it okay to do this injustice?  The worst atrocities in our

5 history have been because they're only a minority, we shouldn't

6 continue that.

7        The motion to dismiss, why is it so hard?  Why is

8 this such a hard ask?

9        I'll complete my presentation with this.  We've heard

10 about good intentions, the Circuit spoke about good intentions.

11 I'm not speaking about their good intentions because I don't

12 credit them.  I'm speaking about the Court's good intentions.

13       We've spent a long time over the last several days

14 together, I've read Your Honor's opinions closely.  I know that

15 Your Honor, when Your Honor issued the denial of the first

16 motion to dismiss, when Your Honor issued the first preliminary

17 injunction, when Your Honor refused *sua sponte* in the beginning

18 of this case to dismiss, and when Your Honor kept the automatic

19 stay as to LTL and kept a limited preliminary injunction as to

20 others, I know that Your Honor had good intentions, I know that

21 Your Honor had the best intentions in mind.  Those good

22 intentions, however, cannot cure the bad faith filing, those

23 good intentions cannot cure the lack of financial distress.

24       And I was thinking, how would I be, having traveled

25 down this road so far and having been cognizant and struggling

1   with the impact on these people by my decisions, if I were in

2   your chair, how would I feel that, right now, how easy is it to

3   get off that road?  And I'll admit to Your Honor, I don't know

4   that I could get off the road.  And I was thinking, so what

5   gives me hope?  What gives me hope in this case?  Actually, it

6   was your suggestion.

7          Over the lunch break, I went downstairs and I looked

8   into those cabinets, and what I saw was tremendous, what I saw

9   was amazing.  And what most struck me was the former U.S.

10  Trustee Mr. Leonard, and he said I've always been fascinated by

11  the fact that somebody got into trouble and there's a way to

12  get out for those who deserve it, by the way, not for the

13  characters who just did it to abuse the system.  That, Your

14  Honor, is the legacy that I think you were pointing us to to go

15  look at.

16         You are the guardian, as Chief of the Bankruptcy

17  Court, to that honorable legacy.  As I told you, I don't know

18  if I could get off the road traveled thus far by Your Honor,

19  but I humbly and respectfully ask Your Honor to be better than

20  I could be, to uphold the honorable legacy of this Court, to

21  stop the half-trillion-dollar bully and its abuse of the

22  system, and to uphold the rule of law, Your Honor, please

23  dismiss this case.

24         THE COURT:  Thank you, Mr. Maimon.

25         Are we done?

1            UNIDENTIFIED COUNSEL:  I think so.

2            THE COURT:  Wow.  All right.  Well, then we will

3    close the record and close the proceedings.

4            I will await your submissions.  I assume you'll

5    address the exhibit lists.

6            UNIDENTIFIED COUNSEL:  We will.

7            THE COURT:  Is there anything --

8            UNIDENTIFIED COUNSEL:  Just one second.

9            MR. JONAS:  Your Honor, we're just wondering about

10   the timing of the submissions.

11           THE COURT:  I thought it had been stipulated.

12           UNIDENTIFIED COUNSEL:  No, I think we have a date --

13   yeah, we have a date, we have a date.

14           THE COURT:  Yeah.  I think they're due by July 19th

15   or so?

16           UNIDENTIFIED COUNSEL:  Correct.

17           MR. JONAS:  May I just ask --

18           THE COURT:  Sure.

19           MR. JONAS:  -- it just came up in the Aearo case

20   where the judge had us submit proposed findings and conclusions

21   of law off the record, so to speak, he asked for them to just

22   be submitted to chambers without going on the docket, so that

23   he could use them to form -- you know, take pieces and whatnot,

24   and I just was wondering, I want to be sure --

25           THE COURT:  I don't have a practice as that --

1          MR. JONAS:  Okay, we'll do whatever you like, but --

2          THE COURT:  You can -- it would be helpful if you

3    want to submit it -- file it the normal way --

4          MR. JONAS:  Okay.

5          THE COURT:  -- submit it in Word --

6          MR. JONAS:  Okay.

7          THE COURT:  -- to us in chambers, in case I want to

8    make use --

9          MR. JONAS:  Okay, we'll do that, Your Honor.

10          THE COURT:  -- if I need any of your stuff.

11                         (Laughter)

12          MR. JONAS:  I wasn't suggesting that you find --

13          THE COURT:  But just make sure -- I mean, obviously,

14    whatever is privileged continues --

15          MR. JONAS:  Yes.  Thank you, Your Honor.

16          THE COURT:  -- and redact, if necessary, and all of

17    that.

18          MR. JONAS:  Okay.  Thank you, Your Honor.

19          THE COURT:  Otherwise, I want to thank you all --

20    oops, Mr. Malone.

21          MR. MALONE:  It's more of a request.  Any of the

22    slide decks that are submitted to chambers, could they be

23    distributed to counsel of record, Your Honor?

24          THE COURT:  I have no problem with that, exchange it

25    all.

1          Once again -- it seems like we did this a year and a

2     half ago -- thank you all for your efforts, your

3     professionalism, your cordiality.  Thank you for cleaning up

4     after yourselves.

5                              (Laughter)

6          THE COURT:  And I appreciate, you know, I think -- I

7     won't say the world, but we have a lot of people watching and I

8     think you all did very good to show how the system works, and I

9     appreciate your efforts.

10         Take care.  Have a good holiday weekend.

11         ALL:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13                          *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

182

1
# C E R T I F I C A T I O N

2          We, DIPTI PATEL, KAREN WATSON, and TRACEY WILLIAMS,

3    court approved transcribers, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of our ability.

7

8    /s/ Dipti Patel

9    DIPTI PATEL

10

11   /s/ Karen Watson

12   KAREN WATSON

13

14   /s/ Tracey Williams

15   TRACEY WILLIAMS

16   J&J COURT TRANSCRIBERS, INC.          DATE:  July 7, 2023

17

18

19

20

21

22

23

24

25