# EXHIBIT M

# Trust Distribution Procedures

## TRUST DISTRIBUTION PROCEDURES

### Table of Contents

**Page**

Article 1 INTRODUCTION & OVERVIEW ................................................................ - 1 -

    1.1    Purpose ................................................................................................ - 1 -

    1.2    Interpretation ....................................................................................... - 1 -

    1.3    Exclusivity ........................................................................................... - 1 -

    1.4    General Principles ................................................................................ - 1 -

Article 2 INTERPRETATION & DEFINITIONS ..................................................... - 2 -

    2.1    Pan and Confirmation Order Control ................................................. - 2 -

    2.2    Incorporation of Plan Definitions; Interpretation ............................... - 2 -

    2.3    Definitions ........................................................................................... - 2 -

Article 3 TDP ADMINISTRATION ........................................................................ - ~~11~~12 -

    3.1      General Administration .................................................................. - ~~11~~12 -

        3.1.1      Coordination of Trustees, Claims Administrator & Claims Processor ..... - ~~11~~12 -

        3.1.2      Preparation of and Deadline for Distribution of ~~Trust Rules and~~ Submission Procedures - ~~11~~12 -

        3.1.3      Consent & Consultation ~~with the Payor, the TAC, and the FCR~~<u>Requirements</u> - ~~12~~13 -

    3.2      Appropriateness of Costs .............................................................. - ~~12~~13 -

    3.3      Lien Resolution .............................................................................. - ~~13~~14 -

        3.3.1      In General ........................................................................... - ~~13~~14 -

        3.3.2      Procedures .......................................................................... - ~~13~~14 -

    3.4      Trust Disclosure of Information .................................................... - ~~14~~15 -

    3.5      Notice Requirements ..................................................................... - ~~14~~15 -

    3.6      Auditing ......................................................................................... - ~~15~~16 -

        3.6.1      Cross-Trust Audit Program ............................................... - ~~15~~16 -

        3.6.2      Claims Audit Program ....................................................... - ~~16~~17 -

        3.6.3      Consequences of Audit Programs ...................................... - ~~16~~17 -

Article 4 INDIVIDUAL CLAIMS ALLOWANCE PROCESS ................................ - ~~17~~18 -

    4.1      General Principles ......................................................................... - ~~17~~18 -

        4.1.1      Recovery Only With Respect to a Single Individual Claim .... - ~~17~~18 -

        4.1.2      Treatment of Individual Claims Previously Resolved ......... - 18 -

i

LTL II TDP

4.2      Submission Deadlines ............................................................... - ~~19~~20 -

4.2.1      Deadline to Submit Existing ~~Individual~~ Claims to Trust ............... - ~~19~~20 -

4.2.2   Effect of Statutes of Limitations and Repose ..................... - 20 -

4.3      Submission Procedures ........................................................... - 21 -

4.3.1   FIFO Processing Queue ........................................................ - 21 -

4.3.2   Withdrawal of Submitted Claims ....................................... - ~~21~~22 -

4.3.3   Deferral of Submitted Claims ............................................ - 22 -

4.3.4   Non-Responsive Individual Claimants .............................. - ~~22~~23 -

4.3.5   Submission Requirements .................................................. - ~~22~~23 -

4.3.6   Disallowed Claims .............................................................. - ~~24~~25 -

4.4      Claim Evaluation Procedures ................................................ - 25 -

4.4.1   FIFO Processing .................................................................. - 25 -

4.4.2   Preliminary Evaluation of Claim Submissions ................. - 25 -

4.4.3   General Principles for Evaluation of Confirmed Claims ... - 26 -

4.4.4   Standard Qualification Evaluation Process ....................... - 27 -

4.4.5   Accelerated Evaluation Process ........................................ - ~~28~~29 -

Article 5 VALUATION OF ALLOWED CLAIMS ................................... - ~~29~~30 -

5.1      In General ............................................................................... - 30 -

5.2      Determination of Scheduled Values for Qualifying Claims ... - 30 -

5.2.1   Qualifying Ovarian Cancer Claims ................................... - 30 -

5.2.2   Qualifying Mesothelioma Claims ...................................... - 35 -

5.3      ~~Scheduled Values~~Allowed Claim Amounts for Approved Accelerated Claims - ~~39~~38 -

5.3.1   Individual Claims Which Could Have Appropriately Elected to Proceed Under the Standard Qualification Evaluation Process .......................... - ~~39~~38 -

5.3.2   Canadian Claims ................................................................. - ~~39~~38 -

5.3.3   Other Allegedly Talc-Related Diseases ............................. - ~~39~~38 -

Article 6 RECONSIDERATION REQUESTS & ADR PROCEDURES ....... - 39 -

6.1      Reconsideration of Determination ......................................... - 39 -

6.1.1   Requirements for Reconsideration Requests ..................... - 39 -

6.1.2   Forfeiture of Right to Request Reconsideration ................ - ~~40~~39 -

6.1.3   Failure to Request Reconsideration Deemed Acceptance .. - ~~40~~39 -

6.1.4   Reconsideration Request Procedures ................................. - ~~40~~39 -

6.2      ~~Post-Reconsideration~~ADR Procedures. ................................ - ~~41~~40 -

~~LTL II TDP~~

6.3          ~~Post-Reconsideration~~ Litigation .................................................... - ~~42~~41 -

Article 7 INDIVIDUAL CLAIMS PAYMENT PROCESS .................................. - ~~43~~42 -

7.1          Points-Based Monetary Values .......................................... - ~~43~~42 -

7.1.1    Uncertainty of Debtor's Talc Liabilities .......................... - ~~43~~42 -

7.1.2    Description & Application of Points Valuation System .......... - ~~43~~42 -

7.2          General Guidelines for Liquidating & Paying Allowed Claims ...... - ~~45~~44 -

7.2.1    Documentation Requirements ...................................... - ~~45~~44 -

7.2.2    Offsets ................................................................ - ~~46~~44 -

7.3          Payment of Claims .......................................................... - ~~46~~45 -

7.3.1    Allowed Claim Amounts Held in Escrow ........................ - ~~46~~45 -

7.3.2    Payment of Allowed Claims ........................................ - ~~47~~45 -

7.4          Payment Processing ........................................................ - ~~47~~45 -

7.4.1    FIFO Payment Processing .......................................... - ~~47~~45 -

7.4.2    Discretion to Vary the Order & Amounts of Payments in Event of Limited
Liquidity ............................................................................... - ~~47~~46 -

7.5          Punitive Damages .......................................................... - ~~48~~46 -

Article 8 RESOLUTION OF GOVERNMENTAL ACTION CLAIMS .................. - ~~49~~47 -

8.1          Governmental Action Claims Are Subject to These TDP ............ - ~~49~~47 -

8.2          Settlement Offer and Negotiations ...................................... - ~~49~~47 -

8.3          Mediation ..................................................................... - ~~49~~47 -

8.4          Arbitration .................................................................... - ~~50~~58 -

8.5          Litigation ..................................................................... - ~~50~~49 -

8.6          Payment of Settlement Amount, Arbitration Award, and Judgment ...... - ~~51~~49 -

8.6.1    Payment Upon Final Determination .............................. - ~~51~~49 -

8.6.2    Initial Payment Percentage ........................................ - ~~51~~49 -

8.6.3    Supplemental Payment Percentage ............................... - ~~51~~49 -

8.6.4    Release ................................................................ - ~~52~~50 -

8.6.5    FIFO Claims Processing Queuing .................................. - ~~52~~50 -

8.7          ~~Statute~~Statutes of Limitations & Repose .............................. - ~~52~~50 -

Article 9 RESOLUTION OF INDIRECT DERIVATIVE TALC PERSONAL INJURY CLAIMS
- 50 -

9.1          Indirect Derivative Talc Personal Injury Claims ...................... - 50 -

9.2          Offset .......................................................................... - 52 -

9.3          Court Review ................................................................. - 52 -

~~LTL II TDP~~

9.4        Non-Resposive Indirect Derivative Talc Personal Injury Claimants        - 52 -

Article ~~9~~10  MISCELLANEOUS ................................................................................. - 53 -

~~9.1~~10.1        Non-Binding Effect of Trust and/or Litigation Outcome ................ - 53 -

~~9.2~~10.2        Independence of Trust ................................................................ - 53 -

~~9.3~~10.3        Amendments ................................................................................ - 53 -

~~9.4~~10.4        Severability ................................................................................ - 53 -

~~9.5~~10.5   Governing Law ...... - 53 -

LTL II TDP

**TRUST DISTRIBUTION PROCEDURES**

The Trust Distribution Procedures (hereafter "**TDP**") contained herein provide the means for resolving all Talc Personal Injury Claims, including Individual Claims, Indirect Derivative Talc Personal Injury Claims, TPP Lien Claims, and Governmental Action Claims, as provided in and required by the Plan and the Talc Personal Injury Trust Agreement (the "**Trust Agreement**").

The Plan and the Trust Agreement establish the Talc Personal Injury Trust (the "**Trust**"). The trustee(s) of the Trust (the "**Trustees**") shall implement and administer these TDP in accordance with the Trust Agreement.

**Article 1**
**INTRODUCTION & OVERVIEW**

**1.1    Purpose**

These TDP have been adopted pursuant to the Plan and Trust Agreement and are intended to provide reasonable assurance that the Trust will evaluate, value, and pay Talc Personal Injury Claims that involve similar claims in substantially the same manner, and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code.  To achieve this goal, these TDP set forth procedures for processing, evaluating, resolving, and paying (as appropriate) Individual Claims through either the Standard Qualification Evaluation Process or the Accelerated Evaluation Process described herein, and for liquidating and paying Indirect Talc Personal Injury Claims, including Governmental Action Claims.  These TDP are designed to be consistent with characteristics known to be relevant to the valuation of Talc Personal Injury Claims in the tort system, including disease type and age at diagnosis, and/or the theories promulgated by plaintiffs' experts in the MDL, including time since last talc use.

**1.2    Interpretation**

Except as expressly provided below, nothing in these TDP shall be deemed to create a substantive right for the holder of any Talc Personal Injury Claim.  To the extent these TDP provide certain rights and benefits to holders of Talc Personal Injury Claims, such rights and benefits shall vest in such holders as of the Effective Date.

**1.3    Exclusivity**

These TDP and any related procedures set forth or designated herein shall be the sole and exclusive method by which a Person may seek allowance and distribution on a Talc Personal Injury Claim.

**1.4    General Principles**

These TDP are founded on the following principles:

LTL II TDP

1)      The efficient resolution of all Talc Personal Injury Claims and equitable valuation of all similarly situated Talc Personal Injury Claims;

2)      Clear and objective qualification and valuation criteria;

3)      Clear and reliable evidentiary requirements;

4)      A rigorous review and evaluation process requiring the Trustees to determine the appropriate Scheduled Values for Individual Claims in accordance with these TDP and applicable law;

5)      Independence of the Trust and the Trustees;

6)      Administrative transparency; and

7)      Fraud detection and prevention.

**Article 2**
**INTERPRETATION & DEFINITIONS**

**2.1      Plan and Confirmation Order Control**

Except as set forth in Section 2.2 below, the terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

**2.2      Incorporation of Plan Definitions; Interpretation**

Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Trust Agreement, and such definitions are incorporated by reference herein. Terms defined in the singular shall include the plural, and vice versa. To the extent a term is defined in these TDP, as well as in the Plan and/or the Trust Agreement, the definition contained in these TDP shall control. For purposes of these TDP, "includes" and "including" are not limiting.

**2.3      Definitions**

1. **"Accelerated Evaluation Process"** shall mean the claims evaluation process by which the Claims Administrator shall evaluate Confirmed Claims to determine whether they are Other Approved Claims and shall be allowed, as set forth in Section 4.4.5.

**1.**      2. **"Accelerated Claims Criteria"** shall mean the requirements set forth in Section 4.4.5, which a Confirmed Claim proceeding under the Accelerated Evaluation Process must satisfy in order to be deemed an Other Approved Claim.

~~LTL II TDP~~

2.  **"Accelerated Evaluation Process"** shall mean the claims evaluation process by which the Claims Administrator shall evaluate Confirmed Claims to determine whether they are Other Approved Claims, as set forth in Section 4.4.5.

3.  **"Acceptance and Release"** shall have the meaning set forth in Section 7.2.1(A).

4.  **"Adjusted Point Value"** shall ~~mean the Point Value of an Individual Claim after the Initial Point Value has been adjusted by the Diagnostic Adjustment, as~~have the meaning set forth in ~~Sections~~Section 5.2.1(B) ~~and~~or Section 5.2.2(B), as applicable.

5.  **"ADR Procedures"** shall mean the alternative dispute resolution procedures set forth in Section 6.2.

~~6. **"Allowed"** shall mean, with respect to Individual Claims, Indirect Talc Personal Injury Claims and Governmental Action Claims, that such claims have been determined to be appropriate for valuation under these TDP.~~

6.  ~~7.~~ **"Allowed Claim Amount"** shall mean the actual dollar value of an Allowed Claim~~, which is calculated~~ which, except as otherwise specified herein, is determined by multiplying the Cash Value of a Point by the Scheduled Value of the Allowed Claim, subject, in the case of an Allowed Claim of an Individual Claimant who is a Specified Insured Individual, to reduction pursuant to Section 3.3.

7.  ~~8.~~ **"Allowed ~~Claim(s)~~Claims"** shall mean all Qualifying Claims and Other Approved Claims, collectively.

8.  ~~9.~~ **"Allowed ~~Claimant(s)" shall mean Individual Claimants whose Submitted Claims are determined to be Allowed Claims~~Judgment Amount"** shall have the meaning set forth in Section 6.3.

9.  **"Auditor"** shall have the meaning set forth in Section 3.6.1.

10. **"Cash Value of a Point"** shall mean the dollar value assigned to a point by the Trustees.

~~11. **"Claimant's Jurisdiction"** shall mean either (a) the jurisdiction in which the Individual Claim was filed against the Debtor or any of its Affiliates in the tort system prior to the Petition Date or, (b) if the Individual Claim was not filed against the Debtor or any of its Affiliates in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the Individual Claimant resided on the Date of Diagnosis; (ii) the jurisdiction in which the Individual Claimant resides at the time he/she submits his/her Individual Claim to the Trust; or (iii) the principal jurisdiction in which the claimant engaged in Regular Use of J&J Talc Products.~~

11. **"Cash Value of a Point Adjustment Notice"** shall have the meaning set forth in Section 7.1.2(B).

12. **"Claim Materials"** shall mean any evidence and other materials submitted in support of Individual Claims, including the materials required pursuant to Section 4.3.5.

13. 12. **"Claim Submission"** shall mean an Individual Claimant's substantially complete submission to the Trust of all Claim Materials.

14. 13. **"Claim Submission Form"** shall mean the form developed and adopted by the Trustees, in concert with the Claims Administrator and the Claims Processor, and approved by the TAC and FCR, which Individual Claimants must complete and submit to the Trust pursuant to the Submission Procedures as set forth herein. The Claim Submission Form shall include, among other things, a requirement that the Individual Clamant elect whether to proceed under the standardStandard Qualification Evaluation Process or the Accelerated Evaluation Process, as well as an option for the Individual Claimant to elect to receive distributions made pursuant to these TDP through his/her retained counsel.

14. **"Claim Materials"** shall mean any evidence and other materials submitted in support of Individual Claims, including the materials required pursuant to Section 4.3.5.

15. **"Claimant Information"** shall have the meaning set forth in Section 4.3.5.

16. **"Claimant's Jurisdiction"** shall mean either (a) the jurisdiction in which the Individual Claim was filed against the Debtor and/or any LTL Corporate Party in the tort system prior to the Petition Date or (b) if the Individual Claim was not filed against the Debtor and/or any LTL Corporate Party in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the Individual Claimant  resided on the Date of Diagnosis; (ii) the jurisdiction in which the Individual Claimant resides at the time he/she submits his/her Individual Claim to the Trust; or (iii) the principal jurisdiction in which the claimant engaged in Regular Use of J&J Talc Products.

17. 15. **"Claims Administrator"** shall mean ARCHER Systems LLC and/or any other Talc Trust Claims Administrator subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP.

18. **"Claims Audit Program"** shall mean the audit program, if any, developed and implemented by the Guarantor pursuant to Section 3.6.2.

19. 16. **"Claims Processor"** shall mean Pattern Data, Inc., which shall be engaged by the Claims Administrator to assist in the development of procedures and protocols to implement these TDP effectively and efficiently.

LTL II TDP

**20.**   ~~17.~~ **"Common Benefit Fund"** shall mean the common benefit fund established pursuant to Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the MDL.

**21.**   ~~18.~~ **"Common Benefit Fund Obligations"** shall mean any common benefit fund obligations arising from the MDL, including obligations in respect of the Common Benefit Fund.

**22.**   ~~19.~~ **"Confirmation Order"** shall mean the order of the Bankruptcy Court and the District Court acting jointly or the order of the District Court affirming an order entered separately by the Bankruptcy Court, in either case which order confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

**23.**   ~~20.~~ **"Confirmed Claim"** shall mean ~~a~~any Submitted Claim which the Claims Administrator determines has satisfied the Preliminary Evaluation Criteria.

~~21. "Claims Audit Program"~~ ~~shall mean the audit program~~ ~~adopted and implemented by the Trust pursuant to Section~~ 3.6.2.

**24.**   ~~22.~~ **"Cross-Trust Audit Program"** shall mean the audit program ~~adopted~~developed and implemented by the Trust pursuant to Section 3.6.1.

**25.**   ~~23.~~ **"Date of Diagnosis"** shall mean the date on which an Individual Claimant received the original pathologic diagnosis that is the basis of his/her Individual Claim.

**26.**   **"Deferral Request"** shall have the meaning set forth in Section 4.3.3.

**27.**   ~~24.~~ **"Diagnostic Adjustment"** shall mean the percentage by which the Initial Point Value is to be adjusted to account for the claim-specific disease subtype for each Individual Claim submitted to the Trust.

**28.**   **"Disallowed Claim"** shall mean (i) any Individual Claim that, pursuant to Section 4.3.6, is not entitled to progress to a Preliminary Evaluation pursuant to Section 4.4.2, (ii) any Individual Claim that, pursuant to Section 4.4.2, is not entitled to become a Confirmed Claim and progress to the Standard Qualification Evaluation Process or the Accelerated Evaluation Process pursuant to Section 4.4.4 or Section 4.4.5, respectively, (ii) any Individual Claim that is a Confirmed Claim but, pursuant to Section 4.4.3, is not entitled to become an Allowed Claim, (iv) any Individual Claim that is a Confirmed Claim proceeding under the Standard Qualification Evaluation Process but, pursuant to Section 4.4.4, is not entitled to become an Allowed Claim, or (v) any Individual Claim that is a Confirmed Claim proceeding under the Accelerated Evaluation Process but, pursuant to Section 4.4.5, is not entitled to become an Allowed Claim, as applicable.

29. **"Disallowed Claim Notice"** shall mean a written notice delivered by the Trustees to an Individual Claimant informing such Individual Claimant that his/her Individual Claim has become a Disallowed Claim.

30. ~~25.~~ **"Evaluation ~~Track(s)~~Tracks"** shall mean the Standard Qualification Evaluation Process and/or the Accelerated Evaluation Process ~~that is elected by an Individual Claimant on his/her Claim Submission Form~~.

~~26. "Existing Claim(s)" shall mean Individual Claims held by Existing Claimants.~~

31. ~~27.~~ **"Existing ~~Claimant(s)~~Claimants"** shall mean, collectively, ~~all~~any Existing Mesothelioma ~~Claimants~~Claimant, Existing Ovarian Cancer ~~Claimants, as well as any~~Claimant, Individual ~~Claimants~~Claimant who ~~submit~~submits an Other Talc Claim to the Trust which involved a Date of Diagnosis prior to April 1, 2023, as well as any Indirect Derivative Talc Personal Injury Claimant that files a Proof of Claim asserting an Indirect Derivative Talc Personal Injury Claim by the Claims Bar Date.

32. ~~28.~~ **"Existing ~~Individual Claim(s)~~Claims"** shall mean ~~Individual~~all Talc Personal Injury Claims held by Existing ~~Ovarian Cancer Claimants and Existing Mesothelioma~~ Claimants, collectively.

~~29. "Existing Individual Claimant(s)" shall mean an Individual Claimant who holds an Existing Individual Claim.~~

33. ~~30.~~ **"Existing Mesothelioma ~~Claimant(s)~~Claimants"** shall mean ~~a~~any Mesothelioma Claimant who holds a Mesothelioma Claim involving a Date of Diagnosis before April 1, 2023~~, and~~ that is not ~~otherwise~~ barred by applicable statutes of limitations.

34. ~~31.~~ **"Existing Ovarian Cancer ~~Claimant(s)~~Claimants"** shall mean any Individual Claimant who holds an Ovarian Cancer Claim involving a Date of Diagnosis prior to April 1, 2023~~, and~~ that is not barred by applicable statutes of limitations.

35. ~~32.~~ **"FIFO Payment Queue"** shall mean the processing queue for the payment of Qualifying Claims and Other Approved Claims, as described in Section 7.4.

36. ~~33.~~ **"FIFO Processing Queue"** shall mean the processing queue for the evaluation of Submitted Claims, as described in Sections 4.3 and 4.4.

37. ~~34.~~ **"Future ~~Claimant(s)~~Claims"** shall mean~~, Future Mesothelioma Claimant(s) and Future Ovarian Cancer Claimant(s)~~ all Talc Personal Injury Claims held by Future Claimants, collectively.

38. ~~35.~~ **"Future ~~Mesothelioma Claimant(s)~~Claimants"** shall mean any ~~Mesothelioma Claimant who is not an~~claimants who submit a claim to the Trust

LTL II TDP

who are not Existing ~~Mesothelioma Claimant~~Claimants and Governmental Holders.

~~36. "Future Ovarian Cancer Claimant(s)" shall mean any Ovarian Cancer Claimant who is not an Existing Ovarian Cancer Claimant.~~

**39.**    **"GAC Arbitration Award"** shall have the meaning set forth in Section 8.4.

**40.**    **"GAC Arbitrator"** shall have the meaning set forth in Section 8.4.

**41.**    **"GAC Mediator"** shall have the meaning set forth in Section 8.3.

**42.**    ~~37.~~ **"Governmental Action Trust"** shall mean the Talc Personal Injury Governmental Action Claims Sub-Trust described in the Plan.

**43.**    **"Governmental Amounts"** shall have the meaning set forth in Section 8.6.1.

**44.**    ~~38.~~ **"Governmental ~~Holder(s)~~Holders"** shall have the meaning set forth in Section 8.1.

**45.**    **"Guarantor"** shall mean Johnson & Johnson and its permitted successors and assigns, collectively.

**46.**    ~~39.~~ **"Gynecologic Claim~~(s)~~"** shall mean any Individual Claim ~~that involves~~involving allegations that ~~the~~, as a result of her use of J&J Talc Products, the relevant Individual Claimant developed a cancer of the female gynecologic tract that is not an Ovarian Cancer ~~in connection with the Individual Claimant's use of J&J Talc Products~~.

**47.**    ~~40.~~ **"Identifying Information"** shall mean, with respect to any Individual ~~Claims~~Claim, (a) the relevant Individual Claimant's (i) full legal name, (ii) date of birth, (iii) physical and email address, and (iv) social security number, and (b) the name and physical address of the law firm and attorney serving as the relevant Individual Claimant's representative (if any).

**48.**    ~~41.~~ **"Imerys/Cyprus Indirect Talc Personal Injury Claim"** shall mean ~~a~~any Talc Personal Injury Claim ~~of~~held by any Imerys/Cyprus Party for contribution, reimbursement, subrogation, or indemnity under any Imerys/Cyprus Agreement or otherwise.

**49.**    ~~42.~~ **"Indirect Derivative Talc Personal Injury Claim"** means ~~a~~any Talc Personal Injury Claim (other than Imerys/Cyprus Indirect Talc Personal Injury Claims) for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other derivative Talc Personal Injury Claim~~,~~ (other than Imerys/Cyprus Indirect Talc Personal Injury Claims), whether in the nature of or sounding in contract, tort, warranty, or other theory of law, in respect of (i) the payment, whether pursuant to a settlement, judgment, or

verdict, of any claim for or otherwise relating to death, injury, or damages that is asserted by or on behalf of an injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual, or (ii) the payment of medical or other expenses of, or the provision of medical treatment, medical equipment, or other services or goods to, an injured individual, but for the avoidance of doubt, not a Claim for contribution, reimbursement, subrogation, or indemnity, or any other derivative Claim, in respect of legal fees or expenses incurred by the holder of such Talc Personal Injury Claim in connection with such payment.

50. **"Indirect Derivative Talc Personal Injury Claimant"** means a holder of an Indirect Derivative Talc Personal Injury Claim.

51. 43. **"Individual Claim"** shall mean any unliquidated Talc Personal Injury Claim other than an Imerys/Cyprus Indirect Talc Personal Injury Claim or, an Indirect Derivative Talc Personal Injury Claim, a TPP Lien Claim, or a Governmental Action Claim.

52. 44. **"Individual Claimant"** shall mean the any holder of any an Individual Claim. Unless otherwise specified herein, Individual Claimant also collectively refers to any relevant minors, decedents, or other derivative claimants, and the person(s) asserting the Individual Claim on behalf of such claimants and/or their estates in a representative capacity.  For avoidance of doubt, Individual Claimant specifically excludes any person whose Individual Claim was filed and dismissed with prejudice or whose Individual Claim was adjudicated and resulted in a final judgment in favor of the Debtor and/or relevant defendant(s) prior to October 14, 2021.

53. **"Initial Cash Value of a Point"** shall have the meaning set forth in Section 7.1.2.

54. **"Initial Distribution"** shall have the meaning set forth in Section 8.6.2.

55. 45. **"Initial Filing Date"** shall mean the date on which the Trust first begins to accept claims.

56. 46. **"Initial Point Value"** shall mean the initial Point Value assigned to an Individual Claim based on an Individual Claimant's age and cancer stage as of his/her Date of Diagnosis, as described in Section 5.2.1 (A) or Section 5.2.1 (B).

57. 47. **"J&J Talc Product(s)Products"** shall mean any and all products formulated, manufactured, distributed, and/or sold by the Debtor and/or any LTL Corporate Party containing talcum powder, to which Individual Claimants allege they were exposed, including Johnson's Baby Powder and Johnson & Johnson's Shower to Shower.  J&J Talc Products also includes any product containing talcum powder formulated, manufactured, distributed, and/or sold by the Debtor and/or any LTL Corporate Party..

58.    **"Judgment Amount"** shall have the meaning set forth in Section 6.3.

59.    **"Judicial Review Election"** shall have the meaning set forth in Section 9.3.

60.    **"Judicial Review Election Deadline"** shall have the meaning set forth in Section 9.3

61.    **"Judicial Review Election Notice"** shall have the meaning set forth in Section 9.3

62.    **"Length of Use Factor"** shall have the meaning set forth in Section 5.2.2(C).

63.    **"Length of Perineal Use Factor"** shall have the meaning set forth in Section 5.2.1(C).

64.    48. **"Lien Resolution Administrator"** shall mean shall mean ARCHER Systems LLC and/or any other Talc Trust Lien Resolution Administrator appointed pursuant to the Plan, Trust Agreement, and these TDP to assist in the resolution of Individual Claimants' relevant medical liens and Indirect Derivative Talc Personal Injury Claims.

65.    49. **"Maximum Judgment Amount"** shall be determinedmean, at the time thea judgment is issued and shall be, the lesser of (i) the Maximum Value of the Individual Claim and (ii) the Judgment Amount.  No further calculation of the Maximum Judgment Amount shall be made if the Cash Value of a Point is adjusted in the future.

66.    50. **"Maximum Value"** shall mean the maximum amount any Individual Claimant may receive on account of his/her Individual Claim.  The Maximum Value shall equal three times (3x) the applicable Adjusted Point Value for the relevant Individual Claim based on the Individual Claimant's age on the Date of Diagnosis, disease type, and Diagnostic Adjustment, multiplied by the Cash Value of a Point in effect at the time of the calculation.  For avoidance of doubt, Individual Claimants who receive the Maximum Value pursuant to these TDP are not eligible for any future supplemental payments based on adjustments to the Cash Value of a Point.

67.    **"Maximum Years of Regular Use"** shall have the meaning set forth in Section 5.2.2(C).

68.    **"Maximum Years of Regular Perineal Use"** shall have the meaning set forth in Section 5.2.1(C).

69.    51. **"MDL"** shall mean *In re: Johnson & Johnson Talcum Powder Products Marking, Sales Practices and Products Liability Litigation* (D.N.J.) (MDL No. 2738).

**70.** **52.** **"Mesothelioma"** shall mean the type of cancer that develops from the mesothelium (*i.e.*, the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities). For purposes of evaluating Individual Claims pursuant to these TDP, this definition is limited to malignant mesothelioma that develops in the lining of the lungs, chest wall, abdomen, heart, and testes—*i.e.*, pleural, peritoneal, pericardial or testicular mesothelioma. Notwithstanding the foregoing, "Mesothelioma" specifically excludes well-differentiated papillary mesothelioma (WDPM).

**71.** **53.** **"Mesothelioma Claim(s)"** shall mean any Individual Claim involving allegations that the relevant Individual Claimant developed Mesothelioma in connection with such Individual Claimant's use of talc or talc-containing products J&J Talc Products.

**72.** **54.** **"Mesothelioma Claimant(s)"** shall mean any Individual Claimant who asserts a Mesothelioma Claim.

**73.** **55.** **"Mesothelioma Qualification Criteria"** shall mean the requirements set forth in Section 4.4.4(B), which an Individual Claim alleging Mesothelioma must satisfy in order to be deemed a Qualifying Claim.

**74.** **"MSA"** shall have the meaning set forth in Section 4.1.2(B).

**75.** **56.** **"Net Award Amount"** shall mean the total Allowed Claim Amount, less any amounts required to satisfy any valid medical liens or claims (other than liens or claims held by Settling Third Party Third-Party Payors) against the Individual Claimant or his/her property and less any attorneys' fees and litigation expenses born by the Individual Claimant's counsel.

**76.** **57.** **"Non-J&J Talc Products"** shall mean any and all talc-containing products which are not J&J Talc Products, collectively.

**77.** **58.** **"Other Approved Claim(s)"** shall mean an any Individual Claim that has satisfied the Accelerated Claim Claims Criteria, as determined by the Claims Administrator pursuant to Section 4.4.5.

**78.** **59.** **"Other Approved Claimant(s)"** shall mean an any Individual Claimant whose Individual Claim has been determined to be who holds an Other Approved Claim.

**79.** **60.** **"Other Talc Claim(s) Claims"** shall mean any Individual Claim that is not an Ovarian Cancer Claim or Mesothelioma Claim.

**80.** **61.** **"Ovarian Cancer"** shall mean, collectively, epithelial cancer, that originates in the ovaries, fallopian tubes, and/or peritoneum (*i.e.*, primary peritoneal cancer), with serous, endometrioid, clear cell, or undifferentiated subtypes (or a mixture of

subtypes that includes one or more of these subtypes).  This definition specifically includes tumors designated as "borderline" or of "low malignant potential."

**81.** 62. **"Ovarian Cancer Claim"** shall mean any Individual Claim involving allegations that the relevant Individual Claimant developed Ovarian Cancer in connection with such Individual Claimant's use of talc or talc-containing products.

**82.** 63. **"Ovarian Cancer Claimant**" shall mean any Individual Claimant who asserts an Ovarian Cancer Claim.

**83.** 64. **"Ovarian Cancer Qualification Criteria"** shall mean the requirements set forth in Section 4.4.4(A), which an Ovarian Cancer Claim must satisfy in order to be deemed a Qualifying Claim.

65. **"Payor"** shall mean Holdco (NA), Inc. or Johnson & Johnson or their permitted successors or assigns under the terms of the Funding Agreement or the Support Agreement, as applicable.

**84.** **"Pending MSA Determination"** shall have the meaning set forth in Section 4.1.2(C).

**85.** 66. **"Point Value"** shall mean the points allotted to an Individual Claim pursuant to the points-based claim valuation process described in Article 5 of these TDP.

**86.** 67. **"Preliminary Evaluation"** shall mean the preliminary evaluation process described in Section 4.4.2, pursuant to which ~~determinations shall be made as to~~the Claims Administrator shall determine whether a Submitted Claim constitutes a Confirmed Claim and should be evaluated via either the ~~standard~~Standard Qualification Evaluation Process or the Accelerated Evaluation Process.

**87.** 68. **"Preliminary Evaluation Criteria**" shall mean the four (4) preliminary criteria set forth in Section 4.4.2 which Individual Claims must satisfy in order to progress to either the ~~standard~~Standard Qualification Evaluation Process or Accelerated Evaluation Process.

**88.** **"Proof of Claim"** shall have the meaning set forth in Section 4.3.5.

**89.** 69. **"Qualification Criteria"** shall ~~collectively~~ mean the Ovarian Cancer Qualification Criteria and the Mesothelioma Qualification Criteria, collectively.

70. **"Qualification Evaluation Process"** shall mean the claims-resolution process in which an Individual Claim is evaluated as described in Sections 4.4.3 and 4.4.4 of these TDP.

LTL II TDP

90.   71.  **"Qualifying Claim(s)"** shall mean any Individual Claim that the Claims Administrator determines, pursuant to Sections 4.4.4(A) ~~and~~or 4.4.4(B), has satisfied the applicable Qualification Criteria.

91.   72.  **"Qualifying Claimant(s)"** shall mean ~~an~~any Individual Claimant whose Individual Claim has been determined to be a Qualifying Claim.

92.   **"Reconsideration Request"** shall have the meaning set forth in Section 6.1.1.

93.   73.  **"Regular Non-J&J Talc Perineal Use"** shall mean an Individual Claimant's ~~regular use (*i.e.*, use on her own body at least fifty (50) times per year for minimum of four (4) consecutive years)~~Regular Use of Non-J&J Talc Products in her own perineal area after puberty.

94.   74.  **"Regular Non-J&J Talc Use"** shall mean an Individual Claimant's ~~regular use (*i.e.*, use on his/her own body at least fifty (50) times per year for a minimum of four (4) consecutive years)~~Regular Use of Non-J&J Talc Products on his/her own body, established by sworn testimony or affidavit.

95.   75.  **"Regular Perineal Use"** shall mean an Individual Claimant's Regular Use of J&J Talc Products in her own perineal area after puberty, established by sworn testimony or affidavit~~, as described in Section 4.4.4(A)~~.

96.   76.  **"Regular Use"** shall mean ~~an Individual Claimant's~~, with respect to the use of J&J Talc Products ~~on~~or Non-J&J Talc Products, as applicable, an Individuals Claimant's use thereof on her own perineal area after puberty or his/her own body, as applicable, at least fifty (50) times per year for a minimum of four (4) consecutive years, established by sworn testimony or affidavit~~, as described in Section 4.4.4(B)~~.

97.   77.  **"Scheduled Value"** shall mean the final scheduled Point Value for any Qualifying Claim or Other Approved Claim, as determined by the Claims Administrator pursuant to Sections 5.2.1(D) and 5.2.2(D) ~~of these TDP~~, as applicable.

98.   **"Scheduled Value Notice"** shall have the meaning set forth in Section 5.1.

99.   **"Settlement Amount"** shall have the meaning set forth in Section 8.2.

100.   **"Settlement Offer"** shall have the meaning set forth in Section 8.2.

101.   78.  **"Settlement Trust"** shall mean the Talc Personal Injury Tort Claims Sub-Trust described in the Plan.

102.   **"Standard Qualification Evaluation Process"** shall mean the claims-resolution process in which an Individual Claim is evaluated as described in Sections 4.4.3 and 4.4.4 of these TDP.

LTL II TDP

103.  **"Submission Requirements"** shall have the meaning set forth in Section 4.3.5.

104.  ~~79.~~ **"Submitted Claim"** shall mean ~~an~~any Individual Claim that has been submitted to the Trust pursuant to these TDP.

105.  ~~80.~~ "**Submission Procedures**" shall mean the procedures developed and adopted by the Trustees, in conjunction with the Claims Administrator and Claims Processor, and approved by the TAC and FCR, and described in Section 4.3 ~~of these TDP~~.

106.  ~~81.~~ **"TAC"** shall mean the Trust Advisory Committee, which shall ensure that these TDP are properly implemented and the Trust properly administered in accordance with the terms of the Plan and the Trust Agreement.  The TAC shall at all times include at least five (5) attorneys, each from a different law firm who actively represents Individual Claimants.  ~~J&J~~The Guarantor may, through its counsel, assist the TAC, provided that such assistance shall be in an advisory role only.

107.  ~~82.~~ **"Talc Personal Injury Claimant"** shall mean ~~the~~any holder of a Talc Personal Injury Claim.

~~83. **"TPP Lien Claims"** means (a) any and all Indirect Talc Personal Injury Claims held by Settling Third-Party Payors in respect of the Specified Insured Individuals and (b) all claims of Settling Third-Party Payors against (i) Specified Insured Individuals that hold Talc Personal Injury Claims or (ii) payments to such Specified Insured Individuals by the Talc Personal Injury Trust.~~

108.  **"TDP"** shall have the meaning set forth in the preamble.

109.  **"Time Since Last Use Factor"** shall have the meaning set forth in Section 5.2.1(C).

110.  **"Trust"** shall have the meaning set forth in the preamble.

111.  **"Trust Agreement"** shall have the meaning set forth in the preamble.

112.  **"Trustees"** shall have the meaning set forth in the preamble.

113.  **"Years of Regular Use"** shall have the meaning set forth in Section 5.2.2(C).

114.  **"Years of Regular Perineal Use"** shall have the meaning set forth in Section 5.2.1(C).

LTL II TDP

**Article 3
TDP ADMINISTRATION**

**3.1      General Administration**

**3.1.1    Coordination of Trustees, Claims Administrator & Claims Processor**

The Trust shall utilize the services of the Claims Administrator and Claims Processor to assist in the evaluation of claims submitted to the Trust.  The Trustees shall implement these TDP to resolve any and all existing and future ~~Individual Claims, Indirect~~ Talc Personal Injury Claims, ~~and~~including Individual Claims, Indirect Derivative Talc Personal Injury Claims, TPP Lien Claims and Governmental Action Claims pursuant to the Plan and Trust Agreement, with the assistance of the Claims Administrator and the Claims Processor.  Further, the Trustees, the Claims Administrator, and the Claims Processor shall consult and coordinate with each other to develop and implement administrative and background processes intended to (i) provide the Trustees with all information necessary to implement these TDP, (ii) streamline the ~~submission procedures~~Submission Procedures for Individual Claimants, (iii) ensure maximally efficient evaluation of the Individual Claims and the Reconsideration Requests, (iv) ensure proper application of the Qualification Criteria and audit provisions described herein, ~~and~~ (v) limit ~~payment of Trust funds to and~~the use of the Trust's assets to uses permitted by the Plan, and (vi) promote prompt payment of Allowed Claims.

**3.1.2    Preparation of and Deadline for Distribution of ~~Trust Rules and~~ Submission Procedures**

Within sixty (60) days following entry of the Confirmation Order, the Trustees shall propose detailed Submission Procedures required by these TDP to the TAC and FCR, whose approvals are required prior to distribution of the Submission Procedures to counsel for Individual Claimants.  Such approvals shall not be unreasonably withheld; however, if either TAC or FCR approval is not obtained, the ~~Trustee is~~Trustees are authorized to seek an order of the Bankruptcy Court approving the proposed Submission Procedures.  Promptly after approval, the Trustees shall make the Submission Procedures publicly available on a website addressing the same.

To effectuate this Section and the other terms of these TDP, immediately upon entry of the Confirmation Order, the Trustees, the Claims Administrator, and the Claims Processor shall coordinate with respect to the development, procurement, documentation, and finalization of the comprehensive platforms, systems, procedures, rules, documents, and actions necessary to implement these TDP.

**3.1.3    Consent & Consultation Requirements**

The Trustees shall administer the Trust and implement these TDP in consultation with the TAC, the FCR, and the ~~Payor~~Guarantor.  Pursuant to the Plan, the Trust Agreement, and these TDP, the Trustees, in consultation with the ~~Payor~~Guarantor, shall (i) obtain the consent of the TAC and FCR on such matters as are required herein or in the Trust Agreement, including with respect to any proposed substantive amendment, change, or modification to the terms of

LTL II TDP

these TDP, and (ii) consult and coordinate with the Claims Administrator and Claims Processor with respect to the submission, evaluation, and processing of Individual Claims.

In the event that consultation with or consent of the TAC and FCR is required, the Trustees shall provide written notice to the TAC and each of its members and the FCR, the Claims Administrator, and the Claims Processor. The Trustees shall not proceed with any matter requiring consent or consultation unless and until the parties have engaged in the Consultation Process or the Consent Process each as defined and described in the Trust Agreement. Neither the TAC nor the FCR shall unreasonably withhold consent sought by the Trustees pursuant to these TDP; however, if the Trustees are unable to obtain consent required by these TDP, then the Trustees are authorized to seek an order of the Bankruptcy Court approving the proposal or matter at issue, including any substantive amendment, change, or modification to the terms of these TDP.

Notwithstanding the foregoing, absent Bankruptcy Court approval after appropriate notice and opportunity to object, neither the Trustees, Claims Administrator, Claims Processor, Lien Resolution Administrator, TAC nor FCR may amend these TDP in any material manner that is inconsistent with the Plan.

## 3.2    Appropriateness of Costs

The Trustees shall seek to ensure that the costs incurred by the Trust with respect to evaluating and investigating the validity of the Claim Materials submitted by an Individual Claimant are necessary and reasonable in light of the expected benefit to the Trust. Nothing herein, however, shall prevent the Trustees from either (i) contesting the validity of any Individual Claim, whatever the costs, or (ii) declining to accept the Claim Materials from sources determined to be deceptive, fraudulent, or otherwise unreliable.

The Trustees shall periodically, and at least annually, review the cost of evaluating and investigating the Submitted Claims and take steps to reduce such costs where feasible and appropriate, while still ensuring that the Trust's obligations pursuant to the Plan, the Trust Agreement, and these TDP are appropriately satisfied.

## 3.3    Lien Resolution

### 3.3.1    In General

With respect to Existing Claims that become Qualifying Ovarian Cancer Claimsany Individual Claim of a Specified Insured Individual that becomes an Allowed Claim pursuant to these TDP, the Debtor anticipates thatall related medical liens and claims shall be resolved through the Talc Personal Injury TPP Lien Claims Sub-Trust funds, with appropriate allocations to each Qualifying Ovarian Cancer , using Talc Personal Injury TPP Lien Claims Sub-Trust Funds, with a corresponding reduction to the Allowed Claim Amount of such Allowed Claim to be determinedmade by the Trustees in coordination with the Lien Resolution Administrator. With respect to Future Claims that becomeIn determining the appropriate lien withholding and/or reduction amount to be allocated to each Allowed Claim, the Trustees and Lien Resolution Administrator shall reduce the amount allocated to each Qualifying Ovarian Cancer

LTL II TDP

Claim by the amount necessary for the TPP Lien Claims Sub-Trust to satisfy relevant lien claims.  With respect to all other Individual Claims that are similar to Individual Claims of Specified Insured Individuals and become Allowed Claims, the Lien Resolution Administrator shall endeavor to ensure that the final negotiated lien amounts withheld from or allocated to resolve Individual Claims iseach Allowed Claim are substantially similar to thosethe same as the lien withholding and/or reduction amount to allocated to resolve Qualifying Ovarian Cancerthe similar Allowed Claims of Existing ClaimantsSpecified Insured Individuals.  To that end, the Lien Resolution Administrator is authorized to individually or collectively resolve valid medical liens and claims that are asserted against holders of Futuresuch other Individual Claims, including TPP Lien Claims, *provided* that any collective resolution of such liens or claims should be based onshall be limited to such Individual Claims that have common characteristics of such Future Claims as a percentage of the then-known aggregate amount of funds allocated to satisfy Existing Claims(*e.g.*, the same disease).   The Trustees shall seek to ensure that each such collective resolution of valid medical liens or claims by the Lien Resolution Administrator is substantially similar tothe same as each othersimilar collective resolution, and as similar individual resolutions taken as a whole.

For the avoidance of doubt, medical liens that may be resolved through the TPP Lien Claims Sub-Trust funds by the Lien Resolution Administrator as described above shall be subject to this Section 3.3 and not the provisions related to the resolution of Indirect Derivative Talc Personal Injury Claims in Article 9 herein.

### 3.3.2  Procedures

Upon completion of (i) the applicable evaluation process for each Allowed Claim, and (ii) resolution of any Reconsideration Request of the Claim Administrator's determinations, the Settlement Trust shall remit the Allowed Claim Amount to a segregated account under the control of the Lien Resolution Administrator pending the satisfaction and release of all related medical liens and claims, TPP Lien Claims, Indirect Derivative Talc Personal Injury Claims, and the resolution of anyall related administrative issues, after which time payment to the relevant Individual Claimant and/or his/her respective attorneyscounsel will be made.  Subject to the terms of the Trust Agreement, the Lien Resolution Administrator shall, among other things, be responsible for the distribution of net proceeds for Allowed Claims to the appropriate Approved or QualifyingAllowed Claimants.  All Lien Resolution AdministratorTalc Personal Injury Trust Expenses related to TPP Lien Claims shall be paid using Talc Personal Injury TPP Lien Claims Sub-Trust Funds.

On or as soon as practicable following the Effective Date and the submission of any Individual Claim to the Trust, the Lien Resolution Administrator shall begin working to quantify any and all known medical liens or claims, including any applicable Indirect Derivative Talc Personal Injury Claims (other than liens or claims asserted by Settling Third Party PayorsThird-Party Payors in respect of Individual Claims of the Specified Insured Individuals) arising from or related to any Individual Claims for which liens are not covered by Talc Personal Injury TPP Lien Claims Sub-Trust Funds, with the goal of negotiating the satisfaction of any such liens or claims as to each Allowed Claim by the time the Trustees have finalized the

relevant Allowed Claim Amount.  The Lien Resolution Administrator shall be responsible for the satisfaction of any and all such known and valid medical liens and claims, including TPP Lien Claims, and Indirect Derivative Talc Personal Injury Claims arising from or related to each Allowed Claim from the Talc Personal Injury TPP Lien Claims Sub-Trust Funds or Allowed Claim AmountAmounts being held in the segregated accountaccounts referenced above.  The Lien Resolution Administrator shall provide written verification of the same to the Trustees, Reorganized Debtor, and the PayorGuarantor prior to distributing the remaining portion of the Allowed Claim Amount to the relevant Individual Claimant and/or his/her counsel.  Neither the Debtor, the Reorganized Debtor, the Guarantor, nor any LTL Corporate Party shall bear any responsibility for payment of any Individual Claimant's liens.

### 3.4    Trust Disclosure of Information

Periodically, and at least annually, the Trust shall publish a report summarizing the Individual Claims resolved pursuant to these TDP, including breakdowns with respect to (i) the types of Individual Claim involved; (ii) application of the standardStandard Qualification Evaluation Process, Accelerated Evaluation Process, and/or any ADR Procedures, settlements, or litigations described herein, and (iii) the average Allowed Claim Amounts by type of Individual Claim, specific category of injury within the Qualification Criteria and Accelerated ClaimClaims Criteria.  The Trustees also shall provide the PayorGuarantor, the TAC, and the FCR with (i) a more detailed version of the above-mentioned report that also includes breakdowns as to Claimant's Jurisdiction and the law firm and/or attorneyscounsel representing Individual Claims submitted to the Trust, and (ii) detailed monthly status reports regarding the evaluation status of all SubmittedAllowed Claims, as well as the valuation and payment status of all Approved Claims and Qualifying Claims for which Scheduled Values have been determined.

### 3.5    Notice Requirements

Following entry of the Confirmation Order, the Trustees shall, in consultation with the PayorGuarantor, coordinate with the Claims Administrator to develop formal procedures for providing notice to Individual Claimants of determinations made pursuant to these TDP, which shall be adopted by the Trust upon consent of the TAC and FCR—provided that such consent shall not be unreasonably withheld, and that if such consent is not obtained, the Trustees are authorized to seek an order of the Bankruptcy Court authorizing the Trustees to develop such procedures.  Such notice procedures must include both hard copy and electronic methods of notice and incorporate the applicable notice deadlines as set forth in these TDP.

Individual Claimants shall be provided with notice pursuant to the notice requirements adopted by the Trust after any determination is made by either the Claims Administrator or Trustees with respect to Individual Claims.  This includes the following: (i) determinations that insufficient information has been submitted to the Trust to further evaluate an Individual Claim; (ii) determinations as to whether any Submitted Claim satisfied the Preliminary Evaluation Criteria; (iii) determinations as to whether any Confirmed Claim satisfies the required Qualification Criteria or Accelerated ClaimClaims Criteria, whichever is applicable; (iv) determinations as to whether or not any Individual Claim is an Allowed Claim; (v) determinations as to the Scheduled Value and/or Allowed Claim Amount for an Individual Claim; and (vi) determinations regarding the outcome of any Reconsideration Request.

**3.6    Auditing**

**3.6.1    Cross-Trust Audit Program**

The Trustees, in consultation with the ~~Payor~~Guarantor, and with the consent of the TAC and FCR, shall develop and implement a Cross-Trust Audit Program, which shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of usage of talc or talc-containing products for which the Trust has legal responsibility and the reliability of reporting on other asbestos exposure.  Neither the TAC nor the FCR shall unreasonably withhold consent sought by the Trustees related to the development and/or implementation of the Cross-Trust Audit Program; however, if the Trustees are unable to obtain the required consent, then the Trustees are authorized to seek an order of the Bankruptcy Court approving the development and/or implementation of such Cross-Trust Audit Program.  This Cross-Trust Audit Program will be designed to compare Individual Claims submitted to the Trust against claims filed with any other bankruptcy trusts at the sole discretion of the Auditor ~~(defined below), and is not limited in count to the number of bankruptcy trusts that are subject to the Cross-Trust Audit Program~~.  Further, as part of its coordination with other bankruptcy trusts, the Trust shall fully comply with reasonable subpoenas served against it by other bankruptcy trusts or mass-tort trusts seeking to conduct a similar audit.

By submitting an Individual Claim to the Trust, regardless of the treatment sought, an Individual Claimant shall be deemed to have affirmatively consented to (i) any release by the Trust of necessary and sufficient information sought either through the Cross-Trust Audit Program or in response to any subpoena served against the Trust; (ii) any release by any other bankruptcy or mass-tort trusts that participate in the Cross-Trust Audit Program or the Trust has served a subpoena on, to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") of all information submitted to such other trusts by or on behalf of the relevant Individual Claimant pursuant to the provisions of the Cross-Trust Audit Program, or subpoena, if applicable, and (ii) disclosure by or to the Auditor of the status, amount, and date of payment made with respect to the claim asserted or filed by the relevant Individual Claimant to the  Trust or any other bankruptcy or mass-tort trust.

To the extent that the Trustees believe it is relevant, nothing herein shall preclude the Trust or the Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state or federal court complaints, available discovery from any such case, or other claims filed against other mass-tort trusts.  Any Individual Claimant ~~subject to the Cross-Trust Audit Program~~ shall cooperate with and provide the Trust with (i) any non-privileged information reasonably requested by the Trust, and (ii) upon request by the Trust, authorization to obtain from other mass tort trusts any information such claimant has provided to such other trusts.

**3.6.2    Claims Audit Program**

Separate from the Cross-Trust Audit Program, ~~J&J and the Reorganized Debtor are~~the Guarantor is authorized, but not required, under these TDP to ~~design~~develop and implement its own annual Claims Audit Program, and to (i) audit up to ten percent (10%) of the determinations by the Claims Administrator and/or Trustees with respect to any and all Individual Claims

- 18 -

submitted to the Trust, which may be either based on 10% of the total universe of Submitted Claims, or be a stratified subset of claims of particular interest to the ~~Payor and/or the Reorganized Debtor~~Guarantor, and/or (ii) audit any determinations by the Claims Administrator and/or Trustees with respect to any and all Individual Claims submitted to the Trust where the Individual Claimant is represented by a law firm or attorney whom the Trustees have previously determined submitted fraudulent or deceptive material to the Trust.  Any Claims Audit Program pursuant to this Section shall be implemented by Barnes & Thornburg, LLP~~, as the Payor's~~ (or such other Person as the Guarantor may designate to the Trustee in writing), as the Guarantor's agent.  Except as otherwise detailed herein, the ~~Payor~~Guarantor has the sole discretion regarding whether and/or when to implement such Claims Audit Program.  The ~~Payor~~Guarantor shall bear the costs associated with implementing the Claims Audit Program, except in cases where the Claims Audit Program reveals that deception or fraudulent information has been provided to the Trust, ~~as described below in Section 3.6.3~~in which case the Trust shall reimburse the Guarantor for such costs.

### 3.6.3    Consequences of Audit Programs

In the event that the Trustees determine that an audit under either the Cross-Trust Audit Program or the Claims Audit Program reveals that deceptive or fraudulent information has been provided to the Trust with respect to an Individual Claim, the Trust may penalize the relevant Individual Claimant and his/her counsel by (a) disallowing the Individual Claim, (b) seeking to require the source of such deceptive or fraudulent information, including the Individual Claimant and his/her counsel, to reimburse the Trust and/or ~~Payor~~Guarantor for all costs incurred in connection with such audit and any future audit or audits of the Individual Claim, including future audits of Individual Claims subsequently submitted by such Individual Claimant, (c) reordering the priority of payment of the relevant Individual Claimant, and (d)~~, and (e)~~ any other appropriate action, including seeking sanctions.    The Trust may also place reasonable restrictions, limitations, or affirmative requirements on Individual Claims submitted to the Trust in the future by Individual Claimants represented by any attorney and/or law firm who previously represented an Individual Claimant that was determined to have submitted deceptive or fraudulent information to the Trust, including (a) requiring that the attorney and/or law firm representing such Individual Claimants pay a $1,000 penalty for each new Individual Claim submitted to the Trust, (b) subjecting all such Individual Claims to audit under the Cross-Trust Audit Program and/or the Claims Audit Program, provided that such audit shall not prejudice the relevant Individual Claimant with respect to the processing or evaluation of his/her Individual Claim, or, to the extent such Individual Claim is deemed an Allowed Claim, as to the timing of payment to the Individual Claimant.

Individual Claims determined to be subject to heightened scrutiny pursuant to any part of these TDP shall be automatically subject to audit under either the Cross-Trust Audit Program or the Claims Audit Program, or both.  However, taken alone, the fact that an Individual Claim is subject to heightened scrutiny shall not affect or prejudice the relevant Individual Claimant, including with respect to the processing, evaluation, or payment of such ~~the~~ Individual Claim~~,~~ or its place in the FIFO Processing Queue or the FIFO Payment Queue.

Claim Submissions must be signed under the pains and penalties of perjury and, to the maximum extent permitted under applicable law, the submission of a fraudulent Claim

LTL II TDP

Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, including 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in any federal court of competent jurisdiction.

### Article 4
### INDIVIDUAL CLAIMS ALLOWANCE PROCESS

**4.1    General Principles**

**4.1.1    Recovery Only With Respect to a Single Individual Claim**

An Individual Claimant may assert no more than one Individual Claim to the Trust, and may recover only in respect of such Individual Claim from the Trust, based on the Individual Claim asserted at the time he/she submitted the claim to the Trust. For the avoidance of doubt, after submitting his/her claim to the Trust, an Individual Claimant may not allege or seek to assert an additional or different Individual Claim, with the exception that an Individual Claimant may at any time after the date his/her Individual Claim was submitted to the Trust, but before disallowance or payment of such Individual Claim, as applicable, request that his/her Individual Claim be processed pursuant to the Accelerated Evaluation Process, as set forth in Section 4.4.5.

Individual Claims properly deferred pursuant to Section 4.3.3 shall be evaluated based on the date of the conclusion of the deferral period.

**4.1.2    Treatment of Individual Claims Previously Resolved**

**A.    Individual Claims Previously Settled but Unpaid**

If, prior to October 14, 2021, (i) an Individual Claimant submitted his/her Individual Claim to the Debtor and/or any LTL Corporate Party for settlement consideration, and thereafter (ii) reached an agreement with the Debtor and/or any LTL Corporate Party to settle said Individual Claim at an amount certain, but (iii) the Debtor and/or any LTL Corporate Party were unable to process the related transfer of settlement funds before October 14, 2021, then such Individual Claimant may choose to either: (~~i~~a) submit his/her Individual Claim to the Trust for evaluation pursuant to the procedures set forth in these TDP; or (~~ii~~b) agree to accept the amount certain that was previously agreed upon to settle his/her claim ~~up to the Maximum Value allowed under these TDP~~. In the event that an Individual Claim is submitted to the Trust pursuant to this Section, the prior settlement agreement shall be immediately deemed null and void and relevant Individual Claimant's right to recover pursuant to such prior agreement waived.

**B.    Individual Claims Previously Settled and Paid**

~~Any~~Except as otherwise expressly provided in Section 4.1.2(A) or Section 4.1.2(C), any Individual Claimant who previously (i) reached a settlement with the Debtor or any ~~of its predecessors~~LTL Corporate Party related to an Individual Claim, (ii) settled in principle subject to a prepetition master settlement agreement ("**MSA**"), (iii) submitted a release ~~(with the exception of Individual Claims subject to the preceding Section 4.1.2(A))~~, or (iv) received payment with respect to ~~Individual Claim~~ his/her ~~such~~ Individual ~~Claimant~~Claim may not receive any ~~additional~~ payment from the ~~Settlement~~ Trust. Further, any Individual Claim being

LTL II TDP

submitted on behalf of or derivative of a previously released Individual Claimant, including any Indirect Derivative Talc Personal Injury Claim, may not receive any additional payment from the Settlement Trust. As part of the establishment of the Trust, the Debtor will provide the Trust and the Trustees with a list of all Individual Claimants subject to this Section, their Identifying Information, and basic settlement information.

## C.    Individual Claims Subject to Pending MSA Determination

If, prior to October 14, 2021, (i) an Individual Claimant submitted his/her Individual Claim to the Debtor and/or any LTL Corporate Party for settlement consideration, (ii) such Individual Claim is subject to aan MSA with said Individual Claimant's counsel, but (iii) a determination as to whether said Individual Claim qualifies for a settlement has not yet been made (a "**Pending MSA Determination**"), then such Individual Claimant may not submit his/her Individual Claim for valuation pursuant to these TDP until such Pending MSA Determination is made.  Individual Claims that are subject to a Pending MSA Determination and satisfy clauses (i) and (ii) of this paragraph shall be tolled pursuant to Section 4.2.2(C)(i) below.

If, following a Pending MSA Determination, an Individual Claim is determined to satisfy the qualification criteria set forth in the relevant MSA (regardless of whether such Individual Claim has received his/her final allocation pursuant to the MSA), then such Individual Claim is subject to Section 4.1.2.(A) above, unless such MSA requires that such Individual Claim receive distributions from a qualified settlement fund.   However, if, following a Pending MSA Determination, the Individual Claim is rejected as ineligible for settlement under the relevant MSA, then such Individual Claim is subject to Section 4.1.2.(D) below.

## D.    Individual Claims Previously Rejected or Dismissed

Any individual who filed an Individual Claim in any state or federal court prior to October 14, 2021, which was thereafter dismissed with prejudice shall not be eligible to recover any payment whatsoever from the Trust.

Individual Claims which were filed before October 14, 2021, and thereafter either (i) dismissed without prejudice or (ii) rejected as ineligible under an MSA may be submitted to the Trust for evaluation pursuant to these TDP, but shall be subject to heightened scrutiny by the Trustees and the Claims Administrator during their evaluation.  For the avoidance of doubt, such Individual Claimant must submit his/her Individual Claim to the Trust for evaluation pursuant to the procedures set forth in these TDP, just as any other Individual Claimant not subject to Section 4.1.2.  Failure to submit such an Individual Claim to the Trust in accordance with the Submission Deadlinesubmission deadline and Submission Procedures provisions below in Sections 4.2 and 4.3, respectively, shall result in disallowance of such Individual Claim.

## E.    Individual Claims Otherwise Subject to Final Judgment

Any individual who filed an Individual Claim in any state or federal court, and whose Individual Claim was adjudicated and resulted in a final unfavorable judgment (*e.g.*, a defense verdict) shall not be eligible to recover any payment whatsoever from the Trust.

LTL II TDP

**4.2     Submission Deadlines**

**4.2.1     Deadline to Submit Existing ~~Individual~~ Claims to Trust**

Existing ~~Individual~~ Claimants must submit their Individual Claims to the Trust within one-hundred twenty (120) days of the Trust's distribution of its rules and Submission Procedures.[1]  If an Individual Claimant fails to submit his/her Existing ~~Individual~~ Claim or seek a deferral pursuant to Section 4.3.3 within this time period, such Individual Claimant shall be deemed to have waived the right to submit his/her Existing ~~Individual~~ Claim or otherwise seek compensation from the Trust ~~pursuant to these TDP~~.

**4.2.2     Effect of Statutes of Limitations and Repose**

**A.     Existing ~~Individual~~ Claims Previously Filed in Tort System**

For each Individual Claim submitted to the Trust that was filed in the tort system against the Debtor and/or a~~any other~~ Protected Party prior to October 14, 2021, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in Article 4, the Individual Claim must have been timely filed pursuant to the applicable federal or state statutes of limitations and/or repose that were in effect at the time the related case was filed in the tort system.

**B.     Unfiled Existing ~~Individual~~ Claims**

For each Existing ~~Individual~~ Claim submitted to the Trust that was not filed in the tort system against the Debtor, ~~J&J,~~ and/or a~~any other~~ Protected Party prior to October 14, 2021, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in Article 4, the Individual Claim must not be time-barred under the applicable federal or state statutes of limitations as listed in Exhibit [●] to these TDP.  The applicable federal or state statutes of limitations shall be deemed to have begun running as of May 19, 2020, the date that J&J publicly announced the discontinuation of the sale of talc-containing products, including J&J Talc Products~~, which was May 19, 2020~~.

**C.     Tolling and Timeliness**

(i)     Existing ~~Individual~~ Claims

---

[1] In the event that the Trustees fail to include an Existing Claimant or his/her counsel in the initial distribution of the Submission Procedures ~~or Trust Rules~~, then the deadline for any such Existing Claimant to submit his/her Individual Claim to the Trust shall instead be the earlier of (i) one-hundred twenty (120) days after the Submission Procedures ~~or Trust Rules~~ are in fact distributed to the Existing Claimant or his/her counsel, or (ii) within three (3) years of the Initial Filing Date.

~~LTL II TDP~~

The running of the applicable statute of limitations or repose shall be considered tolled as of the earliest of: (a) October 14, 2021; (b) the actual filing of a claim against Debtor~~, J&J,~~ and/or ~~a~~any other Protected Party in the tort system prior to the October 14, 2021; or (c) the date specified in any tolling agreement between the relevant Individual Claimant and the Debtor ~~and/or J&J,~~or any LTL Corporate Party; *provided* such tolling was still in effect as of April 4, 2023.  Any Existing ~~Individual~~ Claim that meets any of these three tolling provisions shall be treated as timely filed so long as (i) the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, and (ii) the Submitted Claim is submitted to the Trust within one hundred twenty (120) days after the Initial Filing Date.

(ii)    Future ~~Individual~~ Claims

Any ~~Individual Claim involving a Date of Diagnosis after the Effective Date, irrespective of the application of any relevant federal or state statute of limitations or repose,~~Future Claim shall be treated as timely filed if it is submitted to the Trust: (i) within three (3) years of the Initial Filing Date, (ii) within two (2) years of the relevant Date of Diagnosis, or (iii) within applicable state statutes of limitations, as listed in Exhibit [●] to these TDP, whichever is later.

**4.3    Submission Procedures**

The Submission Procedures shall be developed and adopted by the Trustees, in ~~conjunction~~consultation with the Guarantor, the Claims Administrator~~,~~ and the Claims Processor and with the ~~consent~~approval of the TAC and FCR.  As provided in Section 3.1.2, such approvals shall not be unreasonably withheld; however, if either the TAC or FCR approval is not obtained, the Trustees are authorized to seek an order of the Bankruptcy Court approving the proposed Submission Procedures.  The Submission Procedures shall include, but not be limited to, to the following:

**4.3.1    FIFO Processing Queue**

The Trust shall order all claims to be reviewed for processing purposes on a FIFO basis in the order each Claim Submission is received, except as otherwise provided herein. For all Individual Claims submitted to the Trust on or before the date that is one hundred and twenty (120) days after the Initial Filing Date, an Individual Claimant's position in the FIFO Processing Queue shall be determined based on the earliest of (i) the date prior to the Petition Date that the Individual Claimant filed a related case against Debtor~~, J&J,~~ or any other Protected Party in the tort system; (ii) the date prior to the Petition Date that the Individual Claimant filed a related case against another defendant in the tort system, if at the time the related claim against was subject to a tolling agreement with Debtor or ~~J&J~~any LTL Corporate Party; (iii) the date the Individual Claim is submitted to the Trust; (iv) the date after the Petition Date but before the Effective Date that a Proof of Claim was filed by the Individual Claimant against the Debtor in the Debtor's first chapter 11 case; and (v) the date a ballot was submitted on behalf of the Individual Claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

For all Individual Claims involving a Claim Submission submitted more than one hundred and twenty (120) days after the Initial Filing Date, an Individual Claimant's position in the FIFO Processing Queue shall be determined based on the date that the Individual Claim was properly and completely submitted to the Trust.  If any Claim Submissions are filed on the same date, an Individual Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day Claim Submissions shall be determined based on the alleged Date of Diagnosis for each, with the earlier Date of Diagnosis having priority over the later.  In the event that two or more Individual Claims are submitted to the Trust on the same date and also have the same Date of Diagnosis, the Individual Claimant with the earliest date of birth shall receive priority in the FIFO Processing Queue over one with a later date of birth.

### 4.3.2   Withdrawal of Submitted Claims

An Individual Claimant may, at any time after submitting his/her Individual Claim to the Trust, withdraw his/her Submitted Claim, by providing written notice to the Trust.  The related Individual Claimant shall retain the right to file a new Individual Claim after withdrawal of the first; however, any such subsequent Claim Submission shall be evaluated the same as a new Claim Submission and otherwise unrelated to the first, except that (i) it shall be subject to heightened scrutiny by Claim Administrator, Claim Processor, and Trustees, and (ii) the Individual Claimant's place in the FIFO Processing Queue shall be determined only based on the most recent date that the Individual Claim was submitted to the Trust (*i.e.*, the Individual Claim is moved to the end of the queue).  For the avoidance of doubt, the one hundred and twenty (120) day deadline to submit an Existing Claim pursuant to Section 4.2.1 shall apply to any Individual Claim submitted by the Individual Claimant, including a Submitted Claim that was previously withdrawn.

### 4.3.3   Deferral of Submitted Claims

An Individual Claimant also may request that the Trust defer processing his/her Submitted Claim for up to three (3) years (a "**Deferral Request**") so long as the Deferral Request is made (i) in writing pursuant to any procedures adopted by the Trust for such requests, and (ii) before the date the Trustees provide notice to the Individual Claimant either that his/her Submitted Claim is being disallowed, or that the Submitted Claim is an Allowed Claim and of the Scheduled Value proposed by the Claims Administrator.  For the avoidance of doubt, an Individual Claimant may make only one Deferral Request.

The Trust shall approve any properly submitted Deferral Request; however, the Trust may only defer a Submitted Claim for a maximum of three (3) years from the date the Individual Claim was originally submitted to the Trust, without such deferral affecting the status of the Submitted Claim for statute of limitations or repose purposes.  Any Individual Claimant who makes a Deferral Request shall retain his/her original place in the applicable FIFO Processing Queue only until the earliest of (i) his/her written request that the Trust end the deferral and proceed with processing the relevant Individual Claim, (ii) the expiration of the deferral, or (iii) three (3) years after the date the deferred Individual Claim was originally submitted to the Trust.

LTL II TDP

### 4.3.4   Non-Responsive Individual Claimants

Except for those Individual Claimants who (a) have submitted a Reconsideration Request (as defined in as defined in Section 6.1 below), or (b) (i) hold Submitted Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court approval before accepting any Scheduled Value proposed by Trust, Allowed Claimants shall have one hundred eighty (180) days from the date an offer is made by the Trust to accept such offer.  In the event that an Individual Claimant neither accepts such settlement offer within 180 days nor falls under either exception (a) or (b) of this Section, such Individual Claimant's Individual Claim shall be deemed waived and ineligible for compensation from the Settlement Trust.

LTL II TDP

### 4.3.5  Submission Requirements

Any Individual ~~Claimants~~Claimant who wishes to submit his/her respective Individual Claim to the Trust must satisfy the following applicable requirements with respect to the information and documentation required to prove that the Individual Claim should be ~~allowed~~processed pursuant to these TDP.  Regardless of the type of treatment sought, every Individual Claimant seeking compensation from the Trust must include the following at the time of submission (the "**Submission Requirements**"):

1) Citizenship/Residency: Proof that the Individual Claimant (and, to any extent applicable, the minor, deceased, or incapacitated individual represented by such Individual Claimant) is a United States citizen, a lawful permanent resident of the United States (or otherwise lawfully residing in the United States), or a Canadian citizen;

2) Claimant Information: All claimant information required under the Submission Procedures adopted by the Trust (the "**Claimant Information**"), including ~~but not limited to~~ the Individual Claimant's Identifying Information~~.~~;

3) Proof of Claim: A properly completed Form 410 (~~i.e.,~~ the "Proof of Claim"), which shall include~~, without limitation,~~ complete information for where notices to the creditor should be sent, and where payments to the creditor should be sent (including if such payments should be sent directly to counsel for the claimant).  If there is any conflict between the Proof of Claim and the Claim Submission Form the Proof of Claim shall control;

4) Claim Submission Form: A properly completed Claim Submission Form (the template for which shall be attached to the Submission Procedures adopted by the Trust);

5) Retention Agreement: To the extent the Individual Claimant is represented by counsel, a copy of the related retention agreement;

6) Talc Use Evidence: A sworn affidavit or other testimony establishing the Individual Claimant's use, and extent of use, of any and all talc and talc-containing products (including both J&J Talc Products~~) that the Individual Claimant reasonably believes is sufficient to satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to these TDP;~~ and Non-J&J Talc Products);

7) <u>Lack of Asbestos Exposure:</u> In the case of a Mesothelioma Claim a sworn affidavit asserting the Mesothelioma Claimant (i) has not alleged any prior asbestos exposure unrelated to use of talc-based products as the basis of a mesothelioma claim he/she has previously asserted against a separate asbestos trust or asbestos tort defendant and (ii) does not, and will not in the future, allege any prior asbestos exposure unrelated to use of talc-based products that may form the basis of a mesothelioma claim he/she may assert against a separate asbestos trust or asbestos tort defendant; and

8) <u>Medical Evidence:</u> Medical records that the Individual Claimant reasonably believes is sufficient to (i) satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to these TDP, and (ii) provide the Claims Administrator with all information necessary to accurately determine the appropriate Scheduled Value and Allowed Claim Amount.

While the precise extent of medical records required by the above Submission Requirements may vary from claim to claim, as well as generally, depending on the particular types of Individual Claims involved, diseases alleged, and other factors relevant to the valuation of Individual Claims pursuant to these TDP, in general, production of all pathology reports and contemporaneous treatment records, along with records sufficient to establish an Individual Claimant's relevant medical history, would be satisfactory for any Individual Claimant regardless of the type of Individual Claim asserted or Evaluation Track elected.

Notwithstanding the foregoing, in the event that the Medical Evidence submitted is deemed insufficient by the Claims Administrator to establish an Individual Claimant's relevant medical history, the Individual Claimant may submit an affidavit from his/her counsel attesting, under the pains and penalties of perjury, to the fact that all available relevant documentation has been submitted, which affidavit must show proof of the Individual Claimant's MyChart or similar patient portal. The Claims Administrator shall have the sole discretion to determine whether such affidavit is sufficient to resolve the deficiency as to the Medical Evidence submitted. However, Medical Evidence that does not include either a pathology report related to the Individual Claimant's alleged disease or, for Ovarian Cancer Claims only, the Individual Claimant's treating physician's detailed report as to the Individual Claimant's pathologic diagnosis shall not be deemed satisfactory evidence to establish a Qualifying Claim. Individual Claimants who are unable to satisfy these requirements may, however, still be eligible to proceed under the Accelerated Evaluation Process.

Individual Claims that are substantially complete at the time of submission shall be deemed Submitted Claims and be subjected to the Preliminary Evaluation Process set forth below.

### 4.3.6   Disallowed Claims

In the event that an Individual Claimant submits materials that are ~~clearly~~ insufficient (as determined by the Claims Administrator) to satisfy the Submission Requirements, the Trustees shall provide notice of each deficiency to such Individual Claimant and automatically defer the

related Submitted Claim for sixty (60) days (the "Deficiency Cure Period"), to ensure the Individual Claimant a fair opportunity to cure any such deficiencies. If the Individual Claimant fails to either timely supplement his/her Submitted Claim with materials sufficient to resolve any deficiencies identified, or timely respond to the deficiency notice requesting further relief, upon expiration of such sixty (60)-day period, the Submitted Claim at issue shall be disallowed (the "become a Disallowed Claim") and the Trustees shall provide notice to the Individual Claimant of the same (the "send a Disallowed Claim Notice") to the relevant Individual Claimant.

If the Trustees find that a Submitted Claim is becomes a Disallowed Claim, the Trustees will not perform the analysis pursuant to the Qualification conduct a Preliminary Evaluation Process of such Submitted Claim as described below in Section 4.4.4 4.4.2. Individual Claimants shall have the ability to seek reconsideration of the Trustees' determination set forth in the Disallowed Claim Notice as described in Article 6 herein.

**4.4    Claim Evaluation Procedures**

To determine whether each Individual Claim submitted to the Trust is either (i) legally valid and therefore should be allowed processed pursuant to these TDP, or (ii) legally invalid and therefore should be disallowed a Disallowed Claim, the Claims Administrator, in conjunction with the Claims Processor, shall act according to the following uniform procedures and guidelines to thoroughly and individually evaluate all related Claim Submissions.

**4.4.1    FIFO Processing**

Individual Claims shall be processed based on their place or places in the applicable FIFO Processing Queues based upon the election of an Evaluation Track. The Trust shall take all reasonable steps to resolve Individual Claims as efficiently and expeditiously as possible at each stage of claims processing, including with respect to any Reconsideration Requests and/or pursuant to the ADR Procedures, which steps may include, in the Trust's sole discretion, conducting settlement discussions with representatives with respect to more than one Individual Claim at a time, provided that the relevant Individual Claimants' respective positions in the applicable FIFO Processing Queues are maintained, and each Individual Claim is individually evaluated pursuant to the valuation factors set forth in Article 7.

**4.4.2    Preliminary Evaluation of Claim Submissions**

Within sixty (60) days of each Individual Claim being submitted to the Trust and thereby becoming deemed a Submitted Claim, the Claims Administrator shall conduct a Preliminary Evaluation of the related Claim Submission to determine whether:

a)    the Submitted Claim was timely submitted to the Trust pursuant to Section 4.2;

b)    the Submitted Claim has not previously been submitted to the Trust pursuant to these TDP or otherwise (except for Individual Claims that were submitted and later formally withdrawn pursuant to Section 4.3.2);

    c)      the Submitted Claim had not previously been resolved through litigation and/or settlement involving a Protected Party, other than Individual Claims that have previously been resolved in any manner described in Section 4.1.2(A); and

    d)      the Individual Claimant's Proof of Claim and Claim Submission are substantially and substantively completed and signed under penalty of perjury.

Submitted Claims that satisfy these four (4) preliminary criteria (the "the Preliminary Evaluation Criteria"), which are set forth above, shall be deemed Confirmed Claims and thereafter routed to either the standardStandard Qualification Evaluation Process or the Accelerated Evaluation Process, as elected by the Individual Claimant in his/her Claim Submission. A Submitted ClaimsClaim that failfails to satisfy one or more of the Preliminary Evaluation Criteria shall be disallowed and the Trust shall give written notice to thebecome a Disallowed Claim and the Trustees shall provide a Disallowed Claim Notice to the relevant Individual Claimant of the disallowance.

In the event that a Submitted Claim is disallowedbecomes a Disallowed Claim because it was previously submitted to the Trust with different independent counsel, the Trust shall provide notice to the related Individual Claimant regarding the duplicative submission and such Individual Claimant shall have thirty (30) days to submit to the Trust a certification signed by himself/herself, and bothall independent counsel who purported to represent the Individual Claimant for one of his/her IndividualClaim Submissions confirming which counsel shall be representing the Individual Claimant with respect to the original Submitted Claim and withdrawing any later Submitted Claim. If the Individual Claimant satisfies this option, he/she may retain his/her place in the FIFO Processing Queue and the Individual Claim may proceed through the evaluation processes set forth in these TDP. Failure to submit such certification shall result in (i) the original Submitted Claim being indefinitely deferred pending clarification from the Individual Claimant and his/her counsel as to who represents the Individual Claimant and (ii) any later Submitted Claim being deemed withdrawn.

### 4.4.3    General Principles for Evaluation of Confirmed Claims

For each Confirmed Claim, the Claims Administrator shall, in conjunction with the Claims Processor, individually evaluate the related Claim Submission pursuant to the Individual Claimant's selected Evaluation Track to determine whether the Individual Claim should be allowedan Allowed Claim. Regardless of the Evaluation Track selected, this process shall involve (i) a thorough review and consideration of all the submitted Claim Materials, (ii) a full evaluation and determination as to the credibility of such evidence, and (iii) determination as to whether such evidence satisfies the substantive criteria for the applicable Evaluation Track.

If the Claims Administrator verifies that a Confirmed Claim (i) satisfies the applicable substantive criteria as set forth in this Section and (ii) the related Claim Materials are not deceptive or fraudulent, then the Confirmed Claim shall be deemed an Allowed Claim. If, on the other hand, the Claims Administrator verifies that (i) the relevant Claim Materials are not

deceptive or fraudulent, but (ii) the Confirmed Claim does not satisfy the applicable substantive criteria, then the Claims Administrator has the discretion to either (i) disallow the claima) make the Confirmed Claim a Disallowed Claim, in which case the Trustees shall provide a Disallowed Claim Notice to the relevant Individual Claimant, or (iib) request, in writing, that supplemental evidence sufficient to resolve the deficiency from the Individual Claimant in question be submitted within thirty (30) days of the Claims Administrator making such request.   The deadline to provide such supplemental evidence may be automatically extended for an additional thirty (30) days upon written notice by the Individual Claimant to the Claims Administrator. Additional extensions of time to produce requested supplemented evidence may be requested upon written request by the Individual Claimant to the Claims Administrator, who retains full discretion to either grant or deny such request.  If such supplemental evidence is not received by the Claims Administrator prior to the expiration of the thirty (30)-day period (as extended, if applicable), the Claims Administrator will notifyConfirmed Claim will become a Disallowed Claim and the Trustees, who shall disallow said Individual Claim and provide written notice thereof shall provide a Disallowed Claim Notice to the relevant Individual Claimant.

In the event, however, that the Claims Administrator determines that any portion of the Claim Materials are deceptive or include fraudulent information (each, a "**Fraudulent Claim Submission**"), then such Individual Claim shall be disallowedbecome a Disallowed Claim, and the Trustees shall provide the required notice of such disallowance to the relateda Disallowed Claim Notice to the relevant Individual Claimant (theeach a "**Fraudulent Claimant**").  Further, if the Trust determines that any individual attorney or firm is continually representing Fraudulent Claimants and submitting Fraudulent ClaimantsClaim Submissions to the Trust, the Trustees have the discretion to subject the Individual Claims of other Individual Claimants who share the same counsel as a prior Fraudulent Claimant (to the extent such counsel represents other Individual Claimants who have submitted, or in the future submit, their Individual Claims to the Trust) to heightened scrutiny, so long as any such other Individual Claimants are not otherwise prejudiced with respect to the processing of their Claim Submissions and/or the payment (including the timing of payment) of any Qualifying Claims.

Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulentFraudulent Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in any federal court of competent jurisdiction.

### 4.4.4    Standard Qualification Evaluation Process

For each Confirmed Claim electing to proceed under the standardStandard Qualification Evaluation Process, the Claims Administrator shall, in conjunction with the Claims Processor, thoroughly review and evaluate the related Claim Submission to determine whether either the Ovarian Cancer Qualification Criteria or the Mesothelioma Qualification Criteria, as applicable, are satisfied.  If, in undertaking thisthe Standard Qualification Evaluation Process, the Claims Administrator determines that a Confirmed Claim satisfies the applicable Qualification Criteria, then such claim shall be deemed a Qualifyingan Allowed Claim and may proceed to the valuation processes set forth in these TDP.   Individual Claimants who do not satisfy the applicable Qualification Criteria are non-qualifying claims under these TDP and shall be

disallowed become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Individual Claimants.

### A.    Ovarian Cancer Qualification Criteria

Individual Claimants who submit to the Trust an Ovarian Cancer Claim and satisfy the following three (3) Ovarian Cancer Qualification Criteria shall be deemed Qualifying Ovarian Cancer Claimants.  Ovarian Cancer Claims that fail to satisfy these criteria are non-qualifying claims under these TDP and shall be disallowed Disallowed Claims.

1)  Proof of Regular Perineal Use of J&J Talc Products: the Individual Claimant consistently used establishes Regular Use of J&J Talc Products in her perineal area after puberty at least fifty (50) times per year for a minimum of four (4) consecutive years, and proves as much via sworn testimony or affidavit, including the alleged dates of first and last use;

2)  Proof of Injury: the Individual Claimant was newly diagnosed with a Ovarian Cancer at least ten (10) years following her first post-pubertal[2] perineal use of J&J Talc Products; and

3)  Timeliness: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

### B.    Mesothelioma Qualification Criteria

Individual Claimants who submit to the Trust a Mesothelioma Claim and satisfy the following three four (3 4) Mesothelioma Qualification Criteria shall be deemed Qualifying Mesothelioma Claimants.  Mesothelioma Claims that fail to satisfy these criteria are non-qualifying claims under these TDP and shall be disallowed Disallowed Claims.

1)  Proof of Regular Use of J&J Talc Products: the Individual Claimant establishes Regular Use of J&J Talc Products on his/her own body at least fifty (50) times per year for a minimum of four (4) consecutive years, and proves as much via sworn testimony or affidavit;

2)  Lack of Asbestos Exposure: the Individual Claimant (i) has not alleged any prior asbestos exposure unrelated to use of talc-based products as the basis of a mesothelioma claim he/she has previously asserted against a separate asbestos trust or asbestos tort defendant and (ii) does not, and will not in the future, allege any prior asbestos exposure unrelated to use of talc-based products that may form the basis of a

---

[2] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

mesothelioma claim he/she may assert against a separate asbestos trust or asbestos tort defendant;

3) <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with Mesothelioma at least ten (10) years following his/her first use of J&J Talc Products; and

4) <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

**4.4.5   Accelerated Evaluation Process**

**A.      In General**

For each Confirmed Claim electing to proceed under the Accelerated Evaluation Process, the Claims Administrator shall, in conjunction with the Claims Processor and with a focus on efficiency, review and evaluate the related Claim Submission to determine whether the Accelerated Evaluation Criteria are satisfied.  If in doing so the Claims Administrator determines that a Confirmed Claim satisfies the Accelerated Criteria, then such claim shall be deemed an ~~Approved~~<u>Allowed</u> Claim and the Settlement Trust shall promptly issue payment of the applicable Scheduled Value under Section 5.3.

An Individual Claimant who initially elected on his/her Claim Submission to have his/her claim evaluated pursuant to the Standard Qualification Evaluation Process set forth in Section 4.4.4 above may, at any time ~~(i)~~ after the date his/her Individual Claim was submitted to the Trust, but before ~~disallowance or payment of~~ such Individual Claim <u>becomes a Disallowed Claim or is paid</u>, as applicable, request to have his/her Individual Claim evaluated under the Accelerated Evaluation Process in this Section 4.4.5~~,~~ instead ~~(the "Acceleration Request"). Such Acceleration Request must be submitted and received by the Trust before the Trustees or Claims Administrator disallow such claim, if applicable.~~<u>.</u>

**B.      Accelerated Claims Criteria**

Individual Claimants who submit an Other Talc Claim to the Trust <u>or elect to have their Mesothelioma Claim or Ovarian Cancer Claim, as applicable, evaluated through the Accelerated Evaluation Process</u> and satisfy the following four (4) Accelerated Claims Criteria shall be deemed Other Approved Claimants:

1) <u>Proof of Regular Use of J&J Talc Products</u>: the Individual Claimant establishes Regular Use of J&J Talc Products ~~at least fifty (50) times per year for a minimum of four (4) consecutive years~~, and proves as much via sworn testimony or affidavit;

2) <u>Lack of Asbestos Exposure</u>: the Individual Claimant <u>(i) has not alleged any prior asbestos exposure unrelated to use of talc-based products as the basis of a mesothelioma claim he/she has previously asserted against a separate asbestos trust or asbestos tort defendant and (ii)</u> does not, and will not in the future, allege any prior asbestos exposure

unrelated to use of talc-based products that may form the basis of a mesothelioma claim he/she may assert against a separate asbestos trust or asbestos tort defendant;

3) <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with a Gynecological Cancer, Ovarian Cancer, or Mesothelioma at least ten years following his/her first use of J&J Talc Products; and

4) <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

**Article 5**
**VALUATION OF ALLOWED CLAIMS**

## 5.1     **In General**

The Claims Administrator, in conjunction with the Claims Processor, shall identify and utilize the appropriate multi-stage valuation process, as described in this Article, to determine the Scheduled Value for every Allowed Claim under these TDP.  These valuation processes are intended to be a direct continuation of the resolution process for Individual Claimants, immediately upon determination of allowance pursuant to the standardStandard Qualification Evaluation Process or the Accelerated Evaluation Process.  Promptly after determination of each Allowed Claim's Scheduled Value, the Trustees shall notify the related Individual Claimant in writing of (i) the determination that his/her Individual Claim is an Allowed Claims (*i.e.*, either a Qualifying Claim or Other Approved Claim and), (ii) the Scheduled Value determined as to the same pursuant to Sections 5.2 and 5.3, below, and (such noticeiii) the proposed Allowed Claim Amount (each a "**Scheduled Value Notice**").

## 5.2     **Determination of Scheduled Values for Qualifying Claims**

### 5.2.1   **Qualifying Ovarian Cancer Claims**

Upon determination that an Ovarian Cancer Claim submitted to the Trust is a Qualifying Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following seven (7) stage valuation process for any such Ovarian Cancer Claim that elected evaluation under the Standard Qualification Evaluation Process.  This process requires the Claims Administrator:

1) To identify the Initial Point Value based on the Individual Claimant's age at diagnosis and specific category of injury; then

2) To establishedestablish the Adjusted Point Value based on the Initial Point Value and the Diagnostic Adjustment as determined by the disease subtypes; then

3) To further adjust that Point Value based on the length of Regular Use of J&J Talc Products; then

4) To further adjust that Point Value based on the length of time between the end of the Individual Claimant's Regular Use and the relevant date of diagnosis; then

5)   To further adjust that Point Value based on less-than-Regular Use of J&J Talc Products, if applicable; then

6)   To further adjust that Point Value by a certain percentage discount based on the existence of certain risk factors, if applicable; and finally

7)   To further adjust the resulting Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable.

Gynecologic Claims other than Ovarian Cancer claims shall only be eligible to receive amounts based on the Accelerated Evaluation Process below in Section 5.3.3.

### A.   Initial Point Values

The Initial Point Values for Qualifying Ovarian Cancer Claims, prior to the application of any of the listed adjustments and/or reductions will be determined based on the Individual Claimant's age and stage of cancer as detailed in the chart below. The relevant age shall be determined based on an Individual Claimant's age on her Date of Diagnosis. The relevant stage of cancer shall be determined by the most advanced stage of Ovarian Cancer the Individual Claimant received a diagnosis for, as established by the medical evidence submitted with the Claim Materials.

| Age at Diagnosis (in years) | Stage IV OR Related Death | Stage III (with or without recurrence) | Stage I-II (with recurrence) | Stage II (without recurrence) | Stage I (without recurrence) |
|---|---|---|---|---|---|
| Under 45 | 1,200 | 840 | 420 | 240 | 120 |
| 45-49 | 1,020 | 715 | 355 | 205 | 100 |
| 50-54 | 780 | 545 | 275 | 155 | 80 |
| 55-59 | 660 | 460 | 230 | 130 | 65 |
| 60-64 | 480 | 335 | 170 | 95 | 50 |
| 65-69 | 360 | 250 | 125 | 70 | 35 |
| 70+ | 300 | 210 | 105 | 60 | 30 |

### B.   Point Value Adjustment Factors

Each Individual Claimant's Initial Point Value will then be adjusted based on multiplication of theby multiplying such Initial Point Value by the applicable Diagnostic Adjustment pursuant to the chart set forth in this Sectionthe chart below. The resulting claim-specific point value shall be referred to as the "**Adjusted Point Value**."

The standard Initial Point Value for all claims is the value of a qualifying serous carcinoma claim (i.e., "100%"), and claims involving other Ovarian Cancer disease subtypes shall be treated as being worth a percentage of whatever that standard Initial Point Value is, as follows:

| Ovarian Cancer Diagnostic Subtypes | Diagnostic Adjustment (as a percentage of a qualifying serous carcinoma) |
|---|---|
| Serous Carcinoma | 100% |
| Endometrioid Carcinoma | 90% |

LTL II TDP

| Clear Cell Carcinoma | 75% |
|---|---|
| Mixed Epithelial Carcinoma | See below |
| – Each subtype identified is a qualifying subtype (*e.g.*, serous with clear cell) | 100% |
| – Primary subtype is a qualifying subtype (*i.e.*, serous, endometrioid, clear cell) but other subtypes are non-qualifying (*e.g.*, serous with mucinous) | 65% |
| Undifferentiated Epithelial Carcinoma | 100% |
| Ovarian Carcinoma with Epithelial Component of Unknown or Unidentified Subtype (*e.g.*, "ovarian adenocarcinoma") | 50% |
| Borderline Ovarian Tumors with Serous, Endometrioid, or Clear Cell Subtypes | 30% |

### C.    Talc Use and Risk Factor Reductions

Each Individual Claimant's Adjusted Point Value will then be further adjusted based on a series of multiplicative talc usage and medical risk factors to determine the Scheduled Value for the Individual Claim, as set forth in this Section.

### (i)    Step I Adjustment:  Length of Perineal Use

Each Individual Claimant's Adjusted Point Value shall be adjusted based on the total length of the Individual Claimant's Regular Perineal Use (*i.e.*, the number of years she regularly usedof Regular Use of J&J Talc Products in her perineal area).  Specifically, the Adjusted Point Value shall be reduced proportional to the Years of Regular Perineal Use relative to the Maximum Years of Regular Perineal Use. For purposes of this valuation process, where "**Years of Regular Perineal Use**" shall be defined asmean the lesser of (i) the number of full years of Regular Perineal Use after the Individual Claimant reached puberty[2], and the Individual Claimant's Date of Diagnosis[3] or (ii) 40 years. Similarly, the , and "**Maximum Years of Regular Perineal Use** is defined as" shall mean the lesser of (i) the number of years elapsed between puberty and the Individual Claimant's Date of Diagnosis or (ii) 40 years.[34]

$$\text{Step I Adjustment of Adjusted Point Value} = 1 - \frac{(\text{Years of Regular Perineal Use})}{(\text{Maximum Years of Regular Perineal Use})}$$

---

[2] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

[3] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

[34] By way of example, if an Individual Claimant was 43 years old on her Date of Diagnosis, the Maximum Years of Regular Perineal Use is 30 years.  If she regularly used J&J Talc Products in her perineal area for 20 years, then the Adjusted Point Value would be subject to a Length of Perineal Use Factor adjustment of 1 – (20 years /30 years) = 33.33%.

This reduction factor shall be referred to as the "**Length of Perineal Use Factor**" and, as defined, cannot expressed as a percentage, and shall not be less than 0.00% or exceed 1.0100%.

(ii)    Step II Adjustment: Time Since Last Perineal Use

Next, the Adjusted Point Value shall be further adjusted based on the length of time between the Individual Claimant's last Regular Perineal Use and her Date of Diagnosis, as set forth in the following table:

| Time Since Last Regular Use | Reduction of Point Value |
|---|---|
| 0 to <6 years since last Regular Perineal Use | 0% |
| 6 to <30 years since last Regular Perineal Use | 2% per year[45] |
| 30+ years since last Regular Perineal Use | 55% |

This reduction factor shall be referred to as the "**Time Since Last Use Factor**" and, as defined, cannot expressed as a percentage, and shall not be less than 0.00% or exceed 1.055%.

(iii)    Step III Adjustment:  Non-Regular Perineal Use

Next, if the Claims Administrator and/or Claims Processor determines that an Individual Claimant's perineal use of J&J Talc Products varies substantially from the use pattern of the typical qualifying claim, the TrusteeTrustees may, at histheir sole discretion, conduct an individual review of the Claim Submission and reasonably reduce the Adjusted Point Value based on the frequency the Individual Claimant's perineal of talc use, as compared to what would constitute normal use based on other submissions.  This discretionary adjustmentreduction factor shall be referred to as the "**Non-Regular Perineal Use Factor**" and, as defined, cannot expressed as a percentage, and, if applicable, shall not be less than 0.00% or exceed 1.0100%.

(iv)    Step IV Adjustment:  Medical Risk Factors

Next, the Adjusted Point Value shall be further reduced based on the Individual Claimant's family history and genetic predisposition to Ovarian Cancerovarian cancer, based on the table below.  Only the greatest of the reductions for applicable medical risk factors shall apply.  For avoidance of doubt, discounts applicable pursuant to this Section 5.2.1(C)(iv) are not applied cumulatively (*i.e.*, if an Individual Claimant has BRCA 1 as well as a family history of ovarian cancer, the total reduction is 45%, not 80%).

| Risk Factor | Reduction of Point Value |
|---|---|

---

[45] For avoidance of doubt, an Individual Claimant who was diagnosed with a qualifying disease 10 years after her last Regular Perineal Use would be subject to a Time Since Last Use Factor discount of (10 − 5) x 2% = 10%.

~~LTL II TDP~~

| | |
|---|---|
| BRCA 1 or BRCA 2 | 45% |
| Family ~~Hx~~history of ovarian cancer (in 1st degree relative) | 35% |
| Personal or family history (in 1st degree relative) of colon or breast cancer | 20% |

This reduction factor shall be referred to as the "**Medical Risk Factor**" and~~, as defined, cannot~~ expressed as a percentage, and, if applicable, shall not be less than ~~0.0~~20% or exceed ~~1.0~~45%.

(v)   Step V Reductions:  Non-J&J Talc Perineal Use

Next, the Adjusted Point Value shall be further adjusted based on an Individual Claimant's Regular Non-J&J Talc Perineal Use (if applicable and established by affidavit or legal pleadings).

| Discounts | Reduction of Point Value |
|---|---|
| Other Talc Use (applies only if Individual Claimant ~~establishes~~has established Regular Non-J&J Talc Perineal Use for a period of greater than 4 years) | 25% (increasing to the total percentage of other Regular Non-J&J Talc Perineal Use) |

This reduction factor shall be referred to as the "**Non-J&J Talc Perineal Use Factor**" and~~, as defined, cannot~~ expressed as a percentage, and, if applicable, shall not be less than ~~0.0~~25% or exceed ~~1.0.~~[5]100%.[6]

~~[5] By way of example, if an Individual Claimant used J&J Talc Products every morning in her perineal area and used Non J&J Talc Products every evening for thirty years (i.e., half of her perineal area applications were J&J Talc Products and half were non J&J Talc Products), then the Adjusted Point Value of her claim will be reduced by 50% = 30 years of Non J&J Talc Perineal Use / (30 years of Regular Perineal Use + 30 years of Non J&J Talc Perineal Use). If, instead, she had used Non J&J Talc Products in her perineal area once a week for a 5 years and used J&J Talc Products in her perineal area every day for 20 years (i.e., one fifth of the total years she regularly used talc based products in her perineal area was use of Non J&J Talc Products), then the Adjusted Point Value of her claim will be reduced by the minimum 25%.~~

[6] By way of example, if an Individual Claimant used J&J Talc Products every morning in her perineal area and used Non-J&J Talc Products every evening for thirty years (i.e., half of her perineal area applications were J&J Talc Products and half were Non-J&J Talc Products), then the Adjusted Point Value of her claim will be reduced by 50% = 30 years of Non-J&J Talc Perineal Use / (30 years of Regular Perineal Use + 30 years of Non-J&J Talc Perineal Use).  If, instead, she had used Non-J&J Talc Products in her perineal area once a week for a 5 years and used J&J Talc Products in her perineal area every day for 20 years (i.e., one-fifth of the total years she regularly used talc-based products in her perineal area was use of Non-J&J Talc Products), then the Adjusted Point Value of her claim will be reduced by the minimum 25%.

LTL II TDP

### D.    Scheduled Value

Each Qualifying Claimant's Scheduled Value shall be determined based on her Initial Point Value multiplied by the relevant Diagnostic Adjustment and any applicable reduction factors outlined in Steps I–V (rounded to the nearest whole number), as follows:

$$
\begin{aligned}
Scheduled\ Value \\
= (Initial\ Point\ Value) \times (Diagnostic\ Adjustment) \times \\
(1 - Length\ of\ Use\ Factor\ Reduction) \times (1 \\
- Time\ Since\ Last\ Use\ Factor\ Reduction) \times (1 \\
- Less\ Than\ Daily\ Use\ Factor\ Reduction) \times (1 - Medical\ Risk\ Factor\ Reduction) \\
\times (1 - Non\ J\&J\ Talc\ Use\ Factor\ Reduction)
\end{aligned}
$$

By way of example, if the Individual Claimant for an Ovarian Cancer Claim is a woman who was diagnosed with Stage IV ~~Clear~~clear cell ~~ovarian~~ carcinoma at age 53, had 30 years of Regular Perineal Use, stopped using J&J Talc Products in her perineal area 10 years before her Date of Diagnosis, has a family history of colon cancer in her mother, and never used Non-J&J Talc Products in her perineal area, then her Scheduled Value would be 316 points.

| Initial Point Value | | | 780 |
|---|---|---|---|
| Diagnostic Adjustment | Clear cell ovarian carcinoma = 75% | × | 75% |
| **Adjusted Point Value** | | | 585 |
| Adjustment for Length of Regular Perineal Use Factor | 1–(30÷40) = 25% | × | 75% = 1 − 25% **438.79** |
| Adjustment for Time Since Last Regular Perineal Use Factor | (10–5)×2% = 10% | × | 90% = 1 − 10% **394.879** |
| Adjustment for Non-Regular Use | Discretionary (not applied) | × | n/a |
| Adjustment for Medical Risk Factor | Colon cancer in family history = 20% | × | 80% = 1 − 20% **315.9** |
| Adjustment for Non-J&J Talc Perineal Use Factor | 0 years of total use = 0% | × | 100% = 1 − 0% **315.9** |
| **Scheduled Value** | | = | **315.9 (rounded to 316)** |

### 5.2.2    Qualifying Mesothelioma Claims

Upon determination that an Individual Claim submitted to the Trust is a Qualifying Mesothelioma Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following five (5) stage valuation process for any such Mesothelioma Claim that elected evaluation under the Standard Qualification Evaluation Process.  This process requires the Claims Administrator:

1)   To identify the Initial Point Value based on the Individual Claimant's age at diagnosis; then

2) To ~~established~~establish the Adjusted Point Value based on the Initial Point Value and the Diagnostic Adjustment as determined by the disease subtypes; then

3) To further adjust that Point Value based on length of use of J&J Talc Products; then

4) To further adjust that Point Value based on the non-regular use of J&J Talc Products, if applicable; and finally

5) To further adjust that Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable.

### A.    Initial Point Value

The Initial Point Value for Qualifying Mesothelioma Claims, prior to the application of any of the listed adjustments will be determined based on the Individual Claimant's age on his/her first Date of Diagnosis, as detailed below:

| Age on Date of Diagnosis | Mesothelioma |
|---|---|
| Under 45 | 2,400 |
| 45-49 | 2,040 |
| 50-54 | 1,560 |
| 55-59 | 1,320 |
| 60-64 | 960 |
| 65-69 | 720 |
| 70+ | 600 |

### B.    Point Value Adjustment Factors

Each Qualifying Claimant's Initial Point Value will then be adjusted ~~based on multiplication of the~~by multiplying such Initial Point Value by the applicable Diagnostic Adjustment ~~pursuant to the chart~~ set forth in ~~this Section~~the chart below.  The resulting claim-specific point value shall be referred to as the "**Adjusted Point Value**."

~~The standard Initial Point Value for all Qualifying Mesothelioma Claims is the value of a qualifying pleural mesothelioma claim (i.e., "100%"), and claims involving other types of malignant mesothelioma are treated as being worth a percentage of whatever that standard Initial Point Value is, as follows:~~

| Diagnostic Subtypes | Diagnostic Adjustment ~~(as a percentage of a qualifying Pleural Mesothelioma claim)~~ |
|---|---|
| Pleural Mesothelioma ~~(non-WDPM)~~ | 100% |
| Peritoneal Mesothelioma | 75% |

LTL II TDP

| Pericardial Mesothelioma | 10% |
|---|---|
| Testicular Mesothelioma | 10% |

### C.    Talc Use & Risk Factor Reductions

Each Individual Claimant's Adjusted Point Value will then be reduced based on a series of multiplicative talc usage factors to determine the Scheduled Value for the Individual Claim, as set forth in this Section.

(i)    Step I Adjustment:  Length of Regular Use

Each Individual Claimant's Adjusted Point Value shall be reduced based on the length of time the Individual Claimant regularly used J&J Talc Products on his/her Date of Diagnosis. Specifically, the Adjusted Point Value shall be reduced proportional to the Years of Regular Use relative to the Maximum Years of Regular Use. For purposes of this valuation process, where "**Years of Regular Use**" shall be defined as mean the lesser of (i) the number of full years of Regular Use, on the Date of Diagnosis or (ii) 40 years. Similarly, the , and "**Maximum Years of Regular Use** is defined as" shall mean the lesser of (i) the Individual Claimant's age on his/her Date of Diagnosis or (ii) 40 years.

$$Length\ of\ Regular\ Use\ Adjustment = 1 - \frac{(Years\ of\ Regular\ Use)}{(Maximum\ Years\ of\ Regular\ Use)}$$

This reduction factor shall be referred to as the "**Length of Use Factor**" and, as defined, cannot expressed as a percentage, and shall not be less than 0.00% or exceed 1.0100%.

(ii)    Step II Adjustment:  Non-Regular Use

Next, if the Claims Administrator and/or Claims Processor determines that an Individual Claimant's use of J&J Talc Products is insufficient to establish Regular Use, the Trustee Trustees may, at his their sole discretion, conduct an individual review of the Claim Submission and reasonably reduce the Adjusted Point Value based on the frequency the Individual Claimant's use of J&J Talc Products, as compared to what would constitute normal use based on other submissions.

This discretionary reduction factor shall be referred to as the "**Non-Regular Use Factor**" and, as defined, cannot expressed as a percentage, and, if applicable, shall not be less than 0.00% or exceed 1.0100%.

(iii)    Step III Adjustment:  Non-J&J Talc Use

Next, the Adjusted Point Value shall be further reduced based on an Individual Claimant's Regular Non-J&J Talc Use (if applicable and established by affidavit or legal pleadings).

| Discounts | Adjustment Reduction of Point Value |
|---|---|

~~LTL II TDP~~

| Other Talc Use | 25% (increasing to the total percentage of other talcum powder use in pleadings or affidavit) |
|---|---|

This reduction factor shall be referred to as the "**Non-J&J Talc Use Factor**" and, ~~as defined, cannot~~ expressed as a percentage, and, if applicable, shall not be less than ~~0.0~~25% or exceed ~~1.0.[6]~~100%.[7]

## D.    Scheduled Value

Each Qualifying Claimant's Scheduled Value shall be determined based on his/her Initial Point Value multiplied by the relevant Diagnostic Adjustment and any applicable reduction factors outlined in Steps I–III, as follows:

$$Scheduled\ Value$$
$$= (Initial\ Point\ Value) \times (Diagnostic\ Adjustment) \times$$
$$(1 - Length\ of\ Use\ Factor\ Reduction) \times (1 - Non$$
$$- Regular\ Use\ Factor\ Reduction) \times (1 - Non\ J\&J\ Talc\ Use\ Factor\ Reduction)$$

By way of example, if a Qualifying Claimant was diagnosed with pleural mesothelioma at age 60, used J&J Talc Products every morning for 30 years, and used Non-J&J Talc Products every evening for 30 years (*i.e.*, half his applications were J&J Talc Products and half were non-J&J Talc Products), his Scheduled Value would be 360 points.

| **Initial Point Value** | | | **960** |
|---|---|---|---|
| Diagnostic Adjustment | Pleural = 100% | × | 100% |
| **Adjusted Point Value** | | | **960** |
| Reduction for Length of Use Factor (30 years) | 1 − (30 ÷ 40) = 25% | × | 75% = (1 − 25%) **720** |
| Adjustment for Non-Regular Use Factor | Discretionary (not applied) | × | n/a |
| Adjustment for Non J&J Talc Use Factor(half of applications) | 50% | × | 50% = (1 − 50%) **360** |
| **Scheduled Value** | | = | **360** |

---

[6] ~~By way of example, if an Individual Claimant used J&J Talc Products twice a day and used Non-J&J Talc Products once a day for thirty years (i.e., two thirds of his applications were J&J Talc Products and one third were non-J&J Talc Products), then the Adjusted Point Value of his claim will be reduced by 33.33%. If, instead, he used Non-J&J Talc Products twice a week for a period of greater than 4 years and used J&J Talc Products every day (i.e., regularly used Non-J&J Talc Products two-sevenths of the time he used J&J Talc Products), then the Adjusted Point Value of his claim will be reduced by 25%.~~

[7] By way of example, if an Individual Claimant used J&J Talc Products twice a day and used Non-J&J Talc Products once a day for thirty years (*i.e.*, two-thirds of his applications were J&J Talc Products and one-third were non-J&J Talc Products), then the Adjusted Point Value of his claim will be reduced by 33.33%. If, instead, he used Non-J&J Talc Products twice a week for a period of greater than 4 years and used J&J Talc Products every day (*i.e.*, regularly used Non-J&J Talc Products two-sevenths of the time he used J&J Talc Products), then the Adjusted Point Value of his claim will be reduced by 25%.

**5.3**    ~~Scheduled Values~~**Allowed Claim Amounts** **for Approved Accelerated Claims**

Upon determination that an Individual Claim submitted to the Trust is an Other Approved Claim, the Claims Administrator, in conjunction with the Claims Processor, shall determine the ~~Scheduled Value~~Allowed Claim Amount for any such Other Approved Claim, as follows:

### 5.3.1  Individual Claims Which Could Have Appropriately Elected to Proceed Under the **Standard** Qualification Evaluation Process

If an Individual Claimant could have appropriately elected to submit his/her Individual Claim to the Trust pursuant to the ~~standard~~Standard Qualification Evaluation Process, but for whatever reason chose ~~to~~instead to elect the Accelerated Evaluation Process, the resulting Other Approved Claim shall have ~~a Scheduled Value~~an Allowed Claim Amount of one thousand dollars and zero cents ($1,000.00).

### 5.3.2  Canadian Claims

Other Approved Claims that involve an Individual Claimant who is not a citizen or legal permanent resident of the United States, but who is a citizen or legal permanent resident of Canada, shall have ~~a Scheduled Value~~an Allowed Claim Amount of five hundred dollars and zero cents ($500.00).

### 5.3.3  Other Allegedly Talc-Related Diseases

Other ~~Talc~~Individual Claims that become Other Approved Claims shall have ~~a Scheduled Value~~an Allowed Claim Amount of one thousand dollars and zero cents ($1,000.00).

### Article 6
### RECONSIDERATION REQUESTS & ADR PROCEDURES

**6.1**    **Reconsideration of Determination**

### 6.1.1  Requirements for Reconsideration Requests

An Individual Claimant may submit a request to the Trust that the Trustees reconsider any initial determination (a "**Reconsideration Request**"), as indicated by the Disallowed Claim Notice or Scheduled Value Notice, as applicable, (i) that the Individual Claimant's Submitted Claim is a Disallowed Claim (regardless of the stage of the resolution process pursuant to these TDP that this determination occurred), or (ii) of the applicable Scheduled Value for the relevant Allowed Claim.  For a Reconsideration Request to be considered, it must be made pursuant to process described in the Submission Procedures adopted and published by the Trust.  Each properly submitted Reconsideration Request must include:

  a)    A completed Reconsideration ~~Form~~Request form, the template for which shall be designed and adopted by the Trustees and included as an Exhibit to the Submission Procedures;

b)      Payment of five hundred dollars ($500) as an administrative reconsideration fee, in the form of either check, money order, or via any electronic payment process deemed acceptable by the Trustees; and

c)      At the requesting Individual Claimant's discretion, further evidence in support of the relevant Submitted Claim.

### 6.1.2    Forfeiture of Right to Request Reconsideration

Individual Claimants found to have submitted deceptive or fraudulent information or documents to the Trust shall be deemed to have forfeited their right to request reconsideration pursuant to these TDP.

### 6.1.3    Failure to Request Reconsideration Deemed Acceptance

The deadline to submit a Reconsideration Request shall be thirty (30) days after receiving a Disallowed Claim Notice or Scheduled Value Notice (the "Reconsideration Deadline").  Any Individual Claimant who fails to properly submit a Reconsideration Request to the Trust by the Reconsideration Deadlineprior to the expiration of such thirty (30)-day period shall be deemed to accept the original determination of the Claims Administrator, which determination shall become final and non-appealable.

### 6.1.4    Reconsideration Request Procedures

Upon receipt of a properly submitted Reconsideration Request, the Trustees shall proceed with an independent evaluation of the Individual Claim and specific determination in question. The Trustees will have the sole discretion whether to grant the Reconsideration Request.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Trustees will provide written notice within thirty (30) days of receiving the Reconsideration Request that it will not reconsider the specific determination in question.  The Individual Claimant shall retain the ability to pursue his/her Individual Claim in mediation or litigation pursuant to the Post-ReconsiderationADR Procedures and Litigation procedures set forth below in SectionSections 6.2 and 6.3, respectively.

If the Reconsideration Request is granted, the Trustees will provide written notice to the Individual Claimant within thirty (30) days of receiving the Reconsideration Request that they are reconsidering his/her Individual Claim.  The Trustees will then reconsider the Individual Claim—including all new information provided by the Individual Claimant in the Reconsideration Request—and will have the discretion to maintain or revise the original determination or, alternatively to request supplemental information and/or materials necessary to reach a final conclusion.  The Trustees will use their best efforts to notify the Individual Claimant of itstheir decision to affirm or revise the original determination within sixty (60) days of  having sent notice that they were reconsidering the Individual Claim.

To the extent that the Trustees determine that a Submitted Claim is, upon reconsideration, an Allowed Claim or should receive a higher proposed Scheduled Value, the

Trustees shall provide a Scheduled Value Notice and return the administrative fee to the Individual Claimant.    If, however, the Trustees decide that no change to the original determination is warranted, that the Allowed Claim should receive a lower proposed Scheduled Value, or that insufficient information was provided by the Individual Claimant to reach a different conclusion at the time, then the administrative fee shall not be returned and the earlier allowance determination and/or Scheduled Value shall stand and the Trustees will provide written notice thereof within sixty (60) days of the Trust having sent notice that it is reconsidering the Individual Claim.

## 6.2    ~~Post-Reconsideration~~ ADR Procedures

If (i) a Reconsideration Request is denied or (ii) the Individual Claimant remains unsatisfied with the Trustees' determination upon reconsideration, then the Individual Claimant may elect to proceed to mediation by providing written notice to the Claims Administrator within thirty (30) days of completion of the ~~Reconsideration Request Procedures~~procedures set forth in Section 6.1.4.    If the Individual Claimant does not provide such written notice requesting mediation, then the Disallowed Claim Notice or Scheduled Value Notice shall stand.

The Trustees shall maintain a list of approved mediators, which shall be made available to all Individual Claimants who submit their Individual Claims to the Trust.    The Claims Administrator and the Individual Claimant shall jointly choose a mediator (the "**Mediator**") from the list maintained by the Trustees.    If the Claims Administrator and the Individual Claimant are unable to reach agreement regarding the Mediator, the TAC shall select one from the list maintained by the ~~Trustee~~Trustees.

The Mediator will work with the Claims Administrator and the Individual Claimant to reach a settlement of the Individual Claim that is mutually acceptable to both parties; *provided*, *however*, that the settlement amount may not exceed the Maximum Value of the Individual Claim.    The Mediator shall not have the authority to unilaterally impose a settlement upon the parties.    The Individual Claimant and Claims Administrator shall split the fees and expenses incurred by the Mediator equally; *provided*, that the Individual Claimant's share of the Mediator's fees and expenses shall be capped at $2,500.    The parties shall otherwise bear their own costs, including legal fees.

If the ~~Post Reconsideration Mediation~~mediation results in a settlement agreement, the agreed upon amount shall constitute the Individual Claimant's Allowed Claim and payment of such Allowed Claim shall be processed in the same manner as payments made to Individual Claimants who accept the Claims Administrator's original Scheduled Value determined and proposed for their Allowed Claims, pursuant to Article 5.    If the ~~Post Reconsideration Mediation~~mediation concludes with no settlement, the Mediator will formally conclude mediated discussions and the Individual Claimant may proceed to litigation pursuant to Section 6.3 below.

## 6.3    ~~Post-Reconsideration~~ Litigation

An Individual ~~Claimants who have~~Claimant who has exhausted ~~their Reconsideration Request and Post Reconsideration ADR~~his or her rights pursuant to Sections 6.1 and 6.2~~, respectively~~ shall retain the right to institute a lawsuit in the tort system against the Trust in the

- 44 -

LTL II TDP

Claimant's Jurisdiction.  Such lawsuit may not name the Debtor, any LTL Corporate Party, or any other Protected Party and must only be filed against the Trust as defendant.  Any such lawsuit must be filed by the Individual Claimant in his/her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.

An Individual Claimant seeking to commence litigation pursuant to this Section must notify the Trust of his/her intention to seek judicial review within thirty (30) days of receiving notice of the Trust's determination following the conclusion of Post-Reconsideration ADR Procedures pursuant to Section 6.3.  Individual Claimants (i) who seek judicial review of the Trust's determination of the Scheduled AmountValue must pay a fee of $2,500 to the Trust, and (ii) who seek judicial review of the Trust's determination of the Individual Claim's disallowanceClaim is a Disallowed Claim must pay a fee of $10,000 to the Trust.

Both the Individual Claimant and the Trust shall have all appropriate defenses available to them (including, with respect to the Trust, all defenses which could have been asserted by any Protected Party).  Further, the Trust may use any and all information and/or materials submitted to the Trust by the Individual Claimant in its defense of any lawsuit in the tort system, including evidence of deceptive or fraudulent behavior.  In the event that the Individual Claimant does not prevail at trial or prevails but is awarded a judgment less than the Allowed Claim amountAmount offered by the Trust, the final Allowed Claim Amount shall be reduced on a dollar-for-dollar basis by all costs the Trust incurred in defending against the Individual Claimant's lawsuit, including costs associated with retention of experts, if any; *provided*, that such dollar-for-dollar reduction shall not exceed the Allowed Claim Amount, if applicable.

At any time during the course of a lawsuit pursued under this Section the Individual Claimant and Trustees and/or Claims Administrator may agree to engage in settlement discussions or any mutually agreeable alternative dispute resolution procedure, including, without limitation, mediation or arbitration.  The Trustees shall have authority to settle such lawsuits in the exercise of their business judgement and such settlements may include, among other things, the waiver of attorney fees that may otherwise be due pursuant to the preceding paragraph.  However, the settlement amount of such settlement agreement may not exceed the Maximum Value of the Individual Claim.

In the event an Individual Claimant elects to pursue a lawsuit pursuant to this Section which results, after waiver and/or exhaustion of any party's rights of appeal, in a final judgment for monetary damages, then such Individual Claimant shall be eligible to receive payment of the portion of such judgment that constitutes compensatory damages (the "**Judgment Amount**") through the Trust, up to the Maximum Judgment Amount (the "**Allowed Judgment Amount**").  Payment of the Allowed Judgment Amount shall be processed in the same manner as payments made to Individual Claimants who accepted the Claims Administrator's original Scheduled Value determined and proposed for their Allowed Claims, pursuant to Article 5, except that upon reaching the front of the FIFO Processing Queue, the Settlement Trust shall distribute to the Individual Claimant only an initial payment equal to Trust's last offer, if any, to the Individual Claimant (provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system).  The balance of the judgment, up to the Allowed Judgment Amount for the Individual Claim, if any, shall be paid to the Individual Claimant in

- 45 -

five (5) equal installments in years six (6) through ten (10) following the year of the initial payment.  Under no circumstances shall any non-compensatory monetary damages or any interest be paid under any statute on any judgments obtained in the tort system.

## Article 7
## INDIVIDUAL CLAIMS PAYMENT PROCESS

### 7.1    Points-Based Monetary Values

#### 7.1.1    Uncertainty of Debtor's Talc Liabilities

Litigation arising from the use of talc or talc-containing products is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtor's total talc-related liabilities.  As a result of this uncertainty, in undertaking to ensure substantially equitable treatment of all similar Existing Claims and Future Claims, the Trustees must from time to time determine the per-point dollar value of the points used to value Individual Claims under these TDP (, i.e., the "Cash Value of a Point").

#### 7.1.2    Description & Application of Points Valuation System

##### A.    In General

Promptly after the Trust is established, the Trustees, in consultation with the Payor Guarantor, TAC, and FCR shall establish an initial Cash Value of a Point (the "**Initial Cash Value of a Point**").  This Initial Cash Value of a Point shall be calculated on the basis of the initial trust claim submissions, an estimate of future submissions, and the claim valuation procedures outlined in these TDP, and the factors set forth in Section 7.1.2(D) below.  Given the uncertainty associated with Individual Claims, and in recognition of the fact that the Trust may increase the Cash Value of a Point in the future, the Trust shall take a conservative posture in setting the Initial Cash Value of a Point.

The totality of the Individual Claims to be paid over time pursuant to these TDP is not certain.  Further, there is also some uncertainty surrounding the value of the Trust's assets in the future.  If the value of the Trust's future assets increases materially and/or if the value or volume of Individual Claims actually filed with the Trust is materially lower than originally estimated, the Trust shall use the increase in Trust assets available first to maintain the Cash Value of a Point then in effect.

##### B.    Supplemental Payments Owed Due to Increases to the Cash Value of a Point

If the Trustees, after consultation with the Payor, TAC, and FCR determine that an increase to the Cash Value of a Point is warranted due to a material change in the estimates of the Trust's future assets and/or liabilities, then the Trustees shall provide cause the Trust to make supplemental payments to the Individual Claimants, subject to the terms set forth herein, upon written notice of the increase to all Individual Claimants and Indirect Talc Personal Injury Claimants and their counsel (the "Cash Value of a Point Adjustment Notice") who previously received payment on account of an Allowed Claim based upon a lower Cash Value of a Point.

Individual Claimants and Indirect Talc Personal Injury Claimants that wish to receive a supplemental payment must provide written notice to the Trustees within sixty (60) days of the Trustee's issuance of the Cash Value of a Point Adjustment Notice. Individual Claimants and Indirect Talc Personal Injury Claimants who do not submit such a request to the Trust shall be deemed to have waived their rights to this and any and all future supplemental payments.  For the avoidance of doubt, the Trustee shall not provide a notice of any future adjustments to the Cash Value of a Point to parties that did not request a supplemental payment in response to a prior all Individual Claimants and their counsel (each a "**Cash Value of a Point Adjustment Notice**"). The amount of any supplemental payment shall be the liquidated value Scheduled Value of the Allowed Claim in question multiplied by the newly adjusted Cash Value of a Point, less all amounts previously paid by the Settlement Trust with respect to that Allowed Claim. the previous Allowed Claim Amount of the Allowed Claim.  Checks issued by the Trust in respect of any supplemental payments shall be mailed to the last address the Individual Claimant provided to the Trust for the Trust to send payments, which address may be the Individual Claimant's attorney.  Checks issued by the Trust in respect of any supplemental payments shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Trust.  Any Allowed Claim in respect of such voided check shall be discharged and forever barred from assertion against the Trust and the Individual Claimant shall not be entitled to any future payments from the Trust.

The Settlement Trust's obligation to make a supplemental payment to any Individual Claimant shall be suspended in the event the payment in question would be less than one hundred dollars and zero cents ($100.00), and the amount of the suspended payment shall be added to the amount of any prior supplemental payment(s) also suspended because they would have been less than one hundred dollars and zero cents ($100.00).  The Settlement Trust's obligation to make a previously suspended supplemental payment shall resume when the payment in question is equal to or greater than one hundred dollars and zero cents ($100.00).  For the avoidance of doubt, no supplemental payment shall be made to any Other Approved Claims.

### C.    Determination of Cash Value of a Point

The Trustees shall base its their determination of the Cash Value of a Point on (i) current estimates as to the number, types, and Scheduled Values determined for Existing Claims and Future Claims, (ii) the value of the assets available to the Trust for payment of Allowed Claims, (iii) all anticipated administrative and legal expenses, and any other matters that are reasonably likely to affect the sufficiency of funds to pay on an equal application of the TDP methodology to all Existing Claimants and Future Claimants based on the same application of the TDP methodology to all Individual Claimants and the points awarded to each Individual Claimant. When making these determinations, the Trustees shall evaluate all relevant factors to determine a conservative Point Cash Value of a Point with the goal of assuring that the Trust will be able to treat all similar Existing Claims and Future Claims in a similar substantially the same manner.

The Cash Value of a Point shall be subject to change pursuant to the terms of these TDP and the Talc Personal Injury Trust Agreement.  The Trustees shall review the then-applicable Cash Value of a Point as it deems necessary to assure that it is based on accurate, current information, and shall compare the liability forecast on which the then-applicable Cash Value of a Point was based with the actual claims submission and payment experience of the Trust to

LTL II TDP

date, and the projected assets of the Trust on which the then-applicable Cash Value of a Point was based with the current assets, and any updated projections of asset values, of the Trust and Future Claims.  If the results of the comparisons call into question the ability of the Trust to rely upon the current liability and asset forecasts, the Trustees may, if necessary, propose a change in the Cash Value of a Point.  Any adjustment to the Cash Value of a Point Value must be made in consultation with the ~~Payor~~Guarantor, TAC, the FCR, and must be approved by the Bankruptcy Court.  In the event that adjustment of the Cash Value of a Point is approved, the Trust shall ~~publically~~publicly disclose the approval and adjusted Cash Value of a Point on its website.

### D.  Factors to Determine Cash Value of a Point

~~The Trustees shall consider the following factors in determining the Cash Value of a Point, including the Initial Cash Value of a Point, and any changes to the Cash Value of a Point, if applicable:~~

~~[●]~~

**7.2**    **General Guidelines for Liquidating & Paying Allowed Claims**

### 7.2.1    Documentation Requirements

#### A.    Acceptance & Release

An Individual ~~Claimants~~Claimant who ~~decide~~decides to accept an offer of payment from the Trust based on the proposed Scheduled Value for their Allowed Claims shall complete and execute the applicable acceptance and release form ~~to be adopted by the Trust in consultation with the Payor and with the consent of the TAC and FCR~~, a copy of which is attached hereto as Exhibit [●] to these TDP and shall be included with the distribution of the Submission Procedures  (the "**Acceptance and Release**").  ~~The TAC and FCR shall not unreasonably withhold such consent; however, if such consent~~ is not obtained, the Trustees are authorized to seek an order of the Bankruptcy Court approving ~~such Acceptance and Release~~.  The Acceptance and Release provided to Qualifying Claimants and Other Approved Claimants shall include a release of all claims against the Debtor, which is discharged, the LTL Corporate Parties, and all of the other Protected Parties, to the extent any such claims arise from or are related to the accepting Individual Claimant's alleged use talc or talc-containing products, including J&J Talc Products, and resulting injury.  The ~~Acceptance and Release  shall be filed as a supplemental exhibit to these TDP prior to the Initial Filing Date and included with the distribution of the Submission Procedures.  The~~ applicable Acceptance and Release shall be available for completion electronically and may be executed by the accepting Individual Claimant or his/her legal Representative via Adobe Sign or DocuSign, or a similar authorized electronic signature and notarization program, or such other simplified and expedient means that the Trust, in consultation with the ~~Payor~~Guarantor and with the consent of the TAC and FCR, may adopt. The TAC and FCR shall not unreasonably withhold such consent; however, if such consent is not obtained, the Trustees are authorized to seek an order of the Bankruptcy Court approving the adoption of such similar programs or other simplified and expedient means.

- 48 -

### B.    Documents Establishing Legal Representation

Individual Claimants asserting an Individual Claim on behalf of a minor, incapacitated, or deceased person, must, before any funds related to such Allowed Claim may be distributed from the Settlement Trust, submit to the Trust appropriate documentation confirming the Allowed Claimant's legal authority to resolve the Individual Claim on behalf of the minor, incapacitated, or the deceased person and his/her estate.

### 7.2.2    Offsets

The Trust shall have the right to offset or reduce payment of an Allowed Claim Amount, on a dollar-for-dollar basis based on any amounts paid, agreed upon, or reasonably likely to be paid to the relevant Individual Claimant on account of his/her Individual Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Trust.

## 7.3    Payment of Claims

### 7.3.1    Allowed Claim Amounts Held in Escrow

Promptly upon receipt of an Individual Claimant's properly executed Acceptance and Release, the Allowed Claim Amount for the released Allowed Claim shall be set aside and held in escrow within the Settlement Trust pending the final resolution of various administrative issues involving the resolution of the Individual Claim including, but not limited to issues related to probate, guardianship, personal bankruptcy filings, lien resolution, and duplicate sign-ups.

### 7.3.2    Payment of Allowed Claims

Once all applicable administrative issues related to an Individual Claimant's acceptance of his/her Allowed Claim Amount are resolved, the Trustees shall transfer to the Individual Claimant his/her Net Award Amount (i.e., the total Allowed Claim Amount, less amounts required to satisfy liens and less any attorney's fees and litigation expenses born by the Individual Claimant's counsel). Alternatively, if an Individual Claimant elected to receive his/her distribution pursuant to these TDP through his/her retained counsel, then the Trustees shall transfer the Net Award Amount to the retained counsel identified on the Individual Claimant's Claim Submission Form.

For those Individual Claimants represented by counsel with respect to their Allowed Claims, the Trust shall only pay attorneys' fees or expenses to the attorneys and/or law firms named in the Individual Claimants' client retention agreements with their counsel. For avoidance of doubt, no payments may be made to any attorney not specifically identified on such agreement. Further, thisthe Plan and these TDP do not contemplate any Common Benefit Fund Obligations forin respect of Allowed Claim Amounts paid by the Trust. As such, no common benefit fees or costs shall be deducted from Allowed Claim Amounts or paid by the Settlement Trust, regardless of whether the Allowed Claim Amount was awarded via the procedures set forth in the TDP or outside of the bankruptcy, via the tort system.

**7.4    Payment Processing**

### 7.4.1    FIFO Payment Processing

Individual Claims that have been liquidated in accordance with the terms herein shall be paid from the Settlement Trust in FIFO order based on the date that ~~they~~each relevant Individual Claimant accepted an offer from the Trust and their liquidation became final, all such payments being subject to the applicable~~, the applicable~~ Maximum ~~Payment,~~Value and sequencing adjustment provided for ~~in~~ below, and as otherwise provided herein~~ (~~, *i.e.*, the "FIFO Payment Queue~~")~~.

For those Individual Claimants who (i) hold Qualifying Claims or Other Approved Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court or other probate approval before accepting any Scheduled Value proposed by Trust, the Individual Claim shall retain its position in the FIFO Payment Queue so long as the as proceedings to obtain such approval remain pending, and provided that the Individual Claimant has provided the Trust with evidence that the proposed Allowed Claim Amount has been submitted to such court or in that probate process for approval.  If the Individual Claimant ultimately obtains the required court or probate approval and a properly completed Acceptance and Release is submitted to the Trust, the Settlement Trust shall pay the Allowed Claim Amount offered, accepted, and approved.

In the event that any Allowed Claims are liquidated on the same date, each Individual Claimant's position in the applicable FIFO Payment Queue shall be determined by his/her relevant Date of Diagnosis, with the earlier diagnosis having priority over the later diagnosis.  In the unlikely event that any Allowed Claims are liquidated on the same date and also have the same relevant Date of Diagnosis, those Individual Claimants' positions in the FIFO Payment Queue shall be determined by the Trust based on the such Individual Claimants' dates of births, with older claimants given priority over younger claimants.

### 7.4.2    Discretion to Vary the Order & Amounts of Payments in Event of Limited Liquidity

Consistent with the provisions hereof and subject to the FIFO Processing Queue, FIFO Payment Queue, and applicable Maximum Values, the Trustees shall proceed as quickly as possible to liquidate Allowed Claims and shall promptly make payments to relevant Individual Claimants in accordance with these TDP on an ongoing basis, as funds become available and as Individual Claims are liquidated, while maintaining sufficient resources to pay Future Claimants who submit Individual Claims that are determined to be Allowed Claims in substantially the same manner.

Because the Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to Individual Claimants.  The Trustees shall, however, use their best efforts to treat similar Individual Claims in substantially the same manner, consistent with their duties as

Trustees, the purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Trust faces issues with respect to liquidity that cannot be resolved based on adjustments to the Cash Value of a Point, the Trustees may, upon consultation with the ~~Payor~~Guarantor, and with the consent of the TAC and FCR, (a) suspend the normal order of payment, or (b) temporarily limit or suspend payments altogether.  The TAC and FCR shall not unreasonably withhold such consent; however, if such consent is not obtained, the Trustees are authorized to seek an order of the Bankruptcy Court suspending the normal order of payment or temporarily limiting or suspending payments altogether.

## 7.5    Punitive Damages

In determining the value of any liquidated or unliquidated Individual Claim, punitive or exemplary damages (*i.e.*, damages other than compensatory damages) shall not be considered or allowed, notwithstanding their availability in the tort system.   Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system pursuant to Article 6 herein.

## Article 8
## RESOLUTION OF GOVERNMENTAL ACTION CLAIMS

## 8.1    Governmental Action Claims Are Subject to These TDP

Each holder of a Governmental Action Claim which (a) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) filed a Proof of Claim asserting a Governmental Action Claim by the Claims Bar Date (each a "**Governmental Holder**"~~ and collectively, the "Governmental Holders"~~) shall participate in these TDP.  The Claims Administrator shall have the right at any time to request additional information from any Governmental Holder regarding its Governmental Action Claims.

## 8.2    Settlement Offer and Negotiations

The Claims Administrator shall make a written or oral offer to settle the Governmental Holder's Governmental Action Claim (a "**Settlement Offer**").   The offer shall be made to counsel for the Governmental Holder or, if no counsel has been identified, the Governmental Holder.

After a Governmental Holder has received a Settlement Offer, the Governmental Holder shall contact the Claims Administrator and provide a written or oral response to the Settlement Offer (the "**Response**").  The Governmental Holder may accept or reject the Settlement Offer or make a counteroffer.  In the event the Governmental Holder declines to accept the Settlement Offer, the Governmental Holder and the Claims Administrator shall engage in good faith negotiations regarding the Governmental Action Claim.

If the Governmental Holder accepts the Settlement Offer or the Claims Administrator and the Governmental Holder otherwise reach agreement on the amount of the Governmental Holder's Governmental Action Claim (in either case, the "**Settlement Amount**"), the

Governmental Action Claim shall be fixed at the Settlement Amount.    The Governmental Action Trust shall pay the Settlement Amount pursuant to Section 8.6 below.

If the parties are unable to reach agreement pursuant to the procedures in this Section 8.2, the Governmental Holder's Governmental Action Claim shall be referred to mediation.

## 8.3    Mediation

A Governmental Holder's Governmental Action Claim shall be referred to mediation if the Claims Administrator and the Governmental Holder are unable to reach agreement pursuant to the procedures set forth in Section 8.2 of these TDP.

A mediator (the "**GAC Mediator**") shall be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the GAC Mediator, the Governmental Holder's Governmental Action Claim shall either, at the option of the Governmental Holder, (i) be referred to arbitration as provided in Section 8.4 of these TDP or (ii) proceed to litigation as provided in Section 8.5 of these TDP.

The GAC Mediator will work with the Claims Administrator and the Governmental Holder to reach a settlement of the Governmental Action Claim that is mutually acceptable to both parties.  The GAC Mediator shall not have the authority to unilaterally impose a settlement upon the parties.  The Governmental Holder and the Claims Administrator shall each pay one half of the fees and expenses, including legal fees, incurred by the GAC Mediator.  The parties shall otherwise bear their own costs, including legal fees.

If the mediation results in a settlement agreement, the Governmental Action Trust shall pay the Settlement Amount pursuant to Section 8.6, below.  If the mediation concludes with no settlement, the Governmental Holder shall elect to either (i) participate in binding arbitration pursuant to Section 8.4 of these TDP or (ii) proceed to litigation pursuant to Section 8.5 of these TDP.

## 8.4    Arbitration

A Governmental Action Claim may be referred to binding arbitration as provided in Section 8.3 of these TDP and at the option of the Governmental Holder.

If a Governmental Holder's Governmental Action Claim is referred to arbitration, an arbitrator (the "**GAC Arbitrator**") shall be jointly chosen by the Claims Administrator and the Governmental Holder.    If the parties are unable to reach agreement regarding the GAC Arbitrator, the a Governmental Holder's Governmental Action Claim shall proceed to litigation as provided in Section 8.5 of these TDP.

The arbitration shall be governed by the Federal Arbitration Act, Title 9, United States Code.    The GAC Arbitrator shall determine the amount of the Governmental Holder's Governmental Action Claim.  Unless otherwise agreed by the parties, the arbitration shall be conducted pursuant to the dispute resolution procedures for commercial claims of the American Arbitration Association, as currently in effect and appropriate.  The Governmental Holder and the Claims Administrator shall each pay one-half of the fees and expenses, including legal fees

LTL II TDP

incurred by the GAC Arbitrator.  The parties shall otherwise bear their own costs, including legal fees.

The amount of the Governmental Holder's Governmental Action Claim awarded by the Arbitrator (the "**GAC Arbitration Award**") shall be binding and determined by the Arbitrator, in their discretion.  In no event shall the Arbitration Award include any punitive or exemplary damages.  Neither party shall have the right to appeal the GAC Arbitration Award except on the grounds set forth in the Federal Arbitration Act.  There will be no right to a trial de novo.  Once the GAC Arbitration Award is final and non-appealable, the Governmental Action Trust shall pay the GAC Arbitration Award pursuant to Section 8.6, below.

**8.5    Litigation**

Any Governmental Holder that elects to litigate his/her Governmental Action Claim(s) pursuant to the procedures in this Section 8.5 of these TDP, or is otherwise required to litigate his/her Governmental Action Claim pursuant to Section 8.4 of these TDP, shall have the right to institute a lawsuit against the Trust in:  (i) the United States District Court for the District of New Jersey (the "District Court"); or (ii) if Governmental Holder commenced litigation against the Debtor prior to the Petition Date and that litigation remains pending on the Effective Date, at the option of the Governmental Holder, in the United States District Court for the District of New Jersey or the United States District Court in the jurisdiction in which the pre-petition litigation is pending.  All defenses, which include all defenses that could have been asserted by the Debtor, shall be available to the Talc Personal Injury Trust at trial.

The court adjudicating the Governmental Action Claims shall determine the Debtor's liability for the Governmental Action Claims and shall not consider or allow punitive or exemplary damages.  Once any Governmental Action Claims is litigated to a final, non-appealable judgment in accordance with this Section 8.5, the Governmental Action Trust shall pay judgment pursuant to Section 8.6, below.  The Governmental Holder shall be responsible for its fees and costs, including legal fees.  The Governmental Holder shall also be responsible for the fees and costs, including legal fees, incurred in the litigation by the Claims Administrator if the amount of the final non-appealable judgment is less than the last Settlement Offer made to Governmental Holder by the Claims Administrator.

**8.6    Payment of Settlement Amount, Arbitration Award, and Judgment**

**8.6.1    Payment Upon Final Determination**

Only after the Trustees have established an Initial Payment Percentage in accordance with Section [●] of the Trust Agreement, then once there is an agreed upon Settlement Amount pursuant to Section 8.2 or Section 8.3, an a GAC Arbitration Award pursuant to Section 8.4, or a money judgment against the Trust pursuant to Section 8.5 with respect to any Governmental Action Claim (collectively, the "**Governmental Amounts**"), the Governmental Holder will receive a payment of the applicable amounts based on the Payment Percentage then in effect as described in Section 8.6.2 and Section 8.6.3.

### 8.6.2   Initial Payment Percentage

After the applicable Governmental Amount has been determined, the Governmental Action Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Trustees in accordance with the Trust Agreement.

### 8.6.3   Supplemental Payment Percentage

When the Trustees determines that the then-current estimates of the Governmental Action Trust's assets and its liabilities, as well as then-estimated value of then-pending Governmental Action Claims, warrant additional distributions on account of the Governmental Amounts, the Trustees shall set a Supplemental Payment Percentage in accordance with the Trust Agreement. Such Supplemental Payment Percentages shall be applied to all Governmental Amounts that became final prior to the establishment of such Supplemental Payment Percentage. Governmental Holders whose Governmental Action Claims are assigned a Governmental Amount after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then existing payment percentage.

### 8.6.4   Release

In order for ~~an Allowed~~a Governmental Action Claim to receive any payment from the Settlement Trust, the Governmental Action Claimant must submit~~, as a precondition to receiving any payment from the Governmental Action Trust,~~ an executed release in the form attached hereto.

### 8.6.5   FIFO Claims Processing Queuing

The ~~Governmental Action~~ Trust shall review all Governmental Action Claim Submissions for processing purposes on a FIFO basis as set forth below.  A Governmental Holder's position in the FIFO Processing Queue shall be determined as of the Governmental Holder's Governmental Action Claim submission date. If any Governmental Action Claims are filed on the same date, a Governmental Holder's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the date on which the basis of such Governmental Action arose, with earlier claims given priority over newer ones.

## 8.7   Statutes of Limitations & Repose

To be eligible for payment pursuant to these TDP, a Governmental Holder must have either (i) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) submitted a Proof of Claim asserting a Governmental Action Claim by the Bar Date, in either case prior to the expiration of any applicable statute of limitations or repose as such statute may have been tolled pursuant to section 108 of the Bankruptcy Code.  At any time during the administration of these TDP, including during arbitration or litigation, the Claims Administrator may agree to a settlement with a Governmental Holder.

LTL II TDP

## Article 9
## RESOLUTION OF INDIRECT DERIVATIVE TALC PERSONAL INJURY CLAIMS

**9.1     Indirect Derivative Talc Personal Injury Claims**

To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Derivative Talc Personal Injury Claim:

(1)  must have filed a Proof of Claim asserting an Indirect Derivative Talc Personal Injury Claim by the Claims Bar Date or otherwise submitted the Indirect Derivative Talc Personal Injury Claim to the Trust;

(2)  must have an Indirect Derivative Talc Personal Injury Claim that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof (subject to the right of the holder of the Indirect Derivative Talc Personal Injury Claim to seek reconsideration by the Trustees under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law;

(3)  must submit to the Trustees a properly executed Acceptance and Release; and

(4)  must establish to the satisfaction of the Trustees that:

(a)  such Indirect Derivative Talc Personal Injury Claimant has paid in full all of the Claim holder's total share of the liability and/or obligation of the Settlement Trust to a Talc Personal Injury Claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (as to which the holder of the Allowed Indirect Derivative Talc Personal Injury Claim seeks payment); and

(b)  the Indirect Derivative Talc Personal Injury Claim is not otherwise subject to a valid defense, including, without limitation, that such Indirect Derivative Talc Personal Injury Claim is barred by a statute of limitations or repose or by other applicable law.

In no event shall any Indirect Derivative Talc Personal Injury Claimant have any rights against the Trust superior to the rights that the Talc Personal Injury Claimant to whose claim the Indirect Derivative Talc Personal Injury Claim relates, would have against the Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment.  No Indirect Derivative Talc Personal Injury Claim may be liquidated and paid in an amount that exceeds what the Indirect Derivative Talc Personal Injury Claimant has paid to the related Talc Personal Injury Claimant or to the Trust in respect of such claim for which the Trust would have liability, and in no event shall any Indirect Derivative Talc Personal Injury Claim exceed the Allowed Claim Amount of the related Talc Personal Injury Claim, *provided that* an Indirect Derivative Talc Personal Injury Claimant may assert against the Trust an Indirect Derivative Talc

LTL II TDP

Personal Injury Claim for the recovery of defense costs solely to the extent permitted under applicable law.

To the extent that an Indirect Derivative Talc Personal Injury Claim is a lien claim that may be properly resolved pursuant to Section 3.3 above, Section 3.3, rather than this Article 9, shall apply to resolve such lien claim.

Indirect Derivative Talc Personal Injury Claims that become Allowed Indirect Derivative Talc Personal Injury Claims shall receive distributions in accordance with Article 7 hereof and shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims pursuant to Articles 5 and 7 hereof.

## 9.2    Offset

The liquidated value of any Indirect Derivative Talc Personal Injury Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any related Talc Personal Injury Claim that might be subsequently asserted against the Trust as being against any Protected Party(ies) whose liability was paid by the holder of an Indirect Derivative Talc Personal Injury Claim.

## 9.3    Court Review

Within thirty (30) days after an Indirect Derivative Talc Personal Injury Claimant receives written notice from the Trust of the proposed allowed amount of its Indirect Talc Personal Injury Claim or denial thereof (the "**Judicial Review Election Deadline**"), an Individual Derivative Talc Personal Injury Claimant may notify the Trust of its intention to seek a de novo review of the Trustees' determination of its Indirect Derivative Talc Personal Injury Claim in accordance with these TDP (including Section 9.1 hereof) by a court of competent jurisdiction (a "**Judicial Review Election**").  Such notification shall be made by submitting a written notice to the Trustees (a "**Judicial Review Election Notice**") by the Judicial Review Election Deadline. Unless the Trustees agree to extend the Judicial Review Election Deadline, an Indirect Derivative Talc Personal Injury Claimant who fails to so submit a Judicial Review Election Notice by the Judicial Review Election Deadline shall be deemed to accept the disallowance of its Indirect Derivative Talc Personal Injury Claim or the proposed Allowed Claim Amount (as applicable) and shall have no right to seek any further review of its Indirect Derivative Talc Personal Injury Claim.  An Indirect Derivative Talc Personal Injury Claimant that makes a Judicial Review Election may not seek costs or expenses against the Trust in any judicial proceeding commenced on account of its Judicial Review Election and the Trust may not seek costs or expenses against the Indirect Derivative Talc Personal Injury Claimant.  In no event shall the submission and/or filing of a Judicial Review Election Notice entitle the holder of an Indirect Derivative Talc Personal Injury Claim to request or receive treatment different than the treatment provided for under these TDP (including Section 9.1 hereof).  The de novo review provided for herein shall be to determine the allowed amount of the Indirect Derivative Talc Personal Injury Claim under and in accordance with these TDP.  All defenses (including, with respect to the Trust, all defenses that could have been asserted by the Debtor or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides at any judicial

proceeding commenced on account of the Indirect Derivative Talc Personal Injury Claimant's Judicial Review Election.  Upon entry of final non-appealable order of a court competent jurisdiction fixing the allowed amount of the Indirect Derivative Talc Personal Injury Claim, if any, such Indirect Derivative Talc Personal Injury Claim shall be deemed an "**Allowed Indirect Derivative Talc Personal Injury Claim**" and paid in accordance with Article 7 hereof.

### 9.4    Non-Responsive Indirect Derivative Talc Personal Injury Claimants

Except for those Indirect Derivative Talc Personal Injury Claimants who have submitted a Judicial Review Election, Allowed Indirect Derivative Talc Personal Injury Claimants shall have one hundred eighty (180) days from the date an offer is made by the Trust to accept such offer.  In the event that an Indirect Derivative Talc Personal Injury Claimant neither accepts such settlement offer within 180 days nor submits a Judicial Review Election under Section 9.3, such Indirect Derivative Talc Personal Injury Claimant's Indirect Derivative Talc Personal Injury Claim shall be deemed waived and ineligible for compensation from the Settlement Trust.

## Article 10Article 9
## MISCELLANEOUS

### 10.1    9.1 Non-Binding Effect of Trust and/or Litigation Outcome

Notwithstanding any other provision of these TDP, the Trust's determination to pay or not to pay any claim shall not be binding inon, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against, the Debtor, the other Protected Parties, or any other entityPerson other than the Trust.  Nor shall the outcome of litigation against the Debtor by the holder of an Indemnified Claim be used in, admissible as evidence in, binding in, or have any other preclusive effect in connection with the Trust's resolution or valuation of an Indemnified Claim.

### 10.2    9.2 Independence of Trust

Except as otherwise specifically stated herein, neither(i) none of the Debtor nor J&J or, the Reorganized Debtor, or any other entity, or any LTL Corporate Party shall have any rights or involvement whatsoever in the Trust.  Neither, (ii) none of the Debtor nor J&J or the, Reorganized Debtor areor any LTL Corporate Party is a third-party beneficiary of the Trust or these TDP, and (iii) nothing herein creates any rights or obligations that may give rise to a claim or cause of action by the Debtor, the Reorganized Debtor, or J&Jany LTL Corporate Party against the Trust or any Talc Personal Injury Claimant.

### 10.3    9.3 Amendments

The Trustees may not amend these TDP in any material manner that is inconsistent with the Plan without consulting with the TAC, FCR, and PayorGuarantor, and subsequently filing a motion in the Bankruptcy Court seeking approval of Bankruptcy Court for such material modifications. Absent Bankruptcy Court approval after appropriate notice and opportunity to object, neither the Trustees, Claims Administrator, Claims Processor, Lien Resolution Administrator, TAC nor FCR may amend these TDP in any material manner that is inconsistent with the Plan.   Nothing herein is intended to preclude the TAC or FCR from

proposing to the Trustees, in writing, amendments to these TDP.  For the avoidance of doubt, these TDP may not be amended to alter the allocation of the assets of the Trust between or among the Settlement Trust, the Governmental Action Trust, and the Talc Personal Injury TPP Lien Claims Sub-Trust.

**10.4     9.4 Severability**

Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**10.5     9.5 Governing Law**

Except for purposes of determining the liquidated value of any Talc Personal Injury Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of New Jersey.  The review and evaluation of Individual Claims under these TDP and the law governing mediation, arbitration, or litigation in the tort system shall be the law of the jurisdiction in which the Individual Claimant could have filed a lawsuit alleging an Individual Claim under applicable law.

| Summary report:<br>Litera Compare for Word 11.3.0.46 Document comparison done on<br>7/11/2023 7:15:10 PM | |
|---|---|
| **Style name:** 2_WC_StandardSet | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** TDP - clean version (6.26.2023)-1.docx | |
| **Modified filename:** LTL - TDP (FOR FILING 7.11.2023).docx | |
| **Changes:** | |
| Add | 695 |
| Delete | 597 |
| Move From | 34 |
| Move To | 34 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1360 |