**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

~~*PROPOSED*~~ *ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
|                  Debtor. | Judge: Michael B. Kaplan |

**DISCLOSURE STATEMENT**
**FOR**
**AMENDED CHAPTER 11 PLAN**
**OF REORGANIZATION OF LTL MANAGEMENT LLC**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**Table of Contents**

DISCLAIMER ................................................................................................ I

ARTICLE I. INTRODUCTION ........................................................................ 1

    1.1    Introductory Statement ..................................................................... 1

    1.2    Legal Disclosure .......................................................................... ~~3~~4

    1.3    Voting and Confirmation ............................................................... ~~6~~7

    1.4    Important Dates ............................................................................. ~~8~~9

ARTICLE II. OVERVIEW OF THE PLAN ..................................................... ~~9~~10

    2.1    Summary of Plan Treatment of Talc Personal Injury Claims ........ ~~9~~10

        (a)    *Background* ............................................................................ ~~9~~10

        (b)    *Talc Personal Injury Trust* ................................................... ~~10~~11

        (c)    *The Trust Distribution Procedures* ....................................... ~~11~~13

        (d)    *The Channeling Injunction* .................................................... ~~11~~13

    2.2    Summary Description of Classes and Treatment ......................... ~~12~~13

    2.3    The Plan Supplement ................................................................... ~~13~~15

    2.4    Modification and Amendments ..................................................... ~~14~~16

ARTICLE III. GENERAL INFORMATION ...................................................... ~~15~~16

    3.1    The Debtor's Corporate History ................................................... ~~15~~17

        (a)    *Prior to the 2021 Corporate Restructuring* ......................... ~~15~~17

        (b)    *The 2021 Corporate Restructuring* ...................................... ~~16~~18

        (c)    *Commencement of the 2021 Chapter 11 Case* ..................... ~~18~~20

        (d)    *Transfer by Holdco of its Consumer Business* ..................... ~~18~~20

        (e)    *Dismissal of the 2021 Chapter 11 Case and New Financing Arrangements* ...................................................................... ~~19~~20

    3.2    The Debtor's Organizational Structure and Business Operations ... ~~20~~22

    3.3    The Debtor's Assets ..................................................................... ~~21~~23

        (a)    *Cash* ..................................................................................... ~~21~~23

        (b)    *Equity Interests of Royalty A&M* ........................................... ~~21~~23

        (c)    *The 2023 Funding Agreement and J&J Support Agreement* ... ~~21~~23

        (d)    *The Debtor's Insurance Coverage* ......................................... ~~22~~23

        (e)    *Imerys/Cyprus Related Rights* ............................................... ~~23~~25

NAI-~~1537329582v1~~1537329582

ARTICLE IV. EVENTS LEADING TO THE FILING OF THE 2021 CHAPTER 11 CASE .......................................................................................................... ~~23~~25

    4.1    Cosmetic Talc Litigation and Related Costs and Burdens ........................ ~~23~~25

        (a)    *Overview* ........................................................................ ~~23~~25

        (b)    *Decades of Studies and Testing* ........................................ ~~24~~26

        (c)    *Cosmetic Talc Litigation* ................................................. ~~24~~26

        (d)    *Costs and Burdens of Cosmetic Talc Litigation* .............. ~~25~~27

    4.2    The MDL Proceeding ............................................................. ~~26~~28

    4.3    The Canadian Actions ............................................................. ~~27~~29

    4.4    The AG State Actions ............................................................. ~~27~~29

    4.5    The Securities Action ............................................................. ~~28~~30

    4.6    Insurance Coverage and Related Litigation ............................... ~~29~~30

    4.7    Retailers and Third Party Indemnities ....................................... ~~29~~31

    4.8    Chapter 11 Filings by Talc Suppliers ....................................... ~~30~~32

    4.9    The Decision to File the 2021 Chapter 11 Case ......................... ~~31~~33

ARTICLE V. EVENTS DURING THE 2021 CHAPTER 11 CASE .................. ~~31~~33

    5.1    Commencement of the 2021 Chapter 11 Case in North Carolina .... ~~31~~33

    5.2    Qualified Settlement Fund Motion ........................................... ~~31~~33

    5.3    Commencement of the 2021 Chapter 11 Case in North Carolina – Preliminary Injunction, Automatic Stay, and Motion to Show Cause .... ~~32~~33

    5.4    Appointment of the Original Talc Claimant Committee ............... ~~32~~34

    5.5    Transfer of the 2021 Chapter 11 Case to New Jersey ................. ~~33~~34

    5.6    Canadian Recognition of the 2021 Chapter 11 Case ................... ~~33~~35

    5.7    The U.S. Trustee's Appointment of Two Talc Committees ........... ~~33~~35

    5.8    Appointment of the FCR ......................................................... ~~34~~36

    5.9    Retention of Professionals ....................................................... ~~34~~36

    5.10    The New Jersey Preliminary Injunction and Dismissal Trial ....... ~~35~~37

    5.11    The Insurance Lift Stay Motions ............................................. ~~36~~38

    5.12    Mediation ............................................................................. ~~36~~38

    5.13    Estimation ............................................................................. ~~37~~39

    5.14    Exclusivity ............................................................................. ~~37~~39

    5.15    Securities Action Injunction and Appeal ................................... ~~38~~40

    5.16    Attorney General Matters ....................................................... ~~38~~40

5.17    The Third Circuit's Ruling ................................................ ~~39~~41

ARTICLE VI. EVENTS DURING THE CHAPTER 11 CASE ................................ ~~40~~42

6.1    Commencement of the Chapter 11 Case ................................ ~~40~~42

6.2    The Preliminary Injunction .................................................. ~~41~~42

6.3    Canadian Recognition of the Chapter 11 Case ...................... ~~42~~44

6.4    Appointment of the TCC .................................................... ~~42~~44

6.5    Appointment of the FCR .................................................... ~~43~~45

6.6    Retention of Professionals ................................................ ~~43~~45

6.7    Approval of the J&J Support Agreement .............................. ~~43~~46

6.8    Mediation .......................................................................... ~~43~~46

6.9    Motions to Dismiss ............................................................ ~~44~~46

6.10    The Writ of Mandamus ...................................................... ~~44~~47

6.11    Motion to Suspend the Chapter 11 Case .............................. ~~44~~47

6.12    Motion for Derivative Standing ........................................ ~~44~~47

6.13    Expense Reimbursement Agreement .................................... 47

6.14    Motion to Terminate Exclusivity ........................................ 48

6.15    Bar Date Motion ................................................................ 48

6.16    Extension of Period to Remove Claims .............................. 48

ARTICLE VII. THE PLAN OF REORGANIZATION .............................. ~~45~~48

7.1    Treatment of Administrative Claims, Fee Claims, and Priority Tax Claims ...... ~~46~~49

(a)    *Administrative Claims* .......................................... ~~46~~49

(b)    *Fee Claims* ............................................................ ~~46~~50

(c)    *Payment of Statutory Fees* .................................... ~~47~~51

(d)    *Allowed Priority Tax Claims* .................................. ~~47~~51

7.2    Treatment of Classified Claims and Equity Interests of the Debtor ............ ~~48~~51

(a)    *Class 1 – Priority Non-Tax Claims* ........................ ~~48~~51

(b)    *Class 2 – Secured Claims* ...................................... ~~48~~52

(c)    *Class 3 – Unsecured Claims* .................................. ~~48~~52

(d)    *Class 4 – Talc Personal Injury Claims* .................. ~~49~~52

(e)    *Class 5 – Intercompany Claims* .............................. ~~49~~53

(f)    *Class 6 – Equity Interests of the Debtor* ................ ~~49~~53

7.3    Conditions Precedent to the Confirmation of the Plan ............ ~~49~~53

NAI-~~1537329582v1~~-1537329582

7.4     Conditions Precedent to the Effective Date of the Plan ............................ ~~55~~59

7.5     Waiver of Conditions Precedent ............................................................. ~~56~~60

7.6     Notice of Effective Date ......................................................................... ~~56~~60

7.7     Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan ................................................................................................ ~~56~~60

7.8     Means for Implementation of the Plan .................................................... ~~57~~60

    (a)     *General* ........................................................................................ ~~57~~60

    (b)     *Operations of the Debtor Prior to the Effective Date* .................. ~~57~~61

    (c)     *Articles of Organization and Operating Agreement* ..................... ~~57~~61

    (d)     *Corporate Action* ......................................................................... ~~57~~61

    (e)     *Authority of Officers* .................................................................... ~~57~~61

    (f)     *Post-Effective Date Governance, Continued Existence of the Reorganized Debtor* ................................................................... ~~58~~61

    (g)     *Arrangements of the Reorganized Debtor with Managers, Officers, and Employees* ......................................................................... ~~58~~62

    (h)     *Good Faith Compromise and Settlement* ..................................... ~~58~~62

    (i)     *Resolution of Talc Personal Injury Claims* ................................... ~~59~~62

    (j)     *Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan* ................................................................... ~~59~~63

    (k)     *Modification of the Plan* ............................................................... ~~59~~63

    (l)     *Revocation or Withdrawal of the Plan* ......................................... ~~60~~63

    (m)    *Certain Technical Modifications* .................................................. ~~60~~63

7.9     Effect of Confirmation ............................................................................ ~~60~~64

    (a)     *Preservation of Rights of Action by the Debtor and Reorganized Debtor* ......................................................................................... ~~60~~64

    (b)     *Imerys/Cyprus Related Rights* ..................................................... ~~61~~65

    (c)     *Talc Insurance Assets* ................................................................. ~~63~~67

    (d)     *Preservation of Rights of Action by the Talc Personal Injury Trust* ~~66~~69

    (e)     *Terms of Injunctions and Automatic Stay* .................................... ~~66~~70

    (f)     *The FCR and the TCC* .................................................................. ~~67~~70

    (g)     *No Effect on United States Trustee* .............................................. ~~67~~71

    (h)     *Binding Effect* .............................................................................. ~~67~~71

7.10    Discharge, Settlement, Releases, Injunctions, and Exculpation .............. ~~67~~71

    (a)     ***Discharge and Injunctions*** .................................................... ~~67~~71

- iv -

| (b) | *Settlement of Certain Estate Claims* | ~~68~~72 |
| (c) | *Releases* | ~~69~~73 |
| (d) | *Channeling Injunction and Insurance Entity Injunction* | ~~71~~75 |
| (e) | *Exculpation* | ~~76~~80 |

ARTICLE VIII. THE TALC PERSONAL INJURY TRUST AND TRUST DISTRIBUTION PROCEDURES ............ ~~77~~80

| 8.1 | Overview | ~~77~~80 |
| | (a) *Establishment* | ~~77~~80 |
| | (b) *Purposes* | ~~77~~81 |
| | (c) *Initial Talc Trustee* | ~~77~~81 |
| | (d) *Initial Talc Trust Advisory Committee and FCR* | ~~78~~81 |
| | (e) *Initial Talc Trust Administrators* | ~~78~~82 |
| | (f) *Payment of Talc Personal Injury Expenses Prior to the Effective Date* | ~~79~~82 |
| | (g) *Trust Distribution Procedures* | ~~79~~83 |
| | (h) *Assumption of Liability for Trust Personal Injury Claims* | ~~79~~83 |
| | (i) *Effects of the Sub-Trusts* | ~~80~~84 |
| | (j) *No Common Benefit Fund Obligation* | ~~81~~85 |
| | (k) *Contribution of Certain Assets* | ~~81~~85 |
| | (l) *Payment of Talc Personal Injury Trust Expenses From and After the Effective Date* | ~~85~~89 |
| | (m) *Treatment of Remainder Assets* | ~~85~~89 |
| | (n) *Dissolution* | ~~85~~89 |
| | (o) *Funds and Investment Guidelines* | ~~86~~90 |
| | (p) *Compliance with QSF Regulations* | ~~86~~90 |
| | (q) *Cooperation Agreement* | ~~86~~90 |
| | (r) *Indemnification and Reimbursement of the Protected Parties* | ~~86~~90 |
| | (s) *Exculpation of the Protected Parties* | ~~87~~91 |
| 8.2 | ~~The~~ Select Provisions of the Trust Distribution Procedures | ~~87~~91 |
| | (a) *Overview* | 92 |
| | (b) *Trust Distribution Procedures Administration* | 92 |
| | (c) *Individual Claims Allowance Process* | 94 |
| | (d) *Valuation of Allowed Claims* | 103 |

- v -

| | | | |
|---|---|---|---|
| | (e) | *Reconsideration Requests and ADR Procedures* | 105 |
| | (f) | *Individual Claims Payment Process* | 108 |
| | (g) | *Resolution of Governmental Action Claims* | 111 |
| | (h) | *Resolution of Indirect Derivative Talc Personal Injury Claims* | 114 |
| ARTICLE IX. | | CERTAIN FACTORS TO BE CONSIDERED | ~~88~~116 |
| 9.1 | | Risks Related to Confirmation of the Plan | ~~88~~116 |
| 9.2 | | Risks Related to Occurrence of the Effective Date | ~~89~~117 |
| 9.3 | | Risks of a Return to the Tort System | ~~89~~117 |
| 9.4 | | Risks Related to Recoveries from the Talc Personal Injury Trust by Holders of Talc Personal Injury Claims | ~~90~~118 |
| 9.5 | | Risk of Appointment of Different Talc Trustees, Talc Trust Advisory Committee Members, FCR, Talc Trust Claims Administrator, or Talc Trust Liens Resolution Administrator | ~~90~~118 |
| 9.6 | | Risk of Classification Objections | ~~90~~118 |
| 9.7 | | Risks Related to U.S. Federal Income Tax Consequences | ~~91~~119 |
| 9.8 | | Risk of Amendment of Plan by the Debtor Prior to Confirmation | ~~91~~119 |
| 9.9 | | Additional Factors | ~~91~~119 |
| | (a) | *Debtor Could Withdraw the Plan* | ~~91~~119 |
| | (b) | *Debtor Has No Duty to Update* | ~~91~~119 |
| | (c) | *No Representations Outside this Disclosure Statement Are Authorized* | ~~91~~119 |
| | (d) | *No Legal or Tax Advice Is Provided by this Disclosure Statement* | ~~91~~119 |
| | (e) | *This Disclosure Statement May Contain Forward Looking Statements* | ~~92~~120 |
| | (f) | *No Admission Made* | ~~92~~120 |
| ARTICLE X. | | SOLICITATION PROCEDURES AND REQUIREMENTS | ~~92~~120 |
| 10.1 | | Solicitation Procedures Summary | ~~92~~120 |
| 10.2 | | Voting Deadline | ~~96~~124 |
| 10.3 | | Holders of Claims and Interests Entitled to Vote | ~~96~~124 |
| 10.4 | | Vote Required for Acceptance by a Class | ~~96~~124 |
| 10.5 | | Solicitation Procedures | ~~97~~125 |
| | (a) | *Ballots* | ~~97~~125 |
| | (b) | *Withdrawal of Votes and Multiple Votes on the Plan* | ~~98~~126 |
| | (c) | *Requesting a Solicitation Package* | ~~99~~127 |

NAI-~~1537329582v1~~ 1537329582

ARTICLE XI. CONFIRMATION OF THE PLAN ................................................ 99127

    11.1    Confirmation Hearing ............................................................... 99127

    11.2    Requirements for Confirmation of the Plan ................................. 100128

        (a)    *Acceptance* ................................................................ 100128

        (b)    *Issuance of Injunction Pursuant to Sections 524(g) and 105(a) of the Bankruptcy Code* ............................. 100128

        (c)    *"Best Interests" Test* ................................................. 100128

ARTICLE XII. CERTAIN TAX CONSEQUENCES OF THE PLAN .................... 101129

    12.1    Treatment of the Talc Personal Injury Trust ............................... 102130

    12.2    Tax Consequences to Holders of Talc Personal Injury Claims ........ 103131

ARTICLE XIII. CONCLUSION AND RECOMMENDATION ......................... 104132


EXHIBIT A:  Amended Chapter 11 Plan of Reorganization of LTL Management LLC, dated May 15June 26, 2023, including certain Exhibits and Schedules thereto as follows:

    (1)    Exhibit C – Cash Contributions

    (2)    Exhibit D – Cash Contributions Parent Guarantee

    (3)    Exhibit M – Trust Distribution Procedures

    (4)    Schedule 1 – Imerys/Cyprus Parties

    (5)    Schedule 2 – LTL Corporate Parties

    (6)    Schedule 3 – Retailers and Indemnified Parties

EXHIBIT B:  Letter from LTL and J&J in Support of the Plan

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF LTL MANAGEMENT LLC, DATED ~~MAY [•]~~ JUNE 26, 2023 AND ATTACHED HERETO AS EXHIBIT A  (THE "PLAN"), AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.

———————

ALL HOLDERS OF CLAIMS IN CLASS 4 (TALC PERSONAL INJURY CLAIMS) ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO AS EXHIBIT A, INCLUDING ITS ATTACHED EXHIBITS AND SCHEDULES, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES TO THE PLAN, WHETHER ANNEXED THERETO OR INCLUDED IN THE PLAN SUPPLEMENT, WHICH CONTROL OVER THE DISCLOSURE STATEMENT IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THE DEBTOR WILL FILE ALL EXHIBITS AND SCHEDULES TO THE PLAN, WHETHER ATTACHED THERETO OR INCLUDED IN THE PLAN SUPPLEMENT, WITH THE BANKRUPTCY COURT AND MAKE THEM AVAILABLE FOR REVIEW ON THE WEBSITE OF EPIQ CORPORATE RESTRUCTURING, LLC AT http://dm.epiq11.com/case/ltl/dockets NO LATER THAN TEN (10) DAYS BEFORE THE DEADLINE TO OBJECT TO CONFIRMATION OF THE PLAN. THE DEBTOR WILL ALSO SERVE SUCH EXHIBITS AND SCHEDULES TO THE PLAN ON ITS THEN CURRENT BANKRUPTCY RULE 2002 SERVICE LIST NO LATER THAN TEN (10) DAYS BEFORE THE DEADLINE TO OBJECT TO CONFIRMATION OF THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

———————

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

————————

THIS DISCLOSURE STATEMENT AND ANY EXHIBITS ATTACHED TO THE ORDER WHICH APPROVES THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, ESTABLISHES SOLICITATION PROCEDURES, AND SETS THE VOTING DEADLINE AND THE DEADLINE FOR OBJECTING TO CONFIRMATION OF THE PLAN (THE "SOLICITATION PROCEDURES ORDER") [DKT. [●]] ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.  NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS ATTACHED TO THE SOLICITATION PROCEDURES ORDER, OR ANY DOCUMENT INCORPORATED BY REFERENCE OR REFERRED TO HEREIN OR THEREIN.  IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.  THE DEBTOR WILL MAKE AVAILABLE TO HOLDERS OF CLAIMS IN CLASS 4 (TALC PERSONAL INJURY CLAIMS), WHO ARE THE ONLY HOLDERS OF CLAIMS ENTITLED TO VOTE ON ACCEPTANCE OF THE PLAN, AS WELL AS HOLDERS OF INTERESTS IN CLASS 6 (EQUITY INTERESTS OF THE DEBTOR), WHO ARE THE ONLY HOLDERS OF INTERESTS ENTITLED TO VOTE ON ACCEPTANCE OF THE PLAN, SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE.

————————

NAI-~~1537329582v1~~-1537329582

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE IX, "CERTAIN FACTORS TO BE CONSIDERED." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTOR AND THE REORGANIZED DEBTOR DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

―――――――――

UNLESS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE HISTORICAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE DEBTOR.

―――――――――

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

―――――――――

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, EITHER THE DEBTOR, THE REORGANIZED DEBTOR, OR AS TO BENEFICIARIES OF THE TRUST TO BE ESTABLISHED BY THE PLAN.

# ARTICLE I.

# INTRODUCTION

*Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in Article I of the Plan.*

1.1    Introductory Statement

LTL Management LLC (the "Debtor") is seeking approval of the Plan, a copy of which is attached hereto as Exhibit A. The purpose of this Disclosure Statement is to provide parties who have a right to vote on the Plan with adequate information to make an informed determination as to whether to accept or reject the Plan.

During the Debtor's prior chapter 11 case, the extent of the Debtor's liability for cosmetic talc-related claims was the subject of dispute between the Debtor and the claimants. After extensive negotiations, including mediation, the Debtor, Johnson & Johnson ("J&J") and Johnson & Johnson Holdco (NA) Inc., a New Jersey Corporation formerly named Johnson & Johnson Consumer Inc. ("Holdco") reached agreement with various plaintiff law firms who represent approximately 58,000 claimants to settle that dispute and establish the basis for a full resolution of the Debtor's chapter 11 case, including all talc-related liability. That agreement was memorialized in a series of plan support agreements executed by the plaintiff law firms, the Debtor, J&J, and Holdco (the "Plan Support Agreements"). The Plan implements the settlement by, among other things, providing for the creation and funding of a trust to pay the talc-related claims. ~~The talc trust to~~

In addition, the Debtor, with the support of the Ad Hoc Committee of Supporting Counsel, engaged in discussions with counsel to over fifty Third-Party Payors (the "Insurers") asserting direct claims against the Debtor and its affiliates and liens or subrogation claims against proceeds to be received by current talc claimants under the Plan. The Debtor, the Ad Hoc Committee of Supporting Counsel, and the Insurers have reached an agreement in principle whereby $750 million of the approximately $12.08 billion that will be contributed to the Trust will be used to fund a lien claim sub-trust to fully and permanently resolve all TTP Lien Claims. Counsel to the Insurers, the Debtor and the Ad Hoc Committee of Supporting Counsel are working to secure final authorization of the settlement, which is currently expected. The Debtor and the Insurers also are in active discussions with representatives of other Third-Party Payors, including the United States Department of Health and Human Services, regarding their agreement to the settlement. This settlement, if finalized and implemented, will provide clarity as to the amount of TTP Lien Claims, and the Specified Insured Individuals will be able to receive compensation for their Talc Personal Injury Claims under the Plan far sooner than they would have otherwise received it.

Confirmation of the Plan is subject to a settlement with the Imerys/Cyprus Parties. Because Imerys was a former talc supplier to the Debtor's predecessors, personal injury

claimants have and may assert Talc Personal Injury Claims against both the Debtor and the Imerys/Cyprus Parties.  The Plan provides that the Imerys/Cyprus Parties will be Protected Parties and that Talc Personal Injury Claims against them will be enjoined by a channeling injunction.  The Plan contemplates that a contribution by or on behalf of the Imerys/Cyprus Parties will be made to the talc trust to compensate it for processing and paying the Talc Personal Injury Claims.  Confirmation of the Plan is subject to a settlement being reached between the Debtor and the Imerys/Cyprus Parties that provides for a contribution to the talc trust by the Imerys/Cyprus Parties in an amount that is acceptable to the Debtor, J&J, and the Ad Hoc Committee of Supporting Counsel.  The Debtor intends to engage in discussions with representatives of the Imerys/Cyprus Parties regarding the Plan in the near future.

The talc trust to be created under the Plan will contain ~~two~~three sub-trusts for the payment of talc-related claims:  one for all talc-related claims that are ~~not~~ governmental unit claims, ~~and the other for~~a second for all TPP Lien Claims, and a third for all other talc-related claims other than governmental unit claims and TPP Lien Claims.  The talc trust will be funded with approximately $12.08 billion over 25 years as follows for the benefit of holders of talc-related claims against the Debtor:

*Cash Contributions*

- On the effective date of the Plan, $3.0 billion in cash will be delivered to the talc trust, with (i) $400 million of that amount to be delivered to the sub-trust for governmental unit claims, (ii) $~~2.6~~250 million of that amount to be delivered to the sub-trust for TPP Lien Claims, and (iii) $2.35 billion of that amount to be delivered to the sub-trust for all other talc-related claims.  The $~~2.6~~2.35 billion to be delivered to the sub-trust for talc-related claims other than governmental unit claims and TPP Lien Claims on the effective date of the Plan is subject to adjustment as follows:  (a) commencing on the first business day after the confirmation date, interest will accrue on such amount at the rate of 4% per annum and (b) such amount will be reduced by the amount of expenses of the talc trust that are paid by the ~~reorganized~~ Debtor in advance of the effective date of the Plan;

- On the first anniversary of the effective date of the Plan $~~2.5~~2.50 billion will be delivered to the talc trust, with ~~it all being~~(i) $250 million of that amount to be delivered to the sub-trust for TPP Lien Claims and (ii) $2.25 billion of that amount to be delivered to the sub-trust for all talc-related claims other than governmental unit claims and TPP Lien Claims;

- On the second anniversary of the effective date of the Plan $1.0 billion will be delivered to the talc trust, with (i) $250 million of that amount to be delivered to the sub-trust for TPP Lien Claims and (ii) $750 million of that amount to be delivered to the sub-trust for all talc-related claims other than governmental unit claims and TPP Lien Claims;

NAI-~~1537329582v1~~-1537329582

- On each of the ~~second,~~ seventh, twelfth, seventeenth, and twenty-second anniversary of the effective date of the Plan, $1.0 billion will be delivered to the talc trust, with it all being delivered to the sub-trust for all talc-related claims other than governmental unit claims _and TPP Lien Claims_; and

- On the twenty-fifth anniversary of the effective date of the Plan, $1.18 billion will be delivered to the talc trust, with it all being delivered to the sub-trust for all talc-related claims other than governmental unit claims _and TPP Lien Claims_.

*Promissory Note*

- On the ~~Effective Date~~_effective date_ of the Plan, a $400 million promissory note will be delivered to the sub-trust for all talc-related claims other than governmental unit claims _and TPP Lien Claims_, with such promissory note to _bear no interest and_ mature on the first anniversary of the ~~Effective Date~~_effective date_ of the Plan.

The level of funding under the Plan to process and pay talc claims is unprecedented. In particular, while the Debtor has agreed to fund a trust with over $12 billion for payment of talc-related claims, $5.9 billion will be funded within the first year after the Plan is approved and effective. If the Plan is confirmed and becomes effective, this funding would constitute the largest settlement ever reached in an asbestos bankruptcy case, even as compared to cases where (unlike here) the manufacturer conceded that its products contained asbestos. The funding would also constitute the largest resolution in any mass tort product liability bankruptcy case.

It is anticipated that the talc trust will pay all current talc-related claims against the Debtor within one year after it is established.

All talc-related claims will be processed, liquidated, and paid by the talc trust. In that regard, the Plan includes talc personal injury trust distribution procedures for talc-related claims that describe a detailed methodology for the fair and equitable resolution of talc-related claims. The trust distribution procedures are attached as an exhibit to the Plan and are summarized later in this Disclosure Statement. The compensation anticipated to be paid by the trust for talc-related claims against the Debtor compares very favorably to amounts claimants have received to date in the tort system, as the trust will pay out over $~~12,000,000,000~~_12 billion_ while the vast majority of talc claimants have recovered nothing. In particular, over the last decade in which tens of thousands of talc claims have been pursued, only 48 cases have been tried, and of those, the vast majority resulted in no recovery for the claimants.

Pursuant to the Plan and sections 524(g) and/or 105(a) of the Bankruptcy Code, the sole recourse of talc claimants will be to the talc trust. The talc claimants of the Debtor will no longer have any right to assert talc-related claims against the Debtor, J&J or other parties identified in the Plan.

3

All other classes of creditors and interest holders of the Debtor, except for the holder of interests in the Debtor, are unimpaired by the Plan because the Plan does not modify the legal, equitable or contractual rights of the holders of the claims or interests in those classes, other than by curing defaults and reinstating maturities.  The specific treatments of other classes of creditors and interest holders of the Debtor are set forth in the Plan and summarized later in this Disclosure Statement.

The only classes that are entitled to vote on the Plan are Class 4 (Talc Personal Injury Claims) and Class 6 (Equity Interests of the Debtor).  All holders of Talc Personal Injury Claims in Class 4 are urged to vote in favor of the Plan by no later than 4:00 p.m., Eastern time, on _____.  See Section 1.3 below for voting instructions.

The Debtor's Boards of Managers believe that the Plan is in the best interests of the Debtor's creditors and other stakeholders because it equitably resolves the dispute over the extent of the Debtor's liability for Talc Personal Injury Claims and provides a mechanism for the prompt and efficient payment of such claims on a fair and equitable basis.  The Debtor and other supporting parties strongly encourage all holders of Talc Personal Injury Claims to vote in favor of the Plan.  A letter from the Debtor and J&J encouraging all holders of Talc Personal Injury Claims to vote in favor of the Plan is attached hereto as Exhibit B and is also included in the solicitation package you have received.

The Ad Hoc Committee of Supporting Counsel likewise supports the Plan.  The Official Committee of Talc Claimants opposes the Plan.  A letter from the Ad Hoc Committee of Supporting Counsel encouraging all holders of Talc Personal Injury Claims to vote in favor of the Plan is included in the solicitation package you have received.

_____.

1.2    Legal Disclosure

This Disclosure Statement is being furnished by the Debtor, as proponent of the *Amended Chapter 11 Plan of Reorganization of LTL Management LLC*, dated May 15June 26, 2023, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes for acceptance or rejection of the Plan.

This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Claims in Class 4 (Talc Personal Injury Claims), which is the only Class of Claims that is Impaired and entitled to vote on the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan.

_____

As defined in the Plan and used in this Disclosure Statement:

"Ancillary Indemnity Claim" means a Claim for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other derivative Claim,

whether in the nature of or sounding in contract, tort, warranty, or other theory of law, that is not an Indirect Talc Personal Injury Claim.

"Indirect Talc Personal Injury Claim" means (a) a Talc Personal Injury Claim for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other derivative Talc Personal Injury Claim, whether in the nature of or sounding in contract, tort, warranty, or other theory of law in respect of (i) the payment, whether pursuant to a settlement, judgment, or verdict, of any claim for or otherwise relating to death, injury, or damages that is asserted by or on behalf of an injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual or (ii) the payment of medical or other expenses of, or the provision of medical treatment, medical equipment, or other services or goods to, an injured individual, but, for the avoidance of doubt, not a Claim for contribution, reimbursement, subrogation, or indemnity, or any other derivative Claim, in respect of legal fees or expenses incurred by the holder of such Talc Personal Injury Claim in connection with such payment, (b) a Talc Personal Injury Claim of any Imerys/Cyprus Party for contribution, reimbursement, subrogation, or indemnity under any Imerys/Cyprus Agreement or otherwise, or (c) a Governmental Action Claim. For the avoidance of doubt, an Indirect Talc Personal Injury Claim shall not include (i) any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual caused by talc or a product or material containing talc regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict or (ii) any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights. By way of illustration and not limitation of claims contemplated by the foregoing clause (i), an Indirect Talc Personal Injury Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

"Talc Personal Injury Claim" means any claim or Talc Personal Injury Demand against the Debtor, Old JJCI, or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtor, Old JJCI, or any other Person for whose conduct the Debtor has, or is alleged to have, liability, whether by assumption of such liability from such other Person, by agreement to indemnify, defend, or hold harmless such other Person from and against such liability, or otherwise, including any such claims and Talc Personal Injury Demands directly or indirectly arising out of or in any way relating to: (a) any talc or talc-containing products previously mined, processed, manufactured, designed, marketed, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, and/or in any other way made available by the Debtor or any other Person; (b) any talc or talc-containing materials present at any premises owned, leased, occupied, or operated by any Person; or (c) any talc in any way connected to the Debtor alleged to contain asbestos or other constituent.  Talc Personal Injury Claims include all such claims and Talc Personal Injury Demands, whether:  (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, reimbursement, or any other theory of law, equity or admiralty, whether brought, threatened, or pursued in any United States court or other court anywhere in the world, including Canada; (2) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise (including under piercing the corporate veil, agency, alter ego, successor liability, fraudulent conveyance,

conspiracy, enterprise liability, market share, joint venture, or any other legal or equitable theory); (3) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs, fees, injunctive, or similar relief, or any other measure of damages; (4) seeking any legal, equitable, or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims and Talc Personal Injury Demands arising out of or in any way relating to the presence of or exposure to talc or talc-containing products assertable against the Debtor or any other Protected Party; or (5) held by Persons residing within the United States or in a foreign jurisdiction, including Canada.  Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict.  Talc Personal Injury Claims do not include any claim or demand by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer.  For the avoidance of doubt, Talc Personal Injury Claims include: (i) all claims, demands, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; (ii) PI/Stay Order Claims; (iii) Indirect Talc Personal Injury Claims, and (iv) Canadian Claims.  Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.  For the avoidance of doubt, Talc Personal Injury Claims do not include any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.  Notwithstanding the foregoing, Talc Personal Injury Claims shall not include Ancillary Indemnity Claims.

———————————

By order dated [●], 2023, the Bankruptcy Court approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, and found that it contained "adequate information" sufficient to enable a hypothetical member of the relevant class to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.  **Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan**.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

———————————

**On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust.**

As defined in the Plan and used in this Disclosure Statement:

"Talc Personal Injury Governmental Action Claims Sub-Trust" means the sub-trust of the Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement to resolve and satisfy Governmental Action Claims.

"Talc Personal Injury TPP Lien Claims Sub-Trust" means the sub-trust of the Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement to resolve and satisfy TPP Lien Claims.

"Talc Personal Injury Tort Claims Sub-Trust" means the sub-trust of the Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement to resolve and satisfy Talc Personal Injury Claims other than Governmental Action Claims and TPP Lien Claims, which sub-trust sub-trust is a "qualified settlement fund" within the meaning of Treasury Regulations issued under Section 468B of the Internal Revenue Code.

"Talc Personal Injury Trust" means the LTL Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement and comprised of the Talc Personal Injury Governmental Action Claims Sub-Trust, the Talc Personal Injury TPP Lien Claims Sub-Trust, and the Talc Personal Injury Tort Claims Sub-Trust.

"Talc Personal Injury Trust Agreement" means that certain trust agreement, substantially in the form of Exhibit J to the Plan.

The Talc Personal Injury Governmental Action Claims Sub-Trust shall assume the liabilities, obligations, and responsibilities for all Governmental Action Claims, the Talc Personal Injury TPP Liens Claims Sub-Trust shall assume the liabilities, obligations, and responsibilities for all TPP Lien Claims, and the Talc Personal Injury Tort Claims Sub-Trust shall assume all liabilities, obligations, and responsibilities for all Talc Personal Injury Claims other than Governmental Action Claims and TPP Lien Claims.

———————

As set forth in greater detail in Article VIII of this Disclosure Statement, the purposes of the Talc Personal Injury Trust shall be to: (i) assume all Talc Personal Injury Claims; (ii) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (iii) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.

The Debtor believes and intends to show at the Confirmation Hearing that the Talc Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly and equitably, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.

The Talc Personal Injury Trust Distribution Procedures are attached to the Plan as Exhibit M (the "Trust Distribution Procedures"). The Trust Distribution Procedures are binding on the holders of all Talc Personal Injury Claims.

**A DETAILED SUMMARY OF THE TRUST DISTRIBUTION PROCEDURES CAN BE FOUND IN SECTION 8.2 OF THIS DISCLOSURE STATEMENT.**

———————

1.3     Voting and Confirmation

**Article X of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating Ballots (as defined below). The following is an overview of certain information**

related to voting that is contained in <u>Article X</u> of this Disclosure Statement and elsewhere in this Disclosure Statement.

Each holder of a Claim in Class 4 (Talc Personal Injury Claims) is entitled to vote to accept or reject the Plan. Class 4 shall have accepted the Plan pursuant to the requirements of sections 1126(c) and 524(g) of the Bankruptcy Code if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of those voting Claims in Class 4 (Talc Personal Injury Claims) vote to accept the Plan. Class 4 (Talc Personal Injury Claims) is the only Class of Claims that is Impaired and entitled to vote on the Plan.

Holdco, as the holder of all Interests in Class 6 (Equity Interests of the Debtor), is also entitled to vote to accept or reject the Plan. Class 6 shall have accepted the Plan pursuant to the requirements of sections 1126(c) of the Bankruptcy Code if at least two-thirds (2/3) in amount and fifty percent (50%) in number of those voting Interests in Class 6 (Equity Interests of the Debtor) vote to accept the Plan. Accordingly, if Holdco, as the holder of all Interests in Class 6, timely votes to accept the Plan, Class 6 shall have accepted the Plan. Holdco, which is a party to the Plan Support Agreements, is expected to timely vote to accept the Plan.

Assuming the requisite acceptances are obtained from holders of Claims in Class 4 (Talc Personal Injury Claims) such that Class 4 also accepts the Plan, the Debtor intends to seek confirmation of the Plan at the Confirmation Hearing scheduled for [●], 2023, at [●] [●].m. (Prevailing Eastern Time) before the Bankruptcy Court.

The Debtor has engaged Epiq Corporate Restructuring, LLC (the "<u>Solicitation Agent</u>" or "<u>Claims Agent</u>") to assist in the voting process.

The Solicitation Agent will provide copies of all materials and process and tabulate Ballots for Class 4 (Talc Personal Injury Claims) and Class 6 (Equity Interests of the Debtor).

**To be counted, your Ballot indicating acceptance or rejection of the Plan must be received by the Solicitation Agent no later than 4:00 p.m. (prevailing Eastern Time) on [●], 2023** (the "<u>Voting Deadline</u>"), unless the Debtor, in its sole discretion, extends the period during which votes will be accepted on the Plan for any Person, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended for such Person. **Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either sections 524(g) or 1129 of the Bankruptcy Code;** *provided*, *however*, **that a Master Ballot may indicate that some holders of Claims voted to accept the Plan while others voted to reject the Plan. <u>Solely with respect to holders of Indirect Talc Personal Injury Claims, a Ballot cast on account of an Indirect Talc Personal Injury Claim that is not listed in the Schedules or is listed as contingent, unliquidated, disputed, in the amount of $0.00, or unknown, shall not be counted for voting purposes unless (1) the holder of such claim timely files a Proof of Claim by the applicable Bar Date or (2) such claim is deemed timely filed by an order of the Court before the Voting Deadline.</u>**

Prior to deciding whether and how to vote on the Plan, each holder of a Claim in Class 4 (Talc Personal Injury Claims) and Interest in Class 6 (Equity Interests of the Debtor) entitled to vote should consider carefully all of the information in this Disclosure Statement, including Article IX entitled "*Certain Factors to be Considered.*"  **You should read this Disclosure Statement and the Plan attached hereto as** <u>**Exhibit A,**</u> **including its attached exhibits and schedules, with care in evaluating how the Plan will affect your Class 4 Claim(s) or Class 6 Interest(s) before voting to accept or reject the Plan.**

**The Debtor believes that the Plan is in the best interests of all holders of Claims in Class 4 (Talc Personal Injury Claims) and Interests in Class 6 (Equity Interests of the Debtor) and all other creditors and stakeholders of the Debtor.  The Debtor recommends that all holders of Claims in Class 4 (Talc Personal Injury Claims) and Interests in Class 6 submit Ballots to accept the Plan.**

1.4      Important Dates

| **Event** | **Date** |
|---|---|
| Deadline for Law Firms Representing Talc Personal Injury Claims to Return Certified Plan Solicitation Directive and Client List | [~~____~~ August 15, 2023~~]~~ |
| Voting Record Date | **[____, 2023]** |
| Deadline to Mail Solicitation Packages and Related Notices, ~~including Direct Talc Personal Injury Claim Solicitation Notice~~ | **[____, 2023]** (the "<u>Solicitation Date</u>"), which is **[57]** business days after entry of the order approving the Disclosure Statement, or as soon as reasonably practicable thereafter |
| Date of Publication of Confirmation Hearing Notice | On the Solicitation Date (or as soon thereafter as reasonably practicable) |
| Deadline to File Plan Supplement | **[____, 2023]**[2] |
| Voting Deadline<br><br>Confirmation Objection Deadline | **[____, 2023 at 4:00 p.m.]**[3] |
| Deadline to File Voting Certification* | **[____, 2023 at 4:00 p.m.]**[4] |

---

[2]      **[Note:  Approximately 59 days from the hearing on the motion to consider approval of the Disclosure Statement (the "<u>Disclosure Statement Hearing</u>").]**

[3]      **[Note:  Approximately 69 days from the Disclosure Statement Hearing.]**

[4]      **[Note:  Approximately 83 days from the Disclosure Statement Hearing.]**

| | |
|---|---|
| Deadline for the Debtor to File Memorandum of Law, any Reply and Declarations in Support of Plan Confirmation, and Form of Confirmation Order | **[____, 2023 at 4:00 p.m.]**[5] |
| Confirmation Hearing | **[____, 2023, subject to the Court's availability]**[6] |

\*   In addition to tabulating the votes from Class 4 (Talc Personal Injury Claims) to accept or reject the Plan, the Voting Certification shall also include a list of holders of Claims in Class 4 who opted out of the releases contained in the Plan, as well as those holders of Claims in Class 4 whose solicitation packages were returned as undeliverable, or who were not served with a solicitation package.

---

[5]   **[Note:  Approximately 83 days from the Disclosure Statement Hearing.]**
[6]   **[Note:  Approximately 90 days from the Disclosure Statement Hearing.]**

NAI-~~1537329582v1~~-1537329582

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following is a general overview of how the Plan treats all holders of Claims against, and Equity Interests in, the Debtor.  It is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions and information appearing elsewhere in this Disclosure Statement and in the Plan.  For a more detailed description of the terms and provisions of the Plan, please refer to <u>Article VII</u> of this Disclosure Statement titled "THE PLAN OF REORGANIZATION."

2.1     Summary of Plan Treatment of Talc Personal Injury Claims

(a)     *Background*

The Debtor commenced a chapter 11 case (the "<u>2021 Chapter 11 Case</u>") on October 14, 2021, to resolve permanently all claims relating to its liability for cosmetic talc products in an efficient and equitable manner through implementation of a chapter 11 plan of reorganization that would establish a trust to efficiently process and pay such claims.  On January 30, 2023, a panel of the United States Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") issued an opinion directing the Bankruptcy Court to dismiss the 2021 Chapter 11 Case on the basis that the bankruptcy case was not filed in good faith.  The Bankruptcy Court ultimately entered an order dismissing the 2021 Chapter 11 Case on April 4, 2023.  Such events are described in more detail below.

Throughout the 2021 Chapter 11 Case, the Debtor participated in court-ordered mediation with the Debtor's key constituencies to negotiate a potential consensual resolution of the case.  Despite a multitude of discussions with various parties and the efforts of the mediators, no agreement was reached prior to the Third Circuit's decision to dismiss the 2021 Chapter 11 Case.  Following the Third Circuit's ruling, however, and with the assistance of the mediators and the encouragement of the Bankruptcy Court, negotiations continued between the Debtor and J&J, and various plaintiff law firms.  Those negotiations ultimately culminated in an agreement with thousands of claimants on a broad outline of terms, including financial terms, for a plan of reorganization that, if confirmed and consummated, would fully resolve all of the Debtor's liability for talc-related claims.  That agreement was memorialized in a series of Plan Support Agreements that were executed and delivered by counsel on behalf of approximately 58,000 claimants and subsequently signed by the Debtor, Holdco, and J&J.  The Plan Support Agreements provide that, among other things, the Debtor, J&J, Holdco, and the applicable claimants will work together to finalize, file, and seek confirmation of a plan of reorganization that provides for the establishment of a trust funded in the amount of $8.9 billion on a net present value basis.  Such events are described in more detail below.

<u>The Debtor, with the support of the Ad Hoc Committee of Supporting Counsel, also engaged in discussions with counsel to over fifty Third-Party Payors (the "Insurers") asserting direct claims against the Debtor and its affiliates and liens or subrogation claims against</u>

proceeds to be received by current talc claimants under the Plan.  The Debtor, the Ad Hoc Committee of Supporting Counsel, and the Insurers have reached an agreement in principle whereby $750 million of the approximately $12.08 billion that will be contributed to the Trust will be used to fund a lien claim sub-trust to fully and permanently resolve all TTP Lien Claims. Counsel to the Insurers, the Debtor and the Ad Hoc Committee of Supporting Counsel are working to secure final authorization of the settlement, which is currently expected.  The Debtor and the Insurers also are in active discussions with representatives of other Third-Party Payors, including the United States Department of Health and Human Services, regarding their agreement to the settlement.  This settlement, if finalized and implemented, will provide clarity as to the amount of TTP Lien Claims, and the Specified Insured Individuals will be able to receive compensation for their Talc Personal Injury Claims under the Plan far sooner than they would have otherwise received it.

Confirmation of the Plan is subject to a settlement with the Imerys/Cyprus Parties. Because Imerys was a former talc supplier to the Debtor's predecessors, personal injury claimants have and may assert Talc Personal Injury Claims against both the Debtor and the Imerys/Cyprus Parties.  The Plan provides that the Imerys/Cyprus Parties will be Protected Parties and that Talc Personal Injury Claims against them will be enjoined by a channeling injunction.  The Plan contemplates that a contribution by or on behalf of the Imerys/Cyprus Parties will be made to the talc trust to compensate it for processing and paying the Talc Personal Injury Claims.  Confirmation of the Plan is subject to a settlement being reached between the Debtor and the Imerys/Cyprus Parties that provides for a contribution to the talc trust by the Imerys/Cyprus Parties in an amount that is acceptable to the Debtor, J&J, and the Ad Hoc Committee of Supporting Counsel.  The Debtor intends to engage in discussions with representatives of the Imerys/Cyprus Parties regarding the Plan in the near future.

The Debtor's stated goal in the current Chapter 11 Case is to finalize, obtain confirmation of, and ultimately consummate a plan of reorganization containing the terms agreed to in the Plan Support Agreements.  To that end, the Plan, among other things, (a) establishes a trust and provides it with funding of $8.9 billion on a net present value basis to resolve and pay all current and future talc-related claims, including all ovarian cancer claims and all mesothelioma claims, and (b) provides for the issuance of an injunction that will permanently protect the Debtor, its affiliates, and certain other parties from further talc-related claims arising from products manufactured and/or sold by Old JJCI (as defined below), or for which Old JJCI may otherwise have had legal responsibility, pursuant to sections 524(g) and/or 105(a) of the Bankruptcy Code.  The Debtor believes that, as a result of the Cash Contributions described below, talc-related claims will be paid in full.

Pursuant to the Plan, other Claims against the Debtor will be paid in full, and Holdco will retain its Equity Interests in the Debtor.

(b)  *Talc Personal Injury Trust*

Pursuant to the Plan, a Talc Personal Injury Trust that complies in all respects with the requirements of section 524(g)(2)(B) of the Bankruptcy Code will be established and assume all Talc Personal Injury Claims.  The Talc Personal Injury Trust will be comprised of ~~two~~three

sub-trusts – the Talc Personal Injury Governmental Action Claims Sub-Trust, the Talc Personal Injury TPP Lien Claims Sub-Trust, and the Talc Personal Injury Tort Claims Sub-Trust. The Talc Personal Injury Governmental Action Claims Sub-Trust will assume all Governmental Action Claims, the Talc Personal Injury TPP Lien Claims Sub-Trust will assume all TPP Lien Claims, and the Talc Personal Injury Tort Claims Sub-Trust will assume all Talc Personal Injury Claims other than Governmental Action Claims and TPP Lien Claims. The Talc Trustees will segregate, and separately account for the use of, funds of the Talc Personal Injury Governmental Action Claims Sub-Trust, on the one hand Talc Personal Injury TPP Liens Claims Sub-Trust, and the Talc Personal Injury Tort Claims Sub-Trust, on the other hand.

The Talc Personal Injury Trust will manage its assets, and use such assets to pay compensable Talc Personal Injury Claims, in accordance with the Talc Personal Injury Trust Documents. The Talc Personal Injury Trust Documents include the Talc Personal Injury Trust Agreement (Exhibit J to the Plan), the Trust Distribution Procedures (Exhibit M to the Plan), the Cooperation Agreement (Exhibit E to the Plan), and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust (which, along with the Talc Personal Injury Trust Agreement and the Cooperation Agreement, will be included in the Plan Supplement).

Pursuant to the Plan, the Reorganized Debtor will deliver Cash Contributions to the Talc Personal Injury Trust as follows:

- on the Effective Date, total Cash Contributions of $3.0 billion, with (i) $400 million thereof to be delivered to the Talc Personal Injury Governmental Action Sub-Trust and (ii) $2.6 Claims Sub-Trust, (ii) $250 million thereof to be delivered to the Talc Personal Injury TPP Liens Claims Sub-Trust, and (iii) $2.35 billion thereof to be delivered to the Talc Personal Injury Tort Claims Sub-Trust. The $2.6 2.35 billion to be delivered to the sub-trust for talc-related claims other than governmental unit claims and TPP Lien Claims on the effective date of the Plan is subject to adjustment as follows: (a) commencing on the first business day after the confirmation date, interest will accrue on such amount at the rate of 4% per annum and (b) such amount will be reduced by the amount of expenses of the talc trust that are paid by the reorganized Debtor in advance of the effective date of the Plan;

- on the first (1st) anniversary of the Effective Date, total Cash Contributions of $2.5 billion, with the entirety (i) $250 million thereof to be delivered to the Talc Personal Injury TPP Liens Claims Sub-Trust and (ii) $2.25 billion thereof to be delivered to the Talc Personal Injury Tort Claims Sub-Trust;

- on the second (2nd) anniversary of the Effective Date, total Cash Contributions of $1.0 billion, with (i) $250 million thereof to be delivered to the Talc Personal Injury TPP Liens Claims Sub-Trust and (ii) $750 million thereof to be delivered to the Talc Personal Injury Tort Claims Sub-Trust;

- on each of the second (2nd), seventh (7th), twelfth (12th), seventeenth (17th), and twenty-second (22nd) anniversary of the Effective Date, total Cash

13

Contributions of $1.0 billion, with the entirety thereof to be delivered to the Talc Personal Injury Tort Claims Sub-Trust; and

- on the twenty-fifth (25th) anniversary of the Effective Date, total Cash Contributions of $1.18 billion, with the entirety thereof to be delivered to the Talc Personal Injury Tort Claims Sub-Trust.

Pursuant to the Plan, on the Effective Date, the Reorganized Debtor will deliver the Talc PI Note to the Talc Personal Injury Tort Claims Sub-Trust.  The Talc PI Note will be in the principal amount of $400 million, will bear no interest, will mature on the first anniversary of the Effective Date, will be secured by the Talc PI Pledge, and will provide for payment in full of the principal amount on or before maturity date.

(c)     *The Trust Distribution Procedures*

As set forth in the Plan and described in Article VIII of this Disclosure Statement, on the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures.

(d)     *The Channeling Injunction*

The effect of "channeling" Talc Personal Injury Claims to the Talc Personal Injury Trust is that Talc Personal Injury Claims may only be pursued against, and resolved by, the Talc Personal Injury Trust, or as otherwise set forth in the Trust Distribution Procedures.

The Channeling Injunction to be issued as part of the Plan will permanently and forever stay, bar, and enjoin holders of Talc Personal Injury Claims from taking any action for the purpose of directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim against a Protected Party.  As a result, no holder of a Talc Personal Injury Claim will have any right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.

The Protected Parties include:  (i) the Debtor and its Representatives; (ii) the Reorganized Debtor and its Representatives; (iii) the LTL Corporate Parties listed on Schedule 2 to the Plan and their respective representatives; (iv) the Settling Talc Insurance Companies; (v) the retailers, parties indemnified by the Debtor, and other Persons listed on Schedule 3 to the Plan; and (vi) the Imerys/Cyprus Parties listed on Schedule 1 to the Plan~~, *provided, however*, that the Imerys/Cyprus Parties shall only be Protected Parties if, at least fourteen (14) days prior to the deadline for objecting to Confirmation of the Plan, either (i) a settlement agreement, acceptable in form and substance to the Debtor, J&J, and the AHC of Supporting Counsel, is entered into by and between Imerys Talc America, Inc. and the Debtor or (ii) the Debtor, J&J, and the AHC of Supporting Counsel jointly determine that the Imerys/Cyprus Parties shall be Protected Parties absent such a settlement agreement.~~.

2.2     Summary Description of Classes and Treatment

Except for Administrative Claims and Priority Tax Claims (which are not required to be classified), all Claims and Equity Interests are divided into classes under the Plan.  The following chart summarizes the treatment of such classified and unclassified Claims and Equity Interests under the Plan.  This chart is only a summary of such classification and treatment and reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.  The Debtor reserves the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The summary of classification and treatment of Claims against and Equity Interests in the Debtor is as follows:

| Class | Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Each holder of an Allowed Priority Non-Tax Claim will receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim plus Postpetition Interest thereon, unless the holder of such Claim agrees to less favorable treatment. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unless otherwise agreed to by the holder of an Allowed Secured Claim in Class 2 and the Debtor or Reorganized Debtor, each holder of an Allowed Class 2 Claim, at the option of the Debtor or Reorganized Debtor, will either: (i) be paid in full in Cash, plus Postpetition Interest thereon; or (ii) have its Allowed Class 2 Claim Reinstated.<br><br>Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim will be entitled to treatment as an Allowed Class 3 Claim. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 3 | Unsecured Claims | Each holder of an Allowed Unsecured Claim against the Debtor will be paid the Allowed Amount of its Unsecured Claim. Such payment will be (i) in full, in Cash, plus Postpetition interest, or (ii) upon such other less favorable terms as may be mutually agreed upon | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |

15

| Class | Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| | | between the holder of such Unsecured Claim and the Debtor or Reorganized Debtor. | | |
| 4 | Tale Personal Injury Claims | On the Effective Date, liability for all Talc Personal Injury Claims will be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures. Pursuant to the Plan and the Trust Distribution Procedures, each holder of a Talc Personal Injury Claim will have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim will thereafter be resolved in accordance with the Talc Personal Injury Trust Documents. | Impaired<br><br>Entitled to Vote | 100% |
| 5 | Intercompany Claims | On the Effective Date, each Allowed Claim in Class 5 will be Reinstated. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 6 | Equity Interests of the Debtor | On the Effective Date, Equity Interests of the Debtor will be Reinstated, and the holder of such Interests will retain such interests, subject to the Talc PI Pledge. | Impaired<br><br>Entitled to Vote | 100% |

The Debtor reserves the right to eliminate any Class of Claims in the event it determines that there are no Claims in such Class.

2.3____The Plan Supplement

The Debtor will file the Plan Supplement with the Clerk of the Bankruptcy Court by [•], 2023. The Plan Supplement will include: (a) the Amended Articles of Organization of the Reorganized Debtor (Exhibit A to the Plan), (b) the Amended Operating Agreement of the Reorganized Debtor (Exhibit B to the Plan), (c) the Cooperation Agreement (Exhibit E to the Plan), (d) a list or description of Governmental Claims (Exhibit F to the Plan), (e) a list or description of Retained Rights of Action (Exhibit G to the Plan), (f) a list of Talc Insurance Policies (Exhibit H to the Plan), (g) a list of Talc Insurance Settlement Agreements (Exhibit I to

NAI-1537329582v1 1537329582

the Plan), (h) the talc Personal Injury Trust Agreement (Exhibit J to the Plan), (i) the Talc PI Note (Exhibit K to the Plan), (j) the Talc PI Pledge Agreement (Exhibit L to the Plan), (k) the list of Executory Contracts and Unexpired Leases to be rejected by the Debtor (Exhibit N to the Plan), and (l) the list of officers and manager of the Reorganized Debtor (Exhibit O to the Plan); *provided*, *however*, that the Plan Document listed in subsection (k) will be revised as needed to take into account any additional Executory Contracts and Unexpired Leases to be rejected in accordance with Article V of the Plan.  The Plan Supplement will be served only on those parties that have requested notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtor.  Once the Plan Supplement is filed, a copy will be available for review on the Claim Agent's website free of charge at https://dm.epiq11.com/case/ltl/dockets.

2.4    Modification and Amendments

**Mediation and settlement negotiations with various parties are ongoing and will continue after the date of this Disclosure Statement.  Subject to the limitations contained in the Plan, the Debtor reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its rights to alter, amend, or modify materially the Plan with respect to the Debtor one or more times including after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.**

**For the avoidance of doubt, such modification(s) may include a settlement pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in this Disclosure Statement.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article IX of the Plan.  If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Case, that the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of any holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all holders of Claims or Equity Interests who have previously accepted the Plan. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.**

**For the avoidance of doubt, any and all rights of holders of Claims against the Debtor or Equity Interests in the Debtor are expressly reserved under Bankruptcy**

**Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules, or Bankruptcy Code.**

## ARTICLE III.

## GENERAL INFORMATION

This <u>Article III</u> provides a general overview of the Debtor's corporate history, organizational structure, business operations, and assets.

3.1    <u>The Debtor's Corporate History</u>

(a)    *Prior to the 2021 Corporate Restructuring*

The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("<u>J&J Baby Products</u>"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J, a New Jersey company incorporated in 1887.

J&J first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder.

In 1978, consistent with J&J's policy of decentralizing its business, J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products.  This was part of a larger restructuring of J&J that included the transfer of assets and liabilities of seven principal operating divisions to wholly owned subsidiaries.  To effectuate the transaction, J&J and J&J Baby Products entered into an Agreement for Transfer of Assets and Bill of Sale, effective January 1, 1979 (the "<u>1979 Agreement</u>"), pursuant to which J&J transferred all assets and liabilities associated with the baby products division to J&J Baby Products.  As part of the transfer, J&J Baby Products agreed to indemnify J&J for all claims relating to the baby products business, including the talc powder products. Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including JOHNSON'S® Baby Powder.  A copy of the 1979 Agreement is attached as Annex A to the *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 4] (the "<u>First Day Declaration</u>").

In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("<u>Omni</u>"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program.  Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.

In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc.

In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").

Following these intercompany transactions, Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases. Old JJCI also was obligated to indemnify J&J for all claims relating to the talc products.

Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases. Before J&J's decentralization, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division. Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products. The operational responsibilities, liabilities, and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.

In 2012, Old JJCI sold the assets and liabilities relating to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant"). Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc.) entered into an indemnification agreement. Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the agreement.

In 1989, J&J sold its talc mining business to Cyprus Mines Corporation by means of the sale of stock of Windsor Minerals Inc. ("Windsor"). From 1989 to 2011, Old JJCI entered into certain agreements to purchase talc from Windsor and certain other Imerys/Cyprus Parties (the "Imerys/Cyprus Agreements"). Certain of the Imerys/Cyprus Agreements included indemnity provisions, with some running in favor of the applicable Imerys/Cyprus Parties and others running in favor of Old JJCI. Under one of the Imerys/Cyprus Agreements, an Imerys/Cyprus Party agreed to indemnify Old JJCI for (i) damages, losses, costs, and expenses arising from (A) talc provided by the Imerys/Cyprus Party not meeting specifications provided by Old JJCI or (B) the Imerys/Cyprus Party failing to sample or test talc in accordance with the agreement and (ii) all liabilities arising out of any violation of law by the Imerys/Cypress Party.

(b)    *The 2021 Corporate Restructuring*

As described above, Old JJCI and its affiliates engaged in multiple restructurings through the years. In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021. The 2021 Corporate Restructuring

was effectuated through a series of steps.  On October 11, 2021, Old JJCI organized Royalty
A&M LLC ("Royalty A&M"), a North Carolina limited liability company, contributing to it
$367.1 million, whereupon Royalty A&M became a wholly owned subsidiary of Old JJCI.
Subsequently, Royalty A&M used those funds to acquire certain royalty streams from Old JJCI
and certain of its affiliates.  That same day, the following transactions were effected, in
sequence:

- Old JJCI's then-direct parent, Janssen Pharmaceuticals, Inc., organized Currahee
Holding Company Inc. ("Currahee"), a New Jersey corporation, contributing to it
all of the issued and outstanding stock of Old JJCI, whereupon Currahee became
the direct parent of Old JJCI; and

- Currahee organized Chenango Zero LLC, a Texas limited liability company, as its
wholly owned subsidiary.

On October 12, 2021, the remaining transactions in the 2021 Corporate Restructuring
occurred in the following sequence:

- Old JJCI merged with and into Chenango Zero LLC, with Chenango Zero LLC as
the surviving entity;

- J&J and Currahee, as payors (on a joint and several basis), and Chenango Zero
LLC, as payee, entered into a funding agreement;

- Old JJCI effected a divisional merger under Chapter 10, Subchapter A of the
Texas Business Organizations Code;

- Upon the effectiveness of the divisional merger, (i) Old JJCI ceased to exist;
(ii) two new Texas limited liability companies—Chenango One LLC and
Chenango Two LLC—were created; and (iii) all of the assets and liabilities of
Old JJCI were allocated between Chenango One LLC and Chenango Two LLC,
with Chenango One LLC being allocated certain of Old JJCI's assets and
becoming solely responsible for the talc-related liabilities of Old JJCI and
Chenango Two LLC being allocated all other assets of Old JJCI and becoming
solely responsible for all other liabilities of Old JJCI;

- Immediately following the effectiveness of the divisional merger, (i) Chenango
One LLC and Chenango Two LLC entered into certain agreements, including a
divisional merger support agreement that, among other things, provides that
Chenango One LLC will indemnify and hold harmless Chenango Two LLC and
its affiliates for any losses, liabilities, or other damages relating to claims against
Chenango Two LLC and its affiliates in respect of the assets and liabilities of
Chenango Two LLC, including talc-related liabilities, and (ii) Chenango One
LLC entered into certain agreements with other affiliates, including secondment
and services agreements;

NAI-1537329582v1 1537329582

- Following the effectiveness of the divisional merger, (i) Chenango Two LLC merged with and into Currahee, with Currahee as the surviving entity, which then changed its name to Johnson and Johnson Consumer Inc. ("New JJCI"), and (ii) Chenago One LLC converted from a Texas Limited liability company into a North Carolina limited liability company, the Debtor, and changed its name to LTL Management LLC; and

- Finally, the funding agreement, the divisional merger support agreement, and the other intercompany agreements, including the secondment and services agreements, were amended and restated to reflect the names of the parties to those agreements at the conclusion of the 2021 Corporate Restructuring.

As noted above, pursuant to the divisional merger, the Debtor became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims.  In addition, pursuant to the divisional merger, the Debtor received the following assets:

- A bank account and approximately $6 million in cash;

- Old JJCI's rights and interests as payee under the funding agreement;

- All contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, service contracts and engagement and retention contracts, if any;

- All equity interests in Royalty A&M;

- Causes of action that relate to the assets and liabilities allocated to the Debtor;

- Privileges that relate to the assets and liabilities allocated to the Debtor; and

- Records that relate to the assets and liabilities allocated to the Debtor.

(c)      *Commencement of the 2021 Chapter 11 Case*

Old JJCI implemented the 2021 Corporate Restructuring to facilitate a chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future talc-related claims through a plan of reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding.  As noted above and described in more detail below, the Debtor in fact filed for chapter 11 relief on October 14, 2021, two days after the completion of the 2021 Corporate Restructuring, thereby commencing the 2021 Chapter 11 Case.

(d)      *Transfer by Holdco of its Consumer Business*

Following the 2021 Corporate Restructuring, New JJCI's business operations included the manufacture and sale of a broad range of products used in the baby care, beauty, oral care,

wound care, and women's health care fields, as well as over-the-counter pharmaceutical products (collectively, the "Consumer Business").  In December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc., Holdco, and in early January 2023, Holdco, the Debtor's direct parent and an obligor on the Debtor's funding agreement, transferred its Consumer Business assets to its parent entity (the "Consumer Business Transfer").

       (e)    *Dismissal of the 2021 Chapter 11 Case and New Financing Arrangements*

A key component of the 2021 Corporate Restructuring described above was the funding agreement between the Debtor, as payee, and New JJCI and J&J, as payors (the "2021 Funding Agreement").  The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by the Debtor.  The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (i) the administrative costs of the Debtor's chapter 11 case and (ii) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M were insufficient to pay such costs and further, in the case of the funding of a trust, the Debtor's other assets were insufficient to provide that funding.  In connection with the 2021 Funding Agreement, New JJCI and J&J entered into a commitment and loan agreement, dated October 12, 2021 (the "2021 Commitment and Loan Agreement"), pursuant to which New JJCI and J&J agreed that (i) New JJCI would be the primary obligor under the 2021 Funding Agreement, (ii) upon the request of New JJCI, J&J would make revolving credit loans to New JJCI, with the proceeds of the loans to be used by New JJCI solely to satisfy its obligations under the 2021 Funding Agreement, and (iii) if New JJCI failed to make any payment to the Debtor required by the 2021 Funding Agreement and instead J&J made such payment under the 2021 Funding Agreement, New JJCI would reimburse J&J for that payment and, if it failed to do so, the amount New JJCI owed would be deemed to be financed with a loan from J&J.

As noted above and described in more detail below, the 2021 Chapter 11 Case was dismissed on April 4, 2023 at the direction of the Third Circuit.  The Third Circuit found that the Debtor was not in financial distress as a result of its rights under the 2021 Funding Agreement.  That determination had the effect of defeating the fundamental purpose of that agreement, which purpose was to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code.  The Third Circuit determined that it had the exact opposite effect, *i.e.*, that it required dismissal of the 2021 Chapter 11 Case.  As a result, the Debtor believed there was a material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable. To eliminate that risk and secure funding terms consistent with the terms set forth in the Plan Support Agreements described below, on April 4, 2023, prior to the Debtor filing the Chapter 11 Case, the Debtor, J&J, and Holdco entered into new financing arrangements.

The Debtor, J&J, and Holdco effectuated these new financing arrangements by entering into three new agreements.  The Debtor, J&J and Holdco entered into a termination and substitution agreement (the "T&S Agreement") by which the 2021 Funding Agreement and the 2021 Commitment and Loan Agreement were terminated and the parties, in substitution therefor, agreed to enter into two new agreements.  Simultaneously with their entry into the T&S Agreement, the Debtor, J&J, and Holdco then entered into these two new agreements:

(i) Holdco and the Debtor entered into a new funding agreement (the "<u>2023 Funding Agreement</u>") and (ii) the Debtor, Holdco, and J&J entered into a separate support agreement (the "<u>J&J Support Agreement</u>").

The 2023 Funding Agreement is similar to the 2021 Funding Agreement, except that J&J is not a payor thereunder.  It imposes no repayment obligation on the Debtor and is not a loan.  It obligates Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the normal course of its business (i) at any time when there is no bankruptcy case and (ii) during the pendency of any chapter 11 case filed by the Debtor, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay those costs and expenses.  In addition, the 2023 Funding Agreement requires Holdco to fund amounts necessary (i) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (ii) in the event of a chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreements, as such terms may be amended or supplemented with the consent of the parties, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

The J&J Support Agreement, which the Debtor intends to seek approval of from the Bankruptcy Court, is operative only in the Chapter 11 Case.  It obligates J&J to provide the trust funding Holdco is required to provide under the 2023 Funding Agreement under a supported plan, but only if Holdco fails to provide the funding.  In return, Holdco is obligated to reimburse J&J for any amounts it pays to the trust on Holdco's behalf, and any amounts that are not reimbursed by Holdco will be deemed to be financed with a loan from J&J to Holdco.  The Debtor is obligated to use commercially reasonable efforts to cause a plan of reorganization containing the terms reflected in the Plan Support Agreements to become effective as soon as reasonably practicable. The Debtor has the right to enforce J&J's obligation under the J&J Support Agreement.

A copy of the T&S Agreement is attached as <u>Annex D</u> to the First Day Declaration, a copy of the 2023 Funding Agreement (without its Schedule 2 that includes confidential bank account information) is attached as <u>Annex E</u> to the First Day Declaration, and a copy of the J&J Support Agreement is attached as <u>Annex F</u> to the First Day Declaration.

<u>3.2     The Debtor's Organizational Structure and Business Operations</u>

Holdco is the direct parent of the Debtor, and the Debtor is the direct parent of Royalty A&M.  A chart depicting the Debtor's corporate structure is attached as Annex B to the First Day Declaration.

As of the Petition Date, Holdco is a holding company with ownership interests in various subsidiaries.  The most substantial of Holdco's ownership interests are held through its wholly owned subsidiary Apsis SAS (France) ("<u>Apsis</u>").  Apsis owns (through its wholly owned subsidiary Johnson & Johnson Holding GmbH (Germany)) a 36.1% ownership interest in GH Biotech Holdings Limited (Ireland) ("<u>GH Biotech</u>").  GH Biotech holds ownership interests,

either directly or through wholly owned subsidiaries, in four entities, Janssen Sciences Ireland Unlimited Company, Janssen Irish Finance Unlimited Company, C Consumer Products Denmark ApS, and Impulse Dynamics (71% interest). Apsis also owns, either directly or indirectly, interests in various limited risk distributors (which distribute J&J products in foreign countries), a German-based subsidiary that manufactures 3D-printed titanium interbody implants for spinal fusion surgery, and various other subsidiaries.

The Debtor was formed to manage and defend thousands of talc-related claims and to oversee the operations of its subsidiary, Royalty A&M.

Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of CLOROX®, ECOLAB®, ESSITY®, LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, SPARTAN®, and TENA® products. It reviews royalty monetization opportunities in the healthcare industry and seeks to grow its business by reinvesting the income from existing royalty revenue streams into both the acquisition of additional external royalty revenue streams as well as financings to third parties secured by similar royalty streams.

The Debtor's ultimate parent company, J&J, is a holding company that, through its operating subsidiaries, conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being. J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years. That innovation includes novel oncology, immunology, and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing.

3.3    The Debtor's Assets

The Debtor's assets consist primarily of cash, equity interests of Royalty A&M, the 2023 Funding Agreement, the J&J Support Agreement, and insurance assets. Each of these asset categories is described below.

(a)    *Cash*

As of the date of this Disclosure Statement, the Debtor has approximately $[●] in cash, which is maintained in a Bank of America bank account.

(b)    *Equity Interests of Royalty A&M*

The Debtor holds the equity of Royalty A&M. At the time of the filing of the 2021 Chapter 11 Case, the Debtor projected that Royalty A&M would generate approximately $50 million in revenue per year over the next five years and estimated the fair market value of its interest in Royalty A&M to be approximately $367.1 million.

Royalty A&M has not paid, and does not currently intend to pay, cash distributions to the Debtor.

(c)    *The 2023 Funding Agreement and J&J Support Agreement*

The Debtor is not party to any secured financing arrangements or any third party credit facilities.  Instead, as described above, the Debtor is party to the 2023 Funding Agreement with Holdco and the J&J Support Agreement with J&J and Holdco.

(d)    *The Debtor's Insurance Coverage*

The Debtor has access to certain primary and excess liability insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.  In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.  These policies that cover the Debtor were issued to J&J as the "Named Insured."  Those policies cover the period when Old JJCI was operated as a business unit of J&J, as well as the period when Old JJCI was a subsidiary of J&J.

As of the date of this Disclosure Statement, the Debtor has identified various insurance assets, including:

- Primary general liability policies:  Aetna Casualty and Surety Company ("Travelers"), now part of Travelers Insurance Company, issued primary general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980 (the "Travelers Policies").  The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $293 million in the aggregate.  The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977.  The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits.  From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued primary coverage that covers the Debtor (the "AMICO Policies").  AMICO is insolvent, having been placed into liquidation in 2013.  The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.

- Excess liability coverage:  from 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor.  The combined aggregate limits of those policies total approximately $563 million.  From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor.  Those insurers include subsidiaries or affiliates of the following companies:  American International Group, Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide Indemnity Company, and North River Insurance Company.  The combined limits of those excess policies total more than $1.09 billion in the aggregate.  Certain of the insurers that issued these excess policies are insolvent (including, in particular, Home Insurance Company).

- Middlesex Insurance Company ("Middlesex"):  From 1973 through 1985, Middlesex, a captive insurance company that is a wholly-owned subsidiary of

J&J, issued policies that cover J&J and the Debtor.  Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies.  From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI.  After 1985, Middlesex issued liability coverage to J&J and the Debtor.  There is a dispute between J&J, the Debtor, and Middlesex, on the one hand, and the third-party insurers (*i.e.*, insurers other than the Middlesex captive), on the other hand, regarding the applicability and extent of coverage the Middlesex policies provide, as well as the potentially applicable Middlesex coverage limits, including in particular with respect to post-1985 Middlesex policies.

Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to these third-party insurers.  To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid its costs of defense, or indemnified J&J or Old JJCI for settlements or judgments.  Instead, the third-party insurers have asserted coverage defenses.

In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, along with Middlesex, in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI. The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020, which is currently the operative complaint.  J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants.  Travelers and certain other insurers filed cross-claims against J&J, Old JJCI, and Middlesex, to which J&J, Old JJCI, and Middlesex responded later in 2020.

In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic stay to permit the NJ Coverage Action to proceed.  The Bankruptcy Court denied those motions but permitted certain third-party discovery to occur.  The NJ Coverage Action remains pending.

(e)    *Imerys/Cyprus Related Rights*

The Debtor has certain talc-related indemnity rights under the Imerys/Cyprus Agreements.

## ARTICLE IV.

## EVENTS LEADING TO THE FILING OF THE 2021 CHAPTER 11 CASE

4.1    Cosmetic Talc Litigation and Related Costs and Burdens

(a)    *Overview*

Both the 2021 Chapter 11 Case and the Chapter 11 Case were precipitated by the filing of thousands of cosmetic talc lawsuits against Old JJCI and J&J.  The Debtor believes, for the reasons indicated below, that these claims have no valid scientific basis, as Old JJCI's talc products never contained asbestos and the safety of cosmetic-grade talc has been confirmed by

dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades. Nevertheless, the number of claims has continued to increase, and the Debtor anticipates that, absent a chapter 11 resolution, the litigation and its associated burdens will continue for decades more.

Cosmetic talc litigation against the Debtor, Old JJCI, and J&J focused primarily on JOHNSON'S® Baby Powder, with plaintiffs historically asserting two types of claims: (i) claims alleging ovarian cancer arising as a result of talc exposure, *i.e.*, ovarian cancer claims, and (ii) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure, *i.e.*, mesothelioma claims. As of the filing of the 2021 Chapter 11 Case on October 14, 2021, there were approximately 40,000 pending lawsuits asserting ovarian cancer claims and approximately 470 pending lawsuits asserting mesothelioma claims against the Debtor. As of April 4, 2023, the petition date for this Chapter 11 Case (the "Petition Date"), based on information available to the Debtor, the number of current claims against the Debtor, both filed and unfiled, had increased substantially to approximately 100,000.

(b)   *Decades of Studies and Testing*

Questions regarding whether JOHNSON'S® Baby Powder contained asbestos and whether use of cosmetic talcum powder could cause ovarian cancer were raised as early as the 1970s and 1980s, respectively. Such allegations have been investigated by the Food & Drug Administration (the "FDA"), among others, and found to be unsupported by fact or science.

Over the past four decades, at least 34 case-control studies looking at a potential association between perineal talc use and ovarian cancer have been published. While the case-control studies are inconsistent as to the finding of a statistically significant positive association, not one of the authors of the case-control studies that reported an "association" took the position that its findings establish causation.

To date, the FDA has not concluded, based on its review of the scientific literature, that there is a causal relationship between talc and ovarian cancer, and has not recommended that consumers generally avoid talcum powder products. Other public health authorities that have evaluated the scientific literature relating to talc also have not concluded that the existing evidence demonstrates that perineal exposure to talc causes ovarian cancer.

In addition, there has been decades of testing by J&J and Old JJCI to establish product safety. The approach to such testing has been state of the art, exceeding regulatory and industry standards. The talc testing program begins with selective mining – carefully chosen and vetted sources for talc – and continues with layers of quality assurance testing at every point in the manufacturing and production chain, up to the moment of bottling. The program relies on industry experts to ensure testing protocols are implemented at each stage of the process with a high level of precision and integrity. Because of this, sourcing and testing exceed industry standards, and dozens of government institutions, independent laboratories, and major universities that studied and tested J&J's/Old JJCI's talc for decades time and again have declared it free from asbestos.

Additional information regarding the studies and testing that show J&J's and Old JJCI's talcum powder products are safe can be found in the *Informational Brief of LTL Management LLC* [Dkt. 3 in Case No. 21-30589] (the "2021 Informational Brief").

(c)     *Cosmetic Talc Litigation*

Prior to 2010, only a small number of isolated cases involving cosmetic talc had been filed against Old JJCI and J&J.  These cases alleged a range of claims, including talcosis due to substantial misuse of JOHNSON'S® Baby Powder, mesothelioma, dermatitis, and rashes.

The number of claims began to increase significantly after the *Berg* (2013) and *Fox* (2016) trials.  *Berg v. J&J*, filed in December 2009, was the first case alleging ovarian cancer as a result of genital exposure to Old JJCI's cosmetic talc-based products.  The jury found for the plaintiff, but awarded no damages.  By the end of 2015, there were over 1,300 ovarian cancer lawsuits filed against Old JJCI and J&J.

In February 2016, the first St. Louis, Missouri ovarian cancer case, *Fox*, went to trial. The jury awarded the plaintiff $72 million dollars.  While ultimately overturned on appeal, the verdict sparked interest on the part of plaintiff lawyers.  Five more cases were tried in that venue over the next year and a half, resulting in plaintiff verdicts totaling more than $235 million dollars (in addition to a defense verdict and a mistrial).  All of those verdicts subsequently were reversed on appeal.

New filings alleging that JOHNSON'S® Baby Powder caused mesothelioma also dramatically increased.  At the time of the *Fox* trial, there were only six mesothelioma cases naming Old JJCI or J&J as a defendant and alleging JOHNSON'S® Baby Powder as a cause of the plaintiff's disease.  Within two months of the *Fox* trial, that number had increased to 23 mesothelioma cases.  By the beginning of 2017, more than 100 mesothelioma cases had been filed naming Old JJCI or J&J as a defendant.  The number of mesothelioma cases steadily grew in the years that followed.

(d)     *Costs and Burdens of Cosmetic Talc Litigation*

Although JOHNSON'S® Baby Powder has been safely used by hundreds of millions of people worldwide for over 125 years, on May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based JOHNSON'S® Baby Powder in the U.S. and Canada.  The decision was based on business considerations, including lack of sales due, to Old JJCI's belief, to misinformation about the safety of Old JJCI's talc-based JOHNSON'S® Baby Powder.

Prior to the filing of the 2021 Chapter 11 Case, roughly 1,300 ovarian cancer and over 250 mesothelioma cases were dismissed without payment, and Old JJCI achieved 16 key defense verdicts, including in four trials in 2021 alone. Old JJCI also succeeded in obtaining reversals of many plaintiff verdicts on appeal.  Despite these results, Old JJCI was also subject to a number of plaintiff verdicts involving unpredictable and wildly divergent compensatory and punitive damages awards.

Notably, all of the ovarian cancer plaintiff verdicts to date have been reversed on appeal with the exception of *Ingham*. Although the verdict in *Ingham* was reversed in part and reduced, the total damages award was still $2.243 billion.  The St. Louis, Missouri trial court had permitted the consolidation of 22 ovarian cancer plaintiffs, 17 of whom were non-residents, for a single trial. The jury found defendants Old JJCI and J&J liable for every claim.  The jury awarded compensatory damages in the aggregate amount of $550 million and punitive damages in the aggregate amount $4.1 billion.  On appeal, the punitive damages award was later reduced to $1.6 billion.

Prior to the commencement of the 2021 Chapter 11 Case, Old JJCI incurred nearly $1 billion in defending personal injury lawsuits relating to alleged talc exposure, nearly all of which was spent in only the last five years prior to the 2021 Chapter 11 Case.  In the months prior to the filing of the 2021 Chapter 11 Case, Old JJCI was paying anywhere from $10 million to $20 million in defense costs on a monthly basis.  In addition to these costs, Old JJCI paid approximately $3.5 billion in indemnity costs in connection with settlements and verdicts.

Cosmetic talc litigation against the Debtor was anticipated to continue for decades more and grow, as were the extraordinary costs of defending and resolving tens of thousands of expected claims.  Beyond the sudden influx of ovarian cancer claims, plaintiffs were also filing mesothelioma claims, alleging in the case of mesothelioma claims that Old JJCI's cosmetic talc products contained asbestos, which the Debtor disputes.  Plaintiff experts estimate that the latency period for mesothelioma can be as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.  As a result, even though Old JJCI stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020, individuals who develop mesothelioma in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.

At the time of the filing of the 2021 Chapter 11 Case on October 14, 2021, there were approximately 40,000 ovarian cancer cases pending against the Debtor, including approximately 36,000 cases pending in the MDL Proceeding and more than 3,800 cases in multiple state court jurisdictions across the country.  As of the filing of the 2021 Chapter 11 Case, Old JJCI had been served with over 12,300 ovarian cancer complaints in just the first ten and a half months of 2021.

In addition to the ovarian claims, more than 470 mesothelioma cases were pending against the Debtor as of the filing of the 2021 Chapter 11 Case. These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio.

As of April 4, 2023, the Petition Date, based on information available to the Debtor, the number of current claims against the Debtor, both filed and unfiled, had increased substantiallyto approximately 100,000.

Additional information regarding the cosmetic talc litigation and related costs and burdens can be found in the 2021 Informational Brief.

NAI-1537329582v1-1537329582

4.2      The MDL Proceeding

On October 4, 2016, the U.S. Judicial Panel on Multidistrict Litigation (the "MDL Panel") ordered that pending and future personal injury or wrongful death actions in federal courts alleging that plaintiffs or their decedents developed ovarian cancer from the use of JOHNSON'S® Baby Powder and Shower to Shower body powder be transferred and centralized in the U.S. District Court for the District of New Jersey, Trenton Division (the "MDL Proceeding").  In addition to individual actions pending in federal district courts around the country, two consumer class actions alleging that JOHNSON'S® Baby Powder and Shower to Shower body powder products were marketed for use without disclosure of talc's alleged carcinogenic properties were included in the MDL Proceeding.

The MDL Panel assigned U.S. District Judge Freda Wolfson as presiding judge for the MDL Proceeding.  Judge Wolfson designated U.S. Magistrate Judge Lois Goodman to assist her in the MDL Proceeding.  The cases were consolidated to (a) reduce or eliminate duplicative discovery, (b) prevent inconsistent pretrial rulings on discovery and privilege issues, (c) prevent inconsistent rulings on Daubert motion practice, and (d) conserve the resources of the parties, their counsel, and the federal judiciary in these actions.  Additionally, there are common factual issues in these cases related to the alleged risk of cancer posed by talc and talc-based body powders, whether the defendants knew or should have known of this alleged risk, and whether defendants provided adequate instructions and warnings with respect to these products.  As of the filing of the 2021 Chapter 11 Case, approximately 36,000 actions were pending in the MDL Proceeding.

After creation of the MDL Proceeding and its assignment to Judge Wolfson, she ordered a hearing at which all parties could present their summary views of the medical and scientific issues related to the MDL Proceeding, as well as evidence as to whether talc-based body powder products could cause or contribute to ovarian cancer.  That hearing was held on January 26, 2017.  Judge Wolfson subsequently ordered full briefing by the parties on the threshold Daubert issue of whether reliable and sufficient scientific and medical evidence exists on the issue of causation.  Judge Wolfson set an evidentiary hearing on that issue that ran from July 22 to July 31, 2019, with plaintiffs presenting five witnesses and J&J presenting three witnesses.  At the conclusion of the hearing, the Judge requested final Daubert briefing from all parties which was submitted on October 7, 2019.  On April 27, 2020, Judge Wolfson rendered her Daubert decision on the opinions offered by these witnesses, granting in part and denying in part J&J's motion to exclude opinions of plaintiffs' five witnesses and denying plaintiffs' motion to exclude the opinions of J&J's three experts.  See In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Products Litig., MDL No. 2738, Civil Action No. 16-2638 (FLW) (D.N.J. April 27, 2020).

Following Judge Wolfson's retirement in January 2023, on January 31, 2023, the MDL Proceeding was reassigned to Judge Michael Shipp.

4.3      The Canadian Actions

As of the filing of the 2021 Chapter 11 Case, in addition to the thousands of talc claims pending in the United States, Old JJCI, J&J, Johnson & Johnson Inc. ("J&J Canada"), a federal

corporation incorporated under the laws of Canada, and Bausch were named defendants in one certified class action, three proposed class actions, and one individual action in four Canadian provinces (Alberta, British Columbia, Ontario and Quebec).  The certified class action and the proposed class actions commenced in Alberta, British Columbia, Ontario, and Quebec are brought on behalf of classes (or proposed classes) of Canadian individuals who allege injury or damages arising from the use or purchase of talc-containing products manufactured, marketed, and/or sold by Old JJCI, J&J, J&J Canada, or Bausch.  The individual action was commenced in British Columbia by an individual who likewise alleges injury arising from the use of talc-containing products manufactured or sold by Old JJCI, J&J, or J&J Canada.

Although subject to a stay of proceedings arising from the recognition of the 2021 Chapter 11 Case in Canada, in December 2021, 12 additional Ontario-based Canadian claims were served in March 2022 and 26 additional British Columbia-based claims were filed in January and February 2023.

4.4     The AG State Actions

In the last several years, upon the request of certain state attorneys general, J&J, Old JJCI, or certain affiliates thereof provided information about the corporate family's sale of talc-containing products, specifically JOHNSON'S® Baby Powder and Shower to Shower, to certain States.  Prior to the filing of the 2021 Chapter 11 Case, two States, Mississippi and New Mexico, filed suit against J&J, Old JJCI, and certain other parties alleging that Old JJCI and J&J are liable for claims in connection with the sale, promotion, and marketing of talc-containing products, including making misrepresentations about the safety of the talc products sold by Old JJCI.

The Mississippi suit, captioned <u>State of Mississippi ex rel. Hood v. Johnson & Johnson, et al.</u>, No. 25CH1:14-cv-001207, pending in the Chancery Court of the First Judicial District of Hinds County, Mississippi, was initially filed on August 22, 2014, and alleges that J&J, Old JJCI, and certain other defendants violated the Mississippi Consumer Protection Act, Section 75-45-5, by failing to disclose alleged health risks associated with female consumers' use of talc contained in talc products.  The Mississippi suit seeks damages, punitive damages, disgorgement, civil penalties, costs for prosecuting the action, and injunctive relief.

The New Mexico suit, captioned <u>State of New Mexico ex rel. Balderas v. Johnson & Johnson, et al.</u>, No. D-101-CV-2020-00013, pending in the First Judicial District Court for the County of Santa Fe, New Mexico, was initially filed on January 2, 2020, and alleges that J&J, Old JJCI, and certain other affiliated defendants are liable for (a) violation of the New Mexico Unfair Practices Act, NMSA 1978, Section 57-12-21; (b) violation of the New Mexico False Advertising Act, NMSA 1978, Section 57-15-1; (c) fraud and negligent misrepresentation; (d) negligence; (e) unjust enrichment; and (f) punitive damages.  The claims in the New Mexico suit are based ultimately on the disputed allegation that talc products manufactured and/or distributed by the Debtor's predecessors or J&J were contaminated with asbestos or otherwise harmful.  The New Mexico suit seeks damages, punitive damages, restitution, civil penalties, costs for prosecuting the action, and injunctive relief.

NAI-1537329582v1 1537329582

Prior to the filing of the 2021 Chapter 11 Case, the attorneys general of other States had also initiated investigations in their respective States against Old JJCI and J&J related to the marketing, promotion, and sale of the talc products, all based on allegations of unfair business practices and consumer protection violations similar to those at issue in the Mississippi and New Mexico actions. Specifically, the attorneys general for the states of Arizona, North Carolina, Texas, and Washington issued civil investigative demands, and the Maryland attorney general issued an Administrative Subpoena for Consumer Protection.

4.5     The Securities Action

On February 8, 2018, a securities action was filed in the United States District Court for the District of New Jersey against certain non-debtor individuals and affiliates of the Debtor (the "Securities Action"). The central issue in the Securities Action is whether the defendants knew of, concealed, and made false or misleading statements regarding the allegation that Old JJCI's talc products contained asbestos or caused cancer. The defendants in the Securities Action maintain (as does the Debtor) that the talc products were safe and free from asbestos. Although the Debtor is not a defendant, there is substantial overlap between the claims in the Securities Action and the talc-related claims against the Debtor.

4.6     Insurance Coverage and Related Litigation

The Debtor believes it has insurance coverage for talc-related liability. In particular, as described more fully above, the Debtor has access to certain primary and excess liability insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies. In total, the limits of solvent primary and excess insurance policies issued by third-party insurers that potentially cover the Debtor's talc-related liabilities are in excess of $1.95 billion. The policies that cover the Debtor were issued to J&J as the named insured. The policies cover the period when Old JJCI was operated as a business unit of J&J, as well as the period when Old JJCI was a subsidiary of J&J.

Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered claims to the third-party insurers. To date, none of those insurers has acknowledged its coverage obligations, defended J&J or Old JJCI, paid any costs of defense, or indemnified J&J or Old JJCI for settlements or judgments. Instead, the third-party insurers have asserted coverage defenses. As more fully described above, since May 2019, this insurance coverage has been the subject of litigation.

4.7     Retailers and Third Party Indemnities

Old JJCI had relationships with various retailers who sold Old JJCI's talc-containing products (the "Retailers"). Old JJCI agreed to indemnify the Retailers for claims related to the sale of Old JJCI's talc-containing products, and these contractual indemnities were allocated to the Debtor in the 2021 Corporate Restructuring. In addition, to the extent a Retailer is held liable for a claim arising out of the products manufactured and/or sold by Old JJCI, and not by independent actions of the Retailers, certain state laws could require the Debtor to indemnify the Retailers for these liabilities.

Old JJCI would periodically accept from Retailers tenders of talc-related claims related to the sale of its products. When a Retailer was sued on a claim related to Old JJCI's

talc-containing products, the Retailer would notify Old JJCI by submitting a tender request. Old JJCI would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender Agreement"). Since the commencement of the talc-related litigation, Old JJCI has indemnified and agreed to assume the defense of nearly 790 talc-related claims against the Retailers pursuant to Tender Agreements.

Old JJCI also agreed to indemnify certain other transaction counterparties for liability arising from talc-containing products sold by Old JJCI. For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020. In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated. Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims related to talc products. Further, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the agreement. The claims against PTI and Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI.

4.8    Chapter 11 Filings by Talc Suppliers

In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Imerys Bankruptcy"). Imerys has potential liability for personal injury claims arising from exposure to talc it sold to customers, including Old JJCI. In its bankruptcy case, Imerys has contended that it has claims against Old JJCI and J&J for indemnification and joint insurance proceeds, claims alleged to be in the billions of dollars. Old JJCI and J&J had settlement discussions with Imerys and other parties to permanently resolve talc claims against them. Those discussions ended in May 2021 with no resolution.

In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking declaratory judgments with respect to certain indemnity agreements with Imerys. The Debtor and J&J thereafter filed a motion to dismiss the adversary proceeding. In October 2021, the Debtor filed a notice of bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11 Case applied to this adversary proceeding. No further activity has taken place in this adversary proceeding since the filing of the 2021 Chapter 11 Case.

In May 2020, Imerys, its parent Imerys S.A., the tort claimants' committee and the future claimants' representative (collectively, the "Imerys Plan Proponents") filed a plan of

reorganization and a related disclosure statement. The Imerys Plan Proponents subsequently filed numerous amendments to the plan and disclosure statement. A hearing on the Imerys Plan Proponent's disclosure statement was held in January 2021, and the court entered an order approving the disclosure statement, permitting Imerys to proceed with soliciting votes on the plan.

In March 2021, Old JJCI and J&J voted to reject the plan and opted out of the consensual releases in the plan. In April 2021, the Imerys Plan Proponents announced that the plan had received the requisite number of accepting votes to confirm the plan. Old JJCI and J&J challenged certain portions of the vote based on certain improprieties and sought to disqualify those votes. In October 2021, the Imerys bankruptcy court issued a ruling deeming thousands of votes withdrawn. In October 2021, Imerys cancelled the confirmation hearing on the plan. The Imerys bankruptcy remains pending.

Cyprus Mines Corporation and its parent company (together, "Cyprus"), which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary proceeding against Old JJCI, J&J, Imerys Talc America, Inc., and Imerys Talc Vermont, Inc. seeking a declaration of indemnity under certain contractual agreements. Old JJCI and J&J denied that any indemnification was owed, and filed a motion to dismiss the adversary complaints. In February 2021, Cyprus Mines Corporation filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and filed a disclosure statement and plan of reorganization. The Cyprus plan contemplates a settlement with Imerys and talc claimants where Cyprus would make a monetary contribution to a trust established under the Imerys plan in exchange for an injunction against talc claims asserted against it and certain protected parties. Cyprus has not yet sought approval of its disclosure statement and plan. In October 2021, the Debtor filed a notice of bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11 Case applied to the Cyprus adversary proceeding. The Cyprus chapter 11 case remains pending and no further activity has taken place in the Cyprus adversary proceeding since the filing of the 2021 Chapter 11 Case.

4.9    The Decision to File the 2021 Chapter 11 Case

After consideration of the cost, burden, uncertainty, and anticipated duration of the cosmetic talc litigation, the Debtor determined that the filing of the 2021 Chapter 11 Case was prudent and necessary. The Debtor further concluded that chapter 11 was the only alternative for equitably and permanently resolving all current and future talc-related claims against it. As described above, Old JJCI had been the subject of a virtual tidal wave of claims during the prior five years and the significant number of claims that were being filed against it were anticipated to continue unabated, if not increase, for decades more. In addition, the lottery-like results of the litigation created substantial uncertainty and were inhibiting Old JJCI's ability to fully focus on its business operations.

## ARTICLE V.

## EVENTS DURING THE 2021 CHAPTER 11 CASE

The following is a general description of the major events that occurred during the course of the 2021 Chapter 11 Case.

5.1    Commencement of the 2021 Chapter 11 Case in North Carolina

On October 14, 2021, the Debtor commenced the 2021 Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the bankruptcy court for the Western District of North Carolina (the "NC Bankruptcy Court").

5.2    Qualified Settlement Fund Motion

On October 14, 2021, the Debtor filed a motion in the NC Bankruptcy Court seeking approval of the establishment and funding of a North Carolina trust, which would be funded, in part, by a $2 billion advance from J&J and New JJCI, that would constitute a "qualified settlement fund" to resolve or satisfy current and future talc-related claims asserted against or related to the Debtor [Dkt. 8]. A hearing on this motion was adjourned to May 22, 2023 [Dkts. 793, 1798, 2159, 2860, 3196, 3435, 3834].

5.3    Commencement of the 2021 Chapter 11 Case in North Carolina – Preliminary Injunction, Automatic Stay, and Motion to Show Cause

On October 21, 2021, the Debtor filed an adversary complaint, No. 21-03032 [Adv. Dkt. 1], commencing an adversary proceeding and also filed a preliminary injunction motion (the "PI Motion") seeking (i) a declaration that the automatic stay applied to prohibit the commencement or continuation of certain actions against Old JJCI, various non-debtor affiliates including New JJCI, the Retailers, and insurance entities who have issued insurance policies to which the Debtor had access for coverage for talc-related liabilities (together, the "PI Protected Parties") while the 2021 Chapter 11 Case remains pending; and (ii) a preliminary injunction under section 105(a) of the Bankruptcy Code to enjoin the commencement or prosecution of actions outside of the Chapter 11 Case on account of the same talc claims that exist against the Debtor in the 2021 Chapter 11 Case (the "Adversary Proceeding"). Such relief was necessary because, among other things, following the 2021 Corporate Restructuring and the commencement of the 2021 Chapter 11 Case, Talc Personal Injury Claimants immediately challenged the application of the automatic stay and threatened to pursue their talc claims against the PI Protected Parties.

On October 26, 2021, the NC Bankruptcy Court entered a temporary restraining order [Adv. Dkt. 28] prohibiting and enjoining talc claims against the Debtor and Old JJCI and scheduling a further hearing on the PI Motion for November 4 and 5, 2021. Thereafter, counsel to certain objectors conducted discovery and deposed five witnesses between October 27, 2021 and November 3, 2021. The parties then presented evidence at a two-day hearing before the NC Bankruptcy Court (the "NC PI Hearing"). Based on the factual record developed during the NC PI Hearing, on November 10, 2021 Judge Whitley of the NC Bankruptcy Court issued oral findings of fact and conclusions of law in respect of the PI Motion. Judge Whitley ruled that talc-related litigation against the PI Protected Parties was automatically stayed and should be enjoined for 60 days. As discussed below, after the 2021 Chapter 11 Case was transferred to New Jersey, the Bankruptcy Court made additional rulings related to the PI Motion.

35

5.4    Appointment of the Original Talc Claimant Committee

On October 15, 2021, the Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator") filed a notice of solicitation of parties interested in serving on an Official Committee of Talc Claimants for the Chapter 11 Case [Dkt. 38]. After reviewing over fifty responses to the notice, on October 28, 2021, the Bankruptcy Administrator filed a motion seeking appointment of an eleven member committee [Dkt. 227]. At the November 4, 2021 hearing, the Bankruptcy Administrator noted that, while she considered whether to propose two talc claimants' committees, one for ovarian cancer claims and one for mesothelioma claims, she decided that such a proposal was unwarranted, because "ultimately, I could find no statutory or case law to support creating separate committees based on disease type nor any earlier cases where two such committees or anything close to that were appointed."[7]

On November 8, 2021, the NC Bankruptcy Court entered an order appointing the Official Committee of Talc Claimants in the Chapter 11 Case (the "TCC").

5.5    Transfer of the 2021 Chapter 11 Case to New Jersey

On October 25, 2021, the Bankruptcy Administrator filed a motion to transfer the 2021 Chapter 11 Case to the District of New Jersey on grounds that such a transfer was both in the interest of justice and for the convenience of the various constituencies in the case [Dkt. 205]. Following the First Day Hearing, on October 26, 2021, the Court also ordered the Debtor to appear and show cause why the case should not be transferred to another judicial district where venue is proper [Dkt. 208]. On November 16, 2021, following arguments presented by various parties, including the Debtor, the Bankruptcy Administrator, and counsel for certain Talc Personal Injury Claimants, the NC Bankruptcy Court entered an order [Dkt. 416] transferring the 2021 Chapter 11 Case and the Adversary Proceeding to the District of New Jersey, which referred the 2021 Chapter 11 Case and the Adversary Proceeding to the Bankruptcy Court for the District of New Jersey.

5.6    Canadian Recognition of the 2021 Chapter 11 Case

The 2021 Chapter 11 Case was recognized in Canada in a proceeding commenced before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA"). Recognition of the 2021 Chapter 11 Case was sought to provide for a stay of proceedings against the Debtor, to keep Canadian stakeholders informed regarding the 2021 Chapter 11 Case, and to provide a venue to seek recognition of orders issued in the 2021 Chapter 11 Case to facilitate a global resolution of talc-related claims against the Debtor. Recognition of the 2021 Chapter 11 Case was sought and obtained from the Canadian Court on December 17, 2021.

The orders issued by the Canadian Court on December 17, 2021 and March 7, 2022, among other things, (i) recognized the 2021 Chapter 11 Case as a "foreign main proceeding" under the CCAA; (ii) stayed all existing proceedings against the Debtor in Canada; (iii) appointed Ernst & Young Inc. ("E&Y") as information officer (the "Information Officer") to

---

[7]    See LTL Management, LLC, No. 21-3089, November 4, 2021 Hr'g Tr. at 56:9-24.

report to the Canadian Court, creditors, and other stakeholders in Canada on the status of the 2021 Chapter 11 Case; and (iv) recognized the Bankruptcy Court's preliminary injunction order.

5.7____The U.S. Trustee's Appointment of Two Talc Committees

Following the 2021 Chapter 11 Case's transfer to the Bankruptcy Court, on December 23, 2021, Andrew R. Vara, the United States Trustee for Region 3 (the "U.S. Trustee") filed a notice [Dkt 965] (the "Notice of Appointment") purporting to reconstitute and amend the TCC by appointing the Official Committee of Talc Claimants I, which was to represent Ovarian Cancer claimants ("TCC I"), and the Official Committee of Talc Claimants II, which was to represent Mesothelioma Claimants ("TCC II").

On January 3, 2022, the Debtor filed a motion seeking an order determining that the U.S. Trustee's Notice of Appointment was invalid and reinstating the TCC appointed by the NC Bankruptcy Court [Dkt. 1047].[8]  In its motion, the Debtor argued that the U.S. Trustee lacked the authority to unilaterally alter the Bankruptcy Administrator's order appointing the TCC.  Instead, because the TCC was a committee created by court order, the Debtor argued that such authority properly resided solely with the Court.  Finally, the Debtor noted that creating two official talc committees according to disease type (ovarian cancer versus mesothelioma) was devoid of precedent and a separate committee for mesothelioma claims was not necessary where mesothelioma claims comprised only 1% of the talc claims asserted against the Debtor. Following arguments on January 19, 2022, the Court struck the U.S. Trustee's Notice of Appointment on grounds that the U.S. Trustee's Notice of Appointment is inconsistent with the Bankruptcy Administrator's order appointing the TCC, and thereby violated the law of the case doctrine [Dkts. 1212, 1273].  The Court also ordered that TCC I and TCC II be disbanded on March 9, 2022, and ordered the reinstatement of the TCC (with its original members) that had been originally approved by the NC Bankruptcy Court as of March 9, 2022.  On March 8, 2022, the Court issued a bench order extending the existence of both TCC I and TCC II through and including April 12, 2022.  TCC I and TCC II were formally disbanded on April 12, 2022 and reverted back to the TCC originally appointed by the Bankruptcy Administrator.

5.8____Appointment of the FCR

In January 2022, the Bankruptcy Court filed the *Case Management Order Setting Selection Protocol for Future Talc Claims Representative* [Dkt. 1048, as Amended, Dkt. 1135] ( the "FCR Protocol") governing the nomination and appointment of a legal representative for future talc claimants in the Debtor's 2021 Chapter 11 Case (the "FCR").  Pursuant to the FCR Protocol, the Debtor, TCC I, and TCC II submitted nominees for appointment as FCR to the Court.  The Bankruptcy Court also proposed its own nominees for consideration in accordance with the FCR Protocol.  In total, the eight nominees for FCR were:  Marina Corodemus, Randi S. Ellis, Mark Falk, Eric D. Green, Joseph W. Grier, III, Gary J. Russo, Lawrence F. Stengel, and R. Scott Williams [Dkt. 1436, as Amended, Dkt. 1452]. Each of the Debtor, TCC I, and TCC II ultimately consented to the appointment of nominee Randi S. Ellis as FCR and on March 18,

---

8    Arnold & Itkin, LLP, also filed a motion seeking entry of an order vacating the U.S. Trustee's appointment of TCC II.

NAI-1537329582v1 1537329582

2022 the Bankruptcy Court entered an order appointing her as FCR in the 2021 Chapter 11 Case [Dkt. 1786].

5.9    Retention of Professionals

In the 2021 Chapter 11 Case, the Debtor retained:  (i) Jones Day, as the Debtor's bankruptcy co-counsel; (ii) Wollmuth Maher & Deutsch LLP, as the Debtor's bankruptcy co-counsel; (iii) Blake, Cassels & Graydon LLP as Canadian counsel to the Debtor; (iv) AlixPartners, LLP, as financial advisor to the Debtor; (v) Bates White, LLC, as talc consultants and expert for the Debtor; (vi) King & Spalding LLP, as special counsel to the Debtor; (vii) Epiq Corporate Restructuring, LLC, as claims, noticing, and solicitation agent; (viii) McCarter & English, LLP, as special insurance counsel for the Debtor; (ix) Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), as special counsel to the Debtor; (x) Weil, Gotshal & Manges LLP as special counsel to the Debtor; and (xi) Shook, Hardy & Bacon, L.L.P., as special counsel to the Debtor.  The Bankruptcy Court has also authorized the Debtor to engage other law firms and professionals in the ordinary course of business.

Various parties appealed the Debtor's retention of Jones Day and Skadden, which were procedurally consolidated, to the District Court of New Jersey.  On May 31, 2022, the District Court entered an order staying the briefing on these appeals pending the Third Circuit Court of Appeal's ruling on the PI Motion and dismissal motions.

In the 2021 Chapter 11 Case, the TCC retained:  (i) Genova Burns LLC as local counsel to the TCC; (ii) Bailey Glassler LLP as co-counsel to the TCC; (iii) Otterbourg, P.C. as co-counsel to the TCC; (iv) Brown Rudnick LLP as co-counsel to the TCC; (v) Parkins Lee & Rubio LLP as co-counsel to the TCC; (vi) Massey & Gail LLP as co-counsel to the TCC; (vii) Miller Thomson LLP as Canadian Counsel to the TCC; (viii) Mololamken LLP as special appellate litigation counsel to the TCC; (ix) Houlihan Lokey as investment banker to the TCC; and (x) Anderson Kill P.C. as special insurance counsel to the TCC.

In the 2021 Chapter 11 Case, the FCR retained:  (i) Walsh Pizzi O'Reilly Falanga LLP as counsel for the FCR and (ii) Berkeley Research Group, LLC, as talc claim liability consultants.

5.10   The New Jersey Preliminary Injunction and Dismissal Trial

On December 1, 2021, the TCC filed a motion to dismiss the Debtor's 2021 Chapter 11 Case with prejudice pursuant to section 1112(b) of the Bankruptcy Code on grounds that the case was not filed in good faith [Dkt. 632].  On December 9, 2021, Arnold & Itkin LLP also filed a motion [Dkt. 766] seeking dismissal of the Debtor's case on similar grounds.  Two law firms representing talc claimants also filed joinders to the dismissal motions [Dkts. 1003, 1092].  The Debtor filed opposition to these dismissal motions, arguing that, among other things, filing for bankruptcy to equitably resolve mass tort claims qualifies as a valid bankruptcy purpose [Dkt. 956].  Replies and sur-replies were filed by the Debtor and movants [Dkts. 1354, 1357, 1358, 1444, 1457].

Following the NC PI Hearing, on November 10, 2021 Judge Whitley ruled that talc-related litigation against the PI Protected Parties was automatically stayed and should be enjoined for 60 days.  However, Judge Whitley made clear that this order was without prejudice

and was not intended to bind a subsequent presiding court.  Following the transfer of the 2021 Chapter 11 Case to the Bankruptcy Court for the District of New Jersey, on November 17, 2021, the Bankruptcy Court assumed exclusive jurisdiction of the Adversary Proceeding and the underlying 2021 bankruptcy case.  While initially, argument on the extension of the preliminary injunction was scheduled to be heard on January 11, 2022, three days before the 60-day expiration date for the preliminary injunction, in light of an identity of issues and evidence with the pending motions to dismiss, the Bankruptcy Court adjourned the hearing date on the Preliminary Injunction to coincide with the scheduled date for arguments on the motions to dismiss.  On January 15, 2022, the Bankruptcy Court entered a bridge order [Dkt. 157] extending the Preliminary Injunction entered by the NC Bankruptcy Court to February 28, 2022.

On February 14, 2022, the Court commenced a five-day trial, which included multiple fact and expert witnesses, to address the dismissal motions and the related PI Motion in the pending Adversary Proceeding.

On February 25, 2022, the Court denied the dismissal motions, noting that filing a chapter 11 case with the expressed aim of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code and, further, the prospect of continued, costly talc-related litigation pointed to the need for bankruptcy consideration [Dkts. 1572, 1603].

Also on February, 25, 2022, the Court granted the PI Motion, held that the automatic stay applied to Talc Personal Injury Claims, and also enjoined the commencement or continued prosecution of talc-related claims against the PI Protected Parties [Adv. Dkts. 184, 187].  In its ruling the Court noted that it would revisit continuation of the automatic stay and preliminary injunction on June 29, 2022, and similar periods thereafter.

After the entry of these orders denying dismissal and granting the PI Motion, various parties filed notices of appeal, as well as motions for certification of direct appeal to the Third Circuit.[9]  On April 4, 2022, the Court entered an order certifying direct appeal of the orders to the Third Circuit [Dkt. 1955; Adv. Dkt. 231].  The Third Circuit granted the petitions for direct appeal on May 11, 2022 and granted the appellants' motion to consolidate their appeals and to expedite the case. The parties briefed the issues and argued the matters before the Third Circuit on September 19, 2022.

Via an oral ruling on July 28, 2022, the Bankruptcy Court declined to set another date to consider the extension of the Preliminary Injunction or automatic stay until after the estimation process and appellate process concluded.

The Third Circuit decision on the dismissal motions and PI Motion are further discussed below.

---

9    See Dkts. 1651, 1653, 1654, 1709, 1713, 1720, 1747, 1803; Adv. Dkts. 189-191, 201, 205, 206, 210.

5.11___The Insurance Lift Stay Motions

In February 2022, various insurers filed motions seeking an order confirming that the automatic stay does not apply to certain insurance actions pending in New Jersey state court or, in the alternative, granting relief from the automatic stay to allow these insurance coverage actions to proceed [Dkt. 1488, 1491] (the "Insurance Lift Stay Motions"). Both the Debtor and TCC I objected to the Insurance Lift Stay Motions on various grounds, including the fact that the insurance policies are estate property and, therefore, are subject to the automatic stay [Dkts. 1738-39]. On July 28, 2022 the Bankruptcy Court granted limited relief to the insurers to allow for continued third-party discovery, but otherwise declined to lift the automatic stay.

5.12___Mediation

On March 18, 2022, after determining that mediation may produce a mutually agreeable resolution of all or some of the issues and claims in the 2021 Chapter 11 Case, the Court entered an *Order Establishing Mediation Protocol* [Dkt. 1780] (the "Mediation Protocol") referring the Debtor and its affiliates, TCC I, TCC II, and the FCR to mediation. Pursuant to the Mediation Protocol, the Hon. Joel Schneider (Ret.) and Gary Russo were appointed co-mediators and authorized to mediate a comprehensive resolution of issues in the case, including, without limitation, a chapter 11 plan and all matters related to the estimation and plan treatment of personal injury claims against the estate related to talc or talc-containing products. Confidential mediation efforts began after entry of the Mediation Protocol and are ongoing. On May 16, 2022, various insurers, class action plaintiffs, and Canadian representatives were also referred to mediation [Dkt. 2300].

On May 27, 2022, the Debtor and its affiliates, along with the ad hoc committee of states holding consumer protection claims, was referred to mediation [Dkt. 2370]. The Hon. Donald H. Steckroth (Ret.) was appointed as co-mediator and authorized to mediate a comprehensive resolution of, among other things, issues related to the estimation and plan treatment of consumer protection claims held by the states [Dkt. 2370].

By order of the Bankruptcy Court dated March 23, 2023, the appointment of each of the mediators was terminated. Despite the efforts of the mediators and the various constituents, at the time of the termination of their appointment, no agreement had yet been reached on the terms of a plan to consensually resolve the 2021 Chapter 11 Case.

5.13___Estimation

During this same time period, and primarily for the purpose of facilitating the parties' mediation efforts, the Debtor proposed a process to estimate the aggregate value of the talc claims asserted against it [Dkt. 2473]. Various parties, including the TCC, opposed estimation [Dkts. 2715, 2717, 2722, 2723]. On July 28, 2022, the Court authorized an estimation, ruling that "the need for transparency and to preserve the integrity of the bankruptcy process and the system requires a reasonable effort to estimate the debtor's aggregate liability for both present and future claims for both ovarian and meso[thelioma] diseases." See July 28, 2022 Hr'g Tr., 4:13-17 (No. 21-3089).

In its July 28, 2022 ruling, the Bankruptcy Court also indicated that it would appoint an expert (the "Court Expert") under Rule 706 of the Federal Rules of Evidence to prepare and file a report containing his or her opinions on the estimation of the current and future talc claims.  On August 15, 2022, the Bankruptcy Court entered an order appointing Kenneth R. Feinberg, Esq. as the Court Expert [Dkt. 2881].

Following his appointment, the Court Expert gathered information from claimants, the Debtor and J&J, engaged in discussions with the TCC, the FCR and the Debtor and J&J, and retained counsel and an economic consulting firm.  By order of the Bankruptcy Court dated March 23, 2023, the appointment of the Court Expert was terminated.  The Court Expert did not file a report in the 2021 Chapter 11 Case.

5.14    Exclusivity

On February 7, 2022, the Debtor obtained its first extension of the periods during which it may exclusively propose and solicit acceptances of a chapter 11 plan beyond the initial 120-day and 180-day periods for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code (the "Exclusivity Periods") [Dkt. 1405].  The TCC objected to the Debtor's second request to extend the Exclusivity Periods for an additional 60 days [Dkt. 2095], arguing that terminating exclusivity to allow the TCC to file its own plan was the best way to move this case towards a prompt resolution [Dkt. 2181].  The Court entered an order on May 9, 2022 extending the Exclusivity Periods through September 9, 2022 [Dkt. 2267].  On July 15, 2022, the TCC filed a motion to terminate the Exclusivity Periods to allow the TCC to file and prosecute a chapter 11 plan [Dkt. 2721].  On August 2, 2022, the Debtor filed its third request to extend the Exclusivity Periods [Dkt. 2813].  The Court adjourned the hearing on the Debtor's third request to extend the Exclusivity Periods and the TCC's motion to terminate the Exclusivity Periods in order to allow time for the Court Expert to complete and file a report [Dkt. 2870].  The Court ultimately adjourned the hearing to March 20, 2023 and extended the Debtor's exclusive right to file a plan through April 14, 2023, provided that, if the Debtor filed a plan prior to April 14, 2023, the TCC had 15 days to file a motion seeking authority to permit the TCC to file a competing plan [Dkts. 2870, 3208, 3378, 3570, 3688, 3843].

5.15    Securities Action Injunction and Appeal

On March 7, 2022, the Debtor commenced the Securities Action, by initiating an adversary proceeding [Adv. No. 22-01073; Adv. Dkts. 1-2] against San Diego County Employees Retirement Association ("SDCERA") and filed a motion seeking injunctive relief preliminarily enjoining the prosecution of a securities class action pending in the United States District Court for the District of New Jersey against certain non-debtor individuals and affiliates of the Debtor.  See Hall v. Johnson & Johnson, No. 3:18-cv-01833 (D.N.J.).  The plaintiffs in the Securities Action are individuals who purchased J&J stock during the period from February 22, 2013, through December 31, 2018.  SDCERA is the lead plaintiff for that putative plaintiff class.  The Debtor argued that injunctive relief was necessary because the Securities Action involved issues related to the safety of its cosmetic talc products, which were inextricably intertwined with the Talc Personal Injury Claims being resolved in the 2021 Chapter 11 Case.  On May 9, 2022, the Court held that the defendants were prohibited and enjoined from pursuing discovery from or enforcing discovery orders against certain non-debtor individuals and affiliates of the

debtor that were third party defendants in the Securities Action, along with their officers directors, employees, or agents [Adv. Dkts. 52, 55].  The Court held that it would periodically revisit continuation of the automatic stay and preliminary injunction approximately every 120 days.  On May 12, 2022, SDCERA appealed the Bankruptcy Court's ruling to New Jersey District Court [Adv. Dkt. 57].  On April 11, 2023, following the Third Circuit's ruling dismissing the 2021 Chapter 11 Case, the New Jersey District Court granting the parties' request to dismiss the appeal [Adv. Dkt. 69].

5.16    Attorney General Matters

On or about March 15, 2022, the 41 states and the District of Columbia formed an ad hoc committee (the "Ad Hoc Committee") and retained bankruptcy counsel to represent it in this Chapter 11 Case in connection with consumer protection claims alleged or asserted by the members of the Ad Hoc Committee against the Debtor.  To facilitate a settlement of the Ad Hoc Committee members' consumer protection claims in an efficient and effective manner, the Debtor negotiated the terms of a reimbursement agreement with the Ad Hoc Committee (the "Reimbursement Agreement"), whereby the Debtor will pay up to $750,000 of the reasonable and documented out of pocket expenses of members of the Ad Hoc Committee and its counsel from March 10, 2022 through the termination of the Reimbursement Agreement [Dkt. 2338].  On June 24, 2022, the Court entered an order authorizing the Debtor to enter into the Reimbursement Agreement [Dkt. 2585].

On July 14, 2022, the Debtor initiated an adversary proceeding and sought an order temporarily enjoining the continued prosecution of the New Mexico State Action and the Mississippi State Action on grounds that these state actions rely on the same underlying allegations and evidence relied upon by Talc Personal Injury Claimants, and allowing these actions to continue would allow a key issue in the 2021 Chapter 11 Case to be adjudicated outside of the Bankruptcy Court and undermine ongoing mediation efforts [Adv. No. 22-01231; Adv. Dkts. 1-2].  The State of New Mexico, State of Mississippi, the TCC, and various other parties filed objections to the Debtor's injunction request [Adv. Dkts. 18, 21-22], and the Debtor filed its reply on August 19, 2022 [Adv. Dkt. 24].  On October 4, 2022, the Bankruptcy Court ruled that the automatic stay extended to protect J&J and other parties from the continued prosecution of the New Mexico State Action and the Mississippi State Action  [Adv. Dkt. 31]. To the extent the automatic stay was not an independent basis for such extension, the Bankruptcy Court also held that a preliminary injunction under section 105(a) of the Bankruptcy Code enjoining such actions was appropriate.  In its opinion, the Bankruptcy Court noted that it would revisit continuation of the automatic stay in December 2022.

On November 1, 2022, the State of New Mexico and State of Mississippi appealed the order granting the automatic stay and preliminary injunction to the District Court of New Jersey [Adv. Dkt. 34] and also filed a motion seeking direct certification of the appeal to the Third Circuit [Adv. Dkt. 37].  The Debtor objected to the motion for certification of appeal [Adv. Dkt. 47].  On December 1, 2022, the Bankruptcy Court entered an order certifying the direct appeal of its automatic stay and preliminary injunction order to the Third Circuit [Adv. Dkt. 54].  The State of New Mexico and State of Mississippi filed their appeal petition on December 21, 2022.

NAI-1537329582v1-1537329582

On March 22, 2023, following the Third Circuit's ruling dismissing the 2021 Chapter 11 Case, the Third Circuit dismissed the petition as moot.

5.17    The Third Circuit's Ruling

On January 30, 2023, a panel of the Third Circuit issued an opinion directing this Court to dismiss the 2021 Chapter 11 Case.  See In re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) *as amended by* 64 F.4th 84 (3d Cir. 2023) (the "Third Circuit Panel Opinion").  While the Third Circuit recognized that the Debtor "inherited massive liabilities" and faced "thousands" of future claims, it evaluated the Debtor's ability to "call on assets to fund them."  Third Cir. Panel Op. at 94, 109.  The Third Circuit found the Debtor held "reliable" funding rights from "highly creditworthy counterparties:" Holdco and its "cash-flowing brands" and, "[m]ost important," "LTL's direct access to J&J's exceptionally strong balance sheet."  Id. at 106.  Given those rights, the Third Circuit found the Debtor "highly solvent," with "access to cash to meet comfortably its liabilities as they came due for the foreseeable future."  Id. at 108.  The Third Circuit panel acknowledged the "apparent irony" that, by providing the funding backstop to place beyond dispute the Debtor's ability to fund a chapter 11 plan, J&J had made the Debtor too financially able for chapter 11.  Id. at 110-11; see id. at 111 ("Put another way, the bigger a backstop a parent company provides a subsidiary, the less fit that subsidiary is to file.").  Additionally, the Third Circuit concluded that its decision to dismiss the 2021 Chapter 11 Case rendered moot the appeals of the Bankruptcy Court's order granting the PI Motion.  Id. at 112.

On February 13, 2023, the Debtor filed a petition for rehearing and rehearing *en banc* with the Third Circuit.  See In re LTL Mgmt. LLC, No. 22-2003 [Dkt. 153] (3d Cir. Feb. 13, 2023).  On March 22, 2023, the Third Circuit entered an order denying the Debtor's petition for rehearing.  That same day, the Debtor filed a motion seeking a stay of the Third Circuit's mandate pending appeal to the United States Supreme Court.  The Third Circuit entered an order denying the stay motion on March 31, 2023, and, on the same day, issued its mandate directing this Court to dismiss the 2021 Chapter 11 Case.  This Court subsequently entered an order dismissing the 2021 Chapter 11 Case on April 4, 2023 [Dkt. 3938].

**ARTICLE VI.**

**EVENTS DURING THE CHAPTER 11 CASE**

In view of the substantial support of talc claimants, Holdco, and J&J, for both a bankruptcy filing and the material terms of a plan, and taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the cosmetic talc litigation (as described above), the Debtor determined that the filing of a second chapter 11 case in this Court was prudent, necessary and in the best interests of all constituents. The Debtor believes, as do Holdco and J&J, that chapter 11 proceedings present the only method through which the Debtor and talc claimants can fully, equitably and permanently resolve all current and future talc-related claims.

The following is a general description of the major events occurring during the course of this Chapter 11 Case.

NAI-1537329582v1 1537329582

6.1____Commencement of the Chapter 11 Case

When the Third Circuit declined to stay its mandate to dismiss the 2021 Chapter 11 Case, the Debtor entered into new financing arrangements and filed for bankruptcy a second time to seek confirmation of a plan containing the terms agreed to in the Plan Support Agreements. Given the substantial support for the terms of a plan reflected in the Plan Support Agreements, the Debtor determined that there was no reason to delay refiling.  In particular, on April 4, 2023, the Petition Date, the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the bankruptcy court for the District of New Jersey. Since the filing of the Chapter 11 Case, the Debtor has continued to manage its affairs as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On the Petition Date, the Debtor filed motions seeking typical "first-day" relief in chapter 11 cases (the "First Day Motions").  The Debtor's stated purpose of the First Day Motions was to establish procedures for the smooth and efficient administration of this Chapter 11 Case and further the Debtor's ability to achieve a successful reorganization that would fairly and equitable resolve the Debtor's liability for Talc Personal Injury Claims.

The First Day Motions sought to:  (i) obtain authorization for the continued use of the Debtor's bank account; (ii) appoint a foreign representative authorized to act on behalf of the Debtor's estate in any Canadian judicial or other proceedings; (iii) appoint a claims, noticing and ballot agent; and (iv) seek authority to file and provide the U.S. Trustee with a list of law firms with the most significant representations to facilitate evaluation of members for the TCC.  A description of the First Day Motions is set forth in the First Day Declaration.

6.2____The Preliminary Injunction

On the Petition Date, the Debtor filed an adversary complaint, No. 23-01092 [Adv. Dkt. 1], commencing an adversary proceeding and also filed a preliminary injunction motion (the "PI Motion") seeking (i) a declaration that the automatic stay applies to prohibit the commencement or continuation of certain actions against Old JJCI, various non-debtor affiliates including Holdco, the Retailers, and insurance entities who have issued insurance policies to which the Debtor has access for coverage for talc-related liabilities while this Chapter 11 Case remains pending; and (ii) a preliminary injunction under section 105(a) of the Bankruptcy Code to enjoin the commencement or prosecution of actions outside of the Chapter 11 Case on account of the same talc claims that exist against the Debtor in the Chapter 11 Case (the "Adversary Proceeding").

Such relief was necessary because, without the requested declaration or injunction, Talc Personal Injury Claimants would be permitted to litigate, in other forums, the exact same talc claims that are being asserted against the Debtor in the Chapter 11 Case.  Permitting the litigation of Talc Personal Injury Claims to continue or commence against the protected parties while the Debtor simultaneously works to reorganize by resolving the same claims in its Chapter 11 Case pursuant to the Bankruptcy Code would (a) defeat the purpose of the Debtor's bankruptcy case, (b) result in irreparable harm to the Debtor's estate, (c) undermine and circumvent the purposes and spirit of the automatic stay, and (d) divert the Debtor from its reorganization efforts.  Such litigation would also undermine a central aim of the plan terms that

44

have been agreed to by thousands of claimants, which is to treat all similarly situated claimants in an equivalent manner.

Certain parties, including the U.S. Trustee, filed objections to the preliminary injunction motion and also filed motions seeking to lift the automatic stay to allow their claims to go forward in the tort system against the Debtor and non-debtor affiliates [Dkts. 71, 73, 208, 213].

On April 20, 2023, the Bankruptcy Court authorized a 60-day modified preliminary injunction that enjoined the commencement or continuation of trials against certain non-debtor parties, including Holdco and J&J (the "Modified PI"). This Modified PI did not prevent the continuation or commencement of discovery or other pre-trial matters, except in the MDL, and did not prevent the filing of complaints related to Talc Personal Injury Claims in the tort system. The Bankruptcy Court held that it would revisit continuation of if the claimant first provided notice to the Debtor of its intent to file a complaint. Pursuant to the Court's order, the Modified PI at the May 22was initially to expire on June 15, 2023 omnibus hearing.

On April 21, 2023, the TCC appealed the Modified PI to the District of New Jersey [Adv. Dkt. 83]. On July 3, 2023, the TCC filed a brief in support of its appeal of the Modified PI [No. 23-02567, Dkt. 17]. The Debtor's response is due on August 2, 2023.

On April 21, 2023, the TCC filed a motion for certification of direct appeal of the order granting the Modified PI to the Third Circuit [Adv. Dkt. 84]. On April 24, 2023, an ad hoc group of mesothelioma claimants and Paul Crouch also filed motions for certification of direct appeal of the Modified PI to the Third Circuitseeking the same relief [Adv. Dkts. 88, 89]. On May 8, 2023, the Debtor filed an objection to the motions for certification. [Adv. Dkt. 123]. On May 15, 2023, the Bankruptcy Court entered an order denying the certification motions. [Adv. Dkt. 133].

On May 16, 2023, the Bankruptcy Court indicated that any request by the Debtor to extend the Modified PI beyond June 15, 2023 would be heard on June 13, 2023.

On May 325, 2023, the Bankruptcy Court made an additional modification toentered an order granting Emory Valadez relief from the automatic stay and the Modified PI, authorizing counsel to Anthony Hernandez Valadez to proceed to to permit them to conduct a trial on histheir asbestos personal injury action against the Debtor and certain non-debtor affiliates in California [Dkt. 595].

On May 31, 2023, the Debtor filed a motion for a bridge order confirming that the automatic stay applies to certain successor liability actions asserted against certain non-debtor affiliates or temporarily extending the stay and Modified PI to protect those non-debtor affiliates from those actions pending a final hearing [Adv. Dkt. 147] (the "Motion for a Bridge Order"). On June 1, 2023, the TCC filed an objection to the Motion for a Bridge Order [Adv. Dkt. 157]. On June 2, 2023, counsel to certain claimants filed an objection to the Motion for a Bridge Order [Adv. Dkt. 158]. At a hearing on June 2, 2023, the Bankruptcy Court ruled that it would consider the requested relief on June 13, 2023.

On June 5, 2023, the Debtor filed a motion seeking a 90-day extension of the Modified PI and further seeking confirmation that the commencement or continuation of litigation asserting

certain talc claims against certain non-debtor affiliates, including claims wholly or principally under theories of success liability, were enjoined and barred by the automatic stay [Adv. Dkt. 163] (the "Motion to Extend the Modified PI").  On June 9, 2023 and June 12, 2023, the TCC, U.S. Trustee, and counsel to certain claimants filed objections to the Motion to Extend the Modified PI [Adv. Dkts. 169-70, 177].  On June 12, 2023, the Ad Hoc Committee of Supporting Counsel filed a statement in support of the Motion to Extend the Modified PI [Adv. Dkt. 175].

On June 13, 2023, the Bankruptcy Court ruled that the Modified PI will continue through August 22, 2023 on the same terms.  It also ruled that the portion of the Motion to Extend the Modified PI that sought a ruling that certain claims are barred by the automatic stay would be heard by the court on June 22, 2023.  On June 14, 2023, counsel to certain claimants filed an objection to the Motion to Extend the Modified PI [Adv. Dkt. 180].  On June 16, 2023, the Debtor filed a reply in support of the Motion to Extend the Modified PI [Adv. Dkt. 185].  On June 20, 2023, the TCC filed a supplemental objection to the Motion to Extend the Modified PI and counsel to certain claimants filed an objection to the Motion to Extend the Modified PI [Adv. Dkts. 187, 189].  On June 22, 2023, the Bankruptcy Court ruled that successor and similar claims asserted against certain of the Debtor's non-debtor affiliates were not automatically stayed but would be subject to the Modified PI.  On _____, the Court entered an order approving in part and denying in part the Motion to Extend the Modified PI [Adv. Dkts. ____].

6.3    Canadian Recognition of the Chapter 11 Case

On April 13, 2023, the Chapter 11 Case was recognized in Canada in a proceeding commenced before the Canadian Court.  Recognition of the Chapter 11 Case was sought to provide for a stay of proceedings against the Debtor, to keep Canadian stakeholders informed regarding the Chapter 11 Case, and to provide a venue to seek recognition of orders issued in the Chapter 11 Case to facilitate a global resolution of talc-related claims against the Debtor.

Orders issued by the Canadian Court on April 13, 2023 and May 1, 2023, among other things:  (i) recognized the Chapter 11 Case as a "foreign main proceeding," (ii) stayed all existing proceedings against the Debtor in Canada; (iii) appointed E&Y as Information Officer to report to the Canadian Court, creditors, and other stakeholders in Canada on the status of the Chapter 11 Case; and (iv) recognized the Bankruptcy Court's Modified PI.

6.4    Appointment of the TCC

On April 14, 2023, the U.S. Trustee appointed 11 creditors to the TCC [Dkt. 162].  The individuals comprising the TCC are (listed with the law firm representing each member):

| Committee Member | Law Firm / Attorney |
|---|---|
| Rebecca Love | Ashcraft & Gerel, LLP |
| Tonya Whetsel | Karst von Oiste LLP |
| William A. Henry | Levin Papantonio Rafferty |

| Committee Member | Law Firm / Attorney |
|---|---|
| Patricia Cook | Weitz & Luxenberg, P.C. |
| Alishia Landrum | Beasley Allen Law Firm |
| Blue Cross Blue Shield of Massachusetts | Hill Carter Franco Cole & Black, PC |
| Kristie Doyle | Kazan, McClain, Satterley & Greenwood PLC |
| Randy Derouen | Levy Konigsberg LLP |
| April Fair | Robinson Calcagnie, Inc. |
| Brandi Carl | Golomb Spirt Grunfeld |
| Sue Sommer-Kresse | Motley Rice, LLC |

6.5    Appointment of the FCR

On April 10, 2023, the Debtor filed a motion to appoint Randi S. Ellis as the FCR to protect the rights of future talc claimants in this Chapter 11 Case [Dkt. 87]. Ms. Ellis was previously appointed to serve as the FCR in the 2021 Chapter 11 Case. The TCC, certain claimants, and the U.S. Trustee filed objections to the appointment of Ms. Ellis as FCR [Dkts. 311, 318, 320-21], and on April 28, 2023, the Debtor filed an omnibus reply in support of the FCR motion [Dkt. 355]. The Bankruptcy Court held a hearing on the Debtor's FCR motion on May 3, 2023, and on May 9̶18, 2023, the Bankruptcy Court appointedentered an order appointing Ms. Ellis as FCR. [Dkt. 551]. On May 26, 2023, the TCC appealed the order appointing Ms. Ellis as FCR to the District Court of New Jersey [Dkt. 608].

6.6    Retention of Professionals

In the Chapter 11 Case, the Debtor filed motionsapplications to retain: (i) Jones Day, as the Debtor's bankruptcy co-counsel; (ii) Wollmuth Maher & Deutsch LLP, as the Debtor's bankruptcy co-counsel; (iii) Blake, Cassels & Graydon LLP as Canadian counsel to the Debtor; (iv) AlixPartners, LLP, as financial advisor to the Debtor; (v) Bates White, LLC, as talc consultants and expert for the Debtor; (vi) King & Spalding LLP, as special counsel to the Debtor; (vii) Epiq Corporate Restructuring, LLC, as claims, noticing, and solicitation and balloting agent; (viii) McCarter & English, LLP, as special insurance counsel for the Debtor; (ix) Skadden as special counsel to the Debtor; (x) Weil, Gotshal & Manges LLP as special counsel to the Debtor; (xi) Shook, Hardy & Bacon, L.L.P., as special counsel to the Debtor; and (xii) Orrick, Herrington & Sutcliffe LLP as special talc litigation appellate counsel to the Debtor; and (xiii) Signal Interactive Media, LLC as plan noticing consultant and expert to the Debtor. The Bankruptcy Court has entered orders approving the Debtor's retention of each of these professionals.

47

In the Chapter 11 Case, the TCC filed ~~motions~~applications to retain:  (i) Genova Burns LLC as local counsel to the TCC; (ii) Otterbourg, P.C. as co-counsel to the TCC; (iii) Brown Rudnick LLP as co-counsel to the TCC; ~~and~~(iv) Massey & Gail LLP as ~~co-counsel to the TCC.~~special counsel to the TCC; (v) Houlihan Lokey Capital, Inc. as investment banker to the TCC; (vi) FTI Consulting, Inc. as financial advisor to the TCC; (vii) Miller Thomson LLP as special counsel to the TCC; (viii) MoloLamken LLP as special talc appellate litigation counsel to the TCC; (ix) Anderson Kill, P.C. as special insurance counsel to the TCC; (x) the Honorable Royal Furgeson as expert witness and consultant; and (xi) Professor D. Theodore Rave as expert witness and consultant.  The Bankruptcy Court has entered orders approving the TCC's retention of each of these professionals aside from Anderson Kill, whose objection deadline does not expire until July 11, 2023.

In the Chapter 11 Case, the FCR filed applications to retain: (i) Walsh Pizzi O'Reilly Falanga LLP as counsel, (ii) EconONE Research, Inc. as talc claim liability consultants, and (iii) Bederson LLP as financial advisor.  The Bankruptcy Court has entered orders approving the FCR's retention of each of these professionals aside from EconONE Research, whose objection deadline does not expire until July 11, 2023.

6.7    Approval of the J&J Support Agreement

The J&J Support Agreement requires the approval of the Bankruptcy Court.  The Debtor intends to file a motion seeking approval of the J&J Support Agreement ~~in due course~~prior to confirmation of the Plan.

6.8    Mediation

On April 10, 2023, the Debtor filed a motion to appoint the Hon. Joel Schneider (Ret.) and Gary Russo as co-mediators to mediate all issues in the Chapter 11 Case [Dkt. 107].  The Hon. Joel Schneider and Mr. Russo were previously appointed to serve as co-mediators in the 2021 Chapter 11 Case.  At the April 20, 2023 hearing, the Bankruptcy Court indicated that it would appoint a mediator and directed the Debtor and the TCC to confidentially submit up to three mediation candidates to the Bankruptcy Court.  As a result, the Debtor withdrew as moot its motion to appoint co-mediators.  At a hearing on May 3, 2023, the Bankruptcy Court stated that it intended to appoint Gary Russo and Eric Green as co-mediators.  On May 8, 2023, the Bankruptcy Court entered an order appoint Mr. Russo and Mr. Green as co-mediators and establishing procedures for the mediation [Dkt. 459].

6.9    Motions to Dismiss

On April 24, 2023, the TCC filed a motion to dismiss the Chapter 11 Case [Dkt. 286].  On April 27, 2023, an ad hoc group of mesothelioma claimants filed a joinder to the TCC's motion to dismiss [Dkt. 335].  On April 28, 2023, an ad hoc committee of states holding consumer protection claims filed a motion to dismiss the Chapter 11 Case [Dkt. 350].  On May 1, 2023, the U.S. Trustee filed a motion to dismiss [Dkt. 379].  On May 10, 2023, New Mexico and Mississippi filed a motion to dismiss the Chapter 11 Case [Dkt. 480].  Counsel for various additional claimants also filed motions to dismiss, and joinders in support of motions to dismiss, the Chapter 11 Case [Dkts. 346, 352, 358, 384, 473].  ~~These~~On May 26, 2023, the Debtor and

48

the Ad Hoc Committee of Supporting Counsel filed objections to the motions to dismiss are scheduled for a [**four**] day hearing commencing on _____[Dkts. 613-14].  On June 22, 2023, the TCC, U.S. Trustee, an ad hoc group of mesothelioma claimants, an ad hoc committee of states holding consumer protection claims, New Mexico, Mississippi, and counsel for various claimants filed replies in support of their dismissal motions [Dkts. 854-55, 857, 862-63, 866, 872].  On June 26, 2023, the Debtor and the Ad Hoc Committee of supporting Counsel filed sur-replies in opposition to the dismissal motions [Dkts. 900, 906].  The Bankruptcy Court held a four-day hearing on the dismissal motions from June 27, 2023 through June 30, 2023.

6.10    The Writ of Mandamus

On May 1, 2023, the TCC filed a petition for a writ of mandamus with the Third Circuit, requesting that the Third Circuit determine whether (i) the Debtor's second bankruptcy filing complied with the Third Circuit's good faith and financial distress requirements, as articulated in the Third Circuit Panel Opinion, and (ii) the Bankruptcy Court applied the correct standard when granting the Modified PI [Dkt. 387].  On May 9, 2023, the Third Circuit denied the writ of mandamus [No. 23-1826, Dkt. 13].

6.11    Motion to Suspend the Chapter 11 Case

On May 4, 2023, the TCC filed a motion to suspend the Chapter 11 Case in its entirety other than (i) permitting the prosecution of the TCC's motion to dismiss, (ii) permitting the prosecution of the TCC's motion for derivative standing to file a complaint related to certain estate causes of action and (iii) allowing for the continued compliance with the Court's direction to re-evaluate the Modified PI [Dkt. 414].  The (the "Suspension Motion").  On May 17, 2023, the Bankruptcy Court will consider this motion at a hearing scheduled for May 16, 2023entered an order denying the Suspension Motion [Dkt. 543].

6.12    Motion for Derivative Standing

On May 11, 2023, the TCC filed a motion seeking leave, standing, and authority to commence, prosecute and, if appropriate, settle any causes of action that could be asserted against the Debtor's parent and affiliates, and the Debtor's directors and officers, including but not limited to those arising out of the (i) termination of the 2021 Funding Agreement and entry into the 2023 Funding Agreement and J&J Support Agreement, (ii) the 2021 Corporate Restructuring, and (iii) the Consumer Business Transfer [Dkt. 489].  The motion is currently scheduled to be heard by the Bankruptcy Court on August 2, 2023.  The deadline for parties to respond to the motion is July 26, 2023.

### 6.13    Expense Reimbursement Agreement

On May 23, 2023, the Debtor filed a motion seeking authority to enter into an expense reimbursement agreement with the Ad Hoc Committee of Supporting Counsel, which would allow the Debtor to pay for certain reasonable expenses of the Ad Hoc Committee of Supporting Counsel and its counsel [Dkt. 575] (the "Expense Reimbursement Motion").  On June 6, 2023, the TCC, counsel to certain claimants, and the U.S. Trustee filed objections to the Expense Reimbursement Motion [Dkts. 707, 711, 713].  On June 9, 2023, the Ad Hoc Committee of Supporting Counsel and the Debtors filed replies in support of the Expense Reimbursement Motion [Dkts. 744-45].  On June 20, 2023, the Bankruptcy Court entered an order granting the Expense Reimbursement Motion [Dkt. 838].

### 6.14    Motion to Terminate Exclusivity

On June 5, 2023, the TCC filed a motion to terminate the Debtor's exclusive period to file a chapter 11 plan and solicitation acceptances thereof, so the TCC can file and solicit its own chapter 11 plan [Dkt. 702].  On June 12, 2023, the Debtor and the Ad Hoc Committee of Supporting Counsel filed objections to the motion to terminate exclusivity [Dkts. 753, 758].  Also on June 12, 2023, the TCC filed a reply in support of its motion to terminate exclusivity [Dkt. 759].  The Bankruptcy Court has indicated it will consider the motion to terminate exclusivity at the August 2, 2023 hearing.

### 6.15    Bar Date Motion

On June 20, 2023, the Debtor filed a motion to establish a bar date and related procedures for filing proofs of claim other than with respect to certain Direct Talc Personal Injury Claims [Dkt. 842].  The motion is scheduled for a hearing on August 2, 2023.

### 6.16    Extension of Period to Remove Claims

On July 3, 2023, the Debtor sought an extension of the deadline by which it may file notices of removal under Bankruptcy Rules 9006(b) and 9027 [Dkt. 978] (the "Removal Motion").  The Removal Motion seeks an extension of the removal period by roughly six months, through December 29, 2023.  The Removal Motion is scheduled to be heard on August 2, 2023.

## ARTICLE VII.

## THE PLAN OF REORGANIZATION

The confirmation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for treating claims against, and equity interests in, a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes it binding on the debtor, any person or entity acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, whether or not such creditor or equity interest holder has accepted the plan or received or retains any property under the plan.  Subject to certain

limited exceptions and other than as provided in a plan itself or in a confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan of reorganization.

This Article of this Disclosure Statement summarizes certain relevant provisions of the Plan. This Article is intentionally not a recitation of the entirety of the Plan, a copy of which is attached hereto as Exhibit A.

For additional information regarding the Plan not discussed in this Article, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Treatment of Executory Contracts and Unexpired Leases | Article V |
| Distributions Under the Plan on Account of Non-Talc Claims | Article VI |
| Resolution of Disputed Claims Other than Talc Personal Injury Claims | Article VII |
| Disallowed Claims | Section 11.6 |
| No Successor Liability | Section 11.7 |
| Corporate Indemnities | Section 11.8 |
| Jurisdiction of Bankruptcy Court | Article XII |
| Reservation of Rights | Section 12.4 |
| Miscellaneous Provisions | Article XIII |

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE DEBTOR URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.

7.1    Treatment of Administrative Claims, Fee Claims, and Priority Tax Claims

(a)    *Administrative Claims*

(1)    Allowed Administrative Claims

Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 2.2 of the Plan, and Cure Amount Claims, which are governed by Section 5.4 of the Plan) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such other amounts and on such other terms as may be agreed to by the

holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; provided, however, that (a) Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtor shall be paid by the Debtor or the Reorganized Debtor, as the case may be, in accordance with the terms and conditions of the particular transactions and agreements relating to such liabilities without any further action by the holders of such Claims or further approval of the Bankruptcy Court and (b) holders of such Administrative Claims shall not be required to comply with the requirements set forth in Section 2.1.2 of the Plan.

(2)    Administrative Claims Bar Date

Except as otherwise provided in Article II of the Plan, requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than sixty (60) days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtor or the Reorganized Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

(3)    Disputed Administrative Claims

If a Disputed Administrative Claim is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtor) distribute to the holder of such Administrative Claim, the Cash that such holder would have received on account of such Claim if such Administrative Claim had been an Allowed Administrative Claim on the Effective Date.

(b)    *Fee Claims*

All final fee requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 329, 330, 331, 363(b), 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtor, the TCC, the AHC of Supporting Counsel, or the FCR, all Fee Claims of members of the TCC or the AHC of Supporting Counsel for reimbursement of expenses, and all requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtor and other parties required to be served by the Compensation Procedures Order no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; provided, however, that AHC of Supporting Counsel shall be deemed to have substantially contributed to the Chapter 11 Case and shall not be required to make any further showing under section 503(b)(3)(D) of the Bankruptcy Code. Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed no

later than twenty (20) days after the filing of such Claim.  The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with <u>Section 2.2</u> of the Plan.  The Fee Examiner appointed under the Fee Examiner Order shall continue to act in this appointed capacity unless and until all final Fee Claims have been approved by order of the Bankruptcy Court, and the Reorganized Debtor shall be responsible for the payment of the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

The amount of the Fee Claims owing to the Professionals on and after the Effective Date shall be paid by the Reorganized Debtor in Cash to such Professionals as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  Upon the Effective Date, any requirement that Professionals and Ordinary Course Professionals of the Reorganized Debtor comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Compensation Procedures Order, the Fee Examiner Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtor may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

  (c)  *Payment of Statutory Fees*

All fees payable under section 1930 of title 28 of the United States Code, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid on or before the Effective Date.  The Reorganized Debtor shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Case, and shall comply with all applicable statutory reporting requirements.

  (d)  *Allowed Priority Tax Claims*

On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, plus Postpetition Interest, if any, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such Claim agrees to an alternative treatment.  Notwithstanding the provisions of <u>Section 2.4</u> of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

7.2  <u>Treatment of Classified Claims and Equity Interests of the Debtor</u>

The classification and treatment of Claims against and Equity Interests in the Debtor are set forth in detail in Article III of the Plan.

NAI-1537329582v1 1537329582

(a)    *Class 1 – Priority Non-Tax Claims*

    (1)    Classification:  Class 1 consists of all Priority Non-Tax Claims against the Debtor.

    (2)    Treatment:  On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim plus Postpetition Interest thereon, unless the holder of such Claim, agrees to less favorable treatment.

    (3)    Voting:  Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of an Allowed Claim in Class 1 is entitled to vote to accept or reject the Plan.

(b)    *Class 2 – Secured Claims*

    (1)    Classification:  Class 2 consists of all Secured Claims against the Debtor.

    (2)    Treatment:  On the Distribution Date, unless otherwise agreed to by the holder of an Allowed Secured Claim in Class 2 and the Debtor or Reorganized Debtor, each holder of an Allowed Class 2 Claim, at the option of the Debtor or Reorganized Debtor, shall either (i) be paid in full in Cash, plus Postpetition Interest thereon, or (ii) have its Allowed Class 2 Claim Reinstated.  Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.

    (3)    Voting:  Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of an Allowed Claim in Class 2 is entitled to vote to accept or reject the Plan.

(c)    *Class 3 – Unsecured Claims*

    (1)    Classification:   Class 3 consists of all Unsecured Claims against the Debtor.

    (2)    Treatment:  Each holder of an Allowed Unsecured Claim against the Debtor shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date.  Such payment shall be (i) in full, in Cash, plus Postpetition Interest, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of such Unsecured Claim and the Debtor or Reorganized Debtor.

    (3)    Voting:  Class 3 is Unimpaired and each holder of an Allowed Claim in Class 3 is presumed to accept the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  No holder of an Allowed Claim in Class 3 is entitled to vote to accept or reject the Plan.

(d)    *Class 4 – Talc Personal Injury Claims*

(1)    Classification:  Class 4 consists of all Talc Personal Injury Claims.

(2)    Treatment:  On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Talc Personal Injury Trust Documents.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Talc Personal Injury Trust Documents.

(3)    Voting:  Class 4 is Impaired and each holder of a Talc Personal Injury Claim in Class 4 is entitled to vote to accept or reject the Plan.

(e)    *Class 5 – Intercompany Claims*

(1)    Classification:  Class 5 consists of all Intercompany Claims.

(2)    Treatment:  On the Effective Date, each Allowed Claim in Class 5 shall be Reinstated.

(3)    Voting:  Class 5 is Unimpaired and each holder of an Allowed Claim in Class 5 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of a Claim in Class 5 is entitled to accept or reject the Plan.

(f)    *Class 6 – Equity Interests of the Debtor*

(1)    Classification:  Class 6 consists of all Equity Interests of the Debtor.

(2)    Treatment:  On the Effective Date, Equity Interests of the Debtor shall be Reinstated, and the holder of such Interests shall retain such Interests, subject to the Talc PI Pledge.

(3)    Voting:  Class 6 is Impaired and each holder of an Equity Interest of the Debtor in Class 6 is entitled to vote to accept or reject the Plan.

7.3    Conditions Precedent to the Confirmation of the Plan

Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Section 8.3 of the Plan:

(a)     The Bankruptcy Court shall have entered an order, acceptable in form and substance to the Debtor, J&J, and the AHC of Supporting Counsel approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(c)     The Plan and the Plan Supplement, including any schedules, documents, supplements, and exhibits thereto, shall be in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel and shall be consistent with (i) section 524(g) of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan.

(d)     The Confirmation Order shall:

(1)     have been entered by the Bankruptcy Court and the District Court acting jointly, or by the District Court affirming an order entered separately by the Bankruptcy Court;

(2)     be reasonably acceptable in form and substance to the Debtor, J&J, and the AHC of Supporting Counsel; and

(3)     provide for the Injunctions in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel.

(e)     The Bankruptcy Court and the District Court acting jointly or the Bankruptcy Court acting separately but affirmed by the District Court shall have made the following findings, each of which shall be contained in the Confirmation Order:

(1)     The Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Plan and the Talc Personal Injury Trust.

(2)     (A) As of the Effective Date, the Talc Personal Injury Trust shall assume all liability and responsibility, financial and otherwise, for all Talc Personal Injury Claims and (B) subject to the delivery, transfer, or assignment, as applicable, to the Talc Personal Injury Trust of the Cash Contributions, Talc PI Note, Talc Pledge Agreement, Imerys/Cyprus Related Rights, and Talc Insurance Assets pursuant to Section 4.9 of the Plan, from and after the Effective Date, no Protected Party (other than any Imerys/Cyprus Party, if the Imerys/Cyrus Parties are Protected Parties, for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights, as applicable) shall have any liability or responsibility, financial or otherwise, for any Talc Personal Injury Claims.

(3)     As of the Petition Date, the Debtor had been named as a defendant in personal injury or wrongful death actions seeking recovery for damages

allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

(4) The Talc Personal Injury Trust shall be funded in whole or in part by securities of the Reorganized Debtor and by the obligation of the Reorganized Debtor to make future payments.

(5) The Talc Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor.

(6) The Talc Personal Injury Trust shall use its assets or income to pay Talc Personal Injury Claims, including Talc Personal Injury Demands.

(7) As to Talc Personal Injury Demands:

(i) The Debtor is likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(ii) The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(iii) Pursuit of Talc Personal Injury Demands outside the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plans purpose to deal equitably with Talc Personal Injury Claims and Talc Personal Injury Demands.

(8) The terms of the Channeling Injunction and the Insurance Entity Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.

(9) The Plan establishes a separate class of the claimants whose claims are to be addressed by the Talc Personal Injury Trust which class has voted, by at least 75% of those voting, in favor of the Plan.

(10) Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms, such as structured, periodic, or supplemental payments, *pro rata* distributions, matrices, or periodic review of estimates of the numbers and values of Talc Personal Injury Claims, or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust shall value, and be in a financial position to pay,

Talc Personal Injury Claims, including Talc Personal Injury Demands, that involve similar claims in substantially the same manner.

(11)   Each Protected Party is:

(i)   identifiable from the terms of the Channeling Injunction and the Insurance Entity Injunction by name or as part of an identifiable group and is or may be alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor to the extent that such alleged liability arises by reason of one or more of the following:

(a)   such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(b)   such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(c)   such Person's service as an officer, director, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(d)   such Person's provision of insurance to the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); or

(e)   such Person's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtor

NAI-1537329582v1-1537329582

or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or any Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (I) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (II) acquiring or selling a financial interest in any Person as part of such transaction; and/or

(ii)  otherwise entitled to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code.

(12)  The FCR was appointed as part of the proceedings leading to issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of protecting the rights of all Persons, whether known or unknown, that might subsequently assert, directly or indirectly, against the Debtor a Talc Personal Injury Demand that is addressed in the Channeling Injunction and the Insurance Entity Injunction and channeled to the Talc Personal Injury Trust.

(13)  Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Channeling Injunction and the Insurance Entity Injunction is fair and equitable with respect to individuals that might assert Talc Personal Injury Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of any such Protected Party.

(14)  The Plan and the Plan Documents comply with section 524(g) of the Bankruptcy Code in all respects, and the Talc Personal Injury Trust Documents are fully consistent with the Plan.

(15)  The Plan, including the Channeling Injunction and the Insurance Entity Injunction, and the other Plan Documents are a fair, equitable, and reasonable resolution of the liability of the Debtor for the Talc Personal Injury Claims, including Talc Personal Injury Demands.

(16)  The FCR has adequately and completely fulfilled her duties, responsibilities, and obligations as the representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown, in accordance with section 524(g) of the Bankruptcy Code.

(17)    Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to: (A) all known creditors and holders of Interests; (B) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the TCC and the FCR); (C) all parties to Unexpired Leases and Executory Contracts with the Debtor; (D) all taxing authorities listed on the Debtor's Schedules or in the Debtor's Claims database; (E) the Department of the Treasury by service upon the District Director of the IRS; (F) state attorneys general and state departments of revenue for states in which the Debtor has conducted business; and (G) the Securities and Exchange Commission; in each case, (I) in accordance with the solicitation procedures governing such service and (II) in substantial compliance with Bankruptcy Rules 2002(b), 3017, and 3020(b). Such transmittal and service were adequate and sufficient to bind, among other parties, each holder of a Talc Personal Injury Claim, and each party represented by the FCR, and no other or further notice is or shall be required.

(18)    Each holder of a Talc Personal Injury Claim and each party represented by the TCC or the FCR has been afforded due process based on the notice referenced in clause (17) above, the appointment of the TCC and the FCR, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

(19)    The Bankruptcy Code authorizes the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4 of the Plan, and from and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust, no Imerys/Cyprus Party may assert under any Imerys/Cyprus Agreement or otherwise (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 of the Plan, or any other action contemplated by Section 4.9.3 of the Plan, is prohibited by any Imerys/Cyprus Agreement or by applicable non-bankruptcy law.

(20)    The Bankruptcy Code authorizes the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4 of the Plan, and from and after the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to Section 4.9.4 of the Plan, no Talc Insurance Company may assert under any Talc Insurance Policy or Talc Insurance Settlement Agreement (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4 of the Plan, or any other action contemplated by Section 4.9.4 of the Plan, is prohibited by

any Talc Insurance Policy or Talc Insurance Settlement Agreement or by applicable non-bankruptcy law.

(21)     Neither the Plan nor any other Plan Document, including the Trust Distribution Procedures, creates any obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, that would require the Reorganized Debtor or the Talc Personal Injury Trust to withhold any amounts from payments made by it under the Plan or any other Plan Document, including the Trust Distribution Procedures, in respect of Talc Personal Injury Claims to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(f)     The Bankruptcy Court and the District Court, as required, shall have entered an order approving the Channeling Injunction and the Insurance Entity Injunction, which order may be included in the Confirmation Order and which order shall be in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel.

(g)     The Debtor shall have entered into a settlement agreement with Imerys Talc America, Inc. and such other Imerys/Cyprus Parties as may be necessary or appropriate in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel, pursuant to which a contribution shall be made to the Talc Personal Injury Trust by or on behalf of the Imerys/Cyprus Parties.

7.4     Conditions Precedent to the Effective Date of the Plan

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the first Business Day on which each of the following conditions has been satisfied or waived pursuant to Section 8.3 of the Plan:

(a)     The Confirmation Order in form and substance reasonably acceptable to the Debtor, J&J, and the AHC of Supporting Counsel shall have been entered by the Bankruptcy Court and the District Court acting jointly or by the District Court affirming an order entered separately by the Bankruptcy Court, and shall have become a Final Order.

(b)     An order shall have been entered by the Bankruptcy Court and the District Court acting jointly or by the District Court affirming an order entered separately by the Bankruptcy Court approving the Channeling Injunction and the Insurance Entity Injunction and authorizing the Debtor and the Reorganized Debtor to implement the Plan, which order may be included in the Confirmation Order and which order shall be in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel.

(c)     The Confirmation Order, the Channeling Injunction, and the Insurance Entity Injunction shall be in full force and effect, and no order shall be in effect staying or enjoining the implementation or enforcement of the Plan, the Confirmation Order, the Channeling Injunction, or the Insurance Entity Injunction.

(d)     ~~No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall be pending.~~

(ed)    The Talc Personal Injury Trust Defenses, initial Cash Contribution, Talc PI Note, Talc PI Pledge Agreement, Imerys/Cyprus Related Rights, and Trust Insurance Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be delivered, transferred, and assigned, as applicable, to the Talc Personal Injury Trust in accordance with Article IV of the Plan.

(fe)    The Talc Personal Injury Trust Agreement (and related documents), and the other applicable Plan Documents (including those attached to the Plan Supplement) necessary or appropriate to implement the Plan shall have been executed, delivered, and, where applicable, filed with the appropriate governmental units in form and substance acceptable to the Debtor, J&J, and the AHC of Supporting Counsel, and shall be fully enforceable in accordance with their terms.

(gf)     The fees of the United States Trustee then owing by the Debtor shall have been paid in full.

(hg)    The Canadian Court shall have entered an order in the Canadian Proceeding recognizing the Confirmation Order in its entirety and ordering the Confirmation Order and the Plan to be implemented and effective in Canada in accordance with their terms.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time, on the date that the Debtor or Reorganized Debtor files a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

7.5     Waiver of Conditions Precedent

Pursuant to Section 8.3 of the Plan, to the greatest extent permitted by law, each of the conditions precedent in Article VIII of the Plan may be waived or modified, in whole or in part, by the Debtor (with the consent of (a) in the event such waiver or modification affects the rights of J&J expressly contained herein, J&J and (b) in the event such waiver or modification affects the rights of the AHC of Supporting Counsel expressly contained herein, the AHC of Supporting Counsel). For the avoidance of doubt, the condition precedent to Confirmation of the Plan set forth in Section 8.1(g) of the Plan may not be waived or modified, in whole or in part, by the Debtor without the consent of J&J and the AHC of Supporting Counsel. Any waiver or modification of a condition precedent under Section 8.3 of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any

other formal action.  Confirmation and the Effective Date shall occur irrespective of whether any Claims allowance process or related litigation has been completed.

7.6     Notice of Effective Date

Pursuant to Section 8.4 of the Plan, the Debtor shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within five (5) Business Days thereafter, which notice shall confirm that the conditions described in Sections 8.1 and 8.2 of the Plan have been satisfied or waived.

7.7     Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan

If any of the conditions precedent to the Effective Date of the Plan set forth in Section 8.2 of the Plan has not been satisfied or duly waived in accordance with Section 8.3 of the Plan, then, upon motion by the Debtor made before the time that each of such conditions precedent has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent set forth in Section 8.2 of the Plan is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section 8.5 of the Plan:  (a) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtor or (ii) prejudice in any manner the rights, including any claims or defenses, of the Debtor or any other Person.

7.8     Means for Implementation of the Plan

(a)    *General*

On or after the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtor to implement effectively the provisions of the Plan, the Talc Personal Injury Trust Documents, and the Confirmation Order, including the creation of the Talc Personal Injury Trust and the preparations for the delivery, transfer, and assignment of assets to the Talc Personal Injury Trust pursuant to Article IV of the Plan.

(b)    *Operations of the Debtor Prior to the Effective Date*

The Debtor shall continue to operate as debtor and debtor-in-possession through and until the Effective Date.

(c)    *Articles of Organization and Operating Agreement*

From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the Amended Charter Documents.  The Amended Articles of Organization and the Amended Operating Agreement shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as

required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.

(d)     *Corporate Action*

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtor or Reorganized Debtor, including actions requiring a vote of the board of managers and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or managers of the Debtor or Reorganized Debtor.

(e)     *Authority of Officers*

Each officer of the Debtor and the Reorganized Debtor shall be authorized and empowered to execute, deliver, file, or record such contracts, instruments, releases, and other agreements and documents and take such other actions as may be necessary or appropriate to effect and implement the provisions of the Plan. The secretary or any assistant secretary of the Debtor or the Reorganized Debtor shall be authorized to certify or attest to any of the actions taken pursuant to <u>Section 9.5</u> of the Plan.

(f)     *Post-Effective Date Governance, Continued Existence of the Reorganized Debtor*

(1)     <u>General</u>. The Reorganized Debtor shall continue its existence as a separate entity after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is formed and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

(2)     <u>Officers and Managers</u>. On the Effective Date, the officers and managers of the Reorganized Debtor shall consist of the individuals that will be identified in <u>Exhibit O</u> of the Plan.

(3)     <u>Property and Operations</u>. On the Effective Date, all property of the Debtor's Estate other than the assets delivered, transferred, or assigned to the Talc Personal Injury Trust pursuant to <u>Article IV</u> of the Plan, including any property acquired by the Debtor or the Reorganized Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, interests, liens, other Encumbrances, and liabilities of any kind. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, interests, or Retained Rights of Action, without supervision or approval by the Bankruptcy Court, or notice to any other Person, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

NAI-1537329582v1 1537329582

(g)    *Arrangements of the Reorganized Debtor with Managers, Officers, and Employees*

As of the Effective Date, the Reorganized Debtor shall be authorized to: (a) maintain, amend, or revise existing indemnification and other arrangements with its active and retired managers and officers, subject to the terms and conditions of any such agreement, or enter into new indemnification and other arrangements with its active and retired managers and officers; and (b) maintain, amend, cancel, or revise the Secondment Agreement or enter into new employee secondment arrangements with its Affiliates; all as determined by the board of managers of the Reorganized Debtor.

(h)    *Good Faith Compromise and Settlement*

The Plan, the other Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies based on the unique circumstances of this Chapter 11 Case, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.

(i)    *Resolution of Talc Personal Injury Claims*

Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, subject to:  (a) the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee having the exclusive right to right (i) to pursue and resolve any Talc In-Place Insurance Coverage, (ii) to pursue and resolve any Talc Insurance Action, (iii) to pursue and obtain any Talc Insurance Recoveries, and (iv) to negotiate and enter into any Talc Insurance Settlement Agreement, pursuant to the Cooperation Agreement) in respect of any Talc Insurance Assets; and (b) the right of any Imerys/Cyprus Party to raise any valid Imerys/Cyprus Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust in respect of any Imerys/Cyprus Related Rights.

(j)    *Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan*

All Cash for the payment of Cash Contributions, Distributions, and other Cash payments to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund the payment of such Cash Contributions, Distributions, and other Cash payments pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through (a) the Reorganized Debtor's Cash balances or, (b) the Funding Agreement and, if such funding is not provided to the Reorganized Debtor under the Funding Agreement as required pursuant

thereto, the Support Agreement, or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.  On the Effective Date, J&J and Holdco shall execute and deliver to the Talc Personal Injury Trust the Cash Contributions Parent Guarantee as provided in Section 4.9.1(c) of the Plan.  For the avoidance of doubt, nothing contained in Section 9.10 of the Plan shall in any way affect the obligations of J&J and Holdco under the Cash Contributions Parent Guarantee.

(k)      *Modification of the Plan*

To the extent permissible under section 1127 of the Bankruptcy Code, at any time prior to substantial consummation of the Plan, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will~~may~~ be submitted by the Debtor (with the consent of J&J and the AHC of Supporting Counsel), without additional disclosure pursuant to section 1125 of the Bankruptcy Code ~~at any time prior to substantial consummation of the Plan,~~ unless section 1127 of the Bankruptcy Code requires additional disclosure.  To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary or appropriate to carry out the purposes and intent of the Plan.  From and after the Effective Date, any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented pursuant to Section 9.11 of the Plan, unless the Bankruptcy Court rules otherwise.

(l)      *Revocation or Withdrawal of the Plan*

The Debtor reserves the right to revoke and withdraw the Plan (with the consent of J&J and the AHC of Supporting Counsel) at any time before its substantial consummation.  If the Debtor revokes or withdraws the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, or any other Person, or to prejudice in any manner the rights of the Debtor, or such Person in any further proceedings involving the Debtor until the occurrence of the Effective Date.  For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

(m)      *Certain Technical Modifications*

Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Interests under the Plan.

7.9      Effect of Confirmation

(a)      *Preservation of Rights of Action by the Debtor and Reorganized Debtor*

(1)     <u>Retained Rights of Action</u>. The Reorganized Debtor shall retain and may enforce, prosecute or settle, and shall have the sole right to enforce, prosecute or settle, the Retained Rights of Action.  The Reorganized Debtor or its successors may pursue or resolve such Retained Rights of Action, as appropriate in accordance with the best interests of the Reorganized Debtor or its successors holding such Retained Rights of Action.  The Reorganized Debtor's rights under <u>Section 10.1.1</u> of the Plan shall be preserved notwithstanding the occurrence of the Effective Date.

(2)     <u>Reservation of Rights</u>. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Rights of Action against them as any indication that the Reorganized Debtor will not pursue the Retained Rights of Action.  The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Rights of Action.  Unless any of the Retained Rights of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all such Retained Rights of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Rights of Action as a consequence of the Confirmation of the Plan.

(3)     <u>Retained Defenses</u>. Without limiting the generality of the foregoing, upon the Effective Date, except as expressly provided in <u>Article IV</u> of the Plan with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights, and Talc Insurance Assets, the Reorganized Debtor shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtor or its Estate, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

(4)     <u>No Approval Required</u>. On or after the Effective Date, subject to <u>Article IV</u> of the Plan with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights, and Talc Insurance Assets, the Reorganized Debtor may pursue, settle, or withdraw, without Bankruptcy Court approval, claims, rights, or causes of action as it determines in accordance with its best interests.

(b)     *Imerys/Cyprus Related Rights*

The provisions of <u>Section 10.2</u> of the Plan shall apply to all Persons (including the Imerys/Cyprus Parties).

(1)     <u>Preservation of Imerys/Cyprus Related Rights</u>. All Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, shall

be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order.  For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

(2)     Actions in Respect of Imerys/Cyprus Related Rights From and After the Effective Date.

    (i)     Upon the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 of the Plan on the Effective Date, the Imerys/Cyprus Related Rights shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code;

    (ii)    From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 of the Plan on the Effective Date, the Talc Personal Injury Trust shall retain the Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court; and

    (iii)   From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 of the Plan on the Effective Date, the Talc Personal Injury Trust shall have the exclusive right to pursue and resolve the Imerys/Cyprus Related Rights.

(3)     No Impairment of Rights or Obligations of Imerys/Cyprus Parties.

    (i)     Nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Imerys/Cyprus Party or the Debtor arising out of or under any Imerys/Cyprus Agreement.  For all issues relating to indemnity rights of the Debtor, including the venue and choice-of-law rules for resolving disputes relating thereto, the provisions, terms, conditions, and limitations of the Imerys/Cyprus Agreements shall control.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Imerys/Cyprus Party to indemnify or pay the liability of any other Protected Party that it would not have been required to

pay in the absence of the Plan, or to impose any requirement for an Imerys/Cyprus Party to mount the defense of any claim, indemnify any claim, or otherwise undertake any action that an Imerys/Cyprus Party would not have been required to take in the absence of the Plan.

(ii)    The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Imerys/Cyprus Parties, and the Talc Personal Injury Trust under the Imerys/Cyprus Agreements. Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

(4)    <u>Plan Binding on Imerys/Cyprus Parties</u>. The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Imerys/Cyprus Parties; *provided*, *however*, that, except as provided in <u>Section 10.2.5</u> of the Plan, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to the Imerys/Cyprus Parties, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any of them under any Imerys/Cyprus Agreement.

(5)    <u>Issues Actually Litigated by Imerys/Cyprus Parties</u>. Nothing in <u>Section 10.2</u> of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against the Imerys/Cyprus Parties with respect to any issue that is actually litigated by any of them as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by any Imerys/Cyprus Party in conjunction with or related to Confirmation of the Plan; provided, however, that any Plan objection that an Imerys/Cyprus Party withdraws prior to the conclusion of the Confirmation Hearing (or a finding that an Imerys/Cyprus Party lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated. The resolution of any related objection raised by other parties and any related findings or determinations (other than those contemplated by <u>Section 8.1(e)(xix)</u> of the Plan) shall not be offered for evidentiary purposes nor be binding on any Imerys/Cyprus Party in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) an Imerys/Cyprus Party's legal,

NAI-1537329582v1 1537329582

equitable, or contractual rights or obligations. No Imerys/Cyprus Party shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that an Imerys/Cyprus Party withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

(c)     *Talc Insurance Assets*

The provisions of <u>Section 10.3</u> of the Plan shall apply to all Persons (including all Talc Insurance Companies).

(1)     <u>Preservation of Talc Insurance Assets</u>. Except as otherwise provided in <u>Section 11.2.1</u> of the Plan, all Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, shall be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order. For the avoidance of doubt, except as otherwise provided in <u>Section 11.2.1</u> of the Plan, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Talc Insurance Company based on, arising out of, or in any way relating to the Talc Insurance Assets.

(2)     <u>Actions in Respect of Talc Insurance Assets From and After the Effective Date</u>.

(i)     Upon the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> of the Plan on the Effective Date, subject to the provisions of <u>Section 4.9.4</u> of the Plan and the Cooperation Agreement, the Talc Insurance Assets shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code;

(ii)     From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> of the Plan on the Effective Date, subject to the provisions of <u>Section 4.9.4</u> of the Plan and the Cooperation Agreement, the Talc Personal Injury Trust shall retain the Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court; and

(iii)     From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> of the Plan on the Effective Date, pursuant to the provisions of <u>Section 4.9.4</u> of the Plan and the Cooperation Agreement, (i) the Reorganized Debtor, as the agent

for and subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement and (ii) any of the following received by the Talc Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor: (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement.  For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any LTL Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

(3)    <u>No Impairment of Rights or Obligations of Talc Insurance Companies</u>.

(i)    Except as provided in any Talc Insurance Settlement Agreement or in <u>Section 11.2.1</u> or <u>Section 11.3.1</u> of the Plan, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Talc Insurance Company or the Debtor arising out of or under any Talc Insurance Policy.  For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or Talc Insurance Settlement Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

(ii)    The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Talc Insurance Companies, and the Talc Personal Injury Trust under the Talc Insurance Policies.  Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

(4)    <u>Plan Binding on Talc Insurance Companies</u>. The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Talc Insurance Companies; provided, however, that, except as provided in

Section 10.3.6 of the Plan, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Talc Insurance Company under any Talc Insurance Policy.

(5)    Plan Protections of Settling Talc Insurance Companies. No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in Article XI of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

(6)    Issues Actually Litigated by the Talc Insurance Companies. Nothing in Section 10.3 of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan; provided, however, that any Plan objection that a Talc Insurance Company withdraws prior to the conclusion of the Confirmation Hearing (or a finding that a Talc Insurance Company lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated.    The resolution of any related objection raised by other parties and any related findings or determinations (other than those contemplated by Section 8.1(e)(xx) of the Plan) shall not be offered for evidentiary purposes nor be binding on any Talc Insurance Company in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) a Talc Insurance Company's legal, equitable, or contractual rights or obligations.    No Talc Insurance Company shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that a Talc Insurance Company withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

(d)    *Preservation of Rights of Action by the Talc Personal Injury Trust*

As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury

Trust, including Talc Personal Injury Claims and Talc Personal Injury Trust Defenses.  Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions in the name of either the Debtor or the Reorganized Debtor, if deemed necessary or appropriate by the Talc Personal Injury Trust. The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising out of or in any way relating to any such legal action or other proceeding.  Section 10.4 of the Plan shall not apply to legal actions and other proceedings related to the Imerys/Cyprus Related Rights, which shall be pursued, resolved, and settled in accordance with the provisions of Section 4.9.3 and Section 10.2 of the Plan, or the Talc Insurance Assets, which shall be pursued, resolved, and settled in accordance with the provisions of Section 4.9.4 of the Plan, Section 10.3 of the Plan, and the Cooperation Agreement.

    (e)   *Terms of Injunctions and Automatic Stay*

        (1)   <u>General</u>. All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Case, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtor may seek such further orders as the Debtor deems necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

        (2)   <u>Effectiveness</u>. Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

    (f)   *The FCR and the TCC*

        (1)   <u>General</u>. The FCR and the TCC shall continue in their official capacities until the Effective Date.  The Debtor shall pay the reasonable fees and expenses incurred by the FCR and the TCC through the Effective Date, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Section 2.2.

        (2)   <u>Dissolution</u>. On the Effective Date, the TCC shall dissolve and the members of such committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case. Similarly, on the Effective Date, the FCR shall be deemed released and discharged from all duties and obligations from or related to the Chapter 11 Case.  The Professionals retained by the TCC and the members thereof

or by the FCR shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2.2 of the Plan.

(g)   *No Effect on United States Trustee*

Nothing in Section 10 of the Plan shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Fee Claims and other Administrative Claims.

(h)   *Binding Effect*

Subject to Section 10.2 and Section 10.3 of the Plan, the Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtor, the Reorganized Debtor, the Talc Personal Injury Trust, any and all holders of Claims against or Interests in the Debtor (regardless of whether such Claim or Interest is Impaired and regardless of whether such holder voted to accept the Plan), and any and all other Persons that are affected in any manner by the Plan.

7.10   Discharge, Settlement, Releases, Injunctions, and Exculpation

The discharge, settlement, release, injunction, and exculpation provisions are set forth in Article XI of the Plan, and a summary of such provisions is provided below.

(a)   ***Discharge and Injunctions***

(1)   **Discharge of Claims Against the Debtor**

As of the Effective Date, Confirmation of the Plan shall afford the Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

(2)   **Discharge Injunction**

**From and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand, or other debt or liability that is discharged are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, demands, debts, or liabilities: (i) commencing or continuing any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any lien or other Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors of the Debtor**

NAI-1537329582v1 1537329582

(including the Reorganized Debtor) and their respective properties and interests in property. The discharge provided in <u>Section 11.1.2</u> of the Plan shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.

     (b)    ***Settlement of Certain Estate Claims***

     (1)    <u>**Settlement of Certain Claims Against Certain Released Parties**</u>

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the Reorganized Debtor, the LTL Corporate Parties, and the respective Representatives of the Debtor, the Reorganized Debtor, and the LTL Corporate Parties that are or would have been property of the Estate or could have been brought by the Estate, including Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud, or conspiracy, except for Intercompany Claims, shall be deemed settled, released, and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtor, the Reorganized Debtor, and the holders of Claims and Interests and is fair, equitable, and reasonable.  For the avoidance of doubt, nothing contained in <u>Section 11.2.1</u> of the Plan shall release or affect the obligations of any Person to be performed from and after the Effective Date under the Funding Agreement or the Support Agreement.

     (2)    <u>**Settlement of Certain Claims Against Holders of Talc Personal Injury Claims**</u>

Pursuant to Bankruptcy Rule 9019 and in consideration for the releases and other benefits provided under the Plan, any and all claims against the holders of Talc Personal Injury Claims who received payments in respect of their claims from the Debtor or any of its predecessors, or from any Affiliate of the Debtor or any of its predecessors, prior to the Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), that are or would have been property of any of the Estate or could have been brought by the Estate or any Protected Party, including Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising out of, based upon, or resulting from payments to holders of Talc Personal Injury Claims from the Debtor or any of its predecessors, or from any Affiliate of the Debtor or any of its predecessors, prior to the Petition Date, shall be deemed settled, released, and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtor, the Reorganized Debtor, and the holders of Claims and Interests and is fair, equitable, and reasonable.

(c)    *Releases*

(1)    **Releases by the Debtor and Its Estate**

As of the Effective Date, for good and valuable consideration (including services provided before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust), the adequacy of which is hereby confirmed, the Reorganized Debtor, the LTL Corporate Parties, and the respective Representatives of the Debtor, the Reorganized Debtor, and the LTL Corporate Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtor and the Estate from any and all claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs, liabilities, fees (including attorneys' fees) and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtor or the Estate would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the Prepetition Funding Agreement Modifications, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and the Reorganized Debtor, any LTL Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any LTL Corporate Party, on the other hand, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation of, the solicitation of votes with respect to, the Plan, or any other related act or omission.  Notwithstanding the foregoing, claims or causes of action against the Reorganized Debtor, any LTL Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any LTL Corporate Party arising out of or relating to any act or omission of such Person prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to <u>Section 11.3.1</u> of the Plan. For the avoidance of doubt, nothing contained in Section 11.3.1 of the Plan shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under the Funding Agreement, the Support Agreement, the Cash Contributions Parent Guarantee, or any other Plan Document to which it is a party.  The Reorganized

Debtor, and any other entity that continues the Debtor's business after the Effective Date, shall be bound, to the same extent the Debtor and the Estate are bound, by the releases set forth in <u>Section 11.3.1</u> of the Plan.

(2)      <u>Releases by Holders of Claims</u>

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs, liabilities, fees (including attorneys' fees), and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the Prepetition Funding Agreement Modifications, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and any other Released Party, on the other hand, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other related act or omission.  Notwithstanding the foregoing, claims or causes of action against a Released Party arising out of or relating to any act or omission of such Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to <u>Section 11.3.2</u> of the Plan. For the avoidance of doubt, nothing contained in <u>Section 11.3.2</u> of the Plan shall release or otherwise affect the obligations of any Person to be performed from and after the Effective

77

Date under the Funding Agreement, the Support Agreement, or the Cash Contributions Parent Guarantee or any other Plan Document to which it is a party.

(3)    <u>Injunction Related to Releases</u>

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action, and liabilities released pursuant to <u>Section 11.3</u> of the Plan.

(d)    *Channeling Injunction and Insurance Entity Injunction*

In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

(1)    <u>Channeling Injunction</u>

(i)    To preserve and promote the settlements contemplated by and provided for in the Plan and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 524(g) and 105(a) of the Bankruptcy Code, notwithstanding anything to the contrary contained in the Plan, (i) the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be to and against the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents and (ii) such holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively, collecting, recovering, or receiving payment, satisfaction, or recovery of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including:

(A)    commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or

78

affecting any Protected Party or any property or interests in property of any Protected Party;

**(B)** enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;

**(C)** creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

**(D)** asserting, implementing, or effectuating any setoff, recoupment, right of contribution, reimbursement, subrogation, or indemnification, or similar right of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

**(E)** taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(ii) Notwithstanding anything to the contrary in <u>Section 11.4.1(a)</u> of the Plan, this Channeling Injunction shall not impair:

**(A)** the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents;

**(B)** the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

**(C)** the rights of all Persons to assert any Claim, debt, obligation, cause of action, or liability for payment of

79

> Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust; or

**(D)** the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents, including the Imerys/Cyrus Related Rights.

(iii) There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(iv) Nothing in the Plan or the Talc Personal Injury Trust agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

(v) The Debtor's compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(vi) Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

(vii) If a non-Settling Talc Insurance Company asserts that it has Contribution Claims against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee having the exclusive right to pursue and resolve any Talc Insurance Action, pursuant to the Cooperation Agreement) may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.

(2) **Insurance Entity Injunction**

(i)    **In order to protect and preserve the Talc Insurance Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction; provided, however, that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance Settlement Agreement.**

(ii)    **Subject to the provisions of <u>Section 11.4.1</u> of the Plan and <u>Section 11.4.2</u> of the Plan, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand, or cause of action against any Talc Insurance Company based on, arising out of, or in any way relating to any Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including:**

(A)    **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

(B)    **enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

(C)    **creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc**

Insurance Company, with respect to any such claim, demand, or cause of action; and

(D)      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

*provided*, *however*, that (A) the injunction set forth in <u>Section 11.4.2(b)</u> of the Plan shall not impair in any way (I) any actions pursued by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) against any Talc Insurance Company or (II) the rights of any co-insured of the Debtor (x) with respect to any Talc Insurance Policy or Talc Insurance Settlement Agreement against any Talc Insurance Company or (y) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance Settlement Agreement; and (B) the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) shall have the sole and exclusive authority at any time to terminate, reduce or limit the scope of, the injunction set forth in <u>Section 11.4.2(b)</u> of the Plan with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) shall not have any authority to terminate, reduce, or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(iii)    Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(A)      the rights of all Persons to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Talc Personal Injury Trust Documents;

(B)      the rights of all Persons to assert any claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust;

**(C)**     the rights of the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its agent and subrogee, pursuant to the Cooperation Agreement) (i) to pursue and resolve any Talc In-Place Insurance Coverage, (ii) to pursue and resolve any Talc Insurance Action, (iii) to pursue and obtain any Talc Insurance Recoveries, and (iv) to negotiate and enter into any Talc Insurance Settlement Agreement; or

**(D)**     the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance Settlement Agreement.

**(iv)**     For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any LTL Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

(e)     *Exculpation*

(1)     <u>Exculpation of Certain Parties</u>

None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission taken or to be taken, whether before, on, or after the Petition Date through and including the Effective Date in connection with, arising out of, or in any way relating to: (a) the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the Prepetition Funding Agreement Modifications, or the Chapter 11 Case; (b) the negotiation, formulation, and preparation of the Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents, and the releases and Injunctions contained in the Plan; (c) the pursuit of Confirmation of the Plan; (d) the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan or the Trust Distribution Procedures; or (e) the management or operation of the Debtor (except for any liability that results primarily from such Person's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order). In all respects, each and all of such Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Case, the Plan, the Plan Documents, and the administration of each of them.

(2)     <u>Injunction Related to Exculpation</u>

The Confirmation Order shall permanently enjoin all Persons from taking any action against any Exculpated Party for the purpose of, directly or indirectly or

**derivatively, receiving payment of, on, or with respect to any liability from which the Exculpated Parties are exculpated pursuant to Section 11.5 of the Plan.**

## ARTICLE VIII.

## THE TALC PERSONAL INJURY TRUST AND TRUST DISTRIBUTION PROCEDURES

8.1    Overview

    (a)    *Establishment*

       On the ~~Effective~~first Business Day following the Confirmation Date, the Talc Personal Injury Trust, and the Talc Personal Injury Governmental Action Claims Sub-Trust, Talc Personal Injury TPP Lien Claims Sub-Trust, and the Talc Personal Injury Tort Claims Sub-Trust comprising the Talc Personal Injury Trust, will be created in accordance with the Plan Documents. ~~The~~Each of the Talc Personal Injury TPP Lien Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust will be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code. The Talc Trustees will segregate, and separately account for the use of, Talc Personal Injury Governmental Action Claims Sub-Trust Funds, ~~on the one hand~~Talc Personal Injury TPP Lien Claims Sub-Trust Funds, and Talc Personal Injury Tort Claims Sub-Trust Funds~~, on the other hand~~.

    (b)    *Purposes*

       The purposes of the Talc Personal Injury Trust will be to assume all Talc Personal Injury Claims and, among other things: (a) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents. The Talc Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly and equitably, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code. In the event of a conflict between the terms or provisions of the Plan and the Talc Personal Injury Trust Documents, the terms of the Plan will control.

    (c)    *Initial Talc Trustee*

       There will be two initial Talc Trustees. The initial Talc Trustees of the Talc Personal Injury Trust will be [●] and [●]. All successor Talc Trustees will be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trustee will be deemed to be (and the Confirmation Order will provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code. A Talc Trustee will be designated as the "administrator" of the Talc Personal Injury ~~Trust~~TPP Lien

Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust as such term is used in Treasury Regulation Section 1.468B-2(k)(3).

(d)   *Initial Talc Trust Advisory Committee and FCR*

(1)   Initial Talc Trust Advisory Committee.   The Talc Trust Advisory Committee will be established pursuant to the Talc Personal Injury Trust Agreement.   The initial Talc Trust Advisory Committee Members will include: [●]. Each of the Talc Trust Advisory Committee Members will serve in accordance with the terms and conditions contained in the Talc Personal Injury Trust Agreement.   Successor Talc Trust Advisory Committee Members will be appointed pursuant to the terms of the Talc Personal Injury Trust Agreement.   For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trust Advisory Committee Member will be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

(2)   Initial FCR.   The Talc Personal Injury Trust Agreement will provide for the continuation of an FCR to represent any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown.   The initial FCR under the Talc Personal Injury Trust Agreement will be [●].   Any successor FCR under the Talc Personal Injury Trust will be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.   For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, the FCR under the Talc Personal Injury Trust will be deemed to be (and the Confirmation Order will provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

(e)   *Initial Talc Trust Administrators*

(1)   Initial Talc Trust Claims Administrator.   The initial Talc Trust Claims Administrator of the Talc Personal Injury Trust will be [●].   All successor Talc Trust Claims Administrators will be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.   For purposes of performing his or her duties and fulfilling his or her obligations under the Talc Personal Injury Trust Agreement and the Plan, the Talc Trust Claims Administrator will be deemed to be (and the Confirmation Order will provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

(2)   Initial Talc Trust Liens Resolution Administrator.   The initial Talc Trust Liens Resolution Administrator of the Talc Personal Injury Trust will be [●].   All successor Talc Trust Liens Resolution Administrators will be

appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing its duties and fulfilling its obligations under the Talc Personal Injury Trust Agreement and the Plan, the Talc Trust Lien Resolution Administrator will be deemed to be (and the Confirmation Order will provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

(f)     *Payment of Talc Personal Injury Expenses Prior to the Effective Date*

From and after the Confirmation Date until the earlier of (i) the Effective Date and (ii) such time as the Confirmation Order is vacated by the Bankruptcy Court, the Reorganized Debtor will pay all reasonable and documented Talc Personal Injury Trust Expenses. For the avoidance of doubt, Talc Personal Injury Trust Expenses do not include payments to holders of Talc Personal Injury Claims on account of such Claims. All Cash necessary for the Reorganized Debtor to fund such Talc Personal Injury Trust Expenses will be obtained through (i) the Debtor's Cash balances or (ii) the Funding Agreement.

(g)     *Trust Distribution Procedures*

On the Effective Date, the Talc Personal Injury Trust will implement the Trust Distribution Procedures in accordance with the terms of the Talc Personal Injury Trust Agreement. From and after the Effective Date, the Talc Trustees will have the authority to administer, amend, supplement, and modify the Trust Distribution Procedures solely in accordance with the terms thereof and of the Talc Personal Injury Trust Agreement.

(h)     *Assumption of Liability for Trust Personal Injury Claims*

(1)     <u>Assumption of Liability Generally</u>. In consideration for the assets delivered, transferred, and assigned to the Talc Personal Injury Trust pursuant to <u>Article IV</u> of the Plan, and in furtherance of the purposes of the Talc Personal Injury Trust and the Plan, on the Effective Date, and without further action of any Person, subject to <u>Section 4.8.4(a)</u> of the Plan, the Talc Personal Injury Trust will assume all liabilities, obligations, and responsibilities of the Debtor and the other Protected Parties for all Talc Personal Injury Claims, financial or otherwise, including Governmental Action Claims and TPP Lien Claims, Indirect Talc Personal Injury Claims, Talc Personal Injury Demands, and claims of any Imerys/Cyprus Party against the Debtor or any Protected Party under any Imerys/Cyprus Agreement or applicable law. This assumption will not affect (a) the application of the Discharge Injunction and the Channeling Injunction to the Debtor; (b) any Talc Insurance Company's obligation under any Talc Insurance Policy; or (c) the Imerys/Cyprus Related Rights. From and after the Effective Date, the Debtor, the Reorganized Debtor, and the other Protected Parties will have no liability, obligation, or responsibility, financial or otherwise, for any Talc Personal Injury Claim.

86

(2)     Defenses.  Except as otherwise expressly provided in the Plan, the Talc Personal Injury Trust Documents, and the Confirmation Order, upon the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for Talc Personal Injury Claims as contemplated by Section 4.8.1 of the Plan, subject to Section 4.8.4(b) of the Plan, the Talc Personal Injury Trust Defenses will be transferred to the Talc Personal Injury Trust.  The transfer of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to Section 4.8.2 of the Plan will not impair, affect, alter, or modify the right of any Person (including the Imerys/Cyprus Parties), against whom the Talc Personal Injury Trust may exercise Talc Personal Injury Trust Defenses to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor prior to the Effective Date, *provided*, *however*, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to Section 4.8.2 of the Plan, or any other action contemplated by Section 4.8.2 of the Plan, is prohibited by applicable non-bankruptcy law.

(3)     Enforcement of Defenses and Other Related Rights.  Except as otherwise expressly provided in the Plan, the Talc Personal Injury Trust Documents, and the Confirmation Order, from and after the Effective Date the Talc Personal Injury Trust will have control over the Talc Personal Injury Trust Defenses and the Talc Personal Injury Trust will thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each of the Talc Personal Injury Trust Defenses.  Subject to Section 4.8.4(c) of the Plan, the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses will be deposited in and become the property of the Talc Personal Injury Trust and the Talc Personal Injury Trust will have the right to enforce the Plan and any of the other Plan Documents (including the Cooperation Agreement) according to their respective term.  Notwithstanding the provisions of Section 4.8.2 and Section 4.8.3 of the Plan, (a) the Talc Personal Injury Trust will have no rights against the Reorganized Debtor or the other Protected Parties except to enforce the Plan and the other Plan Documents, (b) the Talc Personal Injury Trust Defenses transferred to the Talc Personal Injury Trust will not include any claims fully and finally released, enjoined, compromised, or settled pursuant to the Plan, and (c) for the avoidance of doubt, the Talc Personal Injury Trust Defenses transferred to the Talc Personal Injury Trust will not include any rights of the Debtor, the Reorganized Debtor, or the other Protected Parties arising under the Channeling Injunction or any of the other injunctions or releases, or the discharge, granted under the Plan and the Confirmation Order.

NAI-1537329582v1 1537329582

(i)    *Effects of the Sub-Trusts*

For the avoidance of doubt, notwithstanding anything to the contrary contained in Article IV of the Plan:

(1)    under Section 4.8.1 of the Plan, (i) the Talc Personal Injury Governmental Action Claims Sub-Trust will assume the liabilities, obligations, and responsibilities for all Governmental Action Claims and, (ii) the Talc Personal Injury TPP Lien Claims Sub-Trust will assume the liabilities, obligations, and responsibilities for all TPP Liens Claims, and (iii) the Talc Personal Injury Tort Claims Sub-Trust will assume all liabilities, obligations, and responsibilities for all Talc Personal Injury Claims other than Governmental Action Claims and TPP Lien Claims;

(2)    under Section 4.8.2 of the Plan, (i) the Talc Personal Injury Trust Defenses regarding Governmental Action Claims will be transferred to the Talc Personal Injury Governmental Action Claims Sub-Trust and, (ii) the Talc Personal Injury Trust Defenses regarding TPP Lien Claims will be transferred to the Talc Personal Injury TPP Lien Claims Sub-Trust, and (iii) the Talc Personal Injury Trust Defenses regarding Talc Personal Injury Claims other than Governmental Action Claims and TPP Lien Claims will be transferred to the Talc Personal Injury Tort Claims Sub-Trust; and

(3)    under Section 4.8.3 of the Plan, (i) the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding Governmental Action Claims will be deposited in and become the property of the Talc Personal Injury Governmental Action Claims Sub-Trust and, (ii) the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding TPP Lien Claims will be deposited in and become the property of the Talc Personal Injury TPP Lien Claims Sub-Trust, and (iii) the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses regarding Talc Personal Injury Claims other than Governmental Action Claims and TPP Lien Claims will be deposited in and become the property of the Talc Personal Injury Tort Claims Sub-Trust.

(j)    *No Common Benefit Fund Obligation*

Notwithstanding anything to the contrary contained in the Plan, neither the Reorganized Debtor nor the Talc Personal Injury Trust will have any obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, to withhold any amounts from payments made by it under the Plan or any other Plan Document, including the Trust Distribution Procedures, in respect of Talc Personal Injury Claims to account for any

common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(k)    *Contribution of Certain Assets*

(1)    <u>Cash Contributions</u>.  The Reorganized Debtor will deliver, or cause to be delivered, to the Talc Personal Injury Governmental Action Claims Sub-Trust, the Talc Personal Injury TPP Lien Claims Sub-Trust, and the Talc Personal Injury Tort Claims Sub-Trust the Cash Contributions in accordance with <u>Exhibit C</u> of the Plan.  All Cash Contributions to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents will be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund such Cash Contributions pursuant to the Plan and the Talc Personal Injury Trust Documents will be obtained through (a) the Reorganized Debtor's Cash balances, (b) the 2023 Funding Agreement and, if such funding is not provided to the Reorganized Debtor under the 2023 Funding Agreement as required pursuant thereto, the J&J Support Agreement, or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.  On the Effective Date, J&J and Holdco will execute and deliver to the Talc Personal Injury Trust the Cash Contributions Parent Guarantee.  For the avoidance of doubt, nothing contained in <u>Section 4.9.1</u> of the Plan will in any way affect the obligations of J&J and Holdco under the Cash Contributions Parent Guarantee.

(2)    <u>Talc PI Note and Related Talc PI Pledge</u>.

(a)    On the Effective Date, (i) the Reorganized Debtor will execute and deliver to the Talc Personal Injury Tort Claims Sub-Trust the Talc PI Note and (ii) Holdco will execute and deliver to the Talc Personal Injury Trust the Talc PI Pledge Agreement.

(b)    The Talc PI Note will:  (i) bear no interest; (ii) mature on the first anniversary of the Effective Date; (iii) be secured by the Talc PI Pledge; and (iv) provide for payment in full of the principal amount of the PI Talc Note on or before its maturity date.

(c)    A Reorganized Debtor Payment Event of Default will not provide a basis for the Talc Personal Injury Trust or any other Person to contend that a material breach of the Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to the Plan, including the protections of the Channeling Injunction and related indemnification by the Talc Personal Injury Trust.  If a Reorganized Debtor Payment Event of Default occurs, the Talc Personal Injury Trust may, upon

five (5) days' written notice to the Reorganized Debtor and Holdco, foreclose upon the Talc PI Pledge.

(3)　Imerys/Cyprus Related Rights

    (a)　On the Effective Date, the Reorganized Debtor and J&J will (and J&J will cause any other LTL Corporate Party that has Imerys/Cyprus Related Rights to) transfer and assign to the Talc Personal Injury Trust the Imerys/Cyprus Related Rights.  The transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust pursuant to Section 4.9.3 of the Plan will not impair, alter, or modify the right of any Imerys/Cyprus Party against whom the Talc Personal Injury Trust may exercise the Imerys/Cyprus Related Rights to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor prior to the Effective Date; *provided*, *however*, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust  pursuant to Section 4.9.3 of the Plan, or any other action contemplated by Section 4.9.3 of the Plan, is prohibited by applicable non-bankruptcy law.

    (b)　The Talc Personal Injury Trust will have control over the Imerys/Cyprus Related Rights and the Talc Personal Injury Trust will thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce the Imerys/Cyprus Related Rights.  The proceeds of the recoveries on any Imerys/Cyprus Related Rights will be deposited in and become the property of the Talc Personal Injury Tort Claims Sub-Trust.

    (c)　Pursuant to the Cooperation Agreement:  (i) the Reorganized Debtor, J&J, and the Talc Trustees will cooperate and use their respective commercially reasonably efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust in accordance with Section 4.9.3 of the Plan; and (ii) without limiting the generality of the foregoing clause (i), the Reorganized Debtor and J&J will provide the Talc Personal Injury Trust with copies of the Imerys/Cyprus Agreements and such other information within the possession and control of the Reorganized Debtor and J&J as the Reorganized Debtor and J&J may determine to be necessary or appropriate in their respective sole discretion.  Pursuant to the Plan and the Confirmation Order,

to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the provisions of Section 4.9.3 of the Plan or the Cooperation Agreement, such provision of information will not result in the destruction or waiver of any applicable privileges pertaining to such information.

(4)     Talc Insurance Assets

(a)     Subject to the provisions of Section 4.9.4 of the Plan and the Cooperation Agreement, on the Effective Date, the Reorganized Debtor will transfer and assign to the Talc Personal Injury Trust the Talc Insurance Assets; *provided*, *however*, that, for the avoidance of doubt, the Reorganized Debtor will not transfer and assign to the Talc Personal Injury Trust, and will retain, (i) all proceeds of Talc In-Place Insurance Coverage received by the Debtor on or prior to the Effective Date, (ii) all proceeds or benefits of any Talc Insurance Action received by the Debtor on or prior to the Effective Date, and (iii) all amounts payable pursuant to any Talc Insurance Settlement Agreement received by the Debtor on or prior to the Effective Date.

(b)     From and after the Effective Date, in consideration of the Reorganized Debtor's obligations under Section 4.9.1, Section 4.9.2, and Section 4.9.3 of the Plan, (i) the Reorganized Debtor, as the agent for and subrogee of the Talc Personal Injury Trust, will have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement and (ii) any of the following received by the Talc Personal Injury Trust will be delivered to, and retained by, the Reorganized Debtor:  (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement.  Subject to the provisions of the Cooperation Agreement, the Reorganized Debtors will pay, and bear sole responsibility with respect to the payment of, all costs and expenses, including attorneys fees and expenses and other out-of-pocket fees and expenses, incurred by the Reorganized Debtor acting as agent for and subrogee of the Talc Personal Injury Trust pursuant to Section 4.9.4(b) of the Plan. For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order will impair or otherwise affect any rights that any LTL Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

NAI-1537329582v1-1537329582

(c)      Pursuant to the Cooperation Agreement:  (i) the Reorganized Debtor, J&J, and the Talc Trustees will cooperate and use their respective commercially reasonably efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with Section 4.9.4 of the Plan; and (ii) without limiting the generality of the foregoing clause (i), the Reorganized Debtor and J&J will provide the Talc Personal Injury Trust with copies of the Talc Insurance Policies and Talc Insurance Settlement Agreements and such other information within the possession and control of the Reorganized Debtor and J&J as the Reorganized Debtor and J&J may determine to be necessary or appropriate in their respective sole discretion. Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the provisions of Section 4.9.4 of the Plan or the Cooperation Agreement, such provision of information will not result in the destruction or waiver of any applicable privileges pertaining to such information.

(d)      If, notwithstanding the provisions of the Plan and Confirmation Order, the transfer and assignment of any of the Talc Insurance Assets is determined by any court of competent jurisdiction to be invalid under, or to violate the provisions of, any Talc Insurance Policy, then, notwithstanding anything to the contrary in the Plan, solely with respect to such Talc Insurance Asset, (i) the Reorganized Debtor will be deemed to have retained such Talc Insurance Asset and (ii) each provision of the Plan that provides or contemplates that the Talc Personal Injury Trust will act through the Reorganized Debtor, or that the Reorganized Debtor will act, as the agent for and subrogee of the Talc Personal Injury Trust with respect to such Talc Insurance Asset will be deemed to instead provide or contemplate that the Reorganized Debtor will act for the benefit of the Talc Personal Injury Trust with respect to such Talc Insurance Asset.  For the avoidance of doubt, nothing in Section 4.9.4(d) of the Plan shall affect clause (ii) of Section 4.9.4(b) of the Plan.

(l)      *Payment of Talc Personal Injury Trust Expenses From and After the Effective Date*

Subject to Section 4.6 of the Plan, the Talc Personal Injury Trust will pay all Talc Personal Injury Trust Expenses from the assets of the Talc Personal Injury Trust.  The Talc Personal Injury Trust will bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses.  Subject to Section 4.9.4(b) of the Plan and the provisions of the Cooperation Agreement, the Talc Personal Injury Trust will promptly pay all reasonable and

documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtor or any Non-Debtor Affiliate for any and all liabilities, costs, or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.  The Talc Trustees will cause (ai) all Talc Personal Injury Trust Expenses related to Governmental Action Claims to be paid using Talc Personal Injury Governmental Action Claims Sub-Trust Funds, (ii) all Talc Personal Injury Trust Expenses related to TPP Lien Claims to be paid using Talc Personal Injury TPP Lien Claims Sub-Trust Funds, and (biii) all Talc Personal Injury Trust Expenses related to Talc Personal Injury Claims other than Governmental Action Claims to be paid using Talc Personal Injury Tort Claims Sub-Trust Funds.

(m)    *Treatment of Remainder Assets*

To the extent there are any assets of the Talc Personal Injury Governmental Action Claims Sub-Trust remaining at such time as the Talc Personal Injury Governmental Action Claims Sub-Trust is dissolved or any assets of the Talc Personal Injury TPP Lien Claims Sub-Trust remaining at such time as the Talc Personal Injury TPP Lien Claims Sub-Trust is dissolved, such remaining assets will be transferred to the Talc Personal Injury Tort Claims Sub-Trust.  To the extent there are any assets of the Talc Personal Injury Tort Claims Sub-Trust remaining at such time as the Talc Personal Injury Tort Claims Sub-Trust is dissolved, such remaining assets will be transferred to a charity or charities for such charitable purposes as the Talc Trustee, in their reasonable discretion, shall determine.

(n)    *Dissolution*

The Talc Personal Injury Trust will be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents.  Upon dissolution of the Talc Personal Injury Trust, the Talc Trustees,  the Talc Trust Advisory Committee Members, the FCR under the Talc Personal Injury Trust Agreement, the Talc Trust Claim Administrator, and the Talc Trust Liens Resolution Administrator will be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case.

(o)    *Funds and Investment Guidelines*

All monies held in the Talc Personal Injury Trust, whether held in the Talc Personal Injury Governmental Action Claims Sub-Trust, the Talc Personal Injury TPP Lien Claims Sub-Trust, or the Talc Personal Injury Tort Claims Sub-Trust, will be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

(p)    *Compliance with QSF Regulations*

The Debtor and the Reorganized Debtor will take all actions required of them as "transferor," and the designated Talc Trustee will take all actions required of him or her as "administrator," with respect to the Talc Personal Injury TPP Lien Claims Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust pursuant to Treasury Regulations promulgated under section 468B of the Internal Revenue Code.  Pursuant to such Treasury Regulations, the Talc Trustees designated as "administrator" will be responsible for all tax reporting and withholding requirements in respect of distributions made from the Talc Personal Injury TPP Lien Claims

93

Sub-Trust and the Talc Personal Injury Tort Claims Sub-Trust.  Any issue of interpretation of the Plan, the Talc Personal Injury Trust Agreement or other Talc Personal Injury Trust Documents, or the Confirmation Order will be resolved in favor of an interpretation that conforms to the requirements of section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

(q)     *Cooperation Agreement*

On the Effective Date, the Reorganized Debtor, J&J, and the Talc Personal Injury Trust will enter into the Cooperation Agreement.  The parties to the Cooperation Agreement will be bound by the terms thereof.  The provision of information by the Reorganized Debtor or J&J to the Talc Personal Injury Trust pursuant to the Cooperation Agreement will not result in the destruction or waiver of any applicable privileges pertaining to such information.

(r)     *Indemnification and Reimbursement of the Protected Parties*

From and after the Effective Date, the Talc Personal Injury Trust will indemnify, defend, and hold harmless, to the fullest extent permitted by applicable law, each of the Reorganized Debtor and the other Protected Parties (other than the Imerys/Cyprus Parties, if they are Protected Parties, for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) from and against any and all claims, demands, disputes, suits, damages, remedies, losses, awards, judgments, settlements, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever suffered or incurred by it subsequent to the Effective Date arising out of or in any way relating to any Talc Personal Injury Claim.  Without limiting the generality of the foregoing, from and after the Effective Date, the Talc Personal Injury Trust will promptly reimburse each Protected Party (other than the Imerys/Cyprus Parties, if they are Protected Parties, for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) for any and all out-of-pocket damages, remedies, losses, awards, judgments, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever actually incurred by such Protected Party subsequent to the Effective Date attributable to the defense of any Talc Personal Injury Claim in the event that the holder of such Talc Personal Injury Claim seeks to hold such Protected Party liable for such Talc Personal Injury Claim in violation of the Plan and the Channeling Injunction.  For the avoidance of doubt, notwithstanding the foregoing, under Section 4.16 of the Plan, (a) the Talc Personal Injury Governmental Action Claims Sub-Trust will indemnify, defend, and hold harmless such Persons from against such items arising out of or in any way relating to any Governmental Action Claim and, (b) the Talc Personal Injury TPP Lien Claims Sub-Trust will indemnify, defend, and hold harmless such Persons from and against such items arising out of or in any way relating to any TPP Lien Claim, and (c) the Talc Personal Injury Tort Claim Sub-Trust will indemnify, defend, and hold harmless such Persons from and against any such items arising out of or in any way relating to any Talc Personal Injury Claim other than Governmental Action Claims and TPP Lien Claims.

(s)     *Exculpation of the Protected Parties*

None of the Protected Parties shall have or incur any liability to any Person for any act or omission taken or to be taken in connection with, arising out of, or in any way relating to the

94

administration or operation of the Talc Personal Injury Trust, including (a) the management of the assets of the Talc Personal Injury Trust and (b) the processing, liquidation, and payment of Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.

8.2    ~~The~~Select Provisions of the Trust Distribution Procedures

The Trust Distribution Procedures, which are attached to the Plan as <u>Exhibit M</u>, set forth procedures for processing and paying Talc Personal Injury Claims.  These procedures will be binding on the holders of all Talc Personal Injury Claims.  The Trust Distribution Procedures provide, among other things, for the resolution of Talc Personal Injury Claims pursuant to the terms of the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures, and that resolution of a Talc Personal Injury Claim by the Talc Personal Injury Trust will result in satisfaction of such Claim against the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Distribution Procedures.

This Section summarizes certain provisions of the Trust Distribution Procedures, and is intentionally not a recitation of the entirety of the Trust Distribution Procedures.

THE FOLLOWING SUMMARY DESCRIBES CERTAIN PROVISIONS OF THE TRUST DISTRIBUTION PROCEDURES, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE TRUST DISTRIBUTION PROCEDURES.  THE DEBTOR URGES ALL HOLDERS OF TALC PERSONAL INJURY CLAIMS TO READ AND STUDY CAREFULLY THE TRUST DISTRIBUTION PROCEDURES, A COPY OF WHICH IS ATTACHED AS EXHIBIT M TO THE PLAN.  CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS SECTION 8.2 HAVE THE MEANINGS ASCRIBED TO THEM IN THE TRUST DISTRIBUTION PROCEDURES.

(a)    *Overview*

(1)    Trust Purpose

The purpose of the Talc Personal Injury Trust is to assume the liability for Talc Personal Injury Claims pursuant to the terms of the Plan and the Talc Personal Injury Trust Agreement, and to use the Talc Personal Injury Trust Assets to resolve and, if appropriate, promptly pay Talc Personal Injury Claims in such a way that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code.  To achieve this goal, the Trust Distribution Procedures set forth procedures for processing, evaluating, resolving, and paying (as appropriate) Individual Claims through either the Standard Qualification Evaluation Process or the Accelerated Evaluation Process described therein, and for liquidating and paying Indirect Talc Personal Injury Claims, including Governmental Action Claims.  The Trust Distribution Procedures are designed to be consistent with characteristics known to be relevant to the valuation of Talc Personal Injury Claims in the tort system, including disease type and age at diagnosis, and/or the theories promulgated by plaintiffs' experts in the MDL, including time since last talc use.

(b)  *Trust Distribution Procedures Administration*

(1)  Coordination of Talc Trustees, Claims Administrator, and Claims Processor

The Talc Personal Injury Trust will utilize the services of the Claims Administrator and Claims Processor to assist in the evaluation of claims submitted to the Talc Personal Injury Trust. The Talc Trustees will implement the Trust Distribution Procedures to resolve any and all existing and future Talc Personal Injury Claims, including Individual Claims, Indirect Derivative Talc Personal Injury Claims, TPP Lien Claims and Governmental Action Claims pursuant to the Plan and Talc Personal Injury Trust Agreement, with the assistance of the Claims Administrator and the Claims Processor. Further, the Talc Trustees, the Claims Administrator, and the Claims Processor will consult and coordinate with each other to develop and implement administrative and background processes intended to (i) provide the Talc Trustees with all information necessary to implement the Trust Distribution Procedures, (ii) streamline the Submission Procedures for Individual Claimants, (iii) ensure maximally efficient evaluation of the Individual Claims and the Reconsideration Requests, (iv) ensure proper application of the Qualification Criteria and audit provisions described herein, (v) limit the use of the Talc Personal Injury Trust's assets to uses permitted by the Plan, and (vi) promote prompt payment of Allowed Claims.

(2)  Preparation of and Deadline for Distribution of Submission Procedures

Within sixty (60) days following entry of the Confirmation Order, the Talc Trustees will propose detailed Submission Procedures required by the Trust Distribution Procedures to the TAC and the FCR, whose approvals are required prior to distribution of the Submission Procedures to counsel for Individual Claimants. Those approvals cannot be unreasonably withheld; however, if either TAC or FCR approval is not obtained, the Talc Trustees are authorized to seek an order of the Bankruptcy Court approving the proposed Submission Procedures. Promptly after approval, the Talc Trustees will make the Submission Procedures publicly available on a website addressing the same.

(3)  Consent and Consultation Requirements

The Talc Trustees will ~~implement and~~ administer the Talc Personal Injury Trust ~~pursuant to~~ and implement the Trust Distribution Procedures in consultation with the TAC, the FCR, and the Guarantor. Pursuant to the Plan, the Talc Personal Injury Trust Agreement, and the Trust Distribution Procedures. The goal of, the Talc Trustees, in consultation with the Guarantor, will (i) obtain the consent of the TAC and the FCR on such matters as are required therein or in the Talc Personal Injury Trust ~~Distribution Procedures is to provide fair, equitable, and substantially similar treatment for all Talc Personal Injury Claims channeled to the Talc Personal Injury Trust that may presently exist or may arise in the future. To that end, the Talc Personal Injury Trust Distribution Procedures set forth procedures for processing and, if valid, paying claims generally on an impartial, first-in-first-out basis, with the intention of enabling each holder of a valid Claim against the Talc Personal Injury Trust to receive a payment from the Talc Personal Injury Trust of the unpaid portion of the liquidated value of Talc Personal Injury Claims that is at a level proportionate to other similar claimants.~~ Agreement, including with respect to any proposed

96

substantive amendment, change, or modification to the terms of the Trust Distribution Procedures, and (ii) consult and coordinate with the Claims Administrator and Claims Processor with respect to the submission, evaluation, and processing of Individual Claims.

In the event that consultation with or consent of the TAC and the FCR is required, the Talc Trustees will provide written notice to the TAC and each of its members and the FCR, the Claims Administrator, and the Claims Processor.  The Talc Trustees will not proceed with any matter requiring consent or consultation unless and until the parties have engaged in the Consultation Process or the Consent Process each as defined and described in the Talc Personal Injury Trust Agreement.  Neither the TAC nor the FCR will unreasonably withhold consent sought by the Talc Trustees pursuant to the Trust Distribution Procedures; however, if the Talc Trustees are unable to obtain consent required by the Trust Distribution Procedures, then the Talc Trustees are authorized to seek an order of the Bankruptcy Court approving the proposal or matter at issue, including any substantive amendment, change, or modification to the terms of the Trust Distribution Procedures.

Notwithstanding the foregoing, absent Bankruptcy Court approval after appropriate notice and opportunity to object, neither the Talc Trustees, Claims Administrator, Claims Processor, Lien Resolution Administrator, TAC nor FCR may amend the Trust Distribution Procedures in any material manner that is inconsistent with the Plan.

(4)   Lien Resolution

In General.  With respect to any Individual Claim of a Specified Insured Individual that becomes an Allowed Claim pursuant to the Trust Distribution Procedures, all related medical liens and claims will be resolved through the Talc Personal Injury TPP Lien Claims Sub-Trust, using Talc Personal Injury TPP Lien Claims Sub-Trust Funds, with a corresponding reduction to the Allowed Claim Amount of such Allowed Claim to be made by the Talc Trustees in coordination with the Lien Resolution Administrator.  In determining the appropriate lien withholding and/or reduction amount to each Allowed Claim, the Talc Trustees and Lien Resolution Administrator shall reduce the amount allocated to each Qualifying Ovarian Cancer Claim by the amount necessary for the TPP Lien Claims Sub-Trust to satisfy relevant lien claims.  With respect to all other Individual Claims that are similar to Individual Claims of Specified Insured Individuals and become Allowed Claims, the Lien Resolution Administrator will endeavor to ensure that the final lien amounts withheld from or allocated to each Allowed Claim are substantially the same as the lien withholding and/or reduction amount to be allocated to the similar Allowed Claims of Specified Insured Individuals.  To that end, the Lien Resolution Administrator is authorized to individually or collectively resolve valid medical liens and claims that are asserted against holders of such other Individual Claims, including TPP Lien Claims, *provided* that any collective resolution of such liens or claims will be limited to such Individual Claims that have common characteristics (*e.g.*, the same disease).  The Talc Trustees will seek to ensure that each such collective resolution of valid medical liens or claims by the Lien Resolution Administrator is substantially the same as each similar collective resolution, and as similar individual resolutions taken as a whole.  For the avoidance of doubt, medical liens that may be resolved through the TPP Lien Claims Sub-Trust funds by the Lien Resolution Administrator as described above will be subject to Section 3.3 of the Trust Distribution

Procedures and not the provisions related to the resolution of Indirect Derivative Talc Personal Injury Claims in Article 9 of the Trust Distribution Procedures.

Procedures. Upon completion of (i) the applicable evaluation process for each Allowed Claim, and (ii) resolution of any Reconsideration Request of the Claim Administrator's determinations, the Settlement Trust will remit the Allowed Claim Amount to a segregated account under the control of the Lien Resolution Administrator pending the satisfaction and release of all related medical liens and claims, TPP Lien Claims, Indirect Derivative Talc Personal Injury Claims, and the resolution of all related administrative issues, after which time payment to the relevant Individual Claimant and/or his/her respective counsel will be made. Subject to the terms of the Talc Personal Injury Trust Agreement, the Lien Resolution Administrator will, among other things, be responsible for the distribution of net proceeds for Allowed Claims to the appropriate Allowed Claimants. All Talc Personal Injury Trust Expenses related to TPP Lien Claims will be paid using Talc Personal Injury TPP Lien Claims Sub-Trust Funds.

On or as soon as practicable following the Effective Date and the submission of any Individual Claim to the Talc Personal Injury Trust, the Lien Resolution Administrator will begin working to quantify any and all known medical liens or claims, including any applicable Indirect Derivative Talc Personal Injury Claims (other than liens or claims asserted by Settling Third-Party Payors in respect of Individual Claims of the Specified Insured Individuals) arising from or related to any Individual Claims, with the goal of negotiating the satisfaction of any such liens or claims as to each Allowed Claim by the time the Talc Trustees have finalized the relevant Allowed Claim Amount. The Lien Resolution Administrator will be responsible for the satisfaction of any and all such known and valid medical liens and claims, including TPP Lien Claims, and Indirect Derivative Talc Personal Injury Claims arising from or related to each Allowed Claim from the Talc Personal Injury TPP Lien Claims Sub-Trust Funds or Allowed Claim Amounts being held in the segregated accounts referenced above. The Lien Resolution Administrator will provide written verification of the same to the Talc Trustees and the Guarantor prior to distributing the remaining portion of the Allowed Claim Amount to the relevant Individual Claimant and/or his/her counsel. Neither the Debtor, the Reorganized Debtor, the Guarantor, nor any LTL Corporate Party will bear any responsibility for payment of any Individual Claimant's liens.

(c)     *Individual Claims Allowance Process*

(1)     Recovery Only With Respect to a Single Individual Claim

An Individual Claimant may assert no more than one Individual Claim to the Talc Personal Injury Trust, and may recover only in respect of such Individual Claim from the Talc Personal Injury Trust, based on the Individual Claim asserted at the time he/she submitted the claim to the Talc Personal Injury Trust. For the avoidance of doubt, after submitting his/her claim to the Talc Personal Injury Trust, an Individual Claimant may not allege or seek to assert an additional or different Individual Claim, with the exception that an Individual Claimant may at any time after the date his/her Individual Claim was submitted to the Talc Personal Injury Trust, but before disallowance or payment of such Individual Claim, as applicable, request that

his/her Individual Claim be processed pursuant to the Accelerated Evaluation Process, as set forth in Section 4.4.5 of the Trust Distribution Procedures.

Individual Claims properly deferred pursuant to Section 4.3.3 of the Trust Distribution Procedures will be evaluated based on the date of the conclusion of the deferral period.

(2)     Treatment of Individual Claims Previously Resolved

Individual Claims Previously Settled but Unpaid.  If, prior to October 14, 2021, (i) an Individual Claimant submitted his/her Individual Claim to the Debtor and/or any LTL Corporate Party for settlement consideration, and thereafter (ii) reached an agreement with the Debtor and/or any LTL Corporate Party to settle said Individual Claim at an amount certain, but (iii) the Debtor and/or any LTL Corporate Party were unable to process the related transfer of settlement funds before October 14, 2021, then such Individual Claimant may choose to either: (a) submit his/her Individual Claim to the Talc Personal Injury Trust for evaluation pursuant to the procedures set forth in the Trust Distribution Procedures; or (b) agree to accept the amount certain that was previously agreed upon to settle his/her claim.   In the event that an Individual Claim is submitted to the Talc Personal Injury Trust pursuant to Section 4.1.2(A) of the Trust Distribution Procedures, the prior settlement agreement shall be immediately deemed null and void and relevant Individual Claimant's right to recover pursuant to such prior agreement waived.

Individual Claims Previously Settled and Paid.  Except as otherwise expressly provided in Section 4.1.2(A) or Section 4.1.2(C) of the Trust Distribution Procedures, any Individual Claimant who previously (i) reached a settlement with the Debtor or any LTL Corporate Party related to an Individual Claim, (ii) settled in principle subject to a prepetition master settlement agreement ("**MSA**"), (iii) submitted a release, or (iv) received payment with respect to his/her Individual Claim may not receive any payment from the Talc Personal Injury Trust.  Further, any Individual Claim being submitted on behalf of or derivative of a previously released Individual Claimant, including any Indirect Derivative Talc Personal Injury Claim, may not receive any payment from the Talc Personal Injury Trust. As part of the establishment of the Talc Personal Injury Trust, the Debtor will provide the Talc Personal Injury Trust and the Talc Trustees with a list of all Individual Claimants subject to Section 4.1.2(B) of the Trust Distribution Procedures, their Identifying Information, and basic settlement information.

Individual Claims Subject to Pending MSA Determination. If, prior to October 14, 2021, (i) an Individual Claimant submitted his/her Individual Claim to the Debtor and/or any LTL Corporate Party for settlement consideration, (ii) such Individual Claim is subject to an MSA, but (iii) a determination as to whether said Individual Claim qualifies for a settlement has not yet been made (a "Pending MSA Determination"), then such Individual Claimant may not submit his/her Individual Claim for valuation pursuant to the Trust Distribution Procedures until such Pending MSA Determination is made.  Individual Claims that are subject to a Pending MSA Determination and satisfy clauses (i) and (ii) of this paragraph will be tolled pursuant to Section 4.2.2(C)(i) of the Trust Distribution Procedures.

If, following a Pending MSA Determination, an Individual Claim is determined to satisfy the qualification criteria set forth in the relevant MSA (regardless of whether such Individual

Claim has received his/her final allocation pursuant to the MSA), then such Individual Claim is subject to Section 4.1.2(A) of the Trust Distribution Procedures, unless such MSA requires that such Individual Claim receive distributions from a qualified settlement fund.  However, if, following a Pending MSA Determination, the Individual Claim is rejected as ineligible for settlement under the relevant MSA, then such Individual Claim is subject to Section 4.1.2(D) of the Trust Distribution Procedures.

Individual Claims Previously Rejected or Dismissed.  Any individual who filed an Individual Claim in any state or federal court prior to October 14, 2021, which was thereafter dismissed with prejudice will not be eligible to recover any payment whatsoever from the Talc Personal Injury Trust.

Individual Claims that were filed before October 14, 2021, and thereafter either (i) dismissed without prejudice or (ii) rejected as ineligible under an MSA may be submitted to the Talc Personal Injury Trust for evaluation pursuant to the Trust Distribution Procedures, but will be subject to heightened scrutiny by the Talc Trustees and the Claims Administrator during their evaluation.  For the avoidance of doubt, such Individual Claimant must submit his/her Individual Claim to the Talc Personal Injury Trust for evaluation pursuant to the procedures set forth in the Trust Distribution Procedures, just as any other Individual Claimant not subject to Section 4.1.2 of the Trust Distribution Procedures.  Failure to submit such an Individual Claim to the Talc Personal Injury Trust in accordance with the submission deadline and Submission Procedures in Sections 4.2 and 4.3 of the Trust Distribution Procedures, respectively, will result in disallowance of such Individual Claim.

Individual Claims Otherwise Subject to Final Judgment.  Any individual who filed an Individual Claim in any state or federal court, and whose Individual Claim was adjudicated and resulted in a final unfavorable judgment (*e.g.*, a defense verdict) will not be eligible to recover any payment whatsoever from the Talc Personal Injury Trust.

(3)      Submission Deadlines

Deadline to Submit Existing Claims to Talc Personal Injury Trust.  Existing Claimants must submit their Individual Claims to the Talc Personal Injury Trust within one-hundred twenty (120) days of the Talc Personal Injury Trust's distribution of its rules and Submission Procedures.  If an Individual Claimant fails to submit his/her Existing Claim or seek a deferral pursuant to Section 4.3.3 of the Trust Distribution Procedures within this time period, such Individual Claimant will be deemed to have waived the right to submit his/her Existing Claim or otherwise seek compensation from the Talc Personal Injury Trust.

(4)      Withdrawal of Submitted Claims

An Individual Claimant may, at any time after submitting his/her Individual Claim to the Talc Personal Injury Trust, withdraw his/her Submitted Claim, by providing written notice to the Talc Personal Injury Trust.  The related Individual Claimant will retain the right to file a new Individual Claim after withdrawal of the first; however, any such subsequent Claim Submission will be evaluated the same as a new Claim Submission and otherwise unrelated to the first, except that (i) it shall be subject to heightened scrutiny by Claim Administrator, Claim

Processor, and Trustees, and (ii) the Individual Claimant's place in the FIFO Processing Queue will be determined only based on the most recent date that the Individual Claim was submitted to the Talc Personal Injury Trust (*i.e.*, the Individual Claim is moved to the end of the queue). For the avoidance of doubt, the one hundred and twenty (120) day deadline to submit an Existing Claim pursuant to Section 4.2.1 of the Trust Distribution Procedures will apply to any Individual Claim submitted by the Individual Claimant, including a Submitted Claim that was previously withdrawn.

(5)    Deferral of Submitted Claims

An Individual Claimant also may request that the Talc Personal Injury Trust defer processing his/her Submitted Claim for up to three (3) years (a "Deferral Request") so long as the Deferral Request is made (i) in writing pursuant to any procedures adopted by the Talc Personal Injury Trust for such requests, and (ii) before the date the Talc Trustees provide notice to the Individual Claimant either that his/her Submitted Claim is being disallowed, or that the Submitted Claim is an Allowed Claim and of the Scheduled Value proposed by the Claims Administrator. For the avoidance of doubt, an Individual Claimant may make only one Deferral Request.

The Talc Personal Injury Trust ~~Distribution Procedures establish a schedule of different compensable cancers, all of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria") and, based on the circumstances surrounding the claims, will be valued on the basis of an initial point value (the "Initial Point Values"), which is then subject to potential adjustment factors (the "Point Value Adjustment Factors") and caps on their liquidated values ("Maximum Values"). The Medical/Exposure Criteria, Initial Point Values, Point Value Adjustment Factors, and Maximum Values have all been selected and derived with the intention of achieving a fair allocation of the Talc Personal Injury Trust funds as among claimants suffering from different disease processes in light of the best available information. The Talc Personal Injury Trust was established with the goal of achieving a point value of one dollar ($1) per point and the Debtor believes that the Initial Point Value will be between fifty cents ($0.50) and two dollars ($2) per point~~ will approve any properly submitted Deferral Request; however, the Talc Personal Injury Trust may only defer a Submitted Claim for a maximum of three (3) years from the date the Individual Claim was originally submitted to the Talc Personal Injury Trust, without such deferral affecting the status of the Submitted Claim for statute of limitations or repose purposes. Any Individual Claimant who makes a Deferral Request will retain his/her original place in the applicable FIFO Processing Queue only until the earliest of (i) his/her written request that the Talc Personal Injury Trust end the deferral and proceed with processing the relevant Individual Claim, (ii) the expiration of the deferral, or (iii) three (3) years after the date the deferred Individual Claim was originally submitted to the Talc Personal Injury Trust.

(6)    Submission Requirements

Any Individual Claimant who wishes to submit his/her respective Individual Claim to the Talc Personal Injury Trust must satisfy the following applicable requirements with respect to the information and documentation required to prove that the Individual Claim should be processed pursuant to the Trust Distribution Procedures. Regardless of the type of treatment sought, every

Individual Claimant seeking compensation from the Talc Personal Injury Trust must include the following at the time of submission (the "**Submission Requirements**"):

A)      Citizenship/Residency: Proof that the Individual Claimant (and, to any extent applicable, the minor, deceased, or incapacitated individual represented by such Individual Claimant) is a United States citizen, a lawful permanent resident of the United States (or otherwise lawfully residing in the United States), or a Canadian citizen;

B)      Claimant Information: All claimant information required under the Submission Procedures adopted by the Talc Personal Injury Trust (the "Claimant Information"), including the Individual Claimant's Identifying Information;

C)      Proof of Claim: A properly completed Form 410 (the "Proof of Claim"), which shall include complete information for where notices to the creditor should be sent, and where payments to the creditor should be sent (including if such payments should be sent directly to counsel for the claimant).  If there is any conflict between the Proof of Claim and the Claim Submission Form the Proof of Claim shall control;

D)      Claim Submission Form: A properly completed Claim Submission Form (the template for which shall be attached to the Submission Procedures adopted by the Talc Personal Injury Trust);

E)      Retention Agreement: To the extent the Individual Claimant is represented by counsel, a copy of the related retention agreement;

F)      Talc Use Evidence: A sworn affidavit or other testimony establishing the Individual Claimant's use, and extent of use, of any and all talc and talc-containing products (including both J&J Talc Products and Non-J&J Talc Products);

G)      Lack of Asbestos Exposure: In the case of a Mesothelioma Claim a sworn affidavit asserting the Mesothelioma Claimant (i) has not alleged any prior asbestos exposure unrelated to use of talc-based products as the basis of a mesothelioma claim he/she has previously asserted against a separate asbestos trust or asbestos tort defendant and (ii) does not, and will not in the future, allege any prior asbestos exposure unrelated to use of talc-based products that may form the basis of a mesothelioma claim he/she may assert against a separate asbestos trust or asbestos tort defendant; and

H)      Medical Evidence: Medical records that the Individual Claimant reasonably believes is sufficient to (i) satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to the Trust Distribution Procedures, and (ii) provide the Claims Administrator with all information

necessary to accurately determine the appropriate Scheduled Value and Allowed Claim Amount.

While the precise extent of medical records required by the above Submission Requirements may vary from claim to claim, as well as generally, depending on the particular types of Individual Claims involved, diseases alleged, and other factors relevant to the valuation of Individual Claims pursuant to the Trust Distribution Procedures, in general, production of all pathology reports and contemporaneous treatment records, along with records sufficient to establish an Individual Claimant's relevant medical history, would be satisfactory for any Individual Claimant regardless of the type of Individual Claim asserted or Evaluation Track elected.

Notwithstanding the foregoing, in the event that the Medical Evidence submitted is deemed insufficient by the Claims Administrator to establish an Individual Claimant's relevant medical history, the Individual Claimant may submit an affidavit from his/her counsel attesting, under the pains and penalties of perjury, to the fact that all available relevant documentation has been submitted, which affidavit must show proof of the Individual Claimant's MyChart or similar patient portal. The Claims Administrator will have the sole discretion to determine whether such affidavit is sufficient to resolve the deficiency as to the Medical Evidence submitted. However, Medical Evidence that does not include either a pathology report related to the Individual Claimant's alleged disease or, for Ovarian Cancer Claims only, the Individual Claimant's treating physician's detailed report as to the Individual Claimant's pathologic diagnosis will not be deemed satisfactory evidence to establish a Qualifying Claim. Individual Claimants who are unable to satisfy these requirements may, however, still be eligible to proceed under the Accelerated Evaluation Process.

Individual Claims that are substantially complete at the time of submission will be deemed Submitted Claims and be subjected to the Preliminary Evaluation Process set forth below.

(7)    Disallowed Claims

In the event that an Individual Claimant submits materials that are insufficient (as determined by the Claims Administrator) to satisfy the Submission Requirements, the Talc Trustees will provide notice of each deficiency to such Individual Claimant and automatically defer the related Submitted Claim for sixty (60) days, to ensure the Individual Claimant a fair opportunity to cure any such deficiencies. If the Individual Claimant fails to either timely supplement his/her Submitted Claim with materials sufficient to resolve any deficiencies identified, or timely respond to the deficiency notice requesting further relief, upon expiration of such sixty (60)-day period, the Submitted Claim at issue will become a Disallowed Claim and the Talc Trustees will send a Disallowed Claim Notice to the relevant Individual Claimant.

If the Submitted Claim becomes a Disallowed Claim, the Talc Trustees will not conduct a Preliminary Evaluation of such Submitted Claim as described in Section 4.4.2 of the Trust Distribution Procedures. Individual Claimants will have the ability to seek reconsideration of

the Talc Trustees' determination set forth in the Disallowed Claim Notice as described in Article 6 of the Trust Distribution Procedures.

(8)     Preliminary Evaluation of Claim Submission

Within sixty (60) days of each Individual Claim being deemed a Submitted Claim, the Claims Administrator will conduct a Preliminary Evaluation of the related Claim Submission to determine whether:

A)      the Submitted Claim was timely submitted to the Talc Personal Injury Trust pursuant to Section 4.2 of the Trust Distribution Procedures;

B)      the Submitted Claim has not previously been submitted to the Talc Personal Injury Trust pursuant to the Trust Distribution Procedures or otherwise (except for Individual Claims that were submitted and later formally withdrawn pursuant to Section 4.3.2 of the Trust Distribution Procedures);

C)      the Submitted Claim had not previously been resolved through litigation and/or settlement involving a Protected Party, other than Individual Claims that have previously been resolved in any manner described in Section 4.1.2(A) of the Trust Distribution Procedures; and

D)      the Individual Claimant's Proof of Claim and Claim Submission are substantially and substantively completed and signed under penalty of perjury.

Submitted Claims that satisfy the Preliminary Evaluation Criteria, which are set forth above, will be deemed Confirmed Claims and thereafter routed to either the Standard Qualification Evaluation Process or the Accelerated Evaluation Process, as elected by the Individual Claimant in his/her Claim Submission.  A Submitted Claim that fails to satisfy one or more of the Preliminary Evaluation Criteria will become a Disallowed Claim and the Talc Trustees will provide a Disallowed Claim Notice to the relevant Individual Claimant.

(9)     General Principles for Evaluation of Confirmed Claims

For each Confirmed Claim, the Claims Administrator will, in conjunction with the Claims Processor, individually evaluate the related Claim Submission pursuant to the Individual Claimant's selected Evaluation Track to determine whether the Individual Claim should be an Allowed Claim.  Regardless of the Evaluation Track selected, this process will involve (i) a thorough review and consideration of all the submitted Claim Materials, (ii) a full evaluation and determination as to the credibility of such evidence, and (iii) determination as to whether such evidence satisfies the substantive criteria for the applicable Evaluation Track.

If the Claims Administrator verifies that a Confirmed Claim (i) satisfies the applicable substantive criteria as set forth in Section 4.4.3 of the Trust Distribution Procedures and (ii) the related Claim Materials are not deceptive or fraudulent, then the Confirmed Claim will be deemed an Allowed Claim.  If, on the other hand, the Claims Administrator verifies that (i) the

relevant Claim Materials are not deceptive or fraudulent, but (ii) the Confirmed Claim does not satisfy the applicable substantive criteria, then the Claims Administrator has the discretion to either (a) make the Confirmed Claim a Disallowed Claim, in which case the Talc Trustees will provide a Disallowed Claim Notice to the relevant Individual Claimant, or (b) request, in writing, that supplemental evidence sufficient to resolve the deficiency from the Individual Claimant in question be submitted within thirty (30) days of the Claims Administrator making such request.  The deadline to provide such supplemental evidence may be automatically extended for an additional thirty (30) days upon written notice by the Individual Claimant to the Claims Administrator.  Additional extensions of time to produce requested supplemented evidence may be requested upon written request by the Individual Claimant to the Claims Administrator, who retains full discretion to either grant or deny such request.  If such supplemental evidence is not received by the Claims Administrator prior to the expiration of the thirty (30)-day period (as extended, if applicable), the Confirmed Claim will become a Disallowed Claim and the Talc Trustees will provide a Disallowed Claim Notice to the relevant Individual Claimant.

In the event, however, that the Claims Administrator determines that any portion of the Claim Materials are deceptive or include fraudulent information (each, a "**Fraudulent Claim Submission**"), then such Individual Claim will become a Disallowed Claim, and the Talc Trustees will provide a Disallowed Claim Notice to the relevant Individual Claimant (each a "**Fraudulent Claimant**").  Further, if the Talc Personal Injury Trust determines that any individual attorney or firm is continually representing Fraudulent Claimants and submitting Fraudulent Claim Submissions to the Talc Personal Injury Trust, the Talc Trustees have the discretion to subject the Individual Claims of other Individual Claimants who share the same counsel as a prior Fraudulent Claimant (to the extent such counsel represents other Individual Claimants who have submitted, or in the future submit, their Individual Claims to the Talc Personal Injury Trust) to heightened scrutiny, so long as any such other Individual Claimants are not otherwise prejudiced with respect to the processing of their Claim Submissions and/or the payment (including the timing of payment) of any Qualifying Claims.

Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a Fraudulent Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in any federal court of competent jurisdiction.

(10)    Standard Qualification Evaluation Process

For each Confirmed Claim electing to proceed under the Standard Qualification Evaluation Process, the Claims Administrator will, in conjunction with the Claims Processor, thoroughly review and evaluate the related Claim Submission to determine whether either the Ovarian Cancer Qualification Criteria or the Mesothelioma Qualification Criteria, as applicable, are satisfied.  If, in undertaking the Standard Qualification Evaluation Process, the Claims Administrator determines that a Confirmed Claim satisfies the applicable Qualification Criteria, then such claim will be deemed an Allowed Claim and may proceed to the valuation processes set forth in the Trust Distribution Procedures.  Individual Claimants who do not satisfy the applicable Qualification Criteria are non-qualifying claims under the Trust Distribution

Procedures and will become a Disallowed Claim, and the Talc Trustees will provide a Disallowed Claim Notice to the relevant Individual Claimants.

(11)   Ovarian Cancer Qualification Criteria

Individual Claimants who submit to the Talc Personal Injury Trust an Ovarian Cancer Claim and satisfy the following three (3) Ovarian Cancer Qualification Criteria will be deemed Qualifying Ovarian Cancer Claimants.  Ovarian Cancer Claims that fail to satisfy these criteria are non-qualifying claims under the Trust Distribution Procedures and will be Disallowed Claims.

A)   Proof of Regular Perineal Use of J&J Talc Products: the Individual Claimant establishes Regular Use of J&J Talc Products in her perineal area after puberty, and proves as much via sworn testimony or affidavit, including the alleged dates of first and last use;

B)   Proof of Injury: the Individual Claimant was newly diagnosed with a Ovarian Cancer at least ten (10) years following her first post-pubertal perineal use of J&J Talc Products; and

C)   Timeliness: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2 of the Trust Distribution Procedures.

(12)   Mesothelioma Qualification Criteria

Individual Claimants who submit to the Talc Personal Injury Trust a Mesothelioma Claim and satisfy the following four (4) Mesothelioma Qualification Criteria will be deemed Qualifying Mesothelioma Claimants.  Mesothelioma Claims that fail to satisfy these criteria are non-qualifying claims under the Trust Distribution Procedures and will be Disallowed Claims.

A)   Proof of Regular Use of J&J Talc Products: the Individual Claimant establishes Regular Use of J&J Talc Products on his/her own body, and proves as much via sworn testimony or affidavit;

B)   Lack of Asbestos Exposure: the Individual Claimant (i) has not alleged any prior asbestos exposure unrelated to use of talc-based products as the basis of a mesothelioma claim he/she has previously asserted against a separate asbestos trust or asbestos tort defendant and (ii) does not, and will not in the future, allege any prior asbestos exposure unrelated to use of talc-based products that may form the basis of a mesothelioma claim he/she may assert against a separate asbestos trust or asbestos tort defendant;

C)   Proof of Injury: the Individual Claimant was newly diagnosed with Mesothelioma at least ten (10) years following his/her first use of J&J Talc Products; and

D)    Timeliness: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2 of the Trust Distribution Procedures.

(13)    Accelerated Evaluation Process

For each Confirmed Claim electing to proceed under the Accelerated Evaluation Process, the Claims Administrator will, in conjunction with the Claims Processor and with a focus on efficiency, review and evaluate the related Claim Submission to determine whether the Accelerated Evaluation Criteria are satisfied.  If in doing so the Claims Administrator determines that a Confirmed Claim satisfies the Accelerated Criteria, then such claim shall be deemed an Allowed Claim and the Settlement Trust will promptly issue payment of the applicable Scheduled Value under Section 5.3 of the Trust Distribution Procedures.

An Individual Claimant who initially elected on his/her Claim Submission to have his/her claim evaluated pursuant to the Standard Qualification Evaluation Process set forth in Section 4.4.4 of the Trust Distribution Procedures may, at any time after the date his/her Individual Claim was submitted to the Talc Personal Injury Trust, but before such Individual Claim becomes a Disallowed Claim or is paid, as applicable, request to have his/her Individual Claim evaluated under the Accelerated Evaluation Process in Section 4.4.5 of the Trust Distribution Procedures instead.

(14)    Accelerated Claims Criteria

Individual Claimants who submit an Other Talc Claim to the Talc Personal Injury Trust or elect to have their Mesothelioma Claim or Ovarian Cancer Claim, as applicable, evaluated through the Accelerated Evaluation Process and satisfy the following four (4) Accelerated Claims Criteria shall be deemed Other Approved Claimants:

A)    Proof of Regular Use of J&J Talc Products: the Individual Claimant establishes Regular Use of J&J Talc Products, and proves as much via sworn testimony or affidavit;

B)    Lack of Asbestos Exposure: the Individual Claimant (i) has not alleged any prior asbestos exposure unrelated to use of talc-based products as the basis of a mesothelioma claim he/she has previously asserted against a separate asbestos trust or asbestos tort defendant and (ii) does not, and will not in the future, allege any prior asbestos exposure unrelated to use of talc-based products that may form the basis of a mesothelioma claim he/she may assert against a separate asbestos trust or asbestos tort defendant;

C)    Proof of Injury: the Individual Claimant was newly diagnosed with a Gynecological Cancer, Ovarian Cancer, or Mesothelioma at least ten years following his/her first use of J&J Talc Products; and

D) Timeliness: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2 of the Trust Distribution Procedures.

 (d) *Valuation of Allowed Claims*

The Claims Administrator, in conjunction with the Claims Processor, will identify and utilize the appropriate multi-stage valuation process, as described in Article 5 of the Trust Distribution Procedures, to determine the Scheduled Value for every Allowed Claim under the Trust Distribution Procedures.  These valuation processes are intended to be a direct continuation of the resolution process for Individual Claimants, immediately upon determination of allowance pursuant to the Standard Qualification Evaluation Process or the Accelerated Evaluation Process.  Promptly after determination of each Allowed Claim's Scheduled Value, the Talc Trustees will notify the related Individual Claimant in writing of (i) the determination that his/her Individual Claim is an Allowed Claims (*i.e.*, either a Qualifying Claim or Other Approved Claim), (ii) the Scheduled Value determined as to the same pursuant to Sections 5.2 and 5.3 of the Trust Distribution Procedures, and (iii) the proposed Allowed Claim Amount (each a "Scheduled Value Notice").

 (1) Determination of Scheduled Values for Qualifying Claims

Qualifying Ovarian Cancer Claims.  Upon determination that an Ovarian Cancer Claim submitted to the Talc Personal Injury Trust is a Qualifying Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following seven (7) stage valuation process for any such Ovarian Cancer Claim that elected evaluation under the Standard Qualification Evaluation Process.  This process requires the Claims Administrator:

  A) To identify the Initial Point Value based on the Individual Claimant's age at diagnosis and specific category of injury; then

  B) To establish the Adjusted Point Value based on the Initial Point Value and the Diagnostic Adjustment as determined by the disease subtypes; then

  C) To further adjust that Point Value based on the length of Regular Use of J&J Talc Products; then

  D) To further adjust that Point Value based on the length of time between the end of the Individual Claimant's Regular Use and the relevant date of diagnosis; then

  E) To further adjust that Point Value based on less-than-Regular Use of J&J Talc Products, if applicable; then

  F) To further adjust that Point Value by a certain percentage discount based on the existence of certain risk factors, if applicable; and finally

NAI-1537329582v1 1537329582

G)    To further adjust the resulting Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable.

Gynecologic Claims other than Ovarian Cancer claims will only be eligible to receive amounts based on the Accelerated Evaluation Process in Section 5.3.3 of the Trust Distribution Procedures.

Qualifying Mesothelioma Claims.    Upon determination that an Individual Claim submitted to the Talc Personal Injury Trust is a Qualifying Mesothelioma Claim, the Claims Administrator, in conjunction with the Claims Processor, will undertake the following five (5) stage valuation process for any such Mesothelioma Claim that elected evaluation under the Standard Qualification Evaluation Process.  This process requires the Claims Administrator:

A)    To identify the Initial Point Value based on the Individual Claimant's age at diagnosis; then

B)    To establish the Adjusted Point Value based on the Initial Point Value and the Diagnostic Adjustment as determined by the disease subtypes; then

C)    To further adjust that Point Value based on length of use of J&J Talc Products; then

D)    To further adjust that Point Value based on the non-regular use of J&J Talc Products, if applicable; and finally

E)    To further adjust that Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable.

(2)    Allowed Claim Amounts for Approved Accelerated Claims

Upon determination that an Individual Claim submitted to the Talc Personal Injury Trust is an Other Approved Claim, the Claims Administrator, in conjunction with the Claims Processor, will determine the Allowed Claim Amount for any such Other Approved Claim, as follows:

A)    Individual Claims Which Could Have Appropriately Elected to Proceed Under the Standard Qualification Evaluation Process.  If an Individual Claimant could have appropriately elected to submit his/her Individual Claim to the Talc Personal Injury Trust pursuant to the Standard Qualification Evaluation Process, but for whatever reason chose instead to elect the Accelerated Evaluation Process, the resulting Other Approved Claim shall have an Allowed Claim Amount of one thousand dollars and zero cents ($1,000.00).

B)    Canadian Claims.  Other Approved Claims that involve an Individual Claimant who is not a citizen or legal permanent resident of the United States, but who is a citizen or legal permanent resident of Canada,

shall have an Allowed Claim Amount of five hundred dollars and zero cents ($500.00).

C)    Other Allegedly Talc-Related Diseases.  Other Individual Claims that become Other Approved Claims shall have an Allowed Claim Amount of one thousand dollars and zero cents ($1,000.00).

(e)    *Reconsideration Requests and ADR Procedures*

(1)    Reconsideration of Determination

An Individual Claimant may submit a request to the Talc Personal Injury Trust that the Talc Trustees reconsider any initial determination (a "Reconsideration Request"), as indicated by the Disallowed Claim Notice or Scheduled Value Notice, as applicable, (i) that the Individual Claimant's Submitted Claim is a Disallowed Claim (regardless of the stage of the resolution process pursuant to the Trust Distribution Procedures that this determination occurred), or (ii) of the applicable Scheduled Value for the relevant Allowed Claim.  For a Reconsideration Request to be considered, it must be made pursuant to process described in the Submission Procedures adopted and published by the Talc Personal Injury Trust.   Each properly submitted Reconsideration Request must include:

A)    A completed Reconsideration Request form, the template for which shall be designed and adopted by the Talc Trustees and included as an Exhibit to the Submission Procedures;

B)    Payment of five hundred dollars ($500) as an administrative reconsideration fee, in the form of either check, money order, or via any electronic payment process deemed acceptable by the Talc Trustees; and

C)    At the requesting Individual Claimant's discretion, further evidence in support of the relevant Submitted Claim.

(2)    Reconsideration Request Procedures

Upon receipt of a properly submitted Reconsideration Request, the Talc Trustees will proceed with an independent evaluation of the Individual Claim and specific determination in question.  The Talc Trustees will have the sole discretion whether to grant the Reconsideration Request.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Talc Trustees will provide written notice within thirty (30) days of receiving the Reconsideration Request that it will not reconsider the specific determination in question.  The Individual Claimant will retain the ability to pursue his/her Individual Claim in mediation or litigation pursuant to the ADR Procedures and Litigation procedures set forth below in Sections 6.2 and 6.3 of the Trust Distribution Procedures, respectively.

If the Reconsideration Request is granted, the Talc Trustees will provide written notice to the Individual Claimant within thirty (30) days of receiving the Reconsideration Request that

110

they are reconsidering his/her Individual Claim.  The Talc Trustees will then reconsider the Individual Claim—including all new information provided by the Individual Claimant in the Reconsideration Request—and will have the discretion to maintain or revise the original determination or, alternatively to request supplemental information and/or materials necessary to reach a final conclusion.  The Talc Trustees will use their best efforts to notify the Individual Claimant of their decision to affirm or revise the original determination within sixty (60) days of having sent notice that they were reconsidering the Individual Claim.

To the extent that the Talc Trustees determine that a Submitted Claim is, upon reconsideration, an Allowed Claim or should receive a higher proposed Scheduled Value, the Talc Trustees shall provide a Scheduled Value Notice and return the administrative fee to the Individual Claimant.  If, however, the Talc Trustees decide that no change to the original determination is warranted, that the Allowed Claim should receive a lower proposed Scheduled Value, or that insufficient information was provided by the Individual Claimant to reach a different conclusion at the time, then the administrative fee shall not be returned and the earlier allowance determination and/or Scheduled Value shall stand and the Talc Trustees will provide written notice thereof within sixty (60) days of the Talc Personal Injury Trust having sent notice that it is reconsidering the Individual Claim.

(3)     ADR Procedures

If (i) a Reconsideration Request is denied or (ii) the Individual Claimant remains unsatisfied with the Talc Trustees' determination upon reconsideration, then the Individual Claimant may elect to proceed to mediation by providing written notice to the Claims Administrator within thirty (30) days of completion of the procedures set forth in Section 6.1.4 of the Trust Distribution Procedures.  If the Individual Claimant does not provide such written notice requesting mediation, then the Disallowed Claim Notice or Scheduled Value Notice shall stand.

The Talc Trustees shall maintain a list of approved mediators, which shall be made available to all Individual Claimants who submit their Individual Claims to the Talc Personal Injury Trust.  The Claims Administrator and the Individual Claimant shall jointly choose a mediator (the "Mediator") from the list maintained by the Talc Trustees.  If the Claims Administrator and the Individual Claimant are unable to reach agreement regarding the Mediator, the TAC shall select one from the list maintained by the Talc Trustees.

The Mediator will work with the Claims Administrator and the Individual Claimant to reach a settlement of the Individual Claim that is mutually acceptable to both parties; provided, however, that the settlement amount may not exceed the Maximum Value of the Individual Claim.  The Mediator shall not have the authority to unilaterally impose a settlement upon the parties.  The Individual Claimant and Claims Administrator shall split the fees and expenses incurred by the Mediator equally; provided, that the Individual Claimant's share of the Mediator's fees and expenses shall be capped at $2,500.  The parties shall otherwise bear their own costs, including legal fees.

If the mediation results in a settlement agreement, the agreed upon amount shall constitute the Individual Claimant's Allowed Claim and payment of such Allowed Claim shall be

processed in the same manner as payments made to Individual Claimants who accept the Claims Administrator's original Scheduled Value determined and proposed for their Allowed Claims, pursuant to Article 5 of the Trust Distribution Procedures.  If the mediation concludes with no settlement, the Mediator will formally conclude mediated discussions and the Individual Claimant may proceed to litigation pursuant to Section 6.3 of the Trust Distribution Procedures.

(4)    Litigation

An Individual Claimant who has exhausted his or her rights pursuant to Sections 6.1 and 6.2 of the Trust Distribution Procedures will retain the right to institute a lawsuit in the tort system against the Talc Personal Injury Trust in the Claimant's Jurisdiction.  Such lawsuit may not name the Debtor, any LTL Corporate Party, or any other Protected Party and must only be filed against the Talc Personal Injury Trust as defendant.  Any such lawsuit must be filed by the Individual Claimant in his/her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.

An Individual Claimant seeking to commence litigation pursuant to Section 6.3 of the Trust Distribution Procedures must notify the Talc Personal Injury Trust of his/her intention to seek judicial review within thirty (30) days of receiving notice of the Talc Personal Injury Trust's determination following the conclusion of ADR Procedures pursuant to Section 6.2 of the Trust Distribution Procedures.  Individual Claimants (i) who seek judicial review of the Talc Personal Injury Trust's determination of the Scheduled Value must pay a fee of $2,500 to the Talc Personal Injury Trust, and (ii) who seek judicial review of the Talc Personal Injury Trust's determination of the Individual Claim is a Disallowed Claim must pay a fee of $10,000 to the Talc Personal Injury Trust.

Both the Individual Claimant and the Talc Personal Injury Trust will have all appropriate defenses available to them (including, with respect to the Talc Personal Injury Trust, all defenses which could have been asserted by any Protected Party).  Further, the Talc Personal Injury Trust may use any and all information and/or materials submitted to the Talc Personal Injury Trust by the Individual Claimant in its defense of any lawsuit in the tort system, including evidence of deceptive or fraudulent behavior.  In the event that the Individual Claimant does not prevail at trial or prevails but is awarded a judgment less than the Allowed Claim Amount offered by the Talc Personal Injury Trust, the final Allowed Claim Amount will be reduced on a dollar-for-dollar basis by all costs the Talc Personal Injury Trust incurred in defending against the Individual Claimant's lawsuit, including costs associated with retention of experts, if any; provided that such dollar-for-dollar reduction shall not exceed the Allowed Claim Amount, if applicable.

At any time during the course of a lawsuit pursued under Section 6.3 of the Trust Distribution Procedures the Individual Claimant and Talc Trustees and/or Claims Administrator may agree to engage in settlement discussions or any mutually agreeable alternative dispute resolution procedure, including mediation or arbitration.  The Talc Trustees will have authority to settle such lawsuits in the exercise of their business judgement and such settlements may include, among other things, the waiver of attorney fees that may otherwise be due pursuant to

the preceding paragraph.  However, the settlement amount of such settlement agreement may not exceed the Maximum Value of the Individual Claim.

In the event an Individual Claimant elects to pursue a lawsuit pursuant to Section 6.3 of the Trust Distribution Procedures that results, after waiver and/or exhaustion of any party's rights of appeal, in a final judgment for monetary damages, then such Individual Claimant will be eligible to receive payment of the portion of such judgment that constitutes compensatory damages (the "Judgment Amount") through the Talc Personal Injury Trust, up to the Maximum Judgment Amount (the "Allowed Judgment Amount"). Payment of the Allowed Judgment Amount will be processed in the same manner as payments made to Individual Claimants who accepted the Claims Administrator's original Scheduled Value determined and proposed for their Allowed Claims, pursuant to Article 5 of the Trust Distribution Procedures, except that upon reaching the front of the FIFO Processing Queue, the Settlement Trust shall distribute to the Individual Claimant only an initial payment equal to Talc Personal Injury Trust's last offer, if any, to the Individual Claimant (provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system).  The balance of the judgment, up to the Allowed Judgment Amount for the Individual Claim, if any, shall be paid to the Individual Claimant in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment.  Under no circumstances shall any non-compensatory monetary damages or any interest be paid under any statute on any judgments obtained in the tort system.

(f)    *Individual Claims Payment Process*

(1)    Points-Based Monetary Values

Uncertainty of Debtor's Talc Liabilities.  Litigation arising from the use of talc or talc-containing products is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtor's total talc-related liabilities.  As a result of this uncertainty, in undertaking to ensure substantially equitable treatment of all similar Existing Claims and Future Claims, the Talc Trustees must from time to time determine the per-point dollar value of the points used to value Individual Claims under the Trust Distribution Procedures, *i.e.,* the Cash Value of a Point.

Description and Application of Points Valuation System.  Promptly after the Talc Personal Injury Trust is established, the Talc Trustees, in consultation with the Guarantor, TAC, and FCR will establish an initial Cash Value of a Point (the "Initial Cash Value of a Point"). This Initial Cash Value of a Point will be calculated on the basis of the initial trust claim submissions, an estimate of future submissions, and the claim valuation procedures outlined in the Trust Distribution Procedures.  Given the uncertainty associated with Individual Claims, and in recognition of the fact that the Talc Personal Injury Trust may increase the Cash Value of a Point in the future, the Talc Personal Injury Trust will take a conservative posture in setting the Initial Cash Value of a Point.

The totality of the Individual Claims to be paid over time pursuant to the Trust Distribution Procedures is not certain.  Further, there is also some uncertainty surrounding the value of the Talc Personal Injury Trust's assets in the future.  If the value of the Talc Personal Injury Trust's future assets increases materially and/or if the value or volume of Individual

Claims actually filed with the Talc Personal Injury Trust is materially lower than originally estimated, the Talc Personal Injury Trust will use the increase in Talc Personal Injury Trust assets available first to maintain the Cash Value of a Point then in effect.

Supplemental Payments Owed Due to Increases in the Cash Value of a Point. If the Talc Trustees, after consultation with the TAC determine that an increase to the Cash Value of a Point is warranted due to a material change in the estimates of the Talc Personal Injury Trust's future assets and/or liabilities, then the Talc Trustees will cause the Talc Personal Injury Trust to make supplemental payments to the Individual Claimants, subject to the terms set forth in the Trust Distribution Procedures, upon written notice of the increase to the Cash Value of a Point to all Individual Claimants and their counsel (each a "Cash Value of Point Adjustment Notice"). The amount of any supplemental payment will be the Scheduled Value of the Allowed Claim in question multiplied by the newly adjusted Cash Value of a Point, less the previous Allowed Claim Amount of the Allowed Claim. Checks issued by the Talc Personal Injury Trust in respect of any supplemental payments will be mailed to the last address the Individual Claimant provided to the Talc Personal Injury Trust for the Talc Personal Injury Trust to send payments, which address may be the Individual Claimant's attorney. Checks issued by the Talc Personal Injury Trust in respect of any supplemental payments will be null and void if not negotiated within 180 days after the date of issuance thereof. Thereafter, the amount represented by such voided check will irrevocably revert to the Talc Personal Injury Trust. Any Allowed Claim in respect of such voided check will be discharged and forever barred from assertion against the Talc Personal Injury Trust and the Individual Claimant shall not be entitled to any future payments from the Talc Personal Injury Trust.

Determination of Cash Value of a Point. The Talc Trustees will base their determination of the Cash Value of a Point on (i) current estimates as to the number, types, and Scheduled Values determined for Existing Claims and Future Claims, (ii) the value of the assets available to the Talc Personal Injury Trust for payment of Allowed Claims, (iii) all anticipated administrative and legal expenses, and any other matters that are reasonably likely to affect the sufficiency of funds to pay all Existing Claimants and Future Claimants based on the same application of the Trust Distribution Procedures methodology to all Individual Claimants and the points awarded to each Individual Claimant. When making these determinations, the Talc Trustees will evaluate all relevant factors to determine a conservative Cash Value of a Point with the goal of assuring that the Talc Personal Injury Trust will be able to treat all similar Existing Claims and Future Claims in substantially the same manner.

The Cash Value of a Point will be subject to change pursuant to the terms of the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement. The Talc Trustees will review the then-applicable Cash Value of a Point as it deems necessary to assure that it is based on accurate, current information, and will compare the liability forecast on which the then-applicable Cash Value of a Point was based with the actual claims submission and payment experience of the Talc Personal Injury Trust to date, and the projected assets of the Talc Personal Injury Trust on which the then-applicable Cash Value of a Point was based with the current assets, and any updated projections of asset values, of the Talc Personal Injury Trust and Future Claims. If the results of the comparisons call into question the ability of the Talc Personal Injury Trust to rely upon the current liability and asset forecasts, the Talc Trustees may, if necessary, propose a change in the Cash Value of a Point. Any adjustment to the Cash Value of a Point

114

Value must be made in consultation with the Guarantor, TAC, the FCR, and must be approved by the Bankruptcy Court.  In the event that adjustment of the Cash Value of a Point is approved, the Talc Personal Injury Trust will publicly disclose the approval and adjusted Cash Value of a Point on its website.

(2)    Payment of Claims

Allowed Claim Amounts Held in Escrow.  Promptly upon receipt of an Individual Claimant's properly executed Acceptance and Release, the Allowed Claim Amount for the released Allowed Claim will be set aside and held in escrow within the Settlement Trust pending the final resolution of various administrative issues involving the resolution of the Individual Claim including issues related to probate, guardianship, personal bankruptcy filings, lien resolution, and duplicate sign-ups.

Payment of Allowed Claims.  Once all applicable administrative issues related to an Individual Claimant's acceptance of his/her Allowed Claim Amount are resolved, the Talc Trustees will transfer to the Individual Claimant his/her Net Award Amount.  Alternatively, if an Individual Claimant elected to receive his/her distribution pursuant to the Trust Distribution Procedures through his/her retained counsel, then the Talc Trustees will transfer the Net Award Amount to the retained counsel identified on the Individual Claimant's Claim Submission Form.

For those Individual Claimants represented by counsel with respect to their Allowed Claims, the Talc Personal Injury Trust will only pay attorneys' fees or expenses to the attorneys and/or law firms named in the Individual Claimants' client retention agreements with their counsel.  For avoidance of doubt, no payments may be made to any attorney not specifically identified on such agreement.  Further, the Plan and the Trust Distribution Procedures do not contemplate any Common Benefit Fund Obligations in respect of Allowed Claim Amounts paid by the Talc Personal Injury Trust.  As such, no common benefit fees or costs will be deducted from Allowed Claim Amounts or paid by the Settlement Trust, regardless of whether the Allowed Claim Amount was awarded via the procedures set forth in the Trust Distribution Procedures or outside of the bankruptcy, via the tort system.

(g)    *Resolution of Governmental Action Claims*

(1)    Governmental Actions Claims Are Subject to the Trust Distribution Procedures

Each holder of a Governmental Action Claim which (a) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) filed a Proof of Claim asserting a Governmental Action Claim by the Claims Bar Date (each a "**Governmental Holder**") will participate in the Trust Distribution Procedures.  The Claims Administrator will have the right at any time to request additional information from any Governmental Holder regarding its Governmental Action Claims.

(2)    Settlement Offer and Negotiations

NAI-~~1537329582v1~~ 1537329582

The Claims Administrator will make a written or oral offer to settle the Governmental Holder's Governmental Action Claim (a "Settlement Offer").  The offer will be made to counsel for the Governmental Holder or, if no counsel has been identified, the Governmental Holder.

After a Governmental Holder has received a Settlement Offer, the Governmental Holder will contact the Claims Administrator and provide a written or oral response to the Settlement Offer (the "Response").  The Governmental Holder may accept or reject the Settlement Offer or make a counteroffer.  In the event the Governmental Holder declines to accept the Settlement Offer, the Governmental Holder and the Claims Administrator will engage in good faith negotiations regarding the Governmental Action Claim.

If the Governmental Holder accepts the Settlement Offer or the Claims Administrator and the Governmental Holder otherwise reach agreement on the amount of the Governmental Holder's Governmental Action Claim (in either case, the "Settlement Amount"), the Governmental Action Claim  will be fixed at the Settlement Amount.   The Governmental Action Trust will pay the Settlement Amount pursuant to Section 8.6 of the Trust Distribution Procedures.

If the parties are unable to reach agreement pursuant to the procedures in Section 8.2 of the Trust Distribution Procedures, the Governmental Holder's Governmental Action Claim shall be referred to mediation.

(3)    Mediation

A Governmental Holder's Governmental Action Claim will be referred to mediation if the Claims Administrator and the Governmental Holder are unable to reach agreement pursuant to the procedures set forth in Section 8.2 of the Trust Distribution Procedures.

A mediator (the "GAC Mediator") will be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the GAC Mediator, the Governmental Holder's Governmental Action Claim shall either, at the option of the Governmental Holder, (i) be referred to arbitration as provided in Section 8.4 of the Trust Distribution Procedures or (ii) proceed to litigation as provided in Section 8.5 of the Trust Distribution Procedures.

The GAC Mediator will work with the Claims Administrator and the Governmental Holder to reach a settlement of the Governmental Action Claim that is mutually acceptable to both parties.  The GAC Mediator will not have the authority to unilaterally impose a settlement upon the parties.  The Governmental Holder and the Claims Administrator will each pay one half of the fees and expenses, including legal fees, incurred by the GAC Mediator.  The parties will otherwise bear their own costs, including legal fees.

If the mediation results in a settlement agreement, the Governmental Action Trust will pay the Settlement Amount pursuant to Section 8.6 of the Trust Distribution Procedures.  If the mediation concludes with no settlement, the Governmental Holder will elect to either (i) participate in binding arbitration pursuant to Section 8.4 of the Trust Distribution Procedures or (ii) proceed to litigation pursuant to Section 8.5 of the Trust Distribution Procedures.

116

(4)     Arbitration

A Governmental Action Claim may be referred to binding arbitration as provided in Section 8.3 of the Trust Distribution Procedures and at the option of the Governmental Holder.

If a Governmental Holder's Governmental Action Claim is referred to arbitration, an arbitrator (the "GAC Arbitrator") will be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the GAC Arbitrator, the a Governmental Holder's Governmental Action Claim will proceed to litigation as provided in Section 8.5 of the Trust Distribution Procedures.

The arbitration will be governed by the Federal Arbitration Act, Title 9, United States Code.  The GAC Arbitrator will determine the amount of the Governmental Holder's Governmental Action Claim.  Unless otherwise agreed by the parties, the arbitration will be conducted pursuant to the dispute resolution procedures for commercial claims of the American Arbitration Association, as currently in effect and appropriate.  The Governmental Holder and the Claims Administrator will each pay one-half of the fees and expenses, including legal fees incurred by the GAC Arbitrator.  The parties will otherwise bear their own costs, including legal fees.

The amount of the Governmental Holder's Governmental Action Claim awarded by the Arbitrator (the "GAC Arbitration Award") will be binding and determined by the Arbitrator, in their discretion.  In no event will the Arbitration Award include any punitive or exemplary damages.  Neither party will have the right to appeal the GAC Arbitration Award except on the grounds set forth in the Federal Arbitration Act.  There will be no right to a trial de novo.  Once the GAC Arbitration Award is final and non-appealable, the Governmental Action Trust will pay the GAC Arbitration Award pursuant to Section 8.6 of the Trust Distribution Procedures.

(5)     Litigation

Any Governmental Holder that elects to litigate his/her Governmental Action Claim(s) pursuant to the procedures in Section 8.5 of the Trust Distribution Procedures, or is otherwise required to litigate his/her Governmental Action Claim pursuant to Section 8.4 of the Trust Distribution Procedures, will have the right to institute a lawsuit against the Talc Personal Injury Trust in:  (i) the United States District Court for the District of New Jersey; or (ii) if Governmental Holder commenced litigation against the Debtor prior to the Petition Date and that litigation remains pending on the Effective Date, at the option of the Governmental Holder, in the United States District Court for the District of New Jersey or the United States District Court in the jurisdiction in which the pre-petition litigation is pending.  All defenses, which include all defenses that could have been asserted by the Debtor, will be available to the Talc Personal Injury Trust at trial.

The court adjudicating the Governmental Action Claims will determine the Debtor's liability for the Governmental Action Claims and will not consider or allow punitive or exemplary damages.  Once any Governmental Action Claims is litigated to a final, non-appealable judgment in accordance with Section 8.5 of the Trust Distribution Procedures, the Governmental Action Trust will pay judgment pursuant to Section 8.6 of the Trust

Distribution Procedures.  The Governmental Holder will be responsible for its fees and costs, including legal fees.  The Governmental Holder will also be responsible for the fees and costs, including legal fees, incurred in the litigation by the Claims Administrator if the amount of the final non-appealable judgment is less than the last Settlement Offer made to Governmental Holder by the Claims Administrator.

<u>(6)</u>      Payment of Settlement Amount, Arbitration Award, and Judgment

*Payment Upon Final Determination.*  Only after the Talc Trustees have established an Initial Payment Percentage, then once there is an agreed upon Settlement Amount pursuant to Section 8.2 or Section 8.3 of the Trust Distribution Procedures, a GAC Arbitration Award pursuant to Section 8.4 of the Trust Distribution Procedures, or a money judgment against the Talc Personal Injury Trust pursuant to Section 8.5 of the Trust Distribution Procedures with respect to any Governmental Action Claim (collectively, the "Governmental Amounts"), the Governmental Holder will receive a payment of the applicable amounts based on the Payment Percentage then in effect as described in Section 8.6.2 and Section 8.6.3 of the Trust Distribution Procedures.

*Initial Payment Percentage.*  After the applicable Governmental Amount has been determined, the Governmental Action Trust will pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Talc Trustees in accordance with the Talc Personal Injury Trust Agreement.

*Supplemental Payment Percentage.*  When the Talc Trustees determines that the then-current estimates of the Governmental Action Trust's assets and its liabilities, as well as then-estimated value of then-pending Governmental Action Claims, warrant additional distributions on account of the Governmental Amounts, the Talc Trustees will set a Supplemental Payment Percentage in accordance with the Talc Personal Injury Trust Agreement.  Such Supplemental Payment Percentages will be applied to all Governmental Amounts that became final prior to the establishment of such Supplemental Payment Percentage.  Governmental Holders whose Governmental Action Claims are assigned a Governmental Amount after a Supplemental Payment Percentage is set will receive an Initial Distribution equal to the then existing payment percentage.

*Release.*  In order for a Governmental Action Claim to receive any payment from the Settlement Trust, the Governmental Action Claimant must submit an executed release in the form attached to the Trust Distribution Procedures.

<u>(h)</u>      *Resolution of Indirect Derivative Talc Personal Injury Claims*

<u>(1)</u>      Indirect Derivative Talc Personal Injury Claims

To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Derivative Talc Personal Injury Claim:

A)      must have filed a Proof of Claim asserting an Indirect Derivative Talc Personal Injury Claim by the Claims Bar Date or otherwise submitted

118

the Indirect Derivative Talc Personal Injury Claim to the Talc Personal Injury Trust;

B)      must have an Indirect Derivative Talc Personal Injury Claim that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof, (subject to the right of the holder of the Indirect Derivative Talc Personal Injury Claim to seek reconsideration by the Trustees under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law;

C)      must submit to the Talc Trustees a properly executed Acceptance and Release; and

D)      must establish to the satisfaction of the Talc Trustees that:

i.      such Indirect Derivative Talc Personal Injury Claimant has paid in full all of the Claim holder's total share of the liability and/or obligation of the Settlement Trust to a Talc Personal Injury Claimant to whom the Trust would otherwise have had a liability or obligation under the Trust Distribution Procedures (as to which the holder of the Allowed Indirect Derivative Talc Personal Injury Claim seeks payment); and

ii.     the Indirect Derivative Talc Personal Injury Claim is not otherwise subject to a valid defense, including, without limitation, that such Indirect Derivative Talc Personal Injury Claim is barred by a statute of limitations or repose or by other applicable law.

In no event will any Indirect Derivative Talc Personal Injury Claimant have any rights against the Trust superior to the rights that the Talc Personal Injury Claimant to whose claim the Indirect Derivative Talc Personal Injury Claim relates, would have against the Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. No Indirect Derivative Talc Personal Injury Claim may be liquidated and paid in an amount that exceeds what the Indirect Derivative Talc Personal Injury Claimant has paid to the related Talc Personal Injury Claimant or to the Trust in respect of such claim for which the Trust would have liability, and in no event will any Indirect Derivative Talc Personal Injury Claim exceed the Allowed Claim Amount of the related Talc Personal Injury Claim, *provided that* an Indirect Derivative Talc Personal Injury Claimant may assert against the Trust an Indirect Derivative Talc Personal Injury Claim for the recovery of defense costs solely to the extent permitted under applicable law.

To the extent that an Indirect Derivative Talc Personal Injury Claim is a lien claim that may be properly resolved pursuant to Section 3.3 of the Trust Distribution Procedures, Section 3.3 of the Trust Distribution Procedures, rather than Article 9 of the Trust Distribution Procedures, will apply to resolve such lien claim.

NAI-1537329582v1-1537329582

Indirect Derivative Talc Personal Injury Claims that become Allowed Indirect Derivative Talc Personal Injury Claims will receive distributions in accordance with Article 7 of the Trust Distribution Procedures and will be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims pursuant to Article 5 and Article 7 of the Trust Distribution Procedures.

(2)    Court Review

Within thirty (30) days after an Indirect Derivative Talc Personal Injury Claimant receives written notice from the Trust of the proposed allowed amount of its Indirect Talc Personal Injury Claim or denial thereof (the "Judicial Review Election Deadline"), an Individual Derivative Talc Personal Injury Claimant may notify the Trust of its intention to seek a de novo review of the Talc Trustees' determination of its Indirect Derivative Talc Personal Injury Claim in accordance with the Trust Distribution Procedures (including Section 9.1 of the Trust Distribution Procedures) by a court of competent jurisdiction (a "Judicial Review Election"). Such notification shall be made by submitting a written notice to the Talc Trustees (a "Judicial Review Election Notice") by the Judicial Review Election Deadline.  Unless the Talc Trustees agree to extend the Judicial Review Election Deadline, an Indirect Derivative Talc Personal Injury Claimant who fails to so submit a Judicial Review Election Notice by the Judicial Review Election Deadline will be deemed to accept the disallowance of its Indirect Derivative Talc Personal Injury Claim or the proposed Allowed Claim Amount (as applicable) and shall have no right to seek any further review of its Indirect Derivative Talc Personal Injury Claim.  An Indirect Derivative Talc Personal Injury Claimant that makes a Judicial Review Election may not seek costs or expenses against the Trust in any judicial proceeding commenced on account of its Judicial Review Election and the Trust may not seek costs or expenses against the Indirect Derivative Talc Personal Injury Claimant.  In no event shall the submission and/or filing of a Judicial Review Election Notice entitle the holder of an Indirect Derivative Talc Personal Injury Claim to request or receive treatment different than the treatment provided for under the Trust Distribution Procedures (including Section 9.1 of the Trust Distribution Procedures).  The de novo review provided for herein will be to determine the allowed amount of the Indirect Derivative Talc Personal Injury Claim under and in accordance with the Trust Distribution Procedures.  All defenses (including, with respect to the Trust, all defenses that could have been asserted by the Debtor or Protected Parties, except as otherwise provided in the Plan) will be available to both sides at any judicial proceeding commenced on account of the Indirect Derivative Talc Personal Injury Claimant's Judicial Review Election.  Upon entry of final non-appealable order of a court competent jurisdiction fixing the allowed amount of the Indirect Derivative Talc Personal Injury Claim, if any, such Indirect Derivative Talc Personal Injury Claim will be deemed an "Allowed Indirect Derivative Talc Personal Injury Claim" and paid in accordance with Article 7 of the Trust Distribution Procedures.

**ARTICLE IX.**

**CERTAIN FACTORS TO BE CONSIDERED**

Holders of Claims in Class 4 (Talc Personal Injury Claims) should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the Plan attached hereto as **Exhibit A**, including its attached

**exhibits and schedules, prior to voting to accept or reject the Plan.  These factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

9.1     Risks Related to Confirmation of the Plan

Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, that the Plan was filed in good faith, and that the value of distributions to dissenting holders of Claims may not be less than the value such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtor believes that the Plan will meet these tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that a Plan must provide the same treatment for each claim or interest in a particular class, unless a holder agrees to a less favorable treatment of its particular claim or interest.  The Debtor believes that it has complied with the requirements of the Bankruptcy Code by its classification and treatment of various holders of Claims and Equity Interests under the Plan.  However, if a member of a Class objects to its treatment or if the Bankruptcy Court finds that the Plan does not comply with the requirements of the Bankruptcy Code, confirmation of the Plan could be delayed or prevented.

The Plan provides for a number of specific conditions precedent to confirmation of the Plan, including conditions related to section 524(g) of the Bankruptcy Code and the provision for, and implementation of, the Channeling Injunction.  While the Debtor believes that the Plan and the Channeling Injunction provided for therein comply with the requirements of the Bankruptcy Code as necessary to allow for the satisfaction of all such conditions, including conditions related to section 524(g) of the Bankruptcy Code and the provision for, and implementation of, the Channeling Injunction, objections to confirmation of the Plan asserting the failure of the Plan and the Channeling Injunction to comply with such requirements may be asserted.  If the Bankruptcy Court finds that the Channeling Injunction or any other provision of the Plan does not comply with the requirements of the Bankruptcy Code and, as a result, conditions precedent to confirmation of the Plan are not satisfied, confirmation of the Plan could be delayed or prevented.

In addition, holders of Talc Personal Injury Claims will have the opportunity to vote to accept or reject the Plan.  If sufficient votes are not received to enable the Bankruptcy Court to confirm the Plan pursuant to the Bankruptcy Code, the Plan will not be confirmed.  If the Debtor seeks to confirm an alternative chapter 11 plan, there can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Talc Personal Injury Claims as those proposed in the Plan.

Further, it is a condition precedent to confirmation of the Plan that a settlement is reached between the Debtor and the Imerys/Cyprus Parties that provides for a contribution to the Talc Personal Injury Trust by the Imerys/Cyprus Parties in an amount that is acceptable to the Debtor, J&J, and the Ad Hoc Committee of Supporting Counsel.  There can be no assurance that the

NAI-~~1537329582v1~~-1537329582

parties will reach a settlement that is acceptable to the Debtor, J&J, and the Ad Hoc Committee of Supporting Counsel.

9.2    Risks Related to Occurrence of the Effective Date

The Debtor cannot assure you that the Effective Date will occur or, if it does, as to the timing thereof.  The Plan provides for a number of specific conditions precedent to the occurrence of the Effective Date.  If at any time after confirmation of the Plan and prior to the Effective Date the conditions precedent to the Effective Date have not been satisfied or waived, the Bankruptcy Court could vacate the Confirmation Order.  In that event, the Plan would be deemed null and void.  If the Debtor proposes an alternative reorganization plan, there can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Talc Personal Injury Claims as those proposed in the Plan.

9.3    Risks of a Return to the Tort System

In the event that the Plan is not confirmed or the Confirmation Order is vacated, the Chapter 11 Case could be dismissed, in which case talc claims against the Debtor would be pursued and defended in the tort system.

While the Plan would establish a trust to appropriately assess, resolve, and pay current and future talc claimants in an efficient and equitable manner, the tort system would subject such talc claimants to the cost, uncertainty, and delay of litigation.

As described in more detail above, Old JJCI prevailed in the majority of talc cases it tried in the tort system, although Old JJCI was subject intermittently to extreme judgments.  While the Plan would establish a trust that would value and pay similar talc claims in substantially the same manner, there can be wildly divergent verdicts across cases in the tort system, such that talc claimants with the same alleged injury receive substantially disparate treatment.

Furthermore, it is possible that one or more trials in the tort system may involve a causation determination regarding whether the Debtor's cosmetic talc products caused claimants' injuries.  It is possible that one or more of these causation determinations could result in a finding that the Debtor did not cause the claimants' injuries, which would mean that the implicated claimant(s) would not receive any recovery from the Debtor.

The Debtor anticipates that, if resolution of talc claims against it returns to the tort system, it will be subject to a deluge of talc cases and will continue to be sued for talc claims for decades.  The Debtor cannot assure you that its financial resources will be sufficient to indefinitely bear defense costs and judgments associated with talc litigation.

9.4    Risks Related to Recoveries from the Talc Personal Injury Trust by Holders of Talc Personal Injury Claims

If the Effective Date occurs, Talc Personal Injury Claims will be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, and their treatment will be based upon, among other things, estimates of the number, types, and amount of Talc Personal Injury Claims, the liquidity of the Talc Personal Injury Trust, the Talc Personal

Injury Trust's expected future income and expenses, and other matters.  There can be no certainty as to the precise amounts that will be distributed by the Talc Personal Injury Trust in any particular time period or when Talc Personal Injury Claims will be resolved by the Talc Personal Injury Trust.

In addition, holders of Talc Personal Injury Claims who are Medicare beneficiaries and receive a distribution from the Talc Personal Injury Trust may be required to reimburse Medicare for medical expenses paid on behalf of such holder.

9.5___Risk of Appointment of Different Talc Trustees, Talc Trust Advisory Committee Members, FCR, Talc Trust Claims Administrator, or Talc Trust Liens Resolution Administrator

The Plan provides that the initial Talc Trustees will be [●] and [●], the initial Talc Trust Advisory Committee Members will be [●], the initial FCR under the Talc Personal Injury Trust Agreement will be [●], the initial Talc Trust Claims Administrator will be [●], and the initial Talc Trust Liens Resolution Administrator will be [●].

There may be objections to the proposed Talc Trustees, Talc Trust Advisory Committee Members, FCR, Talc Trust Claims Administrator, or Talc Trust Liens Resolution Administrator. If such objections are successful, alternate Talc Trustees, Talc Trust Advisory Committee Members, FCR, Talc Trust Claims Administrator, or Talc Trust Liens Resolution Administrator would have to be nominated, potentially resulting in delays in the confirmation of the Plan and the occurrence of the Effective Date.  In addition, the selection of different Talc Trustees, Talc Trust Advisory Committee Members, FCR Talc Trust Claims Administrator, or Talc Trust Liens Resolution Administrator could adversely affect administration of the Talc Personal Injury Trust.

9.6___Risk of Classification Objections

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class.  Parties in interest may object to the classification of certain claims and interests both on the grounds that certain claims and interests have been improperly placed in the same Class and/or that certain claims and interests have been improperly placed in different Classes.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Parties in interest may object to the classification of certain Claims and Equity Interests both on grounds that certain Claims and Equity Interests have been improperly placed in the same Class and/or that certain Claims and Equity Interests have been improperly placed in different Classes.

9.7___Risks Related to U.S. Federal Income Tax Consequences

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to holders of certain Claims and Interests, see Article XII of this Disclosure Statement.

NAI-1537329582v1 1537329582

9.8 _____ Risk of Amendment of Plan by the Debtor Prior to Confirmation

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for confirmation. The potential impact of any such amendment or waiver on holders of Claims and Equity Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

9.9 _____ Additional Factors

(a)     *Debtor Could Withdraw the Plan*

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtor.

(b)     *Debtor Has No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

(c)     *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

(d)     *No Legal or Tax Advice Is Provided by this Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

(e)     *This Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and

uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The timing and amount of actual distributions to holders of Talc Personal Injury Claims satisfied by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

(f)     *No Admission Made*

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Equity Interests.

## ARTICLE X.

## SOLICITATION PROCEDURES AND REQUIREMENTS

### 10.1    Solicitation Procedures Summary[10]

The following section describes in summary fashion the Solicitation Procedures, which establishes the solicitation and vote tabulation procedures, schedules the Confirmation Hearing, and sets the voting deadline and the deadline for objecting to confirmation of the Plan.  Those procedures and requirements establish, among other things, the place to send completed Ballots, in the forms approved by the Bankruptcy Court in the Solicitation Procedures Order, used in voting on the Plan, together with the deadline for returning completed Ballots for voting on the Plan and the deadline for objecting to the Plan.  The Debtor has distributed Solicitation Packages in connection with the foregoing containing:

---

[10] Capitalized terms used in this Article X and not otherwise defined herein or in the Plan have the meanings ascribed to them in the Solicitation Procedures Order or Solicitation Procedures (as defined in the Solicitation Procedures Order) (as applicable).

NAI-1537329582v1 1537329582

(a)     a cover letter describing (i) the contents of the Solicitation Package, (ii) the contents of any enclosed USB flash drive and instructions for use of the USB flash drive, and (iii) information about how to obtain access to, free of charge, the Plan, the Disclosure Statement, the order approving the Disclosure Statement, together with the exhibits thereto, and any other documents mentioned in the Solicitation Package;

(b)     notice of the hearing to consider confirmation of the Plan (the "Confirmation Hearing Notice" and the "Confirmation Hearing," respectively), substantially in the form attached to the Solicitation Procedures Order as Exhibit 7-1;

(c)     copies (in electronic format) of the Disclosure Statement with all exhibits, including the Plan with its exhibits (to the extent such exhibits are filed with the Court more than [_] business days before prior to entry of the Solicitation Date Procedures Order);

(d)     the Solicitation Procedures Order, excluding any exhibits thereto (in electronic format);

(e)     solely for holders of Talc Personal Injury Claims, as applicable, and Equity Interests of the Debtor, an appropriate Ballot and voting instructions for the same;

(f)     solely for holders of Talc Personal Injury Claims, as applicable, and Equity Interests of the Debtor, a pre-addressed, postage prepaid return envelope for completed Ballots;

(g)     any letters from (i) the Debtor, which letter will be included as Exhibit 7-3 to the Solicitation Procedures Order; (ii) the AHC of Supporting Counsel, which letter will be filed no later than one week prior to the deadline to object to this Motion and included as Exhibit 7-5 to the Solicitation Procedures Order; and (iii) certain other constituencies that who may recommend acceptance of the Plan setting forth their recommendations with respect to the Plan; and

(h)     any other materials ordered by the Court to be included as part of the Solicitation Package.

The Solicitation Procedures Order, the Solicitation Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot, as applicable, should be read in connection with this Section of this Disclosure Statement as they set forth the Solicitation Procedures and deadlines in detail.  If you are a holder of a Claim who is entitled to vote on the Plan and you or your attorney did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent (i) by telephone at (888) 431-4056 (Toll-Free) or +1 (503) 822-6762 (International); (ii) by e-mail at LTLVote@epiqglobal.com; (iii) by visiting their website at https://dm.epiq11.com/ltl; or (iv) by writing at LTL Management LLC, c/o Epiq Ballot Processing Center, P.O. Box 4422, Beaverton, OR 97076-4422, or LTL Management LLC, c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005.

The Solicitation Procedures set forth a process by which attorneys representing holders of Direct Talc Personal Injury Claims, as listed on the Schedules or in the Debtor's or the Solicitation Agent's records (collectively, the "Firms"), ~~will~~would receive copies of the Direct Talc Personal Injury Claim Solicitation Notice and the Certified Plan Solicitation Directive.  The Direct Talc Personal Injury Claim Solicitation Notice ~~will notify~~notified the Firms of the options proposed for soliciting votes on the Plan in respect of Direct Talc Personal Injury Claims and ~~request~~requested that each Firm complete and return the Certified Plan Solicitation Directive to the Solicitation Agent no later than [~~____~~August 15, 2023~~]~~.

The Certified Plan Solicitation Directive ~~permits~~permitted each Firm to direct the Solicitation Agent with regard to the solicitation of votes on the Plan from individuals, estates, or ~~Entities~~entities who or which hold Direct Talc Personal Injury Claims (collectively, the "Clients") according to one of the following procedures:

(a)    <u>Master Ballot Solicitation Method</u>.  A Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm will record the votes of each of its Clients on the Plan if the Firm certifies, *inter alia*, that it will:  (i) solicit, collect and record the votes of its Clients through customary and accepted practices or will obtain authority to procedurally cast each Clients' vote; (ii) comply with the solicitation procedures set forth in the Solicitation Procedures Order and the Master Ballot; and (iii) only submit votes that reflect the informed decision of its Clients.  If a Firm elects this procedure, the Firm must either (i) provide a Solicitation Package to each Client, or (ii) request that the Solicitation Agent serve Solicitation Packages (without a Ballot) on its Clients.

(b)    <u>Direct Solicitation Method</u>.  If a Firm chooses not to solicit, collect, record and submit the vote of any of its Clients, such Firm may direct the Solicitation Agent to solicit votes on the Plan directly from its Clients.

(c)    <u>Indirect Solicitation Method</u>.  If a Firm prefers to solicit the votes of its Clients but chooses to have the Clients cast their votes on the Plan by submitting separate ballots, the attorney may direct the Solicitation Agent to send the Solicitation Packages (including appropriate Ballots) to the Firm, which will, in turn, provide the Solicitation Packages (including appropriate Ballots) to its Clients.  If the Firm selects this method:  (i) the Solicitation Agent will cause the requested number of Solicitation Packages, including appropriate Ballots, to be sent to the Firm; (ii) the Firm must provide the Solicitation Packages to the Clients within three Business Days after receipt; and (iii) the Firm must file an affidavit of service with the Court, and send a copy of such affidavit to the Solicitation Agent, within three Business Days of such service.  The Firms will not be required to list the names and addresses of the Clients served on the affidavit of service.  The affidavit of service only needs to state that service was completed, the date(s) that service was completed, and that the attorney has provided the Solicitation Agent with the required list of Clients, as described in the Solicitation Procedures.

(d)    <u>Hybrid Solicitation Method</u>.  If a Firm ~~chooses to elect~~<u>elects the</u> Master Ballot Solicitation Method for only certain of its Clients (collectively, the "<u>Master Ballot Clients</u>") and makes all the certifications described in subsection (a) above with respect to the Master Ballot Clients, the Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes of each of its Master Ballot Clients on the Plan and otherwise comply with the requirements of the Master Ballot Solicitation Method for the Master Ballot Clients.  If a Firm elects this procedure, the Firm must either (i) provide a Solicitation Package to each Master Ballot Client, or (ii) request that the Solicitation Agent serve Solicitation Packages (without a Ballot) on its Master Ballot Clients.  With respect to such Firm's other Clients that are not Master Ballot Clients (collectively, the "<u>Individual Ballot Clients</u>"), the Firm must elect the procedure under either the Direct Solicitation Method (subsection (b) above) or the Indirect Solicitation Method (subsection (c) above).

The Solicitation Agent will serve the Solicitation Packages in accordance with the instructions set forth on the Certified Plan Solicitation Directives.  If a Firm ~~fails~~failed to return the Certified Plan Solicitation Directive by [___,August 15, 2023], the Firm will be deemed to have directed the Solicitation Agent to solicit votes on the Plan from its Clients according to the Indirect Solicitation Method described above.  The Debtor will reimburse Firms for actual postage paid for transmitting Solicitation Packages.

The Certified Plan Solicitation Directive also required each Firm submit to the Solicitation Agent a list (the "Client List~~(s)~~") that ~~contain~~contains the name and last four digits of the Social Security Number, to the extent that such Client has a Social Security Number (and if not, the Client's month, date, and year of birth), and, if the Firm is requesting that the Solicitation Agent directly or indirectly serve a Solicitation Package on the Client, the personal, home address of each Client.  To the extent Client Lists were not submitted with the Certified Plan Solicitation Directives by the deadline set forth above, the Solicitation Agent will distribute Solicitation Packages for the affected Clients as soon as practicable after the receipt of such lists.  If a Firm is retained by additional Clients following the submission of its Certified Plan Solicitation Directive, the Firm must submit a supplement to its Certified Plan Solicitation Directive, which the Firm shall be deemed to have certified consistent with its original Client List, in order to submit the votes of such Clients in the manner set forth on the Certified Plan Solicitation Directive.

If you are entitled to vote on the Plan, a form of Ballot for your Claim has been provided to you, unless otherwise provided to a Firm, as contemplated by the Certified Plan Solicitation Directive.  Holders of Talc Personal Injury Claims or their attorneys, as applicable, should have received a Class 4 Ballot (relating to Talc Personal Injury Claims) and holders of Equity Interests of the Debtor or their attorneys should have received a Class 6 Ballot.  You should refer to the Solicitation Procedures sent with this Disclosure Statement to determine precisely those procedures that apply with respect to the return of your Ballot.

Completed and signed Ballots can be submitted (i) by first class mail to LTL Management LLC,  c/o Epiq Ballot Processing Center, P.O. Box 4422, Beaverton, OR 97076-4422 or by overnight courier or hand delivery to: LTL Management LLC, c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005 or (ii) through electronic or online transmission through the Voting Portal on the Solicitation Agent's website at https://dm.epiq11.com/ltl.  As set forth in the Solicitation Procedures, no other forms of electronic transmission of Ballots, *e.g.*, email or facsimile, will be accepted.

10.2    Voting Deadline

**To be considered for purposes of accepting or rejecting the Plan, all Ballots must be returned to and *actually received by* the Solicitation Agent on or before the Voting Deadline of 4:00 p.m. (prevailing Eastern Time) on [____, 2023].**

NAI-~~1537329582v1~~-1537329582

10.3    Holders of Claims and Interests Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof, or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan:  (1) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy); (2) reinstates the maturity of such claim or equity interest as it existed before the default; (3) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment; and (4) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Holders of claims and equity interests in impaired classes are generally entitled to vote to accept or reject a plan.  However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan in respect of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan (unless such holder has agreed to such treatment) and provides that the holder of such claim or equity interest is not entitled to vote. If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote.

**Holders of Claims in Class 4 and Holders of Interests in Class 6 are Impaired and, thus, entitled to vote to accept or reject the Plan**.  All other Classes are not entitled to vote on the Plan because they are Unimpaired and are therefore presumed to accept the Plan.

10.4    Vote Required for Acceptance by a Class

Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Talc Personal Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of Talc Personal Injury Claims actually voting on the Plan have voted to accept the Plan in accordance with the Solicitation Procedures Order.

Pursuant to section 1126(c) of the Bankruptcy Code, Class 6 (Equity Interests of the Debtor) shall have accepted the Plan only if at least two-thirds (2/3) in amount and fifty percent (50%) in number of Holders of Equity Interests of the Debtor vote to accept the Plan.  Accordingly, if Holdco, as the holder of all Interests in Class 6, timely votes to accept the Plan, Class 6 shall have accepted the Plan.  Holdco, which is a party to the Plan Support Agreements, is expected to timely vote to accept the Plan.

10.5    Solicitation Procedures

(a)    *Ballots*

NAI-~~1537329582v1~~ 1537329582

All votes to accept or reject the Plan with respect to Class 4 and Class 6 must be cast by properly submitting the duly completed and executed form of Ballot designated for such Claims or Interests.  Holders of Talc Personal Injury Claims in Class 4 and Equity Interests of the Debtor in Class 6 or their attorneys (as applicable) voting on the Plan should complete and sign the appropriate Ballot in accordance with the instructions thereon, being sure to check the appropriate box to "accept" the Plan or "reject" the Plan.  In addition, if any holder of a Claim elects not to grant the releases set forth in Article XI of the Plan, then it should check the appropriate box on its Ballot and follow the instructions contained in the Ballot.

No vote in favor of or against the Plan by or on behalf of a holder of a Talc Personal Injury Claim shall be counted by the Solicitation Agent unless the Ballot reflecting such vote is timely submitted to the Solicitation Agent with the written certifications contained on the Ballot, provided that a Ballot that is properly submitted electronically via the Voting Portal shall be deemed to contain an original signature.

**As set forth in the Solicitation Procedures, improperly completed Ballots will not be counted.  By way of example and not limitation, any Ballot received which is not signed or which contains insufficient information to permit the identification of the claimant will be an invalid Ballot and will not be counted for purposes of determining acceptance or rejection of the Plan.  Further, (i) a Master Ballot on which the attorney fails to make the required certifications, (ii) a Master Ballot that fails to include the required Exhibit, (iii) a ~~Ballot submitted by or on behalf~~ solely with respect to the vote of a holder of a Direct Talc Personal Injury Claim ~~in the United States~~ whose information is not provided, a Ballot submitted by or on behalf of such holder of a Direct Talc Personal Injury Claim that does not (a) provide the last four digits of the claimant's Social Security Number ~~when such number is available~~ or indicate that the claimant does not have a Social Security Number and (b) provide, for claimants who do not have a Social Security Number, the claimant's month, date, and year of birth or (iv) a Ballot submitted by or on behalf of a holder of a Direct Talc Personal Injury Claim that does not include the required ~~certification~~ certifications will not be counted.  In addition, a vote cast on a Ballot as to an individual holder will not be counted if it is returned to the Solicitation Agent:   (i) indicating neither acceptance nor rejection of the Plan; (ii) indicating both acceptance and rejection of the Plan; or (iii) indicating partial rejection and partial acceptance of the Plan.  Furthermore, solely with respect to holders of Indirect Talc Personal Injury Claims, a Ballot cast on account of an Indirect Talc Personal Injury Claim that is not listed in the Schedules or is listed as contingent, unliquidated, disputed, in the amount of $0.00, or unknown, shall not be counted for voting purposes unless (i) the holder of such claim timely files a Proof of Claim by the applicable Bar Date or (ii) such claim is deemed timely filed by an Order of the Court before the Voting Deadline.**

Ballots must be delivered to the Solicitation Agent, at the addresses set forth above in Section 10.1, or submitted via ~~through~~ electronic or online transmission through the Voting Portal on the Solicitation Agent's website at https://dm.epiq11.com/ltl, ~~and~~ so that, in either case, the Ballot is received by the Voting Deadline.  **The method of such delivery is at the election and risk of the voter.**  Although the method of delivery is at the risk of the voter, for the convenience of each holder of a Talc Personal Injury Claim entitled to vote on the Plan or such holder's attorney, as applicable and in accordance with the

Certified Plan Solicitation Directive, the Solicitation Package contains a pre-addressed, postage prepaid envelope for return of such holder's Ballot.  In all cases, sufficient time should be allowed to ensure timely delivery.  Instructions for casting an electronic Ballot can be found on the Solicitation Agent's website at https://dm.epiq11.com/ltl.

If you are entitled to vote and you or your attorney (as applicable) did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Solicitation Agent in the manner set forth above.  For additional information regarding the voting process, please refer to the Solicitation Procedures Order, the Solicitation Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot (to the extent a Ballot was not otherwise received by your attorney pursuant to the Certified Plan Solicitation Directive).

Please refer to the Solicitation Procedures and Solicitation Procedures Order for more information regarding the voting of Talc Personal Injury Claims.

(b)      *Withdrawal of Votes and Multiple Votes on the Plan*

A voter that submits a valid Ballot may withdraw his, her, or its vote by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline (or such later date as agreed by the Debtor).  To be valid, the notice of withdrawal must be signed by the party who signed the Ballot, <u>provided</u> that the withdrawal or change of a vote that is cast on a Master Ballot will only be effective with respect to claimants who have made an informed decision regarding such withdrawal or change.  The Debtor reserves the right to contest any withdrawals.

In addition, the following procedures for voting will be used by the Debtor to address multiple Ballots.

- If the Solicitation ~~Agency~~Agent receives more than one Ballot from different holders purporting to hold the same Claim or Interest, in the absence of contrary information establishing which holder held such Claim or Interest as of the Voting Deadline, the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtor) will be the Ballot that is counted.

- If the Solicitation Agent receives a Ballots from the holder of a Claim or Interest **and** someone purporting to be his, her, or its attorney or agent, the Ballot received from the holder of the Claim or Interest will be the Ballot that is counted, regardless of when it is received so long as it is received before the Voting Deadline, and the vote of the purported attorney or agent will not be counted.  For the avoidance of doubt, any Ballot received directly from the holder of a Talc Personal Injury Claim shall supersede any Master Ballot returned on account of a Talc Personal Injury Claim and shall be the vote that is counted.

- If the Solicitation Agent receives more than one Ballot from a holder of a Claim or Interest for the same Claim or Interest, in the absence of contrary information establishing which Ballot is valid as of the Voting Deadline, the latest-dated

otherwise valid Ballot that is received before the Voting Deadline will be the Ballot that is counted as a vote to accept or reject the Plan. If multiple Ballots (other than Master Ballots, which are addressed below) are received from a Firm or agent with respect to the same Claim or Interest (but not from the holder thereof), in the absence of contrary information establishing which Ballot is valid as of the Voting Deadline, the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtor) will be the Ballot that is counted.

- If the same holder of a Direct Talc Personal Injury Claim appears on more than one Master Ballot, the Solicitation Agent will attempt to coordinate with the respective Firms to cure the discrepancy. However, if the Firms are unsuccessful in curing the discrepancy, the vote of the holder appearing on more than one Master Ballot will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan; in the event that the votes are not consistent, none of the votes will be counted.

The Debtor will not be obligated to recognize any withdrawal, revocation or change of any vote received after the Voting Deadline (or such later date as agreed by the Debtor with the consent of the Debtor, with such consent not to be unreasonably withheld).

(c)    *Requesting a Solicitation Package*

If a holder of a Talc Personal Injury Claim contacts the Solicitation Agent before the Voting Deadline and requests a Solicitation Package, the Solicitation Agent will provide such claimant with a Solicitation Package within five Business Days of such request. Copies of the materials contained in the Solicitation Packages (excluding the Confirmation Hearing Notice and the Ballots, which will be provided in paper copy) may be provided in paper copy or on USB drive at the Debtor's discretion and shall be made available free of charge on the Document Website; provided, however, that any party may request to receive paper copies of such materials from the Solicitation Agent at no cost to such party.

## ARTICLE XI.

## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps, among others, must be taken to confirm the Plan:

### 11.1    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization. By order of the Bankruptcy Court, the Confirmation Hearing is scheduled for [_____] at [__] [].m. (Prevailing Eastern Time) before the Honorable Michael B. Kaplan, United States Bankruptcy Judge for the District of New Jersey, in the United States Bankruptcy Court for District of New Jersey, Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608. The Confirmation Hearing may

be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of the Plan must be filed with the Bankruptcy Court no later than **[_____] at []:00 p.m. (Prevailing Eastern Time)**, and will be governed by Bankruptcy Rules 3020(b) and 9014 and the Local Rules.  **Unless an objection is timely and properly served and filed, it may not be considered by the Bankruptcy Court.**

11.2    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.

(a)    *Acceptance*

Class 4 is Impaired under the Plan, and the holders of Claims in such Class are entitled to vote on the Plan.  Class 6 is Impaired under the Plan, and the holder of Interests in such class is entitled to vote on the Plan.  Class 4 must accept the Plan in order for it to be confirmed.

(b)    *Issuance of Injunction Pursuant to Sections 524(g) and 105(a) of the Bankruptcy Code*

The Bankruptcy Court shall be asked to issue the Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those holders of Class 4 Claims and seventy-five percent (75%) in number of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.  The amount of the Claim for voting purposes for each Class 4 Claim holder shall be as set forth in the Solicitation Procedures Order.

If the Bankruptcy Court or the District Court does not enter the Channeling Injunction, the Effective Date shall not occur.

(c)    *"Best Interests" Test*

The "Best Interests Test" under Section 1129 of the Bankruptcy Code requires, as a condition to confirmation of a plan of reorganization, that each holder of claims or equity interests of an impaired class either (i) accept the Plan or (ii) receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation.  Section 1129 of the Bankruptcy Code thus requires that holders of Talc Personal Injury Claims in Class 4 who do not vote to accept the Plan will receive or retain an amount under the Plan not less than the amount that such holders would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.  While Class 6 (Equity Interests of the Debtor) is also impaired under the Plan, the holder of those interests in Class 6, Holdco, will timely vote in favor of the Plan, thus rendering the Best Interests Test inapplicable to Class 6.

The Debtor believes that, under the Plan, holders of Talc Personal Injury Claims will receive property with a value equal to or in excess of the value such holders would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. Specifically, while both under the Plan and in a hypothetical chapter 7, holders of Talc Personal Injury Claims may be paid in full, there are unique risks to consider in a chapter 7 that may ultimately result in reduced recoveries for Talc Personal Injury Claims.

First, there would necessarily be costs and delays involved in liquidating claims in chapter 7, as compared to the relative efficiency of the trust processes established in the Plan for handling and resolving Talc Personal Injury Claims. In addition, the trustee in any chapter 7 proceeding would be unable to make distributions to creditors until all assets of the Debtor's estate were reduced to cash and all of the estate's liabilities were liquidated, including the administrative expenses from the preceding chapter 11 case, as well as for the chapter 7 proceeding. Further, in the chapter 7 context the Debtor would be unable to access the remedies provided in section 524(g) of the Bankruptcy Code, including the section 524(g) channeling injunction, which would eliminate reliable and satisfactory means of making provisions to allow for distributions to future asbestos claimants.

In addition to the above risks and pursuant to the provisions of the 2023 Funding Agreement, if the Debtor was in a hypothetical chapter 7 liquidation, funds provided pursuant to the 2023 Funding Agreement would not be available to provide recoveries for Talc Personal Injury Claimants. In the absence of the 2023 Funding Agreement, and without the protections provided by section 524(g) of the Bankruptcy Code, it is also unlikely that J&J would contribute substantial funding to resolve talc claims in any chapter 7 liquidation.

Finally, if the Chapter 11 Case proceeds to a chapter 7 liquidation, in light of the unavailability of the 2023 Funding Agreement, it is possible that a trustee may dismiss the chapter 7 case in order to ensure that funds are available pursuant to the 2023 Funding Agreement for claimants' recoveries in the tort system. Alternatively, the trustee in a chapter 7 proceeding might bring a fraudulent transfer cause of action against certain non-debtor affiliates. In connection with the fraudulent transfer litigation, it is possible that the Debtor's liability for talc-related claims might need to be determined, and it is possible that such determination could result in a court finding that the Debtor has no liability for its cosmetic talc products, or that such liability is smaller than the amount the Debtor had agreed to pay pursuant to the Plan.

## ARTICLE XII.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to U.S. holders of Talc Personal Injury Claims other than Governmental Action Claims. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local, or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and

administrative pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Disclosure Statement.  These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances.  In addition, it does not address considerations relevant to non-U.S. holders or to U.S. holders subject to special rules under the federal income tax laws, such as holders subject to the alternative minimum tax, holders who utilize installment method reporting with respect to their Claims, and holders who have a functional currency other than the U.S. dollar and partnerships or other pass-through entities for U.S. tax purposes (and investors therein).  For the avoidance of doubt, this discussion also does not address the U.S. federal income tax consequences to the holders of Governmental Actions Claims or the holders of Claims (a) whose Claims are Unimpaired or (b) that are deemed to accept the Plan.  Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim, including any tax consequences to the holder of the Equity Interests of the Debtor.  Moreover, this discussion does not address the tax treatment of the Reorganized Debtor given that the tax treatment of the Reorganized Debtor should have no impact on holders of Talc Personal Injury Claims.

For purposes of this discussion, a "U.S. holder" is a holder of a Claim that is:  (a) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Internal Revenue Code) have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Internal Revenue Code).

**Holders of Talc Personal Injury Claims should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Plan and the receipt of amounts from the Talc Personal Injury Trust, as well as any tax consequences arising under any state, local, or foreign tax laws, or any other federal tax laws.  The Debtor and the Reorganized Debtor shall not be liable to any person with respect to the tax liability of a holder or its Affiliates.**

12.1    Treatment of the Talc Personal Injury Trust

It is anticipated that the Talc Personal Injury Tort Claims Sub-Trust will be a "qualified settlement fund" within the meaning of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code.  Such Treasury Regulations provide that a fund, account, or

trust will be a qualified settlement fund if three conditions are met.  First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority.  A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision.  Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort.  Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.  The Talc Personal Injury Tort Claims Sub-Trust has been established with the express purpose of satisfying the requirements of a qualified settlement fund and will be treated as a separate taxable entity.  Its modified gross income will generally be subject to U.S. federal income tax at the highest rate applicable to estates and trusts.  For purposes of determining the Talc Personal Injury Tort Claims Sub-Trust's modified gross income, payments to the Talc Personal Injury Tort Claims Sub-Trust and payments from the Talc Personal Injury Tort Claims Sub-Trust to holders of Talc Personal Injury Claims in settlement of their Claims will not be taken into account.

## 12.2   Tax Consequences to Holders of Talc Personal Injury Claims

The tax consequences of payments received by holders of Talc Personal Injury Claims will depend on the individual nature of each such Claim and the particular circumstances and facts applicable to such holder at the time each such payment is made.  To the extent that payments from the Talc Personal Injury Tort Claims Sub-Trust to holders of Talc Personal Injury Claims constitute damages received by such holders on account of physical injuries or physical sickness, such payments generally should not constitute gross income to such recipients under Section 104 of the Internal Revenue Code, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the Internal Revenue Code for a prior taxable year.  To the extent that any payments from the Talc Personal Injury Tort Claims Sub-Trust to holders of Talc Personal Injury Claims constitute damages received by such holders on account of claims other than physical injuries (such as lost wages) or received as interest (or any other amounts not excludable from income under Section 104 of the Internal Revenue Code), such payments generally should be includible in gross income to such holders.

All distributions to holders of Talc Personal Injury Claims under the Plan are subject to any applicable withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding, in each case on a properly completed and validly executed IRS Form W-9.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in

an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations, and financial institutions.

**The foregoing is intended to be a summary only and not a substitute for careful tax planning with a tax advisor. The federal, state, local, and foreign income tax consequences of the Plan are complex and, in some cases, uncertain. Such consequences also may vary based on the individual circumstances of each holder of a Talc Personal Injury Claim. Accordingly, each holder of a Talc Personal Injury Claim is strongly urged to consult with its, his, or her own tax advisor regarding the federal, state, local, and foreign income tax consequences of the Plan.**

**Furthermore, any U.S. federal tax discussion contained in this Disclosure Statement, the Plan, and any Plan Documents, and any exhibits or attachments to any such documents, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the IRS.**

## ARTICLE XIII.

## CONCLUSION AND RECOMMENDATION

The Debtor believes that the Plan is in the best interests of all holders of Claims in Class 4 (Talc Personal Injury Claims) and all other creditors and stakeholders of the Debtor and urges all holders of Claims in Class 4 (Talc Personal Injury Claims) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they **WILL BE** actually received on or before [_] p.m. (Prevailing Eastern Time), on [_____], 2023.

*[Remainder of page left intentionally blank]*

Dated: ~~May 15~~July 11, 2023                    **WOLLMUTH MAHER & DEUTSCH LLP**

_/s/ Paul R. DeFilippo_____
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (_pro hac vice_)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted _pro hac vice_)

~~_PROPOSED_~~ _ATTORNEYS FOR DEBTOR_

NAI ~~1537329582v1~~ 1537329582