**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
gkinoian@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126

*Local Counsel for the*
*Official Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
Eric R. Goodman, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
egoodman@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Co-Counsel for the*
*Official Committee of Talc Claimants*

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
Rachel S. Morse, Esq.
jmassey@masseygail.com
rmorse@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467

*Special Counsel for the*
*Official Committee of Talc Claimants*

**OTTERBOURG PC**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
David A. Castleman, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
dcastleman@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
*Co-Counsel for the*
*Official Committee of Talc Claimants*

| | |
|---|---|
| In Re: | Chapter 11 |
| **LTL MANAGEMENT, LLC,[1]** | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

### MOTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS FOR ENTRY OF AN ORDER (I) AUTHORIZING AN ESTIMATION OF CURRENT TALC CLAIMS FOR VOTING PURPOSES, (II) APPOINTING KENNETH R. FEINBERG AS EXPERT PURSUANT TO FEDERAL RULE OF EVIDENCE 706, AND (III) ESTABLISHING PROCEDURES AND SCHEDULE FOR ESTIMATION PROCEEDINGS

**THE TCC HAS ASSERTED AND CONTINUES TO ASSERT THAT THE DEBTOR'S CHAPTER 11 CASE WAS FILED IN BAD FAITH AND SHOULD BE DISMISSED. THIS MATTER IS PENDING BEFORE THIS COURT. ANY ESTIMATION OR RELATED PROCEDURES PROPOSED BY THE TCC ASSUMES, *ARGUENDO*, THAT THE DEBTOR'S CHAPTER 11 CASE IS NOT DISMISSED AS A BAD FAITH FILING. THE TCC RESERVES ALL RIGHTS WITH RESPECT TO ITS ARGUMENTS AND POSITION THAT DISMISSAL IS REQUIRED UNDER THE BANKRUPTCY CODE.**

The Official Committee of Talc Claimants (the "TCC"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") seeking entry of an order substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a) and 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018(a), (I) authorizing the estimation of current talc claims for voting purposes, (II) appointing Kenneth R. Feinberg as a court-appointed expert pursuant to Federal Rule of Evidence 706 ("FRE 706") in connection the estimation process, and (III) establishing procedures and a schedule for estimation proceedings. In support of the Motion, the TCC respectfully states as follows.[2]

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]    The TCC has moved to dismiss this bankruptcy (*see* Dkt. No. 286) on the ground that the Debtor's case was filed in bad faith, which the Third Circuit held is the gateway issue for a Debtor to be entitled to any bankruptcy relief. *In re LTL Mgmt. LLC*, 64 F.4th 84, 102 (3d Cir. 2023). This case should be dismissed. Until such time as this case is dismissed, and with a complete reservation of its rights to continue to seek dismissal of this case and all other appropriate relief, the TCC proceeds to participate in this bad faith bankruptcy to ensure that its constituents' rights are protected, most importantly, with respect to any effort to confirm a plan that forever denies claimants

2

## **INTRODUCTION**

1.      The Debtor has proposed a fixed pot plan in which the talc claimants (in the broadest sense of the term) would share in a fixed sum capped at payments with a present value equal to $8.9 billion.  J&J has made it clear that it will not pay more than $8.9 billion under **any** plan proposed by LTL.  The universe of claims that would share in this $8.9 billion pot (*e.g.*, ovarian cancer, mesothelioma, government, third-party payor, etc.) vary in value and nature.

2.      Estimation is necessary for two reasons:  *first* to ensure the proper eligibility for and weighting of votes given the different values of the claim types, and *second* so that claimants may be adequately informed prior to voting as to their potential recovery under LTL's plan.  For claimants to cast informed votes and for those votes to be weighted appropriately, an estimation regarding the volume and value of each present and future claim type must be first conducted.

3.      In LTL's first bankruptcy case ("LTL 1.0"), this Court *sua sponte* appointed Mr. Kenneth R. Feinberg to "prepare and file a Rule 706 report . . . estimating the volume and values of current and future ovarian and mesothelioma claims for which the Debtor may be liable . . . ." (the "First 706 Order") [Dkt. No. 2881 in Case No. 21-30589].  Mr. Feinberg is well qualified to serve in a similar role in LTL's second bankruptcy case ("LTL 2.0"), and he has already undertaken significant work in that capacity in LTL 1.0.

4.      LTL has proposed a plan for which estimation is required.  According to LTL, 60,000 claimants whose attorneys have pledged to support LTL's plan did not appear or otherwise make themselves known in LTL 1.0.  If these claimants are permitted to vote and if LTL's plan is confirmed, **all** talc claimants will be forced to accept nuisance value settlements and, at the same time, talc claimants who reject such awards will be denied the right to pursue J&J in the tort system

---

the right and ability to seek and receive fair and equitable compensation in Courts from LTL, J&J and other non-debtor affiliates.

and recover the amounts award to them by a jury.  If this Court is inclined to let LTL proceed with its plan, one of the most significant questions that will need to be determined is ***who*** can vote and with what ***weighting***.  *See* 11 U.S.C. § 1126(c) & 11 U.S.C. § 502(c).

5.     Section 1126(c) of the Bankruptcy Code sets forth the requirements for acceptance of a plan by a class of claims.  A class has accepted a plan only if (a) at least two thirds in ***amount***, and (b) more than one half in number of the creditors that voted accepted the plan.  *See* 11 U.S.C. § 1126(c) (emphasis added).  Section 1126(c)'s two thirds in amount requirement means that the value of current claims must be taken into consideration when determining whether a class has accepted a plan.  Obtaining the support of 50% or 75% in number, standing alone, is insufficient.

6.     To have a claim, an individual must have a "right to payment." 11 U.S.C. § 101(5).  J&J has made it clear that there is no scientific connection between non-ovarian gynecological cancers and J&J's talc products.  However, in unveiling LTL 2.0, LTL trumpeted the purported support of some 60,000 claimants—who, to this day, have not been confirmed to have been diagnosed with mesothelioma or ovarian cancer, which are both ailments scientifically shown to be linked to the use of J&J's talc products and for which J&J has paid, or agreed to pay, compensation in the tort system.  To the extent these gynecological cancer claims are neither ovarian cancer claims nor mesothelioma claims, they should not be permitted to vote on LTL's plan.  At the very least, their claims should be accorded substantially less value for voting purposes than talc claims that could survive a *Daubert* challenge.

7.     Weighing each talc claim equally for voting purposes (regardless of whether the ailment has a proven causal relationship to talc exposure) in one massive class comprised of highly variable claims is unsupported by the facts and circumstances of this case.  Doing so would only advance J&J's scheme of dredging up a mass of valueless "made for bankruptcy" claims to not

only forever rob ovarian cancer and mesothelioma claimants of their Constitutional rights to a jury, but also to dilute their votes in an attempt to irrevocably bind them to capped, less than full and deeply discounted recoveries.[3]  The Debtor's motion to establish solicitation procedures filed on July 11, 2023 reveals that this is, in fact, the Debtor's game plan.  *See* Dkt. No. 1011-1 at ¶¶ 51-56.  In its motion, the Debtor asks this Court to estimate **all** talc claims to be worth $1.00 for voting purposes—meaning that talc claims involving ovarian cancer and mesothelioma would have the same weight as non-ovarian gynecological claims for voting purposes.

8.     This Court should not permit a plan process to go forward that, in effect, uses claimants with claims not entitled to compensation under applicable law to stifle claimants with *Daubert*-supported claims that have been compensated in the tort system from ever litigating their claims in the future against solvent J&J.

9.     Section 502(c) provides a tool for exactly this purpose—an estimation of the various claims against the Debtor will ensure that claimants are informed when they cast their votes and that such votes carry deserved weight.  Mr. Feinberg, having familiarity with the Debtor, the talc claims (filed and unfiled) against J&J and the Debtor, and the benefit of more than six months of work in this area in LTL 1.0, is the obvious and most qualified individual to perform this analysis in LTL 2.0.  Appointing Mr. Feinberg to this role will facilitate data-driven weights by claim type for voting purposes that will serve to ensure the integrity and equity of the plan voting process.

---

[3]     J&J's promise that talc claims will be "paid in full" through LTL's bankruptcy is a falsehood.  By "paid in full," J&J means that all talc claimants will be forced to accept nuisance value settlement awards and will be denied the right to seek fair and equitable compensation from J&J in the tort system.  The sole purpose of LTL's bankruptcy is to permit J&J to dictate what constitutes full payment and deny any talc claimant who disagrees with J&J's determination the right to collect the amount awarded by a jury from J&J.  This is not a "paid in full" case; rather, it is an unlawful use of a manufactured bankruptcy for J&J's benefit to silence anyone who would dare stand up to J&J.

10.     Other parties in interest who want to participate in this critical matter should also have the right to be heard. The TCC is proposing an estimation process under the facts of this case that affords the TCC, the FCR, the Debtor, J&J, and other interested parties with the right to conduct discovery, offer expert reports, and to be heard in connection with how much weight, if any, should be assigned to the various categories of talc claims for voting purposes. The Debtor and J&J have already retained Bates White to offer an expert report on this issue and have long expected this battle as part of any confirmation proceeding.

11.     To be clear, the TCC believes that LTL's plan is patently unconfirmable for many reasons, including the fact that the sole purpose of LTL 2.0 is to obtain an illegal discharge of J&J's independent talc liability. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004). If the plan process is to move forward, it must be consistent with the Bankruptcy Code and the Bankruptcy Rules. Given the circumstances before the Court and the danger posed by J&J's plan to the rights of talc claimants to seek fair and equitable compensation for their injuries, LTL's plan process must begin with an estimation proceeding under section 502(c).

## **BACKGROUND**

12.     The Debtor re-filed for bankruptcy the same day its case was dismissed. The Debtor's second bankruptcy, by its own admission, is a continuation of its first bankruptcy— designed to accomplish the same objective, all for the benefit of non-debtor J&J. The Debtor has made clear, its sole objective (now, as in its first bankruptcy) is to resolve all talc claims against **non-debtor** J&J for all time and to deny talc claimants the ability to pursue their rights against J&J in courts of law.

13.     But it is worth pausing for a moment to examine what the universe of talc claims includes. Often, parties refer to the need to resolve the "ovarian cancer claims" and the

"mesothelioma claims."  But J&J seeks to garner support for a plan from holders of purported talc claims other than "ovarian cancer claims" and "mesothelioma claims."  To appreciate the obstacles that must be overcome for talc claimants to fairly vote on a plan and to be provided with adequate disclosure to do so—*i.e.*, the reasons why estimation is now necessary in this case—it is useful to begin with a general description of the various classes or categories of talc claims.

### *The Talc Claims*

14.    **Ovarian Claims**.    One universally acknowledged category of talc claims are personal injury claims involving epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer.[4]  This is what is commonly referred to in the Debtor's bankruptcy case as an "Ovarian Claim."

15.    The term "Ovarian Claim" does **not** include other types of gynecological cancers, including mucinous ovarian cancer, borderline mucinous ovarian cancers, endometrial cancer, uterine cancer, vaginal cancer, cervical cancer, germ cell cancer, small cell cancer, stromal cancer, or vulvar cancer.  Ovarian Claims are talc claims that have been found to have a **clear link** to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females.  These are talc claims that Courts have found have scientific support sufficient to get past summary judgment and for submission to a jury for consideration.[5]  And these are talc claims

---

[4]    The scientific literature describes, and it is generally understood, that epithelial ovarian cancer, fallopian tube cancer and primary peritoneal cancer all fall within the same category of cancer (*i.e.*, epithelial ovarian cancer) and share the same pathogenesis.  *See* Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact.* J CLIN ONCOL 26:5284-5293 (2008).  A causal connection between the genital application of talcum powder and epithelial ovarian cancer is supported for the following histologic subtypes: serous, endometrioid, clear cell, undifferentiated, mixed, serous borderline and endometrioid borderline.

[5]    *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 181 (D. N.J. Apr. 27, 2020).  The *Daubert* briefing in the MDL proceeding focused solely on ovarian cancer.  Plaintiffs' experts specifically limited their opinions to epithelial ovarian cancer, which added strength to their scientific conclusions.  J&J did not substantively discuss non-ovarian gynecological cancers, except to assert that talc "does not" cause "vaginal, cervical, [or] endometrial cancer."  *Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions*, No. 3:16-md-02738-FLW, Doc. 9736, at 88 (D.N.J.).  LTL has offered no explanation as to how or why the *Daubert* ruling in the

for which J&J has been held liable in the tort system, or has settled in the tort system.[6]  These are, in short, the types of claims that have been actually compensable in the tort system and for which J&J has agreed to pay thousands of dollars in settlements

16.    The Debtor's proposed plan implicitly acknowledges the key distinction between ovarian and non-ovarian gynecological cancer.[7]  The Gynecological Cancer Claims are treated as the lowest category of claims and are paid under the "Accelerated Evaluation Program."  Dkt. No. 912, Ex. M, § 5.2.1 ("Gynecologic Claims other than Ovarian Cancer claims shall only be eligible to receive a Point Value based on the Accelerated Evaluation Process.").  Moreover, the record at the motion to dismiss hearing established that J&J has never had to pay a judgment and has never agreed to pay by settlement a Gynecological Cancer Claim in the tort system.[8]

17.    In fact, in a mass email communication sent by Onder Law—one of the plaintiff firms supporting the Debtor's plan—admitted as follows:  "Many of these claimants **have**

---

MDL should not be followed by this Court.

[6]    *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. 2020), cert. denied, 141 S. Ct. 2716 (2021) (highest Missouri state court sustaining $2.2 billion judgment against J&J and JJCI for 22 women alleging ovarian cancer claims, finding J&J "engaged in reprehensible conduct of its own."); *see also Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation (as against JJCI) and for compensatory damages from JJCI arising out of its breach of its duty to warn customers of the risk of ovarian cancer from use of its talc products); *accord Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d at 181.  Other state-court appellate cases upholding talc claims have similarly addressed ovarian cancer specifically.  *E.g.*, *Carl v. Johnson & Johnson*, 464 N.J. Super 446, 475, 237 A.3d 308, 326 (App. Div. 2020).

[7]    The term "Gynecological Cancer Claim" refers to a talc claim for the following types of cancers:  mucinous ovarian cancer, borderline mucinous ovarian cancers, endometrial cancer, uterine cancer, vaginal cancer, cervical cancer, germ cell cancer, small cell cancer, stromal cancer, vulvar cancer, metastatic cancer from any non-qualifying primary cancer, and benign pathology.

[8]    *See* Hr'g Tr. July 28, 2023 (AM Session), 111:4-20 (J. Murdica) ("Q.  Okay.  It's true is it not that Johnson and Johnson never paid any settlement money on non-ovarian cancer gynecological cases, true?  A.  If you're asking me the same questions I was asked before, unless it was inadvertent, we were paying non-borderline epithelial ovarian cancer, or more strict than that in the few ovarian settlements I did in the tort system.  Some of them, it was not just epithelial.  It had to be a specific histologic pathology called Sirius.  Q.  And so the answer to my question was, yes.  Johnson and Johnson never knowingly paid on a claim for a non-ovarian gynecological cancer, true?  A.  I believe that that's true, and I believe I gave that same answer earlier this morning.  Q.  Okay.  You did settle thousands of ovarian cancer cases in the tort system, correct?  A.  Primarily with Mark Lanier.").

**gynecologic cancers that are not as convincingly proven by science to be related to talc; as such they will receive lesser compensation**." *See* **Exhibit B** (emphasis in original).[9]  The phrase "not as convincingly" is in fact an exaggeration—Gynecological Cancer Claims are unproven and scientifically unfounded.

18.    **Mesothelioma Claims**.  Another universally acknowledged category of talc claims are personal injury claims involving mesothelioma—*i.e.*, a type of cancer caused by exposure to asbestos that develops in the thin layer of tissue that covers many of the internal organs, including the lining of the lungs and chest wall, abdomen, heart, and testes.  This is what is commonly referred to in the Debtor's bankruptcy case as a "<u>Mesothelioma Claim</u>."

19.    Mesothelioma is fatal.  And, like Ovarian Cancer, it is a horrific disease. Mesothelioma is caused by exposure to asbestos, including (as has been found by juries) exposure to J&J's talc products.  Since 2018, J&J has suffered multiple defeats in the tort system when it comes to Mesothelioma Claims—*see, e.g.*, Anderson ($22.75 million), Leavitt ($29 million), Schmitz ($12 million), Barden ($787 million for 4 plaintiffs, including $750 million in punitive damages), Cabibi ($12 million), Moure-Cabrera ($6.22 million), Prudencio ($25.5 million), and Johnson ($27.5 million).  J&J's litigation strategy of denying that its talc products contained asbestos has become untenable, and it is clear that Mesothelioma Claims—like Ovarian Claims described above—have been actually compensable and have been settled by J&J in the tort system.

---

[9]    At least 12,000 of the claimants represented by Onder Law appear to hold non-compensable claims. *See* Hr'g Tr. July 28, 2023 (PM Session), 93:5-24 (J. Onder) ("Q.  Okay.  And he [Mr. Murdica] said that they would never pay on cervical cancer claims, right?  A.  Just as he said they wouldn't pay on ovarian.  Q.  Well, you knew that they did pay on ovarian cancer claims, right?  A.  Depending which time frame.  I knew they settled Lanier's docket.  Q.  Well, you knew that they settled Lanier's docket.  You knew they settled other cases as well, correct?  A.  I'm not aware of any other than Lanier.  Q.  Okay.  Then but you did know that in the tort system they settled ovarian cancer cases, correct?  A.  Correct.  Q.  Okay.  But the – he [Mr. Murdica] told you that never uterine, right?  A. Correct.  Q.  He told you never cervical, right?  A.  Correct.  Q.  You broke down for us between your case load of the gynecological cancers 9,000 uterine, 9,000 ovarian, 3,000 unknown.  Do you have cervical cancers in your -- in your inventory?  A.  For the most part, I do not.  I'm not saying there isn't a single one there…")

20.    **Governmental Claims**.  J&J's sale of talc products has also resulted in consumer protection claims asserted by governmental units (the "Governmental Talc Claims").

21.    In June 2014, the Mississippi Attorney General filed a complaint against J&J and Old JJCI alleging that they violated the Mississippi Consumer Protection Act by failing to disclose health risks associated with use of talc.  *See LTL Mgmt. LLC v. State of New Mexico, et al*., Case No. 22-01231-MBK, Dkt. No. 2-3.  In January 2020, the State of New Mexico filed a consumer protection case against J&J, Old JJCI, and certain other defendants alleging that they deceptively marketed talc products by making misrepresentations about the safety of the products.  *See id.* at Dkt. No 2-2.

22.    Further, forty-one states and the District of Columbia have commenced a joint investigation into J&J's and Old J&J's marketing of talc products.  And five states have issued Civil Investigative Demands seeking documents and other information.  These investigations could lead to additional states filing consumer protection claims against J&J based on its fraudulent conduct and years of deceiving consumers.  *See* Dkt. No. 4 (Decl. of John H. Kim in Support of First Day Pleadings), ¶ 39.[10]

23.    **Third Party Payor Talc Claims**.  Third party payor claims are claims asserted by governmental units, insurance companies, health maintenance organizations, employers or other entities that paid for medical services to treat individual individuals injured on account of talc-related injuries, including Ovarian Cancer and Mesothelioma (the "Third Party Payor Talc Claims").  *E.g*., *In re LTL Mgmt. LLC*, Case No. 21-30589-MBK, Dkt. No. 755.  According to the Debtor, third party payors hold direct claims against the Debtor and its affiliates, as well as liens

---

[10]    The Governmental Talc Claims are not "personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products" under section 524(g)(2)(B)(i)(I) of the Bankruptcy Code and cannot be paid by a section 524(g) trust.

and subrogation claims against proceeds to be received by current and future talc claimants for medical costs. The medical costs associated with treating Ovarian Cancer and Mesothelioma are significant. To date, no settlement agreement has been reached regarding the treatment of claims asserted by the Centers for Medicare & Medicaid Services ("CMS") and the U.S. Department of Veterans Affairs. *See* Hr'g Tr. July 28, 2023 (PM Session), 132:1-8 (J. Onder).[11]

24.    **Canadian Claims**. The Debtor's stated intention is to resolve claims in both the United States and Canada. Multiple class action lawsuits, certified and uncertified, exist in Canada as well as individual actions. These are collectively referred to as "Canadian Claims." *See* Dkt. No. 4 (Decl. of John H. Kim in Support of First Day Pleadings), ¶¶ 38, 102-04.

25.    The Canadian civil litigation process and governing law, including in respect of class actions, has significant nuanced differences to that of the United States. A class action may be commenced in any common law province and can be brought on behalf of class members in that province or across multiple regions in Canada. It is therefore common to see separate class actions launched in multiple jurisdictions against the same defendant for the same claims.

26.    Unlike the United States, Canada does not have a "multidistrict litigation" system to consolidate these cases. Class actions can proceed in multiple jurisdictions simultaneously and the cases will not necessarily be consolidated. They may proceed at different speeds and for different relief. This has the greatest impact for class actions commenced in the French-speaking province of Québec, which has a different legal and procedural regime than the rest of Canada (Québec has a civil law, rather than a common law system).

---

[11]    The Debtor asserts that it negotiated a term sheet with the lawyers of a sub-set of the holders of private non-CMS Third Party Payor Talc Claims—namely certain private payors that assert claims for medical expenses paid for non-mesothelioma talc personal injury claims, although a large number of other private third party payors are **not** in agreement with the term sheet.

27.     Aggregation of damages is allowed under provincial class action legislation that allows the Canadian court to determine monetary damages at a class-wide level based on the total monetary damage caused by the defendant's wrongdoing.   An individual class member's entitlement to a share of the aggregate award is left to be determined later through a claims process. Class-members may "opt-out" to pursue individual actions.   Due to the nature and stage of the various Canadian Claims, as well as the stay imposed on these proceedings pursuant to the recognition proceedings LTL has commenced in Canada, the universe of direct Canadian talc claims is presently unknown.

28.     It must be noted as well that the governments of each of the Canadian provinces and territories also have subrogated claims for recovery of universal health care costs.  A resolution of talc claims in Canada will require a claims identification process to comply with Canadian law and be recognized by the Canadian Court.   Some class action plaintiffs have already indicated that they may object to the recognition of J&J's plan in Canada on public policy and other grounds.

29.     **Talc Supplier Claims**.  The Debtor also faces liability for claims asserted by third-party suppliers who mined and sold talc to JJCI (sometimes referred to as "Talc Supplier Claims"). Talc Supplier Claims include claims for damages for breach of contract arising from JJCI's breach of any contractual obligation to indemnify a talc supplier other than payment of the indemnity itself, as well as claims for indemnification against JJCI.   The clear example of these claims are the claims that have already been asserted against JJCI in the *Imerys* and *Cyprus* bankruptcy cases. *See* Dkt. No. 4 (Decl. of John H. Kim in Support of First Day Pleadings), ¶¶ 56-60.

30.     In addition to the Ovarian Claims, the Mesothelioma Claims, the Gynecological Cancer Claims, the Governmental Talc Claims, the Third Party Payor Talc Claims, the Canadian

Claims, and the Talc Supplier Claims, various distributors and retailers may assert talc claims against the Debtor as well, including claims for indemnification and contribution.

31.    To fully appreciate the scope of the liabilities that J&J is seeking to resolve for all time through LTL's bankruptcy, the Court need only examine the definition of "Talc Related Liabilities" found in both Funding Agreements, which is so broad that it requires its own separate Schedule and includes every conceivable claim related directly or indirectly to the sale of J&J's talc products.

32.    The Debtor's proposed plan, **_e.g._, J&J's desired plan**, would channel **all** these talc claims to a trust for payment—including all future claims and claims involving cancers for which a scientific link to the use of J&J's talc products is established in the future—and, **_at the same time_**, it would bar all current and future claimants from ever pursuing J&J or any of its affiliates in the tort system.  If the trust runs out of money, future talc claimants will have no recourse other than to argue that their right to due process was denied.

33.    And, if J&J's desired plan trust were created pursuant to section 524(g) or otherwise, it would be required to establish reserves to ensure that it is in a financial position to pay present and future talc claims in substantially the same manner.  And the trust could be required to establish reserves to ensure that Governmental Talc Claims, Third Party Payor Talc Claims and Talc Supplier Talc Claims receive the same _pro rata_ distribution as other talc claims when their claims are liquidated years from now.  Further, under LTL's proposed plan the trust would be required to pay all defense costs associated with liquidating such claims, which would further deplete the limited and fixed assets available to pay talc victims.  _See_ Dkt. No. 912 at § 4.16.

34.    If this Court is inclined to let LTL proceed with its proposed plan, one of the most significant questions that will need to be determined is **_who_** can vote and with what **_weighting_**.

*See* 11 U.S.C. § 1126(c) & 11 U.S.C. § 502(c).  The Debtor cannot satisfy the requirements of

section 524(g) or section 1126(c) based on the votes of claimants holding non-compensable claims.

Section 524(g)'s seventy-five percent (75%) voting requirement can only be met by a class or

classes of "claimants whose claims are to be addressed by a trust" that votes in favor of a plan—

*i.e.*, no claim, no vote.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

35.     Under section 1126(c) an impaired class is deemed to accept a plan only if it is

approved by those creditors who "hold at least two-thirds in amount and more than one-half in

number of the allowed claims of such class held by creditors."  11 U.S.C. § 1126(c).  Accordingly,

consideration must be given to the amount (or value) of the claims held by the various groups of

talc claims (or types of talc claims) as well as the number of creditors who support the plan.

36.     If these requirements are not observed, non-compensable claims could be used to

drown-out cancer victims who are dying based on illnesses found to be linked to J&J's talc

products.  LTL and J&J cannot stuff the ballot box with unfiled, unscheduled, non-compensable

claims to prevent claimants from asserting Ovarian Claims and Mesothelioma Claims against a

solvent Fortune 50 company in the tort system when most claimants holding such claims reject the

plan.  Under these circumstances, section 502(c) requires this Court to estimate claims for voting

purposes to ensure that the proper weight is accorded to each claim under section 1126(c) of the

Bankruptcy Code.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein

are sections 105(a) and 502(c) of the Bankruptcy Code, Bankruptcy Rule 3018(a), and Federal

Rule of Evidence 706.

## RELIEF REQUESTED

38.    By this Motion, the TCC seeks an order, pursuant to sections 105(a) and 502(c) of

the Bankruptcy Code, Bankruptcy Rule 3018(a), and Federal Rule of Evidence 706, authorizing

the estimation of current talc claims for voting purposes, appointing Kenneth R. Feinberg as a

court-appointed expert pursuant to FRE 706 in connection the estimation process, and establishing

procedures and a schedule for estimation proceedings.

## ARGUMENT

I.    **For LTL's Plan to Go Forward, the Court Is
      Required to Estimate Talc Claims for Voting Purposes**

39.    For LTL's plan to go forward under the facts presented by this case, this Court must

estimate the talc claims.  Section 502(c) of the Bankruptcy Code provides that the Court "shall"

estimate "any contingent or unliquidated" claims against a debtor if the "fixing or liquidation"

thereof "would unduly delay the administration of the case."  11 U.S.C. § 502(c).  Bankruptcy

Rule 3018(a) provides that "the court after notice and hearing may temporarily allow the claim or

interest in an amount which the court deems proper for the purposes of accepting or rejecting a

plan." Fed. R. Bankr. P. 3018(a).

40.    Courts applying section 502(c) have estimated claims when such is necessary to

ensure that such claims are accorded the proper weight for voting purposes.  *See Bittner v. Borne

Chem. Co.*, 691 F.2d 134, 137 & fn. 9 (3d Cir. 1982) (affirming court's estimation of stockholders'

claims for "voting" purposes "at zero, and temporarily disallowing them until the final resolution

of the state action"); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y.

1996) (estimating former chief executive officer's claim for voting purposes); *In re Farley, Inc.*,

146 B.R. 748, 756 (Bankr. N.D. Ill. 1992) (estimating personal injury claims "for purpose of voting and determining plan feasibility"); *In re Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) (estimating personal injury tort claims "for purposes of voting on the debtor's plan of reorganization, and not for the purpose of determining the debtor's ultimate liability for the claim or the amount of the claim for purposes of distribution."); *In re Continental Airlines Corp.*, 60 B.R. 903, 906 (Bankr. S.D. Tex. 1986) (estimating claim "at zero value for voting purposes" pending liquidation "through subsequent proceedings, independent of [the] reorganization [proceeding].")

41.    In *Bittner*, the Court estimated a stockholder's claims at zero for voting purposes based on the stockholder's "chances of ultimately succeeding in the state court action" due to the uncertainties surrounding the claim and "probability of success" on the merits.  691 F.2d at 137. The Third Circuit found that this was necessary to ensure that stockholders did not wield undue influence and exercise a "controlling[] voice in the reorganization proceeding." *Id.*  The temporary disallowance of the claim for voting purposes was not a "final adjudication of the state court action." *Id.*  But it was necessary for the Court to avoid undue delay in the reorganization and was consistent with "the Chapter 11 concerns of speed and simplicity." *Id.*

42.    In LTL 1.0, the Debtor proposed a standalone estimation proceeding divorced from any plan.  LTL argued that estimation was necessary "for the purposes of formulating" a plan. *See* Case No. 21-30589, LTL Status Report (Dkt. No. 2473) at 3.  This argument has now been shown to be false—the plan the Debtor filed in LTL 2.0 was "formulated" without the benefit of any judicial findings made in an estimation proceeding.  The standalone estimation proceeding in LTL 1.0 was outside the traditional use of estimation under section 502(c) of the Bankruptcy Code.

43.     However, as the TCC argued in LTL 1.0, Courts can and do estimate claims under

section 502(c) of the Bankruptcy Code for *voting* purposes.  *See* Case No. 21-30589, TCC

Statement in Opposition to Estimation at Dkt. No. 2722, ¶ 30.  Cases like *Bittner*, *Ralph Lauren*,

*Farley*, *Federal Press*, and *Continental Airlines* show that estimation for voting purposes can take

place to resolve issues that arise in the context of attempts to confirm a filed chapter 11 plan.  Here,

LTL has now filed a chapter 11 plan.  And it is the type of plan that necessitates an estimation

proceeding under section 502(c) of the Bankruptcy Code.[12]

44.     If the Court is inclined to permit LTL to move forward with its plan, estimation is

required to determine who can vote and with what weighting.  J&J's litigation, verdict, and

settlement history, as well as LTL's proposed plan and trust distribution procedures reflect

significant variances in the values of the various groups of talc claims.  Prior to LTL 2.0, J&J had

never settled a single Gynecological Cancer Claim.  And no holder of a Gynecological Cancer

Claim had ever obtained a jury verdict against J&J or any affiliate.

45.     Under *Bittner*, the chances of these talc claims succeeding on the merits in a state

court action would justify a zero valuation for voting purposes, particularly in determining whether

any class including talc claims is an accepting class under section 1126(c) of the Bankruptcy Code.

46.     But this does not end the inquiry or the need for estimation in this case.  A cursory

review of LTL's proposed trust distribution procedures shows variances in the proposed treatment

of Mesothelioma Claims, Ovarian Claims, Governmental Talc Claims, Canadian Claims, Third

---

[12]   The TCC's plan does not suffer from the same defects as LTL's plan.  The TCC's plan does not impose a limited
or fixed $8.9 billion fund but instead makes the full value of Old JJCI—at least $61.5 billion—available to pay
talc claims, consistent with LTL's representations to this Court and the Third Circuit.  The TCC's plan classifies
the various claims and interests into eleven separate classes, six of which would be entitled to vote.  And the
TCC's plan does not discriminate between the classes of talc claims.  The TCC's plan would not require
estimation unless a party opposed feasibility and argued that LTL's total liability is more than $61.5 billion (which
no party has ever suggested).  Estimation could be helpful in showing that the TCC's plan is confirmable.  The
TCC's plan would require far less litigation to confirm than LTL's plan.  If this case is not dismissed, the TCC's
plan remains the only viable path forward.  The TCC, however, has not been permitted to file its plan.

Party Payor Talc Claims and Talc Supplier Claims.  An understanding of the value of these talc claims is necessary to determine proper weighting for voting purposes and to determine how much claimants can realistically expect to recover under LTL's proposed capped settlement fund.  A critical issue for each claimant under LTL's proposed plan is: *what am I going to receive*?

47.    Section 1125 of the Bankruptcy Code requires that the disclosure statement contain "adequate information" sufficient to enable a hypothetical reasonable creditor to make an informed judgment about the plan.  *See* 11 U.S.C. § 1125(b).  In this case, adequate information requires information about likely recovery.  *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 408 (Bankr. S.D. Tex. 2016) (finding that the disclosure statement did not contain adequate information under section 1125 because it failed to disclose actual or projected recoveries).

48.    In other words, a party solicited to vote on LTL's plan may only be said to have adequate information if such party knows what its recovery will be under the plan.  A disclosure statement that does not provide recovery amounts cannot be said to contain adequate information, and votes thereon may not be solicited under section 1125 of the Bankruptcy Code.  Instead, LTL offers "points" of an undetermined value with no further assurances or guarantee.  The supporting law firms do not even know what "points" under LTL's plan will be worth.[13]

49.    With the pot fixed at a present value of $8.9 billion, each claimant's recovery depends on the number and nature of ***all*** talc claims.  At present, claimants lack that information. Claimants do not know, for instance, the number of present and future Ovarian Claims, Mesothelioma Claims, Gynecological Cancer Claims, Governmental Talc Claims, Canadian

---

[13]    *See* Hr'g Tr. July 28, 2023 (PM Session), 97:25-98:14 (J. Onder) ("Q.  You can't call up a client and say, hey, I know you said you're with me – A.  Right.  Q. -- but I got good news for you, here's how much money you get, I want authority to settle.  You can't do that now, can you?  A.  That's correct.  Q.  In fact, the most you can do is you can say, hey, I got news for you, you got 720 points, right?  A.  Right. Or -- and – Q.  Or whatever points. But you don't know, because it hasn't been determined, how many points equals a dollar or how many dollars equals a point, true?  A.  Without the input of the FCR, you can't tell with certainty.  We can estimate, but correct.")

Claims, Third Party Payor Talc Claims, or Talc Supplier Claims.  Nor do they know the value of the respective claims and what impact the allowance of such talc claims could have on their recoveries.

50.    LTL is proposing a fixed fund.  Thus, without this information it is *impossible* for claimants to answer the critical question: *what am I going to receive*?

51.    Estimating claims for voting purposes will enable claimants and the Court to have a clearer understanding of the universe of potential talc claims that would be paid exclusively from LTL's proposed settlement trust if LTL's plan is confirmed.  This would inform the value of the "points" awarded under LTL's plan and enable talc claimants who are entitled to vote to have a clearer understanding of the plan's impact on their legal rights and likely recoveries.  If talc claimants will only recover pennies on the dollars under LTL's proposed plan, that information must be clearly disclosed in any disclosure statement approved in connection with LTL's plan.

## II.    <u>The Court Should Appoint Mr. Feinberg as an Expert Witness</u>

52.    This Court has already addressed many of these issues.  To be as efficient as possible, the Court should appoint Mr. Feinberg as an expert witness in connection with the estimation of the Debtor's talc liability.

53.    Federal Rule of Evidence 706 allows a Court to appoint an expert witness to serve the court on its own motion or by that of another party.  *See* Fed. R. Evid. 706; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) ("Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing.").  In LTL 1.0, this Court appointed Mr. Feinberg pursuant to FRE 706 "in connection with estimating the Debtor's liability for present and future talc under section 502(c) of the Bankruptcy Code."  *See* First 706 Order.  Specifically, this Court ordered Mr. Feinberg to prepare and file a Rule 706 report "estimating the volume and

values of current and future ovarian and mesothelioma claims for which the Debtor may be liable, whether arising in the United States or Canada." *Id.* at ¶ 2.

54.     Prior to entering the First 706 Order, this Court made two notable observations. **First**, this Court observed that "[w]ith respect to 706 . . . use [of an expert] in the fashion that I am going to describe is not new or extraordinary." Hr'g Tr. July 28, 2022, 7:12-14.[14]

55.     **Second**, this Court observed that "the work of such an expert is especially critical in dealing with complex mass tort problems," reasoning that "Courts cannot proceed towards a just and equitable result without some reasonably firm data projecting the numbers and volume of claims at issue and that all parties have a strong and conflicting interest in the character of the data." Hr'g Tr. July 28, 2022, 7:22-8:2.  As such, this Court concluded that "these factors alone and in combination point to the necessity of a neutral expert providing assistance under the auspices of the Court." Hr'g Tr. July 28, 2022, 8:2-4.

56.     After determining that a Court-appointed expert was critical to the case, this Court elucidated the qualifications of its intended (and eventual) selection, Mr. Feinberg.[15]  Not only did this Court find that Mr. Feinberg was well qualified for the role, the Court also noted that "the universe of applicants who could fill this role is somewhat limited," and compared the small applicant pool to the relative difficulty that the FCR, Ms. Ellis, had securing an expert. *See* Hr'g Tr. July 28, 2022, 8:10-15.

57.     The TCC further submits that Mr. Feinberg is the best and most appropriate expert for the role for three reasons.

---

[14]    This Court went on to note that "[i]t has been used in the past, for instance, by Judge Burton Lifland, in Calpine, also in the Joint Eastern and Southern District asbestos litigation matters which arose out of Manville. I think Judge Isgur actually recently in HONX spoke to the possibility of appointing a 706 expert." Hr'g Tr. July 28, 2022, 7:14-19.

[15]    *See* Hr'g Tr. July 28, 2022, 8:6-9 ("Mr. Feinberg, I'm sure is well-known to most of you, has an extensive career and record in this type of work and a familiarity with many if not all of the issues that are presented.").

58.      *First*, as the Court already found in LTL 1.0, Mr. Feinberg has the necessary qualifications to serve as the Rule 706 expert and the potential pool of qualified applicants who can fill this role remains limited.

59.      *Second*, Mr. Feinberg has significant knowledge regarding the Debtor and the nature and extent of its talc liability (including filed, unfiled and future claims) because of his experience as the Rule 706 expert in LTL 1.0.  As a result of his experience in LTL 1.0, Mr. Feinberg will not need to spend time familiarizing himself with the Debtor and its liabilities and should be able to immediately engage in meaningful discussions and decisions with the Debtor, the TCC, and other key constituents regarding the estimation of the Debtor's talc liabilities for voting purposes.

60.      *Finally*, and relatedly, consideration of alternative candidates would result in additional costs and delays, and any other expert would require additional time to familiarize himself with critical facts in this case.

61.      The terms and guidelines that apply to Mr. Feinberg, in his capacity as the Court-Appointed Expert, in the preparation and submission of his Rule 706 Report are consistent with the *Order Appointing Expert Pursuant to Federal Rule of Evidence 706* (Dkt. No. 2881) entered by this Court in LTL 1.0 and as set forth in Paragraph 3 of the Proposed Order.

62.      The scope of Mr. Feinberg's engagement, however, has been expanded to include not just the appropriate weight to be accorded to different types of talc claims for voting purposes, but also the aggregate volume and value of all current and future talc claims that will be satisfied by any trust formed pursuant to LTL's proposed plan.  LTL's proposed plan trust is not limited to current and future Ovarian Claims and Mesothelioma Claims.  Giving weight or value to Gynecological Cancer Claims (which should be estimated at zero or *de minimis* values), among

others, could cause significant dilution to the recoveries of holders of Ovarian Claims and Mesothelioma Claims.  Mr. Feinberg's engagement, therefore, must mirror the universe of talc claims being channeled under LTL's plan since this universe necessarily informs the ultimate distribution to each talc claimant under LTL's plan.

### III.    The Court Should Approve the Proposed Estimation Schedule

63.    Finally, the TCC requests that the Court approve a schedule and procedures for the estimation proceeding to ensure that all parties in interest that want to participate can do so.  Courts have adopted claims estimation procedures in the course of granting estimation orders.  *See*, *e.g.*, *In re CMTSU Liquidation, Inc. (f/k/a CIBER, Inc.)*, Case No. 17-10772 (BLS) (Bankr. D. Del. Sep. 29, 2017) (approving claims estimation procedures); *In re VeraSun Energy Corp.*, Case No. 08-12606 (BLS) (Bankr. D. Del. Nov. 19, 2009) (same); *In re Motors Liquidation Co.*, Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Dec. 15, 2010) (same).

64.    The TCC proposes the following schedule for fact and expert discovery, motion practice, briefing and a hearing in advance of the consideration of any disclosure statement.  This process—appropriate specifically for this case—is intended to avoid undue delay while ensuring a transparent process in which all parties in interest may participate.  The TCC would welcome a prompt meet and confer process with all parties in interest to negotiate an agreed schedule and set of procedures, but nonetheless offers the following schedule and procedures for the Court's consideration:

a.    Within 7 days after entry of the Order granting this Motion, any party in interest that wishes to submit evidence in connection with the estimation hearing shall file a Notice of Estimation Participating Party, in the form attached hereto as **Exhibit C**.  The TCC, the FCR, the Debtor, J&J, and each party that timely files the Notice of Estimation Participating Party shall

be a Participating Party. Any party in interest other than the TCC, the FCR, the Debtor, and J&J that fails to timely file a Notice of Estimation Participating Party within such time period shall be barred from submitting evidence in connection with the estimation hearing, provided, however, that nothing in the Order granting this Motion shall limit or restrict the rights of any party in interest to defend or respond to discovery requests, including, without limitation, defending or objecting to the taking of depositions and responding to subpoenas, all of which are expressly reserved.

      b.      Any party that timely files a Notice of Estimation Participating Party shall be deemed to have assented to and shall be bound by the *Order Governing Confidential Information by and between the Official Committee of Talc Claimants and the Debtor Pursuant to D.N.J. LBR 9021-1(B)* (Dkt. No. 545) (the "Protective Order"). Each party in interest that files a Notice of Estimation Participating Party shall include a statement indicating that such party has reviewed the Protective Order and agrees to comply with it in all respects.

      c.      Within 10 days after entry of the Order granting this Motion, the Debtor and J&J shall produce to the other Participating Parties (i) information in their possession sufficient to show all amounts paid to settle or otherwise satisfy talc claims and (ii) all information previously produced to the Court-Appointed Expert. The Debtor and J&J shall promptly supplement this production to the extent that they obtain, receive, or provide any new information responsive to Paragraphs (c)(i) and (c)(ii) above.

      d.      Within 90 days after the entry of the Order granting this Motion, all fact discovery, including all fact depositions, shall be completed. No party may serve fact discovery on the Court-Appointed Expert.

e.      Within 120 days after the entry of the Order granting this Motion, each Participating Party may serve on all other Participating Parties its expert reports, along with all documents considered or relied upon by the experts authoring those reports.

f.      Within 130 days after the entry of the Order granting this Motion, the Court-Appointed Expert shall serve on all other Participating Parties his expert report, along with all documents considered or relied upon by the expert(s) authoring that report.  This report shall offer an opinion as to (i) the aggregate volume and value of all current and future talc claims asserted against the Debtor and J&J that will be satisfied by any trust formed pursuant to LTL's proposed plan and (ii) an average claim value to be used to weigh claims for voting purposes to the following categories of talc claims:  Mesothelioma Claims, Ovarian Claims, Gynecological Cancer Claims, Governmental Talc Claims, Canadian Claims, Third Party Payor Talc Claims, and Talc Supplier Claims.  The Court-Appointed Expert's opinion and/or estimates shall have no binding or preclusive effect and shall not be used for any purpose other than to weigh the values assigned to votes on LTL's plan.

g.      Within 140 days after the entry of the Order granting this Motion, each Participating Party may serve on all other Participating Parties its rebuttal expert reports, along with all documents considered or relied upon by the experts authoring those reports (to the extent not previously produced).

h.      Within 160 days after the entry of the Order granting this Motion, all expert discovery, including all expert depositions, shall be completed.

i.      Within 180 days after the entry of the Order granting this Motion, each Participating Party shall file its proposed estimation order, trial brief, motions in limine (if any), and motions to preclude expert testimony (if any).  No dispositive motions shall be permitted.  As

part of its trial brief, each Participating Party shall propose an average claim value to be used to weigh claims for voting purposes to the following categories of talc claims:  Mesothelioma Claims, Ovarian Claims, Gynecological Cancer Claims, Governmental Talc Claims, Canadian Claims, Third Party Payor Talc Claims, and Talc Supplier Claims.  This claim value shall have no binding or preclusive effect and shall not be used for any purpose other than to weigh the value assigned to votes on LTL's plan.

j.      The estimation hearing will commence on a date to be set by the Court.

k.      No party may solicit votes on any plan of reorganization until the Court issues its ruling on the weight to be accorded to the categories of talc claims for voting purposes.

65.      Although the proposed estimation schedule will take some time, albeit subject to the aggressive schedule proposed above, estimation is necessary here given the plan proposed by LTL.  LTL cannot provide adequate disclosure in relation to LTL's plan until this process is complete and claimants can determine whether they are being fairly compensated under LTL's plan.  If LTL's plan is to go forward, delaying this process would only create more delay.

## NOTICE

66.      Notice of this Motion has been served on:  (a) the U.S. Trustee; (b) counsel to the Debtor and the Debtor's non-debtor affiliates, Johnson & Johnson Holdco (NA) Inc. and Johnson & Johnson; and (c) all persons who have formally appeared in this chapter 11 case and requested service pursuant to Bankruptcy Rule 2002.  Considering the nature of the relief requested herein, the TCC respectfully submits that no other or further notice need be provided.

## NO PRIOR REQUEST

67.      No prior request for the relief sought in this Motion has been made to this or any other court in connection with this case.

## CONCLUSION

68.    **WHEREFORE**, based on the foregoing, the TCC respectfully requests that the

Court grant the Motion and grant such other and further relief as the Court deems necessary and

appropriate.

Respectfully submitted,

**GENOVA BURNS, LLC**

By:    */s/ Donald W. Clarke, Esq.*

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee
of Tort Claimants*