**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
gkinoian@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126

*Local Counsel for the*
*Official Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
Eric R. Goodman, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
egoodman@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Co-Counsel for the*
*Official Committee of Talc Claimants*

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
Rachel S. Morse, Esq.
jmassey@masseygail.com
rmorse@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467

*Special Counsel for the*
*Official Committee of Talc Claimants*

**OTTERBOURG PC**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
David A. Castleman, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
dcastleman@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
*Co-Counsel for the*
*Official Committee of Talc Claimants*

| | |
|---|---|
| In Re: | Chapter 11 |
| **LTL MANAGEMENT, LLC,**[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

### MOTION OF THE OFFICIAL COMMITTEE
### OF TALC CLAIMANTS FOR ENTRY OF AN ORDER
### (I) ESTABLISHING A DEADLINE FOR FILING PROOFS OF
### CLAIM, (II) APPROVING THE PROPOSED MODEL CLAIM FORM FOR
### PERSONAL INJURY TALC CLAIMS AND RELATED PROCEDURES, AND
### (III) DIRECTING THE DEBTOR TO PROVIDE ADEQUATE NOTICE OF THE
### DEADLINE FOR FILING PROOFS OF CLAIM TO ALL TALC CLAIMANTS

**THE TCC HAS ASSERTED AND CONTINUES TO ASSERT THAT THE DEBTOR'S CHAPTER 11 CASE WAS FILED IN BAD FAITH AND SHOULD BE DISMISSED. THIS MATTER IS PENDING BEFORE THIS COURT. ANY DEADLINE FOR FILING PROOFS OF CLAIM PROPOSED BY THE TCC ASSUMES, *ARGUENDO*, THAT THE DEBTOR'S CHAPTER 11 CASE IS NOT DISMISSED AS A BAD FAITH FILING. THE TCC RESERVES ALL RIGHTS WITH RESPECT TO ITS ARGUMENTS AND POSITION THAT DISMISSAL IS REQUIRED UNDER THE BANKRUPTCY CODE.**

The Official Committee of Talc Claimants (the "TCC"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") seeking entry of an order substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a) and 501 of the Bankruptcy Code and Bankruptcy Rules 3001(a) and 3003(c)(3), (I) establishing a deadline for filing proofs of claim by talc claimants against the Debtor (the "Talc Bar Date"), (II) approving the proposed model Proof of Claim Form for personal injury talc claims ("PI Talc Claims") (attached hereto as **Exhibit B**) (the "PI Talc Claim Form") and related procedures for filing PI Talc Claims, and (III) directing the Debtor provide adequate notice of the Talc Bar Date to all talc claimants. In support of the Motion, the TCC respectfully states as follows.[2]

---

[1]  The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]  The TCC has moved to dismiss this bankruptcy (*see* Dkt. No. 286) on the ground that the Debtor's case was filed in bad faith, which the Third Circuit held is the gateway issue for a Debtor to be entitled to any bankruptcy relief.

## INTRODUCTION

1.      The Debtor's bar date motion is inadequate.  *See* Dkt. No. 842.  The Debtor's failure to seek a bar date for personal injury talc claims speaks volumes.  The Debtor cannot confirm a chapter 11 plan that strips dying talc claimants of their Constitutional rights and claims against solvent J&J using the votes of claimants that hold claims that are not compensable under applicable law or that may not even exist.

2.      The Debtor has announced its intent to try to confirm one of the most ambitious and controversial chapter 11 plans in United States history.  Yet the Debtor's proposed plan and disclosure statement—in furtherance of J&J's aim to force talc claimants to accept patently unfair settlement amounts for their injuries—are nothing more than a bait and switch scheme intended to shield one of the most profitable corporations in the United States from liability for harm that it caused.

3.      In an attempt to create artificial "support" in furtherance of its efforts, the Debtor seeks the votes of holders of talc claims for which there is no valid scientific connection between exposure to J&J's talc products and the alleged injury.  Under the Debtor's scheme, these individuals with unsupported claims will be entitled to vote in the same manner as if they were cancer victims with scientifically and legally supported claims.  The Bankruptcy Code and the Bankruptcy Rules simply do not allow for LTL's desired rigged election.

4.      If this Court is inclined to let the Debtor proceed with its plan, one of the most significant questions that will need to be determined is *who* can vote and with what *weighting*.

---

*In re LTL Mgmt. LLC*, 64 F.4th 84, 102 (3d Cir. 2023).  This case should be dismissed.  Until such time as this case is dismissed, and with a complete reservation of its rights to continue to seek dismissal of this case and all other appropriate relief, the TCC proceeds to participate in this bad faith bankruptcy to ensure that its constituents' rights are protected, most importantly, with respect to any effort to confirm a plan that forever denies claimants the right and ability to seek and receive fair and equitable compensation in Courts from LTL, J&J and other non-debtor affiliates.

*See* 11 U.S.C. § 1126(c) & 11 U.S.C. § 502(c).  Further, section 1122(a) of the Bankruptcy Code precludes placing claims together in a single class when the legal rights are not substantially similar.  And section 1123(a)(4) mandates that each claim in a particular class receive the same treatment.

5.       Here, the Debtor's plan seeks to place in a single class claims involving different legal rights—*i.e.*, on the one hand, claims found to be supported by science for which LTL faces legal liability and, on the other hand, claims that have not been found to be supported by science for which LTL does not face legal liability.[3]  And the Debtor's plan then seeks to channel these talc claims (placed in a single class) to different funds (or sub-funds), and applies different payment percentages to sub-groups of talc claims, which is the definition of different treatment.[4]

6.       To allow the Court to determine the essential issues of ***who*** can vote and with what ***weighting***, and to provide all parties with relevant information regarding the talc claims at issue here, this Court should follow Bankruptcy Rule 3003(c)(3), which provides that the Court shall fix the time within which proofs of claim may be filed so that eligibility to vote can be determined. *See* Fed. R. Bankr. P. 3003(c)(3).  This means that <u>**all**</u> talc claimants—not just ***other*** general unsecured creditors (as the Debtor seeks)—should be required to file a proof of claim under penalty of perjury, as provided by the Bankruptcy Rules, before such claimants can vote on any chapter 11

---

[3]   Disparities between legal rights of claims precludes claims from being classified together under section 1122(a) of the Bankruptcy Code.  *See, e.g.*, *Matter of Woodbrook Associates*, 19 F.3d 312, 319 (7th Cir. 1994); *In re LOOP 76, LLC*, 465 B.R. 525, 536 (9th Cir. BAP 2012), *judgment aff'd*, 578 Fed. Appx. 644 (9th Cir. 2014); *In re SM 104 Ltd.*, 160 B.R. 202, 219 (Bankr. S.D. Fla. 1993).

[4]   *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members.").  LTL's proposed TDPs assign preferred sub-groups of talc claims point or dollar values that closely align with or exceed the actual value of such claims.  Disfavored sub-groups, in contrast, are assigned point values that are substantially lower than the value of the claims.  This is mathematically no different than assigning different payment percentages to different sub-groups within a class.  When TDPs discriminate in this manner—*i.e.*, afford certain claimants with inferior recoveries relative to other claimants—separate classification is required under section 1123(a)(4). *See In re W.R. Grace & Co.*, 729 F.3d 311, 329-30 (3d Cir. 2013).

plan in this case (including the TCC's plan).  The Debtor's reliance on unfiled claims[5] falls well short of what is required under the Bankruptcy Rules.

7.       Bankruptcy Rule 3003(c)(2) provides that any creditor whose claim or interest (a) is not scheduled in the Debtor's schedules of assets and liabilities and statements of financial affairs, or (b) is scheduled as disputed, contingent, or unliquidated (as are all talc claims in this case) shall file a proof of claim by a bar date fixed by the Court.  Bankruptcy Rule 3003(c)(2) further provides that "any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution."  Fed. R. Bankr. P. 3003(c)(2).  Under the circumstances of this case, adherence to the Rule's plain language is appropriate and talc claimants who do not timely file a proof of claim should not be permitted to vote on the Debtor's plan.

8.       The Debtor cannot confirm a plan based on votes submitted by parties that do not hold claims recognized under applicable law against the Debtor, even though the Debtor and J&J clearly desire this result.  To have a claim, an individual must have a "right to payment."  11 U.S.C. § 101(5).  The Debtor's plan cannot force outcomes on individuals who have cancers that have been found to have a valid scientific link to J&J's talc products based on votes by individuals who do not either have cancers found to have a valid scientific link to J&J's talc products or individuals who may not have been exposed to J&J's talc products.

9.       Doing so would undermine the chapter 11 process by permitting a debtor to strip talc claimants with legitimate claims of their right to a jury trial and their ability to obtain recovery

---

[5]    *See* Hr'g Tr. July 28, 2023 (AM Session), 29:7-30:16 (J. Murdica) ("Q.  And with respect to the unfiled claims, you believe those claims are real claims, correct?  A.  Yes.  Q.  Now, you didn't ask any of those firms if they had engagement letters with any of the unfiled claimants, correct?  A.  No.  Q.  And you didn't ask if they had any complaints actually drafted for any of the unfiled claimants, right?  A.  I wouldn't.  Q.  And you don't know, and you didn't know if they had pathology reports for any of the unfiled claimants, right?  A.  No, not for anybody.  Q.  And you didn't know if they had any medical records for any of the unfiled claimants, right?  A.  I presume all of that, but no.").

from non-debtors based on the votes of individuals who should not be entitled to vote (or, at least, to vote with anything more than nominal weight). To ensure the integrity of the bankruptcy process, each claimant who wants to vote on the Debtor's plan must, at a minimum, file a proof of claim under penalty of perjury setting forth their legal right to payment from the Debtor, as the Bankruptcy Rules contemplate.

10. This is the practice followed by Courts in asbestos cases going back to the 1992 decision in *Eagle-Picher*. *See In re Energy Future Holdings Corp.*, 522 B.R. 520, 538 (Bankr. D. Del. 2015) (Judge Sontchi) (analyzing Bankruptcy Rule 3003 and holding that the establishment of bar date for asbestos claims is not discretionary with the Court but is mandatory given the plain language of Bankruptcy Rule 3003(c)(3)); *In re Specialty Prods. Holding Corp.*, No. 10-11780 (PJW), Hr'g Tr. at 40:8-10 [Dkt. 4286] (Bankr. D. Del. Nov. 5, 2013) & Hr'g Tr. at 6:10-14 [Dkt. 4458] (Bankr. D. Del. Jan. 7, 2014) (ruling in favor of a bar date for asbestos claims); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) [Dkt. 13061] (Bankr. D. Del. Aug. 24, 2006) (setting bar dates for asbestos personal injury claims); *In re The Babcock & Wilcox Co.*, Nos. 00-0558, 00-10992, 2000 WL 36743341, at *9 (E.D. La. Aug. 25, 2000) (approving bar date for asbestos personal injury claims); *In re Eagle-Picher Indus. Inc.*, 137 B.R. 679, 680-81 (Bankr. S.D. Ohio 1992) (holding that a bar date should be set for asbestos personal injury claimants)

11. This is the practice followed by Courts in recent mass tort cases outside of the asbestos context. For example, in *In re PG&E Corporation*, No. 19-30088 (DM) (Bankr. N.D. Cal.), the debtors asked the Court to establish a bar date for tort claims and the Court did so. *See PG&E* Dkt. Nos. 1784 & 2806. Only after the bar date passed and tens of thousands of individual claimants filed proofs of claim identifying evidence of the validity of their claims (*e.g.*, the fire caused by PG&E that destroyed their homes or damaged their property), did the Court

approve a disclosure statement, *see PG&E* Dkt. No. 6340, and permit the debtors to solicit votes

on a chapter 11 plan.  The parties who voted on PG&E's plan (*e.g.*, individuals, governmental

units, and businesses), and whose votes were counted, were the parties who filed proofs of claim

under penalty of perjury (and not some other group that was not impacted by the fires caused by

PG&E).

12.     In addition to setting a bar date, the Court, under the facts of this case, should also

approve a customized claim form like the form used in *PG&E*.[6]  The evidentiary effect of a proof

of claim is akin to a verified complaint.  A proof of claim must provide enough details to provide

parties with a fair idea of the basis of the claim and the legal grounds claimed for recovery.

13.     For example, in *PG&E*, the tort claimants committee proposed a claim form, which

the debtors and the Court adopted.  *See PG&E* Dkt. No. 2806 (approving TCC's model claim form

for fire victims who suffered damages because of fires caused by the debtors).  Tort claimants who

completed this claim form provided basic information establishing a claim entitled to vote—*e.g.*,

loss location, name of fire that caused the damage, and the nature of the damages.

14.     Claimants in *PG&E* were permitted to use the Official Form, but the customized

form made it easier for them to provide other basic information.  For example, if a claimant listed

a loss location in Nevada (or some other state), parties could immediately tell that the claim should

not be eligible to vote since PG&E only operated in California and none of the fires damaged

property in another state.  The TCC here has created a proposed customized claim form that will

serve a similar function.  The PI Talc Claim Form is designed to elicit basic information—*e.g.*,

type of cancer, date of diagnosis, and whether the claimant was exposed to J&J's talc products.

---

[6]     A copy of the claim form the *PG&E* Court adopted is attached hereto as **Exhibit C** for this Court's convenience.

15.     The PI Talc Claim Form, if approved for use, would accomplish several objectives in aid of any future voting process:  (a) it is easy to use and will ease the burden on potential claimants; (b) it will assist in removing duplicate claims by revealing those claimants represented by multiple law firms; (c) it will show if any claimants are asserting claims involving cancers for which there is no established, valid scientific connection to J&J's talc products; (d) it will show which claimants allege exposure to J&J's talc products; and (e) it will assist the Court in determining which claimants belong in a particular class (following likely objections on this issue).

16.     This Court should not be put in a position where it rules that separate classes are required only to learn subsequently that the data necessary to properly classify claims has not been collected.  This would only create delay that could be avoided through compliance with the Bankruptcy Rules in the first instance.

17.     The PI Talc Claim Form will also elicit information that can be used to properly weigh talc claims for voting purposes.  There is an established scientific connection between J&J's talc products—which has been found to contain asbestos—and mesothelioma.  Asbestos is the only cause of mesothelioma.  There is also an established, valid scientific connection between J&J's talc products and epithelial ovarian cancer cases.  *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 181 (D. N.J. Apr. 27, 2020).  This means that talc claims involving mesothelioma and epithelial ovarian cancer are compensable (*i.e.*, there is a "right to payment") under applicable law, and such claims should be entitled to vote on the Debtor's plan.

18.     In the event that holders of non-ovarian gynecological cancer claims are found to be entitled to vote, such claims must be separately classified (as J&J has made it clear by its admitted refusal to pay any amounts in the tort system on account of such cancers that there is no

scientific connection between such cancers and J&J's products) or, at a minimum, accorded substantially less weight. J&J's recent suggestion to this Court that all talc personal injury claims should be treated the same because there is no causal link between talc products and any injury (so J&J says) is not only belied by the course of litigation, in which J&J has been willing to settle ovarian cancer and mesothelioma claims, but also in LTL's own proposed plan which gives far more points to ovarian cancer claims and mesothelioma claims than to other claims. *See* Dkt. No. 912 at Ex. M, § 5.2.

19.    Again, this Court should not be put in a position where it rules that mesothelioma claims and ovarian cancer claims must be accorded substantially greater weight for voting purposes than non-ovarian gynecological claims only to learn that the data needed to determine if the requirements of section 1126(c) has not been collected.

20.    The TCC's proposed procedures do not eliminate the ability to use Official Form 410. But claimants who use the Official Form 410 and do not provide the information requested in the PI Talc Claim Form may face objection on the grounds that they have not provided the parties with a fair idea of the basis of their claims and the legal grounds claimed for recovery. In a similar fashion, a blank or incomplete Form 410 may not entitle the filer of such form with the right to vote on a plan.

21.    Under the facts of this case, following the letter of the Bankruptcy Rules under the facts of this case will also ensure that the appropriate disclosures are made to claimants who are eligible to vote. Since the Debtor has proposed a pot plan—*i.e.*, one fixed and limited fund for all talc claims for all time—the proofs of claim filed in response to a bar date will provide claimants with critical information that must be included in any disclosure statement. Individual claimants need to have some sense of the population of current claims to evaluate the amount that they can

reasonably expect to receive from the fixed and limited fund offered by J&J.[7]

22.    The Debtor's plan, which assigns talc claims "points" based on a variety of factors, does not promise that one point equates with any specific payment amount or dollar value.  The supporting law firms do not even know what "points" under LTL's plan will be worth.[8]  Depending on the overall claim population, it could be that value of a "point" is substantially less than commonly believed.  A talc claim valued at 1,000 ***points*** could generate a total recovery of less than $25,000 over the next 25 years.  The population of current talc claims will inform the population of future talc claims.  And the FCR must make a reasoned decision as to whether LTL's plan adequately protects the rights of future talc claimants.  *See* 11 U.S.C. § 524(g)(4)(B)(i).

23.    The TCC submits that J&J's pot plan structure will necessarily mean that current and future talc claimants will be forced to accept unfairly small settlements on which they will not receive any distributions for years (if not decades).  Whether the law firms that have pledged support for J&J's plan understand that they have made a truly terrible and regrettable deal is not the point.  **The point is that all this information must be disclosed before claimants can make an informed decision on whether they want to support J&J's plan**.  As such, a bar date must

---

[7]    J&J's promise that talc claims will be "paid in full" through LTL's bankruptcy is a falsehood.  By "paid in full," J&J means that all talc claimants will be forced to accept nuisance value settlement awards and will be denied the right to seek fair and equitable compensation from J&J in the tort system.  The sole purpose of LTL's bankruptcy is to permit J&J to dictate what constitutes full payment and deny any talc claimant who disagrees with J&J's determination the right to collect the amount awarded by a jury from J&J.  This is not a "paid in full" case; rather, it is an unlawful use of a manufactured bankruptcy for J&J's benefit to silence anyone who would dare stand up to J&J.

[8]    *See* Hr'g Tr. July 28, 2023 (PM Session), 97:25-98:14 (J. Onder) ("Q.  You can't call up a client and say, hey, I know you said you're with me – A.  Right.  Q. -- but I got good news for you, here's how much money you get, I want authority to settle.  You can't do that now, can you?  A.  That's correct.  Q.  In fact, the most you can do is you can say, hey, I got news for you, you got 720 points, right?  A.  Right.  Or -- and – Q.  Or whatever points.  But you don't know, because it hasn't been determined, how many points equals a dollar or how many dollars equals a point, true?  A.  Without the input of the FCR, you can't tell with certainty.  We can estimate, but correct.")

be established, and that bar date must pass before the Court can approve a disclosure statement for

the Debtor's plan.

24.     The bar date will also assist the Court in ensuring that it has material information

going into any confirmation vote—*i.e.*, the number and nature of the talc claims—so that claimants

will not discover that they are receiving an undervalue recovery (decades from now) until after

J&J is released (assuming that this bankruptcy is not dismissed on the threshold good faith test and

J&J's plan can even be confirmed and survives appeal).

25.     The Bankruptcy Rules are designed to prevent parties like LTL from using bait and

switch tactics to confirm a plan (here, for the benefit of its parent company, J&J).  The information

that will follow from a claims bar date for talc claims will enable claimants and this Court to

discern key issues more clearly.  Bankruptcy Rule 3003(c)'s mandate that a claims bar date be

established here and that only claimants with compensable claims be entitled to vote are key

safeguards that must be respected if this case is not dismissed.

26.     Providing adequate notice of a claims bar date is also critical.  It is a fundamental

principle of due process that known creditors of a debtor are entitled to actual notice of a claims

bar date and plan confirmation before their claims can be extinguished.  And a known creditor is

one whose identity is either known or reasonably ascertainable by the debtor.

27.     The TCC submits that it is incumbent upon the Debtor here to design an appropriate

notice program to ensure that all known talc claimants receive adequate notice of the claims bar

date.  The TCC is willing to work with the Debtor to ensure that a constitutionally sufficient notice

program is implemented here.  Since this program should be proposed by the Debtor in the first

instance, the TCC requests that the Court order the Debtor to do so by a date certain.

28.     The TCC continues to stand on its motion that this case should be dismissed.  The TCC believes that the Debtor should not be permitted to go forward with a plan.  If the Court disagrees, a bar date must be fixed and a bar date must pass before the Debtor can solicit votes.

## **BACKGROUND**

29.     The Debtor re-filed for bankruptcy the same day its case was dismissed.  The Debtor's second bankruptcy, by its own admission, is a continuation of its first bankruptcy—designed to accomplish the same objective, all for the benefit of non-debtor J&J.  The Debtor has made clear, its sole objective (now, as in its first bankruptcy) is to resolve all talc claims against *non-debtor* J&J for all time and to deny talc claimants the ability to pursue their rights against J&J in courts of law.

30.     But it is worth pausing for a moment to examine what the universe of talc claims includes.  Often, parties refer to the need to resolve the "ovarian cancer claims" and the "mesothelioma claims."  But J&J seeks to garner support for a plan from holders of purported talc claims other than "ovarian cancer claims" and "mesothelioma claims."  To appreciate the obstacles that J&J must overcome for its desired plan to be confirmed, and the reason why a bar date as to all talc claims is essential in this case, it is useful to begin with a general description of the various classes or categories of talc claims.

### *The Talc Claims*

31.     **Ovarian Cancer Claims**.  One universally acknowledged category of talc claims are personal injury claims involving epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer.[9]  This is what is commonly referred to in the Debtor's bankruptcy case as an "Ovarian Claim."

---

[9]     The scientific literature describes, and it is generally understood, that epithelial ovarian cancer, fallopian tube cancer and primary peritoneal cancer all fall within the same category of cancer (*i.e.*, epithelial ovarian cancer)

32.     The term "Ovarian Claim" does **not** include other types of gynecological cancers, including mucinous ovarian cancer, borderline mucinous ovarian cancers, endometrial cancer, uterine cancer, vaginal cancer, cervical cancer, germ cell cancer, small cell cancer, stromal cancer, or vulvar cancer.  Ovarian Claims are talc claims that have been found to have a **clear link** to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females.  These are talc claims that Courts have found have scientific support sufficient to get past summary judgment and for submission to a jury for consideration.[10]  And these are talc claims for which J&J has been held liable in the tort system, or has settled in the tort system.[11]  These are, in short, the types of claims that have been actually compensable in the tort system and for which J&J has agreed to pay thousands of dollars in settlements.

33.     The Debtor's proposed plan implicitly acknowledges the key distinction between ovarian and non-ovarian gynecological cancer.[12]  The Gynecological Cancer Claims are treated as

---

and share the same pathogenesis.  *See* Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact.* J CLIN ONCOL 26:5284-5293 (2008).  A causal connection between the genital application of talcum powder and epithelial ovarian cancer is supported for the following histologic subtypes: serous, endometrioid, clear cell, undifferentiated, mixed, serous borderline and endometrioid borderline.

[10]    *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 181 (D. N.J. Apr. 27, 2020).  The *Daubert* briefing in the MDL proceeding focused solely on ovarian cancer.  Plaintiffs' experts specifically limited their opinions to epithelial ovarian cancer, which added strength to their scientific conclusions.  J&J did not substantively discuss non-ovarian gynecological cancers, except to assert that talc "does not" cause "vaginal, cervical, [or] endometrial cancer."  *Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions*, No. 3:16-md-02738-FLW, Doc. 9736, at 88 (D.N.J.).  LTL has offered no explanation as to how or why the *Daubert* ruling in the MDL should not be followed by this Court.

[11]    *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. 2020), cert. denied, 141 S. Ct. 2716 (2021) (highest Missouri state court sustaining $2.2 billion judgment against J&J and JJCI for 22 women alleging ovarian cancer claims, finding J&J "engaged in reprehensible conduct of its own."); *see also Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation (as against JJCI) and for compensatory damages from JJCI arising out of its breach of its duty to warn customers of the risk of ovarian cancer from use of its talc products); *accord Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d at 181.  Other state-court appellate cases upholding talc claims have similarly addressed ovarian cancer specifically.  *E.g.*, *Carl v. Johnson & Johnson*, 464 N.J. Super 446, 475, 237 A.3d 308, 326 (App. Div. 2020).

[12]    The term "Gynecological Cancer Claim" refers to a talc claim for the following types of cancers:  mucinous ovarian cancer, borderline mucinous ovarian cancers, endometrial cancer, uterine cancer, vaginal cancer, cervical cancer, germ cell cancer, small cell cancer, stromal cancer, vulvar cancer, metastatic cancer from any non-

the lowest category of claims and are paid under the "Accelerated Evaluation Program." Dkt. No. 912, Ex. M, § 5.2.1 ("Gynecologic Claims other than Ovarian Cancer claims shall only be eligible to receive a Point Value based on the Accelerated Evaluation Process."). Moreover, the record at the motion to dismiss hearing established that J&J has never had to pay a judgment and has never agreed to pay by settlement a Gynecological Cancer Claim in the tort system.[13]

34.     In fact, in a mass email communication sent by Onder Law—one of the plaintiff firms supporting the Debtor's plan—admitted as follows:  "Many of these claimants **have gynecologic cancers that are not as convincingly proven by science to be related to talc; as such they will receive lesser compensation**." *See* **Exhibit D** (emphasis in original).[14] The phrase "not as convincingly" is in fact an exaggeration—Gynecological Cancer Claims are unproven and scientifically unfounded.

35.     **Mesothelioma Claims**. Another universally acknowledged category of talc claims are personal injury claims involving mesothelioma—*i.e.*, a type of cancer caused by exposure to asbestos that develops in the thin layer of tissue that covers many of the internal organs, including

---

qualifying primary cancer, and benign pathology.

[13]   *See* Hr'g Tr. July 28, 2023 (AM Session), 111:4-20 (J. Murdica) ("Q.  Okay.  It's true is it not that Johnson and Johnson never paid any settlement money on non-ovarian cancer gynecological cases, true?  A.  If you're asking me the same questions I was asked before, unless it was inadvertent, we were paying non-borderline epithelial ovarian cancer, or more strict than that in the few ovarian settlements I did in the tort system.  Some of them, it was not just epithelial.  It had to be a specific histologic pathology called Sirius.  Q.  And so the answer to my question was, yes.  Johnson and Johnson never knowingly paid on a claim for a non-ovarian gynecological cancer, true?  A I believe that that's true, and I believe I gave that same answer earlier this morning.  Q. Okay. You did settle thousands of ovarian cancer cases in the tort system, correct?  A. Primarily with Mark Lanier.").

[14]   At least 12,000 of the claimants represented by Onder Law appear to hold non-compensable claims. *See* Hr'g Tr. July 28, 2023 (PM Session), 93:5-24 (J. Onder) ("Q.  Okay.  And he [Mr. Murdica] said that they would never pay on cervical cancer claims, right?  A.  Just as he said they wouldn't pay on ovarian.  Q.  Well, you knew that they did pay on ovarian cancer claims, right?  A.  Depending which time frame.  I knew they settled Lanier's docket.  Q. Well, you knew that they settled Lanier's docket.  You knew they settled other cases as well, correct?  A.  I'm not aware of any other than Lanier.  Q.  Okay.  Then but you did know that in the tort system they settled ovarian cancer cases, correct?  A.  Correct.  Q.  Okay.  But the – he [Mr. Murdica] told you that never uterine, right?  A. Correct.  Q.  He [Mr. Murdica] told you never cervical, right?  A. Correct.  Q.  You broke down for us between your case load of the gynecological cancers 9,000 uterine, 9,000 ovarian, 3,000 unknown.  Do you have cervical cancers in your -- in your inventory?  A.  For the most part, I do not.  I'm not saying there isn't a single one there…")

the lining of the lungs and chest wall, abdomen, heart, and testes.  This is what is commonly referred to in the Debtor's bankruptcy case as a "<u>Mesothelioma Claim</u>."

36.    Mesothelioma is fatal.  And, like Ovarian Cancer, it is a horrific disease. Mesothelioma is caused by exposure to asbestos, including (as has been found by juries) exposure to J&J's talc products.  Since 2018, J&J has suffered multiple defeats in the tort system when it comes to Mesothelioma Claims—*see*, *e.g.*, Anderson ($22.75 million), Leavitt ($29 million), Schmitz ($12 million), Barden ($787 million for 4 plaintiffs, including $750 million in punitive damages), Cabibi ($12 million), Moure-Cabrera ($6.22 million), Prudencio ($25.5 million), and Johnson ($27.5 million).  J&J's litigation strategy of denying that its talc products contained asbestos has become untenable, and it is clear that Mesothelioma Claims—like Ovarian Claims described above—have been actually compensable and have been settled by J&J in the tort system.

37.    **<u>Governmental Claims</u>**.  J&J's sale of talc products has also resulted in consumer protection claims asserted by governmental units (the "<u>Governmental Talc Claims</u>").

38.    In June 2014, the Mississippi Attorney General filed a complaint against J&J and Old JJCI alleging that they violated the Mississippi Consumer Protection Act by failing to disclose health risks associated with use of talc.  *See LTL Mgmt. LLC v. State of New Mexico, et al*., Case No. 22-01231-MBK, Dkt. No. 2-3.  In January 2020, the State of New Mexico filed a consumer protection case against J&J, Old JJCI, and certain other defendants alleging that they deceptively marketed talc products by making misrepresentations about the safety of the products.  *See id.* at Dkt. No 2-2.

39.    Further, forty-one states and the District of Columbia have commenced a joint investigation into J&J's and Old J&J's marketing of talc products.  And five states have issued Civil Investigative Demands seeking documents and other information.  These investigations

could lead to additional states filing consumer protection claims against J&J based on its fraudulent conduct and years of deceiving consumers.  *See* Dkt. No. 4 (Decl. of John H. Kim in Support of First Day Pleadings), ¶ 39.[15]

40.    **Third Party Payor Talc Claims**.  Third party payor claims are claims asserted by governmental units, insurance companies, health maintenance organizations, employers or other entities that paid for medical services to treat individual individuals injured on account of talc-related injuries, including Ovarian Cancer and Mesothelioma (the "Third Party Payor Talc Claims").  *E.g.*, *In re LTL Mgmt. LLC*, Case No. 21-30589-MBK, Dkt. No. 755.  According to the Debtor, third party payors hold direct claims against the Debtor and its affiliates, as well as liens and subrogation claims against proceeds to be received by current and future talc claimants for medical costs.  The medical costs associated with treating Ovarian Cancer and Mesothelioma are significant.  To date, no settlement agreement has been reached regarding the treatment of claims asserted by the Centers for Medicare & Medicaid Services ("CMS") and the U.S. Department of Veterans Affairs.  *See* Hr'g Tr. July 28, 2023 (PM Session), 132:1-8 (J. Onder).[16]

41.    **Canadian Claims**.  The Debtor's stated intention is to resolve claims in both the United States and Canada.  Multiple class action lawsuits, certified and uncertified, exist in Canada as well as individual actions.  These are collectively referred to as "Canadian Claims."  *See* Dkt. No. 4 (Decl. of John H. Kim in Support of First Day Pleadings), ¶¶ 38, 102-04.

---

[15]    The Governmental Talc Claims are not "personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products" under section 524(g)(2)(B)(i)(I) of the Bankruptcy Code and cannot be paid by a section 524(g) trust.

[16]    The Debtor asserts that it negotiated a term sheet with the lawyers of a sub-set of the holders of private non-CMS Third Party Payor Talc Claims—namely certain private payors that assert claims for medical expenses paid for non-mesothelioma talc personal injury claims, although a large number of other private third party payors are **not** in agreement with the term sheet.

42.     The Canadian civil litigation process and governing law, including in respect of class actions, has significant nuanced differences to that of the United States.  A class action may be commenced in any common law province and can be brought on behalf of class members in that province or across multiple regions in Canada.  It is therefore common to see separate class actions launched in multiple jurisdictions against the same defendant for the same claims.

43.     Unlike the United States, Canada does not have a "multidistrict litigation" system to consolidate these cases.  Class actions can proceed in multiple jurisdictions simultaneously and the cases will not necessarily be consolidated.  They may proceed at different speeds and for different relief.  This has the greatest impact for class actions commenced in the French-speaking province of Québec, which has a different legal and procedural regime than the rest of Canada (Québec has a civil law, rather than a common law system).

44.     Aggregation of damages is allowed under provincial class action legislation that allows the Canadian court to determine monetary damages at a class-wide level based on the total monetary damage caused by the defendant's wrongdoing.   An individual class member's entitlement to a share of the aggregate award is left to be determined later through a claims process. Class-members may "opt-out" to pursue individual actions.  Due to the nature and stage of the various Canadian Claims, as well as the stay imposed on these proceedings pursuant to the recognition proceedings LTL has commenced in Canada, the universe of direct Canadian talc claims is presently unknown.

45.     It must be noted as well that the governments of each of the Canadian provinces and territories also have subrogated claims for recovery of universal health care costs.  A resolution of talc claims in Canada will require a claims identification process to comply with Canadian law

and be recognized by the Canadian Court. Some class action plaintiffs have already indicated that they may object to the recognition of J&J's plan in Canada on public policy and other grounds.

46.    **Talc Supplier Claims**. The Debtor also faces liability for claims asserted by third-party suppliers who mined and sold talc to JJCI (sometimes referred to as "Talc Supplier Claims"). Talc Supplier Claims include claims for damages for breach of contract arising from JJCI's breach of any contractual obligation to indemnify a talc supplier other than payment of the indemnity itself, as well as claims for indemnification against JJCI. The clear example of these claims are the claims that have already been asserted against JJCI in the *Imerys* and *Cyprus* bankruptcy cases. *See* Dkt. No. 4 (Decl. of John H. Kim in Support of First Day Pleadings), ¶¶ 56-60.

47.    In addition to the Ovarian Claims, the Mesothelioma Claims, the Gynecological Cancer Claims, the Governmental Talc Claims, the Third Party Payor Talc Claims, the Canadian Claims, and the Talc Supplier Claims, various distributors and retailers may assert talc claims against the Debtor as well, including claims for indemnification and contribution.

48.    To fully appreciate the scope of the liabilities that J&J is seeking to resolve for all time through LTL's bankruptcy, the Court need only examine the definition of "Talc Related Liabilities" found in both Funding Agreements, which is so broad that it requires its own separate Schedule and includes every conceivable claim related directly or indirectly to the sale of J&J's talc products.

49.    The Debtor's proposed plan, *e.g.*, **J&J's desired plan**, would channel **all** these talc claims to a trust for payment—including all future claims and claims involving cancers for which a scientific link to the use of J&J's talc products is established in the future—and, *at the same time*, it would bar all current and future claimants from ever pursuing J&J or any of its affiliates

in the tort system.  If the trust runs out of money, future talc claimants will have no recourse other than to argue that their right to due process was denied.

50.      And, if J&J's desired plan trust were created pursuant to section 524(g) or otherwise, it would be required to establish reserves to ensure that it is in a financial position to pay present and future talc claims in substantially the same manner.  And the trust could be required to establish reserves to ensure that Governmental Talc Claims, Third Party Payor Talc Claims and Talc Supplier Talc Claims receive the same *pro rata* distribution as other talc claims when their claims are liquidated years from now.

51.      Further, under LTL's proposed plan the trust would be required to pay all defense costs associated with liquidating such claims, which would further deplete the limited and fixed assets available to pay talc victims.  *See* Dkt. No. 912 at § 4.16.  In these circumstances, without a bar date and a complete disclosure of the universe of potential claims, it is not possible for talc claimants entitled to vote on a chapter 11 plan to know how much they will receive on account of their claims and, thus, to make an informed decision.

52.      Likewise, without a bar date and basic information about the claims pool, it is not possible to know which claimants should be entitled to vote on the plan and with what weight. The Debtor cannot satisfy the requirements of section 524(g) or section 1126(c) based on the votes of claimants holding claims that are not compensable under applicable law.  Section 524(g)'s seventy-five percent (75%) voting requirement can only be met by a class or classes of "claimants whose claims are to be addressed by a trust" that votes in favor of a plan—*i.e.*, no claim, no vote. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Under section 1126(c) an impaired class is deemed to accept a plan only if it is approved by those creditors who "hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors."  11 U.S.C.

§ 1126(c).  Accordingly, consideration must be given to the amount (or value) of the claims held by creditors who vote on a plan as well as the number of creditors who support the plan.

53.     If these requirements are not observed, non-compensable claims could be used to drown-out cancer victims who are dying based on illnesses found to be linked to J&J's talc products.  LTL and J&J cannot stuff the ballot box with unfiled, unscheduled, non-compensable claims to prevent claimants from asserting Ovarian Claims and Mesothelioma Claims against a solvent Fortune 50 company in the tort system when most claimants holding such claims reject the plan.  J&J wants a "vote," but not a free and fair election.  Bankruptcy Rule 3003(c)(3) was designed, in part, to prevent rigged elections.

### *Proposed Bar Date*

54.     By this Motion, the TCC requests that this Court fix a deadline for filing **all** talc claims against the Debtor in accordance with Bankruptcy Rule 3003(c)(3).  To be clear, the TCC is **not** asking this Court to establish a bar date for filing claims against any non-debtors.[17]  The TCC is also **not** asking the Court to set a specific bar date, other than one that is at least one hundred and fifty (150) days from that date that the Debtor first provides notice of the deadline for filing talc claims in this case, given the immense volume of claims in this case.

### *PI Talc Claim Form*

55.     To ensure that the Talc Bar Date process generates useful information, the TCC has prepared a model proof of claim form, attached to this Motion as Exhibit B, which has been tailored to this chapter 11 case but also substantially conforms to Official Form 410.  On this issue, the TCC would like to be clear on two points.

---

[17]    Since the term "creditor" means an "entity that has a claim against the debtor [or] against the estate," Bankruptcy Rule 3003(c) applies only to claims against a debtor.  11 U.S.C. § 101(10)(A)-(B); *see* Fed. R. Bankr. P. 9001 ("The definitions of words and phrases in §§ 101, 902, 1101, and 1502 of the Code, and the rules of construction in § 102, govern their use in these rules").

56.    **First**, the TCC's claim form does **not** require information beyond the basic information required for a personal injury claimant to provide adequate notice of their claim.  In some mass tort cases, the debtor's game plan is to propose lengthy and unduly burdensome claim forms and attempt to require tort victims to submit substantial documentation to timely file a proof of claim.  This is obviously improper.  The TCC respects the Bankruptcy Rules.  The PI Talc Claim Form is intended to make it easier for individual talc claimants to file claims and submit an appropriate level of detail.

57.    **Second**, the TCC is **not** attempting to preclude the use of the Official Form by any claimant.  A proof of claim must conform substantially to the appropriate Official Form.  *See* Fed. R. Bankr. P. 3001(a).  Further, pursuant to recent amendments to the Bankruptcy Rules, the Official Forms prescribed by the Judicial Conference of the United States must be used without alteration, except as otherwise provided in the Bankruptcy Rules.  *See* Fed. R. Bankr. P. 9009(a).

58.    Under the proposed procedures any claimant who wants to do so can use Official Form 410 to file a proof of claim.  *See In re Diocese of Buffalo, N.Y.*, 620 B.R. 445 (Bankr. W.D.N.Y. 2020).  And talc claimants that are not asserting claims involving personal injury or wrongful death would be required to use Official Form 410.

59.    However, there are several parts of Official Form 410 that are not applicable to a personal injury or wrongful death claim and may cause confusion—*e.g.*, secured status [Official Form 410 at § 9], cure amount under a lease [*id.* at § 10], setoff rights [*id.* at § 11], and priority [*id.* at § 12].  Likewise, since claimants must provide adequate notice of the nature of the claim being asserted, it is appropriate under the facts of this case to use a form that will elicit basic information needed to assert a plausible claim.

60.     Talc claimants who elect to use the PI Talc Claim Form will be asked to identify

the cancer with which they have been diagnosed, the date of diagnosis, whether there is a pathology

report or other medical documentation confirming the diagnosis, and whether they have ever used

Johnson's Baby Powder (made with talc and not cornstarch) or Shower to Shower.  If the talc

claimant is represented by an attorney, the claimant must identify whether his or her attorney has

a copy of the pathology report or other medical documentation diagnosing the claimant's cancer.

The person who signs the PI Talc Claim Form must do so under penalty of perjury—as required

under the Official Form 410.  The PI Talc Claim Form also includes the standard warning that a

person who files a false claim could be fined up to $500,000, imprisoned for up to 5 years, or both.

### ***Proposed Procedures***

61.     To implement the use of the proposed PI Talc Claim Form, the TCC proposes the

following procedures:

A.      Epiq Corporate Restructuring (the "<u>Claims Agent</u>"), or any other claims agent retained by the Debtor, will modify the website maintained for the Debtor's chapter 11 cases located at https://dm.epiq11.com/case/ltl/dockets so that (a) the PI Talc Claim Form is publicly accessible and (b) the webpage associated with the link entitled "<u>File a Claim</u>" (the "<u>Electronic Filing System</u>") is modified so that potential talc claimants that choose to file a proof of claim form before any deadline to file talc claims against the Debtor is established are directed to, and can, complete the PI Talc Claim Form.

B.      Any individual talc claimant that has already filed a proof of claim with the Claims Agent against the Debtor utilizing a claim form that substantially conforms to Official Form No. 410 is not required to file another proof of claim, or an amended proof of claim, using the PI Talc Claim Form.

C.      Any individual talc claimant that chooses to do so may file a proof of claim using Official Form 410 or the PI Talc Claim Form; *provided*, *however*, that the Electronic Filing System shall default to the PI Talc Claim Form for any party who identifies himself or herself as holding an individual talc claim involving personal injury or wrongful death.

D.      PI Talc Claim Forms shall be maintained by the Claims Agent as confidential documents and shall not be made available to the general public

unless the claimant consents in writing; *provided*, *however*, that PI Talc Claim Forms shall be made available to the TCC, the Debtor, the Future Claimants Representative, and their respective professionals who agree to keep the information provided in the PI Talc Claim Forms confidential.

62.      These procedures are designed to maximize the use of the PI Talc Claim Form and ensure that medical information is not publicly disclosed.  Again, individual talc claimants would be able to use the Official Form, but claimants who do so and fail to provide at least the same amount of information regarding their claims may face objection, particularly when it comes to voting on any plan proposed by the Debtor.  Talc claimants asserting claims based on subrogation rights or indemnification would be required to use Official Form 410.

## JURISDICTION AND VENUE

63.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and 501 of the Bankruptcy Code and Bankruptcy Rules 3001(a) and 3003(c)(3).

## RELIEF REQUESTED

64.      By this Motion, the TCC seeks an order, pursuant to sections 105(a) and 501 of the Bankruptcy Code and Bankruptcy Rules 3001(a) and 3003(c)(3), establishing a deadline for filing proofs of claim against the Debtor, approving the PI Talc Claim Form and related procedures for filing PI Talc Claims, and directing the Debtor provide adequate notice of the deadline for filing proofs of claim to all talc claimants.

## ARGUMENT

### I.      Under the Circumstances Here, the Court Is Required to Establish a Deadline for Filing Proofs of Claim

65.      This Court must establish a bar date for filing proofs of claim against the Debtor on the facts of this case.  As the Debtor admits in Paragraph 13 of its own motion for a bar date (Dkt.

No. 842), Bankruptcy Rule 3003(c)(3) provides that the Court "shall fix" the time within which proof of claim may be filed.  Fed. R. Bankr. P. 3003(c)(3).

66.    Moreover, Bankruptcy Rule 3003(c)(2) provides that any creditor whose claim (a) is not scheduled in a debtor's schedules, or (b) is scheduled as disputed, contingent, or unliquidated must file a proof of claim by a bar date fixed by the Court.  *See* Fed. R. Bankr. P. 3002(c)(2).  Bankruptcy Rule 3003(c)(2) further provides that "any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution."  *Id.*

67.    Courts interpreting Bankruptcy Rule 3003(c)(3) have found that the use of the word "shall," as opposed to "may," in reference to the fixing of the time within which proofs of claim may be filed means that establishing a claims bar date is mandatory.  *See Energy Future Holdings*, 522 B.R. at 538 (analyzing Bankruptcy Rule 3003 and holding that the establishment of bar date for asbestos claims is not discretionary with the Court but is mandatory given the plain language of Bankruptcy Rule 3003(c)(3)).[18]    Other Courts have concluded that Bankruptcy Rule 3003(c)(3)'s use of the word "shall" does not mandate a bar date and that a Court can exercise its discretion as to whether to impose a bar date.[19]

68.    Bar dates have been required in asbestos cases.  *See*, *e.g.*, *Energy Future Holdings* 522 B.R. at 538; *Specialty Prods.*, No. 10-11780 (PJW), Hr'g Tr. at 40:8-10 [Dkt. 4286] (Bankr.

---

[18]    Judge Sontchi's analysis in *Energy Future Holdings* accords with recent Supreme Court decisions interpreting the Bankruptcy Code.  *See*, *e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1759 (2018) ("Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'") (quotation omitted); *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) ("Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'") (quotation omitted).

[19]    *See*, *e.g.*, *In re Congoleum Corp.*, No. 03-51524, 2008 WL 314699, at *3-4 (Bankr. D.N.J. Feb. 4, 2008) (finding that Bankruptcy Rule 3003(c)(3) does not mandate setting a bar date and denying motion to set a bar date for asbestos claims); *Eagle-Picher*, 137 B.R. at 680-81 (holding that Bankruptcy Rule 3003(c)(3) does not mandate setting a bar date and that "the court may dispense with . . . [a bar date] in a given case").

D. Del. Nov. 5, 2013) & Hr'g Tr. at 6:10-14 [Dkt. 4458] (Bankr. D. Del. Jan. 7, 2014) (ruling in

favor of a bar date for asbestos claims); *W.R. Grace*, No. 01-01139 (JKF) [Dkt. 13061] (Bankr. D.

Del. Aug. 24, 2006) (setting bar dates for asbestos personal injury claims); *Babcock & Wilcox*,

2000 WL 36743341, at *9 (approving bar date for asbestos personal injury claims); *Eagle-Picher*,

137 B.R. at 680-81 (holding that a bar date should be set for asbestos personal injury claimants).

69.     Regardless of whether imposing a bar date is mandatory or discretionary, the

circumstances of this case demand a Talc Bar Date.  The purported deal that J&J negotiated during

LTL's last bankruptcy appears to be with law firms that represent a large number of claimants

holding Gynecological Cancer Claims that would be non-compensable under applicable law.  As

J&J's own actions reflect in agreeing to settlements, the holders of such claims do not have the

same legal rights here as the holders of claims involving ovarian cancer and mesothelioma.

70.     In these circumstances, Rule 3003(c)(3) provides a mechanism to obtain

information necessary to evaluate the viability of the Debtor's plan.  This Court cannot confirm a

plan that would silence the voices of holders of Ovarian Claims and Mesothelioma Claims based

on votes cast by parties that have no cognizable right to payment.[20]  At a minimum, this Court

needs the information that a Talc Bar Date would generate to evaluate J&J's plan and address the

voting issues that J&J's plan raises.

## II.     The Approval of the PI Talc Claim Form and Procedures Is Appropriate

71.     Bankruptcy Rule 3001(a) provides that "[a] proof of claim is a written statement

setting forth a creditor's claim."  Fed. R. Bankr. P. 3001(a).  The purpose of the proof of claim is

---

[20]  *See* 11 U.S.C. 1126(a) (a holder of "a claim or interest allowed under section 502 of this title may accept or reject a plan."); 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under 501 of this title, is deemed allowed, unless a part in interest ... objects."); 11 U.S.C. § 101(5) (the term "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

to alert the court, trustee, and other creditors, as well as the debtor, to claims against the estate.[21]

The evidentiary effect of a proof of claim is similar to a verified complaint.[22]  It follows that a

proof of claim needs to set forth "enough details so as to provide a defendant and the court with *a*

*fair idea of the basis of the complaint and the legal grounds claimed for recovery*."[23]

72.     A proof of claim must conform substantially to the appropriate Official Form.

*See* Fed. R. Bankr. P. 3001(a).  Further, pursuant to recent amendments to the Bankruptcy Rules,

the Official Forms prescribed by the Judicial Conference of the United States must be used without

alteration, except as otherwise provided in the Bankruptcy Rules.  *See* Fed. R. Bankr. P. 9009(a).

Tort claims are not based on a writing; therefore, there is no requirement that tort claimants provide

supporting documentation to submit a proof of claim.[24]

73.     Given the number of talc claims and the individuals who can be expected to file

proofs of claim, not affording individual claimants with a customized claim form here would be

---

[21]  *In re Baker*, 839 F.3d 1189, 1195 (9th Cir. 2016) ("The proof of claim plays the important role of alert[ing] the court, trustee, and other creditors, as well as the debtor, to claims against the estate,' and the creditor's intention to enforce the claims."); *Matter of Fernstrom Storage and Van Co.*, 938 F.2d 732, 734 (7th Cir. 1991) ("The purpose of the proof of claim is to alert the court, and other creditors, as well as the debtor, to claims against the estate"); *In re Stern*, 70 B.R. 472, 476 (Bankr. E.D. Pa. 1987) ("The purpose of the filing requirement is to alert the court, the trustee and other creditors, as well as the debtor, to a particular claim.").

[22]  *See Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("Courts have traditionally analogized a creditor's claim to a civil complaint"); *In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985) ("[t]he filing of a proof of claim is tantamount to the filing of a complaint in a civil action"); *In re Heath*, 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005) (the evidentiary effect of a proof of claim is "similar to a verified complaint."); *In re Eads*, 417 B.R. 728, 747 (Bankr. E.D. Tex. 2009) ("Bankruptcy Rule 3001(f) permits the proof of claim itself to act like a verified complaint").

[23]  *In re Latin*, No. EC-08-1082, 2009 WL 7751424, at *5 (B.A.P. 9th Cir. Feb. 11, 2009) (quoting *In re Acequia, Inc.*, 34 F.3d 800, 814 (9th Cir. 1994)) (emphasis in original).

[24]  When a claim is "based on a writing," Bankruptcy Rule 3001(c) generally requires the claimant to provide supporting documentation by filing "a copy of the writing" with the proof of claim. Fed. R. Bankr. P. 3001(c). Under appropriate circumstances, parties with claims based on a writing may attach a summary and thereby comply with Rule 3001(c) and the Official Form and thus entitle the claim to *prime facie* status. *In re Habiballa*, 337 B.R. 911, 915-16 (Bankr. E.D. Wis. 2006) (citing, *inter alia*, *In re Cluff*, 313 B.R. 323, 331-32 (Bankr. D. Utah 2004)) (when documents are "voluminous," parties can attach a summary to prevent "inundate[ing]" the court with documents and "unduly burden[ing] the parties"). When a claim is not based on a writing, "claimants need not attach any documents evidencing of the value or validity of their claims" to achieve *prima facie* status. *In re The Budd Co., Inc.*, 540 B.R. 353, 361 (Bankr. N.D. Ill. 2015). This is the case for claims created by statute or by operation of tort law. *See, e.g.*, *Cluff*, 313 B.R. at 332; *In re Carlisle*, 320 B.R. 796, 799 (M.D. Pa. 2004); *In re Vines*, 200 B.R. 940, 949 (M.D. Fla. 1996).

ill-advised.  Individual talc claimants who use the Official Form could fail to include sufficient information to provide the Court with a fair idea of the basis of the claim and the legal grounds claimed for recovery.  And, again, the TCC—unlike the case of debtors in other mass tort bankruptcy cases—is not proposing a claim form that materially deviates from the Official Form, is overly burdensome or seeks to impose obligations beyond what is required under the Bankruptcy Rules.

74.    The TCC's proposed form is designed to embody the Official Form without making any substantive alterations, and, at the same time, ensure that an appropriate level of information is provided.  Courts often approve customized forms for tort victims in bankruptcy cases.[25]  Ample cause exists here for the Court to approve the PI Talc Claim Form and related procedures, including provisions intended to ensure that confidential medical information is not disclosed to the public.

## III.    Adequate Notice of the Deadline for Filing Proofs of Claim Is Required

75.    Finally, the Debtor must be required to propose and implement appropriate notice procedures in connection with the bar date.  Bankruptcy Rule 2002(a)(7) requires a ***debtor*** to provide at least twenty-one (21) days' notice of the time fixed for filing a proof of claim.

76.    In most mass tort cases Courts typically provide tort claimants with at least eighty to one hundred and seventy days' notice.  *See, e.g.*, *Boy Scouts*, No. 20-10358 (LSS) (Bankr. D. Del.) (174 days after notice for abuse and general claims); *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.) (137 days after notice for asbestos claims); *In re Commonwealth*

---

[25]    *See, e.g.*, *In re Boy Scouts of America*, No. 20-10343 (LSS) (Bankr. D. Del. May 26, 2020) (Dkt. Nos. 695, 695-7) (approving customized claim form for claimants asserting sexual abuse claims); *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2020) (Dkt. Nos. 800, 800-3) (approving customized claim form for holders of opioid claims); *In re Insys Therapeutics, Inc.*, No. 19-11292 (JTD) (Bankr. D. Del. July 15, 2019) (Dkt. Nos. 294, 294-1) (same); *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. July 1, 2019) (Dkt. No. 2806) (approving model claim form for fire victims who suffered damages because of fires caused by the debtors); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. 2017) (Dkt. No. 959, Ex. B 2) (approving model proof of claim form for individuals who owned vehicles equipped with airbag inflators containing phase-stabilized ammonium nitrate).

*of Puerto Rico*, No. 17-03283 (Bankr. D. Puerto Rico) (123 days after notice, which was extended from original deadline of 92 days for general claims); *PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal.) (176 days after notice (extended for fire victim claims)); *In re Purdue Pharma*, No. 19-23649 (148 days after notice and extended an additional 30 days); *In re TK Holdings, Inc.*, No. 17-11375 (Bankr. D. Del.) (82 days after notice, inclusive of a supplemental extension, for personal injury, wrongful death, or property damage that resulted from defective airbag inflator).  Governmental units are afforded at least one hundred and eighty days after the order for relief to file a proof of claim.  *See* Bankruptcy Rule 3002(c)(1).

77.    In addition, Bankruptcy Rule 2002(l) provides that the Court may order notice by publication if it finds that notice by mail is impracticable or if it is desirable to supplement with other notice.  Finally, Bankruptcy Rule 9008 provides that the Court shall determine the form and manner of publication notice, the newspapers and other media used, and the frequency of publication.

78.    To determine the adequacy of notice to a creditor, the case law distinguishes between "known" and "unknown" creditors.[26]  Generally, a known creditor is a creditor whose identity is either known or is "reasonably ascertainable by the debtor."[27]  Customers with whom a debtor has a "direct relationship" are generally considered known creditors.[28]  For unknown creditors, constructive notice by publication typically satisfies the requirements of due process.[29]

---

[26]    *See In re Maya Const. Co.*, 78 F.3d 1395, 1399 (9th Cir. 1996) (due process requires formal notice to known contingent creditors); *In re Reg'l Care Servs. Corp.*, No. 16-1213, 2017 WL 2871751, at *6 (B.A.P. 9th Cir. July 5, 2017) ("It is a fundamental principle of due process that known creditors of a debtor are entitled to actual notice of a claims bar date before their claims can be extinguished") (citation omitted).

[27]    *See Tulsa Prof'l Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988).

[28]    *See PacifiCorp and Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764, 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006).

[29]    *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) (publication is acceptable where it is not "reasonably possible or practicable to give more adequate warning," whereas when names and addresses are available, notice must be mailed); *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 159-62 (2d Cir. 2016) (holding product liability claimants were entitled to "direct mail notice" because Old GM "knew or reasonably

79.    When actual or constructive notice is required, a "process which is a mere gesture is not due process." *Mullane*, 339 U.S. at 315. "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974). The level of notice due to a party is "highly dependent on the context;" thus, a "process that may be constitutionally sufficient in one setting may be insufficient in another." *In re Mansaray-Ruffin*, 530 F.3d 239 (3d Cir. 2008).

80.    Because the Bankruptcy Rules require the Debtor to provide notice of a claims bar date, it is appropriate here for the Debtor to formulate and propose a proper notice program. To meet the requirements of due process here, such program must be tailored to the facts and circumstances of the Debtor's case. For the purposes of this Motion, the TCC requests that the Debtor be required to propose such a program and that any bar date set by this Court be set at least one hundred and fifty (150) days from the date that the Debtor can provide the required notice.

## **NOTICE**

81.    Notice of this Motion has been served on: (a) the U.S. Trustee; (b) counsel to the Debtor and the Debtor's non-debtor affiliates, Johnson & Johnson Holdco (NA) Inc. and Johnson & Johnson; and (c) all persons who have formally appeared in this chapter 11 case and requested service pursuant to Bankruptcy Rule 2002. Considering the nature of the relief requested herein, the TCC respectfully submits that no other or further notice need be provided.

---

should have known about the ignition switch defect prior to the bankruptcy") *Chemetron Corp. v. Jones*, 72 F.3d 341, 348–49 (3d Cir. 1995) ("Publication in national newspapers is regularly deemed sufficient notice to unknown creditors, especially where supplemented, as here, with notice in papers of general circulation in locations where the debtor is conducting business.").

## NO PRIOR REQUEST

82.    No prior request for the relief sought in this Motion has been made to this or any other court in connection with this case.

## CONCLUSION

83.    **WHEREFORE**, based on the foregoing, the TCC respectfully requests that the Court grant the Motion and grant such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

**GENOVA BURNS, LLC**

By:    _/s/ Donald W. Clarke, Esq._____

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

_Local Counsel to the Official Committee
of Tort Claimants_