Levy Konigsberg, LLP
605 Third Avenue, 33rd Floor
New York, New York 10158
(212) 605-6200
*Counsel for Paul Crouch, Individually and as*
*Executor and as Executor Ad Prosequendum of*
*the Estate of Cynthia Lorraine Crouch*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) |
| | )    Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, | ) |
| | )    Lead BK Case: 23-12825-MBK |
| Debtor. | ) |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION TO DISMISS OF PAUL CROUCH, INDIVIDUALY AND AS EXECUTOR *AD PROSEQUENDUM* OF THE ESTATE OF CYNTHIA CROUCH

Paul Crouch, individually and as executor *as prosequendum* of the Estate of Cynthia

Lorraine Crouch, respectfully files the following Proposed Findings of Fact and Conclusions of

Law in support of the Motions to Dismiss the petition in this case.  As grounds therefore, Mr.

Crouch states as follows:

1.      In the interests of judicial economy, Mr. Crouch adopts the arguments advanced by

all movants for dismissal and does not restate those cogent and compelling arguments here, but

instead highlights additional arguments and evidence that require dismissal of this case.

## THE PETITION IN LTL2 FALLS OF ITS OWN WEIGHT WITH THE NECESSARY FAILURE OF THE "FRUSTRATION OF PURPOSE" GAMBIT

2.      In their desperation to justify the termination of the 2021 Funding Agreement, LTL

and J&J deliberately manipulate its plain language, its integration clause, and its no-modification

clause - all to improperly assert an alleged secret purpose inconsistent with the clear admissions

of their corporate officials and duly authorized agents/attorneys.  But the lie was put to this notion

with the testimony of the first witness at the MTD Hearing – Robert Westhoff. LTL's President admitted that a) the purpose of the Funding Agreement was "to provide LTL with the funds it would need to resolve all current and future claims" b) it obligated J&J "whether or not LTL was in bankruptcy", c) he and the LTL board had the independence to vote "no" on the bankruptcy option d) there was no threat or perceived risk that voting "no" would have jeopardized the Funding Agreement and e) if the board had voted "no" it still would have had the Funding Agreement available for its purpose.

3.      While the evidence is clear that J&J/LTL and their lawyers have misrepresented the 2021 funding agreement in LTL1 and colluded after the 3rd Circuit Decision regarding the pretextual and both legally and factually impossible "frustration of purpose" argument, the Court need not reach that issue (though it should) because the argument is precluded by the integration clause that specifically says there can be no such condition precedent[1].  As such, the Motions to Dismiss must be granted and the Petition dismissed.

**THE SPECIOUS J&J/LTL "INDEMNITY" ARGUMENT LIKEWISE MUST FAIL AND REQUIRE DISMISSAL OF THE PETITION**

4.  Under controlling New Jersey law, specific, not general, language is required for an

---

[1]      FA1 is governed by North Carolina law.  In making their specious claim about "frustration of purpose," J&J/LTL ignores controlling North Carolina law that, in a commercial context, the doctrine applies "when the Parties could not reasonably have protected themselves by the terms of the contract against contingencies that later arose."  *WRI Raleigh L.P. v. Shaikh*, 644 S.E.2d 245, 254 (2007)(*quoting Brenner v. School House, Ltd.,* 210, 274 S.E.2d 206, 209 (N.C. 1981)).  As reflected by the 2023 Funding Agreement and related documents, there can be no dispute that J&J – one of the most wealthy and sophisticated companies in the world, with legions of lawyers from the largest law firms in the world – could "reasonably have protected [itself] by the terms of the contract" against this contingency.  J&J/LTL ignore this controlling North Carolina law, ignore the plain language of FA1, ignore its own repeated affirmative representations about the unconditional applicability of FA1 outside of bankruptcy, and ignore the Third Circuit's binding holding regarding the legal effect of FA1 and brazenly ask this Court to do the same. Your Honor should not be led into such clear error.

indemnity contract to cover independent tortious action of an alleged indemnitee.  *See e.g.*, *Cozzi v. Owens-Corning Fiber Glass Corp.*, 164 A.2d 69 (N.J. Super. 1960); *Mantilla v. NC Mall Assoc.*, 770 A.2d 1144 (NJ 2001).  In *Cozzi*, the Court noted:

> The general rule appears to be that where the act of negligence of the indemnitee is the sole cause of the accident, he is not entitled to recover against the indemnitor unless an intent to indemnify is unequivocally spelled out in the contract, the surrounding circumstances, and the objects to be attained by the parties.

*Cozzi*, 164 A.2d at 71.  Four decades later, in 2001, *Mantilla* reaffirmed this principle of New Jersey law, citing *Cozzi,* among other cases:

> "As a matter of well-settled legal doctrine, it is clear that an indemnity provision is to be construed in accordance with the rules for construction of contracts generally, and hence that the judicial task is to ascertain the intention of the parties . . . ." Doloughty v. Blanchard Constr. Co., 139 N.J.Super. 110, 116, 352 A.2d 613 (Law Div.1976); see also Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J.Super. 117, 121, 164 A.2d 69 (App.Div.1960) (stating "[a] contract of indemnity is to be interpreted in accordance with the rules governing the construction of contracts generally"). "When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee." Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 191, 510 A.2d 1152 (1986). **"Thus, a contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms." Ibid**.

*Mantilla*, 167 N.J. at 272-3 (emphasis added).[2]

> 5.    Similarly, New Jersey law prohibits indemnification agreements for wanton and reckless conduct, *Johnson & Johnson v. Aetna*, 667 A.2d 1087 (N.J. Super. 1995); *Tyranowski v. Lodi Bd. Of Educ.*, 643 A.2d 1057 (N.J. Super 1994), which numerous juries have found non-debtor Johnson & Johnson perpetrated in connection with talc products. *See, e.g., Ingham v.*

---

[2] At oral argument on June 13, 2023, counsel for the Debtor accused the counsel for Crouch of misrepresenting the holdings of *Cozzi* and *Mantilla*, quoting as alleged support of this accusation the first sentence of the quoted language from *Mantilla* here.  See Transcript of oral argument June 13, 2023 at 67.  In making this false and unsupported accusation, counsel for the debtor deliberately omitted the two immediately following sentences, which reflect precisely the rule of New Jersey law Mr. Crouch has argued repeatedly to this Court.  The three sentences above are the three sentences the undersigned requested to present to the Court on June 13, 2023 and which the Court presciently noted "I'm sure well squeeze it in somewhere along the way over the next few weeks."  *Id.* at 70.

*Johnson & Johnson*, 608 S.W.3d 663, 701-02 (Mo. App. 2020), cert. denied, 2021 WL 2194948 (June 1, 2021) (affirming approximately 20 ovarian cancer jury verdicts answered separately as to J&J and JJCI, as well as punitive damages imposed separately as to each, with a greater amount of punitive damages imposed on J&J).

6.    J&J/LTL have ignored this controlling New Jersey law[3]. As such, the "indemnification" argument as a basis for the Petition also fails and the Motions to Dismiss must be granted.

**LTL IS NOT IN FINANCIAL DISTRESS AND THE HYPOTHETICAL WORST-CASE SCENARIO ADVANCED BY ITS EXPERT CANNOT SUPPORT A FINDING**

7.    In any analysis of financial distress in this case, *only* LTL's liability can be considered. At the MTD Hearing LTL's officers unequivocally estimated their talc liability at up to $8.9B. Indeed, in filing the instant Petition the Debtor itself – by its Chief Legal Officer (acknowledging that if false it subjected him to fines up to $500,000 and/or imprisonment for up to 20 years) – that its estimated liabilities were between $1B - $10B.

---

[3]    While Crouch adopts the arguments of the TCC on this issue concerning the language in the 1979 Agreement that limits the indemnity to those reflected "on the books and records", the Court need not reach this contractual construction issue – given the dispositive New Jersey law.

8.      Given the worst-case (lowest valuation) scenario of assets estimated by J&J/LTL's economic expert (Dr. Bell) however, the Debtor knew it could not establish financial distress for the valuation of its talc liabilities testified to by its corporate officers (including the filed Petition), and needed to construct a hypothetical worst-case scenario of possible talc liabilities. Enter Dr. Mullin[4].

9.      In short, as conclusively established in cross examination (and encapsulated in Crouch's closing argument and closing PowerPoint) there can be no dispute that Dr. Mullin's opinions are (1) contrary to LTL's continued factual representations to the Court; (2) based on assumptions not based on the record when such information was available to him if he/LTL asked or did the work; (3) ignore Murdica's and Onder's testimony about non-epithelial ovarian cancer cases being not viable/compensable in the tort system and the plain language of the MSAs that demonstrate that non-epithelial cases were disqualified from all prior settlements (the MSAs are in the record pursuant to the post-hearing evidentiary stipulation of the parties; (4) definitely contain an expressly hypothetical/fictional 45,000 additional claimants in his scenarios 1 & 3 and 20,000 additional claimants in his scenario 2.

## CONCLUSION

10.     In sum, as stated in the closing arguments of the undersigned counsel for Mr. Crouch – and as set forth in their PowerPoint Presentations previously submitted to the Court (and

---

[4]      The debtor's proffered expert testimony asserts that, if non-debtor Holdco is forced to liquidate, it might lose value otherwise available to it for various reasons. *Bell Report* at VI.C.  Mr. Bell's ultimate opinion, however, is that the minimum value that could be generated by forced liquidation of Holdco is $22.3 billion. *Bell Report* at ¶ 58. Because the maximum cost of the total liability of LTL under Mr. Mullin's hypothetical worst-case (speculative) scenario is $21 billion, it is a logical certainty that LTL has available to it the means to fund even the worst-case scenario - it is not in financial distress.

attached hereto as Exhibits A and B respectively) – the undisputed (and undisputable) facts and the clearly controlling law mandate one and only one result here: J&J/LTL's second bad faith bankruptcy filing must be dismissed.

WHEREFORE, Mr. Crouch requests that the Court enter an Order DISMISSING this case with prejudice and, to the extent that the Court declines to do so, Mr. Crouch requests that the Court certify its decision for immediate direct appeal to the Third Circuit Court of Appeals.

Respectfully submitted:

Dated: July 20, 2023

/s/ Moshe Maimon

Moshe Maimon (I.D. 042691986)

LEVY KONIGSBERG, LLP
605 Third Avenue, 33rd FL
New York, NY 10158
Tel: (212) 605-6200
Fax: (212) 605-6290
Email: mmaimon@levylaw.com
Attorneys for Talc Claimant
Paul Crouch, Individually and as Executor
and as Executor Ad Prosequendum of the
Estate of Cynthia Lorraine Crouch
and
JONATHAN RUCKDESCHEL
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043
Email: ruck@rucklawfirm.com
Attorneys for Talc Claimant
Paul Crouch, Individually and as Executor
and as Executor Ad Prosequendum of the
Estate of Cynthia Lorraine Crouch
*Admitted Pro Hac Vice