MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com
150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Plaintiff Katherine Tollefson*
*and Certain Mesothelioma Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LTL MANAGEMENT LLC, | ) | |
| | ) | BK Case: 23-12825-MBK |
| Debtor. | ) | |
| ------------------------------------------------------- | ) | |
| | ) | |
| LTL MANAGEMENT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro.: 23-01092-MBK |
| v. | ) | |
| | ) | |
| THOSE PARTIES LISTED ON | ) | |
| APPENDIX A TO COMPLAINT and | ) | |
| JOHN AND JANE DOES 1-1000, | ) | |
| | ) | |
| Defendants. | ) | |

## MRHFM'S PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND BANKRUPTCY PETITION OF LTL MANAGEMENT LLC

## Table of Contents

*FINDINGS OF FACT* ....................................................................................................2

*CONCLUSIONS OF LAW* .............................................................................................2

I.   *LTL Management Has Not Filed in Good Faith* .......................................................4

   **A.   LTL Management Can Pay All Current and Future Claimants in Full.** ................5

   **B.   LTL Management is Not in Financial Distress.** ........................................................6

      1.   LTL can pay all its liabilities as they come due. ...................................................7

      2.   LTL is able to pay $30 billion to resolve talc claims. ..........................................8

      3.   LTL's reasonably foreseeable liabilities are far below $30 billion. .......................9

II.   *LTL Management Filed for an Improper Purpose* ..........................................................12

   **A.   Johnson & Johnson has Independent Non-Derivative Liability, Separate from
LTL, for All Talc Products for All Time.** .........................................................13

      1.   Johnson & Johnson has separate liability from LTL. .........................................14

      2.   LTL is not required to indemnify J&J. ...............................................................16

   **B.   Demanding an Injunction for J&J is, as a Matter of Law, an Improper
Bankruptcy Purpose.** .........................................................................................19

      1.   Section 362(a)'s automatic stay cannot cover claims against non-debtors. .........20

      2.   Section 105 does not give this Court jurisdiction to enjoin talc claims against
non-debtors. .........................................................................................................21

   **C.   The Third Circuit Already Found LTL Management's Bankruptcy Purpose—
the Same One Advanced Here—is Improper.** ..................................................25

III.   *Johnson & Johnson's Conduct Proves LTL's Bad Faith and that its Petition is an
Abusive and Unfair Litigation Strategy* .........................................................................25

   **A.   J&J's Misrepresentations to the Courts Shows Bad Faith.** ................................26

      1.   J&J lied about the tort system. .............................................................................26

      2.   LTL lied about the 2021 Funding Agreement .....................................................27

      3.   Johnson & Johnson lied about wanting to equitably resolve claims. ..................29

      4.   J&J tried to manufacture bankruptcy jurisdiction. ..............................................34

      5.   J&J forum shopped. .............................................................................................35

i

6.    J&J treats Section 524(g) as a menu choice for half-trillionaires. .........................36

**B.   J&J's Fraud on the Parties Shows Bad Faith.............................................................37**

1.    J&J and LTL—while bound as the Debtor in Possession to act only for the benefit of the Estate—secretly conspired to give away $61 billion. ...........................38

2.    LTL insists on indemnifying J&J contrary to New Jersey state law. ...................41

3.    J&J lied about the Third Circuit's decision. ...........................................................42

4.    J&J lied about seeking Supreme Court review.......................................................43

5.    J&J lied about the support for its Plan....................................................................44

6.    J&J lied about the United States Trustee. ...............................................................46

7.    Johnson & Johnson is clearly controlling the Debtor. ..........................................48

*IV.  Conclusion* .........................................................................................................................**48**

## MRHFM'S PLAINTIFFS'[1] PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND BANKRUPTCY PETITION OF LTL MANAGEMENT LLC

MRHFM's plaintiffs urge this Court to follow the Third Circuit's directive to "start, and stay, with good faith." *In re LTL Mgmt., LLC*, 64 F.4th 84, 93 (3d Cir. 2023).[2] This Court, as the Third Circuit did, took Johnson & Johnson at its word in February 2022 when it wrote:

> With Debtor's chapter 11 filing, this Court now has **jurisdiction and oversight over the bankruptcy estate, which controls LTL's rights under the Funding Agreement**, and can ensure that Debtor pursues its available rights against J&J and New JJCI. It is inexplicable that Movants would want to dismiss this proceeding and lose such leverage and access to an immediate enforcement vehicle. The Court is unpersuaded that the tort claimants have been placed in a worse position due to either the 2021 Corporate Restructuring or implementation of the Funding Agreement…. Significantly, the resources under the Funding Agreement will be available upon confirmation of a plan—**whether or not** the plan is acceptable to J&J or New JJCI, and **whether or not** the plan offers payors protection under § 524(g). *In re LTL Mgmt., LLC* 637 B.R. 396, 423-24 (Bankr. D.N.J. 2022) (emphasis).

J&J's word is worth *nothing*. The Company must be held accountable in the civil justice system. Before this Court is overwhelming opposition to the most flagrant abuse

---

[1] Maune Raichle Hartley French & Mudd, LLC only represents mesothelioma victims, including eighty with filed cases in state courts across the country. The Motion to Dismiss is brought on their behalf, including specifically Katherine Tollefson, an appellant before the Third Circuit in *LTL1*, as well as Sandra Weathers, Mary Jackson, Elizabeth Meikle, Marzena Zachara, Robert Radin, Christine Woodfin and Jacklyn Pena. All are listed in MRHFM's 2019 Verified Statement. *See* Dkt. 678.

[2] "We start, and stay, with good faith. Good intentions—such as to protect the J&J brand or comprehensively resolve litigation—do not suffice alone. What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes. Only a putative debtor in financial distress can do so. LTL was not. Thus we dismiss its petition."

of the bankruptcy system in the history of the United States. The Third Circuit already rejected Johnson & Johnson's bad faith attempt to access bankruptcy's "safe harbor," and the Circuit did so on a record with much less bad faith than exists here.

## FINDINGS OF FACT

In the interests of judicial economy, MRHFM joins all arguments and adopts all evidence contained in the TCC's Proposed Findings of Fact and Conclusions of Law, as well as the arguments and evidence introduced by all movants in their respective findings and conclusions, including Paul Crouch (Dkt. 1067), Arnold & Itkin, the Ad Hoc of States, the states of Mississippi and New Mexico, and the Office of the United States Trustee.[3]

## CONCLUSIONS OF LAW

"Given Chapter 11's ability to redefine fundamental rights of third parties"—like those of mesothelioma plaintiffs **wrongly** deprived of their Constitutional rights and state law remedies for over 20 months—"only those facing financial distress can call on bankruptcy's tools to do so." *LTL Mgmt.*, 64 F.4th at 110 (emphasis).

---

[3] MRHFM incorporates by reference its Motion to Dismiss (Dkt. 358) and Reply in Support (Dkt. 855), as if set forth fully herein, as well as the motions and replies filed by the TCC (Dkts. 286 & 863), UST (Dkts. 379 & 862), Paul Crouch (Dkt. 346), Ad Hoc of States (Dkts. 350 & 863), the States of Mississippi and New Mexico (Dkts. 480 & 872) and the Barnes Law Group (Dkt. 473). The Ad Hoc Group of Mesothelioma Claimants joined the motion and reply filed by the TCC. *See* Dkts. 335 & 866. All exhibits and transcripts MRHFM referenced herein are attached to the TCC's Proposed Findings of Fact and Conclusions of Law. MRHFM refers to transcripts from hearings and to exhibits in the same format as the TCC. "TCC Ex." refers to documents listed on the TCC's Amended Exhibit list, filed 6/30/23, Dkt. 958.

Under 11 U.S.C. § 1112(b), LTL's bad faith filing must be dismissed. *LTL Mgmt.*, 64 F.4th at 99 (citing *15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009)). *See In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999);[4] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004). A petition needs to be filed for a proper bankruptcy purpose and **not** "merely to obtain a tactical litigation advantage." *LTL Mgmt.*, 64 F.4th at 101.

The Debtor—not the movants—has the burden to establish good faith. *LTL Mgmt.*, 64 F.4th at 100. Here, as in 2022 before this Court, the movants have raised the issue of the Debtor's good faith "sufficiently to shift the burden upon the Debtor." *LTL Mgmt., LLC*, 637 B.R. at 405 n.7. This Court recognized the good faith "requirement ensures that the Bankruptcy Code's careful balance of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy…" 637 B.R. at 404.

Black-letter law, uniformly applied by the federal appellate courts for over a century, forbids the wielding of bankruptcy courts' powerful equitable weapons by **non**-distressed debtors whose petition was filed for an improper purpose.[5]

---

[4] In *SGL Carbon*, the Third Circuit held that a "financially healthy company" that filed a Chapter 11 petition in the face of potentially significant civil liability acted outside the purposes of the Code, reversed the bankruptcy court (on "clearly erroneous" review), and remanded for dismissal on bad faith grounds. *In re SGL Carbon*, 200 F.3d at 156, 162–63.

[5] *See Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (relieving "oppressive indebtedness" a primary purpose of the Bankruptcy Act); *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (emphasis here) ("[W]e have previously defined 'bankruptcy' as the 'subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief…Congress' power under the Bankruptcy Clause

# I.     LTL MANAGEMENT HAS NOT FILED IN GOOD FAITH

The Third Circuit recognized this Court's "commendable effort to resolve a

more-than-thorny problem," but refused to allow that effort to excuse lack of good faith

and financial distress. *LTL Mgmt.*, 64 F.4th at 111. LTL's filing was not permissible even

*if* it would "create[] the best of all possible worlds for it and the talc claimants." *Id.* The

---

contemplate[s] an adjustment of a failing debtor's obligations."); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some sort of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least…face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d 154, 164–66 (3d Cir. 1999) (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith,'" and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280–81 (4th Cir. 2007) (dismissal upheld because debtor was not "experiencing financial difficulties;" the debtor's filings "reveal a solvent business entity," a fact that "alone may justify dismissal of [the debtor's] Chapter 11 petition"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created … to isolate the insolvent property and its creditors, exemplifies … bad faith cases…Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning … was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"); *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs … But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'").

benefits of bankruptcy "cannot displace the rule that resort to Chapter 11 is appropriate only for entities facing financial distress. This safeguard ensures that claimants' pre-bankruptcy remedies—here, the chance to prove to a jury of their peers injuries claimed to be caused by a consumer product—are disrupted only when necessary." *Id.* A good faith requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.'" *SGL Carbon*, 200 F.3d at 161 (citation omitted).[6]

## A.    LTL Management Can Pay All Current and Future Claimants in Full.

The Third Circuit found LTL "was highly solvent with access to cash to meet comfortably its liabilities as they [come] due for the foreseeable future." On March 30, 2023, the Third Circuit amended its opinion to emphasize "[t]his all comports with the theme LTL proclaimed in this case from day one: it can pay current and future talc claimants *in full*." *LTL Mgmt.,* 64 F.4th at 109 (emphasis). *See* Case: 22-2003, Dkt. 181-3, pg. 6. On June 27, 2023, John Kim, the Chief Legal Officer of LTL, admitted that "LTL 2.0" the Debtor in *this* case, can *still* pay "all current and future claimants *in full*"(emphasis).[7]

---

[6] "As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion." *Id.* (citation omitted); *see also In re 15375 Mem'l Corp. v. BEPCO, L.P.,* 589 F.3d 605, 624 n.14 (3d Cir. 2009) (debtor's breach of fiduciary duty is "relevant to the good faith inquiry"); *In re Korn,* 523 B.R. 453, 467-68 (Bankr. E.D. Pa. 2014) (breach of fiduciary duty provides "cause" for dismissal); *In re Kholyavka,* 2008 WL 3887653, *4 (Bankr. E.D. Pa. Aug. 20, 2008) ("performance of . . . fiduciary obligation is a quid pro quo for the protection the debtor enjoys under the reorganization provisions of the Bankruptcy Code").
[7] Tr. 6/27/23, 318:4-9 (emphasis).

Of the numerous independent grounds for dismissal, this one is sufficient, by itself, to

close the doors on Johnson & Johnson and LTL. Companies that can pay all creditors,

now and forever, in full, are not distressed.

**B.**     **LTL Management is Not in Financial Distress.**

The Third Circuit's "confidence in the conclusion that financial distress is vital to

good faith is reinforced by the central role it plays in other courts' inquiries." *LTL Mgmt.*,

64 F.4th at 103-04 n.14 (citing related holdings by other circuit courts of appeal). The

Debtor fails to show financial distress, let alone the "imminent" and "immediate" distress

the Third Circuit requires. *See LTL Mgmt.*, 64 F.4th at 102, 108. The Circuit found that J&J's

total liabilities over the next 24 months—including talc—was $2.4 billion. *LTL Mgmt.*, 64

F.4th at 95. That equates to $1 billion per year. This evidence is not contradicted anywhere

on the evidentiary record in this second bad faith filing. Companies that give away over

$12 billion a year in dividends aren't in distress (in millions):[8]



---

[8] *See* TCC Ex. 161 showing that J&J settled 1,098 mesothelioma cases and nearly 6,000 ovarian cancers for less than $1 billion. *See* footnote 39 *infra*.

6

After being presented with evidence of several large verdicts, this Court saw "clear inconsistency" in the message from the TCCs in the first motion to dismiss: "either JJCI was facing increased unmanageable financial risk from the talc litigation" or it was not. 637 B.R. at 421. But the issue is not whether in the future J&J or LTL will be subject to large verdicts, the issue is whether LTL is in imminent financial distress, right now. Even after the Debtor's officers and Jones Day breached their fiduciary duties to the Estate in March and April by giving away LTL's unconditional entitlements under the 2021 FA for conditional funding under the 2023 Funding Agreement ("2023 FA"), the Debtor still is not in financial distress.

### 1.    *LTL can pay all its liabilities as they come due.*

The Debtor's Chief Financial Officer, Richard Dickinson, acknowledged that, "after the restructuring, LTL was able to meet its [foreseeable] liabilities as they came due."[9] Mr. Kim similarly admitted LTL has "the capability to pay their debts as they became due for the foreseeable future."[10] Mr. Wuestoff testified that, as of the filing date, both the Debtor and Holdco "had the capacity to pay their debts as they became due for the foreseeable future."[11] He added that, at the time of the second bankruptcy filing, LTL was solvent, able to pay its bills, able to meet its liabilities, and had sufficient liquidity to

---

[9] Tr. 6/27/23, 134:19-21 (Dickinson) ("[Question] Okay. And on April 4th, after the restructuring, LTL was able to meet its liabilities as they came due, true?  [Answer] The foreseeable liabilities, correct.").
[10] TCC Ex. 1073 (Kim Decl.) ¶ 44.
[11] Wuesthoff Decl. ¶ 26.

7

meet its obligations.[12] Dr. Bell, LTL's expert, admits the Debtor was and continues to be solvent, but "equitably" and based on its balance sheet.[13]

### 2. LTL is able to pay $30 billion to resolve talc claims.

LTL has access to approximately $1.3 billion in cash from Holdco, the obligor under 2023 FA, including a $912 million dividend that Holdco received in June 2023,[14] and $14.5 million in cash.[15] Most importantly, the Debtor has access to the value of Holdco's equity interests, valued at approximately $29.9 billion or, if discounted in a forced liquidation, $22.3 billion.[16]

Holdco will continue to receive dividends in the future and may borrow from J&J's internal bank to generate cash flow to satisfy its obligations under 2023 FA. LTL may demand payment from Holdco, and there is no obligation for LTL to take Holdco's

---

[12] Tr. 6/27/23, 71:1-14.

[13] TCC Ex. 1003 (Bell Report) ¶¶ 10, 55.

[14] TCC Ex. 1021 (Bell Supp. Report) ¶ 3; Tr. 6/28/23 pm, 160:15-21 (Lisman). Dr. Bell testified that Holdco's plan for the dividend is to loan it to J&J at an interest rate of 4.7667% for a ten-year term, callable on demand Ex. 1021 (Bell Supp. Report) ¶ 2. Given J&J's credit rating, this loan is essentially as good as cash.

[15] TCC Ex. 1003 (Bell Report) ¶¶ 39-41.

[16] TCC Ex. 1003 (Bell Report) ¶ 58.

financial condition into account when making such demands.[17] LTL also owns Royalty

A&M, worth nearly $400 million.[18]

### 3.    LTL's reasonably foreseeable liabilities are far below $30 billion.

LTL did no "estimate or valuation of aggregate talc liability" before filing its

second petition.[19]  The Debtor's CFO "didn't see any financial analysis [of LTL's talc

liabilities], nor did [he] know that they were in financial distress."[20]  J&J's assistant

controller admitted that outside of bankruptcy, "J&J has no aggregate estimate of talc

liability."[21]

Mr. Kim testified that "in no event was the dollar-value of the costs to defend and

resolve talc claims in the tort system believed to approach the $29 billion asset value of

Holdco."[22] He said the magnitude of talc liabilities was in the $8 billion to $10 billion

range, but was unable to provide further detail.[23]  Mr. Wuestoff testified several times

---

[17] LTL also maintains a $41.5 billion litigation claim for the transfer of the Consumer Business for no considerations.  In addition, the assets of the bankruptcy estate (but not of LTL pre-filing) also consist of the debtor-in-possession's right to bring a potential fraudulent transfer claim against J&J for abandoning its funding backstop without reasonable exchange in value.  Dismissing this case returns the right to bring such cause of action (if any) to the creditors of LTL.  *See, e.g.*, N.J. Rev. Stat. 25:2-29(a)(1) (Remedies of Creditor) ("In an action for relief against a transfer or obligation under this article, a creditor, subject to the limitations in R.S.25:2-30, may obtain (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim. . . .").
[18] TCC Ex. 1003 (Bell Report) ¶¶ 39-41.
[19] TCC Ex. 802 (March 28 Meeting Presentation), at 25; Ex. 805 (April 2 Meeting Presentation), at 10.
[20] Tr. 6/27/23, 129:18-23 (Dickinson).
[21] Tr. 6/28/23, 144:12-15 (Lisman).
[22] TCC Ex. 1073 (Kim Decl.) ¶ 44.
[23] Tr. 6/27/23, 185:7-25 (Kim).

that the value of the talc liabilities was not more than $8.9 billion.[24] He testified that, if

LTL's experts assumed that talc liabilities were greater than $8.9 billion, "we'd have a

difference of opinion."[25]

LTL's CFO did not have any financial flow analysis if the talc claims were returned

to the tort system.[26]  As to defense costs, "[a]ll I know is what they did spend."[27]  LTL did

not perform any evaluation of how much cash flow it would need in the tort system over

the next three or even five years.[28]  J&J's assistant controller similarly testified that outside

of bankruptcy, "J&J has no aggregate estimate of talc liability."[29] LTL's own expert, Dr.

Charles Mullin, estimated its total liabilities were less than $12 billion.[30]

Further, Dr. Mullin's flawed assumptions greatly exaggerated his estimate of talc

litigation expenses. He opined that each trial costs $5 million, which Mr. Burian noted

was at the high end of J&J's historical experience and did not consider economies of

scale.[31] Dr. Mullin assumed J&J would settle uterine and cervical cancer claims in the tort

---

[24] *See, e.g.*, Tr. 6/27/23, 58:13-16 (Wuestoff) ("Q: Sir, you don't believe, LTL doesn't believe that its talc
liabilities exceed $8.9 billion, right? / A: At this point, nothing that we see would indicate that it's more.");
*id.* at 72:20-24 (Wuestoff) (testifying that the data point of the PSA was the key estimate of the talc liabilities
when deciding whether or not to file the second bankruptcy).

[25] *Id.*, at 66:12-20.

[26] *Id.* at 129:24-130:19.

[27] *Id.* at 137:9.

[28] Tr. 6/27/23, 163:17–22 (Dickinson).

[29] Tr. 6/28/23pm, 144:12-15 (Lisman).

[30] TCC Ex. 1001 (Mullin Report) ¶¶ 102, 104, 112; Day 3 trial tr. 1191:17-1192:14

[31] TCC Ex. 1001 (Mullin Report) ¶ 69 & n.82 (noting that the $40 million quarterly figure also included costs
related to talc-related bankruptcies such as the *Imerys* bankruptcy).

system for $50,000 each, even though J&J **has never** paid a dime for such claims historically in the tort system.[32]

The TCC's expert, Saul Burian, performed a re-analysis of Dr. Mullin's estimate, accepting his $40 million quarterly figure for non-trial litigation costs, revising per-trial costs to $3.5 million based on the historical average cost (which Mr. Burian opines is a more reasonable estimate and does not even account for economies of scale),[33] and assuming an average of ten trials per year, consistent with the historical average and LTL's president's testimony.[34]  With Mr. Burian's adjustments, LTL's total costs in the first three years upon return to the tort system would be only $600 million under the first scenario, $2.6 billion under the second scenario, and $4.8 billion under the third scenario.[35]

Unfiled and non-compensable claims are far too speculative to support a finding of financial distress. Although LTL and J&J have entered Plan Support Agreements ("PSAs") with attorneys purportedly representing tens of thousands of talc claimants, not a single claimant has signed a PSA. LTL merely has "commitments from attorneys representing those clients" to "recommend that their clients support the agreement."[36]

---

[32] Tr. 6/29/23, 118:19-119:13 (Mullin).
[33] TCC Ex. 1112 (Burian Report), at 12-14. *See also* Tr. 6/29/23pm, 58:20-61:24 (Burian).
[34] TCC Ex. 1112 (Burian Report), at 12.
[35] TCC Ex. 1112 (Burian Report), at 15.
[36] TCC Ex. 952, at 59:17–22 (April 15, 2023, Pulaski Dep. Tr.).

Some attorneys who signed the PSAs have described their commitment as merely "an agreement to agree" or "a conditional agreement with a right to opt out."[37]

Dr. Mullin wrongly assumed 100,000 talc claims are pending, but Mr. Watts (with purportedly 17,000 claims) and many of the other lawyers who signed PSAs have not filed any of their cases in the tort system.[38] Regardless, these are not "new" claimants. This Court considered LTL's current and *future* liability in *LTL1*, as did the Circuit. The Company anticipated future talc claims and the only thing new is that the parties now know these victims—not yet diagnosed in February 2022—by name. Or at least, by first name. What disease do the claimants have that are represented by AHC's member firms? The AHC won't say, and J&J doesn't care.

## II.    LTL MANAGEMENT FILED FOR AN IMPROPER PURPOSE

The stated purpose of this case is to procure permanent equitable relief for non-debtor Johnson & Johnson (and various affiliated companies). Irrespective of the Debtor's well-established lack of financial distress, and the many indicia of bad faith outlined below (*see* Section III, *infra.*), such a purpose is not a valid one.

A bankruptcy must be filed for a "valid reorganizational purpose." *SGL Carbon*, 200 F.3d at 165-66. The main functions of bankruptcy law are (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *Integrated Telecom*,

---

[37] TCC Ex. 776, at 155:6–25, 157:24–158:2 (May 24, 2023, Nachawati Dep. Tr.).
[38] Tr. 6/29/23, 112:14-113:19 (Mullin).

12

384 F.3d at 119 (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,

526 US. 434, 453 (1999)).

Johnson & Johnson has independent liability for all talc products for all time,

separate from LTL. But LTL demands—contrary to its duty to maximize the Estate—that

J&J, a half-trillion-dollar ***non-debtor*** that gives away more than $1 billion to shareholders

every 30 days, be given a permanent injunction.[39] To LTL's Chief Legal Officer, this is a

"necessary condition" of the Debtor's bankruptcy filing and it would make "no sense"

for LTL to file without ***non-debtor*** Johnson & Johnson benefiting from a channeling

injunction.[40] This is not a proper bankruptcy purpose, and shows bad faith.

A.    **Johnson & Johnson has Independent Non-Derivative Liability, Separate from LTL, for All Talc Products for All Time.**

The facts before this Court make plain that J&J has separate and independent talc

liability. Fabricating the Debtor and forcing it into bankruptcy (twice) does not extinguish

Johnson & Johnson's liability for its most signature product. The record before the Court

shows J&J is independently liable for pre- and post-1979 talc liabilities, and LTL is (as a

matter of law) under no obligation to indemnify J&J.

---

[39] The Company has 2,604,286,303 shares of Common Stock outstanding. Johnson & Johnson Annual Report 2022, Form 10-k, available at: https://www.investor.jnj.com/asm/2022-annual-report. The Company presently gives away $1.19 per share per quarter. The total dividend in 2022 was $4.45 per share. *See* Johnson & Johnson Dividend History, available at: https://johnsonandjohnson.gcs-web.com/stock-information/dividends-splits. *See* MRHFM Reply, Ex. 9, 2022 Annual Report and Ex. 10, Dividend history.
[40] Tr. 6/27/23, 233:6-25.

1.      *Johnson & Johnson has separate liability from LTL.*

At all relevant times, J&J has owned, and continues to own, all intellectual property relating to Johnson's Baby Powder ("JBP"), including package labeling and advertisements, all of which lacked any health warnings.[41] Even after 1979, when J&J ceased to manufacture JBP directly, J&J's copyright continued to appear in advertisements for JBP, and J&J's logo continued to appear on certain JBP packaging.[42] When Reuters published an article in December 2018 reporting on the presence of asbestos in JBP, it was J&J itself that responded with full-page newspaper ads, featuring photos of the JBP container, signed "Johnson & Johnson."[43]

Despite this (or perhaps because of it), LTL did not analyze whether J&J has talc liabilities separate and apart from LTL's.[44] The Debtor instead plunges into self-harm, insisting that *it* holds all talc liabilities, both before 1979 and after, due to the Transfer Agreement ("Agreement") between J&J and Old Consumer.

The Third Circuit did not reach whether it was proper to enjoin actions against J&J—the Company's manifest bad faith made it unnecessary—but noted "it is ***not***

---

[41] TCC Ex. 601.005 (Tr. 10/22/21), 77:10–78:19 (testimony about 1980 advertisement for JBP copyrighted by "J&J"); Ex. 603.012 (Tr. 11/4/21), 270:5–15 (J&J owns intellectual property regarding JBP).
[42] TCC Ex. 601.005 (Tr. 10/22/21), 77:10–78:19, 89:22–90:17.
[43] TCC Ex. 601.005 (Tr. 10/22/21), 96:19–102:19.
[44] Tr. 6/27/23, 232:1-233:14.

*obvious that LTL must indemnify J&J* for the latter's independent, post-1979 conduct that
is the basis of a verdict rendered against it." *LTL Mgmt.*, 64 F.4th at 108 n.16 (emphasis).

For decades after the Agreement in 1979, J&J—not its subsidiaries—continued to
make health and safety policy decisions (*e.g.*, whether to include health and safety
warnings) governing the manufacture and sale of those products.[45] The corporate
representative of both J&J and Old JJCI, Dr. John Hopkins, admitted that J&J made all
health and safety policy decisions with regards to asbestos and talc products.[46] Dr.
Hopkins testified that J&J retains the authority to require warnings (or not) on Johnson's
Baby Powder.[47]

In the tort system, juries and courts have found J&J directly liable for its tortious
conduct and have separately considered J&J and Old Johnson & Johnson Consumer ("Old

---

[45] TCC Ex. 601.005 (Tr. 10/22/21), 85:9–86:8, 88:6–89:9.

[46] TCC Ex. 601.159 (Barden Trial Tr.), 20:11–17, *quoted in* Ex. 601.005 (Tr. 10/22/21), 86:25–87:21) ("Q: Johnson
& Johnson Corporate in New Brunswick made all health and safety policy decisions with regard to asbestos
and talc products, correct? A: The -- yes. The company in New Jersey is the parent company for all the
global companies, made those decisions, yes.").

[47] TCC Ex. 601.006 (Olson Trial Tr.), 7752:11–15, *quoted in* Ex. 601.005 (Tr. 10/22/21), 88:16–89:9) ("Q: And
you would agree that Johnson & Johnson has the authority to require warnings on Johnson's Baby Powder
about cancer, correct? A: They have the authority to require warnings. If that were a medical requirement,
they would, yes.").

JJCI") in apportioning fault.[48]   Appellate courts have affirmed the separate liability

findings against J&J and Old JJCI.[49]

> ## 2.    *LTL is not required to indemnify J&J.*

LTL and J&J insist the Agreement forces LTL to indemnify J&J. Wrong.[50] Neither

the plain text nor New Jersey law allow for a reading that permits the Agreement to

saddle LTL with J&J's talc liabilities. The Agreement provides that Johnson & Johnson

Baby Products Company ("Old Consumer") agreed to assume "all indebtedness,

liabilities and obligations of every kind and description ***which are allocated on the books***

***or records*** of J&J as pertaining to its BABY Division."[51]

Its recitals similarly state that "J&J is desirous of transferring to this Subsidiary all

assets and liabilities which are ***now*** allocated to the BABY Division ***on the books or***

***records*** of Johnson & Johnson."[52] There is no evidence showing that liabilities relating to

---

[48] *See, e.g.*, Ex. 259 (Leavitt Mesothelioma Verdict, 3-13-19), at 1 (jury answered "Yes" to separate verdict questions as to J&J JJCI, and another co-defendant Cyprus Mines Corporation, finding that all 3 corporations were "negligent"); Ex. 267, Prudencio Mesothelioma Verdict, at 5 (jury asked to enter separate findings as to each defendant and apportioned 85% to J&J and 15% to JJCI); Ex. 263 (Barden Verdict), at Da15519 (jury apportioned 80% to J&J and 20% to JJCI).

[49] *See Leavitt v. Johnson & Johnson*, A157572/A159021, 2021 WL 3418410, at *7 (Cal. Ct. App. Aug. 5, 2021) (affirming separate jury verdicts against J&J and JJCI); *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (affirming the separate liabilities of J&J and Old JJCI, with a greater amount imposed on J&J because of its greater reprehensibility and larger net worth).

[50] As discussed below, LTL's insistence that it weaken its own financial position in favor of J&J is one of several indicia of bad faith in this bankruptcy, and calls into question whether LTL and its attorneys are acting as J&J's fiduciaries as opposed to fiduciaries for LTL and its creditors.

[51] TCC Ex. 794 (First Day Kim Decl.) Annex A, at 6 (emphasis).

[52] TCC Ex. 794 (First Day Kim Decl.) Annex A, at 2 (emphasis).

present or future talc-related personal injury lawsuits were "on the books or records of Johnson & Johnson" in 1979 or that were "allocated" to Old Consumer at that time.

Mr. Kim testified that to identify the specific "indebtedness, liabilities and obligations . . . allocated on the books or records" of the Baby Products division that were assumed, "you would have to look at books or records."[53] Mr. Kim has "not looked."[54]

Susan Schirger-Ward, J&J's Senior Legal Records Coordinator, was never asked to look for the books or records.[55] Neither Mr. Kim nor any other representative of the Debtor has identified "a single document where J&J has talc liabilities described in books" or records prior to execution of the Agreement.[56] In fact, Mr. Kim admitted that "prior to January 1, 1979, there were no lawsuits claiming any personal injury arising from the alleged use of Johnson's Baby Powder and/or Shower to Shower filed against any of the J&J companies."[57]

On its face, the Agreement does not burden LTL with Johnson & Johnson's pre- or post-1979 talc liabilities. New Jersey law, which the parties do not dispute controls, underscores the point by *forbidding* the type of indemnification that the J&J and its cat's paw Debtor insist upon.

---

[53] Tr. 11/4/21, 194:2–12.
[54] TCC Ex. 603.001 Kim Dep. Tr. 10/31/21, 54:6–11; Tr. 11/4/21, 196:6–16.
[55] TCC Ex. 601.205 Schirger-Ward 10/31/21, Dep. Tr., at 11:1–2, 13:21-14-11, 53:16–54:6, 55:16–56:1, 58:22–63:4, 64:6–16; Tr. 11/4/21, 194:19–24.
[56] Kim Dep Tr. 10/31/21, 54:6–11; Tr. 11/4/21, 196:6–199:7.
[57] Tr. 11/4/21, 198:4–11.

New Jersey law forbids promising to indemnify against one's own negligence. The Debtor has not made any serious attempts to refute this proposition, which is well-established. *See Cozzi v. Owens-Corning Fiber Glass Corp.*, 164 A.2d 69 (N.J. Super. 1960); *Mantilla v. NC Mall Assoc.*, 770 A.2d 1144 (N.J. 2001). Furthermore, Johnson & Johnson has been found by juries to have engaged in willful, wanton, or reckless conduct warranting punitive damages. Such conduct **cannot***, as a matter of law, be indemnified. *See Johnson & Johnson v. Aetna*, 667 A.2d 1087 (NJ Super. 1995); *Tryanowski v. Lodi Bd. Of Educ.*, 643 A.2d 1057 (N.J. Super. 1994).

It is likewise settled that "[c]orporations cannot discharge liabilities for their torts against third parties through contract." *Jaycox v. Terex Corp.*, 541 F. Supp. 3d 954, 967–69 (E.D. Mo. 2021) (discussing case law and treatise). Hence, "[e]ven if a successor assumes the tort liability of the predecessor through an asset purchase agreement, a plaintiff may still bring a claim against the predecessor." *Id.* (*citing* 15 FLETCHER'S CYCLOPEDIA OF THE LAW OF CORPORATIONS § 7123 (2020)).

In *Federal-Mogul*, one asbestos defendant (Pneumo Abex, a brake manufacturer) attempted to secure relief under § 524(g) because it had entered into an indemnification agreement with the debtor (Federal Mogul). *In re Federal-Mogul Global Inc.*, 411 B.R. 148, 161–67 (Bankr. D. Del. 2008). "The indemnity provisions allocated liabilities between [Federal Mogul] and Pneumo Abex. They did not impact the claims against either party that may be brought directly by an asbestos claimant." *Id.* at 161. Because lawsuits against

18

Pneumo Abex "*do not derive in any way from the liability of the Debtors, they cannot be enjoined* and channeled under § 524(g)." *Id.* at 166.

**B.      Demanding an Injunction for J&J is, as a Matter of Law, an Improper Bankruptcy Purpose.**

Neither Section 362(a) nor Section 105(a) reach the ultimate relief requested by the Debtor. Quite simply—and dispositive by itself—an injunction barring state court litigation violates 28 U.S.C. § 2283, the Anti-Injunction Act.[58] In exercising statutory (and inherent) powers, bankruptcy courts "may not contravene specific statutory provisions" like the Anti-Injunction Act. *Law v. Siegel*, 571 U.S. 415, 420–21 (2014). No statute authorizes that expansive exercise of power, and binding precedent flatly forbids it. The Debtors continuing insistence that all trials against J&J be enjoined—when J&J's liability is independent of LTL's—cannot be said to be a proper bankruptcy purpose.

Moreover, the stated purpose of LTL's second foray into Chapter 11 cannot sustain the pendency of this bankruptcy. Permanent equitable relief under the circumstances here—the *sine qua non* of this entire case, according to the Debtor—would broaden this Court's power past well-established boundaries.

---

[58] "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

19

1.    *Section 362(a)'s automatic stay cannot cover claims against non-debtors.*

Section 362(a) grants "no authority" to bankruptcy judges. *In re Canter*, 299 F.3d 1150, 1155 n.1 (9th Cir. 2002). Instead, it describes the *effect* of filing a petition: it "operates as a stay." 11 U.S.C. § 362(a). The stay is an "automatic consequence of the filing of a bankruptcy petition," imposed directly by section 362. *Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021). Because it is "automatic" and "self-executing," *Gruntz v. Cnty. of Los Angeles*, 202 F.3d 1074, 1081 (9th Cir. 2000) (en banc), it "differ[s] from a bankruptcy court-ordered injunction, which issues under 11 U.S.C. § 105," *Canter*, 299 F.3d at 1155 n.1.

Section 362(a)(1) provides that the filing of a bankruptcy petition "operates as a stay" of any accrued action "against the debtor" or "to recover a claim against the debtor." 11 U.S.C. § 362(a)(1). The automatic stay also covers "any act to obtain possession of," or "exercise control over," "property of the estate." *Id.* § 362(a)(3). But the stay cannot reach tort claims against J&J (or any other company) for its independent liability.

Section 362(a)(1) plainly does not apply in this case. "[T]he clear language of section 362(a) stays actions only against a 'debtor.'" *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509 (3d. Cir. 1997). It is thus "universally acknowledged" that the stay does not include suits against non-debtors for their own liability, like those J&J seeks to enjoin here. *Id.* Nor does section 362(a)(3) apply. The only "property of the estate" even arguably implicated by third-party litigation are insurance policies shared by LTL and some non-

20

debtors. The existence of these policies, however, does not trigger the automatic stay even for claims against those non-debtors.

**2.    *Section 105 does not give this Court jurisdiction to enjoin talc claims against non-debtors.***

Section 105 authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But it "does ***not*** provide an independent source of federal subject matter jurisdiction." *In re Combustion Eng'g*, 391 F.3d 190, 224–25 (3d Cir. 2004)(emphasis). Congress has granted bankruptcy court jurisdiction over only two kinds of proceedings: (1) core proceedings and (2) proceedings "related to" core proceedings. 28 U.S.C. § 1334(b); *id.* § 157(a). The enjoined claims against Johnson & Johnson and other non-debtors are neither.

**a)    The Debtor has not established core jurisdiction.**

This Court does not have jurisdiction over talc claims against non-debtors simply because LTL has invoked the Bankruptcy Code. The Third Circuit rejected that contention in *W.R. Grace*. The question here isn't whether the *adversary proceeding* is a core proceeding, but whether the claims sought to be enjoined are core proceedings. *In re W.R. Grace & Co.,* 591 F.3d 164, 174 (3d Cir. 2009). Otherwise, "a bankruptcy court would have power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding." *Id.* "The

21

existence of a bankruptcy proceeding itself," however, is not "an all-purpose grant of jurisdiction." *Id. See also Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006).

"It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code … Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits." *Law v. Siegel*, 571 U.S. 415, 420–21 (2014). Talc claims against non-debtors are not "core" proceedings. There can be no basis for exercising core jurisdiction over them. As such, the very purpose of this bankruptcy—securing permanent equitable relief in favor of non-debtors like J&J—is improper.

### b)    The Debtor has not established related-to jurisdiction.

That leaves related-to jurisdiction, which encompasses "suits between third parties" that "have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995).  Four times—in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 986 (3d Cir. 1984), *In re Federal-Mogul Glob. Inc.*, 300 F.3d 382 (3d Cir. 2002), *Combustion Eng'g*, and *W.R. Grace*—the Third Circuit has rejected efforts to enjoin asbestos suits against non-debtors under "related-to" jurisdiction, even where the suits might trigger indemnification claims against the debtor.[59]

---

[59] The Third Circuit has indicated that a "clear contractual right" to indemnity could confer jurisdiction if liability were "automatic." *W.R. Grace*, 591 F.3d at 173; *see Combustion Eng'g*, 391 F.3d at 226. But the Debtor has adduced no evidence to establish "automatic" liability exists between itself and any non-debtor. Even

Talc lawsuits against non-debtors for their own liability do not affect the Estate. Although LTL points to the 1979 Agreement, the agreement covers only liabilities "on the books or records of J&J" in 1979—*not* future liabilities.[60] *LTL Mgmt., LLC*, 638 B.R. at 309. That is the only interpretation that gives this language meaning. *See Wash. Constr. Co. v. Spinella*, 8 N.J. 212, 217–18 (N.J. 1951). And even if it were ambiguous, such ambiguity is construed *against* indemnification. 638 B.R. at 310; *Kieffer v. Best Buy*, 14 A.3d 737, 743 (N.J. 2011).

The Third Circuit has "rejected 'related to' jurisdiction over third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim did not directly result in liability for the debtor," and has done so even when non-debtors might later have indemnity claims against the debtor. *See Combustion Eng'g*, 391 F.3d at 231; *W.R. Grace*, 591 F.3d at 171–73. Whenever hypothetical "indemnification claims against" the debtor "would require the intervention of another lawsuit to affect the bankruptcy estate," the claims "cannot provide a basis for 'related to' jurisdiction" because their resolution, by itself, does not affect the estate. *Combustion Eng'g*, 391 F.3d at 232.

---

so, no "clear" right exists here. Any such liability would be based, at best, on tenuous, ambiguous contract language that cannot support an inference of indemnification.

[60] There is no other "record evidence of an indemnity obligation" beyond the 1979 Agreement. *Combustion Eng'g*, 391 F.3d at 224 n.35.

Accordingly, Third Circuit "precedent dictates that a bankruptcy court lacks subject matter jurisdiction over a third-party action if the only way in which that third-party action could have an impact on the debtor's estate is through the intervention of yet another lawsuit." *W.R. Grace*, 591 F.3d at 173.

The state lawsuits LTL seeks to enjoin (on behalf of its non-debtor parent and affiliates) would result in judgments that will ***not*** bind LTL.[61] Those actions might later give rise to an indemnification claim asserted against LTL by J&J, but that hypothetical possibility cannot establish related-to jurisdiction.[62]

Johnson & Johnson cannot qualify for an essential condition of LTL Management's bankruptcy: a permanent channeling injunction under either §§ 105(a) or 524(g). Yet the Debtor insists upon seeking relief for its non-debtor $500 billion parent, claiming that the instant bankruptcy petition would make "no sense" without such permanent equitable relief. Because this relief lies beyond the Court's power to grant, LTL's bankruptcy does not serve a valid purpose and is not before this Court in good faith. Demanding to

---

[61] Moreover, contingent indemnification claims are disallowed in bankruptcy, so they cannot affect the estate. 11 U.S.C. § 502(e)(1)(B). And even if a non-debtor were eventually to pay a judgment, it would still have no effect on the estate. In that scenario, the non-debtor would have a right to take over the plaintiff's separate claim against LTL via subrogation. *Id.* ¶ § 509(a). But swapping one claimant for another has no effect on the estate, much less a "direct and substantial adverse effect." *Celotex*, 514 U.S. at 310; *see* Levitin, *Bankruptcy Markets: Making Sense of Bankruptcy Claims Trading*, 4 Brook. J. Corp. Fin. & Com. L. 64, 74 (2010) (discussing market for claims trading).

[62] At the very least, LTL has a legitimate argument against indemnification. As debtor in possession and fiduciary of the estate, it cannot unilaterally forfeit that potential argument without committing an act that throws its actions as a purported fiduciary into question.

24

indemnify J&J for J&J's own independent tort liability is a breach of the Debtor's duty to maximize the assets of the Estate, shows bad faith, and is an abuse of the bankruptcy code.

**C.** **The Third Circuit Already Found LTL Management's Bankruptcy Purpose—the Same One Advanced Here—is Improper.**

LTL and J&J have repeatedly contended that bankruptcy is superior to the tort system at handling mass tort cases. Indeed, in *LTL 1*, the Debtor persuaded this Court to share this view. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 407–13 (Bankr. D.N.J. 2022). But the Third Circuit rejected the notion that effectuating a policy preference for bankruptcy over tort is within this Court's power. When the Third Circuit reversed, it held that neither the desire to "comprehensively resolve litigation" (even *if* J&J was sincere[63]) nor the professed desire to give claimants the "best of both worlds" were grounds to access bankruptcy's "safe harbor" in the absence of financial distress. *LTL Mgmt.*, 64 F.4th at 93. Johnson & Johnson cannot qualify for an essential condition of LTL's bankruptcy: a permanent channeling injunction.

## III.   JOHNSON & JOHNSON'S CONDUCT PROVES LTL'S BAD FAITH AND THAT ITS PETITION IS AN ABUSIVE AND UNFAIR LITIGATION STRATEGY

Johnson & Johnson and/or LTL have now lied to the bankruptcy court in *Imerys*, to this Court, to the Third Circuit, and to the public. LTL and J&J's ongoing fraud shows

---

[63] The Court specifically does *not* find that LTL's or J&J's assertions regarding "comprehensive resolution" or "fair and equitable payment to victims" are put forth sincerely.

bad faith. This Court considered the "totality of the circumstances" when evaluating

whether LTL's first petition was an abusive or unfair litigation strategy (637 B.R. at 426)

and should do so again.

**A.      J&J's Misrepresentations to the Courts Shows Bad Faith.**

Johnson & Johnson has not limited its lies to its customers or the public, it has lied

to the courts as well. All of these misrepresentations are indicia of bad faith.

**1.      *J&J lied about the tort system.***

Johnson & Johnson has taken diametrically opposed positions on litigating talc

claims in the tort system.[64] Only thirty-six months ago, the Company told another

bankruptcy judge that talc plaintiffs should "keep their day in court and be assured a full

recovery" outside of bankruptcy.[65] After all, in a bankruptcy trust, lawyers representing

claimants could settle claims "without proving causation and establish their own

eligibility criteria."[66] Instead, talc plaintiffs were better off in the tort system where J&J

stood ready to "pay proven claims in full," especially *future* plaintiffs where "J&J as a

source of recovery…is undoubtedly a more certain bet than the standard bankruptcy

claims trust."[67]

---

[64] *See* MRHFM Reply, Dkt. 855, <u>Ex. 12</u>, Appendix of Flip Flops.
[65] *Id.*, No. 1.
[66] *Id.*, No. 2.
[67] *Id.*, Nos. 3 & 4.

Now, J&J is willing to pay thousands of claims worth *nothing* in the tort system if it means it can "capture" all its talc liability. Future victims are no longer assured the "certain bet" of proceeding against J&J in the tort system because their state damages are capped, and their jury trial rights are effectively extinguished under J&J's Plans. *See* Dkts. 525, 912, & 1008.

### 2.    *LTL lied about the 2021 Funding Agreement.*

Debtor's Counsel told this Court on February 18, 2022, that the 2021 Funding Agreement ("2021 FA") would apply even if the case were dismissed:

> Funds available to pay settlements, to pay judgments in the tort system. So it makes it very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. So this is there to protect the claimants. It's there to assure this isn't treated or consider a fraudulent conveyance.  The idea was and the intent was the claimants are covered either way in bankruptcy or outside.[68]

The Debtor's Legal Officer testified to the same.[69] This Court, as the Third Circuit did, believed the Debtor's promises. Rejecting TCC2's argument to dismiss on equitable grounds, the Court reasoned that "form should not supplant substance. Such is the very reason the Court is disinclined to dismiss this case based on the Debtor's 2021 corporate reorganization efforts." 637 B.R. at 428. "[W]ith the bankruptcy filing, the bankruptcy

---

[68] Tr. 2/18/22, 60:16–20, 61:5–20 (emphasis).
[69] Kim First Day Decl., *LTL1*, at ¶ 27 ("at any time when there is no bankruptcy case").

**estate** succeeds to all rights held by the Debtor, with the **oversight and jurisdiction** of this Court as needed for enforcement." 637 B.R. at 423 (emphasis).

As it turns out, the reorganization efforts, the 2021 FA, the Debtor's rights thereunder, and J&J's representations about all the above weren't worth the paper they were printed on. LTL and its lawyers lied to this Court and to the Circuit and conspired—while under this Court's jurisdiction—to rescind the 2021 FA and remove assets from the Estate. That J&J could lose on good faith grounds before the Circuit was well known. Debtor's Counsel, Greg Gordon, speaking at the ABI in April 2022 (well before briefing and argument to the Circuit), said "… this case is on appeal. Maybe it'll get reversed."[70]

The Debtor told the Third Circuit at oral argument that the 2021 FA applied outside of bankruptcy and that $61 billion was a floor, not a ceiling.[71] Then January 30th happened, and it was time for fraud and breached fiduciary duties. LTL says the Circuit's decision had the "exact opposite" effect of what LTL intended.[72] LTL now says, post-dismissal, there was material risk that the 2021 FA was no longer enforceable because it was void or voidable. *Id.* In other words, J&J wants talc claims in bankruptcy, so it wanted

---

[70] MRHFM Reply, Dkt. 855, Ex 1, ABI.

[71] MRHFM Reply, Dkt. 855, Ex. 16, Tr. 9/19/22, 65:13-17 and 83:21-25 ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something. I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

[72] Kim First Day Decl. ¶ 78.

its $61 billion back. Lying to the Circuit and to this Court shows bad faith and makes

plain that the present petition is simply another attempt to gain litigation advantage.

### 3. *Johnson & Johnson lied about wanting to equitably resolve claims.*

The Company's oft repeated statements about seeking an "equitable and efficient"

resolution are well documented. On July 26, 2022, when this Court was hearing argument

on estimation in *LTL1*, the Debtor chided MRHFM for opposing any bankruptcy

resolution when a plan had yet to be filed:

> He doesn't know what values might be offered. So to me, I don't think we
> can put much stock in a position like that where a party's telling you that
> no agreement would be acceptable. We don't care about the aggregate
> value. Well, of course, [MRHFM doesn't] care about the aggregate value.
> They want to know what the claim values are.[73]

Last July, the Debtor recognized lawyers representing claimants would want to

know what individual values would be assigned. Now, the Debtor says the Plan's

aggregate value ($8.9 billion) (Dkts. 525 (First Plan) & 1008 (Third Amended Plan)) is

"historic" and must be accepted. However, on the Plan's face, it's unknowable what

individual plaintiffs will receive until *after* the Trust is established (Dkt. 1009, Exhibit M,

pg. 38):

---

[73] MRHFM Reply, Dkt. 855, Ex. 23, Tr. 7/26/22, 100.

Article 7
**INDIVIDUAL CLAIMS PAYMENT PROCESS**

**7.1    Points-Based Monetary Values**

**7.1.1    Uncertainty of Debtor's Talc Liabilities**

Litigation arising from the use of talc or talc-containing products is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtor's total talc-related liabilities. As a result of this uncertainty, in undertaking to ensure substantially equitable treatment of all similar Existing and Future Claims, the Trustees must from time to time determine the per-point dollar value of the points used to value Individual Claims under these TDP (the "Cash Value of a Point").

**7.1.2    Description & Application of Points Valuation System**

**A.    In General**

Promptly after the Trust is established, the Trustees, in consultation with the Payor, TAC, and FCR shall establish an initial Cash Value of a Point (the "Initial Cash Value of a Point"). This Initial Cash Value of a Point shall be calculated on the basis of the initial trust claim submissions, an estimate of future submissions, the claim valuation procedures outlined in these TDP, and the factors set forth in Section 7.1.2(D) below. Given the uncertainty associated with Individual Claims, and in recognition of the fact that the Trust may increase the Cash Value of a Point in the future, the Trust shall take a conservative posture in setting the Initial Cash Value of a Point.

An individual plaintiff, today, cannot know what he/she would receive under the Plan because the dollar amount assigned to the confusing point structure won't be known until *after* the trust is established and several administrators—including the FCR, whose appointment was hotly contested—decide how much "cash" to pay per point. Johnson & Johnson purports to create a limited fund and give control to trustees and administrators, instead of where authority belongs: trial judges and juries in courts of competent and general jurisdiction across the country.

30

The facts above about J&J's of the facially unconfirmable plans hasn't stopped J&J

from scolding the lawyers who dare to protect their clients' Constitutional rights:[74]

**Statement on TCC Standing Motion to Dismiss**

May 12, 2023 - Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:

This motion is yet another desperate attempt by a small group of plaintiff's law firms—whose financial interests conflict with, diverge from and contravene those of their clients—to deprive all claimants of the right to vote and decide for themselves whether to accept the proposed plan, which a growing and significant majority of claimants already support. The court rulings this week cleared the way for the filing of the plan in the near term, and we will vigorously oppose the effort to derail that filing with this baseless and premature motion.

What does Mr. Haas mean by conflicting financial interests?

As a general matter, any lawyer opposing the settlement is taking an interest that is in conflict with their clients because in the tort system, most claimants receive nothing. They receive zero in the tort system. So by not supporting the proposed plan, the lawyers are inherently in conflict with their clients. Likely because they are seeking the aberrant one-off large verdict, notwithstanding the fact that their clients get nothing.[75]

In other words, the $500 billion tortfeasor doesn't think the claims are valid, so

anything above zero should be accepted. Johnson & Johnson settled at least 1,098

mesothelioma cases in the tort system at arm's length, including several with MRHFM

and its co-counsel, as well as nearly 6,000 ovarian cancer cases.[76] Mr. Haas knows, or

should know, what these cases settled for, including those cases involving the "small

---

[74] TCC Exs. 772 (Haas Dep. Tr. 6/7/23) & 790 (Ex. 12 to Haas Dep.).
[75] Haas Dep. Tr. 6/7/23, 110:11-22.
[76] *See* TCC Ex. 161.

group of plaintiff's firms," but he issues these edicts anyway, criticizing the firms that refuse to be complicit in J&J's fraud.

Mr. Haas relies on Mr. Murdica's representations about plaintiff's firms that support a settlement. But Mr. Murdica does not know the subtypes of any of the unfiled claimants, and the claimant lists he requested do not specify them.[77] James Onder, a member of the AHC, testified repeatedly that non-ovarian cancers such as uterine and cervical cancer had not been compensable in the tort system, including based on his experience in negotiating with Mr. Murdica, agreeing that settlement of uterine cancers was "something that [Mr. Murdica] said he'd never give you [Mr. Onder] in the tort system."[78] Mr. Watts agreed that "the science is better" for some types of talc cases than others.[79]

J&J has never settled or paid any compensation for non-ovarian gynecological cancer claims, such as uterine and cervical cancer.[80] Dr. Mullin admitted that the master settlement agreements in which J&J has entered (including with Mark Lanier) *exclude*

---

[77] Tr. 6/28/23, 444:14-21, 445:19-25.

[78] Tr. 6/28/23, 94:2-8; *see also id*. at 65:10-16 ("Q: Okay. Some cancers -- or strike that. Some cases are stronger than others, right? A: Correct. Q: And that's because – that some cases are stronger than others, that's because some diagnoses have a weaker association with talc, right? A: Correct."), 70:20-71:3 ("Q: And they're lower-value talc claims because they are not as strongly supported by the medical literature, right? A: That's correct."), 92:19-93:18, 97:6-9 ("Q: Then you say, in addition to that, J&J will pay small Settlements to clients with other gynecological cancers.  And by that you meant other than ovarian cancer, right? A: Correct.") (Onder).

[79] Tr. 6/28/23, 23:24-24:2.

[80] Tr. 6/28/23, 41:1-7 (Murdica).

non-ovarian gynecological cancers.[81] Under the *Daubert* decision in the MDL, the only

gynecological cancer found to be scientifically linked to talc was epithelial ovarian cancer.

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod Litig.*, 509 F. Supp.

3d 116, 181 (D.N.J. 2020). Mr. Onder admitted he was not pushing his uterine cancer cases

in the tort system due to *Daubert* challenges and because uterine claims are "not as strong

as the other ones. I agree."[82]

The Debtor's expert opined that the "values of mass tort claims correlate strongly

with the strength of the causal evidence linking the allegedly defective product to the

alleged harm," and analyzed the potential costs only of ovarian cancer and mesothelioma

claims, not non-ovarian "gynecological" cancers.[83] But the trust distribution procedures

in Debtor's June 2023 Proposed Plan treat ovarian cancer and mesothelioma claims very

differently from non-ovarian cancer claims; the latter are eligible only for $1,000 quick-

pay compensation.[84][85]

The present Plan is facially unconfirmable and itself shows bad faith. Like the first

and second plans, the Third Amended Plan (7/11/23) caps amount payable to any

---

[81] Tr. 6/28/23, 102:7-103:1, 104:12-16 (Mullin)

[82] Tr. 6/28/23, 100:18-101:24.

[83] TCC Ex. 1001 (Mullin Report), at 12, 44-46.

[84] Dkt. 912-13 at Ex. M § 5.3.3 ("Other Allegedly Talc-Related Diseases").

[85] This is not to diminish in any way the pain and suffering endured by women suffering from uterine or other non-ovarian gynecological cancers. One day there may be scientific basis showing a link between talc and uterine cancer, for example. But it does not exist now. The AHC and J&J are using victims of cancers not linked to talc in order to cram down on the plaintiffs with mesothelioma and epithelial ovarian cancer, which both have been established to be caused by talc exposure.

claimant at three times the scheduled value (Dkt. 1008-1 (Redline Version), pg. 14 ("Maximum Judgment Amount" and "Maximum Value")), pays "Other Talc Claims" that are *not* ovarian cancer or mesothelioma (*id.*, pg. 15 ("Other Talc Claims") $1,000 each ((*id.*, pg. 47 Sec. 5.3.3.) claims worth *nothing* in the tort system), excludes mesothelioma victims with any exposure other than talc (*id*, pg. 36), implements a convoluted and useless "Initial Point Values" system (*id.*, pgs. 39-47), and the exact amount paid to any individual claimant will *not* be known until after voting, confirmation, and the volume of submissions are evaluated. *Id.*, pg. 51, Sec. 7.1.

### 4.    *J&J tried to manufacture bankruptcy jurisdiction.*

LTL's Officers clearly take their orders from Johnson & Johnson; it was J&J that first raised the ridiculous "void or voidable" argument, not the Debtor.[86]   LTL's admissions show it is not in financial distress, and the Debtor's efforts to manufacture distress (and, it thinks, bankruptcy court jurisdiction) cannot serve as the basis for a good faith filing. The Circuit found LTL had the right—outside of bankruptcy—to cause J&J and New Consumer (jointly and severally) to pay it up to $61.5 billion to satisfy talc claims. *LTL Mgmt.*, 64 F.4th at 106-09. The Circuit held that LTL had a "*duty*" "to access its payment assets." *Id.* at 107 (emphasis). Exchanging an unconditional entitlement to over $61 billion—without consideration—for a conditional promise of $8.9 billion, and

---

[86] Tr. 6/27/23, 197:17-24 (Kim).

only if Johnson & Johnson receives a permanent injunction, is bad faith, and cannot give

this Court subject matter jurisdiction.

Under North Carolina law, which governs the 2021 FA, frustration of purpose is

merely an affirmative defense to a breach of contract action. *Brenner v. Little Red School*

*House, Ltd.*, 274 S.E.2d 206, 209 (N.C. 1981). J&J never refused to make a payment under

the 2021 FA, so that affirmative defense has no role here.

### 5.    *J&J forum shopped.*

Johnson & Johnson tried to avoid the Third Circuit and its precedent. The

Company made LTL file for bankruptcy in North Carolina, which shows bad faith. Mr.

Kim, testified about why J&J decided to file in North Carolina:

> Again, we followed all the rules and did the -took all the appropriate steps
> necessary, because we believed that North Carolina would offer the best
> chance to get a -- an efficient -- so because of the existing case law about
> divisional mergers and these types of transactions, we thought that filing in
> North Carolina would get us the quickest resolution to, again, fairly, you
> know, and efficiently resolve this litigation. So we took all the proper,
> appropriate legal actions to do that. Similar to people who file -- incorporate
> in Delaware even though they have absolutely no presence in Delaware,
> because Delaware has a body of law on corporate governance that is --
> frankly, it's not even that it's better or worse but that it's there, and they
> know what it is. So similarly, in North Carolina, there were some rulings
> there that aren't beneficial, but there were rulings that gave us a roadmap
> about how to -- for example, what a funding agreement should look like.
> And so we utilized that knowledge to come up with the right terms.[87]

No claimants have been paid in Georgia-Pacific's, CertainTeed's, Trane's or

---

[87] MRHFM Reply, Dkt. 855, Ex. 27, Tr. 2/15/2022, pgs. 170-171.

Ingersoll-Rand's manufactured "bankruptcies" (now or as of October 2021), all of which

remain pending in North Carolina. Mr. Kim had to have known that fact. Then what

exactly was the "roadmap" to the "quickest resolution" that LTL found so appealing in

North Carolina in October? The answer is obvious:  LTL does not want to equitably pay

anyone, let alone do so efficiently.

### 6.    *J&J treats Section 524(g) as a menu choice for half-trillionaires.*

Johnson & Johnson's and the AHC's perversion of 11 U.S.C. § 524(g) stands in stark

contrast to the history of asbestos litigation. Johns-Manville filed for protection in 1982;

Section 524(g) was added to the Code in 1994; the Supreme Court struck down asbestos

class action settlements—for infringing on *future* plaintiffs' Seventh Amendment Rights

and capping their state law damages—in 1997 and 1999. Notably, back-end "opt-outs"

with capped damages against companies with unlimited funds, as J&J here, were rejected

by the Supreme Court on Constitutional grounds.[88]

The Supreme Court did *not* read 524(g) as applying to non-debtors like Fibreboard

(then) and would *not* apply it to non-distressed debtors like LTL Management or non-

---

[88] *See Amchem Prods. v. Windsor*, 521 U.S. 591, 628-29 (1997) ("The argument is sensibly made that a
nationwide administrative claims processing regime would provide the most secure, fair, and efficient
means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution")
and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-46, n.23 (1999) (recognizing the "serious constitutional
concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale" as "a
mandatory settlement-only class action with legal issues and future claimants compromises their Seventh
Amendment rights without their consent" and noting the impropriety of "opt-outs" to the tort system
which capped damages recoverable to plaintiffs).

debtors like J&J now. During the early 2000s, Congress decided *against* several bills proposed to "address" asbestos litigation.[89] During this time several companies filed real (non-Two Step) asbestos bankruptcies because they (and their lawyers) interpreted all the above the same way then that MRHFM's plaintiffs do now.[90]

Section 524(g) is a tool within Chapter 11, available only to good faith debtors overwhelmed by asbestos liabilities that subject their assets to the jurisdiction of the bankruptcy court. LTL argued extensively to the Third Circuit that it was entitled to establish a 524(g) trust if it was able to garner support from over 75% of its claimants and that bankruptcy court was a better forum to resolve these disputes.[91] The Circuit rejected these arguments and denied LTL entry to bankruptcy's "safe harbor." *LTL Mgmt.*, 64 F.4th at 93.

**B.     J&J's Fraud on the Parties Shows Bad Faith.**

LTL has repeatedly breached its fiduciary duty to the plaintiffs to protect the Estate and J&J and LTL have repeatedly misrepresented their motivations to the public and to their victims.

---

[89] *See e.g.* The Fairness in Asbestos Injury Resolution Act of 2005 (S. 852, 109th Cong.); The Fairness in Asbestos Compensation Act of 1999 (S. 758, 106th Cong.), the Asbestos Compensation Act of 2000 (H.R. 1283, 106th Cong.), and the Asbestos Claims Criteria and Compensation Act of 2003 (S. 413, 108th Cong.).

[90] *See In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013); *In re Armstrong World Indus., Inc.*, 348 B.R. 136 (D. Del. 2006); *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003); *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012); *In re Celotex Corp.*, 204 B.R. 586 (Bankr. M.D. Fla. 1996); *In re Nat'l Gypsum Co.*, 257 B.R. 184 (Bankr. N.D. Tex. 2000).

[91] *See* Tr. 9/19/22, pgs. 83-84, 94-95.

### 1.    *J&J and LTL—while bound as the Debtor in Possession to act only for the benefit of the Estate—secretly conspired to give away $61 billion.*

LTL has a "trustee's" "fiduciary duty ... 'to protect and conserve property in [their] possession for the benefit of creditors.'" *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). A debtor in possession is "bound by all of the fiduciary duties of a bankruptcy trustee." *In re Insilco Tech., Inc.*, 480 F.3d 212, 215 n.3 (3d Cir. 2007). Those duties include "[o]pen, honest and straightforward disclosure to the Court and creditors" and the "duty to protect and conserve property in its possession for the benefit of creditors." *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (internal quotation marks and citations omitted).

To eliminate the alleged "risk" of the 2021 FA being void, LTL, J&J, and Holdco entered into new financing agreements. Put another way, J&J decided the 2021 FA's existence prevented LTL from manufacturing bankruptcy court jurisdiction. Tellingly, Johnson & Johnson—at least when lawyers were not involved—never refused to honor the 2021 FA. J&J's head of litigation admitted it was *J&J*, not the Debtor, that first raised the "void or voidable" issue.[92]

Mr. Wuesthoff testified that the LTL Board did not consider seeking to enforce the 2021 FA against J&J.[93]  The Board did not discuss negotiating with J&J over the "void or

---

[92] Haas Dep., 29:18-30:7.
[93] Tr. 62/27/23, 83:8-11 (Wuestoff).

voidable" issue.[94] It did not evaluate other options to terminating the 2021 FA.[95] It never

received any analysis about the strength of the "void or voidable" argument.[96] It never

discussed the chances of success of LTL's prevailing on the "void or voidable" issue.[97] No

member of the Board suggested that LTL should seek better terms than what ended up

being the 2023 FA.[98]

      LTL never raised its "void or voidable" concern with the TCC, the U.S. Trustee's

Office, or this Court.  LTL never publicly suggested it was uncertain about the status of

the 2021 FA. LTL never indicated it was considering replacing it.  Indeed, on March 21,

2023 (only two weeks before the second bankruptcy filing), LTL filed a monthly operating

report, signed by LTL's CFO and its counsel, indicating that the 2021 FA remained in

place.[99] And, as Mr. Kim admitted at the 341 Hearing in this case, J&J continued to honor

requests on the 2021 FA between January 30, 2023 and April 4, 2023, even though Mr.

Kim had purportedly already concluded that such agreement was "void or voidable."[100]

      The 2023 FA is between LTL and Holdco (not Johnson & Johnson), and operates

in *or out* of bankruptcy. Kim Decl. ¶ 81. A second arrangement, a so-called J&J Support

---

[94] *Id.* at 83:12-23.
[95] *Id.* at 84:17-21.
[96] *Id.* at 85:5-12.
[97] *Id.* at 85:13-86:2.
[98] *Id.* at 89:12-15.
[99] TCC Ex. 858, at 14 (March Monthly Operating Report, Case No. 21-30589-MBK, Doc 3886-1, at 2).
[100] TCC Ex. 904, at 25:13–26:22 (341 Hearing Tr.).

Agreement, is subject to this Court's approval and is operative only in the Chapter 11

case. *Id.* The Debtor contends these changes "resolve the concerns" that lead the Third

Circuit to dismiss *LTL1*. ***Concerns?*** What the Circuit said was that "we cannot currently

see how [LTL's] lack of financial distress could be overcome." *LTL Mgmt.*, 64 F.4th at 110.

Does Mr. Haas have an explanation for how J&J addressed ***this*** finding of the Circuit?

***No.*** And asking him draws "harassing" objections.[101]

Still, LTL's assets, including the 2023 FA, are worth $30 billion "which is greater

than any realistic estimate of the Debtor's talc liabilities."[102] According to LTL, the "value

of the [Funding] [A]greement" is the aggregate amount of "the Debtor's talc liability" —

*i.e.*, the value of the payment obligations—which LTL insists is less than $30 billion.[103]

Even after all the fraud, the Debtor is ***not*** in financial distress.

All the Debtor's machinations took place in secret. It never raised its (J&J's) "void

or voidable" theory to the Court, the United States Trusteee, or the TCC. Mr. Wuesthoff

thinks his "fiduciary duties are primarily to LTL," rather than to the Estate and its

creditors. If this case is not dismissed, Mr. Wuesthoff and all the Debtor's Officers and

lawyers must be removed. *See* 11 U.S.C. § 1104. LTL Management gave away an

---

[101] Haas Dep., 98:6-99:24.
[102] Debtor MTD Obj., 8, 55 (Dkt. 614).
[103] Debtor MTD Obj., 17-18, 42-44, 47 (Dkt. 614).

unconditional promise of $61 billion, and did so while under this Court's jurisdiction in

*LTL1.*

### 2.    *LTL insists on indemnifying J&J contrary to New Jersey state law.*

The Debtor insists it has all liability for all talc products for all time, regardless of

what New Jersey law says. LTL demands it must indemnify Johnson & Johnson for the

latter's independent non-derivative state tort liability[104] and now, LTL says claims against

non-debtors Kenvue, Janssen, and Holdco ("Affiliates") must also be enjoined because

the Debtor is liable for those, too. That's not how fiduciary duties—which LTL and its

officers owe to the Estate—work. If Johnson & Johnson or the Affiliates have separate

liability for Johnson's Baby Powder—as the cancer plaintiffs claim—any recovery from

those non-debtors would *reduce* what LTL owes to claimants in this bankruptcy and thus

increase the value of the Estate. But protecting claimants isn't this Debtor's style; it is a

naked platitude meant to provide nice public relations window dressing on this facially

bad faith bankruptcy. *See* Section II, *supra.*

---

[104] Mr. Dickinson, the CFO, didn't bother to do any analysis of what portion of the alleged $8.9 billion "settlement" reflects LTL's liability or J&J's, he just insists that LTL must pay the bill. Dickinson Dep., 5/31/2023, 108-11. The Debtor didn't perform any analysis on this issue before its second bad faith bankruptcy. Kim Dep., 226. Nor did LTL seek to have non-debtor retailers, who also have independent liability, contribute funding to a trust. Kim Dep., 192. LTL doesn't care what state law says—how it apportions fault between co-defendants, for example—it's "all one liability" as far as the Debtor is concerned. Kim Dep., 168 & 192-93.

### 3.      J&J lied about the Third Circuit's decision.

Johnson & Johnson lied about the Third Circuit's holding in announcing its second

bankruptcy filing. The Company omitted "financial distress" when quoting the Circuit's

discussion about the propriety of bankruptcy to address mass tort liability. *See LTL*

*Mgmt.*, 64 F.4th at 104. J&J's April 4th statement gives the impression that the Circuit

"agreed" bankruptcy could be used in this way, it's just that J&J's benevolence with the

2021 FA got in the way so the first case was dismissed.

During his deposition, Mr. Haas was shown the slide below in which the

Company's Press Release of April 4th[105] and the relevant portion of the Third Circuit

opinion,[106] referenced by the press release, were contrasted: [107]

---

[105]  Ex. 786 (Haas Dep., Ex.  7) and Ex. 772 (Hass Dep. Tr. 6/7/23).
[106] Ex. 787 (Haas Dep., Ex. 8) and Ex. 772 (Hass Dep. Tr. 6/7/23).
[107] Haas Dep., 6/7/23, 96:8-18. "Q. Okay. The highlighted part in pink says, '[o]n appellate review, the United States Court of Appeals for the Third Circuit agreed that bankruptcy is 'an appropriate forum for a debtor to address mass tort liability.' Do you see where I read that? A. I see where you are reading Mr. Thompson. I'm not here to just endorse your statements. If there is a question please ask it."



The Company is so eager to protect its reputation—another purpose the Third Circuit **rejected** as improper—that it will pervert 524(g) and blatantly misrepresent the Circuit's ruling if it means cramming down on the plaintiffs it poisoned. [108] Financial distress is required, and it does **not** exist here.

### 4. *J&J lied about seeking Supreme Court review.*

On March 22, 2023, Johnson & Johnson told the public its petition for rehearing—denied that day—"raised significant concerns with the Third Circuit's

---

[108] Mr. Haas testified that he found the slide[s] "entirely false and misleading and mischaracterized both the statement and opinion in terms of how they were juxtaposed." Haas, 6/7/23, 97:6-22. What exactly was false or misleading about showing an image from the press release against an image of the Circuit opinion? Mr. Haas wouldn't say.  Johnson & Johnson accuses first and verifies never.

decision…[including] the impracticality of the Third Circuit's new legal standard. We

will immediately move for a stay of this opinion so we can seek review directly from the

U.S. Supreme Court."[109]

Turns out that during February and March, while LTL and its *amici* were urging

the Circuit to grant *en banc* review and then to stay the mandate, and while LTL was in

bankruptcy, J&J and the Debtor were conspiring about how LTL could rid itself of its

$61.5 billion asset.[110]

### 5. J&J lied about the support for its Plan.

Johnson & Johnson's press release, issued April 4th, proclaimed (Ex. 18, Haas Dep.

Exhibit 7):

**NEW BRUNSWICK, N.J., APRIL 4, 2023, -** Johnson & Johnson (NYSE:JNJ) (the
Company) today announced that its subsidiary LTL Management LLC (LTL) has re-filed for
voluntary Chapter 11 bankruptcy protection to obtain approval of a reorganization plan that
will equitably and efficiently resolve all claims arising from cosmetic talc litigation against
the Company and its affiliates in North America. To that end, the Company has agreed to
contribute up to a present value of $8.9 billion, payable over 25 years, to resolve all the
current and future talc claims, which is an increase of $6.9 billion over the $2 billion
previously committed in connection with LTL's initial bankruptcy filing in October 2021. LTL
also has secured commitments from over 60,000 current claimants to support a global
resolution on these terms.

Who qualifies as a claimant? Mr. Haas won't say.[111] The Plan pays claims worth

nothing in the tort system and that J&J never settled.  Non-ovarian gynecological cancer

---

[109] MRHFM Reply, Dkt. 855, Ex. 17, Appendix of Statements, No. 1.

[110] *See* Kim Decl. ¶¶ 78-81 and Termination and Substitution Agreement, Apr. 4, 2023, Dkt. 4-4, Annex D.

[111] Ex. 772, Haas Dep. Tr., 6/7/23, 92:2-11 (J&J counsel instructing Mr. Haas not to answer whether someone
with pancreatic cancer qualified as a claimant).

claims were not at issue in *LTL1* but are now being recognized by J&J. The Company purports to use victims of uterine, vaginal, cervical and other non-ovarian cancers as pawns in its ongoing effort to "overcome the tort system."

The number of "claimants" who support the Plan doesn't cure bad faith—whether they have a talc caused cancer or not. [112] But it turns out the lawyers representing these "claimants" (the Ad Hoc of Supporting Counsel ("AHC") don't support the Plan anyway, and there's *zero* evidence that their "claimants" do. Majed Nachawati, who represents close to 5,000 "claimants" (Dkt. 470-1)—he doesn't know how many of these are ovarian cancer or non-ovarian gynecological cancers—testified that the AHC and J&J are "working with the issues with the idea of a pathway to resolution that I can support and recommend to my clients…"[113] Will he recommend the filed Plan to his clients? Mr. Nachawati can't "fortune tell."[114]

Johnson & Johnson told the world 60,000 "claimants" supported its Plan on April 4th. This has been proven false. Lies like these are all designed to keep juries from seeing the evidence and to stay hundreds of mesothelioma and thousands of ovarian cancer cases pending in courts of general jurisdiction.

---

[112] The "best interests" test is not an exercise in nose-counting.  The test for what is in the best interests of the creditors and the estate "is not one of majority rule."  7 Collier on Bankruptcy, ¶ 1112.04[7], at p. 1112-49 (16th ed. 2013 & 2023 supp).

[113] MRHFM Reply, Ex. 19, Nachawati Dep., 5/24/2023, 164.

[114] *Id.*, 165.

Yesterday, after a weeks-long trial, a California jury found asbestos in J&J's talc caused a man's mesothelioma.[115] Mr. Haas said in response: "[T]his decision has absolutely no impact on that [bankruptcy] process, which has the support of lawyers representing the **majority** of claimants" (emphasis).[116] Mr. Haas is wrong. Again. There is zero competent evidence that a majority of claimants or their lawyers support J&J's Plan, but claimant support means nothing. Bad faith can't be cured by consent. Emory Valadez, age 24, now entitled to $18.8M from J&J, would receive $50,000 under the Plan.[117]

### 6.    *J&J lied about the United States Trustee.*

Mr. Haas was at the hearing on April 18th.[118] He was aware that there was an argument about whether the TCC and the UST had a common interest *privilege* that shielded discussions between TCC counsel and the UST.[119] At no point in Mr. Molton's deposition (which Mr. Haas was on for at least part of) or at the hearing on April 18th was there an assertion that the TCC and UST had a common *fee* agreement. In fact, Linda

---

[115] 'Johnson & Johnson must pay $18.8 million to California cancer patient in baby powder suit', CNN, 7/18/23,https://www.cnn.com/2023/07/18/business/johnson-and-johnson-baby-powder-suit/index.html#:~:text=Johnson%20%26%20Johnson%20must%20pay%20%2418.8%20million%20to%20a%20California%20man,products%20in%20US%20bankruptcy%20court.
[116]https://www.factsabouttalc.com/_document/johnson-johnson-statement-on-valadez-verdict?id=00000189-6b53-d2fb-adb9-efdbd3ff0000
[117] The initial scheduled value for a pleural mesothelioma victim under the age of 45 was $500,000. The Third Amended Plan (Dkt. 1008-1), does not provide comprehensible scheduled values, but victims of pericardial mesothelioma—like Mr. Valadez—would receive only 10% of what a victim of pleural mesothelioma would receive.
[118] Ex. 772, Hass Dep., 100:6-12.
[119] Haas Dep., 102:9-23.

Richenderfer from the Office of the United States Trustee made clear the UST did **not**

have a common interest privilege with the TCC.[120] Common interest privilege and

common interest *fee* agreement are completely different. There could be no reasonable

conclusion—from Mr. Molton's deposition and the argument on April 18th—that the

UST had common interest *fee* agreement with the TCC.Despite this, on May 2nd, J&J

issued a press release asserting: [121]

> **Statement on United States Trustee Motion to Dismiss**
>
> May 2, 2023 - Statement from Erik Haas, Worldwide Vice President of Litigation, Johnson & Johnson:
>
> The Trustee's motion repeats the positions of the small minority of law firms that oppose the plan, whose counsel testified that they entered into a common interest fee agreement with the agency. We consider more compelling the views of the vast majority of the claimants' law firms who support the proposed reorganization plan.

The "agency" is the Office of the United States Trustee, a component of the

Department of Justice whose "mission is to promote the integrity and efficiency of the

bankruptcy system for the benefit of all stakeholders—debtors, creditors, and the

public."[122] The Company later said that "fee" was a typo. That's quite a typo. For several

days visitors to J&J's website were told the DOJ had a financial incentive to oppose this

bankruptcy and to do so against the interests of the "vast majority of claimants."

---

[120] Ex. 788, Haas Dep. 6/7/23, Exhibit 9; Tr. 4/18/23, 14:8-24.

[121] Ex. 789, Haas Dep. Exhibit 10. *See* Dkt. 453.MRHFM included the press release as an Exhibit to its objection to scheduling a hearing on approval of disclosure statement on May 6th. The statement was corrected before the May 9th hearing.

[122] https://www.justice.gov/ust

Typo aside, the UST believes this case should be dismissed, so the UST has drawn J&J's ire. The "vast majority" talking points are objectively false given the sworn admissions of the AHC members referenced above and the complete absence of evidence about the number of epithelial ovarian cancer and mesothelioma *claimants*—not lawyers working on a plan—that actually support this "reorganization." J&J keeps repeating "vast majority" anyway.

### 7.    *Johnson & Johnson is controls the Debtor.*

On full display before this Court during closing arguments on June 30th was J&J's complete control over its bad faith bankruptcy scam. Mr. Haas demanded that his lecture about the "egregious conflicts of interest" plaintiff's lawyers be played at the hearing. Adamant about taking the rostrum, Mr. Haas said "I'm litigating this case."[123] No doubt. Johnson & Johnson *is* litigating this case. J&J is not a debtor, Johnson & Johnson did not subject itself to bankruptcy court jurisdiction. Seeking to derive all the benefits of bankruptcy without taking on any of the burdens is evidence of bad faith.

## IV.    CONCLUSION

This Court has the power—*today*—to end Johnson & Johnson's abuse of the legal system, mockery of its victims, and fraud on the courts. This Court credited J&J's representations the first time, MRHFM's plaintiffs urge the Court to decline to do so

---

[123] Tr. 6/30/23, 148:24-25.

again.[124] Bankruptcy is not a menu choice for billionaires. This is not mediation court. This is not "efficiency" court. This is not "one liability" court. This is bankruptcy court, and Johnson & Johnson and its Debtor are not allowed into Chapter 11's "safe harbor," nor are they worthy of this Court's continued time and attention. This Court should dismiss, and should warn J&J and its stooge that a third foray into bankruptcy will be met with sanctions.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

_____

Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhfmlaw.com

---

[124] "It is non-sensical to accept the notion that J&J and Old JJCI would bear the brunt of public and judicial scrutiny…simply to stall claimants or walk away from its financial commitments under the Funding Agreement." 637 B.R. at 416. "The record before the Court does not reflect assets that have been ring-fenced, concealed, or removed. Neither J&J nor New JJCI (nor any J&J affiliate for that matter) are to be released from liability, or their assets placed out of reach of creditors, absent a negotiated settlement under a plan in which J&J's and New JJCI's roles and funding contributions warrant a release as a matter of both fact and law." 637 B.R. at 416.