**GIBBONS P.C.**
Robert K. Malone, Esq.
David N. Crapo, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
rmalone@gibbonslaw.com
dcrapo@gibbonslaw.com
kmcevilly@gibbonslaw.com

*Attorneys for the States of*
*New Mexico and Mississippi*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Judge: Michael B. Kaplan |

**POST-HEARING MEMORANDUM OF LAW OF THE STATES OF NEW MEXICO**
**AND MISSISSIPPI IN FURTHER SUPPORT OF THEIR MOTION**
**TO DISMISS DEBTOR'S SECOND BANKRUPTCY PETITION**

The States of New Mexico and Mississippi (together, the "**States**"), by and through their counsel, Gibbons P.C., hereby submit this Post-Hearing Memorandum of Law in further support of the *Motion of the State of New Mexico and the State of Mississippi to Dismiss the Second Bankruptcy Petition of LTL Management LLC for Cause, Pursuant to Section 1112(B) of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), and Joinder in Motions to Dismiss Filed by Certain Other Parties* (the "**Motion to Dismiss**") [Dkt. No. 480] (the "**Post-Hearing Memorandum**"), and, in support thereof, respectfully represent as follows:[2]

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion to Dismiss.

3085459.1 117532-107747

**PRELIMINARY STATEMENT**

LTL Management, LLC, the debtor and debtor in possession herein (the "**Debtor**" or "**LTL**") and its ultimate parent, Johnson & Johnson Company ("**J&J**"), have a problem with reality, especially when it is financially inconvenient. LTL filed its initial Chapter 11 bankruptcy case in October of 2021. *See In re LTL Management, LLC*, Case No. 21-30589 (MBK) ("**LTL 1.0**"). That filing was met with vigorous opposition and was ultimately ordered to be dismissed on January 30, 2023, in a precedential opinion by the United States Court of Appeals for the Third Circuit, which, based upon the Debtor's lack of "financial distress," found that LTL 1.0 was filed in bad faith. *In re LTL Management, LLC*, 64 F.4th 84, 110 (3d Cir. 2023). Undeterred by the Third Circuit's opinion and before this Court dismissed LTL 1.0, J&J and LTL devised a scheme to manufacture financial distress by abandoning the LTL 1.0 funding agreement for one that supposedly yields imminent "financial distress." Importantly, J&J and LTL proceeded with this course of action in direct contradiction to the blatant warning by the Third Circuit for them not to alter or replaced the original funding agreement, which would amount to fraud. *Id*. at 109 n.18. With its new funding agreement in hand, LTL filed its Chapter 11 petition in the instant case at 4:00 p.m. on April 4, 2023 (the "**Petition Date**"), barely two (2) hours after the dismissal of LTL 1.0 by this Court.

With LTL and J&J continuing in their fraudulent gamesmanship, not to mention their cynical mockery of this judicial proceeding, the States find themselves reliving LTL 1.0 in LTL 2.0. However, unlike a new model of technology, LTL 2.0 is no better, no more advanced or ultimately any different than LTL 1.0. At the dead center of this case is the very same divisive merger ("**Texas Two-Step**") J&J utilized in LTL 1.0 and which the Third Circuit characterized as a scheme whose "stated goal [is] to isolate the [mass tort] liabilities in a new subsidiary so that

entity [can] file for Chapter 11 without subjecting [J&J's] entire operating enterprise to bankruptcy proceedings." *Id.* at 93. The moral bankruptcy so evident in J&J's use of the Texas Two-Step in LTL 1.0 remains, notwithstanding LTL's refusal to acknowledge it. Similarly, LTL still refuses to acknowledge the States' sovereign regulatory and police powers to enforce their consumer protection laws and, instead, seeks to usurp the States' powers through this bankruptcy case. LTL belittles and/or flatly ignores that the States' Eleventh Amendment sovereign immunity bars LTL's proposed treatment of the States' claims. LTL attempts, obliquely and implicitly, to reduce the States' Constitutional rights to an insignificant issue to be addressed at confirmation. Fortunately, the sovereignty and Constitutional rights of the States solidly trump and triumph over LTL's weak averments—if not here, certainly on appeal.

So, why the feigned ignorance by LTL of such well-established state's rights? The answer is that this case is not about LTL. Rather, it is about insulating J&J from liability for talc-related personal injury and state consumer protection law claims, without requiring J&J to "face the music" in a bankruptcy of its own. That point was vividly demonstrated by the demand of J&J's World Wide Vice President of Litigation, Erik Haas, to be heard at closing arguments conducted before the Court on June 30, 2023. Like the wizard in the *Wizard of Oz*, found behind the scenes, controlling all—Haas' testimony revealed he too, is behind the scenes, controlling all. Haas' insistence on being heard pulls back the curtain to reveal that this case is all about J&J as it "pulls the strings" of LTL, attempting to "control" the entire bankruptcy process. Dismissal Hearing Transcript, June 30, 2023 ("**6/30/23 Tr.**"), at 146:14-149:7. Accordingly, as amply demonstrated below, this case must be dismissed as yet another case filed in bad faith by LTL.

3

## PROCEDURAL BACKGROUND

LTL filed its voluntary Chapter 11 petition in the above-captioned case on the Petition Date ("**LTL 2.0**"). By May 10, 2023, several parties in interest, including the States (collectively, the "**Movants**"), had each filed a motion to dismiss LTL 2.0 (collectively, the "**Dismissal Motions**"). *See* Dkt. Nos. 286, 335, 346, 350, 352, 358, 379, 384, 473, 480. LTL filed its omnibus objection to the Dismissal Motions on May 26, 2023 (the "**Omnibus Objection**"). Dkt. No. 614. By June 22, 2023, the Movants had filed their respective replies to LTL's Omnibus Objection (collectively, the "**Replies**"). *See* Dkt. Nos. 854, 855, 857, 862, 863, 872. On June 26, 2023, LTL filed its *Amended Chapter 11 Plan of Reorganization of LTL Management LLC* (the "**Plan**"). Dkt. No. 912.[3] From June 27, 2023 through June 30, 2023, having found that the Dismissal Motions were "Contested Matters" under Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Court held a plenary hearing on the Dismissal Motions (the "**Dismissal Hearing**").

## LEGAL ARGUMENT

In support of the Post-Trial Memorandum, the States adopt and incorporate herein the legal arguments contained in the post-hearing memoranda of law, statements of facts and conclusions of law filed by the Movants.

### A. It is Unconstitutional for LTL and J&J to Attempt to Manipulate the Bankruptcy Process to Usurp the States' Sovereign Powers and Evade the States' Eleventh Amendment Sovereign Immunity

LTL's (and J&J's) transparent attempt to fabricate a semblance of federal jurisdiction over the States' claims against non-debtors J&J and Holdings is the means by which they seek to usurp the States' sovereign powers to enforce their consumer protection laws against wrongdoers like

---

[3] The Debtor has since amended its eleventh hour Plan, which is not part of the evidentiary record and should not be considered by the Court. *See* Dkt. Nos. 1008, 1009.

4

J&J. If this Court were to somehow confirm the Plan proposed by LTL (and J&J), the States would be enjoined from pursuing their consumer protection law claims against non-debtor J&J. Plan, Art. XI. This Plan would see the States' claims channeled to an inadequately small pool of $400 million, which would be established to pay the claims of *all* governmental entities. Dismissal Hearing Transcript, June 27, 2023 ("**6/27/23 Tr.**"), at 218-20. Essentially, where legislatures and Congress have not set caps on such claims—noting the will of the people—LTL (and J&J) use their corporate power and funds to have this Court cap their known liability instead. This tramples on not only the States' Constitutional rights, but also on the separation of powers on which our system relies. As LTL (and J&J) must concede, the States have not consented and will not consent to this treatment of their claims against J&J. *Id*.; Dismissal Hearing Transcript, June 28, 2023, AM Session ("**6/28/23 AM Tr.**"), at 124:4-7; 125:6-8.

The channeling injunction and trust distribution procedures (collectively, "**TDPs**") LTL proposes in connection with the Plan, in and of themselves, constitute a blatant attempt to usurp the States' sovereign power to enforce their consumer protection laws. As the first step in that attempt, LTL conflates the States' claims under their respective consumer protection laws (collectively, "**Consumer Protection Claims**") with the personal injury claims of individuals arising out of the use of talc products (collectively, "**Personal Injury Claims**"). This reflects the erroneous testimony of LTL's Chief Legal Officer, John Kim, and others during the Dismissal Hearing, who demonstrated that the Debtor's fiduciaries have no understanding of consumer protection law. 6/27/23 Tr., at 225:14-226:2. The Consumer Protection Claims, according to the Debtor, are merely duplicative of the Personal Injury Claims. 6/27/23 Tr., at 225:8-226:3; 239:-240:1; 6/28/23 AM Tr., at 124:6-125:8. LTL's purposeful conflation of the Consumer Protection Claims with Personal Injury Claims completely ignores the fact that their respective functions and

5

enforcement differ significantly. The Personal Injury Claims, like other tort claims, are enforced through civil suits for monetary damages to compensate the plaintiff for injuries suffered. By contrast, the primary purposes of the Consumer Protection Claims are proactive and protective—stopping bad actors from violating the consumer protection statutes and keeping them honest in their representations and statements, thereby protecting consumers from deception. Notably, consumer protection statutes do not require actual injury or actual damages—this is another way in which they differ from personal injury claims. Simply stated, the States' consumer protection laws were enacted to provide a means by which the States can protect their respective residents, under their police and regulatory powers of the Tenth Amendment, no different than the States' ability to regulate guns and fireworks.

To achieve those purposes, the States may pursue remedies that go beyond the monetary damages afforded in personal injury cases, including temporary or permanent injunctive relief, disgorgement, restitution and civil penalties. *See* Miss. Code Ann. § 75-24-1 *et seq*.; NMSA 1978, § 57-12-1 *et seq*. Contrary to the testimony during the Dismissal Hearing, J&J admits as much in its Form Q-10 filed with the U.S. Securities and Exchange Commission on April 28, 2023, which states that certain consumer protection claims seek "injunctive and monetary relief." J&J Form Q-10, April 28, 2023, Movants' Ex. 785. Moreover, the States' Attorneys General are not required to establish actual deception, reliance, injury to any consumer, wrongful intent or causation to prevail on a Consumer Protection Claim. *See* Miss. Code Ann. § 75-24-1 *et seq*.; NMSA 1978, § 57-12-1 *et seq*. Consequently, to prevail on the Consumer Protection Claims, the States' Attorneys General need only show that: (i) J&J represented to the public market (the States' argue knowingly) that its talc products were safe; (ii) because of, or likely because of, these deceptive misrepresentations consumers purchased J&J products; and (iii) J&J made its deceptive

misrepresentations despite possessing science and information to the contrary. *See* Miss. Code Ann. § 75-24-1 *et seq.*; NMSA 1978, § 57-12-1 *et seq.*

The indisputable intended effect of LTL's conflation of the Consumer Protection Claims with the Personal Injury Claims, is to effectively convert the Consumer Protection Claims into Personal Injury Claims that can be addressed by the plan confirmation process in this case. The result of such a "conversion" would be the treatment of the States' Consumer Protection Claims against non-debtor J&J as if they were Personal Injury Claims against LTL. The States' sovereign authority to enforce the Consumer Protection Claims, would effectively be transferred to this Court, which lacks such sovereign powers. The real beneficiaries of such a transfer, however, will be J&J, who will have usurped the States' sovereign authority to enforce the Consumer Protection Claims through the plan confirmation process (which J&J through its own admission controls), all the while keeping J&J out of bankruptcy.

Such a usurpation of the States' sovereign powers would strip the States of their substantial constitutional right to choose how their claims would be adjudicated and overrule their election, made long before the filing of LTL 1.0, to seek redress against non-debtor J&J, among others, for its violations of their respective consumer protection statutes in *state court*. Such a result would fly in the face of the States' inherent sovereign authority to enforce their own regulatory laws in their state courts. *See, e.g.*, *West Virginia v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) ("[w]ere [the federal courts] now to mandated that the State was not entitled to pursue its action in its own courts, we would risk trampling on the sovereign dignity of the State"). It would impinge on the States' sovereign right to decide whether and where to pursue the enforcement of

3085459.1 117532-107747

violations of their civil laws and substantially and negatively impacts the States' sovereign interest in the timely resolution of their claims against violators of statutes.[4]

A tangentially erroneous argument given by LTL is that this process will be more expeditious. The States respond to emphasize that in 2021 and 2022, state and local governments entered into global settlements worth approximately $50 billion with nine (9) companies accused of misconduct in connection with the manufacture, distribution and dispensing of opioids.[5] Meanwhile, despite nearly four (4) years of bankruptcy court proceedings and related appeals, claims against Purdue Pharma and its owners, the Sackler family, await final resolution. *See In re Purdue Pharma, L.P*., 69 F.4th 45, 60, 65 (2d Cir. 2023). In other words, there is no guaranty of the expeditious resolution of either the Consumer Protection Claims or the Personal Injury Claims that LTL and J&J have repeatedly contended would be the result of this case. Indeed, the long delay in resolving *Purdue Pharma* suggests that non-debtor, co-obligors on mass tort claims like the Sacklers and J&J have every incentive to delay the resolution of claims while enjoying the protections of an affiliate's bankruptcy. That being the case, States should not be further burdened with the affronts to their sovereign authority and dignity they have suffered in both this case and in LTL 1.0.

When all is said and done, LTL's (and J&J's) transparent scheme to trample on the sovereign authority and dignity of the States in this case must fail. As amply demonstrated in their

---

[4] To make matters worse, in a further attempt to deprive the States of their sovereignty, LTL (and J&J) are coercing the States to consent to this Court's jurisdiction by requiring them to file proofs of claim, which may obstruct their ability to have their claims heard by a jury comprised of residents of their respective states. Reducing the States' consumer protection claims, non-core proceedings under any definition or analysis, to the claims administration process in this Chapter 11 case violates all notions of bankruptcy law and jurisdiction. *See generally Granfinanciera v. Nordberg*, 492 U.S. 33 (1989); *Langenkamp v. Culp*, 498 U.S. 42 (1990).

[5] *See* Press Release, N.C. Dep't of Justice, Bipartisan Coalition of Attorneys General Secures More Than $10 Billion in Opioid Funds from CVS and Walgreens: Brings Total Recoveries from Drug Industry to More than $50 Billion (Dec. 12, 2022), https://ncdoj.gov/bipartisan-coalition-ofattorneys-general-secures-more-than-10-billion-in-opioid-funds-fromcvs-and-walgreens/.

8

Motion to Dismiss [Dkt. No. 480] and their Reply [Dkt. No. 872], the Eleventh Amendment sovereign immunity enjoyed by the States bars, *inter alia*, the imposition of the TDPs on the States, who have not consented to either the TDPs or the proposed treatment of their claims by the Plan. Indeed, LTL seems keen to ignore the factual impediment of the States' Eleventh Amendment sovereign immunity to the confirmation of the Plan (or any plan providing similar treatment of the States' claims) and, therefore, to the mere continuation of this case. Underscoring this position, LTL failed to expressly address the States' sovereign immunity in its Omnibus Objection. Instead, LTL implicitly—and improperly—invited this Court to defer consideration of the crucial impact of the States' Eleventh Amendment sovereign immunity until confirmation. Dkt. No. 614 at 71-72. Any discussion of the States' Eleventh Amendment sovereign immunity is also missing from LTL's closing arguments at the Dismissal Hearing. 6/30/23 Tr., at 87:24-149:6. However, the sovereign immunity enjoyed by the States and confirmed by the Eleventh Amendment cannot be ignored. It is submitted, therefore, that the attempted usurpation of the States' sovereign powers and dignity, as well as the affront to their Eleventh Amendment sovereign immunity, that is at the center of the this case in general and the Plan and TDPs in particular, requires dismissal of this case.

### B. This Court Must Reject LTL and J&J's Blatant Attempt to Manufacture Jurisdiction Over the States' Claims Against Non-Debtor J&J in Flagrant Violation of Federal Law

As the States noted in their Motion to Dismiss [Dkt No. 480, ¶8], as of the Petition Date, the only "claims" the States assert against LTL are the "claims" manufactured by J&J and LTL by way of the Texas Two-Step. In fact, the States currently assert no claims against LTL directly—only against non-debtors J&J and Holdings. More to the point, they have not filed proofs of claim in this case. The only "dealings" the States have had with LTL are in connection with its

9

bankruptcy filings as parties in interest. Established only in 2021, LTL could not have engaged in the violations of the States' consumer protection statutes the States seek to enforce in their respective state court actions.

It is through their own manufacturing of "claims" by the States against LTL, that LTL (and J&J) seeks to artificially create federal jurisdiction over the resolution of those claims. LTL's latest attempt to do so constitutes a blatant violation of federal law. Federal courts lack jurisdiction over civil actions where "any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. Congress intended section 1359 and its predecessors to guard against "litigants' attempts to manipulate jurisdiction where none would otherwise exist." *In re Samsung Elecs. Co.*, 2 F.4th 1371, 1377 (Fed. Cir. 2021). In other words, section 1359 was "designed to prevent litigation of claims in federal court by suitors who by sham, pretense or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts." *Nolan v. Boeing Co*., 919 F.32d 1058, 1067 (5th Cir. 1990). The ultimate predecessor of section 1359 was enacted in 1875 to stop corporations from using stock transactions and asset assignments to manufacture jurisdiction in federal courts. *See* 7C Charles Alan Van Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1830 (3d ed.).

Here, J&J and LTL used the Texas Two-Step transaction, which included the ***assignment*** (in the form of a division of assets pursuant to the Texas Two-Step transaction) of talc liabilities to LTL, in a transparent attempt to manufacture claims by, *inter alia*, the States against LTL, claims that were designed to permit the invocation of this Court's jurisdiction. However, Congress was aware that litigants had concocted asset assignments in an attempt to wrongfully obtain federal jurisdiction when it enacted section 1359's predecessors. Moreover, it is hornbook law that

10

although one can assign one's rights, one cannot defeat the rights of obligees by assigning one's obligations. *See* Restatement (Second) of Contracts, § 318 (1981). *See also* N.J.S.A. §12A: 2-210 ((1) non-assignability of obligations and; (2) assignability of rights).[6] It is submitted, therefore, that the assignment of liabilities like the talc liabilities asserted against J&J and certain of its non-debtor affiliates provides even less of a basis for the legitimate assertion of federal jurisdiction than did the asset assignments that triggered the enactment of the predecessors to section 1359. Further, an even more tenuous basis for federal jurisdiction is created if the assignment takes the form of a division of assets pursuant to a Texas Two-Step transaction.

As it specifically relates to the States' consumer protection claims, Congress' intent with respect to federal jurisdiction over pending actions "by a governmental unit to enforce such governmental unit's police or regulatory power" could not be more clear—there is none. 28 U.S.C. § 1452(a). Section 1452(a) of title 28 of the United States Code expressly prohibits the removal of the States' claims from state court to federal court. *Id.*; *Mayor of Baltimore v. BP P.L.C.*, 31 F.4th 178, 224-25 (4th Cir. 2022) (even if bankruptcy jurisdiction exists, section 1452 bars removal of governmental claims to enforce police and regulatory powers). LTL (and J&J) conspicuously disregard section 1452, requiring the States, at "their own election," to proceed with their claims in either the United States District Court for the District of New Jersey or the United States District Court in the jurisdiction in which the pre-petition litigation is pending. Plan, Ex. M. Art. 8. Ironically, not only does the law prohibit the removal of the States' actions, LTL (and J&J) want the States to choose a new venue. The States have already done so. The States elect to pursue their claims in their respective state courts, where they began and belong. Respectfully, this Court does not possess the authority or jurisdiction to force the States to litigate their claims in federal

---

[6] J&J is a New Jersey corporation, headquartered in New Brunswick, New Jersey.

court nor does the law permit LTL (and J&J) to do so. Consequently, LTL's transparent attempt to create federal jurisdiction over the States' claims against non-debtor J&J by such legerdemain must be rebuffed by this Court.

### C. The Emperor LTL Still Lacks Clothes: J&J, through LTL, is Still Using the Texas Two-Step to Game the Bankruptcy Process

The Texas Two-Step provides a scheme by which a wealthy and profitable business entity like J&J may obtain the benefits of the bankruptcy process without having to undergo the corresponding burdens or accountability of that process. The entity simply creates a direct or indirect subsidiary to which certain liabilities—particularly mass tort liabilities—are transferred, but either retains the profitable assets or ensures that they are housed in one or more additional subsidiaries. By doing so, the non-debtor entity obtains indirect access to the Bankruptcy Code's coercive and non-consensual tools, including injunctive relief, for its own benefit. In LTL 1.0, LTL obtained a temporary order enjoining the States from further pursuing the Consumer Protection Claims against non-debtor J&J in state court. In this case, LTL (which has *not* been sued by the States) has filed the Plan which, if confirmed, would have the same effect on a permanent basis. The States would be barred from further pursuing the Consumer Protection Claims against non-debtor J&J.

In exchange for the "involuntary relinquishment" of their sovereign rights, the Plan provides for distributions on the States' Consumer Protection Claims (as well as the claims of all other governmental units) out of a fund capped at an embarrassingly low amount of $400 million, even though the States have not consented to, and cannot consent to, such treatment of their claims. Additionally, the States would be subject to an injunction, channeling any further litigation of the Consumer Protection Claims away from the state courts initially chosen by the States to federal courts. Despite the obvious benefits inuring to non-debtor J&J were the Plan to be confirmed,

there is no proposal to subject J&J to the burdens imposed on LTL as a debtor in this case; nor will J&J be subject to the oversight LTL faces in this case by this Court and the United States Trustee.

The ability of non-debtor entities like J&J to protect assets from the claims of those harmed by its own tortious and deceptive activity through the Texas Two-Step is troubling. It is a maneuver that seeks to "provide . . . [a tortfeasor] with additional leverage to negotiate a global settlement" with plaintiffs—leverage that a tortfeasor could not ordinarily achiever if it were to litigate the claims in an Article III federal court or state court. *In re Aero Techs. LLC*, 642 B.R. 891, 912 (Bankr. S.D. Ind. 2002), *appeal pending*, No. 22-2606 (7th Cir.). It is not surprising, therefore, that a bankruptcy judge in a Texas Two-Step bankruptcy expressed "concerns about the propriety of what [a predecessor company] wrought in" executing a scheme facilitated by a Texas Two-Step transaction. *In re DBMP LLC*, 2021 Bankr. LEXIS 2194, at *107 (Bankr. W.D. N.C. Aug. 10, 2021). Nor should it surprise anyone that a commentator has argued that the Texas Two-Step "fits the textbook definition' of a fraudulent transfer." Michael A. Francus, *Texas Two-Stepping out of Bankruptcy*, 120 Mich. L. Rev. Online 38, 42 (2022). It is also telling that the Third Circuit dismissed LTL 1.0, which was grounded in a Texas Two-Step transaction, as having been filed in bad faith. *LTL*, 64 F.4th at 106-10. Applying the foregoing analysis to this case and considering the bankruptcy-related benefits that J&J, although not a debtor, has enjoyed and will continue to enjoy if this case is not dismissed, inevitably leads to the conclusion that J&J and LTL are simply gaming the bankruptcy process, which requires the dismissal of this second chapter 11 case as the only proper and just result.

That this case involves the gaming of the bankruptcy process underscores its status as a litigation tactic. As noted above, the proposed treatment of the States' claims under the Plan and their subjection to the TDPs unequivocally violates their Eleventh Amendment sovereign

13

immunity. Putting aside the fact that the Plan does not address any of the States' non-monetary claims, the States have clearly not consented to that treatment, and, in fact, were not involved in the negotiation of either the Plan, the TDPs or the related Plan Support Agreement. 6/28/23 Tr., at 123:21-124:3. More specifically, the States have not consented to a $400 million cap on the claims of all governmental entities. In point of fact, the only basis for the $400 million cap was an agreement between J&J and certain talc plaintiff's firms that the cap was fair, an agreement to which the States were not a party. 6/27/24 Tr., at 219:24-220:20; 6/28/23 AM Tr., at 123:21-124-3. Establishing a $400 million cap for government entity claims before those claims are reviewed and properly estimated is in and of itself absurd. Without such a review and estimation, there can be no determination whether those claims will be impaired. *See LTL*, 64 F.4th at 103 (mass tort bankruptcies "inevitably . . . involve a bankruptcy court estimating claims on a great scale"). Nor can there be determination whether the cap will result in disparate treatment of similarly situated claims in violation of 11 U.S.C. § 1123(a)(4). LTL (and J&J) readily concede that no such analysis or estimation was conduction before commencing LTL 2.0 or establishing the $400 million limit. 6/27/24 Tr., at 72:20-77:9; 129:18-131:13; 201:22-203:2; 203:16-205:7. Again, as stated above, state legislatures and Congress have set no such caps on consumer protection claims in what can only be interpreted as the will of the people. As such, the huge corporate empire of J&J turns to this Court to set a cap in violation of the States' sovereign rights and in violation of the separation of powers. Accordingly, it is submitted that, especially when the patently unconfirmable aspect of the Plan is considered, the circumstances surrounding the establishment of the $400 million cap amply demonstrates that this case is nothing more than a litigation tactic on the part of LTL and J&J that should be dismissed.

### D. LTL's and its Creditors' Interests Have Been Subordinated to those of J&J, the Real Party in Interest in this Case, Requiring Dismissal of the Petition

At bottom, this case is not about LTL and its creditors at all. It is about protecting J&J from talc claims without requiring it to undertake the burdens of the Bankruptcy Code and undergo the oversight and scrutiny all debtors in possession face in bankruptcy cases. Indeed, LTL's Chief Financial Officer and a member of its Board of Directors, Richard Dickinson, testified at the Dismissal Hearing that J&J would not provide funding to LTL in this case unless it received a release of talc-related claims. 6/27/23 Tr., at 124:22-165:5.

It should come as no surprise that the interests of LTL and its creditors have been subordinated to those of J&J in both this case and in LTL 1.0. LTL's Chief Legal Officer, John Kim, and Mr. Dickinson, seem to have trouble comprehending the fiduciary duties of LTL as a debtor in possession. At the Dismissal Hearing, Mr. Dickinson, who has been seconded to LTL from J&J Services, Inc., seemed taken aback when asked about his understanding of his fiduciary duties to LTL and spoke of a duty to take into account the interests of all "stakeholders," but fails to mention at all LTL's estate and its creditors as stakeholders. 6/27/23 Tr., at 176:2-20.

Furthermore, Mr. Kim, who has worked for J&J since 2001,[7] testified at the Dismissal Hearing that: (i) there were no LTL financial statements on which he could rely in connection with the termination of the LTL 1.0 funding agreement; (ii) there were no negotiations between J&J and LTL as to the enforceability of the LTL 1.0 funding agreement; (iii) he did not obtain a fairness agreement before the termination of the LTL 1.0 funding agreement; (iv) he didn't feel the need for LTL to have a financial advisor in connection with the filing of this case; (v) he did not remember discussing his fiduciary duties towards LTL with the U.S. Trustee's Office in LTL 1.0; and (vi) the funding agreement between J&J and LTL in this case was prepared while LTL 1.0

---

[7] 6/27/23 Tr., at 180:1-3.

15

was still pending.[8]  6/27/23 Tr., at 198:2-200:14; 281:23-288:6.  LTL undeniably did nothing before giving away its most important and valuable asset (*i.e.*, the LTL 1.0 funding agreement), while a debtor in possession in LTL 1.0, required to seek court approval of transactions outside the ordinary course of business.  6/27/23 Tr., at 184:15-18.

In light of their testimony, it cannot be said that Messrs. Kim and Dickenson functioned as independent fiduciaries to LTL during LTL 1.0 or be relied upon to function as independent fiduciaries to LTL, a debtor in possession in this case.  Indeed, they appear to view their fiduciary duties as owing not to LTL's estate and its creditors, but to J&J.  The subordination of the interests of LTL and its creditors to those of J&J and the failure of at least two of LTL's officers to understand their fiduciary duties to LTL and its creditors, let alone act in accordance with them, requires the dismissal of this case as having been filed in bad faith.

As amply demonstrated herein, the pleadings in support of the Dismissal Motions, the Omnibus Objection, the Replies and the overwhelming evidence produced at the Dismissal Hearing, clearly support a finding that this second bankruptcy case by LTL was filed in bad faith. The need for a "full, fair and final resolution" of talc-related claims and other mass tort claims cannot cure a bad faith filing; nor can the filing of a plan and disclosure statement do so.  Even the support of the Plan by an unprecedented and unorthodox Ad Hoc Committee of Supporting Law Firms will not cure LTL's bad faith.  Moreover, LTL as hard as it tries, cannot escape the conclusion that this case was filed as a litigation tactic against among others, the States, further evidencing bad faith.  Because LTL's bad faith cannot be cured or justified, there is no legitimate

---

[8] Likewise, the President of LTL, Robert Wuestoff, was apparently unaware that LTL's primary obligor, HoldCo, received a $912 million dollar dividend shortly before the Dismissal Hearing, while simultaneously admitting that HoldCo could receive billions more.  6/27/23 Tr., at 67:2-71:21.  No wonder LTL presumes that it is in "imminent financial distress"—its fiduciaries are oblivious to what it is entitled to. 6/27/23 Tr., at 208:1-209:18.  In fact, LTL, as its fiduciaries concede, can presently fund talc related litigation in the tort system for years without experiencing financial hardship.  6/27/23 Tr., at 78:15-80:14; 206:18-208:21; 212:2-15.  Thus, there is not a scintilla of any credible evidence before this Court that LTL 2.0 is facing in any "imminent financial distress" for several more years.

alternative but for this Court to dismiss LTL 2.0.  However, if despite all of the evidence presented during the Dismissal Hearing, the Court is not inclined to dismiss this bankruptcy case, the States respectfully request that the Court nevertheless find that it does not have jurisdiction over the States' consumer protection claims, permitting the States to exercise their sovereign rights in their respective state courts against J&J as beyond the influence and control of the Debtor's (and J&J's) proposed Plan's TDPs, channeling injunction and exculpation provisions.

## **NOTICE**

Copies of this Post-Hearing Memorandum have been served upon the following: (i) Jones Day, 2727 N. Harwood Street, Dallas, TX 75201 (Attn: Gregory M. Gordon, Esq., Dan B. Prieto, Esq., and Amanda S. Rush, Esq.); (ii) Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, 12th Floor, New York, NY 10110 and 90 Washington Valley Road, Bedminster, NJ 07921 (Attn: Paul R. DeFilippo, Esq. and James N. Lawlor, Esq.); (iii) the Office of the United States Trustee for Region, One Newark Center, Suite 2100, Newark, NJ 07102 (Attn: Jeffrey M. Sponder, Esq. and Lauren Bielskie, Esq.); (iv) Genova Burns LLC, 110 Allen Road, Suite 304, Basking Ridge, NJ 07920 (Attn: Daniel M. Stolz, Esq., Donald W. Clark, Esq., and Gregory S. Kinoian, Esq.); (v) Brown Rudnick LLP, Seven Times Square, New York, NY 10036 (Attn: David J. Molton, Esq., Jeffrey L. Jonas, Esq., and Michael S. Winograd, Esq.); and (vi) all parties having formally requested notice in these proceedings via the Court's CM/ECF System.

**WHEREFORE**, the States respectfully request that, pursuant to 11 U.S.C. § 1112(b), this Court dismiss the LTL 2.0 chapter 11 petition as having been filed in bad faith, and, alternatively, if this case is not dismissed, that the Court find that it does not have jurisdiction over the States' consumer protection claims, permitting the States to exercise their sovereign rights in their respective state courts as beyond the influence and control of the Debtor's (and J&J's) proposed Plan's TDPs, channeling injunction and exculpation provisions.

Dated: July 19, 2023
Newark, New Jersey

**GIBBONS P.C.**

By: /s/ *Robert K. Malone*
Robert K. Malone, Esq.
David N. Crapo, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
rmalone@gibbonslaw.com
dcrapo@gibbonslaw.com
kmcevilly@gibbonslaw.com

*Attorneys for the States of
New Mexico and Mississippi*