UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR
9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES
LLP**
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
     crobinson@pszjlaw.com
     pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>          Debtor. [1] | Chapter 11<br><br>Case No. 23-12825 (MBK) |

## POST-TRIAL BRIEF IN SUPPORT OF
## MOTION OF ARNOLD & ITKIN, ON BEHALF OF
## CERTAIN TALC CLAIMANTS, TO DISMISS CHAPTER 11 CASE

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George
Street, New Brunswick, New Jersey 08933.

1

## TABLE OF CONTENTS

                                                                                    **Page**

I. PRELIMINARY STATEMENT. .......................................................................1

II. ARGUMENT. ...........................................................................................13

    A.    The Evidence Belies any Claim that the Debtor Is in Financial
        Distress. ..............................................................................................13

        1.    ███████████████████████████████
            ██████████████████████████
            ███████████████████████████████
            ███████████████████████████████
            ████████████████ ....................................13

        2.    The Debtor's Claim of Financial Distress is Based on
            Conjectural and Counterfactual "Scenarios" of
            "Potential" Talc Litigation Costs that Are Not Supported
            by the Evidence and, under LTL Mgmt., Can Not
            Support a Finding of Financial Distress. ...............................17

        3.    The Debtor Presented No Evidence that J&J Would Stop
            Funding the Payment of Talc Litigation Costs if This
            Case Is Dismissed, and No Evidence to Rebut the
            Evidence of J&J's Compelling Incentives to Continue
            Funding Such Costs Following Dismissal. ............................24

    B.    The Evidence Established that the Eve-of-Bankruptcy
        Termination of the 2021 Funding Agreement Was in Bad Faith. ......28

        1.    The Debtor's Agreement to Eliminate J&J's Funding
            Backstop Disregarded Representations and Repudiated
            Assurances that the Debtor Made to this Court and the
            Third Circuit in LTL I. ......................................................28

        2.    The Debtor's Eve-of-Bankruptcy Agreement to Restrict
            its Previously Broad Plan Trust Funding Rights Against
            HoldCo and J&J in a Chapter 11 Case Had No Purpose
            Other than to Increase Their Leverage and Limit the Plan
            Options Available to Talc Creditors in this Case. ..................31

i

a.      The Replacement of the 2021 Funding Agreement
by the New Funding Agreements Sharply
Diminished that Debtor's Plan Trust Funding
Rights in Order to Limit the Plan Options
Available to Creditors....................................................31

b.      There Was No Evidence that the Debtor's
"Frustration of Purpose" Theory Could Have
Provided a Basis for Treating the Entire 2021
Funding Agreement as Invalid or Unenforceable. ........33

c.      There Was No Evidence of any Justification for
Treating HoldCo's Funding Obligations Under the
2021 Funding Agreement – Including its Broad
Plan Trust Funding Obligations in a Chapter 11
Case – as "Void or Voidable.".......................................35

d.      There Was No Evidence of any Justification for
Applying a "Frustration of Purpose" Theory to
Render J&J's Severable Plan Trust Funding
Obligations in a Chapter 11 Case Under the 2021
Financing Agreement "Void or Voidable."...................37

C.      The Evidence Does not Support the Findings Necessary to
Apply Section 1112(b)(2) to Prevent Dismissal in This Case. ..........38

1.      Evidence that this Case Shares Certain Characteristics of
a Mass Tort Asbestos Case Does not Support a Finding
of "Unusual Circumstances."................................................38

2.      The Debtor Presented No Evidence to Support its
Baseless Claim That It Will Pay Talc Claims "In Full." .........41

3.      The Evidence Shows that there is Virtually No
Likelihood of Plan Confirmation in a Reasonable Period
of Time...................................................................................42

DOCS_DE:243840.2 05471/003

a.  The Amended Plan is Unconfirmable as a Matter
of Law Because of the Overbreadth of its
Channeling Injunction; and There Was No
Evidence that any other Plan that J&J and HoldCo
Will Support and Fund Will Avoid the Same Legal
Infirmity. .................................................................... 42

b.  The Newly-Added Imerys/Cyprus Settlement
Condition to Plan Confirmation Makes It Even
More Unlikely that a Plan Will Be Confirmed
Within a Reasonable Period of Time. ........................... 47

c.  The Debtor Has Failed to Show that is Likely to
Achieve the "Supermajority" 75% Vote Necessary
to Confirm a Plan under Section 524(g) of the
Code. .......................................................................... 50

4.  The Debtor's Lack of Financial Distress or Other Lack of
Good Faith Cannot Be Justified or Cured By Confirming
a Plan or by Granting the TCC Derivative Standing to
Prosecute Fraudulent Transfer Claims that the Debtor
Proposes to Release under its Plan. ......................................... 51

III. CONCLUSION. ............................................................................................. 54

DOCS_DE:243840.2 05471/003

# TABLE OF AUTHORITIES

## CASES

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*,
   13 F.4th 279 (3d Cir. 2022) ................................................................ 10, 44

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*,
   900 F.3d 126 (3d Cir. 2018) .................................................................44

*In re Aearo Techs. LLC*,
   No. 23-02890, 2023 Bankr. LEXIS 1519 (Bankr. S.D. Ind. June 9, 2023) .........25

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004) ........................................................ 10, 45, 49

*In re Federal-Mogul Global*,
   684 F.3d 355 (3d Cir. 2012) .................................................................40

*In re Green*,
   2016 WL 6699311 (9th Cir. B.A.P. Nov. 9, 2016) ...............................................52

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) .................................................................23

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ........................................................ 10, 46, 49

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL
   Mgmt., LLC)*,
   64 F.4th 84 (3d Cir. 2023) .......................................................... passim

*Union County Utils. Auth. v. Bergen County Utils. Auth.*,
   995 F.Supp. 506 (D.N.J. 1998) ............................................................ 9, 34

## STATUTES

11 U.S.C. § 1112(b) ..............................................................................1

11 U.S.C. § 1112(b)(2) ......................................................... 9, 38, 39, 42

11 U.S.C. § 1112(b)(2)(A) ................................................................ passim

11 U.S.C. § 1112(b)(2)(B) ............................................................... 11, 51

11 U.S.C. § 524(g) ........................................................................ passim

11 U.S.C. § 524(g)(4) .................................................................. 44, 46, 48

11 U.S.C. § 524(g)(4)(A)(ii) ........................................................ 43, 44, 46, 48

DOCS_DE:243840.2 05471/003

## RULES

Fed. R. Bankr. P. 1017 ........................................................................................................1

Fed. R. Bankr. P. 23(b)(3) ...................................................................................................39

DOCS_DE:243840.2 05471/003

The law firm of Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of certain

talc personal injury claimants who are represented by Arnold & Itkin (the

"Movants"), through the undersigned counsel, hereby submits this post-trial brief in

support of their motion [LTL II D.I.[2] 384] (the "Motion")[3] for an order pursuant to

Section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code" or the

"Code") and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules') dismissing the Debtor's chapter 11 case. In further support of

the Motion, the Movants respectfully represent as follows:[4]

## I.

## PRELIMINARY STATEMENT.

1.      The Debtor and the Ad Hoc Committee of Supporting Counsel ("Ad

Hoc Committee") seek to use the "bankruptcy tools" afforded by chapter 11 and

Section 524(g) to impose their preferred "settlement" on what are likely to be over

25,000 dissenting Talc Claimants (based on numbers cited by the Debtor in closing

argument[5]) and thousands more future claimants who will never get to vote. This

---

[2] Citations to "LTL II D.I. ___" are to docket entries in the Debtor's second chapter 11 case. Citations to "LTL I D.I. ___" are to docket entries in the Debtor's first chapter 11 case.

[3] Capitalized terms used and not otherwise defined herein have the meaning ascribed to them in the A & I Memo of Law, as defined below. "Section" refers to a section the Bankruptcy Code unless otherwise noted.

[4] In support of the Motion, Movants submitted the *Memorandum of Law in Support of Motion of Arnold & Itkin on Behalf of Certain Talc Claimants to Dismiss Chapter 11 Case* (the "A&I Memo of Law") [LTL II D.I. 384-1] and the *Declaration of Laura Davis Jones in Support of Motion to Dismiss Bankruptcy Case* (the "Jones Dec.") [LTL II D.I. 384-2]. Movants have also submitted their *Reply in Support of Motion of Arnold & Itkin, on Behalf of Certain Talc Claimants, to Dismiss Chapter 11 Case* (the "A&I Reply") [LTL II D.I. 854] and the *Declaration of Laura Davis Jones in Support of Reply in Support of Motion of Arnold & Itkin, on Behalf of Certain Talc Claimants, to Dismiss Bankruptcy Case* (the "Jones Reply Dec.") [LTL II D.I. 856].

[5] *See* Reporter's Transcript of Proceedings, June 30, 2023 ("R.T. 6/30/23") [LTL II D.I. 1000] at 135:23-136:2.

1

"settlement" includes their involuntary release of talc claims against the Debtor's very solvent non-debtor parent. However, "given Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so."[6] The evidence here belies the Debtor's claim of financial distress. As a result, the Debtor cannot use "bankruptcy's tools" against dissenting talc claimants.

2.    HoldCo is obligated to fund the payment of any costs of defending and resolving talc claims against the Debtor.[7] ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████ ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████ █████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[6] *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 110 (3d Cir. 2023) ("LTL Mgmt.").

[7] *See* Exhibit 1082 (2023 Funding Agreement) at 4-5 (definition of "Permitted Funding Use") and 6, § 2(a)). "Exhibit ___" refers to the exhibits listed in the proposed *Joint Stipulation and Agreed Order Regarding the Admission of Exhibits and Deposition Designations in Connection with Motion to Dismiss Hearing* between the Debtor, J&J, the Ad Hoc Committee, the TCC and the other parties who filed motions to dismiss this case.

█ ████████████████████████████
█ ████████████████████████████

2

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████▌█████████████████████████████████████

████████████████████ Moreover, the possibility that HoldCo – which is

not the debtor in this case – might have to liquidate assets to perform its funding

obligations to the Debtor is not evidence of *the Debtor's* financial distress.[11]

3. ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████▌█████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████▌

4. █████████████████████████████████████████

███████████████████████████████████████████████

---

[11] *See LTL Mgmt.*, 64 F.4th at 106-07.

DOCS_DE:243840.2 05471/003



5.

6.

[14] *See LTL Mgmt.*, 64 F.4th at 106-107.



cannot form a basis for extrapolating projections of future talc litigation costs for purposes of establishing financial distress.[19]

7. ██, the Debtor's claim of financial distress still requires the unsupported assumption that the Debtor's assets and those of HoldCo would provide the sole source for funding the payment of talc litigation costs following a dismissal of this case. That assumption ignores the fact that J&J is a co-defendant in every talc suit against Old JJCI or the Debtor and, until LTL I was filed, functionally made talc

---

[19] *See LTL Mgmt.* 64 F.4th at 106-07.

DOCS_DE:243840.2 05471/003

payments from its accounts.[20] As a co-defendant in tens of thousands of talc suits, J&J would have an uncontroverted and powerful incentive to ensure that talc litigation costs were paid in order to protect itself.



9.    In the face of all of this uncontroverted evidence, the Debtor presented *no testimony* at trial that J&J would no longer fund talc litigation costs if this case were dismissed and if HoldCo could not honor its funding obligations under the 2023 Funding Agreement. Being unable to present such testimony (because it would be

---

[20] *See id.* at 95; *see also id.* at 94.

false), the Debtor instead asks this Court to speculate that J&J would change its historic talc litigation cost funding practice and take the enormous risk of refusing to fund talc litigation costs if HoldCo did not have the liquidity to fund such costs on a current basis. The Third Circuit has made clear that such implausible conjecture cannot form the basis for a finding of financial distress.

10.    Moreover, whether or not the Debtor is in financial distress, the Debtor's agreement to relinquish its funding rights against J&J and HoldCo under the 2021 Funding Agreement in exchange for sharply diminished funding rights under the New Funding Agreements, all to set the stage for this chapter 11 case, precludes a finding that this case was filed in good faith. One purpose of this eve-of-bankruptcy transaction was to try to place the Debtor in financial distress by eliminating the linchpin for the Third Circuit's ruling that the Debtor was not in financial distress – J&J's funding backstop[22] – so as to qualify the Debtor for chapter 11 relief. Another purpose of the transaction was to limit the plan options available to creditors in the chapter 11 case to come, by limiting the previously broad plan trust funding obligations of J&J and HoldCo, which were not conditioned on their support for a plan, to a limited obligation to fund a trust only under a plan they support. The evidence also shows that in agreeing to eliminate J&J's funding backstop, the Debtor repudiated unqualified assurances given to this Court and the

---

[22] *See LTL Mgmt.*, 64 F.4th at 106, 109 n.18.

7

Third Circuit in LTL I that J&J's funding backstop would protect talc creditors from any diminution in HoldCo's value resulting from the planned spinoff of its Consumer Business.[23] The Debtor's conduct is a poster child for bad faith.

11.    The purported justification for terminating the 2021 Funding Agreement is that the purpose of that Agreement was to facilitate a resolution of talc liabilities in a bankruptcy, and that this purpose was allegedly "frustrated" when the Third Circuit directed the dismissal of LTL I on the basis that J&J's funding backstop precluded a finding of financial distress. However, the Debtor's current version of the supposed "purpose" of J&J's funding backstop is very different from the way the Debtor portrayed the purpose of that backstop to this Court and the Third Circuit in LTL I. Then, the Debtor represented to the Court and the Third Circuit that the purpose of J&J's funding backstop under the 2021 Funding Agreement was to protect talc creditors from any decline in HoldCo's value and to allay fears about that planned spin-off of its Consumer Business. The Debtor assured both courts that J&J's funding backstop would protect creditors from any drop in HoldCo's value resulting from the planned spin-off.[24] Nothing in the Third Circuit's opinion

---

[23] *See* A&I Reply at 41-42, ¶¶ 92-96.

[24] As set forth in the A&I Memo of Law at 5-6 and the A&I Reply at 41-43, the Debtor made multiple statements and representations to this Court and the Third Circuit regarding the protections afforded to talc claimants by the J&J funding backstop. *See*, R.T. 6/27/23, at 195:24-196:12; *Debtor's Objection to Motion to Dismiss Chapter 11 Case* [LTL I D.I. 956] at 25, n.33; *id.* at 30; *id.* at Exhibit 16; *See, also,* Exhibit 768 (Transcript of Oral Argument Before Third Circuit (10.4.22)), Case No. 22-2003 [D.I. 148] at 65:10-17; *id.* at 66:3-8; *id.* at 68:15-21.

"frustrated" the backstop's stated purpose of protecting creditors. J&J simply abandoned that purpose and caused its tools, HoldCo and the Debtor, to comply.

12.     Moreover, even if the Third Circuit's ruling had frustrated the purpose of J&J's funding backstop outside of bankruptcy, that would not have justified terminating the 2021 Funding Agreement *in its entirety*. At most, the "frustration of purpose" theory would affect only the enforceability of J&J's severable funding obligations outside of bankruptcy.[25] That theory had nothing to do with J&J's and HoldCo's obligations to fund a plan trust *in* bankruptcy. Yet, acting in bad faith to increase its parents' leverage in its upcoming chapter 11 case, the Debtor agreed to limit its previously broad plan trust funding rights against HoldCo and J&J in bankruptcy. Now, J&J and HoldCo are obligated to fund a plan trust only under the Amended Plan[26] or some variant they support. That limitation effectively gives them a veto over any plan that any other party in this case, including the TCC, might seek to file - other than one that depends on the successful prosecution of a fraudulent transfer action to avoid the termination of the 2021 Funding Agreement.

13.     Finally, Section 1112(b)(2) of the Code cannot serve as a basis for denying the motions to dismiss. To begin with, the Debtor and the Ad Hoc Committee seek to have this Court adopt a definition of "unusual circumstances"

---

[25] *See* Exhibit 792 (2021 Funding Agreement) at 14, ¶ 12 ("Severability"); *Union County Utils. Auth. v. Bergen County Utils. Auth.*, 995 F.Supp. 506, 517 (D.N.J. 1998).
[26] The "Amended Plan" refers to the *Amended Chapter 11 Plan of Reorganization of LTL Management LLC* [LTL II D.I. 912].

9

that would apply to *every* asbestos mass tort case. In essence, the Debtor and the Ad Hoc Committee seek to have this Court use Section 1112(b)(2) to transmute Section 524(g) into a generally available asbestos claims resolution regime that is untethered to financial distress or good faith – something that Congress has refused to enact.

14.    Moreover, the Debtor has not met its burden to show that there is a reasonable likelihood (or even shown any likelihood at all) that a plan will be confirmed in a reasonable period of time, as required by Section 1112(b)(2)(A). The Amended Plan is unconfirmable as a matter of law, because it includes a channeling injunction that exceeds the permissible scope of a channeling injunction in a plan for an asbestos debtor under Section 524(g) under applicable Third Circuit precedent. This is because the channeling injunction in the Amended Plan enjoins claims against entities that do not fit within any of the four categories set forth in clauses (I)-(IV) of Section 524(g)(4)(ii)(A) of the Code.[27] The Debtor presented no evidence that it is prepared to modify the Amended Plan to limit its channeling injunction to claims against entities that fit within one of those four categories, or that J&J and HoldCo would support and fund a plan that included such a limited channeling

---

[27] *See Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.),* 13 F.4th 279, 283 (3d Cir. 2022); *Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.),* 900 F.3d 126, 135 (3d Cir. 2018); *In re W.R. Grace & Co.,* 475 B.R. 34, 99-100 (D. Del. 2012) (contractual indemnity rights against the Debtor do not qualify a party for inclusion in any of the four categories of statutorily-defined relationships set forth in clauses (I) – (IV) of Section 524(g)(4)(A)(ii) so as to qualify claims against that party for inclusion in a plan channeling injunction). *See also In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236-27 (3d Cir. 2004) (Section 105 of the Code cannot be used as an independent basis for including an entity that would not otherwise qualify under Section 524(g) within the scope of a plan channeling injunction).

injunction. A finding that the requirement of Section 1112(b)(2)(A) has been satisfied cannot be based on mere speculation that they might do so.

15.    In addition, when it comes to the "supermajority" 75% vote necessary to confirm a plan under Section 524(g), the numbers do not favor the Debtor. In closing argument, the Debtor indicated that 57,292 claimants are represented by the law firms on the Ad Hoc Committee, as compared to 25,797 claimants being represented by law firms that have made or support motions to dismiss.[28] Based on the Debtor's own numbers, the Debtor is short *over 20,000 votes*. Achieving a 75% majority in the face of 25,797 likely dissenting votes would require 77,391 affirmative votes – as contrasted with the 57,292 claimants said to be represented by members of the Ad Hoc Committee. It is questionable whether there are even enough current claimants not accounted for in the Debtor's numbers to provide the additional votes needed by the Debtor; and there is no basis in the record to believe that all or most of such claimants will accept the Debtor's plan.

16.    Moreover, there is, and can be, no "reasonable justification" for the grounds for dismissal here - a lack of financial distress and other bad faith on the Debtor's part - and those grounds for dismissal cannot be cured, as required by Section 1112(b)(2)(B). Contrary to the Debtor's theory,[29] a lack of financial distress

---

[28] *See* R.T. 6/30/23 [LTL II D.I. 1000] at 135:5-10; 135:23-136:2.
[29] *See Debtor's Sur-Reply in Further Support of Omnibus Objection to Motions to Dismiss Chapter 11 Case* [LTL II D.I. 906] ("Debtor Sur-Reply") at 34-35.

11

or a lack of good faith on other grounds cannot be "justified" or "cured" by confirming a chapter 11 plan. A debtor that did not belong in chapter 11 in the first place, because it was not in financial distress or otherwise filed in bad faith, cannot bootstrap its way into chapter 11 by using Section 524(g) to impose a plan and third party releases on thousands of dissenting creditors. Good faith must precede the use of Section 524(g); the result of using Section 524(g) cannot excuse a lack of good faith.

17.    The Debtor's argument that its lack of good faith can be "cured" by granting the TCC derivative standing to prosecute fraudulent transfer claims[30] is emblematic of the Debtor's lack of candor. The Debtor fails to mention that its Amended Plan (like the Plan before it) provides for the ***complete release*** of fraudulent transfer claims against J&J and HoldCo, among others.[31] The Debtor cannot credibly argue that the grounds for dismissing the case – its lack of good faith – can be "cured" by granting the TCC derivative standing to prosecute fraudulent transfer claims, while at the same time arguing that there is a reasonable likelihood that it will, within a reasonable period of time, confirm a plan that calls for the obliteration of those very fraudulent transfer claims.

---

[30] *See* Debtor Sur-Reply at 9; R.T. 6/30/23 [LTL II D.I. 1000] at 143:9-11.
[31] *See* Amended Plan at 11, § 1.183; 14, § 1.1.101; 64-65, § 11.2.1.

DOCS_DE:243840.2 05471/003

## II.

## <u>ARGUMENT.</u>

**A.     The Evidence Belies any Claim that the Debtor Is in Financial Distress.**



DOCS_DE:243840.2 05471/003



14



22.



15



23.

DOCS_DE:243840.2 05471/003

24.    Any "financial distress" that HoldCo – which is not the debtor in this case – may face in having to sell assets to fund the payment of its obligations to the Debtor under the 2023 Funding Agreement should not be conflated with financial distress *of the Debtor*. *See LTL Mgmt.*, 64 F.4th at 105 ("Only LTL's Financial Condition is Determinative."); *id.* at 107 (characterizing the Court's "focus[] on how talc litigation affected *Old [JJCI]*" and "ma[king] the financial means of Old [JJCI], and not [the Debtor], the lodestar of the Court's financial-distress analysis" as a "misdirection" that constituted "legal error") (emphasis in original). As long as HoldCo's assets are sufficient to fund the payment of talc litigation costs – ████████

████████████████████████████████████████████████████████

████████████ – the fact that a non-chapter 11 debtor would supposedly have to liquidate its assets to provide contractually required funding to the Debtor for the payment of the Debtor's talc liability is not a reason for the Debtor to seek bankruptcy protection.

**2.    The Debtor's Claim of Financial Distress is Based on Conjectural and Counterfactual "Scenarios" of "Potential" Talc Litigation Costs that Are Not Supported by the Evidence and, under *LTL Mgmt.*, Can Not Support a Finding of Financial Distress.**

25.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

17



26.

because projections of future costs must have some basis in historical fact and evidence, rather than surmise. *See LTL Mgmt.*, 64 F.4th at 106 (accepting Bankruptcy Court's findings on the scope and costs of talc exposure up to the filing date, but rejecting projections of future liability derived from those facts.); *id.* at 107 (explaining how projections of future liability were inconsistent with Old JJCI's settlement and litigation history).



18



28.

DOCS_DE:243840.2 05471/003



29.

30.

[32] *See LTL Mgmt.*, 64 F.4th at 107;

20





33.

34.

35.    Relying on a statement in *LTL Mgmt.* taken out of context, the Debtor argues that, "'uncertain and unliquidated future liabilities' may nevertheless justify a filing in appropriate circumstances."[56] ▆▆▆▆▆▆▆▆▆▆ other evidence failed, however, to establish that any such "appropriate circumstances" exist here. In elaborating on the statement quoted by the Debtor, the Third Circuit

---

[56] Debtor Sur-Reply at 16, *quoting LTL Mgmt.*, 64 F.4th at 102.

explained that, "for instance, uncertain and unliquidated future liabilities could pose an obstacle to a debtor efficiently obtaining financing and investment."[57] Here, the Debtor has no need for any "financing and investment," because it has no business operations that require financing or in which anyone would invest. The Third Circuit also referred to the possibility in other cases of "'serious . . . managerial difficulties'" or "the exodus of customers and suppliers wary of a firm's credit-risk;"[58] but the Debtor provided no evidence that it has any "serious managerial difficulties," and the Debtor has no customers or suppliers who could be the subject of an "exodus."

36.

 J&J's historical talc litigation cost funding practice of making such payments from its accounts, or the compelling incentives that J&J has to continue that practice if this case is dismissed.

---

[57] *LTL Mgmt.*, 64. F.4th at 102.
[58] *Id.* (*quoting In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999)).

DOCS_DE:243840.2 05471/003

**3.     The Debtor Presented No Evidence that J&J Would Stop Funding
the Payment of Talc Litigation Costs if This Case Is Dismissed, and
No Evidence to Rebut the Evidence of J&J's Compelling Incentives
to Continue Funding Such Costs Following Dismissal.**

37.     As found by the Third Circuit, until LTL I was filed, "J&J functionally

made talc payments from its accounts . . ."[59]. Although the Debtor claims that talc

litigation costs "have always been borne by Old JJCI,"[60] the Third Circuit found that

such costs were "borne" by Old JJCI only as an accounting matter, and were paid by

J&J itself as a "functional[]" matter:

> [W]hile it [J&J] allocated all talc-related payments to Old
> [JJCI] per the 1979 Spin-Off, J&J functionally made talc
> payments from its accounts and received an intercompany
> payable from Old [JJCI] in return.

*LTL Mgmt.*, 64 F.4th at 95.

38.     If this case is dismissed and the talc litigation returns to the tort system,

J&J has strong incentives to continue to ensure that talc litigation costs are funded.

Even though J&J's historical talc litigation cost funding practice was a salient issue

in LTL I and is a salient issue here, the Debtor presented no evidence that J&J would

deviate from its prior practice if this case was dismissed, and no evidence to rebut

J&J's incentives to continue to adhere to that prior practice.

---

[59] *LTL Mgmt.*, 64 F.4th at 95.
[60] Debtor Sur-Reply at 17.

24

39.    J&J is a co-defendant in every talc suit against Old JJCI or the Debtor.

*See id.* at 94 (referring to "actions . . . pending against Old [JJCI] and J&J when LTL

filed its Chapter 11 petition"). As such, J&J has every incentive to continue to pay

talc litigation and settlement costs to protect ***itself***. *See In re Aearo Techs. LLC*, No.

23-02890, 2023 Bankr. LEXIS 1519, at *53 (Bankr. S.D. Ind. June 9, 2023) ("*Aearo*

*Techs.*") (in dismissing Aearo's bankruptcy for lack of financial distress, court noted

that 3M, Aearo's parent, had continued to defend CAEv2 actions "and almost

assuredly will continue to do so if Aearo's bankruptcy is dismissed given that 3M

has joint and several liability at best, . . . "). Indeed, the Debtor's Chief Legal

Officer, John Kim ("Kim") agreed that "... J&J's talc liability and LTL's talc

liability are one and the same as far as you're concerned, correct?" *See* Reporter's

Transcript of Proceedings June 27, 2023 ("R.T. 6/27/23") at 234:1-4.

40.    Over three days of trial testimony and the submission of declarations of

multiple witnesses for the Debtor, not a single witness testified that, if this case were

dismissed and Holdco was unable to honor its obligations under the 2023 Funding

Agreement, J&J would stop funding talc litigation costs and expose ***itself*** to the

attendant risks in the tens of thousands of talc suits in which it is a co-defendant.

Indeed, it is hard to imagine that a public company like J&J would take such a

reckless approach.

41.     The Debtor argues that J&J "has no obligation to bail out the Debtor or HoldCo" and makes the bald assertion that, "A bailout of HoldCo to pay the talc liability would not have been in J&J's economic interest."[61] But argument of counsel is not evidence; and when J&J funds the payment of talc litigation costs in cases in which it is a co-defendant, *i.e.*, all talc litigation against the Debtor or Old JJCI, J&J "bails" *itself* out. As a co-defendant in all talc litigation against the Debtor, J&J faces potential liability which, according to Kim, is "one and the same" as that of the Debtor.



---

[61] Debtor Sur-Reply at 8.

26



44.    The Debtor's evidence also failed to address yet another incentive for J&J to pay talc litigation costs to prevent a liquidation of HoldCo's equity interests. Currently, all of the equity in the subsidiaries in which HoldCo has an equity interest is owned by J&J or entities affiliated with, and controlled by, J&J. This gives J&J considerable freedom to move assets to, from, and among these various subsidiaries.[65] If HoldCo had to liquidate its equity interests to satisfy its funding obligations to the Debtor, entities not affiliated with, or controlled by, J&J could end

---

[65] *See* Reporter's Transcript of Proceedings, June 28, 2023 ("R.T. 6/28/23") at 148:4-16 (Lisman) (acknowledging that "the payment of dividends by entities within the HoldCo structure is governed by J&J's worldwide financial procedures and, more directly, J&J's worldwide dividend policy . . ." and noting that dividend forecasts ". . .are based on the ongoing need of the J&J global enterprise . . .")

27

up owning minority interests in these subsidiaries, thereby restricting J&J's current

freedom of action with respect to the assets of those subsidiaries.

45.    The Debtor presented no evidence to rebut the existence of these

incentives or to show that, despite these incentives, J&J would no longer fund talc

litigation costs, even if HoldCo was unable to do so. Instead, the Debtor argues that,

"… J&J was unwilling to make payments to avoid the Debtor's current and prior

chapter 11 filings."[66] But J&J had no desire "to avoid the Debtor's current and prior

chapter 11 filings." To the contrary, J&J wanted those chapter 11 filings so that it

could "move thousands of claims out of trial courts and into bankruptcy court. . ."[67]

By contrast, if this case was dismissed and HoldCo was (somehow) in financial

distress, J&J would not want talc litigation costs to go unpaid or force HoldCo to

liquidate its equity interests to pay such costs.

**B.      The Evidence Established that the Eve-of-Bankruptcy Termination of the
2021 Funding Agreement Was in Bad Faith.**

**1.      The Debtor's Agreement to Eliminate J&J's Funding Backstop
Disregarded Representations and Repudiated Assurances that the
Debtor Made to this Court and the Third Circuit in LTL I.**

46.    In LTL I, the Debtor told this Court and the Third Circuit that an

important purpose of J&J's funding backstop under the 2021 Funding Agreement

was to protect talc creditors against any diminution in HoldCo's ability to pay talc

---

[66] Debtor Sur-Reply at 17-18.
[67] *See LTL Mgmt.*, 64 F.4th at 110.

claims, and that J&J's funding backstop should allay creditor concerns about the proposed spin-off of HoldCo's Consumer Business. The proof is in the record.[68] The Third Circuit did not, as the Debtor claims,[69] "frustrate" the "purpose" of J&J's funding backstop when it directed that LTL I be dismissed. Rather, J&J and the Debtor decided to abandon the purpose of J&J's funding backstop when they agreed to dismantle it after the very occurrence against which that funding right was supposed to provide protection – the consumer health spin-off – occurred.

47.      Kim claimed that the 2021 Funding Agreement ". . . was specifically intended to facilitate a resolution of these talc liabilities in a bankruptcy."[70] Kim acknowledged, however, that Debtor's counsel had represented to the Court that J&J's funding backstop outside of bankruptcy would apply whether or not a chapter 11 case for the Debtor was filed or dismissed.[71] Kim was never able to explain how a funding obligation outside of bankruptcy that would apply even if the Debtor had never set foot in the bankruptcy court could have been "intended to facilitate a resolution of these talc liabilities in a bankruptcy."

48.      Kim's current story about the supposed purpose of J&J's funding commitment outside of bankruptcy is very different from what Debtor's counsel told this Court about the purpose of that funding backstop when the Debtor opposed the

---

[68] See fn. 24 supra.
[69] See Debtor Sur-Reply at 6.
[70] R.T. 6/27/23 at 264:19-21.
[71] Id. at 266:22-267:2; 267:13-22.

29

motion to dismiss in LTL I. In particular, Kim was asked at trial about the following

statement of Debtor's counsel made in this Court on February 18, 2022:

> ***So it makes very clear, this is what we're talking about if there's no proceeding in bankruptcy, whether there was no case filed or whether the case is filed or dismissed, the money is available for that purpose.*** And you can imagine, Your Honor, by the way, the hue and cry you would have heard if this provision weren't in there, because ***they would have said we're manipulating the whole system, because you filed bankruptcy, and now you're going to tell the Court you can't dismiss because there's no money available if we go back in the tort system. So this is there to protect the claimants***. So this is there to protect claimants.  It's there to assure this isn't treated or considered a fraudulent conveyance. ***The idea was and the intent – intent was the claimants are covered either way, in bankruptcy or outside***.

*See*, R.T. 6/27/23, at 195:24-196:12 (emphasis added); *See id.* at 196:13-15 (Kim

acknowledging that he was in Court when Debtor's counsel made this statement on

February 18, 2022).

49.    When confronted with these prior statements of Debtor's counsel and

asked whether counsel accurately reflected the intent of the parties to the 2021

Funding Agreement, Kim dissembled. His answer was, "[B]ased upon the facts and

what was known at the time, I believe that was true."[72] Kim could not explain how

any change in "facts" or "what was known at the time" could have changed counsel's

---

[72] R.T. 6/27/23 at 196:25-197:4.

30

statement of the intent of J&J's funding backstop – to protect talc creditors "either

way in bankruptcy or outside" – from a true statement to a false statement.

> **2.    The Debtor's Eve-of-Bankruptcy Agreement to Restrict its Previously Broad Plan Trust Funding Rights Against HoldCo and J&J in a Chapter 11 Case Had No Purpose Other than to Increase Their Leverage and Limit the Plan Options Available to Talc <u>Creditors in this Case</u>.**

> > **a.    The Replacement of the 2021 Funding Agreement by the New Funding Agreements Sharply Diminished the Debtor's Plan Trust Funding Rights in Order to Limit the Plan Options <u>Available to Creditors</u>.**

50.    On the afternoon of filing this case, the Debtor agreed to replace its

right to compel HoldCo and J&J to fund a trust for talc claimants under a plan

confirmed by this Court, ***regardless*** of whether the plan had the support of J&J and

HoldCo, with the highly restricted right to have HoldCo and (if HoldCo is unable to

do so) J&J fund a plan trust only under a plan they support.[73] It is uncontroverted

that this change effectively gave HoldCo and J&J a veto over any plan that any other

party in this case, including the TCC, might seek to file (other than one that requires

the successful prosecution of an avoidance action against them) and limits the plan

options available to creditors to a plan acceptable to J&J and HoldCo or one that

requires the successful prosecution of an avoidance action against them. This is

because the 2021 Corporate Restructuring left the Debtor devoid of any meaningful

---

[73] *See* A&I Reply § E.1, ¶¶ 75-77.

source of funding other than its funding rights against J&J and HoldCo under the now-terminated 2021 Funding Agreement. The Debtor has already sought to invoke this self-imposed restriction on its plan trust funding rights against its parents as a basis to oppose the termination of plan exclusivity and prevent the TCC from filing a competing plan.[74]

51.    The Debtor's response to Movants' "plan veto" point is that the 2023 Funding Agreement provides funding for a "Supported Plan," which means the Amended Plan or another plan that is acceptable not only to the Debtor, J&J and HoldCo, but also to counsel who signed Plan Support Agreements.[75] But the fact that a plan *also* needs the support of the Ad Hoc Committee to qualify as a "Supported Plan" does not change the reality that the only plan that HoldCo and J&J are required to fund is the Amended Plan or some variant to their liking. They are no longer obligated, as they were under the 2021 Funding Agreement, to fund a trust under a plan confirmed by this Court – such as a creditor plan – that does not have their support. By design, this construct – created in anticipation of this bankruptcy – limits creditors' plan options and ensures a closed plan process in this case.

---

[74] *See id.* ¶ 13.
[75] *See* Debtor Sur-Reply at 27.

> **b.    There Was No Evidence that the Debtor's "Frustration of Purpose" Theory Could Have Provided a Basis for Treating the *Entire* 2021 Funding Agreement as Invalid or <u>Unenforceable</u>.**

52.    The Debtor has never addressed the limited applicability of its "frustration of purpose" theory. Even if that theory applied to J&J's funding obligations outside of bankruptcy (that funding obligation being the linchpin of the Third Circuit's ruling), that theory provided no basis for treating the ***entire*** 2021 Funding Agreement as invalid or unenforceable. At most, that theory would only have affected the enforceability of J&J's funding obligations under the 2021 Funding Agreement ***outside of bankruptcy***. It would not have affected the enforceability of J&J's or HoldCo's severable obligations to provide up to $61.5 billion to fund a plan trust ***in bankruptcy*** under a plan confirmed by this Court, regardless of whether they supported the plan.

53.    The 2021 Funding Agreement included a severability clause:

> 12. <u>Severability</u>. If any one or more of the provisions contained in this Agreement are ***invalid, illegal or unenforceable*** in any respect, ***the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired***. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

*See* Exhibit 792 (2021 Funding Agreement) at 14, ¶ 12 (emphasis added).

DOCS_DE:243840.2 05471/003

54.    The provision of the 2021 Funding Agreement that required J&J to fund the payment of the Debtor's talc liabilities outside of bankruptcy was severable from the rest of that Agreement. That provision was set forth in a clause of that Agreement that was separate from the clause that provided for funding when the Debtor is in bankruptcy.[76] Any invalidity or enforceability concern respecting the provision that required J&J to fund the payment of the Debtor's talc liabilities outside of bankruptcy did not require, or even justify, an entirely new funding arrangement. At most, the "frustration of purpose" theory would have resulted only in "voiding" J&J's funding obligation outside of bankruptcy, while leaving the balance of the 2021 Funding Agreement intact.

55.    This conclusion finds support in a case cited and relied on extensively by the Debtor in its closing argument, *Union County Utils. Auth. v. Bergen County Utils. Auth.*, 995 F.Supp. 506 (D.N.J. 1998).[77] There, the Court explained that:

> For example, contracts are void as against public policy or because of supervening frustration of purpose *only where the offending portion of the contract is so central to the contract that it cannot be severed from the whole* . . . . Courts consistently have held that *contracts should be construed in ways that preserve the legality and validity of the agreements that the parties have freely entered into, even where portions of the contracts may*

---

[76] *See* Exhibit 792 (2021 Funding Agreement) at 4 (definition of "Permitted Funding Use"), clause (c)(i) (providing for obligation to fund payment of Talc Related Liabilities "… when there is no proceeding under the Bankruptcy Code pending with respect to the Payee") and clause (c)(ii) (providing for the funding of amounts to satisfy Talc Related Liabilities "following the commencement of any Bankruptcy Case.").

[77] *See* R.T. 6/30/23 [LTL II D.I. 1000] at 128:11-129:6.

34

> *subsequently become void because of government*
> *orders.*

*Id.* at 517 (emphasis added; citations omitted).

56.     Here, the Debtor's own arguments show that the "offending portion of
the contract" – *i.e.*, J&J's funding obligation outside of bankruptcy – was not "so
central to the contract that it cannot be severed from the whole." According to the
Debtor, the "primary purpose" of the 2021 Funding Agreement was "financially
supporting and otherwise facilitating LTL's reorganization through chapter 11
proceedings."[78] The provision for J&J's funding obligation *outside of bankruptcy*
was not "central" to the asserted purpose of facilitating a reorganization *in*
*bankruptcy*. To the contrary, it was the severable funding obligations of J&J and
HoldCo *in bankruptcy* under the 2021 Funding Agreement that were "central" to
that purpose and should have been preserved.

> **c.     There Was No Evidence of any Justification for Treating**
> **HoldCo's Funding Obligations Under the 2021 Funding**
> **Agreement – Including its Broad Plan Trust Funding**
> **Obligations in a Chapter 11 Case – as "Void or Voidable."**

57.     The Debtor has provided no credible basis to tie its "frustration of
purpose" theory to *HoldCo's* severable funding obligations under the 2021 Funding
Agreement, whether in a chapter 11 case, or outside of one. The Debtor has made
clear that the "frustration of purpose" theory applies to *J&J's* funding backstop;

---

[78] Declaration of John K. Kim, [Exhibit D-1] at 8-9, ¶ 23; *see id.* at 9 ¶ 24.

there is no evidence that the Third Circuit's decision provided any basis for "voiding" any of *HoldCo's* obligations under the 2021 Funding Agreement.

58.     Thus, for example, the Debtor refers to "[t]he material risk that the *J&J backstop* was rendered void or voidable by the Third Circuit opinion . . ."[79] It argues that, ". . . *J&J* took the position that *its* obligations under the 2021 Funding Agreement were no longer enforceable due to the Third Circuit's ruling . . ."[80] and that "[t]he record shows that, after the issue was raised, the Debtor's board considered the material risk that the *J&J backstop* had become void or voidable at three separate meetings. . ."[81] The Debtor's President, Robert Westhoff, testified that the Third Circuit's decision "… frustrated the purpose *of the J&J backstop* …."[82] Kim explained that J&J said that "… because of the Third Circuit ruling, that agreement, *at least the backstop of that* became unenforceable."[83] Yet, even though the Debtor has never articulated a basis for claiming that the Third Circuit's decision "frustrated the purpose" of *HoldCo's* obligations under the 2021 Funding Agreement, or for treating HoldCo's funding obligations thereunder as "void or voidable" the Debtor agreed to limit its plan trust funding rights against HoldCo anyway. Had the Debtor not been so gratuitously accommodating to HoldCo,

---

[79] Debtor Sur-Reply at 6 (emphasis added).
[80] *Id.* at 20.
[81] *See id.* (emphasis added).
[82] R.T. 6/27/23 at 119:5-10 (emphasis added).
[83] *Id.* at 283:17-19 (emphasis added).

36

HoldCo would still be obligated to fund a trust under a plan confirmed by this Court, whether or not J&J and HoldCo supported the plan, and a creditor plan would have been a viable option. Even without the J&J funding backstop, HoldCo's assets give it the capacity to fund a plan trust with far more than $8.9 billion. ▮▮▮▮▮▮

> ### d. There Was No Evidence of any Justification for Applying a "Frustration of Purpose" Theory to Render J&J's Severable Plan Trust Funding Obligations in a Chapter 11 Case Under the 2021 Financing Agreement "Void or Voidable."

59.    The Debtor has yet to articulate any cogent connection between its "frustration of purpose" theory and J&J's trust funding obligations *in a chapter 11 case* under the 2021 Funding Agreement. In fact, there is none. J&J's broad plan trust funding obligations in a bankruptcy case under the 2021 Funding Agreement were not implicated in the Third Circuit's decision. Hence, that decision cannot be said to have "frustrated the purpose" of those obligations. There was no legitimate basis for the Debtor's eve-of-bankruptcy agreement to eliminate J&J's broad plan trust funding obligations in a chapter 11 case under the 2021 Funding Agreement.

60.    The Debtor simply mischaracterizes the Third Circuit's ruling when it claims, in its Sur-Reply, that, "… the Third Circuit reasoned that the backstop J&J provided through the 2021 Funding Agreement to satisfy talc liabilities *in a chapter 11 bankruptcy* negated the Debtor's financial distress."[84] In fact, the portion of *LTL*

---

[84] Debtor Sur-Reply at 10 (*citing LTL Mgmt.* 64 F.4th at 106)(emphasis added).

DOCS_DE:243840.2 05471/003

*Mgmt.* cited by the Debtor referred to the Debtor's "rights, ***outside of bankruptcy***" to funding from J&J.[85] The obligations of J&J and HoldCo to provide plan trust funding ***in a chapter 11 case*** did not enter into the Third Circuit's decision. Nevertheless, the Debtor agreed to relinquish its broad right to such funding under the 2021 Funding Agreement in exchange for far more restricted plan trust funding rights in anticipation of this chapter 11 case, and for no apparent purpose other than to increase its parents' leverage and limit the plan options available to creditors in this case.

## C.  The Evidence Does not Support the Findings Necessary to Apply Section 1112(b)(2) to Prevent Dismissal in This Case.

### 1.  Evidence that this Case Shares Certain Characteristics of a Mass Tort Asbestos Case Does not Support a Finding of "Unusual Circumstances."

61.    The Debtor and the Ad Hoc Committee have failed to show the existence of "unusual circumstances" that would justify invoking Section 1112(b)(2) to avoid dismissal. The supposed "unusual circumstances" on which they rely are merely the characteristics of a typical asbestos mass tort case. Thus, for example, the Debtor cites "potential latency periods of 60 years or more" and "a constituency of 100,000 current claimants and many thousands more future claimants, many of

---

[85] *LTL Mgmt.*, 64 F.4th at 106; *see also id.* at 96 (noting that 2021 Funding Agreement "gave LTL, ***outside of bankruptcy***, the ability to cause New [JJCI] and J&J . . . to pay in cash up to the value of New [JJCI] for purposes of satisfying any talc-related costs as well as normal course expenses.") (emphasis added).

DOCS_DE:243840.2 05471/003

whom future claimants likely could not readily be identified or provided with notice." [86] But *all* asbestos mass tort cases involve long latency periods, tens or hundreds of thousands of current claimants, and many thousands of future claimants to whom notice cannot readily be provided.

62.    For its part, the Ad Hoc Committee cites the fact that "… resulting talc litigation, *like all asbestos related litigation before it,* will involve tens of thousands of plaintiffs over many decades to come"; long latency periods; the fact that, "… *like the asbestos litigation before*, here, it is nearly impossible to know how many more claims the future might hold"; and the fact that as in other latent injury cases, claimants cannot be specifically identified and a Rule 23(b)(3) class settlement is therefore unobtainable.[87] By this standard, *every* asbestos case presents "unusual circumstances." Under this approach, Section 1112(b)(2) would enable any asbestos mass tort debtor to gain access to chapter 11 and the extraordinary powers afforded an asbestos debtor under Section 524(g) of the Code, even if the asbestos debtor was not in financial distress or otherwise did not file its chapter 11 case in good faith.

63.    In pressing for such a broad definition of "unusual circumstances," the Debtor and the Ad Hoc Committee essentially seek to convert the asbestos claims resolution powers and mechanisms that are unique to bankruptcy under Section

---

[86] Debtor Sur-Reply at 32.
[87] *See Omnibus Response of Ad Hoc Committee of Supporting Counsel to Replies in Support of Motions to Dismiss* [LTL II D.I. 900] at 11-12 (emphasis added).

524(g) of the Code into a generally available asbestos mass tort claims resolution scheme. Congress has declined to enact such a scheme.[88] Although asbestos mass tort defendants that are in genuine financial distress and file their chapter 11 cases in good faith may resort to the extraordinary powers afforded by the Bankruptcy Code to resolve their mass tort claims, Congress has chosen not to enact a generally available analog to Section 524(g) for all asbestos mass tort debtors Movants respectfully submit that it is not for this Court to do so through the back door by adopting the expansive and unprecedented definition of "unusual circumstances" advocated by the Debtor and the Ad Hoc Committee.

64.    As the Third Circuit cautioned in *LTL Mgmt.*:

> J&J's belief that this bankruptcy creates the best of all possible worlds for it and the talc claimants is not enough, no matter how sincerely held. Nor is the Bankruptcy Court's commendable effort to resolve a more-than-thorny problem. These cannot displace the rule that resort to Chapter 11 is appropriate only for entities facing financial distress. ***This safeguard ensures that claimants' pre-bankruptcy remedies – here, the chance to prove to a jury of their peers injuries claimed to be caused by a consumer product – are disrupted only when necessary.***

64 F.4th at 110 (emphasis added).

---

[88] *See generally In re Federal-Mogul Global,* 684 F.3d 355, 358-59 (3d Cir. 2012) (noting that "Congress has yet to create the 'national asbestos dispute-resolution scheme' requested by the Supreme Court" and the "failure to create a comprehensive resolution to asbestos litigation").

DOCS_DE:243840.2 05471/003

**2.    The Debtor Presented No Evidence to Support its Baseless Claim That It Will Pay Talc Claims "In Full."**

65.    With respect to both the requirement of "unusual circumstances" and the requirement that there be a reasonable likelihood that a plan will be confirmed within a reasonable period of time, the Debtor continues to assert, without any evidentiary basis, that the terms of its plan will pay all "current and future talc claims in full."[89] This statement is baseless. The Trust Distribution Procedures under the proposed Amended Plan would value individual talc claims by according them a certain number of "points;" but no one knows the cash value of a "point," and the Debtor presented no evidence of the cash value of a "point." The testimony of James Murdica made it clear that no one knows the cash value of a point or can predict what that value will be.[90] Thus, not only is there no basis on which to claim that the Amended Plan will pay talc claims "in full," but no member of the Ad Hoc Committee can even tell any of those clients to whom counsel will recommend a vote in favor of the Amended Plan what the client will receive under the Amended Plan, or even provide an approximation of that amount.

66.    The Amended Plan is not a "payment in full" plan. Rather, the Plan provides for trust funding in a fixed amount, which will be used to pay talc claims only in accordance with an allocation of "points" under a claims matrix. There is no

---

[89] Debtor Sur-reply at 9; *see id.* at 8 (asserting that Plan "will pay claimants in full").
[90] *See* Reporter's Transcript of Proceedings, June 28, 2023 (morning) at 51:15-53:15.

provision to pay talc claims "in full" in any commonly understood sense of the term.

As Kim explained, "[T]he plan distributes the amount of money that's put in. It's

not . . . a plan where you figure out how much money you need to put in and then it

gets distributed."[91]

> **3.      The Evidence Shows that there is Virtually No Likelihood of Plan Confirmation in a Reasonable Period of Time.**

67.     In order to invoke Section 1112(b)(2), the Debtor has the burden of

showing that there is a reasonable likelihood that a plan will be confirmed within a

reasonable period of time. *See* 11 U.S.C. § 1112(b)(2)(A). The evidence did not even

come close to meeting that burden.

> **a.      The Amended Plan is Unconfirmable as a Matter of Law Because of the Overbreadth of its Channeling Injunction; and There Was No Evidence that any other Plan that J&J and HoldCo Will Support and Fund Will Avoid the Same Legal Infirmity.**

68.     There is virtually no likelihood of confirming a plan in this case, and

certainly no reasonable likelihood of doing so in a reasonable period of time, because

the plan that J&J and HoldCo have agreed to support and fund (the Amended Plan)

is unconfirmable as a matter of law. This is because, as more fully set forth in detail

in the A&I Memo of Law[92] and the A&I Reply[93], under applicable Third Circuit

---

[91] R.T. 6/27/23 at 230:2-5.
[92] *See* A&I Memo of Law § F., ¶¶ 83-99.
[93] *See* A&I Reply § G, ¶¶ 111-116.

42

precedent the channeling injunction in the Amended Plan exceeds the scope of a

permissible channeling injunction in a plan for an asbestos debtor under Section

524(g) of the Code. There is nothing but speculation to support any contention that

J&J and HoldCo might agree to support and fund a modified version of the Amended

Plan that does not suffer from this fatal legal infirmity. Such speculation does not

satisfy a burden of proof.

69.     Section 524(g)(4)(A)(ii) of the Bankruptcy Code provides that:

> (ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor *to the extent such alleged liability of such third party arises by reason of-*
>
>> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>>
>> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>>
>> (III) the third party's provision of insurance to the debtor or a related party; or
>>
>> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . .

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).

70.    The Third Circuit has cautioned that the protections afforded by a

channeling injunction permitted by Section 524(g):

> ***do not extend to all claims brought against third parties***.
> In order to conform with the statute, (1) these claims must
> be "directed against a third party who is identifiable from
> the terms of such injunction" and (2) the third party must
> be "alleged to be directly or indirectly liable for the
> conduct of, claims against, or demands on the debtor"; in
> addition, (3) ***"such alleged liability" must arise "by
> reason of" one of four statutory relationships . . . .***

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*, 13 F.4th 279, 283 (3d Cir. 2022)

(emphasis added). The "four statutory relationships" referred to by the Third Circuit

– one of which must exist in order for claims against a non-debtor entity to be

covered by a channeling injunction - consist of the four relationships set forth in

clauses (I)-(IV) of Section 524(g)(4)(A)(ii). *See id.* at 283 n.6. The Third Circuit

refers to the second requirement as the "derivative liability" requirement, and the

third requirement as the "statutory relationship" requirement. *Id.* at 284*; see Cont'l

Cas. Co. v. Carr (In re W.R. Grace & Co.),* 900 F.3d 126, 135 (3d Cir. 2018). ***Both***

requirements must be satisfied in order for a claim to fall within the scope of a

permissible Section 524(g)(4) channeling injunction.

71.    Thus, if an entity does not fit within one of the categories set forth in

clauses (I) – (IV) of Section 524(g)(4)(A)(ii), that entity cannot be the beneficiary

of a channeling injunction under a plan for an asbestos debtor. Moreover, if an entity

44

is not among the parties in whose favor a channeling injunction can be issued under

Section 524(g), Section 105 of the Code cannot be used as a basis for including

claims against that entity within a channeling injunction.

> Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction – and sets out the specific requirements that must be met in order to permit inclusion – *the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g).*

*In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236-37 (3d Cir. 2004) (emphasis

added).

72.    The Amended Plan clearly runs afoul of this limitation and is

unconfirmable as a result. The Amended Plan defines the "Protected Parties" who

are to be protected by its Channeling Injunction to include a list of entities, "each of

which is a third party retailer that sold Old JJCI's talc-containing products or a third

party for which the Debtor has contractual indemnification obligations relating to

Old JJCI's talc-containing products."[94] Under the plain language of Section

524(g)(4), neither "retailers" nor "indemnified parties" are among the parties in

whose favor a channeling injunction may be issued. Neither a party's status as a

retailer, nor a party's status as an indemnified party, qualifies the party for inclusion

in any of the four categories of statutorily-defined relationships set forth in clauses

---

[94] Amended Plan at 12-13, § 1.1.100(e) (definition of "Protected Party"); 68-70 § 11.4.1 ("Channeling Injunction").

(I) - (IV) of Section 524(g)(4)(A)(ii), so as to qualify claims against that party for inclusion in a third-party channeling injunction. The fact that such parties may have contractual indemnity rights against the Debtor does not change that result. *See In re W.R. Grace & Co.,* 475 B.R. 34, 99-100 (D. Del. 2012).

73.    The Debtor presented no evidence that J&J or HoldCo would be willing to support or fund a plan whose channeling injunction was limited to claims against entities that have one of the four "statutory relationships" required by Section 524(g)(4)(A)(ii)(I)-(IV), of the type described in these provisions. The absence of such evidence is fatal to the Debtor's claim that plan confirmation is likely within a reasonable period of time, because, as a practical matter, no plan in this case that could be confirmed within a reasonable period of time is feasible without funding from J&J and HoldCo.

74.    The 2021 Corporate Restructuring left the Debtor devoid of any meaningful assets to fund a plan trust for talc claimants other than the Debtor's funding rights against J&J and HoldCo. J&J and HoldCo are, however, now required to fund only a plan trust under a plan they support; and they seem to require that a plan include a channeling injunction that exceeds the scope of a channeling injunction permitted under Section 524(g)(4) of the Code. The only way around this problem would be the successful prosecution of an action to avoid the termination of the 2021 Funding Agreement, resulting in the reinstatement of the original plan

trust funding obligations of J&J and HoldCo. Those plan trust funding obligations were tied to the finality of an order of this Court confirming a plan, without regard to J&J's and HoldCo's support for such a plan. There is no evidence, however, that a plan predicated on the successful prosecution of an avoidance action could be confirmed "within a reasonable period of time," as required by Section 1112(b)(2)(A).

> **b.    The Newly-Added Imerys/Cyprus Settlement Condition to Plan Confirmation Makes It Even More Unlikely that a Plan Will Be Confirmed Within a Reasonable Period of Time.**

75.    The Debtor touts the fact that its plan will supposedly resolve the Imerys and Cyprus chapter 11 cases as well as this one.[95] In fact, however, the attempt to fold a resolution of those two chapter 11 cases of debtors not affiliated with this Debtor into the resolution of this case further diminishes the likelihood of plan confirmation in this case within a reasonable period of time.

76.    What the recently-filed Amended Plan actually includes is a newly-added condition to confirmation that the Debtor shall have entered into a settlement agreement with Imerys Talc America, Inc. and other Imerys/Cyprus Parties "in form and substance acceptable to the Debtor, J&J and the [Ad Hoc Committee] pursuant to which a contribution will be made to the Talc Personal Injury Trust by or on behalf

---

[95] *See* R.T. 6/30/23 [LTL II D.I. 1000] at 134:5-22.

47

of the Imerys/Cyprus Parties."[96] No evidence was presented to establish the likelihood that such a settlement could or would be reached with the Imerys/Cyprus Parties.[97] Moreover, this condition to confirmation cannot be waived without the consent of both J&J and the Ad Hoc Committee;[98] and there is no evidence that either of them is inclined to consider a waiver of this condition.

77.    Relatedly, the Amended Plan defines the "Protected Parties" who are to be protected from suit by the Amended Plan's Channeling Injunction to include all of the Imerys/Cyprus Parties.[99] The Amended Plan's inclusion of claims against the Imerys/Cyprus Parties within the scope of its Channeling Injunction is illegal and renders the Amended Plan unconfirmable on its face.

78.    As described in the previous section, under applicable Third Circuit precedent, the only entities in whose favor a channeling injunction may be issued under a chapter 11 plan for an asbestos debtor are entities who have one of the four statutory relationships set forth in Section 524(g)(4)(A)(ii)(I)-(IV). Under the plain language of Section 524(g)(4), however, none of the Imerys/Cyprus Parties fits within any of the four required categories. There is no evidence that any Imerys/Cyprus Party had or has a financial interest in the Debtor, any past or present affiliate of the Debtor, or a predecessor of the Debtor; was involved in the

---

[96] *See* Amended Plan at 53, § 8.1(g); R.T. 6/28/23 (afternoon) at 88:5-7 (Onder).
[97] *See id.* at 88:20-24 (Onder).
[98] *See* Amended Plan at 54, § 8.3; R.T. 6/28/23 (afternoon) at 88:15-19 (Onder).
[99] *See* Amended Plan at 12, § 1.1.100(f) (definition of "Protected Party"); 68, § 11.4.1 ("Channeling Injunction").

DOCS_DE:243840.2 05471/003

management of the Debtor or any predecessor of the Debtor; is an insurer; or was involved in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of, the Debtor or a related party. The fact that Imerys/Cyprus parties may have contractual or other indemnification claims against the Debtor does not qualify them for inclusion in any of the four categories of statutorily-defined relationships set forth in clauses (I) - (IV) of Section 524(g)(4)(A) (ii), so as to qualify claims against them for inclusion in a third-party channeling injunction. *See In re W.R. Grace & Co.,* 475 B.R. 34, 99-100 (D. Del. 2012).

79.    Moreover, because the Imerys/Cyprus Parties are not among the parties in whose favor a channeling injunction can be issued under Section 524(g), Section 105 of the Code cannot be used to include them within the scope of a channeling injunction in a plan for this Debtor. *See In re Combustion Eng'g, Inc., Inc.,* 391 F.3d 190, 236-37 (3d Cir. 2004). Consequently, the Channeling Injunction in the Amended Plan exceeds the scope of a permissible channeling injunction in a plan for an asbestos debtor, and, therefore, the Amended Plan cannot be confirmed. As a practical matter, moreover, the illegality of a plan that includes claims against the Imerys/Cyprus Parties within the scope of its channeling injunction will likely make it impossible to satisfy the plan confirmation condition relating to a settlement with the Imerys/Cyprus Parties.

49

    **c.**      **The Debtor Has Failed to Show that is Likely to Achieve the "Supermajority" 75% Vote Necessary to Confirm a Plan under Section 524(g) of the Code.**

80.     Contrary to the impression that the Debtor (and the Ad Hoc Committee) have sought to convey throughout this case, when it comes to the 75% vote necessary to confirm a plan under Section 524(g), the numbers are against them. In closing argument, the Debtor made much of the fact the law firms on the Ad Hoc Committee claim to represent 57,292 talc claimants, as compared to "only" 25,797 talc claimants being represented by law firms who have made or support motions to dismiss.[100] But if one assumes that claimants will follow the voting recommendations of their counsel – as the Debtor and the Ad Hoc Committee seem to do – then in order for the Debtor to achieve a 75% vote for its plan, *more than 20,000 additional claimants who are not accounted for in the Debtor's numbers would have to exist and vote for the Debtor's final plan*. To achieve a 75% majority in the face of 25,797 likely dissenting votes, the Debtor would need 77,391 affirmative votes – as contrasted with the 57,292 claimants that members of the Ad Hoc Committee claim to represent.

81.     It is hard to see how the Debtor and the Ad Hoc Committee plan to come up with another 20,000 claimants who will accept the Debtor's final plan, when the Ad Hoc Committee's efforts to recruit additional law firms who will

---

[100] *See* R.t. 6/30/23 [LTL II D.I. 1000] at 135:5-10; 135:23-136:2.

recommend that their talc clients accept the Debtor's plan seem to be yielding only a small increase in the number of claimants represented by such law firms.[101] Indeed, the total number of existing talc claimants may not even be enough to come up with the additional votes the Debtor needs. A total of over 102,000 existing claimants, inclusive of those accounted for in the Debtor's numbers, would be required to achieve a 75% affirmative vote in the face of 25,797 dissenting votes. Moreover, there is simply no basis in the record to believe that every single claimant's counsel and claimant who is not already accounted for in the Debtor's numbers will support the Debtor.

4.    **The Debtor's Lack of Financial Distress or Other Lack of Good Faith Cannot Be Justified or Cured By Confirming a Plan or by Granting the TCC Derivative Standing to Prosecute Fraudulent Transfer Claims that the Debtor Proposes to Release under its Plan.**

82.    The Debtor claims, in substance, that a lack of financial distress or a lack of good faith on other grounds can be "reasonabl[y] justif[ied]" and "cured" for purposes of satisfying Section 1112(b)(2)(B) by confirming a chapter 11 plan.[102] But "filing a petition in bad faith could never be reasonably justified or curable, no matter what plan [the Debtor] could now propose." *In re Green*, 2016 WL 6699311, at *11

---

[101] For example, between the filing of its original Rule 2019 statement on May 9, 2023, and the filing of a supplement on June 16, the Ad Hoc Committee added only two law firms representing 358 claimants. *See First Supplemental Verified Statement of Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP Pursuant to Bankruptcy Rule 2019* [LTL II D.I. 807], Exhibit A.

[102] *See* Debtor Sur-Reply at 34-35.

DOCS_DE:243840.2 05471/003

(9th Cir. B.A.P. Nov. 9, 2016). If the Debtor was not entitled to be in chapter 11 in the first place because it was not in financial distress or otherwise did not file its chapter 11 case in good faith, then it should never have had any right to use Section 524(g) to impose a plan and third party releases on dissenting talc creditors and unknown future talc claimants. A plan confirmed using illegitimately obtained chapter 11 powers cannot "cure" the fact that the Debtor should never have enjoyed those powers in the first place.

83.    Contrary to the Debtor's theory, "The end justifies the means" has not yet become a principle of bankruptcy law generally, or of "good faith" jurisprudence in particular. The end of confirming a chapter 11 plan cannot justify the means of allowing a Debtor who had no business being in chapter 11 to use bankruptcy tools to impose a settlement on dissenting creditors who have a right to press their claims in a jury trial.

84.    The Debtor also claims that its lack of financial distress (and any other bad faith conduct) can be "cured" by "granting the TCC derivative standing to prosecute fraudulent transfer claims in a single proceeding for the benefit of all claimants."[103] In closing argument, the Debtor argued that, "… there would be a benefit to the estate to have that litigated in this Court . . ."[104] This is a truly

---

[103] *Id.* at 9.
[104] R.T. 6/30/23 [LTL II D.I. 1000] at 143:9-11.

DOCS_DE:243840.2 05471/003

disingenuous argument, because the Debtor failed to mention that its Amended Plan (as did the Plan before it) provides for a ***complete*** release of fraudulent transfer claims against J&J and HoldCo.[105] Indeed, after touting the benefit of having the fraudulent transfer claims litigated in this Court, the Debtor, in the very next breath, highlighted its efforts to obtain confirmation of its plan (which includes the elimination of fraudulent transfer claims) in a reasonable time.[106]

85.    The Debtor cannot have it both ways. It cannot argue that the grounds for dismissing this case – its lack of good faith – can be "cured" by granting the TCC derivative standing to prosecute fraudulent transfer claims in this Court, while simultaneously arguing that there is a reasonable likelihood that it will soon confirm a plan that calls for the obliteration of those very fraudulent transfer claims. That argument is the capstone of the bad faith that J&J and the Debtor have exhibited throughout this proceeding, and in the "bankruptcy planning" that preceded it.

---

[105] *See* Amended Plan at 11 § 1.1.83 (definition of "LTL Corporate Parties"); 14 § 1.1.101 (definition of "Recovery Actions" as including "fraudulent conveyance actions"); 64-65 § 11.2.1 (providing for release of "Recovery Actions" against "LTL Corporate Parties").
[106] *See* R.T. 6/30/23 [LTL II D.I. 1000] at 143:12-25.

## III.

## <u>CONCLUSION.</u>

For the reasons set forth herein and in the A&I Memo of Law and the A&I

Reply, this case should be dismissed.

Dated:  July 19, 2023          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:     ljones@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

54