**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**WOMBLE BOND DICKINSON (US) LLP**
Ericka F. Johnson (NJ #032162007)
Lisa Bittle Tancredi (admitted *pro hac vice*)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Email: ericka.johnson@wbd-us.com
Email: lisa.tancredi@wbd-us.com

*Counsel for Ad Hoc Committee of States*

| | |
|---|---|
| In re: | Case No.: 23-12825 (MBK) |
| LTL MANAGEMENT LLC, | Chapter: 11 |
| Debtor.[1] | Hon. Michael B. Kaplan |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL ON MOTIONS TO DISMISS CHAPTER 11 CASE SUBMITTED BY THE AD HOC COMMITTEE OF STATES HOLDING CONSUMER PROTECTION CLAIMS**

The Ad Hoc Committee of States Holding Consumer Protection Claims (the "Ad Hoc Committee"), by its undersigned counsel Womble Bond Dickinson (US) LLP, in support of its motion to dismiss the chapter 11 case [Docket No. 350] (the "Motion"), hereby submits these proposed findings of fact and conclusions of law after trial on the Motion stating the following:

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY .......................................................................................1

II.     PROCEDURAL POSTURE ................................................................................................7

III.    PROPOSED FINDINGS OF FACT ......................................................................................9

    A.    Divisive Merger History & Events Leading to First Bankruptcy ....................................9

    B.    Enforceability of the 2021 Funding Agreement In and Out of Bankruptcy ..................12

    C.    Consumer Health Business Spinoff in 2022 ..................................................................14

    D.    Pre-Second Filing Maneuverings Related to Termination of the 2021 Funding
        Agreement and Entry into the Second Funding Arrangement.......................................15

    E.    Pre-Second Filing Plan Support Maneuverings With Tort Lawyers .............................19

    F.    Absence of Diligence About Financial Distress Before Second Filing.........................24

    G.    LTL's Fact Witnesses Testified to Lack of Financial Distress......................................25

    H.    The Experts Conclude Lack of Financial Distress........................................................28

    I.    Other Indicia of Bad Faith ............................................................................................32

    J.    No Unusual Circumstances............................................................................................34

    K.    No Reorganization Possible Because Claimant Support Is Overstated and Plan Is
        Patently Unconfirmable ................................................................................................35

IV.     PROPOSED CONCLUSIONS OF LAW ............................................................................36

    A.    Bankruptcy Court Jurisdiction .....................................................................................36

    B.    The Burden Rests with the Debtor to Demonstrate Good Faith ...................................36

    C.    LTL Was Not in Financial Distress when it Filed LTL 2.0...........................................37

    D.    The LTL 2.0 Filing Was a Bad Faith Filing .................................................................39

    E.    The Bankruptcy Filing Was an Improper Litigation Tactic..........................................40

    F.    The "Void" or "Voidable" Argument Lacks Merit........................................................42

    G.    The Potential for a Successful Reorganization Does Not Cure Bad Faith ...................43

    H.    The Debtor Cannot Show a Likelihood of Success ......................................................44

    F.    Equity Demands Dismissal because Value Is Not Being Maximized ...........................46

V.      ADOPTION OF OTHERS' PROPOSALS ..........................................................................47

VI.     CONCLUSION................................................................................................................48

# TABLE OF AUTHORITIES

## Cases

*Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,*
  526 U.S. 434 (1999)................................................................................................... 47

*Bartenwerfer v. Buckley,*
  214 L. Ed. 2d 434, 143 S. Ct. 665 (2023) ............................................................... 46

*Bestwall LLC v. Official Comm. of Asbestos Claimants (In re Bestwall LLC),*
  71 F.4th 168 (4th Cir. June 20, 2023)............................................................... 39, 43

*Brenner v. Little Red Schoolhouse, Ltd.,*
  302 N.C. 207 (1981) .................................................................................................. 42

*Commodity Futures Trading Comm'n v. Weintraub,*
  471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985)........................................... 47

*Faulconer v. Wyson and Miles Co.,*
  155 N.D. App. 598 (N.C. App. 2002)....................................................................... 42

*Green v. Howard Family Trust (In re Green),*
  2016 WL 6699311 (B.A.P. 9th Cir. Nov. 9, 2016)................................................. 43

*In re Aldrich Pump LLC,*
  Case No. 20-30608 (JCW); 2021 WL 3729335 (Bankr. W.D.N.C. August 23, 2021) ........... 43

*In re Am. Capital Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012)...................................................................................... 46

*In re Armstrong World Indus., Inc.,*
  348 B.R. 111 (D. Del. 2006)...................................................................................... 44

*In re HBA East, Inc.,*
  87 B.R. 248 (Bankr. E.D.N.Y. 1988)....................................................................... 41

*In re Integrated Telecom Express, Inc.,*
  384 F.3d 108 (3d Cir. 2004)...................................................................................... 36

*In re Jer/Jameson Mezz Borrower II, LLC,*
  461 B.R. 293 (Bankr. D. Del. 2011) ......................................................................... 36

*In re Johns-Manville Corp.,*
  68 B.R. 618 (Bankr. S.D.N.Y. 1986)........................................................................ 45

*In re LTL Management LLC,*
  58 F.4th 738 (3d Cir. 2023) ...................................................................................... 14

*In re LTL Mgmt.,* LLC,
  64 F.4th 84 (3d. Cir. 2023) ................................................................................ passim

*In re Main Street AC, Inc.,*
  234 B.R. 771 (Bankr. N.D. Cal. 1999) .................................................................... 46

*In re Marvel Ent. Grp., Inc.,*
  140 F.3d 463 (3d Cir. 1998)...................................................................................... 40

*In re Pecht,*
  57 B.R. 137 (Bankr. E.D. Va. 1986)......................................................................... 46

*In re Phila. Newspapers, LLC,*
  599 F.3d 298 (3d Cir. 2010)...................................................................................... 37

*In re Rent-A-Wreck of Am., Inc.,*
  596 B.R. 112 (D. Del. 2019)................................................................................ 37, 38

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999)................................................................ 38, 41, 46
*In re Tamecki*,
  229 F.3d 205 (3d Cir. 2000)........................................................................ 39
*Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*,
  779 F.2d 1068 (5th Cir. 1986) .................................................................... 37
*Matter of Northwest Place, Ltd.*,
  73 B.R. 978 (Bankr. N.D. Ga. 1987) ........................................................... 39
*Merit Management Group, LP v. FTI Consulting, Inc.*,
  ___ U.S. ___, 138 S.Ct. 883 (2018)............................................................ 47
*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (Integrated Telecom Express, Inc.)*,
  384 F.3d 108 (3d Cir. 2004)........................................................................ 38
*Pepper v. Litton*,
  308 U.S. 295 (1939).............................................................................. 46, 47
*Santa Fe Minerals, Inc. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*,
  589 F.3d 605 (3d Cir. 2009) ............................................................ 36, 41, 42
*Scaffidi v. DeSoto*,
  No. 06-cv-03786 (FSH), 2007 WL 2156358 (D.N.J. July 25, 2007) ............... 37
*Toibb v. Radloff*,
  501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) ........................... 46, 47

**Statutes**

11 U.S.C. § 1104 ......................................................................................... 46
11 U.S.C. § 1112 ......................................................................................... 46
11 U.S.C. § 1112(b)(1) .......................................................................... 36, 43
11 U.S.C. § 1112(b)(2) ................................................................................ 44
11 U.S.C. § 1129(b)(1) ................................................................................ 44
11 U.S.C. § 541(a) ...................................................................................... 46
11 U.S.C. § 542 ........................................................................................... 46
11 U.S.C. § 543 ........................................................................................... 46
11 U.S.C. § 544 ........................................................................................... 46
11 U.S.C. § 545 ........................................................................................... 46
11 U.S.C. § 546 ........................................................................................... 46
11 U.S.C. § 547 ........................................................................................... 46
11 U.S.C. § 548 ........................................................................................... 46
11 U.S.C. § 548(a)(1)(A) ............................................................................. 40
11 U.S.C. § 549 ........................................................................................... 46
11 U.S.C. § 550 ........................................................................................... 46
11 U.S.C. § 552 ........................................................................................... 46
11 U.S.C. § 554 ........................................................................................... 46
28 U.S.C. § 1334(a) .................................................................................... 36
28 U.S.C. § 1334(b) .................................................................................... 40
28 U.S.C. § 157(a) ...................................................................................... 36
28 U.S.C. § 157(b)(2)(A) ............................................................................ 36

**Rules**

Fed. R. Bankruptcy P. 7052 .......................................................................... 9
Fed. R. Civ. P. 52 .......................................................................................... 9

## I.    **INTRODUCTION AND SUMMARY**

1.      The law does not allow a company that is not in financial distress to file for bankruptcy.  When a company attempts to ignore this requirement in the name of convenience, it undermines the goals of the bankruptcy process and severely prejudices creditors.  The United States Court of Appeals for the Third Circuit (the "Third Circuit") mandated that the Debtor's first bankruptcy case be dismissed because the Debtor was not in financial distress.  The Third Circuit requires that a debtor's financial distress be "immediate," "imminent," and "apparent"; an "attenuated possibility" of a future filing is insufficient.  *In re LTL Mgmt.*, LLC, 64 F.4th 84, 102, 108 (3d. Cir. 2023).  LTL did not satisfy its burden of showing immediate, imminent, and apparent financial distress then, and it has not satisfied its burden now.  LTL's chapter 11 case should be dismissed.

2.      In a blatant and misguided attempt to manufacture just enough financial distress to satisfy the Third Circuit, the Debtor allowed its most valuable asset — its funding arrangement with Johnson & Johnson ("J&J") — to be terminated and replaced with a new arrangement that provides for substantially less funding.  The Debtor asks this Court to believe that this new agreement allows it to maintain solvency, which would protect these transactions from being unwound as constructive fraudulent transfers, while at the same time generating enough financial distress to remain in bankruptcy.  The Court should refuse to entertain this gamesmanship.

3.      The evidence demonstrates that the Debtor's lack of financial distress is unchanged from the first bankruptcy case and that LTL can satisfy its obligations in the tort system.  LTL's own fact witnesses and expert testimony confirm that there is no financial distress.  LTL's president testified that both Debtor and Holdco "had the capacity to pay their debts as they became

due for the foreseeable future."[2]  He added that, at the time of the second bankruptcy filing, LTL was solvent, able to pay its bills, able to meet its liabilities, and had sufficient liquidity to meet its obligations.[3]  The Debtor's Chief Financial Officer, Mr. Dickinson, testified that on the eve of the second bankruptcy filing and after the second bankruptcy filing, LTL was able to meet its foreseeable liabilities as they came due.[4] ████████████████████████████████████

████████████████████████.[5]  On the liability side, Dr. Mullin performed an "above-expectation" estimate of LTL's total aggregate talc liabilities, which would extend out for "decades" into the future and includes the cost to "defend and resolve" all personal injury talc claims, governmental talc claims, and any purported *Imerys* talc indemnification obligations, and concluded the aggregate to be approximately $12 billion.[6]  Dr. Mullin also performed a "high-end stress test scenario" — a doomsday worst-case scenario for talc liability — and concluded that the liability was $21 billion.[7]  Accordingly, even using worst-case scenario liability estimated by Dr. Mullin ($21 billion) and the liquidation value of Holdco estimated by Dr. Bell ████████, LTL's assets exceed its liabilities.  Nor is there imminent financial distress.  The stress range as determined by Dr. Mullin is $3 - 7 billion over the next three years.[8]

4.     Notwithstanding LTL's arguments to the contrary, the claimant pool remains the same.  Assertions from plaintiff firms that they represent thousands of new claimants that LTL asserts were not known during the first bankruptcy case does not mean that the previously

---

[2]     Wuesthoff Decl. ¶ 26.

[3]     June 27, 2023 Hg. Tr., at 71:1–14.

[4]     June 27, 2023 Hg. Tr., at 134:19–21.

[5]     Ex. 1003 (Bell Report) ¶ 58.

[6]     Ex. 1001 (Mullin Report) ¶¶ 7, 102, 104, 112; *see also* June 29, 2023 P.M. Hg. Tr., at 82:7–83:19, 154:13–16.

[7]     Ex. 1001 (Mullin Report) ¶¶ 19, 105; *see also* June 29, 2023 P.M. Hg. Tr., at 83:3–5.

[8]     June 29, 2023 P.M. Hg. Tr., at 154:8–12.

unknown claims are newly-arising claims.  Rather, it means that (i) some previously future

claimants became current claimants and (ii) firms accepted cases that would previously have been

rejected because, under existing scientific knowledge, they involved cancer claims that would not

have been considered compensable in the tort system.  Indeed, prior to January 30, 2023, Mr.

Murdica advised Mr. Onder that J&J would never pay on uterine or cervical cancer claims that

now make up a portion of the claimant pool represented by plaintiff law firms.[9]

     5.     The relative "values" of the various personal injury claims are issues better left to

the tort system to resolve.  In this case, the evidence shows that the claimant body includes victims

of many cancers, including cancers that have yet to be tested in *Daubert* hearings.  In no

circumstances is it fair or equitable to impose on the victims of these other cancers a compensation

scheme that places a higher value on ovarian cancer (which has survived *Daubert* challenges) than

others simply because the other cancers have not yet been challenged in the tort system.

Conversely, if it is determined in the tort system that the other cancers are not compensable, it

would not be fair or equitable to undercompensate ovarian cancer victims to pay otherwise non-

compensable claims.  The personal injury litigation is too premature to accurately estimate

liabilities other than, perhaps, ovarian cancers.  Indeed, LTL's management never did any analysis

of the tort exposure prior to filing LTL 2.0.[10]

     6.     This is not a case where LTL cannot afford to let the *Daubert* process proceed with

respect to other cancer types in the tort system.  The evidence shows that it can.  In fact, LTL's

expert, Sheila Birnbaum, confirmed that obtaining a favorable *Daubert* decision makes multi-

district litigation the better forum for resolving mass tort claims.[11]  This case should be dismissed

---

[9]       June 28, 2023 P.M. Hr. Tr., at 92:19 – 93:18.

[10]     June 27, 2023 Hr. Tr., at 72:20–24, 135:7-20.

[11]     June 29, 2023 P.M. Hr. Tr., at 65:16 – 66:9.

and the talc litigation returned to the tort system, which has been designed to efficiently adjudicate mass tort issues.

7.      No special circumstances exist to deny the motions to dismiss.  The Debtor makes much of the fact that there are lawyers for certain plaintiffs who support the chapter 11 filing.   The evidence showed that Mr. Watts was the first to approach J&J to discuss whether it would be possible to resolve his case inventory.[12]  It must be noted that Mr. Watts accumulated his inventory as an investment.  He did not begin to acquire cases until after the Court denied the motions to dismiss in the first bankruptcy case.[13]   Having successfully resolved claims in the PG&E bankruptcy case, he thought the talc tort claims could be settled in the same fashion.[14]  By the time that he requested a meeting with J&J, he had acquired around 15,000 cases.[15]  Once the Third Circuit ruled a material premise of his business plan — that the cases would be paid as part of a bankruptcy settlement — was upended, Mr. Watts met with J&J to maximize the return on his investment.

8.      Together, Messrs. Watts, Murdica, and Haas developed a strategy for the filing of a second bankruptcy case.  They would argue that circumstances have changed, in part, because there are new talc claims.  As stated above, however, these claims are not new.  The evidence shows that law firms ran advertisements during the pendency of the first bankruptcy case and individuals responded and engaged firms to pursue talc claims.  These "new" claims have existed all along; talcum powder has been used for decades.

---

[12]     June 28, 2023 P.M. Hr. Tr., at32:5-14; 46:11-18.
[13]     June 28, 2023 P.M. Hr. Tr., at 32:1 – 32:3.

[14]     June 28, 2023 P.M. Hr. Tr., at 56:15 – 57:5.

[15]     June 28, 2023 P.M. Hr. Tr., at 32:5 -21.

9.      Mr. Watts, who onboarded or is in the process of onboarding more than 17,000 clients, could not testify how many had completed his firm's intake protocols or had a confirmed diagnosis of cancer.[16]  Mr. Onder testified that these protocols are designed to identify and reject non-compensable cases, and most, if not all, talc leadership firms utilize the same or substantially the same intake criteria.[17]  The rejection rate can be significant.  Mr. Onder testified that his firm has accumulated an inventory of approximately 21,000 cases over ten years, but it also rejected 80,000 cases over the same period.[18]  Nor can it be said that the lawyers on the Ad Hoc Committee of Supporting Counsel ("AHCSC") championed the bankruptcy filing.  Rather, as Mr. Nachawati testified, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████[19]  Mr. Onder testified that he believed that he was free to withdraw from the plan support agreement if he chose to do so.[20]  Mr. Pulaski understood that additional negotiations would be necessary before he would recommend a plan to his clients.[21]  Taken together, the argument that bankruptcy is justified because of "new" cases, or that the bankruptcy filing is resoundingly supported by the AHCSC, is not borne out by the evidence.

10.     Section 1112(b)(2) of title 11 of the United States Code (the "Bankruptcy Code") provides an exception to dismissal of a bankruptcy case where cause to dismiss otherwise exists.  However, that exception is narrow and not applicable in this case.  No court has extended the use

---

[16]     June 28, 2023 P.M. Hr. Tr., at 20:15-20, 21:4 – 22:5, 29:1 – 14.

[17]     Ex. D-7, ¶¶ 9, 13.

[18]     Ex. D-7, ¶¶ 6,7, and 11.

[19]     Nachawati June 24, 2023 Depo. Tr., at 187:8-188:2.

[20]     June 28, 2023 P.M. Hr. Tr., at 75:9 –23.

[21]     Pulaski June 14, 2023 Depo. Tr., at 79:16 – 21.

of Bankruptcy Code section 1112(b)(2) to a case that was filed in bad faith because there is no reasonable justification for bad faith and bad faith cannot be cured. Given the Third Circuit's holding that section 1112(b)(2) is unavailable to LTL because there are no unusual circumstances and no reasonable justification for lack of good faith and financial distress, the Court should not adopt the exception here.[22]

11.     Even if the Court were inclined to adopt the exception in section 1112(b)(2), there is no reasonable probability of confirmation of a plan because LTL's plan[23] (the "Plan") is patently unconfirmable. Among other things, it would violate the absolute priority rule and the best interest of the creditors test. Moreover, the Plan creates a single class of creditors that includes both governmental claims and talc claimants, but then provides for disparate treatment within the same class in violation of the Bankruptcy Code. Accordingly, the Debtor being in bankruptcy serves no valid bankruptcy purpose.

12.     Cause exists to dismiss this bankruptcy case pursuant to Bankruptcy Code section 1112(b). LTL has acted in bad faith. It is not in financial distress. The nature of the purported "support" for the Plan has been misstated. The Plan is patently not confirmable under the Bankruptcy Code. The Debtor's machinations before the Bankruptcy Court are antithetical to the integrity of the bankruptcy process. LTL filed the second chapter 11 case not for any valid bankruptcy purpose, but instead to gain a litigation advantage over its creditors, to artificially cap its liability (and non-Debtor J&J's liability), and to achieve certainty for J&J at the expense of justice and fairness to tort claimants and other creditors, including the states asserting consumer

---

[22]     *In re LTL Mgmt.*, 64 F.4th 84, 110 (3d Cir. 2023).

[23]     Docket No. 525.

6

protection claims.  For these and other reasons, the Bankruptcy Court should dismiss the chapter 11 case.

## II.    **PROCEDURAL POSTURE**

13.    On October 15, 2021, LTL commenced its first bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Western District of North Carolina.[24]  The North Carolina bankruptcy court transferred the case to this Court by order entered on November 16, 2021.[25]  Various parties moved to dismiss the first bankruptcy case, and this Court denied the motions to dismiss by order entered on March 2, 2022. [26]

14.    Following appeal, on January 30, 2023, the United States Court of Appeals for the Third Circuit issued an order reversing the Court's March 2, 2022 Order.[27]  The Third Circuit issued an amended order and opinion on March 30, 2023, and shortly thereafter issued its mandate of dismissal.[28]  On April 4, 2023, this Court dismissed LTL's first bankruptcy case.[29]

15.    Less than three hours later, LTL filed it second voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing this case. [30]

---

[24]    *In re LTL Management LLC*, Case No. 21-30589.

[25]    Case No. 21-30589, Docket No. 416.

[26]    Case No. 21-30589, Docket Nos. 1572, 1603.

[27]    *In re LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023).

[28]    *LTL Mgmt.*, 64 F.4th 84 (3d Cir. 2023).

[29]    Case No. 21-30589, Docket No. 3938.

[30]    Case No. 23-12825 (MBK).

16.     Various parties (collectively the "Movants") filed ten motions to dismiss this second bankruptcy filing.[31]  LTL and the AHCSC filed objections to the Dismissal Motions.[32] Reply briefs and a joinder were filed by six of the Movants.[33]  The Debtor and the AHCSC filed sur-replies.[34]

17.     An evidentiary hearing on the Dismissal Motions and opposition thereto was conducted over four days, from June 27, 2023, through June 30, 2023 (the "Hearing").  Prior to the Hearing, the Movants, the Debtor and the AHCSC stipulated to the admission of certain evidence.[35]  The Court took live testimony from thirteen fact witnesses and five expert witnesses.[36] Five fact witnesses and one expert witness testified by declaration.[37]  The Court admitted certain

---

[31]     Dismissal Motions were filed by (i) the TCC (Docket No. 286); (ii) the Ad Hoc Group of Mesothelioma Claimants ("Meso Ad Hoc") (Docket No. 335); (iii) Paul Crouch (Docket No. 346); (iv) the Ad Hoc Committee of States Holding Consumer Protection Claims ("States Ad Hoc") (Docket No. 350); (v) law firms on behalf of various mesothelioma claimants ("Moving Meso Claimants") (Docket No. 352); (vi) Maune Raichle Haryley French & Mudd, LLC ("MRHFM") (Docket No. 358); (vii) the Office of the United States Trustee (the "U.S. Trustee") (Docket No. 379); (viii) Arnold & Itkin LLP ("A&I") (Docket No. 384); (ix) certain claimants represented by the Barnes Law Group (Docket No. 473); and (x) the States of New Mexico and Mississippi ("NM & MS") (Docket No. 480).

[32]     Docket Nos. 614 and 613, respectively.

[33]     Docket No. 863 (filed by the TCC), Docket No. 863 (filed by the States Ad Hoc), Docket No. 862 (filed by the U.S. Trustee), Docket No. 854 (filed by A&I), Docket No. 855 (filed by MRHFM), Docket No. 872 (filed by NM and MS) and Docket No. 866 (a joinder filed by the Meso Ad Hoc).

[34]     Docket Nos. 900 and 906.

[35]     Docket No. 852.

[36]     Live testimony was taken from fact witnesses (1) Robert Wuesthoff, the President of the Debtor and a member of the Debtor's Board of Managers, (2) Richard Dickinson, the Chief Financial Officer of the Debtor and a member of the Debtor's Board of Managers, (3) John Kim, the General Counsel of the Debtor, (4) James Murdica, outside counsel for J&J, (5) Mikal Watts, a member of the AHCSC, (6) James Onder, a member of the AHCSC, (7) Adam Lisman, Vice President and Assistant Corporate Controller of J&J.  Live testimony was taken from expert witnesses (1) Saul Burian, a managing director of Houlihan Lokey, (2) Professor Theodore Rave, a professor of law at the University of Texas School of Law, (3) Hon. Royal Ferguson (retired), retired judge of the United States District Court for the Western District of Texas and a former member of the Judicial Panel for Multi-District Litigation, (4) Shiela Birnbaum, a partner at Dechert LLP and co-chair of the firm's product liability and mass torts practice, and (5) Charles H. Mullen, Ph.D., an economist and partner at Bates White, LLC.

[37] Fact witnesses testifying by declaration were (A) Majed Nachawati, a member of the AHCSC, (B) Adam Pulaski, a member of the AHCSC, (C) Erik Haas, a senior lawyer at J&J and its worldwide head of litigation, (D) Andrew Birchfield, a member of the TCC, and (E) Arthur Wong, a financial analysis in S&P Global's corporate healthcare services team.  Expert witness Gregory K. Bell, Ph.D., an expert in economics and accounting in the life sciences industries, also testified by declaration.

exhibits offered by the Movants and the Debtor and instructed the parties to meet and confer as to

the admission of certain evidence.  On June 30, 2023, the Court heard closing arguments and the

parties submitted their electronic slide decks to the Court.  The parties were instructed to meet and

confer and to submit a stipulation of admitted exhibits, along with any disputes, and to submit

proposed findings of fact and conclusions of law by July 19, 2023.

18.     To the extent adopted by the Court, the court hereby issues the following findings

of fact and conclusions of law after considering the evidence received at trial and the other papers

and pleadings relating to this adversary proceeding pursuant to rule 52 of the Federal Rule of Civil

Procedure (the "<u>Federal Rules</u>"), made applicable here by rule 7052 of the Federal Rule of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

### III.     <u>PROPOSED FINDINGS OF FACT</u>

A.     <u>Divisive Merger History & Events Leading to First Bankruptcy</u>

19.     Johnson & Johnson Consumer Inc. ("<u>Old JJCI</u>"), a wholly owned subsidiary of J&J,

sold consumer healthcare products and also produced Johnson's Baby Powder.[38]  The base of

Johnson's Baby Powder was talc.[39]  Concerns that talc contained asbestos and "[g]overnmental

actions, including the U.S. Food and Drug Administration's finding of asbestos traces in a sample

of Johnson's Baby Powder in 2019 and Health Canada's confirmation in 2021 of its 2018 finding

of a significant association between exposure to talc and ovarian cancer" spurred litigation against

Old JJCI and J&J.[40]

---

[38]     *LTL Mgmt*, 64 F.4th at 92.

[39]     *Id.*

[40]     *Id.* at 94.

20.    In October 2021, J&J implemented a restructuring of Old JJCI under the Texas divisive merger statute, T.B.O.C. §§ 10.0001 *et seq*.[41]  Through use of the Texas statute, Old JJCI ceased to exist, and its talc liabilities were transferred to a new special-purpose entity, LTL.[42]  Its business assets and other liabilities went to a new Johnson & Johnson Consumer Inc. ("New JJCI").[43]  Within 48 hours of its creation, LTL filed a bankruptcy petition in the Western District of North Carolina ("LTL 1.0").[44]

21.    LTL's most valuable asset was its rights under a funding agreement (the "2021 Funding Agreement"), under which J&J and New JJCI, on a joint and several basis, are obligated to pay "any and all costs and expenses" up to the value of New JJCI  excluding the talc liability that LTL incurred during LTL 1.0, "including the costs of administering the Bankruptcy Case [LTL 1.0]" to the extent necessary.[45]  In addition, the 2021 Funding Agreement obligated New JJCI and J&J to fund amounts necessary: "(a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.[46]"  Debtor has no repayment obligation as the Funding Agreement does not establish a loan.[47]

---

[41]    *Id.* at 95.

[42]    *Id.*

[43]    *Id.* at 97.

[44]    *Id.*

[45]    Ex. 1.52 (2021 Funding Agreement), at 6 (Permitted Funding Use definition).

[46]    Ex. 533 (Kim Decl. – LTL I) ¶ 27 (summarizing Ex. 1.52 (2021 Funding Agreement))

[47]    Ex. 533 (Kim Decl. – LTL 1.0) ¶ 27.

22.    "In bankruptcy, the [2021 Funding] Agreement gave LTL the right to cause New [JJCI] and J&J, jointly and severally, to pay it cash in the same amount to satisfy its administrative costs and to fund a trust, created in a plan of reorganization, to address talc liability for the benefit of existing and future claimants. In either scenario, there were few conditions to funding and no repayment obligation."[48]

23.    Under the 2021 Funding Agreement, "LTL had the right, outside of bankruptcy, to cause J&J and [New JJCI], jointly and severally, to pay it cash up to the value of [New JJCI] as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses. Plus this value would increase as the value of [New JJCI's] business and assets increased."[49]

24.    The 2021 Funding Agreement was the value LTL received for the talc liability.[50]

25.    LTL has none of its own employees. The only employees are Mr. Wuestoff, Mr. Kim, and Mr. Dickinson, each of whom admitted that their employer is Johnson and Johnson Services, Inc., a J&J subsidiary, and that they have been seconded to LTL under a services agreement.[51]

26.    LTL has no significant operations that would benefit from reorganization. Mr. Wuesthoff explained that LTL has "two operations. One is to resolve the talc claims, current and future. The other operation is the RAM equity business."[52] It is undisputed that RAM is a "royalty

---

[48]    *LTL Mgmt.*, 64 F.4th at 96–97.

[49]    *Id.* at 106.

[50]    June 27, 2023 Hr. Tr., at 283:1–14 (Kim) ("Q: Okay. There was a JJCI that had talc liabilities; correct? / A: Correct. / Q: Okay. And . . . we end up with LTL holding all the talc liabilities; correct? / A: That is correct. / Q: And in exchange for that wasn't one of the things that LTL got the 2021 funding agreement? A: It was . . . one of the assets that it was given.").

[51]    Ex. 1077 (Wuestoff Decl.) ¶ 3; Ex. 1075 (Dickinson Decl.) ¶ 2; Ex. 1073 (Kim Decl.) ¶ 2.

[52]    June 27, 2023 Hr. Tr., at 50:21–25.

acquisition business[53] that the Third Circuit described as "a collection of bare rights to streams of payments cobbled together on the eve of bankruptcy."[54]

27.     "LTL, whose employees are all J&J employees, is essentially a shell company 'formed,' almost exclusively, to manage and defend thousands of talc-related claims while insulating the assets [then in New JJCI]."[55]

B.     Enforceability of the 2021 Funding Agreement In and Out of Bankruptcy

27.     In September of 2021, Mr. Wuesthoff was approached and asked if he would be interested in becoming the president of a subsidiary that J&J was creating, which ultimately became the Debtor.[56]

28.     When Mr. Wuesthoff was approached about becoming the president of LTL, he was told that the filing of bankruptcy by LTL was a "possibility."[57]

29.     LTL was formed on October 12, 2021, and Mr. Wuestoff became president of LTL on the same day.[58]

30.     After he became president, on October 12, 2021, Mr. Wuestoff signed the 2021 Funding Agreement.[59]

31.     LTL had a meeting of its board of managers on October 14, 2021.[60]

---

[53]      June 27, 2023 Hr. Tr., at 28:10–12.

[54]      *LTL Mgmt.*, 64 F.4th at 109.

[55]      *Id.*

[56]      June 27, 2023 Hr. Tr., 26:24 – 27:4.

[57]      *Id.* at 27:10 – 27:14.

[58]      *Id.* at 29:19 – 27:21.

[59]      *Id.* at 36:12 – 36:6.

[60]      June 27, 2023 Hr. Tr., 29:22 – 30:1.

32.     Those present at the board of managers meeting discussed various options that were available to LTL to resolve its talc claims.[61]  One of the options that was discussed was to stay the course and continue to litigate or address the tort cases in the tort system.[62]  Another option that was discussed, briefly, was to tender the defense of talc claims to insurance companies.[63]  The third option discussed was filing for bankruptcy.[64]  Those present at the board of managers meeting discussed the pros and cons of LTL filing for bankruptcy.[65]  The meeting lasted approximately ninety minutes.[66]

33.     The board of directors voted on October 14, 2021, to put LTL into bankruptcy.[67]

34.     Mr. Wuesthoff testified that he did not feel pressured to vote in favor of a bankruptcy filing, and that he could have voted against a bankruptcy filing.[68]

35.     No one advised Mr. Wuesthoff that if he voted against filing for bankruptcy, there would be a risk that the funding agreement would be unenforceable.[69]

36.     Mr. Wuesthoff understood, when he voted in favor of bankruptcy in October of 2021, that he could have voted against bankruptcy and the funding agreement would have remained in place.[70]  Indeed, the 2021 Funding Agreement's terms made clear that it applied

---

[61]     *Id.* at 31:5 – 31:13.

[62]     *Id.* at 31:11 – 31:13.

[63]     *Id.* at 31:25 – 32:5.

[64]     *Id.* at 32:19 – 32:20.

[65]     June 27, 2023 Hr. Tr., at 30:13– 30:15.

[66]     *Id.* at 30:20 – 31:2.

[67]     *Id.* at 29:22 – 30:1.

[68]     *Id.* at 40:2 – 42:5.

[69]     *Id.* at 41:25 – 42:13.

[70]     June 27, 2023 Hr. Tr., at 119:15 – 21.

outside of bankruptcy.[71]   LTL's management and agents also agreed that the 2021 Funding Agreement applied in and out of bankruptcy.[72]   Mr. Wuestoff testified that he "understood as president of LTL that the [2021 Funding Agreement] obligated J&J whether or not LTL was in bankruptcy."[73] He also testified that, he did not "feel that there was a risk that [2021 Funding Agreement] would be taken away," if he had voted "no" on the first bankruptcy."[74]

C.    Consumer Health Business Spinoff in 2022

37.    In December 2022, before the Third Circuit's January 30, 2023 ruling, New JJCI (*i.e.*, Johnson & Johnson Consumer, Inc.) changed its name to Johnson & Johnson Holdco NA in preparation to spin off the Consumer Health Business.[75]   In early January 2023, while LTL 1.0 was still pending, J&J transferred the Consumer Health Business to Holdco's parent, Janssen Pharmaceuticals, Inc., and then to Kenvue.[76]   The appeals of the motions to dismiss in LTL 1.0 were pending with the Third Circuit at the time of these transactions.

---

[71]    *See* Ex. 1.52 (2021 Funding Agreement), at 5–6 (Permitted Funding Uses definition, noting funding obligations for both normal course expenses and talc liabilities outside of bankruptcy); *id*. §5 at 12 (indemnification obligations of LTL apply even outside bankruptcy); *id*. § 9 at 13 (choice of venue if LTL is not in bankruptcy).

[72]    *See, e.g.*, Feb. 15, 2022 Hr. Tr., at 65 (Mr. Mongon (head of J&J's consumer business and now CEO of Kenvue) testified that the 2021 Funding Agreement was available outside bankruptcy); TCC Tr. Ex. 514, ¶ 27 (Kim First Day Decl. LTL 1.0) ("at any time when there is no bankruptcy case"); Ex. 768 (Sept.19, 2022 Third Circuit Oral Arg. Tr.), at 83:21–25 ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought."); Tr. Feb. 18, 2022, at 60:16–20, 61:5–20 (Mr. Gordon stated, "Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. So this is there to protect the claimants. It's there to assure this isn't treated or consider a fraudulent conveyance.  The idea was and the intent was the claimants are covered either way in bankruptcy or outside.").

[73]    June 27, 2023 Hr. Tr., at 37:18–21.

[74]    June 27, 2023 Hr. Tr., at 41:21–42:3.

[75]    Ex. 794 (First Day Kim Decl.) ¶ 26; Ex. 1119 (Lisman Decl.) ¶ 21.

[76]    Ex. 794 (First Day Kim Decl.) ¶ 26; Ex. 1119 (Lisman Decl.) ¶ 21.

14

38.    The value of the transferred Consumer Health Business ███████████
████████████████████████████████████[77] ████████████████████████████
███████████████████████.[78]

D.    <u>Pre-Second Filing Maneuverings Related to Termination of the 2021 Funding Agreement
and Entry into the Second Funding Arrangement</u>

39.    On January 30, 2023, the Third Circuit announced its decision in *In re LTL
Management LLC*, 58 F.4th 738 (3d Cir. 2023), holding that because LTL was not in immediate
financial distress at the time of its bankruptcy filing, such filing was not in good faith.  That
decision was later amended on March 31, 2023, which became the operative decision.  *In re LTL
Management LLC*, 64 F.4th 84 (3d Cir. 2023) (as amended).

40.    The 2021 Funding Agreement was the Debtor's most important asset.[79]  According
to Mr. Kim, the concept that the 2021 Funding Agreement was void or voidable was discussed in
a group meeting on January 30, 2023.[80]  Starting on January 30, 2023 and multiple times after that
date, counsel for J&J told Mr. Kim that the 2021 Funding Agreement had become void or voidable
as a result of the Third Circuit's ruling.[81]  However, Mr. Kim also testified that "in-house counsel
for J&J actually represent all J&J's subsidiaries."[82]

41.    Despite the importance of LTL losing its most valuable asset, Mr. Dickinson
testified that the board of managers was not advised that J&J was taking the position that the 2021
Funding Agreement was void or voidable until a board meeting that took place a few months later

---

[77]    Ex. 876 (Burian Report) at 15; Ex. 68 (discounted cash flow analysis of JJCI), at LTL0030541.

[78]    Ex. 876 (Burian Report) at 14, 21.

[79]    June 27, 2023 Hr. Tr., at 82:3 – 5.

[80]    *Id.* at 197:17 – 198:1.

[81]    Ex. D-1, ¶ 26.

[82]    June 27, 2023 Hr. Tr., at 244:9-10.

on April 2, 2023.[83]  The board was advised that there was a material risk that the 2021 Funding

Agreement could not be enforced.[84]  However, the board did not receive any written memorandum

analyzing the strength of the legal argument that the 2021 Funding Agreement was void or

voidable, or an assessment of the likelihood of success.[85]

42.    Upon learning of the void or voidable issue, neither Mr. Wuesthoff nor any other

member of the board considered seeking to enforce the 2021 Funding Agreement against J&J after

LTL's first bankruptcy case was dismissed.[86]

43.    Neither Mr. Wuesthoff nor any other member of the board discussed negotiating

with J&J about resolution of the void or voidable issue; Mr. Wuesthoff did not know whether any

negotiations had taken place between LTL and J&J, and he did not inquire.[87]

44.    Mr. Dickinson did not reach out to anyone at J&J to confirm whether J&J intended

to void the 2021 Funding Agreement.[88]

45.    The board of managers of LTL did not evaluate whether there were other options

to terminating the 2021 Funding Agreement.[89]

46.    On April 2, 2023, LTL held a board meeting (the "April 2 Meeting").  The April 2

Meeting minutes indicate that Mr. Kim presided and that all members of the board were in

attendance, as well as lawyers from Jones Day.[90]  At this meeting, the board was presented for the

---

[83]      June 27, 2023 Hr. Tr., at 152:15 – 18.

[84]      *Id.* at 112:21 – 113:10.

[85]      June 27, 2023 Hr. Tr., at 85:5 – 17, 112:21 – 113:10, 152:19 – 25.

[86]      *Id.* at 83:8 – 11.

[87]      *Id.* at 83:12 – 23.

[88]      *Id.* at 158:11 – 21.

[89]      *Id.* at 83:17 – 21.

[90]      Ex. 804, at 1.

first time with the Termination and Substitution Agreement, the 2023 Funding Agreement and Support Agreement, and a resolution to file a new voluntary chapter 11 petition.[91]  Although the minutes contain a section entitled "Company Options Upon Dismissal," the minutes make clear that bankruptcy was the only option presented to the Board for consideration.[92]  In addition, the LTL Board was shown a presentation at the April 2 Meeting, which summarized the new chapter 11 filing, and repeated as a financial consideration that LTL had "no estimate or valuation of the aggregate talc liability."[93]

47.     In connection with the second funding agreement, LTL did not request that any entity other than HoldCo be a counterparty under the second funding agreement.[94]  When asked whether he requested that J&J give LTL a guarantee, like it did in the First Funding Agreement, Mr. Kim testified, "Of course not."[95]  Mr. Kim nonetheless concedes that "there may have been other ways to try to deal with it" but the solution "that presented itself" was the 2023 Funding Agreement.[96]

48.     Mr. Kim admits that the Debtor parted with the 2021 Funding Agreement and transferred its Consumer Health Business so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third Circuit."[97]  Mr. Kim confirmed that the purpose of changing the "LTL's "funding arrangements" at the April 2 Meeting

---

[91]     Ex. 804, at 2.

[92]     Ex. 804, at 4.

[93]     Ex. 805, at 10.

[94]     *Id.* at 200:15 - 18.

[95]     *Id.* at 201:3 – 12.

[96]     June 27, 2023 Hr. Tr., at 283:15-284:5.

[97]     TCC Tr. Ex. 514 ¶¶ 78, 83 (Kim First-Day Decl. LTL 2.0).

was to "support that filing [of LTL's second bankruptcy]."[98]  Mr. Kim testified that when LTL

entered into the second funding agreement, he believed that after doing so, LTL would be in

financial distress.[99]

49.    LTL entered into three agreements to implement the April 4, 2023 changes to its

funding arrangements.  First, LTL executed a Termination and Substitution Agreement (the

"TSA") with Holdco and J&J to terminate the 2021 Funding Agreement.[100]  Second, LTL executed

the 2023 Funding Agreement with Holdco, which obligated Holdco to provide funding to LTL for

talc liabilities and other costs in the normal course of business.[101]  Third, LTL executed a Support

Agreement with J&J and Holdco, for J&J to provide a funding backstop only upon the

confirmation of a plan with terms acceptable to J&J.[102]  Although the record is clear that these

agreements were all negotiated and approved by the LTL board while LTL was still a debtor in

possession, each is dated effective as of April 4, 2023, and purportedly executed in the few hours

between LTL's two bankruptcies.

50.    LTL claims that no value was lost between the 2021 Funding Agreement and the

2023 Funding Agreement, because the value of each "is the amount of the talc liability minus the

value of LTL," and LTL's "Board was aware of no reasonable approximation of the value of

defending and resolving the talc litigation in the tort system that approaches $29 billion."[103]  This

method of valuation does not, however, account for the value of the J&J backstop in the 2021

Funding Agreement that was absent in the 2023 Funding Agreement.  Nor does it account for the

---

[98]      Ex. 1073 (Kim Decl.) ¶ 48.

[99]      June 27, 2023 Hr. Tr., at 200:19 - 22.

[100]     Ex. 1081.

[101]     Ex. 1082.

[102]     Ex. 1083.

[103]     Ex. 1073 (Kim Decl.) ¶ 53.

loss of LTL's ability to make direct claims against J&J for payments in cash, with minimal
conditions.

E.      Pre-Second Filing Plan Support Maneuverings With Tort Lawyers

51.      Prior to dismissal of the LTL 1.0 bankruptcy case, James Murdica negotiated a
settlement with certain plaintiff lawyers on behalf of LTL memorialized in plan support
agreements (the "Plan Support Agreements").  Mr. Murdica has worked for Johnson & Johnson
for his whole 20-year legal career.[104]  More than 95% of Mr. Murdica's work is for matters for
which J&J retains him.[105]

52.      Mr. Murdica has referred to himself as J&J's "resolution counsel" or "settlement
counsel."[106]  In his role as "resolution counsel," Mr. Murdica testified that prior to LTL's first
bankruptcy case, J&J settled over 1,000 mesothelioma cases and approximately 6,000 ovarian
cancer cases in the talc litigation.[107]  In all of these settlements, J&J had not compensated anyone
for non-ovarian gynecological cancer.[108]

53.      The Plan Support Agreements were negotiated primarily between Mr. Murdica and
Mr. Watts.[109]  The Plan Support Agreements were based on a template given to Mr. Murdica by
Mr. Watts.[110]  Until the plan was filed, the term sheet referenced in the Plan Support Agreements
was not public and no person saw it other than the signatories to the Plan Support Agreements,

---

[104]      June 28, 2023 A.M. Hr. Tr., at 7:7 – 8:16.

[105]      June 28, 2023 A.M. Hr. Tr., at 69:12 – 14.

[106]      *Id.* at 8:21 – 9:3.

[107]      *Id.* at 40:16 – 23.

[108]      *Id.* at 41:1 – 7.

[109]      *Id.* at 69:22-25.

[110]      June 28, 2023 A.M.  Hr. Tr.,42:15-19.

who also signed nondisclosure agreements.[111]  The claimant lists attached to the Plan Support Agreements classified personal injury tort claimants by two types of cancer:  gynecological or mesothelioma.[112]   The Plan Support Agreements are signed by plaintiffs' law firms, not claimants.[113]

54.     Mr. Watts and his firm, Watts Guerra, LLC, became involved in talc cases much more recently than some of the other supporting law firms.  Mr. Watts signed up his first LTL claimant on March 19, 2022, after this Court denied the motions to dismiss filed in LTL 1.0.[114]

55.     Mr. Watts testified that part of the business plan in any tort was to spend money to pay marketing vendors, and for retrieval and record evaluation.[115] Mr. Watts testified that his firm obtained his clients at significant cost through coordinated advertising and marketing efforts.[116] Mr. Watts testified that it cost, or would cost, his firm "tens of millions of dollars" to obtain medical records for his clients.[117]

56.     Mr. Watts testified that his firm, Watts Guerra, LLC, represented 17,214 talc tort claimants as of the hearing on the motions to dismiss.[118] Mr. Watts' firm obtained these clients through coordinated advertising and marketing efforts that relied on intake criteria developed by Mr. Jason Itkin, a partner of the law firm of Arnold & Itkin LLP.[119]

---

[111]      June 28, 2023 A.M.  Hr. Tr.,73:17-74:2; 74:14-17.

[112]      *Id.* at 31:8 – 13.

[113]      June 28, 2023 A.M. Hr. Tr., 43:8-10.

[114]      *Id.* at 32:1 – 3.

[115]      *Id.* at 54:15 – 21.

[116]      Ex. D-6, ¶ 8.

[117]      June 28, 2023 A.M. Hr. Tr., at 54:8 – 21.

[118]      June 28, 2023 A.M.  Hr. Tr. at 28:5 – 18.

[119]      Ex. D-6. ¶ 8.

57.     Mr. Watts was unable to testify how the intake protocol confirmed that a claimant actually had a confirmed diagnoses of cancer.[120]  At the hearing, Mr. Watts was unable to state how many of those clients had provided medical records or had cleared the intake protocol.[121]  Mr. Watts testified that, of the approximately 17,000 clients, more than a thousand had cleared the intake criteria, and he knew for certain that he would file "thousands" in the tort system if the case were dismissed.[122]

58.     Mr. Watts viewed bankruptcy as a one-time opportunity to settle his inventory of tort claimants.[123]  Accordingly, Mr. Watts requested a meeting and met in January 2023 with Mr. Haas and Mr. Murdica to discuss talc.[124]  In his meeting with Mr. Haas, and then, as relayed to him by Mr. Murdica, Mr. Watts was told that J&J would not settle the cases globally unless it was done in bankruptcy.[125]

59.     Mr. Onder is also a party to the Plan Support Agreements.[126]  Mr. Onder is the managing partner of OnderLaw, LLC, and his firm was first retained in connection with potential talc-related litigation in 2013.[127]

---

[120]     June 28, 2023 P.M. Hr. Tr., at 29:1 – 14.

[121]     *Id.* at 20:15 – 20, 21:4 – 22:5.

[122]     *Id.* at 20:15 – 20, 21:4 – 22:5, 22:6 – 14.

[123]     *Id.* at 47:1 – 7, 46:11 – 25 ("My reading was that there were timing opportunities that existed while this was in bankruptcy that would not exist after.").

[124]     *Id.* at 32:5 – 14; 46:11 - 18.

[125]     June 28, 2023 P.M. Hr. Tr., 46:2 – 18.

[126]     Ex. D-7, ¶ 26.

[127]     Ex. D-7, ¶ 6.

60.     Over the following ten years, Mr. Onder's firm's talc client base has steadily grown to presently include approximately 21,000 individuals who claim to suffer from cancer because of their use of and exposure to Johnson & Johnson talc products.[128]

61.     Mr. Onder's firm uses talc intake procedures to ensure that his firm devotes time, money, and resources to only those clients whose claim shave a viable chance of recovery in the tort system.[129]  Mr. Onder testified that he understands that most, if not all, talc leadership firms utilize the same or substantially the same intake criteria.[130]

62.     His firm has rejected over 80,000 potential claimants, including individuals who (i) were diagnosed with types of cancer that medical literature identifies as having negligible or more limited degrees of association with talc usage, (ii) used talc products not produced by J&J or for an insufficient duration, and/or (iii) possessed claims likely to be dismissed on statute of limitations grounds.[131]

63.     The evidence did not show that the members of the AHCSC are lockstep with J&J's strategy to resolve the tort claims in bankruptcy, or that there is overwhelming support for a plan.

64.      Mr. Murdica testified that he would not recommend to J&J that it settle talc cases if they return to the tort system.[132]

65.     Mr. Onder testified that "the consensus was that a second bankruptcy was going to be filed."[133]

---

[128]     *Id.* at ¶ 7.

[129]     *Id.* at ¶ 9.

[130]     *Id.* at ¶ 13.

[131]     *Id.* at ¶ 11.

[132]     June 28, 2023, P.M. Hr. Tr., at 24:4 – 7.

[133]     June 28, 2023, P.M. Hr. Tr., at 71:14 – 20.

22



66.

134

67.     Specifically, he said,

68.

69.

70.

138

71.     Mr. Pulaski understood when he signed the plan support agreement that there would

be an opportunity to negotiate a plan before he recommended it to his clients.[139]

72.     When Mr. Pulaski signed the plan support agreement, he was not in agreement with

everything in the term sheet, but he agreed as to the structure.  There were still a number of items

that needed to be changed and negotiated.[140]

---

[134]     Nachawati Dep. Des., June 24, 2023 Depo Tr., 187:8 – 188:2.

[135]     *Id.* at 150:7 – 150:12.

[136]     Nachawati June 24, 2023 Dep. Tr., at 158:14 – 159:7.

[137]     *Id.* at 155:10 – 155:25.

[138]     *Id.* at 165:14 – 165:18.

[139]     Pulaski June 14, 2023 Dep. Tr., at 78:7 – 79:16-21; 87:6-22.

[140]     *Id.* at 78:3 – 19.

73.     Mr. Onder testified that he was free to withdraw from the Plan Support Agreements if he chose to do so.[141]

74.     Although Mr. Watts signed a Plan Support Agreement, he testified that he did not believe that his signing the agreement obligated his clients to accept the plan.[142]  Mr. Watts testified that he never committed to Mr. Murdica or Mr. Haas that his clients would vote in favor of the plan.[143]

75.     Mr. Murdica acknowledged that the plaintiffs' lawyers who signed plan support agreements had the right to "opt out" of them.[144]  He also conceded that none of the lawyers that he spoke with, who signed the Plan Support Agreements, told him that they had commitments from their clients to support the plan.[145]

F.     Absence of Diligence About Financial Distress Before Second Filing

76.     When LTL's board decided to file the second bankruptcy case, it did not have an estimate or valuation of LTL's aggregate talc liabilities, other than the data point provided by the Plan Support Agreements.[146]

77.     When LTL's board decided to file the second bankruptcy case, it did not have any financial projections of what returning to the tort system would cost, nor did it request that its professionals provide an analysis of the financial impact of a return to the tort system after the dismissal of the first bankruptcy case.[147]

---

[141]    June 28, 2023 P.M. Hr. Tr., at 75:9 – 23.

[142]    *Id.* at 24:12 – 22.

[143]    June 28, 2023 P.M. Hr. Tr., at 52:17 – 53:3.

[144]    June 28, 2023 A.M. Hr. Tr*., at 95:21 – 95:24.

[145]    June 28, 2023 A.M. Hr. Tr., at 43:19-23.

[146]    *Id.* at 72:20 – 24.

[147]    *Id.* at 76:5 – 77:4, 129:24 – 131:5, 162:17 – 164:2.

24

78.     When it voted to file the second bankruptcy case, the LTL board relied upon the same information concerning the projected cost of continuing to litigate in the tort system as it had considered before voting to file the first bankruptcy case.[148]

79.     Mr. Kim testified that "we knew things were getting worse" as relates to the cost of continuing to litigate in the tort system, but Mr. Kim did not offer any data or information that was more specific.[149] Mr. Kim admitted that "the only numbers, real numbers, you had were what it had cost you over the last five years before you filed, which was ten to $20 million a month, those were the litigation, the talc defense costs."[150]

80.     In response to Mr. Jonas's question "Don't you think it's important that somebody know how much case is available if you're making a decision if you're going to defend yourself in the tort system?" Mr. Kim responded, "Yeah . . . I don't think it particularly important, no. I think – yeah, I don't think it's particularly important, no."[151]

81.     Mr. Dickinson, LTL's Chief Financial Officer, testified that he had not seen and was not aware of an estimate of the dollar amount of LTL's total liability, nor did he request that any be prepared.[152]

82.     No financial advisor or investment banker was present at the LTL board meetings on March 28, 2023, and April 2, 2023.[153]

G.      LTL's Fact Witnesses Testified to Lack of Financial Distress

---

[148]    *Id.* at 204:20 – 205:2.

[149]    June 27, 2023 Hr. Tr., at 205:8 – 214:15.

[150]    *Id.* at 275:25 – 276:4.

[151]    *Id.* at 214:4 – 15.

[152]    *Id.* at 135:7 – 20.

[153]    *Id*. at 200:11 – 14.

83.    In his declaration, Mr. Kim stated that the financial distress suffered by LTL at the time that it filed its first and second bankruptcy cases "emanates from the same source: the extreme and ceaseless financial burden of the defense of the talc litigation."[154]

84.    Mr. Wuesthoff testified that LTL's talc liability, including costs of defense, was no more than $8.9 to $10 billion.[155]  Mr. Wuesthoff testified that the value of the 2021 Funding Agreement and the value of the 2023 Funding Agreement was the same.[156] Mr. Wuesthoff testified that the 2023 Funding Agreement is sufficient to satisfy LTL's talc liabilities.[157]

85.    Adam Lisman, Vice President and Assistant Corporate Controller of J&J, testified that no liquidation value analysis of HoldCo has been done.[158]  Holdco is a holding company with ownership interests in various foreign subsidiaries and indirect affiliates that are largely foreign in nature.[159]  Mr. Lisman testified that the estimated fair market value of Holdco's interests in its subsidiaries and indirect affiliates was approximately $30 billion.[160]

86.    Holdco's receipt of dividends from its subsidiaries and affiliates is governed by J&J's Worldwide Dividend Policy.[161]  Any dividends from Holdco's non-U.S. affiliates must be approved by J&J, and dividends paid by indirect operating affiliates must "pass through" other entities before they may be paid to Holdco.[162]  Once a dividend received by Holdco, J&J may elect

---

[154]    Ex. D-1, ¶ 15.

[155]    June 27, 2023 Hr. Tr., at 58:9 – 61:4.

[156]    *Id.* at 61:5 – 61:10.

[157]    *Id.* at 72:13 – 72:18.

[158]    Ex. D-4, ¶ 1; June 28, 2023 P.M. Hr. Tr.,at 146:15 – 146:19.

[159]    Ex. D-4, ¶ 22.

[160]    *Id.* at ¶ 23.

[161]    *Id.* at ¶ 31.

[162]    *Id.* at ¶¶ 33-34.

to receive the dividends via a loan and apply the funds elsewhere in the J&J enterprise.[163]  "The ultimate decision of whether a dividend is declared requires J&J's corporate approval, as well as approval of any intermediate entities the dividend would need to pass through to reach Holdco."[164]

87.    In addition to dividends, Mr. Lisman testified that "J&J affiliates [have the option to] borrow money from J&J's in-house bank." [165] ███████████████████████████████████

████████████████████████.[166] ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████[167]

88.    When LTL filed its second bankruptcy case, its board of managers was aware that Holdco could be paid substantial dividends from its subsidiaries in the amount of at least $1.8 billion in the near term.[168]  Indeed, on June 22, 2023, a dividend in the amount of approximately $912 million was paid to Holdco from a wholly-owned subsidiary.[169]  The dividend was then loaned to J&J under a ten-year borrowing agreement, payable upon any demand from Holdco.[170]

89.    LTL's predecessor spent between $10 and $20 million per month in defense of talc litigation, or $120 to $240 million per year (excluding payment of any judgments).[171]

---

[163]    *Id.* at ¶¶ 38, 45 ("Rather than being used to fund hypothetical dividends to Holdco, future cash flows likely will be used for funding acquisitions, additional research and development activities, payment of debt and external obligations, payment of taxes, and more.").

[164]    *Id.* at ¶ 48.

[165]    June 28, 2023 P.M. Hr. Tr., at 146:2-4.

[166]    Ex. 1003 (Bell Report) at 37-38.

[167]    Ex. 876 (Burian Report) at 31.

[168]    June 27, 2023 Hr. Tr., at 67:5 – 15.

[169]    Ex. D-4, ¶ 38.

[170]    *Id.*

[171]    June 27, 2023 Hr. Tr., at 77:10 – 78:1.

90.     Mr. Wuesthoff, LTL's president, testified that there were two differences in the Debtor's financial condition from the first to the second filing:  there might be more talc claims, and the 2023 Funding Agreement had replaced the 2021 Funding Agreement.[172]

91.     Mr. Wuesthoff testified that immediately before it filed its bankruptcy case on April 4, 2023, LTL was solvent.[173]  Mr. Dickinson, LTL's Chief Financial Officer, testified that LTL is solvent.[174]

92.     Mr. Wuesthoff and Mr. Dickinson testified that on April 4, 2023, LTL was able to pay its bills and meet its foreseeable liabilities as they were coming due.[175]

H.     The Experts Conclude Lack of Financial Distress



[176]

[178]

94.     [179]

---

[172]    June 27, 2023 Hr. Tr., at 72:7 – 71:12.

[173]    *Id.* at 71:1 – 71:3.

[174]    *Id.* at 128:3 – 128:4.

[175]    *Id*. at 71:4 – 71:11; 134:15 – 134:21.

[176]    Ex. 1003 (Bell Report) ¶¶ 39-41.

[177]    Ex. 1021 (Bell Supp. Report) ¶ 3.  Dr. Bell testified that Holdco's plan for the dividend is to loan it to J&J at an interest rate of 4.7667% for a ten-year term, callable on demand. Ex. 1021 (Bell Supp. Report) ¶ 2.

[178]    Ex. 1021 (Bell Supp. Report) ¶ 2.

[179]    Ex. 1003 (Bell Report), at Exhibits M & N.



97.      LTL did not perform any analysis of talc liabilities prior to filing the LTL 2.0

case.[190]  Mr. Kim testified that "in no event, was the dollar-value of the costs to defend and resolve

---

[180]    Ex. 1003 (Bell Report), at Exhibit M.

[181]    Ex. 1112 (Burian Rebuttal Report) at 34.

[182]    Ex. 1119 (Lisman Decl.) ¶ 23 & Ex. C.

[183]    Ex. 1003 (Bell Report) ¶ 45.

[184]    Ex. 1003 (Bell Report), at Exhibit H; Ex. 1119 (Lisman Decl.) ¶ 24.

[185]    Ex. 1003 (Bell Report), at Exhibit H; Ex. 1119 (Lisman Decl.) ¶ 24.

[186]    Ex. 1003 (Bell Report), at Exhibit H; Ex. 1119 (Lisman Decl.) ¶ 24.

[187]    Ex. 1003 (Bell Report) at ¶ 44 n.80.

[188]    Ex. 1003 (Bell Report) ¶ 58.

[189]    Ex. 1003 (Bell Report) ¶¶ 39-41.

[190]    Ex. 802 (March 28 Meeting Presentation), at 25; Ex. 805 (April 2 Meeting Presentation), at 10.

talc claims in the tort system believed to approach the $29 billion asset value of Holdco."[191]  On

cross, Mr. Kim testified that the magnitude of the Talc Liabilities was in the $8 billion to $10

billion range, but was unable to provide detail.[192]  Mr. Wuestoff testified several times that the

value of the talc liabilities was not more than $8.9 billion.[193]

98.    The Third Circuit found that LTL's litigation cost was between $10 million to $20

million per month.[194]  In addition, LTL asserts that it costs "$2 million to $5 million" per trial.[195]

Mr. Wuesthoff testified that LTL could not realistically try more than 10 cases per year.[196]  Dr.

Mullin admitted that despite a "litigate all" strategy from 2013-2019, LTL never tried more than

approximately 10 cases per year.[197]

99.    In his expert report, Dr. Mullin testified that his "baseline" balance sheet estimate

for the total talc liabilities extending decades into the future was ████████████,[198] which

includes personal injury, indemnification, and governmental claims.  Dr. Mullin also ran an even

more overstated "high end stress test" for a worst-case scenario for LTL and found that "the total

costs of defending and resolving talc claims would be ██████████████████████████

████████████████████.[199]

100.   Dr. Mullin prepared three hypothetical "cash flow" scenarios to model LTL's

potential trial costs and payments to claimants in the first three years after a return to the tort

---

[191]     Ex. 1073 (Kim Decl.) ¶ 44.

[192]     June 27, 2023 Hr. Tr., at 185:7-25.

[193]     *See, e.g.*, June 27, 2023 Hr. Tr., at 58:13-16.

[194]     *LTL Mgmt.*, 64 F.4th at 94.

[195]     Dkt. 614, at 40.

[196]     TCC Tr. Ex. 1006, at 180:7–11 (Feb. 14, 2022 Hearing Tr.).

[197]     June 29, 2023 PM Hr. Tr. at 94:18-15.

[198]     Ex. 1001 (Mullin Report) ¶¶ 102, 104, 112; June 29, 2023 A.M. Hr. Tr., at  1191:17-1192:14

[199]     Ex. 1001 (Mullin Report) ¶¶ 19, 105; June 29, 2023 A.M. Hr. Tr., at 11:92:8-13.

system: [201]

101. Dr. Mullin was unable identify a specific source for his assumption of 100 trials, conceding that from 2013-2019 J&J followed a "litigate all" strategy and never tried more than approximately 10 cases per year. [202]

102. Dr. Mullin also made other questionable assumptions that served to inflate his estimate of talc litigation costs.

Dr. Mullin assumed that J&J would settle uterine and cervical cancer claims in the tort system for $50,000 even though it had never paid such claims historically in the tort system.[204] Moreover, with respect to governmental unit claims, Dr. Mullin made unsupported and unrealistic

200 Ex. 1001 (Mullin Report) ¶¶ 59-89.

201 *Id.* at ¶ 88.

202 June 29, 2023 P.M. Hr. Tr., at 94:18-15; *see also id.* at 98:7-99:11.

203 Ex. 1001 (Mullin Report) ¶ 69 & n.82 (noting that the $40 million quarterly figure also included costs related to talc-related bankruptcies such as the *Imerys* bankruptcy); Ex. 1112 (Burian Rebuttal Report) p.11.

204 June 29, 2023 P.M. Hr. Tr., at 118:19-119:13.

assumptions in reaching his conclusions. He was directed by LTL's counsel to assume and did assume a settlement value of $400 million for the governmental unit claims. He further assumed that 20 states would file suit and that the average cost to defend such suits would be $25 million per suit, a number that was based on the most expensive litigation J&J ever defended at $17 million, which was then randomly adjusted upward to $25 million.[205]

103.    Mr. Burian re-analyzed Dr. Mullin's estimates.



.[208]

104.    Mr. Burian testified that, even taking the testimony of Dr. Bell and Dr. Mullin at face value, their estimates simply do not demonstrate any financial distress either under the Third Circuit's standard or based on what a bankruptcy practitioner would consider financial distress. [209]

I.    Other Indicia of Bad Faith

105.    The plan allocates no more than $400 million to satisfy all governmental unit claims, which includes the consumer protection claims.[210]

---

[205]    June 29, 2023 P.M. Hr. Tr., at 147:8-150:18.

[206]    Ex. 1112 (Burian Report), at 12-14. *See also* June 29, 2023 P.M. Hr. Tr., at 58:20-61:24 (Burian).

[207]    Ex. 1112 (Burian Report), at 12.

[208]    Ex. 1112 (Burian Report), at 15.

[209]    June 29, 2023 P.M. Hr. Tr., at 48:2-14.

[210]    June 27, 2023 Hr. Tr., at 218:13 – 25.

106.    Mr. Haas testified ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.[211]

107.    When asked whether he, or to his knowledge any other J&J counsel had spoken

with any attorney generals regarding the value of state consumer cases against Johnson & Johnson,

Mr. Haas testified "████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████.[212]

108.    When asked whether Mr. Haas' answer applied to the ad hoc group of attorney

generals as well, █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████."[213]

109.    Mr. Kim had no independent knowledge of any negotiations with the states

concerning the $400 million allocation.[214]

110.    Mr. Kim testified that the $400 million was an amount negotiated between the

plaintiff law firms that signed plan support agreements and Mr. Murdica on behalf of LTL and

J&J.[215]

---

[211]    Haas April 14, 2023, Depo. Tr., 155:7-155:14.

[212]    *Id.* at 48:13 – 48:25.

[213]    *Id.* at 49:2 – 49:21.

[214]    June 27, 2023 Hr. Tr., at 219:4 – 14.

[215]    *Id.* at 220:16 – 20.

111.    Mr. Watts, who was one of the principal plaintiffs' lawyers negotiating the plan support agreement, testified that he had no input into the $400 million allocation.  He was told that it was going to be "necessary" but that he thought that following the filing of the amended plan shortly before the hearing on the motion to dismiss, "we've got more control over that than we did before."[216]

112.    Mr. Watts testified that "what happened was is [sic] I negotiated the money with Mr. Haas, negotiated the term sheet with Jones Day and Mr. Murdica, and I very clearly said we must have a plan out by May 14."[217]

113.    Mr. Kim testified that he believed that the consumer protection claims are the same claims that are being brought by talc tort claimants.[218]

114.    The $400 million allocated to governmental units was not agreed by the states.[219]

115.    Mr. Kim testified that the purpose of LTL's bankruptcy filing is to ensure that talc claims against J&J are funneled to a trust.[220]

J.    No Unusual Circumstances

116.    LTL suggests that the future claims involved in this case creates unusual circumstances necessitating a bankruptcy filing.  LTL has no constitutional right to full and final resolution of its talc liabilities.[221]

117.    Nonetheless, Judge Furgeson provided numerous examples of the MDL system's ability to resolve products liability and other complex litigation, such as Deepwater Horizon and

---

[216]    June 28, 2023 P.M. Hr. Tr., at 50:25 – 51:11.

[217]    *Id.* at 55:13 – 18.

[218]    June 27, 2023 Hr. Tr., at 225:15 – 226:2.

[219]    June 27, 2023 Hr. Tr., at 219:15 – 17.

[220]    *Id.* at 233:15 – 25.

[221]    June 29, 2023 A.M. Hr. Tr. at 78:17-21.

Vioxx.[222]  Professor Rave cited further examples of the MDL system's capacity to provide defendants with "global peace" and to address future claims.[223] For example, Professor Rave noted that, in a settlement class action, a subclass with separate counsel (much like an FCR under Section 524(g)) could be created to represent the interests of future claimants and, even with regard to a group of not readily identifiable future claimants, the challenge of providing effective notice would not be insurmountable.[224] In the context of the talc litigation, Professor Rave added that concerns regarding notice are ameliorated by the ubiquity of J&J's products.[225]  Professor Rave further explained that there are "lots and lots of class actions where it's hard to identify the class of people you're giving notice to," and yet "there are lots and lots of notice programs designed to get at that problem."[226]

K.    No Reorganization Possible Because Claimant Support Is Overstated and Plan Is Patently Unconfirmable

118.    All the plaintiff law firms that executed the plan support agreements understood that the plan support agreements were agreements to negotiate and that they were not binding on any of their respective clients.

119.    Settlement in the Imerys Talc America Incorporated bankruptcy case is a condition precedent to confirmation of the plan.  That settlement must provide that the Imerys/Cyprus parties contribute to the LTL settlement.[227]

---

[222]    Ex. 980 (Furgeson Report) ¶¶ 47-50.

[223]    Ex. 966 (Rave Report) ¶¶ 34-80.

[224]    June 29, 2023 A.M. Hr. Tr., at 25:13-25; 26:3-28:7, 30:9-31:2 (Rave).

[225]    June 29,2023 A.M. Hr. Tr., at 26:3-28:6 (Rave).

[226]    June 29, 2023 A.M. Hr. Tr., at 27:5-20 (Rave).

[227]    June 28, 2023 P.M. Hr. Tr., at 88:3 – 7, 125:22 – 126:21.

120.    The Imerys case has been pending for approximately four years and it is not settled.[228]

## IV.    PROPOSED CONCLUSIONS OF LAW

A.    <u>Bankruptcy Court Jurisdiction</u>

121.    The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court.

122.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

B.    <u>The Burden Rests with the Debtor to Demonstrate Good Faith</u>

123.    "'[T]he burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith.'"  *Santa Fe Minerals, Inc. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004)); *see also In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298 (Bankr. D. Del. 2011) ("[T]he burden is on the Debtors to establish that they filed their petitions in good faith . . . .").

124.    In its Opposition, the Debtor argues that existing law in this jurisdiction has been modified by the 2005 amendment to Bankruptcy Code section 1112(b) where section 1112(b)(1) stated that a bankruptcy court shall dismiss or convert a case "if the movant establishes cause." *See* 11 U.S.C. § 1112(b)(1) (West) (2005).  However, in 2010, Congress further amended this section and the language providing for the movant to establish cause was stricken.  *See* 11 U.S.C. § 1112(b)(1) (West) (2010) (". . . the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and

---

[228]    *Id.* at 88:20 – 21, 127:24 – 128:16.

the estate, for cause unless the court determines that the appointment under section 1104(a) of a

trustee or an examiner is in the best interests of creditors and the estate.").

125.    Courts "must presume that a legislature says in a statute what it means and means

in a statute what it says there." *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010).

The statute as it is in effect today does not place the burden on the movant to demonstrate lack of

good faith.  It is silent on burden and the statute should continue to be interpreted by the courts in

this jurisdiction as it has been for many years by placing the burden on the debtor who is seeking

the extraordinary relief offered by the Bankruptcy Code.  *See, e.g.*, *Scaffidi v. DeSoto*, No. 06-cv-

03786 (FSH), 2007 WL 2156358, at *3 (D.N.J. July 25, 2007) ("Normally the party who moves

for dismissal "for cause" has the burden of proof, but if that party moves for dismissal of a petition

made in bad faith, then the debtor has the burden of showing that the filing was made in good

faith."); *In re Rent-A-Wreck of Am., Inc.*, 596 B.R. 112, 117 (D. Del. 2019) ("When

a motion to dismiss a bankruptcy case is filed, the burden is on the petitioner to establish by a

preponderance of the evidence that good faith exists.").

126.    Once good faith is placed at issue as it has been in this case, demonstrating good faith

is the burden of the debtor.  *In re LTL Mgmt., LLC*, 64 F.4th 84, 100 (3d. Cir. 2023).

C.    LTL Was Not in Financial Distress when it Filed LTL 2.0

127.    A Chapter 11 debtor may not enjoy the rights and privileges of bankruptcy unless

it has filed its bankruptcy petition in good faith.  *LTL*, 64 F.4th at 103 (good faith is necessary in

light of bankruptcy's disruption of creditors' claims against the debtor).  "[A] good faith standard

protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons

... available only to those debtors and creditors with 'clean hands.'"  *Little Creek Dev. Co. v.

Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir.

1986).

37

128.     In short, a debtor must <u>need</u> to use the tools afforded under Chapter 11, not merely

<u>want</u> to use them.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999).  "The theme is

clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose."

*LTL*, 64 F.4th at 101.  "[A]bsent financial distress, the debtor's desire to benefit from certain Code

provisions . . . could not justify its presence in bankruptcy".  *Id.* (citing *NMSBPCSLDHB, L.P. v.

Integrated Telecom Express, Inc.* (*Integrated Telecom Express, Inc.*), 384 F.3d 108, 126-129 (3d

Cir. 2004)).

129.     The Third Circuit requires "evidence" of financial distress, rather than "conclusory

assertions."  *SGL Carbon*, 200 F.3d at 168; *see also In re Rent-A-Wreck of America, Inc.*, 580 B.R.

364, 379 (Bankr. D. Del. 2018) (dismissing a bankruptcy petition because "[d]ebtors did not

analyze their current ability to pay their debts as they came due prior to filing their bankruptcy

cases.").  At the time that the LTL 2.0 filing was authorized, LTL's board had no financial

projections, it had no estimates of talc liability, and it thought LTL was able to meet its financial

obligations for the foreseeable future – the same information it possessed when it authorized the

filing of LTL 1.0, which was deemed insufficient to show financial distress by the Third Circuit.

*LTL*, 64 F.4th at 107–08.

130.     The Third Circuit opined that a debtor's solvency is "likely always relevant" to

financial distress.  *LTL Mgmt.*, 64 F.4th at 102.  LTL concedes it is solvent.[229]  The Debtor's

President, Chief Financial Officer, and Chief Legal Officer, all acknowledged that LTL, as of the

bankruptcy filing, was able to meet its liabilities as they came due for the foreseeable future.  The

evidence makes clear that LTL was not in immediate financial distress when it filed for bankruptcy.

---

[229]     *See* LTL Surreply (Dkt. No. 900) at 14 (explaining that its own expert "opinions show balance sheet
solvency").

LTL has access to more than $1.3 billion in cash,[230] plus billions of dollars in ongoing dividends

and the assets in Holdco ($30 billion) to fund defense costs in the tort system. The report of LTL's

expert Dr. Bell shows ███████████████████████████████████████.[231]  The evidence also

shows that, under J&J policies, Holdco can borrow from J&J through intercompany loan's against

Holdco's roughly $30 billion in assets.

131.    The Third Circuit held that LTL is the focus of the financial distress, not Holdco or

any other non-debtor entity.  *See LTL Mgmt*., 64 F.4th at 105.  Holdco's financial condition is

relevant "only to the extent that it informs [the Court's] view of the financial condition of LTL

itself."  *Id.* at 106.  Accordingly, the need to liquidate Holdco to fund LTL's liabilities does not

establish the financial distress of LTL.

D.    The LTL 2.0 Filing Was a Bad Faith Filing

132.    A debtor may be denied relief under the Bankruptcy Code where it has "abused the

provisions, purpose, or spirit of bankruptcy law."  *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000)

(affirming dismissal of chapter 7 case for bad faith where debtor accrued substantial debt just prior

to filing).  Although a debtor may adhere to the letter of the law, its case may be dismissed where

it fails to comply with the spirit of the law.  *Matter of Northwest Place, Ltd*., 73 B.R. 978, 982

(Bankr. N.D. Ga. 1987) (dismissing Chapter 11 case).  The jurisdiction of the bankruptcy court

should not be "improperly manufactured" as J&J and LTL have done in this case through the

divisional merger in 2021 followed by the manipulation of the intercompany funding arrangements

in 2023.  *Bestwall LLC v. Official Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th

168, 195 (4th Cir. June 20, 2023) (J. King, dissenting) ("any jurisdiction that the bankruptcy court

---

[230]    Ex. 1021 (Bell Supp. Report) ¶ 3; June 28, 2023 P.M. Hr. Tr., at 160:15-21 (Lisman).

[231]    Ex. 1003 (Bell Report), at Exhibit M.

was vested with under 28 U.S.C. § 1334(b) was improperly manufactured by the parties before it

. . .".).  The Bankruptcy Code should not be "'manipulated by solvent, blue-chip companies faced

with mass tort liability' that, '[t]hrough dubious readings of the Bankruptcy Code that Congress

never intended . . . have invented elaborate loopholes enabling them to pick and choose among the

debt-discharging benefits of bankruptcy without having to subject themselves to its creditor-

protecting burdens.'"  *Id.* (internal citation omitted).

133.    LTL's manipulation of the 2023 restructuring transactions is also a basis for finding

bad faith.  The 2023 transactions were undertaken to evade the Third Circuit's ruling in violation

of the Debtor's fiduciary duties and with no disclosure to this Court.  Congress did not enact the

Code to enable debtors to self-impose financial distress, much less to use that distress as a pretext

for resolving mass tort (or other disfavored) liabilities.  The Third Circuit has noted that bankruptcy

"can impose significant hardship on particular creditors."  *LTL*, 64 F.4th at 103.  Therefore, good

faith is a necessary to accessing the tools afforded by the Bankruptcy Code.

134.    The 2023 restructuring transactions are also fraudulent transfers undertaken while

LTL 1.0 owed a fiduciary duty to creditors further demonstrating bad faith.  *In re Marvel Ent.*

*Grp., Inc*., 140 F.3d 463, 474 (3d Cir. 1998).  Section 548(a)(1)(A) provides that transfers made

with the "actual intent to hinder, delay, or defraud" creditors can be avoided and recovered for the

benefit of creditors.  *See* 11 U.S.C. § 548 (a)(1)(A).  Insolvency is not an element of actual fraud

under section 548(a)(1)(A).  This case is a classic example of an actual fraudulent transfer because

LTL reduced the value available to pay claims amounts to actual intent to hinder, delay, or defraud

one's creditors.

E.    The Bankruptcy Filing Was an Improper Litigation Tactic

135.    LTL filed the bankruptcy case to avoid the tort system to gain a litigation advantage

over its adversaries.  "[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages

40

is not within the legitimate scope of the bankruptcy laws[. Therefore], courts have typically dismissed Chapter 11 petitions under these circumstances." *See SGL Carbon Corp.*, 200 F.3d at 165; *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 608–09 (3d Cir. 2009) ("[T]he Debtors' bankruptcy petitions . . . were used primarily as a litigation tactic to protect the Debtors [from] pending litigations. Thus, we . . . [dismiss] the bankruptcy petitions for lack of good faith."). "As a general rule where . . . the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *In re HBA East, Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) (quoted by *SGL Carbon Corp.*, 200 F.3d at 165).

136.    The Third Circuit warned of the danger of "premature" bankruptcy filings in mass tort cases and observed that "a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling these [mass tort bankruptcy] issues." *LTL*, 64 F.4th at 103.   The talc litigation is in the early stages of mass tort litigation and many of the *Daubert* hearings have yet to be conducted.   As a result, the LTL Plan proposes to arbitrarily set values on claims that ultimately in the tort system may not be compensable while reducing payments to other claimants to make up the difference.

137.    The use of bankruptcy as a litigation tactic can also be demonstrated through the way the Plan Support Agreements were negotiated.   LTL did not participate in any of the negotiations.   Negotiations were handled only by J&J and select plaintiff firms.   Neither J&J nor LTL have engaged all the case constituents.   Instead, J&J negotiated with one group to artificially cap liability and then allocated amounts to various constituents without their input or any analysis into actual liability.   For example, the Plan Support Agreement and the accompanying term sheet propose to cap liability to governmental entities at $400 million.   This number is not based on any

calculation of statutory penalties, and it was not negotiated with any governmental entities nor any other party with knowledge of the claims. LTL has then used the bankruptcy process to try to force its resolution on non-consenting parties. This demonstrates an improper use of the bankruptcy process as a litigation tactic to shield non-debtor parent entities from liability. *BEPCO,* 589 F.3d at 624–25 (a petition is in bad faith where it is "primarily concerned with protecting [a non-debtor parent], not the Debtor").

F.    The "Void" or "Voidable" Argument Lacks Merit.

138.    LTL fastened upon the doctrine of "frustration of purpose" to justify termination of the 2021 Funding Agreement. The 2021 Funding Agreement, by its terms, is governed by North Carolina law. Under North Carolina law, frustration of purpose applies when a supervening event or changed conditions may excuse performance, because there exists an implied condition in the contract that performance would be excused if the event occurred. *Brenner v. Little Red Schoolhouse, Ltd*., 302 N.C. 207, 211 (1981); *Faulconer v. Wyson and Miles Co*., 155 N.D. App. 598, 601 (N.C. App. 2002). However, for the doctrine to apply, the changed condition cannot have been reasonably foreseeable. *Brenner* at 211; *Faulconer* at 602. Further, if the parties allocated risk in the contract in reference to the frustrating event, then the contract may not be rescinded under the doctrine. *Brenner* at 211; *Faulconer* at 602.

139.    Frustration of purpose has no application to the 2021 Funding Agreement. There was no implied condition that LTL be in bankruptcy for the 2021 Funding Agreement to be effective. The only conditions to J&J's payment obligations were set forth in Section 2(d) of the 2021 Funding Agreement, and they required that LTL's representations and warranties in Section 3(b) be true and correct "without regard to the impact of any Bankruptcy Case." Funding Agreement. Indeed, the J&J Funding Agreement articulated the parties' rights *outside* of bankruptcy.

140.    The changed condition (dismissal of the bankruptcy case) was reasonably foreseeable – prior divisive merger bankruptcy cases had been challenged, and the "Texas Two Step" was and continues to be the subject of debate.  *See, e.g., In re Aldrich Pump LLC,* Case No. 20-30608 (JCW); 2021 WL 3729335 (Bankr. W.D.N.C. August 23, 2021) (noting that opposition to preliminary injunction sought, in essence, dismissal of bankruptcy case); *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019) (denying motion to dismiss).  The parties expressly allocated their risks if LTL 1.0 were dismissed.  Finally, counsel for LTL articulated to the Bankruptcy Court and to the Third Circuit that the J&J Funding Agreement applied if there was no bankruptcy case.

141.    LTL's decision to terminate the 2021 Funding Agreement, without attempting to enforce it, without waiting for J&J to assert it was void, without consulting with estate fiduciaries, without seeking judicial interpretation, and in contravention of the Third Circuit's opinion, was a fraudulent conveyance, was in bad faith, and taints the filing of the second bankruptcy case.

G.    The Potential for a Successful Reorganization Does Not Cure Bad Faith

142.    Bankruptcy Code section 1112(b)(1) mandates dismissal (or conversion) upon a showing of cause.  *See* 11 U.S.C. § 1112(b)(1) (" . . . the court shall convert a case . . . or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . .").  The exceptions to mandatory dismissal pursuant to Bankruptcy Code section 1112(b)(2) are inapplicable because a bad faith filing cannot be cured through the filing of a plan.  *See Green v. Howard Family Trust (In re Green)*, 2016 WL 6699311, at *11 (B.A.P. 9th Cir. Nov. 9, 2016) ("filing a petition in bad faith could never be justified or curable, no matter what plan Debtors could now propose.").

143.    The Third Circuit recognized that LTL's lack of financial distress could not be overcome to invoke the exceptions under Bankruptcy Code section 1112(b)(2) because "no 'reasonable justification' validates [the missing requirement of financial distress]".  *See LTL*, 64

43

F.4th at 110.  The Third Circuit described good faith as a "gateway" issue that "asks whether the

debtor faces the kinds of problems that justify Chapter 11 relief." *LTL Mgmt.*, 64 F.4th at 102.

The Third Circuit specifically rejected LTL's argument that, notwithstanding the absence of good

faith, the Debtor should be permitted "to move thousands of claims out of trial courts and into

bankruptcy court so they may be resolved, in J&J's words, 'equitably' and 'efficiently.'" *Id.* at

110.

H.    The Debtor Cannot Show a Likelihood of Success

144.    If the Court, notwithstanding the Debtor's lack of financial distress, seeks to invoke

the exception under Bankruptcy Code section 1112(b)(2), the Debtor must establish unusual

circumstances justifying retaining the case as in the best interests of creditors and a reasonable

likelihood that a plan will be confirmed on a timely basis. *See* 11 U.S.C. § 1112(b)(2).  The Debtor

cannot satisfy either requirement.  First, there are no unusual circumstances here and it is not in

the best interests of the creditors for the case to remain in bankruptcy.  It is a mass tort case like

any other mass tort case and for the reasons set forth herein, retaining the Chapter 11 Case is not

in the best interests of creditors.  Moreover, the Third Circuit held that there is no basis for finding

that the absence of financial distress can be cured: "we cannot currently see how its lack of

financial distress could be overcome. For these reasons, we go counter to the Bankruptcy Court's

conclusion that 'unusual circumstances' sanction LTL's Chapter 11 petition." *LTL*, 64 F.4th at

110.

145.    Second, the Debtor cannot confirm a plan on a timely basis.  A plan may not

discriminate unfairly against a rejecting class.  11 U.S.C. § 1129(b)(1).  The prohibition against

unfair discrimination ensures that a dissenting class "will receive relative value equal to the value

given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111,

121 (D. Del. 2006) (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y.

44

1986)).  To avoid the requirements of Bankruptcy Code section 1129, LTL has instead classified governmental units into the same class as other talc claims.  *See* Plan Article III.  The Plan purports to pay all such claims 100%; however, the Plan also provides for disparate treatment of claims within the same class, which results in disparate recoveries.  *See* Plan Ex. C (compare (i) cash contributions to governmental claims is $400 million less the amount of Talc Personal Injury Trust Expenses (as defined in the Plan) paid by the Reorganized Debtor (as defined in the Plan) under section 4.6 of the Plan with (ii) cash contributions to Talc Personal Injury Tort Claims (as defined in the Plan) of $10.28 billion).  There is no analysis in the disclosure statement to support the Debtor's assertion that $400 million will pay all governmental unit claims in full. No determination or estimation of their values has been made by this Court.  Accordingly, the Plan has provided disparate treatment to claims within the same class in violation of Bankruptcy Code section 1123(a)(4).  Specifically, LTL has allocated only $400 million as the capped amount available to pay all governmental unit claims while providing the remaining $8.5 billion (present value) to all other talc related claims.  This does not provide for similar treatment of claims within the same class.  Accordingly, LTL did not resolve its plan confirmation issues by grouping all claims into one class.

146.    The Plan would also fail to satisfy the best interest of creditors test of section 1129(a)(7).  Reinstatement of the J&J funding agreement through an avoidance action pursued by a chapter 7 trustee would augment the value available to creditors by more than $50 billion over the $8.9 billion contemplated by the plan.  The third-party releases contemplated by the Debtor present yet another obstacle to confirmation.

147.    The defects in the Plan cannot be overcome by creditor voting results.  Indeed, such a plan should not even be solicited under applicable law.  A disclosure statement describing a plan

45

that cannot be confirmed must be denied, regardless of the extent of disclosure it contains. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). The purpose behind this rule is common sense: courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that — even if unanimously accepted by creditors — could never be confirmed. *See, e.g., In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

F.     Equity Demands Dismissal because Value Is Not Being Maximized

148.    Bankruptcy courts "'are essentially courts of equity, and their proceedings inherently proceedings in equity.'" *Pepper v. Litton*, 308 U.S. 295, 304 (1939) (internal citations omitted). The good faith analysis is grounded in the "equitable nature of bankruptcy" and the "purposes underlying Chapter 11." *SGL Carbon Corp.*, 200 F.3d at 161-62. The Bankruptcy Code is not, however, an exercise in the "unadulterated pursuit of the debtor's interest." *Bartenwerfer v. Buckley*, 214 L. Ed. 2d 434, 143 S. Ct. 665, 675 (2023). The Bankruptcy Code balances multiple, competing interests. *Id*.

149.    Maximization of the estate for the benefit of creditors is a foundational policy. *Toibb v. Radloff*, 501 U.S. 157, 163, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991) (Chapter 11 "embodies the general Code policy of maximizing the value of the bankruptcy estate"). The policy of maximization of value for the benefit of creditors is expressed in provisions throughout the Bankruptcy Code. *See, e.g.*, 11 U.S.C. §§ 541(a) (expansive description of property of the bankruptcy estate); 542 and 543 (turnover); 544 – 550 (avoidance actions); 552 (restricting post-petition effect of security interest); 554 (abandonment of burdensome property); 1104 (appointment of a trustee for mismanagement of estate); 1112 (conversion or dismissal for

46

substantial and continuing loss to or diminution of estate and absence of likely rehabilitation);

1129 (confirmation requirements).

150.    Maximization of value available to creditors has also grounded Supreme Court

bankruptcy decisions for decades. *See Merit Management Group, LP v. FTI Consulting, Inc.,* ___

U.S. ___, 138 S.Ct. 883, 887-88 (2018) (trustee's avoidance powers maximize funds available for

creditors); *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,*

526 U.S. 434, 453 (1999) (interpreting the absolute priority rule in a manner that reconciles the

twin policies of "preserving going concerns and maximizing property available to satisfy

creditors"); *Toibb*, 501 U.S. at 163, 111 S.Ct. at 2201, (ruling that Chapter 11 is available to

individual debtors, as well as business debtors with ongoing operations); *Commodity Futures

Trading Comm'n v. Weintraub*, 471 U.S. 343, 353, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985)

(noting that it would be difficult for a trustee to maximize the value of the estate if former

management controlled the attorney client privilege and used the privilege to shield transactions).

151.    LTL deliberately attempted to make itself financially distressed – which is the exact

opposite of furthering the bankruptcy policy and purpose of maximizing value for creditors.

Viewed through the lens of this important policy, LTL's voluntary impairment does not gain it

entrance to the sanctuary of the Bankruptcy Code and its extraordinary remedies.   The Court

should exercise its equitable powers "to the end that fraud will not prevail, that substance will not

give way to form, that technical considerations will not prevent substantial justice from being

done." *Pepper*, 308 U.S. at 305.

## V.    ADOPTION OF OTHERS' PROPOSALS

152.    The Ad Hoc Committee adopts and incorporates by reference any proposed

findings of fact and conclusions of law, which are not inconsistent with this submission that are

submitted by any of the other Movants.

47

## VI.    <u>CONCLUSION</u>

153.    On the heels of dismissal of its first bankruptcy case, LTL filed a second case after

orchestrating transactions to manufacture financial distress and garner perceived support for a plan

capping funding at $8.9 billion, more than $50 billion less than what was available in LTL's first

bankruptcy case.  The Bankruptcy Code balances the many protections and advantages afforded

an honest, but unfortunate debtor against the significant disruptions, attendant disadvantages, and

hardship faced by creditors.  By seeking the Bankruptcy Code's protections when it does not

qualify for it, LTL seeks to upset that balance, and if the Court permits it to do so, the Court is

denying creditors their due.  That is why bankruptcy relief is limited and not available to all

entities.  To find otherwise is inequitable.  The Bankruptcy Code is not an all-purpose tool for

resolving mass tort liability, and it should not be used to provide litigation advantages or to

artificially cap the liability of financially viable entities.  LTL's artificial and voluntary impairment

for the purpose of using the Bankruptcy Code to do exactly this is an abuse of the process and

should not be condoned.  For the reasons set forth herein, the Ad Hoc Committee requests that the

Court adopts these findings of fact and conclusions of law dismissing the Debtor's second chapter

11 case.

Dated: July 19, 2023              **WOMBLE BOND DICKINSON (US) LLP**

                                  */s/ Ericka F. Johnson*
                                  Ericka F. Johnson (NJ #032162007)
                                  Lisa Bittle Tancredi (admitted *pro hac vice*)
                                  1313 N. Market Street, Suite 1200
                                  Wilmington, Delaware 19801
                                  Telephone: (302) 252-4320
                                  Email: ericka.johnson@wbd-us.com
                                  Email: lisa.tancredi@wbd-us.com

                                  *Counsel for Ad Hoc Committee of States*